1    MR. JUDD:  I mean, let's take these, you
2    know, in due course, but our feet are a little bit held
3    to the fire, and I would like to finish up the briefing
4    and the discovery for the engineer's case and then we
5    can take the others.
6        THE COURT:  Why don't we -- have answers been
7    filed?
8        MR. JUDD:  I honestly don't know, your Honor.
9        MS. FLEISHMAN:  We have not been served with
10   an answer in that case.
11       THE COURT:  Okay.  Both of your actions,
12   obviously, we have to focus on, and I don't fault you
13   for bringing them up now.  I mean, I want you to, and
14   we have to deal with them, but I think at this point we
15   should deal with them preliminarily at the next
16   management conference when a little more time has
17   passed and then we can start to do some orders for
18   discovery or motions -- the defense should at least
19   have time to review the complaints.
20       MR. DAVID COHEN:  Well, your Honor, they have
21   had time to review the complaint.  They have had it for
22   at least a month.  I mean, I understand that they would
23   portray it as a surprise, but it certainly is not.  I'm
24   simply trying to -- I'm trying to do what seems to make
25   sense to me, which is to move the class cases forward

1    together.  I don't know if we want to have three
2    separate certification briefing, three separate class
3    discoveries, three separate summary judgment motions.
4        THE COURT:  As far as certification as a
5    class there are a lot of issues that are unique to each
6    of them.
7        MR. DAVID COHEN:  So they can depose our
8    plaintiff.  They have more than a month to do it.
9        THE COURT:  It is not going to happen.  The
10   next meeting in January I will discuss with both of you
11   and with counsel for the class for the defense a
12   schedule for some discovery for you, but I'm just not
13   going to do it at this point because I'm putting them
14   under the gun in this case as far as -- I have to --
15   although I have to keep the pressure on I don't want
16   them to implode.  I mean, I need to keep them alive
17   here.
18       MR. DAVID COHEN:  Your Honor, in the time
19   between now and the next meeting may we serve
20   discovery?  May we file our certification brief?
21       THE COURT:  Between now and January whatever
22   it is?
23       MS. FLEISHMAN:  13th.
24       THE COURT:  Can you serve discovery, like
25   send out interrogatories?

1        MR. DAVID COHEN:  Yes, your Honor.
2        THE COURT:  Do you have any objection to
3    that?
4        MR. CHARLES COHEN:  Is it different from the
5    four million pages I have already produced and the
6    three million that is coming out?  I mean, he is in
7    this litigation, he has all that.
8        MR. JUDD:  He should have access to the
9    documents.  If he hasn't worked that out with
10   plaintiffs he needs to work that out on the plaintiffs'
11   side to get him access to the repository.
12       THE COURT:  You're not going to reinvent the
13   wheel as far as discovery is concerned.
14       MS. FLEISHMAN:  We're coordinating with
15   plaintiffs' counsel.  We're going to meet in advance of
16   the January 13th conference to set some sort of a
17   schedule to propose to the Court to see if we can work
18   all those issues out.
19       THE COURT:  Have you two sat down?
20       MS. FLEISHMAN:  No, but I'm plaintiffs'
21   counsel in this other class.
22       THE COURT:  Medical monitoring.
23       MS. FLEISHMAN:  In the medical monitoring
24   class action, and I have to sit down with O'Melveny and
25   Meyers and see if we can work out some sort of

1    schedule.
2        THE COURT:  I'm not going to deal with this
3    before the next meeting in January.  If either of you
4    have an agenda of items that you want to address in
5    January, which would include a list of what you want to
6    be able to send out for discovery -- not your detailed
7    discovery, but you don't have to give me the discovery
8    requests, but you need X, Y, Z, we need a dep or we
9    need this or that, but, otherwise, as far as -- I don't
10   know.  I don't know what you need different than what
11   they need.
12       MS. FLEISHMAN:  We're completely comfortable
13   with what's been offered as part of this discovery.  I
14   don't think that we're going to need additional
15   discovery that relates to the medical monitoring
16   issues.
17       THE COURT:  So maybe the issues are going to
18   be the summary judgment and the class certification
19   issue, but we can address that at the next meeting,
20   what a reasonable discovery period is for the defense
21   on that.  All right?
22       MR. JUDD:  One last issue on the engineer's
23   case, your Honor.  We did serve interrogatories, and at
24   the time you requested it plaintiff voluntarily
25   shortened the time, and I believe the time to respond

1  from the statutory 60 days.  I believe that that was
2  discussed.  I wasn't present at the last status
3  conference, but I thought that that had arisen as an
4  issue.
5      THE COURT:  I did think that you were going
6  to be able to get them.
7      MR. BUCHANAN:  We did.  We -- documents were
8  expedited.  Interrogatories were never discussed, and,
9  frankly, 61 interrogatories I would have never agreed
10  to answer on an expedited basis.  I don't know how I
11  feasibly could.  Well, certainly, there's numerous
12  contention interrogatories; I'm not going to vet the
13  concerns I have with them here, but I do think the
14  statutory window is the right window, and I don't think
15  they should be permitted to squeeze us now for their
16  delay for the last year on that last issue.
17      I don't think they're necessary.  I think
18  they can get talking interrogatories from our witnesses
19  and/or witness or witnesses, depending on how many it
20  takes to answer the topics that they have proposed in
21  the deposition notice, but the interrogatories, it
22  seems to me, were served to get an extension.  I would
23  be happy to send them to your Honor and show them to
24  you and we can discuss it in a telephonic conference,
25  if necessary, but I don't think they're necessary to

1  respond to our motions.
2      MR. JUDD:  With all due respect, plaintiffs'
3  counsel's speculation as to my intentions for
4  undertaking discovery is completely irrelevant to this.
5  There are questions that are specifically addressed at
6  the allegations and motion for class certification.
7  How those are irrelevant to the briefing on class
8  certification is beyond me.
9      Whether or not plaintiff has specific
10  objections as to the form or whatever I'm happy to
11  consider those, but I would like to get them in enough
12  time so that we can resolve this before our brief is
13  due.
14      MR. BUCHANAN:  Your Honor, the
15  interrogatories -- "provide all evidence to support
16  your allegation that," okay?  That's a lot of evidence.
17  You have received the two volumes attached to our class
18  certification brief.  Do I need to produce the hard
19  drive that they produced to me that contains all the
20  documents that support the allegations in our case?  I
21  mean, I would agree that I should not be permitted to
22  argue a class certification from documents not in the
23  record, that I haven't attached to motions, that
24  haven't been submitted to the Court.
25      They're entitled to know the evidence that

1  supports my claims, but these are truly end of
2  discovery merits type interrogatories that either are
3  permissible or are not permissible depending on the
4  circumstances.  They are way out of bounds for a class
5  cert motion, and I would be happy to submit them to
6  your Honor, and you can review them to determine, you
7  know, on a preliminary basis whether they're
8  appropriate, but to suggest that now we have to respond
9  on an expedited basis because you served them the first
10  week of December -- okay -- the first week of December,
11  the 60 days would have been February.  Our reply brief
12  would have been well under construction at that point
13  in time.  I don't know how that could have helped.
14      Now they want us to squeeze our time frame to
15  accommodate the fact that they didn't do it earlier.  I
16  do think it is not appropriate for them to be able to
17  do that in this circumstance, and the substance of the
18  interrogatories is equally problematic, and if the
19  Court were inclined to shorten the time for
20  interrogatory responses I would like to submit the
21  interrogatories to your Honor because I think, perhaps,
22  there's some that can be answered on an expedited
23  basis, but 61 of the nature they asked for are well out
24  of bounds, given the volume of materials that have
25  already been produced to them.

1      THE COURT:  I usually tend to think in all
2  litigation, even in the most minor personal injury case
3  up to this that interrogatories are one of the most
4  useless tools for discovery.
5      MR. JUDD:  In terms of getting real
6  information, your Honor, I agree with you most of the
7  time.  In terms of locking in particularly corporate or
8  an entity --
9      THE COURT:  But he has filed his brief, and
10  you haven't.  And he has all his documents attached.  I
11  know because it is sitting in the corner of my desk.  I
12  haven't read it yet, but, unfortunately, I'm going to,
13  and as he said he is willing to be limited to that.  So
14  when you say before you need interrogatories you need
15  to know what records he is going to use, well, every
16  record is there.  You need to know what his arguments
17  are.  Well, he has already made his arguments.  He has
18  already made each point.  I mean, I don't know how well
19  he made it, but he set forth whatever he's got.
20      MR. BUCHANAN:  I did my best.
21      THE COURT:  And you know what you have to
22  respond to.  Now, if when you read that you need
23  something in response to that I assume, you know,
24  you're going to read it before I do since you're going
25  to send your reply, and I was waiting to get your reply

1  before I read it.  But it seems to me you can look at
2  that, and if there's something specific that you need
3  just tell him you need this before the motion, and if
4  there's a problem set up a phone conference with me and
5  I'll be happy to address it.
6      If there's some particular document, some
7  particular information you need and you need to have it
8  certified or you need an affidavit of something I'll
9  make him give it to you before you have to file your
10  brief, but we can do that by phone conference as
11  opposed to somebody answering 60 something
12  interrogatories.
13      All right?  We'll take a short break and
14  we'll come back, and anyone who doesn't know Chris,
15  this is Chris, my law clerk, Chris Morgan.  He is the
16  person you will probably talk to.  There's just a
17  couple -- well, we'll do those in a minute, but make
18  sure when you send in correspondence we need to have
19  the Verilaw date on it.  There's -- when we file an
20  original correspondence -- if you're filing the hard
21  copy with the Court downstairs it is supposed to say
22  this was filed with Verilaw on December 9th.  It just
23  keeps the people downstairs when they enter the data in
24  they're supposed to be entering the data as of the
25  Verilaw complaint date.  I mean, they're used to

1  entering the date as of the date that they get it.  But
2  we have changed that in this litigation, which is fine,
3  they're working very diligently downstairs to do that,
4  but in order for them to do it if you have a letter
5  that says this complaint was filed on Verilaw -- this
6  motion was filed December 10th if we're going to make
7  the filing date Verilaw -- most of them don't even have
8  access to Verilaw.
9      MR. BUCHANAN:  So we need to indicate in the
10  cover letter the Verilaw filing date.
11      THE COURT:  We need to put in the cover
12  letter the Verilaw filing date, and that's strictly to
13  make life easier for the people who, you know -- I
14  always call them the people downstairs, but as it is
15  they're down in that cubicle center where they're all
16  jammed together, and we have got really nice people
17  that really work hard, so when they come up with a
18  complaint it is usually pretty legitimate.
19      MR. BUCHANAN:  Okay.
20      THE COURT:  So that's an issue.  And there's
21  some people who are not on the Verilaw system, and I
22  hope counsel is going to talk to them about that so we
23  can see how that's working out, and we haven't been
24  officially notified that you don't want to be on the
25  system, so we don't know who is or isn't, but, you

1  know, it certainly worked well so far in the
2  litigation.  It has kept it moving.  All right.  And
3  then we'll just wait and let me know when you're ready
4  to talk again.
5      (Break taken.)
6      MR. SEEGER:  We swap in a week then take a
7  week to look at them.
8      MS. SULLIVAN:  With the holidays and travel
9  schedule.  How about we swap December 28th and strike
10  by the first of the year?
11      MR. BUCHANAN:  That's fine.  That's the same
12  time.
13      MR. SEEGER:  The proposal to the Court is
14  that each side would select from the group of the cases
15  filed in New Jersey there are approximately 70 or so MI
16  cases.  Each side will select 15.
17      MR. WEISS:  Cases filed on record as of
18  September 30, 2004.
19      MR. SEEGER:  I got it.  You keep jumping in.
20  That's like the next item.  Each side will select 15
21  cases that have been filed by no later than September
22  30th, 2004.  That's the cutoff date.  Each side will
23  then strike three cases they don't like from the other
24  side's list.  That will bring us down to 12 cases each.
25  We will then submit those cases to the Court for the

1  Court to make a decision on whatever basis the Court
2  deems appropriate.
3      Cases should be selected for trial and that
4  we also indicated that liaison counsel would be willing
5  and interested to meet to at least discuss the case
6  selection criterion with her Honor.
7      THE COURT:  So the first deadline is December
8  28th is going to be when you're going to exchange your
9  15 each?
10      MR. SEEGER:  Yes.  The 15 each are by
11  December 28th then did you say by January 2nd?  You
12  said the 1st, but you don't mean that.
13      MS. SULLIVAN:  Do you want to say by January
14  3rd?
15      THE COURT:  By January 3rd you're going to
16  strike the three?
17      MR. SEEGER:  Yes.
18      THE COURT:  And send me the list of the 24.
19      MR. SEEGER:  And you'll get it on the 4th,
20  let's say.
21      THE COURT:  As soon as I get that list I'll
22  have my secretary call, you and we'll try to set up a
23  meeting with liaison counsel.
24      MR. SEEGER:  Okay .
25      MS. SULLIVAN:  That's fine, your Honor.

1    MR. SEEGER: Your Honor, it might be helpful

2    for you, you don't have to decide this now, but,

3    perhaps, a one-page summary on each case would be

4    helpful to you on the 12 each.

5    MR. JACOBY: Absolutely, to have a certain

6    set form so you can look at it and get an idea.

7    THE COURT: Maybe you can agree so the

8    summaries match.

9    MR. JACOBY: They should.

10    THE COURT: They have the age, duration --

11    MR. SEEGER: We want to impression upon you

12    the attempt to really make them representative so we

13    want to give you that summary.

14    THE COURT: Okay.

15    MS. SULLIVAN: And, your Honor, obviously,

16    because we have a new slate of cases we would like an

17    extension on the schedule to make sure we have medical

18    records and take depositions and work up those new

19    cases.

20    MR. SEEGER: On that issue one of the ways to

21    do this, obviously, we're not thrilled with extensions

22    in the schedule, but why don't we set as a trial

23    date -- if we can set a trial date now let's say end of

24    April or beginning of May we can work back from that

25    date. That still leaves them five months.

1    MS. SULLIVAN: You're kidding, right?

2    MR. SEEGER: No, I'm serious.

3    MS. SULLIVAN: Even before the withdrawal

4    when we were working up the first 15 cases the

5    discovery end date was April, not the trial date.

6    MR. SEEGER: Diane, I'm wrong. I was

7    corrected by David. Right now I think the discovery

8    cutoff date is what?

9    MR. BUCHANAN: April 1.

10    MR. SEEGER: I didn't mean to shorten that.

11    MS. SULLIVAN: For a July trial? We talked

12    about a July trial. Is that what you want?

13    MR. SEEGER: We also talked about June. Our

14    preference would be June.

15    MS. SULLIVAN: That's going to be really

16    tough working up a whole new slate, particularly if it

17    is going to be -- we would look for a July trial.

18    There's going to be motion practice. There is going to

19    be in limine motions. There's probably going to be

20    Daubert motions. We have a new slate of cases. We

21    have Merck witnesses to schedule. We would like if

22    possible --

23    THE COURT: I'm not going to sit here and say

24    this is the trial date. That's, I don't think,

25    realistic. The important thing is we have a discovery

1    end date, which we still have as April 30th, and at

2    this point I'm not going to move that.

3    MS. SULLIVAN: You're right. You extended it

4    so it was April 30th.

5    THE COURT: At this point it is April 30th.

6    As long as we have a discovery end date after that then

7    we start to talk about what hearings we have to have

8    before the trial and scheduling those hearings.

9    MS. SULLIVAN: Your Honor, that discovery end

10    date included expert discovery, and we were looking in

11    order to get these Merck witnesses scheduled and work

12    up these new cases for 60 days on the fact discovery to

13    have discovery fact cutoff some time in June and then

14    expert discovery in looking toward a summer trial date.

15    MR. BUCHANAN: Your Honor, could we -- it may

16    be possible if we had a moment to discuss it we could

17    probably pin down a schedule and resolve it before we

18    conclude today.

19    MS. SULLIVAN: That makes sense.

20    MR. BUCHANAN: So we don't just wing the

21    dates. Your Honor has indicated the discovery end date

22    of April 30th. We can set some milestones between now

23    and then to get the other things done we need to get

24    done. Obviously, expert reports on cases that haven't

25    been selected for trial yet are not going to be served

1    by January 15th, so --

2    MR. SEEGER: We can work those dates.

3    MR. BUCHANAN: Those are the types of dates I

4    want to pin down with defense counsel so we have some

5    clarity.

6    MR. MAYER: I think the end expert date is

7    going to be beyond April 30th.

8    MR. BUCHANAN: We probably have some

9    flexibility with the end of expert discovery.

10    THE COURT: Okay. All right.

11    MR. FERRARI: Your Honor, Mike Ferrara. It

12    may be a good idea just to send a message around the

13    country because people are wondering about this case if

14    you had an actual trial date which could be changed of

15    whatever May, June, July to just pick a date I think it

16    would be really helpful.

17    MS. SULLIVAN: I'm not sure why.

18    MR. SEEGER: My biggest reason was more for

19    scheduling because when you have a date -- let's say if

20    the trial date is May 1 you work back from that date on

21    the motions and that was the only reason to do it. I

22    do recognize now that that date may have to have some

23    time built into it, but working off a discovery cutoff

24    of the end of April if you left all of the month of May

25    for scientific motions and even June, I mean, easily --

Transcript - Monthly Status Conference (2004/12/16)

1   I didn't know that July was a day in play, but we can
2   set mid month June as a trial date and try to sit down
3   them with them and work out a schedule backwards from
4   July.
5        MS. SULLIVAN:  June is not going to be enough
6   time with new cases.  We could probably, you know,
7   working hard do a July trial date, but June is not
8   going to give us enough time to work up a new slate of
9   cases.  And I defer to your Honor whether you want to
10  set something firm in July or wait to see how the
11  schedule works out.
12       THE COURT:  See, for me a discovery end date
13  still has a lot of meaning because once it is over I'm
14  not going to let you have any more discovery at least
15  on those cases we're going to try, and we're ready to
16  try them as of that time.  I'm not going to set a trial
17  date.
18       MR. SEEGER:  That's fine.
19       THE COURT:  I have taken the position that
20  the people in the other states are doing what they are
21  doing.  We're doing what we're doing here, and we're
22  not going to let it affect us too much.  I don't plan
23  to slow my cases up for other places, and I don't
24  intend to create artificial -- I don't care what they
25  do -- I'm not dying to have the first case.  It is not

Transcript - Monthly Status Conference (2004/12/16)

1   that important to me.  On the other hand, I'm not going
2   to delay a case because one is being tried in Texas.
3        MR. SEEGER:  The company had a press
4   conference with Wall Street and said that the first
5   trials were in Texas and Alabama anyway, they won't be
6   in New Jersey anyway.  I learned that the other day
7   myself.
8        THE COURT:  Wherever they are they are.
9   We're just going to move ours, but realistically it had
10  always been in my mind that April 30th was the end.
11  May were some motions and other things, and we would be
12  trying this case in the beginning of the summer, and
13  whether we are going to be trying this case June 5th or
14  whether we're trying it July 6th, I don't know, but I
15  don't think that's that big a difference, and I think
16  in there is when we're actually going to be trying the
17  case, okay?  Everybody agrees?
18       MR. SEEGER:  We agree, your Honor.
19       MS. SULLIVAN:  Mr. Placitella and I are
20  neighbors in Long Beach Island, and it's not great for
21  us, but that's acceptable to us.
22       MR. SEEGER:  For those of us that don't have
23  summer homes it works just fine.
24       Your Honor, we also had, if we're ready to
25  move off that, we have the issue of the protective

Transcript - Monthly Status Conference (2004/12/16)

1   order filed by Miss Sullivan and her colleagues on
2   Mr. Gilmartin.
3        MR. LOCKS:  Judge, can I say something?  The
4   scheduling from September 30th when we're obviously the
5   first cases, and there are only three or four firms
6   that filed those cases, and they have been working on
7   them all that period of time and how representative
8   these cases are may or may not be as representative as
9   the cases posted September 30th, but we'll take.
10  There's also other firms that are filing cases that may
11  have different views about what's representative or may
12  have different views about how cases should be tried,
13  and I don't want our silence to sound as if we agree
14  with everything that counsel is doing at this point.
15  We have no role in what they're doing.  So I just want
16  to at least express it now.  It may come up later, and
17  I don't want to act as if not having said anything up
18  until now that we would do it.
19       THE COURT:  Each of these cases is an
20  individual case.  They're not even consolidated.
21  They're just coordinated.
22       MR. LOCKS:  Good.
23       THE COURT:  And, obviously, each of you have
24  the right to pursue your actions, but cases that
25  haven't even been filed yet you can't be setting trial

Transcript - Monthly Status Conference (2004/12/16)

1   dates for.
2        MR. SEEGER:  And I didn't mean to indicate
3   that.  I wasn't speaking for Mr. Locks.
4        THE COURT:  And I just wanted to suggest to
5   counsel there's a lot of people here who have been
6   telling me they're going to file cases or they're
7   thinking of filing cases.  I understand that a lot of
8   you might be waiting to see where you want to file your
9   cases for whatever reasons or the MDL, who gets picked
10  to be the MDL judge or whatever -- I don't know what
11  your reasons are -- but if you aren't sure you're going
12  to file in New Jersey I would appreciate it if you just
13  file groups of cases each week instead of waiting and
14  one day bringing us a big box of all your cases.  File
15  them as you get them, I would say, or file them as
16  opposed to saying, well, we have 100 cases I would
17  prefer if you filed 15 and then 15 and then 15 or 10
18  and 10.  I'm not saying -- there's no number.  I'm just
19  suggesting for us it is easier if you don't keep them
20  as a group and wait until you have every single thing
21  done before you file them all.  But that's only a
22  suggestion, obviously, it is not an order.  You do what
23  you feel is appropriate.  And you may have reasons to
24  wait until a certain point, and I understand that.
25       All right.  The next issue is -- is the next

1    issue the motion?

2         MR. SEEGER:  Yes, the motion for protective

3    order filed by Merck.

4         THE COURT:  Do you want to argue it here?  Do

5    you want to argue it in the courtroom?

6         MS. SULLIVAN:  I'm happy to argue it here.

7         THE COURT:  Fine.  Is there any -- all right.

8    And we don't have -- there's no problem with anybody in

9    the room who hasn't already filed a case?  There's

10   nobody here from the press, right?

11        (No response.)

12        THE COURT:  Okay.

13        MR. SEEGER:  Well, we have attached exhibits,

14   but we haven't distributed them.  They're under seal.

15        MS. SULLIVAN:  Your Honor, Mr. Gilmartin is

16   the Chief Executive Officer of Merck.  Merck is a

17   public company, 60,000 employees, that is now

18   responding to issues on many fronts.  The law in this

19   area recognizes the potential for abuse and harassment

20   and oppressiveness when depositions are sought of the

21   CEO of a public company of an individual who has

22   extensive duties and responsibilities to shareholders

23   to continue the business of Merck and continue

24   distributing pharmaceutical products to customers and

25   so the law has recognized reasonable limits on

1    depositions of such apex executives.

2         And the case law recognizes that such limits

3    are necessary to prevent abuse in the process.  Chief

4    Executive Officers rarely possess information or

5    knowledge that cannot be readily obtained from other

6    individuals, and this case is no different.  The core

7    issues in this case relate to the safety and clinical

8    trials conducted by the company.  It is Merck's

9    position that there was an extensive review and

10   analysis of the safety issues using the gold standard

11   of placebo controlled studies.

12        There are many scientists at Merck who have

13   been involved who were involved in the safety testing

14   and safety analysis of VIOXX.  Those depositions of

15   those scientists have been taken and are continuing to

16   be scheduled in this litigation.  Information about

17   that core issue can readily be obtained from such

18   scientists.

19        Another core issue in the case is the

20   warnings issue.  It is Merck's position that it

21   promptly and responsibly warned about the risks of this

22   product, both sharing information to the FDA and

23   appropriately labeling and changing labeling to its

24   product as risk information developed.  Depositions of

25   witnesses at the company who know about that core issue

1    have been taken.  The regulatory individuals and other

2    scientists they continue to be taken.

3         The courts who have looked at the issue of

4    whether or not a deposition of a CEO should be

5    permitted have determined that there should be a

6    showing by the proponent of that deposition that they

7    have exhausted other areas for obtaining the

8    information, that they have reviewed documents, that

9    they have deposed or interviewed other persons at the

10   company who have such information to determine whether

11   that information can be obtained without burdening the

12   company, its shareholders and the executive with a

13   deposition, particularly in cases like this where you

14   have products claims that are pending throughout the

15   country and to subject a CKO like this to multiple

16   depositions would certainly impact the business of the

17   company and its ability to function.

18        There has been no showing, Judge, in the

19   plaintiffs' papers as far as I could see as to what

20   particular information Mr. Gilmartin has that cannot be

21   obtained from others in the company.  They submitted --

22   and, in fact, the documents submitted by the plaintiffs

23   in support of their motion made clear that the e-mails

24   were sent to other individuals in addition to

25   Mr. Gilmartin.  Certainly those other individuals can

1    be asked about the information in the e-mails.  The

2    other document they submitted was a safety summary that

3    went to Mr. Gilmartin.  Certainly the scientists that

4    drafted that memo have more relevant and more specific

5    information and knowledge about the safety information

6    in the briefing memo to Mr. Gilmartin.

7         There is a sensible and appropriate way to do

8    this to protect the shareholders and the company and

9    still permit plaintiffs to obtain their discovery, and

10   that is defer this issue until plaintiffs have

11   completed the deposition process of the Merck

12   witnesses, the review of the Merck documents and then

13   let the plaintiffs make a showing as to what

14   information -- specific information they need from the

15   CEO that they could not obtain from other individuals

16   and set some reasonable limits in terms of time

17   limitations and subject matter of the deposition of a

18   CEO if the Court determines that it should be

19   permitted.

20        The other issue is it is critically important

21   to coordinate depositions of high level executives like

22   this when you have multiple claims around the country,

23   and so if Mr. Gilmartin is going to be deposed in VIOXX

24   litigation, certainly, Merck would urge the Court that

25   his deposition be set at such a time at the back of the

1   discovery schedule that it can be coordinated with the

2   MDL and with other jurisdictions so he can minimize --

3   certainly appear one time, provide the information that

4   could not have been obtained from other witnesses to

5   the extent the plaintiffs can make that showing and is

6   not burdened by multiple depositions in various

7   jurisdictions.

8       At this moment in time, your Honor,

9   plaintiffs have not made the showing of compelling need

10  for this deposition at this time versus revisiting the

11  issue at the end of the schedule after they have

12  explored subject matter that's relevant to this

13  litigation with other witnesses and reviewed other

14  documents.

15      The plaintiffs in their briefs refer to the

16  fact that New Jersey -- or allege the fact that New

17  Jersey law does not recognize limits on depositions

18  such as this, and while there's no published case in

19  New Jersey directly on point there's certainly no

20  suggestion in New Jersey case law that it rejects

21  reasonable limitations on depositions of chief

22  executives like this.  The general law in the area of

23  protective orders provides the Court discretion to set

24  limits where the burden of the discovery sought

25  outweighs the need for it and can certainly set

1   reasonable limits on the discovery process.  And other

2   courts when they examined this issue have looked to

3   what other states have done if it is an issue of first

4   impression in this area, and certainly the plaintiffs

5   cannot suggest to the Court a single case around the

6   country where the courts have not recognized the

7   potential for abuse in noticing the CEO of a public

8   company and set reasonable limitations and requirements

9   on the need for and the setting of depositions like

10  that.

11      And that's, your Honor, essentially, the

12  defendant's argument in this regard.

13      MR. SEEGER:  Judge, I'll keep this brief, but

14  I want to sort of clarify what we're really talking

15  about here.  I would agree if a person gets out of a

16  car at one of the Trump casinos and they trip over a

17  curb and skin their knee that that would not be an

18  appropriate case for Donald Trump to be deposed in.

19  That would be, for reasons we all know which would not

20  go to the issue of the case, but let's talk a little

21  bit about Mr. Gilmartin.  Something missing from their

22  motion papers, which is telling on this motion, there's

23  no affidavit from Mr. Gilmartin even attempting to give

24  the Court an indication of what his personal knowledge

25  is or isn't in the case.

