1  dismiss was scheduled a month ago, and then they moved
2  it back to the -- we have to move it back to the 7th
3  then we agreed to the 28th on the condition that we
4  would both file the motions at the same time.  It seems
5  inappropriate for them to now ask the Court to
6  intervene to their benefit.
7      THE COURT:  Well, they are both going to be
8  filed on the same date, right?
9      MR. JUDD:  They'll be filed on the same date.
10     THE COURT:  You're just asking that the
11 dismissal motion be heard before the certification
12 motion.
13     MR. JUDD:  Correct.
14     MS. FLEISHMAN:  We're asking they be briefed
15 simultaneously since there's going to be cross issues.
16     THE COURT:  Is it a distinct issue that has
17 nothing to do with the class certification?
18     MR. JUDD:  I believe so.  I mean, I believe
19 the motion to dismiss is unrelated to the certification
20 issues that we would be raising in opposition -- I
21 mean, I haven't seen the motion for certification, so I
22 can't say that for certain.
23     THE COURT:  I'll get those February 28th.
24 Why don't we hold -- well, maybe by the time the next
25 conference comes would that be too long a period of

1  time for me to -- I'll review them before then and at
2  that point I can decide whether I want to hear the
3  motion to dismiss independently even though I won't
4  have the opposition.  I'll have at least an idea of
5  what it is you're talking about.
6      MR. JUDD:  That's only two weeks after the
7  file --
8      MS. FLEISHMAN:  We also had agreed to speak
9  with defense counsel to see if we can resolve any open
10 issues before they filed their motion to dismiss, so if
11 there were issues that they were 100 percent right then
12 we would withdraw those.
13     THE COURT:  Have you had a chance to discuss
14 those things?
15     MR. JUDD:  No.
16     MS. FLEISHMAN:  I had spoken to Mr. Judd's
17 partner about it.
18     THE COURT:  What time do you have to leave?
19     MR. JUDD:  I don't have to catch a plane
20 until 6:20 at this point.
21     THE COURT:  You just didn't want to eat pizza
22 for lunch.  Is it possible you two could speak?
23     MS. FLEISHMAN:  Absolutely.  We can talk
24 about it.
25     MR. JUDD:  Actually, you'll have to talk to

1  John Nedblock (ph) about the substance of that.
2      THE COURT:  So it won't do any good for you
3  two to sit down?
4      MR. JUDD:  Correct.  I have to say that in
5  almost 16 years I have never had opposing counsel say
6  you're right we'll dismiss, but that's --
7      THE COURT:  But here you have a lawyer who is
8  saying that they would do that, so take advantage of
9  it.
10     MS. FLEISHMAN:  If you're right we'll
11 absolutely withdraw the claim.  And if you're wrong we
12 won't.
13     THE COURT:  That would eliminate me having to
14 make any decision at all.  Okay.
15     MR. JUDD:  I somehow suspect you'll be in the
16 mix.
17     THE COURT:  We'll see.  All right.  No other
18 issues then?
19     MR. BUCHANAN:  There are, your Honor.  There
20 are some issues that were put on by counsel for the
21 consumer class, not all of which relate to scheduling
22 issues that I imagine Mr. Judd would be involved with.
23 Some of these relate to general discovery requests by
24 counsel in that case.  I don't know who is going to
25 address that, is that you Ted?

1      MR. LIEVERMAN:  Ted Lieverman, your Honor,
2  law firm of Spector, Roseman and Codrov.  Mr. Cohen is
3  here with me today.  We represent the plaintiffs in the
4  Klineman and the Martin case, which are class actions
5  for consumer economic damages only.  The first thing is
6  we have spoken to Mr. Buchanan and Mr. Judd.  I believe
7  there's no opposition to our request to have our firm
8  appointed as lead counsel solely for the class of
9  economic damages only, and we would like to submit to
10 the Court an order -- proposed order under the five-day
11 rule toward that end.
12     MR. JUDD:  I understood it to be slightly
13 different in the sense that the economic damages are
14 broader than just the consumer cases.  In fact, there's
15 an overlap, I believe, between the third-party payers
16 and the consumers or economic damages generally, but
17 subject to that distinction I have no objection
18 certainly.
19     MR. BUCHANAN:  Your Honor, when I spoke to
20 Mr. Lieverman yesterday he raised that he wanted to
21 submit an order under the five-day rule proposing that
22 he be lead for claims asserting claims on behalf of
23 consumers seeking reimbursement for economic loss
24 arising from the purchase or use of VIOXX.  I told him
25 that I couldn't speak for all the lawyers who had cases

1  in New Jersey.  I don't know what other class actions
2  are out there, but, certainly, if he served an order
3  under the five-day rule if there was any objection it
4  would rise to the forefront.
5          There is, I think, a technical overlap
6  between their complaint because I think by the terms of
7  it they could be perceived to represent the interests
8  of third-party payers, which, as you know, we represent
9  in the Local 68 matter.  I understand from
10  Mr. Lieverman that that is not a class definition that
11  he intends to press in his separate consumer class, so
12  as I am the only -- as our firm is the only firm that
13  would have a conflict in term of counsel structure like
14  that we don't have an objection as he has proposed it.
15          THE COURT:  Your class is consumer only.
16          MR. LIEVERMAN:  That's correct, your Honor.
17          THE COURT:  Not third-party payers.
18          MR. LIEVERMAN:  Separate and distinct from
19  the third-party payers.
20          MR. JUDD:  The only point I make is there's a
21  ruling already that says that the third-party payers
22  are consumers, so except for the possible confusion of
23  the terms you may want to come up --
24          MR. BUCHANAN:  Can we call them end users and
25  third-party payers?

49

1          lead counsel is I think Lieff Cabraser, so that's been
2  a distinction that has been drawn and previously
3  entered orders, but we are communicating with other
4  liaison counsel in our capacity here to make sure
5  they're getting the information they need for those
6  cases.
7          MS. SULLIVAN:  And that order was entered
8  with the same understanding as it relates to discovery
9  against Merck will coordinate through you.
10          MR. BUCHANAN:  I don't know there was any
11  understanding at that point in time.  As a practical
12  matter we're coordinating discovery, and whatever is
13  produced to us is shared with all plaintiffs' counsel.
14          MS. SULLIVAN:  Well, the only thing we would
15  like to avoid, and it may be a nonissue if it doesn't
16  happen, but to have to deal with various plaintiffs'
17  counsel seeking the same information from Merck.
18          THE COURT:  I don't think it will be a
19  problem.  If it does become an issue then we'll address
20  it.  All right?
21          MR. JACOBY:  We can deal with it.
22          MR. BUCHANAN:  As a practical matter, your
23  Honor, we have made the documents available to counsel
24  regardless of whether it is a class case or an
25  individual case.

51

1          MR. JUDD:  Just to avoid the confusion.
2          MR. KIEVERMAN:  We'll come up with a
3  terminology that delineates, your Honor.  I have no
4  problem with that.  I think we agree on the concept.
5          MS. SULLIVAN:  Your Honor, on that point the
6  only issue is to the extent there's discovery issues we
7  would like to deal with plaintiffs' liaison counsel
8  Mr. Buchanan and the Anapol firm rather than deal with
9  multiple counsel on the same discovery issues that may
10  overlap with the products cases.  We're happy if -- we
11  are not going to have an objection if they want another
12  class counsel to speak on behalf of the economic
13  claims, but in terms of the discovery issues we would
14  like to deal with Mr. Buchanan and Mr. Weiss.
15          MR. BUCHANAN:  I would be happy to be a
16  vehicle to communicate either side's position as a
17  practical matter.  If it is specific to an individual
18  case, you know, individual plaintiff discovery, things
19  of that nature, I assume they would be dealing directly
20  with lead counsel as proposed by the parties on those
21  matters.
22          The one clarification, I think there has been
23  a separate order entered already, Diane, as it related
24  to the medical monitoring case appointing liaison and
25  lead, and that specific lead is Esther Berezofsky and

50

1          THE COURT:  Okay.
2          MR. JUDD:  I don't think there's anything
3  further involving the class cases.
4          MR. LIEVERMAN:  I believe there were a couple
5  other issues about access to the documents, but I had a
6  long conversation with Mr. Buchanan yesterday, and
7  based on that, I think it makes sense to take that
8  issue off the agenda from our point of view, and I
9  think we can work directly with Mr. Buchanan, Mr. Weiss
10  and address that issue now.  If it becomes a problem
11  we'll raise it at the next conference.
12          THE COURT:  All right.  That's good.  Okay.
13  So those issues are resolved.  If you wish to leave if
14  you're just involved in the class actions that's fine.
15          MR. JUDD:  Thank you, your Honor.
16          MR. LIEVERMAN:  I'm sorry.  There was one
17  other issue, which is the motion for class
18  certification for the consumer class.  We expect to
19  file our motion by March 15th, maybe March 20th, and we
20  have not discussed scheduling with Mr. Judd yet.  I
21  think it makes sense for us to talk to him informally
22  about scheduling before we present something to the
23  Court, although we're happy to talk about it now if the
24  Court prefers.
25          MR. JUDD:  The only point I would raise, your

52

Transcript - Monthly Status Conference (2005/02/17)

1  Honor, is that I think many -- there will be many
2  issues that overlap on certification issues,
3  particularly with respect to the -- I'm going to use
4  the term broadly -- consumer economic damage cases.  I
5  think that whatever happens in the engineer's case is
6  going to be instructive in particular for the Klineman
7  and Martin cases, but we're on separate tracks, and if
8  they want to file a motion all I would suggest is
9  rather than put the opposition on the track so that
10 we're furiously making very similar arguments to
11 engineers that we get a schedule in the engineer's case
12 and maybe get a ruling before we get too far down the
13 road.
14       THE COURT:  You can file your motion whenever
15 you want, and then after you file your motion whenever
16 it is filed then we'll deal with what should be done
17 post filing of it, whether discovery should -- has
18 there been any discovery with this class?
19       MR. JUDD:  No, not yet.
20       MR. LIEVERMAN:  We anticipate that discovery
21 is not going to be a major issue either for us or them.
22       THE COURT:  Okay.  Well, file it.  See if you
23 can work it out, your discovery issues.  If you can't
24 we'll address it at the next meeting.
25       MR. LIEVERMAN:  Very good, your Honor.  Thank

Transcript - Monthly Status Conference (2005/02/17)

1  you.
2       THE COURT:  Anything else?
3       MR. JUDD:  No.  Thank you, your Honor.
4       THE COURT:  All right.  Thank you.
5       MS. SULLIVAN:  Your Honor, as it relates to
6  the agenda items of plaintiffs and Merck subject to the
7  Court's okay and Mr. Buchanan's agreement if we can
8  just alternate, take one of their agenda points and go
9  to Merck's agenda point because the plaintiffs' agenda,
10 no fault of theirs, has tended to dominate the
11 conference, and sometimes we don't get to some of them.
12       THE COURT:  We'll start with one of Merck's
13 then.
14       MR. BUCHANAN:  Diane, I think you went first
15 last time, actually.  I don't oppose your proposal.
16       MS. SULLIVAN:  I didn't think you would.
17       MR. BUCHANAN:  I guess we're on to ours?
18       MS. SULLIVAN:  Fine.  Go ahead.
19       Judge, the first item on Merck's agenda
20 relates to an issue that I thought we had resolved both
21 with the Court and with Mr. Mariano.
22       THE COURT:  I'm sorry.  I don't have it.  Can
23 I have it back?
24       MS. SULLIVAN:  And that relates to additional
25 the supplemental fact discovery from Merck to the

Transcript - Monthly Status Conference (2005/02/17)

1  individual plaintiffs.  The Court may remember we
2  submitted supplemental fact discovery.  We had some
3  discussion about it, and it related to things if they
4  have day in the life films, videotapes, additional
5  documents related to VIOXX and what they saw in public
6  documents or on the internet about it, and at
7  plaintiffs' request we added those to the facts sheet,
8  and then I was surprised after negotiating the
9  information to get some additional objections, so I'm
10 not sure what to suggest, unless to go through each one
11 of them or if your Honor at a break -- there's about a
12 dozen additional fact questions.
13       MR. BUCHANAN:  Your Honor, if I may, before
14 we go through those I just wanted to frame the context
15 as I think the transcript should reflect.  Defendant
16 served supplemental discovery requests on plaintiffs
17 some time in the fall -- I think it was in October --
18 directed to all plaintiffs who had cases of record.  It
19 was October 13th.
20       We submitted letter objections in early
21 November initially asserting that most of this
22 discovery was already contemplated and encompassed by
23 the current facts sheet and that the additional
24 discovery exceeded what the Court's earlier order was
25 in terms of what the facts sheet was supposed to

Transcript - Monthly Status Conference (2005/02/17)

1  represent.
2       You didn't accept our position in terms of
3  the facts sheet was the only discovery to be taken from
4  plaintiffs, but you still reminded the defendant to
5  reserve the request and have the plaintiffs submit a
6  formal answer to those and we would address it at the
7  December conference.
8       We did, we submitted formal objections.
9  Several items in their document requests are just
10 objectionable not because they have already asked for
11 information in the facts sheet.  We don't mind if they
12 want to put a duplicative request in, no harm no foul,
13 but they have also asked for information that's just
14 not appropriate in a facts sheet or in discovery in an
15 early point in litigation.
16       So we spoke to defense counsel, highlighted
17 all our objections to them.  It wasn't a topic of
18 conversation during the December conference and told
19 them the requests we had objection with.  Defense
20 counsel said, okay, I'll take another look at it and
21 they reissued those requests.  They reissued the
22 request with many of the objected to items in the same
23 requests again.  We dealt with this issue again at the
24 last conference, and there's been some confusion about
25 the Court having signed off on these discovery

1  requests.  Many of them are objectionable, and I think
2  you'll see that when we go through them, but there's
3  another problem here, and our suggestion was, well,
4  rather than serve supplemental discovery requests on
5  all plaintiffs why don't you just -- if you want day in
6  the life videos put it in the facts sheet request.  If
7  you want photographs put them in the facts sheet
8  request.  Let's amend the facts sheet to take account
9  of those things.  Let's not require plaintiffs to
10 answer two discovery documents.  Let's make one.
11      But what they have since done is they have
12 used this supplemental request and a couple of things
13 we agreed to as a vehicle to renegotiate the facts
14 sheet.  We had a very lengthy conference here.  They
15 have gone through the facts sheet and added columns of
16 additional information they request from plaintiffs on
17 the facts sheet that aren't called for by their
18 discovery requests.  Additional context on tell me
19 every pharmacy you have ever had your prescriptions
20 filled at.  That's not a facts sheet item.  You get
21 medical records, you get authorizations.
22      So what they're doing is using a couple
23 legitimate requests we can agree to as a vehicle to try
24 to get additional discovery.  If we'll go item by item
25 my colleague, Mr. Maiorano, has dealt extensively with

1  Miss Sullivan's office and we can go through them, but
2  I object strongly to the characterization that this was
3  ever ordered or that it was ever consented to.
4      MS. SULLIVAN:  Your Honor, I'm actually
5  confused because there's always pharmacy record
6  requests included in the facts sheet.  If you look at
7  the first page of the facts sheet in terms of the
8  definition of health care provider it talks about
9  pharmacy records, and what we did, your Honor, is at
10 their request include the supplemental requests for
11 information in the facts sheet at the same time because
12 we wanted to standardize the facts sheet for the MDL we
13 took the same information and made it user friendly in
14 terms of putting columns for health care providers and
15 pharmacies.  If they don't like the reformatting,
16 frankly, we don't care that much about it, but what we
17 do care about are the supplemental questions that I
18 thought we had discussion about and they agreed would
19 be included in the facts sheet and then I have gotten
20 renewed objections, so if you want to go through
21 those --
22      THE COURT:  Where are the specific
23 objections?
24      MS. SULLIVAN:  The new questions are the
25 highlighted ones.

1      THE COURT:  Page 31 N through T?
2      MR. BUCHANAN:  There are earlier additional
3  items.  Maybe you're not aware of this, Diane, turn to
4  Page 15, and I did speak on a not entirely informal
5  basis when you look at the columns on 15, prescription
6  medicine, they have added four additional columns of
7  information they want from plaintiffs.  Not only the
8  medication, which was on the original list, date first
9  taken, date last taken, prescribing doctor, and reason
10 for prescription.
11      You know, we spent a lot of time a year and a
12 half ago going through all these items in a lot of
13 detail.  We asked for a red line of this document, and
14 they said all we have done is inserted a couple of
15 requests into the facts sheet and changed the structure
16 around.  When I did it I was surprised to see four
17 other columns of information being sought at different
18 places in the facts sheet.  So as a process we have a
19 concern, but, frankly, we have been down this road
20 already.  They get all this information in the medical
21 records.
22      Plaintiff is not the -- plaintiff is not the
23 person who prescribed the drug.  The doctor is.  That's
24 in medical records.  We're giving them authorizations.
25 If they want to ask a plaintiff at deposition what the

1  reason was for that, fine, ask them, see what their
2  understanding is, but there's no reason to ask the
3  plaintiff what the reason was this stuff was
4  prescribed.  These are sworn to statements.
5      MR. CORONATO:  Your Honor, this information
6  was actually in the original facts sheet, these
7  columns, but they weren't set forth very clearly as
8  columns, but the information was requested in the
9  original facts sheet.  All we have done is reformatted
10 so it would be easier for plaintiffs and defendants to
11 review the responses once we get them.
12      Very often the plaintiffs were not answering
13 the columns because it wasn't clear that they were
14 columns the way it was formatted, but the information
15 that you see here on Page 15 and 16 that was
16 information that was in the original facts sheet, a
17 request for.
18      MR. BUCHANAN:  That's not my understanding,
19 your Honor.  What I'm concerned about, and, frankly,
20 this came over on Tuesday this is a stalking horse
21 where we haven't gotten a red line, and they're
22 inserting new questions that aren't on their
23 supplemental discovery request and looking for a so
24 ordered plaintiff facts sheet from your Honor today to
25 be applied to all cases when in reality there's

1  obviously some confusion about what's being snuck into
2  the new version -- not even snuck -- what is being put
3  into this that we may not be clear about because,
4  frankly, we did find things that were simply not
5  reordered, Will, and that's my concern.
6          MR. CORONATO:  Your Honor, another issue that
7  Mr. Buchanan raised with respect to he was saying for
8  the first time we're asking for a list of pharmacies --
9          MR. BUCHANAN:  I have clarified that.  It was
10  the columns in the prescription records that I was
11  confused about.  That was not in the earlier version.
12          MR. CORONATO:  It was a matter of
13  reformatting it so it would be easier.
14          THE COURT:  Is 15 and 16 in the first facts
15  sheet or not?
16          MR. MAIORANO:  Judge, if I may, in the
17  original facts sheet it asks for all the prescription
18  medications that somebody has taken in the last 10
19  years period.  You then go on and then there were
20  specified types of medications, ace inhibitors, beta
21  blockers, calcium channel blockers, and in that section
22  where it specified categories of drugs Mr. Coronato is
23  right that it said date first taken, date last taken,
24  prescribing doctor, reason for prescription, and then
25  there was a checklist and you would circle or check off

1  THE COURT:  This doesn't sound like it is a
2  big deal.
3          MR. CORONATO:  We can eliminate those columns
4  but on Page 16 where we had the columns from the very
5  beginning --
6          THE COURT:  On Page 15 you'll remove the
7  columns; on Page 16 you'll leave them in.  That's
8  question two?
9          MR. CORONATO:  Yes.
10          THE COURT:  So remove the columns on 15.
11          MR. WEISS:  I think it goes to 19.
12          MS. SULLIVAN:  It goes to 21.
13          THE COURT:  The columns will stay from 16 to
14  21.
15          MR. WEISS:  Yes, because they're all about
16  specific drugs that allegedly have some effect on the
17  cardiac system.
18          THE COURT:  So that takes care of that issue.
19          MS. SULLIVAN:  Yes, your Honor.
20          THE COURT:  That's simple.  What is your
21  next?
22          MS. SULLIVAN:  The supplemental fact
23  discovery that I'm not sure they're agreeing to or not,
24  but --
25          THE COURT:  On Page 33?

1  the reason.  But the first question all the
2  prescription medications in the last 10 years is much
3  broader than the second question.  Here are a couple of
4  specific types of medications now circle the correct
5  boxes.
6          What they have done is not just reformatted,
7  but they have made the first question much larger to
8  the extent now where it not only subsumes the second
9  question, but it also adds extra information for any
10  type of drug that the person took, whether it is
11  related to their heart condition or not.
12          MR. CORONATO:  Your Honor, if that question
13  was -- that first question lists the medications I was
14  under the impression it had both columns.  Clearly the
15  one with respect to ace inhibitors and specific
16  medications had those columns.  If the first one on
17  Page 15 did not I mean, I don't see -- I wasn't aware
18  of that, but I don't see what the problem is if they're
19  already answering that for the specific drugs, but
20  clearly we are entitled to for the second question with
21  respect that starts on Page 16 because that was in the
22  original facts sheet.
23          MR. MAIORANO:  We're not arguing for the
24  second question, but what they have done now is at the
25  very minimum they're making us --

1          MS. SULLIVAN:  31 through 33.
2          THE COURT:  Let's look at 31.  Is that your
3  next issue?
4          MS. SULLIVAN:  It starts with N.
5          THE COURT:  N?
6          MR. MAIORANO:  There's something else that's
7  at work here because the defendant did serve notice to
8  produce and interrogatories in late December.
9  Plaintiffs have now answered -- responded to the notice
10  to produce timely and will timely respond to the
11  interrogatories.  They have our objections to their
12  discovery requests, but what they have done now is
13  rather than to compel or do something or even
14  contemplate the objections that we have asserted
15  correctly and timely in response to their notice to
16  produce they have just ignored it and said let's dump
17  it all into the facts sheet.
18          MS. SULLIVAN:  Mr. Maiorano, you asked me to
19  put it on the facts sheet when we met and talked about
20  this.
21          MR. MAIORANO:  Not the ones we objected to.
22  What we talked about were things that clearly are not a
23  problem to be in the facts sheet.  A day in the life
24  video, if we have them they're entitled to it, fine,
25  let's put it into the facts sheet.  But not things --

1   MS. SULLIVAN:  Which ones do you object to?

2   MR. MAIORANO:  Let me finish.  Which when we

3   sat down in December and we talked about a whole host

4   of expert discovery which is completely not

5   contemplated by the New Jersey Rules and Miss Sullivan

6   said I have to go back to my office and look at it,

7   where there were other questions in here which they

8   were told in which we objected to clearly bring in

9   attorney work product, attorney/client communications,

10  trial preparation materials, other types of

11  objectionable materials.  Again, in December they

12  punted, and we have continued to assert objections to

13  those things.  Those objections are asserted in our

14  responses in our notice to produce.  Now they're put

15  back into here, and it is presented to the Court as,

16  okay, we talked about this, let's go down this line

17  by line.  I mean, I think if they're taking issue with

18  our responses then let's brief it and do this on a

19  complete record.

20  THE COURT:  All right.

21  MR. BUCHANAN:  Your Honor, there's one other

22  difference to the new document request.  There's a

23  yes-no box check off if you're providing documents

24  relating to a particular category or another category

25  or not.  That was not in the earlier facts sheet.

1   MS. SULLIVAN:  Your Honor, I'm not sure why

2   this is such a problem.  There's no expert discovery.

3   We can put aside the expert discovery for now.  They

4   asked us to put the information in the facts sheet.  We

5   have still gotten some objections, and I'm happy to

6   file a motion if the judge wants that, but it seems

7   like it is a pretty simple issue to resolve to find out

8   which ones we object to and see if we can resolve it

9   today and go forward and retain the discovery.

10  MR. MAIORANO:  Your Honor, what was submitted

11  to the Court along with the agenda was proposed expert

12  discovery.

13  MS. SULLIVAN:  But I'm talking about what's

14  in the facts sheet now.  I'm happy to talk about the

15  expert discovery as part of the agenda items but right

16  now --

17  THE COURT:  So N was not previously asked

18  for, photographs, drawings --

19  MR. MAIORANO:  Everything from N down, your

20  Honor.

21  THE COURT:  Okay.  So what is your particular

22  objection to N?

23  MR. MAIORANO:  Well, Judge, you know, day in

24  the life films, photographs showing a particular

25  plaintiff's limitations or damages, things like that

1   Plaintiffs are obviously making a production.

2   Plaintiffs are not asserting objections to these if

3   they have not been objected to in our document request.

4   We think it represents the complete production.  The

5   only concern I have about this is are we providing

6   this, are we not providing information in response to

7   particular requests is that we think it responds to one

8   item and not another item, and we have checked yes and

9   not no and they assert that we haven't given something

10  that we say we have.

11  It seems a little unnecessary to require you

12  to say yes or no I have things relating to these

13  categories when we're, in fact, obligated by the facts

14  sheet to turn them over.  We're giving them everything

15  that's responsive to these document requests.  If we

16  have to say yes or no and that's your Honor's ruling

17  then I would like very detailed responses to our

18  document requests which we have never received.  I

19  would like them to tell us what we have responded to

20  and what is specific to each of those categories.

21  That's certainly something we don't have for their

22  seven million pages.

23  MS. SULLIVAN:  I'm happy to say yes or no.

24  MR. BUCHANAN:  It is not easy to pin down

25  what is particular to each one.

1   are fine, but the way this is worded now it is over

2   broad because it includes preliminary expert materials,

3   includes certain work product, certain attorney work

4   product.  It would include trial prep material.  If

5   we're sitting down with an expert in drafting a report

6   and there are graphs or diagrams that are generated by

7   that this arguably gets dumped into there, and they're

8   not entitled to that discovery under the Jersey rules,

9   so if you want to specify day in the life films or

10  photographs showing a plaintiff's limitations or

11  damages we certainly have no problem with that.  With

12  just the way this is worded now it is too broad.

13  MS. SULLIVAN:  I'm sorry, what language makes

14  you happy?

15  MR. MAIORANO:  Day in the life films,

16  photographs showing plaintiff's limitations.

17  MR. WEISS:  You say edited and unedited;

18  that's where the problem starts coming in.

