1  your Honor, and I would be happy to submit a complete
2  record.  The company has changed its position on
3  ARCOXIA.  It changed its position on COX-2s in light of
4  the APPROVe trial.
5      THE COURT:  Well, they're still trying to get
6  ARCOXIA approved.
7      MR. COHEN:  If you want to put this in a
8  motion again, let him make a motion, and we'll respond
9  and get --
10     MR. BUCHANAN:  I don't see why it is
11  necessary.
12         THE COURT:  I don't know that we need to do a
13  motion, but what I do want --
14     MR. COHEN:  So far you and the Court in Texas
15  have both agreed.
16     MR. BUCHANAN:  You highlighted the Court's
17  decision to the judge in Texas.
18     MR. COHEN:  The Court of appeals still agreed
19  with her.
20     THE COURT:  I don't have any problems still
21  with the concept that, generally, references to ARCOXIA
22  should be redacted.  I'm wondering if you can't look,
23  Mr. Buchanan, specifically at things that you want.  If
24  you have got --
25     MR. BUCHANAN:  The comparisons are pervasive,

1  MR. MAYER:  We have been over all the reasons
2  for that.  We'll talk to our client and see if we can
3  come up with a proposal that will address your issue on
4  these documents.
5      MR. BUCHANAN:  On comparisons?
6      MR. COHEN:  This one just showed up in the
7  agenda.  This is not one that was part of our meet and
8  confer, so I haven't spoken to the client at all about
9  it.
10     MR. BUCHANAN:  It is becoming increasingly
11  prevalent, and, frankly, I reviewed your FDA
12  submission, and I was hoping to see more about the
13  underlying ARCOXIA data in the ARCOXIA submission that
14  was filed by Merck, and I didn't.  And it didn't answer
15  the questions I had, which is why I was hoping for more
16  detailed guidance from the Court and the withdrawal of
17  these designations.
18     MR. MAYER:  And this is just for the record,
19  but earlier in your argument you made a
20  characterization of what the company's position was
21  that the advisory committee, and I do not accept that
22  characterization.
23     MR. BUCHANAN:  They're not your words,
24  they're my words, Ted.
25         THE COURT:  How about if we -- I would

1  your Honor.  That's the issue.  General guidance -- I
2  was trying to be narrow.  I mean, I was trying to limit
3  the revisiting ARCOXIA.
4      THE COURT:  I was wondering if there are two
5  or three studies that you want then maybe they would be
6  willing to give you those.  For example, maybe they'll
7  give you this, but that's the only one --
8      MR. BUCHANAN:  I don't know.  Will they?
9      THE COURT:  -- or they'll give you three of
10  those.
11     MR. BUCHANAN:  I don't know what they'll give
12  us.  If you want to give us the CSR's?
13     THE COURT:  What are the CSR's?
14     MR. BUCHANAN:  Clinical study reports for the
15  ARCOXIA trials, and if that's not enough I can raise an
16  issue as it relates to an individual document.
17  Honestly, your Honor, comparing the CV safety --
18  comparing CV safety of two NSAIDs -- if this was
19  Celebrex -- and we have them like this -- where they
20  have Celebrex CV event on the other side of this.  They
21  have Naproxen CV events on the other side, but they
22  won't show us the ARCOXIA ones.  It does seem somewhat
23  absurd that they'll show us any other drug other than
24  their own COX-2 that they have more information about
25  than any other competitor's drug.

1  suggest that over the course of the next week you pull
2  out a certain number of documents, a limited number of
3  documents that you would like to ask then would you be
4  willing to give us these, would you be willing to give
5  us the data limited to this and let's see if there's,
6  you know, a limited amount of data that they might not
7  have that big a problem with because they think -- or
8  maybe already it is public record, but you just can't
9  find it.
10     MR. BUCHANAN:  Your Honor, there is a -- and
11  when you issued your ruling on ARCOXIA in the summer my
12  sense from the Court, and I can understand this
13  concern, is that to allow plaintiffs to do broad
14  ranging discovery into a different Merck product could
15  be nothing other than a fishing expedition in search of
16  a future case.  That's not what your Honor said.  I can
17  understand logic and concern by a court in trying to
18  protect a defendant from broad ranging discovery into
19  another product.  One of the things we tried to do is
20  focus on documents they already collected, documents
21  that had been redacted, comparisons on the safety of
22  this drug to the --
23         THE COURT:  Are there hundreds of documents
24  that compare the two?  Is that what you're saying?
25         MR. BUCHANAN:  There's a lot of documents

1  that make the comparisons.  There was a COX-2 task
2  force.  This is a document, Q and A media briefing to
3  the public.  This is redacted.  A media briefing for
4  the public is redacted, redacted as to ARCOXIA not as
5  to VIOXX.  These drugs were considered together.  There
6  was a team.  There was a lot of overlap.  I deposed the
7  statistician who was the blinded statistician on
8  APPROVe, Jennifer Ng.  For the years prior she has been
9  the statistician on the ARCOXIA trials.
10       Look, we don't want another 10 million pages.
11  Absolutely not.  We don't need it.  We have plenty to
12  look at, but as it relates to the material we have on
13  issues that go right to CV safety and comparative
14  safety to another COX-2 agent we just wanted to get
15  that information.
16       THE COURT:  Have you had a meet and confer
17  where he pulled out these specific articles?
18       MR. COHEN:  No.  This just came up two days
19  ago, so let's do something --
20       THE COURT:  Then I want you to have a meet
21  and confer where you have specific -- if it is 100 or
22  500 at least show him the specific things and say are
23  you willing to unredact these?
24       MR. BUCHANAN:  I am hopeful we can come up
25  with some categories, and I'll give you 25 that

1  represent that, so we can develop some rules or
2  processes.
3       MR. COHEN:  Okay.  I'll take it to the
4  client.
5       THE COURT:  What I don't want them to have to
6  do is have the burden of going through every other
7  document.  There's something general that says any
8  place where there's a comparison they should have to
9  produce it.  Because that means they have to go through
10  each and every document again.  If you have seen places
11  that are redacted that you want unredacted -- I mean, I
12  know I'm shifting the burden to you, but it seems like
13  it should be shifted at this point.
14       MR. BUCHANAN:  It feels that way.
15       THE COURT:  Yes, I am.
16       MR. BUCHANAN:  Your Honor --
17       THE COURT:  But I have been putting a lot of
18  burden on the defense.  I don't feel too bad about
19  putting a little more on the plaintiffs.
20       MR. BUCHANAN:  That's fine.  It is one of
21  those issues that it arises in the context of document
22  review.  It arises in the context of preparing --
23       THE COURT:  I agree something like this seems
24  like it might have some scientific use with an expert
25  and may not be that -- I mean, may not go to anything

1  that we were concerned about, which was not -- believe
2  me, I wasn't concerned about whether or not they were
3  going to start soliciting ARCOXIA clients.  What I was
4  concerned about was having to produce another four
5  million ARCOXIA documents, which would really slow us
6  up.  And not just slow us up, but maybe be -- I don't
7  know that it's -- you're starting to explain to me some
8  of the reason why it would be relevant.  Otherwise, I
9  mean, it is a different drug.  Did they get the same
10  results with it?  Did they get different results with
11  it?  I guess we don't know.
12       MR. BUCHANAN:  I don't have the data.  That's
13  the reason why people want me on the agenda, your
14  Honor.
15       THE COURT:  Well, I'm not saying you're not
16  going to get it.  I just want you to give them some
17  specific documents, whether it is 500, 100 or 10 that
18  you want to ask him please unredact these documents
19  then let him look at him with his people or talk to you
20  and say yes or no.  Then if you need to have a --
21  before the next meeting you need to have -- or before
22  your report if you're under deadlines and you want to
23  meet with me one morning and we'll go on the record and
24  you can show me those records, I can do it without a
25  formal motion.  I understand what the issues are for

1  your protection, and I also understand -- but,
2  hopefully, you can work out specific things, and some
3  of them can be produced.
4       MR. BUCHANAN:  We're going to try to do it on
5  an expedited basis because of the timing basis.
6       MR. COHEN:  Off the record for a second.
7       (Discussion off the record.)
8       MS. SULLIVAN:  The Ogilvie Committee
9  Commission is on our agenda.
10       THE COURT:  What is that?
11       MS. SULLIVAN:  Mr. Placitella served an
12  application for a commission for a third-party.  It is
13  an advertising firm, and it is our position that the
14  subpoena is significantly over broad, so we talked
15  about a briefing schedule and I'll get to him and
16  propose something to the Court with him on that.
17       MR. BUCHANAN:  At this point I think he had
18  to leave.
19       MS. FLEISHMAN:  He was in agreement.
20       MS. SULLIVAN:  I'll call him and get it to
21  you.
22       MR. CORONATO:  Your Honor, just two quick
23  items.  We have discovery deficiencies --
24       THE COURT:  So I'm not going to sign any
25  order on the commission until I hear from you.

1    MS. SULLIVAN:  Thank you.

2    MR. CORONATO:  We have discovery

3    deficiencies, and what I would propose on that is that

4    if the Court would enter an order saying that within --

5    if parties don't respond to those deficiencies or

6    provide the facts sheets within 14 days the Court will

7    dismiss the cases with prejudice.

8    MR. BUCHANAN:  Which cases are you referring

9    to?

10   THE COURT:  If you don't produce facts sheet

11   they should be dismissed without prejudice, and then if

12   they don't move to reinstate within 90 days they should

13   be dismissed with prejudice.  I think the same with

14   answers to interrogatories.

15   MR. CORONATO:  We'll do it under the rule,

16   and what about for failure to respond to deficiency

17   letters?

18   MR. BUCHANAN:  What does that mean, Will,

19   that you sent a deficiency letter that you haven't

20   gotten a response from?

21   MR. CORONATO:  No response, no response.

22   THE COURT:  These deficiency letters -- you

23   have gotten no facts sheet?

24   MR. CORONATO:  We got a facts sheet, it was

25   deficient in many respects.  We sent a letter saying

1    you didn't answer these 15 questions and then we get no

2    response to that letter.

3    THE COURT:  How many of these are there?

4    MR. CORONATO:  Pending there are two.  There

5    are three outright failures to answer facts sheets and

6    two failures to answer deficiencies.

7    THE COURT:  File them just as regular motions

8    with motions to dismiss.

9    MS. SULLIVAN:  Monthly, your Honor?

10   THE COURT:  Yes, I guess.  Is that what you

11   want to do file motions to dismiss?

12   MR. CORONATO:  Yes.  We don't have to do

13   motions.  We can have an order entered that says what

14   the rule says 4:23(5).

15   MS. SULLIVAN:  Dismissed without prejudice.

16   MR. BUCHANAN:  There's been no showing as it

17   relates --

18   THE COURT:  Well, I think I have to do it by

19   motion so they have an opportunity to say yes we did

20   send it to you but we forgot, here it is, withdraw your

21   motion.  I would like to avoid that, but especially at

22   this point -- I mean, maybe if we could have

23   specifically done it on the record with the people --

24   are they Seeger, Weiss clients?

25   MR. CORONATO:  One is an Anapol case that's I

1    believe --

2    MR. WARD:  I had an opportunity to speak to

3    defense attorneys, and two of those cases we have

4    worked out an agreement on how we're going to -- which

5    is similar what's been talked about right now.

6    MR. CORONATO:  On Constance, Ware and

7    Bergeron I can submit an order that says if they don't

8    respond within 14 days the Court will enter an order of

9    dismissal with -- without prejudice.

10   MR. BUCHANAN:  Those are your cases Beasley,

11   Allen.  I don't oppose that.

12   THE COURT:  That's fine in that case.

13   MR. CORONATO:  And the others we'll do the

14   way your Honor just ordered.  And then the only other

15   issue, your Honor --

16   THE COURT:  Don't make it a motion for 14

17   days; make it a motion to dismiss.

18   MR. CORONATO:  I'm sorry?

19   THE COURT:  Don't make your motion to allow

20   them 14 more days; make your motion to dismiss without

21   prejudice because then they got their 90 days.  Their

22   14 is built into it.

23   MR. CORONATO:  Okay.

24   THE COURT:  Plus it will scare them more, and

25   then they actually might do it.

1    MR. CORONATO:  Your Honor wanted me to report

2    back on providing medical records to plaintiffs'

3    counsel via the web.  We contacted our vendor and they

4    can do that, and what we're proposing is the records

5    would be posted to the website where plaintiffs'

6    counsel can access the records.  They'll be charged $25

7    per record by the web, which works out to about what

8    they're paying now on average because they're being

9    charged 10 cents a page per record, and the average

10   record is about 250 pages and --

11   THE COURT:  Per record meaning per plaintiff?

12   MR. CORONATO:  No, $25 per medical provider.

13   MS. FLEISHMAN:  That's expensive.

14   MR. CORONATO:  $25 per medical provider.

15   THE COURT:  How can they be averaging 250

16   pages?

17   MR. CORONATO:  There are some where we have

18   thousands of pages of records, it is a large hospital

19   chart.  They have collected records in some instances

20   that are thousands of pages, and if we charge them 10

21   cents a page, it is going to be a lot more than $25 for

22   a --

23   THE COURT:  There are lots of plaintiffs who

24   may have a two-page record or a one-page doctor visit,

25   and they're going to pay $25?

1    MR. CORONATO:  I'm told by my vendor that the

2    average they are collecting is 250 pages per medical

3    provider.

4        MR. BUCHANAN:  We're content with the prior

5    deal we had, which is we pay 10 cents a page.  If that

6    turns out to you guys benefit from it, you benefit from

7    it.  10 cents a page is just a very easy thing.  There

8    was a lot of concern expressed when I circulated your

9    proposal among the 50 other lawyers who aren't here

10   right now I explained what the prior proposal was and

11   what your new proposal was, which didn't seem to

12   provide a lot of certainty as compared to what we

13   currently have.

14       MR. CORONATO:   Mr. Weiss e-mailed me when I

15   sent the proposal saying that seems reasonable, can you

16   get records from us in the same way.  So they have a

17   vendor, Zerop, which is charging them a similar fee.  I

18   got a call from a vendor who is working with Motley

19   Rice offering me the same exact rate.  You can get

20   records at Motley Rice orders $25 per medical provider,

21   and they're available on the web.  You can download

22   whenever you want them.  This is a standard price in

23   the industry, your Honor.  So they're not being over

24   charged.  We're certainly not making any money off it.

25   It is coming strictly from the vendor.  They're also

1    getting the records online.  They can get them whenever

2    they want.  They'll get e-mail notification when the

3    records will be available, so we won't have any more

4    issues with whether or not we're getting them the

5    records timely enough.  There are a lot of advantages

6    worked into the system.  While some of the records may

7    be less than 250 pages and they'll be paying, in

8    essence, more than 10 cents per page, some records will

9    be more than 250 pages, and they'll get a discount.

10   And built into this is the convenience of e-mail

11   notification, the convenience of being able to access

12   the records wherever they want whenever they want.  So

13   there are a lot of advantages built into the system,

14   and it is the industry price.  If we want to revisit

15   this at the next conference, that's fine, but they're

16   not being overcharged.  I have looked into this in many

17   different ways, I checked with other vendors to see

18   what they're charging, and this $25 per provider is not

19   outrageous.  If you want to defer to the next

20   conference, that's fine.  I was hoping to get this in

21   place right away because plaintiffs' counsel have been

22   saying where are the records, and it is very costly and

23   time consuming for us to burn CD's for all these

24   records when we're having hundreds of plaintiffs now.

25   So I'm trying to figure out a faster way to do it.

1    MR. BUCHANAN:  What we proposed, and one

2    thing I think your Honor said was if an individual

3    firm -- you remember Mr. Locks I think said I don't

4    need them X number of days before a deposition or X

5    number of days after they're received, they can give

6    them to me every month or every two months.  Mr. Weiss

7    Sol Weiss, apparently, is very comfortable with what

8    you proposed, but the broader group of plaintiffs were

9    concerned about deviating from the current process that

10   works reliably with a charge that is tied directly to

11   the pages that they receive.

12       MR. CORONATO:  We're not going -- I'm sorry.

13       MR. BUCHANAN:  I'm just wondering why if it

14   is good enough -- the Court had suggested if somebody

15   wants to do something differently that's a matter of

16   agreement or stipulation between you and the party.

17       MR. CORONATO:  Because we're now asking a

18   third-party vendor to come in and make the records

19   available to them immediately, give them e-mail

20   notification, have tech support for them, when they

21   have problems with the website they can call tech

22   support and get assistance, so there's a little more

23   involved.  So it is not just -- we're in a different

24   world now.  We have more cases.  They want the records

25   quicker.  I'm trying to find out a way to do it via the

1    web, and, again, as I said, the vendor is charging what

2    other vendors are charging the very own plaintiffs who

3    are using similar vendors to get records, so it is

4    really not an outrageous amount of money.

5        THE COURT:  The 10 cents a page will cost you

6    more you're saying?

7        MS. SULLIVAN:  Because it doesn't account for

8    the manpower and resources that people full time have

9    to burn CD's for them in hundreds of cases.

10       MR. BUCHANAN:  What we talked about was

11   doing -- sending CD's on a periodic basis that have

12   directories by plaintiff so that, you know, if

13   there's -- I mean, there's liaison counsel or local

14   counsel for all the firms here there's not more than 20

15   local firms in New Jersey right now, not on my service

16   list.

17       MR. CORONATO:  It takes a long time to

18   download the records from the internet, burn them to CD

19   and give them with charts that have the provider and

20   Bates range.  It takes a lot of time and energy.  It is

21   going to slow down the process in getting them the

22   records.  As I said, $25 per medical provider is the

23   going rate.  This is not an outrageous rate.  If they

24   want to check with Zerop, if they want to check with

25   Record Track -- Record Track is the company that called

Transcript - Monthly Status Conference (2005/02/17)

1   me saying that Motley Rice has contacted them, they are
2   offering --
3       THE COURT:  What are they charging you?
4       MR. CORONATO:  Record Track said we will
5   charge you to get records that Motley Rice is ordering
6   $25 per medical provider, and my vendor LMI is going to
7   charge the same thing to plaintiffs.  Zerop has a
8   different scale.  Their scale ranges from $19 to 26 or
9   $27 depending on how fast you want the records.  If you
10  want the records, you know, within, let's say, 14 days
11  you pay more.  If you don't need them that urgently you
12  pay a little less.  So they have a slightly
13  different -- but it is still in the ballpark of $25 per
14  medical provider, but Record Track quoted me the exact
15  figure of $25 per record.
16      MR. BUCHANAN:  Just so I'm clear on this, and
17  maybe this is what the Court was asking, is that $25 a
18  shared cost or is it per entity that accesses --
19      MR. CORONATO:  Per firm, and it's a one-time
20  charge, so if it is General Hospital's records you will
21  pay $25 for the General Hospital record.  It could be a
22  1,000-page record, but you'll only pay $25 for the
23  record.  It is available online.  You can get it
24  wherever you want, and you'll get e-mail notification
25  from the vendor when that record has been posted, and

Transcript - Monthly Status Conference (2005/02/17)

1   you can get it immediately.
2       THE COURT:  What about you, when you get that
3   record?  Plaintiff has a hospital record.  Defense
4   wants it.  You subpoena it, right?  These are records
5   you're getting, not the ones they're sending to you,
6   obviously.
7       MR. BUCHANAN:  These are the authorizations.
8       MR. CORONATO:  These are by way of
9   authorization.
10      THE COURT:  Okay.  So you send out the
11  authorization and you get a record.  Is the vending
12  company buying them for you?
13      MR. CORONATO:  They pass the cost on -- let's
14  say the hospital charges them for the records.  That
15  charge gets passed on to Merck, and then they -- I
16  don't deal with the billing.  It goes directly to Merck
17  on that, so I don't know what the exact charge is for
18  us to access those records by the web.  But there's
19  also other charges in place for Merck because they
20  charge Merck for doing the -- making the request to the
21  provider, following up with the provider for that
22  record, so there's other charges that are being
23  incurred by Merck for those same records.
24      THE COURT:  Were you paying at least $25 a
25  provider.

Transcript - Monthly Status Conference (2005/02/17)

1       MR. COHEN:  Yes.  How much are we paying to
2   burn the CD's to get out?
3       MR. CORONATO:  Well, we're charging them 10
4   cents a page, but it is costing our paralegals more in
5   time.  It is costing Merck, the paralegals charge four
6   or $500 per CD or more to burn these CD's.  It is a lot
7   of time and effort to burn those CD's.
8       MR. BUCHANAN:  Your Honor, I think maybe
9   there's been some confusion, too, on the plaintiff's
10  part on what you were proposing, so what you're saying
11  is that for each provider that has produced records
12  there will be a fixed charge one time only $25 per
13  provider for all their records.  No supplemental
14  charges that the provider passed on to you?
15      MR. CORONATO:  Correct.
16      MR. BUCHANAN:  Could we do this because
17  people had strong feelings against the proposal, the
18  web proposal for a couple reasons.  One was technical
19  and file size of larger downloads.
20      THE COURT:  There's no requirement that you
21  buy any records.
22      MR. CORONATO:  No.  They'll go to a site, and
23  if they want a record they'll buy it.
24      MR. BUCHANAN:  I think one of them was the
25  size of the files with larger PDF's I don't know how

Transcript - Monthly Status Conference (2005/02/17)

1   they're delivered, but if there is a thousand pages
2   will people actually be able to download them.
3       MR. CORONATO:  We haven't had problems.  They
4   can break it up.
5       MR. BUCHANAN:  Can you coordinate with us and
6   give me a couple more facts?  I'll get it out to the
7   plaintiffs' counsel and we can work on this
8   between now and the next conference and get it pinned
9   down.  If it is as good as you say economically what
10  you're telling me is plaintiffs are fools for not
11  taking it --
12      MR. CORONATO:  Yes.
13      MR. BUCHANAN:  -- and there's better access,
14  more speedy access and it is more convenient for you.
15      THE COURT:  And the bottom line may be that
16  the 10 cents a page may not eventually be -- they
17  agreed to 10 cents a page now it has become
18  prohibitive, and I may make you pay more.
19      MR. BUCHANAN:  I think we'll talk to the
20  plaintiffs and see if we can get some agreement from
21  everybody.
22      MR. CORONATO:  Okay.  Thank you, Judge.
23      (End of proceedings.)
24
25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

265

**Transcript - Monthly Status Conference (2005/02/17)**

C E R T I F I C A T I O N

        I, REGINA A. TELL, C.S.R., C.R.R., License Number

30X100161000, an Official Court Reporter in and for the

State of New Jersey, do hereby certify the foregoing to

be prepared in full compliance with the current

Transcript Format for Judicial Proceedings and is a

true and accurate compressed transcript to the best of

my knowledge and ability.

                        _____

                        Regina A. Tell, CSR-CRR

                        Official Court Reporter

                        Atlantic County Courthouse

                        Mays Landing, New Jersey

Transcript - Case Management Conference (2006/02/23)

```
 1            SUPERIOR COURT OF NEW JERSEY
              ATLANTIC COUNTY
 2            CASE TYPE NO. 619
 3   ----------------------------x
     IN THE MATTER OF IN RE:
 4
 5   VIOXX
                        STENOGRAPHIC TRANSCRIPT
 6   ----------------------------x   OF:
                                   - CASE MANAGEMENT -
 7                                    CONFERENCE
 8        PLACE:  ATLANTIC COUNTY CIVIL COURTHOUSE
                  1201 BACHARACH BOULEVARD
 8                ATLANTIC CITY, NJ  08401
 9
          DATE:  FEBRUARY 23, 2005
10
11   B E F O R E :
12        THE HONORABLE CAROL E. HIGBEE, J.S.C.
13   TRANSCRIPT ORDERED BY:
14        DAVID BUCHANAN, ESQ. AND THEODORE MAYER, ESQ.
15   A P P E A R A N C E S :
16        DAVID BUCHANAN, ESQUIRE
          SINDHU DANIEL, ESQUIRE
17        SEEGER, WEISS
          ATTORNEYS FOR THE PLAINTIFFS
18
          DAVID JACOBY, ESQUIRE
19        SOL WEISS, ESQUIRE
          GREGORY SPIZER, ESQUIRE
20        ANAPOL, SCHWARTZ, WEISS, COHAN, FELDMAN & SMALLEY
          ATTORNEYS FOR THE PLAINTIFFS
21
          MICHELLE TIGER, ESQUIRE
22        KLINE & SPECTER
          ATTORNEYS FOR THE PLAINTIFFS
23
                  *     *     *     *     *     *
24                        REGINA A. TELL, CSR-CRR
                          OFFICIAL COURT REPORTER
25                        1201 BACHARACH BOULEVARD
                          ATLANTIC CITY, NJ  08401
```

1

Transcript - Case Management Conference (2006/02/23)

```
 1   APPEARANCES CONTINUED...
 2        ROBERT DASSOW, ESQUIRE
          HOVDE, DASSOW & DEETS
 3        ATTORNEY FOR THE PLAINTIFFS
 4        STEVEN CHUNG, ESQUIRE
          SHRAGER, SPIVEY & SACKS
 5        ATTORNEY FOR THE PLAINTIFFS
 6        CYNTHIA ZEDAIER, ESQUIRE
          RICK SANDOVAL, ESQUIRE
 7        BRANCH LAW FIRM
          ATTORNEYS FOR THE PLAINTIFFS
 8
 9        ROBERT W. ROWAN, ESQUIRE
          GALLATE, GRIFFIN & EWING
          ATTORNEY FOR THE PLAINTIFFS
10
          MARC GROSSMAN, ESQUIRE
11        SANDERS, VIENER, GROSSMAN, LLP
          ATTORNEY FOR THE PLAINTIFF
12
          FRANCES TOMES, ESQUIRE
13        TORTORETI, TOMES & CALLAHAN
          ATTORNEY FOR THE PLAINTIFFS
14
          JACQUELINE DeCARLO, ESQUIRE
15        HOBIE, CORRIGAN
          ATTORNEY FOR THE PLAINTIFFS
16
          EDWARD GOLDIS, ESQUIRE
17        FELDMAN, SHEPHERD
          ATTORNEY FOR THE PLAINTIFFS
18
          JOHN WAGNER, ESQUIRE
19        SIMMONS, COOPER
          ATTORNEY FOR THE PLAINTIFFS
20
          MICHAEL WEINKOWITZ, ESQUIRE
21        LEVIN, FISHBEIN
          ATTORNEY FOR THE PLAINTIFFS
22
          THEODORE V.H. MAYER, ESQUIRE
23        WILFRED CORONATO, ESQUIRE
          ERIC BLUMENFELD, ESQUIRE
24        HUGHES, HUBBARD & REED, LLP
          ATTORNEYS FOR THE DEFENDANT, MERCK
25
```

3

Transcript - Case Management Conference (2006/02/23)

```
 1
     APPEARANCES CONTINUED . . .
 2
          PAULINA doAMARAL, ESQUIRE
 3        LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
          ATTORNEY FOR THE PLAINTIFFS
 4
          GREG GORSKI, ESQUIRE
 5        DAVIS, SAPERSTEIN & SALOMON, P.C.
          ATTORNEY FOR THE PLAINTIFFS
 6
          DANIEL MIRARCHI, ESQUIRE
 7        THEODORE M. LIEVERMAN, ESQUIRE
          SPECTOR, ROSEMAN & KODROFF, P.C.
 8        ATTORNEY FOR THE PLAINTIFFS
 9        MICHAEL GALPERN, ESQUIRE
          LOCKS LAW FIRM
10        ATTORNEYS FOR THE PLAINTIFFS
11        MICHAEL FERRARA, ESQUIRE
          THE FERRARA LAW FIRM
12        ATTORNEY FOR THE PLAINTIFFS
13        THERESA CORSON, ESQUIRE
          LEVY, ANGSTREICH
14        ATTORNEY FOR THE PLAINTIFFS
15        GREG SHAFFER, ESQUIRE
          WILENTZ, GOLDMAN & SPITZER
16        ATTORNEY FOR THE PLAINTIFFS
17        DANIEL FETTERMAN, ESQUIRE
          KASOWITZ, BENSON, TORRES & FRIEDMAN
18        ATTORNEY FOR THE PLAINTIFFS
19        CLAUDINE HOMOLASH, ESQUIRE
          SHELLER, LUDWIG
20        ATTORNEY FOR THE PLAINTIFFS
21        CHRISTOPHER GOMEZ, ESQUIRE
          MILLER & ASSOCIATES
22        ATTORNEYS FOR THE PLAINTIFFS
23        SUSANNE SCOVERN, ESQUIRE
          ALEXANDER, HAWS, AUDET
24        ATTORNEY FOR THE PLAINTIFFS
25
```

