1  ask the question about was -- and this is all good
2  stuff, but I just need some guidance on how to deal
3  with a transcript that I have to make an independent
4  judgement representing independent clients about what
5  I'm going to do about that, and if we have a privilege
6  log to deal with documents then we should have a log to
7  deal with pages, and with all due respect to counsel
8  for him to require me to find Mr. Buchanan, ask him the
9  question so he can call Merck and Merck can get back to
10 Mr. Buchanan and Mr. Buchanan can get back to me, and I
11 have to interpret, all I want to know is the same thing
12 as if I had a privilege log because maybe I'll look at
13 it and say, okay, I understand the log, I'll speak to
14 Mr. Buchanan about filing a motion, but how can I make
15 a judgement if I have 35 pages, some of which I may
16 think don't relate to a document at all that are
17 being -- and I'm giving a hypothetical; I don't want to
18 raise anybody's ire -- that don't look like they even
19 relate to a document that are designated confidential.
20 And, by the way, maybe the first question on Page 3 was
21 about the document, but on page 37 it is an entirely
22 legitimate question independent of the document? And I
23 just need as a lawyer the ability to make a judgement,
24 and all I'm asking for is a procedure to help me do
25 things with the minimum of angst between everybody.

1  another layer here.
2       As long as they're going through the pages
3  and they're saying confidential why can't they put the
4  reason next to it?  Why, because, obviously, when they
5  put confidential they have the reason in their head.
6  Why do I have to make that phone call?  Just put the
7  reason because if they're putting marketing I would
8  suggest that that's not a valid assertion and should
9  never be asserted, marketing.
10      MS. SULLIVAN:  There's proprietary marketing
11 information.  That's business secret --
12      MR. PLACITELLA:  Then say trade secret.
13      THE COURT:  Well, it is not trade secret.  It
14 is a business strategy which makes it a confidential
15 business -- it may be.  It may not be, but it could be.
16      MR. BUCHANAN:  Your Honor, we addressed this
17 in March.  The issue that came up in March was the
18 broad designation of documents that remained
19 confidential, and the way that was resolved was that
20 defense counsel was diligently going through the
21 deposition transcripts and going through the deposition
22 exhibits, and they were primarily remaining unsealed,
23 and the majority of the content of the testimony, 25
24 percent, 75 percent of the exhibits to the deposition
25 testimony were being dedesignated as confidential by

1  That's all.
2       MR. BUCHANAN:  Just one observation.
3       THE COURT:  Mr. Cohen has given you one
4  answer.  He is the one who designates these, and he
5  will accept your phone call to discuss it with you.
6  You don't have to go through an intermediary or through
7  liaison counsel.  He said he will talk to you.  I mean,
8  is that --
9       MR. COHEN:  Any time.
10      THE COURT:  Is that a problem?
11      MR. PLACITELLA:  Okay.  If that's the
12 procedure that means every deposition we get has pages
13 and pages and pages --
14      THE COURT:  Tell me what advantage it is
15 going to be to you to get pages and pages that say
16 marketing, what difference does it make?
17      MR. PLACITELLA:  Because I'm assuming what it
18 is going to say is privileged or, you know, the real
19 things they're allowed to designate as confidential.
20 Trade secret, not marketing, because that's not a basis
21 for asserting confidentiality.  That's the whole point.
22 They can say marketing.  They have to say trade secret,
23 privilege, the things that are law, with all due
24 respect to counsel, provided that can be designated
25 confidential, I don't understand why I have to add

1  them pursuant to that review.
2       And your Honor deferred further review of all
3  their other confidential materials, the 3 million pages
4  in the productions that continue to have
5  confidentiality stamps on the basis that those
6  documents may never see the light of day, recognizing
7  that the documents attached to the exhibits and the
8  testimony concerning those documents was likely the
9  most relevant information in the case, and that's where
10 the focus of confidentiality should be in the case.
11      And I don't think it is asking too much maybe
12 to go back and do it as to old stuff is a different
13 story, but as it relates to all the transcripts that
14 you have not yet sent us a confidentiality designation
15 to make a note of the claims, so if lawyers in New
16 Jersey want to address the issue there's a reference
17 they can go to it that identifies the basis for it
18 since that is supposedly the resource where all the
19 nonconfidential material is and supposed to be the
20 focus of the confidentiality challenges now.
21      MR. COHEN:  I'm not going to sit here and
22 tell the Court that this is tremendously burdensome for
23 me to put three words next to each line or something
24 like that.  I just know what is going to happen.  It is
25 not going to satisfy Mr. Placitella, and he is going to

1   do exactly the same thing one way or the other, and
2   what I would propose we do first is let's have a
3   conversation and see if we can resolve any of these
4   differences now so that we can get more on the same
5   page because we're going to have a tempest and a
6   teapot.  If I write this goes beyond the product what
7   is his next step?
8       MR. PLACITELLA:  My next step is to read the
9   10 pages and see if you're correct, and if I don't
10  believe you're correct I'll either write you a letter
11  if you allow me to do that or I'll write a letter for
12  Mr. Buchanan to write to you.  However everybody tells
13  me to do it.
14      MR. GALPERN:  If I may, your Honor, I think
15  Chris' suggestion is in accordance with New Jersey law,
16  the party asserting the privileged under 4:10(3) under
17  Chippalone (ph) has the prima facie burden of
18  establishing a privilege, and that's really all we're
19  asking them to do.  We're asking them to give us their
20  thought process as to what the privilege is.
21      MR. COHEN:  It is not a privilege.  We have
22  gone through this, but, in any event, I'm happy to put
23  a general category of what it is and let's see where we
24  go.  Let me do one or two, send it over, and see what
25  happens, and we'll be here next month, and we will see

1   how it works.
2       MS. SULLIVAN:  And Mr. Placitella can show
3   the information to his experts consistent with the
4   terms of the protective order.  He has been using the
5   information at depositions.  Other than an improper
6   desire to dump the transcripts into the press I'm not
7   sure why we're spending a lot of time on this.
8       MR. WEISS:  See, that's the point.  That's
9   unfair, and I would like to have the next -- we'll file
10  a motion if we have to.  You guys have been dumping
11  stuff in the press.
12      MS. SULLIVAN:  In response to the leaks.
13      MR. WEISS:  That's not really true because
14  all the underlying documents suggest that what's in the
15  press is at best a half truth, and that's not fair.
16  And I don't want to take the time up and do it now.  I
17  can go line by line and give you all the stuff you're
18  still hiding and saying it is confidential and yet
19  Dr. Scolnick puts what amounts to a 35-page press
20  release out in the public domain, and that's not fair.
21      MR. SEEGER:  The truth is if you read the
22  document that Dr. Scolnick published I think, and I
23  were allowed to take depositions I think we would find
24  out it wasn't even written by him, but putting that
25  aside, Andy Birchfield, who is the lawyer that's been

1   brought to your attention a couple times, he has a case
2   going to trial May 23rd.  Merck prepared a motion to
3   dismiss that case and sent it to the New York Times
4   before it was even served.  We have that on pretty good
5   information --
6       MS. SULLIVAN:  They searched the docket.
7       MR. SEEGER:  -- and if asked to prove it I
8   could prove it, so be careful.
9       MS. SULLIVAN:  There's a difference between
10  information produced designated as confidential and a
11  publicly filed, unsealed motion in a courthouse where
12  everybody has access to it.  There is a dramatic
13  difference, Mr. Seeger, between the two events.
14      MR. SEEGER:  We have it on good
15  information -- if you would like to see my information
16  I would be glad to show you -- that the brief was sent
17  maybe by their local counsel to a reporter before it
18  was even served on Mr. Birchfield.  And I would like to
19  know what Mr. Birchfield's client has done to Merck to
20  warrant that to put her personal information out there
21  other than lose her husband and think VIOXX is the
22  reason she lost him.  I mean, this is spinning out of
23  control.
24      If you remember we brought before you a few
25  times on these type of things and now what we have is

1   Dr. Scolnick publishing documents on Merck's website
2   counteracting documents that are central to the
3   litigation, putting aside the confidentiality issue,
4   and we have it on pretty good advice that Merck -- I
5   don't know if it is through the lawyers sitting here, I
6   think the world of the lawyers representing Merck in
7   your office, but somebody in Merck sent that document
8   to a reporter at the New York Times.  That is just not
9   the way to do things.
10      MS. SULLIVAN:  It is a publicly filed
11  document.
12      MR. SEEGER:  Did your client send it?
13      MS. SULLIVAN:  This is the first time I heard
14  anybody make that mud slinging allegation.  That is a
15  publicly filed document.  It is different from a
16  document produced under protective order where the
17  attorneys have been signed off and ordered to keep it
18  confidential.
19      MR. WEISS:  I think the problem, your Honor,
20  in a nutshell is that you have to have consistency and
21  fairness, and we'll file a motion and bring it to your
22  attention, but it is real tough to live with certain
23  documents being classified as confidential and certain
24  portions of deposition transcripts being labeled
25  confidential when Merck has a public website and puts

1    counterspins out on everything, and that's just not

2    fair.  It is polluting the jury pool.

3         MS. SULLIVAN:  You guys have a lot of nerve

4    saying that.

5         MR. WEISS:  Oh, yeah?  We took -- I'm not

6    going to get into it.

7         MS. SULLIVAN:  Mr. Weiss and Mr. Placitella

8    made it absolutely clear they would like to litigate

9    this in the press.

10        MR. SEEGER:  How have they done that?

11        MR. WEISS:  We have not said that.

12        MS. SULLIVAN:  There's no other reason for

13   him to battle to desesignate this stuff because his

14   experts can use it, he can use it, except that he wants

15   to dump it in the press, and you're saying you would

16   like to respond to what you think Scolnick said --

17        MR. WEISS:  No.

18        MS. SULLIVAN:  -- by dumping information into

19   the press.

20        MR. WEISS:  We have clients to represent, and

21   the clients haven't signed confidentiality orders, and

22   sometimes the client would want to see a transcript and

23   know about his or her case.  And when that stuff is

24   being labeled confidential the client doesn't see it,

25   and you know that.  So it is not going to the press,

1    can find the timeline of liability, epidemiology

2    studies and the conclusions they draw from epidemiology

3    studies.  They post it on the website.  The public can

4    see.  The public is interested in it.  We were

5    admonished not to do that, and we haven't done it.  Can

6    I post my expert reports on my website to counteract

7    that?  Can I do that, counsel?  Is that the appropriate

8    way to litigate this case because that's the course you

9    have put us on.

10        MS. SULLIVAN:  The confidential documents

11   were what you were prohibited from posting on your

12   website.  You folks have been liberal about stating

13   your positions on various issues in the press.

14        MR. BUCHANAN:  Fair enough.  I will deal with

15   the nonconfidential information to expand to it.

16        MR. GALPERN:  You're accusing him of

17   litigating in the press.  That's the last thing you

18   said.

19        THE COURT:  All right.  All right.  I think

20   we're deteriorating.  Let's just say that this -- it is

21   important to me that it has been very useful that

22   counsel initially entered into confidentiality

23   agreements and exchanged information.  I have said this

24   before.  It worked out well.  A lot of documents were

25   produced.  There's also case law that suggests that

1    Diane.  And I am not litigating the case in the press.

2         MS. SULLIVAN:  I hope not.  It is not

3    consistent with New Jersey law.

4         MR. PLACITELLA:  You don't have to defend

5    yourself.

6         MR. WEISS:  This court has been burdened by

7    confidentiality issues going way back when, and every

8    time I turn around there's something else being posted

9    on the website that's inaccurate.

10        MR. BUCHANAN:  There was early

11   representations that plaintiffs' attorneys would not be

12   posting documents, confidential or otherwise, on the

13   website.

14        MR. SEEGER:  That's my point.

15        MR. BUCHANAN:  And they have done precisely

16   that.  They have posted a 30-page summary of their

17   position.

18        MS. SULLIVAN:  There's no internal documents.

19        MR. BUCHANAN:  Can I finish, please, Diane?

20        MS.SULLIVAN:  I'm sorry.

21        MR. BUCHANAN:  They posted a 30-page summary

22   of their position in this litigation responding to --

23   whether there are public allegations, whether there are

24   allegations and complaints filed in court.  It is their

25   position piece.  You go further in that page, and you

1    every single thing that's produced in discovery even if

2    it is not privileged doesn't necessarily have to become

3    public information.  I mean, that's true whether it is

4    people's personal information about their lives on

5    behalf of the plaintiffs or whether it is defense

6    e-mails.  Everything doesn't have to become public

7    information.

8         But, things that are critical to the case,

9    documents that are going to be used at trial, documents

10   that are being used to cross-examine witnesses at

11   trial, those are the kind of documents that should

12   almost never be confidential.  Now, we're not talking

13   about people having access to six million documents

14   that include all kinds of e-mails and include

15   everything else, include all the personal information.

16   We're talking about specific documents that are

17   actually being -- because we have all said from the

18   beginning or at least I have hoped that this case boils

19   down to -- or that all these cases boil down to a

20   subset of documents.  You go through six million

21   documents hopefully by the time you come to trial I

22   would like to think that there's -- I mean, I may be

23   overly optimistic, but I would like to think that

24   there's 100 documents or 200 documents that are

25   important --

1    MR. JACOBY:  That's about right, your Honor.
2    THE COURT:  -- and that are going to matter.
3    And there are documents that the defense is going to be
4    presenting.  There are documents plaintiffs are going
5    to be presenting.  There are documents witnesses are
6    asked about.  There's documents that experts are going
7    to comment on, and they can't be kept confidential and
8    shouldn't be, unless they happen to be a document that
9    came from, you know, if it is -- well, if it is
10   privileged it is not going to get into evidence.  If it
11   gets into evidence it becomes public record, and it
12   should be produced.
13   The bottom line is the confidentiality
14   agreement was good, it is still good for the
15   production -- general production of records, and the
16   bottom line is the plaintiffs have been given by Merck
17   in that agreement you bargained for it, you both agreed
18   to it, but you were allowed -- you are allowed to use
19   that with your experts, you're allowed to use it with
20   each other, you're allowed to -- you know, there's
21   plenty of freedom for you to use documents, but I
22   agree, and I have been concerned, Mr. Cohen, with the
23   idea that pages of depositions, 15, 20 pages of
24   100-page or 200-page depositions would be marked
25   confidential just because it refers to something that

93

1    was confidential, and just because something is a
2    marketing strategy while good reason for it not to
3    be -- I mean, it is a good thing that it is initially
4    marked confidential.  It is probably not going to be --
5    if it is one of those 150 documents that's at the core
6    of the case it is not going to be confidential for
7    long, and the longer we prolong it the longer we make
8    it difficult for everybody, and that's what I have said
9    about the sealing of documents.  These records are not
10   going to be sealed.  I have a real question as to
11   whether the four documents that you agreed with the
12   Inquirer should be sealed should really be sealed.
13   You know, if another newspaper asks for them
14   or if they come in and ask for them they're really
15   close as to whether they even merit sealing, those four
16   documents.  But they do talk about some business
17   strategy.
18   MS. SULLIVAN:  Pricing.
19   THE COURT:  And I would say one of the four I
20   would probably find, and the other three, I'm not sure.
21   MR. COHEN:  I would like to think I could
22   change your mind, but two things, we have two different
23   issues, and I understand what you're saying.
24   THE COURT:  From now on we have got to come
25   up with a way -- now, a public -- the publicity issue,

94

you know, nobody has been forbidden to go to the press.
2    There was an agreement right from the beginning that
3    people would try not to go to the press.  I don't think
4    that -- I mean, both sides have been in the press.
5    There's no question.  I see quotes from both of you.
6    My law clerk tells me there's articles every day in the
7    press, and, you know, they're there.  And I don't know,
8    you know, I guess you do those things at your own risk
9    if you choose to do it.  But releasing confidential
10   documents that you have agreed to be confidential in an
11   order is inappropriate.
12   Now, if, in fact, you feel they shouldn't be
13   confidential and you want to move, I would hope it
14   wouldn't be because you want to publish them.  I would
15   hope it would be because you have you want to have ease
16   of access to them, and I think that's what counsel is
17   talking about.  I'm uncomfortable with sealed records
18   both because the public has a right and because it
19   creates a problem for us.  All the sudden I have a
20   burden on my staff and myself to keep certain things
21   protected.  We don't have a vault for that, so we have
22   to create an area, et cetera, and counsel I'm sure has
23   some concerns about that.  I mean, they don't want to
24   leak confidential information and be sanctioned or be,
25   you know, somehow -- hopefully they don't want to be in

95

1    disfavor with the Court, but, on the other hand, it
2    becomes a real problem juggling what's confidential and
3    what's not.
4    There has got to be a change in the attitude
5    of what is confidential when they come to these core
6    documents.  I am not going to allow pages and pages and
7    pages of depositions of key people to be marked
8    confidential, and I'm not going to allow documents that
9    are going to be key documents that are going to be used
10   in the case to be marked confidential, and that's what
11   I have been trying to say to you is we're not going to
12   go back over the six million and declassify everything
13   that should be or not and things that are just produced
14   for discovery even the new things, the Medco things,
15   whatever, those things should be kept confidential
16   until there's a need to use them.  I mean, they don't
17   have to put them out en mass, but the things that are
18   actually relevant to the case actually used by the
19   case, actually are important for witnesses to talk
20   about, those things really shouldn't be confidential.
21   They can't be.
22   MR. COHEN:  We have just two issues here that
23   are slightly separate.  One is on the standards for
24   what makes a confidential document, and the Court is
25   aware there are two.  One for substantive motions filed

96

```
 1   with the Court and the Court record, and one for
 2   documents not filed with substantive motions.  This
 3   includes in discovery and then nonsubstantive motions
 4   in the Court.
 5        The second is actually something I have been
 6   advocating, and now I think I have convinced the
 7   plaintiffs that what I have been saying all along is
 8   right, which is where we should focus the most
 9   attention is on the documents and the testimony at
10   depositions and the documents that are exhibits to
11   depositions.  What we're going to do is, and what we
12   have been doing is, it gets looked at twice because
13   first at a deposition they may actually want to look at
14   confidential documents.  They may use them at
15   deposition, find that they really don't do what they
16   want them to do or drop it, and that's the end of it,
17   and it will never see the light of day again, or it may
18   be something that finds its way into a motion or
19   eventually into a trial.
20        Basically the standard for what is
21   confidential is what is the content of the information,
22   not where it is used.  Where it is used, though -- and
23   I totally agree with this is where I should focus
24   attention to really look at that and make those hard
25   calls, and, so, in fact, if any of these documents ever
```

```
 1   get attached to a substantive motion what my remedy
 2   there is if I think that something maybe will not
 3   satisfy the confidentiality standard of a substantive
 4   motion, but I think they did it for an improper
 5   purpose -- and I'm not accusing anyone of that -- is to
 6   make a motion saying to strike that exhibit as not
 7   being pertinent to that motion and ask you to take it
 8   out of the file.  My remedy would not be to mark it
 9   confidential.
10        So I think basically wherever there's a
11   dispute and much of the time, actually, if there's been
12   a dispute and people have come to me we have worked it
13   out.  If there's still further a dispute we can always
14   have another motion on documents, but I don't think it
15   is going to come to that.  But I wanted to be clear
16   that the standard when it is in the Court file and
17   certainly, you know, we knocked that down dramatically,
18   and we'll go over the entire file to see what else
19   falls in that category, but there's also some self
20   selection by us.  They can certainly under a regime
21   that just says anything that's attached to a deposition
22   is not confidential then there's an incentive to put
23   every document into a deposition, and I'm not accusing
24   them of doing that, and they're not going to do that,
25   because the standard is actually is this in the
```

```
 1   substantive motion or not, and if it is not I still --
 2   I'm still going to take -- do the best job I can
 3   possibly do on it, and I have 20 lawyers here willing
 4   to tell me if I have made a mistake, and I will deal
 5   with them first, and if we can't resolve it we'll have
 6   a motion.
 7        THE COURT:  What I am suggesting, maybe what
 8   we're going to have to do, we have taken care of it for
 9   motions file, we're using this seven-day process, so
10   we're now on documents that are attached to motions.
11   If plaintiffs feel that their hands are being tied by a
12   group of documents I don't have a problem with a motion
13   being filed at this point or first sending a list to
14   Charlie, do that first, these are the 50, 60, 70, 80
15   documents marked confidential that should no longer be
16   marked confidential.  That way, otherwise, I mean, it
17   would be nice if I could say before you take a dep send
18   them the documents you're going to use, but I can
19   understand why you might not want to do that.
20        But it might be at this point enough deps
21   have been taken and everybody knows there might be some
22   smoking gun, but basically people know what you think
23   is important and what they think is important.  It
24   would seem to me if you look through 200 documents that
25   you think are most important to the case hopefully half
```

```
 1   of them aren't confidential, and the other half you
 2   could send a letter to Charlie and say, look, and to
 3   Diane and to all the defense counsel and say, look,
 4   look at these documents, which one of these do you want
 5   to be subject to a motion and which ones do you want to
 6   declassify?  Give them a certain amount of time to
 7   review it and discuss it amongst themselves which ones
 8   they feel they can defend as remaining confidential and
 9   then when they give you the list back of the ones they
10   won't declassify make a motion, and we may have to
11   spend two days here going over, you know -- in court
12   going over specific documents as to whether this does
13   or doesn't reach the level of confidentiality.
14        I don't know.  I don't know what else to do.
15   Are there any other suggestions?  Does defense counsel
16   have a different suggestion?
17        MR. COHEN:  That sounds appropriate, your
18   Honor.
19        MR. PLACITELLA:  Your Honor, that sounds
20   reasonable, and I find myself coming close to what
21   counsel just spoke about, which is why I rose to begin
22   with because I'm focusing on the depositions, the
23   documents as they are appearing in the depositions, and
24   I'm trying to understand because I think now we have
25   some procedure for what we're going to sounds
```

1  reasonable for the documents, but when they're
2  designating pages and pages of testimony I was trying
3  to understand -- which is why I rose.  I'm focusing on
4  the depositions, and I don't think necessarily there's
5  disagreement, just the procedure, which is the reason I
6  guess I started this fiasco a half-hour ago for which I
7  apologize.
8       MR. COHEN:  I'll clarify deposition testimony
9  or documents.  Send me a list.
10      THE COURT:  It can, obviously, be an
11 objection to deposition testimony, but that's so much
12 more cumbersome for me to read.  So let's start with
13 the documents.
14      MR. WEISS:  Cumbersome?
15      THE COURT:  Let's start with documents and
16 see where we go.  Meanwhile, if you have a question
17 next time you get a transcript call him and ask him.
18 And if you can't -- you know, there is -- counsel is
19 right, the bottom line is is it something that should
20 be public or not public, but there's always been that
21 issue, and there is some issue of whether it is a
22 discovery issue, and deps are discovery, you know, they
23 are discovery, but they are discovery that's going to
24 be used at trial.  They start to move over the line.
25      MR. BUCHANAN:  Your Honor, two observations.

101

1  I guess the first one as it relates to confidentiality,
2  you know, without regard to who is going to see it, who
3  is entitled to it I think they are different issues.
4  The first is whether the document is confidential under
5  New Jersey law, and that is something that is
6  determined with that regard to whether it is in a
7  deposition, whether it is a document that's been
8  produced, et cetera.  I don't know that there's a
9  different standard for confidentiality, regardless of
10 whether it is attached to a motion or not.  The case
11 law says if it is attached to a motion it is in the
12 Court record then there's a different right of public
13 access that attaches to even confidential information
14 in there.  So it is not necessarily because it is in a
15 court file it is no longer confidential.  It is the
16 confidential information even if entitled to a
17 protective order before is presumptively not protected
18 at that point in time, so I'm hoping you're not going
19 to approach this with two different levels of review
20 based on whether it is attached to a deposition or
21 whether it is in the underlying documents because I
22 think the standard for confidentiality is the same.
23      MS. SULLIVAN:  Actually, Dave, there's a
24 difference in terms of level of protection, but one
25 side cannot make something that's trade secret not

102

1  trade secret just by attaching documents to a motion
2  and filing it.  That's not the law.
3       MR. BUCHANAN:  The issue is confidentiality
4  under New Jersey law is a document confidential or not.
5       MS. SULLIVAN:  But you can't making something
6  that is clearly confidential not confidential by
7  attaching it to a motion and filing it.
8       MR. BUCHANAN:  It may still be, quote,
9  "confidential," but you may not have a right to protect
10 it once it is in the file and then you have a motion to
11 protect it, and that is what the Court is establishing.
12      One thing I am clear about Mr. Cohen did
13 offer to provide a short statement of what the basis
14 was for the confidentiality of deposition transcripts
15 to provide to New Jersey counsel, and I'm assuming
16 that's going forth.
17      MR. COHEN:  Let's see if it helps.  Let's do
18 a couple and see if it does any good, and, if not,
19 maybe  what is ordered now will be more fruitful.
20      THE COURT:  The document lists.
21      MR. BUCHANAN:  We'll provide it.
22      THE COURT:  Hopefully we can set that up and
23 narrow down what documents -- you know, we'll see.
24      MR. COHEN:  We'll have to have a dialogue and
25 all the same information we're going to be talking

103

1  about will come out in the same conversation, but let's
2  do one or two and see if that helps.  We'll do this and
3  see if that helps.
4       MR. BUCHANAN:  The documents is the same from
5  the testimony, and the documents are probably the topic
6  for a letter to you, and, perhaps, a motion if we can't
7  resolve it.
8       THE COURT:  I mean, the bottom line is I
9  don't think there's any reason why a whole dep
10 transcript has to be released to the press or should be
11 released to the press or there's this many deps taken,
12 people should be able to pull lines out of the
13 depositions.  I guess it depends on what you're using
14 it for and how, but I don't know that there's anything
15 to stop you unless it is marked confidential.
16      MS. SULLIVAN:  Certainly, your Honor, we
17 would submit under the Frankel case it is inappropriate
18 to publish information produced in discovery, including
19 deposition transcripts, to the press.
20      MR. SEEGER:  I'm sorry, your Honor, I will
21 say this, and I think I can speak --
22      THE COURT:  I'm hoping plaintiffs' counsel is
23 taking the same line that they're not interested in
24 wholesale production of and posting of what is
25 discovery in the case because, again, I'm talking about

104

1    there's key documents, key deposition testimony, key
2    things that are going to wind up being public record.
3         MR. SEEGER:  I make this comment because
4    there is a reference to Mr. Weiss and Mr. Placitella.
5    We're working closely with them.  I can assure the
6    Court that the intention is not to start leaking things
7    to the press; it is to litigate the case and get it
8    ready, and that's the idea.
9         MS. SULLIVAN:  The confidentiality doesn't
10   prevent you from doing that.  The confidentiality
11   designation does not prevent you from doing that.  You
12   can show the transcripts.
13        MR. SEEGER:  I don't want to reopen this.  I
14   wanted to respond.
15        MS. SULLIVAN:  You have articulated how the
16   confidentiality issue is preventing you from litigating
17   your case, other than you can't dump things into the
18   press.
19        MR. BUCHANAN:  Your Honor, do you want a
20   further response from us on this?
21        THE COURT:  No.  I think we discussed it.  Is
22   there anything else?  All right.  Let's take a break
23   and finish up with whatever items are left.
24        (Break taken.)
25        MS. SULLIVAN:  We have worked a few things

1    discoverable we will not seek from one another
2    communications between the expert and counsel for
3    purposes of this litigation.  Is that accurate?
4         MR. BUCHANAN:  Just one clarification.  We
5    don't agree that they're discoverable at all under the
6    rules.
7         MS. SULLIVAN:  The communications?  We don't
8    need to fight about it.
9         MR. BUCHANAN:  We don't we have an agreement.
10        MR. WEISS:  That was the agreement we
11   reached.
12        MR. BUCHANAN:  And that, of course, supplied
13   to test cases.  We're not authorized to sign off on
14   that as it relates to any other attorneys and their
15   experts.
16        MS. SULLIVAN:  So for the five test cases?
17        MR. BUCHANAN:  Right.
18        MS. SULLIVAN:  And also for --
19        MR. WEISS:  And that would go to the Anapol
20   firm forever.  We'll agree to that.
21        MS. SULLIVAN:  I'll accept that.  That's
22   fine.  The other thing, your Honor, we have agreed to
23   exchange curriculum vitaes for the experts.  There are
24   two from the other sides, although we requested them we
25   don't have Dr. Eagleman and Dr. Lucazey's (ph) CV.

1    out, your Honor.
2         MR. WEISS:  Can we talk about, Diane, the
3    expert depositions first?
4         MS. SULLIVAN:  I'm happy to talk about that.
5    Your Honor, one of the items on our agenda was expert
6    discovery, and I believe we reached agreement with the
7    plaintiffs in term of the scope of expert discovery.
8    Both sides agree that the other is entitled to all
9    documents the expert relies on in support of their
10   opinion --
11        MR. WEISS:  Considered is the word.
12        MR. BUCHANAN:  It is considered, Diane.
13        MS. SULLIVAN:  Okay.  Considered or relied
14   on.  I'll look at the rule, but --
15        THE COURT:  Considered is broader than
16   relied on.
17        MR. BUCHANAN:  Considered is broad.
18        MS. SULLIVAN:  That's fine, your Honor.  All
19   documents considered in support of their opinion.  In
20   addition, both sides agree that any documents relating
21   to fee arrangements, fee payments, invoices, fee
22   statements, agreements concerning the relationship
23   between counsel and the expert, the testifying expert,
24   are discoverable.
25        Both sides agree that although otherwise

1         MR. BUCHANAN:  I'm told they're on the way.
2    I think I saw an e-mail with Dr. Lucazey (ph) today,
3    and I'll follow-up on Eagleman's CV.
4         THE COURT:  That should take care of that.
5    Your expert reports are due May 30th.
6         MS. SULLIVAN:  They asked for a week
7    extension, so we got another week on ours, your Honor,
8    on the generics.
9         MR. BUCHANAN:  There's one more issue.  I
10   spoke with Miss Sullivan before the conference today
11   plaintiffs would like an additional two weeks for their
12   case specific expert reports just because of scheduling
13   issues.
14        THE COURT:  What day are they due?
15        MR. BUCHANAN:  They're currently due April
16   30th.
17        MS. SULLIVAN:  I believe it is April 30th.
18        MR. BUCHANAN:  They're currently due April
19   30th.
20        MS. SULLIVAN:  In terms of the new date.  May
21   14th.  We get the corresponding two week extension on
22   our case specific, which would be June 14th.
23        THE COURT:  So then by then we should have
24   all the discovery except for expert deps.
25        MS. SULLIVAN:  That's right.

1    MS. SULLIVAN:  Correct.

2    THE COURT:  Start taking expert deps as soon

3  as defense expert reports are produced.

4    MR. BUCHANAN:  That's correct.

5    MS. SULLIVAN:  And, your Honor, you reminded

6  me by raising the issue we'll need an additional two

7  weeks because the Court gave us 30 days for the

8  completion of the plaintiffs and defense experts, and

9  now because of the additional two weeks time we'll need

10  an extension on the deadline for expert depositions of

11  an additional two weeks.

12    MR. BUCHANAN:  We anticipated that, and

13  there's no objection.

14    THE COURT:  Okay.

15    MR. WEISS:  There is one more issue that you

16  raise about experts.

17    MS. SULLIVAN:  Yes, and I'm happy to raise

18  that.

19    MR. WEISS:  I want to respond to that.

20    MS. SULLIVAN:  May I raise it first?

21    MR. WEISS:  Yes.

22    MS. SULLIVAN:  We received, consistent with

23  the disclosure requirements, a significant number of

24  expert -- generic expert reports from the plaintiffs,

25  and we can address at a later date the cumulative

---

1  nature of some of the opinions, and we anticipate some

2  motion practice for some of them.  There are a couple

3  of expert reports that the scope of the testimony is so

4  outside what is normally admissible in this state in

5  terms of expert opinion, including opinions about

6  ethics, opinions about communication -- corporate

7  communication practices where you have an FDA regulated

8  company that has to follow the FDA rules, and they also

9  have a summary witness that basically goes through

10  Merck's documents and will essentially, we would argue,

11  usurp the jury's function and instruct the jury what

12  these factual documents mean, and there's some

13  substantial case law that both the ethics expert and

14  the summary witness are not proper experts in

15  litigation like this.

16    And Merck is confronting, given the deadlines

17  now, facing expert reports that we believe are not

18  proper either working up experts to rebut these

19  opinions, our own summary witnesses and our own ethics

20  experts even though it is our position that neither

21  kind of testimony should be admissible in cases like

22  this.  And, so, rather than invest the time, money and

23  resources in doing that for those categories of

24  experts, your Honor, we're asking that the Court permit

25  leave to supplement after Daubert or Rubanick hearings

---

1  or 702 issues on the issue leave from Merck to

2  supplement to add a summary witness or an ethics

3  witness or a corporate communications witness should

4  the Court determine that expert testimony on those

5  topics is, indeed, admissible.

