```
0001
 1                    SUPERIOR COURT OF NEW JERSEY
                           ATLANTIC COUNTY
 2                       CASE TYPE NO. 619
 3     ----------------------------x
       IN THE MATTER OF IN RE:
 4
       VIOXX
 5                             STENOGRAPHIC
                               TRANSCRIPT
 6                             OF:
       ----------------------------x   STATUS CONFERENCE
 7
             PLACE:  ATLANTIC COUNTY CIVIL COURTHOUSE
 8                       1201 BACHARACH BOULEVARD
                         ATLANTIC CITY, NJ  08401
 9
             DATE:   November 7, 2005
10
11     B E F O R E: THE HONORABLE CAROL E. HIGBEE, J.S.C.
12
       A P P E A R A N C E S:
13
             CHRISTOPHER SEEGER, ESQUIRE
14           DAVID BUCHANAN, ESQUIRE
             JEFFREY GRAND, ESQUIRE
15           SEEGER, WEISS
             ATTORNEYS FOR THE PLAINTIFFS
16
             SOL H. WEISS, ESQUIRE
17           DAVID JACOBY, ESQUIRE
             ANAPOL, SCHWARTZ, WEISS, COHAN, FELDMAN &
18           SMALLEY
             ATTORNEYS FOR THE PLAINTIFFS
19
             LEE BALEFSKY, ESQUIRE
20           KLINE & SPECTER
             ATTORNEYS FOR THE PLAINTIFFS
21
                 *      *      *      *      *
22
                         LINDA L. GOLKOW
23                  CERTIFIED SHORTHAND REPORTER
                    REGISTERED DIPLOMATE REPORTER
24                  215.787.7772
                    LGOLKOW@NEXTEL.BLACKBERRY.NET
25
```

1

```
 1
 2      APPEARANCES CONTINUED . . .
 3           STEVEN B. STEIN, ESQUIRE
             LEVIN SIMES & KAISER
 4           ATTORNEY FOR THE PLAINTIFFS

 5           TERRENCE SMITH, ESQUIRE
             DAVIS, SAPERSTEIN & SALOMON, P.C.
 6           ATTORNEY FOR THE PLAINTIFFS

 7           DANIEL J. FETTERMAN, ESQUIRE
             CHRISTOPHER JOHNSON, ESQUIRE
 8           KASOWITZ, BENSON, TORRES & FRIEDMAN
             ATTORNEY FOR THE PLAINTIFFS
 9           EDWARD S. GOLDIS, ESQUIRE
             FELDMAN, SHEPHERD, WOHLGELERNTER & TANNER
10           ATTORNEYS FOR THE PLAINTIFFS
11           JEREMY HEISLER, ESQUIRE
             SANFORD, WITTELS & HEISLER
12           ATTORNEY FOR THE PLAINTIFFS
13           DEBORAH BAIRD, ESQUIRE
             JOHN P. KOPESKY, ESQUIRE
14           SHELLER, LUDWIG
             ATTORNEY FOR THE PLAINTIFFS
15
16           THOMAS N. SWEENEY, ESQUIRE
             COHEN SEGLIAS PALLAS GREENHALL & FURMAN
17           ATTORNEY FOR THE PLAINTIFFS

18           CHRISTOPHER PLACITELLA, ESQUIRE
             ERIC WEINBERG, ESQUIRE
19           COHEN PLACITELLA & ROTH
             ATTORNEYS FOR THE PLAINTIFFS
20           MICHELE A. DIMARTINO, ESQUIRE
             MILLER & ASSOCIATES
21           ATTORNEY FOR THE PLAINTIFF
22           MELANIE H. MUHLSTOCK, ESQUIRE
             PARKER & WAICHMAN
23           ATTORNEY FOR THE PLAINTIFF
24           CYNTHIA L. ZEDALIS, ESQUIRE
             BRANCH LAW FIRM
25           ATTORNEY FOR THE PLAINTIFF
```

3

```
 1      APPEARANCES CONTINUED . . .
 2
 3           W. MARK LANIER, ESQUIRE
             RICHARD D. MEADOW, ESQUIRE
 4           DARA HEGAR, ESQUIRE
             ROBERT LEONE, ESQUIRE
 5           LANIER LAW FIRM
             ATTORNEY FOR THE PLAINTIFFS
 6           PERRY WEITZ, ESQUIRE
             JERRY KRISTAL, ESQUIRE
 7           ROBERT J. GORDON, ESQUIRE
             WEITZ & LUXEMBERG
 8           ATTORNEY FOR THE PLAINTIFFS
 9           BENEDICT P. MORELLI, ESQUIRE
             MORELLI RATNER, P.C.
10           ATTORNEY FOR THE PLAINTIFFS
11           THEODORE M. LIEVERMAN, ESQUIRE
             DANIEL MIRARCHI, ESQUIRE
12           SPECTOR, ROSEMAN & KODROFF, P.C.
13
             JAMES J. PETTIT, ESQUIRE
14           LOCKS LAW FIRM
             ATTORNEYS FOR THE PLAINTIFFS
15
             MICHAEL FERRARA, ESQUIRE
16           HENRY MILLER, ESQUIRE
             THE FERRARA LAW FIRM
17           ATTORNEY FOR THE PLAINTIFFS
18           ROBERT DASSOW, ESQUIRE
             HOVDE, DASSOW & DEETS, LLC
19           ATTORNEY FOR THE PLAINTIFFS
20           SUSANNE N. SCOVERN, ESQUIRE
             ALEXANDER, HAWES & AUDET
21           ATTORNEY FOR THE PLAINTIFFS
22           KEVEN FRIEDMAN, ESQUIRE
             WILENTZ, GOLDMAN & SPITZER
23           ATTORNEY FOR THE PLAINTIFFS
24           THERESA S. CORAN, ESQUIRE
             LEVY, ANGSTREICH, FINNEY, BALDANTE,
25           RUBENSTEIN & COREN
             ATTORNEY FOR THE PLAINTIFFS
```

2

```
 1      APPEARANCES CONTINUED . . .
 2           JOHN TROTMAN, ESQUIRE
             SILVERMAN & FODERA
 3           ATTORNEY FOR THE PLAINTIFF
             STEVEN CHUNG, ESQUIRE
 4           SHRAGER, SPIVEY & SACHS
             ATTORNEY FOR THE PLAINTIFF
 5
 6           SHEPARD A. HOFFMAN, ESQUIRE
             HOFFMAN LAW FIRM
 7           ATTORNEY FOR THE PLAINTIFF
             BRUCE MATTHEWS, ESQUIRE
 8
             GREGORY V. SHARKEY
 9           ATTORNEY FOR THE PLAINTIFF
10           EVAN SMITH, ESQUIRE
             BRODSKY & SMITH
11           ATTORNEY FOR THE PLAINTIFF
12           ROSALIND T. KAPLAN, ESQUIRE
             MCELDREW & FULLAM
13           ATTORNEY FOR THE PLAINTIFF
14           FRANCES TOMES, ESQUIRE
             TORTORETI TOMES & CALLAHAN
15           ATTORNEY FOR THE PLAINTIFF
16           MARC GROSSMAN, ESQUIRE
             SANDERS VIENER & GROSSMAN
17           ATTORNEY FOR THE PLAINTIFFS
18           ESTHER BEREZOFSKY, ESQUIRE
             WILLIAMS, CUKER & BEREZOFSKY
19           ATTORNEY FOR THE PLAINTIFFS
20           PAULINA DO AMARAL
             LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
21           ATTORNEY FOR THE PLAINTIFFS
22           THOMAS M. SOBER, ESQUIRE
             HAGENS, BERMAN, SOBER, SHAPIRO
23           ATTORNEY FOR THE PLAINTIFFS
24           TRENT MIRACUS, ESQUIRE
             JEFFREY COOPERY, ESQUIRE
25           MICHAEL ANGELIDIS, ESQUIRE
             ATTORNEY FOR THE PLAINTIFFS
```

4

```
1    APPEARANCES CONTINUED . . .
2              JAMES R. RONCA, ESQUIRE
               SCHMIDT, RONCA & KRAMER
3              ATTORNEY FOR THE PLAINTIFFS
4              MICHAEL FERRARA, ESQUIRE
               THE FERRARA LAW FIRM
5              ATTORNEY FOR THE PLAINTIFFS
6              THEODORE V.H. MAYER, ESQUIRE
               CHARLES W. COHEN, ESQUIRE
7              ROBERTA KOSS, ESQUIRE
               WILFRED P. CORONATO, ESQUIRE
8              WILLIAM STEIN, ESQUIRE
               HUGHES, HUBBARD & REED, LLP
9              ATTORNEYS FOR THE DEFENDANT, MERCK
10             BEN BARNETT, ESQUIRE
               HOPE FREIWALD, ESQUIRE
11             PHILIP YANNELLA, ESQUIRE
               DECHERT, LLP
12             ATTORNEYS FOR THE DEFENDANT, MERCK
13             MATTHEW POWERS, ESQUIRE
               O'MELVENY & MEYERS, LLP
14             ATTORNEY FOR THE DEFENDANT, MERCK
15             ROBERT W. ROWAN, ESQUIRE
               GOLLATZ GRIFFIN & EWING
16             ATTORNEY FOR MEDCO HEALTH SOLUTIONS, INC.
17             SCOTT PUGLIESE, ESQUIRE
               PARKER MCCAY
18             ATTORNEY FOR THE DEFENDANT PFIZER
19
20
21
22
23
24
25
```

5

```
1                    -  -  -
2              THE CLERK:  The Superior Court of the
3    State of New Jersey is now in session.  The
4    Honorable Carol B. Higbee now presiding.
5              MR. WEISS:  Good morning, Your Honor.
6              THE COURT:  If anyone addresses The
7    Court, please stand, and if you're in the back, move
8    forward so the court reporter can hear you.
9              MR. SEEGER:  Judge, plaintiffs are
10   satisfied with this jury.
11             THE COURT:  You want to take your
12   shot with those.
13             MR. SEEGER:  Now the roles are
14   reversed.
15             THE COURT:  Did people get these
16   forms that I have given out?
17
18             (Whereupon, an off-the-record
19             discussion was held.)
20                   -  -  -
21             THE COURT:  This is what I've done,
22   and she's going to be bringing them.  I guess you
23   haven't been given them yet.  But we've done an
24   Access database, and I've tried to incorporate all
25   the cases that have been filed here because we
```

6

```
1    wanted to figure out where we stand with numbers of
2    cases.
3              I've issued an order, and I've sent a
4    couple of letters out, but we have not gotten a
5    complete response.  A lot of the firms have sent me
6    their database information.  We gave you
7    instructions how to do it, it's on the website.  I
8    need to have them filled out.  Your case -- I mean,
9    if you want to have a chance to have your case tried
10   or considered, whether it's for trial dates or
11   settlements or anything else, you're going to have
12   to give me the information.
13             Right now I have a list of 1,933
14   cases.  We have filed approximately 3,500 cases.
15   So, I've got about 2,000 of the 3,500.  So, we're
16   missing about half of the cases, which means -- I
17   mean, we have them filed in the court system, don't
18   get me wrong, but in this database that we can
19   manipulate, we don't have them.
20             We're going to have to get those
21   filled out.  And eventually I don't know what
22   sanction I can impose -- I don't think I can dismiss
23   for failure to fill out my database form, but I can
24   certainly start imposing fines.  So far it's been 12
25   years and I've never fined an attorney yet, but I
```

7

```
1    could, and I will have if I have to.  So, please,
2    let's fill out these forms.  If you don't have your
3    names, your cases in the database, then we can't use
4    them to get an accurate picture of what's going on.
5              What I have so far shows me that 60
6    percent, approximately 60 percent of the cases of
7    the 1933 are heart attack cases.
8              Approximately 60 percent of the
9    cases, not the heart attack cases, but the cases,
10   are people who took the drug for over 18 months.
11             I was sort of surprised by that
12   number, and I don't know if it will hold up when we
13   get the other 1,500 cases in the database, but right
14   now it's there.
15             We also did a run of the number of
16   cases per firm, and it appears that Seeger Weiss has
17   the most, Anapol Schwartz is very close, Chris
18   Placitella has a lot of cases, Kasowitz has a lot of
19   cases, Locks Law Firm has a lot of cases, Parker &
20   Waichman have a lot of cases, Lanier Law Firm has a
21   large number of cases, Wilentz has a large number of
22   cases.  So, we have a substantial number of cases of
23   those law firms.
24             The goal now, and I just spoke to
25   counsel back in chambers, but everything I said to
```

8

1   them I'm going to say to you.

2            The goal now is to move on and to

3   figure out what we have to do next.  And what we

4   have to do next is start to try some cases and get

5   more representative cases.  There's going to be a

6   point, if we actually have to try every case, where

7   we're going to have to take some drastic measures to

8   get every case tried.

9            And I've mentioned that I have

10  resources.  I have six judges here.  I can do six

11  days, six trials at once.  I have other resources.

12  I can go to Judge Carchman and tell him I need 50

13  judges from the state, and I need 50 Vioxx trials to

14  start the same day.  I mean, I can do a lot of

15  things.  We're not at that point yet.  We still need

16  more representative cases.  We still need to be able

17  to find out what's happening.  But if there comes a

18  point where you actually think -- where I believe

19  we're going to have to try these cases, we're going

20  to move them, and we're going to move them somewhat

21  expeditiously.

22           THE COURT:  Off the record.

23                -  -  -

24           (Whereupon, an off-the-record

25           discussion was held.)

9

1                -  -  -

2            THE COURT:  So, at this point my goal

3   is to try to get some cases scheduled and ready to

4   try so we can have some more representative cases.

5            If you could just pass this out, and

6   they will pass them around themselves, I'm sure.

7            We have on appeal the class action

8   that I certified.  We also have on appeal the class

9   action I refuse to certify, but the one that we

10  certified is probably going to be decided fairly

11  soon, I would think in the next three to six months,

12  because it's an interlocutory appeal.  The concept

13  of law issue is going to be addressed by that court,

14  so, we're going to know whether we should be

15  applying -- at least the concept of laws to consumer

16  fraud is going to be addressed.  The failure to warn

17  still won't be addressed.  At least from the

18  language -- I'm hoping the appellate division will

19  give us some guidance on what they want me to do.

20           That being the case, and having found

21  what I found out about the percentage of heart

22  attack cases that we have, the percentage of 18 plus

23  cases, it seems to me that at this point I want to

24  focus for the next few trials on New Jersey

25  plaintiffs who have had heart attacks who took the

10

1   drug for over 18 months.  That's my goal.

2            Now, at this point, what I'm going to

3   do is tell you cases that I've chosen that I think

4   I'd like to have geared up for trial as quickly as

5   possible over the next couple of months.

6            I've chosen them from diverse law

7   firms, different law firms that have the majority of

8   cases, and that have New Jersey plaintiffs over 18

9   months' duration, heart attacks, and I've picked

10  those cases hoping that each of the plaintiffs' law

11  firms can prepare their cases, defense counsel can

12  prepare those cases, and we can be ready to try

13  them.  If one for some reason goes down, we can take

14  the next one, et cetera, and try to have a base of a

15  few cases that we're ready to go with.

16           We're going to meet on November 17.

17  When we meet on November 17, I really just want to

18  meet with those people who are going to be trying

19  cases in the first -- the next ten cases we're going

20  to schedule, next whatever.  Anybody is welcome to

21  attend.  I'm never going to bar you from the

22  meetings.  But that's what the focus will be on, so,

23  that's who I think should try to attend.

24           If you have a case that fits the

25  criteria of 18 months' duration taking the drug, New

11

1   Jersey plaintiff, and you want to try your case

2   right away, then you should send me a letter in the

3   next couple of days saying I have this case, I want

4   to try this case.  And I don't want you to posture

5   here.  I mean, it costs a lot of money to try one of

6   these cases, it's a lot of time that you have to

7   devote.  I'm not suggesting that all of you aren't

8   willing to do that at some point, but these are the

9   test cases.  So, we don't need heros here.  We need

10  people that have the resources and the time to do

11  the test cases.  So, those of you who -- if you are

12  not named here and you feel like, hey,  maybe I've

13  only got ten cases, but I have a right to try my

14  cases, too, and I want to be in the forefront

15  because of whatever reason, I'll consider your

16  request.  My criteria right now are 18 months' use,

17  heart attack, New Jersey plaintiff.

18           My thinking at this point, and what

19  we're going to do, because I don't know any of these

20  plaintiffs, obviously, I don't know details about

21  your files, it may turn out that I picked a case

22  where the plaintiff was a nun or somebody who was

23  pregnant or whatever, there may be some reason why

24  the defense would say, please, this is not

25  representative at all.  I may pick a plaintiff who

12

1  is a felon who is in jail, and if I choose that,
2  obviously, that's not probably the best case to
3  bring before a jury.  So plaintiffs can come back to
4  me on the 17th and say we've looked over our files,
5  we don't think this should be a test case, and I'll
6  talk to you about it.  I'm not giving anybody veto
7  power at this point, but we'll discuss it.
8            At this point, the first case that I
9  have in mind to be tried next is Patricia Hatch,
10  Docket Number 0403-05.  It's a death heart attack
11  case, New Jersey male, nonsmoker, 18 months, and
12  it's Anapol Schwartz's case.  I think he's age 52.
13            MR. WEISS:  Correct, Your Honor.
14            THE COURT:  So, I don't know any
15  other details about him, but that's what I'm looking
16  at as being the first case.
17            The next cases are not in order of
18  the way they're going to be tried.  They're just
19  ones that I want to get prepared right away.
20            We have two Seeger Weiss plaintiffs,
21  Robert McFarland, 0199-04, and Howard, Gregory,
22  2268-04.  Those are 18 months' use, heart attacks,
23  males, a nonsmoker, a past smoker, 53-year-old and a
24  38-year-old, both New Jersey residents, and the time
25  frame of diagnosis stays right within 2002.  I'm

13

1  and Vincent something, 1307-05.  Those cases are
2  both within four or six days of each other, date of
3  heart attack.  They are both 18 months plus.  One is
4  a nonsmoker, one is a past smoker.  They are two
5  females, age 65 and 62.  So, I want the Locks Law
6  Firm to look at those and see if they can be tried
7  together and what the issues are with those.
8            The Buchko case, 1565-05, and
9  Cruikshank, 1568-05.  Those are two Chris Placitella
10  cases.  It's a male and a female.  They're both past
11  smokers.  The diagnosis dates are within three
12  months of each other.  One's 62, one's 59.
13            MR. MAYER:  Could you repeat those
14  numbers?
15            THE COURT:  It is Buchko,
16  B-U-C-H-K-O, 1565-05.  And Cruikshank, 1568-05.
17  Their diagnosis dates are December '03, February
18  '04.  Female 62; male 59; 18 months plus.
19            Then I have two Anapol Schwartz
20  cases.  I have two that were the same date, two
21  Anapol Schwartz cases that might be tried together.
22  Factor, F-A-C-T-O-R, 2921-05 and Ezzi, E-Z-Z-I,
23  Joseph, 5556-05.  Those are both -- Ezzi is 1/22/01,
24  and Factor is 12/2000, a nonsmoker, a past smoker,
25  both males, both 18 months, both New Jersey

15

1  considering trying those two plaintiffs together.
2  They have the same diagnosis within a few months.
3  We can also discuss whether the two plaintiffs that
4  I'm -- because the rest of these are going to be in
5  twos, where I'm looking at trying two plaintiffs
6  together.
7            The first one, Hatch, is single.  The
8  others I'm looking at in twos.  So, we need a
9  similar diagnosis date, by heart attacks, obviously
10  that's the date of the heart attack.  If the heart
11  attack date is -- if it turns out that there was a
12  major break, you know, study done between the two
13  dates, then we'll have to reconsider that.  That's
14  all stuff we can discuss on the 17th as stuff I want
15  you to look at.  I'm not giving you too much here.
16  I'm giving you two cases.  I expect you to know
17  those cases really well and be able to report to me
18  as to why they are not the ones I should try or I
19  should try them.
20            For the Locks Law Firm -- is Locks
21  here?
22            MR. PETTIT:  Yes, Your Honor.
23            THE COURT:  I have two cases for you
24  to look at, Doherty, 638-05, that's the docket
25  number, 638-05, and another case, it's CarolE Ann

14

1  residents.  One of them is 61.  One of them is 57.
2  So, those are two Anapol cases that I would probably
3  try together.
4            MR. WEISS:  Okay.
5            THE COURT:  I sort of looked at Hatch
6  as picking one case that would be a single plaintiff
7  and then going to double plaintiffs.
8            MR. WEISS:  Okay.
9            THE COURT:  If I can match up dates
10  of diagnosis, and I'm not going to try somebody
11  who's diagnosed in 2004 and somebody diagnosed in
12  2001, because the science may be different, and I'm
13  not going to -- I don't think that's fair to
14  anybody.  I'm going to hear from defense and
15  plaintiffs on the 17th about what's wrong with my
16  selection process.
17            Counsel?
18            MR. DASSOW:  Your Honor, I'm sorry to
19  interrupt.  Robb Dassow, Hovde, Dassow & Deets.  We
20  had faxed -- and I know you are doing the trial
21  dates and things like that, but on October 28th we
22  provided all of our cases through Mr. Ferrara and I
23  think you are basing some of the trial dates based
24  upon some of the cases per firm.  We had submitted
25  those, and they should have been part of this

16

**Column (page 17):**

1  spreadsheet, and they are not there.  We have 351
2  cases.  I, personally, have 203 filed.  I just
3  wanted to bring that to The Court's attention.  I
4  know you haven't looked at any of our cases, but I
5  at least wanted to bring that up right now for The
6  Court's consideration.
7       THE COURT:  Well, you can get it in
8  today.  Dennis Medwick is doing this for me.  He's a
9  tech guy in Middlesex.  Some of you know him.  He
10  was Judge Corademus' computer guy, and he is the one
11  doing the database for me.  If you get him the
12  information today or tomorrow, they will be on there
13  tomorrow.  If you have this number of cases, if you
14  can give me in a letter form in the next couple of
15  days -- and I said, even if you have ten cases, but
16  definitely if you have a lot of cases, and you want
17  to try some, send me a letter saying we've got these
18  two cases we think should be -- I'm looking for two
19  people that have heart attacks, 18 months --
20       MR. DASSOW:  Right.  I was really
21  surprised by the spreadsheet that we weren't on
22  there.  I just wanted to bring it to The Court's
23  attention.  We'll gladly do that immediately, Your
24  Honor.
25       THE COURT:  What I'm trying to say

**Column (page 19):**

1  H-O-O-P.  It's a husband and wife case, it's smoker,
2  male, died -- not a death case, 51.  He was 51.  He
3  had his heart attack in 2003.  The other Wilentz
4  case is also 2003; 61 and 51.  So, those are two
5  Wilentz cases that I can consider putting together
6  also.
7       Counsel, identify yourself.
8       MR. MORELLI:  Your Honor, Benedict
9  Morelli.  I have cases filed under two different
10  names because I changed the name of my firm.  I have
11  104 cases under Benedict P. Morelli & Associates,
12  which is the second firm down.
13       THE COURT:  Okay.
14       MR. MORELLI:  I have 17 cases filed
15  under the new name of my firm, which is Morelli
16  Ratner, and so I would like The Court to realize
17  that the new name of the firm is Morelli Ratner, and
18  all cases should be filed under that name.  I would
19  like to be considered also for some trial cases.
20       THE COURT:  From what it looks like
21  to me on my list of 18 months, New Jersey, you have
22  one case.
23       MR. MORELLI:  I'll try it.
24       THE COURT:  That is Jose Nunez.  His
25  name is Jose Nunez.  It is 2047-05.

17

19

**Column (page 18):**

1  is, you can still be involved for this first group
2  of test cases.  First of all, send in your database
3  stuff.
4       Secondly, though, send me a letter
5  saying you'll note that we have these two and two
6  cases or whatever, and these are the ones that we
7  want to be tried.  It is not a problem.
8       MR. DASSOW:  Thank you, Your Honor.
9       THE COURT:  I didn't have a chance to
10  meet with counsel.  I did try to express that the
11  database is important, but it's not -- I don't even
12  know.  We'll find out if it is accurate and
13  everything, but I think it's -- I trust Dennis.  It
14  probably makes sense.
15       Counsel?
16       MR. MAYER:  Are you through with the
17  list yet?
18       THE COURT:  The list?
19       MR. MAYER:  I have some things to
20  address, but I thought you should finish first.
21       THE COURT:  I had two Wilentz cases.
22  One is Taylor, 2762-05.  It's a heart attack, 61
23  years old, male, past smoker, 18 months.  And Henry
24  Hoop, heart attack.  I don't have the Docket Number.
25  I don't know how that got left off.  Henry Hoop,

**Column (page 20):**

1       MR. MORELLI:  Okay.
2       THE COURT:  It is a 7/1/2000 case, 18
3  plus months, 49 year old, heart attack.  I'll put
4  that on the list.
5       MR. MORELLI:  Thank you.
6       THE COURT:  It's a single.  I don't
7  have a match up with it.  At this point I'm not
8  going to try anything where I have two plaintiffs'
9  lawyers that are different.  If we do do a case, it
10  is going to be two plaintiffs with the same
11  attorney.  I don't want to double team the defense.
12  I don't know if that makes any sense, when there's
13  multiple law firms for the defense in place.  But it
14  is double teaming in terms of double openings,
15  double closings.  So, I was trying to make
16  arrangements at this point.
17       Again, this is not the way we're
18  going to try all the cases.  This is flexible.  When
19  I picked the first five, I know a lot of people
20  thought I was going to try one, two, three, four,
21  five, but I said, if you were listening, I said
22  several times that I wasn't going to do that.
23  Several times I said I was going to pick one of
24  those five to be the first case.  I never said we
25  were going to go one, two, three, four, five.  Here,

18

20

Transcript - Monthly Status Conference (2005/11/07)

1    I may change as we go along.  Nothing is in stone.
2    I want to see where we're going.  We have two single
3    cases, Mr. Morelli's and the Anapol Schwartz one
4    that's by itself, and then we have several twin
5    cases, and we'll see where we're going.  I'll listen
6    on the 18th.
7              Counsel, if you just have objections
8    to the procedure, you might want to hold them, but
9    you can put preliminarily what your thoughts are.
10             MR. MAYER:  First thing I want to say
11   is, to make the conference on the 17th meaningful,
12   for most of these cases, we have very little
13   information, maybe only what's in the complaint.
14   So, for these cases that you've listed, if anybody
15   else is writing to you and wanting to participate in
16   that conference, I would suggest that we should be
17   provided a plaintiffs' fact sheet, authorizations
18   and any medical records that are in the possession
19   of the plaintiff's counsel a certain number of days
20   before that conference so we can come prepared to
21   talk about the cases.
22             THE COURT:  That's fair.  If you
23   can't get two plaintiffs' fact sheets together and
24   you can't get as many medical records as possible,
25   then maybe it shouldn't -- and you may not -- I

21

Transcript - Monthly Status Conference (2005/11/07)

1              THE COURT:  What day is Monday?
2              MR. MAYER:  Monday is the 14th.  The
3    conference is the 17th.  Friday would be a lot
4    better if we could get them this Friday.
5              THE COURT:  Let's say this.  Anybody
6    that can get it to them by Friday, please do.
7    Anybody who can get it to them by Monday, please do.
8    Nothing should be later than the 15th.
9              MR. MORELLI:  Fact sheets and
10   authorizations?
11             MR. MAYER:  Fact sheets,
12   authorizations and medical records.
13             THE COURT:  If you have copies of
14   medical records, I expect you to give them to them.
15             All right?  Then we'll talk on the
16   17th about which cases are not representative and
17   which are, and defense may be a little disadvantaged
18   there, so, I want to make sure we can have an even
19   playing field for them.
20             MR. MAYER:  Then, Your Honor, I do
21   have some thoughts on the process, and I can maybe
22   just flag them now.
23             THE COURT:  Go ahead.
24             MR. MAYER:  I know you don't want to
25   discuss them in detail.

