1    MR. DICKERSON:  I'm Dick Dickerson --

2        THE COURT:  There's co-plaintiffs' counsel.

3        MR. DICKERSON:  Okay.  I have a few more.

4    I'll hand them out and you can use them up here.

5        THE COURT:  So we have -- we basically have --

6        MR. DICKERSON:  These are some notes I'm

7    making for my staff to follow, so when it comes to the

8    date, you note that I have written "tentatively" there,

9    because that has to do with your future discussions

10   with the judge as to the actual starting date.

11       I'll talk about the facilities that you'll be

12   using first.

13       Well, let's go right down the page here.

14       We would like the technicians to come in on

15   Friday, the 24th of February to set up any IT issues

16   that they may have, and I think, sir, you talked with

17   John Sullivan briefly about that.

18       MR. SANOV:  Yes, sir.

19       THE COURT:  Let me ask you, are you going to

20   be using the same tech people you used last time as far

21   as the equipment, same company or different company

22   or...

23       MR. FREIWALD:  We're using the same.

24       MR. LANIER:  I believe we're using the same

25   folks, but so much of ours is done in-house, so we're

1    going to have a lot of in-house equipment.

2        MR. SANOV:  We've got our people from Houston

3    that come with me, and we use our stuff and set up.

4        MR. LANIER:  If that's okay.

5        MR. MORELLI:  So it is not the same as your

6    last trial.  It is the same as in Houston.

7        MR. SANOV:  That's how we interacted with the

8    IT people on the Merck side when we were doing our

9    prior trial.

10       THE COURT:  Okay.  I don't care if you each

11   have your own teams or a joint team or whatever, but

12   there has to be coordination.  Obviously, there has to

13   be a single screen in the courtroom.

14       MR. SANOV:  Yes, ma'am.

15       THE COURT:  There has to be -- somebody has to

16   wire my laptop up, you know, I mean, we have --

17       MR. LANIER:  And we'll see all of that will be

18   done seamlessly.

19       THE COURT:  We have to make sure there's

20   cooperation.

21       MS. JONES:  Right.  I just want to make sure.

22   We are going to be in the big courtroom, is that the

23   plan?

24       THE COURT:  Yes.  We're still going to be in

25   3-A.  We're basically going -- I envisioned it being

1    the exact same set-up as the last trial.  That's what

2    we're willing to give you.  If you want something

3    different, you're going to have to ask us about it.

4        MR. FREIWALD:  Could somebody just send me the

5    names of the people who will be your contacts for me to

6    forward to FTI?

7        THE COURT:  Do we have any of your tech people

8    here today?

9        MR. FREIWALD:  No, not today, but it is going

10   to be the same crew.  It will be Derek again sitting in

11   the courtroom, I believe.

12       THE COURT:  Okay.  Well, the 24th is going to

13   be when we want it set up, is basically what we're

14   saying, the Friday before, so we're not dealing with it

15   during the week of the trial.

16       MR. FREIWALD:  That's fine.

17       THE COURT:  And as far as physically putting

18   it in here.  And if you wish, and I think it is

19   probably a good idea, we should have your team and your

20   team show up for a joint meeting with Dick and with

21   Howard and with John from IT --

22       MR. LANIER:  That would be great.

23       THE COURT:  -- a day before then, maybe

24   two weeks before then or two or three weeks, just to

25   make sure that everything is okay.

1        MR. SULLIVAN:  Your Honor, I can volunteer

2    that whenever it is convenient for the firms, we're

3    here, and we can do a walk-through whenever it is

4    convenient for them to come to the building.

5        MR. LANIER:  And we'll bend to the Court's

6    schedule, however y'all want to do it, so basically,

7    Merck can decide, and we'll cooperate fully.

8        MR. FREIWALD:  We'll find a mutually

9    convenient date and we'll advise the Court and make

10   sure it is okay with Mr. Sullivan.

11       THE COURT:  You can go out with them today,

12   but also in conjunction with the other people so we

13   know what is happening.

14       Okay, Dick, go ahead.

15       MR. DICKERSON:  So Friday, the 24th is your

16   tech day set-up, and that also gives you, if you don't

17   finalize it, it gives your technicians Monday, the 27th

18   to come in and finalize in Courtroom 3-A, because there

19   won't be any court activities in Courtroom 3-A on that

20   Monday.  If there's any activities, it will be down on

21   the first floor.

22       Okay.  We have assigned Jury Room 3-E to the

23   plaintiffs in this case, and that's across the hall

24   here.

25       THE COURT:  Christy, we're sort of switching

1   the plaintiffs and defense rooms, just because the jury
2   room that you had was a little larger.
3        MS. JONES:  The jury room I had was a little
4   larger.
5        MR. DICKERSON:  The war room.
6        THE COURT:  I don't care who has which, but --
7   do you want to stay where you were?
8        MS. JONES:  My preference would be to stay
9   where we are, but it doesn't -- I don't really care.
10        THE COURT:  Who is going to have more people,
11  do you know?
12        MR. LANIER:  We'll have two full sets of
13  lawyers.  We'll have two sets of plaintiffs, but --
14        MS. JONES:  We'll work it out.
15        MR. LANIER:  We get along.
16        THE COURT:  There is not a big difference
17  between the two.  We'll switch the rooms this time.
18  Maybe we'll just alternate them every trial.
19        MS. JONES:  I'm just suspicious enough to
20  think that it was good luck to have it back there last
21  time.
22        MR. MORELLI:  That's why we're switching the
23  rooms.  We're switching the rooms and the verdict.
24        MR. DICKERSON:  Sorry to cause that, Your
25  Honor.

9

1        Anyway, 3-E is across the hallway for the
2   plaintiffs.  Jury Room 3-B is right through this wall
3   as you were coming in the door, and that will be for
4   the defense side.
5        Jury Room 3-F, which is down the hallway and
6   sort of out of sight and out of mind, is where the
7   actual jurors sit while they're here.
8        THE COURT:  The smaller jury room has two
9   bathrooms and the larger jury room has one.  So there's
10  equality all through.
11        Go ahead.
12        MR. DICKERSON:  On Monday, the 27th we have
13  drawn a bunch of jurors to come in here for selection,
14  and Maria Waldman, the jury manager, will address some
15  of those jury-related issues shortly with you, but
16  they're coming in on the 27th.
17        They'll be attended to downstairs.  They'll be
18  answering a questionnaire that will be constructed, if
19  not already constructed, for that purpose.
20        Again, on Tuesday, the 28th I tentatively have
21  said that will be the first time that we go into -- or
22  you go into jury selection, but that's up to decisions
23  that the judge makes.
24        Courtroom 3-A is still the courtroom for the
25  trial itself.  That's the large courtroom that some of

10

1   you -- most of you know.  If you don't, you ought to at
2   least look at it before you leave.
3        And the second page, for all attorneys that
4   are not Atlantic or Cape May Bar, you'll need access
5   cards to get to the back of the house.  We're prepared
6   to give you them.  We would also like to give you an
7   identification.  This is the prototype of it, and if
8   the lead attorneys, you'll see my name and address down
9   there and my e-mail address, if you can e-mail me the
10  names of the attorneys that you need to work in the
11  back of the house, and that is not necessarily limited
12  to attorneys.  If you have paralegals working back
13  here, we need to know that so we can give you access
14  cards.  And we would like you, if you have it in your
15  database, ship me the digital photos of those folks
16  also and we'll create an ID very similar to this for
17  them to wear not in the courtroom, but when they're
18  working in the back of the house so the Sheriff's
19  Department knows that you are with this event.
20        THE COURT:  Originally we were going to
21  have -- the plan was to have you wear tags, but I told
22  them I don't think you want the jury to know that
23  there's 60 lawyers in the room, so we would prefer not
24  to have everybody identified as attorneys.  Therefore,
25  we're just going to make it so you can put it in your

11

1   pocket and have it available to flash if you need it.
2        And for these, it can basically be any number
3   of -- we can get one for every one of your paralegals
4   and attorneys who might be coming in and out.  The
5   passes are limited to 14, the actual opening-the-door
6   passes.
7        MR. DICKERSON:  Correct.  So...
8        Go ahead.  I'm sorry.
9        MS. JONES:  Fourteen each, or 14 total?  We
10  get seven, they get seven?
11        THE COURT:  Well, we might have to go -- we're
12  going to go eight/six.
13        MR. DICKERSON:  So what will happen is your
14  attorneys and paralegals will have some identification
15  with their photograph on it to wear in the back of the
16  house in the restricted corridor, something like this.
17  It will probably be a different color to differentiate
18  you from judiciary employees itself.  And eventually,
19  the teams of attorneys will have an access card very
20  similar to this, which will allow you access to the
21  restricted corridor.
22        THE COURT:  Those of you who did it before,
23  the access card opens, unlocks the doors to get to the
24  back.  There's going to be six for defense and eight
25  for plaintiffs.  Those are interchangeable so that if

12

1  you -- you know, if you want to give it to somebody
2  else, you can, as far as only legal -- this is not to
3  be used by anybody other than you or your paralegals.
4  It is not for any lay -- it is not for any of your
5  witnesses or any of your -- to have those.
6       And, unfortunately, there's just not enough
7  for everybody, and it is just a physical thing. We're
8  actually changing the system. The State is in the
9  process of changing the whole system. So in changing
10 the whole system, they're not making new cards. We
11 physically have 14 cards. It is not a question of us
12 wanting to only limit it to 14 people. We physically
13 have 14 cards, so we are giving you all we have, but
14 there is a phone by each door and you can just pick up
15 the phone and dial my secretary's extension and tell
16 her who you are and that you're at a specific door and
17 it can be opened for you, if that's necessary, although
18 we really want that to be limited use, you know.
19      Hopefully, between passing the cards around,
20 you'll be able to -- I don't think it will be a problem
21 for you.
22      MR. LANIER: We can use our cells to call each
23 other.
24      MR. DICKERSON: Okay. When you get on Page 2,
25 you'll see when the media -- we're going to have a

13

1  meeting with the media the 20-what, 23rd?
2       THE COURT: You don't have to attend that,
3  unless you wish.
4       MR. DICKERSON: We had some issues with the
5  media last time, and the judge -- and I assume, Judge,
6  I defer to you on this, of course, we would like all
7  interviews to be conducted outside of the courthouse,
8  not in the hallways, with the exception the judge
9  granted permission in the last trial, if you're still
10 holding to that, that the media could interview the
11 attorneys in Courtroom 3-B, physically inside of that
12 courtroom, which is our overflow courtroom should the
13 event become too large to hold.
14      THE COURT: You can give interviews outside,
15 you can give interviews in 3-B. We just don't want
16 people gathering in hallways. We don't want reporters
17 following you through the hallways and asking you
18 questions. You're going to be able to give as many
19 interviews as you want, however you want, but we don't
20 want it to be -- if we restrict them to not being able
21 to interview in the hallways, then as you walk through
22 and walk out, they're going to be able to grab you and
23 ask you questions, which basically -- which I don't
24 want. All right.
25      MR. DICKERSON: Okay. The other thing I have

14

1  written on that page is we don't have any word from
2  either side about any handicapped issues, be they --
3  any ADA accommodations, be they attorneys, be they
4  plaintiffs in the case.
5       THE COURT: Counsel?
6       MR. KRISTAL: Mr. McDarby is in a wheelchair.
7       MR. DICKERSON: Mr. McDarby? Is he bringing
8  his own wheelchair?
9       MR. KRISTAL: Yes.
10      THE COURT: But it is important that we know
11 it. It is important that he is one of the plaintiffs,
12 he will be at counsel table, so we have to make sure we
13 have room for him and make sure it is wide enough for
14 him to sit and things like that.
15      MR. DICKERSON: And if there's any late minute
16 stuff, please get in touch with me so I know what to
17 expect.
18      THE COURT: Does he use a --
19      MR. KRISTAL: He uses a walker at times for
20 short distances. We'll have that.
21      THE COURT: So he doesn't need a lift type of
22 thing?
23      MR. KRISTAL: No, he will be able to get in
24 and out of his vehicle and out of the wheelchair, yes.
25      THE COURT: Okay.

15

1       MR. DICKERSON: Because I think there's a step
2  up in your witness box.
3       MR. KRISTAL: He will be able to manage one
4  step. We will help him.
5       MR. DICKERSON: Security issues. This is a
6  controlled access building. Anything you bring in here
7  will go through a metal detector, including your
8  papers, your attache cases. We certainly ask you that
9  knives and guns are not necessary in this building, so
10 keep them out, because they will be screened.
11      MR. LANIER: This is different than Texas.
12      MR. MORELLI: Just the opposite, actually.
13      MR. DICKERSON: And all of you will be passing
14 through the metal detector, as you did this morning, on
15 a daily basis. Once the Sheriff's Department gets to
16 know you and know you're about, they may just
17 automatically pass you through the metal detector
18 system.
19      Parking. I have attached a list of available
20 parking in the area, and there's two law firms that are
21 very close to this building, if you want to contact
22 them. They sort of control the two big lots, one
23 behind this building and one directly across the street
24 on North Carolina. Their name and phone number is
25 there on that page.

16

1    THE COURT: They're both defense firms, but I
2    don't know if that makes a difference. Actually,
3    Cooper does both plaintiffs and defense.
4        MR. DICKERSON: They may open up some spots
5    for you, but we don't facilitate that. You have to
6    make that contact.
7        THE COURT: What it comes down to is there's
8    parking on a daily basis, but it is expensive. There's
9    parking -- but what I was thinking was, if you contact
10   the -- sometimes the lots fill up. There's limited
11   parking on the streets. I think if you contact the
12   managers of those two firms and try to make a deal with
13   one of them to give you X number of spaces for the
14   length of the trial, you'll probable be better off. I
15   can't guarantee they'll do that, but it is just an
16   idea. I don't know, where did you guys park last time?
17       MR. FREIWALD: We had shuttles. We just
18   avoided the problem by having somebody bring us back
19   and forth.
20       MR. BUCHANAN: They wouldn't do a 30-day,
21   45-day three spaces, full price, and we weren't looking
22   for a discount. They wouldn't do it.
23       THE COURT: They wouldn't?
24       MR. BUCHANAN: No. Maybe they will this time.
25       THE COURT: If it becomes a problem, let me

17

1    know, and I might be able to -- I didn't know that the
2    last time.
3        MR. BUCHANAN: We made it work.
4        THE COURT: It may be that it doesn't matter
5    to you.
6        MS. SOLIMANI: The lot behind the building, is
7    that on the list?
8        MR. DICKERSON: Yes. I put that on the list.
9    You didn't get that.
10       Now, a couple housekeeping issues. Your war
11   rooms or your preparation rooms, which are the one here
12   and the one across the hall, they'll be locked down at
13   night, so you can leave stuff in there.
14       We ask you that you take all your trash and
15   push the can outside of the war room so it can be
16   emptied in the morning and prepared and ready for you
17   for when you get in here.
18       I assume that you'll be having some type of
19   firm delivering food items for you for lunch, and no
20   problem. You'll give them your cell phone when you
21   order the food, and when they get to the restricted
22   door, they'll call somebody and you can meet them at
23   the door and escort them back to your war room.
24       I want to let you know that, obviously, when
25   you're working in the restricted corridor, it is an

18

1    office environment. We have many judiciary staff back
2    here. We would like you to confine your arguments to a
3    low decibel, your conversations to a lower decibel.
4    Not that it happened last time, but we don't want it to
5    get out of hand, because we are trying to conduct other
6    type of business in this hallway in the back.
7        Any other questions or problems, I have left
8    my telephone number and e-mail on this page, so you
9    certainly can get in contact with me, and whoever is
10   going to send me the digital photos, send it to me
11   e-mail, and I'll -- I promise you I'll destroy the
12   e-mail after we download the photo.
13       MR. GORDON: May I ask you a question? I'm
14   Robert Gordon in McDarby.
15       The access card, isn't that the card that has
16   the photo and that's interchangeable? What is the name
17   of the card we're requesting when we e-mail you the
18   photos?
19       THE COURT: It is just an ID card.
20       MR. DICKERSON: An identification card similar
21   to what I'm holding here with a court seal on it and
22   your photo.
23       MR. GORDON: Okay.
24       THE COURT: That's the blue card in the back.
25       MR. DICKERSON: The blue card is the access

19

1    card. There's actually two cards in the folder. One
2    is my identification, one is the access card that opens
3    the doors.
4        MR. GORDON: Thank you.
5        MR. DICKERSON: Smoking. No smoking in this
6    building. You have to go outside. That wasn't an
7    issue last time.
8        THE COURT: And people are not --
9    non-attorneys are not allowed in the back, for security
10   reasons.
11       Now we'll go off the record.
12       (Discussion off the record.)
13       THE COURT: Back on the record.
14       Go ahead.
15       MS. JONES: Well, I have two questions about
16   that. One is I assume that in terms of moving our
17   things into one of these respective offices that we can
18   do that the week before sometime, that that would be
19   available.
20       And the second thing really, Your Honor, goes
21   specifically to the last question. We did have a tech
22   person back in each one of the rooms, I think, the last
23   time, because we had it wired in, and I assume that
24   your --
25       THE COURT: A tech person to me is on the same

20

1  status as a paralegal.

2      MS. JONES:  I wanted to make sure you weren't

3  excluding --

4      THE COURT:  You can include them in your

5  identification, if they're in-house tech people that

6  they can get identification cards, also.  All right?

7      MR. DICKERSON:  Okay.  If you have any future

8  questions, my name and number is on this sheet.  Please

9  get in contact with me.

10     MR. LANIER:  Thank you.

11     THE COURT:  Okay.  John, do you want to

12  address any issues as far as the access to the

13  wireless?

14     MR. SULLIVAN:  Yes.  As I said earlier, at any

15  point after today that people want to coordinate a

16  walk-through, they can just contact Stephanie and

17  myself.  The judiciary, the State judiciary does

18  provide a wireless access point for laptops to get out

19  on the Net.  We filter those laptops by Mac address, so

20  at some point I'll talk to your technical teams about

21  providing Mac addresses of specific laptops, and

22  anything they want from us we can subsequently address,

23  I guess, during a walk-through any time this month they

24  want to do it, whether it is separately or together or

25  both.

21

1      THE COURT:  Okay.  Theresa, do you want to

2  address any issues?

3      MS. UNGARO:  If you have any questions, feel

4  free to call me at 345-6700, extension 3579, and we'll

5  work out any questions you may have.

6      I want to let you know that Courtroom Connect

7  has asked for permission to tape the entire matter,

8  just as they did last time, and I believe that was

9  granted, just so you're aware of that.

10     We also plan on using the website for

11  snowstorms, closings, and any issues that may come up.

12  Take advantage of that.  Read that before you leave

13  your hotels or homes in the morning.

14     Also, what we did last time is right behind

15  the counsel tables, we reserved two rows for maybe your

16  other attorneys, families, witnesses.  If you would let

17  me know how many seats you need reserved by the Friday

18  before, so we can do that for you --

19     THE COURT:  Charlie, what did we do last time?

20     MR. COHEN:  I actually have the seating chart

21  on my laptop.

22     THE COURT:  This is only important for the

23  openings and closings.

24     MS. UNGARO:  We basically reserved the two

25  rows right behind the two counsel tables.  We want an

22

1  idea if that's what you need this go-round.

2      Anything else you may come up with, just let

3  me know.

4      THE COURT:  So if you submit to Theresa a list

5  of who you want to be sitting in the audience during

6  the openings, these would be other attorneys other than

7  those at counsel table, staff, family, you know, your

8  brother, anybody you want to have sitting in the

9  courtroom during the openings, submit us -- send us one

10  defense list and one plaintiffs' list, or two

11  plaintiffs' lists, whatever, and we'll see how many

12  seats there are and we'll hopefully be able to --

13  hopefully, be able to accommodate you all.  If we

14  can't, then we'll restrict the number and let you

15  choose who gets to sit in there.

16     Again, I mean, maybe -- I'm still hoping --

17  last time I hoped nobody would come, and this time I

18  hope nobody comes, but, you know, we'll see.  I think

19  that the openings and closings are still going to be

20  crowded.

21     MR. GORDON:  We'll submit one plaintiff's

22  list.

23     MS. FREIWALD:  I think last time we had an

24  even number of seats between the two.  If we can do

25  that again and notify you of how we're going to fill

23

1  our seats, unless you want to reserve a larger number

2  of seats than you did last time...

3      THE COURT:  Why don't we at this time -- why

4  don't you give me your lists.  We'll do it a little

5  different.  Last time I think we gave you a list and

6  you told us who you want to sit.

7      MS. UNGARO:  Here, this is what it looked

8  like.

9      MS. SOLIMANI:  We had ten each side last time.

10     MR. GORDON:  We have two plaintiffs, and

11  there's children, who I'm sure would want to be there

12  for the openings.  I'm not sure if there's just as many

13  people at Merck as interested, at least in terms of

14  coming to court.

15     MR. FREIWALD:  You would be surprised.  I

16  think we had more people wanting to come than had

17  reserved seats last time, but what ended up happening

18  was, frankly, anybody got in early enough basically got

19  a seat, even if it wasn't in the reserved seats.  So we

20  could reserve X number of seats.

21     THE COURT:  What we said last time was we

22  didn't think it was fair to reserve every seat, so we

23  left at least one row or two rows for the people to

24  come in who just wanted to come in.  Frankly, they were

25  mostly local lawyers anyway who wanted to watch --

24

1    MR. LANIER:  It is an open court.

2         THE COURT:  It is a public courtroom.  We

3    should have a couple rows of -- I mean, we have six

4    rows total, right?

5         All right.  Why don't we at this point just

6    say that give us a list from both plaintiffs and from

7    the defense, try to keep it, you know, in the under-ten

8    range, but, you know, let's -- give us your list.  Give

9    us your list and then we'll see.

10        Okay.  Anything else?

11        Jill, did you have anything you wanted to

12   address?

13        MS. SOLIMANI:  If you don't know, I'm Jill

14   Solimani.  I'm the case manager for VIOXX litigation.

15   If you have anything at all you need during the course

16   of the trial, I can coordinate among -- I can certainly

17   call any of these folks, but you may see my face a

18   little bit more, so just let me know if you need

19   anything.  I'll come into your rooms once in a while if

20   there's announcements.

21        I'll leave my business card on the table so

22   you can pick it up on your way out.  It has my direct

23   line for any outside calls, and I'll add my extension

24   for in-house calls once the trial starts if you need to

25   reach me for anything at all.  Okay?

---

1         THE COURT:  Okay.  I think that's it.

2         MR. GORDON:  Your Honor, one question:  The

3    openings in terms of the people sitting in the

4    audience, plaintiff and spouse would be at counsel

5    table, so that won't include them in the list of people

6    sitting in the first row.

7         THE COURT:  Well, we also need to know --

8    that's one of the things we need separately is we need

9    to know how many people are going to be at counsel

10   table.  Who is going to be the lead counsel for

11   McDarby?

12        MR. GORDON:  Jerry Kristal and I will be.

13        THE COURT:  So it will be the two of you.

14        MR. GORDON:  Yes.  And depending on if there's

15   days when one of us doesn't have a witness or the other

16   does, we'll work that out.  It won't necessarily be

17   every single minute of every single day, but we would

18   need two chairs.

19        THE COURT:  Plus you need Mr. McDarby and

20   Mrs. McDarby.

21        MR. GORDON:  Mr. McDarby doesn't need a chair.

22        THE COURT:  He's going to need space.

23        MR. GORDON:  We don't have to have

24   Mrs. McDarby.  I would like it.  I just want to know

25   however you do it, whether it is fist row or at table,

---

1    counsel table.

2         THE COURT:  We'll probably have to put the

3    spouses in the first row behind them.

4         Mr. Lanier, how many attorneys do you want to

5    have at counsel table?

6         MR. LANIER:  It will probably be me and two

7    other attorneys, if possible.  My client will probably

8    sit on the front row, if you will allow it, but we'll

9    do it however you want to do it.  It could just be me.

10   And I can put my lawyers on the front row.  It doesn't

11   matter.  We'll do -- we aim to police.

12        THE COURT:  David, how much room was there at

13   the table?

14        MR. BUCHANAN:  Room for three at the table.

15   That's kind of the maximum at the table, and there's

16   room for three behind, if you slide the tables forward

17   a foot or so.

18        THE COURT:  Where did you have your clients?

19        MR. BUCHANAN:  Between us, between Chris and

20   I, and then Mr. Humeston's wife sat behind us with

21   another lawyer.  You can get three and three on the

22   Court side of the bar.

23        MS. SOLIMANI:  If you move the table forward,

24   is that going to interfere with --

25        MR. BUCHANAN:  I think we moved it forward

---

1    last time.  I think the tables had been crept up to

2    give us that breathing room.  The defense had three at

3    the table.  They had Dr. Morrison right behind them and

4    no other lawyers on the counsel table side of the bar.

5         So you can fit five to six, it is tight, but

6    really no more than three to a table, unless the tables

7    are going to be altered in some way.

8         THE COURT:  Christy, you and David were --

9         MS. JONES:  He hit me periodically.

10        MR. BUCHANAN:  Did those bruises go away?

11        THE COURT:  You'll look.  We have these

12   rounded counsel tables.  The whole courtroom is done in

13   a circular design, and actually, it is not that

14   efficient space-wise.  It looks nice, but it is a

15   problem.  So if we have two and two, that's four

16   attorneys.

17        MS. JONES:  Your Honor, this may be

18   unnecessary, but it may be --

19        THE COURT:  We may not have two plaintiffs.

20        MS. JONES:  No.  That would be nice, you know,

21   we're going to talk about that, but what I'm thinking

22   about is based upon where we are right now, it might be

23   that we want to just set aside that first row

24   temporarily and just divide it in half so that, you

25   know, if they have got four or six lawyers and their

1    plaintiffs and all right behind them, it is there, and

2    if we would do the same so you don't have people right

3    at the bar so crowded.  I do think it is going to be

4    difficult.  I mean, you have four --

5              MR. LANIER:  We have three parties in the case

6    in a sense, so I don't know if dividing it in half --

7              MS. JONES:  I don't really want your lawyer

8    sitting right behind me.

9              MR. LANIER:  Really?

10             MS. JONES:  No.  Okay.

11             MR. LANIER:  Do you write big?

12             MS. JONES:  Nobody can read it.  I promise

13   you.  That's all I was thinking about.

14             MR. LANIER:  That makes sense, Christy.

15             MS. JONES:  Whatever you do beyond that is

16   different.  I was trying to figure out logistically a

17   way that you could set aside that first row until we

18   see what is going on here.

19             MR. LANIER:  We might do that.  It seems to me

20   we can go out and look at it and figure out something.

21             MS. FREIWALD:  You had three parties in the

22   case?

23             MR. LANIER:  Not three parties, three

24   entities, three families; the Merck family, the McDarby

25   family, and the Cona family.

1              MS. FREIWALD:  I thought you were including on

2    the plaintiffs' side.

3              MR. MORELLI:  We're trying to squeeze another

4    plaintiff in there.

5              MS. JONES:  We can work it out.  I was

6    thinking, though, that might be something, that given

7    the number of lawyers and all here --

8              THE COURT:  We may have to forget this whole

9    thing, a list of people that can sit in there, and just

10   have to have -- it may have to be the actual trial

11   attorneys sitting in there.

