1    but not you?

2         MR. BUCHANAN:  It is -- it can be used against

3    you Diane.  You attended and cross-examined.  The

4    issue, Your Honor, is if they're going to cross-notice

5    us and require us to attend, and Eric Weinberg attended

6    for New Jersey but didn't have any exam time.  This

7    isn't a situation where we're complaining in a vacuum.

8    He was there.  He was prepared, and he didn't get exam

9    time.

10        MR. MAYER:  Judge, Curfman is a special

11   situation, I think, because this was one where it was

12   an MDL notice issued by the plaintiffs in the MDL on

13   short notice.  We went, we had some opportunity to

14   examine but really not a full opportunity to examine.

15   Judge Fallon indicated that there could be another

16   deposition, and we were able to complete our

17   examination of Curfman at the second deposition.  So we

18   did get notice and Mr. Weinberg was able to get there.

19   This is not something that I think is going to happen

20   often, but there will be situations because we'll have

21   trials around the country where there will be,

22   therefore, urgency situations where somebody may do a

23   deposition of a third-party on short notice.

24        I don't think it will happen often, and in

25   those situations I think the responsible thing to do

41

1    where we can is to cross-notice those, so that for the

2    third parties, you know, in this case it was a

3    third-party who resisted the deposition.  It was

4    litigated.  The judge ordered that it go forward and

5    there's a maximum opportunity to get people there.

6    That's what we did here.

7         So Dave and I have talked, and, you know, I

8    think, going forward we'll continue to communicate

9    about those things and try to work these things out so

10   there's time for, you know, more time where it is

11   possible and coordination works as well as it possibly

12   can.  Not to say there might not be some time where

13   this comes up again, but we'll work together.  On

14   Curfman itself I think it is a special situation

15   because the circumstances in that should be when we

16   argue in a trial context of what's admissible the whole

17   thing should be considered in that mix when we argued

18   that.

19        MR. WEISS:  That's the problem, Ted.  All of

20   this last minute deposition noticing was because there

21   was the MDL was getting ready for the trial in the MDL

22   and on two or three days' notice we have to get people

23   to staff them.  We don't have the documents.  We're not

24   permitted to ask questions.

25        MS. SULLIVAN:  You do have documents.  Curfman

42

1    produced documents.

2         MR. WEISS:  Curfman was taken in the MDL as an

3    MDL deposition.  It was not a New Jersey deposition.

4    So we weren't even on the loop on that one.

5         MS. SULLIVAN:  David was at the deposition.

6         MR. WEISS:  He was there on behalf of the MDL

7    not New Jersey.

8         MS. SULLIVAN:  Come on.

9         MR. WEISS:  You can't say that.

10        THE COURT:  I get the point.  The bottom line

11   is this, how many cases right now are in the MDL,

12   personal injury cases, does anybody know?

13        MR. BUCHANAN:  4,500 representing 11,000

14   plaintiffs.

15        MR. MAYER:  The number of plaintiffs is over

16   10,000 now in the MDL.

17        MR. BUCHANAN:  It includes tolling claimants.

18        MR. MAYER:  No, it doesn't include tolling

19   claimants.

20        MR. BUCHANAN:  Are you sure about that?  I

21   think that was the representation at the last

22   conference.

23        THE COURT:  It is the number of cases or are

24   you adding class action cases?

25        MR. MAYER:  There are cases where -- there are

43

1    cases that have been filed in there that are one

2    complaint with 200 plaintiffs, so these are, you know,

3    Charlie knows about that.

4         MR. COHEN:  I do them every month.  I'm

5    reattaching my computer to the network.  My

6    recollection was it was around -- as of December 31st

7    it was around 4,300 cases involving about 12,000

8    plaintiffs because they allow multiple plaintiffs per

9    case.  I like yours better, but that's a different

10   story.  So it is about 4,000 something plus involving

11   12,000 plaintiffs, and there's an additional 3,780

12   tolling agreements, and then there are 189 class

13   actions all together, but I don't remember how many of

14   those were federal and state, and then the federal ones

15   their master class action complaints.  So at some point

16   the number of class action stuff doesn't matter because

17   they merge into one because I have to do these reports

18   every month, so that's why I know it.

19        THE COURT:  Are there any other states --

20   after New Jersey what is the next most populus number

21   or largest number of complaints?

22        MR. COHEN:  California, and they have over

23   2,000 plaintiffs.  They also have way fewer number of

24   cases because they have been allowing several hundred

25   per complaint, but the plaintiff count is over 2,000 in

44

1  California.

2        MR. JUDD:  2,118.

3        THE COURT:  Okay.  -- I guess what I'll do is

4  I'll call Judge Fallon and talk to him about what I

5  perceive to be a problem because I'm not going to not

6  have New Jersey counsel be able to question witnesses,

7  so if the New England Journal of Medicine's witnesses

8  aren't able to be cross-examined by New Jersey counsel

9  in the MDL deposition then we're going to have to

10  conduct a New Jersey deposition, and I'll sign a

11  commission to let you, and, you know, if they fight you

12  wherever they are then you'll have to fight that battle

13  wherever they are, but in the meantime I'll talk to

14  Judge Fallon and see if we can work something out.  It

15  seems to me that it has been working pretty much up

16  until now, but there's times when it doesn't work.

17        MR. BUCHANAN:  In candor, Your Honor, I think

18  a lot of this is driven by discovery urgency in the

19  MDL.  I think with the trial that's coming forward in

20  the MDL in early February these were defense noticed

21  depositions that were noticed on shorter time frames

22  than have been typical in the litigation and under

23  circumstances that did not seem to allow for full

24  participation, and full participation was sought.  I

25  think the issue was they were cross-noticed on

1  everyone, and that's the concern.  That signals to us

2  that these are depositions they would like to use

3  against us affirmatively in New Jersey and that we need

4  to have examiners prepared to cross-examine from New

5  Jersey, and that's our concern if they're going to

6  cross-notice them cross-notice us affirmatively on

7  them.

8        MR. MAYER:  And there's a counterveiling

9  concern with that.  When a third-party has been ordered

10  to appear for a limited time frame there should be

11  cooperation among counsel.

12        THE COURT:  The cooperation that New Jersey

13  counsel doesn't ask any questions is not cooperation.

14  That's not cooperation.  That's noncooperation.  That's

15  us being shut out of the deposition.

16        MS. SULLIVAN:  There was no indication, Your

17  Honor --

18        THE COURT:  That's not cooperation.

19        MR. MAYER:  The judge is going to speak to

20  Judge Fallon.

21        THE COURT:  I will speak to him.  In the

22  meantime, as far as I'm concerned, if you have to

23  take -- we have to take a dep and the MDL has to take a

24  dep, if that's what we're going to do then we'll do it.

25        MS. SULLIVAN:  That is silly though, Judge.

1        THE COURT:  Excuse me, ma'am?

2        MS. SULLIVAN:  I said it is a shame for the

3  witnesses.

4        THE COURT:  I thought you said it is silly

5  after I said something.

6        MS. SULLIVAN:  No, Your Honor, I was just

7  thinking about --

8        THE COURT:  Well, you know what?  It is silly

9  not to be allowed to be able to cross-examine, and I

10  think this isn't the first time I have made this point.

11  I think I have sat here and said this many other times.

12  We either work it out or we don't work it out, but

13  we're not going to have depositions used in New Jersey

14  where New Jersey counsel had no opportunity to question

15  a witness.  It is not going to happen.  They're either

16  going to get to question the witness at the MDL dep or

17  they're not going to be able to question them, and

18  they're going to be redeposed.

19        I'm hoping that redeposing them is not going

20  to be the answer.  Either we're going to be able to

21  cooperate with the MDL or defense counsel is going to

22  make an effort to keep the witness there for another --

23  you know, if the MDL order orders a seven and a half

24  hour dep if you notice -- maybe we can order an

25  extension of that just for the New Jersey, whatever, we

1  can try to work it out for the benefit of the

2  witnesses, but we have got to allow New Jersey counsel,

3  and allowing Mr. Buchanan to be there is not the same.

4  Most of the New Jersey counsel are not part of the MDL.

5        MR. WEINBERG:  Eric Weinberg.  I was there at

6  the deposition.  One, if the deposition is

7  cross-noticed there should be adequate time between the

8  cross-notice and the deposition for state court counsel

9  to prepare.  This deposition was cross-noticed.  I

10  think the cross-notice went up sometime on Thursday.  I

11  didn't find out about it until Friday evening, and I

12  had to spend the weekend and Monday both preparing and

13  traveling, and I had other things going on so that was

14  difficult, so if there's more time, that will help.

15        Secondly, there was, apparently, a rolling

16  production by the New England Journal pursuant to, I'm

17  not sure, but I think pursuant to a subpoena of

18  documents at the last minute.  Those documents came

19  to -- apparently to Merck counsel and to MDL counsel.

20  I don't know if they were loaded up on the Concordance

21  or not.  I tried to find them.  So I think just in

22  terms of these third-party depositions where there are

23  additional document productions done those documents

24  should be produced here in a discrete form, not that I

25  have to go into Concordance and find them and be

Transcript - Monthly Status Conference (2006/01/26)

1   produced so I have them prior to the deposition.  That
2   will make life easier for everybody.
3           And, three, if there's going to be a
4   cross-notice and there's going to be a negotiation and
5   an order in the MDL then for purposes of Your Honor's
6   discussion with Judge Fallon it does make sense to in
7   every order from now on block out time for state court
8   counsel to ask questions, and if those three things
9   happen then I don't think we're going to have problems.
10          MR. PLACITELLA:  Some additional information,
11  I don't think it is quite as egregious as this
12  situation, but, for instance, I went to the
13  cross-notice of Jo German, who was a vice-president of
14  sales.  She was in sale charge of delivering
15  information to the doctors and that was noticed some
16  time ago so the notice issue doesn't occur.
17          I asked before the deposition what time I
18  would be allotted since I was cross-noticed on it to
19  ask questions.  I was told I was to work that out with
20  the MDL.  I said I understand but the MDL has what they
21  want to do, what time is going to be allotted for me.
22  Just give me a different day.  Well, you show up and
23  work it out.  So I showed up.  They asked questions all
24  day.  I never asked a single question, and they did now
25  say they'll give me time with her another day, which

49

Transcript - Monthly Status Conference (2006/01/26)

1   was good, but it would have been better if I could have
2   just had the option of just reading the transcript and
3   coming another day and not figuring out, well, will
4   they finish at 1:00 so I'll have time to get started.
5   It is difficult.
6           Then we have another situation for instance
7   with Mr. Caroll where we decided that we weren't going
8   to show up because we just wanted to read the
9   transcript, we figured we didn't get another day, and
10  we were told that although Merck produced Mr. Caroll
11  for a deposition for the MDL they weren't going to
12  produce it for New Jersey, and we had to go get a
13  commission to then take his deposition in Connecticut,
14  and we were led to believe that then they were going to
15  fight to have his deposition taken in Connecticut,
16  fight the commission, so I don't know if that's true,
17  but it has to be better.  I know they're trying.  I
18  know they're trying to get it worked out, but it is
19  hard.  You don't know what decisions to make.  •
20          MR. MAYER:  Let me speak to that because those
21  are different issues.  The situation with Jo German
22  yesterday we cross-noticed that deposition in November.
23  It has been scheduled for a long time.  We have had
24  witnesses that went for a day.  Nobody else wanted to
25  question that were cross-noticed.  Nobody had any

50

Transcript - Monthly Status Conference (2006/01/26)

1   interest in questioning.  We have had other witnesses
2   that have been initiated in the MDL and a lot of
3   witnesses initiated here that have been cross-noticed
4   elsewhere and nobody -- people have shown up but nobody
5   had an interest in examining.  And so where we have.
6   had -- in situations where the MDL counsel has said I'm
7   hearing from state counsel that they want to examine,
8   too, with this witness an important witness we think it
9   makes sense to schedule two days instead of one, and we
10  have heard that and scheduled it that way.
11          With German who was the witness yesterday, you
12  know, Mr. Placitella had spoken with plaintiff's
13  counsel in the MDL, found out he was going to take the
14  full day.  We could have been told that in advance,
15  scheduled the other day.  Mr. Placitella could have
16  decided whether or not to show up for the first day.
17  As it is we're working that out.  We're going to get
18  another day for her anyway, but it makes a lot more
19  sense to talk both for efficiency for everybody for
20  that to be talked about in advance among the
21  plaintiffs' counsel.  We can't arbitrarily figure out
22  how much time somebody is entitled to.  We can't
23  legislate you're only going to get three hours so
24  Mr. Placitella can go, but they can talk, and he can
25  find out if the guy is going to take the full day or he

51

Transcript - Monthly Status Conference (2006/01/26)

1   can call us and say do you think you're going to go the
2   full day, if I'm not there and he ends at 3:00 are you
3   going to bar me from the second day, and we can work
4   those things out, and I have talked to Mr. Placitella
5   about that, and we can work that out.
6           The situation with Caroll is a different
7   situation.  He is a nonparty.  He is an executive --
8   senior executive in another company with a very full
9   schedule.  That one he was willing to make himself
10  available for the deposition, and we did cross-notice
11  that, and a second deposition was requested after the
12  first one had concluded.  His decision was he was not
13  going to make himself available for that, and that's a
14  dispute -- that's a third-party making that call, so it
15  is a very different category from --
16          THE COURT:  You don't represent him so you're
17  not objecting to it?
18          MR. MAYER:  We're not representing him for
19  purposes of his decision to appear.  That's a decision
20  that we can't make for him or control him on because he
21  doesn't work for the company.
22          THE COURT:  So you're not objecting to the
23  commission?
24          MR. MAYER:  Pardon?  No, that's a dispute
25  between Mr. Caroll and the plaintiffs.

52

1   MR. PLACITELLA:  And you're not going to pay

2   to have Mr. Caroll lawyer fight the commission, you're

3   not going to pay Mr. Caroll's lawyer in order to have

4   him fight the commission?

5   THE COURT:  Because that's interfering -- I do

6   not believe that Merck should be trying to in any way

7   prevent third-party witnesses from testifying.  If a

8   third-party witness doesn't want to testify that's

9   their business.  And if they have counsel that they

10  want to object to testimony that's their business, but

11  that's not Merck's role to interfere with the ability

12  of the plaintiffs to subpoena witnesses.  In fact, it

13  is improper as far as I'm concerned.

14  MR. MAYER:  You know, without talking about

15  any given situation -- without talking about any given

16  situation, though, if a company had an obligation to

17  provide counsel for somebody that counsel represents

18  that person, he doesn't represent the company and the

19  company doesn't control that counsel.  That's the way

20  it works.

21  MR. PLACITELLA:  This week we went to court on

22  Dr. Demopolous.  She was originally offered as a rep of

23  Merck.  I said that's much too late for trial.  They

24  asked me to see if they could work it out.  I said

25  okay.  Next thing I know they handed Dr. Demopolous off

53

1   to private counsel in New York.  Merck was no longer

2   representing her for purposes of producing her.  I then

3   had to start a separate action in Pennsylvania to carry

4   out Your Honor's commission, and the counsel from New

5   York showed up in Pennsylvania to fight the commission.

6   Now, I don't know if Merck was paying for.

7   Dr. Demopolous's counsel.  I understand they had

8   counsel from New York.  They had counsel from

9   Pennsylvania.  I don't know who else was there.  There

10  were four or five lawyers there, but it doesn't feel

11  right.

12  THE COURT:  Do you think it is appropriate if

13  we have litigation involving Merck, and Merck has an

14  opportunity to object to any commission and they for

15  some reason want a commission to take the deposition of

16  X.  You have the opportunity to object to that

17  commission if you feel for some reason that person

18  should not be deposed and then I make a decision.  Once

19  I order that commission are you telling me that you

20  think it is appropriate for Merck to hire private

21  counsel to oppose that commission in another state,

22  because I don't think that's right.  Is that what is

23  happening?

24  MR. MAYER:  This is a person that doesn't work

25  for the company.  She is a physician in private

54

1   practice.

2   THE COURT:  And if she doesn't want her dep

3   taken she can hire a lawyer, but if Merck is paying a

4   lawyer to object for her then Merck is attempting to

5   thwart what I have ordered.

6   MR. MAYER:  No, her counsel represents her.

7   Her counsel represents her, so her counsel is not

8   acting on behalf of Merck.  Her counsel is acting on

9   behalf of --

10  THE COURT:  But Merck is paying for her

11  counsel?  Is that true or not true?

12  MR. MAYER:  I'm not at liberty to discuss

13  that.  It doesn't change -- I'm not at liberty to

14  discuss it either way.

15  MR. PLACITELLA:  Next question is when I go to

16  take Dr. Demopolous --

17  THE COURT:  Wait.  I have supervision over

18  Merck here in this litigation, and I can order and will

19  order unless, you know, you're telling me you think it

20  is appropriate if we agree that it is not appropriate

21  then I'm just going to enter an order that Merck cannot

22  pay to try to thwart commissions, they can't hire

23  counsel for people.

24  MR. MAYER:  I think that's not an accurate

25  characterization of what is happening here.

55

1   MR. FERRARA:  Tell us.

2   THE COURT:  Tell us what is happening.

3   MR. MAYER:  Of course I'm not going to get

4   into a relationship between a lawyer and their client.

5   Of course I'm not going to get into that.

6   THE COURT:  I'm talking about Merck's

7   relationship.  I don't care about her lawyer.

8   MS. SULLIVAN:  But, Your Honor --

9   MR. MAYER:  We're talking about she has

10  counsel, her counsel has represented her.

11  THE COURT:  If that counsel is being paid by

12  Merck, then Merck is interfering in their right to take

13  the deposition.

14  MR. BUCHANAN:  In fairness Dr. Demopolous

15  didn't identify a Wall Street law firm to represent her

16  in connection with quashing a subpoena in Common Pleas

17  in Philly.  Dr. Demopolous had counsel from Manhattan

18  to represent her in Philly.

19  MR. MAYER:  He is representing her --

20  MR. BUCHANAN:  Counsel selected by Merck and

21  counsel paid by Merck.

22  MR. MAYER:  If I could control her and produce

23  her for deposition --

24  MR. BUCHANAN:  She is in private practice.

25  She didn't stumble on a Wall Street law firm.

56

1    MR. MAYER:  In fact, she had been willing to
2  appear on certain dates that were rejected.  When it
3  became a dispute she was entitled to her own counsel to
4  handle that dispute.  Merck's not controlling that.
5    MR. PLACITELLA:  Judge, I noticed the
6  deposition in October.  They gave me dates in February.
7    THE COURT:  Well, I don't have any problem
8  with it as long as Merck is not controlling it or
9  contributing to it or paying for it because that's the
10  same as if Merck is appearing objecting to something
11  they should have objected to initially in this Court.
12    MS. SULLIVAN:  Your Honor, for certain -- and
13  I don't know what the situation is with this witness,
14  but for certain witnesses companies have obligations to
15  provide counsel, and then they pay, but they don't have
16  anything to do with it, and they can't have anything to
17  do with it because there's conflict issues, and there's
18  independent counsel, so while the company may be paying
19  they have no control.
20    THE COURT:  I'm fully aware of the distinction
21  you're making, but I agree, that counsel even if
22  Merck's paying them has their only obligation to their
23  client, and, therefore, if their client says they don't
24  want to testify they're doing whatever their client
25  wants, and if their client says they do want to testify

1  they're doing whatever their client wants.  That
2  doesn't change the fact that Merck by hiring counsel
3  for them and paying for it is, unless they have a
4  contract with them that says that whenever they want to
5  go into any kind of litigation -- I can't imagine the
6  contract you're talking about that requires you to
7  provide counsel to that person, and if you can show it
8  to me that you have a contract with her that says you
9  have to pay for her lawyers then I'm probably not going
10  to interfere with that contract, but if it is just by
11  choice that Merck is choosing to hire outside counsel
12  or at least even pay outside counsel it is even more if
13  you're choosing counsel, but even if you're not
14  choosing counsel if you're paying the counsel to object
15  to something that you can't object to directly that is
16  improper.  I believe it is improper.
17    Now, you can brief it, argue it, and we can go
18  over it, but I think it is wrong, and I don't want it
19  to happen again.  And I'm going to enter an order.  It
20  is not going to happen.
21    Now, if you think you need time to address
22  that issue because it is a new issue then, you know,
23  and you want time to give me a copy of your contract or
24  to show me the law that says you can do that, you know,
25  we can do that.  We can go through this.  We can have

1  a --
2    MR. MAYER:  Without characterizing the facts
3  here we certainly do need to address that.
4    MR. PLACITELLA:  The next question that comes
5  up is we're now going to take the deposition of Dr.
6  Demopolous.  When we got to court right before we were
7  going to argue it they found a way to work it out even
8  though I asked them two days before that, please can't
9  we work it out.  Not Merck, whoever counsel, whoever
10  paid that counsel.
11    Now, the question is when we get to the
12  deposition is Merck representing -- is Merck sitting
13  next to Dr. Demopolous?  When I asked Dr. Demopolous,
14  Did you have any discussions with the lawyers from
15  Merck what is she going to say, that's privileged?  It
16  is not privileged.  She has her own lawyer.  Is Merck
17  defending her?  Is private counsel defending her?  Is
18  Merck there defending her?  Why didn't they just
19  produce her?
20    MR. MAYER:  They're two different issues.  If
21  you have a privileged relationship with somebody, but
22  not control --
23    MR. DASSOW:  I will ask that order be broader.
24  It should be for ex-employees as well as ex-detail reps
25  just to be even more specific or even broader because

1  we're going to find with these ex-detail reps the same
2  thing.
3    MR. BUCHANAN:  They would be ex-employees.
4    MR. COHEN:  This is an important issue, and we
5  should set a time.
6    THE COURT:  I'm giving you my gut reaction,
7  which is it is wrong.  I will give you an opportunity
8  to show me it is not either because you have a
9  contractual obligation to these people to do something
10  or because it is appropriate for some reason, but I
11  want that.
12    MR. MAYER:  We will take that opportunity, and
13  we would also like the opportunity to address with Your
14  Honor what the best way to do that is.  We would like
15  the opportunity to consider -- to consider what the
16  best way is to bring that before Your Honor is.
17    THE COURT:  Look, I'm not trying to hang
18  anybody out.  I'm not trying to -- I'm not worried
19  about what has happened up until now.  I'm worried
20  about what happens from now forward.
21    MS. SULLIVAN:  It is a conflict issue.
22    THE COURT:  As far as I'm concerned it is
23  wrong, and I don't want it happening in the future.  If
24  you feel that it is appropriate and should be happening
25  then I want to know what your basis is for that,

1   otherwise it is not going to happen.
2        MR. MAYER:  Without characterizing the facts
3   in any way I understand the issue Your Honor is
4   raising.  What I'm saying, and I understand you want to
5   hear from us on that, and you will hear from us, and
6   what I'm requesting now is that in the first instance
7   you give us a little bit of time to think about the
8   best way to present that to Your Honor is without
9   violating any privilege and so on, and then we'll work
10  out a schedule for presenting it.
11       MS. SULLIVAN:  It is a huge conflict issue.
12       THE COURT:  Excuse me?
13       MS. SULLIVAN:  From Merck's standpoint it puts
14  them in a tough position with potential conflict issues
15  if someone has independent counsel and then we're put
16  in a position of directing what they do.
17       MR. MAYER:  Let's defer it.
18       THE COURT:  No, you're not going to direct
19  what independent counsel does.  I'm never going to put
20  in you that position.  What I'm going to say is you're
21  not going to pay for their independent counsel.  You're
22  not going to attempt to thwart the order that I have
23  given that there can be a commission by paying an
24  attorney to object to that commission under someone
25  else's name.  It is not going to happen, unless you can

61

1   show me -- it is wrong.  I have a real problem with
2   this, and I'm trying not to be, you know -- I don't
3   know how you can defend it, but, all right.
4        Let's take a break.  This is a list of state
5   attorneys with their pro hacs.  If you can check it
6   over and see if you think it is correct, incorrect.  I
7   guess it really has to go to -- we'll give one to
8   defense or a couple to defense, but, basically, it
9   should be going to the plaintiffs counsel.
10       MR. BUCHANAN:  Are these the cases listed in
11  the pro hac?
12       (Break taken.)
13       THE COURT:  All right.  Before we break for
14  lunch, and after lunch we're just going to deal with
15  the counsel for the two waves of trials, the April and
16  June trial dates, before we -- I also wanted to -- I
17  passed out a few things to some people, the percentage
18  of cases by state, and you have some of these things
19  that we have tried to give.  I think I gave Charlie one
20  of those too, but we're trying to run some numbers.
21  I'm trying to get some sense of what's going on as far
22  as what I have and what I don't have.
23       I passed out this list of pro hac attorneys.
24  This is basically the plaintiffs.  If you haven't
25  gotten it see if you can take one, and, you know, make

62

1   sure that -- we want to correct data that's wrong, and
2   we're giving you data and seeing if it is accurate.
3        MR. BUCHANAN:  Your Honor, my understanding of
4   the pro hac order was once pro hacked in you would be
5   pro hacked in generally into the cases that you were
6   counsel of record for, that your firm was, and that it
7   would be deemed to apply.  So I'm not sure how this was
8   actually prepared.  I see attorneys' names next to
9   specific cases.
10       MS. SULLIVAN:  That was the order.
11       MR. BUCHANAN:  That is the order.
12       MS. SULLIVAN:  In other words, if you are pro
13  hac you have to have cases attached to the pro hac.
14       MR. BUCHANAN:  Okay.  But then I thought it
15  was deemed to -- for subsequently filed cases you were
16  also pro hacked in.
17       THE COURT:  Nothing I'm giving you now came
18  from the official court database.  The official court
19  database is, you know, it is the Trenton official base.
20  It is very accurate.  It is also so unuser friendly
21  that I can't begin to use it or figure it out.  It is
22  basically a -- I'm told it is what's called a DOS-based
23  program, which means it was designed in 1975, and they
24  have never changed it.  And you have to go to 10
25  different pages to find anything, and it is really hard

63

1   to use.
2        So what I'm giving you here is not -- this is
3   not official things.  These are -- but this is from the
4   database where we have asked plaintiffs' attorneys to
5   provide the information, and now we're trying to use it
6   to get some information for us, and, basically, Dennis
7   Medwick is still in charge of this.  It is sort of my
8   private database of the cases.
9        There's 4,000 something cases filed.  I think
10  we have over 4,600 cases filed in ACMS with Trenton
11  that are officially complaints filed.  I think we have
12  3,600 that have actually been entered in this database
13  because that's how many cases have been provided to me
14  by plaintiffs' lawyers.
15       MR. WEISS:  So this database is the spread
16  sheet database?
17       THE COURT:  This database is the spread sheet
18  database.  This isn't the whole database, but
19  everything here is from --
20       MR. BUCHANAN:  The pro hac database?  Are we
21  talking about the same printout?
22       THE COURT:  Yes.  It came from that database.
23  This database came from that.
24       MR. BUCHANAN:  Okay.  Because that's not
25  information we supply when we fill out our spread

64

1   sheets.

2           THE COURT:  Heather, can you get Dennis?  It

3   all came from Dennis's database.

4           MR. BUCHANAN:  We don't provide pro hac

5   filings in our spread sheet, I don't believe.

6           MR.SEEGER:  Sorry, Judge.  Hi.

7           MR. BUCHANAN:  Okay.  I confess to not seeing

8   that in the earlier iterations of it.  Maybe we

9   actually do provide that, and I'm unaware of it.

10          THE COURT:  We didn't add it.  It has to be

11  there because this was from that database.

12          MR. BUCHANAN:  That's why I'm confused.

13  because --

14          THE COURT:  We'll have Dennis come in.  Have

15  any of you on the plaintiffs' side not filled in your

16  database?  Is there anyone that doesn't know who I'm

17  talking about?

18          MR. WEISS:  The people here probably filled it

19  out.  There are people who are not here who some

20  haven't, and we'll try to get them to you promptly.

