1  Court parses it down because they're not exactly -- I
2  don't know how they analyze it, but we'll see.
3      All right.  That's it then.  What is the next
4  thing we have to go to?
5      MR. RABER:  Can we talk about this de bene
6  esse Alan Nies issue?
7      THE COURT:  Okay.  What is that?
8      MR. RABER:  Before there's any kind of
9  $150,000 fee for a motion I want to revisit something
10  that's been discussed and get some clarification.
11      Your Honor may recall that at the Cona/McDarby
12  case Merck wanted to play the deposition of Alan Nies,
13  and Your Honor found that he was not unavailable and
14  suggested at the April conference that preservation
15  deposition, some sort of de bene esse deposition be
16  taken of Dr. Nies.  We have had difficulty scheduling
17  Dr. Nies's deposition and in the context of a
18  scheduling discussion an issue came up which raised the
19  question of should we even bother, is it worth the
20  effort, the issue being in speaking with Mr. Buchanan
21  he informed me that certainly the June plaintiff's firm
22  and possibly his firm would take the position that even
23  if a second deposition of Dr. Nies were taken they
24  would still argue that he is not unavailable and try to
25  preclude using even the second deposition, so I wanted

77

1  to raise that with Your Honor and see, you know, is
2  there some assurance that if we go through the trouble
3  of doing a second deposition can it be used?
4      That opened up a question, though, of going
5  back and looking at square one about the original
6  deposition, and I went back and looked at the
7  transcript, and, Your Honor -- the basis for Your
8  Honor's ruling, as I understand it, was that Merck
9  didn't try to get Dr. Nies to come to New Jersey, and
10  without that kind of a showing he is not unavailable,
11  and that the law that being just out of state isn't
12  enough that the party seeking to introduce the
13  deposition needs to contact the person, make a request
14  and have their request denied.
15      And I went and I looked at a case, and there's
16  a distinction between employees and lay witnesses who
17  are not employees, and with Your Honor's permission I
18  would like to show you the Avis Rent A Car case.  And
19  the Avis Rent A Car case is, I believe, kind of the
20  lead case on this issue, and it clearly makes a
21  distinction between nonemployees and employees, and I
22  have highlighted on the third page there, Your Honor,
23  some language where it deals with -- there were really
24  two sets of witnesses.  There was a nonemployee
25  witness, and then there were two employees.  And what

78

1  the Court held was that the nonemployee, that
2  deposition should have been allowed, and it didn't
3  impose any kind of requirement of going out and trying
4  to procure that witness' attendance, and that's in that
5  section there which I have labeled number one.  And
6  then it made a distinction for the employees --
7  basically as I read this -- that as an employee by not
8  asking and not offering to pay the person to come and,
9  you know, you control that employee, that's the
10  equivalent of sending them out of the jurisdiction.
11  And so we think Dr. Nies fits the category of this
12  first witness Clayton Usa, and that he lives in Texas,
13  he no longer works for Merck and that the inquiry under
14  the rules is whether or not the opposing counsel was
15  present, had an opportunity to examine the witness and
16  they clearly did.
17      Dr. Nies sat for three days of depositions 750
18  pages of transcript, questioned by  Mr. Seeger and
19  Mr. Specter.  I did an examination that consisted of
20  about 130 pages out of the 750, and, in fact, the
21  plaintiffs came to Your Honor and said they needed more
22  time for the cross-examination.  They were given an
23  additional 4 hours and 4 months to prepare for that.
24  My examination was in April of '05 and they went out
25  and finished it in August of '05.

79

1      So our position, Your Honor, in looking at the
2  Avis case before we go down the path of trying to
3  reschedule yet another deposition of somebody, before
4  all that is set in stone I want to revisit this issue
5  because I think that the legal premise that would guide
6  us down that path misses this distinction between
7  someone who is an employee and someone who is not, and,
8  so, I would first seek reconsideration of this question
9  as to the first deposition, and, second, that if a
10  second deposition appears to be the path that Your
11  Honor wants to take that there's some assurance that
12  that would be admissible at the end of the day.  But,
13  again, I don't think the second deposition
14  necessarily -- it doesn't touch on the unavailability
15  issue, which is, I think, is what David's point was in
16  our conversation, that, you know, you can go take a
17  second deposition, but that doesn't change the facts
18  about Dr. Nies's availability or unavailability.
19      So that's where we are.  And so -- and I guess
20  I want to have an understanding of if Your Honor still
21  believes that there's a burden on Merck to show
22  contact, request and refusal what's the nature of the
23  evidence, what kind of a standard are we being held to,
24  is it an affidavit from Dr. Nies, is it a statement
25  from counsel that as an officer of the Court we have

80

1   contacted him and he has said no?  Because this is a
2   practical kind of issue --
3       THE COURT:  If you listened during trial I
4   specifically said several times -- or if you look at
5   the transcript -- that if they can have a certification
6   from Dr. Nies indicating that he was totally
7   unavailable or unavailable or couldn't come or wouldn't
8   come, wasn't that presented as part of the trial?
9       MR. RABER:  Well, I don't know that it got to
10  that point because I think Your Honor said he could be
11  done live via video conference from out of state.
12      THE COURT:  I gave them options to video
13  conference him or if they truly couldn't produce him to
14  produce at least a certification as to why he couldn't
15  be produced or why he wouldn't come.  I don't think we
16  ever got that.  We also indicated that he could be
17  produced live by video conferencing.
18      MR. BUCHANAN:  Your Honor, I want to be heard
19  on a couple of things.  As a threshold matter, it did
20  not -- it was not raised at the April conference, and
21  we did not suggest he be taken de bene esse.
22      MR. RABER:  I have the transcript, and, as a
23  matter of fact, it was.
24      MR. BUCHANAN:  That was with respect to
25  Curfman.

1   trial preservation testimony and put it in the can, so
2   to speak, we would go.  We wanted an ample opportunity
3   to prepare and to cross-examine, and we would do so.
4       The issue that has arisen, and counsel has
5   correctly pointed it out, is whether or not it can be
6   played, and not having been a part of the prior trying,
7   but being made aware at least of the circumstances
8   surrounding the request to play his deposition it was
9   my understanding that he was viewed as unavailable as a
10  witness, and whether Merck -- or Merck was offered an
11  opportunity to show that he was not unavailable and
12  didn't make that showing or didn't see as an
13  alternative option to present his testimony live, and I
14  understand there was an offer for him to appear by
15  video conference.
16      The Locks Firm, which has the next case in New
17  Jersey, advised that they were reserving all their
18  objections as to anything relating to the de bene esse
19  testimony of Nies.  One of those would have been
20  whether or not the witness -- whether the witness's
21  deposition could be played as a nonhearsay statement.
22  Frankly, I'm not prepared to address for the June
23  setting.  That issue I'm not prepared to address for
24  the June trial setting.  It was my understanding in the
25  last trial it was resolved in a quasi 104 setting,

1       MR. RABER:  Page 15, and -- sorry, it is Page
2   12.  It says you have a de bene esse in order to use
3   him or you have to have him available.
4       MR. BUCHANAN:  Is that Dr. Nies?
5       MR. RABER:  Dr. Nies, right here.
6       MR. BUCHANAN:  The issue is whether it is de
7   bene esse or not, and what happens is the defendant
8   served a de bene esse notice in late April after the
9   conference.  Initially it was going to be a single day
10  deposition.  It was then widely cross-noticed and
11  morphed into a 3-day deposition, and, frankly, I'm
12  surprised at the suggestion this has been herding cats
13  because plaintiffs' counsel undertook to coordinate
14  with counsel from three or four different jurisdictions
15  or three different jurisdictions that were
16  cross-noticed to try to get a 3-day window to
17  accommodate their request, and this was their request
18  for a de bene esse --
19      MR. RABER:  Excuse me.  I'm one of the cats,
20  Your Honor.  I'm not trying to blame anybody.
21      MR. BUCHANAN:  Well, you did earlier.  And
22  they currently offered the 29th, 30th and 31st, which
23  we accepted, and now there's apparently an issue with
24  that.  We didn't think it was our place to object to
25  the de bene esse notice.  If they wanted to take his

1   where there was an offer made to extend it to the
2   parties to do it, and, frankly, that's what I thought
3   was going to happen here that they would take it, they
4   would decide whether they wanted to play it or not,
5   they would make a showing as to unavailability or the
6   appropriateness of playing the deposition, and trial
7   counsel in that case would make the arguments
8   applicable to that case both for the plaintiffs and the
9   defense as to whether the deposition would be played.
10      I understand counsel wants to get certainty
11  around that issue now, but, respectfully, I do think it
12  is an issue that is for this trial.  And a deposition
13  is being taken for that purpose.  It should be made, I
14  think, as a motion so that trial counsel in that
15  case -- and I understand Mr. Locks is here, but Mr.
16  Galpern, Mr. Pettit or Mr. Knowlton aren't, should have
17  an opportunity to address it in the context of their
18  trial.
19      I do think there are facts recited in the
20  prior transcript that strongly support this is a
21  witness under Merck's control.  I understand you take
22  exception to that, but I think arguments can be made by
23  trial counsel as to why he is somebody in Merck's
24  control.  He has been up here in Pennsylvania.  He has
25  been in D.C.  He has been in SanDiego.  He has been

1    deposed in four different locations.  You have been
2    able to procure three consecutive dates for a witness,
3    which has been a rare occurrence in my experience in
4    this litigation for his trial preservation testimony.
5    He has appeared live in Texas.  He has certainly
6    behaved as he is a witness under your control,
7    notwithstanding that now he is unwilling, apparently --
8    I don't even know if that representation has been made.
9    Notwithstanding that you're now claiming that he is not
10   somebody as to which the unavailability exception
11   applies.
12        So I do think that counsel have arguments.  I
13   think they should have an opportunity to make them.  I
14   don't think it is appropriate to make them on their
15   behalf for a June trial setting here today.  I think
16   that they should have an opportunity to argue it for
17   themselves.
18        MS. RELKIN:  I would like to join because we
19   were involved in that issue with McDarby.  There were
20   other issues.  I believe Dr. Nies is on the faculty of
21   UMDNJ, so there's still A New Jersey connection with
22   him, and it is a case-by-case issue -- UMDNJ or Robert
23   Wood Johnson.  There's that New Jersey connection.  And
24   it sounds like Mr. Raber is looking for an advisory
25   ruling.

1         MR. RABER:  I'm looking for a practical common
2    sense approach to a problem, and if we're going to have
3    this kind of argument with trying 50 cases this
4    illustrates the point exactly.  I'm trying to cut
5    through this and pin them down.  Is it worth the
6    trouble?  Should we go do three more days of deposition
7    if it is only going to be met with, oh, he is still not
8    unavailable.  And I need to address some of these
9    things because, Your Honor, the reason he came to
10   Pennsylvania, the reason he came to D.C. for a
11   deposition was because it was understood that if he did
12   a deposition and let everybody ask questions that could
13   be used in trial, and he wouldn't have to come for
14   another trial.  And we did it -- we did it to be
15   cooperative, Your Honor, and I would ask this, what
16   kind of incentive is it for any counsel to cooperate if
17   our act involuntarily providing him at everyone's
18   convenience is then used against us?  I don't think
19   that's right.
20        And he did testify in Texas.  He testified in
21   Texas because he lives in Texas and he was subpoenaed
22   to testify in Texas.  He didn't show up voluntarily.
23   So my point is that the Avis Rent A Car case here shows
24   that for somebody in Dr. Nies's circumstances we don't
25   even need to make the showing.  His being out of state

1    living in Texas is enough under Avis Rent A Car.  If he
2    were a current employee I agree that's what the case
3    says, but this case clearly makes a distinction between
4    somebody who is an employee and somebody who is not an
5    employee.
6         THE COURT:  Actually -- all right.  The Avis
7    case is one that I did rely on when I made my decision
8    previously.
9         MR. BUCHANAN:  I confess to not having looked
10   at it.  I didn't think we were arguing a motion.
11        THE COURT:  They talk about two different
12   witnesses.  One, they say he is a -- you can use his
13   witness, he is a lay witness outside of New Jersey.
14   And then it says his absence was not procured or caused
15   by Avis.  And, therefore, they said he can be produced.
16        The next paragraph talks about an employee,
17   but it doesn't turn on the fact that since he is an
18   employee he has to be produced.  That's not the way it
19   turns.  What it says is, quote, "he could have been
20   produced simply by agreeing to provide transportation.
21   Life testimony at trial is still preferred."  It then
22   went on to the unavailability of a witness.  "Under
23   Rule 4:16-1(c) is essentially the same as under New
24   Jersey Rule of Evicence 804(a)4 where all reasonable
25   means to procure the declarant's attendance at trial

1    must be exhausted."  There is another case that
2    specifically talks about if you don't even ask the
3    witness you haven't --
4         MR. RABER:  That's the Witter case, and that's
5    a case where the counsel stood up and said I control
6    this witness, and I, as a strategic matter, chose not
7    to bring him.
8         THE COURT:  Exactly.  And the bottom line
9    is --
10        MR. RABER:  And that is not in case.
11        THE COURT:  The bottom line is that's the case
12   if you could simply ask -- my way of thinking with what
13   Avis and Witter say is if all it comes down to is you
14   want to bring Mr. Nies in you have to just call him and
15   say, Mr. Nies, will you come in and testify and we'll
16   pay your transportation, and I think plaintiffs are
17   willing to pay his transportation, then you can call
18   him in life as a witness.  You could procure him, in
19   other words, easily.  He was not unavailable.  For
20   strategic reasons you wanted to use the deposition
21   instead of his live testimony, and that's exactly what
22   was happening in the case.  And that's why I said, no,
23   you can't do that.  You could have taken a de bene esse
24   deposition of him or should or produced him live, and
25   you should, in fact -- if you're going to take him

1  live -- you can do him by video conferencing, and I

2  said I may consider allowing to use the deposition.

3         MR. RABER:  Your Honor, as I understand it,

4  though, the rules speaks to a deposition that's already

5  been done.  The de bene esse deposition is a creature

6  of the old rules, and it applies to expert witnesses

7  and treating physicians.

8         THE COURT:  And it doesn't apply to a lay

9  witness who is unavailable.

10        MR. RABER:  And it applies to somebody who

11 maybe you know might be out of the jurisdiction, might

12 be unavailable, and there's a --

13        THE COURT:  Counselor, why don't you do this,

14 this is step one.  As far as I'm concerned, if you can

15 procure the witness by producing him live you have a

16 responsibility to do that.  If, in fact, and that's the

17 way I interpret this case law.  If, in fact, Dr. Nies

18 says, as he may very well, I am sick of this, I am

19 never appearing in another VIOXX case, I'm willing to

20 give one de bene esse dep, but I'm not willing to

21 testify live, fine, but I'm not going to let you use

22 him by videotape in the cases where you wanted to use

23 him by videotape then produce him live in cases where

24 you want to produce him live.  I'm not going to let you

25 use a prior deposition when you could produce him by

1  video conferencing.

2         I think you have to ask him are you willing to

3  appear in New Jersey.  If you're not, are you willing

4  to appear by video conferencing.  If he says he won't

5  appear by video conferencing or won't appear live then

6  we'll probably -- I'll order that his de bene esse dep

7  be taken.

8         MR. RABER:  But why doesn't the deposition

9  attended by everybody that went for 3 days with

10 cross-examination, why under the rules is that

11 deposition not allowed?

12        MS. RELKIN:  He is a Merck party.

13        MR. RABER:  He is not a Merck party.  He

14 retired.

15        MS. RELKIN:  You can't -- plaintiffs could use

16 it, but you can't.  The rules differentiate.

17        MR. RABER:  He is not a party.  He does not

18 work for Merck.  He retired in 2002.

19        THE COURT:  I have given you every

20 opportunity.  If you really want to use Nies I gave you

21 the opportunity last time, and I'm going to give you

22 the opportunity this time.  You can produce him live.

23 You can produce him by videotape -- not by videotape,

24 you can produce him by video conferencing, so he can

25 sit right in Texas and testify.  If he refuses to do

1  that -- if you ask him, and he refuses to do those two

2  then I will order a commission that he take his de bene

3  esse dep.  He has already agreed he will appear for a

4  de bene esse dep.

5         MR. BUCHANAN:  And the significant thing that

6  we're talking about --

7         MR. RABER:  But --

8         MR. BUCHANAN:  Excuse me.  We're talking about

9  three consecutive days for a de bene esse dep when he

10 could appear for a video conference in the same

11 location and testify in court.

12        THE COURT:  I can see where the guy is not

13 going to want to testify a thousand times.

14        MR. RABER:  But the point is if you do the

15 video conferencing route it is over and over again.  If

16 we're trying to find ways to try multiple cases, and we

17 have the plaintiffs floating the idea of doing

18 preservation depositions for experts, and for, perhaps,

19 other people -- my fundamental question is I don't

20 understand on that record why the old deposition

21 doesn't work and how a new de bene esse deposition

22 occurs that --

23        THE COURT:  Because counsel's argument was

24 that it was a discovery deposition not a trial dep, and

25 they did not cross-examine him the same way they would

1  have at trial.

2         MR. RABER:  But the rules don't make that

3  distinction for a witness like Nies.  They do for an

4  expert and for a treating physician, but the rule which

5  applies to Nies is a deposition is a deposition, and --

6         THE COURT:  A deposition is a deposition only

7  if he is unavailable.  And he is not unavailable.

8         MR. RABER:  But then how does a new deposition

9  cure that?  They're going to object even if we go

10 through this exercise.  They're being coy.  They're not

11 committing here.

12        MR. BUCHANAN:  I don't think I was coy at all.

13 I have to tell you I object to the entire process

14 because, as I said at the beginning, this is a

15 motion -- this is being done for the June trial.  It

16 should be raised in a June trial, and they should have

17 an opportunity to raise it whatever concessions they

18 want.

19        THE COURT:  If Mr. Nies -- Dr. Nies provides a

20 certification -- if you want clarification that he is

21 unavailable that he will not appear, it is so hard for

22 him to say that he would refuse to come to a video

23 conference, but he will come for three days of

24 testimony how can he say that?  Obviously --

25        MR. COHEN:  He has to schedule it three days

1    in advance.  He may call him in the next case and the
2    next case, and you never know when the phone is going
3    to ring, and in three days it is in the can, and it is
4    done.  I would take the dep.
5              MS. RELKIN:  He is a doctor, so he comes
6    within the requirements for a de bene esse.  You're
7    going to have some expert testimony.
8              MR. RABER:  He is not a treating physician.
9              MS. RELKIN:  He is an expert.
10             MS. FREIWALD:  I don't understand that
11   argument because if that argument holds then how --
12   what is your objection because you're playing tons of
13   de bene esse depositions of doctors who are perfectly
14   available to show up for trial, and we know that, so if
15   that's the argument then it has to go both ways, and
16   you're negatively doing that --
17             MR. BUCHANAN:  That's proper.
18             MS. FREIWALD:  -- with doctors who we all know
19   could come live if they only were subpoenaed.
20             THE COURT:  Let's go off the record.)
21             (Break taken.)
22             THE COURT:  As far as -- let me just backtrack
23   quickly.  Is Allison here?  On the database the sheets
24   you were given at least one counsel had approached
25   Allison, who is doing entry for us, and indicated that

1    would update the correct information.
2              THE COURT:  Let's go back to the Nies
3    deposition.  I think that for future cases, not the
4    June case but for future cases we are going to have to
5    clearly enter into some kind of agreement about de bene
6    esse deps being used in all cases.  I mean, that's just
7    going to have to happen on both sides.
8              MR. RABER:  That's where I was headed because
9    there are under the rule what we call absent but not
10   unavailable witnesses, and if we're going to have an
11   ambitious trial program of doing lots of cases, you
12   know, should we work towards trying to schedule those
13   kind of depositions?
14             THE COURT:  There should be some kind of
15   agreement, though.  I don't think plaintiff should be
16   deprived of any Merck corporate witness live -- of
17   having one corporate witness live.  I might change my
18   mind later, but I'm not sure I want to get to the point
19   at this point where I'm going to require everything to
20   be produced by deposition.
21             On the other hand, I'm not going to --
22   obviously, no corporate witness for Merck is going to
23   appear 6,000 times.  Well, maybe they are; if they have
24   to they have to.
25             MR. KRISTAL:  Only if Merck wants them to.

1    the cases were all dismissed that were on his list, so
2    you don't have to give us all the information about
3    those cases, obviously.  We'll just enter them as
4    dismissed.
5              Charlie Cohen had given to me this, which
6    basically includes the entire database with red
7    whereever the defense believes the fact that was
8    entered didn't match the facts sheet.  For example,
9    smoker, and he put "past smoker" because that's what it
10   says on the facts sheet.
11             We can just make these changes, assuming that
12   Charlie is infallible or close to it.
13             MR. COHEN:  Some of them there is a difference
14   between the facts sheet and the database, and I don't
15   know which one is right, so I can't speak to the change
16   is right as to those.  Some are typos where I believe
17   I'm right, but the other ones I need counsel input to
18   tell us which ones --
19             MR. BUCHANAN:  Obviously, for docket numbers
20   he is right, but I think what we agreed to do is
21   Charlie would send us an Excel spreadsheet, that
22   printout in an Excel spreadsheet form, and we would
23   send it around to everyone, all the plaintiffs'
24   counsel, and they would review the suggestions from
25   Charlie, and when they updated their spread sheets they

1              MR. MAYER:  We should work towards something
2    for future trials, not the June trial, but for future
3    trials where witnesses on both sides could appear.
4              MR. BUCHANAN:  I would rather put a proposal
5    together and submit it in June because I'm not so sure
6    the rules should be bent to accommodate the defendant's
7    unwillingness to resolve claims.  I think we should put
8    together a proposal, and there's a lot of people who
9    are affected by going down this path, not to mention
10   the people in trial, but as well as those who have
11   future trials and those who have an interest in
12   whatever the outcomes of those trials are.
13             MR. SEEGER:  If this isn't going to affect the
14   June trial we don't have to deal with it now.
15             MR. BUCHANAN:  We can deal with it at the
16   subsequent status conference.
17             MR. RABER:  But there's been sentiment in
18   looking ahead and I think it would be helpful to have a
19   sense should we be looking ahead to try to work
20   something out where there are clearly repeat players,
21   and should we be looking ahead toward taking a
22   preservation deposition that Your Honor would have
23   discretion in any case to say this person is not
24   unavailable but they're absent, they have to testify in
25   another case, they're not available for this trial, I'm

1  going let you do the video instead.  Should we be

2  working towards something like that to facilitate more

3  efficient trials?

4       MR. SEEGER:  That's where this is heading, and

5  you can't do that right now with Alise Reicin, Briggs

6  Morrison.  They're showing up at the trials.  We're not

7  there with them.

8       MR. WEISS:  Second of all --

9       MR. RABER:  We're also not trying the cases.

10  Now we're being accused of jumping the gun.

11       MR. SEEGER:  No, now you're being accused of

12  trying to use the momentum -- what we're asking for in

13  terms of getting trials set to cut corners on what the

14  rules are, and you just can't throw out rules.

15       MR. RABER:  I'm saying the rule says that the

16  Court has discretion in exceptional circumstances, that

17  if somebody is absent but not unavailable that the

18  Court can allow a de bene esse deposition for someone

19  under those circumstances, my simple point is if

20  we're trying the kinds of volume of cases that's being

21  discussed here that would be exceptional circumstances

22  at least in my mind and Your Honor might find the same

23  thing.

24       MR. SEEGER:  That's not for corporate

25  witnesses.

97

1       MR. BUCHANAN:  It is for experts and treating

2  physicians.

3       MR. RABER:  I have the rule right here.  It is

4  4:16-1 subsection C, "the deposition of an absent but

5  not unavailable witness may also be so used if upon

6  application and notice the Court finds that such

7  exceptional circumstances exist as to make such use

8  desirable in the interest of justice and with due

9  regard to the importance of presenting the testimony of

10  witnesses orally in open court."  The Court weighs it

11  all.

12       MR. SEEGER:  It is exceptional circumstances.

13       MR. BUCHANAN:  We don't object -- what I would

14  like to do is put together a proposal for the

15  plaintiffs because I don't think exceptional

16  circumstances exist in this case or certainly warrant

17  going down this path.  I understand what Dr. Nies there

18  was an issue the last time.  He is a former employee,

19  although from what I understood from his deposition

20  testimony a Merck consultant, but, you know, as to

21  current employees we think this is --

22       THE COURT:  He did give a certification saying

23  he is no longer a Merck employee, and he is no longer a

24  consulting for them, I think.

25       MR. BUCHANAN:  There is testimony that he

98

1  was --

2       THE COURT:  There was a certification to that

3  effect.  There was a trial certification saying that --

4  there was a certification saying he is not employed and

5  he is no longer consulting.  As I recall, there was not

6  a certification that said he wouldn't be willing to

7  testify.

8       MS. RELKIN:  It didn't say that --

9       MS. FREIWALD:  There was a certification that

10  said he could not appear at trial because of medical

11  reasons, which he laid out in greater detail in the

12  certification, and after submitting that Your Honor

13  said you didn't deem that sufficient unavailability,

14  but we believe --

15       THE COURT:  Believe me, if he was sick enough

16  that he couldn't have appeared at trial, and I felt

17  that that was the case, as I recall there was something

18  saying --

19       MS. RELKIN:  He had an MRI is all it said.

20       MS. FREIWALD:  He injured his back, and he had

21  a follow-up MRI and the doctor did not want him to

22  travel.

23       THE COURT:  And then I said he should do it by

24  video.  Then the thing was his only issue was he had a

25  back injury, which he had injured skiing, and he said

99

1  that he wasn't able to fly, which is fine, but I then

2  said you could take him by video conferencing.  You're

3  right, facts change with different circumstances.  I'm

4  100 percent comfortable with that decision.  I think it

5  fits 100 percent with what the case law is and what the

6  facts were at that time.  There is no question in my

7  mind that that was the right decision, and that if Nies

8  was important to the defense he would have been there

9  live.  And if he wasn't there live he would have been

10  there by video conferencing, which would have been the

11  equivalent of live or a lot more than a tape.

12       MR. RABER:  I guess that's where we part ways

13  here because my reading of Avis is somebody in Dr.

14  Nies's situation is not -- the mere fact that he is

15  outside the jurisdiction we didn't cause him to be

16  there, is sufficient under the law.

17       THE COURT:  And I don't think that Avis says

18  that at all.

19       MR. RABER:  Okay.

20       THE COURT:  It says pretty clearly that it has

21  to be someone that you have failed to procure and

22  cannot procure.  I think you have to make an effort.

23       MR. RABER:  So I understand the clarity on

24  that then the question is --

25       THE COURT:  The question is should you take a

100

1    de bene esse dep of Nies for the next trial.

2          MR. RABER:  We don't want to go to the trouble

3    of scheduling 3 days of deposition for somebody to show

4    up and say he is still unavailable you can't use it.

