1   done very quickly.  We want to do the discovery now.
2   We want to get the discovery done surrounding it,
3   everything about it.
4        Look, it was provided to the press before it
5   was ever made available to anybody involved in this
6   litigation, okay?  It went up on the website at like
7   6:00.  People started getting calls from press who had
8   been provided an advance copy of it at 10:00 in the
9   morning.  None of which was provided to the plaintiffs.
10       You know, this is not a decision by the
11  commission as to when to release things.  I'll withdraw
12  that.  I can't question the motives.  I'm very
13  interested in understanding it, but I move for
14  discovery on it.
15       MR. PLACITELLA:  Just to add one thing, I
16  think in the context of briefing it raises serious
17  issues about whether anything in this litigation,
18  especially by witnesses by way of testimony remains
19  privileged and outside the public view.  If Merck is
20  going to interview witnesses that we have deposed and
21  take the position that they can publish their result of
22  the interviews to the public but the depositions with
23  the truth can't be made known to the public that's a
24  dichotomy that I don't think the public should suffer.
25       MR. DASSOW:  How can any document be marked

1   "confidential" -- you know, how can they be marked
2   "confidential" -- how can any document be marked
3   "confidential" now?
4        MR. BUCHANAN:  We have a lot of concerns now.
5   I think there's -- we have a lot of concerns.  They may
6   want to address it, but we would ask them to address it
7   by Monday.
8        MR. MAYER:  We can't do it.  We need --
9        MR. BUCHANAN:  I can't imagine you didn't have
10  a legal justification in your mind before you did
11  something so dramatic to jury pools in New Orleans, to
12  the veneer everywhere in the country, to all the
13  doctors, to all the sales reps, every percipient
14  witness in the country, I can't imagine nobody thought
15  about it, Ted.  There's got to be a memo.  We would
16  like it done quickly.
17       MR. MAYER:  Plaintiffs have been effectively
18  getting their message across in the press.  This is a
19  serious matter.  It is a very far-reaching request, and
20  it requires us to make --
21       THE COURT:  How far reaching?  He is
22  requesting copies of documents that you gave to an
23  outside group.  It is not internal stuff.  It is all an
24  outside group.
25       MR. BUCHANAN:  My request --

1        MR. MAYER:  It is a firm that is hired by the
2   board of directors.  It is a law firm hired by the
3   board of directors.  It is a law firm that is working
4   for the company, so...
5        MR. PLACITELLA:  It is privileged?
6        MR. MAYER:  So there is a privilege that
7   attaches, yes, and the privilege attached, unless
8   there's been a waiver, and there has not been a waiver,
9   so it is a serious matter of privilege.  We need to
10  make a record, and we need time to do that.  And I
11  think we'll need at least two weeks to put together our
12  papers on this to move for protective orders because
13  we'll need it.
14       THE COURT:  No.  If it is a problem, and if
15  you need two weeks then you have to take it off the
16  website until it is briefed, but I'm not going to order
17  that on Monday.  I'm going to order that on Tuesday
18  morning you contact me by phone and let me know what
19  Merck's position is.  I want to know -- and if you can
20  get me any documents before Tuesday let me know.  If
21  the issue is going to be whether the report should be
22  removed from the website and whether -- you can either
23  brief the whole issue of whether it is privileged, not
24  privileged or you can -- I'm just going to leave open
25  Tuesday what I can do.  I may order it removed until

1   briefs can be filed.  The point of it is if it is a
2   publicity -- if it is done for publicity but it is not
3   -- and then being claimed to be privileged that's such
4   a dichotomy that it is impossible really to reconcile
5   the two, and if it is all privileged stuff then Merck
6   should be willing to protect it and want to protect it
7   in which case they may --
8        MR. MAYER:  We'll consult with the client and
9   communicate that to the Court.
10       THE COURT:  Let me know what you want to do by
11  Tuesday.  That gives you some time.  It gives you time
12  to talk to the client, gives you time to brief it.  You
13  may be able to present me with a brief on Tuesday which
14  shows me that everything is okay, that you have the
15  right to publish it and that it is still privileged,
16  the underlying documentation.  I understand that's your
17  position, and I may find that way.  But it is not going
18  to do much good if I find that way two or three weeks
19  from now.  I think it is more emergent than that.
20       MR. MAYER:  You want to hear from us by
21  Tuesday on the website issue.  You're reserving your
22  judgment as to what you're going -- what action you may
23  take Tuesday with respect to the website issue.
24       THE COURT:  And I may make a decision on the
25  privileged issue then, too.  If what your issue is,

1  though, that you cannot possibly -- I don't understand
2  how you can't brief anything in two or three days.
3      MR. MAYER:  We need to make a factual record
4  on this -- on these issues.  I don't know who is
5  available, you know, who we'll have to contact.
6      THE COURT:  That's why -- I'm saying you don't
7  have to do it this afternoon.  You don't have to do it
8  Monday.  You have to do it Tuesday.  I mean, I want by
9  Tuesday your briefs basically.  And if you tell me we
10  can't do it, we would rather have two or three weeks,
11  we would rather have a month, well, fine, we can give
12  you a month, but meanwhile it can't be on the website.
13      MR. BUCHANAN:  We would ask it not be used
14  with witnesses in any way, Judge.
15      MR. MAYER:  I don't expect that's going to be
16  a problem.
17      THE COURT:  I'll rule on that in the future.
18      MR. BUCHANAN:  I don't mean in a motion in
19  limine.  Pending resolution of it we want to make sure
20  it is not going to experts.
21      THE COURT:  Nobody in the next few days is
22  going to be using it with witnesses.
23      MS. RELKIN:  Can we make sure they're not
24  sending out a Dear Doctor letter.  I'm concerned they
25  may be sending out a Dear Doctor letter saying here is

1  the findings of a Federal Judge.
2      THE COURT:  Are you planning on doing that?
3      MR. COHEN:  No.
4      MR. DASSOW:  That's what it says in the press.
5  That's what's been exposed.  Anybody who reads it now
6  that's what they're reading.  That's what is happening
7  right now.
8      MR. WEISS:  New York Times front page.
9      MR. BUCHANAN:  We have the representation that
10  it is not going to be used with any persons with the
11  litigation, and we'll address that on Tuesday.
12      THE COURT:  Maybe you feel you should have a
13  right to send it to all your doctors.  I'm not saying
14  you can't do it, but don't do it between now and
15  Tuesday.
16      MR. BARNETT:  We understand.
17      MR. PLACITELLA:  Judge, I just think, and it
18  doesn't have to be done Tuesday, we're going to want to
19  brief the issue independent for every witness they
20  interviewed that was part of that, their entire
21  transcript will now become public record and --
22      THE COURT:  The transcript of the interview.
23      MR. PLACITELLA:  No, the transcript of the
24  witness in the litigation and the interview.
25      MR. BUCHANAN:  There's an independent issue

1  with the confidentiality materials in the litigation.
2      THE COURT:  Almost none of these people -- you
3  know, there's very little that should still be
4  confidential.
5      MR. COHEN:  There is, actually, very little.
6  And I -- actually, the confidentiality team is actually
7  doing a rereview.  In fact, unfortunately, how skewed I
8  am, my first thought on seeing this was not any grand
9  thoughts it was call the confidentiality team I have
10  stuff on the website, so they're already doing that.
11      MR. BUCHANAN:  With due respect, it is not
12  limited to the materials that were provided to the
13  committee.  I think once you put into public debate the
14  way did you the consideration of all the evidence that
15  you provided to them the confidentiality designations
16  on the rest of your documents are meaningless.  You
17  have put into public debate the science, marketing,
18  management decisions, et cetera, with respect to the
19  drug to keep anything out of the public eye because you
20  seem to believe it is a public issue how the evidence
21  is perceived I think is very disingenuous, and the
22  confidentiality designations are meaningless.
23      MR. MAYER:  I'm not sure that's really what
24  the dispute is really going to be about.
25      MR. BUCHANAN:  That's fine.  We can withdraw

1  confidentiality designations, and it is open season.
2      MR. MAYER:  I think a lot of what's
3  confidential that's in the documents that's now marked
4  "confidential" is stuff that's not VIOXX related.
5      MR. BUCHANAN:  That's not the case.
6      MR. PLACITELLA:  All depositions are still
7  confidential.
8      MR. BUCHANAN:  If that's going to be the
9  direction --
10      THE COURT:  You know what, I don't think that
11  everybody is on the same page on this.  The fact of the
12  matter is there's -- almost every document in the case
13  at one point or another has been marked "confidential."
14  Obviously, depositions have now been played at trial.
15  Testimony has been reviewed extensively at trial.
16  Those things are no longer confidential.  And most of
17  it I think, Charlie, is actually, quote,
18  "declassified."
19      MR. BARNETT:  We have.
20      THE COURT:  But I don't even know that the
21  plaintiffs are aware of what's been declassified.
22      MR. BUCHANAN:  Actually, there is somebody
23  here who is pretty familiar with it, and there's
24  probably at least 30 to 40 percent of the production
25  that has confidentiality designations on it.

Transcript - Monthly Status Conference (2006/09/08)

1    THE COURT:  Still?
2    MR. BUCHANAN:  We can do a search at lunch.
3    THE COURT:  Not transcripts of the depositions
4  of any of the parties.
5    MR. WEISS:  Yes, they are.
6    MR. GRAND:  Virtually every transcript is
7  designated as confidential.
8    MR. BARNETT:  They were initially designated
9  as confidential, and there's a mechanism in place --
10    MR. COHEN:  They're not actually, Ben.  They
11  marked it with an interim thing that says we're doing a
12  review and then if there's anything that's going to be
13  designated as confidential then we send a letter into
14  the court reporter that says what that is.  Those have
15  been tiny and probably have personal stuff, and we can
16  go through --
17    MR. BUCHANAN:  I think that's true.
18    MR. COHEN:  People --
19    MR. BUCHANAN:  The majority of depositions
20  have some portions of them designated as confidential.
21    MR. GRAND:  Charlie, with all due respect, we
22  were at a deposition a few days ago, and he opened the
23  deposition by saying on the record that the deposition
24  was confidential.
25    MR. COHEN:  But you have to -- in order to

89

Transcript - Monthly Status Conference (2006/09/08)

1  invoke the period by which we get to review it and not
2  waive it at the moment you have to make the magic
3  invocation of the protective order to get the review
4  period.
5    MR. SHAFFER:  Maybe I'm missing something.  If
6  an independent judge is reviewing it the judge is
7  independent and then it is subject to subpoena.
8    MR. MAYER:  You are missing something, with
9  due respect.
10    MR. SHAFFER:  If an independent judge is
11  independent, he is held out as independent, he is
12  reviewing materials which are subject to subpoena.
13    MR. BUCHANAN:  There are two different but
14  related issues.  We're going to take them both up.
15    THE COURT:  Was the committee a law firm you
16  hired or a group of people?
17    MR. MAYER:  The committee is members of the
18  board of directors.  They're acting for the company,
19  and they retained a law firm.  The law firm was counsel
20  to the committee, and they performed the investigation.
21    MR. SHAFFER:  They're not independent, and
22  that's a fraud on the public.
23    MR. GRAND:  That's a committee.
24    MR. PLACITELLA:  I think you made your ruling.
25    MR. BUCHANAN:  We, obviously, have a lot of

90

Transcript - Monthly Status Conference (2006/09/08)

1  dissatisfaction on our side with how this was handled.
2    THE COURT:  There's no problem -- look,
3  there's nothing inherently wrong with a board of
4  directors asking legal counsel to review the actions of
5  their officers.  In fact, the board of directors might
6  be remiss if they didn't do that.  It is perfectly
7  appropriate for Merck's board of directors to have done
8  that.  Publishing it becomes another issue, although I
9  guess if the board of directors wants to present to
10  their shareholders who are members of the public the
11  information then it becomes a question of whether is
12  that what they're doing or not.  I don't know if the
13  front page of the New York Times is necessarily the
14  place to convey that to your shareholders, but...
15    I understand -- I am fully aware of the fact
16  that there are reasons why it would be important for
17  them to have that information, deciding whether they
18  wanted to maybe get rid of executives, keep executives,
19  do different things in the future as far as controlling
20  executives, set different policies in effect.
21    I think, again, the basic idea of having an
22  investigation, although generally such as investigation
23  you consider it to be sort of a privileged thing, you
24  hire lawyers to do an internal investigation and your
25  communications with them are privileged.  But when you

91

Transcript - Monthly Status Conference (2006/09/08)

1  go and publish the results as a public document...
2    MR. MAYER:  There's a lot of lawyer -- final
3  product of a lawyer that becomes public, but that
4  doesn't mean that the communications with the client
5  that led to that product are public.  It doesn't mean
6  that the work product that led up to that final product
7  is public.  This is such a situation, and that's the
8  record that we intend to make.
9    THE COURT:  There's really two -- the issue on
10  this we'll deal with Tuesday and beyond, and we may
11  have to deal with it for a few days in a row or months,
12  but we're going to try to bring to a head what
13  everybody's position is on Tuesday, and I may make some
14  preliminary rulings at that point.
15    The issue on confidentiality generally is
16  something that I would like to have addressed before
17  the next meeting, and I'm going to require that the
18  confidentiality committee for the defense, at least
19  some portion of it, maybe that's just Charlie, maybe
20  its other people, have a meeting, an in-person meeting,
21  not just a phone meeting, with the plaintiffs, and a
22  real procedure be set up codified in an order as to
23  what is still confidential, what is not and in the
24  future how we're going to designate things as
25  confidential.

92

1  This is unrelated to this report.  Meaning
2  that the report is not going to be part of that
3  meeting.  We're dealing with that separately.  The
4  confidentiality issue is dealing with everything but
5  the report, to deal with past depositions, future
6  depositions, documents, because, you know, for a lot of
7  reasons -- for everybody's sake it is a waste of time
8  to have "confidential" stamped on things that are no
9  longer confidential or never should have been
10  confidential.
11      And in the beginning, again, to give -- to
12  just make the record clear it was agreed that the
13  defense could stamp almost everything confidential so
14  they could produce a lot of documents fast.  That was
15  the purpose of that.  Without having to have as in
16  depth a review and the time delay that they might have
17  had to have if they produced things slower.  So we had
18  a purpose to do it, and now we're past that, and not
19  only that, but now so much has become public and seen
20  by so many people that we really have to start looking
21  at it.  And I really think that you have been looking
22  at it.
23      MR. BARNETT:  We have.  Beyond the full
24  rereview we did in February of last year we have a team
25  of people who much of their job is to rereview

1  documents on a daily basis and see whether we're going
2  to stand on the original designation.  We have
3  dedesignated tons of material, but I think the meeting
4  is a very good idea.
5      THE COURT:  It is very important for the
6  plaintiffs to know what is dedesignated so every
7  plaintiffs lawyer -- there's people in their office who
8  still think they have to keep every deposition, you
9  know, in a special drawer.  I mean --
10      MR. BUCHANAN:  The reality is once documents
11  are printed out and they have the "confidential -
12  subject to protective order" they have been used in
13  depositions they may retain that designation, and if
14  you've gone back and withdrawn that designation in the
15  last month and produced a new image that doesn't have
16  that on there, you know, it is very difficult to track
17  when things have truly been dedesignated.
18      THE COURT:  That's why we're going to have a
19  meeting where it becomes clear what is designated and
20  what is not designating.
21      MR. BUCHANAN:  I would like to put on the
22  agenda for that meeting, Judge, because it is one thing
23  that you raised in the past and had some interest in, I
24  think, is the continued designation of clinical trial
25  data in the form of SAS files as confidential.

1  There's, obviously, a scientific debate that's
2  considered in Merck's particular independent
3  investigation.  We don't think there's any warranted
4  basis for continuing to maintain those as confidential,
5  and we'll raise that in our meet and confer with the
6  defense at the end of the month.
7      THE COURT:  Discuss that with them at the
8  confidentiality meeting, and that may be something we
9  may have to address on separate briefs because that
10  involves a lot of issues, especially -- issues about
11  market and competitive market and those things.
12      MR. WEISS:  Your Honor, I would like to ask
13  Charlie if he could get to liaison counsel a complete
14  list of all the letters that are filed on Lexis/Nexis
15  for all the depositions where you designated portions
16  of transcripts confidential because we can't get them
17  anymore on Lexis/Nexis.  They go out of existence after
18  a while.
19      MR. BARNETT:  Sol, we can do that for you.
20  You want copies of all the correspondence indicating
21  all the materials within the deposition that are
22  confidential?
23      MR. PLACITELLA:  Yes, maybe the easier way is
24  to give you a list of every dep and tell me what is
25  confidential now.

1      MR. WEISS:  You guys filed a letter in every
2  case, every dep that's been filed saying what is
3  confidential.
4      MR. COHEN:  No problem.
5      MR. WEISS:  Everything else is not
6  confidential by our definition, correct, Charlie?
7      MR. COHEN:  There's going to be three
8  categories.  There's -- maybe two.  There's the one
9  where we started this process then we have -- there's
10  ones that were done before the process that don't have
11  letters, so it would be part of the meeting as to
12  what's going on.
13      MR. WEISS:  Can you get it to Jeff and I and
14  Dave?
15      THE COURT:  All right.  Does somebody -- is
16  Michael London here?  Anybody from Douglas and London?
17  Anybody who can sign a CIS.
18      MR. BUCHANAN:  We'll get it done at the break.
19      MR. WEINBERG:  Your Honor, I want to raise an
20  issue related to the issue of the report.  The tone and
21  the conclusions of this report are very similar to the
22  tone and the representations that have been made
23  repeatedly in Merck's media blitz and their television
24  advertising in their print media, all of which is also
25  on the website, and my concern is that what is being

1  put out to the public in this very, very intense
2  corporate effort to get out a message has to do with
3  corporate ethics and scientific rigor.
4      In other words, what is happening here, and I
5  think this is something that's different, I don't think
6  this has really happened before.  I know that the
7  courts have been reluctant to permit plaintiffs to
8  offer evidence of corporate ethics in cases, and I
9  understand the reasons why, but in this case what is
10 happening is Merck is fostering their arguments about
11 their own ethical conduct in support of their ethical
12 conduct in ways that are very, very pervasive, and all
13 of us who watch television know that as we get closer
14 to trials the number of these television advertisements
15 with the CEO of Merck talking to the public about the
16 corporate ethics and the scientific rigor over the last
17 60 years, and that includes the whole time that VIOXX
18 was developed and marketed is really beginning to --
19 and I think probably successfully injecting the issue
20 of Merck's corporate ethic into the public
21 consciousness.
22     And I submit that if this company is going to
23 use its best resources to taint jury pools in that way
24 that, perhaps, the Court should revisit the issue of
25 whether corporate ethics are fair game in these trials

97

1  because it doesn't seem fair that the company should be
2  able to do this or, perhaps, revisit the idea of
3  whether the plaintiffs if we choose to mount a
4  competing, you know, public relations program are
5  permitted to address whether Merck was ethical in their
6  conduct without any repercussions to us.
7      I just want to put that out there because it
8  seems to me that when you look at this report, and
9  particularly the way that it was pushed out to the
10 media all over the country and all over the world that
11 it is consonant with and consistent with a very
12 aggressive effort to argue their ethical -- the
13 propriety of their ethical conduct outside of the
14 courtroom with effects that would be seen inside the
15 courtroom.  And I think that it's the new approach and
16 something that merits another look, and, perhaps, we
17 can brief that issue, too.
18     MS. RELKIN:  A related issue --
19     MR. MAYER:  That's just not accurate.
20     MR. FERRARA:  I think he just said what is the
21 elephant in the room here.  David Buchanan is a
22 diplomatic guy, and he presents things in a diplomatic
23 fashion, and sometimes things have to be said, and I
24 would like to go one step further than Eric and say
25 that I really think that this is jury tampering, and as

98

1  a judge at some point Your Honor has to conduct some
2  kind of inquiry as to why the frequency of ads on the
3  Atlantic City and Wildwood stations and Philly stations
4  increases before trials, why this thing is released
5  before the federal trial begins next Monday.
6      You know, we can -- you know, I'm reluctant --
7  I was reluctant to say anything, but we have got to
8  deal with it.  What we have here is we have a Merck --
9  we have a Dow 30 component stock.  Merck is in the Dow
10 30.  This is major, major stuff, and they have
11 unlimited resources to launch any kind of PR campaign,
12 including hiring former retired federal judges and
13 spinning it the way they want.  I'm just curious as to
14 whether or not, Ted, if it had come out bad if you
15 would have put that on the website.
16     You know, at some point somebody has got to do
17 something about it, and I would suggest that that's a
18 judicial function or a function for the State
19 Commissioner of Investigation or a function of the
20 Atlantic County Prosecutor or a function of somebody or
21 the FBI to do an investigation.  I'm not saying indict
22 these corporate folks yet, but I'm saying conduct an
23 investigation to see what's going on, and, you know, it
24 sounds harsh, but that's the reality of the fact.
25 These folks are trying to taint these jury pools, and

99

1  somebody has got to stop it.
2      MR. MAYER:  That's absolutely false.  In
3  response to your question the question was asked
4  to the chair of the special committee what would have
5  happened, and he made very clear if the report had come
6  out a different way they would have made it public in
7  the same way.
8      I think we're talking about two things.  We're
9  talking about the report, which we have already
10 addressed, which was done for a purpose of the board to
11 do the self-examination of the kind the Court
12 described, and then there's a separate issue that you
13 guys have raised, which we have discussed before,
14 regarding corporate image advertising.  It is not
15 localized to Atlantic City in any way, shape or form.
16 It is something that every large company does from time
17 to time.  This company does it from time to time.  They
18 have a right to do it, and there's nothing wrong with
19 it, and it is in no way, shape or form jury tampering.
20 It is a large business with 60,000 employees and a
21 large number of shareholders, and they have the ability
22 to continue to run their business.
23     MR. WEINBERG:  I'm not arguing with the right
24 of somebody to express their opinions about themselves
25 in the media if they have the money to do it.  What I'm

100

Transcript - Monthly Status Conference (2006/09/08)

1  saying is that they have chosen to address issues that
2  are relevant to these trials, and that it is unfair.
3       MR. MAYER:  They make medicines that save
4  lives.  That's what they have to talk about.
5       MS. FREIWALD:  The law is what it is, and the
6  law is these are failure to warn cases and not ethics
7  cases and so the law is what it is.  It is a failure to
8  warn case.
9       MR. BUCHANAN:  Actually it is a Consumer Fraud
10  Act case, as well, with unconscionable commercial
11  business practices, which define a broad business ethic
12  as being unconscionable commercial business practices,
13  so, in fact, ethics are relevant to the claims.
14       MS. FREIWALD:  I would disagree with that.
15       MR. BUCHANAN:  Of course, we raise this issue.
16       MS. RELKIN:  Just for the January trial we
17  would probably ask you, again, to have voir dire
18  directly to see which jurors got this report, saw
19  Kenneth Frasier on TV yesterday morning, et cetera.
20       MR. MAYER:  Along with Mr. Gordon.
21       THE COURT:  Along with Mr. Gordon?
22       MS. FREIWALD:  And Mr. Lanier and Mr. Seeger.
23       MR. STRAIN:  I don't understand --
24       MR. PLACITELLA:  We picked the best looking
25  ones.

Transcript - Monthly Status Conference (2006/09/08)

1  rather unique here in that corporate boards rarely
2  publish the reports of their internal investigations
3  because they're internal investigations, that's what
4  they're called.  They don't publish the reports.  You
5  may see examiners -- bankruptcy trustees do it.  The
6  SCC might do it.  Government officials might do it.
7  State government officials might do it.  You don't see
8  a lot of corporations conducting internal
9  investigations, issuing press releases and releasing
10  their reports because that triggers a whole host of
11  concerns that are behind our discovery request that
12  we'll address on Tuesday.
13       I think I'll defer my other point.
14       THE COURT:  All right.  We'll wait until
15  Tuesday.
16       Are there any other issue we should address
17  immediately or before we take a break?
18       MR. BUCHANAN:  I think we have to go through
19  the list with Charlie.  Why don't we do that over the
20  lunch break?
21       THE COURT:  All right.
22       (Break taken.)
23       THE COURT:  All right.  What have we got,
24  Charlie, on the list?
25       MR. COHEN:  All right.  So, Your Honor, what I

Transcript - Monthly Status Conference (2006/09/08)

1       MR. STRAIN:  My impression is that the
2  plaintiffs speak freely to the press making accusations
3  about Merck.  Some of them are no doubt sincere, some
4  of them are, in my mind, pretty extreme.  Nobody is
5  claiming jury tampering by them.  They're made in the
6  public press in places where the cases are going to be
7  tried.  Sometimes they're made during the trial.  I
8  mean, I think we have to get grounded in reality here
9  on some of these accusations.
10       This is a proper thing done by a responsible
11  board, and that's it, and the Court will deal with the
12  legal implications.
13       MR. GRAND:  How many exhibits are they going
14  to use in the trial next week on the internet with a
15  Federal Judge's spin on what those exhibits mean.
16       MS. FREIWALD:  We had a trial in the spring,
17  we had a trial in the summer, we had a trial in the
18  later summer, we had a trial in the fall, we have
19  another trial in the fall.  It is not surprising that
20  things that people do happen near trials because there
21  are trials going on all the time.
22       MR. BUCHANAN:  Two final points, Your Honor,
23  and then we can defer this to Tuesday.  There is
24  something that's unique.  You acknowledge that
25  corporate boards often do this.  There is something

Transcript - Monthly Status Conference (2006/09/08)

1  did at your direction was I got the dates for almost
2  every one of the reps.  I got to speak to many of the
3  plaintiffs' counsel personally, and we talked about it.
4       For each of these cases that are in the group
5  B cases we'll get the documents before the doctors'
6  depositions.  Since I don't have the doctors' dates yet
7  I don't know exactly how far in advance it will be, but
8  I'll work, obviously, the best I can, and we'll work
9  things out.  So that's what's going to happen on these
10  cases.
11       We have one case which I meant to try and grab
12  Dave ahead of time, and I don't mean to sandbag you,
13  but it is the Griffin case is a case where the
14  plaintiff's counsel never actually submitted a
15  sufficient plaintiff's profile form, so nothing has
16  happened from as far back as a plaintiff's profile form
17  to Merck producing anything or picking any reps.  I
18  understand that there was in the beginning counsel left
19  their firm, they are now at a new place.  I'm thinking
20  that we just need direction from the Court that says
21  this case is -- you know, we can't start now with a new
22  case and get it done.
23       MR. BUCHANAN:  Is this the case that Scott
24  Levenston is co-counsel on?
25       MR. COHEN:  Yes.

1    MR. BUCHANAN:  I had no communications with
2  him regarding this, and I didn't realize it was an
3  issue.  There may be some issue with the transition of
4  the file; I'm not sure.
5    MS. YEARY:  Just so you know, our
6  communications with the firm with them now has been
7  that they can't find their client so they haven't --
8  not only can't they update their facts sheet to give us
9  the right information they haven't given us any
10  authorizations in the case.
11    MR. BUCHANAN:  Do you want to try and set a
12  teleconference with the Court next week?
13    MR. COHEN:  I couldn't get them to return our
14  phone calls.
15    MS. YEARY:  They tell us they don't have a
16  client so they can't give us anything.
17    MR. BUCHANAN:  That's, obviously, an issue.
18  I'll be happy to communicate any message you want us to
19  send to them.
20    MR. COHEN:  Then what I said is the same way
21  we did last time --
22    THE COURT:  One thing we know for sure if you
23  don't have authorizations yet then that case is out of
24  the 39, and that's not going to be one of the trial
25  cases.  So we'll eliminate it from the A and B list.

