IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: VIOXX<br>    PRODUCTS LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>ALL ACTIONS<br><br>FILER:  Henry A. King/Rebecca Dietz | MDL NO. 1657<br><br>SECTION L<br><br>JUDGE FALLON<br>MAG. JUDGE KNOWLES |

### KLINE & SPECTER'S REPLY TO
### THE FEE ALLOCATION COMMITTEE'S RESPONSE TO
### THE OBJECTIONS OF THE RECOMMENDED
### COMMON BENEFIT FEE ALLOCATIONS

Kline & Specter P.C. ("Kline & Specter") hereby submits this Reply to the Fee Allocation Committee's Response to the Objections to Recommended Common Benefit Fee Allocations ("the FAC Response").  In support thereof, Kline & Specter incorporates by reference its previously filed Objection of Kline & Specter, P.C. to the Vioxx Fee Allocation Committee's Common Benefit Fee Recommendation ("the KS February 2011 Objection") as if set forth herein in full.  Kline & Specter further incorporates by reference the legal arguments contained in the various filings of lead counsel for the Objectors.

A litigation of this size requires the efforts of many attorneys, paraprofessionals and support staff.  The vast percentage of this common benefit work did not take place in full view of this Court.  This litigation was indisputably a team effort.  However, the FAC would have this Court believe that they were the only firms that carried the ball.  That is not accurate.  Throughout the entirety of this litigation, Kline & Specter worked hand-in-hand as part of the core group that ran discovery, science, law and briefing, and trial preparation and execution.

Before it came time to divide the money, it was not disputed by the FAC that Kline & Specter's contributions to this litigation were of the highest quality.  Russ Herman called Kline

& Specter's work "integral to ALL efforts." *See* November 8, 2007 email from Russ Herman to Thomas Kline, attached as Exhibit 1 (emphasis in original). Andrew Birchfield, Esquire, co-lead counsel described Kline & Specter's contributions to the litigation as "really phenomenal." *See* December 1, 2008 transcript of Kline & Specter's presentation to the FAC, attached as Exhibit 2 at 39. After witnessing Kline & Specter's presentation to the FAC, co-lead counsel Chris Seeger said, "your presentation really speaks for itself, and it is a real reminder about how many pieces of the litigation you were involved with. Clearly, from the day we got involved together in Vioxx . . . you have been one of the go-to people." *Id.* at 37-38.

Despite those glowing reviews of Kline & Specter's "integral" work, the FAC has chosen to ignore the quantity and quality of those contributions and has recommended that the firm receive the manifestly unreasonable award of only $4,000,000. This represents only approximately one-third of Kline & Specter's lodestar, and less than one seventh of what Kline & Specter should receive, consistent with the multiplier of its peer firms. The FAC did not take the quantitative value of the work performed by Kline & Specter and other common benefit applicants (represented by accepted hours and/or lodestar), and adjust that lodestar qualitatively via the Johnson factors for its value to the litigation. Rather, the FAC developed an illegitimate "point grid" with a "point system" that failed to provide any points to significant work performed by Kline & Specter, such as the hours spent by the members of the firm directly assisting and participating in trial, and the hours spent by the firm vetting trial cases for the PSC. These hours, not accounted for in the FAC's pre-set "points" grid, simply fell into a black hole and disappeared. Under the "point system," the work performed was not merely devalued; it was given no value.

Kline & Specter's lodestar is $12,080,690. This is based upon Kline & Specter's submission of 25,743.25 hours of professional time to Wegmann Dazet.[1] **This is the <u>sixth highest total</u> of common benefit hours of all firms in this litigation**, comparable to those of FAC members the Herman firm, the Levin Fishbein firm, and the Girardi Firm.[2] *See*, table extracted from data produced by Wegmann Dazet, attached as Exhibit 6. Every single one of Kline & Specter's hours was used by the PLC as part of the aggregate sum of professional time to justify the creation and size of the Common Benefit Fund. *See*, Plaintiffs' Liaison Counsel's Motion for Plaintiffs' Common Benefit Counsel Fees and Reimbursement of Expenses, filed January 20, 2009.

Since the quality of the Kline and Specter's contributions to the litigation has been described in superlative terms, and Kline & Specter's lodestar was based on the tremendous investment of 25,391 of "accepted" hours of work, the FAC was presented with an obvious dilemma when they faced the task of dividing the fixed sum of the Common Benefit Fund between themselves and other claimants. Rather than perform an objective and fair valuation of Kline & Specter's many "integral" contributions via the accepted lodestar/Johnson factor

---

[1]     Kline & Specter has 25,391 "accepted" common benefit hours invested in this litigation for a substantial lodestar of $11,933,751.85. *See*, April 11, 2011 email and attachments from Phillip Garrett to Robert Arceneaux, Esq. attached as Exhibit 3. The discrepancy of some 300+ hours between Kline & Specter's submissions and Wegmann Dazet's "accepted" hours appears to be due to a clerical error. Kline & Specter's September 2007 submission was inadvertently submitted without a signature. In February 2009, Kline & Specter was informed of the error, and asked that the form be signed so that it could be accepted. Accordingly, Tom Kline signed the submission of 300+ hours, and it was transmitted to Wegmann Dazet. *See*, email from Kathleen Spurka to Jason Fontenot, dated February 5, 2009, attached as Exhibit 4. However, a review of the recently produced data indicates that those hours were never entered into Wegmann Dazet's database, and to this day, those 300+ hours have not been credited to Kline & Specter. *See*, Affidavit of Kathleen Spurka, dated May 5, 2011, attached as Exhibit 5.

[2]     The recommended award for these FAC firms ranges from $20,100,000 to $32,500,000. Much of the time of these firms was the result of work undertaken after the settlement on administrative, non-contingent work. Kline & Specter was shut out of post-settlement work. Therefore all of Kline & Specter's work was contingent upon the result of the litigation.

method, the FAC chose to use its inappropriate and illegitimate "point" system and then chose to inappropriately apply the Johnson factors to those "points."  The recommended award is simply not commensurate with the quantity and quality of the work done by Kline & Specter.  The FAC now attempts to justify its appallingly low recommended award by resorting to basest of all arguments--an *ad hominem* attack on Tom Kline.  This is pretextual, and it must not stand.

A.    <u>KLINE & SPECTER'S "INTEGRAL" CONTRIBUTIONS TO VIOXX LITIGATION</u>

Kline & Specter is among the preeminent law firms in the country focusing on personal injury litigation, with extensive experience in complex medico-legal and scientific matters and a track record that includes dozens of seven and eight figure verdicts (some in pharmaceutical litigation).  Its attorneys include several who are recognized as among the best in the United States.  Other members of the firm include attorneys who are also medical doctors who possessed a detailed understanding of medical and scientific issues presented by Vioxx litigation. *See* Kline & Specter Attorney biographies, attached as Exhibit 7.  It would be impractical to detail fully Kline & Specter's common benefit work across 25,743 hours, so the highlights are described below.

Through the NJ coordinated litigation, Kline & Specter first became involved in Vioxx litigation in 2003, before Merck removed the drug from the market in September 2004. Following the withdrawal of Vioxx from, Kline & Specter attorneys stepped up repeatedly, and became key, valued members of the plaintiffs' team.

1.    **Leadership Positions and Committee Service**

Kline & Specter's attorneys held leadership positions and served on multiple committees in three of the coordinated litigations:

| Kline & Specter attorney | Position | Litigation |
|---|---|---|
| Tom Kline, Esq. | Member, Plaintiffs Steering Committee | MDL |
| | Co-chair, Trial Committee | MDL |
| Lee Balefsky, Esq. | Member, Discovery Committee | MDL |
| | Liaison Counsel | PCL |
| | Chair, Stroke Committee | NJCL |
| Lisa Dagostino, M.D., J.D. | Member, Science Committee | MDL |
| | Member, Discovery Committee | MDL |
| | Member, Trial Package Committee | MDL |
| | Member, Stroke Committee | NJCL |
| Mark Hoffman, M.D., J.D. | Member, Science Committee | MDL |
| Michelle Tiger, Esq. | Liaison Counsel | PCL |

*See also*, PowerPoint slides summarizing Kline & Specter's Committee Membership, attached as Exhibit 8.

Tom Kline's co-chairmanship of the Trial Committee deserves special attention and comment. Under his guidance, Kline & Specter's staff "single handedly reviewed all of the case submissions" around the clock to meet deadlines set by the Court.[3] *See*, February 14, 2006 email from Chris Seeger to Thomas Kline, attached as Exhibit 9. Mr. Seeger wrote to Mr. Herman:

> Russ, respectfully, we have a case selection committee that has been working extremely hard on these issues. Kline's office has pretty much single handedly reviewed all of the case submissions. i love you and respect you, but i think it's unfair and undermining to them to contradict them in an email to an outsider.

*Id.  See also*, email from Chris Seeger to Tom Kline, attached as Exhibit 10 ("you and you're [sic] firm have done so much that I feel bad you have to deal with this [having to review a Bextra case mistakenly sent by Mr. Herman's office] too. Thanks for stepping up."). *See also*, February 10, 2006 email from Lenny Davis to Lisa Dagostino, attached as Exhibit 11 ("Lisa, you are amazing. I know you have not slept and we have slammed you. Because of you we can at least go before judge fallon [sic] and let him know of the efforts performed."). Kline & Specter,

---

[3]     Kline & Specter's physician-attorneys substituted for paid outside medical experts during this process, performing detailed, technical reviews of the medical records for the PSC. The "point system" set up by the FAC has no category or sub-category into which this work falls.

along with other leading firms, performed their duties on the Trial Committee under extraordinarily difficult circumstances.  Unlike most litigations, cases were forced to trial in the middle of discovery.  Co-lead counsel Seeger repeatedly defended the Kline & Specter team from unwarranted criticism by liaison counsel Russ Herman, and thanked Tom Kline and the Kline & Specter team "for once again bailing us out."  *See,* Exhibits 9 and 11.