1      So let's go to the public record.  Let's talk

2   about what we know about him.  We know from the

3   discovery in the case that he sat on very high level

4   committees and they had discussions regarding the

5   marketing and the safety and the sales of the drug.  We

6   know he has done many, many press conferences, and he

7   has done many -- from the time the drug was launched

8   and he has done many meetings with Wall Street and with

9   regard to telling the financial people sort of what to

10  expect from VIOXX, its sales.

11      We have memos that he has done board

12  presentations explaining the pharmacological properties

13  of the drug, that it was prothrombotic, yet he now

14  tells the public he had no idea this drug was

15  prothrombotic or could cause cardiovascular problems.

16  We know Mr. Gilmartin from the testimony of

17  Dr. Silverman, who is the chief of regulatory affairs

18  at the company, that it was his decision ultimately to

19  pull from the market a $2 billion a year drug.  So --

20  and maybe most significantly here what we have is

21  Mr. Gilmartin telling Congress, the medical community

22  and the public that he just learned -- the company just

23  learned that VIOXX, which is a COX-2 inhibitor, has the

24  potential to cause death and heart attacks.

25      Now think of the safety implications of that.

1   There are other drugs on the market right now.  Not

2   VIOXX but Bextra is now implicated in cardiovascular

3   problems.  And you have the CEO of Merck continuing to

4   tell the medical community -- in our view

5   misrepresenting to the medical community the dangers of

6   this drug.  Yet we see in discovery back in 1996 the

7   company is talking about the drug's potential to cause

8   heart attacks.  We know in their clinical trials there

9   were more deaths and many of them in the VIOXX arm

10  versus placebo or comparative drugs.  We know in the

11  VIGOR trial, which the results were published in 2000

12  there were five times as many heart attack in the VIOXX

13  arm versus Naproxen, yet Mr. Gilmartin and the company

14  promoted in the New England Journal of Medicine and to

15  the medical community a theory that Naproxen was

16  cardioprotective, which I'll tell you experts will be

17  in your court to tell you if it were true it would have

18  been the biggest or the greatest scientific finding in

19  the last 50 years, that, in fact, a drug like Naproxen

20  was more cardioprotective than aspirin.

21      We have documents in this case where

22  Mr. Gilmartin -- we have -- forget about the documents,

23  his public statements, we have the Wall Street Journal

24  article where Mr. Gilmartin is explaining how it was

25  important to him to merge marketing with science where

1 in the past in Merck marketing people were seen and not
2 heard. Under Mr. Gilmartin marketing people were
3 brought right into the research. They sat in the rooms
4 and they talked about label changes with scientists.
5 They talked about how to characterize studies. They
6 talked about how to draft up press releases, and we all
7 know the famous press release in this case after VIGOR
8 where there were five times as many heart attacks in
9 the VIOXX arm Merck put out a press release that said
10 the VIGOR trial confirms the cardiovascular safety of
11 VIOXX.
12 And in response to that Mr. Gilmartin
13 received directly a letter from the head of Dee Dee
14 Mac, which is the regulatory arm of the FDA that
15 overlooks advertising, telling him that that claim was
16 not only false and misleading but incomprehensible.
17 So before we talk about how unfair it is to
18 make the CEFO of a company come in and testify, how
19 disruptive it is to Merck, I think we need to compare
20 that to his involvement in the case, his personal
21 knowledge of the facts, including clinical trials, his
22 presentations to the board and Wall Street and the
23 medical community, and we need to weigh that against
24 the projected 100,000 heart attacks that the FDA has
25 said we can expect to get from this. So I have some

73

1 sympathy to Mr. Gilmartin's schedule, but I have very
2 little.
3 On the issue of the protective order the law
4 is very straight. Protective orders are issued to
5 prevent annoyance, embarrassment, oppression and undue
6 burden. This isn't done to annoy him or the company.
7 There's no intention to embarrass him. We want his
8 facts, and that's it. There's no case law in New
9 Jersey that supports many of the things that Miss
10 Sullivan has told this Court it does. For example, I
11 never even heard of an apex deposition until I saw it
12 in her brief. I don't think there are cases that
13 discuss it, other than in Texas, but they're not
14 relevant or binding on your Honor.
15 The concept of limitations in a deposition --
16 an hourly limitation I find no support for either, and
17 I think she conceded, in fact, there's no support in
18 New Jersey for that. So I understand that
19 Mr. Gilmartin as a CFO of a big company with 60,000
20 employees may find sitting in a chair for seven hours
21 one day inconvenient; there's not much that we can
22 countenance to that in the light of what's gone on
23 here, what has been described by David Graham to
24 Congress as one of the biggest catastrophes in the
25 history of public health care and he made analogies to,

74

1 you know, people suffering heart attacks on this drug
2 was the equivalent to like two airplanes falling out of
3 the sky weekly.
4 So it is a serious thing, yet they give no
5 support to this Court by way of affidavit from
6 Mr. Gilmartin himself at least explaining to his Honor
7 I know about this and I don't know about that.
8 And, finally, there's one very important
9 document you have heard a lot about but we need to talk
10 to Mr. Gilmartin about. A letter was written to
11 Mr. Gilmartin by a professor at Stanford accusing
12 Merck, not just of intimidating him but of intimidating
13 any scientist that spoke out against this drug. We
14 need to talk to him about that. We know there was a
15 scientist in Spain that wrote a critical review of
16 VIOXX and Merck sued him for defamation. Merck
17 ultimately lost that trial, but there is a pattern and
18 a practice here. It was to intimidate scientists who
19 told the truth.
20 I mean, I don't think a case has ever been
21 more ripe for the deposition of a CEO than this one,
22 and I will tell you there's precedent for it. In
23 Resulin we had the opportunity to depose Ludwig
24 Davink (ph), and that was ordered by Judge Kaplan in
25 the MDL. And in regard to coordination -- I wanted to

75

1 point out one more thing, the whole motivation --
2 Mr. Gilmartin, by the way, is not a medical doctor; he
3 is not a scientist. He is a business person, and
4 Mr. Gilmartin when he came to the company gave many
5 interviews to the press about how important it was to
6 market their drug directly to consumers, and never in
7 the history of the pharmaceutical industry has a
8 company spent as much as Merck did to market this drug
9 directly to consumers. That's obviously going to be a
10 very important issue here, your Honor, because we have
11 the rulings by the Supreme Court in Perez that need to
12 be explored.
13 So I mean, I don't think there's ever been a
14 stronger case for the deposition of a chief executive.
15 With regard to coordinating I don't want to leave out
16 one of Miss Sullivan's important points. I don't
17 understand how we can ask your Honor to limit how many
18 times Mr. Gilmartin gets deposed. If a federal judge
19 in an MDL says that Mr. Gilmartin should be deposed or
20 does not prohibit him from being deposed in the MDL I
21 don't understand why your problem or New
22 Jersey's problem. If a state court judge in Texas
23 thinks that a state court lawyer litigating cases there
24 is entitled to his deposition I don't understand how
25 that becomes New Jersey's problem or your problem. All

76

1   we can do is litigate our cases here in New Jersey on
2   behalf of our clients.  We need his deposition for this
3   case.  We don't expect him to show up live for trial.
4   So they're going to hear from the CEO of the company by
5   videotape, and that's all we have.
6       MR. FERRARA:  Your Honor, CEO's have been
7   deposed in tobacco cases, General Motors' CEO car
8   manufacturing CEO's in certain types of litigation.  So
9   the mere fact that somebody is a CEO there is a history
10  of CEO's being deposed.
11      MS. SULLIVAN:  There are some cases where the
12  CEO's are deposed, and it is almost always, always in
13  our review of the research under reasonable
14  restrictions, limitations and done in an orderly
15  fashion so to protect and done, in my experience, with
16  mass tort only once so it can be coordinated with the
17  MDL and other states at the end of the schedule so to
18  avoid the burden and oppression and diverting attention
19  from the business of the public company to sit through
20  depositions.
21      One of the reasons that there was no
22  affidavit submitted by Mr. Gilmartin is because there
23  was no showing in the plaintiff's papers as to
24  specifically what they wanted to talk to him about.
25  What is it that they believe is the unique information

77

1   people, other individuals other individuals and a
2   review of documents.
3       There's been no showing here that
4   Mr. Gilmartin possesses any unique information that the
5   plaintiffs can't obtain from other sources, and the
6   courts from federal courts in Alabama, federal courts
7   in North Carolina, federal courts in New York, the
8   Fifth Circuit, the Tenth Circuit, courts in Texas,
9   California, the Eastern District of Pennsylvania have
10  found that there should be a process by which first
11  plaintiffs attempt to obtain this information from
12  other sources and then if that's -- if there is a
13  showing that Mr. Gilmartin is the only individual who
14  possesses certain information then a deposition may be
15  appropriate, but under -- with some reasonable
16  restrictions and certainly in situations like this some
17  coordination so that if Mr. Gilmartin does it it is
18  done in a way and a time where it can be coordinated
19  with the MDL and with other state litigation.
20      MR. SEEGER:  I have a couple of points.  One
21  is it is not our showing.  If I make a motion before
22  your Honor that requires evidentiary support I'll
23  submit it to you, and I give you my word on that.  They
24  have asked for something so important to them, which is
25  to block the deposition of the CFO of the company, the

79

1   that Mr. Gilmartin possesses that they can't get from
2   the scientists and the marketing people who we
3   interface with that Mr. Seeger references.  They have
4   misrepresented, Judge, the context of Mr. Gilmartin's
5   statements to the press and the facts.  There is no law
6   that stands to the proposition that because a CEO
7   exercises his first amendment right and comments about
8   matters important to the company that justifies his
9   deposition.  If there's a showing that Mr. Gilmartin
10  does possess unique knowledge that cannot be obtained
11  from any other Merck witnesses that cannot be obtained
12  through documents then at some point down the road it
13  may be appropriate to revisit with your Honor the
14  subject matters that would be appropriate to depose
15  Mr. Gilmartin about and coordinate his deposition,
16  hopefully, with other forums, but at this juncture in
17  the discovery process in view of the case law -- and it
18  is not just from Texas, all the courts that have looked
19  at this have come out the same way, and that is that
20  there should be reasonable limits and a test before
21  plaintiffs' lawyers can sit the CEO down and divert
22  time from his duties with the public company, there's
23  got to be a showing of what is so special that he knows
24  that the plaintiffs cannot obtain via other discovery
25  vehicles, such as depositions of scientists, regulatory

78

1   man who has been their spokesman since the drug has
2   been withdrawn, has done nothing in the last two months
3   but talk about VIOXX, and they don't even submit an
4   affidavit from him.  It is their burden if they're
5   moving for the protective order; it is not ours.  What
6   we are governed by are the rules of discovery in New
7   Jersey, and there's no question that his testimony is
8   relevant, and that's all.
9       Now, I have lists of cases -- I'm being
10  handed notes, I can go off, I won't waste your time.
11  Baycol, Fen-Phen where CEO's, CFO's have been deposed.
12  To not allow his deposition I think would be really
13  tying the plaintiffs' hands to try their cases.  He is
14  too important to the case.
15      But the last point I'll make is the whole
16  thing of when his deposition is.  Your Honor, I'm not
17  going to force you to -- I'm not pushing you to make a
18  ruling as to when.  If you want to depose him last in
19  New Jersey we have a cutoff of April.  Do you want to
20  depose him in March?  We'll depose him in March.  If
21  that makes their life easier we intend to depose the
22  senior executives all the way up the chain.  We have
23  Scolnick still we don't have a date.  We have Anstice,
24  we still don't have a date.  All these important
25  executives, head of departments, we wanted to talk to

80

Transcript - Monthly Status Conference (2004/12/16)

```
1    them first then we want to talk to their boss.
2         MR. PLACITELLA:  Can I just comment on one
3    procedural issue?  The concern I have, having litigated
4    cases in New Jersey state court in relation to the MDL
5    is your Honor has set a discovery schedule.  The
6    discovery schedule is tight.  The MDL panel has not
7    even met to hear this.  It has to be assigned, and I
8    have experienced firsthand the issue of going to a
9    deposition as a New Jersey lawyer subject to sometimes
10   federal judges are reasonable and sometimes they don't
11   really pay much mind to what goes on in state courts.
12   But you end up in a proceeding where the lawyers
13   litigating in a federal case tell you you have to wait
14   until they're all done, and they sit there for four
15   days and ask questions, and you stay there for a week
16   while the questioning goes on and then finally at the
17   end you as the New Jersey lawyer who noticed the case
18   to begin with get to ask your questions, but only under
19   the rules that some federal judge, with all due
20   respect, has set forth.  So I'm a little bit concerned
21   about having to complete discovery and then end up
22   being the tail wagging the dog procedurally.
23        MS. SULLIVAN:  Your Honor, that's not what
24   we're asking.  We're asking if the plaintiffs make the
25   showing that there's certain unique information that
```

Transcript - Monthly Status Conference (2004/12/16)

```
1    Mr. Gilmartin possesses that justifies a deposition
2    that he be placed at the back of the schedule in late
3    April so that we can permit maximum coordination with
4    other forums, and the largest number of cases
5    consistent with moving these cases and that some
6    reasonable limitations in terms of the specific topics
7    that they think he knows about that nobody else does
8    and they can't get information from anybody else be set
9    forth and some reasonable time limitations, your Honor.
10        THE COURT:  All right.  Well, the Court's had
11   a chance to review this matter, and counsel for the
12   defense submitted a brief, which included numerous
13   cases where they talk about the primarily Texas cases
14   where they talk about an apex deposition, which is a
15   term I hadn't been familiar with either, but I now know
16   what it is, and it is not a concept that hasn't been
17   discussed in New Jersey and hasn't been dealt with, but
18   there is a dearth of published opinions on it.  There
19   have been numerous times when I have been asked to
20   order the deps of CEO's of companies.  Frequently it is
21   a very young lawyer.  It is the first day of the case
22   and they want to take the CEO's dep, and there's -- my
23   first reaction is always, yeah, you didn't depose
24   anybody else, you haven't put any money in the case and
25   you want to harass the CEO, and you're not going to get
```

Transcript - Monthly Status Conference (2004/12/16)

```
1    to do it.  And I have entered those orders routinely.
2    Because there is a rule in New Jersey that you can't
3    take a dep if it is going to be oppressive or
4    embarrassing or for harassment only.  You have to take
5    deps to get information, and that's why you take a dep,
6    and it is the only reason you take a dep.
7         But New Jersey law has consistently been that
8    there's broad discovery of people who have relevant
9    information or could lead to relevant information and
10   they -- and depositions of parties, including CEO's and
11   other representatives are allowed.  A person's status
12   in and of itself is not a basis for denying their
13   deposition, and I don't think that CEO's should have or
14   do have in New Jersey a separate status from other
15   individuals.  It is more likely that you're going to be
16   taking a CEO's deposition to harass him and more than
17   likely those depositions will be turned down, but the
18   standard is still the same.  If the person has relevant
19   information -- and the difference is with this apex
20   theory in Texas and in some of the other cases that
21   counsel has cited, I know there's a Missouri case you
22   cited where they said we don't deal with the apex, but
23   we realize you have to protect people from harassment.
24   I mean, as you remember, Clinton was deposed.
25        MS. SULLIVAN:  With reasonable limitations.
```

Transcript - Monthly Status Conference (2004/12/16)

```
1         THE COURT:  And what a disaster that was.  So
2    the apex rule that you have to have exhausted every
3    other piece of discovery first or that if you can get
4    the information from a lower level employee you
5    shouldn't be able to ask it of the higher level
6    employee I don't find that that's the law in New Jersey
7    at all.  It certainly is not the law in New Jersey as
8    of now, and I don't think that it should be the law in
9    New Jersey, and since I'm the one deciding at this
10   point without a directive from the Appellate Division
11   of the Supreme Court to the contrary I think that the
12   law in New Jersey as it is provides enough protection
13   for CEO's, which is if they're being deposed just to be
14   harassed or bothered or it is unduly burdensome or they
15   don't have any relevant information to the specific
16   litigation then they shouldn't be deposed.  Otherwise,
17   they should be deposed.
18        So the Court's going to order the deposition
19   of Mr. Gilmartin.  I think in this case it is clear
20   that he was a hands-on executive, that he was involved
21   in important meetings, that he had CEO and third-party
22   contact and contact with his own -- both internally and
23   externally of the company, the e-mails from the
24   Stanford professor and other things suggest that he --
25   it is not a matter of just talking to the press, but
```

1   the fact is he is a hands-on guy.  He deals with the

2   drug.  He has dealt, apparently, with the marketing of

3   the drug and dealt with the review of the studies and

4   dealt with the company decisions at the highest levels

5   and he has been involved.

6       I guess in the end he has been the last

7   decision maker on a lot of things.  He is not a

8   hands-off CEO who simply defers things to his

9   subordinates or delegates 100 percent of his -- so he

10  is someone who has -- who appears to have knowledge

11  that's relevant.  It appears to me that he should be

12  deposed.

13      Now, again, he is not a scientist.  I don't

14  know that he should have to sit there and be asked

15  questions about the chemical compounds.  Obviously,

16  that might be harassing because it might be beyond his

17  expertise and somewhat embarrassing to him if the idea

18  is that a CEO has to know everything; they don't

19  necessarily.  I don't know what he does or doesn't

20  know, but I also think he has a pretty good

21  understanding of the studies and what the studies

22  showed.  I'm assuming he does.  From the information it

23  appears that he was involved at least in decisions on

24  those things.

25      So now we have to find a balance.  We're not

85

1   going to depose him in April.  I want the expert

2   reports in.  I want to move along.  He's got to be

3   deposed.  There's no reason to have him deposed last as

4   far as I'm concerned.  If counsel -- as long as

5   everybody else is being deposed my goal is to depose

6   everybody from Merck in December and January with a

7   couple of tail people the first week in February.  I

8   still have that goal.  We didn't get there yet, but it

9   is my intent to have everybody done December/January.

10  February is fine for Mr. Gilmartin.  If he is the last

11  dep that's fine.  I don't care whether he is or he

12  isn't.  But some time in February Merck is to produce

13  Mr. Gilmartin for a deposition.

14      Now, I have no objection, and I think it

15  makes sense that counsel can, if you want to notify

16  other individuals so they can attend the depositions.

17  Is there any reason why we shouldn't allow attorneys

18  from other litigation in Texas or California or Federal

19  Court if they want to attend his dep to attend?

20      MR. SEEGER:  No problem at all as long as it

21  is clear it is a New Jersey deposition and we're going

22  to question the witness first, but we would make time

23  for other questions.

24      MS. SULLIVAN:  Your Honor, the plaintiffs

25  have suggested March, and one of our hopes was that we

86

1   could coordinate this deposition with the MDL to try to

2   minimize the number of times Mr. Gilmartin is produced,

3   so I would ask that the Court order if not April, which

4   would be consistent with the discovery schedule at

5   least late March for Mr. Gilmartin's deposition so we

6   can coordinate.

7      MR. MAYER:  His deposition --

8      THE COURT:  The problem with the MDL is it is

9   not even going to be under way when I want to try this

10  case.

11      MR. SEEGER:  That's disingenuous.  The date

12  for the hearing is the 27th of January.  The panel

13  traditionally takes four weeks.  It will be the end of

14  February.  The lawyers by the time they organize and

15  get discovery they'll never be ready for Mr. Gilmartin

16  in March.  Miss Sullivan and her colleagues know his

17  deposition is going to be taken by these lawyers.

18      MS. SULLIVAN:  But what is the prejudice to

19  the plaintiffs?  They may be right.  Maybe an MDL won't

20  be up and running and ready but maybe it will be, and

21  we would like to have a chance to coordinate that with

22  the MDL, and there's no prejudice to the Plaintiff if

23  Mr. Gilmartin is scheduled in April versus February.

24      THE COURT:  There is a problem, because it

25  very well may result in a delay of something else.

87

1   Discovery leads to discovery, and a dep of a CEO then

2   has to be -- that dep has to be provided to their

3   experts.  They may have to have some discovery as a

4   result of his dep.  Deps lead to other deps sometimes.

5   I'm hoping it won't, but the bottom line is, no, I'm

6   not putting this case off for the MDL.  I have said

7   that from the beginning.  I'm not going to coordinate

8   this case for their purposes.

9      Eventually they may order me to do something,

10  and I'll have to decide whether I have to do it or not

11  then.  But at this point I'm not going to coordinate

12  things to accommodate an MDL that doesn't even exist.

13  I understand there will be an MDL, but by the time they

14  pick it and it is organized and they have their first

15  conference -- we did nothing at our first conference --

16  I mean, we didn't not do anything, but we had a first

17  conference, how much can you get done at a first

18  management conference?  And then the first order of

19  discovery, and is the MDL judge really going to order

20  the deposition of the CEO of the company as the first

21  thing he is going to do?  It is probably not going to

22  be the first thing they do.

23      MR. MAYER:  Your Honor, what we're asking is

24  that we have a date that's within the time frame of

25  discovery.  It is not going to affect the expert

88

1 depositions.  It is not going to affect the trial date.
2 If it's farther back it gives us a better opportunity
3 to coordinate with other cases.  That's all we're
4 saying.  It may or may not give us the opportunity to
5 coordinate with the MDL.  It depends how quickly they
6 get their act together.  We're not going to come to you
7 and say we can't have the deposition in this case
8 because of something that's going on in the MDL.
9 We're just asking to have the maximum opportunity to
10 do --
11 THE COURT:  Isn't the MDL going to have the
12 advantage of having his dep?  I mean, if we get it done
13 in February then they're going to have his deposition.
14 MS. SULLIVAN:  And they'll want it too,
15 Judge, and that's the problem.
16 THE COURT:  Why should they -- you know, I
17 don't care what they want or don't want.  At that
18 point -- if the dep had already been taken -- I can
19 tell you right now I'm dealing with some other cases
20 like Accutane where deps have been taken other places.
21 I'm not going to automatically order that people be
22 allowed to depose people twice, and if you were coming
23 to me saying Mr. Gilmartin has already been deposed
24 three times I would probably say then you ask another
25 hour or two of questions max or you don't get to ask

1 any questions until you show me what you're going to
2 ask him different than what they asked.  The practical
3 matter is just because there's new counsel it could be
4 the same counsel in the MDL.  I don't know, but --
5 MR. MAYER:  All we're asking is for the
6 opportunity to do what we can to protect his time
7 within the time frame that we already all agreed --
8 THE COURT:  I don't think his time is that
9 sacred.  I don't think his time is that sacred.
10 MR. SEEGER:  The practical problem is this,
11 here's an example:  Mr. Gilmartin made the decision to
12 pull the drug.  That may lead to other discovery.  That
13 may raise some new issues.  What did you base it on?
14 He may discuss things that haven't been disclosed to us
15 yet.  He may bring up a name of somebody that we don't
16 know about.  So if we do him in March or April we're
17 doing him right up against the trial.  February is the
18 ideal time frame.
19 MS. SULLIVAN:  Your Honor, there is no -- and
20 I challenge my brethren to cite one -- there is no
21 situation I know of where the CEO has been required to
22 be deposed twice in state litigation and in the MDL.
23 Maybe you're right, the MDL may say they need to have
24 him again, but at least the prejudice to them is
25 minimal versus the prejudice of having --

1 THE COURT:  You have a better argument, Miss
2 Sullivan, to the MDL judge in March or April that he
3 has already been deposed in New Jersey, and, therefore,
4 let them read that deposition, and why should he have
5 to be deposed twice?  The bottom line is this case is
6 not going to be -- I'm not scheduling anything, and I
7 said this from the day it went off the market and the
8 day somebody mentioned an MDL, I'm not scheduling my
9 case in coordination with what they're doing in a sense
10 that -- at some point it may become logical to
11 coordinate with them, but it doesn't become logical for
12 me to coordinate with somebody who is just starting
13 when I have been doing this case for two years.
14 MS. SULLIVAN:  And, your Honor, you made that
15 clear, and we're not suggesting that.  What we're
16 suggesting is deferring Mr. Gilmartin's dep until April
17 doesn't affect this Court's schedule, and it would
18 permit the defendants at least to try to coordinate in
19 more forums and limit the number of times that
20 Mr. Gilmartin needs to be deposed.  So the balancing
21 here, your Honor, I would suggest, weighs in the
22 defendants' favor.  You have said the plaintiffs are
23 entitled to this discovery.  We have got a schedule
24 that would entitle them to -- that would permit them to
25 schedule this discovery consistent with what the Court

1 has said should be the target trial date or end date
2 for discovery pushing Mr. Gilmartin to the back of that
3 schedule to permit the defendants to try to limit the
4 number of times -- to talk to other judges to say we
5 have got the deposition coming up in April in New
6 Jersey, everybody should attend and coordinate there as
7 opposed to redoing it in Texas and the MDL seems a
8 reasonable approach and reasonable limits on a
9 deposition such as this, Judge.
10 THE COURT:  All right.  The first week in
11 March Mr. Gilmartin is to be deposed, and the first
12 week in March it is to be scheduled for two days back
13 to back days, and if he can be deposed in one day
14 that's great.  If he can't -- let me ask counsel for
15 plaintiff.  Are you assuming in one day you'll be able
16 to cover your questioning so if other lawyers want to
17 handle it they would have a second day, is that
18 possible?
19 MR. SEEGER:  It is hard to say what his
20 responses are going to be like.  Now, my anticipation
21 would be that we would need him for a day, but we
22 would, obviously, want to notice his deposition as a
23 day-to-day until it was completed.  If they want to
24 bring in other lawyers it will not be done in one day,
25 I can assure you of that because I know some of the

```
 1    other lawyers.  If they're going to cross-notice it and
 2    they want lawyers from Texas and Alabama and other
 3    places to come up and talk to him I would imagine we're
 4    going to need at least two days, and two days would be
 5    fair.
 6         THE COURT:  If I was Mr. Gilmartin I don't
 7    know if I would want to be deposed by everybody at once
 8    three or four days in a row.  That's his choice.  If
 9    you're talking about preserving his -- I don't know, if
10    you wanted to protect him from bothersome -- I guess --
11    I'm not questioning your -- I'm not questioning the
12    integrity of your position.  I think you're trying to
13    protect the CEO of the company, and you're trying to
14    protect him from having to appear in a burdensome way,
15    but I don't know if he were my client if -- I would
16    think let's get him done in the New Jersey litigation,
17    get the dep taken and then if other people need him and
18    if he has to appear twice maybe that's better than
19    appearing when you're tired three or four days in a
20    row.
21         MR. WEISS:  Your Honor --
22         MR. MAYER:  Can we have an understanding that
23    any lawyers who are in these cases have to -- I mean,
24    they have to channel their deposition of Mr. Gilmartin
25    into this session?
```

93

```
 1         MR. BUCHANAN:  Your Honor, just one
 2    observation of that.  There are a number of lawyers
 3    from around the country who have now filed a case in
 4    New Jersey.  Those lawyers may or may not be in the
 5    first trial round.  This deposition is being taken for
 6    use in New Jersey by lawyers who really are focused on
 7    the current trial settings.  To require any lawyer who
 8    has got a case here to subject their other clients'
 9    cases in other jurisdictions to a deposition that's
10    being taken here I submit that's an argument to those
11    other judges when they want Mr. Gilmartin's deposition.
12         MR. SEEGER:  That's how this is dealt with.
13    You go to the judge and say, Judge, my client has been
14    deposed once already and that's sufficient, and the
15    judge says, I agree, or he says, Well, there's new
16    evidence that came to light and I don't agree, well,
17    produce him for another day.  I don't see, frankly,
18    your Honor, how it becomes a New Jersey -- or this
19    Court's problem that their client might get deposed in
20    another court.  That other judge has to deal with that.
21    They move to quash the deposition that gets noticed.
22         MR. PLACITELLA:  I think your question was
23    was two days back to back reasonable.  I would think it
24    would be reasonable.  It would be hard to predict one
25    only because if he decides he is going to wrestle with
```