19  MR.MAIORANO:  It comes in with drawings,

20  slides, the types of things that might be produced --

21  and the best example I can think of are expert

22  materials in sort of the collaborative prereport

23  process.  So if we specify -- because I'm assuming what

24  they really want are things showing a plaintiff's

25  damages, a day in the life film, a photograph showing

1  the plaintiffs damages.
2      MS. SULLIVAN:  Plaintiff's limitations or
3  damages.  We can make that amendment, Judge.  That's
4  fine.
5      MR. MAIORANO:  As to the next one O, each and
6  any document --
7      THE COURT:  All we're going to do is change
8  the language to --
9      MS. SULLIVAN:  Relating to plaintiff's
10  limitations or damages.
11      MR. MAIORANO:  Well, if we specify day in the
12  life films or photographs then fine, but once you start
13  bringing in slides, graphs, charts, things like that it
14  starts getting into other areas potentially.  If I'm
15  sitting down with an economist as an example to, you
16  know, who is an expert witness and who we're in the
17  prereport process and we're discussing it, and I can't
18  understand what this guy is talking about so he is
19  drawing me pictures and a graph and a chart, okay, that
20  relates to the plaintiff's damages but now this text
21  facially sweeps that in.
22      That's why what I would like to do is specify
23  the types of things I think they're interested in,
24  which are films and photos.
25      MR. BUCHANAN:  We don't object to the things

1  we think they're interested in.  To the extent there's
2  over broad language that is there to lynch us I see no
3  reason for it to be there.
4      MR. CORONATO:  We also include a modifier
5  that says nonprivileged photographs, drawings, slides,
6  movies day in the life films, those types of things, as
7  well.
8      MR. MAIORANO:  As a technical matter the
9  expert materials are not privileged; they're barred
10  from discovery under New Jersey rules.
11      MR. CORONATO:  Unprotected.
12      MR. MAYER:  Otherwise barred from discovery
13  by the rules.
14      MR. BUCHANAN:  I'm sure we can craft that
15  language, guys.  Honestly.
16      MS. SULLIVAN:  I thought we had.  My problem
17  is I talk to him, and I think we have an agreement --
18  and then this has been going on for three months.  We
19  just want it finished.
20      MR. MAIORANO:  We thought we had an
21  agreement, as well.  And, apparently, there was a
22  disjoint, which is why it is good we're on the record
23  now, that way there's no confusion.
24      THE COURT:  How could it be worded?
25  Photographs, drawings, slides, movies, day in the life

1  films or videotapes edited or unedited taken by anyone
2  in your possession.
3      MR. MAYER:  To the extent they're protected
4  from discovery by privilege or under provision of the
5  New Jersey rules.
6      MR. MAIORANO:  Rather than adding more
7  verbiage to it I would take some out.  If they can tell
8  us what they're really interested in because we're
9  guessing.  My assumption is films and photos.  The
10  plaintiff who can't get through his daily life.
11      MR. MAYER:  How do we know what you have?  We
12  want the stuff that is relevant that is not protected
13  from discovery.
14      MR. BUCHANAN:  I like hearing that argument
15  coming from defense counsel.  Your Honor, we'll agree
16  to exclude any -- we'll accept it as long as there's a
17  provision that it excludes any materials that may be
18  protected or otherwise -- probably there should be an
19  overarching limitation before all of these document
20  requests to the extent they call for privileged
21  protected work product, any other claim that would
22  prevent their disclosure there's an overarching
23  protection up top.
24      MR. MAIORANO:  Which was our response to the
25  notice to produce.

1      MS. SULLIVAN:  Isn't that the rules, though?
2      MR. CORONATO:  Because it is the facts sheet
3  doesn't mean the Court is making a ruling on whether or
4  not certain things are protected.
5      MR. BUCHANAN:  Well, you interpreted it that
6  way.  It has been interpreted that way, Will.
7      MR. CORONATO:  By whom?
8      MR. BUCHANAN:  By people who send out the
9  deficiency letters.
10      THE COURT:  Okay.  So it is going to end with
11  which are not privileged work product or otherwise not
12  discoverable.
13      MS. SULLIVAN:  Great.  Thank you, your Honor.
14      THE COURT:  O?
15      MR. MAIORANO:  That asks for each and any
16  document you contend constitutes an express warranty.
17  It is a contention interrogatory that's dressed up.
18      THE COURT:  It is not a fact on a facts
19  sheet.  O is out.  P.
20      MR. MAIORANO:  P is redundant of everything
21  else.  It says give us anything that Merck ever
22  generated that wasn't given to you by Merck in this
23  litigation.  So, really, we can have one question in
24  this case which is P give us all of Merck documents
25  that were not created by Merck and given to you during

1  discovery.

2       MS. SULLIVAN:  There may be a variety of

3  types of documents that plaintiffs may have that was

4  generated from Merck that is not covered by other

5  questions in the facts sheet, your Honor, and certainly

6  if there's information that the plaintiff has from

7  Merck that relates to VIOXX we're entitled to see it as

8  part of discovery.

9       MR. WEISS:  Well, the real problem is it is

10  really directed to the lawyers, and let's assume six

11  months down the road we get more information then we

12  have to go back and amend 100 facts sheets?  I don't

13  think that's reasonable.

14       MS. SULLIVAN:  It says other than what's been

15  produced by Merck to you, Sol.

16       MR. WEISS:  I understand that.  Let's assume

17  three months down the road we get a document that fits

18  that description we have to go back and amend all the

19  facts sheet that have been filed before?

20       MR. CORONATO:  We'll allow you to amend it

21  once and say it applies to all the cases.

22       MR. BUCHANAN:  The more fundamental issue,

23  your Honor, is work protect and privilege issues apply

24  to this.  That's the overarching issue.  We're not

25  getting privilege logs from them as to all their

1  internal correspondence and everything they generate

2  during the course of the litigation, you know, from

3  their attorneys.  This is a request to get information

4  from attorneys.  Isn't it --

5       MS. SULLIVAN:  Well, I didn't read it that

6  way.

7       MR. BUCHANAN:  Well, it encompasses that.

8       THE COURT:  All right.  If what they're

9  looking for is what actual individual plaintiffs have

10  then let's just make it all documents relating to VIOXX

11  in plaintiff's possession or control that were

12  generated, published or disseminated by or obtained

13  from Merck whether it originated at Merck that were in

14  the possession of the plaintiff before the litigation

15  began.

16       MS. SULLIVAN:  That's fair, your Honor.

17       THE COURT:  So if they have their own little

18  ads or their own little --

19       MR. JACOBY:  They're entitled to that.

20  That's acceptable.

21       THE COURT:  Before the litigation began.

22  Before the plaintiff's complaint was filed so we have a

23  deadline.

24       MR. JACOBY:  Sure.

25       THE COURT:  That way it is clearly not the

1  lawyers that are being asked for the documents, it is

2  the plaintiffs.  Q, all documents in your possession

3  relating to VIOXX obtained by you or your attorneys,

4  experts or consultants.

5       Well, that's not a facts sheet thing.  It is

6  appropriate for -- probably something similar can be on

7  a motion to produce but not in a facts sheet.

8       MS. SULLIVAN:  You're right, your Honor.  We

9  put it on the facts sheet because I thought that's what

10  they wanted, but this is certainly discoverable

11  information, so we will serve it as a supplemental

12  interrogatory.

13       MR. JACOBY:  It is not necessarily

14  discoverable.

15       MS. SULLIVAN:  Freedom of Information Act

16  requests that you had relating to VIOXX?  It clearly

17  is.

18       MR. JACOBY:  Information that goes between us

19  and our experts that anything that is generated between

20  us and our experts in preparation for the case is

21  clearly work product, and those kind of things should

22  never have to be disclosed by either side.

23       MS. SULLIVAN:  Information obtained by you or

24  your experts from public sources is clearly

25  discoverable, and that's what that asks for.

1       MR. JACOBY:  That's fine.

2       THE COURT:  Include in your notice to produce

3  any documents which have been discovered pursuant to

4  the Freedom of Information Act.

5       MS. SULLIVAN:  Thank you, your Honor.

6       THE COURT:  As long as you limit it to that

7  language they have to produce it.

8       MR. BUCHANAN:  The one observation I have is

9  as it relates to consultants, your Honor, there may be

10  no obligation at any point in time for a consultant to

11  be disclosed in this case.

12       THE COURT:  Did I just -- there's nothing

13  about consultants in that demand.

14       MR. BUCHANAN:  It is specific to counsel.

15       THE COURT:  It is only documents that have

16  been obtained by counsel pursuant --

17       MS. SULLIVAN:  Or that they have.

18       MR. BUCHANAN:  Fair enough, your Honor.

19       THE COURT:  All documents in plaintiff's

20  possession or control discussing alleged risks of

21  VIOXX.

22       MR. MAIORANO:  There are two things with that

23  one.  First, it asks for documents related to any other

24  COX-2 inhibitor, which Merck has been the first one in

25  this case to say that those are not relevant.  If they

1  want to say they're going to give us anything they

2  have, comparative studies --

3      THE COURT: Are these documents, again, you

4  want from the individual plaintiffs that they had in

5  their possession before they filed the complaints?

6      MR. CORONATO: Yes.

7      THE COURT: So we're going to add before they

8  filed the complaints.

9      MR. MAIORANO: But there are two issues.

10  First, is that it sweeps in any other COX-2 inhibitors.

11  It is also redundant of J because --

12      THE COURT: I think they're entitled to know

13  if for some reason a plaintiff had an article that said

14  that Celebrex and other COX-2 inhibitors was causing

15  heart attacks, and they had that article presuit while

16  they were taking the drug and maybe then, yes, I think

17  it is relevant. The defense is entitled to that.

18      MR. MAIORANO: That's fine.

19      THE COURT: We're not talking about

20  attorneys' documents, we're talking about what the

21  plaintiffs had, and they should know everything the

22  plaintiffs looked at. They're entitled to that.

23      MR. MAIORANO: There's another issue.

24      THE COURT: It could make these things

25  simpler and say give them everything the plaintiffs

1  might have looked at, but that never works, so let's do

2  it this way.

3      MR. JACOBY: That's reasonable, your Honor.

4      THE COURT: All right. S, all documents in

5  plaintiff's possession or control concerning any

6  guidelines, procedures, warnings or prescriptions for

7  VIOXX or any COX-2 inhibitor drugs before they filed

8  the complaint as long as we put that in --

9      MR. WEISS: Fine.

10      MR. MAIORANO: I think that will hold true

11  now, Judge, for at least down to you.

12      THE COURT: Okay. But not limited to

13  communications from you or received by you. Support

14  groups or information -- I think as long as that is

15  before that was filed --

16      MR. MAIORANO: It is already in the facts

17  sheet elsewhere.

18      THE COURT: Okay. Well then -- then it is

19  being provided, so it is no big deal. All right. U

20  and V cover those?

21      MR. WEISS: U is covered, yes.

22      THE COURT: And V is not.

23      MR. MAIORANO: As long as it is understood

24  that S, T and U they add the qualification about before

25  the complaint was filed.

1      THE COURT: Okay. As long as you put that in

2  they're going to answer it, and then we're down to V.

3  Any videotape or sound recordings that have been

4  broadcast on television or radio wherein plaintiff has

5  discussed VIOXX.

6      MR. MAIORANO: As long as it is understood --

7      MR. WEISS: It goes further, then asks

8  whether plaintiff's attorney has discussed it.

9      MS. SULLIVAN: I can put that in a

10  supplemental interrogatory.

11      THE COURT: Let's take out plaintiffs'

12  attorneys have discussed it. So now it is just an

13  article where the plaintiff is quoted or a sound

14  recording of the plaintiffs themselves.

15      MS. SULLIVAN: Fair enough, your Honor.

16      MR. JACOBY: There will be like zero, Judge.

17      THE COURT: What else?

18      MR. MAIORANO: X and Y will be the same issue

19  as S, T and U that we would need a before the complaint

20  filed in the plaintiff's possession, individual

21  plaintiffs.

22      THE COURT: Before the complaint was filed.

23  That's fine.

24      MR. MAIORANO: And so X and Y as long as --

25  it is fine as long as it is covered by what we

1  discussed with S, T and U.

2      THE COURT: In the individual plaintiff's

3  possession. Okay.

4      MR. MAIORANO: As to Z, Z is asking for all

5  documents constituting referring to or concerning any

6  communications between you and any persons who may be

7  called as a witness at any hearing, trial or motion in

8  this case. I mean, that clearly invades

9  attorney/client privilege. It is attorney work

10  product. It is trial prep material. It also sweeps in

11  communications we would have with experts. There's

12  nothing good about that particular request.

13      THE COURT: It is definitely not a facts

14  sheet request. Z is out.

15      MR. MAIORANO: Same thing holds true for AA,

16  all statements written or otherwise recorded of persons

17  who have knowledge or claim to have knowledge relevant

18  to this case.

19      Again, that sweeps in attorney/client, work

20  product.

21      MS. SULLIVAN: It is a proper discovery

22  interrogatory, but I agree with the Court that it is

23  not proper for the facts sheet and we can serve --

24      MR. MAIORANO: It is objectionable as

25  privilege.

1    THE COURT:  I'm not ruling on it at this

2  point.

3    MR. MAIORANO:  As long as it is out now we

4  can --

5    THE COURT:  And it would -- you know, I mean,

6  it is a basic statement interrogatory statement to ask

7  for written statements and recordings.

8    MR. CORONATO:  But that's why I'm not sure

9  what is the problem with answering it in a facts sheet.

10    THE COURT:  In a facts sheet you have to have

11  the plaintiff sit down and certify to things.  It

12  becomes more complex than having attorneys produce it.

13  It means you have to actually discuss it with each one

14  of their clients.

15    MR. MAIORANO:  BB is the same issue as the

16  prior two, all documents reflecting communication

17  between plaintiff and any other person or entity

18  relating to the allegations.

19    THE COURT:  I think, again, this should be

20  limited to before the complaint was filed, and then

21  we're not talking about attorneys, we're talking about

22  anything -- if they wrote to Merck or they wrote to

23  somebody else.

24    MR. MAIORANO:  Although before the complaint

25  was filed there was substantial communications between

1  the attorney and the client that happened --

2    MR. CORONATO:  That's not otherwise

3  privileged.

4    MS. SULLIVAN:  Yes.

5    THE COURT:  Okay.  So before the complaint

6  that's not otherwise privileged.  I mean, if a

7  plaintiff wrote a letter to somebody who is not their

8  attorney it is discoverable.

9    MR. MAIORANO:  And it is being provided under

10  a different part of the facts sheet to the extent

11  there's a letter to the editor or a letter to Merck

12  that the plaintiff sent in we're already providing it.

13    THE COURT:  So see previously attached.  CC,

14  that's a short answer.  Each and every document that

15  evidences any communication between plaintiff and any

16  doctor.

17    MR. MAIORANO:  As a practical matter we're

18  returning similar materials over --

19    THE COURT:  This, again, is before the

20  complaint.  As long as that language is in there they

21  wrote to their doctor, they wrote to a federal agency,

22  they're entitled to get that.

23    MS. SULLIVAN:  For that one even after the

24  complaint is filed that would be relevant if they have

25  written a letter to their doctor about their doctor or

1  employer about their medical condition so that one even

2  postcomplaint.

3    MR. CORONATO:  And we have a parenthetical

4  that says other than your attorney.

5    THE COURT:  You know what, that this one I

6  think is an appropriate question so CC should go in as

7  it is without any modification.  Then we're up to that

8  was CC and now we're at --

9    MR. CORONATO:  The last one should be DD --

10  it should be EE.

11    THE COURT:  Personal diaries that are

12  continued to be kept.  Wow.

13    MS. SULLIVAN:  Your Honor, we have seen in

14  litigation like this, and the plaintiffs' lawyers

15  typically go about redacting things that aren't

16  relevant and are personal, but we have seen in

17  litigation like this plaintiffs keep daily logs of

18  their health status and health history and other

19  information that may be relevant to their medical

20  condition.

21    MR. MAIORANO:  If that's what they want then

22  that's not a problem, and they certainly ask about it

23  at the deposition, but this is asking for personal

24  calendars, as well.  If a plaintiff had a dentist

25  appointment in, you know -- on January 2nd, 1995 we

1  have to turn over all those old calendars, have the

2  clients go back and try to look for them.

3    MR. CORONATO:  It may not be a dentist.

4    MR. MAIORANO:  If they want a log -- excuse

5  me?

6    MR. CORONATO:  It might be a primary treating

7  physician visit.

8    MR. MAIORANO:  And you're getting those

9  records.  If it is a primary treating and a prescriber

10  you're already getting those records, and you know

11  about it.  To find out that they had an appointment at

12  Saturday at 10:00, you know, for 10 years before, four

13  years before the drug even came on the market that's

14  just over broad.  If --

15    MR. CORONATO:  Not if it goes to a

16  preexisting condition.

17    MR. MAIORANO:  If what you're looking for is

18  a log about their health status that's something to

19  talk about, but the way this is written --

20    MR. CORONATO:  The factual information they

21  keep about their health history, their employment

22  history that goes to the damages pre the time they took

23  VIOXX and after the time they took VIOXX which is

24  reported in diaries and in calendars is relevant.

25    THE COURT:  How about if we limit it to all

1    personal diaries, calendars, journals, logs,
2    appointment books, data books or similar materials kept
3    or continued to be kept -- well, still in their
4    possession I guess it should be.
5        MR. LOCKS:  Should it be limited to their
6    health concerns?
7        THE COURT:  From 1995 to the present that
8    relate to their medical care, medical conditions or
9    physical complaints or physical --
10       MR. CORONATO:  Or their employment history.
11       THE COURT:  Or their employment history.
12       MS. SULLIVAN:  The only issue with that is
13   the plaintiffs may have journals that relate to a
14   variety of things including their health condition.
15       THE COURT:  Yes.  Well, they have to
16   delete --
17       MS. SULLIVAN:  If they understand it that
18   way, that's fine.
19       THE COURT:  Let's say all references in, all
20   entries in -- all entries in personal diaries,
21   calendars, journals, logs, appointment books, data
22   books or similar materials from 1995 to the present
23   which relates to their medical care, medical condition
24   or employment history.
25       MS. SULLIVAN:  Health status and employment

1        MS. SULLIVAN:  It is clearly not privileged.
2        MR. GALPERN:  Absolutely absolutely.  I'm
3    asking my client to keep -- to prepare a continuing
4    document to communicate to me, your Honor.  I'm asking
5    my client to create a document to communicate to me.
6    I'm asking them to create an attorney/client
7    communication.
8        MS. SULLIVAN:  Facts about your client's
9    health status are not privileged.
10       THE COURT:  Well, this particular DD should
11   say conditions or employment not prepared at the
12   direction of counsel.
13       MR. GALPERN:  Yes.
14       THE COURT:  However, I'll allow defense to
15   ask a second question of FF, have you prepared a
16   personal diary or journal pursuant to the direction of
17   counsel.
18       MS. SULLIVAN:  If they say yes we can raise
19   it with the Court.  Does that violate privilege?
20       MR. BUCHANAN:  The mere fact that it's been
21   done --
22       MR. SEEGER:  It is a yes-or-no answer.
23   That's okay.
24       THE COURT:  We'll do the yes or no.  Let's
25   see how many you get and then -- truthfully, I don't

1    history.
2        THE COURT:  Employment status -- just say
3    employment; it doesn't have to say history.
4        MR. GALPERN:  Your Honor, shouldn't that
5    be -- that has to cut off at the time they first
6    consulted an attorney for representation in a VIOXX
7    action because at that point some counsel at some time
8    may instruct their client to keep a diary of their
9    symptoms, of their problems of interrelationship with
10   doctors at the counsel's direct direction.
11       MS. SULLIVAN:  That's not privileged.
12       MR. GALPERN:  At that point it becomes a work
13   product.
14       MS. SULLIVAN:  Communications with you would
15   be privileged.
16       MR. GALPERN:  If I tell my client to keep a
17   diary to track his or her concerns to better relate
18   them to me that's not privileged?  If I direct my
19   client to keep a diary, of course, it is work product.
20       MS. SULLIVAN:  Your telling her to keep it is
21   privileged.  The facts in the diary are not privileged.
22       MR. GALPERN:  With the understanding that she
23   is going to give that to me as a communication, of
24   course, it is.  She is preparing a communicative
25   document for me at my direction.

1    know the answer to that off the top of my head.  It is
2    generally, obviously, if the plaintiffs intend to use
3    those diaries and plaintiff is going to sit on the
4    stand and start talking about what happened in December
5    and January the defendants certainly have the right to
6    see them in advance.  If you're not going to use them
7    and you did it truly like saying to the plaintiff write
8    down a list of your complaints to me so we can talk
9    about them next time then that may still fall under
10   privilege, I don't know.  We may have to identify it
11   more specifically later, but let's see what we're
12   really dealing with by dividing it into two questions.
13       MS. SULLIVAN:  Fair enough.  The last one is
14   a supplemental interrogatory.  We'll serve it as such
15   rather than on the facts sheet.
16       THE COURT:  Okay.  With that facts sheet --
17   we should be able to sign that facts sheet -- I mean,
18   those changes should be able to be made very quickly.
19       MR. COHEN:  I have the portable printer with
20   me, Judge.
21       THE COURT:  The order that covers those there
22   was a request that they be ordered that those have
23   previously been order should produce them within 45
24   days and all other counsel everybody else should
25   produce them within 45 days of the defendant's answer,

1   is that what you wanted in the order?

2        MS. SULLIVAN:  Yes, your Honor.

3        THE COURT:  Did you submit an order or not

4   really?

5        MR. WEISS:  There was a request, your Honor,

6   that the old facts sheets be amended, and I think

7   that's overly burdensome.  We already completed facts

8   sheets for 400 people.  Why are we going to go back and

9   redo them?

10        MS. SULLIVAN:  Well --

11        THE COURT:  How many people do you have of

12   that 400?

13        MR. WEISS:  Over 100.

14        MR. CORONATO:  Your Honor, I think as you

15   indicated before the facts sheets weren't intended to

16   be the only means for us to obtain discovery, so if

17   we're serving supplemental requests now we should be

18   entitled to get all the information from all the

19   plaintiffs who answered discovery today.

20        MR. LOCKS:  Your Honor, wouldn't that be a

21   little more suitable to be scheduled at some time in

22   advance of when those other cases might see the light

23   of day and come forward, rather than to say 45 days

24   from an order now to go back to 100 or 200?

25        THE COURT:  I'm not going down that road.  My

1   road has been we're doing the discovery in every case.

2   We're moving these cases, and if I start to change that

3   and have cases just sitting around, quote, "waiting to

4   see the light of day" I'm not into that.  I'm going to

5   order that they be provided within -- if 45 days isn't

6   reasonable, Mr. Weiss, what is to amend your facts

7   sheet?

8        MR. WEISS:  Some of these plaintiffs have

9   already been deposed.  What are we supposed to do now?

10        MS. SULLIVAN:  Call them and ask them for the

11   information.

12        MR. WEISS:  Well --

13        MR. BUCHANAN:  Your Honor, there's one issue

14   that is a process issue it is just, you know, in terms

15   of processing the paperwork associated with in

16   Mr. Weiss' case 100 --

17        THE COURT:  I don't think you should have to

18   do them in 45 days.  We're going to do them in 45 days

19   for new cases.

20        MS. SULLIVAN:  Yes.

21        THE COURT:  From the time the answer is

22   filed.  The ones that have had to be amended -- you

23   know, I don't care, what do you want to put in the

24   order a reasonable time?

25        MR. CORONATO:  We have fact discovery cut off

1   dates that your Honor has ordered for some of those

2   cases, so it has to be within a reasonable time in

3   light of those dates.

4        MR. WEISS:  What I respectfully suggest is

5   what has to be done is whatever additional questions

6   are added that weren't on the first time that should be

7   answered, but not a whole new 64 page facts sheet.

8        MS. SULLIVAN:  We're not suggesting that.

9        THE COURT:  It is only the new questions.

10   Oh, no.  It is only new questions, and it should be

11   answered within the discovery period within a

12   reasonable time, and those people that haven't been

13   deposed it should be answered before they're deposed.

14        MR. CORONATO:  Since we have clarified

15   Mr. Weiss' misunderstanding that he doesn't have to

16   submit a new 64 page facts sheet it shouldn't be a

17   problem if we set forth a time period within which

18   those plaintiffs now have to answer.  To say a

19   reasonable period of time leaves it open ended, but

20   what I think is reasonable is not what Mr. Weiss thinks

21   is reasonable.

22        MR. WEISS:  In all deference to my good

23   friend over there we have new clients doing facts

24   sheets for, so it is an ongoing process.  We'll get

25   them certainly before they're deposed in a reasonable

1   amount of time.

2        THE COURT:  And with his hundred clients he

3   may have 10 who he filed in the very beginning, which,

4   obviously, I can go through by docket number when each

5   of these has to be amended, but I don't want to do

6   that.  Obviously, before anybody is deposed they should

7   have amended their facts sheet.  Does that cover you

8   enough or it doesn't really?

9        MR. CORONATO:  Or we can track it to the

10   current order that sets forth the discovery end dates

11   by waves.  So those falling in the first wave within 30

12   days; those in the second wave are within 45 days;

13   those in the third wave by 60 days, something like

14   that.

15        MR. SPIZER:  All the plaintiffs in the first

16   wave were all deposed, and treating doctor depositions

17   have been taken.  All these questions -- I mean, I sat

18   through eight-hour depositions.  I think just about any

19   question that can be asked of these people were.  I

20   mean, we can answer it, and I can certainly do it

21   within the time frame.  I guess the first wave is March

22   30th, so if they're really concerned by March 30th to

23   get the first wave I can make sure those 10 in the

24   first 15 are done by then, and then we can do the other

25   ones in order.  If they're concerned about the March

1  30th date at least we can get our 10 Anapol cases done

2  and --

3        THE COURT:  Actually, they were given you 45

4  days, so just include 45 days for those in the first

5  discovery period, and then --

6        MS. SULLIVAN:  Stagger them.

7        MR. SPIZER:  And then --

8        MR. BUCHANAN:  How about giving an additional

9  30 days for each subsequent traunch, your Honor?

10        MR. CORONATO:  That takes us beyond March

11  30th.  It is 10 cases.  What is the big deal?

12        THE COURT:  So by March 30th the first cases.

13  Okay.  Is that what you want?

14        MR. CORONATO:  I'm sorry?

15        THE COURT:  You asked for 45 days in your

16  agenda.  I didn't create 45 days.  By March 30th is

17  fine for the first wave of cases.

18        MS. SULLIVAN:  Then 30 day staggers.

19        MR. WEISS:  Fine.  All right.  We'll comply.

20        THE COURT:  You only have to answer those

21  particular questions.  If they're answered in the

22  deposition say see page 10 of the deposition.

23        MR. WEISS:  No problem.

24        MS. SULLIVAN:  Okay.  Thank you, your Honor.

25        THE COURT:  10 through 60 of the deposition.

1  the -- additional supplements for the first.  Okay.  We

2  did that.

3        MR. BUCHANAN:  There's one other issue.

4        (Break taken.)

5        THE COURT:  Okay.  Now we're going to go to a

6  plaintiff's agenda item.

7        MR. BUCHANAN:  Your Honor, I think it may

8  make sense to deal with the document and database

9  issue, item three on our agenda.  The first one is

10  several databases that we have requested that we have

11  met and conferred about that for the most part we

12  haven't heard an objection and don't have a commitment

13  to produce them.  It has dragged on for quite some

14  time.  The litigation is pretty advanced.  We don't see

15  any reason why we shouldn't get them.  There's really

16  no material issue as to relevancy or discoverability,

17  and I haven't heard anything on the burden, so --

18        THE COURT:  Okay.  Any objection on

19  CORNERSTONE, DIAMOND and SPIDER?

20        MR. COHEN:  Yes, your Honor.  What we have

21  with the databases, as you know, we have provided

22  several months ago a list of databases and then we have

23  been -- after a couple months plaintiffs came and asked

24  for some and asked for more information about some.

25  They have on this list three or four that they have

1        MR. BUCHANAN:  One thing, your Honor, just

2  given if it was only a handful of cases I'm sure we

3  could all just wing this and pick the ones we know

4  we're supposed to answer.  Could I suggest that defense

5  counsel propose a supplement for those 400 people who

6  have already answered facts sheets, and we can

7  standardize our response and we'll answer?