2

Transcript - Case Management Conference (2006/02/23)

```
 1   A P P E A R A N C E S   C O N T I N U E D . . .
 2        PHIL YANNELLA, ESQUIRE
          BEN BARNETT, ESQUIRE
 3        MICHELLE YEARY, ESQUIRE
          DECHERT, LLP
 4        ATTORNEYS FOR THE DEFENDANT, MERCK
 5        STEPHEN RABER, ESQUIRE
          EVA ESBER, ESQUIRE
 6        WILLIAMS & CONNELLY, LLP
          ATTORNEY FOR THE DEFENDANT, MERCK
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

1          P R O C E E D I N G S
2          THE COURT:  Stay seated.  Hi.  Okay.  We have
3     the agendas for the plaintiffs and the defendants.
4          MR. MAYER:  I think we made a lot of progress.
5          MR. BUCHANAN:  Ours is substantial.  You could
6     start there if you want to.
7          THE COURT:  What do you want to start with?
8          MR. BUCHANAN:  I think, if I understand, Your
9     Honor, the oral argument on the application relating to
10    third-party discovery or retention of attorneys has
11    been -- by Merck has been moved to Tuesday; is that
12    correct?
13         THE COURT:  Correct.
14         MR. MAYER:  What time?
15         THE COURT:  What time is good for you?  I
16    figured you would be here all day Tuesday.
17         MR. BUCHANAN:  I may or may not be here.
18         THE COURT:  Is 10:00 good?
19         MR. BUCHANAN:  That's fine.
20         MR. MAYER:  I think that's all right.
21         THE COURT:  All right.  So 10:00 Tuesday we'll
22    address that issue.
23         MR. BUCHANAN:  Yup.  Moving on to Page 2, Your
24    Honor, we have resolved the issue relating to treating
25    physician detail records.  That was more of a McFarland

1     issue going to the IMS data for prescribing physicians.
2     There's been some correspondence exchanged on this.  As
3     I understand it, Merck really doesn't have a dog in
4     this race.  They have been kind of sucked into this
5     because of a confidentiality provision in their
6     agreement with IMS.  We understand they are going to be
7     making IMS productions -- production of IMS data in
8     connection with the Merck profile forms -- there's a
9     provision in there that spells that out -- and
10    separately working on a production of the IMS database
11    that Merck has collected.
12         The hiccup has been the confidentiality
13    concern by IMS.  They have insisted on, I guess, a
14    letter agreement individually with plaintiffs' counsel
15    in this litigation who would have access to the IMS
16    data.  We think it is improper.  It does include a
17    couple of provisions that we object to, specifically,
18    you know, even being in an order because it would
19    preclude us from going back to IMS.  There was an
20    indemnification provision.  There were things we
21    thought were fundamentally improper.  We thought once
22    you struck those provisions it was fundamentally the
23    same as the protective order, and we can't understand
24    why that's not good enough for IMS, frankly, the
25    protective order.  If they have any other concerns we

1     would like to hear -- we would like to hear them.
2          So what we propose, and, frankly, we don't
3     want to agree to an agreement that they may seek to
4     enforce in some other place rather than here.  This is
5     where the discovery is happening.  It should be not a
6     side contract or agreement.  It should be a
7     stipulation, an order or the protective order to govern
8     the production of the IMS data.
9          So we ask Your Honor, and I don't know whether
10    Merck takes a position in this or not, but that IMS
11    appear and raise any objections they have to production
12    of the IMS data under the terms of the confidentiality
13    order, and, again, we're just talking about Merck's
14    production of the IMS data at this point.
15         So if they have any concerns ask them to show
16    up within some limited number of time 5 days, 7 days,
17    something on that order, we don't think they're going
18    to find the protections of the protective order
19    insufficient which we agreed to as plaintiffs.
20         THE COURT:  All right.  I think what we can do
21    is have plaintiffs' counsel submit me an Order to Show
22    Cause that would be served on IMS, which would indicate
23    unless the Court hears an objection from them on a set
24    date and time, which should probably be some time next
25    week -- I guess maybe it should be two weeks.  We

1     should give them some time.
2          MR. BUCHANAN:  As I understand it, we're going
3     to operate under the provisions of the protective order
4     with respect to the trial cases because we have near
5     term needs for this data in connection with discovery
6     right now.  The one wrinkle, Your Honor, and I don't
7     know how this plays out in an Order to Show Cause
8     against a third-party outside of the jurisdiction
9     raises some issues.  It is -- I think Merck has the
10    data in their possession, custody and control right
11    now.
12         THE COURT:  That's true.  IMS is not --
13         MR. BUCHANAN:  They're not a party.
14         THE COURT:  They're not a New Jersey entity.
15         MR. BUCHANAN:  I think the appropriate
16    procedure would be for you to direct Merck to give them
17    notice that you're going to direct Merck to produce
18    this data subject to the provisions of the protective
19    order and advise IMS that they have some window of time
20    to raise an objection to the production of Merck under
21    the protective order.  Merck has the contractual
22    obligations to provide notice to IMS, and if IMS shows
23    up they show up; if they don't the production happens
24    and everything is fine.  I'm hopeful that IMS will find
25    the protections of the protective order satisfactory.

1    THE COURT:  Fine.  We'll do it that way.

2    MR. BARNETT:  As far as Merck's position we

3  are between a rock and a hard place because the

4  plaintiffs have asked for this data.  It is within our

5  possession, but contractually we can't produce it

6  without protections being in place.  If there is an

7  order like that entered we would, obviously, comply

8  with our other obligations to provide IMS notice of the

9  Court's order and give them the opportunity to be heard

10  on the issue.

11    THE COURT:  Prepare an order and submit it to

12  me.

13    MR. BUCHANAN:  We will.

14    MR. WEISS:  And there is an issue on Tuesday,

15  I believe Tuesday is Dr. Murchanian's deposition, and

16  we don't have the IMS data, and I think it is wholly

17  unfair if Merck asks any questions about that data

18  about his prescribing habits.

19    MR. BARNETT:  That a prescribing physician?

20    MR. WEISS:  He is the treater.  He is the

21  prescriber and the treater.

22    MR. BARNETT:  What we have done, just to be

23  clear so we're not holding up the trial cases, is we

24  are producing the IMS data.  At this point under at

25  least the protection of the protective order.  We don't

1  know how it is going to roll out eventually, but we

2  don't want to be in a position where the plaintiffs say

3  this is -- we're at an unfair advantage because you

4  have the data and we don't.  So we're making the

5  productions.

6    MR. WEISS:  But today is Thursday.  We haven't

7  seen it.  The deposition is Wednesday.  I should have

8  an opportunity to discuss it with the doctor before his

9  deposition.  It is 9:00 in the morning Wednesday.

10    MR. BARNETT:  All right.  Well --

11    THE COURT:  So when is the IMS data for that

12  doctor going to be produced?

13    MR. BARNETT:  I don't know.

14    MR. YANNELLA:  We could do it Monday morning.

15    MR. WEISS:  Monday morning?

16    MR. RABER:  Your Honor, as I understand, that

17  doctor never prescribed VIOXX to the plaintiff.

18    MR. WEISS:  Let's get the facts straight.  The

19  doctor received 9,000 sample pills of VIOXX, and he

20  gave samples to the client.  He also received Celebrex

21  samples, Mobig samples, other samples from all

22  different reps, and if you're going to get into what

23  his prescribing habits are because he doesn't like to

24  give out samples to a lot of people, he would rather

25  give prescriptions I'm entitled to know what that is

1  before the deposition.

2    THE COURT:  All right.  Was Monday

3  satisfactory?

4    MR. WEISS:  Monday morning, Phil, not Monday

5  at 5:00.

6    MR. YANNELLA:  Monday morning.

7    THE COURT:  The IMS data will be in your hands

8  Monday morning.

9    MR. WEISS:  Thank you.

10    MR. BUCHANAN:  We'll submit an order to you

11  today.

12    THE COURT:  You'll submit an order one

13  specific to that doctor and the other specific to the

14  issue of IMS.  Okay.  See if you can draw those orders

15  up before you leave so I can sign them.

16    MR. BUCHANAN:  That will be ideal, Your Honor.

17    THE COURT:  Then what do we have?

18    MR. BUCHANAN:  The next is supplemental proof

19  production.  This is an issue that, frankly, I need to

20  deal with Mr. Cohen with, who is on vacation, and I

21  have spared him e-mail interruptions over the week, so

22  it is something we can discuss, and I think it is an

23  issue specific to the later trials.

24    THE COURT:  Good.  He has only been disturbed

25  two or three times a day then.

1    MR. BUCHANAN:  It hasn't been by us at least.

2    THE COURT:  Supplemental APPROVe, where are we

3  at on that?

4    MR. BUCHANAN:  Sales representative

5  productions what we have agreed to do, and this is in

6  connection with the April trial cases, we understand

7  there's 15 mid-level managers who supervised our sales

8  representatives.  We have agreed to identify six that

9  we would like expedited production on, and I understand

10  that they'll be able to get the production to us by I

11  think it was March 21st, correct, Phil?

12    MR. YANNELLA:  That's correct.

13    THE COURT:  So you can submit that in an

14  order.

15    MR. BUCHANAN:  We will.  And we have agreed

16  that there won't be any objection to taking a

17  deposition of these sales rep managers after the

18  discovery cutoff in the trial cases because we're not

19  going to be getting the productions until that point in

20  time.

21    THE COURT:  Then include that in the order.

22    MR. BUCHANAN:  We will.

23    We have worked out an agreement on the Merck

24  profile forms, the details of which I could defer to

25  Mr. Yannella or Mr. Dassow who handled that issue.

1    MR. YANNELLA:  In brief, Your Honor, what
2  we're going to do is we have got a schedule.  We'll
3  produce all of the Merck profile forms that are in
4  arrearages within a 6-month period beginning on May
5  15th.  The schedule, it is a little lighter in the
6  front and it is backloaded.  We'll start doing 100 May
7  15th, another hundred two weeks later, and then it will
8  increase to 200 every two weeks, then 300 every two
9  weeks.
10    One point of clarification is that we do need
11  to give notice to all the plaintiffs as to the Court
12  criteria that we need in order to process a Merck
13  profile form, and it is really simple, name of the
14  plaintiff, address, prescriber name, prescriber
15  address.  Those are the four criteria.  A lot of the
16  forms are deficient in that way.  We want to give the
17  plaintiffs an opportunity to cure that because we can't
18  do a Merck profile form without that information.  I
19  think we're in agreement on that.
20    MR. DASSOW:  That's correct.
21    MR. WEISS:  Plaintiffs have been notified
22  about this four or five times in the last 6 months to
23  get the prescriber information on the facts sheets.
24    MR. BUCHANAN:  As we understand it you're
25  going to list the specific questions you need specific

13

1  answer to --
2    MR. YANNELLA:  We're sending general notice to
3  all plaintiffs posted on Lexis.  We'll send, as well, a
4  copy of that to Mr. Buchanan or Mr. Dassow, so they can
5  circulate that to plaintiffs via e-mail, if they'd
6  like.
7    MR. BUCHANAN:  You won't require plaintiffs to
8  resubmit that information if it's already in the facts
9  sheet, only if they believe they're deficient?
10    MR. YANNELLA:  Exactly.
11    MR. DASSOW:  Once they get that that will
12  trigger, and they'll start producing the Merck profile
13  forms as we have agreed.
14    MR. WEISS:  Well, can I raise a little
15  question about that?  There's 3,500; 4,500 cases on
16  file and there were a couple hundred on file before the
17  recall.
18    THE COURT:  5,063 as of yesterday.
19    MR. WEISS:  You're giving me oldest first?
20    MR. YANNELLA:  Yes.
21    MR. BUCHANAN:  First in first out.
22    MR. WEISS:  Did you stay 5,063?
23    THE COURT:  As of yesterday that's what I have
24  been told.
25    MR. BUCHANAN:  So it will be first in first

14

1  out?
2    MR. YANNELLA:  Correct.
3    THE COURT:  All right.  The class
4  certification briefing schedule?
5    MR. LIEVERMAN:  Your Honor, I assumed Mr. Judd
6  or Mr. Powers was going to be here.  Apparently,
7  they're not.
8    MR. CORONATO:  Your Honor, someone from
9  O'Melveny can call in if we want to handle it after
10  we're done with the regular part of the conference.
11    MR. LIEVERMAN:  That's fine, Your Honor.
12    THE COURT:  Okay.  We have the defense -- we
13  also have a letter from Mr. Ferrara.  These are
14  LoPresti issues?
15    MR. FERRARA:  Yes.  Perhaps, rather than
16  burden everybody with that we can deal with that in
17  chambers on a break?
18    THE COURT:  Okay.  Then we have the agenda for
19  Merck.
20    Update on cases set for April and June.
21  Anything you want me to address?
22    MR. CORONATO:  No, we're doing well.  We have
23  depositions scheduled, and I think we're just looking
24  for -- Mr. Spizer is going to assist us in getting
25  deposition dates for the person who did the autopsy.

15

1    MR. SPIZER:  I can talk to you after the
2  conference.  I spoke with the pathologist late last
3  night.
4    THE COURT:  Okay.  LoPresti, we have a couple
5  issues that Mr. Ferrara wants to raise on financial
6  documents.
7    MR. FERRARA:  They're the issues we addressed
8  in the letter, Judge.
9    THE COURT:  Okay.  What, plaintiff hasn't
10  given you a date for what?
11    MR. CORONATO:  For the deposition of
12  Dr. Blannet.  They want to take a de bene esse
13  deposition.  They have agreed to produce Dr. Blannet
14  for a deposition, a discovery deposition, on a day
15  prior.  We're just waiting for that date.  I have also
16  asked for an answer to a very direct question; that is,
17  whether or not they intend to elicit any opinions from
18  Dr. Blannet.  We were told last week that he was a fact
19  witness.  On Monday I saw Mr. Dassow and Miss Scovern
20  in Philadelphia.  I asked them, again, I said, "Are you
21  going to be eliciting any testimony, any opinion
22  testimony from Dr. Blannet"?  They told me they needed
23  to think about it, they would get back to me on
24  Tuesday.
25    I e-mailed them on Tuesday and said, "What's

16

Transcript - Case Management Conference (2006/02/23)

1  the deal?" And they wrote back that he is a fact
2  witness, which is what they told me last week, so I
3  still haven't gotten an answer.
4      MR. DASSOW: Your Honor, we can head that off.
5  I don't think Will was e-mailed or we sent to Tessie
6  that he was going to be a fact witness and not an
7  opinion expert witness. We sent it to Tessie.
8      THE COURT: He is not going to be asked
9  causation questions?
10     MR. DASSOW: He is not going to be asked
11 causation.
12     THE COURT: Is he going to be asked -- I guess
13 he will be asked diagnosis?
14     MR. DASSOW: Oh, yes.
15     MR. FERRARA: But, Judge, of course the
16 underlying issue is whether or not a court or anybody
17 can separate out what's a fact and what's an opinion.
18 In other words, if the question is did you have a heart
19 attack is that a fact or an opinion? So, to the extent
20 that that area is a gray area, you know, we don't
21 intend to use him as a causation expert to say that
22 VIOXX was a cause of Mr. LoPresti's heart attack, but
23 some of what he says, even though he is a factual
24 witness, you know, I'm certain that some opinions will
25 be elicited by one side or the other, because how do

17

Transcript - Case Management Conference (2006/02/23)

1  you separate out what's an opinion and what's a fact
2  with the doctors? So, hopefully, that will take care
3  of that.
4      The issue as far as --
5      THE COURT: The bottom line is they have a
6  right to know what you're going to do before you get
7  there and before they take their discovery dep, and if
8  you're going to elicit causation testimony they
9  certainly have a right to know that. If you're not
10 doing that then now they know you're not eliciting
11 causation testimony. I assume if you take the de bene
12 esse dep and he is a treating doctor you're going to
13 ask him, Did you prescribe X, Y, Z, Why did you
14 prescribe that? You're going to ask him what happened,
15 if he is a cardiologist, did he have a heart attack.
16 But if you're not going to ask him why he had a heart
17 attack then I don't think we have a problem. I just
18 don't want to have them sandbagged by some question
19 that, you know, well, I have reviewed the literature
20 on, you know, X, Y, Z, and I know that it is --
21     MR. FERRARA: We are very clear on that,
22 Judge. There will not be a question asked about
23 causation and whether VIOXX was a cause of his heart
24 attack.
25     THE COURT: Okay.

18

Transcript - Case Management Conference (2006/02/23)

1      MR. FERRARA: Now, the interesting issue is
2  this doctor saw him in the E.R. and then treated him
3  for his heart attack over in Pennsylvania, and that's
4  the only visit, and our de bene esse will take
5  45 minutes at the most, and we have proposed doing it
6  on the same day because they have a right to a
7  discovery deposition, so, you know, we make our guy
8  available from three to four, but they have insisted on
9  a separate day to do the discovery deposition, which
10 just puts the doctor and his -- you know, he is a
11 treating cardiologist in the E.R., and I guess our
12 request, and it is a shame we burden everybody with
13 these minor issues, but I don't know why they can't do
14 the discovery deposition from nine until one in the
15 afternoon, four or five hours and then we do the de
16 bene esse afterward, but they want to do it the day
17 before, which the doctor just -- we'll have to subpoena
18 the doctor through a commission because he is in
19 Pennsylvania, and it is a shame we can't work that out
20 on a friendly basis.
21     MR. CORONATO: Well, Your Honor, we're
22 entitled to a discovery deposition. There's no dispute
23 about that, and we're also entitled to sufficient time
24 to prepare an adequate cross, and doing a discovery
25 deposition going right into a de bene esse deposition

19

Transcript - Case Management Conference (2006/02/23)

1  where we have to do our cross for use at trial is, in
2  my mind, unfair.
3      THE COURT: Well, it is certainly not always
4  unfair. It has been done. It can be done. It is
5  certainly not something if I was in your shoes I would
6  want to do. I would definitely want to have that day
7  to take it back and review with an expert if I wanted
8  to, so --
9      MR. CORONATO: I know it has been done, Your
10 Honor, and I agree with you, but it is less than ideal.
11 It is less than optimal, and we would just request that
12 we be given that overnight to adequately prepare.
13     THE COURT: So he is not available, is that
14 what you're saying?
15     MR. FERRARA: He is not being cooperative to
16 us or to Merck, and, you know -- so we're going to
17 subpoena him, and we have a commission that we're going
18 to ask Your Honor to execute, and we're asking him for
19 two full days, and I have a feeling, and I'm trying to
20 project ahead, is that he has, you know, surgeries and
21 stuff in the hospital, he is not going to make himself
22 available for two full days.
23     THE COURT: If you're going to have a
24 45-minute direct maximum then you don't need two full
25 days, do you?

20

1  MR. FERRARA:  As far as ours?

2  THE COURT:  Right.

3  MR. CORONATO:  I don't think we'll need a full

4  day with this doctor for discovery purposes.

5  THE COURT:  I would think that each of you if

6  he could free himself up from four to six on back to

7  back days everything could be done.

8  MR. FERRARA:  With most doctors, Judge, that

9  would be the case, but this fellow is very unhappy that

10  he is in this litigation just because he treated this

11  guy's heart attack.

12  MR. DASSOW:  I have a question on that, too.

13  Say the Merck lawyers ask -- now that we have talked

14  about opinion testimony on the discovery dep they ask,

15  "Hey, do you think that VIOXX caused his heart attack?"

16  What happens if that question is elicited from

17  defendants, what are we allowed to do then?  Because

18  they have opened the door.

19  THE COURT:  Okay.  I thought you were going to

20  argue it the other way that they shouldn't be allowed

21  to ask that.

22  MR. DASSOW:  I want to hear if they're going

23  to be asking that.  They shouldn't do it.  If we're all

24  tied, they shouldn't.

25  THE COURT:  Do you agree you're not going to

1  ask him causation?

2  MR. CORONATO:  Your Honor, I'm not asking the

3  questions and taking that deposition, so I don't know.

4  I have no idea what the intent is with respect to

5  taking the deposition.

6  MR. DASSOW:  Come on, Will.  I mean, there is

7  all these lawyers.  I don't think any of the lawyers in

8  this room are going to be there taking it.  I had seven

9  and five and five the last three days in Philly.

10  Somebody is going to be there, but, I mean, somebody

11  has to -- I just represent to the Court we're not going

12  to elicit a causation opinion.  I guess I need to know

13  in a discovery dep whether you're going to elicit a

14  causation question to the doctor.

15  MR. FERRARA:  And we have a good faith basis

16  for that concern, because on a couple of treaters so

17  far that question -- they have tried to elicit expert

18  testimony, and --

19  MR. DASSOW:  What is good for the goose is

20  good for the gander.  If we're acknowledging we're not

21  going to do it, they can't elicit that.

22  MR. BUCHANAN:  There's nothing improper about

23  it.

24  MR. RABER:  Your Honor, what about this

25  question, what about, you know, in the course of

1  treating so-and-so did you form an opinion about

2  whether VIOXX played any role in his heart attack, and

3  if he answers no, I don't understand how that is really

4  eliciting expert testimony.  He is asking in his care

5  of the patient did he form an opinion one way or the

6  other, and it seems --

7  THE COURT:  Then it is not expert testimony

8  when they ask it at the de bene esse dep.

9  MR. FERRARA:  I think the guidance we would

10  like, Judge, is when we have made a representation on

11  the record that that issue using this doctor to try to

12  buttress their case shouldn't be allowed.  In other

13  words, there shouldn't be any discussion with this

14  doctor on whether VIOXX had any role in this guy's

15  heart attack or not on our side or their side.

16  Otherwise, they're going to convert this treater as

17  their expert -- as an expert.

18  MR. CORONATO:  Well, Your Honor, I would just

19  like the opportunity to just confer with the trial

20  lawyers who will be taking that deposition before we

21  take any position on that question.

22  THE COURT:  And when is the dep scheduled?  It

23  is not scheduled yet?

24  MR. DASSOW:  We're working on that.

25  THE COURT:  Okay.

1  MR. BUCHANAN:  Your Honor, just for purposes

2  of this past discussion I want to be clear that that's

3  a LoPresti-specific discussion in terms of the

4  requirement for somebody to disclose what they want to

5  do with a treater at his deposition because I don't

6  believe we're required to do that.

7  THE COURT:  Treaters are allowed to give

8  opinions on causation, and they're allowed to -- just

9  as counsel just indicated to ask a Doctor, you know,

10  what is your opinion on what caused this condition that

11  you're treating, what was your opinion when you were

12  treating him, you know, not what your opinion is today.

13  That is sort of a distinction.  It is a gray area, but

14  it is not that gray.

15  The case law pretty much says you can talk

16  about your diagnosis and you can give opinions, a

17  treating doctor can give opinions as to causation,

18  but -- without issuing an expert report, per se.  If he

19  is going to start talking about I reviewed this study

20  and that study and I read the literature and now I'm

21  pretty sure this is why it is, then that becomes an

22  expert report.

23  MR. DASSOW:  Stigliano says --

24  THE COURT:  And the line is if you ask him at

25  that time what was your opinion of causation you can do

1    it.  You can do it and they can do it without a report.

2        MR. DASSOW:  Okay.

3        MR. CORONATO:  And the rules also state when

4    you're going to take a de bene esse deposition of a

5    treating physician that typically your rules require

6    30 days notice, and we can work with them on that, but

7    they also require that you give a report from that

8    treating physician before the de bene esse and allow

9    for a discovery deposition before the de bene esse.

10       THE COURT:  You don't need to provide a

11   report, per se, other than -- I mean, a report, you

12   have a report if you have his records.

13       MR. BUCHANAN:  Only if he has a report.  Only

14   if he has a report of his examination.

15       MR. CORONATO:  The rule doesn't make that

16   distinction, Your Honor.

17       MR. BUCHANAN:  That's the way it is

18   interpreted.

19       THE COURT:  Have you provided any report from

20   the doctor?

21       MR. DASSOW:  His medical records.

22       THE COURT:  He is just a treater, and you're

23   asking him basic questions.  I think that's acceptable.

24   They're going to just -- if you want to address it

25   differently than what I'm saying you can brief it, but

1    I think that a treater can be called, a treater can be

2    asked without issuing an expert report what his

3    diagnosis is and what his causation opinion is as long

4    as you have provided them with all the background.  And

5    all the background in this case would be the medical

6    records at that time.  If he is giving a report based

7    on any knowledge that he acquired afterwards then he

8    becomes an expert, and then you have to provide a

9    written report.

10       MR. DASSOW:  Understood Your Honor.

11       MR. CORONATO:  Your Honor, the rule does

12   say -- Rule 4:14-9(A) that when you take a videotape

13   deposition it says of a treating physician or an expert

14   witness which is intended for use in lieu of trial

15   testimony shall not be noticed until 30 days after a

16   written report of that witness has been furnished to

17   all parties.

18       MR. GALPERN:  A written report, but it also

19   says you can furnish treating records in lieu of a

20   written report for a treating doctor.

21       MR. CORONATO:  Where does it say that?

22       MR. GALPERN:  4:14-7.

23       MR. JACOBY:  I think it does.  If you provide

24   his records, that's been my experience.

25       MR. GALPERN:  Provide records of a treater

1    as --

2        MR. JACOBY:  It may contain a report if he

3    wrote it to another physician, but that's a part of his

4    records.

5        MR. CORONATO:  I don't know see that, Your

6    Honor.

7        THE COURT:  I think we can certainly agree if

8    you both want to agree in this particular case to

9    restrict it to nobody is going to ask a causation

10   question in advance you can both agree on that.  If you

11   don't both agree on that then I don't think either side

12   is bound by -- so I think at this point I know you have

13   to --

14       MR. DASSOW:  That's fine, Your Honor.

15       THE COURT:  I think a record in lieu of a

16   report is acceptable.  Unless, again, if you want to

17   use that treater to say something that's not in his

18   records in a sense you want to use him to say what the

19   future prognosis is going to be, and if he has that in

20   his record, if his prognosis says future prognosis

21   guarded or -- basically, you have to look at the

22   records and look at what you're asking him.  I might

23   make a decision afterwards that it was a surprise and

24   it shouldn't have been asked, but I can't rule in

25   advance.  Okay?

1        MR. FERRARA:  That makes sense, Judge, and,

2    you know, for Will's interpretation it would mean that

3    we're going to subpoena somebody and then we have to

4    force him or her to sit down and write a report.  That

5    can't be the law, so I think Your Honor's resolution is

6    correct.

7        MR. CORONATO:  Your Honor, that is also the

8    comment to the rule.  It says, "While written reports

9    of experts are not absolutely required by the discovery

10   rules and the interrogatory rules recognize that

11   occasionally oral reports will be rendered.  It is the

12   intent of this rule that a written report be a

13   prerequisite of the taking of a party of a de bene esse

14   deposition of his own witness."  So I think the law is

15   pretty clear on this.

16       MR. GALPERN:  Operative words is "his own

17   witness."  They're not saying -- I don't hear them

18   saying they're going to get expert testimony without an

19   expert report.  We're talking about a treater.

20       THE COURT:  A doctor doesn't have to -- he has

21   already indicated this doctor is not cooperative.

22   We're issuing a subpoena to force him to testify.  He

23   may never provide a written report.  Am I now supposed

24   to send a letter to him indicating -- or an order

25   indicating that he has to provide a written report?  I

Transcript - Case Management Conference (2006/02/23)

1   can't do that.  And I don't think that the rule goes

2   that far, that it intends that.

3       Okay.  McFarland, Doherty, any other issues?

4       MR. CORONATO:  We have also requested an IME.

5       MR. FERRARA:  We're happy to produce him at

6   any time within a couple hour drive of Philly.

7       MS. YEARY:  I think the issue is --

8       MR. DASSOW:  We'll call it an DME.

9       MS. YEARY:  On the issue of whether or not

10   somebody -- the plaintiff's lawyer was going to be

11   present, you're going to work that out?

12       MS. SCOVERN:  Yes.

13       MR. DASSOW:  I like the term DME much better.

14       MR. CORONATO:  So you're going to work with

15   the doctor to get us a date for the discovery?

16       MS. SCOVERN:  Yes.

17       MR. CORONATO:  Correct.

18       MR. FERRARA:  I missed that.

19       MR. CORONATO:  You're going to work with us to

20   get a date for the discovery deposition and the de bene

21   esse dep.

22       THE COURT:  Anything else on Klug?

23       MR. CORONATO:  We have an issue on McFarland,

24   Your Honor, that Mr. Raber was going to address.

25       MR. RABER:  Good morning, Your Honor.

29

Transcript - Case Management Conference (2006/02/23)

1       Very briefly, we issued a subpoena some time

2   ago for Mr. McFarland's employment records as a police

3   officer with the City of Gloucester.  We took a

4   deposition and discovered before the deposition that it

5   was confirmed at the deposition that the city is

6   withholding documents on the basis of confidentiality,

7   documents that relate to a domestic violence matter

8   involving the plaintiff and documents that relate to an

9   internal affairs investigation relating to the

10   plaintiff.

11       The city has cited the Prevention of Domestic

12   Violence Act along with some executive orders that

13   designate these documents as confidential.  We believe

14   that the discovery rules trump those confidentiality

15   provisions, that those confidentiality provisions are

16   really designed to protect records from public

17   disclosure in response to a public records act request

18   or something of that nature.

19       We have a protective order in place.  When we

20   questioned the witness at the deposition, who was the

21   police chief, the counsel for the city basically took

22   the position that absent a court order they wouldn't

23   produce these documents.  They refused to answer the

24   basic questions that you might find in the privilege

25   log, such as what is the date of the document, how many

30

Transcript - Case Management Conference (2006/02/23)

1   documents are there, who prepared them, who received

2   them, and we would just ask Your Honor to enter an

3   order compelling the city to produce these files.

4       MR. BUCHANAN:  We don't oppose it, Your Honor.

5   It is the Gloucester City Police Department.  You know,

6   they have their own procedures.  They have their own

7   protections, and, as I understand it, it is not

8   necessarily a confidentiality issue, per se.  I think

9   there's a statutory protection, and I don't practice in

10   the area generally.

11       I think there's a statutory protection for

12   internal files of police departments that precludes

13   them from production for any number of reasons.

14   Mr. McFarland doesn't have a dog in this race and

15   doesn't oppose the production of them to you subject to

16   the terms of the protective order.

17       MR. RABER:  The provisions that Mr. Buchanan

18   is referring to have a provision that says unless as

19   otherwise -- except as otherwise provided by law, so it

20   is clear that, you know, these are internal affairs

21   type confidentiality provisions that tell people if you

22   get a public records request for these documents don't

23   give them up, but that's different from a subpoena in a

24   civil litigation matter where we have Mr. McFarland as

25   a party, and we have a protective order in place here,

31

Transcript - Case Management Conference (2006/02/23)

1   and we're talking about discovery at this phase, so we

2   have an order here, Your Honor, that we would ask to

3   enter compelling the city to produce these documents.

4       MR. BUCHANAN:  The only observation I have,

5   Your Honor, is I think the Gloucester City Police

6   Department may want to be heard on the issue, so I

7   don't know what procedure you want to --

8       THE COURT:  Let's do something similar to what

9   we're doing with IMS.  I'll sign an order that says

10   that the Gloucester Police are to produce the records

11   and/or file a brief with the Court as to why they

12   shouldn't be produced within X days.

13       MR. RABER:  Okay.

14       THE COURT:  That will give their attorney

15   opportunity if he wishes to oppose it.  He may not

16   oppose it.  It is basically going to say the records

17   shall be produced unless a -- you know, an objection is

18   filed with the Court along with a brief by the counsel

19   for the city.  So if they don't feel like fighting it

20   then they'll just give you the records.  You can term

21   it that way.  Give them a date certain.  It can be

22   within two weeks or something.

23       MR. RABER:  We'll submit something to Your

24   Honor.  Thank you.

25       THE COURT:  And I'll sign it.

32

1   MR. BUCHANAN:  The one thing I would say is I
2   know that they're represented internally.  They don't
3   have outside counsel.
4       THE COURT:  I would assume it is the city
5   solicitor.
6       MR. RABER:  Yes.  I have the name in the
7   transcript.
8       MR. BUCHANAN:  You can give them a reasonable
9   time.  Two weeks sounds fair.
10      THE COURT:  Well, put in the order by such and
11  such a date or contacting the Court requesting an
12  extension because city solicitors sometimes don't
13  have -- it depends on the city.  Sometimes they don't
14  have any -- they have to type their own stuff.  It
15  depends.  Gloucester is -- I don't really know.  I
16  don't think it is that small.
17      All right.  Police departments hold on to
18  those internal affairs records for a lot of legitimate
19  reasons, But they're very protective of them.  Okay.
20      MR. CORONATO:  The other issues in McFarland
21  we worked out with Mr. Buchanan.
22      THE COURT:  One of the reasons is McFarland
23  has to continue to work with these officers.
24      MR. BUCHANAN:  He is a former now.
25      THE COURT:  At least that's not an issue.  How

1   about Doherty?
2       MR. CORONATO:  The plaintiff's deposition was
3   scheduled for March 1st, and I was told it has now been
4   adjourned by the plaintiffs.
5       MR. GALPERN:  Actually, I'm not sure that's
6   entirely accurate.  It was first noticed around 4:00
7   yesterday for March 1st, and I advised that I don't
8   know that it is going to go forward March 1st, but we
9   may -- we'll work with counsel, obviously, to get it
10  scheduled, but first notice I had for the Doherty dep
11  of March 1st was around 4:00 yesterday.
12      MR. CORONATO:  We're going to get alternative
13  dates then soon.
14      MR. GALPERN:  Certainly.  Absolutely.
15      MR. CORONATO:  And then we're also working
16  with them to schedule depositions of some physicians,
17  as well.
18      MR. GALPERN:  That's correct.
19      THE COURT:  Okay.  If you can't work it out,
20  set up a phone call with my -- call my secretary and
21  set up a time where I can do a phone conference at the
22  beginning or the end of the day and schedule dates.
23  I'm sure that's not going to be necessary.
24      Klug versus Merck?
25      MR. CORONATO:  Your Honor --

1   MS. YEARY:  You asked for another copy of the
2   stipulation.  Have you received it?  It was sent to
3   your office.
4       MR. GALPERN:  Your Honor, on December 14th I
5   advised Dechert that we're not pressing a claim for
6   lost wages.  As Your Honor knows, the long form
7   complaint has a prayer for lost wages, as well as
8   future lost earning capacity.  We have never waived
9   that in our facts sheet.  December 14th I sent them a
10  letter stating we are not pressing a claim for lost
11  wages.
12      Twelve phone calls and six faxes later they're
13  asking me to stipulate to both waiving lost wages and
14  lost earning capacity.  I advised an associate -- I
15  can't remember who it is at Dechert -- that we're not
16  pressing a claim for future lost earning capacity.
17  We're not waiving the claim for future lost earning
18  capacity, and I advised them of that in a letter of
19  February 15th.  Nevertheless, they're still asking me
20  to sign a stipulation waiving both issues.
21      THE COURT:  I don't think they want you to do
22  that.
23      MR. GALPERN:  Yes, ma'am.  The stipulation is