6    MR. WEISS:  I would like to respond, your

7  Honor, by first handing up to you portions of the

8  president of Merck's David Anstice's deposition.  Here

9  is a set for Diane, and I just want to indicate that

10  Merck raised the issue itself because the first two

11  pages deal with the direct examination by Merck's

12  counsel of Mr. Anstice in which he goes -- volunteers

13  information about what a good corporate citizen Merck

14  is, that they have a free program for river blindness

15  and all the good stuff they do out of the kindness of

16  their hearts.

17    The second cut is from the first day of David

18  Anstice's deposition Merck has a code of conduct which

19  they claim is essential to their method of doing

20  business.  A code of conduct requires them to be honest

21  and forthright to patients and physicians, and you can

22  go through it, and one of the things that they did was

23  send out press releases, which were not true and

24  accurate and mislead patients and physicians, and they

25  testified that they sent the releases even though they

---

1  knew the FDA said they couldn't do it.

2    So that is in the transcript and that's the

3  reason why we have an ethicist who is going to testify

4  that maybe they do have a good code of conduct but they

5  didn't follow their own doctrines and that's

6  irresponsible, and that's part of the reason why these

7  people were harmed by taking VIOXX.

8    MR. BUCHANAN:  There's another aspect to

9  ethics in this case, and the company has defended in

10  some instances the types of studies it did or didn't do

11  on the basis of the ethical ability to conduct certain

12  types of activity.  It wouldn't be proper to do the

13  type of tests that you suggest, counsel, or we did this

14  type of test because that was the only type of ethical

15  study we could do.  They're using ethics to define

16  their duties in this case, and to the extent they're

17  going to use ethics to define their duties and explain

18  away their activity, ethics are quite relevant, and I

19  do think it is premature to be arguing what is

20  fundamentally a motion in limine during this discovery

21  phase.  I'm happy to provide your Honor with copies of

22  the expert reports.

23    The problem with that is it won't frame the

24  way a motion in limine would.  All the testimony that

25  the company has introduced through its witnesses either

1   on direct or in response to counsel's questions the
2   ethical nature of their conduct, but I think the right
3   time to do that is in the context of motions in limine
4   when we're at the trial phase.  To get involved in that
5   side show at this point, I think, is way premature.
6            MR. PLACITELLA:  Could I supplement?
7            MR. WEISS:  Let me finish to add something
8   that David did bring a point up.  With regard to the
9   quote "communications expert" as you frame him he
10  happens to be a marketing expert who worked for Bristol
11  Myers Squibb for many years, and he is going to testify
12  that the marketing of VIOXX was unlawful and improper,
13  and that's an element in this case, your Honor, because
14  there's a lot of direct to consumer advertising, plus
15  there's other things that they said to the physicians
16  that was just not true from our perspective, and, so,
17  it is not a communications expert, he is a marketing
18  expert.
19           MR. PLACITELLA:  Your Honor, if I can
20  supplement that, since that expert I served the report,
21  it is true he is a former communications professional
22  from Bristol Myers Squibb, and, you know, this is a
23  case of not just a failure to warn, but, actually, what
24  I would term antiwarnings; in other words, statements
25  that were put out to the public to convince the public

1   that this product was safe, which this expert will
2   opine, I believe, violated FDA rules and standard
3   industry practices, and it really even goes beyond that
4   because when Mr. Anstice, for instance, was deposed he
5   indicated that the press releases that were issued --
6   and there were numerous -- including videos, et cetera,
7   so on, were actually meant to be part of marketing to
8   both the doctor and to the consumer.  So, for example,
9   if there is a press release that says Merck confirms
10  that VIOXX is safe for the heart and Merck knows that
11  to be not correct and that's violative of FDA rules and
12  of standard procedure that goes directly to the issue
13  of failure to warn, and I would echo Mr. Buchanan and
14  Mr. Weiss' comments in that these are really issues
15  that need to be framed for your Honor in the context of
16  motions, and they're very, very relevant, and, you
17  know, we'll supply you with all the relevant pages of
18  the defendant's deposition to frame those, most of
19  which will at this point still be confidential, but
20  hopefully at some point we'll get past that.  Thank
21  you.
22           THE COURT:  Counsel is not really asking for
23  the hearing right now on those motions or to bar those
24  experts right now.  Counsel is saying can she have the
25  right to reserve her decision as to whether or not she

1   wants to hire her own experts until after those
2   hearings are held, so can you address that issue?
3            MR. WEISS:  The problem is that puts the
4   rabbit in the hat because let's assume we have Rubanick
5   hearings in July then she is going to want two or three
6   months to get those experts to rebut those, assuming we
7   prevail.
8            MS. SULLIVAN:  No, 30 days.
9            MR. WEISS:  And that is going to push the
10  trial back for three months, and it's not fair.
11           MS. SULLIVAN:  I can do it in 30 days if the
12  Judge rules it is admissible.
13           MR. BUCHANAN:  With all due respect, your
14  Honor, these expert reports are not on the fringe.  I
15  mean, these experts -- these expert reports --
16           MS. SULLIVAN:  You were in the Resulin
17  litigation, and many of the rulings --
18           MR. BUCHANAN:  Do I interrupt you every time
19  you make a speech?
20           MS. SULLIVAN:  Most of the time.  Many of the
21  rulings about the impropriety of ethics opinions, the
22  impropriety of summary witnesses and the things we're
23  talking about come directly from the Resulin
24  litigation, and there's case law in many jurisdictions
25  where this kind of stuff -- particularly for an FDA

1   regulated product, if you had an FDA expert to say we
2   violated the law or we didn't, and that would be one
3   thing, but to have ethics experts come in and talk
4   about standards that the company may have complied with
5   but are not at issue because the issue is whether or
6   not the company complied with the law or not and you
7   have mischaracterized Mr. Anstice's testimony.  We have
8   pretty strong evidence that Merck did comply with the
9   FDA requirements and regulations, but rather than bring
10  in an FDA expert we're facing these kind of what I
11  would call fringe experts where we believe the case law
12  is pretty strong that it is really not appropriate
13  subject matter for expert testimony.
14           So rather than that invest -- and they have
15  other experts, but rather than invest a lot of time and
16  resources on these suspect experts we would ask for a
17  procedure where if the judge rules that any of these
18  three are admissible that we would have a right to
19  supplement in rebuttal.
20           MR. BUCHANAN:  These are the warnings
21  experts.  These are the people who evaluate what the
22  company said or how they said it, how they communicated
23  with the physicians, how they communicated with the
24  consumers and determine whether their statements
25  accurately reflected what was in internal documents and

1  what they were saying through all these different
2  vehicles.  These are the warnings experts.  Miss
3  Sullivan is calling them ethicists because, certainly,
4  it is unethical to have information about the safety of
5  the drug and keep it to yourself and not share with it
6  the physicians or the FDA or the medical community, but
7  it fundamentally is a failure to warn issue, and I
8  think rather than lose several months on the
9  possibility -- I think your Honor will -- could
10  determine rather quickly from a reading of the expert
11  reports whether this is the type of testimony that is
12  germane to a failure to warn claim or to a design
13  defect claim or a consumer fraud claim, and based on
14  that assess whether they should be entitled to defer
15  preparation of experts that address these issues in New
16  Jersey.  I mean, they are getting ready for trial
17  around the country right now.  I can't imagine that
18  they have not retained somebody to address these
19  issues.
20         MS. SULLIVAN:  An ethicist, no.
21         MR. BUCHANAN:  Maybe the testimony is coming
22  out of their witnesses' mouth that we're an ethical
23  company, but, again, their witnesses are testifying to
24  this information on direct that they're leading, and it
25  is coming right out.  We prepared expert reports that

117

1  address not only the accuracy of the warnings, not only
2  the underlying information that was withheld, but,
3  also, whether that information was consistent with
4  appropriate conduct for a pharmaceutical company, and,
5  you know, they have set that landscape.  And if they
6  want to address that in a motion in limine and say
7  Dr. So-and-so's opinion on whether we're an ethical
8  company or not shouldn't come in your Honor might say
9  that's fine, but you're not going to be able to talk
10  about what a good company you are, and if you do then
11  it is going to come in -- it can come in in plaintiff's
12  case or rebuttal.  But I do think that your Honor will
13  see these expert reports are a lot more about they're a
14  good company or a bad company, and they're an undercell
15  of these pretty substantial expert reports.
16         THE COURT:  Well, at this point I think we
17  have basically been pushing towards getting trials of
18  the first five cases.  I'm working with you as far as
19  moving things back a couple weeks.  I'm not willing to
20  move things back a couple months, which is what it
21  would be a minimum requirement, I think, even if I gave
22  you 30 days to get your expert reports, deps would have
23  to be taken and there might be replies to your
24  positions.  I'm going to require you to have all your
25  expert reports by the deadline, so if you want to

118

1  address these issues you can address them.  Whether
2  they're going to eventually be barred or not I don't
3  know what they're saying.
4         MS. SULLIVAN:  Fair enough.
5         THE COURT:  Obviously, ethics is not a cause
6  of action.  Being unethical is not a cause of action.
7  It is not really for the jury to decide that maybe in
8  the punitive damage phase where it becomes more of a
9  relevant issue, but you shouldn't -- this isn't an
10  accurate warning or this is -- or this is not a proper
11  way to market, you know, maybe it is a question of what
12  language is being used.  I don't know.
13         MS. SULLIVAN:  Thank you, your Honor.
14         THE COURT:  We'll have to look at that.
15  Certainly I couldn't decide that just by even reading
16  reports.  That's going to require a hearing.  Okay.
17  Let me just ask, I'm forgetting, but where were we on
18  those databases, were those things ever resolved?
19         MR. BUCHANAN:  They weren't resolved.
20         THE COURT:  SPIDER, CORNERSTONE.
21         MR. BUCHANAN:  We have reached an
22  understanding as it relates to the document databases.
23  Well, let me take a step back.  After we were here at a
24  conference we pulled it off calendar, the three
25  document databases were the most direct to deal with.

119

1  We had two meetings, defense counsel and plaintiff's
2  counsel, to address the databases generally.  The
3  document databases we were able to reach some agreement
4  on by providing for the production of underlying -- the
5  underlying documents in those databases together with
6  sufficient information for us to correlate the
7  documents with whatever was in the databases
8  themselves.  And we have, I think, reserved the ability
9  to come back to you if there's additional detail in the
10  database to get additional detail in the database for
11  particular --
12         THE COURT:  So which one of the databases is
13  that?
14         MR. YENELLA:  The DIAMOND database, SPIDER
15  and PLC.
16         THE COURT:  We're left with CORNERSTONE and
17  IMED.
18         MR. BUCHANAN:  CORNERSTONE and IMED have been
19  more mettlesome, and in some respects we had meaningful
20  meet and confers on CORNERSTONE.  We're having issues
21  with IMED, and this is, again, the medical educational
22  database where the company tracks activities of people
23  like Peter Holt in seminars where the drug is marketed,
24  and there's 10 attendees and reviews of people.  So
25  we're interested in that database.

120

1   There's two issues that are going to be

2   there.  One I don't think the parties are going to be

3   able to reach agreement on, and that is to the scope of

4   their obligation to produce records from this

5   particular database.  The defendant's position is that

6   they should only have to produce the IMED records for

7   physicians in a particular case who attended a Merck

8   medical educational seminar, okay?

9   Our position is that the content of the

10  medical education seminars, generally what Peter Holt

11  was saying, what the reviews of Peter Holt were, the

12  compensation to quote "thought leaders" for leading

13  these particular presentations is relevant regardless

14  of whether, you know, Dr. Smith in Mr. Humiston's case

15  was at that particular medical educational seminar.

16  That is a divide I don't think we're going to

17  bridge as the parties.  We can probably work out

18  technical details.  We can probably work out details on

19  the scope of the fields from that database that should

20  be produced, but the real issue is if it is a table,

21  you know, like a spread sheet with 100 rows in it and

22  100 columns we may be able to agree that we can live

23  with 90 of the hundred columns, but we're not going to

24  be able to agree that we should only get the rows for

25  the prescribing physician in the cases in New Jersey.

1   We think the information in that database goes to more

2   general liability issues in the case as to the

3   company's conduct in dealing with physicians throughout

4   the country, the medical community generally and the

5   interactions with them.

6   THE COURT:  Does counsel agree?

7   MR. BARNETT:  I think our model -- I agree

8   with what Mr. Buchanan has said as far as the document

9   basis.  I think those were resolved, and I think we

10  were still talking as late as two days ago you were

11  sending fields and that sort of thing over to Dave.

12  MR. BUCHANAN:  I agree.

13  MR. BARNETT:  So it is ongoing, and the meet

14  and confers have gone on for four or five hours, and I

15  think they have moved the ball forward.  So at this

16  point I think the process is doing what you asked us to

17  do.  Our model has been what was done for FACTS and so

18  we have given to Jeff and Dave the data dictionary so

19  they can go through them and review them, and our view

20  is that the scope of the FACTS production ought to

21  govern here.

22  Our understanding was that FACTS was tied to

23  the physicians and physicians and the prescribers'

24  office because these were New Jersey plaintiffs who saw

25  New Jersey doctors, and they are New Jersey cases.

1   So if, in fact, what Mr. Buchanan is saying

2   is that in the context of this New Jersey litigation

3   they're looking for national production then, yes, the

4   prospects for resolution are probably not good.

5   THE COURT:  All right.  Then what you should

6   do is schedule an oral argument on those outstanding

7   issues so that we can get it resolved one way or the

8   other, and hopefully that won't deter you from you

9   meeting and conferring before that oral argument to

10  narrow the issues to whatever you can narrow it to.

11  MR. BUCHANAN:  I think the one issue we'll

12  have difficulty reaching agreement on is the scope.

13  THE COURT:  Maybe we should set up an oral

14  argument on the issue of IMED and the scope of it, and

15  maybe you can supplement the briefs you have already

16  sent obviously not repeating them, but, simply, if you

17  want to focus on just that issue.

18  MR. BUCHANAN:  The same issue is in

19  CORNERSTONE.

20  THE COURT:  So you'll -- why don't we do

21  that.  Why don't we have you both provide me with your

22  positions on the scope of the production of those two.

23  How much time do you want?  I just want to get it

24  scheduled.  It doesn't matter to me when it is.

25  MR. BUCHANAN:  I couldn't do argument next

1   week.  That's my only block out period.  I can do the

2   following week.

3   MR. BARNETT:  The following week is bad.  I'm

4   actually -- I'm effectively out both the end of next

5   week and the following week.  I can do it the second

6   week in May.

7   MR. BUCHANAN:  That gives us more time to do

8   the brief, and we can confer about the fields and other

9   issues, so we can start working out the form of

10  production.

11  THE COURT:  May 6th is the other one so for

12  my clerk and I to work on it because I know you may

13  have different teams running these things, but we

14  don't.  So why don't we say the week of May 6th we're

15  talking about May 13th.  Have your briefs in by May

16  13th, and we'll argue it on May 21st.

17  MR. BUCHANAN:  That's our next status

18  conference?

19  THE LAW CLERK:  Yes.

20  MR. BUCHANAN:  Can we argue it at the next

21  status conference?

22  THE COURT:  Yes.

23  MR. BUCHANAN:  Fair enough.  May 13th will be

24  the briefs.

25  THE COURT:  And I think they would just be

1    simultaneously exchanged briefs.  And, again, I have
2    your generic briefs as to -- this is limited to what
3    we're talking about scope and why it should be limited
4    to what.  Okay?  We'll resolve that issue and then
5    we'll send you back to meet and confer and see if you
6    can go from there.
7            MR. BUCHANAN:  There's one issue, and there's
8    been confusion between both sides of the aisle on the
9    meeting and conferring.  Counsel has been nice enough
10   to take what are more voluminous data dictionaries and
11   extract pertinent fields or identifying tables, but if
12   you recall in FACTS I think your Honor had a binder
13   that was that thick that set forth -- three inches
14   thick for the record -- that set forth all the fields
15   and the table identities with the rough description of
16   the fields.  It would be helpful if plaintiffs were
17   able to use the same data dictionary for IMED and
18   CORNERSTONE in conferring back and forth about the
19   scope issues and certainly in preparation for the
20   argument that we are going to make to the Court or in
21   our papers on the 13th.  Those have not been produced
22   to us, your Honor.  There's been a super secret
23   confidentiality concern as it relates to the database
24   dictionaries, but your Honor expressed this only in
25   chambers is that with regard to FACTS you didn't see

1    anything particularly super secret like trade secret
2    for Coke in the binder that would prevent defendants
3    from turning it over to us to use in meeting and
4    conferring or in this case maybe even for briefing.
5            So I just ask you provide us with the data
6    dictionary so we at least have that, and we'll treat it
7    with heightened confidentiality, but I think we're at a
8    significant disadvantage having to use only counsel's
9    characterization of a data dictionary rather than a
10   data dictionary itself.
11           MR. BARNETT:  Your Honor, if I might, just
12   for the record we presented to you the data dictionary.
13   The only thing we didn't allow you to do was take it
14   back to your office or take it home, and, in fact, you
15   requested that we bring it today, and we have done
16   that.  We can set aside a time.  Jeff can come down to
17   our offices, whatever.  You're at full liberty to
18   review it and do what you need to do to prepare for the
19   briefing.  We just don't have authorization to hand it
20   out because in some cases the data dictionary is not a
21   Merck product.  It is something we have licensed from
22   another company.
23           MR. BUCHANAN:  I don't think I have ever seen
24   the IMED data dictionary.  I have seen only extracts
25   that you guys have created listing tables from the IMED

1    data dictionary, and I do think that there's nothing
2    super secret about it, that equates it with Coke that
3    you can't produce it to us under confidentiality and if
4    you want to limit it to distribution to just my firm,
5    and I would notify you if any other firm wanted access
6    to it, that's fine.  We won't duplicate it or
7    distribute it, but we are at a disadvantage trying to
8    respond to briefing, and this is part of the meet and
9    confer process that is supposed to deal with exchange
10   at least of that information.
11           THE COURT:  Do you have them with you today?
12           MR. YENNELLA:  I do.
13           THE COURT:  For both databases?
14           MR. YENNELLA:  He actually has the
15   CORNERSTONE data dictionary.  The IMED I have.  I need
16   to make a copy of it.  I only have one copy.
17           THE COURT:  All right.  Why don't we have
18   Mr. Buchanan look at it while he is here, and, if
19   necessary, the Court will look at it.  Let's wait until
20   the end and see whether it is worth copying.
21           MR. BUCHANAN:  Thank you.
22           MS. SULLIVAN:  Can I just go back briefly on
23   the expert discovery in terms of the documents
24   considered by the expert?  I haven't received them yet
25   from the plaintiffs.  Can I get the documents by the

1    end of next week?
2            MR. BUCHANAN:  Oh, I don't know.  We'll talk
3    to the experts.  Diane, we just reached a stipulation
4    on that now.  I don't know where they are.
5            MS. SULLIVAN:  You clearly knew that that was
6    discoverable before we talked.  That's routine, the
7    documents your expert reviewed and considered.
8            MR. WEISS:  I believe, Diane, in your three
9    expert reports we tendered to you they're all listed.
10           MS. SULLIVAN:  I need the documents.  A lot
11   of it is unpublished stuff.  I need the documents.
12           MR. WEISS:  We'll deliver them to you as
13   quickly as they can be copied and Bates number.
14           MS. SULLIVAN:  I just need -- can we agree by
15   the end of next week?
16           MR. BUCHANAN:  I haven't spoken to any of the
17   experts about it.  This is the first time we reached an
18   agreement.  We will do our best to get them to you by
19   the end of next week.
20           MS. FLEISHMAN:  May I be heard in on this, as
21   well?  In Sinclair we produced four expert reports, and
22   in the expert reports we listed all the documents that
23   the experts reviewed, and they're all public documents.
24           MS. SULLIVAN:  I'm not counsel in the
25   Sinclair action, so if you want to take that up with

1   Mr. Judd, that's fine, but certainly for the products
2   case -- the individual products cases I would like the
3   documents.
4       MR. WEISS:  Certainly.  As soon as we get
5   them you'll have them.  No delay.
6       THE COURT:  Why don't we do this:  You
7   provide them as soon as you can.  Miss Sullivan, if you
8   don't have them in a week or two give me a call, 10
9   days, whatever, and we'll set up a conference to find
10  out which ones you have and which ones you don't have
11  and see if we can set a time frame for a deadline.
12  Maybe it won't even be an issue.  Okay?
13      MR. BUCHANAN:  Fair enough, your Honor.
14      THE COURT:  All right.  There is an issue
15  about internet transmission of realtime depositions.
16  Have you worked that out or are you working it out?
17      MR. CORONATO:  I think we worked it out.
18  There was one provision that we had a little debate
19  over, but I think that's resolved.  It was examination
20  of witnesses shall occur only by counsel who are
21  physically present on site at the deposition.  My
22  concern was if there was technical difficulty in the
23  internet stream I didn't want that being used to delay
24  the deposition or to say that somebody, you know,
25  couldn't ask questions, but we have other provisions in

129

1   here that say that an attorney who participates by way
2   of the internet does so at his own risk and that any
3   problems won't cause any delay in the start or the --
4   any reasonable delay in the start or the completion of
5   the deposition.
6       So I think that we can take that provision
7   out of the protocol.
8       THE COURT:  Okay.  Then we have a protocol?
9       MR. JOHNSON:  That provision has been taken
10  out.
11      THE COURT:  Mr. Cohen, can you type that up
12  today?
13      MR. COHEN:  Yes.
14      THE COURT:  He is going to type that up
15  today.
16      MR. CORONATO:  There are two blanks that need
17  to be filled in, because we refer in the proposed order
18  to the order regarding depositions of Merck corporate
19  witnesses which is awaiting your Honor's signature,
20  which is item seven on our agenda so once that order --
21      THE COURT:  I did sign that yesterday.
22      MR. CORONATO:  You did?
23      MS. SULLIVAN:  The deposition protocol?  I
24  haven't seen it come through.
25      THE COURT:  Oh, is that attached to your

130

1   agenda here?
2       MS. SULLIVAN:  Yes.
3       THE COURT:  No.  I didn't sign that yet.
4   Okay.  So that will take care of that issue.
5       MS. SULLIVAN:  Are we good to go now on the
6   deposition protocols?
7       THE COURT:  The deposition protocol Exhibit B
8   okay?
9       MR. CORONATO:  Mr. Johnson, there were some
10  typos that I noted this morning.  I made those
11  corrections.
12      MR. JOHNSON:  Okay.
13      THE COURT:  It looked good to me.
14      MS. SULLIVAN:  I think we took care of any
15  questions or problems based on letters.  The only thing
16  there was a clarification between Mr. Buchanan and me,
17  your Honor, at a break that the errata sheet for
18  purposes of correcting any errors in the deposition
19  transcript is now it is going to be due 30 days after
20  completion of the entire deposition because many of
21  these depositions have been going multiple days and so
22  rather than doing one after each day we're just going
23  to do it at the end of the deposition, and Mr. Buchanan
24  has agreed to that.
25      MR. BUCHANAN:  That's fine, your Honor.

131

1       MR. WEISS:  Every time you asked we agreed to
2   that.
3       MS. SULLIVAN:  I know.  I just wanted to make
4   that clear.
5       THE COURT:  There were two cases that have
6   been filed, one in Camden and one in Middlesex.  They
7   weren't transferred here.  They're supposed to be
8   automatically transferred here.  They weren't
9   transferred here because they have other defendants and
10  they're titled Brown versus Pfizer, Urosi versus Pfizer
11  because they have both Merck and two or three other
12  defendants at least Pfizer and Merck in each one.  And
13  I know that I think the Brown one has Upjohn and Searle
14  and three or four other defendants.
15      MS. SULLIVAN:  Right, your Honor.
16      THE COURT:  So what's everyone's thoughts on
17  how they should be handled?
18      MR. LEVENSTEN:  Scott Levensten from the
19  Beasley firm.  We're counsel in Brown.  Previously we
20  filed a case here in Atlantic County that named Merck
21  and Pfizer.  I think it was a co-administration of
22  Bextra and VIOXX, and I think your Honor severed Pfizer
23  and sent them to a county where -- no disrespect
24  intended -- we may not have originally filed against
25  Pfizer.  So we weren't quite sure what to do with this

132

1  action, and maybe we were wrong, but we wanted to
2  prosecute the action -- the Celebrex action -- against
3  Pfizer in Camden County if Camden County would keep it,
4  and that's why we initiated the action there.
5        I'm not quite sure what we should do, but we
6  would agree, if necessary, to discontinue that action
7  and refile it here with the statute relating back to
8  the date of the original filing if we could just have
9  some input as to where the severed defendant goes.
10       THE COURT:  I don't recall severing the
11 Pfizer defendants.  As I recall, they were dismissed
12 voluntarily.  Counsel decided to just proceed with the
13 VIOXX litigation and severed -- they didn't sever, they
14 dismissed their other action.  I mean, obviously, we
15 can't have -- I don't feel that I can properly manage
16 these cases within the context of the group, but on the
17 other hand, it doesn't make too much sense to have two
18 other counties dealing with VIOXX discovery.
19       MR. COHEN:  The federal system is actually
20 severing them and sending the VIOXX claims to the
21 federal MDL and not putting the Pfizer claims there.
22       THE COURT:  Is that what they're doing?
23       MS. SULLIVAN:  They're severing individual
24 plaintiffs, so you have the same plaintiffs suing each
25 in different jurisdictions.

133

1  THE COURT:  What happens when causation
2  issues come up at trial?
3        (Discussion off the record.)
4        MR. COHEN:  The theory behind that is the
5  same which you just articulated is you don't want a
6  different track for essentially you have managed all
7  the Merck stuff here, and it doesn't make sense to have
8  that somewhere else.  I think that's the best way to
9  go.
10       MR. WEISS:  Well, what you're talking about
11 in the federal system, your Honor, is VIOXX cases are
12 being transferred to the MDL for pretrial issues but
13 not for -- for trial they go back to the original
14 court.  So I assume what can happen here is the VIOXX
15 portion of the case can be discovered here, and,
16 perhaps, the Pfizer end can be discovered in Camden
17 County, whatever it is, and is neither case go to trial
18 until your Honor is finished with discovery in VIOXX.
19       MS. SULLIVAN:  The issue of trial can be
20 deferred, your Honor, but I would agree with Mr. Weiss.
21 It does make some sense to sever the Pfizer and VIOXX
22 claims if it is feasible to have the VIOXX claims here
23 and the Pfizer claims elsewhere.
24       MR. COHEN:  It is my understanding you can
25 send these back for trial to their original counties

134

1  anyway.  We reserved a change of venue -- one of the
2  first orders we ever did just in case you did decide to
3  send these back to the original counties of filing, so
4  I think that model would work, actually, just sever
5  them, take the VIOXX here and then if it comes to a
6  trial you can decide what you want to do with it then.
7        MR. WEISS:  Your Honor, we still have the
8  best practices issue to deal with, but that would be
9  the problem of Camden County, wouldn't it, because --
10       MS. SULLIVAN:  It would be suspended here
11 under the mass tort.
12       THE COURT:  I don't think the AOC agrees with
13 you.
14       MR. WEISS:  I know they don't agree with me,
15 you know, your Honor, but that's what happens, but then
16 they will start sending nasty grams, but --
17       THE COURT:  All right.  It is a problem.  The
18 first step is that they should be transferred here
19 automatically.  You don't have to do anything about
20 that.  I'll make sure that happens, and I'll talk to
21 the judge in Camden and the judge in Middlesex and see
22 if they are interested in keeping the Pfizer portion of
23 it I would be happy to -- and the other drug companies
24 that would be good for -- certainly I don't want to get
25 involved in that if I can avoid it.

135

1  MR. COHEN:  Also, I think those other drug
2  companies are just predecessors.  Pfizer, they bought
3  Pharmacia, which used to be Searle and Upjohn, which
4  used to be Monsanto and sort of those are the
5  companies.
6        THE COURT:  Which became Merck.  So it is
7  just Merck and Pfizer.
8        MR. COHEN:  Right.
9        THE COURT:  So they're basically Celebrex
10 VIOXX cases.
11       MR. WEISS:  And Bextra.
12       MR. COHEN:  Either way it is Pfizer.
13       THE COURT:  All right.  We'll see what we can
14 do with those two.  I'll get them transferred here, and
15 I may have to set up a conference with counsel and
16 Merck's counsel in order -- you just have the one?
17       MR. LEVENSTEN:  Correct.
18       THE COURT:  Nobody here has the Middlesex
19 case?  Okay.  We'll see who has it after we get it
20 here, and then I'll probably set up a conference with
21 Merck and with the two of you after I talk to the
22 judges are there and see what we can do.
23       MR. LEVENSTEN:  Thank you, your Honor.
24       THE COURT:  All right.  So that takes care of
25 that.  I guess the last thing is the request for

136

1    productions.

2          MS. SULLIVAN:  Well, on the filing we also

3    have the issue, I guess, of some counsel hedging their

4    bets and filing the same action against Merck for the

5    same plaintiff in Philadelphia and here.

6          MR. LEVENSTEN:  This is also me, your Honor.

7          THE COURT:  I'm pretty sure you can't do

8    that.

9          MR. LEVENSTEN:  Well, here --

10         THE COURT:  And I'll dismiss mine willingly.

11         MR. LEVENSTEN:  In the beginning we filed one

12   case in Philadelphia County with some nondiverse

13   defendants, and I think others did the same, and it was

14   removed, we believe, improperly to Federal Court, and

15   we have filed a motion to remand.  Once that case was

16   removed we decided to dual file cases in New Jersey and

17   in Philadelphia, and the reason we -- we prefer -- no

18   disrespect intended -- if we can litigate in

19   Philadelphia we prefer to stay in Philadelphia.  If we

20   win the motions to remand we would dismiss the New

21   Jersey cases.  If we lose the motions to remand we

22   would prefer to litigate our cases here in Atlantic

23   County and would dismiss the federal actions, your

24   Honor.

25         Essentially why we dual filed is we believe

1    the removals were improper, and maybe we will lose the

2    removals but until there is a determination on the

3    removed actions we would ask that your Honor --

4          THE COURT:  They're VIOXX cases?

5          MR. LEVENSTEN:  Yes.

6          THE COURT:  That were removed to Federal

7    Court?

8          MR. LEVENSTEN:  Correct, from Philadelphia.

9    So once they removed the first case we started dual

10   filing.

11         MS. SULLIVAN:  Your Honor, counsel has been

12   candid about what appears to be blatant forum shopping,

13   and you can't abuse the process in that way, and it

14   shouldn't be permitted.  They should be compelled to

15   choose or their cases here be dismissed.

16         THE COURT:  I tend to think she's right,

17   although I haven't actually -- I assumed it was a

18   mistake.  I had no idea you actually did it on purpose,

19   but if you did it as a strategy it doesn't strike me,

20   without doing any research, that you can.  But I don't

21   know.  I'm willing to, if you want to brief the issue,

22   Miss Sullivan, why don't you file a motion to dismiss

23   the cases.  We'll just do it on a regular motion

24   period.  File your motion, and they can file their

25   brief, and I'll review it.

1          MS. SULLIVAN:  We'll do that, your Honor.

2          MR. LEVENSTEN:  Thank you, your Honor.

3          THE COURT:  This has never come up before.  I

4    just assumed it was a mistake.  I didn't really look

5    into it too much.  All right.  But I'm glad you're

6    being candid that that's why you did it.

7          And then there were --

8          MS. SULLIVAN:  The two request for

9    production, your Honor.

10         THE COURT:  Right.

11         MS. SULLIVAN:  I thought we clarified this at

12   the last conference, but I'm still getting letters

13   objecting to these two supplemental requests.  One is

14   your Honor may recall that when we went through the

15   facts sheets supplemental questions on the facts sheets

16   there were certain questions that the Court felt were

17   more appropriate for the plaintiffs and certain

18   questions that were more appropriate for counsel.  And

19   so the ones that were determined more appropriate for

20   counsel we served a supplemental request for production

21   consistent with the Court's guidance at the conference,

22   and there's two basic questions in that request for

23   production that some plaintiffs objected to.  One is

24   videotape, sound recordings, published articles where

25   the plaintiffs, their attorneys or family or friends

1    make statements about VIOXX or their lawsuit I think is

2    fair game.  I'm not sure why we're getting objections

3    to that.

4          And the second is documents that plaintiffs'

5    attorneys may obtain from public sources other than

6    documents provided by Merck.  In other words, if they

7    serve an FOIA request on the FDA and obtain public

8    documents we're entitled to that in discovery, and that

9    was discussed at the last conference and the Court

10   agreed we could serve those requests, so I'm not

11   certain why we're getting objections to these two.

12         THE COURT:  Any objection to those?

13         MR. WEISS:  Greg Spizer of my office is

14   working with you on this, Diane, am I correct?

15         MS. SULLIVAN:  Greg has withdrawn his

16   objections.  We were still getting letters from some

17   other counsel, and I wasn't sure why.

18         MR. WEISS:  He is taking a deposition today

19   in a VIOXX case.

20         MS. SULLIVAN:  I know we talked to Greg, and

21   he has withdrawn.  He wanted clarification that we

22   weren't seeking documents that Merck provided to --

23         THE COURT:  Does anybody else have any

24   objection?