23

Transcript - Monthly Status Conference (2005/11/07)

1    don't know, I didn't pay attention to filing date.
2    That wasn't one of my criteria.  So, these are not
3    in chronological order.  So, I do think that maybe
4    none of these plaintiffs have fact sheets.  That
5    will be a factor in deciding what we can try first,
6    but I don't think that at this point, discovery,
7    when we're talking about ten cases and multiple
8    different firms, that it should be a problem to have
9    people -- you know, no matter what, we're done a
10   bulk of the discovery.  I don't see, even if the
11   case was filed yesterday, it being three years until
12   we try that case.  That's not going to be the way it
13   is going to be.  The discovery has been done.  That
14   doesn't mean that the defense is not entitled to be
15   able to review every single record of the plaintiff,
16   their employment, their school records, and you
17   should have that in your possession before you go to
18   trial.  The defense is entitled to that.  Obviously,
19   deps of treating doctors have to be taken.  But
20   these things can be done fairly quickly.  We have to
21   have case specific experts.  But, again, I think it
22   can be done fairly quickly.  So, that's my focus.
23   But you're right, counselor, I would suggest --
24             MR. MAYER:  If we can do that by
25   Friday or by Monday, by a week from today.

22

Transcript - Monthly Status Conference (2005/11/07)

1              THE COURT:  Give me stuff to think
2    about.
3              MR. MAYER:  I was surprised to hear
4    the statistics and to see them.  The breakdown
5    between heart attacks and strokes is very much what
6    we would expect to see, about a third of the cases
7    are strokes and 60 percent heart attacks, and that
8    would be consistent with what we've seen in the
9    cases here and around the country where we have
10   enough information to judge.
11             The 18-month continuous use number
12   seems off to us, and I'm sure that's accurately
13   taken from the information that was submitted to
14   you.  When we look at these cases, maybe we'll get
15   some sense of what the variation within those cases
16   that have been characterized in the spreadsheets
17   that have been provided to you is in terms of what's
18   being characterized as 18 months, because certainly
19   there were people who had chronic conditions, who
20   were on the medicine a long time, who got relief
21   from it, who didn't have side effects on it, who
22   stayed on it for a long time.  But there were also a
23   lot of people who took the drug for acute pain or
24   temporary conditions, and certainly the mix of cases
25   that we have enough information on, the percentage

24

1   looks very different.  So, I'll be surprised if that
2   pans out, but I recognize Your Honor is dealing with
3   the information you have at hand.
4           THE COURT:  It is a very rough
5   number, because all we did was give the choice of 0
6   to 3, 0 to 6 months, 3 to 6, 6 to 9 months, 6 to a
7   year, a year to 18, and 18 plus.  So, these are ones
8   where the attorneys have responded 18 plus.
9   Obviously, if you can, pull your prescription
10  records out as quickly as possible so the defense
11  has them.  And it's true, it may be an 18 plus in an
12  honest answer because the plaintiff took the drug,
13  and then 12 months later took the drug one more day,
14  and 18 months, 19 months took one more dose of the
15  drug.  That could have happened.
16          MR. MAYER:  It could have been, I
17  assume, I don't know how the question was asked, but
18  could it also include people who took the drug,
19  suffered an event, but kept on the drug for a year
20  after, that sort of thing?  That pattern actually
21  exists quite commonly as well.
22          THE COURT:  Well, we don't know that.
23          MR. MAYER:  We'll see that better.
24          THE COURT:  I hope fairly quickly.
25  It's in the plaintiffs' interest to find that out

25

1   right now is that we certainly object to the pairing
2   of cases for trial, and we don't have to argue that
3   now, but at such time as it's ripe, we will want to
4   talk about that.  We think it will confound, rather
5   than assist the process, and we would like the
6   opportunity to argue that and brief it before
7   anything is decided on that issue.
8           THE COURT:  Okay.  Timewise, the
9   Seeger cases are 2002.  The Anapol twin cases are --
10  well, the Placitella twin cases are the end of 2003,
11  beginning of 2004.  The Wilentz cases are 2003, I
12  think.  I think we actually have some spread out
13  here.  The Morelli case is a 2000 case, the only
14  case.  So, we actually do have dates that are
15  different.  I was just trying to match the two
16  together, but the other dates are spread out.
17          All right.  There's going to be some
18  other things that are going to be done, and I will
19  discuss those with the people on the 18th who are
20  going to try the next set of cases.  But I can tell
21  you that we cannot -- I consider the trial, the
22  seven-week trial to have been a free college
23  education in pharmaceutical cases for me, but
24  obviously, I'm going to be watching Judge Fallon
25  very carefully.  He swears he can try his case in

27

1   before trial, and it's in plaintiffs' interest to
2   let the defense know that.  If I'm looking to try
3   18-month cases, I'm looking to try 18-month cases.
4   That doesn't mean they had to take the drug every
5   day for 18 months, I don't think.  But I do think --
6   well, we'll see.  Maybe we have to break it down
7   more specifically.  Like I said, I don't know much
8   about these people, but they fit the criteria I
9   wanted, which was law firms with a lot of cases, New
10  Jersey, heart attacks, 18 months on the forms.
11  That's what I want.
12          MR. MAYER:  The other point I wanted
13  to make that's not unrelated to that is that I think
14  there are a lot of other categories and divisions of
15  cases that one could look at in terms of cases to
16  try that might be informative, including the date of
17  injury, in terms of what was known at the time of
18  injury, the date of first prescription in terms of
19  what was in the label at the time of first
20  prescription, the different categories of injury
21  beyond heart attack, and especially strokes being
22  the most prominent.  So, there are a lot of other
23  categories that I feel we should be looking at
24  before we have scheduled a whole series of trials.
25          I guess the last point I want to make

26

1   two weeks.  I'll see what he does.  If he can
2   actually try the case in two weeks, then we'll
3   immediately adopt his rules.
4           MR. SEEGER:  But he has two shifts.
5   I think he's starting early and then taking a break
6   in the middle of the day and comes back.
7           THE COURT:  A siesta?
8           MR. SEEGER:  In terms of trial days,
9   it is not --
10          MR. MORELLI:  No bathrooms.
11          MR. SEEGER:  He's cramming like two
12  trial dates into a day.  But we can see how it goes.
13  But I definitely --
14          THE COURT:  Well, I'm not going to do
15  that, obviously.  You know that.  I have a family,
16  and I don't intend to spend every night here.  I did
17  spend a lot of nights here for the seven weeks, and
18  I'm sure I'll spend a lot of nights, but I don't
19  think that's fair.  I can't do it to my staff.  Our
20  people don't even make overtime.  They get like
21  another hour that they can take off at some other
22  time.  I can't have people here until 9:00 at night.
23  It's not going to be like in Texas.  I just can't
24  work that late.
25          MR. LANIER:  Your Honor, for what

28

1   it's worth, Mark Lanier.

2        My indication from the MDL is exactly

3   what Chris said. I think the judge is going to run

4   it from 8:30 in the morning until 6:30 at night, and

5   he's going to try it six days a week with the jury,

6   and then on Sunday afternoons, have the lawyers in

7   to handle other matters. That's how he's trying to

8   press it into two weeks.

9        The case that we tried in Texas was

10   one that took about the same time as yours, maybe a

11   day or two less, but ultimately, I agree with Chris,

12   we've talked about it, and we think you could

13   probably try these in four weeks, especially having

14   already made many of the rulings that would be

15   repetitive without that much problem. I think all

16   the lawyers ought to be able to put it on without

17   overworking your staff and everything else.

18        THE COURT: Well, we're not going to

19   be trying it on Saturday.

20        MR. LANIER: Thank you.

21        THE COURT: That's not going to

22   happen.

23        MR. LANIER: Thank you.

24        THE COURT: We're not going to be

25   trying it on Sunday, and we're not going to be

1   routinely keeping jurors here until 6:30. That's

2   not going to happen either. I didn't do that well

3   with my rules in the first case. My rule number one

4   was everybody be nice to each other. It didn't work

5   too well. I'm going to still try rule number one

6   for the second trial. I think it's important that

7   we be nice to each other. Everybody has got enough

8   acute stress in their life without -- you have to

9   have a little bit of civility in your professional

10   life. You deserve better than to be constantly

11   attacked by each other. So, I expect civility from

12   everybody.

13        What I was considering was probably

14   something that's maybe even more arbitrary than

15   Judge Fallon, so, you probably won't like it, I

16   don't know. I'm thinking about it, I'm going to

17   keep thinking about it. One of my thoughts was to

18   limit witnesses, to put maybe time restraints in the

19   sense of four hours per witness on direct, a

20   maximum, and cross can't exceed the length of the

21   direct. So, if you have a witness on for an hour

22   for direct, you can have an hour of cross. If you

23   have the witness on for four hours, you can have

24   four hours of cross, but no more. Hopefully people

25   don't assume that they have to fill their four hours

1   or three or two. I don't know. I mean, that's just

2   a thought I had.

3        Most of the witnesses really do say

4   everything they need to say or could say within four

5   hours. You know, they repeat things. I know it's

6   the nature of the beast that you want to repeat, and

7   I can't say it's wrong, either. I mean, people

8   learn from repetition, so, I'm not foolish enough to

9   say to you, they don't need to hear it twice,

10   because if I was trying the case, I would want to

11   say it more than once, any point I want to drive

12   home. But I think that we may be able to work out

13   some rules or some time restraints. Maybe it should

14   be the quantity of witnesses, maybe it should be the

15   length. I don't know. I'm willing to discuss it.

16   Maybe it should be unlimited direct and cross, but

17   15 minutes of redirect and 15 minutes of recross. I

18   think that we have to look at some parameters. But

19   I don't think we should have witnesses on the stand

20   for three or four days saying what they've already

21   said the first day. The jurors don't like it, and

22   it is just not productive. So, I think we should

23   really try to work something out. I'm trying to be

24   sensitive to your needs and not -- I mean, I don't

25   want the jury to get half a case. I mean, I want to

1   make sure they get both sides' proofs. I don't want

2   to cheat anybody on their chance to present their

3   case. But on the other hand, I think we can do it

4   in a lot less time. So, I'm going to be open to

5   suggestions from counsel, and it may be that counsel

6   will be able to hopefully agree, because it's always

7   hard for me to impose these things arbitrarily, but

8   I'm hoping we'll be able to get some agreement and

9   do things that would move these cases faster from

10   the time that we use witnesses, to the stacks of

11   documents we gave the jurors. How could they read

12   200, 300 pages? Maybe we should agree to premark 50

13   documents each or something. I don't know. We have

14   to look at that.

15        But you really need to look at what

16   makes sense, you know, as far as if you've got some

17   document you really want them to look at, having it

18   in a stack this high isn't necessarily conducive to

19   having them ever look at it anyway. It's not going

20   to happen.

21        I also think that I'm going to invoke

22   the rules that state that if an issue is not in

23   dispute, you're not going to try it. In this case,

24   for example, there was a dispute about whether Mr.

25   Humeston actually took the drug or not. So, that's

1    always going to be a legitimate dispute.  But on the
2    other hand, the fact that somebody had a heart
3    attack on such and such a date, if it is not
4    disputed, it should be admitted before we start, and
5    we should go on from there as far as dealing with it
6    so that you don't have to call some witness or play
7    some tape to get in one piece of paper or spend a
8    half-hour questioning somebody to get in a document
9    that everybody knows should come in.  There is a
10   rule in New Jersey that says you have to show that
11   there's actually a genuine issue before you can
12   dispute.  Every single fact is just not disputed in
13   a case.  There are some facts that you can agree on.
14   I'm going to find out what those are before we
15   start.  We're going to have to agree to facts
16   because jurors shouldn't have to -- and it's not
17   going to be stuff like did he take the drug or not,
18   if that's an issue.  But I'm just saying that it
19   should be stuff that we -- it should be a lot of
20   stuff that just everybody knows is in.
21         So, we will learn as we go along.
22   We'll do better and better hopefully.
23         The other thing I said in the back
24   and I'm going to say it here is, there's been a
25   longstanding belief amongst defendants that they get

1    a better shot in Federal Court.  There's been a
2    longstanding belief amongst plaintiffs that they get
3    a better shot in State Court.  I don't think there's
4    any evidence that supports either one of those
5    positions.  I don't think it's true.  That being the
6    case, I've never been one, and I've said it, and
7    I'll say it again -- my cases are my cases.  I run
8    my own court.  I do what I want.  I'm not going to
9    defer to a Federal Court to tell me what to do with
10   my cases or how to handle them.  I had that from day
11   one.  On the other hand, that doesn't mean I'm not
12   going to cooperate and try to work with them and
13   work together.
14         We've talked about settlement.  I
15   mean, hopefully Judge Fallon and I and any other
16   State Court judges that are involved in these cases
17   can work together to reach settlements or to work
18   resolutions or get dismissals or whatever it is.  I
19   don't want to make it sound like I'm trying to force
20   Merck to settle.  I mean, whatever it is.  There's
21   certain things we should be able to  -- hopefully,
22   we'll be able to work it out.  So far we've been not
23   only just civil to each other, but believe it or
24   not, we've developed a bit of a rapport.  So, I
25   think we get along fine, and I think we'll be able

1    to work together.
2          I think it does a disservice to the
3    jury system and a disservice to The Court to suggest
4    repeatedly that the forum that's chosen, Federal or
5    State, makes a difference in the outcome.  It
6    cheapens the whole process.  It makes the whole
7    judiciary look bad.  I'm not just talking about PR
8    now, but I just don't believe it is true.  I think
9    in Federal Court you're going to get a fair trial,
10   and I think in State Court you are going to get a
11   fair trial most of the time.  Sometimes you are not
12   in both courts.  But most of the time you are going
13   to get a fair trial in both.
14         I guess Kline & Specter just sent in
15   their spreadsheet.
16         MR. BALEFSKY:  Your Honor, Lee
17   Balefsky from Kline & Specter.  I was told we sent
18   that in a couple of weeks ago.  I don't know why it
19   didn't appear.
20         THE COURT:  It is not on the sheet.
21         MR. BALEFSKY:  We have 180 cases,
22   Your Honor.
23         THE COURT:  If you have any cases
24   that fit the criteria of Jersey plaintiff, 18
25   months, send a letter in the next couple of days,

1    send your information to defense counsel and be here
2    on the 17th or 18th and pick your two cases that you
3    like.  I don't want a list of ten from you.
4          MR. BALEFSKY:  I understand.  Thank
5    you.
6          MR. WEITZ:  Your Honor, Perry Weitz
7    from Weitz & Luxenberg.
8          Your Honor, first of all, to address
9    what The Court just said about State Court cases and
10   Federal Court cases, I think that there were a lot
11   of mischaracterizations by the media about that, and
12   I think it is important for this Court to know and
13   Judge Fallon to know that the lawyers that have the
14   majority of State Court cases and have been filing
15   them here and have always planned on filing them
16   here didn't change any opinions based upon some
17   crazy theory about Federal Court jurors versus State
18   Court jurors because it would depend upon where
19   those cases would be remanded, which is the mandate
20   of the Federal Court or District Court.  So, anybody
21   who said that probably was somebody from the media,
22   because I can't really see any lawyer that's
23   litigated in both Federal Court and State Court
24   making a statement like that, because, quite
25   frankly, it really would depend upon so many

1  factors.  So, I would agree with The Court that
2  there is no basis for that, and that was not the
3  basis for the lawyers filing in New Jersey State
4  Court or in Federal Court.
5          I think that for at least the lawyers
6  that I know of that have filed and are continuing to
7  file in New Jersey State Court, they have offices in
8  New York or New Jersey.  They always planned on
9  filing their cases in State Court in New Jersey, and
10  so I would just hope that Your Honor and Judge
11  Fallon doesn't read too much into some of the
12  media's mischaracterizations because nobody at least
13  that I know and from my firm and from some of the
14  other firms that I've been working with ever planned
15  on filing their cases in any other place and don't
16  believe that there's a great disparity between
17  Federal Court jurors and State Court jurors, because
18  we've tried cases all over the country in both, and
19  there is none.  So, it might be the way that one
20  judge expeditiously handles a case in one Federal
21  Court versus another Federal Court, one State Court
22  versus another, but it has nothing to do with a jury
23  pool.  So, I would just think that it is important
24  that this court knows that from us.
25          In addition, Your Honor, I saw that

37

1  our name or my firm's name was not on that list that
2  was provided.  In working in consistency with The
3  Court's lower stress theory and in civility, I just
4  called my office where there will be no civility and
5  the stress factor would be very high considering our
6  name is not on here, and I ran reported me as I ran
7  out for a second that we have filed approximately
8  500 cases with The Court, but the fact sheets were
9  sent to the defendants.
10          THE COURT:  Oh, I don't get the fact
11  sheets.  This is a separate database.
12          MR. WEISS:  Spreadsheets.
13          MR. WEITZ:  So, for some reason --
14          THE COURT:  No, your cases -- I don't
15  want anybody to think -- your cases are filed once
16  the complaint is filed.  We have you all in the
17  system.  Your case is there.  As far as Trenton is
18  concerned, the Court system is concerned, being in
19  this database has actually no effect.  This is a
20  personal database that I'm using for me.  But the
21  instructions for that, I did post an order on
22  Lexis/Nexis saying everyone was to use the database,
23  and it did have an instruction sheet asking you to
24  put your cases on there.  But it is no big deal.  If
25  they are on there tomorrow, we will print out new

38

1  printouts.
2          MR. WEITZ:  But I think it is a big
3  deal, because I think it is important that the
4  plaintiffs do have an obligation to provide The
5  Court and the defendants with that information so we
6  can expeditiously --
7          THE COURT:  Don't start sending me
8  500 fact sheets.  I don't want your fact sheets.
9          MR. WEITZ:  But you want the database
10  information.  I think it is important we get that so
11  The Court can identify the cases they want on trial.
12          THE COURT:  He did it on nice little
13  drop downs.  All you have to do is check heart
14  attack or whatever.  We try to make it really easy
15  for everybody.
16          MR. WEITZ:  Well, I apologize to The
17  Court for not getting that information to The Court.
18          THE COURT:  Don't be mean to your
19  staff though.
20          MR. WEITZ:  No.  That's why I ran
21  outside, because I was jumping out of my seat
22  because I didn't understand why they hadn't provided
23  that information.
24          THE COURT:  I mean, we may have
25  missed somebody, too.

39

1          MR. DASSOW:  Judge, I'll admit I was
2  mean to my staff.
3          MR. WEITZ:  But they have to make
4  sure The Court has that information hopefully by the
5  end of the week so that we can participate in the
6  trial that will be coming up and provide the
7  defendants with whatever information as far as
8  authorization.
9          THE COURT:  You can talk to Carmen,
10  you can talk to Heather, you can talk to Dennis
11  directly.  Dennis Medwick is in --
12          MR. SEEGER:  Middlesex.
13          THE COURT:  -- Middlesex.  He's
14  always available to talk.  He's a computer tech
15  person that's been assigned to all the mass torts.
16  He was just assigned to Judge Corademus.  He's now
17  assigned to all three mass tort judges, and he does
18  whatever we need him to do.  But he's doing this
19  database.  This is the unofficial listing.  This is
20  for us to play with.
21          MR. WEITZ:  Thank you, Your Honor.
22          MR. MAYER:  I wanted to ask The
23  Court whether you've given any thought to how the
24  program you've outlined today affects the wave
25  discovery program we're on where I guess you have

40

1   the three first test cases that are already worked
2   up and ready to try, we have another wave of cases
3   that are sort of sprinting towards deadlines in
4   February and so on, which was set up with the idea
5   of your deadline of December, and so it was set up
6   with the idea of generating cases to try, but if
7   they are not going to get to trial, then we may have
8   to look at those.
9         THE COURT:  Well, I've said all
10  along, I don't want to say that we have five cases,
11  therefore, the other 3,000 are being ignored.  We've
12  got to keep moving all the cases, and the logical
13  way to move -- other than those that we pick out for
14  special purposes for trial, the others all have to
15  be moving along.  The way to move all the others
16  along is probably in time frame priority, the
17  earliest files going along.
18        Of the 30-month cases, I have to say,
19  those cases that have now been filed for 30 months,
20  I did a listing of those, too, and I have -- first
21  of all, there are three gastrointestinal cases, and
22  there's probably 50/50 heart attack and stroke.
23  Right now, the ones that are over 30 months old
24  concern me, I'm not going to jump to the front of
25  the list, but I am concerned about gastrointestinal

1   as a group, and I want to have those -- I mean, I
2   want to know, and I'm not disparaging those cases, I
3   want to know whether you've got the experts and you
4   intend to pursue them or not.  The way we're going
5   to do that is at the same time we're doing this, I
6   want to have deadlines for the gastrointestinal,
7   general experts, you know, I want to look at the,
8   quote, other -- I mean, what are these cases, what
9   are they claiming if they haven't had a heart attack
10  or stroke or gastro, the gastro cases.  I do want to
11  weed out those cases that should be weeded out.  If
12  it turns out that there's strong, you know -- it
13  doesn't have to be strong.  It just has to be strong
14  enough to get past the motion, and you have the
15  experts, but I'm not going to just let cases just
16  park and ride along.  We have to know whether the
17  cases have value or not or whether they should be
18  dismissed.  So, I think we had a briefing scheduled
19  for gastrointestinal cases submitted?
20        MR. COHEN:  Yes.
21        THE COURT:  Is there any objection to
22  that?
23        MR. WEISS:  I think there are some in
24  the first wave, and we agreed amongst ourselves to
25  move them back to the second or third wave, and we

1   have been submitting case specific reports, expert
2   reports in the gastro cases.  I know there's one
3   here for summary judgment, the Boyd case.  It's on
4   the agenda.  And we understand it, and we are moving
5   towards that.  The APPROVe data, Your Honor, has
6   changed the landscape a little bit for GI cases.
7        MS. FREIWALD:  Your Honor, I'm just
8   looking at the schedule.  It looks like our motion
9   is due the 18th, and the plaintiffs have a February
10  response date.
11        MR. CORONATO:  December.
12        MS. FREIWALD:  I'm sorry, December.
13        THE COURT:  The response is not going
14  to be we need more time or we need more experts --
15        MR. WEISS:  No.
16        MS. FREIWALD:  That's one case.
17        MR. WEISS:  That's one case.
18        MS. FREIWALD:  What we've certainly
19  done in other litigation, Your Honor, even in
20  advance of the case being fully worked up, we've had
21  plaintiffs come forward with expert reports on the
22  prima facie issue of whether anybody is going to
23  support there was a failure to warn, for example, on
24  a GI case and whether a person actually had the
25  injury.  And that kind of circumvents the need to do

1   some of the extensive discovery if the expert report
2   doesn't come forward.
3        As Your Honor knows, though, we do
4   have a lot of of cases that we've worked up that are
5   due for expert reports.  The plaintiffs have
6   provided their reports, and our reports are due
7   December 9th.  There are several heart attack cases
8   in that group, and maybe Your Honor wants to save it
9   until the 17th.  But I think we would like the
10  opportunity to talk about the representativeness of
11  those cases and putting them into the mix since a
12  considerable amount of work has been done on those
13  cases.
14        THE COURT:  Okay.  We'll talk about
15  it on the 17th.
16        MR. WEISS:  Your Honor, there are six
17  or seven waves of cases that have been moved, not
18  just one.  Most of them do not involve New Jersey
19  plaintiffs, but we have been providing expert
20  reports on a timely basis to Merck's counsel.
21        THE COURT:  If defense wants to waive
22  conflict of laws issues, then we can widen the
23  database.
24        MS. FREIWALD:  I'm not saying that,
25  Your Honor, but there is an issue --

Transcript - Monthly Status Conference (2005/11/07)

1      THE COURT:  I'm just saying I have a
2  legitimate reason why I'm choosing New Jersey
3  plaintiffs.
4      MS. FREIWALD:  I understand.
5      THE COURT:  I think that reason is
6  not going to continue that long.  I think the
7  appellate division is going to come down in 30 --
8  well, I don't think they will come down in 30 days,
9  but I think they will come down in 90 days or six
10 months at the outside with a decision on that.  It
11 is an interlocutory appeal.  They generally treat
12 them much faster, and that will give us some
13 guidance, and then we may open up to other kinds of
14 cases.
15     MS. FREIWALD:  Abdel-Malek is a New
16 Jersey plaintiff.
17     THE COURT:  Abdel-Malek is a New
18 Jersey plaintiff, but I just got -- the wife is
19 divorcing him at the present time, counsel is
20 conflicted between he's represented both the husband
21 and the wife and they are fighting with each other.
22 That makes Abdel-Malek not my favorite case because
23 I don't really want to get into family court here
24 with the wife here with her lawyer and the husband
25 here with his lawyer.  That's a problem for me.