12             MR. COHEN:  We did keep the Reserved signs on

13   the whole trial.  After openings, everyone had plenty

14   of seats in the first two rows.  We had reserved for

15   TCA --

16             THE COURT:  We're going to go over there and

17   show you what you have.  We will save the first two

18   rows, basically, and if we have to, we'll draw a line

19   where the plaintiffs' side is and where the defense

20   side is.

21             MS. SOLIMANI:  Last time we used the first two

22   and there was less people.

23             (Discussion off the record.)

24             THE COURT:  We're going to save you the first

25   two rows and split it up somehow and see if we can add

1    seats from the third row.

2              All right.  Anything else?  That's it,

3    basically, I think from everyone.  If you want to go

4    walk with them to look at the courtroom again, I don't

5    know if you need to or not...

6              MR. SANOV:  I will.

7              THE COURT:  John, can show you the two jury

8    rooms, which I don't think you have seen, and Dick, if

9    you want to go, or Howard.

10             Okay.  Well, thanks a lot, guys, and I think

11   we're done, except for Maria I want to have stay.

12             MS. WALDMAN:  Okay.

13             THE COURT:  All right.  Jury questionnaires

14   and jury selection.

15             This is a little more getting into things that

16   I'm much more interested in than I am in the seats in

17   the courtroom.

18             Have you had a chance to look at the

19   questionnaires at all?

20             MR. LANIER:  Yes, we have, Your Honor.

21             THE COURT:  The first questionnaires I had no

22   input into, counsel did themselves, and I just rubber

23   stamped it, basically.  I let you do what you want to

24   do.  I'm not sure whether it wasn't a little bit maybe

25   too many questions and -- but I'm not sure.  What was

1    your reaction?  You have had a chance to see the

2    federal questionnaire, also.

3              MR. LANIER:  Yes, Your Honor.

4              THE COURT:  Are there more questions you want,

5    less questions you want?

6              MR. LANIER:  There were some questions we

7    would like in addition to what has been asked.  There

8    are some that were asked that, frankly, we don't care

9    if they get asked or not, so we would be able to, like,

10   substitute some in for some that are already there, if

11   you want to keep it that length or shorter, but it is

12   conceivable that the ones we want to pull may be ones

13   that Merck wants, because I wasn't in on the

14   strategizing.

15             My view of the questionnaire is the more

16   information, the better, and so I don't have any qualms

17   at whatever they want to ask, by and large, and

18   whatever we want to ask, so long as it is not something

19   that's a polluting question, but I think both sides

20   have done this stuff enough to know where that line is

21   and we ought to be able to throw them in there and get

22   all the data we can on these folks.

23             MS. JONES:  I think that suits us.  What I

24   suggest maybe is that if you give us what you think you

25   might want to add to it and let us see if we can submit

1  something to Your Honor that we both agree to and then
2  let you look at it and see if you agree with us.
3      MR. LANIER:  And, Your Honor, we would be
4  ready to do that timewise however you want us to,
5  because we basically have already done the work.  It
6  may not be typed up, but you tell us what schedule you
7  would like us to submit it to Merck, we can get it to
8  you by Monday, give us the weekend to look at it, and
9  y'all take whatever time you need, and we'll get it to
10  Your Honor whenever you choose.
11      MS. FREIWALD:  I agree.  We can do that.  I
12  don't think that's a problem.
13      THE COURT:  Okay.  And let's try to set a date
14  of like a week from Monday you'll submit to me a
15  proposed jury form that I'll look at and see if I have
16  any problems with it.
17      MS. FREIWALD:  That's fine.
18      MR. MORELLI:  That's what, the 6th?
19      THE COURT:  Is that good for everybody?
20      MR. LANIER:  Yes.
21      THE COURT:  Now, Maria has requested...
22      This is Maria Waldman.  She is in charge of
23  the jury.
24      MS. WALDMAN:  Hello.
25      THE COURT:  She sent out 2,000, which is what

1  she sent out the last trial, believe it or not.
2      MS. JONES:  2,000?
3      MS. WALDMAN:  But there was a difference.
4      THE COURT:  We have a lot more people that
5  don't show up or have excuses than they do, apparently,
6  in Federal Court where they sent out 200 and get 180
7  people.  We have a whole different system.  We send out
8  200 and we get 40 people.
9      MS. WALDMAN:  Well, also, we have a lot of
10  union representation, and the union contracts in this
11  area pay only ten days of jury duty.  After that,
12  there's no payment.  So there is no law in the state of
13  New Jersey that says that the employer has to pay a
14  person to serve on jury duty, so that's also another
15  reason why we summon so many for these long cases.
16      THE COURT:  We lose a lot of people, and --
17      MS. FREIWALD:  Judge, is there any mechanism
18  for dealing with those hardship cases up front, even
19  before we get through the questionnaires?
20      MS. WALDMAN:  Yes.  Right now there's a
21  screening process that I am doing.  I have already a
22  disqualified pool because of statute.  I have an
23  excused pool because of hardship.  They're either
24  students, they fall under that category that they're
25  not going to get paid for a long period of time, but

1  that's if they have indicated to me.  I have some
2  people that I have qualified that I know from my gut
3  they're not going to be sitting because their employer
4  is not going to pay them, but they didn't stipulate
5  that on the questionnaire.
6      So, you know, I have 233 people qualified, but
7  I kind of fingered through them yesterday, and I see a
8  large portion of people that won't be able to sit, but
9  I did not prescreen those.
10      THE COURT:  We're going to get -- basically
11  what she does is when she sends out the notice, it has
12  a short little form that you have to send back, and
13  there's certain things that disqualify you or it says
14  if you have a reason you can't serve.  Some people will
15  write "Can't afford to serve" or whatever, but there's
16  a lot of other people when they show up that give us
17  reasons why they can't serve.
18      What we're going to do is we're going to have
19  to structure the questionnaire, and what I would like
20  you to do when you submit it to me is we're going to
21  have to pick a spot, hopefully, probably the last
22  couple questions, and in those last couple questions we
23  want to ask the questions about "Do you use VIOXX"...
24      Does everybody agree that anybody who used
25  VIOXX is out?  That is --

1      MR. LANIER:  Unless they had a heart attack.
2      MR. MORELLI:  And they don't have a lawyer.
3      MS. JONES:  There won't be anybody who will
4  qualify for that, Your Honor.
5      THE COURT:  All right.  So "Do you use VIOXX"
6  should be one of the very last questions.
7      One of the other very last questions should be
8  "Do you have a hardship reason why you can't serve,
9  such as child care, parent care, economic hardship
10  because of your financial situation," you know, and
11  what we're going to do is when we get the answers --
12  they come in and fill them out on Monday.  When we get
13  those, we can flip right to the last page and, you
14  know, have them explain their hardship or explain that
15  they take VIOXX, and we can pull those people right out
16  and notify them they don't have to show up again.  And
17  then that's a screening process before we even get to
18  it.  So we're going to do that.
19      Jury Management has requested, and I'm going
20  to -- unless there's a strong objection, I'm going to
21  agree to their request -- that the forms be filled out
22  on Monday, which is what we did last time.  We then
23  picked the jury on Tuesday.  They are requesting that
24  we pick the jury Wednesday and we have a day in
25  between.  It actually gives you more time to look at

1  the forms.

2       MR. LANIER:  That's helpful.

3       MR. GORDON:  It gives us a chance --

4       THE COURT:  I don't think, David, you really

5  had enough time.

6       MR. BUCHANAN:  It was a late night.

7       MS. FREIWALD:  I don't remember it as a night

8  at all, actually.

9       MR. BUCHANAN:  We didn't pass the first pool,

10  thankfully.  I don't think you folks got much past the

11  first pool.

12       MS. FREIWALD:  This is a terrific idea.

13       THE COURT:  And Maria, they like you.

14       You know, there's other reasons we're doing

15  it.  We're going to let other judges select their

16  trials on Tuesday.

17       MS. WALDMAN:  From a different panel.

18       THE COURT:  From other panels.  So we can have

19  jury selection for other judges so they don't have to

20  wait until Wednesday to select.  Last time we tried to

21  do that on Tuesday.  It was too much for Jury

22  Management.  So it will give you more time to review

23  the forms, and it will give us more time to excuse

24  people, because we actually physically call those

25  people and tell them, You're excused, You're excused,

                              37

1  so we want to -- we need to -- we want to eliminate as

2  many people as we can Monday going on, you know, as we

3  get the forms.

4       We still want you to be here Monday, copying

5  the forms in a sort of very quick manner, reviewing the

6  forms.  We don't want to wait until Tuesday to do it

7  necessarily, but it is just going to give you more time

8  and it gives us more time.  And the only downside of it

9  is, is it is another day on the trial.

10       MR. LANIER:  Mechanically what we have done

11  before, if this works -- you may have another way you

12  want it done -- is I would get with Christy or Hope or

13  Ted or whoever, and we would agree on a copy service or

14  something so once the questionnaires are filled out,

15  we're able to deliver them or a copy service will take

16  custody of them, we'll make each of us our sets, and

17  deliver them to us at the same time, give the originals

18  back to the Court.

19       MS. WALDMAN:  We do that.  We're talking about

20  prior to you getting your set that's going to be

21  printed, you come up here, I quickly give you those

22  questionnaires that are the ones that are going to be

23  quickly out the door.  Why make copies of those?

24       MR. LANIER:  Makes sense.  Okay.  Thank you.

25       MS. WALDMAN:  So I bring you a batch, and you

                              38

1  quickly look through, yes, these are going to come,

2  these are not going to be copied, you can leave those.

3       Once I have a pile of those that are going to

4  be excused, I can call those people and tell them not

5  to come.  On that Monday of the first trial, we were

6  rushing and calling people not to come Tuesday.  This

7  way we have a grace day of a Wednesday to do that and

8  you can digest it a little bit more.

9       MR. LANIER:  Thank you.

10       THE COURT:  David, am I correct that

11  plaintiff's counsel had some concern last time that

12  there were a lot of -- just the fact that there's so

13  many hardship -- that there's somewhat of an economic

14  disparity in the jury pool?

15       MR. LANIER:  That's a real concern that we

16  have.

17       MR. BUCHANAN:  It was a thought last time.

18       MR. LANIER:  What we had done with Merck in

19  Houston or the Engleton case is both sides agreed to

20  supplement juror pay, and the jurors didn't know that

21  the parties were doing it or anything like that.

22       MS. WALDMAN:  That's interesting.

23       MR. LANIER:  Merck would do it one week, we

24  would do it another week.  It would take, in essence, a

25  cashier's check for each of the jurors, so the jurors

                              39

1  knew there wouldn't be an economic hardship if they

2  wanted to do their civic duty, and it -- it makes the

3  jury truly one of the community at that point, because

4  it doesn't isolate only the people wealthy enough to

5  stay on the jury panel.

6       And Merck had agreed to do it.  In fact, Merck

7  I think did the very first week of the cashier's

8  checks, and then we would bring them the other, the

9  next week, and it would just be a check made out to

10  each juror that supplemented the jury pay for them.

11       MR. MORELLI:  And they didn't know where it

12  came from.

13       MR. LANIER:  Neither side knew it came from

14  the parties.  They thought -- in fact, Judge Hardin

15  probably got a few votes out of it.

16       MR. MORELLI:  I think they thought it came

17  from the Court.

18       MS. WALDMAN:  That's an AOC issue, because it

19  deals with finance and, you know, will it set

20  precedence?  I can check into it, but that's the only

21  thing.

22       THE COURT:  Our push is from the Court's

23  perspective, we would love to have the legislature pass

24  a statute that says people have to be paid for jury

25  duty, which is the way it should be, but then you

                              40

1  always have people of small businesses who say, you
2  know, it is such a hardship for them to pay somebody
3  when they're not, and have to pay a substitute, also.
4  So there are definitely countervailing issues.
5          MR. LANIER:  Right.
6          THE COURT:  It certainly hasn't been done in
7  New Jersey before, and for us to get it approved by
8  February by the AOC...
9          MR. LANIER:  It may be tight.
10         THE COURT:  It would be a miracle.  I could
11  propose it to them.
12         MS. JONES:  Well, you know, I would be happy
13  to check with Merck.  I will be honest with you.  I'm
14  not familiar with what was done in Texas, Your Honor,
15  and I don't feel like I have the authority to even
16  suggest to you we could agree to that.
17         THE COURT:  What do they get paid in Texas?
18  What did you pay them?
19         UNIDENTIFIED WOMAN:  Up to 12 --
20         MR. LANIER:  How much did we pay on the
21  supplemental checks?
22         UNIDENTIFIED WOMAN:  100, I think.
23         MR. LANIER:  The check was -- I thought it was
24  100 a day, I don't know.  I don't know.
25         THE COURT:  100 a day?

41

1          MR. MORELLI:  If it was 100 a day, they would
2  still be deliberating.
3          MR. GORDON:  They would be standing up and
4  objecting to a mistrial.
5          THE COURT:  We have an unfair system, because
6  we pay $5 a day for the first three days, so most
7  jurors only get $5, because most jurors owe me good.
8  We then start paying them $40 a day, and whether they
9  get paid their salary or not, they get the $40.  So
10  people who serve who -- I know in the Humeston jury, I
11  believe everyone was getting paid their salary, plus
12  everybody at the end of the trial got like a $1,200
13  check or so.
14         MS. WALDMAN:  Only three of them were State,
15  County, Municipal employees.
16         THE COURT:  And they were not anxious to
17  leave.
18         MR. MORELLI:  That makes them take their time,
19  at least.
20         MS. WALDMAN:  State, County, Municipal
21  employees do not get the jury payment, because they're
22  salaried employees, but the others, they do get the $40
23  increase, so they get that.  And they get that weekly,
24  so it becomes a nice check.
25         THE COURT:  But if you're not getting paid and

42

1  you make 200 a week, if you have a job that pays 400 a
2  week, it's just not --
3          MR. LANIER:  You can't do it.
4          THE COURT:  You're not doing it.  So it really
5  knocks out your paycheck people who -- lower and lower
6  middle.
7          MS. WALDMAN:  Your Honor, the other thing is,
8  too, that with the salary goes your health benefits, so
9  with the contract people that I was talking about that
10  only get ten days of jury service, if you put a person
11  in that category of where you're going to compensate
12  them, their benefits still may be affected, because
13  their policy is you have to work X number of hours to
14  be qualified for benefits.
15         THE COURT:  This is the casino benefits.
16         MS. WALDMAN:  These are the casino benefits.
17  So you also have to keep that in mind, that it is a
18  contract issue when you're dealing with the casinos
19  because of the fact that they're going to lose their
20  benefits unless they accept payment, which they may,
21  you know, for the benefits.  So that stipend might
22  cover the cost of the benefits as keeping those
23  benefits going, but benefits are very, very touchy.
24         THE COURT:  Anyway, I just wanted to -- with
25  the hardship issue, we can -- we can either talk to the

43

1  people or we can excuse them right away.  Certainly
2  some people -- generally speaking, when somebody tells
3  me they have a hardship, I just am not going to keep
4  them on the jury and force them to stay.
5          MR. LANIER:  It is hard to do.  I agree.
6          MR. GORDON:  Judge, if I may ask -- Rob Gordon
7  again -- a couple of questions.
8          In the screening process so far, you indicated
9  that there were some hardships.  Have they been told so
10  far, the ones who you sent notice to, the length of the
11  trial or anything like that?
12         MS. WALDMAN:  Nothing.
13         THE COURT:  Originally they were told -- in
14  the last trial we did.  In the notice we sent out, we
15  told them it was going to be a seven- to eight-week
16  trial.
17         MS. WALDMAN:  A five-week trial.
18         THE COURT:  Five or six.  This time we didn't
19  do that.  But we're hoping this time it will only be a
20  three- to four-week trial.
21         MR. MORELLI:  Are there 400 jurors still, or
22  is it down to 230?
23         MS. WALDMAN:  Right now I have 233 qualified,
24  still waiting to hear from 594, because summonses are
25  still coming in.

44

1    MR. MORELLI:  So you hope to bring it up to

2   the level that it says on the paper, which is 400.

3    MS. WALDMAN:  We hope to.

4    The problem is also our facilities.  We are

5   limited in how many number of people we can bring in,

6   so that's why that grace period of that Tuesday

7   hopefully will allow us to dwindle the numbers down,

8   also, so that we can house all these four panels.

9   Right now I'll have the panels coming in at different

10  times for the questionnaire purpose.  I have --

11   THE COURT:  These people are grouped into four

12  groups.

13   MS. WALDMAN:  Yes.

14   THE COURT:  We'll bring the first group at 9,

15  second group at 11, third group at 1, and then by the

16  next Wednesday, we hope to have a smaller pool.

17   MR. MORELLI:  I was trying to understand, was

18  the intention to try to reach the 400?

19   MS. WALDMAN:  Hopefully, yes.  We try to get a

20  good size pool for you.  You know, that's our hope.

21   MR. GORDON:  Judge, again, on the second

22  question, on the Tuesday -- I was actually going to

23  suggest that when I saw the schedule here about that

24  additional day in between.  The question is, Monday

25  we'll go through the obvious ones before Xeroxing them,

45

---

1   but once we have the opportunity to review them Monday

2   night, does Your Honor want us to try to meet and

3   confer on the more subtle -- not the differences, but

4   the challenges for cause where we can agree, or does

5   Your Honor not allow strikes by consent for both

6   parties?  Do you want us to try to weed it down on

7   Tuesday and also perhaps --

8    MS. WALDMAN:  There's different methods of

9   doing that, so...

10   MR. GORDON:  Once we read it, we may see

11  there's a line in the middle that says I hate all

12  lawyers and I hate all companies and I hate all

13  plaintiffs and I hate everybody, and we may agree it is

14  a waste of time to bring that person back on Wednesday,

15  but the question is some judges don't want the lawyers

16  to thin the pool any further without being directly

17  involved in the process.

18   And the other question is on Tuesday

19  afternoon, perhaps, if there's things we can agree

20  on --

21   THE COURT:  Tuesday I'll be here, so if you

22  two -- I hope you will each go over the questionnaires

23  and be here on Tuesday, and even be here on Monday, so

24  Monday afternoon --

25   MR. GORDON:  Once --

46

---

1    THE COURT:  -- if you agree a person should be

2   dismissed for cause based on the questionnaire and you

3   bring me the questionnaire, I won't let you do it

4   yourself, but if you say to me, These are the ones that

5   we agree should be excused for cause, I'll probably

6   excuse them for cause.

7    MR. JACOBY:  Just going back to the jury

8   questionnaire for a second, the question that was

9   directed to VIOXX use, was that only to the prospective

10  juror or the prospective juror's household, and is

11  there going to be any questioning of Celebrex or Bextra

12  or...

13   I'm concerned if you're asking the prospective

14  juror, Did you take VIOXX and it is in his house, in

15  his household, that's just as potentially polluting as

16  anything else, and maybe the question should just be

17  modified a little bit.

18   THE COURT:  Well, probably on the form it

19  should be "Do you take VIOXX" is one question, and

20  "Does anyone in your -- close to you" --

21   MS. FREIWALD:  They were on the questionnaire

22  last time, but they were not disqualifying, right?

23   MR. BUCHANAN:  They weren't disqualifying.

24  The immediately disqualifying question was if they

25  personally used it.  The others were subject to

47

---

1   discussion.

2    MS. FREIWALD:  That's right.

3    MR. BUCHANAN:  And there were questions about

4   Celebrex and Bextra.

5    MS. WALDMAN:  I also have extra

6   questionnaires, if you want to look at them.

7    THE COURT:  You have them, don't you?

8    But at any rate, just put those things that

9   you think would be disqualifying questions near the end

10  so you can flip to the back so we can -- as I said,

11  there's going to be -- the hardship questions should be

12  right at the end.

13   I think there's also an advantage to that in

14  that they sort of become part of the process,

15  hopefully, that they're asking the questions, and some

16  people might right at the beginning say they have a

17  hardship, but maybe once they're involved, they might

18  say, I would like to do this.

19   MR. GORDON:  Some people fill out the form and

20  say, Maybe I better have a hardship.

21   MR. MORELLI:  The form is a hardship.

22   MS. WALDMAN:  Regarding the vendor who is

23  going to print the questionnaires, I don't know last

24  time who was the contractor.  Was it --

25   MS. FREIWALD:  We used Kinko's, and there's

48

1   one 15 or 20 minutes away, and a paralegal from our
2   group and the plaintiff's worked it out between them.
3           MS. WALDMAN:  So I need to know who the person
4   is so I can communicate with them, because we want to
5   try to get that questionnaire printed, the first copy,
6   of course, printed so that I can distribute it on
7   Monday.  So I would like to have that.  Maybe when
8   they're coming with the IT people, on that day, the
9   questionnaires can be delivered to me.
10          Also, I can give you the jury list on a
11  spreadsheet, Excel.  It has the group number, and then
12  it has a random sequence number, which is a drawn
13  number that they were assigned to that particular
14  panel.  I use that number as an identifier on the
15  questionnaire, so when you're going through the voir
16  dire process, I normally -- because the judge has a
17  random list, she knows who is going to be the next
18  prospective juror.  I have that list ready, and I just
19  give her the questionnaire.  So we need to put those in
20  order, as well.
21          Unfortunately, you will not have the random
22  list, and you don't know who the next juror will be to
23  fill in the box.  You will have an alpha list, so
24  you'll have that, as well.
25          THE COURT:  Okay.  Anything else?

1           MS. WALDMAN:  Just to let you know, if you are
2   going to start using those challenges on that Tuesday,
3   I can have, like I said, a database spreadsheet so that
4   we can sit together and I can say, you know, who is
5   going to be excused for cause, mark it up so everybody
6   can have that, as well, so you can have a tally, so
7   we'll know where our numbers are.  I mean, that's
8   important, too, to know where our numbers are.
9           THE COURT:  Maria does all the capital cases,
10  so she does issues that are pretty significant in jury
11  selections, so she is pretty -- she is very
12  experienced.
13          MR. BUCHANAN:  Maria, if the attorneys are
14  interested in the pool, I remember you shared with us a
15  copy of the juror list that was in the pool several
16  weeks before trial.
17          MS. WALDMAN:  Yes.  Our statute says that
18  ten days prior to the trial, you're entitled to the
19  jury list, so, again, I can give that to you in
20  database form.  I have an e-mail address.  I'll give
21  you my AOL address, because sometimes I cannot receive
22  documents in my State address because it is kind of
23  strange.  Jurymom@aol is my name, so if you want to
24  send me something or anything like that...
25          THE COURT:  That's okay.  I'm judgemom5, but

1   I'm Hotmail.  All right.
2           MS. WALDMAN:  Also, if you want to know about
3   New Jersey and the judicial system, we have a website
4   that will give you some information about our source
5   list in terms of how the names are combined or anything
6   like that.  If you have any questions, jurymom, you can
7   send it to me, AOL.  That won't be a problem.  And I
8   think that should be it.  Just the questionnaires, the
9   vendor.  That's it that I can think of.
10          THE COURT:  Okay.
11          MS. WALDMAN:  All righty.
12          THE COURT:  Thank you.
13          I thought the trial went smoothly last time.
14  The one thing I wasn't happy about at all was the
15  marking of evidence, and there's just so many exhibits,
16  and we really -- I thought we had it totally under
17  control, but at the end there was a question about one
18  document the plaintiffs thought had been marked into
19  evidence that wasn't, and I don't want that, you know,
20  to happen again.
21          So I want to make sure that at the end of each
22  day, the Court list is reconciled with the plaintiffs'
23  list and the defense list, and I don't want -- last
24  time, basically, each side left that to a paralegal,
25  which is -- I don't care if you want to leave it to a

1   paralegal, but at the end of the day, what's been
2   marked is going to be the Court's list only, and we're
3   going to have to make sure that you -- you know, and in
4   the end, for that one, the plaintiff's exhibit was not
5   on the Court's list, so we didn't include it.  It
6   didn't go to the jury.  So I'm sure it wasn't a factor
7   in the decision, but I'm just saying that we don't want
8   that to happen.
9           MR. LANIER:  We'll be careful.
10          THE COURT:  So we'll have to make sure that at
11  the end of each day, I don't want you going home
12  without somebody from each side checking the Court's
13  list of what's been marked against your list and making
14  sure that the documents that you believe have been
15  marked into evidence and/or marked for identification
16  have been marked in evidence and for identification.
17          MS. JONES:  May I ask you a question?
18          THE COURT:  Sure.
19          MS. JONES:  Part of our problem, and I confess
20  it is probably mine for not being a member of the New
21  Jersey bar, was that we didn't always offer the
22  exhibits at the time, because everybody said we can do
23  this at the end of the day, and I just wonder whether
24  or not we could have an agreement with Your Honor that
25  we will offer them at the time that they are used; even

1  if we don't go through all the marking and stop
2  everything at that point in time, that at least we can
3  have that where we have it clear that it actually has
4  been offered at that point, as opposed to coming back
5  and doing it at the end of the day.
6      THE COURT:  That's fine.
7      MS. JONES:  If you would prefer us not to do
8  that, I understand.
9      THE COURT:  I don't have a problem with having
10  the evidence marked and -- offered and marked at the
11  time.  Maybe sometimes there is going to need to be
12  lengthy argument about a piece of evidence and it
13  doesn't have to be decided at that moment, so we'll
14  move on with the trial, but --
15      MS. JONES:  But at least we would have it so
16  we can check it to make sure it had, in fact, been
17  done.
18      THE COURT:  It may be that we should be more
19  careful about the record.  That was my only concern.  I
20  want to make sure.  I mean, we had hundreds of exhibits
21  and, basically, like I said, there was only a dispute
22  about one.  Things pretty much went smoothly, but I
23  want to refine that process, and maybe part of it is
24  making -- trying to get more evidence admitted at the
25  proper time during the trial and really going through

53

1  the formalities of having it marked at that point is
2  probably much better.
3      MR. BUCHANAN:  One thing we can probably do,
4  too, is try and see what kind of stipulations we can
5  reach about evidence in advance.  There were -- we were
6  unable to reach significant stipulations on any of the
7  medical records on certain issues.
8      I'm not faulting you.  I'm saying
9  collectively, you had issues, we had issues with
10  certain of your medical records, and you wanted to mark
11  your issues with the company liability documents.  Now,
12  having been informed by two or three trials, the
13  parties can probably stipulate on a number of things to
14  expedite the evidence coming into evidence.
15      THE COURT:  And that's the next thing we want
16  to address, and that's the way we're going to shorten
17  the trial and how we're going to shorten the trial from
18  the seven-week trial, and if we have two plaintiffs, it
19  becomes even more difficult to shorten the trial, which
20  is what we want to do.
21      You know, I told Judge Fallon a couple times
22  that I was very impressed with how he was able to move
23  things.
24      MR. LANIER:  But he hung his jury.
25      THE COURT:  I don't know that that had

54

1  anything to do with the speed of the trial.
2      MR. COHEN:  In New Jersey they would have had
3  a valid verdict.
4      THE COURT:  We don't know.
5      MR. GORDON:  We don't know whether the count
6  was what they say it was.
7      MR. MORELLI:  In the Federal Court, it has to
8  be unanimous.
9      THE COURT:  Okay.  Well, but I wanted to talk
10  to you about some of the things that we can do as far
11  as -- and I know you want to get through some discovery
12  issues, and we have to get to those, but as far as
13  trial issues are concerned, we don't have to decide
14  everything today, but I want to as quickly -- I wanted
15  to make sure we have several meetings between now and
16  the trial.  I know you have a lot of other things to
17  do, but I do want to have meetings that we can try to
18  streamline some things, and there are things that I
19  want to talk to you about.
20      And we don't have to do it today, so you can
21  think about what you want to do, but one of the things
22  I want to have decided is whether or not we're going to
23  limit the voir dire of experts.  I know that Judge
24  Fallon had limited the qualifications of experts to
25  basically he put in their CVs in evidence and he

55

1  allowed them to read from a paper as to what their
2  credentials were or something.
3      We had also talked about the timing thing of
4  just having -- so if you want to use your time on voir
5  dire, you can.  If you don't want to use your time on
6  voir dire, you can't.  I guess if we do an even split
7  of time, but then we have to decide, when we're talking
8  about an even split of time, are we talking about equal
9  time for the plaintiffs and defense or talking about
10  equal time for three people?
11      MR. LANIER:  I think what -- Your Honor, in
12  that regard, and maybe I'm speaking when I should shut
13  up and listen, so like give me a raised eyebrow.
14      The thought that I had was clearly the
15  plaintiffs have a burden of proof, and I think Judge
16  Fallon indicated that he would give the plaintiffs more
17  time than the defendants for that reason.  Clearly, the
18  plaintiffs have two parties instead of Merck having
19  just one.  But so many of the witnesses are duplicative
20  and so many of the issues are duplicative that the only
21  place that really makes a difference is we have got to
22  offer some extra family members up where all of Merck's
23  witnesses by and large will apply to both plaintiffs,
24  whereas we're going to have an extra treater or two, we
25  may have an extra family member or two.