21          MR. LIEVERMAN:  Your Honor, we didn't because

22  we spoke to your assistant.  We don't have any personal

23  injury cases.

24          THE COURT:  That's fine.

25          I understand the class motion is being argued

1   -- well one of them -- January 31st.

2           MR. BUCHANAN:  January 31st.

3           THE COURT:  So call me afterwards and tell me

4   how I did.

5           MS. SULLIVAN:  Will do, Judge.

6           (Discussion off the record.)

7           THE COURT:  Okay.  Yes.  I'll have Dennis, but

8   if anybody hasn't filled this out, and, Sol, again,

9   we're going to need to get the information.  Some

10  people just leave out stuff like where the state is

11  where there's 42 cases that just at the top say don't

12  have a state, that's because people just didn't put in

13  a state and we can only get the data that people give

14  us, and I really don't -- at this point we're actually

15  having somebody go back and try to look on our system

16  to add the stuff.  We can't add stuff like smokers and

17  age, but some of the stuff we can add.

18          Dennis, they wanted to ask are pro hacs

19  actually on this database?

20          MR. MEDNICK:  No.

21          THE COURT:  How did we run this?

22          MR. MEDNICK:  That's a good question.  At one

23  point I was attempting to put up a table called for pro

24  hacs and to associate back and forth, but I decided I

25  couldn't do that because I didn't know how to do it

1   accurately, so I stopped doing it.

2           THE COURT:  So throw these away.  So these are

3   not important.

4           MR. WEISS:  Dennis, will you let me know who

5   is not compliant?

6           THE COURT:  We don't want pro hacs filing the

7   Excel sheets or if they file them we want them to put

8   the New Jersey attorneys' name in them.

9           MR. BUCHANAN:  In other words, you don't want

10  the same case filed twice.

11          THE COURT:  And we have gotten quite a few.

12          MR. BUCHANAN:  And that has happened.

13          THE COURT:  Where a pro hac has filed it and

14  the Jersey counsel has filed it.

15          MR. BUCHANAN:  We'll make sure we send a

16  message out to people who weren't here.

17          THE COURT:  If New Jersey counsel is letting

18  your pro hacs do it make sure when they put in the

19  attorney they put in, and we have removed pro hac from

20  our list now as a field.

21          MR. MEDNICK:  Yes.

22          THE COURT:  Dennis knows what is going on, and

23  I don't.  Okay.

24          MR. WEISS:  So, Dennis, you're telling me that

25  there's a thousand cases you don't have the spread

1   sheets for, correct?

2           MR. MEDNICK:  That's correct.

3           MR. BUCHANAN:  Are we current, though, as of

4   cases by the end of September?  Was there 4,440 cases

5   by the end of September?

6           MR. MEDNICK:  The 4,000 I'm comparing to it

7   the current case list.

8           MR. BUCHANAN:  Right.

9           MR. MEDNICK:  So I'm saying our database

10  should match the case list.

11          MR. BUCHANAN:  Within a month or so.  There

12  should be a month lag or so.

13          MR. MEDNICK:  And that's what we have been

14  trying to do.

15          MR. BUCHANAN:  I see you picked up another

16  1,000 cases.

17          MR. MEDNICK:  We have a thousand to go.

18          MR. WEISS:  Every month they're supposed to

19  send it back to the Court.

20          MR. MEDNICK:  Just new cases.

21          MR. MEDNICK:  Just new cases.

22          MR. BUCHANAN:  The filings.

23          MR. WEISS:  All right.

24          THE COURT:  As often as possible to keep it

25  updated.  All right?

1     MR. COHEN:  Your Honor, last month we made a
2  request.  I think Dave joined, but correct me if I'm
3  wrong, that plaintiffs and defense get a copy of that
4  database since the Court is using it to make decisions
5  that we could look at it, and if we thought there was
6  any information we thought was inaccurate we could
7  raise it with the plaintiffs that would better inform
8  the Court if you're making decisions because I get a
9  lot of information from facts sheets and stuff.
10     THE COURT:  Let's wait until we get it -- we
11  don't want to do that yet, but we will probably, but at
12  this point we don't want to do it.
13     MR. BUCHANAN:  We're still on beta.
14     THE COURT:  We're still figuring it out.
15  Dennis and I have been commiserating about the fact if
16  we only could have started this with something other
17  than VIOXX because we're learning how to do it with
18  VIOXX, and then we're going to be doing it in Accutane
19  and Celebrex and the ones that have less, so,
20  unfortunately, we could have started with 150 cases, it
21  would have been nicer than starting with 4,000 cases,
22  but we're doing the best we can do.  But Dennis has
23  done a wonderful job.
24     (Applause.)
25     THE COURT:  So the only thing he has to deal

1  with is me who doesn't understand what he is saying
2  half the time, and I don't think he can decide if he
3  likes it better with Judge Corodemus telling him what
4  to do or if he likes it better with me not
5  understanding what he is doing.
6     MR. MEDWICK:  Judge Corodemus would say it is
7  done, right?
8     THE COURT:  All I know is whenever I say to
9  him can I get this he gives it to me.
10     MR. COHEN:  One plug in favor of that.  It
11  could be I could offer some assistance based on my
12  experience as to whether there's any sources of
13  confusion that I can see based on the data because I
14  have been over this quite a bit.
15     THE COURT:  Right now we're refining how we're
16  going to put the docket numbers in, but I think it is
17  going to be -- it is already useful, and I think it is
18  going to be much more useful as soon as we get all the
19  data in, and Dennis will -- if he wants to talk to you
20  Charlie that will be up to him.  Okay?
21     MR. FERRARA:  Your Honor, maybe I'm paranoid,
22  but I feel uncomfortable having Merck people involved
23  in the Court system.
24     MR. COHEN:  I won't talk to them without Dave,
25  and the issue is that if the Court is using a database

1  of information to help inform the decisions of such
2  things as trial selection --
3     THE COURT:  I think you're being paranoid.
4     MR. COHEN:  -- I want to have the opportunity
5  to see the same data.
6     THE COURT:  We're not going to turn over the
7  database to Mr. Cohen to add anything to it or change
8  anything.
9     MR. COHEN:  No.
10     THE COURT:  I think what he was suggesting was
11  on actual creation of fields or things like that if
12  there was some issue about merging documents or
13  something that happen to be beyond what Dennis is
14  doing, and Dennis wants to know if he can do a certain
15  thing not related to any entry of specific data.
16     MR. COHEN:  I would certainly never presume to
17  change the Court's official records.  I do think --
18     THE COURT:  This is not an official -- this is
19  our unofficial record.  I have to emphasize that.
20     MR. COHEN:  I certainly would not presume to
21  change any of the Court's data, but if there was data I
22  thought was inaccurate I would probably raise it with
23  liaison counsel and see if he would agree to change it,
24  and, if not, I would bring to it the Court's attention
25  at a conference, but I am never asking for direct

1  access to the Court's database.  I'm not asking to
2  change anything.  It is just a copy of the data because
3  I think with 4,000 records it is possible that there
4  will be some margin of error that I want to correct
5  with liaison counsel, and since liaison counsel is on
6  the other side that's technological savvy we would have
7  discussions.
8     THE COURT:  Dennis, are you sorry you got into
9  this whole thing?
10     MR. MEDWICK:  No.
11     THE COURT:  All right.  Does anybody else have
12  any other questions for Dennis?  If any of you have
13  suggestions of things you would like to be able to find
14  out let me know and we can talk to Dennis.
15     UNIDENTIFIED WOMAN:  Does Dennis have a
16  hotline, especially for out of state counsel?
17     MR. MEDWICK:  Yes.  My number is on the web.
18     UNIDENTIFIED WOMAN:  It is on the website?
19     THE COURT:  And if you forget it, he is the
20  mass tort tech person, and he is in Middlesex County.
21  So you would call the Middlesex County courthouse and
22  ask for Dennis the mass tort -- or just the computer
23  guy, and whoever you want to call him and they will
24  find him.
25     Is there anything else anybody feels we should

1   address?

2         MR. BUCHANAN:  There's one general item on our

3   agenda.  It relates to the IMS prescribing data.  Just

4   I'm not sure whether this has come up at prior

5   conferences or not.  IMS is a third-party entity that

6   surveys various prescription services, whether they be

7   CVS or Walgreen's and they capture information on

8   prescribing habits for physicians down to the level of,

9   you know, the extent that one doctor prescribes Bextra

10   rather than VIOXX as opposed to Celebrex.

11         Pharmaceutical companies contract to obtain

12   this information from IMS, and Merck is no exception

13   there.  Merck has purchased IMS data for the relevant

14   date here from '99 until I believe the time the drug

15   was withdrawn from the market.

16         We first lodged a request for IMS data in I

17   believe it was encompassed by our initial document

18   request, and it was the subject of a meet and confer in

19   2004.  We understand at that point there was some

20   impediment to getting the documents from IMS.  Because

21   of contractual concerns with IMS they believed -- Merck

22   believed they could not do it absent a court order.

23         We have since received the contracts and don't

24   believe that is, in fact, what the contracts provide

25   for.  They required notice to IMS, but, nonetheless, we

73

1   did go through the exercise and have obtained data from

2   IMS, and IMS is saying go get it from Merck, which is

3   what we have tried to do, and we think we're in a

4   position --

5         THE COURT:  Has it been produced in the

6   federal?

7         MR. BUCHANAN:  No.  It is the subject of

8   dispute for other reasons in the MDL, but the issue, I

9   think is we think we had properly requested the data in

10   the possession, custody and control of Merck.  If they

11   had a contractual concern with IMS, which was at the

12   time to provide notice to IMS that was Merck's

13   obligation to do so.  We think it was Merck -- it was

14   then IMS's obligation under these contracts to show up

15   and complain.

16         You know, that's the appropriate process,

17   okay?  And IMS is now saying go get it from Merck.  I'm

18   not quite sure how we go about getting this now.  I

19   understand there have been communications with IMS.

20   Candidly, there's some slippery discussions with

21   them in terms of we consent to you getting it from

22   Merck then they come back and say, no, we consent to

23   you asking for it from Merck.  So I don't know what

24   that really means, but there's some near term emergency

25   for the trial cases.  We would like to insure we get

74

1   the data promptly for them.  There's a longer term

2   concern that we get the data in connection with the

3   defense profile sheet, which calls for its protection.

4         I think if this is truly an issue with, you

5   know, IMS and they have got a concern about what they

6   consider to be proprietary information it should show

7   up here.  Merck should advise them they're going to

8   produce it, absent them coming into court to seek a

9   protective order to prevent its production, but it is

10   information in their possession, custody and control,

11   and it has been for years.  We don't have it.  We would

12   like to make sure we don't go through the next trials

13   without it.

14         THE COURT:  So your request is I enter an

15   order it be provided, that notice be given to IMS that

16   it is going to be provided, and that if IMS doesn't

17   object within 10 days or five days that it be provided.

18         MR. BUCHANAN:  Yes, Your Honor.

19         MR. COHEN:  Not surprisingly I have a

20   different request.  Actually, if we just go back over

21   the history, and I actually agree with most of what Mr.

22   Buchanan said.  This came up early and often.

23   Consistently I advised Mr. Buchanan we had a

24   contractual relationship and that he would need to

25   subpoena them.  They did.

75

1         Then, apparently, Mr. Buchanan had

2   conversations with IMS that didn't go so well, so they

3   asked me to please get involved and straighten this all

4   out, which I have now done.  I have spoken to IMS, and

5   IMS now has a proposal that just says we need certain

6   things from you such as the people the plaintiffs agree

7   that it is confidential under the protective orders and

8   they have a few other such items, but we were doing

9   this globally for all plaintiffs because the MDL

10   plaintiffs want it, the California plaintiffs want it,

11   everybody wants it.

12         So what I had done was when I got the proposal

13   I turned it over to Mr. Barnett, who is dealing with

14   the actual profile forms, because that's where it most

15   comes up in the sense that they want it in connection

16   with these profile forms, we're going to employ the

17   same one in the MDL here, and they're trying to

18   finalize that MDL one.  We have had some difficulty

19   finalizing those negotiations.  What I think happened

20   here, and I know Mr. Buchanan is here, and if we can

21   get the MDL person on the line today I don't see any

22   reason why they can't finish these negotiations if we

23   get consent from the MDL plaintiffs, from the New

24   Jersey plaintiffs I'm sure I won't have any problems

25   with the California folks, go back to my client by the

76

1    end of the week and I think the whole thing can be
2    worked out.  But it is just tied in with this profile
3    form that Mr. Barnett needs to finish, but I think the
4    whole thing can be completely wrapped up, both the
5    profile forms and the IMS data by the end of the week.
6    We need them to get in a room, and this is one -- I
7    don't have to get in the room, but I'm happy to make
8    you force them to get in a room or on the telephone and
9    get this done.
10        MR. BUCHANAN:  I spoke to Mr. Cohen before the
11   conference.  To be clear, IMS told us that we needed.
12   to -- they authorized us to go to you.  That was, as I
13   said, squirrely conduct on it.  It sounds like IMS is
14   consenting to the production of the data by Merck, but
15   it just has to be afforded confidential treatment.
16   They claim it is proprietary.  There's a protective
17   order that governs the confidential information by
18   third parties.  They're free to designate information
19   confidential on their own, and we don't have to agree
20   it is confidential.  They designate it, it is treated
21   as such, and if anyone needs to take issue with that
22   there's procedures to deal with that under the order.
23   Those terms are fine.
24        What I'm concerned about is trying to link up
25   that to a negotiation over a profile sheet in the MDL.

1    I mean, there are trials coming up in 30 something
2    days, maybe not even that, in New Jersey.  We just
3    don't want to get bogged down trying to finalize that.
4    It is in our interest to get the profile sheet resolved
5    for New Jersey and the MDL promptly, but if you have
6    consent to turn it over on those terms plaintiff's in
7    New Jersey accept it and believe it should be turned
8    over promptly, and it should not be linked to some
9    negotiation on a different issue.
10        MR. BARNETT:  If I might, Your Honor, it is
11   necessarily linked because as Mr. Buchanan knows the
12   plaintiffs' Steering Committee in the MDL has taken the
13   position that this is required in the profile form that
14   was entered by Judge Fallon.  We don't agree with the
15   current -- the way it is worded now.  We don't agree
16   with that, and that's what we're trying to work out,
17   and the bigger issue, much is set forth --
18        THE COURT:  But what does that have to do with
19   just producing it now and here?
20        MR. BARNETT:  The way most people have said
21   they want the profile form information is not a huge
22   data dump that they have to then go through and mine.
23   What they want is in the profile form they want a
24   separate production of the prescribing information, so
25   as they're looking at all the information that relates

1    to their plaintiff they can go to one place and say,
2    okay, here are the PIR's, here are the Dear Doctor
3    letters, here is the prescribing information.  Those
4    aren't my words, that's what the PSC lawyers have told
5    me.  And that's really what is envisioned by what's in
6    the agenda here.  They want to change the language of a
7    profile form, which I understand.
8        And our view is, again, as we discussed with
9    you last conference, whatever the form is going to be,
10   I mean, we have set, and I'll say again, whatever is
11   the final version of the form in the MDL we're prepared
12   to do in New Jersey, as well.  We have to talk about
13   timing.  But what is necessarily wrapped into this
14   larger discussion of what form that profile form is
15   going to take, and I agree with Mr. Cohen.  I think --
16   we have been trying, actually, to discuss this issue
17   for some time, and I think if we can get on the phone
18   maybe we can hammer something out quickly that will
19   address the concerns that people have about having this
20   data available for pending trial cases.
21        THE COURT:  Who are you going to get on the
22   phone with?
23        MR. BARNETT:  Chris Tisi, who is the point
24   person for the profile form in the MDL.
25        MR. BUCHANAN:  Yes.  My concern is really one

1    of -- I don't know how that process is going.  I mean,
2    I'm familiar with the issue.  I know Mr. Barnett wants
3    clarification on some points, and I know this IMS issue
4    is involved in it, but the IMS issue is broader than
5    just the defense profile sheet.  There have been
6    redactions for IMS data in the productions for the last
7    two and a half years.  I mean, there are -- IMS
8    redactions are not proper now by IMS's agreement.  It
9    won't happen going forward, and prospectively they'll
10   be withdrawn, I assume.  We don't have a process in
11   place to do that.
12        I mean, that's what -- I just don't see how
13   the two are necessarily linked.  We want to make sure
14   we have IMS data near term.  We can agree on the form.
15   We have had a separate conversation about it, Ben, I
16   just -- there's no impediment to producing IMS data any
17   more, as I understand it.  IMS now consents subject to
18   it being accorded confidential treatment under the
19   protective order.  We're okay with that.  And we just
20   have to get the vehicle to get it to us.
21        MR. COHEN:  The question is what is the "it,"
22   and, basically, there are various manifestations of how
23   IMS data has been treated throughout the litigation.
24   There's some data in general documents that have black
25   boxes on them, but the vast majority of what the data

1    folks want are just relevant to their prescribing
2    doctors and their case-specific cases tied into the
3    form.  Just as a practical matter, I now have these
4    conditions -- I'm supposed to talk to the plaintiffs
5    and get agreement from all the plaintiffs, which I will
6    do, and I think as a practical matter I couldn't get
7    done and everybody signed off on until Friday anyway,
8    and so the thing is if they can handle their issue at
9    the same time once the agreement is done then not only
10   is there some general in the air some IMS data will be
11   produced, but, in fact, there will now be an agreement
12   on here is the form, this is the IMS data you're going
13   to get, and they can move to talk about timing, who is
14   getting it when.  We can get for anybody who says they
15   need it quickly to be prioritized and get that all
16   done.
17        My concern is we're just going to come back to
18   you in two or three days, and there's going to be some
19   other ancillary fight over this because there's -- it
20   is really tied up with this form, and if we just, you
21   know, it seems to me that in the past it has worked
22   when you made me go into a room and get this worked
23   out.  If we can get it worked out, the whole problem
24   goes away.  I think I have actually managed to take a
25   problem that really, as Mr. Buchanan said, we have been

1    dealing with for over a year I think I can bring to it
2    a complete close now by the end of the week if we can
3    get this form worked out.
4        THE COURT:  Is this the only issue left on the
5    profile form?
6        MR. BARNETT:  There are a couple others, but
7    it is not clear to me that there is going to be
8    agreement on those other issues.
9        MR.SEEGER:  Just to make one thing clear,
10   because the judge may not be aware of it, the defendant
11   facts sheet being used in the MDL has been ordered by
12   the Court after, in fact, it was agreed upon and the
13   Court ordered it.  A couple of guys on your side said a
14   few things don't work here and could we just really
15   have a discussion on it.
16        MR. BUCHANAN:  To clarify, they were -- as I
17   understand it, there were two different versions of the
18   defendant's facts sheet that went to Judge Fallon.  He
19   entered a defendant's profile form, whatever he calls
20   it, that reflected his resolution of the disputed
21   points, and, as I understand it, there are some issues
22   that the defense now has with certain provisions in the
23   as-ordered Merck profile form that they want to take up
24   with plaintiffs in the MDL first and then with Judge
25   Fallon, if necessary.

1        MR.SEEGER:  But that can be delayed.  I may
2    have to go back to Judge Fallon.
3        MR. BUCHANAN:  Look, I don't know that IMS --
4    the issue over the IMS data from my perspective doesn't
5    go hand-in-hand with the MDL Merck profile form, and
6    that's my concern.  There are -- there is, of course,
7    case-specific IMS data.  There's also regional and
8    national IMS data that's going to reveal, you know,
9    percentages of VIOXX sales compared to other sales
10   compared to Celebrex and Bextra and other things that
11   have been redacted or not produced that also need to be
12   produced.  It is not just the Merck profile form.
13        MR. BARNETT:  But, again, just to give Your
14   Honor some more background, what was ordered ultimately
15   by Judge Fallon was something of a hybrid between the
16   competing versions that were submitted by the PSC and
17   the DSC.  We are trying to iron out differences.  They
18   are small differences and we have been working for the
19   better part of three months to get the issue resolved.
20   We haven't delayed production of the Merck profile
21   forms.
22        THE COURT:  They don't care about the Merck
23   profile forms.  They care about getting the IMS before
24   their trial.
25        MR. BARNETT:  I think there's a way to do

1    both.  We would not be holding up the production of IMS
2    data that they need for their trials.  We wouldn't be
3    holding that hostage to doing the form.  What we are
4    trying to do is get the issue resolved so everybody
5    understands exactly what it is that they're getting
6    that's associated with a profile form, whether it is in
7    New Jersey or the MDL or California.  And just from a
8    practical standpoint, and, again, I'm probably beating
9    a dead horse, but the only way for us to do it, given
10   the volume of cases particularly in New Jersey, where,
11   frankly, we have been getting plaintiff facts sheets
12   for years, the only way to deal with that and the
13   numbers in the MDL is to have one standard form, and,
14   you know, it is an exhaustive list of case-specific
15   information that we're producing for each plaintiff on
16   the profile form.
17        MR. COHEN:  There's a dispute as to whether
18   the profile form covers IMS at all.  The other concern
19   is that even if the IMS consent comes in you have to
20   iron out what is called for by that form.  You guys
21   just need to get the form done, and this whole thing is
22   going to get wrapped up by Friday.  It is a problem
23   that we have had for over a year, and I think we can
24   actually solve it in three days.
25        MR. BUCHANAN:  Ben, can we do this so we don't

1   go round and round too many times?  It sounds like it
2   is a question of format on the production.  Can we
3   agree, I mean, we just need to make sure that people
4   who are going to trial in 30 days get this stuff fast,
5   their experts might want it.  They might want it for,
6   you know, to evaluate treating physicians who may still
7   need to be deposed.  I don't know.  I have a sense they
8   may be done with that, I'm not sure.  But I want to
9   find a way to get that stuff in their hands quickly,
10  and then I also want to find a way that we get the data
11  for use in the litigation on a more broad basis going
12  forward.  If we agree it is going to happen as a matter
13  of the format we'll talk about it, and if we can't get
14  it worked out promptly, within a day or two, we'll get
15  back to the Court and just --
16          THE COURT:  Who do you want to call right now?
17          MR. BARNETT:  It would be Chris Tisi.  I don't
18  know if the argument is still going on in Dr. Graham.
19          MR.SEEGER:  He is involved in it right now as
20  of the time I walked in the door.
21          MR. BARNETT:  What Mr. Buchanan is.
22  suggesting -- that's fine.  I think we should follow
23  what the Court did last time as far as the other
24  information of the profile form and say, you know, we
25  have these trial cases coming up, get them the

1   information.  It is not going to be in the form but get
2   them the same information.  We should be able to do the
3   same thing, assuming we can address the confidentiality
4   issues and the other global issues that Charlie has
5   talked about, we can move that data to the front of the
6   line and get it the trial counsel, so they have it in
7   preparation of trial.
8           THE COURT:  That's all they want.  They want
9   the IMS data provided to them within, you know, 10 days
10  on the cases.  Is it case-specific data or is it not?
11          MR. BUCHANAN:  There's multiple categories of
12  it.  As it relates to the trial cases we're talking
13  about case-specifically.  More broadly they're going to
14  have to remove the redactions on the documents that
15  were redacted for IMS, but I assume there's a way to
16  search for the IMS documents and unredact them, but we
17  can work out a time frame for them.
18          MR. DASSOW:  Judge, since we're on that
19  subject I want to make sure we're clear.  We agreed
20  that January 31st is when we were going to get our
21  defendant's profile form for the trial cases.  Are we
22  saying now we're not going to get those the 31st, and
23  if we're not, when are we going to get them?
24          MR. BARNETT:  No.  That's a separate issue.
25          THE COURT:  Okay.  Let's over the break for

1   lunch if there is any possibility of getting the person
2   from the MDL on the phone and having you all talk about
3   this then let's try to do that just as Mr. Cohen
4   suggested.  And if he can't do that then at least we
5   want some kind of agreement on when the IMS stuff is
6   going to be produced just for the trial cases.
7           MR. BARNETT:  That's fine, Your Honor.
8           THE COURT:  Through June.
9           MR. BUCHANAN:  Your Honor, there was one
10  issue, since the facts sheet had came up, and it was
11  dealt with in the competing proposed orders that were
12  submitted to the Court.  One thing that I was advised
13  we didn't put in our correction -- in our clarification
14  to what you proposed in the facts sheet is you guys I
15  think had agreed to give us a signed facts sheet prior
16  to the trials.  I think that's reflected in the
17  transcripts.  You were going to get the information
18  called for on an expedited basis, but you would get us
19  a signed facts sheet prior to trial so we had something
20  tantamount to interrogatories that could be used.
21          MR. BARNETT:  That's correct.
22          MS. YANNELLA:  Was that the case for Cona and
23  McDarby?
24          MR. BUCHANAN:  I think it is for all seven.
25          MS. YANNELLA:  We ought to take a look at

1   that.
2           MR. BUCHANAN:  I don't remember how it played
3   out in the transcript, but I thought you were going to
4   provide them for all the trial cases before -- before
5   the trials.
6           MS. YANNELLA:  Again, I remember it being for
7   April and June.  I don't remember it being for Cona and
8   McDarby just because the actual form itself takes
9   90 days to do, and we had a timing problem with the
10  first cases.
11          MR. BUCHANAN:  But you produced the
12  information to them already.
13          MS. YANNELLA:  But the form itself is the
14  problem.  I'll go back and look.
15          MR. BARNETT:  We'll look at the transcript.
16          MR. BUCHANAN:  Okay.  I may have to get those
17  orders into our afternoon session, so they can speak
18  their peace on that.
19          THE COURT:  What's the issue about Tracey
20  Stenn.  Has that been resolved?
21          MR. PLACITELLA:  He is giving me a dep on a
22  date before the trial.  It is not a problem.
23          MR. MAYER:  We'll work it out.
24          THE COURT:  Okay.  Displaced by Hurricane
25  Katrina I guess we have to give those people additional

1    time.  There's no issue about that.

2        MS. SULLIVAN:  No, Your Honor.

3        THE COURT:  Okay.  All right.  Is there

4    anything else anybody else wants to address other than

5    the issues that we're going address that are

6    case-specific?

7        Okay.  Let's break.  Let's come back at 1:30.

8    All right.  We'll see you back at 1:30.

9        (Break taken.)

10        MR. WEISS:  On the Joann Lonner motion to

11    quash deposition Ted and I reached an agreement on

12    extending the time to which the plaintiff had to file a

13    response and then they had a week after.  I think ours

14    are due the 6th.  Theirs is due the 13th, and then it

15    will be up to the Court to decide.

16        THE COURT:  Do you have that motion?

17        THE LAW CLERK:  Yes.

18        MR. WEISS:  Plaintiff has until February the

19    6th, and Ted will be in in a minute, and then Merck's

20    got a week to file a reply.

21        MR. BUCHANAN:  There was a related motion, I

22    believe.  There's a related motion on a document,

23    purportedly privileged document.

24        MR. WEISS:  On the call back, that's going to

25    be the same way.  All heard the same time.

1        THE COURT:  Okay.  You can hold them then.

2        MR. WEISS:  And Ted will be back, and he will

3    confirm that.

4        THE COURT:  All right.  What's the first

5    issues you want to talk about?  Let's start with

6    plaintiffs since we started with defense this morning.

7        MR. BUCHANAN:  Our issue is trying to put.

8    some -- one of our first issues is one that we have

9    addressed previously, and I know you worked with Cona

10    and McDarby, and that's trying to get prompt production

11    of the called for sales materials just lay that out.  I

12    don't know if it is a point of dispute.  It may not be.

13    I think you guys finished Cona and McDarby and are

14    close to finishing it.  We might be nearly in cue to

15    start getting documents.