5          MR. SEEGER:  Judge, speaking being trial

6    counsel in that September trial, our issue is that we

7    do believe he is available.  If you were to rule

8    otherwise on that I'm not sure that we would

9    necessarily require a de bene esse dep be taken because

10   there is deposition testimony in the can, but we do

11   think this witness is available for testimony live at

12   trial.  He showed up all over the place for them.  He

13   has been all over the country for them.  But that's

14   really more our issue than the de bene esse deposition.

15   Taking another deposition in this case I don't think is

16   something, at least for the September trial, we care

17   about.

18         THE COURT:  There should be a motion filed

19   with supporting papers before the trial.

20         MR. SEEGER:  Okay.  But we don't have him

21   before the September trial?

22         THE COURT:  Well, are you planning on using

23   him in the June trial?

24         MR. RABER:  I'm not trial counsel for June.  I

25   don't know.

---

1    have already ruled that.  Now the question is should a

2    de bene esse dep be taken of some of these people so

3    that they're available to testify?  Should we on a

4    general basis have de bene esse deps available, that's

5    number one.

6          Number two issue is if the person is available

7    at the time of trial can you use the de bene esse dep

8    in lieu of the live testimony or are you required to

9    first show that they're unavailable?  That's an issue

10   that I'll address through briefing.

11        MR. SEEGER:  So the second issue you want the

12   briefing on?

13        THE COURT:  It was not an issue in the last

14   trial because we didn't have a de bene esse dep.  Now

15   the question is if the de bene esse dep is taken that's

16   generic basically to be used in all cases because it is

17   a corporate witness talking about the history of VIOXX

18   should we then say that that's, therefore, for an

19   emergency when he is unavailable.  There still would be

20   a reason to do it, but the question is or can it be

21   used as treating doctors are used just because the

22   person without really unavailability or were

23   unavailable because we didn't try to procure him.

24        Actually, I don't want to rule in advance.

25   When you take somebody's de bene esse dep you have

---

1         THE COURT:  I don't know either.

2         MR. SEEGER:  I thought you indicated this

3    wasn't going to be an issue for the June trial.  It

4    sounded like you were standing on your ruling from Cona

5    and McDarby.  I might have misunderstood.

6         MS. FREIWALD:  The issue with the de bene esse

7    is we don't want to take a deposition and have a

8    different ruling in every single trial.  This is a

9    liaison-type issue.  This isn't an individual trial

10   counsel issue.  It seems to me --

11        MR. KRISTAL:  You're never going to bring him

12   to any trial life.  You're not hiring him as a

13   consultant in the future?

14        MR. RABER:  I never say never.

15        MR. SEEGER:  That's exactly the problem.

16        MR. RABER:  Wait a second.  Wait a second.

17   The question is he appeared for these depositions on

18   the understanding that that would be it, he wouldn't

19   have to come testify.

20        MR. SEEGER:  Why would you tell him that?  We

21   never said that.

22        THE COURT:  I'm not going back to that.  I

23   already ruled that's not true and not the case, and if

24   that was his understanding it was a false

25   understanding.  That was not a de bene esse dep.  I

---

1    taken steps towards trying to procure them.  That's the

2    issue.  That was not there in the other case.

3         MR. RABER:  It is difficult because there's no

4    such thing as a de bene esse deposition under the rules

5    for a person in Nies's circumstances.  That's why I

6    don't understand.  How can we have taken a de bene esse

7    deposition when the rules don't provide for it?

8        THE COURT:  What we're saying now is if

9    there's a generic deposition out there that would have

10   been an attempt to procure a witness -- really that's a

11   point in your favor.

12        MR. RABER:  Okay.  I understand that.  I

13   understand that.

14        THE COURT:  It is in your favor because if, in

15   fact, if I'm ruling that you didn't even try to get the

16   witness and you haven't tried to get him for trial for

17   strategic reasons if you set up a de bene esse dep and

18   allow counsel to cross and scheduled it and took it I

19   would think that would be something that would

20   certainly fall to the weight of whether or not you have

21   actually attempted to procure the witness or not.

22   That's all I'm saying.

23        Having said that, I'm still willing to listen

24   to the arguments and the briefs and not make a final

25   decision.  Okay?

1    MR. BUCHANAN:  Just so we can advise the folks

2    in the June trial for purposes of the June trial I will

3    probably get a call later today or Mr. Locks is still

4    here, but they'll probably be interested in knowing.

5    THE COURT:  Was the dep going to be taken

6    before the June trial?

7    MR. BUCHANAN:  They have -- the June folks

8    have raised -- have taken exception, I think, with the

9    general timing of the de bene esse dep.  That was

10   originally set for May 16th, it was moved to May 29th.

11   They wanted to reserve all their rights with respect to

12   availability, unavailability, timing of the dep,

13   without regard to that 2-week adjournment or other use

14   of the deposition, but I'm just not clear on what I'm

15   advising them with respect to the Nies issue at this

16   moment.

17   MR. RABER:  The answer is we don't have

18   agreement on dates right now before the June trial.

19   MR. BUCHANAN:  Well, you offered dates, and we

20   accepted them.

21   MR. RABER:  It is not quite that simple.  We

22   had May 16th to 18, and then the plaintiffs reneged on

23   that, and then we offered --

24   MR. BUCHANAN:  You had May 16th at and you

25   turned it into a 3-day deposition.

1    MR. RABER:  And then we mistakenly offered May

2    29th through 31st and May 29th is Memorial Day.

3    MR. BUCHANAN:  Which I moved everything around

4    so I could do it on Memorial Day.

5    MR. RABER:  And we proposed May 30th, 31st and

6    June 1st, and we were told certain people couldn't be

7    there, and that's the lawyers, not the witness.  So the

8    bottom line is everybody -- there's a little bit of

9    blame all the way to go around.  It is just the

10   practical reality of trying to schedule a lot of people

11   to do 3 days in a row when we're trying to do a lot of

12   different things.  And, so, as it stands now, there's

13   no agreement on any dates in the meantime for the

14   June --

15   MR. BUCHANAN:  As a practical matter if it is

16   not going to be usable in the June trial then we'll

17   find alternative dates.  That's what I'm trying to

18   advise the folks.  I want to be able to advise the

19   people in June.

20   MR. SEEGER:  I can tell you -- and Mr. Locks

21   on the way out did say to me his expectation is this

22   wouldn't be an issue for the June trial because he

23   thinks all the deadlines have come and gone designating

24   what is going to play, what depositions you're going to

25   use.

1    MR. KRISTAL:  It is a fact witness.

2    MR. SEEGER:  Right.  And it is a fact witness.

3    So it shouldn't apply to the June trial.  And then we

4    have time to work all this out.

5    THE COURT:  All right.  If there's any issue

6    as to whether Dr. Nies is going to be called in the

7    June trial then a motion should be made to that

8    effect -- in limine to rule that you can use him or not

9    use him or you can just wait until the end of

10   plaintiffs' case and see if he is ever talked about.

11   They say they're going to try a little different case,

12   so maybe his testimony won't even be an issue.  Who

13   knows?

14   MR. KRISTAL:  Maybe you won't Nies him.

15   THE COURT:  Oh, God.  I'm not laughing at that

16   one either.

17   MR. SEEGER:  You're smiling.

18   (Discussion off the record.)

19   THE COURT:  Okay.  Are we done with

20   everything?

21   MR. BUCHANAN:  I think we have dealt with the

22   issues on the agenda, Your Honor.

23   There are two McFarland specific issues we

24   agreed to deal with separately and probably in

25   chambers, but there's two other items, there's the

1    consumer class action and there's a few issues that

2    need to be raised and then we go into the Local 68

3    conference.

4    MR. DAVID COHEN:  Good afternoon, Judge.

5    David Cohen from Spector, Roseman and Kodroff on behalf

6    of the consumer class.

7    THE COURT:  Let me ask, are there any issues

8    that don't deal with either the class actions or with

9    McFarland?

10   (No response.)

11   THE COURT:  Okay.  And you'll be sending me

12   your suggestions with how we can dispose of the entire

13   list in the next 2 years?  Okay.

14   MR. WEISS:  60 days.

15   THE COURT:  I'll be happy to hear it.  If

16   anybody wants to leave who is not involved in those

17   issues you are free to leave.  If you want to stay you

18   can stay.

19   THE COURT:  Okay.  What about the consumer

20   class.

21   MR. DAVID COHEN:  Good afternoon.  David Cohen

22   from Spector, Roseman and Kodroff on behalf of the

23   consumer class.  I submitted some issues to the Court

24   today for resolution having to do with discovery.

25   During breaks Mr. Judd and I were able to discuss and

1   resolve or get some guidance on the majority of the
2   issues.
3       I think when you came back into the Court from
4   break you saw in your chair a one-page list of open
5   discovery issues in the Klineman and Martin cases, and
6   I prepared that just for guidance on the issues.  I
7   wanted to discuss, Your Honor, because the agenda
8   wouldn't bear a detailed discussion of each of the
9   issues.
10      THE COURT:  Okay.
11      MR. DAVID COHEN:  Just running down the issues
12   I have reached agreement with Mr. Judd as to what the
13   presentation would be on the majority of them.  I'm
14   going to skip over number three because that's the only
15   one where we have a disagreement that we're unable to
16   resolve, so I'll just run through the others, except
17   for number three, and let you know where we stand just
18   with the one caveat, Your Honor, that this is not a
19   complete list of every possible discovery issue in our
20   litigation.  These are simply the issues that are
21   joined for discussion today.
22      There will be, I'm sure, other issues in the
23   future, but these are the ones we have now.  Starting
24   at number 1(a) Mr. Judd has advised that Merck expects
25   to be able to produce its supplemental production of

1   documents showing net profits or controllable income
2   from VIOXX within the next 45 to 60 days, pending his
3   ability to confirm that -- those dates.
4       Moving to 1(b), Mr. Judd has advised that
5   Merck expects to be able to produce supplemental VIOXX
6   profit plan source materials within 60 to 75 days.
7       MR. JUDD:  60 to 90.
8       MR. DAVID COHEN:  I think I agreed to 75, but
9   I think he promised a rolling production for all of
10   these categories, so if the documents are available in
11   advance of the dates I'm mentioning they'll be
12   produced; is that correct.
13      MR. JUDD:  Yes.
14      MR. DAVID COHEN:  Moving to number 1(c)
15   Mr. Judd has advised that Merck expects to make a
16   production of other requested documents currently being
17   searched for within the next 60 to 90 days or on a
18   rolling basis as soon as they're available.
19      I'm skipping over issues 1(d) and 2.  Issue
20   1(d), the plaintiffs are letting go for now, pending
21   our review of documents, that Merck has identified and
22   our ability to confirm Merck's representations about
23   the responsiveness of those documents.  Issue two we're
24   going to let go for now pending the result of
25   individual follow-up discovery from individual experts.

1       Skipping over No. 3, as I said, brings us to
2   item 4.  Mr. Judd has advised that Merck will provide
3   defendant case profile forms for the Klineman and
4   Martin cases within 60 to 75 days or again as soon as
5   that are available.  For issue 5(a) Mr. Judd has
6   advised that Merck will produce copies of Dr. Wilson's
7   presentations related to VIOXX in the next 2 weeks.
8       For issue 5(b) Mr. Judd still has some work to
9   do and has said that he will get back to me about his
10   ability or interest in producing Dr. Wilson's expert
11   testimony in VIOXX cases.  That may be a future issue.
12   And issue 5(c) Mr. Judd has advised that Merck will
13   produce copies of Dr. Wilson's bills for expert work on
14   VIOXX cases within the next 2 weeks.
15      That leaves only issue No. 3 for resolution,
16   so a bit of background might be in order.  On February
17   10th of this year the plaintiff served a deposition
18   notice seeking the deposition of a corporate
19   representative with knowledge of VIOXX profit plans.
20      In our meet and confer on March 28th Mr. Judd
21   mentioned this individual Tom Cannell as Merck's likely
22   designee and suggested that a date might be presented
23   in the first week of May for his deposition.  The first
24   week of May has come and gone and no date for
25   Mr. Cannell's deposition has been provided.  In our

1   discussions today Mr. Judd has suggested that the
2   deposition should take place beginning July 19th of
3   this year, which I'll note to remind Your Honor is a
4   week or more after the date set for argument on our
5   class certification motion, which is July 7th, and more
6   than a month after the due date for our class
7   certification will apply, which, as I understand, is
8   June 15th.
9       The idea that Merck would need more than
10   5 months to prepare Mr. Cannell for a 30(b)(6) type
11   deposition is completely unacceptable.  I have not
12   heard any explanation from Merck to justify that delay,
13   other than there's simply a lot of work to be done, and
14   he needs to be able to answer questions.
15      I will say firmly that I would not ask the
16   Court to delay our class certification schedule to
17   permit this deposition to take place on Merck's time
18   frame.  If the deposition won't take place before our
19   argument for class certification I can live with that.
20   I don't think it is appropriate.
21      THE COURT:  What's that date of argument?
22      MR. DAVID COHEN:  July 7th is the class
23   certification argument.  My preference and what I think
24   is fair and appropriate is to insist that Mr. Cannell
25   be deposed before June 15th, which is the date of our

1   class certification reply brief.  Otherwise, we
2   wouldn't -- otherwise, there's no reason to take the
3   deposition if you understand what I'm saying.
4       I don't see that there's a justifiable reason
5   to delay a 30(b)(6) deposition another 2 months and for
6   a period of 4 months after the guy has already been
7   identified.
8       THE COURT:  So in all these records
9   productions he has agreed to produce them as quickly as
10  possible on a rolling basis but some of them may not be
11  produced for 90 days, and you're not asking for any
12  adjournment of the class certification based on that
13  production?
14      MR. DAVID COHEN:  No, Your Honor.  Our
15  preference would be to proceed to class certification
16  on the present schedule without any delays at all.  The
17  only issue that seems unreasonable to live with is the
18  delay in this 30(b)(6) deposition because, frankly,
19  Merck has known who this fellow is for quite some time,
20  and I don't understand why you would need 4 or 5 months
21  to prepare someone for a 30(b)(6) deposition.  It just
22  doesn't seem fair.
23      THE COURT:  Mr. Judd, why can't he be produced
24  by June 15th?
25      MR. JUDD:  Well, the whole question of the

113

1   VIOXX profit plans is huge.  This is one document
2   that's prepared every year that brings in literally all
3   aspects of the sales and marketing that is going to
4   occur for the next year.  This includes market
5   research, forecasting, questions about the strategy
6   that they want to pursue for pricing.  I mean, I could
7   go on with many different subject matters.  It is huge.
8   It is really the subject of the deposition for all
9   intents and purposes is all aspects of marketing and
10  sales for the VIOXX business for a period of a year.
11  And we're talking about five and a half years that is
12  covered there.
13      So the one thing that needs to be kept in mind
14  initially is that this is a very broad area that covers
15  many different substantive areas.  The second point is
16  that to date this has never been a feature of the PI
17  cases.  Certainly, the profit plans have come up and
18  they have been discussed in the cases, but penetrating
19  the sources, how people arrived at the statements that
20  are set out in the profit plans, the source materials,
21  who was involved, what kinds of documents in addition
22  to the profit plan itself were generated, these are the
23  kinds of topics that are included, and they have never
24  been the subject of any discovery, so we're starting
25  internally at not quite ground zero because a number of

114

1   custodians have produced relevant documents, but we
2   have never undertaken internally an investigation of
3   the facts from this perspective.
4       This is a 30(b)(6) type deposition.  Merck,
5   the corporation, is going to be charged with
6   essentially having or being able to present all
7   information reasonably available in this very broad
8   subject matter.  There's very little margin for error.
9   Whenever I do these 30(b)(6) type depositions I'm
10  constantly facing criticism that we haven't adequately
11  prepared a witness, that we haven't chosen the right
12  witnesses.  What we're trying to do is to get someone
13  who is in a position -- Mr. Cannell was an executive
14  director in the marketing group over a period of about
15  3 years.  He covers the largest span, and we had to
16  collect documents from those that have already been
17  produced.  We had to identify those that are relevant
18  to the subject matter.  Mr. Cannell has been diligently
19  reviewing those documents.  We meet with him or speak
20  with him weekly, and I met with him last Friday
21  specifically to talk about what he viewed he would need
22  to be able to do and when he was available because he
23  does have some vacation time and some three or 4-day
24  trips, and we wanted to come up with a series of days
25  because I'm virtually certain this will be more than a

115

1   one-day deposition, and I want to try to avoid a
2   situation where we have a day and then have to
3   reschedule the follow-on days.
4       So we found this block of time, July 19th
5   through 21 when he is available, and we have got a
6   very, I think, diligent schedule to prepare.  He says
7   that he has been looking at documents 5 and 6 hours a
8   day.  I don't know that he does that 7 days a week, but
9   he has also got his own responsibilities.  He is not a
10  professional witness, and he needs the time to prepare
11  so that we can adequately cover this broad subject
12  matter.
13      MR. DAVID COHEN:  If I may briefly respond,
14  Your Honor, yes, it is true what Mr. Judd says that
15  Merck's profit plans involve an extraordinary range of
16  information, materials culled from all over the
17  company, but what he didn't tell you is that within the
18  past month and a half I have sent him two letters
19  identifying extraordinarily narrow sentences, phrases,
20  paragraphs and charts, parts of charts from the profit
21  plans as relevant to our claims so they don't have to
22  brief Mr. Cannell on the entire plan for every year,
23  they can just go by what I have already told them is
24  important to us.  They have had our class motion for
25  more than a year.  If they didn't know the profit plans

116

1  were important to that important to our case I don't
2  know whose fault that is.  They have had our notice of
3  deposition since February.  If they didn't know that
4  they were going to have to identify someone about
5  profit plans I don't know whose fault that is.
6  Certainly I have to question the diligence with which
7  Mr. Cannell is preparing for this deposition if in our
8  meet and confer in March Mr. Judd and his associates
9  proposed the first week of May for a deposition and now
10 Mr. Judd is telling me that it is going to be the
11 middle of July.
12      I think that that completely ignores the
13 importance of a deposition to our class certification
14 schedule which, again, was set months ago.  This guy
15 should be deposed.  He should be deposed before class
16 certification is over, and he should be ready for that
17 deposition.
18      MR. JUDD:  Let me address some of the last
19 issues first.  This is a classic case of giving
20 information with less than a full deck.  I never should
21 have proposed or suggested that even a May date was
22 conceivable.  Back in March I had no idea until we got
23 into this process in earnest of the depth of material
24 and the extraordinary amount of material that would be
25 covered.

117

1       It is true that Mr. Cohen has identified
2  specific sentences that he is interested in a profit
3  plan as an initial item.  He hasn't said that he is not
4  interested in the remainder, but as a practical matter
5  I can't have a witness parsing through a document for
6  one topic and one sentence.  If there's a relevant
7  document he needs to read it, and if I've got people
8  that I'm interviewing to find out who has relevant
9  documents and what information they have I can't keep
10 going back to them multiple times.  As a practical
11 matter I have to cover the subject matter that's
12 contained in the deposition notice.  Otherwise, that
13 would be extremely -- I mean, otherwise, we're talking
14 about either an endless deposition or a series of
15 depositions.
16      And, so, yes, I mistakenly thought it was a
17 narrower subject matter, and we could be prepared by
18 May.  That was clearly a mistake, and we need this time
19 in order to do justice to the broad subject matter.
20 And I guess the other point that I would make a
21 30(b)(6) deposition is going to be used by everyone.
22 It is the corporation testifying, as you well know.  We
23 have to get it right.
24      THE COURT:  All right.  How many days do you
25 anticipate his testimony would be?

118

1       MR. JUDD:  I think two days.  There is
2  substantial overlap with one of the cases -- the
3  coordinated cases in California that is being handled
4  by co-counsel to the Martin Klineman cases, so
5  presumably they should coordinate.  I suspect that Mr.
6  Buchanan and the engineers folks may want some
7  involvement in this, as well, because I assume there's
8  substantial overlap there, but I'm thinking two days
9  and the possibility of a third depending on what
10 plaintiffs do.
11      MR. DAVID COHEN:  To be clear, there's been no
12 discussion about the length of the deposition or the
13 involvement.  I haven't spoken to Mr. Buchanan or
14 whether they would be interested.  I have had vague
15 discussions with Hoggins, Berman about the fact of the
16 deposition, but I haven't talked to them about whether
17 there would be any mutual effort.
18      THE COURT:  Okay.  Mr. Cannell should be
19 produced for a deposition prior to July 7th.  It will
20 be before your briefing, but let's say prior to July
21 1st.
22      MR. DAVID COHEN:  After the brief but before
23 the argument.
24      THE COURT:  After the brief but before the
25 argument.  By July 1st.  He should be produced for one

119

1  day of deposition.  He can then be brought back for
2  additional days after the argument and for additional
3  coverage by other counsel, if necessary.
4       MR. SEEGER:  Just for the record, I mean, I
5  didn't know about this issue.  I don't know if Dave did
6  or not, and I apologize.
7       MR. BUCHANAN:  I didn't appreciate it until it
8  was fully laid out.
9       MR. SEEGER:  We need to talk with, obviously,
10 them and you guys but we're going to need to be
11 involved in this in some way.  I think you're right,
12 you suggested we should talk to you.
13      MR. BUCHANAN:  To clarify, the Court just
14 indicated that he should appear for his purposes and
15 then he will be reproduced at a later point.
16      MR. SEEGER:  Is that what you just ruled?
17      THE COURT:  I'm assuming his dep is going to
18 be at least two days and -- at least two days maybe
19 three but at least two days.  He has to provide himself
20 or make himself available for at least one day of dep
21 prior to the certification, and I would assume that
22 counsel who is arguing that would be the one who would
23 want to be involved with that deposition.
24      MR. SEEGER:  Fine.  We'll work with you.
25      THE COURT:  And other counsel can sit in on

120

1  that deposition if you choose to.  And you can also --

2  I don't want to have -- it's not a question of having

3  two separate depositions.  It is a question of if it is

4  this much material you're just not going to cover it

5  all in one day.

6       MR. DAVID COHEN:  Your Honor, frankly --

7       THE COURT:  You may cover your questions in

8  two hours for all we know.

9       MR. DAVID COHEN:  And that's just it.  I don't

10  know how long his deposition will take because we don't

11  know what he will say, but....

12      THE COURT:  That's true.  If you could write

13  his answers down it would take less time.

14      MR. DAVID COHEN:  I'll talk to Mr. Judd about

15  that.

16      MR. JUDD:  If you give me the questions ahead

17  of time I'd be happy to consider that.

18      MR. DAVID COHEN:  I thought she was saying I

19  could submit the answers.

20      MR. JUDD:  That might give some clue to what

21  the questions are.

22      THE COURT:  Is that the only issue then for

23  class certification?

24      MR. DAVID COHEN:  That's the only open

25  discovery issue in the Klineman and Martin cases that

1  was not resolvable by Mr. Judd and myself in advance of

2  speaking with Your Honor.  There will no doubt be other

3  issues, but for now that's all I have.

4       THE COURT:  Okay.  All right.  Then we have

5  Local 68 and --

6       MR. SEEGER:  Judge, could I just start by

7  introducing you to Tom Kline from Kline and Specter,

8  and Arnold Levin from Levin Fishbein.  They're going to

9  be not only working with us on Local 68 but part of our

10  trial team in that case.  I think we'll get papers in

11  for Mr. Levin so we can get him pro hacked in.

12      MR. BUCHANAN:  Your Honor, since the last

13  conference we have exchanged proposed Case Management

14  Orders.  I think notwithstanding what may have been

15  more disparate initial points of view where the trading

16  range appears to be about a month.  The plaintiffs are

17  targeting a February trial setting.  Merck had

18  initially proposed, I think, an August trial setting.

19  And I think now they can accommodate an April trial

20  setting, so we're between April and February right now.

21      The plaintiffs had suggested maybe March would

22  work just fine, and we can work deadlines back from

23  that point.

24      That's one issue we would like to try and

25  resolve today if we can -- because there are a number

1  of other dates that are triggered to that.

2       Another point for discussion today is our

3  class notice submission.  Plaintiffs are going to

4  propose -- submit a class notice proposal to Your Honor

5  by the end of next week.  We're working with experts

6  who do this and who are guiding our notice plan.  It

7  will be a combination of first-class mailing to

8  identifiable plans, coupled with publication notice

9  through appropriate media.  And we'll have that all to

10  Your Honor by the end of next week.

11      We have proposed, and I think we are on the

12  same page with a few weeks for the defense to get back

13  and object or comment on or supplement in any way

14  plaintiffs' proposal, and then if there's need for a

15  reply and argument we have that.  Our hope would be to

16  get the notice process commenced by mid summer.  That

17  will all be laid out in greater detail in our class

18  notice submission, which we'll be sending in a week and

19  a half or so.

20      We don't have any dispute on notice, do we,

21  Jeff?

22      MR. JUDD:  No, I think.

23      MR. BUCHANAN:  The proposal is laid out in our

24  papers.

25      MR. JUDD:  I think the only concern will be an

1  adequate opt-out period, so until we see what your

2  proposal is we'll just sit tight.

3       MR. BUCHANAN:  We were contemplating that, and

4  it will be generous.

5       The defendants had additional items in theirs,

6  but in term of the items that plaintiffs specified the

7  only items that I think where we may have disagreement

8  is where we see the trial of this matter, when we see

9  that happening, and then the other operative dates I

10  think will be cued off of that.

11      We think realistically 6 months of fact

12  discovery coupled with two and a half month expert

13  window and briefing following that for any issues that

14  linger are necessary for pretrial is sufficient, and

15  we're gearing up the horses to get it done in that time

16  frame.

17      MR. JUDD:  There is one area that we

18  discussed, and that is the completion of expert

19  depositions, and I think that you were agreeable to

20  extending that through the end of January.

21      MR. BUCHANAN:  Provided that we're agreeable

22  to trying the case in March.

23      MR. JUDD:  Okay.  So we haven't agreed on

24  that, but we think that a January 15th deadline to have

25  concluded expert depositions really means that all of

1    that discovery will occur probably in the 10 days -- in

2    that 10-day period, and it is our suggestion that that

3    be extended through at least the end of the month.

4         THE COURT:  That's fine.  I'll extend that to

5    January 31st.

6         MR. JUDD:  Okay.

7         THE COURT:  That gives you another 16 days for

8    that.  We can set a pretrial conference in February.

9         MR. JUDD:  February 2007.

10        MR. BUCHANAN:  I was anticipating we would be

11   getting together in the fall so we could talk about a

12   briefing schedule for -- and submission dates for --

13        MR. JUDD:  Not 2008?

14        THE COURT:  So February, I don't know what

15   date.

16        MR. BUCHANAN:  As a practical matter I think

17   we probably need to do it in the fall so we can set

18   time frames for exchange of witness lists and

19   witnesses, exhibits.  There's going to be briefing.

20        THE COURT:  You think it needs it earlier?

21        MR. BUCHANAN:  I think we need it in the fall.

22        THE COURT:  Before your fact discovery, before

23   your expert reports.

24        MR. BUCHANAN:  I think November time frame

25   would be fine.

125

1         THE COURT:  How can you exchange witness lists

2    and exhibit lists.