1  That I'll do today.  Whether defense wants to make a
2  motion to dismiss the case for failure to update the
3  facts sheet or to provide authorizations or whatever,
4  again, I suggest you call counsel and tell them that's
5  what you're going to do, and if they don't respond to
6  you then that's what you do.  And I think that will
7  make them find either their client or their file or
8  make a decision what they're going to do.  But that
9  case is now out of your -- so we now have 38.
10    MR. COHEN:  Unless you count Humeston coming
11  back in.
12    THE COURT:  Oh, Humeston is 39.
13    MR. BUCHANAN:  You don't have to do any work
14  on that, do you?
15    MR. COHEN:  I told Sol and Dave, which both
16  sides found helpful is I'm going to send them the list
17  the whole list also to liaison counsel so they have the
18  list of all the updates.
19    THE COURT:  All right.  So those dates are --
20  Charlie, can you submit an order to me which indicates
21  that these are the dates of depositions of sales
22  representatives.  That should be one part of the order
23  with the dates attached.
24    The second part of the order should be
25  plaintiff's counsel have seven days to contact their

1  doctors and schedule dates for their doctor's
2  depositions, which should be held either before or
3  after the sales reps depending on whether they're in A
4  or B.
5    If they can't provide a date within seven days
6  then the defense may contact the doctor to discuss
7  scheduling of the deposition.
8    MR. BUCHANAN:  Can we say doctor's office?
9    THE COURT:  Doctor's office.  And as we have
10  said before the discussion, hopefully, would be
11  paralegal staff-type discussion, not anything else.
12    MR. COHEN:  I'll do that.
13    THE COURT:  And the -- okay.  Does that cover
14  everything we had talked about as far as those
15  schedules are concerned?  And it should also include in
16  there that records from all sales reps should be
17  provided within 10 days prior to doctors' depositions.
18    MR. COHEN:  No it has to be --
19    THE COURT:  Seven days.
20    MR. COHEN:  Right now I don't want to have any
21  days because I don't know what the dates coming back
22  are, you know, on some of them.  They're all 10 days
23  before the reps.  I'm thinking that some of them may be
24  sooner and some of them will be longer.  Some of them
25  are very small amounts of records.  Some of them are

1  more, and right now until we see if there's any kind of
2  issue I don't think, you know, I hate to put something
3  ahead of time when I don't know if there's an issue or
4  a problem, and I do know that in some of the cases it
5  can't be, and, in fact, for the earlier ones, you know,
6  many of them might be less than that.
7    MR. BUCHANAN:  Obviously, Judge, if there's
8  going to be 20,000 pages of sales rep documents
9  produced three days before a doctor's deposition it
10  takes a day to load them up, you can't get ready and
11  review that kind of volume, so we're happy to work with
12  you on it, Charlie.
13    MR. COHEN:  My thought is when I get the
14  doctors' deposition dates back I'll cross-reference it
15  with what I can do, plus do whatever I have to do.
16    MR. BUCHANAN:  Maybe jigger the schedule a
17  little bit.
18    THE COURT:  Try to work it so they get, you
19  know, a minimum of a week, hopefully 10 days.
20    MR. COHEN:  Can I just say let's work with it
21  first?
22    THE COURT:  You don't have to put it in the
23  order.  Then if it turns out there's a doc scheduled
24  where there's going to be -- you're not going to be
25  able to get the records to them and you can't work out

**Page 109**

```
1    changing the date then give me a call, but --
2         MR. BUCHANAN:  In fairness to the doctors that
3    are affected because they -- you know, we don't want to
4    have dates that have to be rescheduled -- as soon as
5    you know the volume of a production within some kind of
6    parameters can you share that with the counsel or to us
7    to communicate to counsel so they can anticipate
8    resetting a deposition if it is going to be a problem.
9         MR. COHEN:  I'm going to find out whatever the
10   situation is, and we're going to deal with it.
11        MS. FREIWALD:  We have also, to the extent
12   some doctors have already agreed to dates to the extent
13   that you take those dates and nobody needs to go back
14   to the doctors then those are dates we can agree are
15   known, and that's helpful.
16        MR. BUCHANAN:  As long as we're going to get
17   the documents sufficiently in advance of them that's
18   what Charlie is figuring out.
19        MS. FREIWALD:  We will let you know the dates
20   where the doctor has already agreed to a date.
21        THE COURT:  In your list of sales rep dates
22   you can include the following doctors' dates have
23   already been scheduled.  But don't have a doctor
24   scheduled for next week and you can't produce the
25   documents.  You know, work it out.
```

**Page 110**

```
1         MS. YEARY:  I don't think there's a doctor
2    that is scheduled before October.
3         MR. COHEN:  I wouldn't even ask you to do
4    that, Your Honor.
5         THE COURT:  I know you wouldn't, Charlie.
6         MR. COHEN:  We're going to work this out.  It
7    is going to be fine.
8         MR. BUCHANAN:  We do have some issues with
9    redactions.  I raised them with Mr. Barnett earlier
10   today, and I prefer to just see if we can work out
11   some --
12        THE COURT:  Do you think you can work it out?
13        MR. BARNETT:  Absolutely.
14        MR. BUCHANAN:  It relates to the sales rep
15   documents.  We don't want to needlessly redact things
16   to slow the process down to create additional burden,
17   and we'll see if we can come to some revised process on
18   that.
19        MR. BARNETT:  And as I told Mr. Buchanan when
20   we started to include new data that was actually
21   originally negotiated in the MDL but we incorporated in
22   New Jersey there was some glitches there.  We're now
23   incorporating the IMS data, so to the extent that there
24   are processing issues we'll, obviously, correct those.
25   If there are redaction issues we can't work out we'll
```

**Page 111**

```
1    bring them back to the Court, but I think we should be
2    able to resolve them.
3         THE COURT:  Okay.  We don't have anyone here
4    from the Locks Firm do we?  Oh, Jim was here.  Darn.
5    David, would you convey to him what I'm going to say
6    now?  And that is that I have seen Judge Fallon's
7    decision on foreign jurisdiction, forum non for foreign
8    plaintiffs, and Carl has had the fortunate experience
9    of spending his first week reading that box.  So one of
10   the positions of the defense in the motion, and I know
11   that the right people aren't here, but I'm assuming you
12   can convey it to the right people.
13        MR. STRAIN:  You didn't say the bright people
14   aren't here, did you?
15        THE COURT:  No.  The bright people are there,
16   but the people who did the motions are not.
17        MR. STRAIN:  I was hoping I misheard, Your
18   Honor.
19        THE COURT:  I know the people who may be
20   involved in that particular briefing are probably not
21   here, but the bottom line is Merck took the position in
22   the papers filed with New Jersey Court that they would
23   agree to service in, say, England but wouldn't agree to
24   anything else.  In the Judge Fallon order he indicated
25   indicates that he finds there should not be -- he
```

**Page 112**

```
1    basically says it is not convenient for the action to
2    be brought here by the foreign plaintiff, but he
3    includes a list of things that Merck has, quote,
4    "agreed to."  And that includes that they will --
5    basically it assures that the plaintiff will have the
6    right to have their action elsewhere.  Because what it
7    says is Merck will not prevent the action from being
8    brought in the foreign country because of the statute
9    of limitations, because of service, because of -- and
10   there's a list of things.  And then it says they will
11   not oppose this matter being brought back here if it is
12   impossible for plaintiff to proceed -- you can look at
13   the language.
14        MR. MAYER:  You want to us review the list?
15        THE COURT:  You can look at that language and
16   let us know whether those are things you would agree to
17   in the New Jersey litigation because one of the key
18   things in forum non, obviously, is there an alternate
19   forum.  And he really covered that in his order, and
20   the way it is worded, Carl said he just stuck in there
21   that Merck agreed, and I said that's because Merck
22   probably did agree.  I don't think -- maybe federal
23   judges can say Merck agreed when they didn't, but they
24   probably did.
25        So assuming that they did agree at some point
```

1    I just want to know they would be willing to take the
2    same position in this litigation, and, if so, I would
3    like a letter to that effect.
4         MR. MAYER:  We'll get that to you next week.
5         THE COURT:  Okay.  Because that may make --
6    may simplify -- at least one of the issues will be --
7    the preliminary issue of whether there is another
8    forum.
9         MR. COHEN:  I'll get to that Monday because I
10   did handle that in New Jersey.  It is good to see I
11   made a good impression on you, Your Honor.
12        MR. WEISS:  That was a wonderful Power Point
13   you used.  Do you remember that?
14        THE COURT:  That's true, I remember now you
15   argued it.  That's right.  So I got the right bright
16   person.
17        MR. BUCHANAN:  It sounds like you may have
18   prevailed on some of the issues.
19        THE COURT:  You're a lot tougher that those
20   people that handled it in the MDL.  The MDL people
21   were, you know...
22        Anyway, I told Carl how that probably
23   agreement came about, how Judge Fallon probably had
24   them in and said do you want to win this motion this is
25   what I need, but, you know, we'll see.

1    just for the cases through September 30th, which, of
2    course, is our position --
3         THE COURT:  But that does not alleviate the
4    need to file them with the Court.
5         MR. BUCHANAN:  They absolutely have to be
6    filed with the Court.
7         THE COURT:  And you have to absolutely include
8    that in the order.  I mean, I don't want somebody who
9    is not familiar with the cases to get confused.
10        MR. BUCHANAN:  Fair enough.
11        THE COURT:  Because we don't have electronic
12   filing complaints, and we still have to have it.
13        MR. COHEN:  And then on the -- I don't know it
14   is the October agenda or the November agenda one of our
15   fun things is going to go through all these and find
16   out all the people who filed more than one complaint
17   for the same plaintiff because I'm up to quite a few
18   already, and I'm expecting a lot more.
19        MR. BUCHANAN:  Good for filing fees.
20        THE COURT:  Yes, we get the $300.
21        MR. BUCHANAN:  And you also get a dismissal
22   probably.
23        THE COURT:  So far we haven't had any problem
24   where that has come up with, thank goodness, we haven't
25   had firms battling over it.  They talk to each other

1         MR. BUCHANAN:  There's two other things,
2    Judge.  One, Charlie Cohen, after great effort back and
3    forth with Mr. Kristal, negotiated an order that has
4    not yet been submitted to the Court but will be
5    submitted either this afternoon -- I was looking at the
6    clock -- or Monday providing for electronic service of
7    complaints that are filed prior to September -- on or
8    prior to September 30th.  We'll notify plaintiff's
9    counsel, and, also, obviously, submit it to Your Honor
10   for approval.  Hopefully that will ease everybody's
11   tracking of cases in the last month.
12        MR. COHEN:  Two things.  Jerry actually asked
13   for they didn't have to sign in ink for these cases
14   because they were afraid they had too many, and Jerry
15   didn't want to do it, and then we actually said --
16   actually said not only could I agree to that I can do
17   you one better, which, of course, made him really
18   suspicious, but it was actually -- it is just as much
19   as a burden on Merck to get served with all these
20   complaints as it is for the Court to get them the week
21   before, so we are actually are going to agree instead
22   of them serving Merck directly we have an agent for
23   that.  They can actually e-mail the complaints to us
24   and we'll take care of it, and that's in the order, so
25   both Jerry's original thing and the waiver of service

1    and it has been agreed to.
2         MR. COHEN:  Here in this litigation they may
3    not have talked to each other because different firms
4    will be filing for the same plaintiff.  We have the
5    same social security number, we know it is the same
6    person.  Let's wait until we get a list together and
7    we'll deal with them.
8         THE COURT:  Right.  We'll deal with them all
9    at once.  And we are getting a little -- you know,
10   because of the quantity of cases now we are no longer
11   going to -- we pretty much tried -- we're not going to
12   not be helpful.  We're going to still try to help you,
13   but we can't promise you if you don't -- that we're
14   going to sort of spoon feed you and call you and say we
15   don't have, you know, we don't have a CIS.  We don't
16   have a CIS, so, you know -- they still get stamped with
17   the date anyway and then you have so many days to
18   provide the CIS, but we sort have been putting them
19   aside phoning; now we'll probably send them back to
20   you, but we'll see.
21        MR. BUCHANAN:  Your staff has been very
22   accommodating.
23        THE COURT:  We don't just do that -- the staff
24   downstairs tries to accommodate everybody.  One thing
25   Williams, his whole thing was always customer service,

1  your service -- your customers are the lawyers and the

2  public, and you should try to, you know, treat them

3  like customers, you know, try to treat them like people

4  you want to take care of instead of your enemy, you

5  know? So we have always done that. He has really

6  instilled that in this county, and I think that was a

7  good thing, but, you know, we get tired, too, and

8  11,000 complaints we're sort of -- right now they're

9  having a contest downstairs as to who can enter the

10  most complaints in one day, so that's really speeded up

11  their work level, and I promised a prize, and I still

12  don't know what I'm going to get.

13       MR. WEISS: There's about five pizzas that

14  haven't been eaten.

15       MR. BUCHANAN: We're filling the third deck of

16  the Continental Arena with cases. 11,000.

17       THE COURT: But they built us a new room and

18  promised us one more person. The only problem is the

19  one more person and the new room aren't going to be

20  here before all the complaints are here.

21       So what else do we have that we have to

22  address today?

23       MR. BUCHANAN: There is the timing for

24  Tuesday's call on the -- is it 2:00 in the afternoon

25  oh, I thought it was morning. Ted, I think the offer

1  was to do the other call in the morning. Is it okay if

2  we do it at noon with your calendar and also the

3  judge's? I just have a mediation I'm in, and I can

4  excuse myself after the initial presentation.

5       THE COURT: What day is that? 2:00 is Lahner.

6       MR. BUCHANAN: The issue of the investigative

7  report, and what Merck's position is going to be.

8       THE COURT: Oh, that. That will be 12:00

9  then.

10       MR. BUCHANAN: That's fine. Thank you.

11       THE COURT: Is there anything else that anyone

12  else needs to address today?

13       MR. WEISS: Thank you for your patience.

14       THE LAW CLERK: You told me to bring that

15  amended complaint.

16       THE COURT: Yes. This is Berezofsky wants to

17  join some additional defendants.

18       MR. WEISS: She does?

19       MR. BUCHANAN: Is it a co-ingestion case?

20       THE COURT: No, that's not a problem. She

21  wants to join -- Merck Sharp and Dohme.

22       MR. COHEN: That's foreign, so that would be

23  stayed right now.

24       THE COURT: Merck Sharp and Dohme. Was that

25  stayed?

1       MR. COHEN: You stayed everything having to do

2  with any of the foreign stuff pending resolution of

3  this motion.

4       MR. BUCHANAN: Is it a foreign plaintiff,

5  though?

6       MR. MAYER: Former U.S. corporate name, but I

7  don't know that it exists -- I just don't know if it

8  exists as a separate entity.

9       MR. WEISS: I think Merck Sharp and Dohme is

10  the European name.

11       MR. BUCHANAN: Are they a U.S. plaintiff, Your

12  Honor?

13       THE COURT: I'm looking at that. No. He

14  resides in Ireland.

15       MR. WEISS: That's a stayed case.

16       MR. BUCHANAN: Well, she just wants to amend the

17  complaint to join them.

18       MR. BUCHANAN: Discovery is stayed.

19       THE COURT: I think she can do that. We

20  haven't really stopped the filing of complaints, have

21  we?

22       MR. COHEN: I guess it may not matter, and,

23  hopefully, Merck will dismiss that one pretty soon

24  anyway.

25       THE COURT: You have to talk to Carl. All

1  right. I'll just send out an order. I think that she

2  should be allowed to add them, whether they then

3  subsequently get dismissed if we dismiss all their

4  they'll be out with everybody else or they'll stay in

5  with everybody else, and we'll move on. Discovery is

6  stayed, but I don't think a complaint is stayed,

7  otherwise, we're going to have issues of statute

8  questions.

9       MR. WEISS: Judge, a question has been asked

10  -- I take it the calls on Tuesday are liaison counsel

11  only? Is that correct? The 12:00 call and the 2:00

12  call? It will include Placitella on 2:00 because he is

13  the one doing the questioning for Joann Lahner.

14       THE COURT: Well, I certainly don't want lots

15  of people on the telephone, you know? I prefer liaison

16  counsel only.

17       MR. BUCHANAN: We'll arrange that, Judge.

18  There was one other issue that I believe Heather before

19  she left contacted plaintiffs and wanted us to put on

20  the agenda. It related to plaintiffs with children --

21  children surviving parents. I don't have a lot of

22  knowledge about this, other than what's on our agendas.

23       THE COURT: I think that we have gotten a lot

24  of calls or she was getting a lot of calls from people

25  who were confused about what to put into their estate

1  cases, how to word their complaints even though it is

2  pretty much check off survivor, check off wrongful

3  death.  I don't know what we can do about that because

4  it is just not appropriate for me to be giving

5  attorneys advice about how to word their complaints or

6  what actions to bring because then I'm -- of course,

7  when the defense files a motion that they have brought

8  the wrong actions, you know, I don't want the counter

9  to be, well, that's what the judge told us to file.  So

10  I don't know whether plaintiffs as a group want to try

11  to do something to assist your fellow plaintiffs'

12  attorneys as to --

13       MR. BUCHANAN:  If we get calls as liaison we

14  address these issues.  If people go around us...

15       THE COURT:  So, Carl, if someone calls you or

16  calls Megan and asks about how they file a wrongful

17  death complaint if they have to name an administrator,

18  what they have to do you should probably tell them to

19  call Sol Weiss or Dave Buchanan.

20       MR. BUCHANAN:  Sol is fine.  Or they can just

21  call Dechert if they want to rely on what the defense

22  tells them.  They can call whoever they like.

23       Anything else?

24       MR. WEISS:  One thing.  I have been asked to

25  contact two pro se plaintiffs and help with the facts

C E R T I F I C A T I O N

I, REGINA A. TELL, C.S.R., R.M.R, R.P.R., C.R.R.,

License Number 30XI00161000, an Official Court Reporter

in and for the State of New Jersey, do hereby certify

the foregoing to be prepared in full compliance with

the current Transcript Format for Judicial Proceedings

and is a true and accurate compressed transcript to the

best of my knowledge and ability.

_____09-10-06

Regina A. Tell, CSR-RMR-CRR

Official Court Reporter

Atlantic County Courthouse

Mays Landing, New Jersey

1  sheets so I want --

2       THE COURT:  You want to what?

3       MR. WEISS:  I have been asked by Dechert to

4  contact two pro se plaintiffs to help them with facts

5  sheets.

6       THE COURT:  Please do that.  There's no

7  objection to that?

8       MS. YEARY:  We would prefer for him to handle

9  them.

10       THE COURT:  Good.  Please do.

11       MR. WEISS:  Okay.  Will do.

12       THE COURT:  And, okay, that's it then.

13       (Discussion off the record.)

14       (End of proceedings.)

15

16

17

18

19

20

21

22

23

24

25

0001

```
 1
 2
 3
 4
 5
 6                    SUPERIOR COURT OF NEW JERSEY
 7                    ATLANTIC COUNTY
 8                    CASE TYPE NO. 619
 9
10      ----------------------------x
11      IN THE MATTER OF IN RE:
12
13      VIOXX
14                              STENOGRAPHIC TRANSCRIPT
15                              OF:
16      ----------------------------x  - HEARING -
17                                      SEALED TRANSCRIPT
18
19        PLACE:  ATLANTIC COUNTY CIVIL COURTHOUSE
20                1201 BACHARACH BOULEVARD
21                ATLANTIC CITY, NJ  08401
22
23        DATE:   SEPTEMBER 15, 2006
24
25
26      B E F O R E :
27
28        THE HONORABLE CAROL E. HIGBEE, J.S.C.
29
30      TRANSCRIPT ORDERED BY:
31
32        DAVID BUCHANAN, ESQ. AND THEODORE MAYER, ESQ.
33
34      A P P E A R A N C E S :
35
36        DAVID BUCHANAN, ESQUIRE
37        SKEGER, WEISS, LLC
38        ATTORNEYS FOR THE PLAINTIFFS
39
40        SOL WEISS, ESQUIRE
41        ANAPOL, SCHWARTZ, WEISS, COHAN, FELDMAN & SMALLEY
42        ATTORNEYS FOR THE PLAINTIFFS
43
44        CHRISTOPHER PLACITELLA, ESQUIRE
45        RACHEL PLACITELLA, ESQUIRE
46        COHEN PLACITELLA & ROTH
47        ATTORNEY FOR THE PLAINTIFFS
48
49
50             *       *       *       *       *
51                    REGINA A. TELL, CSR-CRR
52                    OFFICIAL COURT REPORTER
53                    1201 BACHARACH BOULEVARD
54                    ATLANTIC CITY, NJ  0840 1
```

1

```
 1
 2
 3
 4
 5
 6      APPEARANCES CONTINUED . . .
 7
 8        DONALD MIGLIORI, ESQUIRE
 9        FRED THOMPSON, ESQUIRE
10        MOTLEY RICE, LLC
11        ATTORNEYS FOR THE PLAINTIFFS
12
13        ERIC WEINBERG, ESQUIRE
14        LAW OFFICE OF ERIC H. WEINBERG
15        ATTORNEYS FOR THE PLAINTIFFS
16
17        CHRISTIE JONES, ESQUIRE
18        BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
19        ATTORNEY FOR THE DEFENDANT
20
21        THEODORE V.H. MAYER, ESQUIRE
22        CHARLES W. COHEN, ESQUIRE
23        HUGHES, HUBBARD & REED, LLP
24        ATTORNEYS FOR THE DEFENDANT, MERCK
25
26        DANE H. BUTSWINKAS, ESQUIRE
27        WILLIAMS AND CONNOLLY, LLP
28        ATTORNEY FOR THE DEFENDANT, MERCK
29
30        MATTHEW SHORS, ESQUIRE
31        O'MELVENY & MYERS
32        ATTORNEY FOR THE DEFENDANT, MERCK
33
34        ALSO PRESENT:  MICHAEL NOONAN
```

2

```
 1
 2              SEALED TRANSCRIPT - DO NOT DISTRIBUTE
 3
 4
 5
 6                    P R O C E E D I N G S
 7
 8        THE COURT:  You can be seated.
 9
10        MR. WEISS:  Good morning, Your Honor.
11
12        THE COURT:  All right.  We're ready to
13      proceed.  Counsel, do you want to enter your
14      appearances?
15
16        MS. JONES:  Yes, Your Honor.  Christie Jones
17      for Merck, along with Ted Mayer, Charlie Cohen, and we
18      have Dane Butswinkas here.  And I think Mr. Cohen would
19      like to move orally for him to appear pro hac.
20
21        MR. COHEN:  We would like to move the
22      admission pro hac of Dane Butswinkas, who is a member
23      in good standing of the bar of the States of Virginia
24      and Washington, D.C.
25
26        THE COURT:  Counselor, do you want to raise
27      your right hand?
28
29        Do you swear to tell the truth, the whole
30      truth and nothing but the truth?
31
32        MR. BUTSWINKAS:  I do.
33
34        THE COURT:  You're a member in good standing
35      of the Washington and Virginia bar?
36
37        MR. BUTSWINKAS:  Washington, D.C.
38
39        THE COURT:  You can put your hand down.
40
41        Do you have any disciplinary proceedings
42      pending or have you had any in the past against you in
```

3

```
 1
 2              SEALED TRANSCRIPT - DO NOT DISTRIBUTE
 3
 4
 5
 6      either state?
 7
 8        MR. BUTSWINKAS:  No, Your Honor.
 9
10        THE COURT:  And you have a connection of some
11      sort with the defendant?
12
13        MR. BUTSWINKAS:  Yes, I'm a lawyer for the
14      defendant.
15
16        THE COURT:  Have you worked for them in the
17      past?
18
19        MR. BUTSWINKAS:  Yes, I have.
20
21        THE COURT:  Okay.  All right.  Any objection?
22
23        MR. PLACITELLA:  No, Your Honor, we welcome
24      his admission.
25
26        THE COURT:  Okay.  Counselor, you will be
27      admitted pro hac.  I do want to have formal papers
28      along with an order and a certification so that it will
29      be in the file.
30
31        MR. COHEN:  And I'll take care of the payment,
32      as well.
33
34        MR. BUTSWINKAS:  Thank you, Your Honor.
35
36        THE COURT:  All right.
37
38        MR. WEISS:  For the plaintiffs, Your Honor,
39      Sol Weiss, liaison counsel, Christopher Placitella,
40      Fred Thompson, Bob Migliori and Rachel Placitella and
41      Eric Weinberg.  Mr. Buchanan is running late.  He will
42      be here.  He said to start.  Traffic is bad.
```

4

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

THE COURT: All right.

MR. THOMPSON: Mr. Migliori has a pro hac vice application that I believe has been forwarded to the Court. It has not been ruled upon, but we are also moving his pro hac admission into the case, and that is for the act of trial proceedings of the cases as they are called for.

THE COURT: Unless he intends to speak on the record today, it is not necessary.

MR. MIGLIORI: I don't intend to.

THE COURT: He is observing today.

MR. MIGLIORI: But I believe the order was signed late yesterday afternoon.

THE COURT: We signed a lot of them yesterday.

MR. MIGLIORI: Thank you, Your Honor.

THE COURT: Okay. Is there anyone in the courtroom who has not been identified?

MS. JONES: Your Honor, we do have Ms. Lahner here, as well as Matt Shors who has previously been admitted and appeared on behalf of Merck.

MR. PLACITELLA: Michael Noonan from my office, who makes sure the stuff works.

THE COURT: Okay. All right. Then I guess we're ready to proceed. This is really -- go ahead. What do you want to say, Counselor?

5

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

MS. JONES: I have a few preliminary matters I would like to take up with the Court --

THE COURT: All right.

MS. JONES: -- beforehand, but I don't want to interrupt Your Honor.

THE COURT: Go ahead.

MS. JONES: Your Honor, as you know, we are here on Merck's motion for protective order to preclude the deposition of its in-house counsel, Joanne Lahner, as well as for the return of an inadvertently produced document on which we have asserted the attorney/client privilege.

Your Honor has asked that we appear this morning in order that you may hear from Joanne Lahner. We have previously sent correspondence to Your Honor, and I think noted on the record, but so that the record is clear, Merck, while we have Ms. Lahner here, does formally object to this proceeding inasmuch as we don't believe that the plaintiffs have met their burden to overcome the presumption of good cause for the issuance of a protective order, number one.

Number two, that they haven't shown that the information is equally available for another -- from another source or that the discovery is essential to this litigation. But beyond that, this is a hearing

6

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

which, as we have previously advised the Court, is one in which it may become necessary for us to assert the attorney/client privilege. My understanding is that Your Honor has limited the hearing to the scope of Ms. Lahner's role in order to allow you to determine those issues, and I understand that we may have to take that on a case-by-case basis.

Nonetheless, there is the potential that attorney/client privileged issues or those subject to work product protection will come up. I have raised with counsel for the plaintiff that under these circumstances and the fact that we believe we are appearing here at Your Honor's request, that there be a stipulation entered that in the event of an inadvertent waiver of the attorney/client privilege during some of Miss Lahner's testimony, that we would be able to assert or reassert that privilege at a later date. And as I understand counsel for the plaintiff, they have no objection to that.

THE COURT: Nothing Miss Lahner says today will be considered as a waiver of her claim of attorney/client privilege or Merck's waiver of attorney/client privilege, since she's here at the direction of the Court and has been required to be here by the Court. She hasn't -- this is certainly not a

7

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

voluntarily relinquishment of information.

MS. JONES: Thank you, Your Honor.

There's one other issue with respect to that. Because of these proceedings, I know Your Honor has suggested that the hearing be somewhat restricted in terms of participation. We would ask preliminarily that the record be sealed until such time as we go through this and know whether or not there's a need for it to be sealed.

THE COURT: All right. At this point, the court reporter is aware of the fact that until further order of the Court, the record is sealed and won't be distributed to anyone without explicit directions from me as to who she is to release the transcript to.

MS. JONES: Thank you, Your Honor.

THE COURT: All right. So are we just going to call the witness at this point? I thought I would ask some preliminary questions and then let the plaintiffs...

MS. JONES: I do have one other suggestion, Your Honor, that I forgot.

One of the issues that has clearly come up and that we anticipate Your Honor will decide upon today is whether or not the press release with the handwritten notations on it was inadvertently produced. As Your

8

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

Honor knows, we have raised and asserted that the attorney/client privilege with respect to that document. As I understand the appropriate procedures under the Ocean Spray case and the other cases, if Your Honor wishes to question Miss Lahner specifically about that document, that examination ought to be in camera. And I would suggest to Your Honor that for judicial economy in moving this thing along, that if Your Honor wishes to question Ms. Lahner on the contents of that document, that that might be an appropriate place to start.

MR. PLACITELLA: Your Honor, can I be heard on that? I think the preparation of that document, what's reflected, what is not reflected is appropriate examination by counsel. We have some specific things in terms of Ms. Lahner's role that we don't think will be properly elucidated without the ability to ask her the questions. If you think that for some reason we should not hear the answer then, by all means, whatever the Court feels is appropriate, but I think the questions at least should be asked in the form that we have presented them.

MS. JONES: I think, Your Honor, and I have got a copy of the Ocean Spray case and some of the others, as I understand it, once we assert the

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

processes. It should be as if it didn't occur, although you can't forget it, you have to ignore it.

And at the same time, I mean what I'm -- quite frankly, when I'm looking at this, it appears that the notations on that document are outside the scope of normal attorney-type remarks and attorney-type actions. And what I didn't want to, and though I considered simply ordering that she be deposed about it, I wanted -- I was afraid that that would -- that I might, then, the way it was answered, it may, in fact, turn out that she should have the privilege, and certainly I'm very respectful of that privilege and didn't want to endanger it, so I felt it was important I have some type of hearing.

I do think, though, that allowing the plaintiffs to ask some questions about it makes sense. It is not as though we're going to show them something they haven't seen before.

On the other hand, I don't want to turn this into the deposition that should be taken afterwards if, in fact -- why don't we just start with the basics. The first thing I want to know is some really just background information of when she started working for Merck, what she does generally, what she has done in the past, how long -- those are the type of things I

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

privilege, as we have in this case, it is perfectly appropriate for the Court to determine whether or not the privilege was appropriately asserted, but that it should be done in camera so that the privilege is not waived and then --

MR. PLACITELLA: Judge, we started with the premises of there's no waiver of a privilege. And with all due respect, I don't think the Court can make a determination whether that document should be given back until the Court hears all the evidence that surrounds that document.

THE COURT: Yes. You know, we have a bit of a -- you know, whenever you're questioning someone who is claiming privilege, I guess there's always a tight sort of rope to walk to some degree, and I'm conscious of that.

On the other hand, we have -- I think realism still has some place in the law. Everybody has seen that press release in this room. If, in fact, I find it has to be returned, then everybody has to, from that point on, just as juries have to forget about things they shouldn't have heard, the document has to be returned, all copies of it have to be returned. It can't be used and counsel can't -- counsel can't or shouldn't even use it within their deliberative

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

want her to start with. Really background information. So why don't we just reserve the right to object to any particular question as we go along.

MS. JONES: Fine, Your Honor.

THE COURT: All right? Ms. Lahner, do you want to approach?

(Whereupon, Joanne Lahner, affirmed.)

EXAMINATION BY THE COURT:

Q. Miss Lahner, who are you presently employed by?

A. Merck & Company.

Q. And how long have you worked for Merck?

A. Since 1992.

Q. What law school did you go to?

A. University of California at Berkeley Boalt Hall School of Law.

Q. And when did you graduate from law school?

A. 1984.

Q. What bar did you take?

A. Pennsylvania.

Q. As soon as you were out of law school?

A. Yes.

Q. Okay. And when were you licensed to practice in Pennsylvania?

A. The fall of 1984.

Transcript - Sealed Hearing (2006/09/15)

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

Q.   What did you do when you were first out of law school?

A.   I became an associate in the litigation department at the law firm of Drinker Biddle & Reath in Philadelphia.

Q.   Okay.  And how long did you stay there?

A.   Until 1992.

Q.   And then where did you go?

A.   Directly to Merck & Company, where I have been employed ever since.

Q.   Okay.  And when you were hired at Merck, what were you hired -- what was your title?

A.   I was hired as a senior attorney to do regulatory work and product liability litigation related to the vaccine products at Merck.

Q.   Okay.  And when did you first come and have any -- any relationship with the VIOXX product, as far as reviewing any documents or doing anything, I mean going to meetings, anything related to that?

A.   To the best of my recollection, it was in 1998.

Q.   1998?

A.   Yes.

Q.   So prerelease to the market?

A.   Correct.

Q.   All right.  And at that point in time, what

13

---

Transcript - Sealed Hearing (2006/09/15)

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

Q.   Where were the materials coming from that you were reviewing?  Was the advertising coming from one place and the other things --

A.   There are various units within U.S. Human Health division that have responsibility at that time for supporting various commercial activities, and so the sales groups would generate sales training materials, the marketing group would develop marketing materials, and all of those materials would come to me for legal review as the lawyer assigned to the product.

Q.   All right.  But we're talking, what, millions of documents, thousands of documents?  How many documents are we talking about?

A.   I could not give a good estimate of that now, but as we approached the launch of the product, nearly all of my time was spent reviewing materials and meeting with clients in order to provide them legal advice about the product that was about to be launched.

Q.   While you were working on this, were you working on other products and other things or just VIOXX?

A.   My recollection is that at least from the beginning of 1999 and, perhaps, before that, although I don't specifically recall, I was working exclusively on VIOXX.

15

---

Transcript - Sealed Hearing (2006/09/15)

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

type of work were you doing in 1998?

A.   I was assigned as the regulatory lawyer for VIOXX.  And so my principle responsibilities related to, I was the legal representative to the labeling committee at the time.  I reviewed promotional materials that were being prepared in connection with the launch.  I reviewed -- provided legal review of sales training materials to be used by the field.  Those would be the principle areas that I can recall now.

Q.   Now, were you the only lawyer that was doing that for Merck or was there a group of you that were doing it?

A.   I was the only lawyer in the regulatory group, which is based in the U.S. for the U.S. headquarters then in West Point who was doing that.  There was another --

Q.   So your offices were in West Point?

A.   West Point, Pennsylvania, yes.  There was another lawyer assigned for the international group.

Q.   Okay.  And, basically, when that launch was being conducted, you were getting ready to launch the product, was most -- where were most of the materials coming from?

MS. JONES:  I'm sorry, Your Honor?

BY THE COURT:

14

---

Transcript - Sealed Hearing (2006/09/15)

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

Q.   And how long did that take all of your time, from 1999 until when?

A.   Until today.

Q.   So VIOXX is it?

A.   Yes, Your Honor.

Q.   You and I have something in common.

So you spent all your time on VIOXX and you are the senior counsel in-house?

A.   My current title is vice-president and assistant general counsel.  I have responsibility now for the U.S. product liability litigation and for the regulatory work related to VIOXX.  And I have lawyers who work for me in my capacity as a senior manager in the department on VIOXX.