        **2.**       **Development of the case through extensive document review**

Kline & Specter attorneys, particularly Dr. Dagostino, devoted extraordinary hours to the review of documents produced by Merck during the course of this litigation.  Along with Seeger Weiss's Jeff Grand and Levin Papantonio's Pete Kaufman, Dr. Dagostino was considered to be one of the top document reviewers, and one of the individuals most knowledgeable about the factual aspects of the case.  *See,* July 19, 2006 email from Seeger Weiss partner David Buchanan to Tom Kline attached as Exhibit 12 ("Tom, we're talking about some discovery tasks and we're putting together a team of senior attys to perform 2nd cut review…we could use a fourth person who knows the case….can Lisa take a significant role in this?").  *See also*, August 15, 2005 email between David Buchanan, Jeff Grand and Lisa Dagostino, attached as Exhibit 13 ("Absolutely amazing. Great find." "Awesome"). *See also*, January 19, 2007 email from Mark Lanier requesting Dr. Dagostino's assistance during the Hermans/Humeston trial ("Any chance I could have Lisa's help Monday and Tuesday?...Egilman says we need her!  'She knows the documents as well as I do' was the exact quote. (High praise, Lisa. David does not praise lightly)," attached as Exhibit 14.  *See also*, September 30, 2007 email from David Buchanan, attached as Exhibit 15 ("Lisa, this is huge"); and January 17, 2006 email from Troy Rafferty to Lisa Dagostino, attached as Exhibit 16 ("great stuff").  *See also*, March 15, 2007 email chain between Mark Lanier, Jeff Grand, and Lisa Dagostino, attached as Exhibit 17 ("Lisa to the rescue! (Again!!!)").  *See also*, October 16, 2006 email exchange between David Buchanan, Jeff

Grand and Lisa Dagostino, attached as Exhibit 18 ("This is great stuff." "Wow, Great find, Lisa").  Review of the emails themselves reveals the extraordinary depth of Dr. Dagostino's research, scientific knowledge, and brilliance.

In addition to review of the Merck documents, Dr. Dagostino extensively reviewed documents produced from third party discovery.  *See*, October 10, 2005 email from Chris Tisi, attached as Exhibit 19, and November 10, 2005 email exchange between Lisa Dagostino and Penny Herman, attached as Exhibit 20.

When liaison counsel, for what appear to be nonmeritorious reasons,[4] initially excluded Dr. Dagostino and other valuable team players from placement on the trial package committee, Seeger Weiss partner David Buchanan called her exclusion "ridiculous" and a "mistake."  *See*, March 15, 2007 email exchange between David Buchanan and Tom Kline, attached as Exhibit 21.  Mr. Buchanan then emailed Mr. Davis and Russ Herman as follows:

> I understand that there is a committee undertaking to complete assembly of the trial package.  While I understand that I was included on this committee, I know that Jeff Grand wasn't, but I was.  *I was also advised that Lisa Dagostino is not on the committee.  I assume that their exclusion was an oversight as they are on the short list of people who know all there is to know about the case  (Jeff and Lisa are the people the trial teams call in the middle of trial to get what is needed on just about any issue).  Their contributions have been way too significant to the success of the case for them not to be a part of any call or meeting on the package.*  They will make real contributions to the discussions that we will be having in that regard.  If it's a space issue, I'll yield my spot in favor of those of people who are more knowledgeable.  I consider both Jeff and Lisa to be just that.

---

[4]     When Mr. Herman assembled the Trial Package Committee in March 2007 to put together a product for common benefit work purposes, it was at the exact same time that negotiations with Merck for settlement were taking place.  In retrospect, Kline & Specter's exclusion from the trial package committee, like its exclusion from the NPC, was based on nonmeritorious considerations.

*See*, March 16, 2007 email from David Buchanan, attached as Exhibit 22 (emphasis added).  Mr. Buchanan and Mr. Kaufman ultimately resolved the issue, and Dr. Dagostino was named to the committee.  *Id*.  Mr. Kaufman, who had been actively lobbying for Dr. Dagostino's assistance on this project, then emailed her as follows:

> First, let me apologize for the bullshit surrounding the committee. Next, please (please, I am begging you) let me welcome you…[as a] named [member] of the committee, if you can see your way to participating.  I completely understand being annoyed.  It would have driven me batshit.

*See*, March 16, 2007 email from Pete Kaufman to Lisa Dagostino, attached as Exhibit 23.

**3**.     **Development of the case through depositions**

Because of Kline & Specter's experience with discovery and trial of complex medical and pharmaceutical cases, early on its lawyers were assigned an enormous role in the development of the liability and causation cases.  *See*, December 17, 2004 13:54 email from David Buchanan to Shanin Specter, attached as Exhibit 24 ("given your commitment to the docs over the last month, you should know that yours is the first firm outside the orginal [sic] working group that is getting deps").  Kline & Specter's deep commitment to factual discovery continued throughout the entire pendency of the litigation, from 2004-07.  *Id*.  *See also, e.g.*, December 29, 2005 email chain including David Buchanan, Troy Rafferty, Tom Kline, Chris Tisi, and Chris Seeger, attached as Exhibit 25; September 23, 2006 email exchanges between Tom Kline, Chris Tisi, Dave Buchanan, and Shanin Specter, attached as Exhibit 26 (Mr. Buchanan notes "we're down to a small group of firms that know the case well enough to take these very important deps."); July and August 2007 email exchanges regarding *de bene esse* depositions, attached collectively as Exhibit 27.

As a result of the depth and level of its commitment, Kline & Specter was assigned to depose many of key Merck scientists and executives, including Merck trial witnesses (some of whom had two or more questioners, of which Kline & Specter was one):

| Merck Executive/Scientist | Dates | Kline & Specter Deposition Taker | Kline & Specter Deposition Preparer |
|---|---|---|---|
| Raymond Gilmartin (CEO)  | 4/11/05 | Shanin Specter, Esq. | Lisa Dagostino, MD, JD Michelle Tiger, Esq. |
| Edward Scolnick, M.D. (Former President, Merck Research Laboratories)  | 5/17/05 6/1/05 8/16/05 | Thomas Kline, Esq. | Lisa Dagostino, MD, JD |
| Peter Kim, Ph.D. (President, Merck Research Laboratories)  | 3/15/05 3/16/05 4/8/05 6/8/05 | Shanin Specter, Esq. | Lisa Dagostino, MD, JD |
| Alise Reicin, M.D. (Senior Director, Merck Research Laboratories)  | 3/2/05 3/23/05 8/19/05 | Thomas Kline, Esq. | Lisa Dagostino, MD, JD |

| Merck Executive/Scientist | Dates | Kline & Specter Deposition Taker | Kline & Specter Deposition Preparer |
|---|---|---|---|
| Deborah Shapiro, Ph.D. (Director of Clinical Biostatistics)  | 1/25/05 2/14/05 6/29/05 6/30/05 | Shanin Specter, Esq. | Lisa Dagostino, MD, JD |
| Peter DiBattise, M.D. (Merck Research Laboratories cardiologist)  | 4/7/06 6/9/06 | Shanin Specter, Esq. | Lisa Dagostino, MD, JD Michelle Tiger, Esq. |
| Alan Nies, M.D., Ph.D. (Senior VP, Clinical Sciences, Merck Research Laboratories)  | 4/1/05 8/23/05 | Shanin Specter, Esq. | Lisa Dagostino, MD, JD Michelle Tiger, Esq. |
| David Anstice (President US Human Health)  | 3/18/05 | Lee Balefsky, Esq. | Michelle Tiger, Esq. |
| Barry Gertz, M.D., Ph.D. (Executive Vice President)  | 9/28/05 | Mark Hoffman, M.D., J.D. | Lisa Dagostino, MD, JD |

| Merck Executive/Scientist | Dates | Kline & Specter Deposition Taker | Kline & Specter Deposition Preparer |
|---|---|---|---|
| Thomas Simon, M.D. (Senior Director, Clinical Research)  | 1/5/05 1/19/05 | Mark Hoffman, M.D., J.D. | Mark Hoffman, MD, JD |
| Kathleen Metters, Ph.D. (Head of Basic Research, Merck Frosst)  | 7/28/05 | Shanin Specter, Esq. | Lisa Dagostino, MD, JD |
| Joseph Lynch, Ph.D. (Senior Director, Pharmacology) | 3/21/06 | Shanin Specter, Esq. Lisa Dagostino, M.D., J.D. | Lisa Dagostino, MD, JD |

*See also*, PowerPoint slide summarizing Kline & Specter's deposition work of Key Merck Scientists and Executives, attached as Exhibit 28.  Kline & Specter attorneys also prepared to take the cancelled depositions of Merck executives Gregory Geba, M.D. (Senior Director of Clinical Development) and Robert Silverman, M.D. (Senior Director, Regulatory Affairs).  Mr. Kline was preparing to take the *de bene esse* deposition of Alise Reicin, M.D. when the litigation settled.

In addition, Kline & Specter took the depositions of key third parties in the Vioxx litigation and/or helped prepare the lawyers who took such depositions:

| Third Party | Dates | Kline & Specter Deposition taker | Kline & Specter Deposition Preparer |
|---|---|---|---|
| Eric J. Topol, M.D. (Cleveland Clinic Chair of Cardiology)  | 11/22/05 | Thomas Kline, Esq. | Lisa Dagostino, MD, JD |
| David J. Graham, M.D., M.P.H. (FDA Medical Officer)  | 5/9/06 | Thomas Kline, Esq. | Lisa Dagostino, MD, JD Robert Englert |
| Steve Nissen, M.D. (Chairman Cleveland Clinic Department of CV Medicine)  | 12/12/06 | N/A | Thomas Kline, Esq. Lisa Dagostino, MD, JD |
| Gregory Curfman, M.D. (Editor of the NEW ENGLAND JOURNAL OF MEDICINE).  | 1/17/07 | Thomas Kline, Esq. | Lisa Dagostino, MD, JD |
| Jerry Avorn, M.D. (Chair of the Division of Pharmaco-epidemiology at Brigham and Women's Hospital)  | 6/29/06 6/30/06 | N/A | Thomas Kline, Esq. Lisa Dagostino, MD, JD |

| Third Party | Dates | Kline & Specter Deposition taker | Kline & Specter Deposition Preparer |
|---|---|---|---|
| Mal Mixon (Chairman of Board of Trustees Cleveland Clinic)  | 1/25/06 | Thomas Kline, Esq. | Lisa Dagostino, MD, JD |

*See also*, PowerPoint slide summarizing Kline & Specter's deposition work of Key Third Parties, attached as Exhibit 29.

Mr. Kline deposed Eric J. Topol, M.D., Chair of Cardiology at the Cleveland Clinic and an independent third-party witness. Dr. Topol was among the first to raise the warning flags on cardiovascular risks associated with Vioxx back in 2001. Mr. Kline's deposition chronicled Dr. Topol's attempts to warn Merck and the public about the risks of Vioxx and to conduct a cardiovascular safety study. *See* Deposition of Eric J. Topol, M.D., dated November 22, 2005, attached as Exhibit 30. This deposition would be played at virtually every trial in the MDL and NJCL, repeatedly placing Mr. Kline in the courtroom on the plaintiffs' behalf.