94

```
 1    every question it may be hard to finish it in one day.
 2    If he is responsive it is possible to finish in one
 3    day.  So your suggestion about two days with the right
 4    to make an application should there be issues arising I
 5    think is a fairly --
 6         MR. LOCKS:  Judge, I would like to respond to
 7    Mr. Mayer because he talked about me indirectly as one
 8    of the lawyers who has filed cases after September 30th
 9    but have already got them filed and more that are being
10    filed daily.  I absolutely agree with your Honor that a
11    deposition taken in New Jersey should only be taken in
12    New Jersey.  It should not be coordinated with the MDL
13    or anybody else, frankly, because of the procedural and
14    logistics problems that occur.  Also having deposed 12
15    or 15 CEO's of public companies have never taken a
16    deposition of a CEO where I have asked questions that
17    have already been asked and answered by anyone else who
18    ever took them, and I don't think there's any
19    legitimate judge in the country that would allow a CEO
20    to be taken a second time if they were going to repeat
21    the same questions and answers.  And with all due
22    respect to my colleagues around the country, if they
23    want to ask questions about their cases that haven't
24    been asked and answered in New Jersey God bless them.
25    The same respects, however, if my colleague who I am
```

95

```
 1    assaulting again by patting him on the back --
 2         MR. SEEGER:  That's okay.
 3         MR. LOCKS:  If my colleague, Mr. Seeger, were
 4    to ask numerous questions and not ask questions that I
 5    thought later on six months, nine months from now in my
 6    case is mature I intend to come into the Court and ask
 7    leave of the Court to ask additional questions or new
 8    questions, and the Court will deal with them at that
 9    time.  And that's what should happen around the
10    country, and I don't think it would be necessarily
11    appropriate or fair to include those of us who are new
12    to this litigation to be sitting at the table while
13    they're taking the deposition in their cases that they
14    have worked up at this point in time.  So I disagree
15    with Mr. Mayer that it should bind everybody forever in
16    New Jersey, but that doesn't have to be decided now.
17         THE COURT:  Well, Mr. Locks, good luck in
18    trying to get a second deposition from me.
19         MR. LOCKS:  I understand I'm on thin ice,
20    Judge, but I'll take my chances on that.
21         THE COURT:  What I am saying is  -- what I am
22    saying is any lawyer who has any case filed in New
23    Jersey it is the understanding that Mr. Gilmartin, even
24    though I find he has relevant information, doesn't have
25    separate information as to each individual plaintiff.
```

96

1   He has very general information, and if any of you have
2   any questions that you want to be asked of him you'll
3   submit them to liaison counsel, and if you want to
4   really feel that you can't trust that he is going to
5   ask everything appropriately or you're going to need
6   something else asked you're probably going to have to
7   attend the deposition, listen to him testify and then
8   hand questions to liaison counsel because we're not
9   going to let him be deposed by 25 lawyers; that's not
10  going to happen.  And I'm certainly not going to let
11  somebody later say I wish I could have asked one more
12  question.  I don't think I'm going to do that,
13  Mr. Locks, but unless you show me that question is so
14  important -- but that's the issue that comes up with
15  the second dep, and that's the issue that will come up
16  with the MDL, and that's the MDL judge's decision and
17  it is not mine.  My decision is what to do in this case
18  where he hasn't been deposed yet, and I have got X
19  number of cases that I want to have ready to go to
20  trial, all discovery done April 30th.  The first week
21  in March Mr. Gilmartin is to put aside two days back to
22  back for him to be deposed by New Jersey counsel in New
23  Jersey.  If, in fact, you want to notice other counsel
24  you can do so.  If they can take their deps in that
25  time after New Jersey counsel in this case, that's

1   fine.  You can coordinate that any way you want with
2   other counsel, but I am only handling the New Jersey
3   aspect, and --
4        MR. MAYER:  So there's no confusion for
5   people here that the other counsel here understand that
6   our position will be -- and there are other cases --
7   that this is their opportunity.
8        THE COURT:  You certainly can send those
9   letters out, and we'll have those days, and you can let
10  them know that they can be there, and, you know, and I
11  don't expect because I said two days this means it is a
12  two-day dep.  I expect if it can be done in a day it
13  should be done in a day, and I do also think that --
14  well, we'll see.  If there's other specific parameters
15  you want on the deposition as far as starting time,
16  ending time, break times or if there's any parameters
17  you want as far as areas that can be questioned about
18  or something that shouldn't be I would suggest you
19  first address it with Mr. Seeger, and if you can't
20  resolve them then I'll either have a meeting with you
21  or we'll discuss it.  There may be other protections
22  that can be given.
23        MS. SULLIVAN:  I appreciate that, your Honor.
24        MR. FERRARA:  Judge, would you consider
25  having it here in case --

1        MR. SEEGER:  We don't need to do that.  We'll
2   work it out.  Judge, the truth is we haven't had
3   problems.  I deposed Mr. Schechter, who is the VP of
4   marketing.  We said 8:00 to 6:00.  We started at 9:00,
5   and we were done at 3:30.  We're not keeping people in
6   the chair longer than we need to.  We're asking
7   questions and we're moving on.  It happened once or
8   twice, and we're working it out with the other side.
9   So I think we beat this horse.
10        MR. EGDORF:  Your Honor, I'm one of those
11  Texas lawyers.  And a New Jersey lawyer.  We have cases
12  in both places.  Right now we have cases set for trial
13  in January and February.  It looks like they'll be in
14  agreement to move those trials to April.  I haven't
15  thought through the whole issue about Mr. Gilmartin's
16  deposition, but I can tell you that we're going to want
17  his deposition in Texas.  I know about the law in
18  Texas.  We'll get his deposition in Texas, and it is
19  going to be before April, and it is probably going to
20  be before March.
21        I'm happy to coordinate with all these
22  people, but when people are saying things to sort of
23  imply because I'm here and also in Texas I don't get to
24  do that deposition I'm just saying I don't think that's
25  going to be a proper thing for my clients who are going

1   to have trials that are coming up where the discovery
2   period is going to end before you have ordered his
3   deposition to take place.
4        Now, I don't want to be unfair to these folks
5   and you and say my deposition is first and they're
6   second --
7        THE COURT:  When is your dep scheduled for?
8        MR. EGDORF:  We haven't scheduled it.  I have
9   asked for it, and I haven't gotten a response, and what
10  I have been told in Texas is we're going to see what
11  the New Jersey judge has to say about your deposition
12  in Texas and then we'll get back to you.
13        THE COURT:  Maybe Mr. Gilmartin should be
14  done next week so he only has to be done once.
15        MR. EGDORF:  I don't have a problem with
16  that.  I don't want somebody upset with me when I turn
17  around and say I have a trial date and I want to depose
18  him sooner than.  March I'm happy to coordinate with
19  everybody the best we can.
20        MR. SEEGER:  Can I make a recommendation,
21  your Honor?  Can we handle this the way it has already
22  been handled?  I will sit and talk with counsel from
23  Texas.  If they want to participate we can work that
24  out, but I don't hear your ruling to be exclusionary to
25  other judges and other jurisdictions.  I heard you just

1 order his deposition for New Jersey. What happens in
2 other jurisdictions is going to happen there. But as
3 liaison counsel that's part of our role. Let us see
4 what we can coordinate. Maybe he would be happy to
5 come in and ask questions.
6     MR. EGDORF:  All I was trying to say was
7 when they're over here trying to say because I'm bound
8 by it and I don't get to take a different deposition
9 that's the only reason I raised it.
10     MR. SEEGER:  I was going to say on behalf of
11 lawyers not in the room in other jurisdictions their
12 objections in this battle will be fought another day in
13 another court.
14     MR. MAYER:  I just wanted to make my position
15 clear. Mr. Egdorf has made his position clear.
16     MS. SULLIVAN:  But it does highlight the
17 position for abuse here, your Honor. Counsel certainly
18 could come to the March deposition in New Jersey and
19 participate in that instead of trying to burden Merck
20 with a second Texas deposition of Mr. Gilmartin.
21     MR. EGDORF:  I don't have a problem with
22 there being one deposition. If that's what their real
23 concern is it ought to be earlier than March.
24     MR. WEISS:  So the record is clear, your
25 Honor, different states have different procedural and

1 substantive laws, and part of the problems in the past
2 when we tried to cooperate and coordinate a deposition
3 in multi jurisdictions the objections get ridiculous
4 because the burdens of proof are different and the
5 standards of admissibility are different, so I agree
6 this would be a New Jersey deposition, and if they want
7 to ask questions afterwards under Texas law that's
8 fine. But it is different law in Texas. The laws are
9 certainly different than they are in New Jersey,
10 especially with Perez.
11     MR. MAYER:  There are a lot of cases in which
12 depositions have been successfully coordinated. I
13 think Mr. Seeger's proposal on this one is a good one,
14 and I think we should try to work it out.
15     MR. SEEGER:  Let's just try to work it out.
16     THE COURT:  I'm going to focus, again, on
17 this litigation, the first week in March Mr. Gilmartin
18 should advise plaintiffs' counsel through defense
19 counsel of two -- which two days he wants in the first
20 week in March, and two back to back days his deposition
21 is going to be taken in these cases in New Jersey. And
22 if you want to coordinate it to the degree you will
23 tell other counsel that he is being deposed so they can
24 be present and after the New Jersey liaison counsel is
25 done questioning him if they want to question him, too,

1 they should do so at the same time, I don't discourage
2 that at all. I don't mind defense counsel doing that.
3 I'm certainly not going to limit it to just New Jersey
4 counsel, but I am going to have the case done those
5 dates here first with, you know -- and, again, if other
6 judges -- there are other orders other places that's
7 fine.
8     MR. DAVID COHEN:  Excuse me, your Honor, just
9 to avoid letting this pass without word, I don't know
10 whether to assume that the order you're entering now is
11 going to apply equally to counsel with class cases as
12 opposed to mass tort cases and whether you have
13 anything to say about our participation.
14     MR. SEEGER:  Can I deal with this privately?
15 We should meet about this and talk about it. Is that
16 all right?
17     THE COURT:  Yes. I don't foresee that a
18 class case, either for medical monitoring or consumer
19 costs or for third-party payers --
20     MR. DAVID COHEN:  I just don't want to be
21 held to something that I sat in for today. I don't
22 know --
23     MR. SEEGER:  Do you have a case on file here?
24     THE COURT:  He has filed a class action. He
25 has filed a class action case, and he has that class

1 action case, and it is an appropriate question. But I
2 do think what we should do is -- it doesn't seem to me
3 as far as Mr. Gilmartin is concerned, again, that he is
4 going to be asked details about the insurance
5 agreements or the price -- I don't know that he will
6 have decided whether the drug is $80 or $60 or $10.
7 Even he I don't think, as hands on as he was, got to
8 that. I think he was a little more policy level and
9 marketing level than that.
10     MR. BUCHANAN:  To the extent those issues are
11 germane they're germane to the other class action that
12 we're also counsel on, and --
13     THE COURT:  What I suggest is if you want to
14 submit questions to Mr. Seeger in the sense that
15 there's something that you think should be asked that
16 would be important for your action and you feel for
17 some reason Mr. Gilmartin is the right person give them
18 to Mr. Seeger or Mr. -- whoever is taking the dep, and
19 let them look at them and discuss them with you
20 beforehand, and am I going to let you take a second
21 deposition of Mr. Gilmartin? I don't think so, but I'm
22 not ruling in advance, so if the medical monitoring
23 class, same thing, if you have some questions you feel
24 you need to submit give them to liaison counsel, and I
25 am holding you bound as far as to the extent that it

1  certainly is going to be a major factor if you come in

2  and ask me for another dep.  Just as it would be for

3  Mr. Locks or anybody else.  It is going to be a major

4  major, major factor, and I doubt whether he is going to

5  come in twice.

6      MR. BUCHANAN:  We understand, your Honor.

7      THE COURT:  Anything else on that?  You'll

8  submit an order?

9      MR. BUCHANAN:  We will, your Honor.

10      THE COURT:  So that takes care of the

11  Gilmartin issue.  The Verilaw issue you're going to try

12  to deal with counsel about.  The selection issue we

13  have dealt with.  The depositions of other VIOXX

14  people -- or not VIOXX but Merck people who haven't yet

15  been scheduled for December and January, December is

16  over basically.

17      MR. BUCHANAN:  I know Mr. Seeger has to go to

18  another conference --

19      MR. SEEGER:  Would you mind if I excused

20  myself for the record?  Dave is going to take over.

21      MR. BUCHANAN:  Your Honor, there's a number

22  of people --

23      THE COURT:  Nobody insults me if you want to

24  leave to actually eat lunch or something.

25      MR. BUCHANAN:  Your Honor, there's a number

1  of open deposition requests, and I heard from counsel

2  for defense before this hearing, and they provided --

3      THE COURT:  Do you two want to sit down and

4  talk about this?

5      MR. MAYER:  We're making it work, I think.

6      MR. BUCHANAN:  Well, that's not entirely

7  clear, your Honor.  We're still waiting for David

8  Anstice.  He was supposed to be done by the end of

9  December.  We're still waiting for Ed Scolnick.  He was

10  supposed to be done by the end of December.  Peter Kim

11  is a deposition that was to be deferred until this

12  conference, and we don't have a date for that one.  All

13  three of those individuals are senior, admittedly, but

14  very important and central.

15      THE COURT:  Why don't you sit right now with

16  counsel and talk about those.  If they can't give you

17  the exact date of the dep they should give you a

18  deadline by which he will be deposed.

19      MR. BUCHANAN:  That's fine.

20      THE COURT:  And let's have that worked out

21  between you and then we'll come back.  And if I have to

22  make a call I'll make a call.  Is there any other

23  issues that you still have outstanding?

24      MR. FERRARA:  The pro hac issue whether or

25  not if we just file in the ones --

1      THE COURT:  Thank you, counsel.  The pro hac,

2  it is creating -- again, for the people who work

3  downstairs, when someone is admitted pro hoc I have

4  been allowing a lot of pro hacs in.  Everybody

5  basically fits the criteria, and since I have been

6  doing that we have a lot of different ones, and some

7  are admitted in some cases and not in others.  We have

8  entered them in the computer under the main case and

9  what they have been doing now is entering them under

10  each individual case that they say -- I mean, there's

11  an Exhibit A attached -- for defense counsel,

12  obviously, they're admitted for everybody for every

13  case.  Those admitted for the plaintiffs have just been

14  admitted to their Exhibit A list.  It is really

15  burdensome, and I'm just wondering what the point of

16  that is, why we even have to.  Is there a reason why we

17  can't enter them pro hoc in all the cases?

18      MR. MAYER:  For our point we want to know who

19  is representing who.  As long as they put their name on

20  the papers or something so we know they're counsel in

21  that case, once they're pro hocked into the litigation

22  and we have a way of knowing what cases they're in I

23  think we're okay, as opposed to separate admission for

24  purposes of each separate case once they have been

25  admitted once.  Does that make sense?

1      MR. BUCHANAN:  The issue hasn't been clear to

2  us as to what --

3      THE COURT:  What is your issue?  That you

4  want to make sure you're settling with everybody with

5  the right person --

6      MR. MAYER:  There's a lot of reasons why we

7  want to make sure for any particular plaintiff we know

8  which lawyers represent them and which don't, because

9  if there's misconduct we want to know what lawyers are

10  responsible.  If we want to deal with people about a

11  particular case on any issue we want to know who the

12  lawyers are that are representing that plaintiff.  So

13  that's very important to us, and that's something one

14  always knows in litigation is who from a room full of

15  people --

16      MR. PLACITELLA:  If they're not on the

17  complaint we'll file a notice of appearance in that

18  case.

19      MR. MAYER:  And that works.

20      MR. BUCHANAN:  Excuse me one moment.  Your

21  Honor, there is one issue with that, and, frankly, I

22  agree with Mr. Placitella that if we can file a notice

23  of appearance to the extent somebody is appearing in an

24  action that they have not yet filed a pro hac paper in

25  that would work great, except the clerk won't accept a

1  notice of appearance if somebody hasn't filed a pro hac

2  paper, which was a surprise to me.

3       THE COURT:  Because you can't really appear

4  if you're not -- you have to be admitted in New Jersey

5  to file an appearance, I think.  You don't?

6       MR. BUCHANAN:  There's no limitation of doing

7  it on a complaint.

8       MR. PLACITELLA:  Once you're pro hocked in

9  once then you file a notice of appearance in an

10  individual case.

11       MR. BUCHANAN:  We agree with that.

12       MS. SULLIVAN:  That makes sense.

13       MR. WEISS:  Dave and I are trying to separate

14  that and we split the alphabet up to try to keep the

15  list current.  And we'll keep you in the loop, Ted, and

16  we'll try to match the pro hacs --

17       MR. BUCHANAN:  It is a slightly different

18  issue though, I think.

19       THE COURT:  All right.  Keep it the way it

20  is.  If pro hac is filed you attach an exhibit to the

21  cases that that person is going to be in and then after

22  that they'll file an appearance for any case filed

23  thereafter.

24       MR. BUCHANAN:  That they're not on the

25  complaint on.

1       THE COURT:  That they're not on the complaint

2  on that they're involved in.

3       MR. FERRARA:  But if they're on the complaint

4  then the initial pro hac grant will cover them.

5       MR. BUCHANAN:  Yes.  So the simplest solution

6  is for every case you're involved in you're counsel in

7  that case to put your name on the complaint.

8       THE COURT:  That would probably be the

9  easiest thing.

10       MR. BUCHANAN:  Okay.

11       MR. CHARLES COHEN:  Can we put up on Verilaw

12  a chart that people could put their names on?  Is there

13  a high tech way we can do this?

14       THE COURT:  I'm sure you can figure this out

15  for all of us.  Why don't you do that?  I love high

16  tech as long as I don't have to figure it out.  That's

17  good.  What we're going to do -- again, I tried to

18  follow what I thought they were doing in Middlesex.

19  I'm not sure now -- basically I was told that they

20  filed initially where we have this one mass -- I hate

21  to bog everybody down with this minutia, but this is

22  something we have to deal with all the time here.  We

23  took the first docket number and made that the lead

24  case, and we filed all kinds of documents that are for

25  all cases under that.  We have now realized that maybe

1  that's not the best thing to do.  What if that case is

2  either disposed of or dismissed or whatever, so we'll

3  probably create a fake docket number, which I

4  understand Judge Walsh did, and just so you know, we

5  may be switching the documents over and giving you a

6  new docket number, and the only reason we will do that,

7  and we're not going to do it today, but the only reason

8  we're doing that is just management purposes of keeping

9  the VIOXX filings that are for all cases under a docket

10  number and then --

11       MR. BUCHANAN:  They can't be filed under the

12  MT number, under the mass tort number?  That doesn't

13  track your system here?

14       THE COURT:  That's the goal.  We may have to

15  assign it a docket number.  Yes.  That's what we want

16  to do, but that's not what's happening.  Everything is

17  being filed under the first.  So whether we can file it

18  under -- the computer is not set up for MT 619.

19       MR. WEISS:  Your Honor, what you could do is

20  take that first docket number and have that complaint

21  refiled with a new docket number and use the old docket

22  number for all the general filings.

23       THE COURT:  All right.

24       MR. WEISS:  You wouldn't have to get a new

25  docket number for the general filing.

1       THE COURT:  I'll talk to the case manager,

2  and since that's one of your complaints maybe we'll

3  see.  It is, obviously, not one that somebody wants to

4  try right away.  Otherwise, it is number one.

5       MR. WEISS:  If it is okay.

6       THE COURT:  It is not a heart attack, so it

7  is not going to be the first one to go.  Oh, it is a

8  heart attack?

9       MR. WEISS:  It is a heart attack.

10       MR. BUCHANAN:  Your Honor, there's a number

11  of other agenda items, I think, on both our agenda and

12  defense agenda.  I think if we talk now in light of

13  what your Honor has done on trial selection and

14  schedule we can hammer through a number of these

15  issues.  If we could have 15 minutes with defense

16  counsel.

17       THE COURT:  Take whatever time you need.

18  I'll be here the rest of the day whenever you're ready

19  or if you're going to tell me you have resolved things.

20       (Break taken.)

21       MR. BUCHANAN:  Okay, your Honor, let's close

22  out the first issue, that was the schedule on -- to

23  apply to the cases to be submitted for your Honor's

24  review.  We have the dates already on the calendar for

25  those submissions.  We're going to meet.  We have

1  proposed some dates back and forth in terms of

2  depositions that will be consistent with the dates your

3  Honor has proposed and expert discovery dates and what

4  not for our own internal use. We're going to try and

5  see if we can't reach an agreement. I think we can,

6  and we'll submit something to your Honor promptly

7  hopefully within a few days.

8      THE COURT: Okay.

9      MR. BUCHANAN: Next issue just to close out

10  the agenda we have some open document production

11  issues. I'm going meet with Mr. Cohen tomorrow, see

12  what we can resolve. Hopefully we'll reach resolution

13  on all those issues. If not, perhaps we can do a

14  telephonic conference with your Honor. Is the court

15  closed next week?

16      THE COURT: Next week I'm actually going to

17  be around Monday, Tuesday and Wednesday. The Court is

18  closed between Christmas and New Year's. We're closed

19  that week and --

20      MR. BUCHANAN: If we have any open issues

21  back and forth on scheduling or document issues --

22      THE COURT: From Thursday afternoon on I

23  won't be able to help you.

24      MS. SULLIVAN: From the defendant's

25  standpoint there were two things. Mr. Buchanan and we

1  have been talking about the Gilmartin deposition, and

2  it may be that we can work out an arrangement that's

3  agreeable to both sides so we would ask that your Honor

4  hold off entering an order to let us negotiate

5  something.

6      MR. BUCHANAN: Your Honor, we're happy to

7  negotiate with them and see if there's something that

8  can work for both of us. I think we'll either have it

9  resolved or not resolved by Monday. So we consent to

10  their request until Monday, your Honor.

11      MS. SULLIVAN: And the second issue, your

12  Honor, is in terms of the scheduling Mr. Mayer and

13  Mr. Buchanan were working very hard to try to come up

14  with a witness schedule.

15      THE COURT: Is this Gilmartin thing to change

16  dates?

17      MR. BUCHANAN: We have --

18      THE COURT: It's just I spent a lot of time

19  on the date thing, and I think I want to keep it there.

20      MR. BUCHANAN: And we didn't want to turn

21  anything upside down. There are a couple of witnesses

22  that are fairly important to plaintiffs from our

23  perspective as a timing matter. I'm trying to work

24  with them to see if I can get those dates which I think

25  I need prior to the time we would have to submit expert

1  reports up front. There's some scheduling issues.

2  There's some other things wrapped in it.

3      THE COURT: Let me know Monday by phone.

4      MR. BUCHANAN: Thank you, your Honor.

5      MS. SULLIVAN: Your Honor, just in terms of

6  practical issues on the schedule Mr. Mayer and

7  Mr. Buchanan were working very hard laying out the

8  schedule for Merck witnesses. We're going to have a

9  new or maybe a new slot of cases, and in terms of

10  working up a new slot of cases in a compressed time

11  frame. We're all agreeable to work very hard at it,

12  but it may be that we come back to you in January for a

13  little more time on that issue.

14      MR. MAYER: With luck we'll work that out.

15      MR. BUCHANAN: I'm sorry, a little more time

16  on what issue, Diane?

17      MS. SULLIVAN: In terms of when the expert

18  deadlines will be. We have a new set of cases that

19  we're getting medical records, taking depositions of

20  treaters, but, hopefully, you and we can work out a

21  schedule consistent with your discussions with

22  Mr. Mayer.

23      MR. BUCHANAN: That's more consistent with

24  where I thought we were. Okay. I think we have an

25  understanding, your Honor. We don't think we need to

1  request additional time at this point. Let's see if we

2  can we can work that out. We'll --

3      THE COURT: I think we're on the track.

4      MR. BUCHANAN: Okay. Final issue, your

5  Honor, a few other issues, we have open case discovery

6  issues, but I think we have agreed amongst counsel,

7  given that we're in the case selection mode with trial

8  cases that the current discovery disputes as it relates

9  to some of the current cases that were arising in

10  connection with them if they were to be trial cases can

11  be deferred until a point in time when the trial cases

12  are actually selected.

13      THE COURT: You can focus on the first trial

14  cases.

15      MR. BUCHANAN: And to that end we have

16  discussed -- there was a January 15 expert discovery

17  date or expert report due date for plaintiffs' first 15

18  cases, and we have agreed to defer that pending the

19  resolution of what cases are trial cases and what cases

20  aren't.