8        THE COURT:  In order to do this so we get a

9  facts sheet order out immediately let 's do the amended

10  facts sheet that indicates those cases which are in the

11  first group should be provided by March 30th.  Answers

12  just to the amended to the added questions.  And that

13  everybody will answer within 45 days of filing an

14  answer, then do a second order where you take a little

15  time to sit down and figure out when everybody's dates

16  are or giving them the time.

17        MR. WEISS:  To follow up on what Mr. Buchanan

18  was suggesting, Diane, would your side give us a

19  supplemental facts sheet with just additional questions

20  on it by itself?

21        MS. SULLIVAN:  Is that what you want?  That's

22  fine.

23        MR. WEISS:  That makes it easier.

24        THE COURT:  So attached to the first order

25  will be two facts sheets.  The new facts sheets.

1  asked for a production on and a number that they have

2  asked for additional information for.  They have asked

3  for screen shots.

4        I have -- and have been able to get and have

5  with me --some screen shots that I can show plaintiffs'

6  counsel, but at the end of the day there will be a

7  dispute on databases.  We're not going to reach

8  agreement, so the real issue here is how to handle it,

9  and it seems to me that the best way to handle it is

10  after they see the screen shots today they decide what

11  databases they're going to ask for, and I have agreed

12  to produce some information and some of the database

13  information already and everything else could probably

14  go into a motion and we can address it on a full record

15  because I will have burden affidavits.

16        Some of the databases are the exact same

17  people that have been spending over 900 person hours

18  getting the FACTS database done, and I'm on track to

19  produce that at the end of this month, and I am

20  committed to do so and will do so.  So some of it is

21  the same people and has the same burden issues and a

22  lot of it is the same issues.

23        I have offered to produce out of the SPIDER

24  database and out of the MRL Product Life Cycle Review

25  Committee Application, which are essentially document

1   repositories to the extent that they're nonduplicative
2   documents in there, and I believe I have produced many
3   of those documents from other sources, we have offered
4   to produce all the nonduplicative documents.  I
5   understand through some informal communication that
6   that might not be everything plaintiff is looking for,
7   so it may be that, actually, on everything we end up
8   with a dispute.
9        THE COURT:  If they're producing everything
10   that's nonduplicative how could there be a dispute?
11        MR. BUCHANAN:  First of all, what they
12   propose to do SPIDER and MRl Product Life Cycle Review
13   Committee Application system both of those are document
14   repositories.  They have it is a database that provides
15   fielded information that can be searched and sorted,
16   queried, reported on.  And associated with those
17   particular database records are images or documents
18   that can be viewed.
19        What Mr. Cohen is saying is that some subset
20   of SPIDER and some is subset of MRL may have been
21   produced in various places throughout the production.
22   This is a central repository of information designed to
23   be used internally for their convenience to expedite
24   their review, their retrieval of information.  I don't
25   see any information to be on a different footing in

1   this case.
2        We have been back and forth with defense and
3   for at least two months now on this collection of
4   databases.  And there's been no showing of burden and
5   no objection as to relevance.  It seems to me that, you
6   know, putting a motion on calendar at this point after
7   they haven't interposed any motion for protective order
8   or done anything over the last couple months is only
9   going to serve to delay the production of these items.
10   We dealt with the last item informally over which there
11   was a formal motion process that could have been used.
12   I don't know what information needs to be submitted to
13   the Court to get this particular issue ruled on.
14        MR. COHEN:  Here we actually -- each side is
15   kind of using the same argument both ways depending on
16   who has to give discovery, but in the case of the
17   databases, as you know, we have gone through quite a
18   lot of back and forth on databases.  It is very
19   different from just saying here is another group of
20   documents to produce.  The documents that I would
21   produce out of SPIDER and the other one they get
22   objective coding and full text searchable files
23   pursuant to your Honor's orders so they can search
24   every word and every document that they want.  There is
25   a real burden in terms of getting databases as opposed

1   to producing documents to go through my normal
2   processes, and I don't have to deal with the Merck
3   database people who have to do the work.  And I don't
4   think that they're entitled to if I give them all the
5   documents that people have to go and get all these
6   database information to give them what's essentially
7   the same information and with the one caveat that I'm
8   not going to make a representation all the fields are
9   exactly the same, and if we want -- I got a request to
10   see those fields, as well, I'm getting a screen shot
11   sent down to me, hopefully, I can show it to them
12   today, but we certainly have a burden argument.  We
13   have dealt with that with FACTS.
14        We had extensive discussions.  It actually
15   took us a couple months to get to finally what's going
16   to happen.  That's going to get done, but certainly as
17   to the IMED data database that's the exact same people,
18   as well.  Even if in the unlikely event your Honor
19   ordered me to turn the whole thing over that couldn't
20   actually get done until FACTS gets out of the pipeline.
21   That's the same people.
22        It seems to make the most sense as a matter
23   of practice and then I think there's some additional
24   items they'll ask for that if they're going to push
25   would also be the subject of a motion practice where we

1   want to have a record.  I think the most important one
2   in that regard would be their request for ARCOXIA,
3   which there was a full motion to compel, it was fully
4   briefed, argued, your Honor upheld Merck's objection.
5   A Texas court of appeals agreed with your Honor, and if
6   they're seeking to reopen that that's another one that
7   I think we would need to have them put in a formal
8   motion, put in any new information they have, give us
9   an opportunity to have affidavits and response and get
10   this taken care of once and for all.
11        It actually plays up a little bit of a theme
12   which is the degree to which we're doing formal versus
13   informal discovery and the extent to which it generally
14   works really well.  There's some areas where I'm
15   getting concerned that, in fact, we're going to need to
16   formalize some of the document requests and some of
17   Merck's responses and get that crystallized a little
18   more so we don't hear at these conferences, you know,
19   accusations back and forth about it took me this long
20   or took you that long, which we do have, and since we
21   have additional people, as well, who are working on
22   this from the defense side at some point now it seems a
23   good time to start putting some of this in a little bit
24   more formal communication, formal document request,
25   formal response and we can do a motion.  But certainly

1    at least with respect to databases, which, as you know,
2    have been the subject of extensive briefing with burden
3    affidavits trade secret affidavits, we're going to
4    have -- I think this is properly a subject for a motion
5    to compel.
6         I can go throught some of these things. With
7    CORNERSTONE we are already producing out of it any --
8    that has to do with people who call into the 1-800
9    number for Merck. If the doctor -- prescribing doctor
10   calls, if the plaintiff calls, we already produced all
11   that information. Have been from day one. And so, you
12   know, that's one that I object to for that reason.
13   We're already producing the relevant information, but
14   if we're going to have six or eight of them and then
15   we're also going to have additional materials at the
16   same time let's team up all at once, come in and get it
17   taken care of.
18        MR. BUCHANAN: Your Honor, a couple of
19   points, there a has been a relatively formal request
20   and process for this. We requested we meet. We
21   articulate the importance of it. Counsel goes back to
22   his client and then never comes back. I mean, that has
23   really been the process over the last couple months,
24   and it is unfortunate we have to bring to a head in
25   this manner, but if we go through these databases,

101

1    CORNERSTONE, the name sounds pretty important,
2    CORNERSTONE, and let me tell you what's in it. This is
3    a national service center, and we have printouts of
4    reports from the National Service Center which would
5    shock and fascinate a lot of people. Profiles on
6    problem doctors, okay, doctors who are out there saying
7    negative things about Merck.
8         Dr. Sing, you read about him in the press,
9    okay, there's a three- or four-page dossier on Dr. Sing
10   with reports from all their field agents upstreaming he
11   said this and he said that and so-and-so doctor told me
12   that he said this. It collects profiles on problem
13   doctors. That profile leads to an aggressive attack,
14   and you have seen some of the documents in this area --
15   I won't put it on the record --aggressive attacks which
16   then yield other documents in this case. That
17   particular database is very fitting of its name and is
18   highly relevant beyond any particular interactions with
19   any physician in the case. It sounds like we're
20   debating relevance in some respect in terms of
21   information that's already been produced. It is highly
22   relevant. Burden. Data is put in databases so it can
23   be portable so it can be reported upon. We have seen
24   printed reports. It can be printed in electronic
25   reports. It can be taken from one database to another

102

1    database.
2         We have seen in affidavits and in testimony
3    the way databases talk to each other. This burden
4    argument is really a vehicle for delay. DIAMOND, that
5    contains promotional materials, not only the final ones
6    produced to us but it contains the draft promotional
7    materials. It contains all the iterations along the
8    way before the final ones. How about disclosures about
9    particular risks that never make it into the final
10   product literature or in literature to doctors? We
11   don't have any of the draft stuff.
12        SPIDER is a repository of documents to be
13   used with regulatory agencies. It is highly
14   searchable. It can be searched by part. It can be
15   searched by date. It may not be as complete in some
16   respects as the NDA, but may be far more complete than
17   the rest of the production we have and far more
18   accessible than the NDA. The way we have the NDA
19   500,000 individual pictures of paper, okay? With some
20   coding, but does not make the NDA accessible in any
21   respect.
22        You know, they have made this case about the
23   FDA is our partner, we gave everything to them, we're
24   joined at the hips, and, yet, the document that
25   reflects -- and the IND that reflects all the

103

1    interactions with their, quote, "partner" is
2    inaccessible. I don't see why we shouldn't have the
3    same advantage in this litigation that they have. If
4    Mr. Cohen needs something accessible he can call up his
5    client, they can pull it up. They can give it to him
6    in a moment's notice. We don't have that ability.
7         The MRL Product Life Cycle Committee Review
8    Application the documents that underline a particular
9    committee? Relevance clearly established, and, again,
10   burden these are databases. They have numerous people
11   who do this. FACTS was the most complex database they
12   have. There's affidavit after affidavit that all the
13   sources that it pulls from these are all unique, and
14   that was one of this things we spent doing was trying
15   to identify those that overlap with FACTS so they could
16   be excluded from this particular supplemental request.
17   None of these are encompassed by the FACTS production
18   that's supposed to be coming at the end of this month.
19        So I don't know what type of showing they
20   could make as to burden because the most complex
21   database they have has already been produced or is
22   going to be produced this month. These databases are
23   far simpler. They have produced a database analogous
24   to SPIDER and analogous to the MRL Product Life Cycle
25   Review Committee Application database earlier this

104

1   year.  It was the CLICK database, which contained all

2   the clinical literature or all the peer reviewed

3   medical literature together with fields that correlated

4   to the dates of the articles, the authors, the name of

5   the articles, abstracts for the articles, things like

6   that together with associated documents.  There was no

7   objection there.  That was produced.  It wasn't

8   burdensome.  It was turned over to us.  These other

9   databases are akin to that.  It is a direct process

10   that can be used with all standard database

11   applications, and if there was a real burden here I

12   think we would have seen it by now.

13        I think this is just about trying to push us

14   back so far in the process that by the time production

15   is actually ordered we won't be able to use it in

16   connection with the first wave of trials.

17        MR. COHEN:  I have so many things to say

18   about that, but the number one thing, just as an

19   overall general statement, while I appreciate

20   Mr. Buchanan testifying as to what these databases are

21   and what they contain and what they have and what

22   they're like, it is just not true.  And, so, the

23   problem is for us to be able to explain it to you we

24   have to give you more information.  If you want to make

25   a ruling on whether something is or isn't burdensome or

1   has information that you think is relevant versus

2   something else we have to present it to you because

3   remember from FACTS we ended up doing that in quite an

4   extensive way, and we came in and we showed you

5   everything.

6        It is not the case that these documents are

7   the same as CLICK.  CLICK was easy, and I turned it

8   over right away.  I didn't make any objection to it.  I

9   didn't object to it.  I produced it.  We produced other

10   databases.  But what we're getting to here are

11   databases where we have produced information that we

12   think is relevant out of it or we have actually

13   produced the same -- a subset of the documents already.

14        And as to the NDA, we spent a tremendous

15   amount of time to put it exactly in order, and it's

16   broken up.  The original submission that has a

17   different Bates prefix from submissions made in 2000

18   which has a Bates prefix that tells you it was made in

19   2000, and it goes in order.  And I actually had and

20   used a straight dump from what we produced, and you

21   just -- you can find it.  It is an order.  It has when

22   they send to it the FDA there was an index, so just

23   that a lot of that, and you don't need me to go into

24   all of that, but, basically, the main point is in order

25   to rule on these you really need to see what they are

1   and what the burden is and put in the affidavit.  And

2   as to a delay tactic if you ordered me today to produce

3   IMED, which I don't think you'll do, but if you did, I

4   couldn't do it.  It is the same people who are doing

5   FACTS, so it is not -- it is not put in here to delay.

6        MR. BUCHANAN:  Your Honor, if they want to

7   make a showing there's been many, many months since

8   these databases were first called for.  There's been no

9   submission to the plaintiffs of any burden whatsoever.

10   If your Honor is inclined to hear this we would ask

11   that it be done extremely expediently.  We just would

12   like to get a resolution on an issue that has dragged

13   on too far.

14        THE COURT:  You want CORNERSTONE, DIAMOND

15   SPIDER and MRL?

16        MR. BUCHANAN:  Yes.  And on the next page

17   IMED.

18        THE COURT:  All right.  They have requested

19   those.  I want you to move for a protective order.

20   File your motion immediately.  How long do you need to

21   brief it?

22        MR. COHEN:  It is a matter of affidavits.

23   Three weeks?

24        MR. BUCHANAN:  My expert reports -- our

25   expert reports are due the end of March.

1        MR. COHEN:  You know, it took six weeks to

2   produce FACTS.  I can do it in 15 days.  Anything less

3   than that I wouldn't be able to get the affidavits.  As

4   of right now I haven't gone through each one.  I do

5   think this is the right way to go, unless the Court

6   wants to talk more about each individual one, but I do

7   think I'll get mine in in 15 days, then we'll come back

8   and have it all in one day, and we'll take care of it.

9        MR. BUCHANAN:  You know, we can get our

10   opposition in in a week.  Can they do their papers in a

11   week?  Can we get their papers by next Friday, and

12   we'll serve ours the following Friday?

13        MR. COHEN:  For affidavits to get the detail

14   one week is --

15        THE COURT:  I need -- I want a copy of your

16   what do you call them screen shots of each one included

17   with your papers.

18        MR. BUCHANAN:  Could I ask counsel --

19        THE COURT:  Let's see, next week.  Is it

20   easier if we divided it up, Mr. Cohen, into two and

21   three and do two different motions or is it easier if

22   we do it all -- address all five at once?  Will you

23   have affidavits from the same people for each of these?

24        MR. COHEN:  There's not that much overlap,

25   and it's probably better to do it all at once.

1     MR. BUCHANAN:  Your Honor, there are two that

2    I'm more interested than the other three.  I'm more

3    interested in getting immediately CORNERSTONE and IMED,

4    and if parsing it that way would allow them to

5    prioritize, stagger their briefs if they want to do

6    that.

7     MR. COHEN:  I can do two and three, but what

8    is the proposal to change my 15 days?  It is like a

9    core time when I need to make sure -- writing the brief

10    is no problem.  I can get as many people to do that to

11    do affidavits.

12     THE COURT:  Okay.  Today is the 17th.  All

13    right.  March 2nd I want your briefs on IMED and

14    CORNERSTONE.  And I want the replies by March 8th and

15    oral argument will be on March 9th.

16     MR. BUCHANAN:  Can I ask for a different date

17    for oral argument?

18     THE COURT:  March 11th?

19     MR. BUCHANAN:  That's fine.

20     THE COURT:  Okay.  Does that set that up for

21    those two?  And the other three we'll give you your 15

22    days, so you need -- well, what am I giving you 10 or

23    12 days for that one?  What did I give you March 1st?

24     MS. SULLIVAN:  March 2nd.

25     THE COURT:  Then you have to be looking at

1    his stuff.

2     MR. BUCHANAN:  Maybe he could be writing the

3    next wave while we're doing our opposition, your Honor.

4     MR. COHEN:  I can put that in March 8th.

5     THE COURT:  So March 8th you'll have in the

6    other three, your motion for protective order, and

7    they'll respond by March 15th, and I'll schedule that

8    for oral argument on March 18th.

9     MR. BUCHANAN:  Okay.

10     MR. COHEN:  I think the next conference is on

11    the 17th.

12     THE COURT:  All right.  Then we'll deal with

13    it on the 17th, the last three databases, okay?

14     MR. BUCHANAN:  Fine, your Honor.  Thank you.

15    The next item on the open discovery issues --

16     THE COURT:  Try to be as specific as

17    possible, Mr. Cohen, as to costs and burden and

18    relevance.  I mean, those are the issues relevance and

19    cost and burden.  I'm assuming we're really not arguing

20    over format, per se.  Maybe we are with SPIDER.

21     MR. COHEN:  I don't know.  I'll find out what

22    the format is and see if we have a formatting issue,

23    and we can talk about that.

24     THE COURT:  Hopefully you'll be able to agree

25    on that.  But if that's an issue bring it up at the

1    same time.

2     MR. BUCHANAN:  We have been okay in format in

3    the past.  Hopefully we will be here.

4     Your Honor, just one other request, and I

5    guess I'll wait until some counsel excuse themselves.

6    There were several other databases that it wasn't

7    apparent from the description that counsel gave that we

8    necessarily required their production.  I mean, a

9    company like Merck probably has 50 corporate maintained

10    databases or more related to VIOXX or that contain

11    VIOXX information.  We're not trying to shake the lint

12    out of their pockets for all these databases, but

13    there's a handful of them that seem quite relevant.

14    There's another handful that may or may not be

15    relevant, so we have asked for their screen shots, and

16    I understand from counsel that you have brought some of

17    that today?

18     MR. COHEN:  I should have shown it to you

19    over lunch, but if you have something else maybe we can

20    schedule another one to follow --

21     MR. BUCHANAN:  That's fine.

22     THE COURT:  All right.

23     MR. BUCHANAN:  IMED was rolled into that one,

24    so we're up to C on item 3 of our agenda, your Honor.

25     THE COURT:  We want to go back to Dechert's

1    agenda?

2     MR. COHEN:  They put everything A, B, C.

3     MS. SULLIVAN:  Your Honor, I'm sorry I should

4    have introduced him at the outset, Ben Barnett and Phil

5    Yenella from the Dechert firm will be assisting

6    Mr. Cohen with the document production issues.

7     THE COURT:  Medical authorizations is that

8    next?

9     MS. SULLIVAN:  Yes, your Honor.  We have

10    since the outset of the litigation been getting --

11    there were agreed upon authorization forms then there

12    was revised agreed upon authorization forms that were

13    subject to your Honor's ruling on the Stampler issue

14    that were negotiated and agreed upon with the

15    plaintiffs, and we have been getting the authorizations

16    signed by the plaintiffs to be filled out by my office

17    and to obtain medical records.

18     Mr. Seeger's firm has recently unilaterally

19    decided that they weren't going to do that anymore and

20    had -- without notice or discussion with us, and have

21    refused to sign authorizations without specific treater

22    names in there, and there's a couple of problems with

23    that.  The main problem with that, your Honor, is it

24    requires a lot more time to gather the medical records,

25    rather than once you see a provider in the information

1    you're given in the facts sheet or medical records

2    going and obtaining those records you have to go back

3    to Mr. Seeger's office each time you want a new -- to

4    obtain records from a new prescriber they have to send

5    it out to their client, get it back, et cetera, and

6    there's really no reason I can see for this other than

7    delay, particularly given the protections in the

8    authorization that exempts out psychiatric information,

9    HIV information, has the Stempler exemption, so I'm not

10   sure why it is being done.  It is causing a lot of

11   delay.

12        MR. BUCHANAN:  Actually, your Honor, I was

13   surprised to learn that at earlier points in this

14   litigation we were serving blank authorizations.  It is

15   not my firm's practice in litigation to send blank

16   authorizations in litigation.  We don't believe it is

17   consistent with HIPPA.  We think we're entitled to

18   specify specifically providers that they're getting

19   information from.  It is not a time problem in any

20   respect.  We get a number of number of authorizations

21   signed by our clients which we retain as custodians for

22   those particular authorizations.  When a request comes

23   in it is filled in with the information and sent to the

24   defense.  That's the process.

25        And they get a number of them that are

113

---

1    prefilled out with the specific providers who are

2    identified in the facts sheet.  This is a conceptual

3    problem as far as I'm aware and not something that

4    resulted in any delay whatsoever, but I do think

5    there's -- I don't know why people do what they do.  It

6    has been our practice in litigation to fill out

7    authorizations not in blank but with specific provider

8    names in other litigation.

9         MS. SULLIVAN:  That may make sense if you

10   have one case, but with a mass tort all other counsel

11   have been giving us -- and Mr. Buchanan's firm have

12   been given them, too, with the blank provision for the

13   prescribers to be filled out by us, but it has in the

14   authorization all of the things that are not to be

15   provided like psychiatric, HIV, the Stempler

16   prohibition.  So because of the number of cases and the

17   necessity for the back and forth every time you need to

18   get a new prescriber it does result in more time, more

19   effort and delay, and there's really no good reason for

20   the procedure Mr. Buchanan suggested, given their

21   protections in the hard fought and well negotiated and

22   ordered authorizations that we're using here.

23        MR. BUCHANAN:  The authorizations themselves

24   aren't a problem, it is the way in which they're

25   populated and sent to the defense.  We don't send them

114

---

1    blank authorizations.  We think as our client's counsel

2    we have a right to identify, and if there is a specific

3    cause for objection to identify it before that

4    particular medical authorization is sent out.  There's

5    been no incidence of delay that's been highlighted

6    here.

7         In fact, I know we requested numerous

8    authorizations from our clients that are blank that are

9    on file for each of our cases that we can then send to

10   you, and the only time there would be delay is if we

11   exhaust the supply of authorizations that we received

12   from our clients.

13        MS. SULLIVAN:  It does result in delay.

14        MR. BUCHANAN:  I'm not aware of any instance

15   of that.

16        MS. SULLIVAN:  You just started doing it.

17        MR. CORONATO:  It hasn't been a delay because

18   we have been getting them in blank.  Number two, we

19   just heard arguments before about the number of cases

20   that are going to be filed and how burdensome it is to

21   go back and amend facts sheets.  It is going to be

22   equally burdensome for them to go back and repeatedly

23   ask their clients for more authorizations.  And if

24   we're talking hundreds of cases being filed and each

25   firm representing hundreds of plaintiffs it is going to

115

---

1    result in delay.

2         MR. GALPERN:  May I add there's a myriad of

3    reasons why it is inappropriate to give defense counsel

4    a blank authorization.  First of all, there's the

5    entire notice issue.  By them asking us if they want

6    Dr. Jones's records, Dr. Smith, Dr. Rose's records

7    we're put on notice as to which records they'll get.

8    Presumably, we should know every doctor our client has

9    seen, but in the real world that doesn't happen.  Quite

10   often they'll pick up a name of a treater buried in the

11   medical records, and before they go out and get those

12   records we should be put on notice that they intend to

13   get those records.

14        Furthermore, not every personal injury

15   litigation puts into issue every aspect of medical

16   treatment.  Now, I realize that Miss Sullivan addressed

17   the prohibition against psychiatric records, but that's

18   one small issue.  What they're asking, Judge, is

19   they're asking for cart blanche to get into our

20   client's child abuse record, whether our client has an

21   abortion, whether a client has had different

22   counselling with a priest or a rabbi.  They're asking

23   cart blanche without notice to us and without an

24   opportunity and due process to be heard by way of

25   protective order to get every record dealing with our

116

1    client's health, and like Mr. Buchanan I can't speak
2    for other firms, but we never serve a blank
3    authorization.  We always insist that it gets filled
4    out.  The delay factor is one small factor, Judge.  The
5    fairness factor, the notice factor has to overwhelm the
6    two- or three- or four- or five-day or two-week delay
7    occasioned by them simply putting a doctor's name on an
8    authorization, e-mailing it or faxing it to us and us
9    getting it back.  The balance of the equities has to be
10   in favor of them identifying the source of the records
11   that they want to get.
12          MS. SULLIVAN:  Two quick responses, your
13   Honor.  The authorization is clear it doesn't ask for
14   priest and rabbi counselling information; it asks for
15   medical records relating to the incident in the
16   litigation at issue, and the second maybe there's a way
17   to work this out.  We can --
18          THE COURT:  What I'm thinking is -- well, my
19   proposal, and let's work -- I'm not ordering this at
20   this point, I'm just suggesting it.  What about an
21   order that indicates that the defense has to notify by
22   fax the plaintiffs that I want an authorization for
23   plaintiff X, Y, Z for Dr. B at this address, and
24   there's an order that says that within 24 hours they
25   have to fax back a signed authorization because you

1    already should have them on file, you should have a
2    stack of them on file.
3          MS. SULLIVAN:  It would be okay if there were
4    a few cases, but this many cases it is just going to
5    take so much time.  I know they'll try, and they say
6    they will, but we won't get it back within 24 hours in
7    many cases.
8          MR. CORONATO:  And, your Honor, there hasn't
9    been a complaint to date from any plaintiffs' attorney
10   in the hundred or so cases where we have obtained
11   records that we have obtained records that were
12   inappropriate from the get-go.  So I don't see what
13   this fear is.  There's been no showing -- there's been
14   no showing that there's been abuse on the part of the
15   plaintiffs.
16          THE COURT:  I don't think the problem is  --
17   I don't know.  It is hard for me to remember when I
18   litigated cases, but I think the problem is one issue
19   may be everybody talks about what the issues are, but
20   one of the issues that's most problematic to the
21   plaintiffs probably is that they're going to be somehow
22   sandbagged with some medical record at trial of
23   somebody that they didn't know existed.
24          MS. SULLIVAN:  They'll get the records.
25          MR. LOCKS:  Then they have to pay for

1    records, and if you go out and get records of
2    somebody's grandmother's cousin's church scene, and it
3    is 150 pages to protect the client have to get
4    copies of those records.
5          MS. SULLIVAN:  Right.
6          MR. LOCKS:  Well, come on --
7          MS. SULLIVAN:  Your Honor --
8          MR. LOCKS:  That is burdensome when you're
9    dealing with numbers.
10          THE COURT:  It is simple for me to order that
11   they have to maintain -- each attorney has to maintain
12   in his file blank authorization forms filed by his
13   client.  And that within 24 hours upon request he has
14   to fax back to you the signed authorization with that
15   doctor's name included in it or file a motion for
16   protection.
17          MS. SULLIVAN:  Your Honor --
18          THE COURT:  What is the other --
19          MS. SULLIVAN:  One of the problems is we're
20   dealing with an outside vendor, so it is another step
21   in the process to get the records.
22          THE COURT:  You're dealing with somebody else
23   to get your medical records?
24          MR. CORONATO:  Yes.  We send authorization to
25   the vendor and the vendor gets the records.