24  right here.  They're asking me to.
25      THE COURT:  They either want you to dismiss

1   both or give them authorizations relating to lost
2   earnings.
3       MR. CORONATO:  That's correct, Your Honor.
4       MR. GALPERN:  The lost earnings we're waiving.
5   Future lost earning capacity we're not waiving, and we
6   have provided documents.
7       THE COURT:  But a defendant is entitled to
8   know what a guy earned and what he was paid and what he
9   was making and what his past wage history is in order
10  to make a determination whether he has made a future
11  wage -- future capacity.  You can't say we don't want
12  you to look at anything in the past, and we're not
13  going to talk about anything in the past.  It is
14  understood you're not making a claim that he lost X
15  wages up until now, but that he has lost in earning
16  capacity, but to do that, that's fine.  You don't have
17  to stipulate to that.  But that means you have to
18  provide them with authorizations for the wage
19  information, so those authorizations should be signed
20  and returned to defense counsel.
21      MS. YEARY:  We just ask how quick.  Our
22  request for the authorization stems back to December
23  14th.
24      THE COURT:  They should be filed within seven
25  days, within a week.

Transcript - Case Management Conference (2006/02/23)

1    MR. GALPERIN:  Okay.

2    MS. YEARY:  The only reason I raised that is

3  it may hold up the taking of the plaintiff's deposition

4  if we don't have the information.

5    THE COURT:  He is not producing him on March

6  1st anyway.  You have seven days.  He has seven days to

7  get you the authorizations.

8    Proposed administrators.  There's an order you

9  submitted?  Any problem with that or has defense

10  counsel had a chance to review it?

11    MR. CORONATO:  I think this is an issue that's

12  been discussed a number of times, and I think --

13    MS. YEARY:  Not the last conference, the

14  conference before I believe you entered a ruling that,

15  basically, plaintiffs who file proposed administrators

16  would get 60 days to amend their complaint, get the

17  proper paperwork in and get the complaints amended.

18  That was placed into as one section of an order that

19  never got entered because everything else in the order

20  got resolved and didn't need an order, so we're

21  submitting it as a stand alone at this point, and I

22  think it just enforces your prior ruling.

23    MR. BUCHANAN:  It is consistent with Your

24  Honor's ruling?

25    THE COURT:  I think it is fine, unless anybody

37

---

Transcript - Case Management Conference (2006/02/23)

1  has a problem with it.

2    Okay.  On Martin Klineman.

3    MR. LIEVERMAN:  That's the same issue we

4  discussed before.  We're going to call San Francisco

5  counsel when we're done.

6    THE COURT:  Okay.  And the update on cases

7  pending for 30 months?  I have gotten that from Anapol

8  Schwartz.

9    MR. WEISS:  Can I respond?  You have our

10  letter, don't you?

11    THE COURT:  I said I have your letter.

12    MR. WEISS:  I'm making sure.

13    THE COURT:  It is only from you.

14    MR. BUCHANAN:  Well, my firm separately sent a

15  letter in, Your Honor.

16    MR. WEISS:  I have a copy of that.

17    MR. BUCHANAN:  I have a copy of ours, if you

18  would like it.

19    MR. CORONATO:  We sent one, as well, Your

20  Honor.

21    MR. BUCHANAN:  I think we're the only people

22  who have cases 30 months or older.

23    MR. SANDOVAL:  Rick Sandoval.  We filed

24  100 cases in the last 30 days, and we're looking

25  forward to sending you a letter, as well, with regard

38

---

Transcript - Case Management Conference (2006/02/23)

1  to 30-month use.

2    MR. WEISS:  This is a different issue.  These

3  are cases that have been pending for more than

4  30 months.

5    THE COURT:  Your new cases I'm not addressing.

6    MR. SANDOVAL:  Thank you, Judge.

7    THE COURT:  I'm trying to address the older

8  cases to figure out where we're going.  Several of

9  those are gastrointestinal cases, and we entered an

10  order that there had been an agreement to hold up on

11  the experts in gastrointestinal cases.

12    MR. WEISS:  Yes.

13    THE COURT:  I'm wondering how reasonable that

14  is from my point of view.  I think at some point

15  plaintiffs are going to have to either produce experts

16  on the gastrointestinal cases or not.  Mr. Weiss, did

17  you indicate you already have some experts?

18    MR. WEISS:  Yes.  We have case-specific

19  experts.

20    THE COURT:  Do you have your generic experts?

21    MR. WEISS:  Not yet.  I think we moved it off

22  to the fourth wave; is that correct?

23    MS. YEARY:  The actual cases themselves were

24  moved off, so I think it is more than just expert

25  discovery, if I'm not mistaken, that needs to be done

39

---

Transcript - Case Management Conference (2006/02/23)

1  in some of these gastric cases.

2    MR. SPIZER:  That's correct.  There was some

3  case-specific --

4    MS. YEARY:  Some was done, and then we decided

5  we were holding off on the gastro cases so there is

6  still some fact discovery --

7    THE COURT:  Quite frankly, I'm not quite as

8  interested in the fact-specific for the trial.  What

9  I'm looking for is do these cases withstand a summary

10  judgment motion.  I said that before.  Do plaintiffs

11  have experts that say the gastrointestinal warnings

12  were insufficient or that the product was defectively

13  designed, and if you have got those experts then, you

14  know, let's test that, let's have the generic experts

15  produced.

16    Obviously, that's not going to be

17  case-specific as to each case, but I suggested this a

18  while ago, and then we did the one, but it turned out

19  to be a very bad choice of cases.

20    MR. WEISS:  That was a case in which the

21  plaintiff read the label, was told the warnings by the

22  doctor and disregarded them.  That's why that was

23  granted summary judgment.

24    THE COURT:  And he testified no matter what

25  anybody told him he would have taken it because it was

40

1    the most wonderful drug in the world.

2        MR. WEISS:  That was his testimony.

3        MR. JACOBY:  Other than that it was a pretty

4    good case, Judge.

5        THE COURT:  Fortunately for some plaintiff's

6    attorney, I forget which one, that case is now gone.

7        MR. SPIZER:  That was ours, Your Honor.  I can

8    tell you Mr. Boyd does not remember testifying to those

9    statements.

10       MR. WEISS:  We had to send him his testimony

11   three times.  But be that as it may, we deferred

12   getting a generic expert on the gastro, and if you're

13   asking us to tee it up I guess we'll get it done.

14       THE COURT:  I think we should tee those up

15   now.  I don't think that you have to do it -- I

16   understand you're prosecuting for April trials.  I'm

17   not going to try to make you do this before those are

18   done.  I do think -- I mean, when are the wave four

19   experts reports due?  That would be six months.

20       MS. YEARY:  Right now all the expert deadlines

21   in the wave system have been put on hold.

22       MR. MAYER:  When will the fact discovery be

23   done on the fourth waive, because it does make -- if it

24   is coming up in a rhythm with actual facts and

25   individual cases it may make sense to just --

1        MS. YEARY:  Fourth wave discovery end date is

2    June 11th.

3        MR. WEISS:  So what we have done -- we only

4    have a couple gastro cases.  Most of them are heart

5    attacks, strokes and I think --

6        THE COURT:  The majority of cases are, but,

7    you know, I want to deal with the gastro cases.

8        MR. WEISS:  Except for the gastro cases we

9    have reports -- expert reports on the waves one and

10   two.

11       THE COURT:  Okay.

12       MR. WEISS:  So Merck didn't give us theirs

13   because we suspended them.  We have them in the file.

14   We actually have some of them.  But if we have until

15   July to get a generic report on the gastro that would

16   help.  I'm really not going to focus in on it before

17   April, and we have the trial the end of April.

18       THE COURT:  Okay.  So we're going to say by

19   July 1st?

20       MR. WEISS:  David?

21       MR. BUCHANAN:  That's fine.

22       THE COURT:  Provide generic gastro reports,

23   and you'll provide basically for any gastrointestinal

24   cases that were in that wave that have been filed in

25   the first group.

1        MR. SPIZER:  There might be -- beyond this

2    there might be a couple others -- I know at Anapol not

3    30, they haven't been around for 30 plus months, but

4    total we have a handful, maybe one or two more other

5    than what is on the list.

6        THE COURT:  If you're going to rely on

7    different generic experts --

8        MR. SPIZER:  No.

9        THE COURT:  If everything is going to be the

10   same generic experts, then fine.

11       MR. WEISS:  We'll tee it up.

12       THE COURT:  By July 1st?

13       MR. WEISS:  Yes.

14       THE COURT:  Plaintiffs will at least have

15   provided defendants with experts.  Obviously, if it is

16   a battle of the experts it is not a summary judgment

17   case anyway.  It is a question really on the face of

18   plaintiffs' expert reports is do they have enough.

19   That's really where we come down to probably.

20       MR. CORONATO:  Or we get more testimony like

21   we got from Mr. Boyd.

22       THE COURT:  That can happen in any individual

23   case.  I'm sure in 5,000 cases you'll get nice

24   testimony from plaintiffs like they have gotten

25   testimony that pleased them from the defendants.  It

1    works both ways.

2        MR. WEISS:  It sure does.

3        THE COURT:  I have been in places where I

4    wanted to crawl under the table, too.  I'm sure

5    everybody has.

6        Okay.  I guess that's -- I guess the other

7    thing is whether -- I don't know about suspending

8    expert discovery in these wave one and two cases.  Even

9    the heart attack ones, the case-specific discovery.

10       All right.  Let's just wait.  Let's get these

11   next two trials at least done and then while we're

12   moving into the third trial we might -- I might start

13   getting you to give me more case specifics.

14       MR. BUCHANAN:  To give you some comfort, what

15   we discussed at the last conference was that the fact

16   discovery having been completed I think we showed in

17   Cona and McDarby most recently that really within

18   30 days after they completed the fact discovery they

19   were exchanging expert reports, so however Your Honor

20   wants to proceed, as long as the fact discovery

21   proceeds, you know, the expert discovery will follow

22   shortly thereafter whenever Your Honor wants to set

23   specific deadlines.

24       THE COURT:  Okay.  All right.  At this point I

25   guess we're just going to focus on these cases and tee

1   up the gastrointestinal cases.

2        MR. BUCHANAN:  Your Honor, one other thing.

3        THE COURT:  I guess -- I mean, seriously, look

4   at some of these other cases you filed for other.

5        MR. WEISS:  The others were --

6        THE COURT:  There's a couple.  There's not

7   many.  I know if it is a --

8        MR. SPIZER:  I apologize for interrupting Your

9   Honor.  The other was an inadvertent error.  That was a

10  heart attack.  The other is a pulmonary embolism case.

11       MR. WEISS:  Which we have a report on.

12       MR. SPIZER:  And that report on the PE case

13  has been produced to Merck.  And the other, which was

14  the heart attack cardiac arrest, that's Michael Thomas.

15  That report has been produced to Merck on that case, as

16  well, so that was the -- I don't know if there was a

17  label for the PE case on the spreadsheet.

18       THE COURT:  Okay.  Anything else?

19       MR. BUCHANAN:  Your Honor, you sent a letter

20  out to all counsel asking them to update their spread

21  sheets.  I know we pressed on that.  I know Your Honor

22  had a technology meeting last week with representatives

23  from plaintiffs and defense.  I'm not sure how good

24  we're doing about getting correct information into

25  Dennis, but I know there's been push to do that.

45

1        THE COURT:  Dennis put a new spreadsheet up on

2   the website, so from now on you don't have to change

3   the ones you submitted, but from now on instead of just

4   using -- go to the website to get the new spreadsheet.

5   It does have just a little bit more -- he has more

6   controls on it now so duplicates can't be submitted and

7   some other things, and we're in much better shape.  Let

8   me check with Jill and I'll try to give you some

9   numbers on what we have left.  We're still trying to

10  get that printout of which would be impossible for you

11  to track down, which is the number of cases -- the

12  names, the docket numbers of the cases that have been

13  filed where we haven't got them.  Some of those,

14  obviously, were filed too soon to have provided them,

15  but we wanted to look back.  He is trying to do that,

16  actually, as we speak, so he had to clear up the

17  database itself for duplicates and things.

18       We were very fortunate.  Merck sent two people

19  and Mr. Buchanan sent one person, and we had three tech

20  people who were, you know, much, much smarter than we

21  are, and they were really wonderful.  They sat with

22  Jill and with Dennis all day really, and gave him a lot

23  of good ideas about how to do this so that it will all

24  work.  And most of them he has put in most of their

25  suggestions already and others we're going to be doing,

46

1   and I think it is really going to make it a more

2   accurate database so eventually we can give you the

3   results and give you the data so that you can look at

4   them.  I know defense wants to be able to review them

5   to see if they're accurate.  Michelle, did you have a

6   chance to look at them?

7        MS. YEARY:  Dennis provided us with what he

8   had available, and I have paralegals looking at it for

9   sort of anything that's large.  One of the problems we

10  had that maybe we should probably tell Dennis about was

11  just it looked like the names when they went in, some

12  went in last name first, some first name last; so it

13  was difficult from our perspective to alphabetize it.

14  So that was one global thing that maybe can be changed

15  to be helpful to people as they go forward.

16       THE COURT:  I know.  And we were doing an

17  Accutane database, and we're having first name last

18  name.  But, apparently, it was pretty much agreed by

19  everybody, and, again, these were the tech people that

20  we talked to that they're not going to change that in

21  the database now.  If you do a search for Smith it is

22  still going to come up whether it is James Smith or

23  Smith James, but you're right, if you want to

24  alphabetize it it won't work.

25       MS. YEARY:  And that was our problem for doing

47

1   the error check, which is all our records were in

2   alphabetical order, so our paralegals are going through

3   it, and they're flagging things that they think may be

4   significant where our records don't jive, and we can

5   talk to plaintiffs as to why this case is different.

6        MR. BUCHANAN:  What is the process for

7   corrections, Your Honor?  I sent out some, you know,

8   some spread sheets that we were able to filter and see

9   gaps where people had missed certain fields, how is he

10  going to do the updates?

11       THE COURT:  Let me have Jill come up and

12  explain it to you, but he has the spreadsheet there,

13  and it is -- actually on the spreadsheet now there is a

14  category for whether it is a new spreadsheet or an

15  update or an additional so he can tell, and, if it is

16  additional you just have to fill in the change or the

17  something that wasn't filled in before or the change,

18  and he will then be able to put it in.

19       So it is going to, hopefully, be streamlined.

20       MS. YEARY:  And we won't be submitting any

21  changes because plaintiffs' information if we find an

22  error we'll submit a letter to you guys and say our

23  records don't jive and see if we can't figure out why.

24       THE COURT:  See if they can be worked out.

25  Okay.  But if you haven't done them -- I assume

48

1    everybody in the room has sent in all their sheets for

2    all their cases.  Is this something you wouldn't have

3    done yet.

4         MR. SANDOVAL:  We have a copy for you today,

5    Judge.  The last hundred cases we filed the last

6    30 days.  We'll be doing that every month.  We have a

7    hard copy.

8         THE COURT:  Okay.

9         MR. BUCHANAN:  Your Honor, I received a few

10   requests from people today and then prior to today

11   concerning the time of the trial and when opening

12   statements were going to be.  Are opening statements

13   expected to be the Monday after next?

14        THE COURT:  The opening statements will be

15   9:00, Monday, March 6th, and the jury questionnaires

16   will have been delivered today and printed, and they

17   will be given to the jurors Monday.  And the jurors

18   that we choose after we eliminate some jurors based on

19   the questionnaires the jury pool will return on

20   Wednesday for jury selection.  Tuesday, the rest of

21   Tuesday when we're not reviewing questionnaires and

22   Thursday and Friday will be for the motions in limine

23   and any other 702 motions.

24        MR. LIEVERMAN:  Do we know if Court TV is

25   carrying it?

1         THE COURT:  Court TV is covering the entire

2    trial.  I have told them they cannot cover the motions.

3    We don't need that, so they're -- but they are covering

4    the trial and MSNBC or whoever did it last time is

5    covering the openings and closings and they said any

6    significant witness.  I guess that's their decision.

7         MR. JACOBY:  Are jury lists going to be made

8    available?

9         THE COURT:  We have them already.  They have

10   been provided to counsel, and I think we have 289

11   jurors, and I think we gave you a better list this time

12   than we did before.  We gave you the name and address

13   and employment, right?

14        MS. YEARY:  Yes.

15        THE COURT:  For those 289.  You have got them.

16        MR. JACOBY:  They aren't available?  Because I

17   called yesterday and was told they were not available.

18        THE COURT:  Are we talking about the juror

19   list?

20        MR. JACOBY:  Yes.

21        MR. CORONATO:  Carmen e-mailed them.

22        THE COURT:  They're out.

23        MR. BUCHANAN:  Tuesday.

24        MR. JACOBY:  All right.

25        THE COURT:  Do plaintiffs have them?

1         MR. JACOBY:  I have not seen the list.

2         MR. CORONATO:  I know there was plaintiffs'

3    counsel listed on the e-mail.  Maybe it didn't go to --

4         THE COURT:  Plaintiffs' counsel for the trials

5    are in deps now.  You can pick them up.  Heather will

6    make you a copy now.  They're not that long.  There is

7    like 16 pages.

8         MR. JACOBY:  I would appreciated that.  Thank

9    you.

10        All right.  Anything else?

11        MR. BUCHANAN:  One thing we didn't raise, Ben,

12   is the -- it was a residual IMS issue.  The timing for

13   the production of the prescribing data, and I think you

14   guys were going to talk, and I wanted to get something

15   on the record because I'm not sure when we're going to

16   be back here again -- it may not be until April --

17   concerning the production of that.

18        MR. BARNETT:  What we're talking about is the

19   full production of all the IMS data as opposed to what

20   we're doing for the trial cases where we just give them

21   the piece that relates to the prescribing physician.

22   What we're looking at doing, and I think we're going to

23   be able to do the production within 30 days, so,

24   hopefully, a month from now it will all be produced.

25   We're also looking at, because we know that the trials

1    are coming up, is trying to do a New Jersey specific

2    extract of that data, which may be of some value since

3    all the trial cases involve New Jersey plaintiffs and

4    presumably New Jersey prescribers.

5         If we can do that we will do that before the

6    30-day period.  I should try to get that out fairly

7    quickly, but the goal is to try to get it out in

8    30 days.

9         THE COURT:  That sounds good.

10        MR. MAYER:  It depends on getting over that

11   hump with IMS.

12        MR. BARNETT:  We have to get past the IMS

13   issue.

14        MR. BUCHANAN:  All of that is subject to the

15   confidentiality issue.

16        THE COURT:  Let's get the order signed today.

17        MR. BUCHANAN:  We'll hammer it out when we're

18   done.

19        Your Honor, we're off in March, I assume,

20   there's not going to be --

21        THE COURT:  I think we should notify you of

22   the next date.  It will be between the next two trials,

23   so we're finishing up the week of March 27th, and I

24   would think some time in April, the second or third

25   week.

1  THE COURT REPORTER:  The next meeting is
2  scheduled for Monday, April 10th.
3  THE COURT:  Okay.  Monday, April 10th.  Thank
4  you very much, Regina.
5  MR. CORONATO:  Your Honor, I have somebody
6  from O'Melveny that is calling in.  Do you want to do
7  it here or in your chambers?  Then we have to discuss
8  the LoPresti issue.
9  THE COURT:  What is the issue?
10  MR. LIEVERMAN:  The issue is just scheduling.
11  THE COURT:  Can't the two of you work it out?
12  MR. LIEVERMAN:  We hopefully can.  I thought
13  he was going to be here and we could do it before.
14  THE COURT:  Why don't you try to talk to him
15  on the phone first, and if there's anything for me to
16  do I'll listen to you.  I assume you can work it out,
17  but if you can't let me know, and I'll talk to you
18  about it.
19  MR. LIEVERMAN:  Very good, Your Honor.  Thank
20  you.
21  THE COURT:  All right.  In the matter of
22  LoPresti versus Merck there was a letter from
23  Mr. Ferrara addressing some outstanding discovery
24  issues.
25  MR. DASSOW:  I think Miss Scovern --

53

1  THE COURT:  Has that been resolved the 1099s?
2  MS. DASSOW:  It has not.  Neither one has been
3  resolved, Your Honor.  We attempted to, and we have a
4  disagreement, and we need to chat with you.  Miss
5  Scovern is going to lay it out for you because she was
6  more in charge of documents.
7  MS. SCOVERN:  Essentially we have been
8  requesting the 1099s for the prescribing physician
9  since the first week of February, and in a letter dated
10  February 14th we were assured they would be produced
11  for Dr. Solomon and his practice on February 17th.  And
12  to date we have not received them.
13  THE COURT:  Okay.  So what's with that?
14  MR. YANNELLA:  Well, just as a correction we
15  did send the 1099s Merck had on the 17th.  I think
16  there is a disagreement as to the form of the 1099s,
17  and the plaintiffs are -- I guess they're looking for
18  what was physically sent, the paper that is, on the IRS
19  paper.  It says "1099."
20  What I explained to the plaintiffs is Merck
21  doesn't retain the paper copies.  Everything is in an
22  electronic database, and it is the same data, it is
23  just in an electronic database.  We printed it out and
24  sent it to them on the 17th.  I PDF'd a copy to
25  Mr. Dassow, so that is the issue for Dr. Solomon, who

54

1  is a prescriber.
2  MR. DASSOW:  Your Honor, here is what was
3  produced to us.  What we were told was this was a
4  document that was a 1099.  I send 1099s out myself.
5  They don't look like this.  This is what was produced.
6  Secondly, with regard to the 1099s what was
7  told to me was that these are the 1099s that are
8  related to VIOXX.  And I am looking for the actual
9  1099s sent to the IRS because those are the ones that
10  would be the best evidence of what our prescriber was
11  given.  That totals, Your Honor, approximately $230,000
12  at this time.  That does not include his group.  He was
13  also in clinical trials with Merck, and that may have
14  been paid to his group.  I need to know exactly how
15  much Dr. Solomon was paid by Merck between '99 and
16  2004.
17  MR. YANNELLA:  I can clarify that.  That's not
18  related just to VIOXX.  His 1099 is for everything.
19  THE COURT:  Why are they redacted?
20  MR. YANNELLA:  It is his social security
21  number and his address, that's what we redacted.
22  MS. SCOVERN:  Do they include his group?
23  MR. YANNELLA:  That's just Dr. Solomon.  Those
24  are the.ones personally for Dr. Solomon.  The group
25  ones I think we have a further objection on.

55

1  MR. FERRARA:  Well, when we were in our
2  conference call the only time we asked Your Honor to be
3  on a call, because we have successfully worked things
4  out, on February 15th on that call Your Honor may
5  recall about four or five times Mr. Dassow said, "Are
6  we going to get these by Friday," and it got to a point
7  where I'm thinking, man, you know, it's four or five
8  times and every time it was represented that by Friday
9  we would get it all.  There was no objection, there was
10  no group, there was no nothing.  And then Friday
11  came and went and we didn't get them.  So that's our
12  frustration.
13  MR. DASSOW:  And, you know, Your Honor, there
14  is a specific form that is sent to the IRS under his
15  social security number, and it's a five-by-seven; I
16  have given them to independent contractors myself, and
17  they don't look anything like that.  There's a specific
18  form.  I have tried to get my assistant to fax one, get
19  one.
20  THE COURT:  I know what a 1099 looks like.
21  MR. BARNETT:  But we don't -- my understanding
22  and, Phil, tell me if I'm wrong, we don't retain the
23  copies of the 1099s that were sent.  What we have is
24  the electronic data that the accounting department or
25  whoever generates the 1099s.  I mean, if it is really

56

1   an issue of wanting the actual 1099s you can ask the
2   doctor for the 1099, couldn't you?
3       MR. FERRARA:  Merck has to keep the record for
4   seven years or longer.
5       MR. DASSOW:  Your Honor, if the SCC -- if the
6   SCC came in or somebody like that and asked for the
7   1099 they would have them in 30 seconds.  I keep them
8   in a file all the way back -- I can call, boom, pull
9   them out.
10      MR. CORONATO:  I think Merck has additional
11  independent contractors than Mr. Dassow.
12      THE COURT:  Well, I'm not satisfied that Merck
13  doesn't have them.  It may be true.  And if it is true
14  then I need a certification from the head of their
15  accounting department that you have no copies of the
16  1099s.  And I need that by Monday.  And if they don't
17  have any other copies, and this is the only records, is
18  there any place where they're added up?  There's
19  nothing?
20      MR. BARNETT:  They're done on an annual basis.
21      MR. YANNELLA:  They're for different years.
22      THE COURT:  And what is wrong with the group?
23  If this is all you have, you can't provide something
24  you don't have.
25      MR. YANNELLA:  Exactly.

57

1       THE COURT:  If you don't have 1099s I can't
2   make you produce 1099s, but I want a diligent search to
3   make sure this isn't the way they usually have the
4   records, but somebody has the 1099s somewhere.
5       MR. BARNETT:  We will do that.
6       THE COURT:  If they exist I want them in their
7   hands on Monday or I want a certification to them on
8   Monday signed by a high level accounting person that
9   they are not kept.
10      MR. YANNELLA:  Fair enough, Your Honor.
11      THE COURT:  And what about the group?
12      MR. YANNELLA:  Well, the objection on the
13  group, Your Honor, is that, again, the 1099s are not
14  VIOXX only.  They're all payments, VIOXX, Fosamax,
15  anything that's Merck related would be in a 1099 in the
16  doctor's group.  It is not just the doctor.  There's
17  other doctors who work with them.  They have privacy
18  concerns.  I can't imagine that they want their tax
19  records floating around in a litigation.  Most of these
20  doctors have nothing to do with the litigation.  The
21  only doctor that has anything to do with the
22  litigation, Dr. Solomon, they are the 1099s.
23      MR. DASSOW:  Here is the letter specifically
24  from Tessie that says on February 16th "and the 1099s
25  for Dr. Solomon will be produced on February 17th."

58

1   "And his group," that's what it says.
2       MR. BARNETT:  And I think, Your Honor, because
3   I have talked with -- I did bother Charlie Cohen about
4   this because there was concern, and we agreed to do
5   this, and he said his understanding was, and I'm
6   replaying what he told me, is the group he thought was
7   if Solomon had his own personal corporation.  In other
8   words, if the 1099 was to Solomon or Solomon PC as
9   opposed to the group.
10      MR. DASSOW:  Your Honor, the doctors in his
11  group were detailed by the people I just deposed these
12  three weeks Dr. Maher, sorry I have slept since then.
13      THE COURT:  How big is his group?
14      MR. BARNETT:  I don't know.
15      MR. YANNELLA:  I think it has changed over
16  time, but it is four or five doctors.
17      MS. SCOVERN:  Four physicians in total.
18      MR. DASSOW:  And three of the four for sure I
19  will tell you I asked the witnesses yesterday about
20  detailing Maher, Solomon, and I can't think of the
21  third one.
22      MS. SCOVERN:  Dr. Linda Brecker.
23      MR. DASSOW:  Those three were detailed with
24  regard to VIOXX, and they did preceptorships.  They did
25  tutorials.  They did colloquiums.

59

1       THE COURT:  The bottom line is these people,
2   the group -- it is very relevant how much money his
3   group got, and it is very relevant whether it was from
4   VIOXX or something else to show any kind of bias in
5   favor of Merck.  I mean, there's no question about that
6   if he is getting a substantial amount of money from
7   Merck, even if it is from a nonVIOXX product you might
8   not want to make Merck angry.  It goes directly to a
9   bias issue, and as long as Dr. Solomon -- you know, if
10  Dr. Solomon was an employee of one of these doctors,
11  and, you know, or something different, but if he owns
12  the group, owns a fourth of the group, owns a part of
13  the group if he is a shareholder in a corporation or he
14  is a partner with these people, then they are involved,
15  their tax returns are involved, and they have to be
16  produced.  Just the 1099s, not their personal tax
17  returns.
18      MR. DASSOW:  The 1099s.
19      THE COURT:  The 1099s all you have to
20  reproduce.  Get them to them by Monday.
21      The second issue is in the 25,000
22  or so documents per rep that we have gone through in
23  none of those productions do they contain the American
24  Express Merck credit card monthly statements.  Those
25  are, I think -- I'll be honest with you, I think I

60

1  would like to use those, those are probably good pieces
2  of evidence to show what they were doing.  So I'm
3  asking -- these are Merck credit cards.  These are not
4  personal credit cards.  They can redact the numbers.
5  I'm not going to go to dinner with a Merck credit card,
6  but I'm looking for the monthly statements from 1999
7  through 2004 for the reps that we have asked for, and I
8  have been rebuffed every time I have asked for them.
9           Secondly, yesterday when I asked for a copy
10  of -- asked for them to make a copy of the credit card
11  and that wasn't given to me.  They had it in their
12  pocket, and I said just make a copy of the credit card,
13  so I know what I could be looking for.  I was told no.
14  So --
15           THE COURT:  Each of the detail reps is given
16  an American Express corporate credit card?
17           MR. DASSOW:  Yes.
18           THE COURT:  And they have an individual
19  statement that's issued --
20           MR. DASSOW:  That's correct.
21           THE COURT:  -- for them?
22           MR. DASSOW:  For them.  And they get a monthly
23  statement, and all of them told me they specifically do
24  not use that credit card ever, ever for personal use,
25  so I'm not getting anything, you know, that they have

1  many, a year to 18 months.  That even would cover right
2  at the end.  They're so easy to get for Merck, and it
3  is going to be impossible for us to get, impossible
4  probably for American Express.
5           THE COURT:  Do you want time to check with
6  your people on this?
7           MR. BARNETT:  I do.
8           THE COURT:  Okay.  Monday you're going to
9  provide the group and the 1099s or the certification,
10  and on Monday I'll expect a phone call.  We'll have a
11  phone conference at 3:00 Monday, and at 3:00 Monday
12  you'll address, yes, we have got them, we'll produce
13  them; they don't want to produce them for X reason,
14  whatever.
15           MR. BARNETT:  That's fine.
16           MR. BUCHANAN:  I don't know if Mr. Dassow was
17  clear, but the concern was the American Express receipt
18  or whatever the bill be the one that's coded to reflect
19  the client information or, you know, the doctor that
20  was called upon if there is such a statement that's
21  submitted to Merck for reimbursement.
22           MR. DASSOW:  The way it goes I can tell you
23  exactly how it goes.
24           THE COURT:  Before they go looking, let's know
25  exactly what you want.

1  used for personally for this credit card.  It says
2  Merck and Company on the credit card, and it is for
3  personal use only.
4           THE COURT:  It is not for personal use.
5           MR. DASSOW:  It is not for personal use, and
6  it is used for dinners, it is used for the whole
7  shooting match.  And it is thousands of dollars.
8           MR. FERRARA:  Just so you know, Judge, when
9  Rob reported this back to me we immediately served a
10  subpoena on American Express to produce it, but I know
11  that they are going to -- Merck's lawyers and American
12  Express lawyers are going to fight that, I'm sure.
13           MR. BARNETT:  I don't think we should prejudge
14  the issue.  This has come up fairly recently.  The
15  question I was just asking Phil is whether this is
16  stuff that we have within our possession or within the
17  possession of the representative.
18           MR. DASSOW:  And I took the deposition.
19           THE COURT:  Did you resolve the issue?
20           MR. LIEVERMAN:  We'll contact you tomorrow
21  because he really wanted to talk to Jeff Judd.
22           THE COURT:  Okay.  Good.
23           MR. DASSOW:  In deposing a couple of the reps
24  they said -- one of them said they have statements back
25  in their house back 18 months.  They weren't sure how

1           MR. DASSOW:  I want the American Express
2  statements like if you have on your credit card, Your
3  Honor.
4           THE COURT:  But it is just going to say, you
5  know, Italian restaurant, $75, you know, Borgata room,
6  $500, whatever.
7           MR. DASSOW:  It is going to have the whole
8  statement, that's correct.
9           THE COURT:  But it is not going to say which
10  doctor it is done for.
11           MR. BUCHANAN:  When they submit it for
12  reimbursement if they have to code it to a client, if
13  they have to code it for a particular reimbursement
14  item that's the goal, I think, is to try and tie it to
15  the expenses to the reimbursement, so it would probably
16  be whatever department within Merck handles the T and E
17  requests, travel and entertainment, that's where it
18  should come from.
19           THE COURT:  So what you want are the monthly
20  statements with whatever documents are submitted --
21  vouchers are submitted?
22           MR. DASSOW:  That coincide.
23           THE COURT:  You don't have to request
24  reimbursement to justify them.  I'm sure the company
25  wants some type of --

1    MR. FERRARA:  When you go to the American
2  Express website they brag on companies over a billion
3  dollars what they give them.  American Express works
4  with Merck and gives them exactly what David and Rob
5  have said.
6    MR. MAYER:  So what you're looking for is
7  related to these doctors?
8    MR. DASSOW:  I'm looking for that, but --
9  that's correct, but I'm specifically looking for all
10  the statements back.  There's going to be 12 of them
11  per rep from '99 to 2004.
12    MR. CORONATO:  But you only want the payments
13  made for these doctors?
14    MR. DASSOW:  No, no, no.
15    MR. RABER:  How long is this trial going to
16  last?
17    MR. DASSOW:  That will be 20 minutes,
18  15 minutes.  I just want them all because I can add
19  them up and see what they did and see who was there,
20  especially Dr. Solomon, a lot.
21    MR. CORONATO:  Your Honor, what difference
22  does it make or what is the relevance?
23    MR. DASSOW:  I'm not giving away my trial
24  strategy, but I can tell you the amount of money spent
25  with regard to Dr. Solomon is pretty significant.

65

1    MR. CORONATO:  But if the money was spent on a
2  doctor who didn't prescribe VIOXX, had nothing to do
3  with VIOXX, what difference does it make?
4    MR. DASSOW:  I can -- well, because when you
5  go to the dinner meetings they just explain to me
6  there's five GP's sitting there and Dr. Solomon is
7  leading the charge here, and there's a charge from one
8  of the reps, and it will say Le Bec Fin, it will say
9  $3,800, and I can tie that together on who was there.
10    MR. YANNELLA:  The expenses that are
11  associated with the dinners and remote speaker programs
12  and other programs are all produced through the IMED
13  MESA database.  It is a field.
14    MR. DASSOW:  I'm asking for what we talked
15  about.
16    THE COURT:  I want you to produce the
17  statements, unless you have a good reason not to do so
18  Monday.  I'll listen to you at 3:00.  You know what
19  they want.  See how hard it is, and see what the issues
20  are, and then I'll address it with you.
21    MR. DASSOW:  That's it, Your Honor, thank you.
22    MR. BARNETT:  Thank you, Your Honor.
23    THE COURT:  And you're going to try to type up
24  orders to give me those orders today?
25    (End of proceedings.)

66

C E R T I F I C A T I O N

I, REGINA A. TELL, C.S.R., R.P.R., C.R.R., License
Number 30X100161000, an Official Court Reporter in and
for the State of New Jersey, do hereby certify the
foregoing to be prepared in full compliance with the
current Transcript Format for Judicial Proceedings and
is a true and accurate compressed transcript to the
best of my knowledge and ability.

_____  02-25-06

Regina A. Tell, CSR-RPR-CRR
Official Court Reporter
Atlantic County Courthouse
Atlantic City, New Jersey

67