25         MR. WEISS:  He was responding on behalf of

**Page 141**

1    liaison counsel for all plaintiffs, as well.
2         MR. BUCHANAN:  What is the resolution with
3    Mr. Spizer because I'm confused.  I thought it was a
4    general objection on behalf of all plaintiffs, and I
5    want to understand the resolution that you have reached
6    with Mr. Spizer.
7         MS. SULLIVAN:  I have not -- I was not the
8    one who had conversations with Mr. Spizer, but the
9    attorney in my office who did advised that he has
10   withdrawn the objections because he just wanted
11   clarification that we were not asking for you guys to
12   give us back what Merck had provided to government
13   agencies, so we wanted documents other than those
14   produced by Merck that you obtained.
15        THE COURT:  Miss Sullivan, submit an order
16   under the five-day rule that allows that -- orders the
17   plaintiffs have to produce those items, and if
18   Mr. Spizer -- if it is determined Mr. Spizer didn't
19   agree to that or there's an issue then he can object to
20   the order, and I'll hold a telephone conference to
21   resolve it.
22        MR. WEISS:  My recollection from the
23   correspondence that I saw was that there were six or
24   seven items at issue, and you guys agreed that five of
25   them were duplicative, correct?

**Page 143**

1         MS. SULLIVAN:  Not having the facts sheet in
2    front of me, I don't believe they were duplicative.
3    In other words, there were questions directed to the
4    plaintiffs, and there were questions supplemental
5    directed to their attorneys.
6         MR. BUCHANAN:  Our understanding was that you
7    guys had withdrawn the five that were in the facts
8    sheet.
9         MS. SULLIVAN:  I'll submit a form of order
10   based on whoever was talking to Mr. Spizer's
11   understanding.  I don't believe that's correct.
12        MR. BUCHANAN:  That's the e-mail I saw.
13        MR. WEISS:  That's the e-mail I saw, too.
14        THE COURT:  You have identified two of the
15   items, so it may be that that was all that was agreed
16   that they're going to produce and the others weren't
17   going to be part of an order.  On the other hand, if it
18   turns out that it is different than that, if it clearly
19   is different set up a phone conference and we'll
20   discuss it.
21        MR. WEISS:  He is sorry he couldn't be here
22   today.
23        MS. SULLIVAN:  I thought we had gone through
24   this in detail at the last Case Management Conference,
25   and it is just a shame that we keep getting delay on

**Page 142**

1         MS. SULLIVAN:  No.  Sol, you shouldn't bring
2    it up if you don't know the details because it causes
3    more confusion.  We had a pretty lengthy discussion at
4    the last Case Management Conference about what could be
5    in the facts sheet and what should be in supplemental
6    discovery, and that's been determined, but then on
7    these two -- and we served that supplemental discovery.
8    But then on these two questions your office sent us a
9    letter objecting.  It is my understanding that's the
10   only objection that we worked things out with
11   Mr. Spizer, but just to be sure the Court advised us to
12   submit a form of order, and I'm happy to do that.
13        MR. BUCHANAN:  Excuse me, because we are
14   going down a dangerous territory here, Diane.  As I
15   understand it, there were six, seven, eight requests in
16   that particular document, five of which Mr. Spizer
17   objected to as being duplicative of specific items that
18   were incorporated into the facts sheet.  There were two
19   that were nonduplicative, and those were the two that I
20   understand are being incorporated in the form of order
21   that you're submitting to the Court, and I'll have an
22   opportunity to speak with Mr. Spizer and confirm your
23   representation that, in fact, the plaintiffs have
24   withdrawn that particular objection, and we'll submit a
25   challenge to the proposed order as to those two items.

**Page 144**

1    this discovery because it was pretty much agreed to and
2    decided at the last court conference.
3         MR. BUCHANAN:  We, obviously, have different
4    memories.
5         THE COURT:  I have no problem with the films,
6    the press releases and the federal government or any
7    kind of government documents that you didn't provide,
8    so it is not like you're sending it to them, they're
9    sending them to you.  Obviously, those things should be
10   provided.  What are the other things you're asking for?
11        MS. SULLIVAN:  Let me see if I have them
12   here, Judge.
13        THE COURT:  Unfortunately, we don't have
14   either of the parties that worked this out.
15        MR. WEISS:  I thought it was resolved.
16        THE COURT:  It may have been.  We don't know.
17        MS. SULLIVAN:  I do have them.  Two, four,
18   five and six, so the express warranty question we're
19   entitled to documents that their attorneys have that
20   they believe constitute an express warranty.  I thought
21   we had decided that at the last conference.  That's
22   number two.
23        MR. BUCHANAN:  We didn't.  That's a
24   contention interrogatory dressed up as a document
25   request.

```
 1              MS. SULLIVAN:  That's not a contention --
 2              MR. BUCHANAN:  Can I finish, please, Diane?
 3    Their document requests attached to the end of the
 4    facts sheet that are specific to each plaintiff.  Each
 5    plaintiff pled in an express warranty claim would
 6    provide the documentation that supports their express
 7    warranty claim responsive to that request.  To the
 8    extent they want it from the attorneys that's a dressed
 9    up contention interrogatory.  They're looking for
10    documents that we contend support an express warranty
11    claim.  It is not specific to a plaintiff that's
12    generally in the litigation.  That is a contention
13    interrogatory document request.
14              MR. WEISS:  That was resolved last time.
15              MS. SULLIVAN:  Your Honor, I'm not sure, you
16    know --
17              THE COURT:  Why don't we do this, let's put
18    it off until you have a chance to talk to Mr. Spizer or
19    have -- and if you think you have an order that you
20    agree to submit it.  If you don't submit it as to at
21    least the films and those two items and on the other
22    items call me, and we'll have a phone conference.
23              MS. SULLIVAN:  I will.  But the basic
24    information what is your express warranty that has to
25    be discoverable.  You have a claim breach of express
```

145

```
 1    warranty, tell me what the warranty was.  To argue --
 2              MR. BUCHANAN:  It is in the facts sheet.
 3              MS. SULLIVAN:  -- that is a contention
 4    interrogatory that is gamesmanship.
 5              MR. BUCHANAN:  You get that from every
 6    plaintiff to the extent they have documents that are
 7    responsive to that.  What you're asking for are from
 8    the lawyers provide documents that we believe are
 9    responsive to that.  We never took VIOXX.  We never
10    took it.  What are we going to have?
11              MS. SULLIVAN:  I don't want to be in trial
12    and have documents that they contend supports their
13    breach of warranty claim that I haven't been provided
14    with.
15              MR. BUCHANAN:  That's the word, contend.
16              MS. SULLIVAN:  Well, when do I get it?  We're
17    done with discovery.
18              MR. BUCHANAN:  You get an exhibit list
19    pretrial.
20              MS. SULLIVAN:  That's not proper discovery
21    under New Jersey law.  I don't know until I walk into
22    the courtroom what your express warranty claim is based
23    on?  That's not the law.
24              MR. BUCHANAN:  That's a contention
25    interrogatory, and we understand now why.  It's a
```

146

```
 1    contention interrogatory, state all the facts that form
 2    the basis of your contention that Merck --
 3              MS. SULLIVAN:  That's not what it says.  It
 4    says give me the documents.
 5              MR. BUCHANAN:  And then the question she just
 6    asked is provide the documents to support your
 7    contention.
 8              MS. SULLIVAN:  It says give me the documents.
 9    That's basic discovery.  Give me the documents that
10    support your breach of warranty claim.
11              MR. BUCHANAN:  I think we would like an
12    opportunity to present this to your Honor.  I think we
13    addressed this at the last conference.
14              THE COURT:  Are we talking about the
15    documents Merck hasn't produced?
16              MR. BUCHANAN:  If it is limited to the
17    documents Merck hasn't produced I don't know what would
18    form the basis of a response to that.
19              MS. SULLIVAN:  Your Honor, we have produced,
20    as your Honor knows, seven million documents.  We want
21    to know which they're saying their plaintiff relied on,
22    something we're entitled to know, what they relied on.
23              MR. BUCHANAN:  That's an interrogatory.
24              MS. SULLIVAN:  Why am I not entitled to that
25    information?  I don't understand the gamesmanship.
```

147

```
 1              MR. BUCHANAN:  The term gamesmanship you're
 2    turning into an interrogatory.
 3              THE COURT:  If the plaintiff said they
 4    reviewed before purchase, before use --
 5              MR. BUCHANAN:  No objection.
 6              THE COURT:  -- that definitely should be
 7    provided.
 8              MR. BUCHANAN:  They get that.
 9              MR. WEISS:  And that was what your Honor had
10    us write in at the last conference.
11              THE COURT:  Is that in the facts sheet?
12              MR. WEISS:  You went through item by item.
13              MS. SULLIVAN:  I'm trying to figure out what
14    the attorneys have that they believe supports their
15    express warranty claim that they don't want to provide.
16              MR. BUCHANAN:  What do you mean that we don't
17    want to provide?  Should I propound to you, Diane,
18    identify all the documents that you contend support
19    your defense that you -- I don't know -- told
20    physicians about the cardiovascular risk of VIOXX in
21    '99 and 2000?
22              MS. SULLIVAN:  You sent those to us.  This is
23    a basic what are the documents that support your breach
24    of warranty claim.
25              MR. BUCHANAN:  It is a contention
```

148

```
 1   interrogatory.
 2        MR. WEISS:  Can I make a suggestion?  Since
 3   Greg will be back tomorrow morning why don't we get you
 4   on the phone and call the Court?
 5        MS. SULLIVAN:  Mr. Buchanan is objecting, it
 6   sounds like, regardless.
 7        MR. BUCHANAN:  I think if there are points of
 8   agreement, Diane, that you have reached and submit
 9   those it is my understanding you had agreed to withdraw
10   as being duplicative of the facts sheet the precise
11   item you're now highlighting for the Court that you
12   want an independent protection from the lawyers, okay,
13   now you're in work product territory.
14        MS. SULLIVAN:  You just said you're going to
15   put it on your exhibit list.  I'm entitled to it.
16        MR. BUCHANAN:  I'm not telling you --
17        THE COURT:  All right.  Let's stop it.  I
18   want to find out what the agreement was between the
19   counsel, and then we will go from there.
20        MR. WEISS:  I will make sure Greg gets on the
21   phone with you and Dave and I.
22        MS. SULLIVAN:  I'm out of town, but I'm happy
23   to talk to you on Monday.
24        THE COURT:  Monday.  Call me, and I'll make
25   myself available as soon as I can.  How about the --
```

```
 1   how about all these facts sheets that weren't provided
 2   have they now been provided?
 3        MS. SULLIVAN:  Your Honor, this was a
 4   courtesy list, and Mr. Locks stopped by before he left
 5   and said he is giving me four of the five.  I haven't
 6   heard from the others, and, so, I'll include them in a
 7   motion.
 8        THE COURT:  All right.  I guess a motion will
 9   be filed on those.
10        MS. KLIMCZUK:  Chris Klimczuk from Locks Law
11   Firm.  It was indicated four of the five facts sheets
12   were provided.  It was my understanding that an
13   agreement was reached between Mr. Locks and Miss
14   Sullivan that the fifth will also be provided.
15        MS. SULLIVAN:  That's actually not correct.
16   He said he had a client issue with the other one and
17   there was no agreement, but there was an agreement --
18   he did tell me that he gave me four of the five.  There
19   was no agreement on the fifth.
20        MS. KLIMCZUK:  Okay.  He indicated that you
21   should be getting one within the next week or two.
22   Would you agree to that?
23        MR. FERRARA:  One of those cases is ours, and
24   there was an agreement to extend and it is not
25   reflected.
```

```
 1        MS. SULLIVAN:  If that's true just e-mail me
 2   the letter, and I'm happy to withdraw it.  I'm assuming
 3   my shop knows who we had agreements with before they
 4   gave me the list.
 5        MR. FERRARA:  We'll be happy to provide you
 6   with your agreement to extend.
 7        MR. WARD:  Navan Ward with the Beasley, Allen
 8   firm.  The client on here has also been given an
 9   extension to the 29th, which that sheet will be in by
10   that time, and it was given by the defendants.
11        THE COURT:  All right.  So the Beasley case
12   they're claiming you gave them an extension to the
13   29th.  How long of an extension did you get,
14   Mr. Ferrara?  Is there a specific time frame or no?
15        MR. FERRARA:  There was, Judge.  I don't
16   recall the date.
17        MS. SULLIVAN:  What is the name of the case,
18   Mike?
19        MR. FERRARA:  McCall.
20        THE COURT:  McCall.  All right.  At the end
21   of the day or tomorrow e-mail that to her or send it to
22   her.  Anyone else have cases on here besides the four
23   Locks cases?
24        MS. KLIMCZUK:  We actually have five.
25        THE COURT:  The four that have been provided,
```

```
 1   the one you don't have anything yet.  If you want an
 2   extension you'll have to have Miss Sullivan's consent,
 3   which she hasn't given.
 4        MS. SULLIVAN:  I'm happy to give you a week.
 5        MS. KLIMCZUK:  Thank you.
 6        THE COURT:  Anybody else have cases on here?
 7        MR. LEVENSTEN:  I have one case on here, it
 8   is the DiPietro case that is actually one of the dual
 9   filed cases that I'm obtaining consent from
10   Mr. DiPietro to discontinue the action in this county
11   and just proceed with the Delaware County, Pennsylvania
12   action.
13        MR. WEISS:  There's a second one, Sandra
14   Wines.
15        MR. LEVENSTEN:  My understanding on Wines I
16   didn't realize it was there is that there's an
17   extension on Wines, and if that's incorrect I believe,
18   your Honor, I am also obtaining consent from Ms. Wines
19   to discontinue that action, as well.
20        THE COURT:  All right.  I guess Miss Sullivan
21   will give you a short time and then she is going to
22   file her motion.  So get it to her within a week, she
23   will probably accept it.  After that she is going to
24   file a motion.
25        MS. SULLIVAN:  We'll defer our motion on all
```

1 of these for a week and --

2 THE COURT: To see if you hear from anybody,

3 and if liaison counsel wants to let anybody know she is

4 going to, and I intend to impose sanctions if they are

5 filed after motions are filed. You have time to file a

6 facts sheet. It is a reasonable period of time unless

7 you have contacted counsel and explained why -- I mean,

8 I'm not going to file sanctions if there's a good

9 reason, but there should have been notice to counsel of

10 what that reason was and request for an extension. You

11 can't just do that after she files a motion to dismiss.

12 Because I don't want motions to dismiss, you know,

13 obviously, but you really don't have a choice with this

14 number of cases, you can't just let them hang, so I

15 would let liaison counsel let everybody know that if

16 they are on this list they better provide their facts

17 sheet within the next week.

18 MR. BUCHANAN: And I think that going forward

19 I think Diane if you'll allow us to provide that notice

20 to the plaintiffs if you intend to put them on a

21 dismissal motion or an omnibus motion of some kind, and

22 we'll make sure they get back to you.

23 MS. SULLIVAN: We send you letters advising

24 you of that.

25 MR. BUCHANAN: I'm aware of deficiency

---

1 letters, but in your eyes I think they -- these are

2 deficiency letters as it relates to the service of the

3 facts sheet, correct?

4 THE COURT: These are.

5 MR. BUCHANAN: Failure to serve facts sheet.

6 MS. SULLIVAN: Complete failures on facts

7 sheets.

8 MR. BUCHANAN: Fair enough.

9 MR. WEISS: Have you spoken with anyone from

10 Davis, Sapperstein?

11 MS. SULLIVAN: I'm sure someone has.

12 MR. WEISS: Because Sam was here.

13 MR. BUCHANAN: Then he knew it was on the

14 agenda. The bottom line is that there's a lot to do in

15 these cases, and I don't know that it is their

16 responsibility to call everybody and hold their hand

17 and ask them three times to send it to them. You know,

18 your facts sheets are due. If you can't send them --

19 on the other hand, I appreciate any calls you make so

20 we can alleviate it. But there may be cases where

21 plaintiff just can't get cooperation, counsel may just

22 not be able to get cooperation from a plaintiff.

23 Certainly that happens, and/or there may be a

24 legitimate reason. There may also be a failure to

25 communicate where you don't have a good excuse you

---

1 can't get the information from them, and if that's the

2 case and you may not be willing to dismiss it without

3 their permission, so she will follow the dismissal and

4 you will get rid of a bad client, and we'll be able to

5 move on.

6 MR. WEISS: Do me a favor, send me a copy of

7 the failure to file facts sheets, and I can make a

8 phone call.

9 THE COURT: CC every letter you send out.

10 MR. WEISS: If you're sending out a letter.

11 MS. SULLIVAN: To any plaintiff's counsel?

12 MR. WEISS: Yes, and I'll make a phone call

13 to help you get this resolved.

14 MS. SULLIVAN: I'm happy to do that.

15 MR. WEISS: Thank you.

16 THE COURT: Depositions I think in that order

17 now that you did submit the order from the management

18 order last time it said one more day, one more day, two

19 more days, and I did sign that yesterday, so I think

20 that resolves that issue.

21 MS. SULLIVAN: And Mr. Buchanan and Mr. Mayer

22 have worked out or are trying to work out some of the

23 deposition issues that -- so that can be deferred.

24 Your Honor, we did want to set a time hopefully next

25 week for hearing on the de bene esse issue.

---

1 THE COURT: Okay. Both briefs have already
2 been filed.
3 MR. WEISS: They have been, but your Honor
4 indicated that would be telephonic next week.
5 THE COURT: That's fine. Is that what you
6 want?
7 MR. WEISS: I'll be travelling a little
8 bit next week.
9 THE COURT: Do you know what time would be
10 good for you?
11 MR. WEISS: Friday is Scolnick's deposition
12 in Boston. Thursday is the MDL status conference, so
13 it is Monday, Tuesday or Wednesday.
14 THE COURT: I'm still hoping I get to get
15 down there.
16 MR. BUCHANAN: I'm sure you'll be invited at
17 some point, your Honor.
18 MS. SULLIVAN: So Diane should pick a time.
19 MS. SULLIVAN: I was supposed to have a
20 meeting in Paris that is not looking good, so I can do
21 Monday.
22 MR. BUCHANAN: They're called vacations.
23 MS. SULLIVAN: No. I can do it Monday or
24 Tuesday, did you say that would work?
25 MR. WEISS: That's fine.

Court Hearing

MR. BUCHANAN: Tuesday is fine for
plaintiffs.
THE COURT: Let's say Tuesday at -- is the
end of the day okay?
MS. SULLIVAN: Fine.
THE COURT: Let's say Tuesday at 3:30.
MS. SULLIVAN: That's fine.
THE COURT: Anything else we have to resolve
for today?
MS. SULLIVAN: Not from our standpoint,
Judge.
MR. BUCHANAN: No.
THE COURT: If you have any orders we'll sign
them.
MR. BUCHANAN: There is the one issue we may
need your help with the IMED.
(End of proceedings.)

C E R T I F I C A T I O N

Court Hearing

I, REGINA A. TELL, C.S.R., C.R.R., License Number
30X100161000, an Official Court Reporter in and for the
State of New Jersey, do hereby certify the foregoing to
be prepared in full compliance with the current
Transcript Format for Judicial Proceedings and is a
true and accurate compressed transcript to the best of
my knowledge and ability.

04-23-05

Regina A. Tell, CSR-CRR
Official Court Reporter
Atlantic County Courthouse
Mays Landing, New Jersey

DAVID BUCHANAN, ESQUIRE

DAVID JACOBY, ESQUIRE
SOL WEISS, ESQUIRE
ANAPOL, SCHWARTZ, WEISS, COHAN, FELDMAN & SMALLEY
ATTORNEYS FOR THE PLAINTIFFS
LEE BALEFSKY, ESQUIRE
KLINE & SPECTER
ATTORNEYS FOR THE PLAINTIFFS

* * * * *

REGINA A. TELL, CSR-CRR
OFFICIAL COURT REPORTER
1201 BACHARACH BOULEVARD
ATLANTIC CITY, NJ 08401

Court Hearing
APPEARANCES CONTINUED . . .
NAVAN WARD, JR., ESQUIRE
BEASLEY, ALLEN, CROW, METHVIN, PORTIS, MILES, P.C.
ATTORNEY FOR THE PLAINTIFFS
WENDY FLEISHMAN, ESQUIRE
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
ATTORNEY FOR THE PLAINTIFFS
GARRY SOLOMON, ESQUIRE
DAVIS, SAPERSTEIN & SALOMON, P.C.
ATTORNEY FOR THE PLAINTIFFS
DAVID COHEN, ESQUIRE
THEODORE M. LIEVERMAN, ESQUIRE
SPECTOR, ROSEMAN & KODROFF, P.C.
ATTORNEY FOR THE PLAINTIFFS
MICHAEL GALPERN, ESQUIRE
GENE LOCKS, ESQUIRE
CHRISTINE KLIMCZUK, ESQUIRE
LOCKS LAW FIRM
ATTORNEYS FOR THE PLAINTIFFS
MICHAEL FERRARA, ESQUIRE
THE FERRARA LAW FIRM
ATTORNEY FOR THE PLAINTIFFS
RICK MEADOW, ESQUIRE
THE LANIER LAW FIRM
ATTORNEY FOR THE PLAINTIFFS
THERESA CORSON, ESQUIRE
LEVY, ANGSTREICH
ATTORNEY FOR THE PLAINTIFFS
GREG SHAFFER, ESQUIRE
WILENTZ, GOLDMAN & SPITZER
ATTORNEY FOR THE PLAINTIFFS
BRIAN L. CONDON, ESQUIRE
KASOWITZ, BENSON, TORRES & FRIEDMAN
ATTORNEY FOR THE PLAINTIFFS
BENEDICT MORELLI, ESQUIRE
MORELLI & ASSOCIATES
ATTORNEY FOR THE PLAINTIFFS

Court Hearing
A P P E A R A N C E S   C O N T I N U E D . . .
RONALD JONAS, ESQUIRE
SANFORD, WITTELS & HEISLER
ATTORNEY FOR THE PLAINTIFFS
JOHN F. KAPESKY, ESQUIRE
SHELLER, LUDWIG
ATTORNEY FOR THE PLAINTIFFS
MICHELE A. DiMARTINO, ESQUIRE
MILLER & ASSOCIATES

1

SUSANNE SCOVERN, ESQUIRE
ALEXANDER, HAWS, AUDET
1   P R O C E E D I N G S
JOSEPH MONACO, ESQUIRE
2          THE COURT:  Stay seated.  Okay.  It is my
ATTORNEY FOR THE PLAINTIFFS
3   understanding you have resolved a lot of issues.  So
HOVDE, DASSOW & DEETS
4   why don't we go down and see what you have left or
MOIRA G. LOPEZ, ESQUIRE
5   first what you have resolved.
ATTORNEY FOR THE PLAINTIFFS
6          MR. WEISS:  That's easy to do.  I think you
SHRAGER, SPIVEY & SACKS
7   should take the defendant's agenda first, your Honor.
JERRY KRISTAL, ESQUIRE
8          THE COURT:  Okay.
ATTORNEY FOR THE PLAINTIFFS
9          MR. WEISS:  Give me a minute to --
MCCRINK, NELSON & KEHLER
10         MR. BUCHANAN:  Do you want to go through in
PATRICK RANDAZZO, ESQUIRE
11  sequence or just what we have resolved?
THEODORE V.H. MAYER, ESQUIRE
12         THE COURT:  Let's go first to what's
CHARLES W. COHEN, ESQUIRE
13  resolved.ES, HUBBARD & REED, LLP
          ATTORNEYS FOR THE DEFENDANT, MERCK
14         MR. WEISS:  Four has been resolved.
A P P E A R A N C E S   C O N T I N U E D . . .
15         MR. BUCHANAN:  Four is documents considered
PHIL YANNELLA, ESQUIRE
16  by experts.RNETT, ESQUIRE
          HEATHER BROWN, ESQUIRE
17         MR. WEISS:  That's been resolved, and they
ATTORNEYS FOR THE DEFENDANT, MERCK
18  have these documents.QUIRE
          O'MELVENY & MEYERS, LLP
19         THE COURT:  Four is resolved?

20         MR. HETRICK:  Yes.

21         MR. WEISS:  Five, I think Ted wants to make a

22  statement, but it is resolved.

23         MR. HETRICK:  Five really is in many ways

24  sort of moot.  I want to bring to your Honor's

25  attention that a recent decision by Judge Walsh in

2

1   connection with Stempler interviews, but really it has

2   no application here.  We have deposed the doctors in

3   the first -- the test cases, so it really is -- it has

4   no applicability at the moment.  I just wanted to bring

5   the Court's attention to the new decision.

6          THE COURT:  You sent me a copy of it.

7          MR. HETRICK:  So that's it for number five.

8          MR. WEISS:  Number six we have resolved, and

9   in the future all requests will be funneled through

10  liaison counsel.  Even though we approve these we'll

11  actually send them, and now they're being taken up as

12  if we did.

13         Number seven there's going to be a proposed

14  Stipulation of Order for your Honor.

15         THE COURT:  Okay.

16         MR. WEISS:  We're working on the final

17  details of that.  Number eight we would like to discuss

18  with the Court next week.

19         THE COURT:  What do you mean next week?

20         MR. BUCHANAN:  What we're trying to do --

21         MR. COHEN:  We're trying to get together to

22  make a proposal.

23         MR. BUCHANAN:  What we would like to do is

24  we're trying to hash out a schedule, and we had to take

25  into account schedules of people who weren't in the

3

1   room to try to hash this out and if there's particular

2   milestones your Honor wants to hit, but the parties

3   didn't have everybody they needed to try and hammer out

4   some deadlines we could present to the Court.  If

5   that's okay or we can try to do it telephonically, and

6   come back to your Honor at a break.

7          THE COURT:  Okay.  So your thought is you're

8   going to be able to just submit that for my review?

9          MR. BUCHANAN:  For your review and whatever

10  your Honor --

11         THE COURT:  It is not going to change the

12  trial date?

13         MR. BUCHANAN:  No.

14         MR. WEISS:  Number nine, number nine we're

15  going to submit for your Honor's consideration a CMO on

16  expert discovery.

17         THE COURT:  Okay.

18         MR. BUCHANAN:  And the concept with that,

19  your Honor, is to eliminate the expert interrogatories

20  and substitute a report when the cases are set for

21  trial, and the report would also be accompanied with

22  documents considered by the expert,

23  compensation-related information, CV's, but we can work

24  out the terms of that stipulation, and we'll submit

25  something to the Court later.

4

1   MR. WEISS: Number 10 we worked out. We're

2   going to have a master set that will be on file, your

3   Honor, both the request and responses.

4   THE COURT: So 10 is worked out. Going back

5   to nine, this is the one issue that I want to talk

6   about today is scheduling of the other than the first

7   five, the other cases and where we're going to -- and I

8   don't think I can do it today, but scheduling deadlines

9   for expert reports for each of them, scheduling or at

10  least taking a group of the first 20 and giving us the

11  deadlines and then moving to another, and I'm not sure

12  whether I'm going to just take a group of heart attack

13  cases first and/or how I'm going to group them, but I

14  want to make sure the oldest cases are obviously done,

15  you know, moving, and I don't know exactly which cases

16  deps have been taken in by defendants of plaintiffs.

17  Has it only been the test cases?

18  MR. WEISS: No, there's a lot of deps taken.

19  THE COURT: A lot of deps, then the doctors

20  deps have not been taken that much?

21  MR. WEISS: There's been a fair amount of

22  doctors' deps taken.

23  THE COURT: Great.

24  MR. BUCHANAN: Primarily in the cases filed

25  prior to September 30th.

5

1   specific expert discovery cutoff. We hadn't proposed

2   discussing scheduling on the second waves, but I would

3   be happy to sit down with counsel next week and do it.

4   MR. HETRICK: I think what we envisioned is

5   actually what is covered on our agenda item number

6   eight for the first case was to try to come up with a

7   schedule that incorporated some milestone dates and

8   then if we could use that as a model, apply it to the

9   remaining cases that would be the ideal, I would think.

10  MR. BUCHANAN: Okay. So getting back to

11  8(b).

12  MR. WEISS: Going forward, your Honor, if it

13  worked out in the first few cases it would become a

14  model. If it needed to be changed we would change it,

15  but at least for the expert discovery the CMO would be

16  flexible enough so that it would fit into any time

17  schedule the Court would come up with later on.

18  THE COURT: That's good. I guess hopefully

19  by next time I'll be able to be in a better position to

20  try to start scheduling those deadlines. I mean, we

21  have to have case-specific experts provided by counsel,

22  and you can't just schedule a case and if it goes away

23  then we have nothing left. We have to move along.

24  MR. BUCHANAN: The sense, your Honor, I guess

25  I have gotten in the last couple conferences you want

7

1   MR. HETRICK: I think they were the old first

2   and second wave cases, there have been depositions

3   taken in those of plaintiffs and some treating doctors

4   and prescribers, as well.

5   THE COURT: All right. And what we're going

6   to have to do is, you know, have the plaintiffs in

7   those early cases, the counsel in those early cases --

8   expert reports are going to have to be provided,

9   obviously, they're case specific, and we need to set

10  deadlines for that. Is that what you're talking about

11  here?

12  MR. BUCHANAN: This is a general thing not in

13  terms of timing. What we're trying to do --

14  THE COURT: Procedure.

15  MR. WEISS: Procedure.

16  MR. BUCHANAN: Defendant provided an expert

17  interrogatories that were largely encompassed by a

18  prior agreement that we had to provide an expert

19  report, documents considered, CV, compensation-related

20  information in the first five cases -- now four cases

21  what we were talking about -- was memorializing that

22  and eliminating the general expert rogs that would have

23  applied to all 1,800 cases that are currently on file

24  and make that expert obligation apply in the setting of

25  a trial case or in a case that, you know, had a

6

1   to start thinking about the cases after the cases that

2   have already been set for trial. I saw your request

3   for information.

4   THE COURT: And I'm trying to look at what

5   we're going to have as our second, third and fourth and

6   fifth case, and I don't want to wait until August 1st

7   to just say we're just doing Humeston and all the

8   sudden there's a void, and we have to keep moving

9   everything else because the oldest cases, and,

10  unfortunately, some of the oldest cases are

11  gastrointestinal cases, which haven't really been --

12  MR. WEISS: They haven't been worked on.

13  THE COURT: They haven't been prepped for

14  general causation.

15  MR. BUCHANAN: General liability side on

16  the gastro cases has not been developed in the same way

17  that the heart attack cases have been.

18  THE COURT: So, you know, which is fine,

19  except that we're going to have to address that soon.

20  Okay. And there's some people here, you know, if you

21  have one or two cases you're going to have to be

22  getting your experts and doing what you're going to do

23  now.

24  MR. BUCHANAN: I think what we're trying to

25  do, you know, and counsel, Joe, specifically next week

8

1    is trying to iron out a specific pretrial calendar for
2    obviously the Humeston case, but, also, try and develop
3    some kind of guideposts for, I guess, those other
4    earlier cases or we can talk about other alternatives.
5         MR. HETRICK:  I think that's fine.
6         THE COURT:  I'll wait to hear from you as to
7    what your thoughts are, and probably we should set up
8    another meeting before the next monthly meeting just
9    with liaison counsel or, you know, just to try to get a
10   more limited group and look at the next group of cases.
11        MR. BUCHANAN:  That's fine.
12        THE COURT:  But all of you should be aware if
13   you look at your docket numbers what are the older
14   docket numbers, where does your case fall in the mix,
15   when are you going to be expected to produce reports
16   and things if you filed early.  I guess if you just
17   filed you can sort of -- I would not want you to sit
18   back, but probably being what it is you will be sitting
19   back a little bit, but I'm more focused on the
20   beginning because I have to move things, but I don't
21   want to do things just by docket numbers, so if we're
22   focusing on heart attacks and we're moving heart
23   attacks it behooves you to start looking at your own
24   plaintiffs and your own doctors and who are you going
25   to use as experts on causation.