45

Transcript - Monthly Status Conference (2005/11/07)

1  That doesn't mean we're not going to try
2  Abdel-Malek.  We're going to have to.  I don't know
3  if we have to try it in the middle of the divorce
4  trial.  Maybe the divorce will be over and then
5  we'll try it.  But that's why Abdel-Malek sort of --
6  I know there's another one, Kimmelman.
7      MR. WEISS:  Right.
8      THE COURT:  Isn't Kimmelman a New
9  Jersey plaintiff?
10     MR. WEISS:  Yes.  Kimmelman is a New
11 Jersey plaintiff, but he's a short-term use, and
12 Abdel-Malek is not 18 months either, it is 7 to
13 8-month use, and they dispute that.  So, you are not
14 going to get what you are looking for.  You already
15 had a short duration trial.
16     THE COURT:  I'm looking for an
17 18-month trial at this point, but I'll listen to you
18 though.
19     MS. FREIWALD:  Fair enough.
20     Thank you, Your Honor.
21     THE COURT:  Is there anybody else who
22 wants to address me on this issue or has a problem?
23 If you don't know about the database and you don't
24 understand what you are supposed to do, please call
25 my secretary or Dennis Medwick directly and find

46

Transcript - Monthly Status Conference (2005/11/07)

1  out.
2      Mr. Ferrara?
3      MR. FERRARA:  Good morning, Your
4  Honor.
5      Your Honor, as a housekeeping matter,
6  Merck had submitted an order under the five-day rule
7  dealing with discovery issues, and we objected to
8  that being decided under the five-day rule, and we
9  asked by letter of August 19th to have that disposed
10 of, and Your Honor was tied up with other matters.
11 So, we've asked for that to be revisited even though
12 the order was actually signed by Your Honor in the
13 middle of the trial.
14     THE COURT:  I signed it?
15     MR. FERRARA:  We just would like --
16 that's the order that set down a bunch of discovery
17 dates for the early cases going out to late '06, and
18 that was my argument, that if --
19     THE COURT:  I remember your letter.
20 We're not going to keep doing that.  We're not going
21 to get set -- that schedule is definitely going to
22 have to be revised.
23     MR. FERRARA:  The only thing I'm
24 asking, Judge, is if you would vacate that order for
25 the time being, and then we can discuss it at a

47

Transcript - Monthly Status Conference (2005/11/07)

1  conference or something.
2      MR. WEISS:  Well, Your Honor never
3  signed that order, and what it was, Your Honor, it
4  was the extension of the third amended order of
5  waves of getting cases ready for trial.  There is no
6  order after the --
7      MR. FERRARA:  There was.
8      MR. CORONATO:  No.  It is the third
9  amended discovery order, Your Honor.  That's the
10 order that Mr. Ferrara objected to.
11     MR. WEISS:  It's August 26, 2005, and
12 it doesn't go past cases --
13     MR. FERRARA:  March '04.
14     THE COURT:  Look, I'm thinking that
15 the November 17th date, we're going to stick to this
16 trial selection.  We'll have a December conference.
17 In the December conference, we will try to set
18 discovery deadlines for other cases.  I'll try to
19 deal with the group of cases.  Again, we don't need
20 two years to work up a case anymore.  That's just
21 not going to happen.  We don't need it.  But I also
22 don't want to put you in a position where you have
23 500 cases you have to work up in 90 days.  That's
24 not fair to counsel, for plaintiff or defense.  So,
25 even though I think you could probably work up any

48

**Page 49**

1  one of these cases in 90 days, I can't make -- you
2  can only do so much.  So, I'm not going to push
3  that.  But we'll work that out in December.  We'll
4  try to work out another schedule for that.
5       So, I agree with you, Counselor, that
6  setting discovery and dates for 2006 for -- or
7  continuing out three years is probably not going to
8  work.
9       MR. FERRARA:  Thank you, Your Honor.
10      THE COURT:  It is not the way it
11  should be.  So, I agree with your issue, and we're
12  going to have to revamp that.  I haven't really had
13  the time to think about that yet, how to do that,
14  but we'll do it.
15      MR. MAYER:  Do you have a date yet
16  for the December conference?
17      THE COURT:  No.  We'll pick a date.
18      MR. STEIN:  Good morning, Your Honor,
19  Steve Stein, Levin Simes & Kaiser.
20      I didn't hear you.  Did you say that
21  Your Honor is going to be revising the dates that
22  were set for the wave two, wave three, wave four and
23  those dates?
24      THE COURT:  Have any of those
25  finished?  Are wave ones done?

**Page 50**

1       MR. WEISS:  Wave ones for the
2  plaintiff are done.  Merck has until December 9 to
3  supply expert reports and rebuttal.
4       I think wave two is due in
5  January/February, and we're moving forward on that.
6  But so everyone understands, at the end of the
7  order, it says discovery deadlines for any cases
8  filed after March 31, 2004 will be established in a
9  subsequent order, and there's no subsequent order
10  afterwards.  So, that only applies to cases that
11  were filed before March of 2004.
12      THE COURT:  No.  I would like to keep
13  moving on those.  If you have 30 cases and they are
14  in the first wave, I want to have those ready,
15  banked, ready to go.  Like I said, at some point we
16  may decide we need to send 50 cases out at once and
17  get them tried.  If that happens, I want to have a
18  bank of those -- I'm not going to just put things on
19  hold.  We have to keep moving.  So, I think the
20  first phase and second phase, yes, you still have to
21  stay on schedule.  Is that okay?
22      MR. STEIN:  I'm going to have an
23  application on the Starr case which is before you
24  later, Your Honor, to move it from wave two to wave
25  four because of things that have occurred and a

**Page 51**

1  motion that's pending.  So, I'll make that later
2  when Your Honor takes up the Starr case.
3       THE COURT:  Have you talked to
4  defense about it?
5       MR. STEIN:  The problem that I have
6  to face is that on December 9th, our plaintiffs'
7  expert reports are due.  Due to the working out of
8  protective order issues, the depositions of the treating
9  prescribing doctors, the deposition of the treating
10  Doctor has not been taken because it is all out of
11  state.  So, not having taken those depositions, we
12  have some difficulty now getting our expert reports
13  to be served on December 9.  I think the issue of
14  the protective order where there's been a lot of
15  need to confer is working towards resolution, and it
16  is before Your Honor to discuss today, but I'm
17  looking to move that one case called Starr versus
18  Merck from December 9, wave two, to make it a wave
19  four case because those depositions could be
20  taken.  We need those for our expert reports.
21      THE COURT:  Any objection to the one
22  case being moved?
23      MR. COHEN:  No.
24      MR. BARNETT:  No, Your Honor.
25      THE COURT:  Just submit an order that

**Page 52**

1  moves it.
2       MR. STEIN:  That moves Starr from
3  wave two to wave four?
4       THE COURT:  Yes.
5       MR. STEIN:  Thank you, Your Honor.
6       THE COURT:  Don't send me an order
7  that says it is moved from wave one to wave four.
8  Send me an order saying --
9       MR. STEIN:  Yes, Your Honor.
10      THE COURT:  Send me an order saying
11  that the --
12      MR. STEIN:  Thank you, Your Honor.
13      THE COURT:  -- are as follows for
14  this case.
15      MR. WEISS:  That was item 4 of our
16  agenda.
17      THE COURT:  Which is the Starr case?
18      MR. WEISS:  No.  The Starr case
19  brought it up.  It is the question of out-of-state
20  prescribers that are being deposed, and Merck
21  insists or their counsel insists or the doctors'
22  counsel that they sign the MDL confidentiality order
23  and not the New Jersey order, and that was the rub
24  in this case.  And Mr. Stein wouldn't agree, Merck
25  wouldn't agree to have the same order in place, so,

1  the documents couldn't be given to the doctor, and
2  that's why it's on the agenda.  I don't understand
3  why we can't have -- both orders are comparable.  I
4  don't see the problem.  But Merck can speak to that.
5          THE COURT:  This is another issue
6  that I sort of wanted to address.
7          You can still submit yours.
8          MR. STEIN:  On the date, but did Your
9  Honor want to hear the issue on the protective
10  order?  Because it does apply to other cases, and it
11  is sort of a gap in the New Jersey protective order.
12  And the problem comes up when the out-of-state
13  attorney says we don't to submit to the protective
14  order of New Jersey -- we, attorneys, don't want to
15  submit to New Jersey, and we don't want to submit to
16  the MDL.
17          THE COURT:  Who is objecting, the
18  doctor, the treating physicians?
19          MR. BARNETT:  The doctors' counsel,
20  Your Honor
21          MR. STEIN:  The doctors have retained
22  physicians when their depositions were set.  The
23  attorneys --
24          THE COURT:  Let me ask you something.
25  What's being given to these doctors that should be

1  protected anyway?
2          MR. STEIN:  It could be something as
3  simple as the call sheets, for example.
4          MR. BARNETT:  Your Honor, excuse me,
5  it is not limited to just call notes.  It is other
6  documents as well.  The reality is, we had an
7  agreement with counsel that we were going to pull
8  back this issue in an effort to try to resolve it,
9  but for whatever reason, it was put on the agenda.
10  We are prepared to discuss with Mr. Stein or Mr.
11  Weiss a way to try to resolve this, and I think we
12  should postpone further discussion on this until we
13  have a chance to talk to counsel.
14          MR. COHEN:  This is a classic
15  conference issue, Your Honor.  We can talk to you
16  about where we are and the progress we've made and
17  where we think this is going to go.
18          MR. WEISS:  That's fine with me, Your
19  Honor.
20          MR. STEIN:  That's fine, Your Honor.
21  As long as we don't have the pressure of that --
22          THE COURT:  We're going to break for
23  lunch.  We'll meet back at 1:00.
24          December 15th at 10:00 is the next
25  conference for everybody, and at that point we'll

1  talk about discovery dates for everything, and we're
2  going to try to set some limits.
3          At 1:00, if you want to be here,
4  you're welcome to be here.  If you want to leave,
5  we're going to address what's on the rest of the
6  agenda at 1:00.  If counsel can confer and there's
7  some items you want to confer on at 1:00, instead of
8  having me talk and you see if you can work things
9  out, that will be helpful.  I would like to see you
10  work things out.
11          The thing I hate the most about the
12  case is the protective orders and fighting over what
13  can and can't be.  It's really time consuming and
14  not -- I don't know.  But let's see if you can work
15  it out.  If you can't, then we may have to address
16  some of those issues.  But I don't know if
17  something has been in the New York Times or flashed
18  on a screen and sent out over TV.  I hope that's not
19  what we're talking about.  Those things that have
20  been introduced in evidence at a trial are no longer
21  protected, and we should have an order to that
22  effect.  You shouldn't have to worry about anything
23  that's been shown at trial already that another
24  scientist is going to talk to another scientist
25  about it or that a doctor is going to look at it.

1  We've got to get away from that.  No need to keep
2  protecting everything.  That doesn't mean there
3  aren't some items that you need to have protected.
4  All right?
5          I'll meet you back at 1:00.  If you
6  need more time yourselves before then, let me know.
7              -  -  -
8          (Whereupon, a luncheon recess was
9          taken from 12:03 p.m. until 1:29 p.m.)
10             -  -  -
11          THE COURT:  Let's go quickly down the
12  agenda.
13          The deposition scheduling with the
14  coordination with the MDL.  You've listed specific
15  people, Marty Carroll, Laura Demopoulos.  Is there
16  any problem with those four people?
17          MR. MAYER:  I can go through those
18  four people.  Each one really is a different
19  situation.
20          Mary Ellen Basaman, her name now --
21  that's her maiden name.  Her name is Mary Elizabeth
22  Blake now.  We've offered dates for her at the end
23  of November, November 29 or 30.
24          MR. JACOBY:  That's fine, Your Honor.
25  That's good.

1      MR. MAYER:  Ms. Beauchard is ill.
2   She was in a bad motorcycle accident and was
3   recovering from that and then was diagnosed with
4   breast cancer, and I think she's getting scheduled
5   now for chemotherapy.  So, her situation is kind of
6   a separate one.
7      THE COURT:  Is there any
8   justification for taking her deposition if she has
9   cancer?
10      MR. JACOBY:  Say it again, Your
11   Honor.
12      THE COURT:  If she's in that
13   situation, we probably don't need her dep.
14      MR. JACOBY:  I would think not.  She
15   has other things to concern herself with.
16      We'll work that out.
17      MR. MAYER:  Dr. Demopoulos is a
18   nonparty.  She's a former Merck employee, and we
19   haven't been successful in reaching her.  We think
20   it's likely that she'll want Merck counsel to
21   represent her, but we do not know, and we haven't
22   been successful in reaching her, so, that's where
23   that one stands.
24      THE COURT:  You don't know where she
25   is?

1      MR. MAYER:  We know where she is,
2   but -- we have an address for her and a number for
3   her --
4      MR. BUCHANAN:  We'll submit a
5   commission, Your Honor.
6      THE COURT:  All right.  Submit the
7   order for commission.
8      MR. MAYER:  The fourth one is Marty
9   Carroll.  That was one that had been noticed in the
10   MDL for October 27th.  We cross-noticed it on
11   September 21 through File & Serve here.  I guess
12   just on the eve of that deposition, we heard from
13   plaintiff's counsel that they were objecting to
14   participate in that, and they didn't participate in
15   that, and then they noticed a separate deposition.
16   So, we both believe that they were -- there's two
17   issues on that.  One is, we do believe they should
18   have cooperated under the MDL protocol and used the
19   time that he was there, and that's subject to the
20   motion that they have filed which we can respond to
21   on the schedule.
22      In addition, Mr. Carroll himself, who
23   is a former employee, is an executive with another
24   company and lives in Connecticut, has said he will
25   not appear voluntarily for this deposition.

1      So, we have an issue, and Mr. Carroll
2   has a separate issue.
3      MR. JACOBY:  Your Honor, I think Mr.
4   Placitella has already indicated, and I'm not going
5   to repeat what he said about the difficulties that
6   we have.  We would love to coordinate, but it is a
7   seven-hour deposition, and for us to sit and wait
8   and see, hopefully -- this witness has a wealth of
9   information, and to sit and wait and see if we can
10   get 10 to 15 minutes at the end of the deposition
11   with the odds being that we won't really is not
12   going to satisfy anybody's purposes.  It is not
13   going to get anything accomplished, and we would --
14      THE COURT:  How long --
15      MR. MAYER:  The deposition was one
16   day.  There were people there from the MDL, I think
17   people there from other state cases, and the
18   deposition finished.  The MDL plaintiffs finished.
19   I'm not sure if there was -- I wasn't there.  I'm
20   not sure if anybody else piped up with additional
21   questions, but at the end of the deposition,
22   everybody who was there was done, and the deposition
23   was closed.
24      On the broader issue, what we were
25   trying to encourage, and we know that plaintiffs in

1   other state cases are doing this, is that they talk
2   to each other.  There's an MDL discovery committee,
3   a lot of those people -- an MDL steering committee.
4   A lot of those people have cases here, too, which is
5   well known to the liaison counsel here, and there's
6   overlap, of course, with the liaison counsel here.
7   So, there's an ability to have information for them
8   to talk to each other, and we have had occasions now
9   where the MDL plaintiffs have said, you know, we
10   just need a day, but we know there are state
11   plaintiffs who want to examine, can you get a second
12   day back to back, if possible, that sort of thing.
13   We've been not always agreeing that that's
14   necessary, but in the cases where they have
15   requested it, we have actually done it so far.  And
16   there was a deposition that was commenced the other
17   day of Gilbert Block, which is going to go to a
18   second day, an MDL deposition.  We've talked to Mr.
19   Buchanan about when that's likely to be scheduled,
20   and we'll cross notice that second day and see how
21   it works out.
22      MR. BUCHANAN:  That deposition
23   actually highlights some of the difficulties with
24   crossnoticing.
25      MR. MAYER:  There was an issue in

1  that one because we noticed it, and then the
2  plaintiffs wanted to move it. When it was moved,
3  the cross notice -- a new cross notice wasn't
4  served.
5       MR. BUCHANAN: There wasn't a cross
6  notice served in the New Jersey plaintiffs, so there
7  was no New Jersey representative in the first day.
8  We did learn about it from the day before.
9       MR. MAYER: There had been one for
10 the original date, but not the second date. It does
11 seem to me there needs to be a situation where both
12 the plaintiffs in the MDL and the state cases will
13 talk to each other. We know that's been happening
14 with other state coordinations, and so that's really
15 what we're saying, is talk to each other, let us
16 know what you need.
17      THE COURT: How is it working out
18 with the MDL plaintiffs?
19      MR. BUCHANAN: In what sense, Your
20 Honor?
21      THE COURT: Well, if you tell them
22 that we want to question first or have you
23 discussed with them parameters? Has it worked ever?
24      MR. BUCHANAN: I don't think that
25 conversation has happened. I've been out of

1  commission, as you know, for the last eight weeks or
2  so, and the MDL just started taking deposition
3  depositions, I believe, in September or October.
4       MR. MAYER: I don't think that's
5  happened yet.
6       MR. BUCHANAN: The issue had not
7  arisen prior to that point in time. I know for
8  Block, for example, there was an interest for some
9  New Jersey lawyers to attend to cross-examine and to
10 have a designated New Jersey examining attorney. I
11 don't know when the MDL plaintiffs will pass the
12 witness to New Jersey so that we'll have an
13 opportunity to examine. Obviously, we're
14 constrained by Your Honor's rule to not ask
15 nonduplicative questions. I am not sure how that's
16 all going to dovetail together. That will be the
17 first test in terms of how we're coordinating in
18 terms of examining.
19      The big issue is making sure there's
20 enough time to allocate time to both New Jersey and
21 the MDL. I know this is being discussed at the
22 federal level, I haven't been involved in those
23 communications, but making sure that when you
24 produce a witness -- and presumptively, Judge
25 Fallon's order only allows, I believe, six and a

1  half hours for exam. The question is, is that
2  witness going to be able to be examined by the MDL
3  New Jersey lawyers who are cross-noticed, other
4  state lawyers, physicians who attend -- physician
5  counsel who attend, plus a direct by the defense.
6  If that window is not sufficient, are you going to
7  expand it to allow sufficient time to allow all
8  those things to happen? I mean, I think that's
9  something that needs to take place to allow a
10 deposition to conclude when you cross notice it that
11 way. We will be working with the MDL to make sure
12 that New Jersey has an adequate opportunity to
13 conduct their examination.
14      THE COURT: Well, who sent out these
15 notices for Marty Carroll, for example?
16      MR. KRISTAL: Your Honor, that was a
17 joint -- I'm sorry, my name is Jerry Kristal from
18 Weitz & Luxenberg.
19      Chris Placitella with a number of
20 other signatories had sent out the deposition
21 notice. We were then informed that it had been
22 cross-noticed, and then the issue arose via e-mail
23 communication as to whether or not New Jersey would
24 have sufficient time. I think to answer the last
25 question you asked, Judge Fallon's order, which is

1  appended to our motion for protective order mandates
2  that the MDL attorneys go first. I think that was
3  your question, whether New Jersey could go first
4  during some of those depositions.
5       THE COURT: Well, I said before, I
6  don't see it that way. For the MDL deps, it is
7  nice. For the New Jersey deps, I don't see that the
8  MDL goes first. I mean, not every time. I don't
9  see that. That's not the way I look at this.
10      MR. MAYER: Our intention going
11 forward is going to be cross-noticed either way. We
12 will hope that the counsel in both cases will talk
13 to each other.
14      THE COURT: I think if New Jersey
15 notices Marty Carroll, then New Jersey takes the
16 dep. If they want to cross notice the MDL, fine.
17 It is a New Jersey dep. If the MDL people want to
18 participate, fine.
19      MR. MAYER: In the Carroll case, the
20 MDL plaintiffs noticed it first, and we cross-noticed it
21 with more than a month notice, and it was on the eve
22 of the deposition that we got the objection.
23      MR. BUCHANAN: Was it recross-
24 noticed, Ted?
25      MR. MAYER: It was never rescheduled.

1   It was only scheduled for the one day.  The original
2   notice was for October 27.
3           MR. BUCHANAN:   That's the issue we
4   ran into with Block.  It doesn't sound like it was
5   in Carroll where it was originally set for a day,
6   and New Jersey was cross-noticed, and it wasn't
7   renoticed.
8           Ultimately we'll work through these
9   hiccups, but we do need time for Mr. Carroll.
10          THE COURT:  I understand it's a
11  problem -- it is a waste of everybody's time to ask
12  the same questions.  It is a waste of everybody's
13  time to have separate MDL deps and state deps.  I'm
14  not advocating for that.  But I don't think that
15  means New Jersey plaintiffs have to sit back and
16  take only deps when the MDL is ready to take them
17  and only take them after they are done questioning.
18  I don't think they should be put in that kind of a
19  position, especially when there's, you know, more
20  cases in New Jersey than in the MDL at this moment.
21  Now, that may not continue.  But either way, it
22  doesn't make any difference.  The bottom line is,
23  they are entitled to get their dep time, and that's
24  not necessarily -- a half-hour at the end of the dep
25  is not their dep time.

65

1           MR. MAYER:   To me, the main point is
2   that they need to talk to each other and coordinate.
3   I know Judge Fallon feels very strongly about that
4   as well, and the timing will depend on the
5   individual deposition.  As I said, there are some
6   depositions coming up where the MDL plaintiffs said
7   they knew that there was state plaintiffs who wanted
8   to examine, asked us to get two days and, you know,
9   that's happened.  So, that will be something that
10  will be --
11          MR. BUCHANAN:   I think as a general
12  matter, it's a good idea, Ted.  I think you're one
13  of the people with the most knowledge in terms of
14  what's happening when, and certainly in my absence I
15  wasn't wearing both hats at that point in time, but
16  now that I'm back, I can help assist with that.  But
17  given your position as being the -- I don't deal
18  with any of the other state counsels, for example, I
19  don't know what's happened in the Texas coordinated
20  proceeding, what's happening in California.  So, you
21  are at the center of that hub to know what those
22  other state's counsel expressed in terms of needs to
23  examine.  So, in many respects, I think we're going
24  to count on some information from you as to how much
25  time you are planning on offering the witness to us

66

1   for examination.
2           MR. MAYER:  But I probably won't have
3   that input on the need to examine.  I will know the
4   dates that have been proposed to the MDL.  I'll know
5   the dates that have been proposed on any witness,
6   and I'll know when the MDL accepts them.
7           MR. BUCHANAN:   I just don't want the
8   onus to be on us to track down everybody who you
9   have cross-noticed to figure out how much time
10  they're going to need, to figure whether we have to
11  make an application to get a date with a witness.
12          MR. MAYER:  But it seems to me that
13  onus in an MDL deposition should be on the MDL
14  plaintiffs' committee to figure that out.  That's
15  where it's been put, I think, by the judge's order,
16  to reach out to the states and figure out what
17  people want.
18          MR. BUCHANAN:   Okay.  I haven't worn
19  that hat in a couple of months, so, I'll have to
20  read the order again.
21          THE COURT:  I think what we have to
22  do --
23          MR. MAYER:   I'll be as helpful as I
24  can to that process.
25          THE COURT:  I think, for example,

67

1   with Carroll, he's already done in the MDL; right?
2           MR. MAYER:   Yes.
3           THE COURT:  And not done in the
4   state.  So, commission -- get a commission and get a
5   subpoena and take his dep.
6           MR. MAYER:   Fine.
7           THE COURT:  With the other witnesses
8   coming up, if a New Jersey attorney asks for the dep
9   first, then I think that there should be a New
10  Jersey deposition.  If that can be coordinated with
11  the MDL so you only have to do one, that's great.
12  If the MDL notices it first and probably -- I mean,
13  it should be whoever notices the dep should get to
14  take the dep.  And I don't care, like if it's --
15  actually, if it's like Chris Seeger, he's on both
16  MDL and state, isn't he?
17          MR. BUCHANAN:   Yes.
18          THE COURT:  So, if he takes it, he
19  takes it for both, which is great.
20          But if there's any kind of conflict,
21  I think it comes down to first come and first serve.
22  Then the other one has to read the transcript --
23  that doesn't mean that if the MDL takes the dep,
24  that the New Jersey plaintiffs aren't entitled to
25  take their own dep, too, they are.  And it would be

68

1 preferable not to have a whole separate day, so, it
2 would be preferable if they are given time at the
3 end of the MDL dep. But "the end" does not mean at
4 4:30, you can ask ten questions. That's not an
5 appropriate deposition. I don't know how the best
6 way to work that out is. I don't know if the best
7 way is to say, do your MDL thing, then plaintiffs'
8 counsel from New Jersey can read the transcript, and
9 if they have issues that they want to address, maybe
10 we shouldn't be scheduling them two days in a row,
11 maybe we should just wait, let New Jersey read the
12 deps. I don't think they're going to want to
13 reinvent the wheel. If they are happy with the dep,
14 they won't retake it. If they aren't happy with the
15 dep and find additional issues, then you are going
16 to have to produce the person a second time for a
17 second dep. That's one way to handle it. I don't
18 know that that's the fairest or most logical way. I
19 mean, I would like to see it work out that -- and I
20 do think, again, plaintiffs' counsel -- I mean,
21 there is an overlap. Some of the plaintiffs'
22 counsel is the same counsel in both, so, I would
23 think you would be able to work out something with
24 yourselves. I think State Chris and MDL Chris
25 should be able to schedule his dep the same day;

1 right?
2           MR. KRISTAL: May I say one thing so
3 you have the complete picture unless you are aware
4 of it. We are also trying to work out with the MDL
5 an issue of State Court assessments, because one of
6 the assessment options -- and I don't want to get
7 too deep into it. But if you use MDL work product,
8 you may be subjecting your State Court cases to an
9 MDL assessment. So, we're trying to work through
10 that with the MDL, because it doesn't make sense, as
11 Your Honor has pointed out, to take a duplicate dep.
12 That's ridiculous. On the other hand, if a State
13 Court plaintiff may use portions of an MDL dep, what
14 effect that has on assessment needs to be addressed
15 now. And we're working through that.
16           THE COURT: Well, have we assessed
17 any fees for -- I mean, there were like 20 deps
18 taken at least here; right?
19           MR. BUCHANAN: We probably took 40
20 or 50.
21           THE COURT: Are the MDL plaintiffs
22 paying New Jersey counsel for this?
23           MR. FERRARA: Judge, if we may, can
24 we deal with that without the Merck lawyers being
25 present, please, maybe at the end of the day --

1           MR. MAYER: That's fine with us.
2           MR. FERRARA: -- the whole assessment
3 questions you are asking, because we don't think
4 Merck should be part of that discussion.
5           THE COURT: Okay. But I'm just
6 saying, I don't know whether that's a good rule.
7 I'm not questioning Judge Fallon's decisions. I'm
8 just saying, just because you use one of their deps,
9 I don't know that you should have to pay for
10 everything they do in the MDL or a percentage. I'm
11 not sure why that would be, unless they are paying
12 for a percentage of what they got from here. In
13 this particular case, they got more from the state
14 than the state got from them. I know that's not
15 usually true, but it happened here.
16           MR. KRISTAL: We think we can work
17 that out, and it probably is best to be a plaintiff
18 discussion.
19           THE COURT: I hope so. I would
20 prefer not to be in it.
21           MR. MAYER: From our point of view,
22 we think it's going to be very disruptive to have
23 multiple depositions of the same witnesses, so that
24 if the depositions should be scheduled one time, the
25 examination time should be worked out. They should

1 be back to back where that can be worked out. So,
2 if it has to go two days, where we can work it out,
3 it should be back to back days. It is not always
4 possible, but it is much more efficient to do it
5 that way.
6           THE COURT: Let's face it. Merck has
7 some control with the MDL, too, and with the MDL
8 plaintiffs lawyers. I mean, it's got to be -- I
9 don't know that you can just say it is up to the
10 plaintiffs to work it out between themselves. It
11 seems to me it is a three-way thing. The MDL
12 plaintiffs, the state plaintiffs and Merck. Now,
13 between the three of you, maybe there has to be some
14 kind of conference call before a dep to say we're
15 scheduling the dep here and here, not just a cross
16 notice, but a formal cross notice, but also a phone
17 call. You know, we've got this dep scheduled, how
18 do you guys want to work out the time frames.
19 Should we do two hours with the MDL, two hours with
20 Jersey. You know, I don't know. I mean, different
21 witnesses may require different things.
22           MR. MAYER: I think ultimately most
23 of the times the plaintiffs' counsel will want to
24 have those discussions among themselves without us
25 is my guess.