56

1    I don't think it is going to make that much

2    difference, and I have sat down and tried to really

3    focus on how quickly can we try this case fairly and

4    efficiently in case you do go with a time option, and

5    as I understand the way your court is run, is it

6    reasonable to consider that we make it six hours of

7    testimony a day?  Is that too much, too little?

8         MR. BUCHANAN:  We didn't have that experience

9    last time.  We had a lot of side-bars and evidentiary

10   issues that arose throughout the trial.  I would expect

11   you're going to get more trial testimony.

12        MR. LANIER:  Five to six?  It would be my hope

13   that you might consider giving the plaintiffs somewhere

14   around 45 hours of time to try this case, which would

15   be somewhere between eight and nine trial days, and

16   then give the defendants, you know, I don't know that

17   they would need that much, so hopefully, the defendants

18   would wind up taking something on the range of 35 to

19   40 hours of trial time.  That gives the plaintiffs

20   maybe an extra five to ten hours with the extra

21   witnesses, but, of course, there will be cross of those

22   witnesses.

23        And so Merck has got, in essence, the same

24   number of witnesses.  It is just we have to move that

25   ball extra.  But if you would give us 45 hours of time,

1    we'll voir dire all of our experts, we'll put on all of

2    our witnesses, we'll do all of our crosses.  We can do

3    all of our testimony in that time period without any

4    problem at all.

5         THE COURT:  Forty-five hours.

6         MR. LANIER:  Yes.  And that includes the time

7    we'll use crossing their witnesses, as well.

8         THE COURT:  So you're going to put your proofs

9    on in less than eight days.

10        MR. LANIER:  Absolutely.

11        THE COURT:  Christy, can you put your case in

12   in 35 hours?

13        MS. JONES:  I want to say I would like to see

14   the complete list of witnesses that we're talking

15   about.  I mean, you know, I think that there's a

16   reasonable chance we can do it in 40.  I'm not going to

17   say I can do it in 35, because I'm not sure, frankly,

18   that ten hours difference...

19        I mean, we still have to -- when they're

20   really talking about additional treaters or additional

21   family members, I'm not sure that we're talking about

22   ten hours difference in time, because any way you look

23   at it, we still have to build in some cross.

24        MR. LANIER:  You will have cross.  Maybe it is

25   five hours, I don't know.

1         MS. JONES:  I think it is reasonable to say

2    that, and I'm certainly willing to work with Mark and

3    for us to sit down and for us to sit down and pencil it

4    in.  I would like to not be absolutely bound to a

5    40-hour time deal right now until we see who all the

6    experts are and who all the witnesses are and all of

7    that, but I'm certainly willing to work for it.

8         THE COURT:  What is the problem?

9         MR. GORDON:  We are saying that I think it

10   would be helpful to see what their witness list looks

11   like, as well, and we have a better opportunity to

12   really do the math.  I think the numbers sound close,

13   but it is hard to tell without looking at the total

14   number of witnesses.  But we think that sounds

15   generally right.  It is the best approach.  We agree

16   with the approach that the total hours, use it as you

17   choose to use it is the best format.

18        MS. JONES:  I think there are some things that

19   we need to --

20        THE COURT:  You got the clocks for me?

21        MR. LANIER:  Yes, Your Honor, we do.  I meant

22   to bring them today and I failed to.  I'll bring them

23   next hearing.

24        MS. JONES:  I might need to test them, Your

25   Honor.

1         I'm being funny.

2         MR. LANIER:  That was funny.

3         THE COURT:  They not only have the clocks, but

4    they have the timekeeper.  I know from the high school

5    basketball games that timekeeper can be very critical.

6         MR. LANIER:  You pick the clock, we'll pick

7    the timekeeper.

8         MS. JONES:  The other thing that I do think

9    that we need to work out, and maybe before we pencil

10   this all in definitively, we all need to be on the same

11   page.  For example, if we have an objection and we have

12   one of those lengthy side-bars, which we all hope we

13   won't be arguing that much again, we need to know how

14   that's being handled, whether that's coming out of

15   somebody's time, nobody's time.  I want us all to know

16   what the rules are when we kind of go in so that we

17   have calculated all that.

18        MR. LANIER:  The way we have done that before

19   is the judge -- you neutralize the clocks for a hearing

20   that you think is worthy of significant time, and

21   that's not out of testimony time for either side.  I

22   did have a judge one time who felt like one party was

23   being like needlessly lengthy on that, and he

24   threatened to start using whichever party's time is

25   making the objection, and that threat was sufficient to

1  kind of keep everybody in line, and we started getting
2  a lot shorter with our objections, but the judge
3  generally said, Okay, this is court time, you know,
4  time out, and -- unless it is a one sentence objection.
5       MS. JONES:  I think we have the details to
6  work out.  For example, while I said we need to be
7  offering the exhibits and all, it may be that if we're
8  going to be on a specific timetable, we want to have
9  some specific stipulations that we offer the -- we
10 offer the exhibit and we take things up later on or
11 whatever, but, you know, I think we can work all that
12 out.
13      THE COURT:  Okay.  All right.  Then I suggest
14 that, you know, I probably am not the person that needs
15 to be involved.  The 45 and 40 sounds reasonable to me,
16 but I think that you'll have to sit down and work out
17 those details together.
18      The first thing that has to be done,
19 obviously, and it is the next thing we have to have, is
20 even with the questionnaire, witness lists are supposed
21 to be attached.  I know I gave you deadlines for
22 experts and -- is it a fact that everybody knows right
23 now, not every witness you're going to call, but you
24 know who your experts are going to be, right?
25      MR. LANIER:  True.

61

1  numbers of people, I don't have a problem giving them a
2  general sense of numbers, but there are some people
3  who, frankly, I would really like to not disclose until
4  the 13th, because I'm not sure how it is going to play
5  out exactly.  So we could have a witness list the 1st,
6  with that one exception.
7       MR. LANIER:  I would ask for some measure of
8  flexibility here, because if they're going to come up
9  with a surprising list on the 13th and I have narrowed
10 mine down, not anticipating their surprise, I would
11 hope that I would have the deference of the Court and
12 of Merck to say, Time out, If you're designating those
13 two guys, then I need to go ahead and add this one that
14 we have already deposed and everybody knows to the
15 list.
16      MS. FREIWALD:  You're talking about fact
17 witnesses.
18      MR. LANIER:  Experts or whatever you may have
19 there.
20      MS. FREIWALD:  Well, I mean, the expert
21 deadline for the plaintiffs is the 27th, and I assume
22 that we're not going to get any reports from any
23 experts after the -- after the 27th.
24      So that's always been the case, that your
25 expert disclosures were due before ours, and I never

63

1       MS. FREIWALD:  We have not shared that with
2  each other yet.
3       THE COURT:  I know, but what I want to have
4  you do is share that with each other really quickly.
5       I'm not saying you have to give 100 percent.
6  There may be a witness that you might call, but might
7  not call.  I mean, there's always witnesses that you
8  might call or might not call.  There's maybe two
9  experts that you're going to maybe use, but maybe
10 you'll just use one of the two.  But I would like to
11 have realistic witness lists exchanged.
12      MR. GORDON:  By when?
13      THE COURT:  When can you do them?
14      MS. FREIWALD:  Judge, we actually had gotten
15 together on some of these issues, and we did have a
16 proposal for exchange of witness lists, I think
17 February 1st.
18      Now, the agreed upon exception with that was
19 for Merck's retained experts, because although
20 plaintiffs' disclosures are due this Friday, Merck's
21 are not due until the 13th, and I communicated with Ms.
22 Relkin and Mr. Meadow and Mr. Kristal, and that was the
23 one carve out.  We said we would supplement our witness
24 list at the time of our disclosure of our experts.
25      If the issue is getting a general sense of

62

1  had an expectation that we would see experts from you
2  at some point after February 13th.
3       MR. LANIER:  I understand that, Hope, but my
4  concern is if the judge wants me to give a reasonable
5  listing of my witnesses and I'm going to pare this down
6  and make this as clean as possible and say I have a
7  field of 12 experts that I'm giving you reports on, but
8  realistically, I only anticipate using three, maybe
9  five, so I'm going to put five down on my list, but
10 then I turn back around and I find out you're going to
11 use expert X, Y, Z, who has a surprise report that I
12 didn't anticipate, so I have to come back to my five
13 and say, You know, out of that field of 13 that I
14 narrowed to five, I need six, because I need to add an
15 FDA expert that I hadn't planned on calling because of
16 this surprise you added on yours.  So it will still be
17 in the field of people that we are designating with
18 you.
19      MS. FREIWALD:  And we will have reports for
20 those people already.
21      MR. LANIER:  You will have reports, although
22 if your experts come up with new opinions, certainly
23 I'll be able to ask my experts, What do you think about
24 their experts' reports, and my experts will have to
25 supplement with that data.

64

1    THE COURT:  Holly, this is what I think.  On
2  the 27th --
3    MS. FREIWALD:  For the plaintiffs.
4    THE COURT:  That's when the expert reports are
5  due, and on the 27th, we basically want a witness list
6  of -- we want a witness list that you want read or
7  given to the jury, which would include -- which would
8  be pared down to the reasonable -- anybody who
9  reasonably might be called.
10    MR. LANIER:  Fair enough.
11    THE COURT:  We also want a realistic list of
12  who you actually intend to call as of now, which will
13  be different than the one that's going on the jury
14  list.
15    Like you said, the jury list -- the jurors
16  will be looking at 12 names, because you might -- but I
17  would like your good faith best estimate of who you
18  really think you're going to call.  Again, it might not
19  be the three experts, but five experts out of the 12.
20    MR. LANIER:  Excellent.
21    THE COURT:  And I want you to provide both
22  lists to Holly by the 27th.
23    Holly, by the 1st, I want you to provide him
24  with your list.  You know who your experts are already,
25  and there's not going to be -- I'm not going to make

1  him wait until the 13th to find out who your experts
2  are.
3    MR. LANIER:  Thank you, Judge.
4    THE COURT:  So on the 1st, you'll have a few
5  days to look at his list and to decide...
6    Now, I understand for you, because you won't
7  actually have your reports, you might need to make more
8  changes trial-wise, you might get a report that you
9  don't like as much or a report that you think is better
10  than you thought it would be or raises an issue that
11  you weren't quite as sure.  I'm just saying.  I
12  understand that you may need more flexibility, but I'm
13  giving everybody flexibility.
14    The witness list would include all of your
15  potential experts, the one that the jury is going to
16  see.  The one you are giving to him is your best good
17  faith estimate as of this point, as of the 1st, you
18  think you'll call, and I'm relying on the good faith of
19  counsel to be as honest as you can about the two lists,
20  because after the 1st, then I want you to meet to say,
21  Okay, this is what we think we're going to do, Now, how
22  much time do we need to do it?
23    Does that make sense, or no?
24    MS. JONES:  I think it makes sense.  I want to
25  make sure I'm understanding completely.

1    When you say you want us to give them the
2  list, I mean, certainly it is conceivable that, you
3  know, we have got a list of 20 experts that we have
4  called -- that we have called right now.  There's a
5  potential that's on our list right now.  We obviously
6  don't expect to call all 20 at this time, but we may
7  not make that final cut until it comes December 13th --
8  not December -- February 13th or later, and what I hear
9  you saying is you're asking us to on one list, list all
10  20, and then on the other list, list the five that we
11  think are most realistic.  Is that what you're
12  suggesting?
13    THE COURT:  Yes.  I'm not saying five, but if
14  you think, okay, I know I'm going to call -- I know in
15  my head I'm going to call one, two, and three, unless
16  something drastic happens, I'm going to call one, two,
17  and three, you want them on the list.  Most likely,
18  I'll call three, four, and five.  Then, you know, five,
19  six, and seven, whatever.  You put them on the list.
20  And this is not a list that you're going to be bound
21  by.
22    MS. FREIWALD:  So conversely --
23    THE COURT:  It is a good faith list to give
24  both sides...
25    First of all, there's two reasons for it.  One

1  is simply because you're going to be able to have a
2  realistic idea of how many people you're both going to
3  call.
4    Second, you're going to have, hopefully, a
5  realistic idea of who the witnesses are going to be so
6  you can focus on them for preparing for trial.  This is
7  hard enough to prepare for trial within this short
8  period of time.  You know, if you're fair to each
9  other, you both have the same problems.  You both have
10  to focus and try to get ready for trial.
11    You can make it as hard for each other as you
12  want, and I know there's always a natural inclination
13  to want to make it hard for the other side, but you can
14  also make it easier for each other, and I'm hoping
15  you're going to make it easier for each other by using
16  good faith and trying to -- and I'm hoping, and
17  obviously, plaintiffs are going to be watching, and if
18  it turns out that the defense list is totally bogus,
19  then they're going to not trust it next time.
20    We're going to be working together in the
21  future is what it comes down to.
22    MS. FREIWALD:  But conversely, if we come up
23  one or two witnesses shy --
24    THE COURT:  This is not a binding list.  This
25  is not binding on either side.  This is your good faith

1   estimate.

2          MS. FREIWALD:  Fair enough.

3          THE COURT:  It has no legal validity.  It is

4   nothing that's going to be thrown back at you by the

5   Court.  It might be thrown back by your adversary, but

6   not by the Court.

7          The only way I would take it into

8   consideration is whether this whole time frame thing

9   can be the way we can do it next time and whether I can

10  rely on counsel's estimate of who they're going to call

11  and when they're going to call for future trials, but

12  I'm not going to say you can't call them because you

13  didn't list them.  I mean, that's not going to happen.

14         MR. GORDON:  Judge, we have already turned

15  over to them a list and CVs of any new expert who has

16  not previously been involved in the litigation; is that

17  correct?

18         MS. RELKIN:  Yes.

19         MR. GORDON:  So that allows them to get

20  started with researching them, getting their

21  publications, et cetera, and that's just to let you

22  know we have already given them that.  I'm not sure why

23  that wasn't done first.

24         MS. JONES:  Actually, I will tell you,

25  counsel, I think there was a problem in that I first

1   saw it this morning for the first time.  I don't know

2   whether it got lost or didn't get through on the e-mail

3   or whatever...

4          MS. RELKIN:  It was e-mailed last evening.  My

5   e-mail had it going through.  It had a large PDF.

6          MS. FREIWALD:  What we got this morning was an

7   e-mail with the names, but we haven't seen the CVs.

8          THE COURT:  The 27th is the plaintiffs' good

9   faith list, the 1st is the defense good faith list.  By

10  the 10th, I would like to meet again on the 10th, and

11  by the 10th I would like to have from you the time

12  frames solidified as to how long it is going to be for

13  the trial.  I would like you to meet before the 10th to

14  agree on time frames.

15         All right?  Now, if we agree on a time

16  schedule, then we don't have to have rules about

17  anything else, limiting voir dire or limiting...

18         I would also like to have whether the openings

19  and closings are included in your time or whether you

20  want to have the openings and closings separate from

21  the time frame and whether you want to have time limits

22  on them.  I want to have time limits on them.  But

23  let's -- I don't want to have unreasonable time limits.

24         MR. LANIER:  What I am going to propose to

25  Merck in that regard, and I'll tell you all now so you

1   can percolate on it and you can decide if this is even

2   in the realm of possibilities, is if we can divide it

3   up where we're opening in a day, so we can get it done

4   in one day.

5          Closings are all in one day, so we don't have

6   an issue of jurors going home at night and hearing only

7   one end of the story or the other end of the story and

8   letting it germinate too long.

9          Then I had originally thought that that would

10  be outside the scope of the time factors.  I was kind

11  of looking at the time and saying, how can I guarantee

12  to Judge Higbee that I'm going to get this done in

13  four weeks?

14         And I'll talk to Merck about it and see if we

15  can come up with an agreement to say we'll do openings

16  in one day and then we'll do closings in one day, and

17  if we need time restrictions, we'll do it so we can get

18  that done that way.

19         THE COURT:  Okay.  All right.

20         MS. JONES:  I do think --

21         THE COURT:  We have to decide about the

22  plaintiffs.  I think there had been an agreement that

23  they were going to not be two full openings on

24  liability issues, but there would be an address by one

25  counsel on all the issues, and then second counsel

1   would address their individual client's issues.

2          MR. GORDON:  We agreed to do that.  Mr. Lanier

3   will give the general opening and discuss the Cona

4   case, and I will open with regard to McDarby.  If there

5   are some discrete areas that relate to McDarby that may

6   have some minorly tinged issues and he doesn't cover

7   it, and I'll cover that.

8          THE COURT:  That's fine.  And I don't expect

9   you to do him in a vacuum.  I expect you relate him to

10  VIOXX in some way.

11         MR. GORDON:  We'll mention he took it for

12  four years.

13         THE COURT:  Continuously?

14         MR. GORDON:  Yes, day in, day out, every day,

15  every CES record.

16         THE COURT:  Okay.  I already know how the

17  defense can use that.

18         MS. JONES:  I'll take any ideas you have.

19         THE COURT:  All right.  What do you want to

20  talk about?

21         MR. LANIER:  Your Honor, I have a short list

22  of 11 things that I think may be on Merck's list, as

23  well, but if I could probe these with you, it would be

24  helpful to me.

25         THE COURT:  Okay.

1    MR. COHEN:  I need five minutes, and I don't

2    know if anybody needs me.  If not, I would like to step

3    out for a minute.  I'm not feeling well.

4         THE COURT:  Take a break.

5         MR. LANIER:  And if it is contagious, let us

6    know.

7         My first question, Your Honor, is...

8         I'm trying to put the easy ones up first.

9         I have gone through your transcript from the

10   last trial, and I have --

11        THE COURT:  Please.

12        MR. LANIER:  It has answered 90 percent of my

13   questions.  There were a couple of things that have

14   become issues as I have tried to learn New Jersey

15   practice and procedure, one of which is, there is a

16   very important deposition that was taken in the VIOXX

17   litigation after your trial and after my trial.  It is

18   the deposition of Dr. Eric Topol.  Dr. Topol is the

19   head of cardiology with the Cleveland Clinic, the

20   number one ranked cardiology --

21        THE COURT:  I'm familiar with the Topol story.

22        MR. LANIER:  The Topol deposition was not

23   taken in the New Jersey cases.  It was taken in the

24   MDL.  It is a videotaped deposition.  I would hope we

25   do not need to go redepose Dr. Topol, because he is a

1    nonretained expert, and he only gives testified under

2    subpoena under the rules of the Cleveland Clinic, where

3    he works.  He is not allowed to give testimony outside

4    of a subpoena.  And because we don't have this

5    deposition taken under New Jersey rules with New Jersey

6    parameters of expert testimony and all, it is my hope

7    that we could still just use the deposition as it is.

8    It certainly has Merck's cross-examination on it, as

9    well as a direct that was taken by a lawyer out of

10   Philadelphia, Tom Kline.  And I need to understand what

11   the Court's position on that is, or what Merck's

12   position is, I guess, so that I know if I have to try

13   and figure out some way to get a commission and a

14   subpoena and redepose this gentleman and all of that

15   kind of stuff.

16        THE COURT:  Do you anticipate that they would

17   use Dr. Topol's dep?

18        MR. JONES:  I'm sorry?

19        THE COURT:  I'm sure you expected that they

20   would want to use Dr. Topol's dep.  Do you have a

21   procedural objection?

22        MR. MAYER:  We will have evidentiary

23   objections to the use of the deposition.  I don't think

24   they're based on what action that was taken, which I

25   think is what Mr. Lanier is saying.

1    THE COURT:  You're not going to object to it

2    being used based on the fact that it wasn't taken in

3    New Jersey.

4         MS. JONES:  I will stipulate to that.  I will

5    not stipulate to the admissibility of any of his

6    testimony.  I mean, we expect to have and to file the

7    appropriate motions.

8         THE COURT:  Your objection would be the

9    same -- your objection would be the same as if it had

10   been taken in this litigation.

11        MS. JONES:  That's right.

12        MR. LANIER:  In other words, I don't have to

13   list him and give an expert report and all of this kind

14   of stuff since he is a nonretained expert.  The report

15   would be, here is Dr. Topol's deposition, here are his

16   opinions he may offer at trial.

17        MS. JONES:  What I would like to do, Your

18   Honor, is before I commit to this specifically, can I

19   get back to Mr. Lanier in 24 hours on this?  The only

20   reason I raise an issue is that that deposition does

21   include a lot of expert testimony, and there were

22   significant objections to the fact that it included

23   expert testimony that had not previously been

24   designated, and I need to just go back and make sure

25   that I'm not waiving something.

1    I do not anticipate having an objection solely

2    on the basis that it was not taken in this

3    jurisdiction, but we do have other -- we do have other

4    objections to his testimony, and the whole issue of

5    expert testimony, I would just like to have an

6    opportunity to confer with somebody before I -- before

7    we get down to that point.  And I'll give it to you

8    within 24 hours.

9         MR. LANIER:  Recognizing that I have to like

10   give expert reports by Friday and today is Wednesday,

11   so if I have to give -- I mean, if you want me to, to get a

12   statement from Eric Topol that says I can't come

13   testify live, but this deposition has my testimony...

14        I'm just trying to get some guidance here on

15   what I need to do by Friday.

16        I recognize that Merck may have substantive

17   objections.  Merck may say he is not qualified to give

18   this opinion, or this expert opinion doesn't meet your

19   judicial gatekeeping scrutiny, or, this is bogus.

20   Those types of objections I'm not asking you to waive.

21   Make all of those you want in front of the judge and

22   let her decide what comes in and what doesn't.  But

23   what I'm looking for, Your Honor, is, do I need to try

24   and figure out how to navigate the Cleveland Clinic's

25   policy manuals that are going to fight me getting even

1    a written statement from Eric Topol saying, This
2    deposition contains my opinions?  That's the kind of
3    stuff I'm worried about.
4        THE COURT:  So what you're telling the defense
5    today is Dr. Topol is, as far as you're concerned, an
6    expert witness for you --
7        MR. LANIER:  Yes.
8        THE COURT:  -- and that you intend to use him
9    as an expert.
10       MR. LANIER:  As a nonretained expert.
11       MS. RELKIN:  I looked into this issue.  We
12   think it comes in clearly under Rule 804, and there's
13   also a very relevant case that Judge Keith (ph) has
14   written, Beckwith versus Bethlehem Steel, which is 185
15   N.J. Super 50.
16       He is unavailable because we can't get
17   subpoena power over him, and he is a fact witness that
18   goes to lots of notice issues and transactions, what he
19   told Merck, what they did, but because he is a
20   physician, some of the facts have expert or opinion
21   issues interwoven.  But we're not listing him as an
22   expert witness.  He is an unavailable witness who has
23   given deposition testimony.  They were there.  They had
24   the opportunity and they cross-examined him.
25       We think it comes in clearly under 804, but if

77

1    there was a problem by the fact that they didn't
2    cross-notice him in New Jersey, we wanted to make sure
3    we didn't have to run through hoops in that context.
4        MR. LANIER:  And my concern is -- everything
5    she said is legally there, but my concern is because he
6    is a fact witness, a lot of what he says technically, I
7    think, is expert testimony, as well, and I just don't
8    want to get -- I don't want to come up to trial and
9    find out that I have transgressed something because you
10   all expected me to list him since some of his fact
11   testimony is --
12       MS. JONES:  My objection...
13       Well, two things.  One, in the MDL, the
14   argument was he is not an expert, and there were
15   objections made at that point.  I mean, the plaintiffs
16   took the position he wasn't an expert.  There were
17   objections at that point made to him introducing expert
18   testimony.
19       My concern, Your Honor, is it is one thing if
20   they say we're bringing him in here as a fact witness,
21   and I'm saying, okay, that's fine, if you're bringing
22   him in here as a fact witness.  I'm not going to raise
23   the problem that it wasn't noticed in New Jersey.
24       However, I don't want to waive my objections
25   to any of the opinions that this fact witness is

78

1    raising.  And that's the concern that I have, that I'm
2    being placed into a box, and I just want to make sure
3    we're all on the same wavelength.
4        MR. MAYER:  Of course, we're also not waiving
5    objections to the hearsay fact testimony.
6        MR. JONAS:  No, I'm assuming Your Honor
7    understands all that.  It is the opinions that -- it is
8    the opinion testimony that concerns me, Your Honor, and
9    I do intend to assert objections to some of the
10   hearsay -- to some of the opinion testimony that he has
11   offered.
12       THE COURT:  All right.  A fact witness who is
13   unavailable who has been deposed certainly can be used,
14   his testimony can be used.  His opinions as an expert
15   cannot be used.  So I think the plaintiffs better get
16   together and decide whether he is your expert witness
17   or not.
18       MR. LANIER:  If he is, how mechanically --
19   what hoops does Merck want to make me jump through to
20   use him, other than just listing him Friday and giving
21   you a statement that any opinions he is going to offer
22   are in his deposition?
23       MR. WEISS:  You have the transcript.
24       THE COURT:  I'm not going to hold you to
25   needing a report.