16        MS. SULLIVAN:  We'll be done by February 1st?

17        MS. YANNELLA:  Yes.

18        MR. BARNETT:  One rep will be produced

19    February 1st.  Everybody else is the end of the month.

20        MR. BUCHANAN:  In terms of our three cases

21    what are we expecting?  That's our concern that we -- I

22    was surprised by the volume of the productions.  You

23    may have been, too.  We just don't want to be snuck

24    with --

25        MR. WEISS:  The reason why I'm asking is all

1    the plaintiffs' side has been deposed, except Patricia,

2    the widow, because she worked in Dr. Mecurian's office,

3    who is the primary doctor, and I can't really have her

4    deposed until I get the detail stuff on Murchanian.

5    And so the quicker you get it to me the quicker we can

6    get Patricia Natch deposed.  We set February 10th is

7    one of the dates.  If we get Murchanian custodial files

8    and the detail stuff on him like February 1st, no

9    problem.

10        MS. SULLIVAN:  So you want to put off the

11    plaintiffs deposition until --

12        MR. WEISS:  She is not the plaintiff, she is

13    the widow.  But she was the medical assistant in his

14    practice, so I can't put her up for a deposition until

15    I see the records.

16        MS. SULLIVAN:  Did she have anything to do

17    with the decision to prescribe?

18        MR. SPIZER:  If she is mentioned in the sales

19    rep files we should know that.

20        MS. SULLIVAN:  It is clear we have to produce

21    the stuff, and we will.

22        THE COURT:  Diane, if you want to take her dep

23    first before they produce it then you can't ask her

24    anything about sales reps, in which case --

25        MS. SULLIVAN:  That's fair enough, Judge.

1        THE COURT:  If she then comes to trial and

2    testifies about sales reps you have waived your chance

3    to ask her about it.

4        MS. SULLIVAN:  You can ask her at least do you

5    remember anything.

6        MR. WEISS:  Oh, no.

7        THE COURT:  She is not going to be asked does

8    she remember until she has a chance to look at the

9    records.

10        MR. WEISS:  That's exactly what I don't want

11    to do, and you already have taken the son.  The

12    daughter we'll put up.  The mother we'll put up.  The

13    relatives we'll put up.  The people who saw him die

14    we'll put up, the friends on the beach, anybody else

15    you want you can get.

16        MS. SULLIVAN:  How long will it take?

17        MR. BARNETT:  Well, the problem --

18        MS. SULLIVAN:  See, it holds up other

19    discovery, because she is the one with the best

20    knowledge of who may be the providers if we have got a

21    deceased.

22        MR. WEISS:  No, you don't, because we have

23    sent you the records, and Murchanian was the decedent's

24    treating physician from 1985 to the time of his death,

25    and his records were produced.  You have got the

1  chiropractors.  You got all the records, you have life

2  insurance records.  We have a whole bunch of records.

3       THE COURT:  The question is what is the time

4  frame for producing the sales reps' files in the

5  three cases that are listed for trial in April.

6       MR. BARNETT:  Right.  And the situation is,

7  Your Honor, I mean, we pushed everything aside to get

8  Cona and McDarby out by the end of January.  We have a

9  bunch of other things that we know have been requested

10  and we agreed to produce in New Jersey, including we're

11  doing Merck Frosst productions.  We have got to get

12  Kaufman out because Mr. Lanier has said he wants

13  Kaufman before the Cona case.  We have Lynch.  We have

14  Quan.  We have the commercialization team.  We have the

15  clinical team.  We have stuff that we need to produce,

16  as well.  And that just needs to be factored into what

17  the schedule is.

18       The reality is, I mean, we learned a lot in

19  January having to do rep productions in this sort of

20  volume.  It is going to go faster, but it may be -- it

21  may be mid February before I can start producing rep

22  files for the next three cases.

23       And my suggestion would be we can sit down and

24  come up probably the first week of February with a

25  schedule similar to the one I think was submitted to

1  you yesterday that says here's what we can do in terms

2  of production, and if you identify those reps that you

3  have a real interest in doing first we can order the

4  production in that way and try to get this all done in

5  a time consistent with the April trial dates.

6       MR. BUCHANAN:  I thought, though, I mean, the

7  big bottleneck was, actually, getting all the sales

8  reps deps in to do it.  I assume you have done that

9  already for our sales reps, right?

10       MR. BARNETT:  We're looking ahead to the June

11  cases.  Now we're trying to get everything collected,

12  so in the January productions, yes, there was a problem

13  with that, which mostly centered around the reps.

14  But we have addressed that issue.  I mean, every step

15  of the process of our process we're doing what we can

16  to move it along faster, but the reality is there are a

17  lot of other productions we're trying to deal with at

18  the same time.  But I really think by the first week in

19  February we'll be able to give to you guys and

20  potentially the Court a calendar for what we can

21  produce when.

22       MR. WEISS:  When we last talked about this,

23  Ben, Charlie said he thought he would be done by the

24  last week in January in getting all of the reps'

25  information out for Cona and McDarby, and by February

1  1st Merck would be in a position to start giving us the

2  custodial files on the reps in the April trials.  Now

3  you're saying you want to push it back two more weeks?

4       MR. COHEN:  Close.  I said we would be done

5  and we wouldn't hold up the next round of productions.

6  What Ben is saying is that New Jersey has also asked

7  for things that weren't reps that turn out to be large

8  like Kaufman that they want for Cona and McDarby, and

9  so Ben has to slot those things in in between, and I

10  think those take the first two weeks of February and he

11  was thinking somewhere in the last two weeks is when

12  the reps were going to come out, but since the

13  collections are more -- were further along than we were

14  with Cona and McDarby when you guys prioritized there's

15  a much better chance that if you wanted somebody first

16  we could do that because we collected all of them.  So

17  he can juggle the review process much better than I

18  could here where I was -- even if you wanted someone

19  earlier I couldn't do it.

20       MR. BARNETT:  The last time we did it it was

21  more driven by whose files we had when, and if we had

22  somebody's files we put them through the process.  Here

23  we have basically collected the documents.  It is

24  fitting them into the review of the production cue.

25       MR. BUCHANAN:  One point of clarification.  I

1  mean, you identified several other production

2  obligations that you have right now.  Those things have

3  been on the production calendar since October/November.

4  Just to be candid about it.  The Kaufman one I

5  understand, apparently, recently arose, but I have had

6  that production schedule from Phil calling out a

7  production order for months now, so those aren't new

8  obligations.

9       MR. BARNETT:  I'm not suggesting that they

10  are.  I'm giving a very realistic sense of what we're

11  being asked from several different fronts, and it is

12  not a question of whether we're going to produce them.

13  We clearly are.  It is just a question of timing, and

14  if you want to tell us, you know, we want to hold off

15  on those other people in favor of the reps we're happy

16  to talk with you about that and work out some priority

17  schedule, but I meant we put literally everything aside

18  in order to get Cona and McDarby out the door in

19  January, and we're not playing the MDL off of New

20  Jersey.  These are requests that have been made in New

21  Jersey, and, you're right, they have been pending in

22  New Jersey.  We're trying to get then done and out the

23  door.

24       MR. BUCHANAN:  The concern, I mean, during the

25  last call, Your Honor, where we addressed Mr. Cohen got

```
1    on and proposed the timing for January, which I think
2    wasn't exactly what the Cona and McDarby folks were
3    expecting in terms of timing then they suggested
4    January is going to be Cona and McDarby month and then
5    you would turn to our cases in February, I expressed a
6    concern that we don't want to be getting documents, you
7    know, late in February, it is going to push off treater
8    deps and prescriber deps.  It is going to --
9         MS. SULLIVAN:  Why treater deps?  Prescribers
10   I could understand.  Why treater deps?
11        MR. BUCHANAN:  I think we're going to show
12   treaters, perhaps, what you were telling them about
13   VIOXX, as well.
14        MS. SULLIVAN:  Nonprescribers?
15        MR. BUCHANAN:  Why not.
16        MS. SULLIVAN:  Because it has no relevance to
17   the decision to prescribe to plaintiffs.
18        MR. BUCHANAN:  You can decide if you want to
19   ask follow-up questions on it.
20             It may be relevant as to whether VIOXX was a
21   cause or not and what they were told over time whether
22   they agree that VIOXX was a potential cause.  We have
23   no dep set, but we have a cutoff for prescribers, and
24   expert reports, I believe, are due the first week in
25   March.
```

97

```
1         MR. WEISS:  March 2nd.
2         THE COURT:  All right.  The number one
3    priority has to be the production for the trial, and so
4    I don't know what this -- you have got one production
5    that you still have to do for the Cona trial, and you
6    have got the sales reps that you have to do for the
7    April trial, and those sales reps should take
8    precedence over --
9         MR. BARNETT:  All other New Jersey
10   productions?
11        THE COURT:  If necessary.
12        MR. SEEGER:  I guess --
13        THE COURT:  I would think all the sales reps
14   should be produced in the first two weeks in February.
15        MR. BARNETT:  I don't think there's any way we
16   can do that, Your Honor.  We just produced --
17        THE COURT:  I don't care what you just did.
18   I'm talking about what you're going to do next.
19        MR. WEISS:  Are some of the reps the same in
20   LoPresti as in McFarland?
21        THE COURT:  Are the reps the same?
22        MS. YANNELLA:  There's some overlap.
23        MR. WEISS:  I wouldn't be surprised if some of
24   the reps that saw Murchanian.
25        MR. DASSOW:  Sure, saw Dr. Solomon.
```

98

```
1         MR. COHEN:  None of the Hatch ones overlap.
2    There's some -- I know there's some for them so --
3         MR. SEEGER:  You mean with McFarland and
4    LoPresti?
5         MR. WEISS:  Yes, they're the same area.
6         MR. COHEN:  The key is, as Ben was saying, it
7    is not like there's a whole bunch of sales reps and
8    they get -- because the scope got from just VIOXX
9    documents to also general documents it got much larger.
10   The best thing is to sit down and say which ones do you
11   want first because Ben can always put -- he just can't
12   say I'm going give them all to you by such and such a
13   day.
14        THE COURT:  How many can you do in a week?
15        MR. BARNETT:  It is purely a volume issue.  It
16   depends on the volume of the documents.  It is a
17   question of how many documents they have.  If it is a
18   low number we can, obviously, kick out several a week.
19   If it is a larger number it takes more time.
20        MS. YANNELLA:  Can I raise one other issue,
21   Your Honor?  The productions for Cona and McDarby we
22   continue to get requests for new custodial files.  We
23   just got two this week, so we committed to providing
24   all the sales reps by February 1st, but we're
25   continuing to get these requests that are going to
```

99

```
1    bleed over into February, and that's going to impact
2    our ability to get the sales reps out for the April
3    cases, so it is not as though we have all the requests
4    for Cona and McDarby done.  We don't.  We're still
5    getting requests.
6         MR. COHEN:  We might have to address those.  I
7    don't know what those are.
8         MS. YANNELLA:  We got a request for Carol
9    Revis's manager.  We got a request for Jennifer
10   Anderson.  We don't know why that request has come up.
11        MR. BUCHANAN:  Your Honor, the one concern I
12   have is some of these other pending requests that
13   they're addressing that they now say have to be
14   sidelined to get this discovery done are requests that
15   have been pending since before and during the trial in
16   New Jersey.  Some of them are MDL requests; others are
17   New Jersey-specific requests.
18        MR. BARNETT:  The ones I listed specifically
19   were the New Jersey requests.
20        MR. BUCHANAN:  Okay, fine.  You didn't list
21   foreign regulatory?
22        MR. BARNETT:  I did not.
23        MR. BUCHANAN:  Those are ones that have been
24   on the books now for four months, and I recall when
25   this came up recently, again, that Merck was going to
```

100

1   have to find a way to get the case scientific discovery
2   done, you know, that's what we're talking about with
3   these sales reps.  It is the case-specific discovery,
4   and they talked about ramping the operation up, ramping
5   it up at the expense of -- at the expense of what would
6   have been long-term, you know, long-term requests.  I
7   mean, animal studies, for example.  We have got a bunch
8   of Merck Frosst custodians.  It came up prominently in
9   the last trial.  There's probably a dozen custodians.
10      MR. COHEN:  Can I say one thing before you
11  guys keep going back and forth?  The one thing I
12  learned from the phone conferences we had is these
13  discussions really go nowhere.  When Ben can sit down
14  with here are the people you're looking for, here is
15  volume and here is a calendar and the judge says put
16  that in an order and send it to me then things get
17  produced on these days.  And what happens at these
18  conferences is you guys yell at each other and until
19  you sit down and say this is what we're actually
20  talking about, this is what we're actually telling you
21  you have wanted produced, get a calendar, see if you
22  guys actually have a disagreement.
23      THE COURT:  Don't you have their list of
24  representatives already?
25      MR. BUCHANAN:  Charlie, you have our list.

1   to Charlie on the phone.  We said we won't bother the
2   Court until the 26th.  It is every step of the way as
3   far as our group is concerned we're put off, we're put
4   off, we don't get dates, we're put off, and I know
5   everybody is busy.  I acknowledge that Merck people are
6   busy.  The plaintiffs are busy.  But we're the ones
7   ready to go for trial, all of us collectively, and
8   they're going to have to get more staff just like when
9   they're faxing us and when everybody else is faxing us
10  looking for all the things that they want the discovery
11  it needs to be a two-way street, Your Honor, and we're
12  ready.  Let's pick some dates.  And we're going to get
13  some solid dates, otherwise, we're going to be here in
14  two weeks.
15      MR. COHEN:  Didn't you say next week you could
16  have it.
17      MR. BARNETT:  I said by the beginning of
18  February we can give a list of what we can do when.  We
19  have ramped up.  Our review centers are basically
20  working seven days a week.  People working 12 to
21  14 hours a day.  I know you don't want to talk about
22  what we have produced, but we got a huge volume of
23  custodial files produced in January.  No one is taking
24  a vacation.  We are committed to working through and
25  getting out what we can.  I am not trying to pit

1   This isn't yelling, this is...
2       MR. DASSOW:  This isn't yelling.
3       MR. BUCHANAN:  This has been an open point for
4   some time, and, you know, we did -- when you discussed
5   making January the Cona/McDarby month I expressly
6   stated on the record on that call that we were
7   concerned that you were going to push our discovery to
8   the end of February and then we were in a position
9   where we would be pushing back prescribers, and I
10  actually get an acknowledgment, I think, on the phone
11  that we may need to reschedule prescribers to allow for
12  the production of sales rep materials before that to
13  happen, and you indicated you were flexible on that.
14      But the Court, I think, said we should be
15  targeting producing the records the first two weeks.
16  That was a month ago when we had that call.  This isn't
17  some new -- now we're talking about shifting long-term
18  prior discovery calendared items that we have
19  requested, I guess, the MDL has requested.
20      THE COURT:  Let's pull out the basic -- this
21  is not supposed to be a general meeting.  Let's pull
22  out the list of sales reps and get an order in today as
23  to when they're going to be produced.
24      MR. DASSOW:  That's what I was going to say.
25  We have been asking for this for two months.  We talked

1   case-specific against general discovery.  All I'm
2   trying to do is come up with a schedule that will work
3   for you getting ready for trial and that we can manage
4   in a responsible way.  That's all I'm asking.
5       THE COURT:  The only thing that's going to
6   work for trial is a production of the sales reps files
7   in the beginning of February because you still have to
8   do it before the end of February, a lot of the other
9   fact discovery including depositions, and you can't
10  take the deps until you get the files, and after you
11  take those deps then you have to go to your experts.
12  What it comes down to is the beginning of February is
13  critical probably to get the rest of the dominoes in
14  place.
15      MR. BARNETT:  I understand.
16      THE COURT:  Where are the lists of reps?
17  Whose got them?
18      MR. WEISS:  Your Honor, the day after you
19  selected --
20      THE COURT:  Let me see your list.  Nobody else
21  has their list?
22      MR. WEISS:  I didn't bring it with me, Your
23  Honor.  There's 13 reps.  I asked for them the day
24  after we picked Hatch as a case.
25      MS. SULLIVAN:  13 reps?  Whether or not the

1   prescriber remembers them?

2       MR. DASSOW:  Those are the current reps, Your

3   Honor, on the first page.

4       THE COURT:  So he has nine employees, nine

5   people whose files he wants.

6       MR. DASSOW:  And I'm not speaking for him, but

7   if you remember in LoPresti there was at least 1,500

8   details of Dr. Solomon and his firm.  I mean, it is

9   enormous.

10      THE COURT:  So all you're looking for files

11  for is current employees?

12      MR. DASSOW:  We're, obviously, looking for the

13  ex-employees, as well.  I think that will be another

14  issue, Your Honor, because, you know, obviously,

15  that's -- the ex-employees are very important to us, as

16  well.

17      THE COURT:  So we're talking 13 between the

18  current and the ex?

19      MR. DASSOW:  Correct.

20      MS. SULLIVAN:  They can talk to prescribers

21  and see who they remember.

22      MR. BUCHANAN:  Obviously, we can't look at all

23  13 the same day.  We can traunch them in some way.

24      THE COURT:  Would any of those 13 be on the

25  things you already produced for Cona?

1       MR. COHEN:  I'm trying -- I think LoPresti and

2   one of Cona and McDarby has some overlap.

3       THE COURT:  That's good.  That will be the one

4   you will produce first.

5       MR. BARNETT:  I think we have already produced

6   it.

7       THE COURT:  Did you already get a file?  Have

8   you gotten any sales reps files?

9       MR. DASSOW:  No, Your Honor.

10      MR. BUCHANAN:  None.

11      MR. COHEN:  I am telling you, as you know, to

12  get the final order out on Cona and McDarby was every

13  day talking to the folks to get the stuff down.  We now

14  have a Court order that says when it has to get done.

15  So in fairness to the reviewers, and, folks, they are

16  focused like a laser beam on not violating a court

17  order to get that thing done, so they haven't looked as

18  much beyond except for the collection people who are

19  getting all the stuff in so they are in a position to

20  be more flexible.  I have a spread sheet.

21      MR. BUCHANAN:  Judge --

22      MR. FERRARA:  The way I hear it Ben is --

23  these folks can't work any harder.  They are working

24  seven days a week.  They are working 24 hours a day.

25  However, maybe it is a question, and it is none of my

1   business, but if the plaintiffs are required to do

2   something we're all going to work together, any

3   deposition dates that are given we will have somebody

4   available, so we're always going to be ready.  If Merck

5   is too busy for whatever reason the simple answer would

6   be just hire more people, just hire another law firm.

7   I never understand why their busyness should impede the

8   litigation.  We're always available at any time.

9       MR. COHEN:  And we notice deposition, and you

10  say you don't have staffing.

11      MS. SULLIVAN:  We heard you didn't have staff

12  to cover depositions.  I mean, everybody is working

13  hard.  You know, we are an army.

14      MR. FERRARA:  Hire three more firms.

15      THE COURT:  Please don't hire three more

16  firms.  I'm just getting used to the firms we have.

17  Maybe we should send this request to Christy and make

18  her do it herself while she is preparing for Cona.

19      MS. SULLIVAN:  It would help, Your Honor --

20  they have the right to ex-parte these prescribers if

21  they would submit a letter or an affidavit to the

22  Court.  I have talked to the prescriber, and the

23  prescriber remembers these reps, and maybe it is only

24  three or four instead of 20, and we can start with

25  those.

1       MR. WEISS:  Can I make a suggestion?

2       MS. SULLIVAN:  Instead of producing files that

3   are going to be completely irrelevant to the litigation

4   because the prescriber doesn't remember half of these

5   people.

6       MR. WEISS:  What I propose we do, we all

7   receive the detail information, that is when the

8   prescribers were detailed, who was there and the little

9   "Re:" line what was discussed.  I propose that tomorrow

10  pick a time, we get on the phone, I will tell you, for

11  example, I want these four or five people out of the

12  box for Murchanian and then put them first and then we

13  can stagger the rest.

14      MS. SULLIVAN:  You talked to prescribers, you

15  know --

16      MR. WEISS:  Please let me finish.

17      MS. SULLIVAN:  I'm sorry.

18      MR. WEISS:  There are two issues with that.

19  There are -- some of the reps still work for Merck,

20  others do not, and I don't think you're going to -- I

21  don't know if you're representing all that don't.  What

22  we need to have is the last known address and contact

23  information for the nonemployed reps, and we'll try to

24  do it in a fair fashion, so I know there's five or six

25  people in the sweet spot for Hatch.  I know there are.

1  I just -- but I don't have the names committed to
2  memory, so tomorrow afternoon we can have a conference
3  call on all three firms to get involved.  We'll tell
4  you who we want to put up front, and you're going to
5  stagger the rest.
6      MS. SULLIVAN:  That makes sense.
7      MR. WEISS:  That makes more sense.
8      MR. BARNETT:  That's fine with me, Your Honor.
9      MR. WEISS:  That doesn't mean we're not going
10 to get the rest.  That doesn't mean we won't get the
11 rest in February because we really have to get cracking
12 on this stuff.  Ben, does that sound okay to you?
13     MR. BUCHANAN:  My issue is I don't know how
14 many I have yet.  I'm counting as we're talking for
15 McFarland, but if we have 13 reps, and we identify five
16 as being the ones we want to target let's find a very
17 aggressive time frame to meet for those first five,
18 give us the maximum opportunity to get that discovery
19 out of the way prior to the time of the prescribers and
20 everything, so I'm thinking the first week to 10 days
21 of February to get -- we'll each go down our list,
22 you'll be basically producing for 15 rather than 40.
23     MR. BARNETT:  If you are selective in
24 identifying -- it is -- there's going to be a tension
25 between your selection and the aggressiveness of the

109

1  will be by February 1st.
2      MS. SULLIVAN:  Problem solved.
3      MR. DASSOW:  I'm sorry?
4      MR. COHEN:  You'll get nine of 13 by February
5  1st because they're due.  So you're in really good
6  shape.
7      THE COURT:  And there's four left, so that's
8  not too much of a problem.  Now we have to get your
9  list.  Sol, can you get your list faxed over.
10     MR. COHEN:  Sol has no overlap.  There's no
11 overlap.
12     MR. WEISS:  We sent an e-mail, but Greg is
13 going to call.
14     MR. BUCHANAN:  Actually, Charlie, Cona is from
15 the same area as McFarland.
16     MR. WEISS:  We're the only one that doesn't
17 have overlap because we're north of everybody else.
18     MR. COHEN:  And of the four that are -- we
19 don't yet have the LoPresti people two or maybe more
20 are McFarland and LoPresti, so they're the same folks.
21     MR. DASSOW:  So you have zero Fagan, Elias,
22 zero, Stefan and Holloway are zero, so that means you
23 don't have them?
24     MR. COHEN:  Those are nonduplicative.
25     MR. DASSOW:  What would you like for us to get

111

1  schedule.  The more you can identify that these are
2  like the two key reps based on the facts data that we
3  want first then we can be much more aggressive in the
4  time, and, obviously, reserving the right to get the
5  productions.
6      MR. WEISS:  Let me just tell you the problem
7  with that, Ben.  I'll give you a date, April 15th,
8  2002, when you had the label change, that month you had
9  four or five different reps come into Dr. Murchanian's
10 office and speak.  Same thing happened around the
11 publication of the New England Journal of Medicine
12 VIGOR results in October/November of 2000.  You had
13 four, five different reps come in and detail him on
14 that day or that week, as a matter of fact.  We have
15 it.  Charlie produced the stuff.  So it is just not
16 two.  There are four or five people that we really need
17 to get.
18     MR. BARNETT:  I'm not suggesting -- all I'm
19 saying is I'm trying to link what you said with what
20 Dave said.  If you can be more selective and who it is
21 you want immediately it is going to allow us to produce
22 them more quickly.  I'm not trying to tie to you a
23 limited number.
24     THE COURT:  What do you have?
25     MR. COHEN:  Nine of the 13 LoPresti people

110

1  the ball rolling on depo dates?  Do you want me to give
2  you five out of the box to get the first depo dates?
3      MS. SULLIVAN:  In terms of your plaintiff and
4  the treaters?  I'm sorry.  You're talking about sales
5  reps?  I'll sorry.
6      MR. DASSOW:  I know what you want, Diane.
7      THE COURT:  They're entitled to plaintiffs.
8      MR. DASSOW:  I agree with you.
9      THE COURT:  I'm pretty sure they're still
10 allowed to take those.
11     MS. SULLIVAN:  Thank you, Judge.
12     MR. BUCHANAN:  I'm creating it.  I'm going
13 through my spread sheet, and I didn't have them
14 organized that way.
15     MR. COHEN:  We're talking about databases.  My
16 way is not set up in a good way to sort.
17     MR. MAYER:  I, unfortunately, have to go.
18     MR. SEEGER:  You have to stay.
19     MR. WEISS:  Ted --
20     THE COURT:  Ted, what do you want to do --
21 let's go off the record for a minute.
22     (Discussion off the record.)
23     THE COURT:  We're back on the record.  We have
24 agreed that we already did this on the record before
25 the dates were already on the record, we're just

112

1    confirming that they're right.  By Tuesday you're going

2    to get back to me on the issue of Merck paying for

3    counsel fees for third-party resistance to subpoenas.

4        MR. MAYER:  Which, Judge, I'm not accepting

5    that characterization.

6        THE COURT:  Which may not even exist.

7        MR. MAYER:  Absolutely not.

8        THE COURT:  Not paying for resisting, paying

9    for counsel to respond.  Okay.

10       MR. MAYER:  The loose end was whether Mr.

11   Lanier had questioned Mr. Mixon yesterday, and I have

12   reconfirmed that he did so.

13       THE COURT:  He did?

14       MR. BUCHANAN:  He did.

15       THE COURT:  Well, he shouldn't have done that.

16       MR. BUCHANAN:  I have an e-mail in him to

17   let --

18       THE COURT:  We talked about this yesterday.

19   It should have been presented to me that he was going

20   to do that because it was represented to me that New

21   Jersey counsel had no ability to get there and that New

22   Jersey counsel had no time to prepare for it.

23       MR. WEISS:  That's correct, Your Honor.

24       THE COURT:  And it wasn't going to count in

25   New Jersey.  So I gave you what you wanted, and then to

1    go use the dep anyway doesn't really -- is somewhat

2    troublesome to me.

3        MR. SEEGER:  Does he count for New Jersey?

4    Isn't he Texas?

5        THE COURT:  Well, I think he is trying to wear

6    two hats, but I think --

7        MR. SEEGER:  The truth is the position of the

8    group was what conveyed to you so --

9        MR. BUCHANAN:  Our position was we want

10   documents before we examine Dr. Mixon.  That's our

11   position.

12       MR. WEISS:  And I do apologize, Your Honor.  I

13   had no idea he was going out there.  It was requested

14   that I file the papers.  I did.  We had a conference

15   call in New Jersey, and we all agreed that we couldn't

16   staff it, we couldn't get the documents in time, and we

17   were not going to be bound by it, and that's what we

18   asked you to you, and I apologize to what Mr. Lanier

19   did, and I apologize.

20       On December 5th, 2005 I e-mailed a letter to

21   Hope Freiwald listing all the detail people that came

22   to Dr. Murchanian's office and ask that we have

23   deposition dates for them.  I can tell some of the

24   people on this list who are in the sweet spot.  I can't

25   tell them all.  I would like to get back to you

1    tomorrow, Ben.

2        THE COURT:  How many people do you have?

3        MR. WEISS:  I think there's 13.  There's 13.

4        MR. SEEGER:  Maybe they have them in the cue.

5        THE COURT:  He thinks he has none.

6        MR. BARNETT:  He is looking --

7        THE COURT:  I thinks he has some of yours.

8    Hand this over to Charlie so he can double check.

9        MR. SPIZER:  Our client was probably in a

10   different territory.  We're in Point Pleasant, which

11   is -- and these are all Mount Laurel.

12       MR. WEISS:  And I didn't push them because I

13   wanted to get the Cona and McDarby stuff out first.

14       MR. BARNETT:  We appreciate your

15   consideration.

16       THE COURT:  Very kind of them to worry about

17   you.