3         MR. BUCHANAN:  We're going to set a time frame

4    for doing that at that pretrial conference.

5         THE COURT:  Deadlines will be set.  All right.

6         MR. BUCHANAN:  We thought it would be

7    premature to spell out -- at least plaintiffs did -- to

8    spell out all the items now.  We can do it in the fall.

9         THE COURT:  So let's pick a day in October.

10   Not a day we have 15 cases listed for trial.  What is

11   the first week in October?

12        MR. SEEGER:  Okay.  That's fine, because we'll

13   be in trial, but that's okay.  We can take a break from

14   that.  We'll be doing Hatch and McFarland.

15        THE COURT:  We won't be done in October?

16        MR. BUCHANAN:  We're starting September 11th.

17        MR. SEEGER:  I heard you wanted to move it off

18   September 11th.

19        MR. COHEN:  We talked about.  Right now it is

20   pick a jury -- the jury is coming in September 11th.

21        MR. SEEGER:  It is a strange day really to

22   start a case just.

23        THE COURT:  It is a Monday.

24        MR. SEEGER:  But it is September 11th.  It is

25   the fifth anniversary.  I don't know how much people

126

1    down here were affected by it.

2         THE COURT:  Not as much as you.  I think

3    everybody -- I mean, everybody in the country was

4    affected, but we didn't carry the personal brunt of it

5    as they did a North Jersey and New York.

6         MR. SEEGER:  In the city they usually have

7    memorials and stuff like that.

8         THE COURT:  You want to pick the jury the

9    12th?

10        MR. COHEN:  We talked about that, but then the

11   Court had some logistical issues.  There were issues.

12        THE COURT:  There was a problem with Maria

13   Waldman, wasn't there?

14        MR. COHEN:  You couldn't get the room on

15   Thursday and Friday, so you had to pick it Monday.

16        THE COURT:  I think we were saying Monday

17   they're coming in and filling out the questionnaires,

18   so we're not actually going to see them on September

19   11th.

20        MR. SEEGER:  We won't really do it.  In the

21   last trial you gave them Tuesday to review and

22   Wednesday.

23        THE COURT:  So, actually, we'll be picking the

24   jury September 13th.

25        MR. SEEGER:  Okay with me.

127

1         THE COURT:  September 11th they will be asked

2    to come fill out forms.  You know, if somebody has lost

3    a loved one September 11, and they're going to a

4    memorial service they'll, obviously, be excused.

5    Probably it wouldn't be the best week for them to be on

6    a jury anyway.

7         All right.  So what is the first week in

8    October?

9         MR. SEEGER:  The week of the 2nd.

10        THE COURT:  During trial you won't want to

11   talk about this.

12        MR. SEEGER:  Yes, I will.

13        THE COURT:  You'll have Mr. Kline.

14        MR. SEEGER:  The truth is we do have other

15   people that can cover it.

16        THE COURT:  So what is the first Thursday in

17   October?

18        MR. SEEGER:  That's the 5th.

19        THE COURT:  So October 5th at 4:00 or

20   something like that.  And then the trial -- so it is

21   February or April, so I guess March sort of cries out.

22   So March 2007 with jury selection to commence on March

23   what?

24        MR. BUCHANAN:  Our Mondays in March are --

25        THE COURT:  Is Easter in there?

128

1  MR. BUCHANAN: I don't think so. March 5th
2  will be the first Monday in March.
3  MR. JUDD: Do we have to do it on Monday?
4  MR. BUCHANAN: That's your protocol.
5  THE COURT: If it is a jury selection. If you
6  want me to make all the calls I can make it any day you
7  want.
8  MR. BUCHANAN: Do you want to waive a jury
9  trial?
10  MR. JUDD: No. Can we do it on the 12th?
11  MR. SEEGER: Did you get that no down?
12  THE COURT REPORTER: Yes.
13  THE COURT: Mostly plaintiffs want to waive
14  jury trials in Atlantic County.
15  MR. SEEGER: We'll waive it.
16  THE COURT: You haven't seen my numbers.
17  MR. JUDD: Judge Higbee, the only two items
18  that really don't affect dates but we believe need to
19  be included in the other pretrial matters, and one is
20  the dispositive motions I guess that's included in
21  number two pretrial motion briefing schedules --
22  MR. BUCHANAN: We envision talking about that
23  at that conference.
24  MR. JUDD: Okay. And then the other thing we
25  think is going to be critical is for plaintiffs to

1  on the table, I expect to see the defendants, Merck in
2  this case, obviously, revisit the class certification
3  issue, and there will probably be several motions to
4  decertify the class between now and trial. I think
5  that's just one more thing that they're looking for for
6  the purpose. We don't need it for the trial. We know
7  the trial issues. So we see it as an extra wasted
8  step.
9  THE COURT: When we get to the October meeting
10  I certainly agree with Mr. Judd that I want some
11  picture of what the trial is going to look like.
12  MR. SEEGER: We can do that.
13  THE COURT: How detailed a trial plan we're
14  going to need is something I haven't thought about, and
15  I can think about it. It is not something --
16  MR. SEEGER: Sure, so we'll leave it for the
17  conference.
18  THE COURT: We'll leave it for the conference
19  at this point, but at the conference we can add here
20  the need for specific trial plan, which can be
21  discussed. I'm going to look at what's been done in
22  the federal trial plan. If you want to send me some
23  examples or something I'd be happy to look at that.
24  MR. JUDD: What I was going to suggest is that
25  the parties prior to the October 5th hearing to the

1  present a trial plan, particularly if they anticipate
2  any phasing or subclassing. Right now they're saying
3  they don't anticipate that.
4  THE COURT: We certainly should discuss it.
5  MR. SEEGER: May I say one thing? The whole
6  concept of a trial plan is not something that's needed
7  in this case because you have trials under your belt
8  and we do, too. If you want some sort of pretrial memo
9  on sort of what a trial might look like that's one
10  thing that we could talk about -- and sit and talk with
11  them about, but there's really no need for it here.
12  They're going to be making their pretrial motions,
13  motions in limine. When they're ruled on we'll know
14  what the trial will look like, who the experts will be,
15  and as far as damages we're going to look to do an all
16  issues trial. There's no subclassing, and it is going
17  to be all issues, damages and liability.
18  So we don't see the need for the extra step.
19  Now I know in Federal Court it has become practice to
20  do trial plans, but typically you see them proposed at
21  the class certification phase to give the judge some
22  comfort that the case could be tried, and it is
23  manageable. You have ruled on that and the Appellate
24  Division ruled on that. The case is manageable for
25  trial. I see this as another step, and to put the card

1  extent we want to provide any sort of an agenda or
2  any -- you know, identify issues that we want discussed
3  that we make a submission some time prior to that that
4  might --
5  THE COURT: When?
6  MR. JUDD: Some time prior to the October 5th,
7  you know, a week before or something.
8  MR. BUCHANAN: I actually assumed we would
9  continue, Jeff, to attend the monthly status
10  conferences in any event. I thought we were trying to
11  layout the framework, and we can certainly revisit
12  our -- that pretrial conference.
13  THE COURT: Let's schedule this order as it
14  is, because as we go along we can see how much more we
15  need to do.
16  MR. SEEGER: I can tell you, Judge --
17  THE COURT: I doubt on October 5th I'll be
18  able to decide a whole lot of motions. I saw October
19  5th as being a scheduling of the motions for November,
20  December, January because it will probably be a time
21  when I'll be in trial, and I doubt whether I'll want
22  to -- I doubt whether I'll be able to make time to read
23  your motions. Have you filed for cert yet?
24  MR. JUDD: Yes. Well, we sought leave to --
25  THE COURT: Leave to file.

1    MR. JUDD:  -- to appeal.

2    THE COURT:  The notice of appeal has been

3  filed?

4    MR. JUDD:  Yes.  Well, it is a slightly

5  different procedure in interlocutory, but, yes.  We

6  have requested leave for appeal.  We haven't heard back

7  from the Supreme Court.

8    MR. BUCHANAN:  I believe our papers are due --

9  we sought an extra week or two.  I think our papers are

10  due the first week in June.

11    THE COURT:  Well, they probably will make a

12  relatively quick decision.

13    MR. BUCHANAN:  I don't know whether they

14  caucus at the beginning of the month or weekly.

15    MR. JUDD:  If New Jersey is anything like

16  California usually the postcard gets me before I get

17  home from filing.

18    THE COURT:  We'll see.

19    MR. BUCHANAN:  Your Honor, there's one other

20  item I wanted to raise.  It was raised about a year ago

21  after the initial certification, and that wouldn't be a

22  year, about 9 months or so ago.

23    THE COURT:  Does this schedule allow enough

24  time for the notice and for the opt-out?

25    MR. BUCHANAN:  It does.

1    MR. JUDD:  So long as discovery proceeds

2  concurrently, and we're all in agreement.  There's no

3  reason that there isn't adequate time for notice well

4  before trial.

5    MR. BUCHANAN:  We're fortunate because the

6  class is fairly discrete, and many of the class members

7  are identifiable through records of claims services who

8  have sent notices in other cases and they have a

9  relatively comprehensive database, so first-class mail

10  will be the primary notification.

11    MR. SEEGER:  And we think that's going to get

12  about 95 percent of the class.  And we have some expert

13  testimony and affidavits you'll get on that.

14    THE COURT:  Okay.

15    MR. BUCHANAN:  One other item, Your Honor,

16  just -- and I think counsel, Jeff, I think you assured

17  us that Merck has not been communicating with the

18  class.

19    MR. JUDD:  Correct.

20    MR. BUCHANAN:  Subsequent to the

21  certification.  I wanted to confirm that that remains

22  the state of affairs, and we should submit an order to

23  that effect, so we don't have a representation on the

24  record in terms of --

25    MR. JUDD:  When you say "Merck," certainly

1  there is still ongoing business between, you know,

2  Merck Managed Care drug sales and third-party payors.

3  I mean, that has gone on uninterrupted.  There's been

4  no communication about VIOXX or this case.

5    MR. BUCHANAN:  Our concern is not interfering

6  with your business but making sure you're not

7  communicating concerning the claims, the case for

8  VIOXX.

9    MR. JUDD:  And we're anticipating that the

10  discovery -- any discovery we do of third-party payors

11  will be through a notice subpoena.

12    THE COURT:  You can submit an order to that

13  effect but narrowly enough that it doesn't interfere

14  with their ability to conduct business.

15    MR. BUCHANAN:  Understood.  Given that VIOXX

16  isn't on the market I think we can craft something

17  pretty specific.

18    MR. JUDD:  Correct.  And let us look at

19  something.

20    MR. SEEGER:  I have nothing.

21    THE COURT:  Anything else?

22    MR. JUDD:  No, Your Honor.

23    THE COURT:  Okay.  We have McFarland.  You

24  want to talk about it in chambers?

25    MR. BUCHANAN:  That's fine or we can do it

1  here after everyone else leaves.

2    MR. COHEN:  There's really no one else left.

3    THE COURT:  Maybe nobody else is going to

4  leave.  Hope, I might want to -- I want to spend

5  tonight mulling over that decision I made this morning

6  and think about it a little bit more.  If I need to get

7  in touch with you I'll get in touch with you tomorrow.

8    MS. FREIWALD:  With regard to the doctor

9  deposition?

10    THE COURT:  Yes.  But I'll have to get in

11  touch with Mike Galpern, also.

12    MS. FREIWALD:  Can I give you my cell phone

13  because I'm going to be out in the morning, but I can

14  be reached by cell phone if you need to call me.

15    THE COURT:  I can reach in you the afternoon.

16    MS. FREIWALD:  I should be in by 11:00 or so.

17    THE COURT:  I just wanted you to know I might

18  be reaching out to you.

19    MR. COHEN:  The DYFS motion it is fully before

20  Your Honor, and Merck had just asked that you order

21  DYFS to produce the records to you for an in camera

22  review and determine if they're relevant, and if so

23  that's another matter.  I don't know if you wanted to

24  hear argument from anybody or if you were planning to

25  address that.  We wanted to tell you it was fully

```
 1   briefed.
 2          THE COURT:  What year is it, 1990?
 3          MR. COHEN:  What year are the records?
 4          THE COURT:  There were two groups, two
 5   investigations?  According to your papers?  '98?  When
 6   is his heart attack?
 7          MR. BUCHANAN:  2002.
 8          THE COURT:  All right.  It seems to me that
 9   the general rule under the law is that DYFS records are
10   protected and that they should rarely, rarely be
11   ordered to be produced for litigation, particularly
12   rarely ordered to be produced.  I mean, this is not a
13   case where we're dealing with the children's best
14   interests or something involving the children or a
15   claim by the children.  It is a case where we're
16   dealing with a father who, apparently, was investigated
17   for abuse.  There were no abuse charges brought against
18   him, apparently, correct?
19          MR. SEEGER:  Yes.
20          MR. COHEN:  Here we're asking for you to
21   review them in camera.
22          THE COURT:  I'm just wondering how worthwhile
23   that is or why because what are they going to show that
24   would ever make me turn them over to you to the
25   defense?  Or to plaintiffs counsel?  I was trying to
```

```
 1   think about -- the easiest thing for me to say is I'll
 2   look at them and then decide, but if I look at them
 3   what would I be looking for?  Whether there was --
 4   whether the allegations of abuse were gross, whether
 5   the allegations were marginal type of allegations,
 6   whether they involved hitting the kid with a belt or
 7   screaming at the kid or slapping the kid or not doing
 8   anything to the kid but somebody heard somebody say
 9   something about the kids, and whether they found that
10   they were warranted or unwarranted potentially this
11   witness says that it happened, this witness says it
12   didn't happen.  I'm just looking at it as a physically
13   abusive of a child, it looks like, and it appears that
14   the defense's only potential use of that is to show
15   that this guy has anger issues --
16          MR. COHEN:  I think it was --
17          THE COURT:  -- outweighed against and that the
18   stress of his family issues would maybe trigger his
19   heart attack.
20          MR. COHEN:  There's a number of factors,
21   including length and severity of some stress and anger
22   and other sorts of issues that could in combination
23   with other factors be something that would be a
24   possible cause of his heart attack, and I think here
25   what we're saying is not being able to see these and
```

```
 1   not asking to see them it is hard for me, and this is
 2   actually very similar to the second issue, which is
 3   that you have some counseling records already in
 4   camera.  Maybe one thing to do is if Your Honor had a
 5   chance to look at those, and we had suggested that we
 6   have somebody available I think Paul Strain volunteered
 7   to explain a little bit more why he thought those
 8   particular records would be relevant to the litigation,
 9   and, perhaps, if you looked at those first --
10          THE COURT:  You have seen the counseling
11   records?
12          MR. GRAND:  The counseling records we sent you
13   were produced to us under your order.  We redacted them
14   to remove the children and wife information, and then
15   we sent them to you for review, but those counseling
16   records were made pursuant to the DYFS investigation,
17   so I assume there may be some overlap in whatever the
18   DYFS file is.
19          MR. COHEN:  What I would recommend then if
20   Your Honor had time would be to look at those, you're
21   considering our request to have Mr. Strain explain a
22   little bit more --
23          MR. BUCHANAN:  We had a telephone conference
24   on this in April.
25          THE COURT:  I know.  I remember the records.
```

```
 1   I read them.  I know exactly what they say, actually.
 2          MR. COHEN:  So we recommended --
 3          THE COURT:  But I'm trying to figure out if I
 4   actually entered an order on them.  Check with Carmen
 5   and see if she remembers.  I guess I didn't.
 6          MR. COHEN:  We haven't seen an order, so what
 7   we thought if Mr. Strain had an opportunity to explain
 8   a little more why those records were relevant then it
 9   is a similar issue here, you would have that guidance
10   to see whether or not you wanted to review these.
11          THE COURT:  Well, what's Mr. Strain going to
12   say?
13          MR. COHEN:  He was going to explain a little
14   bit more in specifics about the connection and what
15   sorts of things specific to Mr. McDarby would be shown
16   in these kind of records that would lead to what we all
17   know are the general things of stress and having worked
18   it up he would more specifically put them together.
19          MR. SEEGER:  This is going to be a big waste
20   of everybody's time.  The allegation was made by the
21   wife during the time when they were splitting up.  The
22   kid lived with McFarland after this.  So -- and they're
23   completely unsubstantiated.  Anybody who has done any
24   time in family court if anybody makes an allegation of
25   child abuse there's going to be a DYFS investigation.
```

1  And it is 5 years prior to his heart attack.  If it was
2  on the eve of his heart attack, a month before, I just
3  don't see why digging into these records is going to
4  help in any way.
5        MR. COHEN:  We have had a set of counseling
6  records in, so I think at some point you can start to
7  get some guidance on that issue and then apply that to
8  here, because it is similar.  But, you know, we're
9  looking for information that I think, other juries have
10  found relevant, but we don't want to --
11        MR. SEEGER:  It only goes to whether they like
12  him or not.
13        MR. COHEN:  Speaking as somebody who is fully
14  aware of and protects confidentiality as much as
15  anybody you're ever going to meet --
16        MR. SEEGER:  Nevertheless, you'll violate this
17  guy's.
18        MR. COHEN:  No, we're asking for an in camera
19  review, and if the Court said, forget it, you're not
20  looking at a page that's fine, but we wouldn't be
21  zealously advocating for our client if we didn't say --
22        MR. SEEGER:  I'm not faulting you for that at
23  all.
24        MR. COHEN:  And the Court under the law has
25  the opportunity to review it, and I have no doubt that

1  stressful situation.
2        THE COURT:  Well, there's no question about
3  that.  Divorce is highly stressful.
4        MR. SEEGER:  We'll stipulate to that.
5        THE COURT:  Child custody battles are
6  stressful.  Was there a divorce and a child custody
7  battle?
8        MR. SEEGER:  Yes.  There was a divorce, but he
9  got the kids.  I think that was by agreement.
10        MR. BUCHANAN:  He has custody of one.  And the
11  other is out of the house.
12        MR. SEEGER:  But the kid who is involved, yes.
13  The kid went to live with him right after that.  DYFS
14  would have never allowed that kid without more to go
15  live with his father after the divorce if they thought
16  there was something.  And would the kid say I'd like to
17  go with the guy who beats me?  I don't think so.
18        MR. COHEN:  The Court is asking specific
19  questions.  I would like to consult Mr. Strain and give
20  you an answer on Friday.
21        THE COURT:  Okay.  Because I understand that
22  the argument is that he was under stress for years and
23  that he is an angry person or a type A type of
24  aggressive person because of the type of job he had and
25  because of all the other factors, and as a result of

1  the Court is not going to be telling anybody else or
2  violating privacy.
3        THE COURT:  There's always a risk, though,
4  when you pull somebody's DYFS records even into court,
5  I mean, I'm not suggesting -- the bottom line is they
6  go through other hands, they go through my hands and
7  other hands.  They still have to be secure, and
8  everybody has an obligation to keep them confidential.
9  But I don't even know if we should expose the DYFS
10  records to that, unless there's some basis by which if
11  I see this in the record then I'm going to release it
12  to you, and that's why I have been pondering if I saw
13  in the record what, that he -- certain people said he
14  abused the child, the child said that he was abused,
15  that is enough there that I think he probably did abuse
16  the child, even though there were no charges filed.
17  Does that make any difference to this trial?
18        MR. COHEN:  If I could let me consult with
19  Mr. Strain on Friday when we do the rest of the
20  motions, and I'll tell you if there's anything specific
21  to answer the questions.
22        THE LAW CLERK:  No order.
23        MR. MAYER:  We could have a situation where
24  whatever gave rise to the allegation, whether the term
25  was "abuse" or not was a situation was a highly

1  that he is the type of personality, but I don't know
2  whether any details in the DYFS records would be useful
3  to argue that above and beyond the penalties.
4        You can certainly make your argument, and then
5  I'll make a decision and decide whether it is even
6  worth looking at them or not.  And we'll decide that on
7  Friday.  Okay?
8        MR. SEEGER:  Yes.
9        THE COURT:  Anything else?
10        MR. BUCHANAN:  Thank you, Judge.
11        (End of proceedings.)

```
1              C E R T I F I C A T I O N

2

3

4       I, REGINA A. TELL, C.S.R., R.M.R, R.P.R., C.R.R.,

5   License Number 30X100161000, an Official Court Reporter

6   in and for the State of New Jersey, do hereby certify

7   the foregoing to be prepared in full compliance with

8

9   the current Transcript Format for Judicial Proceedings

10

11  and is a true and accurate compressed transcript to the

12

13  best of my knowledge and ability.

14

15

16

17

18

19

20

21              _____05-19-06

22              Regina A. Tell, CSR-RPR-RMR-CRR

23              Official Court Reporter

24              Atlantic County Courthouse

25              Mays Landing, New Jersey
```

145

```
0001
 1                        SUPERIOR COURT OF NEW JERSEY
                              ATLANTIC COUNTY
 2                          CASE TYPE NO. 619
 3       ----------------------------x
         IN THE MATTER OF IN RE:
 4
         VIOXX
 5                                     STENOGRAPHIC TRANSCRIPT
                                       OF:
 6       ----------------------------x    - MOTIONS -
 7
                  PLACE:  ATLANTIC COUNTY CIVIL COURTHOUSE
 8                        1201 BACHARACH BOULEVARD
                          ATLANTIC CITY, NJ  08401
 9
                  DATE:  MAY 19, 2006
10
11       B E F O R E:
12            THE HONORABLE CAROL E. HIGBEE, J.S.C.
13       TRANSCRIPT ORDERED BY:
14            CHRISTOPHER SEEGER, ESQ. AND CHARLES COHEN, ESQ.
15       A P P E A R A N C E S :
16            CHRISTOPHER SEEGER, ESQUIRE
              DAVID BUCHANAN, ESQUIRE
17            JEFFREY GRAND, ESQUIRE
              SEEGER, WEISS
18
              SOL WEISS, ESQUIRE
19            ANAPOL, SCHWARTZ, WEISS, COHAN, FELDMAN & SMALLEY
20            FRED THOMPSON, III
              MOTLEY RICE
21
              CHRISTOPHER PLACITELLA, ESQUIRE
22            ATTORNEYS FOR THE PLAINTIFF
23            *      *      *      *      *      *      *
                                  REGINA A. TELL, CSR-CRR
24                                OFFICIAL COURT REPORTER
                                  1201 BACHARACH BOULEVARD
25                                ATLANTIC CITY, NJ  08401

                                                                1
```

```
 1       APPEARANCES CONTINUED . . .
 2            CHARLES W. COHEN, ESQUIRE
              HUGHES, HUBBARD & REED, LLP
 3
              PAUL STRAIN, ESQUIRE
 4            RONNIE FUCHS, ESQUIRE
              DECHERT, LLP
 5
              CHARLES LIFLAND
 6            O'MELVENY & MEYERS
              ATTORNEYS FOR THE DEFENDANT, MERCK
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                                                                2
```

```
 1                     P R O C E E D I N G
 2            THE COURT:  You can be seated.  Is defense
 3       counsel here?
 4            MS. MANGUAL:  Defense counsel is by phone,
 5       Judge.  I guess they thought it was going to be by
 6       phone.  And I have David Buchanan on the phone, as
 7       well.
 8            MR. THOMPSON:  Judge, this is a motion for a
 9       protective order filed by the defendant, Merck.  In
10       their papers they have taken the position that the
11       burden is on the plaintiff to show good cause as to why
12       the deposition of Joanne Lahner should go forward.
13       We're happy to go forward and assume that burden of
14       showing the good cause and go first, but we're
15       certainly at your pleasure.  It is Merck's motion.
16            THE COURT:  Is there anyone in the audience
17       who is press?
18            MR. PLACITELLA:  They're with me, Judge.
19            MR. BUCHANAN:  Good morning, Your Honor.
20            THE COURT:  Good morning.  Let's just put
21       counsel's appearance on the record on the telephone
22       first starting with defense counsel.
23            MR. COHEN:  Charles Cohen, Paul Strain, Ronnie
24       Fuchs and Charles Lifland.
25            MR. BUCHANAN:  Dave Buchanan for plaintiffs,

                                                                3
```

```
 1       Your Honor.
 2            THE COURT:  And here?
 3            MR. THOMPSON:  Fred Thompson from Motley Rice
 4       with the plaintiffs.
 5            MR. PLACITELLA:  Your Honor, Christopher
 6       Placitella, on behalf of the plaintiffs.
 7            MR. SEEGER:  Chris Seeger on behalf of
 8       plaintiffs.
 9            MR. GRAND:  Jeff Grand on behalf of
10       plaintiffs.
11            MR. WEISS:  Sol Weiss on behalf of plaintiffs.
12            THE COURT:  Okay.  We're ready to proceed.
13       The first motion we're going to deal with is the issue
14       of a protective order for the document that was
15       produced and the question of the deposition of Joanne
16       Lahner.
17            So we'll start with defense counsel, I guess,
18       counsel?
19            MR. LIFLAND:  Good morning, Your Honor, it is
20       Charles Lifland.  I think it is pretty well laid out in
21       the papers.  We start with the Kerr case, which creates
22       a presumption in favor of a protective order for the
23       lawyer's deposition, and specifies the showing that has
24       to be made to overcome that.  It has to be
25       nonprivileged information that has to be not available

                                                                4
```

1   from alternative sources, and it has to be essential,
2   and as we have laid out in the briefs, they haven't
3   made a showing on any one of those points.
4        You know, the role of Joanne Lahner apart from
5   her current full-time role as the client lawyer
6   managing the litigation was as a regulatory compliance
7   lawyer.  She reviewed things that were submitted for
8   purposes of giving advice as to whether they complied
9   with statutes and FDA rules and the like.  That's
10  quintessentially privileged, and there isn't any basis
11  here to break that privilege or to ask her questions
12  about her role in providing that advice or her thought
13  process or what the advice was.
14       Obviously, we don't claim privilege on press
15  releases that were released, but that's not what we're
16  talking about when we're talking about asking her what
17  advice she gave about how they should be written or
18  corrected or changed in order to comply with FDA
19  regulations or her advice on what the regulations
20  require with respect to those.
21       That's all privilege, and there's no basis for
22  going into that.
23       The notion that there's a crime fraud
24  exception applicable I think we have also covered in
25  the briefs, but I wanted to say something more about it

1   supplemental memo that was filed.  There still has to
2   be a showing that for the crime fraud exception that
3   advice was sought for perpetrating a fraud.  There is
4   no evidence of that.  There's no evidence that Merck
5   asked its in-house lawyer to do regulatory compliance
6   review for the purpose of committing a fraud.  We still
7   have to go to other witnesses first for information,
8   for example, about the medical/legal committee and the
9   review it did.  There are other people on that
10  committee that did nonlawyer things.  Those people are
11  available for discovery.  That's been out there for a
12  while.
13       So just to sum up, our position would be there
14  isn't any basis for a deposition.  There's been no
15  showing made to overcome the presumption in the Kerr
16  case, and, therefore, the motion for protective order
17  ought to be granted.
18       THE COURT:  Okay.  Counsel for plaintiff?
19       MR. THOMPSON:  Your Honor, it is my pleasure
20  to be before you.  Let me cut straight to the chase.
21  If I was a judge and someone came before me and asked
22  me for permission to take a lawyer on the other side my
23  initial reaction would be great reluctance to do that,
24  and we have not rushed into this willy-nilly.  We have
25  come painfully to this conclusion that we need to