Q.   Okay.  Now, back in 1999/2000, did you have other attorneys that were working under you on VIOXX or were you doing it yourself?

A.   I was the sole attorney assigned to VIOXX at that time.

Q.   Okay.  So having people under you occurred after you were promoted to your present position at the time of the litigation?  I mean, what triggered that?

A.   Okay.  I had lawyers reporting to me beginning in approximately 1998, but they were assigned to other

16

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

products.  I think the first lawyer reporting to me on

VIOXX was in 2001 or 2002.

Q.   Was that related to litigation or was that

related to regulation?

A.   It was related to litigation.

Q.   Now, who supervises you?  Who supervised you,

first, in 1999 and then if it changed up to the

present?  Who has supervised what you're doing?

A.   In 1999 I reported to Ronald Henshall, who was then

vice-president and assistant general counsel for

regulatory.  He retired in 2004.

And when he retired, I began reporting to Ken

Frazier, who is the general counsel at Merck.  And I

think in 2005 I began to report to Bruce Kuhlik, who is

the vice-president and associate general counsel at

Merck.

Q.   And he reports to Frazier?

A.   He reports to Frazier.

Q.   Now, as far as the -- when you say you did

regulatory, there was the submissions, initial

submissions to the FDA for the drug application, for

the New Drug Application.  Did you review all that

material or were there other people involved in that?

A.   As the regulatory lawyer for VIOXX at that time, I

did not review any of the submissions related to the

17

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

them, and that also got legal review and approval.

Q.   And you were solely responsible for all of

that?

A.   Yes.

Q.   And then --

A.   I'm sorry.  I should say solely responsible in the

sense that I was the only lawyer.

Q.   You were the only lawyer doing the final legal

review?

A.   Right.  Correct.  Those documents --

Q.   Obviously, everything or most of the documents

were prepared by other people?

A.   All of the documents were prepared by other people

and were reviewed by me for purposes of providing legal

advice.

Q.   So you didn't prepare any of the documents,

any of the -- personally prepare any of the documents

that were used for advertising purposes or publication

purposes?

A.   To the best of my recollection, that's correct.

Q.   How about the warning itself or the label

itself, I know we talked about the label.  The contents

of the label, is that something that you would have

been involved in actually originating or drawing up, or

would that have been something -- obviously, you're

19

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

IND or to the original NDA for the product.

Q.   Okay.  So there were other attorneys that were

doing that?

A.   No, there were no other attorneys who were

reviewing that.  That's handled by Merck Research

Laboratories.

Q.   Okay.

A.   There was no legal review of those documents.

Q.   There is no legal review of those documents?

A.   There was not at that time.  I can't say whether

today that happens or not, but at that time, we did not

review them.

Q.   Okay.  So were you primarily reviewing

advertising or marketing as opposed to regulatory -- as

opposed to FDA submissions?

A.   At the time around launch?

Q.   Around launch, yes.

A.   Okay.  The primary responsibilities around launch

related to the labeling that would be approved by FDA

and that would serve as the basis for the company's

communication about the product, the preparation of

press materials related to the approval, the

preparation of the original launch campaign, which

would be the detail pieces used by representatives, and

the sales training material that had to be prepared for

18

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

working with the FDA on that, but would that have been

something you reviewed afterwards?

A.   There's a committee of Merck Research Laboratories

called, at that time, the worldwide product circular

review committee, that's comprised primarily of

scientists, physicians, statisticians.  I was a member,

I was the legal representative of that committee.

There was also, I believe, at that time, a

marketing representative of that committee.  The

document was primarily prepared by Merck Research

Laboratories and then brought to that committee for

review, and I provided legal review and advice and

legal approval of the submission made to FDA with the

New Drug Application.

Q.   And would you participate in the discussion

with the committee about the -- what the contents of

that label was going to be?

A.   I would provide legal advice about the content and

presentation of data in that labeling.

Q.   Okay.  When the VIGOR study came out, you were

still involved in basically in the same role.  Is it

your testimony at that point you were still counsel

still solely assigned to VIOXX and still the primary

supervising lawyer for that?

A.   Yes.  I was the primary regulatory lawyer for

20

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

VIOXX, and at that time, the only regulatory lawyer for
VIOXX.

Q.   All right.  There were a lot of negotiations
with the FDA over the label between the time VIGOR came
out and/or at least it appears that way from the
testimony at trial, that there were a lot of
negotiations with the FDA or correspondence or
interaction, maybe was the best word instead of
negotiation.  There was interaction between the FDA and
Merck between the time the second label came out and
between VIGOR and the second label.  What was your role
then?

A.   I was the legal representative to the product
circular review committee, and so I participated in the
meetings related to the drafting of that labeling that
went in with the original submission in June of 2000.
And then following that, I participated in the
revisions to the labeling that were proposed by the
company after the FDA advisory committee in February of
2001, and submitted to FDA in March of 2001.  And I
would have participated in the labeling committee for
the subsequent drafts that were exchanged with FDA.

     I also attended, but did not speak, at several
teleconferences with FDA related to the labeling.

Q.   And did that committee remain basically the

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

same, this circular committee, from when VIGOR came out
to when the label -- or from '99 on, was it the same
committee?

A.   For as long as I have been with Merck, there's been
a product circular review committee.  The membership of
that committee changes over time.  And according to the
issues that are being addressed by the labeling
committee, there's also a different group of
individuals who are responsible for different products.

     And so as that -- so you can't say it is
consistent and the same people, but the concept of the
committee, that it was an MRL committee with
scientists, physicians and statisticians from MRL to
which I was legal representative remained the same.

Q.   All right.  And this committee, the circular
you called this?

A.   We called it PCRC.

Q.   PCRC.  Product circular --

A.   Review committee.

Q.   -- review committee.  Okay.

     This PCRC, is it one committee for all the
drugs and then there would be some members of it that
would be assigned to VIOXX, or was this a specific PCRC
committee that was devoted to VIOXX and then there
would be another PCRC committee particularly devoted to

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

another drug?

A.   There is a PCRC committee that has a core group of,
I believe at that time, there were only three core
members.

Q.   And who were they?

A.   There was one legal representative, one editor and
one secretary of the committee.

     And then the functional areas were represented
on the committee according to the product that was
under review by the committee and based on the product
that was being discussed.

     And so clinical would have a different
representative depending on the product that was being
discussed.  Regulatory affairs would have a different
representative depending on the product that was being
discussed.  But there was always a core committee at
Merck.

Q.   And were you on that core committee or you
were just assigned to the VIOXX ones?

A.   I was, in the 1999 to approximately 2000, 2001 time
frame, I was a core member of the PCRC, and so I had
responsibility for work on PCRC related to other
products.

Q.   From when to when?

A.   I couldn't say with certainty, Your Honor.

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

Q.   And what was your estimate again?

A.   In the time frame that we were talking about, 1999
to 2000/2001.  My recollection is at some point in
there I was a core member of PCRC.

Q.   And then how many people would be on the PCRC
that would be devoted to VIOXX itself?  It would be you
representing what, what would you be called, a
regulatory or you would just be called the legal?

A.   I would be called legal.

Q.   Okay.  And then the regulatory would have
somebody else?

A.   There would be a regulatory representative from the
research labs and that person would attend.

Q.   And that person is not a lawyer?

A.   That's correct.

Q.   But they're a regulatory -- what does that
mean?  Because usually you think of regulatory as being
legal.

A.   And there is a regulatory group in the legal
department in the office of general counsel, which I
was a member of at that time.  In the Merck Research
Laboratories they actually, I'm not sure what they're
called now, but they perform a liaison function to FDA,
so that all of the company's formal communications with
the Food and Drug Administration are through the

**Transcript - Sealed Hearing (2006/09/15)**

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

individuals in that group.

Q.   Okay.  And those people are not attorneys?

A.   And they are designated -- that's correct.

Q.   Okay.  And then there would be -- clinical would be the scientists devoted to the FDA or devoted to VIOXX?

A.   Devoted to VIOXX; that's correct.  And then there would be a group from the statistical area.  There might be a representative from the preclinical area.  There may be multiple members from a given area depending on the issue.  Legal always had one representative.

Q.   And you were that representative for VIOXX?

A.   Yes.  Through at least 2002.

Q.   Through the label change at least?

A.   Yes.

Q.   Did you -- do you have any scientific background or did you have any training in any of the scientific --

MS. JONES:  I'm sorry, Your Honor, I'm having a hard time hearing.

THE COURT:  I'm sorry.

BY THE COURT:

Q.   Did you have any scientific training?

A.   No.

25

---

**Transcript - Sealed Hearing (2006/09/15)**

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

Q.   So you weren't involved with the science at all except from the review of the legal position, that's what you are telling me?

A.   I have no science background, but a core part of what a regulatory lawyer does for a pharmaceutical company is to understand the data, the studies, the disease state, and then take that information and apply a complex regulatory structure on that and provide legal advice to my client.  That's what I do.

So I do my best to understand that in an effort to provide sound legal advice, but I have no training in that area.

Q.   Now, when we're talking about -- we have talked about the FDA somewhat, but who would have been dealing with the advertising and the marketing that would have come not through PCRC?

A.   That's correct.

Q.   That would come directly from marketing or from the marketing end of Merck?

A.   The marketing group at Merck would develop materials, and then there was a review process at Merck called the medical/legal board comprised of one lawyer and two physicians, and that group would have responsibility for reviewing it.  I was the legal representative to that through 2000 -- through the

26

---

**Transcript - Sealed Hearing (2006/09/15)**

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

summer of 2002.

And then there's an office of medical/legal in the U.S. Human Health division that's responsible for submitting those pieces to DDMAC, which is the division at FDA responsible for advertising.

Q.   And what about press releases during that period of time, what was your responsibility?

A.   I was the lawyer responsible for the product, and in that capacity, would review press releases that the company intended to issue or wanted to issue in connection with VIOXX.

Q.   And what did you see your role as, simply you gave legal advice?

A.   Yes.

Q.   All right.  There's been a question raised about the press release and you have seen the handwritten notes that were on there?

A.   Yes.

THE COURT:  Do we have the documents so we can have it marked or was it premarked?

MR. THOMPSON:  I had my own copy.  I did not premarked it.  I'm happy for you to use it in your examination.

THE COURT:  Okay.  It wasn't marked?

MR. THOMPSON:  I marked some other ones.

27

---

**Transcript - Sealed Hearing (2006/09/15)**

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

MS. JONES:  I assume, Your Honor, actually this has handwritten notes on it.  If you give me one second, I'll give you an unmarked one.

MR. THOMPSON:  That's what this is, the clawback document, right?

MS. JONES:  Right.  But this that's written in blue are your notes.

MR. THOMPSON:  Yes.  Thank you.  If I knew it was going to be my marks, I would have put something better in there.

MR. PLACITELLA:  I have other copies.

THE COURT:  At this point, I'm going to let plaintiff's counsel question her about her role, and if you want to, I just want her to identify the document first.  So we'll have the document marked as C-1.  It is a court exhibit.

BY THE COURT:

Q.   This is a document which was provided, and Merck has taken the position that it was inadvertently provided, or at least not the whole document, but the notes on it were inadvertently provided.  It's titled "Draft 5/18/00 Embargoed Release Until," and it appears to be a press release.

Can you identify that document, C-1?

A.   It appears to be a draft of a press release that

28

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

has my handwritten notations on it providing legal

advice to my client.

Q.   All right.  And all those notes on the side

are yours, as far as you can tell, on each page?

A.   Not all of the notes are mine.  The neat

handwriting is mine.

Q.   Okay.  Let me see it.

A.   The larger handwriting at the top towards the right

is not my handwriting.

Q.   All right.  So in the top corner is not your

handwriting.  This whole area in the upper right-hand

corner of Page 1 is not yours?

A.   That's correct.

Q.   All right.  I think maybe what we should do is

give you a highlighter and let you highlight those

things that are your handwriting, so we can see for the

purposes of...

THE COURT:  For the record, the witness has

been handed a highlighter, and she's highlighting the

exhibit that's been marked C-1.

While the witness is doing that, has

plaintiff's counsel had the opportunity to depose the

other members of the PCRC, Mr. Placitella?

MR. PLACITELLA:  I'm still not sure who they

are.

29

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

of having legal counsel review a press release?

A.   There is a complex regulatory structure that exists

for the company in issuing any type of release related

to a medicine, whether the medicine is approved or not

approved.  And as the lawyer for the product, it was my

job to be familiar not only with the FDA regulations,

but, also, with the numerous guidances and letters that

the agency had issued over the years, as well as

informal comments the agency had provided.  And to

distill that information and to provide legal advice in

an effort to insure that the press releases that the

company issued were compliant with the FDA's

expectations around such releases.

Q.   And is that your contention what these remarks

were on this paper?

A.   Absolutely.

THE COURT:  Okay.  Why don't we have

plaintiff's counsel ask what questions they want first

not about the press release, since that seems to be

more of a problem for the defense, and more about

generally what her role was.  And then we'll discuss

the issue of the press release specifically.

MR. THOMPSON:  Your Honor, I will -- Fred

Thompson for the plaintiffs, and I will not -- as a

matter of fact, I am going to plow the same ground

31

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

MR. WEISS:  If Robert Silverman was a member,

he has been deposed and his notebooks were produced.

(Whereupon, Exhibit-C-1 was marked for

identification.)

THE COURT:  Let's have -- is counsel aware of

what is hers and what is not?

MR. PLACITELLA:  Your Honor, I can look at

that while Mr. Thompson is doing the examination to

move things forward, unless the Court has more

questions.

BY THE COURT:

Q.   Who was on the PCRC committee that dealt with

VIOXX, first of all, premarket or through the launch?

A.   I can't recall everyone, but the people that I

remember who participated in the committee would have

been Bob Silverman, Beth Seidenberg, Brian Daniels,

Ellen Westrick, although I'm not sure Ellen was a

member of PCRC.  No, maybe not.  That's all I can

remember at this time who were members then.

Q.   And who was a member between the VIGOR results

and the warning label change?

A.   Bob Silverman, Alise Reicin, me.  I can't really

recall the members other than that.

Q.   Okay.  The -- why would press releases be

reviewed by legal counsel?  What would be the purpose

30

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

twice, but I'll use a tiller plow and not repeat the

same things.

EXAMINATION BY MR. THOMPSON:

Q.   Ms. Lahner, were you a member of the data

safety review board?

A.   The Data Safety Monitoring Board.

Q.   Monitoring Board, yes, ma'am.

A.   I was not.

Q.   And that consists of who?  Is that all

scientists?

A.   The Data Safety Monitoring Board for VIGOR was

comprised of physicians and statisticians outside the

company, and one statistician from the company who was

a nonvoting member.

Q.   Who would be the Merck liaison, would that be

you or somebody else?

A.   There was no liaison to that group.  To the best of

my understanding, they would communicate from time to

time with Dr. Alise Reicin, who was the clinical

monitor for the VIGOR study.

Q.   All right.  And I think, as I wrote down, you

were a member of the medical/legal review board for

VIOXX; is that right?

A.   Up through the middle of 2002, that's correct.

Q.   And you were on the -- is it the worldwide

32

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

scientific review committee?

A.   The worldwide product circular review committee.  I was the legal representative to that committee.

Q.   All right.  And what time period was that?

A.   For VIOXX, from approximately 1998 and I believe through 2002, although I'm not certain about the end date.

Q.   Okay.  The labeling committee, you were on that, as well?

A.   That's the committee I just described.

Q.   All right.  Now, Ms. Lahner, was there any other member of the Merck VIOXX group, any other individual who was on all of those committees other than yourself?

MS. JONES:  At what point in time, Counselor?

MR. THOMPSON:  From 1999 to 2002.

THE WITNESS:  I don't know.  I can't recall.

BY MR. THOMPSON:

Q.   All right.  Now, with regard to the medical/legal review board for VIOXX, that was yourself and two physicians?

A.   That's correct.

Q.   Did the medical/legal review board meet as a group, or was it more often a circulation of information with a signoff between the three members?

33

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

A.   As a general rule, that's correct.

Q.   All right.  So if there are notations or there are corrections or drafts that take place and those proposed changes have to do more with, say, a medical or a business reason, that would be something that would be a change that would be recommended by one of the medical people?

MS. JONES:  Your Honor, I'm going to object at this time to the extent that he is asking specifically about changes that Ms. Lahner may have made, as it infringes upon the attorney/client privilege, and I'm going to instruct her not to answer to that extent.

If he is asking about changes that were made by a medical doctor, I don't have any objection to her answering the question, although I think that goes beyond the scope of this hearing.

MR. THOMPSON:  Your Honor, I don't know if you need or want colloquy on the objection.  Let me just ask another question.

THE COURT:  If you're going to withdraw the question, then we don't need anything.

MR. THOMPSON:  I'll withdraw that question.

BY MR. THOMPSON:

Q.   The medical/legal review board, did it review submissions that were going to be made to the FDA

35

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

How did the day-to-day paperwork move through that committee?

A.   We met at regularly scheduled meetings.

Q.   And who called the meetings?

A.   They were regularly scheduled.  There was a routine time that the medical/legal board met, and that was arranged through the U.S. Human Health division.  There's a group within the office of medical/legal responsible for scheduling those meetings.

Q.   Were minutes taken and kept of those meetings?

A.   Not to the best of my knowledge.

Q.   If a press release was to be approved, as you have said, the medical/legal review board would review and approve, say, a press release, would that wait until a regularly scheduled meeting or would that take place in real time?

A.   The medical/legal board did not review, as a general rule and to the best of my recollection, press releases.  There was a medical review and a legal review that was done, but that was done in a serial fashion, not in a regularly scheduled meeting.

Q.   All right.  When you say there was a medical review and a legal review, what I'm hearing is that you would review in your capacity as a lawyer, but you would not review it as a group?

34

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

regarding direct-to-consumer advertising?

A.   The medical/legal board would review promotional pieces, including direct-to-consumer advertising that were proposed.  And the medical/legal board did review the drafts of those materials that were submitted to FDA for preclearance, and I would have provided legal advice on them.

Q.   Okay.  Now, with regard to, if I call it marketing copy are we talking about the same thing, direct-to-consumer, direct-to-prescriber information with regard to VIOXX?

A.   I'm sorry.  I didn't follow the question.

MS. JONES:  Objection, Your Honor.  I just don't understand.

MR. THOMPSON:  All right.  I'll ask it differently.

BY MR. THOMPSON:

Q.   Did the medical/legal review board review marketing copy that was going to be used to promote VIOXX?

A.   The medical/legal board would review detail pieces, journal advertisements, and we would review the piece in its entirety, which would include the statements which could be some -- referred to by some people as copy that were proposed by the marketing area.

36

## Page 37

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

Q.   All right.  And this may or may not be

submitted to the FDA for preclearance; is that right?

A.   We submitted for preclearance certain categories of

promotion, but not all categories of promotion.

Q.   For example, with regard to press releases,

those would not be routinely submitted for

preclearance, those would be submitted after the fact

on a DD 2253, right?

A.   Well, again, press releases are not reviewed in

medical/legal board, okay?  But as a routine matter,

press releases were not precleared with FDA, although

there are times when they are precleared with FDA.  But

as a general rule they were not.

Q.   Now, with regard to the office of

medical/legal, I believe Miss Ellen Westrick was the

director of that office from about, I guess, 1999

through around June of 2000, or maybe even earlier than

1999.

Do you recall the day that she became the

director and the approximate time she left?

A.   I do not recall the date on which Ms. Westrick

became the executive director for the office of

medical/legal.  I do know that she was in that position

at the time VIOXX was approved.  And my recollection is

that she was in that capacity through some time in the

## Page 38

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

summer of 2001.

Q.   All right.  With regard to the office of

medical/legal, do you know Miss Westrick's background?

MS. JONES:  Objection, Your Honor.  I think

this clearly goes beyond the scope of this hearing,

which is to explore Ms. Lahner's role as opposed to

that of other employees in this case.

THE COURT:  Counsel, is there --

MR. THOMPSON:  Yes, Your Honor.  What I need

to set out and what I intend to set out is that Ms.

Lahner provided the legal expertise for the office of

medical/legal, because Miss Westrick and her successor,

Mr. Casola, have no background in law at all.  And that

at both of their depositions they defer to the

medical/legal review board as the author of

communications to the FDA.  And that's where I'm going.

MS. JONES:  Well, Your Honor, with all due

respect, Ms. Lahner has testified she is counsel to the

medical/legal board and provided legal council.

THE COURT:  I think you said the medical/legal

board was one lawyer and two physicians, correct?

THE WITNESS:  That's correct.

THE COURT:  And the two individuals that's he

talked about were physicians?

THE WITNESS:  No.

## Page 39

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

THE COURT:  So who were the physicians that

were on the medical/legal board?

THE WITNESS:  At the time of launch, that

would have been Brian Daniels and Sean Harper.

THE COURT:  And at the time of the VIGOR to

label change, it would have been?

THE WITNESS:  I believe Bob Silverman, but I'm

not certain.  And I can't recall who else may have been

the other physician.

THE COURT:  All right.  As far as counsel's

assumption, it is correct that none of these people had

legal training?

THE WITNESS:  I don't know the answer to that

question, but I was the person providing legal advice

to the company with respect to VIOXX.

THE COURT:  So none of those individuals that

he mentioned or any of the other people on the medical

review committee -- medical/legal review committee were

involved in any legal advice.  That wasn't their role.

THE WITNESS:  I would say that it was my

function to provide legal advice, and that I'm not

aware that anyone else believed that they were acting

in a capacity to provide legal advice.

THE COURT:  Okay.  You can proceed.

BY MR. THOMPSON:

## Page 40

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

Q.   And it is my fault.  I had created the -- I

was not being clear enough.

The office of medical/legal is the arm of

Merck that communicates with DDMAC at the FDA; is that

right?

A.   That's correct.

Q.   The director of the office of medical/legal

until 2001 was Miss Westrick, correct?

A.   The executive director of that office, yes.

Q.   And her successor was Mr. -- I'm going to just

call it Casola?

A.   That's correct.

Q.   Now, neither Miss Westrick nor Mr. Casola are

attorneys, correct?

A.   That's my understanding.

Q.   And both of them come from -- although

Mr. Casola comes from a marketing background and Miss

Westrick comes from a marketing and a scientific

background; isn't that right?

MS. JONES:  Your Honor, with all due respect,

I object to this line of questioning as going beyond

the scope of this hearing, and really getting more into

what we would expect to see in the course of a

deposition, not relative to Ms. Lahner's role.

THE COURT:  Well, he is talking about the

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

roles of different people.  I'll allow it for a little

bit longer.

MR. THOMPSON:  It will only be a little bit

longer, Your Honor.

BY MR. THOMPSON:

Q.  What I'm leading up to is that in

communications by letter from the medical/legal -- the

office of medical/legal to the FDA, the director of the

office of medical/legal would look to you to author

those letters; isn't that right?

MS. JONES:  Your Honor, I'm going to object.

I'm not sure that I understand Mr. Thompson's question,

but to the extent that --

THE COURT:  Well, I don't know if you can

answer what other people looked to you to do, but I

thought your testimony to me was that as far as

communications with the FDA and communications or

documents related to VIOXX, that you reviewed them but

you didn't prepare them.

Did you, in fact, prepare correspondence to

DDMAC as opposed to reviewing it?

THE WITNESS:  There were times when I would

draft letters to FDA.  When we were speaking earlier, I

had understood your question to mean the promotional

pieces that were going to FDA.  I did not understand

41

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

the question to be focused on letters.

THE COURT:  Okay.

THE WITNESS:  But I did -- there were times

when I would review letters that would be prepared by

someone else, and I would provide legal review.  There

were times when the nature of the legal issues raised

by the communication, I was asked by the client to

provide a first draft, and I did so.

THE COURT:  Would your signature be on those?

THE WITNESS:  No.  They were always by the

designated person who is the designated communicator

with DDMAC.

THE COURT:  So it would have either been

Westrick or Casola?

THE WITNESS:  Yes.

THE COURT:  At times they would have actually

signed letters that would have been actually written by

you?

THE WITNESS:  That would have been in the

first instance drafted by me, yes.

THE COURT:  Okay.  If you have additional

questions on that, go ahead.

MR. THOMPSON:  Your Honor, if I can just ask

Miss Lahner...

BY MR. THOMPSON:

42

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

Q.  Are you familiar with the letter May 12th,

2000, from the office of medical/legal signed by Ellen

Westrick to DDMAC?  Do you recall that letter?

A.  Not as I sit here.

Q.  Okay.  Well, then let me strike that question.

MR. PLACITELLA:  I'll cover it later.

MR. THOMPSON:  Okay.

BY MR. THOMPSON:

Q.  Let me -- Ms. Lahner, I have got a couple of

documents that we have looked at.  There are a number

of documents that have been withheld on attorney/client

privilege, and there are a number of documents that

have been redacted based on attorney/client privilege.

I picked eight documents that are sort of illustrative

that I would like for us to look at together just very

briefly, to look at to illustrate and try to flush out

what your role would have been with regard to certain

concrete examples.

MR. THOMPSON:  That's what I would like to

propose to do now, Your Honor.

THE COURT:  These are eight documents which

were produced by the defense to the plaintiffs?

MR. THOMPSON:  Yes, Your Honor.  There were

342 documents, which on the privilege log were -- there

was a partial redaction based on an attorney/client

43

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

privilege.  And enough of the document was not redacted

that allows us to see the time and place, and to get

some insight into just how documents and how decisions

flowed on certain occasions.  And I would like to use

those to illustrate Miss Westrick's role and

responsibilities.

MR. PLACITELLA:  Lahner.

MR. THOMPSON:  Oh, Miss Lahner.  Sorry.

THE COURT:  Okay.  Counsel, it makes sense to

me.  What's your objection?

MS. JONES:  My objection is that if he is

going to ask about specific documents that it may, in

fact, infringe upon the attorney/client privilege.

THE COURT:  Well, let's wait and see what he

asks.

MR. THOMPSON:  May I approach, Your Honor?

THE COURT:  Yes.  They have been premarked?

MR. THOMPSON:  Yes, Your Honor.

BY MR. THOMPSON:

Q.  Ms. Lahner, let me hand you up Plaintiff's

Exhibit 1.

This is an e-mail chain that commences with an

e-mail and then has several responses.  The second

one from -- well, I don't want to go before you're

ready to go.

44

Transcript - Sealed Hearing (2006/09/15)

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

It looks as though there was an e-mail from
Mary Basaman on Friday, February 11, 2000, to Jeffrey
Melin, copies to Theresa Joanne Lahner.  And it says,
"For medical review.  Blurb from Physician's Weekly:
Deadline Monday.  Following is a blurb Physician's
Weekly plans to run in an upcoming edition.  Please
review and let me know ASAP if there's any medical
inaccuracies.  They'll go to press on Monday."  Do you
see that?

A.   I do.

Q.   And then it looks as though there is a
response to that e-mail from Joanne Lahner to Jeffrey
Melin, Mary Blake -- Mary Blake.  And I guess my
question to you is, this is the sort of e-mail that you
would respond to, an e-mail which asks for someone to
review and let me know if there are any medical
inaccuracies; is that right?

MS. JONES:  Your Honor, I'm going to allow Ms.
Lahner to answer that to the extent that she can answer
it without infringing upon the attorney/client
privilege that relates specifically to this document.
To the extent that to answer that question, if she can
tell at this point, it would be necessary to reveal
attorney/client privilege material, then I would
instruct her not to answer.

45

---

Transcript - Sealed Hearing (2006/09/15)

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

THE WITNESS:  And although I'm not certain
about the nature of the redaction, I believe I cannot
answer that question without revealing the advice.

MR. WEISS:  Your Honor, with all due respect,
what privilege could there be?  It is not asking for
legal advice.

THE COURT:  Well, the question that was asked
I don't think necessarily calls for you to respond as
to exactly what -- I mean, do you even remember what
advice you gave today?

THE WITNESS:  I do not recall the advice, but
I have a belief about the advice based on the
recipients of the e-mail.

THE COURT:  Okay.  Who are the recipients?

THE WITNESS:  That I sent it to, Jeffrey
Melin, Mary Elizabeth Blake, Theresa Chope and Diane
Frangiose.

THE COURT:  And who was Mary Elizabeth --
that's you, right?  Who is Mary Elizabeth Blake?

THE WITNESS:  She was in public affairs.

THE COURT:  Who was Jeffrey Melin?

THE WITNESS:  He was a physician in U.S. Human
Health.

THE COURT:  Okay.  In here, the question is,
let me know if there are any medical inaccuracies.

46

---

Transcript - Sealed Hearing (2006/09/15)

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

They did c.c. you.  Would you have considered it part
of your role at that point in time to identify any
medical inaccuracies?

THE WITNESS:  No.  And I don't believe that's
the nature of the response that I made to this.

THE COURT:  Okay.  We're looking at what's
been marked as P-2?

BY MR. THOMPSON:

Q.   Let me hand you Plaintiff's Exhibit 2.

Now, Ms. Lahner, I'll ask you to take my word
for it that the privilege log which recites the partial
redaction describes the redaction as, "Draft
presentation reflecting legal advice and opinions
regarding the management of rheumatoid arthritis in
adults and gastrointestinal outcomes."

If we go through this document and we look,
there are a number of privilege redactions.  The
document itself, as I look at it, is entirely a
document devoted to scientific and clinical analysis,
do you see that?

Let me ask it this way.  Do you agree with the
nature of the document?

A.   I don't recall the document as I sit here.  I can
see that it is a presentation of clinical and
scientific data that appears to be related to the

47

---

Transcript - Sealed Hearing (2006/09/15)

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

labeling for VIOXX.  And to the extent that my comments
appear there, that would be the reason why I would have
reviewed it.

Q.   All right.  You don't recall the use to be
made of this presentation?

A.   Not sitting here today, I don't recall.

Q.   All right.  And you're saying that that -- in
your capacity -- well, in what capacity would you
review this document and, I guess, make fairly
extensive notes on scientific clinical analysis?

A.   I don't recall the document.  I don't agree with
your characterization of the document as one that calls
solely for scientific clinical analysis.  I do believe
that this is the type of document that could be
reviewed in the medical/legal board in which I would
provide legal advice in that capacity.

Q.   And the legal advice would -- I guess my
question would be, what legal advice would they receive
in the context of a scientific presentation?

MS. JONES:  Your Honor --

THE COURT:  Not specifically what legal advice
you gave, but what type of legal advice would be -- can
you give us some kind of general area without
compromising attorney/client privilege as to the type
of legal advice that might be generated with this type

48

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

of document?

THE WITNESS:  My --

THE COURT:  What you would be looking for generally?

THE WITNESS:  My client is in the science business, and they are extensively regulated by the Food and Drug Administration.  And there's a core set of regulations, but they are only the very beginning of the regulatory structure and environment in which we operate.  There's extensive commentary that the agency has provided over decades in guidance documents, in informal letters, in speeches, that directs a pharmaceutical company how they can talk about their products in many, many contexts.

And as a regulatory attorney for Merck and for VIOXX, in particular, it was my job to distill that complex regulatory structure down to precise scientific information my client wanted to present in various forms.

BY MR. THOMPSON:

Q.  Now, do you agree with me that the redactions in this document don't just -- and I'm assuming that you would have made handwritten notes here?