Mark Lanier of the Lanier Law Firm wrote the following email to Tom Kline regarding his deposition of Dr. Topol:

> Put down your computer/blackberry… Go outside… Listen… Can you hear that??? Can you hear the applause? It is coming from England… The applause is so loud, it is traveling the Atlantic!
>
> ***I just read the Topol dep. If that is not your best work, I would love to see what is! Fantastic!!! Absolutely fantastic!!!***
>
> My compliments and praise… Happy Thanksgiving…

*See* November 24, 2005 email from Mark Lanier to Tom Kline, attached as Exhibit 31 (emphasis added). Andy Birchfield called Mr. Kline's examination "remarkable work." *See*, Exhibit 2 at 39. FAC member Troy Rafferty said that the testimony elicited by Kline was "tremendous" and

that the deposition allowed plaintiffs to make "great strides" in the litigation. *See*, November 23, 2005 email from Troy Rafferty to Tom Kline, attached as Exhibit 32.

Tom Kline also took the deposition of David J. Graham, M.D., M.P.H., dated May 9, 2006, an FDA Safety Officer and epidemiologist who is an expert in post-marketing drug safety. Dr. Graham, characterized by many as a "whistleblower," had been a strong critic of both the FDA and Merck for their handling of Vioxx, but was a somewhat reluctant witness that required a skilled exam, so Tom Kline was tapped to take the deposition. Tom Kline elicited testimony from Dr. Graham that Vioxx should not have been approved at the time it was approved, that there were significant concerns around cardiovascular safety that should have been explored more fully, and that Vioxx was the greatest drug safety catastrophe in American history. *See* Deposition of David Graham, attached as Exhibit 33. Following Graham's testimony, Seeger Weiss partner David Buchanan recapped:

> Tom did an excellent job on the dep both substantively and keeping [Merck lawyer Phil Beck] in check. *Tisi, Lisa, and Moshe –great job at every level….it was obvious to all who were there how much work went into this project at every level. Beck was nicely surprised by some documents that Lisa found that his crew hadn't seen.*

*See*, May 10, 2006 09:42:20 email from David Buchanan, attached as Exhibit 34.

Mr. Specter's examination of Deborah Shapiro, Merck's Director of Clinical Biostatistics, singlehandedly made the plaintiffs' punitive damages case. On the fourth day of her deposition, Mr. Specter questioned Dr. Shapiro about a draft of a Merck meta-analysis evaluating the number of cardiac events sustained by patients on Vioxx in all Merck studies to date from 2001. The draft contained a sub-analysis done with the "MI endpoint" that demonstrated a statistically significant increase in the rate of heart attacks in patients on Vioxx. On questioning from Mr. Specter, Dr. Shapiro admitted that this sub-analysis was removed from the final version of the document and never submitted to the FDA. Significantly, Dr. Dagostino

of Kline & Specter discovered the differences between the draft and final versions of this document, enabling the right questions to be asked by Mr. Specter. *See* Excerpts from Deposition of Deborah Shapiro, Ph.D., dated June 30, 2005, attached as Exhibit 35. During the Cona/McDarby trial, this evidence was found by New Jersey Superior Court Judge Carol Higbee to provide the <u>only</u> evidence sufficient to support a punitive damages verdict against Merck. *See* Email from Mark Lanier to Shanin Specter, dated April 12, 2006, attached as Exhibit 38.

Mr. Lanier's partner, Mr. Meadow, said to Mr. Specter, "we got to punis because of you." The deposition also would be played to the jury during the punitive liability phase, which resulted in a $9 million award of punitive damages. This deposition also exposed Merck to an unlimited number of punitive damages verdicts and doubtless played a role in the settlement of the cases.

Also of particular significance was Shanin Specter's deposition of Peter S. Kim, Ph.D., the President of Merck Research Laboratories and the person at Merck primarily responsible for patient safety during critical time-periods when Merck knew and was learning about the risks associated with Vioxx. Mr. Specter deposed Dr. Kim for more than three days, and elicited admissions from him that he had failed to pass on to Merck's adverse event department a report that he had received of stroke in two teenage girls taking Vioxx, and also that he did not cause Merck to timely pass on the report of those adverse events to the FDA. This conduct was admitted by Dr. Kim to be improper and raised issues about Merck's compliance with federal reporting requirements. Mr. Specter also elicited Dr. Kim's admission that he personally took Vioxx after Merck had withdrawn the drug from the market, and would not fault another who took Vioxx post-withdrawal and suffered a cardio-vascular event. Mr. Specter's deposition of Dr. Kim hindered Merck from developing a "blame the victim" defense to claims arising from injuries caused to persons who took Vioxx post-withdrawal. In addition, likely as a result of

these admissions, Merck never called Dr. Kim to testify at any Vioxx trials, even though Dr. Kim would have been an obvious person to testify on Merck's behalf.  In sum, Mr. Specter's deposition caused Merck to lose both a key witness and a defense.  *See* Deposition of Peter S. Kim, Ph.D., dated April 8, 2005, attached as Exhibit 36.

Deposition testimony elicited by Kline & Specter lawyers had a powerful impact on the litigation.  Fellow plaintiffs' counsel in Vioxx litigation described the work done by Kline & Specter lawyers during these depositions as "fantastic," "spectacular," and "incredible," and credited this work as "essential" during the bellwether trials.  Focus groups deemed both the Graham and Topol depositions to be lynchpins of the plaintiff's case:

> We focused Graham and Topol yesterday in New Orleans…Many jurors were upset with the FDA and its relationship with Merck…overall graham got higher marks than Topol on believability, however both did well, especially with Plaintiff jurors.

*See*, July 1, 2006 email from Mark Robinson to the PSC, attached as Exhibit 37.

As noted above, Mr. Specter's videotape deposition of Dr. Shapiro was played to the jury during the punitive damages aspect of the *Cona/McDarby* case.  Mark Lanier informed Mr. Specter of this during the trial:  "You were played in closing puni argument…Great find and delivery form [sic] you and Lisa both!"  *See* Email from Mark Lanier to Shanin Specter, dated April 12, 2006, attached as Exhibit 38.  Mr. Lanier's partner, Mr. Meadow, said to Mr. Specter, "we got to punis because of you."  *Id*.  This case resulted in a $4.5 million compensatory award for one plaintiff.  After hearing Mr. Specter's deposition of Dr. Shapiro, the jury imposed $9 million in punitive damages against Merck.  Regarding the punitive award, Mark Lanier wrote the following to Ms. Specter:

> Shanin…
> Thanks again for the great job you did on Shapiro…***Made all the difference in the world…***

*See,* Email from Mark Lanier to Shanin Specter, dated April 14, 2006, attached as Exhibit 39 (emphasis added).  This email speaks volumes about Kline & Specter's contributions to the successful result in *McDarby*, and the ramifications of this on all other cases.  Mr. Lanier's law partner Rick Meadow put it simply, "your firm played a big part of this win."  *See*, email from Richard Meadow to Lisa Dagostino, dated April 11, 2006, attached as Exhibit 40.

If any question remains about the productive impact of Kline & Specter's depositions, it was answered by Michael Ferrara during his observation of Shanin Specter's deposition of Dr. Kim:

> I am sitting here at Dr. Kim's deposition. Based on my observations after 33 years of practice, the job that Shanin Specter is doing is nothing short of spectacular. He's forcing Kim to answer questions, he's following up when tries to hide, and he's forcing him to respond to the tough questions. It's ashame [sic] you can't see the body language of Merck's lawyers. They know they are dead. Reading this transcript and viewing this video tape will make all of your [sic] very very happy. ***As good as this case was before today, it now has improved 100 fold.*** Thanks to Shanin and his partners for being so well prepared and doing such a wonderful job.

*See* Email from Michael Ferrara, dated April 8, 2005, attached as Exhibit 41 (emphasis added).

Another Vioxx plaintiff's lawyer, Steve Knowlton of the Locks Law Firm, wrote this to Dr. Dagostino during the *Doherty* trial in New Jersey:

> Lisa:  Thank you.  Please tell Tom Thanks for me.  ***Your work, as a firm, has been an essential part of our case.***  Win or Lose, if there is anything I can do for you guys, all you have to do is ask.

*See* Email from Steve Knowlton to Lisa Dagostino, dated June 27, 2006, attached as Exhibit 42 (emphasis added).

MDL Liaison Counsel, Russ Herman, acknowledged the significance of this work. Following Kline & Specter's presentation to the FAC, Mr. Herman commented, "when you take 17 key depositions in the case, and they are taken by partners, and you've got two physician

lawyers doing the background work, it's significant.  That's my view of this."  *See* Exhibit 2 at 35.

### 4.     Participation in Trials

As noted above, videotaped deposition testimony elicited by Kline & Specter's lawyers was played during the trials and used extensively by the trial teams.  Tom Kline's deposition of Dr. Topol was played in nearly every trial in the MDL and NJCL.  Mr. Kline's deposition of Dr. Graham was also played during several trials.  As Mr. Meadow noted to Mr. Kline during the Hermans/Humeston trial in February 2007, "I seem to play a lot of your stuff."  *See*, February 2, 2007 email from Rick Meadow to Tom Kline, attached as Exhibit 43.   These depositions eventually became key parts of the MDL product "trial package" ("trial in a box") that would literally place Kline & Specter in the courtroom.   As discussed above, Shanin Specter's deposition of Deborah Shapiro, Ph.D., was solely responsible for the lone New Jersey punitive damages verdict.

Mr. Kline and Dr. Dagostino also provided significant assistance during the *Ernst, Irvin*, *Cona/McDarby*, and *Humeston* trials. *See, e.g,* August 4, 2005 email from Lisa Dagostino to Shelly Sanford attached as Exhibit 44 (providing scientific assistance and key cross examination points the *Ernst* trial in TX state court); November 30, 2005 email from Tom Kline, attached as Exhibit 45 (developing arguments for Mr. Birchfield to use during the *Irvin* case); December 3, 2005 email from Beasley Allen's Paul Sizemore to Lisa Dagostino during the *Irvin* trial, attached as Exhibit 46("doc, thank you so much for your help.  You were great"); December 4, 2005 email from Andy Birchfield to Shanin Specter during the *Irvin* trial, attached as Exhibit 47 ("Lisa is a tremendous help"); and February 6, 2007 email exchange between Mark Lanier, Jeff Grand and Lisa Dagostino on a point of cross examination, attached as Exhibit 48 ("beautiful find" "Thanks. You're the best").  *See also*, Exhibit 14.  As Mr. Meadow told Shanin Specter

following the *Cona/McDarby* trial in NJ, "all you guys delivered." *See*, April 7, 2006 email from Richard Meadow to Shanin Specter, attached as Exhibit 49. *See also*, PowerPoint slide summarizing trials in which Kline & Specter provided assistance, attached as Exhibit 50.