21      THE COURT: Okay.

22      MR. BUCHANAN: I think that's it.

23      MR. MAYER: That's wrapped up in our

24  discussion of what's a reasonable schedule to get done

25  fast, given the new cases and so on. So the expert

```
1    dates will have to change as part of that, yes.  We
2    have agreed that you don't have to aim for January
3    15th.
4             MR. BUCHANAN:  I think we all understand that
5    wouldn't be feasible.
6             THE COURT:  All right.  We'll go off the
7    record.
8             (Discussion off the record.)
9             THE COURT:  All right.  Okay.
10            MR. BUCHANAN:  One other issue.  The FACTS
11   database.
12            MR. CHARLES COHEN:  I'm putting the database
13   stuff in our meeting.
14            MR. BUCHANAN:  I was going to say that the
15   open issue we left last week was the FACTS database.
16   Your Honor so thoroughly combed it I guess plaintiffs
17   need more clarification than you did from counsel, so
18   we're going to meet --
19            THE COURT:  I didn't really understand what I
20   was doing. I was just giving a preliminary, this looks
21   like this, this looks like that.
22            MR. CHARLES COHEN:  It was pretty effective.
23            THE COURT:  But I don't think it is going to
24   be that easy to resolve probably.  It will probably be
25   very easy to resolve, just easy for him to understand
```