1          MS. SULLIVAN:  One thing that might solve
2    their problem is when they get the records we give them
3    notice, and they can raise an objection.  In other
4    words, when the vendor requests the records they copy
5    that request to the plaintiff's counsel and then
6    they'll know and can object.
7          MR. PLACITELLA:  What we have dealt with, not
8    these attorneys and not necessarily attorneys, but when
9    an outside vendor is involved and they're looking and
10   they have a mercantile interest in getting the records
11   a lot of times they'll start sending out -- they
12   identify, they send out and there's no check and
13   balance while these things are going out.
14          MR. CORONATO:  That doesn't happen with us.
15          MR. PLACITELLA:  I know, your vendor is
16   perfect.  It has no profit motive.
17          MR. CORONATO:  Because we have a process in
18   place that the vendor can get records identified by
19   plaintiffs' facts sheets.  If in their investigation of
20   records they uncover other providers that weren't
21   identified by plaintiff they notify counsel, Merck's
22   counsel, and Merck's counsel has to approve whether or
23   not those records can be obtained by the vendor.  Our
24   vendor does not have cart blanche to get all records.
25          MR. PLACITELLA:  I understand that's the

procedure, but in practice that doesn't always happen
when you have an outside vendor doing your work for
you.  I mean, we can deal with the judge's proposed
procedure, but like other counsel --

    MS. SULLIVAN:  It is not workable.

    THE COURT:  That's not workable?

    MS. SULLIVAN:  Not in accordance with this
discovery schedule, your Honor.  To get the records, to
get notice to them, to get back the authorizations, get
them to the vendor.  It adds another layer of delay and
time.  The procedure -- if they want notice, the
procedure where the vendor gives them notice when they
send their requests in they can call me and I'll say
stop, and I'll stop, and we'll stop the process until
we can raise it with your Honor is a much more
workable --

    MR. BUCHANAN:  I guess I thought we could
eliminate the step of sending them to counsel and then
counsel sending them to the vendor, give us an address
and we'll copy you guys in transmittal of the
authorizations you request.  We can comply with 24
hours.  We have a supply with them.

    MS. SULLIVAN:  It is not going to happen.
You may comply, Dave.  Believe me, it's not going to
happen.

    MR. CORONATO:  With the number of plaintiffs
we're dealing with that's going to be way too difficult
to monitor and follow-up.

    MR. PLACITELLA:  It is going to be way
difficult to monitor whether you're doing it right with
the number of plaintiffs.

    MR. CORONATO:  We haven't done it wrong to
date.

    MR. PLACITELLA:  So the better way --

    MS. RELKIN:  Your Honor, this is Ellen
Relkin.  I heard it said it is done in other mass torts
because in mass tort we need it this way.  I have never
seen it done in any mass torts.  It wasn't done in PPA
before Judge Corodemus.  I'm not aware of any other
precedent where plaintiffs gave blank authorizations.
It has a potential for problems.  I thought your
Honor's solution made sense.  I would just say --

    THE COURT:  There have been cases I have been
involved in where authorizations have been given in
blank, although I don't recall a case where I have
ordered that.

    MR. BUCHANAN:  There's a HIPPA condition
here.  The client is supposed to have the opportunity
to object to a particular authorization before it is
cut.

    THE COURT:  Before it is sent out.  I think
there is a HIPPA concern here, and I think that unless
I'm shown that it is unworkable I'm sticking with the
24 hours.  You notify them, your vendor directly or you
directly that you're going to request -- and this does
not have to be any kind of formal thing.  This -- as
long as it is faxed to them in writing I want an
authorization for Dr. One, two, three for this client,
they have 24 hours from when you send it to them to
reply.  By sending you a faxed authorization filled in
with that doctor's name or filing a motion of
protective order.  And the burden is on the plaintiffs
to do that.

    MR. CORONATO:  Your Honor, if I could --

    THE COURT:  And if you don't do it and it
turns out that they can start showing me that they sent
them to you and you didn't reply, then I guess you'll
have to let your clients know they have to be available
within 24 hours so you can get them on the phone.  I
recognize you have issues because you're going to call
the client.  You're not going to get the client, and
you might not yourself know.  I understand that, but I
think it is a fair compromise here that in that case I
guess you have to file a motion that says I tried to
reach the client and couldn't get them.  Let your

clients know you need to have access to them.

    MR. CORONATO:  Your Honor, I think it might
be more sufficient if we do it the other way, in other
words, the vendor sends it -- we provide notice to them
that we're getting the records that they give us the
authorizations ahead of time, and we will advise them
that we're going to send this authorization to this
provider unless you object within 24 or 48 hours.  If
there's no objection then the authorization goes, but
for us to have to wait to get the authorization when
the vast majority of these records are going to be
noncontroversial and we're getting them anyway it might
be easier --

    MR. LOCKS:  You have a reverse problem by
doing that because knowing the type of vendors that get
this stuff, they send it out by different methodology
whether it is e-mail, whether it is fax, whether it is
overnight mail, it becomes somewhat of a form letter.
It doesn't always necessarily go to the attorney
assigned to it.  It doesn't go -- for some people who
have multiple offices where it goes to the right office
at which point you can't react in 24 hours because you
can't figure out who to pass it through some time
within your own internal system.

    MR. CORONATO:  We'll give you more time.

1     MR. LOCKS:  Wait a minute.

2     THE COURT:  Obviously, time isn't the issue.

3   The issue here is control.  Everybody wants to stay in

4   control.  I understand that, but I'm going to do the 24

5   hours.  I think they have a HIPPA right to that at this

6   point.

7     MS. SULLIVAN:  They have a HIPPA compliant

8   authorization.

9     THE COURT:  But doesn't HIPPA say they should

10  have notice?

11     MS. SULLIVAN:  They do because their counsel

12  told them when they signed the authorization to get the

13  records as limited by the authorization.

14     MR. GALPERN:  But we're not advising our

15  client that they waive their right to privacy from the

16  treatment from the time they were born to the present.

17  We can't tell our clients that the act of signing a

18  blank authorization is waiving your HIPPA rights --

19     MS. SULLIVAN:  Not when it is limited.

20     MR. GALPERN:  -- whether you serve it a week

21  later or your mercantile agent serves it a week later

22  it is signing of the authorization is the waiving of

23  the HIPPA right, and, in essence, it is a matter of

24  control, but it is also a matter protecting our

25  clients.

1     MS. SULLIVAN:  There's two issues.  Once your

2   client has put their medical condition at issue HIPPA

3   is no longer applicable.  And, second, even if it were

4   you have a HIPPA compliant authorization which

5   specifically excerpts and tells the provider the kind

6   of information they're to provide.

7     MR. GALPERN:  Miss Sullivan, with all due

8   respect, when a plaintiff files a personal injury case

9   they don't waive their HIPPA right to their entire

10  treatment.  They waive their HIPPA right to the

11  treatment that's at issue, and that's what this

12  fundamental very important dispute is over.

13     MR. BUCHANAN:  Your Honor, just one

14  observation, the HIPPA compliant authorization

15  contemplates that the client has signed it upon

16  identification of the provider who was unspecified in a

17  blank authorization.  The HIPPA compliant authorization

18  is not HIPPA compliant if it does not have the specific

19  provider spelled out.

20     MS. SULLIVAN:  HIPPA -- when you put your

21  medical condition at issue HIPPA says it is up to state

22  law as to what is discoverable and what is not, but, in

23  any event, to satisfy their concern and make it

24  workable consistent with the deadlines Mr. Coronato's

25  suggestion of a notice provision to them where if they

1   want 48 hours or longer where they can object rather

2   than us having to go and get an authorization each time

3   makes it much more workable.

4     MR. GALPERN:  Why is that more workable, your

5   Honor?  You have a 24- or 48-hour turnaround time, but

6   what defense is asking for is a fundamental shift in

7   who's protecting my client's HIPPA rights.  Are my

8   client's HIPPA rights now going to be protected by

9   Dechert and by their adjustor or by their agent or my

10  ability to respond within 48 hours?  That's just

11  fundamentally unfair.

12     MR. CORONATO:  They're going to have to

13  provide us with authorizations within 24 hours.

14     MR. GALPERN:  Or object.

15     MR. CORONATO:  What is the difference if they

16  give us the authorizations in advance and object to us

17  using that authorization.  They still have to respond

18  in 24 hours or if they want more time we'll give them

19  48 or 36 hours, but if we have the authorizations in

20  hand first and provide them on notice that we are going

21  to send this authorization to X provider unless you

22  object within 48 hours that is the more efficient way

23  to do it.  And for us to each time get an

24  authorization -- then what happens when they don't

25  respond in 24 or 48 hours then we have to call them,

1   and if they don't respond we have to file a motion.

2   It's going to be way too burdensome when the vast

3   majority of records are not going to be objected to.

4     MR. BUCHANAN:  Isn't it premature to say it

5   doesn't work?

6     THE COURT:  I'll enter the order that I said,

7   I'm going to order.  Plaintiffs' counsel should prepare

8   it, I guess, or defense counsel.  I don't care who

9   prepares it, but 24 hours from the time you get notice

10  they want a doctor 's authorization you have to get it

11  to them or you have to file the motion to protect that

12  information, and if I find you're not doing it you're

13  going -- then we're going to have to change that order

14  and do something different because I'm not going to

15  make them wait weeks to get authorizations in hundreds

16  of cases.  They should not have to wait weeks for each

17  doctor.  They shouldn't have to make eight phone calls

18  to get them.  It should be a fax.  It is your job to

19  make sure you get it back to them, and as we have said

20  99 percent of the time that will result in one phone

21  call to your client, who is this person, and you can

22  request the records and you can request the records.

23  You don't get the opportunity to get them first.  It is

24  sort of like we don't need to play all those games

25  whether you get them first or they get them first,

1  you're still going to have them, and you can buy them
2  or not buy them, but I just think that I want to see if
3  this is workable.
4      I know the defense has some objection to it,
5  but I think your objection that it is unworkable or
6  that it is going to take you too much time we have to
7  see if that's true then I'll readdress it.  And I'll
8  readdress it at the next meeting, so keep track of any
9  problems you have with specific -- as to who gave you a
10  problem.  Just make sure that, you know, we have to
11  make sure that plaintiffs' counsel who aren't here
12  because that's the problem for the defense side, we're
13  dealing with a lot of people, and there are some people
14  who aren't here that maybe have cases, and if that
15  becomes a problem I may have to order different things
16  for some people.
17      MR. JACOBY:  It is their responsibility to
18  stay up to speed, so that shouldn't be your worry.
19      THE COURT:  Okay.  The order will be posted
20  on the website so everybody will know they have 24
21  hours.  I want that order submitted to me right away.
22      MR. BUCHANAN:  We'll try to get it to you
23  tomorrow, your Honor.
24      THE COURT:  Or Mr. Cohen can type it out
25  today.  All right.  What else?  We went to one that's a

1  Dechert issue, so let's go back to what was your next
2  thing?
3      MR. BUCHANAN:  You know, my next one is a
4  very fast one, so I would rather not count as a whole
5  one, your Honor.  Give me C and D together, your Honor.
6      THE COURT:  Well standard operating
7  procedures and organizational charts you don't have
8  those already?
9      MR. COHEN:  They're coming next week.
10      MR. BUCHANAN:  Excuse me?
11      MR. COHEN:  They're coming next week.
12      MR. BUCHANAN:  What is being produced in
13  terms of standard operating procedures?
14      MR. COHEN:  They asked us -- here is the
15  issue with C and D, and the first thing is let me take
16  two seconds because we come here and all you hear is
17  the negative.  The positive with these is generated out
18  of is last month we produced over 1.6 million pages.
19  During that same time period we met and conferred over
20  a whole set of new requests.  That 1.6, by the way,
21  finished the production that your Honor ordered a
22  couple of months ago and got done January 31st.
23      THE COURT:  I meant what I said on the
24  record.  Again, on the record, I think you have done --
25  you and other defense counsel and the firms have done

1  an excellent job with complying with discovery.
2      MR. COHEN:  But that said, I did take a lot
3  of time to get that thing to come in on time.  But we
4  met with plaintiffs' counsel, and we have -- they made
5  quite a number of requests.  They asked for over 30 new
6  people's document.  They asked for new documents -- all
7  kind of new documents, and we actually agreed on 90
8  something percent of them.  And we offered to do it,
9  and we found documents they're looking for.  They have
10  occasionally asked us to make some documents a
11  priority, and one in particular is the Board of
12  Scientific Advisors, which I have found the file that
13  they're going to want, and I'm going to get it to them
14  quickly so they get it in the time period that they
15  want, but what that means is a couple of things have to
16  be at the back of the line.  And it just so happens, as
17  pointed out here in D, that SOP and work charts went to
18  the end of the line.
19      Now, I can explain to you why they went to
20  the end of the line because at Merck everything in the
21  world is called a standard operating procedure, and by
22  the time you try and figure out what these documents
23  actually are and what we think they're entitled to and
24  what they actually want and how I'm going to get a set
25  together became more complicated, and so when there

1  were other things that I could kick out faster I did
2  it, but this is now taken care of.  There are
3  productions in process.  They'll get them next week,
4  and we can discuss if there's anything further on it.
5      THE COURT:  That goes for number six, too?
6      MR. BUCHANAN:  C?
7      MR. COHEN:  The reason why I have C and D
8  together is because what they're asking for for C is
9  they have asked for the files of individuals who sit
10  either on the Medical Legal Board or on the Management
11  Committee, and there are, I think, over 10 people who
12  sat on the Medical Legal Board at one time or another
13  and somewhere in the neighborhood of 20 people in the
14  Management Committee, and what I offered to them I
15  said, look, there are a couple of lawyers who sit on
16  these things, and I'm not going to give you the
17  lawyers' files.  I'll give you everybody's files along
18  with all of the other materials you have asked for, and
19  they said, We want a privilege log.  I said, Why would
20  I spend all the time going document by document to give
21  you a privilege log of documents I'm not giving you
22  when you're telling me that I'm not producing the
23  documents you do want fast enough?
24      So I think we should give you the documents
25  you do want that you're going to get fast, and I

1  shouldn't have to run through to go document by

2  document on documents they're not going to get.

3      THE COURT:  They should let Mr. Cohen argue

4  all these things.  That sounds reasonable, very

5  reasonable.  Why should he have to list everything in

6  the lawyers' file that you're never going to get?

7      MR. BUCHANAN:  The reality is they're

8  quasilegal people who participate in marketing

9  decisions throughout this company.  One of those sat on

10  the Medical Legal Board, and we have seen documents

11  that have been produced without redaction by her and

12  been produced in the litigation.  We don't have a

13  custodial file, and it appears that a significant

14  portion of her involvement was on nonlegal matters.  I

15  don't think that it is going to be a privilege log for

16  every document in her production.  If that's the

17  assertion that the entirety of her collection of

18  materials would be privileged then, okay, maybe it is a

19  different story and she should be at the back of the

20  line.

21      MR. PLACITELLA:  Who are you talking about?

22      MR. BUCHANAN:  I think it was JoAnn Lawner

23  was on the Medical Legal Board, and just to clarify

24  what the Medical Legal Board is, your Honor, what it

25  is, it is a committee, as I understand it, that

                                                    133

1  reviewed basically everything before it left the

2  company.  It consisted of scientists, marketing folks

3  and a lawyer who would review things -- I don't know

4  what law to comply with -- but to review things before

5  they left either for whether the marketing message was

6  right scientifically, whether it was communicating what

7  we want to communicate, et cetera, et cetera.

8      I don't know that substantively that

9  information would appropriately fill a privilege log.

10  And maybe I have the name wrong if it is not JoAnn

11  Lawner, but I know what the board does.  The board

12  does, in fact, review those materials.  There's been

13  testimony from a couple witnesses, and the witnesses

14  that have been on that committee went in and out.  The

15  other individuals went in and out, Brian Daniels was on

16  it at a point in time.  There was a marketing person

17  who was on only for a point in time.  We don't have

18  complete records in any respect for the Medical Legal

19  Board.  If you'll recall we asked for --

20      THE COURT:  He told you he is going to

21  produce --

22      MR. COHEN:  There are two doctors and one

23  lawyer on the board at any one time, and it changed

24  over time, and I offered every single one of the

25  doctors.  You'll get all of their individual files.

                                                    134

1      MR. PLACITELLA:  Here is the problem with

2  that, when I took Wendy Dixon's deposition, your Honor,

3  as much as it --

4      THE COURT:  Is she on the board and she is a

5  lawyer?

6      MR. PLACITELLA:  She is head of marketing,

7  and I would ask her a question like why did this go out

8  or how did this go out, and the response repeatedly was

9  "nothing went out without the Medical Legal Board

10  looking at it."  Not only that, but the key letters

11  back to the FDA where violations were cited were

12  written by the Merck's in-house lawyers, so this is not

13  a trivial issue.

14      The Medical Legal Board, you know, I think

15  they reviewed every piece of correspondence for two

16  things, one, how did it comply scientifically with what

17  they thought they needed to do with respect to their

18  duty, and, two, how did it comply legally with respect

19  to their duty?  Now, the experts that I'm aware of, you

20  know, that we have consulted with they may have

21  opinions as to whether both the legal and medical

22  duties were complied with and how these things were

23  disseminated, so to just say I'm not giving anything

24  with respect to what the lawyer did this was not a

25  lawyer giving legal advice about litigation, this was a

                                                    135

1  lawyer about, you know, dealing with what was going to

2  be transmitted to the public and how it was going to be

3  transmitted.

4      It is not -- it is not about going to court.

5  This is about what, for instance, under the Rules of

6  Advertising can they give to the public, what should

7  they say in a press release.  If they have a press

8  release that says, for example, after VIGOR we have

9  just confirmed that VIOXX is safe from a cardiovascular

10  perspective, and it says something to that effect a

11  lawyer approved of that.

12      Now, from our perspective that's a falsehood.

13  It is violative of a whole bunch of rules and duties,

14  and if a lawyer had a role in that, that lawyer's

15  perspective and what that lawyer knew and what that

16  lawyer did or didn't do is highly evidential.  In fact,

17  I would submit to you we would probably be sending out

18  a subpoena in the not too distant future for a couple

19  of those lawyers because they are key witnesses in this

20  case.

21      MR. COHEN:  The Medical Legal Board has two

22  doctors and one lawyer, and the lawyer gives legal

23  advice and that's privileged, and the doctors give

24  medical advice and that is not.  And I'm giving them

25  all the doctors.  We have already produced a lot of

                                                    136

1  documents that have gone through the Medical Legal
2  Board, and where there is legal advice I have redacted
3  it, done privilege logs they already have and have had
4  for months.  Any of these arguments has nothing to do
5  with what is privilege and what isn't.  There's a
6  lawyer who always acts as a lawyer and doctors who
7  always act as doctors, and it is set up that way.
8       MR. PLACITELLA:  With all due respect, your
9  Honor, that is not the law in New Jersey.  Just because
10  a lawyer is a lawyer doesn't mean they're providing the
11  kind of legal advice that's protected, and if we need
12  to brief that we may need to tee that up.  Just because
13  you have an Esquire behind your name doesn't mean
14  everything you do inside a company is protected.
15       MR. COHEN:  Legal advice --
16       MR. PLACITELLA:  Excuse me.  This is the same
17  issue that was briefed in tobacco and other cases.  The
18  rule of the in-house lawyer is always not so clear.
19  Especially when the head of marketing is saying that
20  nothing can leave without them looking at it, and we
21  know the things that are being disseminated are untrue,
22  and if the lawyer knows they're untrue and they're
23  giving permission to have untrue statements
24  submitted -- that's our position -- by the way, that's
25  our position, then that is relevant inquiry, and it is

1  I don't know how any lawyer could come up and say 100
2  percent of somebody's documents are privileged or
3  relevant or anything like that, and I don't want
4  anybody to get a misimpression because I will never do
5  that, but the idea that a lawyer giving their client
6  legal advice is not privileged is, A, wrong and, B, a
7  different issue from what I'm being asked to do right
8  now, which is to go back over all these documents and
9  do a privilege log.
10       THE COURT:  When will you have them, within a
11  week?  If you can have them within a week would you
12  produce it?  You said you could have the SOP's and the
13  organizational charts within a week?  Can you have C in
14  within a week, too?
15       MR. COHEN:  No, because C is the privilege
16  logs.
17       THE COURT:  Forgetting the privilege logs,
18  the doctor's files.
19       MR. COHEN:  No, that's not going to be within
20  a week.  That's like 10 people's whole files, and I
21  don't know what the percentage is, but it is in the
22  pipeline already.
23       THE COURT:  Let's give a time frame.  Prepare
24  an order that indicates that within one week from today
25  they're going to produce D, the SOP's and the

1  something we need to tee up, not to just dismiss and
2  say it is a lawyer's file we won't do that until some
3  time in the summer with all due respect.
4       THE COURT:  Anything else?
5       MR. BUCHANAN:  Your Honor, I understand the
6  need to get these documents out the door, and we're
7  chomping at the bit to get this production.  One thing
8  that may make sense, though, is if you were inclined
9  not to give us the documents from that particular
10  person to pick a window of time for these lawyers and
11  ask them to at least review those and confirm that the
12  documents in there the entirety of them would be on a
13  privilege log.  So rather than look through 10 boxes
14  for a particular person, pick a box from 1999, 2000,
15  look at those documents and see whether, indeed, it is
16  true, as counsel has represented, that they would feel
17  entitled to put every one of those documents on a
18  privilege log.
19       MR. COHEN:  I want to make clear, okay, there
20  is no way, without going through it, that I can tell
21  you that 100 percent of the documents are, but what I
22  can tell you is it has got to be a tremendous
23  percentage, if not almost all, and what you're trying
24  to do in prioritizing all this stuff is asking me to go
25  with a privilege log on a document by document basis.

1  organizational charts.  And that within -- you want to
2  give me a time frame for the eight doctors who served
3  on the Medical Legal Board?
4       MR. COHEN:  They have half of them.  Do you
5  have the chart?
6       THE COURT:  You have half of them done?
7       MR. COHEN:  They already have half of them.
8       THE COURT:  You already gave them half?
9       MR. BUCHANAN:  Some of these people were
10  relevant for other reasons and were previously
11  produced.
12       MR. BUCHANAN:  The way this issue arose, your
13  Honor, is we asked for departmental files of various
14  departments.  There were these boards and committees
15  that existed.  We asked for essentially the custodial
16  files of the committees.  We were told that there were
17  no formal custodial files for these committees, so we
18  were left with give us the custodial files of the
19  custodians on the committee, and we ran into this issue
20  with regard to attorneys that may have participated in
21  management committees and this medical legal committee.
22       THE COURT:  Do you have the list from each --
23  do you have the names of the three people that were on
24  the board for each period of time?
25       MR. BUCHANAN:  Counsel for defense may have

1    them here.  I don't have them here.

2         MR. COHEN:  Yes.  I gave them to Jeff.  He has

3    the list of the whole -- here are all the people.

4         THE COURT:  Who sat and when they sat?

5         MR. COHEN:  I didn't give him specific time

6    frames when they started when they stopped, I just gave

7    a list of here is everybody I would have to collect to

8    comply with your request to give you all the custodial

9    files.  It turns out there were 13 of those people.

10   There were three lawyers, 10 doctors.  They have three

11   of the doctors already, and a couple other doctors are

12   already on the schedule for production, and then the

13   rest we're actually going out to collect and then they

14   follow behind.

15        THE COURT:  How long?  For your seven

16   doctors.

17        MR. COHEN:  I would actually ask to take a

18   break and call back to the folks doing this, then we

19   can put a blank and fill that in.

20        THE COURT:  What I'm thinking I'm ordering

21   you to provide is the doctor's files within an

22   expedited time.  And within it can be the same time

23   frame or a short time frame it can be a two-page

24   certification from the lawyer that he acted as the

25   lawyer for the board from X date to X date, that he has

1    looked through his file and that he believes that the

2    majority of the documents are privileged or he believes

3    that 50 percent of them are privileged or none of them

4    are privileged.  He does not have to produce a

5    privilege log at this point.  Simply somebody looking

6    at it and because I was giving legal advice in the

7    terms of legal advice, and then we can deal with an

8    issue of once you get that if you need to file a motion

9    to get those we'll address it at the next management

10   conference.  Ask me before you file a motion, but if it

11   becomes an issue we'll have a motion, and we'll brief

12   whether they -- I'm not going to make him prepare the

13   privilege log for no reason at this point.

14        Quite frankly, I agree with you, there are

15   times when lawyers don't act as lawyers.  But when a

16   lawyer is reviewing things to decide whether it is

17   legal to send them out or not that's when he is acting

18   as a lawyer probably, so it would seem to me, most

19   likely, the defense would prevail in this situation.

20        MR. MAYER:  Just to be clear, these lawyers

21   that sat on this board had no other role in the company

22   except as counsel.

23        THE COURT:  That's what I'm saying.  If

24   they're not, you know, CEO's and lawyers some people

25   have dual roles or some people -- but if they're there

1    just to give legal advice --

2         MR. BUCHANAN:  Your Honor, just to, you know,

3    so the factual premises are correct, and I understand

4    this is a very practical solution to allow us to get

5    the immediate discovery that can be given without a

6    privilege log, and we can address the attorneys at a

7    later point in time, there are attorneys within this

8    company who act as -- supposedly as attorneys who are

9    being copied on whether decisions should be made about

10   running particular clinical trials or to run particular

11   studies.  I don't know what legal advice would be given

12   in that capacity, just kind of FYI, we're going to do

13   this or we're going to do that.  These people acted --

14   certainly, they have a legal capacity, but they're not

15   always acting in it, so it is an issue we may have to

16   revisit at a later point in time more generally with a

17   privilege log, but --

18        THE COURT:  I'm requiring them to give a

19   certification that indicates whether they feel they

20   were acting as legal counsel and giving legal advice

21   and basically what percentage of documents they would

22   estimate would fall under that without listing the

23   documents or anything like that.  We're talking about a

24   one- to two-page certification for each of them.

25        MR. COHEN:  We talked about the Medical Legal

1    Board, and that had the 13 people.  The Management

2    Committee has 20 something people, including the

3    general counsel of the company.  Can we start -- let's

4    get this process for the Medical Legal Board first and

5    then see if they're going to do anything in that regard

6    before I have to start doing the same thing for the

7    general counsel.  Clearly the general counsel is --

8         THE COURT:  What are you saying?

9         MR. COHEN:  I have more -- whatever timetable

10   for the Management Committee I have more people to do

11   and then the lawyers who sit on that committee it is

12   pretty obvious they are the general counsel.

13        THE COURT:  So the Management Committee is

14   different than the Medical Legal Board, which is what

15   we have been talking about.

16        MR. COHEN:  Right.  There are also lawyers

17   who sit on that committee.  That is the highest level

18   committee at Merck, and sitting on that committee is

19   the general counsel of the company, and he provides

20   legal advice to the company.

21        THE COURT:  Well, is the Medical Legal

22   Board -- so they have a Medical Legal Board, and they

23   have a Management Committee.