```
                SUPERIOR COURT OF NEW JERSEY
                ATLANTIC COUNTY
                CASE TYPE NO. 619
---------------------------x
IN THE MATTER OF IN RE:
VIOXX
                          STENOGRAPHIC TRANSCRIPT
                             OF:
---------------------------x  - MONTHLY MEETING -
        PLACE:  ATLANTIC COUNTY CIVIL COURTHOUSE
                1201 BACHARACH BOULEVARD
                ATLANTIC CITY, NJ  08401
        DATE:   JANUARY 13, 2005
B E F O R E :
        THE HONORABLE CAROL E. HIGBEE, J.S.C.
TRANSCRIPT ORDERED BY:
        THEODORE MAYER, ESQ. AND DAVID BUCHANAN, ESQ.
A P P E A R A N C E S :
        CHRISTOPHER SEEGER, ESQUIRE
        DAVID BUCHANAN, ESQUIRE
        MATTHEW J. MAIORANA, ESQUIRE
        SEEGER, WEISS
        ATTORNEYS FOR THE PLAINTIFFS
        DAVID JACOBY, ESQUIRE
        GREGORY S. SPIZER, ESQUIRE
        SOL H. WEISS, ESQUIRE
        ANAPOL, SCHWARTZ, WEISS, COHAN, FELDMAN & SMALLEY
        ATTORNEYS FOR THE PLAINTIFFS
        LEE BALEFSKY, ESQUIRE
        KLINE & SPECTER
        ATTORNEYS FOR THE PLAINTIFFS
              *       *       *       *       *

                   REGINA A. TELL, CSR-CRR
                   OFFICIAL COURT REPORTER
                   1201 BACHARACH BOULEVARD
                   ATLANTIC CITY, NJ  08401
```

1

```
        JENNIFER YOUNG, ESQUIRE
        SULLIVAN, PASAIN, BLOCK, McGRATH & CAMARO
        ATTORNEY FOR THE PLAINTIFFS
        DANIEL J. FETTERMAN, ESQUIRE
        KASOWITZ, BENSON, TORRES & FRIEDMAN
        ATTORNEY FOR THE PLAINTIFFS
        MICHAEL FERRARA, ESQUIRE
        ALEX KRASNITSKY, ESQUIRE
        THE FERRARA LAW FIRM
        ATTORNEY FOR THE PLAINTIFFS
        DANIEL S. WEINSTOCK, ESQUIRE
        EDMUND GOLDIS, ESQUIRE
        FELDMAN, SHEPHERD, WOHLGELERNTER & TANNER
        ATTORNEYS FOR THE PLAINTIFFS
        JOHN BALDANTE, ESQUIRE
        LEVY, ANGSTREICH
        ATTORNEY FOR THE PLAINTIFFS
        ROBERT DASSOW, ESQUIRE
        HOVDE, DASSOW & DEETS, LLC
        ATTORNEY FOR THE PLAINTIFFS
        SUSANNE N. SCOVERN, ESQUIRE
        ALEXANDER, HAWES & AUDET
        ATTORNEY FOR THE PLAINTIFFS
        CHRISTOPHER M. PLACITELLA, ESQUIRE
        WILENTZ, GOLDMAN & SPITZER
        ATTORNEY FOR THE PLAINTIFFS
        RONALD JONAS, ESQUIRE
        SANFORD, WITTELS & HEISLER
        ATTORNEY FOR THE PLAINTIFFS
        MICHAEL WEINKOWITZ, ESQUIRE
        LEVIN, FISHBEIN
        ATTORNEY FOR THE PLAINTIFFS
        JULIE C. PARKER, ESQUIRE
        SACKS & WESTON
        ATTORNEY FOR THE PLAINTIFFS
```

3

```
        EDWARD G. D'ALESSANDRO, JR., ESQUIRE
        D'ALESSANDRO, JACOVINO & GERSON
        ATTORNEY FOR THE PLAINTIFFS
        NAVAN WARD, JR., ESQUIRE
        SCOTT LEVENSTEN, ESQUIRE
        BEASLEY, ALLEN, CROW, METHVIN, PORTIS, MILES, P.C.
        ATTORNEY FOR THE PLAINTIFFS
        ELIZABETH J. CABRASER, ESQUIRE
        PAULINA DO AMARAL, ESQUIRE
        LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
        ATTORNEY FOR THE PLAINTIFFS
        ESTHER BEREZOFSKY, ESQUIRE
        WILLIAMS, CUKER & BEREZOFSKY
        ATTORNEY FOR THE PLAINTIFFS
        SUSANNE SCOVERN, ESQUIRE
        ALEXANDER, HAWES & AUDET
        ATTORNEY FOR THE PLAINTIFFS
        TERRENCE SMITH, ESQUIRE
        DAVIS, SAPERSTEIN & SALOMON, P.C.
        ATTORNEY FOR THE PLAINTIFFS
        DAVID J. COHEN, ESQUIRE
        SPECTOR, ROSEMAN & KODROFF, P.C.
        ATTORNEY FOR THE PLAINTIFFS
        RICHARD D. MEADOW, ESQUIRE
        LANIER & ASSOCIATES, LLC
        ATTORREYS FOR THE PLAINTIFFS
        JOSEPH MONACO, ESQUIRE
        TRIEF & OLK
        ATTORNEY FOR THE PLAINTIFFS
        MICHAEL GALPEN, ESQUIRE
        GENE LOCKS, ESQUIRE
        STEVE KNOWLTON, ESQUIRE
        CHRISTINE KLIMCZUK, ESQUIRE
        LOCKS LAW FIRM
        ATTORNEYS FOR THE PLAINTIFFS
        MOSHE MAIMON, ESQUIRE
        LEVY, PUILLORS & KONIGSBERG
        ATTORNEY FOR THE PLAINTIFFS
```

2

```
        STEVEN L. SCHEPPS, ESQUIRE

        GORDON & GORDON

        ATTORNEY FOR THE PLAINTIFFS

        JACQUILINE DeCARLO, ESQUIRE

        HOBBIE, CORRIGAN, BERTUCIO & TASHJY, P.C.