1         MR. BUCHANAN:  To some extent in sitting down
2    with defense counsel it will be helpful to have your
3    Honor's thoughts on the next traunches of cases your
4    Honor is interested in seeing for trial so we can try
5    to prioritize among the cases that are on file.
6         THE COURT:  And I'm trying to work that out.
7    What I should do here -- I'm not sure if I want to do
8    the next, you know, two, three and four cases and five
9    cases.  I, too, want to have groups of them, obviously.
10   I don't know if we just want to remain with Humeston
11   and then go to the next 10 cases or whether we want
12   to -- or five cases that are going to -- and we have
13   dates assigned.  If Humeston settles -- I shouldn't
14   even put that on the record because it is not, I'm
15   assuming it won't -- but if it settles or a group
16   settle or -- you know, I don't want to just be in a
17   void, okay, now we're another year away or another six
18   months or even three months away.  I want to move right
19   to the next thing and keep moving along.
20        MR. BUCHANAN:  There's a lot of people in the
21   room that share your view.
22        MR. WEISS:  We want to get your proposal on
23   that.
24        THE COURT:  I want to have two and three and
25   four and five lined up so we're ready to go along.  If

1    you settle one we go to two.  If you settle two we go
2    to three.  If you settle three we go to four.  And if
3    in the meantime you settle another loop of them great,
4    but I want to be moving them.  So I have to look at
5    those deadlines, and I have to look at how we should
6    group them and whether we should focus because we have
7    causation you have general causation on heart attack
8    whether we should just move on the heart attack cases
9    and just give some slack to the others at this point so
10   we can bring them up to speed or whether we should try
11   to move older cases, whether we should try to focus on
12   the diverse mix of different plaintiffs' lawyers having
13   an opportunity to present their cases or focus on those
14   people who file the first cases or the liaison
15   counsel's -- obviously, there's certain law firms that
16   have worked on the general causation and experts
17   primarily and it would make sense to try those cases in
18   the first wave, but --
19        MR. MAYER:  As part of the discussion we have
20   before the next conference we'll talk about whether
21   other injury categories should be moved up next in
22   line.
23        THE COURT:  And that may be.  Maybe we should
24   start focusing on when are these gastrointestinal cases
25   going to be tried, when are the stroke cases going to

1    be tried, and when are we going to get them worked up.
2         All right.  So I'll wait to hear from you
3    until the end of next week either a phone conference or
4    letters from you, and then I'll try to set up a
5    conference with you in person which will be somewhat
6    short.
7         MR. BUCHANAN:  It may be that a telephonic
8    conference may guide our discussions so that we can
9    present something, you know, more definitive after
10   having gone back to our contingencies.
11        THE COURT:  Right now I'm just trying to
12   get -- I did send out that request that you sent me the
13   information on your clients, so I have somebody who
14   knows a lot more than I do put them in an access
15   database and so I can have them organized and try to
16   find things.
17        MR. WEISS:  Which brings up a good point.  I
18   gave a chart to -- our chart to Carmen this morning and
19   then she said have someone e-mail, which is a better
20   idea, so I think people should e-mail the spread sheets
21   to Carmen, that way they can access them better.  Is
22   that a problem with the Court?
23        MR. BUCHANAN:  Or, alternatively, maybe we
24   should send a disk to the Court with whatever filing
25   letters so you have something more permanent in the

1    event there's any issue.  It is your preference.

2         MR. WEISS:  It is your preference.

3         MR. BUCHANAN:  Hard copy with a disk.

4         THE COURT:  I'll tell you what, it is really

5    not me that's going to be entering these, so let me

6    talk to Carmen and we'll see what we're going to do.

7    It is not going to be Carmen that is doing the data

8    entering, but I actually have Dennis Medwick from

9    Middlesex creating an access base for me, and he has

10   already done that, and now we just need to input, and

11   let me talk to them about what they want.

12        MR. BUCHANAN:  It may be, your Honor --

13        THE COURT:  Actually, Dennis is going to be

14   coming down in a couple days so to say that we can --

15   what we can move in from --

16        MR. BUCHANAN:  If there's a way we can do

17   this in a standard way and we have a lot of plaintiffs'

18   firms who filed cases here, just knowing a little bit

19   about databases and how you try and track this

20   information, if your folks on the IT side can decide

21   how they want to, you know, treat different types of

22   information, you know, if you don't want MG to indicate

23   milligrams in the dosage field that may mess up your

24   database, so if you can have your IT folks get in touch

25   with liaison we can get rules out to the group so that

1    us ?

2         MR. HETRICK:  Once we get yours we can have

3    them to you probably within 10 days.

4         MR. BUCHANAN:  Okay.  Thanks.

5         MR. WEISS:  Item 12, whatever is in arrears

6    will be paid.

7         MR. HETRICK:  Yes, that's done.

8         MR. WEISS:  Item 13 we have worked out a

9    process for the facts sheet issues.  I will discuss it

10   with somebody each week generally from Dechert, and I

11   can tell you that Dechert's been pretty good in giving

12   extensions on the plaintiffs' side and the plaintiffs

13   have been pretty good in trying to get better

14   information on the facts sheets.  Some of it is just

15   time issues.  You just don't have all the information

16   when the facts sheet is due, and we're working through

17   it, and if some firms need assistance liaison counsel

18   will help in that process.  But we hope this way we'll

19   have less work for the Court to deal with.

20        THE COURT:  Okay.  Everybody agrees that "see

21   plaintiff's medical records" is not a response to a

22   facts sheet.

23        MR. BUCHANAN:  In some cases, your Honor, the

24   plaintiffs are waiting for, you know, the selected

25   medical records from earlier periods, and we understand

1    people can provide information in a standard way so

2    that you can actually dump it into your database and be

3    usable.

4         THE COURT:  Okay.  Dennis is going to be

5    coming down soon, and, as I said, he created it.  He

6    has given it to us.  Our next step is to get the

7    information and input it, and you're right probably how

8    we get the information is going to be important.

9         MR. BUCHANAN:  If we can develop a standard

10   format it will probably make it easier on his end when

11   he receives it.  If you want to patch either Mr. Weiss

12   or me into the call we would be happy to do that.

13        THE COURT:  Okay.  All right.  I'll get

14   someone from the other side, too.  It should be, I

15   guess, Charlie.

16        MR. COHEN:  I'll do it.

17        MR. WEISS:  Item 10 has been resolved.  A CMO

18   document for the Court.  Item 11, a schedule is being

19   worked on.

20        MR. BUCHANAN:  We're going to work to get the

21   dates by the end of May.

22        MR. HETRICK:  We're hoping to have the

23   experts generic and case specific by the end of May.

24        MR. BUCHANAN:  In terms of reciprocally how

25   long do you think it will take you to get your dates to

1    that's one of the larger delays.

2         MR. WEISS:  So we have gone through that.

3    That's now finished today at least.  I think that's it

4    on the --

5         THE COURT:  So the (b) where there's specific

6    ones listed, you're going to handle that?

7         MR. WEISS:  I have been getting stuff.  I

8    have been talking with plaintiffs' counsel and Dechert,

9    and the Dechert folks are very amenable to talking with

10   the plaintiffs' lawyers directly, as well, in working

11   things out.

12        THE COURT:  Okay.

13        MR. CORONATO:  One issue we didn't discuss,

14   Sol, out there was the issue of the authorization

15   requests and that last chart that's on Pages 8 and 9.

16        MR. WEISS:  You're right.  We didn't talk

17   about that.

18        MR. CORONATO:  This is, your Honor, when

19   we're requesting an authorization that wasn't provided

20   with the facts sheet and your Honor has indicated that

21   counsel should provide that within three business days

22   of a request that chart on Page 9 and 10 sets forth

23   some of the deficiencies there in responding within a

24   three-day time period.

25        MR. BUCHANAN:  Will, I don't know if all the

1  effective lawyers are in the room for this, but I think
2  liaison will be happy to try to help you with this
3  issue, as well.
4        MR. WEISS:  But you have gotten most of the
5  authorizations.
6        MR. CORONATO:  That's true, but we have a
7  court order in place that says three business days, but
8  we can work with you on that if you can provide us with
9  assistance on that that would be great.
10       MR. BUCHANAN:  Absolutely.  One of the things
11 that's hard to do is identify whether all these have
12 specifically been dealt with, and we'll be happy to
13 work with you offline.   If it doesn't work we'll take
14 it back to the Court.
15       MR. CORONATO:  Okay.
16       MR. WEISS:  Thanks for bringing that up.  We
17 did not talk about that.  And the first three items of
18 the agenda were not covered by liaison counsel, I
19 believe; is that correct, Dave?
20       THE COURT:  These are the class
21 certifications, so let's go to plaintiffs' list before
22 we go to those.
23       MR. BUCHANAN:  We're in pretty good shape on
24 ours as well.  You can skip one.  You can skip one.
25 That's one we have to discuss, one that we need to

17

1  discuss at least.  Production of Merck related
2  databases there's, of course, the iMED motion on
3  calendar for today that both parties briefed.  There's
4  separately an issue with the FACTS database.  I'll just
5  outline what that is.  I think we have reached an
6  agreement on it.  There's some technical issues with
7  the production.  I understand they're going to make one
8  of their IT folks available to work with the technical
9  issues, and there's a scope issue in terms of bringing
10 that current to reflect all of the sales-related calls
11 and other information and facts for the cases that were
12 filed after September 30th.  We're going to talk and
13 see if we can't get that worked out.  We targeted
14 Monday to get a firm process and procedure.
15       There's, obviously, a number of other
16 plaintiffs' lawyers in the case that were in cases
17 prior to 9/30.  They're anxious to find the
18 sales-related information from their cases.  They want
19 assurances they're going to get that well before
20 prescribers are deposed and before the fact discovery
21 cutoffs arise, and we're going to try to set some
22 milestones to get that updated production out, and I
23 understand counsel for the defense is in a position to
24 do that today, but we are going to set a firm schedule
25 next week to get that done.

18

1        THE COURT:  Okay.
2        MR. BUCHANAN:  Other database-related issues
3  there are three document databases; as you may recall
4  SPiDER and two others that escape me.  We met and
5  conferred.  They're being processed for production.
6  They are not the subject of any motion as you may have
7  noticed in the database motion papers.  CORNERSTONE,
8  the parties have pulled off the disputed category.
9  We're conferring over that, and to expedite the FACTS
10 production plaintiffs have agreed to put the expedited
11 FACTS production in front of whatever CORNERSTONE
12 production will be made to help prioritize that because
13 we think the FACTS production needs to be made.  It is
14 a real priority.
15       THE COURT:  Okay.
16       MR. BUCHANAN:  Three, outstanding requests
17 concerning confidential information, that has been
18 resolved.  We think we dealt with all of those issues
19 as it relates to the informal requests of counsel that
20 have been made since the last status conference as of
21 this morning.  If there's an exception it is a minor
22 exception at this point.  It is not encompassed by this
23 paragraph.
24       THE COURT:  You didn't resolve the two issues
25 as to the e-mail and to the -- or did you?

19

1        MR. BUCHANAN:  I'm sorry?
2        MR. COHEN:  It is all taken care of.  The
3  only issue left now is the order for the going forward
4  we have competing proposals for the order of when things
5  go into the public file.  I just don't know if your
6  Honor had a chance to look at that yet.
7        MR. BUCHANAN:  The parties had a different
8  proposal with regard to how we're going to deal with
9  filing of papers under seal when defendant maintains
10 documents notwithstanding be in a filing should be
11 filed under seal.
12       We're in the disputed portion of the agenda.
13 We don't have an agreement on that, but
14 plaintiffs' view was what we understand your Honor
15 wanted to do we file our papers with your Honor only as
16 a courtesy copy; we don't file them with the clerk.
17 They then have a week to get back with us and either
18 tell us that they object to the content to filing the
19 disputed documents not under seal or they'll give us
20 their consent, and if they object it was our
21 understanding -- and, candidly, your Honor, it is my
22 understanding your Honor from hearing you in other
23 contexts on the procedure to be used for final
24 documents under seal is that a motion for protective
25 order was supposed to be promptly filed at that same

20

1    date within seven days.  We're not on the same page

2    with the defense as to the process that should be

3    employed as to challenging or addressing the filing of

4    documents under seal with respect to a motion in that

5    window of time.

6          MR. COHEN:  Basically, I just think as a

7    matter of actual practicality and not setting up an

8    order that we're never going to be able to comply with

9    in seven days if it turns out there's a marketing

10   documents, a sales document, a science document, to get

11   three certifications on different issues it is not

12   going to work in seven days.  What I proposed was to

13   promptly, immediately call the Court for a briefing

14   schedule on it, and we can address it, and if for any

15   reason something has to be tremendously expedited

16   plaintiffs will ask your Honor to make a very expedited

17   schedule and you order that I will do it on an

18   expedited schedule, but if it is something I can do on

19   a regular schedule I can do that on a regular schedule

20   because your Honor will already have the papers because

21   it won't slow down the underlying motion; it's just

22   what ends up in the public file.

23          So I think the only difference is I just want

24   to call the Court and get a briefing schedule, and

25   we'll do it on a motion by motion basis and not say

1    going to present to the Court, other than if there's an

2    affidavit that needs to be made to make the case then

3    they do have seven days to make that letter

4    submissions, frankly, are probably sufficient as it

5    relates to the law, and a certification to support

6    those would be sufficient.

7          MR. COHEN:  Two things on that.  First, just

8    as an example of how this works beautifully in

9    practice, I had with Mr. Cohen's office the Klineman

10   brief.  We sent within the seven days a notice saying

11   we objected to one document.  Then we had a meet and

12   confer, which was a couple days later.  During the meet

13   and confer we determined that, in fact, he was only

14   citing a particular portion of the only one document

15   that I thought had confidential information.  That

16   particular portion itself wasn't confidential, so what

17   we agreed to do was we agreed to stipulate that they

18   were accurately getting the information from that

19   document, they were quoting it properly, and then they

20   didn't have to attach the rest of the document, and it

21   took care of the whole problem and your Honor never has

22   to get involved.  That takes a couple days.

23          So with that plus the just saying when do I

24   get the certifications I think we're going to need the

25   certifications because it is, unfortunately, possible

1    immediately I have to file a motion because, otherwise,

2    all I'll be doing is calling the Court every time I

3    can't do it and asking for an extension, and maybe we

4    actually agree -- we probably will agree most of the

5    time on a briefing schedule and we will say, your

6    Honor, does that work for you, and it will be done, and

7    if there's a dispute we don't have to do anything.

8          MR. BUCHANAN:  One thing this litigation has

9    been frequently addressed, the confidential issue in

10   this litigation.  I don't think there's any case that's

11   been unturned in New Jersey on confidential standards

12   law filing.  We're not writing new briefs.  Really

13   fundamentally what we're talking about are the specific

14   facts that need to be presented to the Court to make

15   the case that we're talking about the trade secret for

16   Coke or something near equivalent to the trade secret

17   for Coke.

18          And we have heard, your Honor, this is going

19   to be the vehicle through which the Court is going to

20   address the documents that were not unsealed through

21   their rereview process.  We're a little concerned about

22   creating monster briefing challenges with every

23   submission we file or corollary issues.  I think the

24   Court is pretty familiar with the law at this point,

25   and there's not a lot of new twists and turns we're

1    with the confidential information thing it should just

2    be on the record.  I know plaintiffs' counsel likes to

3    have -- I should say plaintiffs' counsel expressed an

4    interest in having things in the record appropriately

5    should any other kind of action be needed, and I agree

6    with that, and I think that all I'm saying is instead

7    of putting a specific time on when the motion has to be

8    filed as soon as we reach an agreement we'll pick up

9    the phone and say here's a briefing schedule we

10   propose, and if we mostly agree -- it is going to be

11   mostly the fact-specific information, but, you know,

12   there could be in the brief itself, sure, there will be

13   some section on the case law that will be the same, but

14   you'll have to apply it to the facts.  It could be

15   completely different kind of information.  I think it

16   is going to get less and less as it goes along.  I

17   already worked the first one out.  I think there may be

18   one or two that we're going to tee up pretty quickly,

19   which he can check to get some resolution on some of

20   the substance of this, but the difference we have is

21   very narrow, do you put a specific time frame on it

22   ahead of time or do we just call for a briefing

23   schedule, and I think that realistically even if you

24   went the first way half the time I would have to call

25   you and say can I get an extra week, and why don't we

1 see if I can work it out with plaintiffs' counsel
2 first, as I just did, and, if not, just call up and say
3 what is going to work.  If you already have a motion on
4 file to be heard and we can throw it on the same day --
5 we can work things out.  We have been doing that pretty
6 well here.

7   MR. BUCHANAN:  There's one practical problem,
8 your Honor, and what happens is that we filed a motion
9 to compel the production of databases pursuant to one
10 of your Honor's earlier orders back in March, and
11 through, frankly, just oversight it was filed with your
12 Honor, it is not in the Court record.  You know, it is
13 not in the file, and there's no good reason for it not
14 to be in the file.

15   Two months has lapsed, and it is through no
16 fault of defense counsel.  It is just the process that
17 was created that didn't require the filing of the
18 motion and the specific period of time to address
19 confidential information, and now we're in a position
20 where two months has lapsed and the Court file doesn't
21 reflect what is really happening what has happened,
22 and, you know, I take personal responsibility for that
23 because our firm filed a motion.  We filed it with your
24 Honor.  We conferred with defense counsel.  They
25 identified those that they didn't think were

25

1 confidential, and we should be in a position to file
2 that with the Court, and now --
3   THE COURT:  Why don't we revamp our procedure
4 a little bit.  If we want to address that issue
5 probably plaintiffs should be able to file their motion
6 with the clerk's office with a courtesy copy to me, and
7 the motion to the clerk's office should include a cover
8 letter that says this includes everything except those
9 items which have been marked confidential which are
10 being provided to the Court and a courtesy copy, and if
11 counsel objects within -- doesn't object within seven
12 days we'll supplement the court -- the official court
13 record by sending those documents to the clerk.  If, in
14 fact, the clerk doesn't -- if, in fact, you object I
15 think you should file within seven days a formal notice
16 of motion, the notice of motion for a protective order,
17 but you do not have to include briefs.

18   You file a motion for a protective order.
19 You don't have to include certifications.  You just
20 have to file a formal motion.  I think for this it
21 makes sense because I do think we'll start to them, but
22 you don't have to have your supporting papers.  Send
23 the motion and request it be returnable on short notice
24 directly to the clerk and with a request that the Court
25 set up a phone conference, and then we'll at that point

26

1 I'll have the document.  I'll be able to look at it.
2 I'll know what your motion is.  There will be something
3 formal on both sides, but at that point we may wind up
4 with a briefing schedule or time for a facts
5 certification.  I may look at it and say clearly should
6 be attorney/client privilege or, you know, whatever or
7 vice versa.  I may look at it and say I don't know how
8 you're ever going to convince me, what are you going to
9 give me and you can tell me.
10   MR. COHEN:  Basically, Judge, just the notice
11 of motion saying we're filing this and then all the
12 supporting papers will be done.
13   THE COURT:  So we're sort of changing the
14 procedure.
15   MR. BUCHANAN:  That's fine.  That makes
16 sense, your Honor.
17   MR. COHEN:  I was just going to suggest if
18 you wanted to put within three days I have to call the
19 Court and get the schedule I could do that, too, but
20 putting in a piece of paper as a place holder is not
21 a problem.
22   THE COURT:  I think it is probably good.
23   MR. BUCHANAN:  It is good for the file, I
24 think, your Honor.
25   THE COURT:  Okay.

27

1   MR. COHEN:  So we'll have to redo our
2 proposals.  Maybe we can get that put together.
3   MR. BUCHANAN:  I think we understand what you
4 want to do.  We'll be able to change that language.
5   THE COURT:  Can you try to submit one order
6 on that?
7   MR. COHEN:  Yes.  I brought the printer with
8 me.
9   THE COURT:  Now, there hasn't been a ruling
10 though on the two documents that were submitted, right?
11 Or have you resolved those?
12   MR. COHEN:  We resolved those.
13   THE COURT:  The e-mail and the Gilmartin?
14   MR. COHEN:  That's privileged, not
15 confidentiality.  Privilege, that was pending before
16 your Honor, and that was not the subject of either
17 side's agenda.  That is a brief -- you have a motion
18 you just have under advisement.  That's attorney/client
19 privilege.
20   THE COURT:  So you have not resolved those
21 issues?
22   MR. BUCHANAN:  No, they have not been
23 resolved.
24   THE COURT:  I have resolved the e-mail issue,
25 and I don't think I'm going to even write it up.  If

28

1  the plaintiffs file an appeal then I'll write
2  something, but I don't think that it is necessary,
3  otherwise there's an e-mail from Deborah -- or from --
4  yes, it is from Shapiro to Scolnick dated February 11,
5  2000.  There is one long sentence that's been deleted
6  and redacted.  Counsel has claimed it is
7  attorney/client privilege.  Defendants have claimed it
8  is attorney/client privilege.  Plaintiffs have said
9  that they don't understand how that can be because Miss
10  Shapiro in her deposition said she didn't consult with
11  counsel, et cetera.
12       The crux of the matter is it is one sentence
13  in which she says Merck's counsel has advised us of
14  this -- whether she spoke to them or not I don't know,
15  but it is clear to me that it is attorney/client
16  privilege, and the redaction should remain in place.  I
17  know it is always hard to argue against something when
18  you can't see it.  That's the problem with these in
19  camera things, but that's all I'm going to say.
20       MR. BUCHANAN:  We understand the ruling, your
21  Honor.
22       THE COURT:  If there's an issue then I'll
23  write it up, but I don't intend to write it up.
24       The other one I haven't made a decision on
25  yet, but I'll try to get that out to you this week or

1  next week within the next couple days where that was
2  the patent pending thing.
3       MR. BUCHANAN:  That's right.  Just in terms
4  of milestones obviously that document arose -- the
5  privilege assertion with respect to that document arose
6  during the deposition of Mr. Gilmartin.  Counsel who
7  was defending the deposition represented they would not
8  discuss the particular document with Mr. Gilmartin in
9  the intervening period until the issue was resolved
10  with the Court.  His deposition has not yet been set,
11  but I understand we're targeting a day.
12       THE COURT:  He is not done?
13       MR. MAYER:  We have had three days of him,
14  but the last day is going to be --
15       MR. BUCHANAN:  He was cross-noticed in other
16  jurisdictions.
17       MR. MAYER:  And various dates offered.
18       THE COURT:  I should be able to have that to
19  you within the next two or three days.
20       MR. BUCHANAN:  I wanted to apprise you of
21  that situation.
22       THE COURT:  Yes, because you do want it
23  before that dep.
24       MR. BUCHANAN:  If it is going to be found not
25  to be privileged I should know.

1       THE COURT:  Okay.  I should have a decision
2  to you before then.  All right?
3       MR. BUCHANAN:  Outstanding document
4  production requests, that's the next item on plaintiffs
5  agenda.  There are a number of items that have been
6  requested.  We received a status report this morning
7  from defense counsel which traunches productions in
8  waves, and what we're going to do is just go back to
9  our list, go back to our office and verify the timing
10  and the sequence of requests and work with defense
11  counsel if there's any concerns so I can have an
12  opportunity to raise those with you in an intervening
13  teleconference, but I think we have worked it out.
14       THE COURT:  Where are we at now?
15       MR. BUCHANAN:  Up to the deposition of the
16  Merck detailer in Mr. Humeston's case.
17       THE COURT:  Is there an issue about that?
18       MR. BUCHANAN:  I think we have worked it out.
19  We're going to be deposing Jennifer Brown.
20       THE COURT:  So that takes care of everything,
21  except really the class action.  I need from counsel
22  just to clarify where we are at, what your
23  understanding is of what else is outstanding that I
24  haven't decided just for the reasons you have said
25  because we deal with things, things are filed then we

1  address it in a management conference, address it again
2  in a management conference and make a ruling, and I
3  just don't want to have things out there and you're
4  waiting for a decision and don't know where it is and
5  don't want to, you know -- of course you certainly
6  could call the clerk and ask, but I just want to know
7  what your understanding is of anything else that's out
8  there that hasn't been addressed.
9       MR. BUCHANAN:  The one issue that would jump
10  to my mind is iMED, we still need to argue that.  I'm
11  told the deposition protocol was signed.  I hadn't seen
12  it come through yet, but I'm told the deposition
13  protocol was signed.
14       THE COURT:  I believe I did sign it.
15       MR. BUCHANAN:  That was a precursor for the
16  next document, which was the protocol for internet
17  depositions.  I think there was a trigger date.
18       THE COURT:  Is there a dispute about that
19  one?
20       MR. BUCHANAN:  We have it worked out, but we
21  needed the deposition protocol signed first so that
22  will be an order that will be forthcoming to your
23  Honor.
24       MR. CORONATO:  I submitted it by Lexis Nexis,
25  the internet protocol.

1    THE COURT:  So that will be signed.

2    MR. BUCHANAN:  That is on consent.  There's

3    no objection.

4    THE COURT:  I'll get that signed today.

5    MR. BUCHANAN:  Okay.

6    THE COURT:  Anything else that anyone knows

7    is outstanding that they need a ruling on?

8    MR. BUCHANAN:  There may have been some

9    disputed provisions in our competing Case Management

10   Orders.

11   THE COURT:  Oh, the April order.

12   MR. BUCHANAN:  The April order has not been

13   addressed.  You have the defendant's initial proposal,

14   their supplemental proposal and our letter.

15   THE COURT:  There were four.

16   MR. BUCHANAN:  We only sent one.

17   THE COURT:  I have them in a pile on my desk.

18   I'll look at those.  Okay.  They're not major

19   differences.

20   MR. BUCHANAN:  I don't think so.

21   THE COURT:  One of the differences might have

22   been this.

23   MR. BUCHANAN:  It was the confidentiality

24   issue.

25   THE COURT:  Was the issue of what to do with

1    know.  You can do it by letter or you can do it here.

2    The best way to do it would be to first send a letter

3    to Sol and say to him that I have concerns about this

4    and this and I need to meet with you or I need to

5    address this.  If it is not addressed and you want

6    to -- you know, I want to make sure that everybody if

7    there's any problems I want to make sure we get them

8    ironed out, and I don't want any plaintiffs' counsel

9    who maybe don't have a huge number of cases who are

10   feeling that some of their issues aren't addressed --

11   MR. BUCHANAN:  Your Honor, just to give you a

12   sense of a little bit of our inner workings without

13   going into too much detail, as a general matter the

14   agendas for the status conferences are if people have

15   requested they have any items they would like to put on

16   the agenda -- we occasionally do get additional items,

17   and we incorporate those and attempt to advocate on

18   behalf of those people who don't come to the

19   conferences.  People are here to handle their issues.

20   They handle them separately, and at the suggestion of

21   some of the others in the New Jersey group we started

22   having a call among plaintiffs' counsel and will

23   continue to do that to get everybody's feedback and

24   make sure that we're steering the right course for the

25   New Jersey litigants.

1    those, so that part I may cross out and let you submit

2    the revised order from today as opposed to entering

3    anything on that, and that may resolve 90 percent of

4    what that issue was.

5    MR. BUCHANAN:  We can probably work out a

6    stand alone order for filing of documents that we can

7    provide to your Honor.

8    THE COURT:  Before you leave, Charlie, I'll

9    pull that order back and maybe we can retype it.

10   MR. COHEN:  Give me your side, and I'll get

11   the printer.

12   THE COURT:  Is there anything else other than

13   the class action so that everybody else can leave?  I

14   guess one of the things I also want to throw out to you

15   is whether there's any -- does everybody feel as far as

16   the plaintiffs do you have any -- so far with liaison

17   counsel it is working out, they are being able to

18   contact everybody?

19   MR. BUCHANAN:  Mr. Weiss is doing a great

20   job.

21   THE COURT:  We get more people in.  If any of

22   the people that have lesser cases -- no case is lesser,

23   but less number of cases quantitywise feel that they're

24   not -- their issues aren't being addressed or they're

25   not -- you know, you're just going to have to let me

1    To the extent people take exception to

2    certain of those issues they're, obviously, free to

3    raise them here, but so far I think it is working out

4    okay.

5    THE COURT:  I'm not suggesting there is a

6    problem, but I don't want there to be something under

7    there or somebody who felt they really weren't sure to

8    express or when to express, but as Mr. Buchanan said as

9    long as you contact Mr. Weiss with your concern and

10   then if you need to ask to have something on the

11   agenda --

12   MR. JACOBY:  I can also say, and maybe we

13   should say it again for everybody, we take calls -- our

14   office and I'm sure David's office every day of the

15   week from counsel all over the country.  We always make

16   sure we call them back that day, answer their

17   questions.  I haven't heard any complaints.  No one has

18   told us, well, I called you Monday and you didn't call

19   me back till Friday.  We try to address everybody's

20   concerns informally and, things I think, have been

21   working out pretty well, but there has been a lot of

22   telephone communication.

23   THE COURT:  Good.  I assume everything is

24   working well.  I want to make sure.  Okay.  I am going

25   to be going to -- you know, I assume there is no

1  objection -- if there is any objection tell me now
2  because Monday I'm going to be in New Orleans with the
3  federal judge, the Texas judge and the Alabama state
4  court judge.  I believe everyone is fully aware of
5  that, but just to make sure everybody knows so there's
6  no objection to it if there is one I need to know
7  before I go.  And we're hoping that, you know, we can
8  work somewhat together so we can coordinate things
9  whatever we can work together on we can do so that
10  things go more smoothly.  I think things have gone
11  smoothly already, but go smoothly in the future, so
12  hopefully everybody is -- we can address some of the
13  different needs that people have because of the
14  competing states' calendar issues and the federal
15  judges issue, and, you know, I have spoken to all three
16  individuals.  The Texas judge is Judge Hardin, Judge
17  Rochester from Alabama and Judge Fallon from the
18  Federal Court, and everybody, I think, wants to work
19  together, so I think it will work.
20         MR. JUDD:  All we need is a judge in
21  California.
22         THE COURT:  Have they replaced the judge yet?
23         MR. GALPERN:  She sent a letter admitting she
24  took VIOXX, and they're expecting a motion at any time
25  to disqualify her.