1    MR. BUCHANAN:  I don't know.  From
2  what I understand, there were some concerns about
3  whether the cross-noticed plaintiffs would have to
4  fit under the umbrella of the MDL deposition
5  schedule.  So, in other words, if it was
6  six-and-a-half hours worth of exam time, my
7  understanding is that the original position of Merck
8  is that all the plaintiffs had to fit under that
9  order.
10    THE COURT:  What I'm saying real
11  clear is we're not going to have a six-and-a-half
12  hour dep where the MDL goes first and they take
13  five-and-a-half hours and then the state people get
14  half an hour.  If that's the case, then the state
15  people are not going to have to participate in the
16  MDL deps.  They are going to have their own deps.
17  I'm not saying that that's the way it should be,
18  that there should be separate deps.  They should be
19  coordinated.  But, again, these cases aren't going
20  to be subordinated to somebody else's cases.  So, it
21  is not going to work that way.  I wouldn't expect to
22  say that the people in the MDL can only have the
23  last hour of the state deps.  I would never presume
24  to do that, and I'm not going to.  But I'm also not
25  going to require the state attorneys to be relegated

73

1  to the back seat and the last -- you know, everybody
2  knows by 4:00, everybody is pretty tired.  They get
3  the last hour.  That's not the way it should always
4  be.  Now, does that mean that the MDL, that
5  shouldn't happen sometimes with some witnesses where
6  all you need is an hour at the end?  I'm sure that's
7  true for a lot of witnesses.  Is it wrong to have to
8  be deposed in California, Texas, New Jersey and the
9  MDL?  Yes.  It shouldn't happen.  We should be able
10  to work to try to avoid that.  But the way to work
11  to avoid that, I don't think, is to say that state
12  plaintiffs, you get the last half-hour of our
13  six-and-a-half hours.  That's not the solution.
14  There's got to be some other solution that works
15  more fairly between everybody.
16    And I agree.  The last thing I want
17  to do is order two deps of every person, a New
18  Jersey dep and an MDL dep.  I mean, that's stupid.
19  I don't want to do that if we can avoid it.  But I
20  don't know -- my hands are being a little tied by if
21  the MDL plaintiffs are going to insist they are
22  entitled to go first always and take all the time,
23  and then when they have fully exhausted everything,
24  and it is only a six-and-a-half hour dep and they
25  get whatever is left, then it is not going to work.

74

1  But I think you can work it out.  I really do.
2    MR. FERRARA:  Judge, if I may make a
3  suggestion.  It is actually a lot more complicated
4  than we've actually been talking about because only
5  Merck knows -- we're talking about the MDL and
6  Jersey and California, but you read in the lay press
7  that there are cases pending in Illinois where they
8  named the pharmacy as a defendant to prevent
9  removal, there are cases pending in the State Court
10  of Texas.  So, the problem I can just foresee down
11  the road is that there may be all kinds of people
12  that want to depose the same people.  So, maybe the
13  first thing that we might want to ask Merck for is
14  to give us a list of the cases that are pending in
15  other courts, if they haven't done that already, so
16  we can then get a better handle on what we're
17  dealing with here, because the lawyers who just have
18  Jersey cases and are not in the MDL, like our 400
19  cases, we're not in any MDL case.  So, quite
20  frankly, I don't care what happens in the MDL.  You
21  know, I care, but I mean, as far as my preparation
22  for my clients, I want to be able to take my
23  depositions in Jersey and under our rules.  And, you
24  know, I don't want somebody to tell me, well, you
25  should have been in Houston three weeks ago for an

75

1  MDL dep and now you can't take one.  I'm sure Your
2  Honor doesn't want that to happen either.  This is a
3  big problem.  I'm glad we're addressing it.
4    THE COURT:  Well, I think it is going
5  to be able to be worked out, but I think it has to
6  be worked out by counsel saying we have these five
7  -- let's have a dep phone conference with liaison
8  counsel, and anybody else -- I mean, liaison counsel
9  for the state is responsible for finding out what
10  state attorneys want to question the witness and
11  coordinating that, and if you want to question the
12  witness, that has to be coordinated within the state
13  first.  And then there has to be a phone call, I
14  think, before these deps between a member of the MDL
15  steering committee and the state and Merck, and they
16  have to say, well, this is one we should take for
17  two days, we'll let the MDL go on Monday and we'll
18  let the New Jersey go on Tuesday.  Or this is one we
19  can do three hours and three hours or two and two.
20  I mean, if the MDL Plaintiffs' Steering Committee's
21  position is that they always have to go first, then
22  we can't work with them.  If they want to work with
23  us, fine.  If they can't, we can't work with them,
24  we can't work with them.
25    MR. MAYER:  We'll pass this on to

76

1    Judge Fallon and to the MDL committee.
2              THE COURT:  Why don't you pass it on
3    and see if you can discuss it as a group.
4              I think the goal should be to have
5    six-and-a-half hour depositions, if possible, with
6    everybody having some amount of time to ask
7    questions, if possible.  Some people can't be
8    deposed in six-and-a-half hours, and some people are
9    more important to one plaintiff maybe than another,
10   I don't know.  The biggest people, the key people
11   have already been taken.
12             MR. MAYER:  That's right.
13             THE COURT:  So, let's not fight about
14   the tail wagging the dog.  The biggest deps are
15   done.
16             MR. MAYER:  Yes, they are.
17             THE COURT:  The biggest deps have
18   already -- I just think the MDL has the advantage of
19   taking advantage of the use of those.  I think I've
20   made my position clear.  I know Judge Fallon is
21   making his decisions based on his perspective, and
22   maybe all these can be thought out.  But there
23   should be no question, there should be some
24   coordination.  I just don't think the coordination
25   can be imposed from one side.

1              MR. MAYER:  Understood.
2              THE COURT:  Try to work it out.  If
3    you can't work it out, give me a call.  If you can't
4    work it out, I'll get on the phone with Judge Fallon
5    if I have to.  I don't want to do that, but I may
6    call him and say, can we have a joint conference on
7    this if we have to.
8              MR. BUCHANAN:  Okay.
9              THE COURT:  The bottom line is, the
10   biggest bulk of the cases, I know there's maybe one
11   or two cases in this state and that state, I know
12   there's still several hundred in California, but the
13   bulk of the cases are in two spots, and hopefully he
14   and I can work together.
15             All right?
16             MR. BUCHANAN:  Thank you.
17             THE COURT:  The next thing,
18   Litigation Management.  This is an issue.  Was this
19   a mistake by defense counsel?
20             MR. CORONATO:  It was a mistake by
21   Litigation Management, Your Honor.  What happened
22   was, the exhibits that are attached to the agenda,
23   Greg Spizer contacted us to let us know this had
24   happened.  We were as shocked as he was that this
25   had happened.  I immediately contacted LMI and was

1    told the language used in the letters was
2    against their own procedures.  They immediately
3    undertook an investigation.  They reviewed every
4    single letter that went out from LMI requesting
5    letters since they began collecting records for us
6    back in November of 2003, approximately 70,000
7    letters.  In total, they found 245 letters or about
8    a third of a percent of all the letters that had
9    language not as bad as in Kimmelman, but language
10   that violated their procedures.  They also traced
11   all these letters to a single records coordinator.
12   They spoke with that records coordinator.  She
13   conceded that she violated procedure, and she
14   indicated that she was doing this out of her own
15   misguided attempt to try and express urgency in the
16   letters to the providers to get them to provide
17   records on an expedited basis.
18             As a result of having done this, this
19   records coordinator was terminated by LMI.  LMI then
20   reinforced its proper procedures with all of its
21   staff, and they now have instituted another
22   procedure to make sure this doesn't happen again.
23   Now an in-house attorney will review every letter
24   that goes out from records coordinating to make sure
25   it is consistent with their own procedures.

1              The letters that went out in the
2    Kimmelman case are the worst example.  The other
3    letters really just are from this coordinator, and
4    she's saying things like The Court has requested
5    that I follow up with information; or there's a
6    trial date; we know a trial date has been set.  Or a
7    deposition has been set when no deposition has been
8    set, again, all in an attempt to get the provider to
9    respond more quickly to the request.  There was no
10   substantive communications with the providers asking
11   them for their opinions on causation or their
12   opinions about Vioxx.  They were all just attempts
13   to get records on an expedited basis.
14             I spoke to David Jacoby about this
15   and told him that we can provide what I've just said
16   by way of an affidavit.  He feels that would be
17   sufficient.
18             MR. JACOBY:  I think so, Judge.
19             THE COURT:  It seems to me, people
20   make mistakes, they have rectified it, and we'll
21   move on.
22             MR. JACOBY:  That's the way we look
23   at it.
24             MR. BUCHANAN:  Your Honor, actually,
25   one comment.  I have asked defense counsel to

1   provide me with copies of the correspondence in the
2   Seeger Weiss case because I know one of the affected
3   cases was the Humeston matter.  I was surprised to
4   learn that that actually arose after we got the
5   verdict on Thursday, but if you could get those to
6   me expeditiously, I would appreciate it.
7            MR. CORONATO:  We will send those to
8   you.
9            MR. BUCHANAN:  Thank you.
10           THE COURT:  Let's go to defense's
11   agenda in case we can't finish everybody.
12           Class action lawsuits welfare fund.
13   Did they leave?
14           MR. POWERS:  I'm here, Your Honor,
15   Matt Powers for the defendant, Merck.
16           THE COURT:  The first request is that
17   we stay the third-party payor case during the
18   pendency of appeals.  Is there an objection from
19   plaintiffs' counsel?
20           MR. LIEVERMAN:  Yes, Your Honor, Ted
21   Lieverman, Spector Roseman.  We had sent a letter in
22   objecting to that.  We had seen that issue in
23   conjunction with the pending motion for protective
24   order because there's the question of assuming that
25   it's not stayed, it is getting an appropriate

1   schedule for completing the motion for class
2   certification, and that, I suppose in theory, could
3   vary depending on whether The Court orders that the
4   medical discovery of the plaintiffs continues or it
5   be truncated or that the motion for protective order
6   be granted.  So, we had actually put those on the
7   plaintiffs' agenda together to be considered.
8            THE COURT:  That's for the end user
9   consumer cases?
10           MR. LIEVERMAN:  That's correct.
11           THE COURT:  The first thing on the
12   agenda is the Engineers.
13           MR. BUCHANAN:  Actually, Your Honor,
14   we don't oppose staying portions of the third-party
15   payor cases, but we do think it is appropriate to go
16   forward with discovery in other areas.  Any way you
17   slice it, there's a case that's going forward as it
18   relates to the individual plaintiff who suffers a
19   substantial loss in that case.  There is some third-
20   party discovery that needs to be done in aid of that
21   third-party payor case, and there's also other
22   discovery from Merck that can go forward which will
23   not be affected one way or the other by the appeal.
24   It is a New Jersey plaintiff.  It is a New Jersey
25   defendant.  We understand the issues with respect to

1   class certification, application of New Jersey law
2   extraterritorially, but with regard to the case
3   that's pending before Your Honor, the case isn't
4   going away, it is already survived a dismissal
5   motion.  There's very likely tryable issues there.
6   We would like to at least proceed forward with
7   discovery that's generic to the case that will not
8   be affected by the appeal.
9            MR. POWERS:  Your Honor, given the
10   likely importance of whatever the appellate division
11   ends up saying, it is Merck's position that it
12   doesn't make sense to proceed with any discovery or
13   any other proceedings in either the third-party
14   payor case or the end user consumer case until we
15   get a decision back from the appellate division and
16   that a complete stay is appropriate.
17           MR. BUCHANAN:  If we were going to
18   be doing discovery, Your Honor, that would go to
19   notice issues or things that may apply uniquely to a
20   class as opposed to an individual claimant, then
21   perhaps I'd agree.  But that's not the discovery
22   that I think we will be looking at.  Third-party
23   discovery against -- you know, one of the entities
24   is Merck Medco, other folks within the third-party
25   payor group of the managed care division at Merck,

1   generic liability information that would be
2   necessary to prepare the case for an individual
3   plaintiff who did suffer substantial losses, we
4   think we should entitled to proceed with during the
5   pendency of the appeal.
6            THE COURT:  Okay.  Well, it is my
7   inclination to grant the stay for 60 or 90 days at
8   least to see what was happening, but Mr. Buchanan
9   has a point.  If there's some information for
10   discovery -- there's no point in simply stopping it
11   for the sake of stopping it.  If there's something
12   that affects only something that would be needed
13   even by the international union themselves to pursue
14   their own claim --
15           MR. POWERS:  I guess I would have to
16   see that discovery before I can agree with that.
17           MR. BUCHANAN:  Your Honor, if we
18   think about this, having just gone through the
19   review of the jury charges on consumer fraud, I
20   mean, it is going to be focused on their conduct or
21   deceptive conduct in connection with the marketing
22   of this product to third-party payors generally even
23   if at the end of the day we're still focused on the
24   loss by an individual claimant.  So, that type of
25   generic discovery is going to happen in the context

1   of an individual plaintiff case or in the context of

2   a class case.  We submit we can go forward with it

3   at this point.

4           MR. MAYER:   That sounds like class

5   discovery to me.

6           MR. BUCHANAN:   It's not.  Ultimately

7   it is a consumer fraud on the third-party payor

8   community.  That's going to be the liability

9   standard that this is going to be measured up

10  against.  We just went through this two weeks ago.

11          MR. POWERS:  Well, not --

12          THE COURT:  Have you sent them a

13  notice to produce records, or you haven't?

14          MR. BUCHANAN:   We have sent them a

15  notice to produce records that was complied with in

16  some respects in connection with the class cert

17  motion.  They answered some discrete portions of it.

18  They didn't answer all of it.  There was the

19  30(b)(6) notice that was taken down to facilitate

20  the schedule, but we would like to go through that

21  and clean up the areas that have not been addressed

22  and go forward.

23          THE COURT:  Why don't you address

24  with them more in detail exactly what it is you want

25  now.  You look at it and see if there's any things

1   that you feel you can respond to and things that you

2   think would be just too burdensome to respond to

3   until there's an agreement or until there's a

4   decision.

5           MR. POWERS:  Okay, Your Honor.

6           THE COURT:  Then we'll look at it

7   again.

8           MR. BUCHANAN:   That's fine.

9           MR. POWERS:  Sounds good.

10          THE COURT:  The third party, you have

11  the individual consumer case?

12          MR. LIEVERMAN:  Individual consumer.

13          THE COURT:  Let me just say this.

14  The appellate division -- well, do we have counsel?

15          MR. LIEVERMAN:  That's Mr. Judd.

16          MR. POWERS:  Actually, I'm prepared

17  to discuss that, too, but Mr. Judd would like to be

18  on the phone for this conversation, if it's

19  possible.

20          THE COURT:  I don't know how to do

21  that, but we can figure it out and try and get him

22  on the phone.

23          The discovery in the gastrointestinal

24  injury cases, are you going to go with this?

25          MR. BUCHANAN:   Briefing schedule?

1           THE COURT:  Briefing schdule in the

2   Boyd case?  Incorporate that into an order and

3   submit it to me then.

4           MR. CORONATO:  Your Honor, one

5   correction.  We noted it out there, but

6   plaintiffs' opposition is December 6, not February

7   6.

8           MS. FREIWALD:  I think I corrected

9   that.  I misspoke on the record.

10          THE COURT:  Okay.

11          MR. BUCHANAN:   Do you want to make

12  that motion returnable for the same days for the

13  next status conference, which will be the 17th?  It

14  is not my motion, but --

15          THE COURT:  What motion?

16          MS. FREIWALD:  That's not the return

17  date.  That's the date for filing your response.

18          MR. BUCHANAN:   Okay.

19          THE COURT:  The return date is 12/16.

20  We'll leave it like that.

21          MS. FREIWALD:  We can make the return

22  date 12/15.

23          THE COURT:  Make it 12/15.  That's

24  good.

25          MR. COHEN:  International plaintiffs

1   lawyer.  We filed a motion on Friday, and we put in

2   a --

3           THE COURT:  You already filed it?

4           MR. COHEN:  We filed it on Friday and

5   just put in the notice of motion.  It will be

6   returnable on a date set by The Court.  If liaison

7   counsel is prepared to give a briefing schedule,

8   great.  If not, I can talk to somebody on the phone

9   and agree to a schedule.  I don't think we'll have

10  any problems.

11          THE COURT:  Who has the most

12  international cases, do we know?

13          MR. PETTIT:  Your Honor, Jim Pettit,

14  Locks Law Firm.  We have about 25 at least, 30.

15  Obviously we've not had a chance to look at the

16  motion in depth.  It came in Friday night.

17          THE COURT:  The problem with the

18  forum non, it may be depend on what the other forum

19  is, too.

20          MR. PETTIT:  My specific problem,

21  Your Honor, is I served discovery for the Canadian

22  cases that we had in June and the UK cases that took

23  discovery in August.  I sent a letter to defense

24  counsel saying what could we do or can we have a

25  resolution or shall I file a motion.  I have no

1    response, so, I suppose what I'm asking today, Your
2    Honor, is for leave to file a motion to compel
3    discovery even if it is focused on forum non
4    conveniens, which I can call out for defense
5    counsel.  That's no problem.
6              One of the main oppositions, points
7    of opposition that I'm going to have is lack of
8    discovery.  Having just gone through the wars in
9    Pennsylvania in the PPA cases where a lot of the
10   motion practice for forum non conveniens took place
11   without forum non conveniens discovery, so, I really
12   made an effort to have forum non conveniens served
13   during the summer.
14             MR. MAYER:  I had talked to both Mr.
15   Pettit and Mr. Locks and told them that we had
16   planned to file this motion some time ago, we just
17   got it on file now, and our view really is the
18   motion should go first because this kind of
19   discovery is extremely burdensome, reaching out to
20   all of these other countries and so on, and we think
21   there's enough of a record there to decide the
22   motion if --
23             MR. PETTIT:  Your Honor, I'm not
24   asking for the issue to be decided today.  I would
25   like to file a motion to compel discovery and,

1    therefore, not to start the forum non conveniens
2    briefing schedule.  I can file that this week and
3    have it returnable in a couple of weeks because,
4    otherwise, I have a couple of pages in my brief
5    saying we don't have discovery, and then there has
6    to be a ruling in the abstract.
7              MR. COHEN:  Most of the motion,
8    actually, is just when you look at it on its face,
9    the differences in laws and the potential issues of
10   such things like personal jurisdiction over the
11   other corporations and stuff like that, that it's
12   just on its face should get decided, and the
13   international plaintiffs shouldn't come here at all.
14   One of the whole points about the whole thing is
15   that international plaintiffs should be in their own
16   countries, all of which have well-developed
17   systems.  You will see in our brief we go through
18   each country in which people come from and talk
19   about the United Kingdom, Australia, places that
20   have well-developed legal systems.  Once you see
21   that, Your Honor would just be inclined to grant
22   this motion, and one of the bases for doing it is to
23   avoid having to get bogged down in already expanding
24   this litigation when Your Honor had already ruled
25   out the foreign regulatory and marketing information

1    and general discovery in the first place.
2    Otherwise, all the benefits we're seeking by doing
3    this -- some of them, I shouldn't say all, but some
4    of the benefits can get undermined.  So, I think
5    what we need to do is take a look at the motion
6    and --
7              THE COURT:  Is Merck addressing the
8    issue of whether, for example, the Canadian
9    litigants, they are going to be barred from
10   proceeding at this point in Canada?
11             MR. COHEN:  There are cases pending
12   in Canada right now.  Canada has a system of
13   discovery.  In fact, in the affidavits, we talk
14   about what discovery is available and the other
15   forums.  Places like Canada has pretrial discovery,
16   United Kingdom has pretrial --
17             THE COURT:  Would you have the
18   ability to waive objections to them refiling in
19   their countries?
20             MR. COHEN:  Yes.  Yes.  You could
21   make that a condition of the --
22             THE COURT:  Well, what I think we
23   should do, is they filed their motion.  Why don't
24   you just file a cross motion for discovery.
25             MR. PETTIT:  Fine.

1              THE COURT:  And it will be returnable
2    the same time.  Lay out what you need in discovery
3    to compel the discovery, and either I can decide the
4    motion on its merit or its face, or I may decide
5    additional discovery is needed, in which case the
6    whole thing will be adjourned until discovery is
7    done.
8              MR. BUCHANAN:  This may be a dicey
9    issue to coordinate the response of this.  What
10   countries are you dealing with in terms of foreign
11   claims?  I know Mr. Pettit has referred to the UK
12   and Canadian plaintiffs that he represents.  But
13   being liaison for this mass group of people --
14             MS. AMARAL:  We also have South
15   Africa.
16             MR. COHEN:  We have South Africa.  We
17   have an affidavit on South Africa, UK, Australia
18   Canada, New Zealand.
19             THE COURT:  I think the plaintiff's
20   counsel who has those countries, each of you better
21   review the affidavit.
22             MR. BUCHANAN:  It strikes me,
23   though, we may need to do separate responses.  It
24   just may take some coordination on our part to get,
25   whether it is going to be separate briefs or

1 separate brief sections for different countries, and
2 we probably need to coordinate the assembly of this.
3 I haven't seen their brief yet.
4 MR. PETTIT:  Can I ask Your Honor
5 just generally how many foreign cases are there are
6 there?  Do you have a concept?  It would seem like
7 Canada and UK would be the largest so far.
8 MR. COHEN:  Canada and UK are the
9 largest.  I don't think I know off the top of my
10 head how many --
11 MR. PETTIT:  Do you know how many
12 plaintiff law firms are involved?
13 MR. COHEN:  Your firm definitely has
14 the most.  I can't remember even beyond one or two
15 others.
16 THE COURT:  I don't think on my
17 little sheet, I don't know that we broke that out.
18 MR. BUCHANAN:   For countries?
19 THE COURT:  Yes.  So, if there's no
20 state it might be foreign?
21 MS. AMARAL:  That is actually what we
22 did.
23 MS. CORSON:  Your Honor, Theresa
24 Corson from Levy Angstreich.
25 I have a Canadian plaintiff, and I

93

1 had let Dennis Medwick know that he was from Canada,
2 and he said, okay, that's fine.  I can fill in CN
3 there.  So, if you let Dennis know, he will fill in
4 the country or province or wherever.
5 MR. MAYER:  We can let one of you
6 know what firms have non-US claimants --
7 MR. BUCHANAN:  You --
8 MR. MAYER: -- if that would help your
9 conversation on the briefing.
10 THE COURT:  We're just going to stop
11 on this one now.  What I'm going to do is say that
12 you filed your brief.  I would ask you to coordinate
13 with liaison counsel to talk to the other
14 plaintiffs, determine which attorneys are going to
15 address which issues.  Some of them may want to
16 address the Canadian issues and somebody else the
17 UK.  I mean, I don't know how you want to do it.
18 But you work it out and then talk to Charlie and set
19 up a briefing schedule and submit an order to me.
20 MR. BUCHANAN:  That's fine, Your
21 Honor, we'll do so.
22 THE COURT:  Jeff?
23 MR. JUDD:  Yes, Judge Higbee.
24 THE COURT:  We're just going over
25 very quickly -- we don't have a lot of time here,

94

1 but Kleinman versus Merck, there's an application on
2 the agenda to stay the end user consumer cases.
3 MR. JUDD:  Yes.  I had sent a letter
4 several weeks ago suggesting and requesting that The
5 Court stay both the end user consumer and the
6 Engineers' cases pending the completion of the
7 appellate division appeal of the Engineer's
8 certification order.
9 THE COURT:  My thought on that is
10 that the Engineer's case should probably be stayed,
11 but I'm not prepared to order it yet.  Mr. Buchanan
12 is going to make a list of what he thinks he needs
13 that he would need no matter what as far as
14 discovery is concerned.  In other words, even if
15 class certification is denied, even if New Jersey
16 class certification is denied, but if he still has
17 the international Engineers, he's still going to
18 proceed with that case and will still need some
19 discovery.
20 MR. JUDD:  Sure.
21 THE COURT:  So, he's going to try to
22 coordinate a request to you for what he feels he
23 needs that's a little more limited, and then we'll
24 see where we go from there.
25 MR. JUDD:  Okay.