79

1        MR. LANIER:  So I just will list him.
2        THE COURT:  Miss Jones, I think the question
3    is if they want to take a different position than the
4    people in the MDL did, that he, in fact, is an expert
5    and they are going to use him as an expert.
6        MS. JONES:  That's what they're saying, and so
7    I have to go back and look at that, because I do have
8    some objections to those opinions, and if by listing
9    him as an expert Your Honor would say, They have listed
10   him as an expert, and therefore, I'm going to allow all
11   of this opinion testimony to come in, then I have a
12   different -- I mean, I want to preserve all objections
13   to that.  That's my concern, and if I can -- what I
14   will -- what I can propose to Your Honor is that I
15   am --
16       THE COURT:  Well, this is the -- the whole
17   expert -- the reason for expert reports and the reason
18   for all the expert rules are very simple, and they come
19   down to simply giving notice to the other side that the
20   person is an expert, that you're going to use him as an
21   expert and that they're going to offer opinions.
22   That's what all the rules and the case law come down
23   to, so that there's no surprise at trial and you have
24   the chance to counter his expert report with your
25   experts, or his expert opinions, and you have the

80

1  chance to prepare for cross-examination of expert
2  opinions, and that's why we have all those rules.
3       Now, this is a somewhat unique case, because
4  this is a witness who is clearly a -- I don't think
5  there would be too much doubt that he is an expert type
6  witness, at least, even just the fact that he is a
7  physician.  And if his dep had just been taken and he
8  wasn't listed as an expert witness and he wasn't
9  deposed as an expert witness, then under New Jersey
10 law, he wouldn't be allowed to give expert opinions.
11      On the other hand, if he is listed as an
12 expert witness, if you have notice that they're using
13 him as an expert and they do intend to rely on his
14 opinions, then that basis for objecting is gone.  You
15 can still object on that basis, but what they're
16 telling you, I think, is since they didn't do it in
17 terms of a report and then a dep saying we're taking
18 the video of our expert, is that something that you
19 feel that you need?  Do you feel that you need to
20 redepose him?
21      MS. JONES:  Well, I think that the issue that
22 confronts us, Your Honor, is that we need to at least
23 reserve the right to redepose him and to force them to
24 produce him if they have to in the fact that he was not
25 deposed as an expert originally.  He was not noticed as

1  an expert, he was not deposed.  So he wasn't deposed as
2  an expert witness for the plaintiff.  I mean --
3       THE COURT:  Are there things you would ask him
4  different?
5       MS. FREIWALD:  It would have been handled
6  differently.  There were time constraints.  The
7  deposition would have been handled differently, and, in
8  fact, the MDL argument was he wasn't an expert witness,
9  so the notice practice in New Jersey is notice first,
10 deposition second.  Once the deposition is in the can,
11 and if we were to be stuck with what we have, the
12 notice effectively becomes moot, because there's not
13 really anything we can do with the notice.
14      So I think that the issue we need to go back
15 and reconsider is whether we would need to say to the
16 plaintiffs, If you're seeking to admit expert parts of
17 his testimony and you're giving us notice of your
18 intent to do that now, do we need to have him produced
19 by you for an additional deposition?
20      MR. BUCHANAN:  Your Honor, this is very
21 similar to the issue we had with Dr. Avorn, you may
22 recall, prior to the Humeston trial.
23      Dr. Topol is an unretained expert.  He is not
24 retained as an expert by any party in the litigation.
25 By nature of his profession, he is an expert in certain

1  areas, and the testimony that was taken in the MDL
2  deals with his writings at various points in time, his
3  interactions with the company at various points in
4  time, his conclusions he drew in connection with those
5  interactions and those writings, and the information he
6  was given.  What that is, you know, what is that
7  testimony?  Is that testimony expert testimony?  Is
8  that testimony fact testimony?  That's where the lines
9  are blurred.
10      Judge Fallon, I believe, concluded that it was
11 testimony of an expert nature, but because he was not
12 retained by a party, Rule 26 didn't apply, and,
13 therefore, there was not a requirement to disclose an
14 initial expert report.
15      Then the Court got into its gatekeeping
16 function under the 700 series in the expert rules and
17 whether he was, in fact, an expert, whether he used
18 proper methodology, whether he used the type of
19 methodology he uses day-to-day, and the Court allowed
20 the testimony in on that basis.
21      But there was the dichotomy there, but the
22 testimony is not like a litigation expert who had no
23 contemporaneous exposure to information who is then
24 given a bunch of information as a retained expert who
25 synthesizes the information, reaches opinions, and

1  draws conclusions specifically for purposes of
2  litigation.  That is a distinct -- I think a distinct
3  expert, as compared to the nature of the testimony that
4  was taken of Dr. Topol in the MDL testimony.  It was
5  taken as a person with exposure to VIOXX, with exposure
6  to study information, with writings in the area,
7  testimony concerning his interactions in those areas.
8       It was not a situation where information was
9  given to him after the fact and he was asked to say,
10 Well, what do you think now that you have had a chance
11 to examine all of this in retrospect for purposes of
12 litigation?  That's not the type of expert he is.
13      So what Mr. Lanier is reconciling here is what
14 do we call that and what type of disclosure do we need
15 to make so we can play his testimony in this
16 deposition?  He is not a retained expert, and that's
17 important.
18      MR. LANIER:  And that fuses nicely with the
19 concern Miss Freiwald has brought up, which Miss
20 Freiwald indicated if we use him as an expert, we may
21 like to ask him different questions.  We're not going
22 to ask him any additional questions that weren't
23 allowed in that original deposition within the time
24 constraints.  That applied to both sides.
25      Everybody went into that deposition.  The

1  direct that we'll be asking -- or playing, and some of
2  the cross that we seek to play, as well, are all
3  questions that were asked under those rules that
4  applied to everybody.  And so it is this meshing of
5  opinions that I'm concerned about, and I just want to
6  make sure that we're able to play -- and I'll be candid
7  with you, I don't know that we can get Dr. Topol to
8  give another deposition.  It is not like he is friendly
9  to us or anything like that.  I know that a lot of work
10  went into getting the subpoena the first time, and
11  actually, it was opposed by his employer, by Dr.
12  Topol's employer the Cleveland Clinic, and --
13      MR. BUCHANAN:  We actually have been advised
14  if there's a commission that's issued for his testimony
15  that they will seek to deal with that commission, the
16  subpoena that issues that, whatever Ohio court would
17  issue it.
18      So, I mean, the Cleveland Clinic will oppose
19  that.  I don't know how we'll be able to deal with that
20  for trial.
21      It is the type of thing, Mark, where we can
22  provide the Court with the testimony, the designations
23  we intend to play, and, you know, now a month before
24  trial, and Your Honor can give us guidance as to what
25  we need to do between now and then, if anything, to

85

1  because I don't want a motion in limine granted when I
2  have no power to cure it.  Right now I don't know that
3  I have the power to cure it, but if I'm going to be
4  under that onus, I need to know now, because I need to
5  try and go find someone who can change the Cleveland
6  Clinic's mind and get Jones, Day to lose all of their
7  clout in Cleveland.
8      MR. WEISS:  My point was, there are portions
9  of that transcript they're not objecting to, correct?
10      MS. JONES:  I am saying we will not object to
11  the transcript on the basis that it was taken in
12  another litigation, so that to the extent he is a
13  fact witness and it is taken there elsewhere, I'm not
14  going to object to that.  I have a lot of other
15  objections in the context of a deposition, but that
16  fact alone won't be the basis of our objection, except
17  to the extent that I don't want to be barred from
18  objecting to his opinions because you designate him as
19  an expert on Friday.
20      THE COURT:  Was this dep taken before Dr.
21  Topol was relieved of some of his duties?
22      MR. LANIER:  Yes.  He was relieved of his
23  duties the day after it played.
24      MR. MORELLI:  With no connection, of course.
25      MR. MAYER:  And it was taken totally as a fact

87

1  allow that testimony to play at trial.
2      MS. JONES:  But the point is, and what I want
3  to make sure that the Court understands, the point
4  is -- Mr. Buchanan makes a persuasive argument that the
5  expert testimony is all incorporated within the fact
6  testimony, and what I'm saying is, Your Honor, that we
7  have significant objections -- we don't agree with him
8  to that extent.
9      To the extent -- we will say to Your Honor
10  that while we have significant objections --
11  evidentiary objections that will have to be taken up,
12  one of those objections is whether or not that opinion
13  testimony goes beyond or is not incorporated within
14  this fact testimony.
15      And that's the concern that I have that's
16  being raised here is that we need to reserve that
17  objection to that, let Your Honor rule on it, and my
18  concern is that what Mr. Lanier is saying is, no, I
19  want to identify him as an expert witness so I take
20  that argument away from you.  Do you see what my
21  concern is there?  And I'm not willing to give that
22  argument up.
23      MR. WEISS:  Can I suggest we file a motion in
24  limine and have it argued before the trial?
25      MR. LANIER:  But I need to know now, Sol,

86

1  deposition, as you know, so he was asked questions that
2  he gave broad opinions, but there was no advance notice
3  of those opinions before.
4      THE COURT:  And in the MDL, his testimony was
5  allowed.
6      MS. JONES:  Some of it.
7      MR. BUCHANAN:  Three hours or so played of his
8  deposition in the MDL, three to four hours of a
9  six-hour or seven-hour deposition.
10      MS. RELKIN:  Your Honor, this has come up --
11  Merck sent -- there was a deposition of Dr. Curfman
12  from the New England Journal that was their subpoena.
13  He is a physician, and therefore, some of this stuff is
14  factual, but it has interplay with expert.
15      MR. MAYER:  It is not a fact deposition.
16      MR. WEISS:  That's precisely what you are
17  doing, and I wrote Your Honor a letter today and posted
18  it on Lexis Nexis, because in preparation for the Irwin
19  trial, you're cross-noticing depositions to be used in
20  that case here without giving us two days notice to
21  show up.
22      MR. MAYER:  That's a totally different issue.
23      MR. WEISS:  Curfman was deposed to ameliorate
24  some of the testimony of Eric Topol.
25      MR. MAYER:  I think you have that confused.

88

1    MR. WEISS:  I apologize.

2    MR. GORDON:  I'm not sure to what extent you
3  are familiar, perhaps you're very familiar with the
4  story, but in terms of when Ted says these opinions are
5  something that were surprise to them, the whole point
6  of this is that this was a doctor who was an early
7  critic of VIOXX, had told Merck that, Merck came out
8  spoke with him about his opinions.

9    It is almost impossible -- obviously, as a
10  doctor and as an expert in VIOXX, he would be saying --
11  which is in and of itself evidentiary in terms of its
12  notice to the defendants, actual notice of dangers and
13  what they did or didn't do about that, but he published
14  on this.  He published in medical literature peer
15  reviewed opinions.  He was on 60 Minutes.  He was in
16  the New York Times.  There was no opinion.  There were
17  internal memos about what his opinions are at Merck.
18  You shouldn't be left with the impression that in any
19  way, shape, or form that Merck didn't know everything
20  there was to know about Dr. Topol and his opinions.

21    And, perhaps, perhaps -- I know it would be a
22  burden on the Court, but if you, I think, just read the
23  transcript, which is very interesting reading, you
24  might, you know, perhaps be able to have a better sense
25  of what we're talking about when we say he is an expert

89

1  witness giving opinions.

2    The fact, if he says that VIOXX is dangerous
3  and he told Merck that VIOXX was dangerous, well, I
4  guess there's a medical opinion in there, but he is
5  obviously qualified.  The difference between an expert
6  witness and a witness giving an opinion because he is
7  qualified by the Court as having more knowledge than
8  the average person on that particular thing.

9    But I think there's many prongs in which
10  evidence comes in, but I'm just concerned that everyone
11  here knows everything about this aspect, and I know
12  Your Honor knows plenty about this litigation, but I
13  don't know if you're familiar specifically with that
14  particular story.

15    MR. BUCHANAN:  We could provide the deposition
16  cut promptly to Your Honor that played in the Irvin
17  trial.

18    THE COURT:  I know that Dr. Topol was a
19  witness that's been talked about since the beginning of
20  this litigation, and I know that the plaintiffs had
21  wanted to use him as their witness for a long time and
22  apparently were having difficulty or couldn't get him,
23  didn't feel they could get him as a witness.  He
24  apparently wasn't willing to or not allowed to act as
25  an expert --

90

1    MR. LANIER:  All true.

2    THE COURT:  -- and that at some point there
3  was arrangements made where he was finally deposed.

4    All right.  I want to see two things:  One, I
5  want his complete deposition, and two, I want the part
6  of his deposition that was played to -- I want two
7  separate packages, one that has his total deposition,
8  one that has the part of his deposition that was played
9  in the other trial.

10    MR. BUCHANAN:  Your Honor --

11    THE COURT:  And I want to have -- I mean, the
12  defense is on notice now that the plaintiffs intend to
13  use Dr. Topol's deposition, that they want to use his
14  deposition, that he is not a retained expert by them,
15  but that he is giving both opinions -- he is giving
16  factual testimony, which includes a mix of expert
17  opinions and fact, and that if you object to that, I
18  guess basically we need to have -- and you do, I
19  know -- we need to have your brief on your...

20    Let me ask you, is what you're asking to --
21  maybe I don't have to look at the whole deposition.  At
22  this point, do you know what parts of his deposition
23  you wish to read in?

24    MR. LANIER:  Yes, Your Honor, I do.  I haven't
25  put it in writing, but I watched the video.  I am

91

1  concerned there are parts that the judge did not allow
2  in the Irvin case, I don't know if it was because it
3  was duplicative, if he was in a time rush, but there
4  were critical points not allowed to play in Irvin that
5  I'm going to ask to be played.  So I can give you three
6  things; the whole depo, the Irvin cuts, and what my
7  requested cuts would be.

8    THE COURT:  I would like to have them by...

9    How soon can you get me those?

10    MR. LANIER:  I would have trouble doing it by
11  tomorrow, but --

12    THE COURT:  By Monday.

13    MR. LANIER:  Easily by Monday.

14    THE COURT:  By Friday?

15    MR. LANIER:  Today is Wednesday?

16    THE COURT:  Yes.

17    MR. LANIER:  I would love Monday.

18    THE COURT:  All right.  So by the 6th you're
19  going to give it to me.

20    MR. LANIER:  No.  I can give it to you early
21  Monday.

22    THE COURT:  And obviously, to the defense at
23  the same time.

24    Miss Jones, how long is it going to take you
25  to do your brief and objecting, basically, your motion

92

1  in limine to prevent him from using it just on this one

2  motion?

3      MS. JONES:  If we get it Monday, just give me

4  until Friday.

5      THE COURT:  So you'll file your papers, your

6  legal papers by the 3rd and we'll set up -- we'll set

7  up oral argument.  I would ask that your opposition or

8  any response to their papers be to me by the 7th, and

9  by the 8th, we'll have an oral argument at 10:00 on

10  February 8th.  We'll have oral argument on that motion.

11      MS. JONES:  May I?

12      THE COURT:  Yes.

13      MS. JONES:  You can say no.

14      THE COURT:  You can do it by phone if you

15  want.

16      MS. JONES:  What I was going to suggest to

17  you, you have already scheduled another meeting for the

18  10th.

19      MR. BUCHANAN:  The more time the better, I

20  think, not knowing how this is going to turn out.

21      THE COURT:  Why don't we schedule the next

22  meeting for the 8th and not for the 10th --

23      MS. JONES:  That's fine.

24      THE COURT:  -- just so we don't have to have

25  two meetings.

93

1      MS. FREIWALD:  Can we ask if we're going to

2  get their brief on the 7th that we get it early enough

3  in the day that we can read it before the argument on

4  the 10th?

5      THE COURT:  You have to get the brief to them

6  by the 7th at noon.

7      MS. FREIWALD:  Can we get it by noon so if we

8  have argument on the 8th, we'll have more than

9  ten minutes?

10      THE COURT:  The 10th hearing is off and now

11  we're on the 8th for the hearing for the meeting.  The

12  meeting is going to be the 8th and the oral argument on

13  the Topol dep is also going to be on the 8th.  It will

14  be the first thing we address on the 8th.

15      MR. GORDON:  And I assume you want the video

16  and the transcript.

17      THE COURT:  Me?  I don't want the video.  No,

18  I'm not going to watch him.  I don't care what he looks

19  like.

20      MR. LANIER:  Movie night at home.

21      THE COURT:  Unless you get it for me in a

22  cassette I can play in my car.  I don't have that long

23  a commute.

24      No.  I want a written transcript so I can read

25  it and fall asleep reading it and let it drop to the

94

1  floor as I drift off.

2      MR. LANIER:  Your Honor, with permission,

3  then, may I approach a new subject real quick?

4      THE COURT:  Okay.  If we have 11 things and

5  that took that long, we're in trouble.

6      MR. LANIER:  Because that took that long, I

7  eliminated five of the 11 while we were waiting.  I

8  think this is an easy one.

9      We have requested Alise Reicin, David Anstice,

10  and Raymond Gilmartin.  If we give the time, you'll

11  make them available for us in our case in chief, is

12  that true?

13      MR. MAYER:  That is true, with this caveat,

14  basically:  That we want to make sure they can be

15  available on the dates you want them, basically.  So we

16  will produce them, no need to subpoena them.  If there

17  is a process server trying to serve them, please call

18  them off.  But we need to work out the dates.  I

19  understood from Rick that you didn't want them all in

20  the first week.

21      MR. LANIER:  That is true.

22      MR. MAYER:  And I was not committing to that,

23  because I wasn't sure with Dr. Reicin's schedule

24  whether that would work, and I still don't have an

25  answer on that.  So we will continue to discuss that.

95

1      THE COURT:  She does something else other than

2  testify?  I'm sure she does.  I just meant that I know

3  she has testified in all the trials and, unfortunately

4  for her, may wind up having to testify a lot more.  I'm

5  sure she feels that all she does is testify.

6      MR. MAYER:  She has other important work, too.

7      MR. LANIER:  All right.  Your Honor, the next

8  subject might be --

9      THE COURT:  So you'll try to work out the

10  dates for that?

11      MR. LANIER:  Yes.

12      THE COURT:  We did have...

13      Well, okay.

14      MR. LANIER:  Number next --

15      THE COURT:  Yes.

16      MS. JONES:  Whoa (indicating).

17      MR. LANIER:  How.

18      MS. JONES:  This is a signal to stop.

19      The one thing that I would ask Your Honor is,

20  if we agree to produce them and we produce them on a

21  certain day, we work out a day and we say we'll have

22  them here on Tuesday, I would ask that they go on

23  Tuesday and at the very least carry over only until the

24  following day so that -- we are having to interrupt

25  their schedules and all, so I'm hoping we have an

96

Transcript - Meeting (Cona and McDarby Trials) (2006/01/25)

1  agreement with counsel that if you ask for them to be
2  here on Tuesday and we say we'll have them here on
3  Tuesday, they will, in fact, go on Tuesday.
4          MR. MAYER:  And you represented that.
5          MR. LANIER:  I'll do the best I can,
6  recognizing the trial is an amoeba and we have to all
7  maintain some level of flexibility.
8          MR. MAYER:  But these are people, and Mr.
9  Anstice is president --
10         MR. LANIER:  I never lost at trial by hiding
11  when I'm calling someone.  I'm not worrying about it.
12         MR. MAYER:  We're worried about it.
13         MR. LANIER:  Okay.  I will tell you.
14         THE COURT:  Last time I really felt that if
15  anything, and I know there was one -- there was one
16  witness for the defense who spent --
17         MR. MAYER:  Anstice was on again, off again.
18         THE COURT:  But we did accommodate.  You know,
19  we also -- but his testimony went for days.  I mean,
20  hopefully, we're not going to have any of that this
21  time.  If we're having these time restrictions,
22  hopefully, somebody is not going to spend three of
23  their eight days on one witness.
24         MR. LANIER:  That's right.
25         MR. MAYER:  We put them on, examine them,

Transcript - Meeting (Cona and McDarby Trials) (2006/01/25)

1  we'll do our examination, you'll do whatever recross
2  you have, and they'll go.
3          MS. JONES:  What happened the last time, it
4  wasn't anybody's fault, what happened is we had him
5  here on Monday, and then a determination was made to
6  bring some other people, and that's certainly their
7  option.  You know, I don't criticize that at all.  But
8  the fact of the matter is, he was here waiting and had
9  arranged the schedule because of that, and that's all
10  I'm asking.
11         MR. LANIER:  And I'll represent to you and the
12  Court that I will treat his schedule as I would like my
13  own schedule to be treated.
14         THE COURT:  All right.  So if a witness is due
15  to be started on a day and you bring him that day, he
16  will use him that day if he can.  He is not going to
17  put two other witnesses in front of him just because it
18  fits better.
19         However, if a witness that's on the stand goes
20  longer than expected and it has to go into the next day
21  to bring him in, that's the way it has to be.
22  Everybody is going to work within those parameters.
23  Plaintiffs' side will both -- all counsel will be
24  respectful.
25         What's next?

Transcript - Meeting (Cona and McDarby Trials) (2006/01/25)

1          MR. LANIER:  Next, Your Honor, you allowed the
2  use of jury questions in the last trial.  I would like
3  to have an opportunity to change your mind on that for
4  this trial.
5          THE COURT:  What, no jury questions?
6          MR. LANIER:  Yes, Your Honor.
7          MR. GORDON:  We would agree with that, as
8  well.
9          THE COURT:  Does the defense want to...
10         I don't mind.
11         MR. LANIER:  We have time constraints, we
12  have -- it's a concern of mine.
13         MS. JONES:  Actually, it was the first time I
14  ever had it done.  I thought it was interesting and
15  helpful, and I'm perfectly willing to allow the
16  questions to be asked and not count into anybody's
17  time.
18         MR. LANIER:  The concern I have is, as I read
19  the transcript, it looked like the jurors would ask the
20  questions a lot during the plaintiff's case and by the
21  time the case was to the defense case, the defense has
22  the opportunity to hear what the jurors are asking
23  during the plaintiff's case and mold their defense
24  around that and have their witnesses already handle
25  their questions, and by the time you got to the defense

Transcript - Meeting (Cona and McDarby Trials) (2006/01/25)

1  case, the jurors had kind of petered out and weren't
2  asking many questions and were ready to get the trial
3  over with.  And I think it plays in the defense's
4  favor, and I don't think it works out fairly is my
5  concern.
6          MR. GORDON:  I would second that.  We can't
7  respond the way they can because we have already gone,
8  so some of these questions come up and it looks like we
9  didn't ask the right questions, but now they have had
10  the benefit of that in their case in chief, they're
11  asking all the right questions, according to the jury.
12         In that sense, I have never had it before, and
13  I'm very troubled about it, especially where we have
14  these kind of time limits where we have to choose not
15  to ask questions because of certain timing, and I think
16  it creates a problem and they're going to be better
17  able to adjust to it better than we are because they go
18  second.
19         MS. FREIWALD:  Your Honor, I think...
20         First of all, I'm not sure that that's true.
21  My sense of things were that there were questions in
22  both parties' cases.  However, the reality is that most
23  of the generic science of the case went on in the
24  plaintiffs' case, so by definition, the kind of big
25  issues that the plaintiffs had -- that the jury had got

Transcript - Meeting (Cona and McDarby Trials) (2006/01/25)

1  asked early on.  I don't think it is that they petered
2  out.  I think it is that they understood those
3  scientific issues by the time we got to, you know, our
4  case-specific cardiologists, for example.
5      MR. LANIER:  One of the reasons ultimately
6  when we fuss about time, I'm going to say the
7  plaintiffs need a little more time because we have to
8  go first and we have to explain there are four chambers
9  to the heart and this is what the blood is, and once we
10  play that groundwork, it has been played for the
11  benefit of all parties, but what the juror questions
12  came up with are not all just about mechanically what
13  is prostacyclin.  There were some other juror
14  questions, as well.
15      And so I'll just throw it out there.  I'm not
16  going to make a federal case out of it, because I like
17  the state court, but I would just throw it out there
18  for Your Honor to consider maybe.
19      MS. FREIWALD:  Obviously, I actually think
20  that there was more teaching about the heart and other
21  things in our case, but putting that aside, there was
22  even, you know, on the timing issue, obviously, again,
23  any witness they put on, we cross-examined.  I think
24  that the plaintiffs probably had more different kinds
25  of experts than we did, as their choice, but that was

Transcript - Meeting (Cona and McDarby Trials) (2006/01/25)

1  the function of our feeling, that, frankly, they had
2  used a lot of time and the jury was ready to be done
3  with us at that point.
4      So in any event, I didn't think that the
5  questions -- there were days where I thought the
6  questions suggested that the jury was interested in the
7  plaintiffs' case, and there were days where I thought
8  the questions suggested maybe they were agreeing with
9  some things Merck had to say, and I didn't think there
10  wasn't much of a split, and it was probably useful for
11  both sides.  People are dealing day-to-day --
12      MS. JONES:  It certainly kept them interested.
13      MR. LANIER:  It is a good way to streamline
14  the case, though.  We're looking to cut this down
15  timewise, and I don't know, I have spoken my piece.
16      MS. JONES:  I think it is one of those places
17  where the jurors may be a little bit progressive and at
18  the -- it was the first case I have ever had where they
19  did that, but certainly that's one of the real issues
20  if you look at any of the writings and complaints about
21  jurors that they have nationwide is the fact that they
22  don't get a chance to get their questions answered and
23  they don't necessarily always feel like part of the
24  process.  And I have to admit, I was very dubious about
25  it initially, but I thought it worked out pretty well.