18       MR. BARNETT:  I'll pass it along to the folks.

19       (Discussion off the record.)

20       MR. COHEN:  There are seven McFarland folks

21   being produced on or before February 1st.

22       MR. BUCHANAN:  We have 21 reps.

23       (Discussion off the record.)

24       MR. WEISS:  On the 8th of December I wrote

25   Hope an e-mail, again, a letter, e-mail to her saying

1    we want the personnel files of those 13 people.

2        THE COURT:  All right.  Okay.  Let's talk

3    about now what the final resolution of this can be.  It

4    would seem to me that at this point we know that by

5    February 1st you're getting almost all your sales reps,

6    but for four.  They're going to be getting seven out of

7    21, and you're going to be getting -- we don't know

8    yet -- but probably none.  So at this point I would

9    think, Sol, you should have the opportunity to pick

10   five of your people that you want or let's say six of

11   your people that you want.

12       All right.  So we're going to let Sol pick six

13   people that he wants first.  We're going to let --

14   we're going to let David look at his.  The problem is

15   you have got seven of his, but they may not be the

16   seven he wants.  We don't know.

17       MR. SEEGER:  Chances are.

18       MR. BARNETT:  Let me think.

19       (Discussion off the record.)

20       THE COURT:  All right.  So we're going to say

21   Sol is going to pick six and David is going to pick

22   five and --

23       MS. DASSOW:  I gave them seven.

24       THE COURT:  Seven more.  I'm talking about

25   production.  Your production should probably be okay

1  for the 1st.  You're not going to get any more
2  production so by February -- David is whispering seven.
3       MR. SEEGER:  I was holding up two fingers.
4       THE COURT:  By February 7th can you produce 10
5  sales reps or will it be 11?
6       MS. YANNELLA:  What is the date.
7       THE COURT:  Let's say by February 10th on a
8  rolling basis with February 10th being your goal you're
9  going to produce five for David and six for Sol and
10  before the end of February you're going to produce all
11  the records.
12       MR. BARNETT:  Can I step out for one second?
13       THE COURT:  Go ahead.
14       MR. SEEGER:  For the seven you have in the cue
15  for us we'll get those.
16       THE COURT:  The cue is coming by February 1st.
17       MR. BUCHANAN:  Can I -- Charlie, can I make
18  one request of the -- the productions that you have
19  already made, will you make a copy of the productions
20  that you have provided to the individual plaintiffs'
21  firms so we can consolidate them with liaison counsel?
22  I think they have been individually produced to the
23  lawyers in their trial cases, but given that you have
24  produced them and they may be genuinely applicable to
25  other New Jersey cases I would like to make sure we get

1  a copy of the sales rep materials for the general
2  database.
3       MR. BARNETT:  Charlie can do that.  If I can
4  just step out a second.
5       THE COURT:  Sure.
6       MR. PETIT:  Jim Petit.  I'm just being very
7  quiet so everybody gets their notices in their
8  depositions for the earlier cases, but I have a March
9  24th fact deadline.  I think I have 11 sales reps, and
10  I have two docs, so if we can start thinking about the
11  end of February maybe.
12       MR. WEISS:  If you have the same docs that
13  everybody else has you should get them.
14       MR. DASSOW:  Whatever docs you have
15  overlapping you should get.
16       MR. WEISS:  The overlapping --
17       MS. YANNELLA:  If they're overlapping that's
18  true.
19       THE COURT:  Your trial date is June?
20       MR. PETIT:  Yes.
21       MR. COHEN:  You have -- Ben is not here.  Ben
22  is here, but you have to let him get the stuff.  It is
23  going to be --
24       THE COURT:  Guess what, I'm not going to make
25  you do his stuff in February.

1       MR. BARNETT:  Thank you.  Thank you very much.
2       THE COURT:  You have to work out with him in
3  March when you'll produce them.
4       MR. WEISS:  But if he has the same reps as
5  LoPresti --
6       MR. BARNETT:  If there's overlap.
7       THE COURT:  If there's any overlaps between
8  any reps they will be produced as soon as they're
9  produced, so, Mr. Petit, you'll get your -- you know,
10  you'll get -- hopefully you'll get a lot of your sales
11  reps.  If not, you'll get them in early March.  Okay?
12       MR. BUCHANAN:  Okay in terms of -- I'm sorry?
13       THE COURT:  Everything is okay now in the
14  production checks.  Then we have to deal with deps of
15  sales reps, deps of plaintiffs and everybody has a fact
16  cutoff date, right, which is what?
17       MR. WEISS:  End of February, I thought, am I
18  right?
19       MR. SPIZER:  I don't know if this was ever
20  signed.
21       MS. YANNELLA:  March 3rd.
22       THE COURT:  Do you have a signed order?
23       MS. YANNELLA:  I don't think it was signed.
24       MS. SULLIVAN:  This one, Your Honor, for some
25  reason the February and June trial cases have briefing

1  schedules, and the proposed one for April I'm not sure
2  why David --
3       MR. WEISS:  Because we decided not to do it.
4       MS. SULLIVAN:  You don't like briefs?
5       MR. WEISS:  No.  Because it was in between,
6  and let's see how far we got, and we were going to
7  revisit another day the briefing schedule.  That was
8  Hope's idea.
9       MR. BUCHANAN:  It was a mutual idea.  We
10  figured as we approached, and in light of what happens
11  in February we'll be informed about what motions need
12  to be made, and we can talk to the Court about what
13  works for the Court.
14       MS. SULLIVAN:  That's fine.
15       THE COURT:  As few as possible is my
16  preference.
17       MR. BUCHANAN:  We heard you, and we agree.
18       MS. YANNELLA:  Your Honor, one problem with
19  the April scheduling order I just noticed it, is
20  there's a paper discovery cutoff of February 7th.  We
21  just got interrogatories and requests for production in
22  like last week, and the date would be well after that
23  if we get the full time.
24       MR. BUCHANAN:  The paper discovery cutoff is
25  flexible in our eyes.

1      MR. WEISS:  Right.

2      THE COURT:  So change that number.

3      MR. WEISS:  You're not going to give us up all

4  the reps until the end of February.

5      THE COURT:  You have until March 1st for paper

6  discovery.

7      MR. WEISS:  The Court has ordered it.  Now,

8  obviously, we can't finish all the fact depositions by

9  March 3rd.

10      MS. SULLIVAN:  We can do nonprescriber

11  treaters and we can do plaintiffs that don't work in

12  the prescriber's office.

13      MR. WEISS:  You can get anything you want,

14  except for Patricia Hatch because she is in the office.

15      MR. BUCHANAN:  We're going to work with you on

16  scheduling.

17      MR. WEISS:  We can't take all the reps

18  depositions by March 3rd.  I'm not going to have the

19  files until the end of February.

20      THE COURT:  You're going to take a rep's dep

21  when you get that file.  You can't wait for all the

22  reps' files.

23      MR. DASSOW:  We'll get them right away.

24      THE COURT:  You're not going to take every

25  rep, are you?

1      MR. WEISS:  No.

2      MR. SPIZER:  If I can, Your Honor.

3      MR. BUCHANAN:  15 out of 21.

4      MR. SPIZER:  I know there's deps in our cases

5  Tortolla for example, which I think are probably going

6  to get teed up the first few weeks of March, and I know

7  it is already going to extend beyond that, but we'll

8  work out an agreement.

9      MR. WEISS:  We're agreeable, as Your Honor

10  knows, to work it out with Merck and hues had you been

11  and read about extending the deadlines so everything

12  gets done in time at the end of the day, but they asked

13  for commissions for all the witnesses in the police

14  reports in Tortolla.  We're not going to oppose it.

15  Good luck finding these people.  We found some, but

16  they want to take those deps, I think the first week in

17  March.

18      THE COURT:  Who is Tortolla?

19      MR. BUCHANAN:  British Virgin Islands.

20      MR. WEISS:  Stephen Hatch died surfing.  He

21  had a heart attack on the beach.

22      MR. BUCHANAN:  I think they would like Your

23  Honor to go down and mediate those depositions.

24      MR. SPIZER:  We're concerned --

25      MR. BUCHANAN:  Regina will be the court

1  reporter, of course.

2      MR. SPIZER:  I think that's March 6th or 10th.

3  Some of the people are amenable to coming up here, and

4  they'll come up here for deps, but, for example, the

5  police department is not going to come up here.  The

6  man who tried to resuscitate the decedent is not coming

7  up here.  A guy who called 911 or whatever the

8  equivalent is down there, he is not coming up here.

9      THE COURT:  So you're going to be going down

10  there to take deps of all the people.

11      MR. WEISS:  If they want to take them.

12      MR. SPIZER:  Commissions were put before you

13  at the beginning of this week, and we haven't objected.

14  Which depositions will be actually taken is I think to

15  be decided.

16      MR. WEISS:  There are signed statements that

17  the police did independent of before lawyers were ever

18  involved, and maybe we can work out something about it.

19  Maybe we can't.  If they want to take the deps we're

20  not going to stop them.  We think it is a waste of

21  time, but so be it.

22      MS. SULLIVAN:  Sol, you can work with Joe

23  Hedrick in my office about the schedule.

24      MR. WEISS:  Yes.  We know we have -- we'll get

25  it done.  And since Mr. Hatch died there are not a lot

1  of treater deps.  There are none.  It is just a

2  prescriber dep.  Other doctors they may want to ask

3  questions, but no other physician prescribed

4  painkillers to him.

5      THE COURT:  Okay.  What else do you want to do

6  today to get accomplished to help you get ready for the

7  April and June trial?  Are you telling me you don't

8  want an order with specific dep dates, that you're

9  going to work those out?

10      MR. WEISS:  There was an order that we're

11  working on even though you didn't sign it, and I think

12  we'll in good faith try to keep up with this order.

13      THE COURT:  Give me the order, and we're going

14  to change the paper discovery to March 1st.  Is there

15  anything else in that order that people aren't happy

16  with?

17      MS. SULLIVAN:  We need a briefing schedule.

18      MR. DASSOW:  If we could on the one that

19  Charlie is giving us February 1st and our priority that

20  we gave Michelle, if we can have dates on those deps

21  that would be great.

22      MS. SULLIVAN:  On which deps?

23      MR. DASSOW:  I gave Michelle the first.

24      THE COURT:  And how many of those do you

25  already have files?  And they're going to have all

1    those files by February 1st?

2        MR. SULLIVAN:  Shouldn't you look at the files

3    to see who you want to depose?

4        MR. DASSOW:  I don't think I need to do that.

5        THE COURT:  You're taking all five of them.

6        MR. DASSOW:  In fairness to Charlie the ones

7    he is producing are the overlap cases, so the ones I

8    asked for the first four he is going to produce to me

9    on February 1st, so we can tee those deps up right

10   away, and those are priority deps.  That's what we just

11   did.

12       THE COURT:  All right.  So those deps should

13   be taken almost the first week -- you're going to need

14   time to review them.

15       MR. COHEN:  Some of them.

16       MR. DASSOW:  We need to look at the files.

17       MR. COHEN:  The Cona folks haven't taken any

18   deps yet, even though we have given a whole bunch of

19   files they're trying to decide who they want and when,

20   and so if they -- if they tell me a schedule that works

21   and I make these folks available I'm just going to ask

22   for some cooperation because if they say I need these

23   people on Wednesday and I can do it I have to do it for

24   Cona.

25       MR. DASSOW:  If we say the second week of

---

1    February they're going to happen in the order we'll

2    work with that because that will give us enough time to

3    review --

4        THE COURT:  Why don't we do this, why don't we

5    say if you're positive that you're going to take those

6    five, let's say those five should be produced the

7    second week in February, and if there's any -- and if

8    anybody from Cona wants to attend they'll be required

9    to take them on the same day.

10       MS. SULLIVAN:  Your Honor, given the issues

11   sometimes with individual schedules it looks like the

12   fact discovery deadline is early in March.  Can we just

13   order that all of them have to be to know done by the

14   end of fact discovery, rather than saying I have these

15   two this weeks and this other three --

16       THE COURT:  She is concerned that we're

17   locking in five deps for a week when she doesn't know

18   they're available.

19       MS. SULLIVAN:  How about the end of fact

20   discovery?

21       MR. FERRARA:  Just say fist and second week of

22   February.

23       THE COURT:  I think if you can get five reps

24   taken -- this is my sneaky suspicion -- maybe nobody

25   else will have to be taken, maybe you can move on.

---

1        MR. DASSOW:  Well --

2        MR. COHEN:  Are you guys telling me you're

3    available any day in the first two weeks of February?

4        MR. COHEN:  I don't think we'll have a

5    problem.  If you're available any day --

6        MR. SEEGER:  But hold on.  The only problem is

7    in fairness to the guys coming up February 27th you

8    can't have the April guys moving -- scheduling their

9    depositions since they have the heat on them right now,

10   so why don't we check with the Lanier people and sync

11   it up.

12       MR. COHEN:  They have to go first.

13       MR. SEEGER:  They're getting ready for trial.

14       THE COURT:  If they have somebody they want to

15   bump in ahead --

16       MR. DASSOW:  We'll take a back seat to them.

17       MR. COHEN:  If I schedule them I'll send it to

18   the Lanier folks, and they can tell me yes or no.

19       THE COURT:  It should be five rep deps taken

20   in the first two weeks of February.  You guys can work

21   out with Charlie who those are going to be, and they

22   can include Cona deps, hopefully some crossover deps,

23   maybe one where you have the same as a couple where you

24   have the same as Cona, so everybody can have a chance

25   to ask about their doctors and Sol is going to have to

---

1    throw in one of his.  Let's say six sales rep deps

2    within the first two weeks.  That gives two to each of

3    you and none to Cona --

4        MR. DASSOW:  We'll get to Cona and McDarby

5    lawyers on our cross-overs.  I'll get them, you know,

6    we're getting them, as well.  We want to pony them up,

7    and they can tell us.

8        THE COURT:  And, you know, June counsel should

9    do the same.  I think that if you can -- you shouldn't

10   add in any of your own at this point, obviously, but if

11   you look for somebody who is a treater for you that you

12   want they're going to be giving you the files at the

13   same time.  Let's not make these sales reps come back.

14   Let's get their deps, okay?

15       MR. DASSOW:  Your Honor, can you put the

16   ones --

17       THE COURT:  I'm certainly hoping that

18   eventually we won't have to depose sales reps.  Well,

19   that's not going to happen because we have across the

20   country sales reps.  At least maybe for New Jersey we

21   will have taken enough Jersey reps.  Eventually we'll

22   take enough reps period that we don't have to take them

23   anymore.

24       MR. DASSOW:  I want to for the record it will

25   be Tim O'Connor, Allison O'Connor, Jacklyn Harley,

1    Jeanette Holloway and we have asked for Joseph Fagan.

2    THE COURT:  All of those would be Cona

3    cross-overs.

4    MR. DASSOW:  Those should be -- I don't

5    think --

6    MR. BUCHANAN:  The names again?

7    MR. DASSOW:  Tim O'Connor, Allison O'Connor.

8    Jacklyn Harley, Jeanette Holloway and Joseph Fagan.

9    MS. YEARY:  Fagan is not a cross-over.

10    MR. DASSOW:  That's right.

11    MR. BUCHANAN:  Four of the five were on the

12    list of the detailers who detailed Mr. McFarland's

13    prescribing physician.

14    THE COURT:  That's good.  So we can start with

15    four that are on for three, and Soi is going to pick at

16    least one of his detailers that he wants to depose.

17    Maybe you'll get two.

18    MR. BUCHANAN:  I need to make sure that what

19    they say are priority detailers --

20    THE COURT:  Other deps have to be scheduled

21    even if you have to start -- I'm hoping you can will

22    schedule two and three a day.  Obviously, this doesn't

23    mean that's all you're limited to in the first two

24    weeks.  If we can get more in we'll get more in.

25    Plaintiffs are all going to be deposed by when?  You're

1    saying your plaintiff can't be deposed, your rep can't

2    be deposed until after March 1st because that gives you

3    March 2nd or 3rd to have her dep taken.

4    MR. WEISS:  Here is what we do.  We

5    tentatively penciled in February 10th.  I want to see

6    what production we get in production for that.  You can

7    get Patricia Hatch when we look at the stuff.

8    Everybody else is fair game any time they want them.  I

9    have been working with Joe or Hope or Diane, whoever it

10    is.  We got lawyers to cover the depositions, not a

11    problem.

12    THE COURT:  Okay.  Any other issues with any

13    other plaintiffs or treaters?  They're going to be made

14    available for the defendants during February or

15    whenever they can take them?

16    Okay.

17    MR. WEISS:  And there's one prescriber for

18    Mercurian.  It is all samples.

19    MS. SULLIVAN:  There will be treaters, not

20    prescriber treaters.

21    MR. WEISS:  Not for his heart attack; he died.

22    MS. SULLIVAN:  But he had primary care

23    doctors.

24    MR. WEISS:  That's Murchanian, his primary

25    care doctor.

1    THE COURT:  Did he have a cardiologist before

2    his heart attack?

3    MR. WEISS:  No, he had no heart problems.  He

4    had some orthopedic problems, so had a chiropractor.

5    Had he a surgery for his back 25 years ago.  He busted

6    his ankle when he was working, and they want to take

7    those depositions, well, that had nothing to do with

8    VIOXX.  I think all this stuff occurred before he even

9    started VIOXX.

10    (Discussion off the record.)

11    MR. BUCHANAN:  Your Honor, one other thing

12    about sales reps we would like the identity of whoever

13    the regional business group managers or supervisors

14    were for the regions.  I don't know if it is one region

15    or more than one region for the sales reps and a

16    custodial production for that person or persons if it

17    is more than one person.

18    MR. BARNETT:  I shouldn't have left the room.

19    You want -- this is in addition to everything else

20    we're trying to do as far as the custodial files?

21    MR. BUCHANAN:  Unless you're telling me that

22    one of these people is the supervisor for the region.

23    If that's true then it is not an issue.  I want to make

24    sure we were going to get the person who was in charge

25    of this particular business group.  What are they

1    called RBG's or regional business groups?

2    MS. YANNELLA:  Yes.

3    MR. BUCHANAN:  We want to make sure we get the

4    RBG head.

5    THE COURT:  It is just one more file.

6    MR. BUCHANAN:  What are we talking about one

7    more file?

8    MS. YANNELLA:  That would take a couple

9    months, I would think.

10    MR. COHEN:  The top of the whole.

11    MR. BUCHANAN:  Who is in between the

12    detailers.

13    MR. COHEN:  Above the detailers is a business

14    manager who has six or seven reps.  The top of the RBG

15    is a person who reports into a vice-presidential level.

16    MR. BUCHANAN:  Can you tell us who the folks

17    are and we can pick to people who seem to be most

18    relevant to us?

19    THE COURT:  Is there somebody that would be in

20    charge of the sales force in New Jersey or would it be

21    more a sales force for the northeast?

22    MR. COHEN:  Believe it or not -- can we go off

23    the record?

24    THE COURT:  Go off the record.

25    (Discussion off the record.)

1       THE COURT:  Check and see who would be the
2  person who is the most close to being a New Jersey
3  person, is that what you want?
4       MR. BUCHANAN:  New Jersey supervisor.  I don't
5  know how the regions are divided.  New Jersey may be
6  subdivide into the Philadelphia region and the New York
7  region.
8       MR. COHEN:  The regions are multi states, so
9  it is like Atlantic or something like that.
10      MR. WEISS:  I think it is mid Atlantic.
11      MR. BUCHANAN:  Can we have a call tomorrow to
12 discuss what hierarchy there is there, and we'll
13 identify the small number hopefully one.
14      MR. COHEN:  Actually, I can figure it out.
15      MR. WEISS:  Okay.
16      MR. DASSOW:  We'll, obviously, be asking for
17 an organizational chart somewhere along the line, I
18 would guess, would probably be helpful.
19      MS. YANNELLA:  Didn't we produce those?
20      MR. BUCHANAN:  Not for the sales force, I
21 don't believe you produced it for the sales force.
22 Look, there's a lot of paper, guys.  Maybe you did but
23 you produced --
24      MS. YANNELLA:  There is.
25      MR. BUCHANAN:  There is, but in the --

1       THE COURT:  Anything that has been produced
2  you'll send them right away, so they can start plowing
3  through the pages.
4       MR. BUCHANAN:  And as a general matter with
5  the prospective productions of sales reps send a copy
6  to liaison counsel.
7       MR. WEISS:  That's me.  I'll get them then
8  I'll get them to you.
9       MR. BUCHANAN:  That's fine.
10      MR. WEISS:  Send them to my office in Philly.
11      MR. BUCHANAN:  The courtesy copy to liaison
12 counsel, and then he will get them to me.
13      THE COURT:  All right.  Anything else that we
14 need to address on fact discovery?  I'm going to sign
15 the pretrial order for the April 24th cases.  The close
16 of expert discovery is April 14th.  The trial begins
17 April 24th.  Obviously, I would assume in limine
18 motions -- I pointed out to Christy just so that she
19 would know, and I'm just going to repeat it for you,
20 Diane, that there's no -- if you don't make a summary
21 judgment motion it doesn't preclude you in any way from
22 any appellate issue that I know of.  In other words, it
23 is not like if you don't make one you can't make one at
24 the end of the plaintiff's case.
25      MR. WEISS:  Your Honor the --

1       THE COURT:  Could you look through everything
2  and see if you produced it?
3       MR. BARNETT:  After I look at the label.
4       MR. BUCHANAN:  They're in charge for the
5  region for the applicable time.
6       MR. SPIZER:  Are we able to get the sales reps
7  by February 10th?
8       MR. BARNETT:  I was waiting for a moment.  We
9  can do the five rep files to be identified tomorrow,
10 correct?  Five for McFarland, six for Hatch to be
11 identified tomorrow.  We'll produce those on February
12 10th.
13      MR. WEISS:  What time is the phone call?
14      MR. BARNETT:  Mid afternoon.
15      MR. SPIZER:  Are they on a rolling basis?
16      MR. BARNETT:  We always do things on a rolling
17 basis.
18      MR. SPIZER:  We might be able to get --
19      THE COURT:  Hopefully you'll roll out -- you
20 won't wait until February 1st necessarily to roll out
21 the -- you'll send them as soon as possible the ones
22 they already have?
23      MS. YANNELLA:  Some of the crossover probably
24 haven't been produced yet.  They're scheduled to be
25 produced.

1       THE COURT:  If you feel you have a meritorious
2  summary judgment, file it.  If you don't, please don't.
3       MR. WEISS:  The 24th of April, what day is
4  that?
5       MR. BUCHANAN:  Monday.
6       MR. WEISS:  I don't think it is a Monday.
7       THE COURT:  By meritorious I mean --
8       MS. SULLIVAN:  The only issue, Your Honor, is
9  the Daubert -- the preservation of the Daubert 702
10 motions there will probably be dispositive motions that
11 need to be filed.
12      THE COURT:  I wasn't talking about that.
13      MR. WEISS:  Can I start a request instead of
14 starting the 24th because I can have David can handle
15 it.  I have my daughter's bar mitzvah on the 29th.
16      THE COURT:  Is that a Friday?
17      MR. WEISS:  That's a Saturday.  Dave will be
18 there that day.  He will be there the whole trial, but
19 I'll have to take a day off.
20      THE COURT:  Wait a minute.  Wait a minute.
21 Okay.  So you have to take off for the bar mitzvah is
22 Saturday so you'll be off anyway.
23      MR. WEISS:  I'll take off the Friday, but Dave
24 will be there.  It will work out.
25      MR. BUCHANAN:  And for the people who weren't

1      here --

2              THE COURT:  Your wife is going to kill you.

3              MR. WEISS:  I'm in the dog house already.  But

4      she understands.  This is as important.

5              THE COURT:  Please don't say that.

6              MS. SULLIVAN:  Don't put that on the record.

7              (Discussion off the record.)

8              MR. BUCHANAN:  Your Honor, I know this is a

9      little remote right now in terms of timing, but you

10     indicated yesterday, I think, that in terms of how you

11     anticipate the first week going for the Cona/McDarby

12     trial is that you'll do jury selection day one then

13     you'll have the jury come in for the questionnaires on

14     the 24th, but you're going to have a day off on Tuesday

15     and then the actual jury selection will take place on

16     Wednesday.  So openings, presumably, would be scheduled

17     for Thursday of that week.  Just in terms of witness

18     lineups and things like that.  I wanted to make sure

19     you anticipated that extra day as being --

20             THE COURT:  I think that's probably the same

21     schedule we would be on.  The jury management people

22     have basically requested that they have a day so that

23     they can get the other juries picked for other judges,

24     instead of us going Monday and Tuesday and everybody

25     has to sit around until, you know, we have other civil

1      and Christy bargained up to 45, 40 and that didn't

2      include openings and closings and it didn't include

3      arguments if they're lengthy.

4              MR. BUCHANAN:  That's the proposal.

5              THE COURT:  Of course the arguments will be --

6              MR. WEISS:  It should include arguments.  If

7      they're lengthy arguments it will be included.

8              THE COURT:  They agreed that the ability to

9      include arguments in the person's time would be at the

10     discretion of the judge.

11             MR. WEISS:  Okay.  That's correct.

12             THE COURT:  I believe that was basically what

13     was talked about.

14             MR. SEEGER:  That sounds good to us.

15             THE COURT:  Is that how you recall it?

16             MS. YEARY:  I recall the same.

17             MS. SULLIVAN:  I like the idea of deferring as

18     to whether or not that precise model will be applied to

19     April and June, because there's an issue whether it

20     works to do it per witness certain hours or the whole

21     40, so it certainly makes sense to see how this one

22     goes and revisit it for the April and June trials.

23             THE COURT:  Okay.  Let's face it, everybody is

24     going to be -- we're going to do it, and it will be

25     close to when you're going to be doing yours, and if it

1      cases can be picked on Tuesday and then we can come

2      back.  Plus, you know, it gives you more time to look

3      at the jury forms, and it also gives them more time to

4      call people and tell them not to bother to come back.

5      The only thing we did talk about at the Cona was they

6      have agreed on a time limit for each side.

7              MR. SEEGER:  We want that, too.

8              THE COURT:  I don't know if you want to wait

9      until after the trial to see how it goes, and we can

10     talk about it briefly, but --

11             MR. SEEGER:  Both sides agreed to what was

12     proposed, the 40 and 45.

13             THE COURT:  Christy wanted to get back.  She

14     basically said it sounded good to her, but that she

15     wanted to reconfirm it because she hadn't really made

16     her witness list.

17             MS. YEARY:  We bumped up the witness list

18     exchange.  We're doing the good faith estimate witness

19     lists and the longer witness list so that both parties

20     can get a sense of how many witnesses they're looking

21     at so that the hour estimates could be more accurate.

22             THE COURT:  Both sides have agreed that there

23     will be a time allotted to both sides and that that's

24     the way they're going to do the trial.  The proposed

25     numbers right now I think Lanier's proposal was 45/35

1      turns out that plaintiffs or defense or both sides are

2      happy with it or both sides are uncomfortable with it

3      you can revisit it.  Just make sure you ask them

4      whether they're comfortable with it before the final

5      verdict comes in so they can give you -- because

6      afterwards your whole view of the trial tends to be

7      skewed one way or the other.

8              MR. FERRARA:  The April team isn't bound to

9      this 45/40.

10             THE COURT:  You're not even bound to the fact

11     that it is going to be timed.  I mean, I indicated that

12     I was going to put some restrictions on cases in order

13     to make them go faster.  I proposed that I was going to

14     limit witnesses to a certain number of hours per day

15     and that I was going to maybe limit the number of

16     witnesses.  Those are different things that could be

17     done.  It was the attorneys' response that they would

18     prefer to have a bank of time to use as they wanted to

19     use as much time on voir dire as they want, to use as

20     much time on direct as they want, to save some for

21     cross and just to decide how they want to put in their

22     case.

23             MR. FERRARA:  My only thinking is because we

24     have the burden of proof we should have -- whatever it

25     is it should be skewed in our favor.