1   because there was a supplemental brief filed on the
2   question of the effect of the Cona and McDarby verdict
3   that really doesn't change anything.  There's a jury
4   verdict in that case.  The jury found there was a
5   consumer fraud.  None of it is linked to any advice
6   that Joanne Lahner gave or any request that was made to
7   her, but, you know, before you even get there, by the
8   same token, we have another jury verdict in the
9   Humeston case on the same facts that found 10 to zero
10  there was no fraud, and to take the second verdict and
11  say somehow that makes all the privilege suddenly
12  disappear is not something that's supported anywhere in
13  the law.
14       In fact, it is sort of another side of this
15  issue of collateral estoppel.  I don't know if you had
16  a chance to look at the brief we filed this week.  I
17  know you probably haven't yet, but that lays out the
18  law there, and it is quite clear that you can't have
19  offensive collateral estoppel and apply a second
20  verdict as if it's sort of the answer when there's been
21  a prior inconsistent verdict on the same question.
22       So we don't think there's any basis for saying
23  that the Cona/McDarby verdict gives the basis for
24  breaking all of Merck's attorney/client privilege,
25  which seems to be the contention that's made in the

1   examine Joanne Lahner because we have done exactly what
2   counsel for the defense has said, and that is, we have
3   taken the depositions of a great number of Merck
4   employees, each one of whom has, in essence, proven to
5   be unavailing in terms of knowing and being able to
6   testify about the workings of the medical/legal
7   committee, the review committee in particular, but,
8   also, with regard to the action by and between various
9   members of the marketing department, the marketing
10  folks and their interactions with the FDA.
11       We have taken the deposition of Ellen
12  Westrick, who is the head or was the head of the
13  medical/legal department, and who, in fact, was charged
14  with communicating with DDMAC, which is the consumer --
15  the promotional materials review arm of the FDA.
16       Let me just take as a quick example, and I
17  would -- I can either put this on the Elmo or I can
18  hand a copy of it up to the Court.  This is the May
19  12th, 2000 letter.  I'm sure you're familiar with.
20       THE COURT:  You might as well put it on.  Can
21  you put that microphone on that table?  You might as
22  well have two mics over there.
23       MR. THOMPSON:  Judge, this is the letter by
24  which Merck attempted to drop a dime on Pfizer for
25  certain statements that they claimed Pfizer were making

1   with regard to VIOXX versus Celebrex in the
2   marketplace.  This is the -- on Page 3 of the
3   document --
4       THE COURT:  You have to get these lights up
5   top.
6       Okay.  I've got the document.  Page 3?  Does
7   defense counsel have the document?  It is the May 12th,
8   2000 letter.
9       MR. LIFLAND:  Yes, I have it, Your Honor.  It
10  was attached to the plaintiff's brief.
11      THE COURT:  Okay.  Page 3.  I want to make
12  sure -- I know you have it.  I want to make sure you
13  know what he was talking about.
14      MR. LIFLAND:  I appreciate that.  I have it in
15  front of me.
16      MR. THOMPSON:  If you look down at the final
17  paragraph the final full paragraph on the page at
18  number one it says, "By presenting the VIGOR results
19  for VIOXX only as a statistically significant increase
20  in cardiovascular adverse events the letter fails to
21  reveal material facts hiding that the significantly
22  fewer heart attacks observed in patients taking
23  Naproxen were consistent with that drug's ability to
24  block platelet aggregation, so that the results do not
25  indicate any increase in cardiovascular adverse

1   reaction due to VIOXX."
2       Even if Searle Pfizer chose not to accept this
3   rational the failure to at least acknowledge it in the
4   letter is a failure to reveal material facts in
5   violation of Section 201N of the Food Drug and Cosmetic
6   Act.
7       Your Honor, this letter at Page 4 was signed
8   by Ellen Westrick.  When we examined Miss Westrick,
9   who, by the way, is not a lawyer and is not a scientist
10  by profession, Miss Westrick, in essence, threw up her
11  hands.  She did not author the letter.  She had no
12  input into its contents, and she declined to give any
13  insight into the positions or the statements of fact
14  that were contained within the letter.
15      She did allude to the fact that this letter
16  was drafted by members of the medical/legal review
17  board or reviewed by them.  It is clear that this
18  letter was drafted by someone with knowledge -- with
19  personal knowledge with regard to the facts and
20  assertions stated therein, and we should have the right
21  and opportunity to understand why Merck -- and if, in
22  fact, this is Merck's position, that the failure to
23  include alternative explanations is a material
24  violation of the Food Drug and Cosmetics Act because
25  that in and of itself is quite an astounding position,

1   and it is one that is very relevant to our case here.
2       At the same time that Miss Westrick did not
3   have any sort of insight into this letter, and, in
4   fact, her deposition shows that she viewed her role in
5   this letter as simply signing it and forwarding it on,
6   it was a product of the company, although she could
7   give no insight into the authorship of it, it is clear
8   that the medical/legal review board, the member of that
9   board who had the longest standing who was present from
10  1999 until the present or throughout the whole relevant
11  period is Ms. Lahner.
12      Miss Westrick declined even to name the
13  members of the medical/legal review board.  The only
14  name she could recall who was on it was Ms. Lahner.
15  That medical/legal review board deserves to be examined
16  and understood.  We have taken the deposition of Ms.
17  Weiner.  We have taken the deposition of Miss Basaman
18  or Miss Blake now Basaman.  We have taken the
19  deposition of Mr. McKinnes.  We have taken the
20  deposition of Mr. Casseola.
21      In each and every case they have deferred to,
22  in essence, a black box that they didn't do these
23  things personally, that it was a product that came down
24  to them and that they would follow the edicts of the
25  medical/legal review board because that's what they

1   did, that was the procedure set up.
2       Now, certainly the end document itself is very
3   interesting in and of themselves were sufficient for
4   this past -- this past month for the jury to find
5   consumer fraud, to make a finding in their verdict form
6   of fraud.  Certainly, these documents themselves were
7   sufficient, but we have the right and we have the
8   opportunity or we should have the opportunity to
9   inquire into these physicians, to inquire into the
10  organization and inquire into the give and take by
11  which, number one, positions like this were taken to
12  the FDA -- certainly this was communicated to a
13  third-party, and to the extent if Ms. Lahner drafted
14  this letter she should be -- she certainly should be
15  able to respond to the questions relating to its
16  contents.
17      Secondly, with regard to the Naproxen -- the
18  cardioprotective aspects of Naproxen, which served as
19  the centerpiece of promotional materials, press
20  releases, positions to the FDA, those -- that position
21  deserves to be inquired upon.  We should have the right
22  and opportunity to understand where that position came
23  from, the basis for it and how it was developed because
24  from the documents that have been made available to us
25  thus far that have not been cloaked with the claim of

1   privilege or a claim of attorney work product.
2   Certainly, we share the FDA's view in their
3   September 2000 letter in which they indicated that it
4   was simply inconceivable that they would take the
5   position that Naproxen was cardioprotective based on
6   the rational evidence that was available at the time.
7          These positions were taken through the office
8   and through the medical/legal review board of which the
9   only identifiable member, the only identifiable member
10  who had full continuity is Miss Lahner.  We certainly
11  have no intention of asking about trial strategy.  We
12  have no intention of pursuing into litigation tactics
13  or strategy.  Certainly, in any event that this Court
14  allows an inquiry it will be under circumscribed
15  guidelines and circumscribed limits in which we would
16  limit ourselves to objective information, and, also,
17  information for which I truly believe that information
18  which would talk to the development of the Naproxen
19  position that was communicated to the FDA, was
20  communicated to physicians both through the CV card,
21  which was approved by the medical/legal review board,
22  although it seems as though it simply sprang into life
23  because the ability to get behind the card itself has
24  been very limited, and it has been limited because of a
25  very broad definition of privilege, which has been

1   asserted by the defendant in this case.
2          The documents that have been produced to date,
3   the documents and the testimony that provided the
4   ability for this jury to find -- to make a finding of
5   consumer fraud certainly provides the necessary
6   foundation which the Court would require for an
7   independent basis to believe that a wrongful act has
8   been taken.
9          Certainly, the Ocean Spray case, which was the
10  New Jersey statement as to crime fraud makes it very
11  clear we're not talking about a crime.  We're not
12  talking about common law fraud; we're talking about
13  conduct that contains an element of deceit.  We're
14  talking about conduct that contains an element of
15  deception, and that is certainly met by the documents
16  that have been provided that have been discovered to
17  date, and, certainly, that serves as the basis for the
18  jury decision.
19         Judge, we meet the Kerr standard.  I believe
20  should the Appellate Court revisit Kerr that they would
21  place less reliance on the Shelton case, which is a
22  federal case, which I think will find the shepardizing
23  of the Shelton case will show that it has been a
24  minority view and most courts have chosen not to follow
25  it, and it may well be that given another opportunity

1   this Appellate Court would follow some of the newer
2   precedents as well, but we're not here arguing against
3   precedent.
4          We meet the elements of Kerr.  Ms. Lahner will
5   give testimony that goes to the transaction itself.  As
6   a matter of fact, in Kerr, as you recall, in Kerr the
7   attorney's only source of information was secondhand.
8   There was no direct involvement with the transaction
9   himself.  It was simply that he had learned certain
10  information.  In this case you have probably the most
11  knowledgeable long-lived participant of the marketing
12  and regulatory efforts of VIOXX is Ms. Lahner.  She was
13  present when the decision was made not to include the
14  four additional heart attacks in the New England study.
15  She was present, she participated in the Naproxen
16  cardioprotective effects, both representations to the
17  FDA, to doctors and to the general public through press
18  releases.
19         Merck has organized their affairs to put her
20  in a business capacity, and having so organized
21  themselves they cannot completely insulate an entire
22  part of their business from meaningful review by
23  raising an attorney/client privilege.  We have the
24  privilege log, which has 40,000 entries, 43,000
25  attorney/client privilege assertions.  Many of those

1   assertions relate to Ms. Lahner, and so the question
2   arises here it is a two-step problem.
3          Number one, we have a right to take her
4   deposition with regard to nonprivileged items for the
5   reasons that we have talked about.  We also believe
6   that we're entitled to inquire into areas in which
7   privilege has been claimed because we meet the
8   exception to the attorney/client privileges set out in
9   the Ocean Spray case.
10         The question arises how do we obtain this
11  information and, yet, also, permit the Court to
12  safeguard the attorney/client privilege.  We have
13  several things that we would suggest to the Court.
14         Number one obviously being that you direct the
15  subject matter of the deposition at the threshold to
16  limit it and make it absolutely clear that we're not on
17  a fishing expedition into trial tactics or strategy.
18         Number two, that we have an opportunity to
19  forward to either you or to an appointed special master
20  to review some portion of these claimed privilege
21  documents so that we can understand whether or not and
22  get some preliminary ruling on whether or not they may
23  be subject to an exception or whether they simply have
24  been overly broad in the claim of privilege and then
25  taking those documents to conduct a meaningful inquiry

1  of Ms. Lahner.

2  And, thirdly, possibly even to have a special

3  master or yourself, we can take the deposition at a

4  place and a time where that person would be available

5  to make contemporaneous rulings on the objections that

6  may arise.  And in that way I believe that we will be

7  able to accomplish this.

8  The defendant has taken the position that to

9  take the deposition of an attorney is like the end of

10  western civilization as we know it.  I may be

11  unintentionally self-disclosing here, but I would be

12  really surprised if there's any attorney here who has

13  not been deposed in the course of his career.  Things

14  arise.  Transactions go bad, and people under the Court

15  rules give deposition testimony about what they know,

16  and that's what we're asking here.  This is certainly a

17  transaction gone bad, and Ms. Lahner has first-hand

18  knowledge and a firsthand view of it, and she

19  participated in many of the substantive business and

20  marketing decisions that brought us to this point, and,

21  so, we believe that we have met the criteria of Kerr.

22  We believe that this deposition can go forward under

23  such appropriate guidelines as you may set to make sure

24  that all the parties's interests are protected.

25  Thank you very much, Your Honor.

1  THE COURT:  Do you want to address the

2  document itself?  The document?

3  MR. PLACITELLA:  That was going to be

4  separate.

5  THE COURT:  Separate?

6  MR. PLACITELLA:  It is related before Your

7  Honor would rule because they're intertwined and things

8  we would learn about that document, as an example,

9  would impact, I think, the ultimate resolution of the

10  Lahner issue.

11  THE COURT:  All right.  Let's hear from the

12  defense on the document itself.

13  MR. LIFLAND:  Your Honor, we think the

14  document pretty much illustrates why all of this is

15  legal advice.  It is a draft of a press release.  It

16  was submitted to Miss Lahner for her comments.  She

17  made comments on it, which is the type of comments that

18  you would expect a regulatory compliance lawyer to

19  make.  We shouldn't be saying we approved for efficacy

20  because in the FDA's definition that's not what this

21  study was about.  We shouldn't include language

22  suggesting that Naproxen is indicated for

23  cardioprotection because that's not correct within the

24  meaning of what indication is in the FDA rules.  This

25  is exactly the kind of thing that is privileged.

1  Her comments in the margins of the documents

2  are what we want your regulatory compliance lawyers to

3  be doing.  It clearly was produced inadvertently.  I

4  think Your Honor has already ruled on the issue of

5  inadverse production not being a waiver in the context

6  of the huge document production in this case --

7  THE COURT:  You don't have to address that

8  issue.

9  MR. LIFLAND:  You know, that's our position on

10  that.  If I could, I would like to respond just very

11  briefly to the argument --

12  THE COURT:  Okay.

13  MR. LIFLAND:  -- that was made.  The letter to

14  the FDA, obviously, we're not contending the letter

15  itself is privileged, and, of course, it says what it

16  says, but to the extent Miss Lahner had any role in

17  drafting that, if she did, it was just like as a

18  lawyer -- a lawyer who drafts a complaint doesn't get

19  deposed about what they were thinking and why they put

20  this or that in the complaint.  That's another purely

21  legal role.

22  Her affidavit or her certification is clear

23  that she didn't act in any capacity other than a

24  lawyer.  I mean, we have an argument, but we have no

25  evidence that she was acting in a business capacity,

1  and there clearly are lots of other witnesses who

2  aren't lawyers on all of these subjects.  There are

3  many members of the medical review board that discovery

4  has been out there.  Charlie Cohen would know better

5  than I who they are, but there are quite a few of them

6  over this period.  Certainly there's Anstice who

7  testified a lot about marketing.  There's Reicin, who

8  testified about the New England Journal, on all of

9  these subjects.  I mean, I don't mean any disrespect,

10  but to say that there isn't other sources of evidence

11  on what -- where the Naproxen theory came from is

12  almost laughable.

13  We have had two trials where we had witnesses

14  testify extensively about what the basis for that was,

15  and the studies that were relied on for that and how

16  that came about after the VIGOR results were received.

17  So it seems to me that that doesn't meet the Kerr test

18  that the lawyer's testimony that is needed for any

19  event.

20  The Ocean Spray case is a memo discussing a

21  coverup, which was found to be in the crime fraud

22  exception.  There is no suggestion in the evidence of

23  anything like that here.  So, again, our position is

24  the showing hasn't been made.

25  On the question of the privilege log and

1   special masters, you know, that's something that if
2   there's an issue of the privilege log a motion ought to
3   be made.  It is really not on the table with this
4   motion, and we ought to have the opportunity to address
5   that specifically and brief that, rather than just
6   having sort of a generic claim of there's this big
7   privilege log.  Of course, there are Joanne Lahner
8   documents on the privilege log.  She was the in-house
9   lawyer on this, but to just come and say without having
10  made a motion for any kind of relief with respect to
11  the privilege log that we now turn it over to a special
12  master or do anything with it at this point I think is
13  not procedurally proper and ought to be addressed
14  separately.
15         THE COURT:  Okay.  All right.  Let's move on
16  to the document that is specifically talked about that
17  the defense wants to get back.
18         MR. PLACITELLA:  Yes, Your Honor, it has been
19  coined the claw back memo.  I'm not sure why.  I know
20  there's a lot of clawing about it.  I think in
21  addressing that document we have to put it in
22  perspective as to where we are, and it points up where
23  we are in concluding the discovery of Merck, and
24  unfortunately, you know, I do have visuals here, and
25  counsel is not here, so I'll try to describe them for

21

1   the record, but despite numerous corporate depositions
2   ordered by the Court many questions still remain
3   unanswered.  I took the deposition of Dixon, McKinnes
4   Blake, Weiner Jerman, Caroll has been taken,
5   Demopolous.  Many, many sales reps.  And despite the
6   fact that those depositions have been taken we don't
7   have answers to questions, and we really need the
8   Court's help to chart a course to end the corporate
9   discovery, and important questions have been blocked or
10  witnesses have claimed ignorance all pointing in their
11  depositions to Joanne Lahner as the person with the
12  source of the information.
13         And Joanne Lahner, I submit, holds the key to
14  many of the outstanding questions in -- that's left to
15  be answered in discovery.  Press release and public
16  relations, communications to the FDA, marketing to
17  consumers, scientific communications, marketing to
18  doctors, all those issues have been examined, and the
19  witnesses keep pointing back to Joanne Lahner, so we
20  respectfully submit that the answer should be provided
21  by Lahner without, as Mr. Thompson says, invading the
22  litigation privilege.
23         Now, these are questions or answers that are
24  available from no one else because we have tried.  And
25  the need for the Lahner discovery is evident from

22

1   focusing on a single document, which they call the claw
2   back document as an example.  This is a perfect
3   example.
4         Now, keep in mind this is one document that
5   they say slipped through the cracks that while I was
6   asking Miss Blake questions in a deposition, who was
7   head of VIOXX public relations, I was stopped, and then
8   she conveniently or what didn't have any memory of
9   anything having to do with it.  But at that point in
10  time I was stopped because I was told this is a memo
11  that Ms. Lahner had a lot to do with.  And this is not
12  just some ordinary document.  This is the document, the
13  first press release that was drafted where Merck was
14  putting its strategy to the public and to the doctors
15  in play after the publication of the VIGOR data.
16         And as you can see the document apparently has
17  Ms. Lahner's handwriting all over it, and I'm not going
18  to dispute that, but only Ms. Lahner will be able to
19  provide answers as to why Merck approved in that press
20  release and at the conference that followed it where
21  that press release was to be submitted approved
22  misrepresentations about the need for VIOXX, because
23  according to Ms. Lahner in the press release aspirin,
24  if you take aspirin you get all kinds of
25  hospitalizations and deaths.  And, in fact, in the very

23

1   press release of 5/18/2000 that she was, apparently,
2   involved in writing or drafting she writes, "the
3   serious GI side effects of NSAIDs are associated with
4   more than 100,000 hospitalizations and more than 16,500
5   deaths each year in the U.S."  And then they go on to
6   talk about Dr. Laine.
7         Well, this is a statement that was made over
8   and over by Merck that they knew -- that they knew was
9   at best unreliable, and at worse, a boldfaced lie, and
10  I do not say that lightly before a court of law
11  because -- and I asked Miss Basaman about these
12  questions and she couldn't answer the questions, but,
13  apparently, Dr. Laine, who they rely upon, who they say
14  was the chief investigator in the VIGOR trial and
15  became their spokesperson to the world about the
16  results of the VIGOR trial, Dr. Laine was taped, and
17  Dr. Laine made some very revealing statements.  He says
18  the statements about whether -- well, let's hear it for
19  itself.
20         (Portion of videotape played.)
21         MR. PLACITELLA:  And while they were trying to
22  prepare Dr. Laine for his videotape news release that
23  was going to go to the world they didn't -- they
24  weren't satisfied, the Merck PR people and the
25  medical/legal review board, with Dr. Laine's statements

24

1    saying the numbers were totally wrong, and they kept

2    going back to him over and over again to get him to

3    change his opinion.

4           (Portion of videotape played.)

5           THE COURT:  Okay.

6           MR. PLACITELLA:  Now, Your Honor, these are

7    outtakes that we secured from a third-party where Dr.

8    Laine testifies on -- well, he doesn't testify, he is

9    telling the truth on videotape about what the real

10   facts are about deaths due to NSAIDs.  And, in fact, I

11   won't play the rest, but, you know, they rehearse his

12   statements over and over again where he says, well, and

13   this is approved by Joanne Lahner in the medical/legal

14   review board.  He says, well, it is wrong, it is

15   totally bogus, but as long as it is not me saying it,

16   if I can say it is estimated that I'll be willing to go

17   on national television and say that, and that's exactly

18   what he did.  He went on national television and told

19   the world that the numbers that he said were totally

20   bogus were, in fact, true.  And this is his statement

21   as it appeared on national television.

22          (Portion of videotape played.)

23          MR. PLACITELLA:  Now, this is the statement

24   that appeared in the claw back memo that was either

25   written and approved or participated in by Joanne

1    Lahner where she said Merck told the world that more

2    than 16,500 people are going to die, and it is the same

3    information in the claw back memo that Dr. Laine, the

4    head researcher told Merck was totally bogus.

5           Now, it is interesting because a number of

6    months later Jo Jerman who, we also deposed in this

7    case, and it was referenced in our brief, we asked her

8    questions about that because Jo Jerman goes before the

9    entire sales force when the New England Journal of

10   Medicine article, which we'll get to, is released and

11   she says to the entire sales force that I think Dr.

12   Laine, the lead author of VIGOR and professor of

13   medicine at Southern California said it best, summed it

14   up very well.  It has been estimated that more than

15   100,000 patients are hospitalized and 16,500 will die

16   each year, something that Merck knew to be false and

17   that Dr. Laine knew to be false.  And that was approved

18   by Joanne Lahner.

19          Now, Joanne Lahner will also be able to

20   provide answers, we hope, concerning why inaccurate

21   health information was conveyed about VIOXX to doctors,

22   to patients, to the FDA and to the New England Journal

23   of Medicine.  And, you know, back in you remember last

24   year in 2005 there was a big to-do, a big furor because

25   it was learned that the information that Merck provided

1    to the New England Journal of Medicine about the number

2    of heart attacks wasn't true, and Dr. Curfman became

3    upset and wrote articles to correct those

4    misstatements.

5           Well, in fact, what Dr. Curfman testified to

6    is that the downgrading of the risk had significant

7    public health consequences, and he said, I believe, in

8    his testimony that that calculates into a very large

9    number of patients who would be put at risk.

10          Now, why is that important?  Because Joanne

11   Lahner, the person who they say only provided legal

12   advice was a member of the VIOXX SWAT team, and the

13   VIOXX SWAT team has nothing to do with legal advice.

14   She is on the VIOXX SWAT team while drafting the claw

15   back memo and putting together the strategy not to tell

16   the truth to the doctors at the upcoming conference for

17   DDW, not to tell the truth to the patients and not to

18   tell the truth to FDA in the New England Journal of

19   Medicine as I will demonstrate.

20          It is interesting at first -- the very first

21   press release approved by Joanne Lahner told the truth,

22   but no one really knows about that press release.  At

23   first Merck apparently told in their first press

24   release that the difference in heart attacks was five

25   to one, and that ultimately turned out to be the truth.

1    Now, that was back in April 2000, so the information

2    that Dr. Curfman was concerned about in 2005 we now

3    know was known to Joanne Lahner all the way back in

4    April of 2000, and we know that for a number of

5    reasons.

6           You see, because they also have another press

7    release that predated, I assume, the claw back press

8    release, and the other press release draft that Ms.

9    Lahner was familiar with and helped draft, no doubt,

10   actually says at the top that it contains bridging

11   language from five to four.  In other words, the

12   medical/legal committee was involved in changing the

13   statistics on the incidence of heart attacks from five

14   to four in May of 2000.

15          THE COURT:  Is this the document?  Which

16   document is this?

17          MR. PLACITELLA:  This is the document that

18   immediately, I guess, predated this document which,

19   again, is the claw back document, and you can see that

20   the claw back document, which is, apparently, authored

21   or contributed to by Joanne Lahner has the risk at four

22   to one and not five to one.  And so, clearly, Joanne

23   Lahner is intimately knowledgeable about what is going

24   on in Merck's effort to not only overstate the need for

25   VIOXX but to downgrade the risks related to VIOXX.

1    Now, this is very, very telling.  The final

2  press release that was released by Merck and approved

3  or written by Joanne Lahner during the DDW conference,

4  which was the big conference where doctors from all

5  over the world would come, and they were going to

6  announce what happened in the VIGOR study, and there's

7  a footnote in the bottom of the final press release,

8  and the footnote in the bottom of the final press

9  release raises many issues that, apparently, only

10 Joanne Lahner can answer.  The footnote says, "on the

11 basis of the preliminary analysis Merck previously

12 reported that significantly fewer heart attacks were

13 observed in patients taking Naproxen .01, compared to

14 patients taking VIOXX .05," and they did that why?

15 Because they actually put out the truth the first time

16 around.

17    But the next sentence is very revealing.  The

18 next sentence says, "final adjudication of all events

19 in the study has now been completed.  Final results

20 show the rate among VIOXX patients was .04 percent."

21 In other words, there was nothing left to do, the final

22 tally after you look at all of the information that

23 Merck had showed that the risk was four to one and not

24 five to one, something Dr. Curfman said had tremendous

25 public health consequences.

1    But at the DDW conference Dr. Laine makes

2  presentations, and Dr. Laine, fortunately, we actually

3  got his slides and Dr. Laine told the doctors at the

4  DDW conference that the actual results were four to

5  one, not five to one.  And a Dear Doctor letter is sent

6  out with the same information and approved by Joanne

7  Lahner citing to Dr. Laine's presentation at the DDW

8  conference, again, telling the doctors that the risk is

9  four to one and not five to one, and we'll put it to

10 the side for now, the issue of whether the Naproxen

11 theory had any basis, just go on this.

12    Now, the interesting part about this is the

13 exact same time Alise Reicin is circulating information

14 within Merck that clearly shows that they have looked

15 at all the heart attacks, and she has identified on the

16 exact same time the three additional heart attacks that

17 Dr. Laine forgot to tell the other doctors about, that

18 Dr. Laine, apparently, forgot to put in the press

19 release or that Joanne Lahner forgot to put in the

20 press release.  And then on the exact same day, and

21 this becomes important as it gets to what the FDA

22 ultimately found out, on the exact same day there's

23 national teleconferences held to talk about what the

24 VIGOR MI rates were, and the slides that are used are

25 Dr. Laine's slides, and what do they say in the

1  national teleconferences?  Not five to one but four to

2  one, yet it continues to be debated within Merck -- not

3  debated but discussed, and memos are circulated

4  throughout the summer while these telephone conferences

5  continue to go on, and Merck clearly understands if you

6  look at Dr. Shapiro's table that they have the

7  information in their possession that shows five to one

8  for heart attacks.