MS. JONES:  I'm sorry, I just didn't understand.

49

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

document, the title of it is "Gastrointestinal Safety Profile for VIOXX."  And if you note, there are several privilege redactions in this document on the face of the document.  And then as we get into it later at Page 14, there are some redactions within the body of the document itself.  And then again at Page 17.

Now, with regard to -- I don't want to rush, but my question is actually very limited because I'm not asking you about the content of the statement, simply the procedure that was used by you and your office and by Merck.  How would this document come to you or a document such as this?  How would it come to you or a document such as this?  How would it come to you or a document such as this?

A.  I have no recollection of this particular document, and, so, I can't tell.

Q.  Let me withdraw that.

On a routine basis, if there is a document, a multipage document that looks to make some comparisons with or to discuss the gastrointestinal safety profile for VIOXX, would that document be forwarded to you by office of medical/legal or by the marketing people or just how would the document come into your office for comment?

A.  It depends on the nature of the document.  This appears to be training material for field

51

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

BY MR. THOMPSON:

Q.  I'm assuming that what you did would be similar to the inadvertent document, that is that you had made handwritten notes; is that right?

A.  I have no recollection of the document, but I can say it was my practice to make handwritten notes.

Q.  Is there any production of a document like this with the text without your handwritten notes on top of it?  I mean, is there any way that we can compare what the draft was with what the end result would be?

A.  I have no way of determining that, but I do know that Merck has produced millions and millions of pages of documents to the plaintiffs.

Q.  And, of course, as counsel you know that Merck has withheld 4,900 documents on attorney/client privilege basis.

MS. JONES:  Your Honor, I do believe that this goes beyond the scope.

MR. THOMPSON:  Well, we were having a colloquy.  Let me move along here.

BY MR. THOMPSON:

Q.  Miss Lahner, let me hand you Plaintiff's Exhibit Number 3.

Now, Ms. Lahner, I've handed you a multipage

50

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

representatives, although I don't, as I said, have a distinct recollection of this.  So information like this could come in from the medical services group in U.S. Human Health, or from sales training.  And depending on the source of the document, would depend on whether it came to me in a serial fashion, then I reviewed it separately in my office, or whether it went into medical/legal board.

Q.  I'm sorry?

A.  Or whether it went into medical/legal board.

Q.  Okay.  All right.  Now, you certainly don't have a medical background, so you're not reviewing it for the factual nature of it or the accuracy of the science, or are you?

A.  I am reviewing this in my capacity as a lawyer for the company.  But in that capacity, part of what I'm doing is, in a piece like this, assessing whether the statements that can be made in here are consistent with the labeling for the products that are being described.  And that would include, for the NSAIDs, three of which were at that time manufactured by Merck.

Q.  Okay.  All right.  And your comments would be handwritten and then the document would go where?

A.  Again, I have to emphasize, I don't recall the document.

52

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

Q.   On a routine basis, a document like this.

A.   On a routine basis, I would say that my -- I would hand write on them, that was my practice.  Lawyers at Merck generally make their comments in red ink so it is very clear to the clients which comments are coming from a lawyer.  Those comments then would go back to whoever sent the document to me for review.  And depending on whether there were other reviews occurring at the same time or whether I was the only reviewer, I may see multiple versions of a particular document.

THE COURT:  You wrote your comments in red ink?

THE WITNESS:  That was my practice.  And it is the practice at Merck that lawyers write in red ink.

THE COURT:  Are they the only ones that write in red ink?

THE WITNESS:  Yes, by practice.  I can't say that no one ever else picks up a pen, but it is the practice in the U.S. Human Health division and in Merck Research Laboratories division that lawyers provide comments in red ink.

THE COURT:  So if we saw C-1 in its original form, the ones you have written would be in red ink?

THE WITNESS:  Most likely, because most of the time I wrote in red ink unless I didn't have a red pen

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

Q.   I'm taking this there's no claim of privilege there, that's somebody else's mark on that?

A.   I can't say for certain, but it was not my practice to make deletions in that way.

Q.   Now, this is -- I think this is actually a display board?

A.   I don't recall.

Q.   Would something that was going to be used at a conference, would that be presubmitted or would there be an effort to preapprove that with DDMAC?

A.   I can't answer that question generally, and I don't have a specific recollection of whether we precleared this.

Q.   All right.  Let me hand you Plaintiff's Exhibit 5, and I promise it is not nearly as formidable as the number of pages that are on it.

Ms. Lahner, my first question is going to be, do you recognize whose handwriting that is on the first page of the Plaintiff's Exhibit 5?

A.   Yes.

Q.   And who is that?

A.   That's my handwriting.

Q.   So this is your handwriting that's actually on -- underneath the privilege redaction?

MS. JONES:  Your Honor, at this point in time,

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

available.  But it was my practice to do that, and it was the expectation of the clients that legal advice would be written in red ink.

BY MR. THOMPSON:

Q.   All right.  Let me hand you Plaintiff's Exhibit 4, just very briefly.

Ms. Lahner, this -- it appears as though this is a -- well, it is labeled Advertisement for Conference Program, do you see that?

A.   Yes.

Q.   And there is a little note here on the front, it says, "Privilege Redaction."  And here, again, you're going to just need to make my word for it.  The privilege log does reflect that this was a legal advice by you, but how would an advertisement such as this, how would this come into your purview?  How would you come to look at this?

A.   I don't recall this particular document, but I do recall this program speaking of pain, and I don't remember whether it came to me in medical/legal board or through serial review.

Q.   All right.  Now, there is some scratching on it.  If you look it says, Or call the American society, do you see that on the first page?

A.   Yes.

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

having just seeing this, I'm going to assert the attorney/client privilege to this particular document as one that appears to have been inadvertently admitted without appropriate redactions made on what's been marked as P-5.

MR. THOMPSON:  It's P-5, Your Honor.

MS. JONES:  And I want the witness not to answer any questions with respect to --

MR. THOMPSON:  Your Honor, I'm a little bit at a loss here.  This was regularly produced to us in the course of production.  It was languaged in the database for years, and we're prepared and we wish to ask questions about it.  It is quite an intriguing document.

MS. JONES:  Well, Your Honor, at this point in time, I assert the attorney/client privilege and instruct the witness not to answer any questions with respect to that, other than with respect to answering questions that Your Honor might pose in camera.

MR. WEISS:  Your Honor --

MS. JONES:  We would ask for return of the document at this point in time.

THE COURT:  The document you're only asking for the return of Page 1, right?  You're asking for a redaction of her handwritten notes?  You're not asking

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

for return of the document, but for the redaction of

the handwritten comments by counsel?

MS. JONES:  I would ask for anything that was

inappropriately not redacted to be returned.

MR. WEISS:  Your Honor, we do have an

agreement that there's no waiver -- no inadvertent

waiver to privilege in this hearing.  We had that at

the beginning, and so there's no need to keep raising

that objection.

THE COURT:  Well, this is different.  This is

counsel notifying us that this particular -- that they

never objected to this, but they now are.

MR. WEISS:  We understand that.

THE COURT:  Okay.  All right.  Well, ask your

question and let's see what your question is.

MR. THOMPSON:  All right.

THE COURT:  We'll determine whether you can

answer it or not.

BY MR. THOMPSON:

Q.  Okay.  My question will be, would you review

proposed PowerPoint presentations for content -- or

strike that.

For what reason would you review a proposed

PowerPoint presentation that was to be given to the RMD

HSA specialty representatives teleconference on April

57

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

that someone has specifically sought Ms. Lahner's

advice on this particular document, that is privileged

communication and I would instruct her not to answer

that.

MR. WEISS:  Your Honor, I don't believe that's

privileged at all.  The advice would be privileged, but

we would like to know who sought the advice.

THE COURT:  I'll allow the question.

Do you know who sent you this document for

review or no?

THE WITNESS:  I don't know.

MR. THOMPSON:  Your Honor, I would like to

make a record of specific questions, knowing in advance

that Ms. Jones is going to object to them, I don't want

to belabor the Court's attention, but I feel as though

I would like for these to be of record.

THE COURT:  All right.  Put them on the record

then.  You may even be able to ask them.

MR. PLACITELLA:  Can I just understand the

procedure so I can streamline my questions?  Is it

within the purview of counsel to decide what questions

the witness is going to answer or not answer, or is

that the Court's determination?  Because I hear counsel

saying I direct the witness not to answer the

questions.  I thought the procedure was that the Court

59

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

17th, 2000?

MS. JONES:  Your Honor, I don't have any

objection to Ms. Lahner answering in general for what

purpose she might prepare PowerPoints such as this.  I

do object to any questions relating to a specific

advice relating to Plaintiff's Exhibit 5 on the basis

of attorney/client privilege, and instruct her not to

answer.

THE COURT:  The objection is sustained at this

time as to that.  He is asking her, I think a more

general question as to what her role would be in a

PowerPoint such as this.

BY MR. THOMPSON:

Q.  Could you answer that question?  That question

is this one I'm trying to ask.

A.  In general, without regard to this particular

document, I, in my role as a regulatory lawyer for

VIOXX, would review presentations to be made to the

field sales organization to insure compliance with the

rules that govern how representatives are permitted to

promote a prescription medicine in the United States.

Q.  All right.  And you don't have a recollection

of who forwarded this to you for review, or do you?

MS. JONES:  Your Honor, again, I object on the

basis of the attorney/client privilege.  To the extent

58

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

was going to make that determination.  And I just want

to understand the procedure so I can streamline what

I'm going to ask.

MS. JONES:  Your Honor, with all due respect,

I'm not trying to unduly delay this or prolong this,

but having looked at the cases, I do believe that I

have an obligation to instruct the witness not to

answer and to request that Your Honor take up such

matters in camera if, in fact, they intend to pursue

certain questions.  That's the reason for my objections

that have been stated thus far.

THE COURT:  It is counsel's position, and has

been, that if the witness is going to be asked

specifically about a document that's in her hand or a

portion that's in her handwriting, where there's been a

claim of privilege, which as of now there is in P-5 as

to this one paragraph, that questions about that should

be addressed by the Court in camera as opposed to by

plaintiff's counsel.

I think specific questions about the nature of

what is said should, in fact, be done in camera.

General questions about what her role was in producing

this type of document, the question so far -- again, I

have to say we'll rule on a question-by-question basis.

So ask your questions, put them on the record, and it

60

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

may be that she'll answer them.

BY MR. THOMPSON:

Q.   Ms. Lahner, let me direct your attention to the third page, which is the last three numbers of the Bates stamp marker 135.  Now, that handwriting doesn't look like your handwriting.

A.   And I don't believe it is my handwriting.

Q.   All right.  Let's look at that together.  It says, "Excluding platelet aggregation in CV events sections does not want us to make comparisons or linkage between the studies, does not want any links of our Phase III" -- I wish I hadn't started reading now -- "but with CLASS did not delineate first degree, second degree end points," do you see that?

A.   I do, and I take the position that I can't answer any questions with respect to this without violating the attorney/client privilege.

Q.   All right.  So what I'm hearing is that it sounds like somebody may or may not have written down some advice that they may or may not have gotten, and you're asserting a privilege.  Is that what I'm hearing?

MS. JONES:  I'm going to instruct the witness not to answer on the basis of the attorney/client privilege.

61

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

MR. THOMPSON:  All right.

MR. BUTSWINKAS:  And, Your Honor, we incorporate this into the request to have this document back.

THE COURT:  She said it is not her handwriting.

MR. BUTSWINKAS:  But it appears to be advice that someone got and wrote down that may, in fact, be legal advice which would still be privileged.

MR. THOMPSON:  All right.  Judge, may I continue or are we --

THE COURT:  Well, we don't know whether it is privileged or not, because we don't know who they're talking about.  What we do know is that it is not the only lawyer that's involved that put the note on there, so I don't see, at this point, I have any evidence that what is on the third page of this document P-5 is subject to attorney/client privilege, unless she is going to tell me that that was her advice to them, which she is not going to do, because you don't want her to.

MS. JONES:  Your Honor, with all due respect, I think that's a matter that's better taken up in camera.  The witness has suggested that she cannot answer that question without intruding upon the

62

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

attorney/client privilege, so, therefore, I instruct her not to answer that.

THE COURT:  I am not going to make her answer at this point.

MR. THOMPSON:  Just a few follow-ups quick.

BY MR. THOMPSON:

Q.   Ms. Lahner, it looks as though, if I go through page-by-page, there are some annotations that look like approvals of each individual or some slides, do you see that?

A.   Can you direct me to a page?

Q.   Let's look at random at, say, 140.  Checkmark it says, Check approve for VIGOR.

A.   I see that.

Q.   And is that also your input on the document?

A.   I don't think so.

THE COURT:  Is that your handwriting?

THE WITNESS:  No.

BY MR. THOMPSON:

Q.   Okay.  All right.  Who would approve -- who would check it and say approve for VIGOR, if you know?  Do you recognize the handwriting?

MS. JONES:  I do believe that goes beyond the scope of Ms. Lahner's role.

THE COURT:  I'll allow it.  If she knows, she

63

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

knows, she can tell us.  If she doesn't...

THE WITNESS:  I don't recall who wrote that.  I don't recognize the handwriting.  I do know it was the practice of my clients when submitting material to me for review to indicate whether I had previously reviewed and previously approved a particular slide or a particular type of communication.

BY MR. THOMPSON:

Q.   All right.  Now, there's some that actually have an "X" mark on them.  Let's take, for example, 142.  It looks like it has been X'd out.  Can you recognize who may have made that notation on this document?

MS. JONES:  And, Your Honor, since I have not seen this document before, and clearly some of it was un -- was not properly redacted, I instruct the witness not to answer to the extent that it would intrude upon the attorney/client privilege.

MR. WEISS:  Your Honor, there's no -- how could you assert a privilege?

THE COURT:  Let me just ask it.  Did you make the X on this?

THE WITNESS:  I believe that's my handwriting, my mark.

THE COURT:  You believe the X's are your mark?

64

Transcript - Sealed Hearing (2006/09/15)

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

THE WITNESS:  Yes.

BY MR. THOMPSON:

Q.   So let's go to one last question at 169.  As a matter of fact, it is the page that I put the little yellow sticky on.

MS. JONES:  Your Honor, for the record, I instruct the witness not to answer on the grounds of this document was clearly inadvertently produced without appropriate redactions having been made that are subject to the attorney/client privilege, and, therefore, any further questioning whatsoever with respect to this document should first be taken up by the Court in chambers to determine whether or not the document and the unredacted portions are, in fact, privileged.

THE COURT:  Put your question on the record and see what your question is.

BY MR. THOMPSON:

Q.   Ms. Lahner, does this page, page 169, look at this, is it fair to say that as of April 17th, 2000, the presenters from within Merck were prepared to make a presentation that there were two alternative implications of the platelet aggregation, one, that the NSAIDs could inhibit thromboxane and platelet aggregation, and the other that COX-2 specific

65

---

Transcript - Sealed Hearing (2006/09/15)

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

inhibitors could theoretically cause an imbalance in the platelet aggregation through inhibition of prostacyclin, without inhibition of thromboxane, this imbalance could potentiated thrombotic events?

THE COURT:  That question is not appropriate for this hearing.  That would be appropriate at a deposition if, in fact, I allow a deposition to be taken.

MR. THOMPSON:  Your Honor, I have several more documents, but let me pass to -- since I know that you had put a time limit on this, and I know that Mr. Placitella is prepared to argue certain aspects of the clawback document, I think in the interest of allowing him his opportunity, I ought to yield at this time.

THE COURT:  Okay.

MR. WEISS:  I would just like to make a record.  I think at this point, we hope the Court would entertain a process by which we can review these 342 documents that were partially redacted.  Not today, obviously, but there should be some process, because we believe that they have been overly broad and some of the claims cannot hold up when they're put under scrutiny.  So I just throw it out, Your Honor, that we would like to have some process in place --

66

---

Transcript - Sealed Hearing (2006/09/15)

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

THE COURT:  Which 342?

MR. WEISS:  There are 342 documents which were partially redacted based upon Miss Lahner having attorney/client privilege with the client.  These are either documents that she authored, received or mentioned had a copy of.  Of the 4,000 documents that were withheld, there's 3,600 withheld entirely that either Miss Lahner or Mrs. Lahner, received -- I apologize.

THE COURT:  You should just use Ms., Counselor.  It works better.  I think he would know that by 2006.

Mr. Weiss:  Either received or had a copy of it.

MS. JONES:  Not in Mississippi, Your Honor.

MR. WEISS:  So we just want to bring it to the Court's attention that we do want to pursue this at some later point in time to get a process.

THE COURT:  Well, I think that it is an issue that may be appropriate to address and, certainly, it appears to be one that's been presented, but it is not for purposes of this hearing here.

MS. JONES:  I would agree, and I think that Mr. Cohen would be willing to work with the Court to see that that's evaluated and appropriate.

67

---

Transcript - Sealed Hearing (2006/09/15)

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

THE COURT:  All right.  Let's take a short break.  How long are you going to be?

MR. PLACITELLA:  About an hour.

THE COURT:  An hour?  All right.  Let's break.

MR. PLACITELLA:  That would depend on how many times Miss Jones gets up.  If she doesn't get up a lot, an hour.  If she gets up a lot, we might eat lunch and come back.

MS. JONES:  Well, that depends upon how proper Mr. Placitella is in his questions.

MR. PLACITELLA:  I'll try to be appropriate. I don't know about proper.

THE COURT:  We'll take a break for an hour. You know what, let's take basically a 35-minute break and come back at 12:30.  We don't have the "you can't talk to your witness rule" here, so you can talk to your lawyer.

THE WITNESS:  Thank you.

(Break taken.)

68

**Transcript - Sealed Hearing (2006/09/15)**

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

A F T E R N O O N   S E S S I O N.

(Exhibits P-11 to P-42 premarked for

identification.)

THE COURT:  All right.  Are you ready,

Counselor?

MR. BUCHANAN:  Yes, Your Honor.

MR. PLACITELLA:  Your Honor, in order to move

things along, I tried to put some things on overheads,

and I don't know if it would be easier for the witness,

I don't know what Your Honor's preference is.

THE COURT:  She can turn there, I think.

MR. PLACITELLA:  Or she can sit in the

first -- either way.

THE COURT:  Can you see from there?

THE WITNESS:  I would rather have the

document, if I could.

MR. PLACITELLA:  You'll get that, too.

THE WITNESS:  Okay.

THE COURT:  If you wish to, you can turn.

You'll also be given the document.

Sharon, put the lights down.

MR. PLACITELLA:  It will probably show, Your

Honor.

THE COURT:  Go ahead, keep going.

EXAMINATION BY MR. PLACITELLA:

---

**Transcript - Sealed Hearing (2006/09/15)**

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

presented data.

Q.  Well, you were also present at meetings when

outside consultants, scientific consultants to Merck,

made presentations about VIOXX, weren't you?

A.  I recall I was in attendance at one meeting where

outside consultants made a presentation in my capacity

as the regulatory lawyer for VIOXX.

Q.  So the answer to my question is yes?

A.  No.  I can recall a single meeting at which I was

present as the regulatory lawyer for VIOXX.

Q.  You were present when outside marketing

consultants consulted with Merck about VIOXX, weren't

you?

A.  I don't recall that.

Q.  You were present when outside public relations

people met with people from Merck, weren't you?

A.  I can recall a single meeting that I attended with

an outside public affairs consultant, which I attended

in my capacity as the regulatory lawyer for VIOXX.

Q.  You --

THE COURT:  Is that the same single meeting

you were talking about before?

THE WITNESS:  No, a different meeting.

BY MR. PLACITELLA:

Q.  You were a member of the VIOXX SWAT team,

---

**Transcript - Sealed Hearing (2006/09/15)**

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

Q.  Good afternoon, Ms. Lahner.  I won't get to

the technological issues for a while.

You were present when the results of the VIGOR

study were first disclosed to Merck marketing

executives, correct?

A.  I don't believe so.

Q.  You don't believe so?

A.  I don't believe so.

Q.  Were you present when the VIGOR results were

presented to the Merck executives?

A.  I was in attendance as the regulatory lawyer for

VIOXX at a meeting where the results were discussed

before they were made public, but I don't know whether

that was the first time those individuals in attendance

saw the data.

Q.  Well, you were present many times where Merck

scientists made presentations concerning VIOXX and its

potential health effects, correct?

A.  I was present as the regulatory lawyer for VIOXX in

numerous meetings where the data were presented by

Merck scientists.

Q.  So is the answer to my question yes?

A.  The answer to the question is as I stated it.  I

was present at numerous meetings in my capacity as the

regulatory lawyer for VIOXX where Merck scientists

---

**Transcript - Sealed Hearing (2006/09/15)**

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

weren't you?

A.  I was the regulatory lawyer that was assigned to

work on that team.

Q.  And what was the function of a VIOXX SWAT team

when you served on it?

A.  My function on that team was to provide regulatory

advice to the clients in preparing -- regulatory legal

advice to the clients in preparing responses, public

responses, to issues that were arising in the media, I

believe.

MR. PLACITELLA:  Could you read my question

back see and see if I can get an answer to my question.

(Whereupon, the court reporter read back the

requested portion of the proceedings.)

THE WITNESS:  I thought I answered that

question.

THE COURT:  You were discussing your role, but

he wants to know what the function of the team was.

THE WITNESS:  The function of the team, as I

understood it, was to provide prompt responses to

issues arising in the media, primarily.  And that I

provided legal advice to that group.

BY MR. PLACITELLA:

Q.  Why did you call it the SWAT team?

A.  I did not call it the SWAT team.

Transcript - Sealed Hearing (2006/09/15)

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

Q.   Did you ever object to it being called the SWAT team?

MS. JONES:  Your Honor, I'm going to object.

MR. PLACITELLA:  I'll move on.

THE COURT:  The question is withdrawn.

BY MR. PLACITELLA:

Q.   When you reviewed material, press releases, you determined whether or not those press releases were going to be sent to the FDA, didn't you?  You were the final word on that issue for preapproval.

Do you understand my question?

A.   No, I don't.

Q.   I'll rephrase it.

In whatever capacity you have at Merck, you made the determination whether press releases were going to be submitted to the FDA for preapproval before they were issued to the public.  That was your job, right?

MS. JONES:  I'll allow the witness to answer to the extent it doesn't infringe on the attorney/client privilege in a generic discussion of press releases.

THE WITNESS:  Okay.  The only role I ever had at Merck was as a lawyer.  In that capacity, I would provide legal advice as to whether a particular press

73

Transcript - Sealed Hearing (2006/09/15)

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

release should be precleared with FDA as being -- as whether it would either be anticipated by the agency that they would want to preclear it or consistent with Merck policy that we would seek preclearance.

BY MR. PLACITELLA:

Q.   You were the ultimate person who decided whether a press release was given to the FDA, yes or no?

A.   I can't answer that question yes or no.

Q.   Okay.  Let me move on.

You, when you served on the medical/legal review board, the doctors on that board that served with you, were they conducting scientific studies while they were on that board as part of the function on that board?

A.   Some of the physicians were involved with clinical studies, but that was not as in their role as members of the medical/legal review board.

Q.   Yes.  And they weren't giving medical advice, they weren't telling people take this antibiotic to get rid of this infection, right, as they sat on the medical/legal review board?

A.   I understood them to be providing medical advice to the marketing organization about the appropriateness of promotion.

74

Transcript - Sealed Hearing (2006/09/15)

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

Q.   Okay.

A.   I understand that they weren't providing patient level advice in that setting.

Q.   And the job of the medical/legal review board as a whole was to insure that the materials that were disseminated were true and fairly balanced, correct, that was part of the job?

A.   That was part of the job as defined -- true and fairly balanced as defined by the regulatory scheme in which we operated.

Q.   So the answer is yes?

A.   The answer is as I stated it.

Q.   And if the information in the materials was untrue, or critical information was intentionally left out, by definition, it would be fraudulent under the FDA guidelines, correct?

MS. JONES:  Your Honor, I object to this as going beyond the scope of this hearing, which is to determine Ms. Lahner's role, and an appropriate question in this proceeding.

THE COURT:  Counsel?

MR. PLACITELLA:  I'll stand by whatever ruling you think is appropriate, Your Honor.  I think the question stands.  It is in her role in the medical/legal review board.

75

Transcript - Sealed Hearing (2006/09/15)

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

THE COURT:  It is basically asking her for a legal decision as to whether something would be fraudulent under the FDA.  I'll sustain the objection.

BY MR. PLACITELLA:

Q.   Okay.  You also wrote letters, authored letters as Merck.  You acting as Merck accusing respected scientists of fraudulent misconduct, correct?

MS. JONES:  Your Honor, I'm going to object to this question.  I'm not sure where it is going, but to the extent that it infringes upon the attorney/client privilege on whether or not --

THE COURT:  Well, if she sent letters to outsiders, then that's not attorney/client privilege.

MR. PLACITELLA:  Right.

THE COURT:  So she can answer that question.

MS. JONES:  If she personally sent letters.

THE COURT:  If she sent letters that she signed, not letters that she reviewed for them, correct.

MR. PLACITELLA:  I didn't get to the ones where she wrote them and had somebody else sign them.  I'll do that later.

BY MR. PLACITELLA:

Q.   Right now I want to know whether you wrote letters accusing others of fraudulent misconduct as it

76

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

related to VIOXX and that you signed yourself.

A.   I don't recall.

Q.   Do you recall ever doing that with respect to
Pfizer, telling them that things they were saying about
VIOXX were fraudulent and misleading and violated the
FDA regulations, you personally?

MS. JONES:   You're asking questions as to
whether she personally signed a letter?

MR. PLACITELLA:   Yes.  Do you recall doing
that?

THE WITNESS:   I recall that I did send at
least one letter to an attorney who was the regulatory
counsel at either Searle or Pharmacia, I'm
not sure which corporate structure they were at that
time, regarding promotional activities related to
VIOXX.

BY MR. PLACITELLA:

Q.   And you told them that what they were doing
was fraudulent, right?

A.   I don't recall.

Q.   I'll just approach the witness and show her
P-22.

MR. WEISS:   Your Honor, premarked as Exhibit
P-22, Plaintiff's 22.

THE COURT:   Okay.  P-22 has been given to the

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

witness.

BY MR. PLACITELLA:

Q.   Did you sign this document, Ms. Lahner?

A.   Can I finish reading it?

Q.   I'm just asking you if you signed it.

THE COURT:   Give her a minute to read it.

MR. PLACITELLA:   Sure.

THE WITNESS:   I did.  That's my signature at
the end of the document.

BY MR. PLACITELLA:

Q.   And this document accused Searle, as it
related to the marketing of VIOXX, of violating federal
law, right?

MS. JONES:   Your Honor, I object.  The
document speaks for itself.  And questions regarding
the contents of this go beyond the scope of this
hearing with respect to Ms. Lahner's role at Merck, as
opposed to the details of specific events.

THE COURT:   I think that this is relevant to
her role.  I'll allow it.  Counselor, your language
about fraud I don't see in here.

MR. PLACITELLA:   It is the very first
paragraph, Your Honor.  "I am forwarding the following
information about activities of Searle and Pfizer
representatives that we contend violate federal law."

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

That's what I'm referring to.

BY MR. PLACITELLA:

Q.   You wrote that?

A.   That would be my recollection, that I did write
that.

Q.   And one of the people you were accusing was
Andrew Whelton of inappropriate conduct, and he was
somebody that Merck had actually hired on other
occasions, correct?

MS. JONES:   Your Honor, again, the document
speaks for itself.  The questions that Mr. Placitella
is posing, frankly, relate more to a deposition-type
question rather than Ms. Lahner's role --

THE COURT:   The letter, obviously, references
that doctor, Counsel.  You can move on.

MR. PLACITELLA:   The reason I say it, Your
Honor, is because you asked some general questions this
morning that we would hope that you got some more
information.  So I just want to bring some more things
up.

THE COURT:   Okay.  That's fine.  I said that
this is appropriate.  Going into the details of the
letter.

BY MR. PLACITELLA:

Q.   You're aware of the Nitromed project in your

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

role as counsel at Merck?

A.   The information I have related to that project, I
learned in the course of managing the litigation.

Q.   Well, that's not true, is it?

MS. JONES:   Your Honor, first of all, I object
to the argumentative --

MR. PLACITELLA:   Let's give her an opportunity
to change her answer before I ask her more questions.

THE COURT:   You can rephrase it slightly and
ask her are you sure that's correct.

BY MR. PLACITELLA:

Q.   Are you sure that that's correct?

A.   That's the best of my recollection at this time.

Q.   Okay.

A.   I don't have a recollection of knowing about that
before.

Q.   And that was a project that Merck was engaged
in to find a safer VIOXX, was it not?

MS. JONES:   Your Honor, I object to this, and
instruct the witness not to answer on the basis that it
intrudes upon the attorney/client relationship and work
product, in light of the fact that she has testified
that she learned about this in the course of
litigation.

MR. PLACITELLA:   I'll follow-up then.

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

THE COURT:  All right.  There's no question
pending then.

BY MR. PLACITELLA:

Q.  Did you ever review in your capacity, whatever
capacity you had, did you ever review slides concerning
the Nitromed project that were going to be used by
Nitromed on their road show about a safer VIOXX?

A.  I don't recall that.

MR. WEISS:  Well, Your Honor, we premarked
Exhibits 40 and 41.

MR. PLACITELLA:  I'm sorry, I didn't have
that.

MS. JONES:  Your Honor, may I be heard on
this?

THE COURT:  This is P-40 or 41?

MR. PLACITELLA:  We have to mark this one.
I'm sorry.

MR. WEISS:  P-42.

THE COURT:  What is your position, Counselor?

MS. JONES:  My position is Ms. Lahner has
testified that she was unaware of this except to the
extent that she learned it in the course of litigation.
This document is dated 2003, which I believe, Your
Honor will recall, Ms. Lahner testified that after 2002
she was heavily and exclusively involved in the

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

Q.  And eventually it made its way all the way up
to you?

MS. JONES:  Objection, Your Honor,
mischaracterizes the document.

THE COURT:  All right.  It is withdrawn.
What is Nitromed?

BY MR. PLACITELLA:

Q.  Why don't you tell the judge what Nitromed is.

THE COURT:  Is it something within the
company?

THE WITNESS:  No.  It was a --

THE COURT:  A product?

THE WITNESS:  No.  Nitromed is a company that
we had entered into a contract with, as I recall, a
developmental contract.

THE COURT:  Okay.  So Nitromed was an outside
developmental company?

THE WITNESS:  Yes.

BY MR. PLACITELLA:

Q.  Nitromed was an outside company that you
entered into a contract with for a minimum of
$350 million to develop a CV-safe VIOXX, right?

MS. JONES:  Your Honor, I object to this line
of questioning.  It is totally inappropriate at this
particular hearing, which is directed to Ms. Lahner's

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

litigation.

MR. PLACITELLA:  That's precisely why I'm
asking the question, because I don't think that's what
this document is about.  I think Ms. Lahner told you
she kind of stopped with her in-house stuff in VIOXX in
2002, but this -- if I can ask her a couple questions,
maybe we can decide what is going on.

THE COURT:  Go ahead.  I'll allow it.