Along with attorneys from Seeger Weiss, Ashcraft and Gerel, and Levin Papantonio, Kline & Specter attorneys were involved in teaching the case to other members of the PSC via a "trial school" that was held in Miami, Florida in January 2006. *See*, December 21, 2005 email from Chris Seeger to Tom Kline and Chris Tisi, attached as Exhibit 51 ("this is the reason for the trial school. Many of the people on this psc [sic] have no idea what this case is about. Those of us who do know need to protect this case by speaking up when we see a screw up about to occur….as the 3 of us have.").

> **5.      Kline and Specter's physician-attorneys developed the causation theory through extensive document and literature review and by working with experts.**

Drs. Hoffman and Dagostino were assigned by Beasley Allen and Seeger Weiss early in the litigation to develop the causation case. *See*, December 17, 2004 email from Shanin Specter, attached as Exhibit 52 ("We've been asked by Seeger Weiss and Beasley Allen to take on what I think is the most important assignment: to put together the causation case"). When the MDL was formed, they continued that role, and that work was not only approved, but specifically authorized by the PSC. *See*, email exchange between Russ Herman and Tom Kline, dated April 20, 2005, attached as Exhibit 53. *See also*, June 6, 2005 email exchange between Troy Rafferty, and Tom Kline, attached as Exhibit 54. Drs. Hoffman and Dagostino applied their medical, scientific, and bioethics training and committed extensive time to this project as members of the Science Committee.[5] They played a critical role in developing the fundamental

---

[5]      As will be demonstrated further within, the system implemented by the FAC dramatically devalues the work of these two highly trained physician-attorneys to the level of a bargain-basement hourly rate for their services.

causation theory for Vioxx litigation, in particular refining the strategy to embrace the unique pathophysiology of Vioxx usage in patients with underlying atherosclerotic and/or hypertensive disease (the so-called "eggshell plaintiffs"). In addition to their own critical analysis, they performed extensive document review of Merck documents and the medical literature, and worked with experts as necessary to support the causation theory.

As stated previously, Dr. Dagostino devoted herself full-time for a period of over two years so that she could perform common benefit work to Vioxx litigation. She performed extensive research, medical literature review, and document review necessary to produce significant contributions to the Plaintiffs' causation theories. *See e.g,* January 8, 2006 email from David Buchanan to Tom Kline, attached as Exhibit 55. In particular, she prepared lead counsel for all of the above named depositions, and helped non-Kline & Specter counsel prepare for the depositions of Ned Braunstein, M.D. (Merck Senior Director-Regulatory) and Steven Nissen, M.D. (cardiologist at the Cleveland Clinic and noted Merck critic).

Dr. Dagostino, Dr. Hoffman and Mr. Lee Balefsky also undertook significant work in the area of expert development and preparation. They developed and prepared expert Steven Levine, M.D. (Mt. Sinai—stroke neurology). Along with other lawyers, Drs. Dagostino and Hoffman prepared expert Cecil Pace-Asiak, Ph.D. (Pharmacology, University of Toronto). Dr. Dagostino also worked with non-Kline & Specter co-counsel to develop experts Jerry Avorn, M.D. (Harvard, pharmacoepidemiologist), Suzanne Parisian, M.D. (FDA medical officer), Wayne Ray, M.D. (Vanderbilt, pharmacoepidemiology), Edward Feldmann, M.D. (Brown -- stroke neurology) and Stephen Schondelmeyer, Pharm.D., Ph.D. (University of Minnesota -- Health Systems). *See, e.g.*, selected emails demonstrating these extensive efforts, collectively attached as Exhibit 56. *See also*, PowerPoint slide summarizing Kline & Specter's role in expert development, attached as Exhibit 57.

In addition to the above, Dr. Dagostino undertook a systematic review of the underlying medical records of all of the cardiovascular adverse events and adjudication packets in the Merck clinical trials; this extensive project was underway at the time the settlement was announced and was therefore halted prior to completion. *See, e.g.*, Exhibit 15.

### 6.     Contributions to the Trial Package

The Trial Package represents a comprehensive body of common benefit work prepared during Vioxx Litigation.  The package is 350 GB, which if printed out would be many banker's boxes.  It represents one of the most through analyses of any mass tort in American History.  It organized and summarized the materials necessary for Plaintiffs' counsel to try a Vioxx case anywhere in the country.  It laid out the liability theories and underlying science.  It included relevant transcripts and deposition cuts.  It demonstrated how to present a plaintiff's case and organized the critical evidence by themes that might be developed at trial.  It provided videotaped examinations of dozens of key witnesses.  It included sample motions in limine and sample responses to Merck's motions in limine.  It provided numerous additional materials as well.  *See* Vioxx MDL Trial Package index, attached as Exhibit 58.  This Trial Package was of exceptional quality and represented a substantial piece of common benefit work.  As this Court observed:

> The trial package in this case has been very helpful.  One of the things that an MDL can do, and we've tried to do in this particular case, is not only to try the case but also to try to prepare a package, so to speak, for lawyers who are interested in trying their cases in another jurisdiction or even in this jurisdiction but not have to pull in all of the witnesses.
>
> As I mentioned, we tried six cases here, they were bellwether cases but they were very expensive cases to try.  Each case the plaintiffs spent between a million and $2 million.  The defendants spent between two and $3 million in each case.  Not lawyer fees, just court costs.  Now, obviously if somebody wants to try a case, they don't want to try a case and put it on for $1 million; particularly if the case is worth 400,000 or 500,000, it doesn't make sense.  And

so what we've tried to do is to have a package prepared so that that lawyer would be able to put the package, which is a video presentation of a lot of the general witnesses, instead of calling these high powered witnesses on their own ticket, so to speak.

**So they have a large portion of the case already prepared, already in the can**, and they put that on and then garnish it with some of the witnesses that are germane and significant for their particular case.  Hopefully in that way they can try a case for less amount and get the same benefit that was achieved.

Transcript of Monthly Status Conference Proceedings, dated January 6, 2011, pp. 11-12, attached as Exhibit 59.

Kline & Specter lawyers made significant contributions to the Trial Package.  In particular, Dr. Dagostino researched, digested and indexed the "List of Articles," a compendium of over 3,000 relevant articles from the medical literature.  She developed the "Cast of Characters," a comprehensive guide to the over 700 Merck employees, third parties, and experts involved in Vioxx litigation.  She also developed the "Vioxx Dictionary," a comprehensive guide to 500 scientific terms and Merck's complex corporate structure.  These were massive and brilliant projects, as can be readily seen by observation of the work product.  *See* List of Articles, attached as Exhibit 60; Cast of Characters, attached as Exhibit 61; Vioxx Dictionary, attached as Exhibit 62.  *See also*, PowerPoint slide summarizing Kline & Specter contributions to the Trial Package, attached as Exhibit 63.

In addition, Dr. Dagostino assisted with the development of the stroke package with Michael Weinkowitz of the Levin Fishbein firm.  She helped refine the Vioxx "theme grid" with Jeff Grand of Seeger Weiss, and Peter Kaufman of Levin Papantonio.  She helped craft appropriate deposition designations for the depositions taken by Kline & Specter as well as the Avorn and Nissen depositions.  She also assisted the development of trial modules that organized plaintiffs' response to Merck's various defenses under various topics with Chris Tisi of Ashcraft and Gerel, Leigh O'Dell of Beasley Allen and Mr. Grand.

Even though Dr. Dagostino had initially been excluded from the committee, *supra*, her contributions to the Trial Package were considered invaluable.  Pete Kaufman, Esquire of the Levin Papantonio firm characterized them in this way:

> Lisa,
> What an incredible resource.
> ***Your contributions to the trial package have been astonishing.  If I knew a word better than "astonishing," I would use it.***
> And Kathy[6], thank you very much.  It's almost painful to think of how much work went into this.

Email from Pete Kaufman, dated August 15, 2007, attached as Exhibit 64 (emphasis added). Another member of the Trial Package Committee described Dr. Dagostino's contributions to the trial package as "fantastic" and added, "You guys are the best," while Mr. Herman characterized them as "excellent work as usual," "top-notch," and at "alevel [sic] of excellence."  *See* Email from Chris Tisi, dated August 15, 2007, attached as Exhibit 65; Emails from Russ Herman, dated July 28, 2007 and Aug. 2, 2007, attached as Exhibit 66.

Mr. Herman recognized Dr. Dagostino's contributions again after Kline & Specter's presentation to the FAC, when he emphasized the Trial Package's importance in justifying the common benefit fee:

> I want to thank Lisa particularly.  ***The trial package to me is one of the most important single things that we can do, because it justifies a common benefit fee.***  Individual trials, those that won, some that didn't, depositions, document review, we all know what that is as lawyers.  But the ability to resolve the case and at the same time produce a trial package that no one can deny cures a lot of issues in any view, and it's why I pushed so hard for it.  I think we had our best people on that committee in terms of knowing the case…the work to me on the trial package is a fundamental situation absolutely necessary in this case.  It is the only trial package I have ever seen come out of an MDL that's worth a damn.  Nobody else had a trial package where you could go try a case.  This one you could.

---

[6]  "Kathy" refers to Dr. Dagostino's paralegal, Kathleen Spurka, who devoted hundreds of hours to provide assistance in the assembly of these projects for the Trial Package.

*See* Exhibit 2 at 32-33 (emphasis added).

      **7.**      **Kline & Specter provided vitally important legal briefing**

      At the direction of lead and liaison counsel, Kline & Specter also played a major role in the preparation of the MDL response to Merck's preemption challenge.  *See*, July 6, 2006 email chain between Shanin Specter, Chris Seeger, and Tom Kline, attached as Exhibit 67 (Seeger: "the team has to be you guys with Arnold [Levin]").  This issue was a threatened death-knell for this litigation, so its importance cannot be overstated.  Partners Shanin Specter and David Caputo prepared legal briefing on this issue, and Dr. Dagostino prepared a detailed factual response and presented factual background at oral argument.  Because of the sensitive nature of some of the FDA documents that had been provided through discovery granted by this Court, the motion was filed under seal.