117

```
1    what you have got.  All right.  See you.  We'll hear
2    from you Monday on the Gilmartin order?
3             MR. BUCHANAN:  We'll advise you by Monday.
4             MS. SULLIVAN:  Thank you, your Honor.
5             (End of proceedings.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Court Hearing
                    C E R T I F I C A T I O N
         I, REGINA A. TELL, C.S.R., C.R.R., License Number
   30X100161000, an Official Court Reporter in and for the
   State of New Jersey, do hereby certify the foregoing to
   be prepared in full compliance with the current
   Transcript Format for Judicial Proceedings and is a
   true and accurate compressed transcript to the best of
   my knowledge and ability.
                    _____ 12-22-04
                    Regina A. Tell, CSR-CRR
                    Official Court Reporter
                    Atlantic County Courthouse
                    Mays Landing, New Jersey

DAVID BUCHANAN, ESQUIRE
MATTHEW J. MAIORANA, ESQUIRE
SEEGER, WEISS
ATTORNEYS FOR THE PLAINTIFFS
DAVID JACOBY, ESQUIRE
GREGORY S. SPIZER, ESQUIRE
SOL H. WEISS, ESQUIRE
ANAPOL, SCHWARTZ, WEISS, COHAN, FELDMAN & SMALLEY
ATTORNEYS FOR THE PLAINTIFFS
LEE BALEFSKY, ESQUIRE
KLINE & SPECTER
ATTORNEYS FOR THE PLAINTIFFS
              *       *       *       *       *

                REGINA A. TELL, CSR-CRR
                OFFICIAL COURT REPORTER
                1201 BACHARACH BOULEVARD
                ATLANTIC CITY, NJ  08401

Court Hearing
EDWARD G. D'ALESSANDRO, JR., ESQUIRE
D'ALESSANDRO, JACOVINO & GERSON
ATTORNEY FOR THE PLAINTIFFS
NAVAN WARD, JR., ESQUIRE
SCOTT LEVENSTEN, ESQUIRE
BEASLEY, ALLEN, CROW, METHVIN, PORTIS, MILES, P.C.
ATTORNEY FOR THE PLAINTIFFS
ELIZABETH J. CABRASER, ESQUIRE
PAULINA DO AMARAL, ESQUIRE
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
ATTORNEY FOR THE PLAINTIFFS
ESTHER BEREZOFSKY, ESQUIRE
WILLIAMS, CUKER & BEREZOFSKY
ATTORNEY FOR THE PLAINTIFFS
SUSANNE SCOVERN, ESQUIRE
ALEXANDER, HAWES & AUDET
ATTORNEY FOR THE PLAINTIFFS
TERRENCE SMITH, ESQUIRE
DAVIS, SAPERSTEIN & SALOMON, P.C.
ATTORNEY FOR THE PLAINTIFFS
DAVID J. COHEN, ESQUIRE
SPECTOR, ROSEMAN & KODROFF, P.C.
ATTORNEY FOR THE PLAINTIFFS
RICHARD D. MEADOW, ESQUIRE
LANIER & ASSOCIATES, LLC
ATTORNEYS FOR THE PLAINTIFFS
JOSEPH MONACO, ESQUIRE
TRIEF & OLK
ATTORNEY FOR THE PLAINTIFFS
MICHAEL GALPEN, ESQUIRE
GENE LOCKS, ESQUIRE
STEVE KNOWLTON, ESQUIRE
CHRISTINE KLIMCZUK, ESQUIRE
LOCKS LAW FIRM
ATTORNEYS FOR THE PLAINTIFFS
MOSHE MAIMON, ESQUIRE
LEVY, PHILLORS & KONIGSBERG
ATTORNEY FOR THE PLAINTIFFS
Court Hearing
JENNIFER YOUNG, ESQUIRE
SULLIVAN, PASAIN, BLOCK, McGRATH & CAMARO
ATTORNEY FOR THE PLAINTIFFS
DANIEL J. FETTERMAN, ESQUIRE
KASOWITZ, BENSON, TORRES & FRIEDMAN

1

MICHAEL FERRARA, ESQUIRE
ALEX KRASNITSKY, ESQUIRE
ATTORNEY FOR THE PLAINTIFFS
1        THE COURT:  Stay seated.  We, obviously, have
EDMUND GOLDIS, ESQUIRE
2   too many people, so we have to work on that.  Maybe
ATTORNEYS FOR THE PLAINTIFFS
3   we're going to have to say people whose name begin with
LEVY, ANGSTREICH
4   A, C, and E, we can alternate the alphabet and come to
ROBERT DASSOW, ESQUIRE
5   one meeting then the other people come to another
ATTORNEY FOR THE PLAINTIFFS
6   meeting.  We have to really -- I do want you all to
ALEXANDER, HAWES & AUDET
7   know, and I'm serious about this, you don't need to
CHRISTOPHER M. PLACITELLA, ESQUIRE
8   come to every meeting from my point of view.  I know
ATTORNEY FOR THE PLAINTIFFS
9   some of you -- I feel troubled saying it because I know
SANFORD, WITTELS & HEISLER
10  if I was in your shoes I would probably want to come to
MICHAEL WEINKOWITZ, ESQUIRE
11  every meeting, but if you're not, you know -- you can
ATTORNEY FOR THE PLAINTIFFS
12  get a transcript of the meeting.  You can always buy a
SACKS & WESTON
13  complete copy of what is said.  Very little is said off
Court Hearing
14  the record.  I'm not that funny, so there's very little
GORDON & GORDON
15  humor.  I'm not very good at jokes, so there's not much
JACQUILINE DeCARLO, ESQUIRE
16  humor here, and there is not much entertainment, so if
ATTORNEY FOR THE PLAINTIFFS
17  you feel that, you know, you're coming just because you
WILFRED CORONATO, ESQUIRE
18  want to show that you're concerned and interested you
JENNIFER GRAHAM, ESQUIRE
19  can do the same by reading the transcript and by
ATTORNEYS FOR THE DEFENDANT, MERCK
20  keeping in touch -- I know they won't like to hear
DECHERT, LLP
21  it -- but keeping in touch with liaison counsel,
JEFFREY JUDD, ESQUIRE
22  sending them suggestions of things to address or things
ATTORNEY FOR THE DEFENDANT, MERCK
23  you're concerned about or sending a letter to the Court
24  about things you're concerned about.  I'm not saying
25  you can't come.  I'm not going to preclude people at

2

1   this point.  Obviously, I couldn't or I wouldn't.
2        All right.  Let's proceed with the issues.
3   Let's start with depositions.  Do we have a schedule of
4   depositions?
5        MR. BUCHANAN:  We have a number of them
6   scheduled, your Honor.  We had about 20 witnesses that
7   we were pending dates on.  We have plugged dates in for
8   several of those witnesses.  The calendar for the rest
9   of the month just for the Court's benefit and everyone
10  in the room, since we're all here, we have Wendy Dixon
11  on the 19th.  We have a continuation of a witness Simon
12  on the 19th.  We have Jennifer Ng, N-G, on for the
13  21st.  We have Deborah Shapiro on for the 25th.  We
14  have Elliott Barr on for the 28th.
15       Defendants previously had given us a witness
16  for the 31st that we need to reschedule.  There are
17  several set in February, a few in March, several that
18  we have requested, particularly senior people, we
19  continue to await dates on.  And we're looking for some
20  guidance, and Mr. Seeger is prepared to address that.
21       THE COURT:  All right.  Okay.  Who do you
22  need?
23       MR. SEEGER:  Well, here's the way it is
24  laying out, and because we have a discovery cutoff in
25  April, and what we would like to do is have David

3

1   Anstice, who is the head of marketing by mid February.
2   That --
3        THE COURT:  Is that a problem?
4        MS. SULLIVAN:  Your Honor, we have -- Mr.
5   Mayer is actually outside talking now.  We have
6   given -- as Mr. Buchanan knows we have given dates.
7   They have taken more than a dozen Merck
8   depositions.  They have got 15 now on calendar for
9   January and February.  There's only a handful left that
10  we're working very hard on scheduling.  Mr. Anstice was
11  one that was particularly difficult because he is an
12  international -- and I think Mr. Mayer is about to
13  confirm some dates.  It may not be in February, it may
14  be early March, but we're working hard on getting dates
15  for the remaining handful of witnesses, and Mr. Mayer
16  can report when he gets back, but we have been working
17  hard and have provided dates in addition to the more
18  than dozen of them have been scheduled have given dates
19  for 16 additional witnesses for January and
20  February.  A couple had to be moved because of
21  scheduling issues on their end, which happens, but I
22  think that we have been working pretty hard to get
23  witnesses.
24       MR. SEEGER:  I wasn't disputing that I was
25  responding to what we need to get the case ready by the

4

Transcript - Monthly Status Conference (2005/01/13)

1   end of April.  Anstice any time in February, I think I
2   suggested mid February before the end of February would
3   be fine.  We would like to do Scolnick, whose name has
4   come up every status conference.  We don't have a date
5   on him.  End of the first week of March we thought
6   would be good because we would like to do Gilmartin and
7   Kim in the middle of March, which, you know last time
8   we argued this I think the Court was ready to ask the
9   defendant to produce him the first week in March, but
10  we have agreed to give them some breathing room on
11  that.  But we have a lot of slots open in February, and
12  we would like to use February and March as months to
13  really get the case done.
14          THE COURT:  What do plaintiffs need -- do you
15  need all these deps before you do your expert reports?
16          MR. SEEGER:  Well --
17          MR. BUCHANAN:  We're trying to get -- we have
18  identified those we need prior to our expert reports.
19  That's what we have been trying to work with the
20  defense on, and more importantly, your Honor, or as
21  importantly, we have about 45 days left in the
22  discovery schedule on the first trial cases as of mid
23  March.  I anticipate that some of these witnesses we're
24  talking about in the first and second week in March may
25  lead to some supplemental clean-up deps, and we just

Transcript - Monthly Status Conference (2005/01/13)

1   think the defense agrees.
2           MS. SULLIVAN:  Your Honor, on the issue of
3   the scheduling, and Merck's been working very hard,
4   plaintiffs have been working very hard, but, as you
5   know, we have changed the cases that are being worked
6   up from the first wave of 15 to now a new set of five,
7   and the defendants -- the plaintiffs want a discovery
8   cutoff of March 30th, which would leave only two and a
9   half months to work up those cases.  Some of those
10  cases we don't have medical records.  We just got
11  authorizations from the plaintiffs in one, so we'll
12  work very hard to get the records.  It usually takes a
13  couple of weeks.  You know, you're subject to the
14  treating physicians in terms of getting records.
15          We also are subject to treating physicians'
16  schedules in terms of depositions, so the defendants
17  are prepared to work very, very hard to work up these
18  cases, but a two and a half month time frame to do it
19  in light of the medical records collection, the
20  treating doctors' schedules may be very difficult to
21  do.
22          Your Honor had already set an expedited
23  schedule for the first wave of cases that contemplated
24  about five and a half months, which was tough, but two
25  and a half months is really going to be tough, but

Transcript - Monthly Status Conference (2005/01/13)

1   need some time built into the schedule to allow for
2   that.  That's why we're going to mid March beyond and
3   don't really want to go any further than that.
4           The thing that's happening, though, your
5   Honor, is that I realize the most senior people have
6   the greatest scheduling issues, but the most senior
7   people are also those that we're not getting dates for.
8   And these are not witnesses that have been newly
9   requested.  Anstice, Gilmartin, Kim are witnesses that
10  you have heard about from conference to conference.
11  They are witnesses we have yet to receive dates for.
12  Many of these witnesses we asked for back in August.
13  We understand they're trying to work through a couple
14  of issues.  It is just incomprehensible to me that a
15  guy who has been traveling overseas has not come home
16  in four months.
17          MR. SEEGER:  There are a couple witnesses
18  with regard to expert reports we were going to propose
19  some time in February; Watson Morris and Neese (ph) we
20  had a scheduling problem with Neese (ph), but they're
21  accommodating us by moving that to the end of February.
22  But these are with regard to getting expert reports
23  done and out to the defendant by the beginning of
24  April, which is what we agreed to do, April 1st.
25          MR. BUCHANAN:  That's our proposal.  I don't

Transcript - Monthly Status Conference (2005/01/13)

1   we'll do our best to try to get it done, but it may be
2   that we need a couple weeks on the end of that to
3   finish fact discovery though.
4           MR. BUCHANAN:  Your Honor, just one
5   observation there, if you recall in the December
6   conference the proposal that was put on the record at
7   the last conference was each side would submit 15
8   cases.  Each side would have three strikes that could
9   be used against the other list then we would meet with
10  your Honor to discuss an appropriate way  of grouping
11  cases for trial.  After we had that conversation Miss
12  Sullivan made an argument for an extension on the
13  schedule.  Advocated quite forcefully that she should
14  get in breathing room then we were talking about
15  working up simultaneously 24 cases but advocated
16  forcefully for an extended discovery schedule beyond
17  what was then in effect, and I think it was April 1
18  going into the last conference.
19          Your Honor agreed to a global discovery
20  cutoff of April 30 at that point in time.  That is, in
21  fact, three and a half months.
22          MS. SULLIVAN:  That's not for fact discovery,
23  though, that includes the expert discovery.  That would
24  be a fact discovery cutoff of March 30th, which is
25  essentially two and a half months, which is tough,

1    Judge.

2         MR. BUCHANAN:  What we discussed is

3    plaintiffs would serve their expert reports by the

4    first of April.  The defendants would have 30 days

5    after that to serve their expert reports.  They could

6    continue if they needed to take fact discovery of

7    plaintiffs' physicians, whomever they think is

8    relevant, in that intervening 30-day period of time

9    after they have received our expert reports.

10        They do have a three and a half month period

11   of time to take discovery pertinent to their expert

12   work-up.  We have not agreed in any respect to or not

13   required that fact discovery be cut off as of April 1st

14   as of the date we submit our expert reports.  In fact,

15   we anticipate there will be some cleanup discovery

16   going on in April, and we anticipate they would be

17   using that time period to do it, as well.  They have

18   three and a half months for five cases.

19        MS. SULLIVAN:  The issue, your Honor, and

20   we're committed to working very hard to get it done is

21   it is difficult to serve expert reports when you don't

22   have treating doctors done yet.  Certainly, your

23   experts are going to want to hear and see some of that

24   key testimony before they serve their expert reports,

25   so these are important cases.  They may be one of the

1         MR. MAYER:  Okay.

2         MR. SEEGER:  And Kim before Gilmartin

3    preferably.  So if you can get us Anstice and Scolnick

4    in the first week, week and a half of March, Kim right

5    after that and Gilmartin the middle of March, I think

6    we could reach an agreement on that.

7         THE COURT:  All right.  This is what we're

8    going to do.  I had looked at -- we have been shooting

9    for this April end date all along.  It is a date that I

10   set a long, long time ago.  It is not a new date.  It

11   was an ambitious date, and it was I think a realistic

12   date to some degree, but that doesn't mean that we

13   didn't recognize there would probably wind up at the

14   end, as there always does, a crunch and people would

15   need more time to do things.

16        I don't want to just sit here with a

17   management order now that's outdated, so I want to

18   today put some new time frames down that make a little

19   more sense, and I recognize that we have to work up

20   these-- that defense counsel has to work up these five

21   cases by taking plaintiffs' doctors and the plaintiffs.

22   And I also recognize that plaintiffs want to move as

23   quickly as possible.  Defendants -- as I said before

24   plaintiffs want to move until they get to trial, and

25   defendants want to move -- everybody wants to move

1    first ones to go to trial across the country, and we're

2    just looking for -- we understand the Court wants an

3    expedited schedule, but a schedule that's workable in

4    order to get everything done in the time frame we need

5    to get it done.

6         THE COURT:  What have you found out about the

7    dep dates?

8         MR. MAYER:  I found out that for Dr. Kim and

9    Mr. Anstice several dates today.

10        MR. BUCHANAN:  When are we looking at for

11   them?

12        MR. MAYER:  They'll be in March.

13        MR. SEEGER:  Anstice in March?

14        MR. MAYER:  Yes.  They'll be in March.

15        THE COURT:  First week in March?

16        MR. MAYER:  I think it -- I don't think it

17   will be the first week.  Well, the first week is like

18   March 4th, so I don't think it will be that week.  I'm

19   hoping it will be the week -- the first full week.

20        MR. SEEGER:  If we could figure out like a

21   schedule that would sort of -- we could work out with

22   Kim, Anstice, Scolnick and Gilmartin I know we have to

23   weave everybody else in there.  I mean, for example, we

24   would like to take Anstice and Scolnick before

25   Gilmartin and Kim.

1    supposedly at different times.  I know everybody is

2    operating in good faith.

3         Now, what I want to do is extend some times

4    but realistic times, but keeping pressure on because I

5    get the impression, and I could be wrong, but I get the

6    impression that the top people at Merck don't want to

7    be deposed ever, and I understand that, but bottom line

8    is they're going to have to be deposed, and they're

9    going to have to be deposed soon.  So I am telling you

10   I don't care when they want to be deposed, they are

11   being ordered that they have to appear for depositions

12   in this case in March, and they have to appear in the

13   order that plaintiffs have requested them.  That's

14   Anstice, Scolnick, Kim and Gilmartin.  And all four of

15   them have got to be produced and deposed before the end

16   of March.

17        I don't care whether you want to give them

18   the last four days in March, four days in a row or six

19   days in a row or if you want to give them the first

20   week, second week, third week or whatever, but I'm

21   telling defense counsel you're to instruct your clients

22   that these four people are going to be deposed in

23   March, and they should give us the Court and counsel

24   the dates or I'll just pick arbitrary dates, and

25   they'll have to come on those days.  I don't want to do

1  that.  I prefer they get some choice.  We talked about
2  a two-day schedule for Gilmartin.  Do we need two day
3  schedules for everybody else?  And I don't expect their
4  deps should take more than one day, but you're going to
5  cross-notice them or whatever you're going to do.
6       MR. BUCHANAN:  I suspect they will be heavily
7  cross-noticed by the defense, your Honor.
8       MR. SEEGER:  And as we have always done, and
9  we don't bind ourselves to do this, but as we have done
10 in every deposition we are trying to coordinate with
11 people from other states that want time.  There's one
12 office in Texas that felt they wanted to come and
13 attend, and if they wanted to ask their own questions
14 at the end they would have their ability to do that.
15 So there is the possibility it could go into a second
16 day.
17      MR. MAYER:  And we plan on cross-noticing.
18      MR. SEEGER:  But we will try to work out.
19      THE COURT:  So I would suggest it would make
20 sense to have each of these people scheduled for a
21 two-day period of time.  Each of them, and hopefully
22 plaintiffs in this case could finish with them in one
23 day or less, and maybe the whole thing will only take
24 one day hopefully, but I think the way to schedule them
25 is to allow each of them to have two days.

13

1       MR. BUCHANAN:  There's one more witness that
2  probable fits, and her name is Elise Rison, and she is
3  on the schedule for the first week in March.  I suspect
4  that she will be somebody that there will be multiple
5  people in attendance, and there should be a second day
6  involved.
7       THE COURT:  I'm leaving it up to defense
8  counsel to leave up to their people.  I don't care if
9  you want to choose a Saturday or Sunday or a Monday or
10 Tuesday, but it is to their convenience, but it is to
11 their convenience in March.
12      MR. SEEGER:  Actually to be truthful a
13 Saturday or a Sunday if that does accommodate their
14 schedule would be fine.  We would work with them.
15 That's not new to us.
16      MS. SULLIVAN:  As it relates to Gilmartin.
17      THE COURT:  It doesn't have to be because
18 everybody has somebody that doesn't want them to be
19 working Saturday and Sunday, even if it is just their
20 dog or cat or somebody.  If you can try to make it
21 Monday through Friday.
22      MR. SEEGER:  Fewer people show up.
23      THE COURT:  I'm not one of those people
24 that's impressed by everybody saying they worked until
25 midnight.  I'm not saying you have to, but whatever.

14

1  Let's just get this done.  The deps have to be done.
2  They have no choice.  I recognize that the discovery
3  fact deadlines are basically for me at this point.  I
4  think that fact discovery deadlines for this basic
5  discovery, although there may be supplemental, I'm not
6  saying you can't take any fact discovery, but to
7  complete the depositions of these five plaintiffs,
8  their five doctors and the defense depositions we
9  should have basically a March 30 cutoff.  And that's
10 not the expert reports that I'm assuming after that
11 they have time for expert reports because they're going
12 to have to use their doctors, also.  What do you
13 need -- we're talking about five deps.
14      MS. SULLIVAN:  Well, your Honor, I'm sorry,
15 if your Honor is talking about plaintiff deps that's
16 plenty of time, but if you're talking about getting the
17 treating doctors done by March 30th some of that is
18 dependent upon when we get the records from the
19 doctors, and in a couple of cases we don't have all the
20 medical records.  One, we have none of the medical
21 records yet.  We just got the authorizations yesterday
22 , so we'll work hard to gather the records, but it
23 takes a couple of weeks to get the records from the
24 doctors and so for the treating doctors the end of
25 April would be an expedited but reasonable cutoff time

15

1  to try to get those done.
2       MR. SEEGER:  Wouldn't it make sense if four
3  cases are ready to go in March we work those up in
4  March, and we have one case that has to spill over a
5  week or two.  Why would we push everything back?  It
6  is -- there's a lot of work to be done.  Let's try to
7  complete it all in March.
8       MS. SULLIVAN:  We decided in these five cases
9  to be the representative ones that the Court will
10 select which trials go first, so they should be worked
11 up contemporaneously, and we shouldn't be prejudiced
12 because we don't have authorizations so they can jockey
13 which ones come first.
14      THE COURT:  Somebody better get
15 authorizations to them today or tomorrow.
16      MR. BUCHANAN:  There is one issue on that,
17 and I'm sorry, the case Miss Sullivan is referring to
18 is a case she proposed and that she picked.
19      MS. SULLIVAN:  You picked it off our list,
20 actually.
21      MR. BUCHANAN:  You were given a list of a
22 range of cases, and you chose it.  Your Honor, I mean,
23 this seems like a vehicle for an extension.  If it
24 needs to spill over until past March that's fine, but
25 it is a case that she chose in the end, and now she is

16

1  complaining about the adequacy of the records.  We
2  didn't hear any of that last week when we were sitting
3  here talking.
4      MR. CORONATO:  That wasn't supposed to be
5  part of the criteria, whether or not we had
6  authorizations.
7      THE COURT:  It wasn't.
8      MR. CORONATO:  It wasn't.  So I don't
9  understand --
10     MR. SEEGER:  Judge, frankly --
11     THE COURT:  How long after the treating
12 doctors' deps do you need to get your expert reports?
13     MR. BUCHANAN:  Plaintiffs are prepared to
14 provide their case specific expert reports by the end
15 of March.
16     MS. SULLIVAN:  But they're in a better
17 position, your Honor, they can talk to the treating
18 physicians ex-parte.  We are barred from that.  We need
19 to take depositions, so our experts can get the same
20 information.
21     MR. BUCHANAN:  They have 30 days after ours
22 to provide the expert reports.
23     MS. SULLIVAN:  The problem is, your Honor,
24 just to make sure we have a schedule that's expedited
25 and reasonable it is going to be almost impossible to

1  take all of the treating -- to get all the records and
2  take all of the treating doctors in two and a half
3  months.  I think what is doable, although tight, if we
4  can get the treating doctor deposition fact cutoff by
5  the end of April.
6      THE COURT:  All right.  By the end of
7  March -- who is going to prepare an order?
8      MR. BUCHANAN:  We will, your Honor.
9      THE COURT:  It should include the fact of
10 these three -- the four people having to be -- first of
11 all, include the deps you already have scheduled in the
12 order then I want you to include these four people that
13 we talked about, four top people, and the fact that
14 they have to make themselves available during March for
15 two-day periods of time in that order.  The dates to be
16 chosen by them by -- how long will it take you to
17 choose the dates by February 1st?  To advise them of
18 the dates of those deps.
19     MR. MAYER:  Yes.
20     THE COURT:  By February 1st they'll tell you
21 when those dates will be.  If you want any language in
22 about cross-noticing tell them what language you want
23 in the order, and they'll put it in.
24     MS. SULLIVAN:  And your Honor was good enough
25 in connection with Mr. Gilmartin because he is the CEO

1  to allow the defendants to come back to you with some
2  conditions that you consider for in terms of his
3  deposition.
4      MR. SEEGER:  What were those?
5      THE COURT:  You don't have them yet?
6      MS. SULLIVAN:  I have some ideas, your Honor.
7  One of the things that happened --
8      THE COURT:  He can have ice water?
9      MS. SULLIVAN:  One obvious thing, as the CEO
10 we expect -- we hope not, but we expect there will be a
11 lot of posturing from plaintiffs' lawyers so we would
12 like to limit the number of questioners to two and that
13 everybody can feed their questions to those folks.
14     THE COURT:  I thought we were going to limit
15 it to one liaison counsel.
16     MR. BUCHANAN:  Two.
17     MR. JACOBY:  I thought that was resolved at
18 the last --
19     MR. SEEGER:  We're fine with two questioners
20 from New Jersey.  I mean, they're going to cross-notice
21 to other states.  We can't -- we can't limit Texans.
22     MS. SULLIVAN:  You need two questioners from
23 New Jersey.
24     MR. SEEGER:  There will probably be one from
25 New Jersey.

1      THE COURT:  There should be one.  I mean, two
2  can sit there.  Obviously, you can sit there and talk
3  to each other and take breaks and discuss it maybe four
4  or five of you there, but I don't see why you switch
5  questioners.
6      MR. SEEGER:  The only reason I left that open
7  is to the extent other lawyers say okay you can ask our
8  questions or they wanted us to sort of do something for
9  them, but the bottom line is just going to be one
10 questioner from New Jersey.  The only reason to add a
11 second one is if another lawyer said I don't have to
12 show up and take the deposition make sure you please
13 cover these areas.  But I don't want to commit to that
14 at this point.  It was something we were trying to do
15 informally, but we'll go with one questioner from New
16 Jersey.
17     THE COURT:  Now, whether that's going to
18 satisfy people from out of state that they have had a
19 chance to take the deposition or not is not -- not from
20 out of state but from litigation that's not in my
21 court, I mean, we're talking about New Jersey, we're
22 not talking about the state -- we're talking about the
23 New Jersey litigation.  It is not my problem, I guess,
24 so if they, therefore, said they didn't have the
25 opportunity to ask questions that's really your

1  problem, not mine.

2       MS. SULLIVAN:  Understood, your Honor.

3       MR. MAYER:  We'll work with them, and we

4  understand that the plaintiffs will also work in good

5  faith to try to limit the number of questioners and

6  help us to limit any waste of time by anybody in this

7  process.

8       MR. BUCHANAN:  Just to give you context in

9  some cases in New Jersey why we have had two examiners.

10  Sometimes there's a discovery dep that's taken up front

11  followed by a trial examination after that.  So then we

12  have something, you know, in the can for trials.  I

13  don't know if they plan on bringing Mr. Gilmartin to

14  trials or whether he will be available for trials, but

15  we try to have something locked in the can for trials

16  that follows a discovery deposition.  That's certainly

17  what we envisioned doing with two examiners from New

18  Jersey.  I know Mr. Seeger referred to also vetting

19  other questions through a second examiner, but we are

20  going to have another status conference before we have

21  to do some Gilmartin's deposition, and, perhaps, we can

22  speak to defense counsel and reach an agreement on it.

23       THE COURT:  This is the first time it has

24  been mentioned.  You're talking about taking a

25  discovery dep and immediately following it with a trial

21

---

1       MR. BUCHANAN:  Can we address this at the

2  next conference?  I think this is very unusual in my

3  experience with CEO depositions, and it hasn't been

4  done in the last pharmaceutical deps that I am familiar

5  with.  I don't know why we would be tipping our hand in

6  terms of to be useful it would have to be very

7  specific, and if it was very useful in that respect

8  then it would be really revealing our hand.

9       MR. SEEGER:  If we are asking him questions

10  that go far afield of this case they'll be on the phone

11  to you so quickly.  But what Mr. Gilmartin has

12  testified to he has given a lot of press conferences,

13  he has talked a lot about the drug.  He has given

14  presentations to the board.  That's the stuff we're

15  interested in.  We're interested in his involvement in

16  this drug and what he knew and what he didn't know and

17  when he knew it.  That's not -- I don't think there's

18  any real magic to this.  So to handcuff and have us

19  write up what the questions are going to be or the

20  topic areas I don't think that makes lot of sense.

21       I don't think, you know, to start off the

22  concerns which there's an expectation there will be

23  posturing at this deposition I don't think is fair.  I

24  don't think there's been posturing in any deposition to

25  date.  Is he going to be asked tough questions?  Yes.

23

---

1  dep?

2       MR. BUCHANAN:  Trial preservation after.

3       THE COURT:  That may be something he wants to

4  do.

5       MS. SULLIVAN:  I'm not sure why the same

6  lawyer can't do both, but we can talk about it.

7       THE COURT:  It doesn't have to be the same

8  lawyer for that.

9       MR. WEISS:  That's the reason so the person

10  doing the trial preservation can concentrate on that

11  portion and not worry about the discovery.

12       MS. SULLIVAN:  The other issue, your Honor,

13  we haven't asked for this of the other witnesses, but

14  he is special in light of his myriad of other

15  responsibilities and to narrow the time away from his

16  company duties in terms of preparation for this

17  deposition, we would ask that the plaintiffs just give

18  us a list of the subject matters they intend to cover

19  with him, so he can focus his preparation.

20       MR. SEEGER:  That was a good one.

21       MS. SULLIVAN:  It is not uncommon in CEO

22  depositions, and we're happy to brief it, if the Court

23  wants -- and in order to limit the time away from the

24  company -- that he can focus his preparation on the

25  subject area that they're interested in.

22

---

1       MS. SULLIVAN:  To sort of --

2       THE COURT:  For Mr. Gilmartin for the next

3  management conference see if you can give me a list of

4  things that you would ask, whatever those things are

5  that he and you are concerned about that you would like

6  to ask as accommodations for him and then send it with

7  your agenda to plaintiffs' counsel.  They may agree to

8  some of them or not, and we'll discuss it at the next

9  management conference.

10       MR. BUCHANAN:  Fair enough.

11       MS. SULLIVAN:  Thank you.

12       THE COURT:  As far as dates are concerned we

13  have gotten up to the end of March.  April 1st you're

14  going to provide -- by the end of March they should

15  have taken all the plaintiffs' depositions, and,

16  hopefully, they will have started the treaters'

17  depositions.  They'll have until the end of April to

18  complete the treaters' depositions April 30th, which is

19  what they requested.

20       MS. SULLIVAN:  Thank you, your Honor.

21       THE COURT:  If you provide your expert

22  reports on April 1st, obviously, you can supplement

23  them after the treaters' deps if you need to, but your

24  initial reports will be provided by April 1st.

25       MR. WEISS:  Yes, your Honor.

24

1    THE COURT:  And your expert reports should be

2  provided, I'm thinking, by May 30th.

3    MS. SULLIVAN:  May 30th is fine.  Thank you,

4  your Honor.

5    THE COURT:  Then deps of the experts should

6  take place in June.  I'm looking now really at -- this

7  is a realistic now I'm looking at mid June or the end

8  of June to actually start preliminary hearings and

9  trials, okay?

10    MR. BUCHANAN:  Your Honor, then in --

11    THE COURT:  I'm trying to now regroup and see

12  where we are.  I think that's realistic.

13    MR. BUCHANAN:  In light of the timing for the

14  treater depositions going through April rather than

15  having our case specific experts supplement I would ask

16  that we stagger this with the same 30-day window we

17  talked about; if the defendants have until the end of

18  May allow us until the end of April to provide our

19  expert reports.  They'll then have 30 days to respond

20  to our expert reports.  That's what we have been

21  talking about.

22    MS. SULLIVAN:  For case specific experts

23  that's fine.  There's no reason that the generic

24  experts can't be served on April 1st.

25    MR. BUCHANAN:  We can work with that.  If we

1  need to raise it we'll raise it at the next management

2  conference.

3    MR. WEISS:  You would supply your generic

4  expert reports by the end of May?

5    MS. SULLIVAN:  May 30.

6    MR. WEISS:  No.  April 30.  If we're giving

7  ours April 1st you have to give yours April 30th.

8    MR. CORONATO:  I thought the Judge said

9  April 1st for plaintiff's expert reports and

10  May 30th --

11    MR. WEISS:  That was case specific experts.

12    MR. BUCHANAN:  We will contemplate 30 days

13  for the exchange of expert reports, your Honor.

14  Whenever their are going to be due we would like to

15  serve ours 30 days before then.

16    MS. SULLIVAN:  And they may be experts, but

17  in terms of generics you folks know what your cases are

18  about because you have been talking to the treaters and

19  you have their records.  We have to take the

20  depositions to know what generics are going to be

21  applicable to these specific cases, your Honor, so it

22  is reasonable to have more time on the defense side on

23  the generics and the case specifics.

24    MR. BUCHANAN:  I don't fault Miss Sullivan to

25  looking for a tactical advantage in terms of timing,

1  but I call it what it is.  We talked about having 30

2  days in between the exchange of defense and plaintiffs'

3  reports.  I understand your Honor is willing to give

4  them additional time to develop the case specific side

5  of the case and take some of the pressure off in that

6  respect.  We just ask, your Honor, that we be provided

7  the same courtesy in terms of using that window of time

8  to confirm those expert reports in April.  We'll file

9  them by the end of April, and they can have until the

10  end of May.  It is the same window we talked about all

11  along.

12    MR. WEISS:  And then, your Honor, they would

13  take our generic experts depositions in May after they

14  have served us with their generic reports.

15    MS. SULLIVAN:  The Court was talking about

16  June for expert discovery, which is reasonable.

17    MR. WEISS:  We get your reports on May 30 how

18  reasonable is taking the deposition in June?  If you're

19  waiting until May 30 to give us your reports on generic

20  issues, as well as case specific issues, that's not

21  really doable.

22    MS. SULLIVAN:  Why not?

23    MR. WEISS:  Because you have had two months

24  in which to focus on generics, our generic experts, and

25  we have to turn around and do everybody on your side in

1  a two-week window.

2    MS. SULLIVAN:  No.

3    MR. WEISS:  Sure.

4    MS. SULLIVAN:  The judge has given you June

5  for expert discovery.  I believe that's what the Court

6  said.  That's reasonable, Sol.  You have the month of

7  June for expert depositions.

8    MR. BUCHANAN:  Your Honor, I think Mr. Weiss

9  raises a good point in terms of the depositions if they

10  do what is often done in these cases, and I'm familiar

11  with some of their expert disclosures in other

12  litigations and serve 10 expert reports, the

13  possibilities of -- 10 generic expert reports.

14    MS. SULLIVAN:  You're not going to see that

15  here.

16    THE COURT:  You have the 60 days.

17    MS. SULLIVAN:  Thank you, your Honor.

18    THE COURT:  I would ask you in good faith

19  when you have an expert report send it.  I don't want

20  the plaintiffs to see expert reports dated May 1st sent

21  to them all together and May 15th sent to them with the

22  May 30 reports.  If you have reports done May 1st send

23  them to them May 1st, and, hopefully, you can send them

24  generic reports earlier.

25    Again, I'm relying on the good faith of

1   counsel to send them the reports when you have them and

2   try not to wait until the last minute to send all the

3   reports.

4        MS. SULLIVAN:  So consistent with the Court,

5   your Honor --

6        THE COURT:  So your deadline is May 30th.

7   We're going to be having other conferences, so we'll go

8   into that when we'll schedule the expert deps and

9   things, but we're basically saying there's a cutoff of

10  everything now we have moved it from April 30th to June

11  30th, but I think that's hopefully real.

12       MR. BUCHANAN:  Your Honor, I understand you

13  have adjusted the times.  The one thing I'm in

14  particular concerned about we had put our feet to the

15  fire in terms of getting, you know, trying to get our

16  expert reports done by the end of March.  The one thing

17  I anticipated is that we would have the treaters

18  deposed by the time we were doing -- by the time we

19  were doing our case specific expert reports.  I thought

20  that all would have been in the can by end of March by

21  the prior schedule.  Now we're in a situation --

22       THE COURT:  I thought we gave you staggered

23  dates.

24       MR. BUCHANAN:  Is that what we have done?

25       MS. SULLIVAN:  We have the plaintiffs -- the

1   Judge gave us until March 30th for the plaintiffs.

2        MR. SEEGER:  Generic is April 1?

3        MR. BUCHANAN:  Generic is April 1 and do they

4   have the 60 days for their generics or case specific or

5   are their generics due 30 days after our generics?

6        MR. SEEGER:  It will be 30 in one case and 60

7   in the other.

8        THE COURT:  They get the 60 days, and they're

9   going to stagger them out and send them to you as they

10  get them.

11       MR. SEEGER:  You're saying in response to the

12  generic if we give them our generic reports when will

13  they be due?

14       MR. BUCHANAN:  Whenever they're ready.

15       THE COURT:  They're not going to wait 60

16  days.  They have told me that.  Some of them will come

17  May 30, but they have others that will be there

18  earlier.

19       MS. SULLIVAN:  Agreed, your Honor.

20       THE COURT:  I always trust everybody until

21  they have showed me they can't be trusted.  It hasn't

22  happened yet here.

23       MR. BALDANTE:  I have a suggestion on this.

24  I don't know if it is appropriate for me to speak to

25  this issue, but if the defendants -- I'm John Baldante,

1   your Honor.  If the defendants have experts that

2   they're going to designate even if the reports aren't

3   ready, perhaps, they can forward those CV's by May 1st

4   because the CV's can be helpful to plaintiffs' counsel

5   to prepare for those depositions even if the reports

6   aren't ready.

7        MS. SULLIVAN:  I think they're giving us too

8   much credit, your Honor, in terms of who -- given all

9   the cases around the country in terms of who is

10  available and who is lined up we just -- they're going

11  to give us the CV's with their reports.  We would like

12  to give the CV's with our reports.  Your Honor made

13  clear that May 30 is an outside date, and I'll

14  represent there will be experts that we'll get to them

15  before then.

16       THE COURT:  All right.  Let's keep it this

17  way.  Anything else as far as the scheduling of deps.

18  We have the deps worked out.  We have -- how about

19  these issues of specific fact sheets, have your people

20  worked that out?

21       MR. BUCHANAN:  Yes.  I have advised

22  Miss Sullivan that I think we were called on the carpet

23  erroneously, and I understand there's no problem with

24  the cases.

25       MS. SULLIVAN:  The Seeger, Weiss cases I

1   believe that's you David.  I have an e-mail in, but

2   there's some cases, your Honor, on the list that we'll

3   follow-up with Mr. Spizer to see and Mr. Weiss about

4   additional information.

5        MR. WEISS:  I believe you have information it

6   is the Beasley, Allen cases, and my understanding is

7   they're in transit.

8        MS. SULLIVAN:  In transit, okay.

9        MR. WEISS:  They were mailed in.

10       MR. SPIZER:  That's correct.  In the one case

11  that is not Beasley, Allen it was sent a month and a

12  half ago.

13       MS. SULLIVAN:  How about the Ware case?

14       MR. SPIZER:  That is a Beasley, Allen case,

15  and I think a representative from Beasley, Allen is

16  here, and he will want to speak with you about that

17  afterwards, but my understanding is other than Ware,

18  McKinnon, Chase and Ehrinlear (ph) will be to you by

19  the end of the day tomorrow, and Kirkland was sent to

20  you a month and a half ago.

21       THE COURT:  Generically, so everybody knows,

22  there had been initially some cases that were filed

23  where there were motions to withdraw as counsel, and I

24  pretty much made a ruling early on for those of you who

25  are new in this that -- and let people know that I'm

1  not going to be letting you out once you file and
2  letting someone ride pro se because we cannot in this
3  litigation have pro se litigants. So I mean, obviously,
4  if somebody truly files for themselves pro se then --
5  but I can't imagine anybody doing that. Nobody has
6  yet. Once you file for somebody if they wind up
7  getting their case dismissed because they don't
8  cooperate or they don't assist you or whatever reason
9  or it is dismissed because it is a bad case that's
10 going to happen with them having counsel. Otherwise,
11 we're not going to be able to deal with it so screen
12 your cases before you file them, not after.
13         We haven't -- a technology issue. I'm
14 telling you I'm pleased to say we now have wireless in
15 here, in my courtroom, in the larger courtroom next to
16 it and in the lawyers library -- they say half of the
17 lawyers' library -- and there's a lawyers' conference
18 room across the hall from the courtroom, and they have
19 it there so we have wireless technology. We haven't
20 yet -- I mean so far we have just played with it but
21 hopefully -- it is free. You don't have to sign up to
22 anything or pay anything. It is done by the AOC, but
23 we may have to work the bugs out of it, but it seems to
24 be working. It has been tested, and it is working.
25         MR. SEEGER: Is this going to be the

33

1  the reason I'm saying it is a month or two before a
2  hearing he might want to come up and look at the room
3  with your court people, your tech people and work
4  together, and he is going to be working with our tech
5  people.
6         We have a really great -- we have a woman who
7  is excellent with our tech, too, and she is not an ego
8  person, so she will be happy to work with Dennis, and,
9  hopefully, we will be able to provide you with whatever
10 you need, the highest technology you can muster,
11 because the AOC probably won't go any higher than the
12 wireless, and at least we got that, and I'm happy we
13 did that, and it is a beginning, and we can probably,
14 hopefully, be able to get you any technology you need
15 as much as we can accommodate you, and in the end
16 you're going to have to bring it with you.
17         So if you let me know in advance if any of
18 your tech people want to meet together if you're
19 sharing technology I don't know whether plaintiffs have
20 their technology, defendants have theirs. Obviously, I
21 assume you have to work together to make it work.
22         MS. SULLIVAN: Probably for space we should
23 coordinate.
24         MR. SEEGER: Judge --
25         THE COURT: He will be happy to meet with you

35

1  courtroom where the trial is going to be?
2         THE COURT: It will probably be the one next
3  to it.
4         MR. SEEGER: In terms of us laying out I
5  would like to know that.
6         THE COURT: If you look next door it is the
7  larger courtroom. I'm assuming. I like my own
8  courtroom. If I can do hearings in there I will, but
9  I'm not sure that I can. In anything I need more space
10 for we'll be going next door.
11         MS. SULLIVAN: You want to see where to put
12 your makeup artist for Court TV?
13         THE COURT: Dennis Medwick -- I don't know if
14 some of you know him, but Dennis Medwick is the tech
15 person in Middlesex who worked very closely with Judge
16 Corodemus on her cases, and he is going to be available
17 for all mass tort cases. So what he had indicated to
18 me was we talked by e-mail the other day, and,
19 basically, he will be prepared if we need to -- and I'm
20 really hoping we're going to have some hearings here
21 this summer, and when we get those things going if you
22 want technology and you want things set up or you want
23 to work out things with him we can have meetings in
24 advance with him here or with your tech people here or
25 he can -- you know, he indicated even a month before

34

1  with the tech people.
2         MR. SEEGER: Do you want to talk about now
3  since we have now got a schedule that goes through the
4  end of June are we going to use the month of July now
5  for Rubanick and motions in limine? Do you have any
6  thoughts on how you want to schedule that so we have
7  that laid out?
8         MS. SULLIVAN: That sounds reasonable.
9         THE COURT: Yes. That's what I had planned
10 to do. I'm hoping to start --
11         MR. SEEGER: I would like to start,
12 obviously, they have until June 30th on some of their
13 reports.
14         THE COURT: Not reports. Deps of experts.
15         MR. SEEGER: Dep of experts. We can start --
16 I mean, we would like to keep it tight.
17         MR. BUCHANAN: You know what we can do, your
18 Honor, just in thinking about this we would like to
19 make our case specific experts available to them the
20 first two weeks of June. They're going to make science
21 motions, and you haven't seen them yet. We have seen
22 them in other cases. They tend to be rather large, and
23 if they're going to do that we can have that heard
24 hopefully earlier in July and maybe still start a trial
25 some point in July.

36

1    So we'll try to make our experts available to
2    you in early June and case specific side, and why don't
3    we just see if we can work this out between now and
4    February -- our February conference we have breathing
5    room now.
6        MS. SULLIVAN:  We want a reasonable briefing
7    schedule because they're key issues, but shooting for
8    July to have these things resolved I agree, your Honor.
9        THE COURT:  I really plan on getting these
10   things resolved in July.  We're shooting for April, and
11   now we're extending it but, I don't plan on extending
12   it again.
13       So let's see where we're going.  Anything
14   else we have to address today then?
15       MR. JACOBY:  Judge, if I may, last week out
16   of a pool of 24 cases we selected five to go to trial
17   leaving 19, and we would like you to think about not
18   throwing those 19 cases back into the general
19   population, but making them the next wave of cases and
20   putting them on some sort of -- I don't want to use the
21   word expedited basis, but putting them on a short lease
22   for the backup for the first five that go to trial so
23   we can begin the process of getting those cases ready
24   for whenever the next wave of trials will be.  The
25   number of issues we couldn't cover with the first five

37

1    long-term use, et cetera, et cetera, that these cases
2    do embody, and we need to give some thought to those
3    cases and how we're going to handle them.
4        MS. SULLIVAN:  Here is our thought on that,
5    your Honor, for the Court's consideration is that we
6    both came up with lists of what we thought were
7    representative cases and we -- and I think they thought
8    ours weren't particularly representative, and we
9    thought most of those weren't particularly
10   representative I guess on the one or two that we agreed
11   on.  And so there's no compelling reason to use the
12   group that we both sort of rejected as not being
13   particularly representative as the next set up.  You're
14   better off if you want to just get representative cases
15   going back to the random selection that the Court had
16   set out in its Case Management Orders in terms of
17   filing date.  There's no reason to give these other
18   cases priority to jump over filing dates of other
19   plaintiffs, particularly since both sides have agreed
20   that the rest of them were not particularly
21   representative.
22       I thought that the next step was going to be
23   to handle the stroke cases, which is the next injury
24   category in terms of numbers and to get test cases set
25   up for stroke cases, but in terms of Case Management

38

1    Ordering for work-up of the remaining cases your Honor
2    has made clear you would like those cases not to sit
3    stagnant and be worked up, so our recommendation and
4    thought was we would go back to the system your Honor
5    set forth in her prior Case Management Order where you
6    consistent with a schedule the cases based on filing
7    date.
8        MR. JACOBY:  Your Honor, I don't know that I
9    agree at all that those cases weren't representative.
10   There were a myriad of reasons why they weren't chosen,
11   tactical and otherwise.  They were carefully put
12   together, and a lot of work and effort went into those
13   cases and they are -- and I think, not to argue it
14   here, very representative, and I would hate to see
15   those cases all the work that was done, put into those
16   cases and the analysis of those cases just go to waste
17   and those cases be thrown back into a general
18   population when we have got a running start on them and
19   getting them ready for whatever is going to happen to
20   the first five cases, whatever method of resolution
21   occurs, that there be some immediate backup, and it
22   seems to me they are by far the most logical choice to
23   be the backup.
24       MR. SEEGER:  Actually, there's one practical
25   consideration also, Dave, in addition to what you just

39

1    said.  Both sides agreed they were somewhat
2    representative.  We agreed to those process on the
3    record.  We selected cases through that process and now
4    we have cases left to go.  They can begin discovery on
5    those cases right now and so can we as far as getting
6    the next round getting worked up.
7        Now, the first five may all go and the first
8    five can settle.  Some of them can get dismissed
9    through motions.  There should be cases to move up, and
10   we know those cases.
11       THE COURT:  Well, at this point.
12       MR. LOCKS:  Your Honor, may I be heard at
13   this point?  I'm sorry.  Gene Locks.  Unfortunately, in
14   the cooperative level on which everybody has worked
15   since the last meeting, and it has been cooperative and
16   friendly, this particular subject wasn't discussed or
17   wasn't brought to our attention.  There are a number of
18   us that have post -- what's the deadline 9/30 cases.
19   And they, hopefully, may have had a selection process
20   that is slightly different than the original filings
21   particularly because of the further information that
22   developed, and I don't think that it should be limited
23   in the case selection necessarily to the pre 9/30
24   cases.
25       We haven't had a chance to present, and maybe

40

1   other counsel haven't, that they may have
2   representative cases that may meet some of the criteria
3   that ought to be representative even on post 9/30
4   cases, so before an immediate decision on that is done
5   I would like, hopefully, to have a chance to talk about
6   that with my colleagues here.  There may be good and
7   logical reasons.
8          There's also something that, again, I don't
9   know if it was covered early on in any way, shape or
10  form, but there may be some compelling circumstances
11  for particular plaintiffs that might make it more
12  appropriate for an acceleration of their cases.  I'm
13  not suggesting that there is.  I don't know what has
14  happened in the past, but, again, those considerations
15  might be applicable to pre and post 9/30 cases.  So I
16  would hesitate to -- I don't want to object, and I
17  don't want to have a dispute, but I haven't had a
18  chance at least -- and maybe some of my other
19  colleagues who filed post 9/30 cases -- to have a
20  dialogue about this, so I would ask that either that be
21  deferred or something that comes up the next go round.
22         THE COURT:  Well, the bulk from my point of
23  view, the bulk of the discovery most of the iceberg is
24  the discovery on the liability issues that would apply
25  to every case or at least -- and there might be some

1   the defendants -- I have admitted pro hoc as many
2   lawyers as they wanted because I expect those lawyers
3   to be doing something.  Right from the beginning I was
4   told let in as many lawyers in, and we should get
5   things faster.  You should be getting records -- the
6   day you get the authorizations you should get all the
7   records.  I don't want to hear -- I don't want to hear
8   cases should be delayed because you don't have records.
9   I don't want to hear that you didn't send them the
10  authorizations.  That gives them a reason to get
11  delayed.  The authorizations should be going out with
12  the fact sheets.  They should be going out right away.
13  They should be getting the records as soon as the fact
14  sheets come in.
15         I mean, I expect that in the cases that were
16  recently filed within a few months you're going to have
17  those fact sheets, you're going to have the records.
18  You're going to know who the treating doctors are.
19  You're going to be taking plaintiffs' deps, and I
20  expect those deps to be continuing.  I would suggest at
21  this point if there is a certain logic to doing them
22  chronologically there's a certain -- no matter what
23  eventually I'm going to be looking at the oldest cases,
24  although I'm not saying that immediately after the five
25  we're going to move to the first 15.  That's probably

1   differences by time frames between post APPROVe study,
2   post VIGOR study, pre VIGOR study.  There's obviously
3   prewithdrawal from the market, postwithdrawal from the
4   market, those time frames may make a difference in the
5   science and the medicine and affect the outcome of the
6   cases and the time the person took the medications.
7   There's lot of different factors that could affect it.
8          We have chosen five cases now.  Initially I
9   said let's start with the next 15 then the next 15 then
10  the next 15.  Counsel -- but that was preliminarily to
11  see what happened, and even then I told counsel I
12  thought we would have to focus in on some test type
13  cases and try to chose cases that were representative,
14  so we didn't just try 10 cases in a row that were not
15  going to make anybody feel comfortable about the
16  results as being representative and that we wanted to
17  try to get things that would educate people as to
18  whether these cases were going to be successful, how
19  successful, what was winning arguments and losing
20  arguments and et cetera.
21         So they have picked five now.  We have picked
22  five cases.  I expect discovery to continue in every
23  case, every single case.  You should all be getting
24  your fact sheets, getting them out within the time
25  frames.  I mean, sending out authorizations.  I expect

1   not going to happen, and I'm also not going to say I'm
2   going to try the first five in a row.  I'm not
3   committing to that.  I'm saying we have got five cases
4   we're going to have worked up.  Then we're going to
5   look at those five and see which one we're going to
6   try.  Then we'll decide whether we're going to have two
7   or three consolidated or whether we're just going to
8   try one.  Then we're going to decide if we're going to
9   try those five in a row or whether we're going to try
10  two or three of those and then switch to something
11  else.  Some of that I don't think can be done until we
12  get into those five.
13         I tend to be, you know, I have said before a
14  pragmatist, and I think you have to be flexible, and if
15  you look at case one and it shows certain things or key
16  issues and other cases will be more representative then
17  it may be that we have to go to a longer duration case.
18  You know, if it turns out the science isn't there for
19  short duration maybe then we want to try a long
20  duration case or I don't know, and I don't think you
21  know yet either.  I don't think it makes any sense for
22  me to say we're going to go back to the 12 that were
23  picked.  Or we're going to go back to the 24 that were
24  picked because for those of you who don't know counsel
25  had each submitted 15.  Each side had struck three and

1    then we got them down to 24 cases.  I did meet with

2    liaison counsel, and it was weaned down to five cases

3    that nobody particularly loves, I think, but the cases

4    everybody loved are gone, so we have five cases that

5    are in between.  But hopefully out of those five we

6    have some representative cases.

7          When we start working them up and they take

8    the doctors dep there may be a reason why one of those

9    cases looks good to one side or the other.  It may be

10    that those cases truly come out to be representative,

11    and they all basically the treaters all take the same

12    position on what they said.  Those type of issues we're

13    not going to know until after we get down to the wire,

14    but I sort of want to move these five simultaneously.

15    At the same time I expect you to be doing discovery on

16    every case, and I expect you as quickly as possible to

17    be taking plaintiffs' deps, getting the records,

18    providing that information, making the plaintiffs

19    available for deps, and I don't expect to be hearing

20    later if we have to keep trying cases that cases aren't

21    ready because oh, we just did five and we thought we

22    could sit around and twiddle our thumbs until the five

23    were tried.  All right?

24          MS. SULLIVAN:  Your Honor, I propose that we

25    submitted a proposed Case Management Order for the

45

1    cases in back of the first -- for the rest of the cases

2    other than the test cases to the plaintiffs yesterday

3    that was consistent with your Honor's prior Case

4    Management Orders in terms of deadlines staggered for

5    waves of cases, and I haven't yet heard back from

6    Mr. Buchanan as to whether that's acceptable or not.

7          MR. BUCHANAN:  We received it yesterday, your

8    Honor.  I haven't had a chance to discuss the schedule

9    with other counsel.

10          THE COURT:  Look at it, understanding after

11    you look at these five we may just pluck one or two or

12    another five out either from that 24 or from some case

13    that was filed just recently to be a representative

14    case that we want to have tried.

15          MR. BUCHANAN:  Fair enough, your Honor.

16          THE COURT:  Then possibly we may not have to

17    try anything if we can all get together and talk at

18    some point.

19          THE COURT:  You may want to talk to

20    Mr. Gilmartin.  I want to talk to Mr. Houston.

21          MR. SEEGER:  Mr. Frasier.

22          MR. WEISS:  Your Honor, Diane did raise

23    something, and that is the stroke cases.

24          THE COURT:  Right.

25          MR. WEISS:  Do we want to get a list of

46

1    stroke cases together, each side, and then go through

2    the same process?

3          MS. SULLIVAN:  It seems reasonable since

4    that's the next big category of injury.

5          MR. BUCHANAN:  I guess the one thing we

6    should do, your Honor, is involve the broader group.

7    Mr. Locks highlighted that some of the post 9/30 people

8    have not been involved because they didn't have cases

9    that were eligible for discussion.  Maybe we can just

10    broaden the discussion as to what the next wave should

11    be.  We could have a proposal the next conference for

12    the Court if we have one.

13          THE COURT:  Yes.  At this point I don't know

14    whether we want to move -- I'm just not willing to say

15    from my point of view that after this is done we're

16    going to move to stroke cases or after this is done

17    we're going to move to a different kind of heart attack

18    case.  I think we have to really play out some of this

19    to see where we're going.

20          MR. SEEGER:  I think there are going to have

21    to be several trials to figure out what's going on.

22          THE COURT:  I don't like that attitude.

23          MR. SEEGER:  Somebody else can think about

24    the strategy.  I'm a warrior.

25          MR. FERRARA:  Your Honor, Mike Ferrara.

47

1    Judge, do we know how many cases have been filed so

2    far, and is there a way of breaking down if they're

3    post 9/30 cases or not?

4          THE COURT:  Well, post 9/30 by filing date

5    doesn't mean much, does it?  It has to be whether they

6    were taken post whether they were ingested.

7          MR. WEISS:  You won't have -- I think there

8    were 175 cases thereabouts that were filed before

9    September 30th 2004.  That's what the docket was.

10          MS. SULLIVAN:  That sounds right.

11          MR. WEISS:  I don't know how many cases have

12    been docketed since then, but someone can get the

13    records.

14          THE COURT:  I don't have the exact number.

15    We can get it in a minute.  My secretary has it.  We

16    haven't had a staggering large number of cases come in,

17    actually.  I think it has gone from approximately in

18    the 170's to about the 300's.  That's where we are,

19    which is fine with me.  And we have gotten calls from a

20    lot of people saying they're going to file X, Y, Z

21    cases, and we'll wait and see if they do or not.  What

22    happened with the MDL, it didn't meet yet?

23          MR. SEEGER:  It is meeting the 27th.  And it

24    will take three, four weeks after that until we know

25    where it is.

48

1    THE COURT: Okay. How about this FACTS

2 database, SAS database, has it been worked upon, agreed

3 upon, problems?

4    MR. BUCHANAN: It is. We met at the end of

5 December, your Honor, and --

6    THE COURT: Mr. Cohen, I'm counting on you,

7 come on.

8    MR. COHEN: I did want to apologize to the

9 Court and to my colleagues. This week I actually -- we

10 met on Friday, and we spoke on the telephone Friday. I

11 had to cut it short. I had some medical issues in my

12 family and -- I actually hurt my eye, and I haven't had

13 a chance to reply on that stuff. I, actually, have a

14 lot of stuff to go through with Mr. Buchanan. I

15 thought maybe we could take a recess, see what we can

16 work out and come to you afterwards.

17    MR. BUCHANAN: We get more done in the hour

18 conferences in side-bar than we do in the four weeks in

19 between, so I'll take Mr. Cohen up on his offer.

20    MR. COHEN: The other thing I'm doing in this

21 regard to make sure that I am not actually solely

22 responsible for dragging on this litigation. It is

23 actually the Dechert firm has agreed to give me

24 somebody else, my contemporary, who will also come with

25 me to the meet and confers, so I'm the only person.

49

1 If I'm for any reason unavailable they'll have another

2 contact who will know everything I know and will be

3 able to go back and forth because this was an

4 unfortunate week, and I do apologize.

5    THE COURT: Okay. All right. So we're going

6 to have you sit down and talk about that. The amended

7 electronic service order, is there an issue on that?

8    MR. CORONATO: We have that. In fact, we had

9 a final conference call with the Verilaw folks on our

10 way down here this morning. They made changes, and

11 it's been e-mailed to us, and we're going to print it

12 out and present it to you for signature and go forward

13 with that. There's one issue in particular that the

14 Court should be aware of. Your Honor, when you issued

15 the electronic service order then issued an order

16 amending it and the amendment was to provide for the

17 fact that --

18    THE COURT: People didn't have to use it.

19    MR. CORONATO: Right. That they had to

20 consent to using it, and it also made clear that the

21 Court didn't have a contract with the vendor that it

22 was being funded by the parties, and I think

23 Mr. Maiorano, Matthew, has an issue or a suggestion

24 with respect to the opt out provision.

25    MR. MAIORANO: I'm not sure there should be

50

1 an opt out, Judge, for two reasons. First of all, one

2 of the purposes of having the electronic service is to

3 facilitate service among a large group of people.

4 Obviously, this group has expanded greatly.

5    THE COURT: Who do you represent?

6    MR. BUCHANAN: He is with our firm.

7    THE COURT: You're with Seeger, Weiss. Go

8 ahead.

9    MR. MAIORANO: To start having people opt out

10 you have some people who are then going to be served

11 electronically, others who have to be served by paper.

12 The more people we have in this room or involved in

13 this litigation the more burdensome that becomes.

14    The other issue is one of the nice things

15 about having everything on this E-service system is

16 that there will be an electronic repository of

17 everything that's been severed or filed that everybody

18 that is in the litigation can go to and hit on. If we

19 have people who are opting out there's a category of

20 documents that are not accessible that way.

21    MR. BUCHANAN: There's a practical issue,

22 too, your Honor, just from liaison's perspective of

23 keeping everybody informed we have relied on Verilaw in

24 terms of keeping everyone up to date in terms of

25 deposition developments or notices correspondence with

51

1 the Court. It is my view -- certainly if it was a

2 smaller group, your Honor, or the group wasn't

3 constantly changing in composition with new faces from

4 month to month it would certainly be simpler to deal

5 with an opt out. What we proposed is in the event

6 somebody has a special case that they would like to

7 raise they could seek relief in an order from the Court

8 and we can deal with it in the terms of a context of a

9 specific application rather than on an ad hoc basis

10 trying to anticipate somebody's problem. We think that

11 we could probably make a showing to your Honor if there

12 wasn't good cause as to why the Court has discretion to

13 order electronic service in a mass tort such as that,

14 but nobody has complained yet, and I think we're

15 planning for the hundred year flood or an issue that

16 hasn't occurred. So in the event it arises we propose

17 putting an order in liaison for both defense and

18 plaintiffs can submit something either way as it

19 relates to that issue, and the Court can rule on that

20 specific request in the context of those issues.

21    THE COURT: All right. The reason for my

22 second order was because I received a letter from the

23 AOC telling me that's what they wanted. And if they

24 hadn't sent me that letter I never would have put it in

25 there because I don't -- I want to have everybody on

52

1    Verilaw or on Lexis or on some serving program.  I
2    really don't care what program it is.  It, obviously,
3    is extremely important to the parties, and it is
4    helpful to the Court and helpful to the parties, and it
5    is just night and day the difference between the
6    difficulty in conducting the litigation if we don't
7    have a way to serve electronically.  And I anticipate
8    that anybody who is interested in handling mass tort
9    cases should be willing to get with the program as far
10   as the electronic serving because it is the only way
11   you're really going to be able to keep up to date with
12   what's happening is to go on the server and look and
13   see what's been served and what the correspondence is,
14   and if you don't have it you can't really participate
15   fairly, I don't think.  Or you're going to be at a
16   strong disadvantage, which really isn't desirable, so
17   we want to keep -- the concern was that it does cost
18   money, so the Court is ordering lawyers to pay money to
19   a private company, and there's a concern about that.
20   They're concerned that someone may object to that and
21   that there may be a problem with it, and we may not be
22   able to compel them to do it, so this is what we'll do.
23        We'll reword the order.  We'll take out --
24   we'll say that this supersedes the last two orders, and
25   it will indicate that people shall use the electronic

1    service, unless they have an objection to the same,
2    which they should file in writing with the Court.  And
3    if someone objects then we may have to deal with them
4    and allow them to -- you know, I'll have to deal with
5    that issue when it comes before me if I can decide -- I
6    don't want to get into the politics of the fact that
7    the AOC, you know, I can direct my own case, but on the
8    other hand for things like the AOC is uniquely set up
9    to handle things like fees and payments and statewide
10   to make sure they're uniform so they have their role,
11   and they have been very helpful to us in a lot of --
12   they're very important and we do have to -- I want to
13   listen to what they say, but I also want everybody on
14   the electronic service, so we'll see how we can work it
15   out.  If I get an objection then I'll talk to that
16   attorney, and we'll see what their objection is, and
17   whether it is a cost factor or whether it is a
18   principle factor or what the problem is.  I mean, if
19   there's some attorney that was being shut out because
20   of the cost factor -- I don't know how expensive this
21   is for you.  I'm sensitive to that that somebody
22   shouldn't be shut out for a cost factor.
23        MR. BUCHANAN:  It should be less expensive
24   than using certified mail or Fed Ex in terms of cost.
25   So it should be less expensive than the alternative

1    means of service and obtaining information for most
2    attorneys.
3        THE COURT:  Well, I'm hoping, so if that's
4    the case and an attorney becomes aware that that's the
5    case then hopefully they won't be concerned about it.
6        MR. BUCHANAN:  Agreed, your Honor.
7        THE COURT:  All right.  We'll leave in the
8    provision if they want to object they can do so.
9        MR. CORONATO:  Your Honor, what I would
10   suggest is we'll prepare a final order today, and if
11   your Honor wouldn't mind signing it today because I
12   know people at Lexis are waiting for us and to receive
13   the order so they can do the conversion to the new
14   platform this weekend.  The system will be down from
15   the end of today until Monday morning.
16        THE COURT:  Okay.  All right?  Okay.  So that
17   takes care of that.  The medical record exchange do we
18   want to put in the order that you're doing -- the fact
19   that plaintiffs should provide any medical records that
20   they have in their possession with their fact sheet.
21        MS. SULLIVAN:  Yes.
22        THE COURT:  If you have them send them with
23   the fact sheet.  Don't just send an authorization and
24   hope -- because you have to reveal to them what records
25   you have, and they might not happen to get the same

1    thing.
2        On the other hand defendants when they
3    subpoena records or acquire records via an
4    authorization should within 10 days of receipt provide
5    them to plaintiffs' counsel.
6        MS. SULLIVAN:  Agreed, your Honor.
7        THE COURT:  So they don't get them the day of
8    the plaintiff's dep a stack of records they haven't
9    seen before.
10        MR. CORONATO:  Your Honor, just on that issue
11   what we're doing is we're producing the records to them
12   on a CD in PDF format, and it is more efficient if we
13   have a number of records to burn to CD than to be
14   constantly burning CD's each time we get a new record,
15   so I would rather if we could send them to them on an
16   ongoing basis and try to get them to them as soon as
17   possible, but rather than doing it that way --
18        MR. WEISS:  Your Honor --
19        MR. BUCHANAN:  The 10 days is a good
20   suggestion, your Honor.  We have just run into issues
21   with deposition where we're getting for the first time
22   supplemental medical record production or the medical
23   record production from their authorizations in the last
24   handful of days before either a doctor dep or a
25   plaintiff deposition, and these are authorizations that

Transcript - Monthly Status Conference (2005/01/13)

1    have been outstanding for some period of time.
2         MR. CORONATO:  Your Honor, when that has
3    occurred it is because we have learned when preparing
4    for the depositions in the final weeks of providers
5    that were not identified by plaintiffs in the fact
6    sheets, and we have been able to secure those records
7    and provided them to them in advance of deposition,
8    number one.
9         Number two, we have also had I know with
10   Mr. Spizer that he said provide me the records within
11   about two weeks before the deposition, so that's been
12   fine up until now.  Now there's some objections, so
13   we're not deliberately holding back records and saying,
14   you know, we're going to get a tactical advantage and
15   not give them to you until the last few weeks.  We're
16   not doing that.  But it would be a lot more efficient
17   if we could just produce them in groups on a rolling
18   basis.
19        MR. WEISS:  I want everybody to be aware that
20   if some firms are obtaining records electronically
21   through services like MCS or Zero, those records when
22   they're gotten are PDF form.  They're Bates stamped.
23   They stay on the internet.  They're encrypted.  You
24   guys get them the same time we do, and there is no
25   delay.  So that is an alternative, and in those cases

57

Transcript - Monthly Status Conference (2005/01/13)

1    you don't have to give us a CD back because you're
2    getting them instantaneously like we are.  So that's an
3    option.
4         MR. BUCHANAN:  Your Honor, I think
5    plaintiffs' counsel are free to reach whatever
6    agreements they want to reach.  I know Mr. Spizer felt
7    comfortable getting them on a certain time frame.  From
8    my firm's perspective -- I know other plaintiffs
9    counsel expressed concern, they would like to get
10   medical records reasonably promptly after they receive
11   them.  Ten days is a fine window.  Two weeks gives them
12   more time so long as there's not a deposition
13   scheduled.  They can aggregate them together, but if
14   there is only one provider who comes in and they're
15   working on another provider to get medical records, and
16   it takes them a month to get them from the other
17   provider we don't want to delay the production of the
18   first provider's records because that could interfere
19   with depositions and other discovery.
20        MR. SPIZER:  Just so the record is clear,
21   Gregory Spizer with the Anapol firm, I don't know about
22   the two-week time frame.  I know Will and I have
23   spoken, and my concern on a few occasions was I
24   understood if he got one record I didn't necessarily
25   want him to burn a CD for every record, but I was

58

Transcript - Monthly Status Conference (2005/01/13)

1    looking for them on a rolling basis.  I didn't think I
2    said two weeks.  I was looking for them on a rolling
3    basis, so I agree with Mr. Buchanan.  Each firm can cut
4    their own deal, but I was looking for them -- if they
5    get them I don't want them two weeks before they have
6    the dep.
7         MR. CORONATO:  And we did that, but you also
8    said you certainly want them no later than two weeks
9    before the dep, the last batch, and we would do that
10   for you, but we also provided them to you on a rolling
11   basis, so if it has been an issue, your Honor, I think
12   it has been an issue on just very few cases, and
13   largely because of providers that were just identified
14   at the last minute through our own investigation and
15   review of reports and because those providers were not
16   identified in fact sheets.  If they were identified in
17   fact sheets we're getting those records right away, and
18   we can provide those much sooner.
19        MR. BUCHANAN:  We have provided
20   authorizations on cases three, four months ago, and we
21   don't have CD's, and we don't have records from you
22   guys for any of those authorizations yet.  I can only
23   assume the reason why is because there's not a
24   deposition set of a treater or of a plaintiff, and once
25   that happens then we'll get the CD two weeks before

59

Transcript - Monthly Status Conference (2005/01/13)

1    the -- two weeks before the deposition, but that's not
2    the arrangement we're operating under.  We turn them
3    over with the fact sheets, we would like to get them,
4    you know, reasonably promptly after they got them.
5    Whatever the Court sets that's fine, but they can burn
6    a CD with all of Seeger, Weiss' clients meds on one CD.
7    If we have 10 clients that they have a supplement for
8    they can send us a CD every two weeks that contain
9    supplemental medical records from each of our clients
10   each in an individual folder.  How many firms are
11   involved here?  There's probably 30 firms in the room.
12   They just have a process in place where they do that
13   every, week they each get a CD with the records.  It is
14   not that hard.
15        MR. CORONATO:  I'm looking for a compromise
16   of some sort rather than having to produce records
17   within 10 days of receipt when we're burning them on CD
18   and providing them in --
19        THE COURT:  What do you want 20 days?
20        MR. WEISS:  Aren't you getting these records
21   or aren't you getting these records, I'm sorry,
22   electronically?  Aren't you getting them electronically
23   from your provider?
24        MR. CORONATO:  Yes.  We can get them
25   electronically.

60

1  MR. WEISS:  Why can't you simultaneously give
2  them to the plaintiff the same day you get them?
3  They're electronic; you're not getting paper.
4  MR. CORONATO:  We have to download them to
5  our system to provide them to you.
6  MR. WEISS:  Give the plaintiffs' lawyers the
7  same access that you have.
8  MR. CORONATO:  I don't know if our vendor
9  offers that.
10  MR. WEISS:  Can we talk about that?  That
11  would save a lot of time and money.
12  MR. CORONATO:  It may not save money.
13  MR. WEISS:  It would save time and money.
14  MR. CORONATO:  We can look at that with our
15  provider, whether or not they have that functionality,
16  but in the event they don't we'll have to continue
17  sending them on CD.  I would prefer to have them on a
18  platform.  You can get them whenever you want, that
19  would be fine, but I don't know if my vendor offers
20  that.
21  MR. WEISS:  You're getting the records from
22  us that way now.
23  MR. CORONATO:  Not really.
24  MR. WEISS:  You are going forward.
25  MR. CORONATO:  Maybe going forward.

1  MR. WEISS:  We're going to use the same
2  vendor or you can just get into our vendor, and they'll
3  send them to you.  So it takes you out of the loop.
4  MR. BUCHANAN:  Your Honor, maybe there is a
5  solution to do it with a server or something.  We can
6  talk about that.
7  THE COURT:  Why don't we include in the order
8  they have to provide you with the records within 20
9  days.  If they can provide them to you automatically
10  through a vendor then that will be better.  They can
11  work that out with you.  If it turns out that 20 days
12  is a problem let me know at the next management
13  conference that it is not working.
14  MR. BUCHANAN:  And, obviously, the only thing
15  that would alter that date would be if we have
16  depositions in that case moving forward.
17  THE COURT:  20 days or at least two weeks
18  before the deps it should say.
19  MR. LOCKS:  Your Honor, I assume, also,
20  individual firms may make --
21  THE COURT:  Whichever is the lesser.
22  MR. LOCKS:  Individual firms can make a
23  different deadline between by stipulation or agreement.
24  If 20 days doesn't matter to some of us and 30 days
25  works, if 40 days works as long as it doesn't slow down

1  the process that's -- you know, I'm not going to come
2  into court.
3  THE COURT:  Everybody can consent, I guess,
4  to whatever they want, as long as it works, but I don't
5  want to start trying to -- I mean, if everybody has
6  different agreements then you're going to expect me to
7  enforce those agreements.  I'm going to enforce the 20
8  days because that's what I have ordered in all the
9  cases.  If you agree to take yours in 60 days and then
10  they give them to you in 60 days, and it's no problem
11  for you --
12  MR. LOCKS:  You won't hear from us.
13  THE COURT:  Then nobody is going to hear from
14  anybody.
15  MR. CORONATO:  We have a revised medical
16  authorization that needs the Court's approval, and I
17  think we're also going to request an order that
18  requires the plaintiffs to sign those and return those
19  to us in two weeks for all plaintiffs.
20  MR. BUCHANAN:  It may be a logistical issue,
21  your Honor.  We signed off on the form with the HIPPA
22  authorizations the cases -- the cases remain
23  entrenched in their 15 case slots.  We don't have the
24  date pinned down for that second slot, but what I
25  propose, your Honor, is plaintiffs prioritize getting

1  revised authorizations from the cases in the earlier
2  traunches and give us an additional week for each extra
3  traunch.
4  MR. WEISS:  Can we post the revised HIPPA
5  form on the website, your Honor?
6  THE COURT:  It should be for everybody to
7  use.
8  MR. CORONATO:  The old one?  The new one
9  should be on the website absolutely.  We need an order
10  today doing that.
11  MR. WEISS:  Right.
12  THE COURT:  The order should say that this
13  will be the -- this is the approved authorization which
14  should be used superseding the last one.
15  MR. CORONATO:  We want the authorizations --
16  I think particularly in the cases where we already have
17  authorizations, we want those plaintiffs to execute new
18  authorizations and return those to us in at least two
19  weeks.
20  MR. WEISS:  My suggestion is you serve
21  everybody on Verilaw and also put it on the Court's
22  website, and it will cover both bases.
23  MR. BUCHANAN:  The issue is getting the
24  executed authorizations from the plaintiffs, and it is
25  a logistical issue your Honor.  I know we can do it.  I

1  think we can do it within 30 days, and we can
2  prioritize certainly trial cases are the first 15
3  cases, get them to you within 15 days, but give us 30
4  days for the bigger slot.
5       MR. CORONATO:  I don't have a problem with 30
6  days, your Honor, as long as it doesn't come back to
7  haunt us when the 30 days turns into 40 days or 50 days
8  or 60 days and there's a delay in getting the records
9  and the plaintiffs say well.  That's my only concern.
10  I'm willing to be reasonable in giving them time
11  because I know they have to get these authorizations
12  out to a lot of people, but I don't want it to come
13  back to haunt me.
14       THE COURT:  Have you worked it out 30 days?
15  Fifteen days for the first 15 cases and the five that
16  have been chosen.
17       MR. CORONATO:  Yes.
18       THE COURT:  We need an order on those five
19  cases.  If you want to prepare that.
20       MR. CORONATO:  Fifteen days for the first
21  five trial cases?
22       THE COURT:  And the first 15 docketed cases.
23  Within 30 days of today for all the others that have
24  already been filed.  And are you going to be removing
25  your confidential designation soon?

1       MR. COHEN:  Yes.  I have worked out kind of a
2  priority plan.  What we're going to be doing as we're
3  going through the depositions and the deposition
4  exhibits first, and it is going to be done on a rolling
5  basis by the end of this month as we discussed those,
6  those are the ones they showed some interest in
7  actually using in the litigation.  The month of
8  February what I have right now, and one thing I want to
9  go through with Mr. Buchanan is a calendar of what's
10  coming up, and what I have done is I have put very -- I
11  have reduced the number of documents we have produced
12  in February give, us lots of time to go back and redo
13  everything and produce what is gone before it.  I want
14  to talk with him and see if there's anything else that
15  if he wants a different priority and pretty much in
16  that regard whatever they're asking me to do I can come
17  up with.
18       MR. BUCHANAN:  Your Honor, we certainly agree
19  that exhibits that are attached to the filings under
20  seal, exhibits that are used in depositions they should
21  be priority reviews for them as it relates to
22  confidentiality.  The concern that plaintiffs have
23  expressed in a broader sense is that new productions
24  that are coming in continue to have the same weight in
25  terms of 95 percent confidential, 5 percent

1  nonconfidential.  This is a stack Mr. Seeger grabbed of
2  500 pages from Sherwood.  They're all marked
3  confidential.
4       MR. SEEGER:  And redacted.
5       MR. COHEN:  There's no doubt what I have done
6  in coming to each of these conferences the one
7  thing that I have heard from you each time is make sure
8  that this case moves, so whenever I have had a choice
9  between putting resources to get more documents or to
10  get these confidentiality things done I have put it
11  towards getting the documents out the door, and I'm
12  actually going to be able to meet the January 31st
13  deadline that I sat here and said I thought was
14  impossible, and I have done that to some extent by
15  robbing Peter to pay Paul and moving things around, but
16  I have scheduled here that February we'll have
17  everything redone, and if they have a particular issue
18  with either certain sets of documents I can certainly
19  do it faster.  We have got the exhibits to the
20  depositions, they're already done.  If there's a box or
21  two let me go, and I'm able to start doing that faster
22  now and get that set in place, and the Dechert firm has
23  given me a lot of resources to get that done, but there
24  is no doubt that the things they're getting right now
25  don't have the new guidelines in place, and my plan was

1  to get that in February.
2       MR. BUCHANAN:  The thing that is puzzling
3  from my perspective is they are reviewing for
4  confidentiality on these documents.  One thing
5  Mr. Seeger flagged is a document that's not stamped
6  confidential in this stack of 500 there's, what, three
7  pages I think that aren't confidential, so there is a
8  confidentiality review going on.  We don't know what
9  guidelines are being applied, and it seems designed to
10  delay, I don't know why.
11       MR. SEEGER:  It was our expectation once the
12  withdrawal and your admonition in October to the extent
13  there is a new production and people are doing that
14  review they would not be confidentiality stamped, but
15  to reach in randomly you pull out a stack this is
16  stamped confidential, and this isn't.
17       MR. COHEN:  The real issue in the review is
18  when the review is to make 20 percent whatever it is
19  going to be confidential that error rate can't be what
20  it is when it is the other way, when it is 20 percent
21  not confidential.  And there's much more of a review
22  process that needs to get done of quality control of,
23  you know, more review by more senior people, if
24  necessary, in getting things done, and that's an
25  apparatus.  And each time I have decided to try to get

1   that in I have looked at the calendar, and I can't come
2   here and tell you I don't have the documents out.  I
3   have to get you the documents.  You can use the
4   documents in the litigation.  If there's a box or two
5   boxes give it to me.  I know I was slow on some things,
6   but I'm much faster now.  I have all the answers I need
7   to get, and these things will be taken care of, and
8   right now what we're talking about is just waiting
9   until next month to get the whole thing completely
10   taken care of and if you have something you need faster
11   I can get it to you faster.
12       THE COURT:  How long is it going to take you
13   to undesignate, until the end of February?
14       MR. COHEN:  The end of February.  They'll be
15   completely redone.  They'll have a whole new set of the
16   labeled redactions, the remove the foreign redactions,
17   the de-designated confidentiality.  I have already
18   produced in one format the labeled redactions with the
19   removal of the foreign -- but they'll get the grand
20   unified set, the once and for all, here it is, and then
21   we can all be singing from the hymnal as Mr. Sizemore
22   likes to say.
23       MR. MAYER:  And we did tell plaintiffs at
24   prior conferences that we're going to put a priority on
25   getting the documents out --

69

1       MR. SEEGER:  The end of February.
2       THE COURT:  That's reasonable.  Put in the
3   order the end of February they'll have declassified --
4       MR. WEISS:  Where is the log of the
5   privilege?
6       MR. COHEN:  He's got it.
7       MR. WEISS:  It is up to date?
8       MR. COHEN:  Yes, I handed it to him.
9       MR. PLACITELLA:  My concern was in providing
10   some assistance in preparing for trial and getting
11   expert reports for this first group done in reviewing
12   documents I'm running into pages and pages of big black
13   pages nothing there, and I don't really understand the
14   context in which that was done, and it would be in a
15   very significant document, and then all the sudden
16   there's three paragraphs and then it continues, and I
17   understand maybe it is because some other drug might be
18   mentioned, but the problem is if VIOXX is being
19   compared to another drug the fact that another drug is
20   being mentioned is clearly evidential to what I'm
21   trying to accomplish, and I'm trying to work under
22   these deadlines, and I don't get it, frankly, the whole
23   system that's gone on so far having come in late.
24       MR. COHEN:  Two things.  First of all, I
25   think on, my learned colleagues would review the motion

70

1   to compel documents to go through all these things all
2   of the documents we have been producing since I think
3   September or October have the reason for the redaction
4   labeled right on them.  I have given plaintiffs'
5   counsel going backwards a set of documents on images
6   that have the reasons for the redactions right on them
7   that I understand might not be in the most -- in the
8   way they would most prefer to have them and put them
9   back together.  That's why the end of February when I'm
10   planning to do a whole new set, but the reason for the
11   redactions now are right on them.  In our responses to
12   document requests we have set forth exactly what we're
13   doing, and the motion to compel where at least one of
14   our redactions was overruled that has a lot of the
15   explanation.  And we are not doing anything such as if
16   VIOXX is being compared to another drug -- there were a
17   couple of instances where it was an actual study with
18   another drug that was not redacted, and all of this is
19   set forth in the responses to the document requests and
20   the motion to compel briefing, which was quite thorough
21   on both sides.
22       THE COURT:  What we did originally for those
23   people that came late is we really did say that VIOXX
24   was still on the market.  It was still an essential
25   part of this company.  It was still making billions of

71

1   dollars, I guess, in profits.  Maybe not profits, maybe
2   gross, I don't know, but at any rate it was important
3   to the company that they be protected from their
4   competitors, and it was clear to me that there were
5   competitors who were selling very similar drugs, and
6   there was a strong need for confidentiality, and the
7   Court wanted documents produced very quickly, and we
8   agreed pretty much that there would be a lot of
9   allowing people to have documents stamped
10   "confidential," and then maybe weeding back through
11   them to see what wasn't just so that plaintiffs would
12   have them in their hands.
13       That worked very well until September 30th
14   when VIOXX came off the market, so the need for
15   confidentiality plummeted as far as I'm concerned.  It
16   doesn't mean it went to zero, but it plummeted, and the
17   fact is that most -- many of the key confidential
18   documents, quote "confidential documents" and "sealed
19   documents" have already been made public not through
20   lawyers here, not from this litigation but from other
21   litigation.  It doesn't really make much sense for us
22   to have a confidential document that everybody has
23   already seen.  I personally think -- I don't care how
24   confidential it is, if it has been on 60 Minutes it is
25   not confidential anymore.

72

1    MR. COHEN:  We might be coming to ask the
2  Court to do something to people who put documents on 60
3  Minutes.
4    THE COURT:  But nobody did that from this
5  litigation.  If they did I would be ready to deal with
6  that.  So now we have, first of all, things that maybe
7  should have been confidential anyway, but they're way
8  past being confidential because they're public record
9  basically at this point, and, two, we have a
10  substantially less number of things that should be kept
11  confidential and at this point counsel had agreed that
12  we were talking a reduction from what was -- they were
13  marking 90 percent confidential, they probably should
14  have been marking 60 percent confidential.  Now they
15  probably should be marking 5 percent confidential, but
16  from their point of view, which is their point of view,
17  they're probably going to be marking 15 to 20 percent
18  confidential, and we'll have to review it.  The end of
19  February is reasonable to change what has already been
20  done.
21    MR. SEEGER:  We agree.  We don't have to --
22  we are going to be asking you to revisit and talk to
23  you again about the issue involving another drug called
24  ARCOXIA because it is pretty clear from documents we
25  have seen that there are, as Chris Placitella just

1  raised, they are being - the safety data from one COX-2
2  is being compared to another COX-2, and that is --
3  obviously, that is going to become important, but we
4  can put that on a future agenda for another status
5  conference.
6    THE COURT:  Is Merck still developing that
7  drug?
8    MS. SULLIVAN:  Yes, your Honor.
9    MR. COHEN:  It is on the market in Europe.
10    MR. SEEGER:  It is currently under review by
11  the FDA here.
12    THE COURT:  Was VIOXX pulled from the
13  European market, too?
14    MR. COHEN:  Yes.
15    THE COURT:  All right.  So you'll work out
16  the databases.  I have a deposition -- not a
17  deposition, but I'm on trial in a medical malpractice
18  case, and there's an expert that can only testify right
19  now, so I'm going to do that.  When he is done that's
20  going to be the end of the day for that trial, so I'll
21  be available in a couple more hours.  If you can work
22  things out that you need to work out when I take a
23  break or whatever I'll sign the orders and we'll leave.
24  You can leave.  If you want me to come back and address
25  you this afternoon or talk to you this afternoon,

1  that's fine.
2    MR. SEEGER:  We have things to talk about, so
3  why don't we try to do that, and we'll let you know
4  through Carmen.
5    THE COURT:  There might be a point I would
6  suggest that liaison counsel there's a lot of people
7  who have sort of popped in who some who are very
8  experienced plaintiff's counsel, some who are not maybe
9  or very experienced but maybe not that as to the mass
10  torts.  I would suggest you take at least some time
11  today to meet with just all the plaintiffs' counsel and
12  maybe give them some advice on what they should or
13  shouldn't be doing.  If we have somebody who is -- not
14  that you have to take it, but I'm just saying there
15  might be some plaintiffs' counsel who have questions
16  that they want to ask you that they don't want to raise
17  in front of everybody or in the group or, you know, the
18  only dumb question is the question you don't ask,
19  right?
20    MR. SEEGER:  Okay.  That's fine.
21    THE COURT:  I don't know if I was -- you
22  know, I didn't do mass tort.  Obviously, it didn't even
23  exist when I was practicing, so I don't know whether I
24  would be expected to be getting my own experts, relying
25  on your experts, sharing costs.  I don't know if you

1  have already dealt with everybody on that.
2    MR. SEEGER:  We have dealt with a lot of
3  people on it.
4    THE COURT:  Some people may not know, and
5  they might want to talk to you.
6    MS. BEREZOFSKY:  Your Honor, before we break,
7  I would like to have the opportunity to address some of
8  the issues on the class case on medical monitoring.
9  Would you prefer to do that now or later when you
10  return?
11    MR. DAVID COHEN:  In that same vein I
12  submitted an agenda for the Court's review concerning
13  class action issues in advance of the conference, and I
14  would like to have a chance to discuss those issues at
15  some point today.
16    THE COURT:  We did do a scheduling order for
17  the one class action.
18    MR. BUCHANAN:  We did.  It is on the record,
19  your Honor, and we have been operated under it.  I
20  think it is actually in the order from November.
21    MR. JUDD:  It needs to be modified.
22    MR. BUCHANAN:  It needs to be modified.  We
23  advised your Honor as to a scheduling difficulty with
24  depositions.
25    MS. BEREZOFSKY:  I would like to get a

1  schedule or order in place or at least begin
2  discussions about that at some point.
3       THE COURT:  All right.  I would suggest class
4  action counsel meet with defense counsel and spend time
5  trying to work things out as far as a schedule, and if
6  you can't I'll be taking a break, and I'll come back
7  in, and so far this case has not been one lawyer.  The
8  attorneys have been relatively quick so I'm hoping this
9  won't take that long.
10      MR. MAYER:  Procedurally we would like to
11 request there be one plaintiff's again through liaison
12 counsel, as opposed to multiple agendas.
13      MR. BUCHANAN:  So the record is clear on that
14 I know Mr. Locks made a reference to it, and you were
15 hoping people would be submitting issues to liaison
16 counsel.  We have been e-mailing out and advising
17 people in advance of the status conferences of the
18 timing for submitting agenda items.  To the extent we
19 receive those we incorporate those in the agenda, and
20 we don't have a problem submitting a unified agenda
21 from everybody.  I didn't receive an agenda from class
22 action counsel, although I put in a place holder
23 knowing they wanted to address scheduling issues today.
24      THE COURT:  I agree.  I mean I don't want
25 multiple agenda items from each person, and maybe I

1  spoke hastily if I said if you wanted to send a letter
2  to the Court on an agenda item you should send it to
3  liaison counsel.  But, you know, I haven't gotten any
4  feedback on liaison counsel, which means I assume
5  everybody is happy with them.
6       MR. JACOBY:  Just a reminder, everybody needs
7  to send us their contact information so we can
8  communicate with them.
9       THE COURT:  I don't want to create issues
10 where there aren't any.  I have been very happy with
11 counsel on both sides as far as moving this, and we
12 have really made a lot of progress and moved things
13 relatively quickly, so I think it has been working
14 well.  But if you do have a problem then I guess we
15 should address it, your Honor you know, let me know.
16      MR. SEEGER:  Let us know so we can fix the
17 problem.
18      THE COURT:  Let them know.  It is not easy to
19 be the liaison counsel particularly for the plaintiffs
20 because there are a lot of people, and I'm sure if you
21 try to get in touch with them there may be times when
22 they don't have much time to just chat with you, but,
23 on the other hand, by having that role they should be
24 making themselves available to you when you need them,
25 especially if you're relatively new to this, and they

1  don't have to become your tutor, but they have to give
2  you some advice, I think.
3       MR. BUCHANAN:  Our goal is to provide that
4  advice so the Court doesn't have to deal with problems
5  with CIS statements and, you know, where the short form
6  complaints are and to guide people through the process.
7  I'm sure issues fall through the cracks, but we're
8  trying to consolidate our own work product or I'll say
9  the New Jersey forms and some of the things that most
10 lawyers would be interested in and to some readily
11 accessible forms so lawyers can get their hands on
12 things quickly without having to chase down myself and
13 Mr. Seeger --
14      THE COURT:  And the basic things you can
15 call.  I mean, obviously, not on strategy things or
16 issues involving, you know, but on basic where you find
17 things you can call my clerk and my secretary and they
18 will help you.  All right.  I'll be back in a little
19 bit.
20      (End of proceedings.)
21
22
23
24
25

Court Hearing

                 C E R T I F I C A T I O N
     I, REGINA A. TELL, C.S.R., C.R.R., License Number
30X100161000, an Official Court Reporter in and for the
State of New Jersey, do hereby certify the foregoing to
be prepared in full compliance with the current
Transcript Format for Judicial Proceedings and is a
true and accurate compressed transcript to the best of
my knowledge and ability.

     _____ 1-17-05
     Regina A. Tell, CSR-CRR
     Official Court Reporter
     Atlantic County Courthouse
     Mays Landing, New Jersey