24        MR. COHEN:  They do completely different

25   things.  We haven't talked about the Management

1  Committee at all.  All the previous discussion was the
2  Medical Legal Board.  The only reason they're both in C
3  is they said give me all the people who sat on
4  something -- at least one of those people was a lawyer,
5  so the same issue came up, but they're two completely
6  different groups that do two completely different
7  things with no overlapping membership.
8       MR. BUCHANAN:  This company has quite a few
9  committees, and what we wanted to do was get committee
10  files.  We were largely unsuccessful in capturing
11  formal committee files.  We had committee minutes, but
12  we don't have all the files.
13       THE COURT:  So the Management Committee
14  doesn't have -- they have minutes, right?
15       MR. COHEN:  We have produced the minutes.
16       MR. BUCHANAN:  Yes, the minutes are not
17  everything that happened at the meetings, so to get the
18  complete story we ask for the custodians on these
19  particular committees that had VIOXX-related
20  information, and that is the overarching discovery
21  threshold.
22       MR. COHEN:  To be complete, when we produce
23  minutes we produce minutes, presentations, agendas,
24  anything we had for it, but we didn't object to
25  producing people who sat on these committees just

1  except for the lawyers where I'm going to then be  --
2  they're going to come in and tell me you have to
3  produce all these documents and then to go after
4  lawyers, I just --
5       THE COURT:  Let's start out with no lawyers.
6       MR. BUCHANAN:  Your Honor --
7       THE COURT:  Anybody who is not a lawyer
8  you'll produce the doctors and anybody on the
9  Management Committee who is not a lawyer and you can
10  give them the time frames when you think you can
11  produce those documents and they can be two different
12  time frames, if you want, Mr. Cohen.  The first can be
13  the Medical Legal Board more important to you than the
14  management?
15       MR. BUCHANAN:  There's people on both boards
16  that are significant to us, so we would probably
17  traunch them with them, and we have been working with
18  Mr. Cohen to try to prioritize --
19       THE COURT:  Figure out what is most important
20  and then please see if you can put it into an order
21  form.
22       MR. BUCHANAN:  We will.
23       THE COURT:  So we know what was decided.
24  Anything else?
25       MR. BUCHANAN:  Your Honor, on the standard

1  operating procedures --
2       THE COURT:  Right.
3       MR. BUCHANAN:  -- this has been a point
4  that's gone back and forth a little bit.  I understand
5  we're getting a production next week, but the company
6  seems to have standard operating procedures, as
7  Mr. Cohen suggested, for just about anything from sales
8  to marketing to running clinical trials, to processing
9  data for clinical trials, for how you're supposed to
10  enter data into the databases.  Everything basically
11  relating to how you -- the appropriate or standard
12  operating procedures for designing, conducting
13  analyzing clinical trials, how you market the results
14  of those clinical trials, how you compile the data and
15  how you just generally speak to doctors and everything.
16  They have intranets and internal websites that list all
17  these standard operating procedures.  I am just
18  concerned about the comprehensiveness of the standard
19  operating procedures.  I don't want to be in a position
20  where four weeks from now I'm saying, well, they gave
21  us standard operating procedure one, 15, and 17 and
22  whatever because that's what, you know, specifically
23  related to one particular issue, but they haven't given
24  us the full range of sales marketing clinical trial,
25  data analysis, standard operating procedures.

1       MR. COHEN:  It is difficult, I think, to be
2  able to respond directly because I think what I'm going
3  to do is I'll give him the production next week and he
4  is going to tell me he thinks it doesn't cover
5  everything for those departments or if there are other
6  departments he wants.  We are starting with a subset of
7  departments that plaintiffs identified as the most
8  important, and let's see if that works out, and, if
9  not, we can always do anything that we have to,
10  including having a telephone call, but I have a
11  production that I have looked at for the department
12  they're talking about, and I think it is going to be
13  pretty good, and they're going to get it next week.
14       THE COURT:  If you get that production and
15  you're unhappy with it make a phone call and we'll have
16  a telephone conference specifically limited to that
17  issue.
18       MR. BUCHANAN:  The issue has arisen more
19  recently in the last six weeks.  Obviously, one of the
20  things you may like to approach a witness with are the
21  company's standard practices versus what they were in
22  this case.  I'm hopeful we'll get the full panoply of
23  standard operating procedures we would use with these
24  witnesses, so we'll contact your Honor if the
25  production is insufficient.

1    THE COURT:  Okay.

2    MR. BUCHANAN:  It is back to your agenda if

3  you have anything left, Diane.

4    MS. SULLIVAN:  Yes.  Your Honor, one of the

5  issues that we wanted to talk about was depositions,

6  and the parties for the most part in the beginning of

7  the litigation had informally agreed on deposition

8  procedures and protocols, and were able to reach

9  agreement for the most part on timing of depositions.

10  Since the withdrawal, obviously, the litigation has

11  changed dramatically and has increased, and the number

12  of plaintiffs' lawyers attending depositions has also

13  increased dramatically, and some of these

14  depositions -- as I understand it there were as many as

15  30 or 40 lawyers in attendance, and there is a need at

16  this point, we would submit, for some uniform either

17  agreement or by order of the Court deposition protocol

18  in terms of the number of examiners and the length of

19  depositions.

20    The plaintiffs had at the last conference

21  raised the issue that they wanted for the New Jersey

22  group two questioners.  One to take a discovery

23  deposition and one, if necessary, to do a trial exam.

24  That's fine, but I would like some agreement or some

25  instruction from the Court that no more than that from

149

1  New Jersey and then for other jurisdictions and one

2  examiner per jurisdiction they can coordinate their

3  questions and then a limit of no more than two days I

4  think was what your Honor had suggested, and rather

5  than keep doing that informally sort of adopt in an

6  order the proposal that the plaintiffs had made in

7  terms of examiners from New Jersey and your Honor's

8  suggestion as far as limits on depositions.

9    MR. JACOBY:  On that, your Honor, it seems --

10  I have reviewed a number of these depositions and

11  participated in a number -- that the system that's been

12  in place, actually, the New Jersey rules has worked out

13  very, very well.  There's accommodation on both sides.

14  There's been accommodation if somebody had family

15  obligations, professional obligations it has gone in

16  good faith.  I don't believe, and I hope I don't

17  misspeak, I don't believe your Honor has had to be

18  called in regard to a depositional dispute in the

19  middle of a deposition to resolve anything.

20    This kind of a protocol at this stage of the

21  game -- I understand there are more people attending a

22  deposition than there have been in the past.  I don't

23  see why that's an issue.  It is an issue for chairs and

24  space.  If someone who is not participating in a

25  deposition, and I will be the first to admit I don't

150

1  understand the reasoning, but it is up to them.  If

2  they're not participating in a deposition and want to

3  actually observe the deposition as opposed to getting a

4  transcript I don't see how they can be denied entrance

5  if they're a lawyer that has clients in this case.

6    In regard to some of these other issues

7  limiting time, which really can be problematic, your

8  Honor, because, as I say, everything has gone

9  forward -- by everything that I have observed -- in

10  total good faith, but you have a situation where you

11  put an arbitrary seven-hour limit on a deposition and

12  then what you get is a 25-minute break every time they

13  have to read a paragraph because they know they're

14  chewing up their seven hours.  And it really subverts

15  the system instead of supporting the system.

16    The New Jersey rules are clear.  Depositions

17  are to be continuous, and I'll come back and talk about

18  that in just a second.  It has worked.  Your Honor has

19  not had to be involved.  I don't know how counsel can

20  ask your Honor to tell a person that has clients to

21  represent that they can't sit in on a deposition.

22    MS. SULLIVAN:  That's not what I'm

23  suggesting.

24    MR. JACOBY:  I thought that's the 30 and 40

25  people.

151

1    MS. SULLIVAN:  No, they can attend.  They

2  just need to coordinate the examination.  And it is not

3  unusual -- with respect, counsel, it is not unusual to

4  have a Case Management Order setting forth -- and I

5  know they had one in Resulin -- setting forth a

6  deposition protocol so you have some uniformity to

7  prevent disagreements going forward.  I understand

8  recently there was a deposition where there were two

9  New Jersey examiners.  The deposition went for two full

10  days then they wanted to continue it for another day

11  and have a third New Jersey examiner, and that's before

12  you get to counsel from other jurisdictions.

13    THE COURT:  Whose dep was that?

14    MS. SULLIVAN:  Wendy Dixon.

15    MR. PLACITELLA:  That's not what happened.  I

16  was there personally.  I'll attest to what happened.

17  That is absolutely not what happened .

18    MR. CORONATO:  With Wendy Dixon we had two

19  days of questioning by Mr. Weiss and Mr. Placitella.

20    MR. PLACITELLA:  That is not true.  That is

21  absolutely not true, your Honor.

22    THE COURT:  All right.  What happened from

23  your point of view?

24    MR. PLACITELLA:  Mr. Weiss and I agreed we

25  were going to break up the questioning so we could

152

1　expedite the situation.  Lawyers showed up from
2　Georgia, Texas, some defense -- a doctor's defense
3　lawyer was there.  We went the first day.  I took over
4　the morning of -- the end of the day, went to the next
5　day in order to accommodate --
6　　　　THE COURT:  You took the whole first day?
7　　　　MR. PLACITELLA:  I took part of the first day
8　and Mr. Weiss took part of the first day because I'm
9　assisting him on getting the experts ready for the
10　marketing aspect of the case, the consumer aspect of
11　the case.  We'll put aside the fact and this is what I
12　think Mr. Jacoby is eluding to.  If you're taking a
13　deposition and, you know, you hope you can finish in a
14　day.  But if you have to ask the witness the same
15　question five and six times to get a response because
16　all you do is get the corporate mantra that has nothing
17　to do with the question -- and I understand it is
18　subjective, and we'll agree to disagree -- but if you
19　ask something that asks for a yes-or-no answer and you
20　get three pages of testimony and then you have to ask
21　it again so you absolutely understand what's happening
22　that is not a full day of deposition.
23　　　　So what happened was Mr. Weiss and I went the
24　first day.  The second day I went.  I then handed off
25　before lunch the deposition to counsel from Texas.  I

1　actually handed him questions that I promised the
2　Georgia lawyer that I would ask so we could coordinate.
3　And I handed him questions that I was trying to
4　get it done, but, of course, it didn't get done.  The
5　deposition didn't finish.  New Jersey never got their
6　full two days.  New Jersey was trying to accommodate
7　everybody else.  The deposition is supposed to be
8　tomorrow, and I understand we got a letter in the
9　mail -- Mr. Weiss got a letter saying, New Jersey,
10　you're done, basically don't show up.  You're not
11　asking any more questions.
12　　　　Now, I tried to accommodate to try to get
13　this done, but if questions are asked tomorrow, and
14　there were things I wanted to ask that weren't asked
15　and they're important in terms of my expert
16　preparation, if questions are asked tomorrow and
17　answers come up, to protect my clients I have to be
18　able to ask follow-up questions.  We never took two full
19　days.  New Jersey took a day and a half, and if you
20　really want to calculate it it came out to 250 pages
21　approximately of our testimony for a day and a half we
22　were there, and a lot of it there were problems, that's
23　all I'll say, so not two days.  We didn't take our two
24　days.
25　　　　We worked really hard, meeting during breaks,

1　trying to figure out ways to consolidate, but sometimes
2　it is just not possible when somebody from another
3　state has a different agenda, different timing, they
4　have different things they want to hit, so I'm not done
5　with Wendy Dixon.  I probably have another two hours of
6　questions I have to ask her, and there's nothing I can
7　do about it.  I tried very hard, but for us to get a
8　letter saying don't come, you're not welcome I said,
9　that's okay, I won't drink any coffee, I won't drink
10　any water, I'll try not to use the bathroom, I just
11　want to ask the questions.
12　　　　MR. CORONATO:  They weren't told they
13　couldn't show up.  It is also my understanding there
14　was a significant amount of questioning about Zocor
15　during that deposition, wasn't there?  So I don't know
16　why we're talking about Zocor if they're so concerned
17　about time asking questions about Zocor.
18　　　　MS. SULLIVAN:  We don't need to get into the
19　specifics.  Mr. Placitella and I have been in
20　litigation where there has been limits -- presumptive
21　limits -- if there's an issue that can be raised with
22　the Court if somebody needs more time and there's a
23　dispute about it we can raise it and agree or take it
24　up with the Court, but they're at this point, given the
25　number of players, and the number of corporate witness

1　depositions still to be taken there is a need for some
2　reasonable protocols and limitations in terms of
3　depositions.
4　　　　We have submitted one to the Court for
5　consideration that basically embodies the suggestion
6　that plaintiffs had the last conference in your Honor's
7　presumptive limit of two days in the protocol.
8　　　　MR. PLACITELLA:  We didn't get two days,
9　okay, we got barely a day and a half.  We were just
10　trying to be cooperative, but sometimes it doesn't work
11　out.  And not every witness is the same.  Miss Dixon
12　was the head of marketing in the U.S. for VIOXX.  She
13　had control over half a billion dollar budget.  She had
14　something to do with PR.  She had something to do with
15　direct to consumer advertisement.  She had something to
16　do with the 1,500 doctors that they hired to go around
17　the United States and talk to other doctors about
18　VIOXX.
19　　　　I mean, we barely scratched the surface on
20　direct to consumer advertising because we didn't have
21　time.  We barely scratched the surface on what they did
22　for public relations and third parties because we
23　didn't have time.
24　　　　MS. SULLIVAN:  This is --
25　　　　MR. PLACITELLA:  Excuse me.

1     MS. SULLIVAN:  I'm sorry.

2     MR. PLACITELLA:  She made statements about

3  what she was allowed to say and not say to the public,

4  and we really didn't have the time to ask her what the

5  basis for those statements were.  Things that went --

6  she said we did X, Y and Z because this is what was

7  known inside of Merck.  We never really scratched the

8  surface with her about what was really known inside of

9  Merck.  I mean, the FDA violation letters that were

10  sent to Merck hardly touched if at all.

11     Now, Ms. Dixon may be a bad example because

12  of her -- because of the breadth of what she would know

13  as the head of marketing for VIOXX versus someone who

14  has a limited role, but like Mr. Jacoby said we're

15  doing our very best.  No one can say that we were

16  redundant, that we didn't try to cooperate and that we

17  weren't -- that we were abusive to this witness because

18  we weren't.

19     MR. MAYER:  We'll take another example,

20  there's a biostatistician being deposed; she had some

21  significant involvement in the product.  It ended in

22  2001.  Since then she's been deposed in three or four

23  other cases, now she is being deposed in this case.

24  We're two days into the deposition and we're still not

25  done, and it's just disproportionate to -- given the

1  number of depositions that are being taken in these

2  cases and what will ever really see the light of day at

3  trial is just it is beginning to be -- it is divided up

4  among a lot of different lawyers, everybody, you know,

5  thinks they have a better way of doing it, and you have

6  to put some reasonable limits on the time frame here.

7     MR. BALEFSKY:  My partner took that

8  deposition -- is taking that deposition of Deborah

9  Shapiro, her being a biostatistician at Merck.  That

10  deposition has been going for two days.  There's been a

11  lot of involvement in clinical trials, especially the

12  VIGOR study.  She was a very critical, key witness.

13  There's been no objection raised at the deposition

14  itself as far as the length of time.  In fact, Merck's

15  attorney that was there accommodated us and said the

16  third day was fine.

17     MR. MAYER:  I was there, and I did object.

18     MR. BALEFSKY:  Merck has some direct that

19  they want to ask at that deposition, so I think, you

20  know, the deposition is going as fast as we can do it,

21  and we just can't limited it.  There's a lot of

22  documents that we need to talk to her about.

23     MR. BUCHANAN:  Your Honor, just a general

24  observation, and I'm not going to recount custodian by

25  custodian or deposition by deposition, this is a high

1  volume document case, surprising in my experience for

2  the number of documents per custodian.  Deborah Shapiro

3  had several hundred thousand pages in her custodial

4  file a hard drive of SAS files produced, involvement

5  with the DSMB for the VIGOR trial, involved in

6  answering all the questions about what that analysis

7  showed for the publication process, involved in the

8  Meta-analysis the company did that analyzed CV events

9  across all trials.

10     When you read the paper when you look at what

11  the FDA is saying, when you look at the company's 145

12  single spaced tone that is the current state of the art

13  defense in this case they filed with the FDA, these

14  all issues that are central to the case.  Now, I'm

15  sorry if they think it can be done more efficiently.

16  They're the ones cross-noticing these depositions.  We

17  have been cooperative and tried to coordinate with

18  other counsel.  There's no evidence of any duplication,

19  and these depositions are not being staffed with junior

20  lawyers.  These are not being taken by people who don't

21  know how to take depositions.  I'm sure defense counsel

22  may disagree with the scope, the focus, any number of

23  things about them, that they're being taken with a

24  purpose, they're being taken with a purpose of being

25  used at trial, and they're being taken with the purpose

1  of pinning down specific issues.  The fact that Miss

2  Shapiro has 200,000 documents, doesn't that factor into

3  how long her deposition is going to take?

4     Now, they're not all originals, but she had a

5  lot of original work at a very central point in the

6  case.  She's one of many people like that.  Doug Watson

7  300,000 pages, Tom Simon 500,000 pages.  These

8  witnesses had paper like you wouldn't believe.

9     THE COURT:  Are they done?

10     MR. BUCHANAN:  Tom Simon is done.  He

11  finished in two days.  Doug Watson, he continued to a

12  second day.  He will be finished on March 9th.  Deborah

13  Shapiro from my understanding is the only witness

14  that's gone more than two days.

15     MR. MAYER:  And, by the way, out of all those

16  hundred thousand -- the examination's been on documents

17  principally that weren't -- didn't have her name on it,

18  weren't from her file, were documents she had been

19  examined on repeatedly before.  Now, we're not fighting

20  over the third day.  Mr. Balefski is right.  We have

21  agreed, and we're fine.  I'm just using it as an

22  example of --

23     MR. BUCHANAN:  I do want to finish one point.

24  This is not developed.  There has been no evidence of

25  duplication of questions as it relates to multiple

1  examiners in New Jersey, and I think that's an
2  important point.  With a couple hundred thousand pages
3  one law firm, one lawyer cannot be expected to really
4  understand the entire examination, understand every
5  piece of that paper.  Maybe they can, maybe they can't,
6  but with a compressed deposition schedule right now
7  what we have done in some instances is whack up
8  particular points in time, particular focus areas for
9  witnesses to try and have examiners concentrate on
10 those particular areas.
11      Now, I'm concerned about limiting the
12 examination to a particular number given the number of
13 depositions that are happening over the next several
14 weeks and our need to get through the documents to
15 accommodate that.  Absent evidence that we're
16 duplicating examination or that we're walking the dog
17 with these witnesses, there's really no evidence of
18 impropriety in terms of how we're conducting ourselves,
19 and these are senior lawyers doing their best.
20      MR. MAYER:  We can fight another time if we
21 want to fight about that.  We're just saying we're
22 seeing a trend of these depositions going on longer and
23 longer.  That's a trend.
24      MR. BUCHANAN:  They weren't cross-noticed
25 before.

1       MR. MAYER:  No, just with the New Jersey
2  examinations, and if we don't put a procedure in place
3  with presumptive limits then we will have to come back
4  and make a record of duplication, and this -- and this
5  examiner wasn't prepared and wasted a lot of time and
6  all that.  We don't want to fight over that.  We want a
7  presumptive rule to give some structure to continue the
8  cooperative environment we have had up until now where
9  we have been able to work things out on a reasonable
10 basis, and sometimes when you get a bigger group
11 involved you need some presumptive rules in place in
12 order to provide a framework for that kind of --
13      MR. BUCHANAN:  You know what is going to
14 happen, your Honor?  If there's a firm time limit when
15 we ask a question, well, your official position at that
16 point in time was that Naproxen was cardioprotective
17 then we get the two-page speech that was based on the
18 best available evidence at the time and we had X, Y and
19 Z that is the message that's to be conveyed in the
20 transcript, we're going to be calling your Honor saying
21 they're taking up our time in examination by not
22 answering our questions.
23      MS. SULLIVAN:  This is in every mass tort,
24 Dave, you had a protocol in Resulin.  Chris lived under
25 a protocol in breast implants.  There's always some

1  presumptive protocol, and then if there's an issue you
2  take up with us or we raise it with the Judge, but not
3  having any rules at all has led recently to more and
4  more disputes, and it doesn't make sentence.
5       MR. JACOBY:  They haven't always worked.  The
6  central issue is -- I have been involved in a number of
7  cases that have had protocols, and they have been
8  abused and have brought on more motion practice than
9  almost any --
10      MS. SULLIVAN:  That's not true.
11      MR. JACOBY:  Absolutely.  These things are
12 fraught with ways to get around it.  The central issue,
13 your Honor, is the should we depart from the New Jersey
14 rules, the New Jersey discovery rules in the taking of
15 a deposition, and if we're going to depart from those
16 rules -- again, I participated in depositions where
17 defense counsel has been late that we have had
18 10-minute lunches to accommodate, and that's been on
19 both sides, and it has worked.
20      They always have the right, if they think
21 that -- and, again, I haven't heard one single
22 assertion that there's been duplicate of questioning,
23 there's been an abuse, that a witness has been
24 physically asked to stay longer if they're tired or any
25 of those kinds of issues.  If anything comes up in a

1  deposition like that they have a right to seek a
2  protective order from your Honor.  We can get you on
3  the phone.  We can say these are the issues, and you
4  can make your call.  It hasn't happened yet, but what I
5  will say, your Honor, if we institute a protocol like
6  this, which is artificial from its inception that
7  doesn't understand this litigation the protocol is not
8  as I looked at what was suggested here does not really
9  embrace what's happening in this litigation.
10 Particularly now with all these other states coming in
11 and cross-noticing we will generate 100 motions for
12 your Honor.
13      MS. SULLIVAN:  That's not true.
14      MR. JACOBY:  I hate to throw cliches at you
15 to, but it is really not broke, your Honor.  It doesn't
16 have to be fixed.
17      MR. PLACITELLA:  I guess what is slightly
18 disconcerting is I would hear the Dixon deposition as
19 the example of the abuse when the New Jersey lawyers
20 didn't take the full two days, coordinated with other
21 lawyers, handed their time over to other lawyers to try
22 to finish it in two day, and that's when they come in
23 and say we're abusing the system.  So I guess since I
24 didn't use the two days it is presumptive that I have
25 another half day with Miss Dixon, which I could really

1  use because if that's the example of the abuse there's
2  no abuse.
3       MS. SULLIVAN:  Our concern is they're
4  entitled to their discovery, but there is some
5  reasonableness here.  These employees have jobs.  The
6  company has a lot of issues that they're addressing.
7  They have other products that they're developing and
8  marketing, so to say that they want depositions until
9  they say they're done is not -- we would submit in this
10  kind of litigation is not reasonable, and some
11  reasonable protocol is in order at this juncture, and
12  the one we submitted embodies some of the plaintiffs'
13  suggestions, Judge.
14       THE COURT:  All right.  So far if we're
15  tailoring it to this we're trying to put in some
16  protocols, and we're tailoring it to the litigation.
17  You haven't had any deps that have extended beyond
18  three days.  Most of them have been completed within
19  two days from what I'm hearing.  New Jersey
20  attorneys -- if we certainly do not want a situation
21  where six, seven, eight attorneys question the same
22  witness.  Is there a problem with a limit of two
23  attorneys for any discovery deposition?
24       MR. PLACITELLA:  No.
25       THE COURT:  Two New Jersey attorneys.

1       MR. DAVID COHEN:  I would like to speak to
2  that.  I'm David Cohen from Spector Roseman.  The issue
3  has only just arisen with the deposition of Miss Wendy
4  Dixon and may arise with a handful of other Merck
5  witnesses who have testimony relevant to the mass tort
6  cases but also marketing and pricing information about
7  VIOXX that is relevant to the economic claims in our
8  class action, and I haven't -- I tried to speak to Mr.
9  Coronato about this briefly today, but we weren't
10  really able to reach a resolution.  Mr. Coronato, of
11  course, is the lawyer who sent the letter stating that
12  New Jersey lawyers could no longer ask questions of
13  Miss Dixon at the continuation of her deposition
14  tomorrow.
15       I see that in Miss Sullivan's proposed
16  deposition protocol in section 3A she talks about the
17  possibility that counsel for plaintiffs could have
18  divergent positions and need to ask questions that the
19  original questioning attorneys might not have in mind,
20  and she makes an allowance for that situation that if
21  it were to occur additional questioning attorneys would
22  be permitted.  I just simply ask your Honor not to
23  approve any protocol that would ignore this issue and
24  ignore the possibility that there are more than one
25  type of plaintiffs' lawyer at the table.

1       THE COURT:  So you're anticipating with Miss
2  Dixon asking questions yourself?
3       MR. DAVID COHEN:  Well, your Honor, I think
4  it is an issue.  We would like the opportunity.  We
5  have been foreclosed, and I think now the issue will
6  become analyzing the testimony she has already given
7  and determining whether it is sufficient to answer all
8  of our questions, and, if not, it would be the subject
9  of motion practice.  Our ideal situation would be to
10  avoid the need to bring back these witnesses more than
11  once, so we would like to address it up front if it is
12  possible -- if in Miss Dixon's case it may not be
13  possible, but I wanted to raise this as an issue for
14  your Honor.
15       MS. SULLIVAN:  Hopefully, your Honor, the
16  plaintiffs can coordinate and feed any questioner --
17  the designated questioner the questions that they would
18  like asked.
19       MR. PLACITELLA:  We tried to do that, Diane,
20  but sometimes if somebody has things they want to get
21  through when somebody hands them the questions they
22  don't always get asked -- you do your best, and, by the
23  way, Judge, the lawyers for Merck at least the
24  depositions I have been in have been professional, you
25  know, great, protect their client, they have not

1  obstructed the deposition, just sometimes things when a
2  witness knows a lot it takes them extra time.
3       MR. CORONATO:  It is my understanding that
4  Wendy Dixon underwent two days of deposition testimony.
5  It may not have been -- the New Jersey counsel may not
6  have taken the entire second day, but it is my
7  understanding they indicated that they were finished
8  with their questioning of Wendy Dixon on the second
9  day.
10       MR. PLACITELLA:  Because I handed it to
11  somebody else to --
12       MR. CORONATO:  Then somebody from Texas
13  started asking questions.  Then they get the transcript
14  back, they review it, they say we should have asked
15  this question, that question, and then they issued
16  another notice for her deposition for tomorrow
17  indicating that they wanted to continue questions on
18  that day, so that's something that your Honor needs to
19  know, and we received another notice for her deposition
20  from the New Jersey counsel for today.
21       MR. BUCHANAN:  They arranged the
22  continuation -- defense counsel arranged the
23  continuation of Miss Dixon's deposition for Friday with
24  Texas counsel that had completed -- I guess it was only
25  a half day the second day.  I think the deposition

1    actually concluded around noon or 12:30 because I saw

2    the lawyer who took the examination that afternoon.

3    Defense counsel arranged a continuation for the Dixon

4    deposition for this Friday.  I learned about it through

5    other sources and knew Mr. Placitella had other

6    additional questions that he ended up yielding his time

7    to Texas counsel, so I served the amended notice of

8    deposition to indicate we planned on coming to this

9    deposition and coordinating, again, with Texas counsel

10   as we had previously.

11       MR. PLACITELLA:  I handed Texas counsel

12   questions that I wanted to ask so he can get going, and

13   he had things he wanted to ask, and he asked one or two

14   of my questions, but he had things he wanted to cover

15   in his own respect.  It is no fault of anybody's.  This

16   is somebody who ran the marketing for the most

17   publicized drug in history, you know, and we got a day

18   and a half, and that's what is cited as abuse, and, you

19   know, I don't site them as abusive.  I mean, they make

20   objections in depositions that I may not agree with,

21   but they're trying to protect their clients.  I thought

22   they acted very professionally on how they handled it,

23   and I thought we acted very professionally, as well.