        ATTORNEY FOR THE PLAITIFFS

        THEODORE V.H. MAYER, ESQUIRE

        WILFRED CORONATO, ESQUIRE

        CHARLES W. COHEN, ESQUIRE

        JENNIFER GRAHAM, ESQUIRE

        HUGHES, HUBBARD & REED, LLP

        ATTORNEYS FOR THE DEFENDANT, MERCK

        DIANE P. SULLIVAN, ESQUIRE

        DECHERT, LLP

        ATTORNEYS FOR THE DEFENDANT, MERCK

        JEFFREY JUDD, ESQUIRE

        O'MELVENY & MEYERS, LLP

        ATTORNEY FOR THE DEFENDANT, MERCK
```

4

1  THE COURT: Stay seated. We, obviously, have
2  too many people, so we have to work on that. Maybe
3  we're going to have to say people whose name begin with
4  A, C and E, we can alternate the alphabet and come to
5  one meeting then the other people come to another
6  meeting. We have to really -- I do want you all to
7  know, and I'm serious about this, you don't need to
8  come to every meeting from my point of view. I know
9  some of you -- I feel troubled saying it because I know
10  if I was in your shoes I would probably want to come to
11  every meeting, but if you're not, you know -- you can
12  get a transcript of the meeting. You can always buy a
13  complete copy of what is said. Very little is said off
14  the record. I'm not that funny, so there's very little
15  humor. I'm not very good at jokes, so there's not much
16  humor here, and there is not much entertainment, so if
17  you feel that, you know, you're coming just because you
18  want to show that you're concerned and interested you
19  can do the same by reading the transcript and by
20  keeping in touch -- I know they won't like to hear
21  it -- but keeping in touch with liaison counsel,
22  sending them suggestions of things to address or things
23  you're concerned about or sending a letter to the Court
24  about things you're concerned about. I'm not saying
25  you can't come. I'm not going to preclude people at

1  Anstice, who is the head of marketing by mid February.
2  That --
3  THE COURT: Is that a problem?
4  MS. SULLIVAN: Your Honor, we have -- Mr.
5  Mayer is actually outside talking now. We have
6  given -- as Mr. Buchanan knows we have given them
7  dates. They have taken more than a dozen Merck
8  depositions. They have got 15 now on calendar for
9  January and February. There's only a handful left that
10  we're working very hard on scheduling. Mr. Anstice was
11  one that was particularly difficult because he is an
12  international -- and I think Mr. Mayer is about to
13  confirm some dates. It may not be in February, it may
14  be early March, but we're working hard on getting dates
15  for the remaining handful of witnesses, and Mr. Mayer
16  can report when he gets back, but we have been working
17  hard and have provided dates in addition to the more
18  than dozen of them have been scheduled have given them
19  dates for 16 additional witnesses for January and
20  February. A couple had to be moved because of
21  scheduling issues on their end, which happens, but I
22  think that we have been working pretty hard to get
23  witnesses.
24  MR. SEEGER: I wasn't disputing that I was
25  responding to what we need to get the case ready by the

1  this point. Obviously, I couldn't or I wouldn't.
2  All right. Let's proceed with the issues.
3  Let's start with depositions. Do we have a schedule of
4  depositions?
5  MR. BUCHANAN: We have a number of them
6  scheduled, your Honor. We had about 20 witnesses that
7  were pending dates on. We have plugged dates in for
8  several of those witnesses. The calendar for the rest
9  of the month just for the Court's benefit and everyone
10  in the room, since we're all here, we have Wendy Dixon
11  on the 19th. We have a continuation of a witness Simon
12  on the 19th. We have Jennifer Ng, N-G, on for the
13  21st. We have Deborah Shapiro on for the 25th. We
14  have Elliott Barr on for the 28th.
15  Defendants previously had given us a witness
16  for the 31st that we need to reschedule. There are
17  several set in February, a few in March, several that
18  we have requested, particularly senior people, we
19  continue to await dates on. And we're looking for some
20  guidance, and Mr. Seeger is prepared to address that.
21  THE COURT: All right. Okay. Who do you
22  need?
23  MR. SEEGER: Well, here's the way it is
24  laying out, and because we have a discovery cutoff in
25  April, and what we would like to do is have David

1  end of April. Anstice any time in February, I think I
2  suggested mid February before the end of February would
3  be fine. We would like to do Scolnick, whose name has
4  come up every status conference. We don't have a date
5  on him. End of the first week of March we thought
6  would be good because we would like to do Gilmartin and
7  Kim in the middle of March, which, you know last time
8  we argued this I think the Court was ready to ask the
9  defendant to produce him the first week in March, but
10  we have agreed to give them some breathing room on
11  that. But we have a lot of slots open in February, and
12  we would like to use February and March as months to
13  really get the case done.
14  THE COURT: What do plaintiffs need -- do you
15  need all these deps before you do your expert reports?
16  MR. SEEGER: Well --
17  MR. BUCHANAN: We're trying to get -- we have
18  identified those we need prior to our expert reports.
19  That's what we have been trying to work with the
20  defense on, and more importantly, your Honor, or as
21  importantly, we have about 45 days left in the
22  discovery schedule on the first trial cases as of mid
23  March. I anticipate that some of these witnesses we're
24  talking about in the first and second week in March may
25  lead to some supplemental clean-up deps, and we just

1   need some time built into the schedule to allow for

2   that.  That's why we're going to mid March beyond and

3   don't really want to go any further than that.

4           The thing that's happening, though, your

5   Honor, is that I realize the most senior people have

6   the greatest scheduling issues, but the most senior

7   people are also those that we're not getting dates for.

8   And these are not witnesses that have been newly

9   requested.  Anstice, Gilmartin, Kim are witnesses that

10  you have heard about from conference to conference.

11  They are witnesses we have yet to receive dates for.

12  Many of these witnesses we asked for back in August.

13  We understand they're trying to work through a couple

14  of issues.  It is just incomprehensible to me that a

15  guy who has been traveling overseas has not come home

16  in four months.

17          MR. SEEGER:  There are a couple witnesses

18  with regard to expert reports we were going to propose

19  some time in February; Watson Morris and Neese (ph) we

20  had a scheduling problem with Neese (ph), but they're

21  accommodating us by moving that to the end of February.

22  But these are with regard to getting expert reports

23  done and out to the defendant by the beginning of

24  April, which is what we agreed to do, April 1st.

25          MR. BUCHANAN:  That's our proposal.  I don't

9

1   think the defense agrees.

2           MS. SULLIVAN:  Your Honor, on the issue of

3   the scheduling, and Merck's been working very hard,

4   plaintiffs have been working very hard, but, as you

5   know, we have changed the cases that are being worked

6   up from the first wave of 15 to now a new set of five,

7   and the defendants -- the plaintiffs want a discovery

8   cutoff of March 30th, which would leave only two and a

9   half months to work up those cases.  Some of those

10  cases we don't have medical records.  We just got

11  authorizations from the plaintiffs in one, so we'll

12  work very hard to get the records.  It usually takes a

13  couple of weeks.  You know, you're subject to the

14  treating physicians in terms of getting records.

15          We also are subject to treating physicians'

16  schedules in terms of depositions, so the defendants

17  are prepared to work very, very hard to work up these

18  cases, but a two and a half month time frame to do it

19  in light of the medical records collection, the

20  treating doctors' schedules may be very difficult to

21  do.

22          Your Honor had already set an expedited

23  schedule for the first wave of cases that contemplated

24  about five and a half months, which was tough, but two

25  and a half months is really going to be tough, but

10

1   we'll do our best to try to get it done, but it may be

2   that we need a couple weeks on the end of that to

3   finish fact discovery though.

4           MR. BUCHANAN:  Your Honor, just one

5   observation there, if you recall in the December

6   conference the proposal that was put on the record at

7   the last conference was each side would submit 15

8   cases.  Each side would have three strikes that could

9   be used against the other list then we would meet with

10  your Honor to discuss an appropriate way of grouping

11  cases for trial.  After we had that conversation Miss

12  Sullivan made an argument for an extension on the

13  schedule.  Advocated quite forcefully that she should

14  get in breathing room then we were talking about

15  working up simultaneously 24 cases but advocated

16  forcefully for an extended discovery schedule beyond

17  what was then in effect, and I think it was April 1

18  going into the last conference.

19          Your Honor agreed to a global discovery

20  cutoff of April 30 at that point in time.  That is, in

21  fact, three and a half months.

22          MS. SULLIVAN:  That's not for fact discovery,

23  though, that includes the expert discovery.  That would

24  be a fact discovery cutoff of March 30th, which is

25  essentially two and a half months, which is tough,

11

1   Judge.

2           MR. BUCHANAN:  What we discussed is

3   plaintiffs would serve their expert reports by the

4   first of April.  The defendants would have 30 days

5   after that to serve their expert reports.  They could

6   continue if they needed to take fact discovery of

7   plaintiffs' physicians, whomever they think is

8   relevant, in that intervening 30-day period of time

9   after they have received our expert reports.

10          They do have a three and a half month period

11  of time to take discovery pertinent to their expert

12  work-up.  We have not agreed in any respect to or not

13  required that fact discovery be cut off as of April 1st

14  as of the date we submit our expert reports.  In fact,

15  we anticipate there will be some cleanup discovery

16  going on in April, and we anticipate they would be

17  using that time period to do it, as well.  They have

18  three and a half months for five cases.

19          MS. SULLIVAN:  The issue, your Honor, and

20  we're committed to working very hard to get it done is

21  it is difficult to serve expert reports when you don't

22  have treating doctors done yet.  Certainly, your

23  experts are going to want to hear and see some of that

24  key testimony before they serve their expert reports,

25  so these are important cases.  They may be one of the

12

1  first ones to go to trial across the country, and we're
2  just looking for -- we understand the Court wants an
3  expedited schedule, but a schedule that's workable in
4  order to get everything done in the time frame we need
5  to get it done.
6       THE COURT:  What have you found out about the
7  dep dates?
8       MR. MAYER:  I found out that for Dr. Kim and
9  Mr. Anstice several dates today.
10      MR. BUCHANAN:  When are we looking at for
11  them?
12      MR. MAYER:  They'll be in March.
13      MR. SEEGER:  Anstice in March?
14      MR. MAYER:  Yes.  They'll be in March.
15      THE COURT:  First week in March?
16      MR. MAYER:  I think it -- I don't think it
17  will be the first week.  Well, the first week is like
18  March 4th, so I don't think it will be that week.  I'm
19  hoping it will be the week -- the first full week.
20      MR. SEEGER:  If we could figure out like a
21  schedule that would sort of -- we could work out with
22  Kim, Anstice, Scolnick and Gilmartin I know we have to
23  weave everybody else in there.  I mean, for example, we
24  would like to take Anstice and Scolnick before
25  Gilmartin and Kim.

13

1  supposedly at different times.  I know everybody is
2  operating in good faith.
3       Now, what I want to do is extend some times
4  but realistic times, but keeping pressure on because I
5  get the impression, and I could be wrong, but I get the
6  impression that the top people at Merck don't want to
7  be deposed ever, and I understand that, but bottom line
8  is they're going to have to be deposed, and they're
9  going to have to be deposed soon.  So I am telling you
10 I don't care when they want to be deposed, they are
11 being ordered that they have to appear for depositions
12 in this case in March, and they have to appear in the
13 order that plaintiffs have requested them.  That's
14 Anstice, Scolnick, Kim and Gilmartin.  And all four of
15 them have got to be produced and deposed before the end
16 of March.
17      I don't care whether you want to give them
18 the last four days in March, four days in a row or six
19 days in a row or if you want to give them the first
20 week, second week, third week or whatever, but I'm
21 telling defense counsel you're to instruct your clients
22 that these four people are going to be deposed in
23 March, and they should give us the Court and counsel
24 the dates or I'll just pick arbitrary dates, and
25 they'll have to come on those days.  I don't want to do

15

1       MR. MAYER:  Okay.
2       MR. SEEGER:  And Kim before Gilmartin
3  preferably.  So if you can get us Anstice and Scolnick
4  in the first week, week and a half of March, Kim right
5  after that and Gilmartin the middle of March, I think
6  we could reach an agreement on that.
7       THE COURT:  All right.  This is what we're
8  going to do.  I had looked at -- we have been shooting
9  for this April end date all along.  It is a date that I
10 set a long, long time ago.  It is not a new date.  It
11 was an ambitious date, and it was I think a realistic
12 date to some degree, but that doesn't mean that we
13 didn't recognize there would probably wind up at the
14 end, as there always does, a crunch and people would
15 need more time to do things.
16      I don't want to just sit here with a
17 management order now that's outdated, so I want to
18 today put some new time frames down that make a little
19 more sense, and I recognize that we have to work up
20 these-- that defense counsel has to work up these five
21 cases by taking plaintiffs' doctors and the plaintiffs.
22 And I also recognize that plaintiffs want to move as
23 quickly as possible.  Defendants -- as I said before
24 plaintiffs want to move until they get to trial, and
25 defendants want to move -- everybody wants to move

14

1  that.  I prefer they get some choice.  We talked about
2  a two-day schedule for Gilmartin.  Do we need two day
3  schedules for everybody else?  And I don't expect their
4  deps should take more than one day, but they're going to
5  cross-notice them or whatever you're going to do.
6       MR. BUCHANAN:  I suspect they will be heavily
7  cross-noticed by the defense, your Honor.
8       MR. SEEGER:  And as we have always done, and
9  we don't bind ourselves to do this, but as we have done
10 in every deposition we are trying to coordinate with
11 people from other states that want time.  There's one
12 office in Texas that felt they wanted to come and
13 attend, and if they wanted to ask their own questions
14 at the end they would have their ability to do that.
15 So there is the possibility it could go into a second
16 day.
17      MR. MAYER:  And we plan on cross-noticing.
18      MR. SEEGER:  But we will try to work out.
19      THE COURT:  So I would suggest it would make
20 sense to have each of these people scheduled for a
21 two-day period of time.  Each of them, and hopefully
22 plaintiffs in this case could finish with them in one
23 day or less, and maybe the whole thing will only take
24 one day hopefully, but I think the way to schedule them
25 is to allow each of them to have two days.

16

1     MR. BUCHANAN:  There's one more witness that

2    probable fits, and her name is Elise Rison, and she is

3    on the schedule for the first week in March.  I suspect

4    that she will be somebody that there will be multiple

5    people in attendance, and there should be a second day

6    involved.

7     THE COURT:  I'm leaving it up to defense

8    counsel to leave up to their people.  I don't care if

9    you want to choose a Saturday or Sunday or a Monday or

10   Tuesday, but it is to their convenience, but it is to

11   their convenience in March.

12     MR. SEEGER:  Actually to be truthful a

13   Saturday or a Sunday if that does accommodate their

14   schedule would be fine.  We would work with them.

15   That's not new to us.

16     MS. SULLIVAN:  As it relates to Gilmartin.

17     THE COURT:  It doesn't have to be because

18   everybody has somebody that doesn't want them to be

19   working Saturday and Sunday, even if it is just their

20   dog or cat or somebody.  If you can try to make it

21   Monday through Friday.

22     MR. SEEGER:  Fewer people show up.

23     THE COURT:  I'm not one of those people

24   that's impressed by everybody saying they worked until

25   midnight.  I'm not saying you have to, but whatever.

1    Let's just get this done.  The deps have to be done.

2    They have no choice.  I recognize that the discovery

3    fact deadlines are basically for me at this point.  I

4    think that fact discovery deadlines are this basic

5    discovery, although there may be supplemental, I'm not

6    saying you can't take any fact discovery, but to

7    complete the depositions of these five plaintiffs,

8    their five doctors and the defense depositions we

9    should have basically a March 30 cutoff.  And that's

10   not the expert reports that I'm assuming after that

11   they have time for expert reports because they're going

12   to have to use their doctors, also.  What do you

13   need -- we're talking about five deps.

14     MS. SULLIVAN:  Well, your Honor, I'm sorry,

15   if your Honor is talking about plaintiff deps that's

16   plenty of time, but if you're talking about getting the

17   treating doctors done by March 30th some of that is

18   dependent upon when we get the records from the

19   doctors, and in a couple of cases we don't have all the

20   medical records.  One, we have none of the medical

21   records yet.  We just got the authorizations yesterday

22   , so we'll work hard to gather the records, but it

23   takes a couple of weeks to get the records from the

24   doctors and so for the treating doctors the end of

25   April would be an expedited but reasonable cutoff time

1    to try to get those done.

2     MR. SEEGER:  Wouldn't it make sense if four

3    cases are ready to go in March we work those up in

4    March, and we have one case that has to spill over a

5    week or two.  Why would we push everything back?  It

6    is -- there's a lot of work to be done.  Let's try to

7    complete it all in March.

8     MS. SULLIVAN:  We decided in these five cases

9    to be the representative ones that the Court will

10   select which trials go first, so they should be worked

11   up contemporaneously, and we shouldn't be prejudiced

12   because we don't have authorizations so they can jockey

13   which ones come first.

14     THE COURT:  Somebody better get

15   authorizations to them today or tomorrow.

16     MR. BUCHANAN:  There is one issue on that,

17   and I'm sorry, the case Miss Sullivan is referring to

18   is a case she proposed and that she picked.

19     MS. SULLIVAN:  You picked it off our list,

20   actually.

21     MR. BUCHANAN:  You were given a list of a

22   range of cases, and you chose it.  Your Honor, I mean,

23   this seems like a vehicle for an extension.  If it

24   needs to spill over until past March that's fine, but

25   it is a case that she chose in the end, and now she is

1    complaining about the adequacy of the records.  We

2    didn't hear any of that last week when we were sitting

3    here talking.

4     MR. CORONATO:  That wasn't supposed to be

5    part of the criteria, whether or not we had

6    authorizations.

7     THE COURT:  It wasn't.

8     MR. CORONATO:  It wasn't.  So I don't

9    understand --

10     MR. SEEGER:  Judge, frankly --

11     THE COURT:  How long after the treating

12   doctors' deps do you need to get your expert reports?

13     MR. BUCHANAN:  Plaintiffs are prepared to

14   provide their case specific expert reports by the end

15   of March.

16     MS. SULLIVAN:  But they're in a better

17   position, your Honor, they can talk to the treating

18   physicians ex-parte.  We are barred from that.  We need

19   to take depositions, so our experts can get the same

20   information.

21     MR. BUCHANAN:  They have 30 days after ours

22   to provide the expert reports.

23     MS. SULLIVAN:  The problem is, your Honor,

24   just to make sure we have a schedule that's expedited

25   and reasonable it is going to be almost impossible to

1   take all of the treating -- to get all the records and
2   take all of the treating doctors in two and a half
3   months. I think what is doable, although tight, if we
4   can get the treating doctor deposition fact cutoff by
5   the end of April.
6          THE COURT: All right. By the end of
7   March -- who is going to prepare an order?
8          MR. BUCHANAN: We will, your Honor.
9          THE COURT: It should include the fact of
10  these three -- the four people having to be -- first of
11  all, include the deps you already have scheduled in the
12  order then I want you to include these four people that
13  we talked about, four top people, and the fact that
14  they have to make themselves available during March for
15  two-day periods of time in that order. The dates to be
16  chosen by them by -- how long will it take you to
17  choose the dates by February 1st? To advise them of
18  the dates of those deps.
19         MR. MAYER: Yes.
20         THE COURT: By February 1st they'll tell you
21  when those dates will be. If you want any language in
22  about cross-noticing tell them what language you want
23  in the order, and they'll put it in.
24         MS. SULLIVAN: And your Honor was good enough
25  in connection with Mr. Gilmartin because he is the CEO

21

1   to allow the defendants to come back to you with some
2   conditions that you consider for in terms of his
3   deposition.
4          MR. SEEGER: What were those?
5          THE COURT: You don't have them yet?
6          MS. SULLIVAN: I have some ideas, your Honor.
7   One of the things that happened --
8          THE COURT: He can have ice water?
9          MS. SULLIVAN: One obvious thing, as the CEO
10  we expect -- we hope not, but we expect there will be a
11  lot of posturing from plaintiffs' lawyers so we would
12  like to limit the number of questioners to two and that
13  everybody can feed their questions to those folks.
14         THE COURT: I thought we were going to limit
15  it to one liaison counsel.
16         MR. BUCHANAN: Two.
17         MR. JACOBY: I thought that was resolved at
18  the last --
19         MR. SEEGER: We're fine with two questioners
20  from New Jersey. I mean, they're going to cross-notice
21  to other states. We can't -- we can't limit Texans.
22         MS. SULLIVAN: You need two questioners from
23  New Jersey.
24         MR. SEEGER: There will probably be one from
25  New Jersey.

22

1          THE COURT: There should be one. I mean, two
2   can sit there. Obviously, you can sit there and talk
3   to each other and take breaks and discuss it maybe four
4   or five of you there, but I don't see why you switch
5   questioners.
6          MR. SEEGER: The only reason I left that open
7   is to the extent other lawyers say okay you can ask our
8   questions or they wanted us to sort of do something for
9   them, but the bottom line is just going to be one
10  questioner from New Jersey. The only reason to add a
11  second one is if another lawyer said I don't have to
12  show up and take the deposition make sure you please
13  cover these areas. But I don't want to commit to that
14  at this point. It was something we were trying to do
15  informally, but we'll go with one questioner from New
16  Jersey.
17         THE COURT: Now, whether that's going to
18  satisfy people from out of state that they have had a
19  chance to take the deposition or not is not -- not from
20  out of state but from litigation that's not in my
21  court, I mean, we're talking about New Jersey, we're
22  not talking about the state -- we're talking about the
23  New Jersey litigation. It is not my problem, I guess,
24  so if they, therefore, said they didn't have the
25  opportunity to ask questions that's really your

23

1   problem, not mine.
2          MS. SULLIVAN: Understood, your Honor.
3          MR. MAYER: We'll work with them, and we
4   understand that the plaintiffs will also work in good
5   faith to try to limit the number of questioners and
6   help us to limit any waste of time by anybody in this
7   process.
8          MR. BUCHANAN: Just to give you context in
9   some cases in New Jersey why we have had two examiners.
10  Sometimes there's a discovery dep that's taken up front
11  followed by a trial examination after that. So then we
12  have something, you know, in the can for trials. I
13  don't know if they plan on bringing Mr. Gilmartin to
14  trials or whether he will be available for trials, but
15  we try to have something locked in the can for trials
16  that follows a discovery deposition. That's certainly
17  what we envisioned doing with two examiners from New
18  Jersey. I know Mr. Seeger referred to also vetting
19  other questions through a second examiner, but we are
20  going to have another status conference before we have
21  to do some Gilmartin's deposition, and, perhaps, we can
22  speak to defense counsel and reach an agreement on it.
23         THE COURT: This is the first time it has
24  been mentioned. You're talking about taking a
25  discovery dep and immediately following it with a trial

24

1  dep?

2       MR. BUCHANAN:  Trial preservation after.

3       THE COURT:  That may be something he wants to

4  do.

5       MS. SULLIVAN:  I'm not sure why the same

6  lawyer can't do both, but we can talk about it.

7       THE COURT:  It doesn't have to be the same

8  lawyer for that.

9       MR. WEISS:  That's the reason so the person

10  doing the trial preservation can concentrate on that

11  portion and not worry about the discovery.

12       MS. SULLIVAN:  The other issue, your Honor,

13  we haven't asked for this of the other witnesses, but

14  he is special in light of his myriad of other

15  responsibilities and to narrow the time away from his

16  company duties in terms of preparation for this

17  deposition, we would ask that the plaintiffs just give

18  us a list of the subject matters they intend to cover

19  with him, so he can focus his preparation.

20       MR. SEEGER:  That was a good one.

21       MS. SULLIVAN:  It is not uncommon in CEO

22  depositions, and we're happy to brief it, if the Court

23  wants -- and in order to limit the time away from the

24  company -- that he can focus his preparation on the

25  subject area that they're interested in.

1       MR. BUCHANAN:  Can we address this at the

2  next conference?  I think this is very unusual in my

3  experience with CEO depositions, and it hasn't been

4  done in the last pharmaceutical deps that I am familiar

5  with.  I don't know why we would be tipping our hand in

6  terms of to be useful it would have to be very

7  specific, and if it was very useful in that respect

8  then it would be really revealing our hand.

9       MR. SEEGER:  If we are asking him questions

10  that go far afield of this case they'll be on the phone

11  to you so quickly.  But what Mr. Gilmartin has

12  testified to he has given a lot of press conferences,

13  he has talked a lot about the drug.  He has given

14  presentations to the board.  That's the stuff we're

15  interested in.  We're interested in his involvement in

16  this drug and what he knew and what he didn't know and

17  when he knew it.  That's not -- I don't think there's

18  any real magic to this.  So to handcuff and have us

19  write up what the questions are going to be or the

20  topic areas I don't think that makes lot of sense.

21       I don't think, you know, to start off the

22  concerns which there's an expectation there will be

23  posturing at this deposition I don't think is fair.  I

24  don't think there's been posturing in any deposition to

25  date.  Is he going to be asked tough questions?  Yes.

1       MS. SULLIVAN:  To sort of --

2       THE COURT:  For Mr. Gilmartin for the next

3  management conference see if you can give me a list of

4  things that you would ask, whatever those things are

5  that he and you are concerned about that you would like

6  to ask as accommodations for him and then send it with

7  your agenda to plaintiffs' counsel.  They may agree to

8  some of them or not, and we'll discuss it at the next

9  management conference.

10       MR. BUCHANAN:  Fair enough.

11       MS. SULLIVAN:  Thank you.

12       THE COURT:  As far as dates are concerned we

13  have gotten up to the end of March.  April 1st you're

14  going to provide -- by the end of March they should

15  have taken all the plaintiffs' depositions, and,

16  hopefully, they will have started the treaters'

17  depositions.  They'll have until the end of April to

18  complete the treaters' depositions April 30th, which is

19  what they requested.

20       MS. SULLIVAN:  Thank you, your Honor.

21       THE COURT:  If you provide your expert

22  reports on April 1st, obviously, you can supplement

23  them after the treaters' deps if you need to, but your

24  initial reports will be provided by April 1st.

25       MR. WEISS:  Yes, your Honor.

1       THE COURT:  And your expert reports should be

2  provided, I'm thinking, by May 30th.

3       MS. SULLIVAN:  May 30th is fine.  Thank you,

4  your Honor.

5       THE COURT:  Then deps of the experts should

6  take place in June.  I'm looking now really at -- this

7  is a realistic now I'm looking at mid June or the end

8  of June to actually start preliminary hearings and

9  trials, okay?

10       MR. BUCHANAN:  Your Honor, then in --

11       THE COURT:  I'm trying to now regroup and see

12  where we are.  I think that's realistic.

13       MR. BUCHANAN:  In light of the timing for the

14  treater depositions going through April rather than

15  having our case specific experts supplement I would ask

16  that we stagger this with the same 30-day window we

17  talked about; if the defendants have until the end of

18  May allow us until the end of April to provide our

19  expert reports.  They'll then have 30 days to respond

20  to our expert reports.  That's what we have been

21  talking about.

22       MS. SULLIVAN:  For case specific experts

23  that's fine.  There's no reason that the generic

24  experts can't be served on April 1st.

25       MR. BUCHANAN:  We can work with that.  If we

1 need to raise it we'll raise it at the next management
2 conference.
3     MR. WEISS: You would supply your generic
4 expert reports by the end of May?
5     MS. SULLIVAN: May 30.
6     MR. WEISS: No. April 30. If we're giving
7 ours April 1st you have to give yours April 30th.
8     MR. CORONATO: I thought the Judge said
9 April 1st for plaintiff's expert reports and
10 May 30th --
11     MR. WEISS: That was case specific experts.
12     MR. BUCHANAN: We will contemplate 30 days
13 for the exchange of expert reports, your Honor.
14 Whenever their are going to be due we would like to
15 serve ours 30 days before then.
16     MS. SULLIVAN: And they may be experts, but
17 in terms of generics you folks know what your cases are
18 about because you have been talking to the treaters and
19 you have their records. We have to take the
20 depositions to know what generics are going to be
21 applicable to these specific cases, your Honor, so it
22 is reasonable to have more time on the defense side on
23 the generics and the case specifics.
24     MR. BUCHANAN: I don't fault Miss Sullivan to
25 looking for a tactical advantage in terms of timing,

29

1 but I call it what it is. We talked about having 30
2 days in between the exchange of defense and plaintiffs'
3 reports. I understand your Honor is willing to give
4 them additional time to develop the case specific side
5 of the case and take some of the pressure off in that
6 respect. We just ask, your Honor, that we be provided
7 the same courtesy in terms of using that window of time
8 to confirm those expert reports in April. We'll file
9 them by the end of April, and they can have until the
10 end of May. It is the same window we talked about all
11 along.
12     MR. WEISS: And then, your Honor, they would
13 take our generic experts depositions in May after they
14 have served us with their generic reports.
15     MS. SULLIVAN: The Court was talking about
16 June for expert discovery, which is reasonable.
17     MR. WEISS: We get your reports on May 30 how
18 reasonable is taking the deposition in June? If you're
19 waiting until May 30 to give us your reports on generic
20 issues, as well as case specific issues, that's not
21 really doable.
22     MS. SULLIVAN: Why not?
23     MR. WEISS: Because you have had two months
24 in which to focus on generics, our generic experts, and
25 we have to turn around and do everybody on your side in

30

1 a two-week window.
2     MS. SULLIVAN: No.
3     MR. WEISS: Sure.
4     MS. SULLIVAN: The judge has given you June
5 for expert discovery. I believe that's what the Court
6 said. That's reasonable, Sol. You have the month of
7 June for expert depositions.
8     MR. BUCHANAN: Your Honor, I think Mr. Weiss
9 raises a good point in terms of the depositions if they
10 do what is often done in these cases, and I'm familiar
11 with some of their expert disclosures in other
12 litigations and serve 10 expert reports, the
13 possibilities of -- 10 generic expert reports.
14     MS. SULLIVAN: You're not going to see that
15 here.
16     THE COURT: You have the 60 days.
17     MS. SULLIVAN: Thank you, your Honor.
18     THE COURT: I would ask you in good faith
19 when you have an expert report send it. I don't want
20 the plaintiffs to see expert reports dated May 1st sent
21 to them all together and May 15th sent to them with the
22 May 30 reports. If you have reports done May 1st send
23 them to them May 1st, and, hopefully, you can send them
24 generic reports earlier.
25     Again, I'm relying on the good faith of

31

1 counsel to send them the reports when you have them and
2 try not to wait until the last minute to send all the
3 reports.
4     MS. SULLIVAN: So consistent with the Court,
5 your Honor --
6     THE COURT: So your deadline is May 30th.
7 We're going to be having other conferences, so we'll go
8 into that when we'll schedule the expert deps and
9 things, but we're basically saying there's a cutoff of
10 everything now we have moved it from April 30th to June
11 30th, but I think that's hopefully real.
12     MR. BUCHANAN: Your Honor, I understand you
13 have adjusted the times. The one thing I'm in
14 particular concerned about we had put our feet to the
15 fire in terms of getting, you know, trying to get our
16 expert reports done by the end of March. The one thing
17 I anticipated is that we would have the treaters
18 deposed by the time we were doing -- by the time we
19 were doing our case specific expert reports. I thought
20 that all would have been in the can by end of March by
21 the prior schedule. Now we're in a situation --
22     THE COURT: I thought we gave you staggered
23 dates.
24     MR. BUCHANAN: Is that what we have done?
25     MS. SULLIVAN: We have the plaintiffs -- the

32

1   Judge gave us until March 30th for the plaintiffs.

2       MR. SEEGER:  Generic is April 1?

3       MR. BUCHANAN:  Generic is April 1 and do they

4   have the 60 days for their generics or case specific or

5   are their generics due 30 days after our generics?

6       MR. SEEGER:  It will be 30 in one case and 60

7   in the other.

8       THE COURT:  They get the 60 days, and they're

9   going to stagger them out and send them to you as they

10  get them.

11      MR. SEEGER:  You're saying in response to the

12  generic if we give them our generic reports when will

13  they be due?

14      MR. BUCHANAN:  Whenever they're ready.

15      THE COURT:  They're not going to wait 60

16  days.  They have told me that.  Some of them will come

17  May 30, but they have others that will be there

18  earlier.

19      MS. SULLIVAN:  Agreed, your Honor.

20      THE COURT:  I always trust everybody until

21  they have showed me they can't be trusted.  It hasn't

22  happened yet.

23      MR. BALDANTE:  I have a suggestion on this.

24  I don't know if it is appropriate for me to speak to

25  this issue, but if the defendants -- I'm John Baldante,

1   your Honor.  If the defendants have experts that

2   they're going to designate even if the reports aren't

3   ready, perhaps, they can forward those CV's by May 1st

4   because the CV's can be helpful to plaintiffs' counsel

5   to prepare for those depositions even if the reports

6   aren't ready.

7       MS. SULLIVAN:  I think they're giving us too

8   much credit, your Honor, in terms of who -- given all

9   the cases around the country in terms of who is

10  available and who is lined up we just -- they're going

11  to give us the CV's with their reports.  We would like

12  to give the CV's with our reports.  Your Honor made

13  clear that May 30 is an outside date, and I'll

14  represent there will be experts that we'll get to them

15  before then.

16      THE COURT:  All right.  Let's keep it this

17  way.  Anything else as far as the scheduling of deps.

18  We have the deps worked out.  We have -- how about

19  these issues of specific fact sheets, have your people

20  worked that out?

21      MR. BUCHANAN:  Yes.  I have advised

22  Miss Sullivan that I think we were called on the carpet

23  erroneously, and I understand there's no problem with

24  the cases.

25      MS. SULLIVAN:  The Seeger, Weiss cases I

1   believe that's you David.  I have an e-mail in, but

2   there's some cases, your Honor, on the list that we'll

3   follow-up with Mr. Spizer to see and Mr. Weiss about

4   additional information.

5       MR. WEISS:  I believe you have information it

6   is the Beasley, Allen cases, and my understanding is

7   they're in transit.

8       MS. SULLIVAN:  In transit, okay.

9       MR. WEISS:  They were mailed in.

10      MR. SPIZER:  That's correct.  In the one case

11  that is not Beasley, Allen it was sent a month and a

12  half ago.

13      MS. SULLIVAN:  How about the Ware case?

14      MR. SPIZER:  That is a Beasley, Allen case,

15  and I think a representative from Beasley, Allen is

16  here, and he will want to speak with you about that

17  afterwards, but my understanding is other than Ware,

18  McKinnon, Chase and Ehrinlear (ph) will be to you by

19  the end of the day tomorrow, and Kirkland was sent to