1         THE COURT:  I never took VIOXX.  We can go
2  on.
3         MR. FERRARA:  Your Honor, a number of lawyers
4  around the country were debating whether to file here
5  in New Jersey or to file in the MDL, and when they went
6  through that analysis I assured them that this case was
7  well on track and has been, what excellent job that
8  liaison counsel had been doing and what your Honor has
9  been doing, and their fear -- just the issue came up
10  when you mentioned you were going to be meeting with
11  Judge Fallon -- is that somehow this case is going to
12  be slowed down to accommodate Judge Fallon and his
13  requests, and I would just like to be able to reassure
14  the folks around the country that your Honor is going
15  to proceed with this case as you have told us in the
16  past and not -- you know, the people who have made the
17  decision to be here don't now want to be bogged down
18  with the MDL and the MDL politics and all that stuff.
19  I don't have a question to ask, but I want to raise the
20  concern that these folks have raised.  Does that make
21  any sense?
22         THE COURT:  Obviously, I haven't met these
23  people in person to be able to talk to them or hear
24  their concerns and my concerns and share views, so to
25  say what I am going to do or not do 100 percent after I

1  speak to everybody certainly, hopefully, we'll be able
2  to help each other coordinate with each other and work
3  together.  I have absolutely no intention of delaying
4  my list for one day.
5         MR. FERRARA:  That's what they wanted to
6  hear.
7         MR. MAYER:  Just for the record, Merck's view
8  is we want the MDL to move along quickly, too.  So we
9  are looking for everybody to work together.
10         THE COURT:  And I'm hoping that happens, too,
11  but I just -- you know, I don't intend to -- I'm not
12  going there with this case.  Judge Fallon hasn't
13  asked me to delay my case, and, actually, from what I
14  understand he never really asked the Texas judge to
15  delay his case.  When I spoke to the Texas judge that
16  request had never been made.  There was some banter
17  that that had been done, that the State court judges
18  had been asked to delay their cases, but that hasn't
19  actually happened.  Judge Fallon hasn't asked me to
20  delay anything.  He hasn't asked Texas to delay
21  anything.  I think he did contact the Alabama judge,
22  but I think that was with counsel's -- almost at
23  counsel's request or not request but agreement,
24  knowledge on both sides, and, you know, it is not a
25  question of -- you know, I feel comfortable that I'm

1  going to well represent the State of New Jersey down
2  there.  I may be a little bit of a fish out of water
3  since there's going to be three Southerners, all
4  gentlemen, but I think it will be fine.
5         I want to look at this as hopefully we're
6  going to be able to coordinate everything.  I am hoping
7  to move things together as quickly as possible is my
8  goal.  I don't intend to be held back at all in order
9  to -- that's not my plan.  My plan is we all try to
10  move together as fast as we can to try to resolve all
11  the cases.
12         MR. FERRARA:  Thank you, your Honor.
13         MR. LOCKS:  Your Honor, without identifying
14  any issue or two, but I'll be glad to if you push me,
15  there might be some issues discussed that might require
16  some decision making that might -- that we might feel
17  that we would like as counsel in New Jersey to have
18  input in before a decision is made if you meet with
19  Judge Fallon, and, hopefully, that discussions won't
20  result in certain decisions that we might feel that we
21  would like to have input in.
22         Now having been obtuse that way I might be
23  more descriptive if you'd like.  I don't know if
24  they're going to come up.  We have heard lots of
25  rumors, and there have been certain things discussed as

```
1    I understand the last day or two that if they were
2    going to be judicially decided we might collectively or
3    individually have some opposite positions on.
4         THE COURT:  I haven't been advised of an
5    agenda or anybody's -- other than just generally
6    talking about cooperation.  If you have a specific
7    concern that you want me to keep in mind, I mean, I
8    think Mr. Ferrara has just put in the concern that he
9    has that the New Jersey cases not be slowed down, and I
10   can assure him I share that concern, and, you know, I
11   can't say I share that concern because it isn't a
12   concern to me.  I'm going to move my cases, you know?
13   I'm not concerned about that.  My cases are going to
14   move.
15        MR. LOCKS:  I wasn't referring to that.  I
16   understand there have been some discussions in the MDL
17   on subjects that haven't been discussed in the State
18   system yet.  Now, whether or not those are going to be
19   asked to be coordinated, I think, at least --
20        THE COURT:  You're going to have to tell me
21   what they are then so I can think about them before
22   next week.
23        MR. LOCKS:  I understand there's issues about
24   tolling agreements where Merck may or may not agree to
25   tolling agreements or have something involved in the
```

41

```
1    MDL that deal with tolling, and, frankly, if some group
2    of judges decided to do something like that I think
3    that we might like to have some input on whether or not
4    we feel that's appropriate or not for the State cases
5    in New Jersey.
6         MR. MAYER:  What we would or wouldn't offer
7    on a tolling agreement is really Merck's decision, and
8    not something --
9         MR. LOCKS:  There may be differing opinions
10   about whether it is something that is globally
11   acceptable that may be imposed here.
12        THE COURT:  Well, let me just -- let me just
13   say this just to make it a little simpler, I don't
14   know, but it is not my attempt to go down there and
15   come out with joint orders immediately and then on
16   Monday you're going to read that we have agreed on X,
17   Y, Z.  We're going to agree to assist each other.
18   There may be specific things that we want to
19   specifically agree on.  If we do I'll bring them all
20   back to you before I sign them or agree to anything.
21   But there is no -- I mean, the Federal Court and myself
22   are not going to have joint orders.  There is no
23   overlap of our jurisdictions.  I have jurisdiction
24   here; they have jurisdiction there.  We may coordinate
25   with each other, but, you know, there's not going to be
```

42

```
1    like a joint order.
2         MR. LOCKS:  I didn't -- all I wanted to make
3    sure was if something came up that we had a chance to
4    react to it.
5         THE COURT:  Obviously, there's always things
6    in the background that the judge doesn't know, and
7    that's the way it should be.  I don't want to know
8    everything you're thinking about because if you did,
9    who knows?  I have enough to worry about with what you
10   want to formally present to me.  The bottom line is
11   before I formally make decisions I will bring them back
12   to the group, all right?
13        MR. LOCKS:  Thank you, your Honor.
14        THE COURT:  There will be no formal decision
15   made.  I will not commit to something without
16   discussing it with New Jersey counsel who are only in
17   New Jersey.
18        MR. BUCHANAN:  Thank you, your Honor.
19        MR. WEISS:  Thank you.
20        THE COURT:  So there will be no formal
21   commitment made for anything until after I have a
22   chance to review it with Jersey counsel or not just
23   Jersey counsel but counsel who are involved in the
24   Jersey litigation, regardless of whether they are from
25   New Jersey or not.  Okay?
```

43

```
1         MR. WEISS:  Thank you.
2         MR. BUCHANAN:  I'm sorry, your Honor, there
3    is one thing that I would be remiss if I didn't raise,
4    and it is an issue we're going to talk with defense
5    counsel about and see if we can't work out a
6    stipulation or understanding, and it relates to the
7    dismissal of cases without prejudice where for one
8    reason or another the plaintiff or the plaintiff's
9    counsel has a consent of the client, but the client
10   doesn't want to pursue the case any more or for reasons
11   it shouldn't be pursued.  We're going to try to
12   negotiate some kind of stipulation, if possible.
13        MR. WEISS:  We did.  My understanding, and I
14   spoke to some people around this room, and I spoke to
15   Ted that Merck is not opposed to allowing a young case
16   to be dismissed without prejudice, assuming the Court
17   agrees with the proviso if it is not a New Jersey
18   plaintiff if the plaintiff wants to refile that
19   plaintiff has to refile in the MDL, and the lawyers in
20   this room have agreed to that, and, your Honor, if
21   that's acceptable to you that is the stipulation that
22   has been agreed to by the parties.
23        MR. HETRICK:  That's true.
24        MR. WEISS:  There's no statute protection.
25   It is simply if for whatever reason the case is going
```

44

1  to be dismissed it is going to be dismissed without
2  prejudice, and there's no statute saving, there's
3  nothing, but if it ever gets refiled and it is not a
4  New Jersey plaintiff it gets filed in the MDL.
5        THE COURT:  I don't know that I could sign
6  that, and the reason is not that you can't agree to
7  that, but what if the plaintiff then changes lawyers
8  and files in New Jersey?  I have to think about it.
9        MR. WEISS:  That's what Mr. Mayer asked that
10  we consider, and the lawyers that I spoke to said that
11  was okay with them, and that was the concern that we
12  raised.
13        MR. BUCHANAN:  Your Honor, there is a broader
14  contingency that may be affected by it.  We should
15  probably circulate it and further discuss with defense
16  counsel.
17        MR. MAYER:  This isn't written that nobody
18  has to agree to that.  If somebody doesn't agree to
19  that then we can consider in that case whether we will
20  stipulate to discontinue, but what we have told Sol is
21  what we would do for cases in an early stage we would
22  basically, be willing, no questions asked, to agree on
23  this basis.
24        MR. BUCHANAN:  We were thinking cases where
25  depositions hadn't been taken.

45

1        MR. LOCKS:  Isn't that a case with an
2  individual lawyer stipulating in a specific case, and
3  it doesn't require the Court to do any more than accept
4  the dismissal.
5        MR. WEISS:  That's correct, but that was what
6  was asked.
7        MR. LOCKS:  So there's no reason to circulate
8  it around as if it is, quote, some policy of the Court.
9        MR. MAYER:  It doesn't have to be a policy of
10  plaintiffs' liaison counsel.  It was a matter I was
11  indicating to Mr. Weiss that we would be willing to do
12  that.
13        THE COURT:  I'm only concerned -- you're
14  absolutely right.  Everybody has the right to do
15  whatever they want with their cases.  They can dismiss
16  them.  You can keep them.  You can move them.  Assuming
17  the other -- you can do what you want with your cases,
18  but he was asking whether I was going to sign an order
19  that says the plaintiff may not come back into New
20  Jersey, and I don't have a problem signing an order
21  saying the case is dismissed and your having
22  agreement --
23        MR. MAYER:  I will tell you it is commonly
24  done in stipulations of dismissal for cases beyond the
25  point where the plaintiff can unilaterally dismiss and

46

1  that conditions are imposed on refiling in that
2  situation.
3        THE COURT:  Then it is a dismissal with
4  prejudice here.
5        MR. MAYER:  Well, but it is without prejudice
6  to renew somewhere else.
7        THE COURT:  If you want to submit a dismissal
8  with prejudice I could sign that, and you can have a
9  separate agreement that you can file somewhere else, I
10  guess maybe, right.  What you're asking me for is a
11  dismissal without prejudice that really is with
12  prejudice to my jurisdiction.
13        MR. WEISS:  That's correct, your Honor.
14        THE COURT:  And I don't think that that's --
15  it depends on how it is worded and what you say, I
16  guess, but I have a problem with it.
17        MR. BUCHANAN:  And it may be, your Honor,
18  that the way to handle that is the parties submit a
19  stipulation without prejudice, and the individual
20  plaintiff has an individual agreement with Merck that's
21  not in the form of order submitted to the Court with
22  regard to the conditions on refiling.
23        MR. MAYER:  We'll think about that before we
24  actually enter into one of those and see if we have a
25  solution that will satisfy your Honor.

47

1        THE COURT:  And this has been something
2  somebody is just bringing up now, so I haven't had a
3  chance to look at it.  It seems like -- there's no
4  question it can be done, you know, you guys can pretty
5  much do anything you want with your cases if you have
6  your client's authorization.  It is just a question of
7  how I am going to handle it as far as dismissal.  I
8  hate to do a dismissal.  I just can't see signing a
9  dismissal without prejudice, but you can never bring it
10  back here.
11        MR. GALPERN:  Your Honor, putting statute of
12  limitations concerns aside, if plaintiffs voluntarily
13  dismiss without prejudice to refiling elsewhere in the
14  MDL that effectively has to operate under the entire
15  Controversy Doctrine as a dismissal with prejudice
16  vis-a-vis the New Jersey court system, so everybody's
17  interests are advanced by working out a dismissal
18  without prejudice to refiling in the MDL or Alabama or
19  California or wherever under our common law it
20  effectively works as a dismissal with prejudice with
21  respect to New Jersey and then everybody's interests
22  are advanced.
23        MR. MAYER:  I think that's correct.  We'll
24  give the Court some help on this the next time we meet.
25        THE COURT:  I don't know if I need help.

48

1    Again, I guess I have to get out the federalists papers
2    in the constitution, Judge Corodemus told me I have
3    to take them with me down there.
4        MR. WEISS:  She had some experience.
5        THE COURT:  But at any rate, the bottom line
6    is I don't know that I would sign -- I don't know that
7    I need help.  I do need to think about it, and I do
8    need to see exactly what you're doing, and I understand
9    there are lots of things that facilitate settlements
10   and facilitate -- you probably would be shocked at the
11   number of things that I'm asked to sign to end cases
12   that I don't have any intention of signing, you know?
13   And if you want to send me an order to dismiss a case I
14   will sign it in a heartbeat, but orders to dismiss a
15   case with orders that it go here or there I don't think
16   I have that -- I don't think that's my job.  I don't
17   think that that's going to be appropriate.
18       The fact that you may have a stipulation
19   somewhere else to do something is something different.
20   I'm throwing it out to you.  Obviously, if you want to
21   submit something to me that says exactly what you said
22   along with a brief I'll read it and look at it.  I'm
23   sure there's no law on it specifically.  I can't
24   imagine a case that says -- there's probably nobody
25   else who has refused to sign it.

49

1        MR. FERRARA:  Your Honor, as a matter of
2    historical perspective Merck has been up to this point
3    kind enough to agree to allow cases to be dismissed
4    without prejudice on a case by case basis, so it's
5    being done, and everybody is happy, and I don't think
6    that it is really that -- I think what Sol proposed if
7    your Honor is uncomfortable with it we can have a side
8    agreement with defense counsel.
9        THE COURT:  You can agree to anything you
10   want.  I'm talking about what I sign.  What I sign says
11   the case is dismissed -- dismissed without prejudice
12   dismissed with prejudice, and that's what I'm signing.
13   If you want to have some side agreement that you're
14   going to the MDL that's fine, if you want to have a
15   side agreement, but that's not going to be in my order.
16       MR. WEISS:  Your Honor, I agree with you.  I
17   only wanted to bring to your attention the discussions
18   that went back and forth this morning, and Merck has
19   been very reasonable as Mike Ferrara said in working
20   things out.  It was a request they made and lawyers --
21   plaintiffs' lawyers thought it was not an unreasonable
22   request, and that's how it came up.  I know your
23   concerns.
24       THE COURT:  I don't think this is going to
25   wind up being a big issue because whatever you want to

50

1    do can be done.  It was just a question of semantics
2    and style.  It is not a question of -- and I think it
3    is more than that.  I think it is more than semantics
4    and style from my point of view, but the bottom line is
5    you can still accomplish what you want to accomplish
6    without me, okay?
7        MR. BUCHANAN:  We understand, your Honor.
8        THE COURT:  Class action people stay and
9    anybody who wants to participate in the iMED issue --
10       MR. BUCHANAN:  Do you want to start with
11   Local 68 matters?
12       THE COURT:  Yes.  What do we have?
13       MR. BUCHANAN:  I think both sides are a
14   little disappointed that we didn't make more progress
15   in terms of document production over the last month.  I
16   certainly don't fault Mr. Judd.  He has been
17   cooperative and provided me with information in the
18   last week or two in terms of the timing problems and
19   potential impediments to producing the documents that
20   we have requested, but by way of background we
21   requested documents in early March in connection with
22   the class cert motion that we have.  There's -- I don't
23   know, there's three or four requests that we tried to
24   prioritize to see if we can expedite those, but that
25   was only last week after Jeff and I had an opportunity

51

1    to talk about the timing problems.  Plaintiffs are
2    concerned about delaying it any longer and don't intend
3    to.
4        We would like to the extent possible counsel
5    maybe can work with us on this to get all the documents
6    they have responsive to three, four and seven, I think,
7    Jeff, those were the ones I prioritized with you.  If
8    we can get those by the end of next week we'll file our
9    papers two weeks from that Friday.  We're not going to
10   take a deposition without a full production from them,
11   and we'll rely on the records hopefully.
12       THE COURT:  Any problem with that production?
13       MR. JUDD:  Unfortunately, the way that the
14   productions are obtained, frankly, makes that a little
15   difficult to do subjectwise.  We can move custodians
16   because what we're doing and really by necessity have
17   to do it this way is as we identify individuals or
18   departments who were reasonably likely to possess
19   responsive documents we go and sweep documents but
20   sweep them broadly because in many cases there are
21   overlapping discovery requests.  For instance, names
22   that come up in our investigation are the subject of
23   individual document demands already in the PI cases,
24   names like Dr. Silverstein and Dr. Goldberg, for
25   instance, and so we go actually -- Dechert goes and

52

1    sweeps an individual completely and then that starts a

2    process to identify, you know, privilege documents and

3    documents that are completely irrelevant to VIOXX

4    matters, but what happens is at the end of the day each

5    custodian may have a variety of subject matters within

6    their collection and as a practical matter we have to

7    process that at one time, and we're really not able to

8    at that point in the process identify responsive

9    documents by the subject matter that's in the subpoena

10    and pull those out and move those to the head of the

11    line.  The entire custodial collection gets processed

12    and Mr. Barnett can tell you in far greater detail what

13    all is involved with that, but it takes a number of

14    weeks to get all of the various processing of a

15    custodian's collection done, at which point it is

16    transferred to O'Melveney, and we are looking at the

17    custodian's collection and identifying responsive

18    documents from that.

19            Bottom line, when we have to produce the

20    entire custodian collection that's what gets processed

21    and produced as opposed to a subset, which may be

22    responsive to the engineers' subpoena, and it is,

23    frankly, that process itself which is causing the

24    delay.

25            At the last conference I sat here and said

---

1    that I thought we would be able to produce documents by

2    5/13, and that was my error.  I thought I had spoken

3    with everyone.  I thought I had understood everything

4    that I needed to know in order to make that

5    undertaking, and I made a mistake.

6            THE COURT:  Now, what time frame can you have

7    it done in?

8            MR. JUDD:  I'm actually going to turn that

9    over to the Dechert folks.

10          MR. BARNETT:  David requested -- or Mr.

11    Buchanan had requested a schedule sort of upcoming

12    productions in terms of New Jersey productions and

13    engineers, and I don't know how that accords, Dave,

14    with what you have requested.

15          MR. BUCHANAN:  I don't know either.  I mean,

16    I don't know what these people were responsible for.

17    There's a list of, you know, a dozen or so people,

18    maybe more, 15, that they have gathered documents for

19    in connection with the engineers' matter.  The

20    production rolls out until mid July.

21          THE COURT:  That's way too long.

22          MR. BARNETT:  In Mr. Judd's defense, given

23    the volume of documents that we're dealing with not

24    only for the products liability litigation but for

25    engineers and other matters we have huge number of

---

1    folks that are doing this.  Right now in order to speed

2    up the engineers' production we have effectively an

3    entire review center in Philadelphia that is working

4    solely on engineers.  It is a substantial number of

5    custodians.  It is a substantial number of documents.

6    I sent an e-mail this morning asking to get some sort

7    of estimate with what we were looking at so I can tell

8    Mr. Buchanan, and I'm still waiting to get that back.

9          What we can try to do is maybe caucus with

10    Mr. Judd and Mr. Buchanan and look at this schedule,

11    and if there are particular custodians that we have got

12    on this schedule that would be potentially responsive

13    to his request we can try to alter this batting order

14    and try to move people up so that it doesn't have an

15    impact on the briefing schedule that Mr. Buchanan has

16    outlined.

17          MR. BUCHANAN:  This is just you can just see

18    some of these are pretty generic topics, and,

19    obviously, completeness is ideal.  I don't think it is

20    realistic right now based on what I have heard.  I

21    can't ascribe fault.  I don't think that's productive

22    at this point.  The three that I think I put in a

23    square, your Honor, are the ones that I suggested to

24    Mr. Judd in a telephone conference that we prioritize.

25    Three, four and seven.

---

1          THE COURT:  You got two, three, four and

2    seven?

3          MR. BUCHANAN:  Two is actually a second

4    traunch.  That was training materials.  But three, four

5    and seven were ones that I hoped we would have in our

6    hands with sufficient time to analyze for our reply

7    brief.

8          MR. JUDD:  And I believe that specifically on

9    the three, four and seven categories the productions

10    that we're looking at 5/27 and 6/2 I can't represent is

11    going to be the universe of responsive documents in

12    those three categories, but it is my understanding, and

13    I can say this very -- with a high degree of certainty,

14    that the production on 5/27 at least the Wisman, in

15    particular, has many of the most responsive documents

16    in those documents, as well as on 6/2 U.S. Medsa

17    category referring to formulary dossiers and

18    communications with managed care entities.

19          So I think in large part we have attempted to

20    respond to the conference that Mr. Buchanan and I had

21    to try to move up those categories of departments and

22    custodians that have those documents that Mr. Buchanan

23    has identified as most important, but I can say without

24    qualification that that will not be exhaustive, that

25    there will be other custodians, other departments that

1   have some responsive documents.

2        I think that's the best I can say at this

3   point.  What I can do, though, is do what Mr. Barnett

4   suggests and look more closely at the balance of these

5   and see if there are any below the 6/2 schedule that we

6   could move up that would, you know, that would give us

7   a better coverage for those three categories that

8   Mr. Buchanan has identified.

9        MR. BUCHANAN:  Your Honor, there is a concern

10  that is difficult for me to articulate because I have

11  the utmost respect for defense counsel and also for the

12  Federal Court, Judge Fallon, who is hearing the MDL

13  proceedings.  My concern, and it is supported by some

14  filings for the defense here, is that the production

15  delays are less, say, technical and procedural and more

16  technical associated with a desire to allow the MDL

17  class action to catch up, and, in fact, in a filing

18  with the Federal Court defense counsel here invited

19  Judge Fallon to hear class certification issues

20  relating to engineers and the quote, which is puzzling

21  to me, and I wouldn't presuppose why Judge Fallon would

22  do that here given how advanced this proceeding is and

23  how long the class cert motion has been on file.  The

24  quote is, "two courts," meaning this court and the MDL

25  court "should not be hearing identical cases brought by

---

1   the same counsel on behalf of identical claimants.

2   Merck respectfully submits that these nationwide

3   classes, particularly the class certification questions

4   presented thereby should be heard by this MDL court."

5   I don't know how that invitation could be extended to

6   Judge Fallon, particularly given the posture of this

7   particular litigation being as advanced as it is, and I

8   wouldn't presume to know how he would respond to that

9   request, but I'm concerned about the delay on

10  production requests that was served on March 3rd.

11       THE COURT:  How many custodians do you have?

12       MR. BUCHANAN:  There's probably 30 on the

13  list, your Honor.  I'm not sure how many go into the

14  categories of four and seven.

15       THE COURT:  How many documents are we talking

16  about?

17       MR. BARNETT:  I'm trying to get an estimate.

18       MR. JUDD:  I know it is well in excess of

19  several hundred thousand at least swept documents, see,

20  but, again, one of the things that --

21       THE COURT:  Are these custodians of records

22  that have already been reviewed?

23       MR. BUCHANAN:  No.

24       THE COURT:  These are all different people.

25       MR. BUCHANAN:  These are all different

---

1   people.

2        MR. BARNETT:  If I could just respond to what

3   Mr. Buchanan said, until he had read that statement I

4   quite frankly, obviously, counsel to Merck I was

5   unaware that that position had been taken.  The issues

6   that have existed as to production at least to my

7   knowledge are in no way tied to any sort of a strategic

8   position that Merck may be taking with the MDL, and I

9   think Mr. Judd was quite kind in assuming some

10  responsibility for the projected production dated, but

11  the reality is a lot of the delay has just been the

12  fact that you have got two firms who for the first time

13  are working together for production issues and there

14  was confusion as to who needed to talk to who and that

15  sort of thing.  It was examples sort of

16  miscommunication and potentially some

17  misunderstandings.  It was not a deliberate device to

18  sort of slow down production in favor of the MDL.  That

19  is not the case at all.

20       THE COURT:  Well, I need a deadline, and I

21  need a deadline that's not July.  I need an earlier --

22  much earlier deadline than that.  I need to know if you

23  need another two weeks, another three weeks and then

24  you can produce it, but I'm not going to delay these

25  things.

---

1        MR. BARNETT:  You want a firm deadline for

2   the entire engineers' production?

3        THE COURT:  For the production of three, four

4   and seven.

5        MR. MAYER:  And just to -- I think what

6   Mr. Buchanan said is he understands that may not be

7   complete, but he wants --

8        MR. BUCHANAN:  I don't need to prove my case

9   on a class cert matter.  I get my reasonable

10  inferences.  The documents don't need to be all of

11  them.  If you can identify -- do your best job to

12  identify the people who you think have the most

13  responsive material, and I would really like to get

14  that super expedited so that we're not so --

15       THE COURT:  We want three, four and seven

16  produced as quickly as possible.  I mean, that's what I

17  want, and I want -- maybe we should be looking at

18  reducing the number of custodians.

19       MR. BUCHANAN:  That's fine.  I can't pick

20  them because I don't know them.

21       MR. JUDD:  Well, as I indicated, your Honor,

22  we're already on track, I think, to produce the lion's

23  share of documents responsive to three, four and seven

24  by June 2nd, but I can't make that representation.

25       THE COURT:  That would be as to all these

Transcript - Monthly Status Conference (2005/05/19)

**Page 61**

```
1   custodians.
2       MR. JUDD:  With respect to those who are
3   listed down through 6/2.  What I'm saying is those
4   custodians that are listed for production on 5/27 and
5   6/2 based on what I know about the documents that --
6       THE COURT:  Let me see it.
7       MR. JUDD:  -- that were swept from them, and
8   the departments -- it is my belief that certainly less
9   than 100 percent, how much less I don't know, but that
10  a substantial quantity of the documents that are
11  focused in those requests three, four and seven will be
12  produced by 6/2.
13      Now, the problem that I have is I can't sit
14  here and look at the remainder of the custodians and
15  identify them in the abstract.  I need to talk to some
16  other people to say are there any others that we might
17  have to move up in the cue because they're reasonably
18  likely to have very responsive documents.
19      What I don't want to do is be in a position
20  of being accused of sandbagging counsel because there
21  may be relatively few documents in one of the
22  custodians' that's currently scheduled for a later
23  production date, which may be important.  I don't know
24  that because I haven't looked at the documents yet.
25  But I don't want to be in a position of making a
```

**Page 63**

```
1   Wisman has many what we have seen are the most
2   responsive documents in those three categories.  I can
3   also sit here today and say in the next traunches these
4   June 2nd traunches the U.S. Medsa has substantial
5   amount of a very -- the most responsive documents to
6   three, four and seven.  The communications -- sales
7   communications to managed care entities.
8       MR. BUCHANAN:  Is there any way to push up
9   the 6/2 production?
10      MR. JUDD:  I don't know.  I have to.
11      MR. BUCHANAN:  I was surprised to read the
12  statement in your submission to Judge Fallon concerning
13  the desires or intents with respect to this action, and
14  I don't want to slow this down.  We have waited a long
15  time, and to the extent you guys can accommodate some
16  accelerated production of the 6/2 production we can get
17  our brief in two weeks after we get the documents, your
18  Honor.
19      THE COURT:  So you want to do deps following
20  this?
21      MR. BUCHANAN:  No, your Honor.  For purposes
22  of this motion -- I mean, it is not a trial.  We do get
23  our reasonable inferences.  The documents are fine.
24  Without a complete production I'm afraid it would be an
25  incomplete deposition and not particularly worthwhile.
```

Transcript - Monthly Status Conference (2005/05/19)

**Page 62**

```
1   representation about what it is that can be produced by
2   6/2 because I don't know what's in the balance of the
3   custodian's documents, and that's the problem I face is
4   that until we look at them and that takes a lot of time
5   I just don't know, but based on what I know about the
6   people.
7       THE COURT:  5/19 are these two individuals on
8   the list?
9       MR. BUCHANAN:  The 5/19 folks, your Honor,
10  are people who were general witnesses in New Jersey as
11  I understand the chart.
12      MR. BARNETT:  That's right.
13      MR. BUCHANAN:  Where it says for New Jersey
14  those are productions that are being done for the
15  general product liability claims.  The engineers
16  parenthetical is for those --
17      THE COURT:  First thing that's due is 5/27?
18      MR. JUDD:  Correct.
19      THE COURT:  And they're one, two, three, four
20  custodians.
21      MR. JUDD:  Correct.
22      THE COURT:  Do we know if those custodians
23  are the ones who are most likely to have the most
24  records?
25      MR. JUDD:  I can sit here today and say that
```

**Page 64**

```
1       MR. JUDD:  We have issues, you know, putting
2   up a deponent without having a complete production
3   first anyway.
4       MR. BUCHANAN:  I suspected that would be your
5   position.
6       MR. BARNETT:  Your Honor, again, just to be
7   clear, the decisions that are driving the production,
8   which, frankly, we're working with Mr. Judd's firm on a
9   daily basis, I have no tie in with whatever, was
10  submitted to Judge Fallon.  Secondly, I can talk to the
11  production people and see if there is a way to move up
12  those productions, but at some point it just becomes a
13  question of what is humanly possible.  We have already
14  devoted one -- we have two review centers, one in New
15  York and one in Philadelphia, and the one in
16  Philadelphia is focused solely right on engineers and
17  trying to get it produced as quickly as possible.  Even
18  if I went back today and said we have got this deadline
19  we need to hire 50 or 100 more contract lawyers by the
20  time I get them trained in a sufficient way that they
21  can actually be helpful in the process we would be on
22  that deadline.
23      MR. BUCHANAN:  Are there any people we can
24  pull -- are there some people like KMDR and PLC that's
25  on this as a line item can we push that back to
```

1    facilitate the engineers' production?

2         MR. BARNETT:  I'm happy -- I mean I can step

3    out now and try to reach the production folks that I

4    work with and see if we rejuggle the order whether that

5    will allow us to move things up and I'll be happy to do

6    that.

7         MR. BUCHANAN:   Are there particular groups

8    in the 6/2 traunches, Mr. Judd, that you think would be

9    the hottest priority that we can get the week earlier?

10        MR. JUDD:  I need to look at the list.  I can

11   tell you that the two, four, six different departments

12   there are at least in the aggregate what I would say

13   all of them comprise the, you know, the juiciest stuff,

14   the most responsive stuff.

15        THE COURT:  The June 2nd production?

16        MR. BUCHANAN:  How about switching the June

17   2nd production for the 5/27 production?

18        MR. JUDD:  I suspect -- it is my

19   understanding that everything from 5/27 is in the

20   pipeline, and everything for 6/2 is behind it and that

21   it's -- I just don't even think it is possible as a

22   practical matter to put a hold on 5/27 and move 6/2

23   ahead of it.  I mean, this really is a linear process,

24   as I understand it.

25        And I just want to say for the record, your

---

1    Honor, and Mr. Barnett can attest to this, I have been

2    very vocal with co-counsel with Dechert about

3    expediting this and moving ahead, and I have been very

4    aggressive trying to get this moved forward, and I'm

5    satisfied that Dechert is doing what is possible within

6    the existing structure, which is substantial for

7    producing documents.  You know, if you're interested

8    Mr. Barnett can tell you about a very substantial

9    enterprise that does nothing other than process and

10   produce documents in huge quantities, and I'm not happy

11   with what I have been told, but I'm satisfied that they

12   have pulled out whatever stops can be pulled out, and

13   for weeks now my team in San Francisco has been

14   conferring and trying to expedite --

15        THE COURT:  But we have been getting

16   documents faster than that in the past.

17        MR. BUCHANAN:  My sense is there are other

18   things that got prioritized.

19        THE COURT:  This is what I want you to do is

20   make a phone call and find out how quickly -- what's

21   the last possible date they can move up June 2nd.  The

22   June 2nd -- it looks like the June 2nd production is

23   the key production.  Of course, we have got May 27, so

24   we're only talking about --

25        MR. HETRICK:  It is a week.

---

1         MR. BUCHANAN:  Honestly, your Honor.

2         THE COURT:  Mr. Buchanan really wants to

3    spend Memorial Day weekend doing this.

4         MR. BUCHANAN:  We'll be reviewing the 5/27

5    one first.  I think it is going to come in waves.

6         MR. BUCHANAN:  So we can start getting

7    whatever they have ready immediately.  This is one of

8    those things, too, your Honor, that has been dragging

9    for a while.

10        THE COURT:  This is what I'm going to say.

11   You can produce them by June 2nd, but I want them all

12   produced by June 2nd in those top categories.

13        MR. BARNETT:  For the ones listed for

14   production?

15        THE COURT:  For 5/27 and June 2nd everything

16   has to be produced by June 2nd, and I don't want to

17   hear any reason why you couldn't do it.  All right?

18   And then the briefs will be due.  Plaintiffs' briefs

19   will be due two weeks from June 2nd.

20        MR. BUCHANAN:  Can we have the Friday of that

21   week?

22        THE COURT:  What date is that?

23        MR. BUCHANAN:  June 17th.

24        THE COURT:  How long do you need for their

25   briefs?

---

1         MR. BUCHANAN:  They're done.

2         MR. JUDD:  Unless you're going to invite a

3    surreply.

4         MR. BUCHANAN:  There will be no invitation on

5    a reply brief for surrebuttal.

6         THE COURT:  June 17th that would be the last

7    brief, and then we'll schedule a hearing.  Okay?  Shall

8    we do that now?

9         MR. BUCHANAN:  I'm happy to do it now.

10   That's going to be a busy month with expert discovery.

11   I would rather fix it in connection with the trial case

12   that you're familiar with.  I would just as soon fix it

13   and plan other things around it.

14        THE COURT:  How long are you expecting it to

15   take, this hearing?

16        MR. JUDD:  Well, let me say first of all that

17   I don't know if Mr. Buchanan is intending on supporting

18   his reply brief with any additional experts or

19   anything.

20        MR. BUCHANAN:  We have spoken to one.  I'm

21   not sure.  It depends on what is in the documents we

22   get.  If we do I would be happy to make them available

23   for you for a deposition and coordinate that, and we'll

24   make sure it is within a week after June 17th.  I'll

25   check his vacation schedule.  If we don't use them we

1  don't use them.

2      MR. JUDD:  I'm looking at my calendar.

3  Please bear with me.

4      MR. BUCHANAN:  I would think, your Honor,

5  just based on past experience with class certification

6  arguments that each side when there's a factual record

7  like there is in this case could probably spend an

8  hour.

9      MR. JUDD:  I was going to say an afternoon, I

10 think, on a calendar, a three-hour block.

11     MR. BUCHANAN:  A three hour block would

12 probably be sufficient.  We don't intend to proffer

13 live testimony.  I don't know if you do.

14     MR. JUDD:  That would not be our -- you know,

15 typically we would not.  All right.  So we'll

16 reschedule it for what does June 28 look like?

17     MR. BUCHANAN:  That's a great day for me.

18 Tuesday.

19     MR. JUDD:  My only concern is if we do have a

20 deposition to take.

21     THE COURT:  You should be able to get it done

22 between June 17th and June 28th.

23     MR. JUDD:  I know we can get the deposition

24 done, but it may raise issues that we want to research

25 or develop something that we want to talk about at the

69

1  hearing, and I don't want to be hamstrung that I have

2  only got a day or two days to do that.  Could we do it

3  the following week?

4      MR. BUCHANAN:  That's a vacation week for me.

5  I would prefer to try and accommodate your request to

6  get our expert's deposition between the 20th and 22nd.

7      MR. JUDD:  Could we do it on the 30th?

8      MR. BUCHANAN:  That's fine for me if it works

9  for the Court.

10     THE COURT:  What day of the week is that?

11     MR. BUCHANAN:  Thursday the 30th.

12     MR. LIEVERMAN:  And, frankly, your Honor, we

13 would prefer it as well even though it is not our

14 motion we very much want to attend.

15     THE COURT:  All right.  I need to look at the

16 calendar to see if the 30th is okay.  I can get back to

17 you on that.  Tentatively if I don't have something

18 else, Chris, why don't you check -- we may have HRT

19 scheduled or Accutane.  We have been doing them on

20 Thursdays.

21     THE COURT:  We'll go with June 30th then.

22     MR. BUCHANAN:  Either is fine for us.

23     MR. JUDD:  Being a west coaster can we do the

24 afternoon?

25     THE COURT:  1:30 June 30th.  Mr. Buchanan,

70

1  submit an order with those dates.

2      MR. BUCHANAN:  I'll submit an order.

3      THE COURT:  You got June 2nd for all record

4  production for the items that are listed for 5/27 and

5  June 2nd.  Keep it as 5/27 and June 2nd two

6  productions.  June 17th for your brief you'll produce

7  if you need to produce an expert report you'll produce

8  it by June 17th, also.

9      MR. BUCHANAN:  It will accompany the brief,

10 and we'll make our expert available the following week.

11     THE COURT:  And June 30th -- at 1:30 on the

12 30th.

13     MR. LIEVERMAN:  On the Klineman class action

14 for the individual consumers we don't really have any

15 issues to bring up today.  We have been conferring with

16 Merck's counsel on discovery that concerning our motion

17 for class certification which had been filed.  We will

18 work through those issues, and if we have a problem

19 we'll present to the Court for expeditious

20 resolution, and, otherwise, I think we're good to go.