95

1 THE COURT:  As far as Kleinman is
2 concerned, I really don't want to stay that.  The
3 reason I don't want to stay it is because, I mean,
4 let's face it, I'm not going to rule any different
5 on Kleinman than I did on the  Engineers case on any
6 of the law -- on any of the issues that are the
7 same.  However, it strikes me that the most key
8 issue that is different is the feasibility of
9 handling a case involving various consumers as
10 opposed to third-party payors because the
11 third-party payors are -- one of the things I had
12 said in the third-party payor decision was that
13 there's a lot of documentation on third-party
14 payors.  They have records, they have specific
15 records.  They have purchases, you know, they make
16 decisions en masse.  It is an easier group of
17 people.  It is larger groups of people.  It is
18 larger economic interests.  It is not a question of
19 the amount of the recovery for each individual
20 consumer being smaller.  It is a question of the
21 difficulty in coordinating the individual consumer
22 claims when you have, you know, who actually paid
23 for the drug, who didn't pay for the drug, how many
24 people actually bought the drug without any
25 prescription benefits, how many people paid

96

1    different amounts of co-pays, how many people -- how
2    you would ever --
3              It seems to me, and there's no
4    question in my mind that the consumer cases, the
5    user consumer cases would be much, much more
6    difficult for me to handle than the third-party
7    payor cases.  Based on that, I think we should move
8    forward to address that issue.  Because it is going
9    to be plaintiffs' burden to convince me that I can
10   do that, that these people can fit together as a
11   class and it can be a manageable class.  So, my
12   thought is we should brief that issue alone, the
13   manageability issue sort of or the things that are
14   related to the difference between the two classes.
15             What do you think, Mr. Judd?
16             MR. JUDD:  Well, I think that makes
17   sense to a certain degree.  My biggest concern,
18   Judge Higbee, that depending on what the appellate
19   division says on these other issues, that that may
20   influence discovery that we may want to take and
21   issues that we would otherwise brief and how we
22   might handle those other issues, setting aside the
23   manageability issue.  And my concern is that to the
24   extent we will have concluded a bunch of discovery,
25   then we're going to end up in a battle, and,

97

1    frankly, possibly have to bring, whether it is named
2    plaintiffs or others back for additional discovery
3    which no one ever likes to do.  So, that's my
4    biggest concern, is that --
5              THE COURT:  How many named plaintiffs
6    are there?
7              MR. LIEVERMAN:  There are two, Your
8    Honor.
9              THE COURT:  I don't think it is that
10   big of deal if we have to bring two people back.
11             Have you deposed them yet?
12             MR. JUDD:  No, we haven't.
13             THE COURT:  We have the issue of
14   their medical records, right?
15             MR. JUDD:  Correct.  And the extent
16   of examination about their medical history that
17   needs to be resolved.  From our perspective, that
18   needs to be resolved before we depose them because,
19   again, we didn't want to take a deposition and limit
20   that examination and then find later, hopefully,
21   that we'll be able to get into it.
22             THE COURT:  All right.  Well, my --
23   what wants to address the protective order?  Anybody
24   in particular?
25             MR. LIEVERMAN:  Yes, Your Honor.  Mr.

98

1    Sobol will address that.
2              MR. SOBOL:  Good afternoon, Your
3    Honor.  Tom Sobol for Kleinman plaintiffs,
4    co-counsel with Mr. Lieverman.
5              On the protective order issue, the
6    important thing I think to be mindful of is look at
7    the nature of the claim the consumers are raising in
8    the case and try and figure out how it is that their
9    medical history or their relationship with their
10   physician or the purposes for which they were
11   prescribed Vioxx relates to it.  The best analog, of
12   course, is the Operating Engineers case where
13   perforce there are numerous consumers, patients, who
14   have been prescribed the product under the auspices
15   of that insured -- insurer.  But in no way did the
16   class certification vis-a-vis those insurers, those
17   third-party payors, require any inquiry into the
18   thousands and millions of medical records and
19   physician records that existed underlying those
20   particular prescriptions.
21             Here, too, with the Kleinman case, it
22   is a classic New Jersey Consumer Fraud Act claim,
23   meaning that I bought a defective product or that
24   the claim is that I bought under a situation where
25   there was unfair and deceptive acts and practices,

99

1    and I've been injured in money, not in personal
2    injury.  Even though some consumers suffer personal
3    injuries, and that's obviously the huge bulk of the
4    time this Court has been dealing with, nevertheless,
5    there are other consumers, and there's a mass of
6    consumers, we suggest, who have suffered large
7    economic harm, even though it comes in very small
8    pieces, each one at a time.
9              In no specific situation, either the
10   class plaintiffs or any other class members, whether
11   they were prescribed Vioxx for an on-label
12   indication or an off-label indication, whether that
13   prescription was appropriately written or
14   inappropriately written, whether or not the product
15   in some sense of the word did or did not have some
16   kind of benefit if it would be subjectively self-
17   reported, those are all irrelevant questions.  The
18   questions really are simply buying a defective
19   product or buying it under an unfair and deceptive
20   act and practice situation.  Just like every other
21   drug pricing case that's happened in this country in
22   the wave of high expenditure prescription drugs, and
23   we've cited these cases in our brief, whether it is
24   the Lupron situation or the Augmentin situation or
25   the AWP situation or I can think of a dozen other

100

1  class situations involving high prescription drugs
2  and consumer protection violations, it doesn't
3  matter what the underlying medical issue is.  It's
4  whether or not the defendant committed a consumer
5  protection wrong and whether or not people paid for
6  the drug as a result of it.  That's it.
7          And so we don't think -- although
8  we've in good faith gone forward and produced some
9  medical authorizations, I think some medical records
10 have been produced, others are on the way, we
11 thought it important to tee this up now to say
12 enough is enough.  At some point we ought not to be
13 spending our time going too far down this road.
14         THE COURT:  Mr. Judd?
15         MR. POWERS:  Actually, I would like
16 to address that.
17         MR. JUDD:  Actually, Matt Powers, my
18 colleague, is there to address that.
19         MR. POWERS:  The first thing I would
20 like to point out is that all the cases Mr. Sobol
21 cited are price fixing, antitrust cases.  They are
22 not cases in which the allegations are that the
23 risks and benefits of the drug were not accurately
24 reported by the defendant.  That is really the
25 distinguishing factor between every case he cited,

1  the Lupron case that they cited in their brief, the
2  Nichols case they cited in their brief.  That's what
3  makes the difference between those cases and this
4  case.
5          Here, the reasons why the consumers
6  took Vioxx are absolutely at issue.  They all claim
7  that the reasons why they took Vioxx -- the
8  plaintiffs will claim, I'm assuming, that Merck's
9  marketing or omissions were part of the causal
10 relationship, part of the causal nexus between their
11 decision to take Vioxx and the economic harm that
12 they claim they have suffered.  Well, here, the
13 reasons why the people took Vioxx, absolutely, it is
14 a prescription drug, those are going to involve
15 medical questions.  They are going to involve
16 medical conditions beyond just the condition for
17 which someone has prescribed Vioxx.  When a
18 physician decides to prescribe a drug to someone,
19 they take into account their medical history and
20 their other medical conditions, and that's why all
21 these questions are relevant.  We have to be able to
22 ask the plaintiffs why they took Vioxx and why their
23 physicians prescribe Vioxx, and those questions
24 absolutely are going to have to involve inquiries
25 into their medical records.

1          THE COURT:  Well, I've heard from
2  both sides.  I don't know, in fact, in the end
3  whether it is going to actually be relevant to my
4  decision or not.  What I do know is we've got only
5  two plaintiffs here, and I think a defense should be
6  able to explore the issue to a point.  I'm going to
7  order that the plaintiffs produce one year of their
8  medical records prior to the prescription dates,
9  authorization for any medical records up to one year
10 before the prescription date.  I don't think
11 someone's entire past medical history is relevant to
12 an economic claim, but what was going on around the
13 time and whether they would or wouldn't have been
14 prescribed the drug may, in fact, be relevant, as
15 defense counsel argues.
16         MR. POWERS:  Your Honor, may I make a
17 comment very quickly?
18         THE COURT:  Sure.
19         MR. POWERS:  For at least two
20 categories of medical conditions, gastrointestinal
21 conditions, things like ulcers, other
22 gastrointestinal problems will absolutely have been
23 relevant to someone's decision to take Vioxx, and
24 those may not show up in someone's medical records
25 until for some period of time before just a year.

1  In addition, concerns about cardiovascular issues
2  may absolutely have appeared.  Someone's
3  cardiovascular history may not be reflected in their
4  medical records just a year before whatever the date
5  is that they were first prescribed Vioxx.  I'm
6  concerned that if we're just limited to a year's
7  worth of medical records on those, particularly on
8  those topics, that we won't be able to accurately
9  ascertain what the causative medical factors were
10 that went into the decision to prescribe Vioxx.  I
11 think that those are two areas where there really
12 shouldn't be any question that that information.
13 For instance, if one of the plaintiffs had an ulcer
14 that was brought on by overuse of over-the-counter
15 NSAIDs, that's absolutely something that would have
16 gone into the physician's decision to prescribe
17 Vioxx, and it is something we ought to know about.
18         THE COURT:  If it is, he's going to
19 mention it in his records.
20         MR. POWERS:  Not necessarily within a
21 year.
22         THE COURT:  When he prescribes a
23 drug, he's going to put down why he prescribed it,
24 isn't he?
25         MR. POWERS:  Hopefully.  But the

1 physician that treated that condition may not be the
2 physician that's prescribing Vioxx.
3 THE COURT: So then he might not have
4 even known about it, so it doesn't make any
5 difference.
6 MR. POWERS: But he might not have
7 mentioned it in his records is my point, Your Honor.
8 MR. SOBOL: If I may, Your Honor --
9 THE COURT: I'm going to limit it to
10 one year, and you may question them at their dep
11 about whether they have had prior gastrointestinal
12 or cardiovascular issues only. All right?
13 MR. JUDD: Your Honor, what about
14 depositions of medical providers, the doctors that
15 prescribed it and/or treated it for some of these
16 other conditions?
17 THE COURT: I don't need it for my
18 motion at this point. Whether we'll need it --
19 let's do this in steps. Let's start with the fact
20 that you can at this point proceed with the
21 depositions of the two plaintiffs as soon as you get
22 their medical records for one year. They will give
23 you the authorizations for any treatment they had
24 within one year of the prescription, you'll get
25 those records and then take the plaintiffs' deps.

105

1 Whether I'm going to let you take doctors' deps or
2 not, I'll decide at a later date. I don't think I
3 am, but I might. Let's see what's in those first
4 set of records.
5 The next step, and one that I want to
6 do -- you know, the issue of manageability of the
7 class is something that I still want to address as
8 soon as possible and I think should be addressed in
9 briefs. There's no point in plaintiffs spending a
10 lot of money in this case if I'm going to throw it
11 out. And there's no point in not moving on with all
12 the discovery if I'm going to keep it in, so let's
13 make a decision. I'm telling you, I have concerns
14 about the ability to lump these consumers together.
15 I need to have explained to me how you think that
16 could be done and other cases where it has been done
17 or information about them. And I need from the
18 defense the arguments against that, one of which, I
19 guess, will be that you need every single person's
20 medical records. But you can throw that out. But
21 we don't need it right now.
22 MR. SOBOL: If I may venture
23 something, Judge. In the briefing, predictably, we
24 didn't focus as much as -- it's now clear from what
25 The Court has indicated. We didn't focus on the

106

1 manageability issue because, frankly, for us, it was
2 almost a given, given the other experiences we've
3 had specifically with class consumer cases and drug
4 pricing matters where it was suspected that there
5 were at least hundreds of thousands, if not millions
6 of people who had actually purchased the drug,
7 whether it was in a pharmacy chain or through the
8 medication -- the medical doctors --
9 THE COURT: But is there a
10 distinction between price fixing and consumer fraud?
11 MR. POWERS: Absolutely --
12 MR. SOBOL: Well, then, we would
13 suggest no. My point would be that because we
14 haven't focused in our briefing on the manageability
15 issue and how we can show how courts have dealt with
16 hundreds of thousands or millions of potential
17 claimants, we can perhaps go first in terms of
18 briefing that sooner than later and give the defense
19 an opportunity to be able to respond fairly sooner.
20 MR. JUDD: Your Honor?
21 THE COURT: What?
22 MR. JUDD: A number of courts, when
23 faced with this precise issue, have actually framed
24 it in terms of requiring plaintiffs to essentially
25 provide a trial plan, essentially blueprint for The

107

1 Court how the manageability issue from their
2 perspective can be overcome. And that might be a
3 useful way to think about this issue, and perhaps
4 that's what plaintiffs are suggesting they want to
5 provide, is essentially a trial plan which would
6 then give us an opportunity to explain why we think
7 that it's not feasible.
8 MR. LIEVERMAN: Your Honor, I don't
9 necessarily think that's what we were thinking
10 about, and I think the beauty of the system is, we
11 get to frame the issue and argue it to The Court in
12 the way we think best.
13 THE COURT: So, talk to Mr. Judd, set
14 up a briefing schedule basically on this issue, and
15 send me a consent order on it.
16 MR. LIEVERMAN: That's fine, Your
17 Honor.
18 THE COURT: Then we'll schedule it
19 for oral argument on this issue, and it may be after
20 that oral argument I'll know what I'm doing. It may
21 be that I'm going to need to move on to lots of
22 other issues where I need to look at this issue in
23 context of other issues, but I think it is a
24 preliminary issue that I want to address.
25 MR. LIEVERMAN: Fine.

108

**Page 109**

1   THE COURT:  Meanwhile we may get the
2   decision on the Engineers case so we will have
3   guidance on the other parts of the case.  So, let's
4   focus on that.
5       MR. LIEVERMAN:  Just so The Court
6   knows, we have provided the medical authorizations
7   for the full period.  My understanding from my last
8   conversation with Mr. Judd is that he's received a
9   lot of those full medical records for the plaintiffs
10  for many of their caregivers.  I don't think we
11  really need to wait for the medical records from the
12  dentists or the gynecologists or some of the other
13  providers in order to take the depositions of the
14  plaintiffs.  I think as soon as they have got
15  somebody who has actually prescribed Vioxx, we can
16  move on.
17      THE COURT:  Mr. Judd, I think they
18  should be deposed as soon as possible.  If you don't
19  have records from a certain person, send up your
20  follow-up letters, send a copy of your follow-up
21  letters to plaintiffs' counsel so they can maybe
22  call the doctors themselves and urge them to get you
23  the records so we can get moving.
24      MR. JUDD:  Okay.
25      THE COURT:  Counsel, I have to leave.

**Page 110**

1   I'm sorry I can't reach the other items on the
2   agenda, but if you can stay here and talk anything
3   out yourself, please do.  If you can't, I'll talk to
4   you about them on November 17th.
5       MR. JACOBY:  Can I ask you a real
6   question?
7       THE COURT:  Yes.
8       MR. JACOBY:  Did you sign the
9   commission on the Topol deposition?  I was asked to
10  inquire about that.
11      MR. JUDD:  What's happening November
12  17?
13      THE COURT:  We're going to have
14  another conference, but it is not going to concern
15  the class actions.
16      MR. JUDD:  Okay.  Thank you, Your
17  Honor.
18      THE COURT:  So, you don't have to
19  come, Mr. Judd.  But if you want to come, we'll
20  welcome you.
21      MR. JACOBY:  Judge, you don't
22  remember if you signed it or not?
23      THE COURT:  I don't have any idea.
24  But I will sign it -- if it was -- was it unopposed?
25      MR. JACOBY:  I understand that it is.

**Page 111**

1   THE COURT:  I don't know if I signed
2   it or not, but I have a stack of them that are
3   unsigned that I intend to sign.  I haven't had a
4   chance to sit down and do that, and I'll do it by
5   Wednesday.
6       MR. JACOBY:  Thanks, Judge.
7       MR. BUCHANAN:  We'll see you on the
8   17th.  There's a couple of issues we're going to try
9   to work out.
10      THE COURT:  I know there are other
11  issues that I should have gotten to today, but I
12  just can't.
13              -  -  -
14      (Whereupon, the hearing concluded at
15  2:33 p.m.)
16              -  -  -

**Page 112**

1   C E R T I F I C A T E
2
3       I, LINDA L. GOLKOW, a Notary Public
4   and Certified Shorthand Reporter of the State of New
5   Jersey, do hereby certify that the foregoing is a
6   verbatim transcript of the testimony as taken
7   stenographically by and before me at the time, place
8   and on the date hereinbefore set forth, to the best
9   of my ability.
10
11
12      I DO FURTHER CERTIFY that I am
13  neither a relative nor employee nor attorney nor
14  counsel of any of the parties to this action, and
15  that I am neither a relative nor employee of such
16  attorney or counsel, and that I am not financially
17  interested in the action.
18
19
20
21  _____
22  LINDA L. GOLKOW, CSR, RDR
    Notary Number: 1060147
23  Notary Expiration: 1.2.08
    CSR Number: 30XI00176200
24  Dated: November 9, 2005
25

Transcript - Monthly Status Conference (2005/11/17)

```
 1                  SUPERIOR COURT OF NEW JERSEY
                    ATLANTIC COUNTY
 2                  CASE TYPE NO. 619
 3   ----------------------------x
     IN THE MATTER OF IN RE:
 4
 5   VIOXX                          STENOGRAPHIC
                                    TRANSCRIPT
 6                                  OF:
     ----------------------------x  STATUS CONFERENCE
 7
 8        PLACE:  ATLANTIC COUNTY CIVIL COURTHOUSE
                  1201 BACHARACH BOULEVARD
 9                ATLANTIC CITY, NJ  08401

10        DATE:   November 17, 2005

11   B E F O R E: THE HONORABLE CAROL E. HIGBEE, J.S.C.
12   A P P E A R A N C E S:
13
          DAVID BUCHANAN, ESQUIRE
14        SEEGER, WEISS
          ATTORNEYS FOR THE PLAINTIFFS
15
16        SOL H. WEISS, ESQUIRE
          DAVID JACOBY, ESQUIRE
17        GREGORY SPIZER, ESQUIRE
          ANAPOL, SCHWARTZ, WEISS, COHAN, FELDMAN &
18        SMALLEY
          ATTORNEYS FOR THE PLAINTIFFS
19
20             *        *        *        *       *

21
22
               LINDA L. GOLKOW
23             CERTIFIED SHORTHAND REPORTER
               REGISTERED DIPLOMATE REPORTER
24             215.787.7772
               LGOLKOW@NEXTEL.BLACKBERRY.NET
25
```

1

Transcript - Monthly Status Conference (2005/11/17)

```
 1   APPEARANCES CONTINUED...
 2
 3        STEVEN WITTELS, ESQUIRE
          SANFORD, WITTELS & HEISLER
 4        ATTORNEY FOR THE PLAINTIFFS
 5
 6        CHRISTOPHER PLACITELLA, ESQUIRE
          ERIC WEINBERG, ESQUIRE
 7        COHEN PLACITELLA & ROTH
          ATTORNEYS FOR THE PLAINTIFFS
 8
 9
          MICHAEL FERRARA, ESQUIRE
10        THE FERRARA LAW FIRM
          ATTORNEY FOR THE PLAINTIFFS
11
12        SIMMONS COOPER
          DOROTHY COOKE, ESQUIRE
13        ATTORNEY FOR THE PLAINTIFFS
14
          WEINER CARROLL & STRAUSS
15        RICHARD WEINER, ESQUIRE
          ATTORNEY FOR THE PLAINTIFFS
16
17        THEODORE V.H. MAYER, ESQUIRE
          CHARLES W. COHEN, ESQUIRE
18        WILFRED P. CORONATO, ESQUIRE
          NORMAN KLEINBERG, ESQUIRE
19        HUGHES, HUBBARD & REED, LLP
          ATTORNEYS FOR MERCK
20
21        HOPE FREIWALD, ESQUIRE
          MICHELLE YEARY, ESQUIRE
22        DECHERT, LLP
          ATTORNEYS FOR MERCK
23
24        ROBERT W. ROWAN, ESQUIRE
          GOLLATZ GRIFFIN & EWING
25        ATTORNEY FOR MEDCO HEALTH SOLUTIONS, INC.
```

3

Transcript - Monthly Status Conference (2005/11/17)

```
 1   APPEARANCES CONTINUED . . .
 2
 3        W. MARK LANIER, ESQUIRE
          RICHARD D.  MEADOW, ESQUIRE
 4        DARA HEGAR, ESQUIRE
          ROBERT LEONE, ESQUIRE
 5        LANIER LAW FIRM
          ATTORNEYS FOR THE PLAINTIFFS
 6
 7        PERRY WEITZ, ESQUIRE
          JERRY KRISTAL, ESQUIRE
 8        ROBERT J. GORDON, ESQUIRE
          WEITZ & LUXEMBERG
 9        ATTORNEY FOR THE PLAINTIFFS
10        BENEDICT P. MORELLI, ESQUIRE
          MORELLI RATNER, P.C.
11        ATTORNEY FOR THE PLAINTIFFS
12
13        GENE LOCKS, ESQUIRE
          LOCKS LAW FIRM
14        ATTORNEYS FOR THE PLAINTIFFS
15        MICHAEL FERRARA, ESQUIRE
          THE FERRARA LAW FIRM
16        ATTORNEY FOR THE PLAINTIFFS
17
          ROBERT DASSOW, ESQUIRE
18        HOVDE, DASSOW & DEETS, LLC
          ATTORNEY FOR THE PLAINTIFFS
19
20        SUSANNE N. SCOVERN, ESQUIRE
          ALEXANDER, HAWES & AUDET
21        ATTORNEY FOR THE PLAINTIFFS
22
          GREG SHAFFER, ESQUIRE
23        WILENTZ, GOLDMAN & SPITZER
          ATTORNEY FOR THE PLAINTIFFS
24
25
```

2

Transcript - Monthly Status Conference (2005/11/17)

```
 1        SCOTT PUGLIESE, ESQUIRE

          PARKER MCCAY
 2        ATTORNEY FOR PFIZER
 3
 4   APPEARANCES CONTINUED...
 5
 6
 7
 8        FOX ROTHSCHILD
 9        KEVIN THORNTON, ESQUIRE
10
11
12
13             -  -  -
14
15
16
17
18
19
20
21
22
23
24
25
```

4

```
1                    -  -  -
2           THE COURT:  All right.
3           We're going to proceed to discuss the
4    selection of the next cases for trial, which
5    basically is the whole purpose of this meeting
6    today.
7           I gave you some ideas of some cases, I
8    gave you a list of some that I was looking at.  I
9    got letters from two firms, Mr. Ferrara and Mr.
10   Locks, about choices of cases.  I haven't heard from
11   the other firms, but I know you have been looking at
12   your cases.
13          Let's hear first from defense
14   counsel, I guess, briefly, and then we'll hear from
15   plaintiffs' counsel.
16          My plan today is to review the cases
17   that I've suggested and any ones that you've
18   suggested and try to decide which cases, if any, do
19   fit the criteria of 18 months continuous use, and I
20   don't know if it has to be totally continuous use,
21   but 18 months' duration of use, a New Jersey
22   plaintiff, and people who are ready to try them and
23   want to try their cases, and look at that and try to
24   get a pool of cases that we can prepare for trial as
25   soon as possible, basically.
```

```
1           MR. WEISS:  Your Honor, the 18-month
2    use is before the event.  That's what was missing
3    from the spreadsheet.  So, you do want 18-month use
4    prior to the event; correct?
5           THE COURT:  If that's what everyone
6    thinks the criteria should be, I guess that's what
7    we were looking for.
8           MR. WEISS:  Because there are a lot
9    of plaintiffs who had an event, and they continued
10   to take Vioxx after the event for some time, and
11   that's what the confusion may have been in the
12   spreadsheet information that was given to The Court.
13          THE COURT:  Okay.
14          Well, what we may have to do is
15   modify our -- we may have to add another column to
16   the Excel forms to ask people to tell us, you know,
17   duration before event or something.  We should
18   actually maybe have a separate column for that,
19   which will give us different numbers probably,
20   beyond the 18 months' use.
21          I think that's what the defense has
22   been concerned about, that they thought the 18
23   month-use number was too high.  And probably it
24   definitely would be lower if we took the number of
25   cases that were actually used before the event.
```

```
1           MR. FERRARA:  I'm sorry.
2           While we're kicking ideas around,
3    maybe it doesn't have to be on the record if we're
4    just BSing here.  Do you think we can --
5           THE COURT:  Do you want to go off the
6    record?
7           MR. FERRARA:  It's up to you, but I
8    would think it might be better if we can exchange
9    our ideas more freely off the record.
10          MS. FREIWALD:  I think our preference
11   would be to be on the record.  I mean, if we're
12   going to have a discussion about trial selection,
13   then I think we should have that discussion on the
14   record.
15          If there's a time we need to break up
16   into small groups, and one of the things we
17   discussed is that, frankly, that's probably what we
18   are going to need to do, to talk conceptually today,
19   and then at some point, when we get a better hand
20   around the specifics of the information, break up
21   into small groups.  We don't need to take Your
22   Honor's time to even do that.  Then we can come back
23   and have a more formal discussion on the record
24   perhaps.  But to the extent we're talking concepts,
25   I think Merck's preference would be to have that
```

```
1    conversation on the record.
2           MR. BUCHANAN:  I think in terms of
3    the process, Your Honor, we can stay on the record
4    for the process, but I think when it comes to
5    talking about particulars of individual cases, we
6    would prefer to be off the record at that point,
7    because when we start talking about pairings or case
8    selection criteria, if you'll recall when we did
9    this about nine months ago, we were off the record
10   for that dialogue.
11          THE COURT:  Yes.  I think it makes
12   sense to be off the record for part of it.
13          At this point, we'll stay on the
14   record at this point.
15          Counsel, it has definitely come to my
16   attention that the 18-month issue is an issue that
17   we have to address, and I guess we'll have to amend
18   our sheet to get a clearer question as to whether
19   there was use prior to the event.
20          MR. BUCHANAN:  Okay.
21          THE COURT:  But meanwhile, I was
22   hoping that in the cases I had listed or in some
23   other cases, we might have that kind of information.
24          MR. WEISS:  We do, Your Honor.
25          MR. JACOBY:  We do.
```

1    THE COURT:  You could let me know.

2    MR. WEISS:  We do, indeed.  We spent

3    the better part of yesterday going through that as a

4    group and individually in the law firms after the

5    last conference we went through that to make sure we

6    could meet Your Honor's criteria.

7    MR. MAYER:  Where we are, Judge, is

8    really two related but separate issues.

9    One is, what is the program for

10   trying cases over the next several months or year,

11   and we have a strong view that that program needs to

12   include a mix of the cases, not just this one

13   category of cases.  We expressed that view in the

14   letter we sent to The Court, and we can talk about

15   that further.

16   The second issue is how we'll select

17   the next case for trial that Your Honor has

18   indicated would be a case within this category.

19   And the mix of information that we

20   have on cases that were suggested either by Your

21   Honor and The Court or by the firms subsequently is

22   varied.  It is not complete, obviously, in any case,

23   but there are cases we have just a fact sheet and no

24   medical records at all.  There are cases where we

25   have a few medical records, but no fact sheet.

9

1    There are cases where we have a greater number of

2    medical records, but we're at a disadvantage in

3    terms of, you know, discussing the individual cases

4    right now, because of the lack of information on a

5    number of them.