Transcript - Meeting (Cona and McDarby Trials) (2006/01/25)

1      MS. RELKIN:  We had jury questions in a PPA
2  trial, Mr. Kristal and I, and it slowed the trial down
3  enormously because twice it was at the end of the day,
4  they wanted expert testimony, many questions we had to
5  take time to debate them, sort out which ones were
6  appropriate, so the judge let the jury go home.
7      Then the expert was not available to come back
8  the next day, we had to bring him back four or five or
9  a week later.  He asked the questions, the jury assumes
10  the expert has seen the questions, because how wouldn't
11  he have, but under the rules, we didn't discuss it with
12  the expert, because that would not be appropriate.  So
13  that expert is kind of getting this question cold, in a
14  delayed fashion, and then each side gets to ask
15  questions, you know, follow-up.
16      And it really -- maybe it didn't happen in
17  Humeston, but in the Kronfeld case before Judge
18  Garruto, it substantially lengthened the trial
19  depending on how the trial works.
20      So if time is an issue here, which it clearly
21  is, I think this is an easy way to eliminate the
22  potential for delay.
23      THE COURT:  What did you think, Dave?
24      MR. BUCHANAN:  I would say that I'm always
25  here to learn.  You know, the concerns that have been

Transcript - Meeting (Cona and McDarby Trials) (2006/01/25)

1  expressed by Mr. Lanier and Mr. Gordon I didn't take
2  into account in connection with the case.  I did see it
3  happen, I think, where the defense was able to build
4  those issues into their questions, but frankly, it was
5  not something that I would have foreseen and attempted
6  to foreclose.  So I frankly would defer to their
7  concerns on it, because it is their trial.
8      THE COURT:  Okay.  I'll take it -- I'll think
9  about it.
10      MR. LANIER:  Thank you, Your Honor.
11      The next two subject areas kind of flow
12  together, and I am concerned both out of practice from
13  the last time I tried a case against Merck and out of
14  e-mails and phone calls I'm getting now on this case.
15      Merck has a wonderful ability to put out a lot
16  of advertisements and put out, oh, at doctor's offices,
17  brochures about how they give away free medicines and
18  what a wonderful company they are, and those
19  advertisements seem to, perhaps coincidentally,
20  accelerate as cases start coming into trial.  I
21  certainly know they did in the Houston area with the
22  last trial.
23      And there is quite a media blitz that is
24  beginning already that I have noticed and suspect will
25  increase with radio time and with TV time and with

1 brochures and every doctor's office that will allow
2 them about what an incredible company Merck is.
3 I am very concerned about Merck
4 unintentionally prejudicing the jury pool through this,
5 and I don't know how to stop that short of maybe doing
6 discovery on why they're doing it or how much money
7 they're putting there and where they're placing the
8 ads.
9 One possibility, though, might be if you would
10 allow some limited voir dire of the prospective jurors
11 by the lawyers. I know under Rule 18-3(a) you have the
12 discretion to allow parties to supplement the Court's
13 voir dire. I think comment six of that rule gives the
14 details, but I'm supposed to request it ahead of time
15 and request it again at the voir dire conference, and
16 maybe if you would allow the lawyers some limited voir
17 dire, that could be one of the subject matters that we
18 could address with them.
19 But I am concerned about the media blitz, and
20 I am concerned about, perhaps, a chance to do some
21 limited voir dire. So those two issues go out together
22 to you, please.
23 MR. MAYER: To speak to the first part of
24 that, the types of -- this is an active company with
25 over 50,000 employees with a lot of medicines that

1 "Merck," and then I'm aware of it, or it actually
2 happens or doesn't. I don't know what other reasons --
3 I don't know how much of it is a legitimate -- I'm
4 assuming that it is not -- I mean, you can argue that
5 there's a business purpose, that trials from a public
6 relations standpoint, just the fact that you're on
7 trial and a defendant makes you look bad to the public,
8 and therefore, you need to show the good side of the
9 company, too, to people and that it is not an attempt
10 to actually sway jurors, but simply to get good PR out
11 as well as bad PR out.
12 I am certainly not going to -- I don't see at
13 this point that I have certainly any way of controlling
14 what Merck does or doesn't do in the way of
15 advertising. I don't think that I could enter any -- I
16 certainly would never do that at a conference. I would
17 never do it without an action being filed, a separate
18 action against them for some reason, and I'm really
19 questioning as to whether that could ever be done
20 anyway. There are First Amendment issues, there's all
21 kind of issues. So I think I have to just say that,
22 you know, if I was counsel, I would, you know --
23 MR. BUCHANAN: I suppose from the plaintiffs'
24 perspective, if the concern is one which we think
25 should be brought to your attention, our recourse is to

1 they're selling, a business to run, and they obviously
2 have an obligation to their shareholders and so on to
3 run the business and promote the company the way the
4 management thinks they should do that. I can represent
5 none of those campaigns have any connection
6 geographically, temporally to a trial -- to having
7 trials going on.
8 THE COURT: I don't know, Mr. Mayer, whether
9 you can actually represent that. I don't know whether
10 you as an attorney can actually know whether that's the
11 case or not, unless you have actually done some kind
12 of --
13 MR. MAYER: That's my belief, and I don't
14 think there's any evidence of that that Mr. Lanier has.
15 So on the issue -- and I'll let Christy speak to the
16 issue of the voir dire, but this company has to be able
17 to continue to conduct its business.
18 THE COURT: I certainly don't know whether
19 there's been an increase in ads or not. There's no way
20 any individual could tell. I don't watch a lot of TV,
21 but I -- it seemed to me there was an increase in ads
22 in the area before the last trial, and it seems to me
23 there's been just recently an increase in ads, and
24 that's troubling to me. But I don't really know
25 whether it is just because I'm more aware of -- I hear

1 take targeted discovery so we can take that action.
2 MR. GORDON: I have been hearing these ads,
3 and I'm wondering if I'm more sensitive to this
4 recently or not. But the ads concern me, because
5 they're not related to any of their products. They're
6 literally just Merck, where people come first, Merck,
7 we're a great company. And Ted was right, well,
8 there's no evidence Mr. Lanier has about why this is,
9 and he is right. That's the question.
10 We would like to get some evidence about it,
11 and I think they could put up somebody who is in charge
12 of their advertising program that is responsible for
13 this, and if we can have some limited discovery of
14 that, what they're doing, where it is being shown.
15 There had to be a string of e-mails about the basis for
16 the campaign. Let us take a look at those.
17 THE COURT: But wait. That's not part of this
18 trial. The bottom line is, you know -- I'm trying to
19 think it out, but the fact of the matter is, it seems
20 to me that if you want some kind of relief related
21 to --
22 MR. BUCHANAN: Your Honor, this is the jury
23 that we're concerned about protecting. This is the
24 jury we don't want to be swayed by ads that are being
25 targeted to them in a disproportionate way. Media buys

Transcript - Meeting (Cona and McDarby Trials) (2006/01/25)

1   should be something they should be able to provide to
2   us in a very easy way.  If you're buying media
3   advertising in one form or another in a targeted way in
4   certain things around trials, then that is an issue
5   that's for the Cona/McDarby team to deal with.
6            MS. FREIWALD:  It was quite clear to me the
7   last trial that Mr. Seeger was in the paper regularly
8   before the trial, and the plaintiffs are in the paper
9   quite frequently.  Mr. Lanier gets called, and every
10  time there's a deposition of any interest, it gets
11  published in the Philadelphia Inquirer, which is read
12  by a large number of the jurors here.
13           There is -- I think Your Honor is well aware
14  of the degree of media savvy on the plaintiffs' part,
15  and whether it is specific to the trial or specific to
16  the litigation generally, that doesn't change the
17  analysis.
18           We have got an awful lot of real work to do to
19  get ready for this trial.  In the questionnaire that
20  was used in Humeston, we had questions about whether
21  anybody held any strong views pro or con for the
22  company, pro or con for the plaintiff, whether they
23  were specifically aware of this litigation.  It was
24  dealt with in the questionnaire, and if somebody gave
25  an answer that really seemed like an outlier, I think

109

Transcript - Meeting (Cona and McDarby Trials) (2006/01/25)

1   there was an opportunity for some side-bar discussion
2   with the prospective juror, and that seemed to work
3   just fine the last time.
4            I think we all had concerns about the amount
5   of activity by the plaintiffs on the defense side.  We
6   had a lot of concerns about it.  We frankly had a lot
7   of concerns about it during the course of the trial.
8   We were very concerned about whether the jurors might
9   be reading the press every day and hearing comments
10  that were directed against Merck, directed against Dr.
11  Morrison, directed against counsel.
12           So I don't think this is a one-sided issue,
13  and, frankly, I think the only thing that can really be
14  done fairly and, frankly, appropriately, given the time
15  constraints is what we did the last time.  It is in the
16  questionnaire.  It can be dealt with if somebody seems
17  to have a real issue.
18           MR. LANIER:  Here is my concern with that,
19  Your Honor, and the reason I linked it up to letting
20  the lawyers do some questioning of the jurors.
21           I have seen Merck documents about other
22  campaigns that Merck has waged through the press, and
23  Merck does focus groups, for example, and determined
24  that 75 percent of the time doctors will give a certain
25  medicine to a patient if the patient asks for it by

110

Transcript - Meeting (Cona and McDarby Trials) (2006/01/25)

1   name.  So Merck used that and extrapolated how many
2   people would ask for it by name, VIOXX, if they ran the
3   Dorothy Hammil ad and this many people saw it.  There's
4   great mathematical precision behind Merck's media plays
5   and the effects it has on people.
6            Some of the effects it has, according to Merck
7   and some of the these other resources, is one that's
8   not so obvious on the brain, and so it is not the kind
9   of thing where someone is going to sit there answering
10  the questionnaire while they're going through this
11  trying to get it done, Do you have any harsh feelings
12  about Merck or any bad feelings one way or the other,
13  they're not going to say anything, unless you say to
14  them, wait a minute, this is a company that runs ads or
15  maybe you have seen their brochures in a doctor's
16  office and they talk about this or they talk about
17  that, does that affect the way you see them as a
18  company?  Those kinds of biases or preset opinions
19  can't easily be elicited merely by a questionnaire.
20           And the last thing I would say on this at this
21  point is, you know, Miss Freiwald talks about, for
22  example, the newspapers.  There's no newspaper in this
23  country who can write a story, even the Philadelphia
24  newspapers, without asking both sides for comments.
25  They're not allowed to do that under their writing

111

Transcript - Meeting (Cona and McDarby Trials) (2006/01/25)

1   ethics and reporting ethics.  So anything that would
2   have the plaintiffs contacted for information would
3   also have the defendants contacted for information.
4   Those have balance.
5            We're talking here about an ad campaign that
6   is orchestrated by a large financial company that -- it
7   would be roughly the equivalent to how do you think
8   Merck would like it if mysteriously on the radio ads
9   there started coming out people who -- citizens against
10  Merck, Merck is a company that did this and this and
11  Merck did that and that and here are all these problems
12  with Merck.  If those ads started coming up during this
13  trial, I assure you Merck might be singing a whole
14  different song about whether or not this is
15  appropriate.
16           MR. GORDON:  Obviously, you take it to the
17  point of absurdity, but how -- would we be right if we
18  ran targeted ads, John and Irma McDarby, family people,
19  Korean War hero, Mr. Cona, family?  I mean, obviously,
20  we don't have the ability to do that financially, but
21  imagine how the Court would feel and how Merck would feel
22  if they brought in a full-page ad about Mr. and
23  Mrs. Cona and Mr. and Mrs. McDarby, what wonderful
24  people they are.
25           And there's probably nothing -- well, maybe

112

1    there's nothing here, but the point is, we can't assure
2    ourselves of that. As you said to Ted, he doesn't
3    really know what necessarily has happened. He hasn't
4    inquired. If he has inquired, perhaps, but we just
5    would like the opportunity to get -- as Dave said, just
6    have there been media buys here? Is there something to
7    indicate that they have information? If not for this
8    court to decide now in McDarby and Cona, then when?
9        And what if it actually did come out that
10   there were actual memos -- I'm not saying there are, I
11   hope there's not -- but that said McDarby and Cona are
12   coming up for trial, it is time to start running the
13   Merck-is-a-great-company ads, we find this will have an
14   influence in such and such, as it did in Humeston and,
15   you know, run it in these channels because we think...
16       What if there were such a memo?
17       THE COURT: That's the question. What if
18   there were?
19       MR. LANIER: Then I don't know what the judge
20   can do absent giving us -- because you have First
21   Amendment concerns, and I understand that, and that's
22   why I don't know what relief to ask for, other than
23   maybe a chance to quiz the jurors and you just be real
24   firm with them, when they hear ads, turn them off.
25       MS. JONES: Well, I think --

1        MS. RELKIN: I was going to say, commercial
2    speech is not absolute. This is just a generic the
3    company is great. It is one thing if you're selling a
4    particular drug, they have a direct commercial
5    interest. That's different than touting the company.
6    That can get to trying to taint a jury. I think some
7    things come within the judiciary function. I think --
8        MR. MAYER: Mr. Gordon's firm does run ads; if
9    you or your family member has been injured by VIOXX...
10       MS. FREIWALD: It is everywhere you go. There
11   were comments after the Curfman editorial. Mr. Lanier
12   was out there.
13       MR. GORDON: If you want to depose my public
14   relations person about the timing of the ads, I have no
15   problem with that, because there's --
16       MR. LANIER: Here's a suggestion. I have --
17   maybe I have an answer.
18       Just make it an area where I'm allowed to
19   cross-examine the corporate rep. I can show the ad in
20   front of the Court, do you know about this ad, do you
21   believe in this, do you really think you're a good
22   company if you have done X, Y, Z? Do you buy these ads
23   and put them out there trying to change the perception
24   of your company with the community? What does it say
25   if you have to brag on yourself instead of other people

1    bragging about you? Make it something where I can --
2        MS. FREIWALD: I may not want to ask that
3    question.
4        MR. LANIER: It may backfire. Maybe it would
5    be an area ripe for examination of a witness or
6    something, and, I don't know, but I would like you
7    apprised of it, because I would like us to figure out
8    some way of making sure the playing field is level.
9        MS. JONES: Your Honor, I have all confidence,
10   based upon the last trial, that you will do everything
11   in your power to ensure that there's a level playing
12   field, and I have all confidence that you will do
13   everything in your power to ensure that you got a fair
14   and impartial jury that is put into that box. The fact
15   of the matter is that we're sitting here with a
16   significant amount of accusations that is -- that are,
17   in fact, implying some bad motive that -- that, one,
18   not even a single ad has been brought in here that
19   shows that there's anything any different from what is
20   happening here versus what is happening in Timbuktu,
21   number one.
22       Number two, as Miss Freiwald pointed out, we
23   did try to address that with the questionnaires.
24       Number three, I do believe that Your Honor --
25   if Your Honor believes that there's any need for doing

1    it, you can address the jury in your own voir dire
2    addressing publicity on either side from the bench and
3    deal with this problem.
4        But the fact of the matter is we have got a
5    case now here that's about one thing, and that's about
6    whether or not you have two men who suffered any
7    injuries as a result of taking VIOXX, and that's what
8    this case is about and that's what we need to be
9    focused about in getting this case ready for trial and
10   trying that case.
11       THE COURT: All right. What is the defense
12   position on lawyer voir dire or a limited lawyer voir
13   dire?
14       MS. JONES: Your Honor, I do voir dire in
15   Mississippi, unfortunately, all the time, and the
16   concern that I have about doing it here is that the way
17   people came in in waves and were put into the box is a
18   little bit different logistically in terms of how we do
19   it. My inclination would be to let Your Honor handle
20   those questions.
21       THE COURT: Okay. I'll let you know within a
22   very short time about lawyer voir dire, jury questions.
23       MR. LANIER: That's my list, Your Honor.
24   Thank you very much.
25       MR. GORDON: Judge, I have one item. I think

Transcript - Meeting (Cona and McDarby Trials) (2006/01/25)

```
1    probably we have some of the same items that you're
2    going to be raising.  One question I had was for the
3    expert depositions going forward.  Does the Court
4    anticipate any sort of time limit or anything along
5    those lines, and, specifically, if somebody has already
6    been deposed -- for example, Dr. DePace has been
7    deposed, he has been cross-examined at trial -- is
8    there some sort of agreement that we not go back over
9    old ground and only the new case-specific areas of his
10   report be examined in order to make these things go a
11   little quicker, or is it open hunting season all over
12   again?
13          MS. FREIWALD:  On Dr. DePace, I mean, I
14   hesitate to lay down any bright line rule, because
15   there has been literature that's come out, there's been
16   other things that are generic that have developed in
17   the litigation, but my intention would be not to try to
18   do a soup to nuts of him all over again.
19          You know, I would ask some amount of leeway
20   and reasonableness.  There may be foundational
21   questions, there may be kind of reference point
22   questions that need to be asked, and I don't want to
23   feel like I'm totally in a straight jacket here, but
24   I'm willing to work and reason.  My focus would be on
25   the case specifics, and primarily, on additional
```

117

Transcript - Meeting (Cona and McDarby Trials) (2006/01/25)

```
1    information.
2           MR. GORDON:  I have no problem with that.
3           THE COURT:  I think everybody recognizes that
4    there's enough work to do with without asking questions
5    that have already been asked.
6           MS. FREIWALD:  I think we can work that out.
7    I don't have a concern about that.
8           MR. GORDON:  What about with new experts,
9    about some sort of -- are these going to go for days
10   and days?
11          MS. FREIWALD:  It didn't happen that way the
12   last time.  I mean, essentially, it didn't.  There were
13   depositions that became hang-ups because of start
14   times, stop times.  There were issues with particular
15   witnesses, but, frankly, for the most part, we got, I
16   think, almost all the depositions done in a day.
17          MR. WEISS:  That's not true.  Most of them
18   were two days.  Especially in my cases, you took
19   two days.
20          MS. FREIWALD:  No, there were people who were
21   unwilling to appear until 3 or 4 or 5 o'clock in the
22   afternoon and then had to leave at 7 or 8 o'clock at
23   night and we got three hours and we came back with
24   them, but for the most part, we did the depositions in
25   a day.  And frankly, I'll tell you, we don't have time
```

118

Transcript - Meeting (Cona and McDarby Trials) (2006/01/25)

```
1    to do a lot more than that, so I think we're -- I think
2    that we're going to be fine with that.
3           MR. LANIER:  We'll work with everybody.
4           MS. FREIWALD:  I think we can work together on
5    this.
6           THE COURT:  Let's do this.  Let's start taking
7    expert deps, and if it is turning out to be burdensome
8    because they're too long, give me a phone call and
9    we'll have a phone conference about it and I may put
10   time limitations on, but let's see if you can work this
11   out together first.
12          MS. FREIWALD:  Fair enough.
13          We have an expert issue on expert deps, which
14   is plaintiffs, at least the McDarby team, has told us
15   that they don't think they should have to make any of
16   their experts available for deposition until after
17   February 13th when they have our reports, and
18   obviously, the problem with that is that I don't think
19   we can humanly squeeze all these depositions into a
20   two-week time period before trial, and I think that the
21   defendants do have the right to have the plaintiffs'
22   experts deposed first before they put their own people
23   up, at least by category.  For example, I think I
24   should have the right to take Dr. DePace's deposition
25   before they get the deposition of our cardiologist.
```

119

Transcript - Meeting (Cona and McDarby Trials) (2006/01/25)

```
1           MR. BUCHANAN:  The issue was the reports.
2           MR. GORDON:  You wanted us to take deposition
3    without our experts having the benefit of your experts'
4    reports.
5           MS. FREIWALD:  I understand.
6           MR. GORDON:  You just said defense
7    depositions.
8           MS. FREIWALD:  Then I misspoke.  What I meant
9    to say was you don't want your experts deposed until
10   after the 13th when you get our reports.  Fair enough.
11   But that would mean that both sides' experts had to be
12   deposed between the 13th and the 27th, which is not
13   possible, and I also don't think that our experts
14   should have to be deposed before their corresponding
15   experts are deposed.
16          So logistically, I think we have to start
17   taking these depositions now.  I don't see any reason
18   why they need our cardiology expert's report before
19   their cardiologist is deposed.  That happens in cases
20   all the time and where the defendants proceed, and
21   particularly here, we're going to lose two weeks of
22   deposition time.
23          MR. BUCHANAN:  Aren't there going to be very
24   few, though, Hope?  If you waited until the 27th to
25   identify what new experts there are that are going to
```

120

Transcript - Meeting (Cona and McDarby Trials) (2006/01/25)

1  require depositions, I only think you'll have a handful
2  to depose anyway.
3         MS. FREIWALD:  I don't think that's going to
4  be the case that we're only going to depose new people,
5  because surely there will be supplemental opinions,
6  there will be things that people say they now
7  incorporate into their opinions.  So I assume that
8  there's going to be some type of deposition on every
9  witness, even if it is narrowed to a prior deposition,
10 and we simply don't have the luxury of time.  We can't
11 lose two weeks of potential testimony time.
12        If I have Dr. DePace's report on the 27th, let
13 me take his deposition.  That's going to move things
14 along, get somebody out of the way.  They'll have the
15 right to ask my expert when they depose him whether he
16 is informed by anything in Dr. DePace's deposition or
17 testimony, which will be to their advantage.
18        But the main issue is the logistical one.  We
19 want to know that we're going to have enough time to
20 take all the depositions and that we're going to get
21 their deposition first by category; their cardiologist
22 before our cardiologist.
23        MR. BUCHANAN:  It may be that one way to do
24 this is if you disclose certain corresponding experts
25 prior to the date you're to disclose the report, then

Transcript - Meeting (Cona and McDarby Trials) (2006/01/25)

1  we can do our corresponding experts earlier, but we
2  want to get your reports before we have to offer up
3  witnesses.
4         MS. FREIWALD:  I can't, Dave, suddenly
5  accelerate --
6         MR. BUCHANAN:  There has to be somebody in the
7  can already.
8         MS. FREIWALD:  No, because this is a new case
9  and I can't accelerate that.
10        MR. LANIER:  Can I ask a practical question?
11        MS. FREIWALD:  Yes.
12        MR. LANIER:  Let's say you depose my expert
13 and then a week later you give me your expert's report.
14 You know I'm going to give that expert's report to my
15 expert.  And say my expert reads it and says, Well,
16 okay, here are my opinions on what their expert has
17 said, one, two, three, four, five.  Are you going to
18 fuss that my guy has five new opinions because he read
19 your guy's report?  Are you going to let me --
20        MS. JONES:  Yes.
21        MS. FREIWALD:  Yes.
22        MR. LANIER:  How?
23        MS. FREIWALD:  It would be the same no matter
24 what.
25        MS. JONES:  It is done all the time.

Transcript - Meeting (Cona and McDarby Trials) (2006/01/25)

1  Plaintiffs designate, we take the deposition, we
2  designate.
3         MR. BUCHANAN:  In Humeston that's the way we
4  have done it, and we have done it that way throughout.
5         MS. FREIWALD:  Either way, you're always going
6  to go first.
7         MR. LANIER:  But we always have our report.
8         MR. GORDON:  Then you can ask them at the
9  deposition.
10        MS. FREIWALD:  It is not going to be in your
11 expert's report.  I'm going to have the same objection
12 to opinions that aren't in your expert's report as I
13 always would.  Whether you get the deposition or you
14 don't get the deposition, I'm always going to have the
15 objection that by the 27th you didn't disclose.
16        MR. LANIER:  So by your perspective, my
17 experts are never allowed to comment on your experts.
18        MS. FREIWALD:  No, that's not the case.
19 Obviously, there's going to be a lot of areas of
20 overlap.  You know certain areas of overlap and you
21 know what the defenses are going to be.
22        MR. GORDON:  No, we don't.
23        MS. FREIWALD:  Come on.
24        MR. GORDON:  I absolutely do not know whether
25 your experts are going to say whether Mr. McDarby had a

Transcript - Meeting (Cona and McDarby Trials) (2006/01/25)

1  prior heart attack, period, the end.  So how are we
2  going to have an efficient -- you want to get his
3  report and then you want to do his depositions, then
4  you want to do his deposition, and then we're going to
5  get a report saying that the guy had a prior heart
6  attack, but he can't comment on whether there's a prior
7  heart attack and you're not going want the deposition.
8  That is completely inefficient.
9         There's only two experts for McDarby
10 specifically.  You're telling me in two weeks we can't
11 take the deposition of two experts, one of whom you
12 have deposed and cross-examined before, Dr. DePace, and
13 the other who is simply an orthopedic expert on his hip
14 fracture?
15        MS. FREIWALD:  If I can say so, Rob, it is a
16 misplaced example, because obviously, your expert is
17 going to say, Here is the history of Mr. McDarby, and
18 part of that history is either going to be the
19 identification of a prior heart attack or the absence
20 of a statement, which implicitly is going to mean he
21 doesn't think he had a prior heart attack, and it is
22 going to be covered affirmatively.
23        It is always the case that the plaintiff goes
24 first, and, frankly, given the short time period we
25 have, there isn't going to be an opportunity for you

1    guys to do some kind of significant supplemental

2    report. There just isn't going to be that. But we can

3    cross that bridge if and when we get to it.

4            It is not just two experts. It is...

5            I forget how many people you identified.

6        MR. GORDON: Four.

7        MS. FREIWALD: Four or five. But I'm not

8    limiting myself to case-specific, because we have to

9    get done everything --

10        MR. GORDON: But the general people are the

11   ones that you can provide before the 13th.

12        MS. FREIWALD: But I can't, and I'm certainly

13   not going to be pushed. We had -- in every other case

14   we had a month staggered. Now we're pushed down to

15   two weeks staggered. And believe me, we're working

16   every single second to meet those deadlines. We're

17   going to have -- you're going to have five or six or

18   however many generic experts you have, plus the two or

19   three experts on each side. So we're going to have an

20   awful lot to do in two weeks.

21            What I'm saying is, I would like to get

22   working on that, and I would also like to know that

23   when we're negotiating these dates that we have

24   guidance that we're going to get to depose their

25   experts first by category.

---

1        THE COURT: Jury questions. So I'm going to

2    go with what we did in the last trial. I know jury

3    questions can be time consuming, but they're basically

4    a good thing, and I don't know, I think lawyers are

5    more afraid of them -- I realize you dealt with them

6    and you didn't like them, but most lawyers who deal

7    with them do, and I'm going to keep doing it until --

8    if it turns out that it is a mistake in this case

9    because of the time, well, let that's going to be my

10   problem, it will just take more time. I want to do it.

11        MS. FREIWALD: I have some more things on my

12   list.

13        THE COURT: Are we done with your list?

14        MR. LANIER: Yes, Your Honor.

15        THE COURT: And the voir dire by attorneys, I

16   guess my reluctance is maybe the same reluctance people

17   have with jury questions because it is an unknown. I

18   really never did it in my practice, and I never have

19   done it as a judge, so I hate to interject -- I hate to

20   experiment with it.

21        MR. LANIER: In a case like this. Fair

22   enough.

23        THE COURT: And I'm not going to.

24        MS. FREIWALD: Judge --

25        THE COURT: We have to exit. We have to move.

---

1        THE COURT: Okay. There's a couple things I

2    have already made a decision about, and this is one of

3    them that's to me a no-brainer.

4            The plaintiffs are to receive your expert

5    reports before their experts are deposed. You can take

6    a plaintiff's expert's dep in a category before the

7    defense expert's dep is taken. But the expert should

8    have the opportunity to get the deposition.

9            We're not going to have time for supplemental

10   reports, and I want you to be able to ask the

11   plaintiff's expert at the deposition, These are your

12   opinions, I'm questioning you about the report, and I'm

13   also going to question you and say, You have seen now

14   my defendant's expert report, Has this changed any of

15   your opinions or supplemented or are there any other

16   opinions you have as a result of that that you intend

17   to offer at trial? And that's going to cover it. So

18   as far as I'm concerned, that's the way it is going to

19   be handled.

20            As far as the questioning by jurors is

21   concerned, I have made a decision on that. I'm going

22   to allow it. As far as the voir dire by attorneys is

23   concerned, I'm not going to allow it.

24        MS. JONES: I'm sorry, Your Honor. You're not

25   allowing voir dire, but you're going to allow --

---

1    This is the -- every Wednesday the judges have lunch in

2    here. So we'll move into the courtroom.

3            (Break taken.)

4        THE COURT: Let me address one of the other

5    issues that I want to deal with, which is the question

6    of the in limine motions, the rest of the in limine

7    motions other than Topol.

8            The last time, the defense filed an in limine

9    motion on every expert of the plaintiff and about --

10   they filed way too many. Way too many. I know that

11   you want to reserve your rights for appeal, but, you

12   know, give me a break. I don't need to reinvent the

13   wheel. Would you try to be more discriminating?

14            Quite frankly, you have a much better chance

15   of winning a few well-placed motions than you do a

16   truckload of motions, I mean, because it tends to

17   obscure your real issues if you argue everything as of

18   equal importance. And I'm just suggesting that...

19            The plaintiffs had quite a few, too. Don't

20   get me wrong. They had too many, also. But it was

21   like they had too many and you had way too many, so...

22        MS. JONES: But, Your Honor, they talked

23   longer and more --

24        THE COURT: They did. They talked faster,

25   according to the court reporter.