1   MR. WEISS: It was.

2   MR. FERRARA: Not 45/40 but a bigger skew.

3   But you know what I think, Judge, as a suggestion --

4   THE COURT: I'll be surprised. We will see

5   how it goes. I would think if they grant a 45/40 split

6   the defense won't use their 40. I have never seen the

7   defense in any case use as much time as the plaintiffs

8   or use as much time as they have said they were going

9   to use in the beginning. I don't think I have ever

10  seen it, but, I mean, it didn't happen in Humeston, did

11  it?

12  MR. SEEGER: They want as long or longer.

13  MS. SULLIVAN: Not in our defense case.

14  MR. BUCHANAN: It is tough to compare. Our

15  case went in in 11 days. We had full days. We had a

16  lot of --

17  MS. SULLIVAN: We only put on two witnesses.

18  MR. SEEGER: Two witnesses?

19  MR. FERRARA: In moving --

20  (Discussion off the record.)

21  MR. FERRARA: What might be helpful in moving

22  things along is there may be a lot of facts on both

23  sides that are facts not in dispute under Rule 3 that

24  if we can agree on them we can eliminate a lot of

25  witnesses and a lot of evidence and maybe at some point

1   Your Honor can convene a little pow wow whether we just

2   work on that topic because Your Honor has been through

3   a trial. Chris has been through, Diane has been

4   through. We know what facts are not in dispute, so

5   maybe either side shouldn't have to prove them.

6   THE COURT: I absolutely agree. I think

7   that's very important, and I'm going to be more

8   inclined than I was in the first trial to when things

9   are proposed for stipulation to really probe whether or

10  not they need to be -- whether there's any legitimate

11  argument for them. Obviously, if there is then they

12  can't be stipulated to, but I think under the rule I

13  even have the power to determine whether or not, in

14  fact, there's a legitimate dispute.

15  I'm hoping -- I mean, the first trial nobody

16  wanted to for a multitude of reasons you're not going

17  to want to agree to things that you don't know how it

18  is going to play out, but it may be that hopefully

19  another two trials are taking place this month then

20  there's going to the Cona trial, so by time we get to

21  your trial hopefully everything is going to keep

22  getting shorter, I would think. People are going to

23  narrow their focuses.

24  MR. WEISS: There is the added advantage, Your

25  Honor, in that you selected 18-month use cases or

1   longer. My understanding and based on everything I

2   have read from Merck is that they agree that there's an

3   increased risk after 18 months.

4   MS. SULLIVAN: Come on, Sol.

5   MR. SEEGER: Can he get a stip from you on

6   that?

7   MS. SULLIVAN: Nope. We agreed the APPROVe

8   study shows --

9   MR. SEEGER: I said do you really think she is

10  going to give you a stip? I'm so glad this played out

11  the way I predicted.

12  MR. WEISS: Wise guy.

13  THE COURT: That's the kind of thing you

14  expect to get stipulated to?

15  MR. SEEGER: Judge, that is how I looked at

16  him. You go to damages at that point.

17  THE COURT: That's not the kind of thing I was

18  envisioning. I was envisioning more something like

19  here is the list of how many times, you know, sales

20  reps saw doctors or this is the list of how many -- and

21  just be able to tell the jury this is it and maybe mark

22  it in or have everybody agree that it is 115 without

23  having to go through a whole thing. Those are the kind

24  of things I was planning, not we agree that we're at

25  fault or --

1   MS. SULLIVAN: Let's just talk about the

2   money.

3   (Laughter.)

4   THE COURT: We agree that we're crazy or we

5   agree the plaintiff is a little greedy. I wasn't

6   planning on those.

7   MR. WEISS: All I'm saying is when we did all

8   the specific -- case-specific defense experts in

9   Kimmelman and Abdel-Malek they all said the same thing,

10  after 18 months, and your client didn't take the drug

11  that long.

12  MR. FERRARA: Sol's position isn't really that

13  unreasonable. There are Merck people who have stated

14  an omission by the party the facts what Sol just said.

15  So at some point we can tee that up as to whether or

16  not that's --

17  THE COURT: I haven't ruled out the fact that

18  you may want to file a motion to either demand for

19  admission or you may, in fact, want to demand for

20  admissions -- but you may want to, in fact, argue that

21  that position has been taken and whatever. But they're

22  not going to be stipulated to, number one.

23  MR. WEISS: That doesn't mean, by the way,

24  that that means that my client's death was caused by

25  VIOXX. It simply means that their position is --

1    MS. SULLIVAN:  That I'll stip that.

2    MR. WEISS:  If you would stipulate there's an

3  increase after 18 months but not in this guy's case

4  we'll live with that, and we'll prove that it was, and

5  that will take a lot out of the trial.

6    MS. SULLIVAN:  Just so the record is clear,

7  Your Honor, I disagree with Mr. Ferrara's

8  characterization of what the Merck witnesses have said

9  on the issues of increased risk.

10    THE COURT:  There was some testimony about

11  18 months.

12    MS. SULLIVAN:  In terms of what the APPROVe

13  study says.  In terms of what the APPROVe study says.

14    MR. BUCHANAN:  Some junior associate has that

15  assignment now.  You'll have to go find those

16  statements in press releases.

17    MR. COHEN:  It goes like this, there's a Greek

18  story as someone explained it to me, there are lots of

19  drugs that companies make that never make to it the

20  market.  There's one in particular where two studies in

21  the earlier phases showed it was tremendously

22  effective, and they went forward and commissioned nine

23  Phase III studies on the product.  They went and spent

24  all the money on it.  They came in, all nine studies

25  came back and said it wasn't effective.  So does that

1  mean if you stopped after the first two you would have

2  said this shows that it was effective.  After the next

3  nine come in you say it is not effective.  What does it

4  show?  It shows that some studies support the

5  hypothesis that it is effective.  I think that's what

6  the testimony was in Humeston.

7    THE COURT:  But APPROVe was the last study.

8    MR. SEEGER:  Your analogy just fell apart.

9    THE COURT:  You know what, Charlie, I thought

10  I read a press release that Merck's position is it

11  takes 33 months.

12    MR. BUCHANAN:  It is until it was

13  statistically significant.

14    THE COURT:  The bottom line is there's a legal

15  issue that may have to be raised or may not.  That's a

16  decision you're going to have to make as to whether it

17  is worth it or not or has a legitimate basis or not.

18  You have the transcripts.  You look back and see

19  whether it is supportable or not.  Merck's comfortable,

20  I think, with the fact that it is not -- that they have

21  never really made that concession, and you'll have to

22  look back and see if they really have made that

23  concession, and then we'll have to argue about whether

24  they're bound by it or not, which is another legal

25  issue.  But it is not going to be by stip.  That's

1  going to be by motion.  That I think would come in

2  between this April 14th and April 24th.

3    MR. BUCHANAN:  It would be a nice thing to

4  have resolved before the trial.

5    THE COURT:  Yes, I think it should be, and,

6  certainly, it is going to be a motion in limine as to

7  what plaintiffs can say defense has and hasn't said

8  previously and what things are going to be able to be

9  used.  It is definitely going to be an issue, I would

10  think.  I'm expecting to get some of that in Cona.  We

11  just haven't got their motions yet.

12    MR. DASSOW:  A deposition that is

13  case-specific for not only Cona/McDarby but all of our

14  cases, and there was a notice that Greg sent out for us

15  and everybody in the plaintiffs' side with trial dates

16  is the media rep for Merck, and that has to do with the

17  increased marketing, increased PR, increased TV/radio.

18    MR. WEISS:  That was done yesterday.

19    MR. DASSOW:  I know.

20    MR. WEISS:  The issue was raised yesterday

21  about the media buys before trials.

22    MR. FERRARA:  We want to confirm that our dep

23  is on here, it is February 6th.

24    MS. SULLIVAN:  No.

25    MR. COHEN:  Send a notice, and we'll object to

1  it.  Based on the discussions yesterday I don't think

2  that's going forward.

3    MR. DASSOW:  We know you're going to object to

4  it.  We fully understand that, but we want to get this

5  in front of the Court.

6    MR. WEISS:  It was raised yesterday.  The

7  notice was filed.  They'll file whatever they want in

8  response, but you heard Your Honor spent about

9  45 minutes on that yesterday.

10    MR. BUCHANAN:  It is an interest that is going

11  to have to be briefed and raised to the Court.

12    MR. DASSOW:  I wanted to raise it because we

13  were --

14    THE COURT:  The bottom line is I have

15  questions about whether there's anything that I can

16  either do about -- I'm sure there's nothing I can do

17  about it as far as if there is a problem, and I don't

18  even know if there is -- I have no way of knowing, but

19  your position was I would have to assume there is a

20  problem, unless you have the right to check and see if

21  there is.

22    MR. BUCHANAN:  Our understanding of the lay of

23  the land right now is that the defendant's position is

24  we're not entitled to the discovery.  It is our

25  position that we think it would be the only way for us

1  to make a proper application to the Court that there's
2  a problem is to get some discovery, so I think what we
3  need to do, and the Court's position is that you're not
4  sure whether we're entitled to the discovery or not or
5  whether there's anything you can do if we, in fact,
6  found the problem, so I think what we need to do now we
7  have a concrete issue, and we can bring it to your
8  attention on papers and we'll do it on papers.
9      MR. WEISS:  The notice was filed.
10     MR. DASSOW:  Perfect.
11     THE COURT:  All right.  Okay.  Anything else?
12     MS. YEARY:  We had listed each one of the
13  April and June cases in our agenda, and I think we
14  covered some of the items that were listed.  There were
15  one or two things in the June cases which we haven't
16  talked about that I thought now would be a good time to
17  raise.
18     MR. BUCHANAN:  We didn't talk -- you have one
19  issue for McFarland, I believe, that we didn't address?
20     MS. YEARY:  The Gloucester Police Department
21  deposition going after the files?
22     MR. BUCHANAN:  Right.  The one thing I think
23  the defense is seeking and we haven't been involved in
24  this with the Gloucester City Police Department, but we
25  understand that Mr. McFarland used to work for the

1  Gloucester City Police Department.  We understand that
2  they have tried to get his personnel records from the
3  police department.  There's been some difficulty, I
4  think, in obtaining them.
5      MS. YEARY:  A lot of the discussion has been
6  just because we seem to -- one story is we don't have
7  personnel records then we have disciplinary records,
8  but then there aren't any disciplinary records.  So it
9  has been a going back and forth process.
10     MR. SEEGER:  If you see a lot of letters in
11  there call me right away, please.
12     MR. BUCHANAN:  Actually, why don't you call
13  Cliff VanSyoc and ask him how to get records from the
14  police department.
15     I don't think that there's anything I can do
16  about that, other than if you're not getting a response
17  to a subpoena if have you sent a subpoena to them.
18     MS. YEARY:  We sent a subpoena.  They didn't
19  want to respond to the subpoena.  We asked if we got an
20  authorization would that move the process again.  We
21  got a signed authorization.  We sent a signed
22  authorization.  We still weren't getting anywhere.  We
23  went the route of actually noticing a deposition of
24  somebody who can tell you how do you maintain personnel
25  records of your employees so we know what to ask for

1  and how to get it, and I don't think we were asking for
2  any relief, unless you're objecting to that.
3      MR. BUCHANAN:  I don't, no.
4      THE COURT:  You might want to call the
5  Gloucester City counsel and ask if you could discuss
6  with him whether he would intervene.
7      MS. SULLIVAN:  That's a good idea.
8      THE COURT:  And see whether or not he would be
9  willing to, you know, look at it, look at the subpoena
10 and see if he sees any issues or get back to you that
11 you would rather avoid having to take a dep, if
12 possible.
13     MS. YEARY:  That's our goal was to avoid
14 taking the dep.
15     THE COURT:  If not, then you may have to take
16 the dep.
17     MR. BUCHANAN:  To be clear you were looking
18 for any physicals he had or anything that was medically
19 related, correct?
20     MS. YEARY:  His employment records.
21     MR. BUCHANAN:  Okay.  I thought it was
22 strictly his medical files and any physicals and other
23 things that he may have had through the police
24 department.
25     MS. SULLIVAN:  The standard of practice,

1  David, in all these is to get employment records, so I
2  can't imagine we're not doing it there.
3      MR. BUCHANAN:  I get your VIOXX-related
4  personnel files, that's what I get.
5      MS. SULLIVAN:  Because our people may not have
6  had stress-induced heart attacks that we're blaming on
7  VIOXX.
8      MR. BUCHANAN:  Is that the hook for all this?
9      MS. SULLIVAN:  We're entitled to look.
10     MR. BUCHANAN:  If it is his entire employment
11 file I would like to have it produced to the Court.
12     MS. YEARY:  By produced, you mean to the Court
13 for in camera review before we get it?
14     MR. BUCHANAN:  Yes.
15     THE COURT:  Does he still work for the police
16 department?
17     MR. BUCHANAN:  No, he retired three years ago.
18     MS. SULLIVAN:  But we have gotten employment
19 records.
20     MS. YEARY:  For just about everybody.
21     MS. SULLIVAN:  All these plaintiffs -- why is
22 this guy different?  Does he have a wage claim?
23     MR. BUCHANAN:  I thought what you were getting
24 is you were getting -- in fact, I thought what you were
25 looking for is his annual physicals and other medically

1  related information that would have been contained in
2  his police records.
3       MS. SULLIVAN:  It is more than that.  It is
4  what else may be in there that could be relevant to his
5  injury claim.
6       MR. BUCHANAN:  Then I prefer we have it turned
7  over to the Court to determine if there's anything
8  that's properly discoverable.
9       MS. YEARY:  What we have done in other
10  situations --
11       THE COURT:  As far as I'm concerned you're
12  entitled to the records, and you can proceed to get
13  them.  You can go and talk to your client, and if
14  there's some issue that you feel -- I mean, just to say
15  we don't want you to produce the employment records if
16  he tells you that there's something he is concerned
17  about he should know generally what records are kept.
18       MR. BUCHANAN:  I'm not aware of anything.
19       THE COURT:  But, quite frankly, if they want
20  to know if he was disciplined or suspended for
21  firing his gun 10 times it may not be admissible in
22  court, but I think they're entitled to know it.  If he
23  was investigated for drug abuse it may not be
24  admissible in court, but they're entitled to know it.
25  If he got merit raises and awards they're entitled to

1  know it.
2       MR. BUCHANAN:  Fair enough, Your Honor.
3       THE COURT:  You know, it is very difficult to
4  get police disciplinary records.  It is probably
5  different than the personnel file, but just do whatever
6  you want to do.  You're entitled to get it.  I'm not
7  going to let it be blocked, unless -- you're going to
8  have to give me a better reason than just I don't
9  really intend to slow the process up by looking at it
10  first.  They're entitled to it.
11       MR. BUCHANAN:  The one thing I would say then
12  is --
13       THE COURT:  Then there will be an issue as to
14  what's admissible.  And if you tell me there's some
15  reason -- talk to your guy and he has something that he
16  thinks is -- shouldn't be discoverable, and he really
17  feels that an in camera review is necessary I'll do an
18  in camera review, but it shouldn't be done just because
19  you don't want them to have the employment records
20  because they're 99 percent they should be entitled to
21  it.
22       MR. BUCHANAN:  It sounds like were you to
23  conduct that review absent some concrete concern they
24  would be turned over, so I'll talk to client and find
25  out if there is anything to be a concrete concern.  I

1  would say with the personnel files we want them
2  produced confidentially.  I don't want to have a
3  situation --
4       MS. SULLIVAN:  You want a protective order?
5  Yes.  No, that's fine.
6       MR. BUCHANAN:  Without having seen anything
7  and knowing what is in it --
8       THE COURT:  It doesn't matter what is in it it
9  shouldn't be exposed.
10       MR. BUCHANAN:  I don't want it attached to a
11  motion.
12       MR. COHEN:  All my personnel files get sent
13  confidential --
14       MR. BUCHANAN:  I'm thinking about the summary
15  judgment motions sometimes it gets attached we don't
16  want to have a situation --
17       THE COURT:  If you intend to put anything in
18  that comes from his personnel file notify counsel
19  before you do it.
20       MS. YEARY:  We discussed the issue that we
21  were going to raise in Hatch.  With respect to LoPresti
22  we had some issues that were raised.  I have heard back
23  from others in my office that I think everything we
24  asked for has now been produced, so we are caught up on
25  LoPresti.

1       With respect to Doherty the plaintiff
2  identified a Lawrence Clinic as one of the places it
3  received primary care.  We have been asking for
4  two months for an address because we can't find the
5  clinic, and we can't find an address.
6       MR. PETIT:  That's mine.  Mrs. Doherty doesn't
7  know the address.
8       THE COURT:  Does she have a town?
9       MR. PETIT:  Mr. Galpern asked her.
10       THE COURT:  Is Mrs. Doherty the patient
11  plaintiff?
12       MR. PETIT:  Yes.  She thinks it might be an
13  OB/GYN she had a long time ago, and she just cannot
14  place it.
15       MS. YEARY:  If there's anything to give us a
16  town it would help us.  We can narrow it down just
17  beyond --
18       THE COURT:  If she doesn't recall it she can
19  give a certification -- within two weeks you should
20  provide them with either, you know, a general location
21  or where it was or a certification from your client
22  stating that she doesn't remember it at all or she
23  vaguely remembers the name, but she doesn't even know
24  -- she doesn't recall it.  Okay.  Anything else?
25       MS. YEARY:  The last case is the Klug case,

```
 1   and in Klug we have been asking for some information
 2   relating to his claims of economic loss.  There's a
 3   claim that he has had an inability to operate a summer
 4   business, an inability to develop a residential
 5   property and he dropped out of a Ph.D. program.  We
 6   have been told that we'll get the records on the summer
 7   business and the residential property in 30 days.  We
 8   have been asking again for two months, and we're
 9   wondering why we need to wait another 30 days for his
10   own business records.
11       MR. PETIT:  Your Honor, we don't object to it.
12   We don't have a problem with it.  We're having a
13   disconnect with our client on this one issue because of
14   those documents, and we think two weeks will probably
15   do it.  Probably 30 days is a little too generous to
16   us, but probably two weeks.
17       THE COURT:  All right.  Within two weeks you
18   provide it or withdraw the claim, one of the two.
19       MS. YEARY:  With respect to the Ph.D. program
20   we asked about this, it was listed in his facts sheet.
21   We were told that he had to transfer to a different
22   Ph.D. program because he couldn't travel.  We're still
23   confused as to whether that's something that's actually
24   being pursued or not as related to his MI.
25       MR. PETIT:  Well, it is being pursued, but it
```

```
 1   is the same problem we're having whether there's
 2   documentation, which is what your request was.  The
 3   answer is it is being pursued, but whether he is going
 4   to be able to give us documentation of why he dropped
 5   out of the Ph.D. program is a different question, so
 6   we'll have that in two weeks.
 7       THE COURT:  Okay.
 8       MS. YEARY:  And the same thing for the facts
 9   sheet in Klug identified nameless friends and family as
10   witnesses, and we have been asking for names and
11   addresses and still don't have them.  If we can get
12   them in the same two weeks.
13       MR. PETIT:  Absolutely.
14       MS. YEARY:  Okay.
15       THE COURT:  All right.  Counsel, I think we
16   should, you know, be a little more conscientious about
17   preparing orders for these things.  Prepare an order
18   for that, send it to me, try to do it right away while
19   I still remember what it is about.
20       MR. BUCHANAN:  Do you want an order on the
21   sales rep issue?
22       THE COURT:  Same thing with sales reps.
23   Plaintiffs' counsel can prepare that.  Defense counsel
24   can prepare the last one.  All right?  What other
25   issues do we have, Mr. Ferrara?
```

```
 1       MR. FERRARA:  You mentioned you were going to
 2   talk to Judge Fallon.  I wanted to reiterate that we
 3   have about 300 cases, and we have none in the MDL and
 4   that just underscores what Your Honor said this morning
 5   that we don't want -- we can't be bound by something
 6   the MDL does or doesn't do because we're not there, and
 7   I have 300 clients that, you know, I have a hard time
 8   explaining to them why I didn't go to a deposition in
 9   some place because I didn't have notice of it.  I think
10   that our Jersey specific people shouldn't have any of
11   their rights taken away by anything that Judge Fallon
12   does, and if you extrapolate it, Judge, there are cases
13   that are pending in Illinois, cases pending in Texas,
14   in other places, those judges we always talk about
15   Jersey and the MDL, Jersey and the MDL.  I'm sure if an
16   Illinois judge wants -- if a lawyer in Illinois wants
17   to take a dep that judge isn't going to say that was
18   already done in the MDL or you had four hours or
19   whatever, so, you know, we're just begging you to
20   not -- and I know Your Honor knows the problem, but we
21   don't want to be restricted in any way about what we
22   can or can't do based on what Judge Fallon decides.  I
23   mean, it is real important.
24       MR. COHEN:  We're not going to put anything
25   further on the record in regard to this issue.
```

```
 1       MR. WEISS:  Your Honor, liaison counsel has
 2   nothing to add.  That's Mr. Ferrara's statement whether
 3   we agree or disagree we make no comments about it.
 4       THE COURT:  I don't know that it changes
 5   anything than what we already said.  I'm not calling
 6   Judge Fallon to ask him for anything, I'm consulting
 7   him to see if we can work together on this, and
 8   hopefully we can.  If we can't then I'll just have to
 9   enter my own orders, but I think we have developed a
10   pretty good relationship as far as being able to work
11   together, and I'm hoping -- not pretty good I think we
12   have developed a very good relationship so far, and I'm
13   going to bring to him my concerns about the lack of
14   time that New Jersey counsel has at the deps and see if
15   there's some way we could work together to work for
16   both sides so that people don't have to be produced in
17   every single state in the MDL.  That's not really fair
18   either.  And, also, make sure that a plaintiff is
19   represented not by some lawyer she doesn't know who is
20   in some other place not even involved in the
21   coordinated litigation.
22       Okay.
23       (End of proceedings.)
24
25
```

C E R T I F I C A T I O N

I, REGINA A. TELL, C.S.R., R.P.R., C.R.R., License
Number 30X100161000, an Official Court Reporter in and
for the State of New Jersey, do hereby certify the
foregoing to be prepared in full compliance with the
current Transcript Format for Judicial Proceedings and
is a true and accurate compressed transcript to the
best of my knowledge and ability.