9    Now, why is that?  Now, it is interesting

10 because we now jump ahead to January 2001, and I tried

11 to get this information from Miss Basaman, who was

12 there on behalf of Merck for the FDA advisory

13 committee, and Miss Basaman couldn't answer the

14 questions.  That's one of the reasons we're here.

15    Now, it is interesting in preparing to speak

16 to the FDA Ms. Basaman authors a memo.  At first she

17 didn't remember authoring the memo, she didn't remember

18 receiving the memo until I showed her the memo that she

19 actually wrote and responded.  She said, well, that's

20 my e-mail, but I don't remember it.  So I have to ask

21 Joanne Lahner.  But the interesting part about that is

22 Ms. Basaman in trying to figure out what they're going

23 to tell the FDA if they're asked questions recounts the

24 history.  And she says, "our materials do reflect the

25 .05.  That's stuff they have with them "for those

1  keeping score."

2    Now, it is interesting, why should anybody

3  ever be keeping score about the truth?  But it says,

4  for those keeping score we don't -- we didn't announce

5  a rate on March 27th, that was 2000.  We announced .05

6  on April 28th and changed to .04 at DDW with an

7  editor's note and a release, which we went for, and we

8  have used that .04 ever since.  Now we're going to use

9  .05 because now we're before the FDA and they might

10 actually figure out the truth.

11    Well, the fact of the matter is that the FDA

12 did figure out the truth and despite -- whatever they

13 told the FDA at the advisory committee hearing Merck

14 continued to tell the doctors that the rate was .04 and

15 not .05, and in the warning letter the FDA actually

16 calls Merck to task and says when it is talking about

17 Dr. Holt's teleconferences, you know, why are you

18 telling the doctors it is .04 when we all know it is

19 .05, and they say you are minimizing the seriousness of

20 the MI rates.

21    Now, and then they -- and they specifically

22 focus on Dr. Holt's statements about Naproxen and the

23 .04 and .01, and why is that important?  Because,

24 apparently, Joanne Lahner -- we don't know this for

25 sure, we have to find out because Miss Westrick, who

1  wrote the letter doesn't know, apparently -- but what
2  Merck told the FDA in response to the warning letter is
3  that, you know, we have determined that Dr. Holt who
4  had a signed speaker contract didn't use slides
5  approved by Joanne Lahner and the medical/legal review
6  board during those teleconferences.  Well, that's
7  concerning because what Dr. Holt apparently did was
8  tell them about the .04, .01.  That was the message
9  that was approved by the medical/legal review board,
10  and it is interesting, and I harken back to the
11  national teleconferences, apparently, what Dr. Holt was
12  part of that began on 5/26/2000, the very day that
13  Alise Reicin was circulating the memo with the three
14  additional heart attacks, those teleconferences
15  actually had slides that the speakers were using
16  showing a downgraded MI risk.
17        And then, lastly, Merck says to the FDA in
18  response, and I can only think that this is authored in
19  part or in whole by Joanne Lahner, and this is really
20  interesting, and I guess she'll answer the questions if
21  we get that far, it says, you know, in responding to
22  the FDA about the .04, .01, it says, "our analysis was
23  submitted to the FDA in June 2000."  And then it says,
24  "in a subsequent analysis which included data or the
25  February cutoff, the rate was .05."

1  telling Merck that putting information, saying that
2  Naproxen is like aspirin is wrong, it is false and you
3  shouldn't do it.
4        But, you know, the question then becomes is if
5  she told Merck that then why a year later almost to the
6  day on 5/23/2001 did Merck put -- admit that their
7  scientists told the FDA that aspirin and Naproxen are
8  the same?  Those are questions that need to be
9  answered.  And when Merck wrote doctors letters they
10  told them that Naproxen was like aspirin.  Well, that
11  belies, I would submit, the very handwriting of Joanne
12  Lahner on the claw back memo where she says you should
13  not say that.
14        So, in conclusion, Joanne Lahner can provide
15  answers so far that have been available from no one
16  else, and should Your Honor permit Joanne Lahner's
17  deposition I submit it will go a long way towards
18  finishing the discovery that we need to finish in this
19  case.
20        Thank you for your time.
21        MR. COHEN:  Charlie Lifland, we're not
22  together, I'm sure you're going to respond to the legal
23  section.  There were quite a number of factual
24  inaccuracies, and I don't know if you want me to
25  address those.

1        Well, how could that be because we saw the
2  evidence that not only did the Merck scientists have
3  all the data before June 2000 when they were supposed
4  to give it to the FDA, apparently the medical/legal
5  review board had it, the public relations people had
6  it, the marketing people had it, but the FDA was given
7  something different, and only Joanne Lahner, I submit,
8  can answer those questions.
9        Now, last point, Joanne Lahner can also supply
10  answers as to why Merck told the doctors and the FDA
11  that aspirin and Naproxen are equally good for the
12  heart.  And I focused, again, directly on the claw back
13  memo, and this is what I attempted to ask Miss Blake
14  about in the deposition and I was stopped, and I think
15  this is the point where I was actually stopped in the
16  deposition, and it was requested that the document be
17  clawed back from me.  I held on to it.  I wouldn't give
18  it back, and I guess that's how it got the claw back
19  name, but what Merck says in this draft press release
20  is, "this is consistent with Naproxen's ability to
21  block platelet aggravation by inhibiting COX-1 like
22  aspirin."  And the handwritten language from Ms. Lahner
23  says, "like aspirin is too strong.  Aspirin is, I
24  guess, irreversible.  And Naproxen is not.  So,
25  clearly, she is not giving legal advice here, she is

1        MR. LIFLAND:  Why don't you go ahead, Charlie.
2  One of the problems is we just heard an argument,
3  90 percent of which was not in the papers where they
4  were supposed to make their showing, and we're on the
5  telephone, and it was very hard to follow, but why
6  don't you go ahead and try, if you can, Charlie.
7        MR. COHEN:  The first point is none of the
8  people that Mr. Placitella said he deposed were medical
9  doctors on the medical/legal board.  The medical/legal
10  board is the medical/legal board.  On the medical side
11  there are two doctors sitting on the board at any one
12  given time; one lawyer, the lawyer always acts in a
13  legal capacity.
14        Second, the question about the .05 to .04 in
15  the press releases, and who can give testimony as to
16  that; in fact, Dr. Alise Reicin can give testimony to
17  that.  She already has testified to most of it in the
18  very first -- in fact, I'll tell you in the very first
19  press release it turned out that the .05 rate came from
20  the investigator reported number and not from the
21  confirmed -- the numbers had come after the
22  adjudication panels had finally adjudicated and decided
23  whether or not, you know, the south side board
24  independently looking at the events has decided whether
25  or not the events are actually what they say they are

1  that, in fact, consistent with a prespecified cutoff,
2  and this I know Dr. Reicin testified to specifically in
3  Cona and McDarby in addition to other places, that the
4  DSMB had asked her to put in and adjudicate CV events
5  in the VIGOR study.  They put in a prespecified plan to
6  do so with a prespecified cutoff date.  There were
7  three, not four, heart attacks that came in following
8  that prespecified cutoff date.  They consistently used
9  the data that was available and that was consistent
10  with that prespecified cutoff date.
11        If you ask doctors and scientists, including
12  Dr. Alise Reicin, who testified to this, you would get
13  called to the carpet if you used numbers that come in
14  different from the cutoff date that you prespecified --
15  that people would say you are trying to rig the
16  numbers.  And, in fact, there was a GI event that came
17  in on Naproxen, and if Merck had said, you know what
18  VIOXX was even better on the GI than when we said
19  everybody would be screaming at Merck, You did the
20  wrong thing, you're not allowed to look at events that
21  come in after the prespecified cutoff date, don't play
22  with the numbers, just give us the numbers as to the
23  prespecified.  On this case the plaintiffs are making
24  the opposite charge saying they should have, in fact,
25  disclosed that.

1        So the .05 was originally because they
2  accidentally put in investigator numbers and not the
3  confirmed numbers.  Then we talked about the
4  prespecified cutoff date that Your Honor has heard
5  testimony from Cona/McDarby, and then when you submit
6  as a matter of regulatory requirement and much of what
7  Mr. Placitella then moved on to is exactly the sorts of
8  things that you have to go to a regulatory lawyer to
9  give you advice on for the periodic supplemental safety
10  report, you not only give the prespecified analysis you
11  give all the information, which Merck did, then Merck
12  put it into the background package for use at the
13  advisory committee that was then held in February of
14  2001 and has used the .05 ever since.
15        So if the point is that only Joanne Lahner can
16  speak to that, in fact, Dr. Alise Reicin has testified
17  to at least I have personal knowledge of at least
18  90 percent of it, and, if not, she knows the answer to
19  the other part, which I just told the Court, and, in
20  fact, they haven't deposed any of the doctors on the
21  medical/legal board and none of the people
22  Mr. Placitella talked about are doctors on the
23  medical/legal board.  That's from the factual side.
24  There are other misstatements, as well, but I don't
25  think it is worth correcting each one.  That is from

1  the factual side.
2        THE COURT:  Who are the doctor on the
3  medical/legal board?
4        MR. COHEN:  They have changed over time, but
5  various people included Bob Silverman, Ned Braunstein
6  Brian Daniels, Sean Harper, Marla Hoffberg, Jeff Melon
7  Glenn Silverstein, Alan Goldberg, Chris Artsiber, and I
8  don't want to certify that this is a complete list, but
9  these are people that I had listed as having been on
10  that board because at one point I had to go look for
11  this because it was requested that Merck produce the
12  documents from these folks, and, in fact, Merck did, so
13  I know that somebody on the document production side
14  had a list of every doctor who ever sat on the
15  medical/legal board because we have, in fact, produced
16  all the documents.
17        MR. PLACITELLA:  Your Honor --
18        MR. BUCHANAN:  And just to clarify something,
19  we have taken the deposition of several of those
20  people.  Notwithstanding what you said, Charlie, Brian
21  Daniels and Bob Silverman have been deposed.
22        MR. PLACITELLA:  Absolutely.
23        MR. BUCHANAN:  We have deposed several people
24  on the medical/legal board.
25        MR. PLACITELLA:  And none of them have been

1  forthcoming with the information.  Two, all the
2  exhibits that I referenced were referenced in the
3  depositions that were referenced in our briefs and
4  Merck was well familiar with them.  And, three, I have
5  not really heard an explanation why Joanne Lahner would
6  approve a marketing campaign that uses totally bogus
7  information that their own expert tells them is totally
8  bogus and then tells the world, the doctors, the
9  consumers and the FDA that.
10        MR. COHEN:  They haven't asked any medical
11  doctors on the medical/legal board about a medical
12  question, which they need to do.
13        THE COURT:  Let's look at Joanne Lahner's
14  actual comments on the document, because I can't read
15  all of them, but let's look at whether they're legal
16  comments, whether they have anything to do with law.
17  That's what I want to know.  Let's look at the top.
18  What is she saying up there?  "H use KM."  Does anybody
19  know what that means?
20        MR. BUCHANAN:  KM is a Kaplan-Meier graph.
21        THE COURT:  Do you have the document in front
22  of you?
23        MR. COHEN:  I actually don't, but I can get
24  it.
25        THE COURT:  Why doesn't everybody pull out the

1 document because I really want to go through it to see

2 what kind of advice she is giving.  This isn't the kind

3 of legal advice most lawyers give, I don't think.  It

4 seems to be more scientific than legal.

5       MR. LIFLAND:  It is.

6       THE COURT:  I don't see anything that says

7 section so-and-so requires this or, you know, there's

8 certainly regulatory compliance that would be very

9 appropriate for an attorney to be saying.  I don't

10 think this complies with this regulation, you need

11 that.  My question is is that what she is doing here,

12 and that's what I want to know.  That's why I want to

13 go really pretty much word-for-word through it and see

14 what it is she is saying.

15       MR. COHEN:  I'll pull that document up.  As

16 someone who has been able to see all the privileged

17 documents, Joanne doesn't in each case write down the

18 full, you know, like the legal memo, I researched it

19 and section such-and-such requires this.  She just

20 basically tells them, you know, you have to do this,

21 you have to do, this you have to do this, and that

22 means based on her reading of the regulations she is

23 always acting in a legal capacity.

24       THE COURT:  That's what I'm questioning.  So

25 that's what I want to see.  What is she saying at the

41

1 top of the document, who knows?  "H use KM."  Use okay.

2 Question mark.  I don't know what she is talking about,

3 does anybody?

4       MR. COHEN:  Can someone read to me.

5       MR. GRAND:  Hui Quan's Kaplan-Meier is okay.

6 Hui Quan, who was the biostatistician for VIGOR.

7       THE COURT:  So they're saying Hui Quan's

8 Kaplan-Meier graph is okay.  And then under that we

9 don't know what says?  There's question marks and

10 then there's 13, 14, ICM.

11       MR. COHEN:  Could someone read to me the Bates

12 number real quick?

13       THE COURT:  Yes.  I want everybody to have it.

14 Does anybody have a Bates number on here?

15       MR. WEISS:  It doesn't have a Bates number,

16 but, Charlie, if you go to the redacted MRKAC 10007

17 looks like 988.

18       THE COURT:  I got 888.

19       MR. WEISS:  I don't have my glasses on.

20       THE COURT:  AC 10007888 is the redacted one,

21 which still has her comments, most of her comments.

22 What was redacted wasn't really the comments, right?

23       MR. THOMPSON:  Judge, he may be able to find

24 this in the factual appendix to our motion it is

25 Exhibit F.

42

1       THE COURT:  It is Exhibit F on the motion.

2       MR. COHEN:  Okay.

3       THE COURT:  Actually, maybe Merck doesn't even

4 think that's -- because that language isn't redacted,

5 so I guess maybe you don't even claim that that is

6 legal advice.

7       MR. LIFLAND:  Yes, I don't think that's

8 something that anybody can read.

9       THE COURT:  Or anybody cares about.

10       MR. LIFLAND:  Let me give you an example from

11 the title of it in the first line where she changes,

12 you know, "a new study shows that VIOXX significantly

13 reduced" to "VIOXX significantly reduced the risks of

14 in a new study."

15       And that's the kind of change that is

16 suggested because the objective is not to overstate

17 what -- overstate the results of the study, so rather

18 than saying the study shows reduced side effects you

19 say we observed reduced side effects in the study, and

20 that's the kind of thing a regulatory lawyer will tell

21 you to do because you don't want DDMAC or whatever

22 going -- coming back to you and saying you put out a

23 press release that says your study shows more than it

24 shows.  And that's sort of what all of these comments

25 are directed to if we go through them, I think.  That's

43

1 the basic idea of what she is doing here.

2       THE COURT:  All right.  I want to see how

3 much -- how that holds up.  The next thing, apparently,

4 is not redacted.

5       MR. PLACITELLA:  The next line "largest GI

6 outcomes study ever."

7       THE COURT:  "Largest GI outcomes study ever"

8 is stricken by her.

9       MR. WEISS:  Your Honor, do you want the

10 redacted copy?

11       THE COURT:  I have them both.  But I'm trying

12 to see, quite frankly --

13       MR. COHEN:  Can I bother you to ask you one

14 more question?  What is the date of the brief that has

15 this as an exhibit?  I can pull it up that way.  I'm

16 having trouble.

17       THE COURT:  Okay.  Wait a second.  It is

18 attached to the certification of Richard Jasaitis, III,

19 which is dated January 18th, 2006.

20       MR. COHEN:  Okay.  Great.

21       THE COURT:  To that I guess it was attached --

22 that's 3 and 4.  It is actually Exhibit 3 and 4.  Did

23 you find it, Charlie?

24       MR. COHEN:  This is killing my reputation.

25 Was it not served on Lexis Nexis because it was

44

1    privileged?  That might be it.

2         MR. BUCHANAN:  Your Honor, one note while

3    Charlie is looking for the document.  The argument that

4    she is a regulatory lawyer and performing review in her

5    capacity as a regulatory lawyer I think belies -- the

6    fundamental nature of the regulation is to speak

7    truthfully, and what she is doing is -- that would

8    protect anything this person does, whether it is

9    marketing, whether it is science driven, whether it is

10   purely a business function.  I mean, that is an

11   obligation of everybody in a pharmaceutical company in

12   communicating to the public.

13        So to say that a lawyer who is marking up a

14   document is acting in a regulatory capacity where

15   they're never rendering any legal advice, they're never

16   doing anything along those lines is actually rendering

17   legal advice by editing words and by making science

18   suggestions and by talking about we can't say this

19   because it is not true, I mean, that is -- that is

20   editing for content.  That is a substantive -- those

21   are substantive edits based on the science and the

22   marketing of the drug for those specific purposes.

23   And, you know, there is an overarching obligation in

24   everything to be true.  To take the defendant's

25   argument where they want to go that would protect

1    anything that any lawyer ever does, even if it is

2    purely as a business nature, and that's what this is.

3    This is business work.  This is the business of

4    business, putting out press releases, putting out

5    marketing, putting out detail materials.  That's what

6    this is, and that's what she is involved in.  It is not

7    law.

8         MR. COHEN:  Actually, it is quite the

9    contrary, because, in fact, the example Mr. Placitella

10   gave if you can't say like aspirin, but you can say

11   pursuant to regulations consistent with Naproxen's

12   ability to block platelets, and this has not been

13   observed in any clinical trials, which is what Merck

14   did and used, and the FDA never took any -- didn't

15   speak to.  So, in fact, what she is saying is there are

16   certain things -- certain ways of saying things that

17   are not legally allowable, and that's what I'm telling

18   you --

19        THE COURT:  You're saying she is saying that,

20   Mr. Cohen, but on the paper she not only doesn't say

21   doesn't fit with FDA regs or even just need to change,

22   need to take out, same as, and then we can say, well,

23   the reason she is doing that is because it is -- what

24   she then goes on to is a scientific thing saying you

25   can't use it because it is not true because aspirin

1    remains in the system.  That's what she says.  It is

2    not a legal opinion.  She says you can't do this

3    because aspirin remains in the system.  She gives them

4    the reason right there, and it doesn't -- if she would

5    have given no reason maybe she was doing it for a reg,

6    if she would have said inappropriate, you know, or

7    something general or if she would have just said change

8    the language, but she here specifically says you can't

9    do that because -- and then she goes into a scientific

10   analysis.

11        MR. PLACITELLA:  And what happens, Your Honor,

12   is either one of two things happen at that point.

13   Either somebody overrides her and says that's not

14   true -- we don't care what you have to say or she

15   decides that she is going -- she is going to ignore her

16   own scientific comments because in subsequent press

17   releases for the life of VIOXX and statements to the

18   FDA they say "like aspirin."  So that's the point.

19   This is not legal advice.  This is factual information

20   or scientific information or business information.

21        MR. COHEN:  This is the problem with trying to

22   go over privileged information like this, and, perhaps,

23   it needs an in camera discussion, but, for example, you

24   know, what she is doing when you compare it to what

25   Merck then sends out later what she is doing is giving

1    them, you know -- she is doing the legal analysis and

2    then, like, helping them so they don't make the same

3    mistake again telling them basically what the reasoning

4    is that then leads her to believe that as a legal

5    matter you can't say it.

6         And so there's no doubt that she doesn't do a

7    legal memo on each document.  She has submitted a

8    certification that says this was the result of her

9    legal review of this document, and, you know, she could

10   tell you that what she is doing is making sure that,

11   you know, if it says "like aspirin" she is going to say

12   the FDA will tell you you can't say that, and, in fact,

13   if you want to say something similar to that here is

14   what the FDA would let you say, and she would approve

15   something else, which is what happened.

16        So the problem trying to look at the face of

17   the document to go through her thought process when you

18   could see she only writes a few words because she is

19   not taking a day on every document to write out the

20   whole thing I think it just -- it doesn't give you the

21   whole context and the whole explanation, although here

22   we have some other documents that I can point to to

23   show why what I'm saying is correct, but still this

24   might need then if you want to quiz on each specific

25   instance that might have to be an in camera discussion.

1  THE COURT: Mr. Cohen have you found it yet?

2  MR. COHEN: I found it. Thank you.

3  THE COURT: Do we have the document -- am I

4  missing -- I've got two versions of the document. One

5  is redacted and one is unredacted. Where is the final

6  one that went out clean?

7  MR. WEISS: I don't know if we have that.

8  MR. PLACITELLA: It only had the footnote

9  where they said it was the 5/18.

10  THE COURT: All right.

11  MR. PLACITELLA: I can tell Your Honor that I

12  recall on the 5/18 one "like aspirin" did not appear,

13  but subsequent press releases all the way until

14  September 2001 said "like aspirin," which is the point.

15  Merck knew not to say that. Joanne Lahner was the

16  person who approved it, and only Joanne Lahner can

17  answer the questions why here she says you can't use

18  "like aspirin" but then she allowed Merck to not only

19  put it in a press release but to say before the FDA

20  before doctors at doctors' meetings -- and, you know,

21  the other point here is there are numerous falsehoods

22  that Joanne Lahner knew to be false and approved and

23  let go out. That's not regulatory advice. That's

24  business decisions.

25  MR. LIFLAND: There's no evidence of that.

49

1  go through this document. So let's just do that.

2  Let's start with what has been redacted. She redacts

3  "largest GI outcome study ever conducted. Showed VIOXX

4  significantly..." she says "reduced the risk of

5  serious gastrointestinal side effects such as ulcers

6  and internal bleeding by 54 to 62 percent." The

7  redaction is -- and this is a sealed record. The

8  redaction of that is that they took out the percentage.

9  She takes them out.

10  MR. LIFLAND: She said they're confusing and

11  should put in the actual numbers, which, again, is

12  trying to make the document.

13  THE COURT: She says this is confusing. Is

14  that legal advice?

15  MR. LIFLAND: Yes. I think that the notion

16  that the -- that you want to be very careful that you

17  don't over represent your studies but you represent

18  them accurately is what an FDA lawyer needs to be

19  looking for.

20  THE COURT: I don't know this is confusing as

21  legal advice. Let's go down to the next line. "This

22  study showed that VIOXX reduced the risk of" instead of

23  "incidence of." It did say "incidence of," and she

24  changed that to "reduced the risk of." Okay. And your

25  argument is that's because that's more in compliance

51

1  MR. PLACITELLA: For the sake of marketing and

2  selling the drug to underestimate the risk and

3  overestimate the benefit has nothing to do with legal

4  advice. They are marketing decisions that the

5  medical/legal review board approved, and every witness

6  that I deposed on the marketing side said I cannot

7  answer that question. You need to ask the

8  medical/legal review board. And if you ask the doctors

9  they're going to say ask the lawyers. That's what has

10  gone on. When we asked Dr. Dixon she said ask the

11  lawyer. This is not unlike tobacco where the lawyers

12  are used to shield things that should not otherwise be

13  shielded.

14  MR. COHEN: That's completely wrong because of

15  the heavily regulated industry that Merck is. All

16  documents have to comply with FDA regulations. Joanne

17  has constantly been the lawyer on the medical/legal

18  board. You have doctors on the medical side who can

19  speak to this. Dr. Reicin could tell you about the .05

20  and the .04 and has, and now what we're doing is we're

21  going through individual pieces of individual words to

22  try and parse them out, but it is clear --

23  THE COURT: I'm not going through any

24  particular -- I want to go through this. This is a

25  particular document. She writes comments. I want to

50

1  with regs. What is "add RA here"?

2  MR. LIFLAND: To explain that the study was

3  done in rheumatoid arthritis patients, which, again, is

4  important from the standpoint of FDA compliance because

5  you don't want to be misleading anybody as to the

6  patient population, and I think -- isn't there

7  somewhere in here where she says you have to add a

8  sentence that VIOXX isn't indicated for RA? That's on

9  the last page. That's another example of wanting to

10  make sure that this complies with FDA and kinds of

11  things that DDMAC would call you on or might call you

12  on in her judgment as a regulatory lawyer.

13  THE COURT: She strikes "the largest GIRA ever

14  conducted" and just has them put "8,000 patients with

15  RA" then she has question mark.

16  MR. COHEN: It was the largest GIRA. She

17  doesn't think it is the largest GI, so that's something

18  the FDA would hit you for, but if they want to put in

19  RA, which they did, you could put in 8,000 patients

20  with RA because this is factual.

21  THE COURT: She is correcting a fact. The

22  next step "the international study called VIGOR

23  compared VIOXX 15 milligrams once daily, which is two

24  to four times higher" and then there's an "N equals

25  4052." What's that.

52

1    MR. COHEN:  That, actually, goes to below, But
2  she struck it to four times because at the time VIOXX
3  was not -- it was never indicated for -- if you said
4  four times that would be 100 milligrams, VIOXX was
5  never indicated for 100 milligrams.  So it wasn't
6  indicated for that.  She struck that opinion consistent
7  with regs.
8    THE COURT:  Two times higher than the daily
9  dose.  She puts in maximum daily dose.
10    MR. LIFLAND:  Right, that's to make it
11  consistent with the label.
12    MR. COHEN:  Right, because there's also 12 and
13  a half, and, so, actually, that would be if you did the
14  12 and a half would be four times, but she was saying
15  the maximum is 25 two times, otherwise --
16    THE COURT:  She is taking out all the things
17  related to 12.5.
18    MR. COHEN:  She is trying to make it not
19  confusing to people as to how much -- what the dosages
20  that are approved are this way.  It is clear this is
21  the maximum daily dose of 25 two times that.
22    THE COURT:  What is this and what does this N
23  equals 4052 relate to?
24    MR. LIFLAND:  Number of patients in the study.
25  Number of patients on VIOXX.

53

1    MR. COHEN:  I'm sorry.  Actually, she did mean
2  that to go after -- I don't know where she meant that
3  to go.  Yes, that's the number of patients.
4    MR. LIFLAND:  The notion here is you need to
5  get the basic information.
6    MR. COHEN:  Right.  Because they said 8,000
7  patients, so she is telling you how many took VIOXX so
8  you don't think it is 8,000 on VIOXX.
9    THE COURT:  And then she says she adds to the
10  sentence "before the study" and you took this out
11  "patients remained in the study for an average of
12  9 months, some patients participated for as long as
13  13 months."
14    MR. LIFLAND:  I think that's information she
15  moved over from the next page where she has that
16  crossed out.
17    THE COURT:  A lot of this seems to be more
18  editorial.
19    MR. LIFLAND:  Part of it is editorial, just
20  making it clear by putting the study facts up front.
21    THE COURT:  The primary end point -- okay.  So
22  the rest of that page isn't redacted.  What she is
23  saying down on the bottom does anybody know?  Is there
24  anything else on the first page that anybody can
25  interpret that means anything to either side?  If not

54

1  we'll go to Page 2.
2    MR. LIFLAND:  She circled the percentages,
3  and, again, I think that's consistent with her view
4  that to be clear not to use the numbers rather than the
5  percentages.
6    MR. COHEN:  I think one of the things she is
7  also doing is --
8    THE COURT:  Of course, in the New England
9  Journal of Medicine they used percentages instead of
10  numbers, didn't they?
11    MR. COHEN:  They used rates.
12    MR. BUCHANAN:  They used percentages.
13  .04 percent versus .01 percent.
14    MR. COHEN:  She has a question on the top
15  right of the document it says if Kaplan-Meier is okay
16  to make sure that they're getting numbers in an
17  approved way, such as an accountant has to use
18  generally accepted accounting principles.  At the
19  bottom I think what she is asking is were you using
20  some other method because after the question mark on
21  the bottom it says "or is it KM like," and that seems
22  to me to be related.
23    THE COURT:  So she is asking him what the
24  basis of the numbers are?
25    MR. COHEN:  Yes.