BY MR. PLACITELLA:

Q.  This document at the top is dated what,
10/1/2003?

A.  That's correct.

Q.  And you are c.c.'d on this document, right?

A.  On the more current -- the more recent e-mails,
yes.

Q.  Right.  There's a whole string of e-mails?

A.  Yes.  The early ones I'm not.

Q.  And the title of it is "Review slides for
Nitromed road show," right?

A.  That's what it says here.

Q.  Okay.  And the very first e-mail in this
string originates with Nitromed, correct, somebody at
Nitromed?

A.  That's what I can determine based on reading the
document.

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

role as a lawyer at Merck, number one.

And, number two, I instruct her not to answer
any questions that would intrude upon the
attorney/client privilege in terms of the legal
relationships whatsoever with respect to this product.

MR. PLACITELLA:  Judge, I thought we heard
this morning that she had nothing to do with VIOXX
after 2002 except in litigation.  I thought that was
what Miss Jones just said.  That's not what this
document says.

THE COURT:  All right.  Well, again, I think
that there are questions that can be asked about this
document and what she was doing as far as whether her
role was as an attorney, what her role was, whether she
was reviewing this, and what role she played in whether
she was involved in the contract negotiations in a
general way.  But specifics such as you just asked,
such as isn't it true it was a $350 million contract, I
know the document talks about 350, but I think at this
point, the objection is sustained as to that question.
And let's hear what your next question is.

BY MR. PLACITELLA:

Q.  Were you involved in the review of slides that
originated from Nitromed concerning their marketing
project?  Isn't that what this says?

**Transcript - Sealed Hearing (2006/09/15)**

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

A.   I don't believe that's what this says, and I don't
recall reviewing the slides, although it is possible
that I would have -- my advice would have been sought
on any range of business issues that might impact the
litigation.

Q.   So you were reviewing information that
originated with companies outside of Merck to give
comments on what should be in the slides that they were
going to use.  Isn't that what this says?

MS. JONES:  Objection, that mischaracterizes
her testimony, Your Honor.

THE COURT:  Well, she just said that that's
not true, but let her answer it again.

THE WITNESS:  I would say no, because it is
clear that there's no document attached to the e-mail
when the form, when it reached my office.

MR. PLACITELLA:  Your Honor, not to belabor
things, but I'll let the document speak for itself in
terms of CV references, in terms of fear about Dr.
Topol and other issues, and I would ask the Court to
consider this document in making its final
determination.  And I will move on.

THE COURT:  Okay.

BY MR. PLACITELLA:

Q.   Now, as a -- in your capacity in the

---

**Transcript - Sealed Hearing (2006/09/15)**

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

the marketing materials?

THE WITNESS:  Merck is a scientific-based
company.  Prescription drugs come with an enormous
amount of data and labeling that governs how the
company is permitted to discuss those products.  And in
my capacity as the regulatory lawyer for VIOXX, it was
my responsibility to ensure I had an understanding of
the data, an understanding of the labeling, and then
the complex regulatory scheme that we operate in, the
FDA letters, the guidance documents, the speeches, and
to make changes in how information is presented in a
press release, in promotional material, in an attempt
to ensure that the company is compliant with FDA
expectations and the FDA regulatory scheme.

Some of those changes may appear as if they
are changed -- that the scientific information is
changed, but changes are being made and legal advice is
being given, because of the nature of the business the
company is engaged in.

MR. PLACITELLA:  Was the answer to the
question yes?

THE COURT:  It was a little bit longer than
that.

MR. PLACITELLA:  I'm just curious.

THE COURT:  Why don't you ask her again.

---

**Transcript - Sealed Hearing (2006/09/15)**

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

medical/legal review board, you made substantive
medical changes for medical information to press
releases that you reviewed, correct?

A.   I'm sorry, could you restate that question?

Q.   In your capacity on the medical/legal review
board, you made substantive changes that were not legal
in nature about the product VIOXX related to the
medical aspects of the product, correct?

MS. JONES:  Your Honor, I'm going to object
and instruct the witness not to answer the question.
Mr. Placitella has put on the screen a portion of the
press release which we have asked to be returned.  We
previously advised the Court that we believe that it is
appropriate, in light of the claims of privilege, that
the questions relating to the details of that press
release should be addressed in camera first by the
Court.

THE COURT:  All right.  Well, I will address
that in camera in a couple minutes, but the question
was more generic than this document, although he did
put the document up.

But did you, in fact, give scientific or
medical advise -- make medical -- make changes to
medical language or scientific language as opposed to
legal language in the -- some press releases or some of

---

**Transcript - Sealed Hearing (2006/09/15)**

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

BY MR. PLACITELLA:

Q.   Let me ask you this, and I don't know if I'm
permitted to.  This document -- we have all seen this
document.  It is not a secret.  5/18/2000, the draft
press release.  In this document you make a comment,
and the comment says, "Like aspirin is too strong.
Aspirin is irreversible.  Naproxen is not."  Those are
your words, correct?

MS. JONES:  Your Honor, I object to the
question on the basis that it invades the
attorney/client privilege relationship, and instruct
the witness specifically not to answer that question.
To the extent that we need to go into the details --

THE COURT:  I'll ask her some questions in
camera about the document.

Is there anything else that you want to ask?

MR. PLACITELLA:  Yes.

BY MR. PLACITELLA:

Q.   In subsequent reviews after 5/18/2000, in
documents that you approved to the FDA and for doctors
to see and patients to see, you, in fact, approved
language that said that VIOXX was like aspirin, true?

MS. JONES:  Objection, Your Honor.  I think he
is asking at this stage legal advice as opposed to her
role.

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

MR. PLACITELLA:  I'm asking -- here, Judge, she said that you can't use like aspirin.  And I'm asking her subsequent to this, did she approve, in her role, other documents that went to doctors and patients and the FDA that said like aspirin is okay.

That would be my proffer, Your Honor, if you want to ask the questions in the context of your chambers.  My proffer would be that after this draft press release was issued, there were subsequent times when Miss Lahner approved the very language, "like aspirin," for doctors, for patients and for submission to the FDA.  That would be my proffer, and I'll move on.

THE COURT:  Okay.

BY MR. PLACITELLA:

Q.   Did you ever make comments in press releases relating to study design and what was the appropriate study design?

THE COURT:  Do you have a particular document you're asking about?  Is this --

MR. PLACITELLA:  Same document.  I'm afraid to show it, because I don't want to get yelled at, so I haven't gone there.  So I'm asking the question.

THE COURT:  Okay.  I'll ask the question in camera.

89

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

MR. PLACITELLA:  This is the page I'm referring to, Your Honor.

BY MR. PLACITELLA:

Q.   After you reviewed press releases -- scratch that.

After you reviewed materials that were to be used with doctors and made substantive scientific commentary, your advice was distributed to people outside of Merck, true?

MS. JONES:  I'm going to object, Your Honor, that the question, in effect, assumes facts not in evidence.

THE COURT:  What advice are you talking about?  I think you have to be a little more specific.

MR. PLACITELLA:  Well, I'm trying to move it along, but --

MR. WEISS:  It is Exhibit P-32, Your Honor.  I have a copy for defense counsel.

MR. PLACITELLA:  I have put the document up overhead for help.

MS. JONES:  Your Honor, perhaps I misunderstood the question that was asked.  I thought that the question that was asked was whether or not she had communications with outside --

MR. PLACITELLA:  That's not what my question

90

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

was.

MS. JONES:  I'm asking Your Honor if we can repeat the question.

MR. PLACITELLA:  My question was, after you gave your advice on information that was being communicated to doctors, your advice was then communicated to people outside of Merck who were involved in the marketing to doctors, nonMerck employees, right?

MS. JONES:  Your Honor, just for the record --

THE COURT:  Well, in this particular instance, which is -- which document is this, P --

MR. WEISS:  32, Your Honor.

THE COURT:  P-32.  What counsel is referring to is a statement from Joanne Lahner sent Wednesday, February 21st to Susan Baumgartner, where she makes comments about a slide presentation.  And from then, it was sent from Susan Baumgartner to other individuals who -- those people were not employees of Merck, do you know?

THE WITNESS:  I don't know.

THE COURT:  It would be the top message.  You don't know if they were or not?

THE WITNESS:  I don't know.

MR. PLACITELLA:  I'll give you my proffer,

91

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

Your Honor.  For the record --

MS. JONES:  Well --

THE COURT:  Just let him give his proffer.

MR. PLACITELLA:  For the record, the change, the alleged legal change made by Ms. Lahner is changes "clearly antithrombotic" to "was clearly antithrombotic".  This advice, with some attachment that we don't have, was then forwarded to and circulated and made its way to John Romankiewicz.

My understanding is that John Romankiewicz was not, in fact, a Merck employee.  John Romankiewicz was the person who helped put together the -- the outside contractor who helped put together the presentations that were given to doctors around the country.

And my question is, you know, the point being that the advice that was allegedly provided by this witness was not limited to inside of Merck, it was circulated outside of Merck.  That's my proffer.

MS. JONES:  And, Your Honor, I would clearly object to that mischaracterization of the document, which clearly demonstrates that Ms. Lahner's advice, if any, was directed solely to Merck personnel.  What Merck personnel did with it thereafter is something different, but does not infringe upon the attorney/client privilege between Ms. Lahner and her

92

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

client.

MR. BUTSWINKAS:  Indeed, Your Honor, in the

e-mail that he is citing it says, "No distribution

outside of Merck without legal approval."

MR. PLACITELLA:  And then it was done, so

there must have been legal approval.

MR. BUTSWINKAS:  Well, that doesn't answer the

question of privilege or nonprivilege.

MR. PLACITELLA:  Well, Judge, I would submit

that anything that's circulated from Miss Lahner to

outside consultants can't be privileged under any law,

under any state.  I'm asking her questions as her role

as counsel for Merck where her legal advice went, and

it, obviously, didn't go just inside of Merck, if it

was, in fact, legal advice.

MS. JONES:  Your Honor, with all due

respect --

THE COURT:  Counsel is correct -- plaintiff's

counsel is correct that whether she is giving legal

advice or not giving legal advice, even if she is

giving legal advice, if that -- to the client, if the

client chooses to forward that to people outside the

company, then the privilege is waived as to that

advice.

That doesn't necessarily waive everything --

93

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

doesn't mean they waive all her advice, it just goes to

that particular piece of information that she wishes to

share with others.

MR. PLACITELLA:  I'm just asking her role in

what happened with her information as a general rule.

I do not have the time, nor would I think I would be

permitted the time to march through time after time

examples.  I'm just throwing out examples to

demonstrate the role of this witness generally.  I

thought that was the function of this hearing.

THE COURT:  Did you know who -- did you ever

directly deal with John Romankiewicz?

THE WITNESS:  I don't recall.

THE COURT:  Do you know who he is?

THE WITNESS:  No, no as I sit here now.  I

have no recollection of --

BY MR. PLACITELLA:

Q.  But he was the person who was in charge of the

constructing of presentations to doctors at

conferences, and you were the one who was in charge of

reviewing all the presentations, isn't that so?

MS. JONES:  Your Honor, with all due

respect --

THE COURT:  Does it refresh your recollection

that counsel has indicated who he believes he was?

94

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

THE WITNESS:  No.

THE COURT:  It still doesn't make you

remember?

THE WITNESS:  No.

MR. PLACITELLA:  Okay.  I'll move on.

BY MR. PLACITELLA:

Q.  You, in your role at Merck, spoke to people at

the FDA on behalf of Merck in person and on the

telephone, correct?

A.  In my role as the regulatory lawyer for VIOXX, I

participated with other Merck employees in one meeting

and several teleconferences with FDA, more than

several.

Q.  And when Merck -- when Merck was accused of

violating FDA regulations concerning materials that you

approved, you got on the phone with the FDA to discuss

it, right?

A.  I participated in a meeting with FDA, and in

several teleconferences, relating to one press release

that I reviewed and approved.

Q.  Well, you also had some discussions with the

FDA when they were very upset about what happened on

the Larry King Live program, right?  You got on the

phone then, too, right?  Because you were in charge of

what promotional material went out to the world?

95

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

MS. JONES:  Objection, mischaracterizes her

role.

THE COURT:  I think she can best tell us that.

You can read the question back.

(Whereupon, the court reporter read back the

requested portion of the proceedings.)

THE COURT:  This isn't a privileged

communication.  It is a question of whether she

contacted the FDA and had discussions.

So you can answer that question.

THE WITNESS:  I did not directly contact the

FDA.  I was one of a number of Merck employees who

participated in a teleconference with FDA regarding the

Larry King Live program in -- I don't remember the

year.  And I did that in my capacity as a lawyer for

the company.

BY MR. PLACITELLA:

Q.  So the answer is yes?

A.  No, the answer is as I stated it.

Q.  And this is Exhibit 25.  For the record, while

she is looking at it, "9/15/2000, Rush, please hand

deliver from Merck, Ellen Westrick, executive

director," is what I'm referring to.

This letter about the Larry King Live program,

you wrote this letter, didn't you?

96

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

A.  I don't recall that.  I do recall participating in

the preparation of the letter in my role as the

regulatory counsel for VIOXX.

Q.  Who else would have written this letter if

Miss Westrick did not?

MS. JONES:  Your Honor, I object on the basis

of attorney/client privilege and instruct the witness

not to answer that if, in fact, her answer would

require divulging attorney/client privileged material.

THE COURT:  Well, is it attorney/client

privilege for an attorney to send a letter to a

third-party?  No.  This is a letter sent to a

third-party.  And the question is, did she send to it

the third-party as opposed to Miss Westrick.

Do you recall?

MS. JONES:  I didn't understand that to be the

question.

THE COURT:  I think that's --

MR. PLACITELLA:  Well, my question is --

THE COURT:  It is signed by Miss Westrick.

The question is, did you write it as opposed to Miss

Westrick?

MR. PLACITELLA:  Correct.

THE COURT:  If you recall.

THE WITNESS:  I don't recall who did all of

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

the drafting.  I recall that I participated in the

preparation of this letter in my role as a lawyer for

VIOXX.

THE COURT:  So it is a letter written

basically by a group of people or more than one person

or you don't remember?

THE WITNESS:  I don't remember.

BY MR. PLACITELLA:

Q.  Were you involved in the gathering of the

information that was necessary to send a response to

this letter?

A.  I don't believe so.

Q.  If there were representations made in this

letter that were untrue, would that be something that

you would be responsible for?

MS. JONES:  I object on the basis of facts not

established by the evidence.

MR. PLACITELLA:  I'm not allowed to do that

now.  I'm only allowed to ask role questions.  In a

deposition I will attempt to establish the things in

this letter are not true, but now I'm only allowed to

ask questions about her role in the letter.

MS. JONES:  Well, with all due respect, Your

Honor --

THE COURT:  She said she participated in the

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

drafting of it.

MR. PLACITELLA:  I'll move on.

THE COURT:  Do you know whether you reviewed

the final document or not?

THE WITNESS:  It would have been my practice

at the time to review the final.

THE COURT:  Okay.

BY MR. PLACITELLA:

Q.  In your role in whatever capacity at Merck,

you were kept aware of what scientific information was

being disclosed to the public and not being disclosed

to the public about the health effects related to

VIOXX, true?

A.  In my role as the regulatory lawyer for VIOXX, I

was kept apprised of data and scientific information

being developed and being published.  I don't -- can't

be more specific than that.

Q.  So is your answer you can't answer my

question?

A.  Only to the extent that I provided an answer

already.

Q.  Well, here is my question.  It is an important

question.

Were you part of the group of people,

executives at Merck, who had knowledge about what

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

information was being given to the public and to

doctors, or what was published and what wasn't about

the health effects of VIOXX?  That's my question.

MS. JONES:  Objection, Your Honor, it is

cumulative.  It has been asked and answered.

THE COURT:  Objection is overruled.

THE WITNESS:  I was the regulatory lawyer for

VIOXX.  And in that capacity, I reviewed materials that

the company was developing to distribute to physicians

and to issue press releases, and I provided legal

advice on them.

BY MR. PLACITELLA:

Q.  And you knew what information was

intentionally not being disclosed at certain points in

time?  That's my question.

MS. JONES:  Your Honor, I object to the

implications of --

MR. PLACITELLA:  I'll bring the document up.

MR. WEISS:  Exhibit 43, Your Honor.

THE COURT:  That's a have you stopped beating

your wife question.

MR. PLACITELLA:  I understand.  That's why I

withdrew the question.

THE COURT:  Objection is sustained.

MR. WEISS:  Exhibit 43, for the record.

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

MS. JONES:  Counsel, may I have one, please?

MR. PLACITELLA:  For the record, the witness is reviewing this short memo, e-mail, it is an e-mail from Mary Elizabeth Basaman, who I think the witness disclosed before, her identity in public relations dated 12/4/2000. "Subject:  Confidential issues VIOXX for December 12th."

BY MR. PLACITELLA:

Q.  Are you finished reviewing the memo?

A.  Yes.

Q.  You got a copy of this memo, this e-mail, didn't you?

A.  I see that I'm copied on it, but I don't have any specific recollection of having received it.

Q.  You have no reason to believe that you didn't get it, did you?

A.  No, I see I'm copied on it.  I just don't have a recollection of it.

Q.  And this memo, this e-mail, was issued right around the time that the VIGOR study was released in the New England Journal of Medicine, correct?

A.  It would have been shortly after the publication in the New England Journal, yes.

Q.  And you had awareness of the Low Back Pain Study?

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

A.  I see it referenced here.  I don't recall what I knew about that at that time.

Q.  Well, the Low Back Pain Study, I'll move to the next document, from Ed Scolnick just for proffers of proof.

The Low Back Pain Study as of August 31st, 2000, showed four times as many people with heart attacks on VIOXX versus placebo, right?

MS. JONES:  Your Honor, just for the record, I object.  There's no indication on that document that he has on the slide show that suggests that Ms. Lahner had that knowledge at that time or any other time.

MR. WEISS:  For the record, so it is complete, that's Exhibit 23, the e-mail from William Ju to Ed Scolnick.

MR. SEEGER:  Just for context, Your Honor, and for your consideration later on in the motion.

BY MR. PLACITELLA:

Q.  But the e-mail to you clearly discusses the Low Back Pain Study, correct?  Says, "Low back pain, but we have not disclosed yet, nor have we disclosed any of the data."

MS. JONES:  Your Honor -- Your Honor, I will allow the witness to answer the question.  The document speaks for itself, but this is far beyond what relates

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

to Ms. Lahner's scope in the course of her employment in terms of what her role was.

MR. PLACITELLA:  Judge, it goes to her role.  Her role is in the loop of deciding what people see and don't see.  And, in fact, if you look at the last line of this e-mail, it talks about this group working on a specific document called "What's been disclosed, what's not been disclosed."  How could that be privileged?

MS. JONES:  Your Honor, there are numerous issues involved at this -- with respect to this motion.  This doesn't relate to a privilege issue.  This relates to the fact that there are 10 or 15 other people on that e-mail about -- that the plaintiffs could examine the witness if, in fact, they want to.  This hearing is supposed to be with respect to Miss Lahner's role in whether or not she was functioning as a lawyer, and that is not the scope of Mr. Placitella's question.

MR. PLACITELLA:  Well, Your Honor, I submit this hearing is also about some decisions you have to make on the application of the crime fraud exception and whether a lawyer is -- in-house lawyer is permitted to be part of the decision-making process on what critical medical information is disseminated to patients and doctors.  And that you can consider this in the context of your ultimate decision.

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

I was supposed to ask her questions about her role.  Curiously, her role up until this point, we never got that far.  We can talk about some other things as they come up, but this document clearly shows that this witness was kept in the loop by Merck about medical information that was being disclosed and not disclosed, and that she was also the person who approved the things that were going out to the doctors.  And if the information that she had was not going out to the doctors, that may be relevant to the decision you have to make.

THE COURT:  All right.  Well, the questions you have asked so far I think are relevant, and I will consider them and consider the document.

What's your next question?

BY MR. PLACITELLA:

Q.  Were you -- who is Mr. Babak, by the way?  Do you know who he is?

A.  I'm sorry, who?

Q.  Do you know who Mr. Babak, B-A-B-A-K, is?  Is he a lawyer for Merck?

A.  Is he on these documents?

Q.  No.

A.  You're just asking?  I'm not sure.  Does he have a first name?

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

Q.   They call him Mr. Babak.

Were you ever part of a decision by Merck not to tape managed care programs for fear that the information would get out?

MS. JONES:   Object.

MR. WEISS:   Exhibit 27, Your Honor.

MS. JONES:   Your Honor, I object to this questioning.

MR. PLACITELLA:   It is just about role.

MS. JONES:   It is intruding upon the attorney/client privilege, and instruct the witness not to answer it.

THE COURT:   Let me see what it is.   This document is not attorney/client privilege, right?

MR. PLACITELLA:   I don't think so.

THE COURT:   Because it has been produced.

MR. PLACITELLA:   It was produced by an outside contractor.   I think it was Mr. Romankiewicz's organization that produced this.

MS. JONES:   Your Honor, the document itself may not be attorney/client privilege, but the question that he posed was whether or not Ms. Lahner was involved in making a recommendation or a decision to not tape something, and that does constitute --

THE COURT:   What reference is there to her in

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

this document?

MR. PLACITELLA:   None.   That's why I asked the question, whether she was part of it, because it apparently came from the legal department.   That was my question, my only question.

She was the only legal person on VIOXX inside Merck during this period of time, so that's why I asked the question.   10/20/2000, there was no other lawyer working on VIOXX, according to her testimony this morning.   Just her.

THE COURT:   Do you know who Babak is?

MR. PLACITELLA:   I do not.

THE COURT:   So do we even know if that's a Merck person?

MR. PLACITELLA:   That's why I asked the question.   But this is about Mr. Romankiewicz talking about what they're allowed to tape, what Merck is allowed to tape and not tape on legal conferences.   And my question to her was, what was her role in deciding what you can tape and not tape, if any.

THE COURT:   Well, it doesn't mention Merck.   It doesn't mention Merck, and I'm not sure whether this is Merck's legal department.   It might be, except she has testified she was the only lawyer that worked on VIOXX, and she doesn't know who Babak is.   "I heard

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

back from Babak regarding the consulting agreement."

MR. PLACITELLA:   Judge, if you look at the bottom --

THE COURT:   He indicated that not only is his legal department concerned, but also the amount -- what is the context information?   Babak at Merck.   Bazmi Babak.   Do you see that?

THE WITNESS:   Yeah, I know Babak Bazmi.   I didn't know Mr. Babak.   Babak is his first name.

THE COURT:   Babak is his first name?

THE WITNESS:   Yes.

THE COURT:   And Bazmi is his last name?

THE WITNESS:   Yes.

THE COURT:   And he is a Merck employee?

THE WITNESS:   Yes.

THE COURT:   And is he in legal?

THE WITNESS:   He is not.

BY MR. PLACITELLA:

Q.   Well, who is he?

A.   He was in the managed care marketing area, I believe, at this time.

THE COURT:   What is this document number?

MR. WEISS:   I think it was 25.

THE WITNESS:   27.

THE COURT:   P-27.

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

MR. PLACITELLA:   Given the fact that the witness is not going to be permitted to answer the question in my presence, I'll move on to the next document.

BY MR. PLACITELLA:

Q.   You're aware that all the witnesses that I have deposed point to you and tell me that I have to ask you questions about why things were approved and not approved?

MS. JONES:   Your Honor --

THE COURT:   I don't understand the question.

MR. PLACITELLA:   I'll back up.

BY MR. PLACITELLA:

Q.   Do you know who Mary Blake is?

A.   Yes.

Q.   She was what with respect to public relations for VIOXX?

A.   She was in the public affairs group at VIOXX -- at Merck and had responsibility for VIOXX.   I don't recall her title.

Q.   And she relied upon you to provide the truth -- you and others.   She relied upon you and others to provide the truth to her concerning the VIGOR findings, correct?

MS. JONES:   Objection, Your Honor.

---

**Transcript - Sealed Hearing (2006/09/15)**

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

THE COURT:  The objection is sustained as to

who she relied on.  I don't know this witness could

possibly testify as to what someone else relied on.

MR. PLACITELLA:  My proffer would be, Your

Honor, that in Miss Blake's testimony, she indicated

that she relied upon Lahner to provide her the truth of

the information concerning VIGOR.

BY MR. PLACITELLA:

Q.  Did Ms. Blake tell the press about VIOXX

whatever you told her she was allowed to say?

MS. JONES:  Your Honor, I object to this as

going beyond --

THE COURT:  Do you remember that -- did you

review Miss Blake's -- the documents Miss Blake had

prepared?  Was that part of your role as counsel?

THE WITNESS:  Mary Elizabeth Blake was in

public affairs and would prepare draft press releases

and other material related to the press, and I would

review them in my capacity as a lawyer for VIOXX.

THE COURT:  All right.  Now, if she said in

her deposition that she relied on you, and I'm

accepting that counsel is correct, do we have the

deposition cite?

MR. PLACITELLA:  I have the -- I can get the

cite.

109

---

**Transcript - Sealed Hearing (2006/09/15)**

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

(Video clip played.)

BY MR. PLACITELLA:

Q.  Now, who is Charlotte McKinnes, could you tell

the Court?

A.  She is in marketing.

Q.  She was the head of the marketing, developing

the marketing message for VIOXX, right?

A.  At the time of the launch, she was, I think, an

executive director in marketing responsible for VIOXX.

And shortly after that, my recollection is she moved

off that assignment.

Q.  And you were the person who approved the

content for the CV card that was ultimately used for

doctors, correct?

MS. JONES:  Objection, Your Honor, on the

grounds that --

THE COURT:  I'm going to allow it for the

purpose of this hearing.

The specific question was whether you reviewed

the CV card.  Do you recall doing that?

THE WITNESS:  I reviewed the CV card as the

lawyer for VIOXX in the context of the medical/legal

board for VIOXX.

THE COURT:  Did you prepare it?

THE WITNESS:  I did not.

110

---

**Transcript - Sealed Hearing (2006/09/15)**

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

BY MR. PLACITELLA:

Q.  I'm going to ask you if Ms. McKinnes's

testimony is accurate?

MS. JONES:  Your Honor, with all due respect,

I don't believe it is appropriate at this hearing to

ask Miss Lahner to comment upon the accuracy of another

witness's testimony.

THE COURT:  All right.  I'm going let him play

it.

MR. PLACITELLA:  I'll do one more, Your Honor.

THE COURT:  Go ahead.

MR. PLACITELLA:  And I'll give you the

transcripts for the rest to move things forward.

(Video clip played.)

BY MR. PLACITELLA:

Q.  Miss Lahner, you were the one that made the

decision that the material that was in the CV card was

consistent with the label, and that's why it could be

used with the doctors, right, that was your role?

MS. JONES:  Objection, Your Honor,

mischaracterizes her role.

THE COURT:  Well, I'm going to let her answer

that question.

Were you the one that decided that the CV card

was consistent with what had been provided to the --

111

---

**Transcript - Sealed Hearing (2006/09/15)**

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

with the label approved by the FDA?

THE WITNESS:  I was the regulatory lawyer for

VIOXX, and I approved the CV card as -- for use in

promotion, which means that to be consistent with

the then approved labeling for VIOXX.

BY MR. PLACITELLA:

Q.  Even though none of the charts that were in

the CV card appeared anywhere in the label?

MS. JONES:  Your Honor --

BY MR. PLACITELLA:

Q.  Right?

MS. JONES:  Your Honor, I object at this point

and instruct the witness not to answer, in that it,

one, goes into attorney/client privilege information on

the basis of the recommendation, and, two, it goes

beyond the scope.

THE COURT:  It does go into that.

MR. PLACITELLA:  I'll move on.

BY MR. PLACITELLA:

Q.  Miss Jerman, do you know who Miss Jerman is?

A.  Yes.

Q.  She was what?

A.  At the time --

THE COURT:  Counselor, as far as I'm

concerned, this is the most relevant evidence I have

112

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

heard so far.  So play the clips and ask her about it.

Let's wrap this up, unless you have something else

major.

(Video clip played.)

MR. WEISS:  That's Ellen Westrick, Your Honor,

not Joanne Jerman.

BY MR. PLACITELLA:

Q.  In your role at Merck, would you be part of

the decision process to take people's names off of

medical articles when the results of the medical

studies were unfavorable to Merck?

MS. JONES:  Your Honor, I'm going to object to

the question as phrased, because as phrased, it

intrudes upon the attorney/client privilege

relationship, and I instruct the witness not to answer.

THE COURT:  I'll ask the question in camera.

MR. PLACITELLA:  Okay.

BY MR. PLACITELLA:

Q.  The messages --

MR. PLACITELLA:  By the way, Judge, are you

going to ask this question in camera, whether Ms.

Lahner was interviewed by Mr. Martin when he prepared

his report and what she told him last week?

THE COURT:  I'll ask that.

MR. PLACITELLA:  The page of the report that I

113

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

approved that, correct?

MS. JONES:  Your Honor --

MR. WEISS:  For the record, it is Exhibit 13.

MR. PLACITELLA:  I'm trying to move through

it, Your Honor.  Everybody knows these documents.  I

just want to know if she approved this message.

MS. JONES:  Your Honor, the witness has

testified that she reviewed --

THE COURT:  All right.  I'll ask her the

question in camera.  What is the document number?

MR. WEISS:  13.

BY MR. PLACITELLA:

Q.  As well as the 4/29/2000 e-mail to Miss

Lahner, which I believe is the next day, confirming

that all the stories, based upon that press release,

confirm that VIOXX is safe.

Did you approve that message?

MR. PLACITELLA:  That's the question that can

be asked in camera.

MS. JONES:  I'm sorry, Your Honor --

MR. WEISS:  14, Your Honor.

THE COURT:  And what is the one that's on the

board?

MR. WEISS:  The one on the board, Your Honor,

is P-14.

115

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

have up on the screen says that Ms. Lahner was

interviewed by Judge Martin in preparing his report,

and what materials she supplied to him.  Thank you.

BY MR. PLACITELLA:

Q.  Now, in your capacity as, whatever capacity in

Merck, you approved the messages that went out to the

public, we agree upon that, correct?

MS. JONES:  Objection, Your Honor,

mischaracterizes the evidence that has been --

MR. PLACITELLA:  Concerning VIOXX.

MS. JONES:  -- in answers repeatedly by Miss

Lahner.

THE COURT:  She said she reviewed them from a

legal point of view.

THE WITNESS:  I reviewed, from a legal

standpoint, promotional materials and press releases

that were either issued --

THE COURT:  What other information would go

out to the public that you wouldn't review?

THE WITNESS:  I don't know.

MR. PLACITELLA:  Could you just turn that a

little bit?

BY MR. PLACITELLA:

Q.  The 4/28/2000 press release, "Merck confirms

favorable cardiovascular safety profile of VIOXX," you

114

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

THE COURT:  Okay.

MS. JONES:  Counsel, I apologize, I apologize

to the Court and to counsel, but I did not hear the

question.

THE COURT:  He is asking again whether she did

review it and approve it, that there was no reason to

believe, and I will ask her that in camera.

Go ahead.

MR. PLACITELLA:  Here's 14, Your Honor, for

you.  That's going to be asked in camera.  I'll move on

to the next one.

BY MR. PLACITELLA:

Q.  Did you approve the message, "Merck stands

behind the efficacy, overall safety and cardiovascular

safety of VIOXX"?  Did you approve that message?

THE COURT:  What is the date of the message?