      In response to an ill-informed comment made by another attorney on a listserv, Seeger Weiss partner Dave Buchanan defended the briefing done by Kline & Specter, Levin Fishbein, and Lieff Cabraser:

> I couldn't disagree more w/ Bert's characterization or concerns about the state of the record.  The MDL briefed [sic] and positioned this beautifully…..

*See*, Exhibit 68, at July 5, 2007 12:01.  Buchanan continued to highlight the work done by the key firms in the litigation in the MDL and NJ, and specifically included Kline and Specter in that core group of key firms.  *Id*.  PSC member Chris Tisi agreed with Mr. Buchanan, noting that the select group of firms, including Kline & Specter, had done "90% of the usable discovery in the litigation," while at the same time conducting "5 federal trials and several state court trials."  *See*, July 5, 2007 10:43:26 email from Chris Tisi, attached hereto as Exhibit 69.  Tom Kline corrected the record for the PSC as to what Kline & Specter had actually put in the briefing, and Mr. Tisi responded by noting, "from an appellate perspective, this is one of the best records and briefs

that I have ever seen and I would challenge anybody who has actually read it to say otherwise."
*See*, Exhibit 69, at July 5, 2007 10:16 email.

### 8.      Funding of the MDL litigation

Finally, Kline & Specter helped to fund Vioxx litigation by paying $355,000 in MDL assessments and approximately $217,000 in MDL common benefit costs (as well as $30,000 in assessments to the NJCL).   These voluntary payments, for which the firm received reimbursement, underscore the firm's deep commitment both to Vioxx litigation and the importance of its common benefit work.   Kline & Specter continues to pay assessments, as recently as this year, despite the shabby treatment of the firm by the FAC.

### B.      THE FAC COMPLETELY MISREPRESENTS AND UNDERVALUES KLINE & SPECTER'S CONTRIBUTIONS TO THE LITIGATION.

### FAC Statement #1

> **Tom Kline was selected to serve as a member of the Plaintiffs' Steering Committee and as co-chair of the Trial Committee. Other members of the firm served on the Science Committee, the Discovery Committee, the Trial Package Committee and the Trial Selection Committee.  Members of the firm engaged in factual discovery including the review of documents and the taking of depositions.**

*See*, FAC Response at 31.

### Kline & Specter Response to FAC Statement #1

These three short and bland sentences are a remarkably incomplete representation of the depth and breadth of Kline & Specter's deep and sustained commitment to this litigation.  A fuller recitation of Kline & Specter's contributions can be found *supra* 4-25.

### FAC Statement #2

> **Lisa Dagostino committed extensive time to the litigation. Dagostino made exceptional contributions to the Plaintiffs' Steering Committee trial package and was a valuable member of the Science Committee.**

*See*, FAC Response at 31.

Kline & Specter Response to FAC Statement #2

On paper, the FAC has chosen to acknowledge that Dr. Dagostino committed extensive time and made exceptional contributions to the litigation.[7] Unfortunately, that acknowledgment is hollow. Its notable that the FAC does not challenge either the quantity or quality of Dr. Dagostino's work, but the fact remains that the FAC's recommend award for the entire firm of Kline & Specter ($4,000,000) is less than that of Dr. Dagostino's own lodestar ($4,384,395)[8] for over three years of acknowledged "exceptional" work. *See*, Exhibit 3 at 15. *See also*, Exhibit 2 at 32, 37, and 39 (Mark Lanier noted, "her picture is in the dictionary next to the indefatigable").

This injustice perfectly illustrates a fundamental and fatal flaw in the FAC's "points" system/grid. The "point" system has a list of strict, self-defined "criteria" that were clearly tailored to enhance the contributions of the FAC members, and devalue the contributions of those not on the FAC who worked a similar numbers of hours.[9] *See*, Point System Guide, attached as Exhibit 70.

As noted *supra*, and specifically acknowledged by future members of the FAC, for a prolonged period from late 2005 to early 2006, Dr. Dagostino worked around the clock

---

[7]    The FAC qualifies this statement by acknowledging Dr. Dagostino's "exceptional contributions" only to the Trial Package. As quoted extensively in this reply, FAC members consistently considered her contributions "exceptional" in many arenas.

[8]    Based on 'accepted' hours.

[9]    The FAC has completely stacked the deck. They have deemed that settlement negotiations and settlement administration are each afforded 100 points (for a grand total of 200 potential points), while science discovery and fact discovery (both intense, difficult, and time consuming aspects of the case) are lumped together in a single category, and only afforded a maximum 50 possible points. This double dipping extravaganza allows FAC members who were also part of the NPC (and who performed limited to no discovery), such as the Herman firm and the Levin Fishbein firm, to assign themselves "190 points," and run up an absurdly high point total in an attempt to justify their self-allocation.

singlehandedly to perform medical reviews for the trial committee so that it could meet deadlines set by the Court.  *See*, Exhibits 9-11.  There is <u>no</u> mechanism in the strict, FAC-defined criteria or sub-criteria of the "Point System" that allows Kline & Specter to recover for the enormous investiture of time and unique expertise that Dr. Dagostino provided to the Trial Committee during this prolonged medical review of cases—all on behalf of the PSC for the common benefit of the litigants.  *See*, Exhibit 70.  *See also*, FAC response at 32.

A Lodestar/Johnson analysis, as provided for in the settled law of the Fifth Circuit, would have equitably reflected the value of Dr. Dagostino's time and the nature of her specialized expertise, and, more importantly would have provided a mechanism for recovery by Kline & Specter for her work.  *See*, KS February 2011 Objection at 30.  The direct consequence of the FAC's failure to use the Lodestar/Johnson factor analysis is that all of Dr. Dagostino's time and expertise reviewing countless medical records fell into a black hole, and was essentially involuntarily donated to the litigation, since no mechanism has been provided for Kline & Specter to recover for her work.[10]

Needless to say, the same principle applies to the hours expended by Mr. Kline, Mr. Balefsky, and Ms. Tiger vetting of cases in the service of the Trial Committee.  Those hours have also all been involuntarily donated to the litigation.

By extension, this means that any work done on behalf of common benefit claimants that was not specifically contemplated by the FAC-created "point system" also falls into the same black hole, and the professional who did the work is unable to recover for that expenditure of time because the FAC failed provide a mechanism to attribute "points" to it.  This is an

---

[10]      It was certainly never the intention of Kline & Specter to pull a valuable physician-attorney away from other pending litigation matters and provide her services to the PSC for a sustained period of time on a critical project for no professional compensation whatsoever. Unfortunately, thanks to the FAC's illegitimate method of "points" allocation, that is precisely what has happened.

absolutely fatal flaw in the construction of the "points"/grid system. Dr. Dagostino's situation is simply the most obvious example.

The FAC has also improperly discounted Dr. Dagostino's work to the level of a firesale. They have determined that all of her acknowledged significant "exceptional" contributions to the litigation in three areas (fact discovery/depositions/document review, science/expert work, and contributions to the trial package) are represented by a grand total of only 40 "points" out of a maximum of 50 in the "Discovery/Science" category.[11] This is completely outrageous. Each of those contributions alone is worthy of significant recognition beyond what the FAC has chosen to do only on paper. But because the "point system" is so fatally flawed in its design and does not contemplate or reflect the true value of those contributions, that work done by Dr. Dagostino has also been involuntarily donated to the litigation.

**FAC Statement #3**

> **As is pointed out in Kline & Specter's objection, Tom Kline is one of the premier trial lawyers in the country. This point is not disputed by the Fee Allocation Committee. And, as described in the firm's submissions, Tom Kline and other members of his firm to several key depositions in the litigation. However, other members of the PSC did extraordinary work in preparation for those depositions. These key depositions were a team effort. And while Kline & Specter is entitled to credit for these depositions, the firm is not entitled to sole credit.**

---

[11]     Those same 40 "points" not only allegedly reflect all of Dr. Dagostino's contributions to the litigation in those three areas of science, discovery, and the trial package, but they also purportedly reflect the all of the many contributions of all Kline & Specter attorneys and paraprofessionals in science, discovery, and the trial package.

Kline & Specter Response to FAC Statement #3

This is not an 8th grade algebra test.  When professional time has been expended, there is no partial credit given simply because the work occurred in the context of a team effort.[12]  As a matter of policy, working together as part of a team to advance the litigation is something to be encouraged, not discouraged.  The success of such an extensive litigation such as this often rises and falls on whether attorneys from different firms are capable of working collaboratively and sharing resources.  Mr. Lanier, the trial attorney with the most success in the courtroom during this litigation illustrated this point perfectly:

> Seeger and his crew are a wonderful compliment [sic] to us.  They are working so hard behind the scenes to make days like Friday possible.  **Of course you [Kline & Specter] and your folks (especially Lisa!) are huge in this as well… This is a great cooperative effort where I get to do the fun part!  What a job**!

*See* Exhibit 71.  Mr. Birchfield, the signatory of the FAC response, won't extend any of the 150 points he has awarded himself for trial work with the other firms in the litigation who contributed time, work-product, and other substantial assistance to him during the trials.  His failure to do so is illegitimate.  And the failure to recognize that the discovery and trial teams were exactly that – teams -- is equally illegitimate.

Kline & Specter has always maintained that is was part of a team, and has always performed as a team player.  *See, collectively*, all emails attached to this filing.  As the records shows, Kline & Specter attorneys were always willing to drop anything to help assist any and all with work product, service, advice, and personnel upon request.  Kline & Specter never functioned as a closed shop, and has never maintained that it deserved "sole" credit for its

---

[12]     By that ludicrous logic, a starting pitcher should get credit for a win only if he pitched the full game by himself, without a relief pitcher. Cooperation does not diminish the achievements of individuals.

achievements.   The firm deserves fair credit and fair compensation for the work that it performed.

**FAC Statement #4**

> **Tom Kline, a premier trial lawyer who was appointed to the PSC and given key assignments based on the strength of his reputation as a trial lawyer, refused to following through on his commitment to try a bellweather case.   At a critical juncture in the litigation, Tom Kline dismissed a bellweather case.   Tom Kline had agreed to try the second MDL case if Merck and the Court would agree that the trial would take place in Philadelphia.  Merck agreed and the Court made all the necessary arrangements to conduct the trial in Philadelphia.  Then, Tom Kline dismissed the case.  This was a significant setback to plaintiffs' cause.   Likewise, Kline & Specter dismissed the leading case in Pennsylvania State Court to avoid trial.  Kline's disengagement and deleterious dismissal of trial set cases in the MDL and state court are major negative factors in evaluating the firm's contributions.**

Kline & Specter Response to FAC Statement #4

Wrong.