```
                SUPERIOR COURT OF NEW JERSEY
                ATLANTIC COUNTY
                CASE TYPE NO. 619
-----------------------------x
IN THE MATTER OF IN RE:
VIOXX
                          STENOGRAPHIC TRANSCRIPT
                          OF:
-----------------------------x   - MONTHLY MEETING -
        PLACE:  ATLANTIC COUNTY CIVIL COURTHOUSE
                1201 BACHARACH BOULEVARD
                ATLANTIC CITY, NJ  08401
        DATE:   FEBRUARY 17, 2005
B E F O R E:
      THE HONORABLE CAROL E. HIGBEE, J.S.C.
TRANSCRIPT ORDERED BY:
      THEODORE MAYER, ESQ. AND DAVID BUCHANAN, ESQ.
A P P E A R A N C E S:
      CHRISTOPHER SEEGER, ESQUIRE
      DAVID BUCHANAN, ESQUIRE
      MATTHEW J. MAIORANA, ESQUIRE
      SEEGER, WEISS
      ATTORNEYS FOR THE PLAINTIFFS
      DAVID JACOBY, ESQUIRE
      GREGORY S. SPIZER, ESQUIRE
      SOL H. WEISS, ESQUIRE
      ANAPOL, SCHWARTZ, WEISS, COHAN, FELDMAN & SMALLEY
      ATTORNEYS FOR THE PLAINTIFFS
      LEE BALEFSKY, ESQUIRE
      MICHELLE TIGER, ESQUIRE
      KLINE & SPECTER
      ATTORNEYS FOR THE PLAINTIFFS
              *      *      *      *      *      *
                REGINA A. TELL, CSR-CRR
                OFFICIAL COURT REPORTER
                1201 BACHARACH BOULEVARD
                ATLANTIC CITY, NJ  08401
```

1

Transcript - Monthly Status Conference (2005/02/17)