24       MR. MAYER:  Just to be clear Texas counsel is

25   also counsel in this case.  He was here today,

1    actually.

2        MR. PLACITELLA:  I can't control what a Texas

3    judge --

4        MR. DAVID COHEN:  To the point of sharing

5    questions or preparing questions for another attorney

6    for trading off questioning responsibilities with

7    respect to my issues in particular having to do with

8    complex pricing issues and the economics of drug

9    pricing and the effective marketing -- drug marketing

10   on pricing issues and so forth, it actually becomes

11   fairly difficult, your Honor, because even if I have

12   prepared a set number of questions to be asked by any

13   attorney around this table they may not have the

14   background in drug pricing, they may not have the

15   background in the connection between the things that

16   are necessary to ask to form any follow-up questions

17   that would be apparent to an attorney with specific

18   economic pricing information or economic information

19   relating to our claims, the establishment of our

20   claims, and it leads to a situation where we could more

21   efficiently and more appropriately conduct the

22   examination if we had someone at the table to do it.

23       MS. SULLIVAN:  That's a legitimate point, and

24   that's an example of counsel who has a divergent issue

25   from the rest, but for the products cases there's no

1    reason why counsel can't coordinate to limit the number

2    of examiners and streamline the deposition.  It happens

3    in many of the other mass torts that these guys have

4    been involved in pursuant to a Case Management Order

5    that sets forth the deposition protocol.  You know, the

6    claim that this litigation is so different than

7    anything else -- all of them are document sensitive in

8    terms of the pharmaceutical mass torts, and there's

9    deposition protocols, and once in a while you have a

10   disagreement and you raise it with the Court whether

11   somebody should be two days or three days, but there

12   should be some presumptive limits to prevent the kind

13   of potential free for all that could occur at the

14   deposition given the number of counsel.

15       THE COURT:  Okay.  Susan Burns is in

16   Courtroom 3A.  She is going to demonstrate or is ready

17   to demonstrate Lexis Nexis as far as their new file and

18   serve for anybody who needs to get up to speed on that

19   that it is not working well for them or they have kinks

20   in it or they're not comfortable with how it is used or

21   they're -- so any of you who would like to go over

22   there can go.  Does everybody want to go or some people

23   are staying?

24       MR. BUCHANAN:  I'm going to stay here.  It is

25   probably helpful to people who are filing that you go

1    so you know how to file and how to find things on

2    there.

3        MR. PLACITELLA:  One point of interest, your

4    Honor, my co-counsel leaned over to me and said, Chris,

5    you forgot you were so accommodating on the second day

6    you only went 45 minutes, so we didn't even go a full

7    half day.

8        THE COURT:  All right.  You're going to get

9    your third day tomorrow, and you can certainly take the

10   dep tomorrow.  I do think that as far as class counsel

11   is concerned I guess you can play it by ear, whether at

12   that dep everybody feels that it is appropriate to have

13   you ask some questions at that time.  I don't know if

14   you want to confer with defense counsel in advance or

15   defer with defense counsel that day of the dep.

16   Depending on how tired the witness is, depending on how

17   long you think you're going to be.  If you have a few

18   short questions to ask they may prefer to just let you

19   ask them and get them over with at the same time or

20   they may prefer to just say, okay, we'll do the -- you

21   know, we'll let you tell us what people you need on the

22   economic issue.

23       MR. DAVID COHEN:  Just so long as --

24       MR. MAYER:  So long as we keep the schedule.

25       MR. DAVID COHEN:  I'm aware, but I believe

1    tomorrow, your Honor, so long as the avenue is open to
2    us to have access to asking specific marketing and
3    pricing questions that are relevant to support our
4    economic damages claim that's all that I need at this
5    point.
6         THE COURT:  Okay.  And I'm going to leave it
7    up to defense counsel whether they want that to take
8    place tomorrow or not.  Whether they prefer to just say
9    on another day she'll be produced half a day for you or
10   whether they want to -- they want to let you add that
11   for an hour or two.
12        MR. DAVID COHEN:  I'll follow-up on that with
13   them.
14        THE COURT:  Let me see where your protocol
15   is.  It is attached.
16        MR. JACOBY:  We also had a couple -- if you
17   want to take a minute -- some housekeeping issues that
18   have come up during the depositions that kind of
19   dovetails with the protocol, if you want to hear it it
20   would take a minute of your time.
21        THE COURT:  All right.
22        MR. JACOBY:  A couple things there have been
23   issues that developed over depositions, and I was
24   hoping we could get it straightened out.  I was asked
25   by a number of attorneys taking the depositions to

173

1    bring this up, and that is a divergence as to
2    interpretation of the rules.  The first issue is
3    talking to the witness or discussing the case with
4    witnesses during breaks in the deposition that has
5    become I think a little bit of a recurrent problem.  If
6    you want we can argue it, we can brief it, we can say
7    our two cents now.
8         Our position is that the rules say
9    depositions are to be continuous.  Continuous means
10   that the testimony is to be continuous.  Obviously,
11   there's bathroom breaks and lunch breaks.  My
12   understanding has been if you have a bathroom break or
13   lunch break that's not an opportunity to coach a
14   witness that's in the middle of being examined.
15        The second issue is the proper way to make an
16   objection.  There's these speaking objections.  There's
17   these things about I don't really understand your
18   question, but if the witness can answer it then he can
19   go ahead, and a nanosecond later the witness says "I
20   can't answer that question."  There's a way to object.
21   You object to the form of the question.  Everything
22   else is reserved.  It is becoming a little bit more
23   problematic, and I thought I would bring it up to your
24   Honor so we can get an understanding from you as to how
25   we're going to proceed.  Can a witness be coached

174

1    during a deposition and can you make a speaking
2    objection?  We would say no.
3         THE COURT:  Can you beat your wife?
4         MR. JACOBY:  And can we ask the witness have
5    you been coached?  We weren't even able to ask the
6    questions.
7         MR. COHEN:  I took the first year ICLE class,
8    and in the ICLE book it says you can.
9         MR. JACOBY:  There's 300 judges in this state
10   that say you can't.
11        THE COURT:  Let me say I have dealt in my
12   experience in litigation I was told by judges many
13   times no one can talk to the witnesses.  I don't know
14   of any case that says that or any rule that says that
15   or any law that says that, and in my courtroom
16   everybody can talk to their witnesses.
17        MS. SULLIVAN:  And there's law to support
18   you.
19        THE COURT:  And that's going to go for the
20   deposition and the trial.  Your expert is on the stand
21   and there's a break, talk to your expert, I don't care.
22   Are you allowed to tell your witness that he should
23   change his answers?  No.  That would be unethical and
24   improper, but are you allowed to discuss the case with
25   your witness?  I think yes.  I don't have a problem

175

1    with it.  It is a two-sided rule.  It goes for you when
2    you take a break, you can talk to your plaintiffs, they
3    can talk to their defendants.  I just don't think it is
4    a problem to be able to talk to witnesses.  That's -- I
5    don't see why you can talk to them for four days -- I
6    use four days because you said they talk to their
7    people for four days -- why can you talk to them four
8    days up to then and then talk to them for a minute
9    during the dep?  I don't have a problem with it.
10        MR. GALPERN:  Your Honor mentioned no rule or
11   no case on point.  With respect, your Honor, there's a
12   court rule directly on point.  It is 4:14(3).
13        MR. PLACITELLA:  Don't overrule the judge.
14        THE COURT:  Go get the book and show it to
15   me.
16        MR. CORONATO:  Judge Pressler says it does
17   not apply during breaks and lunches.
18        THE COURT:  Go ahead, bring the book.
19        MR. GALPERN:  I don't have mine.
20        THE COURT:  Go get it.  I have looked it up
21   before, and I haven't found anything that I felt
22   controlled at least during trials.  I truly haven't had
23   it raised in deps, but for trials I ruled on it before.
24   There's cases that say it is not -- that a judge has
25   the discretion to order that you can't talk to

176

1   witnesses.  I have that power.  I have chosen not to do
2   it.  I don't think it's a problem.  I think there's a
3   lot of these artificial does anybody coach their
4   witnesses?  Well, you prepare your witness, but you
5   don't coach your witness.  Each of you has your
6   conscience and your integrity, and I'm assuming you
7   know where the line is.  And I assume you know that
8   line, whether it is the middle of the dep or whether it
9   is the middle of the day or it is at lunch.
10      I think it is pretty artificial to say that
11  two lawyers and their expert are going to go to lunch
12  and they're not going to mention the case.  That's
13  really -- maybe they're going to, but, I mean, they
14  are I assume if I tell them not to.  They better.  But
15  why should they have to not?
16      MR. JACOBY:  I don't want to get into a
17  debate, but if the witness is in the middle of being
18  examined and counsel is --
19      THE COURT:  I don't think the attorney can
20  stop the deposition and say --
21      MR. JACOBY:  I understand.
22      THE COURT:  I mean, I recognize that, you
23  know, I guess --
24      MS. SULLIVAN:  Hold that question, I'll be
25  back.

1       THE COURT:  At least finish the answer to the
2   one question, you know, what can I say?  They can't ask
3   for a break after a question and an answer, and if
4   they're abusing it, say, for the last 10 questions
5   counsel has asked for a break or counsel is feeding the
6   answers then I'll deal with that, but just so you all
7   know in advance my basic rule is talk to your clients,
8   talk to your witnesses, talk to your experts.  I think
9   you're allowed to.
10      MS. SULLIVAN:  Judge Pressler is consistent
11  with that, your Honor.
12      MR. JACOBY:  Second issue was a speaking
13  objection.
14      MR. CORONATO:  Your Honor, on the --
15      THE COURT:  If the Appellate Division is
16  behind me then I'm really set.
17      MR. CORONATO:  On the objection question the
18  rule, which we'll have in here shortly, also says that
19  you must state the grounds for your objection.  You
20  must do it.
21      MR. BUCHANAN:  Your Honor, we can stipulate
22  that when they object to form counsel on the other side
23  can ask for clarification as to basis of the objection
24  to form.  Frankly, given that all objections other than
25  objections to form are reserved, any objection just the

1   word "objection" -- this has been done in a number
2   of -- in a number of MDL's and other coordinated state
3   proceedings the mere word "objection" is good enough to
4   convey to the opposing counsel that there's a problem
5   with the question.  The clarification is sought, then
6   the basis for the objection is to be identified.
7   Anything more than that objection, mischaracterizes the
8   witnesses last three answers.  Well, the answer is
9   going to be, well, I think I stated that differently
10  the last three times.  There's really no need, and it
11  is coaching during the deposition to provide those
12  types of cues to witnesses.
13      THE COURT:  You're right, and that's
14  improper.  The problem is sometimes I hate to enter an
15  order that says you can only say "objection" or you
16  can't explain your objection at all because so many
17  times I'll see a deposition where counsel has objected
18  and said, you know, I'm objecting for this reason and
19  then counsel will rephrase their question or change
20  their question or bring their question within what is
21  then legitimate bounds where they now can get it into
22  evidence where they couldn't have gotten it into
23  evidence before.
24      MR. BUCHANAN:  Your Honor, simply stating the
25  word "objection" provides that cue to every examining

1   attorney that there's a problem with the form of your
2   question, and if the attorney does not accept that
3   there's a problem with the question what is done
4   usually is what is the basis for that, what is the
5   basis for the objection.  Well, you know, as to what
6   particular point in time, counsel, and then you'll
7   rephrase the question and you cure it, but in my
8   experience --
9       THE COURT:  Has there been a problem with the
10  depositions?
11      MR. JACOBY:  It has come up in the context of
12  I think the one example I gave is kind of recurrent
13  where an attorney will say, well, you know if you think
14  you can answer that question then go ahead.  Clearly
15  when the witness hears that he has no interest in
16  answering that question.  His attorney told him you
17  have cart blanche now not to answer that question, and
18  that's the kind of thing that, number one, takes up a
19  lot of time and energy and paperwork, but is not
20  appropriate.
21      MR. BUCHANAN:  Objection, a complete
22  hypothetical.
23      MR. MAYER:  Certainly the depositions that I
24  have been at we haven't had a lot of colloquy.  The
25  objections have been generally objection to form.

1  There are situations now and then where a lawyer is --
2  examining lawyer is going down a path where the facts
3  are totally wrong.  There's really an abusive question,
4  and you might call the lawyer on it so we can get the
5  deposition back on the track that there is some
6  relationship --
7         MR. JACOBY:  That's not the problem, Judge.
8         MR. MAYER:  -- recognized by all the lawyers
9  in the case, and we have had some of those.
10        MR. JACOBY:  That's not the problem.  That's
11 lawyer to lawyer.  That stuff is easy.  That gets
12 worked out in every deposition.  The stuff that is of
13 concern is lawyer to client in the middle of a
14 deposition and signals being given to the person being
15 deposed.  There's a prompt -- I have had depositions,
16 Ted, where you work it out in a minute and so on, and
17 you get it back on track.  That's not necessarily a
18 problem, and if you have to you step outside or you
19 excuse the witness and we have done that.  That's not
20 what we're talking about; we're talking about
21 suggesting answers to the witness at critical times in
22 a deposition.
23        MR. MAYER:  I don't think there's been
24 suggesting.
25        MR. JACOBY:  Or suggesting to a witness that

1  it is okay that he doesn't have to answer.
2         MR. BUCHANAN:  Objection to the form is
3  enough to highlight there's a form problem with the
4  form of the question, which is the only thing that
5  needs to be preserved at the time of these depositions.
6  Everything else is reserved, so, there is really no
7  need to highlight that a question is misleading or
8  mischaracterizes something or it is a complete
9  hypothetical or it is argumentative or it is asked and
10 answered.  All of these things, your Honor, are
11 encompassed, your Honor, by the cue to the examining
12 attorney that there's a problem with the form of your
13 question that can be rectified if you wanted to.  If
14 you don't you proceed at your own peril.
15        MR. MAYER:  The rules do allow us to state
16 the grounds, and, you know, if there is a problem I
17 haven't seen a problem.  I have read a lot of
18 transcripts, and I haven't seen a problem in the
19 transcripts, and I presume if there was a problem, you
20 know, you guys would tie it up.
21        MR. JACOBY:  That's what we're trying to
22 avoid.
23        MR. BUCHANAN:  Your Honor, there are in
24 recent transcripts and with new counsel when we cut
25 this -- when we cut this case the tape when we start,

1  you know, putting questions and answers together every
2  time there's an objection in between your Honor would
3  rule on it and the ruling will be what it is, but over
4  objecting in the case breaks the flow up, and there's
5  tactics behind that, and there's tactics for breaking
6  flow and tactics for breaking the tape up.  There's
7  tactics for the cues to the witness.  If we stipulate
8  that or we put into an order that objection or
9  objection to form preserves all bases for an objection
10 to form then they're completely protected.  Their
11 record is entirely protected and there is really no
12 exposure to them whatsoever by being deprived the
13 ability to provide a cue to a witness.
14        THE COURT:  Who is taking the deps, you?
15        MR. MAYER:  I am defending a lot of deps and
16 some of my partners and people from other firms and
17 Diane's firm.  There's a lot of it going on.
18        MR. BUCHANAN:  I don't see how they're
19 prejudiced in any way by being limited to saying
20 "objection to form."
21        THE COURT:  You're talking about D, no
22 adjournment, all depositions shall be taken
23 continuously without an adjournment?
24        MR. GALPERN:  Consultation with the deponent,
25 F.

1         MR. CORONATO:  I can show you Judge
2  Pressler's --
3         THE COURT:  I see it here.  Okay.  And it
4  does say that there can be -- once the deponent has
5  been sworn there should be no communication between
6  deponent and counsel during the course of the
7  deposition, except with regard to the assertion of the
8  claim of privilege, right to confidentiality or
9  limitation pursuant to a previously entered court
10 order.  However, in the comments it specifically states
11 that, although it prohibits the consultation by a
12 lawyer with a deponent while the deponent's testimony
13 is being taken it says the rule speaks only to while
14 the deposition is being taken, it does not address
15 consultation during overnight, lunch or other breaks
16 and specifically sites a 1998 case at 320 NJ Super 112,
17 which indicated that in that case the Court had
18 prohibited consultations during all recesses, including
19 the bench break, and they upheld the Court's right to
20 do that, although in that case they confined it to so
21 between the end of the day and the next day.  So you
22 are allowed to coach them at night but not during
23 lunch.
24        I stick with my rule, which is at breaks and
25 lunch you can talk to them.  And afterwards, too, and

1   before.  Now there may be a case, you know, I'm not --
2   if you find a Supreme Court case that tells me I'm
3   wrong tell me I'm wrong before we screw up the whole
4   trial.  I appreciate that.  I don't have any problem
5   with it because God knows if something comes out where
6   I'm wrong don't think it is polite not to tell me.
7   Give me the case, give me the site, I appreciate that,
8   Mr. Galpern, I do.  I don't have a problem with it
9   because none of us are infallible, and I would rather
10  not screw the whole thing up because everybody was
11  trying to be polite because they thought I was an
12  idiot.
13          MR. JACOBY:  Nobody is bashful.
14          MS. SULLIVAN:  We're not a shy group.
15          THE COURT:  All right.  It seems to me
16  that -- I don't know.  It is tempting to just say you
17  can only say object.  You feel that that's really a
18  disadvantage to you?
19          MS. SULLIVAN:  It makes us like potted
20  plants, and the rules do provide that lawyers do have
21  the ability to state the grounds for their objections
22  and --
23          MR. LOCKS:  Can you subtract the amount of
24  time for objections?
25          MR. BUCHANAN:  The reason for the rule that

1   provides -- the rules requirement that they have to
2   make those objections timely or they're waived.  We're
3   providing that they're made timely and preserved as to
4   all form objections, which are the only one that need
5   to be made.  It is really to protect their record for a
6   later point in time in the trial for other use of this
7   testimony, and we're providing them the full protection
8   the rule provides for.
9           THE COURT:  But you're assuming that the
10  questioner is always being fair.  Or even if not fair
11  being at least not completely misleading and abusive,
12  in which case I don't know, a lawyer is there for a
13  purpose.  I understand that there's a very limited
14  purpose under our rules, and there's no reason for
15  counsel to be talking for two pages and the phrase if
16  the witness doesn't understand he shouldn't answer is
17  clearly a problem.  There's no, you know, well, maybe
18  if the witness understands that question he can answer
19  it, why would you say that other than to, you know --
20  although you may be thinking out loud and you don't
21  understand the question.  I think legitimately lawyers
22  say that when they don't understand the question and
23  they're trying to figure it out, but they can also be
24  coaching the witness, and it is really up to the
25  witness to say they don't understand the question.  So

1   if you want to put in the protocol that they can't say
2   they don't understand the question I guess we can do
3   that, but that's getting a little over --
4           MR. JACOBY:  They're instructed at the
5   beginning of every deposition -- you're instructed if
6   you don't understand a question I ask, ask me to repeat
7   it, it is my job to repeat it.  They're supposed to
8   understand.
9           THE COURT:  Let's put in the protocol first
10  attendance who may be present?  Anybody --
11          MR. LOCKS:  Before you do that can I make an
12  observation and a comment?
13          THE COURT:  Sure.
14          MR. LOCKS:  Listening hard, having read a lot
15  of the depositions, not participating and listening
16  hard I haven't heard from the defendants or from the
17  plaintiffs any real level of it is not broken don't fix
18  it or it is really broken you have to fix it, and I
19  haven't heard a lot of abuses, and I haven't heard yet
20  a real showing of a clear cut protocol.  Now, the
21  reason I'm saying that is the minute you put a protocol
22  like this in effect you're going to invite what does it
23  mean, what doesn't it mean by different people.  So far
24  these guys have worked it out pretty well.  I think
25  you're begging the question.  The argument that counsel

1   for defendant has made is we want to look out that we
2   don't have a problem.  You haven't really had a problem
3   yet, so if you think a protocol is likely to be done if
4   you go forward with it now as opposed to letting things
5   go the way they have been until there is maybe a
6   problem then I think you have to be careful in the way
7   it's written and what the intentions are, and you have
8   to be a little fluid or you have to be very hard lined,
9   so just like you said you would like to say how to
10  spell out the objections, you know, the legislative
11  interpretation of a protocol is going to get worse and
12  worse.  It is even going to get worse in my view, and I
13  have had occasionally been told by hindsight maybe I
14  was right, not very often but occasionally, but when
15  you keep cross-noticing these depositions in other
16  jurisdictions and you get the other counsel
17  participating and then you get the -- God help us, the
18  wonderful MDL participating in some way, shape or form
19  it is going to get worse, and I don't know how fruitful
20  it is just because they ask for it and just because we
21  don't really object that hard and it is really the
22  right thing to do discussing it, having more
23  guidelines, you have given guidance in the past pretty
24  well.  I heard the guidance.  I may not have liked it
25  but I got the message how that's multiple deps may not

1  be taken, but I'm not sure that this is the right
2  solution.
3      Now, I have only seen this about four minutes
4  ago or 10 minutes ago because defense counsel gave it
5  to liaison and liaison didn't have a chance to pass it
6  around to anybody, and I'm not faulting anybody for
7  that, but I just give you my view of that before we
8  start because I am going to talk about the issues.
9      MR. CORONATO:  On that last point it was
10  posted to Lexis Nexis.
11      MR. LOCKS:  Last night?
12      MR. CORONATO:  It wasn't just sent to liaison
13  counsel.  There was another purpose of protocol.
14      THE COURT:  February 16th it is dated.
15      MR. CORONATO:  Your Honor, there's also
16  another purpose to the protocol, and it is also to
17  memorialize some of the agreements that the counsel
18  have reached, and that's important because there are
19  more counsel entering into the case.  There will be
20  more counsel at deposition.  There will be different
21  counsel in the future taking depositions or taking lead
22  on depositions, so it is important to memorialize the
23  agreements that have been reached between the parties
24  to date so that everybody knows that these are, in
25  fact, agreements that are in place.

189

1      I can give you one example is the last one,
2  the parties have agreed that regardless of whether or
3  not a certified shorthand reporter is used the witness
4  will have the right to read and sign the transcript and
5  so there are agreements that the parties have reached
6  and that's another purpose behind the protocol.
7      THE COURT:  The protocol, I think we can have
8  some protocol, I like number one cooperation.  Counsel
9  are expected to cooperate and be courteous.
10  Attendance.  Who may be present?  Anybody have a
11  problem with the defense they are allowing counsel of
12  record, members and employees of their firms, attorneys
13  especially engaged for purposes of the deposition, the
14  parties or representatives of a party, court reporters,
15  videographers, counsel for the deponent.  I'm assuming
16  you should be allowed to have your expert.
17      MR. BUCHANAN:  Experts and consultants,
18  that's who seemed to be designed to be carved out of
19  this for reasons --
20      THE COURT:  It seems to me you should be
21  allowed to have your experts and consultants.
22      MR. BUCHANAN:  Who is not allowed because I
23  read this and it may be --
24      THE COURT:  The press.  People who wander in
25  off the street.  People who haven't had a chance --

190

1      MS. SULLIVAN:  People we don't like.  Oh, I
2  forgot.
3      THE COURT:  So the Court may permit
4  attendance of a person who is -- it is going to be upon
5  application for good cause shown the Court may permit
6  attendance by a person who does not fall within any of
7  the categories set forth in the preceding sentence .
8  We're going to add after counsel for the deponent --
9  we're going to add the words experts or consultants.
10      MS. SULLIVAN:  Who have signed the protective
11  order, Judge?
12      MR. BUCHANAN:  Actually, the protective
13  order -- the protective order addresses attendance in
14  deposition, doesn't it?  I think we might have two
15  orders addressing the same things.
16      MS. SULLIVAN:  I don't want anybody there who
17  hasn't signed off, Dave.
18      MR. CORONATO:  The last sentence, while the
19  deponent is being examined about any stamped
20  confidential document the confidential information
21  contained therein persons to whom disclosure is not
22  authorized under the protective order shall be --
23      MR. BUCHANAN:  I don't know how to do that,
24  guys.  You want to cross-notice these depositions
25  around the country.

191

1      MR. MAYER:  I would rather have people under
2  the protective order there, rather than throw people
3  out.
4      THE COURT:  Let's take that out.  What we're
5  going to say is, deposition may be attended by counsel
6  of record, members or employees of their firms,
7  attorneys especially engaged, parties' representatives
8  of a party, court reporters, videographers of the
9  deponent, counsel for the deponent, experts or
10  consultants who have signed the protective order.
11      MR. BUCHANAN:  Signed or subject to
12  probably -- some people don't need to sign the protect
13  order.
14      THE COURT:  Or subject to.  And then we'll
15  eliminate the last sentence while the deponent is being
16  examined about confidential because they all supposedly
17  will have passed the confidential test.  Unnecessary
18  attendance by counsel is discouraged.  Counsel who have
19  only marginal interest or expect their interests to be
20  adequately represented should elect not to attend .
21      MR. JACOBY:  That's a tough one.
22      THE COURT:  Instead of should.  Let's take
23  out who have only marginal interest because that almost
24  creates malpractice.  Let's just say unnecessary
25  attendance by counsel is discouraged.  Counsel who

192

1    expect -- let's say attendance by all counsel is not
2    necessary.  Counsel who expect their interests to be
3    accurately represented by other counsel may elect not
4    to attend.
5            MR. BUCHANAN:  That could be an ugly
6    discussion.  People don't go to depositions then come
7    back and say their interests haven't adequately been
8    represented by people who took depositions and their
9    witnesses are exposed again.
10           THE COURT:  You want that out of there?
11           MR. BUCHANAN:  I think this whole
12   paragraph -- I mean, why don't we just leave it
13   unnecessary attendance by counsel is discouraged.
14           MS. SULLIVAN:  That's fine.
15           THE COURT:  Okay.  That's fine.  And then it
16   is up to you to decide what is unnecessary.
17           MR. CORONATO:  Just for B --
18           THE COURT:  We're going to say unnecessary
19   attendance by counsel is discouraged.
20           MS. SULLIVAN:  Should we say counsel concurs
21   to coordinate and unnecessary attendance is
22   discouraged.
23           MR. BUCHANAN:  That issue comes up later on,
24   I think.
25           THE COURT:  Notice of intent to intend.  Who

1            MR. BUCHANAN:  That actually came up -- that
2    discussion came up in reference to Gilmartin.
3            MR. CORONATO:  So that was just with respect
4    to Gilmartin, Dr. Kim, Anstice and Scolnick.
5            MR. BUCHANAN:  The December conference
6    counsel for the defense had suggested that only one
7    person be permitted to conduct an examination in New
8    Jersey of Mr. Gilmartin.  I suggested it may be
9    necessary to have two, but a general suggestion that
10   one is for deposition and one for trial I think that
11   mischaracterizes the way we're actually doing this and
12   sometimes splitting up topic areas.
13           MR. PLACITELLA:  If you do it for a couple
14   hours, you also don't want a lawyer who is exhausted
15   and you want to keep it moving so a couple I think is
16   reasonable.  It has never been a problem.
17           MR. DAVID COHEN:  If I might, David Cohen
18   again.
19           THE COURT:  Chris, I don't know how fair that
20   is to the witness.  We get one lawyer exhausted and now
21   he can bring in another fresh lawyer.
22           MR. DAVID COHEN:  This is the very paragraph
23   that I was making my original statement about in that
24   in the next sentence it goes on to explain that counsel
25   who have individual positions or divergent positions

1    is having these, are they being done at --
2            MS. SULLIVAN:  Dechert and Hughes, Hubbard
3    generally.
4            MR. JACOBY:  That's certainly reasonable,
5    they should let you know if they're coming.
6            MR. BUCHANAN:  This is a security issue
7    primarily.  They need to let security know.  For the
8    most part we have been operating on 24 hours notice
9    often because we don't know until 24 hours before.
10           THE COURT:  Should we say 24 hours for the
11   deposition?
12           MR. MAYER:  24 hours is okay.
13           Sometimes we have had delay in getting
14   started because it took somebody a while to get up who
15   was actually taking a deposition.
16           THE COURT:  We'll say 24 hours notice, and
17   we're not putting in there people are barred, but it is
18   just really a courtesy thing anyway.
19           Conduct.  Questioning should be limited to no
20   more than one counsel.  All right.  Can we say should
21   be limited to no more than two counsel?
22           MR. CORONATO:  Your Honor, this point came up
23   at the last conference.
24           THE COURT:  At that time we talked about one
25   for discovery and one for trial.