20  you a month and a half ago.

21      THE COURT:  Generically, so everybody knows,

22  there had been initially some cases that were filed

23  where there were motions to withdraw as counsel, and I

24  pretty much made a ruling early on for those of you who

25  are new in this that -- and let people know that I'm

1   not going to be letting you out once you file and

2   letting someone ride pro se because we cannot in this

3   litigation have pro se litigants, so I mean, obviously,

4   if somebody truly files for themselves pro se then --

5   but I can't imagine anybody doing that.  Nobody has

6   yet.  Once you file for somebody if you wind up

7   getting their case dismissed because they don't

8   cooperate or they don't assist you or whatever reason

9   or it is dismissed because it is a bad case that's

10  going to happen with them having counsel.  Otherwise,

11  we're not going to be able to deal with it so screen

12  your cases before you file them, not after.

13      We haven't -- a technology issue.  I'm

14  telling you I'm pleased to say we now have wireless in

15  here, in my courtroom, in the larger courtroom next to

16  it and in the lawyers library -- they say half of the

17  lawyers' library -- and there's a lawyers' conference

18  room across the hall from the courtroom, and they have

19  it there so we have wireless technology.  We haven't

20  yet -- I mean so far we have just played with it but

21  hopefully -- it is free.  You don't have to sign up to

22  anything or pay anything.  It is done by the AOC, but

23  we may have to work the bugs out of it, but it seems to

24  be working.  It has been tested, and it is working.

25      MR. SEEGER:  Is this going to be the

1  courtroom where the trial is going to be?

2  THE COURT:  It will probably be the one next

3  to it.

4  MR. SEEGER:  In terms of us laying out I

5  would like to know that.

6  THE COURT:  If you look next door it is the

7  larger courtroom.  I'm assuming.  I like my own

8  courtroom.  If I can do hearings in there I will, but

9  I'm not sure that I can.  In anything I need more space

10  for we'll be going next door.

11  MS. SULLIVAN:  You want to see where to put

12  your makeup artist for Court TV?

13  THE COURT:  Dennis Medwick -- I don't know if

14  some of you know him, but Dennis Medwick is the tech

15  person in Middlesex who worked very closely with Judge

16  Corodemus on her cases, and he is going to be available

17  for all mass tort cases.  So what he had indicated to

18  me was we talked by e-mail the other day, and,

19  basically, he will be prepared if we need to -- and I'm

20  really hoping we're going to have some hearings here

21  this summer, and when we get those things going if you

22  want technology and you want things set up or you want

23  to work out things with him we can have meetings in

24  advance with him here or with your tech people here or

25  he can -- you know, he indicated even a month before

1  the reason I'm saying it is a month or two before a

2  hearing he might want to come up and look at the room

3  with your court people, your tech people and work

4  together, and he is going to be working with our tech

5  people.

6  We have a really great -- we have a woman who

7  is excellent with our tech, too, and she is not an ego

8  person, so she will be happy to work with Dennis, and,

9  hopefully, we will be able to provide you with whatever

10  you need, the highest technology you can muster,

11  because the AOC probably won't go any higher than the

12  wireless, and at least we got that, and I'm happy we

13  did that, and it is a beginning, and we can probably,

14  hopefully, be able to get you any technology you need

15  as much as we can accommodate you, and in the end

16  you're going to have to bring it with you.

17  So if you let me know in advance if any of

18  your tech people want to meet together if you're

19  sharing technology I don't know whether plaintiffs have

20  their technology, defendants have theirs.  Obviously, I

21  assume you have to work together to make it work.

22  MS. SULLIVAN:  Probably for space we should

23  coordinate.

24  MR. SEEGER:  Judge --

25  THE COURT:  He will be happy to meet with you

1  with the tech people.

2  MR. SEEGER:  Do you want to talk about now

3  since we have now got a schedule that goes through the

4  end of June are we going to use the month of July now

5  for Rubanick and motions in limine?  Do you have any

6  thoughts on how you want to schedule that so we have

7  that laid out?

8  MS. SULLIVAN:  That sounds reasonable.

9  THE COURT:  Yes.  That's what I had planned

10  to do.  I'm hoping to start --

11  MR. SEEGER:  I would like to start,

12  obviously, they have until June 30th on some of their

13  reports.

14  THE COURT:  Not reports.  Deps of experts.

15  MR. SEEGER:  Dep of experts.  We can start --

16  I mean, we would like to keep it tight.

17  MR. BUCHANAN:  You know what we can do, your

18  Honor, just in thinking about this we would like to

19  make our case specific experts available to them the

20  first two weeks of June.  They're going to make science

21  motions, and you haven't seen them yet.  We have seen

22  them in other cases.  They tend to be rather large, and

23  if they're going to do that we can have that heard

24  hopefully earlier in July and maybe still start a trial

25  some point in July.

1  So we'll try to make our experts available to

2  you in early June and case specific side, and why don't

3  we just see if we can work this out between now and

4  February -- our February conference we have breathing

5  room now.

6  MS. SULLIVAN:  We want a reasonable briefing

7  schedule because they're key issues, but shooting for

8  July to have these things resolved I agree, your Honor.

9  THE COURT:  I really plan on getting these

10  things resolved in July.  We're shooting for April, and

11  now we're extending it but, I don't plan on extending

12  it again.

13  So let's see where we're going.  Anything

14  else we have to address today then?

15  MR. JACOBY:  Judge, if I may, last week out

16  of a pool of 24 cases we selected five to go to trial

17  leaving 19, and we would like you to think about not

18  throwing those 19 cases back into the general

19  population, but making them the next wave of cases and

20  putting them on some sort of -- I don't want to use the

21  word expedited basis, but putting them on a short lease

22  for the backup for the first five that go to trial so

23  we can begin the process of getting those cases ready

24  for whenever the next wave of trials will be.  The

25  number of issues we couldn't cover with the first five

1  long-term use, et cetera, et cetera, that these cases
2  do embody, and we need to give some thought to those
3  cases and how we're going to handle them.
4       MS. SULLIVAN:  Here is our thought on that,
5  your Honor, for the Court's consideration is that we
6  both came up with lists of what we thought were
7  representative cases and we -- and I think they thought
8  ours weren't particularly representative, and we
9  thought most of those weren't particularly
10  representative I guess on the one or two that we agreed
11  on.  And so there's no compelling reason to use the
12  group that we both sort of rejected as not being
13  particularly representative as the next set up.  You're
14  better off if you want to just get representative cases
15  going back to the random selection that the Court had
16  set out in its Case Management Orders in terms of
17  filing date.  There's no reason to give these other
18  cases priority to jump over filing dates of other
19  plaintiffs, particularly since both sides have agreed
20  that the rest of them were not particularly
21  representative.
22       I thought that the next step was going to be
23  to handle the stroke cases, which is the next injury
24  category in terms of numbers and to get test cases set
25  up for stroke cases, but in terms of Case Management

41

1  said.  Both sides agreed they were somewhat
2  representative.  We agreed to those process on the
3  record.  We selected cases through that process and now
4  we have cases left to go.  They can begin discovery on
5  those cases right now and so can we as far as getting
6  the next round getting worked up.
7       Now, the first five may all go and the first
8  five can settle.  Some of them can get dismissed
9  through motions.  There should be cases to move up, and
10  we know those cases.
11       THE COURT:  Well, at this point.
12       MR. LOCKS:  Your Honor, may I be heard at
13  this point?  I'm sorry.  Gene Locks.  Unfortunately, in
14  the cooperative level on which everybody has worked
15  since the last meeting, and it has been cooperative and
16  friendly, this particular subject wasn't discussed or
17  wasn't brought to our attention.  There are a number of
18  us that have post -- what's the deadline 9/30 cases.
19  And they, hopefully, may have had a selection process
20  that is slightly different than the original filings
21  particularly because of the further information that
22  developed, and I don't think that it should be limited
23  in the case selection necessarily to the pre 9/30
24  cases.
25       We haven't had a chance to present, and maybe

43

1  Ordering for work-up of the remaining cases your Honor
2  has made clear you would like those cases not to sit
3  stagnant and be worked up, so our recommendation or
4  thought was we would go back to the system your Honor
5  set forth in her prior Case Management Order where you
6  consistent with a schedule the cases based on filing
7  date.
8       MR. JACOBY:  Your Honor, I don't know that I
9  agree at all that those cases weren't representative.
10  There were a myriad of reasons why they weren't chosen,
11  tactical and otherwise.  They were carefully put
12  together, and a lot of work and effort went into those
13  cases and they are -- and I think, not to argue it
14  here, very representative, and I would hate to see
15  those cases all the work that was done, put into those
16  cases and the analysis of those cases just go to waste
17  and those cases be thrown back into a general
18  population when we have got a running start on them and
19  getting them ready for whatever is going to happen to
20  the first five cases, whatever method of resolution
21  occurs, that there be some immediate backup, and it
22  seems to me they are by far the most logical choice to
23  be the backup.
24       MR. SEEGER:  Actually, there's one practical
25  consideration also, Dave, in addition to what you just

42

1  other counsel haven't, that they may have
2  representative cases that may meet some of the criteria
3  that ought to be representative even on post 9/30
4  cases, so before an immediate decision on that is done
5  I would like, hopefully, to have a chance to talk about
6  that with my colleagues here.  There may be good and
7  logical reasons.
8       There's also something that, again, I don't
9  know if it was covered early on in any way, shape or
10  form, but there may be some compelling circumstances
11  for particular plaintiffs that might make it more
12  appropriate for an acceleration of their cases.  I'm
13  not suggesting that there is.  I don't know what has
14  happened in the past, but, again, those considerations
15  might be applicable to pre and post 9/30 cases.  So I
16  would hesitate to -- I don't want to object, and I
17  don't want to have a dispute, but I haven't had a
18  chance at least -- and maybe some of my other
19  colleagues who filed post 9/30 cases -- to have a
20  dialogue about this, so I would ask that either that be
21  deferred or something that comes up the next go round.
22       THE COURT:  Well, the bulk from my point of
23  view, the bulk of the discovery most of the iceberg is
24  the discovery on the liability issues that would apply
25  to every case or at least -- and there might be some

44

1   differences by time frames between post APPROVe study,
2   post VIGOR study, pre VIGOR study.  There's obviously
3   prewithdrawal from the market, postwithdrawal from the
4   market, those time frames may make a difference in the
5   science and the medicine and affect the outcome of the
6   cases and the time the person took the medications.
7   There's lot of different factors that could affect it.
8          We have chosen five cases now.  Initially I
9   said let's start with the next 15 then the next 15 then
10  the next 15.  Counsel -- but that was preliminarily to
11  see what happened, and even then I told counsel I
12  thought we would have to focus in on some test type
13  cases and try to chose cases that were representative,
14  so we didn't just try 10 cases in a row that were not
15  going to make anybody feel comfortable about the
16  results as being representative and that we wanted to
17  try to get things that would educate people as to
18  whether these cases were going to be successful, how
19  successful, what was winning arguments and losing
20  arguments and et cetera.
21         So they have picked five now.  We have picked
22  five cases.  I expect discovery to continue in every
23  case, every single case.  You should all be getting
24  your fact sheets, getting them out within the time
25  frames.  I mean, sending out authorizations.  I expect

1   the defendants -- I have admitted pro hoc as many
2   lawyers as they wanted because I expect those lawyers
3   to be doing something.  Right from the beginning I was
4   told let in as many lawyers in, and we should get
5   things faster.  You should be getting records -- the
6   day you get the authorizations you should get all the
7   records.  I don't want to hear -- I don't want to hear
8   cases should be delayed because you don't have records.
9   I don't want to hear that you didn't send them the
10  authorizations.  That gives them a reason to be
11  delayed.  The authorizations should be going out with
12  the fact sheets.  They should be going out right away.
13  They should be getting the records as soon as the fact
14  sheets come in.
15         I mean, I expect that in the cases that were
16  recently filed within a few months you're going to have
17  those fact sheets, you're going to have the records.
18  You're going to know who the treating doctors are.
19  You're going to be taking plaintiffs' deps, and I
20  expect those deps to be continuing.  I would suggest at
21  this point if there is a certain logic to doing them
22  chronologically there's a certain -- no matter what
23  eventually I'm going to be looking at the oldest cases,
24  although I'm not saying that immediately after the five
25  we're going to move to the first 15.  That's probably

1   not going to happen, and I'm also not going to say I'm
2   going to try the first five in a row.  I'm not
3   committing to that.  I'm saying we have got five cases
4   we're going to have worked up.  Then we're going to
5   look at those five and see which one we're going to
6   try.  Then we'll decide whether we're going to have two
7   or three consolidated or whether we're just going to
8   try one.  Then we're going to decide if we're going to
9   try those five in a row or whether we're going to try
10  two or three of those and then switch to something
11  else.  Some of that I don't think can be done until we
12  get into those five.
13         I tend to be, you know, I have said before a
14  pragmatist, and I think you have to be flexible, and if
15  you look at case one and it shows certain things or key
16  issues and other cases will be more representative then
17  it may be that we have to go to a longer duration case.
18  You know, if it turns out the science isn't there for
19  short duration maybe then we want to try a long
20  duration case or I don't know, and I don't think you
21  know yet either.  I don't think it makes any sense for
22  me to say we're going to go back to the 12 that were
23  picked.  Or we're going to go back to the 24 that were
24  picked because for those of you who don't know counsel
25  had each submitted 15.  Each side had struck three and

1   then we got them down to 24 cases.  I did meet with
2   liaison counsel, and it was weaned down to five cases
3   that nobody particularly loves, I think, but the cases
4   everybody loved are gone, so we have five cases that
5   are in between.  But hopefully out of those five we
6   have some representative cases.
7          When we start working them up and they take
8   the doctors dep there may be a reason why one of those
9   cases looks good to one side or the other.  It may be
10  that those cases truly come out to be representative,
11  and they all basically the treaters all take the same
12  position on what they said.  Those type of issues we're
13  not going to know until after we get down to the wire,
14  but I sort of want to move these five simultaneously.
15  At the same time I expect you to be doing discovery on
16  every case, and I expect you as quickly as possible to
17  be taking plaintiffs' deps, getting the records,
18  providing that information, making the plaintiffs
19  available for deps, and I don't expect to be hearing
20  later if we have to keep trying cases that cases aren't
21  ready because oh, we just did five and we thought we
22  could sit around and twiddle our thumbs until the five
23  were tried.  All right?
24         MS. SULLIVAN:  Your Honor, I propose that we
25  submitted a proposed Case Management Order for the

1  cases in back of the first -- for the rest of the cases
2  other than the test cases to the plaintiffs yesterday
3  that was consistent with your Honor's prior Case
4  Management Orders in terms of deadlines staggered for
5  waves of cases, and I haven't yet heard back from
6  Mr. Buchanan as to whether that's acceptable or not.
7      MR. BUCHANAN:  We received it yesterday, your
8  Honor.  I haven't had a chance to discuss the schedule
9  with other counsel.
10     THE COURT:  Look at it, understanding after
11  you look at these five we may just pluck one or two or
12  another five out either from that 24 or from some case
13  that was filed just recently to be a representative
14  case that we want to have tried.
15     MR. BUCHANAN:  Fair enough, your Honor.
16     THE COURT:  Then possibly we may not have to
17  try anything if we can all get together and talk at
18  some point.
19     THE COURT:  You may want to talk to
20  Mr. Gilmartin.  I want to talk to Mr. Houston.
21     MR. SEEGER:  Mr. Frasier.
22     MR. WEISS:  Your Honor, Diane did raise
23  something, and that is the stroke cases.
24     THE COURT:  Right.
25     MR. WEISS:  Do we want to get a list of

49

1  Judge, do we know how many cases have been filed so
2  far, and is there a way of breaking down if they're
3  post 9/30 cases or not?
4     THE COURT:  Well, post 9/30 by filing date
5  doesn't mean much, does it?  It has to be whether they
6  were taken post whether they were ingested.
7     MR. WEISS:  You won't have -- I think there
8  were 175 cases thereabouts that were filed before
9  September 30th 2004.  That's what the docket was.
10     MS. SULLIVAN:  That sounds right.
11     MR. WEISS:  I don't know how many cases have
12  been docketed since then, but someone can get the
13  records.
14     THE COURT:  I don't have the exact number.
15  We can get it in a minute.  My secretary has it.  We
16  haven't had a staggering large number of cases come in,
17  actually.  I think it has gone from approximately in
18  the 170's to about the 300's.  That's where we are,
19  which is fine with me.  And we have gotten calls from a
20  lot of people saying they're going to file X, Y, Z
21  cases, and we'll wait and see if they do or not.  What
22  happened with the MDL, it didn't meet yet?
23     MR. SEEGER:  It is meeting the 27th.  And it
24  will take three, four weeks after that until we know
25  where it is.

51

1  stroke cases together, each side, and then go through
2  the same process?
3     MS. SULLIVAN:  It seems reasonable since
4  that's the next big category of injury.
5     MR. BUCHANAN:  I guess the one thing we
6  should do, your Honor, is involve the broader group.
7  Mr. Locks highlighted that some of the post 9/30 people
8  have not been involved because they didn't have cases
9  that were eligible for discussion.  Maybe we can just
10  broaden the discussion as to what the next week should
11  be.  We could have a proposal the next conference for
12  the Court if we have one.
13     THE COURT:  Yes.  At this point I don't know
14  whether we want to move -- I'm just not willing to say
15  from my point of view that after this is done we're
16  going to move to stroke cases or after this is done
17  we're going to move to a different kind of heart attack
18  case.  I think we have to really play out some of this
19  to see where we're going.
20     MR. SEEGER:  I think there are going to have
21  to be several trials to figure out what's going on.
22     THE COURT:  I don't like that attitude.
23     MR. SEEGER:  Somebody else can think about
24  the strategy.  I'm a warrior.
25     MR. FERRARA:  Your Honor, Mike Ferrara.

50

1     THE COURT:  Okay.  How about this FACTS
2  database, SAS database, has it been worked upon, agreed
3  upon, problems?
4     MR. BUCHANAN:  It is.  We met at the end of
5  December, your Honor, and --
6     THE COURT:  Mr. Cohen, I'm counting on you,
7  come on.
8     MR. COHEN:  I did want to apologize to the
9  Court and to my colleagues.  This week I actually -- we
10  met on Friday, and we spoke on the telephone Friday.  I
11  had to cut it short.  I had some medical issues in my
12  family and -- I actually hurt my eye, and I haven't had
13  a chance to reply on that stuff.  I, actually, have a
14  lot of stuff to go through with Mr. Buchanan.  I
15  thought maybe we could take a recess, see what we can
16  work out and come to you afterwards.
17     MR. BUCHANAN:  We get more done in the hour
18  conferences in side-bar than we do in the four weeks in
19  between, so I'll take Mr. Cohen up on his offer.
20     MR. COHEN:  The other thing I'm doing in this
21  regard to make sure that I am not actually solely
22  responsible for dragging on this litigation.  It is
23  actually the Dechert firm has agreed to give me
24  somebody else, my contemporary, who will also come with
25  me to the meet and confers, so I'm not the only person.

52

1   If I'm for any reason unavailable they'll have another
2   contact who will know everything I know and will be
3   able to go back and forth because this was an
4   unfortunate week, and I do apologize.
5        THE COURT:  Okay.  All right.  So we're going
6   to have you sit down and talk about that.  The amended
7   electronic service order, is there an issue on that?
8        MR. CORONATO:  We have that.  In fact, we had
9   a final conference call with the Verilaw folks on our
10  way down here this morning.  They made changes, and
11  it's been e-mailed to us, and we're going to print it
12  out and present it to you for signature and go forward
13  with that.  There's one issue in particular that the
14  Court should be aware of.  Your Honor, when you issued
15  the electronic service order then issued an order
16  amending it and the amendment was to provide for the
17  fact that --
18       THE COURT:  People didn't have to use it.
19       MR. CORONATO:  Right.  That they had to
20  consent to using it, and it also made clear that the
21  Court didn't have a contract with the vendor that it
22  was being funded by the parties, and I think
23  Mr. Maiorano, Matthew, has an issue or a suggestion
24  with respect to the opt out provision.
25       MR. MAIORANO:  I'm not sure there should be

1   the Court.  It is my view -- certainly if it was a
2   smaller group, your Honor, or the group wasn't
3   constantly changing in composition with new faces from
4   month to month it would certainly be simpler to deal
5   with an opt out.  What we proposed is in the event
6   somebody has a special case that they would like to
7   raise they could seek relief in an order from the Court
8   and we can deal with it in the terms of a context of a
9   specific application rather than on an ad hoc basis
10  trying to anticipate somebody's problem.  We think that
11  we could probably make a showing to your Honor if there
12  wasn't good cause as to why the Court has discretion to
13  order electronic service in a mass tort such as that,
14  but nobody has complained yet, and I think we're
15  planning for the hundred year flood or an issue that
16  hasn't occurred.  So in the event it arises we propose
17  putting an order in liaison for both defense and
18  plaintiffs can submit something either way as it
19  relates to that issue, and the Court can rule on that
20  specific request in the context of those issues.
21       THE COURT:  All right.  The reason for my
22  second order was because I received a letter from the
23  AOC telling me that's what they wanted.  And if they
24  hadn't sent me that letter I never would have put it in
25  there because I don't -- I want to have everybody on

1   an opt out, Judge, for two reasons.  First of all, one
2   of the purposes of having the electronic service is to
3   facilitate service among a large group of people.
4   Obviously, this group has expanded greatly.
5        THE COURT:  Who do you represent?
6        MR. BUCHANAN:  He is with our firm.
7        THE COURT:  You're with Seeger, Weiss.  Go
8   ahead.
9        MR. MAIORANO:  To start having people opt out
10  you have some people who are then going to be served
11  electronically, others who have to be served by paper.
12  The more people we have in this room or involved in
13  this litigation the more burdensome that becomes.
14       The other issue is one of the nice things
15  about having everything on this E-service system is
16  that there will be an electronic repository of
17  everything that's been severed or filed that everybody
18  that is in the litigation can go and hit on.  If we
19  have people who are opting out there's a category of
20  documents that are not accessible that way.
21       MR. BUCHANAN:  There's a practical issue,
22  too, your Honor, just from liaison's perspective of
23  keeping everybody informed we have relied on Verilaw in
24  terms of keeping everyone up to date in terms of
25  deposition developments or notices correspondence with

1   Verilaw or on Lexis or on some serving program.  I
2   really don't care what program it is.  It, obviously,
3   is extremely important to the parties, and it is
4   helpful to the Court and helpful to the parties, and it
5   is just night and day the difference between the
6   difficulty in conducting the litigation if we don't
7   have a way to serve electronically.  And I anticipate
8   that anybody who is interested in handling mass tort
9   cases should be willing to get with the program as far
10  as the electronic serving because it is the only way
11  you're really going to be able to keep up to date with
12  what's happening is to go on the server and look and
13  see what's been served and what the correspondence is,
14  and if you don't have it you can't really participate
15  fairly, I don't think.  Or you're going to be at a
16  strong disadvantage, which really isn't desirable, so
17  we want to keep -- the concern was that it does cost
18  money, so the Court is ordering lawyers to pay money to
19  a private company, and there's a concern about that.
20  They're concerned that someone may object to that and
21  that there may be a problem with it, and we may not be
22  able to compel them to do it, so this is what we'll do.
23       We'll reword the order.  We'll take out --
24  we'll say that this supersedes the last two orders, and
25  it will indicate that people shall use the electronic

1  service, unless they have an objection to the same,
2  which they should file in writing with the Court.  And
3  if someone objects then we may have to deal with them
4  and allow them to -- you know, I'll have to deal with
5  that issue when it comes before me if I can decide -- I
6  don't want to get into the politics of the fact that
7  the AOC, you know, I can direct my own case, but on the
8  other hand for things like the AOC is uniquely set up
9  to handle things like fees and payments and statewide
10  to make sure they're uniform so they have their role,
11  and they have been very helpful to us in a lot of --
12  they're very important and we do have to -- I want to
13  listen to what they say, but I also want everybody on
14  the electronic service, so we'll see how we can work it
15  out.  If I get an objection then I'll talk to that
16  attorney, and we'll see what their objection is, and
17  whether it is a cost factor or whether it is a
18  principle factor or what the problem is.  I mean, if
19  there's some attorney that was being shut out because
20  of the cost factor -- I don't know how expensive this
21  is for you.  I'm sensitive to that that somebody
22  shouldn't be shut out for a cost factor.
23         MR. BUCHANAN:  It should be less expensive
24  than using certified mail or Fed Ex in terms of cost.
25  So it should be less expensive than the alternative

1  means of service and obtaining information for most
2  attorneys.
3         THE COURT:  Well, I'm hoping, so if that's
4  the case and an attorney becomes aware that that's the
5  case then hopefully they won't be concerned about it.
6         MR. BUCHANAN:  Agreed, your Honor.
7         THE COURT:  All right.  We'll leave in the
8  provision if they want to object they can do so.
9         MR. CORONATO:  Your Honor, what I would
10  suggest is we'll prepare a final order today, and if
11  your Honor wouldn't mind signing it today because I
12  know people at Lexis are waiting for us and to receive
13  the order so they can do the conversion to the new
14  platform this weekend.  The system will be down from
15  the end of today until Monday morning.
16         THE COURT:  Okay.  All right?  Okay.  So that
17  takes care of that.  The medical record exchange do we
18  want to put in the order that you're doing -- the fact
19  that plaintiffs should provide any medical records that
20  they have in their possession with their fact sheet.
21         MS. SULLIVAN:  Yes.
22         THE COURT:  If you have them send them with
23  the fact sheet.  Don't just send an authorization and
24  hope -- because you have to reveal to them what records
25  you have, and they might not happen to get the same

1  thing.
2         On the other hand defendants when they
3  subpoena records or acquire records via an
4  authorization should within 10 days of receipt provide
5  them to plaintiffs' counsel.
6         MS. SULLIVAN:  Agreed, your Honor.
7         THE COURT:  So they don't get them the day of
8  the plaintiff's dep a stack of records they haven't
9  seen before.
10         MR. CORONATO:  Your Honor, just on that issue
11  what we're doing is we're producing the records to them
12  on a CD in PDF format, and it is more efficient if we
13  have a number of records to burn to CD than to be
14  constantly burning CD's each time we get a new record,
15  so I would rather if we could send them to them on an
16  ongoing basis and try to get them to them as soon as
17  possible, but rather than doing it that way --
18         MR. WEISS:  Your Honor --
19         MR. BUCHANAN:  The 10 days is a good
20  suggestion, your Honor.  We have just run into issues
21  with deposition where we're getting for the first time
22  supplemental medical record production or the medical
23  record production from their authorizations in the last
24  handful of days before either a doctor dep or a
25  plaintiff deposition, and these are authorizations that

1  have been outstanding for some period of time.
2         MR. CORONATO:  Your Honor, when that has
3  occurred it is because we have learned when preparing
4  for the depositions in the final weeks of providers
5  that were not identified by plaintiffs in the fact
6  sheets, and we have been able to secure those records
7  and provided them to them in advance of deposition,
8  number one.
9         Number two, we have also had I know with
10  Mr. Spizer that he said provide me the records within
11  about two weeks before the deposition, so that's been
12  fine up until now.  Now there's some objections, so
13  we're not deliberately holding back records and saying,
14  you know, we're going to get a tactical advantage and
15  not give them to you until the last few weeks.  We're
16  not doing that.  But it would be a lot more efficient
17  if we could just produce them in groups on a rolling
18  basis.
19         MR. WEISS:  I want everybody to be aware that
20  if some firms are obtaining records electronically
21  through services like MCS or Zero, those records when
22  they're gotten are PDF form.  They're Bates stamped.
23  They stay on the internet.  They're encrypted.  You
24  guys get them the same time we do, and there is no
25  delay.  So that is an alternative, and in those cases

1  you don't have to give us a CD back because you're
2  getting them instantaneously like we are.  So that's an
3  option.
4       MR. BUCHANAN:  Your Honor, I think
5  plaintiffs' counsel are free to reach whatever
6  agreements they want to reach.  I know Mr. Spizer felt
7  comfortable getting them on a certain time frame.  From
8  my firm's perspective -- I know other plaintiffs
9  counsel expressed concern, they would like to get
10  medical records reasonably promptly after they receive
11  them.  Ten days is a fine window.  Two weeks gives them
12  more time so long as there's not a deposition
13  scheduled.  They can aggregate them together, but if
14  there is only one provider who comes in and they're
15  working on another provider to get medical records, and
16  it takes them a month to get them from the other
17  provider we don't want to delay the production of the
18  first provider's records because that could interfere
19  with depositions and other discovery.
20       MR. SPIZER:  Just so the record is clear,
21  Gregory Spizer with the Anapol firm, I don't know about
22  the two-week time frame.  I know Will and I have
23  spoken, and my concern on a few occasions was I
24  understood if he got one record I didn't necessarily
25  want him to burn a CD for every record, but I was

1  looking for them on a rolling basis.  I didn't think I
2  said two weeks.  I was looking for them on a rolling
3  basis, so I agree with Mr. Buchanan.  Each firm can cut
4  their own deal, but I was looking for them -- if they
5  get them I don't want them two weeks before they have
6  the dep.
7       MR. CORONATO:  And we did that, but you also
8  said you certainly want them no later than two weeks
9  before the dep, the last batch, and we would do that
10  for you, but we also provided them to you on a rolling
11  basis, so if it has been an issue, your Honor, I think
12  it has been an issue on just very few cases, and
13  largely because of providers that were just identified
14  at the last minute through our own investigation and
15  review of reports and because those providers were not
16  identified in fact sheets.  If they were identified in
17  fact sheets we're getting those records right away, and
18  we can provide those much sooner.
19       MR. BUCHANAN:  We have provided
20  authorizations on cases three, four months ago, and we
21  don't have CD's, and we don't have records from you
22  guys for any of those authorizations yet.  I can only
23  assume the reason why is because there's not a
24  deposition set of a treater or of a plaintiff, and once
25  that happens then we'll get the CD two weeks before

1  the -- two weeks before the deposition, but that's not
2  the arrangement we're operating under.  We turn them
3  over with the fact sheets, we would like to get them,
4  you know, reasonably promptly after they got them.
5  Whatever the Court sets that's fine, but they can burn
6  a CD with all of Seeger, Weiss' clients meds on one CD.
7  If we have 10 clients that they have a supplement for
8  they can send us a CD every two weeks that contain
9  supplemental medical records from each of our clients
10  each in an individual folder.  How many firms are
11  involved here?  There's probably 30 firms in the room.
12  They just have a process in place where they do that
13  every, week they each get a CD with the records.  It is
14  not that hard.
15       MR. CORONATO:  I'm looking for a compromise
16  of some sort rather than having to produce records
17  within 10 days of receipt when we're burning them on CD
18  and providing them in --
19       THE COURT:  What do you want 20 days?
20       MR. WEISS:  Aren't you getting these records
21  or aren't you getting these records, I'm sorry,
22  electronically?  Aren't you getting them electronically
23  from your provider?
24       MR. CORONATO:  Yes.  We can get them
25  electronically.

1       MR. WEISS:  Why can't you simultaneously give
2  them to the plaintiff the same day you get them?
3  They're electronic; you're not getting paper.
4       MR. CORONATO:  We have to download them to
5  our system to provide them to you.
6       MR. WEISS:  Give the plaintiffs' lawyers the
7  same access that you have.
8       MR. CORONATO:  I don't know if our vendor
9  offers that.
10       MR. WEISS:  Can we talk about that?  That
11  would save a lot of time and money.
12       MR. CORONATO:  It may not save money.
13       MR. WEISS:  It would save time and money.
14       MR. CORONATO:  We can look at that with our
15  provider, whether or not they have that functionality,
16  but in the event they don't we'll have to continue
17  sending them on CD.  I would prefer to have them on a
18  platform.  You can get them whenever you want, that
19  would be fine, but I don't know if my vendor offers
20  that.
21       MR. WEISS:  You're getting the records from
22  us that way now.
23       MR. CORONATO:  Not really.
24       MR. WEISS:  You are going forward.
25       MR. CORONATO:  Maybe going forward.

**Page 65**

1    MR. WEISS:  We're going to use the same
2  vendor or you can just get into our vendor, and they'll
3  send them to you.  So it takes you out of the loop.
4    MR. BUCHANAN:  Your Honor, maybe there is a
5  solution to do it with a server or something.  We can
6  talk about that.
7    THE COURT:  Why don't we include in the order
8  they have to provide you with the records within 20
9  days.  If they can provide them to you automatically
10  through a vendor then that will be better.  They can
11  work that out with you.  If it turns out that 20 days
12  is a problem let me know at the next management
13  conference that it is not working.
14    MR. BUCHANAN:  And, obviously, the only thing
15  that would alter that date would be if we have
16  depositions in that case moving forward.
17    THE COURT:  20 days or at least two weeks
18  before the deps it should say.
19    MR. LOCKS:  Your Honor, I assume, also,
20  individual firms may make --
21    THE COURT:  Whichever is the lesser.
22    MR. LOCKS:  Individual firms can make a
23  different deadline between by stipulation or agreement.
24  If 20 days doesn't matter to some of us and 30 days
25  works, if 40 days works as long as it doesn't slow down

**Page 66**

1  the process that's -- you know, I'm not going to come
2  into court.
3    THE COURT:  Everybody can consent, I guess,