21     THE COURT:  Okay.  So we can deal with it at

22 the next management meeting or if you have an issue

23 that comes up before then that you want resolved call

24 my secretary and we can schedule you to come in or just

25 do it by phone.

71

1      MR. LIEVERMAN:  That would be fine.

2      THE COURT:  So if there's something you want

3  me to resolve -- anything else we need to do other than

4  the iMED argument?

5      MR. BUCHANAN:  I had one question, Mr. Judd,

6  and that is related to the reproduction of documents.

7      MR. JUDD:  Yes.  I'm sorry.  I was traveling

8  and got hung up yesterday.  I will give you some

9  designation -- I'll get those to you tomorrow.

10     MR. BUCHANAN:  That's perfect.  That works

11 fine.  You also indicated in your agenda there would be

12 production of new documents on the 23rd in conduction

13 with engineers.

14     MR. JUDD:  That's the one that's been pushed

15 to the 27th.

16     MR. BUCHANAN:  I see.  Okay.  I think that's

17 it on class action issues, your Honor.

18     THE COURT:  Okay.  And then the last issue we

19 have to address is the production of iMED.

20     MR. BARNETT:  Right.

21     MR. BUCHANAN:  Right.

22     MR. BARNETT:  Your Honor, there's been,

23 obviously, two rounds of briefing on this, so I'm sure

24 your Honor is familiar with the issues, so I won't go

25 over them in detail, but based on the records of the

72

1  two rounds of briefing there's unrebutted evidence that
2  the national production that the plaintiffs are seeking
3  of iMED would place a substantial burden on Merck and
4  is not balanced by the limited information available on
5  iMED that isn't otherwise -- has already been produced
6  and which will be produced in the FACTS production.
7      You have got the affidavit attached to our
8  original from Terry Jacklin, who was involved in doing
9  the FACTS productions and sample of a database that
10  that was developed for Merck not for litigation
11  purposes.  The FACTS --
12      THE COURT:  There's a problem with that now
13  though FACTS is what you're working out technically.
14      MR. BUCHANAN:  I think we have been working
15  out the technical issues.
16      MR. BARNETT:  That's certainly -- we stand by
17  our -- you know, we, obviously, will produce what we
18  have agreed to produce in FACTS and to the extent
19  there's problems they will be resolved, but it gives
20  you sort of firsthand experience the complexities
21  involved in trying to basically extract data from a
22  nonlitigation database.
23      In any event, the request on iMED really
24  includes two databases; one is iMED and its predecessor
25  MESA.  It is going to take from Miss Jacklin's estimate

1  it is going to take anywhere from two to four months to
2  do.  It will involve four Merck IS employees
3  effectively working full time on this project, and,
4  unfortunately, they're going to be the same folks who
5  have been working on FACTS presumably will be spending
6  time not only cleaning up the FACTS production to the
7  extent it needs to be done, but, also, dealing with the
8  supplemental FACTS production that we, obviously, need
9  to move on, and at the end of the day it is going to
10  cost Merck in excess of $90,000 to do this.
11      And the problem with all that is it is a
12  limited universe of information that exists in iMED
13  that relates to VIOXX and roughly 10 percent of the
14  data on iMED and MESA relate to VIOXX; the rest of it
15  has nothing to do with VIOXX, and somehow if we are
16  forced to do the production we're going to have to be
17  able to pull that data out and not produce the stuff
18  that would be relevant in the litigation.
19      As Miss Jacklin indicated in the affidavit 95
20  percent of the data that's in iMED and MESA is in
21  FACTS, and, therefore, it is a small sliver of data
22  that would, in fact, be produced or would be
23  nonduplicative, and there seems to be no reason why we
24  would have to duplicate data that has been produced or
25  which will be produced in the FACTS production, and

1  given the large cost to Merck in terms of time and
2  resources and money for that small amount of data our
3  view is no production from iMED is warranted.
4      If you view the matter differently and feel
5  like the plaintiffs are entitled to some form of
6  production our view is it ought to be done the same way
7  that FACTS was done, that there's no reason for us to
8  produce data related medical educational programs that
9  occurred in Albuquerque which no prescribing physician
10  in New Jersey ever attended or participated in, and to
11  that extent if there is an iMED production to be done
12  it ought to be limited to the same sort of prescribers
13  and the office mates of prescribers in which hasn't
14  been previously produced in the FACTS production.
15      THE COURT:  Okay.
16      MR. BUCHANAN:  Your Honor, I think it is
17  important in thinking about this database or this
18  database and its predecessor database to understand how
19  it differs from FACTS first of all.  This database
20  tracks medical education programs, okay.  They're
21  called educational programs.  Not all of them are
22  accredited educational programs.  They're primarily
23  promotional programs.  It tracks thought leaders.  It
24  tracks Merck advocates.  It tracks those people on a
25  national basis and on a regional basis.  It talks about

1  what they're saying, what the programs are.  They're
2  speaking on the slide sets they use and the evaluation
3  of their performance relative to those slide sets.
4      There's substantial information that relates
5  to the information that from the top down Merck
6  advocates, thought leaders, national and regional are
7  disseminating to physicians everywhere, okay?  This is
8  the Merck message.  This is one of the primary ways --
9  okay, there's certainly sales representatives that
10  communicate with physicians.  There's also the Merck
11  message that comes down on high and filters down, and
12  you saw our references in our brief to a cascade
13  approach.  That's what it is.  The advocates get
14  information.  They're influential people.  They affect
15  regional advocates.  They affect thought leaders, and
16  their job is to convey Merck's message, consistent with
17  Merck's message.  We have attached documents to our
18  papers, and the focus, again, is on the message, the
19  focus is on these people were they conveying Merck's
20  message, what was Merck's message through the thought
21  leaders, not just relative to the label, okay, not just
22  relative to what the label said and what the sales
23  representatives were allowed to say or not allowed to
24  say relative to the label or physician, what are they
25  PIR's -- they call them professional information

1   requests, the formal Merck statement, what was going

2   out through the advocates?  What was going out

3   national?

4        As your Honor was, aware Peter Holt was an

5   advocate for Merck.  He was out there talking about

6   VIOXX.  The company got in trouble for it.  The company

7   got a warning letter related to Peter Holt's

8   activities.  I think it was a relatively unprecedented

9   occurrence.  At Merck at least several witnesses have

10  said that.  That's the speaker program.  That's the

11  advocate program.  There's evaluations, and, frankly,

12  Merck distanced themselves from Peter Holt.  They said

13  he was off the reservation.  He wasn't our guy, okay?

14  Well, they have got a database that tracks the guys who

15  weren't their guys.  They have got a database that

16  tracks the Peter Holts and what they're saying and

17  whether it is on message or off message, how the

18  audience received it.  They also list who attended,

19  okay?  They list the physicians who attend these

20  things.  They might list the name of Merck

21  representatives who might attend these things.

22       In that respect there's a prescribing

23  physician element to it, okay?  I concede that.

24  There's 10 attendees from around the country who attend

25  programs that Merck sponsors around the country, and

77

1   that's documented in this database, as well.  There's

2   the overlap, okay?  I don't see anything in the FACTS

3   database that we have received, it is 95 percent

4   overlap that's been discussed it talks about the

5   compensation for the advocates that talks about the

6   message they're communicating, the script, the slide

7   sets, all that information.

8        Now, having said that, if there's duplication

9   I don't need it twice.  Plaintiffs don't need it twice.

10  There's complexity of these databases.  I concede that.

11  We worked with it.  We have gotten them up and running

12  in several instances, but we don't need the same data

13  twice, but we definitely need it, and what I hear the

14  argument being saying let's throw the baby out with the

15  bath water because we have already done a piece of this

16  before we shouldn't have to do it at all.

17       THE COURT:  Why don't we addresses that.

18  What is wrong with producing your 10 percent that

19  relates to VIOXX that hasn't already been produced

20  before?  Isn't that what you're saying 10 percent of it

21  relates to VIOXX?

22       MR. BARNETT:  10 percent of iMED and MESA

23  relate to VIOXX.

24       THE COURT:  So you eliminate 90 percent of

25  the database.

78

1       MR. BARNETT:  But that -- in effect, that in

2   and of itself is a huge undertaking because

3   particularly for MESA where most of the VIOXX

4   information is because it was --

5       THE COURT:  What's the transfer year?

6       MR. BARNETT:  2003.  Most of the data related

7   to VIOXX is going to be in MESA, and there is a free

8   text field that exists in MESA that doesn't exist in

9   iMED, and that basically requires a manual review for

10  people to go through and see if there's anything, you

11  know, does it relate to VIOXX, does it relate to other

12  Merck drugs.  It has to be reviewed.  It is an

13  extremely burdensome process, and my understanding, and

14  I appreciate that we don't want to do duplication, that

15  makes perfect sense, but my understanding was the

16  request was to go nationally with this production, and,

17  again, the question is if, in fact, you know, absent

18  some indication under New Jersey prescribing physician

19  attended one of these conferences why would there be an

20  obligation to produce that data?  Whether cascading

21  was -- whether sending out Merck's message or not,

22  whether they wanted to try to cascade it with these

23  thought leaders, if there's no indication that a

24  particular physician heard that message it is not

25  relevant in the lawsuit, and it would be burdensome for

79

1   us to produce that.

2       THE COURT:  If that's your argument you're

3   not going to win on that argument because that argument

4   goes to admissibility really not the relevance of trial

5   as opposed to potentially relevant information.

6       MR. BARNETT:  But respectfully that was the

7   same issue that was considered regarding the FACTS

8   database where that issue was thoroughly briefed and

9   discussed by the parties, and your Honor made a

10  decision saying, you know, I don't think you should

11  have to produce all this information if there's no tie

12  in to the prescribing physician.  Same situation exists

13  here.  The fact that Peter Holt may have gone off

14  message, unless there's a prescribing physician that

15  heard the message that Peter Holt was or was not

16  delivering there's no indication that that ultimately

17  just drove that doctor's decision to prescribe VIOXX

18  for her patients.

19       MR. BUCHANAN:  I'll make the relevancy

20  argument.  I think it is pretty clear if Merck has --

21  if Merck has an advocacy group or a speaker program

22  that encourages people to say something other than what

23  the FDA has authorized Merck to say either on label or

24  otherwise they have not got a problem.  It is a general

25  problem.  It is not a problem specific to a case.  It

80

1   is a problem that applies to all cases.  I mean, that

2   is a pattern of failing to warn or going contrary to

3   the warnings that I think we're entitled to develop

4   certainly in the discovery phase.

5       There are two aspects to this motion, though,

6   your Honor.  There is the scope, should we get all of

7   the records in the database.  Well, I agree, 10 percent

8   of the records I'll accept their representation 10

9   percent of the records concern VIOXX.  How did they

10  figure that out?  You know how they do that?  There's a

11  field that talks about the product that that particular

12  program was about.  That's the only way you can come up

13  with that calculation.  That's the way databases work.

14  It would be incredible to contend, I think, that the

15  MESA database doesn't even have a field that reflects

16  that the program was associated with a particular Merck

17  product.  I submit, your Honor, the way they figured

18  out that 10 percent related to VIOXX was they searched

19  that particular field, and they found that how many

20  medical programs related to VIOXX.  That's 10 percent.

21      Now, if they want to review that 10 percent

22  to say, well, certain aspects of this relate to other

23  products, well, that's, you know, your Honor has

24  allowed them to do that, but that's a burden that I

25  think they're assuming and shouldn't be a justification

1   to defeat production of the database in the first

2   instance.

3       Getting back to the broader question, not

4   just the 10 percent issue should it be a national

5   production, in other words, should they be required to

6   produce information about the programs they sponsored,

7   the speakers who spoke with them, the compensation to

8   those speakers, that's information that's nowhere in

9   FACTS should they be required to provide us that

10  information regardless of whether a prescriber actually

11  sat in that meeting or whether a prescriber from --

12  whether a physician in that prescriber's office

13  actually attended that meeting?

14      Your Honor, we're in a very different place

15  today in this litigation than we were back in

16  September.  Maybe it was July of last year, I think,

17  when we argued the FACTS motion.  We had some 300

18  cases, maybe not even that many, maybe 180.  There are

19  now 1,800 -- 1,800 cases here, and I'll tell you, it is

20  a lot more work I have to think to go through and fish

21  through every prescribing physician in those 1,800

22  cases to see if they're in the FACTS database or iMED

23  and all the other physicians in their office and go

24  through that whole process to figure out specifically

25  what records we should be entitled to than to review

1   the entirety of them.

2       Now, it is a very different situation today

3   than it was a year ago as it relates to the scope of

4   this litigation.  The burden they're contending exists

5   with respect to the production of this the $90,000,

6   they're now 1,800 cases here.  They're getting the

7   benefit of consolidated discovery in this action as it

8   relates to this database.  They're not having to do

9   this in multiple jurisdictions around the country.  If

10  they do it here undoubtedly they'll make it available

11  to Judge Fallon's litigants in the federal proceedings.

12  There's really just no reason to parse this thing

13  because even if it is true that there's this physician

14  element and who attended the specific programs there's

15  this much broader impact here.  We quoted several

16  aspects of the cascade approach, but, you know, the

17  behavioral objectives for advocates were to educate

18  other thought leaders and prescribers on Merck's

19  scientific platform through a cascade approach, top

20  down, message communicating grass roots, whatever you

21  want to call it, and expand access to VIOXX by

22  influenced managed care formularies, another issue that

23  has some relevance in the broader litigation that's

24  before your Honor.

25      It is very clear that the information that's

1   contained in the database reflects more -- has greater

2   relevance than simply the attendance of a particular

3   prescriber and a particular products liability claim

4   case as compared to the broader litigation.  I mean, I

5   do think that the burden argument, which is really the

6   only real argument here, $90,000, 1,800 cases that are

7   currently litigating in this compared to the burden

8   that they're not telling you about of going through and

9   searching for the prescribing physician and the

10  prescribers and the prescribing physicians' office in

11  1,800 cases.  I mean, that has got to be more of a

12  burden than reviewing the entirety of the thing and

13  producing the entirety of the thing.

14      The other thing that's important is -- well,

15  I'll stop at that, your Honor.  I think from a burden

16  perspective the data can be unloaded relatively

17  cleanly.  What they did with FACTS is they combined a

18  lot of different tables, and they ran into some

19  technical issues and we're trying to view it.  I'm told

20  it is not a technical issue, it is our lack of

21  understanding on the plaintiffs side, and that can be

22  resolved with some communication, but other databases

23  that were produced by the defendants, the CTS database

24  you're familiar with there was a lot of discussion

25  about the complexity of that database, and it contained

1   clinical trial data from 200 something trials, dozens
2   and dozens and dozens of tables.  That data was
3   unloaded from the corporate database, big Oracle thing,
4   unloaded, put on a tape and sent to us within two days
5   of the Appellate Division denying the appeal.  There
6   was no processing of the data.
7        They searched for VIOXX clinical trials.
8   They unloaded it and they gave it to us.  They can
9   search for VIOXX medical programs, unload the data and
10  give it to us.  If they choose to further process the
11  data that's a choice, okay, and that's not something
12  that should be used in support of a burden argument as
13  to why we shouldn't get it.  That's all I have, your
14  Honor.
15       THE COURT:  Anything else?
16       MR. BARNETT:  Yes.  I think it is important
17  to remember that there are no two databases the same
18  and that the fact that we were able to do effectively a
19  data dump for CTS doesn't necessarily mean doing a
20  production of iMED would be as simple as Mr. Buchanan
21  suggests, and to that point, you know, when you set the
22  original briefing schedule for the databases you said
23  very specifically that you wanted specific evidence as
24  to the burden that would be imposed by doing this, and
25  we took your instructions very seriously.  We got the

1   affidavit.  We have given estimates in terms of time
2   and the money involved and what we have from the
3   plaintiffs is a generic declaration that doesn't
4   reflect any sort of familiarity with this specific
5   system, and instead arguments that this should be very
6   relatively easy to do.  The evidence of the record
7   makes clear it won't be, and it will be exceedingly
8   costly for Merck to do.
9        There's a significant issue between
10  identification of fields and extracts of those fields.
11  It may be easy to identify in a field structure what
12  are the VIOXX records.  It is a wholly different matter
13  to try to extract those out into a new database and to
14  review them and to produce them.  Moreover, it is clear
15  from the volume of exhibits that have been attached to
16  the plaintiffs' oppositions they have these documents.
17  They have a document reflecting who was on a speaking
18  program and who was paid.  They have a lot of what they
19  claim that they need, and they have it both in the
20  custodial productions as well as the fact that they
21  have the FACTS production, and the information as far
22  as attendees and speakers if the plaintiffs don't
23  already have it that's what we have agreed to produce,
24  and that will be produced.  My understanding is that
25  was produced, and if there are issues as to the

1   production, you will have that information.
2        THE COURT:  That information is useless.  The
3   speakers and the attendees, unless you know what was --
4        MR. BARNETT:  What?
5        THE COURT:  That's useless information
6   without the rest of the information, isn't it?
7        MR. BARNETT:  Such as.
8        THE COURT:  The speakers and the attendees
9   you're saying --
10       MR. BARNETT:  Right.  I mean, if the question
11  is what -- if a prescribing physician spoke at a
12  conference they will have that information.  If they're
13  trying to find out whether a prescribing physician
14  attended conferences they will have that information,
15  as well, and they can develop their arguments about
16  whether these prescribing -- the decisions by those
17  physicians were driven by the Merck message or the
18  cascade system that they cite in their brief.
19       THE COURT:  How can they do that without
20  knowing what the Merck message was?
21       MR. BARNETT:  We have produced substantial
22  marketing materials which reflect clearly what the
23  Merck message was.
24       MR. BUCHANAN:  Your Honor, just to deal first
25  of all with the burden issue, Miss Frederickson we

1   submitted her declaration.  She reviewed the testimony
2   of Terry Jacklin and others, as well as a certification
3   confirmed that the platform that the databases were in
4   was a database platform that could be readily unloaded
5   in a similar manner in which the other database
6   productions have been done.  Data could be searched,
7   and that was confirmed through deposition testimony, so
8   the power of the computers could be used to processed
9   this data expediently.
10       I submit, your Honor, this is not about
11  discovery burden it is really discovery censorship, and
12  it is trying to narrow the production in a way to
13  prejudice us, and this data -- sure we put exhibits in
14  our papers that reflected a reference that was
15  extracted from the database or information that was
16  garnered from the database.  That's a small sliver of
17  the entire data set that's composed in each of these
18  systems.  I just don't see -- there's not a strong
19  relevancy challenge, and there's not a strong burden
20  challenge, and absent that the database should be
21  produced.
22       THE COURT:  All right.  The Court finds that
23  the database should be produced.  How long is it going
24  to take you to produce it?  It appears to me that the
25  only argument that you have is that it is burdensome,

1   and it is not that relevant, but the Court finds that,

2   in fact, under the liberal rules of New Jersey

3   discovery it may be relevant or it may lead to relevant

4   information, and I think it is appropriate that it be

5   produced.  It is limited to VIOXX material, so you're

6   only talking about 10 percent of the databases.  And

7   you don't have to copy if you can sort it out anything

8   that you have already provided.

9               MR. BARNETT:  In the FACTS production or

10  otherwise?

11              THE COURT:  As long as it is the identical

12  thing.  If it is in FACTS and in this don't produce it

13  twice.

14              MR. BUCHANAN:  Your Honor, the one thing I

15  would ask if there's going to be that type of

16  reconciliation between the two productions they provide

17  some way for us to reconcile it, as well.

18              THE COURT:  It might be easier for you to

19  produce it and let them sort it, but if you want to

20  produce it go ahead.

21              MR. BARNETT:  All right.

22              THE COURT:  How long do you think it is going

23  to take you?  I hate to throw that into the mix right

24  now.

25              MR. BARNETT:  The estimates from Miss Jacklin

1   were anywhere from two to four months, so I think at

2   this point I would rather not commit to a date today.

3   I would rather be able to go back and figure out

4   consistent with the discussion about the FACTS

5   production previously what it is that we can do and the

6   time frame for doing that.

7               THE COURT:  Why don't you contact your people

8   and deal with your people, find out the time.  Start it

9   right away, and, hopefully, I'm hoping by July 1st

10  you'll be able to have it.  That's two months.

11              MR. BUCHANAN:  That would still provide us

12  with the ability to use it at trial.

13              MR. BARNETT:  Again --

14              THE COURT:  At this point July 1st -- did I

15  say July 1st?  That will be the tentative date, but if

16  you need more time, you know, let me know, but we're

17  talking about still at this point an August 1st trial

18  date, and they have to have time to look at it and show

19  it to people, so July 1st is probably the time frame

20  we'll need.  All right?

21              MR. BARNETT:  Thank you, your Honor.

22              MR. BUCHANAN:  I think that's the agenda.

23              (End of proceedings.)

24

25

Court Hearing

                    C E R T I F I C A T I O N
        I, REGINA A. TELL, C.S.R., C.R.R., License Number
    30X100161000, an Official Court Reporter in and for the
    State of New Jersey, do hereby certify the foregoing to
    be prepared in full compliance with the current
    Transcript Format for Judicial Proceedings and is a
    true and accurate compressed transcript to the best of
    my knowledge and ability.

                    _____05-23-05
                    Regina A. Tell, CSR-CRR
                    Official Court Reporter
                    Atlantic County Courthouse
                    Mays Landing, New Jersey

```
                SUPERIOR COURT OF NEW JERSEY
                ATLANTIC COUNTY
                CASE TYPE NO. 619
-----------------------------x
IN THE MATTER OF IN RE:
VIOXX
                        STENOGRAPHIC TRANSCRIPT
                             OF:
-----------------------------x   - MONTHLY MEETING -
            PLACE:  ATLANTIC COUNTY CIVIL COURTHOUSE
                    1201 BACHARACH BOULEVARD
                    ATLANTIC CITY, NJ  08401
            DATE:   JUNE 16, 2005
B E F O R E:
        THE HONORABLE CAROL E. HIGBEE, J.S.C.
TRANSCRIPT ORDERED BY:
    DAVID BUCHANAN, ESQ. AND THEODORE MAYER, ESQ.
A P P E A R A N C E S:
    DAVID BUCHANAN, ESQUIRE
    SINDHU DANIEL, ESQUIRE
    SEEGER, WEISS
    ATTORNEYS FOR THE PLAINTIFFS
    DAVID JACOBY, ESQUIRE
    SOL WEISS, ESQUIRE
    GREG SPIZER, ESQUIRE
    ANAPOL, SCHWARTZ, WEISS, COHAN, FELDMAN & SMALLEY
    ATTORNEYS FOR THE PLAINTIFFS
    LEE BALEFSKY, ESQUIRE
    KLINE & SPECTER
    ATTORNEYS FOR THE PLAINTIFFS
            *     *     *     *     *     *
                    REGINA A. TELL, CSR-CRR
                    OFFICIAL COURT REPORTER
                    1201 BACHARACH BOULEVARD
                    ATLANTIC CITY, NJ  08401
```

1

```
APPEARANCES CONTINUED . . .
    SCOTT LEVENSTEN, ESQUIRE
    BEASLEY, ALLEN, CROW, METHVIN, PORTIS, MILES, P.C.
    ATTORNEY FOR THE PLAINTIFFS
    WENDY FLEISHMAN, ESQUIRE
    LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
    ATTORNEY FOR THE PLAINTIFFS
    TERRENCE SMITH, ESQUIRE
    DAVIS, SAPERSTEIN & SALOMON, P.C.
    ATTORNEY FOR THE PLAINTIFFS
    THEODORE M. LIEVERMAN, ESQUIRE
    RACHEL KOPP, ESQUIRE
    SPECTOR, ROSEMAN & KODROFF, P.C.
    ATTORNEY FOR THE PLAINTIFFS
    MICHAEL GALPERN, ESQUIRE
    CHRISTINE KLIMCZUK, ESQUIRE
    LOCKS LAW FIRM
    ATTORNEYS FOR THE PLAINTIFFS
    MICHAEL FERRARA, ESQUIRE
    THE FERRARA LAW FIRM
    ATTORNEY FOR THE PLAINTIFFS
    MEREDITH GURSKY, ESQUIRE
    THE LANIER LAW FIRM
    ATTORNEY FOR THE PLAINTIFFS
    THERESA CORSON, ESQUIRE
    LEVY, ANGSTREICH
    ATTORNEY FOR THE PLAINTIFFS
    GREG SHAFFER, ESQUIRE
    WILENTZ, GOLDMAN & SPITZER
    ATTORNEY FOR THE PLAINTIFFS
    RODNEY VILLAZOR, ESQUIRE
    KASOWITZ, BENSON, TORRES & FRIEDMAN
    ATTORNEY FOR THE PLAINTIFFS
    RONALD JONAS, ESQUIRE
    SANFORD, WITTELS & HEISLER
    ATTORNEY FOR THE PLAINTIFFS
```

2

```
A P P E A R A N C E S   C O N T I N U E D . . .
    JOHN P. KOPESKY, ESQUIRE
    DEBORAH BAIRD, ESQUIRE
    SHELLER, LUDWIG
    ATTORNEY FOR THE PLAINTIFFS
    CHRIS GOMEZ, ESQUIRE
    MILLER & ASSOCIATES
    ATTORNEYS FOR THE PLAINTIFFS
    SUSANNE SCOVERN, ESQUIRE
    ALEXANDER, HAWS, AUDET
    ATTORNEY FOR THE PLAINTIFFS
    TED TRIEF, ESQUIRE
    TRIEF & OLK
    ATTORNEY FOR THE PLAINTIFFS
    ROBERT DASSOW, ESQUIRE
    HOVDE, DASSOW & DEETS
    ATTORNEY FOR THE PLAINTIFFS
    ERIC WEINBERG, ESQUIRE
    WEINBERG LAW
    ATTORNEY FOR THE PLAINTIFFS
    CHRIS BRADLEY, ESQUIRE
    SHRAGER, SPIVEY & SACKS
    ATTORNEY FOR THE PLAINTIFFS
    JERRY KRISTAL, ESQUIRE
    WEITZ & LUXENBERG
    ATTORNEY FOR THE PLAINTIFFS
    CHRIS PLACITELLA, ESQUIRE
    JUSTIN KLEIN, ESQUIRE
    COHEN, PLACITELLA
    ATTORNEY FOR THE PLAINTIFFS
    FRANCES TOMES, ESQUIRE
    TORTORE, TOMES & CALLAHAN
    ATTORNEY FOR THE PLAINTIFFS
    ESTHER BEREZOFSKY, ESQUIRE
    WILLIAMS, CUKER & BEREZOFSKY
    ATTORNEY FOR THE PLAINTIFFS
    JACQUELINE DeCARLO, ESQUIRE
    ATTORNEY FOR THE PLAINTIFFS
```

3

```
A P P E A R A N C E S   C O N T I N U E D . . .
    MARC GROSSMAN, ESQUIRE
    SANDERS, SANDERS, BLOCK
    ATTORNEY FOR THE PLAINTIFFS
    EDWARD GOLDIS, ESQUIRE
    FELDMAN, SHEPHERD, WAHLGELERNTER,
    TANNER & WEINSTOCK
    ATTORNEY FOR THE PLAINTIFFS
    MICHAEL WEINKOWITZ, ESQUIRE
    LEVIN, FISHBEIN
    ATTORNEY FOR THE PLAINTIFFS
    WILFRED P. CORONATO, ESQUIRE
    CHARLES W. COHEN, ESQUIRE
    HUGHES, HUBBARD & REED, LLP
    ATTORNEYS FOR THE DEFENDANT, MERCK
    DIANE SULLIVAN, ESQUIRE
    PHIL DANNELLA, ESQUIRE
    BEN BARNETT, ESQUIRE
    DECHERT, LLP
    ATTORNEYS FOR THE DEFENDANT, MERCK
    JEFFREY JUDD, ESQUIRE
    O'MELVENY & MEYERS, LLP
    ATTORNEY FOR THE DEFENDANT, MERCK
```

4

1    P R O C E E D I N G S

2         (Whereupon the following attorneys were

3    present for the following portion of the transcript:

4    CHARLES COHEN, ESQ.

5    WILFRED P. CORONATO, ESQ.

6    DAVID JACOBY, ESQ.

7    CHRISTOPHER PLACITELLA, ESQ.

8    SCOTT LEVENSTEN, ESQ.

9    SARA GOURLEY, ESQ.

10   STEVEN A. KARG, ESQ.

11   CHRIS GOMEZ, ESQ.

12   FRANCES A. TOMES, ESQ.)

13        THE COURT:  What's the deal here with the

14   Pfizer people we have to deal with?

15        MR. WEISS:  Good morning, your Honor.  That's

16   correct.

17        MS. GOURLEY:  I'm Pfizer.

18        THE COURT:  You're representing Pfizer?

19        MS. GOURLEY:  Yes, Sara Gourley.

20        MR. KARG:  Steve Karg.  Your Honor, I have a

21   pro hac consent order for Sara Gourley.

22        THE COURT:  Do you want to pass that down

23   and -- we have -- I have to review it.

24        MR. WEISS:  Your Honor, the last status

25   conference or the conference before we discussed the

1    issue of the few cases in which Pfizer and Merck were

2    in the same complaint, and my recollection was that the

3    Pfizer piece was going to go to wherever it was Camden

4    County, and the idea would be that neither case would

5    get called for trial until we got finished discovery

6    here.  The problem was having Pfizer in this case

7    complicates matters for confidentiality and a host of

8    other things because they're a competitor of Merck, and

9    I believe that's what we agreed to do the last time.

10   Am I correct?

11        MR. LEVENSTEN:  I'm counsel on the Brown

12   case.  I think the one final feature your Honor was

13   contemplating was setting up a call with the Camden

14   County judge to work out the logistics.

15        THE COURT:  Now, are all the Pfizer cases in

16   Camden County so far as you know?

17        MR. LEVENSTEN:  That's where we filed ours.

18   I don't know how many.  Maybe Steve knows how many we

19   filed there, maybe one?

20        MR. KARG:  Yes, there are one or two in

21   Camden County and one case came from Middlesex.

22        THE COURT:  We have Brown versus Pfizer,

23   Vasquez versus Merck and Pfizer.  Are those yours in --

24        MR. LEVENSTEN:  I'm Brown, and I believe --

25        THE COURT:  Garacci.

1         MS. TOMES:  Frances Tomes.  My case was in

2    Middlesex, and then it was remanded down here.

3         THE COURT:  Okay.

4         MS. TOMES:  But I'll go with the flow.

5         THE COURT:  You'll go wherever you have to

6    go.  All right.  And you have got the two cases, you

7    have the one Middlesex case.  What is Pfizer's position

8    on this?  Do you have any objection to that severing of

9    the claims for discovery purposes?

10        MS. GOURLEY:  We have no objection to the

11   severing of the claims for discovery purposes, your

12   Honor.

13        THE COURT:  Okay.  Well then --

14        MS. GOURLEY:  Now, one suggestion, though, I

15   mean, then the cases would go back to the county where

16   they were filed for discovery so we would have Camden

17   and Middlesex, right?

18        THE COURT:  You would prefer to proceed in

19   two different counties?

20        MS. GOURLEY:  Well --

21        THE COURT:  You're going to have two

22   different judges handling your discovery in Pfizer, and

23   I don't know that that makes -- one thing I would

24   suggest is maybe we move them all three to Middlesex.

25        MR. LEVENSTEN:  For discovery.

1         THE COURT:  For discovery because we have

2    another mass tort judge in Middlesex, and even though

3    it is not designated a mass tort Celebrex and not yet

4    being, you know, handled as a mass tort, there's still

5    a judge there that is dealing with other mass torts and

6    could maybe coordinate it and have the experience in

7    coordinating these cases.

8         MR. LEVENSTEN:  I think it makes sense that

9    all the cases are on one docket for pretrial

10   proceedings, and as long as we don't relinquish our

11   right that we would like to try the case in Camden

12   County we're going to go with the flow.

13        THE COURT:  I'm going to contact the judge in

14   Middlesex.  I believe that it will be Judge Garruto who

15   would handle it.  I'll talk to him today, and hopefully

16   I'll be able to enter an order severing these cases and

17   transferring them to Middlesex, severing the Pfizer

18   claims from the VIOXX -- the Merck claims, and we'll

19   proceed with the Merck action here, discovery, proceed

20   with the Pfizer discovery there, and then at some

21   point, obviously, we're going to have to merge them, I

22   imagine, for trial.