6    So, we do think we need to talk about

7    a process for selecting a group of cases we would

8    work up and then generate enough information about

9    them that we can have a process of selection, maybe

10   similar to the last process, where from that group

11   that have been worked up, in the sense of some fact

12   discovery, we get together and each side selects

13   some cases, have a system of strikes, and Your Honor

14   pick the case that can be worked up for the next

15   trial.

16   So, I think that's where we should be

17   focusing today and on the next trial.  I think

18   that we should focus on that process and a group of

19   cases to look at for that process.

20   THE COURT:  Okay.

21   Mr. Lanier?

22   MR. LANIER:  Thank you, Judge.

23   Two things, if I could.

24   First, I hope, and I've got my office

25   looking for the copy right now, that you got a

10

1    letter from us, because I believe we sent you a

2    letter on November 7th, after the last hearing,

3    setting out two of our cases, the Lanier Law Firm,

4    that meet your criteria.

5    Merck is looking at me like they

6    didn't get it either, so, if this is a wonderful

7    letter that my office wrote and didn't mail out to

8    everybody, I will get it to you today.

9    But, for example, Tom Cona is one of

10   our plaintiffs where Merck has had the releases for

11   Tom Cona, the fact sheet has been on file.  He is a

12   New Jersey resident from Cherry Hill who had over 18

13   months' exposure to the drug, had a heart attack, is

14   on six heart medicines right now, he's not doing

15   great, but is still alive, and had been taking Vioxx

16   for back pain.

17   We had another one, Rosemary Murray,

18   that we also put before The Court as well.

19   It is our hope for the Lanier Law

20   Firm and our clients that we have an opportunity to

21   follow through with the plan that you already gave.

22   I appreciate what the Merck lawyers are saying.  The

23   idea of the mix in the future program is certainly

24   something that's got some merit in some regards.

25   I think part of the mix, though,

11

1    ought to be, though, maybe even the tri-state area,

2    as far as the locus of the plaintiffs, instead of

3    just New Jersey, because as we went through our

4    files, we find there are a ton of cases that are in

5    the tri-state area that may also want to be part of

6    the mix at some point down the road in the future.

7    We know that you have already tried a

8    relatively short-term use case.  We know in Federal

9    Court there's going to be an even shorter-term use

10   case being tried in the next month.  We tried what I

11   would consider a moderate-use case in Texas with

12   about seven to eight months of usage.

13   So, the one thing that's been missing

14   so far are long-term use cases.  No one seems to be

15   trying those.  According to Merck's data, that

16   should be the preponderance of the cases, because

17   the Merck studies have indicated, at least the ones

18   they like to talk about, that you don't have the

19   problem until after 18 months, though, obviously,

20   there's a fuss on that science.

21   We think that it's appropriate to

22   have these long-term focus cases.  We think that

23   we've got several that are ready or could be ready

24   for trial as early as late January/early February

25   without any problem and that meet your criteria and

12

1  would love the opportunity to continue working
2  through our cases to try and find more.
3           And I'll represent to The Court that
4  a great number of us plaintiffs' lawyers have had
5  multiple meetings since your last hearing to try and
6  make sure we give you what you want, what you've
7  asked for.  It's taken us a long time to get through
8  all of these to verify all of the prescription
9  records and verify that we've truly got clients that
10 understood all the questions and have accurately
11 reported all the data.  That's one reason that we
12 don't come with a full plate, but we come with, I
13 think, what we've selected are about five good cases
14 that meet all of your criteria, and then we've
15 certainly got a desire to seek and find more, given
16 time.
17          MR. MAYER:  Just to respond briefly
18 that we didn't get the letter, as Mr. Lanier has --
19          MR. LANIER:  Here's a copy.
20          (Handing over document.)
21          MR. MAYER:  We have very little
22 information, I think, on those cases.  One of them,
23 I'm aware of its existence, but I'm pretty sure we
24 have no medical records, Cona case.
25          The Murray case, I wasn't even aware

13

1  that it was in this category at all.
2           Also, as Your Honor knows, we don't
3  believe these are the preponderance of the cases.
4  Certainly there are cases in this category, but I
5  think the preponderance of cases are not in this
6  category.  Certainly we have seen that that seems to
7  be true.
8           So, in terms of an overall program,
9  we strongly urge The Court to consider other kinds
10 of cases.  Whether that's a subject for today's
11 meeting, I don't know.  But I think we really need
12 now to focus on a process for selecting what the
13 next cases are.
14          MS. FREIWALD:  As Your Honor knows,
15 there is going to be a long-term case tried in the
16 MDL.  That's consistent with the program complex
17 litigation manual.  Frankly, what Your Honor had
18 recognized earlier the last time we did this, that
19 it was important to get a representative group, a
20 good cross-section of the cases.
21          So, that's another reason why this is
22 not the only gap in our knowledge point and our data
23 points.
24          THE COURT:  Well, the MDL case
25 scheduled for this month is a short-term use, very

14

1  short-term use.
2           MS. FREIWALD:  Right.
3           THE COURT:  The Pennsylvania case is
4  what?
5           MS. FREIWALD:  Is a long-term use
6  case.
7           MR. MAYER:  It is not yet scheduled.
8  That's a case being discussed.
9           MR. WEISS:  I thought it was
10 scheduled.
11          MR. MAYER:  Certainly the judge is
12 committed to trying a long-term case.  But as far as
13 I know, the actual final confirmation that that's
14 selected as a trial case and scheduled for February
15 hasn't yet happened.
16          MR. WEISS:  I thought it was
17 scheduled for February.
18          MR. MAYER:  Certainly that's under
19 discussion.
20          MR. BUCHANAN:  As Your Honor knows,
21 there are, of course, nuances to New Jersey law,
22 having gone through the last experience, and,
23 frankly, I'm not sure how much federal trials are
24 going to inform this court and these plaintiffs on
25 how these cases go under New Jersey law.

15

1           There are wrinkles that I think are
2  unique to New Jersey and need to be explored
3  independently of what's happening in the Federal
4  Court.  All cases are not going to turn just on
5  causation.  There's just liability issues that are
6  important to be resolved.  They need to be resolved
7  in the context of New Jersey law, which is what the
8  program is going to start addressing.
9           MR. MAYER:  We understand The Court's
10 position on the appellate division considering the
11 Engineers' case with the other recent appellate
12 division case on choice of law, and that you want to
13 focus for the next case on New Jersey law, and we're
14 not taking issue with that on any Jersey case, that
15 is.  And I don't think Mr. Buchanan is either.
16          MR. BUCHANAN:  No.  My point is, is
17 that the federal long-term case is not going to tell
18 us a lot about long-term cases in New Jersey.
19          THE COURT:  The bottom line is --
20          MR. SHAFFER:  We --
21          THE COURT:  Go ahead.
22          MR. SHAFFER:  Sorry, Your Honor.
23 Greg Shaffer from Wilentz.
24          I was just going to add that when you
25 are considering the cases and different factors to

16

Transcript - Monthly Status Conference (2005/11/17)

1    meet your criteria, that I would just ask, on behalf
2    of my firm at least, that you consider, you know,
3    the tri-state area or, you know -- I know you want a
4    New Jersey plaintiff, but consider that a factor
5    when you are talking about a representative as well,
6    if you could, because we might be able to meet your
7    other criteria a lot better if it weren't strictly
8    just a New Jersey plaintiff.
9        THE COURT:  Well, the bottom line is,
10   I'm not going to change what I'm thinking.  I've
11   listened to you.  I'm listening to your input, and
12   I'm pretty flexible.
13       So, my thinking today may be
14   different than my thinking in March, and I don't
15   know if I made it clear enough, but what I was
16   setting for at the last meeting was a plan primarily
17   designed to pick the next trial.  I wasn't
18   necessarily picking the next ten trials.  But I was
19   suggesting that if we had these ten cases or so,
20   five to ten cases, whatever it is, picked, selected
21   and prepared, then if one settled, we could go to
22   the next one.  If another settled, we can go to the
23   next one.
24       If it doesn't settle, but for some
25   reason one turned out to not be feasible, you know,

17

Transcript - Monthly Status Conference (2005/11/17)

1    a problem with experts, a problem with the client,
2    the client's family, something happened, Counsel,
3    we'd have backup cases and we can go from case to
4    case.
5        The New Jersey appellate division is
6    going to come down with a decision on whether New
7    Jersey law should be applied or the state of the
8    plaintiff should be applied.
9        The only reason I chose New Jersey,
10   it doesn't matter whether it is the tri-state area
11   or whether it is a plaintiff from Alaska or Florida
12   or Texas or Pennsylvania, I mean, somebody in
13   Philly, you know, I wasn't doing it for the
14   convenience of the plaintiffs or because I wanted
15   local plaintiffs, and I'm not doing it because I
16   think New Jersey plaintiffs should be tried first, I
17   was only doing it because I want to have a clear law
18   case where I can just apply New Jersey law, because
19   it is the state of the plaintiff, and it is the
20   state of Merck.
21       So, basically there wasn't going to
22   be any reversal of the case based on a wrong choice
23   of law.  That makes sense to me in the beginning.
24   That may be the criteria for any trials I hold
25   through January.  It may be a criteria through June.

18

Transcript - Monthly Status Conference (2005/11/17)

1    That depends on the appellate division.  If they
2    come down with a decision in March, then we can
3    start trying cases from around the country.  If they
4    come down with a decision in June, then we could
5    start trying cases around the country in July.
6        So, it is not a question of, quote,
7    the tri-state area or, you know, any place, and it's
8    not giving -- saying I want to try New Jersey
9    plaintiffs.  What I was saying was, I want to try
10   New Jersey cases until the appellate division
11   resolves their conflict issue.
12       Now, that may mean we only have to
13   try one New Jersey case and then we can open the
14   doors to other cases.  It may mean that we try five
15   or six New Jersey cases because the appellate
16   division takes two years to decide the class action.
17   I don't have any control over that.
18       Maybe you guys have some pull with
19   the appellate division, but I just sit and wait.  I
20   don't have any control over when they decide things.
21   They took it.  It's a high profile case.  I imagine
22   they are going to decide it relatively quickly.
23   They took it on a motion.  It is not in final
24   appeal.
25       So, I would assume, I think they

19

Transcript - Monthly Status Conference (2005/11/17)

1    track those faster than the final appeal cases.  So,
2    I'm assuming it is going to be decided fairly soon.
3    But right now, we're just going to try New Jersey
4    plaintiffs.
5        As far as the duration of use, we
6    tried a short-term use.  I want to try a long-term
7    use.  Do I want to try two or three long-term uses
8    in a row?  Maybe.  Maybe not.  Let's try one and
9    see, maybe try two and see, maybe try three and see.
10       The concept that I am insisting that
11   the next 12 cases be New Jersey, 12-use cases, was a
12   misconception.  I'm sorry if I gave that impression.
13   What I was trying to say was I want a pool of those
14   cases so we can move from case to case if we need
15   to, and I wanted to consider whether we should have
16   one plaintiff or two plaintiffs at one time.
17       I wanted to consider -- and I do
18   think, I mean, there a lot of criteria here.  It
19   seemed to me, I mean, I know Merck emphasized
20   18-month use as being the most important criteria.
21   Therefore, it is important that 18-month cases be
22   tried.
23       However, it seemed to me as the trial
24   was unfolding that as big a criteria or almost more
25   important is if you are talking about what Merck

20

1  knew when, criteria from a plaintiff's point of
2  view, is when the heart attack occurred.  Did it
3  occur after APPROVe, before APPROVe, after --
4          MR. WEISS:  VIGOR.
5          THE COURT:  -- VIGOR, before VIGOR.
6  Those are key issues.
7          And actually, the cases that I threw
8  out the last time for examination had a mix of
9  times.  So, to say we need different types of cases,
10  I don't want to focus just on duration of use.
11          The fact is, time of event is also a
12  representative issue that eventually may have to be
13  worked out.  The last case was an interesting case.
14  It was -- time wise, it was interestingly framed.
15  It was post-VIGOR, pre-APPROVe.  I don't know if we
16  want to have -- there are a lot of -- in other
17  words, when we talk about representative cases,
18  there are lots of dynamics.
19          As far as picking the cases by doing
20  the exact same thing we did last time, I'm not going
21  to do that.  I don't want to do that.  I did it, I
22  tried it, it worked fine, it worked well the one
23  time, although, I mean, I let the plaintiffs and the
24  defendants pick the case.  By the time we got to
25  trial, neither one wanted it, I don't think.  So,

21

1  that just goes to show -- I mean, I know Diane
2  Sullivan did not want to try Humeston, she told me
3  many times.
4          MR. MAYER:  It was never our pick.
5          MS. FREIWALD:  It wasn't our pick.
6          THE COURT:  No.  That's not true.  I
7  left the room.  You came back and gave me five
8  cases.
9          MS. FREIWALD:  It was from the
10  plaintiffs' list of cases, Your Honor.  It was not a
11  case we affirmatively struck, but it was from the
12  plaintiffs' list of proposed cases.
13          THE COURT:  But wait a second.  Each
14  side made a proposed list.  Then you struck them.
15  Then everybody came here, they sat here for six or
16  seven hours, I wasn't even in the room, and they
17  came back and said these are the five cases we want.
18  Humeston was on that list.
19          Plaintiffs said that and defense said
20  that.  So, Merck chose that case.  I don't care.  I
21  mean, it doesn't matter to me now why we chose
22  Humeston or how we chose it.  I'm not choosing the
23  next case the exact same way.  Maybe I'll go back to
24  that after this.  Maybe I'll just have a lottery and
25  let everybody put in the names of the cases they

22

1  want and we'll draw them at random.  Maybe we'll go
2  back to earliest filed, earliest tried eventually.
3          All I'm trying to focus on now is
4  what we're going to try in the next couple of
5  months.  I'm now proposing a January 30th date.  I
6  think January 9th is a little too optimistic.  It's
7  too close to the holidays, too close to issues.
8          MR. PLACITELLA:  Thank you.
9          THE COURT:  So, I'm now looking at
10  January 30th as being the start date, and I want to
11  pick a case for January 30th, and I want to have a
12  couple, two or three trials ready to go for January
13  30th so that we can either try them separately,
14  combine them, I don't know.
15          And for that criteria, I want
16  18-month use before heart attack, which was not --
17  it's a mistake that I made with the Access.  Nobody
18  is perfect.  We did those things trying to find -- I
19  just said duration of use.  I didn't really think to
20  myself about the issue that came up, which was, it
21  might be duration of use, you know, before and
22  after.  It really didn't occur to me.
23          Now, that's something that in the
24  future, as I said, we're going to try to adjust that
25  and make you guys go back and fill in one more blank

23

1  on your sheets, and then we'll be able to get
2  numbers.
3          I had already decided I was going to
4  do 18 months before I ran the numbers, which showed
5  60 percent.  I've now got new numbers which show 58
6  percent.  But I don't know how many of them were --
7  you know, I don't know what the percentage is before
8  heart attack.  I don't know.
9          So, we've now included 3,254 cases,
10  and we now come up with 61.46 percent for 18 months.
11  But that's, again, the 18 months total use, so it's
12  actually gone up.
13          MR. BUCHANAN:  How many cases, Your
14  Honor?
15          THE COURT:  3,254.
16          MS. FREIWALD:  That's 18 months total
17  use, and it also doesn't deal with significant gaps
18  even pre-event.
19          THE COURT:  It is not a continuous
20  use.  It's a duration of use.  It doesn't address
21  whether it was sporadic use or continuous use or
22  used-gap-use, and it doesn't address before and
23  after.
24          We went through these, and I was just
25  trying to pick out a criteria which would give us a

24

1   handle, trying to get a handle on what -- as counsel
2   has just said, they had to spend a long time just
3   trying to figure out the 12 cases I gave them. I'm
4   trying to get a grasp on 3,000 cases, and we all
5   know statistics are statistics.   They don't always
6   tell the whole picture.
7           So, I've tried to do that by trying
8   to get -- I'm happy with what I've got so far.   It
9   gives me something to look at.  Next we'll have to
10  refine it.  We will just have to keep refining it
11  and hopefully we'll do better, we'll get better at
12  it.
13          These are the first numbers we've
14  gotten, and this idea of duration of use before
15  event is important, and I want to try to, you know,
16  make sure we get that pulled out so we can see what
17  we're talking about for that.  But it doesn't
18  matter. If the 18-month cases are only 25 percent of
19  the cases, I still want to try one of them.  So,
20  it's not going to make a huge difference.  It's not
21  going to matter.
22          And I'll give you out these new
23  sheets like I did before.  We've got -- the heart
24  attacks still come out to 58 percent, strokes came
25  out to 32 percent.  So, the division is about the

1   same.  The 18 months did come out to 61 percent now
2   with the new cases added.  And we've got the new
3   firm lists, so that most of you that were slighted
4   last time are now on the list.
5           If you have other criteria from the
6   defense side or from the plaintiffs' side that you
7   want me to pull on that Excel form that you feel is
8   an important criteria, you know, that we can
9   identify something else other than this duration
10  before, which I know is an issue now --
11          MR. MAYER:  Yes.
12          THE COURT:  -- if there's something
13  else that you want to add to the sheet to parse
14  things down again to see.  I mean, we even said New
15  Jersey plaintiffs.  This only reflects New Jersey
16  people who wrote down New Jersey.  They may have had
17  their heart attack and bought the Vioxx in
18  Pennsylvania and then moved to New Jersey or vice
19  versa.
20          MR. WEISS:  Vice versa, too.  Right.
21          THE COURT:  They may be living now in
22  Pennsylvania, but actually bought it in New Jersey
23  and listed themselves as Pennsylvania, but they
24  would meet New Jersey criteria.   I can only make
25  Dennis fill out so many forms, but we're working on

1   it. If turned out to be something you thought was
2   key -- but I don't think that's key.  It would be if
3   I was only going to do New Jersey cases.  But I'm
4   not.  That's a present criteria, but that's going to
5   change very rapidly.
6           MR. WEITZ:  Your Honor, Perry Weitz
7   from Weitz & Luxenberg.
8           3,254, do you have data on how many
9   of those are in New Jersey and how many are out of
10  state?
11          THE COURT:  I could get that pretty
12  easily.
13          MR. WEITZ:  I think if that's not
14  incorporated, you are going to want to know that
15  sooner or later.
16          MR. BUCHANAN:  The data is captured.
17          THE COURT:  That we can run with just
18  what we have.
19          MR. WEISS:  That's captured.
20          MR. WEITZ:  It's captured?
21          MR. WEISS:  Yes.
22          THE COURT:  But I don't know it, but
23  I can get them to check it today.
24          MR. WEITZ:  Well, I think depending
25  upon what the appellate division decides, you might

1   then group cases if you are consolidating them down
2   the road.  If I state -- depending upon what the
3   appellate division decides, if they say New Jersey
4   law applies, that's one thing, but if they say the
5   other states...
6           THE COURT:  Well, that's true.  If we
7   have to apply Pennsylvania law or Texas law or
8   Florida law, then we're going to want to try Florida
9   plaintiffs together if we group plaintiffs.
10          MR. MAYER:  We'll have more to say
11  about that when the time comes.
12          THE COURT:  I know.  Defense doesn't
13  want to hear me say that.  The plaintiffs want ten
14  groups, and I was throwing out two.  I thought I was
15  being very cautious so far, but the defense doesn't
16  agree with me.  You don't think two is even
17  cautious.
18          MR. MAYER:  That's right.
19          THE COURT:  The New Jersey heart
20  attack over 18 months, we came up with 63 cases now.
21  But that's those three criteria, and I don't know.
22          MR. PLACITELLA:  Your Honor, Chris
23  Placitella.
24          In light of this discussion, maybe it
25  would make sense for the plaintiffs, taking into

1    account this criteria, to get together, I think we

2    can do it, we've been speaking as a group, and

3    submit to you five or six cases with a small summary

4    and to the defendants so you can look at them, and

5    it might aid you in making your choice.  For

6    instance, I know --

7              THE COURT:  Well, I'm anxious to try

8    to pick something as soon as possible because

9    January 30th is close.

10              MR. WEISS:  Yes.

11              THE COURT:  And the defense is

12   worried, you know, they want to make sure they have

13   all the -- are there any of the ones I gave you that

14   they already have the information on?

15              MR. PLACITELLA:  Yes.

16              MR. WEISS:  Well, for example, Hatch

17   was the fact sheet, and medical authorization was

18   provided to Merck six months ago, along with the

19   administration papers.  And we've just sent them all

20   the medical records that we had because they didn't

21   follow through, and now they are following through.

22   Hatch should be ready.

23              MS. FREIWALD:  Well, Your Honor, I

24   mean --

25              THE COURT:  What do you want to say

1    about Hatch?  Let's address some of these cases.

2              MS. FREIWALD:  Do you want to go

3    ahead?

4              THE COURT:  Do you have information

5    about Hatch?

6              MR. MAYER:  Well, just in terms of

7    the level of information we have, we have the

8    medical records that Sol's office sent us.  I'm not

9    sure we have anything else besides that, and, you

10   know, there's a person died in the British Virgin

11   Islands, and so there's going to be medical records

12   down there, so, just in terms of the process for

13   getting them, we can't guarantee how fast that will

14   happen.

15              THE COURT:  Let's go off the record

16   for a few minutes while we talk about individual

17   people's cases.

18                    -  -  -

19              (A discussion off the record

20   occurred.)

21                    -  -  -

22              THE COURT:  We're going to go on the

23   record on the issue of whether cases should be

24   paired or tried with multiple plaintiffs.  Merck's

25   counsel wanted to put on the record their feelings

1    about that.

2              MR. MAYER:  Yes.

3              A suggestion was made about pairing

4    the next cases for trial.  Merck objects very

5    strongly to doing that.  This early stage in trying

6    cases, especially, what you'll find is that the

7    cases will have differences.  Those differences will

8    be blurred in the trying of cases.  We will come out

9    with an outcome and we won't know if it is a result

10   with one case, the other case or the fact that they

11   have been tried together and the prejudicial effect

12   of that.

13              In terms of the program that The

14   Court has said you want to follow of now looking at

15   an 18-month case and seeing what happens, let's look

16   at an individual case, let's work it up as quickly

17   as we can and let's try it and let's see what

18   happens and then we can go from there.

19              Let us not create a process where you

20   have a trial that's really set up in its inception

21   to prejudice us and to blur the distinction between

22   cases so that we don't get any useful information

23   from the trial, whichever way it comes out.

24              In addition, The Court has set --

25              THE COURT:  I think Merck has to

1    recognize that there's going to be multiple

2    plaintiffs tried together eventually.  There's no

3    way we're going to try these cases one at a time.

4              MR. MAYER:  We've heard you on that,

5    Judge, and right now I'm addressing the next trial.

6              THE COURT:  It is not as though it's

7    precedent breaking.  I mean, it has been done

8    before.

9              MR. PLACITELLA:  There's Supreme

10   Court precedent for the bellwether trials in the

11   State of New Jersey.

12              MS. FREIWALD:  I mean, there is a lot

13   of law, and the trend in the law is against group

14   cases particularly at the early stages of the

15   litigation.

16              In fen-phen, where the trials have

17   been grouped, it's been done on a reverse bifurcated

18   basis, after there's been many jury verdicts, after

19   the litigation is far more mature than it is now.

20              I think Your Honor was correct.  You

21   started out today saying, you know, that's an issue

22   we can reserve for another day, and we understand

23   that that issue of group trials may be revisited at

24   some point.

25              If Your Honor is going to make a

Transcript - Monthly Status Conference (2005/11/17)

1    decision on it, we would request the opportunity to

2    brief it, to give Your Honor the opportunity to

3    really fully look at the law, see if the courts have

4    been coming out, frankly, against it in many

5    situations, including Mississippi, we provided some

6    of the case law to you, but for today, the exercise,

7    it seems to us, it seems that this is where you

8    started out, should be conceptually how do we select

9    a case that will be tried next.

10               Admittedly on an extraordinarily

11   ambitious schedule, a schedule that doesn't,

12   frankly, leave us much more than about

13   four-and-a-half weeks of real work time, between the

14   Thanksgiving holiday and the Christmas holiday and

15   New Year's, that's about what we're looking at here.

16               MR. WEITZ:  Your Honor, I couldn't

17   disagree more.  That's absolutely not the trend.

18   And if The Court would like me to brief it, but

19   throughout the history of mass torts, and you can go

20   into every single pharmaceutical litigation or

21   asbestos litigation, in fact, Mr. Mayer and I have

22   tried consolidated DES cases together, the trend is

23   absolutely to coordinate, to consolidate the cases,

24   and especially the courts have rendered decisions

25   that there is no prejudice to the defendants in the

                                                          33

---

1    recorded.

2               MR. FERRARA:  No, but see, it would

3    show the back of my bald head.

4               I'm just interested in how Merck's

5    attorneys, as officers of the court, how they want

6    to help The Court solve a problem of 3,200 trials.

7    What is Merck's solution?  I'm anxious to hear

8    through Your Honor what Merck's solution is to this

9    problem that we're facing, other than waiting 700

10   years to finish the trials.  I would like to hear

11   what Merck's response is.

12               MR. LANIER:  Especially when they

13   settled one case, and they want to try every case.

14               MR. MORELLI:  They want to try every

15   case, one at a time, every two or three months.

16   That's bad for my clients.

17               MR. JACOBY:  Your Honor's purpose, as

18   I understand it, is this litigation needs to be

19   matured on some kind of a rationale plan so that

20   we're not sitting here three years from now and the

21   litigation still has not reached a ripeness or

22   maturity that we can base decisions on.

23               The only way I think rationally that

24   that is going to happen is if we start consolidating

25   these cases and learn what we can.  I don't want to

                                                          35

---

1    consolidation, and in this particular litigation,

2    because the state court cases are focused in one

3    jurisdiction, with so many cases being in this

4    jurisdiction, the defendants want to slow down those

5    cases from coming to having their day in court.

6               The plaintiffs would be greatly

7    prejudiced by trying cases one at a time or two at a

8    time.  This is litigation that is screaming out for

9    consolidation because the plaintiffs would be

10   enormously prejudiced if that did not occur.

11               Like Mr. Morelli said, and I'm a lot

12   younger than him, but I would also state that if we

13   had to try these cases one or two at a time, and we

14   can consolidate them in a larger fashion, because

15   this court is going to have a significant number of

16   cases before it, and the rules calls for it, and New

17   Jersey has been consolidating cases for decades, and

18   I completely disagree.  That is not the trend, there

19   is no prejudice to the defendants, and the

20   plaintiffs would be enormously prejudiced.