1     MS. FREIWALD:  Dr. DePace's speed changed.
2     MR. BUCHANAN:  He made us look slow.
3     MS. FREIWALD:  We had discussion about that,
4  Your Honor, and we said we would try to flag for you
5  previously filed motions, and if there were issues that
6  we thought were substantially different that required
7  particular attention, even if a motion had nominally
8  been filed before, we would make it obvious and right
9  up front for Your Honor.
10     THE COURT:  Okay.
11     MS. FREIWALD:  And we had actually kind of
12  talked through a proposed schedule for getting those
13  briefs in with both sides, obviously, subject to Your
14  Honor's --
15     THE COURT:  Last time we didn't actually
16  have -- we didn't actually have any expert hearings
17  outside the presence of the jury, did we Daubert, Kemp,
18  Frye.
19     MR. BUCHANAN:  We had Lisa Rarick at the end
20  of the trial.  We had Dr. Gaziano outside the presence
21  on the FDA memo.
22     THE COURT:  But pretrial there were objections
23  based on the science, but there weren't any actual
24  hearings, which was wonderful, I thought.  But I want
25  to make sure that, again, you have the opportunity to

129

1  have hearings if you want them, and I don't want to --
2  I'm not going to do them after we have picked the jury,
3  so you'll have to schedule any applications for them in
4  advance.
5     MS. FREIWALD:  And we will do that.  My kind
6  of tentative thinking is we could flag that by the
7  beginning of the month, when we submit our motions.
8     THE COURT:  All right.  So when are your
9  motions going to be filed?
10     MS. FREIWALD:  The schedule that we had here
11  was essentially for the filing of dispositive and in
12  limine motions February 6th, and 702 motions February
13  15th.  And the concept was --
14     THE COURT:  For both plaintiffs and
15  defendants.
16     MS. FREIWALD:  For both plaintiffs and
17  defendants.
18     And dispositive motions would be a response
19  date of February 17th and a reply date of February
20  22nd; for in limine motions, a response date of
21  February 13th and a reply date of February 21st; and
22  for Rule 702, a response date of February 22nd with the
23  parties waiving the right to do replies because of time
24  constraints.
25     There were a couple caveats in there about the

130

1  right to supplement in the event that some party
2  thought that there was some 702 motion that needed to
3  be filed and that couldn't have been anticipated until
4  the taking of an expert deposition if the expert
5  deposition happens after the 15th, and we had jointly
6  agreed that either side could do that within five
7  business days of the deposition with the response being
8  due seven days thereafter, so it would try and put it
9  on as quick a schedule as possible.
10     THE COURT:  Both sides agree to this?
11     MS. RELKIN:  I think we have a little
12  disagreement on that interpretation of the caveat.  We
13  just want five days after any defense experts were
14  deposed to do a 702 motion.  The qualifier issues that
15  could not be previously addressed is vague, and until
16  we hear what the expert is saying, I just think, you
17  know, odds are, plaintiffs don't particularly file many
18  702 motions and we're probably not arguing much, but we
19  want to have the expert deposed in five days and if
20  we're going to make a motion, make a motion.
21     MS. FREIWALD:  My problem, and the reason I
22  put in language saying that the five days after the
23  deposition would apply to issues not reasonably
24  anticipated, I understand that's always somewhat
25  subjective, but I'm trying to avoid the situation where

131

1  the real deadline for the motions isn't February 15th,
2  it is a moving target for every single expert, because
3  our experts are going to be deposed essentially between
4  the 15th and the 27th.
5     So I'm hoping that we won't bicker on the
6  issue of reasonableness and that the real deadline will
7  be the 15th, and if we need to supplement, which both
8  sides may need to do, we'll do that.
9     THE COURT:  Okay.
10     MS. FREIWALD:  I don't feel strongly about it.
11  I was trying to avoid a situation where Your Honor got
12  stuck with a lot of belated filings.
13     THE COURT:  All right.  So you'll submit an
14  order with that schedule in it.  The 23rd and 24th,
15  then, will be days when we will have oral arguments,
16  and the two days before the trial would be -- we could
17  schedule oral arguments, if I need any.
18     MS. FREIWALD:  Okay.
19     THE COURT:  Let me ask you...
20     Well, okay.  Again, try to really think out
21  your motions.  You know, dispositive motions, really
22  think about whether there's any chance summary judgment
23  is going to be granted or whether you have a
24  legitimate, you know, claim for it.  Just remember, you
25  know, you don't have to file any summary judgment

132

1  motion to preserve anything for appeal in New Jersey.
2  You know, you can make the same exact motion at the end
3  of plaintiffs' case when I'll have a chance to hear the
4  evidence and make a more intelligent decision.
5      So I hate to hear dispositive motions, in the
6  plural, and I'm thinking this high on a summary
7  judgment, you know.  And again, there's no need.  Once
8  the trial starts, if that's denied, none of that counts
9  towards appeal, so it is just --
10     MS. FREIWALD:  We hear you.
11     THE COURT:  It is a nonevent for your client,
12  and I would think the attorneys might have better
13  things to do.
14     MS. FREIWALD:  Um.
15     THE COURT:  I don't know with McDarby or Cona,
16  so there may be a legitimate reason why both of their
17  cases should be thrown out before trial.  If there is,
18  try to focus on it generally, will you?
19     MS. FREIWALD:  Fair enough.
20     The other issue that we got together on, since
21  we're on the subject of agreements, is designation of
22  deposition testimony, and the agreement we had was
23  February 3rd for designation, February 15th for
24  objections, and February 22nd for counters, if that's
25  acceptable.  I hadn't discussed this with the other

1  going to take it and revise it and submit it, if that's
2  okay.
3      THE COURT:  Okay.
4      MS. FREIWALD:  Then there are some other
5  areas.
6      I think both sides have some questions and
7  concerns about Dr. Brawn's deposition.  Our
8  understanding, I would just like to have this
9  confirmed, is that Dr. Brawn's deposition is a
10  deposition in the McDarby case only.  It is not a
11  deposition for his case as a plaintiff.
12     The counsel for Dr. Braun apparently has
13  cross-noticed Dr. Braun's McDarby deposition in the New
14  Jersey litigation generally and in the MDL and in his
15  case.
16     I, frankly, don't understand what standing he
17  has to do that, because it is not a New Jersey general
18  litigation deposition.  He is not a party to this
19  action, so I don't think he actually has any standing
20  to issue those cross-notices.
21     Putting that issue aside, I think Your Honor
22  has previously indicated this is a deposition for the
23  McDarby case and should be treated as a deposition for
24  the McDarby case.
25     MR. DAVIS:  Sam Davis.  I have the privilege

1  side, but although...
2      Actually, maybe I raised it with Mr. Meadow
3  briefly.  I thought it might be possible that there
4  might be a day, since we now have a one-day hiatus
5  between the jury questionnaire coming in and jury
6  selection, or even a day after the jury is picked,
7  where we could kind of try and work through many of
8  these objections to depositions before the trial starts
9  so that we're not eating into the trial.
10     THE COURT:  We may be able to deal with them
11  on the 23rd and 24th since we set out two days.
12  Hopefully, we won't have that many things to deal with,
13  and maybe I'll deal with them, too.
14     So let's sort of at this point schedule the
15  23rd and 24th for resolving pretrial issues, which
16  include in limine motions and, hopefully, deposition
17  designation.
18     MS. FREIWALD:  Okay.
19     THE COURT:  I agree with you.  We want to get
20  that done in advance, because it is easier for
21  everybody if you can have the depositions cut and
22  prepared and not have to deal with that during the
23  trial.
24     MS. FREIWALD:  Fine.  I had something
25  prepared, but because it included witness lists, I'm

1  of representing both a treater/prescriber and a
2  plaintiff who took VIOXX, and my first concern, which I
3  think we have a handle on with the court's guidance, is
4  this is not a two-deposition procedure of Dr. Braun,
5  and I think we have an understanding that it is going
6  to be a very short inquiry into his injury and his
7  treatment, because that's not the focus of the
8  deposition.  I think we have worked that out.  I don't
9  anticipate any problems with that.
10     What I am concerned about, and the reason we
11  did universally notice Dr. Braun, Dr. Braun was
12  apparently one of the largest writers in New Jersey of
13  VIOXX, and certainly if there are questions from any
14  other potential plaintiffs either in the New Jersey
15  case or in the MDL that they not drag Dr. Braun, who is
16  essentially, you know, a small practitioner, he is a
17  one-and-a-half physician shop, every time it is
18  discovered that somebody has also received -- another
19  plaintiff has received prescriptions written by Dr.
20  Braun.
21     So that's the reason I did it, and it sort of
22  brings up a second problem, and that is, I was advised
23  in the sales reps -- these are the sales reps who
24  detailed Dr. Braun -- that Merck was disinclined to
25  allow me to ask any questions of the let's say five or

1  six or seven sales reps whose depositions are now
2  ongoing starting this week.  And I thought that given
3  that Dr. Braun is going to be asked very specific
4  questions about these sales reps' visits, and also
5  given the fact that I would like to try to avoid
6  duplicative depositions of these same sales reps, I
7  would also like what's good for the gander, and that is
8  to be able to ask a few questions, if need be, at the
9  conclusion of these depositions of the sales reps.
10      MS. FREIWALD:  Your Honor, the sales reps'
11 depositions are going to focus on the time period for
12 McDarby, the issues that were relevant at the time of
13 McDarby.  If there is an issue down the road of needing
14 to take a supplemental deposition of him or needing to
15 cross-notice his deposition, that can be dealt with,
16 but I'm concerned about expanding the scope of this at
17 this point with the time constraints we have.
18      We have already pushed this deposition very,
19 very late in the game, frankly, because Dr. Braun's
20 been not cooperative.  We have been trying to get his
21 deposition for a long time, and it keeps getting pushed
22 back and pushed back.
23      THE COURT:  He is going to be produced live at
24 trial, correct or not?
25      MR. KRISTAL:  We haven't worked that out.  He

1  is going to be deposed February 1st in the McDarby
2  case, and we have not decided whether he is coming in
3  live or we have to notice a de bene esse deposition
4  yet.
5      MR. DAVIS:  Judge, the representation that he
6  was uncooperative is inaccurate.  We gave several
7  dates.  There are a lot of things that had to happen
8  before.  We negotiated a date, and I don't think it is
9  appropriate to call him an uncooperative witness.  I
10 don't think that's right.
11      MS. FREIWALD:  We had to come to the Court to
12 get a date because it kept changing.
13      THE COURT:  That's all water under the dam.
14 February 1st is now his deposition.  And what is that
15 deposition going to be?  Is it a discovery dep for the
16 defense.
17      MS. FREIWALD:  It is a discovery dep for the
18 defendant.
19      THE COURT:  It is not de bene esse for trial.
20      MS. FREIWALD:  It is a discovery deposition
21 for the defendants in the McDarby case.
22      MR. DAVIS:  Judge, just to be candid, Dr.
23 Braun is very reluctant based upon his pressures as a
24 practitioner and his obligation to his parents and also
25 the levels of stress that a post heart attack victim

1  has to deal with in coming to court.  So Dr. Braun has
2  expressed a strong desire to have his deposition taken
3  de bene esse, so we have not had a chance to discuss
4  that, but that is likely the course that it will take.
5      THE COURT:  Then it should be done at the same
6  time.
7      MS. FREIWALD:  Your Honor --
8      THE COURT:  On February 1st there should be a
9  discovery dep taken followed by a de bene esse dep.
10      MS. FREIWALD:  Your Honor indicated previously
11 that when there was a de bene esse deposition, we had
12 the right to have the deposition, the discovery
13 deposition taken first with time to digest it.  If they
14 wanted to come back --
15      THE COURT:  No.  You have the right to take it
16 first, but it can be taken on the same day.
17      MS. FREIWALD:  We have never done that before.
18 The only reason -- the only reason that we are having
19 this deposition this late is because we couldn't get
20 the deposition before.  Mr. Kristal just said a minute
21 ago he didn't know if Dr. Braun was coming to trial or
22 not.  This is the first time I have heard of this.
23      THE COURT:  This isn't unusual.
24      MS. FREIWALD:  It is, Your Honor, because
25 typically under New Jersey practice, there would be a

1  time period of at least 30 days.  Now, obviously it has
2  been compressed because of the schedule, but it has
3  never been compressed down to nothing in a situation
4  where --
5      THE COURT:  It --
6      MR. BUCHANAN:  It happened in Humeston.  Just
7  to correct the record, it happened with two treaters in
8  Humeston.
9      THE COURT:  It is not just VIOXX.  I have
10 ordered it in hundreds of cases.  Take a discovery dep
11 and then proceed with the de bene esse.  This is not
12 the first time it has been done.  It has been done
13 hundreds of times.  It is not unique for this
14 litigation.  It is not unique for New Jersey.  It is
15 not necessarily an ideal situation, but it is routinely
16 done that someone wants to take a de bene esse dep of a
17 doctor and then there's a discovery dep taken that
18 morning.  It is routinely done, and that's what I'm
19 ordered done in this case, because you're not going to
20 have time after February 1st to come back and take him
21 probably.
22      MS. FREIWALD:  Well, Your Honor, we have been
23 told we have time to take all these other depositions.
24      THE COURT:  That's what you have been telling
25 me, you don't have time.

1    MS. FREIWALD:  Well, I'm talking about

2    somebody who is a critical witness here.  He is an

3    unusual witness in this case.  He is probably the most

4    important witness in the McDarby case.  He has got a

5    lot of issues.  We fully expected to have a real

6    opportunity to take his discovery deposition and

7    prepare for his trial examination.  This is an

8    extremely important witness, and I think it changes the

9    picture dramatically to tell us, with all due respect,

10   Your Honor, that right before we're expecting that

11   we're going to get his discovery deposition that this

12   is going to get treated differently than Humeston.

13       THE COURT:  Is there a time you can have his

14   de bene esse dep taken shortly after the 1st?

15       MR. DAVIS:  I will certainly check with him.

16   I know he runs a full schedule, and I will check with

17   him.  He has been giving us dates and those dates have

18   been pushed back for reasons outside of his control.

19       THE COURT:  If it can't be worked out, you'll

20   have to do it, but I want the plaintiffs to make a good

21   faith effort to try to get him the second date, for the

22   2nd, 3rd, 5th, 6th, the weekend -- maybe you can take

23   it on the 4th or 5th and he won't have to do anything

24   with his patients -- so they can have a day or two to

25   get the transcript and digest it.  If it is that

1    important to them, then let's try to accommodate them.

2        MR. DAVIS:  I will have dates to counsel by

3    tomorrow, Judge.

4        MS. FREIWALD:  Thank you.

5        There are two witnesses who, apparently, the

6    plaintiffs in McDarby are objecting to us deposing.  As

7    I understand the facts, there are two Dr. Kaspers who

8    treated Mr. McDarby.  We didn't understand that until

9    January 17th when we took Dr. Kasper One's deposition.

10   We saw "Kasper, M.D." and we didn't realize that.

11       Now we realize that, and we want Kasper Two,

12   because he had quite a number of progress notes, too,

13   and I gather the plaintiff's position is it is too late

14   and we shouldn't be allowed to take this deposition,

15   and we would like to go forward and take that

16   deposition.

17       THE COURT:  What's the problem with Kasper

18   Two?

19       MR. GORDON:  Judge, I'm trying to check the

20   date.  What day did you say the Kasper deposition was?

21   It wasn't the 17th.  It was much earlier than that.

22       MS. FREIWALD:  I don't think so.

23       MR. GORDON:  Yes.  I was there.  It was

24   certainly the week prior.  Yes.  It was on the 12th.

25       MS. FREIWALD:  Maybe it was the 12th.  We have

1    been requesting it certainly for since the time of that

2    deposition, and I think --

3        THE COURT:  So what is the problem with Kasper

4    Two?

5        MR. GORDON:  Robert Gordon again.

6        With regard to Dr. Kasper, first of all, the

7    deposition of Dr. Joseph Kasper happened the 12th.  We

8    never received her request and only received a request

9    for Dr. Kasper -- and I have the e-mail that requested

10   it for the first time from Michelle Yeary of Dechert

11   asking on Friday, the 20th:  "Jerry:  We have decided

12   we would like to depose Dr. Kaufman and Dr. Andrew

13   Kasper."  So eight days after that deposition, his

14   brother.  All the sudden, now there's this request.

15       Now, discovery of the treaters was supposed to

16   end on January 16th, but we didn't stop it then.  We

17   said, if you tell us before that date, we'll work with

18   you, we'll work with the doctors.

19       Dr. Andrew Kasper is a cardiologist.  He is

20   the brother of his treating doctor, Dr. Joseph Kasper,

21   but he did not see him.  He never saw him in the

22   office.  He only saw him as the one of the

23   cardiologists on service during one of his

24   hospitalizations.

25       I have an expert report from a cardiologist

1    that I basically have to have written because Dr.

2    DePace is leaving the country for a week tonight.  How

3    am I possibly going to get an expert report when they

4    want to start taking depositions now and just telling

5    us now, less than a week before our expert reports are

6    even due, that they want to start taking new

7    depositions of cardiologists in this case?

8        MS. FREIWALD:  May I, Your Honor?

9        I think a couple answers:  First of all, given

10   the compressed time frame, we're digesting things as

11   quickly as we can.  We did not understand that there

12   were two Dr. Kaspers.  So whether it is two days after

13   or eight days after his deposition, we realized that --

14   we realized when we went through -- one of the problems

15   was not that we didn't know there was a second Dr.

16   Kasper, but we couldn't tell whose notes were whose,

17   and as I understand, there was a little bit of an issue

18   at the deposition with Mr. Gordon objecting to the

19   amount of time it was taking to go through and have

20   records read, and that also delayed our clarifying how

21   many of these records were Dr. Kasper's.

22       Bottom line is, he does have a limited scope

23   of records.  He was a treating cardiologist at the time

24   of the heart attack.  We would like to take his

25   deposition, and we didn't know -- if the plaintiffs had

1 identified for us in their facts sheet, as they were
2 supposed to, so that there were two Dr. Kaspers who he was
3 treated by, we wouldn't be in this predicament.
4 MR. GORDON:  Judge, they had the medical
5 records.  It is not like he went and ever saw Dr.
6 Andrew Kasper as a cardiologist.  They had all the
7 medical records since mid December.  They had this
8 record, which is Valley Hospital where he had his heart
9 attack, forever.  There were a number of doctors in
10 there.  There was X-ray technicians, radiologists,
11 there's anybody.  I'm supposed to list every single
12 doctor whose name ever appeared on a stack of medical
13 records from a hospitalization?  He just happened to be
14 the guy who maybe wrote orders for like continue this
15 medication, whatever.  I don't even know that he
16 personally saw the person.
17 In terms of them not knowing about Joseph and
18 Andrew Kasper, interestingly enough, here's a Merck
19 memo from February 21st, 2000.  "Maria:  Dr. J. Kasper
20 is an internist with his brother, Dr. A. Kasper, a
21 cardiologist.  He is young and only newly practicing, I
22 would say about three years.  He went to UMDNJ and
23 practiced there for three years before joining his
24 brother in practice.  Dr. J. is the more reachable, and
25 detailable of the two" et cetera, et cetera.

145

1 So they know about the relationship between
2 these doctors.  It was eight days between the Kasper
3 deposition and the first time they requested it.  Had
4 we gotten a request right at the Kasper deposition for
5 Andrew Kasper's, then possibly -- we certainly would
6 have agreed then, because we would have had time to
7 have it done before Dr. DePace is out of the country,
8 and my reports weren't due to them.  It is completely
9 unfair.
10 MS. FREIWALD:  I don't understand.  On the one
11 hand they're saying he is insignificant, there is no
12 problem with Dr. DePace supplementing.
13 On the other hand, he's saying that he is
14 significant.  I believe that...
15 Oh, I'm being told that I misspoke, that it
16 was really at Dr. Baklajian's deposition on the 17th
17 that we appreciated the difference between Kasper...
18 Am I getting that right, Michelle?
19 MS. YEARY:  Dr. Kasper's deposition was on the
20 12th.  However, Dr. Joseph Kasper never told us that he
21 had his brother, Andrew Kasper, following the plaintiff
22 from a cardiology standpoint.  It wasn't until Dr.
23 Baklajian on the 17th, three days before the 20th, that
24 we were informed there were two different Kaspers, and
25 it was Dr. Baklajian who started to go through the

146

1 notes and tell us this signature is Andrew Kasper, this
2 signature is Joseph Kasper.  We had no way of knowing
3 whose big K versus little K was who, and that's why we
4 need the deposition.
5 MS. FREIWALD:  It is not a question of
6 whether -- look, this isn't a case where we had six
7 months to do discovery and somebody could say that we
8 really delayed.  Everybody is doing things as quickly
9 as they humanly can, and that's putting pressure on
10 both sides.  They're continuing to get and ask for
11 sales rep depositions, as I understand it, and that
12 impacts our witnesses.  I think these are just the
13 things we have to live with.  We're talking about a
14 deposition that's probably going to be a couple of
15 hours and --
16 MR. GORDON:  We didn't delay the sales rep
17 deps.  They didn't turn it over.  It is the same as Dr.
18 Braun, that Braun hasn't been cooperative.  You
19 cancelled the date.
20 In any event, Judge, Dr. Andrew Kasper -- the
21 reason they say Dr. John Kasper never said he had Dr.
22 Andrew Kasper follow him is because he never did.  They
23 asked the questions about who followed him.  He doesn't
24 have a treating cardiologist still to this day.  This
25 was somebody who was in the hospital, the same hospital

147

1 that Dr. Andrew Kasper and Dr. Joseph Kasper work in.
2 It is the hospital in the area, Valley Hospital.  They
3 had the records since mid December.  They can see who
4 our cardiologist is.
5 It is not like there's any typewritten report
6 by Dr. Andrew Kasper.  He wasn't anyone who did any of
7 the intervention, he didn't do the echo, didn't do the
8 EKG, didn't do the angiogram, didn't do the
9 angioplasty.  That was Dr. Baklajian.
10 That was the person who, by the way, ten pages
11 of records, they deposed for three hours on those ten
12 pages.
13 But be that as it may, I don't know about this
14 time aspect.  Everyone was done with their questions,
15 nobody had a problem with that, the doctor was told
16 they could go without any further questions.
17 I just don't think it is right that they're --
18 how am I supposed to deal with that with Dr. -- with my
19 expert report being due on Friday?  Now they want
20 expert reports due before discovery is closed on
21 experts by treaters in the same field?
22 I should also say what they did do is they had
23 Dr. Baklajian go through the handwritten notes and say,
24 What is Dr. Kasper saying, Is this your signature, Is
25 this your handwriting, Who is this, That's Andrew

148

1   Kasper, What did he write?  If there's any --

2       MS. FREIWALD:  That's how we learned that both

3   doctors were providing this care.

4       MR. GORDON:  First of all, I believe there was

5   mention by Joseph Kasper of Andrew Kasper at the Joseph

6   Kasper deposition, not as a treater, because he wasn't

7   treating, but in terms that he was in the hospital and

8   he may have had some records there that were from -- as

9   there were other doctors who did.

10      MS. FREIWALD:  Your Honor --

11      THE COURT:  Okay.  You can take his

12  deposition.  Take his deposition on facts only.  You

13  know, he is not to be asked about his opinion of VIOXX

14  or to be asked about causation of VIOXX.  Just ask

15  factually what he did and didn't do, what his notes

16  say, why he specifically did what he did.  It should be

17  limited to -- very limited to fact testimony.

18      I mean, all treaters have expert opinions,

19  too, but in this case I want you to try to limit it as

20  much as possible to facts.  I mean, you can ask him

21  what his diagnosis was.

22      MS. FREIWALD:  I hear you, Your Honor.  There

23  is one other deposition, there's a Dr. Kaufman who,

24  frankly, Your Honor, you know, there was a time early

25  in the litigation where we tried to get Dr. Kaufman's

1   deposition.  It was clear to us --

2       THE COURT:  What kind of treater is he?

3       MS. FREIWALD:  Dr. Kaufman is a PCP.

4       MR. GORDON:  Cardiologist.

5       MS. FREIWALD:  He is a cardiologist.  I'm

6   sorry.  He treated him while he was hospitalized and

7   handled some of his cardiac care fairly early on, and

8   he treated him post MI for cardiac care, as well.

9       THE COURT:  When did you first ask for him?

10      MS. FREIWALD:  We asked for his deposition

11  early on, and it was very clear that he was quite

12  hostile to being deposed and it was going to be very

13  difficult to get his deposition.  And we did discuss

14  with the plaintiffs the fact that we wouldn't pursue it

15  if they weren't going to call him.

16      As the case has developed, we have become more

17  sensitive than we were before to some of these issues,

18  particularly the post MI issues, I gather, and we asked

19  to take his deposition, and plaintiffs are objecting to

20  that.  They're saying that we have waived our position

21  on that.

22      Again, I think this is a short deposition to

23  take.  He provided care to him.  We're trying to learn

24  as we go.  We did try and make an attempt to narrow

25  down the field of depositions early on.  Maybe that was

1   a mistake on our part.  Maybe we pulled the trigger too

2   quickly on a doctor who clearly was giving us a lot of

3   push back on his deposition.

4       As things have developed, we feel like it is

5   important to take a short deposition of Dr. Kaufman, if

6   we can get him to be available, and we understand that

7   the plaintiffs are objecting to that.

8       MR. KRISTAL:  Your Honor, if I might, I

9   originally had been involved with Michelle Yeary in

10  scheduling the doctor's deposition, the treaters, and

11  when I conveyed the fact that Dr. Kaufman was giving us

12  problems about his deposition, Michelle suggested if we

13  would stipulate we would not call him as a witness, she

14  would run that by her people and they might stipulate

15  that they would not call him as a witness at trial and,

16  therefore, nobody would need to take his deposition.

17      On January 3rd we had a phone call.  I

18  confirmed it with an e-mail to Michelle confirming the

19  fact that both sides had stipulated that neither side

20  would call Dr. Kaufman as a witness and, therefore,

21  both sides were in agreement not to take his

22  deposition.

23      I wanted to get a formal stipulation in

24  writing, and there was some e-mails last week about

25  that, and at 7:00 p.m. this past Friday, the 20th, for

1   the first time, Merck says we now want to take Dr.

2   Kaufman's deposition.  So it was 17 days after we

3   reached our stipulation with both sides before reaching

4   the stipulation involving the parties that needed to be

5   involved with the decision in reaching a decision.  We

6   were not going to take his deposition and neither side

7   was going to call him.  It was a nonissue until Friday

8   night at 7:00 p.m.

9       THE COURT:  I'm not going to order his

10  deposition.  I think that it is too late, and from

11  everything I have heard, if he is an uncooperative

12  witness anyway and both parties had agreed that both

13  sides were going to ignore him, I think we'll leave it

14  at that.

15      Anything else?

16      MS. FREIWALD:  There are one or two things.

17      We sent a letter to...

18      I'm shifting to Cona.

19      We send a letter to Mr. Meadow, I believe it

20  was a while ago...

21      And let's see if I can get the date of the

22  letter.

23      January 19th.

24      ...asking for inspection of what's called a C

25  Pap machine, which is an instrument --

1    THE COURT:  I know what a C Pap is.

2    MS. FREIWALD:  And we have not gotten a

3  response.  We would like the opportunity to read the

4  machine, have an expert read the machine, obviously do

5  it in a nondestructive way and --

6    THE COURT:  Read?

7    MS. FREIWALD:  Apparently, on these machines

8  you can tell how often they have been used.  They have

9  internal monitors and you can pull off the diagnostic

10  information from them and you can see whether they were

11  used regularly or they weren't used regularly, and

12  that's what we would like to know.  It doesn't alter

13  the machine or anything like that.

14    I think it is an easy enough process for them

15  to make the C Pap machine available to us.  We would

16  have it read.  I would gladly arrange for a procedure

17  that's acceptable to them, and that's it.  We want to

18  know if, in fact, Mr. Cona was one of -- by how much or

19  how little he was using his C Pap machine.

20    MR. MEADOW:  Judge, I have two things to say

21  on that.