_____ 02-02-06

Regina A. Tell, CSR-RPR-CRR

Official Court Reporter

Atlantic County Courthouse

Mays Landing, New Jersey

161

```
0001
 1              SUPERIOR COURT OF NEW JERSEY
                     ATLANTIC COUNTY
 2                 CASE TYPE NO. 619
 3     ------------------------------x
       IN THE MATTER OF IN RE:
 4
       VIOXX
 5                              STENOGRAPHIC TRANSCRIPT
                                        OF:
 6     ------------------------------x  - CASE MANAGEMENT -
                                           CONFERENCE
 7
              PLACE:  ATLANTIC COUNTY CIVIL COURTHOUSE
 8                    1201 BACHARACH BOULEVARD
                      ATLANTIC CITY, NJ  08401
 9
              DATE:   MAY 16, 2006
10
11     B E F O R E :
12         THE HONORABLE CAROL E. HIGBEE, J.S.C.
13     TRANSCRIPT ORDERED BY:
14         DAVID BUCHANAN, ESQ. AND THEODORE MAYER, ESQ.
15     A P P E A R A N C E S:
16         DAVID BUCHANAN, ESQUIRE
           CHRISTOPHER SEEGER, ESQUIRE
17         JEFFREY GRAND, ESQUIRE
           SEEGER, WEISS
18         ATTORNEYS FOR THE PLAINTIFFS
19         DAVID JACOBY, ESQUIRE
           SOL WEISS, ESQUIRE
20         ANAPOL, SCHWARTZ, WEISS, COHAN, FELDMAN & SMALLEY
           ATTORNEYS FOR THE PLAINTIFFS
21
22         LEE BALEFSKY, ESQUIRE
           KLINE & SPECTER
23         ATTORNEYS FOR THE PLAINTIFFS
24             *     *     *     *     *     *
                         REGINA A. TELL, CSR-CRR
25                       OFFICIAL COURT REPORTER
                         1201 BACHARACH BOULEVARD
                         ATLANTIC CITY, NJ  0840 1
```

```
 1     A P P E A R A N C E S   C O N T I N U E D ...
 2         JERRY KRISTAL, ESQUIRE
           SHERI TARR, ESQUIRE
 3         ELLEN RELKIN, ESQUIRE
           WEITZ & LUXENBERG
 4         ATTORNEY FOR THE PLAINTIFFS
 5         TURNER BRANCH, ESQUIRE
           MARGARET BRANCH, ESQUIRE
 6         RICHARD SANDOVAL, ESQUIRE
           CYNTHIA ZEDALIS, ESQUIRE
 7         BRANCH LAW FIRM
           ATTORNEY FOR THE PLAINTIFFS
 8
           GREGORY SMITH, ESQUIRE
 9         McELDREW & FULLAM
           ATTORNEY FOR THE PLAINTIFFS
10
           ROBERT W. ROWAN, ESQUIRE
11         GORWITZ, GRIFFIN, EWING
           ATTORNEY FOR THE PLAINTIFFS
12
           FOREST HORNE, ESQUIRE
13         MARTY RAMEY, ESQUIRE
           MARTIN & JONES
14         ATTORNEY FOR THE PLAINTIFFS
15         THOMAS SWEENEY, ESQUIRE
           COHEN SEGLIAS
16         ATTORNEY FOR THE PLAINTIFFS
17         STEVE STEIN, ESQUIRE
           LEVIN, SIMES, KAISER
18         ATTORNEY FOR THE PLAINTIFFS
19         MARC GROSSMAN, ESQUIRE
           SANDERS, VIENNA, GROSSMAN
20         ATTORNEY FOR THE PLAINTIFFS
21         DANIELLE R. VAZ, ESQUIRE
           HOBIE, CORRIGAN
22         ATTORNEY FOR THE PLAINTIFFS
23         ERIC WEINBERG, ESQUIRE
           WEINBERG LAW
24         ATTORNEY FOR THE PLAINTIFFS
25
```

```
 1     APPEARANCES CONTINUED . . .
 2         TERRENCE SMITH, ESQUIRE
           DAVIS, SAPERSTEIN & SALOMON, P.C.
 3         ATTORNEY FOR THE PLAINTIFFS
 4         DAVID COHEN, ESQUIRE
           DANIEL MIRARCHI, ESQUIRE
 5         SPECTOR, ROSEMAN & KODROFF, P.C.
           ATTORNEY FOR THE PLAINTIFFS
 6
           GENE LOCKS, ESQUIRE
 7         LOCKS LAW FIRM
           ATTORNEYS FOR THE PLAINTIFFS
 8
           MICHAEL FERRARA, ESQUIRE
 9         THE FERRARA LAW FIRM
           ATTORNEY FOR THE PLAINTIFFS
10
           THERESA CORSON, ESQUIRE
11         LEVY, ANGSTREICH
           ATTORNEY FOR THE PLAINTIFFS
12
           GREG SHAFFER, ESQUIRE
13         WILENTZ, GOLDMAN & SPITZER
           ATTORNEY FOR THE PLAINTIFFS
14
           CLAUDINE HOMOLASH, ESQUIRE
15         SHELLER, LUDWIG
           ATTORNEY FOR THE PLAINTIFFS
16
           CHRIS GOMEZ, ESQUIRE
17         MILLER & ASSOCIATES
           ATTORNEYS FOR THE PLAINTIFFS
18
           SUSANNE SCOVERN, ESQUIRE
19         ALEXANDER, HAWS, AUDET
           ATTORNEY FOR THE PLAINTIFFS
20
           ROBERT DASSOW, ESQUIRE
21         HOVDE, DASSOW & DEETS
           ATTORNEY FOR THE PLAINTIFFS
22
           STEVE CHUNG, ESQUIRE
23         SHRAGER, SPIVEY & SACKS
           ATTORNEY FOR THE PLAINTIFFS
24
25
```

```
 1     A P P E A R A N C E S   C O N T I N U E D ...
 2         JOHN TROTMAN, ESQUIRE
           ATTORNEY FOR THE PLAINTIFFS
 3
           MICHAEL WEINKOWITZ, ESQUIRE
 4         LEVIN, FISHBEIN
           ATTORNEY FOR THE PLAINTIFFS
 5
           HENRY MILLER, ESQUIRE
 6         ATTORNEY FOR THE PLAINTIFFS
 7         FRANCIS TOMES, ESQUIRE
           TORTORETI, TOMES & CALLI
 8         ATTORNEY FOR THE PLAINTIFFS
 9         MICHELLE ALTENPHOL, ESQUIRE
           ATTORNEY FOR THE PLAINTIFFS
10
           W. STEVEN BERMAN, ESQUIRE
11         NAPOLI, BERMAN, RIPKA ASSOCIATES
           ATTORNEY FOR THE PLAINTIFFS
12
           EVAN JANUSH, ESQUIRE
13         THE LANIER LAW FIRM
           ATTORNEY FOR THE PLAINTIFFS
14
           THEODORE V.H. MAYER, ESQUIRE
15         CHARLES W. COHEN, ESQUIRE
           HUGHES, HUBBARD & REED, LLP
16         ATTORNEYS FOR THE DEFENDANT, MERCK
17         HOPE S. FREIWALD, ESQUIRE
           MICHELLE YEARY, ESQUIRE
18         PHIL YANNELLA, ESQUIRE
           BEN BARNETT, ESQUIRE
19         DIMITRI DUBE, ESQUIRE
           DECHERT, LLP
20         ATTORNEYS FOR THE DEFENDANT, MERCK
21         JEFFREY JUDD, ESQUIRE
           O'MELVENY & MEYERS, LLP
22         ATTORNEY FOR THE DEFENDANT, MERCK
23         STEVEN RABER, ESQUIRE
           WILLIAMS & CONNELLY
24         ATTORNEY FOR THE DEFENDANT, MERCK
25         KEVIN THORNTON, ESQUIRE
           COOPER LEVENSON
```

```
 1                P R O C E E D I N G S
 2          THE COURT:  Stay seated.
 3          (Discussion off the record.)
 4          THE COURT:  Okay.  What I've got is -- the
 5   first thing I have is I have a couple issues that I
 6   need to address, the first of which is the access
 7   database that we have.  We still have quite a few that
 8   have blank, you know, in the Excel sheets that you
 9   filled out.  These are ones -- what I'm dealing with
10   today are ones that you have filed them, but they
11   haven't been -- one area was left blank or there's
12   something missing from them.  And I want to see if we
13   can get them corrected.  And what we have done is they
14   have been able to produce an error report that
15   basically is by attorney and lists your cases and shows
16   what it is that you have left blank.
17          All right.  So is anybody here for Morelli?
18   No.  Okay.  Well, maybe I can just have --
19          MS. RELKIN:  We can get it to him.
20          THE COURT:  Okay.  How about Cohen, Seglias,
21   anybody here from there?
22          MR. SWEENEY:  Here.
23          THE COURT:  That's for you.  Anybody here from
24   Cohen, Placitella?
25          MR. WEISS:  I'll take it to them.
```

```
 1   it.
 2          THE COURT:  Levy, Mark Levy?
 3          MS. CORSON:  Here.
 4          THE COURT:  Leif and Cabraser?
 5          MR. SEEGER:  I can give it to them.
 6          THE COURT:  Locks Firm?
 7          MR. LOCKS:  Here.
 8          THE COURT:  Morelli?
 9          MS. RELKIN:  I got it.
10          THE COURT:  Motley Rice?
11          MR. WEISS:  I'll take it.
12          THE COURT:  Parker and Walkman.
13          MR. BUCHANAN:  We'll take it, Your Honor.
14          THE COURT:  Parks and Crump?  Physicians for
15   Responsible Medicine?  Reingold?  Richardson?  Sacks
16   and Weston?  Sanders and Veneer?  Sanders?  Here's
17   Seeger Weiss.  Sheller Ludwig?
18          MS. HOMOLASH:  Right here.
19          THE COURT:  Schraeger?
20          MR. CHUNG:  Here.
21          THE COURT:  Starkey?  Sterns?  Strobel?
22   Sullivan?  The Beasley Firm?
23          MR. WEISS:  Beasley where, Philly or Alabama?
24          MR. BUCHANAN:  If it is the Beasley Firm it is
25   Philly.
```

```
 1          THE COURT:  Danker and Millstein?  Davis
 2   Saperstein?
 3          MR. SMITH:  Here, Judge.
 4          THE COURT:  Douglas and London?
 5          MS. RELKIN:  I can get that to them.
 6          THE COURT:  Eric Weinberg?
 7          MR. WEINBERG:  Here.
 8          THE COURT:  If you can pass it.  Feldman,
 9   Shepphard?
10          MR. WEISS:  I'll get it to them.
11          THE COURT:  Gare, Gare Coneson.
12          MR. STEIN:  I'll take it to them.
13          THE COURT:  Gill and Chamis?  Glasser and
14   Glasser.  Hobie.
15          MS. VAZ:  That's fine.  I'll take that.
16          THE COURT:  Kasowitz?
17          MR. SEEGER:  I'll send it to them.
18          THE COURT:  Kline and Specter?
19          MR. BALEFSKY:  Yes, Your Honor.
20          THE COURT:  Crenler and Crenler?
21          MR. BUCHANAN:  I'll get it to them.
22          THE COURT:  Levin and Fishbein?
23          MR. WEINKOWITZ:  Right here.
24          THE COURT:  Levin, Simes and Kaiser?
25          MR. STEIN:  Thank you, Your Honor, I'll take
```

```
 1          THE COURT:  It says LLC.
 2          Here is the Beasley Firm and the Schmidt Firm.
 3   Give them that, too.  Ferrara?
 4          MR. FERRARA:  Here.
 5          THE COURT:  Lanier?
 6          MR. SANDOVAL:  I can take that, Judge.
 7          THE COURT:  Trief and Olk?  Waters and Krause?
 8   Weitz and Luxenberg?
 9          MR. WEISS:  Don't you have Waters and Krause
10   cases?
11          MR. STEIN:  Yes, Your Honor, I took them over.
12   I apologize.
13          MR. WEISS:  Waters and Krause goes back there,
14   Your Honor.
15          MR. STEIN:  Sorry.
16          THE COURT:  Wilentz?
17          MR. SHAFFER:  Yes.  The walk of shame.
18          THE COURT:  William Polinger.  And Williams
19   Berezofsky.
20          MS. RELKIN:  We can take them.
21          THE COURT:  All right.  I'll send these to the
22   other counsel.  Basically these are just -- if you look
23   you'll see that something is missing from your Excel
24   sheet.  It may be the age is missing or the event time
25   is missing or something.  We want to clean those up.
```

1    So we have been able to run these reports, so we would

2    like to try to provide that.

3         The next issue that I have that's separate

4    from your agenda is the pro hac issue.  I don't have my

5    staff here yet, so we'll bring them up.  Heather, ask

6    them to come up.  There's been two problems with pro

7    hacs.

8         One is they're not all paying their fee, and

9    if you're not paying your fee I'm going to revoke the

10   pro hacs and then you're going to have an order,

11   obviously, that's not really that complimentary that

12   says that because of failure to abide by New Jersey

13   rules your pro hac had been revoked.  And my staff is

14   bringing up a list of the attorneys that we have been

15   advised by the AOC haven't paid their fees.  I mean, it

16   could have been an oversight, but it just can't happen.

17        The next thing is we have had a problem --

18   well, I thought we didn't have a problem.  We have been

19   doing everything just fine with the pro hacs, but,

20   apparently, the other two mass tort counties are

21   charging $30 per every motion, and if it applies to all

22   the cases they're charging $30 per case.  At least

23   that's what they tell me that they do.

24        MR. BUCHANAN:  So it would cost $150,000 to

25   file a motion?

1         THE COURT:  To file a motion pro hac to have

2    everybody admitted in every case.

3         MR. BERMAN:  Steve Berman.  They just started

4    to impose that for the diet drug cases in Hackensack,

5    but Judge Harris has just taken them over and offered

6    to allow us to move by consent order for pro hac vice

7    if it would ease that kind of burden, although they're

8    all resolving.

9         THE COURT:  Boy, you know, I sat in a room

10   with Judge Harris and the judges from Bergen and from

11   the judges from Middlesex, and I told them that this is

12   the way we do it and I think it is fair and I think it

13   works, and I was told by the other counties that that's

14   not the way they do it, they don't think it is

15   fair, and they think that they constantly get it thrown

16   in their face that I'm doing it differently and that

17   they're tired of hearing that Judge Higbee lets us do

18   this when their position is you can't do it.

19        Um, obviously, there's no question in my mind

20   we can't charge $150,000 for a pro hac motion to have

21   somebody admitted in every case, but I was thinking

22   possibly the solution would be that Merck would just

23   designate a pro hac for those cases that they wanted

24   the person to be pro hacked in.  Very few of your pro

25   hacs are actually acting in every single case, are

1    they?

2         MS. FREIWALD:  The dilemma will be when we

3    have cases that are noticed In Re: New Jersey

4    litigation if somebody takes the position that that's

5    not a good pro hac to appear and bind for all cases if

6    somebody wants to take a deposition or defend a

7    deposition under an In Re: New Jersey caption.

8         MR. MAYER:  Or appear at this conference and

9    talk about discovery issues that apply in these cases.

10        MS. FREIWALD:  If we can do that as a case

11   entity and then file for lawyers as they come up for

12   trial in particular cases or depositions in particular

13   cases that might be an alternative.

14        THE COURT:  I mean, this applies to

15   plaintiffs, too, because some plaintiffs have pro hacs

16   of 100 cases or 200 cases.  It is more of a problem for

17   the defense than it is for the plaintiffs, but...

18        MS. FREIWALD:  Actually, it would be a problem

19   for the plaintiffs, as well, because we would take the

20   position it would have to go both ways.  A plaintiff's

21   lawyer couldn't appear in an In Re: New Jersey

22   deposition if he wasn't pro hacked in every case if we

23   were expected to be pro hacked in in every case.

24        THE COURT:  Do you have that list of

25   attorneys?

1         MS. YOUNG:  Yes, I do.

2         THE COURT:  So...

3         MR. BUCHANAN:  I don't think it is really a

4    parallel because I'm not pro hacked in anybody else's

5    case other than my firm's cases, and we have routinely

6    taken depositions that have been used by other

7    plaintiffs.

8         THE COURT:  There's a separate order basically

9    that any dep taken in any case can be used in any other

10   case.

11        MR. SEEGER:  And counsel can appear.  But

12   Merck is in every case.

13        MS. FREIWALD:  Then we shouldn't have the In

14   Re: New Jersey problem.

15        THE COURT:  Hope, we're not on different

16   pages.

17        MS. FREIWALD:  I don't think we are.

18        THE COURT:  I'm trying to work with you.

19        MS. FREIWALD:  I understand that.

20        THE COURT:  And I'm thinking that we can

21   charge per a case or if you're going to have somebody

22   try a case you'll have to have them admitted for that

23   case or other cases.  If they're going to take a dep

24   they have to be admitted for the case that they're

25   taking it for.  If it is a generic dep they have to be

1  admitted for some case.  We can do it that way.  Maybe
2  we can do it by consent order and not by motion if you
3  guys recognize that everybody is just going to have to
4  file pro hac consents.  That sort of -- I didn't think
5  that's a hassle.  I want to work it out in a way that
6  it works and it is equitable, but I don't want to...
7  Whatever.
8      Here is the list of attorneys who haven't paid
9  their fees so far.  It takes the AOC quite a while to
10  generate this -- how long, Pat?  It takes them a couple
11  months, right?
12      MS. YOUNG:  Yes, maybe 2 months.  When you
13  look at this -- I didn't make a lot of them, I just
14  made one of each, but when you look at it this is our
15  request to the attorney in the middle and -- I'm sorry,
16  request to Trenton to update the system to enter the
17  attorney that has been admitted.  We tell them, as this
18  one says, David S. Mitchell was admitted pro hac on
19  12/27/05, so we send this notice to ADI help that's
20  what we call them up in Trenton, and on June 6th they
21  send us a response that says, "this attorney hasn't
22  paid his fees," so this one was even less than a month.
23  So as you look at them then you can see.  In
24  the middle is where we send our response, and at the
25  top is where they respond to us.

1  THE COURT:  So what you have to do to make
2  sure -- first of all, I'm going to ask that counsel
3  look through these and take your own.  We have one set
4  of these, but I don't know if you want to have somebody
5  call them out.  I already called out one thing today,
6  so I'm not going to do it again.  But just, you know,
7  let's get these people, and take your own 30 days to
8  pay, obviously, and if they don't pay in 30 days --
9  they have to not only pay but they have to sent us a
10  certification saying I have paid all my fees in
11  compliance with and then we're going to have to amend
12  our pro hac order to state that within 30 days of being
13  admitted pro hac or within 45 days you have to file a
14  certification with us saying that you have paid.  That
15  way my clerks don't have to keep going through this.
16  We're not talking about huge amounts of money, but a
17  couple hundred bucks they have to pay, right?
18      MR. WEISS:  I think it is $150 every year.
19      THE COURT:  And you have to pay on a yearly
20  basis.  How we check whether they have paid -- you
21  know, I think what it comes down to is there's no
22  system in effect to make sure they pay it.  There is a
23  system, and that system is they don't get listed in
24  Trenton, but -- so they don't get an attorney number to
25  file papers, but since they file under the New Jersey

1  attorneys' number anyway it is really a breakdown in
2  Trenton.  It is a problem.  But we're working with the
3  AOC on that, and meanwhile, if they don't pay and I get
4  a notice from the AOC saying they haven't paid I'm
5  going to revoke the pro hac.
6      So it is pretty serious.  I don't want to do
7  it to anybody lightly.  I mean, I certainly don't want
8  to do it just because it is an oversight and then have
9  somebody have an order out there that might affect
10  their ability to be pro hacked somewhere else at some
11  other time.
12      So however counsel want to do this, whether
13  defense counsel or plaintiffs' counsel -- Charlie, if
14  you can figure out who the attorney is, and if you have
15  any that you can't figure out give those back to Pat
16  and we'll find the attorney and mail it to them.  All
17  right?
18      MR. BUCHANAN:  Do you have an extra set you
19  can share with us?
20      MS. YOUNG:  I only made one of each.
21      MR. COHEN:  At a break we'll meet, and I'll
22  get you the plaintiffs, and I'll take the defense.
23      THE COURT:  Charlie, you can just go out and
24  have them copied.  Carmen will copy them for you.
25      I have to take a break, so I would like you

1  to -- the AOC is considering giving us some more
2  equipment and more stations for our people so I have to
3  go meet with them.  They are here.  It figures they
4  would come in the middle of a meeting.  They showed up.
5  But we're going to -- I'll be back with you soon.  Can
6  you work over the agenda items and work over that?
7  This is for -- David, we did a full -- this is
8  everybody, but, hopefully, everybody who got an access
9  sheet you'll update as soon as possible.  Okay?
10      MR. BUCHANAN:  And, Your Honor, just to
11  clarify, the procedure for updating the names is just
12  sending an updated spreadsheet with the numbers, is
13  that the process they want us to use?  They just want
14  the corrections or do they want the entire --
15      THE COURT:  They want you to go back on the
16  website and he has a form, and it says, is this a
17  revised form or a new form, check "revised" and then
18  you --
19      MS. SOLIMANI:  It is update.
20      THE COURT:  Do they only want to add the one?
21      MS. SOLIMANI:  The change, you mean?
22      THE COURT:  Yes.
23      MS. SOLIMANI:  Don't resubmit all information,
24  just your change.
25      THE COURT:  Just put your docket number.

Transcript - Monthly Status Conference (2006/05/16)

1    MS. SOLIMANI:  If you realize we made a
2    mistake they're a smoker and we put that they're not a
3    smoker and you have an update, you want to include that
4    updated information.
5        MR. BUCHANAN:  And the docket number I assume,
6    right?
7        THE COURT:  Yes.  Put in the docket number and
8    put in yes or no for smoker.
9        MS. SOLIMANI:  And we added Puerto Rico.  One
10   firm I spoke with yesterday they were proactive in
11   addressing it, and we didn't have Puerto Rico, that's
12   why they left the state blank, so that's being added
13   today to your dropdown menu.  And we may add an other,
14   also, so it covers Canadians or, I don't know, anywhere
15   else that they may file from.  If you know you're going
16   to have something that's not in the dropdown let us
17   know, and we can amend it.
18       THE COURT:  If you find that's the issue, that
19   the reason they're not being entered is because of a
20   problem let us know so we can change the database and
21   fix it.  Okay?  As far as motions are concerned there's
22   five outstanding, I think, motions.
23       MR. WEISS:  Your Honor --
24       THE COURT:  The Stempler motions.
25       MR. WEISS:  The deposition, the claw back

17

Transcript - Monthly Status Conference (2006/05/16)

1    document.
2        MR. BUCHANAN:  There's the IMS motion.
3    There's defendant's communications with former
4    employees, representation of former employees.
5        THE COURT:  The claw back that were produced
6    inadvertently?  I think I ruled on that.
7        MR. WEISS:  That's the claw back.  That's the
8    Joanne Lahner, that's connected.
9        MR. BUCHANAN:  I only had four of them.
10       MR. BARNETT:  I think that's the motion to
11   depose Joanne Lahner.  I think Mr. Placitella, there
12   was a document that was used in deposition.  We asked
13   for it back, said it was inadvertently produced, he
14   said no.  I think it is tied up in briefing.
15       MR. WEISS:  It has been briefed in conjunction
16   with the Lahner motion.
17       THE COURT:  Okay.  We'll do those on Friday?
18   Is that good for everybody?  I know you'll be in New
19   Orleans, right?
20       MR. BUCHANAN:  I'm not available, but I'm not
21   sure that all of these were going to be -- I discussed
22   with Charlie certain of these I thought we could do
23   telephonically.  Charlie is not here right now.  I know
24   that I suspect the defense wants to be here for the
25   Joanne Lahner one, but if I can dial in for the one I'm

18

Transcript - Monthly Status Conference (2006/05/16)

1    specifically responsible for I would appreciate that.
2        THE COURT:  Okay.
3        MR. WEISS:  What time Friday, 10:00?
4        THE COURT:  Is that good for everybody?  Okay.
5    10:00 Friday.
6        MR. MAYER:  I think that works.
7        MR. SEEGER:  You don't really need argument on
8    a renewed Stempler motion, do you?  Are we going to
9    reargue every motion?
10       THE COURT:  Well, they haven't asked to review
11   too many of them.  How come you guys never laugh at
12   each other's jokes?
13       MR. SEEGER:  I thought what I said was funny.
14   Ben laughed.
15       MR. BARNETT:  Right.
16       MR. SEEGER:  I laugh at all of Raber's jokes.
17   I think he's hilarious.
18       MR. BUCHANAN:  Your Honor.  On the IMS one let
19   me call IMS at the break because they're the party on
20   that one, that's not Merck's motion.
21       THE COURT:  Okay.  I'm just throwing Friday
22   out for your convenience.  I'm here Friday.  After then
23   I'm going to be gone for a week then I'll be back and
24   involved in the trial, so I'm concerned about getting
25   these scheduled, so I thought Friday would be a good

19

Transcript - Monthly Status Conference (2006/05/16)

1    day, but if you want to schedule -- I mean, I could do
2    some Thursday, too, but I thought Thursday was bad for
3    you guys, right?
4        MR. MAYER:  Thursday is not good for us.
5        MR. BUCHANAN:  I appear to be the only issue
6    for Friday, and I'm sure we can figure out a way to get
7    whatever I was going to get covered.
8        MS. SOLIMANI:  Judge, excuse me, did you want
9    to cover if there's any issues during the week that
10   you're away what counsel should do?  We had that call.
11   We had discussed if you call in that we would be able
12   to address it with the judge later that day and not
13   refer it to another judge.
14       THE COURT:  Yes.  I don't want calls during
15   depositions referred to other judges I told my staff.
16   So it is really not fair to a judge to get a call, and
17   the staff had done that last couple weeks ago I was out
18   a day or I was up in Trenton and they referred it to
19   another judge, and I think that that's not fair to the
20   judge.
21       MS. SOLIMANI:  It was per counsel's request.
22       THE COURT:  If you do have an issue during a
23   deposition I'm going to be calling in every day.  I can
24   call in again the next day, but I may not be available
25   immediately.  The rule is clear.  There can be no --

20

1  you can't instruct a witness not to answer, unless it
2  is privileged or unless it is confidential or -- you
3  know, there has to be a pretty extreme clear cut basis
4  for instructing someone not to answer on either the
5  plaintiffs' side or the defense side, so witnesses
6  should be allowed to answer.  You can voice your
7  objections, and we can always cut it out if it is
8  inappropriate or not relevant or any other reason why
9  it shouldn't be asked or more prejudicial than
10  probative but, you know, the witnesses should answer
11  the questions.
12      Meanwhile, I will try to address issues, so if
13  you do want to call in I'll try to respond by phone as
14  soon as I can.  All right?  Okay.  All right.  I'll be
15  back.
16      MR. MAYER:  10:00 Friday is okay.
17      THE COURT:  10:00 Friday, okay.  We'll see
18  10:00 Friday on that.  Was there anything else that we
19  wanted to address, the pro hacs...
20      MS. SOLIMANI:  I missed that.
21      THE COURT:  The pro hacs we're going to try --
22  what if we do consent orders then we don't need motions
23  filed, right?
24      MS. SOLIMANI:  That would be the ideal
25  solution, yes.  We don't want to charge $30 per case.

1      THE COURT:  Don't put that on the record.
2  Well, it's already there.  Forget it.
3      Well, I like to try to make it work for
4  everybody.  All right.  Why don't we -- you can
5  consider if there's a way you can do consent orders
6  without motions that would save everybody money that
7  might be worth it, or if you can do both.
8      MR. SEEGER:  If one of the people are pro
9  hacked into one case we could agree --
10      THE COURT:  I can't just do a consent order on
11  a pro hac.  I mean, I have to review it.  It is fine if
12  you consent, but I still have to review the papers.  I
13  mean, I can't just get an order.  I mean, I can get a
14  signed order that says you consent, but I still need --
15  I need the certification and things like that.
16      MR. BUCHANAN:  Your Honor, just for the
17  benefit of our discussions after I'm not exactly clear
18  on the problem from the perspective of the way we're
19  doing things compared to other courts.  I'm trying to
20  remember our practice here.  If you're admitted for one
21  case like one Merck attorney is admitted for -- they
22  file one pro hac it is good for all defense --
23      THE COURT:  They file one motion under the
24  generic docket number that asks that that attorney be
25  admitted pro hac in the VIOXX litigation, and then I

1  sign that order.  The issue as far as the other
2  counties are concerned is that they're paying $30 for
3  that, whereas, if they want that person to be admitted
4  in 100 cases they should be paying $3,000.  It is
5  strictly an economic issue.  But if you then --
6  100 cases is $3,000, you start multiplying by 5,000
7  cases.
8      MR. BUCHANAN:  Understood.  And on the
9  plaintiffs' side --
10      THE COURT:  On the plaintiff's side we were
11  allowing one motion.
12      MR. BUCHANAN:  For all subsequent cases by
13  that firm.
14      THE COURT:  See, that's the other issue,
15  because I don't really understand how the other
16  counties are doing it.  You guys are working in the
17  other counties, aren't you?
18      MR. SEEGER:  Yes.
19      THE COURT:  What they tell me is they're
20  making you file 150 motions and they're charging you
21  for each motion.  Is that happening?
22      MR. SEEGER:  It is.  I know for a fact it is
23  because when we have gotten cases ready for trial we
24  felt it, but we don't have the pro hac issue like the
25  defendant does because even if we're in 100 cases

1  they're in thousands.  So I have never really --
2      MR. MAYER:  Do you have it --
3      MR. BUCHANAN:  The situation is magnified by
4  the virtue of the number of cases.
5      MR. MAYER:  You pay it a hundred times?
6      MR. SEEGER:  I think that's what Judge
7  Corodemus did in prior mass torts.  I could be wrong.
8  I think on our side we don't feel it as much as you
9  guys do.  You feel it, but not like $150,000, you know,
10  to file pro hac.
11      MS. FREIWALD:  I'm sorry, how have you guys
12  been doing it?  You said you have been doing it if you
13  file one case --
14      MR. BUCHANAN:  Frankly, I don't remember
15  exactly what we did.  I thought the way the pro hac
16  motion was presented was you filed it once for an
17  attorney and then for subsequently filed -- for all
18  cases that were on file by that firm you were pro
19  hacked in, and for subsequently filed cases the pro hac
20  would be deemed to apply to that attorney.  That's how
21  I thought the order was structured.
22      MS. SOLIMANI:  It was an umbrella.
23      MR. BUCHANAN:  It was an umbrella pro hac.
24      MR. WEISS:  It was a one-time filing.
25      MR. MAYER:  Here both same sides are operating

1  under the same rules.

2      THE COURT:  Yes.  We were making it --

3      MS. SOLIMANI:  In Middlesex you only have to

4  file one?

5      MR. RABER:  Judge how about a VIOXX bar exam

6  and have everybody come in and sit?

7      THE COURT:  Well, I understand what -- I'll

8  tell you what persuaded me that we should look at it

9  differently is -- I mean, it is Judge McCormick that

10  does the asbestos and Judge Garruto and they said they

11  charge per case, and they were basically saying for an

12  attorney who is out of state who hasn't bothered to get

13  a New Jersey license, hasn't taken the bar -- we're not

14  talking about you, Steve, directly, but if you haven't

15  taken the bar and you haven't chosen to do the things

16  you need to do to be a New Jersey lawyer and you want

17  to have the privilege of coming into the state of New

18  Jersey, and, as she says, taking a case away from a New

19  Jersey attorney or at least working -- you still have

20  to work with a New Jersey attorney anyway, but they

21  basically were just saying that, you know, for them to

22  pay $30 per case is not that big a deal.

23      MS. SOLIMANI:  We have an attorney here who

24  had an experience with Middlesex.

25      MR. BERMAN:  No, it is with Bergen County.  It

1  to do so.

2      THE COURT:  I think Judge Walsh and I were

3  pretty much on the same page, and Judge Corodemus

4  actually I think was doing it the way I did it.  Before

5  I did it I spoke to her, and first she said you have to

6  pay for every one, but then I said you were making

7  people pay -- let's face it, this is a larger

8  litigation than most.  If we're dealing with, say, the

9  Accutane litigation where there's 200 cases it really

10  is feasible and maybe should be done in those cases

11  that you pay per case.  It is just that in the sense

12  there comes a point where it becomes prohibitive.

13      MR. SEEGER:  I think you should charge Merck

14  $149,999 and right now cut that deal.  It is going to

15  go up.  The price is going up.

16      THE COURT:  There are some benefits to me -- I

17  really think, unfortunately, the ones I most want to

18  charge it on are in limine motions are actually

19  directed to one case.  Because I would love to charge

20  $150,000 per in limine motion.  That I think would be

21  fair and just.  I have no problem with that.

22      MR. BUCHANAN:  You would have one motion with

23  47 subparts.

24      MR. WEISS:  Give them a credit for every

25  hundred cases they settle they get a discount.