55

1    THE COURT:  Okay.  Then when we go to page 2,
2  okay, on page 2 what's redacted is or the line to
3  decide and then we have "reductions risk by VIOXX for
4  GI side effects, fewer patients reductions in the risk
5  by VIOXX for GI damage."  Does anybody know what her
6  comments "side effects fewer patients the risk of"
7  means?
8    MR. COHEN:  Here, and actually I slightly
9  misspoke on the percentages.  What she is concerned
10  about on the percentages is doing a relative from one
11  drug to the other, which, actually, usually gets -- we
12  have seen them as relative risk numbers 1.0, 1.2,
13  something like that, and here what she is saying
14  instead of talking about reducing the number of
15  patients she is trying to keep them away from kind of a
16  comparison in some of the tests and saying fewer
17  patients stopped taking it because of, and then she has
18  "nuisance GI side effects."
19    MR. PLACITELLA:  Your Honor, that probably
20  relates -- if I might jump in -- to the handwritten
21  comment down the left-hand side, which I guess is legal
22  advice, which says "although the study was not designed
23  to evaluate efficacy both patients and physicians
24  evaluated the effect of therapy on the signs and
25  symptoms of rheumatoid arthritis."  I say that

56

1  facetiously because I don't see any legal advice there,
2  and my recollection from Dr. Laine was that he told
3  them specifically that those kinds of statements were
4  absolutely incorrect, that their study did not evaluate
5  signs and symptoms, so, I mean, I can go back and
6  review it and submit it to the Court, but on its face I
7  don't see where that has anything to do with legal
8  advice.
9       MR. COHEN:  What she struck out was the study
10  also assessed and the protocol did not state that the
11  study was assessing efficacy, and she is saying you
12  can't say that and putting right up front the study was
13  not designed to evaluate efficacy.
14       MR. PLACITELLA:  But then she goes on to say
15  both patients were evaluated for the effect of signs
16  and symptoms.  One, that's absolutely not true, and,
17  two, that can't be interpreted as legal advice.
18       MR. COHEN:  It wasn't legal advice.  She is
19  saying that is something you can say consistent with
20  the protocol --
21       MR. PLACITELLA:  But, Charlie, the number one
22  principle, the number one principle for Ms. Lahner and
23  Merck is to tell the truth to the FDA and to the
24  public, so if the truth -- if telling the truth is --
25  whether you're telling the truth or not is the gravamen

1  of whether something constitutes legal advice then
2  everything they say is legal advice.  The truth of the
3  matter is there's a whole bunch of misstatements in
4  here that she let go out and that were untrue, and she
5  knew it.
6       MR. SEEGER:  Actually, if I can point one
7  thing out --
8       MR. LIFLAND:  I want to make the comment that
9  that is argument.  There's no evidence of that.  We
10  completely disagree with that.
11       MR. PLACITELLA:  Okay.  I'll show the
12  videotape of your doctor telling Merck that that's
13  untrue.
14       MR. SEEGER:  If I could just say one ting
15  because there's language above that Chris probably
16  should have pointed out if there's anything in here
17  that highlights this is not legal advice it is right
18  above where Chris was reading where they're talking
19  about the heart attacks in the studies, and she writes
20  "why not mention the other risk factors."  So the
21  question is when is a lawyer not a lawyer is when
22  they're marketing because if you want to highlight the
23  fact there's more heart attacks because these people
24  had risk factors that's not legal advice.  Regulatory
25  lawyers don't tell scientists why don't you mention the

1  fact that they had a heart attack because they were on
2  the cliff or as Lanier said --
3       THE COURT:  On the right side she says "why
4  not mention other high risks."
5       MR. SEEGER:  How could that possibly be
6  construed as legal advice?  That's a person acting as a
7  marketing person.
8       MR. PLACITELLA:  I wish I said that.
9       MR. SEEGER:  You did.  It was consistent with
10  the point you were making.
11       MR. LIFLAND:  She struck something, and it is
12  equally plausible she just wanted it to be accurate
13  because that's what the regulations require and that's
14  her job is to try to question the document to make sure
15  that they aren't going to get in trouble with DDMAC.
16  That's her role.  She is not making medical decisions.
17  That's what the medical people on the review board do.
18  That's why she is asking it as a question.
19       MR. COHEN:  The first part of that all talks
20  about the GI, as well.  I don't even know what that
21  goes to.
22       MR. SEEGER:  And changing the word "benefit."
23       THE COURT:  What is she saying at the bottom
24  "we want to separate GI burden and COX-2 hypothesis.
25  We can't say we set out to prove the COX-2 hypothesis.

1  You can include a general mechanism section."
2       MR. LIFLAND:  I think this goes to the point
3  that since the study wasn't designed to assess efficacy
4  and the protocol, it was designed to assess the GI risk
5  that they needed to discuss those things separately,
6  you know, and that they shouldn't say that we set out
7  to prove the COX-2 hypothesis.  You can include
8  discussions on mechanism.
9       MR. COHEN:  I hate to do this in front of the
10  Court and plaintiffs' lawyers, but what they're saying
11  here is that the COX-2 hypothesis was that if you
12  blocked COX-2 but not COX-1 you would get the pain
13  relief without the GI benefits, and what she is saying
14  is you just can't -- you can't say that here as a
15  matter of what the protocol said and as a matter of FDA
16  regulation.  At the end of the day it did prove the
17  COX-2 hypothesis, but what she is saying is you just
18  have to put out what has happened, and in this type of
19  communication you can't put those things together.  So
20  although it did actually prove the COX-2 hypothesis she
21  is making it all mechanism based in here, so it is just
22  clear that they're just reporting factually here and
23  not saying that this is the study in this type of
24  relief that proves COX-2 hypothesis and other avenues
25  of communication where that's allowed, you know, it is,

1    in fact, widely recognized as having proved that

2    hypothesis.

3         THE COURT:  Then we get to page 3 we have the

4    "like aspirin" and the note says "like aspirin is too

5    strong.  Aspirin is irreversible.  Naproxen is not."

6         All right.  And I think I understand that.

7    Let's go down to "which is used to prevent cardiac" and

8    then there's a line that says what?

9         MR. COHEN:  She is saying "which is used to

10   prevent cardiac events, make it sound like it is..."

11   what do you call that an ambiguous modifier?  Like

12   Naproxen, which they're not trying to say.  They're

13   trying to say that aspirin is used, you know, as

14   cardioprotective.

15        MR. LIFLAND:  And "not indicated" means that

16   Naproxen isn't indicated for cardioprotection,

17   therefore, you don't want to be saying something that

18   someone might read as suggesting that.

19        THE COURT:  The next part "approximately half

20   of the heart attacks occurred in the 4 percent of

21   patients who previously had a heart attack" and her

22   note to them is "no, 38 percent, not half."

23        MR. LIFLAND:  That seems to be another --

24        THE COURT:  That's a correction of the

25   scientific data.  Isn't that a scientific correction?

1    It is not a legal correction.

2         MR. LIFLAND:  Well, it is saying instead of

3    saying approximately half, which is, you know, vague,

4    you ought to just give the actual percentage.

5         MR. BUCHANAN:  Well, 38 percent is not

6    approximately half.

7         MR. LIFLAND:  That's why is she saying say

8    38 percent.

9         MR. BUCHANAN:  That's my point.  It is a

10   factual correction.

11        THE COURT:  And it is a factual correction of

12   the data.  It is not -- all right.  Let's go to the

13   next.  Efficacy studies of VIOXX.  What is the question

14   mark.  What is that word there?  You didn't redact that

15   anyway, so I guess it doesn't matter.  The next page we

16   don't have anything.

17        All right.  I just wanted to go through that

18   to see the what heck it is she is talking about and

19   then try to work out whether it is -- because as

20   defense pointed out right from the very beginning there

21   are three things that I'm looking at.  One is whether

22   it is essential to whether it is not from another

23   source available and, three, whether it is

24   nonprivileged initially, whether it really is

25   privileged, whether it is real or legal advice.

1    Because you can talk to a lawyer about a lot of things,

2    but if you're getting legal advice from them it is one

3    thing.  If you're just getting advice on facts it is

4    another.  But I'll look it over.  I'm going to spend

5    more time on it, and I'll -- I recognize that there is

6    a high -- I recognize that an order to order an

7    attorney's deposition is not something that should ever

8    be taken lightly, and that it is something that has to

9    be carefully looked at because we don't want to get

10   into the -- even though many attorneys may have been

11   deposed there's an awful lot of attorneys that haven't

12   been, and I don't think we really -- I certainly don't

13   want to erode the privilege that exists.

14        All right.  Now, let's go to Mr. Buchanan,

15   what is your issue so you can get out of here?

16        MR. BUCHANAN:  I appreciate that, Your Honor.

17        THE COURT:  Or do you have to go?

18        MR. BUCHANAN:  I can do it now.  I don't think

19   this will take that long.  It is actually concerning

20   the issue in Merck's representation of former

21   employees.  You had requested briefing from Merck

22   subsequent to the January 2006 status conference

23   concerning issues that had arisen with respect to Dr.

24   Demopolous and Dr. Caroll.  I had given the defense --

25   submitted the initial papers, and I'll give them the

1    privilege of stating their position first.

2         THE COURT:  Okay.  Counsel for defense?

3         MR. COHEN:  Your Honor, I'll handle this one.

4    The Court's original question was whether it is

5    permissible and mandatory for Merck to pay for counsel

6    for their former employees, and the parties in their

7    papers agree that it is legally permissible to do so.

8    They do have a disagreement on whether it is mandatory

9    to do so.

10        Just before I go into the specific language of

11   the law just so we don't lose sight of who we're

12   talking about right now, we're talking about people who

13   no longer work for Merck.  So just to give an analogy,

14   if I, for example, have decided that I have had enough

15   here and I tell Ted that I'm quitting and I go home and

16   start doing something else and then get a phone call

17   that I have to appear for a deposition in something

18   involving my former firm, and the only reason why

19   they're asking me to participate is because of the work

20   I did for the former firm my first question is going to

21   be, okay, I guess I have to get a lawyer, you're going

22   to pay for that, right, because why should I have to

23   start paying my own money for something that has

24   something to do with the corporation for which I worked

25   for?

1       In fact, there has to be any number of
2   individual Merck people who have been named as
3   individual defendants in VIOXX litigation across the
4   country, including Dr. Peter Kim and David Anstice and
5   Ed Scolnick and others -- maybe not David Anstice.
6   Peter Kim for sure.  Ed Scolnick, Lou Sherwood
7   somewhere, and quite a number of professional
8   representatives.  In fact, in some regards some of our
9   professional representatives have been sued in other
10  places not in New Jersey because of the diversity issue
11  where they're trying to keep them in state court
12  suddenly now can't get mortgages, and their credit is
13  being adversely affected because they have all these
14  lawsuits against them.
15      So, you know, just looking at it from the
16  former employee standpoint it seems to me that it is
17  completely reasonable for the former employees who
18  expect that the corporation would pay for its counsel
19  we have set forth the language of the statute, and we
20  have set forth Merck's bylaws, all of which indicate
21  that it is mandatory, we candidly admit to both sides.
22  Perhaps, surprisingly, there's really not that much
23  case law out here on this specific issue of where a
24  former employee is called to give deposition testimony
25  as to whether that is mandatory or not.  But when you

1   look to the policies behind the statute, and, of
2   course, the New Jersey Business Corporation Act as it
3   has been found is modelled after the Delaware act, and
4   Delaware, not surprisingly, has the most developed
5   spotting of law on corporate law.  And there it is
6   clear that the policy is to encourage people to work
7   for corporations, secure in the knowledge, as they put
8   it, that they can resist suits against them and that
9   the company will pay for it.  And so we have submitted
10  two cases, the Cambridge case and the Stewart case in
11  which people were in investigations or called to
12  testify in Grand Juries, and it was found that it was
13  mandatory.  And where the dispute between the parties
14  comes out, whether it is permissive or mandatory really
15  comes down to the language that says that the employee
16  has to be successful on the merits or otherwise, and
17  the question becomes what is the otherwise, and given
18  -- given the policy and looking at it broadly and
19  taking the view that is consistent with what we're
20  trying to do here is what you're being asked to do is
21  to testify at a deposition and you go ahead and testify
22  at that deposition that nothing untoward has happened
23  to you at the end of that deposition you have
24  successfully testified at your deposition, and we think
25  that given the policy of making sure that folks don't

1   have to pay out of their own pocket for things for
2   which they would never have been involved in in the
3   first place if there wasn't a lawsuit against their
4   former employer that it should be, and, in fact, is
5   mandatory that Merck goes ahead and pays for this
6   counsel.
7       But in any event, the parties agree that it is
8   legally permissible, so in the interest of the Court's
9   original question is that the parties agree Merck can
10  pay for the independent counsel and Merck submits that
11  it must.  But we know that underlying the Court's
12  question and concern, and the plaintiffs have raised
13  this, as well, is was Merck trying to use the
14  independent counsel as kind of an, I don't know, what
15  the right term is but to try and do something Merck
16  itself couldn't do and to go and actually try and
17  impede discovery instead of helping to get the
18  discovery.  And that is just absolutely as a factual
19  matter I can tell you as a matter of personal knowledge
20  and from reviewing the materials here just absolutely
21  not true.  We're not trying to do that, and, in fact,
22  in a discussion that you, Your Honor, had with Mr.
23  Buchanan and Mr. Mayer we tried to figure out how going
24  forward we could avoid any situation such as what
25  happened in the Demopolous and Caroll situation from

1   happening again, and I think we came to the conclusion
2   that the best thing to do is that in the case where a
3   former employee is being asked to sit for a deposition
4   if we know that there's any hint of a desire by that
5   former employee to resist the deposition we would let
6   the Court know right away so there's absolutely no
7   confusion.
8       Just very briefly, just to get it on the
9   record, with Dr. Demopolous she was always willing to
10  testify in a deposition.  Her concern was that given
11  that it was likely to be two days and she has her own
12  practice she didn't want to cancel her patients.  Ted
13  tried to continue to work out a schedule, which he has
14  been doing for New Jersey, and, in fact, he has been
15  doing for the entire -- most of the nation.  He has
16  been doing it through the MDL and the state liaison
17  committee.  He was trying to get the -- I know he and
18  Mr. Placitella were not able to agree on dates in that
19  regard.
20      When it became clear to Ted that Dr.
21  Demopolous and Mr. Placitella were at an impasse and
22  that they just would not -- there was going to be a
23  problem he stopped trying to schedule.  That was his
24  role.  He was trying to be a scheduler and facilitate
25  and just directed Mr. Placitella to her own personal

1  counsel who always, of course, under the ethical rules,
2  you know, Dr. Demopolous's counsel represents Dr.
3  Demopolous and Ted and I and others represent the
4  company, and so we figured if that was -- if she was
5  actually going to now resist or it was going to go to
6  court because of a scheduling problem that was not
7  something that was appropriate for Ted to do.  As a
8  matter of courtesy and as a matter of ethics it had to
9  go to Dr. Demopolous's counsel.  I know they did end up
10  having to go to court and they eventually came up with
11  dates that worked, although I think we're still -- I
12  think we're still waiting for a date to finish so that
13  Merck can ask questions because not to lose sight of
14  the fact Merck actually wanted to get the deposition,
15  as well, because once plaintiffs started Merck wants
16  the opportunity to ask its questions since this is a
17  witness who probably will be unavailable and will get
18  played at trial.  Merck would want to have the
19  opportunity to have their testimony there, as well.
20      With respect to Mr. Caroll who is now a
21  president at another drug company there what happened
22  was there was a deposition, and we had cross-noticed it
23  into New Jersey.  The plaintiffs successfully moved to
24  have that cross-notice quashed.  Mr. Caroll decided,
25  having sat for a deposition, did not want to sit for

1  another one and then, you know so informed his counsel.
2  That, obviously, was not met with extreme pleasure by
3  the plaintiffs' side, and that started a little bit of
4  an unfortunate situation.
5      I am told now that having spoken to his
6  independent counsel that he would sit for a deposition
7  at some point, and I think Ted has asked Mr. Placitella
8  to get in touch with him I think through Dave to try
9  and work that out.  But so when you go back and think
10  about how many depositions we were able to successfully
11  schedule with both current and former employees, and
12  Mr. Placitella mentioned a few just in the few people
13  he named who are former employees that all worked out
14  very well, and in these two cases Ted was not able to
15  act as a facilitator in that regard and that's what
16  happened with those two cases.  But, you know, in no
17  event was Merck trying to sit -- you know at the order
18  for commissions stage and make it appear to the Court
19  that everything was going to go fine and then have a
20  dispute come out later.
21      We realized when we spoke to Your Honor on the
22  phone previously that in hindsight coming back looking
23  at it that is a way that it might have appeared, so, as
24  I said, we did discuss that going forward, and as soon
25  as we get any hint of any notice that somebody will be

1  resisting we'll bring that to this Court so everybody
2  can add all their concerns and we can try and get that
3  resolved, but I wanted to make that record really clear
4  because I do know Ted tried very hard to get Dr.
5  Demopolous scheduled and was dealing with both her
6  inability and unwillingness, justifiably, but still
7  unwillingness to give certain dates and
8  Mr. Placitella's desire to get a deposition in a
9  certain time frame.  And I know he tried very hard and
10  it just wasn't able to be done.
11      So to the extent there's a request for relief
12  that Merck should not be paying for these independent
13  counsel it is permissible both parties agree under the
14  law Merck submits it is mandatory and Merck is not
15  using it in any way to try and resist discovery from
16  going forward, and we have agreed on some procedures
17  going forward to make sure that, you know, even the
18  appearance of that happening doesn't happen again
19  because it doesn't serve anybody's interests for there
20  to be that appearance, so this way as soon as we find
21  out we'll just let everybody know.
22      And then the last issue that has come up in
23  the last round of the papers on this was a privilege
24  issue, and there it is more fully set out in the
25  papers, you know, a corporation can only speak through

1  its people and when the -- if the information has to do
2  with something that happened in the past and the person
3  who has that information is a former employee the
4  privilege extends to that former employee.  We cited a
5  number of cases including the Cool case.  Plaintiffs in
6  response had written in their papers about a different
7  situation, and, actually, it is interesting that the
8  nomenclature of this stuff is particularly confusing.
9  One is a common interest exception to the privilege
10  itself, and that is derived from what is called the
11  joint client rule, where two people have the same
12  lawyer, they're sitting in the same room, they both
13  give privileged information and then it turns out
14  there's a dispute between the two of them and then the
15  privilege cannot be invoked by either one because they
16  were both sitting in the room at the time the
17  information was given to the lawyer and had equal
18  rights to it.
19      The cases the plaintiffs cite are one step
20  derived from that, and believe it or not, before I did
21  this kind of litigation I did insurance coverage work,
22  and I'm very familiar with this situation where the
23  insurance company said, you know, we both have an
24  interest in the plaintiff losing, so, therefore, it is
25  the same sort of thing as we both are represented by

1 the same attorney, and so the company's privilege
2 documents should be shared with the insurer, and, in
3 fact, the NL case that was cited actually expressly
4 noted that the common interest exception to the
5 privilege itself that comes right from Rule 504 is,
6 actually, an exception to the privilege.
7         And this is going to sound a little silly but
8 it is actually the case. We're arguing an exception to
9 the exception. The Rule 530 is the waiver of a
10 privilege, and, so, in one sense Rule 530 is an
11 exception to where privilege applies, that's where the
12 privilege applies but through subsequent action you
13 have waived it. But as the courts have recognized in
14 this Buonno book on the 2006 edition on page 678
15 specifically references the courts have fashioned a
16 common sensical approach to something they also call
17 the common interest exception, this, of course, being
18 the common interest exception to waiver as opposed to
19 the common interest exception to the privilege itself.
20 And there parties or nonparties who have similar but
21 not necessarily identical interests can share
22 privileged information with each other without waiving
23 the privilege. And here in a case where this
24 litigation of this size where there are individual
25 Merck folks who have been, in fact, sued individually

1 where the level of rhetoric and the allegations are
2 particularly high and the media attention particularly
3 strong it seems to be the quintessential situation
4 where folks have a common interest, so, in fact, they
5 are protected by the attorney/client privilege.
6         And then there's also the work product
7 privilege where as we -- I guess that's more fully in
8 the papers -- there any discussion of waiver the issue
9 is not whether there's any third-party in the room but
10 whether somebody from the other side because the point
11 of the work product doctrine is to keep things from
12 your adversary. And as the cases there cite, as we
13 cite in the State here in these circumstances any
14 discussions with the former employee in preparation for
15 the deposition is also covered by work product.
16         So starting with the Court's original
17 question, you know, is this a proper thing for Merck to
18 be doing, again, the parties agree permissible, Merck
19 submits mandatory. Was Merck trying to do something
20 improper? Absolutely not. We can make that
21 representation to the Court without hesitation. And,
22 finally, it is covered by privilege and work product?
23 Absolutely yes because of the attorney/client
24 privilege, the common interest exception to the Rule
25 530 waiver and the work product doctrine.

1         THE COURT: Okay. Mr. Buchanan?
2         MR. BUCHANAN: Well, Your Honor, wow. Let me
3 start, first of all, by saying that I think what Merck
4 is looking to do is have it both ways. What they would
5 like to do is say that people are not represented by
6 iterous lawyers, and, therefore, these third-parties
7 can oppose subpoenas. Dr. Demopolous, Dr. Caroll,
8 other third parties are not represented by Merck or
9 Merck lawyers, therefore, these third parties can come
10 in and attempt to block nonparty discovery sought by
11 the plaintiffs in this action.
12         Yet, when those efforts fail and when the
13 nonparties, nonetheless, agree to permit the discovery
14 go forward Merck then wants communications with these
15 folks to be protected with these nonparties who are
16 outside the litigation control group. They want a
17 privilege to extend to their communications with these
18 folks after the nonparties have sought to block
19 discovery.
20         So they're saying they're entitled to fund
21 representation to block discovery, and, yet, when that
22 fails they're entitled to a privilege in their
23 communications with these parties who they have
24 previously disavowed connection to because we know
25 Merck cannot attempt to block discovery, other than

1 through its own -- other than through itself.
2         Let me go back and piece this together. First
3 of all, there is no agreement that Merck is obligated
4 to pay for representation of former employees. We
5 cited the Pappas v Coach House Diner case in our
6 papers. The circumstances for mandatory payment or
7 mandatory indemnification were situations where the
8 corporate agent has been sued as an agent of the
9 corporation. A former employer has, in fact, been sued
10 or former employee has, in fact, been sued. And they
11 must have been successful in that situation.
12         Now, the setting where this arises is
13 ordinarily where the former employee is stepping
14 forward and saying, you know, I have to pay for
15 defending this case against myself. I have been sued,
16 and I have been sued because I did some act as your
17 corporate agent, and, you know, I don't think that's
18 right, and there's corporate statutes that require --
19 and Merck's bylaws reflect this -- that Merck has an
20 obligation to indemnify this person for the cost but
21 only when they're successful. Only when they're
22 successful. That is the public policy here. The
23 people who work for corporations and do act in their
24 capacity as corporate agents and get sued as a result
25 of conducting their activity as a corporate agent are

1  entitled to be indemnified when they're sued, when

2  they're successful.  Not every time, not if they lose.

3  Their only hope to be indemnified is when they are

4  successful when they have been sued.

5       Here we have Merck saying that they're

6  obligated by corporate law in this state and by their

7  bylaws to pay and indemnify anyone who -- from whom

8  discovery is sought.  I mean, I'm actually pretty

9  surprised that Merck is taking the position that they

10  have an obligation to indemnify every employee of Merck

11  from whom any legal activity is brought against them if

12  it in any way touches on Merck.  I imagine in some

13  future action these papers would be relevant to those

14  lawyers in this case.  In any event, in this case

15  there's no question, there's no mandatory obligation by

16  Merck to fund representation of nonparties, okay?  That

17  is a decision that Merck has chosen to undertake.  They

18  have chosen to do so.  And we don't dispute that Merck,

19  if it wishes, can provide funds to nonparties to

20  represent themselves should they wish to do so in

21  connection with nonparty discovery sought from

22  plaintiffs.  We do object to Merck funding

23  representation -- first of all, not just funding

24  representation, finding the lawyers, hand picking the

25  lawyers, in this case Morvillo Abramowitz, a very

77

1  well-known Wall Street or Manhattan white collar

2  defense firm to represent Dr. Demopolous.  I had great

3  doubt that Dr. Demopolous was able to stumble on

4  Morvillo on her own.

5       In any event, they identify the counsel, they

6  fund the representation.  That representation then is

7  to block the discovery in state court in Pennsylvania

8  after commission is properly issued.  We think there's

9  no question that's not right.  We don't think they can

10  do it.  We think the ethical rules are very clear about

11  it, and it is not just a matter for an ethical board or

12  an ethical committee to take up the action.  New Jersey

13  Supreme Court has affirmed sanctions for parties that

14  have done this, attempted to interfere with nonparty

15  discovery.

16       Merck cannot use its dollars to fund

17  representation with the purpose of blocking discovery

18  in this case.  We think it is clear.  We think it is

19  clear.  And there is -- and that's where I think Merck

20  comes from -- comes at this from with this mandatory

21  obligation position because absent a mandatory

22  obligation Merck has the discretion of when to fund

23  representation.  And they have the discretion to fund

24  representation in such a way so as it is not going to

25  be used to frustrate the purposes of discovery.  We

78

1  think they can't do that, Your Honor.  That's issue

2  one.

3       The next issue is, well, what about this

4  privilege between Merck and nonparties, okay?  Is there

5  such a thing?  Is there such a thing as a privileged

6  communication between Merck and the individual nonparty

7  witness as part of deposition preparation, are those

8  communications privileged, okay?  There may be

9  circumstances where they could be, Your Honor, where,

10  in fact, the former employees are part of the

11  litigation control group.  New Jersey Rule 1.13 defines

12  the parameters of the litigation control group.

13  There's no question these witnesses were not a party to

14  the litigation control group.  These are not the folks

15  that were making litigation based decision while they

16  were Merck employees.  These are people who did touch

17  on factual issues relating to VIOXX while they were

18  there but they were not in any way involved in the

19  litigation decision making.

20       So outside of the litigation control group

21  Merck's communications with these former employees are

22  not presumptively privileged.  So Merck then falls back

23  on two exceptions to the waiver rule, okay, this common

24  interest or joint defense privilege.  The problem with

25  these, however, is that these common interests and

79

1  joint defense privileges are shared among parties to

2  the litigation.  And where they're not parties to the

3  litigation they're targets of the -- targets of

4  investigations, criminal investigations, SCC

5  investigations, regulatory investigations.  The joint

6  defense or common interest exception is applied in

7  circumstances where there is, in fact, a very clear

8  expectation that their interests are aligned as

9  defendants or potential defendants or potential

10  co-litigants, okay?  We do not have the situation at

11  all in this case.  This is not a situation -- Dr.