MR. PLACITELLA:  8/26/2004.

THE COURT:  And what's the document number,

exhibit number?

MR. WEISS:  It's going to be 42, Your Honor.

THE COURT:  I'll ask her in camera whether she

approved the message.

MR. PLACITELLA:  Could you ask her in camera,

Your Honor, that message was -- these messages were

approved, correct, when you, Merck, were told

116

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

specifically by your in-house scientists that these

statements were wrong --

    MS. JONES:  Objection.

    MR. PLACITELLA:  -- and overbroad and should

not be used?

    MS. JONES:  Objection, Your Honor, lacks

foundation.

    THE COURT:  Do you have a specific document

you're asking her about?

    MR. PLACITELLA:  Yes, Your Honor.

BY MR. PLACITELLA:

    Q.   Who is Laura Demopoulos, Miss Lahner?

A.   She was a physician at Merck.

    Q.   I want to play for the record what Laura

Demopoulos told Merck.

    (Video clip played.)

    THE COURT:  Do you know whose voice was in the

background speaking, Ms. Lahner?

    THE WITNESS:  I'm not sure.

    THE COURT:  It is not your voice?

    THE WITNESS:  It is not mine.

    THE COURT:  You were present when Dr.

Demopoulos made that statement?

    THE WITNESS:  No.

    THE COURT:  Have you seen that before?

117

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

document, were you not?

    MS. JONES:  Your Honor, I'm going to object

and instruct the witness not to answer on the basis of

the attorney/client privilege relationship in light of

the fact that clearly the signature on this document is

Ellen Westrick.

    MR. PLACITELLA:  I'm sorry.  I had a question

pending before that, and I interrupted myself.

    THE COURT:  This is P-16?

    MR. PLACITELLA:  Yes.

    THE COURT:  It is a different letter than the

other Westrick letter?

    MR. PLACITELLA:  Yes, it is, Your Honor.

    THE COURT:  And it is written to an outside --

it is written to the Food and Drug --

    MR. PLACITELLA:  FDA.

    THE COURT:  So what are you going to ask,

whether she wrote the letter?

    MR. PLACITELLA:  First, did she write the

letter.

BY MR. PLACITELLA:

    Q.   Did you write this letter?

A.   I don't recall whether I wrote the letter.  I do

recall that I would have participated in the

preparation of it.

119

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

    THE WITNESS:  Only in the context of the

litigation.

BY MR. PLACITELLA:

    Q.   Were you aware that everybody in the company

knew that one of the explanations for the VIGOR study

was the prothrombotic effect of VIOXX?

    MS. JONES:  Your Honor, I object to that

question.  It goes clearly beyond the scope of this

hearing.

    THE COURT:  I'll ask it in camera.

    Anything else?

BY MR. PLACITELLA:

    Q.   You accused Pfizer of violating FDA

regulations by not putting both explanations for the

VIGOR study in their marketing materials, even though

the marketing materials that you, Joanne Lahner,

approved only included one explanation, right?

    MS. JONES:  Objection, Your Honor, lack of

foundation.

    THE COURT:  The objection is sustained.

    MR. PLACITELLA:  I'll approach the witness.

    MR. WEISS:  Exhibit 44.

    MR. PLACITELLA:  It is Exhibit 16.

BY MR. PLACITELLA:

    Q.   Miss Lahner, you were the author of this

118

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

    Q.   And in this letter -- by the way, is it usual

practice for the medical/legal review board to have the

medical/legal committee executive director sign

documents that they know nothing about substantively

that go to the FDA?  Because I think that's kind of

what her testimony was, Miss Westrick.

    MS. JONES:  Your Honor, I object to the

argument.

    THE COURT:  Objection is sustained.

BY MR. PLACITELLA:

    Q.   In this document that you participated in and

approved, you accused Pfizer of violating federal

regulations, right?

    MS. JONES:  The document speaks for itself.

    THE COURT:  What page are you referring to,

Counselor?

    MR. PLACITELLA:  I'm referring to Page 3,

second to last paragraph.  I'll read it for the record.

"By presenting the VIGOR results for VIOXX only as a

statistically significant increase in cardiovascular

adverse events, the letter fails to reveal material

facts, that the significantly fewer heart attacks

observed in patients taking naproxen were consistent

with that drug's ability to block platelet aggregation.

So the results do not indicate an increase in

120

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

cardiovascular adverse reaction due to VIOXX.  Even if

Searle/Pfizer chose not to accept this rationale, the

failure to at least acknowledge it in the letter is a

failure to reveal material facts in violation of 201(n)

of the Food Drug and Cosmetic Act."

BY MR. PLACITELLA:

Q.   That's what you said in this letter, right?

MS. JONES:  Your Honor, I'll stipulate --

BY MR. BUCHANAN:

Q.   That's what Merck said in this letter?

THE COURT:  That's what it says.

BY MR. PLACITELLA:

Q.   Yet in the press releases that you approved,

Ms. Lahner, you only put one explanation for the VIGOR

results, right?  That is, that it was naproxen lowering

the heart attack rate, not that VIOXX might be raising

the heart attack rate?

MS. JONES:  Your Honor, I object.

THE COURT:  The objection is sustained.  That

goes beyond the scope of this hearing.

MR. PLACITELLA:  I know I'm wearing the

Court's patience thin, so I'll go to one further area.

BY MR. PLACITELLA:

Q.   By the way, the V Squad, Be the Power, you

approved that, right?

121

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

more than 100,000 hospitalizations and more than 16,500

deaths each year in the U.S., and often occur without

any warning signs."  And then it references Dr. Laine,

do you see that?

A.   I see the words there.

Q.   You approved that message, right?

MS. JONES:  Your Honor, I'm going to object.

MR. PLACITELLA:  I'll move to the next

document.

THE COURT:  The objection is sustained.

BY MR. PLACITELLA:

Q.   The final press release, in fact, has the same

numbers, correct?

A.   I don't recall.

Q.   Okay.  Ms. Jerman gave the same exact

message -- by the way, when Miss Jerman did an MVX --

do you know what an MVX is?

A.   Yes.

Q.   An MVX is voicemails that go out over the

Merck system, right?

A.   No.  An MVX is the message system at Merck.

Q.   Okay.  And when the marketing people, like Ms.

Jerman, issued an MVX to all of the salespeople, you

had to approve that as accurate and true before it went

out, true?

123

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

A.   I don't recall that I approved that.

Q.   Do you know what I'm talking about?

A.   I do.

Q.   So if Mr. Dunn -- do you know who Mr. Dunn

was?

A.   Yes.

Q.   If he testified that you, in fact, approved

that, would that refresh your memory?

MS. JONES:  Objection, Your Honor.  I don't

believe it is appropriate for her to be asked to

comment on his testimony in this proceeding.

THE COURT:  The objection is sustained.

BY MR. PLACITELLA:

Q.   All right.  Now, let me end with the document

that we started with.

You approved in your message for VIOXX why

VIOXX was needed, correct?  That was part of your

message?

MS. JONES:  I object to this question.

MR. PLACITELLA:  I'm going to go to the -- I

withdrew the question.

BY MR. PLACITELLA:

Q.   The page which doesn't have any redactions,

but it is in the draft press release, it says, "The

serious GI side effects of NSAIDs are associated with

122

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

MS. JONES:  Object.  I object.

BY MR. PLACITELLA:

Q.   In your role --

MS. JONES:  It mischaracterizes the testimony

and mischaracterizes Ms. Lahner's role.

THE COURT:  I think it is a generic enough

question.  I'll allow it.

THE WITNESS:  I provided legal review of the

broadcast voicemail messages sent out by Jo Jerman to

the field sales organization.

BY MR. PLACITELLA:

Q.   Okay.  And the important part of your legal

review, or an important part of your legal review, was

that the information that was being communicated was

true and accurate to the best of your knowledge,

correct?

A.   Yes.

Q.   Okay.  And you approved the MVX from Ms.

Jerman that, again, told all the sales reps that

100,000 patients were hospitalized and 16,500 patients

died, correct?

MS. JONES:  Your Honor, I'm going to object.

If we're now going to something else --

MR. PLACITELLA:  Well, I'll just skip to the

next one.

124

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

BY MR. PLACITELLA:

Q.   You approved those messages even though you were told by the person who was the lead author in the VIGOR study that those messages were totally bogus, right?

MS. JONES:   Objection.  Your Honor, I object.  There's no foundation whatsoever.

THE COURT:   Were you present?  Have you seen the Laine deposition?

THE WITNESS:   I have seen it in the context of the litigation.

THE COURT:   Okay.  Were you present when he made those statements for Merck?

THE WITNESS:   I was not.

THE COURT:   Did you see them before the litigation started?

THE WITNESS:   No.

THE COURT:   Go ahead.

BY MR. PLACITELLA:

Q.   If your scientists and your public relations people were told that the information that you were putting in a press release was totally bogus, isn't that something you would want to know in your role at Merck?

MS. JONES:   Your Honor, I object to that

125

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

question as going beyond the scope of this hearing.  It relates to a legal --

THE COURT:   Objection is sustained.

BY MR. PLACITELLA:

Q.   The response to the warning letter, remember the warning letter that Merck got September 17th, 2001, do you recall that?

A.   Yes.

Q.   You wrote the response for Merck, didn't you, to the FDA?

A.   As the lawyer for VIOXX, I participated in the drafting of that response.

Q.   Well, how much of the drafting did you participate in?  You wrote most of it, didn't you?

MS. JONES:   Your Honor --

THE COURT:   Well, this is a letter that goes to the FDA.

MR. PLACITELLA:   Correct.

THE COURT:   It is public record.  It is part of the case.  It is a public record.  And she can answer whether she was the one who drafted it, whether she drafted it in conjunction with others.

Who signed it?

MR. PLACITELLA:   It was signed on behalf of Mr. Anstice.

126

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

THE WITNESS:   By Margie McGlynn.

THE COURT:   Do you recall who wrote it?

MR. WEISS:   Exhibit 38, Your Honor.

THE COURT:   You said you worked on it.

THE WITNESS:   I participated in drafting a portion of it.  It was also --

THE COURT:   P what?

MR. WEISS:   38.

THE COURT:   Did you write certain sections of it?

THE WITNESS:   Yes.

THE COURT:   What sections would you have written of it?

MS. JONES:   Your Honor, just for the record, I understand Your Honor's ruling that this went to a third-party, but the extent of what she had direct participation in may or may not be subject to the attorney/client privilege.  So I would simply instruct the witness not to answer if, in fact, there's anything in that answer that would infringe upon the attorney/client privilege relationship.  We'll take it up in camera.

THE COURT:   Who else wrote the letter with you?

THE WITNESS:   Bruce Kuhlik, our outside

127

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

counsel at the time.  And then it was reviewed by other lawyers at Merck and physicians in the Merck Research Laboratories.

BY MR. PLACITELLA:

Q.   So you're telling us that not only did you, but the outside lawyer wrote it?

MS. JONES:   Your Honor, I do believe that this gets into attorney/client privileged information, and I instruct the witness not to answer further on that issue.

THE COURT:   The objection is sustained.  I'll ask her some questions about it.

BY MR. PLACITELLA:

Q.   You made a representation to the FDA in this letter that you believed that VIOXX was safe because you, Merck, conducted a meta-analysis that showed that VIOXX was safe from the CV perspective.  You told the FDA in this letter that there was -- that your meta-analysis did not suggest any prothrombotic potential of selective COX-2 inhibition.  Isn't that what you told the FDA?

MS. JONES:   Objection, Your Honor, to lack of foundation, the argumentative nature of the question.  The document is the best evidence.  It speaks for itself.  It goes beyond the scope of this hearing.

128

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

THE COURT:  The objection is sustained.  What

the document says, it says.

MR. PLACITELLA:  I will ask the Court to take

judicial notice, not to accept the truth of it, but

judicial notice that in prior trials concerning the

meta-analysis, that was not given to the FDA and look

at it in the context of this representation by this

witness to the FDA.

BY MR. PLACITELLA:

Q.  And the question that I would ask, however, is

were you part, in your role at Merck, were you part,

were you in the loop to determine whether or not the

Shapiro meta-analysis should be provided to the FDA

that showed a doubling of the increased risk for heart

attacks across all Merck studies?

MS. JONES:  I object to the characterization

of the Shapiro meta-analysis as incorrect and without

foundation.

THE COURT:  The objection is sustained.

BY MR. PLACITELLA:

Q.  Okay.  You approved the message or part of the

program to break the link between hypertension and

edema and heart attacks, right, in your role at Merck?

THE COURT:  She approved the link?

MR. PLACITELLA:  She approved the message

129

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

which was the objective, which was to break the link

between hypertension and edema and heart attacks.

MS. JONES:  Your Honor --

THE COURT:  I don't know what you're referring

to.  I'm not sure if she did or not.

MS. JONES:  I don't know what he is referring

to, but I object to it -- to the question as a lack of

appropriate foundation.

THE COURT:  The objection is sustained.  It

seems to be overly broad.

BY MR. PLACITELLA:

Q.  Okay.  You approved the presentations that

were made by the doctors at the DDW conference,

correct, right after VIGOR was published?

THE COURT:  What is the DDW?

THE WITNESS:  Digestive Disease Week.

I don't recall.

BY MR. PLACITELLA:

Q.  In your role at Merck, there were questions

and answers prepared by others that you reviewed that

people would use if they were asked questions by the

press, right?

MS. JONES:  Could we see the document,

Counselor?

MR. PLACITELLA:  I'm just asking general

130

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

questions.  I didn't get to a document.  When I will, I

will.

THE COURT:  He is just asking if, in general,

people were prepared with questions and answers.  Is

that what you're saying?

MR. PLACITELLA:  Yes.

THE COURT:  By her?

MR. PLACITELLA:  Yes.  This is the last line

of questioning, Your Honor, then I'll sit down.

THE COURT:  The objection is sustained.

BY MR. PLACITELLA:

Q.  You knew that presentations were being made to

doctors at the DDW conference that intentionally

omitted any information whatsoever about the

hypertension and edema findings in the VIGOR study,

correct?

MS. JONES:  Objection, Your Honor.  It's

argumentative, mischaracterizes the evidence, lack of

foundation, and it goes beyond the scope of this

hearing.

MR. PLACITELLA:  No, it doesn't.

THE COURT:  Well, it goes to the issue of

the -- this is one of the few issues -- one of the few

things raised that would actually go to the, how did

you refer to it, to the crime scenario.  I'll allow her

131

---

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

to answer.

You can read the question back to her.

(Whereupon, the court reporter read back the

requested portion of the proceedings.)

THE WITNESS:  I don't have any recollection as

I sit here now about the presentations made at DDW, so

I'm unable to answer the question.

MR. PLACITELLA:  I'll submit the documents to

the Court concerning DDW to move things along.

BY MR. PLACITELLA:

Q.  You are aware -- well, let me ask you this:

In your capacity at Merck, did you have any information

as to what was being included and not being included in

the final publication of the VIGOR study in terms of

scientific findings?

A.  I don't recall.  I do believe that I reviewed an

early draft of the manuscript, but I don't recall

anything beyond that.

Q.  And the early draft of the manuscript had a

different heart attack rate in it than the one that was

finally published, correct?

A.  No.

Q.  It didn't?  Did any draft of the manuscript

have information on hypertension and edema in it that

was then later deleted?

132

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

A.   I don't recall.

Q.   Did you ever have any discussions -- let me just kind of get to the point.

By the way, you know that -- you're familiar with the letter that Dr. Fries wrote to Merck?

A.   I am.

Q.   Okay.  And in that letter, Dr. Fries complained about how Merck was handling certain physicians, correct?

MS. JONES:  Your Honor --

THE COURT:  We all know that's correct.

MS. JONES:  The document speaks for itself.

THE COURT:  That's correct.  You can proceed.

MR. PLACITELLA:  All right.  Okay.

BY MR. PLACITELLA:

Q.   Now, the thing that Dr. Fries complained about was that other doctors were asking questions at the DDW conference about hypertension and edema, and Merck didn't like that very much, right?

MS. JONES:  I object to the question.  The document speaks for itself.

MR. PLACITELLA:  I'll submit the document in the context of this examination.

THE COURT:  Okay.  What is your next question about it?

133

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

MR. WEISS:  That's Exhibit 30, Your Honor, for the record.

BY MR. PLACITELLA:

Q.   But you specifically knew, you, Merck, that Merck was being cagey with the New England Journal of Medicine by not including the hypertension and edema information in the final published article, right?

MS. JONES:  Your Honor, I object to this line of questioning as going beyond the scope of this hearing as to what Ms. Lahner's role is, and as to the argumentative nature of the question, and the lack of foundation in the question, and assumes facts not in evidence.

MR. PLACITELLA:  I'll play the video.

(Video clip played.)

BY MR. PLACITELLA:

Q.   Now, these cuts that I have shown you, these are preparations for video news releases that were issued by Merck that you ultimately, in your role, had to approve, correct?

A.   I have no idea what these are, other than I have seen them in the litigation.

Q.   You did approve the video news releases that featured Dr. Laine in relation to VIGOR, did you not?

MS. JONES:  Your Honor, I object to the --

134

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

THE COURT:  It is just a question of whether she approved the Laine press releases.  I'll allow it.

THE WITNESS:  I would have reviewed and approved the video news release that the company issued in connection with the VIGOR study in my capacity as the regulatory lawyer for VIOXX.  I do not recall whether Dr. Laine appears in that VNR as I sit here now.

BY MR. PLACITELLA:

Q.   Well, I'll represent to you that's, in fact, what happened.

Now, as you sit here today, are you telling us that you don't remember Merck intentionally leaving hypertension and edema data out of all their presentations to doctors, or that you do remember?

MS. JONES:  Your Honor, I object to the --

THE COURT:  The objection is sustained.

BY MR. PLACITELLA:

Q.   As you sit here today, when you were counsel, in your role as counsel for Merck -- scratch that.

MR. PLACITELLA:  Your Honor, the remainder -- I know it is getting late and you want to ask questions, and I have overstayed my welcome.  Although I have a lot more to ask, and unless the Court feels the need, at some point in the future for me to

135

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

continue, I think I have made some of my points.  I'll submit the remainder of the documents to the Court by subject matter for the Court to review, and we'll stay, and if you want anything further from us, we will be happy to, at that point.  But I know that I'm stretching the Court's patience at this point.  Thank you.

THE COURT:  I'm not even tapping my pencil. All right.  We'll take a short break, and then we'll come back and ask her a few questions in camera, and plaintiff's counsel will sit outside.  We can do it in the courtroom.  You can either go into one of the rooms if you want to sit in there or outside, whatever your preference is.

MR. PLACITELLA:  It wouldn't be the first time I was dismissed from a place I would like to be.

(Break taken.)

(Whereupon, an in camera proceeding was held with Joanne Lahner, defense counsel and the Court.)

THE COURT:  All right.  I have had the opportunity to question the witness in camera, basically, specifically address with her what her role was specifically as to specific documents.  I asked her why she chose to change certain things specifically, how she believes that was legal advice as opposed to

136

**Transcript - Sealed Hearing (2006/09/15)**

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

other types of advice, either marketing advice or

scientific advice, and I have heard her testimony on

that.

At this point what I am going to do is order

that the transcript of -- the portion of the testimony

where she testified with both counsel here, copies of

that can be released to each side, but it should be

released and held only by a maximum of -- you know, I

only want the lawyers that are preparing any additional

briefing one or two lawyers, two or three lawyers to be

involved in reviewing it.  If there's four of you here

and four of you want to look at it, fine.  I do not

want it distributed to the entire plaintiffs' bar or to

the entire defense bar.  It should be kept -- it should

be kept as confidential as possible pending a decision,

and I'm going to allow you to brief in lieu --

including arguments any additional argument you want to

make in your brief as to any additional points you want

to make based on the transcript.

The second part of the transcript I would like

typed up for myself, but I'm not going to give a copy

of that to anyone else.  And that should be just kept,

all right?  And, obviously, the order would include the

fact that this can't be disseminated or published or in

the documents -- the document that's asked to be

137

---

**Transcript - Sealed Hearing (2006/09/15)**

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

review them, check them over and see if, in fact, some

of them could be unredacted.

Some things -- I mean, there was at least one

document that defense counsel chose -- I looked at.  It

was produced during the hearing.  Why you would want to

keep that to yourself I don't know.  There's some you

may just want to give them.  The fact that you give

them one document doesn't mean you waive the entire

privilege issue.  You know, before you may have had

associates go through and just say it looks like a

lawyer said this, but now we are a little further along

in the litigation you may want to consider whether it

is really --

MR. MAYER:  We do intend to assert the

privilege on the privileged document, but we do intend

to reretrieve these documents promptly and confer with

Mr. Weiss to see if anything can be released.

THE COURT:  And if there's anything else I'll

have to look at them in camera and make a decision, but

I certainly hope I don't have to look at 300

something --

MR. WEISS:  That's the reason why we picked

the 342 because --

THE COURT:  You figured you have a chance of

having me review them.

139

---

**Transcript - Sealed Hearing (2006/09/15)**

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

returned, and now I guess there's two documents that

are asked to be or a portion of another one that's

being asked to be returned.  Those should -- those can

remain in plaintiff's hands until I make a decision,

but don't distribute them any further than they have

been distributed.

There is a new issue that's come up, and I

think we should address it, and that's the 300

something pages of documents, some of which are,

apparently, redactions of maybe -- it would appear to

me having seen one document where there's just an "X"

through it and then seeing other documents where

there's just areas that are blotted out that the legal

review in this case must have consisted of an "X".

But whatever it is, and there's a real question in my

mind as to whether that would be a privileged document.

It would seem to me that there must have been a copy

preX, assuming it is an "X".  There would have been a

preX copy and then a post X copy.  The two documents I

think would be, you know, without the lawyer's comments

on them or with the lawyer's comments wiped out it is

hard for me to imagine how this -- but I don't know.  I

didn't see this.  So I guess what we're going to have

to do is, Mr. Cohen, I suggest you meet and confer with

plaintiff's counsel on those 300 and so documents and

138

---

**Transcript - Sealed Hearing (2006/09/15)**

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

MR. WEISS:  No.  They're the ones, Your Honor,

where there were at least --

MR. PLACITELLA:  I'm not going to suggest that

at 4:30 on a Friday.

THE COURT:  I thought Judge Fallon reviewed --

MR. BUCHANAN:  Reviewed 80 boxes, and I heard

through the grapevine that we're expecting a decision

on those 80 boxes shortly.

THE COURT:  Did that include these 300?

MR. BUCHANAN:  Yes, it would include

everything.

MR. COHEN:  I can tell you, Your Honor, what

the process was before Judge Fallon coming down from

the Fifth Circuit.  The Fifth Circuit issued an order

that said that Judge Fallon should have available to

him a representative of the defense to give information

in camera to explain the context and basis for the

privileged documents.  I had the opportunity to make

that presentation on behalf of Merck, and I went

through those.  We did a number of things to try and

make it easier for Judge Fallon to review, and he has

that currently under review, as well as a motion for a

number of documents, a small number but a number of

documents where advice had been given to Merck

marketing people who then worked with an advertising

140

**Transcript - Sealed Hearing (2006/09/15)**

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

firm, and there is law out there, and I just wanted to correct the record from earlier today on in certain circumstances and under certain situations, in fact, the privilege is not waived.  Judge Fallon has had that fully briefed before him, and we can make that same motion here before Your Honor.

But, certainly, in terms of a process it is definitely in my part of the woods, and I will get with Mr. Weiss, as I have to, on a number of issues very quickly.

THE COURT:  How long will it take defense counsel to finalize their brief on this?  You have already briefed it.  You may not want to brief it any further I don't know.

If you want to say you have said enough --

MR. BUTSWINKAS:  Is there any way the briefing can be staggered?

THE COURT:  Staggered seems to be you go first because it is your motion.  For a protective order.

MR. COHEN:  It depends on when we get the transcript.  Regina?

THE COURT REPORTER:  By Monday.

THE COURT:  10 days from receipt of the transcript, and then you guys need 10 days?

MR. WEISS:  10 days after that.

141

---

**Transcript - Sealed Hearing (2006/09/15)**

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

him.  From what I understand, at least, that represented the 20,000 or so documents I think that were on the privilege log.  And he unsealed -- excuse me, declassified as privileged I believe all but about 500 of the documents containing those 80 boxes.  It went up to the Fifth Circuit, the Fifth Circuit asked them to take another look at it.  That's what has happened.  He has taken another look at it, and the parties await his decisions.

THE COURT:  I thought he already declassified them.  So it went --

MR. BUCHANAN:  It went up to the Fifth Circuit.

MR. COHEN:  On specific documents we were able to then get further information.  He didn't have the benefit of either an in camera discussion such as you have had here or of an outside counsel explaining why some of these things were legal advice.  He had some of the same questions you did and instead of having an in-house lawyer give this kind of testimony in that case he had outside counsel, in that case me, basically give that discussion.  I have quite extensively learned and reviewed the regulatory law in this case, as well.

THE COURT:  Why don't we -- well, hopefully -- take that into consideration when you're going over the

143

---

**Transcript - Sealed Hearing (2006/09/15)**

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

THE COURT:  And then I'll make a decision.

MR. WEISS:  I want the record to be clear there's 4,000 privileged documents relating to Joanne Lahner.  343 were redacted, so we can see piece of the 343.  The rest we have no idea what's in them, but that's okay.

THE COURT:  So there's 300 where you have pieces of them and there's 4,000.

MR. WEISS:  343.  3,600 where everything has been withheld.  342, as you see, we have bits and pieces.

THE COURT:  Were those 3,600 presented to Judge Fallon?

MR. COHEN:  Originally, Your Honor, one of the things we learned through the process, and one of the things that will make this much easier is, in fact, many of those are exact duplicates or are e-mail chains where if you got the one furthest in the e-mail chain you then see all the e-mails before then, and, so, you don't have to review all 3,000 in order to effectively look at them.  When I get with Mr. Weiss I will tell him some of the learning I have had in terms of how to make this an effective process.

MR. BUCHANAN:  Judge Fallon reviewed all 60 boxes of privileged documents that were submitted to

142

---

**Transcript - Sealed Hearing (2006/09/15)**

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

300 to decide, but you may want to wait for his decision.  Obviously, if those items are all declassified then we maybe only have to deal with the 500 that he doesn't declassify.

MR. COHEN:  I'm confident he will reach a different decision this time around.

MR. BUCHANAN:  Really?

MR. COHEN:  Yes, I am.

MR. PLACITELLA:  He would know.  He was the only one in the room.

THE COURT:  It is very frustrating to an attorney to have things done in camera.  I know.

MR. PLACITELLA:  I was hoping I could put Mr. Weiss on the stand outside the presence of defense counsel and ask him his interpretation of some of the documents to balance out.

MS. JONES:  Your Honor, and I suppose I should address this to counsel, but while we were in camera it became apparent that Judge Higbee had been furnished with some documents that we have now made a part of the record that we did not have copies of.

THE COURT:  There's a couple.  So if you can stay for a minute like the Fries letter is not marked, and if we just make sure those things that were actually marked were marked.

144

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

MR. WEISS:  We will certainly work it out and on Monday we'll give you a whole complete set for the record, so if there's any confusion --

MS. JONES:  Would you similarly furnish us?

MR. WEISS:  Absolutely.

MR. PLACITELLA:  All the ones that -- we premarked them all.  We'll give you every one that was premarked, even the ones we didn't put in, if you like.

THE COURT:  Limit it to the ones you put in.

MR. WEISS:  Absolutely, we'll make sure you have copies.

THE COURT:  If you think it is important.  I see them -- you can add them, too.

MS. JONES:  Could we also have copies of the outtakes of the depositions that you played just the ones you played?

MR. PLACITELLA:  Sure.  You don't have them?

MS. JONES:  We have the depositions.  I don't have the outtakes that you played, and I think I am correct that Regina doesn't have that text as part of the record.

MR. WEISS:  The depositions you're talking about Demopolous is an outtake from the VNR.

MS. JONES:  Neither the outtakes or the deposition.  You have them on computer, that's all.

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

MR. WEISS:  We'll make sure you get a copy, and I guess we should have delivered to the Court a copy as an exhibit of this hearing?

MR. BUCHANAN:  Can we confirm that Regina does not transcribe them?

THE COURT REPORTER:  No, they're not transcribed in the record.

MR. PLACITELLA:  I think we have transcribed versions.

THE COURT:  However you want to do it.  If you want to include the tape for the record in case this goes on an appellate review they may want to see the tapes.  All right.  We'll see you.

Counsel, can you let Regina know exactly which attorneys are going to be sent copies of the transcript?

MR. WEISS:  I'm going to get a copy, Mr. Placitella, Mr. Buchanan and Mr. Thompson.

MR. COHEN:  And for the defense send it to me.

(End of proceedings.)

SEALED TRANSCRIPT - DO NOT DISTRIBUTE

C E R T I F I C A T I O N

I, REGINA A. TELL, C.S.R., R.M.R, R.P.R., C.R.R., License Number 30XI00161000, an Official Court Reporter in and for the State of New Jersey, do hereby certify the foregoing to be prepared in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate compressed transcript to the best of my knowledge and ability.