Tom Kline did not "refuse" to try a case.  Kline volunteered to try the first MDL Vioxx trial -- the *Irvin* case.  *See*, Affidavit of Thomas R. Kline, dated May 5, 2011, attached as Exhibit 72.  Kline's offer was rejected by Mr. Birchfield.  *Id.*

Mr. Kline then volunteered for the second MDL trial -- the Abrams case.  *Id.*  Because of the severe time pressure involved in the case selection process for bellweather trials in the MDL, this case was picked for trial prior to the beginning of discovery. [13]  *Id.*   This case was

---

[13]     On October 27, 2005, the Abrams case was selected to be the second bellweather trial. At the time, this Court had been recently displaced from New Orleans by the devastating and tragic effects of Hurricane Katrina.  *See*, Exhibit 67.  The trial was originally slated to be tried in New Orleans in early February 2006.  *Id.*   Mr. Kline's request for a change of venue was motivated by the PSC's concern about trying a pharmaceutical case in front of jurors who had recently suffered catastrophic losses.  *Id.*

Kline & Specter acknowledges and appreciates that this Court made significant efforts to move the venue of the *Abrams* case to Philadelphia.  Although the decision to withdraw the case

withdrawn[14] as a bellweather trial case only three weeks later, when it was discovered that the decedent, a health care provider, had ignored advice from his own physicians to discontinue his self-prescription of double the recommended dose of Vioxx when it began to have a deleterious effect on his blood pressure. *Id*. *See*, relevant page extracted from medical records, attached as Exhibit 73. Shortly thereafter, the decedent suffered his fatal heart attack.

Co-lead Seeger and Liaison Herman knew and approved of the decision to pull the case as a PSC offering for a bellweather trial. *See*, Exhibit 72. *See also*, November 21, 2005 email from Lee Balefsky to Tom Kline and Shanin Specter, attached as Exhibit 74. The FAC was satisfied that the withdrawal of Abrams as a potential trial case was the correct decision. *See*, Exhibit 2 at 43-4. In fact, Mr. Herman affirmed that the withdrawal of the *Abrams* case as a potential trial case should not and would not be the "key factor or sine qua non in the judgment of your work. We all have difficulties during trials….but the fact is, your firm made a significant contribution and that you are real lawyers." *See*, Exhibit 2.

Now Mr. Birchfield, on behalf of the FAC, argues in the FAC response that the withdrawal of the Abrams case "damaged the litigation." *See*, FAC response at 32. He is unable to provide any objective evidence that the dismissal of the Abrams case "damaged" the litigation because, quite simply, it did not. Since the *Irvin I* case resulted in a mistrial, the re-trial of *Irvin*

---

was unfortunate, Mr. Kline had a duty to the Abrams family and all plaintiffs in the litigation not to try a case as a "bellweather" trial that was not representative because of patient misuse of Vioxx. The case simply could not be won. *Id*. Trial of the *Abrams* case with those newly discovered facts clearly would have damaged the litigation for all potential claimants. There is no rational basis to claim that the withdrawal of the case as a potential bellweather trial on November 22, 2005, a mere three weeks after it had been selected, in any way "damaged" the litigation. *Id*.

[14]     The case was not dismissed, as the FAC alleges. The *Abrams* case was simply withdrawn as a potential bellweather trial case. The case ultimately settled under the Settlement Program.

ended up occupying the February 2006 spot that had initially been reserved for the *Abrams* case, so no MDL trial listing was lost as a result of the *Abrams* withdrawl.

Mr. Kline was not the only PSC member who withdrew a case that had been set to try. After the withdrawal of Vioxx, one of the very first Vioxx trials in the country was slated to be Mr. Birchfield's *Rogers* case in Alabama state court. On the eve of trial, just after damaging information about the client came out in the press, the case was continued. *See* Exhibit 75. Also, in January 2006, this Court set two other cases for future MDL trials -- the *Diaz* and *Borowitz* cases. *See*, January 12, 2006 email from Chris Seeger, attached Exhibit 76. Several of the Louisiana-based lawyers on the PSC, including Mr. Herman, assisted the *Diaz* counsel (a non-PSC member), but the case ultimately had to be dismissed after several continuances. *Borowitz* was a case from the Seeger Weiss office that was never transferred to E.D. La. Neither case ever tried before this Court.

Tom Kline and Kline & Specter continued to be available to try Vioxx cases but were offered no MDL trial opportunities. The MDL trials were jealously guarded by co-lead Birchfield. While Birchfield's trials were unsuccessful largely because of Birchfield's thin trial experience, the underlying general case remained excellent, and in more experienced hands, plaintiffs' verdicts were achieved.

As noted above, when the *Irvin* case was selected as the first bellweather trial, it was to be tried by the PSC. Mr. Birchfield declined Mr. Kline's assistance as co-lead trial counsel. *See*, Exhibit 72. There was a widespread conclusion within the PSC and outside the PSC as to the damage Mr. Birchfield and his firm did to the litigation with their performance in this trial. *See*, many and various emails attached collectively as Exhibit 77. Objective criticisms of Beasley Allen's performance in *Irvin* and other trials has not, however, diminished their recommended fee, which stands at $40 million.

The FAC also pretextually claims that Kline & Specter dismissed the *McCool* case in Philadelphia state court in early 2007, and further alleges that the dismissal of this claim also "damaged" the litigation.  Mr. McCool was a morbidly obese man with a documented caloric intake up to 10,000 calories a day, including the ingestion of 20 caffeinated beverages a day. Mr. McCool had begun to feel unwell while at work, but ignored advice to seek prompt medical attention and instead went home.  He died in his kitchen of what may have been a myocardial infarction (heart attack), but there was no confirming autopsy.  His prescribing physician was unsupportive of the Vioxx case, and actually informed Kline & Specter that he intended to testify in a way that would have been fatal to the case (that the benefit to Mr. McCool of pain alleviation from Vioxx outweighed the risk of a cardiovascular event).  *See*, Exhibit 72.  Thus, as matter of fact and law, this case could not be won, and it was properly dismissed.

Once again the FAC cannot show any "evidence" that Kline & Specter's withdrawal of the *McCool* case "damaged" the litigation, because, quite simply, there isn't any.  Ironically, the FAC now complains that the Locks firm tried a similarly unwinnable case (*Doherty*) and ended up with a defense verdict, and uses that decision by Locks to try that case as a justification for paring their common benefit fee.  *See,* FAC Response at 36.  Thus, when it benefits them, the FAC criticizes some common benefit claimants for not trying unwinnable cases (*Abrams* and *McCool*), while at the same time criticizes other common benefit claimants for trying an unwinnable case (*Doherty*).  This sloppy and amateurish hypocrisy reveals the FAC's critiques of Kline & Specter as just a self-interested attempt to justify their 73% fee grab.

The FAC also conveniently fails to note that after the dismissal of *McCool*, Kline & Specter recommended to the Court of Common Pleas of Philadelphia County (PCCP) that all pending Vioxx cases filed in PCCP be consolidated for discovery and trial. *See*, February 28, 2007 letter from Thomas R. Kline to the Hon. Paul Panepinto, attached as Exhibit 78.  Kline &

Specter jointly suggested with Merck that plaintiffs with cases pending in PCCP identify ten to fifteen cases for discovery and trial, and further that case specific discovery in those cases proceed with a targeted consolidated trial date of October 15, 2007 .  *Id.* The Court did not set the requested October 15, 2007 trial date, but this process of discovery and trial listing was pending when the Vioxx litigation was settled on November 9, 2007.  *See*, Exhibit 72.  Thus, Tom Kline and Kline & Specter volunteered to try Vioxx cases throughout the pendency of the litigation.  These efforts were thwarted.

Tom Kline absolutely did not "disengage" from the litigation following the withdrawal of the *Abrams* case on November 22, 2005.  To the contrary, Mr. Kline traveled to Houston and assisted during the trial of *Irvin I*, forcefully and unpopularly raising many important points of substance and strategy. *See, e.g.,* Exhibit 45 and Exhibit 77.  Mr. Kline and his firm "stepped up" and "bailed out" the PSC during a difficult period of case selection and review in late 2005-2006.  *See*, Exhibits 9-11.  Mr. Kline continued to take and assist in important depositions after November 22, 2005, including the Topol, Mixon, Graham, Curfman, Avorn and Nissen depositions.  *See e.g.*, Exhibits 25, 26, 27, 30, 33, 34, 37.  In fact, even though he had a pending medical malpractice trial in Pennsylvania state court, in January 2007, at the specific request of Seeger Weiss partner David Buchanan and Mark Lanier, Mr. Kline traveled to Boston on a few days notice to perform a trial deposition of Gregory Curfman, M.D., a senior editor of THE NEW ENGLAND JOURNAL OF MEDICINE, so that the testimony would be available for Mr. Buchanan and Mr. Lanier's upcoming Hermans/Humeston trial in NJ state court.  *See*, January 11, 2007 email from David Buchanan, attached as Exhibit 79 ("Tom, if you're able and willing to move those mountains, it would be my strong preference for you to do it").

Mr. Kline continued to provide support to the trial teams behind the scenes. When Merck noticed the deposition of Mal Mixon, the Chairman of Cleveland Clinic for the trial of *Irvin II*,

Mr. Kline flew to Cleveland on two days notice to perform the deposition for the trial team. *See*, various January 2006 emails regarding strategy for the last minute Mixon deposition, attached collectively as Exhibit 80.  He crafted lines of cross examination for attorneys in trial. *See*, various January 2007 emails between Tom Kline and Chris Seeger regarding the upcoming appearance of Alise Reicin, MD in NJ state court, attached as Exhibit 81.  In July 4th week in 2006, co-leads Birchfield and Seeger both separately asked Kline to argue the issue of the admissibility of the Topol and Graham depositions before Judge Fallon. *See*, various July 2006 emails between Tom Kline and Chris Seeger, and Tom Kline and Andy Birchfield, attached as Exhibit 82.  Mr. Herman asked Tom Kline to defer to him and let him argue the motion regarding Graham, and Mr. Kline deferred to Mr. Herman's wishes but went to New Orleans anyway and helped prepare Mr. Herman for the argument. *Id*. *See also*, Exhibit 72.  Mr. Kline flew to New Orleans for a status conference[15] in October 18, 2006 with co-lead counsel Seeger, and separately made time to meet in person with co-lead Andy Birchfield to discuss strategy for the *Detrick* case. *See*, October 18, 2006 email exchange between Andy Birchfield and Tom Kline, attached as Exhibit 83.