```
APPEARANCES CONTINUED...
      MICHAEL FERRARA, ESQUIRE
      THE FERRARA LAW FIRM
      ATTORNEY FOR THE PLAINTIFFS
      EDWARD GOLDIS, ESQUIRE
      FELDMAN, SHEPHERD, WOHLGELERNTER & TANNER
      ATTORNEYS FOR THE PLAINTIFFS
      THERESA CORSON, ESQUIRE
      LEVY, ANGSTREICH
      ATTORNEY FOR THE PLAINTIFFS
      ROBERT DASSOW, ESQUIRE
      HOVDE, DASSOW & DEETS, LLC
      ATTORNEY FOR THE PLAINTIFFS
      SUSANNE N. SCOVERN, ESQUIRE
      ALEXANDER, HAWES & AUDET
      ATTORNEY FOR THE PLAINTIFFS
      CHRISTOPHER M. PLACITELLA, ESQUIRE
      GREG SHAFFER, ESQUIRE
      WILENTZ, GOLDMAN & SPITZER
      ATTORNEY FOR THE PLAINTIFFS
      RONALD JONAS, ESQUIRE
      SANFORD, WITTELS & HEISLER
      ATTORNEY FOR THE PLAINTIFFS
      MICHAEL WEINKOWITZ, ESQUIRE
      LEVIN, FISHBEIN
      ATTORNEY FOR THE PLAINTIFFS
      JULIE C. PARKER, ESQUIRE
      SACKS & WESTON
      ATTORNEY FOR THE PLAINTIFFS
      HARRISON J. GORDON, ESQUIRE
      GORDON & GORDON
      ATTORNEY FOR THE PLAINTIFFS
      JACQUILINE DeCARLO, ESQUIRE
      HOBBIE, CORRIGAN, BERTUCIO & TASHJY, P.C.
      ATTORNEY FOR THE PLAITIFFS
```

3

Transcript - Monthly Status Conference (2005/02/17)

```
APPEARANCES CONTINUED . . .
      FRED GERSON, ESQUIRE
      D'ALESSANDRO, JACOVINO & GERSON
      ATTORNEY FOR THE PLAINTIFFS
      NAVAN WARD, JR., ESQUIRE
      SCOTT LEVENSTEN, ESQUIRE
      BEASLEY, ALLEN, CROW, METHVIN, PORTIS, MILES, P.C.
      ATTORNEY FOR THE PLAINTIFFS
      WENDY FLEISHMAN, ESQUIRE
      LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
      ATTORNEY FOR THE PLAINTIFFS
      KEVIN HAVERTY, ESQUIRE
      WILLIAMS, CUKER & BEREZOFSKY
      ATTORNEY FOR THE PLAINTIFFS
      TERRENCE SMITH, ESQUIRE
      DAVIS, SAPERSTEIN & SALOMON, P.C.
      ATTORNEY FOR THE PLAINTIFFS
      DAVID J. COHEN, ESQUIRE
      TED LIEBERMAN
      SPECTOR, ROSEMAN & KODROFF, P.C.
      ATTORNEY FOR THE PLAINTIFFS
      RICHARD D. MEADOW, ESQUIRE
      EVAN JANUSH, ESQUIRE
      LANIER & ASSOCIATES, LLC
      ATTORNEYS FOR THE PLAINTIFFS
      MICHAEL GALPEN, ESQUIRE
      GENE LOCKS, ESQUIRE
      CHRISTINE KLIMCZUK, ESQUIRE
      LOCKS LAW FIRM
      ATTORNEYS FOR THE PLAINTIFFS
      JENNIFER YOUNG, ESQUIRE
      SULLIVAN, PASAIN, BLOCK, McGRATH & CAMARO
      ATTORNEY FOR THE PLAINTIFFS
      DANIEL J. FETTERMAN, ESQUIRE
      CHRISTOPHER JOHNSON, ESQUIRE
      KASOWITZ, BENSON, TORRES & FRIEDMAN
      ATTORNEY FOR THE PLAINTIFFS
```

2

Transcript - Monthly Status Conference (2005/02/17)