1    that can't be resolved by negotiations with other
2    plaintiffs' counsel will have an opportunity to
3    question, so I don't know what sense there is to place
4    a limit in one sentence and then in the next sentence
5    to remove the limit.  I mean, can't we just agree that
6    there will -- that the number of questioners will be
7    resolved by good faith negotiation?
8            MS. SULLIVAN:  Your Honor, we do need -- in
9    fairness to the witnesses we need some presumptive
10   limit of reason in terms of the number of questioners.
11   Is two okay for New Jersey, counsel?
12           MR. BUCHANAN:  It seems reasonable to me.
13   The only concern I have is the example that was
14   highlighted earlier today with Miss Dixon.
15   Mr. Placitella and Mr. Weiss took the deposition for
16   New Jersey.  A lawyer in Texas who has also
17   filed a case in New Jersey and did an examination for
18   Texas.  And now, you know, I certainly don't want it
19   being considered that his examination is the New Jersey
20   examination, so that we couldn't do what we already did
21   with Mr. Placitella and Mr. Weiss.
22           MS. SULLIVAN:  In other words, what we don't
23   want is 500 New Jersey lawyers saying, oh, you know I'm
24   different states that they're from.
25           MR. BUCHANAN:  I just want to make sure that

1  this isn't a Trojan horse of some kind.

2      THE COURT:  The questioning should be limited

3  to no more than two counsel admitted in this litigation

4  designated by plaintiffs' liaison counsel and one

5  attorney for defendant.  I guess we might as well say

6  two attorneys for defendant.

7      MR. JACOBY:  They should have two to object,

8  your Honor.  Because that could become tiresome.

9      THE COURT:  Two attorneys for defendant.

10  Obviously, we had said before, and I'm not going to say

11  it again, one guy doesn't ask a question then the other

12  one does a follow-up.  If you ask questions you cover

13  your areas and then you're done then we start

14  anotherone.

15      MS. SULLIVAN:  Your Honor, that would be

16  important.  Can we add that two questioners so long as

17  additional questioner doesn't cover ground that's

18  already been covered?

19      MR. BUCHANAN:  That's in here.

20      MS. SULLIVAN:  I don't think it's in that

21  section.

22      MR. BUCHANAN:  It is not in that section.

23      THE COURT:  I'm going to take out the

24  sentence that says once a witness has answered a

25  question he can't be asked the same question.  That's

1  one of the favorite deposition techniques, isn't it, to

2  ask it three different ways and get three different

3  answers?  I don't know how I can do that.  Sometimes

4  that's asked and answered and sometimes it is just good

5  cross-examination, and I don't know where I draw the

6  line on that.

7      MS. SULLIVAN:  But it is reasonable for the

8  second questioner.  In other words, to have something

9  in there that says that for additional questioners

10  beyond the first they won't cover -- he or she will not

11  cover any ground or any subject matter that's already

12  been covered and will not can questions already asked.

13      MR. BUCHANAN:  That's a loaded phrase.

14      MR. DAVID COHEN:  That's a real problem.

15      THE COURT:  I will say counsel shall not be

16  repetitive.

17      MR. JACOBY:  I don't think it has ever gotten

18  to that point.

19      THE COURT:  The two counsel shall not be

20  repetitive.  Counsel for plaintiffs who have individual

21  or divergent positions that cannot be resolved by good

22  faith negotiations may examine a deponent limited to

23  matters not previously ordered.  I think that covers

24  your concern.  It may open it up too wide to too many

25  people who have a concern.

1      MR. DAVID COHEN:  It is not my intention to

2  create an undue burden in this case.

3      THE COURT:  But should we limit it to class

4  counsel?

5      MS. SULLIVAN:  Yes.

6      THE COURT:  Instead of saying all counsel

7  because we might get five or six other lawyers who feel

8  they're divergent.  They would have to apply to me to

9  ask.

10      MR. LOCKS:  There's one other divergent group

11  I can think of, perhaps, and that's foreign claimants.

12      MS. FLEISHMAN:  Foreign claimants have other

13  issues.

14      MR. LOCKS:  I don't think you ought to limit

15  it to just class.  There may be some other

16  jurisdictional or I don't know whether that's ready or

17  ripe or not.  But there might be some issues.

18      MR. BUCHANAN:  We have your acknowledgment on

19  the record of potential divergent interests.  Can we

20  leave --

21      THE COURT:  We'll leave it for -- we'll leaf

22  it as the defense proposed it and then counsel for

23  plaintiffs who have individual which cannot be resolved

24  may examine a deponent limited to matters not

25  previously covered.  If it turns out there's a dispute

1  about whether the person legitimately as an individual

2  or divergent position then you can contact the Court by

3  phone that day, if necessary.

4      Duration.  Counsel should consult prior to

5  agree upon the time -- on the estimated time required

6  for a particular witness.  Well, I'm not ever going to

7  limit it to seven hours.  Does anybody have a major

8  problem with limiting it to a maximum of three days?

9      MS. SULLIVAN:  We do, your Honor, because

10  that gives a presumption that they're all going to go

11  three days, and that's not reasonable.

12      MR. JACOBY:  That's not the history of this

13  litigation.

14      MR. CORONATO:  Most haven't gone three days.

15      MR. JACOBY:  That's not the history.  A lot

16  of these should be concluded in one day.

17      THE COURT:  They should be.  Once in a while

18  they should go two days, and rarely should they go

19  three days.

20      MR. BUCHANAN:  The problem, your Honor, is

21  when there's 20 other people showing up in the room

22  now.  That really does create an issue.  We had the

23  issue with Dixon.  There are witnesses who we will have

24  that issue with regardless of whether it is

25  cross-noticed or not.

1    MR. MAYER:  How about if we said most

2    depositions would go one, some will go two and rarely

3    will they go three.

4        MR. JACOBY:  What does that really

5    accomplish, though?

6        MR. BUCHANAN:  That puts us in the same area

7    of discretion and good faith and meet and confer that

8    we have already been going through.

9        MR. PLACITELLA:  If we have to go -- if New

10   Jersey counsel has to go beyond three days they have to

11   make an application.

12       MS. SULLIVAN:  Come on.  There's a

13   presumptive limit is usually seven hours.  You guys

14   want two days, and the judge believes that's reasonable

15   I'm talking about your Resulin, the other deposition

16   protocols we have looked at.

17       MR. PLACITELLA:  You keep talking about

18   breast implants.  The only trial I tried I lost.  I

19   don't want to talk about that.

20       THE COURT:  It seems you wanted your two

21   days, which is what we talked about for Gilmartin, so

22   we could put out there absent agreement of the parties

23   or order of this Court, and we don't have to say even

24   based on good showing, I mean, I guess it has to be

25   based on good showing because otherwise or good cause a

1    deposition is limited to -- the deposition by New

2    Jersey counsel is limited to two days, a maximum of two

3    days.  Now, maximum, but it is not anticipated that

4    this should be abused, and I'll put that language in

5    there.

6        MS. SULLIVAN:  Because that guarantees three

7    days for these people.

8        THE COURT:  Estimated -- well, absent

9    agreement of orders based on a deposition is limited to

10   a maximum of two days by New Jersey counsel.  I'm not

11   going to say excluding breaks.  What, are we going to

12   start adding ten minutes?

13       MR. CORONATO:  By New Jersey counsel you mean

14   counsel in the New Jersey coordinated proceeding?

15       THE COURT:  Counsel in the New Jersey

16   coordinated proceeding.

17       MR. BUCHANAN:  That appears to be the Texas

18   counsel issue, your Honor, that came up with Miss

19   Dixon.  I think what they're trying to do is they're

20   going to try to restrict lawyers who have filed a case

21   here but who have significant cases in other

22   jurisdictions from doing an examination in addition to

23   the two attorneys who have already done the examination

24   for New Jersey in their own action.

25       MR. PLACITELLA:  The liaison counsel can

1    designate for defense counsel the two lawyers for New

2    Jersey for that deposition and that would handle the

3    issue.  For instance, when we were at Dixon the

4    attorney who was there from Texas, you know, he got

5    into quite a to-do with the defense lawyer over Texas

6    rules and what the Texas judge was going to order and

7    the Texas -- let's get the Texas judge on the phone.

8    That clearly was not a New Jersey proceeding at that

9    point.  That was a Texas proceeding.  So if we can just

10   say whoever liaison counsel tells defense counsel will

11   be taking the dep for New Jersey that would suffice.

12       MR. BUCHANAN:  That's what is contemplated in

13   paragraph A.  We have two counsel in this litigation

14   designated by plaintiffs' liaison counsel, those people

15   should be the ones that are the ones that have to be

16   completed by two days.

17       MS. SULLIVAN:  The issue of duration maybe we

18   are better off just coordinating with the plaintiffs

19   because the problem here is we're going to get out of

20   state counsel who you know they're going to be thinking

21   they're compelled to go two full days then out of state

22   counsel is going to go a day and these witness will be

23   deposed for days on end.

24       MR. LOCKS:  But we're not going to --

25       THE COURT:  So we'll take duration out all

1    together.  I would suggest to counsel no deposition

2    should take longer than two days from New Jersey

3    counsel and that most depositions should be able to be

4    completed within one day, but we're not going to

5    necessarily at this point if that starts to become an

6    abusive problem let me know.

7        MR. BUCHANAN:  There's only witness I see on

8    the calendar that I know of now I think might go a

9    third day and that's Elise Rison.  She jumps out at me

10   as somebody whose fingerprints are over every time

11   period.

12       MR. PLACITELLA:  What about Scolnick?

13       MR. BUCHANAN:  There are a couple.

14       THE COURT:  I said people could cross-notice.

15   I think I already said that.  Some of you can do that.

16   I guess you're doing it.  I just don't want that to

17   interfere with my deps.  I don't want people from Texas

18   jumping in in front of New Jersey counsel.  The New

19   Jersey case it is a New Jersey deposition, we're at a

20   certain place in our discovery.  I want you to get done

21   so next time don't yield your floor because next time

22   you yield the floor you're done.

23       MR. PLACITELLA:  Okay.

24       THE COURT:  And you can tell them you're done

25   because that's it, you're not going to be able to yield

1   the floor and then come back.

2          MR. PLACITELLA:  That's fair.

3          THE COURT:  So don't yield the floor.  It is

4   your dep.  And if you want we can put in here upon the

5   completion by New Jersey counsel out of state or people

6   from other jurisdictions can -- counsel from other

7   jurisdictions can depose with the consent of defense

8   counsel.  That's up to defense counsel really.

9          MS. SULLIVAN:  We'll make that clear in our

10  cross-notice.

11         THE COURT:  It doesn't need to be in here?

12         MS. SULLIVAN:  No.

13         THE COURT:  All right.  In accordance with

14  the scheduling is that something we have to have?  I

15  don't think we want to limit it to any given month when

16  we're trying to get done here, right?

17         MR. BUCHANAN:  We agree, your Honor.

18         THE COURT:  No two on the same day?  I'm not

19  going to sign C, so we'll eliminate C.  Coordination

20  with actions.

21         MR. LOCKS:  May I make a comment about C that

22  might be helpful in the future?  For the first go round

23  in the trial schedule that's already there I don't

24  think there ought to be any changes, but once you

25  continue on and you have multiple different other

---

1   people that might have deposition requests and things

2   sometimes it is orderly to try to put a little bit of

3   a length of notice or a deadline for notice for

4   depositions to occur the following month, and sometimes

5   it's easier for counsel if depositions are taken within

6   a certain time period.  We used to do depositions by

7   the end of the prior month for whatever comes the

8   following month in the last 10 days of the month.  In

9   other words, so you don't have short notices by

10  agreements or you don't have -- you have a little

11  chance to know when the depositions are going to go on.

12         Now, I don't think there will be any change

13  now but after your first, you know, a little later from

14  here if you want to have wide open discovery that it

15  can be any day of the month and whatever you may be

16  making yourself --

17         MR. MAYER:  We're not crazy about it, but our

18  witnesses don't have that kind of flexibility when we

19  can say make yourself available only on Friday or this

20  way or that way, so I'm not sure we can do it.  We

21  would love to have it, but I just don't know that we

22  can do it.

23         THE COURT:  We'll wait and see.  If it

24  becomes a necessity at some point we have so many

25  lawyers involved as far as the pro hocs and things we

---

1   should not have those problems, but if we do and if it

2   becomes a real problem for counsel on either side as we

3   go along then they have to change that.  At this point

4   I'm going to leave C out.

5          D, coordination with actions pending in other

6   jurisdictions, plaintiffs' counsel shall use their best

7   efforts to coordinate with plaintiffs' counsel from

8   other jurisdictions.  Well, I'm not going to require

9   them to do that.

10         MS. SULLIVAN:  That one is kind of key,

11  though, Judge, to have them cooperate with the other

12  counsel, so --

13         MR. PLACITELLA:  I tried to do that, and I

14  got in trouble.

15         MR. BUCHANAN:  You can only control half of

16  that equation.

17         MR. CORONATO:  It says best efforts.

18         MR. BUCHANAN:  I don't know what this means

19  honestly.  While I think we do that I don't know what

20  you would consider cooperating and using best efforts.

21  I don't know how we can facilitate at that.

22         MR. MAYER:  Figure out who is going to cover

23  what.

24         MR. LOCKS:  I don't know if it should be on

25  the record -- never mind.

---

1          THE COURT:  See, I don't think I have the

2   power to say counsel for plaintiffs in other

3   jurisdictions have to select a lead counsel.  I don't

4   have a jurisdiction over other jurisdictions.  They

5   have to do their own thing.  I'm not going to enter

6   that.

7          THE COURT:  Do you want the depositions of

8   Merck employees or form employees or any other VIOXX

9   product liability action make used by trial by any

10  party, the last sentence?

11         MR. BUCHANAN:  No, your Honor.  The last

12  sentence we object to.  I mean, certainly, if a

13  deposition goes forward in another product liability

14  action we're not cross-noticed on it, that's not usable

15  in this case.

16         THE COURT:  All right.  D is out.  E is

17  cross-noticing any deposition --

18         MS. SULLIVAN:  You're not going to use them?

19         MR. BUCHANAN:  It may be usable by us but not

20  by you.  We have an opportunity to cross-examination.

21  They're admissions of a party opponent sworn under

22  oath.  We can use them.  You can't.  You can

23  cross-notice.  Your solution is give us an opportunity

24  to cross-examine.

25         THE COURT:  Any deposition may be

1   cross-noticed by any party.

2       MR. BUCHANAN:  Your Honor, they can do what

3   they want to do.  This almost suggests that we have to

4   accommodate the cross-noticed parties in some way in

5   our examination.

6       MR. MAYER:  Well, the reality is -- the

7   reality is you're in a hurry to get these done.  Other

8   people are on a schedule, too, and there does have to

9   be some accommodation where the witness is only

10  available, you know, for some window and the deposition

11  you feel you need it, somebody in another case feels

12  they need it, that same window you guys have to

13  accommodate each other.

14      MR. BUCHANAN:  Isn't that an issue for

15  another court?  You guys provide a room big enough for

16  the witness and all the people who are coming, you

17  produce the witness.  We notice the depositions.  We

18  take our deposition.  We complete it within two days or

19  however long it takes with two examining attorneys.

20  What happens with respect to other counsel who are

21  cross-noticed by you at your election following our

22  examination is what happens with them following our

23  examination.  Why is that an issue for this court and

24  this order?

25      MR. MAYER:  Because if the witness is

1   available for two days period, and, you know, the

2   realities are that person you want to examine them, we

3   want to examine them, a third-party wants to examine

4   them, we have to work it out and get as much done as we

5   can in that time period.  It is just a practical issue

6   for getting through a period of -- putting -- everybody

7   is under extreme deadlines, and for you guys to say we

8   get our two days and that's it is not a practical

9   solution.  It is not going to work out.  We're not

10  going to be able to make the witness available for the

11  two days.

12      MR. LOCKS:  But what happens, Ted, is we

13  finish and then Guam decides they want to take the

14  deposition.  Isn't the first question always we're

15  prepared to give you all these questions that have been

16  asked and answered for Guam, and now you answer other

17  things you want to answer?  I mean, it is up to you to

18  decide that they can use the New Jersey deposition.  We

19  can't control them, and if they'll stipulate to that

20  and that all these questions are whatever you think

21  have been asked and answered, you do that, but we don't

22  have to agree to that.  It is up to you.  And we don't

23  have to be bound by whatever agreements you make with

24  those other folks.  That's what I think the problem is.

25  You're trying to bind us to other things that are going

1   on in other places.  I think the other jurisdiction

2   would be happy to take the depositions.

3       MR. DAVID COHEN:  There's a point about

4   subsection E that bears noting.  The first two

5   sentences seem to place the ability to cross-notice on

6   either party and set out the requirements for doing so,

7   but the third sentence creates a problem that I think

8   might be unforeseen, and it is actually demonstrated by

9   the point I raised today, your Honor.  Parties will not

10  notice or take depositions of witnesses previously

11  deposed unless documents relevant to the witness have

12  been produced after the date of the deposition.

13      Well, how about if class counsel in this

14  litigation and counsel for Merck have reached an

15  agreement about the deposition going forward for

16  reasons completely unrelated to documents, but, rather,

17  because of testimony from the witness bearing on issues

18  relating to pricing and marketing.

19      MS. SULLIVAN:  We can say absent agreement.

20      MR. BUCHANAN:  Your Honor --

21      THE COURT:  I'm taking that out.  It is

22  going to be any depositions in the litigation may be

23  cross-noticed by any party in any VIOXX-related action

24  pending in other jurisdictions.  Each deposition notice

25  shall include the name, address and telephone number of

1   the primary examiner designated by the party noticing

2   the deposition in the daytime place of deposition.

3   Questions by counsel from the New Jersey -- questions

4   by counsel from or involved in the New Jersey

5   litigation --

6       MR. BUCHANAN:  We have the two examining

7   attorneys being designated by liaison counsel.

8       THE COURT:  Use that language.  It is going

9   to be those first two sentences.  The rest of it is

10  out.

11      F, postponements.  Once it is scheduled it

12  should not be taken off the calendar less than three

13  days in advance of the date it is scheduled to go.  I

14  think that's a good one.  Anybody object?

15      MR. BUCHANAN:  That's a rule of convenience,

16  your Honor.  We could have reached that without an

17  order.

18      THE COURT:  Avoidance of duplicate

19  depositions?

20      MR. BUCHANAN:  This is a problematic

21  paragraph.

22      MS. SULLIVAN:  That was an easy one, I

23  thought.  You want -- you do want to take duplicative

24  depositions?

25      MR. BUCHANAN:  No, depositions that have

**Page 213**

1    already occurred, I mean, they produce 65 transcripts
2    to us.  Probably 10 or 15 of them took place in the New
3    Jersey litigation by -- on our notices.  Many of them
4    have happened in different contexts and different
5    proceedings over which we had no opportunity to
6    conduct an examination.
7              MS. SULLIVAN:  This is meant to say New
8    Jersey.
9              THE COURT:  As a general no witness should be
10   deposed in the same setting more than once.  It should
11   say in the New Jersey litigation.  The New Jersey state
12   litigation.
13             MS. SULLIVAN:  New Jersey coordinated
14   proceedings.
15             THE COURT:  Maybe we should call them -- it
16   is not going to be a federal New Jersey proceeding that
17   is now gone.  Well, if a party seeks to take a second
18   deposition it should provide the opposing party its
19   basis for an exception.  I think that's okay.  That's
20   basically what we have said.  I'm not going to let you
21   take two deps unless you show good cause why you
22   should.
23             Disputes during depositions.
24             MR. BUCHANAN:  I think we should stick with
25   the rules.

**Page 215**

1    trying to make, your Honor, that there's a problem with
2    that because it prevents subsequent attorneys from
3    asking questions that are necessary in order to lay a
4    foundation or to establish --
5              THE COURT:  This is talking about a second
6    deposition.  It is not questioning at the first
7    deposition.
8              MR. DAVID COHEN:  No, but, for example, if I
9    reach an agreement with Merck's counsel tomorrow then
10   I'll have an opportunity to question Wendy Dixon next
11   week then I won't be able to ask her -- if we read this
12   strictly -- any foundation or history or topic
13   questions to support the questions that I'll elicit
14   from her.  The record of the deposition will be like,
15   you know, the second half of a chapter of a book.  It
16   won't make any sense.
17             THE COURT:  Yes, it is sort of will be.  You
18   won't be able to ask those foundational questions over
19   again.  You know, you're going to be allowed to ask --
20   I mean, I would assume you would be able to use the New
21   Jersey litigation deposition, and I don't expect you to
22   start over with what is your job title and how long did
23   you work with the company.
24             I mean, I agree you have to have that
25   information, but you'll have it from the first

**Page 214**

1              THE COURT:  That's in the rule already?
2              MR. DAVID COHEN:  I mean, the difficulty
3    raised -- at least one difficulty raised by this sort
4    of language is the efforts of questioning counsel to
5    make some sense of their -- of the context of their
6    questions to lay a foundation for questioning.  I mean,
7    it will be difficult as the second deposing attorney
8    not to be able to lay a foundation for questions that
9    become relevant, you know, in a different context.
10             THE COURT:  I think this just sort of
11   restates the rule which probably should leave it the
12   way Judge Pressler stated it.
13             Reading and signing, do we have to have
14   reading and signing?  You want it?
15             MR. CORONATO:  That's what we have been doing
16   with agreement on both sides.  Any problem with that?
17             MR. BUCHANAN:  Does anybody have a problem
18   with that?
19             MR. DAVID COHEN:  What happened to number
20   four?
21             MR. BUCHANAN:  It was struck.
22             MR. DAVID COHEN:  So paragraph G and Roman
23   numeral --
24             MR. BUCHANAN:  Paragraph G is in.
25             MR. DAVID COHEN:  G was the point I was

**Page 216**

1    deposition.  I don't have a problem with this.  I'm
2    going to leave it.  I don't think it hurts you really.
3              MR. BUCHANAN:  Your Honor, there is one odd
4    thing about this paragraph by rereading it I noticed
5    it.  As written it says, no witness should be deposed
6    in the same subject more than once in New Jersey
7    coordinated proceedings, and you have corrected it.
8    The last sentence says, second depositions on new
9    subject matters shall be permitted only by consent.
10   The way it is written is that you can't get a second
11   deposition on the same subject matter but, yet, you
12   still need consent of the other party to do a second
13   deposition on new subject matter.
14             MR. MAYER:  Right.  If you take Deborah
15   Shapiro three days and then a month later you find some
16   other documents and want to take her again we say you
17   have to have our consent or show good cause.
18             MR. BUCHANAN:  Maybe I'm just getting tired.
19   All right.
20             THE COURT:  Reading and signing is okay.
21             MR. BUCHANAN:  Does paragraph B deal with the
22   situation of an unrepresented party?
23             MR. CORONATO:  Right.
24             THE COURT:  Okay.  Submit that order to me
25   and I'll sign it.

1     MR. PLACITELLA:  By way of guidance, and I

2     don't need a court reporter, when Sol was on vacation

3     and I had to serve a deposition notice I did it for him

4     I put his name on it and my name on it I think I like

5     ruffled some feathers because I got a response back

6     that said I'll consider this a request for a deposition

7     and like I did something wrong by serving the

8     deposition notice, and I didn't quite understand just

9     what the procedure was, and I'm trying to get some

10    guidance because I thought I always have to serve a

11    formal notice so I can ask the witness about a notice.

12    I don't know what that meant.

13    MR. MAYER:  What we have been doing is

14    hearing the names of the witnesses that plaintiffs want

15    and then coming back with dates, and then if the dates

16    are acceptable the notice gets issued.

17    MR. PLACITELLA:  But you do want a notice at

18    some point?

19    THE COURT:  They don't need it.  If you want

20    to send one --

21    MR. BUCHANAN:  As a practice we have been

22    issuing notice.

23    THE COURT:  If I was you I would want to send

24    out a notice.

25    MR. PLACITELLA:  I got people upset.

1     THE COURT:  They signed that bill today.

2     MS. SULLIVAN:  The Fairness Act?

3     THE COURT:  The Clean Air Act, the Defend

4     Your Country Act, the Patriot Act, the Fair Class

5     Action Act has just been -- he hasn't signed it yet.

6     Although maybe he is signing it at dinner time.  Who

7     knows?

8     MS. FLEISHMAN:  He said Tuesday morning.  It

9     was on the news today.

10    THE COURT:  Is when he is going to sign it?

11    MS. SULLIVAN:  So we can fight and posture or

12    we can just produce it.

13    MR. BUCHANAN:  What are you going to produce?

14    MR. COHEN:  By Tuesday at the very latest,

15    don't worry about it.  This thing is getting to them.

16    MR. BUCHANAN:  What are we getting.

17    MR. COHEN:  The run down.

18    THE COURT:  The raw date, the analysis.

19    There's the drafts and the finals of the New England

20    Journals.  There's comments back and forth.  There's

21    the work from the custodial files.  Jennifer Ng

22    testified that Lee Kwan has been busy working on it,

23    and I heard otherwise from all the counsel.  Generic

24    experts are due the end of the month, and, obviously,

25    you guys have had it in final form for at least two

1     MR. MAYER:  We're fine with a notice.  We --

2     because the procedure has been we request and we come

3     up with a mutually agreeable date then a notice is

4     issued.  That's how you got the response.

5     MR. BUCHANAN:  We worked it out that the

6     notices will come from liaison.

7     THE COURT:  What is the issue on Gilmartin

8     and the other's dep not being scheduled?

9     MR. BUCHANAN:  We have now scheduled them,

10    your Honor.

11    THE COURT:  How about this order from

12    February 15th that says to an extension of time for

13    Merck to respond to plaintiff's complaint on medical

14    monitoring, there's no objection to that, right?

15    Everybody signed that one, so I'll sign that?  That is

16    a consent order.  We dealt with that.  Is there

17    anything else we have to deal with?

18    MR. BUCHANAN:  There is, your Honor.

19    (Break taken.)

20    MR. BUCHANAN:  Okay.

21    THE COURT:  What are your issues?

22    MR. BUCHANAN:  APPROVe.

23    THE COURT:  Oh --

24    MS. SULLIVAN:  Do we have to fight about it?

25    We'll produce it by the end of the month.

1     months.