4  to whatever they want, as long as it works, but I don't
5  want to start trying to -- I mean, if everybody has
6  different agreements then you're going to expect me to
7  enforce those agreements.  I'm going to enforce the 20
8  days because that's what I have ordered in all the
9  cases.  If you agree to take yours in 60 days and then
10  they give them to you in 60 days, and it's no problem
11  for you --
12    MR. LOCKS:  You won't hear from us.
13    THE COURT:  Then nobody is going to hear from
14  anybody.
15    MR. CORONATO:  We have a revised medical
16  authorization that needs the Court's approval, and I
17  think we're also going to request an order that
18  requires the plaintiffs to sign those and return those
19  to us in two weeks for all plaintiffs.
20    MR. BUCHANAN:  It may be a logistical issue,
21  your Honor.  We signed off on the form with the HIPPA
22  authorizations the cases -- the cases remain
23  entraunched in their 15 case slots.  We don't have the
24  date pinned down for that second slot, but what I
25  propose, your Honor, is plaintiffs prioritize getting

**Page 67**

1  revised authorizations from the cases in the earlier
2  traunches and give us an additional week for each extra
3  traunch.
4    MR. WEISS:  Can we post the revised HIPPA
5  form on the website, your Honor?
6    THE COURT:  It should be for everybody to
7  use.
8    MR. CORONATO:  The old one?  The new one
9  should be on the website absolutely.  We need an order
10  today doing that.
11    MR. WEISS:  Right.
12    THE COURT:  The order should say that this
13  will be the -- this is the approved authorization which
14  should be used superseding the last one.
15    MR. CORONATO:  We want the authorizations --
16  I think particularly in the cases where we already have
17  authorizations, we want those plaintiffs to execute new
18  authorizations and return those to us in at least two
19  weeks.
20    MR. WEISS:  My suggestion is you serve
21  everybody on Verilaw and also put it on the Court's
22  website, and it will cover both bases.
23    MR. BUCHANAN:  The issue is getting the
24  executed authorizations from the plaintiffs, and it is
25  a logistical issue your Honor.  I know we can do it.  I

**Page 68**

1  think we can do it within 30 days, and we can
2  prioritize certainly trial cases are the first 15
3  cases, get them to you within 15 days, but give us 30
4  days for the bigger slot.
5    MR. CORONATO:  I don't have a problem with 30
6  days, your Honor, as long as it doesn't come back to
7  haunt us when the 30 days turns into 40 days or 50 days
8  or 60 days and there's a delay in getting the records
9  and the plaintiffs say well.  That's my only concern.
10  I'm willing to be reasonable in giving them time
11  because I know they have to get these authorizations
12  out to a lot of people, but I don't want it to come
13  back to haunt me.
14    THE COURT:  Have you worked it out 30 days?
15  Fifteen days for the first 15 cases and the five that
16  have been chosen.
17    MR. CORONATO:  Yes.
18    THE COURT:  We need an order on those five
19  cases.  If you want to prepare that.
20    MR. CORONATO:  Fifteen days for the first
21  five trial cases?
22    THE COURT:  And the first 15 docketed cases.
23  Within 30 days of today for all the others that have
24  already been filed.  And are you going to be removing
25  your confidential designation soon?

1    MR. COHEN:  Yes.  I have worked out kind of a
2    priority plan.  What we're going to be doing as we're
3    going through the depositions and the deposition
4    exhibits first, and it is going to be done on a rolling
5    basis by the end of this month as we discussed those,
6    those are the ones they showed some interest in
7    actually using in the litigation.  The month of
8    February what I have right now, and one thing I want to
9    go through with Mr. Buchanan is a calendar of what's
10   coming up, and what I have done is I have put very -- I
11   have reduced the number of documents we have produced
12   in February give, us lots of time to go back and redo
13   everything and produce what is gone before it.  I want
14   to talk with him and see if there's anything else that
15   if he wants a different priority and pretty much in
16   that regard whatever they're asking me to do I can come
17   up with.
18       MR. BUCHANAN:  Your Honor, we certainly agree
19   that exhibits that are attached to the filings under
20   seal, exhibits that are used in depositions they should
21   be priority reviews for them as it relates to
22   confidentiality.  The concern that plaintiffs have
23   expressed in a broader sense is that new productions
24   that are coming in continue to have the same weight in
25   terms of 95 percent confidential, 5 percent

1    to get that in February.
2        MR. BUCHANAN:  The thing that is puzzling
3    from my perspective is they are reviewing for
4    confidentiality on these documents.  One thing
5    Mr. Seeger flagged is a document that's not stamped
6    confidential in this stack of 500 there's, what, three
7    pages I'think that aren't confidential, so there is a
8    confidentiality review going on.  We don't know what
9    guidelines are being applied, and it seems designed to
10   delay, I don't know why.
11       MR. SEEGER:  It was our expectation once the
12   withdrawal and your admonition in October to the extent
13   there is a new production and people are doing that
14   review they would not be confidentiality stamped, but
15   to reach in randomly you pull out a stack this is
16   stamped confidential, and this isn't.
17       MR. COHEN:  The real issue in the review is
18   when the review is to make 20 percent whatever it is
19   going to be confidential that error rate can't be what
20   it is when it is the other way, when it is 20 percent
21   not confidential.  And there's much more of a review
22   process that needs to get done of quality control of,
23   you know, more review by more senior people, if
24   necessary, in getting things done, and that's an
25   apparatus.  And each time I have decided to try to get

1    nonconfidential.  This is a stack Mr. Seeger grabbed of
2    500 pages from Sherwood.  They're all marked
3    confidential.
4        MR. SEEGER:  And redacted.
5        MR. COHEN:  There's no doubt what I have done
6    in coming to each one of these conferences the one
7    thing that I have heard from you each time is make sure
8    that this case moves, so whenever I have had a choice
9    between putting resources to get more documents or to
10   get these confidentiality things done I have put it
11   towards getting the documents out the door, and I'm
12   actually going to be able to meet the January 31st
13   deadline that I sat here and said I thought was
14   impossible, and I have done that to some extent by
15   robbing Peter to pay Paul and moving things around, but
16   I have scheduled here that February we'll have
17   everything redone, and if they have a particular issue
18   with either certain sets of documents I can certainly
19   do it faster.  We have got the exhibits to the
20   depositions, they're already done.  If there's a box or
21   two let me go, and I'm able to start doing that faster
22   now and get that set in place, and the Dechert firm has
23   given me a lot of resources to get that done, but there
24   is no doubt that the things they're getting right now
25   don't have the new guidelines in place, and my plan was

1    that in I have looked at the calendar, and I can't come
2    here and tell you I don't have the documents out.  I
3    have to get you the documents.  You can use the
4    documents in the litigation.  If there's a box or two
5    boxes give it to me.  I know I was slow on some things,
6    but I'm much faster now.  I have all the answers I need
7    to get, and these things will be taken care of, and
8    right now what we're talking about is just waiting
9    until next month to get the whole thing completely
10   taken care of and if you have something you need faster
11   I can get it to you faster.
12       THE COURT:  How long is it going to take you
13   to undesignate, until the end of February?
14       MR. COHEN:  The end of February.  They'll be
15   completely redone.  They'll have a whole new set of the
16   labeled redactions, the remove the foreign redactions,
17   the de-designated confidentiality.  I have already
18   produced in one format the labeled redactions with the
19   removal of the foreign -- but they'll get the grand
20   unified set, the once and for all, here it is, and then
21   we can all be singing from the hymnal as Mr. Sizemore
22   likes to say.
23       MR. MAYER:  And we did tell plaintiffs at
24   prior conferences that we're going to put a priority on
25   getting the documents out --

1    MR. SEEGER:  The end of February.

2        THE COURT:  That's reasonable.  Put in the

3    order the end of February they'll have declassified --

4        MR. WEISS:  Where is the log of the

5    privilege?

6        MR. COHEN:  He's got it.

7        MR. WEISS:  It is up to date?

8        MR. COHEN:  Yes, I handed it to him.

9        MR. PLACITELLA:  My concern was in providing

10   some assistance in preparing for trial and getting

11   expert reports for this first group done in reviewing

12   documents I'm running into pages and pages of big black

13   pages nothing there, and I don't really understand the

14   context in which that was done, and it would be in a

15   very significant document, and then all the sudden

16   there's three paragraphs and then it continues, and I

17   understand maybe it is because some other drug might be

18   mentioned, but the problem is if VIOXX is being

19   compared to another drug the fact that another drug is

20   being mentioned is clearly evidential to what I'm

21   trying to accomplish, and I'm trying to work under

22   these deadlines, and I don't get it, frankly, the whole

23   system that's gone on so far having come in late.

24       MR. COHEN:  Two things.  First of all, I

25   think on, my learned colleagues would review the motion

73

1    to compel documents to go through all these things all

2    of the documents we have been producing since I think

3    September or October have the reason for the redaction

4    labeled right on them.  I have given plaintiffs'

5    counsel going backwards a set of documents on images

6    that have the reasons for the redactions right on them

7    that I understand might not be in the most -- in the

8    way they would most prefer to have them and put them

9    back together.  That's why the end of February when I'm

10   planning to do a whole new set, but the reason for the

11   redactions now are right on them.  In our responses to

12   document requests we have set forth exactly what we're

13   doing, and the motion to compel where at least one of

14   our redactions was overruled that has a lot of the

15   explanation.  And we are not doing anything such as if

16   VIOXX is being compared to another drug -- there were a

17   couple of instances where it was an actual study with

18   another drug that was not redacted, and all of this is

19   set forth in the responses to the document requests and

20   the motion to compel briefing, which was quite thorough

21   on both sides.

22       THE COURT:  What we did originally for those

23   people that came late is we really did say that VIOXX

24   was still on the market.  It was still an essential

25   part of this company.  It was still making billions of

74

1    dollars, I guess, in profits.  Maybe not profits, maybe

2    gross, I don't know, but at any rate it was important

3    to the company that they be protected from their

4    competitors, and it was clear to me that there were

5    competitors who were selling very similar drugs, and

6    there was a strong need for confidentiality, and the

7    Court wanted documents produced very quickly, and we

8    agreed pretty much that there would be a lot of

9    allowing people to have documents stamped

10   "confidential," and then maybe weeding back through

11   them to see what wasn't just so that plaintiffs would

12   have them in their hands.

13       That worked very well until September 30th

14   when VIOXX came off the market, so the need for

15   confidentiality plummeted as far as I'm concerned.  It

16   doesn't mean it went to zero, but it plummeted, and the

17   fact is that most -- many of the key confidential

18   documents, quote "confidential documents" and "sealed

19   documents" have already been made public not through

20   lawyers here, not from this litigation but from other

21   litigation.  It doesn't really make much sense for us

22   to have a confidential document that everybody has

23   already seen.  I personally think -- I don't care how

24   confidential it is, if it has been on 60 Minutes it is

25   not confidential anymore.

75

1        MR. COHEN:  We might be coming to ask the

2    Court to do something to people who put documents on 60

3    Minutes.

4        THE COURT:  But nobody did that from this

5    litigation.  If they did I would be ready to deal with

6    that.  So now we have, first of all, things that maybe

7    should have been confidential anyway, but they're way

8    past being confidential because they're public record

9    basically at this point, and, two, we have a

10   substantially less number of things that should be kept

11   confidential and at this point counsel had agreed that

12   we were talking a reduction from what was -- they were

13   marking 90 percent confidential, they probably should

14   have been marking 60 percent confidential.  Now they

15   probably should be marking 5 percent confidential, but

16   from their point of view, which is their point of view,

17   they're probably going to be marking 15 to 20 percent

18   confidential, and we'll have to review it.  The end of

19   February is reasonable to change what has already been

20   done.

21       MR. SEEGER:  We agree.  We don't have to --

22   we are going to be asking you to revisit and talk to

23   you again about the issue involving another drug called

24   ARCOXIA because it is pretty clear from documents we

25   have seen that there are, as Chris Placitella just

76

1   raised, they are being - the safety data from one COX-2

2   is being compared to another COX-2, and that is --

3   obviously, that is going to become important, but we

4   can put that on a future agenda for another status

5   conference.

6           THE COURT:  Is Merck still developing that

7   drug?

8           MS. SULLIVAN:  Yes, your Honor.

9           MR. COHEN:  It is on the market in Europe.

10          MR. SEEGER:  It is currently under review by

11  the FDA here.

12          THE COURT:  Was VIOXX pulled from the

13  European market, too?

14          MR. COHEN:  Yes.

15          THE COURT:  All right.  So you'll work out

16  the databases.  I have a deposition -- not a

17  deposition, but I'm on trial in a medical malpractice

18  case, and there's an expert that can only testify right

19  now, so I'm going to do that.  When he is done that's

20  going to be the end of the day for that trial, so I'll

21  be available in a couple more hours.  If you can work

22  things out that you need to work out when I take a

23  break or whatever I'll sign the orders and we'll leave.

24  You can leave.  If you want me to come back and address

25  you this afternoon or talk to you this afternoon,

1   that's fine.

2           MR. SEEGER:  We have things to talk about, so

3   why don't we try to do that, and we'll let you know

4   through Carmen.

5           THE COURT:  There might be a point I would

6   suggest that liaison counsel meet with a lot of people

7   who have sort of popped in who some who are very

8   experienced plaintiff's counsel, some who are not maybe

9   or very experienced but maybe not that as to the mass

10  torts.  I would suggest you take at least some time

11  today to meet with just all the plaintiffs' counsel and

12  maybe give them some advice on what they should or

13  shouldn't be doing.  If we have somebody who is -- not

14  that you have to take it, but I'm just saying there

15  might be some plaintiffs' counsel who have questions

16  that they want to ask you that they don't want to raise

17  in front of everybody or in the group or, you know, the

18  only dumb question is the question you don't ask,

19  right?

20          MR. SEEGER:  Okay.  That's fine.

21          THE COURT:  I don't know if I was -- you

22  know, I didn't do mass tort.  Obviously, it didn't even

23  exist when I was practicing, so I don't know whether I

24  would be expected to be getting my own experts, relying

25  on your experts, sharing costs.  I don't know if you

1   have already dealt with everybody on that.

2           MR. SEEGER:  We have dealt with a lot of

3   people on it.

4           THE COURT:  Some people may not know, and

5   they might want to talk to you.

6           MS. BEREZOFSKY:  Your Honor, before we break,

7   I would like to have the opportunity to address some of

8   the issues on the class case on medical monitoring.

9   Would you prefer to do that now or later when you

10  return?

11          MR. DAVID COHEN:  In that same vein I

12  submitted an agenda for the Court's review concerning

13  class action issues in advance of the conference, and I

14  would like to have a chance to discuss those issues at

15  some point today.

16          THE COURT:  We did do a scheduling order for

17  the one class action.

18          MR. BUCHANAN:  We did.  It is on the record,

19  your Honor, and we have been operated under it.  I

20  think it is actually in the order from November.

21          MR. JUDD:  It needs to be modified.

22          MR. BUCHANAN:  It needs to be modified.  We

23  advised your Honor as to a scheduling difficulty with

24  depositions.

25          MS. BEREZOFSKY:  I would like to get a

1   schedule or order in place or at least begin

2   discussions about that at some point.

3           THE COURT:  All right.  I would suggest class

4   action counsel meet with defense counsel and spend time

5   trying to work things out as far as a schedule, and if

6   you can't I'll be taking a break, and I'll come back

7   in, and so far this case has not been one lawyer.  The

8   attorneys have been relatively quick so I'm hoping this

9   won't take that long.

10          MR. MAYER:  Procedurally we would like to

11  request there be one plaintiff's again through liaison

12  counsel, as opposed to multiple agendas.

13          MR. BUCHANAN:  So the record is clear on that

14  I know Mr. Locks made a reference to it, and you were

15  hoping people would be submitting issues to liaison

16  counsel.  We have been e-mailing out and advising

17  people in advance of the status conferences of the

18  timing for submitting agenda items.  To the extent we

19  receive those we incorporate those in the agenda, and

20  we don't have a problem submitting a unified agenda

21  from everybody.  I didn't receive an agenda from class

22  action counsel, although I put in a place holder

23  knowing they wanted to address scheduling issues today.

24          THE COURT:  I agree.  I mean I don't want

25  multiple agenda items from each person, and maybe I

1  spoke hastily if I said if you wanted to send a letter
2  to the Court on an agenda item you should send it to
3  liaison counsel.  But, you know, I haven't gotten any
4  feedback on liaison counsel, which means I assume
5  everybody is happy with them.
6       MR. JACOBY:  Just a reminder, everybody needs
7  to send us their contact information so we can
8  communicate with them.
9       THE COURT:  I don't want to create issues
10 where there aren't any.  I have been very happy with
11 counsel on both sides as far as moving this, and we
12 have really made a lot of progress and moved things
13 relatively quickly, so I think it has been working
14 well.  But if you do have a problem then I guess we
15 should address it, your Honor you know, let me know.
16      MR. SEEGER:  Let us know so we can fix the
17 problem.
18      THE COURT:  Let them know.  It is not easy to
19 be the liaison counsel particularly for the plaintiffs
20 because there are a lot of people, and I'm sure if you
21 try to get in touch with them there may be times when
22 they don't have much time to just chat with you, but,
23 on the other hand, by having that role they should be
24 making themselves available to you when you need them,
25 especially if you're relatively new to this, and they

1  don't have to become your tutor, but they have to give
2  you some advice, I think.
3       MR. BUCHANAN:  Our goal is to provide that
4  advice so the Court doesn't have to deal with problems
5  with CIS statements and, you know, where the short form
6  complaints are and to guide people through the process.
7  I'm sure issues fall through the cracks, but we're
8  trying to consolidate our own work product or I'll say
9  the New Jersey forms and some of the things that most
10 lawyers would be interested in and to some readily
11 accessible forms so lawyers can get their hands on
12 things quickly without having to chase down myself and
13 Mr. Seeger  --
14      THE COURT:  And the basic things you can
15 call.  I mean, obviously, not on strategy things or
16 issues involving, you know, but on basic where you find
17 things you can call my clerk and my secretary and they
18 will help you.  All right.  I'll be back in a little
19 bit.
20      (End of proceedings.)
21
22
23
24
25

C E R T I F I C A T I O N

    I, REGINA A. TELL, C.S.R., C.R.R., License Number
30X100161000, an Official Court Reporter in and for the
State of New Jersey, do hereby certify the foregoing to
be prepared in full compliance with the current
Transcript Format for Judicial Proceedings and is a
true and accurate compressed transcript to the best of
my knowledge and ability.

_____  1-17-05

Regina A. Tell, CSR-CRR

Official Court Reporter

Atlantic County Courthouse

Mays Landing, New Jersey

DAVID BUCHANAN,
MATTHEW MANDRERKA, ESQ.?
ATTORNEYS FOR THE PLAINTIFFS
DAVID JACOBY, ESQUIRE
GREGORY S. SPIZER, ESQUIRE
ANAPOL, SCHWARTZ, WEISS, COHAN, FELDMAN & SMALLEY
ATTORNEYS FOR THE PLAINTIFFS
MICHELLE TIGER, ESQUIRE
KLINE & SPECTER
ATTORNEYS FOR THE PLAINTIFFS

                    *       *       *       *       *

                    REGINA A. TELL, CSR-CRR
                    OFFICIAL COURT REPORTER
                    1201 BACHARACH BOULEVARD
                    ATLANTIC CITY, NJ  08401

Court Hearing
    FRED GERSON, ESQUIRE
    D'ALESSANDRO, JACOVINO & GERSON
    ATTORNEY FOR THE PLAINTIFFS
    NAVAN WARD, JR., ESQUIRE
    SCOTT LEVENSTEN, ESQUIRE
    BEASLEY, ALLEN, CROW, METHVIN, PORTIS, MILES, P.C.
    ATTORNEY FOR THE PLAINTIFFS
    WENDY FLEISHMAN, ESQUIRE
    LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
    ATTORNEY FOR THE PLAINTIFFS
    ESTHER BEREZOFSKY, ESQUIRE
    WILLIAMS, CUKER & BEREZOFSKY
    ATTORNEY FOR THE PLAINTIFFS
    SAMUEL DAVIS, ESQUIRE
    DAVIS, SAPERSTEIN & SALOMON, P.C.
    ATTORNEY FOR THE PLAINTIFFS
    THEODORE M. LIEVERMAN, ESQUIRE
    SPECTOR, ROSEMAN & KODROFF, P.C.
    ATTORNEY FOR THE PLAINTIFFS
    MEREDITH P. GURSKY, ESQUIRE
    LANIER & ASSOCIATES, LLC
    ATTORNEYS FOR THE PLAINTIFFS
    MICHAEL GALPERIN, ESQUIRE
    GENE LOCKS, ESQUIRE
    LOCKS LAW FIRM
    ATTORNEYS FOR THE PLAINTIFFS
    JAMES TRAINOR, ESQUIRE
    SULLIVAN, PAPAIN, BLOCK, McGRATH & CAMARO
    ATTORNEY FOR THE PLAINTIFFS
    FRANK MORREALE, ESQUIRE
    KASOWITZ, BENSON, TORRES & FRIEDMAN
    ATTORNEY FOR THE PLAINTIFFS
    MICHAEL FERRARA, ESQUIRE
    THE FERRARA LAW FIRM
    ATTORNEY FOR THE PLAINTIFFS

Court Hearing
    EDWARD GOLDIS, ESQUIRE
    FELDMAN, SHEPHERD, WOHLGELERNTER & TANNER
    ATTORNEYS FOR THE PLAINTIFFS
    THERESA CORSON, ESQUIRE
    LEVY, ANGSTREICH
    ATTORNEY FOR THE PLAINTIFFS
    GREG SHAFFER, ESQUIRE
    WILENTZ, GOLDMAN & SPITZER
    ATTORNEY FOR THE PLAINTIFFS
    RONALD JONAS, ESQUIRE

        ATTORNEY FOR THE PLAINTIFFS
    MICHAEL WEINKOWITZ, ESQUIRE
        ATTORNEY FOR THE PLAINTIFFS
    SACKS & WESTON
        ATTORNEY FOR THE PLAINTIFFS
    HARRISON J. GORDON, ESQUIRE
        ATTORNEY FOR THE PLAINTIFFS
    WEITZ & LUX
        ATTORNEY FOR THE PLAINTIFFS
    DEBORAH BAIRD, ESQUIRE
        ATTORNEY FOR THE PLAINTIFFS
    NANCY ARMSTRONG, ESQUIRE
    MILLER & ASSOCIATES
        ATTORNEY FOR THE PLAINTIFFS
    RICHARD GALEX, ESQUIRE
        ATTORNEY FOR THE PLAINTIFFS
    TOBIAS L. MILLROOD, ESQUIRE
        ATTORNEY FOR THE PLAINTIFFS
    GORDON & GORDON
    THEODORE V.H. MAYER, ESQUIRE
        ATTORNEY FOR THE PLAINTIFFS
    CHARLES W. COHEN, ESQUIRE
    MYRON MARLIN, ESQUIRE
        ATTORNEYS FOR THE DEFENDANT, MERCK
    PHIL DONELLA, ESQUIRE
    DECHERT, LLP
        ATTORNEY FOR THE PLAINTIFFS
    ROBERT TRUNNES, ESQUIRE
        ATTORNEY FOR THE DEFENDANT, MERCK

Column 1 (lines):

1        P R O C E E D I N G S
2            THE COURT:  Okay.  All right.  Let's just go
3    over the agendas.  Should we start with those first and
4    then get to the motions?
5            MS. SULLIVAN:  Sure.
6            THE COURT:  All right.  Let's start with
7    plaintiff's agenda first.  What's your first item?
8            MR. BUCHANAN:  Our first item is ARCOXIA.
9    This, of course, concerns the --
10           THE COURT:  We started with Merck's last
11   time, so we'll start with you.
12           MR. BUCHANAN:  I appreciate that.
13   Unfortunately, I can't say this is going to be one that
14   is going to be particularly eventful for us, I think.
15   The parties have met in light and considered your
16   Honor's comments both at the last conference as well as
17   the telephonic conference we had subsequent to the last
18   status conference concerning some appropriate way to
19   get ARCOXIA information into plaintiffs' hands.
20           Plaintiffs are prepared to submit an order to
21   the Court under the five-day rule that will provide for
22   the production of the CSR's, clinical study reports,
23   and the data that supports them -- not the electronic
24   data, but the schedules and everything that's attached
25   to those CSR's -- as well as a provision requiring

Column 2 (lines):

1    Merck to unredact certain information contained in
2    documents, and we're still trying to fine tune the
3    language of that.  We'll probably do it during the
4    lunch break today, so, hopefully, we can get at least
5    an understanding of what may be an acceptable term as
6    to that proposed order.
7            The concept, though, is that information
8    pertaining to marketing information, okay, things that
9    would relate to marketing strategy, for example, for
10   ARCOXIA Merck has particular concerns over and plans --
11   while interested in that I think it heard your Honor's
12   suggestions as it relates to that type of information.
13   So we're not inclined to go down that road in the
14   interest of getting this information in our hand as
15   quickly as possible.  I hope that we'll be able to
16   finalize that today and maybe even submit it to the
17   Court before we leave.
18           MR. COHEN:  As you know, ARCOXIA is a major
19   point of disagreement between Merck and the plaintiffs.
20   We have briefed the issue, and your Honor had ruled on
21   it previously.  We also had a case in Texas where the
22   Texas Court of Appeals issued a writ of mandamus to a
23   District Court Judge on ARCOXIA, as well.  The
24   plaintiffs have a proposed order, and, basically, what
25   we are talking about and what we're trying to figure

Column 3 (lines):

1    out is if there's something they're going to propose we
2    think as a matter of strategy or just dealing with the
3    Court's time whether we would put in opposition or
4    whether we would after the five days it would just go
5    away, and that's what we're talking about now to see if
6    what they're asking for is something narrow enough to
7    where that might just be something that makes sense.
8            THE COURT:  So why do you need the five days,
9    why can't you just agree on an order today?
10           MR. BUCHANAN:  Charlie, could we go off the
11   record for a moment?
12           THE COURT:  Yes.
13           (Discussion off the record.)
14           THE COURT:  All right.  We're back on the
15   record.  That way we don't have to talk about it
16   anymore.
17           MR. BUCHANAN:  I don't think so.  I hope
18   we'll have an order to present today, and if we don't
19   we'll advise you quite quickly.
20           THE COURT:  Now the order from February 17th,
21   is that something two of you can sit down today --
22           MR. COHEN:  It is done.
23           MR. BUCHANAN:  It is resolved.
24           THE COURT:  All right.  Let's move to Merck's
25   agenda since we did two of plaintiffs so successfully.

1    Merck's starts out with class actions, though.

2         MS. SULLIVAN:  Do you want to start with

3    something a little bit easier, the confidentiality

4    issues, maybe?  That's number -- actually, that's on

5    plaintiffs' agenda.

6         THE COURT:  Electronic delivery of medical

7    records?

8         MS. SULLIVAN:  Let's start with electronic

9    delivery of medical records.  Your Honor may recall

10   that previously there was an agreement between counsel

11   and Merck that we would produce medical records at

12   least 10 days before any treater deposition.  Your

13   Honor ordered at the last conference that -- or at the

14   January conference that Merck produce records within 20

15   days of receipt, and because of the prior agreement

16   there was an enormous backlog to try to catch up, and

17   we have been burning CD's -- multiple CD's daily and

18   have produced records into the sixth wave of cases, so

19   certainly any upcoming depositions the original medical

20   records are out, and we are producing supplemental

21   records within the 20 day time frame ordered by the

22   Court.

23        It has just become a logistical and costly

24   problem for Merck from a resource standpoint, and the

25   prior agreement of 10 cents a page, I believe, is just

5

1    not workable going forward, and we have been in

2    discussions with Mr. Buchanan and Mr. Weiss about an

3    electronic access formula where a vendor would post the

4    records and both the plaintiffs and Merck could have

5    contemporaneous, instantaneous access, and the cost of

6    that would be $25.

7         MR. CORONATO:  $25 a record, and I have

8    discussed this with Mr. Buchanan and his designee, and

9    I think I have answered all their follow-up questions.

10   Initially they had questions about security.  I

11   answered those questions.  I believe they're satisfied

12   with the answers I gave them regarding security.  They

13   had a question about if there were additional charges

14   after the -- after you have paid for the records if the

15   records are online for 30 or 60 days is there an

16   additional charge for them being online, and the answer

17   is no.  They had a question about --

18        THE COURT:  There's no charge to have them

19   printed out, obviously.

20        MR. CORONATO:  No.  You pay $25 per health

21   care provider records once, and you print it as many

22   times as you want, and it is stored there until the

23   case is concluded -- that particular plaintiff's case

24   is concluded.

25        There was also a question about the cost of

6

1    X-rays.  I explained to counsel this morning that if we

2    order an X-ray our vendor will have a copy made, and

3    the charge is $10 an X-ray, which is the charge that

4    they're being charged by their outside vendor to have a

5    copy made, and it is being passed right through.

6    There's no extra charge -- surcharge on top of that.

7    It is going to be passed to them.

8         So I believe I have answered all their

9    questions, and I don't know what else we can do.

10        MR. BUCHANAN:  Your Honor, we did have an

11   individual who assisted in negotiating this for the

12   plaintiffs.  He addressed security concerns, access

13   concerns, cost concerns that other plaintiffs in New

14   Jersey had raised over the last several weeks since the

15   last status conference.  I believe they have been

16   satisfactorily addressed.  E-mails have gone out, but

17   for the benefit of people who are here, Will, who may

18   not have either understood or processed or received the

19   precise terms can you outline in general terms what

20   this proposal is and so if anybody has a concern now on

21   the record they can voice it?

22        MR. CORONATO:  Sure.

23        MR. BUCHANAN:  From my perspective we're

24   prepared to commit to the Court to this new proposal.

25        MR. CORONATO:  Our vendor would collect

7

1    records -- well, let me back up for a second.

2    Plaintiffs' counsel would be given a user name and

3    password.  They would sign on to a site.  When they get

4    on to the site they would only see a list of the

5    plaintiffs that they represent.  They wouldn't see any

6    other plaintiffs.  They would only have access to the

7    records for the plaintiffs they represent.  They would

8    then select the plaintiff whose records they want.

9    They would be taken to another page, and there would be

10   a list of the records that are available for purchase

11   and downloading.  They want the record, they pay $25

12   per record.  They get access to the record that's in

13   PDF.  They can print it.  They can download it, and it

14   is stored there until the case is concluded.

15        They would also receive e-mail notification

16   when a new record is posted, so we don't have -- so we

17   address any concern about not getting timely notice and

18   not getting the records.

19        THE COURT:  There's no cost for the e-mail

20   notification?

21        MR. CORONATO:  There's no cost for the e-mail

22   notification.

23        THE COURT:  Once they print it once they can

24   print it again for free?

25        MR. CORONATO:  Yes.  In terms of the cost it

8

1    is $25 per record.  That's a competitive price.  I
2    believe plaintiffs' counsel has researched and agrees
3    that is a competitive price.  The average record --
4    number of pages obtained by our vendor is about $250
5    per record.  Now some providers may only have a
6    handful, but hospitals have thousands of pages of
7    records but on balance it is about 250 pages per
8    record, and at 10 cents a page that's $25.  We have
9    also compared it to a vendor that's used by the Anapol
10   firm Xerop.  They charge anywhere from 19 to mid
11   twenties or upper twenties per record, but that's a
12   discounted rate, I understand, for Anapol.  And that
13   vendor also charges $10 extra to get a certified copy
14   of the records, so when you add that in Xerop is
15   actually more expensive.  Our vendor gets the
16   certification of records included in the $25.
17          Another vendor called me.  They're collecting
18   medical records for Motley, Rice.  They called and
19   offered me a similar deal that we could obtain the
20   records they're getting for the plaintiff for this
21   plaintiff firm of $25 per record.  So the cost is not
22   an issue.  It is a competitive price.
23          There's a question about X-rays, and I may
24   have mentioned this before, but it is $10 per copy per
25   film.

9

1          MR. BUCHANAN:  Your Honor, there's one other
2    point worth noting, and this is something that when
3    they request an authorization for a client's dental
4    insurance provider from seven years ago, you know,
5    whether the authorization gets signed or not or
6    objected to or a motion for protective order set that
7    aside, assuming there's an authorization signed the
8    firm that provided the authorization the plaintiff's
9    firm does not need to pay the $25 to get those records
10   unless they choose to, so if the defendants seem to be
11   going down a path in requesting authorizations and
12   they're getting the authorizations granted over
13   protective order or otherwise there's no obligation on
14   the plaintiff's part to pay a fee for records as there
15   would be under the current system.
16          Under the current system plaintiffs are
17   charged 10 cents a page for whatever defendants get.
18   This system allows plaintiffs to use their own judgment
19   in terms of what they download, and I think that's
20   something that's been attractive to the lawyers.
21          MR. CORONATO:  That's a good point.
22          MR. BUCHANAN:  Just to be clear when you say
23   a record you're referring to a particular provider's
24   record?
25          MR. CORONATO:  Correct.

10

1          MR. BUCHANAN:  It could be 100 pages or a
2    thousand pages.
3          THE COURT:  So if it is one doctor it is $25.
4          MR. CORONATO:  One hospital admission $25.
5          MR. BUCHANAN:  All plaintiffs consent to
6    this, unless there's an objection.
7          THE COURT:  Is there any fee to -- any
8    initial sign up fee or anything like that?
9          MR. CORONATO:  I don't believe there is, your
10   Honor.
11          THE COURT:  Is there any termination fee?  I
12   mean, if we start this and it turns out that people
13   don't like it can it be terminated at any time?
14          MR. CORONATO:  The only other option -- yes,
15   it can be terminated, but the only other option would
16   be the CD's, which is becoming prohibitive for Merck.
17          THE COURT:  I'm not suggesting that -- this
18   sounds good.  I mean, I think both sides will be happy
19   with it, but, you know, if it turns out to be something
20   different than what we anticipate.
21          MR. SPIZER:  Would that name and password
22   apply to any member of my firm or are there
23   individual --
24          MR. CORONATO:  We're discussing that with the
25   vendor.  My thought is it would be easier

11

1    administratively if it was one password per firm.  The
2    vendor, though, believes that it really should be on a
3    user basis because they have their own concerns about
4    security and who is getting access to the records, and
5    they want to be able to make sure that only people --
6    individuals at firms have it, but I think that's
7    ultimately where we're going to go is it will be an
8    individual user password, not a firm password.
9          MR. GALPERN:  Can I ask two questions?  First
10   of all, it sounds like a very good proposal.  How
11   quickly do we get the records or e-mail notification
12   after you guys get it?
13          MR. CORONATO:  I think it is simultaneously.
14          MR. GALPERN:  Then they're accessible to us
15   almost simultaneously?
16          MR. CORONATO:  Yes.
17          MR. GALPERN:  Secondly, is there a mechanism
18   by which we can use this service as part of our
19   investigation that we can get records through this
20   service that you won't be able to see until we put the
21   case into suit?
22          MR. CORONATO:  I could ask the vendor.
23          MR. GALPERN:  It would make sense if we're
24   using the system we should use it pre and post
25   complaint, but, obviously, precomplaint we would rather

12