23        MR. LEVENSTEN:  Where exactly is Middlesex?

24        MS. TOMES:  Exit 9 off the turnpike.

25        MR. WEISS:  New Brunswick.

1   MS. GOURLEY:  Your Honor, so you know, there
2   was a case that was filed here against Pfizer, which
3   you transferred to Somerset County, so we have a case
4   there.
5       MR. LEVENSTEN:  I think that's my case, as
6   well.
7       THE COURT:  Has that been proceeding?
8       MR. KARG:  That was a first filed case, and
9   the issue -- one of the issues feeding into venue, I
10  guess, is many of the cases are out of state plaintiff
11  cases, so there's no real venue.
12      THE COURT:  How many cases are there against
13  Pfizer in Jersey, do you know?
14      MS. GOURLEY:  25.
15      THE COURT:  And you're handling them in
16  multiple different counties at this point?
17      MS. GOURLEY:  Uh-huh (nodding head in the
18  affirmative).
19      MR. KARG:  Yes.
20      THE COURT:  Okay.  Well, at this point I'm
21  only going to deal with the ones that are Atlantic
22  County.
23      MS. TOMES:  Can I raise an issue?  Since
24  counsel for Pfizer is here I want to mention that I
25  previously worked for Judge Garruto over 12 years ago

1   before he became a judge when he was a lawyer, so I
2   just wanted to make sure there wouldn't be a conflict
3   problem with that.
4       MS. GOURLEY:  We'll have to discuss that with
5   our client.  That's nothing I can answer on the spot,
6   but we'll do that promptly.
7       THE COURT:  Okay.
8       MR. PLACITELLA:  I'll raise one issue with
9   respect to Frances, I'm assuming with the agreement of
10  severance that that's not going to somehow engender
11  some kind of removal practice because the claims are
12  severed because they were filed together.
13      MR. KARG:  He is concerned if Merck is not
14  the local defendant but --
15      THE COURT:  You're not planning on moving
16  them?
17      MS. GOURLEY:  Not based on severance.
18      MR. LEVENSTEN:  Your Honor, Pfizer determines
19  because of potential conflict that they object to the
20  cases going to Judge Garruto, we would like the
21  opportunity to argue for Camden County consolidation.
22      THE COURT:  Okay.  Why don't we have a phone
23  conference on Monday, say, at 9:00.  Let me check with
24  my secretary and see what else I have.  And I'll give
25  you a time sometime Monday where you can call in.  I'll

1   try to talk to Judge Garruto tomorrow.  Has he recused
2   himself from your cases?
3       MS. TOMES:  I have never been assigned to him
4   for trial.  He has handled some motions.  He signed off
5   on them.
6       THE COURT:  You weren't partners?
7       MS. TOMES:  No.  The partner that he was
8   partners with I'm no longer partners with.  We're on
9   our third split.  So no one in my firm was ever a
10  partner of his.
11      THE COURT:  I doubt if it is a problem.  I
12  don't know that he would -- but we want to hear from
13  Pfizer if they have an issue with it.  Okay.  All
14  right.  Then I will speak to whoever feels they have to
15  participate in a phone conference.  Why don't you just
16  give -- who is going to set it up?  Will somebody
17  initiate it?
18      MS. GOURLEY:  We will.
19      THE COURT:  Anybody who wants to participate
20  in a phone conference give your phone number and name
21  to counsel for Pfizer, Mr. Karg, and he will set up the
22  phone conference.  I'll give him the time, and I'll
23  check with him right now so we can get a time so you
24  can leave and then I'll talk to Judge Garruto hopefully
25  today or tomorrow and if he is not -- if there is a

1   problem then I'll talk to somebody in Camden.  Okay?
2       MR. LEVENSTEN:  I just suggest Sol should be
3   on the call because it may represent a large --
4       THE COURT:  We should have some liaison
5   counsel.
6       MR. COHEN:  And, your Honor, that's just
7   limited to where the Celebrex -- where the Pfizer
8   claims are going, right, because then counsel for Merck
9   doesn't need to go on the call.
10      THE COURT:  The Merck claims would remain
11  here in Atlantic County for discovery purposes at this
12  point.  I mean, eventually maybe they'll be tried
13  somewhere else or maybe they'll be tried here or maybe
14  some of them will be resolved.  Who knows?  Or
15  dismissed as defense counsel keeps urging to consider
16  as one of the options.  Okay.  I'll get a date for you
17  right now and then we'll move on, I guess.  Anything
18  else about this?  Okay.
19      (Whereupon the Pfizer issue was completed and
20  all counsel entered the room to begin the Monthly
21  Management Conference.)
22      THE COURT:  Okay.  Before we get into your
23  agendas I have a list of different docket numbers where
24  we have problems.  I'm not sure how we should deal with
25  it, but I'll give the list to liaison counsel and let

1 them deal with it. I don't know that we have to do it
2 right now on the record, but there's several different
3 problems.
4     One problem is that we -- people are,
5 apparently, not having administrators appointed for
6 estates, and we have several complaints that say
7 "proposed administrator." Well, a proposed
8 administrator can't file a complaint. Now, I have an
9 option of just dismissing those complaints, but I would
10 prefer to have them amended, and I don't know if any of
11 them have statute of limitations issues or not. So I'm
12 going to give a list of those to liaison counsel to
13 give to counsel. I have a group of cases filed by out
14 of stat counsel, New York and Maryland counsel, not
15 filed by New Jersey counsel, and, again, I can just
16 dismiss them, but I guess I'm going to let you --
17 basically, I intend to give you the list and let you
18 have 30 days and let people know that either they amend
19 or these cases are gone.
20     MR. BUCHANAN: Does the docket list have the
21 plaintiff's counsel that are of record?
22     THE COURT: We can get it for you.
23     MR. BUCHANAN: That would be great.
24     THE COURT: I mean, this proposed
25 administrator I don't know if it is just one person,

1 but I have it like 10 times. It is creative, but it is
2 not going to do the job. And there's just a few
3 issues. And I guess those are the primary two, and
4 then we have a couple that have additional Merck
5 defendants. I don't know if that's a problem. They
6 have named Merck Managed Care.
7     MS. SULLIVAN: This is an issue. There will
8 probably be motion practice on this so we can work
9 something out.
10     THE COURT: Yes. I think we have to deal
11 with that. Whatever I give to plaintiffs I'll give to
12 you, and I ask defense to hold off on filing any kind
13 of dismissal action until after they have a chance to
14 contact counsel and amend, if possible, and, if not,
15 then we'll have to deal with it either at the next
16 management conference or by motion or whatever.
17     MR. BUCHANAN: Is Merck Managed Care the sole
18 defendant?
19     THE COURT: No. I think it is an additional
20 defendant. Merck is the defendant in each of the
21 cases, but there's one Merck Managed Care and one
22 Medco.
23     MR. WEISS: Medco is a different --
24     MR. BUCHANAN: It is a former affiliate that
25 was spun off a couple years ago.

1     THE COURT: We'll have to deal with that.
2     I have the decision on the privileged
3 documents, which I have found are privileged. I'm
4 returning to defense counsel the Court's copies DP-1
5 and DP-2. The others have been destroyed from the
6 Court file.
7     MS. SULLIVAN: Thank you, your Honor.
8     THE COURT: Hold those that are marked in
9 case there's an appeal or another issue that comes up.
10 Here is the decision on that.
11     MS. SULLIVAN: Thanks, Judge.
12     THE COURT: As part of that decision, which
13 finds that it is protected, not waived and not crime or
14 fraud. I dealt with each of those issues. At the end
15 I order that Merck, within 30 days, produce any and all
16 nonprivileged information relating to that invention,
17 submit Miss Metters to a deposition within 30 days, not
18 being allowed to be asked about that document, but
19 being allowed to be asked about the proposed invention,
20 the plans, why it was planned, produce all the records
21 pursuant to that. So in a short frame I'm requiring
22 that any nonprivileged documents that relate to the
23 same thing be produced.
24     MR. BUCHANAN: As your Honor is aware there
25 were some documents that were referenced in the CMI

1 that to the best of our knowledge have not been
2 produced and are not on the privilege log. I'm not
3 sure.
4     THE COURT: Produce any and all information
5 regarding the invention that's not otherwise privileged
6 that hasn't been produced within 30 days, including but
7 not limited to the information from Kathleen Metters
8 and Mike Gresser, and the dep of Kathleen Metters, so
9 there's no question -- well, you'll read the decision.
10 There's no question in my mind that -- well, I can't
11 say there's no question. It is a tough -- actually, it
12 was very close on the issue of waiver, and it is close
13 on the issue of -- it might be close on the issue of
14 privilege, except I felt that the Federal Court had
15 dealt with it, and I had to abide by that. I don't
16 know if I would have found that it was privileged, but
17 I think the precedent is it makes sense that it is, and
18 the reasoning is logical, and I'm going to follow it
19 because I'm not as much involved with patent law as
20 those judges that made that decision.
21     So giving deference to that I found it was
22 privileged, and the closest -- the waiver issue from a
23 practical view, which I always am, the waiver issue was
24 a no-brainer in favor of the defense. From a straight
25 legal analysis it is very close.

1    MR. BUCHANAN:  That federal decision you
2  relied on, obviously, to establish the privilege held
3  for strict waiver.
4    THE COURT:  I know.  So it was close.  But
5  anyway, that's my resolution of the issue, and,
6  obviously, if you choose to appeal -- it also orders
7  that the plaintiffs immediately destroy all copies
8  and/or return them to Merck.  So I expect that to be
9  complied with immediately.
10    MR. BUCHANAN:  That may be a logistical
11  issue.  It certainly can be accomplished.  The way the
12  productions have been accomplished in this case they
13  have produced everything either on hard drives, and in
14  some cases repeated the productions of the documents in
15  subsequent hard drives or CD's or DVD's.  Destroying
16  the document would mean destroying the media that
17  contains the rest of the production, so I would suggest
18  what we do is figure out a way to replace the
19  production set that they have already produced to
20  eliminate the document your Honor has ruled is
21  privileged, and I'll be happy to talk with Mr. Cohen,
22  but there's a few more steps than simply --
23    THE COURT:  It is not like you can go back
24  and tear it up like I just did.
25    MR. COHEN:  We'll take care of it.

1    THE COURT:  By immediately then I mean as
2  immediately as is reasonable under the circumstances,
3  so you'll deal with it together, okay?
4    All right.  That takes care of that.  Then we
5  have to go to your agendas.  Start with plaintiff's
6  agenda.
7    MR. WEISS:  Item one has been resolved.
8    THE COURT:  The FACTS database?
9    MR. WEISS:  That's two.  That's been
10  resolved, I believe.
11    MR. BUCHANAN:  Let's just advise the Court
12  what we resolved on item one.
13    MR. WEISS:  Item one the first brief is going
14  to be filed, I believe, June 27th.  The plaintiffs will
15  file their response on July the 8th.  The reply brief
16  is due July 12th, and we'll be in front of you on the
17  14th to resolve the issue.
18    THE COURT:  Okay.
19    MR. BUCHANAN:  And was it agreed this would
20  be an omnibus motion?
21    MR. COHEN:  Yes.  Right now I filed one
22  motion that covers two submissions to the Court file,
23  and I have agreed to add -- I'll probably have to file
24  a second notice of motion on the same schedule for some
25  additional documents that they were challenging the

1  confidentiality to.  They weren't filed in the court
2  record, but it makes sense to have the challenge at the
3  same time, and I have agreed to that.
4    THE COURT:  Okay.  So everything is going to
5  be heard at one time?
6    MR. BUCHANAN:  Yes, and, your Honor, just as
7  a heads up, plaintiffs in the Local 68 matter will be
8  filing their reply brief tomorrow pursuant to the
9  previously discussed schedule.  There will, of course,
10  be confidential material attached to those motions.
11  There may be different arguments as it relates to those
12  exhibits given that it is a dispositive motion.  In any
13  event, I suggest we put it on for the same day.  I
14  think you're required to advise us within seven days
15  and file a notice of motion if you're going to move as
16  it relates to these documents.
17    MR. COHEN:  I can't sit here today and say
18  yes or no in the schedule.  Let's see what they are,
19  but if I'm getting that tomorrow I have seven days to
20  make the notice of motion.  I can certainly contact the
21  Court if we need anything, and, obviously, I would
22  first talk to plaintiffs' counsel.  I can't commit
23  today because I don't know what the documents are.
24    THE COURT:  Okay.  So that sounds like it
25  will work out.  And then the deposition schedule.

1    MS. SULLIVAN:  Your Honor, I believe we have
2  worked out the issues related to that, except for the
3  deposition of Mr. Nies.  It is defendant's position
4  that plaintiffs have been provided adequate time and
5  that the deposition is complete.  He is a former
6  employee who lives in Texas.  He has been subpoenaed to
7  testify in the Texas trial in July.  The plaintiffs
8  deposed him for a full day.  There was a three-hour
9  direct exam done by Merck and then the plaintiffs did a
10  four-hour recross in response to that direct, and it is
11  our position that that was plenty of time and the
12  deposition should be completed given the burden of this
13  witness as a former employee who has now been
14  subpoenaed to testify in Texas and will be busy down
15  there.
16    MR. BUCHANAN:  Your Honor, factually, first
17  of all, plaintiffs did not have four hours of cross.
18  The deposition date was terminated early.
19    MS. SULLIVAN:  I have the time.
20    MR. BUCHANAN:  The deposition was terminated
21  early to accommodate the witness.  I believe it
22  terminated at 4:00 that day.  We have been in
23  discussions with Mr. Mayer and defense counsel now for
24  a few months.  The first I learned that defendants were
25  going to refuse to reproduce Mr. Nies was, frankly,

1    sitting here this morning with Miss Sullivan.  The last
2    conference I was speaking with Mr. Mayer, and the whole
3    issue -- and there's a lengthy e-mail thread on this,
4    and I wish I knew this was going to be an issue and I
5    would have brought it, but the issue was going to be
6    whether they were going to reproduce him for a half day
7    of examination to complete plaintiff's examination
8    either in Texas or San Diego, and this is the first
9    that I have learned that they're refusing to produce
10   him at all.
11          MS. SULLIVAN:  That's not true.
12          MR. BUCHANAN:  They did lengthy direct.  He
13   is a nonparty who is not subpoenable, unless he is just
14   in here in New Jersey at trial, so plaintiffs need to
15   complete their examination and --
16          MS. SULLIVAN:  Just in terms of the factual
17   record I have the e-mails that Mr. Mayer sent to you
18   confirming our position on this, Dave, that the Nies
19   deposition was completed, and, your Honor, we can
20   provide you with the transcript.  The plaintiffs had 11
21   hours and 46 minutes of questioning, including four
22   hours of a recross after a three-hour direct, and we're
23   happy to provide the Court the transcript.  The recross
24   went far beyond the direct.  The time was in excess --
25   an hour in excess of the direct, and we think that it

1    question is when, I guess, and I mean the fact that he
2    has been subpoenaed in Texas, he is in Texas, or he
3    lives in Texas, right?
4          MS. SULLIVAN:  Yes, your Honor.
5          MR. BUCHANAN:  I'm told he splits time
6    between California and Texas.
7          THE COURT:  I doubt if he spends the summer
8    in Texas.  But at any rate, whatever, I just think we
9    should just schedule it as soon as possible.  The fact
10   that he is going to be testifying one or two days, I
11   mean, he will testify in a trial not more than a day in
12   Texas.
13          MS. SULLIVAN:  Maybe after the trial, your
14   Honor, if he is down there we can work something out.
15          MR. BUCHANAN:  Well, I assume this is all
16   about making sure that he is not offered up before the
17   trial.
18          MS. SULLIVAN:  No.  It is about --
19          MR. BUCHANAN:  Given that suggestion now I
20   think I understand what is driving this.
21          MS. SULLIVAN:  It is about trying to
22   accommodate this witness' schedule who doesn't work for
23   us anymore and who you had 12 hours to examine.
24          THE COURT:  Well, I really don't care whether
25   it is before or after the Texas trial as long as it is

1    was plenty of time afforded to the plaintiffs in terms
2    of the discovery dep and in terms of the recross of
3    this former employee.
4          Obviously, Texas counsel thinks they have got
5    enough to proceed to trial.  They have subpoenaed him
6    as a trial witness, and it is, you know -- it is a real
7    burden on these people -- it has been a continuing
8    issue in terms of the length of these depositions,
9    particularly for former employees, and it's Merck's
10   position that the plaintiffs have had adequate time for
11   Mr. Nies, and we're happy to supply your Honor with the
12   transcript of that deposition.
13          MR. BUCHANAN:  Your Honor, there is e-mail
14   upon e-mail from Mr. Mayer representing where do you
15   want to take him in Texas or San Diego.  The first half
16   of June he will be in San Diego, the second half he
17   will be in Texas, and this is sprung on us.  We are
18   prepared to complete his deposition.  We committed in
19   e-mails to complete it in three to four hours, and this
20   is the first I learned they are now refusing to produce
21   him to complete the examination.
22          THE COURT:  It seems to me that the three to
23   four hours additional time in his home base wherever
24   that is, whether it is in Texas or San Diego, wherever
25   he wants it to be done it will be his choice, the

1    done.  The Texas trial is going to last probably -- I'm
2    assuming it would last six to eight weeks, also, so I
3    don't think it is going to be after the Texas trial.
4          MS. SULLIVAN:  I think three weeks are the
5    estimates I'm hearing from the plaintiffs and
6    defendants down there.
7          MR. BUCHANAN:  I heard they expect to wrap
8    that whole thing up by the end of July.
9          THE COURT:  Well, if they can do it in three
10   weeks you guys ought to go down there and figure out
11   how he is doing it.
12          MR. BUCHANAN:  I don't think we said we want
13   six to eight weeks.  I don't know who said that.
14   That's not part of our trial plan.
15          THE COURT:  I mean, you know you get a nice
16   test case there, you can figure out what you can
17   eliminate, take their plan and eliminate some.
18          MR. PLACITELLA:  Can we make that decision
19   after the verdict?
20          THE COURT:  Okay.  All right.  So he has to
21   be produced.  He has to be produced before August 10th
22   or something.  I don't know.  Before August 10th or
23   15th.
24          MR. BUCHANAN:  Plaintiffs are serving their
25   deposition designation and so are the defense to the

1  extent anybody wants to designate testimony from him.
2        MS. SULLIVAN:  You can supplement on him.
3        MR. BUCHANAN:  That's fine.  We'll
4  supplement.
5        THE COURT:  All right.  That takes care of
6  that issue.  Now we'll go to the defense for a little
7  bit.
8        Item one I think is just for information,
9  basically, and everyone pretty much agrees on that,
10  right?  Fred Humeston's medical examination.
11        MS. SULLIVAN:  Yes.  Mr. Buchanan has offered
12  to work that out, objecting to any testing in terms of
13  blood or body cavity, and we'll have to review that
14  issue, but he has offered to produce Mr. Humeston for
15  an IME here, so --
16        MR. BUCHANAN:  Factually, your Honor, the
17  request for Mr. Humeston's IME arrived, I think, right
18  around the time of the last status conference.  We
19  believe it is untimely and beyond the discovery window.
20  We are going to accommodate the defense request.  We
21  strongly oppose any request to take blood, to do body
22  cavity examinations or do diagnostics, other than a
23  traditional IME, and we'll seek a protective order to
24  the extent that can't be agreed upon.
25        THE COURT:  All right.  At this point I think

1  we can say it is resolved as of this moment at least
2  that right now they're not asking for that.
3        MS. SULLIVAN:  We requested that, but we'll
4  review that issue.
5        THE COURT:  Okay.  Plaintiffs deps in John
6  and Eva Crawford and Merck.  Who has that case?
7        MR. WEISS:  I'm not sure.
8        MS. SULLIVAN:  This is the Australian
9  plaintiff, your Honor.
10        MR. WEISS:  I assume Merck knows who has the
11  case for the plaintiffs.
12        MR. COHEN:  We'll take it up at the next
13  conference.  We're moving through the schedule, let's
14  just move.
15        THE COURT:  I don't care.  You can make a
16  motion to dismiss.  You have permission to file a
17  motion to dismiss for failure to cooperate, failure to
18  submit to the deposition, and we'll find out who the
19  plaintiff's lawyer is when they file an opposition.
20        MR. BUCHANAN:  We will be happy to defend in
21  Australia.
22        THE COURT:  And then Litigation Management
23  Inc., again, that just seems to be --
24        MR. WEISS:  That's housekeeping.
25        MR. CORONATO:  Your Honor, one issue --

1        THE COURT:  Vacate prior rulings.  I think
2  you can work out a consent order on that.
3        MR. CORONATO:  That's fine.  One announcement
4  I would like to make with respect to the LMI website,
5  for firms that are out of state that are associated
6  with New Jersey counsel if they can submit their
7  request for access to the LMI site through their New
8  Jersey counsel because what happens is LMI gets
9  requests, say, from Beasley, Allen asking that they be
10  given access to a list of plaintiffs, and LMI doesn't
11  know whether or not that's a proper request because
12  they don't know if Beasley, Allen is truly associated
13  with those plaintiffs, so if it comes through their New
14  Jersey counsel that will be -- and their New Jersey
15  counsel approves it, that will be an easier way to
16  handle that.
17        THE COURT:  Is that a problem for you?
18        MR. WEISS:  No.  As long as they can set up
19  multiple people looking through the records, right?
20        MR. CORONATO:  Sure.  What do you mean?  Each
21  firm can have more than one user, is that what you
22  mean?
23        MR. WEISS:  No.  What about if a firm has 400
24  clients and 20 with different referral counsel?
25        MR. CORONATO:  I don't think that's going to

1  be a problem.
2        MR. WEISS:  That's all I'm asking because
3  Beasley, Allen wouldn't have access to every one of my
4  clients because they have been sending me all the
5  cases.
6        MR. CORONATO:  Right.  It would be client
7  specific.
8        MR. WEISS:  Very good.  Okay.
9        MR. BUCHANAN:  One quick question on the
10  system, will old medical records you guys have
11  collected from the beginning of New Jersey be on this
12  website?
13        MR. CORONATO:  No, not unless your clients
14  are willing to pay $25 per record for the access.
15        MR. BUCHANAN:  I guess I want to know how do
16  I know where to get records that I don't have on CD yet
17  or, say, records you may have captured between January
18  when we first talked about this and now?
19        MR. CORONATO:  They'll be posted -- they
20  should be posted by LMI.  They'll be posted to the
21  website.  I see what you're raising.  We'll have to
22  make sure LMI posts those.
23        MR. BUCHANAN:  I want to make sure the meds
24  we have captured are available on-line.
25        MR. CORONATO:  We'll let LMI know which

1  records we have given to you and they'll post any that

2  we have not already given to you.

3       MR. BUCHANAN:  Okay.

4       THE COURT:  Okay.  On the IMED and MESA

5  databases July 1st is not feasible?

6       MR. BARNETT:  We worked out an agreement, and

7  we'll produce the IMED MESA database by August 1st.

8       THE COURT:  That's the plaintiffs' agenda.

9  The defense agenda.

10       MR. BUCHANAN:  That was the defense.  We did

11  miss one item before we get back to the deposition

12  schedule, it was the FACTS database.

13       THE COURT:  They told me it was resolved.

14       MR. BUCHANAN:  I wanted to make sure the

15  dates are on the record for purposes of an order.

16       THE COURT:  Go ahead.  Put it in the record.

17       MR. BUCHANAN:  What the defendants -- as your

18  Honor knows, the FACTS data for physicians --

19  prescribing physicians and physicians in the office of

20  prescribing physician is to be produced pursuant to

21  your Honor's prior ruling on a motion to compel and

22  subsequent court hearings at these Case Management

23  Conferences.  At this point in time the only data

24  that's been produced is data for cases pending as of

25  the end of September 2004. The defendants have a gap

1  now to catch up.  They have the cases that were filed

2  in the last, you know, eight months.  What they need

3  from the plaintiffs in order to do that is they need

4  the address of the prescribing physician.

5       Plaintiffs are going to work with defense

6  counsel to make sure that the address is provided to

7  the defense counsel so they can do the searches they

8  need to do.  They have agreed to produce all of the

9  FACTS data for the prescribing physician and the

10  physicians and the prescribing physicians offices for

11  physicians they have addresses for as of June 15th, and

12  they'll produce that to us by September --

13       MR. BARNETT:  September 9th.

14       MR. BUCHANAN:  Thereafter, they will produce

15  every 60 days the prior 60 days' worth of FACTS data

16  based on the physicians they have gotten addresses for

17  since June 15th to August 15th, for example, and

18  they'll produce that two months thereafter.

19       THE COURT:  You'll put that in the management

20  order?

21       MR. BUCHANAN:  We will.

22       THE COURT:  Then we go back to the

23  plaintiffs, I guess.  The consumer end users.  I don't

24  have any problem with those -- with that request that

25  they participate by filing a brief in support of their

1  position and address the Court with oral argument.

2       MR. BUCHANAN:  And so the Court is aware, we

3  have, in fact, shared drafts of our memorandum that

4  we'll be filing tomorrow to make sure they're in the

5  loop and to hopefully eliminate any duplication and

6  make sure we're synched up.

7       MR. JUDD:  Your Honor, the only thing I would

8  like to do is to the extent that new issues might be

9  raised in their brief I want to at least have the

10  opportunity to come back and, perhaps, supplement our

11  filing after the hearing.

12       MR. BUCHANAN:  Your Honor, this is what

13  concerns me, I guess.  We object to a surreply.  We

14  don't think we're raising any new issues in our reply

15  memorandum, and I'm happy for the consumer class to be

16  heard, and if they wish to do that, that's fine, but I

17  don't think their brief should be a vehicle for a post

18  hearing memo or a surreply brief as a vehicle to

19  respond to arguments that have already been responded

20  to.

21       THE COURT:  All right.  Well I'm not going to

22  make any decision on that until the argument.  When you

23  make your arguments if I feel I need any additional

24  briefing on an issue you can raise the fact that you

25  may want to, and I'll decide whether I need it.

1       MR. JUDD:  Sure.

2       THE COURT:  But I'll make that decision on

3  the day of the oral argument.  Record request from

4  Merck Medco.

5       MR. BUCHANAN:  This is an issue that's been

6  arising with increasing frequency over the last few

7  months.  Recognizing, of course, that Merck Medco is

8  not a party in all cases, although they may find

9  themselves a party for discovery purposes, perhaps, but

10  they're refusing to produce prescription records or

11  imposing onerous conditions or specific conditions on

12  producing prescription records for the plaintiffs who

13  were their clients who purchased drugs through the

14  Medco pharmacy.  So we're alerting the Court to this

15  issue.  It is an issue that may be raised in a

16  subsequent status conference.  It is not clear how the

17  plaintiffs are going to resolve this uniformly, but

18  Merck Medco seems to have a consistent position.  It is

19  targeted to this case, and we're going to see whether

20  we can resolve this one way or the other.

21       MR. GALPERN:  Merck Medco has also adopted a

22  policy where they're charging a search fee of $75 just

23  to get the records, which is violative of the New

24  Jersey Administrative Code, and according to the letter

25  they have implemented for certain third parties such as

1    law firms.  Now, recognizing that they're a Washington

2    company which does still do business in New Jersey

3    there may be an argument as to whether the N.J.A.C.

4    prohibition against that applies, but it is outrageous

5    for them to be using this as a money-making

6    opportunity, in essence.

7        THE COURT:  All right.  Well, can counsel

8    from Dechert or --

9        MR. COHEN:  I want to first say it hasn't

10   been Merck Medco in a couple of years.  It is a

11   completely different company.  We don't represent them.

12   I have no idea what they're doing.  We can certainly

13   reach out to them and let them know that this issue is

14   coming, but at some point it is probably going to end

15   up with their counsel and plaintiffs' counsel.

16       MR. BUCHANAN:  And, your Honor, we are in

17   touch with their counsel separately.  Weichert, Danzeg

18   (ph) is representing Medco in connection to the

19   subpoena, so I will broach this issue with counsel for

20   Medco.

21       THE COURT:  If not, I guess there will have

22   to be an application made with an order -- an

23   application made but notice to Weichert and notice to

24   them outlining these different issues and let them

25   respond.

---

1       MR. BUCHANAN:  And plaintiffs are trying to

2    outline the correct procedure, I think, to raise this

3    given they are currently a nonparty.

4       THE COURT:  A nonparty.

5       MR. BUCHANAN:  They'll permit a party to be

6    added for discovery purposes, and that's what may be

7    necessary if this is the approach they're going to

8    take.

9       MR. WEISS:  This morning, your Honor, you

10   told us there is a Merck Medco defendant in one of the

11   cases.  You're going to send it to liaison counsel.

12      MR. JUDD:  I think she said Medco.  I don't

13   think she said Merck Medco.  Merck Medco doesn't exist

14   anymore.

15      MR. BUCHANAN:  We understand.  We keep

16   slipping.

17      THE COURT:  I think that the plaintiff in

18   this case -- I'll find it.

19      MR. WEISS:  Okay.

20      THE COURT:  You'll get it in a list.  Statute

21   of limits tolling agreement.

22      MS. SULLIVAN:  Your Honor, in the MDL Merck

23   has been willing to negotiate a tolling agreement with

24   plaintiffs.  We are willing to do the same thing for

25   New Jersey plaintiffs here; in other words, that they

---

1    can adopt the MDL, the terms of the MDL agreement, but

2    we are not willing to do that for foreign plaintiffs

3    because it has been our consistent position that the

4    non New Jersey plaintiffs shouldn't be here, your

5    Honor, so, you know, the New Jersey plaintiffs were

6    happy to have them adopt the MDL -- the terms of the

7    MDL agreement for the non New Jersey plaintiffs, so our

8    position has been consistence, your Honor, that they

9    should not be filing in the State of New Jersey.

10      THE COURT:  What is the MDL's tolling

11   agreement?

12      MR. WEISS:  Very simply, your Honor, it says

13   that they'll toll the statute of limitations to

14   complete certain forms, but when you file your suit it

15   has to be filed in Federal Court in Louisiana.  That's

16   the quid pro quo for this tolling agreement in the MDL.

17      MR. COHEN:  The history of that Judge Fallon

18   asked at one of the hearings, the conferences, for the

19   parties to investigate a tolling agreement.

20   Mr. Seeger from their side and some folks from our side

21   negotiated that.  Of course, thinking back to the civil

22   procedure and federal jurisdiction classes the MDL

23   can't have a New Jersey resident because it would be a

24   New Jersey resident plaintiff and a New Jersey

25   defendant, and there would be no diversity, so for the

---

1    MDL we had to carve out New Jersey residents because

2    they simply couldn't be in the MDL agreement because

3    Judge Fallon would never have jurisdiction over them.

4    Then Mr. Seeger raised a question what to do with the

5    New Jersey residents, and we said, well, what do you

6    want to do, and we hadn't had anything further, but as

7    Miss Sullivan said if they want to get the MDL

8    agreement, obviously, anything that's not MDL specific

9    from that agreement for New Jersey residents they can

10   come here and everybody else is subject to the MDL

11   tolling agreement.

12      MR. WEISS:  Well, you should be clear about

13   that.  Mr. Seeger is not here, but he was the

14   negotiator, and he was not given the option.  He did

15   not want to have an agreement that forced people to

16   choose the MDL if you sign the tolling agreement, but

17   because Judge Fallon wanted a tolling agreement for the

18   MDL that's what occurred, so it is not like Mr. Seeger

19   voluntarily said, okay, that's what it is.  He had no

20   choice.

21      MR. COHEN:  I think we're saying the same

22   thing.