21               MR. FERRARA:  Judge, we're not being

22   taped here, are we?

23               THE COURT:  No.

24               MR. PLACITELLA:  No.

25               THE COURT:  Well, you are being

                                                          34

---

1    get into a debate if the defendants are prejudiced,

2    it's our position very strongly, and I think there's

3    ample precedent for it, that they are not prejudiced

4    in any way by a consolidated case.

5               This is clearly the way these cases

6    are to be handled, and it is clearly the way we're

7    going to learn the most to go forward, or else the

8    litigation has the potential of dying on the vine if

9    we plod along one case at a time.

10               I, personally, would have had no

11   problem with trying four or five cases at one time,

12   as we've done many times in the past and very, very

13   successfully for both sides.  To consolidate two

14   cases for trial, two different cases that we can

15   learn from, so in the next six months, we can have

16   two more verdicts or four more verdicts, that's

17   going to mature this litigation in a way that we can

18   all go forward.  Otherwise, I don't believe we are

19   going to be able to.

20               MR. DASSOW:  Your Honor, if I may

21   comment just for a second.

22               Also, let's say you choose two of

23   these cases and got them together in January.  If

24   The Court would be so inclined, the next two cases

25   ought to be set to go a couple of months after that.

                                                          36

Transcript - Monthly Status Conference (2005/11/17)

```
 1     So, if there's one team that's going to try the case
 2   in January, there's other sufficient lawyers here to
 3   have another case ready to go six weeks later.  So,
 4   we could have two and two, you know, two and three
 5   ready to go, you know, January 30th, February 30th.
 6   There's enough lawyers in this room that can do
 7   that, and Merck has certainly got enough lawyers.
 8          MR. LOCKS:  Your Honor, Gene Locks.
 9          If the goal is to have some test
10   cases, and the criteria that you've suggested, which
11   I happen to believe makes sense, having more cases
12   prepared for trial in the next six months, the
13   better it is.
14          There is no rule that The Court can't
15   consolidate cases for trial, but there's also no
16   rule that says you can't have multiple trials
17   back-to-back or even at the same time.
18          And as the evolution of the discovery
19   occurs and issues may come up on some of these
20   cases, the decision to consolidate two or three, or
21   two, for trial might be a more meaningful decision
22   when that happened as time evolves, or it may be a
23   decision that shouldn't be made based on the
24   pairings that occur.
25          So, I'm not totally saying if you
```

Transcript - Monthly Status Conference (2005/11/17)

```
 1   want to get some precedent and get some
 2   clarification of legal rulings, and one of the
 3   issues that could be challenged is consolidation of
 4   trial, then you can wait a while, but you certainly
 5   could get those two cases or five cases or ten cases
 6   prepared.  You could even do it in a way that
 7   doesn't designate which one is going to go to trial
 8   for sure on the 30th as long as two, three or four
 9   of them are ready to go.  And Merck shouldn't be
10   prejudiced one iota, because they could have trial
11   teams for any one or two or three cases, and even if
12   it doesn't go January 30th and it goes February --
13   there's no February 30th, of course -- or March
14   30th, so what?  They ought to be ready for it,
15   instead of simply taking one case or two cases that
16   could get worked up, and for reasons that are a
17   little bit outside of total control of the parties,
18   has to get bumped off or has some other
19   complications.  So, whether the decision is made
20   today on consolidating or not, you clearly have the
21   option, at one point, to have multiple trials or one
22   after the other.
23          MR. MAYER:  Your Honor, let me
24   respond to some of these.
25          First of all, this is not about
```

Transcript - Monthly Status Conference (2005/11/17)

```
 1   slowing things down.  As Ms. Freiwald was saying,
 2   where you're talking about a very ambitious schedule
 3   to get a case ready for trial, I understand you may
 4   be trying to work up multiple cases at once so we're
 5   sure to have a case for trial, but the fact is, the
 6   schedule becomes that much more ambitious and
 7   unrealistic if you are trying to get more --
 8          THE COURT:  It is not unrealistic
 9   when you've had -- I don't think it is unrealistic.
10   I just don't.
11          MS. FREIWALD:  Your Honor, if I may.
12          I mean, we came in here today, and
13   you said your goal was to try one or two 18-month
14   cases.  We had tried a short-term use case, Mr.
15   Lanier said there had been a moderate length use
16   case tried, and we were talking about some program,
17   some equitable program, not merely the plaintiffs
18   selecting the cases, but some equitable way of
19   trying to reach an understanding on what a long-term
20   use case would be that would be the next case tried.
21          I think Merck has made it very clear
22   that if we try a case that's grouped together, a
23   death case with a case that somebody is alive, that
24   is not going to be a verdict from which we draw any
25   meaning.  It's just not.
```

Transcript - Monthly Status Conference (2005/11/17)

```
 1          And there is a huge difference, we
 2   all know, between strict liability asbestos
 3   litigation that is very old, at this point, reversed
 4   bifurcated fen-phen cases, which is also a very
 5   mature mass tort, and where we are today in this
 6   litigation.
 7          And it is not about speeding up the
 8   cases.  I mean, we're not going to get through every
 9   single trial two at a time as opposed to one at a
10   time.  This is about finding some representative
11   cases to try.  And that's what we came in here today
12   to do.
13          There may -- we fully recognize that
14   you may change your mind on these issues down the
15   road, and we would like a chance to fully brief the
16   aggregation of cases if and when that time comes.
17   But if we're going to talk about doing something
18   that's an exercise that gives meaning, that's fair,
19   that suggests some order to the process, we should
20   be picking a case for the next case, and that's fine
21   to talk about what might be after that.  Maybe
22   different kinds of cases can be after that, and we
23   can work toward those goals if we know those are
24   going to be the real cases.
25          THE COURT:  Let's go off the record
```

1 for a minute.

2 MR. PLACITELLA: Can I just speak to

3 that on the record?

4 THE COURT: Go ahead.

5 MR. PLACITELLA: Respectfully, I

6 believe the New Jersey precedent, despite whatever

7 was submitted outside, favors consolidated

8 bellwether trials, there's written precedent on it

9 in a drug case, not an asbestos case, and what we're

10 talking about is getting bellwethers, which give you

11 values. You are doing almost the same amount of

12 work --

13 THE COURT: Which case are you

14 referring to?

15 MR. PLACITELLA: It is Judge

16 Corademus' case that was -- it will come to me. I

17 should have it sitting on the top of my head, but

18 I'll get it before I leave.

19 But it is an appellate court case.

20 Everyone is free to read it. The purpose of

21 bellwethers is to give values. Here you have a

22 death case and someone who is alive, basically the

23 same amount of work, maybe incrementally it is four

24 or five extra days of trial. We try cases like this

25 all the time in this courthouse. Even if it is an

41

1 auto accident case, you have somebody who died and

2 someone who lived.

3 This is not something that's unique,

4 and if Merck should win that case, then they can

5 tell the world they won two cases instead of one

6 case.

7 So, this is not breaking with

8 tremendous precedent. It is very consistent with

9 what's gone on in the state. I'll get the case. I

10 feel bad I can't remember it. It is age creeping up

11 on me.

12 MR. GORDON: Robert Gordon from Weitz

13 & Luxenberg.

14 I've tried cases 2, 4, 6, 9, up to 48

15 plaintiffs together, and I think a number of the

16 cases that they cited in their footnote in the

17 letter to you were cases that involved somewhere in

18 the neighborhood 36 plaintiffs. No one is talking

19 about that at this point.

20 One thing to keep in mind is an

21 educated jury is a terrible thing to waste. We

22 spend a lot of time taking people out of their

23 lives, bringing them here, it's all the same

24 evidence. And there's techniques that the

25 plaintiffs used where it's one opening, one closing,

42

1 it's not ganging up on, one cross-examination. You

2 are simply asking the jury to, with separate verdict

3 sheets, separate trials, separate cases, but that

4 much of the evidence is consolidated. It makes

5 perfect sense and can give, as Chris said, an

6 example of how much this case is worth, that case is

7 worth, which would be more instructive going

8 forward.

9 MR. BUCHANAN: The liability evidence

10 is the same. There's just no -- the two cases we're

11 talking about, there's no difference in the

12 liability evidence. It's just the same evidence.

13 All we're talking about are two separate

14 case-specific experts, family members and treating

15 physicians. That's it.

16 MR. MORELLI: Your Honor, the reason

17 that that follows along is, when they are talking

18 about such a short period of time to get ready,

19 we've had two trials already totaling 14 weeks of

20 testimony. Much of that testimony was liability.

21 There's been umpteen depositions taken.

22 Everyone knows what the general

23 causation testimony is. The only thing you have to

24 get ready for is the specific, which is a regular

25 negligence case, it takes this much time,

43

1 (indicating). I used to prepare them in two days,

2 go try them, try another one two weeks later. Okay?

3 So, this is not rocket science that

4 they're talking about. We can try these cases, and

5 they will find out what a death case is worth if we

6 win and what a heart attack case is worth if we win.

7 If we don't, they have a doubly

8 strong position. But I don't believe that I've

9 heard anything -- we've been trying DES cases for,

10 what, 25, 30 years. I'm still trying them. I still

11 have DES cases that we're handling, and Ted and I

12 know each other for 20 years as a result of that.

13 And we've been trying those cases consolidated, and

14 by the way, they don't stipulate to liability and

15 causation in DES cases.

16 So, I don't believe that I've heard

17 any argument here that makes any sense to me against

18 it, and certainly not the amount of time to get

19 ready for trial when we all know what we're going to

20 hear. The fight is causation. That's it. And

21 that's what we're going to be talking about.

22 And I don't think that we have to

23 try -- use The Court's time for twice as long as we

24 could use it. If we can add just a couple of days

25 and get two cases instead of using an extra four

44

1   weeks to get two cases in, it doesn't sound to me
2   like judicial economy.
3           MR. JACOBY:  The idea, Your Honor, is
4   to gather as many verdicts as we can rationally and
5   in a timely manner where this litigation is.  And
6   when you weigh it, you weigh what everybody has been
7   talking about, the resources that go into these
8   trials, the expense, the time, the judicial time,
9   everything that's involved.
10          If we have an opportunity with no
11  prejudice to the defendants, and I underscore that,
12  with no prejudice to the defendants, to gather two
13  verdicts by sometime this February/March instead of
14  one, that is going to help all of us understand this
15  litigation, mature the litigation, rationally, not
16  haphazardly.
17          MR. MAYER:  Judge, we can brief it if
18  you'd like.  But the cases that have gone against
19  consolidation have not all involved these large
20  numbers of plaintiffs, and they reflect courts that
21  have a lot of experience with it and have reflected
22  on it and really determine it is not an equitable or
23  a useful way to try cases.
24          THE COURT:  I haven't seen that.
25          MS. FREIWALD:  Well, we would like to

1   have the opportunity to present that to Your Honor.
2           THE COURT:  All right.
3           MR. MAYER:  And to respond to the
4   issue on the DES cases.  There hasn't been a
5   consolidated DES trial in many years.
6           MR. MORELLI:  It's because you are
7   settling them.
8           MS. FREIWALD:  It has always been
9   very different.
10          THE COURT:  She can only take one
11  person down at a time.
12          Counsel?
13          MR. WEINER:  Richard Weiner.
14          Judge, it seems to me, just sitting
15  here and listening to this, is that there's no way
16  that either side is going to agree to what the other
17  side -- how we want to proceed.  And it would seem
18  to me that this has to be formalized in a motion
19  with appropriate papers so that The Court can
20  decide.
21          I think we were hoping that there
22  would be some cordiality here this morning between
23  the defense and the plaintiffs, but defense has --
24          MR. PLACITELLA:  This has been very
25  good.  You haven't been here much.

1           MR. WEINER:  No, I haven't.  That's
2   why I've been listening, why I haven't been talking.
3           MR. JACOBY:  You should have been
4   here this summer.
5           MR. WEINER:  I think that given the
6   diametric opposition that Merck has to the
7   plaintiffs' stance, perhaps it ought to be briefed,
8   and it goes on the record and Your Honor, you know,
9   makes a decision, but that has to be PDQ, because
10  this January 30th date is coming up.
11          THE COURT:  All right.
12          MR. WEISS:  Your Honor, I think we've
13  had a good dialogue, and while there are
14  differences, one thing is for sure.  We've
15  identified cases, Merck has taken down the
16  identification of those cases.  We should rapidly
17  get the records together and start the process of
18  discovering those cases for the individual
19  plaintiffs, and next time we meet, we'll all be in a
20  better position to see how we proceed in these
21  trials.
22          But at least you have these cases
23  ready to go, whether you try them singularly or
24  together.
25          THE COURT:  Does Merck have any cases

1   that they would like to see tried next?
2           MR. MAYER:  Pardon me?
3           THE COURT:  Were there any cases that
4   Merck had that they wanted on this list?
5           MS. FREIWALD:  May I have just a
6   minute?
7           MR. MAYER:  We would like to get the
8   records really on this universe of cases, if we can,
9   with the records that plaintiffs have and throw a
10  few cases into the pot when we have that
11  information.  We can do that very rapidly as soon as
12  we get the records.
13          MR. BUCHANAN:  I think, Your Honor,
14  if we're going to hold an aggressive trial calendar,
15  today would be the day to be talking about other
16  cases.  We all understood what the parameters were,
17  I thought, based on the last conference, 18-month --
18          MS. FREIWALD:  There are a number of
19  18-month cases, and we know it is not the process to
20  have the plaintiff simply say these are the 18-month
21  cases.
22          THE COURT:  Well, today was the day
23  when defense was supposed to bring to me whatever
24  cases you wanted to try.  Which case do you want to
25  try?  Give me one.

1    MS. FREIWALD:  We have the problem

2  of, we were supposed to get records, we have not

3  gotten records for many of the cases that the names

4  were thrown out.  Our only suggestion is --

5    THE COURT:  Have you done discovery

6  of any of those cases?

7    MS. FREIWALD:  Most of the cases have

8  very little, because they were --

9    THE COURT:  Forget most.

10   Have you done discovery on any of

11  them?

12   MS. FREIWALD:  I don't think -- I

13  can't tell you for every single case.  We have a few

14  records on some of the cases.

15   MR. MAYER:  I don't think we have

16  depositions.

17   MS. FREIWALD:  But we don't have

18  depositions on any of them.

19   MR. CORANATO:  Your Honor, with these

20  cases that are New Jersey plaintiffs with MI, 18

21  months or more, from what we can tell, are not in

22  any waves.  The only exception is the McFarland

23  case.  All the other cases are in -- they aren't

24  even in waves, Your Honor.

25   THE COURT:  So, do you propose doing

1  McFarland first?

2    MR. CORANATO:  No, we don't, Your

3  Honor.  We don't have enough information on really

4  any of the cases to be coming here and to be making

5  an educated proposal to Your Honor.

6    The problem here, Your Honor, is that

7  the plaintiffs have their own inventory of cases.

8  They have their own records.  They have developed

9  facts by speaking with their clients, perhaps

10  speaking with physicians.  They can come to Your

11  Honor and they can pretty much cherry pick and say,

12  Your Honor, these are the cases that we would like.

13   Your Honor, we don't have all the

14  information they have, and it is unfair to require

15  us to present cases when we don't have -- we're not

16  on an equal playing field with the plaintiffs.

17   MR. BUCHANAN:  Your Honor, one

18  observation.

19   MR. LANIER:  Your Honor, please.

20   MR. BUCHANAN:  Excuse me, Mark.

21   One thing that's very different, too,

22  and we are both at disadvantages from information

23  sources, I don't know what you have in your facts

24  database about your detailing of any of the

25  plaintiffs that have come up.  I don't know about

1  your sampling activity.  I don't know who was a

2  consultant.  I don't know any of that, you haven't

3  given us that information.  It's irrelevant.  Okay?

4  We each come to this process knowing what we know.

5  You have fact sheets, you have medical records, you

6  have information from our clients.  You have, in

7  many cases, more information than we have on certain

8  of the people that have been proposed, and for

9  people who haven't been proposed.

10   The people who you might put forward,

11  you have your own discovery on them, prescribing

12  physicians, and know that they are cooperative with

13  you.  We don't know that.  Okay?

14   So, there's always an information

15  imbalance, and it is irrelevant.  I mean, we were

16  supposed to be here today with information -- with

17  the cases that we wanted to talk about.  18-month,

18  MI, New Jersey cases.  We're here, we've done that,

19  and I think it's arbitrary to say or it's, frankly,

20  not a proper use of this procedure to say we need

21  more time to go back and collect meds on every

22  18-month New Jersey plaintiff.

23   MS. FREIWALD:  Well, there were names

24  that were put out on November 7th, and we were told

25  we needed medical records for those, and as far as I

1  know, we really have gotten little or nothing.

2    MR. BUCHANAN:  You have them all.

3    MS. FREIWALD:  No.  Others for

4  Buchko, I don't think --

5    MR. PLACITELLA:  That was the case I

6  was substituting in two weeks ago, and I withdrew

7  the case.

8    MR. CORANATO:  Lopresti is a perfect

9  example.  We got the medical records yesterday.

10  Sutherland.  We got the medical records yesterday.

11  So, those are two of the seven cases that have been

12  proposed where we just got the medical records

13  yesterday.  We haven't even had a time to review

14  these records ourselves.

15   MR. LANIER:  But they have

16  questionnaires, fact sheets that are 30, 50, 60

17  pages long on a great number of these cases, and

18  they could have been reviewing those before this

19  hearing, and they could have come to you and said,

20  Your Honor, in addition to the ones you've looked at

21  and pulled off your sheet, and in addition to what

22  plaintiffs have, we've gone through our fact sheets,

23  and here are seven cases or ten cases or five cases

24  of people who are over 18 months that we believe

25  ought to be thrown into the trial mix.  They haven't

1  done that.

2      MR. PLACITELLA:  Well, they have --

3      MR. MAYER:  If this is the chance

4  you're going to give us to do it, then we would like

5  to take a few minutes just among ourselves and we

6  will come back.

7      MR. PLACITELLA:  Can I just fill in

8  one gap, just because this is on the record?

9      The procedure that has gone on with

10  the fact sheets from the plaintiffs' perspective is

11  we give the fact sheets, and you guys have done an

12  unbelievable job of driving us crazy with

13  deficiencies.  You have micro examined every

14  question and taken our staff around the world and

15  back with every tiny thing that was missing, every

16  authorization that was missing, any time somebody

17  didn't put down a treating doctor because it was in

18  some record.

19      So, to say that no one has examined

20  in detail the fact sheets before today I think is

21  not reflective of the actual process that has gone

22  on today.

23      MR. MAYER:  That's not what we're

24  saying.

25      MS. FREIWALD:  That's not what we're

53

1  saying.

2      What we're saying is that we have

3  looked at the fact sheets.  Many of them still have

4  gaps or have inaccuracies or they reflect 18 months

5  that is not before use 18 months.  We don't have the

6  medical records.  We have looked at this.

7      We thought today was going to be

8  about process.  If today is going to be the last and

9  only chance we have to throw names into the mix,

10  then we would like a chance to talk amongst

11  ourselves for a little bit.

12      THE COURT:  All right.

13      The cases that the plaintiffs have

14  proposed at this point is Hatch, which was proposed

15  by The Court, not the plaintiffs, but they have

16  agreed.

17      Strimpell, Cona, Doherty, Sutherland,

18  Lopresti and McFarland.

19      Let's take a break.  Off the record.

20      -  -  -

21      (Whereupon, a recess was taken from

22      12:04 p.m. until 12:12 p.m.)

23      -  -  -

24      MR. WEISS:  As you know, Regina was

25  sending us the daily transcripts in the Humeston

54

1  case, and I refused to give them out because it is

2  unfair.  I worked with a couple of law firms, and

3  they have asked me for the transcripts.  What do I

4  do?  How do we compensate the court reporter fairly

5  for the work they've done in the trial?

6      THE COURT:  You know, that's not my

7  role.  There are rules that the court reporter --

8  she works for a union, and she's employed by the

9  state.

10      MR. WEISS:  I just wanted --

11      THE COURT:  So, I mean, she's

12  supposed to be paid a certain way.  She's supposed

13  to get paid for every transcript that goes out.

14      MR. WEISS:  I understood that.  I

15  just wanted to raise it on the record because, for

16  example, I may work with the Placitella law firm,

17  and Chris has asked for the transcript.  I refuse to

18  give it to them.

19      MR. BUCHANAN:  We have requests that

20  we haven't honored, either.  We've directed them to

21  Regina.

22      MR. WEISS:  I just want to put that

23  on the record.

24      THE COURT:  It is a difficult issue.

25  I mean, obviously, you would like to just share

55

1  things with people and you are working together, and

2  I'm sure defense counsel has got, you know...

3      MR. BUCHANAN:  They must be buying a

4  ton of them.

5      THE COURT:  I'm sure they are not

6  each buying their own.  I don't want to say that.  I

7  don't know what's happened.

8      MR. COHEN:  We talked to Regina about

9  it.

10      THE COURT:  I hope I don't have to

11  get involved in this, please.  It is not really my

12  job, it is actually an administrative job, as far

13  as, I don't really know what Regina gets compensated

14  or by whom or what.  I know that she is a union

15  employee, and they have very strict rules about what

16  she can charge.  She charges less than, I think,

17  most private stenographers charge.

18      MR. WEISS:  Much less.

19      THE COURT:  But she still should get

20  compensated.

21      MR. WEISS:  I understand.  I just

22  wanted to bring it to The Court's attention.

23      MR. PLACITELLA:  We'll talk to her

24  and come up with something that's fair.

25      THE COURT:  I mean, she's not going

56

1    to charge you the daily rate, I'm sure.

2         MR. PLACITELLA:  We have joint cases.

3    We'll just pay her something that's fair so she

4    feels good about it.

5         THE COURT:  She would probably be

6    willing to work with you.

7         MR. WEISS:  Okay.  I just wanted to

8    put it on the record, Your Honor.

9         THE COURT:  Let's break.

10              -   -   -

11         (Whereupon, a recess was taken from

12         12:16 p.m. until 12:51 p.m.)

13              -   -   -

14         THE COURT:  Which cases do defense

15    counsel suggest?

16         MR. MAYER:  Buchko.

17         THE COURT:  What's the docket number

18    for Buchko?

19         MR. PLACITELLA:  Your Honor, that's

20    the case I just said I was substituting two weeks

21    ago because I did somebody a favor.  That's the case

22    they want to put in.

23         MR. CORANATO:  Your Honor, that was

24    one of the cases that was on your list, Your Honor.

25         MR. WEISS:  It is 1565-05.

1         MR. WEITZ:  I'm having my office pull

2    the file, Your Honor.

3         THE COURT:  What do we know about

4    that one, anything?  Smoker, nonsmoker, ages?

5         MR. WEISS:  I can tell you.

6         MR. MAYER:  Capone is 63.

7         THE COURT:  Male?

8         MR. MAYER:  Female.

9         Klug is male, 55.

10         MR. WEISS:  Klug is nonsmoker.

11         Buchko is a past smoker.

12         THE COURT:  How old?

13         MR. CORANATO:  Buchko?

14         MS. FREIWALD:  62 at the time of his

15    heart attack.

16         MR. BUCHANAN:  Male?  Buchko?

17         MS. FREIWALD:  Male.

18         MR. WEISS:  Capone is a past smoker,

19    and it looks like -- I don't have the age for

20    Capone.

21         THE COURT:  Whose law firms?

22         MS. FREIWALD:  He was 63 at the time

23    of his injury.

24         MR. WEISS:  Locks Law Firm.

25         THE COURT:  They are all Locks?

1         MS. FREIWALD:  The records are the

2    records.

3         MR. CORANATO:  We're just getting

4    information yesterday on cases that are on the list.

5    I don't see what the problem is.

6         MR. BUCHANAN:  Can you give us the

7    whole list on the record and then we can talk about

8    them individually?

9         THE COURT:  What's the next one?

10         MR. WEISS:  Klug was the next one,

11    Your Honor, and that's 63305.  That's a Locks case.

12         Third case, guys?

13         MR. CORANATO:  Capone.

14         MR. BUCHANAN:  Do you have a docket,

15    Ted, on your list?

16         MR. MAYER:  I don't have one.  That

17    was one on the original list.

18         MR. CORANATO:  1307-05.

19         THE COURT:  Are these cases where

20    there was actually 18 months, as far as you know?

21         MR. CORANATO:  As far as we can tell,

22    Your Honor.

23         MR. MAYER:  As far as we know.

24         McDarby, which was the Weitz &

25    Luxenberg case, I believe.

1         MR. WEISS:  No.  Capone is Locks.

2    Klug is Locks.

3         THE COURT:  If it's Placitella, I

4    don't want to try.

5         MR. WEISS:  Buchko is Placitella.

6    Klug and Capone are Locks.  McDarby is Weitz, and

7    there's one more.

8         MR. CORANATO:  Daniel.

9         MR. MAYER:  I think that's it.  I

10    think that's all we came up with.

11         MR. WEISS:  That's only four.

12         THE COURT:  Who is Daniel?

13         MR. BUCHANAN:  Daniel is on or off,

14    guys?

15         MR. CORANATO:  Daniels is on.

16         MR. WEISS:  That's the fifth one.

17         MR. CORONATO:  I'm sorry, Daniels is

18    not on.

19         MR. MAYER:  We just came up with

20    those four.

21         MR. BUCHANAN:  You are taking Daniels

22    off?

23         MR. WEISS:  They gave us four.

24         THE COURT:  The one you just got?

25         MR. PLACITELLA:  I've been on the

Transcript - Monthly Status Conference (2005/11/17)

1    case two weeks.  I took it over as a --
2            THE COURT:  Take that one off.  We've
3    got three cases from the defense.
4            MR. WEISS:  Klug, Capone and McDarby.
5            THE COURT:  My thought is we will
6    have a January 30th trial date, then we'll have a
7    March 27 trial date, and we won't go any further
8    than that at this point.  At this point, I think
9    what we should do is gear it up.  I want to take one
10   from the plaintiffs' list, I want to take the Hatch
11   and Coya.
12           MR. LANIER:  Cona.
13           THE COURT:  Cona.
14           Which one of yours do you want, Mr.
15   Locks?
16           MR. LOCKS:  Dougherty.
17           THE COURT:  Dougherty.  McFarland.
18           MR. FERRARA:  Lopresti?
19           THE COURT:  Lopresti.
20           MR. WEITZ:  Your Honor, there was one
21   other case we were going to add.  I think it was
22   just recently filed, so, it wouldn't be ready.
23   There has been no discovery done on it.  I put in
24   another docket number.  The name of the case is Dr.
25   Steven Cheng.  He's from Tenafly, New Jersey.  He's

61

Transcript - Monthly Status Conference (2005/11/17)

1    in 18 months, more than 18 months, and he had --
2            THE COURT:  Well, I'm not going to
3    add that to the mix if it hasn't even been answered
4    yet.
5            MR. WEITZ:  It has not.
6            THE COURT:  Let's not add it to this
7    mix.
8            So, what have we got?  Five New
9    Jersey cases with five different law firms?
10           MR. LANIER:  True.
11           THE COURT:  Right?
12           And then for the defense side, we
13   have three.  So, that's eight cases.
14           MR. BUCHANAN:  Two with the same
15   plaintiffs' firm.
16           MR. LOCKS:  Two of the three that
17   they have chosen are mine.
18           THE COURT:  All right.
19           Pick one of those.
20           MR. MAYER:  Klug.
21           THE COURT:  All right.
22           They want Klug, and what's the other
23   one you wanted?
24           MR. LANIER:  McDarby, Weitz firm.
25           THE COURT:  McDarby, okay.