22    It is not the machine he was using at the time

23  of his heart attack.  I don't think it is relevant at

24  all to this, because I think their claim will be that

25  sleep apnea caused the heart attack and not VIOXX.

1    And number two, I don't know what relevance it

2  is even if it was the machine, because his heart attack

3  was three years ago.  So I don't see the relevance of

4  looking at this machine.

5    MS. FREIWALD:  The threshold question, and we

6  did ask this in our letter, is whether he has the same

7  machine, how long he has had the machine.  There's

8  basic threshold things that we would like the answer

9  to, so we know, obviously, if the answer I get is

10  Mr. Cona bought a new C Pap machine two months ago and

11  the one that was used in the years preceding his heart

12  attack is long gone, I think that my request for the

13  reading is no longer important.  But I haven't gotten

14  any response.  I would like to know whether he has the

15  same machine now as he did then, how long he has had

16  the machine, if it is different, and then work out a

17  schedule for the reading of the machine if it remains

18  appropriate.

19    If they want to come back and say it is not

20  appropriate given the length of time of the existing

21  machine, the machine at the relevant time period is no

22  longer locatable, I'll either agree or we'll have a

23  quick telephone call with Your Honor, but I would like

24  to get a response to my request.

25    MR. MEADOW:  They also could have asked the

1  questions at a deposition that took eight hours that

2  day.

3    MS. FREIWALD:  It is a really simple issue,

4  Your Honor.  I don't know why we have to make a big

5  deal out of this.

6    MR. LANIER:  And I'll find out if it is the

7  same machine.  I'll let Hope know, and if it is the

8  same machine and she is going to represent that she has

9  somebody who can look at that machine without tearing

10  it apart and determine whether or not three years ago

11  it was being used, then I have no objections to her

12  looking at it and making that determination.

13    If her determination is going to be whether it

14  has been used since the heart attack, then it has

15  absolutely no relevance and I don't think she is

16  entitled to that nosy.

17    MS. FREIWALD:  We don't have a problem with

18  that.

19    THE COURT:  I think you'll find there's a

20  number on the top of the machine that shows the total

21  amount of use, and that number is easily discernable,

22  and I think you could break it down how often it is

23  used, but I don't think you'll find anything in the

24  machine that tells you it was used a year ago,

25  two years ago, three years ago.

1    MS. FREIWALD:  I am told they have internal

2  diagnostic monitors that are more complicated than

3  that, but if I'm wrong, we'll work it out.

4    THE COURT:  Check it out.

5    Two things:  Plaintiffs will provide to the

6  defense within 48 hours how long he has had the

7  machine, and defense, I want to you make -- find out

8  from your expert exactly what details you can find out,

9  because if it is only just whether it has been used or

10  not and it is a three-year period, even if he has had

11  it for five years, then it is just not -- it is

12  probably just too speculative to bother with.

13    MS. FREIWALD:  We're completely with you.

14    THE COURT:  And it is a question, if they're

15  going to dismantle his machine, will they buy him

16  another one?

17    MR. LANIER:  Amen.  We're there.  Thank you,

18  Judge.

19    MS. FREIWALD:  I think the other issues were

20  kind of FYI on discovery things, and it is late in the

21  day and I'll skip it.

22    MR. LANIER:  May I throw out one last issue

23  that I think Mr. Buchanan or Mr. Weiss is going to

24  speak on, but it is kind of a critical one for me right

25  now?

1   MR. WEISS:  It is, Your Honor.  I e-mailed a
2   letter that's been served this morning on Lexis Nexis
3   dealing with the quashing subpoena.  The deposition
4   notice of Dr. Mixon.
5   MR. LANIER:  It is not Dr. Mixon.
6   MR. WEISS:  He is the chairman of the board at
7   Cleveland Clinic.
8   MR. LANIER:  Mal Mixon.
9   MR. WEISS:  I had a telephone conversation
10   with Your Honor Monday on that, and you ruled that it
11   shouldn't be cross-noticed, and they cross-noticed it.
12   We're not attending, we're not prepared to take it, and
13   we have asked that it be quashed.
14   MR. LANIER:  In the MDL --
15   THE COURT:  I think I already ruled.
16   MR. LANIER:  You ruled.
17   MR. BUCHANAN:  You issued a new notice
18   yesterday for today.
19   MR. LANIER:  The deposition got moved one day
20   and they recross-noticed it for today instead of last
21   night.
22   MR. MAYER:  Your Honor, what happened in the
23   conference that we had, you ordered the notice for
24   Tuesday stricken.  You strongly urged the parties to
25   confer and see if they can agree on a date.  We did

---

1   confer.  Mr. Buchanan said he was available Thursday.
2   Meanwhile, in the MDL parties, we're fighting
3   over the timing.  They ended up agreeing on Wednesday.
4   Mr. ^ Mixon wasn't available Thursday, Friday, so it
5   is going forward today at 5:30, and that's where we
6   are.  And still, it is going to be a very short
7   deposition.
8   MR. LANIER:  In four hours I'm supposed to be
9   in Cleveland taking the deposition.
10   THE COURT:  It is not going to apply to this
11   case.  I told you that.
12   MR. LANIER:  Thank you.  That's all we need.
13   THE COURT:  If you want to use a deposition
14   for him in this case, you're going to have to renotice
15   him and give plenty of time --
16   MR. LANIER:  To get the documents and stuff.
17   Thank you, Judge.
18   MR. DAVIS:  Can I get the Court's guidance on
19   the issue of my office being able to take some
20   follow-up questions on the sales reps' depositions
21   which are ongoing in the next couple days?
22   THE COURT:  Questions about Dr. Braun?
23   MR. DAVIS:  Questions about Dr. Braun.  For
24   example, this first witness, all together Dr. Braun was
25   detailed over I think 220 times.  So, for example, the

---

1   first witness -- the first sales rep who was detailed,
2   she detailed him 27 times during the period of time
3   before the McDarby heart attack, and -- well, and a
4   couple of times after that, but I should be able to ask
5   questions in follow-up on what communications took
6   place between --
7   THE COURT:  Who do you represent; McDarby?
8   MR. DAVIS:  I represent Dr. Braun, but I
9   universally cross-noticed this in Dr. Braun's case and
10   extended it to all the lawyers in the MDL -- to
11   everybody.
12   MR. KRISTAL:  We're taking the lead on
13   questioning the sales representatives in the McDarby
14   case who detailed Dr. Braun, who is the one and only
15   prescriber for the four-year period, but Sam has
16   cross-noticed that because they may have a few
17   follow-up questions when I'm done.  There was some
18   disagreement at the sales rep deposition yesterday as
19   to whether or not he --
20   THE COURT:  Did they let you ask the
21   questions?
22   MR. KRISTAL:  We didn't complete it.  It is
23   being finished tomorrow morning.
24   THE COURT:  I'm going to let you ask questions
25   at this point at the first sales rep dep.  If it

---

1   becomes onerous or too much or it is not a few limited
2   questions, it is a problem, we'll have a phone
3   conference before you go to the second sales rep deps.
4   MR. KRISTAL:  That will be Friday.
5   THE COURT:  Let's do it in the first one and
6   see how it works.  If it is going to take another
7   two hours, then I'm not going to allow it.
8   MR. MAYER:  This is Mr. Davis's shot at that
9   rep on behalf of Dr. Braun.
10   MR. BUCHANAN:  Then it is more than a few
11   questions, then.
12   THE COURT:  At that rep, yes, you can take as
13   long as you want.  That's your shot.  But if you want
14   to keep taking them, you'll keep it short.  If you want
15   to -- so you have to decide what's more important to
16   you.
17   Everybody's excused.
18   (End of proceedings.)
19
20
21
22
23
24
25

C E R T I F I C A T I O N

I, REGINA A. TELL, C.S.R., R.P.R., C.R.R., License
Number 30X100161000, an Official Court Reporter in and
for the State of New Jersey, do hereby certify the
foregoing to be prepared in full compliance with the
current Transcript Format for Judicial Proceedings and
is a true and accurate compressed transcript to the
best of my knowledge and ability.

_____ 01-27-06
Regina A. Tell, CSR-RPR-CRR
Official Court Reporter
Atlantic County Courthouse
Mays Landing, New Jersey

161

SUPERIOR COURT OF NEW JERSEY
ATLANTIC COUNTY
CASE TYPE NO. 619
-----------------------------x
IN THE MATTER OF IN RE:
VIOXX
                          STENOGRAPHIC TRANSCRIPT
                               OF:
-----------------------------x  - CASE MANAGEMENT -
                               CONFERENCE
        PLACE:  ATLANTIC COUNTY CIVIL COURTHOUSE
                1201 BACHARACH BOULEVARD
                ATLANTIC CITY, NJ  08401
        DATE:   JANUARY 26, 2006
B E F O R E :
        THE HONORABLE CAROL E. HIGBEE, J.S.C.
TRANSCRIPT ORDERED BY:
        DAVID BUCHANAN, ESQ. AND THEODORE MAYER, ESQ.
A P P E A R A N C E S :
        DAVID BUCHANAN, ESQUIRE
        JEFFREY GRAND, ESQUIRE
        CHRISTOPHER SEEGER, ESQUIRE
        SEEGER, WEISS
        ATTORNEYS FOR THE PLAINTIFFS
        SOL WEISS, ESQUIRE
        ANAPOL, SCHWARTZ, WEISS, COHAN, FELDMAN & SMALLEY
        ATTORNEYS FOR THE PLAINTIFFS
        MICHELLE TIGER, ESQUIRE
        KLINE & SPECTER
        ATTORNEYS FOR THE PLAINTIFFS
              *      *      *      *      *      *
                REGINA A. TELL, CSR-CRR
                OFFICIAL COURT REPORTER
                1201 BACHARACH BOULEVARD
                ATLANTIC CITY, NJ  08401

1

APPEARANCES CONTINUED . . .
        GREGORY GORSKI, ESQUIRE
        DAVIS, SAPERSTEIN & SALOMON, P.C.
        ATTORNEY FOR THE PLAINTIFFS
        THEODORE M. LIEVERMAN, ESQUIRE
        DANIEL MIRARCHI, ESQUIRE
        SPECTOR, ROSEMAN & KODROFF, P.C.
        ATTORNEY FOR THE PLAINTIFFS
        JIM PETIT, ESQUIRE
        LOCKS LAW FIRM
        ATTORNEYS FOR THE PLAINTIFFS
        JOHN FOLEY, ESQUIRE
        SIMMONS, COOPER
        ATTORNEY FOR THE PLAINTIFFS
        PAULINA doAMARAL, ESQUIRE
        LIEF, CABRASER
        ATTORNEY FOR THE PLAINTIFFS
        THERESA CORSON, ESQUIRE
        LEVY, ANGSTREICH
        ATTORNEY FOR THE PLAINTIFFS
        KEVEN FRIEDMAN, ESQUIRE
        WILENTZ, GOLDMAN & SPITZER
        ATTORNEY FOR THE PLAINTIFFS
        MIRIAM BENOR, ESQUIRE
        KASOWITZ, BENSON, TORRES & FRIEDMAN
        ATTORNEY FOR THE PLAINTIFFS
        GREGORY SPIZER, ESQUIRE
        ANAPOL, SCHWARTZ
        ATTORNEY FOR THE PLAINTIFFS
        SUSANNE SCOVERN, ESQUIRE
        ALEXANDER, HAWS, AUDET
        ATTORNEY FOR THE PLAINTIFFS
        JOAN TROTMAN, ESQUIRE
        SILVERMAN & FODERA
        ATTORNEY FOR THE PLAINTIFFS
        ROBERT DASSOW, ESQUIRE
        HOVDE, DASSOW & DEETS
        ATTORNEY FOR THE PLAINTIFFS

2

APPEARANCES CONTINUED...
        MARGARET BRANCH, ESQUIRE
        TURNER BRANCH, ESQUIRE
        RICK SANDOVAL, ESQUIRE
        CYNTHIA ZEDALIS, ESQUIRE
        BRANCH LAW FIRM
        ATTORNEY FOR THE PLAINTIFFS
        ED GOLDIS, ESQUIRE
        FELDMAN, SHEPHERD
        ATTORNEY FOR THE PLAINTIFFS
        GREGORY SMITH, ESQUIRE
        McELDEN & FULLAM
        ATTORNEY FOR THE PLAINTIFFS
        JACQUELINE DeCARLO, ESQUIRE
        HOBIE, CORRIGAN, BERTUCIO & TASHJY
        ATTORNEY FOR THE PLAINTIFFS
        STEVEN CHUNG, ESQUIRE
        SHRAGER, SPIVEY
        ATTORNEY FOR THE PLAINTIFFS
        THOMAS SWEENEY, ESQUIRE
        COHAN, SEGLIAS
        ATTORNEY FOR THE PLAINTIFFS
        ERIC WEINBERG, ESQUIRE
        WEINBERG LAW
        ATTORNEY FOR THE PLAINTIFFS
        CHRISTOPHER PLACITELLA, ESQUIRE
        COHEN, PLACITELLA
        ATTORNEY FOR THE PLAINTIFFS
        MICHELLE DIMARTINO, ESQUIRE
        MILLER & ASSOCIATES
        ATTORNEY FOR THE PLAINTIFFS
        MARK GROSSMAN, ESQUIRE
        SANDERS LAW
        ATTORNEY FOR THE PLAINTIFFS
        MICHAEL FERRARA, ESQUIRE
        FERRARA LAW FIRM
        ATTORNEY FOR THE PLAINTIFFS

3

A P P E A R A N C E S   C O N T I N U E D...
        ROBERT ROWAN, ESQUIRE
        GOLKATZ, GRIFFIN & EWING
        ATTORNEY FOR MEDCO HEALTH SOLUTIONS, INC.
        THEODORE V.H. MAYER, ESQUIRE
        WILFRED CORONATO, ESQUIRE
        CHARLES W. COHEN, ESQUIRE
        HUGHES, HUBBARD & REED, LLP
        ATTORNEYS FOR THE DEFENDANT, MERCK
        DIANE SULLIVAN, ESQUIRE
        PHIL YANNELLA, ESQUIRE
        BEN BARNETT, ESQUIRE
        MICHELLE YEARY, ESQUIRE
        DECHERT, LLP
        ATTORNEYS FOR THE DEFENDANT, MERCK
        JEFFREY JUDD, ESQUIRE
        O'MELVENY & MEYERS
        ATTORNEY FOR THE DEFENDANT, MERCK

4

```
 1              P R O C E E D I N G S
 2          THE COURT:  Okay.  All right.  I have a couple
 3   things from my own agenda.  One is we have to be -- I
 4   have to be more careful, I think, with the dismissals
 5   with prejudice.  We're getting the dismissals without
 6   prejudice, now we're starting to get quite a few
 7   dismissals with prejudice.  That's fine.  I think they
 8   should be signed as quickly as possible if the people
 9   haven't responded and everything, but there are
10   built-in -- you know, we are always concerned about
11   dismissing a case with prejudice with making sure that
12   it is not just -- we have to have some safeguards so we
13   know it hasn't just fallen through the cracks or
14   something has happened.  We have to make sure that the
15   plaintiffs know their cases are being dismissed with
16   prejudice.  So at least the attorney is not going to be
17   able to come back to us and say that it was a mistake.
18          So what we're going to do is when there's a
19   dismissal with prejudice requested I'm going to require
20   plaintiff's counsel to respond in a one-page letter
21   that we have no objection to this or we do not agree
22   with this, but we have no way to oppose it because we
23   can't get in touch with our client, but we have
24   notified our client.  I mean, that's what we need.
25   When you dismiss with prejudice for failure to answer
```

5

```
 1   interrogatories under the basic rules you're supposed
 2   to have the plaintiff's attorney, you know, present or
 3   acknowledge that they have served the plaintiff, you
 4   know, just to make sure, because this is the end of
 5   somebody's case.
 6          On the other hand, for my own purposes, I want
 7   to get the dismissals done as quickly as possible; the
 8   more cases we can dispose of that aren't real cases --
 9   it is ridiculous to have them clogging up the system
10   and for everybody to have to have cases on the system
11   that don't belong there that we should be disposing of.
12          So all I'm going to do is say that from now on
13   when a motion to dismiss with prejudice is filed we're
14   going to require that the plaintiff's attorneys
15   without -- I don't want Heather to have to call you
16   every time one is filed.  I want you to take the
17   initiative to make sure that you send in a letter that
18   just says, you know, we agree with this or we can't
19   acquiesce to our client's case being dismissed, we
20   can't find him but we have notified them, something to
21   let us know that the client knows.
22          MS. SULLIVAN:  And, Your Honor, is there a
23   time limit because Your Honor put your finger on one of
24   the issues about no response from the plaintiffs once
25   the motion is filed.  Would there be a time limit by
```

6

```
 1   which the plaintiff's attorney should respond in terms
 2   of a letter?
 3          THE COURT:  Well, I guess the bottom line is
 4   if the plaintiff's attorney doesn't respond by
 5   letter -- are we making those returnable in a motion
 6   period, Heather, so it is a two-week period?
 7          THE LAW CLERK:  Yes.
 8          THE COURT:  If we don't get a written response
 9   then Heather is going to be calling the plaintiff's
10   office and making them appear in person before me to
11   explain why the dismissal with prejudice -- we're not
12   going to let you acquiesce without a letter, and I
13   think if you have to appear a couple times or somebody
14   has to come in for a five-minute, you know, to -- I
15   don't want to do that to you.  I'm just saying we have
16   to have some way of making people do it, so what I'm
17   thinking is if you don't appear by letter within the
18   two weeks then we're just going to make you appear in
19   person and explain that you understand on the record,
20   so I have a record that your client's case is being
21   dismissed.
22          So if liaison counsel will prepare some type
23   of order to all plaintiffs' counsel advising them that
24   that's what's going to happen.
25          MR. BUCHANAN:  Okay.  And I'm not sure whether
```

7

```
 1   the dismissal with prejudice motions are being filed
 2   only in the specific case or are they being filed in
 3   the general docket?  If it is being only made available
 4   to the attorneys in that case or is it being filed in
 5   the general case docket on file and serve, do you know?
 6          MS. SULLIVAN:  My colleague is telling me it
 7   is only in the case-specific.
 8          MR. BUCHANAN:  If you guys can provide us with
 9   a calendar of those that are being filed we can
10   hopefully assist in providing notice, as well, when a
11   motion --
12          MS. SULLIVAN:  In other words, copy you on the
13   notice?
14          MR. WEISS:  Just send them to me because I do
15   the deficiencies anyway.  And we'll get an order, Greg.
16          THE COURT:  Okay.  That was one of the things
17   that I was concerned about, that I wanted to work out.
18          The update on cases set for April and June.
19   Are we going to deal with that basically this
20   afternoon?
21          MR. BUCHANAN:  After this conference.
22          MR. WEISS:  Afterwards, Your Honor.
23          THE COURT:  All right.  And the discovery
24   deadlines in cases assigned in waves.
25          MS. SULLIVAN:  Yes, Your Honor.  We had
```

8

1  submitted a proposed Case Management Order with
2  deadlines and plaintiffs' counsel objected to the
3  deadlines, and so we attached an additional 45 days on
4  to the fact discovery, and I think the proposal agreed
5  upon, which made sense, was that expert discovery would
6  be held in abeyance; there would be no requirement for
7  expert disclosures or expert depositions pending a
8  setting of a case for trial, but the other fact
9  discovery would be completed consistent with the
10  proposed deadlines, Judge.
11      MR. WEISS:  Mike Ferrara was the one who
12  objected to it.  Have you talked to his office?
13      MS. SULLIVAN:  This wasn't a specific --
14      MR. WEISS:  This was the one that did --
15      MS. SULLIVAN:  This is a global order for all
16  cases.
17      MR. WEISS:  I understand.  We did the global
18  of all cases that liaison counsel agreed to.  Mike
19  wrote a letter to Judge Higbee and objected to it, and
20  that's why it never got signed or it got signed late.
21      So my question to you is has anyone talked to
22  Mr. Ferrara's office about this?
23      MS. SULLIVAN:  Liaison counsel agreed.  Does
24  Mike still have a problem with the deadlines?
25      MR. FERRARA:  I'm not sure I know.

1      MR. WEISS:  Michael, you were concerned when
2  we entered into the order for the earliest case the
3  first nine waves, you thought that was unfair.
4      MR. FERRARA:  Discovery on those --
5      MR. WEISS:  Yes, you wrote a letter to the
6  judge objecting to that.
7      MR. FERRARA:  And an order was entered, and I
8  think, Judge, that order was entered in the middle of
9  the trial, and then Your Honor said you were going to
10  revisit it.  It dealt with whether or not the early
11  cases should have discovery dates running out
12  six months or a year, and we said that we don't think
13  that it -- we don't think that having the early cases
14  have discovery end dates way out there is right, we
15  should look at the whole package, I think that was the
16  gist of it.
17      MR. BUCHANAN:  I think I can clarify the
18  concern, Your Honor.  Mike, if I recall correctly, the
19  concern at that point in time was that the Court was
20  based on the waves of discovery and expert discovery.
21  In the earlier waves of cases you expressed concerns
22  that trials will be drawn only from those early waves.
23  Since that point in time, the Court has come to a
24  different position in terms of case selection, identify
25  different criteria, so I think your concern is somewhat

1  muted by the trial selection process that the Court has
2  already undertaken for the next waves.
3      MR. WEISS:  I just wanted to bring it to your
4  attention because you guys were objecting, otherwise,
5  Diane, it was fine.
6      MR. BUCHANAN:  The amended dates are fine,
7  Diane.
8      THE COURT:  All right.  I'm going to step in
9  here, because I may not be satisfied with these dates.
10  We have got to look at this point some of these older
11  cases and start to make decisions on them.  I mean, I
12  have set these first wave of trials, and I wanted to
13  get the 18-month trials.  We really -- I think we have
14  one death case, so maybe we want to have another death
15  case or two scheduled, but after that we have got the
16  stroke and the gastrointestinal, and we have the oldest
17  cases, and there's going to be a point where we're
18  going to move to, you know, start getting rid of older
19  cases.
20      I haven't quite decided how I'm going to
21  handle that, but I'm not sure that I want to enter an
22  order right now without some more thought given.  We
23  have got right now -- we don't have too many cases that
24  are over 30 months old, but we have some.  Anapol,
25  Schwartz has about 13.

1      MR. WEISS:  Correct, Your Honor.
2      THE COURT:  Let me just give to each side a
3  list of cases that are 30-plus months.
4      MS. SULLIVAN:  Thank you, Your Honor.  And,
5  Your Honor, your wave system as the Court originally
6  set it up dealt with the cases based on filing date, so
7  the older cases would be -- fact discovery would be
8  completed first.
9      THE COURT:  It looks like -- yes, it looks
10  like we have one Kline and Specter, one Placitella, one
11  Morelli, three Placitella, Motley Rice, three Seeger
12  Weiss.  One -- these are cases that I'm concerned about
13  because they're now 30 months old, and I do have to --
14  I recognize that this isn't just basic oldest first
15  trials, et cetera.  I mean, I'm not going to be -- you
16  know me now, I think, enough to know that I'm trying to
17  look at the overall global picture now, but at some
18  point I have to address the fact that we have had these
19  cases for 30 months and what are we going to do with
20  them.  And the idea that we're not going to get expert
21  discovery at some point I'm going to say we have to do
22  expert discovery in these 30 cases, you have to get the
23  reports or get rid of the cases.
24      MR. BUCHANAN:  Your Honor, as a point of
25  reference, obviously, you're familiar with the timing

1  in the most recent wave I believe those cases were
2  selected in late November.  The first wave of those is
3  going to trial in two and a half months after that date
4  of selection, and that was fact discovery and expert
5  discovery needed to be accomplished within those time
6  frames, so when the plan is arrived at in out how to
7  set those cases for trial all will be left is expert
8  discovery, which can be promptly done, so I think
9  having gotten the fact discovery moving --
10       THE COURT:  Everything has been done in these
11  cases?
12       MS. SULLIVAN:  No, Your Honor, that's part of
13  the reason for the deadlines.  We would like the
14  Court --
15       THE COURT:  Except for experts.
16       MS. SULLIVAN:  No, Your Honor.
17       MR. BUCHANAN:  Experts aren't done?
18       MS. SULLIVAN:  And fact discovery is not done.
19       THE COURT:  Fact discovery should have been
20  done.
21       MR. BUCHANAN:  The first wave of cases are
22  completed.  The first --
23       THE COURT:  But Diane is telling me they're
24  not done.
25       MS. SULLIVAN:  They're not.

13

1  haven't been exchanged on our cases because of an
2  extension of our specific cases, Michelle, isn't that
3  correct?
4       MS. YEARY:  Yes.
5       MR. BUCHANAN:  And I think fact discovery for
6  the first wave is complete.  What was proposed, I
7  believe, in the amended order is that we extend the
8  fact discovery cutoff to March 16th for the cases where
9  it wasn't complete.  So fact discovery will be complete
10  on those cases by March 16th, and then we were
11  deferring the expert discovery pending the trial
12  setting, Your Honor.
13       THE COURT:  Well, the order actually says
14  "deferring it until further order of the Court," which
15  is okay.  I don't want an order that says until trial
16  schedule, because that may not be what I'm going to do.
17  I think at this point this order is fine.  It extends
18  the fact discovery to March 16th, which means we can
19  clean up the fact discovery, and I'm not sure I want a
20  discovery end date of 135 days for every case.
21       MS. SULLIVAN:  That wasn't our proposal.  It
22  was my understanding the plaintiffs had issues with a
23  more accelerated schedule.
24       MR. BUCHANAN:  Actually, the focus had been on
25  the wave one and wave two cases, Diane.  I don't know,

15

1       MR. WEISS:  We submitted -- Anapol submitted
2  expert reports on first and second wave cases.  I know
3  we did.  And these are the first and second wave --
4       MS. SULLIVAN:  For the 15 cases?
5       MR. WEISS:  We did.
6       MR. BUCHANAN:  The fact discovery cutoff
7  expired.
8       MS. SULLIVAN:  My mistake.  So the first wave
9  fact discovery is done?
10       MS. YEARY:  Fact discovery is done.
11       MR. WEISS:  Fact discovery is done in the
12  first 15 cases.  What's not done is we don't have
13  expert reports from you because you're changing the
14  rules of the game and take expert discovery on those
15  experts who haven't been previously deposed before.
16       THE COURT:  It is my understanding the fact
17  discovery is done in all the 30 plus cases.
18       MR. CORONATO:  Maybe a few where there's some
19  discovery.
20       MR. BUCHANAN:  It is firm by firm.  I think
21  because our firm was involved in trial at the time the
22  second wave discovery on Seeger Weiss cases was
23  deferred.  We extended the completion date on fact
24  discovery for our second wave cases.  Our first wave
25  fact discovery cutoff was complete, and expert reports

14

1  Michelle, you're much closer in the fact discovery
2  cutoffs.  I don't have my person with me today.  What
3  does the 135 days do to the wave three, four cases.
4       MS. YEARY:  You mean what the ultimate dates
5  would be?
6       MR. BUCHANAN:  Yes, what are the ultimate
7  dates?
8       MS. YEARY:  Unfortunately, I don't have the
9  prior order in front of me to tell you what it extends
10  it to.
11       MR. BUCHANAN:  We can probably piece that out
12  on a break.
13       MS. YEARY:  Yes, if you pulled the old order.
14       THE COURT:  Let's get the old order and find
15  out exactly what we're talking about.  I think the
16  first paragraph about March 16th will be fine.
17  Probably four expert discovery deadlines are suspended
18  until further order of the Court is okay, although I'm
19  going to tell you I'm going to be looking at that and
20  have expert deadlines entered for cases.  I mean, we're
21  not going to just keep drifting along without experts
22  and so, all right, we'll look at that in a few minutes.
23       The de bene esse deps of certain Merck
24  employees.
25       MS. SULLIVAN:  We can defer that issue for

16

1   today.