1  was done a different way with Judge Walsh, the late

2  Judge Walsh, and the changes that were discussed with

3  Your Honor were fairly recent and only were beginning

4  to be put into effect in November, December and January

5  of this year, and, unfortunately, it goes beyond pro

6  hac, so that if there's a motion that's filed and the

7  motion in the diet drug cases is generic and affects

8  every case you have to now pay a filing fee for every

9  case that the motion affects.  So if there's a Stempler

10  motion for reconsideration you have to now pay for

11  5,000 cases, $30 times 5,000.  We just paid over

12  $40,000 to reinstate motions -- cases that were

13  dismissed and were supposed to have been reinstated

14  without a fee, but since the change in the policy it's

15  getting to be a little difficult to even address issues

16  to the Court by motion.

17      THE COURT:  How many diet drug cases are left?

18      MR. BERMAN:  I have a conference tomorrow, and

19  they're in the process of winnowing them out at this

20  point, so there's going to be very few -- hopefully

21  there's going to be very few left, maybe a few hundred.

22      THE COURT:  But for the reinstatement purposes

23  you had to do a substantial number?

24      MR. BERMAN:  Correct.  Even though we were

25  promised by the late Judge Walsh that we would not have

1      MS. SOLIMANI:  Blue light special.

2      THE COURT:  It is an issue for plaintiffs, too

3  in generic motions.  It is not just a defense issue,

4  although it did impact more heavily on the defense

5  originally.

6      MS. RELKIN:  So it is two issues.  One is the

7  pro hac per each case, and then the other is every time

8  there's a generic motion it gets --

9      THE COURT:  Well, no, I told them I wasn't

10  doing that.  So everybody can understand what I

11  conceded was on pro hacs I would start charging per

12  case, but I wasn't going to do that for the rest of the

13  motions, and I'm going to enter an order that says that

14  if it is a generic motion that applies to all cases it

15  is one fee.  But they were suggesting that pro hacs

16  should be different, and I think in some counties

17  they're still going to be asking for a fee.  The

18  agreement was that we would allow the judge in their

19  discretion to enter an order in generic cases for

20  generic motions.

21      I don't know.  Maybe I have to go back to the

22  drawing board with these people, and there should be a

23  statewide uniformity on this.  There's no question.

24  Although maybe there shouldn't be.  Things are left to

25  a judge's discretion for a reason.  What is fair in a

1  case where there's 100 cases may not be fair in a case
2  where there's 8,000 cases.  That's the distinction
3  although we only have 6,000 now, but that's a
4  distinction.
5         MS. RELKIN:  Also, the judge's discretion if
6  it is working in your own county then it works.
7         THE COURT:  We physically were not putting
8  your motion in each file.  We're keeping a master file,
9  and we're not entering one -- we have a comment on each
10  one that says look at master file, other orders are
11  entered there.  So we're doing it so our staff isn't
12  physically having to do the work.  If we have to charge
13  per group we have to also have the staff enter each
14  one, so...
15         MR. BUCHANAN:  Maybe you can offer a special
16  sitting for the VIOXX bar?
17         THE COURT:  I can guarantee you the staff is
18  all in favor of generic motions and very happy with the
19  way we have been doing it.
20         Look, I'm being candid with you.  I'm throwing
21  it out there.  If anything, I tend to be a little too
22  open as far as telling you what I think and what is
23  happening maybe more than I should be, but...
24         All right.  Why don't you guys talk about it.
25  We'll have to talk about it more when I get back and

1  I'm going to take this quick tour of the facilities and
2  see if we can get some more things for us.
3         MS. SOLIMANI:  One more thing I want to talk
4  to counsel about --
5         THE COURT:  Go ahead.  You can talk to them.
6         MS. SOLIMANI:  I just wanted to say I had
7  offered to do a training with the paralegals or
8  associates or secretaries for any administrative
9  things.  During this month several calls that I had
10  from paralegals said they would be interested in that.
11  We can accommodate any time would be -- and I know some
12  are coming from across the country, so I would afford
13  counsel to do that, but if there's a need, if there's
14  common questions we can work something out, whether it
15  be just to respond to it, you know, in writing or if
16  you want to have them, for example, have a conference
17  at the same time you're having your conference here
18  that way if we come up with issues we can address them
19  with you and the judge at the same time just to
20  increase efficiency and reduce costs on both sides, so
21  you let me know, and my e-mail address is on the
22  website, so just contact me and then we'll set it up.
23  And if there's times that are more convenient for
24  counsel and you would rather have it on a separate day
25  just express that and we'll be happy to do that, and,

1  of course, call with any questions.  Okay?  Thank you.
2         (Break taken.)
3         THE COURT:  All right.  I just had a meeting
4  with pro hac counsel -- not pro hoc counsel.  That's
5  still in my mind.  Liaison counsel.  And the issue that
6  was raised was the fact that plaintiffs' counsel was --
7  the question of changing a request -- basically that
8  the Court change its direction and stop trying simply
9  bellwether cases as long as Merck has no intent on
10  settling or doesn't intend to settle or doesn't want to
11  discuss settlement, that bellwether cases really are
12  for that purpose.  They're to let the parties know what
13  the strengths and weaknesses of the cases are so that
14  they can make determinations about settlement, which
15  cases they want to not try, which cases they do wanted
16  to try, and if Merck is truly taking a position
17  position that they're never going to settle a case then
18  there's no point in bellwether cases, but instead, we
19  have to look at the fact that we have lots of
20  litigation and start moving as many trials as quickly
21  as possible.
22         And there's no question that the strategy of
23  the courts thus far has been strictly to try bellwether
24  cases, which would hopefully inform both sides.  We
25  have the first woman's case in June.  We have one more

1  case in September.  I did want to try a series of
2  18-month use cases because I thought that was a key
3  area or key possibly to see whether if -- what was
4  happening.  I don't think defense counsel is in that
5  much disagreement with plaintiffs' counsel that we're
6  going to have to do something to move the cases.  The
7  defense counsel -- I guess everybody would like to know
8  how we're going to pick the cases.  I know defense
9  counsel objects to having multiple cases tried at once
10  and continues that objection.  They object to have two
11  tried together, so they're, obviously, going to object
12  to have more than two tried together.
13         My thought is we do have to start putting in a
14  plan B, which is plan A being that we treat it as a --
15  try bellwether cases to try to get information, which
16  is what we have been doing, which we are going to
17  continue to do through September, but plan B is that we
18  need to start moving cases.  You're either going to
19  have to try them or dispose of them, you know, and if
20  settlement isn't an option then you're going to have to
21  dismiss them or come in and try them.  That being the
22  case, plaintiffs are going to have to prepare their
23  cases and defendants are going to have to prepare their
24  cases.
25         Now, everybody is saying to me we have a

```
1    certain number of cases that are already ready.  How
2    many cases would you say that is, Charlie?  Does
3    anybody know?  Michelle?
4         MS. YEARY:  We probably have at least 50 or so
5    where we're well into fact discovery, if not almost at
6    the end of it.
7         THE COURT:  Okay.  But fact discovery is only
8    part of it, you know.  Fact discovery is one thing.
9    Everybody has to name experts.  How many cases, other
10   than the trial cases have experts been named, none?
11        MS. FREIWALD:  You'll recall by agreement that
12   has been adjourned.  But they're at the point where
13   they could be moved into that phase.
14        MR. BUCHANAN:  The one concern, Your Honor,
15   that has been expressed by others in the room is that
16   most of the cases that we're talking about those 40 or
17   50 we can certainly include some of those in whatever
18   proposal you want, but most of them are prior to
19   September 30th, and, therefore, there's a number of
20   other law firms in this room right now who have
21   substantial case interest, substantial client interest
22   who have been working on the case quite a bit since
23   September that aren't represented by those cases that
24   are worked up, so maybe we can do something where we
25   take some -- propose something from that group, and I
```

33

```
1    would recommend like a two-thirds after September 30th
2    because that's where most of the cases are from and
3    maybe take a third of those that we propose from the
4    pre September 30th period.  So that we're at least
5    dealing with the older cases at the same time, but,
6    also, allowing the firms who have a substantial number
7    of cases on file to participate in this process.
8         MS. FREIWALD:  Your Honor, that would
9    essentially be jettisoning several years' worth of work
10   that we have all been doing.  We started out with four
11   test cases.  The plaintiffs then didn't like three of
12   them, and we dismissed those.  Then they picked other
13   test cases with the idea we would continue with the
14   wave system working them up.  We have been working them
15   up.  We have collected medical records.  We dealt with
16   deficiency letters.  We have taken fact witnesses.  We
17   have taken prescribers.
18        THE COURT:  You're talking about 50 cases.
19   What we're going to have to start doing now is Merck is
20   going to have to start having to depose hundreds of
21   plaintiffs, and I'm not talking about hundreds of
22   plaintiffs over months and months and months, I'm
23   talking about you're going to have to start deposing
24   and getting -- I'm going to have to start setting
25   discovery deadlines where you're going to have to take
```

34

```
1    the plaintiffs and the plaintiffs' doctors in hundreds
2    of cases in a short time.
3         MR. KRISTAL:  And that's not going to be
4    wasted work.  We're trying the cases anyway.
5         THE COURT:  They're going to have to be lined
6    up, and we're not going to take them in the kind of
7    waves -- let's face it, the waves we have been doing up
8    until now were for the purposes of moving some cases
9    towards trial, but, basically, we have always had plan
10   A, which is that eventually we were going to be able to
11   determine which cases could be settled, which cases had
12   to be tried, and that's the way I have been approaching
13   it.  If that's going to work out -- I still haven't
14   given up on plan A.  I know some of you have.  I know
15   Merck's position is that at this point -- but, you
16   know, what did Kobert say, just because you believed it
17   on Wednesday you don't have to believe it on Tuesday?
18   A man who believes on Wednesday what he believed on
19   Monday no matter what happened on Tuesday.  And that's
20   not -- the bottom line is what happens on -- what
21   happens every day, what happens in the next trial and
22   the next trial and the next trial, let's face it,
23   there's going to be several more trials that are
24   already scheduled, and if plaintiffs lose all those
25   cases or defendants win all those cases or lose all
```

35

```
1    those cases or vice versa there's still going to be a
2    mix of cases, but if they continue going one goes one
3    side, one goes to the other, one goes for this side,
4    one goes for the other -- there's still things to be
5    learned about the litigation.  But we're just about at
6    the end of our time frame for, quote, "learning."  At
7    this point we're going to learn through the next few
8    months.  We have cases listed through September, but I
9    am going to have to start doing a different kind of --
10   and plaintiffs are going to, you know, let's face it,
11   Merck has a fund to do this and has announced that they
12   have a fund to do this and they're ready to do this.
13   Plaintiffs' firms are also going to have to be ready to
14   sit with their clients, have their clients' deps taken,
15   have their doctors' deps taken and get experts lined
16   up.  And we're going to have to have experts in all the
17   cases.  And we're going to have to know if we're using
18   the same experts over and over and over and if they're
19   going to be put on tape and how they're going to be
20   used, what's going to be used and how we can shorten
21   these trials down.
22        MR. MAYER:  We should take advantage of the
23   work that's already been done in the cases where it has
24   been done.  If we're talking about something that would
25   happen this year we should take advantage of the work
```

36

1    that we have already done, and we should also look at

2    the fact we have now run through seven 18-month cases,

3    not all of them wound up being tried, but five of them

4    were, and look at other categories of choices

5    short-term use and so son.

6          MR. SEEGER:  To go back on what we proposed in

7    chambers to you that the bellwether concept isn't

8    working at this point, and the idea of picking cases

9    that help inform settlement discussions, although none

10    of us are ready to give up on that yet, we have to

11    think beyond that and put a schedule in place.  But we

12    think since it doesn't seem to be informing anything we

13    think it makes sense to allow plaintiffs to come up

14    with a pool or 30 or 40 cases, bring that pool to the

15    Court, start discovery by both sides, we can draw from

16    the older cases if you want, you want to say pick a

17    certain percentage of older cases or you want to even

18    it out in some way, but we can get that -- I believe we

19    can get that list together relatively quickly, and then

20    you would have traunches of cases that could go to

21    trial, and the Court can make the decision if you want

22    to put two together, five together, 10 together, if you

23    want to involve other judges, but then you have the

24    cases worked up and ready to go in front of you, a pool

25    of cases both sides are working up together instead of

1    the defendants sort of noticing up the cases --

2    ordering records in cases they want to order records

3    in.

4          But we think that, you know, so we filed these

5    cases we should have the ability, you know, to get our

6    clients' cases teed up for trial drawing from the older

7    cases as well as new.  Many firms in this room didn't

8    enter the litigation until probably September 30th,

9    2004, but now they have been around for 2 years.

10         MR. BUCHANAN:  And to just frame specifically

11    the proposal that Chris summarized what we would

12    support, Your Honor, is after the September trial

13    having a -- you drawing from a pool of, you know, seven

14    to 10 cases, whatever it is, for each of the monthly

15    trials, we advocate every other month, and that the

16    parties would be working up a significant pool of cases

17    for each of those particular windows of time.  Then you

18    can decide how to consolidate or otherwise for each of

19    those settings and prioritize among the different

20    groups of plaintiffs as you choose, and we would make

21    recommendations obviously, but I'll leave that to you.

22    We want to make sure we're in a position so when

23    September comes we're not thinking about what is our

24    next move in September.

25         We think that we can be in a position if we

1    start now to have 10 cases worked up for October; we

2    can have another 10 ready in December; we can have

3    another 10 ready in February and so on, so this

4    litigation moves forward, and Your Honor may want us to

5    work up more than that, and that's fine, and we'll put

6    the resources to get that done if that's the Court's

7    desire.

8         MR. MAYER:  And we, of course, believe that

9    for this to have any hope of advancing the litigation

10    or being meaningful you have to have both sides

11    involved in selecting what kind of cases get picked and

12    what cases get picked.

13         MR. KRISTAL:  That makes sense if there's two

14    sides who are looking towards some resolution.  When

15    one side -- I personally think it is time for us to

16    take Merck at their word "we're trying every one of

17    these cases."  So there's been nothing wasted on those

18    50 cases that have been worked up.  They will be tried

19    whether it is next year or 20 years from now.  Let's

20    try the cases.  Let's tee them up, work them up, and

21    because there's no magic in whether it is a quote "good

22    case" or "bad case" for either side let the plaintiffs

23    choose the cases.  What is the difference?  Merck is

24    going to try them all anyway.  We know there's no magic

25    as to who picks the cases from the Cona/McDarby case.

1         MS. FREIWALD:  Your Honor, I agree with you

2    that I think it is a little premature to say that the

3    system that we were going to work through until

4    September to see what happened has failed after we have

5    tried one out of three traunches of cases, and what is

6    troubling to me here is that this is not the first time

7    that the plaintiffs have agreed to a master plan of

8    having a set of cases to try and then after one case

9    went saying, well, that didn't work, so let's try

10    something different.  We didn't get the chance to see

11    what would had happened had we tried the first four

12    wave cases and we picked different cases.  Now they

13    want to pick yet different cases.

14         I think that we do need to go forward with the

15    plan that we have in place.  Obviously, we're going to

16    do that, and then some time both sides should sit back

17    and say to themselves, What is the next step?

18    Obviously, there has to be something after September,

19    and that can be done in some different context where

20    the sides are talking more creatively and openly about

21    what the options are.

22         MR. SEEGER:  Actually the proposal, to be

23    clear, just so you know, is beyond September.

24         MS. FREIWALD:  I understand it is beyond

25    September, but you said as a preface to your remark

1    that the system isn't working, and the system has only

2    gone one-third of the way through the process.

3    MR. SEEGER:  It is based on your client's

4    comments to the public.

5    MR. RABER:  In fairness, we have also had the

6    plaintiffs dump two cases that were on the schedule to

7    go forward.

8    MR. SEEGER:  That is going to happen.  These

9    are things that you want to get bogged down in, and it

10    is not going to be helpful.  We're saying there's 6,000

11    cases we have to move through the system.  Some will be

12    dropped.  Some will be dismissed.  Some you'll win and

13    some you'll lose.

14    MS. FREIWALD:  And some have been dismissed as

15    a result of the cases that have already been filed, but

16    we should be having a conversation where both sides

17    have real input into the process.  Clearly it should

18    not be a process where the plaintiffs pick all the

19    cases going forward.  We feel that there's been a huge

20    investment of time and money and judicial resources on

21    the cases that are already set up, so to say it would

22    be okay to make them some small piece of the pie we

23    think is inappropriate, but those are details that we

24    should talk about, frankly, at some other point in

25    time.  This isn't the place to work out the details of

41

1    one shot.  The jurors had pictures of all 48.  It was

2    done without any problem, so that was 48 in that trial.

3    We can do that.  We can do 50 and then 50 and then we

4    can bring in other judges.  We can go to other

5    counties.  We can't just -- it has been two years now.

6    We keep raising the same point, and we have to get

7    it off of dead center.

8    At one point I facetiously said let Merck come

9    up with a solution.  Well, their solution is try one or

10    two cases a year and we'll go for 500 years.  That's

11    not -- we have to be concerned about the civil justice

12    system.  These people are getting old.  They're in

13    their sixties and seventies.  They're going to be dead.

14    This requires Your Honor -- and I know Your Honor is

15    aware of it, and I hate to be stating the obvious, but

16    until we tee this up square on and ask Merck what is

17    your solution to this problem do you really want to

18    take 500 years, what is it, do you want to bring in

19    other judges, there's 21 counties here.  Do we all

20    go -- do 20 of us go to 21 different counties like we

21    did in asbestos and everybody trying cases all over the

22    state, which we're willing to do.  We have to get this

23    thing moving, and if you pick them at random, I

24    understand that Cona was picked by the plaintiffs and

25    McDarby was picked by Merck, so, you know, nobody knows

43

1    what the next step will be.  We can have a conversation

2    with Mr. Buchanan, Mr. Seeger, other representatives

3    about what might be a possibility after September.

4    MR. BUCHANAN:  That's what we discussed.

5    MS. FREIWALD:  No, had you a conversation in

6    chambers, with all due respect, and it is not what we

7    were prepared for today.

8    MR. FERRARA:  Your Honor, at the risk of

9    restating the obvious, Jerry said 20 years and the math

10    is if we tried 10 cases a year and there's 5,000 cases

11    it's a lot longer than -- 10 into 5,000 is 500.  It

12    will take 500 years to finish all the cases, and that

13    plays -- and, you know, and I say it to be funny that

14    we won't be around by then, but Merck will be around,

15    and it really feeds into their strategy to try a couple

16    cases this year and a couple next year and a couple --

17    you know, that's not fair to the plaintiffs, and when

18    the Merck CEO says that "I will never write a check in

19    my lifetime to settle this case" then we have to take

20    him at face value.  That's their position, okay?

21    Now we know what their position is.  That's

22    fine.  Let's take the 5,000 cases, and I don't think --

23    and I haven't talked to David and Chris about this or

24    Sol and David.  Let's take the 5,000 cases and Rob

25    Gordon tells us that he tried 48 asbestos cases in

42

1    who to pick, so if you want to pick them at random, you

2    know, I wouldn't just pick them by numbers.  All odd

3    cases, 10 to 20 go next month and 30 to 40 go.  Just do

4    something to get these things moving, Judge.

5    MR. COHEN:  I was going to say I know this is

6    a very hot button issue.  There are a lot of lawyers in

7    the room who probably want to speak on this for a long

8    time.

9    From my point of view, which is always going

10    down to the practical aspect what are we doing now,

11    what do we need to do in the next month or two while we

12    continue to discuss and come up with a plan and speak

13    to Your Honor.  Clearly, we need to move forward and

14    get cases worked up for trial, and we're doing that,

15    and, in fact, we're doing it in the order in which the

16    cases were filed.  So to the extent people are saying

17    my client isn't getting his day in court the people who

18    have been waiting the longest are the very people we're

19    working up now.  Maybe what we should do is look at the

20    waves and look at how many cases we have, accelerate,

21    do some more, start getting more worked up, because you

22    need a set of cases, and I think Your Honor actually

23    wants to deal with some of the oldest cases, as well.

24    Let's keep working those up so we're in a position to

25    do whatever it is we decide we're going to do, but I'm

44

1  not sure today, given this conference, that we should
2  make final decisions.  What we should do is say, here
3  we go, let's ratchet it up, maybe what you said, start
4  putting some experts after the fact, get this set.
5  Because the plaintiffs only asked for 30 cases.  We're
6  actually working up 50.  So let's keep, you know, we
7  are trying to get a whole bunch of cases worked up, and
8  maybe our idea of not having the experts first --
9        THE COURT:  Are those 50 all from the two law
10  firms?
11        MS. YEARY:  The majority of them.
12        THE COURT:  And that's the plaintiffs'
13  problem, I think.
14        MR. SEEGER:  That is.
15        MR. COHEN:  From the plaintiffs' perspective
16  the ones who have been in line the longest just happen
17  to be those two people.  So if you don't look at a firm
18  perspective but you look at a plaintiff -- are we fair
19  to the plaintiff, and I use the word "fair" from their
20  perspective, the people who filed first those are the
21  people you want to get to and either get, as you said,
22  dismissed, try, whatever is going to happen.  So from
23  my point of view I want to look at the list and say,
24  that's great, let's get more cases worked up, let's
25  have something ready for Your Honor.  We're working on

45

1  do it, but what the objection is to looking at fixing
2  firm trial settings whenever it is convenient for the
3  Court, we proposed every other month starting in
4  October, and working up new cases that include a
5  broader swath of plaintiffs.
6        I mean, I'm trying to understand why if the
7  position of the defense is every case one at a time
8  must be considered on its own merits a case isn't going
9  to be tried, a case isn't going to be resolved by
10  settlement, a case is not going away unless it is
11  considered on its merits, what the problem is with
12  considering another 30, 40, 50, whatever number the
13  Court wants to consider, and fixing them in trial
14  settings.
15        It is very inconsistent with the public
16  statements that we want to try every case, it turns
17  into let's protract the process.  We don't want to get
18  to September and find out we don't have trial settings.
19  We don't want to do that.  And if we want to be in a
20  position -- if they want to be in a position to look at
21  every case on the merits one at a time in trial
22  settings they're in a position to do it.  This should
23  be consistent with what they're asking for, but it
24  sounds like what they're really looking for is
25  500 years to get through 5,000 cases.

47

1  plan A through September.  We'll figure out what we're
2  going to do, but I'm not sure given today given the
3  fact that we're going to be talking and kind of a lot
4  of strong feelings on both sides that we should walk
5  out today or the next half-hour saying this is what
6  we're going to do for the next year and a half when we
7  have a lot of sitting down to do and make sure we know
8  what we are already working up.  We haven't been able
9  to give Your Honor a perfect answer as to which cases
10  we have already worked up.  I would like to be able to
11  do that.  I hate having arguments with Your Honor where
12  I don't have the facts completely at hand, but I think
13  we're working up at least 50.  That's 20 more than the
14  plaintiffs have asked for.
15        What do we need to do in the short-term?  We
16  need to work on getting more cases ready, and I think
17  if the argument is access to justice those who have
18  been waiting the longest we are already working on the
19  cases.
20        MR. BUCHANAN:  Your Honor, the thing I'm
21  wrestling with, Your Honor, is what the resistance is
22  in a try every case mentality that the defense has come
23  forward with to as a plan B giving Your Honor complete
24  discretion as you definitely have to withdraw a trial
25  date or to adjourn a trial date if there's a reason to

46

1        MR. MAYER:  We stepped up to the cases that
2  have come up.  We have continued to do that.
3        MR. SEEGER:  But you have 6,000 --
4        MR. MAYER:  We agree there will be trial
5  settings after September.  We think that we should have
6  meaningful input into what those cases are, how they're
7  set.  We think they should be selected --
8        THE COURT:  Your choice is the oldest cases.
9        MS. FREIWALD:  No.  Our choice --
10        MR. MAYER:  -- on a basis that's fair to both
11  sides.
12        MS. FREIWALD:  Whether we have 50 cases in the
13  mix or 80 cases in the mix isn't going to make a
14  substantial difference in terms of the speed with which
15  this litigation resolves, and everybody in this room
16  knows it.  So the offer of putting in 30 more cases
17  isn't because that's going to make the litigation go
18  away and dealing with the 50 cases isn't.  There are,
19  by my count, I don't have all of the wave cases in
20  front of me.  I have less than all of the wave cases,
21  but even in the less than that I'm seeing six law firms
22  that are involved, but these are plaintiffs who have
23  had their cases out for the longest period of time,
24  and, more importantly, I mean, a consolidated
25  proceeding is supposed to create judicial efficiency

48

1  and some sense of financial efficiency, economic
2  efficiency for all of the parties.
3         We have spent hundreds of thousands of
4  dollars, to say it lightly, on working up these cases.
5  We have been running all over the country.  These are
6  plaintiffs who have had heart attacks.  These are
7  plaintiffs who are represented by good lawyers.  These
8  are plaintiffs who are really injured who have every
9  right to their day in court.
10        THE COURT:  Do you have your list there?
11        MS. FREIWALD:  Yes.  I have a list.
12        MS. YEARY:  These are the 2003 cases that are
13 still active.
14        THE COURT:  And they have all been prepared?
15        MS. YEARY:  There's a status here of where we
16 are.  The fact discovery is completed in several of
17 them.
18        MS. FREIWALD:  But it doesn't include all of
19 the fifth and sixth wave cases.  Our point is we should
20 not throw out the work that we have already done.
21        MR. KRISTAL:  We're trying them all anyway.
22 We're not throwing it out.
23        MS. FREIWALD:  And we should have some smaller
24 meeting where we have, as Charlie says, some reasonable
25 process of talking about how the cases will be

1  organized and selected and prioritized for trial.
2         MR. LOCKS:  What happens at the end of 30 or
3  40 or 50 or 100 cases being tried and getting verdicts?
4  Where do we go?  What is the benefit?  What is the
5  benefit if you guys are not prepared at some point to
6  say we'll go into some sort of algorithm or do what one
7  of your directors said, there's certain people that
8  ought to be paid, which ones are you going to
9  eventually address?
10        MS. FREIWALD:  There's no difference with your
11 method -- there's no difference with what you're
12 proposing.
13        MR. LOCKS:  If you're prepared to want to
14 cooperate, and you're prepared to want to say, sure,
15 we'll try a certain set of cases and we win some and we
16 lose some and then we'll work out some settlement
17 program that makes sense because you admit in some way,
18 shape or form that some of the people are deserving,
19 rather than simply everybody wins their case and waits
20 5 years for appeal.
21        MR. COHEN:  If all the cases are going to get
22 tried why do you care which ones come first?  And if,
23 in fact, if you think there's some prospect of
24 convincing the company otherwise, why don't we have
25 meaningful categories so there's something in place if

1  you ever think there's going to be a change there's --
2         THE COURT:  They think the change is going to
3  occur if Merck loses 30 in a row.  That's what they
4  think.  They think the change is going to occur if
5  Merck loses 30 cases in a row.  And they think those
6  30 cases, even if they work their way through an appeal
7  process for a year or two will then bankroll the rest
8  of their cases.  And that's the bottom line.  Whereas,
9  from Merck's perspective one case is really just like
10 another, unless they think that by losing 30 in a row
11 it would change their settlement posture.  And since
12 that's been ruled out, supposedly, it doesn't make much
13 difference.  That's assuming what I can't assume, which
14 is that anybody can pick which cases are going to be
15 winners and which cases are going to be losers.  That I
16 have a real question about.
17        I mean, we can all talk around it, but we all
18 know what we're talking about, so I'll just throw it
19 out there on the table.
20        MS. RELKIN:  Just with regard to the discovery
21 of the 50 cases there are thousands of cases where
22 there had been medical records exchanged and facts
23 sheets exchanged, so the only difference, since there's
24 no expert discovery in those 50 cases, are, you know, a
25 handful of treating doctor and plaintiff depositions,

1  and we have shown from McDarby and Cona that those can
2  get done.
3         THE COURT:  Let me tell you what is happening
4  right now in the Tropicana litigation, which is taking
5  place in Atlantic County, and it is with another judge
6  under, you know, our civil division, and they are
7  taking depositions every day, and they are taking
8  4 days a week, 4 days a week they have to take deps.
9  Now there's about 10 firms involved in that, 15 firms,
10 but every day 4 days a week they're taking deps until
11 they get ready for trial.  That's just going to be one
12 massive trial, but the bottom line is we don't have
13 anywhere near that intensity going on in our trial
14 prep, and that's what we have to have.
15        We have to intensify the trial prep.  We have
16 to get the deps done.  We have to get the expert
17 reports listed.  We have to have a bank of cases that
18 are ready for trial, whether they're going to be listed
19 40 to be tried together or 10 to be tried together or
20 five or two at a time in front of a lot of people,
21 those details haven't been worked out, but we need a
22 bank of ready cases, and we need -- if anything, if
23 people are also talking about learning from cases
24 hopefully you can learn from discovery, how many cases
25 really aren't worth the discovery effort, how many

1    cases just -- and how many cases are.