12  Demopolous has not been sued.  Nobody has ever

13  expressed, there's no expectation of it.

14       Perhaps, the defendants are going to say she

15  is the target of a regulatory investigation.  I'm not

16  aware of any.  She was involved in planning a large

17  outcomes trial called the VALOR trial.  And Your Honor

18  may have seen the testimony relating to that and,

19  perhaps, a video cut, but she is not a target of any

20  investigation the plaintiffs are aware of.  She is not

21  a potential defendant to the extent plaintiffs are

22  aware of any such cases in that regard.  There is no

23  basis to believe there's a common interest or joint

24  defense privilege here.  The cases are very clear about

25  that.  That is the threshold requirement, and we cited

80

1    cases to that effect, Your Honor.

2            Finally, the defendants cite a work product

3    privilege here.  The cases are clear, and we cited in

4    our papers, as no other privilege has been implicated

5    proper scope of any work product protection would be so

6    narrow it wouldn't afford any protection, the discovery

7    of communications between Merck and Dr. Demopolous or

8    Dr. Caroll or others.

9            And the one thing I want to highlight is the

10   preparation of Dr. Demopolous for deposition, I think,

11   highlights, perhaps, the greatest danger here.  Dr.

12   Demopolous left the company several years ago, and

13   among the documents that Dr. Demopolous has shown was a

14   standby statement concerning the VALOR trial that was

15   prepared years after she left.  Years after she left

16   Merck prepared a standby statement, I believe, or

17   briefing document from February 2005 summarizing

18   allegations that Merck had designed a study in 2001 and

19   2002 to test cardiovascular safety, and it was

20   basically Merck's position paper on the adequacy of

21   their conduct in 2001 and 2002.

22           In connection with Dr. Demopolous's deposition

23   Merck's lawyers, together with Dr. Demopolous's

24   personal counsel who has been funded by Merck, sat down

25   and reviewed documents.  They reviewed the physician

1    paper, the physician paper from 2005 years after she

2    left the company, and, quite unsurprisingly, her

3    testimony is dead on with the Merck physician paper

4    from 2005.  We think that's improper.  At a minimum

5    it is not protected.  These types of communications are

6    in no way protected.  This has nothing to even do with

7    her employment at the time.  This is Merck's position

8    on it.  They're not even showing her documents from

9    that point in time.  They're showing them the way Merck

10   has recharacterized history, and they want -- they want

11   her to see Merck's position in terms of what happened

12   years ago.  We think that's improper, Your Honor.

13           So to wrap up, this obligation that Merck

14   contends exists to fund the representation of former

15   employees is nonexistent.  They are permitted to do so.

16   They are permitted to pay for former employee

17   representation.  They're not required to do so.

18   However, they're not permitted to do so to effectuate

19   things they could not do themselves.  They are not

20   permitted to fund counsel, to impede discovery that's

21   properly sought by these litigants, plaintiffs against

22   nonparties.  And further, Your Honor, as to any

23   privilege that exists between Merck and nonparties it

24   is limited to the control group, that's it.  The

25   litigation control group is limited to those people

1    that had decision making responsibility with respect to

2    the litigation decisions while they were at the

3    company.  Dr. Demopolous, Dr. Caroll or Marty Caroll

4    don't fit the requirements, and it shouldn't be

5    extended there.

6            MR. COHEN:  Your Honor, I have a very brief --

7    first of all, on the mandatory versus permissive the

8    entire dispute really hangs on what does it mean to be

9    successful on the merits or otherwise.  When Your Honor

10   goes back to read the cases and sees the policies

11   behind it it is actually a policy that protects the

12   corporation against having to pay the fees of people

13   who, actually, did something wrong against it, and it

14   is to protect the corporation from adding insult to

15   injury of not only being hurt, but then having to pay

16   the counsel fees of the people who hurt it in the first

17   place.

18           Secondly, on the litigation control group and

19   whether that affects the evidentiary privilege there

20   are, actually, two completely separate things, and, in

21   fact, if you -- if you look at the rule of professional

22   conduct 1.13 it tells you who the lawyer represents,

23   and it expressly tells you why this rule is in effect

24   because it expressly in the second sentence refers to

25   for the purposes of rules 4.2 and 4.3 those rules talk

1    about communications with corporate employees as to

2    whether or not plaintiffs' lawyers can call people in

3    the corporation and who is considered represented by

4    the corporation to counsel without more and has

5    absolutely nothing to do with the evidentiary

6    privilege.  They're two completely separate things, and

7    I won't go further into that other than to ask Your

8    Honor to focus on that.

9            In terms of -- one thing I do agree with Dave

10   on, and right now if Your Honor were to order right now

11   Merck cannot try and impede discovery by doing

12   something that it can't do itself.  Merck can't impede

13   discovery.  I don't disagree with that statement.

14           As to separating the scheduling of the

15   deposition from then representing and protecting

16   privileges in other relationships with the former

17   employees which relates to information while the person

18   was still employed at the company that's absolutely

19   something that can be separated.  Merck was just trying

20   to -- if the -- once the person decides that they will

21   testify then they're going to be testifying about the

22   corporation's information that is appropriate for the

23   corporation to have a role there.  If the person is

24   deciding whether or not to agree to testify we have to

25   stay far away, and we do not want to be blurring that

1  line, and we do not even want to have an appearance of

2  doing something like that because, as we said, we're

3  not going to be impeding discovery.

4      So -- and that's it.  So thank you very much.

5      THE COURT:  All right.  Let's go to the last

6  issue, which is I guess I'm forgetting right now.

7  Stempler.

8      MR. BUCHANAN:  Your Honor, if I may before you

9  turn to Stempler do you anticipate needing anything

10  further from me or can I excuse myself?

11      MR. COHEN:  The DYFS stuff.

12      THE COURT:  What do you want to say on the

13  DYFS stuff?

14      MR. COHEN:  Mr. Strain from Merck is going to

15  address that.

16      MR. BUCHANAN:  Actually, Chris and Jeff are

17  going to do that.

18      THE COURT:  Thank you Mr. Buchanan, good-bye.

19      Let's move on.  Do you want to address DYFS

20  first or Stempler.

21      MR. STRAIN:  DYFS would be fine.  This is Paul

22  Strain.

23      THE COURT:  Keep your voice up, please.

24      MR. STRAIN:  Can you hear me now?

25      THE COURT:  You know what, we have members of

1  the press present, and DYFS records shouldn't be part

2  of an open court proceeding.  So let's deal with

3  Stempler.

4      MR. COHEN:  Was the privilege discussion

5  before a member of the press?

6      MS. FUCHS:  This is Ronnie Fuchs on Stempler.

7  I know that Your Honor has already addressed this

8  issue, but we feel compelled to raise this again.  The

9  Supreme Court in its Stempler decision clearly stated

10  that it understood that the reason that defendants

11  would want to speak with plaintiffs' treating physician

12  were twofold.  First of all, for the reason of saving

13  resources, not having to go through with depositions

14  being able to informally and more inexpensively go

15  ahead and speak to some people to decide what to do.

16      But the Court also noted that what they called

17  an unexpressed interest that they assumed was the hope

18  that one or more of the physicians might provide

19  evidence or testimony that would be helpful to the

20  defendant at trial.

21      Then looking to what the plaintiffs' interests

22  would be the Court said, of course, the plaintiffs are

23  interested in protecting privilege, that is the

24  information from the physician that still would be

25  privileged even despite the waiver on the particulars

1  that have anything to do with the matter at hand, that

2  have anything to do with the lawsuit, and here we think

3  that would be very broad because of all the prior

4  history that goes to cardiac risks.

5      But then the Court also recognized that what

6  they called an equally if not more important interest

7  of the plaintiff, although not specifically pressed but

8  for them.  It is a desire to preserve the physician's

9  loyalty to the plaintiff in the hope that the physician

10  will not voluntarily provide evidence or testimony that

11  would assist the defendant's cause.  And I think fairly

12  the dispute -- the problem that we're continuing to

13  have really focuses still on those very same interests

14  that the Supreme Court identified.

15      I mean, on the one hand we have had issues, as

16  Your Honor knows, with the efficiency and the ability

17  to deal with the discovery of physicians.  There are a

18  number of factual issues that have come up.  There are

19  things as simple as Your Honor knows we have in these

20  cases the prescribing physician and then the

21  cardiologist who really maybe you can call them the

22  central cardiologist.  It may be the interventionalist

23  or in some cases it might be a surgeon, but then there

24  are any number of other doctors whose testimony may or

25  may not be important.

1      If you could meet with that Doctor, if you

2  could interview that doctor and find out whether they

3  remember anything, I mean, for example, in the Klug

4  case we had Dr. Chang who was an interventionalist who

5  saw Mr. Klug one single time, and he performed an

6  intervention.  Then later on when Mr. Klug was no

7  longer taking VIOXX he had another intervention, and

8  there was an issue about whether we should take the

9  deposition of the later interventionalist.  And these

10  issues would more easily be resolved if we could speak

11  to them and decide whether we need to go forward.  It

12  may be that the person tells you in an interview that

13  they don't remember anything, the records are the

14  records, and they don't have any opinion on anything

15  else and then maybe neither side wants to go forward.

16      As we stand right now the plaintiffs can speak

17  to those people and decide to use their resources in a

18  certain -- a certain efficient direction, but the

19  defendants they have to make the decision to just go

20  ahead and do the discovery or do a deposition or not.

21  And while it sounds simple the more cases that we're

22  preparing, the more complicated it becomes because

23  doctors have their schedules, and the lawyers have

24  their schedules, and, obviously, the depositions of the

25  key witnesses have to go forward, and then you're

1  trying to schedule these smaller maybe less important
2  depositions all around it.  A simple conversation could
3  so clearly eliminate much of that possibility.
4          And then we had in the McDarby case,
5  obviously, the semi absurd situation where we were
6  almost done with discovery and one of Dr. -- one of the
7  McDarby treaters was Dr. Kasper at the deposition of --
8  we had taken Dr. Kasper's deposition.  We were done
9  with it.  We had taken his prescriber's deposition.  We
10 were done with that.  We were now taking the deposition
11 of the interventionalists, one of the
12 interventionalists who saw him in the hospital, and he
13 was looking over the progress notes and said, you know
14 what, I think he was seen by the other Dr. Kasper.  And
15 as it turned out Dr. Richard Kasper had a brother Dr.
16 Kasper, who was a cardiologist at the same hospital,
17 and this interventionalist thought that he saw two
18 different signatures Dr. Kasper, and he said I think he
19 was treated by the doctor.
20         Now, the plaintiff had never told us that, and
21 we didn't know it was true or not, but under the
22 Court's Stempler ruling we couldn't call the second Dr.
23 Kasper.
24         Now, eventually, as plaintiffs pointed out at
25 the last status conference, the issue got cleared up

89

1  because although we went ahead and scheduled the
2  deposition and everybody had blocked out time when the
3  plaintiff's counsel went to meet or talk to the second
4  Dr. Kasper as they're allowed to do and we're not, he
5  said to them, no, that's not my signature, it is not
6  anywhere on the records.  And eventually they came back
7  and said what do you need from us, so we don't have to
8  go through with this deposition, and they arranged for
9  a certification from the second Dr. Kasper, and we
10 didn't need to do the deposition.
11         But the point is we could have avoided all
12 that two weeks earlier the minute Dr. Baklajian said to
13 us there's a second Dr. Kasper we could have called him
14 and said will you look over these records is any of
15 this yours, but we weren't allowed to, we were held
16 hostage to the plaintiff's timetable.  Understandably,
17 that was not their priority.  They had many, many other
18 things going on in the case, but meanwhile we were
19 struggling to figure out which handwriting looked like
20 one Dr. Kasper and which looked like the other.  It was
21 truly an absurd situation that could have been avoided.
22 So that really goes to the Supreme Court's, you know,
23 the note that this is an appropriate way to avoid
24 having to waste time on depositions, and this is a
25 method that as the Court said should be encouraged and

90

1  should be used in other informal means of discovery
2  that reduces the cost and time of trial preparation.
3          But on the other side there is clearly the
4  issue that the Court -- that the Stempler court noted
5  was the underpinning of everybody's desire to speak to
6  physicians, which is whether the doctor has any
7  opinions that are helpful to the defendant or helpful
8  to the plaintiff here on the core issue of causation.
9  And what has happened is that the plaintiffs are able
10 to have off the record private conversations with
11 treating physicians who may not have any opinion at
12 all, but after they are shown documents that have
13 nothing to do with a specific plaintiff, they're shown
14 Waxman reports and various medical articles that they
15 may or may not have read at the time that they were
16 treating the plaintiff, and by the time we walk into a
17 deposition we don't know whether what we're getting is
18 what the doctor would have said earlier.
19         Now, what Stempler recognizes exactly that
20 this may happen, that the plaintiff may want to try to
21 encourage the doctor not to give opinions in the hope
22 that they will not voluntarily provide evidence or
23 testimony that will assist the defendant's case and on
24 the flip side the defendant's counsel would prefer to
25 have a conversation to see if there is such helpful

91

1  testimony coming from the doctor.  And what the Court
2  says is that there should be equal access.  Defendants
3  ought to have the same right of access as plaintiff to
4  potential witnesses even if they're treating
5  physicians.
6          I understand that there's -- that there has
7  been a concern about privacy.  I think that Stempler
8  speaks to that and speaks to the type of authorization
9  that should be granted, speaks to giving advance notice
10 of the source of interviews, but it doesn't speak of
11 allowing one side access and the other side to not have
12 access.
13         THE COURT:  Okay.
14         MR. SEEGER:  Your Honor, I'm going to address
15 this.  For the record Chris Seeger.  Basically, what I
16 have just heard is there are no new reasons.
17         THE COURT:  Can you hear on the phone?
18         MS. FUCHS:  I'm having trouble hearing.
19         THE COURT:  We have the mics over there.
20         MR. SEEGER:  Basically what I have just heard
21 is there's no new reason for you to revisit the ruling
22 on Stempler because the arguments just made were
23 exactly the same arguments you addressed the first
24 time.  We can go through them one more time.
25         You know, the idea of Stempler is to make the

92

1  litigation more efficient.  It is to allow the
2  defendant in personal injury cases to go in there and
3  talk to doctors and avoid taking depositions.  As you
4  ruled the first time, and the defendant continues to
5  acknowledge, whether they interview the doctor on their
6  own or not they're going to take the doctor's
7  deposition.
8        They come in here with two examples, one of
9  which was a success story showing that this thing is
10  actually working.  In the situation involving Weitz and
11  Luxenberg and Dr. Kasper I believe was the name they
12  did exactly what was supposed to happen.  As soon as
13  they realized they had the wrong doctor Paul Pennock or
14  somebody from the Weitz and Luxenberg firm dialed the
15  doctor and got a certification, gave it to the
16  defendant, and they didn't have to take that
17  deposition.  That's how it works.
18        Now, a couple things I think that are
19  important to address here because I don't think any of
20  those arguments you heard are new.  They want to be
21  able to talk to the doctors for their own reasons.
22  They want to be able to influence the doctor's
23  testimony.  They say that we're doing it, yet it is not
24  true, and they say to the Court -- and there's a lot of
25  things in their briefs that are not true that I want to

93

1  address.  It is not true to say to the Court that if
2  the plaintiffs shows the document that they can have
3  these discussions in private.  Any document shown to
4  the doctor gets produced as part of the doctor's
5  production.  You have heard about this.  It has come to
6  you a couple times where a doctor has requested of a
7  lawyer the VIGOR study so they'll send the published
8  New England Journal of Medicine article.  It shows up
9  in his records and they find out about it, and they
10  question him about it.  Did you talk to the plaintiff
11  lawyer about it?  They get all the information they
12  want.
13        This isn't about scheduling.  It's about them
14  grabbing the doctors who, by the way, Merck already
15  still has their sales representatives in their offices,
16  and the sales representatives are still selling them
17  the Merck half truths about VIOXX, and they're still
18  telling doctors things they shouldn't be saying about
19  the drug.  For example, they're still telling doctors
20  that you don't have any increased risk of heart attack
21  until after 18 months when we all know now, and all the
22  scientists are coming out now that APPROVe is out there
23  that that was just a boldfaced lie.  They had no
24  evidence for it.
25        Let me address something in their papers which

94

1  is very important.  They say to Your Honor that Judge
2  Walsh ordered Stempler interviews.  They give some of
3  the reasons for it but not all of it, but what they
4  don't tell Your Honor is the judge that has taken over
5  for Judge Walsh is denying Stempler interviews, and he
6  cited to Your Honor's opinion as support for that.
7        I don't understand, I think I learned in law
8  school that when you tell the judge something you tell
9  the Court something about the law you should tell them
10  if somebody has come along later and reversed that
11  decision or has come out a different way.  I think
12  that's an egregious omission from their papers.
13        Something else that happened with Garruto they
14  tell that you Judge Garruto ordered them, but what they
15  don't give you is -- what they don't give you, which
16  I'm handing up to you is the authorization Judge
17  Garruto said to use, and I highlight the language.  It
18  is a one-page authorization which tells doctors you can
19  cooperate if you want in this lawsuit, but, by the way,
20  you might be sued if you give up too much information.
21  Tell me a doctor that's going to cooperate in an
22  ex-parte interview after looking at that?  What they
23  also don't tell you is Judge Garruto said in the
24  transcript that we have looked at that he was very
25  suspicious of their motives for even asking for it, but

95

1  he felt -- he felt after looking at Stempler that he
2  could give them something on it, and he would do it
3  with that authorization.
4        Now, we're not saying that you should go the
5  way Judge Garruto has gone, although I think the result
6  will be the same, there will be no ex-parte interviews,
7  there will be depositions, I think that Judge Garruto,
8  respectfully, just is wrong on the Stempler issue.
9        This is an extreme circumstance involving now
10  6,000 cases in New Jersey.  I will tell you, and I'm
11  sure the plaintiffs' lawyers in the courtroom will tell
12  you that if they want to do ex-parte interviews we're
13  going to be in here for every single doctor asking Your
14  Honor to look at the authorization, to look at what
15  they're trying to get, to circumscribe what they're
16  asking, and we're going to do that in every case
17  because we need to do it to protect our clients.  Our
18  clients have the doctor/patient relationship, and we
19  have a right to talk to the doctors for that reason.
20        So, you know, unless Your Honor has any
21  questions about this they have really cited nothing new
22  that should cause you to revisit your ruling here.  In
23  fact, your ruling is now being followed by Judge Wilson
24  in Fen-Phen.  I think your ruling -- it started with
25  Judge Corodemus denying Stempler interviews in PPA for

96

1  different reasons.  You picked your ruling has expanded
2  upon that and now we see Judge Wilson following it.
3  And Garruto, even though Judge Garruto has not exactly
4  said I don't think -- and, by the way, the HRT
5  litigation I believe is a lot smaller than this one.  I
6  don't have all those facts.  But Judge Garruto simply
7  said --
8          THE COURT:  It is under 200 cases.
9          MR. SEEGER:  I don't want to hurt myself in
10 future litigations, but I would say that's a different
11 animal than what we're dealing with in VIOXX.  But even
12 there Judge Garruto questioned their motives and
13 drafted that authorization, which you have to
14 acknowledge after you look at it, any doctor looking at
15 that is not going to be meeting with any defense
16 lawyers ex-parte.  And it also says -- this is a big
17 point.  Thanks Jeff.  It doesn't allow for them to do
18 it alone.  It says that the plaintiff's counsel should
19 be present, and one other thing I forgot to say, and
20 thank God I have Jeff Grand with me, in a case
21 involving Walsh, which the defendant now loves what he
22 did, those weren't ex-parte.  I believe they had to be
23 transcribed, the interviews, and they had to be
24 provided to the plaintiff's lawyer.
25          We're getting nowhere on this one, other than

1  just my time to revisit it.  There's nothing new, and,
2  Your Honor, I recommend just like you did the first
3  time, you deny their motion.
4          THE COURT:  I spoke to both Judge Garruto and
5  Judge Wilson on this.  I have spoke to them not in
6  relation to this motion but previously, and I don't
7  think anyone in New Jersey is really allowing Stempler
8  interviews in mass torts, ex-parte interviews.  I don't
9  think that's happening at all.  Because of the nature
10 of the litigation.
11         One of the other problems, not problems but
12 one of the other issues, the primary argument from the
13 defense point of view which at first blush because any
14 time an efficiency argument simply just doesn't work,
15 allowing -- it is simply not efficient.  Actually, we
16 have been doing -- you have been doing a lot of
17 doctors' depositions, and it has been very efficient.
18 I have had almost no motions, issues, problems brought
19 to my attention.  Everything has been moving very
20 quickly and very smoothly.  If we have to add a whole
21 other layer of HIPPA disclosure, Stempler interviews
22 should they be with plaintiffs' counsel, without
23 plaintiffs' counsel, what is the scope of the interview
24 for each single plaintiff it is going to add huge
25 amounts of inefficiency, and, as I said previously and

1  I still believe, the defense, except maybe in the case
2  where a doctor didn't even treat the patient, is going
3  to want to take a deposition to preserve what the
4  doctor said in case that doctor is called at trial.
5          So that's one factor.
6          The other factor is this idea that it is
7  really not fair plaintiffs get to talk to the treating
8  doctors and we don't.  Well, you know, fairness in a
9  lawsuit always involves, obviously, there has to be a
10 search for the truth, but when it comes to witnesses we
11 all know and we just dealt with the issue that Merck
12 has the opportunity to talk to all of their employees,
13 they can spend weeks, months or days with their
14 employees preparing them for depositions, and they
15 probably do spend time prepping them.  If they didn't
16 they would be negligent.
17         I mean, I'm not suggesting that they suggest
18 that they say anything that's untrue, but they
19 certainly can remind them of things, discuss things
20 with them, and Merck has been doing that not only with
21 their employees but with their ex-employees.
22         Certainly each side, both sides can do it with
23 their doctors.  Plaintiffs don't get the opportunity to
24 go talk to Merck's employees off the record or talk to
25 Merck's -- even their former employees I don't think

1  they're interviewing off the record the way this has
2  been working out, so what has happened is there's a
3  huge disadvantage there.  But it is balanced.  It is
4  basically this is our side so our side can talk to the
5  attorneys.
6          Now, a doctor who is a treating doctor has a
7  different role, there's no question, but the bottom
8  line is the truth should be coming from the employees,
9  the truth should be coming from the independent doctor.
10 The truth should be coming from experts.  But our
11 system recognizes that it is appropriate for attorneys
12 to meet with witnesses and to provide them with
13 information and to discuss stuff with them and then
14 they have a right, obviously, as counsel pointed out,
15 defense counsel or plaintiffs counsel have a right to
16 ask what were you given by the other side, what
17 documents did you review in preparation for this
18 deposition, what documents have you reviewed is a
19 question that is usually asked in almost every
20 deposition.  It is going to be asked of the employees
21 so they know what you went over with them.  It is going
22 to be asked of the doctors so you know what the
23 plaintiffs went over with them, and in the case of the
24 treating doctors there's two things that I think are
25 important.  One is that Merck had the opportunity to

1  talk to the treating doctor for years through their
2  sales reps.  In the last trial there were like 300
3  sales calls on the doctor.  So the Merck side of what
4  was going on has certainly been presented to the
5  doctors in detail.  For plaintiffs to say, but did they
6  ever show you this, this or this before I don't see
7  that as being very nefarious or wrong and then letting
8  the doctor say, you know, I didn't know this, this or
9  this.  Obviously, again, what did plaintiff show me?
10  What did they tell me?  I think the doctor at that
11  point certainly has to be honest and reveal that
12  information, and the doctor still is going to be able
13  to speak truthfully, and certainly, defense can
14  certainly say, well, you didn't know that at that time,
15  you know, and, obviously, can question if it is
16  carefully crafted questions which both sides do in this
17  case because we have top lawyers on both sides.
18       It is very easy to ask the witness, okay, put
19  that aside, what did you know at that time, what did
20  you know at this time, what do you know now and what
21  did you base your opinion on then.
22       The whole point from the plaintiffs' side is
23  there was only one side of exposure to the doctors, and
24  they want to have the opportunity, and they have had
25  the opportunity.

1       Now should Merck be able to meet with them and
2  prep them from their side?  Well, the problem with that
3  is that there is a relationship which really can't be
4  entirely discarded between a person and their doctor.
5  A person's doctor just like a person's lawyer has a
6  very unique type of relationship with that person
7  hopefully.  Hopefully they have somewhat of a close
8  relationship, and the doctor is interested in that
9  person's health and interested in them.  That quote if
10  you consider it a bias it can be brought out, but it is
11  a fact just like if I'm your lawyer, I'm your
12  accountant, I'm your doctor.  If I'm your friend, if
13  I'm your wife I'm going to testify truthfully and
14  hopefully set aside any bias, but -- and the defense or
15  the plaintiffs can bring out that that bias exists.
16  The juries understand these issues.
17       But now if you have a treating doctor who I
18  believe, and I don't have -- I didn't pull it, but the
19  AMA has a specific requirement that doctors cooperate
20  with their patients in their legal actions, and that's
21  part of the AMA ethics.  It doesn't mean that doctors
22  should ever say anything untrue.  It doesn't mean that
23  there should ever be anything deceptive.  It doesn't
24  mean they're supposed to bend over to accommodate the
25  patient's point of view, and I haven't found that

1  that's the case.  Doctors as a whole are a pretty
2  independent lot, and doctors as a whole pretty much
3  aren't that receptive to lawyers for either side, and
4  doctors on the whole pretty much just say what they
5  think.  But there is a relationship there, and there is
6  an element of trust there, and there is an idea that,
7  okay, the doctor sends his records, the patient knows
8  what was given to the defense.  The doctor takes a
9  deposition.  The doctor testifies at trial.  The
10  patient knows what the doctor said about him.  You have
11  an ex-parte interview with someone who is your
12  adversary with your doctor, and you have no idea what
13  your doctor said to them about you.  It sort of taints
14  that relationship.
15       MS. FUCHS:  Your Honor, with all due respect,
16  I think that the Stempler court addressed exactly that
17  few, and they quote at length from decisions that go
18  the other way and do not allow defense counsel to meet
19  with physicians and then they come out differently.
20       THE COURT:  Yes, but that's the whole point.
21  Your argument in your brief is that the Stempler
22  decision is really based on -- that the Stempler
23  decision isn't based on efficiency, that it is based on
24  fairness.  I don't read Stempler that way.  Stempler is
25  based on efficiency, and then it says even though

1  there's these other issues of privilege, et cetera,
2  there's still this core issue that it is so much more
3  efficient and it is so much more expensive -- it was
4  written with the idea that taking a dep is a burden, it
5  is a huge cost to people.  Well, that's true when you
6  have a little lawyer, not a little lawyer but a small
7  firm who is representing one person in a small case
8  involving an injury.  It might be -- it could be -- it
9  could be anything.  It could be a minor injury that
10  resolved.  It can be a person who fell and twisted
11  their ankle.  And then there becomes a question of is
12  it worth taking a doctor's dep for this?
13       I mean, the bottom line was cases can be
14  settled for the cost of the doctor's dep.  And that was
15  the problem that the Supreme Court was wrestling with.
16  We don't want to have the time and inefficiency of
17  taking depositions of these doctors in order to -- and
18  make people pay for this when really the doctor is not
19  going to say anything.  The whole purpose of it if you
20  look at it was so there didn't have to be a dep, and
21  that's what I said the first time I ruled on this.  In
22  these cases that's not an issue.  The money is
23  different.  The defense money is different.  The
24  plaintiffs' money is different.  The cases are of a
25  different nature.  The depositions are always going to

1   be taken.