_____09-17-06
Regina A. Tell, CSR-RMR-CRR
Official Court Reporter
Atlantic County Courthouse
Mays Landing, New Jersey

```
                 SUPERIOR COURT OF NEW JERSEY
                 ATLANTIC COUNTY
                 CASE TYPE NO. 619
------------------------------x
IN THE MATTER OF IN RE:
VIOXX
                      STENOGRAPHIC TRANSCRIPT
                           OF:
------------------------------x  - TRIAL COUNSEL -
                         MEETING
          PLACE:  ATLANTIC COUNTY CIVIL COURTHOUSE
                  1201 BACHARACH BOULEVARD
                  ATLANTIC CITY, NJ  08401
          DATE:   OCTOBER 5, 2006
B E F O R E :
     THE HONORABLE CAROL E. HIGBEE, J.S.C.
TRANSCRIPT ORDERED BY:
     DAVID BUCHANAN, ESQ. AND THEODORE MAYER, ESQ.
A P P E A R A N C E S :
     DAVID BUCHANAN, ESQUIRE
     JEFFREY GRAND, ESQUIRE
     SEEGER, WEISS
     ATTORNEYS FOR THE PLAINTIFFS
     SOL WEISS, ESQUIRE
     ANAPOL, SCHWARTZ, WEISS, COHAN, FELDMAN & SMALLEY
     ATTORNEYS FOR THE PLAINTIFFS
     W. MARK LANIER, ESQUIRE
     RICHARD D. MEADOW, ESQUIRE
     DARA HEGAR, ESQUIRE
     ROBERT LEONE, ESQUIRE
     LANIER LAW FIRM
     ATTORNEYS FOR THE PLAINTIFFS
           *      *      *      *      *      *
                    REGINA A. TELL, CSR-CRR
                    OFFICIAL COURT REPORTER
                    1201 BACHARACH BOULEVARD
                    ATLANTIC CITY, NJ  08401
```

1

```
A P P E A R A N C E S   C O N T I N U E D . . .
     COURTNEY DeCRISTOFARO, ESQUIRE
     RODNEY VILLAZAR, ESQUIRE
     KASOWITZ
     ATTORNEYS FOR THE PLAINTIFFS
     CYNTHIA ZEDALIS, ESQUIRE
     BRANCH LAW FIRM
     ATTORNEY FOR THE PLAINTIFFS
     PETE MILLER, ESQUIRE
     MICHAEL MILLER, ESQUIRE
     MICHELE DiMARTINO, ESQUIRE
     MILLER & ASSOCIATES
     ATTORNEYS FOR THE PLAINTIFFS
     ERIC WEINBERG, ESQUIRE
     WEINBERG
     ATTORNEY FOR THE PLAINTIFFS
     FRANCES TOMES, ESQUIRE
     TORTORETO, TOMES & CALLAHAN
     ATTORNEY FOR THE PLAINTIFFS
     ROBERT BAUER, ESQUIRE
     STARKEY, KELLY, BAUER, KENNEALLY & CUNNINGHAM
     ATTORNEY FOR THE PLAINTIFFS
     PAUL STRAIN, ESQUIRE
     VENABLE
     ATTORNEY FOR THE PLAINTIFFS
     WILFRED CORONATO, ESQUIRE
     CHARLES W. COHEN, ESQUIRE
     HUGHES, HUBBARD & REED, LLP
     ATTORNEYS FOR THE DEFENDANT, MERCK
     HOPE FREIWALD, ESQUIRE
     DAVID VENDERBUSH, ESQUIRE
     MICHELLE YEARY, ESQUIRE
     DECHERT, LLP
     ATTORNEYS FOR THE DEFENDANT, MERCK
     MATTHEW SHORS, ESQUIRE
     O'MELVENY & MEYERS, LLP
     ATTORNEY FOR THE DEFENDANT, MERCK
```

3

```
APPEARANCES CONTINUED . . .
     BENEDICT J. MORELLI, ESQUIRE
     ARTHUR L. SALMON, ESQUIRE
     MORELLI RATNER
     ATTORNEY FOR THE PLAINTIFFS
     PAUL FENNOCK,, ESQUIRE
     WEITZ & LUXENBERG
     ATTORNEY FOR THE PLAINTIFFS
     CHRISTOPHER TISI, ESQUIRE
     JENNIFER DRENDI, ESQUIRE
     ASHCRAFT & GEREL
     ATTORNEY FOR THE PLAINTIFFS
     NICHOLAS DIAMAND, ESQUIRE
     LIEFF CABRASER
     ATTORNEY FOR THE PLAINTIFFS
     MICHAEL GALPERN, ESQUIRE
     LOCKS LAW FIRM
     ATTORNEYS FOR THE PLAINTIFFS
     NIKI TRUNK, ESQUIRE
     THE FERRARA LAW FIRM
     ATTORNEY FOR THE PLAINTIFFS
     CHRISTOPHER PLACITELLA, ESQUIRE
     COHEN, PLACITELLA
     ATTORNEY FOR THE PLAINTIFFS
     SUSANNE SCOVERN, ESQUIRE
     ALEXANDER, HAWES & AUDET
     ATTORNEY FOR THE PLAINTIFFS
     STEVEN STEIN, ESQUIRE
     LEVIN, SIMES & KAISER
     ATTORNEY FOR THE PLAINTIFFS
     TOM SWEENEY, ESQUIRE
     COHEN, SEGLIAS
     ATTORNEY FOR THE PLAINTIFFS
     JAYNE CONROY, ESQUIRE
     HANLY CONROY
     ATTORNEY FOR THE PLAINTIFFS
```

2

```
 1              P R O C E E D I N G S
 2         THE COURT:  Okay.  Do you want to talk about
 3    the trial?
 4         MR. BUCHANAN:  Sure.
 5         THE COURT:  And what cases we're going to
 6    select for the trial, what criteria we should use.  I
 7    understand the defendants have taken the position that
 8    they don't think there should be any group of cases
 9    consolidated.  I don't agree with that analysis.  But I
10    do agree that there has to be -- that we have to
11    carefully consider issues of manageability and issues
12    of jury confusion, and make sure that any selection of
13    cases we have will have the least possible potential
14    for either confusing a jury as to causes of actions or
15    make it too administratively complicated to administer
16    really properly by the judge at the time.  Since it
17    will be me I want to make sure that I can do it.
18         So let's address that issue.  Do the
19    plaintiffs have any particular proposals that they have
20    worked out?
21         MR. BUCHANAN:  Well, Judge, I guess coming at
22    this today there's 39 complaints on file, all of which
23    assert application of New Jersey law.  The complaints
24    as pled are New Jersey -- they assert New Jersey causes
25    of action.  I thought where we would be at this point
```

4

1    is that the defendants, if they wanted to challenge us,

2    would file a motion; we would oppose and we would be

3    talking about that today in the context of whatever

4    specific challenges they had.

5         As you recall, in early September they raised

6    some issues in chambers, and I believe the process,

7    Your Honor directed was for them to assert -- to file a

8    motion for us to oppose and them to address that at a

9    hearing or at this conference, whatever -- whatever may

10    be the case.

11         So as we stand right now, there are cases that

12    assert application of New Jersey law.  Any type of

13    choice of law analysis that would be raised presumably

14    as a challenge by the defense has not been raised in an

15    affirmative way.  The conflicts among the various

16    states' laws, to the extent they exist, have not been

17    highlighted, and any governmental interests or

18    competing governmental interests analysis have not been

19    raised.

20         Having said that, we have, in fact, analyzed

21    the law on what we believe are the core legal issues,

22    and we see significant common threads among the various

23    states' laws on the core product liability issues.

24         So I'm not sure whether you would even find

25    the existence of a conflict under the Product Liability

5

1    Act.  I'm not sure that you get to the second prong of

2    that analysis.  I do think it is fair to go through

3    that process and try to understand that if they want to

4    go down that road, but if you recall in Humeston,

5    Humeston, obviously, an Idaho plaintiff, that went to

6    the jury under New Jersey law, and I reviewed the

7    transcript of that hearing in preparation for today to

8    understand exactly how we got there, and I believe the

9    defendant conceded there were no conflicts.

10         THE COURT:  That was my -- that is my

11    understanding.

12         MR. BUCHANAN:  I think they conceded at that

13    point there are no conflicts.  That may have been for

14    tactical reasons; it may have been because they favored

15    New Jersey law over Idaho law, I don't know, but I

16    don't know what their position is going to be on each

17    of these 39 cases.  They have articulated it as a

18    preliminary matter, a concern about how would you

19    manage all these different cases, but they haven't

20    ripened the issue in such a way that their position

21    that each of these states' laws should control

22    in this case and articulated that they believe there's

23    a conflict.  I do think that's necessary.  I do think

24    that's necessary.

25         In Humeston we got to the point where there

6

1    wasn't a conflict or they at least stipulated there

2    wasn't a conflict, and it went to the jury on New

3    Jersey law.  So I don't know where they're going to be

4    on these cases here.  It may very well be they're in

5    the same place, but they should certainly articulate

6    what their view is on that so that we can be guided

7    accordingly because I think their position on that does

8    matter.

9         THE COURT:  Okay.  What is the defense's

10    response on that?

11         MR. STRAIN:  Your Honor, I think the first

12    thing -- and maybe Dave was going to get into this --

13    and we took a look at what came in late last night on

14    their survey of the law, the first thing in the format

15    Your Honor is thinking of with a general failure to

16    warn the medical community question in phase one, which

17    I think has been discussed with, you know, some degree

18    of certainty, the first question is whether any state

19    permits that, whether any of these states' laws we're

20    talking about permits that, and that's not dealt with

21    because as I saw it with a quick read if in a given

22    state -- let's take first one up on their list

23    Connecticut -- if it is not a proper question under

24    Connecticut law of failure to warn the medical

25    community, the general warning question, then cases

7

1    from that state can't be in a trial of this format.

2    And that's the first question.  Before we talk about

3    whether any other law is identical to New Jersey we

4    have to decide, and I haven't seen that in the

5    submission, whether in any state is a proper question

6    to the jury failure to warn the medical community.

7         Now, we have, obviously, taken a look at that.

8    We believe in none of these states is that a proper

9    question.

10         THE COURT:  Well, you don't believe it is a

11    proper question in New Jersey, so you just don't

12    believe it is a proper question.

13         MR. STRAIN:  Beyond that, Your Honor, we're

14    focusing on these other states.  We have a disagreement

15    on New Jersey, but Your Honor to my knowledge has not

16    looked at that issue for these other states, and I

17    think that's what we need for the parties to focus on

18    for the Court, is it a proper question in any of these

19    states to ask the general question, and if they find a

20    state or two or three or five, I don't think they will,

21    where it is a proper question then at least in theory

22    that could be combined into a phased trial like this.

23    If not, it can't be.  That's the initial question.

24         THE COURT:  All right.  Well that -- I have

25    not had -- I have not yet specifically reviewed the law

8

1   from each state.  I certainly have reviewed enough

2   general literature and articles and other types of

3   writings devoted to tort law and mass tort law and

4   pharmaceutical cases to recognize that the learned

5   intermediary doctrine is pretty much accepted by most,

6   if not all states.  I'm sure it is not every one, but

7   most.

8          My preliminary question is based on my

9   understanding of the learned intermediary doctrine.

10  The consumer -- direct-to-consumer advertising is a New

11  Jersey issue, and it is not accepted by most other

12  states.  So it might be -- you know, my original

13  thought, and this is just I'm thinking out loud now,

14  I'm not giving final decisions because I haven't looked

15  at the law of each state, my original thinking is I

16  probably don't want New Jersey cases in this group even

17  though I put some in, that what I probably want is a

18  mix of other states where there is acceptance of the

19  learned intermediate doctrine and general strict

20  liability and basic law that is going to be the same.

21  And most strict liability in most states have adopted a

22  restatement or something close to it, the fact of the

23  matter is most of the country doesn't have -- they have

24  little nuances of law that are different, but most of

25  the country has pretty uniform law.

1          I understand that each state has some

2   differences, and there may be some states where there's

3   law that simply would make it a position where you

4   couldn't -- you couldn't really mix that state's case

5   with another -- with others in front of a jury.  And I

6   recognize that that's certainly going to be true.  I

7   mean, for example, I know Pennsylvania has a negligence

8   standard; that's a separate standard.  I'm sure several

9   states do.  But if plaintiffs waive the negligence

10  standard and just want to try it under strict

11  liability --

12         MS. FREIWALD:  There is no strict liability in

13  Pennsylvania.

14         MR. WEISS:  Pennsylvania has failure to warn,

15  Your Honor.  It is a negligence standard, but it is

16  very similar.

17         THE COURT:  New Jersey has strict liability,

18  which is a negligence standard, too --

19         MS. FREIWALD:  It is not at all similar to

20  strict liability.  In fact, there's plenty of

21  Pennsylvania law that says that's not the case.

22         MR. WEISS:  You misunderstood what I said.

23  The strict liability statute in New Jersey is

24  essentially a negligence standard.  To that extent, the

25  laws are similar.

1          MR. VENDERBUSH:  But it imputes knowledge to

2   the defendant.  We have the burden of proof on that

3   issue.

4          MS. FREIWALD:  I think the issue, Judge is --I

5   can't imagine you want us to debate the nuances of

6   every state's law in this forum.

7          THE COURT:  I don't know them yet, and I

8   haven't had a chance to --

9          MS. FREIWALD:  It wouldn't be fair for you to

10  do that; it wouldn't be practical for anybody to do

11  that.  I think the plaintiffs are still grappling with

12  some of the specifics.

13         THE COURT:  Pennsylvania has no strict

14  liability?

15         MS. FREIWALD:  Not in prescription

16  pharmaceutical cases.

17         THE COURT:  Neither does New Jersey.

18         MR. WEISS:  That's my point.

19         THE COURT:  What it comes down to is we have

20  strict liability, and we have a Products Liability Act,

21  but the Court has molded it in terms of reasonable

22  conduct, which is what is negligence.

23         MR. GALPERN:  We have a knew or should have

24  known strict liability standard.

25         MS. FREIWALD:  Your Honor, I think there are

1   certain areas that we have identified.  One is the

2   failure to warn the medical community versus the

3   failure to warn the specific doctor, whether the

4   question can be put up that way, and we do believe,

5   notwithstanding whatever difference we respectfully

6   have with you in New Jersey that there are considerable

7   differences among the state's law.  You have identified

8   the learned intermediary issue, which is clearly a

9   difference state by state.

10         THE COURT:  It is not really different.  Well,

11  all right.

12         MS. FREIWALD:  There are states where it is

13  different.  There's differences in the application of

14  comparative contributory negligence, variety of

15  differences.  There are differences in how various

16  states either do or don't apply the restatement second,

17  whether they have adopted it at all.

18         There are several areas where we could

19  probably try to identify --

20         THE COURT:  It looks like, Hope, you have done

21  a pretty thorough -- you have already done an analysis

22  of the states, right?

23         MS. FREIWALD:  We are fairly well along.

24         THE COURT:  Which states are similar?  Which

25  couple of states could be tried together?

1    MR. VENDERBUSH:  That's their burden.

2    MR. BUCHANAN:  Actually, we said they could

3    all be tried together under New Jersey law.  We pled

4    them as New Jersey cases.  I think it is their burden

5    to come forward and challenge that.  They have

6    stipulated to it in the past.  New Jersey manufacturer,

7    New Jersey relevant conduct here.  There's a strong

8    governmental interest.  We would be happy to go through

9    the balancing of those competing interests if they want

10   to file the motion they said they were going to file

11   30 days ago.  They haven't done so.  But I do think --

12   you can't get to -- you can't get to the subtleties of

13   all the different state laws until you work through it,

14   and the process is supposed to be worked under, and

15   they are New Jersey pled complaints.  Where are the

16   conflicts if they exist?  Are they real conflicts or

17   are they transient or theorial conflicts?

18       We think that for many of the states on the

19   core issues that you're focused on for phase one they

20   are illusory conflicts that ultimately the duty that's

21   owed by the manufacturer is the same, the proofs are

22   the same.

23   MR. STRAIN:  Which states are they, Dave?  You

24   say "for many of the states."

25   MR. BUCHANAN:  We laid them out.  I would like

13

---

1    to respond to a motion by you challenging New Jersey

2    law.  That's what I'd like to do.

3    MR. STRAIN:  That' not what you said to the

4    Court for many of the states.

5        I thought when you said that --

6    MR. BUCHANAN:  You can look through and see --

7    MS. FREIWALD:  There are a variety of

8    differences.  Even you identified differences, and then

9    many of your commonalities are, frankly, only at the

10   30,000-foot level.

11   MR. BUCHANAN:  I would like to know whether

12   the defense contention is New Jersey law does not apply

13   to out-of-state plaintiffs.  I would like -- I mean --

14   MR. STRAIN:  Certainly.

15   MR. BUCHANAN:  -- I would like that in a

16   motion.  I would like them to contend that New Jersey

17   law is not going to apply and for them to make a

18   showing when New Jersey law doesn't apply.  They said

19   that could be done quickly.  I thought it would be done

20   prior to this motion.  It hasn't been done, but there

21   is an analysis that is supposed to be undertaken that

22   hasn't been undertaken on which they bear the burden.

23   MS. FREIWALD:  Respectfully, Dave, we said we

24   would submit a brief that would deal with the trial

25   plan management issues, and Your Honor asked us to

14

---

1    frame that as a motion for reconsideration, which we

2    will.  We don't think that shifted the burden to us,

3    and we didn't understand that that was specifically to

4    address each state's choice of law because we didn't

5    think it would be until today that we would get to a

6    discussion of narrowing the field and then add that

7    into the mix.

8        I think it is plaintiffs' burden to argue what

9    state's law applies.  The fact that they chose to plead

10   these cases as New Jersey cases I don't think makes any

11   difference.  That is simply an error which has been

12   deferred up until this point or the facts that we might

13   have believed prior to what's happening now in the

14   Appellate Court that you could apply New Jersey law I

15   think also doesn't change it.  They have the obligation

16   to make the argument that an out-of-state plaintiff is

17   entitled to New Jersey law or, alternatively, to come

18   up with a trial plan -- I think Mr. Venderbush or Mr.

19   Shors can correct me if I'm wrong, but I think other

20   courts that have tried to develop complex trial plans

21   have put the burden on the plaintiffs to say what would

22   be a reasonable plan, and they have the burden, I

23   believe, to say what state's law they believe are so

24   identical that it will work together and what cases

25   would fit in there.

15

---

1        We're more than happy to brief this issue for

2    Your Honor, but it is not our burden to disprove it.

3    It is their burden to say to Your Honor that the plan

4    they want is doable.

5    MR. BUCHANAN:  The plan we want is doable

6    under New Jersey law.

7    THE COURT:  This was not the plaintiffs' plan.

8    I think it is my plan.

9    MR. PLACITELLA:  Can I be heard on the issue

10   just for a second and a question...

11       Having tried and litigated cases in this state

12   for 25 years when we file a case for an out-of-state

13   plaintiff we usually proceed under New Jersey law

14   unless challenged by the defense, and then the Court

15   makes a decision.  To my knowledge most of the

16   decisions have gone in the plaintiff's favor, but

17   putting that aside for another day, I think that

18   that's kind of normal practice.  The fact that you have

19   four cases together doesn't change the normal practice.

20       The second question I have is on the

21   direct-to-consumer part I just want to kind of separate

22   that out, I don't see why -- because we believe New

23   Jersey law should apply -- I don't see why as a

24   separate question a jury could not answer that, and if

25   some Appellate Court thought that was -- that was not

16

1    correct, okay, but that's not a very complex issue;
2    they're going to hear most of the evidence anyhow.  So
3    I would just, in talking through it, be a little
4    concerned about taking that out of the mix when the
5    evidence is kind of all-inclusive in any event.
6         We think New Jersey law applies.  There's been
7    no Appellate Court in the last 5 years in New Jersey
8    who said that it hasn't applied, you know, in this
9    context that I'm aware of, and I think it is their
10   challenge.
11        MR. STRAIN:  You know, we think that the
12   Court -- the question was asked the other day from the
13   plaintiffs, and, obviously, with opportunity for us to
14   have comment after they gave it to you on looking
15   toward identity or similarity among the laws of the
16   State is a key question -- is the key question, and I
17   think it is important that we have a selection of
18   39 cases.  There could have been 39 cases from one
19   state.  There were 39 cases from a mix of states.  We
20   don't want to buy into manageability and appeal
21   problems by the happenstance of what states those 39
22   happen to be.  We don't have to, because of that
23   selection, mix plaintiffs from different states.  It
24   would be much better for manageability and for appeal
25   and prejudice reasons to deal with plaintiffs from one

1    state only.  I don't think any of us should feel, and
2    Your Honor should feel we're stuck with the mix of the
3    39 cases that we had, that they happen to be from
4    whatever it is, 20 states or 15 states or whatever it
5    was.  They could have been all from the same state, but
6    they weren't.  There are several groups in there states
7    that have two, three, four plaintiffs each, but, you
8    know, we don't want the tail to wag the dog here.  The
9    important thing here is a fair trial that's manageable,
10   and it is not going to be reduced on appeal, and it
11   protects the rights of all the parties.  And we don't
12   need to be slave to just what 39 cases happen to come
13   out of the box when you picked the 39.
14        I think the Court has focused us right on --
15   in the last couple days on the a key question, maybe
16   the key question; that is, which state's law are
17   identical or are sufficiently identical that can be
18   fairly tried together without considerations of jury
19   confusion, which Your Honor highlighted a moment ago,
20   and manageability, and that's a big, important issue.
21        MR. WEISS:  Are you finished, Paul?
22        MR. STRAIN:  I am.  Thank you, Sol.
23        MR. WEISS:  I would just like to add, Your
24   Honor, the following facts:  I think you're right in
25   picking 39 cases to vet out.  I would like Merck to

1    face its obligations to the people who were harmed by
2    the drug -- allege to be harmed by the drug and come up
3    with a fair trial plan that doesn't take us to 2225 to
4    try cases, because that's what you're doing.
5         Every time we sit around this table we hear
6    nothing but a filibuster on why you can't do anything
7    other than one case at a time.  That's all we hear.
8         MS. FREIWALD:  Sol --
9         MR. WEISS:  No, let me finish.
10        You have all different reasons why.  We all
11   came into this court.  The plaintiffs have agreed that
12   New Jersey law would apply.  And Chris is right.  Most
13   Appellate Courts in the last five years in New Jersey
14   have agreed in products liability cases because of New
15   Jersey's interest in its own corporations -- and Merck
16   is in New Jersey -- that New Jersey law would apply.
17   Why can't you agree to that?  I know the reason why,
18   because if you agree to it we won't have these silly
19   arguments about lumping cases together from different
20   states.
21        That's what the case law says.  I know there's
22   a case on appeal right now.  There's a case in the
23   Supreme Court on that very issue.
24        THE COURT:  No, I don't think there's a case
25   in the Supreme Court on that issue, really.

1         MR. WEISS:  On choice of law?
2         MR. BUCHANAN:  It is a different issue.
3         MR. WEISS:  It is going to be decided on that
4    issue.
5         MR. BUCHANAN:  It was a statute.  I think it
6    was a statute of limitations.
7         THE COURT:  Which case?
8         MR. BUCHANAN:  Rowe, I assume.
9         MR. WEISS:  I thought Rowe was on that issue,
10   though.
11        MR. BUCHANAN:  Rowe was on choice of law
12   issue, but I thought it was a statute of limitations
13   under Michigan law or maybe it is on the FDA ban, I'm
14   not sure.
15        MR. GALPERIN:  Product liability.
16        THE COURT:  I guess it will -- it may give us
17   some guidance.
18        MR. WEISS:  Some guidance on whether New
19   Jersey law should apply.
20        So you won't agree to that --
21        THE COURT:  Although it is a specific case
22   where plaintiff has no cause of action in Michigan.
23        MR. WEISS:  In Michigan, I understand.
24        THE COURT:  And it is a question of whether he
25   should be allowed to proceed -- he or she should be

1    allowed to proceed here, and the judge made a point of
2    the fact that this was their only forum.
3        MR. PLACITELLA:  That was the record that was
4    created.
5        THE COURT:  So it is a little bit different.
6        MR. WEISS:  If you are now talking about every
7    state --
8        THE COURT:  Here we're not talking about no
9    forum or a forum, we're talking about applying
10   different law.
11       MR. WEISS:  You're right, Your Honor.  Almost
12   every state in the United States has the learned
13   intermediary defense to drug cases.  And if the issue
14   is --
15       THE COURT:  Except New Jersey.
16       MR. WEISS:  Well, it depends on the situation
17   in Perez.
18       MS. FREIWALD:  And Wisconsin and West
19   Virginia.  Sol, I think the Judge --
20       MR. WEISS:  Can I finish, please?  You have
21   all had a chance to talk.
22       MS. FREIWALD:  I thought you were finished.
23       MR. WEISS:  If the question is whether the
24   duty is owed to the prescriber or owed to the community
25   at large we can deal with that in a fair way.

1        MR. VENDERBUSH:  How?
2        MR. WEISS:  Maybe it is to the physician.
3    That doesn't mean you can't try four or five cases
4    together.
5        MR. STRAIN:  That's right.
6        MR. VENDERBUSH:  Specific stuff --
7        MR. WEISS:  That's right.
8        MR. STRAIN:  That's right, but not as to the
9    issue of whether you divide this into phases.  There
10   are two different issues on state law, and one is the
11   question of whether the laws of different states can be
12   molded -- can be melded, and you can try a group of
13   five plaintiffs from five different states before the
14   same jury.  That's one question.  The first question
15   relates to the phased trials we're talking about.  And
16   that is -- and that is whether under the laws of any
17   state is it proper to ask the question to the jury did
18   Merck fail to warn the medical community.  If that's
19   not a proper question under Pennsylvania law you can't
20   try the Pennsylvania plaintiffs in that fashion.
21       MR. WEISS:  It is how you frame the question
22   that puts the rabbit in the hat.  The real question is
23   whether Merck's conduct warned the doctors
24   sufficiently, period.
25       MR. LANIER:  Can I ask a dumb question?  And

1    it may be stupid, and y'all can just ignore me when I'm
2    done, and we'll go on, but it seems to me that if you
3    have these cases and you ask that learned intermediary
4    question in phase one, and there are some states that
5    don't have a learned intermediary defense then you
6    clean that up in Phase II when you ask the questions
7    that would be appropriate in that state as they're
8    going to need to be appropriate in every other state,
9    and it may be for those states that don't have a
10   learned intermediary defense that the fact that phase
11   one was answered yes is irrelevant for those cases.
12   Those cases will be more dependent upon the phase two
13   answers, specifically for each plaintiff.  I don't see
14   how the failure to have a learned intermediary defense
15   vitiates the ability to have those cases in phase one.
16   You just don't have anything that's of any use to them
17   when you get the finding.
18       MS. FREIWALD:  Can we step back here a second,
19   Your Honor?  I think that Your Honor has appropriately
20   recognized a couple conferences ago that particularly
21   in light of the engineers appeal and other things that
22   there is a lingering and significant appellate issue
23   about not applying -- about applying New Jersey law to
24   out of state's plaintiffs.  Up until this time, with
25   the exception of Humeston, Your Honor tried New Jersey

1    cases.
2        You went down the road -- we all went down the
3    road of having 39 cases randomly selected, perhaps,
4    with an initial belief that you might apply New Jersey
5    law to them.  I think there has been a step back,
6    appropriately, and a recognition that that is going to
7    create significant appellate issues.  The last thing we
8    want to do is try a case for four or five months
9    knowing that we have this huge appellate issue hanging
10   over our heads.
11       THE COURT:  It is really too late for that.
12   Every case we have tried it has had 15 or 20 new
13   appellate issues.
14       MR. PLACITELLA:  Tell us what cases which
15   cases you won't appeal, and that's the ones we'll try.
16       MS. FREIWALD:  There are appellate issues that
17   will arise, and there are appellate issues that are,
18   frankly, just staring you in the face before you even
19   start.
20       THE COURT:  The engineers case has nothing to
21   do with the personal injury case.  The engineers case
22   is a consumer fraud case, and I dealt with it in terms
23   of the conflict of law issues on consumer fraud.  That
24   is totally different or could be totally different than
25   the application to a personal injury case.  There's a

1   large distinction between the two.  The reasons for a
2   consumer fraud action, the purpose of it, as opposed to
3   personal injury actions, are different.  The engineers
4   case, as far as I'm concerned, is not going to really
5   give me any guidance.  I don't think -- I mean, it
6   certainly may give me guidance, but it is not going to
7   be the definitive decision.  It is not a personal
8   injury case at all.  It is strictly a consumer fraud
9   case.  Although it would -- I can't say it wouldn't
10  give me guidance, because it would give me guidance on
11  consumer fraud, obviously.  We may not have a decision
12  on that in a year, and I'm not waiting for it.
13       MS. FREIWALD:  So there is this issue, and
14  there is, also, I think we have all recognized that
15  even those courts who have developed some kind of group
16  trial plans have not grouped plaintiffs from different
17  states.
18       Mr. Weiss certainly knows that in Pennsylvania
19  in the Baycol litigation the judge contemplated
20  grouping by states, in Fen-Phen by states.  So the idea
21  that plaintiffs from different states are grouped is
22  really something that has not happened before, and
23  there's been a recognition in the law that the
24  plaintiff's state apply.  The Rhone Poulenc decision,
25  which many people here are familiar with, talks about

1   the fact that it is not just the big differences in
2   state law that have to be considered, it is the
3   subtleties and the nuances because they can drive jury
4   decisions.
5        So if the plaintiffs have identified states
6   where they feel the law is truly identical, not just at
7   the 30,000-foot level but in its application and for
8   all stages of the trial so the jury isn't hopelessly
9   confused that would be productive.
10       THE COURT:  Well, that's the benefit of the
11  bifurcated trial because what we're doing is really a
12  very generic first part of the trial.  Did Merck know?
13  What did they know?  What did they warn?  Basically,
14  it's a real simple issue, and most law in the end --
15  tort law boils down to simple issues.  Did Merck know
16  that there was a risk that they failed to warn about?
17  That's what the first half of the trial is.
18       The second half of the trial the way I'm going
19  to do is it will be individualized, so that each
20  plaintiff will then have to establish that they had a
21  heart attack that was caused by VIOXX, that they --
22  that there's proximate cause between the failure to
23  warn, which would identify -- which could be defended
24  based on the individual physician's knowledge, could be
25  based on the individual consumer's knowledge, can be

1   based on what they have done.  It is not a question of
2   if you find the first phase then we're just going to
3   damages.  I didn't bifurcate this in terms of liability
4   and damages.  I bifurcated it in terms of the generic
5   huge issue which takes several weeks to present, and
6   that issue is what did Merck know, when did they know
7   it, what did they do.  I have now watched these trials,
8   and that is the bulk of the trial.  And that takes a
9   lot of time to try, and to try that over and over and
10  over again is not logical.  It should be applied to
11  multiple plaintiffs.
12       Now, can you -- if we had a res judicata if
13  the juries all found the same way we could say, you
14  know, well, hopefully, if they found against the
15  plaintiffs all the time the plaintiffs would not be
16  ready to invest any more money in trials, and if they
17  find in favor of the plaintiffs every time then we
18  could probably say we don't have to do that first
19  issue, let's move to the specific plaintiffs.  Since
20  that hasn't occurred, and it has been really an almost
21  even division between the two, obviously, it is a
22  factual issue that juries have to determine at this
23  point.
24       So it seems to me that it is a logical
25  approach to have them decide that one issue which takes

1   the most of the time, because you have to go through
2   the whole history of the drug and how it was developed
3   and why it was developed and the science behind it and
4   the science of how it does or doesn't increase the risk
5   of heart attacks and the advertising and the marketing
6   and the warnings and the choices, all those witnesses
7   apply to every case.  And I have now watched the cases.
8   I have reviewed the federal cases.  They're all the
9   same for a bulk of the trial.  I have spoken to Judge
10  Fallon about this, and he agrees that most of the cases
11  are the same, then it comes down to the individual
12  issues of each plaintiff.  But, unfortunately, we
13  can't, because there's this division in the jury's
14  findings, we can't just skip over that.  We have to try
15  that.  But to try that large group and then try
16  individual -- you know, I felt since the beginning that
17  Merck's been trying to define this in terms of you
18  can't ask that question because that's not the question
19  because then you have to know what the physician
20  knew -- true, fine.  We're going to get to that with
21  each plaintiff individually, but that's the way I
22  structured the trial.  I structured the trial with
23  generic questions that deal with basic liability first
24  and then specifics.
25       MR. WEISS:  I want to point out, please,

1  Paul, Hope, I want to correct you about Philadelphia

2  and Pennsylvania in Fen-Phen.  We tried test cases

3  first with plaintiffs in different states.

4       MS. FREIWALD:  Not as a group.

5       MR. WEISS:  As a group.  I was involved in

6  them.  And then we turned around and we did reverse

7  bifurcation and just tried damages.

8       MS. FREIWALD:  Grouped by state.

9       MR. PENNOCK:  Your Honor, Paul Pennock from

10  Weitz and Luxenberg.  In New York Judge Freidman put

11  together -- and Hope was not involved in this

12  litigation at all, so she would have no reason to know

13  this -- but she certainly put together cases from

14  different states for trial.

15       MR. LANIER:  Happens all the time in Texas,

16  too.