Further, with respect to the issue of "disengagement," the PSC ceased to function as a body in early 2007, and conference calls and meetings were cancelled with regularity. *See*, thirty-four (34) emails cancelling 34 weekly PSC conference calls, attached collectively as Exhibit 84.  At this time, the NPC had been formed and was secretly negotiating a settlement with Merck.  This shadow committee (the NPC) essentially usurped the role of the PSC.  Kline did not disengage from the litigation.  The PSC disengaged from the litigation.

The FAC notes that the appointment of Tom Kline to the PSC was personal. That's true. Tom Kline performed brilliantly and tirelessly as set forth herein, mostly outside of the direct

---

[15]     Illustratively, the FAC is wrong about Mr. Kline's attendance at status conferences.

view of this Court.  And it is equally true that all PSC members utilized teams within their firm

to assist.  For Kline & Specter, 14 attorneys, most of them senior members of the firm, worked

on the case.  While Tom Kline logged 3,211.75 hours on the case, the entire Kline & Specter

team, including paraprofessionals, logged 25,743 hours during this period.  *See*, Exhibit 5.

Comparison of this record to the other PSC (but non-FAC) firms yields similar proportions:  PSC

member Mark Robinson recorded 2,963.25 hours, and Robinson Calcagnie firm totaled 21,840

hours; Elizabeth Cabraser logged 2,089.75 hours and the Lieff Cabraser firm totaled 24,270.75

hours.

The FAC uses its pretextual and false critique of Tom Kline to both improperly discount

his contribution <u>and</u> the contributions of all the other Kline & Specter attorneys. There is no

rational basis for this. It is simply a self-interested smearing of the record and cannot stand.

## C.   THE "POINT SYSTEM" AND ITS IMPLEMENTATION BY THE FAC ARE NOT REFLECTIVE OF THE VALUE OF KLINE & SPECTER'S WORK.

For the reasons stated herein and in its previously filed objection, Kline and Specter

strongly opposes the use of this illegitimate Point System.  In the event that the Court does

consider this system (which has no precedent) to be applicable, Kline & Specter proposes this re-

allocation of points available and points to be allocated to the firm.


**Key Leadership/Committee Leadership and Participation/Case Management**

**FAC Recommendation – 55 out of a possible 200 points**
**Suggested Reallocation – 125 out of a possible 175 points**

*"Committee  – a group of men who keep minutes and waste hours."  Milton Berle*

The FAC vastly overrates committee membership and equates titles with "leadership."

Leadership is demonstrated by action, not position.  Leadership means the willingness to step up;

it means directing and then performing the work that needs to be done for the benefit of all

36

litigants; and it means having input into the overall strategy of the litigation.  Kline & Specter's substantial leadership contributions, including contributions as to the strategy of discovery (which Merck scientists to depose, which documents to press for, which third parties to depose, which subpoenas to issue), are detailed herein, and deserve far more recognition than the FAC has given it and that the "Point System" structure provides.  Kline & Specter showed that leadership on numerous occasions, even when those decisions or opinions were unpopular.  The firm was among the core group that Mr. Buchanan and Mr. Tisi specifically referred to in their July 5, 2007 emails that directed, shaped, and conducted the course of this litigation.  *See*, Exhibit 26.  *See also*, Exhibits 68-69.  While the war of attrition claimed many other firms, Kline & Specter stayed through to the end.   During the time that Tom Kline was allegedly "disengaged" from the litigation, he arranged and then joined Mr. Herman, Mr. Seeger, and Mr. Buchanan in meeting with Assistant US Attorneys with respect to the government investigation of the Vioxx matter.  *See*, July 6, 2006 email from Tom Kline to Chris Seeger, David Buchanan, and Russ Herman, attached as Exhibit 85.

If by "committee participation," the FAC means performing the duties of the committees to which they are assigned (Trial, Discovery, Science, Trial Package), Kline & Specter's contributions are far more than merely "modest," as the FAC claims.  *See e.g.*, Exhibit 8-57, 60-69.  The statement that "Tom Kline served as co-chair of the Trial committee but disengaged early in the litigation" is simply flat-out false, as has been shown herein.  *Id*.  *See also*, FAC response at 32.

The FAC claims (again) that Mr. Kline "disengaged" and "stopped regularly attending status conferences," and cites this as the rationale for not awarding the firm the full 25 points for "Case Management."   In their criticism of the firm, the FAC has narrowly focused on Mr. Kline, and has completely ignored the fact that a Kline & Specter senior partner was present for every

status conference prior to the settlement.  When Mr. Kline was unavailable due to scheduling conflicts, his partner, Lee Balefsky (head of the Kline & Specter Mass Tort department), attended the status conference in his stead, just as other PSC members did when they were unavailable.  Kline & Specter was present at all status conference.

When asked by the PSC leadership (after the withdrawal of the *Abrams* case) to take on a specific key tasks such as:  the deposition of Mal Mixon, the deposition of David Graham, MD, MPH, the deposition of Greg Curfman, M.D., argument of motions, or vetting trial cases, Tom Kline performed above and beyond what was expected, and, in Mr. Seeger's words, "bailed us out."  *Supra*.  Mr. Kline most certainly did not "disengage."

It is notable that the FAC has provided a mechanism for the leads of the Texas litigation to receive 'points' for their work as liaison counsel in the Texas MDL (those attorneys were represented on the FAC).  No such provisions in the "Point System Guide" are made for the position of liaison counsel in Philadelphia, which was held by Kline & Specter attorneys Lee Balefsky and Michelle Tiger.  *See*, Exhibit 70.

Finally, as a matter of process, these three categories as created by the FAC allow an individual firm to recover three times for the same hours of work—for example, under this "Points" scheme, Mr. Birchfield could recover 125 out of 125 points for being the MDL co-lead under "Key Leadership," 50 out of 50 points for "Committee Leadership" of the PSC, and a further 25 out of 25 points for performing the duties of the PSC under "Case Management, for a grand total of 200 out of 200 points."  *See*, Exhibit 70.  *See also*, Point Grid, attached as Exhibit 86.  Strangely enough, that seems to be exactly what happened.  *Id*.

**Funding**

**FAC Recommendation –35 out of a possible 75 points**
**Suggested Reallocation – 25 out of a possible 25 points**

The FAC seems to be "rewarding" those firms who managed a significant personal caseload of Vioxx claims.  The management of individual clients is not the purpose of "common benefit."  The number of cases an individual firm manages is completely irrelevant.  This system of rewarding a bonus of to 75 points (far more than is available for discovery and science work combined) to those firms who had a huge caseload ignores the fact that those firms have already been paid for their work on those individual cases through the settlement.  The work on those individual cases had nothing to do with the common benefit of all litigants.  This category is tremendously overvalued, and should be worth 25 points at most.

With respect to assessments, as noted *supra*, Kline & Specter has regularly paid each and every assessment, including one less than two months ago, during this phase of objections.  *See*, email from Mr. Kline to Mr. Herman, dated March 16, 2011, attached as Exhibit 87.  Since Kline & Specter has contributed the full value of assessments, it should receive the maximum points available in this category.  *See*, FAC Response at 32.

**Settlement Negotiations/Settlement Implementation and Post-Settlement issues**

**FAC Recommendation –0 out of a possible 200 points**
**Suggested Reallocation – 0 out of a possible 100 points**

Promises were made by the leadership in this litigation to keep Kline & Specter "at the table."  Those promises were not kept.  *See* Seeger email at Exhibit 89 ("I did tell you I would keep you at the table").  Kline & Specter should not be penalized for these delicts.

The range of potential points available (200) in these two categories is well out of proportion to the value of other work in this matter.  These two categories together in the FAC derived "Points" system also represent more points than the trial of five cases.  They also represent four times the value of science discovery and fact discovery combined, which is simply astonishing.

Further, settlement administration is worth an astonishing 100 possible points, when that work requires considerably less skill and takes place after the outcome of the litigation has been set. Settlement work is undeniably valuable, but it is certainly not four times as valuable as science and fact discovery combined, particularly when settlement administration is not contingent upon the outcome of the litigation and does not require the same level of technical skill as either science or fact discovery.

The categories are tremendously overvalued, and should be worth together only 100 points.

**Law and Briefing**

**FAC Recommendation – 20 out of a possible 100 points**
**Suggested Reallocation – 60 out of a possible 100 points**

Kline & Specter's work in law and briefing on the team that tackled preemption, the most difficult and complex legal issue in the case, was substantial, and included the creation of an encyclopedic underlying record, as well as complex legal arguments. *See*, *supra* at pp. 23-25; Exhibits 67-69. This work was worth far more to the common benefit of all litigants than a mere 20 out of 100 points, and the firm's point value should be adjusted accordingly. Law and briefing should be worth the same as discovery. Law and briefing should be worth the same as science. All three of those aspects of pre-trial work are equally taxing and require similar quantities of specialized skill and knowledge. The exemplary, complex and sophisticated work of Kline & Specter on the preemption issue – which they led along with Levin Fishbein – is easily worth 60 points.

## Trial

**FAC Recommendation – 0 out of a possible 150 points**
**Suggested Reallocation – 125 out of a possible 175 points**

The FAC has recommended that Kline & Specter receive 0 points in this category. Clearly, the FAC has a very myopic view of "trial" work that includes only the individuals seen by the Court. As anyone who has ever worked on a trial team knows, the person who stands in front of the jury must stand on the shoulders of an entire team. In this massive litigation, that team was rarely, if ever, composed solely of members of one firm. The FAC's system only allocates points to those visible individuals, and completely ignores the trial contributions of the unseen members of the litigation, including those who performed critical depositions played during those trials, those who develop the experts, those who developed "the case," those developed lines of cross examination, those who performed deposition cuts, and those vetted the cases for trial in the first place. Kline & Specter attorneys were "on their feet," through multiple depositions played in most trials, and Kline & Specter voices were present as part of the production that the PSC would eventually call the Trial Package.

As this Court has already noted, the work in the Trial Package is done for trial. *See*, Exhibit 59, at 11-12. It is not fact discovery. It is not science. It is the culmination of discovery and science, and represents analysis and preparation for trial. The FAC has acknowledged that Dr. Dagostino made "extraordinary" contributions and expended extensive time on trial package work, but they misattribute that work to the discovery/science category. Dr. Dagostino's hours on this project were submitted and approved by Wegmann Dazet under the category of "Trial." *See*, hours from Wegmann Dazet, attached as Exhibit 88. That work is properly attributed to this category, and is separate and distinct from the extensive science and fact discovery done by Dr. Dagostino and the entire Kline & Specter team.