```
APPEARANCES CONTINUED...
      ELLEN RELKIN, ESQUIRE
      PAUL PENNOCK, ESQUIRE
      JERRY KNIGHERT, ESQUIRE
      JOSEPH WILLIAMS, ESQUIRE
      WEITZ & LUX
      ATTORNEYS FOR THE PLAINTIFFS
      DAVID BEEKMAN, ESQUIRE
      ATTORNEY FOR THE PLAINTIFFS
      MARC GROSSMAN, ESQUIRE
      SANDERS & SANDERS
      OBSERVING COUNSEL
      MATTHEW BURNS, ESQUIRE
      COHEN, SEGLIAS
      ATTORNEYS FOR THE PLAINTIFFS
      GREGORY MARTIN, ESQUIRE
      H. FOREST HORNE, ESQUIRE
      MARTIN, JONES
      ATTORNEYS FOR THE PLAINTIFFS
      DEB BAIRD, ESQUIRE
      SHELLER, LUDWIG
      ATTORNEY FOR THE PLAINTIFFS
      MOIRA G.LOPEZ, ESQUIRE
      NAGEL, RICE & MAZIE
      ATTORNEY FOR THE PLAINTIFFS
      THEODORE V.H. MAYER, ESQUIRE
      WILFRED CORONATO, ESQUIRE
      CHARLES W. COHEN, ESQUIRE
      JENNIFER GRAHAM, ESQUIRE
      HUGHES, HUBBARD & REED, LLP
      ATTORNEYS FOR THE DEFENDANT, MERCK
      DIANE P. SULLIVAN, ESQUIRE
      PHIL YENELLA, ESQUIRE
      BEN BARNETT
      DECHERT, LLP
      ATTORNEYS FOR THE DEFENDANT, MERCK
      JEFFREY JUDD, ESQUIRE
      O'MELVENY & MEYERS, LLP
      ATTORNEY FOR THE DEFENDANT, MERCK
```

4

1   THE COURT: You can be seated.

2   MR. SEEGER: Good morning, your Honor.

3   THE COURT: Good morning. This is the In Re:

4   VIOXX consolidated cases. Counsel have been able to

5   sign in. If you haven't signed in please do sign in

6   because we want to make sure that everybody's name is

7   accounted for. I think we have got most of you signed

8   in already.

9   Today is our management conference which we

10   do on a monthly basis. Both sides have sent me their

11   usual agendas somewhat more detailed this time than

12   usual with actually a lot more issues than we usually

13   have to deal with, but there was one issue that was

14   brought to my attention even before the regular agendas

15   were submitted and that was a letter concerning whether

16   or not there had been any ethical or unlawful conduct

17   by any of the plaintiffs' counsel in revealing or

18   releasing confidential documents to the press.

19   Miss Sullivan, is there anything you want to

20   say in support of that letter or the application that

21   you have or request that you have to the Court?

22   MS. SULLIVAN: Yes, your Honor, if I may.

23   Good morning, your Honor. Your Honor, the request was

24   prompted by a recent article that appeared in the Wall

25   Street Journal that cited plaintiffs' lawyers as

1   providing information and documents to the journal, and

2   it comes after a history, unfortunately, in this

3   litigation of plaintiffs' counsel providing documents

4   that were produced in litigation under the guise of a

5   protective order stamped "confidential" to the press.

6   We know -- and your Honor has addressed this at prior

7   conferences -- we know Mr. Birchfield of the Beasley,

8   Allen firm appeared on 60 Minutes with a document with

9   a Bates number that was produced in litigation that

10   that firm is counsel of record here and certainly

11   subject to the protective order here.

12   We know that many of the plaintiffs' counsel

13   of record in this litigation have repeatedly spoken to

14   the press, have been quoted in the press, made

15   statements that have the potential of biasing potential

16   public perception -- certainly potential juror

17   perception in these cases.

18   There are -- in addition to your Honor's

19   protective order -- there are ethical rules in this

20   state as the Court is well familiar that prevent or

21   prohibit certain statements to the press during

22   pendency of lawsuits, and, your Honor, in view of the

23   continued disclosure of confidential documents to the

24   media by the plaintiffs in this litigation in violation

25   of court orders we have asked the Court to solicit from

1   each of plaintiff's counsel of record an affidavit

2   attesting to the fact that they did not -- they weren't

3   the plaintiff's counsel who provided confidential

4   information to the press.

5   There is some precedent for it. I know it is

6   an unusual request, but at this point I don't know what

7   else to ask the Court to do to try to enforce this

8   Court's orders. There are going to be continued

9   document productions by Merck in this litigation,

10   including highly sensitive information like employment

11   records, information that contains business trade

12   secrets, information that would be considered

13   proprietary in the business community, and we think by

14   this court, and in order to protect Merck's continued

15   business interests and, also, the employees of the

16   company we're asking the Court to take some steps to

17   insure enforcement of the confidentiality provisions

18   set forth in this Court's protective order.

19   It is Merck's position these cases should be

20   litigated in the courtroom based on the evidence in

21   front of a jury and not in the press based on snippets

22   of documents taken out of context by plaintiffs'

23   counsel. So we would ask the Court to take the step of

24   asking for affidavits. There's no prejudice to the

25   plaintiffs' counsel in providing that information, and

1   we could get to the bottom, hopefully, of this issue

2   and prevent this kind of thing going forward hopefully,

3   Judge.

4   MR. SEEGER: Good morning, your Honor. It is

5   hard to even know where to begin on this one because

6   the letter that was written to the Court was just so

7   blatantly misleading on points that are so easy to

8   demonstrate to you.

9   Number one, the New York Times article, the

10   one that Miss Sullivan quotes from, and the one that

11   followed, I believe, the next day, specifically state

12   that they got the documents through a public official.

13   We're talking about documents -- and maybe it is hard

14   not to take this personally, but this is the second

15   time we have been accused of unethical -- of ethics

16   violations, and I do take that personally.

17   These documents that Miss Sullivan is talking

18   about have been produced here. They have been produced

19   in Texas. They have been produced to the government.

20   They have been produced in connection with these

21   hearings in Washington right now. I mean, you know,

22   and there isn't a lawyer that is looking at documents

23   in this courtroom or anywhere in the country, your

24   Honor, that we have not asked to sign the protect

25   order. We have discussions every day. We have done a

1   good job of controlling this.  I don't know what the

2   issue is with Andy Birchfield from the Beasley, Allen

3   firm.  I know him to be an extremely ethical lawyer who

4   has litigated in major litigations throughout the

5   country for years as well as his partners and his firm.

6   So before Miss Sullivan comes in here and says let's

7   get the plaintiffs' lawyers, let's attack the

8   plaintiffs' lawyers and get them to give you affidavits

9   where is the showing there's been an ethics violation?

10          The fact that a document in this kind of case

11   shows up in the press -- and, by the way, and maybe it

12   was an unintended misstatement, but the Wall Street

13   Journal article, which I happen to have in front of me,

14   does not say they got the documents from plaintiffs'

15   lawyers.  After talking about what the story is about

16   it says, "the records which plaintiffs' attorneys have"

17   show that external -- the external committee blah,

18   blah, blah, blah, blah.  Yes, the plaintiffs' lawyers

19   probably do have it.  We have seven million pages of

20   documents.  It is somewhere in their document

21   production.  A document that this reporter is writing

22   about exists.

23          But, you know, before -- and I will tell you

24   because I myself have been called by the press.  I have

25   never specifically discussed a document.  I have never

9

1   really talked much about the case.  The comments I have

2   made have been very general.  I was asked yesterday by

3   a New York Times reporter what do I think about the

4   federal cases going to Judge Fallon in New Orleans.  I

5   said he is a good judge and it was a fair draw for both

6   sides.  That's not the kind of comment that's designed

7   to influence jurors.

8          So, your Honor, I think Miss Sullivan by

9   writing this letter has taken this to a new level.  I

10   think at a minimum she should put some evidence up.

11   She should make a showing as to why attorneys who are

12   litigating this case representing their clients should

13   be signing affidavits and be subject to depositions.

14   At a minimum she should make that showing.

15          MS. SULLIVAN:  Your Honor, if I may briefly

16   respond, we do have the evidence of Mr. Birchfield and

17   the document that contained the Merck Bates number

18   appearing on 60 Minutes.  That was clearly produced

19   subject to protective order.  We have the Wall Street

20   Journal talking about previously undisclosed company

21   records and referring in multiple pieces about

22   plaintiffs' lawyers and what the plaintiffs' lawyers

23   intend to do with these previously undisclosed company

24   records.  We have the striking coincidence that issues

25   covered in depositions of company witnesses being taken

10

1   in this litigation appearing the next day in the New

2   York Times and other papers referring to confidential

3   information and confidential documents that was probed

4   that very day or the day before with Merck witnesses.

5   And we have repeated statements to the press by

6   Mr. Seeger and other plaintiffs' counsel of record in

7   this litigation relating to the substance of the

8   litigation and characterizations of Merck and what

9   agencies should do to Merck because of their, as

10   Mr. Seeger characterizes it incorrectly, quoted/unquote

11   misconduct, and that does have the potential of biasing

12   public perception and potentially biasing potential

13   jurors in this case.

14          And there are prohibitions, your Honor, and

15   given the history here, including blatant production of

16   Bates stamped confidential documents on a TV news show

17   we urge the Court to take some steps, in part, based on

18   the prior action, but in large part, because Merck

19   continues to produce very sensitive business

20   information and employment records that the Court take

21   additional steps to insure the confidentiality and set

22   forth confidentiality provisions set forth in this

23   Court's protective order are followed going forward.

24          MR. SEEGER:  Again, I have to correct the

25   record on this.  The document that she keeps referring

11

1   to from the 60 Minutes piece was not produced in the

2   New Jersey litigation.  Why aren't they in that court

3   in front of that judge asking that judge to address

4   what Mr. Birchfield did.  They are not subtle points

5   they're just failing to tell you.  This is very

6   important.  The article I was quoting in saying

7   whatever it is -- she remembers the quote better than I

8   do -- Mr. Mayer was quoted in that article saying Merck

9   did everything right.

10          I mean, you know, it is becoming -- I think

11   this is becoming a side show.  It is not relevant to

12   the litigation.  It has nothing to do with it, Judge.

13   No plaintiffs' lawyer litigating before your Honor has

14   violated any of your orders that I'm aware of.  We're

15   doing a very good job of policing this.  And, you know,

16   you want to talk about statements to the press, how

17   reckless is it for Mr. Gilmartin to stand up and make

18   press conferences mischaracterizing data that we

19   know -- people who look at it know -- it is just not

20   true.  I mean, we haven't responded to that.  We're not

21   going point by point with Merck.  The APPROVe data,

22   which you're going to hear about today, your Honor told

23   them give to it the plaintiffs when you get it; don't

24   give it to them after you submit it.  What do they do?

25   They have an article published in the New England

12

1  Journal of Medicine on the APPROVe data.

2  So, Judge, it is a two-way street.  If Merck

3  wants to stop talking to the press I'm more than happy

4  to tell you I won't take a call from another reporter

5  on any case.

6  MS. SULLIVAN:  Your Honor, if Mr. Seeger is

7  correct that no counsel of record in this case has

8  disclosed confidential documents to the press then

9  there's no prejudice or harm in them providing the

10  affidavits to the Court attesting to that fact, and we

11  can get to the bottom of the issue easily.

12  THE COURT:  All right.  Well --

13  MR. JACOBY:  I'm going to reserve, your

14  Honor.  It's been said.

15  THE COURT:  I was a litigator myself for 17

16  years before I became a judge, and I think -- acting

17  both on behalf of plaintiffs and on behalf of

18  defendants -- a great profession.  I think that lawyers

19  today are repeatedly subject to disparaging comments by

20  the public and by the press and by people who really

21  don't understand everything that goes on in the justice

22  system because since I have been a judge and when I was

23  litigating and including my adversaries who I litigated

24  against and watching both sides from the bench I think

25  that the majority -- not the majority, the vast

1  majority of attorneys are ethical, honest, hard

2  working -- and, sure, they're trying to advance their

3  own client's interests.  That's what it is about.

4  That's what the adversary system is about.  Each side

5  tries to advance their own client's interest.  It is a

6  battle of wits and intelligence and strategies and

7  facts -- hopefully, most of all, facts.

8  But we all know that there are frequently two

9  sides to every story and that in the middle somewhere

10  and sometimes on one side more than the other the truth

11  falls and sometimes the truth really is more clear cut

12  than in other cases on one side rather than the other.

13  But the fact of the matter is our system

14  that's worked for hundreds of years has been that

15  through the adversary process of each side presenting

16  what they believe is truthful facts and advocating for

17  what the truth is and what things mean, out of that

18  comes the truth, the verdict, and it's a verdict that

19  hopefully reflects justice, and I personally believe

20  greatly in the system.  I believe in the system of --

21  the adversary system.  It works.  It doesn't always

22  work.  There's nothing that always works.  It is not

23  perfect.  There's nothing that is perfect, but the fact

24  of the matter is, generally speaking, it is great.

25  And, generally speaking, attorneys, I feel, should

1  deserve to be well respected.

2  I'm sure in this room there must be one bad

3  apple, I guess, but the rest of you work very, very

4  hard tirelessly -- hopefully there are no bad apples,

5  there might not be -- and on the defense and on the

6  plaintiffs' side you spend hours and hours and hours

7  working.

8  You know, attorneys sometimes are said to

9  make a lot of money.  First of all, there's a lot of

10  attorneys that don't make a lot of money, and, second,

11  the ones that do make a lot of money and a lot of those

12  who don't make a lot of money work very, very hard for

13  their money.  It is not an easy job.

14  I hate it when I see attorneys disparaging

15  other attorneys and accusing each other of things, and

16  in the heat of battle it is common.  It is very common.

17  It is not something unusual to this case.  It is

18  something that happens frequently.  We get motions

19  every two weeks, and every two weeks we get some

20  motions where the different lawyers accuse each other

21  of hiding stuff, doing this, doing that,

22  misrepresenting things, outrageous statements really

23  some of them and some of them -- and I understand that

24  they come out of the heat of battle.  They come out of

25  a need to defend your client and a feeling that the

1  other side is your adversary and some of the emotion of

2  the moment because I think good lawyering involves some

3  emotion as well as intelligence, but it is still

4  disturbing, and it is not something that I am going to

5  allow in my litigation.

6  I am not going to have the plaintiffs saying

7  bad things about the defense lawyers, and I'm not going

8  to have the defense lawyers saying bad things about the

9  plaintiffs' lawyers.  If you truly believe on either

10  side that an ethical violation has been committed file

11  an ethics complaint.  I do not want each side -- you

12  know, I do not want each side attacking each other in

13  their papers on a personal level.  I'm not going to

14  deal with that.  I don't want to deal with that.  It is

15  inappropriate.

16  In this case we look at the rule which talks

17  about trial publicity.  First I would like to note that

18  I have been handling these cases for over a year, I

19  guess, before the drug was taken off the market.  There

20  was very little -- extremely little publicity, and

21  there were millions of pages of documents produced.

22  The publicity or the avalanche of publicity has started

23  since the drug has been pulled off the market, since it

24  has become a national issue, since it has become a

25  congressional issue and an FDA issue and now the New

1   York Times, the Wall Street Journal have become
2   interested in it.  The Star Ledger was interested in it
3   before because it was a New Jersey corporation, but
4   they're more interested in it now probably.  The bottom
5   line is that it's become a national news topic.  And,
6   quite frankly, it is a little disconcerting to me.  I
7   haven't dealt with that before.  My clerk has been
8   fielding calls also from the Times and from the Journal
9   and from the Star Ledger, and I'm not speaking to any
10  of those people, obviously.  I prefer that the
11  attorneys don't speak to them.  I don't want to see
12  this tried in the press, but the bottom line is this is
13  not the center of the universe as far as this
14  litigation is concerned.
15          There are hearings going on in Washington.
16  There are FDA hearings.  There are congressional
17  hearings.  There are things happening that are
18  newsworthy.  The public has a right to know about them.
19  They're going to know about them, and there's going to
20  be very little that is not newsworthy or of public
21  record before this case is over.  That doesn't mean
22  that every single document is going to be revealed
23  because there are some things that are truly
24  privileged, trade secret, truly confidential that
25  should truly not be revealed.  Those documents should

17

1   be limited in number.
2           Dealing with first the ethics question RPC
3   3.6 trial publicity is the rule of professional conduct
4   which deals with what a lawyer can do, and it states
5   that, "a lawyer who is participating or has
6   participated in the litigation of a matter shall not
7   make extrajudicial statements that the lawyer knows or
8   reasonably should know would have a substantial
9   likelihood of materially prejudicing an adjudicative
10  proceeding."  And then it goes on with things that he
11  may state.  "He may state the claim, the defense."
12  Those are pretty general terms.  I'm allowed to tell
13  you what my claim is, and I'm allowed to tell you what
14  my defense is.  I would like to know what that doesn't
15  cover.  It covers most everything.
16          We then come down to they're allowed -- and
17  notwithstanding paragraph A, "a lawyer may make a
18  statement that a reasonable lawyer would believe is
19  required to protect a client from substantial
20  prejudice, from substantial undue prejudicial effect of
21  a recent publicity not initiated by the lawyer or the
22  lawyer's client.  This statement should be limited to
23  such information as is necessary to mitigate the recent
24  adverse publicity."
25          Now, does not that open up a world of things

18

1   when there's congressional hearings, FDA hearings,
2   there's publicity from sources outside the lawyers and
3   the lawyers feel that they have to respond to
4   something.  I note that from the beginning as soon as
5   this came off the market there was a lot of publicity.
6   Before there were even hearings Merck chose to go
7   public with a lot of statements.  I mean, I try not to
8   particularly pick out VIOXX articles to read, but I do
9   read the papers every day.  I do get the New York
10  Times.  I do read the Inquirer.  I read the Star
11  Ledger, I do read the Press, and there's -- you know,
12  there's articles about it.  And the bottom line is that
13  when Merck representatives are coming out and saying,
14  you know, my wife takes the drug, it is perfectly safe,
15  we did everything right, that's fine, and it may very
16  well be true in the end, but they can't expect that the
17  plaintiffs are just going to let that spin go on or
18  nonspin -- maybe it is the truth -- but they're not
19  going to let it out there for three years and then try
20  to get an unbiased jury at the end of it or vice versa.
21          The bottom line is I don't think most of the
22  public probably thinks all this is all that
23  interesting.  I'm sure some people do.  Stockholders
24  do, but I'm not sure that -- everybody in my family,
25  you know, I have to bring to my husband's attention if

19

1   there's a VIOXX article because he is not reading it.
2   He could care less.  He wants to read the sports page
3   and maybe about Iraq because it is more pressing.  He
4   is not all that interested in VIOXX.  So I think with
5   this it is really going to be difficult for anybody to
6   show that anybody ethically violated anything as far as
7   making unethical trial statements or statements to
8   trial publicity statements.  But I'm not the ethics
9   committee.  If either of you or all of you or any of
10  you feel there's an ethical violation file a
11  complaint with the ethics committee and let them deal
12  with it.  I don't want to know about it.
13          As for the violation of my orders, obviously,
14  I am concerned about that, and I do want to be advised
15  of that.  I look through -- I would also note that
16  Mr. Mayer is quoted at least as much, if not more, than
17  Mr. Seeger.  They just about have equal press.
18          MR. MAYER:  I would say only when I'm told
19  that the plaintiffs have made a statement.
20          THE COURT:  And, Mr. Mayer, most of your
21  statements are very much in terms of -- they're
22  certainly within the rules -- they're certainly within
23  the proper statements and they're not relating to
24  direct documents.  I realize that.  But I don't see any
25  quotes in here from the plaintiffs' counsel that relate

20

1  directly to documents either.  The 60 Minutes show I
2  didn't see.  I don't know what it is about, but we
3  dealt with it before.  Counsel came to me before and
4  said there was a 60 Minutes show, something was
5  produced, I want to take the testimony of the
6  plaintiffs' lawyers under oath, and, as I recall, the
7  plaintiffs' lawyer from that law firm said he would be
8  happy to go under oath that day and tell me what he
9  knew about that or didn't know about that.  I said, no,
10  there's nothing here before me to hold a hearing on.
11       If somebody wants to show me that my order
12  has been violated at least prima facially show me a
13  document that was produced from this Court -- that was
14  another court another judge.  I can't deal with every
15  litigation around the country.
16       The protective order in this case is designed
17  to protect confidential information.  There's nothing
18  in these articles that specifically states that
19  plaintiffs produced anything that's in that
20  confidential order.  The reference in the article from
21  what I can see the only real documents they talk about
22  they definitely talk about some documents that were
23  produced by officials, not lawyers, but they do talk
24  about minutes, committee meeting minutes.  They don't
25  say they were produced by plaintiffs' lawyers, but they

1  mention committee meeting minutes.  Quite frankly, I
2  don't know whether the committee meeting minutes were
3  stamped confidential or not.  If they were I don't know
4  why they were because it doesn't seem to me that they
5  would be a trade secret, privileged or in any way
6  subject to a confidential order.  I don't know why
7  committee meeting minutes would ever be considered
8  confidential.  I can hear argument on it if at some
9  point there's an issue about that, but I think one of
10  the problems in this case is initially everything was
11  confidential almost because that allowed quick
12  production of records.  Plaintiffs' counsel wanted to
13  get the records fast.  Defense counsel said they could
14  produce them fast if they didn't have to worry about
15  each individual record being released.  We, therefore,
16  agreed that almost all the records, anything they
17  deemed sensitive, could be marked sensitive.
18       At that time Merck was still marketing this
19  drug.  They were still making substantial amounts of
20  monies for their shareholders selling the drug.  People
21  were still using the drug.  Doctors were still
22  prescribing the drug.  It was important to me that
23  there be a strong effort by the Court to protect the
24  company and to protect the integrity of the process so
25  that there wasn't information released, especially

1  about a drug that had not been taken off the market.
2       Now the drug's been taken off the market.
3  The flood gates of publicity are open.  The
4  confidentiality still pertains.  There are certain
5  documents in this case that should never see public
6  view.  They are private.  They are trade secrets.  They
7  are things that simply would be too unduly prejudiced
8  to the defendants to be produced not, quote, in the
9  litigation sense because they're bad for the company
10  litigation, but they're truly things that would disturb
11  their business that are not relevant to the trial or
12  that don't have the need to be produced at trial.
13  There's other things that are going to come out that
14  are going to be prejudicial and some things are going
15  to be -- lots of stuff that's going to be prejudicial
16  to the plaintiffs.  I'm sure that's what the adversary
17  system is all about.
18       Now, when I looked at the cases, and I looked
19  at the Frankel case at 181 NJ 1 it specifically states
20  by the Supreme Court that there can be agreements
21  between counsel for protective orders, and that when a
22  third-party comes in and in that case neither the
23  plaintiffs nor the defendants wanted the information to
24  be released but a third-party wanted access to the
25  information and the Court found that there was no

1  public right to access a discovery information that was
2  otherwise agreed to be confidential by the parties.
3  And, certainly, I would concur, and I certainly will
4  follow that and would follow that.  And I certainly
5  don't want people picking and choosing what they think
6  is confidential and violating court order, but the
7  point I'm getting at is very quickly -- supposedly I
8  think we have a February 28th deadline for the
9  declassification of most of this information, and the
10  bottom line is there should be only limited documents
11  that are at that point, quote, "confidential."
12       The Court has a real problem just
13  logistically with confidential documents.  I mean, this
14  is a place where records are public.  It is a place
15  where reporters are allowed to come in and sit in
16  hearings, a place where reporters are allowed to go
17  through the files.  Now, we have a request today by
18  someone saying they want to see the entire file.
19  Obviously, to do that I have to have staff sit through
20  and look through and make sure that we don't have
21  anything confidential or sealed in those records.  And
22  that's a burden that we have to accept.  But there
23  shouldn't be that many confidential records.  Now we're
24  talking about things that have been filed with the
25  Court.  We're not even talking about discovery.  There

1   should be very few things that are still confidential
2   that wind up getting filed with the Court, if any.
3           I just got plaintiffs -- and I got it before,
4   but I got plaintiffs' motion for class certification
5   all filed under seal. I don't want entire motions
6   filed under seal. I want the motions filed with the
7   papers attached and only those few documents that are
8   actually confidential should be separated out, kept in
9   sealed folders so we can keep them off in one filing
10  drawer by themselves.
11          MR. BUCHANAN: Your Honor, I think that's how
12  it was done. There were two filings. There was a
13  redacted filing that excluded the truly confidential --
14  there was a redacted filing that excluded a handful of
15  documents over which defendants maintained
16  confidentiality over. The rest of the affidavit was
17  filed in the Court's public folder, submitted for
18  filing in the court's public folder. The complete
19  affidavit that includes the handful of exhibits over
20  which defendants have refused to withdraw
21  confidentiality challenges remains in an envelope under
22  seal, but there are two versions, one that is
23  predominantly nonconfidential in the Court's file just
24  for the Court's knowledge --
25          THE COURT: Well, we got one initially which

1   sure in that Good Year file there were thousands of
2   documents -- I would assume -- that were produced and
3   there were 31 that were in issue in this case. So I'm
4   hoping that we can soon get to a point where there are
5   very limited confidential documents. Because, let's
6   face it, with the congressional hearings and everything
7   else there's not much that is confidential about this
8   case. There's not much that is going to be
9   confidential about this case, and to me we can have
10  more respect for, more concern and more protection for
11  those few documents that really need to be protected if
12  they're limited in number because if we have a small
13  number of documents that truly should be protected then
14  I can be much more aggressive as far as enforcing
15  orders to protect them. I can be much more aggressive
16  with plaintiffs' counsel and let them know if they
17  violate my orders they will be sorry if they release
18  things that are deemed to be confidential. I don't
19  want you to get the wrong idea that I'm now giving you
20  an open access to releasing things without any
21  repercussions because that's not the fact. There are
22  some things that deserve to be protected. Those things
23  will be protected, and they will be protected at a
24  price that you will not want to pay if you violate
25  them.

1   was another problem. We got the original
2   unconfidential file and then the other day we got a box
3   where the whole thing says sealed, includes all the
4   original papers, includes --
5           MR. BUCHANAN: Maybe it is not my case. I
6   thought you were referring to the Local 68 class
7   action, your Honor.
8           THE COURT: That's what I'm referring to.
9           MR. BUCHANAN: Okay. There's a portion of it
10  that is unsealed and a portion sealed. I'll straighten
11  it out later.
12          THE COURT: But the bottom line is we're
13  going to have to deal with this in the future. That's
14  the next issue. It doesn't have to do -- but the
15  second issue I want to address, and I hope to get
16  straightened out soon is that even in the case the
17  Frankel case which dealt with the Good Year Tire was
18  that the Good Year Tire?
19          MS. SULLIVAN: Yes, your Honor.
20          THE COURT: I think there were 30 documents
21  that were marked confidential or something like that.
22  It wasn't like we were dealing with -- we weren't
23  dealing with four million pages and three and a half
24  million of them were confidential for some reason. We
25  were dealing with 31 documents that are at issue. I'm

1           But, on the other hand, we have to make sure
2   that that's a limited amount of things. If it is not
3   and it becomes varied the really important private
4   truly confidential document shouldn't be buried in an
5   avalanche of other things that are, quote, "sensitive"
6   that are not; for example, committee meetings. I don't
7   see how committee meeting minutes will fall under the
8   role of confidential. Things that appear to me to be
9   confidential are trade secrets, privilege things that I
10  don't know would be produced, so I don't know where you
11  come with confidential because they're not even going
12  to be produced, privilege items, and we talk about
13  personnel files, I mean, give me a break. I didn't
14  order the personnel files of Merck employees. I
15  ordered items from their personnel files that discussed
16  VIOXX. Personnel file documents that discuss VIOXX are
17  not likely to be very personal documents. I did not
18  order their evaluations, unless they dealt with VIOXX
19  specifically. I didn't order their applications. I
20  didn't order their medical histories, their personal
21  information I declined to give. Plaintiffs' counsel
22  asked for all personnel files. I didn't give them
23  that. I gave them VIOXX mentioned things. Now that's
24  not personal information, even though it might be in a
25  personnel file. So I think we have to be careful about

1   over broadly trying to -- and I don't want to be too --
2   I know it sounds like I'm being critical of defense
3   counsel, and in some degree I am, but the fact of the
4   matter is I know that defense counsel has been in this
5   case extremely cooperative with the Court.  They have
6   been very forthcoming with information.  They have
7   produced documents after documents.  They have met
8   numerous deadlines.  They have kept up with the Court's
9   constant demands on them to produce things, and they
10  have done an excellent job, and defense counsel has
11  been doing an excellent job, has been cooperating with
12  the Court, and I don't want to sound critical of them
13  simply because I'm not happy about this one letter
14  because, in fact, the defense counsel have also been
15  doing an excellent job working hard and what they're
16  doing is zealously protecting their clients.
17          MR. COHEN:  If you wanted an update pursuant
18  to the agreement with counsel we have already gone back
19  over 10 depositions.  Four of the 10 we designated zero
20  of the testimony confidential.  If you talk about the
21  number of pages that has any line, even if it is one
22  line confidential it was 6 percent.  If you take out
23  one witness, whose almost whole deposition was on the
24  way in which Merck does a particular process, it is
25  down to 2 percent in terms of the testimony, and we're

29

1   to argue that in the context of a particular situation.
2           THE COURT:  What I said was I don't see how
3   committee meeting minutes would be confidential, but
4   there may be something said in a committee meeting that
5   would be confidential, you're right.  And there may be
6   something even in the VIOXX-related documents in
7   someone's personnel file that may be personal.
8           MR. MAYER:  Some of these people worked on
9   that product for an entire year so any comment on their
10  performance and so on might be VIOXX related depending
11  on how the thing is framed.
12          THE COURT:  I have not ruled that they're
13  automatically not confidential.  You're correct,
14  Mr. Mayer.  It is appropriate that some of those may --
15  you know, obviously we have to go page by page.  That's
16  the difficulty of this thing.  And you may share
17  something to plaintiffs' counsel.  From what has
18  happened before I think plaintiffs' counsel will agree
19  with you if it turns out it is something that they
20  think it is something that should be protected
21  hopefully it will be worked out.  99 percent of what
22  has happened in this case so far has been worked out
23  through the professionalism and through the cooperation
24  of both sides, so I'm very happy with both sides of the
25  attorneys as far as what's been done and the way this

31

1   over 200 exhibits attached to those, and we have gone
2   down from wherever we were the numbers very bantered
3   about but between 20 and 25 percent, and that is with a
4   selection bias, and so that's where we are, and as you
5   know we do have a February 28th deadline for the rest
6   of it.
7           THE COURT:  True.  Mr. Cohen, you have done a
8   wonderful job in this case as far as I'm concerned.
9   Mr. Mayer and Miss Sullivan, you know, I compliment the
10  way you have worked with the Court.  I don't want to
11  make this appear that it is a negative thing and I have
12  a problem with defense counsel because I don't.  You
13  have done an excellent job and you have, in fact, been
14  very cooperative with me and you have, in fact,
15  produced a great number of records, much more readily
16  and much more easily and with much less difficulty than
17  I have encountered with many, many other lawyers in
18  other litigations on both sides.
19          MR. MAYER:  Judge, may I just say something?
20          THE COURT:  Certainly.
21          MR. MAYER:  I'm sure your Honor didn't mean
22  it that way, but I didn't want the record to be
23  construed that you were ruling either that no committee
24  minutes are confidential or that none of these
25  personnel records are confidential.  I think it is best

30

1   case has been progressing.
2           All right.  I think we're going to go to the
3   conference room to just deal with more in an informal
4   management issues as far as discussing the rest of the
5   case, so if you'll want to retire there we have got
6   seats there.  We are having the file and serve
7   electronic service people coming in this afternoon to
8   explain that process to you.  I also have my case
9   manager is going to come in and go over a few technical
10  details downstairs as to problems they're having, and I
11  understand we have an MDL judge.
12          MR. SEEGER:  Yes, Judge, Judge Fallon.
13          THE COURT:  I have no idea who that judge is.
14  I mean, I don't know the judge, but I'm glad to see it
15  was in New Orleans because I'm going to request that I
16  be allowed to go down there.
17          MR. SEEGER:  I had the pleasure of being in
18  front of Judge Fallon in the Propulsid litigation.  I
19  spoke with some of the defense counsel.  He is a good
20  judge.
21          (Break taken.)
22          THE COURT:  Stay seated.  I don't know if
23  this is better or worse.  I came up with this as
24  another idea.  We'll see.  This is Jill, you have met
25  her before.  She is the case manager downstairs from

32

1  the mass torts.  She is going to just remind you of a
2  few administrative points.

3       MS. SOLIMARI:  What I have are very
4  administrative tasks that I ask you to bring back to
5  your secretaries, and while I'm addressing that, if you
6  at any point through the course of this case if you
7  would like me or my staff to meet with your secretaries
8  or paralegals in this format we would be happy to do so
9  so just let us know, okay, and they can, of course,
10 e-mail me with any questions that they have at any
11 point.  Like I said, these are very secretarial issues
12 so get ready.

13      On the CIS's and complaints we request, and
14 it is required under rule, that you have original
15 signatures on both.  Failure to do so will delay the
16 filing of the document.  You should also include just
17 one original and one copy only on the complaints.  Any
18 subsequent documents you just require just the one
19 copy, one original.  You will not receive a file copy
20 back because you may know that they are filed on Lexis
21 Nexis, and, therefore, you can have your service there.
22 So there's no need for us to return.

23      Also, when you send multiple filings in
24 please send a large manila envelope to return them.
25 For example, we may get 50 complaints and a small

1  letter envelope, and it is difficult to return them.
2  So, as I said, just be mindful of those things.  Also,
3  I appreciate -- I know counsel have been in the case
4  have been alerting the Court when they're filing 100
5  complaints in one day.  We appreciate that, and, you
6  know, hope that you can continue to do so.  And even
7  that can also be with other multiple complaints.  Just
8  so we have some idea.

9       Also, in the caption you want to be sure that
10 your ATL first and the MT designation should follow the
11 docket number.  Some firms have been using it in place
12 of the ATL number and, apparently, that is a problem
13 administratively up to the AOC level, so we ask that
14 you do that.

15      Let me see what else.  For docket number
16 requests particularly with multiple filings you can
17 e-mail the person that is entering the complaints
18 directly so at her convenience she can get back with
19 those docket numbers.  Her e-mail addresses is
20 Lori.Fulton@judicairy.state.nj.us.

21      THE COURT:  You know what, Jill, I'm trying
22 to think with the complaints -- we don't have Mark
23 here, but if they come to the desk with 100 complaints
24 or 50 complaints whatever and they have an original and
25 one they would have to actually wait to have them all

1  entered into the system to go back with a docket
2  number, right?

3       MS. SOLIMARI:  That's correct.  And I don't
4  know where this comes from.  Couriers do often wait,
5  and they require a time frame that they're here.  I
6  don't know because you're being billed.  The courier
7  service it is difficult for us.

8       THE COURT:  Then they'll need two copies.
9  This is the situation.  You bring your complaint in.
10 It has a copy with it.  If you have one copy with it
11 and you just leave them here we'll stamp them all that
12 day immediately.  It might take them two days to enter
13 them into the system and get docket numbers.  They'll
14 then return to you the one copy with the docket number
15 on it.  If you feel that you need to walk away from the
16 counter with a stamped document that shows you filed it
17 that day, which some attorneys they want to have that
18 in their hand, that's fine, but then you're going to
19 have to provide an original and two copies that way
20 they can stamp one of the copies with the date.  You
21 still won't have a docket number, but you'll have the
22 date of filing.

23      MS. SOLIMARI:  Would it satisfy the attorneys
24 to have the cover letter stamped with the date with all
25 of the captions, would that work or do you need to have

1  the actual complaint because that may save your offices
2  some copies?

3       THE COURT:  Each of you have your choice when
4  you come.  Make sure your courier knows what you're
5  bringing, so if you want a stamped copy of the
6  complaint you need two.  If you want -- with the
7  docketed number you'll have to sit around for 24 hours
8  for them to get them entered.

9       MS. SOLIMARI:  And when there is 300 filed in
10 a day it may be a little bit longer -- and, also, we
11 had a Fed Ex situation when they Fed Ex something into
12 the building because of the volume of Fed Ex that we
13 receive often it will get misdirected to the TCA's
14 office, for example, so it is stamped Fed Ex February
15 14th gets to our division February 15th.  We are making
16 every attempt to make sure that filing is the 14th.  If
17 your offices should see that there is an error made
18 please call us right away, and we'll take care of it.
19 It shouldn't happen, but I want you to be aware because
20 of the statute of limitation issues and so forth.

21      And one more thing.  As I said, document
22 filings when you put your subsequent documents after
23 the complaint just be sure you put a cover letter
24 indicating the date it was filed on Lexis Nexis just as
25 a filing date because that will be your filing date if

1   we receive it two days later or three days later for
2   example.  And no file copies, again, will be returned
3   in those scenarios because you have them on Lexis
4   Nexis.
5          THE COURT:  So they get the motion in they
6   are entering it on the system.  It was filed on Lexis
7   Nexis the day before, so, therefore, it was timely and
8   they'll enter it for that day, but they need a cover
9   letter from you saying enclosed is a hard copy of this
10  motion.  This was filed on Lexis Nexis the next date
11  that way they can enter it in for that date without
12  looking at Lexis Nexis.  And the other issue was
13  checks?
14         MS. SOLIMARI:  Charge accounts.  We prefer
15  that no checks be utilized at all, that everyone
16  utilize a charge account.  Of course, that is not
17  required, but it certainly is our preference.  And you
18  also need to be aware of your account balances.  We had
19  a situation yesterday where the account balance was
20  low.  We were unable to enter any of the documents, but
21  in that scenario we did learn that you can wire money
22  to the account, which is something that hadn't been
23  done in the past.  So I think that may help all of your
24  offices.  So if you realize you don't have enough wire
25  it up there and we'll be set and ready to go.  So just

1   try to be aware of that because that will result in
2   timely filing, as well.
3          THE COURT:  Apparently, checks have to go
4   through a lot of hands and they really slow us down.
5          MS. SOLIMARI:  Checks it is a
6   three-department issue just to back up, so we really
7   prefer the charges, and it is much more timely for
8   everyone.  Did anyone have any questions?
9          MR. WENKOWIT:  Can the charge account be
10  connected to a credit card?
11         MS. SOLIMARI:  That I don't know.  There
12  is -- I don't know if you have been -- I'm hoping you
13  have all been to the website and in the case manager
14  recommendations there is a phone number of a contact
15  person in that department, but I will probably be
16  coming and going through the day, and I'll make every
17  attempt to find out because that would be -- I would
18  think ideal.  We'll see if it is not being done if they
19  can at least approach the subject.  Any other
20  questions?  Okay.  Thank you.
21         THE COURT:  Okay.  Let's go with the agendas
22  we got.
23         MS. SULLIVAN:  Your Honor, Mr. Buchanan was
24  good enough to agree we can start with the class action
25  case so Mr. Judd could get back on a plane to

1   California.
2          THE COURT:  All right.
3          MR. JUDD:  We have just a very, few I think,
4   brief issues, your Honor.  As you may recall we had
5   kind of a floating date for the due date for the
6   opposition brief.  That's been firmed now.  That will
7   be filed next Wednesday February 23rd, which raises the
8   issue of a schedule for reply briefing, and the only
9   reason I raise it now is because there will be almost
10  three weeks transpiring before the next conference
11  after the opposition is filed.  So --
12         MR. BUCHANAN:  Your Honor, ordinarily I would
13  feel comfortable just picking a date right now.  Just
14  in conversations with counsel I understand there's
15  going to be a number of substantive affidavits attached
16  to their opposition brief.  We're going to need to
17  coordinate deposition dates, if appropriate, but not
18  having seen the affidavits it may not even be necessary
19  to take all those depositions, so if we could call the
20  Court a handful of days after we have gotten their
21  opposition brief and set a date for the reply brief
22  once we know we have a deposition scheduled and we'll
23  be able to firm up.
24         MR. JUDD:  That will be fine.
25         THE COURT:  Okay.

1          MR. BUCHANAN:  Maybe the Tuesday after.  Is
2   that okay?
3          THE COURT:  So that would be, what, the 29th?
4   That would be March 1st?
5          MR. BUCHANAN:  I think that's.
6          MR. JUDD:  The Tuesday after that would be
7   March 1st.
8          THE COURT:  So on March 1 -- let's just say
9   that 1:30 on March 1 you'll put in a phone call to me.
10         MR. JUDD:  Sure.
11         THE COURT:  At that point we'll be able to
12  schedule, hopefully, the date for the reply briefs.
13  There was some scary request for a surreply brief.
14         MR. JUDD:  That's not a request at this
15  point.  I just want to flag the issue that if, indeed,
16  the plaintiffs submit substantive affidavits in support
17  of their reply we may want to undertake discovery of
18  their experts, and it may warrant further briefing.
19         MR. BUCHANAN:  And I suspect, your Honor,
20  that there would be no need for a surreply, they could
21  probably raise whatever issues they had.  If they
22  needed such depositions we could arrange them at
23  argument, but I think that may be an issue for a letter
24  date.
25         THE COURT:  All right.  Let's deal with

1  what -- we'll deal with the time schedule then on
2  Tuesday, March 1st at 1:30.
3      MR. JUDD:  Sure.
4      THE COURT:  Chris, make sure you tell Carmen.
5  Anything else?
6      MR. JUDD:  Not on the engineers case.
7      MS. SULLIVAN:  Anything else on engineers,
8  Dave?
9      MR. BUCHANAN:  Nothing.
10     MS. SULLIVAN:  Your Honor, subject to the
11 Court --
12     THE COURT:  Mr. Buchanan, I would like you to
13 stop just some time today just briefly to talk to
14 Carmen and see what needs to be kept sealed and what
15 doesn't in that motion.
16     MR. BUCHANAN:  Your Honor, let me state for
17 the record, I mean, first of all, it is a substantive
18 motion.  The cases that are cited in their briefs don't
19 really apply to substantive motions.  They apply to
20 discovery motions, you know.  From my perspective we
21 have a lot going on in the case right now.  I'm not
22 interested in briefing another issue as to the
23 appropriateness of the sealed documents in our motion
24 for class certification remaining under seal, but I
25 just want to note I really have no interest in it.  It

1  is just the process has been put in place under the
2  protective order, and I thought they were filing their
3  papers today, and I wanted to make sure before their
4  papers were in the Court record we at least had the
5  public and nonpublic versions of our motion for class
6  certification in the public court record.
7      MR. COHEN:  I think the question is just do
8  you want a split or do you want to have -- I think the
9  way they did it, which, actually, I think is a good
10 idea, was have a complete set under seal for the Court
11 and then a public set for the public, but on the bench
12 he is going to be saying split it and just put the
13 small exhibits under seal.  If you did that you would
14 have a much smaller envelope, but there are pluses and
15 minuses to both sides.
16     If you wanted to see everything at once the
17 way plaintiffs did it you get the whole thing, instead
18 of having to put two pieces together, and that's a
19 matter for the Court, and, clearly, plaintiffs are
20 doing -- I commend them for putting it under seal.  It
21 is my issue.
22     THE COURT:  All right.  Well, then if that's
23 the way you have done it you respond that way.
24     MR. JUDD:  Actually, your Honor --
25     THE COURT:  It will probably actually work

1  out better.
2      MR. JUDD:  We have a third-party --
3      THE COURT:  My initial thought from the bench
4  was the opposite that we should just keep those
5  documents separate, but maybe if we have two separate
6  copies it is easier for me to keep the whole copy
7  that's mine together and the public copy somewhere
8  else.  Okay.
9      MR. JUDD:  It becomes particularly
10 problematic where you discuss in the text of the brief
11 a confidentially designated document, whether we have
12 to redact and have a hybrid --
13     MR. BUCHANAN:  Hopefully these issues
14 regarding confidentiality will be water under the
15 bridge in the forthcoming weeks because substantially
16 less will be designated.
17     MR. JUDD:  In our case there's been a
18 third-party designated some documents that they
19 provided to plaintiffs.
20     MR. BUCHANAN:  Yes.
21     THE COURT:  Okay.
22     MR. JUDD:  The only other --
23     THE COURT:  I guess nobody wants to file one
24 of those e-briefs?  Judge Corodemus showed showed them
25 to me, and I had Dennis Medwick here yesterday, and he

1  was going over some of the technology with me, and I
2  asked him -- I said none of the lawyers seem to be
3  using these.  He said they cost about 20 grand a piece.
4  I said, well, that would explain it.  That sound a
5  little prohibitive to me.  So, hopefully, they'll bring
6  that technology down to a reasonable price some day
7  because that would be wonderful.  It would be nice if
8  there was software that lawyers could use in their
9  office instead of sending it out.  Anyway.
10     MR. JUDD:  The only other issue is really one
11 involving the Sinclair case, and that's a scheduling
12 issue, as well.  We're currently planning where
13 plaintiffs are going to file a motion for certification
14 on the 28th of February, and Merck is going to file a
15 motion to dismiss, and from our perspective it would
16 make the most sense to have the motion to dismiss heard
17 first if it is dispositive, and if lightning strikes
18 and we prevail then it will avoid the need to brief the
19 certification motion, and we'll go from there.
20     THE COURT:  Okay.  When do you plan on filing
21 your motion?
22     MR. JUDD:  On the 28th.
23     THE COURT:  Same day they file theirs?
24     MS. FLEISHMAN:  We had agreed specifically
25 they could do that because initially their motion to