2     MR. MAYER:  That's just completely not true.

3     MR. BUCHANAN:  That's what the record is Ted.

4     MR. MAYER:  That's not the record.  This is

5     exactly what I came here in October, I came here in

6     November, I told you what the chronology was going to

7     be.  I told you they're going to freeze the file.

8     Frozen file is not the end; that is the beginning.

9     That's when they begin to do the analysis.  I said

10    frozen file will be late December, early January, then

11    they'll do the analysis, then they'll be working all

12    this stuff to get this to the FDA and out to the

13    medical and scientific community.  That's what was

14    done.  That's why we asked for time to put these

15    depositions off until after the advisory committee of

16    anybody who is working on that because they were going

17    to be busy working on this.  That's what was done.

18    THE COURT:  Let's not argue about what was

19    said.  When is APPROVe going to be  --

20    MR. BUCHANAN:  It was published yesterday.

21    THE COURT:  An article was published, right?

22    If that's the case then you already got it; you don't

23    need anything.

24    MR. BUCHANAN:  It is the underlying data that

25    was generated in connection --

1    MR. COHEN:  He will get the data by Tuesday.

2  The issue of all of the other working --

3    THE COURT:  What was actually published the

4  study -- not the study or someone's interpretation of

5  the study.

6    MR. MAYER:  The cardiovascular results of the

7  study were published.  What they do -- I can't testify

8  to exactly what is done here.  I know from the other

9  studies that we have been through in depositions and so

10  on they get the data which they got at the time of the

11  preliminary data, it wasn't the final data they were

12  going to get, which they got at the time of the

13  withdrawal.  The people who were writing begin writing

14  from the nonfinal data.  If the final data works out to

15  be more or less similar to what the final data is they

16  plug that final data in once it is ready, and in this

17  case -- and then they send it in for publication.

18    In this case the publication happened very

19  quickly along with publication of Celebrex and Bextra

20  data because of the urgency to get it out to -- the

21  perceived urgency of the New England Journal to get it

22  out to the community in.  Other cases the Journal goes

23  back and forth on it for months, but that's what

24  basically happened.  That was just the final data of

25  the CV part of the APPROVe study.

221

---

1    MR. COHEN:  I have a SAS file that I'm going

2  to send.

3    MR. BUCHANAN:  And the raw CTS data, as well?

4    MR. COHEN:  Yes.  I'll try to see if there's

5  anything different because I know -- what I thought was

6  the best way to get to it them, actually, we had

7  previously agreed to keep the NDA productions updated

8  on a rolling basis, and so since we have sent APPROVe

9  data to the FDA I'm actually bringing that production

10  up to date, so you're going to get additional NDA and

11  IND filings, so it has a SAS file.

12    MR. BUCHANAN:  There's two different issues

13  here, I guess, with regard to the APPROVe data.  The

14  experts want the SAS files, and they want to analyze

15  that.  I'm assuming that the SAS file contains all the

16  different patient characteristics and everything that

17  would be in the CTS database, which from my experience

18  from looking at the data is more rich than the SAS

19  files, is that the case?

20    MR. COHEN:  I'm giving you the data.

21    MR. BUCHANAN:  All the data?

22    MR. COHEN:  Yes.

23    MR. BUCHANAN:  The other issue, your Honor,

24  relates to updating witness productions before their

25  depositions.  What happened here with APPROVe, and what

223

---

1    MR. COHEN:  The question about going beyond

2  the data and going into people's files and getting

3  documents actually leads directly into what was F on

4  their agenda, which is their request to bring documents

5  further up in time than October 15th, and, basically,

6  that leads into the same discussion that we have had

7  for a few months, which is that we basically have a

8  choice here.  We either can bring documents up to a

9  certain point and then depositions have to wait until

10  that happens -- it took me three and a half months to

11  do the last one working really hard -- or they have to

12  take depositions knowing they're not getting all the

13  documents from this time period.  And so far that's the

14  choice they have made.  They wanted to keep the

15  schedule, and they wanted to go forward.

16    So we can't go to all the people who were

17  working on this or all the people working on the

18  advisory committee or all the scientists and collect

19  all their documents while they're working to get to the

20  public advisory committee where all this is getting --

21    THE COURT:  When did you say you can have the

22  APPROVe study to them?

23    MR. BUCHANAN:  The APPROVe data they can have

24  by Tuesday.

25    MR. BUCHANAN:  What form is that in?

222

---

1  brought this to the forefront, but I was comforted

2  somewhat by what counsel has told me is that when we

3  took the deposition of the blinded statistician on

4  APPROVe in late January, apparently, she was involved

5  in a lot of the data analysis for APPROVe.  She had

6  been involved -- the frozen file had existed since

7  December, which was news to us and contrary to

8  honestly, Ted, what you said.

9    MR. MAYER:  That is not contrary to what I

10  said.

11    MR. BUCHANAN:  But the data exists and

12  they're meeting with witnesses to prepare for these

13  depositions on numerous occasions.  I don't understand

14  why when they're meeting with people and they're doing

15  analysis and they're spending so much time with them

16  why they're not collecting additional documents to

17  bring their custodial files current.  I mean, that's

18  the thing that I was trying to focus on in our agenda

19  today as it relates to people we're deposing, why

20  aren't you asking them if they have got data relating

21  to VIOXX since October 15th and that includes APPROVe

22  data in turning it over to us?  Miss Ng said --

23    MR. COHEN:  I can't produce it to you in time

24  for the deposition.

25    MR. BUCHANAN:  Sure you can.  Just produce

224

1    paper.

2            MR. COHEN:  You have to collect.  You have to

3    go process.  You have to review.  It is the same stuff.

4            MR. BUCHANAN:  They're meeting with people on

5    four occasions, sometimes weeks before the deposition.

6    There's no reason for productions to be current as of

7    October 15th when we're in March.

8            MR. COHEN:  Their point is a larger one.

9    What you're saying now is about particular deponents,

10   but you actually want a whole lot of information about

11   the science.  It is no secret to anybody that Merck is

12   continuing to do work on this.  In fact, what Merck

13   considers the final document on APPRoVe, the clinical

14   study report, is not going to be ready until March, so

15   they're still doing analysis to get that document put

16   together, and as soon as that document is finished I

17   have let them know to send it to me right away and I'll

18   send it to the plaintiffs, but there is clearly work

19   being done and things are going on and we --

20           THE COURT:  You sent them the drafts in

21   progress?  I'm only kidding.

22           MR. COHEN:  While they're working he wants me

23   to pull things out from under their pen and hand it

24   over.

25           MR. BUCHANAN:  That's just not true, your

1    summarized the APPRoVe data.  They undoubtedly crunched

2    these numbers three ways from Sunday before they went

3    to the advisory committee.  They did subgroup analyses.

4    I watched the video yesterday.  I saw it.  What I want

5    to know is where is -- I was told last week, Ted, that

6    no analysis had been done on APPRoVe.

7            MR. MAYER:  I told you -- that's what I told

8    you last fall.  They get the data, they do all these

9    subgroup analyses, and they present it to the advisory

10   committee.  That's what we have been talking about.

11           MR. BUCHANAN:  Why can't I get it?

12           MR. MAYER:  They have been doing the work.

13           THE COURT:  Wait.  You're giving him the raw

14   data.  There certainly has been some analysis --

15   substantial analysis done by Merck.  They may not have

16   done their final report, which they're working on

17   still, but they have done enough to create a journal in

18   the article, correct?  That's a Merck employee that

19   wrote it, right?

20           MR. MAYER:  The lead author is not, but some

21   of the authors are.

22           THE COURT:  The point is any analysis that

23   was done and that's been presented in testimony before

24   the FDA charts, graphs, statistical analysis, summaries

25   that have been presented in FDA hearings or

1    Honor.

2            MR. COHEN:  Then what do you want?

3            THE COURT:  The raw data should go to him.

4            MR. COHEN:  He is getting that.

5            THE COURT:  The APPRoVe study started and

6    ended in September.  It ended September 30th, right?

7            MR. COHEN:  They broke it, and they got --

8    the final -- the final data --

9            MR. MAYER:  The patients stopped taking the

10   medicine.

11           MR. BUCHANAN:  The data has been frozen file

12   since December, and we don't have it.

13           THE COURT:  You'll have the data next week.

14           MR. BUCHANAN:  I know.  I'm trying to get the

15   timing pinned down, which is part of my frustration

16           THE COURT:  You'll have the data by next

17   week, which includes SAS files, which includes all the

18   raw data.

19           MR. COHEN:  Whether it is all in a CTS

20   extract or SAS file I can't tell him which format it

21   is.

22           MR. BUCHANAN:  They presented to the advisory

23   committee -- they're probably presenting it today;

24   maybe it is over now.  They presented yesterday.

25   They're probably presenting Friday, as well.  They

1    congressional hearings you don't have to worry about

2    confidentiality anymore because it is out there.  They

3    should get copies of that next week along with the raw

4    data.  So at least they have what has been presented in

5    these hearings, which would include, I would assume, at

6    least some intermediate summaries, if not your final

7    summary and some statistical analysis, although not

8    maybe your final statistical analysis.  So that will be

9    produced.  Does that cover what you're talking about,

10   Mr. Buchanan?

11           MR. BUCHANAN:  I think it does, your Honor.

12   I think the other as it relates to APPRoVe in the

13   general sense, you know, all the work-up and everything

14   that's gone on since the interim data came out and now

15   it has been finalized.  Obviously, we're anxious to get

16   it.  We have depositions we have to take.  I would like

17   to the extent we can analyze it and incorporate it into

18   our analysis as we take those depositions that would be

19   good.  What I am frustrated by, Ted, and it is water

20   under the bridge now, but so I'm clear, I think we

21   could have used some of that material that was

22   available in December for these witnesses since then

23   and now we haven't had that benefit and you have the

24   data.  So if we have to revisit it we will.

25           THE COURT:  After you get the data and you

1  feel you need to revisit somebody let us know.

2        MR. BUCHANAN:  The other issue is, your

3  Honor, as it relates to updating productions in

4  connection with witnesses that are being deposed.  Your

5  Honor, in the October conference the first time post

6  withdrawal, obviously, that we had to address how do we

7  update the productions.  We picked October 15th as a

8  date to basically go out and collect the data as it

9  exists as of this point in time.  Update all your

10  productions, and we debated when that would be due and

11  we went back and forth over a few months on that.

12        That was as a general matter updating the

13  productions.  Now we're taking testimony from people

14  and learning that they certainly have information from

15  October, November, December, now January.  When we meet

16  with witnesses to prepare them for deposition we ask

17  them what else they have.  I don't know why that's not

18  being done for their witnesses in connection with their

19  production and seeing if there is a supplementation

20  that needs to be made or at least a disclosure to us

21  about the additional information that exists that's not

22  going to be turned over to us.

23        MR. COHEN:  Disclosure is no problem.  All

24  the scientific people are working probably today on

25  stuff including APPROVe and working on this issue, and

1  if they're working the day before the deposition you

2  can't get documents and turn it over to them.

3        MR. MAYER:  Although most of the people who

4  have been deposed to now were people who have not

5  really been very actively involved in this.  That's why

6  we put the ones who have been most active afterwards.

7        MR. BUCHANAN:  And we agreed to do that.  One

8  of the reasons I was surprised about Jennifer Ng having

9  the involvement with APPROVe that she did and the

10  involvement with the data that she did and why that

11  happened in January before we actually had gotten the

12  data, but --

13        THE COURT:  How much time -- obviously, you

14  can't give them what happened last week.

15        MR. COHEN:  The thing is if you keep going to

16  people at different times -- like what we basically

17  told them is if you want another update then we do

18  another update at some point.  We haven't said no to

19  that.  The whole point has been how are you going to

20  run this litigation, and to run out and get one

21  person's file, what happens when that person's file has

22  a document that says it was shown to someone else,

23  they're going to say I need that person's file before

24  the deposition, I need this person's file before the

25  deposition.

1        The problem with the fact that the work is

2  ongoing is you could always -- it is where do you draw

3  the line so we can talk --that we can have the

4  witnesses and they can depose the witness and you can

5  get this all done with some kind of cutoff because in

6  reality if they're still working on it they're still

7  working on it.  There are still people working on the

8  clinical study report, and that's not done till next

9  month, so even if I collected it today they'll have the

10  same complaint, she told me she is working on the

11  clinical study report, and I don't have that document

12  and they won't.

13        MR. BUCHANAN:  Don't you ask for the

14  documents when you call to set up the prep and you meet

15  with a witness don't you ask for what they have three

16  weeks before the dep?  Can't they supplement at that

17  point in time?  I'm mean, we're quibbling about what

18  happened the day before.  We're now four months of

19  additional material related to analysis work-up for FDA

20  now and other things that have not been supplemented

21  for any of the witnesses who we're deposing.  That's

22  what I'm talking about.  Not a general update of your

23  150 or 200 custodians right now, we're talking about

24  the witnesses we're deposing.

25        THE COURT:  All right.  Let's forget whoever

1  you're deposing for the rest of February.  But let's

2  take anybody who is being deposed in March, and how

3  many people are scheduled to be deposed in March?

4        MR. BUCHANAN:  Probably six right now.

5        THE COURT:  Six or seven.  Is it possible to

6  produce -- and tell me how much of a burden it is,

7  recognizing what else you're doing -- but to produce

8  those people, those six people are being deposed in

9  March to produce their files at least one week before

10  their deposition, each one, one week before their

11  deposition up to being current up through, say,

12  February 1st, which wouldn't be current through this

13  month, but current through the end of January.  Is that

14  doable?

15        MR. MAYER:  The first person Elise Rison is

16  March 2.

17        MR. COHEN:  She'll have a lot of stuff.

18        THE COURT:  Who is she?

19        MR. MAYER:  Elise Rison.  She is one of

20  the -- she is a vice-president in the research

21  laboratories.

22        THE COURT:  She is going to have huge

23  quantities?

24        MR. BUCHANAN:  It is four months, though.  I

25  mean, I don't know -- she has a substantial --

1    THE COURT:  Four busy months probably.

2        MR. BARNETT:  And, your Honor, I recognize

3    that I'm somewhat new to this, but the problem is you

4    can't separate out document production from deposition

5    preparation.  It is essentially the same process.  It

6    is collection, review and production.  So at the same

7    time that we're trying to do everything as far as

8    review facts production, new custodians for

9    medical/legal, that whole sort of thing and other

10   people that they have requested just outright where

11   does that come into priority?  Is this a higher

12   priority for them than the medical/legal?  Okay.  Then

13   maybe we can do something.

14       But at some point you reach what it is that

15   you can actually do and do well.  And that's what our

16   concern is is that first that we clearly have to have

17   some sort of cutoff date, which you have already

18   identified February 1st, that sounds reasonable, but

19   then where does this fall in the order of the

20   priorities for the plaintiffs?

21       THE COURT:  Look at your six people.  Look at

22   seven people, are there any of them that were not

23   involved with APPROVe or were not going to have limited

24   ongoing stuff from September to now or October to now?

25       MR. BUCHANAN:  One is a former employee,

1    Scolnick.  I imagine Ray Gilmartin's quantity -- the

2    only person that has a substantial quantiy is probably

3    Rison.

4        MR. MAYER:  Peter Kim will have a lot.

5        MR. BUCHANAN:  What day is Oxemius?

6        MR. MAYER:  She is March 3rd.

7        MR. COHEN:  The clinical study report won't

8    be done by that time.

9        MR. MAYER:  This is March 2.  Scolnick is

10   March 9th.  Kim and Anstice are next week.

11       THE COURT:  Let's start with the people --

12   I'm just trying to be reasonable, and let's move our

13   date up for production for those people that are

14   produced after March 7th.  Those people that are

15   produced March 2nd and 3rd you're just going to have to

16   go with what you've got.

17       MR. BUCHANAN:  Frankly Elise Rison is

18   unlikely to finish in two days.  On the third day we

19   can focus on the APPROVe issues with her.

20       MR. MAYER:  After March 7 you have Kim,

21   Anstice, Gilmartin, Scolnick.  Those are the ones in

22   March.

23       THE COURT:  After the 7th.  Does that work

24   then those four you'll have them a week before their

25   dep?

1        MR. BUCHANAN:  Ben Eddlesberg is also --

2        MR. MAYER:  I thought you changed that.

3        MR. BARNETT:  I think that is quite a bit.

4        MR. BUCHANAN:  Scolnick is not going to have

5    much at all.  He is a former, unless he has stuff at

6    his house.

7        MR. COHEN:  Oxemius and Kim will be a

8    problem.

9        THE COURT:  What do you want to make it

10   December?  Does that make it easier?  I don't think the

11   time frame cutoff makes it that much difference.

12       MR. COHEN:  Because it is like the variable

13   cause and fixed cause if I think back to my college

14   days.  It is the going out, getting the stuff, getting

15   them shipped off --

16       THE COURT:  You took different courses in

17   college than I did.  I don't know what you're talking

18   about.  We English/history majors we didn't --

19       MR. COHEN:  Some of it is the fixed cost kind

20   of issue.  I am most concerned about Peter Kim, Bettina

21   Oxemius.  Then let's say even we're able to do some of

22   this then we have the people in April.  You want the

23   same thing for people in April?  Then you say I want

24   these departmental files.  We need to figure out what

25   we're doing.  We basically finish now January 31st is

1    like a big phase, and we need to figure out an orderly

2    way how do we go now that we're in February, what is

3    the next way to do this?  One way is to collect all the

4    documents they have asked me to get, and the next thing

5    is moving it up, but --

6        THE COURT:  I think it would be more logical

7    to be producing people who are going to be deposed in

8    the future and update their files so you don't have to

9    redepose them than to be going back and produce people

10   whose deps have already been taken.

11       MR. COHEN:  My concern is say I bring

12   somebody up to date and then the clinical study report

13   comes out, and they say I have a new document.  It is

14   still going on.

15       MR. BUCHANAN:  The point is it is a pretty --

16   it is a pretty pertinent window of time that you have

17   accumulated information.  You have it now, and we have

18   an opportunity to use it hopefully with these

19   witnesses, but, you know, honestly, if you're talking

20   about Elise Rison having 200,000 pages of supplemental

21   production producing it the week before doesn't help

22   anyway.  We need to understand what you're talking

23   about in terms of quantity.  I'm sure all these people

24   have legal hold files that are divided between things

25   you have gotten and things you haven't gotten, so maybe

1  you can contact them and get an assessment and if the

2  proposal by the Court doesn't work we can call the

3  judge together tomorrow or Monday.

4      MR. MAYER:  The proposal is anybody deposed

5  after March 7th --

6      THE COURT:  March 7th be produced through

7  February 1st.  Why don't you talk to those people, find

8  out what the quantities are going to be.  Discuss it

9  with each other.  Maybe you can work out that we only

10 want two of those witnesses.  We don't care about

11 Gilmartin's file from -- we assume he has been more

12 busy with public relations or something.  Maybe he has

13 been hands on and writing the summary, I don't know.  I

14 don't know what these people do.

15     MR. BUCHANAN:  What is the time limit for Lee

16 Kwan's document production?  Lee Kwan was the unb_led

17 statistician with Deborah Shapiro of the APPROVe trial.

18     MR. COHEN:  I don't have a firm date.  I

19 would have to call back and find out.  And we'll give

20 you a volume.

21     MR. BUCHANAN:  He is a witness we're going to

22 want to take, and, also, one we're going to want to get

23 his documents earlier rather than later.  I know Ted

24 and I haven't picked a date for him because we don't

25 have his documents, but I think we do need to pick a

1  firm date for the production of his files because he is

2  pretty central in this whole thing.

3      THE COURT:  One of the other things I want to

4  throw out to you is just I haven't involved myself at

5  all in the science of any of these issues or in the

6  liability at all.  And I'm assuming in the summer we're

7  going to be -- or soon enough -- we're going to be

8  thrust into issues about that.  I'm wondering if

9  counsel want to provide me with, I guess, reading

10 material that I could start reading over the next

11 couple months just for my own because I'm going to have

12 the same problem you have of how much can I absorb in

13 how short a time.  And up to now I haven't seen any

14 depositions.  I haven't seen any scientific articles or

15 materials, for example.

16     Now, I don't want to go get this New England

17 Journal of Medicine article; I wouldn't go get that

18 without letting you know and making sure that you agree

19 that you want me to read it.  But I'm just wondering --

20 we don't have to do it this minute, but I would like

21 to, I guess, know from each of you and maybe you could

22 come to some agreement whether you want me to start out

23 by reading waiting until plaintiffs submit their expert

24 reports and then let me start reading their expert

25 reports along with any articles they rely on and

1  afterwards read the stuff you submit with your experts

2  or whether there's some general reading that you think

3  I should do that you assume everybody is going to be

4  talking about.

5      You know, I don't know if these studies

6  there's general reports and summaries that I should be

7  familiar with that everybody is going to be talking

8  about.  I'm just hoping that it would be a way to start

9  giving me materials that both sides think I should be

10 reading and have some familiarity with before we get

11 into the hearings.

12     MS. SULLIVAN:  Your Honor, that's I think a

13 good idea.  One of the things we have done -- Dave, you

14 may have done it in Resulin -- was to have a science

15 day for the judge.  Have some parameters about what

16 kinds of materials you should get that's reasonable and

17 we can agree on and have a proposal and then have a

18 science day where each side the lawyer gets up and

19 gives sort of a position statement on their view of the

20 science with some Power Points or some demonstratives

21 and the other side does the same to educate the judge

22 as we go forward.  That's actually a pretty good idea.

23     THE COURT:  That sounds wonderful.

24     MR. BUCHANAN:  That is a good idea.  As a

25 timing matter we want to do it -- I'm looking at the

1  schedule and seeing that we have a fairly aggressive

2  schedule over the next two months.  If we're going to

3  do it sufficiently in advance but not this month --

4      THE COURT:  March might not be the time to do

5  it.

6      MR. BUCHANAN:  April or May.

7      THE COURT:  It is something I wanted to throw

8  out to you that I was feeling that at this point in

9  order for me to be able to keep up I might need to

10 start reading at night.

11     MS. SULLIVAN:  That's a good idea, Judge.  We

12 appreciate the Court's interest.

13     THE COURT:  But I don't want to go out and

14 get material that might either be inadmissible some day

15 or irrelevant or unreliable or something.

16     MR. BUCHANAN:  Final item, and I'm sorry to

17 keep pressing on with our agenda at this point.

18     THE COURT:  Go ahead.

19     MR. BUCHANAN:  We noted that the redaction

20 issue in our agenda, there's -- I know defense counsel

21 has cured certain redactions that were raised and

22 earlier motions that we have brought.  We have looked

23 at documents, and there are repeated redactions on

24 issues that I think you have counselled are

25 inappropriate redactions, they're not redactions for

1    confidentiality, per se; they're redactions in areas
2    where there's, say, comparisons to another drug.
3    Sometimes it is another Merck product completely
4    different Merck product like Flosamax (ph) for example.
5    There's examples of comparisons of background rates of
6    CV issues and placebo control trials, other control
7    trials.  There's also redactions of comparisons between
8    ARCOXIA, the other COX-2 inhibitor that Merck makes and
9    VIOXX side by side.  The company thought it relevant to
10   examine background rates and --
11        MR. COHEN:  I can cut you short.  I know that
12   document, and very early on -- it is a guideline for
13   the reviewers.  That's not supposed to be redacted.  So
14   maybe you should show me some examples of various
15   documents because other than ARCOXIA this shouldn't be
16   an issue.
17        MR. BUCHANAN:  It is an issue with ARCOXIA,
18   and these are -- I'll show you what I had in mind when
19   I was saying that.  Your comparison of CV rates between
20   ARCOXIA on one side and Rofecoxib on the other side.
21   Obviously, the company thought it relevant to make a
22   comparison between the two drugs to determine do we
23   have a CV problem or don't we have a CV problem.  It is
24   pretty relevant to the analysis.  This is not getting
25   into an area where we're looking for marketing

1    information for ARCOXIA.  We're looking for safety
2    information.
3        And one thing I found particularly
4    interesting yesterday during the conference was that
5    Merck's position yesterday was this was a class effect
6    that we see this problem with all COX-2 inhibitors.  Of
7    course, ARCOXIA is in the same class.  Comparisons
8    between the two drugs on safety issues seem pretty
9    relevant.  The drug is not marketed in this country.
10   It may be marketed elsewhere, and we're really not
11   looking for the marketing information.  I have other
12   examples.
13        You know, one document, cardiovascular safety
14   of COX-2 inhibitors, the discussion of CV safety with
15   VIOXX isn't redacted.  The contrary side of this that
16   would reflect the CV safety of ARCOXIA which could be
17   relevant, charts showing the number of events in
18   similar trials.  Naproxen is the answer for VIGOR, your
19   Honor --
20        THE COURT:  Well, Naproxen we agree that if
21   Naproxen is compared to VIOXX it should definitely not
22   be redacted.
23        MR. MAYER:  We agree.
24        THE COURT:  The only thing I think we agreed
25   should be redacted was the ARCOXIA which I said was an

1    ongoing product that you were still researching and
2    was, quote, "in your pipeline."  Is it sold
3    internationally?
4        MR. MAYER:  It is.
5        MR. BUCHANAN:  The issue we focused on, your
6    Honor, and one of the things they did was they studied
7    ARCOXIA and Naproxen together in clinical trials then
8    they separately studied VIOXX and Naproxen in clinical
9    trials, and if Naproxen is really cardioprotective we
10   should see the same result vis-a-vis these two
11   different Merck drugs.  Well, they redact the section
12   that shows the results from that particular clinical
13   trial with Naproxen, and it is a big issue in this
14   case.  It was a big issue in their defense yesterday
15   before the FDA that the results that were seen in the
16   VIGOR trial were not real signals of the cardio
17   toxicity of VIOXX, it was really a showing of the
18   cardioprotectiveness of Naproxen.
19        Well, it would be interesting to see -- I
20   don't know what it shows, it is all blacked out -- what
21   the difference is between the Naproxen trials with
22   VIOXX and the Naproxen trials with ARCOXIA.  I don't
23   know why this should be protected as it relates to
24   safety information that they thought was relevant to
25   examine to determine whether they had an issue or not

1    and made their own decisions based on those
2    evaluations.
3        THE COURT:  Has there been a drug
4    application -- is there a drug application for the
5    approval of ARCOXIA?
6        MR. MAYER:  Yes.  And the data compared to
7    Naproxen -- there is published data comparing Naproxen.
8        MR. BUCHANAN:  It has all been redacted?
9    Then why is it redacted?
10        MR. COHEN:  The entire ARCOXIA program of
11   that kind of information.
12        MR. BUCHANAN:  Then what would be the basis
13   for redacting the side by side comparisons if it is in
14   the public?
15        MR. COHEN:  It is impossible to tell the
16   reviewers which one of these graphs is public and which
17   isn't.  If you need information you can get a single
18   document that has everything you need publicly
19   downloaded off of FDA.gov.
20        MR. BUCHANAN:  You can't, and I have looked
21   at the review presented by the FDA and that Merck
22   actually submitted to FDA, and you can't get it out of
23   that.  You can't -- these comparisons, they have
24   different -- they do subgroupings.  They do different
25   windows of time.  The comparisons are quite relevant,