```
1    you not look at the records before we decide to put it
2    into suit, so, perhaps, somebody can take a look at
3    that and get back at the next case management
4    conference because if this is going to save time and
5    money after the complaint it would probably save time
6    and money before.
7         MR. BUCHANAN:  You wouldn't have to rerequest
8    the records.
9         MR. GALPERN:  Exactly.
10        MR. CORONATO:  I would rather that issue not
11   hold up --
12        MR. GALPERN:  I agree with that remark.  It
13   was just a question.  I support what you guys have
14   done.
15        THE COURT:  All right.  So why don't you
16   prepare and submit an order.  Do you need a court
17   order?
18        MR. CORONATO:  I'm not sure we need an order.
19        THE COURT:  As long as you two agree.
20        MS. SULLIVAN:  We do because we have an order
21   that says we have to.
22        MR. CORONATO:  We need to at least vacate
23   that portion of your Honor's prior order.
24        THE COURT:  Submit an order saying whatever
25   you want it to say.  If you want it to say -- I prefer
```

13

```
1    it not give a particular vendor that I'm ordering to
2    one vendor because of AOC concerns.  I prefer it just
3    to say that the prior order of 10 cents a page is
4    vacated, and that the --
5         MR. BUCHANAN:  Parties have resolved --
6         THE COURT:  Have resolved the issue and will
7    be producing records through an outside vendor agreed
8    to by the parties or something like that.
9         MS. SULLIVAN:  Your Honor, on a related
10   medical records collection note, the 24-hour
11   authorization procedure that we discussed that the
12   Court ordered at the last case management conference in
13   one -- about one-third of the cases we have not been
14   getting the authorizations in.  We have requested
15   100 -- made 100 provider-specific requests to
16   plaintiffs' counsel for 24-hour turnaround on the
17   authorization, and in about one-third of those cases
18   we're not getting responses within the 24 hours, and
19   most of them are taking more than three days or longer.
20   Some firms have agreed to just give us blanket
21   authorizations, but we are running into a problem with
22   the 24-hour authorization for specific providers.
23   We're also getting pushed back now from counsel saying
24   give me the basis for each provider.  Give me the basis
25   on why you're requesting this, so it is just delaying
```

14

```
1    the process of medical records collection in the face
2    of some very stringent deadlines for the test cases and
3    some cases behind it, and so we would ask the Court to
4    reconsider the blanket authorization rule or some other
5    procedure that is more workable.
6         MR. BUCHANAN:  Your Honor, this is the first
7    time I have heard this.  It is not on our agenda.
8         MS. SULLIVAN:  The issue is not with your
9    firm.
10        MR. BUCHANAN:  I haven't had an opportunity
11   to understand which firm you're referring to because
12   this is something we have been discussing among
13   plaintiffs' counsel, and as far as I know there have
14   been no violations.  That's why I'm surprised to hear
15   there's been 100 requests and so many people haven't
16   complied.  This would have been an appropriate thing to
17   raise with us so we could have sorted out what the
18   concern is.  I can't give an answer on behalf of
19   plaintiffs as to what is driving the delay or even if
20   it is founded.
21        MS. SULLIVAN:  Dave, it is your firm that's
22   giving us responses not authorizing or not moving for a
23   protective order, but saying why do you need each
24   record, and that's not proper procedure, and it is not
25   consistent with the Court's order.
```

15

```
1         MR. BUCHANAN:  We have given you every
2    authorization within 24 hours.
3         MS. SULLIVAN:  But we have gotten responses
4    on several providers saying, Give us the basis as to
5    why you're requesting it.
6         MR. BUCHANAN:  But you got the authorization
7    in response --
8         MS. SULLIVAN:  No, that's not the case in the
9    instances that I have been provided with.
10        MR. BUCHANAN:  Well, your Honor, I can sort
11   this out at the lunch break, but I have serious doubts
12   about that assertion.
13        MS. SULLIVAN:  My problem, your Honor, and I
14   don't want to make this, you know, unworkable for
15   anybody, but my problem, your Honor, is we have very,
16   very tight deadlines for depositions of treating
17   physicians, and we're finding it difficult to get the
18   records because in one-third of the cases we're not
19   getting the authorizations back in a timely fashion,
20   and it is pushing us up against dates for plaintiffs'
21   depositions and treating doctor depositions, and some
22   firms have agreed to give the blanket authorizations,
23   and it was workable before, and we would submit that we
24   return to that procedure.
25        MR. BUCHANAN:  I think I just heard about one
```

16

1  of these instances, Diane, you wanted an employment
2  authorization for Long John Silver's, and our client
3  never worked for Long John Silver's so we said why do
4  you need an employment authorization.  I mean, I would
5  be happy to go through this with you, Diane.  I feel a
6  little bit blindsided by having this kind of detail on
7  the record.
8      MS. SULLIVAN:  But that's one of the
9  examples, and we have a medical record that says he
10  worked at Long John Silver's for X number of years, and
11  that was our grounds for requesting the records.  It is
12  in the medical records.  Let us make the request.  They
13  can come back and say they have no records or they have
14  records consistent with the doctor's note, but the
15  point is it is not for plaintiffs to say it is not
16  proper procedure, and it obstructs discovery and delays
17  things for you to come back for many providers and say
18  give me the basis as to why you need the record.
19      The basis is it's been listed in your facts
20  sheet or it is listed in the medical records, which
21  makes it fair game.  If there is sensitive information
22  the Court has come up with a procedure where you move
23  for a protective order.  You don't delay things by
24  faxing back give us more information before we decide
25  whether or not we'll give you the authorizations.

1      MR. BUCHANAN:  I have a concern about
2  addressing this when there seems to be a very well
3  prepared presentation on this issue with a list of
4  particular violations and bases for everything, none of
5  which has been shared with us prior to the conference.
6  I can't sort it out on the fly.
7      THE COURT:  Before it is dealt with today --
8  we may deal with it today, but when we take the next
9  break I would expect counsel for Merck to identify
10  which firm she has had problems with and what those
11  items are and what counsel and let counsel address them
12  and see if it is really a problem.
13      MR. BUCHANAN:  Fair enough, your Honor.
14      THE COURT:  She is -- I think Miss Sullivan
15  is right if she is getting back, you know, in 100 or a
16  third of the cases she is not getting the
17  authorizations back then that's a real problem.
18      MR. BUCHANAN:  I think we would agree, your
19  Honor.  I'm surprised by those statistics, but we'll
20  sort that out at the break.
21      THE COURT:  Okay.  As I said, I'm assuming
22  counsel have the blank authorizations filled out in
23  their office signed by their clients.
24      MR. BUCHANAN:  We do.
25      THE COURT:  So all they have to do is call

1  their clients and, hopefully, confirm with them that,
2  you know -- and, again, I understand the Long John
3  Silver's.  I'm not going to go through each one.  I
4  hope I don't have to.  But if they ask for the Long
5  John Silver employment records and your client never
6  worked at Long John Silver why can't you send them an
7  authorization for Long John Silver with a note saying
8  we don't think they ever worked there, but if you want
9  go ahead and look --
10      MR. BUCHANAN:  I don't know what we did in
11  that case.  I think we actually did send the
12  authorization, but we said why do you want this, we
13  don't think our client worked there.  I don't think a
14  telephone call to provide them that notice is
15  discourteous.
16      MS. SULLIVAN:  We didn't get the
17  authorization though.  That's the problem.
18      MR. BUCHANAN:  I am told we sent it, Diane.
19  We'll sort it out at the break.
20      THE COURT:  Let's check it out and see what
21  is happening.  Okay.  Then we'll go to deposition
22  protocol.  I hate to talk about that, but let's hear
23  it.  What is the story on deposition protocol?  Haven't
24  they been working pretty well?
25      MR. BUCHANAN:  I think there were two open

1  issues.  There was one that we negotiated at length, as
2  you may recall, during the last status conference,
3  and --
4      THE COURT:  We discussed time being a day,
5  two days, we went over all that.
6      MR. BUCHANAN:  Then we pulled out that
7  provision.  There's no date restriction, actually, in
8  the timing restriction on the length of the
9  depositions.  There was one open issue, I think, that
10  we objected to in our letter to the Court in early
11  March concerning identifying in the deposition notice
12  who the examining attorneys are going to be.  It is not
13  something we discussed at the last status conference,
14  and it is not something we know at the noticing of the
15  deposition.
16      THE COURT:  I thought the order said three
17  days before.
18      MR. BUCHANAN:  That's attendance.  Attendance
19  is the day before.
20      MS. SULLIVAN:  It is critical that we know
21  who the designated New Jersey examiners are prior to
22  the deposition because of all the other out of state
23  counsel and efforts to maybe get more examiners by
24  having people in New Jersey also act as if they're
25  taking it from Pennsylvania or Texas or somewhere else

1  so we need to know for purposes of making the protocol
2  work and making it reasonable who the New Jersey
3  designated examiners are so we know who may or may not
4  be entitled to question from out of state.
5      MR. BUCHANAN:  It happens at every
6  deposition, your Honor.  There's two designated lawyers
7  from New Jersey, and, frankly, I'm not aware of any
8  circumstance where you have asked and you haven't been
9  told.  I'm personally not aware of any circumstance
10  where you have asked who the designated New Jersey
11  examiners are --
12      MR. MAYER:  We usually know at the start of
13  the deposition or in advance, but we do need to know in
14  advance.  It doesn't have to be in the notice but we
15  would like to know in advance.
16      MR. BUCHANAN:  We send the attendance list
17  the day before, and we can certainly identify at that
18  point in time who the expected New Jersey examining
19  attorneys are.  We should have it pinned down by then,
20  but I don't understand why that is something you need
21  prior notice of.
22      MS. SULLIVAN:  Why is it an issue for you
23  guys to send us a letter five days before, here are the
24  two New Jersey examiners?
25      MR. BUCHANAN:  Because it is often unknown.

21

1      MR. JACOBY:  What if there's a substitution?
2      MR. BUCHANAN:  I don't want to get into a
3  situation where -- first of all, Diane, I don't think
4  you're entitled to it, but beyond that, okay, beyond
5  whether you're entitled to it --
6      MS. SULLIVAN:  That was the terms of the last
7  Case Management Order.
8      MR. BUCHANAN:  It was a provision we didn't
9  discuss.  I thought logistically it didn't work in
10  light of the way in which we have been scheduling the
11  depositions and staffing the depositions.  I don't
12  think we can provide the type of notice that you would
13  like in the deposition notice.  And I fail to see --
14      MS. SULLIVAN:  I actually don't understand
15  that.
16      MR. BUCHANAN:  I understand what you're
17  saying.  I don't understand the relevance of that
18  information to you in connection with the examination
19  that's being conducted.  I can understand why you would
20  like to know as of the deposition who the two attorneys
21  are to insure that a third -- that New Jersey doesn't
22  put forward three New Jersey attorneys, but that's
23  something that I would think would be fine as of the
24  date of the deposition, but if you would like advance
25  notice we can tell you the day before.  We know it

22

1  then.
2      MS. SULLIVAN:  Your Honor, we would like -- I
3  mean, I don't need 10 days notice, but we would like a
4  little more advance notice than that so we can compare
5  it to the list of New Jersey counsel from out of state
6  and see who has cross-notices and figure out the number
7  of proper New Jersey attorneys versus Pennsylvania
8  attorneys who are also in New Jersey, so they're not
9  getting, in effect, six New Jersey questioners because
10  they have got out of state counsel in the case.  So we
11  would like some advance notice so we can go through our
12  list to make sure that they're acting consistent with
13  the protocol.
14      MR. BUCHANAN:  I don't understand that.  I
15  don't understand that point.  New Jersey is entitled to
16  two examining attorneys.
17      MS. SULLIVAN:  The problem, Dave, is you have
18  New Jersey counsel who are also Pennsylvania counsel
19  and Texas counsel and Alabama counsel, and so you, in
20  effect, without some notice and some policing you can
21  have seven New Jersey examiners because they are acting
22  as if they're taking depositions in Alabama, but when
23  we look at the list they're actually New Jersey
24  counsel.
25      MR. BUCHANAN:  Lawyers who have cases

23

1  elsewhere are entitled to cross-notice and do whatever
2  they can do with their judges in those other
3  jurisdictions.  That is not an issue for this Court.
4  We have done this a number of times as to what I think
5  is proper for this Court to control versus what is
6  proper before another Court.
7      MS. SULLIVAN:  I don't see the prejudice to
8  you from giving us advance notice of who the New Jersey
9  questioners are.
10      MR. BUCHANAN:  We don't know, Diane.  I'll
11  give you the earliest notice that we know.  Usually it
12  is a day before.  Quite often in the last three weeks
13  rescheduling with witnesses getting cancelled or
14  rescheduling we have shuffled deposition assignments
15  within the three to five days before depositions.
16      MS. SULLIVAN:  So give it to us three days
17  before.
18      MR. BUCHANAN:  Your Honor --
19      THE COURT:  Two days?
20      MR. JACOBY:  With a reservation for some
21  reason there is -- and it does happen because there's a
22  lot of depositions -- if there is a substitution
23  they're not going to put the deposition off because we
24  changed a name that somebody else jumped in and took a
25  deposition.

24