23      MR. WEISS:  It didn't come out that way, so I

24   want to make it clear it wasn't an arm's length

25   negotiation.  Judge Fallon insisted on a tolling

1  agreement in the MDL because of one-year statues in a
2  lot of states and for other reasons, and Mr. Seeger had
3  no choice but to agree in exchange for a tolling
4  agreement that the only place it could be filed was in
5  the MDL.
6      MR. BUCHANAN:  It is, obviously, an
7  agreement, and the defendants have the ability to
8  dictate the terms of the agreement in many respects as
9  your Honor would imagine in tolling agreements.
10     MR. WEISS:  I intend to have conversations,
11 your Honor, with Merck directly to see what can be done
12 in New Jersey.
13     THE COURT:  All right.  There's nothing
14 really I can do about that.  I know that there seems to
15 have been some concern by some counsel who maybe aren't
16 as familiar with the New Jersey rules as to whether a
17 dismissal without prejudice would result in any statute
18 problems in New Jersey.  That's really not an issue, so
19 just so counsel at least are aware of that.  That
20 doesn't do anything for people who are filing the
21 original complaint.
22     MR. BUCHANAN:  Your point being, your Honor,
23 that the statute doesn't start to begin again
24 immediately upon dismissal without prejudice.
25     THE COURT:  Yes.  My point being that they

1  the paragraph with the bulleted or subparagraph items
2  Gertz, Gruer, Honig, McKines,  Slater, Westrick,
3  Wilholm and Weiner.  These names may be familiar to
4  you.  They are names that appeared on prior agendas.
5  Some of these have been set and adjourned.  Some have
6  been set and adjourned for reasons plaintiffs aren't
7  sure about.
8      But, in any event, the plaintiffs are in the
9  broader group.  I'm speaking clearly on this is
10 concerned that the depositions that are set forth here
11 have been not reset, and plaintiffs are anxious to get
12 them reset so this discovery can be completed.
13     MS. SULLIVAN:  I thought -- first of all,
14 that's a characterization that is not fair.  Many of
15 these were set and adjourned by your side, Mr.
16 Buchanan, and we're happy and have provided you dates
17 for many of these.  Thomas Bald we have proffered July
18 22nd, which is accepted by your side.  Wendy Dixon we
19 proffered August 5th, which has been accepted by your
20 side.  Elise Reicen we proffered June 28, which you
21 guys had rejected.  Mr. Scolnick you and we are working
22 with his own counsel to get dates.  Mr. Wilholm we have
23 proffered July 21st, which has been accepted, and
24 that's going to be coordinated with the MDL by
25 agreement.  For Mr. Gruer there's a July date that was

1  don't have to refile their complaints.  We just
2  reinstate them back to the date of the original filing.
3      MR. WEISS:  And that's my understanding from
4  the conversation with the Dechert people yesterday,
5  that's correct.
6      MS. SULLIVAN:  I wasn't in any conversations,
7  Sol, so there's no agreement.
8      MR. CORONATO:  They're related to dismissals
9  without prejudice.
10     MS. SULLIVAN:  You're thinking of the facts
11 sheet deficiency, the 90-day provision.
12     MR. WEISS:  That's right.  That was the
13 agreement.  So I understand, Diane, that today you're
14 offering New Jersey residents --
15     MS. SULLIVAN:  The terms of the MDL.
16     MR. WEISS:  -- the tolling agreement that
17 allows them to file suit later in New Jersey?
18     MS. SULLIVAN:  Consistent with the terms of
19 the MDL agreement.
20     MR. WEISS:  Correct?
21     MS. SULLIVAN:  Yes.
22     MR. BUCHANAN:  Okay.  Your Honor, there was
23 one other item we didn't get to complete it.  It
24 relates to deposition scheduling.  We talked about the
25 Nies deposition and trying to set that.  You'll see in

1  proffered and accepted, and that's going to be
2  coordinated with the MDL.  I spoke with Mr. Placitella
3  about getting a date for Miss McKines in July.
4      So, your Honor, we're working hard on
5  scheduling these witnesses and the others.  Mr. Mayer
6  is on vacation this week, but we are working with Merck
7  to get dates, new dates for -- some of these were
8  scheduled and adjourned, many by plaintiffs, some by
9  us, and we're working to get dates for Mr. Buchanan, so
10 these issues will be worked out.
11     MR. WEISS:  There is one that's important,
12 and that is Jan Weiner.  She has to be deposed, your
13 Honor, before her expert Tom --
14     MS. SULLIVAN:  No, Mr. Placitella and I
15 worked out an arrangement on that.
16     MR. WEISS:  I understand that.  I want that
17 on the record so --
18     MS. SULLIVAN:  We're in agreement so why are
19 we fighting about it?
20     MR. BUCHANAN:  It is difficult to sort the
21 exceptions out on the list that I have identified and
22 counsel has identified, your Honor.  There are a few
23 that have not been referenced by counsel.  Barry Gertz,
24 Peter Honig, Eve Slater, I'm not sure whether Ellen
25 Westrick was one that you're working on.

1    MS. SULLIVAN:  We're working on a July date
2  for her.
3    MR. BUCHANAN:  Gertz, Honig and Slater I
4  believe the others are all in discussions for dates,
5  but we need to have a window to complete those
6  particular witnesses.  Barry Gertz was previously
7  scheduled for two days at the end of May, so we're
8  going to need consecutive days for him, and it is a
9  matter of when we can get those reset.  We would like
10  to get them in sufficient time so their testimony can
11  be used at trial.
12    MS. SULLIVAN:  And, your Honor, we are
13  working -- it makes sense for everybody, including the
14  witnesses, specifically the witnesses, to now that we
15  have the MDL to coordinate their depositions with the
16  MDL.  Plaintiffs have agreed to do that with some of
17  these witnesses, and we're hopeful they'll agree to do
18  it with the others, but we'll get them the dates and
19  work that out.
20    THE COURT:  So we're talking about July
21  dates?
22    MS. SULLIVAN:  Some in August that I have
23  mentioned, and certainly July or August, your Honor.
24    MR. WEISS:  Our position is you can't hold
25  the depositions up if the MDL is not ready to go

1  forward on them.  If we're getting dates in July, and
2  they're going to be coordinated with the MDL that's
3  great, but if the MDL is not ready, we're going
4  forward.
5    MS. SULLIVAN:  We can defer that fight until
6  we figure out the dates.
7    THE COURT:  I want these depositions taken in
8  July.
9    MR. WEISS:  Thank you, your Honor.
10    MR. BUCHANAN:  Thank you.
11    MS. SULLIVAN:  Well, your Honor, we have
12  agreed on Wendy Dixon.  She is another -- Wendy Dixon
13  is a former employee high level exec at Bristol Myers.
14    THE COURT:  What date is she scheduled?
15    MR. WEISS:  August 5th.
16    THE COURT:  We can extend the deadline to
17  August 5th for all these people, but everybody has to
18  be deposed by August 5th.
19    MR. WEISS:  Thank you.
20    MS. SULLIVAN:  Can we have until August 15th
21  for former employees and the summer vacation schedules?
22    MR. BUCHANAN:  We are going to be in the
23  thick of pretrial starting the last week in July, and
24  you know, Diane, we have got deposition designations.
25  A number of these witnesses are people who have --

1    MS. SULLIVAN:  Who we have proffered and you
2  have adjourned depositions, and it is not fair to
3  crunch these witnesses in a summer schedule.
4    MR. BUCHANAN:  Let me identify for you three
5  people that I think you should plan on putting at the
6  front of the schedule then.  Gertz, Honig and Slater.
7    THE COURT:  And Weiner.  Gertz, Honig, Slater
8  and Weiner should definitely be July.  August 15th is
9  the deadline for all the deps, all right?
10    MR. BUCHANAN:  And Miss McKines pursuant to
11  agreement.  Somebody is available for Wendy Dixon's
12  deposition.
13    THE COURT:  And everybody should be deposed
14  before -- okay.  That will work out.  And
15  participation, the reply brief, you did that?
16    MR. WEISS:  I think we have finished the
17  agendas.
18    MS. SULLIVAN:  There is one more issue.  On
19  the Humeston case, since Mr. Humeston's deposition --
20  his deposition we took for six hours on a day, the
21  plaintiff's deposition in the case.  Since that time he
22  has served a supplemental facts sheet alleging several
23  new pieces of information, including a new damage claim
24  for emotional distress, new records have been produced.
25  It is now a test case, and we have asked to go back for

1  a three-hour deposition of Mr. Humeston.  Mr. Buchanan,
2  I believe, is in agreement but wants to limit the
3  subject matter of the deposition, and, your Honor, our
4  position is since it is just a three-hour deposition,
5  and it is tough to say was this question asked, was
6  this subject covered, the Court has been liberal for
7  both sides in terms of discovery.  It is a test case.
8  It is an important case.  It is clearly an important
9  witness.  We would like a three-hour examination of
10  Mr. Humeston.
11    MR. BUCHANAN:  This is just highlighting, I
12  think, my foolishness in trying to meet halfway and
13  then to see a position extended beyond halfway.  The
14  issue here, your Honor, is he has been deposed.  It has
15  been a test case since January.  They got a full day
16  with him.
17    MS. SULLIVAN:  Before it was a test case.
18    MR. BUCHANAN:  Can I prove my points?
19  There's been a few supplemental productions.  They
20  identified some additional medical records they
21  gathered since that point in time.  There's been a
22  supplemental facts sheet that's been produced for
23  Mr. Humeston.  I stated that we'll offer him for a
24  deposition in Idaho, and I believe they have agreed to
25  go to Idaho to complete the deposition at the time when

```
1    other discovery is going to be taken out in Idaho,
2    namely a sales representative.  But I believe it should
3    be limited to the new material.  It is the same
4    standard they're going to hold plaintiffs to with their
5    witnesses so good cause showing there's a need for
6    further examination beyond what they could have done
7    when they had the full day with him previously.  There
8    was no complaint about inadequate time.  They
9    terminated the deposition when they were done, not
10   because Mr. Humeston said he had to leave, and I think
11   to allow ambling rediscovery, opportunity for
12   cross-examination about prior answers into old areas I
13   think is improper, and they wouldn't allow it with us.
14            MS. SULLIVAN:  Your Honor, we're not going to
15   take Mr. Humeston's deposition and cross-examine him
16   on -- we want an opportunity to examine him on the
17   substantial new material in his facts sheet and medical
18   records, and now it is a test case.  They have had
19   three, four and five days of Merck witnesses, some
20   times duplicating questions and subject areas.  We're
21   willing to limit the time frame but don't want to spend
22   time fighting about whether this question was asked and
23   that question was asked, and we are asking for a
24   three-hour dep of this important witness.
25            THE COURT:  You can have it.  Three hours you
```

45

```
1    can ask him whatever you want.
2            MS. SULLIVAN:  Thank you, your Honor.
3            THE COURT:  I wanted to see if we can start
4    to get some other discovery done in some other cases,
5    too.  I know as liaison counsel and people that are
6    going to be involved in the trial are going to be
7    gearing up through the next few weeks that this is a
8    schedule where it is going to be hard, but I want to
9    start dealing with, like, the first hundred cases and
10   make sure that --
11            MR. WEISS:  We have been doing that.
12            MR. BUCHANAN:  There's a substantial
13   interest, I know, on the plaintiffs to get those cases
14   moving forward, and the plaintiffs don't want to put
15   this case into pause.  Personally, I'll be pretty
16   involved in the trial preparations.  Mr. Weiss has
17   assumed substantial additional liaison responsibilities
18   in dealing with various plaintiffs specific issues over
19   the last months as my involvements tend to focus more
20   on the trial of the case, but there are some issues
21   that we need to address with respect to that, your
22   Honor.  Some of the plaintiffs' firms have served
23   case-specific discovery in their cases.  We need to
24   understand and develop protocol for dealing with
25   case-specific discovery.  It is Mr. Weiss' view and my
```

46

```
1    view that we're not the negotiators or responsible for
2    developing the case-specific discovery for an
3    individual plaintiff's case.  We believe that
4    plaintiffs' firms are entitled to serve case-specific
5    discovery in connection with their cases, and we need
6    to develop some protocol so that the plaintiffs' firms
7    in those hundred cases can get that discovery before
8    they're exposing their witnesses to depositions.
9    There's been a couple of instances where the defendants
10   have just outright objected to responding to those
11   case-specific document requests and interrogatories,
12   and, perhaps, this is an issue for another day, but it
13   is one that needs to be addressed.
14            THE COURT:  We don't have to deal with it
15   today, but I do want to start to deal with that, and it
16   has to be both maybe some case-specific discovery from
17   the defense, but we also need case-specific doctors'
18   reports, expert reports.  The plaintiffs are going to
19   have to, you know, go and get their own doctors and get
20   their own reports as far as their own clients are
21   concerned, and I want to start setting deadlines for
22   those so we can weed out those cases where people just
23   aren't going to be doing anything and those cases where
24   people have issues.
25            We also have the issue of the fact that the
```

47

```
1    gastrointestinal claims that there's a subset of those
2    claims and that those are some of the earliest claims
3    timewise, and there we have to deal with maybe not only
4    case specific but general discovery and general --
5    well, I hope you have taken your discovery.
6            MR. BARNETT:  We do, too, your Honor.
7            MR. WEISS:  Let's talk about it in two
8    aspects.  With regard to the next -- there's three
9    tranches of cases after the first.
10            MR. CORONATO:  Actually there's more than
11   that.
12            MR. WEISS:  Speaking for our office we have
13   been defending plaintiffs' depositions and physician
14   depositions in those groups, so that's ongoing.  One of
15   the concerns that the plaintiffs had was we don't have
16   the detail information, and our doctors are getting
17   deposed.  We have now reached an agreement on the FACTS
18   database, and that would eliminate some of the concerns
19   and some of the case-specific discovery that was sent
20   to Merck had to do with that very issue, so maybe
21   that's a step forward.  Getting reports from physicians
22   I think we have to do that, and we should talk about it
23   at the next conference about the gastro cases because,
24   yes, we have taken discovery, but the discovery that we
25   have taken with the Merck witnesses really has been
```

48

1  focusing on the strokes and the heart attacks.

2          MS. SULLIVAN:  No one prevented you from

3  asking questions about the GI issues.

4          MR. WEISS:  Did I say you were?  I simply

5  said the discovery was focused in that area because

6  that's where the first test cases were pictured were

7  heart attack cases.

8          MR. BUCHANAN:  I think they were coming out

9  of the first hundred.  I was aware of, I think, 100 GI

10  cases.

11         MS. SULLIVAN:  You're not suggesting we're

12  bringing Merck witnesses back so you can ask them

13  questions about GI, are you?  You had an opportunity

14  to --

15         MR. WEISS:  I didn't say one way or the

16  other.  We're going to discuss it.

17         MS. SULLIVAN:  You have had the opportunity.

18  Nobody limited your questioning of these witnesses.

19  You have had the opportunity.  You filed these cases.

20  You know, you put the issues on the table.

21         MR. BUCHANAN:  Frankly, your Honor, it is not

22  something that plaintiffs had even considered before we

23  walked in here today in terms of a procedure to deal

24  with that.  We should go back and talk about it.

25         MS. SULLIVAN:  You should dismiss them.  It

1  was a warned about side effect.  I'm not sure why you

2  filed the cases.

3          MR. WEISS:  You can make statements all you

4  want on the record, but we'll talk about it afterwards,

5  and we'll come back with a protocol or some

6  understanding about those cases.

7          THE COURT:  I just wanted to really put my

8  warning out to the plaintiffs that even though we have

9  a test case and hopefully then we have a couple other

10  test cases or maybe not, whatever happens, there's

11  still a bulk of cases that there has to be discovery,

12  and I said all along that that has to be ongoing, but I

13  do think I'm going to have to impose deadlines on the

14  first group of cases and the second group of cases, et

15  cetera.  And I do think we have to deal with the issue

16  of stroke as a straight separate issue and gastro as a

17  separate issue.

18         MR. BUCHANAN:  And your Honor has the census

19  of the cases and liaison doesn't even have that.  I'm

20  not sure if plaintiffs in the room would object to

21  sharing -- the Court sharing with us the census of

22  cases you collected, and the defendants may find it

23  helpful, but it may help us in trying to make a

24  proposal for traunching these cases because I, frankly,

25  don't know how the cases break out in New Jersey among

1  the hundred firms that have cases.

2          MS. SULLIVAN:  The last time we looked at it

3  the stroke cases were about a third, which was the last

4  time we were selecting test cases.

5          MR. BUCHANAN:  January.

6          MS. SULLIVAN:  I don't know how that has

7  changed.

8          THE COURT:  We now have, I think, 2,030

9  cases.

10         MS. SULLIVAN:  And, your Honor, consistent

11  with the Court's deadline and wanting new cases the

12  parties have been working hard on the first wave,

13  second wave, third wave and some into the fourth wave

14  in terms of fact discovery, and it probably is a good

15  idea at the next conference to talk about expert

16  discovery deadlines for those cases to keep those

17  things moving.

18         THE COURT:  I'll try.  We need from counsel

19  in order to create our database that we're trying to

20  create, which would include all this information about

21  everybody, we need those Excel spread sheets.  We don't

22  have them from everybody.  So they have got to be in,

23  and I'm at this point ordering -- not asking -- that

24  counsel provide me with that information.  It does us

25  no good.  I mean, we have the list of cases.  That is

1  actually up on the mass tort site.  I think at this

2  point we have 18 or 1,900 of them listed, but that

3  doesn't have the individual information about those

4  things that we had asked, particularly the type of

5  claim it is, whether it is a stroke, heart attack, who

6  the attorneys are.

7          MR. WEISS:  I think there was about 12 or 13

8  fields.  If I remember, you wanted to know whether they

9  were smoker or nonsmoker.

10         MR. BUCHANAN:  Age.

11         THE COURT:  Smoker, nonsmoker, filing date,

12  length of use, and it is just basic information whether

13  it is an individual claim of death claim or an estate

14  claim.  And what we're saying is if we can get it on

15  Excel we have someone who is now working with us who is

16  creating an access database, which would include all

17  these things so searches can be done more easily, but

18  he can input it from Excel.  We can't have somebody

19  typing in all this information, obviously.  He has put

20  in everything we have got.  He is up to date, but we

21  still don't have nearly everybody's, so we have to

22  really get these sheets, and I guess I'll just do my

23  own order, which I'll put on the --

24         MR. WEISS:  Serve it on Verilaw.

25         THE COURT:  Which I'll serve, but I'm still

1  telling counsel hopefully everybody knows how to use
2  Excel.  Since I don't know how to use anything except
3  when they give me the sheets I'm somewhat sympathetic
4  to counsel, but you're going to have to get somebody in
5  who can do it for you.  Probably your high school
6  student or --
7       MR. WEINKOWITZ:  Mike Weinkowitz.  It may be
8  a good idea for all the plaintiffs' lawyers to submit
9  that document to you with each new case filed, also,
10 this way you're not having to periodically -- it
11 depends.
12      MR. BUCHANAN:  I think your administrator
13 will have a harder time to deal with 200 spread sheets
14 coming in every other week than if we -- we could agree
15 or your Honor could order that we supplement every 90
16 days or every 60 days or whatever your Honor wants, so
17 we're not burdening --
18      THE COURT:  But we do need at least -- even
19 if you only at this point have one case or five cases
20 we need your sheet.  We need your spread sheet and we
21 have a format and we want you to use that format
22 because that way -- and if there's anybody that doesn't
23 have it --
24      MR. WEISS:  If Carmen could send it to Dave
25 and I again, we'll get it out to the group, the format.

53

1       MR. BUCHANAN:  The other thing, your Honor,
2  and I'm not sure --
3       THE COURT:  We talked about trying to put it
4  on-line, which is the next step where he could put it
5  in and you can fill it out on-line, and we're working
6  on that.  I don't know that we'll be able to do that,
7  but the next step we're working on is to have the form
8  on-line so you can type in the information and then we
9  can use that.  We haven't got that done yet.
10      MR. WEISS:  I don't know that you can do that
11 because that would require using PDF.
12      THE COURT:  We may not figure it out, but I
13 have got somebody work on it.
14      MR. BUCHANAN:  Have you been able to actually
15 analyze the census?  The one thing that occurred to me
16 when we talked about this when your Honor said we send
17 this in unless the plaintiffs firms filled out the
18 categories MI, stroke, you know, whatever the terms
19 were in a consistent way maybe with a number with a
20 letter with a code that it may be difficult to really
21 aggregate these spread sheets, and I'm wondering
22 whether you have been able to do that or would it be
23 helpful to standardize the way we're giving them to
24 you.
25      THE COURT:  I think we have too many injured

54

1  categories, you're right, because he basically created
2  it from the initial complaints, and if you described it
3  as an MI he used heart attack and MI, but then he also
4  used cardiac arrest as a category which there's a few
5  complaints that say that, so I do think we should
6  probably streamline, and I'll probably try to do that
7  before we send you it.
8       MR. COHEN:  And Dave's point is a good one.
9       MR. BUCHANAN:  If you would like us to
10 correct what we already have we can do that because it
11 can be difficult, obviously, integrating so many
12 different pieces of data.
13      MR. WEISS:  If it is in Excel you can do
14 search and replace.
15      MR. COHEN:  Dave's point is to clean up if it
16 says smoker and someone types a yes, somebody types a
17 Y, and then if it's no and somebody types an N,
18 somebody types no, if you're trying to do a search and
19 do counts you get bad numbers.
20      MR. BUCHANAN:  If the programmer gives us
21 guidelines he can probably save you all time in the
22 back end by trying to have our office conform.
23      THE COURT:  Let me talk to him and see if we
24 can do that.
25      MR. WEISS:  Or conversely if that's a problem

55

1  we get the data, we can change it for you.
2       THE COURT:  Dennis Medwick from Middlesex is
3  the person doing this for me, so he is actually the one
4  who is doing it.  He is the one who is getting the
5  Excel sheets.  He set up the database, which makes it a
6  little harder because he is in Middlesex, but we didn't
7  have anybody here what could do it here.  We had to
8  reach out over there.
9       MR. BUCHANAN:  Do you have any rough census,
10 your Honor, so we can go back, your Honor, and figure
11 out a proposal on these other cases?
12      THE COURT:  I don't think I have them, no.  I
13 haven't had them do that.  I had them give me the -- I
14 had him give me the 2003 cases.  I mean, I have the
15 2002 and 2003 cases.  I don't have numbers, but I have
16 got them with all the information on them.  But I'll
17 try to get some for you as soon as I can.
18      MR. BUCHANAN:  That would be great.  Thank
19 you.
20      THE COURT:  And, actually, I had them so far
21 only pull heart attacks from the different sources
22 because that's what I was looking at.  Again, I was
23 trying to look, too, at backup cases.  We have
24 Abdel-Malek and Kimmelman.
25      MS. SULLIVAN:  And Smith.  And we're on track

56

Transcript - Monthly Status Conference (2005/06/16)

1  with those three.
2      THE COURT:  And I don't know if Seeger, Weiss
3  had any other back up cases.
4      MR. BUCHANAN:  Our case was dismissed, our
5  second case.
6      THE COURT:  Yes.  Okay.  We have those these.
7      MS. SULLIVAN:  We're on track.
8      MR. WEISS:  Case-specific expert depositions.
9  We have tendered our case-specific expert reports
10  generic and expert are the same.
11      THE COURT:  So we have backup cases.
12      MR. BUCHANAN:  Generic experts completely
13  overlap among the cases, so it is just the
14  case-specific experts.
15      MS. SULLIVAN:  And both sides have served
16  case-specific reports in those three cases or are about
17  to --
18      MR. WEISS:  I haven't gotten them yet.
19      MS. SULLIVAN:  -- consistent with the
20  deadlines?
21      MR. WEISS:  Not a complaint.  We haven't
22  gotten any.
23      THE COURT:  Yes.
24      MR. FERRARA:  Judge, our request would be
25  that in scheduling the trials that some consideration

Transcript - Monthly Status Conference (2005/06/16)

1  pretty good on that.  We have some that were before the
2  VIGOR label and we have the Smith case after the VIGOR
3  label, so we have a nice mix in the three backup cases.
4      THE COURT:  So we have got choices on that.
5  We have also got causation issues, and at this point
6  are those all nonsmokers?
7      MS. SULLIVAN:  No.  Abdel-Malek is a smoker.
8      MR. WEISS:  He stopped smoking.  Kimmelman is
9  not a smoker.
10      MS. SULLIVAN:  I believe Smith was a smoker.
11  I believe Smith was a smoker.
12      MR. WEISS:  Kimmelman was not a smoker.
13      MS. SULLIVAN:  And Abdel-Malek is a former
14  smoker, so a good mix there, too.
15      MR. WEISS:  It is a pretty balanced group.
16      THE COURT:  But I agree with you.  We're
17  going to have to start -- we don't have to go in
18  chronological order, obviously.  We can pull some other
19  cases.
20      MS. SULLIVAN:  Although I haven't discussed
21  it with our side, but there may be an argument that
22  once you have your test cases random selection
23  consistent with the manual may give you representative
24  cases, and so filing date may be an appropriate way to
25  after the first round of test cases to go, but we can

Transcript - Monthly Status Conference (2005/06/16)

1  be given to having post September 30th cases moved up
2  and expedited.  I don't know if you ever kicked that
3  around at all.  Do you know of the 2,000 cases how many
4  are pre September 30th cases approximately?
5      MR. WEISS:  Yes.  There was 175 give or take
6  10 cases.  There was 175, give he or take five or 10
7  cases before September 30th.
8      MR. FERRARA:  So I think that would make my
9  point then that the post September 30th may be a more
10  representative sampling and pick a couple of those and
11  move those up to trials four and five or two and three.
12      THE COURT:  It is not necessarily the date
13  that's critical, I don't think.  I think the date of
14  taking the drug may be important.  Obviously, from what
15  I have seen and from what other counsel have seen
16  there's -- the issue in the case clearly is what Merck
17  knew and when and what they did or didn't disclose
18  about what they knew, and at least that's a lynch pin
19  issue, so in that issue it is very important that we
20  look at the cases in terms of -- and I do want to sort
21  of look at that even as far as Kimmelman and
22  Abdel-Malek, and we chose Humeston so we're sticking
23  with that now, but there may be cases that are, you
24  know, before VIGOR, before after you sort of --
25      MS. SULLIVAN:  Actually the backup cases are

Transcript - Monthly Status Conference (2005/06/16)

1  defer that issue to a future conference.
2      THE COURT:  I don't see filing date as being
3  the best way to go.  I doubt it.  Otherwise, we would
4  be starting with a gastro case from --
5      MS. SULLIVAN:  I agree with your Honor.
6      THE COURT:  Where they took VIOXX for two
7  days or something.  It is not like the first case I
8  want to spend three weeks on.
9      MS. SULLIVAN:  Putting the gastro cases aside
10  by filing date for MI cases may be appropriate.
11      THE COURT:  I sort of doubt that, too, but
12  I'm not saying that, you know, we have made an effort
13  to try to pick somewhat neutral cases that everybody is
14  happy with, but, you know, at some point maybe we do
15  have to try a best case and a worst case or maybe just
16  dismiss some of the worst cases and try a best case.
17  I'm open to that.  Even though we're focusing on
18  Humeston I want to focus on Humeston, I don't want to
19  overburden everybody, but we have to start looking at
20  the future as far as banking these cases and setting up
21  additional tests or seeing what we're going to do.
22      MR. BUCHANAN:  If your Honor wants a
23  conference with the parties at some point before the
24  next status conference we would be happy to make
25  ourselves available to discuss your thoughts, and I

1   know you have been thinking about it, and you have

2   printouts of cases.

3       THE COURT:   So far all I have is heart attack

4   cases, but I have been looking to see, like I said, who

5   has what, and I did look at the older cases only.  You

6   can have any spread sheets you want, though I still

7   don't know, you know, when we had our meeting before

8   one plaintiff was proposed and it turned out that he

9   had schizophrenia.  I'm just giving that as an example,

10  that's really not going to be a test.  What I'm saying

11  is if you know your cases hopefully and on the spread

12  sheet you really even when you have it you still need

13  the input of counsel.  But, you know, maybe not.  Maybe

14  like Diane said maybe in the end I have to do some

15  randomness and throw something into a hat and draw some

16  out.  See what happens.  I'm not sure.  I'm going to

17  think about it.  All right.  Anything else today?

18      MR. WEISS:  Can we meet with you afterwards?

19      MR. PLACITELLA:  I have one issue for Diane.

20  You probably don't have an answer now, but on the

21  tolling agreement if somebody should dismiss a case

22  without prejudice in New Jersey do they get the

23  advantage of the tolling agreement in Federal Court?

24      MS. SULLIVAN:  I have to review that with our

25  client, Chris, and get back to you on that.

61

1       THE COURT:   No, I'm not going to do that.

2   You should raise that issue if there's a motion filed.

3   I don't want that issue raised a year from now.  If

4   they're going to be out during the statute of

5   limitations let's get them out on the statute of

6   limitations.  You can hold it for a year if you want,

7   but if you do it is going to be part of my

8   decision-making process.

9       MR. GALPERN:  Your Honor --

10      MR. CORONATO:  But that's just the concern in

11  terms of having a record in terms of statute of

12  limitations.  If we were to file the motion now you

13  would say we need more of a record.

14      THE COURT:  I don't want -- at this point I

15  think you have agreed you're not waiving anything if

16  you don't file motions immediately.  I expect you to

17  wait the 30 days that I have asked so they have a

18  chance to amend.  If you want to then object if there's

19  somebody whose statute passed and since they filed the

20  first complaint and you want to object that that

21  complaint shouldn't be amended then I think you have to

22  raise that objection.  We'll only have to deal with it

23  once probably, but --

24      MR. GALPERN:  Your Honor, on that same note,

25  we have a small handful of cases where for whatever

63

1       MR. PLACITELLA:  That may mean something to

2   some people.

3       MS. SULLIVAN:  I understand what you're

4   talking about.

5       MR. CORONATO:  Your Honor, the cases where

6   the plaintiff filed as a proposed administrator how is

7   your Honor going to deal with those?

8       THE COURT:  I'm going to give liaison counsel

9   the list, let them contact counsel, and by the next

10  management conference if those are not amended then I'm

11  going to dismiss them myself.

12      MR. CORONATO:  I think there's a motion -- I

13  don't know the case and how many there are, but I think

14  there's a motion pending to amend the complaint.  I'm

15  not sure when it is returnable.

16      THE COURT:  Anybody who makes a notion to

17  amend the complaint I'll allow it.  I mean, if they're

18  amending to allow that.  You're not going to oppose

19  that, right?

20      MR. CORONATO:  The only concern we would have

21  is our rights and defense statute of limitations be

22  preserved, and we're not -- by not opposing it waiving

23  any argument in terms of relation back.

24      MR. GALPERN:  This is to add what claim?

25      MR. CORONATO:  The proposed administrator.

62

1   reason the plaintiff had one heart attack and we find

2   out the client didn't tell us in reviewing there was a

3   second heart attack or a second stroke, so obviously,

4   we're going to amend the complaint for those types of

5   things.  We initially filed a motion.  Your Honor's law

6   clerk had asked us to get consent.  We have gotten

7   Merck's consent on a couple, but we still have one or

8   two or a small handful of cases where consent orders

9   are still awaiting Merck, and I don't want to sit and

10  wait for Merck to sign a consent order they have had so

11  can we come up with a protocol where we send them a

12  consent order to amend complaints on nonadministrator

13  issues maybe seven days, and if they don't respond to

14  it then we go ahead and file a motion to amend.

15      MS. SULLIVAN:  You can file your motion any

16  time.  We can't stop you.

17      MR. GALPERN:  I understand that, Diane, but

18  we were asked by the law clerk to get your consent, and

19  we did get your consent on one or two, but I know

20  there's at least two, maybe three, outstanding.

21      THE COURT:  The fact of the matter is motions

22  to amend complaints are going to be granted liberally,

23  and it is extremely rare the number of times I don't

24  agree to amend a complaint.  Even for proposed

25  administrator I'm going to agree to amend it.  The

64

**Page 65 (left column)**

1  question is going to be whether that should still
2  relate back or when it was filed -- I don't think
3  that's probably going to come up that much.  It would
4  have to be a case where it was filed and the statute
5  ran in between.  There's facts that would have to come
6  up.  As far as other things where they're changing a
7  name, adding additional damage claims or, you know,
8  changing something, that's going to be routinely
9  granted, so I would assume Merck would consent to
10  those.  I ask that you have an oral -- you know, in
11  order to avoid me having to have a motion, and even if
12  they don't respond having to have a clerk look at it,
13  read it, review it, have me look at it, sign it, I
14  would much prefer to have consent orders.
15       MR. GALPERN:  As would we.
16       MR. CORONATO:  And, your Honor, we have
17  signed those consent orders.  We have just asked in
18  those consent orders and they have been done that we
19  have the provision in there that by us signing the
20  consent order it shouldn't be deemed that or implied
21  that we are waiving any defenses, including a statute
22  of limitations or relation back just so we can help the
23  Court get through this administrative determination.
24       MR. GALPERN:  I full understand and agree
25  with what you're saying.  All I'm saying is you're

**Page 67 (right column)**

1  depositions we're hopeful we can work it out, but a lot
2  of them are former employees.  If we have an issue
3  we'll come back to your Honor if we need a week or two
4  on the July dates on some of the former people we'll
5  try to work it out.
6       THE COURT:  I want to get them as soon as
7  possible.
8       MR. BUCHANAN:  Barry Gertz and Honig are.
9  There's a significant number that are current.
10       MS. SULLIVAN:  I know, but some of them are
11  not, like Scolnick.
12       THE COURT:  If you have a problem call me.
13       MS. SULLIVAN:  Okay.
14       (End of proceedings.)

**Page 66 (left column)**

1  sitting on two or three of my consent orders, and it's
2  been some time.
3       MR. CORONATO:  Let us know the names, and
4  we'll look into that and find out what the hold up is.
5  If we agree to those.
6       MS. SULLIVAN:  Don't send them to me.
7       MR. CORONATO:  As long as it is understood
8  we're not waiving any of those defenses.
9       THE COURT:  So the consent order should go to
10  you?
11       MR. CORONATO:  It should go to somebody at
12  Dechert.
13       MS. SULLIVAN:  Michelle Ury or Heather Brown.
14       THE COURT:  Michelle Ury and Heather Brown
15  will sign your consent orders.  Don't send them to
16  Diane.  She has too much on her desk.
17       MS. SULLIVAN:  Thank you, your Honor.
18       THE COURT:  All right.  Is that it?
19       MR. BARNETT:  We may have one other issue.
20  If we can talk to Mr. Buchanan we may be able to
21  resolve it.
22       THE COURT:  Okay.  If it is a problem we can
23  come back and address it.  And I was going to meet with
24  counsel.
25       MS. SULLIVAN:  And just on the Merck witness

**Page 68 (right column)**

C E R T I F I C A T I O N
     I, REGINA A. TELL, C.S.R., C.R.R., License Number
30X100161000, an Official Court Reporter in and for the
State of New Jersey, do hereby certify the foregoing to
be prepared in full compliance with the current
Transcript Format for Judicial Proceedings and is a
true and accurate compressed transcript to the best of
my knowledge and ability.

                    _____  6/17/05
                    Regina A. Tell, CSR-CRR
                    Official Court Reporter
                    Atlantic County Courthouse
                    Mays Landing, New Jersey