62

Transcript - Monthly Status Conference (2005/11/17)

1            So, we've got five, six, seven cases.
2    Those seven cases I want to have worked up as
3    quickly as possible.  I want to have records
4    provided to the defense if they don't have them.
5    I'm assuming fact sheets have been provided in all
6    of those cases.  I want you to designate who your
7    experts are going to be.  I want you to get your
8    case-specific reports to them as quickly as possible
9    from your expert doctors who are going to be case
10   specific.
11           I want them to be able to get all the
12   records and employment records and prescription
13   records and whatever as fast as they can, and I want
14   the plaintiffs to cooperate to help them get them.
15   And then I want the deps of those plaintiffs and
16   their prescribing doctors taken.
17           And at that point we'll meet and
18   we'll discuss which two or three or one we're going
19   to try January 30th, and in the meantime, starting
20   from any time tomorrow, it doesn't have to be a
21   formal motion filed, defense can file a brief
22   arguing against consolidation of cases for trial, or
23   we can have an agreement between counsel that --
24   let's go off the record.
25                   -  -  -

63

Transcript - Monthly Status Conference (2005/11/17)

1            (A discussion off the record
2    occurred.)
3                   -  -  -
4            MR. LOCKS:  We don't have the detail
5    people information.  We believe that's critical to
6    our cases, and we, particularly because of the way
7    it's been done in the past, we haven't been able to
8    --
9            THE COURT:  I thought you had details
10   of each plaintiffs?
11           MR. WEISS:  Not for these plaintiffs,
12   because they just produced them up to a certain
13   point in time.  It's a rolling basis.
14           MR. BUCHANAN:  We probably have some
15   for McFarland.  We probably don't have it for any of
16   the others.
17           MR. LOCKS:  I believe --
18           MR. COHEN:  You are just going to
19   tell us to produce them.  We'll produce them.  I
20   don't need 20 plaintiffs' lawyers to tell me that.
21           THE COURT:  The bottom line is,
22   Charlie, there's seven cases, seven treating
23   doctors, and whoever called on them or their
24   partners and whatever the notes are from those.
25           MR. COHEN:  We'll go back, and if we

64

1    have any particular problems, I'll call you.

2         THE COURT:  They should be produced

3    as quickly as possible.  Everything should be ASAP

4    as far as producing their records, taking the deps,

5    and I'm going to be available for those cases.  If

6    need be, we can hold phone conferences, we can do

7    whatever we need to do.

8         And then in a week or two, maybe not

9    a week or two, but let's say, well, we've got the

10   rest of November, maybe the first week in December,

11   second week in December, we can really sit down and

12   say, okay, we've been able to do this, this, and

13   this in this case, this case, this case, and then I

14   can hear from you as to why the defense cases are

15   not good cases, not truly representative, and I can

16   hear from you why their cases are truly

17   representative and then we can decide.  Or maybe

18   you'll tell me we both agree we want to try.

19        My first thought was to try Hatch.  I

20   said that before.  I guess it was just because it is

21   a death case.  We haven't had a death case, and it

22   is New Jersey, 18 months, but it might not be the

23   best case.  It is a sample.  It might be that it

24   should be paired with something else.  It might be

25   that two should be paired.  I don't know.

65

1         MR. LANIER:  Great.

2         THE COURT:  But we'll look at it.

3    And it might be that one of the other cases would

4    be.  Or maybe you can actually work something out

5    where you try the two defense cases in March and we

6    try the two plaintiffs cases in January.  Or we try

7    one of the defense cases in March, if you only want

8    to try one and you like one.  Maybe we can actually

9    possibly come to an agreement on something.  There

10   have been a couple of cases where that's happened.

11        So, let's leave it right for now.

12   We've got these seven cases.  We're going to see

13   what we can do.  We're going to try very hard to

14   have something tried January 30th.

15        MR. JACOBY:  Judge, did you schedule

16   the next conference?

17        THE COURT:  No.

18        MR. BUCHANAN:  Is that a conference

19   on the seven cases or is that a general Vioxx?

20        THE COURT:  General conference on the

21   seven cases will be...

22        MR. MAYER:  I would suggest we have a

23   specific conference on the seven cases.

24        THE COURT:  Mr. Ferrara, we didn't

25   get yours, one of your cases; right?

66

1         MR. FERRARA:  We're together.

2         THE COURT:  You're okay.  Everybody

3    is okay.

4         MR. PLACITELLA:  He made sure he had

5    an Italian plaintiff.

6         MR. FERRARA:  I can't hear so well,

7    so he is my seeing eye dog.

8         THE COURT:  Did you say he's your

9    brain and your seeing eye dog?

10        MR. MORELLI:  Do you want to schedule

11   a conference on this issue a little sooner than

12   December 15th?

13        THE COURT:  We probably should.  I

14   think we should talk in two weeks.

15        MR. MORELLI:  All right.

16        Let's see where we are going.

17        MR. DASSOW:  Week after Thanksgiving

18   would be good.

19        THE COURT:  Okay.

20        Let's make it November 29th, which is

21   the Tuesday after Thanksgiving.  Is that okay?

22        MR. WEISS:  Yes.

23        THE COURT:  November 29th.

24        MR. WEISS:  10:00, Your Honor?

25        THE COURT:  Tuesday after

67

1    Thanksgiving.

2         MR. BUCHANAN:  Do you have another

3    day that week, Your Honor?

4         THE COURT:  Marie wants to know,

5    she's going to have to be sending out the list for

6    November 30th.

7         THE JURY MANAGER:  No, January 30th.

8         THE COURT:  Are there any issues on

9    jury selection?

10        MR. BUCHANAN:  Would it be possible

11   to raise that at the next conference?  Would that

12   still give you enough time?

13        THE JURY MANAGER:  Well, I'm going to

14   be sending out, not next week, but the week after,

15   I'm going to start sending out the summonses for

16   January 30th.  So, you will have specialized panels

17   for that.

18        THE COURT:  So, send out the panel.

19   We're not going to give them a time frame for the

20   trial in the initial notice because we're not going

21   to go with a time.  I don't want to tell them it is

22   going to be seven weeks when it's really going to be

23   two-and-a-half weeks, three weeks?  Three?

24        MR. BUCHANAN:  When they show up and

25   after they have been screened, we can address that.

68

1   THE COURT: My proposals, I'm
2   throwing them out, this is not cast in stone, it's
3   just throwing it out, my thought, again, is that we
4   should have a limitation of, I would say like 45-
5   minute openings without evidence being shown during
6   the openings. That's one of my first thoughts.
7   Second would be, I said last time,
8   four, but three to four, I'm thinking maybe three is
9   better, three- to four-hour maximum direct, cross
10  limited, and then recross and redirect limited to
11  half hours or 15 minutes or 20 minutes, I don't
12  know, each.
13  MR. BUCHANAN: Cross not to exceed
14  the direct?
15  THE COURT: Cross not to exceed the
16  direct. Those are my thoughts at this time. I'm
17  not going to put a limit on the closings, I don't
18  think.
19  And obviously premarking exhibits and
20  then trying to go promptly. We did have a lot of
21  breaks in the last trial. We didn't have any daily
22  breaks, but we did have fairly long rest breaks in
23  between where maybe we can try to deal with more of
24  a 9:00 to 4:30, little more rigid schedule as far as
25  15-minute breaks in the morning, 15 in the afternoon

69

1   and not exceed those, those kind of things, to try
2   to move things faster.
3   MR. BUCHANAN: The legal issue should
4   be resolved.
5   MR. MORELLI: Here's my question. If
6   we are scheduled to put Merck's witness on first in
7   our case, are you considering that a cross or a
8   direct? So that we have unlimited cross of their
9   witnesses if we put them on in our case, because
10  that's what we plan to do, which is what we did in
11  Houston. So, would that be a cross or a direct or
12  unlimited?
13  THE COURT: If you call somebody,
14  it's your direct and it is four hours. Their cross
15  is limited to four hours also. When they call their
16  witness, they are limited to four hours and then you
17  are limited to four hours. But if they use two
18  hours, then you are limited to two hours. Maybe you
19  will tell me this won't work, I don't know. Let me
20  know. If you feel it is completely unfair -- I hate
21  that "unfair" word.
22  MR. MORELLI: Well, we don't want to
23  use that word.
24  MR. DASSOW: Unmanageable.
25  THE COURT: If you think it is just

70

1   not going to work and you are going to be too
2   stymied --
3   MR. LANIER: We'll chew on it.
4   THE COURT: Everybody think about it,
5   and maybe we have to say you can each have -- I
6   mean, we could do it other ways. We can say, you
7   know, you are limited to two witnesses for as long
8   as you want, and the other witnesses have to be an
9   hour each. I mean, you know, we could do a lot of
10  different -- I mean, there's other different ways of
11  doing it. I just don't think we should go three
12  days with three or four witnesses per side. It is
13  counterproductive, it is not necessary, and there's
14  got to be a way we can prevent that from happening,
15  having a plaintiffs' witness on for three days or
16  two plaintiff's witnesses, and then having two of
17  the defense witnesses on for three days. We don't
18  need that.
19  MR. MAYER: We agree with that, Your
20  Honor. We think whatever the rules are, we should
21  get those clearly set in advance so everybody knows
22  what they are doing.
23  THE COURT: I'm just throwing out
24  rules. Again, I would love it if you came up with
25  joint rules or if you tell me we're really unhappy

71

1   about this because we need to have one expert on the
2   stand all day, we need to have one Merck person.
3   Whatever.
4   But I really think we should try to
5   have rules in advance, otherwise, it just doesn't
6   work, because one side does it, then the other side
7   doesn't, and vice versa. So, we have to have them
8   before we start, obviously.
9   MR. MAYER: Judge, may I raise
10  another issue?
11  MR. LANIER: Could I --
12  MR. MAYER: Go ahead, Mark.
13  MR. LANIER: Thank you, Ted.
14  Your Honor, one other option, while
15  everybody is chewing this and while Merck may be
16  chewing this as well. I have seen a lot of judges
17  keep little chess clocks that have two sides, and
18  you basically say, okay, each side has X number of
19  hours, you use them on whichever witnesses you want,
20  however you want to use them, it's up to you. You
21  want to spend 10 hours with one witness, fine, but
22  you may only have 30 minutes left for this other
23  witness. And that's another possibility that has
24  certainly been used before effectively. So, we'll
25  try to work together on something, present you with

72

1   something agreed to.

2        THE COURT:  We've got to shorten

3   these trials.  Neither side wants to do another

4   seven weeker.

5        MR. MAYER:  Judge, I want to raise an

6   issue that has to do with the wave cases, which I've

7   been working on the discovery on.  Expert deadlines

8   are coming up, and since those are now being put

9   somewhere farther down in the pecking order in terms

10  of trials, can we put off those expert dates?  We

11  keep working cases up I think on the facts side, but

12  for both sides' benefit, I think to not proceed to

13  expert discovery in those cases until such time as

14  they get restored to a potential trial status seems

15  to make a lot of sense.

16       THE COURT:  Well, when was the next

17  conference?

18       MR. WEISS:  December 15th.  And the

19  first wave cases, plaintiffs have submitted their

20  case-specific experts.  Merck's response and report

21  are due December the 9th.  Am I correct?

22       MS. FREIWALD:  Yes.

23       MR. WEISS:  The second wave, I think,

24  Greg --

25       MR. SPIZER:  December 9th.

1        MR. WEISS:  December 9th.  We had to

2   submit our case-specific expert in the second wave,

3   and they had sometime in January to produce them.

4        MR. MAYER:  I guess we would like

5   relief from those dates so we can focus on the work

6   at hand.

7        MR. BUCHANAN:  It makes sense.

8        MR. WEISS:  I don't care.  Michelle

9   and Greg are going all over the country taking

10  depositions in those cases as well.  Is that going

11  to continue or is that going to stop?

12       MS. FREIWALD:  We're willing to work

13  with you on that.

14       THE COURT:  Why don't you see if you

15  can work something out together, and if you can't,

16  we'll deal with it on December 15th when other

17  counsel will be here for other cases.

18       MR. BUCHANAN:  Okay.

19       Try to stipulate something before

20  that, because I think we probably have obligations

21  coming up before that.

22       MS. FREIWALD:  Nobody wants to spin

23  their wheels.

24       THE COURT:  I want the focus to be on

25  this at this point.  Now, the plaintiffs are going

1   to have the onus of, you know, if you don't get your

2   fact-specific experts to them.

3        MR. WEISS:  On this case?

4        THE COURT:  Yes.

5        MR. WEISS:  We'll have them.  That's

6   no problem.

7        THE COURT:  You've got to get them

8   fast to give them an opportunity to respond.  If you

9   can't, then your case is probably going to be out of

10  the mix, because we have to have them move.  I can't

11  put them under too much time restraints if you don't

12  have your part to them.  You are the ones who want

13  to move them, so, the pressure is on you.

14       MR. JACOBY:  Fair enough, Judge.

15       MS. FREIWALD:  Can I ask just one

16  housekeeping matter, Your Honor?

17       THE COURT:  Yes.

18       MS. FREIWALD:  If I could make a

19  request of plaintiffs' counsel who have cases that

20  are coming up, if you have medical --

21       MR. MAYER:  On the 7th?

22       MS. FREIWALD:  Yes, on the 7th.

23       If you have medical records to send

24  to us or other information that you are going to

25  produce to us, my request would be that you send

1   them directly to Michelle Yeary in our Princeton

2   office and then we know whether they have actually

3   come in or not, because she will be the one point

4   person for that.

5        THE COURT:  Okay.

6        That's simple enough.  Michelle

7   Yeary.  Everybody note it?

8        MR. BUCHANAN:  Charlie, for purposes

9   of the sales rep information, why don't you send

10  that independently, copy Sol and I, I guess, on the

11  transmittal letters.

12       MR. WEISS:  Just so we know we got

13  it.

14       MR. BUCHANAN:  Just to make sure each

15  of the firms get their own stuff in the electronic

16  format that you have been sending it to me in so

17  they have their stuff in the case.

18       MR. PLACITELLA:  I just want to note

19  for the record that the plaintiffs and the defense

20  have agreed on the last three points.

21       THE COURT:  Yes.  It is starting to

22  go nicely.

23       Off the record.

24            -  -  -

25       (A discussion off the record

1  occurred.)

2            -   -   -

3            MR. LOCKS:  Judge, can I go back to

4  the schedule date for these seven cases?  You have

5  said that Tuesday after Thanksgiving?

6            THE COURT:  And Tuesday is not good

7  for some people.

8            MR. LOCKS:  Monday?

9            THE COURT:  Is Monday better or is

10  Wednesday better?

11           MR. BUCHANAN:  Monday is fine.

12           MR. MAYER:  The 30th, I can't do.

13           THE COURT:  The 29th then?  The 29th

14  is Monday.

15           MR. WEISS:  28th?

16           THE COURT:  1:30.

17           MR. WEISS:  28th?

18           THE COURT:  28th at 1:30, and we'll

19  just deal with those seven cases.  Whatever we know

20  about them so far, what's been done on them so far,

21  why they do or don't meet the criteria, what should

22  be first.  Okay?

23           MR. MORELLI:  The 28th.

24           THE COURT:  November 28th at 1:30.

25  December 15th is still the large Vioxx meeting.

1            MR. MORELLI:  That's at 10:00; right?

2            THE COURT:  Right.

3            MR. BUCHANAN:  One issue that arose

4  in the Humeston trial, it related to the publication

5  of analyses that had been done by an expert

6  concerning -- not publication of the underlying

7  data, but publication of the analyses of the data.

8  That expert was Dr. Richard Kronmai.  We may or may

9  not be interested in publishing the results, but I

10  don't want there to be any uncertainty about his

11  ability to do that based on data that's been

12  produced in the litigation.

13           The defense has said loosely offhand

14  that they didn't think he would be able to publish

15  it, so, if he wanted to, fine.  I want to make clear

16  that --

17           MS. FREIWALD:  That was not said.

18           MR. BUCHANAN:  It absolutely was

19  said.  It was said by Mr. Raber.

20           MS. FREIWALD:  No.  I was standing

21  right there.  That was not said.  This is a

22  conversation for another time.

23           MR. BUCHANAN:  If he wants to do it,

24  feel free.  No.  It is a conversation for now,

25  because the data is -- it is a timely issue.  You've

1  asserted that you seek to reintroduce the drug.  It

2  is a public safety issue.  It is a public health

3  issue.  The medical community gets information

4  through the peer-reviewed literature, and I want to

5  know whether or not there's going to be any

6  objection to publication of analyses derived from

7  SAS data that is not otherwise going to be shared in

8  the public.

9            THE COURT:  Why don't we do this.

10  We'll have a phone conference between your office

11  and Mr. Buchanan's office on -- well, why don't we

12  talk about it on November 28th, because we're not

13  going to see each other before then.  I'm not going

14  to be able to talk to you.

15           MR. MAYER:  We'll have to look at the

16  issue.

17           THE COURT:  Look at the issue and see

18  whether you have any objection to what he wants us

19  to allow --

20           MR. BUCHANAN:  I don't think it is

21  confidential.  I don't think the materials

22  themselves are confidential.

23           MR. MAYER:  I'm just not familiar

24  with the issue.  So, let's look at it.

25           THE COURT:  During his testimony, he

1  said that he was cross-examined on what was

2  published, and he said he wanted to publish

3  something, but that he thought he was restrained by

4  the confidentiality order.

5            Whether he really intends to submit

6  something to a journal or not, I think it was a

7  statistical analysis of it.  Wasn't it the

8  Alzheimer's death data?

9            MR. COHEN:  I think it pertains to

10  the charts he put on the screen.

11           MR. BUCHANAN:  I think it pertains to

12  the Alzheimer's issue, I believe.  Alzheimer's

13  mortality data.

14           THE COURT:  I thought it was the

15  overall mortality data that he said he didn't feel

16  would be published, but I could be wrong.  It was a

17  long trial, so...

18           MR. MAYER:  At any rate, you'll let

19  us know in more detail.

20           MR. BUCHANAN:  I think that's the

21  issue.  That is the issue.  That is the detail that

22  I'd give you.  And the question really is, you know,

23  there are spreadsheets of data, raw data, which

24  would never be published themselves, but his

25  conclusion is based on them, and the relative risks

1  and charts that are derived from them, we believe,
2  are, frankly, a matter of public health interest
3  that should be -- that may permissibly be published,
4  and I don't see any confidentiality concerns.  I
5  just to -- is it an issue under the confidentiality
6  order?  It may be.  But I want to raise it before.
7             THE COURT:  I think what they need to
8  know before they can decide is what data are we
9  talking about?  If we're talking about the SAS data.
10            MR. BUCHANAN:  It wouldn't be the SAS
11  data itself.  It would be conclusions drawn from SAS
12  data.  It would be the charts that he derived.
13  Those charts aren't in the data.  Those charts
14  are --
15            THE COURT:  But it is his charts from
16  the SAS data?
17            MR. MAYER:  From the SAS data, and
18  the charts that he presented at trial.
19            MR. BUCHANAN:  Them or others.
20            THE COURT:  From the SAS data.  All
21  right.
22            Think about it and get back to me.
23  I'm not going to deal with that today, but we should
24  deal with it soon.  Okay?
25            MR. BUCHANAN:  Thank you.

81

1             THE COURT:  All right.  See you on
2  the 28th.
3                  -  -  -
4             (Whereupon, the hearing concluded at
5  1:17 p.m.)
6                  -  -  -

82

1          C E R T I F I C A T E
2
3        I, LINDA L. GOLKOW, a Notary Public
4  and Certified Shorthand Reporter of the State of New
5  Jersey, do hereby certify that the foregoing is a
6  verbatim transcript of the testimony as taken
7  stenographically by and before me at the time, place
8  and on the date hereinbefore set forth, to the best
9  of my ability.
10
11
12        I DO FURTHER CERTIFY that I am
13  neither a relative nor employee nor attorney nor
14  counsel of any of the parties to this action, and
15  that I am neither a relative nor employee of such
16  attorney or counsel, and that I am not financially
17  interested in the action.
18
19
20
21        _____
22        LINDA L. GOLKOW, CSR, RDR
           Notary Number:  1060147
23         Notary Expiration:  1.2.08
           CSR Number:  30XI00176200
24         Dated:  November 18, 2005
25

83

```
                SUPERIOR COURT OF NEW JERSEY
                ATLANTIC COUNTY/CIVIL DIVISION
------------------------------x
THOMAS CONA AND JOYCE CONA,      DOCKET NO. ATL-L-3553-05MT
         PLAINTIFFS,
         VS.
MERCK & CO.,INC.,
         DEFENDANT.
------------------------------x
  JOHN MCDARBY,                   DOCKET NO. ATL-L-1296-05MT
         PLAINTIFF,
         VS.                      STENOGRAPHIC TRANSCRIPT
                                  OF:
MERCK & CO., INC.,                - MANAGMENT MEETING -
         DEFENDANT.
-------------------------x
     PLACE:  ATLANTIC COUNTY CIVIL COURTHOUSE
             1201 BACHARACH BOULEVARD
             ATLANTIC CITY, NJ 08401
     DATE:   JANUARY 25, 2006
B E F O R E :
   THE HONORABLE CAROL E. HIGBEE, P.J.Cv.
TRANSCRIPT ORDERED BY:
   DAVID BUCHANAN, ESQUIRE
   HOPE FREIWALD, ESQUIRE
A P P E A R A N C E S :
   MARK LANIER, ESQUIRE
   RICHARD D. MEADOW, ESQUIRE
   LANIER LAW FIRM
   BENJAMIN MORELLI, ESQUIRE
   MORELLI RATNER
      ATTORNEY FOR PLAINTIFF CONA
   ROBERT GORDON, ESQUIRE
   JERRY KRISTAL, ESQUIRE
   ELLEN RELKIN, ESQUIRE
   WEITZ & LUXENBERG
      ATTORNEYS FOR PLAINTIFF MCDARBY
              *    *    *    *    *    *    *
         REGINA A. TELL, CSR-CRR-RPR
         OFFICIAL COURT REPORTER
         1201 BACHARACH BOULEVARD
         ATLANTIC CITY, NJ  08401
```

```
A P P E A R A N C E S   C O N T I N U E D . . .

   DAVID BUCHANAN, ESQUIRE

   SEEGER WEISS

      And

   SOL WEISS, ESQUIRE

   DAVID JACOBY, ESQUIRE

      LIASON PLAINTIFFS' COUNSEL

   SAMUEL DAVIS, ESQUIRE

   DAVIS SAFERSTEIN

      ATTORNEY FOR PLAINTIFF DR. BRAUN

   NIKI TRUNK, ESQUIRE

   FERRARA LAW FIRM

      ATTORNEY FOR PLAINTIFFS

   CHRISTY D. JONES, ESQUIRE

   BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC

      ATTORNEY FOR THE DEFENDANT, MERCK

   THEODORE MAYER, ESQUIRE

   CHARLES COHEN, ESQUIRE

   HUGHES, HUBBARD AND REED

      ATTORNEY FOR DEFENDANT, MERCK

   HOPE FREIWALD, ESQUIRE

   MICHELLE YEARY, ESQUIRE

   PHILIP YANNELLA, ESQUIRE

      ATTORNEY FOR THE DEFENDANT, MERCK
```

```
 1              P R O C E E D I N G S
 2         THE COURT:  Okay.  You can be seated.  I
 3    thought this might be a little smaller.  I know, one
 4    trial.  It is not working quite the way I envisioned
 5    it.
 6         MR. LANIER:  I think everybody wants to come
 7    to your hearings.
 8         THE COURT:  Yes.  Okay.  Before we start
 9    discussing any particular legal issues about the trial,
10    I wanted to discuss some of the facilities issues with
11    you briefly.  And I basically have staff here that each
12    want to address you about their own particular area.
13         So we'll start with -- let me start by
14    introducing you to Theresa, the division manager for
15    Civil.
16         MS. UNGARO:  Good morning.
17         THE COURT:  So she is one of the people who
18    you can contact if you have any issues, and she is
19    going to be basically a major contact person.
20         Howard Birchold is the acting TCA, so he is
21    responsible for -- you know, he is in charge of Civil,
22    plus Family, plus everything else, but since he is the
23    overall person in charge, he will be making the final
24    decisions about things if we need -- ultimately, if we
25    need to go to him.  Our goal is not to bother him too
```

```
 1    much.
 2         MR. BIRCHOLD:  Good morning.
 3         THE COURT:  And we have got John Sullivan here
 4    for our tech, and we have Dennis Medwick for tech.
 5    Dennis is from Middlesex.  He is especially assigned by
 6    Trenton to all mass tort judges, so he travels around.
 7    He is based in Middlesex, but he goes up to Bergen and
 8    comes down here and helps with all tech issues.
 9         We have Louise, who is Theresa's assistant and
10    who did -- basically, Louise stepped in and really
11    handled a lot of the things for the first trial in
12    Theresa's absence, and we have Jill, who is the team
13    leader, who I think you already know, who is the mass
14    tort leader.  We have Dick Dickerson, who does our
15    building facilities and security.
16         So let's start with...
17         Dick, why don't you start by just addressing
18    them about what we need to know about security passes
19    and badges and things like that.  Some of you already
20    know this from the last trial, but...
21
22         MR. DICKERSON:  Are you Miss Jones?
23         MS. JONES:  Unfortunately.
24         MR. DICKERSON:  Mr. Lanier.
25         MR. LANIER:  Thank you, Mr. Dickerson.
```