2        THE COURT:  That's for the trial issues?

3        MS. SULLIVAN:  It looks like we have worked

4   that out for the February trial setting.

5        MR. BUCHANAN:  What has been worked out?

6        MR. MAYER:  Worked out in that we won't

7   need --

8        MS. SULLIVAN:  We're going to do it and not

9   tell you.

10        (Laughter.)

11        (Discussion off the record.)

12        THE COURT:  Plaintiffs widespread failure to

13   comply with Case Management Orders.

14        MS. SULLIVAN:  Your Honor, here is the issue

15   that we have been facing.  In literally half of the

16   cases where we get facts sheets we don't get

17   authorizations, and it really delays collecting -- it

18   is critical to get medical records in all of these

19   cases to determine what treater depositions you want to

20   take, and it really is inexcusable, Judge, that in the

21   face of a Court order we don't get medical

22   authorizations in half of the plaintiff's cases when

23   they file the facts sheets or submit the facts sheets.

24        MR. WEISS:  I want to respond to that, since

25   I'm head of the project on the plaintiffs' side.  I

1   thought it is working rather well.  We're getting more

2   deficiency letters, but most of the firms have been

3   providing authorizations, and if there's anyone who

4   hasn't I would like to -- we used to have weekly calls,

5   but we stopped because Heather is on maternity leave,

6   but then we have the calls and we talk to the lawyer

7   and we get them done.

8        The other thing is at least from my firm we

9   have an understanding that we give you a blank

10   authorization and you tell us you give us the records

11   when you get them and post on the LMI.  Is that for

12   everybody, Diane?

13        MS. SULLIVAN:  No.  In other words, are other

14   plaintiffs doing what you're doing, no, Sol.  We're not

15   getting anything in half the cases or we're getting an

16   authorization that isn't treater specific.

17        MS. YEARY:  Or if it is blank we have no

18   permission to use it at all.  They're not providing

19   permission, and the last I checked with the team that

20   does the letters for us to the plaintiffs' counsel

21   following up on authorization issues they were up to

22   six or 700 letters that had to go out.

23        THE COURT:  If they give you a blank

24   authorization doesn't that mean you can use it?

25        MS. YEARY:  No.  That was the original

1   proposal we had starting the litigation.

2        MS. SULLIVAN:  They objected to that.

3        MS. YEARY:  The plaintiffs said, We don't want

4   to send you blank authorizations.

5        THE COURT:  I understand that.  They have the

6   choice of sending you case-specific or blank, but if

7   they send you blank then you then have a question of

8   whether you can use it or not.  You're being a little

9   overly scrupulous.  Is there a HIPPA problem with that?

10        MS. YEARY:  The agreement that was reached

11   after the plaintiffs asked to do provider specific

12   ones, many of the plaintiffs then came back and said,

13   okay, we realize that that's also very burdensome on

14   us, so we'll go back to giving you blanks, but you

15   can't use them until you tell us who you want to use

16   them for.  So we're still in this consistent back and

17   forth, we have to write to them, we have to wait for

18   them to give us approval, then we have to get the

19   approval.

20        MR. WEISS:  Michelle, what we have done -- at

21   least what I have seen -- is same day someone from your

22   office e-mails us we want to get this, this and this

23   other person.  My people get back to you and say, okay,

24   we understand about this, and this we have no record of

25   this person.  You guys we worked it out and there

1   hasn't been a problem.

2        MS. YEARY:  I don't think any of this is

3   addressed to your firm in particular.

4        MR. WEISS:  For all the other plaintiffs'

5   lawyers in here that should be the procedure they use.

6        MR. FERRARA:  We don't have a problem.

7   There's no problem from our side either.

8        MS. SULLIVAN:  We have the LoPresti case and

9   we have gotten no authorizations in 18 cases.

10        MR. DASSOW:  That's a different issue.  We'll

11   talk about that with the judge later about LoPresti.

12        MR. FERRARA:  Michelle is talking broader.

13        MR. WEISS:  We have to get back and talk

14   weekly about this.

15        MS. SULLIVAN:  Sol, we have been talking about

16   it.  There's an order that says when you have a facts

17   sheet you provide an authorization, and you have got

18   half of your colleagues not doing that or half of the

19   cases your colleagues aren't doing it.  It really

20   delays working up cases.

21        MR. BUCHANAN:  If this is true it is certainly

22   troubling, but I think in fairness we were accused of

23   this last time, putting something on the agenda without

24   having discussed it before.  I mean, I would like to

25   understand -- you have already said the problem is not

```
 1   with Sol's firm.  I would like to know if the problem
 2   is with our firm.  Tell me.  If there are firms that
 3   are particular offenders we should know who the
 4   offenders are, and they should have an opportunity to
 5   fix what the concern is.  Some people probably don't
 6   believe they're offending you by their practice, so if
 7   we can understand that we can fix it.
 8            MS. SULLIVAN:  I can tell you, David, we don't
 9   send out 700 letters and make countless calls every
10   month for no reason.  I mean, we're not getting the
11   authorizations.
12            MR. BUCHANAN:  I want to know, so we're not
13   talking about it in a vacuum, all right.
14            MS. SULLIVAN:  It is not fair to our client.
15   It is not fair to our firm for us to have to --
16            THE COURT:  Who is not providing you the
17   authorizations, you don't know?
18            MS. YEARY:  I don't have the list right in
19   front of me, to be honest with you.  I didn't ask for
20   the list of the 700 letters that were going out, but I
21   can get them.
22            MR. WEISS:  I haven't gotten a list in a
23   while.  Give me an offender list and I'll make some
24   phone calls.  I get stacks of stuff, and I have to tell
25   you every day people are calling my office talking to
```

```
 1   after that we can simply let -- I mean, defense counsel
 2   could file motions to dismiss without prejudice based
 3   on failure to present initial authorizations just as
 4   they can for failure to provide -- not filing the facts
 5   sheets at all.
 6            MR. BUCHANAN:  Your Honor, we tried to create
 7   a process --
 8            THE COURT:  But I do think that, you know,
 9   phone calls -- I think it is easier, better than filing
10   a motion that is then going to work things out by
11   phone, but if you're getting half without
12   authorizations that's widespread that's going to comply.
13   The plaintiffs -- at least the plaintiffs' attorneys
14   who are here apparently think that's a problem.  Is
15   there anybody here who didn't understand they had to
16   send an authorization for at least the treaters and who
17   thinks their firms aren't doing it?  We're not going to
18   sanction you, we're just going to --
19            MS. DOAMARAL:  We're certainly sending an
20   authorization.
21            THE COURT:  You don't have to send blank ones
22   as long as you're sending all the main treaters with
23   them.
24            MR. SWEENEY:  Tom Sweeney.  We got a couple of
25   them for not sending authorizations related to
```

```
 1   my staff.  I talked to someone at Dechert, I need this,
 2   and we have worked it out.  This is the first time I
 3   really heard that people are not complying.  I get
 4   calls every day from people saying here is the e-mails.
 5   I have sent -- they fax me things that they have sent
 6   to Dechert to comply.  I haven't really heard of anyone
 7   who has really not given you authorizations, and I
 8   would like to know who they are.
 9            MS. YEARY:  We'll get a list.
10            MR. BUCHANAN:  Thanks.
11            THE COURT:  You're talking about -- you're not
12   talking about follow-up authorizations, you're talking
13   about initial authorizations.
14            MS. YEARY:  Initial authorizations, and maybe
15   it would clarify it.
16            THE COURT:  I would like to have a list right
17   away --
18            MS. YEARY:  I will send an e-mail immediately.
19            THE COURT:  -- so we can deal with it today.
20   And, I mean, the bottom line is once we try to work out
21   a short period for those people, who if there are
22   people who don't understand what they're supposed to
23   do, and plaintiff's liaison counsel can contact them
24   and let me know that they have to bring their files up
25   to date with the authorizations, I mean, at some point
```

```
 1   insurance carriers and under the terms provider that's
 2   not counted.  I don't know if that's -- we got a couple
 3   of them we just wrote back and said we gave you all the
 4   authorizations for the treaters, but why do you need
 5   Humana an or Aetna.
 6            MR. CORONATO:  Your Honor, I think the order
 7   actually requires them to provide authorizations for
 8   all sources of information identified in the facts
 9   sheet, and there certainly are questions in the facts
10   sheet asking for the identification of health insurance
11   carriers.
12            MS. SULLIVAN:  Because it identifies
13   additional treating physicians.
14            MR. WEISS:  Could I ask --
15            MR. PLACITELLA:  The problem is we don't know
16   what is in the files to be produced.
17            MR. WEISS:  Can I ask a question?  How many --
18   Michelle, how many plaintiffs' lawyers are using LMI?
19            MR. CORONATO:  For what?
20            MR. WEISS:  You're posting the records, right?
21            MS. CORONATO:  Right.
22            MR. WEISS:  Are all the law firms doing it or
23   not?
24            MS. YEARY:  We don't keep track of who goes
25   into LMI on the plaintiffs' side.
```

1   MR. WEISS:  Because I have been asked -- the

2   people that don't use LMI, avail themselves of that

3   opportunity, are you sending them the records you're

4   getting.

5   MR. CORONATO:  No.  We're not required to.

6   Under the order the order says that the means of

7   delivery of the records is via LMI.

8   MS. SULLIVAN:  They go get it.

9   MR. WEISS:  So if someone is not signed up for

10  LMI, and they have given you a blank authorization how

11  are they getting those records?

12  MR. CORONATO:  They're not.

13  MR. WEISS:  Well, that's not right.

14  MS. YEARY:  Because the order says --

15  MS. SULLIVAN:  You proposed it.

16  MR. WEISS:  The agreement is to use LMI.

17  MS. SULLIVAN:  Right.  That was your proposal.

18  THE COURT:  What is the cost of plaintiffs to

19  use LMI?

20  MR. CORONATO:  The cost is $25 per provider

21  record.

22  MR. WEISS:  No matter if it is one page or

23  2,000 pages.

24  MR. SPIZER:  Sometimes you win, sometimes you

25  lose.

25

1   MR. WEISS:  It comes in in a PDF format

2   searchable, and we have had no problem with it.  I can

3   tell you that you.

4   THE COURT:  How many of the plaintiffs'

5   attorneys in the room are not using that service?

6   Everybody else is?  Okay.  Chris, you don't use it?

7   Then you don't get any copies of your records.

8   MR. PLACITELLA:  No, I should get them in any

9   event.

10  MR. CORONATO:  Well, that's how you get them.

11  MR. PLACITELLA:  I pay a different service to

12  do it for a different reason, and I give you whatever I

13  get, so if you're getting records from my clients you

14  have an obligation to give them to me.

15  MR. CORONATO:  Your Honor, we discussed this a

16  long time ago and resolved this issue in terms of the

17  mechanism for our delivery of medical records we

18  collect to plaintiffs, and this was something that has

19  been discussed ad nauseam.  The price has been agreed

20  to.  It has been understood that this is a fair price

21  and a good system, and we can't be making exceptions

22  for certain plaintiffs' counsel.

23  MR. PLACITELLA:  You don't have to give.

24  them -- just send them to me.

25  MS. SULLIVAN:  Chris, you either have to pay

26

1   us or LMI.

2   MR. PLACITELLA:  Send me another disk.

3   MR. CORONATO:  That's the problem.  We were

4   doing it by disk.  It is way too time intensive to be

5   downloading these records to disk, burning them to a

6   disk and sending them to plaintiffs' counsel.

7   MR. PLACITELLA:  Judge, if we were in a

8   regular case, and they got records from my clients, and

9   it was a one off case they would send me a copy of the

10  records, whatever I got I would pay a copy cost.

11  MR. CORONATO:  This is not a one off case.

12  We're in a coordinated proceeding.

13  MS. SULLIVAN:  That's why your liaison counsel

14  proposed this method, and it makes sense.

15  MR. PLACITELLA:  That is good for them.  It is

16  not how I'm doing it.

17  MR. CORONATO:  Well, then do you want to get

18  the records?

19  MR. PLACITELLA:  Then you don't get the

20  authorizations.  They have an obligation to give them

21  to me.  I'm sorry if it is not convenient for them.

22  MR. CORONATO:  Your Honor, I don't know what

23  else we can say.  We have already agreed this is a very

24  efficient system.  We have set up, and all the

25  plaintiffs' counsel have agreed to it and agreed.

27

1   MS. SULLIVAN:  If Mr. Placitella wants to

2   agree to pay Dechert's hourly rates to give you the

3   records.

4   MR. PLACITELLA:  I'll do whatever the Court

5   rules require.

6   MS. SULLIVAN:  Pay LMI or I'm happy for you to

7   pay my rates.

8   THE COURT:  Well, the Court rules require that

9   if they get medical records they have to make them

10  available to you.  The Court rules don't specifically

11  say they have to mail them to you.  We had dealt with

12  how we were going to do this, and I think it wasn't so

13  much my involvement, you know, I was involved slightly,

14  but most of the involvement came through negotiations

15  between counsel, and, basically, there was a lot of

16  discussion about who was getting the records, how they

17  were getting them, whether there was assurances that

18  everybody was getting copies, and, in fact,

19  Mr. Placitella, there's a lot of pluses to this in a

20  sense that I'm sure you have dealt with in cases before

21  where a record comes up at trial and there's, you know,

22  nobody gave me that, well they gave it to you, that's

23  constant.

24  This system sort of bypasses that whole

25  problem.  It makes sure that you get -- there's one

28

1    place where everybody can go to see what records were
2    or weren't provided, produces them, we pay for it. If
3    you feel that -- it is a system that's been in place,
4    and I think it is based -- I think we have an order in
5    place.
6        MR. CORONATO: Yes, we do.
7        THE COURT: If you have an objection to that
8    based on the fact that you feel that it is unfair to
9    your firm you're going to have to raise that as a
10   separate objection. You can do that. But look at it
11   first because they are complying with the rules by
12   making it available to you pursuant to the way we
13   agreed.
14       MR. WEISS: As I understand Your Honor they
15   get the records the same time we do.
16       MR. CORONATO: That's right.
17       MR. WEISS: LMI posts it to us and Dechert at
18   the same time.
19       THE COURT: That was one of the things we were
20   talking about. We weren't getting the medical records
21   fast enough. Plaintiffs were saying they had records,
22   and they were giving them to you later, and this is an
23   immediate -- the records as soon as the gatherer of the
24   records gets them both sides has them, and there's lots
25   of advantages to this.

                                                          29

1        MR. CORONATO: And the cost is very, very
2    competitive. It is cheaper than most services, and it
3    is actually better. You get more for your money with
4    this system.
5        THE COURT: And there were negotiations as to
6    how much they were going to pay for the record
7    gathering and how much was going to be paid for getting
8    copies. I mean, this is really -- I think it is a good
9    system just because I haven't had any complaints about
10   medical records up until now, so it has to be a good
11   system. But if people say to me, you know, this has
12   become oppressive I assume I would have heard
13   something.
14       MR. PLACITELLA: I'll deal with it. I already
15   paid somebody to get all my records. I'll give them
16   the records I got. I'm not going to pay you again.
17   I'll file separate. Take my individual time here.
18       MR. BUCHANAN: Let's just get one fact clear
19   for everybody. As I understand the system, Will, you
20   only pay for what you access, correct?
21       MR. CORONATO: Yes.
22       MR. BUCHANAN: If Mr. Placitella or another
23   plaintiffs' lawyer sends an authorization through their
24   records provider and gotten medical records for that
25   provider they need not pay $25 for that medical records

                                                          30

1    if they have them. They can download the ones they
2    haven't previously gotten pursuant to their other
3    methods.
4        THE COURT: Look and see. Then you don't have
5    to obtain them again.
6        MR. WEISS: Basically, as I understand it, we
7    give Dechert a bunch of records. A lot of times they
8    don't go get those same records again. It is when they
9    want the supplemental records that's what they have the
10   authorizations for, and that's how it is being done.
11       THE COURT: I think if you look at it you
12   might find it is better than what you think, Chris. If
13   you have problems with it afterwards then we'll have to
14   address it, you or any other plaintiffs' counsel.
15       All right. So the authorization issue today
16   we are going to get a list of the key offenders.
17       MS. YEARY: I have made a request to my office
18   for that.
19       THE COURT: Should we call them back sliders?
20   And then we're going to communicate with them, let them
21   know, and after a reasonable period of time, a couple
22   weeks, to let them catch up the procedure should be to
23   file a motion to dismiss without prejudice. If there's
24   a failure to provide an initial authorization at least
25   as to the basic treater, I mean, that should be a given

                                                          31

1    that they're giving you that. All right?
2        MS. SULLIVAN: Thank you, Your Honor.
3        THE COURT: All right. There's almost nothing
4    I can do about facts sheets.
5        Merck has been forced to file 195 motions.
6    Merck has been forced to withdraw 51 of those motions.
7        MS. SULLIVAN: Your Honor, yes, this is sort
8    of the same issue. If there's a Case Management Order
9    that says submit a fact sheet in connection with your
10   complaint and folks just don't do it, and months later
11   they decide to do it after a lot of time and expense it
12   is just not fair to Merck, and it is not fair to the
13   Court and its personnel to have to deal with motions
14   caused by inabilities to comply with orders in anything
15   close to a timely fashion.
16       MR. WEISS: Are you finished, Diane? You're
17   talking about 4,500 cases filed in New Jersey, and you
18   have 195 motions for facts sheets?
19       MR. BUCHANAN: It is about 2 percent.
20       MR. WEISS: That's really low considering if
21   it is a one on case, how many times --
22       THE COURT: Look, I have already looked at it,
23   and I don't think it is a problem. I just don't.
24   think -- it is a problem, it is always a problem when
25   people don't do what they're supposed to do.

                                                          32

1    MR. WEISS:  But the rate is very low, Your

2   Honor.

3    THE COURT:  And sometimes you just can't get

4   the facts sheet on time, and sometimes you should have

5   got it but you didn't, and the question is that is a

6   dismissal, which is a pretty big sanction.  I can't

7   give any stronger sanction than that.  I'm not going to

8   award counsel fees, so if that's what the request is

9   I'm not going to do it.

10    Then we're back over to the plaintiffs'

11   agenda.  Is this the Mal Mixon order?

12    MR. BUCHANAN:  It is resolved.

13    MR. WEISS:  Here it is.

14    MS. SULLIVAN:  Your Honor, one issue about the

15   Mixon deposition.  I understand there was an issue

16   raised yesterday by plaintiffs about the --

17    THE COURT:  It was raised before then, I

18   think.

19    MR. MAYER:  I wanted to express my surprise

20   after what went on yesterday that Mr. Lanier actually

21   was at the deposition in question because I thought we

22   had heard that he couldn't possibly be there.

23    THE COURT:  Has New Jersey participated in the

24   deposition?

25    MR. BUCHANAN:  No.  And I spoke to Mr. Lanier

33

1    MR. MAYER:  That was what you ruled, Your

2   Honor.  It wasn't agreed, but it was ruled.

3    THE COURT:  It was my rule, so whether

4   Mr. Lanier participated or not he is not going to be

5   able to use anything he got.

6    MR. BUCHANAN:  I don't believe he examined,

7   unless I'm mistaken.

8    MR. MAYER:  I was told he did.

9    MR. BUCHANAN:  Okay.  That's not the report I

10   had, but he did not represent New Jersey.

11    THE COURT:  I don't have a problem if he went

12   and watched it.  Quite frankly, he could have ordered

13   the transcript the next day or he could have sat and

14   watched it.  I don't think there's any problem with

15   going to watch it.  I think there is -- I feel that it

16   was unfair to me not to tell me if he intended to go

17   and ask questions under the title of a Texas lawyer.

18    MR. BUCHANAN:  I don't believe he asked

19   questions, unless --

20    MS. SULLIVAN:  We heard he did.  We'll find

21   out.

22    MR. BUCHANAN:  I know Mr. Kline examined for

23   the MDL, but there's a record, so you guys can get that

24   to the end of today.

25    THE COURT:  Unless you guys change your mind

35

1    about that after, and he advised me that he wanted

2   documents and other things, which was our primary

3   objection before we did it.  I know he cross-noticed it

4   in a Texas case is what I understood, and Mr. Lanier

5   was not our designee and would not have been, so I

6   am --

7    MR. MAYER:  I'm not rearguing the motion.  I'm

8   just surprised --

9    MS. SULLIVAN:  It is gamesmanship saying I

10   can't get there and show up and question a witness.

11    MR. BUCHANAN:  Your Honor, I was surprised, as

12   well.  From what I understand, and our position

13   initially from New Jersey was we wanted documents

14   before we took his dep.  And that remains our position.

15   It is a 15-minute dep, they say, to get testimony that

16   can be damaging to us.  We want to establish the

17   conflicts.  We want to establish the bias.  We wanted

18   the documents to do so.  When he is taken we will do

19   that.  I am not sure of the circumstances surrounding

20   Mr. Lanier going and, frankly, was surprised to hear

21   that when I did.

22    THE COURT:  It has been agreed that -- and

23   I'll adhere that -- which is what we agreed yesterday

24   that the deposition of January 24th will not be used in

25   the New Jersey litigation.

34

1    and want to use it and not retake it.  Obviously,

2   that's subject to consent, but, all right.  So we

3   signed that.

4    MS. SULLIVAN:  Your Honor, I have the dates

5   that you asked for for the other wave cases, the

6   current deadlines and the proposal.

7    MR. YEARY:  If you add 135 days to the current

8   that's approximately what they would be.

9    THE COURT:  Do we know what the docket numbers

10   are for the sixth wave about when they were filed,

11   approximately how old they are?

12    MS. YEARY:  We have the order that lists the

13   cases by docket number.

14    THE COURT:  Okay.  All right.  I can live with

15   those dates, so we'll sign the order as it is.

16    MS. SULLIVAN:  Thank you.

17    MR. BUCHANAN:  What are the dates?

18    THE COURT:  They're 2004 cases.

19    MR. BUCHANAN:  What are the dates on the

20   schedule?  I didn't see it.

21    MS. YEARY:  You can give it to him.

22    THE COURT:  But, again, this order just

23   basically leaves up in the air for further order of the

24   Court the expert time frames, and I'm going to be

25   looking at that in the next couple months, and, you

36

1  know, making some decisions about where we're going
2  from here.
3      MR. WEISS:  Your Honor, to the extent that
4  Anapol we have a few cases, not a lot of cases in these
5  waves the third wave, and we have a trial starting
6  April 27th, so we're getting a lot of people involved
7  in that trial.  It may be difficult to finish our
8  discovery on the third wave cases so we may have one or
9  two in that wave.  I'm not sure.
10      MS. SULLIVAN:  We'll have folks down there,
11  too, Sol.
12      MR. WEISS:  It is a little different.  If I
13  had half as many lawyers as Dechert had I wouldn't have
14  a problem.
15      MS. SULLIVAN:  You have a lot of them.
16      MR. PLACITELLA:  Diane, you have been sorely
17  missed.  If I knew you were coming so early I would
18  have had Chris come early.
19      MS. SULLIVAN:  I know, I miss him.
20      THE COURT:  You know what, I really don't want
21  to hear any more about any of that, okay?  Let's stop
22  it on both sides.  The issue of whether -- we'll
23  include in the order that anyone who is on trial for
24  any period of time up to 30 days before the discovery
25  end date will have an extension until 45 days until

37

1  after the trial ends.
2      MR. WEISS:  Thank you very much, Your Honor.
3  That's all I wanted to do.  We'll try to comply and get
4  it done, but there may be some things that slip through
5  the cracks.
6      THE COURT:  I think Dechert gave that courtesy
7  to counsel last time, and it certainly should be
8  extended again.
9      MS. SULLIVAN:  We did.
10      THE COURT:  And if they won't I'll make them
11  extend it.
12      Now plaintiffs agenda.  Case-specific
13  discovery.
14      MR. BUCHANAN:  I think we resolved that.
15      THE COURT:  Cross-notices for the MDL, have we
16  resolved that?
17      MR. BUCHANAN:  There was an issue that arose
18  in the New England Journal deposition that was, I
19  believe, yesterday.  I'm told that the MDL court had
20  allocated seven hours of deposition time for the
21  deposition of the New England Journal editor, Dr.
22  Curfman and allocated three and a half hours for
23  plaintiffs three and a half hours for the defense.
24  It was a defense-noticed deposition.
25      Merck then cross-noticed New Jersey, and there

38

1  was an attorney assigned from New Jersey to conduct the
2  examination, but there was no time to -- but the
3  examination to proceed with New Jersey.  All the time
4  was used by the MDL plaintiffs.  We did approach the
5  MDL plaintiffs and asked for an allocation of time, but
6  they used all their three and a half hours, and the MDL
7  defense used all of their time.
8      So our concern is in this situation, and I
9  don't know what the solution is in this situation, Your
10  Honor, the New England Journal is a third-party.  It
11  was done pursuant to a federal subpoena, and it was
12  cross-noticed against us, so the deposition can be used
13  here, but the dynamics of the deposition didn't allow
14  any opportunity for New Jersey to participate in the
15  deposition.
16      MS. SULLIVAN:  Here is our issue, Your Honor.
17  Mr. Buchanan and Mr. Seeger are on the MDL Steering
18  Committee, and there are a lot of witnesses that are
19  taken, and the hope is both the defense and the
20  plaintiffs can coordinate.  There was an original
21  notice of Curfman's deposition in the MDL, not in New
22  Jersey, the original dep was not noticed in New Jersey,
23  so the MDL plaintiffs including Mr. Buchanan, who was
24  at the deposition, had five hours to depose
25  Dr. Curfman.

39

1      There was a supplemental deposition notice by
2  Merck in the MDL and cross-noticed here of Dr. Curfman
3  where the time was split between plaintiffs and
4  defendants, so the plaintiffs have had more than
5  adequate opportunity to depose Dr. Curfman,
6  including --
7      THE COURT:  Is Dr. Curfman the editor.
8      MR. BUCHANAN:  Dr. Curfman is the executive
9  editor from the New England Journal.
10      THE COURT:  Did you take his deposition?
11      MR. BUCHANAN:  No, it was taken by Don
12  Arbitblit from the MDL.  I attended, but I didn't ask
13  questions.  It wasn't cross-noticed.
14      MS. SULLIVAN:  But you're on the MDL Steering
15  Committee.  You designated him as your questioner for
16  the MDL.
17      MR. BUCHANAN:  I wasn't designated as a
18  questioner for the MDL.  Your facts are mistaken.
19      MS. SULLIVAN:  Curfman wasn't noticed here, so
20  if you're not intending to introduce him then you don't
21  have an issue.  You guys didn't notice him here.
22      MR. BUCHANAN:  We can because it was properly
23  attended by you and you cross-examined during that
24  deposition.  There's a New Jersey rule that allows it.
25      MS. SULLIVAN:  It was properly attended by us

40