2         MR. RABER:  I was hoping to discuss something

3    specific that touches on this, and this is the whole

4    question of de bene esse depositions for trial if we're

5    talking about doing multiple multiple trials.  And one

6    of the difficulties -- this is interesting to hear this

7    conversation because what we're finding now even

8    dealing with the limited universe we have now we're

9    finding there are too many indispensable people in the

10   litigation that we can't get a deposition scheduled

11   because Joe has a conflict or Sally as has a conflict,

12   and we're not able to deal with what we have now.

13        In the Alan Nies deposition is a great example

14   of that.  We're herding cats trying to get 3 days where

15   everybody will agree to come to a deposition, and some

16   issues have come up in connection with Dr. Nies that we

17   want to get some clarification from Your Honor, and I

18   don't know if now is the time to do that, but I think

19   it touches on some of these other issues about people

20   like Alise Reicin, Briggs Morrison, I know there had

21   been some discussion about taking trial preservation

22   depositions for them, which would allow people maybe to

23   do more trials at once and move more quickly.

24        MR. BUCHANAN:  Your Honor, I would like to

25   address the Dr. Nies issue and take issue with a couple

1         MS. FREIWALD:  We're saying in this venue

2    we're not going to --

3         MR. DASSOW:  We don't have a CMC schedule set

4    for July if we don't do it today.

5         MS. FREIWALD:  We don't need to do it.

6         MR. MAYER:  We can meet on this in 2 weeks.

7         MR. BUCHANAN:  Notwithstanding the concerns,

8    we're trying to talk about a framework here, and that's

9    the basis for what we're trying to lay out, the details

10   component.

11        THE COURT:  Who is Levin, Simes and Kaiser?

12        MR. STEIN:  I am, Your Honor.

13        THE COURT:  Because you have got some early

14   cases.  And, otherwise, it is pretty much Seeger Weiss,

15   one Beasley, Allen one D'allesandro.

16        MS. FREIWALD:  There are Anapol cases.  I

17   think there are six firms on that.

18        THE COURT:  Yes, Anapol cases are equally

19   divided with Seeger Weiss, probably or close.  You're

20   right.  It is Anapol and Seeger Weiss, one Kline and

21   Specter, three Beasley, one D'allesandro.

22        MS. FREIWALD:  We have already tried a Weitz

23   Luxenberg case.  We tried a Lanier firm case.  There

24   are -- we tried a Seeger Weiss case.  We're going to do

25   that again.

1    of the premises of Mr. Raber's statement, but if we can

2    stay on track with the trial grouping issue because,

3    respectfully, that's a different issue.

4         MR. RABER:  But this is a more time sensitive

5    issue --

6         MR. BUCHANAN:  We're going to do it today.  It

7    is on the agenda.  We're here to address it, but we

8    committed substantial time to this issue right now, and

9    I want to see if we can bring it to its conclusion.

10        MR. RABER:  I guess I just am echoing

11   Charlie's comments.  I don't know we're going to come

12   out now with a plan of 50 cases that we're going to

13   try, and I don't know how we try a case in October when

14   we have a two-plaintiff case set for September 11th.

15        MR. KRISTAL:  You pick the case, you set the

16   dates, you do the discovery.

17        MR. RABER:  It is easy to say that, but the

18   plaintiffs walked away from the starting gate in two

19   cases that were set by the Court already.

20        MR. KRISTAL:  But Merck's philosophy is let's

21   wait till September and then there will be another six

22   months before we get our next trial date.

23        MR. MAYER:  We're not saying that at all.

24        MR. KRISTAL:  If we do not do anything now to

25   set a trial date what is going to happen?

1         MR. SEEGER:  And we're going to keep doing it.

2         MS. FREIWALD:  And there are, I think, four

3    other firms on that list.  I think there are other

4    firms that are in the fourth and fifth wave that are

5    not on that list.

6         MR. BUCHANAN:  So that's the list of people

7    who didn't buy the Naproxen theory, I guess.

8         THE COURT:  Here.  You can give that back.  I

9    don't want to keep it because it has some of your own

10   notes on there.

11        MR. SEEGER:  Can I make one quick comment?

12        THE COURT:  Sure.

13        MR. SEEGER:  You have made comments in the

14   past about the oldest cases, and I have good reasons

15   for doing it.  The problem is this, you can run through

16   all of those pre September 30th, 2004 cases, and you're

17   still going to have what, five, 6,000 cases here.  So

18   that really isn't the solution.

19        I think the only way for this to work -- I

20   think Mr. Locks made the best point.  What does it

21   matter where the cases come from?  If the strategy is

22   to try and win every single one from the defendant's

23   perspective let us come out.  We can do 50.  We can do

24   40.  That part is easy.  But the plaintiff should take

25   their cases, propose those to the Court for trial, put

Transcript - Monthly Status Conference (2006/05/16)

1   everyone's efforts into working those cases up, and you
2   decide how they go to trial at that point.
3        MR. RABER:  You're still going to have 5,000
4   left.  Why are those 40 --
5        MR. SEEGER:  Can I just finish?  I'll make my
6   last point and I'll shut up.  The last point is this,
7   the way the discovery is going right now is, you know,
8   there's -- every case in this litigation has been
9   touched in some way by discovery; a facts sheet has
10  been served, a medical record has been ordered.
11  There's never going to be an agreement between us and
12  then as to how much discovery has been completed on the
13  so-called 50, 60 cases they say are done, because I
14  don't really think much has been done in the cases,
15  some medical records that's it.  Depositions by and
16  large have not really -- not a ton have been completed.
17       So let's start the process right now.  Let's
18  start a strategy that will bring the litigation to an
19  end in New Jersey, and let's put a plan in place, and
20  it has to include big consolidated trials, and I think
21  if we come up with 30, 40 cases and we give them to
22  them maybe some will go by the wayside as Mr. Raber
23  said.  Maybe some of those in the group won't -- we
24  won't want to try them, then they go away, there's a
25  resolution.  Maybe they decide there's a couple they

57

Transcript - Monthly Status Conference (2006/05/16)

1   don't want to try, and they settle them.  There's a
2   resolution.  What we're left with we'll go to trial.
3   That's fine.  But the cases have to go away some way.
4        MR. DASSOW:  And, Your Honor, that gets more
5   plaintiffs' firms involved so we get more of the cases
6   going than what Chris is talking about.  If you have
7   all the older cases, for instance, we're ready to go
8   with a number of cases to work them up, get them going,
9   and we'll provide them to liaison counsel and get them
10  going.  Then you have more firms in the mix that are
11  ready to try cases down the road.
12       MR. SEEGER:  If there's a plaintiffs' firm who
13  is not ready to go forward you're going to hear about
14  it, and you're going to be able to deal with that,
15  case, too, instead of having them sit out there, five,
16  6,000 cases.
17       MR. KRISTAL:  It also gives you more
18  flexibility to be creative, to send them to other
19  judges as necessary.
20       MS. FREIWALD:  I don't understand how
21  plaintiffs selecting the cases has any impact on the
22  speed of which this litigation resolves, whether the
23  cases go to other judges or not.
24       MR. SEEGER:  You're going to try them all.
25       MS. FREIWALD:  Whether resources are better

58

Transcript - Monthly Status Conference (2006/05/16)

1   used or not.  It has nothing to do with that.  It
2   simply doesn't.  And --
3        MR. DASSOW:  I'll give you a good example of
4   why, because I think we know who the folks are that are
5   older, that are infirm that are -- I'm looking at a
6   couple that we have got that we're ready to go today
7   that we talked about, and they have three kids, it is a
8   young mom.  They need help.  And I think we evaluate
9   our cases on which should go to trial and help these
10  folks out.
11       MR. MAYER:  We worked up the LoPresti case,
12  that was a case on your list.
13       MR. DASSOW:  And it was resolved.
14       MR. SEEGER:  Why complain about that, Ted?
15  You got rid of it.
16       MR. RABER:  I just don't want to hear people
17  saying they're ready to go then they have their chance
18  to go and they walk away.
19       MR. SEEGER:  Steve, this isn't about who
20  pounds their chest harder.  If the case goes away, it
21  goes away.
22       MS. FREIWALD:  We have had a lot of situations
23  where depositions have not been scheduled.  For
24  example, basically, Mr. Seeger's firm has really
25  refused to schedule depositions of certain experts --

59

Transcript - Monthly Status Conference (2006/05/16)

1   of certain doctors in the -- in the 50 cases we're
2   trying to work-up because you have your trial.  You
3   have asked for special consideration.
4        MR. BUCHANAN:  There was a court order that
5   prevented it, Hope, and subsequent to that we reset
6   them.
7        MS. FREIWALD:  And you asked for special
8   relief, so it's a question of how much more are you
9   going to be able to do.
10       MR. BUCHANAN:  I appreciate the accommodation
11  for trial counsel.  That was very kind of you.
12       MS. FREIWALD:  How much more are you going to
13  be able to do?
14       MR. SEEGER:  We can do it.
15       MR. KRISTAL:  Which why you want to broaden
16  the scope of firms.
17       MS. FREIWALD:  We do need a comprehensive
18  plan.  It should have input from both sides.  It should
19  be made reasonably.  This is not the first time we had
20  some plan only to see it implemented part of the way
21  and then plaintiffs say we don't like that plan, we
22  want a different plan.
23       MR. BUCHANAN:  There is an overarching plan,
24  it is try every case.  That is the overarching plan.
25  We would like to steer the cue.  We would like to

60

```
 1   select the cases with Your Honor's guidance we want to
 2   put all our cases in, too, great, we'll select among
 3   those, put them in, but, frankly, there's an investment
 4   of resources for the plaintiffs, as well, in these
 5   cases, okay?  Maybe Merck is counting on that.  Maybe
 6   they're counting for a financial attrition over years
 7   and years.  We would like to prioritize cases to
 8   maximize success to maximize the successes for those
 9   clients that go to trial and future clients.  That's
10   the way we would like to proceed because we think
11   that's in our best interest.  They don't have an
12   interest in it.  They want to try them all --
13        THE COURT:  They have -- as always in
14   litigation they have the opposite interest, which is --
15        MR. BUCHANAN:  I am taking them at their
16   public interest of trying every case.  I agree, they
17   don't want to lose.
18        MS. FREIWALD:  Whether or not there is a
19   settlement strategy there's obvious impact in how each
20   verdict comes out.  That's clear to each side.  And
21   there has never been a mass tort that I know of that
22   has been run with the plaintiffs selecting what goes on
23   for the stated purpose of --
24        MR. SEEGER:  Asbestos.
25        MS. FREIWALD:  Alone.  Pharmaceutical?
```

```
 1        MR. SEEGER:  This is more comparable to
 2   asbestos because it is going to be a 20-year litigation
 3   with thousands of cases.
 4        MS. FREIWALD:  Asbestos cases were tried
 5   reverse bifurcated.
 6        MR. SEEGER:  Name the last pharmaceutical case
 7   where 7 cases were tried and the cases didn't settle.
 8        MS. FREIWALD:  This is not comparable.  There
 9   isn't any pharmaceutical case that -- the idea --
10        THE COURT:  The bottom line is there haven't
11   been too many series of trials in the same state in a
12   pharmaceutical case.
13        MS. FREIWALD:  In the Baycol litigation --
14        MR. MAYER:  Your Honor, in this ligitaion --
15        THE COURT:  Baycol what?
16        MS. FREIWALD:  The plaintiffs didn't simply
17   pick the cases.
18        MR. KRISTAL:  But we had a defendant that was
19   willing to sit down and discuss it.
20        MR. MAYER:  We're not that far down the road
21   here in terms of we're very active.  We're very
22   active --
23        THE COURT:  We're way far down the road.
24        MR. SEEGER:  In this court we are.
25        MR. MAYER:  In terms of plaintiffs being
```

```
 1   actively ready to try cases that didn't start until
 2   less than a year ago.  And we've had some trials.  Your
 3   Honor has set a plan in place.  We're a third of the
 4   way through that really in terms of the trials.  We all
 5   agree that it doesn't stop with the McFarland trial,
 6   and we have a plan for -- to keep trying cases after
 7   that.  But to throw out wholesale, you know, when you
 8   have just started really down the road of your -- of
 9   the plan that you announced earlier this year and throw
10   that out and come up with a whole new plan on a spur of
11   the moment and a plan --
12        THE COURT:  There has been no plan that
13   addressed anything other than getting some of the
14   earliest cases ready and trying some bellwether cases,
15   which were chosen, and now we have to figure out a
16   litigation plan from the Court's point of view as to
17   what would be best, and, I guess, you know, the bottom
18   line is if I could choose and knew which cases were
19   winners and which cases were losers and I chose all the
20   plaintiffs' cases that I thought were winners then from
21   plaintiffs' point of view that's wonderful because they
22   hope if they win 30 in a row, as I just said, Merck
23   will get tired of losing or their stock will get hit or
24   they'll decide that they're going to settle, and, plus,
25   they can fund their cases.
```

```
 1        From the Merck side if they win 30 in a row
 2   they're going to prove to the plaintiffs that they
 3   don't have that strong a case as they think.  They're
 4   going to hopefully shorten the litigation by having
 5   plaintiffs drop out of the litigation or not file
 6   additional litigation.  I mean, the bottom line is both
 7   sides -- I'm not stupid.  I'm sitting here, and I know
 8   you both have advantages to winning and losing.  Huge
 9   advantages, not small, huge advantages at least early
10   on.
11        But early on is almost over, and eventually
12   you just have to start trying them, and then it won't
13   be that significant.  You lost so many, you won so
14   many, and, you know, if you're going to keep going or
15   if you're going to get tired -- both sides are going to
16   get tired.
17        I think I should probably do the case
18   selection from some type of radomized criteria.  Age of
19   cases is something that I'm certainly going to take
20   into account.  The other thing I want to take into
21   account, which for me is more important, is how we can
22   group some cases together.  That would mean date of
23   injury.  For example, as I was looking down the --
24   well, the list that Miss Freiwald gave me didn't
25   indicate what the date of injury was.  We have the date
```

1     of the complaint, but, you know, if they happened pre a

2     certain warning or post the second warning, pre the

3     second warning to me that's key evidentially.  That's

4     an important case because that -- although everybody

5     presents everything anyway it is more likely to be a

6     group-type of case.

7            MR. MAYER:  The date of first prescription is

8     also in terms of the way these cases have been tried in

9     terms of a category, the date of first prescription

10    relative to the label --

11           MR. SEEGER:  So if you got the first

12    prescription before the change.

13           MR. MAYER:  -- as opposed to or in addition to

14    the date of the injury.

15           THE COURT:  The date of the injury, the date

16    of first prescription and duration of use we know are

17    factors.

18           MR. SEEGER:  Judge, you could take 30, 1-year

19    cases, and then we have an answer for 1-year cases.

20    You can take 30 6-month cases or 30 18-month cases and

21    put them together, 30 2-year cases.  There seems to be

22    -- despite some public statements even from the company

23    that it increases risk after 18 months there's no

24    agreement to settle even those cases, so we're really

25    going to have to try it.

1            MR. BUCHANAN:  Even 48 months of continuous

2     use.

3            MR. RABER:  And you wonder why we don't laugh

4     at your jokes?

5            MR. SEEGER:  I wasn't joking that time.

6            THE COURT:  All right.  I'm going to look at

7     how I want to structure an order of discovery as far

8     as...

9            And I'm going to be -- I guess from the more

10    practical point of view, the defense, I think, has the

11    resources to -- well, I don't really care -- at some

12    point I have to not care whether you have the

13    resources.  If you have them you have them, if you

14    don't --

15           MR. SEEGER:  We're going to hang in as long as

16    it takes.  We don't need to involve the Court in that.

17    We just want to try cases.  We'll be around until it is

18    over.

19           THE COURT:  All right.  I'm going to start

20    looking at a plan, and I'm going to start looking at

21    how I can stack together cases that have similarities.

22    Now, obviously, it doesn't always work.  In

23    Cona/McDarby, which we thought we had 18-months use

24    there was a question about use for the one person,

25    obviously, whether he actually took it for 18 months.

1     There's always going to be that, but the generic

2     medicine was for somebody who took it 18-months use

3     and...

4            MR. SEEGER:  And you have samples cases, but

5     they're going to get mixed in with cases where you have

6     prescriptions.

7            MR. BUCHANAN:  Your Honor, do you need

8     anything from us in terms of identifying these cases or

9     do you have these all in the spreadsheet?  Do you have

10    date of injury?

11           THE COURT:  Well --

12           MR. SEEGER:  Do you have date of first

13    prescription?  You may not have that.

14           MR. BUCHANAN:  If you have a date of injury

15    and you have the number of months that you were on it

16    before you had the injury you have that.

17           THE COURT:  Yes.  Well, what it comes down to

18    is I have to think about it.  In the interim I would

19    suggest that counsel talk to each other.  If you have

20    some kind of joint ideas that you want to come up with

21    I'll be happy to listen to them.  If you have some kind

22    of proposals you want to make I'll be happy to listen

23    to it.

24           I mean, there are different ways we can go

25    with this.  We can go with age alone.  We can go with

1     grouping cases randomly, just -- not randomly -- but by

2     certain types of cases and putting them in waves by

3     types of cases.  We can do them by defense counsel

4     choosing a certain number of cases and plaintiffs'

5     counsel choosing a certain number of cases, and this

6     time we don't weed them out we just take them, take the

7     defense cases, we take the plaintiffs' cases, 10 from

8     each side, and we list them together, and I'm not

9     suggesting at this point I have room for 20 cases in a

10    courtroom because I really don't think I do.

11           MR. MAYER:  And, Judge, you know our views on

12    the combining of the cases.

13           THE COURT:  I understand that.  I can

14    guarantee you there's going to be some combination in

15    the litigation in the interest of justice to get these

16    cases moved.  There's going to be no way we can try

17    these cases individually, and there's a such a

18    repetitive -- not that we can't do it but we shouldn't

19    do it, and I'm not just talking about me, I'm talking

20    about the system shouldn't have or require different

21    juries to come in over and over and over again to hear

22    the same expert testimony on the specific issues.  I

23    don't know how we can resolve that, but at this point I

24    don't have any options other than to keep thinking

25    about it, because I don't have an option in mind how to

1   resolve it.

2       All right.  I'll keep thinking about it.  You

keep thinking about it, but...

4       MR. SEEGER:  Could we report back to you in a

5   week to see where we are with this, so we can put a

6   plan in place so we can talk early next week?

7       MR. MAYER:  You're gone next week.

8       THE COURT:  I'm gone all next week.  I will be

9   here -- I think I'll be very tied up the next week with

10  motions.  And the next week we're going to select the

11  jury on a Monday, June 5th, right?

12      MS. FUCHS:  I think we're doing jury selection

13  on the Friday.

14      MR. SEEGER:  We can come back this Friday if

15  you want to talk about it before you go.  I was only

16  saying a week because I thought it would be easier for

17  you.

18      MS. FREIWALD:  We can't.  We have too many

19  depositions scheduled.

20      MR. SEEGER:  I'll be back Friday for motions.

21  We can talk about it this Friday.

22      MR. MAYER:  I can't be here Friday.

23      MR. SEEGER:  But we can talk, and the person

24  who shows up can report on where we are.

25      THE COURT:  We'll discuss it on Friday.  I

1   doubt if we'll come to any resolution on Friday.

2       MS. FREIWALD:  I think we would need more time

3   to talk to our client.  I don't think Friday will be

4   productive.

5       THE COURT:  That's fine.  And I'm not making a

6   decision yet.  I'm accepting Mr. Cohen's suggestion

7   that we at least discuss it a little longer.  We don't

8   want to start -- I want to think this out carefully.

9   But at the same time I'm going to be coming to a

10  resolution of what I want to do.  So if you have

11  input --

12      MR. BUCHANAN:  Send it along.

13      THE COURT:  -- send it to me.  You know, maybe

14  whichever way you want to do it.  Proposals,

15  suggestions, thoughts, send them to me, and I'll read

16  them and think about them and add them to the mix of

17  what I'm deciding.

18      MR. LOCKS:  Can they be directly sent to you

19  or does everything have to go through liaison counsel?

20      MR. SEEGER:  I want to proofread your stuff.

21      MR. LOCKS:  I know you do.

22      THE COURT:  Oh, boy.

23      MR. KRISTAL:  Would you consider adding

24  two cases to the September trial?

25      THE COURT:  I would appreciate it if people do

1   not -- do not go out to the press and start talking

2   about how we're going to try 20 cases at once or

3   30 cases at once or we're going to do this or do that

4   because we have no idea what we're going to do yet, and

5   it would be very inappropriate for people to suggest

6   that we're going to go through a certain track or the

7   judge said we might do this.  What I have said today is

8   there's lots of options, and I have made no decision,

9   and I don't want to read tomorrow that the judge said

10  she may try 30 cases in one day or she may send them to

11  21 counties.  Those are all things I may ask to do, but

12  I'm not going to -- or I may not.  I have to think

13  about it.  And I don't want to see that reported as

14  this is what -- that's not really fair to anybody.  I

15  don't think it is fair to me most of all, but we all

16  worry about ourselves a little bit, and I don't think

17  it is fair.  And I don't really think it is fair to

18  either side either to have things just, you know, I

19  have been very -- I try to put as little restrictions

20  as possible, and even this I'm not entering as an

21  order, but I'm just requesting that you use some

22  discretion on this.  There's no reason -- if truly

23  people are interested in moving cases I really don't

24  think the press is the way we're going to move cases in

25  the end.  I think we're going to have to do it through

1   a system where lawyers are working together with the

2   Court to try to get some kind of efficient management

3   of this and get these things resolved.  And, quite

4   frankly, plaintiffs came to me today, but I was already

5   on this track for the last couple months in my own mind

6   because I drive back and forth thinking what am I going

7   to do next as far as what how I'm going to manage these

8   cases and move them because up until now I think we

9   have had a good system for doing, you know, the masses

10  of company discovery, it is done, there might be a dep

11  here or there of somebody, but it is done.  The fact

12  discovery in individual cases has to get done.  That's

13  going to wind up being much more of a burden for the

14  plaintiffs than the defense.  Much more difficult for

15  plaintiffs than for the defense simply because you're

16  going to have to -- you know, you're going to have to

17  get ready for your individual cases.  I'm assuming that

18  plaintiffs don't have quite the resources -- at least

19  many of them -- as the defense does.

20      MR. BUCHANAN:  We reserved $800 million within

21  our firm for prosecuting these cases.

22      MR. SEEGER:  We have about 8,000 left.

23      THE COURT:  That may not be true.  There are

24  some plaintiffs, I'm sure, who can fund things easily

25  and workwise, too, I'm not even talking about money.

1  I'm talking about time.

2     MR. SEEGER:  I'm trading in my baseball cards

3  at this point.

4     MR. KRISTAL:  Before we move on Weitz and

5  Luxenberg would ask you to consider adding two or

6  3 cases to the Hatch and McFarland case in September.

7  Perhaps we can discuss that on Friday.  I think we have

8  shown in Cona and McDarby we certainly can work it up

9  in that time period, but if you're thinking about

10  expanding groups I think doing four or five cases

11  similar cases at once would be something we would

12  suggest.

13     MR. SEEGER:  That's okay with us.

14     MR. KRISTAL:  So we'll try to have a concrete

15  proposal of cases for the Court and Merck for Friday.

16     MR. RABER:  I don't want -- as one of the

17  people trying the September case I don't want the

18  record to reflect silence by Mr. Raber here.  We would

19  object to that, Your Honor.  We have a very aggressive

20  schedule.  We haven't even taken one expert's

21  deposition yet.

22     THE COURT:  Oh, guys, come on, you were

23  supposed to be doing this.

24     MR. SEEGER:  We are.

25     MR. RABER:  We're trying to work this out.

1  I'm just telling you what the status of the discovery

2  is.  There is a lot to be done.  I don't want anybody

3  having any question.

4     MR. WEISS:  You identified most of the same

5  experts you used in other cases.

6     MS. FREIWALD:  You guys -- we had a proposal

7  for what would happen through September.  It was

8  ordered by the Court it was your request --

9     THE COURT:  Do you have any cases in the first

10  wave, the second wave, third wave.

11     MR. SEEGER:  They're post September '04.

12     MR. BUCHANAN:  Present a proposal.

13     THE COURT:  I wouldn't mind hearing from some

14  of the other counsel, even liaison counsel, too, if you

15  have any suggestions about your own cases or how you

16  want to see it managed.  Again, I would like to make

17  sure that it is not published letters, it is just

18  letters that you send, you know, and let's keep this

19  process amongst ourselves for a while.  Eventually you

20  might be able to -- when we make decisions, obviously,

21  the world wants to know what they are they're going to

22  know, but it doesn't do any good to either -- I've said

23  what I'm going to say.

24     MR. WEISS:  Could you let us also go copy to

25  liaison counsel so we can have a collection of --

1     MS. FREIWALD:  I'm assuming that they go to

2  defense counsel.  Since they seem like there was a

3  privacy issue here I want to make sure.

4     THE COURT:  Do they have to go where?

5     MR. WEISS:  If they send a letter to Your

6  Honor can there be a copy to liaison counsel and

7  defense liaison counsel?

8     THE COURT:  Does anyone have a problem with

9  that?  I just don't see how I can accept ex-parte

10  letters from anybody.  I could say you don't have to

11  send them to plaintiffs' liaison counsel but defense

12  liaison counsel is going to see them.  Be gutsy, if you

13  want to complain about liaison counsel put it in a

14  letter.  I'm not asking you for complaints at this

15  point.

16     MR. SEEGER:  There's nothing to complain

17  about.

18     THE COURT:  I don't think there is either.  I

19  have been very happy with liaison counsel on both

20  sides.  So I have no problems with liaison counsel.

21  Both sides have worked very hard in representing a lot

22  of people and trying to represent a lot of interests.

23     MS. ZEDALIS:  Cynthia Zedalis of the Branch

24  Law Firm.  Would you consider out of state plaintiffs?

25     THE COURT:  Yup.

1     MR. WEISS:  Right.

2     THE COURT:  I can't keep limiting it to New

3  Jersey only, I don't think.  We're trying that

4  experiment now.  I'm not going to add a nonNew Jersey

5  to Cona/McDarby, I can guarantee you -- to Hatch.

6     MR. MAYER:  The Supreme Court does have that

7  case that you hear of.

8     THE COURT:  But we're not talking about

9  scheduling a case for trial right now, we're talking

10  about -- and I think we'll hear from the Supreme Court

11  before cases would actually go to trial.  But, yes, I

12  don't think we should just work up New Jersey cases at

13  this point.

14     MS. ZEDALIS:  So date of injury, out of state

15  plaintiffs, those kind of things will be considered?

16     THE COURT:  Uh-huh.

17     MR. WEISS:  Most of the first I guess six,

18  seven waves are out of state plaintiffs.

19     MS. YEARY:  Most are.  Yes.

20     THE COURT:  Well, I'm hoping to get, you know,

21  a final -- we have gotten some direction because we

22  have an appellate decision.

23     MR. BUCHANAN:  Two.

24     THE COURT:  Two on issues, but they're really

25  different decisions, and we have to see how the Supreme