2         You know, when you're dealing with small

3   claims cases you have to allow for some -- you have to

4   keep the rules of evidence because the rules have to be

5   the same, but you have to recognize that people -- that

6   you have to shortcut the costs to people to some degree

7   so they can make the litigation worthwhile.  You

8   can't -- it is not just a cost factor, but cost is one

9   factor.  Time is another factor.  And the most

10   important thing is that this system is working.

11   Plaintiffs -- I do not feel outraged is what I'm saying

12   by any kind of unfairness.  This is not an unfairness

13   that's -- that's a problem for me at all, that one side

14   gets to talk to their treaters.

15         MS. FUCHS:  Your Honor, I understand that.

16         THE COURT:  And the most important thing, Miss

17   Fuchs, is that it is not an efficiency of any type.  In

18   fact, it will, I think, be the opposite.  Everything,

19   whether it is evidence or this type of ruling, is done

20   on a prejudice -- not maybe a prejudice.  A prejudice

21   probative value, how useful is it.  There is always a

22   balancing in law, and judges decisions -- otherwise, we

23   wouldn't even have to have judges because everybody

24   would know the law says you do this, you do that.

25   Every case and every fact is different, and there's

1   always issues of this is the law, but, also, you have

2   to balance and when -- I allow Stempler interviews in

3   personal injury cases.  I did it for years.  I have

4   done it before.  It is not as though I don't -- I'm

5   disagreeing with the Supreme Court so I don't allow

6   Stempler interviews.  I do allow Stempler interviews.

7   But in mass torts I don't see that it is necessary or

8   appropriate.  And I don't think -- and I realize the

9   fairness issue doesn't go to that, but I also recognize

10   that that's what you keep -- that's what the defense

11   keeps questioning, and there is some unfairness to it,

12   there's no question, some unfairness to everybody

13   talking to corporate employees.  Some unfairness --

14   there's some balance in this whole system, but the fact

15   is the system works, and in the end without Stempler

16   interviews these cases have been moving just fine, and

17   I don't feel that Merck has been prejudiced at all, and

18   I think that we have made much more progress and much

19   quicker progress, and we still have thousands more

20   cases to deal with.  And these cases are going to have

21   to be streamlined.  And there are other things in the

22   future that I'm going to be doing to streamline these

23   cases.  Stempler is one of the things I did early on.

24   But there's going to be other things, and the other

25   judges are agreeing with me and doing the same thing.

1   Not that it came from me originally, but in -- all

2   right.

3         Miss Fuchs, I think you said everything in

4   your letter.  I don't like to make a decision and then

5   hear additional argument.  If you're going to appeal

6   you can argue it to the Appellate Division.

7         MS. FUCHS:  Your Honor, I understand that.

8   Can I just ask whether the Court would entertain

9   limiting the topics on which the plaintiffs' counsel

10   can speak to plaintiffs' physicians; for example, they

11   cannot show plaintiffs' physicians Merck documents or

12   Waxman reports or post event materials to try to

13   influence their opinions?

14         THE COURT:  That they can't show them

15   scientific studies from later?

16         MS. FUCHS:  Yes.  And congressional reports

17   and internal Merck documents.

18         THE COURT:  No, I absolutely wouldn't do that.

19   There's absolutely no basis for that in the law.

20   Stempler definitely doesn't say that.  There's been

21   never, again, a court case that has said that a patient

22   can't sit down with their own doctor and with their

23   attorney and talk about the case.  I mean, there is no

24   such decision.  Or that that conversation should be

25   limited in any way.

1         Again, we come back to that patient/physician

2   relationship, and that's a somewhat fiduciary

3   relationship that every doctor has to their own

4   patients.  A fiduciary has to be honest, but a

5   fiduciary also has to have a trust relationship.  I

6   don't know whether fiduciary is really the right

7   analogy, but it seems to me it is a similar type of

8   thing.  A patient has to have trust in their physician.

9         No, I'm not going to rule that the plaintiffs

10   are forbidden from discussing things with doctors.  And

11   Merck is -- or, obviously, Merck's representatives are

12   no longer talking to them about VIOXX, but they

13   certainly have every opportunity to and did before in

14   great detail.

15         MS. FUCHS:  You're talking about prior to the

16   litigation?

17         THE COURT:  Prior to the litigation, yes.

18   All right.  That's it.

19         MR. PLACITELLA:  Thank you, Your Honor.

20         THE COURT:  As far as DYFS is concerned I

21   don't need oral argument on that.

22         MR. SEEGER:  I don't think you do, and I don't

23   feel compelled, unless you have an argument.

24         THE COURT:  You can get back to the defense

25   and you can see if they want oral argument I'll do it

Transcript - Motion for Protective Order (2006/05/19)

1    when I get back.

2              MR. SEEGER:  Yes, that's fine.

3              THE COURT:  I don't think I need it.

4              I want a copy of the Power Point, and I want a

5    copy sent to the defense and to me.

6              (End of proceedings.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Transcript - Motion for Protective Order (2006/05/19)

1              C E R T I F I C A T I O N

2

3

4         I, REGINA A. TELL, C.S.R., R.M.R, R.P.R., C.R.R.,

5    License Number 30X100161000, an Official Court Reporter

6    in and for the State of New Jersey, do hereby certify

7    the foregoing to be prepared in full compliance with

8

9    the current Transcript Format for Judicial Proceedings

10

11   and is a true and accurate compressed transcript to the

12

13   best of my knowledge and ability.

14

15

16

17

18

19

20

21         _____05-25-06

22              Regina A. Tell, CSR-RPR-RMR-CRR

23              Official Court Reporter

24              Atlantic County Courthouse

25              Mays Landing, New Jersey

```
 1              SUPERIOR COURT OF NEW JERSEY
                ATLANTIC COUNTY
 2              CASE TYPE NO. 619
 3    ----------------------------x
 4    IN THE MATTER OF IN RE:

 5    VIOXX
                      STENOGRAPHIC TRANSCRIPT
 6    ----------------------------x    OF:
                                - CASE MANAGEMENT -
 7                                  CONFERENCE

 8        PLACE:  ATLANTIC COUNTY CIVIL COURTHOUSE
                  1201 BACHARACH BOULEVARD
                  ATLANTIC CITY, NJ  08401
 9
          DATE:   JULY 18, 2006
10
11    B E F O R E :
12      THE HONORABLE CAROL E. HIGBEE, J.S.C.
13    TRANSCRIPT ORDERED BY:
14      DAVID BUCHANAN, ESQ. AND THEODORE MAYER, ESQ.
15    A P P E A R A N C E S :
16      DAVID BUCHANAN, ESQUIRE
        JEFFREY GRAND, ESQUIRE
17      SEEGER, WEISS
        ATTORNEYS FOR THE PLAINTIFFS
18
        TRACY FINKEN, ESQUIRE
19      ANAPOL, SCHWARTZ, WEISS, COHAN, FELDMAN & SMALLEY
        ATTORNEYS FOR THE PLAINTIFFS
20
        LEE BALEFSKY, ESQUIRE
21      KLINE & SPECTER
        ATTORNEYS FOR THE PLAINTIFFS
22
23           *      *      *      *      *

24              REGINA A. TELL, CSR-CRR
                OFFICIAL COURT REPORTER
25              1201 BACHARACH BOULEVARD
                ATLANTIC CITY, NJ  08401

                                                    1
```

```
 1    APPEARANCES CONTINUED . . .
 2      NICHOLAS DIAMAND, ESQUIRE
        LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
 3      ATTORNEY FOR THE PLAINTIFFS
 4      TERRENCE SMITH, ESQUIRE
        DAVIS, SAPERSTEIN & SALOMON, P.C.
 5      ATTORNEY FOR THE PLAINTIFFS
 6      DAVID COHEN, ESQUIRE
        THEODORE M. LIEVERMAN, ESQUIRE
 7      SPECTOR, ROSEMAN & KODROFF, P.C.
        ATTORNEY FOR THE PLAINTIFFS
 8
        GENE LOCKS, ESQUIRE
 9      JAMES PETTIT, ESQUIRE
        LOCKS LAW FIRM
10      ATTORNEYS FOR THE PLAINTIFFS
11      MICHAEL FERRARA, ESQUIRE
        THE FERRARA LAW FIRM
12      ATTORNEY FOR THE PLAINTIFFS
13      RICK MEADOW, ESQUIRE
        MEREDITH GURSKY, ESQUIRE
14      THE LANIER LAW FIRM
        ATTORNEY FOR THE PLAINTIFFS
15
        GREG SHAFFER, ESQUIRE
16      WILENTZ, GOLDMAN & SPITZER
        ATTORNEY FOR THE PLAINTIFFS
17
        CHRISTOPHER JOHNSON, ESQUIRE
18      DANIEL FETTERMAN, ESQUIRE
        KASOWITZ, BENSON, TORRES & FRIEDMAN
19      ATTORNEY FOR THE PLAINTIFFS
20      BENEDICT MORELLI, ESQUIRE
        MORELLI & ASSOCIATES
21      ATTORNEY FOR THE PLAINTIFFS
22      JONATHAN SHUB, ESQUIRE
        SHELLER, LUDWIG & BADEY
23      ATTORNEY FOR THE PLAINTIFFS
24      MICHELE A. DiMARTINO, ESQUIRE
        MILLER & ASSOCIATES
25      ATTORNEYS FOR THE PLAINTIFFS

                                                    2
```

```
 1    A P P E A R A N C E S   C O N T I N U E D . . . .
 2      SUSANNE SCOVERN, ESQUIRE
        ALEXANDER, HAWS, AUDET
 3      ATTORNEY FOR THE PLAINTIFFS
 4      ROBERT DASSOW, ESQUIRE
        HOVDE, DASSOW & DEETS
 5      ATTORNEY FOR THE PLAINTIFFS
 6      DAVID CHRISTIE, ESQUIRE
        BURRELL, REGENSTREICH
 7      ATTORNEY FOR THE PLAINTIFFS
 8      STEVEN B. STEIN, ESQUIRE
        LEVIN, SIMES & KAISER
 9      ATTORNEY FOR THE PLAINTIFFS
10      JERRY KRISTAL, ESQUIRE
        PAUL PENNOCK
11      WEITZ & LUXENBERG
        ATTORNEY FOR THE PLAINTIFFS
12
        CHRISTOPHER PLACITELLA, ESQUIRE
13      COHEN, PLACITELLA
        ATTORNEY FOR THE PLAINTIFFS
14
        MICHAEL WEINKOWITZ, ESQUIRE
15      LEVIN, FISHBEIN, SEDRAN & BERMAN
        ATTORNEY FOR THE PLAINTIFFS
16
        ROBERT W. ROWAN, ESQUIRE
17      GOLLITZ, GRIFFIN & EWING
        ATTORNEY FOR THE PLAINTIFFS
18
        MARC GROSSMAN, ESQUIRE
19      SANDERS, VIENER & GROSSMAN
        ATTORNEY FOR THE PLAINTIFFS
20
        ROBERT BAYER, ESQUIRE
21      STARKEY, KELLY, BAYER, KENNEALLY & CUNNINGHAM
        ATTORNEY FOR THE PLAINTIFFS
22
        FRED THOMPSON, ESQUIRE
23      MOTLEY RICE
        ATTORNEY FOR THE PLAINTIFFS
24
        ANDREW SEHIR, ESQUIRE
25      SILVERMAN & FODERA
        ATTORNEY FOR THE PLAINTIFFS

                                                    3
```

```
 1    A P P E A R A N C E S   C O N T I N U E D . . . .
 2      FOREST HORNE, ESQUIRE
        MARTIN & JONES
 3      ATTORNEY FOR THE PLAINTIFFS
 4      MICHELLE ALTENPOHL, ESQUIRE
        ALTENPOHL
 5      ATTORNEY FOR THE PLAINTIFFS
 6      JACQUELINE DeCARLO, ESQUIRE
        HOBIE CORRIGAN
 7      ATTORNEY FOR THE PLAINTIFFS
 8      GREG SMITH, ESQUIRE
        McELDREW & FULLER
 9      ATTORNEY FOR THE PLAINTIFFS
10      THEODORE V.H. MAYER, ESQUIRE
        WILFRED CORONATO, ESQUIRE
11      CHARLES W. COHEN, ESQUIRE
        HUGHES, HUBBARD & REED, LLP
12      ATTORNEYS FOR THE DEFENDANT, MERCK
13
        HOPE FREIWALD, ESQUIRE
14      JAN CALL, ESQUIRE
        DECHERT, LLP
15      ATTORNEYS FOR THE DEFENDANT, MERCK
16      JEFFREY JUDD, ESQUIRE
        O'MELVENY & MEYERS, LLP
17      ATTORNEY FOR THE DEFENDANT, MERCK
18
19
20
21
22
23
24
25
                                                    4
```

1    P R O C E E D I N G S

2    THE COURT:  Okay.  We have Paul on the line?

3    MS. MANGUAL:  I'm going to get him on the

4    phone now, Judge.

5    THE COURT:  Okay.  The first thing I wanted to

6    talk about briefly was the Doherty trial was just

7    finished, as you know.  I passed out for -- I didn't

8    make enough copies for everybody, but there's a jury

9    verdict form.  If you want to get it you can get it off

10   the website.  I just wanted to point out in the first

11   two trials we didn't put direct-to-consumer advertising

12   on the verdict form.  In this trial the Locks Law Firm

13   convinced me finally that Perez applied and that I

14   should put the question on the form, so I did, in fact,

15   put direct-to-consumer advertising on the form.

16   In addition, I was not persuaded that the

17   rebuttable presumption did not apply, and in Cona for

18   those of you who were --

19   Hello, Paul.

20   (Whereupon, Mr. Strain appears by phone.)

21   MR. STRAIN:  Thanks very much.  I'm sorry to

22   make you go to the trouble of hooking me in.

23   THE COURT:  You're connected now.

24   So there's two things different in Doherty.

25   And one was that the plaintiffs had wanted the

1    direct-to-consumer, they requested it in Humeston and

2    in Cona/McDarby, and I didn't give to it them.  I did

3    decide that it was appropriate and should be on the

4    jury verdict form, which is somewhat of a change, and I

5    just wanted to bring that to people's attention.  I did

6    do it in Doherty.

7    The heeding presumption I applied in

8    Cona/McDarby and in Humeston, and I still believe the

9    heeding presumption applies.  I still do not believe

10   that the jury should have to make a determination as to

11   whether the doctor would have prescribed the drug or

12   whether the consumer would have taken the drug,

13   however, what I did here was basically for

14   informational purposes because I don't want to have

15   to -- if we can avoid the prospect of having a 7-week

16   trial redone I put the two questions, the third

17   question is the Caskey question, and the fourth is the

18   Doherty question, whether Mrs. Doherty had been

19   adequately warned would she have taken the drug.  I put

20   them on the jury form, but I didn't make them

21   determinative, so whether they answered yes or no they

22   just kept going on.  That way if, in fact, the

23   Appellate Division found that that was a key question

24   that should have been on the form we wouldn't require a

25   new trial.

1    I'm throwing that out because for the next

2    trial everybody may want to think about it, whether

3    they think that's appropriate, not appropriate, maybe

4    we'll have to talk about it, but, obviously, it is in

5    everyone's best interest if we can avoid having to have

6    retrials.  So it was an alternative way, and I'm giving

7    it to everybody so it doesn't come up at the last

8    minute.  It is something you can give to the people in

9    your offices that are really smart to look over and

10   tell us how we can do it better.

11   The next thing is there's a September trial

12   listed.  I got a letter yesterday indicating that the

13   plaintiffs had withdrawn or were dismissing the Hatch

14   case.  I also got a call from Steve Raber that

15   indicated he was no longer going to be able to try the

16   September trial on behalf of the defense and he would

17   be trying cases in California in September or in

18   October.  And probably Mr. Strain would be lead counsel

19   for the next case.

20   Is that right, Paul?

21   MR. STRAIN:  Yes, it is, Judge.

22   THE COURT:  I hate to do this to you, Paul,

23   but the September case is cancelled.  I'm not going to

24   try McFarland in September.  I do not intend to have

25   a -- you know, I have done three of these now, which is

1    a lot in one court.  I don't think it is productive for

2    me to continue to try one case for 7 weeks.  I also

3    don't think it is productive for me to try cases where

4    one of the primary issues -- and it turned out that

5    that really probably wasn't a major factor in this

6    case -- I think it was in Cona -- but the issue of

7    whether or not someone took the medication or not.  It

8    doesn't really seem like we have to take 7 weeks to try

9    a case for the jury to decide whether somebody was on

10   VIOXX or not.

11   I understand the Hatch case is being dismissed

12   with prejudice, so the McFarland case will be in the

13   next group of cases that are tried.  It is not going to

14   be wasted work.  The next group of cases that are tried

15   will include McFarland.  But I intend to group cases at

16   this point and start trying hopefully...

17   My plan is to do this:  My plan is to try to

18   take between five and 10 cases, group them together,

19   set them up for trial together with one attorney trying

20   liability at least.  Either plaintiffs it will have to

21   be one attorney's cases or plaintiffs will agree

22   they'll allow somebody to handle the general -- one

23   attorney doesn't mean you have to have one lawyer

24   there.  It just means that we're not going to have

25   three openings or three closings.  It can be one firm

1   working in conjunction with another, one does the
2   opening, one does the closing, but it is going to have
3   to be -- it is not going to be separate. I'm not going
4   to have three openings, five openings, five closings,
5   five crosses, five directs.
6        MR. KRISTAL: But different lawyers can do the
7   questioning.
8        THE COURT: Different lawyers can do different
9   parts. Basically what you did in Cona/McDarby, except
10  I'm going to restructure it, and I'm going to try this
11  once. Everything has to be done on an experimental
12  basis, unfortunately. Poor VIOXX is going to be the
13  experiment for here, but I think it is -- so far what
14  we have done has really worked, actually, and now I'm
15  going to try something a little different, and what I'm
16  going to do is my plan at this point, and I'll have to
17  see if it is workable, but my plan at this point is I'm
18  going to take these five to 10 cases that are grouped
19  together. I'm going to have the case tried on
20  liability first, liability being whether or not there
21  was a failure to warn and whether or not there was
22  consumer fraud. At the end of that question --
23  those questions will be submitted to the jury. If the
24  jury finds in favor of the defense on those two
25  questions then we have resolved 10 cases or 8 cases or

9

1   out and hear the next plaintiff, then they will make a
2   decision on that plaintiff, then they'll hear the next
3   plaintiff and make a decision on that plaintiff, I
4   think. I guess we could do all the plaintiffs, but I
5   think it would be better to do one at a time. But, you
6   know, we can play with that a little bit. I can think
7   about that.
8        MR. PLACITELLA: In the beginning of the case
9   the jury will know that there are --
10       THE COURT: They will know that there are 10
11  plaintiffs who are claiming they had a heart attack or
12  stroke or whatever. But they're not going to hear
13  details about it. I'm going to identify approximately
14  50 to 60 cases that I intend to have worked up for
15  trial very quickly. From that pool we'll start pulling
16  the trials of 10 or so together. I'm going to need a
17  bank of cases in order to pick, hopefully, two trials
18  of 10 cases each or something like that. I'm sure
19  there won't be 10. As I said, it is five to 10.
20       There might be two cases of seven or six or
21  eight or whatever works out. But, basically, we're
22  going to need a bank of that many cases from what I can
23  see because people take their cases and then they
24  decide they have to dismiss them because they really
25  aren't good cases. People have problems or issues that

11

1   whatever. If the jury finds in favor of the plaintiffs
2   on those cases we are then going to proceed with the
3   same jury to try specific causation and damages with
4   each plaintiff. Those cases would last, approximately
5   I'm hoping, two days each. One to two days, hopefully
6   we could do them two days maximum with the cardiologist
7   testifying to specific causation. They will have
8   gotten some general causation testimony through the
9   failure to warn case. There's no question that they're
10  sort of intermingled. That's why I'm not doing a
11  bifurcation the other way and doing damages first
12  because -- Paul, are you hearing this?
13       MR. STRAIN: Yes, I am.
14       THE COURT: I wanted to make it a lot more
15  exciting for you.
16       MR. STRAIN: All right. I appreciate the
17  thought anyway.
18       THE COURT: So, all right. So that's the way
19  I'm planning it at this point.
20       MR. LOCKS: Judge, do you expect that after
21  you -- assume the plaintiffs win, and you try the first
22  case on damages the jury will then deliberate on the
23  first case for damages.
24       THE COURT: Yes. They'll do one case, go out
25  make a decision on that plaintiff and then they'll go

10

1   really illnesses or other -- you know, Abdel-Malek,
2   remember, had a divorce, a messy divorce going on.
3   Hopefully he is done that. We may want to resurrect
4   his case. But those kind of issues maybe --
5        It is my intent, and I said this about the
6   prescription issue at least, whether they took the drug
7   or not to not make that part of any of the long trials.
8   What I do intend to do is if, in fact, there's a real
9   question as to whether -- and I'm talking about
10  somebody who doesn't have prescriptions, they either
11  say they took samples or they took it and say they took
12  it when the records don't verify that they have
13  prescriptions. There's always going to be, of course,
14  some fact issue as to whether somebody took the drug or
15  not maybe, but those where there's a genuine issue
16  after the plaintiff's dep and after the doctor's dep
17  and after the defense has those they should be able to
18  identify those cases where they have an issue as to
19  whether the plaintiff took the drug or not.
20       I intend to have those tried in mini trials
21  with separate juries simply as to the issue of did this
22  plaintiff take the drug or not. That would be a
23  one-day trial probably, which will be decided before
24  the trial -- before the damages liability trial.
25  Again, I'm not going to try a case for 7 weeks for the

12

1    jury to find they didn't take the drug.  That is such a
2    waste of judicial time, such a waste of defense time
3    and such a waste of plaintiff time.
4        MR. BUCHANAN:  We agree with that observation,
5    Judge.  There's at least some science there's some
6    science surrounding what's insufficient usage that may
7    render -- obviously, if there's a samples issue, that's
8    one thing.
9        THE COURT:  Let me say this:  I'm not going to
10    dismiss cases -- those cases would have to be very fact
11    oriented.  The jury forms would have to be -- it is a
12    fact-finding jury, and the fact -- it would be real
13    simple if the question is did the plaintiff ever take
14    VIOXX, and if those cases are -- if they say, no, they
15    never took it then, obviously, those cases will be
16    dismissed.  But if they say, yes, they took VIOXX, and
17    we determined that they took it for 2 years but hadn't
18    taken it for 3 months before the drug we may, actually,
19    ask specific questions, depending on what the
20    allegation is.  Then there would be that determination,
21    and if they determined, for example, that the plaintiff
22    took the drug for 6 months and then didn't take it for
23    3 months that would be told to the second jury.  It
24    would be a predetermined fact, and the plaintiffs then
25    would have the option of saying I don't want to try

13

1        THE COURT:  What I'm going to do is have --
2    what we're going to try to do is schedule that in, and
3    as soon as the plaintiffs' deps and the doctors' deps
4    are taken before the experts are hired and before the
5    experts give reports let the defense identify those
6    cases where they're going to challenge whether they did
7    or didn't take the drug.  If they identify it as a case
8    where they're challenging that they took the drug then
9    we can have a mini hearing right then, and then
10    plaintiffs can make a determination as to whether or
11    not they want to proceed with their case.
12        I'm assuming that those will weed out a lot of
13    cases.  But it may turn out that that's a disaster, and
14    I may go back to way I did it before.  You know, I'm
15    throwing these out as ideas of things that I'm going to
16    try.  I really have to -- we have to see how it plays
17    out.  It may not work.  These are things I have been
18    trying to rack my brain to think about about how we can
19    do this, what we can do to try to move things with some
20    efficiency, and these are some ideas I have come up
21    with.  If it doesn't work, and it turns out that it is
22    being abused by plaintiffs or it is just not -- it is
23    not creating what I want, which is efficiency as
24    opposed to, you know.
25        MR. BUCHANAN:  That's the issue, you know,

15

1    this case.  I'm not going to put my money into a case
2    where that's an issue or they could -- and I assume
3    plaintiffs aren't going to really want to try too many
4    of those.  Maybe I'm wrong.
5        MS. FREIWALD:  You're talking about having a
6    different jury decide the usage question?
7        THE COURT:  The usage question will be decided
8    in a very short one-day trial.  I may be able to do
9    five of those in a week.  That's really optimistic.  I
10    might be able to do two of those in a week.  But I can
11    also have some other judges do bench trials on that.
12    If people wanted bench trials I could get other judges
13    to do bench trials.  If you want juries we can have
14    juries.  Eventually I would hope that's an issue that
15    can be done through an arbitrator or a mediator.  Not a
16    trial issue.  Not in a 6-week trial.  It is just too
17    expensive for both sides.
18        MR. KRISTAL:  Does the Court need to think
19    about how specific factual determination on use may
20    impact the expert's opinions, whose opinions might have
21    been based on prior assumptions of fact?  In other
22    words, if you take what was an 18-month use case and
23    the jury finds it was 3 months if the discovery has
24    already happened on the experts...
25        I'm just throwing that out.

14

1    what is sufficient to trigger one of these hearings in
2    terms of a usage issue?  And I guess we'll talk with
3    the Court about that.  Obviously, we have been in
4    trials where the plaintiff has had, you know, 50
5    something days' worth of drug for 60 days, are we going
6    to litigate about intermittent use on that type of case
7    as opposed to the gap in usage you spoke about?
8        It will probably -- I could foresee a
9    situation where rather than expediting the case we're
10    doing 104 hearings on 45 cases, and we spend 3 months
11    doing 104 hearings.
12        THE COURT:  Well, if it turns out that the
13    plaintiffs are -- if it turns out that -- not that
14    either side is misusing it, but if it turns out that it
15    is not just working out fairly for both sides, but if
16    it is not saving time then, obviously, we're not going
17    to do it.  I'm just throwing it out there.  It is
18    something I'm thinking about.
19        MR. MAYER:  Just in the realm of flagging an
20    issue as you think about it, I think we do have concern
21    that if you have a plaintiff who's misrepresenting
22    about ingestion that it shouldn't necessarily be barred
23    from the main case to be able to cross-examine the
24    plaintiff on that and so on.  We should have a right to
25    do that, so and...

16