17       MR. PENNOCK:  Including Nevada and Michigan,

18  including a case Rob Gordon and I tried.

19       MR. LANIER:  It happens all the time in Texas.

20       MR. STRAIN:  Your Honor, recognized -- Your

21  Honor had three groups so far of these VIOXX cases, and

22  they didn't all go as a group because the groups fell

23  apart.  Doherty was going to be a group of two, both

24  New Jersey.  McFarland was going to be a group of

25  three, all of New Jersey.  Cona/McDarby, of course,

1  were both New Jersey.  Until now we haven't had this

2  problem that we're dealing with, and that problem is a

3  real serious one when the Court is trying to structure

4  something that's logical but it is going to fall apart

5  if the different states don't all permit, make

6  appropriate, make proper that first general question.

7  We don't think they do, but if they don't it falls

8  apart.

9       Secondly, it falls apart if you ask the same

10  jury to apply successively 10 different legal rules in

11  deciding on the facts of 10 different cases.  Asking

12  one jury to do that I can't imagine that anyone

13  stepping back and looking at that wouldn't say the jury

14  confusion, which the Court has rightly said is an issue

15  here, I can't imagine anybody stepping back and looking

16  at that wouldn't say jury confusion is inevitable and

17  extreme unless the law is identical.  It is already

18  hard to ask one jury to apply one set of rules, one

19  law, to 10 different facts situations, and that's

20  already maybe a super human thing to ask of the jury.

21  To ask them to apply 10 different rules to 10 different

22  facts situations two weeks apart, two weeks apart,

23  two weeks apart, the jury just can't do that.

24       THE COURT:  It is not going to be two weeks.

25  It will be shorter than that.

1       MR. STRAIN:  It will be close to that.

2       THE COURT:  It will be shorter than that.

3       MR. GRAND:  Can we ask for an application in

4  New Jersey law?

5       THE COURT:  All right.  Let's stop.  I'm tired

6  of this topic.

7       Let's just put this simply.  I intend to

8  proceed the way I have planned.  I intend to ask the

9  generic question.  If the defense wants to file a brief

10  on that do it now.  You have given me no arguments so

11  far, and you have given me a -- you have given me a

12  host of arguments, not just none.  You have given me a

13  host of arguments.  You wrote me a letter that listed

14  pages of arguments against it.  I have read them.  I

15  have reviewed them.  I'm not inclined to change my

16  mind.  File a brief if you want.

17       On the issue of conflict of law we're going to

18  have to pick the plaintiffs, and then there's going to

19  have to be a motion filed by the defense immediately as

20  to whether they feel there's a conflict of law and

21  which law should apply.  I'm not going to make that

22  decision in January or even in December.  I'm going to

23  make that decision now.

24       Now let's go to a different approach, and that

25  approach is which of these cases has -- how many of

1  them have we had the plaintiffs dep?  Almost all of

2  them or half of them?

3       MR. MORELLI:  We have had -- I have four cases

4  that I'm preparing.  Two plaintiffs have already been

5  deposed.  One is being deposed right now today, and one

6  is scheduled for next week.

7       MR. PLACITELLA:  I think they're all going to

8  be deposed within the week.

9       MR. MORELLI:  By next week all my cases all

10  the plaintiffs will be deposed, and we have also done

11  sales reps and a couple of prescribers.

12       THE COURT:  I hope people have had the

13  opportunity both from the defense and the plaintiff's

14  point of view even if deps haven't been taken or if

15  they have been taken to look at the facts of their

16  cases and have some idea which one of these cases

17  involves people who have no prescriptions --

18       MR. WEISS:  Yes.

19       THE COURT:  -- prior chest pain, were

20  shoveling snow when they died, you know, those kind of

21  things so we can identify those issues because, quite

22  frankly, those aren't the cases I want to try to

23  determine issues.

24       MR. MORELLI:  There's no shoveling snow where

25  you die cases.

1    THE COURT: There was just a federal case.
2   That's what the federal case was, and Judge Fallon said
3   it was hard for his jury to understand anything about
4   snow because they don't get snow.
5        MR. PLACITELLA: That could be a real conflict
6   issue.
7        MR. MORELLI: That can be tried in New Jersey.
8   The question I have is whether or not if Humeston gets
9   tried again will it be Idaho law next time?
10       THE COURT: I believe the -- my recollection
11  was that the defendants conceded last time, and I
12  haven't looked back on the record, that there were no
13  substantial differences between Idaho law and New
14  Jersey law.
15       MR. BUCHANAN: That's my reading of the
16  transcript.
17       THE COURT: That's my recollection, and that's
18  what I felt was in the transcript.
19       MR. SHORS: Your Honor, just for the record,
20  my memory is different of that. I think we had three
21  briefs on the choice of law question. We filed a
22  summary judgment motion, we filed a reply brief, and
23  then the Court directed us to file one more brief on
24  choice of law. We continue to assert the application
25  of Idaho law, and the Court ruled against us.

33

1        MR. COHEN: And Christy argued --
2        MR. BUCHANAN: Actually, it was Diane. Diane
3   argued the choice of law. I read the transcript last
4   night. I believe the Court made a pointed question to
5   defense counsel and asked, Are you contending there's
6   any differences in the substantive law of Idaho versus
7   New Jersey, and the defense conceded that there were
8   no -- as I read it -- no differences between the
9   substantive law on the Product Liability Act claim.
10  There was an assertion of there being some issue in the
11  punitive damage standard under Idaho, but I can't
12  remember how that worked out because there was
13  subsequent briefing on that.
14       THE COURT: Which we never got to.
15       MR. BUCHANAN: I don't know if we ever argued
16  that issue. The final issue was a Consumer Fraud Act,
17  and I think --
18       THE COURT: And in that I'm applying New
19  Jersey law. I have already made that decision. So the
20  issue of the Consumer Fraud Act I'm applying New Jersey
21  law. I have already made that decision. It has
22  actually been affirmed by the Appellate Division. That
23  is the law. The Supreme Court may decide differently,
24  but at this point that's the law of New Jersey.
25       MR. WEISS: Your Honor, in response to your

34

1   question, of the four Anapol cases the one picked by
2   the defendant Williams-McCray, I believe, has a product
3   ID issue, am I correct, defense, do you agree? Hope?
4        THE COURT: Do you have the individual cases?
5        MS. FREIWALD: I don't know the facts of that
6   case well enough to say.
7        MR. STRAIN: I don't either.
8        MR. WEISS: That's the one you picked, and I
9   can put the facts on the record, but, guys, my
10  understanding is there's a lot of samples, and there's
11  a lot of gaps, and there are no prescriptions at the
12  time she had the MI. The only thing is in the hospital
13  records when she went in she was on VIOXX with samples.
14  That's what Your Honor suggested is a summary case.
15       MS. FREIWALD: Are you going to dismiss with
16  prejudice?
17       MR. WEISS: No. It is a case you picked.
18  That's one of the cases I thought Your Honor wanted to
19  have a summary trial on to see whether or not there was
20  product ID.
21       MR. BUCHANAN: I thought the procedure you
22  outlined in July, or maybe it was August, Judge, was
23  to deal with this issue in trying to get things
24  that may clutter the length of the trial or clutter the
25  issues in the trial to identify, and I thought it was

35

1   asked from the defense which cases the defense was
2   going to contend there was a product usage or product
3   ID issue in, and they were going to identify that so we
4   could decide in framing the cases are those cases that
5   should be a part of a consolidated trial or are those
6   cases that we know we're not going to have that issue
7   in, they shouldn't be a part of a consolidated trial.
8        And I know I asked Mr. Cohen earlier this week
9   if they could identify those cases in which they either
10  believed there was an issue or those cases where they
11  didn't believe there was such an issue, and we haven't
12  gotten a list yet.
13       MR. STRAIN: There was discussion of that,
14  Dave. The Court did not ask us to go forward and name
15  which ones we thought there was a product ID issue,
16  product usage issue. One of the things we have to
17  focus on is we're talking about the extension data, and
18  you're making the argument that gaps don't matter. I
19  mean, are you going to drop that argument, that gaps
20  don't matter, because if you're making that argument
21  then this is not an issue.
22       MR. BUCHANAN: As I understood it, and I
23  didn't review the transcript prior to today, but
24  there's a lot of people in the room who have a good
25  recollection of this, it was a concern about whether

36

1    product usage issues would clutter up the trial, and I
2    think the goal was at this point in the case you guys
3    would know having done discovery and having reviewed
4    medical records, having reviewed prescription records
5    which cases are those in which you believe product
6    usage was likely to be an issue, and you were going to
7    identify those cases, and the Court would develop a
8    procedure to deal with those either in the context of
9    this trial or maybe separate them up and go forward
10   with a different set of cases, but I thought it was on
11   you guys to identify those cases in which you believe
12   there was a product usage issue.
13          THE COURT:  Let me just -- this was, again,
14   something I wanted to do, and I still want to do it,
15   and I'm still going to do it.  I am not going to try
16   for 10 weeks a case where the issue is whether the
17   person took the drug.  I'm not going to do it.  That's
18   such a waste of court time.  I have already done it
19   once.  I am not doing it again.  When there's an issue
20   as to whether the person actually took the drug or not
21   there's going to be a preliminary trial.  If it has to
22   be a jury trial it will be a jury trial.  I would
23   prefer that it be an arbitration or a bench trial, but
24   if counsel is going to insist on both sides or either
25   side, because either side has a right to it, to a jury

1    trial on that issue, then we'll have a two- or
2    three-day jury trial on the issue of whether they did
3    or didn't take the drug and for how long a period and
4    whether they took it during gaps, factual
5    determinations by a jury, not a verdict, but factual
6    determinations.  It will take two days probably per
7    case, and then that will not be -- and if it is
8    determined they didn't take the drug then I would think
9    at that point that plaintiff is either going to dismiss
10   or be dismissed on summary judgment, I mean, one of the
11   two.
12          MR. PLACITELLA:  There's plenty of precedent
13   for that procedure.  We do it all the time in the
14   context of statute --
15          THE COURT:  We're not arguing whether we can
16   do it or not; I'm doing it.
17          MR. WEISS:  That's the reason I raised, Your
18   Honor --
19          THE COURT:  I want to review these cases, and
20   I don't want to try cases where the primary defense is
21   they didn't take the drug.
22          Now, on the other hand, McCray is a three-year
23   old case, and I do not want William-McCray's case to be
24   or is it --
25          MR. WEISS:  It is Xavier Williams-McCray.

1          THE COURT:  I don't want Mr. McCray's case
2    hanging around forever.
3          MR. WEISS:  I agree.
4          THE COURT:  What I would like to do is have
5    one of those hearings on McCray.  Right now we're
6    gearing up for the major trial, so we won't do those.
7    As soon as this trial is over it is my intent, and I
8    didn't want to do that at this meeting because we have
9    the whole VIOXX meeting, but at the next VIOXX meeting
10   it is my intent to identify a few things.  One is those
11   cases that were filed in the first two years where
12   discovery should have been done on whether or not
13   there's a taking the drug issue and have hearings on
14   those cases.  I want to have -- or at least see how
15   many of them there are.  I also want to identify cases
16   where there's no medical record and this I would like
17   to do for the whole period of time pretty much up to
18   anything filed up to six months ago.  The issue of
19   medical records to show that they actually had a heart
20   attack or stroke.
21          We may have 5,000 cases -- hopefully we don't,
22   but we may have 300 where the person actually didn't
23   have a heart attack or a stroke.  Merck certainly
24   shouldn't be bothered with those cases, shouldn't have
25   to try those cases.  I don't want to try those cases.

1    I mean, weeding out fraudulent cases -- not fraudulent,
2    but I know sometimes -- well, fraudulent or very
3    questionable cases is an important part of this.
4    There's no question that Merck's entitled to have
5    dismissals on probably a large number of cases, and I'm
6    going to make sure that happens, and I'm going to try
7    to do it as quickly as possible.  But that's going to
8    require separate -- and I didn't want to do that at
9    this meeting, but, certainly, if one of these people in
10   these 30 -- this is the 36-year old, and we'll start
11   with these old cases, we'll weed out the junk.  On the
12   new cases -- and I'm not suggesting that your client's
13   case is junk, but it is questionable.
14          MR. WEISS:  All I can tell you, Your Honor, I
15   agree with you, I just brought it up because that's
16   what I thought you wanted to do, and that's one of the
17   cases that fits that description.
18          THE COURT:  I don't know that plaintiffs have
19   had a chance to meet, but I would like to have them
20   meet today here and discuss that.  I want to weed out
21   the cases -- I mean, I don't know that there are
22   anywhere there's not a diagnosis of a heart attack.
23   You know, if the medical record doesn't --
24          MR. MORELLI:  Are you talking in these
25   39 cases, that there's no diagnosis of an injury of a

1   heart attack?

2          MR. BUCHANAN:  We'll address that issue.

3          THE COURT:  I'm assuming that's not the case,

4   but I'm just saying it is something that I want to look

5   for.  I'm sure in some of these cases that have been

6   filed the person thinks they might have a heart attack

7   next week.  There's some people who think they had

8   chest pains and then they relate it to this.

9          MR. STRAIN:  We had a plaintiff testify

10  yesterday she did not have a heart attack, and then on

11  redirect -- on direct -- then by her counsel she was

12  asked, Don't you remember you had a heart attack, and

13  she said, Oh, yes that's right, I did, and then in the

14  recross she was asked, Well, can you tell me any

15  particulars, when did you have that, and she didn't

16  have any idea she had a heart attack.

17         MR. WEISS:  So what do the medical records

18  say, she had a heart attack?

19         THE COURT:  We also want to exclude any

20  plaintiffs with Alzheimer's.

21         MR. PLACITELLA:  Unless it was caused by

22  VIOXX, right?

23         MR. MORELLI:  Who was shoveling snow in

24  Louisiana.

25         THE COURT:  There are going to be cases -- I

1   have no question where there's not the real injuries of

2   the type that should have compensation.  I mean, and we

3   have got to get rid of those cases.  And --

4          MR. BUCHANAN:  That's fine, Judge.  I just

5   want to understand the concept.  You want to proceed

6   with the 39 cases, identify those that should go into

7   that separate track, and you're going to define when

8   that separate track, deadlines and other --

9          THE COURT:  That separate track is not going

10  to take precedence over this track.

11         MR. STRAIN:  Are you going to do those

12  individual trials before January?

13         THE COURT:  No.  No.  And I intend to make the

14  individual trials encompass a lot more cases than just

15  the 39.  I would think they would encompass cases in

16  the first two years.

17         MR. WEISS:  Right.  That's what you said.

18         MS. FREIWALD:  We'll need --

19         THE COURT:  You'll need time to identify.

20         MS. FREIWALD:  We'll need time and we'll need,

21  also, some kind of discovery program because one

22  problem we have had --

23         THE COURT:  We're talking about ones now where

24  the first waves of discovery are done.

25         MS. FREIWALD:  The wave cases?  Okay, Your

1   Honor.

2          THE COURT:  Then we have to set up new waves

3   of other cases.  I may just require everyone within

4   60 days to provide a medical record and prescription

5   records or the -- so that we can get those things --

6          MR. BUCHANAN:  We actually do that, but we do

7   that with the facts sheet.  All those things go with

8   the facts sheet.  Any medical records the plaintiffs

9   already have are produced together with the facts sheet

10  together with authorizations that they then use to get

11  more --

12         THE COURT:  You have plaintiffs' attorneys who

13  don't even know whether their clients had heart attacks

14  and don't have the medical records.

15         MR. BUCHANAN:  I guess I'm surprised to hear

16  that knowing how the people I know in the litigation

17  work and just having spoken to a lot of people prior to

18  the statute of limitations.

19         THE COURT:  There must be one out there.

20         MR. BUCHANAN:  I have no doubt, Judge, with

21  14,000 cases there's probably -- or 15,000 cases now

22  I'm sure there's a case with a plaintiff who didn't

23  have a heart attack who claims they have a heart

24  attack.

25         MS. FREIWALD:  Your Honor, just so that our

1   silence on the record isn't taken as some kind of

2   acceptance, I feel like I need to make a record, as we

3   have said before, that we think there are very

4   significant concerns in peeling off the issue of

5   product usage from the other issues in the case.  We

6   think it goes to the representativeness of the claims,

7   if that's what we're trying to do is get a sense of

8   representative claims, and there are also -- frankly,

9   there are shades of reliability in somebody's usage.

10  There are situations where we have very glaring gaps

11  for weeks or months before the use, and then we have

12  other cases where there are intermittent gaps.  We

13  have, quite interestingly to me, all the sudden a great

14  deal of plaintiffs testifying that they got shopping

15  bags of samples.  I don't know where that particular

16  language came from, but it sounds vaguely familiar to

17  me, and I think those -- I think those cases are all a

18  little bit different.

19         THE COURT:  Did they know, those plaintiffs,

20  how that shopping bag of samples played with the jury?

21         MS. FREIWALD:  I have asked myself that

22  question.

23         THE COURT:  Well, the bottom line is those are

24  the people, people who say they got samples, that's

25  where you have to try to put the witness in front of a

1   jury, put the doctor in front of a jury either by
2   videotape or live and let plaintiffs cross-examine
3   them, let the defense cross-examine them and let the
4   jury make up their mind.  Other than the doctor, the
5   family and the plaintiff, they're the only ones that
6   are going to know that, and to try that case where
7   that's the main defense for seven weeks is absolutely
8   ludicrous, and I'm never going to do it, and I don't
9   think any Appellate Court is going to make me do it.  I
10  think it is an issue that has to be -- this is so
11  logical.
12          There's so many questions in these cases that
13  are cutting edge that are difficult.  This is a
14  no-brainer.  This is a no-brainer.
15          MR. LANIER:  So do you want us to meet at some
16  point or I have five cases, three of my own and two of
17  Louis and Roberts, and I can tell you right now which
18  ones are questionable and which ones are not.  How do
19  you want us to do that?
20          THE COURT:  Why don't plaintiffs meet and make
21  a decision of the 39 which cases you feel have real --
22          MR. LANIER:  Viability in terms of
23  prescription history and prior medical.
24          THE COURT:  And let me know.
25          MR. STRAIN:  And then, Your Honor --

1           THE COURT:  And I'll hear from the defense
2   anything you want to tell me -- you can also tell me
3   about any particular case you want to tell me about you
4   think has specific issues that either would not merit
5   it being a part of the next trial for any reason.
6           MR. STRAIN:  Or comments on -- because,
7   obviously, Your Honor doesn't want this to become a
8   back door selection of cases by the plaintiffs of their
9   favorite cases, so we'll comment on that.
10          MR. GALPERN:  Your Honor, can I can a quick
11  point of clarification?  For the cases that counsel out
12  of the 39 feel should be deselected from the 39 can we
13  accomplish that simply with a one-sentence letter to
14  the Court saying, We believe these should be
15  deselected --
16          THE COURT:  No, I want you to tell me in about
17  a half-hour which ones those are.
18          MR. GALPERN:  Do we need to put any reasons
19  whatsoever because I don't think we can ethically put
20  any reasons in our -- if we're going to be candid and
21  indicate which ones should be deselected I think that's
22  as far as we can go.
23          MR. STRAIN:  If it is deselection it is not
24  deselection because you don't like the plaintiff and
25  don't think she'll play well with the jury, it is

1   because you see a gap or a sample issue, and that's on
2   the record.
3           MR. GALPERN:  I don't think we can make that
4   representation to the Court in any medium whatsoever.
5   That's why I bring that up.  I think if we can do a
6   one-sentence letter that's as far as we, as advocates
7   for our client, can go.
8           MR. STRAIN:  For Your Honor to evaluate that
9   and for us to evaluate that they have to give a reason.
10  The plaintiff testified in deposition that they had a
11  shopping bag of samples, and there's no prescription
12  records.
13          MR. GALPERN:  We cannot fulfill our ethical
14  obligations to our client and give a reason why we
15  think the case should be dismissed.
16          MR. PLACITELLA:  Why can't you say we think
17  there's a sample issue, and we can say we agree there's
18  an issue?
19          MS. FREIWALD:  We have an ethical obligation
20  to the Court.
21          MR. LANIER:  Am I in an ethical problem if I
22  say, Your Honor, in the Sunz case it looks like
23  prescription history is going to be an issue, and it
24  looks like his prior medical condition will be an
25  issue?  I don't think that's unethical.  I think that

1   is candor to the tribunal.  I think those will be
2   issues in the Sunz case.  I think I'm unethical if I
3   don't tell you that.
4           MR. STRAIN:  Counsel mentioned -- Mr. Lanier
5   mentioned prior medical condition.  There would be
6   these what I thought would be usage trials would
7   include prior medical condition which gets into
8   causation.
9           MR. WEISS:  Time out.
10          MR. STRAIN:  If they're going to be deselected
11  because of prior medical condition there has to be a
12  mechanism for determining -- for the jury determining
13  that.  I thought we were talking about usage and
14  samples and things like that.  If we're talking about
15  prior medical condition making your case weak --
16          MR. PLACITELLA:  We think it makes it strong.
17          MR. STRAIN:  -- that has to be put before a
18  jury who then determines the causation issue.
19          MR. PLACITELLA:  That's why we have phase two.
20          MR. STRAIN:  And we can't do this on the prior
21  medical condition, Your Honor.
22          I understand the Court's desire on usage
23  issues, but to do this on prior medical condition just
24  gets into alternate causation.
25          MR. BUCHANAN:  I understood the Court's issue

1 to be whether or not there was a documentary evidence
2 of the harm that the plaintiff claims --
3         MR. MORELLI:  Of the injury.
4         MR. WEISS:  Of the injury, not prior heart
5 attacks.
6         MR. MORELLI:  Not a history.
7         MR. BUCHANAN:  Prior medical conditions -- I
8 think we're talking about evidence of the actual injury
9 that is claimed.
10         Judge, can we have some time with the
11 plaintiffs to discuss things?
12         THE COURT:  The plaintiffs can stay in here,
13 and the defense can move.
14         MS. FREIWALD:  Is there a room?  We were told
15 there is no jury room today.
16         (Break taken.)
17         THE COURT:  I did rule on the forum non for
18 the UK plaintiffs, and I did dismiss all the UK cases.
19 So Charlie argued that. Too bad he is not in the room.
20 I did tell him.
21         MR. STRAIN:  We won't congratulate him for
22 you, but we'll congratulate him for us.
23         THE COURT:  This is what I'm going to do.  I'm
24 just going to put it on the record briefly.  Plaintiffs
25 need time to talk. Defense needs time to think, too, I

49

1 think, based on things I have said today.  I'm going to
2 let the plaintiffs meet together, and I'm going to let
3 plaintiffs' counsel submit to me a list of the 10 cases
4 they want to try together.
5         One of the main reasons I'm doing that, or the
6 main reason is because plaintiffs are giving up their
7 right to have their own attorney handle a large part of
8 all of the case.  There were issues of who was going to
9 fund the case, who is going to pay for costs, how fees
10 will be divided.  There are all kinds of problems that
11 I do not want to get involved in, but that would have
12 to be resolved by plaintiffs with the decision and by
13 lawyers and their clients.
14         A lawyer may have one client who would be
15 willing to have their case tried like this and another
16 client who would say, I want you to be there for me, I
17 hired you.
18         So, you know, there's all those issues.  And I
19 don't want to pressure anybody unduly, and I'm going to
20 let you each pressure each other so that you can come
21 up with a list of what you want. If there's a
22 disagreement I guess in a week I would like a list of
23 the 10 that most attorneys agree on, and if there's
24 some dissension you can send a separate letter.
25         Within three or four days of the receipt of

50

1 that the defense will have the opportunity to object to
2 any of those particular plaintiffs on any grounds other
3 than conflict of law.  Although conflict of law is
4 something I would like plaintiffs to be aware of when
5 they're picking cases.
6         The defense, within two weeks from today, is
7 going to make a motion.  I'm going to require them to
8 file it within two weeks from today or forever hold
9 their peace on the issue of whether grouping of cases
10 is, in fact, too prejudicial to the defense.  They will
11 file, and there will be a response, so they have two
12 weeks to do that.
13         After I get the response from the defense to
14 the plaintiffs' list of cases then I will make a
15 decision on which cases I'm going to decide I'm going
16 to try.
17         At that point I'll let you know, and within
18 two weeks from that date the defendants are required to
19 file any conflicts of law because at that point they'll
20 know which states are involved.
21         If plaintiffs feel that there should be
22 something less than 10 cases -- I have said all along
23 basically five to 10 would be -- what my goal is.  It
24 doesn't have to be 10.
25         MR. LANIER:  We like 10.

51

1         THE COURT:  Well, you have to think about the
2 jury you're going to get because it is a long time.  10
3 is a long time, but, anyway, you know, there's lots of
4 issues that both sides can think about, but I know from
5 the defense point of view I think they think the less
6 the better, and I think that there might be some
7 prejudice to plaintiffs to actually have long, long
8 cases.  And to defense.  It is -- you know, who knows
9 who it would work to the benefit of.
10         MR. MORELLI:  It is a mixed bag.
11         THE COURT:  You always know things are out
12 there, basically, that may prejudice one side or the
13 other.  The hard thing is figuring out which side it is
14 going to prejudice because so often these things are
15 double-edged swords and they cut both ways, and a lot
16 of times in law getting what you wish for is not really
17 what you wanted at the end.
18         All right.
19         MR. PLACITELLA:  I have a question, Your
20 Honor, just in terms of phase two has the Court
21 determined that it will be the same jury?
22         THE COURT:  Yes.
23         MR. PLACITELLA:  Okay.
24         MR. VENDERBUSH:  On the first brief for
25 defendants on the grouping, that's the grouping and

52

1  also the trial plan bifurcation or trifurcation.

2       THE COURT:  Yes, together, both those issues.

3       MR. PLACITELLA:  On discovery if the 10 cases

4  are selected are we just going to focus discovery then

5  on those 10 cases, or are we going to for the balance

6  of the year --

7       THE COURT:  I want to have discovery on all

8  the cases continue.

9       MR. MORELLI:  That's what you said originally.

10      THE COURT:  Is there going to be a priority?

11 I guess, yes.  If it is a trial case and there's a

12 conflict and the trial case will bump one of the

13 others, but it shouldn't be, okay, those cases aren't

14 going to be tried so we're going to put them back.  At

15 the end of this trial I would like to look and say I

16 have another 20 to pick from.

17      MS. FREIWALD:  Perhaps we can come to an

18 agreement with the plaintiffs on some slight staggering

19 of the schedule at that point which wouldn't put off

20 the discovery in the other cases but would make it a

21 slightly less pressurized situation.

22      THE COURT:  That's fine, that's fine.  And I

23 do think, also, that -- after this I'm not guaranteeing

24 that I'll go to the 20, but there will certainly be, I

25 think -- they will be given priority for next trials.

53

1  I may at that point combine them with the wave

2  one cases and pick 10 of those or five of those or I

3  may go back to one trial a piece if we find out that it

4  was simply unworkable.  We have to see.

5       MR. MORELLI:  I think at one point you had

6  talked about the next trials after these trials were

7  the stroke cases at some point, and I think that you

8  had said something about that.

9       THE COURT:  I did say we have to try a stroke

10 case.

11      MR. MORELLI:  And I just wanted to know

12 whether or not the cases that we now have on the list

13 after we pick 10 will the remainders have priority over

14 the stroke cases or will we go to stroke cases then and

15 come back or...

16      THE COURT:  Well, they'll have priority along

17 with the first and second wave cases for trial of heart

18 attacks.  Whether we're going to move to stroke trials

19 I guess is the next -- I think a lot will depend on

20 where everybody is at in January and where we're going.

21      And from what I understand there are some

22 discovery issues.  The people who handle production of

23 records aren't here for the defense, so what we're

24 going to do is have -- have you confer.  If you,

25 hopefully, can resolve discovery issues here those that

54

1  you can't resolve if they involve people that aren't

2  here today for the defense side then we're going to set

3  up a phone conference Monday or Tuesday of next week to

4  resolve it.  We'll do it Tuesday.  And if there are

5  those that -- Monday is Columbus Day.

6       If there are some that the people here are

7  involved in and you need a call from me I'll come back

8  in and make calls on those.

9       MR. MORELLI:  Can I ask one question because I

10 have to leave?

11      I have three wrongful death cases in this

12 group, and the defendants want to take depositions of

13 every single person in the family, not only the widow

14 and one of the children, but if there's four or five

15 children in the family they want to depose everybody.

16 You know --

17      MR. STRAIN:  Isn't that the kind of thing

18 we're supposed to work out and try to resolve all these

19 issues?

20      MR. MORELLI:  Because right now it has been

21 just out there, and we haven't been able to resolve it.

22      MR. BUCHANAN:  That's among our list of

23 case-specific issues that we would like to work out

24 with the defense and get back to you.

25      THE COURT:  Do you want me to tell you the

55

1  answer real quickly?

2       MR. MORELLI:  Yes, if you have an answer.

3       THE COURT:  The answer is they're entitled to

4  take a dep of every survivor.  The survivors divide the

5  proceeds, and there's no question if there's four or

6  five children they're allowed to take each child.

7  Whether that's practical or whether you want to trade

8  things off for it, I don't know, but they certainly can

9  if they want to.

10      MR. BUCHANAN:  I think the issue is also one

11 of timing and whether that happens today or whether

12 that happens a month from today.

13      THE COURT:  No.  A survivor can be taken at

14 any time.  I mean, a kid's dep can be taken the week

15 before the trial.  It is not going to change the

16 outcome.  But it is still something that they have to

17 be made available to get done.  You know, the fifth kid

18 is not the reason to delay expert deps or something.

19 That's not going to happen.

20      MR. MORELLI:  Prioritize.

21      THE COURT:  But they are, in fact, something

22 that is discoverable, no question.

23      MR. MORELLI:  There's no question.  That's

24 true in all death cases.

25      MR. BUCHANAN:  Okay.

56

Transcript - Trial Counsel January Cases (2006/10/05)

```
 1          THE COURT:  Okay.
 2          MR. GALPERN:  Your Honor, when does the Court
 3  anticipate a written opinion on the UK cases?
 4          THE COURT:  It is done, and you have got it.
 5  Carmen has it on her desk.
 6          I forgot, this is Carl and this is Megan.
 7  Carl Adamo and Megan Quinlivan.  They are both
 8  brilliant, and they're going to be helping me a lot,
 9  and, hopefully, I'll be able to get a lot more done
10  with two rather than one, although I'm going to miss
11  Heather just like I missed Chris, but if you need
12  anything they have got their instructions not to talk
13  to you for too long but to briefly find out what you
14  need.
15          (End of proceedings.)
```

57

Transcript - Trial Counsel January Cases (2006/10/05)

```
 1              C E R T I F I C A T I O N
 2      I, REGINA A. TELL, C.S.R., R.M.R, R.P.R., C.R.R.,
 3  License Number 30XI00161000, an Official Court Reporter
 4  in and for the State of New Jersey, do hereby certify
 5  the foregoing to be prepared in full compliance with
 6  the current Transcript Format for Judicial Proceedings
 7  and is a true and accurate compressed transcript to the
 8  best of my knowledge and ability.
 9                      _____10-06-06
10                      Regina A. Tell, CSR-RPR-RMR-CRR
11                      Official Court Reporter
12                      Atlantic County Courthouse
13                      Mays Landing, New Jersey
```

58