41

The extensive vetting of trial cases for the MDL by Kline & Specter also belongs in this category.   The trial category points available should be expanded to 175 to reflect these contributions and those of the trial package committee.

**Discovery/Science**

**FAC Recommendation – 40 out of a possible 50 points**
**Suggested Reallocation – 200 out of a possible 200 points (100 out of 100 for Science; 100 out of 100 for Discovery)**

It is in this category that the FAC reveals the completely indiscriminate nature of its recommended award.   It is factual discovery that drives cases and ultimately, settlement. Pharmaceutical litigation requires extensive specialized knowledge of science.   Kline & Specter deserves maximum value in the arenas of both discovery and science, two areas that are severely undervalued by the FAC.   The available points for discovery and science should each equal the available points for law and briefing –100 points each.

Kline & Specter did far more than the "several" depositions noted by the FAC; as Mr. Herman noted, Kline & Specter attorneys performed depositions of seventeen different scientists, executives, and third parties, with many of these depositions taking place over multiple days, and with two physician attorneys providing background. This alone is worth maximum value.

The substantial development of the case on key factual discovery issues, performed by Dr. Dagostino, is worth maximum value.

Dr. Dagostino and Dr. Hoffman were trained physician-attorneys who performed substantial, highly technical work in the development of the causation case and in fact discovery. Their contributions on those issues alone are worth maximum value.

Yet despite all these contributions in all these crucial arenas, the FAC still only awards Kline & Specter 40 points out of 50.[16] This is a complete travesty.

**Total Net Points**

**FAC Recommendation – 115 out of 775**
**Suggestion Allocation – 535 out of 775**

This adjusted point total brings Kline & Specter to a net 535 out of 775 points, which is commensurate with Kline & Specter's many contributions to this litigation, as detailed herein.

**Johnson Factors (as applied to the "Point System")**

**FAC Johnson Factor – 0.5**
**Suggested Johnson Factor – 1.15**

The FAC has improperly claims that their method is an "objective" assessment of the work. That is incorrect. Simply because numbers are placed into a spreadsheet, that does not mean the method that the FAC used to derive those numbers is objective. In fact, it is clearly not. The "Points" grid places value judgments on different types of work. Therefore, it is a highly subjective assessment of the work performed.

In the accepted Lodestar/Johnson Factor analysis, which the FAC did not perform, an objective (quantitative) assessment of work (Lodestar) is modified with a subjective (qualitative) assessment -- a multiplier or Johnson Factor. In the FAC's illegitimate method, an already highly subjective assessment of work (the "Point System") is further modified by a second highly subjective assessment -- the multiplier. This is another fatal flaw in the construction of this system. It is inappropriate to apply a Johnson Factor to "Points." The Point system already does the work of the Johnson Factor by weighing certain types of work as more valuable than others. There is no objective assessment of work performed under this system.

---

[16]    This value purportedly also includes Dr. Dagostino's "exceptional" work on the trial package, which was inappropriately attributed to this category by the FAC.

The second subjective assessment only magnifies the disparities created by the first.

The FAC has chosen to devalue Kline & Specter's contributions three times.  First, it devaluated them with a 'stacked deck' point system that devalued or undervalued the type of work Kline & Specter performed.  Second, it devalued the "points" even further with an inappropriate Johnson Factor of 0.6, [17] resulting in an initial recommended award of $4,514,057.15.  Finally, it devalued Kline & Specter's contribution even further by reducing the Johnson Factor to 0.5 and the recommend award to $4,000,000 when Kline & Specter dared to object to its manifestly unreasonable first recommended award.  *See*, FAC Response at 33.

To whatever extent this Court choses to follow the FAC's system and apply the Johnson Factor to the "Points," Kline & Specter should receive the same multiplier/Johnson Factor as other leading firms in this litigation.  Therefore the firm's multiplier as applied to the "Points" should be the commensurate with the other leading firms in the litigation (1.15).  If each point is worth $48,703.59, then with a suggested allocation of 535 points and a Johnson Factor of 1.15, the final allocation for Kline & Specter should be approximately $30,000,000. [18]

**Lodestar Cross-Check**

It's completely clear from the record that the FAC did not perform a lodestar cross-check with respect to Kline & Specter.  The FAC reports that they gave "due consideration" to Dr. Dagostino's hours.  Wrong.  According to Wegmann Dazet, Dr. Dagostino's lodestar, as noted above, is $4,384,395 representing 8199.25 hours of full-time "approved" time expended on

---

[17]    The error of the use of the illegitimate point grid now becomes compounded with the application of the Johnson Factor to the point grid.  Neither of these have any basis in established law.

[18]    One might modestly reduce or increase Kline & Specter's point total or modestly reduce or increase Kline & Specter's multiplier.  Any way you rationally slice it, Kline & Specter's contributions are in the first rank, as should be their fee.

behalf of Vioxx litigants over the course of 3 years.  *See* Exhibit 3 at 15.  Her lodestar, which the FAC does not dispute, represents 36.7% of the firm's lodestar.

36.7% of Kline & Specter's recommended award is $1,468.000.  Given Dr. Dagostino's hourly billing rate, Kline & Specter is therefore only being reimbursed for 2718.52 hours of her "exceptional" work.  Should the FAC's recommended award stand, Kline & Specter will have involuntarily donated 5480.73 hours of work performed by one of their physician-attorneys to the litigation.  This is absurd.  Due consideration to her hours, and those of the firm, was clearly not given.

The FAC also alleges that some hours (which they do not identify) appear to be "inflated."  Also wrong.  Kline & Specter kept meticulous and exquisite contemporaneous time records that were all approved by Wegmann Dazet, and were all used by the PLC to justify a Common Benefit Fund.  The vapid accusation of inflated hours is beneath contempt.

## D.   CONCLUSION

A litigation of this size requires teamwork.  A successful team does not necessarily mean a harmonious team.  In the Vioxx litigation, conflicts arose between team members, but the work on behalf of the litigants was nevertheless accomplished.  All the remains at this juncture is the need for an objective and fair evaluation of the quality and quantity of professional work performed on behalf of those litigants.  Personal conflicts and *ad hominem* attacks on the part of the FAC are simply pretexts, and are not a basis for Kline & Specter to be denied a fair and just allocation of the common benefit fund for the extensive quantity and superb quality of work performed by it on behalf of all litigants.  Mr. Seeger acknowledged this in an email to Mr. Kline following the settlement, "[you are] in a fantastic position to be rewarded for all your common benefit work and I will once again be there protecting your interests."  *See*, November 2007

email exchange between Mr. Seeger and Mr. Kline, attached hereto as Exhibit 89. Unfortunately, that has not occurred.

The record provided herein speaks for itself.  Kline & Specter has provided work of the highest quality that significantly advanced the litigation.  Its lawyers served on the PSC and numerous of its subcommittees.  They served on important steering committees in Vioxx state court proceedings, namely the New Jersey Consolidated Litigation ("NJCL") and the Philadelphia Coordinated Litigation ("PCL").  In these leadership roles, Kline & Specter provided extensive, critical, and highly competent services for the common benefit of all Vioxx litigants.  The firm provided litigation funding.  It developed substantial portions of the liability and causation cases, taking numerous depositions of key figures in the litigation, including depositions that would be played at trial.  The firm performed expert development.  It helped put together the trial package.  It singlehandedly reviewed medical records from all over the United States for the PSC to select cases for trial in this Court.  The firm provided significant assistance in the management and oversight of the litigation.  It participated in all aspects of discovery, briefing, trial case selection, and trial strategy.  Its assignments were among the most difficult in the litigation.  Even the FAC admits in its response when it notes that Kline and Specter did "significant common benefit work."  *See*, FAC Response at 32.  In the words of Mr. Herman, the firm "made a significant contribution . . . you are real lawyers."  *See,* Exhibit 2 at 44.

For all the reasons described above, Kline & Specter's contributions toward the common benefit were significant and crucial, and all occurred during the heat of litigation, when no recovery was certain, before settlement.   These contributions equaled those of other top firms.  At a minimum, they were no less significant than the average contribution of the FAC's members toward creating the settlement fund.  Should this Court utilize the FAC's point system, Kline & Specter respectfully requests that the Point allocations be readjusted as demonstrated

herein to properly reflect the level of work performed by this firm and others.  Under this system, Kline & Specter should receive a point value of 535 points and with a multiplier of 1.15, similar to the other top firms in the litigation.  This would result in a final allocation of approximately $30,000,000.  If the Court wishes to not apply the point system and grid and instead apply a standard Johnson analysis, then Kline & Specter's multiplier should be at the same level as the average multiplier of the FAC members: 2.46.  This multiplier times Kline & Specter's lodestar yields a recommended fee of $29,743,097.

Respectfully submitted,

Dated: May 6, 2011

HENRY A. KING, ESQUIRE (#7393)
REBECCA H. DIETZ, ESQUIRE (#28842)
**KING, KREBS & JURGENS, P.L.L.C.**
201 St. Charles Avenue, 45th Floor
New Orleans, LA 70170
504-582-3800 telephone
504-582-1233 facsimile
hking@kingkrebs.com
rdietz@kingkrebs.com

*Attorneys for Kline & Specter, P.C.*

Dated: May 6, 2011

THOMAS R. KLINE, ESQUIRE (#28895)
SHANIN SPECTER, ESQUIRE (#40928)
LEE B. BALEFSKY, ESQUIRE (#25321)
LISA S. DAGOSTINO, ESQUIRE (#89282)
CHARLES L. BECKER, ESQUIRE (# 81910)
**KLINE & SPECTER
A PROFESSIONAL CORPORATION**
1525 Locust Street
The Nineteenth Floor
Philadelphia, PA 19102
215-772-1000 telephone
215-735-0957 facsimile

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Reply to the Fee Allocation Committee's Response To The Objections of The Recommended Common Benefit Fee Allocations have been served on Liaison Counsel, Russ Herman and Phillip Wittman, either by U.S. Mail and e-mail, or hand delivery and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8 (B), and that the foregoing was electronically filed with the Clerk of Court of the United State District Court for the Eastern District of Louisiana by using the CM/ECF system, which will send a Notice of Electronic Filing.

This 6th Day of May, 2011,

/s/ Rebecca H. Dietz

{N0462735 -}