Exhibit "30"

Page 1

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF LOUISIANA
2
   IN RE: VIOXX LITIGATION: MDL DOCKET
3                             NO. 1657
   _____
4
   SUPERIOR COURT OF THE STATE OF CALIFORNIA
5          COUNTY OF LOS ANGELES
                     -   -   -
6
   Coordination Proceeding: CASE NO.  JCCP
7  Special Title      : JCCP NO. 4247
   (Rule 1550(b))     :
8                      :
   This Document Applies  :
9  To All                 :
   VIOXX CASES
10
                     -   -   -
11
                  CONFIDENTIAL
12
        SUBJECT TO PROTECTIVE ORDER
13
                     -   -   -
14
                November 22, 2005
15
                     -   -   -
16
17        Videotape deposition of ERIC J.
   TOPOL, M.D., held in the InterContinental
18 Hotel, 9801 Carnegie Place, Cleveland,
   Ohio 44106, commencing at 9:41 a.m., on
19 the above date, before Linda L. Golkow, a
   Federally-Approved Registered Diplomate
20 Reporter and Certified Shorthand Reporter.
21                   -   -   -
22        GOLKOW LITIGATION TECHNOLOGIES
             Four Penn Center - Suite 1210
23         1600 John F. Kennedy Boulevard
           Philadelphia, Pennsylvania 19103
24              1.877.DEPS.USA                    **KS-000133**

Page 2

```
 1   A P P E A R A N C E S :
 2
 3        KLINE & SPECTER, P.C.
          BY: THOMAS R. KLINE, ESQUIRE
 4            and
          LISA DAGOSTINO, M.D., J.D.
 5            and
          LEE B. BALEFSKY, ESQUIRE
 6        (By Telephone)
          19th Floor
 7        1525 Locust Street
          Philadelphia, Pennsylvania 19102
 8        (215) 772-1000
          Counsel for Plaintiffs
 9
10
          SEEGER WEISS LLP
11        BY:  DAVID R. BUCHANAN, ESQUIRE
          Suite 920
12        550 Broad Street
          Newark, New Jersey 07102
13        (973) 639-9100
          Counsel for Plaintiffs
14
15
          LEVIN SIMES & KAISER LLP
16        BY:  STEVEN B. STEIN, ESQUIRE
          One Bush Street - 14th Floor
17        San Francisco, CA  94104
          (415) 646-7171
18        Counsel for Plaintiffs
19
20        THE BEASLEY FIRM LLC
          BY:  SCOTT D. LEVENSTEN, ESQUIRE
21        1125 Walnut Street
          Philadelphia, Pennsylvania 19107
22        (215) 592-1000
          Counsel for Plaintiffs
23
24            -  -  -
```

Page 3

```
 1   A P P E A R A N C E S : (Continued)
 2
 3        LEVIN FISHBEIN SEDRAN & BERMAN
          BY:  MICHAEL M. WEINKOWITZ, ESQ.
 4        Suite 500 - 510 Walnut Street
          Philadelphia, Pennsylvania 19106
 5        (215) 592-1500
          Counsel for Plaintiffs
 6        (By Telephone)
 7
          MINTZ, LEVIN COHN FERRIS GLOVSKY
 8        AND POPPEO P.C.
          BY:  H. JOSEPH HAMELINE, ESQUIRE
 9        One Financial Center
          Boston, Massachusetts 02111
10        (617) 542-6000
          Counsel for the Witness,
11        Eric J. Topol, M.D.
12
13        THE CLEVELAND CLINIC FOUNDATION
          BY:  VICTORIA L. VANCE, ESQUIRE
14        1950 Richmond Road
          Lyndhurst, Ohio 44124
15        (216) 297-7067
          Counsel for the Witness,
16        Eric J. Topol, M.D.
17
18        BARTLIT BECK HERMAN PALENCHAR &
          SCOTT, LLP
19        BY:  ANDREW L. GOLDMAN, ESQUIRE
          Courthouse Place
20        54 West Hubbard Street
          Chicago, Illinois 60610
21        (312) 494-4400
          Counsel for Merck & Company, Inc.
22
23
24
```

Page 4

```
 1   A P P E A R A N C E S :  (Continued)
 2
 3        JOSEPH D. PIORKOWSKI, JR., ESQUIRE
          910 17th Street, N.W.
 4        Suite 800
          Washington, DC  20006
 5        (202) 223-5535
          Counsel for Merck & Company, Inc.
 6
 7
 8        HUGHES HUBBARD & REED
          BY: JAMES C. FITZPATRICK, ESQUIRE
 9        One Battery Park Plaza
          New York, New York, 10004
10        (212) 837-6000
          Counsel for Merck & Company, Inc.
11
12
13        CRUSE, SCOTT, HENDERSON & ALLEN
          BY: JAY HENDERSON, ESQUIRE
14        7th Floor - 2777 Allen Parkway
          Houston, Texas 77019-2133
15        (713) 650-6600
          Counsel for Texas physicians
16        (By Telephone)
17
18            -  -  -
19
20
21
22
23
24
```

Page 5

```
 1   A P P E A R A N C E S (VIA INTERNET)
 2
 3        LOPEZ, HODES, RESTAINO,
          MILMAN & SKIKOS
 4        BY: JOSEPH JANE, ESQUIRE
          (Via Internet)
 5
          LEVIN PAPANTONIO THOMAS MITCHELL
 6        ECHSNER & PROCTOR, P.A.
          BY: TROY RAFFERTY, ESQUIRE
 7            JASON TISDALE, ESQUIRE
          (Via Internet)
 8
 9        SNAPKA & TURMAN, LLP
          BY: KATHRYN SNAPKA, ESQUIRE
10        (Via Internet)
11
          EVANS & ROWE
12        BY: NATHAN KETTERLING, ESQUIRE
          (Via Internet)
13
14        CLARKE PERDUE ARNOLD & SCOTT
          BY: D. ANDREW LIST, ESQUIRE
15        (Via Internet)
16
          CRUSE SCOTT HENDERSON & ALLEN
17        BY:  SHARON ALFORD, ESQUIRE
          (Via Internet)
18
19        GIBBONS DEL DEO DOLAN GRIFFINGER &
          VECCHIONE
20        BY:  VIK ADVANI, ESQUIRE
          (Via Internet)
21
22            -  -  -
23
24
```

**KS-000134**

Page 6

1        DEPOSITION SUPPORT INDEX
2
3
     Direction to Witness Not To Answer
4    Page Line Page Line
     (None)
5
6
7
8
     Request For Production of Documents
9    Page  Line  Page  Line
     (None)
10
11
12
13
     Stipulations
14   Page  Line  Page  Line
       (None)
15
16
17
18
     Questions Marked
19   Page  Line  Page  Line
     (None)
20
21
22
23
24

---

Page 7

1           - - -
2          I N D E X
3    WITNESS              PAGE NO.
4    ERIC J. TOPOL, M.D.
5      By Mr. Kline        25, 555
6      By Mr. Goldman        316
7           - - -
8        E X H I B I T S
9
     NO.    DESCRIPTION    PAGE NO.
10
11
     Topol-1    Curriculum Vitae    26
12          Eric Jeffrey Topol,
            M.D.
13          TOPOLE 0000001 -
            TOPOLE 0000127
14
15   Topol-2    E-mails    45
            TOPOLE 0000450
16
17   Topol-3    "The sad story of    53
            Vioxx, and what we
18          should learn from
            it," (Karha/Topol),
19          Cleveland Clinic
            Journal of
20          Medicine, Volume
            71, Number 12,
21          December 2004,
            933-939
22
23
24

---

Page 8

1
2    Topol-4    "Risk of        82
            Cardiovascular
3           Events Associated
            with Selective
4           COX-2 Inhibitors,"
            (Mukherjee, et al),
5           JAMA, August 22/29,
            2001 Vol 286, No.
6           8, 954-959
7    Topol-5    E-mails    87
            MRK-ABA009274
8
9
     Topol-6    E-mail 4-26-01,    89
10          with attachment,
            "Selective COX-2
11          Inhibitors are
            Associated with An
12          Increased Risk of
            Cardiovascular
13          Events,"
            (Mukherjee, et al)
14          draft manuscript
            MRK-AAZ0001561 -
15          MRK-AAZ0001593
16
17   Topol-7    E-mails, with    106
            attachment,
18          "Selective COX-2
            Inhibitors are
19          Associated with An
            Increased Risk of
20          Cardiovascular
            Events,"
21          (Mukherjee, et al)
            draft manuscript,
22          MRK-ABA009661 -
            MRK-ABA009693
23
24

---

Page 9

1
2    Topol-8    Memo 2-1-01,    115
            "Consultation NDA
3           21-042, S-007
            Review of
4           cardiovascular
            safety database
5           (Targum)
            (37 pages)
6
7    Topol-9    Excerpt from "Risk  126
            of Cardiovascular
8           Events Associated
            with Selective
9           COX-2 Inhibitors,"
            (Mukherjee, et al),
10          JAMA, August 22/29,
            2001 Vol 286, No.
11          8, 956
12
     Topol-10    "Raising a    167
13          Cautionary Flag
            about COX-2 Use in
14          High-Risk Heart
            Patients,"
15          Cleveland Clinic
            Heart Center
16          (2 pages)
17
     Topol-11    "Lack of    173
18          Cardioprotective
            Effect of
19          Naproxen," Arch
            Intern Med/Vol 162,
20          Dec 9/23, 2002 2637
21
22
23
24

**KS-000135**

Page 10

1
2   Topol-12    "Cyclooxygenase-2:  181
         Where are we in
3        2003?
         Cardiovascular risk
4        and COX-2
         inhibitors,"
5        (Mukherjee et al),
         Arthritis Research
6        and Therapy 2003,
         Vol. 5, 8-11
7
8   Topol-13    "Pharmaceutical   187
         advertising versus
9        research spending:
         Are profits more
10       important than
         patients?
11       (Mukherjee et al)
         American Heart
12       Journal, October
         2003, 563-564
13
14  Topol-14    "A coxib a day    195
         won't keep the
15       doctor away,"
         (Topol, et al), The
16       Lancet Vol 364,
         August 21, 2004,
17       639-640
18
     Topol-15    "Risk of         201
19       cardiovascular
20       events and
         rofecoxib:
21       Cumulative
         meta-analysis,"
22       (Juni, et al) The
         Lancet, Vol. 364,
23       December 4, 2004,
24       2021-2029

Page 11

1
2   Topol-16    "Rofecoxib, Merck,   226
         and the FDA," (Kim
3        et al), N Engl J
         Med 351;27 December
4        30, 2004,
         2875 - 2878
5
6   Topol-17    "Good Riddance to a  230
         Bad Drug," (Topol)
7        New York Times
         Reprint, October 2,
8        2004
         (2 pages)
9
10  Topol-18    "Failing the Public  237
         Health - Rofecoxib,
11       Merck, and the FDA
         (Topol) N Engl J
12       Med 351;17 October
         21, 2004
13       1707-1709
14
15  Topol-19    "Risk of acute       240
         myocardial
16       infarction and
         sudden cardiac
17       death in patients
         treated with
18       cyclo-oxygenase 2
         selective and
19       non-selective
         non-steroidal
20       anti-inflammatory
         drugs..." (Graham,
21       et al), The Lancet,
         Vol. 365, February
22       5, 2005, 475-481
23  Topol-20    E-mails              245
         TOPOLE 0000458
24

Page 12

1   Topol-21    E-mails          250
         TOPOLE 0000333
2   Topol-22    Handwritten notes   265
         TOPOLE 0000469
3
4   Topol-25    "Cardiovascular      274
         System Clinical
5        Profile in
         Osteoarthritis
6        Studies,"
         Cardiovascular
7        Card,
         MRK-ABW00000243 -
8        MRK-ABW0000248;
         MRK-ADB0009039 -
9        MRK-ADB0009042;
         MRK-ACW0008375;
10       MRK-ACZ0072955 -
         MRK-ACZ0072956
11
12  Topol-23    Handwritten notes   277
         TOPOLE 0000504
13
14  Topol-24    Handwritten notes   288
         TOPOLE 0000463
15
16  Topol-26    "Preliminary         300
         Questions - 60
17       Minutes"
         TOPOLE 0000465
18
19  Topol-27    Letter 10-7-04 with  303
         handwritten notes
20       TOPOLE 0000462
21
22  Topol-28    Memo 10-17-04        305
         TOPOLE 0000474
23
24  Topol-29    New York Daily News  319
         Reprint (3 pages)

Page 13

1
2   Topol-30    "Arthritis Advisory  351
         Committee NDA #
3        21-042/S007, Vioxx
         (Rofecoxib, Merck)"
4        2-8-01, 1-3; 210
5
6   Topol-31    E-mails              367
         MRK-AAZ001594
7
8   Topol-32    "Rofecoxib in the    367
         Prevention of
9        Ischemic Events in
         Patients with Acute
10       Coronary Syndromes
         and Elevated
11       Markers of
         Inflammation,"
12       (Bhatt, et al)
         MRK-ABA0003235 -
13       MRK-ABA0003244
14  Topol-33    "Selective COX-2     387
         Inhibition Improves
15       Endothelial
         Function in
16       Coronary Artery
         Disease,"
17       (Chenevard, et al)
         Circulation,
18       January 28, 2003,
         405-409
19
20  Topol-34    E-mails              410
         MRK-ABA0011062
21
22  Topol-35    E-mails              413
         TOP1PRO0000282 -
23       TOP1PRO0000283
24

**KS-000136**

Page 14

```
1
2   Topol-36   E-mail 6-20-01,    417
3         with attachment,
          "Risk of
4         Cardiovascular
          Events Associated
5         with Selective
          COX-2 Inhibitors,"
6         (Mukherjee, et al)
          Draft Manuscript,
7         TOP1PRO0000285 -
          TOP1PRO0000311
8
9   Topol-37   E-mails          429
          TOP1PRO0000279
10
11  Topol-38   "Risk of         434
          Cardiovascular
12        Events Associated
          with Selective
13        COX-2 Inhibitors,"
          JAMA August 22/29,
14        2001 Vol 286, No.
          8, 954-958,
15        MRK-ADJ0035003 -
          MRK-ADJ0035008
16
17  Topol-39   "A coxib a day   444
          won't keep the
18        doctor away,"
          (Topol, et al) The
19        Lancet Vol 364
          August 23, 2004,
20        639-640
21  Topol-39A  Letter 10-16-01  450
          EJT 000323 -
22        EJT 000324
23
24
```

Page 16

```
1
2   Topol-44A   Memo 2-1-01     527
3         "Consultation NDA
          21-042, S-007
4         Review of
          cardiovascular
5         safety database,"
          (Targum) with
6         handwritten notes,
          EJT 000211 -
7         EJT 000248
8   Topol-45   E-mail 10-17-04  533
          EJT 000343
9
10  Topol-46   E-mails          538
          FDACDER 023057 -
11        FDACDER 023058
12  Topol-47   Letter 4-11-02,  543
          with attached label
13        EJT 000044;
          EJT 000050 -
14        EJT 000065
15
16  Topol-48   "Dr. Topol's     588
          Analysis CV Events
17        in Study 090,"
          Chart
18        (1 page)
19  Topol-49   E-mail 3-9-00    589
          MRK-ABH0016219
20
21  Topol-50   E-mails          592
          MRK-ABC033809
22
23  Topol-51   E-mails          601
24        TOPOLE 000149 -
          TOPOLE 000150
```

Page 15

```
1
2   Topol-40   "Systematic      455
          adjudication of
3         myocardial
          infarction
4         end-points in an
          international
5         clinical trial,"
          (Mahaffey, et al),
6         Current Controlled
          Trials in
7         Cardiovascular
          Medicine August
8         2001 Vol. 2 No. 4,
          (6 pages)
9
10  Topol-41   E-mails          484
          EJT 000191
11
12  Topol-42   E-mails          494
          EJT 000192
13
14  Topol-43   E-mails          501
          EJT 000190
15
16  Topol-44   "MRL Clinical Study 513
          Report, Multicenter
17        Study: A
          Randomized,
18        Placebo-Controlled,
          Parallel-Group,
19        Double-Blind Study
          to Evaluate the
20        Efficacy and Safety
          of MK-0966
21        (Rofecoxib) 12.5 mg
          Versus Nabumetone
22        1000 mg in Patients
          with Osteoarthritis
23        of the Knee
          (Protocol 090),"
24        MRK-00420016832 -
          MRK-00420016849
```

Page 17

```
1
2   Topol-52   "Cardiovascular  612
          Thrombotic Events
3         in Controlled,
          Clinical Trials of
4         Rofecoxib,"
          (Konstam, et al),
5         Circulation
          2001;104:r15-r23
6
7   Topol-53   Letter 12-17-01  619
          TOPOLE 0000511
8
9   Topol-54   Letter 1-7-02    622
          TOPOLE 0000456 -
10        TOPOLE 0000457
11
          Topol-55   Letter 2-5-02   625
12        TOPOLE 0000452
13
          Topol-56   E-mails          632
14        MRK-AAC0152575 -
          MRK-AAC0152576
15
16
17
18
19
20
21
22
23
24
```

**KS-000137**

Page 18

1    DEPOSITION SUPPORT INDEX
2
3
    Direction to Witness Not To Answer
4   Page Line Page Line
    (None)
5
6
7
8
    Request For Production of Documents
9   Page Line Page Line
    (None)
10
11
12
13
    Stipulations
14  Page Line Page Line
    (None)
15
16
17
18
    Questions Marked
19  Page Line Page Line
    430
20
21
22
23
24

Page 19

1                 - - -
2          MR. GOLDMAN:  Merck objects
3    to the use of Dr. Topol's
4    deposition in the upcoming
5    Plunkett trial because, among
6    other things, Dr. Topol has not
7    been designated as an expert
8    witness and has not submitted an
9    expert report, and I expect that
10   much of Dr. Topol's testimony
11   today will be in the form of
12   opinion testimony.
13          In Plunkett, also the
14   deposition designations and
15   exhibit lists have already been
16   submitted, and the trial starts in
17   six days.
18          MR. KLINE:  Before we go on
19   the video, we have a loose
20   understanding worked out between
21   myself and Mr. Goldman that I will
22   examine for three hours, he will
23   then -- we split the time
24   four/three, four hours and three

Page 20

1    hours of actual tape running time.
2    We will attempt to finish sooner,
3    if we can.  Something tells me
4    that won't happen.
5           There's going to be time
6    kept on the record as to the
7    actual running time, which will
8    not include time taken for
9    objections or time off of the
10   record.
11          I've also advised Mr.
12   Goldman that I'm going to reserve
13   an hour.  So, I'm going to do
14   three hours, hopefully I'll get
15   through everything, and then we'll
16   do an hour -- or we'll do his
17   examination, I'll come back and do
18   redirect, and then he will do
19   limited recross, if needed, to the
20   areas that I examine.  He and I
21   have agreed that we will limit our
22   redirect and our recross very
23   specifically to the rules of
24   evidence as you would do a

Page 21

1    redirect and a recross, rather
2    than open up new areas.
3           I think that's our basic
4    understanding, and we've agreed to
5    attempt to agree on as much as
6    possible today.
7           We've also agreed that we'll
8    go off the video record for any
9    objections.  So, if there's an
10   objection, we'll go off the record
11   if there's something to be added
12   other than the word "objection."
13   Is that fair enough?
14          MR. GOLDMAN:  Well, if I
15   state the basis for some of the
16   objections, you don't expect to go
17   off the record for those.  So, for
18   example, if I say "objection,
19   opinion testimony" --
20          MR. KLINE:  No.
21          MR. GOLDMAN:  Okay.
22          MR. KLINE:  That's fine.
23   But if you have some longer
24   objection, then go.  It is either

KS-000138

Page 22

1  objection, two or three words or
2  objection, off the record.  And
3  I'll do the same if there's
4  something longer to be said.
5       MR. GOLDMAN:  Fair enough.
6       MR. KLINE:  Thomas R. Kline
7  for plaintiffs.  This deposition
8  is being taken pursuant to the
9  federal litigation pending in the
10  MDL.
11       I'm here with Lisa
12  Dagostino, M.D., J.D., and she
13  will be assisting me.
14       MR. BUCHANAN:  Dave
15  Buchanan, Seeger Weiss, also for
16  plaintiffs in the MDL litigation.
17       MR. STEIN:  I'm Steve Stein.
18  I'm here for the California
19  plaintiffs in the state
20  proceedings, state coordination
21  proceeding, which has been
22  cross-noticed -- which was
23  cross-noticed for this deposition.
24       My understanding from Jim

Page 23

1  O'Callahan, liaison counsel, is
2  that Merck also cross-noticed it
3  in the California state
4  proceeding.  So, we're here for
5  the California state plaintiffs in
6  the JCCC coordination.
7       Steve Stein, Levin Simes &
8  Kaiser, San Francisco, California.
9       MR. LEVENSTEN:  Scott
10  Levensten, The Beasley Firm,
11  Philadelphia.
12       MR. GOLDMAN:  My name is
13  Andy Goldman.  I represent Merck.
14       MR. PIORKOWSKI:  Joseph
15  Piorkowski, I represent Merck.
16       MR. FITZPATRICK:  Jim
17  Fitzpatrick, I represent Merck.
18       MR. HAMELINE:  My name is
19  Joseph Hameline.  I'm with the law
20  firm of Mintz Levin, and I'm here
21  on behalf of Dr. Topol.
22       MS. VANCE:  Vicki Vance,
23  in-house counsel at the Cleveland
24  Clinic Foundation, associate

Page 24

1  counsel.
2       MR. BALEFSKY:  Lee Balefsky,
3  Kline & Specter.
4       MR. HENDERSON:  Jay
5  Henderson, Houston, Texas,
6  pursuant to an agreement with
7  Merck for some Texas physicians.
8       MR. STEIN:  Linda, I've
9  provided you the notice that was
10  served.  Can we have that entered
11  as part of the record, our
12  California state notice?
13       THE COURT REPORTER:  Yes.
14       THE VIDEOTAPE TECHNICIAN:
15  We're on the video record.  The
16  time is 9:41.  The date is
17  November 22, 2005.
18       This is the videotape
19  deposition of Eric Topol, M.D. in
20  the matter of In Re: Vioxx
21  Products Liability Litigation in
22  the U.S. District Court, Eastern
23  Division, District of Louisiana,
24  MDL Number 1657.

Page 25

1       The court reporter, would
2  you please swear in the witness.
3            - - -
4       ERIC J. TOPOL, M.D., after
5  having been duly sworn, was
6  examined and testified as follows:
7            - - -
8       E X A M I N A T I O N
9            - - -
10  BY MR. KLINE:
11       Q.   Dr. Topol, good morning.
12  Nice to meet you, sir.
13       A.   Good morning.
14       Q.   I have four hours, three of
15  which I'm going to take to do your direct
16  examination.  I have a lot of material to
17  cover with you, so, I want to be very
18  direct and hopefully elicit your
19  testimony, but I want to keep moving to
20  accomplish that.
21       Are you prepared to do that
22  with me, sir?
23       A.   Yes.
24       Q.   Okay, good.

KS-000139

Page 26

1      And if you'd speak up just a
2  little bit, I think that would be
3  helpful.
4      A.   Certainly.
5      Q.   That would be good.
6      I want to review very
7  briefly the highlights of your
8  background.
9      You have a curriculum vitae.
10  I'm marking it as Exhibit 1 for this
11  deposition.
12              -  -  -
13      (Whereupon, Deposition
14      Exhibit Topol-1, Curriculum Vitae
15      Eric Jeffrey Topol, M.D., TOPOLE
16      0000001 - TOPOLE 0000127, was
17      marked for
18      identification.)
19              -  -  -
20  BY MR. KLINE:
21      Q.   The version that I have is
22  what I understand to be an abridged
23  version of 127 pages.  Suffice it to say,
24  you have a very substantial curriculum

Page 27

1  vitae outlining your background and
2  experience; correct?
3      A.   Yes.
4      Q.   You are -- what is your
5  current position, sir?
6      A.   I'm Provost of the Cleveland
7  Clinic Lerner College of Medicine, Chief
8  Academic Officer of the Cleveland Clinic,
9  and also the chairman of the Department
10  of Cardiovascular Medicine of the
11  Cleveland Clinic.
12      Q.   Take them one at a time.
13  Identify each one of those positions, and
14  tell me very briefly what they entail.
15      A.   The Provost of the medical
16  college is providing the oversight of
17  this college of medicine, which had its
18  beginning just three years ago, and it's
19  part of Case Western Reserve University.
20      The chief academic officer
21  responsibility is responsible for all
22  research and education here at this
23  academic medical center, and I've been
24  chairman of the department of

Page 28

1  cardiovascular medicine since 1991, and
2  this is a large department, one of the
3  largest departments in cardiovascular
4  medicine in the country.
5      Q.   My understanding, sir, that
6  this -- and you are a cardiologist; is
7  that correct?
8      A.   That's right.
9      Q.   Trained as a cardiologist;
10  correct?
11      A.   That's exactly right.
12      Q.   You did your undergraduate
13  degree at the University of Virginia,
14  your medical school at the University of
15  Rochester, a residency at the University
16  of California, San Francisco, a
17  fellowship at Johns Hopkins in
18  cardiology, and then you became Board
19  Certified in internal medicine and in
20  cardiology.  All correct?
21      A.   That's all correct.
22      Q.   And then you practiced
23  medicine and eventually worked yourself
24  up to become the top person in the

Page 29

1  department of cardiovascular medicine at
2  the Cleveland Clinic; correct?
3      MR. GOLDMAN:  Object to
4      form.
5      THE WITNESS:  That's
6      correct, yes.  As of 1991, I came
7      to Cleveland Clinic.
8  BY MR. KLINE:
9      Q.   And when did you become
10  chairman of the department of
11  cardiovascular medicine?
12      A.   On my arrival.
13      Q.   Oh, right on your arrival?
14      A.   Yes.  That was why I was
15  recruited here.
16      Q.   Where were you previously?
17      A.   University of Michigan,
18  where I directed the cardiocatherization
19  laboratory, and I was a professor of
20  medicine there.
21      Q.   And you've spent your entire
22  career as a practicing cardiologist, sir?
23      A.   Yes.  I continue to practice
24  cardiology with patients.

KS-000140

Page 30

1    Q.   And how many years have you
2  been a cardiologist?
3    A.   20 years.
4    Q.   You also -- it mentioned
5  that you're the Provost of the Cleveland
6  Clinic, and that involves overseeing the
7  entire medical college?
8    A.   The medical college, which I
9  founded with Case Western Reserve
10  University back in 2001.
11    Q.   In addition -- oh, and I
12  might add, the Cleveland Clinic, sir,
13  give us a sentence or two on what is the
14  Cleveland Clinic, especially in heart
15  medicine.
16    A.   Well, in the field of heart
17  medicine, it's been ranked by the U.S.
18  News & World Report as the number one
19  center for the last 11 years
20  consecutively.
21    Q.   You have been a clinical
22  investigator on many clinical studies; is
23  that correct?
24    A.   That's right.

Page 31

1    Q.   Tell us about it briefly, a
2  few sentences.
3    A.   Well, I've chaired a number
4  of clinical trials over the past 20
5  years.  The most widely known are the
6  so-called GUSTO trials of heart attack.
7  All these trials had something to do with
8  heart attack prevention or better
9  treatment.
10          The cumulative 200,000
11  patients were enrolled, the largest heart
12  attack trials ever performed in the
13  United States, coordinated.  I've been
14  the chair of all of those trials.
15  They've been multinational trials,
16  involving 40 different countries around
17  the world, and these trials have had, I
18  think, a substantial impact on clinical
19  practice in the field of cardiology and
20  for patients.
21          MR. GOLDMAN:  Move to strike
22  as nonresponsive.
23  BY MR. KLINE:
24    Q.   You hold two patents; is

Page 32

1  that correct, sir?
2    A.   I think the patents have
3  been applied for.  I'm not -- yes, yes.
4    Q.   Now, in addition, you are on
5  the editorial board of a number of
6  peer-review journals; is that correct?
7    A.   Yes.
8    Q.   Would you explain them?
9  Well, let me tick them off.  I think it
10  could be done more quickly.
11          Circulation, JACC, American
12  College -- American Journal of
13  Cardiology, American Journal of Medicine,
14  among others; is that correct?
15    A.   That's right.
16    Q.   And what does that involve,
17  sir, very briefly?
18    A.   Well, that means being a
19  peer reviewer for manuscripts, work,
20  research that's being conducted
21  elsewhere, and to provide reviews and
22  input and at times editorials, to help
23  advance the field insofar as biomedical
24  research and literature.

Page 33

1    Q.   You have been an
2  investigator, according to your vitae, on
3  many NIH projects, National Institutes of
4  Health.  Briefly, a few sentences, tell
5  us about that.
6          MR. GOLDMAN:  Objection to
7  form.
8          THE WITNESS:  Well, the main
9  one is at a specialized center of
10  clinically-oriented research,
11  which is the flagship grant of the
12  NIH, which I was awarded a year
13  ago.  It's a five-year grant for
14  nearly $18 million to support our
15  work in genetics and genomics of
16  coronary artery disease and heart
17  attack, and that's been the main
18  research interest that I've had
19  over the past five years, has been
20  in the genetics and genomics of
21  heart attack.
22  BY MR. KLINE:
23    Q.   You've been a manuscript
24  reviewer for a number of journals, peer

**KS-000141**

Page 34

```
 1   review, including Nature, Science, the
 2   New England Journal of Medicine, JAMA,
 3   Lancet and many other prestigious
 4   journals; correct?
 5           MR. GOLDMAN:  Object to
 6       form.
 7           THE WITNESS:  Yes.
 8   BY MR. KLINE:
 9       Q.   I have by count, and I'm
10   doing all of this, I might say, just to
11   save time, to get through all of this,
12   you have by my count, 909 original
13   publications in the scientific
14   literature.  Does that sound about right?
15       A.   That's about right.
16       Q.   You have 36 collaborative
17   group-authored papers, meaning papers
18   where a group is mentioned, not you, but
19   you really were a major contributor.  Is
20   that also correct?
21           MR. GOLDMAN:  Object to
22       form.
23           THE WITNESS:  That's
24       correct.
```

Page 36

```
 1       Q.   And these all deal in the
 2   field of cardiology, sir?
 3       A.   Virtually all are cardiology
 4   pieces of work, yes.
 5       Q.   And there was a recent
 6   article, and I'd like you to tell me if
 7   this is correct, it sort of pulls some
 8   things together, on November 11th in the
 9   Associated Press which says, "One medical
10   journal index service ranked Topol as the
11   eighth most cited medical researcher
12   among its index publications in the past
13   ten years with his 498 papers cited by
14   colleagues, 21,050 times."
15           Is that about correct?
16           MR. GOLDMAN:  Object to
17       form.
18           THE WITNESS:  That's
19       correct.  The ISI ranks medical
20       researchers, and in the last ten
21       years, I'm ranked number eight of
22       the most widely cited medical
23       researchers in the world.  So,
24       that's correct.
```

Page 35

```
 1   BY MR. KLINE:
 2       Q.   You are -- you have 39
 3   articles submitted for publication at the
 4   time that the curriculum vitae you handed
 5   us was.  In other words, these are not
 6   even yet published, they're in the mill;
 7   is that correct?
 8           MR. GOLDMAN:  Object to
 9       form.
10           THE WITNESS:  Yes.
11   BY MR. KLINE:
12       Q.   Again, by my count, an
13   author or co-author on 30 books?
14           MR. GOLDMAN:  Objection to
15       the form.
16           THE WITNESS:  That's
17       correct.
18   BY MR. KLINE:
19       Q.   164 book chapters?
20           MR. GOLDMAN:  Same
21       objection.
22           THE WITNESS:  That's
23       correct.
24   BY MR. KLINE:
```

Page 37

```
 1   BY MR. KLINE:
 2       Q.   Let me ask it in a different
 3   way just to be sure.
 4           How does the -- what is the
 5   ISI, and how does it rank you as someone
 6   who is cited by others in the medical
 7   field?
 8       A.   That means that if you
 9   publish a paper and that paper is cited
10   by others, that's the cumulative tally of
11   citations of your impact in the medical
12   literature, in the medical community, and
13   so that is the most highly regarded
14   authority for collating that data.  And
15   in the ten-year cumulative tally, as you
16   mentioned, somewhere around 500
17   manuscripts were published, and that was
18   the eighth leading, I believe, citation
19   tally in the rankings.
20       Q.   Are you, sir, with this
21   background, an expert in the field of
22   cardiovascular medicine?
23           MR. GOLDMAN:  Object to the
24       form.
```

KS-000142

1        THE WITNESS:  I believe I
2    am, yes.
3  BY MR. KLINE:
4        Q.   I see here your either
5  notepad or a prescription pad says "The
6  Cleveland Clinic Foundation, A National
7  Referral Center and International Health
8  Resource."
9        Is that a correct
10  description?
11        A.   Yes, it's correct.
12        Q.   And it says, "Eric Topol,
13  M.D., Provost and Chief Academic Officer,
14  Chairman, Department of Cardiovascular
15  Medicine," listing your address.  Is that
16  a correct description of your title at
17  this institution?
18        A.   Yes.
19        Q.   Sir, at some point in time
20  you became interested in the drug Vioxx;
21  is that correct?
22        A.   Yes.
23        Q.   And that would have been
24  sometime around what year?

1        A.   Well, it was February 2001.
2        Q.   Okay.
3        Now, I want to fast forward
4  before going to February 2001, which I'll
5  go back.
6        Between February 2001 and
7  today, sitting here today, which is
8  November --
9        MS. VANCE:  22.
10  BY MR. KLINE:
11        Q.   -- 22nd of 2005, have you
12  expressed certain opinions publicly and
13  in the academic literature, as well as
14  privately in e-mails and writings,
15  relating to your beliefs and opinions
16  regarding the drug Vioxx?
17        A.   Yes, certainly.
18        MR. GOLDMAN:  Objection,
19    calls for expert testimony, and
20    Dr. Topol has not been designated
21    as an expert.
22        MR. KLINE:  Let's go off the
23    record.
24        THE VIDEOTAPE TECHNICIAN:

1    Off the record at 9:52.
2        MR. KLINE:  The only thing I
3    would ask is so we can have the
4    ground rules from the beginning,
5    if we're going to go off the
6    record, let's go off the record.
7    If we're going to just state
8    objection, a word or two, then
9    let's do it that way per our
10    agreement.  Is that fair.
11        MR. GOLDMAN:  Sure.
12        MR. KLINE:  Okay.
13    I appreciate it.
14        THE VIDEOTAPE TECHNICIAN:
15    Back on the record at 9:52.
16  BY MR. KLINE:
17        Q.   The opinions and conclusions
18  which you reached, were they formed
19  within the scope and context of your
20  practice of cardiology, as well as your
21  interest as a researcher and in your
22  responsibilities to patients and to this
23  institution?
24        A.   Yes.

1        MR. GOLDMAN:  Object to the
2    form, calls for expert testimony.
3        MR. KLINE:  Let's go off the
4    record again.
5        THE VIDEOTAPE TECHNICIAN:
6    Off the record at 9:53.
7        MR. KLINE:  I'm just trying
8    to figure out a shorthand way to
9    handle it.
10        MR. GOLDMAN:  It was just a
11    few words.
12        MR. KLINE:  But if that's
13    going to be the objection all of
14    the time, why don't you say
15    objection, expert testimony, and
16    then I'll know what it is, and any
17    judge who reads it will know what
18    it is, and that way I don't have
19    to constantly hear the disruption
20    of it.
21    Or we can do it another way,
22    which is, to the extent that you
23    believe that there's expert
24    testimony, which I think is going

**KS-000143**

Page 42

1    to be your objection all day, Mr.
2    Goldman, why don't we just reserve
3    that as an objection, and then you
4    don't have to say it all of the
5    time.  It will be one of those
6    reserved objections.
7          MR. GOLDMAN:  I will reserve
8    the objection, but I also have to
9    make it as often as I hear it,
10   because it's unclear in many
11   states whether or not reserving an
12   objection is recognized as
13   actually preserving it.  So, I'm
14   going to have to make the
15   objection.
16         What I will do, though, is
17   when it calls for expert
18   testimony, I will say objection,
19   opinion testimony.
20         MR. KLINE:  As far as I'm
21   concerned, you can say objection
22   to any objection and state the
23   basis at some time when it is
24   being argued in front of a court

Page 43

1    unless it is something that has to
2    be off the record.  That way I
3    don't have the disruption all day.
4    Is that agreeable?
5          MR. GOLDMAN:  Mr. Kline, I'm
6    just telling you what I'll do is
7    what you said a minute ago, and
8    that is, when you are asking for
9    opinion testimony, I will say
10   objection, opinion testimony.
11         MR. KLINE:  That's the best
12   I can do with you?
13         MR. GOLDMAN:  Yes.
14         MR. KLINE:  Let's go back on
15   the record.  I'm sorry for the
16   interruption, Dr. Topol.
17         THE VIDEOTAPE TECHNICIAN:
18   Back on the record at 9:55.
19   BY MR. KLINE:
20   Q.   Okay.
21        I believe you answered the
22   last question, which was, you have formed
23   opinions in the scope and context of your
24   duties and responsibilities to your

Page 44

1    patients, your research in this
2    institution; is that correct?
3          MR. GOLDMAN:  Objection,
4    opinion testimony.
5          THE WITNESS:  That's
6    correct.
7    BY MR. KLINE:
8    Q.   Now, you also formed
9    opinions relating to the conduct of the
10   pharmaceutical company, Merck, and its
11   conduct of research and its marketing and
12   its making available to the public the
13   drug Vioxx; is that correct?
14         MR. GOLDMAN:  Objection,
15   opinion testimony and form.
16         THE WITNESS:  That's
17   correct.
18   BY MR. KLINE:
19   Q.   And those opinions were
20   expressed in many forms, and they would
21   include places such as 60 Minutes,
22   ranging from 60 Minutes to the New York
23   Times, to the Journal of the American
24   Medical Association; is that correct?

Page 45

1          MR. GOLDMAN:  Object to the
2    form, opinion testimony.
3          THE WITNESS:  Yes.
4    BY MR. KLINE:
5    Q.   Now, what I'd like to do is
6    to show you a document which is from
7    November 24, '04, marked as Exhibit
8    Number 2.
9                - - -
10         (Whereupon, Deposition
11   Exhibit Topol-2, E-mails, TOPOLE
12   0000450, was marked for
13   identification.)
14               - - -
15   BY MR. KLINE:
16   Q.   It's an e-mail from you to
17   David Graham.  Who is David Graham?
18   A.   David Graham is a safety
19   officer at the Food & Drug
20   Administration.
21   Q.   You wrote an e-mail to him
22   on November 22nd, 2004 following what
23   were Senate hearings relating to the drug
24   Vioxx; is that correct?

KS-000144

12 (Pages 42 to 45)

1    MR. GOLDMAN:  Objection,
2  opinion testimony.
3    THE WITNESS:  That's
4  correct.
5  BY MR. KLINE:
6    Q.   When did you write this to
7  him?
8    A.   It's November 22nd at
9  10:00 p.m.
10    Q.   And when was it in the
11  context of?  What was it after?  I'm
12  asking you in a non-leading fashion.
13    A.   It was -- he had testified
14  on the 18th of November at Senator
15  Grassley's hearings on Vioxx --
16    Q.   Does this --
17    A.   -- and I wrote to him after
18  that.
19    Q.   Does this e-mail --
20    MR. GOLDMAN:  I move to
21  strike opinion testimony.
22  BY MR. KLINE:
23    Q.   Does this e-mail reflect
24  some of the opinions and conclusions that

1  you reached relating to Merck's conduct
2  of its scientific studies and its
3  marketing of the drug Vioxx over the past
4  four years since you have become involved
5  in the matter?
6    A.   Yes.
7    MR. GOLDMAN:  Objection,
8  opinion testimony.
9    And, Tom, we can go off the
10  record for a second.
11    THE VIDEOTAPE TECHNICIAN:
12  Off the record at 9:57.
13    MR. GOLDMAN:  Can I have a
14  standing objection to Exhibit 2
15  and any discussion about Exhibit 2
16  on the ground that it also is
17  irrelevant, and it calls for
18  opinion testimony?
19    MR. KLINE:  Yes.
20    - - -
21    (Whereupon, an
22  off-the-record discussion was
23  held.)
24    - - -

1    MR. KLINE:  Before we go
2  back on the record, let's ask, is
3  there a reason for relevancy
4  objections on the record?  I mean,
5  it's a discovery dep.
6    MR. HAMELINE:  Can I just
7  note on the record here that Dr.
8  Topol is, as you've seen from his
9  resume, a very busy man, he's
10  treating patients, he has academic
11  and professional obligations at
12  the clinic.  He's here pursuant to
13  the deposition notice and also
14  pursuant to The Court order which
15  regulates these depositions.
16    MR. KLINE:  Yes.
17    MR. HAMELINE:  He's here for
18  the seven-hour period.  I
19  understand your concern about
20  working these issues out off the
21  record or at least off the
22  videotape.  However, if this goes
23  on, we're going to count the seven
24  hours as seven hours, and we're

1  going to give you some leeway, we
2  want to get this done in a fair
3  and appropriate fashion, but we've
4  been going now for about 25
5  minutes, 15 of which seem to have
6  been off the record.
7    MR. KLINE:  I agree.
8    MR. HAMELINE:  Just so I
9  note my concern up front.
10    MR. KLINE:  They are off the
11  video record.  I agree fully.  I
12  would like to ask him questions.
13  I've asked Merck's counsel if they
14  will simply agree with me to say
15  the word "objection," and they can
16  say all the objections they want
17  to any court, any time in the
18  country.
19    MR. HAMELINE:  Fine.  Let's
20  just go ahead.
21    THE VIDEOTAPE TECHNICIAN:
22  Back on the record at 9:59.
23  BY MR. KLINE:
24    Q.   Okay.

KS-000145

1          Sir, I'm looking at the part
2   where you say, "I am bothered."  Do you
3   see where you say to David Graham -- is
4   Graham a physician?
5       A.   Yes.
6       Q.   So, you're saying to Dr.
7   Graham, "I am bothered."  Would you read
8   that for us, please?
9       A.   "I am bothered by the
10  continued outrageous lies of Merck with
11  their fullpage multiple ads that 'they
12  published everything' and that they never
13  had a trial which showed any harm of
14  Vioxx until APPROVe, when, in fact, there
15  were two by May 2000."
16      Q.   Continue.
17      A.   "I am also upset that the
18  story of their scientific misconduct for
19  the VIGOR paper in" the New England
20  Journal of Medicine, that's "NEJM, with
21  errors of omission (deaths), erroneous
22  data (MIs)," or heart attacks, "and
23  incomplete data (more than 1/2 of the
24  thrombotic events) has not received any

1   attention whatsoever."
2       Q.   Okay.  Did you believe --
3           MR. GOLDMAN:  I'm going to
4       object, Tom, to the form, and all
5       of this calls for opinion
6       testimony.
7   BY MR. KLINE:
8       Q.   Did you believe what you
9   wrote in that e-mail to Dr. Graham?
10      A.   Yes, I did believe this.
11          MR. GOLDMAN:  Same
12      objection.
13          THE WITNESS:  I was
14      privately expressing it to Dr.
15      Graham, but I certainly stand by
16      that and believe it, yes.
17  BY MR. KLINE:
18      Q.   Okay.
19          You believed it then, and do
20  you believe it now?
21          MR. GOLDMAN:  Same
22      objection.
23          THE WITNESS:  Yes, I
24      certainly do.

1   BY MR. KLINE:
2       Q.   Do you believe that there
3   were, in the context of what Merck did,
4   "outrageous lies" by Merck?
5           MR. GOLDMAN:  Objection,
6       opinion testimony, leading.
7           THE WITNESS:  I believe that
8       the data has been seriously
9       misrepresented, yes.
10  BY MR. KLINE:
11      Q.   You said in the next to last
12  sentence there, "This," the words, "This
13  cannot."  Do you see it in the very last
14  sentence?
15      A.   This cannot?
16      Q.   "This cannot stand and the
17  truth about Vioxx needs to come out."
18          MR. GOLDMAN:  Object to the
19      form, leading.
20          THE WITNESS:  Yes, yes.
21      That's what I wrote.
22  BY MR. KLINE:
23      Q.   Would you read the last
24  sentence of this, please?

1           MR. GOLDMAN:  Same
2       objection, opinion testimony,
3       form.
4           THE WITNESS:  "This cannot
5       stand and truth about Vioxx needs
6       to come out."
7   BY MR. KLINE:
8       Q.   And today, sir, are you
9   prepared to tell what you believe to be
10  the truth about Vioxx?
11      A.   Absolutely.
12          - - -
13          (Whereupon, Deposition
14      Exhibit Topol-3, "The sad story
15      of Vioxx, and what we should
16      learn from it," (Karha/Topol),
17      Cleveland Clinic Journal of
18      Medicine, Volume 71, Number 12,
19      December 2004, 933-939, was
20      marked for identification.)
21          - - -
22  BY MR. KLINE:
23      Q.   Let me show you an article
24  which was in the Cleveland Clinic Journal

KS-000146

Page 54

1  in December of 2004.  December of 2004,
2  there's an article which was written,
3  you'll have it in your hands in a moment,
4  called "The sad story of Vioxx, and what
5  we should learn from it."  Did you
6  co-author that article?
7      A.   Yes, I did.
8      Q.   What is the Cleveland Clinic
9  Journal of Medicine?
10      A.   That's the medical journal
11  of this institution, which is widely
12  circulated, has a circulation of nearly
13  100,000 physicians and paraprofessional
14  staff.
15      Q.   Did you -- that just goes on
16  there, if you would please, sir.
17  Anywhere is fine.
18          What I'd like you to do --
19  and do you consider this to be --
20          Is this a road map to the
21  saga or the story of Vioxx, as you see it
22  as a researcher and prominent physician
23  in cardiology?
24          MR. GOLDMAN:  Object to the

Page 55

1      form.  Can I have a standing
2      objection on this document and
3      testimony about it calls for
4      opinion testimony.
5  BY MR. KLINE:
6      Q.   Please, sir.
7      A.   I believe it's certainly
8  part of trying to get the facts straight
9  about this very sad story, yes.
10      Q.   Okay.
11          MR. GOLDMAN:  Tom, I have a
12      question.  Can I have a standing
13      objection to this document and any
14      testimony about it on the ground
15      that it calls for opinion
16      testimony?
17          MR. KLINE:  Yes.  You can
18      have a standing objection to
19      anything that you say objection to
20      that doesn't take my time in
21      asking questions during this
22      deposition.  I want three hours of
23      direct examination of this
24      witness, and I've had around ten

Page 56

1      minutes so far.
2  BY MR. KLINE:
3      Q.   Sir, I'd like to walk this
4  through, if you would, please.  I want to
5  look at your thing.
6          You said the story starts in
7  1999.  I don't want you to read the
8  article, but I want you to use this as a
9  basis to tell us the story.
10      A.   Yes.
11      Q.   Tell us the story as you
12  understand it as it happened in 1999
13  based on what you know, and tell us how
14  you knew it and what you know and how the
15  story began.
16          MR. GOLDMAN:  Object to the
17      form.
18          THE WITNESS:  Well, in
19      1999 --
20          MR. GOLDMAN:  Calls for
21      opinion testimony.
22          THE WITNESS:  -- in May, the
23      FDA approved Vioxx for commercial
24      use, so, that is an important

Page 57

1      time, timeline.  That was also at
2      the time when the FDA had a formal
3      review of the medicine, where the
4      primary reviewer already had
5      expressed in her document, Dr.
6      Villalba, that there was a concern
7      regarding clotting events with
8      Vioxx even at the time of approval
9      in May 1999.
10  BY MR. KLINE:
11      Q.   You write here that, "The
12  approval was based on data from trials
13  lasting 3 to 6 months and involving
14  patients at low risk for cardiovascular
15  illness."  Do you see that?
16          MR. GOLDMAN:  Object to the
17      form, lacks foundation.
18          THE WITNESS:  That's right.
19  BY MR. KLINE:
20      Q.   What is the significance of
21  that fact?
22          MR. GOLDMAN:  Object to the
23      form.
24          THE WITNESS:  Well, this is

**KS-000147**

Page 58

1  one of the most significant parts
2  of the whole clinical development
3  of the Vioxx medicine, and that is
4  that patients with heart disease
5  were not tested in any meaningful
6  way, and we know from multiple
7  databases and surveys that at
8  least 40 to 50 percent of the
9  patients who actually took this
10  medicine when it was in clinical
11  use actually did have known heart
12  disease.
13        MR. GOLDMAN:  Move to strike
14  as nonresponsive --
15  BY MR. KLINE:
16     Q.   Why --
17        MR. GOLDMAN:  -- and calls
18  for opinion testimony.
19  BY MR. KLINE:
20     Q.   Why, as you view it, is that
21  an important fact?
22        MR. GOLDMAN:  Objection,
23  calls for opinion testimony.
24        THE WITNESS:  Well, it's

Page 59

1  important because if the medicine
2  has a clotting risk in arteries
3  such that it could induce heart
4  attacks, strokes or death, the
5  patients who are most liable to
6  suffer as a consequence of that
7  would be patients with preexisting
8  or known atherosclerotic artery
9  disease.
10  BY MR. KLINE:
11     Q.   And did this medicine or
12  does this medicine, in your opinion, have
13  such a risk?
14        MR. GOLDMAN:  Objection,
15  calls for opinion testimony.
16        THE WITNESS:  There isn't
17  any question about the medicine's
18  risk in this regard.
19  BY MR. KLINE:
20     Q.   When you say there's no
21  question, sir, can you give us broadly,
22  and then I'll get into details with you
23  later, broadly why you say that?
24        MR. GOLDMAN:  Objection,

Page 60

1  opinion testimony.
2        THE WITNESS:  Well, the
3  medicine's risk, Vioxx's risk, has
4  been evident since trials
5  conducted in 1999 and all the way
6  through the time of withdrawal in
7  September 30, 2004.
8  BY MR. KLINE:
9     Q.   Have there been multiple
10  tests and multiple studies that have, in
11  your opinion, proven that fact?
12        MR. GOLDMAN:  Objection,
13  calls for opinion testimony.
14        THE WITNESS:  There's been
15  replication of untoward
16  significant excess of events of
17  heart attack, death and stroke in
18  multiple trials.  That's right.
19  BY MR. KLINE:
20     Q.   Okay.
21        Do you have any doubt about
22  this in your mind, sir?
23        MR. GOLDMAN:  Object to the
24  form, calls for opinion testimony.

Page 61

1        THE WITNESS:  There isn't
2  any question in my mind about
3  that.
4  BY MR. KLINE:
5     Q.   I didn't say in the
6  beginning of this deposition.  You were
7  subpoenaed for this deposition; is that
8  correct, sir?
9     A.   That's correct.
10     Q.   And you have not been -- you
11  are not serving here as an expert witness
12  for any party; is that correct?
13     A.   No, I'm not.
14     Q.   And I'm going to continue to
15  ask you all day long about things that
16  are in your writings.
17        The things that you're
18  telling us today, tell me if there's
19  something that hasn't been said in your
20  writings, because I'm going to ask you
21  about things at least that I found in
22  your writings.  Okay?
23        MR. GOLDMAN:  Objection to
24  form.

**KS-000148**

16 (Pages 58 to 61)

Page 62

1        THE WITNESS:  Yes.
2   BY MR. KLINE:
3        Q.   Now, there was a study
4   called VIGOR; is that correct?
5        A.   Yes.
6        Q.   And you eventually became
7   familiar with this study called VIGOR;
8   correct?
9        A.   Yes.
10       Q.   Did you participate in it?
11       A.   No, not at all.
12       Q.   Who did that study?
13       A.   This study was done by
14  rheumatologists, the doctors looking
15  after patients with rheumatoid arthritis.
16  It was a large trial by a network of
17  rheumatologists and patients, about 8,000
18  patients with rheumatoid arthritis.
19       Q.   Who funded the study?
20       A.   Merck.
21       Q.   Who conducted the study?
22       A.   Merck.
23       Q.   By the way, back to 1999 for
24  a moment.  Before the drug was even

Page 63

1   studied clinically in patients, were
2   there, to your knowledge, signals and
3   issues relating to the drug from a
4   pharmacological perspective that would
5   indicate that the drug had any
6   significant cardiovascular risks of any
7   kind?  Yes or no?
8        MR. GOLDMAN:  Objection,
9        opinion testimony and form.
10       THE WITNESS:  There have
11       been published papers, for
12       example, by Dr. Garret FitzGerald,
13       antedating the trials, which
14       raised a concern regarding
15       suppression of prostacyclin,
16       which, of course, could be linked
17       to the risk of heart attack, but
18       it had not been demonstrated in a
19       definitive way in clinical trials
20       at the time of the approval in May
21       1999.
22            But what was interesting is
23       that in May 1999, there already
24       was the VIGOR trial, the very

Page 64

1        largest -- the largest trial of
2        Vioxx that was ongoing and heading
3        towards completion, but
4        nonetheless, the drug had been
5        approved in May 1999, knowing that
6        this trial would be forthcoming in
7        a matter of months.
8   BY MR. KLINE:
9        Q.   Let me jump ahead for a
10  moment.
11            There came a point in time
12  -- did there come a point in time where
13  you published a study in the Journal of
14  the American Medical Association?
15       A.   Yes.
16       Q.   Okay.
17            And what did that study
18  involve briefly?  I'm going to explore it
19  a lot later, but I want to put it in
20  context right now.
21       A.   Well, the JAMA paper was the
22  first published work to call out that
23  there was indeed a significant risk of
24  heart attack in the VIGOR trial and that

Page 65

1   this needed a whole reset of our thinking
2   of the safety of not just Vioxx, but also
3   this whole class of COX-2 medicines.  We
4   also had the data for Celebrex to analyze
5   from their so-called CLASS trial and all
6   the studies that had been recently
7   completed.
8            And so the main conclusion
9   was that we were concerned about risk and
10  that patients with heart disease needed
11  to be appropriately studied.
12       Q.   In order to --
13            MR. GOLDMAN:  Objection,
14       calls for opinion testimony.
15  BY MR. KLINE:
16       Q.   In order to look at -- in
17  order to write that article -- and you
18  were a co-author; correct?
19       A.   Yes.
20       Q.   -- did you need at that
21  point in time in 2001, which would
22  obviously be true today, to learn and
23  understand the mechanism of action of the
24  drug as well as the clinical trials, as

KS-000149

Page 66

1    well as the animal and in vivo studies
2    that were done?
3         MR. GOLDMAN:  Object to
4    form, opinion testimony.
5         THE WITNESS:  Well, in order
6    to write the article, and I was a
7    senior author, so, I was the
8    person held responsible for the
9    article, I had to be familiar with
10   all those points, that is, the
11   experimental animal data, the
12   pharmacokinetics, the pharmacology
13   of the drug, the background of the
14   drug and, of course, what clinical
15   data were available.  It mostly,
16   of course, centered around the
17   VIGOR trial.
18   BY MR. KLINE:
19        Q.    And how did you educate
20   yourself on that, sir?
21        A.    Well, Dr. Mukherjee, who was
22   our fellow at the time, was pulling all
23   the studies together.  I was also
24   reviewing the literature, as well as Dr.

Page 67

1    Nissen.  So, the three of us worked
2    together to put this analysis and then
3    subsequently the paper together.
4         Q.   Okay.
5              Following our broad outline
6    in the article that you wrote in the
7    Cleveland Clinic Journal of Medicine in
8    December of 2004, you indicate that
9    "VIGOR's strong evidence that rofecoxib"
10   -- that's the name for Vioxx?
11        A.    Yes.
12        Q.    -- "increases the risk of
13   MIs," and it came out of that study;
14   correct?
15        A.    That's right.
16        MR. GOLDMAN:  Object to the
17   form.
18   BY MR. KLINE:
19        Q.    You also say that "The
20   incidence of MIs was higher in the
21   rofecoxib group than in the naproxen
22   group."  Is that correct?
23        MR. GOLDMAN:  Object to the
24   form.

Page 68

1              THE WITNESS:  That's
2    correct.
3    BY MR. KLINE:
4         Q.    All right.
5              Now, also -- well, let's
6    look at the -- let's talk some more.
7    Let's talk about VIGOR now.
8         A.    Yes.
9         Q.    VIGOR was, I think you
10   described, I don't think it's as
11   controversial, is the first -- let me
12   step back.
13              VIGOR, the study, when did
14   you become familiar with it?
15        A.    Well, I only became aware of
16   it, not when it was published in November
17   of 2000, although going back, I reviewed
18   that publication.  But I only became
19   aware of it in February 2001 at the time
20   of the FDA special Advisory Committee to
21   review the data from the VIGOR trial with
22   respect to concerns on cardiovascular
23   risk.
24        Q.    What did the VIGOR trial

Page 69

1    say?  What did Merck say that the VIGOR
2    trial showed relating to cardiovascular
3    risks?
4              MR. GOLDMAN:  Object to the
5    form.
6              THE WITNESS:  Right.  Well,
7    I remember it very well, because
8    the day that that panel had
9    reviewed all the data, and one of
10   the panelists was my colleague,
11   Dr. Steven Nissen, I read -- I was
12   actually at the medical college of
13   Georgia, I was a visiting
14   professor, I was reading the USA
15   Today that morning, and it said
16   that this was due to naproxen,
17   that the VIGOR problems of heart
18   attack was an issue of naproxen
19   being beneficial rather than Vioxx
20   being detrimental.
21              So, I was a little puzzled
22   by that, but I didn't think too
23   much of it until I got back to
24   Cleveland, and the next day met

**KS-000150**

1      with Dr. Nissen and Dr. Mukherjee
2      about the FDA proceedings.  And
3      Dr. Nissen explained he didn't
4      think it was just so simple as the
5      naproxen hypothesis, as we later
6      termed it, and we started to drill
7      down on the data and concluded
8      that it was quite concerning.
9            MR. GOLDMAN:  Objection.
10     Move to strike, nonresponsive.
11  BY MR. KLINE:
12     Q.   Okay.
13           What did you find was
14  concerning about the VIGOR data?
15     A.   Yes.  Well, there were
16  several things that were particularly
17  bothersome.  Number one, that if naproxen
18  was protective, it had not ever been
19  proven, that is, it didn't -- we didn't
20  know for sure it had an aspirin-like
21  effect.  And so even if we could give --
22  assign naproxen the same magnitude of
23  protection as aspirin, that would be at
24  maximum a 25 percent reduction in heart

1   attacks, which has been very carefully
2   studied for aspirin.
3            So, if naproxen was as good
4   as aspirin, that could be 25 percent
5   reduction.  But on the other hand, in
6   VIGOR, we saw a 500 percent, that is, a
7   20-fold increase in heart attacks.  So,
8   the order of magnitude was greatly in
9   excess of anything that aspirin could do.
10           Furthermore, the second
11  point, in that if you have a randomized
12  trial and you have a experimental arm,
13  which is a new drug which hasn't been
14  studied extensively, still a lot of
15  things that need to be discovered about
16  it, and you have an anchor drug,
17  naproxen, that had been available for 20
18  years, and if you then do a comparison
19  and you say, there's more than five-fold
20  heart attacks and two-fold excess of
21  cardiovascular serious events, how could
22  you possibly conclude that it was the
23  naproxen being beneficial?  The only
24  appropriate conclusion from that would be

1      that there's a problem with the
2      experimental drug Vioxx.
3            And beyond those concerns
4      was that this trial was done in patients
5      with rheumatoid arthritis without heart
6      disease, and so whatever was being seen
7      in the VIGOR trial could be far worse in
8      patients with heart disease.
9            MR. GOLDMAN:  Move to strike
10     as nonresponsive, opinion
11     testimony.
12  BY MR. KLINE:
13     Q.   Now, what you've described
14  to us in the previous answer, is that
15  something that -- is that a capsule of
16  what you were thinking, you and your
17  colleagues were thinking, but you in
18  particular, when you saw the VIGOR trial
19  published in the New England Journal?
20           MR. GOLDMAN:  Object to the
21     form.
22           THE WITNESS:  Well, I didn't
23     even take notice of the VIGOR
24     trial when it was in the New

1      England Journal.  It wasn't on my
2      radar screen, and it didn't really
3      catch, I believe, the cardiology
4      community, because the heart
5      attack part of that publication
6      was not -- it was not featured, it
7      was the protection from the
8      gastrointestinal side effects that
9      was the main conclusion, but only
10     looked back at that paper after
11     the FDA review of the VIGOR data
12     and also of the celecoxib data.
13     There were two days of FDA
14     reviews.  One day was devoted to
15     Celebrex, and one day was
16     dedicated to Vioxx.
17  BY MR. KLINE:
18     Q.   To put it in context, the
19  VIGOR trial was published sometime in the
20  year 2000; correct?
21           MR. GOLDMAN:  Objection,
22     opinion testimony.
23           THE WITNESS:  VIGOR was
24     published November, I believe,

**KS-000151**

Page 74

1      November 22nd, 2000.
2   BY MR. KLINE:
3      Q.   And then the FDA hearings
4   were early next year in February of '01?
5         MR. GOLDMAN:  Objection,
6   opinion testimony.
7         THE WITNESS:  February 8,
8   2001.
9   BY MR. KLINE:
10      Q.   And it was after the
11   hearings in '01 where this, would it be
12   fair to say -- I hope there's not an
13   objection -- got on your radar screen?
14      A.   Yes.  It was only after the
15   FDA hearing and Dr. Nissen coming back
16   and Dr. Mukherjee going through the data,
17   getting it all collated and three of us
18   meeting, did this become something of an
19   area of interest.  It certainly was
20   nothing in medicine that I had any
21   interest in.  It wasn't in my field of
22   research up until that point in time.
23      Q.   Was it an area of concern?
24         MR. GOLDMAN:  Objection to

Page 75

1   form.
2   BY MR. KLINE:
3      Q.   Was it something that
4   concerned you?
5         MR. GOLDMAN:  Objection to
6   form.
7         THE WITNESS:  As soon as we
8   looked at -- well, as soon as I
9   read about the FDA panel, as I
10   said, that morning, in the
11   newspaper, I was concerned.  But
12   that concern was magnified after
13   starting to review the data with
14   my colleagues at the Cleveland
15   Clinic.
16   BY MR. KLINE:
17      Q.   Okay.
18         Were you alarmed?
19         MR. GOLDMAN:  Object to
20   form.
21         THE WITNESS:  I don't
22   know --
23         MR. GOLDMAN:  Opinion
24   testimony.

Page 76

1         THE WITNESS:  -- if I would
2   use the word "alarmed," but I was
3   significantly concerned that there
4   was a medicine that was gaining
5   increased wide scale use.  There
6   already was, of course, extensive
7   advertisements and popularity of
8   the medicine, and could something
9   be wrong.  That was a concern.  I
10   would say it was a significant
11   concern.
12   BY MR. KLINE:
13      Q.   Okay.
14         What did you decide to do?
15      A.   So, we decided we would put
16   together a manuscript to pull all the
17   data that we could together, because
18   there had not yet been one, there had not
19   yet been a registration in the medical
20   literature to the medical community that
21   this was potentially a big deal.
22      Q.   Is that the kind of thing
23   that you do as an independent academic
24   physician and scientist?

Page 77

1         MR. GOLDMAN:  Object to the
2   form.
3         THE WITNESS:  That's an
4   obligation that we have, is to
5   process data that's out there, try
6   to make it available to our
7   colleagues in the medical
8   community, and in the interest of
9   patients and caring for patients
10   in the optimal way.  This is the
11   sort of thing that is critical.
12   BY MR. KLINE:
13      Q.   Did you undertake what you
14   did with any axe to grind towards Merck
15   or towards the drug Vioxx?
16         MR. GOLDMAN:  Object to the
17   form.
18         THE WITNESS:  I had
19   absolutely no axe to grind.  I had
20   an excellent relationship with
21   Merck.  I had done clinical trials
22   with Merck.  In fact, I had just
23   completed a very large trial
24   called TARGET of over 6,000

**KS-000152**

1     patients published in the New
2     England Journal of Medicine.  And
3     so I actually, for many years,
4     enjoyed a very good relationship
5     with Merck.  So, I do not believe
6     there was any axe to grind
7     whatsoever.
8  BY MR. KLINE:
9     Q.   Do I hear you correctly that
10 you actually were a clinical researcher
11 who had done a major clinical trial for
12 Merck?
13     A.   Yes.  We had collaborated
14 with Merck to do a trial in patients with
15 coronary intervention, that is, getting
16 stents or balloon angioplasty, and we
17 were testing a medicine that they made
18 called Aggrastat and comparing it with
19 another medicine called Abciximab, and it
20 was a very large trial.
21     Q.   So, you and your colleagues
22 went about the project that you've just
23 described to me, which is collecting
24 essentially everything you could find

1  about the drug Vioxx that was in clinical
2  trials?
3         MR. GOLDMAN:  Object to
4     form.
5         THE WITNESS:  Yes.  All that
6     we could find, which was in the
7     FDA database, as well as whatever
8     publications were available.
9  BY MR. KLINE:
10     Q.   All right.
11         Tell me what you did then.
12 I mean, what process did you follow,
13 briefly?
14     A.   Well, we culled all the data
15 together, which did appear in the JAMA.
16 It didn't have much in the way of changes
17 from our initial submission to the actual
18 publication in August.  But the one
19 concern that came up along the way was
20 that the data were different in the New
21 England Journal of Medicine paper
22 published in November 2000 and the FDA
23 database that was available in February
24 2001.

1         So, at that point, while we
2  were ready to submit and did submit the
3  paper to JAMA for consideration, I sent
4  the paper to Merck, my colleague, Dr.
5  Laura Demopoulos, who I had worked on
6  this so-called TARGET trial, to see why
7  there were discrepancies in the data
8  between the published paper and the FDA
9  database.
10     Q.   Now, it appears --
11         MR. GOLDMAN:  Move to
12     strike, opinion testimony.
13 BY MR. KLINE:
14     Q.   You actually went through
15 the process of getting the information
16 together and then drafting the paper; is
17 that correct?
18     A.   That's correct.
19     Q.   And did the papers represent
20 largely your findings and your
21 conclusions?
22     A.   Yes.
23     Q.   And were those findings and
24 conclusions critical of the VIGOR trial,

1  as well as raising some concerns relating
2  to the drug Vioxx?
3         MR. GOLDMAN:  Object to the
4     form, opinion testimony.
5         THE WITNESS:  There is no
6     question they were critical of the
7     concern about the safety.  But I
8     think the most important statement
9     that we made, which appears in the
10     article, was about how there's a
11     mandate to do the appropriate
12     clinical trials which had not been
13     done and wrote, "definitive
14     evidence of such an adverse effect
15     will require a prospective
16     randomized clinical trial."  "It
17     is mandatory to conduct a trial
18     specifically assessing
19     cardiovascular risk and benefit of
20     these agents.  Until then, we urge
21     caution in prescribing these
22     agents to patients at risk for
23     cardiovascular morbidity."
24 BY MR. KLINE:

KS-000153

Page 82

1    Q.   Okay.
2         And I'm going to mark a copy
3    of your JAMA article as the next exhibit
4    number.  While it's being marked, let me
5    save time so we can keep the ball
6    rolling.  I'll mark it.
7              -  -  -
8              (Whereupon, Deposition
9         Exhibit Topol-4,"Risk of
10        Cardiovascular Events Associated
11        with Selective COX-2 Inhibitors,"
12        (Mukherjee, et al), JAMA, August
13        22/29, 2001 Vol 286, No. 8,
14        954-959, was marked for
15        identification.)
16             -  -  -
17   BY MR. KLINE:
18        Q.   Before it -- you've read to
19   me from your published article; correct?
20        A.   Yes.
21        Q.   It was published in the
22   Journal of the American Medical
23   Association; correct?
24        A.   Yes.

Page 83

1         Q.   It underwent peer review?
2         A.   Absolutely.
3         Q.   And it was published and
4    then out there for the world to see; is
5    that correct?
6         A.   Yes, yes.
7         Q.   Now, along the way, I want
8    to go through with you a couple of steps
9    along the way.  I don't want to spend a
10   lot of time on it, but I do want to get
11   the process.  Before you published it,
12   you said to me, and I'm just recapping,
13   that you talked to Dr. Demopoulos?
14             MR. GOLDMAN:  Object to
15        form.
16             THE WITNESS:  Yes.
17   BY MR. KLINE:
18        Q.   You actually -- and I have a
19   copy of this.  You actually sent to her
20   the manuscript; correct?
21        A.   Yes.
22        Q.   In advance?
23        A.   Yes.
24        Q.   And what was the purpose of

Page 84

1    sending her the manuscript, as you viewed
2    it?
3         A.   The main purpose was to
4    reconcile the differences in data that
5    had been published in the New England
6    Journal of Medicine and what was
7    appearing in the FDA database.  There
8    were some significant discrepancies.
9         Q.   The FDA database was made
10   available after the February 2001 hearing
11   to the public; is that correct?
12        A.   That's right.
13        Q.   Posted on the website?
14        A.   Posted on their website.
15        Q.   Available to anyone to see?
16        A.   Absolutely.
17        Q.   And Merck, did you have
18   access to their internal data?
19        A.   No, we did not.
20        Q.   Did you want to get it?
21        A.   Well, that's one of the
22   reasons that I tried to reach out to Dr.
23   Demopoulos.  Since I had worked with her,
24   we had a very good relationship in our

Page 85

1    other trial that we had done, I know she
2    did not do research in this area of COX-2
3    inhibitors, but I thought she could be
4    helpful to get these concerns about data
5    inconsistencies straightened out.
6         Q.   Was the data forthcoming?
7         A.   We --
8              MR. GOLDMAN:  I'm sorry.
9         Objection, move to strike as
10        nonresponsive.
11             THE WITNESS:  We never
12        received any revisions from anyone
13        from Merck.  That was never sent
14        to us, any suggestions, changes of
15        data.  There was never anything
16        sent back to me or to my
17        colleagues.
18   BY MR. KLINE:
19        Q.   Was there any suggestions of
20   the changes in the -- to be made in the
21   manuscript?
22        A.   No, there were no changes.
23   The only thing was that there was a visit
24   of the Merck researchers to Cleveland

KS-000154

Page 86

1  Clinic, but there was nothing sent.
2       Q.   I want to talk to you about
3  that.  You say they came and saw you at
4  the Cleveland Clinic?
5       A.   Yes.  On April 14, 2001.
6       Q.   Let me hold that.  April 14,
7  2001?
8       A.   That's right.
9       Q.   The JAMA article was
10  published when?
11       A.   August 22nd, 2001.
12       Q.   And did they come to see you
13  after you sent them the draft transcript?
14       A.   Yes.  It was a manuscript.
15  We don't call it a transcript, but yes.
16       Q.   I'm sorry.  I live in the
17  world of transcripts.
18       A.   That's okay.
19       Q.   We actually occasionally
20  have a manuscript.  There's probably a
21  couple of them on the Vioxx story being
22  written right now.
23            What I'd like to ask you is,
24  at some point in time did someone from

Page 87

1  Merck ask you for an electronic copy of
2  the -- of your document?
3       A.   I don't recall if I sent an
4  electronic copy.  It's possible, but I
5  just don't recall.
6       Q.   I'm going to show you an
7  e-mail.  I will mark it as the next
8  exhibit number.  I'm going to put it in
9  the record, it's brief, to save some --
10  you know what, I can put it right in
11  front of you.  Exhibit Number 5.
12            - - -
13            (Whereupon, Deposition
14            Exhibit Topol-5, E-mails,
15            MRK-ABA0009274, was marked for
16            identification.)
17            - - -
18  BY MR. KLINE:
19       Q.   You'll see here it says, "It
20  was great to have the opportunity to meet
21  you in person."  This was after you met
22  with them.  "We appreciate the time you
23  took," and it is a request from a woman
24  by the name of Alise Reicin.  Do you know

Page 88

1  who Alise Reicin was?
2       A.   She was one of the people
3  who visited me.  I had not met her
4  previous to this.
5       Q.   Did you know that her
6  brother was an investment fellow at
7  Morgan Stanley?
8            MR. GOLDMAN:  Object to the
9       form.  Lacks foundation.
10            THE WITNESS:  No, I had no
11       idea of that.
12  BY MR. KLINE:
13       Q.   Have you ever heard that?
14       A.   No.
15            MR. GOLDMAN:  Same
16       objection.
17  BY MR. KLINE:
18       Q.   Okay.
19            The story is, or what
20  happens here is she says -- she wants you
21  to send an electronic copy of the paper.
22  It appears from documents that I have
23  that that was done.  Do you recall doing
24  it?

Page 89

1       A.   After reading this e-mail, I
2  now think, yes, I must have sent a paper
3  copy to Dr. Demopoulos, which prompted
4  their visit, but then subsequently I
5  probably complied and sent an electronic
6  version.
7       Q.   I just have a few questions
8  about the electronic version.  I'm going
9  to mark an exhibit.  It's an internal
10  Merck document.  I don't think you're
11  familiar, would be familiar with it, but
12  I want to ask you just a couple of
13  questions about it.
14            MR. GOLDMAN:  You can ask,
15       but I'll object, lacks foundation.
16            MR. KLINE:  Go ahead.
17            - - -
18            (Whereupon, Deposition
19            Exhibit Topol-6, E-mail 4-26-01,
20            with attachment, "Selective COX-2
21            Inhibitors are Associated with An
22            Increased Risk of Cardiovascular
23            Events," (Mukherjee, et al) draft
24            manuscript, MRK-AAZ0001561 -

**KS-000155**

23 (Pages 86 to 89)

Page 90

1      MRK-AAZ0001593, was marked for
2   identification.)
3      - - -
4   BY MR. KLINE:
5      Q.   Now, it's a copy of -- I
6   would like you to identify it, the front
7   page of it.  There's an e-mail that says
8   it's from Alise Reicin to Laura
9   Demopoulos.  It says, "Did this in the
10  middle of the night -- not sure it makes
11  sense."
12     By the way, are you aware of
13  the fact, Dr. Topol, that the Merck
14  higher-ups did a lot of work at night on
15  Vioxx?
16     MR. GOLDMAN:  Object to
17  form, lacks foundation.
18     THE WITNESS:  No.
19  BY MR. KLINE:
20     Q.   Oh, okay.  Well, they did.
21     And it says here, it
22  basically transmits back Alise Reicin's
23  markup, electronic markup of your
24  document.  Are you familiar with it?

Page 91

1      MR. GOLDMAN:  Objection,
2   lacks foundation.
3      THE WITNESS:  I've never
4   seen this.
5   BY MR. KLINE:
6      Q.   Okay.
7      I want you to turn to Page
8   8, sir.  I want to find out if this is
9   something that was ever suggested to you.
10     If you'd look at the front
11  page, please, first.  Front page.
12     A.   Oh, yes.
13     Q.   Sorry.
14     A.   Yes.
15     Q.   If anyone who listens to
16  this or sees this some day feels that I'm
17  rushing, it's because I have a lot to
18  cover in a short time under a time frame.
19  I want to try to get as much as I can
20  out.
21     "Selective COX-2 Inhibitors
22  Are Associated With an Increased Risk of
23  Cardiovascular Events."
24     MR. GOLDMAN:  Where are you

Page 92

1   reading from?
2      MR. KLINE:  I'm reading from
3   the cover page.
4      MR. HAMELINE:  Second page.
5      MR. KLINE:  The first page
6   of the document, underneath the
7   Reicin to Demopoulos markup.  It
8   is Merck -- MRK AAZ0001562.
9   BY MR. KLINE:
10     Q.   Do you see it?
11     A.   Yes.
12     Q.   Okay.
13     Wait till you see this one.
14     Under "Results" --
15     MR. GOLDMAN:  Object to the
16  form, sidebar.
17  BY MR. KLINE:
18     Q.   This is your paper; correct?
19     A.   Yes.  Well, I mean, this was
20  the one that apparently was worked over.
21     Q.   Correct.
22     A.   This is not our paper.
23     Q.   Were you aware of the fact
24  that Merck was working over your paper?

Page 93

1      MR. GOLDMAN:  Object to the
2   form, lacks foundation.
3      THE WITNESS:  I had no idea
4   until this very moment.
5   BY MR. KLINE:
6      Q.   Look under "Results" on Page
7   8.  Do you see -- I'd like you to look at
8   the -- don't look at the underlined
9   sentence yet.  Look at the last -- the
10  sentence that begins, "The results of the
11  event-free survival analysis on the 66
12  cases showed that the relative risk of
13  developing a cardiovascular event in
14  rofecoxib treatment arm was 2.37"
15  percent.
16     That's something you
17  eventually told people in your JAMA
18  paper; correct?
19     A.   Yes.
20     Q.   Did you know or did they
21  suggest it directly to you that according
22  to Dr. Reicin, "we prefer to flip the
23  data and say it was reduced on naproxen"?
24     MR. GOLDMAN:  Object to the

**KS-000156**

24 (Pages 90 to 93)

Page 94

1    form.
2         THE WITNESS:  It's amazing.
3    Yes, I see it here, but it's
4    amazing.  It certainly didn't
5    appear in our manuscript.
6  BY MR. KLINE:
7         Q.   Are you, sir -- have you
8    ever heard of a medical researcher
9    flipping data?
10        MR. GOLDMAN:  Object to the
11   form.
12        THE WITNESS:  No.  I mean,
13   you don't -- research and flipping
14   data, that doesn't -- no.
15  BY MR. KLINE:
16        Q.   But the naproxen hypothesis,
17   sir --
18        A.   Yes.
19        Q.   -- wasn't that really a way
20   that Merck, the way Dr. Reicin says here,
21   flipped the data?
22        MR. GOLDMAN:  Object to
23   form.
24        THE WITNESS:  Well, I do

Page 95

1    believe there was no basis for the
2    naproxen hypothesis, and that was
3    one of the really significant
4    problems in what happened from
5    VIGOR, all the way through from,
6    you know, 2000, when that paper
7    was published, all the way through
8    to the drug's withdrawal.
9  BY MR. KLINE:
10        Q.   Sir, your JAMA article --
11        MR. GOLDMAN:  Move to strike
12   as nonresponsive, opinion
13   testimony.
14  BY MR. KLINE:
15        Q.   Sir, your JAMA article, I
16   think you read to me that your conclusion
17   was to call for a full large-scale study;
18   correct?
19        A.   That's right.
20        Q.   Did you want a primary
21   cardiovascular endpoint study performed?
22        A.   Not only did it need to have
23   cardiovascular endpoints, but it had to
24   have cardiovascular patients.  Patients

Page 96

1    had been excluded essentially from all of
2    these studies, and so that was a patient
3    group that we were most worried about,
4    because they would have the highest
5    predisposition to life-threatening
6    events.
7         Q.   Why was it important to
8    study patients who were at high risk for
9    cardiovascular events when taking the
10   drug Vioxx and COX-2s generally?
11        A.   Well, we already knew that a
12   large proportion of patients who have
13   heart disease have concomitant arthritis.
14   And, in fact, in my practice, the vast
15   majority of patients who have come to see
16   me with heart disease, they also have
17   arthritis.  But there was the Ray paper
18   in Lancet, the Tennessee Medicaid
19   database, there was the other papers that
20   I have referred to where 45, 50 percent
21   or higher percent of patients taking
22   Vioxx or other medicines in this class
23   had established known coronary heart
24   disease.  So, these patients were

Page 97

1    essentially the highest risk for having a
2    life-threatening event.
3         MR. GOLDMAN:  Move to strike
4    as nonresponsive, opinion
5    testimony.
6  BY MR. KLINE:
7         Q.   So, did your study, what you
8    were proposing, was it to study the drug
9    in those people who were the logical
10   people who were going to take the drug?
11        A.   Yes.  The only way we could
12   get to the answer here, was it safe for
13   people with heart disease who have
14   arthritis to take the medicine, was to do
15   a trial in these particular patients who
16   had been completely neglected in the
17   development of Vioxx.
18        Q.   What did you think --
19        MR. GOLDMAN:  Object to the
20   form.  Move to strike the
21   nonresponsive opinion testimony.
22  BY MR. KLINE:
23        Q.   -- when you got into this
24   sir, in 2001, what did you think of

KS-000157

25 (Pages 94 to 97)

Page 98

1 Merck's failure to study patients, the
2 very patients in whom the drug was going
3 to be taken?
4 MR. GOLDMAN: Objection,
5 opinion testimony.
6 THE WITNESS: Well, there're
7 a couple of possible explanations,
8 but one is that they didn't want
9 to know or they didn't want to do
10 the trials that were obviously, as
11 we said, mandated. They didn't
12 want to do the trials.
13 BY MR. KLINE:
14 Q. Did you believe that they
15 should have?
16 MR. GOLDMAN: Objection.
17 THE WITNESS: Absolutely.
18 And both, not just Merck, but also
19 Pfizer, and any manufacturer of a
20 COX-2 inhibitor. It wasn't just
21 about a Merck problem, although
22 clearly the VIGOR trial was the
23 one that was most concerning.
24 BY MR. KLINE:

Page 99

1 Q. If you'd look at the last
2 sentence of the paper on Page 18, there's
3 more, but I don't have time to go through
4 it all. Maybe we can furnish you a copy,
5 and you can see how they were marking
6 your paper up, sir. I've provided a copy
7 to your counsel. Would you at some
8 point, after this deposition, like to see
9 how they marked up your paper internally?
10 MR. GOLDMAN: Objection to
11 the foundation.
12 THE WITNESS: No. I am just
13 reading some, and it's very
14 disturbing, but, yes.
15 BY MR. KLINE:
16 Q. Look at Page 18.
17 A. Yes.
18 Q. "Until then," and this ended
19 up in your paper, "we urge caution in
20 prescribing these agents to patients at
21 risk for cardiovascular morbidity." Your
22 words?
23 A. That's the words that's here
24 in the paper that are published, yes.

Page 100

1 Q. The underlined words are Dr.
2 Reicin's, according to her e-mail which
3 she wrote. Did you see what she said?
4 A. Yes.
5 Q. "Conclusion needs to be
6 toned down."
7 MR. GOLDMAN: Objection,
8 lacks foundation.
9 BY MR. KLINE:
10 Q. By the way, you met with Dr.
11 Reicin; correct?
12 A. Yes.
13 Q. She came out to see you?
14 A. Yes. With Dr. Demopoulos.
15 Q. I see.
16 You knew Dr. Demopoulos
17 before; correct?
18 A. Yes.
19 Q. Did you know Dr. Reicin?
20 A. No, I'd never met her
21 before.
22 Q. Did anyone introduce or did
23 you know, sir, at the time that her
24 personnel file, her actual personnel file

Page 101

1 described her as the "tenacious defender
2 of the Vioxx franchise"? Did you know
3 that fact?
4 MR. GOLDMAN: Object to the
5 form, lacks foundation.
6 THE WITNESS: Well, it has
7 become -- I didn't know that, but
8 certainly over time, that's become
9 increasingly and abundantly clear.
10 BY MR. KLINE:
11 Q. Is she even a cardiologist,
12 sir?
13 MR. GOLDMAN: Objection,
14 lacks foundation.
15 THE WITNESS: I don't
16 believe so, no.
17 BY MR. KLINE:
18 Q. And when she came to see
19 you, sir, did you believe that one of the
20 purposes was to neutralize you and your
21 opinion?
22 MR. GOLDMAN: Object to the
23 form, lacks foundation.
24 THE WITNESS: Well,

KS-000158

Page 102

1    certainly.  The comments she made
2    at that meeting would go along
3    with that.  I mean, she basically
4    said that -- I remember the
5    conversation.  It actually was
6    supposed to be three people coming
7    to visit, which was unusual, to
8    discuss a manuscript, but because
9    of our prior relationship with
10   Merck and Dr. Demopoulos and Dr.
11   DiBattiste, I had reluctantly
12   agreed to this meeting.  But Dr.
13   DiBattiste didn't show up, it was
14   supposed to be the three of them,
15   and the meeting started out with
16   that we got it wrong, that we
17   would be embarrassed.
18 BY MR. KLINE:
19   Q.   "We" meaning?
20   A.   Dr. Nissen, Dr. Mukherjee
21 and I.
22   Q.   Three physicians at the
23 Cleveland Clinic?
24   A.   Right.

Page 103

1    Q.   Got it wrong?
2    A.   Got it wrong, that we would
3 be embarrassed if we published this
4 paper.
5    Q.   Her word?
6    A.   That's the word.  The word
7 is "embarrassed."  And I thought that was
8 harsh.  And she came across as kind of
9 arrogant, I thought.  But we talked it
10 through, and I explained to her that, you
11 know, we don't feel that way at all, and
12 we will stand by our data.  We only
13 wanted the input on inconsistencies of
14 data.  We did not ask to them -- for Dr.
15 Reicin or colleagues to opine about our
16 perspective.
17      But the discussion ended up
18 okay.  You know, she came about the
19 naproxen hypothesis, which I dismissed as
20 the explanation.  She came with the
21 rheumatoid arthritis -- that patients
22 with rheumatoid arthritis, you know, Dr.
23 Topol, have much higher rates of heart
24 attack.  And I said, well, that doesn't

Page 104

1    explain it, because all the patients had
2    rheumatoid arthritis.  So, if there's a
3    gradient of heart attack, it can't just
4    be from that explanation.
5         She also came with the
6    notion that there were lots of data that
7    we didn't know about, Dr. Nissen, Dr.
8    Mukherjee and I, that was in the Merck
9    files that the FDA had, but we didn't
10   have access.  And I said, well, we can't
11   comment on data we don't have access to,
12   and I'm sorry.
13        So, the meeting probably
14   went on about an hour-and-a-half.  It
15   ended cordially.  And at times she said
16   that Merck was considering doing a trial
17   in heart patients, and if we had any
18   ideas, she welcomed us to forward a
19   proposal, protocol, and that seemed to
20   be -- I got the sense it was a gesture.
21   I didn't really think that Dr. Reicin was
22   serious about it, but nonetheless, I
23   thought that we probably should at least
24   send some type of protocol sketch if they

Page 105

1    would like to see what our ideas were for
2    pursuing this question.
3         MR. GOLDMAN:  Move to strike
4         the nonresponsive testimony.
5    BY MR. KLINE:
6         Q.   Let me use a
7    characterization, and you can agree or
8    disagree.
9         Did you think that her
10   attempts were to intimidate you?
11        A.   I don't know if I would at
12   that point use the word "intimidation,"
13   but she was quite strong.  In some
14   respects, I would even consider her
15   comment brazen.  But she didn't say, if
16   you publish this, we're going to do such
17   and such.  You know, it was nothing like
18   that.
19        I think she knew when she
20   left that we were going to publish this
21   paper without any change in the types of
22   things that she was interested in.  There
23   was no quid pro quo.
24        Q.   There appears to have been

KS-000159

Page 106

1  -- there appears to have been some
2  revisions that were made to the draft
3  after it was submitted to JAMA; is that
4  correct?
5      A.  Well, the reviewers of the
6  paper certainly had some revisions
7  requested, but I don't believe anything
8  substantive was changed in the review
9  process.  The process was already -- had
10  started when that visit in April had
11  occurred, and that independent review was
12  something that we had to attend to, of
13  course.
14      Q.  Let me just briefly show you
15  another document.  It's a Merck document,
16  Exhibit Number 7.
17          -  -  -
18          (Whereupon, Deposition
19      Exhibit Topol-7, E-mails, with
20      attachment, "Selective COX-2
21      Inhibitors are Associated with An
22      Increased Risk of Cardiovascular
23      Events," (Mukherjee, et al) draft
24      manuscript, MRK-ABA0009661 -

Page 107

1      MRK-ABA0009693, was marked for
2      identification.)
3          -  -  -
4  BY MR. KLINE:
5      Q.  Very briefly.  And, again, I
6  don't have the time to have you sit and
7  read the whole thing, but I want you to
8  look at the front page.
9          Apparently the manuscript
10  was further worked on internally at
11  Merck.  Are you aware of that fact?
12      A.  No.
13          MR. GOLDMAN:  Objection to
14      the characterization.
15          THE WITNESS:  I had no
16      knowledge of that.
17  BY MR. KLINE:
18      Q.  And there's an e-mail from
19  Dr. Demopoulos to a number of people,
20  including Alise Reicin.  And they took a
21  crack at revising it, and if you look at
22  the last sentence of the e-mail, "We
23  recognize that the revised" transcript
24  "does not completely neutralize the

Page 108

1  potential negative impact of the
2  publication, but...it is substantially
3  removed from the original.  We" feel
4  "that revising it further to more
5  completely present a Merck perspective
6  might alienate the authors and" thus
7  "jeopardize our opportunity to contribute
8  at all."
9          Did you know that's what was
10  going on?
11          MR. GOLDMAN:  Objection, and
12      object --
13          THE WITNESS:  This is
14      remarkable.  I didn't know --
15          MR. GOLDMAN:  -- to the use
16      of the document.
17          THE WITNESS:  -- this was
18      going on at all.
19          MR. GOLDMAN:  Dr. Topol, let
20      me just insert an objection.
21          Lacks foundation, and can I
22      have a standing objection to your
23      use of documents that Dr. Topol's
24      never seen?

Page 109

1  BY MR. KLINE:
2      Q.  Dr. Topol --
3          MR. GOLDMAN:  Can I have
4      that, Mr. Kline?
5          MR. KLINE:  Yes.
6  BY MR. KLINE:
7      Q.  You've now seen it.  What do
8  you think of that kind of conduct?
9          MR. GOLDMAN:  Object to the
10      form, opinion testimony.
11          THE WITNESS:  I'm actually
12      appalled by this.  Yes, to say
13      that, you know, this was trying to
14      "neutralize the potential negative
15      impact" and "jeopardize our"
16      "ability to contribute."  We
17      didn't ask them to contribute.  We
18      asked them to reconcile the data
19      inconsistencies.
20  BY MR. KLINE:
21      Q.  Is part of the academic
22  process -- you've worked --
23          You've done studies for
24  large pharmaceutical companies, Merck?

KS-000160

28 (Pages 106 to 109)

Page 110

1    A.   Yes.
2    Q.   Is part of the process to
3  get the scientific facts in the medical
4  literature, or is the real objective, or
5  is part of the objective to get the,
6  quote, drug company perspective?
7         MR. GOLDMAN:  Objection.
8         THE WITNESS:  Well, you
9     know, I had been trying to have an
10    intellectually fulfilling and
11    collaborative relationship with
12    people at Merck, and that was
13    something that I think we enjoyed
14    up until this sort of thing, which
15    is obviously a departure from
16    that, but --
17 BY MR. KLINE:
18    Q.   Is it --
19    A.   -- it's unfortunate.
20    Q.   Is it a departure --
21         MR. GOLDMAN:  Move to strike
22    as nonresponsive.
23 BY MR. KLINE:
24    Q.   -- from sound academic and

Page 111

1  scientific practice to attempt to
2  neutralize papers and try to inject a
3  particular perspective, rather than what
4  is the down the middle truth?
5         MR. GOLDMAN:  Objection,
6     lacks foundation, opinion
7     testimony.
8         THE WITNESS:  Yes.  I mean,
9     I think that the role of academic
10    medicine is to publish a highly
11    objective independent processing
12    of data and perspective, and
13    anything to try to warp that or
14    twist it is unacceptable.
15 BY MR. KLINE:
16    Q.   Is that how you view these
17 e-mails that I've just shown you --
18         MR. GOLDMAN:  Move to strike
19    the nonresponsive portion.
20 BY MR. KLINE:
21    Q.   -- for the first time?
22         MR. GOLDMAN:  Objection,
23    lacks foundation, opinion
24    testimony.

Page 112

1         THE WITNESS:  Yes, I'm quite
2     bothered by this.
3  BY MR. KLINE:
4    Q.   Those e-mails, sir, clearly
5  do relate to you and your paper, and they
6  have attached your paper; correct?
7    A.   Yes.
8    Q.   And they're markups of your
9  paper; correct?
10   A.   Yes.
11   Q.   Which did not make their way
12 into the New England Journal; correct?
13   A.   No, JAMA.
14   Q.   I'm sorry.
15   A.   They didn't even make their
16 way to me.  I've never -- I've not seen
17 these.
18   Q.   Okay.
19        Now, let's move to your JAMA
20 article itself.
21   A.   Yes.
22   Q.   I think we're moving along,
23 I hope.
24        I want to stop at this point

Page 113

1  and say I've now covered that pre-JAMA
2  period.  Is there anything in your mind
3  significant that's been missed in the
4  story leading up to the publication of
5  the JAMA article?  If so, I'd like to
6  know.
7         MR. GOLDMAN:  Object to the
8     form, opinion testimony.
9         THE WITNESS:  Well, I think
10    there were --
11        MR. KLINE:  It can't be an
12    opinion.  I just asked him to tell
13    me what he knows, please.
14        THE WITNESS:
15    Chronologically, if we were to
16    look at the VIGOR trial, there are
17    some concerning things that were
18    not incorporated in JAMA that I
19    only tuned in to later.  I don't
20    know if you would like to get into
21    that now from the Targum FDA
22    report or whether you'd like to
23    get into that subsequently.  But
24    it's about the VIGOR trial in

KS-000161

1    December and November of 1999.
2    BY MR. KLINE:
3    Q.   Please tell us.
4         MR. GOLDMAN:  That's why I
5    objected on opinion testimony
6    grounds.  Move to strike, opinion
7    testimony.
8         THE WITNESS:  If I could get
9    the Targum report.  It was in the
10   document submitted, but I have a
11   copy that I brought.
12   BY MR. KLINE:
13   Q.   You actually -- I think I've
14   seen in your file, you have the Targum
15   memo in your file produced us, and you
16   marked it up?
17   A.   Yes.  I marked it up, but I
18   have a clean copy here that I wanted to
19   refer to.  Here it is.  Because this was
20   while the VIGOR trial was being
21   conducted.  And this is an independent
22   FDA review of the data from VIGOR.  It
23   also, in this report, includes the data
24   from two other trials, VIGOR -- trial 090

1    and trial 085.
2         - - -
3         (Whereupon, Deposition
4    Exhibit Topol-8, Memo 2-1-01,
5    "Consultation NDA 21-042, S-007
6    Review of cardiovascular safety
7    database (Targum) (37 pages), was
8    marked for identification.)
9         - - -
10   BY MR. KLINE:
11   Q.   I'm marking, and those who
12   see this will be familiar with this, the
13   February 1, 2001 memo of Shari L. Targum
14   of the Division of Cardiorenal Drug
15   Products at the FDA --
16   A.   Yes --
17   Q.   -- correct?
18   A.   Yes.
19        MR. GOLDMAN:  Exhibit number
20   8?
21        MR. KLINE:  Exhibit number
22   8.
23   BY MR. KLINE:
24   Q.   You've interacted with Dr.

1    Targum?
2    A.   Yes.  I know Dr. Targum.
3    Q.   Okay.
4         Please tell us the
5    significance to you.
6    A.   Well, this --
7    Q.   You did not have this at the
8    time that you published the JAMA article
9    or you did?
10   A.   No.  Well, Dr. Mukherjee
11   had, I think, reviewed this online, but I
12   had not.  I only had reviewed the data
13   that he presented to Dr. Nissen and I,
14   but I went back to this report and found
15   many things that still had not even yet
16   surfaced that are quite concerning.
17   Q.   Which are?
18        MR. GOLDMAN:  Objection,
19   move to strike the opinion
20   testimony.
21   BY MR. KLINE:
22   Q.   What are the concerning
23   parts to you that were known and flagged
24   in the Targum report dated February 1,

1    2001?
2         MR. GOLDMAN:  Object to
3    form, opinion testimony.
4         THE WITNESS:  On Page 5 it
5    talks about the DSMB, which is the
6    data and safety monitoring board.
7         MR. GOLDMAN:  I'm sorry,
8    what page?
9         THE WITNESS:  Page 5.
10   BY MR. KLINE:
11   Q.   Yes.
12   A.   And the first thing it says
13   is during -- this is at the bottom of the
14   page, the last paragraph, "During the
15   November 18, 1999 meeting, discussion and
16   focus on the 'excess deaths and
17   cardiovascular adverse experiences in
18   group A compared to group B'...In this
19   report, there were 40 and 17 patients
20   that discontinued the study because of
21   cardiovascular adverse events," and then
22   there's a blood pressure.  And it's
23   pretty easy to tell which is group A and
24   group B.

KS-000162

1       This is November 18, 1999.
2   This is highly concerning, that there's
3   excess deaths in a trial and the DSMB is
4   noting in the course of the VIGOR trial.
5       Q.   You said November 18, 1999?
6       MR. GOLDMAN:  Object to the
7   form opinion testimony.
8       THE WITNESS:  Yes.  This
9   would be a time when any concerns
10  about the drug, and, of course,
11  now already the 090 trial, which I
12  presume we'll get into, that
13  already was known in May of 1999.
14      So, now we have the largest
15  trial ever of the drug, and it's
16  causing, in the midst of the
17  trial, excess deaths and serious
18  cardiovascular events.  So, this
19  did not apparently lead to the
20  alert that I would have thought in
21  the course of a large scale trial
22  of 8,000 patients.
23      MR. GOLDMAN:  Move to strike
24  opinion testimony, nonresponsive.

1   BY MR. KLINE:
2       Q.   What are you saying to us?
3   Are you saying that in the period by the
4   year 2001 that there were a series of
5   things that were known to Merck?
6       MR. GOLDMAN:  Object to the
7   form, opinion testimony, lacks
8   foundation.
9       THE WITNESS:  Well, what's
10  evident here is it calls out the
11  53 versus 29 serious excess deaths
12  in cardiovascular events as early
13  as November of 1999.  In the wake
14  of another trial, they had a 760
15  percent excess of heart attacks.
16  BY MR. KLINE:
17      Q.   What study was the 53
18  deaths, for instance?
19      A.   That's the VIGOR trial.
20      Q.   The VIGOR trial?
21      A.   At this juncture, at this
22  interim analysis by the safety and
23  monitoring board.
24      Q.   That's what I wanted to

1   establish.
2       A.   And it actually then goes on
3   in this document by Dr. Targum, and it's
4   highly concerning because it says on Page
5   6, it says that, "The DSMB recommended
6   development of a separate analysis plan
7   for adjudicated events," this is in the
8   first full paragraph.  "One concludes" --
9   this is the last sentence of that
10  paragraph.  "One concludes from this
11  statement that the DSMB," the Data Safety
12  Monitoring Board, "received unadjudicated
13  adverse event data," and that there had
14  been -- further along, the last sentence
15  of this, "At the time," this is now the
16  next interim analysis, December of 1999,
17  "no cardiovascular analysis plan was in
18  place" for this trial, which is quite
19  concerning, to say the least.
20      MR. GOLDMAN:  Move to strike
21  nonresponsive opinion testimony.
22  BY MR. KLINE:
23      Q.   Is what you're saying that
24  the Targum memo, to put it in

1   perspective --
2       Is what you're saying is
3   that the VIGOR -- you learned from seeing
4   this document that the VIGOR data had
5   been analyzed, as you would expect, going
6   along at various stages?
7       A.   Yes.
8       Q.   And that at various stages,
9   were there red flags that you can see in
10  this data?
11      A.   Exactly.
12      MR. GOLDMAN:  Object to the
13  form, opinion testimony.
14      THE WITNESS:  Exactly.  And
15  the point is, is that later we're
16  told that the first time they ever
17  knew about any problem was well
18  into 2000, which couldn't possibly
19  be true.  Someone of the sponsor
20  had to be alerted by this DSMB
21  concern of excess deaths and
22  serious cardiovascular events.
23      MR. GOLDMAN:  Move to
24  strike, nonresponsive, lacks

KS-000163

1        foundation.
2    BY MR. KLINE:
3        Q.   Now, let's talk about VIGOR,
4    because that was some focus of what you
5    were doing when you retrospectively
6    looked at VIGOR and also a number of
7    other studies including 090.
8        A.   Yes.
9        Q.   Okay.
10            You looked at, I think, a
11   study called 085, 090, VIGOR.  Any other?
12       A.   Those are the principal
13   ones.  I think all the studies, but those
14   are the ones that we focused on the most.
15            MR. GOLDMAN:  Can you set a
16       time frame for this, please?
17            MR. KLINE:  Yes.  For the
18       JAMA article of 2001.  That's what
19       I'm back to and referring to.
20            THE WITNESS:  Right.
21       That --
22   BY MR. KLINE:
23       Q.   I think while we've jumped
24   around a little bit, we've done a pretty

1    concerned about it, but I have not
2    -- and I've discussed it with the
3    FDA, but I've not gotten an
4    adequate response.
5            MR. GOLDMAN:  Same
6    objections.
7    BY MR. KLINE:
8        Q.   I see.  Okay.
9            Go ahead.
10       A.   Back to the JAMA paper,
11   though --
12       Q.   Yes.
13       A.   -- we really zoomed in on
14   three trials of Vioxx, study 085, study
15   090 and VIGOR.
16       Q.   Okay.
17            You looked at the VIGOR
18   trial, and you made some determinations
19   there; correct?
20       A.   That's right.
21       Q.   Okay.
22            What did you -- I would like
23   you to list out sequentially.  If you've
24   covered it already, list it so we have it

1    good job of keeping things straight so
2    far.
3        A.   Well, we tried --
4        Q.   But the beauty will be in
5    the eyes of beholder of somebody who sees
6    this.
7        A.   Right.  I was just trying
8    to, while commenting on VIGOR, trying to
9    incorporate that there were problems in
10   the conduct during the trial, which have
11   not really surfaced, as far as I know.
12            But regarding the JAMA
13   paper, the August 2001 --
14       Q.   You mean not surfaced to
15   this date?
16       A.   To this date.
17            MR. GOLDMAN:  Objection,
18       most to strike, nonresponsive,
19       opinion testimony, lacks
20       foundation.
21            THE WITNESS:  I'm not aware
22       that this concern regarding the
23       data and safety monitoring board
24       has been registered.  I've been

1    in a list.
2            What were your major
3    findings as you looked independently back
4    at the VIGOR trial?
5            MR. GOLDMAN:  Objection,
6    lack of foundation.
7            THE WITNESS:  I think the
8    most important finding is
9    summarized in Figure 1 of that
10   paper, which comes right from the
11   FDA Targum report.  And basically
12   what that figure, first time now
13   published to the medical
14   community, it shows that there's a
15   divergence of the heart attack and
16   serious event curves.  The event
17   curves is Figure 1, whereby
18   starting at four to six weeks
19   after the start of the medicine,
20   Vioxx compared to naproxen, there
21   is an over two-fold risk of
22   serious events.
23   BY MR. KLINE:
24       Q.   That Kaplan-Meier curve,

**KS-000164**

Page 126

1  which will be marked -- we don't have to
2  display it right now, but I want to mark
3  it so that it's part of an exhibit to be
4  displayed as part of this transcript. We
5  will put a number 9 on table -- on Figure
6  1 of the Topol JAMA article.
7              - - -
8              (Whereupon, Deposition
9        Exhibit Topol-9, Excerpt from
10       "Risk of Cardiovascular Events
11       Associated with Selective COX-2
12       Inhibitors," (Mukherjee, et al),
13       JAMA, August 22/29, 2001 Vol 286,
14       No. 8, 956, was marked for
15       identification.)
16             - - -
17       MR. GOLDMAN:  Haven't you
18    already marked the JAMA article?
19       MR. KLINE:  I did, but I
20    want to mark Figure 1 as a
21    separate exhibit.
22  BY MR. KLINE:
23       Q.   That Figure 1, which is the
24  Kaplan-Meier curve showing the time to

Page 127

1  cardiovascular adverse events, the line
2  separated how many days?
3       A.    Between four and six weeks
4  these curves diverge.
5       MR. GOLDMAN:  Move to strike
6    the opinion testimony.
7  BY MR. KLINE:
8       Q.   Is this, by the way,
9  something that has been replicated in
10  other studies?
11       MR. GOLDMAN:  Objection,
12    move to strike.
13       THE WITNESS:  It's been
14    replicated in four randomized
15    trials.
16  BY MR. KLINE:
17       Q.   That it separates at an
18  early time?
19       MR. GOLDMAN:  Objection.
20       THE WITNESS:  That's right.
21  BY MR. KLINE:
22       Q.   Okay.
23       And what are those studies?
24       A.   Study 090, which was a

Page 128

1  six-week trial, which had a 760 percent
2  excess within the six weeks.
3       Q.   Yes.
4       A.    The VIGOR trial I just
5  mentioned.
6       Q.   Yes.
7       A.    The ADVANTAGE trial, which
8  was a 12-week trial that showed a
9  significant excess in the 12-week time
10  frame.
11       And the VICTOR trial, which
12  has not yet been published, which is a
13  colon cancer trial of 2,300 patients
14  coordinated out of Oxford, which has been
15  at least commented on by the
16  investigators having immediate excess in
17  heart attack risk.
18       Q.   What then, sir --
19       MR. GOLDMAN:  Objection,
20    move to strike nonresponsive
21    opinion testimony, lacks
22    foundation.
23  BY MR. KLINE:
24       Q.   What, then, sir, opinion and

Page 129

1  conclusion have you reached -- let me
2  strike it and start again.
3       What conclusion have you
4  reached, Dr. Topol, relating to the
5  increased risk of cardiovascular events,
6  heart attacks and strokes relating to
7  short-term usage of the drug?
8       MR. GOLDMAN:  Objection,
9    opinion testimony.
10       THE WITNESS:  Well, there is
11    -- I should also add the four
12    randomized trials, there's the
13    cumulative analysis by Dr. Juni
14    published in the Lancet which
15    shows no relationship between
16    duration of therapy and heart
17    attack excess.
18       But interestingly, all four
19    of these trials, and the
20    cumulative Juni analysis, was on
21    patients without heart disease.
22    So, the risk of it being immediate
23    and early could actually be much
24    more exaggerated in patients with

KS-000165

1  heart disease.
2  BY MR. KLINE:
3       Q.   Any doubt --
4            MR. GOLDMAN:  Objection,
5       move to strike the nonresponsive
6       testimony.
7  BY MR. KLINE:
8       Q.   -- about it in your mind?
9       A.   There isn't any question
10 about this.  To see it replicated across
11 four trials in patients who don't even
12 have heart disease is quite an important
13 finding.
14           MR. GOLDMAN:  Objection to
15      opinion testimony in the last
16      question.
17 BY MR. KLINE:
18      Q.   In this particular
19 Kaplan-Meier curve for the VIGOR trial,
20 that was not published in the New England
21 Journal of Medicine; is that correct?
22      A.   No.  As I mentioned earlier,
23 the New England Journal of Medicine paper
24 featured the gastrointestinal side

1       Q.   Replicated by other studies
2  we now know later?
3            MR. GOLDMAN:  Objection to
4       the opinion testimony.
5            THE WITNESS:  Three other
6       randomized trials.
7  BY MR. KLINE:
8       Q.   Yes.
9       A.   Yes.
10      Q.   And by the way, I'm going to
11 get to naproxen.  On this naproxen
12 theory, has there ever been a randomized
13 clinical trial demonstrating that
14 naproxen is cardioprotective?
15      A.   There is no -- there are no
16 data that I am aware of to show that
17 naproxen in any randomized trial is
18 cardioprotective.
19      Q.   Do you think that if there
20 were such a study, you would know about
21 it?
22      A.   I would think so.
23           MR. GOLDMAN:  Objection.
24 BY MR. KLINE:

1  effects and benefit, but it did not show
2  in any graphic form, and there are other
3  irregularities of this paper, but it
4  certainly did not highlight the heart
5  attack problems.
6       Q.   Okay.
7            Now, I want to do findings.
8  Then I want to go to what you've
9  described as irregularities --
10           MR. GOLDMAN:  Move to strike
11      as nonresponsive.
12 BY MR. KLINE:
13      Q.   -- because you have a
14 perspective on both of those issues;
15 correct?
16      A.   Yes.
17      Q.   Okay.
18           Let's talk about the
19 findings.
20           You mentioned already that
21 there was an increased risk of
22 cardiovascular events starting at the
23 six-week period in this study; correct?
24      A.   Yes.

1       Q.   So, what do you think of
2  this naproxen hypothesis that was put
3  forward by Merck to justify the results
4  in VIGOR?
5            MR. GOLDMAN:  Objection,
6       opinion testimony.
7            THE WITNESS:  It doesn't
8       justify -- I mean, as I mentioned
9       earlier, the problem is you have
10      an experimental drug which is not
11      fully defined, and you compare it
12      to a drug that's been known for 20
13      years.  To all of a sudden to
14      ascribe some type of magical
15      protective effect without any
16      basis is not acceptable.
17 BY MR. KLINE:
18      Q.   I don't have the document in
19 front of me, but I think I've read in the
20 many documents that I've had in front of
21 me a comment by you to the effect that if
22 Merck's view were true, it would be the
23 wonder drug of wonder drugs or something
24 like that.  Did you say something like

KS-000166

Page 134

1   that at some point?
2          MR. GOLDMAN:  Object to the
3      form, opinion testimony.
4          THE WITNESS:  I don't think
5      I did, but probably some other
6      person who astutely made that
7      statement, but that wasn't me.
8   BY MR. KLINE:
9      Q.   Would that be a correct
10  statement?
11         MR. GOLDMAN:  Time out.
12     Object to the form, lacks
13     foundation.  You're now asking him
14     to comment about a statement that
15     somebody else might have made.
16  BY MR. KLINE:
17     Q.   Would it be a correct
18  statement that naproxen would be the
19  wonder drug of wonder drugs if the Alise
20  Reicin/Merck hypothesis were true?
21         MR. GOLDMAN:  Object to the
22     form, opinion testimony, lacks
23     foundation.
24         THE WITNESS:  Well, as I

Page 135

1      mentioned earlier, to have a
2      20-fold benefit over aspirin,
3      which is a very important part of
4      our armamentarium for preventing
5      heart attacks, to be 20-fold
6      better than that, that would be
7      quite remarkable.
8          MR. GOLDMAN:  Move to
9      strike, nonresponsive.
10  BY MR. KLINE:
11     Q.   Okay.
12         So, your opinion formed in
13  the context of reviewing this Merck data
14  and Merck study in VIGOR, was that the
15  naproxen hypothesis was tenable or
16  untenable?
17         MR. GOLDMAN:  Objection,
18     opinion testimony.
19         THE WITNESS:  Well, in the
20     manuscript, back in 2001, we tried
21     to present that that's a possible
22     explanation.  We actually pointed
23     that out in a couple of points in
24     the paper.  But at the end, our

Page 136

1      cautionary statement was because
2      we didn't believe that this was an
3      acceptable explanation.
4   BY MR. KLINE:
5      Q.   Tell me, Dr. Topol, as you
6   wrote it in JAMA and as you believed it
7   then and today, the significance of 090,
8   the study 090.  What was that study?
9   When was it performed?  Just tell me what
10  it was and what its significance was to
11  you.
12         MR. GOLDMAN:  Objection,
13     opinion testimony.
14         THE WITNESS:  To me, that
15     study has been overlooked.  It
16     has, in many ways, extraordinary
17     significance in the clinical
18     development of Vioxx.  And the
19     reason is is that this study had
20     978 patients.  And within the 978
21     patients, they were randomly
22     assigned, they had the typical
23     arthritis, osteoarthritis
24     so-called, they were randomly

Page 137

1      assigned to Vioxx, a medicine
2      called nabumetone or known as
3      Relafen, which isn't used very
4      much, or placebo.
5          And so what they had were
6      these three arms tested with only
7      12-and-a-half milligrams of Vioxx.
8      So, it's a very low dose of Vioxx
9      relative to these other trials
10     that we've been discussing.
11  BY MR. KLINE:
12     Q.   090 being a 12.5 milligram,
13  as opposed to VIGOR, which was 50?
14     A.   That's right.
15     Q.   Okay.
16     A.   And what is so striking
17  about this trial is that it has, at the
18  end of six weeks of therapy, a
19  statistically significant 760 percent
20  excess of heart attacks.  Now, it's not
21  quite 1,000 patient trial, but certainly
22  that can't be minimized.  And the point
23  being is that if you see that trial in
24  replication with the problems with VIGOR,

KS-000167

Page 138

1    you have a very serious problem.
2          But moreover, what is the
3    misleading statements that have been
4    made, is that there have been no trials
5    ever done with Vioxx, before APPROVe,
6    comparing the drug except for naproxen,
7    in which there was a risk. In fact,
8    there was study 090, which compared to
9    placebo or nabumetone, which showed a
10   highly significant excess risk.
11         MR. GOLDMAN: Move to strike
12   nonresponsive opinion testimony.
13   BY MR. KLINE:
14       Q. Was there a public -- the
15   Merck lawyer keeps objecting as
16   nonresponsive. He just simply doesn't
17   like what he hears.
18         MR. GOLDMAN: Object to the
19   sidebar.
20   BY MR. KLINE:
21       Q. Was there, as you view this
22   and as you viewed it back then in 2001, a
23   real public health threat out there in
24   the form of the drug Vioxx?

Page 139

1          MR. GOLDMAN: Objection,
2    opinion testimony.
3          THE WITNESS: Yes. When we
4    published our article in August
5    2001, there was an accompanying
6    article in the Wall Street
7    Journal, an A1 article, in which I
8    stated just precisely that, that
9    we're staring a public health -- I
10   don't know if I used the word
11   "disaster," but it was a
12   significant word, that this is a
13   major public health issue, yes.
14   BY MR. KLINE:
15       Q. Why did you state it in
16   those blunt terms, sir?
17       A. Because it obviously was a
18   public --
19         MR. GOLDMAN: Objection,
20   opinion testimony.
21         THE WITNESS: Here you have
22   a possible five-fold increase in
23   heart attacks in patients without
24   heart disease; you have a drug

Page 140

1    that's being given to -- tens of
2    millions of prescriptions,
3    millions of people are taking it,
4    and it could be much worse in
5    patients with heart disease; we've
6    got direct-to-consumer advertising
7    unleashed with the most successful
8    launch of prescription medicines
9    in the history of pharmaceutical
10   development; we have a major
11   significant jeopardy, yes.
12   BY MR. KLINE:
13       Q. And at that point in time --
14         MR. GOLDMAN: Move to strike
15   as nonresponsive.
16   BY MR. KLINE:
17       Q. At that point in time, all
18   you're asking Merck to do was what?
19       A. All --
20         MR. GOLDMAN: At what point
21   in time?
22         MR. KLINE: 2001.
23         THE WITNESS: All we
24   wanted --

Page 141

1    BY MR. KLINE:
2        Q. I'll rephrase the question.
3    As of -- give me the date of your article
4    again. It would be August 22, 2001.
5          As of August 22, 2001, all
6    you were asking Merck to do was what?
7        A. To do an appropriate trial,
8    to acknowledge that there may be risks,
9    and that didn't occur, but to also do an
10   appropriate trial in patients with heart
11   disease.
12       Q. You made a big point in your
13   paper about the fact that the trials that
14   were done, I think you already told us,
15   weren't done in patients who were at risk
16   for cardiovascular disease. Correct so
17   far?
18       A. Yes.
19       Q. Those would be the real
20   patients you'd have to really worry
21   about; correct?
22         MR. GOLDMAN: Object to the
23   form.
24         THE WITNESS: Exactly. The

KS-000168

36 (Pages 138 to 141)

Page 142

1    patients with heart disease had
2    been completely excluded from
3    these trials.
4         MR. GOLDMAN:  Opinion
5    testimony.
6    BY MR. KLINE:
7         Q.   You needed to study them;
8    correct?
9         MR. GOLDMAN:  Object to the
10   form.
11        THE WITNESS:  That's
12   correct.
13   BY MR. KLINE:
14        Q.   And you also say in your
15   paper that you needed to do an evaluation
16   of endpoints which were specific.  We
17   have two minutes left on this video
18   before we go to the second video.
19        Tell me why that was so
20   important, to do specific cardiovascular
21   endpoints.  First of all, had that study
22   ever been done by Merck?
23        MR. GOLDMAN:  Objection,
24   opinion testimony, lacks

Page 143

1    foundation.
2    BY MR. KLINE:
3         Q.   Had that study ever been
4    done by Merck up until this point?
5         MR. GOLDMAN:  Same
6    objection.
7         THE WITNESS:  As far as I
8    know, there had not been a
9    trial -- as I reviewed from the
10   Targum report, there had not been
11   a trial with a cardiovascular
12   analysis plan with an external
13   review, adjudication of the
14   events.  No, it had not been done.
15   BY MR. KLINE:
16        Q.   Had anything that is called
17   a prespecified cardiovascular endpoint
18   study, has it ever been done by Merck?
19        A.   It has never been done in my
20   mind to this day.
21        Q.   Did it need to be done?
22        MR. GOLDMAN:  Objection,
23   opinion testimony.
24        THE WITNESS:  Absolutely.

Page 144

1         And we called for it innumerable
2    times.
3    BY MR. KLINE:
4         Q.   And here's the question.
5    Why?  And why is that different than what
6    we've heard -- we hear from Merck that,
7    well, we studied, and we went back and we
8    looked at the end points.  Why, sir --
9    you can tell us, why?
10        MR. GOLDMAN:  Objection to
11   form.
12        THE WITNESS:  Well, as I put
13   you to the letter in the New
14   England Journal, which responded
15   to that point.
16   BY MR. KLINE:
17        Q.   Or just tell us, if you can.
18        A.   Yeah.  The main thing is
19   that Merck was saying that they were
20   doing trials to look at cardiovascular
21   endpoints like APPROVe, like VICTOR and a
22   prostate cancer trial.  These were not
23   being done for a cardiovascular endpoint.
24   They were done in patients without heart

Page 145

1    disease.
2         These were trials being done
3    to extend the indications for the drug to
4    new areas, such as prevention of colon
5    polyps or prevention of prostate cancer.
6    They had nothing to do with assuring
7    safety from a cardiovascular standpoint.
8    That could only be done in trials of
9    patients with heart disease.
10        Q.   Any doubt about that, sir?
11        MR. GOLDMAN:  Move to strike
12   as nonresponsive.
13        THE WITNESS:  There is no
14   doubt whatsoever about that
15   statement.
16        MR. GOLDMAN:  Objection,
17   opinion testimony.
18   BY MR. KLINE:
19        Q.   Did they do what they should
20   have done here?
21        MR. GOLDMAN:  Objection,
22   opinion testimony.
23        THE WITNESS:  They did not
24   do what was needed to be done,

KS-000169

Page 146

1  which we called for in our JAMA
2  paper.
3      MR. KLINE:  Okay.
4      We'll move to the next
5  videotape, and we will take a
6  two-minute break to do it.
7      THE VIDEOTAPE TECHNICIAN:
8  Off the record, 11:05.
9          - - -
10     (Whereupon, a recess was
11  taken from 11:05 a.m. until
12  11:17 a.m.)
13         - - -
14     THE VIDEOTAPE TECHNICIAN:
15  Back on the record, 11:17 a.m.
16  Tape Number 2.
17 BY MR. KLINE:
18     Q.  Dr. Topol, in the believe it
19 or not category, I want to pick up speed.
20 I want to try to go through a lot of
21 things that you've said and done, and
22 we're using time up quickly.
23     You mentioned -- first of
24 all, what you've told us so far are the

Page 147

1  various conclusions that you reached,
2  those which you formed during the process
3  of gathering information, learning about
4  this drug and researching this matter.
5      MR. GOLDMAN:  Object to the
6  form.
7      THE WITNESS:  Yes.
8  BY MR. KLINE:
9      Q.  Okay.
10     Now, let me go.
11     After your study came out in
12 JAMA, did it raise a public health
13 concern in the lay press?
14     MR. GOLDMAN:  Object to the
15  form.
16     THE WITNESS:  I believe
17  there was a concern that was
18  brought out by the paper and then
19  many subsequent studies as well.
20     MR. GOLDMAN:  Move to
21  strike, nonresponsive.
22 BY MR. KLINE:
23     Q.  Okay.
24     First of all, in The Wall

Page 148

1  Street Journal there's a quotation
2  attributed to you.  You said, "Either
3  they are moving at glacial speed,"
4  referring to Merck or, "they are waiting
5  to see what the fallout will be from this
6  and other reports.  We're staring at a
7  major public health issue."
8      A.  Yes.
9      Q.  Is that a quote that could
10 be attributed to you?
11     MR. GOLDMAN:  Object to
12  form, opinion testimony.
13     THE WITNESS:  That certainly
14  was, and that was the one I was
15  referring to a little earlier
16  about this public health concern,
17  yes.
18 BY MR. KLINE:
19     Q.  It says that "Merck sought
20 to downplay the cardiac issue."  Is that
21 true?
22     A.  That's what the reporter
23 said.
24     MR. GOLDMAN:  Object to the

Page 149

1  form.
2      THE WITNESS:  But I do
3  believe that's true, because that
4  was, I think, the ulterior purpose
5  of the visit in April.
6  BY MR. KLINE:
7      Q.  Apparently at some point,
8  Merck, according to the published report
9  here says, that they asked Dr. DeAngelis
10 at JAMA -- who is he?
11     A.  It's a woman.
12     Q.  I'm sorry, I apologize.
13     A.  Cathy DeAngelis, and she's
14 the editor-in-chief of JAMA.
15     Q.  And that they wanted to have
16 a rebuttal right to your article when it
17 was published?
18     MR. GOLDMAN:  Object to the
19  form.
20     THE WITNESS:  Yeah, this was
21  quite extraordinary.  I had not
22  heard of something like this
23  before.  This was because we had
24  been, I think, decent and

KS-000170

Page 150

1    collegial to let Merck know about
2    the paper, now they wanted to
3    publish their own paper at the
4    same time and an editorial as a
5    simultaneous publication in JAMA.
6  BY MR. KLINE:
7     Q.   Why was --
8          MR. GOLDMAN:  Move to
9    strike, nonresponsive.
10 BY MR. KLINE:
11    Q.   -- as you saw it, the
12 incremental risk of increased risk of
13 heart attacks and strokes so important,
14 and how did it relate to the numbers of
15 people who were taking it?
16          MR. GOLDMAN:  Object to the
17    form, opinion testimony.
18          THE WITNESS:  Well, if one
19    thinks about the risk here, if
20    it's -- if we use the APPROVe data
21    in colon cancer patients without
22    heart disease, it's 16 per
23    thousand patients, and you can
24    just do the math about -- if you

Page 151

1    have millions of people, 16 per
2    thousand having a heart attack,
3    that's an extraordinary risk for
4    the population.
5          MR. GOLDMAN:  Move to strike
6    as nonresponsive.
7  BY MR. KLINE:
8     Q.   Okay.
9          Merck took after you, sir?
10          MR. GOLDMAN:  Object to the
11    form, leading.
12          THE WITNESS:  The problems
13    that occurred after August 22nd,
14    2001 were quite profound in many
15    respects.  So, not only did they
16    have consultants that they
17    communicated to the media, like
18    Dr. Konstam and Dr. FitzGerald,
19    accusing us of having tortured the
20    data and manipulated the data, but
21    they also sent out an overnight
22    mail to every healthcare provider
23    in the country that was commented
24    on -- Dr. Sherwood, he was the

Page 152

1    doctor who sent it, and it was in
2    the JAMA letter correspondence
3    about our article, that one of the
4    doctors was complaining, having
5    received this overnight with the
6    five-page taking on the
7    Mukherjee/JAMA paper, and so it
8    certainly unleashed a very robust
9    response from Merck and its
10    consultants.
11          MR. GOLDMAN:  Objection,
12    move to strike as nonresponsive.
13 BY MR. KLINE:
14    Q.   Did you ever hear of them
15 refer to Dr. Sherwood as the enforcer?
16    A.   I hadn't heard that, but he
17 certainly --
18          MR. GOLDMAN:  Object to the
19    form --
20          THE WITNESS:  -- was the
21    person --
22          MR. GOLDMAN:  -- lack of
23    foundation.
24          THE WITNESS:  -- whose

Page 153

1    signature is attached to the
2    letter that went out to, I don't
3    know how many, apparently tens of
4    thousands of doctors following our
5    article.
6  BY MR. KLINE:
7     Q.   Okay.
8          Did you believe the attacks
9    were ad hominem?
10          MR. GOLDMAN:  Object to
11    form, lacks foundation --
12          THE WITNESS:  I don't
13    believe --
14          MR. GOLDMAN:  -- opinion
15    testimony.
16          THE WITNESS:  -- that they
17    were directed personally.  I don't
18    think that Merck wanted to accept
19    that there was a cardiovascular
20    risk.  They also said there was no
21    need to do any trial because there
22    was no cardiovascular risk.
23          That, to us, was
24    unthinkable, but I don't believe

**KS-000171**

Page 154

1  it was a personal directed --
2  anyone who wrote the paper would
3  have probably had the same type of
4  response, I imagine.
5       MR. GOLDMAN:  Move to strike
6  as nonresponsive.
7  BY MR. KLINE:
8       Q.   Did you keep your scientific
9  focus, sir?
10      A.   Without any question, we
11 stayed on point regarding the need to
12 press on the clinical science and the
13 research.
14      Q.   In a reply to a series of
15 letters written by folks associated with
16 Merck, did you say, "Since publication of
17 our meta-analysis" -- was your study a
18 meta-analysis?
19      MR. GOLDMAN:  Object to
20 form.
21      THE WITNESS:  Well, it's one
22 form of meta-analysis.  That's a
23 term that's very loose.  Any time
24 you're pooling data and looking at

Page 155

1  multiple trials, you can term it a
2  meta-analysis.  But yes, that was
3  basically the best we could do
4  with the data that were available
5  at that time.
6  BY MR. KLINE:
7       Q.   You said, "Several basic
8  research studies have supported the
9  potential thrombotic effect of COX-2
10 inhibitors," and you cited various
11 studies; correct?
12      MR. GOLDMAN:  Object to the
13 form, lacks foundation, opinion
14 testimony.
15      THE WITNESS:  Yes.
16 BY MR. KLINE:
17      Q.   And you were speaking there
18 not only of COX-2s generally, but a
19 thinking of -- were you thinking of Vioxx
20 in particular, sir?
21      MR. GOLDMAN:  Same
22 objection.
23      THE WITNESS:  Vioxx appeared
24 in the continuum to be the one

Page 156

1  associated with the highest risk
2  as an outlier.
3       MR. GOLDMAN:  Same objection
4  as before.
5       THE WITNESS:  But it
6  certainly, as we raised in the
7  JAMA paper, could have easily been
8  ascribed as a concern with
9  Celebrex as well.
10 BY MR. KLINE:
11      Q.   Now, there was a label --
12      MR. GOLDMAN:  Objection,
13 move to strike as nonresponsive.
14 BY MR. KLINE:
15      Q.   -- on Vioxx at the time;
16 correct?
17      A.   Yes, there was a package
18 insert, yes, and a label.
19      Q.   Right.
20      And the label which would be
21 in the PDR as well as in the package
22 insert, did it in any way warn of the
23 cardiovascular risks which were, as I
24 think your testimony could be fairly

Page 157

1  described, obvious to you?
2       MR. GOLDMAN:  Objection to
3  the opinion testimony.
4       MR. HAMELINE:  Again, if you
5  need to look at the document, let
6  us know.  If you have memorized
7  it...
8  BY MR. KLINE:
9       Q.   You know generally the
10 label?
11      MR. GOLDMAN:  Object to
12 form.
13      THE WITNESS:  Yeah, I'm
14 familiar with the two different --
15 the initial and then the April
16 2002, I'm familiar with them.  At
17 least I couldn't recite it, but
18 I've reviewed them in the past.
19      The initial label, package
20 insert, did not mention any
21 cardiovascular risk.  And only in
22 April 2002, which is considerably
23 long after the FDA panel requested
24 that there be a label change, was

KS-000172

Page 158

1   there an insertion about the risk
2   and some of the data, but it is
3   certainly not prominently featured
4   in the new label. It's actually
5   in a very small print and, in my
6   mind, not adequately highlighting
7   the risk for patients and for the
8   medical community.
9       MR. GOLDMAN:  Objection,
10  move to strike, nonresponsive
11  opinion testimony.
12  BY MR. KLINE:
13      Q.   So, in your opinion, the
14  label, as you now understood the data as
15  it pertained to the '99 label when you
16  learned about this in 2001 and as you
17  understand it today based on the '99 and
18  2002 labels --
19      A.   Yes.
20      Q.   -- those labels, did they
21  provide adequate warnings and information
22  relating to the real risk of patients
23  taking Vioxx?
24      MR. GOLDMAN:  Objection,

Page 160

1       MR. KLINE:  Let's go off the
2   record.  I don't want to take any
3   time on this.
4       THE VIDEOTAPE TECHNICIAN:
5   Off the record, 11:25.
6           - - -
7       (A discussion off the record
8   occurred.)
9           - - -
10      MR. KLINE:  I, again, invite
11  counsel to make any objection to
12  form or opinion testimony, which I
13  believe 90 percent of them are,
14  and now I can't even hear the
15  objections because they're just
16  being whispered, so, I don't have
17  a chance to correct anything that
18  might be to the form because I
19  haven't heard the ones that are
20  being whispered.
21      I invite them to give Mrs.
22  Golkow at the end of the
23  deposition all of the bases of the
24  objections so I don't have to hear

Page 159

1   opinion testimony.
2       MR. HAMELINE:  Wait for his
3   objections.
4       THE WITNESS:  I'm sorry.
5       MR. KLINE:  Yes.  For those
6   who hear the constant stream of
7   talking, it's Merck's lawyer
8   objecting the entire deposition.
9       MR. GOLDMAN:  Mr. Kline, I'm
10  whispering, as the court reporter
11  can confirm.  I'm intentionally
12  whispering into the microphone so
13  she can hear me.  I'm not trying
14  to interrupt the deposition at
15  all.  You're asking him for clear
16  opinion testimony, and that's my
17  objection.
18      MR. KLINE:  I don't know why
19  we can't simply agree that you
20  have a standing objection to form
21  and opinion, and I'm willing to do
22  it.
23      MR. GOLDMAN:  And I told you
24  before, sir, that's not --

Page 161

1   them.  They object to everything
2   Merck says.  It's as clear as it
3   can be.  Or everything that Dr.
4   Topol says.  Let's go back.
5       MR. GOLDMAN:  Mr. Kline, to
6   be clear, I'm saying the
7   objections loud enough for you to
8   hear and if for some reason if you
9   want me to say them louder, I'm
10  happy to do that.
11      MR. KLINE:  Yes.
12      MR. GOLDMAN:  But don't say
13  later on that you did not hear my
14  objections.
15      MR. KLINE:  What you want to
16  do -- what you clearly want to do,
17  and I didn't want to get to this
18  point today, Andy, but what you
19  clearly want to do is object to
20  every single question.  I don't
21  understand how it's not preserved
22  if I say to you I agree on behalf
23  of all of the parties taking the
24  deposition in this case, the

KS-000173

Page 162

1   thousands of people who have sued
2   Merck in this litigation in the
3   MDL, that I will agree that for
4   that purpose you can go back and
5   fill it in.  I'm sure if we call
6   Judge Fallon, which I don't want
7   to do, that's what he would say.
8   It's as clear as can be.  You have
9   the objection.
10       MR. STEIN:  I make that
11  agreement for the people in
12  California, the state cases in
13  California that I represent.  You
14  can have a standing objection.
15       MR. GOLDMAN:  Are there any
16  other cross notices in this
17  deposition?
18       MR. KLINE:  No.
19       MR. GOLDMAN:  Well, with all
20  due respect, I don't know how the
21  judge is going to rule on that
22  later, and I can't just preserve
23  my objection, Mr. Kline.  I will
24  do my best to do it in a

Page 164

1   suggestion.  Can you just say
2   objection, period?  Do you have to
3   state the basis each time?
4       MR. KLINE:  I asked that,
5   too.
6       MR. GOLDMAN:  You want to me
7   to say objection period, and then
8   later I can go in and put in what
9   the objection is?
10      MR. KLINE:  Yes.  If it is
11  to form or opinion, you can go
12  back in and Linda can fill it in.
13      MR. GOLDMAN:  Fine.  I will
14  do that.  That is fair.
15      Just for the record, I will
16  object just by saying "objection,"
17  and after the deposition I will
18  contact Linda and tell her what
19  the basis for that objection is.
20      MR. KLINE:  You have to say
21  any other objection out loud.  If
22  it is form or opinion, which 99
23  percent of this is, I'm fine.  If
24  it's something else, you've got to

Page 163

1   non-disruptive way.  I've tried to
2   do that.
3       I don't want to hear later
4   that you couldn't hear my
5   objections, because that's not
6   true.
7       MR. KLINE:  I couldn't.
8       MR. GOLDMAN:  And if Dr.
9   Topol just gives me a second to
10  make the objection, then we
11  wouldn't have the problem.
12      MR. KLINE:  But then we're
13  still going to end up with a
14  transcript that is this and that.
15  But you know what, some day we'll
16  play it, and I'll ask for an
17  instruction from the judge that
18  this is what Merck was doing
19  during the deposition because they
20  didn't want to hear what Dr. Topol
21  said.
22      Let's go.
23      THE COURT REPORTER:  I just
24  have one quick question or

Page 165

1   let me know.
2       MR. GOLDMAN:  Like what?
3       MR. KLINE:  I don't know.
4       MR. GOLDMAN:  What objection
5   would you like me to make now?
6       MR. HAMELINE:  Foundation is
7   the only other objection you've
8   been making, so, let's keep that
9   in the three.
10      MR. KLINE:  We'll keep that
11  in the three.  Foundation is in
12  the three.
13      If there's anything other
14  than those three, state it.
15      MR. GOLDMAN:  Sounds good.
16      MR. KLINE:  Let's go.
17      THE VIDEOTAPE TECHNICIAN:
18  Back on the record at 11:30.
19      MR. KLINE:  Okay.
20      We're back on the record;
21  correct?
22      THE COURT REPORTER:  Yes.
23  BY MR. KLINE:
24      Q.   We have the warning labels,

KS-000174

1  and I ask you about them and there were
2  objections and I'm not sure what came
3  through or not, so, I'm going to do it
4  again to be sure.
5           The warnings on this drug,
6  were there adequate warnings on this
7  drug, sir, in the '99 and 2002 labels?
8           MR. GOLDMAN:  Objection.
9  BY MR. KLINE:
10      Q.   As to cardiovascular risks?
11          THE WITNESS:  In my opinion,
12      both the original label and then
13      the revision in April 2002 did not
14      show adequate safety concerns
15      about heart attacks, strokes and
16      death that could occur from the
17      medicine.  So, it wasn't present
18      at all in the first iteration in
19      1999, and it certainly was not
20      adequately flagged in the 2002
21      revision.
22          MR. GOLDMAN:  Move to
23      strike, nonresponsive.
24  BY MR. KLINE:

1      Q.   You, sir, online at the
2  Cleveland Clinic Heart Center, you
3  apparently have online for your patients;
4  correct?  There's an online service
5  called Cleveland Clinic Heart Center, and
6  there was something in the winter '01 was
7  actually posted on the website, what I
8  see, "Raising a Cautionary Flag About
9  COX-2 Use in High-Risk Heart Patients."
10      A.   Yes.
11      Q.   Do you see that, sir?
12      A.   Yes, I do.
13      Q.   I've marked it as an
14  exhibit.  I'll get you a copy, counsel
15  for Merck.  We'll mark it as the next
16  exhibit number.
17           - - -
18          (Whereupon, Deposition
19      Exhibit Topol-10, "Raising a
20      Cautionary Flag about COX-2 Use
21      in High-Risk Heart Patients,"
22      Cleveland Clinic Heart Center (2
23      pages), was marked for
24      identification.)

1           - - -
2  BY MR. KLINE:
3      Q.   And I'm going to ask you to
4  identify it.
5      A.   Yes.  This is from the
6  Cleveland Clinic Heart Center website.
7      Q.   Right.
8           Having said what you've just
9  told us, that there weren't adequate
10  warnings on the drug, were you at least
11  going to tell your patients certain
12  things about the drug?
13          MR. GOLDMAN:  Objection.
14          THE WITNESS:  Yes.
15  BY MR. KLINE:
16      Q.   As you understood it?
17          MR. GOLDMAN:  Objection.
18          THE WITNESS:  Well, this
19      could be for patients or it could
20      be for physicians, anyone who
21      comes to the website.  It's a
22      public access website.  So, it was
23      anyone who wanted to go to the
24      Cleveland Clinic Heart Center

1      website would see our take and our
2      further recommendations from the
3      recent JAMA paper.
4  BY MR. KLINE:
5      Q.   Is the information that's
6  contained here, including, "Both
7  researchers call for prudent use of COX-2
8  inhibitors among coronary patients until
9  the potential risk can be fully addressed
10  in prospective randomized multicenter
11  trials," was that your advice to anyone
12  who came to the website to read it?
13          MR. GOLDMAN:  Objection.
14          THE WITNESS:  Yes.
15  BY MR. KLINE:
16      Q.   Was that being told to
17  people by Merck in their label?
18      A.   No.
19          MR. GOLDMAN:  Objection.
20  BY MR. KLINE:
21      Q.   "We'd like to see a study of
22  patients at the highest cardiovascular
23  risks in which they get either a
24  combination of one of the coxibs and

KS-000175

Page 170

1  aspirin or aspirin alone, says Dr.
2  Topol."
3          Is that a statement that's
4  yours and fairly attributed to you?
5          MR. GOLDMAN:  Objection.
6          THE WITNESS:  Yes, it is.
7  BY MR. KLINE:
8      Q.   "We think the aspirin and
9  coxib combination would provide
10 anti-platelet protection, and it may be
11 even more protective than aspirin alone.
12 But it could be worse, and that's what we
13 need to find out."  That's what you were
14 telling people posted on the website of
15 the Cleveland Clinic?
16         MR. GOLDMAN:  Objection.
17         THE WITNESS:  That's
18     correct.
19 BY MR. KLINE:
20     Q.   Dr. Nissen, your colleague,
21 added, "It wouldn't be a hard trial to
22 do."  We can get "a study of 6,000
23 patients, and reach enrollment goals in
24 as little as six months."

Page 171

1          Did Merck do that study?
2      A.   No.  That trial was not
3  done.
4      Q.   Should it have been done?
5          MR. GOLDMAN:  Objection.
6          THE WITNESS:  Any trial
7      would have been helpful, but no
8      trial was done.
9  BY MR. KLINE:
10     Q.   Did you have to take it upon
11 yourself to warn patients yourself
12 without the adequate warnings that were
13 being given by Merck, sir?
14         MR. GOLDMAN:  Objection.
15         THE WITNESS:  The website
16     was one way in which we put our
17     concerns out there beyond what was
18     published in the medical
19     literature.
20 BY MR. KLINE:
21     Q.   I'd like to move in the
22 period from -- move forward into the year
23 2002/2003/2004.
24         You wrote an editorial which

Page 172

1  was published in the Archives of Internal
2  Medicine, December of '02, and apparently
3  there were three or so articles that were
4  funded by Merck -- I think you'll put
5  this in context -- that were funded by
6  Merck which were attempting to show the
7  cardioprotective effects of naproxen.
8          If I've stated that wrong,
9  I'm just trying to get through a lot with
10 one simple concept.  Is that what was
11 going on and what you were responding to?
12         MR. GOLDMAN:  Objection.
13         THE WITNESS:  I'm not sure
14     what you're referring to.  Is it
15     one of the publications that I've
16     written?
17 BY MR. KLINE:
18     Q.   Let me withdraw this and
19 I'll go back.
20         I'm looking for a document,
21 which I'll show you, which was December
22 of '02, "Lack of Cardioprotective Effect
23 of Naproxen," written by you.
24     A.   Okay.  Yes, yes.

Page 173

1      Q.   (Handing over document.)
2          Put it in context.  Now I
3  won't get an objection to the question if
4  I just say put this in context, sir.
5      A.   Yes.
6          (Witness reviewing
7  document.)
8          MR. KLINE:  I've marked it
9      as Exhibit Number 11.
10         - - -
11         (Whereupon, Deposition
12     Exhibit Topol-11, "Lack of
13     Cardioprotective Effect of
14     Naproxen," Arch Intern Med/Vol
15     162, Dec 9/23, 2002 2637, was
16     marked for identification.)
17         - - -
18 BY MR. KLINE:
19     Q.   It says, "In summary, there
20 remains currently no definitive evidence
21 that naproxen has a cardioprotective
22 effect."  What were you responding to
23 there?
24     A.   So, there were three studies

KS-000176

1  in the archives that were published and
2  an editorial.  We were responding to
3  that, that still there was no adequate
4  data to show that naproxen has any
5  cardioprotective effect, and that still
6  remains the case today.
7          MR. GOLDMAN:  Objection.
8  BY MR. KLINE:
9      Q.   Sir, in the VIGOR study --
10         MR. GOLDMAN:  Move to
11  strike.
12  BY MR. KLINE:
13     Q.   One thing I have not -- I
14  haven't testified to --
15         MR. KLINE:  Mr. Goldman, if
16  you would just state your --
17         MR. GOLDMAN:  Objection.
18  Move to strike as nonresponsive.
19         MR. KLINE:  Say it out loud
20  anymore, because that way I can
21  hear it.  No sense hiding it.
22         MR. GOLDMAN:  I'm not hiding
23  it, Mr. Kline.  I really don't
24  want you to argue to the judge

1  that you couldn't hear my
2  objections.  Okay?
3          MR. KLINE:  I'm not going to
4  argue that up until this point,
5  but now I want to hear it, because
6  I want to know what's said at this
7  point.
8          What I find disruptive,
9  honestly, is the talking, the
10  whispering.  I just find it
11  disruptive.  I'm not -- I'm just
12  saying it is.
13  BY MR. KLINE:
14     Q.   Now, let's move -- I lost my
15  train of thought, so bear with me.
16         We were talking about
17  naproxen and this whole thing, its
18  cardioprotective effect.  In VIGOR, Merck
19  had made the point, as you well know,
20  that they had no long-term randomized
21  clinical trial to show that naproxen was
22  cardioprotective.  We've covered that
23  point; correct?
24         MR. GOLDMAN:  Objection.

1          THE WITNESS:  Yes, yes.
2  BY MR. KLINE:
3      Q.   I'm just putting it in
4  context.
5      A.   No.  There are no data to
6  support in any definitive fashion or
7  meaningful way that naproxen has a
8  cardioprotective effect.
9      Q.   And what they did in the
10  VIGOR paper was they went to comparing it
11  to a flurbiprofen article which was done
12  in some post-CABG patients, I believe, if
13  you recall.  How did you view that?
14     A.   Well, there were several
15  things that were done to try to make a
16  case for a cardioprotective effect.
17         MR. GOLDMAN:  Objection.
18  BY MR. KLINE:
19     Q.   Tell me what things Merck
20  tried to do to make a case for
21  cardioprotective effect of naproxen.
22         MR. GOLDMAN:  Objection.
23         THE WITNESS:  Quoting the
24  platelet biology effects of

1  naproxen compared with other
2  nonsteroidal anti-inflammatory
3  drugs, other comparisons, but
4  these were not randomized trials
5  with clinical cardiovascular
6  endpoints.  So, there's no way to
7  ascertain whether there's any
8  cardioprotective effect with
9  naproxen.
10  BY MR. KLINE:
11     Q.   And, therefore, when you
12  were writing here that "lack of
13  cardioprotective effect of naproxen,"
14  were you saying that there was definitely
15  no at all cardioprotective effect, or
16  were you saying that a cardioprotective
17  effect of naproxen could not explain the
18  results in VIGOR?
19         MR. GOLDMAN:  Objection.
20  BY MR. KLINE:
21     Q.   Or something else?
22         MR. GOLDMAN:  Objection.
23         THE WITNESS:  No.  It was
24  the latter.  That if there was a

KS-000177

1    cardioprotective effect, it was
2    modest at best, and it could not
3    explain the five-fold increase in
4    heart attacks in the VIGOR trial.
5  BY MR. KLINE:
6    Q.   Okay.
7        Now came the year 2003.
8  What was roughly going on?
9    A.   Well --
10       MR. GOLDMAN:  Objection.
11  I'm sorry, Dr. Topol.  Objection.
12       THE WITNESS:  By 2003, now
13  we had several of these so-called
14  epidemiologic or observational
15  studies.  These were case-control
16  studies, multiple studies in large
17  populations published in various
18  journals.  And in these studies,
19  there were, by 2003, I think
20  probably five of them, four of
21  which showed very concerning
22  evidence of -- confirming our
23  initial paper in JAMA, but not in
24  a randomized trial like VIGOR,

1  are we as of October 28, 2002?
2    A.   That's correct.
3    Q.   You already had New Year's
4  planned for apparently; correct?
5    A.   That's correct.
6    Q.   And I want to look at that
7  article with you so that you can tell the
8  members of the jury where you saw this
9  Vioxx situation as of that time.
10   A.   Yes.
11   Q.   And by the way, while we're
12  getting the paper out and marked, we're
13  marking it as the next exhibit number,
14  which is Number 12, were you still
15  concerned?
16       MR. GOLDMAN:  Objection.
17       THE WITNESS:  Our concern
18  never went away, so, yes, just as
19  in 2001 -- it actually got
20  reinforced over time because of
21  the other studies that I
22  mentioned.
23  BY MR. KLINE:
24   Q.   Now, what you --

1    but, rather, in these population
2    studies, twofold or greater risk
3    of Vioxx compared with other
4    agents to be used for arthritis.
5        MR. GOLDMAN:  Objection,
6    move to strike as nonresponsive.
7  BY MR. KLINE:
8    Q.   And by the fall of that
9  year, actually, you have a paper that was
10  received September '02; revisions,
11  October '03; accepted '04 and published
12  October 28, '02, so, it's late '02.
13       You actually wrote an
14  article which said, "Where are we in
15  2003?"  You actually -- it was an October
16  2002 publication that's projecting
17  forward to 2003; correct?
18       MR. GOLDMAN:  Objection.
19       THE WITNESS:  Right.
20  BY MR. KLINE:
21   Q.   Correct?
22   A.   Right.
23   Q.   So, if it would really be
24  technically described, it would be, where

1              - - -
2        (Whereupon, Deposition
3    Exhibit Topol-12,
4    "Cyclooxygenase-2: Where are we
5    in 2003? Cardiovascular risk and
6    COX-2 inhibitors," (Mukherjee et
7    al), Arthritis Research and
8    Therapy 2003, Vol. 5, 8-11, was
9    marked for identification.)
10             - - -
11       MR. GOLDMAN:  Mr. Kline, I
12   didn't get a chance to insert my
13   objection because the document was
14   being handed to me.  So, objection
15   to the last question.
16  BY MR. KLINE:
17   Q.   What you we stated here is
18  in the second paragraph, "Given the
19  results of several large clinical trials
20  of COX-2 inhibitors, it is clear that
21  theoretical concern for a prothrombotic
22  effect is now transformed to a clinical
23  reality."
24   A.   Yes.

**KS-000178**

Page 182

1     MR. GOLDMAN:  Where are you?
2  BY MR. KLINE:
3     Q.   We are under "Conclusions,"
4  in the first sentence of the second
5  paragraph saying, "Given the results of
6  several large clinical trials of COX-2
7  inhibitors, it is clear that the
8  theoretical concern for a prothrombotic
9  effect is now transformed to a clinical
10 reality."
11     Indeed it was; correct?
12     MR. GOLDMAN:  Objection.
13     THE WITNESS:  There is no
14     question that we, at this point --
15     we had had adequate replication
16     through multiple studies, and so
17     this is a reality, yes.
18 BY MR. KLINE:
19     Q.   You said, "The apparent
20 hazard does not appear to be large and,
21 in absolute terms, may be a fraction of 1
22 percent excess and may be confined to
23 patients with an as yet undefined,
24 specific genetic susceptibility.  With

Page 183

1  such an exceptionally large patient
2  population at risk, however, it is
3  imperative to determine the precise
4  extent of the risk and the methods to
5  avoid risk."
6     That's what you were after;
7  is that correct?
8     MR. GOLDMAN:  Objection.
9     THE WITNESS:  Yeah, we --
10     this is exactly the theme for
11     multiple years.  In fact, we were
12     underestimating the risk of less
13     than 1 percent.  It turned out, of
14     course, it was more than 1
15     percent, but this is what -- we
16     were trying to come up with the
17     best way to process the data as of
18     that point in time.
19     MR. GOLDMAN:  Objection,
20     move to strike as nonresponsive.
21 BY MR. KLINE:
22     Q.   You then wrote, "The
23 importance of the public health issue
24 cannot be overstated.  The class of

Page 184

1  drugs...yet to be assessed in a single
2  trial of patients with known
3  atherosclerotic disease, who stand to be
4  at the highest risk of adverse events."
5     Is that the nub of the
6  problem?
7     MR. GOLDMAN:  Objection.
8     THE WITNESS:  That's a
9     big --
10     MR. GOLDMAN:  Dr. Topol,
11     just give me one minute.
12     Objection.
13 BY MR. KLINE:
14     Q.   Please, sir.
15     A.   I'm sorry.
16     That's a big part of it,
17 because it already is a significant risk
18 in people without heart disease.  What's
19 going to happen if you have heart
20 disease?  So, all the problems that have
21 been registered and replicated are
22 potentially magnified in a higher risk
23 population.
24     Q.   Now, you became interested

Page 185

1  in something that I'm going to get into
2  in the next article and wrote on in the
3  medical literature, which is that you
4  state here, "Ironically, the
5  manufacturers of the first generation
6  COX-2 inhibitors" -- that includes Merck;
7  correct?
8     MR. GOLDMAN:  Are you
9     looking at a particular document?
10     MR. KLINE:  I'm looking at
11     the last sentence on the bottom of
12     the first column of page -- of the
13     last page of the exhibit.
14 BY MR. KLINE:
15     Q.   "Ironically, the
16 manufacturers of the first generation
17 COX-2 inhibitors spent over $265 million
18 in 2001 for direct-to-consumer
19 advertising to promote their drugs, but
20 have failed to conduct a prospective
21 trial of COX-2 inhibitors in patients
22 with cardiovascular disease."  We have
23 not -- "We will not have advanced in any
24 meaningful way in 2003 unless such a

**KS-000179**

Page 186

1  trial is undertaken."
2       MR. GOLDMAN:  Objection.
3  BY MR. KLINE:
4       Q.   Couple of questions.
5       Are those words that you
6  wrote?
7       MR. GOLDMAN:  Objection.
8       THE WITNESS:  They're
9  absolutely words that I wrote,
10  yes.
11  BY MR. KLINE:
12       Q.   And did you take the time to
13  actually look and find out what the
14  manufacturers, including Merck, were
15  spending advertising the drug?
16       MR. GOLDMAN:  Objection,
17  lacks foundation.
18       THE WITNESS:  Yes, we did
19  research the data for how much the
20  direct-to-consumer advertising was
21  costing for both Celebrex and
22  Vioxx.
23  BY MR. KLINE:
24       Q.   And were you asking for the

Page 187

1  same thing, for Merck to do a
2  cardiovascular endpoint study?
3       A.   Yes, we were.
4       Q.   And was it done?
5       A.   No, it was not.
6       Q.   And should it have been
7  done?
8       MR. GOLDMAN:  Objection.
9       THE WITNESS:  Absolutely it
10  should have been done.
11  BY MR. KLINE:
12       Q.   Now, I want -- you actually
13  wrote later an article called,
14  "Pharmaceutical advertising versus
15  research spending:  Are profits more
16  important than patients?"  Did you write
17  that?
18       A.   Yes.
19       Q.   Were you becoming
20  increasingly more frustrated, Dr. Topol?
21       MR. GOLDMAN:  Objection.
22       - - -
23       (Whereupon, Deposition
24  Exhibit Topol-13, "Pharmaceutical

Page 188

1       advertising versus research
2       spending:  Are profits more
3       important than patients?
4       (Mukherjee et al) American Heart
5       Journal, October 2003, 563-564,
6       was marked for identification.)
7       - - -
8  BY MR. KLINE:
9       Q.   Exhibit 13.
10       A.   The frustration level was
11  clearly rising over time, yes.
12       Q.   And in this particular
13  editorial, which you published -- where
14  did you publish it, sir?
15       A.   American Heart Journal.
16       Q.   American Heart Journal.
17       Is that a major journal,
18  peer-reviewed journal?
19       A.   It's one of the four leading
20  heart journals in the United States.
21       Q.   You state here, sir, "We
22  would like to call on the leaders" -- I'm
23  in the last paragraph of the article.
24       "We would like to call on

Page 189

1  the leaders of the medical community to
2  voice their concern regarding the adverse
3  effects of direct-to-consumer
4  advertising, whose sole aim is to sell
5  drugs without other considerations."
6       Did you write that?
7       MR. GOLDMAN:  Objection, and
8  lacks --
9       THE WITNESS:  Yes, sir, I
10  did write that.
11  BY MR. KLINE:
12       Q.   Were you thinking of Vioxx
13  and Merck when you stated that?
14       MR. GOLDMAN:  Objection.
15       THE WITNESS:  There isn't
16  any question.  In fact, in the
17  figure of that article, we showed
18  how Vioxx had $160 million of
19  advertising in the year compared
20  to Budweiser, 140 odd and Pepsi,
21  125 million, and Nike, 70 million.
22       So, in fact, Vioxx exceeded
23  all these consumer products in
24  that very year that we looked at.

KS-000180

48 (Pages 186 to 189)

1          MR. GOLDMAN:  Objection,
2     move to strike as nonresponsive.
3 BY MR. KLINE:
4          Q.    You're referring to Figure
5     1, which will be displayed, where you
6     compare the amount of money that was
7     being spent by Vioxx -- by Merck to do
8     this.
9          You're an academic
10    cardiologist.  Let me understand this.
11    What takes you to the -- what takes you
12    to analyze something like this?  Why are
13    you doing it and why are you saying this
14    to your colleagues?
15         A.    Well --
16         MR. GOLDMAN:  Objection.
17         THE WITNESS:  -- there's
18    many reasons.  Firstly, our
19    patients come in, my patients come
20    and see me and they say, Doctor, I
21    saw the commercial on the Vioxx or
22    the Celebrex, I would like that
23    medicine.  That looks like a good
24    medicine.

1          Or I watch television
2     sometimes, and I might see the
3     advertisement and say, that's
4     concerning, because here we have
5     registered our concerns about
6     heart attack risk, and there's
7     nothing on television to transmit
8     that.
9          And beyond all those, it's
10    the idea that we are responsible
11    for public health.  I mean, that's
12    what medical research is about, is
13    to improve public health, and here
14    we're trying to prevent heart
15    attacks and we've got this
16    countercurrent, this stream of
17    marked promotion, aggressive
18    promotion of a medicine with an
19    unsure safety profile.
20         In fact, we've moved --
21    migrated from unsure to pretty
22    darn sure that it's unsafe, at
23    least in some patients.  So, that
24    is a recipe for trouble.

1 BY MR. KLINE:
2          Q.    Were you, sir --
3          MR. GOLDMAN:  Objection,
4     move to strike as nonresponsive.
5 BY MR. KLINE:
6          Q.    Were you, sir, back here,
7     sitting here in the position as the
8     chairman of the department of
9     cardiovascular medicine of the Cleveland
10    Clinic and the Provost of the Cleveland
11    Clinic and the chief academic officer
12    here, were you here saying to yourself or
13    worried that direct-to-consumer
14    advertising was having an effect on the
15    health and safety of patients when they
16    were taking the drug Vioxx?
17         MR. GOLDMAN:  Objection.
18         THE WITNESS:  Yes.  That
19    back in '97 was when the laws were
20    changed to allow for
21    direct-to-consumer advertising,
22    and so essentially the COX-2 era,
23    the COX-2 inhibitor era, these new
24    medicines, Celebrex and Vioxx,

1     were really the first medicines
2     launched in the direct-to-consumer
3     advertising new era.
4          And the concern there is how
5     many millions of people could
6     rapidly take a medicine without an
7     adequately established safety
8     profile.
9 BY MR. KLINE:
10         Q.    You said here, "Editors of
11    major cardiology journals."  That at one
12    time was you; correct?  Have you been an
13    editor of a major cardiology journal?
14         A.    Not one of the top journals.
15         Q.    I see.
16         So, you were saying,
17    "Editors of major cardiology journals
18    also need to be more cognizant of the
19    effects of publishing biased literature,
20    since this may significantly influence
21    the prescribing habits of practicing
22    physicians."
23         Did you make that statement?
24         MR. GOLDMAN:  Objection.

**KS-000181**

Page 194

```
 1          THE WITNESS:  Yes.
 2          MR. GOLDMAN:  Objection.
 3  BY MR. KLINE:
 4      Q.   Was the literature
 5  published, in particular, the Vioxx VIGOR
 6  trial as published by Merck, biased
 7  literature?
 8          MR. GOLDMAN:  Objection.
 9          THE WITNESS:  I believe
10      there was considerable biased
11      literature that was published with
12      authors either for Merck or
13      consultants of Merck.
14  BY MR. KLINE:
15      Q.   Finally moving ahead, there
16  is a comment that you had in the Lancet.
17  Lancet is a British journal?
18      A.   Yes.
19      Q.   And of the highest caliber;
20  correct?
21      A.   Yes.  It's one of the top
22  three medical journals, the New England
23  Journal, JAMA and the Lancet, yes.
24      Q.   Those are the three?
```

Page 196

```
 1  black-box warning for cardiovascular
 2  patients is indeed troubling.  The coxib
 3  debate will not go away until safety and
 4  efficacy questions are answered; if only
 5  a small fraction of the
 6  direct-to-consumer advertising costs or
 7  revenue were appropriately channeled for
 8  clinical trials, we might be able to have
 9  an enhanced perspective and make sound
10  recommendations for our patients."
11          MR. GOLDMAN:  Objection.
12  BY MR. KLINE:
13      Q.   Did you write that?
14          MR. GOLDMAN:  Objection.
15          THE WITNESS:  Yes,
16      absolutely I wrote that.  I wrote
17      that with Dr. Gary Falk, who is
18      here as a colleague at Cleveland
19      Clinic.
20  BY MR. KLINE:
21      Q.   Okay.
22          Sir, when you did that, were
23  you talking about Merck and their conduct
24  in particular on the drug Vioxx?
```

Page 195

```
 1      A.   Yes.
 2      Q.   And you wrote an article
 3  called, "A coxib a day won't keep the
 4  doctor away"?
 5      A.   Yes.
 6          MR. KLINE:  I marked it as
 7      Exhibit Number 14.
 8          -  -  -
 9          (Whereupon, Deposition
10      Exhibit Topol-14, "A coxib a day
11      won't keep the doctor away,"
12      (Topol, et al), The Lancet Vol
13      364, August 21, 2004, 639-640,
14      was marked for identification.)
15          -  -  -
16          THE WITNESS:  Yes.
17  BY MR. KLINE:
18      Q.   I want to look on Page 2.
19  There's a lot here, but I want to
20  particularly talk about Page 2, all the
21  way at the bottom of the column, after
22  footnote 18 where you reach a conclusion.
23  And you say, "The continued commercial
24  availability of rofecoxib, without a
```

Page 197

```
 1          MR. GOLDMAN:  Objection.
 2          THE WITNESS:  Yes.
 3  BY MR. KLINE:
 4      Q.   And you did believe at that
 5  time that the drug needed a black box
 6  warning; correct?
 7          MR. GOLDMAN:  Objection.
 8          THE WITNESS:  Yes.  We're
 9      now in August of 2004 publishing
10      this.
11  BY MR. KLINE:
12      Q.   Yes, sir.
13      A.   And the extraordinary amount
14  of evidence, not just from VIGOR, but
15  from various other trials and studies,
16  was really quite excessive in my opinion,
17  and that's why the black box warning was
18  long overdue in August 2004.
19      Q.   Do you have a sense of when
20  it was due by?
21          MR. GOLDMAN:  Objection.
22          THE WITNESS:  It could have
23      easily been imposed as of February
24      2001, or if we go back to the Juni
```

KS-000182

Page 198

1     analysis in the Lancet, also
2     published in the Lancet, it could
3     have been back in year 2000. So,
4     somewhere between 2000 and 2001
5     there was more than adequate
6     confirmation.
7         Essentially all you need is
8     VIGOR and study 090 together, and
9     I could take you through the Juni
10    analysis in the Lancet, but that
11    basically crosses the line for
12    proven hazard of heart attacks.
13  BY MR. KLINE:
14      Q.   Did you observe any pattern
15  of conduct by Merck every time or any
16  time an investigator like yourself or
17  Juni did a critical analysis and
18  questioned the safety of the drug Vioxx?
19        MR. GOLDMAN:  Objection.
20        THE WITNESS:  Each time we
21    published a paper or a study was
22    also published by other
23    investigators questioning the
24    safety of Vioxx, there would be

Page 199

1     immediately a PR attack on the
2     report. Merck would refute the
3     findings and/or they would have
4     consultants of theirs refute the
5     findings. So, there was a
6     published and then anti force that
7     would occur without any question.
8   BY MR. KLINE:
9       Q.   Juni article, when it was
10  published, first of all, where was it
11  published?
12      A.   The Juni article was
13  published in November of 2004 in the
14  Lancet.
15      Q.   And who was Juni?
16      A.   Juni, I don't know him, I've
17  never met him, but he's a very highly
18  regarded investigator in Europe out of
19  Switzerland, Peter Juni and colleagues,
20  and they published, I think, quite an
21  important cumulative meta-analysis, where
22  they just looked at the data as it was
23  coming out. And I think that's a very
24  important figure to go at, to look at. I

Page 200

1     believe it's Figure 2 or Figure 3 in that
2     paper, if we can.
3       Q.   Yes.  I actually was trying
4   to get it in front of us.  I didn't have
5   my copy handy, but let's see if we can
6   find it.
7         MR. KLINE:  Let's go off the
8     record for a minute.
9         THE VIDEOTAPE TECHNICIAN:
10    Off the record, 11:55.
11        - - -
12        (Whereupon, a recess was
13    taken from 11:55 a.m. until
14    11:58 a.m.)
15        - - -
16        THE VIDEOTAPE TECHNICIAN:
17    Back on the record, 11:58.
18  BY MR. KLINE:
19      Q.   I wanted to find out what
20  you believed was significant about the
21  Juni article.  You pointed us to --
22        MR. GOLDMAN:  I'm sorry, are
23    we on the record?  Start over.
24        MR. KLINE:  Are we back on

Page 201

1     the record?
2         THE VIDEOTAPE TECHNICIAN:
3     Yes.
4         - - -
5         (Whereupon, Deposition
6     Exhibit Topol-15, "Risk of
7     cardiovascular events and
8     rofecoxib: Cumulative
9     meta-analysis," (Juni, et al) The
10    Lancet, Vol. 364, December 4,
11    2004, 2021-2029, was marked for
12    identification.)
13        - - -
14  BY MR. KLINE:
15      Q.   I referred you to the Juni
16  article as part of our continuing
17  discussion.  You mentioned that the Juni
18  article contained a figure which is
19  worthy of discussion, given the fact that
20  that's what you believe is significant or
21  part of the significant findings.
22        I assume you are referring
23  to the figure which shows the relative
24  risks of myocardial infarction based upon

**KS-000183**

1   many studies that had been done of the
2   drug, clinical trials; is that correct?
3         MR. GOLDMAN:  Objection.
4         THE WITNESS:  I'm referring
5   to Figure 3, which is the
6   so-called cumulative
7   meta-analysis, and what this does
8   is each study as it's done, and
9   these are all studies in patients
10  with arthritis, each study as it's
11  done is put in, and then as the
12  next one comes in, it adds to
13  that, adds to that.  So, you have
14  basically the readout of all the
15  data cumulatively as it's being
16  accrued in the various randomized
17  trials of Vioxx.  And what's
18  interesting here is that up until
19  2000 in the first entry, there's
20  5,193 patients, which is about
21  what was in at the time of the May
22  '99 approval.
23        Then comes the VIGOR trial,
24  which jumps from 5,193 patients to

1   13,269 patients.  And you can see
2   what happens here is that we're
3   almost at a statistically
4   significant two-fold excess of
5   heart attacks and events.
6         But what is interesting is,
7   the next addition is the 978
8   patients.  That's study 090.  And
9   what happens with study 090 is
10  that now we have truly
11  statistically crossed the line,
12  and now no longer are the
13  confidence limits spanning or
14  crossing the line of identity.
15        So, now, if one were to ask
16  when should the drug have not been
17  either on the market or should
18  have been a black box warning
19  because of definitive risks, the
20  Juni meta-analysis answers that,
21  because once you have VIGOR and
22  090, statistically it's proven,
23  without any question, from this
24  analysis.

1         MR. GOLDMAN:  Objection,
2   move to strike, nonresponsive
3   opinion testimony.
4   BY MR. KLINE:
5         Q.   Now, this was published in
6   the Lancet?
7         A.   Yes, in November of 2004.
8         Q.   So, not only could
9   physicians see it, but Merck could see it
10  as well; correct?
11        A.   Yes.
12        Q.   Okay.
13        Did they go about trashing
14  Juni?
15        MR. GOLDMAN:  Objection.
16        THE WITNESS:  As I mentioned
17  earlier, every time a study was
18  published, there was a vehement
19  response to that to try to provide
20  an antidote or a negation of the
21  results, whether it was our study
22  or whether it was other reports.
23        This would have been -- in
24  this case, they said that Dr. Juni

1   and his colleagues didn't include
2   the right trials, and they had all
3   sorts of criticism that I believe
4   was largely unfounded, and there
5   was quite a bit of correspondence
6   in the Lancet that followed this
7   up subsequently.
8   BY MR. KLINE:
9         Q.   I guess one thing that comes
10  to mind, was Juni --
11        MR. GOLDMAN:  Objection,
12  move to strike, nonresponsive.
13  BY MR. KLINE:
14        Q.   Was Juni independent of
15  Merck, from what you knew?
16        A.   Juni was, as best I know,
17  fully independent of Merck.
18        Q.   Now, the drug -- one day you
19  woke up and found that Merck took the
20  drug off the market; correct?
21        A.   Yes.  I think it'd be
22  helpful to review that morning what
23  happened.
24        Q.   Tell me.

**KS-000184**

1        MR. GOLDMAN:  Objection.
2   BY MR. KLINE:
3        Q.   What happened the morning
4   that you got up that Merck took the drug
5   off the market?
6        MR. GOLDMAN:  Objection.
7        THE WITNESS:  On September
8   30, 2004, just over a year ago, I
9   came into work here at the clinic
10  and, oh, somewhere about 8:30 in
11  the morning, later after being
12  here for a while, I got a call
13  from Dr. Richard Pasternak.  Dr.
14  Pasternak, who I knew as a
15  cardiologist and only recently had
16  joined Merck, in fact, I didn't
17  even know he joined Merck until
18  that morning, was calling me
19  somewhere between 8:30 and 9:00 to
20  say that Merck is going to
21  withdraw Vioxx from the market and
22  that we, that is, the Cleveland
23  Clinic team, was right.
24       And I said, well, Richard,

1   can you tell me what were the
2   data?  What was the incidence of
3   the APPROVe trial, which I didn't
4   know much about APPROVe, the colon
5   cancer, colon polyp trial, what
6   were the data?  And he did explain
7   to me that it was 3.5 percent of
8   heart attacks in the Vioxx arm and
9   2.6 -- let's see.  I'm trying to
10  remember the numbers now.  Excuse
11  me.  It was 1.6 excess.  So, it
12  was 1.9 and 3.5.  So, 1.9 percent
13  heart attacks in the placebo arm
14  and 3.5 percent heart attacks in
15  the APPROVe Vioxx arm.
16       And he said, we decided to
17  take the drug off the market and
18  that our work had been prescient,
19  that is, work back three, four
20  years ago.
21  BY MR. KLINE:
22       Q.   This is someone from Merck?
23       A.   Yes.  I hadn't heard from
24  anyone from Merck in quite a long time.

1   So, that morning I got a phone call from
2   Dr. Pasternak.
3        Q.   And did I hear your words
4   that he said to you that the Cleveland
5   Clinic was right and Merck was wrong?
6        MR. GOLDMAN:  Objection.
7        THE WITNESS:  He didn't say
8   that Merck was wrong.  He said,
9   you got it right or you were
10  right, something like that.  He
11  was being supportive.  And he had
12  been an acquaintance and friend
13  for some time, and I believe he
14  only, at that point, had only,
15  within weeks or very recently had
16  joined Merck.
17  BY MR. KLINE:
18       Q.   What was your next
19  involvement?  Tell me the story as it
20  progressed through your eyes.
21       MR. GOLDMAN:  Objection.
22       THE WITNESS:  Well, as the
23  day unfolded, in some ways it was
24  kind of like a nightmare coming

1   true.  Who would want to be right
2   about this?  Why would we want to
3   be right that the heart attacks
4   were being engendered by a
5   medicine?  All we wanted were
6   trials to be done and get to the
7   definitive story here.  We didn't
8   want there to be -- this type of
9   thing to occur, not by any means.
10  But what then started to happen
11  was, the same type of what I
12  viewed as unacceptable publicity
13  about Vioxx was now being
14  disseminated, and this was quite
15  disconcerting, to say the least.
16  BY MR. KLINE:
17       Q.   What are you referring to,
18  sir?
19       MR. GOLDMAN:  Objection,
20  move to strike nonresponsive
21  opinion testimony.
22  BY MR. KLINE:
23       Q.   Dr. Topol, what are you
24  referring to?

KS-000185

Page 210

1    A.   Well, what was being done
2  here is to say, number one, that this was
3  the first time that the company was ever
4  aware of the heart attack risk.
5    Q.   You're referring to Merck's
6  press release?
7    A.   Yes.  That, in fact, that
8  the problems with this drug had never
9  been seen against placebo --
10    MR. GOLDMAN:  Objection to
11  last question.
12    THE WITNESS:  -- or other
13  non-steroidals, only naproxen,
14  which is untrue.
15  BY MR. KLINE:
16    Q.   Sir, I didn't focus, and I
17  apologize.
18    What was the second thing
19  you said?
20    A.   The second point was that
21  they made the claims on that day of
22  withdrawal and subsequently that they had
23  never seen a problem with Vioxx in any
24  trial except against naproxen.

Page 211

1    And that was not true,
2  because in study 090, which was never
3  published, as I've already reviewed,
4  there was a significant 760 percent
5  excess, which somehow or another has been
6  forgotten about.
7    Now, beyond that, they also
8  used numbers that were not being
9  communicated adequately to the public.
10  So, instead of saying 3. -- 1. -- what's
11  the number?  1.5 percent and 3. -- let's
12  see, 1.9 and 3.5 percent, that is -- I
13  can't write it down because I'm not
14  allowed to have any numbers here in front
15  of me.  But instead of saying what the
16  numbers really were in APPROVe, so that
17  the public would know there was a 1.6 per
18  100 or 16 per thousand, no, no, the
19  numbers that were communicated, like in
20  the New York Times that day, were .75 and
21  1.5 per thousand patient years.
22    And reporters, journalists,
23  could not understand those numbers and
24  thought the excess was a fraction of what

Page 212

1  it really was.
2    Q.   Did that disturb you?
3    A.   Yes, it disturbed me,
4  because I spoke to the journalist that
5  day.  Virtually all of them called of the
6  major newspapers, Gina Colata -- Barbara
7  Martinez of the Wall Street Journal, Gina
8  Colata of the New York Times and various
9  others, and they said well, there's not
10  very much difference.  I said, wait a
11  minute, I talked to Dr. Pasternak.
12  Because they said, well, where did you
13  get your information?  This morning.  And
14  the numbers I have suggest a 1.6 per
15  hundred or 16 per thousand excess of
16  heart attacks, which is very different.
17    MR. GOLDMAN:  I tried to
18  make an objection before.  I
19  object to that last answer as
20  nonresponsive.  It calls for
21  opinion testimony, and the
22  previous answer, too.
23    Okay, Tom?
24    MR. KLINE:  Yes.  Not that

Page 213

1  you -- just to the fact that you
2  have objected, and they're
3  preserved.
4  BY MR. KLINE:
5    Q.   Are you saying that the
6  effect here was to distort the data so
7  that it would be both difficult to
8  understand and it would lessen the true
9  impact and nature of the problem?
10    MR. GOLDMAN:  Objection.
11    THE WITNESS:  That's an
12  adequate summary of how I felt
13  that day, yes.
14    MR. KLINE:  All right.
15    Let's take just a brief
16  break, like two to three minutes.
17    THE VIDEOTAPE TECHNICIAN:
18  Off the record at 12:08.
19    - - -
20    (Whereupon, a recess was
21  taken from 12:08 p.m. until
22  12:18 p.m.)
23    - - -
24    THE VIDEOTAPE TECHNICIAN:

**KS-000186**

Page 214

1    Back on the record at 12:18.  Tape
2 Number 3.
3 BY MR. KLINE:
4    Q.   Dr. Topol, thanks for
5 hanging in there.  We're now in the third
6 hour of examination on the subject.
7    One thing that Merck said
8 from the APPROVe study was that there was
9 an increased risk after 18 months.  Do
10 you recall that claim?
11    A.   Yes.
12    Q.   How did you see that in the
13 context of the full picture of the
14 articles?
15    MR. GOLDMAN:  Objection.
16    THE WITNESS:  This was
17 another extremely concerning part
18 of that dissemination on the day
19 of withdrawal, that it took 18
20 months for there to be any risk,
21 because that's not true.
22    In fact, as I reviewed
23 earlier in this deposition, there
24 were four trials that showed that

Page 215

1 the timeline for that was
2 considerably quicker.  In VIGOR,
3 with four to six weeks, there was
4 separation.  In ADVANTAGE, within
5 12 weeks, there was in VICTOR, this was
6 immediate.  And in study 090,
7 within six weeks.
8    And in all of these trials,
9 there were no heart disease
10 patients.  So, it could have been
11 much worse than -- in the days or
12 weeks.  And beyond all that,
13 there's the issue of a problem of
14 statistical power, that is, you
15 have to do a very large trial if
16 you're not expecting adequate
17 number of events, and so none of
18 the trials were adequately powered
19 from a time perspective.
20    But, given all those things,
21 that is, statistical power, lack
22 of cardiovascular patients, and
23 four randomized trials, in
24 addition to the Juni analysis,

Page 216

1 there's a pretty strong case that
2 the risk of Vioxx for heart
3 attacks can occur at any time
4 after the initiation of the
5 medicine.
6    MR. GOLDMAN:  Objection,
7 move to strike, nonresponsive,
8 opinion.
9 BY MR. KLINE:
10    Q.   What you've stated to us is
11 your conclusion, based on your review of
12 all of the information which you cited;
13 is that correct?
14    MR. GOLDMAN:  Objection.
15    THE WITNESS:  Yes.
16 BY MR. KLINE:
17    Q.   By that time or by the
18 time -- by today, by today there were
19 studies done by -- let's see, there was a
20 study done by Ray, correct, in Lancet, in
21 '02, the Ray study?
22    A.   Yes.
23    Q.   I'm talking epidemiology
24 studies.

Page 217

1    A.   There were two Ray studies
2 in the Lancet.
3    Q.   Did that show an increased
4 risk of heart attacks?
5    MR. GOLDMAN:  Objection.
6    THE WITNESS:  Yes.
7 BY MR. KLINE:
8    Q.   There was a study by Solomon
9 in Circulation in 2004.  I'm talking just
10 the epidemiological studies.  Did that
11 show an increased risk of heart attacks?
12    MR. GOLDMAN:  Objection.
13    THE WITNESS:  Yes.
14 BY MR. KLINE:
15    Q.   There was a study by Graham
16 in Lancet in 2005, which we'll get to.
17 Did that show an increased risk of heart
18 attacks?
19    MR. GOLDMAN:  Objection.
20    THE WITNESS:  Yes.
21 BY MR. KLINE:
22    Q.   There was a study by Kimmel
23 in the Annals of Internal Medicine
24 published, I'm not sure when.  Did that

**KS-000187**

Page 218

1   show an increased risk of heart attacks?
2           MR. GOLDMAN:  Objection.
3           THE WITNESS:  Yes.
4   BY MR. KLINE:
5       Q.   There was a study by
6   Levesque, L-E-V-E-S-Q-U-E.  Did that show
7   an increased risk of heart attacks?
8           MR. GOLDMAN:  Objection.
9           THE WITNESS:  Yes.
10  BY MR. KLINE:
11      Q.   Now, I'd like to go back to
12  VIGOR because I didn't cover this, and I
13  think it's essential.
14          In VIGOR, you have a series
15  of criticisms of VIGOR about the data and
16  about -- and I had that in the memo that
17  you wrote to Graham originally.  You
18  cited scientific misconduct in the VIGOR
19  trial, and I think I glossed over this,
20  and I don't want to miss it.
21          You said there were errors
22  of omissions --
23          MR. GOLDMAN:  Do you have a
24      document?

Page 219

1           MR. KLINE:  I'm back to the
2       Graham thing, which is Exhibit 2.
3   BY MR. KLINE:
4       Q.   You said there were "errors
5   of omission (deaths)."  Please explain.
6   You're talking about what Merck did that
7   constituted scientific misconduct.
8   That's the point I'm at.
9           MR. GOLDMAN:  Objection, and
10      can I have the same standing
11      objection about this document that
12      I had before?
13          MR. KLINE:  Yes.
14  BY MR. KLINE:
15      Q.   Scientific misconduct in
16  VIGOR by Merck.  First of all, you said
17  there were "errors of omission."  Please
18  explain concisely.
19          MR. GOLDMAN:  Objection.
20          THE WITNESS:  I summarized
21      this in the letter in the New
22      England Journal, which goes
23      through the VIGOR correct data, as
24      compared to the data that was in

Page 220

1       the manuscript from November of
2   2000.
3   BY MR. KLINE:
4       Q.   Is that a good place to go
5   to find it?
6           MR. GOLDMAN:  Objection.
7           THE WITNESS:  I really
8       believe you should get this
9       document to look at --
10  BY MR. KLINE:
11      Q.   Let's.
12      A.   -- because together we can
13  take you through this quickly.
14      Q.   Fine.
15          Let's look at the New
16  England Journal of Medicine editorial.
17      A.   No, letter.
18      Q.   I'm sorry, letter.
19      A.   December 30, 2004.
20      Q.   December 30, 2004.
21      A.   Right.  It's a
22  correspondence based on the editorial.
23      Q.   Okay.
24          Let me get that in my hand.

Page 221

1   We have it.
2       A.   Good.
3       Q.   How many articles and
4   editorials have you published in the
5   medical literature, Dr. Topol, relating
6   to the Vioxx and the COX-2s?
7       A.   There have been 16 articles
8   and editorials published.
9       Q.   And what you've done in
10  those is to put your views out in front
11  of the medical world at large to let them
12  know what you're thinking?
13          MR. GOLDMAN:  Objection.
14          THE WITNESS:  Yes.  And a
15      few of those were actually
16      directed to the lay public.
17  BY MR. KLINE:
18      Q.   Okay.
19          Do you have the reply in
20  front of you?
21      A.   Yes.
22      Q.   All right.
23          Now, my purpose is to go
24  through your criticisms of the VIGOR

KS-000188

Page 222

1   trial and what you think Merck did that
2   constitutes scientific misconduct.  Can
3   you do so, sir?
4         MR. GOLDMAN:  Objection.
5         THE WITNESS:  Yes.
6   BY MR. KLINE:
7     Q.   Please.
8         MR. GOLDMAN:  Objection.
9         THE WITNESS:  Okay.
10      So, what I cited here in
11   this correspondence is how the
12   article in the New England
13   Journal -- this goes back to what
14   we discussed earlier today, which
15   is when the paper was published in
16   November 2000 as compared to the
17   FDA documents that we have a
18   chance to review in February of
19   2001, there was -- there were
20   gross discrepancies, which is why
21   we had contacted Merck in the
22   first place about this manuscript.
23      Then, finally, we had the
24   ability to work with the New

Page 223

1   England Journal of Medicine
2   editors, Dr. Curfman, Dr. Drazen,
3   and to figure out what was going
4   on.
5      Now, as it turns out, in the
6   VIGOR manuscript, in the New
7   England Journal in 2000, in three
8   times in the paper, this is first
9   authored by Bombardier, and three
10   times it says that the mortality
11   was the same between naproxen and
12   Vioxx.  And that was untrue.
13      In fact, there was a 46
14   percent difference.  There were 22
15   deaths in the Vioxx arm versus 15
16   deaths in the naproxen arm.  And
17   so instead of presenting the
18   deaths as they should, the authors
19   only used percentages, rounded
20   them off, but moreover, they
21   asserted strongly in three
22   different places that the
23   mortality was the same.  So,
24   that's issue number one.

Page 224

1      Issue number two with that
2   manuscript --
3   BY MR. KLINE:
4     Q.   Before you get to issue
5   number two, if you remember, how do you
6   view that conduct?  What word would you
7   use to describe it?
8         MR. GOLDMAN:  Objection.
9         THE WITNESS:  We're talking
10   about deaths, and we're talking
11   about false assurances that the
12   mortality was the same in three
13   prominent places in the
14   manuscript.
15   BY MR. KLINE:
16     Q.   Outrageous?
17         MR. GOLDMAN:  Objection.
18         THE WITNESS:  I believe it's
19   highly misleading.
20   BY MR. KLINE:
21     Q.   Go ahead.
22     A.   The second issue was the
23   false data regarding heart attacks.  So,
24   instead of a five-fold increase, which we

Page 225

1   know is true at the bare minimum, because
2   there wasn't the right adjudication in
3   this trial as we learned and I reviewed
4   earlier from the Targum report, but now
5   we're talking about that the authors knew
6   the correct number of heart attacks.
7      They could have fixed the
8   galley proofs, and this is told to me by
9   the editors of the New England Journal,
10   but they decided to give the correct
11   numbers in the published New England
12   Journal paper.  So, they had a four-fold
13   increase in heart attacks rather than a
14   five-fold increase in heart attacks.
15      And that is erroneous, and
16   that appears to be, best I can
17   reconstruct with the New England Journal
18   editors, an error of commission.
19         MR. GOLDMAN:  Objection,
20   move to strike as nonresponsive.
21   BY MR. KLINE:
22     Q.   And the third?
23     A.   The third is, rather than
24   report any of the other clotting events,

KS-000189

Page 226

1  like strokes, like transient ischemic
2  attacks, like unstable angina, like
3  peripheral arterial thrombosis, like
4  venous thrombosis, like pulmonary
5  embolism, none of these were reported in
6  the New England Journal of Medicine
7  paper.
8      Q.   You also state on the top of
9  a column on Page 2878 of your
10  correspondence, which is now marked as
11  exhibit --
12          MR. HAMELINE: 16.
13              - - -
14          (Whereupon, Deposition
15      Exhibit Topol-16, "Rofecoxib,
16      Merck, and the FDA," (Kim et al),
17      N Engl J Med 351;27 December 30,
18      2004, 2875 - 2878, was marked for
19      identification.)
20              - - -
21  BY MR. KLINE:
22      Q.   -- 16, thank you.
23          You state here, something we
24  talked about earlier, which is, "We

Page 227

1  indeed" -- top of the second column,
2  2878.
3          "We indeed acknowledged that
4  naproxen may have a cardioprotective
5  effect, but the magnitude of the effect
6  would be unlikely to exceed that of
7  aspirin, at a 25 percent reduction of
8  heart attacks. Instead, in the VIGOR
9  trial, there was a 500 percent increase
10  in heart attacks. This makes any
11  'naproxen hypothesis' of cardioprotection
12  mathematically indefensible." Correct?
13  Your words?
14          MR. GOLDMAN: Objection and,
15      Tom, I didn't get the chance to
16      object to the previous answer.
17          MR. KLINE: You have the
18      objection.
19          THE WITNESS: I wrote this.
20      These are my words, absolutely.
21  BY MR. KLINE:
22      Q.   And you said in this article
23  or this correspondence, putting out there
24  for the public, for the medical

Page 228

1  community, a little further down, "There
2  were no differences in the rate of
3  perforation (0.1 percent in...rofecoxib
4  and naproxen groups)."
5          Your words, "It is hard to
6  imagine that the small protection from
7  gastric or duodenal ulcers in the VIGOR
8  trial is an acceptable trade-off as
9  compared with twice the incidence of
10  death, heart attacks, and strokes."
11          Did you write those words?
12          MR. GOLDMAN: Objection.
13          THE WITNESS: Yes, I
14      certainly did.
15  BY MR. KLINE:
16      Q.   And were you doing a
17  risk/benefit analysis there in your mind?
18          MR. GOLDMAN: Objection.
19          THE WITNESS: Yes.
20  BY MR. KLINE:
21      Q.   And were you weighing the
22  risk of pain medication versus the risk
23  of dying from a disease that -- let me
24  start again.

Page 229

1          Were you weighing the risk
2  of pain relief versus death?
3          MR. GOLDMAN: Objection.
4          THE WITNESS: We were
5      weighing -- I was weighing, when I
6      wrote that statement, the risk of
7      heart attacks principally versus
8      the small protection from
9      significant stomach complications.
10  BY MR. KLINE:
11      Q.   Okay.
12          Let me move on. So much to
13  cover.
14          The drug is withdrawn
15  September 30th of 2004. You told me what
16  happened when you knew then. You put
17  paper to pen and you did an op/ed piece
18  for the New York Times; correct?
19      A.   That's correct.
20      Q.   Couple of sentences. Why?
21          MR. GOLDMAN: Objection.
22  BY MR. KLINE:
23      Q.   Why did you do that?
24      A.   I was extremely upset by the

KS-000190

58 (Pages 226 to 229)

Page 230

1   way this was being handled and the
2   misinformation that was in the first 24
3   hours of the Vioxx withdrawal.
4        Q.   Was it a reaction to Merck's
5   public statements, which you've described
6   and critiqued for the jury already?
7        A.   Yes.
8            MR. GOLDMAN:  Objection.
9            THE WITNESS:  Yes, that, in
10      fact, the word that this was the
11      first time they had ever known
12      that this was a problem and that
13      the incidence not be reported in a
14      responsible -- for the public
15      fashion that they could understand
16      and all the other things that we
17      had already reviewed.
18               - - -
19          (Whereupon, Deposition
20      Exhibit Topol-17, "Good Riddance
21      to a Bad Drug," (Topol) New York
22      Times Reprint, October 2, 2004,
23      (2 pages), was marked for
24      identification.)

Page 231

1               - - -
2   BY MR. KLINE:
3        Q.   While you're testifying,
4   we'll show this to the jury.  It's a
5   document which is entitled, "Good
6   Riddance to a Bad Drug."
7            Let me start with this, sir,
8   because I've seen this in your writings.
9            Was Vioxx and is Vioxx a
10  dangerous drug?
11           MR. GOLDMAN:  Objection.
12           THE WITNESS:  Let me first
13      start off by saying I didn't title
14      this, New York Times op/ed.  I
15      learned, since this was the first
16      op/ed I had in the New York Times,
17      that you don't get a right to pick
18      your title.
19           My title was "Vioxx
20      Vanquished," but the editor of the
21      New York Times of the op/ed picked
22      this one, and I didn't know it
23      until it was actually published.
24  BY MR. KLINE:

Page 232

1        Q.   Did you approve it?
2            MR. GOLDMAN:  Objection.
3   I'm sorry.  Objection,
4   nonresponsive.
5            THE WITNESS:  It was
6       probably different than what I was
7       trying to convey, because what I'm
8       trying to convey in this op/ed is
9       that Vioxx had a risk that had
10      never been adequately defined,
11      that overall it was unacceptable,
12      that the whole class of COX-2
13      inhibitors was suspect, and that
14      we can't tolerate this sort of
15      situation where a medicine is
16      being mass marketed, and it could
17      induce tens of thousands of heart
18      attacks and without the
19      appropriate studies.  So, the FDA
20      is involved in this as well, in
21      this op/ed.
22           So, there are many things,
23      but alerting the public who read
24      the New York Times about that it

Page 233

1       is not safe necessarily for any
2       COX-2 inhibitor, which is in here,
3       about naproxen and Aleve, Motrin,
4       all these other possible
5       alternatives, and some of the
6       lessons that we need to learn from
7       this, and most importantly was the
8       statement that our two most common
9       deadly diseases should not be
10      caused by a drug.
11           MR. GOLDMAN:  Objection,
12      move to strike as nonresponsive.
13  BY MR. KLINE:
14       Q.   Is that what you were trying
15  to convey, what you just said?
16       A.   Yes.
17       Q.   And when you conveyed it, on
18  the second page you listed two points and
19  you say, "Second, and what may be more
20  alarming, is that despite studies showing
21  the magnitude of the public health
22  problem, for several years Merck did
23  nothing to investigate."
24           Is that the message you

**KS-000191**

59 (Pages 230 to 233)

Page 234

1   wanted to convey as well?
2        MR. GOLDMAN:  Objection.
3        THE WITNESS:  That was a
4   critical message that probably was
5   conveyed innumerable times over
6   these last five years.
7   BY MR. KLINE:
8        Q.   You stated, "This surely
9   represents a conflict between the
10  interests of the public and the interests
11  of a company with a blockbuster drug that
12  had sales of 2.5 billion in 2003."
13       Did you write that in the --
14  for the New York Times?
15       MR. GOLDMAN:  Objection.
16       THE WITNESS:  Yes.
17  BY MR. KLINE:
18       Q.   You stated, "At the same
19  time, Merck spent at least $100 million a
20  year for direct-to-consumer Vioxx
21  advertising, while the company's
22  employees and their consultants published
23  several papers in medical journals
24  rebutting studies reporting Vioxx's heart

Page 235

1   attack risk."
2        Did I read that correctly?
3        MR. GOLDMAN:  Objection.
4        THE WITNESS:  Yes, you did.
5   BY MR. KLINE:
6        Q.   And you describe this as
7   "the Vioxx debacle."  Were those your
8   words?
9        MR. GOLDMAN:  Objection.
10       THE WITNESS:  That is my
11  phrase, "As the Vioxx debacle
12  shows," yes.
13  BY MR. KLINE:
14       Q.   You, later in 2004 in that
15  Cleveland Clinic article, and I'm trying
16  to put it in front of me, described this
17  whole thing as the rofecoxib debacle,
18  same language; correct?
19       MR. GOLDMAN:  Objection.
20       THE WITNESS:  Yes.
21  BY MR. KLINE:
22       Q.   Now, let's move on.
23       You then move to publishing
24  an editorial in the New England Journal

Page 236

1   of Medicine; correct?
2        A.   Yes.
3        Q.   Now, you've stated what you
4   believe for the lay consumption.  Now
5   you're stating it in the medical
6   literature; correct?
7        MR. GOLDMAN:  Objection.
8        THE WITNESS:  Yes.  The New
9   England Journal editors read my
10  op/ed in the New York Times and
11  called me that weekend on that
12  Saturday.
13  BY MR. KLINE:
14       Q.   They called you?
15       A.   They called me at home and
16  said, would you be kind enough to write
17  an editorial for the medical community
18  now that you've written one for the
19  public?  And I said I'd be happy to do
20  that.
21       MR. GOLDMAN:  I'll try to
22  insert an objection to the last
23  question.
24       MR. KLINE:  Preserved.

Page 237

1   BY MR. KLINE:
2        Q.   Continue.
3        Do you have anything else on
4   that?
5        A.   So, by the invitation of the
6   New England Journal, I wrote this
7   editorial that was posted on their
8   website in early October, just days after
9   the op/ed.
10       - - -
11       (Whereupon, Deposition
12       Exhibit Topol-18, "Failing the
13       Public Health - Rofecoxib, Merck,
14       and the FDA (Topol) N Engl J Med
15       351;17 October 21, 2004,
16       1707-1709, was marked for
17       identification.)
18       - - -
19  BY MR. KLINE:
20       Q.   I want to run through a
21  number of things.  Let's try to tick them
22  off as points.  I just have to cover so
23  much.
24       You talked about the fact

KS-000192

Page 238

1  that a trial was never done; correct?
2         MR. GOLDMAN:  Objection.
3         THE WITNESS:  Yes.
4         MR. GOLDMAN:  Doctor, if you
5  would please.
6         THE WITNESS:  I'm sorry.
7  BY MR. KLINE:
8      Q.   Meaning a large scale
9  randomized study; correct?
10        MR. GOLDMAN:  Objection.
11        THE WITNESS:  Yes.
12  BY MR. KLINE:
13     Q.   Just wait for him, he'll
14  undoubtedly object, you'll then get to
15  give your answer.
16        You then got to talk about
17  the Merck message and how Merck conveyed
18  a message that the drug was safe;
19  correct?
20        MR. GOLDMAN:  Objection.
21        THE WITNESS:  Yes.
22  BY MR. KLINE:
23     Q.   And you disapproved of that;
24  correct?

Page 239

1         MR. GOLDMAN:  Objection.
2         THE WITNESS:  Yes.
3  BY MR. KLINE:
4      Q.   On Page 1708 of the article,
5  in the first full paragraph, you say, and
6  we've covered this in a different form,
7  you actually say it in print here, "Each
8  time a study was presented or published,
9  there was a predictable and repetitive
10  response" by "Merck, which claimed that
11  the study was flawed and that only
12  randomized, controlled trials were
13  suitable for determining whether there
14  was any risk.  But if Merck would not
15  initiate an appropriate trial and the FDA
16  did not ask them to do so, how would the
17  truth ever be known?"
18        Was that your --
19        MR. GOLDMAN:  Objection.
20  BY MR. KLINE:
21     Q.   Was that your thinking at
22  that point in time?
23     A.   Yes.
24        MR. GOLDMAN:  Objection.

Page 240

1  BY MR. KLINE:
2      Q.   Is that still your thinking
3  today?
4         MR. GOLDMAN:  Objection.
5         THE WITNESS:
6  Unquestionably.
7             -  -  -
8         (Whereupon, Deposition
9  Exhibit Topol-19, "Risk of acute
10  myocardial infarction and sudden
11  cardiac death in patients treated
12  with cyclo-oxygenase 2 selective
13  and non-selective non-steroidal
14  anti-inflammatory drugs..."
15  (Graham, et al), The Lancet, Vol.
16  365, February 5, 2005, 475-481,
17  was marked for identification.)
18             -  -  -
19  BY MR. KLINE:
20     Q.   You then cited the Graham
21  study.  Now, I started this deposition by
22  some discussion that you had with David
23  Graham, who was at the FDA; correct?
24     A.   Yes.

Page 241

1         MR. KLINE:  Whoa, we had a
2  question without an objection.
3  Hallelujah.
4  BY MR. KLINE:
5      Q.   And what did Graham
6  conclude?
7         MR. GOLDMAN:  Objection.
8         THE WITNESS:  He concluded
9  from a very large population study
10  done with the Kaiser Foundation
11  that there was a very high risk of
12  heart attacks with Vioxx,
13  especially in higher doses, but
14  across the board compared to the
15  other conventional nonsteroidal
16  agents.
17  BY MR. KLINE:
18     Q.   Were you in contact with
19  Graham in the period of time in late
20  2004?
21     A.   Yes.  I had some phone
22  discussions and a couple of e-mails back
23  and forth in that time frame.
24     Q.   From what you learned in

**KS-000193**

Page 242

1  e-mails and phone discussions, was he
2  under pressure not to publish his
3  results?
4        MR. GOLDMAN:  Objection.
5        THE WITNESS:  He conveyed
6    that to me aptly.
7  BY MR. KLINE:
8    Q.   What did you learn, sir?
9        MR. GOLDMAN:  Objection.
10        THE WITNESS:  I learned that
11    the FDA, his superiors, did not
12    want him to publish that
13    particular paper, which eventually
14    appeared in Lancet, and according
15    to him and according to the
16    reports about this, and according
17    to the editor at Lancet, FDA tried
18    to suppress that publication.
19  BY MR. KLINE:
20    Q.   It was published by Lancet?
21        Was it published by Lancet?
22    A.   Yes.
23    Q.   And was it one more piece of
24  evidence that you were -- that was now in

Page 243

1  your knowledge bank?
2        MR. GOLDMAN:  Objection.
3        THE WITNESS:  It was one of
4    seven epidemiologic studies
5    published to this point in time,
6    and all but one of them showing a
7    very significant excess of heart
8    attacks with Vioxx.
9  BY MR. KLINE:
10    Q.   Was everyone --
11        MR. GOLDMAN:  Objection,
12    move to strike as nonresponsive.
13  BY MR. KLINE:
14    Q.   And was every one of those
15  seven studies done by someone who was not
16  affiliated with Merck?
17        MR. GOLDMAN:  Objection.
18  BY MR. KLINE:
19    Q.   Those epidemiological
20  studies?
21    A.   Well, some of the authors
22  could have been affiliated with Merck.
23  Like, for example, the Solomon paper,
24  there had been a Merck statistician,

Page 244

1  epidemiologist, Carolyn Cannuscio, who
2  was involved, but then she was deleted at
3  the request of Merck, and I spoke about
4  that with Carolyn, but she had to have
5  her name taken off the paper in
6  Circulation, which was one of the
7  epidemiologic studies.
8        MR. GOLDMAN:  Objection,
9    move to strike, nonresponsive.
10  BY MR. KLINE:
11    Q.   What did she tell you, if
12  anything, about why her name was removed?
13        MR. GOLDMAN:  Objection.
14        THE WITNESS:  She told me in
15    a phone conversation in October of
16    '04 that she was very distraught
17    about the fact that she had done
18    extensive work with the team in
19    Boston, at Harvard, and that at
20    the last minute, after having been
21    on the paper, manuscript
22    submission, she had to have her
23    name taken off at the request of
24    Merck, because they did not agree

Page 245

1    with the conclusions of the study.
2  BY MR. KLINE:
3    Q.   Okay.
4        I want to show you an e-mail
5  that you had between yourself and David
6  Graham.  We covered this way earlier, but
7  I want to make sure that whoever hears
8  this knows who Graham was.  Please.  Who
9  is Graham?
10    A.   David Graham is a safety
11  officer at the FDA.
12        - - -
13        (Whereupon, Deposition
14    Exhibit Topol-20, E-mails, TOPOLE
15    0000458, was marked for
16    identification.)
17        - - -
18  BY MR. KLINE:
19    Q.   I'm marking this as Exhibit
20  Number 20.  It's an e-mail between
21  yourself and Graham, and you say in yours
22  on the bottom, it's an e-mail dated
23  November 15, 2004, you say, "David, I
24  attach my analysis of the 2 trials

KS-000194

Page 246

1    submitted to FDA as part of Supplement
2    007."
3            What are you referring to?
4            MR. GOLDMAN:  Objection.
5            THE WITNESS:  That's the FDA
6        supplement of the three trials,
7        090, 085 and VIGOR.
8    BY MR. KLINE:
9        Q.   One never published, that
10   referring to 090?
11       A.   090 never published.
12       Q.   "I'd be interested in your
13   thoughts as I think this, along with the
14   Juni paper, nails this down as to when
15   there was confirmatory evidence that
16   rofecoxib was," to use your words, "a
17   dangerous drug."
18           Did you write that?
19           MR. GOLDMAN:  Objection.
20   Can I have a standing objection to
21       the use of this document and the
22       testimony about it?
23           MR. KLINE:  Yes.  You can
24       have a standing objection.

Page 247

1        Whether it be successful is
2        another story.
3    BY MR. KLINE:
4        Q.   "A dangerous drug," you say.
5    It nails down "when there was
6    confirmatory evidence."  So, I have to
7    ask you, what is that date that you can
8    nail down, your private words to David
9    Graham, safety officer of the FDA, when
10   can you nail down when there was
11   confirmatory evidence that Vioxx was a
12   dangerous drug?
13       A.   The paper that I reviewed
14   earlier, the Juni paper that shows that
15   time cumulative analysis, shows in 2000,
16   when VIGOR and 090 are put together,
17   that's when you cross the line of
18   statistical significance, and that's the
19   definition of a dangerous drug.
20       Q.   Now --
21           MR. GOLDMAN:  I'm sorry.
22       Objection, move to strike as
23       nonresponsive.
24   BY MR. KLINE:

Page 248

1        Q.   If you look at David
2    Graham's response, he says to you in the
3    second paragraph, "Each day the issue
4    gets more and more complicated and fishy
5    smelling.  Apparently, Merck was heavily
6    lobbying the members of the Finance
7    Committee to cancel the hearing today,
8    and our acting center director, Dr.
9    Galson, has reportedly refused to appear
10   before the Committee."
11           Skipping down a little bit.
12   Anyone who wants to fill in later, may.
13           "But it does make you
14   wonder, why is everyone afraid and what
15   are they trying to hide?"
16           That was his response to
17   you.
18           MR. GOLDMAN:  Objection.
19   BY MR. KLINE:
20       Q.   Did you receive that
21   response?
22       A.   Yes.
23       Q.   And did you recognize that
24   it was coming from a safety officer at

Page 249

1    the FDA?
2        A.   Certainly.
3        Q.   And did you essentially have
4    those same sentiments?
5            MR. GOLDMAN:  Objection.
6    BY MR. KLINE:
7        Q.   Did you share his
8    sentiments?
9        A.   I shared Dr. Graham's
10   sentiments in this regard.
11       Q.   David Graham had written to
12   you that -- and I'm showing you another
13   document, which is marked as 000333,
14   which I will mark, but it's a sentence or
15   two, so, I'll read to keep this thing
16   going.
17           He says -- there was some
18   thought that he would go on 60 Minutes,
19   and you were aware of that fact; correct?
20       A.   Yes.
21       Q.   You ended up -- did you end
22   up publicly speaking on 60 Minutes?
23       A.   Yes.
24       Q.   Did you consider it was

KS-000195

Page 250

1  important to participate in public
2  information to the general public
3  regarding the drug Vioxx?
4        MR. GOLDMAN:  Objection.
5        THE WITNESS:  Yes.  Just as
6  in writing the New York Times
7  op/ed, it was the same thing about
8  getting the public fully informed,
9  appropriately informed.
10        MR. KLINE:  Can I have 0333?
11        MS. DAGOSTINO:  I just gave
12  it to you.
13          - - -
14        (Whereupon, Deposition
15  Exhibit Topol-21, E-mails, TOPOLE
16  0000333, was marked for
17  identification.)
18          - - -
19  BY MR. KLINE:
20     Q.   That's marked now as Exhibit
21  Number 21.
22        He writes to you, "Eric, My
23  perspective and resolve are unchanged.
24  If I went public on 60 Minutes, I think

Page 251

1  the retaliation I would experience would
2  be blistering."
3        Skipping down below.
4  "Internally, the last 2 weeks have been
5  absolute hell."
6        By the way, sir, if I can
7  pause for a minute.  Has Merck made life
8  absolute hell for people who criticize
9  them?
10        MR. GOLDMAN:  Objection, and
11  can I have a standing objection to
12  the use of this document?
13        MR. KLINE:  Yes.
14        THE WITNESS:  I believe that
15  is the case, that is, there have
16  been retaliation and actions taken
17  to make life extremely difficult
18  for people who have objected to
19  their work, to their studies or to
20  the lack of studies.
21  BY MR. KLINE:
22     Q.   Now, let me switch gears and
23  talk to you about what you did in
24  connection with 60 Minutes.

Page 252

1        MR. KLINE:  Can someone tell
2  me about how much time is left?
3  About a half an hour?
4        THE VIDEOTAPE TECHNICIAN:
5  About half an hour.
6        MR. KLINE:  Okay, good.
7  BY MR. KLINE:
8     Q.   Now, let me move ahead.
9        There were Senate hearings;
10  correct?
11        MR. GOLDMAN:  Objection.
12        THE WITNESS:  The 60 Minutes
13  was before the Senate hearings.
14  BY MR. KLINE:
15     Q.   60 minutes was before --
16     A.   It was a Sunday --
17        MR. KLINE:  So, that only
18  goes to show you, the objection
19  was to being a leading question,
20  and I had the leading question
21  wrong.
22        MR. GOLDMAN:  There were
23  several bases for the objection.
24  BY MR. KLINE:

Page 253

1     Q.   Go ahead.
2     A.   Sunday, the 14th, was the 60
3  Minutes segment, and Thursday, the 18th,
4  it was coordinated between the Senator
5  Grassley staffers and the 60 Minutes.
6     Q.   I see.
7        And you appeared on 60
8  Minutes, as we know; correct?
9     A.   Yes.
10        MR. KLINE:  I'm asking Lisa,
11  how difficult is it to show the
12  clip?
13        MS. DAGOSTINO:  Not
14  difficult.  Can we switch over?
15  Give me a second, please.
16        MR. KLINE:  We're going to
17  need to do a little bit of a
18  switch, and then I want to talk to
19  you about what you said.
20        Do you want to pause the
21  tape until we get set up?
22        THE VIDEOTAPE TECHNICIAN:
23  Off the record at 12:47.
24          - - -

KS-000196

Page 254

1      (Whereupon, a recess was
2   taken from 12:47 p.m. until
3   12:48 p.m.)
4         - - -
5      THE VIDEOTAPE TECHNICIAN:
6   Back on the record at 12:48.
7   BY MR. KLINE:
8      Q.   Okay.
9          You were both filmed in your
10  duties at the Cleveland Clinic.  I
11  believe there's some footage of you
12  actually in the capacity of doing
13  clinical work, and then you were
14  interviewed in New York; is that correct?
15     A.   That's right.
16     Q.   Okay.
17         Let me show you clip number
18  1.
19         (Whereupon the following was
20  played:
21      "MR. BRADLEY:  Dr. Eric
22  Topol, chief of cardiovascular
23  medicine of the Cleveland Clinic
24  was Merck's first and most

Page 255

1   persistent critic.  In 2001, he
2   conducted a statistical analysis
3   of all the available data about
4   Vioxx.  His study was published in
5   the Journal of the American
6   Medical Association.
7      "And specifically, your
8   study that came out after the
9   VIGOR study found what?
10     "DR. TOPOL:  That study
11  which looked at all the data
12  available for both the medicines
13  of these COX-2 inhibitors and all
14  other medicines, including
15  aspirin, that were available,
16  showed a very substantial worry
17  risk of heart attacks and strokes
18  across the board from the VIGOR
19  trial and about Vioxx."
20  BY MR. KLINE:
21     Q.   Confirm for me that you made
22  those statements and that that appears --
23  and that that is an accurate
24  representation of what you said to

Page 256

1   millions of people.  Is that correct?
2      MR. GOLDMAN:  Can I have a
3   standing objection to the use of
4   the 60 Minutes --
5      MR. KLINE:  Yes.  I'll
6   rephrase the question.
7      MR. GOLDMAN:  -- and any
8   questions about it?
9   BY MR. KLINE:
10     Q.   Is that what you said on 60
11  Minutes, sir?
12     A.   It certainly was.
13     Q.   And did you mean it then?
14     MR. GOLDMAN:  Objection.
15     THE WITNESS:  I stand by the
16  statement.
17  BY MR. KLINE:
18     Q.   And did you feel it
19  necessary to be on that show and to tell
20  the public what you thought?
21     MR. GOLDMAN:  Objection.
22     THE WITNESS:  Without any
23  question.
24     MR. KLINE:  Next clip.

Page 257

1      (Whereupon the following was
2   played:
3      "DR. TOPOL.  Merck took on
4   any study that questioned the
5   safety of Vioxx with respect to
6   the heart attacks and strokes, any
7   study.
8      "MR. BRADLEY:  But can't
9   they say, on the other hand, okay,
10  there are always dissenters, we've
11  got these other studies that say
12  the drug is fine?
13     "DR. TOPOL:  Whenever you
14  find a problem and you're thinking
15  maybe it's not a problem, you want
16  to see if there's independent
17  replication.  So, if you have
18  study 090 and you want to discount
19  that somehow, then you have VIGOR,
20  you've got two trials now, you
21  have essentially lightning
22  striking twice.  That's
23  independent replication.  That's
24  really serious confirmation.  This

KS-000197

65 (Pages 254 to 257)

Page 258

1    is unequivocal.  This is a
2    problem.
3          "MR. BRADLEY:  Did you ever
4    talk to Merck officials about
5    that?
6          "DR. TOPOL:  I tried.  I
7    called Mr. Gilmartin, the CEO, and
8    the director of research, Dr.
9    Peter Kim, on multiple occasions
10   asking to discuss this, but the
11   calls were never returned."
12   BY MR. KLINE:
13         Q.   Did you make those
14   statements on 60 Minutes as well?
15         A.   I certainly did.
16         Q.   Dr. Gilmartin and Dr. Kim,
17   tell me about that.
18         I'm sorry.
19         Mr. Gilmartin, the M.B.A.,
20   and Dr. Kim, the Ph.D., did you call --
21   neither are medical doctors, I might add.
22         Did you talk to -- in fact,
23   I think Dr. Kim started medical school
24   but didn't finish.  A little side point.

Page 259

1          Here's the question.
2          Did Dr. --
3          Tell me about when you
4    called Dr. Kim and Mr. Gilmartin.
5          MR. GOLDMAN:  Objection.
6          THE WITNESS:  So, in 2001,
7    when we started to get very
8    uncomfortable about the data, I
9    started attempting to reach either
10   Mr. Gilmartin or, at the time, it
11   was Dr. Scolnick, and then later
12   he was replaced by Dr. Kim as the
13   chief scientific officer, and I
14   did not get any responses.
15         I worked with a friend at
16   Merck named Durga Bobba, who I
17   knew very well from this clinical
18   trial we had done, and also I
19   talked with other researchers like
20   Dr. Demopoulos, Dr. DiBattiste,
21   but I never could get any
22   communication established.  No
23   calls were responded -- would be
24   returned from Merck.

Page 260

1    BY MR. KLINE:
2          Q.   Why were you, a head person
3    at the Cleveland Clinic, not received by
4    either Mr. Gilmartin or by the top Merck
5    researcher, Dr. Kim, and do you think --
6    would the ordinary course of who you were
7    and who they were have necessitated them
8    to take your call?
9          MR. GOLDMAN:  Objection.
10   BY MR. KLINE:
11         Q.   Go ahead.
12         A.   I don't know any
13   pharmaceutical company CEO that wouldn't
14   return my call, this was unprecedented,
15   no less the chief scientific officer.  I
16   know most of the large pharma and device
17   company CEOs, they know me, and they
18   would return my calls as a courtesy.
19   Maybe not within minutes, but certainly
20   within hours or a day or two.
21         MR. KLINE:  Let's play the
22   third clip, and then I have a
23   number of things to cover.
24         (Whereupon the following was

Page 261

1    played:)
2          "DR. TOPOL.  I'm trying for
3    now two decades in my career to
4    try to prevent heart attacks and
5    treat heart attacks.  To have a
6    medicine that's causing heart
7    attacks and strokes is something
8    that can't be tolerated.  These
9    are the two biggest, most
10   important killers in our society,
11   and then it's important that we
12   never have something like this
13   happen again."
14   BY MR. KLINE:
15         Q.   On all three clips that I
16   showed, Dr. Topol, for evidentiary
17   purposes, would you simply confirm and
18   authenticate that that is you, and you
19   made those statements on that day?
20         A.   It's authentic.
21         Q.   And it's what you believed
22   then?
23         MR. GOLDMAN:  Objection.
24         THE WITNESS:  I still

KS-000198

Page 262

1    believe today, yes.
2    BY MR. KLINE:
3        Q.   Now, there is an e-mail --
4    let's switch gears.
5        I want to talk about some
6    notes that you made, because I think it
7    provides a road map to discuss some
8    things.  Topol Bates Number 0000469 and
9    504 are what I'm looking for.  I'll start
10   with 469.
11       While we're getting those,
12   maybe I can talk about the study called
13   ADVANTAGE.  Did you come into possession
14   of information regarding a study called
15   ADVANTAGE that was performed by Merck?
16       A.   I didn't come into anything
17   special.  I just read the New York Times
18   article when it came out about that
19   trial.
20       Q.   What did you learn?
21       MR. GOLDMAN:  Objection.
22       THE WITNESS:  That there had
23       been misclassification of events
24       and that the FDA had records that

Page 263

1    there was, by their tally, a
2    significant excess of events, but
3    in the manuscript published by
4    Lisse and colleagues, the New York
5    Times demonstrated that it was
6    ghostwritten, that he had never
7    participated in the writing of the
8    article or the trial, and that he
9    had somehow been made the first
10   author of the paper and that the
11   events were misclassified, and
12   they had e-mails in the article
13   which showed, amazingly enough,
14   how a death, a sudden death was
15   classified as a hypertensive
16   event, which is quite
17   extraordinary.
18   BY MR. KLINE:
19       Q.   I want you to assume that
20   all of the things that you just said that
21   were reported are things that could be
22   independently established and confirmed
23   from firsthand sources.  How, then, would
24   you view that type of conduct?

Page 264

1        MR. GOLDMAN:  Objection.
2        THE WITNESS:  The conduct is
3    totally in continuum with the
4    other concerns that I registered
5    earlier, like the suppression of
6    090, like the erroneous issues
7    about VIGOR and now with
8    misclassifications of deaths and
9    events in ADVANTAGE.  These are
10   all very similar types of things.
11   BY MR. KLINE:
12       Q.   Is this serious business,
13   Dr. Topol?
14       MR. GOLDMAN:  Objection.
15       THE WITNESS:  This is
16       totally inadequate and highly
17       misleading clinical science.
18   BY MR. KLINE:
19       Q.   Does it amount to serious
20   scientific misconduct by Merck?
21       MR. GOLDMAN:  Objection.
22       THE WITNESS:  I think that
23       if this were to be adjudicated by
24       an academic medical center in an

Page 265

1    unblinded way for whether there
2    was scientific misconduct, this
3    would fulfill the definition of
4    scientific misconduct.
5    BY MR. KLINE:
6        Q.   Now, sir, I want to look at
7    your notes, which relate to -- let me
8    show you an exhibit marked Topol-22.
9        - - -
10       (Whereupon, Deposition
11       Exhibit Topol-22, Handwritten
12       notes, TOPOLE 0000469, was marked
13       for identification.)
14       - - -
15   BY MR. KLINE:
16       Q.   Topol-22 appear to be
17   handwritten notes.  Are they in your
18   handwriting, sir?
19       A.   This is my handwriting.
20       Q.   And when were these notes
21   made?
22       A.   These notes were made in
23   October 2004, you know, shortly after the
24   withdrawal, my op/ed, and at the time

KS-000199

Page 266

1  when I was putting together the New
2  England Journal and talking to the
3  producer at 60 Minutes.
4      Q.   What do they represent in
5  terms of what you have down on this
6  paper?
7          MR. GOLDMAN:  Objection,
8      and, Tom, can I have a standing
9      objection to the use of this
10     document and testimony about it?
11         MR. KLINE:  You have a
12     standing objection.
13         THE WITNESS:  These are the
14     salient points that I've reviewed
15     in this deposition, the data
16     safety monitoring board, the study
17     090, the Juni paper, the naproxen
18     that was untenable, and then the
19     suppression issues of what
20     appeared to be deception and
21     falsifying.  All these things are
22     enumerated here.
23 BY MR. KLINE:
24     Q.   And it's being displayed or

Page 267

1  will be displayed and incorporated in a
2  final package so everyone sees it, but
3  you start off by saying, "'What,' 'when'
4  Merck knew."
5          Have you discussed with us
6  today to your satisfaction what and when
7  Merck knew things?
8          MR. GOLDMAN:  Objection.
9  BY MR. KLINE:
10     Q.   If not, I want to have an
11 opportunity to expand.  That's one of my
12 purposes of this line of questioning.
13         MR. GOLDMAN:  Objection.
14         THE WITNESS:  I did touch on
15     this earlier, that is, study 090
16     was completed in May 1999, and the
17     VIGOR trial data and safety
18     monitoring board alert was in
19     November 1999.  So, already by
20     1999 there were very significant
21     issues, and this should have been
22     widely known to the senior
23     management at Merck.
24         MR. GOLDMAN:  Objection,

Page 268

1      nonresponsive, move to strike.
2  BY MR. KLINE:
3      Q.   You then say, "Study 090,"
4  you've discussed that at length with us;
5  correct?  The "DSMB November 18, 1999."
6  We've discussed that at length; correct?
7      A.   (Witness nods.)
8      Q.   I need an audible answer.
9      A.   Yes.
10     Q.   Thank you.
11         And for study 090, have we
12 discussed that at length to your
13 satisfaction in terms of telling what you
14 know or what you think someone should
15 know about it?
16         MR. GOLDMAN:  Objection.
17         THE WITNESS:  Yes.
18 BY MR. KLINE:
19     Q.   Okay.
20         I'm using this as a wrapup.
21         "Lancet," you mentioned the
22 Juni paper, and we've discussed that at
23 length; correct?
24     A.   Yes.

Page 269

1      Q.   "Position, 'naproxen,'" you
2  wrote the word in your handwriting,
3  "Untenable."  You've told us about that
4  today; correct?
5      A.   Yes.
6      Q.   Now, in the middle of the
7  page, or more or less in the middle of
8  the page, you write three words,
9  "Deception/Falsifying/Suppression of
10 Data."  Do they apply -- do all three of
11 those words apply to Merck?
12         MR. GOLDMAN:  Objection.
13         THE WITNESS:  I have
14     reviewed elements of each in this
15     deposition that fulfill those
16     terms.
17 BY MR. KLINE:
18     Q.   As they apply to Merck;
19 correct?
20     A.   As they apply to the studies
21 and the data of Vioxx.
22     Q.   Those would be words,
23 filling in the details from what you've
24 told us earlier, that would describe

KS-000200

Page 270

1  Merck's conduct; correct?
2          MR. GOLDMAN:  Objection.
3          THE WITNESS:  That's
4      correct.
5  BY MR. KLINE:
6      Q.   And then you list underneath
7  this the sort of laundry list of things
8  that fit in the category of deception,
9  falsifying and suppression of data;
10  correct?
11      A.   Yes.  The only thing I
12  hadn't mentioned was the symposia that
13  would be done at each of the national
14  meetings, where they would have these
15  Merck consultants giving lectures, taking
16  apart our data, like the JAMA paper, and
17  assuring the medical community like
18  cardiologists or internists, doctors,
19  that there was nothing wrong with the
20  safety of Vioxx, that it was an illusion
21  of the Cleveland Clinic authors of the
22  JAMA paper.
23          MR. GOLDMAN:  Objection,
24      move to strike as nonresponsive.

Page 271

1  BY MR. KLINE:
2      Q.   Did you believe, sir,
3  looking at your list, that no publication
4  of 090, which we've discussed, the
5  Bombardier paper, which is the VIGOR
6  paper, where there were deaths and
7  incomplete information, the multiple
8  publications by Reicin and Konstam --
9  what does that refer to?
10      A.   The Merck people, whether
11  they were Dr. Reicin or Dr. Konstam, who
12  was a consultant, published multiple
13  articles, and Dr. Konstam published an
14  article in Circulation just a few months
15  after our JAMA paper to challenge it with
16  a so-called meta-analysis of their data
17  which had considerable issues, did not
18  provide the results per trial.  It did,
19  in fact, show a statistically significant
20  excess of heart attacks compared to
21  naproxen.
22          So, the Konstam paper was
23  out there.  There were multiple papers
24  that Merck authored in different journals

Page 272

1  to take the data that we published on as
2  well as other case-control studies that I
3  had touched on earlier.
4          MR. GOLDMAN:  Objection,
5      move to strike, nonresponsive.
6  BY MR. KLINE:
7      Q.   What you're suggesting is
8  that they would assault any publication
9  that was against the safety of the drug
10  Vioxx prior to the time that they
11  withdrew it from the market; correct?
12          MR. GOLDMAN:  Objection.
13          THE WITNESS:  Yes.
14  BY MR. KLINE:
15      Q.   And even today; correct?
16          MR. GOLDMAN:  Objection.
17          THE WITNESS:  Yes.
18  BY MR. KLINE:
19      Q.   "Marketing and sales."  What
20  did you mean there?
21      A.   Well, the marketing and
22  sales has been very much demonstrated in
23  the Waxman report, the Congressional
24  report of the cardiovascular card.  This

Page 273

1  is where it was a card that was
2  distributed by the sales team throughout
3  the country, 3,000, I believe, sales reps
4  for Merck that had a card that showed
5  that there was somehow an eight to
6  ten-fold protection of Vioxx compared to
7  other non-steroidals.
8          So, this was quite
9  extraordinary, these sorts of sales
10  tactics that were going on by the
11  specially-trained Merck sales reps.
12      Q.   Well, assuming --
13          MR. GOLDMAN:  I'm sorry,
14      objection, move to strike.  And,
15      again, Tom, I can go fill in, as
16      you said before, the nature of
17      these objections?
18          MR. KLINE:  Yes.
19  BY MR. KLINE:
20      Q.   Assuming that the drug
21  was -- assuming what you said -- what you
22  just told us was being said about the
23  cardioprotective effects, are you with me
24  so far, that would not only be, I forget

KS-000201

Page 274

1  the word you used, extraordinary, that
2  would just be plain false; correct?
3      MR. GOLDMAN:  Objection.
4      THE WITNESS:  If you look at
5  the cardiovascular card, it's very
6  clear that the data that are being
7  presented are highly misleading.
8  BY MR. KLINE:
9      Q.  You've seen it?
10     MR. GOLDMAN:  Objection.
11     THE WITNESS:  Yes.
12     MR. KLINE:  I don't want to
13  take the time to do it.  We'll
14  simply mark it and we'll put it up
15  when we incorporate it in the
16  exhibit.  We'll reserve number 25
17  for it.
18         - - -
19     (Whereupon, Deposition
20  Exhibit Topol-25, "Cardiovascular
21  System Clinical Profile in
22  Osteoarthritis Studies,"
23  Cardiovascular Card,
24     MRK-ABW00000243 - MRK-ABW0000248;

Page 275

1     MRK-ADB0009039 - MRK-ADB0009042;
2     MRK-ACW0008375; MRK-ACZ0072955 -
3     MRK-ACZ0072956, was marked for
4     identification.)
5         - - -
6  BY MR. KLINE:
7      Q.  You said, "Did not do" an
8  "appropriate trial."  We know what that
9  means.  And they made the claim of 18
10  months post and they paid consultants.
11     Tell me about this thing,
12  "paid consultants on 'Independent DSMB.'"
13  How does that fit in the deception,
14  falsifying and suppression of data
15  category?
16     MR. GOLDMAN:  Objection.
17     THE WITNESS:  Well, I mean,
18  Dr. Konstam, for example, who is a
19  consultant for Merck, has been for
20  many years, he is the cardiologist
21  on the APPROVe trial, DSMB, Data
22  and Safety Monitoring Board.  And
23  he's also an author of the paper.
24     So, he's an author, he's on

Page 276

1     the so-called independent data and
2  safety monitoring board, but he's
3  a consultant.  So, it's hard to be
4  independent when you're being paid
5  by the sponsor of the trial in a
6  separate way, and this is quite
7  irregular.
8      Normally to do clinical
9  trials, which I've been engaged in
10  for a couple of decades, you would
11  not have a person on your data and
12  safety monitoring committee who
13  was a consultant for the company.
14  BY MR. KLINE:
15     Q.  Kind of like having one of
16  the coaches from the sidelines put on a
17  striped shirt?
18     MR. GOLDMAN:  Objection.
19  BY MR. KLINE:
20     Q.  Yes?
21     A.  I have no comment.
22     Q.  I want you to look at Number
23  504.  Let's mark it as the next exhibit
24  number.  I have about 10 or 15 minutes

Page 277

1  left.  I want to use them.
2         - - -
3      (Whereupon, Deposition
4  Exhibit Topol-23, Handwritten
5  notes, TOPOLE 0000504, was marked
6  for identification.)
7         - - -
8  BY MR. KLINE:
9      Q.  There is a document which
10  we're displaying which, again, is your
11  notes, part of your 60 Minutes notes.
12  These are also your notes.  I want
13  to go through it quickly.  I think anyone
14  who sees this now will know what you're
15  saying.  "Compelling evidence of
16  Merck/Vioxx knowledge of serious risk."
17  Was this part of the notes that you made
18  in preparation, sir?
19     MR. GOLDMAN:  Objection.
20  Can I have a standing objection to
21  this document?
22     MR. KLINE:  Yes.  You have a
23  standing objection to this one and
24  the next handwritten one I used as

KS-000202

Page 278

1  well.
2       THE WITNESS:  These notes
3  were later, because it was only
4  later that I learned about the
5  VALOR trial in February 2005, and
6  this was -- these were notes by
7  me, but they were done at a later
8  point in time.
9  BY MR. KLINE:
10      Q.   You have a list of
11  "Compelling evidence of Merck/Vioxx
12  knowledge of serious risks."  Here's the
13  compelling evidence:  1.  Study 090,
14  seven times risk of MIs and strokes.
15  Correct?
16      A.   Yes.
17      Q.   VIGOR:  Two times to five
18  times.  What's the two times number?
19      A.   The two times corresponds to
20  overall cardiovascular events, and the
21  five-fold is the heart attack excess.
22      Q.   And then ADVANTAGE trial,
23  which is mis -- you said, "ADVANTAGE
24  trial, misclassifications of deaths,"

Page 279

1  that's all stuff that we've talked about;
2  correct?
3       MR. GOLDMAN:  Objection.
4  BY MR. KLINE:
5      Q.   Yes?
6      A.   Yes.
7      Q.   "APPROVe trial, heart
8  failure" in "30 days."
9       Have we discussed that?
10      MR. GOLDMAN:  Objection.
11      THE WITNESS:  No.  We had
12  been discussing heart attacks in
13  the first days, but the trials
14  like APPROVe and others also
15  demonstrate things like heart
16  failure in the first 30 days, but
17  that's not necessarily the same as
18  a heart attack, of course.
19  BY MR. KLINE:
20      Q.   By the way, there was -- and
21  last thing is VALOR study 2002 was
22  cancelled.
23       What was the VALOR study?
24      MR. GOLDMAN:  Objection,

Page 280

1  lacks foundation.
2       THE WITNESS:  I only learned
3  about that trial through the New
4  York Times, but Bryan Myers, the
5  reporter, called Dr. Bhatt, who
6  actually had authored a protocol.
7  That was the one, remember when
8  Dr. Reicin and Dr. Demopoulos
9  visited in April of 2001?
10  BY MR. KLINE:
11      Q.   Yes.
12      A.   And she said, well, why
13  don't you send us a protocol?
14      Q.   Yes.
15      A.   So, I spoke to my colleague,
16  Dr. Bhatt, and just a couple of weeks
17  later, around the 2nd of May, we
18  submitted a protocol, actually Dr. Bhatt
19  did, to Dr. Reicin and Dr. Demopoulos.
20       That protocol was testing in
21  patients with so-called acute coronary
22  syndrome, unstable angina, or heart
23  attack, who had abnormal inflammation
24  blood protein markers to test a study of

Page 281

1  Vioxx versus placebo on top of the other
2  normal medicines.  So, that was a
3  proposal.  It was a mini proposal, but
4  that was sent.
5       And then what we found out
6  later was that there was a trial called
7  VALOR reported in the New York Times, a
8  70-page protocol, had extensive network
9  development, and somewhere along the
10  line, the trial that we initially had
11  proposed, apparently, didn't get very
12  far, we never heard back about that, but
13  that trial was, indeed, being planned by
14  Merck, and at some point the plug was
15  pulled, and that's what that New York
16  Times article was about.
17      Q.   You proposed to them to do a
18  study in the people that were high risk
19  patients who had cardiovascular disease
20  who were susceptible.  Do I have it
21  right?
22      A.   Yes.
23      Q.   And your point was to try to
24  see if these people -- look at those

KS-000203

Page 282

1  people with a specified endpoint to see
2  if those people were going to fall victim
3  to Vioxx; is that correct?
4       MR. GOLDMAN:  Objection.
5       THE WITNESS:  No.  No.  The
6  trial that we had proposed, and it
7  was Dr. Bhatt who wrote this and
8  sent it to Merck at their request,
9  it was a trial looking at people
10  who had abnormal artery
11  inflammation.
12       So, they had to have high
13  C-reactive protein, which is a
14  blood test.  They could derive
15  benefit from Vioxx or COX-2
16  inhibitors, just as they could
17  potentially be exposed to risk.
18  So, here we were looking at
19  trade-offs, could we reduce
20  subsequent heart attacks or could
21  we potentially exacerbate the
22  course of patients?
23       So, this was a very
24  reasonable way to study the

Page 283

1       problem.  And VALOR was a very
2  reasonable construct for a trial.
3       MR. GOLDMAN:  Objection,
4  move to strike as nonresponsive.
5  BY MR. KLINE:
6       Q.   But it wasn't done?
7       A.   It wasn't done.
8       Q.   And it should have been
9  done?
10       MR. GOLDMAN:  Objection.
11  BY MR. KLINE:
12       Q.   Should it have been done?
13       A.   Any trial to establish the
14  risk in patients with heart disease
15  should have been done.
16       Q.   Was it an adequate
17  substitute to look at cardiovascular
18  endpoints in the studies that weren't
19  designed by Merck to assess
20  cardiovascular risk?
21       MR. GOLDMAN:  Objection.
22       THE WITNESS:  This was
23  another part of the concern at the
24  point of the withdrawal, saying

Page 284

1       that the trials that had been done
2  for colon polyps were indeed to
3  assess heart risk.  That could not
4  have been further from the truth.
5  In fact, they were to establish
6  new indications for the drug.
7  BY MR. KLINE:
8       Q.   Okay.
9       Now, was it an adequate
10  substitute to look at CV events in
11  studies to which the primary endpoint was
12  something else?
13       MR. GOLDMAN:  Objection.
14       THE WITNESS:  It's more the
15  population of patients.  It's not
16  about patients of population who
17  had colon polyps with no heart
18  disease.  It's about the
19  population of patients who have
20  one of the most common diseases of
21  American society, which is
22  coronary disease, established
23  coronary disease.  That's where
24  there was a gap, that's where 40

Page 285

1  to 50 percent of patients taking
2  the drug of the 20 million
3  estimated had never been studied
4  as to what would happen, would
5  they derive a benefit, or would
6  they incur harm?  Unknown.
7  BY MR. KLINE:
8       Q.   Switching gears, Dr. Topol.
9       Before we switch gears, I
10  have asked you a lot of questions today.
11       MR. GOLDMAN:  I'm sorry, I
12  meant to introduce an objection to
13  the last answer as nonresponsive.
14       Start over, Tom.
15       MR. KLINE:  Would you at the
16  end of the deposition -- I will
17  gladly pay Golkow Litigation
18  Technologies for this.  Would you
19  at the end of the day count up and
20  put in the transcript the number
21  of times that Merck, through its
22  lawyer, objected to this testimony
23  today so that I don't have to do
24  the counting up?  It's

**KS-000204**

1    extraordinary.  Astonishing.
2         THE WITNESS:  I also would
3    like to say it's very hard to
4    answer the questions and have to
5    be in rhythm with the objections.
6    It's disruptive for my train of
7    thought.
8         MR. KLINE:  That's a good
9    question, Doctor.  Thank you for
10   suggesting it to me.
11        MR. GOLDMAN:  Well --
12        MR. KLINE:  Stop it.
13   BY MR. KLINE:
14        Q.   Was it disruptive for you,
15   sir, to, for almost every question that
16   was asked today, have an objection
17   interposed, and have, if at all, did that
18   affect your train of thought?
19        MR. GOLDMAN:  Objection.
20        THE WITNESS:  It has
21   affected my train of thought many
22   times along the way.
23        MR. GOLDMAN:  Because you
24   just made that statement, Mr.

1    Kline, I'm going to be forced to
2    ask Dr. Topol's lawyer, who spoke
3    with me at a break, to see if Dr.
4    Topol's lawyer thinks that I've
5    been intrusive and my objections
6    have been in any way an effort to
7    affect the deposition here today.
8         MR. KLINE:  Okay.  Let's go
9    on.
10        MR. GOLDMAN:  Can you
11   represent, sir, that --
12        MR. KLINE:  We're going to
13   just simply take his deposition.
14   I'll tell you what.  You can --
15        MR. HAMELINE:  Let me just
16   say this --
17        MR. KLINE:  You can take his
18   deposition --
19        MR. HAMELINE:  Let me just
20   say this.  I'm not here to talk
21   for Dr. Topol and whether Dr.
22   Topol was inconvenienced.  I
23   recognize that what you've done is
24   try to be as accommodating as

1    possible in terms of the level and
2    tone of your objections.  The
3    repetitiveness of them, et cetera,
4    is none of my truck in this case.
5         MR. GOLDMAN:  Right.
6         MR. KLINE:  That sounds like
7    a no comment to me.
8    BY MR. KLINE:
9         Q.   Now, a couple of things and
10   we'll finish up.  Switch gears.
11        I don't want to switch
12   gears.  I have got to cover one more
13   thing.
14             - - -
15        (Whereupon, Deposition
16   Exhibit Topol-24, Handwritten
17   notes, TOPOLE 0000463, was marked
18   for identification.)
19             - - -
20   BY MR. KLINE:
21        Q.   Here's some more notes.
22   They're now put on the screen.  Tell me
23   when those notes were written, if you
24   would, sir.

1         A.   These notes were done in
2    concert with the discussion with Michael
3    Radutsky, the producer at 60 Minutes.
4         Q.   Okay.
5         You were taking --
6         MR. GOLDMAN:  Tom, this is
7    the handwritten document which you
8    said I can have a standing
9    objection to?
10        MR. KLINE:  It is.
11        MR. GOLDMAN:  And there's
12   testimony about?
13        MR. KLINE:  Yes.  We've
14   already agreed that you can have a
15   standing objection to these three
16   documents.
17   BY MR. KLINE:
18        Q.   First of all, you talk about
19   Merck suppression of 090, and you talk
20   about FDA's suppression.  Correct, as to
21   both of them, sir?
22        A.   Yes.
23        Q.   And you talk about
24   deceptive, falsifying data, and we've

**KS-000205**

Page 290

1  discussed that as well; is that correct?
2      A.   Yes.
3      Q.   Okay.
4          Now, a couple of things I
5  want to switch gears on to finish up.
6          I think somewhere along the
7  way I saw in documents that you were
8  involved as an advisor to some kind of a
9  stock or bond fund.  Is that correct,
10  sir?
11      A.   It was an investment fund
12  known as Great Point Partners.
13      Q.   What did that involve, and
14  how does that affect anything that either
15  you've said here today or your views, if
16  at all?
17          MR. GOLDMAN:  Objection.
18          THE WITNESS:  I do not
19      believe it has any effect on what
20      I've said, but it has, in an
21      article in Fortune, in a contrived
22      way, been made to give a
23      perception of a conflict of
24      interest, which did not exist.

Page 291

1  BY MR. KLINE:
2      Q.   Did you ever have a conflict
3  of interest when you stated your views
4  publicly either back when you published
5  the JAMA article or up to today when you
6  testified under oath?
7          MR. GOLDMAN:  Objection.
8          THE WITNESS:  I do not
9      believe I've had any conflict of
10      interest whatsoever in all the
11      articles that we've written or
12      even the matter cited regarding
13      this investment fund serving as a
14      medical adviser.
15  BY MR. KLINE:
16      Q.   Now, a couple of additional
17  points here and there.
18          You mentioned that you
19  couldn't get ahold of Dr. Gilmartin.
20  That raised in my mind the question, did
21  Merck or anyone -- let me start it this
22  way.
23          Merck -- does Merck -- let
24  me start again.

Page 292

1          You mentioned that you had
2  done a study for Merck; correct?
3      A.   With Merck, yes, the TARGET
4  trial, yes.
5      Q.   Yes.
6          And what drug was that, by
7  the way?
8      A.   That was a drug, the
9  commercial name is known as Aggrastat,
10  tirofiban.
11      Q.   Were you actually paid by
12  Merck?
13      A.   No.  I was not paid.  I did
14  do the trial.
15      Q.   Was there funding provided
16  to the institution here, the Cleveland
17  Clinic, by Merck?
18      A.   There was funding to the
19  Cleveland Clinic and to the 60 sites that
20  participated in the trial, yes.
21      Q.   Did the Cleveland -- it
22  raises the question, that, has anyone from
23  Merck, to your knowledge, either
24  contacted anyone at the Cleveland Clinic

Page 293

1  or your colleagues or anyone relating to
2  your writings or your public statements
3  relating to Vioxx in any way?  And if so,
4  what is it, if anything?
5          MR. GOLDMAN:  Objection.
6          THE WITNESS:  I was told by
7      a colleague here at the clinic on
8      October 14th, the chairman of the
9      board of trustees, Mr. Mal Mixon,
10      was contacted.
11  BY MR. KLINE:
12      Q.   His name is?
13      A.   Mal, Malachi Mixon, chairman
14  of our board of trustees.
15      Q.   Current?
16      A.   Yes, of the Cleveland
17  Clinic.  That he was contacted directly
18  by Raymond Gilmartin in October of 2004,
19  and that Mr. Gilmartin said to Mr. Mixon,
20  what has Merck ever done to the Cleveland
21  Clinic to warrant this?  And this was
22  relayed by a colleague who spoke to Mr.
23  Mixon.
24      Q.   Who was that colleague, sir.

**KS-000206**

74 (Pages 290 to 293)

Page 294

```
1          MR. GOLDMAN:  Objection,
2     move to strike as nonresponsive.
3          THE WITNESS:  His name is
4     Richard Rudick.
5     BY MR. KLINE:
6          Q.   Who is he?
7          A.   He is the director of
8     clinical research.
9          Q.   Rudick was told by Mixon
10    that Mixon was contacted by Gilmartin.
11    Is that what you're telling me?
12          MR. GOLDMAN:  Objection.
13          THE WITNESS:  Yes.  That he
14    was further told that Mr.
15    Gilmartin and Mr. Mixon were
16    colleagues together at Harvard
17    M.B.A. school, they were old
18    friends, and that Mr. Mixon
19    understood that Mr. Gilmartin was
20    very upset when he called in
21    October '04.
22          This was relayed on October
23    14th to Dr. Rudick.  I don't know
24    exactly what date.  I believe it
```

Page 295

```
1     was the day prior, October 13th,
2     but I can't know for sure.
3          MR. GOLDMAN:  Objection,
4     lacks foundation.
5     BY MR. KLINE:
6          Q.   And where does October 14
7     fit on our chronology?  What event does
8     that relate to?
9          A.   That was eight days after
10    the New England Journal paper, of my
11    editorial, and about 13 or 12 days after
12    the New York Times op/ed.
13          Q.   And from your perspective,
14    assuming we pin all of that down that
15    that, indeed, happened -- first of all,
16    you believe that if called to testify,
17    that's what Dr. Rudick would tell us?  Is
18    that what you're saying?
19          MR. GOLDMAN:  Objection.
20          THE WITNESS:  Yes.  I've
21    confirmed this with Dr. Rudick,
22    yes.
23    BY MR. KLINE:
24          Q.   And what -- how do you view
```

Page 296

```
1     all of this?
2          MR. GOLDMAN:  Objection.
3     BY MR. KLINE:
4          Q.   How do you view this event
5     that you've just described for me?
6          MR. GOLDMAN:  Same
7     objection.
8          THE WITNESS:  I find it
9     entirely repulsive.
10    BY MR. KLINE:
11          Q.   Do you know what was said by
12    -- is it Dr. Mixon?
13          A.   No, Mr. Mixon.
14          Q.   No.  He's an M.B.A. like
15    Gilmartin?
16          A.   That's correct.
17          Q.   Have you talked to Dr. --
18    Mr. Mixon about it?
19          A.   He's never told me about it
20    directly, and I've not questioned him
21    about it.
22          MR. KLINE:  Let's take a
23    very brief break.
24          THE VIDEOTAPE TECHNICIAN:
```

Page 297

```
1     Off the record at 1:22.
2          - - -
3          (Whereupon, there was a
4     luncheon recess from 1:22 p.m.
5     until 2:18 p.m.)
6          - - -
7          THE VIDEOTAPE TECHNICIAN:
8     Back on the record at 2:18.  Tape
9     Number 4.
10    BY MR. KLINE:
11          Q.   Dr. Topol, a few more
12    questions from me, and I'll conclude my
13    examination.
14          In the VIGOR trial, we had
15    mentioned the DSMB earlier.  Do you know
16    if there was any cardiologist on the
17    DSMB?
18          A.   I'm not aware --
19          MR. GOLDMAN:  Objection,
20    lacks foundation.
21          THE WITNESS:  I'm not aware
22    of any -- who the members of that
23    safety monitoring board were, so,
24    I don't know.
```

**KS-000207**

BY MR. KLINE:
   Q.   Would it make a difference
in your mind if you knew that there was
no cardiologist on the DSMB that was
addressing any cardiovascular safety
issues and what would you have expected?
       MR. GOLDMAN:  Objection.
       THE WITNESS:  It's much
   easier to see you.
       Yes, I would be concerned if
   no cardiologist was on the
   committee and they were
   adjudicating -- remember that
   point I made earlier about
   November 19, 1999 when they had
   excess deaths and serious
   cardiovascular events, and that
   does need a cardiologist trained
   in clinical trials to help
   interpret that signal.
BY MR. KLINE:
   Q.   And when Dr. Reicin came to
visit you, did she identify herself as an
internist who was actually an infectious

disease doctor, rather than a
cardiologist?
       MR. GOLDMAN:  Objection.
       THE WITNESS:  Dr. Reicin
   didn't describe her background.
   She just told us or told me when
   she came that she was the director
   of the Vioxx and the COX-2
   inhibitor program.  That's all I
   knew.
BY MR. KLINE:
   Q.   Did you know that the
director of the COX-2 program at Merck
was an infectious disease doctor who had
limited experience prior to coming to
Merck just a few years earlier?
       MR. GOLDMAN:  Objection.
       THE WITNESS:  I did not know
   that.
BY MR. KLINE:
   Q.   Does that surprise you
hearing that today?
       MR. GOLDMAN:  Objection.
       THE WITNESS:  I would have

   thought rheumatologists would have
   worked in that space, but, you
   know, I can't really comment
   beyond that.
BY MR. KLINE:
   Q.   The next thing I'd like to
show you is an exhibit which was Bates
stamped 462, and I'd like to have it
marked and handed to you, if I can.
       Instead of going to 462
because it doesn't matter the order, I'm
going to go to 465, which was -- which
will be the next exhibit, the next
exhibit number being --
       MR. KLINE:  Are we at 26?
       THE COURT REPORTER:  Yes.
       MR. KLINE:  That's what it
   says, 26.
               - - -
       (Whereupon, Deposition
   Exhibit Topol-26, "Preliminary
   Questions - 60 Minutes," TOPOLE
   0000465 and EJT 000334, was
   marked for identification.)

               - - -
BY MR. KLINE:
   Q.   Let me hand it to you, your
counsel, Merck's counsel.
       Apparently there were
preliminary questions from 60 Minutes.
Would you tell me how this document came
about very briefly?
       MR. GOLDMAN:  Objection.
   Can I have a standing objection to
   this document and any testimony
   about it?
       MR. KLINE:  Yes.  For those
   who are viewing this, there's a
   little bit different configuration
   in the room.  That's why Dr. Topol
   now may be looking over to me
   while we finish this examination.
       THE WITNESS:  So, this was a
   list of questions that Michael
   Radutsky, the producer of CBS 60
   Minutes, was providing me.  He
   basically gave me these questions
   over the phone, and then my

KS-000208

Page 302

```
1       assistant typed them up.
2  BY MR. KLINE:
3       Q.   You only wrote in your
4  handwriting one word on that document;
5  correct?
6       A.   Yes.
7       Q.   What is the one word that
8  you wrote on the document?
9       A.   The word is "deception."
10      Q.   What did you mean, sir?
11          MR. GOLDMAN:  Objection.
12          THE WITNESS:  I think that
13      this was about the conversation I
14      had with Michael Radutsky at CBS
15      and what he was particularly cued
16      into regarding concern about
17      deception of Merck.
18  BY MR. KLINE:
19      Q.   Did you, sir, believe there
20  was deception?
21          MR. GOLDMAN:  Objection.
22          THE WITNESS:  As I reviewed
23      throughout this deposition, I
24      thought there were many points of
```

Page 303

```
1       highly misleading errors of
2       omission and what could be
3       considered the false conveyance of
4       data and findings.
5  BY MR. KLINE:
6       Q.   And would those things that
7  you just described fall under the
8  category of deception?
9          MR. GOLDMAN:  Objection.
10          THE WITNESS:  I think that
11      that's certainly a term that could
12      be used to apply to this pattern,
13      yes.
14              - - -
15          (Whereupon, Deposition
16      Exhibit Topol-27, Letter 10-7-04
17      with handwritten notes, TOPOLE
18      0000462, was marked for
19      identification.)
20              - - -
21  BY MR. KLINE:
22      Q.   All right.  I'm showing you
23  Exhibit 27, hand it to you, your counsel
24  and Merck's counsel.
```

Page 304

```
1          I'm only concerned with the
2  handwriting on the document.  It happens
3  to be made on a note of -- with the Bill
4  Moyers show.  It's dated October 7, 2004.
5  Sir, you have key points.  Are these the
6  points that you were raising regarding
7  the November 18 findings of the
8  preliminary data that was coming out on
9  the VIGOR trial?
10          MR. GOLDMAN:  Objection.
11          THE WITNESS:  This is the
12      points that I put after -- this
13      fellow, Bryan Myers and Bill
14      Moyers forwarded me the Targum
15      report, which I had never
16      reviewed.  Once I reviewed it,
17      these were the summary points that
18      I made because then I was asked to
19      contact Mr. Myers and Bill Moyers
20      to convey what I thought were the
21      principal findings.
22  BY MR. KLINE:
23      Q.   The principal findings from
24  what?
```

Page 305

```
1       A.   The VIGOR and -- well, that
2  whole supplement.  I forgot the number of
3  it, but it's the combination of VIGOR,
4  090 and 085, which I've been calling the
5  Targum report.
6       Q.   I understand.  If you can
7  summarize in two or three words, what was
8  your bottom line from all this data that
9  you have handwritten there?
10          MR. GOLDMAN:  Object to
11      form.
12  BY MR. KLINE:
13      Q.   Please.
14      A.   The more I reviewed this
15  particular supplement or Targum report,
16  the more disturbing it became.  I had not
17  ever delved into it as I did at that
18  point in time, and this is, of course,
19  after the drug withdrawal.
20              - - -
21          (Whereupon, Deposition
22      Exhibit Topol-28, Memo 10-17-04,
23      TOPOLE 0000474, was marked for
24      identification.)
```

KS-000209

Page 306

1           - - -
2  BY MR. KLINE:
3      Q.   Sir, I previously marked an
4  exhibit -- I believe I marked this.
5           MS. DAGOSTINO:  You did not
6  mark it yet.
7           MR. KLINE:  I did not?
8  BY MR. KLINE:
9      Q.   I'm showing you -- I guess I
10  did not -- 474, Bates Number 474, which I
11  will mark as Exhibit Number 28 which
12  covers a lot of territory.  It's an
13  e-mail from you to Mike Radutsky from 60
14  Minutes.  I would like to ask you to
15  confirm for me that some of these things
16  were said.
17           You say, "I was asked to
18  review a paper for the Lancet written by
19  well regarded, independent researchers
20  from Europe."  Did I read it correctly?
21      A.   Yes.
22      Q.   Indeed, was it important to
23  you that these folks were independent?
24           MR. GOLDMAN:  Objection.

Page 307

1           THE WITNESS:  Yes.
2  BY MR. KLINE:
3      Q.   "Their study proves," and
4  you used the word "unequivocally that the
5  data on Vioxx had 'crossed the line' by
6  2001 for heart attack risk."  What I've
7  read to you, is that a correct
8  statement --
9           MR. GOLDMAN:  Objection.
10  BY MR. KLINE
11      Q.   -- that you made in this
12  e-mail?
13      A.   Yes, and I reviewed what
14  that line meant earlier today, yes.
15      Q.   That's what I wanted to know
16  as well.
17           Finally you go on to say in
18  the middle of this paragraph, "We can now
19  confirm that the famous study '090'" --
20  you used the word "famous," but would you
21  tell me in other correspondence you
22  actually refer to it as "infamous."
23      A.   Yes.  What I'm referring to
24  is, it's buried, that is, "famous" was

Page 308

1  being somewhat sarcastic.  It never got
2  to the light of day.  It only could be
3  found in the Targum report.  It was never
4  published, and the only abstract about
5  it, it was presented by Dr. Geba at a
6  geriatrics meeting, and it only presented
7  the -- he only presented the efficacy
8  side on arthritis.  He did not present
9  the cardiovascular events.
10      Q.   You say that -- let me just
11  find it here with my eyes.
12           "We now can confirm that the
13  famous...'090' of Merck was NEVER
14  published, that it was part of the FDA
15  pivotal registration packet leading to
16  the May 1999 approval."
17           Do you see that?
18      A.   Yes.
19      Q.   You then say "and" -- that's
20  not what I want to ask you about.
21           I want to ask you about
22  this:  "And that it showed a striking
23  risk of heart attack and stroke before
24  the drug ever got commercialized."

Page 309

1           Is that a correct statement?
2      A.   Well, as it turns out, the
3  dates were wrong because they were not
4  provided in the Targum report.  As it
5  turned out, that data, I guess, was --
6  May 1999 was when it was finalized, and
7  so already the drug had been approved.
8  So, I was mistaken that study 090 was
9  available before approval.  That data
10  must have been available coincident,
11  right around the time of approval.
12  BY MR. KLINE:
13      Q.   I see.
14      A.   But I can't say for sure
15  because I don't have all the 090
16  documents to back that up.
17      Q.   You say, "The cumulative
18  meta-analysis of 21,432 patients also
19  proves that the heart toxicity was not at
20  all dose or duration related."  Correct?
21           MR. GOLDMAN:  Objection.
22  BY MR. KLINE:
23      Q.   That's what you said.
24      A.   That's citing the Juni

KS-000210

1  paper, which was a systematic cumulative
2  meta-analysis.
3      Q.   If you look at 3, you say
4  "One more angle," number 3, your writing,
5  "the former CEO of Merck, Dr. Roy
6  Vagelos, an honorable, capable man.  He
7  hates Gilmartin and thinks he is an idiot
8  (may be accurate).  He would be a good
9  person for you to call - Gilmartin
10 replaced him.  Vagelos is incredibly well
11 respected in the medical and business
12 community, of the highest integrity and
13 ethical standards.  I think he might open
14 up and say - 'Merck should have done the
15 right thing immediately in 1998 when
16 study 090 showed a more than 6-fold heart
17 attack risk at low dose (12.5 milligrams)
18 of Vioxx."
19      Did you make that statement
20 in that document back in October 17 of
21 2004?
22      MR. GOLDMAN:  Objection.
23      THE WITNESS:  I made that
24 statement.  By happenstance, I

1  happened to have had dinner with
2  Dr. Vagelos just a couple of days
3  before the Vioxx withdrawal, and I
4  actually -- we spoke, it was such
5  a coincidence, about the whole
6  Vioxx issue, about his
7  relationship with Ray Gilmartin,
8  and it was actually quite an
9  extraordinary coincidence just a
10 couple of days later to have this
11 whole drug withdrawal and that
12 dinner discussion that evening
13 come back.
14      MR. GOLDMAN:  Objection,
15 move to strike as nonresponsive.
16 BY MR. KLINE:
17      Q.   Couple more points.
18      In your editorial, your
19 op/ed piece, you wrote, there's only a
20 sentence, I won't put it in front of you,
21 "Vioxx has repeatedly carried a far
22 greater risk of heart attack and stroke,"
23 you're saying, I'm reading through it,
24 "than the other COX-2 inhibitors?"

1      A.   (Witness nods.)
2      Q.   Do I have your opinion or
3  your views, your conclusions basically
4  correct when I state that?
5      MR. GOLDMAN:  Objection.
6      THE WITNESS:  The point here
7      is that all the COX inhibitors
8      have to be implicated, the class,
9      but within that class there
10     appears to be a gradient where
11     Vioxx appears to be worse,
12     consistently worse than Celebrex,
13     and somewhere in between perhaps
14     or perhaps closer to Vioxx is
15     Bextra, and there are other agents
16     in this class as well.
17 BY MR. KLINE:
18     Q.   That's what I wanted to --
19     MR. GOLDMAN:  Move to strike
20 the nonresponsive portion.
21 BY MR. KLINE:
22     Q.   That's what I wanted to
23 know.  That's what I wanted to find out.
24     MR. KLINE:  Dr. Topol, thank

1  you for answering my questions.  I
2  may have more questions after
3  Merck counsel examines you.
4      THE VIDEOTAPE TECHNICIAN:
5  Off the record at 2:31.
6      MR. LEVENSTEN:  I'm here on
7  behalf of the Pennsylvania cases.
8  Our Discovery Order Number 1
9  permits me to examine the witness
10 today.  I've informed Mr. Goldman
11 that I intend to conduct an
12 examination of the witness today.
13 I've offered to do it at the
14 conclusion of Mr. Kline's direct
15 examination.  Mr. Goldman's
16 position is that I cannot go
17 forward with -- well, I'll allow
18 him to state his.  I don't want to
19 misstate his position.  Go ahead.
20     MR. GOLDMAN:  I'm not taking
21 any position at all, Mr.
22 Levensten, on whether you can ask
23 questions.  I understand that the
24 MDL plaintiffs' lawyers think that

KS-000211

Page 314

1   the seven-hour rule applies in the
2   MDL and that we should be
3   splitting our time.  So, if you
4   want to coordinate with the
5   plaintiffs' lawyers, that's fine.
6   But I don't take a position one
7   way or the other.
8           MR. LEVENSTEN:  Well, then,
9   can I go forward now?
10          MR. GOLDMAN:  Let's go off
11  the record for a second.
12                  - - -
13          (A discussion off the record
14  occurred.)
15                  - - -
16          MR. WEINKOWITZ:  While we're
17  on a break, can I enter my
18  appearance?
19          Mike Weinkowitz,
20  W-E-I-N-K-O-W-I-T-Z, from Levin
21  Fishbein Sedran & Berman here in
22  Philadelphia.
23          MR. GOLDMAN:  Mr. Levensten
24  has spoken with Mr. Kline, and

Page 315

1   they're going to talk about what
2   questions they might want to ask.
3   I do want to make clear that I
4   don't know whether this deposition
5   has been cross-noticed in New
6   Jersey, and so the record will
7   speak -- or Pennsylvania.  The
8   record will speak for itself on
9   that.
10          MR. LEVENSTEN:  Just so I'm
11  clear on that record, we have a
12  discovery order entered that says
13  that this deposition is deemed
14  taken in Pennsylvania.  The order
15  also talks about how we're allowed
16  to ask questions that aren't
17  duplicative at depositions, and I
18  just need to protect my record
19  today.  Whether or not it's
20  cross-noticed, I don't even know
21  that it's relevant considering the
22  discovery order.
23          THE VIDEOTAPE TECHNICIAN:
24  On the record at 2:39.

Page 316

1                  - - -
2               EXAMINATION
3                  - - -
4   BY MR. GOLDMAN:
5       Q.   Good afternoon, Dr. Topol.
6       A.   Good afternoon.
7       Q.   I want to talk for a few
8   seconds about cardiovascular disease.  Is
9   it the leading cause of death in the
10  United States?
11      A.   Yes, it is.
12      Q.   Is cardiovascular disease
13  the leading cause of death by far?
14      A.   Well, it's significantly
15  greater than the second leading cause of
16  cancer, so, yes.
17      Q.   Is cardiovascular disease
18  the number one killer in the United
19  States and has it been since 1900?
20      A.   Yes.
21      Q.   Do you know that
22  approximately every 34 seconds somebody
23  dies of heart disease in this country?
24      A.   That's, I think, from the

Page 317

1   American Heart Association, and I can't
2   vouch for the calculation, but that's out
3   there, yes.
4       Q.   You also note, Dr. Topol,
5   that every 45 seconds somebody dies of a
6   stroke in the United States?
7       A.   Again, I think that's an AHA
8   fact, but I can't -- I was not involved
9   at all with the calculation, but I've
10  seen that written, yes.
11      Q.   Have you also seen that
12  700,000 Americans will die of a stroke in
13  2005?
14      A.   That number would correspond
15  to heart attacks, 700,000.  Stroke number
16  is not that high.
17      Q.   Do you know that
18  approximately 700,000 Americans will have
19  a stroke in 2005?
20      A.   That may well be the case,
21  but they wouldn't die from the stroke.
22  The number would be too high.
23      Q.   Is it true, Dr. Topol, that
24  every year 400,000 -- 460,000 people die

KS-000212

Page 318

1   of heart disease in the emergency room or
2   before even getting to the hospital?
3        A.   That number may be about
4   right.  There's a lot of out of hospital
5   sudden death, yes.
6        Q.   Did you take Vioxx, Dr.
7   Topol?
8        A.   Yes, I took Vioxx.
9        Q.   You took Vioxx for years,
10  didn't you?
11       A.   I took it occasionally.  I
12  have knee arthritis.  I've had multiple
13  knee surgeries, so, I would take it on
14  demand, you know, whether it be every --
15  once, a couple, every few weeks, that
16  sort of thing.
17       Q.   The reason you took Vioxx is
18  because you had serious knee pain, and
19  traditional NSAIDs were bothering your
20  stomach.  Is that true?
21       A.   I think the medicines that I
22  had taken actually didn't bother my
23  stomach.  I haven't had any things that
24  really bothered my stomach very much, but

Page 319

1   I can't recall that so much as I thought
2   I had better relief of my arthritis than
3   by taking a Motrin or some other
4   over-the-counter preparation.
5        Q.   Vioxx helped relieve your
6   knee pain better than the traditional
7   NSAIDs.  Is that fair?
8        A.   The ones that I had tried,
9   yes.
10                 - - -
11            (Whereupon, Deposition
12       Exhibit Topol-29, New York Daily
13       News Reprint (3 pages), was
14       marked for identification.)
15                 - - -
16  BY MR. GOLDMAN:
17       Q.   Let me show you what I'll
18  mark as the next exhibit.  Let's see if I
19  can refresh your recollection on whether
20  you suffered any stomach problems on
21  traditional NSAIDs.  This is Exhibit 29,
22  and it is an excerpt from the New York
23  Daily News.  Directing your attention,
24  Dr. Topol, to the paragraph, do you see

Page 320

1   it highlighted there?
2        A.   No.  What page are you on?
3        Q.   Let me have it back, sir.
4        A.   (Handing over document.)
5        Q.   On the third page, I'll read
6   it to you, and you tell me if it's
7   accurate.  This is quoting you: "Vioxx
8   and Celebrex are 'great medicines,' adds
9   the Queens born cardiologist who is 47.
10  He takes them for knees wrecked playing
11  college basketball.  'I used to have a
12  lot of stomach problems and I don't
13  challenge the stomach benefit,' says
14  Topol."
15       A.   Well, I haven't seen the
16  thing, and it'd be nice if I could see
17  it.
18            MS. DAGOSTINO:  Where is the
19       quote?  I'm sorry.
20            MR. GOLDMAN:  It's on Page
21       3, the third column to the right,
22       second full paragraph.
23            THE WITNESS:  (Witness
24       reviewing document.)

Page 321

1        Okay.
2   BY MR. GOLDMAN:
3        Q.   Is that correct or not?
4        A.   I don't remember ever saying
5   I used to have a lot of stomach problems,
6   so, I don't believe that's correct.
7        Q.   Is it true, Dr. Topol, that
8   newspapers sometimes report things that
9   aren't true?
10       A.   I would assume that not
11  everything in the newspaper is absolutely
12  correct, yes.
13            MR. HAMELINE:  Can we get a
14       copy of that?
15            MR. GOLDMAN:  Sure.
16            (Handing over document.)
17  BY MR. GOLDMAN:
18       Q.   You have pointed out on
19  several occasions on your direct
20  examination that you read newspaper
21  articles, and you formed opinions in this
22  case based on what you've read in
23  newspaper articles.  Is that true, sir?
24       A.   There are only two newspaper

KS-000213

Page 322

1  articles that I mentioned today that were
2  not substantiated by medical literature
3  that was peer reviewed.  One was the
4  ADVANTAGE trial which was supplementary
5  to the Annals of Internal Medicine paper
6  by Lisse et al.  The other was the VALOR
7  trial which, of course, has not been
8  published, it never was done.  Otherwise,
9  all my comments were derived from the
10 literature that was published in medicine
11 in leading peer-reviewed journals.
12      Q.   Let's talk about the VIGOR
13 study.  When did you first learn about
14 the VIGOR results, Dr. Topol?
15      A.   The VIGOR trial, to my --
16 really learning about it was not until,
17 as I mentioned this morning, February
18 2001.
19      Q.   Was the VIGOR trial
20 published in the New England Journal of
21 Medicine?
22      A.   Yes.  As I mentioned, the
23 November 22nd, 2000.
24      Q.   Is the New England Journal

Page 323

1  of Medicine a top medical journal?
2      A.   It's the leading impact
3  journal in biomedicine today.
4      Q.   Do you read it regularly?
5      A.   I read articles -- it's
6  impossible to keep up with all the
7  medical literature, but I read all
8  articles that are pertinent to my
9  specialty, which is coronary artery
10 disease, which is -- with the primary
11 focus on the heart, yes.
12      Q.   Is the New England Journal
13 of Medicine a peer-reviewed journal?
14      A.   Yes.
15      Q.   That means that before the
16 New England Journal of Medicine will
17 publish an article, doctors who are
18 knowledgeable in the field that's being
19 described in the article review the
20 article for accuracy.
21      A.   "Peer review" means that the
22 data are reviewed, and certainly the
23 conclusions are -- yes, that's what peer
24 review is all about.

Page 324

1      Q.   Peer reviewed is a standard
2  process that medical journals use to
3  ensure the quality of the articles that
4  they publish; correct?
5      A.   Correct.
6      Q.   I want to talk briefly about
7  how the VIGOR trial was conducted, and
8  then we'll discuss the results.  Okay?
9      A.   Yes.
10      Q.   Do you know that VIGOR
11 tested whether Vioxx was safe at treating
12 pain suffered by patients who had
13 rheumatoid arthritis?
14      A.   Yes.  I mentioned that
15 earlier today.
16      Q.   And one of the things that
17 the VIGOR trial sought to test was
18 whether the patients who had rheumatoid
19 arthritis could have relief from their
20 pain without causing them as many stomach
21 problems as naproxen; correct?
22      A.   The primary, I think,
23 endpoint of the study was the relief of
24 gastrointestinal complications.  That

Page 325

1  was, I think, why the sample size and the
2  power of the trial was set up, to detect
3  whether or not rofecoxib/Vioxx would have
4  an advantage over naproxen in that
5  regard.
6      Q.   Are patients with rheumatoid
7  arthritis at higher risk of heart
8  attacks?
9      A.   As I mentioned this morning,
10 yes, patients with RA, rheumatoid
11 arthritis, do have higher event rates for
12 heart attacks.
13      Q.   In the VIGOR trial, patients
14 who participated either used Vioxx 50
15 milligrams once a day or naproxen, 500
16 milligrams twice per day.  Is that right?
17      A.   That's correct.
18      Q.   The dosage for Vioxx that
19 was used is actually twice the highest
20 recommended dose in the label for Vioxx,
21 correct, sir?
22      A.   That's correct, although I
23 must say it was an 8,000 patient trial,
24 so, it was a very large trial, and that's

**KS-000214**

1  the dose that was picked by the trialist
2  and the sponsor, yes.
3       Q.   The dose that was picked was
4  also approved by the FDA; correct, sir?
5       A.   The dose approved by the FDA
6  at the time was not approved for
7  rheumatoid arthritis.  It was approved
8  for osteoarthritis, and I believe the
9  doses were 12-and-a-half milligrams to 25
10 milligrams or up to 50 milligrams.
11      Q.   I wasn't clear, sir.
12           The 50 milligram dose that
13 was used in the VIGOR trial was approved
14 by the FDA to be used in the VIGOR trial,
15 correct, sir?
16      A.   Well, that's not the way it
17 works.  You don't get doses approved by
18 the FDA to use in a trial.  There's an
19 approval mechanism for a drug now that's
20 on the market.  The VIGOR trial, I
21 believe, had started long before the drug
22 was approved.  So, what would be here
23 would be a protocol that would be
24 reviewed by the FDA.  If that's what the

1  sponsor wants to use as a dose, then
2  certainly the FDA isn't going to take
3  issue with that.
4       Q.   Does the FDA approve
5  protocols before clinical trials can be
6  conducted, sir?
7       A.   The FDA reviews the
8  protocols, and in general, unless there's
9  something that's particularly an outlier
10 regarding the design, the FDA will go
11 along with what the sponsor's wishes are
12 as long as there's no concern regarding
13 overt safety and ethical issues.  The
14 sponsor is the one that would be
15 responsible for picking the appropriate
16 dose.
17      Q.   You're not critical, Dr.
18 Topol, of Merck's decision to use
19 naproxen as the drug to compare Vioxx to,
20 are you, sir?
21      A.   No.  I think naproxen, being
22 a widely used nonsteroidal agent for
23 arthritis, all types of arthritis, was a
24 very suitable comparator.

1       Q.   None of the patients in the
2  VIGOR trial used placebo, did they?
3       A.   The VIGOR trial did not test
4  placebo.  It was a so-called active
5  comparison, that is, comparing one active
6  anti-inflammatory versus another.
7       Q.   A placebo is another word
8  for a sugar pill.  Is that right?
9       A.   That would be an inactive
10 drug, yes.
11      Q.   You agree, sir, that it
12 would have been unethical and
13 inappropriate to conduct a study on
14 patients with rheumatoid arthritis and
15 give half of the group Vioxx and the
16 other half a sugar pill?
17      A.   No, I don't agree with that
18 whatsoever.  That is, you could do a
19 trial, as long as you had some pain
20 medicine, anti-inflammatory, that all the
21 patients were getting to relieve their
22 symptoms.  And then on top of that, you
23 could do Vioxx versus placebo on top of
24 that.  So, no, I don't agree with that.

1       Q.   Would it be ethical, Dr.
2  Topol, if half of the patients in the
3  VIGOR study who had rheumatoid arthritis
4  only took a placebo?
5       A.   If they had no other relief
6  for their rheumatoid arthritis symptoms?
7       Q.   Yes.
8       A.   No, that would not be
9  proper.
10      Q.   The VIGOR trial showed that
11 Vioxx was an effective treatment for
12 pain; correct?
13      A.   The VIGOR trial showed there
14 was no difference in pain relief between
15 naproxen and Vioxx.
16      Q.   That wasn't my question, Dr.
17 Topol.
18           I asked you whether Vioxx
19 was shown in the VIGOR trial to be an
20 effective treatment for pain.
21      A.   Effective compared with
22 what, Mr. Goldman?
23      Q.   Effective, period, sir.
24      A.   No.  You can't make --

KS-000215

Page 330

1  effective, you have to have a reference.
2  Here the reference was naproxen.  It was
3  shown to be no more effective than
4  naproxen.  So then you could say it's
5  equally effective to naproxen, then I
6  would say yes, for pain relief.
7       Q.   Do you agree then, sir, that
8  Vioxx worked to reduce pain that
9  rheumatoid arthritis patients were
10 experiencing in the VIGOR trial?
11      A.   It reduced pain, as far as I
12 understand from the data, equally, as
13 well as naproxen at the doses that were
14 administered with the 50 milligrams of
15 Vioxx, yes.
16      Q.   The results of VIGOR also
17 showed that Vioxx significantly reduced
18 the risk of stomach bleeds compared to
19 naproxen; correct?
20      A.   Yes.  As reviewed earlier
21 today, the risk of reduction of stomach
22 bleeds was small, but statistically
23 significant, and it was very much in
24 keeping with the magnitude of the excess

Page 332

1            MR. HAMELINE:  I think he's
2       already answered the question.  If
3       you don't like the answer, that's
4       a different issue.
5  BY MR. GOLDMAN:
6       Q.   Dr. Topol, I'm asking you a
7  very simple question.
8            Did Vioxx in the VIGOR trial
9  substantially reduce or significantly
10 reduce the risk of stomach bleeds
11 compared to naproxen?
12           MR. KLINE:  Objection, asked
13      and answered.
14           THE WITNESS:  Can you read
15      my answer back, my initial answer,
16      please.
17            - - -
18           (Whereupon, the court
19      reporter read the pertinent part
20      of the record.)
21            - - -
22 BY MR. GOLDMAN:
23      Q.   Was there a 54 percent
24 reduction in the risk of perforations,

Page 331

1  of heart attacks and strokes.
2       Q.   Dr. Topol, if you could try
3  to just answer my questions directly --
4            MR. KLINE:  Objection.
5  BY MR. GOLDMAN:
6       Q.   -- and not add anything on
7  to them, that would be helpful.  My only
8  question, sir --
9            MR. KLINE:  Does the same
10      rule apply to Merck?  Let's redact
11      Alise Reicin's deposition.
12           You should answer the
13      questions fully and completely.
14 BY MR. GOLDMAN:
15      Q.   Dr. Topol, did Vioxx
16 significantly reduce the risk of stomach
17 bleeds compared to naproxen in the VIGOR
18 trial?
19      A.   I believe I answered that
20 question to the best of my ability.
21      Q.   Is the answer yes?
22      A.   As I had previously answered
23 the question in context.
24      Q.   Is the answer yes?

Page 333

1  ulcers and bleeds in the Vioxx group
2  compared to the naproxen group, sir?
3       A.   I had to go back to the
4  paper and put that in.  I have to look at
5  the data if you'd like me to answer that.
6  I don't memorize statistics about the
7  gastrointestinal bleeding.  That's not my
8  field of expertise.
9       Q.   Do you want to take a minute
10 to look at it?
11      A.   I don't have the VIGOR
12 paper.  If you'd like to produce it.
13      Q.   What I'll do, Dr. Topol, is
14 show this to you at a break so that you
15 can read it for me rather than do it on
16 the record.  Is that okay?
17      A.   Whatever you would like.
18           MR. HAMELINE:  Let me just
19      note that Dr. Topol is here for
20      one day of deposition.  And we've
21      taken this morning, and I know
22      that it's not your issue, but this
23      morning we've gone off the record
24      repeatedly and not counted that or

KS-000216

Page 334

1  at least the argument is not
2  counted that against his running
3  time. If you're going to ask him
4  questions about an exhibit, why
5  don't you show it to him. We'll
6  try to cooperate off the record if
7  we can, but I don't want this to
8  be an off-the-record issue which
9  prolongs this day unduly.
10      MR. KLINE: I would like him
11  to look at it now, rather than at
12  some break.
13  BY MR. GOLDMAN:
14      Q.  Let's talk about the
15  cardiovascular results of VIGOR. Okay,
16  Doctor?
17          We saw in the VIGOR trial
18  that there were more cardiovascular
19  events in the Vioxx group than in
20  naproxen; correct?
21      A.  That's correct. And I did
22  review that this morning. I'll be happy
23  to review it again if you'd like.
24      Q.  So, you reviewed the data

Page 335

1  about the cardiovascular events in VIGOR
2  this morning, but you didn't review the
3  data about the reduction in stomach
4  bleeds.
5      A.  No. I did review in my
6  letter of December 30, 2004
7  correspondence in the New England
8  Journal. I commented about the
9  gastrointestinal complications, as well
10  as, but I did not cite the particular
11  bleeding figure, percentage that you just
12  asked me about.
13      Q.  Was the difference in
14  cardiovascular events in the Vioxx group
15  mostly due to a five times difference in
16  heart attacks compared to the naproxen
17  group?
18      A.  Well, let me just be very
19  clear about that. Okay? There were 22
20  deaths in the Vioxx group and 15 deaths,
21  as I reviewed, in the naproxen group.
22  There were 20 heart attacks versus -- in
23  the Vioxx group versus 4. So, there was
24  an excess of deaths. That was a 46

Page 336

1  percent excess of deaths, which is
2  similar, if your number is right, with
3  respect to the bleeding complications.
4  If we're talking about percentages, 46
5  percent increase in death and 46 percent
6  increase in bleeding complication, if
7  that's correct. We have a five fold, 500
8  percent increase in heart attack. And
9  then we have also an increase in stroke,
10  11 versus 9.
11          So, according to the correct
12  data, which was not published in the New
13  England Journal paper by Bombardier in
14  November 22, 2000, there was 53 of these
15  events, death, heart attack or stroke
16  versus 28. The largest portion of those
17  in terms of numerical were heart attack,
18  but there was a consistent excess across
19  each, death, heart attack and stroke.
20      MR. GOLDMAN: Move to strike
21          as nonresponsive.
22  BY MR. GOLDMAN:
23      Q.  Dr. Topol, first of all, the
24  deaths that you just described, the 22

Page 337

1  versus 15, those weren't all heart attack
2  deaths or cardiovascular deaths, were
3  they, sir?
4      A.  Predominantly they were,
5  yes, as reported in the study report in
6  the FDA, yes.
7      Q.  Is it your testimony under
8  oath, Dr. Topol, that the majority of the
9  22 deaths and the majority of the 15
10  deaths reported in VIGOR were heart
11  attacks?
12      A.  Not heart attacks, but they
13  were cardiovascular deaths, and I'd be
14  happy to go to the Targum report where
15  they're enumerated in tables if you would
16  like.
17      Q.  My question actually was not
18  about the deaths, Dr. Topol. My question
19  was about whether or not in VIGOR the
20  difference in cardiovascular events was
21  attributed mostly because there was a
22  five times more -- five times greater
23  difference in heart attacks versus
24  naproxen.

**KS-000217**

Page 338

1    MR. KLINE:  Objection to the
2  introduction.
3  BY MR. GOLDMAN:
4    Q.   Dr. Topol, was there a five
5  times difference in heart attacks in the
6  Vioxx group versus the naproxen group in
7  the VIGOR study?
8    MR. HAMELINE:  So, can I
9  just interject a comment here.
10  You're asking him very specific
11  questions about the data in the
12  VIGOR study without putting the
13  VIGOR study in front of him.  To
14  the extent that Dr. Topol has
15  memorized all of this or put it
16  into subsequent articles, that's
17  fine.  I'm just trying to make
18  sure that the answers are fair and
19  complete.
20    THE WITNESS:  Okay.
21  BY MR. GOLDMAN:
22    Q.   Let me back up, Dr. Topol.
23  I think you said in one of your previous
24  answers that there were 20 heart attacks

Page 339

1  seen in the Vioxx group and 4 heart
2  attacks seen in the naproxen group.
3  Right?
4    A.   That's correct.
5    Q.   That's a five times
6  difference; right?
7    A.   That's correct.
8    Q.   What percentage of the
9  patients in the Vioxx group had heart
10  attacks?
11    A.   That would be 20 of 4,047.
12  So, that would be approximately -- I
13  don't have a calculator, but it would be
14  approximately .5 percent.
15    Q.   One half of one percent?
16    A.   One half of one percent.
17    Q.   Do you know what the
18  percentage of heart attacks in the
19  naproxen group was?
20    A.   Well, that was 4 out of
21  4,029, which is less than .1 percent.
22    Q.   Or less than one-tenth of
23  one percent?
24    A.   That's correct.

Page 340

1    Q.   Because there was no placebo
2  group in the VIGOR study.  If you only
3  looked at the VIGOR study without looking
4  at any other data, you wouldn't be able
5  to tell the reason for the difference in
6  heart attacks in the Vioxx group versus
7  naproxen; is that right?
8    A.   I'm not sure that I
9  understand that question.
10    Q.   If you just look at the
11  VIGOR study --
12    A.   Yes.
13    Q.   -- at the time that it was
14  done and you don't consider any data
15  outside of the VIGOR study --
16    A.   Yes.
17    Q.   -- you don't know whether
18  the difference in heart attacks between
19  Vioxx and naproxen was due to Vioxx --
20    A.   Oh, I see.
21    Q.   -- naproxen or chance.
22    A.   Now I understand your
23  question.  Okay.  So, first --
24    Q.   Is that right?

Page 341

1    A.   Yes, you do know.  That is,
2  I reviewed this this morning, but just to
3  recap.  When you're doing clinical trials
4  with an experimental drug, in this case,
5  it's Vioxx, versus a drug that's been
6  around for 20 years, in this case,
7  naproxen, which is considered the control
8  arm, not a placebo, but a control arm,
9  and if you have an untoward event crop up
10  like occurred in the VIGOR trial, one has
11  to assume that it's the experimental drug
12  excess that's the problem rather than
13  what was introduced by Merck, which is
14  substantiated in the Targum report and
15  other places, which is that it was a
16  protective effect of naproxen which was
17  not documented.  The only appropriate
18  conclusion would have been that there was
19  a problem with the experimental drug,
20  which in this case was Vioxx.
21    Q.   Is it your testimony, Dr.
22  Topol, that when you reviewed the VIGOR
23  study, it was your conclusion that Vioxx
24  caused the difference in heart attacks

**KS-000218**

Page 342

1  and not naproxen and not chance?
2      A.   Yes.  That was our
3  conclusion, but we did not at that time
4  have the replication that was needed to
5  say that this drug should be taken off
6  the market or something drastic.  What we
7  did say, as we wrote in the JAMA paper,
8  as you well know and I reviewed earlier,
9  is that more data were needed, and
10  specific significant caution must be
11  exercised in using this medicine because
12  of the heart attack risk.
13      Q.   Did the Food & Drug
14  Administration hold a special Advisory
15  Committee meeting in February of 2001 to
16  discuss the question of whether COX-2
17  inhibitors cause heart problems?
18      A.   Yes.  They had, as I
19  mentioned this morning, a two-day
20  conference, one for each of the drugs,
21  Celebrex and Vioxx.
22      Q.   What is an FDA Advisory
23  Committee briefly, sir?
24      A.   Well, a panel of experts are

Page 343

1  brought in, and the data are reviewed,
2  and there's recommendations by the panel
3  to give to the FDA staff, and the FDA
4  staff can either accept or reject those
5  recommendations.  But this is a panel of
6  experts.  In this particular case, it was
7  predominantly rheumatologists.  There
8  were only two cardiologists who were
9  invited to the panel to review Vioxx and
10  Celebrex.
11      Q.   One of the cardiologists who
12  was on the Advisory Committee was your
13  colleague, Dr. Steven Nissen; is that
14  right?
15      A.   Yes.
16      Q.   He is a well-respected
17  cardiologist, correct, sir?
18      A.   Yes.
19      Q.   The FDA Advisory Committee
20  meetings that are held, those are open to
21  the public, aren't they, Dr. Topol?
22      A.   Yes.
23      Q.   The transcripts from the
24  Advisory Committee meetings are available

Page 344

1  on the FDA website; right?
2      A.   Yes.  And I have even
3  reviewed the transcript of this meeting
4  in depth, yes, in the past.
5      Q.   You also know then that the
6  presentations that are made during the
7  Advisory Committee meeting are also
8  available on the FDA website; right?
9      A.   That's correct.  And I've
10  reviewed the presentations as well.
11      Q.   During the Advisory
12  Committee meeting that your colleague,
13  Dr. Nissen, attended, Merck gave a
14  presentation; right?
15      A.   Merck gave a substantial
16  presentation, that's right.
17      Q.   Pfizer gave a presentation
18  about Celebrex; correct?
19      A.   That was on a different day,
20  yes.
21      Q.   The FDA made a presentation
22  as well; correct?
23      A.   Yes.
24      Q.   The FDA also prepared

Page 345

1  background materials for the Advisory
2  Committee, analyzing the clinical trials
3  that had been done on Vioxx and Celebrex;
4  correct, sir?
5      A.   That's correct.
6      Q.   After the presentations were
7  made, the Advisory Committee discussed
8  the issues, including the risk of --
9  cardiovascular risk that was potentially
10  associated with COX-2 inhibitors; right?
11      A.   In reviewing that,
12  transcripts and the presentations and
13  also discussing this with Dr. Targum, who
14  had the most important data, that is,
15  VIGOR, 085 and 090, she was given less
16  than five minutes to present her
17  findings, which were only really
18  understood by reviewing the report in
19  depth.  Her slides are on the FDA website
20  still.  They do not adequately convey the
21  concerns that she registered, and I'll be
22  happy to review some of the statements
23  that are in her report which are highly
24  disturbing and concerning.  So, in

**KS-000219**

Page 346

1  effect, Dr. Targum, who did the most
2  thorough review, cardiologist at the FDA,
3  never had her chance to express her views
4  at least as she's conveyed to me and
5  certainly as conveyed by reviewing the
6  FDA slides and her -- and the transcript
7  of that day.
8      Q.   Is it your testimony, Dr.
9  Topol, that Shari Targum of the FDA was
10 not permitted by the FDA to get up and
11 give a full presentation of what she
12 thought about the risks, if any,
13 associated with COX-2 inhibitors?
14     A.   She conveyed that to me in a
15 telephone conversation, exactly the sense
16 that she did not -- she was not able to
17 evoke enough concern among the two
18 cardiologists on the panel, even though
19 they recommended strong changes in the
20 language of the package insert and the
21 label of the drug.
22     Q.   Your colleague, Dr. Nissen,
23 was sitting through the presentation that
24 Miss Targum gave, correct, sir?

Page 347

1      A.   The brief presentation.
2  Approximately three minutes as he relayed
3  to me.
4      Q.   If Dr. Nissen wanted to hear
5  more from Shari Targum of the FDA, he
6  would have said to Ms. Targum, can you
7  tell me more, correct, sir?
8      A.   He didn't know there was
9  anything there to add.  Only later, after
10 the review of the data and the review of
11 her report on the website would it become
12 more evident that there were significant
13 concerns.
14     Q.   The Targum report that you
15 keep referring to is a report that was
16 actually presented to the Advisory
17 Committee members, correct, sir?
18     A.   She wrote it February 1st.
19 I don't know whether it was distributed
20 to the Advisory Committee before that
21 meeting.  I don't know that.  You'd have
22 to ask Dr. Nissen that.
23     Q.   Shari Targum prepared a set
24 of materials for the benefit of the

Page 348

1  Advisory Committee; right, sir?
2      A.   I believe that's what -- she
3  did it for that advisory panel, but I
4  don't know -- what you're asking is, was
5  it distributed to the panelists in
6  advance? I don't know that.  I wasn't
7  there.  This was Dr. Nissen's first FDA
8  panel.
9      Q.   Did Dr. Nissen give a slide
10 presentation during the February 2001
11 Advisory Committee meeting?
12     A.   I'm not aware of that.
13     Q.   I thought you said a minute
14 ago you reviewed the transcript?
15     A.   I reviewed the transcripts
16 of the relevant sections.  I did not go
17 through every slide presentation, and
18 it's been quite a while.  I mean, it's
19 been probably at least a year or a year
20 and a half since I reviewed that, but I
21 don't recall seeing a presentation by Dr.
22 Nissen on VIGOR.
23     Q.   Do you remember, Dr. Topol,
24 that Dr. Nissen had actually made a

Page 349

1  presentation to the other members of the
2  Advisory Committee specifically
3  addressing VIGOR, addressing the CLASS
4  trial or the Celebrex trial and
5  addressing an analysis he did of four
6  different aspirin trials?  Do you
7  remember that?
8      A.   That -- now, okay, you're
9  talking about a whole different FDA
10 panel.  This is not February of 2001.
11 Because the aspirin comparison was an
12 idea I had after he got back.  So, you
13 have the wrong FDA panel.
14     Q.   Dr. Topol, did Dr. Nissen
15 make a presentation at the Advisory
16 Committee meeting in February of 2001
17 where he discussed VIGOR, where he
18 discussed the CLASS trial, which was
19 Celebrex's outcome trial, and a trial
20 called the Primary Prevention Project?
21         MR. HAMELINE:  So, can I
22 just interject a comment here.
23 Dr. Nissen -- Dr. Topol has said
24 several times he was not at the

KS-000220

Page 350

1       meeting.  He's --
2           MR. GOLDMAN:  I'm asking if
3   he knows.
4           MR. HAMELINE:  He's reviewed
5   the website.  If it's on the
6   website, why don't you show it to
7   him.  You can ask him if he knows.
8   But I think he's already testified
9   that he doesn't.
10          THE WITNESS:  You just
11  changed your question.
12  BY MR. GOLDMAN:
13      Q.  Dr. Topol, are you aware one
14  way or the other whether Dr. Nissen made
15  a presentation where he talked about
16  VIGOR, CLASS and a trial called the
17  Primary Prevention Project?
18      A.  That is possible, but
19  certainly not the four trials that you
20  just asked about previously.  That's not
21  possible.
22      Q.  Let me show you, sir, an
23  excerpt from the FDA Advisory Committee
24  meeting.

Page 351

1           MR. GOLDMAN:  We'll mark
2   this as the next exhibit, 30.
3               - - -
4           (Whereupon, Deposition
5       Exhibit Topol-30, "Arthritis
6       Advisory Committee NDA #
7       21-042/S007, Vioxx (Rofecoxib,
8       Merck) " 2-8-01, 1-3; 210, was
9       marked for identification.)
10              - - -
11  BY MR. GOLDMAN:
12      Q.  Dr. Topol, do you see on
13  page 210 of the transcript that Dr.
14  Nissen is making comments during the
15  Advisory Committee meeting on February
16  8th?
17      A.  Yes.  I'm familiar with this
18  comment.  I reviewed this -- I remember
19  this -- I mean, it's just the one comment
20  on this one page, 210, but I do remember
21  it, yes.
22      Q.  Do you see that Dr. Nissen
23  was being asked about the label for Vioxx
24  and what it should say about any

Page 352

1   potential cardiovascular risks?
2           MR. HAMELINE:  Objection.  I
3       don't think he's being asked.
4       He's making a comment.
5   BY MR. GOLDMAN:
6       Q.  Dr. Topol, does Dr.
7   Nissen --
8           MR. KLINE:  Objection.
9   BY MR. GOLDMAN:
10      Q.  -- make the following
11  statement to the Advisory Committee?
12  "Briefly, I think what I would say in the
13  label is that there was an excess of
14  cardiovascular events in comparison to
15  naproxen, that it remains uncertain
16  whether this was due to beneficial
17  cardioprotective effects of naproxen or
18  prothrombotic effects of the agent, and
19  leave it at that, that basically we don't
20  know the reason"?
21          MR. KLINE:  Objection.
22  BY MR. GOLDMAN:
23      Q.  Do you see that, sir?
24          MR. KLINE:  Objection,

Page 353

1       multiple reasons I'll fill in
2       later.
3   BY MR. GOLDMAN:
4       Q.  Do you see that?
5       A.  Yeah, I see it, and I
6   understand that completely.  As of
7   February 8, 2001, which I believe was the
8   date of this -- and I also understand
9   that the consensus of the panel was like
10  this, that there needed to be a change in
11  the label about the cardiovascular risk.
12  So, this is consistent with that.
13      Q.  Did you agree with Dr. Topol
14  in February -- I'm sorry, withdrawn.
15          Did you agree with Dr.
16  Nissen in February of 2001 that it
17  remains uncertain whether the excess of
18  cardiovascular events compared to
19  naproxen was due to the beneficial
20  cardioprotective effects of naproxen or
21  prothrombotic effects of Vioxx?
22          MR. KLINE:  Same objection.
23          THE WITNESS:  We expressed
24      the same question in our JAMA

KS-000221

Page 354

```
 1      paper that came out later in the
 2      year, and the point being is that
 3      we, after much more careful review
 4      of the data, it was not at all
 5      apparent that this could be
 6      attributed to naproxen benefit.
 7      At the time in February 8th of
 8      2001 before we had a chance to
 9      rake over the data, there was less
10      certainty.  It was more ambiguous.
11      Over time, as we had a chance to
12      review things, and certainly as
13      more studies came out beyond ours,
14      it became increasingly clear.  And
15      that's why in the JAMA paper Dr.
16      Nissen and I and Dr. Mukherjee
17      concluded about the cautionary use
18      of this drug.
19  BY MR. GOLDMAN:
20      Q.   Dr. Topol, I didn't ask you
21  anything about your opinion.
22          MR. KLINE:  Objection.
23  BY MR. GOLDMAN:
24      Q.   My question is whether --
```

Page 355

```
 1          MR. KLINE:  Move to strike.
 2  BY MR. GOLDMAN:
 3      Q.   -- in February of 2001 you
 4  agreed with Dr. Nissen that it was
 5  uncertain whether the difference in heart
 6  attacks that was seen between Vioxx and
 7  naproxen was due to Vioxx, was due to
 8  naproxen or chance?
 9      A.   I did not see Dr. Nissen on
10  February 8th, 2001.  I saw him on
11  February 9th, 2001 when we both were back
12  in Cleveland, I was in Georgia, he was at
13  the FDA.  And he came to me and said I'm
14  quite concerned.  So, his concern wasn't
15  reflected by this statement.
16      Q.   I'll ask one more time, sir.
17          MR. KLINE:  Objection.
18  BY MR. GOLDMAN:
19      Q.   Did you agree in February of
20  2001 with Dr. Nissen that it was
21  uncertain whether the difference in
22  cardiovascular events seen between Vioxx
23  and naproxen was due to Vioxx, was due to
24  naproxen or chance?
```

Page 356

```
 1      A.   I've answered that several
 2  times earlier today, that it's in the
 3  manuscript.  We didn't know for sure at
 4  that point, and that is pointed out in
 5  our JAMA paper on several, at least two,
 6  if not three times in that manuscript.
 7      Q.   Is the answer to my question
 8  yes, Doctor?
 9          MR. KLINE:  Objection.
10          THE WITNESS:  With the one
11      trial of VIGOR and the very
12      staunch defense of this naproxen
13      hypothesis offered by Merck
14      without independent replication,
15      without any other studies, one
16      could not make definitive -- and
17      we said that in the JAMA paper,
18      not make definitive conclusions.
19      That's true.
20  BY MR. GOLDMAN:
21      Q.   You said on direct
22  examination, Dr. Topol, that a black box
23  warning could easily have been imposed by
24  February of 2001.  Do you remember
```

Page 357

```
 1  testifying to that?
 2      A.   Yes.
 3      Q.   Did anybody at the Advisory
 4  Committee meeting suggest that a black
 5  box warning be put on the Vioxx label?
 6      A.   No.  And that's because the
 7  correct data for study 090 were not
 8  presented.
 9      Q.   We're going to talk a lot
10  about 090, Dr. Topol.
11      A.   Good.  I'll be happy to.
12  Look forward to it.
13      Q.   Dr. Topol, my question is
14  whether anybody at the Advisory Committee
15  meeting in February of 2001, including
16  your colleague, Dr. Nissen, suggested
17  that a black box warning be added to the
18  Vioxx label?
19      A.   I don't know the answer to
20  that.  I don't recall the transcript
21  enough to be able to say whether anyone
22  registered that concern.  I know there
23  are only two cardiologists there, so,
24  that's one issue.  But I don't know.
```

KS-000222

Page 358

1    Q.   Do you see in the excerpt
2  that I provided to you that Dr. Nissen
3  doesn't say anything about a black box
4  warning?  Correct, sir?
5    A.   You provided one page of a
6  1,000 page transcript.  That's not -- I
7  mean, that's not a full disclosure here.
8  It's not very comprehensive, so, I can't
9  say.
10   Q.   Based on the excerpt that I
11 did provide you, do you see that in that
12 answer Dr. Nissen is not saying anything
13 about a black box warning on Vioxx?
14   A.   I certainly don't see that
15 in that excerpt, no.
16   Q.   You talked a lot about your
17 proposed cardiovascular outcome study;
18 correct?
19   A.   I discussed that we were
20 invited by Dr. Reicin --
21   Q.   No.
22   A.   That's what you're talking
23 about.
24   Q.   That's not what I was

Page 359

1  talking about.
2        On direct examination, Dr.
3  Topol, you were asked a bunch of
4  questions about your cardiovascular
5  outcomes study; correct?
6    A.   I addressed that earlier
7  today, yes.
8    Q.   You proposed a
9  cardiovascular outcomes study to both
10 Merck and Pfizer; true?
11   A.   I did not propose any
12 cardiovascular outcome trial to Pfizer,
13 and Dr. Bhatt is the one who picked up
14 the ball and proposed this to Merck.  And
15 I knew about it.  I told them about it,
16 but I wasn't the one that made any
17 proposal to either company.
18   Q.   Do you think, Dr. Topol,
19 back at the time that you were suggesting
20 that both Merck conduct a cardiovascular
21 outcome trial and Pfizer conduct one?
22   A.   I thought that would be
23 appropriate given the uncertainty about
24 this heart attack risk, yes.

Page 360

1    Q.   Do you agree, Dr. Topol,
2  that your suggested approach, the
3  cardiovascular outcomes study, was not
4  the only way to address the question of
5  whether there was a potential
6  cardiovascular risk associated with COX-2
7  inhibitors?
8    A.   I had stated earlier today
9  that the only way to get the answer
10 definitively in patients who have heart
11 disease is to do a trial in patients with
12 heart disease.
13   Q.   You testified before that
14 the clinical trials that were done on
15 Vioxx did not involve patients who either
16 had heart disease or were at risk of
17 heart disease.  Was that your testimony?
18   A.   No.  My testimony was with
19 heart disease.
20   Q.   Dr. Topol, you do know that
21 in the clinical trials for Vioxx, there
22 were people who actually were at risk of
23 heart disease?
24        MR. HAMELINE:  Objection.

Page 361

1        Are you talking about all the
2  clinical trials?
3        THE WITNESS:  "At risk" is
4  not the same as having heart
5  disease.  The number of patients
6  with actual bona fide documented
7  heart disease is vanishingly
8  small, almost nonexistent in these
9  trials.  They were almost
10 systematically excluded.  There's
11 a different matter about whether
12 someone has risk for heart
13 disease, a number of risk factors,
14 but I'm talking about documented
15 coronary artery disease.
16 BY MR. GOLDMAN:
17   Q.   Dr. Topol, you do know that
18 there were patients who participated in
19 Vioxx's clinical trials who did have
20 documented cardiovascular disease; right?
21   A.   As I just said, the numbers
22 of those patients are vanishingly small,
23 perhaps as low as one percent and in some
24 trials, zero.

KS-000223

Page 362

1    Q.   Do you believe, Dr. Topol,
2  that your proposed study, your proposed
3  cardiovascular outcomes study was the
4  only way to -- withdrawn.
5        Do you believe, Dr. Topol,
6  that your proposed cardiovascular
7  outcomes study was the only reasonable
8  way to address the potential risk
9  associated with Vioxx and Celebrex
10  concerning cardiovascular disease?
11    A.   First of all, I would go
12  back to our JAMA paper.
13    Q.   I'm not asking about the
14  JAMA paper. I'm asking you --
15    A.   But you're asking about the
16  cardiovascular trial.
17    Q.   Dr. Topol, I'm asking you,
18  as you sit here today, do you believe
19  that your proposed cardiovascular outcome
20  trial was the only way to assess the
21  potential for cardiovascular risk in
22  patients who took Vioxx and Celebrex?
23    A.   I answered your question
24  earlier. In patients -- if we wanted to

Page 363

1  know about patients with coronary artery
2  disease, and as I reviewed this morning,
3  40 to 50 percent of the patients, of the
4  20 million taking Vioxx or by various
5  registries and surveys, had established
6  coronary artery disease, the only way to
7  find out about those patients and their
8  quantifiable risk is in a study, a trial
9  dedicated to only enter patients with
10  established coronary artery disease, and
11  there's no other way to do that, no.
12  That's the only way to do such a trial.
13    Q.   Do you agree, Dr. Topol,
14  that all clinical trials must offer
15  potential benefits to patients?
16    A.   One can never do a trial
17  with just testing the side effects
18  without at least a putative equal or
19  better benefit.
20    Q.   Is the answer to my question
21  yes, all clinical trials must offer
22  potential benefit to patients?
23        MR. HAMELINE: I think he
24    just answered your question. He's

Page 364

1        given you a fulsome, complete
2        response.
3            THE WITNESS: Can you read
4        back my answer, please.
5  BY MR. GOLDMAN:
6    Q.   I'm not interested in your
7  answer. I'm asking you a separate
8  question.
9    A.   I want to see if I answered
10  the question adequately because you
11  challenged that I didn't.
12    Q.   Dr. Topol, can you answer
13  this question yes or no?
14        Do all clinical trials have
15  to have some potential benefit offered to
16  patients?
17    A.   All clinical trials should
18  have a therapeutic potential, yes, a
19  benefit, yes.
20    Q.   You can't give patients
21  medicine in a clinical trial just to see
22  if they get sick; right?
23        MR. HAMELINE: Can I just
24    read what's in the order for the

Page 365

1        MDL, which is that "Once the
2        witness has fully answered a
3        question, that same or
4        substantially the same question
5        should not be asked again." I
6        think this has been violated for
7        the fourth -- I know you want to
8        get at concrete issues here, but I
9        do think that he's answering and
10        answered that question fully the
11        first time.
12  BY MR. GOLDMAN:
13    Q.   Dr. Topol --
14        MR. KLINE: Can we adopt Mr.
15        Goldman's rule for the Merck
16        witnesses as his approach to --
17        MR. GOLDMAN: I'd really not
18        have a speech on the record, Mr.
19        Kline. If you have an objection,
20        please state it.
21        MR. KLINE: We would be
22        really advanced in this
23        litigation.
24  BY MR. GOLDMAN:

KS-000224

Page 366

1    Q.   Dr. Topol --
2    A.   Yes.
3    Q.   -- you can't give patients
4  medicine just to see if they have a heart
5  attack or die, correct, sir?
6    A.   I would never be involved in
7  a clinical trial or advocate doing a
8  trial where there was just testing for
9  harm.  You have to have -- you don't put
10 patients -- experiment on patients unless
11 you're looking at benefit and also, of
12 course, always assaying the risk as well.
13   Q.   You sent a copy of your
14 proposed protocol to Merck in May of
15 2001; correct?
16   A.   That's incorrect.  I did not
17 send anything to Merck.
18   Q.   Did --
19   A.   Dr. Bhatt sent a proposal to
20 Merck, and I was only relaying Merck's
21 interest to Dr. Bhatt.
22   Q.   Does Dr. Bhatt work at the
23 Cleveland Clinic, sir?
24   A.   Yes, he does.  He works in

Page 367

1  my department, but I did not send this
2  protocol to Merck.
3              - - -
4        (Whereupon, Deposition
5   Exhibit Topol-31, E-mails,
6   MRK-AAZ0001594, was marked for
7   identification.)
8              - - -
9        (Whereupon, Deposition
10  Exhibit Topol-32, "Rofecoxib in
11  the Prevention of Ischemic Events
12  in Patients with Acute Coronary
13  Syndromes and Elevated Markers of
14  Inflammation," (Bhatt, et al)
15  MRK-ABA0003235 - MRK-ABA0003244,
16  was marked for identification.)
17             - - -
18 BY MR. GOLDMAN:
19   Q.   I've marked as Exhibit 31
20 and 32 two documents.  The first is Bates
21 stamped -- this is 31, MRK-AAZ0001594.
22 Exhibit 32 is MRK-ABA0003235 to 3244.
23        Do you see, Dr. Topol, on
24 the first exhibit, Exhibit 31 on May 2nd,

Page 368

1  2001 -- is it Dr. Bhatt?
2    A.   Dr. Bhatt, Deepak Bhatt.
3    Q.   Dr. Bhatt is sending an
4  e-mail to Dr. Reicin and says, "Hello.
5  As Dr. Topol promised, here is our
6  protocol regarding the use of Vioxx in
7  acute coronary syndromes."  Do you see
8  that?
9    A.   I see that, and I already
10 discussed that this morning.  And what I
11 said, if I can go back --
12   Q.   My question was just, do you
13 see that?
14   A.   I see that, yes.
15   Q.   The protocol that Dr. Bhatt
16 sent to Merck is Exhibit 32, isn't it?
17   A.   That's what you just gave
18 me, yes.
19   Q.   Do you see on the second
20 page, top left corner, there's a date,
21 May 2nd, 2001?  Do you see that, sir?
22   A.   Yes.  This was two weeks
23 after it was requested from Dr. Reicin
24 when she visited Cleveland Clinic.

Page 369

1    Q.   I want to talk about the
2  specifics of your proposed outcomes
3  study.  Okay?
4    A.   Dr. Bhatt authored this
5  study.  You probably should talk to him.
6    Q.   This is a study, Dr. Topol,
7  that you, on the first page, and Dr.
8  Bhatt put together; is that right?
9    A.   Well, he put it together.
10 He put my name on it.  And he sent it to
11 Merck.  But I did not go over the study.
12 This was a request by Merck.  I didn't
13 have any particular interest in doing
14 this trial, and I asked Dr. Bhatt if he
15 was interested and he followed up on it.
16   Q.   It's your testimony, Dr.
17 Topol, that you were not interested in
18 conducting the cardiovascular outcomes
19 study that you suggested be done?
20   A.   I wasn't interested in doing
21 the trial per se.  I had been outspoken
22 about the need to do a trial.  I didn't
23 think it would be appropriate if I did
24 the trial per se.

**KS-000225**

Page 370

1    Q.   Well, you -- withdrawn.
2         The protocol for your trial,
3  by "your," I mean the Cleveland Clinic --
4    A.   Right.
5    Q.   -- includes Dr. Bhatt's
6  name and your name; correct?
7    A.   He put my name on it, but
8  that doesn't mean that I was involved in
9  this.  This is a protocol sketch, and I
10 guess he was looking for feedback from
11 Merck.  But I did not go over this in
12 terms of, did I think this was the
13 appropriate design.  This was a brief
14 conversation I had with Dr. Bhatt, and I
15 don't recall all the details.  It's back
16 four years ago in May 2001, but I did not
17 author this protocol, and my name was
18 loosely attached to it.  I was not
19 interested in running a trial personally
20 on this because I didn't feel that was
21 appropriate.  I thought it should be
22 done, but I should not necessarily be
23 involved with it.
24   Q.   Dr. Topol, did the Cleveland

Page 371

1  Clinic send a protocol to Merck outlining
2  what the Cleveland Clinic believed would
3  be an appropriate cardiovascular outcomes
4  study for Vioxx?
5    A.   Dr. Bhatt did, yes.
6    Q.   How many patients did you
7  believe should participate in a
8  cardiovascular outcomes study?
9    A.   Do I believe or did Dr.
10 Bhatt put in the protocol?  I'm not sure
11 if I understand your question.
12   Q.   The question was, do you
13 believe that -- withdrawn.
14        Dr. Topol, did the Cleveland
15 Clinic, when it sent this protocol to
16 Merck, believe that it was the
17 appropriate cardiovascular outcomes study
18 to conduct?
19   A.   I don't -- I would have to
20 read the protocol now if you'd like me
21 to.
22   Q.   Sure.
23   A.   (Witness reviewing
24 document.)

Page 372

1         MR. GOLDMAN:  We can go off
2  the video while Dr. Topol is doing
3  that.
4         MR. HAMELINE:  Again, I
5  don't mean to take this out on
6  your time, but if you want to ask
7  him questions about particular
8  issues, this is going to be a very
9  long day for Dr. Topol.  And so
10 he's going to read through this
11 quickly and will try to answer
12 your questions directly.  So, I
13 don't think it's fair that we go
14 off the record and not count time.
15        MR. GOLDMAN:  We've gone off
16 the record several times for the
17 plaintiffs and not counted the
18 time --
19        MR. KLINE:  Not to review --
20        MR. GOLDMAN:  -- so, I would
21 appreciate the same courtesy.
22        MR. KLINE:  Not to review
23 documents.  Not to sit and review
24 documents.  I provided no

Page 373

1  documents where the witness was
2  then asked off the record to sit
3  and review them.
4         MR. HAMELINE:  I want to be
5  fair to both sides.  We're just
6  trying to get through this.  I
7  recognize this.  You know, if Dr.
8  Topol can review it quickly, let's
9  just move on.
10        (Witness reviewing
11 document.)
12 BY MR. GOLDMAN:
13   Q.   Did you review now, Dr.
14 Topol, the protocol that has your name on
15 it and that was sent to Merck on May 2nd
16 of 2001?
17   A.   I've had a chance to breeze
18 through this.  I would hardly call this a
19 protocol.  This is a concept sheet.
20 There's nothing about sample size.
21 There's nothing about event rates.  This
22 is as minimal as one could ever imagine.
23 I would not call this a protocol.  This
24 is a concept.  There's not even the most

**KS-000226**

Page 374

1 important salient features of a true
2 clinical trial in this document.
3     Q.   Do you agree with the
4 concept that's being expressed in Exhibit
5 32 which has your name on it?
6     A.   The concept of studying
7 Vioxx in patients with acute coronary
8 syndromes who have elevated C-reactive
9 protein is a concept that I discussed
10 with Dr. Reicin and Dr. Demopoulos when
11 they visited Cleveland just two weeks
12 prior to this point on April 14, I
13 believe, of the same year.
14         MR. GOLDMAN:  Objection,
15     move to strike, nonresponsive.
16 BY MR. GOLDMAN:
17     Q.   Dr. Topol, if you'd turn to
18 Page 6 of the concept that Cleveland
19 Clinic sent to Merck, do you see on the
20 top, the criteria for inclusion in this
21 proposed study was that participants be
22 male or female, 18 years or older?  Do
23 you see that?
24     A.   Uh-huh.

Page 375

1     Q.   And then point 2, "Being
2 admitted for acute coronary syndrome.
3 The patient was admitted to an inpatient
4 facility with an acute coronary syndrome
5 defined as:  Ischemic discomfort at rest
6 lasting at least five minutes."  Do you
7 see that, sir?
8     A.   Yes.
9     Q.   Can you briefly, sir,
10 describe what acute coronary syndrome is?
11     A.   It's either a threatened or
12 actual heart attack, that is,
13 inflammation in the arteries that are
14 leading to a crack in the artery wall
15 with a blood clot potentially, and these
16 are patients who could have a small or a
17 threatened heart attack.
18     Q.   So, the concept that
19 Cleveland Clinic was proposing to Merck
20 involved taking patients who were
21 threatened with a heart attack or who had
22 a heart attack to participate in this
23 study; correct?
24         MR. HAMELINE:  Could I just

Page 376

1     note a continuing objection that
2     this is not the Cleveland Clinic's
3     concept, it's Dr. Bhatt's, and I
4     think we've made that abundantly
5     clear.
6 BY MR. GOLDMAN:
7     Q.   Dr. Topol, the concept that
8 has your name and Dr. Bhatt's name on it
9 describes these criteria for inclusion,
10 and as you described acute coronary
11 syndrome, the concept was that patients
12 who either were threatened with a heart
13 attack or who had a heart attack would
14 participate in the study.  Is that right?
15     A.   That's correct.  But you're
16 leaving out one important element.  And
17 as in the title of this concept sheet,
18 "Elevated Markers of Inflammation," and
19 in the inclusion criteria on Page 6 that
20 we are now reviewing, you see Item Number
21 3, it says, "AND Item Number 3, elevated
22 high-sensitivity C-reactive protein"
23 known as CRP "greater than .2."  So, they
24 had to have arterial inflammation, and

Page 377

1 that was the whole point of the concept,
2 was that rofecoxib, as well as celecoxib,
3 have been shown to reduce inflammation.
4 So, in fact, it could be a benefit to
5 these patients to suppress subsequent
6 heart attacks.
7     Q.   I want to talk about that in
8 one minute, Dr. Topol.
9         Do you see, sir, that the
10 concept that you were proposing to Merck
11 calls for the study to last a minimum of
12 one year?
13     A.   Where is that?
14     Q.   If you look on Page 5 under
15 study design, it says, "This study is a
16 multicenter double blind randomized" and
17 it continues "comparing the effects of"
18 Vioxx "versus placebo administered in
19 conjunction with standard therapy
20 (including aspirin...) for a minimum of
21 one year to patients who have suffered an
22 episode of an acute coronary syndrome,"
23 and it goes on.
24     A.   Again, this is a concept

KS-000227

Page 378

1  sheet.  This is not a protocol.  This
2  does not have anything about events rates
3  that are anticipated.  It doesn't have
4  anything about sample size.  It doesn't
5  have the number of triggered events to
6  stop a trial.  One year is just a very
7  loose term, that it has to have some
8  long-term followup.  So, I see it, but,
9  again, it reinforces how sketchy -- this
10  could not be called a protocol.  This is
11  a very early rudimentary design concept
12  sheet.
13       Q.   The concept that you were
14  proposing to Merck, you and Dr. Bhatt --
15            MR. HAMELINE:  Again,
16       objection.  It's Dr. Bhatt's
17       concept sheet.
18  BY MR. GOLDMAN:
19       Q.   Dr. Topol, the concept sheet
20  that has your name on it and Dr. Bhatt's
21  name on it calls for a study that would
22  last a minimum of one year; correct?
23       A.   Very loosely defined, yes.
24       Q.   The concept sheet that has

Page 379

1  your name on it and Dr. Bhatt's name on
2  it also calls for patients to be followed
3  up for a minimum of one year.  Do you see
4  that, sir?
5       A.   That's what it says.
6       Q.   The concept sheet also
7  refers on Page 7, sir, to certain
8  criteria for exclusion.  Do you see that?
9       A.   Yes.
10       Q.   This is another way of
11  saying these are the type of patients who
12  will not be allowed to participate in the
13  study according to this concept sheet;
14  correct?
15       A.   That's correct.
16       Q.   If you look at Number 4, do
17  you see that the concept that Dr. Bhatt
18  was proposing to Merck says that, under
19  4, "Any need for COX-2 inhibitors."  So,
20  if a patient wanted to participate in
21  this study, they couldn't do so if they
22  actually needed COX-2 inhibitors; is that
23  right?
24       A.   You'll have to ask Dr. Bhatt

Page 380

1  about this since he wrote it, but my
2  interpretation is if they didn't have any
3  other relief of their problem without a
4  COX-2 inhibitor, that they couldn't be --
5  that is, they would have to be willing to
6  be randomized.  So, yes, if they had to
7  take a COX-2 inhibitor for some reason,
8  they obviously wouldn't be a suitable
9  candidate for the trial, the way he's
10  written this up.
11       Q.   So, anybody who needed a
12  COX-2 inhibitor like Vioxx could not
13  participate in this concept study that
14  Dr. Bhatt proposed to Merck; correct?
15            MR. KLINE:  Objection.
16       Repetitive and misstates and
17       mischaracterizes.
18            MR. HAMELINE:  Again, this
19       is the same statement that I just
20       read in the MDL which is "Once the
21       witness has fully answered a
22       question, that same or
23       substantially same question --
24            MR. GOLDMAN:  He's not

Page 381

1  answering the question --
2            MR. HAMELINE:  -- shall not
3       be asked again."  That is exactly
4       the same question.
5            MR. GOLDMAN:  He's not
6       answering --
7            THE WITNESS:  If this was a
8       real protocol, you would define
9       what is a need for a COX-2
10       inhibitor particularly since the
11       whole issue about this was we
12       don't know if it's safe and we
13       don't know if it's beneficial.
14       That's why this is so rudimentary.
15       It doesn't define these things
16       adequately.  Any need for a COX-2
17       inhibitor has to have objective
18       criteria laid out, and they're not
19       there.
20  BY MR. GOLDMAN:
21       Q.   Does the rudimentary concept
22  that Dr. Bhatt sent to Merck say that
23  patients who need COX-2 inhibitors would
24  need to be excluded from the proposed

KS-000228

Page 382

1  study?
2       A.   It says that in the very,
3  what I would consider, loose language
4  without adequate definition.  Because
5  it's a circular reasoning in a sense.
6  That is, the trial is trying to
7  understand this safety and need, and then
8  you're putting it in as exclusion
9  criteria.  It wouldn't be suitable unless
10  it was much more rigidly defined.
11       Q.   On the first page of this
12  concept, Dr. Topol --
13       A.   It only has seven pages.
14  The rest is references.  So, it isn't
15  particularly -- there's not a whole lot
16  here.
17       Q.   On Page 2 of this
18  rudimentary concept, do you see the first
19  sentence under the introduction
20  "Inflammatory cells play a significant
21  role in atherosclerosis"?
22       A.   I agree with that.  I see
23  it, and I agree with it.
24       Q.   In the next paragraph, the

Page 383

1  concept sheet says, "Aspirin, by virtue
2  of its preferential COX-1 inhibitory
3  effect, provides minimal
4  anti-inflammatory action."  Do you see
5  that?
6       A.   I see that.
7       Q.   And then further down in
8  that second paragraph -- in that second
9  paragraph, the concept sheet says, "The
10  administration of" Vioxx "may provide a
11  direct approach to reduce coronary
12  inflammation resulting in fewer
13  cardiovascular recurrent ischemic events
14  in patients presenting with acute
15  coronary syndromes."  Do you see that?
16       A.   Yes.
17           MR. KLINE:  What page are
18  you on?
19           MR. GOLDMAN:  2.
20           MR. KLINE:  Thank you.
21  BY MR. GOLDMAN:
22       Q.   Can you explain how it is
23  that Vioxx could actually prevent
24  recurrent ischemic events?

Page 384

1       A.   Right.  So, there have been
2  several studies now with the different
3  COX-2 inhibitors in patients to look at
4  whether C-reactive protein is reduced,
5  whether endothelial function, which is
6  the lining of the artery cells, that
7  whether or not that critical layer of the
8  artery wall functions better and whether
9  the inflammation is reduced.  And indeed
10  these mechanistic studies have supported
11  the concept that there could be an
12  improvement in this process by
13  suppressing inflammation with COX-2
14  inhibitors.
15       Q.   So, the theory that you had,
16  Dr. Topol, when you were suggesting a
17  cardiovascular outcomes study was that if
18  Vioxx was given to patients, it might
19  actually help their heart?
20       A.   It could, and that's put in
21  the JAMA paper.  In all the papers -- I
22  can go through my publications, but that
23  concept is laced throughout, that there's
24  a possible -- there's a putative benefit

Page 385

1  here that can't be summarily dismissed
2  whatsoever.
3       Q.   In May of 2001 you believed
4  that Vioxx could actually help prevent
5  heart attacks; correct?
6       A.   I felt that that was an
7  important mechanism, inflammation of the
8  artery wall, and this is a potent class
9  of anti-inflammatories, and certainly
10  there was that possibility.  And other
11  studies suggested that potential.
12       Q.   You would never have
13  suggested a cardiovascular outcomes study
14  for patients at high risk of
15  cardiovascular disease if you thought
16  that Vioxx would actually cause them
17  heart attacks or worse, cause them to
18  die, correct, sir?
19       A.   You just asked about high
20  risk.  I assume you're not talking about
21  patients with coronary artery disease
22  proven.  Is that correct?
23       Q.   Dr. Topol, the study that
24  you were suggesting in May of 2001 to

KS-000229

1  Merck was suggested because you thought
2  Vioxx might provide a benefit to patients
3  at risk of heart failure -- withdrawn.
4      Am I right, Dr. Topol, that
5  in the concept sheet that Dr. Bhatt sent
6  to Merck in May of 2001, anticipated that
7  Vioxx would actually prevent heart
8  attacks and not cause them?
9      A.  In patients who had active
10  inflammatory coronary disease.
11     Q.  Did you agree with Dr. Bhatt
12  that in May of 2001, patients who had
13  active inflammatory coronary disease
14  might be benefited by taking Vioxx
15  because it could help their heart?
16     A.  I already answered that
17  question affirmatively.
18     Q.  Other scientists shared that
19  view, Dr. Topol, that COX-2 inhibitors
20  could be beneficial to patients who have
21  cardiovascular disease; is that right?
22         MR. KLINE:  Objection,
23  misstatement.
24         THE WITNESS:  I already

1      mentioned that there were several
2      studies published, and I've cited
3      them in my work, that that indeed
4      was a potential benefit of COX-2
5      inhibitors in patients with
6      arterial disease.
7  BY MR. GOLDMAN:
8      Q.  And those were the patients
9  you were suggesting be studied; correct?
10     A.  Patients with inflammatory
11  proven artery disease, yes.
12           -  -  -
13         (Whereupon, Deposition
14     Exhibit Topol-33, "Selective
15     COX-2 Inhibition Improves
16     Endothelial Function in Coronary
17     Artery Disease," (Chenevard, et
18     al) Circulation, January 28,
19     2003, 405-409, was marked for
20     identification.)
21           -  -  -
22  BY MR. GOLDMAN:
23     Q.  I've handed you Exhibit 33,
24  which is an article titled "Selective

1  COX-2 Inhibition Improves Endothelial
2  Function in Coronary Artery Disease."
3  And it was published in Circulation in
4  2003.  Do you see that, sir?
5      A.  Yes.
6      Q.  The author is Remy
7  Chenevard?
8      A.  Chenevard.  I'm familiar
9  with this study.  I've cited it many
10  times in my work.
11     Q.  Do you see in the conclusion
12  of the abstract, Dr. Topol, that the
13  paper says, "This is the first study to
14  demonstrate that selective COX-2
15  inhibition improves endothelium-dependent
16  vasodilation and reduces low-grade
17  chronic inflammation and oxidative stress
18  in coronary artery disease."  Do you see
19  that?
20     A.  Yes, I do.
21     Q.  The next sentence I think is
22  even clearer when it says, "Thus,
23  selective COX-2 inhibition holds the
24  potential to beneficially impact outcome

1  in patients with cardiovascular disease."
2  Do you see that?
3      A.  Yes.  And to put it in
4  context, this is a very small study of 26
5  total patients, and it's with celecoxib
6  versus placebo.  But I believe that their
7  findings and the way they made their
8  conclusions based on that data is very
9  reasonable.
10     Q.  Because you've actually
11  cited this article?
12     A.  Yes, and others like it.
13  They're small studies, they're with both
14  of the coxibs, and there is evidence of
15  some salutary effect.
16     Q.  From May of 2001 through the
17  time that Vioxx was withdrawn in
18  September of 2004, you continued to
19  suggest that Merck or Pfizer conduct a
20  cardiovascular outcomes study; right?
21     A.  That's right.
22     Q.  During that entire time
23  period --
24         MR. HAMELINE:  Can you allow

KS-000230

Page 390

1  him to answer the question in the
2  way that he feels is appropriate
3  and complete?
4      THE WITNESS:  I would like
5  to make a comment.
6  BY MR. GOLDMAN:
7      Q.  Sure.
8      A.  Because there are other
9  reasons besides just this to continue to
10  advance that notion.
11     Q.  Dr. Topol --
12     A.  If you'd allow me to make
13  the comment.
14     Q.  I'll allow you to make the
15  comment in one minute.  If you could just
16  answer my questions, and then you can
17  certainly comment.  Okay?
18     A.  Okay.
19     Q.  From May of 2001 through the
20  time that Vioxx was withdrawn in
21  September 2004, you continue to suggest
22  that Merck and/or Pfizer conduct your
23  cardiovascular outcomes study; correct?
24     A.  Not ours, but a.  And I do

Page 391

1  have it in the public statements and
2  newspapers that it didn't matter who did
3  the trial, it just should be done.  It
4  wasn't our trial.  And this is a concept
5  sheet.  It isn't a trial.  I would never
6  try to pass this thing off that you've
7  been reviewing as a trial.
8      MR. KLINE:  You now told him
9  you were going to let him finish
10  the last concept.
11     MR. GOLDMAN:  Let me finish
12  --
13     MR. KLINE:  Are you going to
14  ask him a question and then let
15  him finish?  Now you're telling
16  him he can't do it.
17     MR. GOLDMAN:  Move to strike
18  the last answer as nonresponsive.
19     MR. KLINE:  You said you
20  would give him a chance to finish.
21  BY MR. GOLDMAN:
22     Q.  Dr. Topol, I'm not asking
23  whether it was your cardiovascular study
24  or some other person's.  Okay?

Page 392

1      A.  A cardiovascular.
2      Q.  Am I right, Dr. Topol --
3      MR. KLINE:  Now, does he get
4  a chance to finish the answer?
5  You said you were going to ask one
6  question and let him finish and
7  now you've asked two.
8      MR. GOLDMAN:  Tom, I'll let
9  him finish in a minute.
10 BY MR. GOLDMAN:
11     Q.  Dr. Topol, am I right that
12 from May of 2001 through the time that
13 Vioxx was withdrawn in September of 2004,
14 you were suggesting that either Merck or
15 Pfizer conduct a cardiovascular outcomes
16 study; correct?
17     A.  Yes.
18     Q.  During that entire time
19 period, you believed that Vioxx or
20 Celebrex might actually prevent heart
21 attacks or other cardiovascular events.
22 Is that right?
23     A.  That's one issue that was
24 pertinent, yes.  But there's another one

Page 393

1  I would like to get into if you give me
2  an opportunity.
3      Q.  Why don't you go ahead and
4  tell me what you want to tell me.
5      A.  Well, this goes along with
6  an e-mail exchange with Alastair Wood
7  that's in the documents that you have.  I
8  can retrieve it if you'd like.
9      Alastair Wood is probably
10 one of the most highly regarded
11 pharmacologists and physicians.  He's at
12 the Vanderbilt University, and he's
13 frequently chairing the FDA advisory
14 panels.  So one of the things that we
15 exchanged our views on was the fact that
16 if you have half the people in the United
17 States with established coronary disease
18 taking rofecoxib or celecoxib, that means
19 that there's a lot of people out there
20 that is a complete random exposure to a
21 drug, millions and millions of people
22 taking a drug without knowledge of
23 whether it's providing a harm, no less a
24 benefit.  So, the point being I'm trying

KS-000231

Page 394

1   to get to is this issue of equipoise.
2   That is, if you have a drug that's so
3   widely used in the population in half the
4   people, and we don't know -- that is, you
5   can justify a cardiovascular trial even
6   without the putative mechanism of
7   benefit, and I'd be happy to draw -- Dr.
8   Wood.
9       Q.   Dr. Topol, I've let you
10  answer now for some time.  Are you
11  finished now?
12      A.   Well, if I've gotten my
13  point across.
14      Q.   Okay.
15          From May of 2001 through the
16  time that Vioxx was withdrawn in
17  September of 2004, you believed that if a
18  cardiovascular outcomes study were done,
19  it could show that Vioxx and Celebrex
20  actually helped protect the heart;
21  correct?
22      A.   That's one possibility, yes.
23      Q.   Do you know Dr. Lucchesi?
24      A.   Yes, I do I was at the

Page 395

1   University of Michigan previous to coming
2   to Cleveland Clinic, and he was on the
3   faculty there.
4       Q.   Are you aware that Dr.
5   Lucchesi has been retained as an expert
6   witness for the plaintiffs in some of the
7   Vioxx cases?
8       A.   I saw that in the newspaper.
9   I've not spoken to him, but I saw that,
10  yes.
11      Q.   I'll mark as -- actually,
12  I'm not going to mark this as an exhibit,
13  but I'm going to show you a portion of
14  Dr. Lucchesi's deposition testimony and
15  ask you a question about it.  Okay?
16          MR. KLINE:  Objection, off
17  the record.
18          THE VIDEOTAPE TECHNICIAN:
19  Off the record at 3:44.
20          MR. GOLDMAN:  I --
21          MR. KLINE:  How long are we
22  on the record on cross?
23          THE VIDEOTAPE TECHNICIAN:
24  An hour and five minutes.

Page 396

1           MR. KLINE:  You are on the
2   record an hour and five minutes on
3   cross.  I haven't --
4           MR. GOLDMAN:  Go ahead.
5           MR. KLINE:  Now I'm asking
6   off the video record.
7           What the witness is being
8   asked to do now is comment --
9           MR. GOLDMAN:  I do not want
10  you talking in front of the
11  witness.
12          MR. KLINE:  Then have him go
13  out of the room.  I'm just going
14  to state an objection, which is, I
15  object to the witness being shown
16  another expert's -- let me start
17  again.
18          He's not designated as an
19  expert.  Merck has said he's not
20  an expert.  And even if he were an
21  expert, under the federal rules he
22  would not be allowed to be shown
23  one person's opinion testimony and
24  be asked to comment on it.  So,

Page 397

1   it's all objectionable.  Having
2   said that, it may be withdrawn
3   after Dr. Topol looks at it and
4   answers.
5           You can go back on the video
6   record.
7           THE VIDEOTAPE TECHNICIAN:
8   Back on the record at 3:45, Tape
9   Number 5.
10  BY MR. GOLDMAN:
11      Q.   This is an excerpt from
12  testimony that Dr. Lucchesi gave in a
13  trial in New Jersey.  Directing your
14  attention to Page 909, line 23, do you
15  see that he's being asked questions about
16  your proposed study concerning acute
17  coronary syndrome?
18          MR. HAMELINE:  Again, feel
19  free to read as much as you need
20  for context, and while you're
21  doing that, let me just note that
22  Dr. Topol, again, here is coming
23  to this deposition as a very busy
24  academic, as a very busy person in

**KS-000232**

Page 398

1   the institution and with patients
2   that he has to treat.  It's fine
3   to ask him any opinions that he
4   has about what he put in his
5   record in his own documents, et
6   cetera.  I think it's
7   inappropriate to ask him about
8   third-party experts.
9   BY MR. GOLDMAN:
10      Q.   Dr. Topol, do you see that
11  --
12          MR. KLINE:  And I would also
13  object.  You are asking a witness
14  to comment on the comments that
15  somebody else made about what he
16  did.
17  BY MR. GOLDMAN:
18      Q.   Do you see that Dr. Lucchesi
19  in his testimony thought that the study
20  that you were proposing for acute
21  coronary syndrome would be a bad idea?
22      A.   I see that, and I have a
23  couple of comments I can offer here --
24      Q.   Do you see that --

Page 399

1       A.   -- if you'll allow me to.
2       Q.   Do you see that Dr. Lucchesi
3   actually compliments Merck on its
4   decision not to do the study you were
5   suggesting?
6       A.   I saw that.  Can I make my
7   further remark about that?
8       Q.   Actually, I'd rather you do
9   that when Mr. Kline asks you questions.
10          MR. HAMELINE:  Let me note
11      very vehemently my objection to
12      putting a document in front of Dr.
13      Topol, showing it to him, reading
14      it to him about someone who is not
15      present.  Dr. Topol is not here as
16      an expert.  He's not trying to
17      take sides in the litigation, and
18      you're showing this to him and not
19      asking a question about it.
20      That's just inappropriate.
21          THE WITNESS:  Well, it's
22      also extraordinary that Dr.
23      Lucchesi is not a clinical
24      trialist.  He's a pharmacologist,

Page 400

1   and he hasn't worked on patients
2   in probably the last 20 or 30
3   years.  He also doesn't know that
4   the protocol that was never
5   written up that talks about a
6   concept sheet, and it was about
7   inflammatory arterial markers.
8   None of that is in that -- so,
9   you're about -- you're asking Dr.
10  Lucchesi in this deposition about
11  things that are just completely
12  foreign to him to make comment.
13  It's quite remarkable, actually.
14  BY MR. GOLDMAN:
15      Q.   Do you think that Dr.
16  Lucchesi is not competent to be
17  testifying about cardiovascular disease
18  associated with Vioxx, sir?
19          MR. KLINE:  Objection.
20          MR. HAMELINE:  Again, coming
21      very close to --
22          MR. GOLDMAN:  Withdrawn.
23      I'll ask another question.
24  BY MR. GOLDMAN:

Page 401

1       Q.   Are you familiar with the
2   drug Reopro?
3       A.   Yes, I am familiar with
4   Reopro, abciximab, yes.
5       Q.   Did Dr. Lucchesi play a role
6   with you in the development of Reopro?
7       A.   He did some experiments with
8   a colleague of mine, Dr. Bates, when I
9   was at University of Michigan in dogs.
10  Most of his work has been experimental
11  models in dogs.
12      Q.   Would you credit Dr.
13  Lucchesi with the development of Reopro?
14      A.   No.  I would not credit him.
15  He did some contributory work.  No, there
16  were many people, and he was just one of
17  the investigators that worked in this
18  field.
19      Q.   I want to talk to you, Dr.
20  Topol, about your JAMA article that you
21  published in August of 2001.  Okay.
22      A.   Sure.
23      Q.   You said on direct
24  examination that you sent the manuscript

KS-000233

Page 402

1  or the draft of the JAMA article to Merck
2  to see where there were discrepancies in
3  the data between the published paper that
4  you were publishing and the FDA database.
5  Do you remember that?
6       A.   That's correct.  I sent the
7  paper to Dr. Demopoulos, and we already
8  went through about, whether it was a
9  paper version, and then Dr. Reicin
10  requested an electronic version.  We went
11  through that this morning.
12       MR. HAMELINE:  Can I just
13       note, I think you said that this
14       discrepancy is between the
15       published version, which is not
16       Dr. Topol's article, but the
17       published version and the FDA.
18       You're talking about three
19       different articles here.
20       THE WITNESS:  The New
21       England Journal --
22  BY MR. GOLDMAN:
23       Q.   Dr. Topol, you met with
24  Merck employees in April of 2001;

Page 403

1  correct?
2       A.   That was a meeting I
3  referred to when they came to Cleveland.
4       Q.   Is that the meeting where
5  you said Dr. Reicin came on quite strong,
6  and that you would consider her comments
7  to be brazen?
8       A.   I considered her remarks
9  about how we would be embarrassed if we
10  published it to be inappropriate, yes.
11       Q.   Did Dr. Reicin or Dr.
12  Demopoulos ever exert any pressure or
13  influence on you during that meeting?
14       A.   Well, it's Dr. Demopoulos,
15  and as I conveyed -- I mean, we
16  summarized this morning, but there were
17  some definite difficult issues that were
18  confronted, and there was no quid pro quo
19  in terms of intimidation.  They didn't
20  say, if you don't pull this paper out and
21  not take it out of its submission phase,
22  such and such would happen.  But it was
23  not what I would consider a pleasant
24  discussion.

Page 404

1       Q.   Actually, isn't it true, Dr.
2  Topol, that you enjoyed meeting with Dr.
3  Reicin and Dr. Demopoulos?
4       A.   Dr. Demopoulos and I are
5  colleagues, and we worked on a trial
6  together, and I had no problem with Dr.
7  Demopoulos.
8            I did have a problem with
9  Dr. Reicin, who I had not met before, who
10  used Dr. Demopoulos as an access point,
11  who came to visit, and as I said, told me
12  that we would regret publishing the paper
13  because we did not have the data that
14  Merck had, that we didn't understand that
15  rheumatoid arthritis patients had more
16  heart attacks, and that we would -- we
17  were making a mistake.  Those were
18  comments that I did not find enjoyable
19  whatsoever.
20       Q.   Do you have Exhibit 5 in
21  front of you that the plaintiffs used?
22            MR. HAMELINE:  We will.
23  BY MR. GOLDMAN:
24       Q.   Do you see Exhibit 5, sir?

Page 405

1       A.   Yes.
2       Q.   This is an exhibit that the
3  plaintiffs used and didn't ask you about
4  the e-mail dated April 20 of 2001 from
5  you to Dr. Reicin.  Do you see that in
6  the middle of the page?
7       A.   Yes, I do.
8       Q.   Do you tell Dr. Reicin on
9  April 20: "I enjoyed the meeting with you
10  and Laura and will have my assistant,
11  Donna Bressan, forward you an electronic
12  copy of the JAMA paper."
13       A.   Yes.  I certainly said that,
14  and I was trying to be politically
15  correct and smooth over the difficulties
16  we had during the meeting.
17       Q.   Was it true what you wrote,
18  Dr. Topol, that you enjoyed the meeting
19  with Laura and Dr. Demopoulos?
20            MR. KLINE:  Objection,
21       violation of Judge Fallon's order.
22            THE WITNESS:  To be exact, I
23       did not enjoy some of the
24       interactions, but I tried to be

KS-000234

Page 406

1    correct about keeping things on an
2    upbeat -- when I wrote that, it
3    was definitely to convey a sense
4    of, let's not have any bad
5    feelings, and I tried to convey an
6    upbeat sense.  That's what that
7    is.
8    BY MR. GOLDMAN:
9        Q.   On direct examination, Mr.
10   Kline read to you a quote from a Wall
11   Street Journal article that came out when
12   you published your article in JAMA.  Do
13   you remember that, sir?
14       A.   Yes, I do, August 22nd.
15       Q.   And the quote that Mr. Kline
16   read to you was the following:
17           "Merck sought to downplay
18   the cardiac issue."
19           Do you remember that?
20       A.   Yes.  That's what the
21   reporter wrote, Tom Burton and Gardiner
22   Harris.  The reporters wrote "Merck
23   sought to downplay."
24       Q.   You said in response to Mr.

Page 407

1    Kline's question that "I do believe
2    that's true because" of the "ulterior
3    purpose of the visit."  Do you remember
4    testifying to that on direct examination?
5        A.   Let me be perfectly clear,
6    Mr. Goldman.  It is unquestionable in my
7    mind that the reason why Dr. Reicin came
8    to Cleveland was to downplay the cardiac
9    risks of Vioxx and try to get this
10   manuscript to be toned down.  There isn't
11   any question about that.
12           MR. GOLDMAN:  Move to strike
13       as nonresponsive.
14   BY MR. GOLDMAN:
15       Q.   Dr. Topol --
16           MR. HAMELINE:  He can move
17       to strike.  It doesn't mean it's
18       going to be stricken.
19   BY MR. GOLDMAN:
20       Q.   Dr. Topol, what the Wall
21   Street Journal said about Merck trying to
22   downplay the cardiac issue was not
23   accurate, correct, sir?
24       A.   It was entirely accurate in

Page 408

1    my view.  In fact, Mr. Goldman, Thomas
2    Burton, who interviewed me for that
3    article, asked me what was going on that
4    day in April 2001 when Dr. Reicin and Dr.
5    Demopoulos visited me.  And he asked me,
6    were there any quid pro quos,
7    intimidations.  And I said, well, it was
8    obvious why she came to Cleveland.  I
9    never had met her before.  I had
10   forwarded the manuscript in advance, and
11   it was obvious what the purpose of that
12   trip was.  And it's obvious that the
13   reporter, Thomas Burton, accurately
14   reported what I told him.
15       Q.   It's your testimony, sir,
16   that Merck actually pressured you or
17   tried to influence you about your JAMA
18   article?
19       A.   I wouldn't call it pressure.
20   I would call it, you don't know about the
21   other data, you don't know about the
22   Alzheimer trial patients, you're going to
23   be embarrassed if you publish it.  You
24   know, I can deal with all of these

Page 409

1    things.  I don't consider that -- the
2    word you used was what?
3        Q.   Did either Dr. Reicin or Dr.
4    Demopoulos --
5        A.   Demopoulos.
6        Q.   Yes.  I'm sorry.
7            -- ever put any pressure or
8    influence on you when they met with you
9    in April of 2001?
10           MR. HAMELINE:  Again, it's
11       the same question you keep coming
12       back with.  Is there some
13       different take that you've given
14       here?  He's already answered the
15       question.
16           THE WITNESS:  I believe that
17       -- pressure -- you know, it's an
18       ambiguous term, but it was very
19       obvious why they met with me, and
20       they subsequently met with Dr.
21       Nissen for the same purpose, which
22       is to reduce the claims that we
23       had, the worries that we had
24       regarding the cardiac risk of

KS-000235

103 (Pages 406 to 409)

Page 410

1      Vioxx.
2          MR. GOLDMAN:  I want to mark
3   the next exhibit.
4          -  -  -
5          (Whereupon, Deposition
6   Exhibit Topol-34, E-mails,
7   MRK-ABA0011062, was marked for
8   identification.)
9          -  -  -
10  BY MR. GOLDMAN:
11     Q.   Dr. Topol, do you see that
12  Exhibit 34 is an e-mail on the top from
13  you to, is it Peter DiBattiste?
14     A.   Yes, Dr. DiBattiste.
15     Q.   Of Merck?
16     A.   Yes.
17     Q.   And this is August 30 of
18  2001; right?
19     A.   Yes.  So, it's after these
20  articles have come out, yes, the JAMA and
21  the Wall Street Journal, yes.
22     Q.   So, you're writing to Merck
23  after the Wall Street Journal comes out,
24  the one that said that Merck tried to

Page 411

1   downplay the cardiac issue; correct?
2      A.   That's right.  I'm writing
3   to Peter DiBattiste.  I'm not writing to
4   Merck in general, yes.
5      Q.   You wrote, sir, "I'd like to
6   talk to you about the COX-2 post-mortem
7   to straighten out any issues.  I hope you
8   know that I never mentioned your name,
9   Laura's or anyone else and never felt a
10  sense of pressure or influence."  Do you
11  see that, sir?
12     A.   Yes, I do.
13     Q.   Was that true?
14     A.   Well, as we just discussed,
15  there was no overt pressure and
16  intimidation, but there certainly was an
17  obvious motive of this trip to come to
18  Cleveland, yes.  There's a difference
19  here, and it's a matter of semantics.
20     Q.   Is the statement that you
21  wrote to Dr. DiBattiste true?
22     A.   I think -- well, I wrote it
23  to Peter, who I viewed as a colleague
24  like Laura Demopoulos, and I certainly

Page 412

1   felt -- we had a relationship that
2   extended over years doing clinical trials
3   together, and I was trying to be
4   appropriate and accurate.  Yes, I believe
5   that I'm conveying what I felt at that
6   time.
7      Q.   If you skip down to the
8   sentence that starts, "Unfortunately, a
9   co-author of the paper had a different
10  perspective and used names and painted a
11  very different picture.  I pleaded with
12  Burton, the reporter, that this wasn't
13  the case but you can see how much that
14  influenced his story."  Do you see that,
15  sir?
16     A.   Yes.  I see that.  I also
17  remember having a phone discussion with
18  Dr. Demopoulos in advance of this, and I
19  knew that both she and he were very
20  upset.  I also know that they were very
21  upset about the COX-2 inhibitor program
22  at Merck, as they conveyed to me, but,
23  yes, I certainly see this.
24         MR. GOLDMAN:  Move to strike

Page 413

1   as nonresponsive after yes.
2   BY MR. GOLDMAN:
3      Q.   Dr. Topol, you actually
4   thought that it would be great to get
5   Merck's input on the JAMA article;
6   correct?
7      A.   I didn't think it would be
8   great.  I thought it would be -- because
9   of being colleagues with Merck, because
10  of having a relationship with Drs.
11  DiBattiste and Demopoulos in another
12  trial, I thought it was appropriate that
13  we give them an opportunity to review the
14  manuscript and the data.
15         MR. HAMELINE:  So, we're
16  done with Exhibit 34?
17         MR. GOLDMAN:  Yes.
18         MR. HAMELINE:  Can we go off
19  the record and take a short break.
20         MR. GOLDMAN:  After we
21  finish this document, yes.
22         -  -  -
23         (Whereupon, Deposition
24  Exhibit Topol-35, E-mails,

KS-000236

Page 414

1    TOP1PRO0000282 - TOP1PRO0000283,
2    was marked for identification.)
3    - - -
4  BY MR. GOLDMAN:
5    Q.   Dr. Topol, I've handed you
6  Exhibit 35, which is a series of e-mails
7  starting at the bottom.  It's Laura
8  Demopoulos is writing to you, Dr. Topol,
9  on April 28, 2001.  Do you see that, sir?
10   A.   Yes.
11   Q.   She writes to you "Hi, just
12 wanted to let you know that Pete and I"
13 -- that's Pete DiBattiste -- "will be
14 working with Alise to try to incorporate
15 some of the data we discussed during our
16 visit into the JAMA manuscript."  Do you
17 see that, sir?
18   A.   Yes.  I see it.  I can read
19 it very well, yes.
20   Q.   You wrote back to Laura on
21 April 28 and you said, "Hi, Laura.  That
22 will be great to get your input."  Do you
23 see that, sir?
24   A.   Yes.  But don't cut off the

Page 415

1  sentence, "we haven't heard from JAMA
2  yet."  That is, the paper was already
3  under review at JAMA.  Okay?  So, the
4  input was, and I told this to Laura on
5  the phone, and it's not conveyed in the
6  e-mail, the input was about data on the
7  manuscript and the discrepancies that
8  we're concerned about.  And I want to be,
9  again, perfectly clear.  We never
10 received any manuscript recommendations,
11 data changes from Merck, from Dr.
12 Demopoulos, Dr. DiBattiste or Dr. Reicin.
13   Q.   We'll talk about that issue
14 in a minute.
15   A.   Yes.
16   Q.   Dr. Topol, was it true what
17 you wrote to Laura Demopoulos, that you
18 thought it would be great to get her
19 input on your manuscript?
20   A.   I was the one who offered
21 the manuscript to get the input, of
22 course.
23   Q.   You actually found some of
24 Merck's comments to be insightful, and

Page 416

1  you wanted to incorporate them.  Isn't
2  that right, sir?
3    A.   No.  I didn't get any
4  comments.  We never got any comments.
5    MR. HAMELINE:  So --
6    THE WITNESS:  The
7  manuscript --
8    MR. GOLDMAN:  We can take a
9  break now.
10   MR. HAMELINE:  That's fine.
11   THE VIDEOTAPE TECHNICIAN:
12 Off the record at 4:02.
13   - - -
14   (Whereupon, a recess was
15 taken from 4:02 p.m. until
16 4:15 p.m.)
17   - - -
18   THE VIDEOTAPE TECHNICIAN:
19 Back on the record at 4:15.
20 BY MR. GOLDMAN:
21   Q.   Dr. Topol, did Merck ever
22 provide comments to you on your JAMA
23 paper that you subsequently published in
24 August of 2001?

Page 417

1    A.   I'm not aware of any
2  comments.
3    Q.   You actually said on direct
4  examination that Merck "never sent...us
5  any suggestions, changes of data.  There
6  was never anything sent back to me
7  or...my colleagues.  Was that your
8  testimony?
9    A.   I referred to the documents
10 that were presented to me this morning
11 when I never saw those before.  These
12 revised manuscripts from internal --
13 I've never seen those before.
14   Q.   Did Merck send you any
15 revised comments about your manuscript?
16   A.   I don't recall ever getting
17 any revised comments.
18   - - -
19   (Whereupon, Deposition
20 Exhibit Topol-36, E-mail 6-20-01,
21 with attachment, "Risk of
22 Cardiovascular Events Associated
23 with Selective COX-2 Inhibitors,"
24 (Mukherjee, et al) Draft

**KS-000237**

Page 418

1  Manuscript, TOP1PRO0000285 -
2  TOP1PRO0000311, was marked for
3  identification.)
4  - - -
5  BY MR. GOLDMAN:
6  Q.  Let me hand you what I've
7  marked as Exhibit 35.  This is an e-mail
8  dated June 20 of 2001 from Pete
9  DiBattiste to you, and it attaches your
10  manuscript for the JAMA paper, doesn't
11  it, sir?
12  A.  Yes.
13  Q.  Do you see that Dr.
14  DiBattiste is saying this to you in this
15  e-mail, "Laura and I have had a chance to
16  review the most recent version of the
17  COX-2 manuscript.  Thanks for sharing it
18  with us.  We've made a few comments,
19  embedded in the text."
20      Do you see that, sir?
21  A.  Yes.
22  Q.  Then if you flip the pages,
23  you can see that on occasion, Merck made
24  some suggestions to your paper.  Do you

Page 419

1  see that, sir?
2  A.  Yes.  There's just
3  limited -- okay, I see them now, yes.
4  Q.  And I want to just point to
5  an example of the type of suggestion that
6  Merck made to you.  Do you see on page --
7  that ends --
8      MR. HAMELINE:  Can you just
9  establish that he received this?
10  BY MR. GOLDMAN:
11  Q.  The e-mail was written to
12  you, wasn't it, Dr. Topol?
13  A.  The e-mail's written to me,
14  but I don't recall ever having seen this
15  document or the e-mail.
16  Q.  Do you have any reason to
17  dispute that you actually received an
18  e-mail from Dr. DiBattiste on June 20 of
19  2001?
20  A.  Well, this looks unfamiliar
21  to me.  I don't remember seeing it
22  before.  So, it's certainly something
23  that I'm not familiar with.
24  Q.  My question was, do you have

Page 420

1  any reason to dispute that you actually
2  received it.
3      MR. HAMELINE:  He's answered
4  the question.
5      THE WITNESS:  Maybe it was
6  sent, and I never got it.  Maybe
7  there was a problem.  I don't
8  know.  But I don't remember seeing
9  it previously.
10  BY MR. GOLDMAN:
11  Q.  Dr. Topol, if you'd turn to
12  the page that ends with a Bates Number at
13  the bottom TOP1PR and then several zeros,
14  294?
15  A.  294.  Yes.
16  Q.  Do you see that?
17  A.  Sure.
18  Q.  And here Merck is providing
19  some input, and you see what's underlined
20  there are their suggested comments.  Do
21  you see that?
22  A.  Where it says "These
23  results"?
24  Q.  Yes.

Page 421

1  A.  Okay.
2  Q.  And in the section about
3  study 085 and 090, Merck says "These
4  results" that you describe, "while
5  important, are incomplete.  Would you
6  consider" --
7      MR. KLINE:  Page?
8      MR. GOLDMAN:  Bates stamp
9  that ends 294.
10  BY MR. GOLDMAN:
11  Q.  "Would you consider
12  substituting the following section to
13  provide more robust data?"  Do you see
14  that, sir?
15  A.  Yes.
16  Q.  That's a question that Merck
17  is asking you about whether you think it
18  would be a good idea to include the
19  language that follows; correct?
20      MR. HAMELINE:  Again, note
21  my objection that he doesn't
22  recall having seen this, so your
23  statement is --
24      MR. GOLDMAN:  You have that

KS-000238

Page 422

1  objection.
2      MR. KLINE:  Can I have a
3  continuing objection as well?
4      MR. GOLDMAN:  Sure.
5      MR. HAMELINE:  Your
6  statement -- your question is
7  misleading then.
8      THE WITNESS:  Well, I also
9  want to point out, we sent this
10  paper -- I sent it to Laura in
11  March, I believe, and submitted it
12  to the JAMA, and this is the 20th
13  of June.  So, this is months after
14  I had sent it to them, but anyway,
15  please.
16  BY MR. GOLDMAN:
17      Q.   Does Merck write here "To
18  further evaluate the relationship of"
19  Vioxx "to adverse cardiac events, a
20  meta-analysis of all Phase II through V"
21  Vioxx "studies using either placebo or
22  NSAID comparators was performed.  This
23  included over 28,000 patients in 23
24  studies in osteoarthritis, rheumatoid

Page 423

1  arthritis, chronic low back pain, and
2  Alzheimer's disease.  In the" Vioxx
3  "meta-analysis (which includes VIGOR),
4  the relative risk for a cardiovascular
5  event was 1.69...when comparing" Vioxx
6  "to naproxen."  That's not statistically
7  significant; correct, sir?
8      A.   That is statistically
9  significant.  1.69 --
10      Q.   That's right.  I'm sorry.
11  You're right.
12      A.   By the way, this is the
13  Konstam paper.  She's summarizing a paper
14  that subsequently came out in
15  Circulation.  We didn't incorporate any
16  of these data in our paper.
17      Q.   Let me withdraw the question
18  for a second.
19          Dr. Topol, do you see that
20  Merck is writing here at the bottom of
21  598 or 294 to 295 that there are studies
22  of over 28,000 patients in 23 studies in
23  osteoarthritis, rheumatoid arthritis,
24  chronic low back pain and Alzheimer's

Page 424

1  disease and then describes what the
2  relative risk for cardiovascular events
3  was.  Do you see that?
4      A.   I see it.
5      Q.   And do you see that when
6  comparing Vioxx to nonnaproxen NSAIDs,
7  ibuprofen, diclofenac and nabumetone that
8  the relative risk was .79.  Do you see
9  that, sir?
10      A.   This is a summary of data
11  across many different trials and
12  indications, and that's what the data
13  indicate that's being supplied, you know,
14  in this paper that I don't recall ever
15  having received or seen.  Yes, I see it.
16      Q.   Do you see that there's no
17  statistically significant difference
18  between Vioxx and nonnaproxen NSAIDs when
19  you look at those 23 studies?
20      A.   The 23 studies includes a
21  statistically significant difference of
22  169 percent increased risk against
23  naproxen.
24      Q.   Right.

Page 425

1      A.   Which is exactly what we
2  were concerned about in this issue, yes.
3      Q.   I'm not talking about
4  naproxen.
5      A.   Okay.
6      Q.   I'm asking you whether the
7  results that were being reported here of
8  the 23 studies about Alzheimer's
9  showed that there was no statistically
10  significant difference in cardiovascular
11  events between Vioxx and NSAIDs other
12  than naproxen.
13      A.   I recognize this passage
14  from the Konstam paper that's published
15  subsequently in Circulation after our
16  JAMA paper.  It looks almost identical to
17  that.
18      Q.   That's accurate, isn't it,
19  sir?
20      A.   I would not say the data are
21  accurate, but I recognize the passage,
22  and I also recognize that these are the
23  things that Alise Reicin told me during
24  that April 2001 visit that, for example,

KS-000239

1  you don't know about the 28,000 patients
2  and Alzheimer's and all these other
3  things. You don't have the data. So,
4  she did tell me about this stuff when she
5  came to visit with Dr. Demopoulos.
6      Q.  Dr. Topol, do you have any
7  reason to dispute whether the results of
8  the 23 studies that are described here in
9  OA patients, in rheumatoid arthritis
10  patients, in Alzheimer's patients showed
11  that there was no statistically
12  significant difference between Vioxx and
13  NSAIDs other than naproxen?
14      A.  Yes, I have -- I have
15  concerns regarding how this analysis was
16  done, and I can review that with the
17  Konstam paper if you would like.
18      Q.  Have you ever said, sir,
19  that the comments -- withdrawn.
20          All that Merck is doing
21  here, by the way, is saying to you, would
22  you consider including this language;
23  correct?
24          MR. HAMELINE:  Again,

1      objection.
2          THE WITNESS:  Well, yes. I
3      guess that's what they're saying
4      in this, but we certainly didn't
5      include, and I don't remember ever
6      seeing this.
7  BY MR. GOLDMAN:
8      Q.  The next comment that Merck
9  makes here is "To further evaluate the
10  risk of sustaining a cardiovascular event
11  on" Vioxx "in an elderly patient
12  population, an interim analysis was
13  performed of two ongoing large placebo
14  controlled studies in elderly patients
15  with Alzheimer's and mild cognitive
16  impairment. The relative risk of
17  sustaining a thrombotic event on" Vioxx
18  "versus placebo was .65," and that's not
19  statistically significant; correct, sir?
20      A.  That is an unacceptable
21  analysis.
22      Q.  Is that number, sir,
23  statistically significant? That's my
24  only question.

1      A.  Interim results of trials
2  that one should not be doing interim
3  results for looking at something like
4  this and putting in a report? No.
5      Q.  Do you see that the .65 is
6  not statistically significant because
7  when you look in the parenthesis, the
8  number 1 actually falls within the range
9  .45 and 1.19?
10          MR. KLINE:  Page?
11          THE WITNESS:  From the
12      standpoint of confidence
13      intervals, that's not
14      statistically significant. But
15      that doesn't mean that the data
16      are authentic or meaningful.
17  BY MR. GOLDMAN:
18      Q.  If you remember, Dr. Topol,
19  you actually felt that Merck's comments
20  to you were insightful about the JAMA
21  paper?
22      A.  No. I didn't say that.
23  Okay?
24      Q.  I know that's not what you

1  said today. Let me show you an e-mail,
2  sir, that I'll mark as the next exhibit,
3  which is 36? Sorry, 37.
4              - - -
5          (Whereupon, Deposition
6      Exhibit Topol-37, E-mails,
7      TOP1PRO0000279, was marked for
8      identification.)
9              - - -
10  BY MR. GOLDMAN:
11      Q.  This is an e-mail from you
12  back to Dr. DiBattiste, June 22nd of
13  2001. Do you see that, sir? At the top?
14      A.  Okay. Yes, I see that.
15      Q.  Do you see that you wrote to
16  Dr. DiBattiste, "Thanks - your comments
17  on the paper came back after it was
18  resubmitted and now we have final
19  acceptance and will try to weave some of
20  the insightful points into the galleys."
21  Do you see that, sir?
22      A.  Yes. It's nice to have this
23  e-mail to help remember the interaction.
24  Yes, I do remember this.

KS-000240

Page 430

1    Q.  So, you now remember getting
2  comments and reviewing them, correct,
3  sir?
4    A.  No.  I'll tell you what I
5  remember exactly.  The galleys -- the
6  paper had been accepted, the galleys had
7  already been sent back, and then after
8  the fact we got this -- you know, three
9  months after submitting it to Merck, we
10  got these comments.  I had basically
11  disregarded them because the paper was
12  complete, so I really never went into it.
13    Q.  Did you say to Dr.
14  DiBattiste on June 22nd, 2001 that you
15  would try to weave in some of the
16  insightful points into the paper?
17    A.  Just like when I said to
18  Doctor --
19    Q.  Can you answer that yes or
20  no?
21    A.  It's not as simple as that.
22  Mr. Goldman --
23    Q.  I asked you what the e-mail
24  says.

Page 431

1    A.  I'm sorry, Mr. Goldman, but
2  things are not quite as simple as you're
3  trying to make them out to be.  Just like
4  with the communication to Dr. Reicin
5  where I said I enjoyed the meeting, when
6  it wasn't enjoyable throughout --
7    Q.  I'm not asking you about
8  that, please, Dr. Topol.  Can you please
9  focus on my question the way that you did
10  for the plaintiffs' lawyers?  Can you
11  just focus on my question?
12    MR. HAMELINE:  He answered
13    questions --
14    MR. KLINE:  Let him finish,
15    and I object to the comment.
16    MR. HAMELINE:  He answered
17    questions to the plaintiffs'
18    lawyers by trying to give his
19    understanding and comments and
20    beliefs, and that's what he's
21    trying to do here.
22  BY MR. GOLDMAN:
23    Q.  Dr. Topol, do you see that
24  on June 22 --

Page 432

1    MR. KLINE:  I think he still
2    has an answer pending.
3  BY MR. GOLDMAN:
4    Q.  Dr. Topol, do you see on
5  June 22 --
6    MR. KLINE:  I object.  He
7    was answering a question.  You cut
8    him off.  You didn't let him
9    finish, and now you are going to
10    ask a question again.  I insist
11    that the question be read back and
12    he be allowed to finish the answer
13    to the question.
14  BY MR. GOLDMAN:
15    Q.  Dr. Topol, I'm conducting
16  this deposition.
17    MR. STEIN:  You interrupted
18    him.
19    MR. KLINE:  No, you're not.
20    You're not conducting this
21    deposition with impunity.  He was
22    answering the question.  He told
23    you he was answering the question,
24    and you cut him off, and you won't

Page 433

1    let him answer.  That's wrong.
2  BY MR. GOLDMAN:
3    Q.  Dr. Topol, I'm going to ask
4  you another question, and if you want to
5  explain, feel free.
6    MR. KLINE:  Let him finish
7    the other answer to the question
8    that's pending.
9    MR. STEIN:  Read back the
10    question --
11    MR. GOLDMAN:  No.
12    MR. STEIN:  Read back the
13    question and answer that was asked
14    when he was cut off in the middle.
15    MR. GOLDMAN:  You know what,
16    you're not participating in this
17    deposition.
18    MR. STEIN:  I am
19    participating in this deposition,
20    and you don't have a right to cut
21    off a witness in the middle of a
22    statement.
23    MR. KLINE:  Please read back
24    the answer to the last question

KS-000241

Page 434

1    where the witness was.
2         MR. HAMELINE:  Can we just
3    move forward.  We'll get all this
4    on the record.
5         MR. KLINE:  Would you tag
6    the question and answer, Linda?
7         MR. GOLDMAN:  Fine.
8    BY MR. GOLDMAN:
9         Q.   Dr. Topol, did you write to
10   Dr. DiBattiste on June 22nd of 2001 that
11   you would try to weave some of the
12   insightful points into the galleys?
13        A.   In a polite way after it was
14   already finished, that was a
15   communication I apparently made to Dr.
16   DiBattiste, who I regarded as a long-term
17   colleague, yes.
18        Q.   Let me hand you what I'll
19   mark as Exhibit 38.
20        - - -
21        (Whereupon, Deposition
22   Exhibit Topol-38, "Risk of
23   Cardiovascular Events Associated
24   with Selective COX-2 Inhibitors,"

Page 435

1    JAMA August 22/29, 2001 Vol 286,
2    No. 8, 954-958, MRK-ADJ0035003 -
3    MRK-ADJ0035008, was marked for
4    identification.)
5        - - -
6    BY MR. GOLDMAN:
7         Q.   This is your JAMA paper.
8         A.   Uh-huh.
9         Q.   That was published in August
10   of 2001, isn't it, sir?
11        A.   Yes.
12        Q.   JAMA is a peer-reviewed
13   publication, isn't it?
14        A.   That's correct.
15        Q.   It is a top journal?
16        A.   One of the top journals.
17        Q.   It's widely reviewed by
18   doctors?
19        A.   That's correct.
20        Q.   When you wrote this article
21   in JAMA, it reflected your and Dr.
22   Nissen's best medical judgment about the
23   potential cardiovascular risks associated
24   with COX-2 inhibitors, correct, sir?

Page 436

1         A.   And Dr. Mukherjee and the
2    input of the reviewers and the editors.
3         Q.   You both had reviewed, Dr.
4    Nissen and you, lots of data concerning
5    COX-2 inhibitors before writing this
6    paper, correct, sir?
7         A.   Yes.
8         Q.   Among the materials that you
9    reviewed and Dr. Nissen reviewed are the
10   VIGOR study, the CLASS study, study 090,
11   study 085, aspirin trials; correct?
12        A.   Yes.
13        Q.   And very scientific
14   literature, right, sir?
15        A.   That's correct.
16        Q.   Isn't it true, sir, that
17   when you wrote this paper, you found that
18   the difference in cardiovascular events
19   seen in VIGOR was unexpected?
20        A.   Well, I don't know if I
21   would qualify it like that.  I would say
22   that it was significantly different, and
23   that we -- there was a biologic
24   mechanism.  So, I don't know that you

Page 437

1    would want to say it was unexpected.  We
2    already knew that prostacyclin was
3    suppressed, a critical constituent for
4    blood clots and normal artery function,
5    and so I don't know that you can say it
6    was unexpected.  It wasn't expected by
7    the trialist per se, but it wouldn't be
8    at all biologically implausible.
9         Q.   If you'd turn to the page in
10   your paper, 958.
11        A.   Yes.
12        Q.   Second column, last
13   paragraph.  Do you write in your paper
14   "Our analysis has several significant
15   limitations.  The increase in
16   cardiovascular events in these trials was
17   unexpected."  Is that what you wrote?
18        A.   That's the statement I'm
19   trying to put in context.
20        Q.   You say --
21        A.   It says, "and evaluation of
22   these end points was not prespecified,"
23   so that's part of -- it's interdependent.
24   If you don't anticipate the endpoints and

**KS-000242**

1  some of the issues are unexpected, it's
2  not a matter of biologic expectation,
3  it's a matter of whether the trial is
4  designed to look at this question.
5      Q.  You said on direct
6  examination that you felt there was no
7  basis for the naproxen hypothesis.  Was
8  that your testimony?
9      A.  That on the course of how
10 this played out from 2001 when that
11 naproxen hypothesis was first touted by
12 Merck and put in the Targum report to the
13 present, over time it was very clear that
14 that could not be tenable.
15     Q.  You said on direct
16 examination "The only appropriate
17 conclusion...would be that there's a
18 problem with the experimental drug
19 Vioxx."  Right, sir?
20         MR. KLINE:  Objection.
21 BY MR. GOLDMAN:
22     Q.  Is that your testimony?
23         MR. KLINE:  Objection.
24     Misstates, mischaracterizes.

1  BY MR. GOLDMAN:
2      Q.  Do you remember testifying
3  to that?
4      A.  I remember testifying, and I
5  remember the statement is very clear,
6  comparing a well-accepted historical
7  anchor, naproxen, versus an experimental
8  new drug and making the conclusion that
9  the only reasonable conclusion as a
10 clinical trialist is to say the
11 experimental arm has a problem.
12     Q.  Well, let's see what
13 conclusion you reached when you wrote
14 this paper in August of 2001.  If you'd
15 turn to Page 957, the first column, last
16 paragraph, "The results of the VIGOR
17 study can be explained by either a
18 significant prothrombotic effect from"
19 Vioxx "or an antithrombotic effect from
20 naproxen (or conceivably both)."  Do you
21 see that, sir?
22     A.  Not only do I see it, but I
23 acknowledged this several times earlier
24 today, that that's a possibility.  We

1  wouldn't just dismiss what Merck put
2  forth.  It's certainly a possibility.
3  And we acknowledge it.  I mentioned at
4  least twice if not three times in the
5  paper.  I put that in the deposition --
6  in the testimony earlier today.
7      Q.  The reason that you felt
8  that naproxen and its cardioprotective
9  effects could explain the results in
10 VIGOR is that naproxen had significant
11 anticlotting effects, doesn't it, sir?
12     A.  That's what Merck was
13 advancing, that notion, but whether or
14 not that was clinically meaningful was
15 not ever determined.
16     Q.  If you look two sentences
17 down, "Naproxen has significant
18 anti-platelet effects" which mean
19 platelet -- "with mean platelet
20 aggregation inhibition of 93 percent
21 compared with platelet aggregation
22 inhibition of 92 percent for those taking
23 aspirin."  Do you see that, sir?
24     A.  Yes.  We referenced where

1  that data came from.
2      Q.  You referenced where that
3  data came from.  That was an FDA
4  document, correct, sir?
5      A.  Right.
6      Q.  When you wrote this article
7  in JAMA, you believed that naproxen has
8  significant anti-platelet effects,
9  correct, sir, or you wouldn't have put it
10 in the article?
11     A.  No.  Let me just put --
12 you're asking about context.  Okay?
13     Q.  No, I'm not.
14     A.  Anti-platelet effects and
15 does that explain off the concerns of
16 Vioxx are different things.
17 Anti-platelet effects doesn't mean that
18 you can ascribe the problems of Vioxx to
19 naproxen's cardioprotective effect.  And
20 that's why in the last sentence of the
21 paper we urge caution in prescribing
22 these agents at risk for
23 cardiovascular morbidity.  If we were so
24 confident about the platelet effect being

KS-000243

Page 442

1  clinically transferable, we wouldn't have
2  come to that conclusion.
3       Q.   Do you see in the second
4  column of your article on Page 957 you
5  also say that "naproxen, but not
6  ibuprofen or diclofenac resulted in a
7  high level of platelet aggregation
8  inhibition similar to that achieved with
9  aspirin."  Do you see that, sir?
10      A.   Yes.
11      Q.   Then you write about
12 flurbiprofen, which is something that the
13 plaintiffs lawyer asked you about; right?
14      A.   Yes.
15      Q.   You wrote in JAMA, "There is
16 clinical evidence that flurbiprofen, 50
17 milligrams twice daily for 6 months,
18 reduced the incidence of MI by 70 percent
19 compared with placebo."  Isn't that what
20 you wrote, sir?
21      A.   Yes.
22      Q.   Then you say "Indobufen,
23 another NSAID, was as effective as
24 aspirin in preventing" and then you

Page 443

1  continue, correct, sir?
2       A.   Yes.
3       Q.   Then you say, "Because of
4  the evidence for an anti-platelet effect
5  of naproxen, it is difficult to assess
6  whether the difference in cardiovascular
7  event rates in VIGOR was due to a benefit
8  from naproxen or to a prothrombotic
9  effect from" Vioxx.  Do you see that?
10      A.   As I said, this was
11 acknowledged at least two to three times
12 in the manuscript, yes.
13      Q.   In fact, sir, isn't it true,
14 that as late as August of 2004, you
15 believed that it was uncertain as to
16 whether the heart attacks in VIGOR were
17 caused by Vioxx or naproxen?
18      A.   I don't know how you could
19 ever come to that conclusion.
20      Q.   I want to show you an
21 article that we were asked about earlier
22 today, and this is the --
23      A.   The TARGET editorial, "A
24 coxib a day won't keep the doctor away"?

Page 444

1            - - -
2            (Whereupon, Deposition
3       Exhibit Topol-39, "A coxib a day
4       won't keep the doctor away,"
5       (Topol, et al) The Lancet Vol 364
6       August 23, 2004, 639-640, was
7       marked for identification.)
8            - - -
9  BY MR. GOLDMAN:
10      Q.   I'm going to mark 39, which
11 is a comment that you wrote --
12      A.   Right.
13      Q.   -- in the Lancet.  Do you
14 see that, sir?
15      A.   Yes, I do.
16      Q.   Directing your attention to
17 the first column, in the last sentence:
18 "It has remained unclear whether this
19 striking increase in myocardial
20 infarctions was related to" Vioxx
21 "directly, or the comparator agent,
22 naproxen, had significant anti-thrombotic
23 effects."  Do you see that, sir?
24      A.   Which paragraph are you on?

Page 445

1       Q.   The left column, first
2  paragraph, do you see that you wrote "In
3  particular," Vioxx "was associated with
4  an unanticipated five-fold increase in
5  myocardial infarctions compared with
6  naproxen.  It has remained unclear
7  whether this striking increase in
8  myocardial infarctions was related to"
9  Vioxx "directly, or the comparator agent,
10 naproxen, had significant anti-thrombotic
11 effects."  Did you write that?
12      A.   Absolutely.
13      Q.   Do you see that you wrote
14 that on August 21st, 2004?
15      A.   Yes.  But I -- you haven't
16 given me a chance to put this in context.
17 The point being is that the TARGET trial
18 is the largest trial ever done with a
19 COX-2 inhibitor --
20      Q.   Sir, I'm actually -- I just
21 asked if you wrote it.  That's all I
22 asked.
23           MR. KLINE:  You did not.
24      You absolutely did not.  Let him

KS-000244

Page 446

1    finish his answer.
2         MR. HAMELINE:  So, let him
3    finish his answer.
4         THE WITNESS:  Okay.  You've
5    just taken the snippets that you
6    like out of this editorial, but if
7    you read the editorial carefully
8    and the TARGET paper which I was
9    asked by the Lancet to comment on,
10   which is the largest COX-2
11   inhibitor trial ever performed,
12   and it compared uniquely the
13   lumericoxib to naproxen or to
14   diclofenac.  And what it showed is
15   there was a small protective
16   effect of naproxen.  And what
17   you're not -- what you're
18   discounting, and that's why I
19   said, how could you possibly come
20   to this conclusion, is because in
21   the same editorial --
22 BY MR. GOLDMAN:
23   Q.   Well, you wrote it?
24   A.   -- that I conclude that "The

Page 447

1    continued commercial availability of
2    rofecoxib, without a black-box warning
3    for cardiovascular patients is indeed
4    troubling."  And that's because the
5    TARGET trial was the most definitive
6    trial that's ever been performed in this
7    field to establish naproxen having a
8    mild, only mild, less than half the
9    benefit of aspirin.  So, instead of a 25
10   percent reduction, we're talking about
11   maybe 10 or 12 percent reduction.  So,
12   instead of the 500 percent protection
13   which would have been required for the
14   naproxen hypothesis, this blew it apart.
15   The TARGET trial and the commentary that
16   I wrote put this in perspective.  It
17   completely took that premise about the
18   naproxen hypothesis and it blew it up.
19        MR. GOLDMAN:  Move to
20   strike.
21        THE WITNESS:  It was no
22   longer tenable at that point.
23        MR. GOLDMAN:  Move to strike
24   as nonresponsive.

Page 448

1  BY MR. GOLDMAN:
2    Q.   Directing your attention
3  back to your JAMA article, sir:
4       MR KLINE: It was responsive.
5       THE WITNESS:  Yes.
6  BY MR. GOLDMAN:
7    Q.   I want to talk about Figure
8  3 for just a minute, Page 957, Figure 3.
9    A.   JAMA article?
10   Q.   Yes.
11   A.   Figure 3?
12   Q.   Do you see that?
13   A.   Yes.  I'm with you, yes.
14   Q.   Let me see if I understand
15 this and your analysis here.
16        What you did in your paper
17 was to take a placebo group and the rate,
18 annualized rate of MIs or heart attacks
19 in a placebo group, and you obtain those
20 numbers from four different aspirin
21 trials.  Is that right?
22   A.   No.  Actually, the trials
23 were pulled together by a British heart
24 journal paper, and we took that, which is

Page 449

1  the largest data set we could find, to
2  have as an anchor or reference to the
3  COX-2 inhibitor trials, yes.
4    Q.   Then you compared the
5  annualized rate of myocardial infarctions
6  in those four trials to the MI rate in
7  VIGOR and in CLASS, the Celebrex trial,
8  correct, sir?
9    A.   Yes.
10   Q.   And according to Figure 3,
11 this shows that Celebrex has a higher
12 annualized myocardial infarction rate
13 than VIGOR.  Is that right, sir?
14   A.   That's right, but they're
15 very close.  They're both .80, .74, yes.
16   Q.   You agree, sir, that there
17 are significant flaws in the analysis
18 that you conducted here in your JAMA
19 article, don't you?
20   A.   There are limitations.  I
21 think flaws is a little strong, but
22 absolutely we acknowledge those
23 limitations.
24   Q.   One of the limitations in

KS-000245

1   your analysis is that the aspirin trials
2   where you were looking at the MI rate in
3   the placebo group did not have any
4   patients who had rheumatoid arthritis;
5   correct?
6       A.   Right.  But the CLASS trial
7   was osteoarthritis as well.  And the
8   incidence of myocardial infarction in
9   rheumatoid arthritis is not well
10  characterized.
11      Q.   The FDA called your analysis
12  invalid and plainly inappropriate,
13  haven't they, sir?
14          MR. KLINE:  Objection.
15          THE WITNESS:  That's a very
16      broad interpretation of a letter
17      that Bob Temple sent to me
18      personally.
19          MR. GOLDMAN: Let me mark the
20      next exhibit, 39.
21          -  -  -
22      (Whereupon, Deposition
23      Exhibit Topol-39A, Letter
24      10-16-01, EJT 000323 - EJT

1       000324, was marked for
2       identification.)
3           -  -  -
4           THE WITNESS:  Yes.
5   BY MR. GOLDMAN:
6       Q.   This is the letter that the
7   Food & Drug Administration wrote to JAMA
8   addressing your article, correct?  The
9   first sentence says, "The question,
10  addressed recently in JAMA."
11      A.   I would like to --
12          MR. KLINE:  Do I have a
13      line, continuing line?
14          MR. GOLDMAN:  Yes, you do.
15          THE WITNESS:  This letter
16      was not published in JAMA.  It was
17      forwarded to me from JAMA, and it
18      was from Dr. Temple.  It was not
19      -- it's Dr. Temple writing this.
20      It is not the FDA.
21  BY MR. GOLDMAN:
22      Q.   Is Dr. Temple somebody who
23  works for the FDA?
24      A.   Yes.  And I know him very

1   well.  Yes.
2       Q.   Does Dr. Temple write to
3   JAMA on the first page, third paragraph,
4   last sentence, "Indeed, merely examining
5   the AMI rates" that's annualized
6   myocardial infarction rates "in the
7   control groups of the studies in the
8   meta-analysis shows the invalidity of
9   this approach."  Do you see that, sir?
10      A.   Which sentence are you?
11      Q.   Last sentence in the third
12  paragraph.
13      A.   Oh, yes, I see it, yes.
14      Q.   And then Dr. Temple shows
15  that in the aspirin studies that you
16  looked at, there were varying MI rates;
17  correct?
18      A.   Yes.
19      Q.   And says that "The placebo
20  rates in the various studies vary by more
21  than a factor of 3."  Do you see that,
22  sir?
23      A.   Yes.
24      Q.   On the next page, Dr. Temple

1   writes "These highly variable results
2   suggest that this is probably a poor case
3   for any meta analysis."  And then he
4   continues.  Do you see that?
5       A.   Yes.
6       Q.   "The weakness of this
7   comparison goes well beyond being
8   'problematic,' the authors' term; it is
9   plainly inappropriate."  Do you see that,
10  sir?
11      A.   I certainly do, and I
12  responded to him.  And I also got a
13  response from him.  If you'd like to just
14  take this out of context.  Are we going
15  to go further into this, or are we just
16  going to leave it at that?
17      Q.   In the JAMA article --
18      A.   Dr. Temple sent me a letter
19  saying --
20          MR. GOLDMAN:  Can you please
21      instruct your witness to answer my
22      question?
23          MR. KLINE:  He's answering
24      your question.

**KS-000246**

Page 454

1    MR. GOLDMAN:  It's not a
2  time to go on with a speech.  If
3  plaintiffs' lawyers want to ask
4  questions, that's fine.  I'm
5  asking questions here.
6    MR. HAMELINE:  He has
7  answered your questions.  You're
8  asking him questions.  He's here
9  as a third-party witness.
10    MR. GOLDMAN:  Fine.
11    MR. HAMELINE:  You're asking
12  him what somebody else said,
13  wasting his time, unless you are
14  going to ask him more detail about
15  it in his personal testimony.  If
16  you want to just show this to
17  somebody and authenticate it by
18  Dr. Temple, you can do that.  If
19  you want to ask Dr. Topol what he
20  thinks about it or his concerns or
21  his response, that's appropriate
22  deposition testimony.  But for you
23  to cut him off without allowing
24  him to testify about is the

Page 455

1  inappropriate step here, just to
2  put it in total context.
3    MR. STEIN:  So, can he
4  finish what he's trying to say?
5    MR. GOLDMAN:  No, he cannot.
6          - - -
7    (Whereupon, Deposition
8  Exhibit Topol-40, "Systematic
9  adjudication of myocardial
10  infarction end-points in an
11  international clinical trial,"
12  (Mahaffey, et al), Current
13  Controlled Trials in
14  Cardiovascular Medicine August
15  2001 Vol. 2 No. 4, (6 pages), was
16  marked for identification.)
17          - - -
18  BY MR. GOLDMAN:
19    Q.   I'm handing you an exhibit
20  that I marked as 40, and this is an
21  article, Dr. Topol, that I think you're a
22  co-author of.  Do you recognize this,
23  sir?
24    A.   Yes.

Page 456

1    Q.   It's called "Systematic
2  adjudication of myocardial infarction
3  endpoints in an international clinical
4  trial."  Do you see that?
5    A.   Yes.
6    Q.   And you published it in
7  August of 2001; right?
8    A.   Yes.
9    Q.   This is about the
10  adjudication process or the evaluation by
11  an independent committee of adverse
12  events that are reported by investigators
13  in clinical trials; correct?  Yes?
14    A.   Yes.
15    Q.   Do you see that in your
16  conclusion here, Dr. Topol?  You say
17  "End-point adjudication by a CEC" -- what
18  is that?
19    A.   That's a clinical event
20  committee.
21    Q.   -- "is important, to provide
22  standardised, systematic, independent,
23  and unbiased assessment of end-points
24  particularly in trials that span

Page 457

1  geographic regions and clinical practice
2  settings."  Do you see that, sir?
3    A.   Yes, I do.
4    Q.   Do you agree that the
5  process that is used to adjudicate or
6  evaluate cardiovascular events is an
7  important one?
8    A.   I agree with that
9  completely, and there's also other issues
10  regarding CEC, clinical event committees,
11  that that statement doesn't encompass.
12    Q.   The JAMA article that you
13  published prompted debate in the
14  scientific community.  Is that fair?
15    A.   I don't know about
16  scientific debate.  There was debate in
17  the media with Merck consultants.  There
18  wasn't much scientific debate that I'm
19  aware of.  I guess there was some, but
20  most of the studies, as we reviewed this
21  morning, came out, the case control
22  studies, six out of seven, came out with
23  a significant adverse profile of Vioxx in
24  these large epidemiologic studies.

KS-000247

Page 458

1    MR. GOLDMAN:  Move to strike
2  as nonresponsive.
3  BY MR. GOLDMAN:
4    Q.   Did you issue a press
5  release after you published your JAMA
6  article?
7    A.   You mean with the article?
8    Q.   Yes.
9    A.   Possibly with the article.
10   Q.   Did you hold a press
11 conference after you published the
12 article?
13   A.   We did not hold any press
14 conference.
15   Q.   Was your article picked up
16 by various newspapers including the Los
17 Angeles Times, the New York Times, the
18 New York Daily News, Newsweek and others?
19   A.   I don't remember all the
20 places it was picked up, but it was
21 certainly covered.  And I've already
22 mentioned the Wall Street Journal article
23 that came out that day.
24   Q.   Did you appear on television

Page 459

1  on NBC Nightly News and the Today Show to
2  talk about your JAMA article?
3    A.   I certainly remember the
4  Today Show, possibly the other one, but I
5  do remember the Today Show interview.
6    Q.   You said on direct
7  examination, sir, that "Vioxx's risk has
8  been evident since trials in 1999 and all
9  the way through the time of withdrawal"
10 in September of 2004.  Do you remember
11 saying that?
12   A.   Yes.
13   Q.   Then you said -- you said
14 that "There's been replication of
15 untoward significant excess of events of
16 heart attack, death and stroke."  Do you
17 remember testifying to that, sir?
18   A.   Yes, I do.
19   Q.   And you said that based on
20 that -- let me ask you this.
21       The studies that you're
22 referring to are VIGOR and 090.  Is that
23 right, sir?
24   A.   No.  I'm referring to the

Page 460

1  Juni cumulative meta analysis in which on
2  all of those randomized trials, I believe
3  there were something like 18 of them, it
4  was after VIGOR and 090 that had crossed
5  the line statistically where the drug was
6  proven to be hazardous for heart attack
7  excess, and that's when Juni and his
8  colleagues concluded that the drug should
9  have been withdrawn.
10       MR. GOLDMAN:  Move to strike
11   as nonresponsive.
12 BY MR. GOLDMAN:
13   Q.   Did you at any point --
14       MR. HAMELINE:  He can move
15   to strike anything that he wants
16   to.  It doesn't mean it's going to
17   be stricken.  It's his comment.
18 BY MR. GOLDMAN:
19   Q.   Did you at any point, Dr.
20 Topol, write an article before Vioxx was
21 withdrawn saying that it should be
22 withdrawn?
23   A.   The article that I cited
24 about the August 2004 black box warning

Page 461

1  was as far as I got in terms of the
2  recommendation.
3    Q.   You never recommended that
4  Merck withdraw Vioxx at any point while
5  it was on the market, correct, sir?
6    A.   I did not recommend its
7  withdrawal.
8    Q.   Let's talk about study 090.
9  I believe you said on direct, "All you
10 need to know is VIGOR and 090 for a
11 proven hazard of heart attack."  Was that
12 your testimony?
13   A.   As I pointed out just a
14 moment ago, that was in the context of
15 not only the two trials together which I
16 reviewed in that letter to the New
17 England Journal, but also the Juni
18 analysis, as I cited, where those two
19 studies on top of every other randomized
20 trial crossed the line in 2000 for
21 recommending that the drug had a
22 significant excess of heart attacks.
23   Q.   The Juni article that you
24 keep referring to is an article that was

**KS-000248**

1  written after withdrawal, correct, sir?
2      A.   It was written before -- I
3  think the data was done before the
4  withdrawal.
5      Q.   The article was published
6  after withdrawal?
7      A.   The article was published
8  shortly after withdrawal, yes.
9      Q.   Is it your position, sir,
10  that -- withdrawn.
11      You were shown a clip from
12  60 Minutes where you said the following:
13  "Whenever you find a problem and you're
14  thinking maybe it's not a problem, you
15  want to see if there's independent
16  replication.  So, if you have study 090
17  and you want to discount that somehow,
18  then you have VIGOR.  You've got two
19  trials now, you have essentially
20  lightning striking twice.  That's
21  independent replication.  That's really
22  serious confirmation.  This is
23  unequivocal.  This is a problem."  Is
24  that what you said on national TV?

1      A.   I said that, and I stand by
2  that, and that is, when you have two
3  trials --
4      Q.   I just asked you if you said
5  it on TV.
6      A.   Okay.
7      MR. HAMELINE:  Again, if all
8      you're going to do is ask him
9      whether he said something which is
10      already in the record from this
11      morning and not allow him to
12      follow up or you're not going to
13      ask him a question about this,
14      this is a complete waste of time.
15  BY MR. GOLDMAN:
16      Q.   Did you say --
17      MR. HAMELINE:  If it's a
18      foundation or an introductory
19      question, that's fine.
20      MR. STEIN:  It is rude to
21      this witness who is not a party to
22      the case.  He doesn't have to be
23      cut off.  It's just not the right
24      thing to do.

1  BY MR. GOLDMAN:
2      Q.   Did you say, Dr. Topol, on
3  national TV that you believe that study
4  090 and VIGOR was essentially lightning
5  striking twice?
6      A.   That was independent
7  replication, and I made the analogy to
8  lightning striking twice as far as a
9  signal and as far as how important that
10  would be, yes.
11      Q.   Did you also say on national
12  TV that study 090 and VIGOR was
13  independent replication, serious
14  confirmation and an unequivocal problem?
15      A.   All that has to do with
16  replication, which is absolute -- yes.
17      Q.   Look at your JAMA article
18  for me, sir.
19      A.   Yes.  And I know exactly
20  what's going to be your line of
21  questioning here.
22      Q.   If you'd turn to Page 956 --
23      A.   Yes.
24      Q.   -- do you see in the middle

1  column you devote a whole section to
2  study 085 and study 090?  Do you see
3  that, sir?
4      A.   That's right.
5      Q.   Yes?
6      A.   Yes.
7      Q.   And you talk about study 090
8  and 085 in this article, don't you, in
9  August of 2001?
10      A.   Yes.
11      Q.   You obtained information
12  about study 090 from the FDA's website,
13  correct, sir?
14      A.   Yes, but not thoroughly
15  enough at this time.
16      Q.   Did you say anything in your
17  JAMA article about study 090 being a
18  lightning strike?
19      A.   The only -- after more
20  careful review of 090 with the
21  misclassifications that Merck had in the
22  FDA document, it was obvious that the
23  data were wrong and that the correct data
24  are published in the New England Journal

KS-000249

1  December 2004 correspondence that I put.
2      Q.   Did you say anything in
3  August of 2001 when you were writing your
4  article that study 090 was a lightning
5  strike?
6      A.   The data in this
7  paragraph --
8      Q.   I'm just asking if you said
9  it in the article.
10      A.   -- are using incorrectly
11  classified data from Merck.
12      Q.   I don't know what you're
13  relying on for that, but I'm not asking
14  you about that right now.
15      A.   Okay.
16      Q.   My question to you is
17  whether anywhere in this article you said
18  that study 090 was a lightning strike?
19      A.   No.  Because we didn't have
20  the right data at that time.
21      Q.   Did you say anywhere in this
22  article that study 090 and VIGOR were
23  independent replication?
24      A.   Again, we didn't have the

1  correct 090 data at that time, and,
2  again, the study was finished a long time
3  before that and still has not yet been
4  published five years later -- six years
5  later now, I should say.
6      Q.   Did you say anywhere in your
7  JAMA --
8          MR. GOLDMAN:  Move to strike
9          as nonresponsive.
10  BY MR. GOLDMAN:
11      Q.   Did you say anywhere in your
12  JAMA article that study 090 and VIGOR was
13  serious confirmation of an unequivocal
14  problem?
15      A.   Again, the --
16      Q.   Did you say that in your
17  article?
18      A.   It would not be possible
19  without having access to the correct
20  data.
21      Q.   Did you say that in your
22  article?
23      A.   It couldn't be said in the
24  article.

1      Q.   Dr. Topol, it's a very
2  simple question.
3          Did you say in JAMA anywhere
4  whether or not study 090 and VIGOR
5  represented a serious confirmation,
6  unequivocal problem?
7      A.   As I said, we could not have
8  possibly said it at that time --
9      Q.   Is that a no?
10      A.   -- with the data that we
11  had.  That's right, no.
12      Q.   You said the things that you
13  said about lightning striking twice,
14  serious confirmation, unequivocal problem
15  about 090 because you wanted to make
16  Merck look bad on TV.  Isn't that true,
17  sir?
18      A.   That is completely untrue.
19      Q.   Do you see in your JAMA
20  article when you were writing to doctors,
21  you wrote about study 085 and study 090
22  together; right?
23      A.   Yes.
24      Q.   You did that, sir, in JAMA

1  because study 085 was a twin study, an
2  identical study to study 090; correct?
3      A.   It is not a twin study when
4  one turns out to come out differently
5  than the other.
6      Q.   I'm talking about the
7  design, not the result.  It was a twin
8  study, wasn't it, sir?
9      A.   No.  There were significant
10  differences in the design as well.  They
11  were both in osteoarthritis, but study
12  085 and 090 had differences, for example,
13  in the dose, and there was aspirin used.
14  There were different -- I don't remember
15  all the details, but 085 and 090 were not
16  identical.
17      Q.   Let's look at what you wrote
18  back at the time in JAMA.  Do you see
19  that study 085, you say, was "a
20  randomized, double-blind
21  placebo-controlled trial" versus -- and
22  that's the 12.5 milligram dose.  Do you
23  see that?
24      A.   Yes.

KS-000250

Page 470

1  Q.  "Versus nabumetone," the
2  thousand milligram dose.  Do you see
3  that, sir?
4  A.  Yes.
5  Q.  That's the identical dose of
6  Vioxx and nabumetone that was used in
7  study 090; correct?
8  A.  Yes.  But as it turns out,
9  there are differences, and I have to go
10  to the Targum report.
11  Q.  Is this what you wrote in
12  your article, sir?
13  A.  That is what's in the
14  article.  But you're asking about whether
15  they are twin studies and the same, and
16  they're not all the same, no.
17  Q.  Do you see that study 085
18  involved an evaluation of the treatment
19  of Vioxx in osteoarthritis patients who
20  had knee problems?  Do you see that?
21  A.  Yes.
22  Q.  That's the same with 090,
23  correct?
24  A.  Yes.  The patient complaint

Page 471

1  of knee arthritis is the same.
2  Q.  The duration of the trials
3  085 and 090 were also the same, six
4  weeks; correct?
5  A.  That's what it says here.
6  I'd like to go back to the Targum report
7  to verify that.
8  Q.  Do you see that in your
9  article that you wrote, patients in 085
10  were allowed to take low dose aspirin for
11  cardioprotection, and for 090, aspirin
12  for cardioprotection was also allowed.
13  Do you see that, sir?
14  A.  That's what it says in the
15  article.  Again, we had limited access to
16  090.
17  Q.  Well, the access you had to
18  090, sir, is referenced on the last page
19  of your article in footnote 22; correct?
20  A.  Which is the FDA website.
21  Q.  You went to the FDA website
22  to find information from the FDA about
23  study 085 and 090, correct?
24  A.  That's right, but that's not

Page 472

1  complete information.  That's the
2  problem.
3  Q.  Let me point out, sir, that
4  when you wrote your article at the time,
5  do you see that you wrote for study 085
6  that there were three total
7  cardiovascular events in the trial, one
8  for Vioxx, two for nabumetone, and none
9  for the placebo group?  Is that what you
10  wrote in your JAMA article?
11  A.  For study 085.
12  Q.  Did you write for study 090
13  that there were 9 cardiovascular events,
14  6 for Vioxx, 2 for nabumetone and 1 for
15  placebo?
16  A.  That's what it says in the
17  article.
18  Q.  It was important to provide
19  information about 085 and 090 because you
20  wanted to give the people who read this
21  article information about both studies;
22  correct?
23  A.  Well, we concentrated mainly
24  on VIGOR, so we gave the other two

Page 473

1  studies, 085 and 090, which at that time
2  we weren't as concerned, we didn't make
3  much of these two studies.  That's true.
4  MR. HAMELINE:  Do you
5  need -- you were looking for a
6  letter.
7  THE WITNESS:  Yes.  The
8  letter -- the letter in the New
9  England Journal that I am
10  referring to -- I just have to --
11  it's number 11 in the packet.
12  BY MR. GOLDMAN:
13  Q.  Go ahead and look for it,
14  Dr. Topol.  I'm going to keep asking you
15  questions because I have a time limit
16  here.
17  A.  Go ahead.
18  Q.  You never mentioned the
19  results of study 085 when you were on 60
20  Minutes, did you, sir?
21  A.  No.  Because all I'm talking
22  about is replication.  I'm not talking
23  about other trials.  There are many other
24  trials of Vioxx, of course.

**KS-000251**

119 (Pages 470 to 473)

Page 474

1    Q.   You never mentioned the
2   results of study 085 when the plaintiffs'
3   lawyers were asking you questions, did
4   you, sir?
5    A.   I wasn't asked about 085.
6    Q.   The truth is, when you wrote
7   your JAMA article, you wrote that study
8   090 did not demonstrate the significant
9   increase in cardiovascular event rates
10  that you saw in VIGOR?
11   A.   Only on more careful review
12  of that data, data that was not
13  accessible to us at that time, was I able
14  to find out, to drill down on these
15  events in 090.  And let me just be
16  perfectly clear that when these data were
17  reviewed, and we can go back to the
18  Targum report and I can take you through
19  patient by patient why this
20  misclassification had led us astray.  If
21  we had -- if this data were properly
22  classified by Merck in what was
23  transmitted to the FDA report, we would
24  have had much more definitive

Page 475

1   conclusions, but we weren't able to get
2   there.  So, if I can go to the Targum
3   report and go right to the table, which
4   is really a critical table, and we can go
5   over that data.
6    Q.   We will do that, Dr. Topol.
7   We're not going to do that right now, but
8   we will do that, I promise you.
9        Dr. Topol, when you did your
10  analysis before Vioxx was withdrawn in
11  August of 2001, you found that study 090
12  did not demonstrate the significant
13  increase in CV event rates,
14  cardiovascular event rates that were seen
15  in VIGOR; correct?
16   A.   When we had incomplete
17  access to the data, yes.  I've already
18  reviewed that.
19       MR. GOLDMAN:  Move to strike
20       as nonresponsive.
21  BY MR. GOLDMAN:
22   Q.   Dr. Topol, I'm going to show
23  you at Page 958 in the first column,
24  second full paragraph, you say, second

Page 476

1   sentence, "Two smaller studies (Study 085
2   and Study 090) of" Vioxx "that both
3   allowed the use of low-dose aspirin did
4   not demonstrate the significant increase
5   in cardiovascular event rate noted in
6   VIGOR."  Did you write that, sir?
7    A.   That was in our paper,
8   again, from the wrong data that we did
9   not have access to.
10   Q.   I want to know what data you
11  had access to after this point that you
12  didn't have access to in --
13   A.   I'll be happy to go over
14  that if you give me an opportunity.
15   Q.    -- JAMA?
16   A.   Page 32 of the Targum
17  report.
18   Q.   The Targum report you saw
19  back in February 2001, sir?
20   A.   Right, but then we had the
21  details of these patients, for example,
22  placebo, coronary occlusion, and we could
23  say had nothing to do with a heart
24  attack.

Page 477

1    Q.   Dr. Topol, the Targum report
2   that you are relying on now for your
3   review that study 090 was a signal --
4    A.   Yes.
5    Q.    -- for cardiovascular risk
6   is the same report that you cite in your
7   JAMA article and that you relied on in
8   your JAMA article.  Is that true?
9    A.   And we had the details of
10  each of the patients.
11   Q.   You had that also in
12  February 2001?
13   A.   I did not have access to it.
14   Q.   Well --
15   A.   That is, how these events
16  were characterized, coronary occlusion,
17  there was one called atrial fibrillation,
18  there was one called congestive heart
19  failure.  When we looked and went through
20  each -- when I looked and others looked
21  going through each of these events, then
22  the numbers changed.
23   Q.   We'll talk about numbers
24  changing in a minute.  Did you write, Dr.

KS-000252

1 Topol, in August of 2001, that two
2 smaller studies -- withdrawn.
3          MR. KLINE:  I apologize.
4 Where are you reading from?
5          MR. GOLDMAN:  First column
6 of the JAMA article on Page 958.
7          MR. KLINE:  Thank you.
8 BY MR. GOLDMAN:
9      Q.   Dr. Topol, did you write in
10 August of 2001 that "Two smaller studies
11 (Study 085 and Study 090)...did not
12 demonstrate the significant increase in
13 cardiovascular event rate noted in
14 VIGOR"?  Did you write that?
15      A.   That's correct.
16      Q.   Did you also say in the next
17 sentence, "However, these studies had
18 smaller sample sizes, used only 25% of
19 the dose of" Vioxx "used in VIGOR, and
20 had few events for meaningful
21 comparison."  Did you write that then,
22 sir?
23      A.   That's right.
24      Q.   You didn't say that on 60

1 Minutes?
2          MR. HAMELINE:  Can I just
3 note an objection.  I know you
4 want to move through these
5 quickly, but raising your voice --
6          MR. GOLDMAN:  I don't mean
7 to raise my voice.
8          MR. HAMELINE:  I know you
9 don't. I'm just noting that for
10 the record.  I think it's late in
11 the afternoon, and we all get
12 involved in the deposition.
13          MR. GOLDMAN:  I promise you
14 if I'm raising my voice, I
15 apologize, but that's not my
16 intent at all.
17          THE WITNESS:  You're also
18 not allowing me to adequately
19 respond.
20          MR. HAMELINE:  That is his
21 intent.  That's different.
22          THE WITNESS:  And you
23 continue to drill ahead, and I
24 don't have a chance to give you

1 the data that's objectionable.  We
2 were erroneously misled.  Not only
3 was the suppression of 090 never
4 published that trial --
5 BY MR. GOLDMAN:
6      Q.   You knew that --
7          MR. HAMELINE:  Could you let
8 him finish?
9          THE WITNESS:  The trial was
10 completed in 1999.  In 2001 we
11 could give a couple of years to a
12 near thousand patient trial not
13 being published.  But now we're in
14 2004, and the study is still not
15 published, and we didn't have the
16 data to go into the table of
17 Targum until 2004 to find out that
18 the events that we misclassify in
19 our JAMA paper were actually very
20 different than what we had
21 estimated and what Targum even had
22 estimated.  She never spent time
23 on this, and it's not a trivial
24 matter.  This is a 978 patient

1 trial with statistically
2 significant results of excess of
3 heart attacks.
4 BY MR. GOLDMAN:
5      Q.   Dr. Topol --
6          MR. GOLDMAN:  Move to strike
7 as nonresponsive.
8 BY MR. GOLDMAN:
9      Q.   Dr. Topol, did you write
10 back when you were writing to doctors in
11 your JAMA article that study 090 had
12 small sample sizes, used only 25 percent
13 of the dose and had few events for
14 meaningful comparison?  Was that your
15 statement in your article?
16      A.   That was the statement based
17 on the data we had at the time, yes.
18      Q.   I want to try to keep track
19 of the numbers that you've used over time
20 for study 090, and so I'm going to give
21 you a chart and ask you to confirm that
22 this is correct.
23          In your August 2001 JAMA
24 article for study 090, you said that

KS-000253

Page 482

1  there were 6 cardiovascular events in the
2  Vioxx group, correct?
3       A.   Right.
4          MR. KLINE:  What page are we
5  looking at here, Mr. Goldman?
6  BY MR. GOLDMAN:
7       Q.   2 in the nabumetone group?
8          MR. GOLDMAN:  It's the JAMA
9  article.
10         MR. KLINE:  Where are you
11  pointing to?
12         MR. GOLDMAN:  I'm pointing
13  to Page 956, second column, second
14  paragraph.
15         THE WITNESS:  Last sentence
16  of that paragraph, Study 090, 6, 2
17  and 1.
18  BY MR. GOLDMAN:
19       Q.   So, when you wrote your JAMA
20  article, you wrote that there were 6
21  cardiovascular events on Vioxx, 2 on
22  nabumetone, 1 on placebo; correct, sir?
23       A.   That's what we thought at
24  the time, unfortunately.

Page 483

1       Q.   Within a month after
2  withdrawal, you started to write 60
3  Minutes various e-mails; correct?
4       A.   Well, I had interaction with
5  Michael Radutsky, the producer, yes.
6       Q.   You talked about study 090
7  in those e-mails, didn't you, sir?
8       A.   Yes, I did.
9       Q.   What you told 60 Minutes
10  about Study 090 was different from what
11  you wrote in your JAMA article.  Isn't
12  that true, sir?
13       A.   By having had a chance to
14  review these data, and I already had
15  mentioned this morning I was asked about,
16  did I get a letter from Mr. Myers and
17  Bill Moyers, and when I got that, he sent
18  me this report to look over, and I
19  started to wonder about these events that
20  we, unfortunately, had not had adequate
21  detail on Page 32 of the Targum report.
22  And it turns out, the numbers, when you
23  characterize each of these patients
24  appropriately, are different.  Less

Page 484

1  events in the Vioxx and less events in
2  the placebo as well.  It changes.  And
3  it's a very important change.
4          MR. GOLDMAN:  Move to strike
5  as nonresponsive.
6             - - -
7          (Whereupon, Deposition
8  Exhibit Topol-41, E-mails, EJT
9  000191, was marked for
10  identification.)
11            - - -
12  BY MR. GOLDMAN:
13       Q.   Dr. Topol, I'm going to hand
14  you what I've marked as Exhibit 41.  This
15  is an e-mail that came from your files
16  that has a Bates Number at the bottom,
17  EJT 191.  Do you see that?
18       A.   Yes.
19       Q.   This is an e-mail at the
20  bottom that you wrote to Marlene
21  Goormastic on October 25, 2004; correct?
22       A.   Yes.
23       Q.   Is that your statistician?
24       A.   That's the statistician,

Page 485

1  that's right.
2       Q.   And you're writing to Ms.
3  Goormastic on October 25, this is a month
4  after withdrawal, to do some statistical
5  analysis; correct?
6       A.   Yes.  There was subsequent
7  to this as well, but this is one of the
8  interactions we had.
9       Q.   You ask Marlene at the
10  bottom, "I need to do a test comparing
11  three treatment arms - Vioxx versus
12  nabumetone and then Vioxx versus the
13  other two combined," meaning nabumetone
14  and placebo.  "Here are the data.  Vioxx,
15  7 out of 390 events."
16       A.   Right.
17       Q.   "Nabumetone 1 out of 392
18  events.  Placebo, 1 out of 196 events."
19  Is that what you wrote to her?
20       A.   These are events that are
21  not death, heart attack or stroke.  These
22  are events requiring cessation of the
23  drug.  This is a different part of the
24  Targum report.  But, yes, this is one of

KS-000254

Page 486

1  the ancillary analyses that was
2  performed.
3      Q.   This is an analysis on study
4  090; correct?
5      A.   Study 090, but not on death,
6  heart attack and stroke.
7      Q.   I'm going to write down the
8  numbers for October 25 of 2004.
9      A.   These numbers do not
10  correspond to death, heart attack and
11  stroke.
12     Q.   I understand that.
13     A.   Okay.  Well, I don't know
14  what you're writing down because you're
15  comparing apples and oranges now.
16     Q.   7 events on Vioxx.
17     A.   They're different events.
18         MR. KLINE:  Are you going to
19  making a chart that's going to be
20  displayed?
21         MR. GOLDMAN:  All I'm doing
22  is trying to keep track of the
23  numbers, that's all.
24         MR. KLINE:  But for your own

Page 487

1  benefit?
2          THE WITNESS:  You're making
3  a table of events, of different
4  types of events.  These are events
5  that are requiring cessation of
6  drug with serious
7  cardiovascular -- I'm more focused
8  on my letter in the New England
9  Journal and what I'm talking about
10  with 60 Minutes and those things
11  you're interested in on death,
12  heart attack and stroke, and
13  they're different numbers.
14  BY MR. GOLDMAN:
15     Q.   The numbers that you're
16  using here on October 25 have to do with
17  the numbers of Vioxx patients who had to
18  be discontinued in the 090 study; right?
19     A.   With serious cardiovascular
20  adverse events, different than death,
21  heart attack and stroke.  That's a
22  different table.
23     Q.   So, the numbers that you
24  have are 7, 1 and 1.

Page 488

1      A.   Okay.
2      Q.   And you ask Ms. Goormastic
3  at the bottom, "Can you or someone run
4  this and get back to me, the p values,
5  RR, 95% CI?"  Do you see that?
6      A.   Yes.
7      Q.   What you are asking her to
8  do -- a p-value is a test for statistical
9  significance; correct?
10     A.   Yes.  Yes.
11     Q.   Relative risk is RR?
12     A.   Yes.
13     Q.   And CI is confidence
14  interval, and that's another test for
15  statistical significance; correct?
16     A.   Yes.
17     Q.   Ms. Goormastic writes back
18  to you that same day above and says "The
19  chisquare," that's a type of statistical
20  test, correct, "including all 3 groups is
21  p equals .06," and then here's the answer
22  to your question:  "For Vioxx versus
23  nabumetone chisquare" p-value is ".03."
24  Do you see that, sir?

Page 489

1      A.   Yes.  I see that, but again,
2  it's not related to my principal
3  interest.
4      Q.   The .03, just so the jury
5  can understand and I can understand, if a
6  p-value is less than .05, that means that
7  it's statistically significant, the
8  result; correct?
9      A.   That's right.
10     Q.   Here, this is showing a
11  statistically significant result for
12  .03; is that right?
13     A.   That's correct, but you're
14  comparing -- you don't even know what
15  these events are.  So, you're just
16  looking at some numbers.  You don't know
17  what this analysis is about.
18         MR. GOLDMAN:  Move to strike
19  as nonresponsive.
20  BY MR. GOLDMAN:
21     Q.   The next line says --
22         MR. KLINE:  How can you
23  possibly say that?  How can you
24  possibly say his answer is

**KS-000255**

123 (Pages 486 to 489)

Page 490

1    nonresponsive?
2  BY MR. GOLDMAN:
3      Q.   -- relative risk.  Do you
4  see you wrote "Relative risk for Vioxx is
5  7" -- I'm sorry, this is what Ms.
6  Goormastic wrote -- "is 7."  And then you
7  have a confidence interval here that she
8  writes ".9 - 56.9."  Do you see that in
9  the parenthesis?
10     A.   Yes.
11     Q.   And if the confidence
12 interval that is described there includes
13 the number 1, that is, if one falls
14 within .9 to 56, that means that the
15 result is not statistically significant;
16 correct, sir?
17     A.   That's correct.
18     Q.   So, Ms. Goormastic writes:
19 "I was puzzled why this confidence
20 interval covers 1 when the p-value is
21 less than .05.  I think it's due to the
22 small number of events" used.  Do you see
23 that?
24     A.   Yes, I do.

Page 491

1      Q.   You had talked about the
2  small number of events in your JAMA
3  article; right?
4      A.   That's correct.
5      Q.   Then she says, "When I ran a
6  logistic regression model" that's another
7  way of calculating statistical
8  significance, right, "I got very similar
9  results, a relative risk of 7.1," and
10 then the confidence interval there covers
11 1.  Correct, sir?
12     A.   That's correct.
13     Q.   Ms. Goormastic is telling
14 you that she's puzzled because she is
15 seeing with one test there's a
16 statistically significant difference and
17 with another one there's not?
18     A.   Yes, but this is really an
19 immaterial look at the data.  It's not on
20 death, heart attack and stroke.  And it's
21 not with the final review of the events,
22 as you've not allowed me to go through
23 patient by patient of study 090 from
24 Table 32 in the Targum report.  You've

Page 492

1  not allowed me to do that.
2          MR. GOLDMAN:  Move to strike
3      as nonresponsive.
4  BY MR. GOLDMAN:
5      Q.   The reason that Ms.
6  Goormastic is puzzled, Dr. Topol, is
7  because one test shows that there's no
8  statistically significant difference, and
9  another test shows that there is;
10 correct?
11     A.   But it's not on the events
12 of interest, Mr. Goldman.
13     Q.   I'm not asking about the
14 events of interest.
15         You wrote the e-mail here.
16 Sir, you wrote an e-mail to your
17 statistician in October of 2004 because
18 you thought that this answer was
19 important.  Is that true?
20     A.   No.  This is not the e-mail
21 of importance.  You've picked this
22 e-mail.  There are other e-mails that are
23 considerably more important with my
24 statistician, and you just picked this

Page 493

1  one.
2      Q.   We'll get to that one, sir.
3      A.   Okay.
4      Q.   When you received this
5  e-mail from Ms. Goormastic, it wasn't
6  clear to you, sir, whether there was a
7  statistically significant difference or
8  not as reflected in Ms. Goormastic's
9  e-mail; correct?
10     A.   That really was not my
11 focus.  I see what you're saying here,
12 but that was not my concern.  The events
13 here for death, heart attack and stroke
14 were unclear.  This is not what this
15 refers to.
16     Q.   What time did you write this
17 e-mail?  I'm sorry, what time --
18 withdrawn.
19         What time did Ms. Goormastic
20 write her e-mail to you on October 25,
21 2004?
22     A.   She wrote that at 4:42 p.m.
23         - - -
24         (Whereupon, Deposition

KS-000256

Page 494

1    Exhibit Topol-42, E-mails, EJT
2    000192, was marked for
3    identification.)
4    - - -
5   BY MR. GOLDMAN:
6    Q.  I'm going to show you an
7   e-mail that I've marked as Exhibit 42.
8   This came from your files, Dr. Topol, and
9   I want to focus on the bottom e-mail.
10  This is an e-mail from you to Michael
11  Radutsky.
12   A.  Radutsky.
13   Q.  Who is that?
14   A.  He's the producer for CBS 60
15  Minutes.
16   Q.  What time did you write this
17  e-mail to the producer of 60 Minutes?
18   A.  14 minutes or so later.
19   Q.  You wrote this e-mail to 60
20  Minutes at 4:46 in the afternoon,
21  correct?
22   A.  Right.
23   Q.  You received an e-mail from
24  Ms. Goormastic at 4:42, four minutes

Page 495

1   earlier; correct?
2    A.  That's right.
3    Q.  And you write to 60 Minutes,
4   "Michael, Great news on the Statistics
5   for Study 090.  The difference between
6   Vioxx and nabumetone is significant, P
7   equals .03."  And then you continue.  Do
8   you see that, sir?
9    A.  I see that.  That's not the
10  end of the story here, though.
11   Q.  You forwarded --
12   A.  You just have an ice pick
13  view of this interaction.
14   Q.  Dr. Topol, you forwarded --
15  do you see the forward "FW" in the
16  subject line of your e-mail to 60
17  Minutes?
18   A.  Yes.
19   Q.  You forwarded the e-mail
20  that Ms. Goormastic sent to you, correct,
21  sir?
22   A.  Yes, yes.
23   Q.  But you didn't include what
24  Ms. Goormastic said to you about being

Page 496

1   puzzled and about there being no
2   statistically significant difference with
3   respect to the confidence interval?  You
4   changed that and wrote that there was a
5   statistically significant difference?
6    A.  Where is that?
7    Q.  Do you see in your e-mail to
8   60 Minutes after you say "Great news.
9   The difference between Vioxx and
10  nabumetone is significant" and you cite
11  only the p-value.  Do you see that, sir?
12   A.  Yes.
13   Q.  You didn't tell 60 Minutes
14  in that e-mail that your statistician was
15  puzzled about these numbers, did you?
16   A.  They were not final numbers.
17  As I already indicated you, these were
18  not the final numbers for death, heart
19  attack and stroke.  And so I will take
20  the opportunity to amplify here because
21  you're trying to take this down the wrong
22  path.  On October 25th, the data were
23  inconclusive because we did not have a
24  chance to learn about these events in the

Page 497

1   Targum table, these patients on death,
2   heart attack and stroke.  They were not
3   reviewed.  I did not have the details of
4   any of those patients.  So, these events
5   that we're looking at were not the
6   interested field of cardiovascular
7   endpoints of deaths, of all cause, heart
8   attack and stroke.
9    Q.  You found it important
10  enough to write to 60 Minutes four
11  minutes after your statistician wrote to
12  you to tell them about what you thought
13  was great news, and you characterized --
14   A.  This was the beginning of
15  the analysis, only the beginning.
16   Q.  Do you see that 60
17  Minutes --
18   A.  This is a work in progress,
19  and you're just taking one part of that
20  work.
21   Q.  Do you see that 60 Minutes
22  writes back to you on the top and says
23  "Remarkable" and then continues.  "So
24  then how does the company ignore numbers

**KS-000257**

Page 498

1  like that?  How does that not warrant
2  further study?"  Et cetera.  And he says
3  "How can they call the study
4  'statistically insignificant'?"  Do you
5  see that?
6      A.   I see that.
7      Q.   Did you ever write back to
8  60 Minutes and say that your statistician
9  told you that under another test there
10  was no statistically significant
11  difference for 090?
12      A.   I discussed this extensively
13  with Michael Radutsky on the phone, and I
14  told him that we needed -- before this
15  could be wrapped up and before I could
16  make any statements about study 090, I
17  needed to have all the information
18  regarding the patients with events,
19  putative events of this trial, which I
20  didn't have at this time.  So, these data
21  did not -- again, I've said it at least
22  three or four times.  These data did not
23  reflect the final categorization of
24  death, heart attack or stroke for study

Page 499

1  090.
2      Q.   Did you in your e-mail to
3  Doctor -- I'm sorry, withdrawn.
4          Did you in your e-mail to 60
5  Minutes say that your statistician was
6  puzzled?  Yes or no?
7      A.   I discussed it on the phone.
8      Q.   Your testimony is that you
9  discussed your statistician being puzzled
10  on the phone, but you told 60 Minutes
11  that there was --
12      A.   No.
13      Q.   -- there was a significant
14  difference here?
15      A.   I discussed with Michael
16  Radutsky that more work had to be done,
17  that we can't use any of these numbers
18  until we get all the details on these
19  patients of this page 32 in the Targum
20  report.  So, all this was preliminary
21  work, and we still didn't have a sense of
22  where we were with the death, heart
23  attack and stroke story.  I discussed
24  that with him.

Page 500

1      Q.   You told 60 Minutes that
2  this was great news about study 090
3  because you wanted to make Merck look
4  bad.  Isn't that true, sir?
5      A.   All I wanted was the truth
6  about this drug and the truth about study
7  090, and it was becoming increasingly
8  clear, now we're in 2004, we're now five
9  years into this whole story, and this
10  trial has never been published.  And we
11  never ran the stats in the JAMA paper.
12  We never actually did the statistics on
13  090 or 085.  We didn't spend enough time
14  going into the details of this, and then
15  it became apparent that there were
16  miscategorizations when this was
17  carefully reviewed.
18      Q.   You said in your JAMA paper
19  that the numbers were too small for
20  meaningful comparison for 090.  Isn't
21  that right, sir?
22      A.   They were not statistically
23  significant, but they were
24  mischaracterized.  So, how can one make a

Page 501

1  definite conclusion.  We were working
2  with erroneous categorization of
3  endpoints.
4          MR. GOLDMAN:  Move to strike
5  as nonresponsive.
6          Let's take a break.
7          MR. HAMELINE:  Sure.
8          THE VIDEOTAPE TECHNICIAN:
9  Off the record, 5:18.
10          - - -
11          (Whereupon, a recess was
12  taken from 5:18 until 5:28 p.m.)
13          - - -
14          THE VIDEOTAPE TECHNICIAN:
15  Back on the record at 5:28.
16          - - -
17          (Whereupon, Deposition
18  Exhibit Topol-43, E-mails, EJT
19  000190, was marked for
20  identification.)
21          - - -
22  BY MR. GOLDMAN:
23      Q.   Dr. Topol, I've handed you
24  what I've marked as Exhibit 43 --

KS-000258

126 (Pages 498 to 501)

Page 502

```
 1      A.   Yes.
 2      Q.   -- which is an e-mail,
 3 November 12, 2004 from you to your
 4 statistician again, and this is now two
 5 days before you go on 60 Minutes.
 6 Correct?
 7      A.   That's right.
 8      Q.   Now you tell Ms. Goormastic
 9 to -- and you say regarding 60 Minutes
10 coming up quickly, "can you run the
11 difference between 5 out of 390 versus 1
12 out of 588 for odds ratio, 95 percent
13 confidence interval, chi square and
14 p-value." Do you see that?
15      A.   Yes.  These are the same
16 numbers as in the New England Journal
17 paper of December 30, 2004.
18      Q.   So, these are the numbers
19 that you say are the right numbers to
20 analyze study 090; right?
21      A.   That is, before we could
22 finalize the appropriate numbers, we had
23 to have all the information for each
24 patient of whether they had an event or
```

Page 503

```
 1 not from this original table, and this is
 2 now where they are all properly
 3 classified for death, heart attack or
 4 stroke.
 5      Q.   The information that you
 6 looked at, sir, when you came up with
 7 your numbers, 7,1,1, back in October,
 8 came from Ms. Targum's report, correct,
 9 sir?
10      A.   The original information,
11 and then we got all the details of each
12 patient subsequently.
13      Q.   You got the details of all
14 the patients when you wrote that the
15 numbers were 7, 1 and 1 --
16      A.   No.
17      Q.   -- in October of 2004?
18      A.   No.  We did not have the
19 details.  All I had was this table.
20 There are multiple tables in the Targum
21 report.  I did not have the appropriate
22 clinical history for each patient and how
23 the endpoint was categorized until
24 shortly before this e-mail.
```

Page 504

```
 1      Q.   So, the basis for your view
 2 that there are five events on Vioxx, 1 on
 3 nabumetone and none on placebo come from
 4 your review of Dr. Targum's report;
 5 correct?
 6      A.   No.  No.  That's only the
 7 beginning.  Then we had -- not in Dr.
 8 Targum's report.  There's a detailed
 9 account of each patient and how that
10 diagnosis of coronary occlusion or
11 congestive heart failure was made.  And
12 remember, the endpoint that is the
13 principal endpoint for clinical trials is
14 death, heart attack or stroke.  So, the
15 final determination of these events for
16 study 090 was based on not just the
17 Targum report, but all those details that
18 were not available to us until we got the
19 subsequent information.
20      Q.   Now, you wrote "5 out of
21 390" and then you wrote "1 out of 588."
22 Do you see that in your e-mail?
23      A.   Yes.  And that's exactly the
24 same as the New England Journal
```

Page 505

```
 1 subsequent correspondence.
 2      Q.   The 588, which is the
 3 denominator here, that is calculated by
 4 taking the number of patients in the
 5 nabumetone group and adding them to the
 6 number of patients in the placebo group;
 7 correct?
 8      A.   Those are control groups for
 9 the trial, that's right.  They're not
10 experimental groups.
11      Q.   So, what you did was you
12 took 5 events on Vioxx, and you compared
13 them to 1 event in placebo and nabumetone
14 combined; correct?
15      A.   That is how this analysis
16 was performed with the appropriate
17 categorization of the endpoints and the
18 statistics.
19      Q.   When you wrote your JAMA
20 article, sir, on Page 955 --
21      A.   Yes.
22      Q.   -- you describe the events
23 that occurred with 090 as 6, 2 and 1 --
24      A.   Right.
```

KS-000259

127 (Pages 502 to 505)

Page 506

1    Q.   -- and you didn't group the
2  nabumetone and placebo groups, did you,
3  sir?
4    A.   And that's precisely because
5  we had misinformation.  We had atrial
6  fibrillation as an event which shouldn't
7  have been.  We had congestive heart
8  failure.  We had coronary occlusion,
9  which wasn't a heart attack, and it was
10  very clear that the more meaningful way
11  to analyze the trial, just as Juni had
12  done, would be to compare controls with
13  the experimental drug.
14    Q.   When you wrote your JAMA
15  article and the events were 6, 2 and 1,
16  you wrote that those numbers were too
17  small for meaningful comparison; correct?
18    A.   With the erroneous data,
19  they were not appropriate to make a final
20  judgment.
21    Q.   The numbers, 6, 2 and 1 were
22  so small that they couldn't be used for
23  meaningful comparison.  Correct?
24    A.   I wouldn't use the term

Page 507

1  exactly, no.  That's not the term that we
2  use.
3    Q.   Well, if we look back at
4  your JAMA article, page --
5    A.   It says, "had few events for
6  meaningful comparison."  "Few events."
7  That's right.
8    Q.   So, when the events were 6,
9  4 -- I'm sorry, withdrawn.
10        When the events were 6, 2
11  and 1 as you analyzed them in your JAMA
12  article for Vioxx, nabumetone and
13  placebo, you considered that to be few
14  events for meaningful comparison;
15  correct?
16    A.   Well, there was no
17  significant difference.  So, that means
18  there's no meaningful difference, yes.
19    Q.   So now in November of 2004,
20  when you say the numbers now are 5 for
21  Vioxx, 1 for nabumetone and 0 for
22  placebo, there's actually fewer events in
23  your analysis from November of 2004 than
24  there were in your analysis in JAMA;

Page 508

1  correct?
2    A.   Correct.  But the events are
3  correct now, and they are the appropriate
4  irrevocable endpoints of death, heart
5  attack and stroke and not admixed with
6  things like atrial fibrillation or a
7  chronic occlusion that had nothing to do
8  with a heart attack.  Now we had a
9  difference of 1.3 versus 0.2 percent.
10  And what I showed in the letter in the
11  correspondence in the New England Journal
12  with those numbers is that with the exact
13  same Vioxx incident, 1.3 percent with
14  those five events that you just cited was
15  exactly the same as in the VIGOR trial,
16  1.2 percent for death, heart attack and
17  stroke.  And there was a 7.6, that's 760
18  percent excess compared with the
19  controls, whether it be naproxen in VIGOR
20  or nabumetone and placebo in the current
21  study 090 that we're discussing.
22        MR. GOLDMAN:  Move to strike
23    everything after the answer to my
24    question.

Page 509

1  BY MR. GOLDMAN:
2    Q.   Dr. Topol --
3        MR. KLINE:  Move to include
4    as very responsive.
5  BY MR. GOLDMAN:
6    Q.   Dr. Topol, the reason you
7  asked your statistician to compare the
8  number of events on Vioxx to the number
9  of events on nabumetone and placebo
10  combined is because you know that if you
11  compare the number of events on Vioxx to
12  just the number of events on nabumetone,
13  there is no statistically significant
14  difference?
15    A.   That's not the appropriate
16  comparison.  We already went through
17  this, that is, when you have drugs that
18  are a control arm that are widely
19  accepted and have been around for 10 or
20  20 years, and you have an experimental
21  drug, it is appropriate, just as Juni did
22  in his analysis in the Lancet, and just
23  as we did here, to compare the control
24  arms with the experimental arm, which in

**KS-000260**

Page 510

1  this case was Vioxx.
2      Q.  You didn't do that in your
3  JAMA article, did you, sir?
4      A.  We didn't do it in the JAMA
5  article, but we didn't have the right
6  data.  So, of course, we couldn't do it
7  in the JAMA paper.  We had erroneous
8  categorization of endpoints.
9      Q.  The reason that you combined
10  nabumetone and placebo and compared that
11  to Vioxx is because you know that if you
12  compare the number of events on Vioxx to
13  placebo for study 090, there is no
14  statistically significant difference;
15  correct?
16      A.  That is not the reason why
17  that analysis was performed that way.
18      Q.  Am I correct, sir, that if
19  you compare 5 events on Vioxx to 0 events
20  on placebo, there's no statistically
21  significant difference?
22      A.  I don't know.  We'd have to
23  run the statistics on that.
24      Q.  You never ran that, did you?

Page 511

1      A.  I don't remember that we ran
2  it.  I don't have it at hand.
3      Q.  The investigators who
4  conducted study 090 did not compare Vioxx
5  against nabumetone and placebo, did they,
6  sir?  They kept the three arms separate?
7      A.  Maybe you can tell me, Mr.
8  Goldman, why was this paper with this
9  extent of harm to patients, why was it
10  never published?
11      Q.  Can you answer my question,
12  sir?
13      A.  I'm just asking you, can you
14  help me to understand why the paper was
15  never published six years later on nearly
16  1,000 patients?
17      MR. GOLDMAN:  I have half an
18  hour left.  Can you please ask
19  your witness not to ask any
20  questions.
21      MR. KLINE:  I think the
22  answer is a rhetorical question.
23  I move to include it.  Simply
24  rhetorical.

Page 512

1  BY MR. GOLDMAN:
2      Q.  Dr. Topol --
3      A.  I just want to point out
4  that's what has made it so difficult for
5  us to do an analysis, because we never
6  had the paper, the manuscript written on
7  1,000 patients.  So, we had to work in a
8  very difficult way, and that's what
9  you're trying to get at, is why didn't
10  you do this or why didn't do that.  We
11  didn't have the data at hand because it
12  was never published.
13      Q.  Dr. Topol, the investigators
14  who conducted study 090 did not compare
15  Vioxx to placebo and nabumetone combined,
16  they compared Vioxx to just placebo or
17  nabumetone; is that right?
18      A.  How would we ever know that?
19  How did you know that?  I've never seen
20  any paper.  How can you say something
21  like that?  Can you show me that
22  evidence?
23      Q.  Do you know, sir, that the
24  protocol for study 090 called for pair

Page 513

1  wise comparisons?
2      A.  Who has ever seen the
3  protocol?
4      Q.  Well, let me show it to you.
5      A.  Okay.
6      Q.  This is Exhibit 44.
7      MR. KLINE:  See, you got
8  discovery from them.
9      THE WITNESS:  This will be
10  interesting.
11      -  -  -
12      (Whereupon, Deposition
13  Exhibit Topol-44, "MRL Clinical
14  Study Report, Multicenter Study:
15  A Randomized, Placebo-Controlled,
16  Parallel-Group, Double-Blind
17  Study to Evaluate the Efficacy
18  and Safety of MK-0966 (Rofecoxib)
19  12.5 mg Versus Nabumetone 1000 mg
20  in Patients with Osteoarthritis
21  of the Knee (Protocol 090),"
22  MRK-00420016832 -
23  MRK-00420016849, was marked for
24  identification.)

KS-000261

1           - - -
2   BY MR. GOLDMAN:
3       Q.   This is the clinical study
4   report for study 090.  Do you see that,
5   sir?
6       A.   This was not in the FDA
7   database.
8           MR. KLINE:  Objection.  It's
9   a piece of the study.  It's not
10  the whole study.
11          MR. GOLDMAN:  That's
12  correct.  This is a piece.
13          THE WITNESS:  Table of
14  contents.
15          MR. KLINE:  I'm suggesting
16  to Dr. Topol's counsel to have him
17  see the whole report.
18          MR. GOLDMAN:  That's fair,
19  Dr. Topol.
20          MR. KLINE:  Like everything
21  that was provided to you today.
22          THE WITNESS:  I've never
23  seen the report of this study.
24  BY MR. GOLDMAN:

1       Q.   Dr. Topol, I'm showing you
2   an excerpt, that's true, an excerpt of
3   the clinical study report --
4       A.   Okay.
5       Q.   -- and if you'd turn to the
6   14th page and the 15th page, do you see
7   that the investigators kept the Vioxx
8   nabumetone and placebo groups separate in
9   the chart at the bottom of Page 14?
10          MR. HAMELINE:  Let me just
11  note the objection.  We're not
12  here on behalf of either party.
13  What Dr. Topol wants to do is give
14  a fair and complete explanation of
15  the research that he produced in
16  this field, and you're giving him
17  a document.
18          MR. GOLDMAN:  He asked for a
19  document.
20          MR. HAMELINE:  Well, he
21  asked for this document six years
22  ago.  You've given him a piece of
23  the document you're asking him to
24  read in a brief period of time.

1   That's my objection.
2           THE WITNESS:  This is very
3   simple.  Mr. Goldman, the problem
4   with this -- you're talking about
5   efficacy.  And it's fine if you
6   want to look at efficacy if you'd
7   like on each column, rofecoxib,
8   12-and-a-half milligrams, Vioxx a
9   low dose, and you want to look at
10  the nabumetone and placebo, where
11  is the safety, but where is the
12  heart attack data in this report?
13  And why isn't that combined?
14  That's a legitimate and a vital
15  comparison that needs to be made
16  on the data.
17  BY MR. GOLDMAN:
18      Q.   If you'd turn to Page 16, do
19  you see that the safety information, the
20  clinical adverse experiences were broken
21  down by Vioxx, nabumetone and placebo and
22  not combined?
23      A.   Are you on Page 16 or which
24  page are you on here?  16?

1       Q.   Yes.
2       A.   Now, I don't see anything
3   with death, heart attack and stroke here.
4       Q.   Can you answer my question,
5   sir?  Do you see that the safety
6   information maintained by the
7   investigators was broken down, Vioxx,
8   nabumetone and placebo?
9           MR. KLINE:  Objection.  May
10  I have an objection to the line of
11  questioning?
12          MR. GOLDMAN:  Yes.
13          MR. KLINE:  He doesn't even
14  have the whole document.
15  BY MR. GOLDMAN:
16      Q.   Do you see that, sir?
17      A.   I see how it's displayed.  I
18  don't agree with that as being the only
19  analysis that should be done also with
20  respect to controls, nabumetone and
21  placebo as compared to the experimental
22  arm, Vioxx.  It should have been done
23  that way.  That doesn't mean -- if Merck
24  wants to present the data this way and

KS-000262

Page 518

1 manipulate the data that way, that's
2 their prerogative. That doesn't mean
3 it's correct.
4      MR. GOLDMAN: Object to the
5      form -- I'm sorry, move to strike
6      as nonresponsive.
7 BY MR. GOLDMAN:
8      Q. Can you answer my question,
9 sir?
10      A. I'll be happy to.
11      Q. Does the table that you
12 looked at on Page 16 reflect that the
13 safety information was maintained in
14 three different columns, Vioxx,
15 nabumetone and placebo?
16      A. The safety information I'm
17 interested in that I've been writing
18 about --
19      Q. That's not my question.
20      A. -- that I've been concerned
21 about this drug is not included in that
22 table, and just because it's displayed
23 under the little excerpt of this report
24 which has never been published for the

Page 519

1 medical community to see doesn't mean
2 that it's the only way and the proper way
3 to -- I don't accept that.
4      Q. Dr. Topol, you have said on
5 several occasions that study 090 was not
6 published; correct?
7      A. That's correct.
8      Q. You knew that study 090 was
9 not published when you wrote your JAMA
10 article, didn't you, sir?
11      A. Well, I already pointed out
12 earlier in our discourse, in our
13 discussion, it was 2001 -- well, it was
14 March of 2001 when we wrote that paper,
15 and the study, we didn't even know when
16 it was done, study 090. So, we give some
17 allowance for when it might be published.
18 But now in 2004, something is very
19 concerning because it's now multiple
20 years later, it's nearly 1,000 patient
21 trial, it's not a cohort, and it
22 still hasn't shown up in the literature.
23 So, there's a big difference between
24 March of 2001 a year or so, two years

Page 520

1 after the study was completed versus six
2 years after the study was completed.
3 That's a big gap.
4      MR. GOLDMAN: Move to strike
5      as nonresponsive.
6 BY MR. GOLDMAN:
7      Q. Dr. Topol, did you know in
8 August of 2001 when you wrote your JAMA
9 article that study 090 was not published?
10      A. Well, I didn't know it was
11 published. So, we have to assume that
12 since we couldn't cite it directly, we
13 only could cite the FDA -- we assumed it
14 was a manuscript in review, soon to be
15 published -- at the time when we
16 published that paper, we didn't know of
17 its publication.
18      Q. You also know that Merck
19 didn't publish study 085 either; right?
20      A. They did publish 085. In
21 fact, there is a publication, and I can
22 get that for you if you'd like. It was
23 published indeed. It was 1,000 patient
24 similar, but I guess Merck was happy with

Page 521

1 the results, but it was published.
2      Q. Well, if you can show me
3 today where Merck published study 085 but
4 not 090, I'd like to see that.
5      A. It's published in the Juni
6 paper.
7      Q. That's not a publication,
8 sir.
9      A. No. What I'm saying is it's
10 cited in the Juni paper.
11      Q. Let's look at the Juni
12 paper.
13      A. I believe it's cited in
14 there. It's an osteoarthritis trial, so,
15 I don't remember the first author, but it
16 was in his analysis, and so it was 1,000
17 patients. I'm trying to remember the
18 exact number, 085. It was -- we have to
19 back it out. 085 had 1,042 patients, and
20 somewhere in this table of Figure 3, that
21 is, there's 1,042 patient trial that's
22 included in here and it's cited. I just
23 don't --
24      Q. Dr. Topol, that 1,042 that

KS-000263

131 (Pages 518 to 521)

Page 522

1   you're referring to in Table 1 of Juni's
2   paper which is on Page 2023 is the same
3   1,042 number that you have in your JAMA
4   article --
5       A.   Right.
6       Q.   -- when you described a
7   number of patients in 085.  Correct, sir?
8       A.   No.  But I'm trying to find
9   the reference for that now, sir, that is,
10  the publication.  There's a publication
11  based on these -- on this trial, 085.
12  Let me see if I can find it in here.
13  085, it's by Kivitz, et al, 2004.  What's
14  that number, Joe?
15          MR. HAMELINE:  22.
16          THE WITNESS:  Reference 22.
17      Okay.  Here it is.  It was
18      published in the Journal of
19      American Geriatric Society in 2000
20      and -- Reference Number 22, 2004,
21      Volume 52.  It's by Kivitz, et al.
22      "Efficacy and safety of rofecoxib
23      12-and-a-half milligrams versus
24      nabumetone 1,000 milligrams in

Page 523

1       patients with osteoarthritis of
2       the knee:  A randomized control
3       trial."  So it was indeed was
4       published --
5   BY MR. GOLDMAN:
6       Q.   Dr. Topol --
7       A.   -- unlike study 090.
8       Q.   Dr. Topol, what you are
9   looking at is a publication after
10  withdrawal; correct?
11          MR. KLINE:  Which means
12      when?
13          THE WITNESS:  No.  It was
14      published before the withdrawal.
15      That was published in early 2004
16      in the Journal of the American
17      Geriatric Society.  It's an
18      eight-page manuscript published by
19      Kivitz and Colley before the
20      withdrawal.
21  BY MR. GOLDMAN:
22      Q.   I don't have that here, Dr.
23  Topol.
24          MR. GOLDMAN:  I'm objecting,

Page 524

1       lack of foundation.
2           THE WITNESS:  It's right
3       here. (Indicating.)
4           MR. GOLDMAN:  I don't see
5       the date.
6   BY MR. GOLDMAN:
7       Q.   But Dr. Topol, let me ask
8   you something.  Withdrawn.
9           When you wrote your article
10  in JAMA in August of 2001, you knew 090
11  was not published, and you didn't say in
12  your article that it should be, did you,
13  sir?
14      A.   We assumed every trial,
15  particularly when it gets to 1,000
16  patients, it's going to be published.
17  That's -- this is -- we're talking about
18  human experimentation.  And you don't
19  experiment on 1,000 patients and not
20  publish the results for the rest of the
21  medical community to see.  That's not
22  acceptable medical research.
23      Q.   Did you ever write the FDA
24  in August of 2001 when you knew that 090

Page 525

1   was not published and say that this study
2   should be published because it's
3   important?
4       A.   We give trials or sponsors
5   an allowance of time.
6       Q.   Did you do that, sir?
7       A.   How would we know that they
8   weren't intending to ever publish the
9   trial?
10      Q.   You knew that study 090 was
11  not published in August 2001.  Did you
12  ever write the FDA, did you ever write
13  Merck, did you ever write anybody and say
14  study 090 should be published?
15      A.   We assumed that it was going
16  to be published.  It was soon after --
17      Q.   That wasn't my question.
18          Did you ever write the FDA,
19  Merck or anybody else before this
20  medicine was withdrawn and say that study
21  090 should be published?
22      A.   I have a simple answer for
23  that question.  Why would we do that?
24      Q.   Is your answer to my

KS-000264

Page 526

1  question no, you didn't?
2      A.   Yes.  Why would we even
3  think of doing it?
4      Q.   Dr. Topol, if you thought
5  that study 090 was that important and the
6  events were so important that they should
7  be publicized, did you ever write the
8  FDA, Merck, or anybody else and say you
9  should publish Study 090?
10     A.   Now, Mr. Goldman --
11     Q.   Can you answer that yes or
12  no?
13     A.   You're confusing everything
14  now.  It was only in '04,
15  October/November '04 that we got the
16  straight data.  We couldn't get to the
17  data.  So how could we have known that it
18  was statistically significant with a 760
19  percent excess of heart attack in '02, in
20  '01.  We didn't have the data.  There was
21  no way of knowing that.
22     Q.   Dr. Topol, can you answer my
23  question yes or no or not?
24          MR. KLINE:  Objection.  He

Page 527

1  answered your question.
2  BY MR. GOLDMAN:
3      Q.   Can you answer it yes or no
4  or not?
5          MR. KLINE:  He answered your
6  question.
7          THE WITNESS:  I believe I
8  answered your question.  You could
9  play it back and listen to it.
10         MR. KLINE:  There are 14
11  minutes left.
12  BY MR. GOLDMAN:
13     Q.   Dr. Topol, I want to ask you
14  about Ms. Targum's analysis that you have
15  referred to so many times today.
16     A.   Yes.
17         MR. GOLDMAN:  And I'm going
18  to mark it for my purposes as 44.
19         THE WITNESS:  Okay.
20              - - -
21         (Whereupon, Deposition
22  Exhibit Topol-44A, Memo 2-1-01
23  "Consultation NDA 21-042, S-007
24  Review of cardiovascular safety

Page 528

1      database," (Targum) with
2      handwritten notes, EJT 000211 -
3      EJT 000248, was marked for
4      identification.)
5              - - -
6  BY MR. GOLDMAN:
7      Q.   This is an analysis by Ms.
8  Targum, February 1st --
9      A.   Dr. Targum.
10     Q.   I'm sorry.
11         Exhibit 44 is the analysis
12  from Dr. Targum dated February 1st of
13  2001; correct, sir?
14     A.   Correct.
15     Q.   Do you see on Page 28 of the
16  document that Dr. Targum spends seven
17  pages studying 090?
18     A.   Yes.
19     Q.   Do you see that Dr. Targum
20  also spends four pages studying 085?
21     A.   Yes.
22     Q.   Starting on pages --
23     A.   I remember that, yes.
24     Q.   The information that you

Page 529

1  obtained to come up with your numbers,
2  5,1,0 came from this document that Dr.
3  Targum prepared in February of 2001, and
4  that has been on the website ever since;
5  correct?
6      A.   That's not true.  I've
7  already stated unequivocally that we had
8  the details of each patient before we
9  could make the final determination of the
10  5, 1 and 0.
11     Q.   If you'd turn to Page 32 of
12  the document, Dr. Topol --
13     A.   That's right.
14     Q.   -- do you see that you have
15  written at the bottom 5, 1 and 0?  Do you
16  see that, sir?
17     A.   Yes, but that's not solely
18  on the basis of this table.  That's notes
19  that I wrote after having access to the
20  clinical details of all the events, the
21  6, the 2 and the 2, that is 10 events, 10
22  putative events.  I didn't have the
23  details.  So, for example, the placebo
24  patient called coronary artery occlusion,

KS-000265

133 (Pages 526 to 529)

Page 530

1  which could have been a heart attack,
2  only did I find out during the details
3  was that, in fact, this was a man who had
4  had a chronically occluded artery for
5  many years. It wasn't a heart attack.
6  So, I couldn't possibly have made a
7  determination about heart attack just on
8  the basis of this table. That's just an
9  example.
10     Q.   Dr. Topol, do the numbers 5,
11  1 and 0 --
12         MR. GOLDMAN: Move to strike
13     the last answer.
14  BY MR. GOLDMAN:
15     Q.   Do the numbers 5, 1 and 0
16  that you wrote down on Page 32 appear on
17  the page that Dr. Targum wrote in
18  February of 2001?
19     A.   Her numbers are 7 --
20     Q.   Her numbers -- that's
21  actually a good point.
22     A.   Cardiovascular system are 7,
23  1 and 1.
24     Q.   Well, let's actually go up

Page 531

1  to the top, Dr. Topol. Do you see that
2  Dr. Targum, who did this analysis, says
3  at the very top, "Below is a listing of
4  serious cardiovascular adverse events.
5  In the" Vioxx "group, a total of 6
6  serious cardiovascular adverse events
7  were reported; in the nabumetone group,
8  there were 2, and in the placebo group,"
9  there were 1. Do you see that, sir?
10     A.   Yes.
11     Q.   Those are the numbers that
12  you used in your JAMA article; correct?
13     A.   We took our JAMA straight
14  without any questions because we didn't
15  have access to the details.
16     Q.   This same table down below
17  that you referred to before where you
18  came up with 7, do you see that, sir, of
19  the 7 in the Vioxx group?
20     A.   Yes. But they --
21     Q.   In the middle?
22     A.   The 7 doesn't correspond to
23  the table above.
24     Q.   The 7, sir, is the number

Page 532

1  that you used in October of 2004 when you
2  wrote to your statistician --
3     A.   Right.
4     Q.   -- correct?
5     A.   Right. So, what we were
6  doing --
7     Q.   My only question was, is
8  that correct?
9     A.   We accepted Dr. Targum's
10  data in proxy for the real data. That
11  was the whole point. We accepted Dr.
12  Targum before we were getting the
13  details. We accepted her data. She
14  apparently didn't do the statistical
15  analysis, not presented here. In fact, I
16  discussed this with Dr. Targum, and I
17  have e-mails back and forth to Dr. Targum
18  that she did not do the statistical
19  analysis that should have been done, but
20  we accepted her numbers before we got the
21  real numbers.
22         MR. GOLDMAN: Move to strike
23     as nonresponsive.
24  BY MR. GOLDMAN:

Page 533

1     Q.   Dr. Topol, the 6, 4 and 2
2  that you wrote in your JAMA article came
3  from a document that Dr. Targum wrote in
4  February of 2001, correct, sir?
5     A.   The JAMA paper, if we can
6  get back to that, was taking that table
7  with the things that were completely
8  erroneous like atrial fibrillation, heart
9  failure, we took those en face. We
10  didn't know the details. We just
11  accepted her numbers. That's why it
12  corresponds to numbers of 6, 2 and 1.
13  That's exactly how the table is laid out,
14  6, 2 and 1. Do you follow me on that?
15         MR. GOLDMAN: Move to strike
16     as nonresponsive.
17  BY MR. GOLDMAN:
18     Q.   Dr. Topol, you were asked a
19  question before about an exhibit, another
20  e-mail that you wrote to 60 Minutes.
21         - - -
22         (Whereupon, Deposition
23     Exhibit Topol-45, E-mail
24     10-17-04, EJT 000343, was marked

KS-000266

134 (Pages 530 to 533)

1    for identification.)
2    - - -
3  BY MR. GOLDMAN:
4    Q.   Dr. Topol, this is an
5  exhibit I'll mark as Exhibit 45. Mr.
6  Kline asked you -- this is another
7  e-mail, October 17, you're writing to 60
8  Minutes, 2004; correct?
9    A.   Right.
10    Q.   And you were asked about the
11  statement in the first paragraph "We can
12  now confirm that the famous study '090'
13  of Merck was NEVER published, that it was
14  part of the FDA pivotal registration
15  packet leading to the May 1999 approval,
16  and that it showed a striking risk of
17  heart attack and stroke before the drug
18  ever got commercialized." Do you see
19  that?
20    A.   Yes.
21    Q.   The reason you told 60
22  Minutes that is because you wanted to
23  make it look like Merck had information
24  before Vioxx was approved about an

1  increased cardiovascular risk; correct?
2    A.   That is absolutely
3  incorrect.
4    Q.   You know, Dr. Topol, that
5  it's false that the study 090 was not
6  part of the pivotal registration packet,
7  which is the NDA, because study 090
8  wasn't completed by the time Merck
9  submitted the NDA?
10    A.   There was no way of us
11  knowing that from the FDA documents.
12  There were no dates in here about when
13  the study was done, and only later did we
14  find out that 085, 090 and VIGOR were in
15  this pivotal supplement to get expanded
16  application -- expanded indication for
17  VIGOR. So, it wasn't in the original
18  approval packet, and I only learned that
19  subsequent to this e-mail.
20    Q.   Do you see if you look at
21  Dr. Targum's report --
22    A.   Yes.
23    Q.   -- that we talked about, do
24  you see your handwriting there in the top

1  left, "Study 090 September 1998 - May
2  1999"? Do you see that?
3    A.   Yes.
4    MR. GOLDMAN: Page 1.
5    MR. KLINE:  Page what?
6    MR. GOLDMAN:  1.
7  BY MR. GOLDMAN:
8    Q.   Dr. Topol, you agree with me
9  that the information that you gave to 60
10  Minutes which you confirmed that Merck
11  submitted study 090 with the NDA was not
12  true?
13    A.   It was because we didn't
14  have the information. It was the best I
15  could do. But just like the numbers that
16  we finally got corrected for 5, 1 and 0
17  on Page 32, I finally did get the dates
18  of the conduct of study 090, and I wrote
19  them down on this report, but I didn't
20  have it at the time and certainly in mid
21  October. I only got that information
22  well into November.
23    Q.   You confirmed to 60 Minutes
24  without knowing whether or not Merck's

1  090 study was part of the NDA. You
2  confirmed that fact with 60 Minutes?
3    A.   I had no idea when the study
4  was performed. And there's no way of
5  telling in this document when this study
6  was performed.
7    Q.   Dr. Topol, when you wrote to
8  60 Minutes, we now can confirm that study
9  090 was part of the NDA leading to the
10  May 1999 approval, you didn't know
11  whether that was true; correct?
12    A.   I thought it was true, but I
13  only found out later it was a mistake.
14  Because, again, dealing with a study
15  that's never been published, and dealing
16  with FDA documents -- and, actually, I
17  called Shari Targum, I sent e-mails to
18  her, I even sent e-mails to Maria
19  Villalba asking them, and they would not
20  release the dates to me. So, I tried
21  very hard to do the best I could to get
22  the dates of the trial. I finally got
23  the dates, but, again, it was extremely
24  difficult because they're not on the FDA

**KS-000267**

Page 538

1  website.
2       Q.   Do you know, Dr. Topol, that
3  the FDA -- withdrawn.
4            MR. GOLDMAN:  Let me show
5  you two documents, sir.  Let's go
6  off the record while I get these
7  if that's okay.
8            THE VIDEOTAPE TECHNICIAN:
9  Off the record at 5:56.
10           - - -
11           (Whereupon, a recess was
12  taken from 5:56 p.m. until
13  5:57 p.m.)
14           - - -
15           THE VIDEOTAPE TECHNICIAN:
16  Back on the record at 5:57.
17           - - -
18           (Whereupon, Deposition
19  Exhibit Topol-46, E-mails,
20  FDACDER 023057 - FDACDER 023058,
21  was marked for identification.)
22           - - -
23  BY MR. GOLDMAN:
24       Q.   Dr. Topol, I've handed you

Page 539

1  Exhibit 46, which is an e-mail exchange
2  within the FDA.  And I want to point your
3  attention to November 1st, 2004.  Do you
4  know who the author is?
5       A.   Dr. Villalba, yes, primary
6  reviewer of this application.
7       Q.   Dr. Villalba of the FDA
8  writes "Study 090 was conducted between
9  September 1998 and May 1999.  This one
10  showed more CV thrombotic events on Vioxx
11  than nabumetone or placebo.  Topol was
12  not interested in study 085 which had
13  identical design and duration (6 weeks)
14  and approximately same size, but showed,"
15  and he underlines this, "no differences
16  in CV thrombotic events."  Do you see
17  that, sir?
18       A.   I see it, and I want to
19  point out that a clinical trial is for 20
20  years.
21       Q.   Doctor --
22       A.   You look for signals and you
23  don't disregard certain trials and look
24  at certain trials.

Page 540

1            MR. GOLDMAN:  Move to strike
2  as not nonresponsive.
3  BY MR. GOLDMAN:
4       Q.   In the next e-mail on
5  November 8 of 2004, Doctor --
6            MR. HAMELINE:  Let me note
7  my objection here.  Again, you are
8  putting in front of him documents
9  that someone else has authored to
10  another third party.  You're
11  asking him to agree or disagree
12  with statements that they are
13  making and not allowing him to
14  concern.  If you have a question
15  for Dr. Topol about these
16  documents, ask him.  But he's not
17  here to simply be a parrot about
18  what other people have said.
19           THE WITNESS:  Yes, I mean --
20           MR. GOLDMAN:  Dr. Topol, I'm
21  not going to use up my time
22  getting into arguments.  I have a
23  few more questions.  Let me ask
24  them.

Page 541

1            THE WITNESS:  Well, it's
2  funny how you don't have the
3  statements about what they said
4  about why Merck should have
5  submitted these data earlier,
6  attributing it to me, but --
7  BY MR. GOLDMAN:
8       Q.   Dr. Topol, you see that Dr.
9  Villalba of the FDA writes on November 8
10  of 2004, "Merck might have submitted
11  study 090 results to the Agency sometime
12  earlier than June 2000, but I do not
13  think we would have done anything with
14  it, since the number of events was small
15  and there was a twin study (085) with
16  identical size and duration, conducted at
17  approximately the same time, that showed
18  no difference in CV thrombotic events as
19  compared to placebo and nabumetone."  Do
20  you see that, sir?
21       A.   I see that.
22       Q.   This was written after the
23  drug was withdrawn; correct?
24       A.   Yes.  And still I was not

KS-000268

136 (Pages 538 to 541)

Page 542

1   informed of these dates.
2       Q.   Dr. Topol, I have a few more
3   questions.
4       A.   And the other issues as
5   well.
6       Q.   Dr. Topol, you talked about
7   the warning label for Vioxx; correct?
8       A.   Yes.
9       Q.   You're not an expert in
10  warnings and labeling under the Food &
11  Drug Administration guidelines, are you,
12  sir?
13      A.   Well, I'm certainly familiar
14  with them.  I wouldn't call myself an
15  expert, no.
16      Q.   You said that the warning
17  label that was approved by the FDA in
18  April of 2002 was inadequate.  Is that
19  your testimony?
20      A.   I not only said it was
21  inadequate, but I also wrote in my New
22  England Journal of Medicine invited
23  editorial that it was unacceptable about
24  the delay from the time the committee

Page 543

1   met, FDA, in February 2001 with the
2   consensus recommendation that the label
3   be changed until April of 2002, a delay
4   unacceptable of 14 months for the label
5   to have a minimal change.
6       Q.   Merck sent you the label
7   that was approved by the FDA in April of
8   2002, didn't they, sir?
9       A.   Yes.
10                  - - -
11          (Whereupon, Deposition
12      Exhibit Topol-47, Letter 4-11-02,
13      with attached label, EJT 000044;
14      EJT 000050 - EJT 000065, was
15      marked for identification.)
16                  - - -
17  BY MR. GOLDMAN:
18      Q.   I'm marking Exhibit 47 for
19  identification, and this is a letter from
20  Tracy Mills of Merck to you, April 11,
21  2002.  "Dear Dr. Topol:  As an advisor
22  and consultant to Merck we wanted to
23  bring to your attention the revised
24  Prescribing Information for Vioxx" and

Page 544

1   then encloses the revised label.
2   Correct, sir?
3       A.   Yes.
4       Q.   Did you ever write back to
5   Merck and say you thought this label was
6   inadequate back in April of 2002?
7       A.   Well, the first point I just
8   made is the time delay was not
9   appropriate, and it's too late at that
10  point.
11          Secondly --
12      Q.   Did you --
13          MR. STEIN:  Let him finish.
14          THE WITNESS:  We're talking
15      about the package insert?
16  BY MR. GOLDMAN:
17      Q.   My question, Dr. Topol, was
18  very simple.  It was, did you ever call
19  Merck in April of 2002 to tell them that
20  you thought the label was inadequate?
21  Yes or no?
22          MR. KLINE:  Please finish
23      the answer that you are being cut
24      off from, sir.

Page 545

1   BY MR. GOLDMAN:
2       Q.   Can you answer that
3   question?
4       A.   Are we talking about the
5   package insert or this?
6       Q.   The package insert.  Did you
7   ever write to Merck --
8       A.   I did not write to Merck.
9       Q.   Did you ever write to the
10  FDA and say, I think that the package
11  insert that you just approved for Vioxx
12  was inadequate in April of 2002?
13      A.   I discussed it with the FDA,
14  and I believe it's in some of my writings
15  as well.  And it may be even in
16  correspondence to the FDA, yes.
17      Q.   I would like you to find,
18  Dr. Topol, because you just said that you
19  wrote to the FDA, I'd like you to find
20  for me where you wrote them in April of
21  2002 or any time in 2002 or any time in
22  2003 or any time in 2004 before the
23  withdrawal where you told the FDA you
24  thought that the warning label that they

**KS-000269**

1  approved was inadequate?
2      A.   I said -- firstly, I would
3  go back to my statement.  I discussed
4  this with the FDA.  I don't recall for
5  sure whether I sent correspondence.
6  Certainly I didn't send a separate
7  letter, but I did discuss it with them
8  that I thought that by not -- the
9  gastrointestinal benefits were
10 highlighted in the new package insert.
11 But the cardiovascular toxicity, although
12 in the package insert, was way down, it
13 was in small print, it wasn't
14 highlighted, not in bold face.  It was
15 certainly not a flag for the consumer and
16 for the physician.
17      MR. GOLDMAN:  Move to strike
18      as nonresponsive.
19 BY MR. GOLDMAN:
20      Q.   Did you ever write any
21 article, Dr. Topol, in any journal in
22 April of 2002 after you saw the
23 FDA-approved label to say, I think this
24 label is inadequate and should be

1  changed?
2      A.   I wrote about the timing
3  being adequate in the peer-reviewed
4  literature.  I did not write -- I do not
5  recall writing in any medical literature
6  that the package insert was inadequate.
7      MR. GOLDMAN:  Two more
8      questions, and I'll reserve
9      whatever time I have, if I have
10     any.
11     MR. KLINE:  You have none.
12 BY MR. GOLDMAN:
13     Q.   Dr. Topol, you referenced
14 the Juni article.  Do you remember that?
15     A.   Yes, certainly.
16     Q.   The Juni article shows that
17 there's no increased risk associated with
18 Vioxx at the 25 milligram dose, correct,
19 sir?
20     A.   No.  No.  That's not at all
21 an appropriate interpretation of that
22 study.
23     Q.   Do you want to look at the
24 table with me?

1      A.   Yes.  I'm happy to, because
2  that's a subgroup analysis, which is
3  unacceptable if you're trying to make
4  that.  What they show is lack of
5  differences between the doses.  It
6  doesn't mean that one dose is not
7  significant.  Here it is right here.  And
8  for you to be able to interpret that
9  is --
10     MR. HAMELINE:  Identify the
11     table.
12     THE WITNESS:  -- is absurd.
13 Table 2 in the Juni paper in the
14 Lancet.  What it says is that the
15 risk of 12 and a half milligrams
16 was 271 percent.  And that wasn't
17 quite statistically significant,
18 although close.  The 50 milligrams
19 was indeed statistically
20 significant at 2.83 or 283 percent
21 increase.  And then what you're
22 trying to say is that 25
23 milligrams was not statistically
24 significant because it was 1.37.

1      Well, you can't make those
2      conclusions.  The analysis is done
3      on the drug.  There's no --
4  BY MR. GOLDMAN:
5      Q.   Dr. Topol --
6      A.   There's no interaction.  The
7  p-value for the interaction of the dose
8  is not significant.
9      Q.   Dr. Topol, does Table 2 of
10 the Juni article show that there's no
11 increased risk associated with Vioxx at
12 25 milligrams versus placebo?
13     A.   It absolutely does not
14 convey that.
15     Q.   Can I see the article for a
16 second?
17     A.   Yes, certainly.
18     (Handing over document.)
19     Q.   Do you see, Dr. Topol, that
20 in Table 2, under "Daily dose ,"25
21 milligrams has a relative risk of 1.37
22 and a confidence interval of .52 to 3.61,
23 so the number 1 falls within the
24 confidence interval, and there's no

KS-000270

1  statistically significant difference in
2  cardiovascular risk associated with the
3  25 milligram dose.
4       A.   You missed on the most
5  important next part of that same --
6       Q.   Can you say whether that's
7  true or false and then you can --
8            MR. HAMELINE:  Well, you
9       have the table.
10           THE WITNESS:  The p-value
11      for the interaction, that is, is
12      .69. So, you can't say anything
13      about statistical significance
14      about any of the doses. You can't
15      say anything about it.
16  BY MR. GOLDMAN:
17      Q.   Doctor --
18      A.   It's an overall conclusion.
19      Q.   Dr. Topol --
20      A.   You're making an
21  illegitimate subgroup, and you can't look
22  at the confidence interval and interpret
23  that.
24      Q.   Dr. Topol, when you look at

1  the 25 milligram dose for Vioxx in Table
2  2, do you see the confidence interval
3  covers 1, which means that the 25
4  milligram dose, there's no statistically
5  significant difference in -- withdrawn.
6            Do you see, Dr. Topol, that
7  in Table 2 of Juni's article with the 25
8  milligram dose that the difference in
9  cardiovascular events -- I'm tired. I'm
10  sorry.
11      A.   If you read the paper, it
12  will --
13      Q.   I don't want to read the
14  paper. I want to look at the data.
15           Dr. Topol --
16      A.   I'm with you, Mr. Goldman.
17      Q.   Dr. Topol, if you look at
18  table 2 at the 25 milligram dose, do you
19  agree that because the confidence
20  interval covers 1, there's no
21  statistically significant difference in
22  cardiovascular risk between Vioxx and
23  placebo?
24      A.   If there was a significant

1  interaction on dose, you could make that
2  assertion, but with a p-value that's
3  insignificant for interaction, you cannot
4  make that conclusion.
5       Q.   Do you also see, Dr. Topol,
6  that in trial duration, do you see that
7  in less than six months there's no
8  statistically significant difference in
9  increased cardiovascular risk in the Juni
10  study?
11      A.   I'm afraid the problem is
12  that you're not interpreting these data
13  properly because the concept -- and I can
14  explain it if you'd like, about
15  heterogeneity and interaction. What this
16  table shows, and the most important
17  aspect of the table is this column for P
18  for interaction. And what this shows is
19  that the duration, there's no difference.
20  217 percent excess for less than six
21  months. 233 percent excess for heart
22  attack for greater than six months. The
23  same thing for dose. Only if there's a
24  p-value for interaction. And the only

1  one there was, interestingly, was on the
2  external endpoint committee, which is a
3  topic I would have loved to address with
4  you. But that is the only one that was
5  significant. And that's the only thing
6  you can say about this table.
7       Q.   Let me ask one more time.
8       A.   Yes.
9       Q.   Without looking at the
10  p-value that you just looked at, do you
11  agree that Table 2 of the Juni study
12  shows that there's no statistically
13  significant difference in cardiovascular
14  risk associated with the Vioxx 25
15  milligram dose?
16      A.   It does not show that there
17  is no statistically significant
18  difference, that there's no statistically
19  significant -- there's nothing you can
20  say about any of the doses higher or
21  lower based on this analysis and the
22  data.
23           MR. GOLDMAN:  I don't have
24      any more questions right now, Dr.

KS-000271

Page 554

1    Topol.
2        Can we take a break?
3        MR. HAMELINE:  We can.  Off
4    the record.
5        THE VIDEOTAPE TECHNICIAN:
6    Off the record at 6:07.
7            - - -
8        (Whereupon, a recess was
9    taken from 6:07 p.m. until 6:24
10   p.m.)
11           - - -
12       THE VIDEOTAPE TECHNICIAN:
13   Back on the record at 6:24.
14       MR. GOLDMAN:  Tom, to be
15   clear for the record, when I just
16   say objection, I can work out
17   exactly what the basis for the
18   objection is and tell Linda, the
19   court reporter, after the
20   deposition?
21       MR. KLINE:  Yes.  With the
22   presumption that it's a few words,
23   not a paragraph, which I assume it
24   will be.

Page 555

1        MR. GOLDMAN:  It is not
2    going to be a paragraph.  It's
3    going to be either lack of
4    foundation or opinion --
5        MR. KLINE:  You --
6        MR. GOLDMAN:  -- testimony or
7    form.
8        MR. KLINE:  You and I are
9    together.  Say objection, say it
10   loud and clear so we hear it.
11           - - -
12       E X A M I N A T I O N
13           - - -
14   BY MR. KLINE:
15       Q.   Dr. Topol, nice to see you
16   again.
17       A.   Yes.
18       Q.   And I want to ask you a
19   couple of questions that the Merck lawyer
20   may not have -- in fact, I know didn't
21   ask you.
22       First of all, I didn't know
23   that he was making a chart of the CV
24   event analysis.  Apparently he was

Page 556

1    writing numbers.  Do you recall when he
2    was writing numbers and you were
3    disagreeing that those numbers were
4    comparing apples and apples?
5        MR. GOLDMAN:  Objection.
6        THE WITNESS:  Yes.
7    BY MR. KLINE:
8        Q.   Well, no, he was
9    disagreeing, that it was comparing apples
10   and apples.  You are saying it was like
11   comparing two different fruits?
12       MR. GOLDMAN:  Objection.
13       THE WITNESS:  Yes.
14   BY MR. KLINE:
15       Q.   All right.
16       I see here that he prepared
17   and marked something called Exhibit 48,
18   and what he says here, I'll put it in
19   front of us, that in August of '01, JAMA,
20   he says Vioxx -- help me with that.
21       A.   Nabumetone.
22       Q.   -- nabumetone, placebo.
23       A.   Right.
24       Q.   And he has August, '91,

Page 557

1    JAMA, 6, 2, 1?
2        A.   Right.
3        Q.   Vioxx, nabumetone, placebo
4    for October 25th, 7, 1, 1?
5        A.   Those are Dr. Targum's
6    numbers, but the basis of them was
7    uncertain.  So, that's what we were going
8    on, until we could zoom in on each and
9    every patient and figure out whether they
10   had a heart attack, a death or a stroke.
11       Q.   Understood.
12       And then in November 12,
13   it's 5, 1, 0?
14       A.   That was after the final
15   review of each patient's detailed
16   clinical history.
17       Q.   This is 090; correct?
18       A.   That's 090.
19       Q.   That study for Merck was
20   bad; correct?
21       MR. GOLDMAN:  Objection.
22       THE WITNESS:  Well, let's
23   put it this way.  I only learned,
24   you know, back in November of '04

KS-000272

Page 558

```
1        that it was finished in 1999.  So,
2    now it's 2005, it's six years
3    later, it hasn't been published,
4    and as far as I know, it's the
5    only significant large trial in
6    nearly 1,000 patients that has not
7    been published in the Vioxx trial.
8  BY MR. KLINE:
9        Q.   Do you recall the
10 questioning when the Merck lawyer showed
11 you an e-mail, and he suggested to you
12 that somebody suggested, so, therefore,
13 he, the Merck lawyer, was suggesting that
14 you weren't interested in 085?
15        MR. GOLDMAN:  Objection.
16        THE WITNESS:  Right, yeah.
17    And that is a really important
18    point, because when you are
19    reviewing a profile of a drug or a
20    device or a biotechnology product,
21    you can't ignore a signal from any
22    given trial.  Each trial in itself
23    is a compartment.  So, if you have
24    a significant excess of events,
```

Page 559

```
1        serious events, we're talking here
2    about death, heart attack and
3    stroke, and you see it in two
4    independent compartments, that's
5    the whole story.  It's right
6    there.
7        It doesn't mean that you had
8    another trial that was very
9    similar, in this case, 085, it
10    doesn't mean that that trial is
11    wrong or right or -- the important
12    point here, and this is a critical
13    thing for interpretation of
14    clinical trials in a field, is
15    signals.  And once you have
16    replication in two compartments,
17    two independent trials, that's the
18    story.  That's basically what I
19    was communicating at the time of
20    the 60 Minutes interview.
21        MR. GOLDMAN:  Objection,
22    move to strike, nonresponsive.
23  BY MR. KLINE:
24        Q.   If there were one of the two
```

Page 560

```
1    studies -- Merck published 085; correct?
2        A.   Yes.
3        Q.   Good for them; correct?
4        MR. GOLDMAN:  Objection.
5        THE WITNESS:  Well, it --
6  BY MR. KLINE:
7        Q.   Good, at least it appeared
8  to be good as far as cardiovascular risks
9  were concerned; correct?
10        MR. GOLDMAN:  Objection.
11        THE WITNESS:  It didn't
12    have, as best I can tell, any
13    heart attack and death and stroke,
14    but it took a long time.  It got
15    published in 2004 by Kivitz and
16    colleagues, as we saw, but that's
17    a very long time lag.  I don't
18    know when that trial was
19    completed, but I assume it was
20    sometime in '99, and that's still
21    a very long time lag.
22  BY MR. KLINE:
23        Q.   Putting aside the time lag,
24  they published 085, which has some good
```

Page 561

```
1    data in them, and they did not publish
2    090, which is bad for them; correct?
3        MR. GOLDMAN:  Objection.
4        THE WITNESS:  That was why
5    090 became a source of increasing
6    concern over time, the fact that
7    it didn't show up, the fact that
8    when Dr. Juni and his colleagues
9    did their analysis, as I reviewed
10    with you, Mr. Kline, this morning.
11  BY MR. KLINE:
12        Q.   Yes, sir.
13        A.   It was that 090 that took
14  VIGOR across the line and made it what
15  they considered a drug that was suitable
16  for withdrawal.  So, this study 090
17  becomes much more important, the fact
18  that it wasn't published, but also the
19  fact that it was a replication of VIGOR.
20        Q.   Is that why you were
21  interested --
22        MR. GOLDMAN:  Objection,
23    move to strike, nonresponsive.
24  BY MR. KLINE:
```

**KS-000273**

1          Q.   Do you consider yourself to
2    be in this whole Vioxx affair a -- strike
3    that, I'm going to start again.
4          Do you consider in looking
5    at the Vioxx safety, do you consider
6    yourself to be independent, sir?
7          MR. GOLDMAN:  Objection.
8          THE WITNESS:  I don't know
9    how I could be more independent.
10   I certainly wasn't involved in the
11   trials, but on the other hand, I'm
12   looking at it as a seasoned
13   clinical trialist, so, yes, I
14   believe I'm an independent viewer.
15   BY MR. KLINE:
16        Q.   Which of the two studies, if
17   they had to pick one, should have been
18   published, and why?
19        MR. GOLDMAN:  Objection.
20        THE WITNESS:  Well, study
21   090 should have been published as
22   soon as possible, and that was the
23   concern that I registered.  And,
24   of course, that was that Mr.

1    Goldman's e-mail that I first saw,
2    internal FDA, they talked about,
3    should they have done something
4    with that data much earlier.  But
5    that one was the one of concern.
6    And just because there's another
7    trial of similar size and design
8    that doesn't show the problem,
9    doesn't negate, it doesn't make
10   you in any way not seriously
11   concerned about 090.
12   BY MR. KLINE:
13        Q.   These data, even looking at
14   them the way he compares them, 6 Vioxx to
15   3 when you combined nabumetone and
16   placebo, or 7 versus 2 or 5 versus 1, are
17   any of those numbers, sir, reassuring
18   that Vioxx is safe?
19        MR. GOLDMAN:  Objection.
20        THE WITNESS:  They're not at
21   all reassuring.  We're running on
22   a relatively low event, but they
23   are an imbalance of events no
24   matter how you look at study 090.

1          And then in the wake of VIGOR, or,
2    actually, it preceded VIGOR by
3    many months, but when you put the
4    two together, you have a large
5    trial of 8,000 patients, you have
6    a trial of 1,000 patients, which
7    is a respectable number, it's not
8    so small, you see the same problem
9    in both trials, that's when you
10   have to make a conclusion that
11   there's a significant problem.
12        MR. GOLDMAN:  Objection,
13   move to strike, nonresponsive.
14   BY MR. KLINE:
15        Q.   Now, when you were running
16   the statistical significance and you were
17   going to your statistician, was that a
18   statistician at Cleveland Clinic?
19        A.   Yes.
20        Q.   Okay.
21        Were you trying to be
22   accurate and correct, sir?
23        A.   Yes.  I mean, I've been
24   doing this for a long time, and I don't

1    ever want to put my name associated with
2    data -- with the wrong data.  And I
3    regret that we could not, back in 2001,
4    get to the right data for 090, because we
5    could have found -- we could have
6    identified this problem a lot earlier.
7         Q.   Now, let's go to that point,
8    if I may.
9         MR. GOLDMAN:  Objection,
10   move to strike, nonresponsive.
11   BY MR. KLINE:
12        Q.   Bear with me.  I've got to
13   find some notes that I had, which I've
14   got here.
15        Okay.  Let's move to that
16   data.
17        You looked to the Targum
18   memo from the FDA to find out information
19   that you couldn't find publicly.  Is that
20   the gist of what you were telling us?
21        A.   Yes.
22        MR. GOLDMAN:  Objection.
23   BY MR. KLINE:
24        Q.   And the fact of the matter

KS-000274

Page 566

1 is, when you looked at that information,
2 did you find things that were troubling?
3 Is that the nub of it?
4        MR. GOLDMAN:  Objection,
5 foundation.
6        THE WITNESS:  Without any
7 question, yes.
8 BY MR. KLINE:
9        Q.   And I think you said maybe
10 three times, four times, five times, that
11 you wanted to look at Page 32 and give an
12 explanation.  Is that correct?
13       A.   Yes, I did.
14       Q.   Okay.
15       A.   Because 32 is the beginning
16 of where the problem lies.  Because on
17 Page 32, there's --
18       Q.   Let me just put it in
19 context, because the jury and whoever is
20 looking at this now, juries in
21 particular, are going to be looking at --
22 let me start again.
23        Jurors will be looking at
24 this for quite a while at this point in

Page 567

1 the day.
2        This is the Targum memo by
3 an FDA reviewer, and the memorandum is
4 dated February 1, 2001; correct?
5        A.   Yes.
6        Q.   But the information is about
7 a study that was done two years earlier;
8 correct?
9        A.   That's correct.
10       Q.   And you now, two years
11 later, are looking at that data as an
12 independent eye and saying, what was
13 really in that study; correct?
14       MR. GOLDMAN:  Objection.
15       THE WITNESS:  Right.  Three
16 years later.
17 BY MR. KLINE:
18       Q.   Three years later.
19        And that study hadn't been
20 published yet?
21       MR. GOLDMAN:  Objection.
22       THE WITNESS:  That's right.
23 BY MR. KLINE:
24       Q.   And you're saying to

Page 568

1 yourself, what does this show me against
2 this problem that was in VIGOR, which now
3 has a lot of attention in the medical
4 community; correct?
5        MR. GOLDMAN:  Objection.
6        THE WITNESS:  That's
7 correct.  And moreover, there's
8 APPROVe in colon polyp patients,
9 not heart patients.  There's also
10 ADVANTAGE in osteoarthritis for 12
11 weeks.  There's other trials now
12 that we have access to and you
13 say, well, wait a minute, where
14 was the signal really there?
15 That's what this is about.  Where
16 was the first signal really there?
17 Why didn't we get the right data,
18 the drilled down data on the study
19 090?
20       MR. GOLDMAN:  Objection,
21 move to strike, nonresponsive.
22 BY MR. KLINE:
23       Q.   Now, recognizing -- I'll put
24 it in a different form to make sure we

Page 569

1 get it.
2        Were you looking for the
3 drilled down data, what you call drilled
4 down data?
5        A.   Yes.
6        Q.   What is -- I've heard that
7 term today.
8        What is drilled down data?
9        A.   Well, basically this table
10 is the bare bones.  It says coronary
11 artery conclusion for the placebo patient
12 on Page 32.
13       Q.   Look at the table.
14       A.   Yes.
15       Q.   Recognize that I have 20
16 other areas I want to cover in less than
17 40 minutes.
18       A.   Okay.
19       Q.   Would you tell the members
20 of the jury with this displayed in front
21 of them what it is that you wanted to
22 communicate to them when you were
23 answering questions by Merck's counsel
24 when he was challenging you, like Merck

**KS-000275**

Page 570

1 challenges everyone, please?
2          MR. GOLDMAN:  Objection.
3          THE WITNESS:  The point
4    being, I gave this example, but
5    the coronary artery occlusion,
6    without having any details, the
7    table just says placebo, coronary
8    artery occlusion.  Dr. Targum
9    concluded that was a heart attack
10   when, in fact, it wasn't a heart
11   attack when we reviewed the
12   details of this 48-year-old
13   gentleman.  He didn't have any
14   heart attack.
15 BY MR. KLINE:
16   Q.   You adjudicated the
17 individuals yourselves?
18          MR. GOLDMAN:  Objection.
19          THE WITNESS:  We had all the
20   information, we had the
21   electrocardiogram, we had the
22   angiogram.  We had all the
23   information that isn't displayed
24   in this report, and then we knew

Page 571

1    that it was never -- this patient
2    never had a heart attack.  So, he
3    was miscategorized.  And that's
4    just one example.
5  BY MR. KLINE:
6    Q.   But if you look at it no
7  matter which way it comes out displaying
8  48, does this study demonstrate anything
9  different in terms of a signal when it's
10 combined with the VIGOR study?
11          MR. GOLDMAN:  Objection.
12          THE WITNESS:  The point
13   about this is, if one is looking
14   at this with an open mind and
15   wanting the best for patients,
16   looking at the data and trying to
17   look at, is there a signal here of
18   worry, you would be worried if you
19   were the manufacturer of this drug
20   or you were the clinical trialist
21   doing this drug.  You would be
22   worried.  And that's data that's
23   available in mid-'99.
24          And you would be even more

Page 572

1    worried later in 1999 when you
2    have a trial where you have an
3    excess of deaths and serious
4    cardiovascular events.
5          And, finally, when the VIGOR
6    trial is cracked in March 2000, if
7    you looked at these data
8    objectively, you would say, we've
9    got two trials, one 1,000
10   patients, one 8,000 patients, we
11   don't need any more trials, we
12   have a problem, we need to have
13   restriction of the use of this
14   drug, particularly in patients
15   with known heart disease, and we
16   need to do the right trials to get
17   this drug, which works well for
18   arthritis, but it's got this
19   noxious side effect problem, and
20   we've got to do something about
21   it.
22          MR. GOLDMAN:  Objection,
23   move to strike, nonresponsive.
24 BY MR. KLINE:

Page 573

1    Q.   So, what we're displaying to
2  this jury in terms of this exhibit, Page
3  32 of the Targum memo, what that really
4  is is, you're showing us that there were
5  a series of patients, for example,
6  patient 2695, a 63-year-old with
7  myocardial infarction, you then looked at
8  each individual --
9    A.   Yes.
10   Q.   -- made your own
11 determination and then calculated the
12 numbers yourself?
13          MR. GOLDMAN:  Objection.
14          THE WITNESS:  This was a
15   bona fide heart attack, but the
16   patient that was listed for 2683
17   with atrial fibrillation.  That
18   was not a thrombotic event.  So,
19   each one of them required a very
20   careful review, which we only were
21   able to get that data, you know,
22   of course, late October/early
23   November of '04.
24 BY MR. KLINE:

KS-000276

144 (Pages 570 to 573)

1      Q.   Now, I want to ask you a
2   question because it was suggested three
3   times in the testimony.
4            Were you doing this or any
5   of your other activities to get Merck?
6            MR. GOLDMAN:  Objection.
7   BY MR. KLINE:
8      Q.   That's what they suggested
9   to you.
10           MR. GOLDMAN:  Objection.
11           THE WITNESS:  I find that
12   highly objectionable, because I
13   worked very closely with Merck.  I
14   did the courtesy of sending the
15   manuscript to Merck for input,
16   meeting with Merck, which I didn't
17   have to do, with Dr. Reicin and
18   Dr. Demopoulos.  I did everything
19   I could, bent over backwards to be
20   collaborative, and it's really
21   extraordinary to suggest that I
22   was trying to have an objective to
23   come at Merck in any way.
24           I was just trying to do the

1   best, what we can with this data
2   and for patients, and I think our
3   work was ultimately validated
4   exceptionally well.
5            MR. GOLDMAN:  Objection,
6   move to strike the nonresponsive
7   portion.
8   BY MR. KLINE:
9      Q.   What was your work a piece
10   of in this process?  What ultimately was
11   the result here of down the road of what
12   you started, sir?
13           MR. GOLDMAN:  Objection.
14           THE WITNESS:  When we
15   published that first paper in JAMA
16   in August of 2001, we certainly --
17   that was the first demonstration
18   in man, in patients, that there
19   was a significant problem that was
20   requiring further study.  So, that
21   started the concern.
22           But, unfortunately, it was
23   met with deaf ears at Merck and
24   with Pfizer with respect to their

1   unwillingness to do the right
2   trials, and although their data
3   weren't as worrisome, there
4   certainly were some data that were
5   concerning.
6            But the manufacturers of
7   these drugs, and particularly
8   Merck, where the data was most
9   concerning, did not do the right
10   thing for patients, and that's the
11   concern.
12           MR. GOLDMAN:  Objection,
13   move to strike, nonresponsive.
14           MR. KLINE:  I think it was
15   exactly responsive.
16   BY MR. KLINE:
17      Q.   Next question.  Got a bunch
18   of stuff I've got to get through with
19   you.
20           In the Juni article you went
21   back and forth.  First of all, Juni, you
22   pointed out to the Merck lawyer, the Juni
23   article cited the 085 study; correct?
24           MR. GOLDMAN:  Objection.

1            THE WITNESS:  Yes, it did.
2   BY MR. KLINE:
3      Q.   It didn't cite the 090 study
4   because it wasn't published?
5      A.   Interestingly, and this was
6   --
7            MR. GOLDMAN:  Objection.
8            THE WITNESS:  We didn't
9   mention this before, but the study
10   090 was cited in the FDA report
11   and the Geba abstract, the one
12   where he only presented the
13   efficacy with no safety data at an
14   American Geriatrics Society.  So,
15   there was no paper to reference.
16   So, he referenced the Targum
17   report and the abstract.
18   BY MR. KLINE:
19      Q.   Now, remember when you were
20   back and forth with the Merck lawyer
21   about when you were telling him that you
22   couldn't show that there was no dose
23   relation?
24      A.   Yes.

**KS-000277**

Page 578

1    Q.   And I think that's what the
2  points were that were being made;
3  correct?
4    A.   Yes.
5    Q.   And that it's not dose or
6  duration dependent, the gist of what you
7  were saying was that Vioxx is a problem
8  at various doses at various durations?
9        MR. GOLDMAN:  Objection.
10       THE WITNESS:  Well --
11 BY MR. KLINE:
12   Q.   And that it was confirmed by
13 Juni?
14       MR. GOLDMAN:  Objection.
15       THE WITNESS:  Yeah.  Not
16   only did Dr. Juni say in the paper
17   that there's no dose relationship,
18   no duration relationship, but
19   going back to the importance of
20   study 090, remember, that was at a
21   dose of 12-and-a-half milligrams
22   to see the over seven-fold excess
23   of heart attack.  So, dose does
24   not appear to be a vital aspect of

Page 579

1    the cardiotoxicity.
2  BY MR. KLINE:
3    Q.   And as you told us earlier,
4  nor does duration?
5        MR. GOLDMAN:  Objection.
6  BY MR. KLINE:
7    Q.   It could be short or long?
8        MR. GOLDMAN:  Objection.
9        THE WITNESS:  We reviewed
10   the duration aspects many times
11   earlier.
12 BY MR. KLINE:
13   Q.   Now, the Juni article, I
14 believe it has a number which it was
15 given.  I have underlined what Juni's --
16 you went back and forth with the Merck
17 lawyer, but I want to highlight the first
18 and underline in red.  I have it for you
19 here, you can read it to the jury.  The
20 first line of the "Interpretation,"
21 that's the bottom line; correct?
22   A.   Yes.  That would be the
23 conclusion of the abstract.
24       "Our findings indicate that

Page 580

1  rofecoxib should have been withdrawn
2  several years earlier."
3    Q.   True statement?
4        MR. GOLDMAN:  Objection.
5        THE WITNESS:  They make -- I
6  cited that in the New England
7  Journal correspondence.  I
8  certainly agree with their
9  systematic analysis.  That was the
10  appropriate conclusion.
11 BY MR. KLINE:
12   Q.   Okay.
13       Now, let's move right along.
14       Let's talk about statistical
15 analysis.
16       As far as your statistical
17 analysis is concerned, did you at all
18 times, sir, conduct a statistical
19 analysis consistent with good and sound
20 scientific practice?
21   A.   That's the only way I would
22 know how to do, is to do the best we can
23 with the data and the statistics and the
24 analysis, yes.

Page 581

1    Q.   Okay.
2        Was that also Merck's
3  obligation, to do the same thing?
4        MR. GOLDMAN:  Objection.
5        THE WITNESS:  Any medical
6  research should be done in that
7  way, yes.
8  BY MR. KLINE:
9    Q.   Okay.
10       Now, have you had a chance
11 now to explain adequately what you wanted
12 explained to the jury about the Targum
13 memo and what you did in terms of
14 drilling down the data and what you were
15 after?
16   A.   I believe so.
17   Q.   Anything else that you think
18 has to be covered to get the full import
19 of it out?
20       MR. GOLDMAN:  Objection.
21       THE WITNESS:  Well, I mean,
22   I think the other points that Dr.
23   Targum made in her conclusion of
24   her report about the fact that

**KS-000278**

146 (Pages 578 to 581)

Page 582

1    the --
2    BY MR. KLINE:
3        Q.   Page?
4        A.   Page 34, "The sponsor claims
5    that the difference in heart attacks
6    between the groups is primarily due to
7    the anti-platelet effects of naproxen."
8        Q.   Yes.
9        A.   I've already discussed that,
10   that that was an untenable conclusion.
11       Q.   Well, wait.  But what does
12   she say?
13           MR. GOLDMAN:  Objection,
14   nonresponsive.
15   BY MR. KLINE:
16       Q.   Does she say something that
17   disagrees with you?
18       A.   Yes.  She says, "The
19   hypothesis is not supported by any
20   prospective placebo-controlled trials
21   with naproxen."
22       Q.   It's the same thing you told
23   us earlier?
24       A.   That's right.

Page 583

1        Q.   And she says here, and you
2    highlighted this next point or put an
3    asterisk next to it, "The sponsor claims
4    that the majority of cardiovascular
5    events in the VIGOR study occurred in
6    those patients who should have been on
7    aspirin for cardioprotection."
8            And what does she say?
9            MR. GOLDMAN:  Objection.
10           THE WITNESS:  Well, this
11       claim has not convinced this
12       medical reviewer, it certainly did
13       not convince me, and so this is
14       not a reasonable conclusion from
15       the data.
16   BY MR. KLINE:
17       Q.   She notes that "The sponsor
18   claims that the patients with rheumatoid
19   arthritis are at increased risk for
20   cardiovascular events."
21           What does she say?
22           MR. GOLDMAN:  Objection.
23           THE WITNESS:  Well, there's
24       some literature.  She agrees with

Page 584

1    it, I agree with it, there's some
2    literature, but it is actually a
3    very modest amount of literature.
4    And actually, the most recent data
5    from 2005, which we didn't have
6    back then, would suggest that
7    there is an increased incidence of
8    heart attacks, but it's not
9    particularly striking.
10           MR. GOLDMAN:  Objection,
11       move to strike the nonresponsive
12       portion.
13   BY MR. KLINE:
14       Q.   And does it explain, does
15   that point explain the results of VIGOR?
16       A.   Not in any way.
17       Q.   VIGOR, when combined with
18   090, combined now with all the
19   epidemiologic studies, where does VIGOR
20   fit into the scheme of things?
21           MR. GOLDMAN:  Objection.
22           THE WITNESS:  The VIGOR was
23       in many ways the front runner.
24       That one is the one that really

Page 585

1        predicted what was going to
2        happen, not only in the
3        epidemiologic studies, but, of
4        course, in the subsequent
5        randomized trials.
6            There was one last point in
7        this report that I think deserves
8        to be underscored, and it says,
9        "The sponsor recommends use of
10       low-dose aspirin in conjunction
11       with rofecoxib in those at risk
12       for cardiovascular events."
13           There are no data whatsoever
14       to substantiate that.  Dr. Targum
15       agrees with that and, again, we're
16       talking about millions of patients
17       in the United States and beyond,
18       and to recommend taking aspirin
19       without having any proof of that,
20       without any data, without any
21       meaningful trial, is really, I
22       believe, unacceptable.
23   BY MR. KLINE:
24       Q.   Moving along.

**KS-000279**

Page 586

1      MR. GOLDMAN:  Objection,
2  move to strike.
3  BY MR. KLINE:
4      Q.   You were asked questions
5  about the article that you wrote where
6  you said the findings were unexpected?
7      A.   Yes.
8      Q.   Okay.
9          Now, did you have access to
10  the Merck e-mails and the Merck internal
11  thinking?
12      A.   Not at all.  In fact, in the
13  October 2004 New England Journal of
14  Medicine editorial, I asked for
15  congressional review so we could get out
16  that stuff that we could never get to.
17      MR. GOLDMAN:  Objection,
18  move to strike.  Hold on, Tom.
19  Objection, move to strike,
20  nonresponsive.
21  BY MR. KLINE:
22      Q.   Did you presume that the --
23          Was that a presumption on
24  your part, that the findings were

Page 587

1  unexpected?
2      MR. GOLDMAN:  Objection.
3      THE WITNESS:  I don't really
4  know.  In retrospect, as you try
5  to reconstruct this, you wonder
6  how unexpected it was.  Because if
7  you go back to 1999 with Dr.
8  Villalba's express concern in the
9  FDA documents that there appears
10  to be an excess of clotting
11  events, you wonder how unexpected
12  it really was.
13  BY MR. KLINE:
14      Q.   Did you know at the time you
15  wrote that whether at the highest levels
16  of Merck they were worried that it was a
17  mechanism-based problem when they got the
18  VIGOR result?
19      MR. GOLDMAN:  Objection.
20  BY MR. KLINE:
21      Q.   Did you know that at the
22  time you wrote your article?
23      A.   I certainly did not know
24  that.

Page 588

1          - - -
2          (Whereupon, Deposition
3  Exhibit Topol-48, "Dr. Topol's
4  Analysis CV Events in Study 090,"
5  Chart (1 page), was marked for
6  identification.)
7          - - -
8  BY MR. KLINE:
9      Q.   Okay.
10          Let me show you an exhibit.
11      MR. GOLDMAN:  Tom, you are
12  not going to be using documents
13  you didn't use before.
14      MR. KLINE:  Well, sure I am.
15  You've challenged -- it has
16  nothing to do with documents.
17      MR. GOLDMAN:  Tom, you are
18  supposed to limit your redirect to
19  the scope of the cross --
20      MR. KLINE:  I am.
21      MR. GOLDMAN:  -- not
22  introduce new --
23      MR. KLINE:  I am limiting to
24  show -- you cross-examined him on

Page 589

1  whether it was unexpected.  I'm
2  now asking him whether this would
3  change his opinion as to whether
4  it was unexpected.
5  BY MR. KLINE:
6      Q.   I want you to look, sir,
7  very briefly, I have two documents --
8          - - -
9          (Whereupon, Deposition
10  Exhibit Topol-49, E-mail 3-9-00,
11  MRK-ABH0016219, was marked for
12  identification.)
13          - - -
14  BY MR. KLINE:
15      Q.   I want you to look, sir,
16  very briefly.  I have two documents --
17      MR. GOLDMAN:  I --
18      MR. KLINE:  You can have an
19  objection to save time.
20      MR. GOLDMAN:  I'll object --
21      MR. KLINE:  You can have an
22  objection, you can fill it in.
23  BY MR. KLINE:
24      Q.   Sir --

**KS-000280**

Page 590

1    MR. GOLDMAN:  I'll object to
2  this --
3  BY MR. KLINE:
4    Q.   Sir, this says Edward
5  Scolnick.
6    MR. GOLDMAN:  I'll object to
7  this as opinion testimony and
8  beyond the scope.
9  BY MR. KLINE:
10    Q.   Did you know him?
11    A.   I had known Dr. Scolnick,
12  yes.
13    Q.   Okay.
14    He's been described, sir, by
15  his own colleagues as unsteady.  Did you
16  ever hear that?
17    MR. GOLDMAN:  Objection.
18    THE WITNESS:  I heard that
19  from his colleagues, yes.
20  BY MR. KLINE:
21    Q.   And in the middle paragraph,
22  I'm going to put a red marker on here,
23  put your eyes to this, and I'll hand it
24  to you.

Page 591

1    A.   Yes.
2    Q.   "It's a shame," this is
3  after VIGOR and they had the results, and
4  he wrote, "It's a shame, but it's low
5  incidence and its mechanism based as we
6  worried it was."
7    Did you know when you said,
8  well, it was unexpected to these folks
9  that there were actually documents in
10  their own things that they acknowledged
11  that they worried about it before?
12    MR. GOLDMAN:  Objection.
13    THE WITNESS:  I didn't know
14  that.
15  BY MR. KLINE:
16    Q.   Incredible, isn't it --
17    MR. GOLDMAN:  Objection.
18  BY MR. KLINE:
19    Q.   -- seeing that document?
20    A.   It --
21    Q.   For a person in your
22  position?
23    MR. GOLDMAN:  Objection.
24    THE WITNESS:  Well, that's

Page 592

1  about the discussion I earlier
2  pointed out, about open mindedness
3  and looking at the data in an
4  objective way and not turning
5  back -- you know, turning your
6  back on the data of the trial.
7    - - -
8    (Whereupon, Deposition
9  Exhibit Topol-50, E-mails,
10  MRK-ABC0033809, was marked for
11  identification.)
12    - - -
13  BY MR. KLINE:
14    Q.   Another document, 50, very
15  quickly, sir.
16    Again, focusing on Mr.
17  Goldman's questions about when you wrote,
18  well, it was unexpected and, oh, it was
19  unexpected, you didn't expect to see it
20  and nobody expected to see it.  Were you
21  privy to this document, sir, out of the
22  Merck files from Edward M. Scolnick to
23  Alise Reicin?  You know who both of those
24  folks are, don't you?

Page 593

1    MR. GOLDMAN:  Objection.
2    THE WITNESS:  Yes, I do.
3  BY MR. KLINE:
4    Q.   And right here he says --
5  and do you know what was going on on
6  April 12, 2000?  That was right after the
7  VIGOR results were known.
8    MR. GOLDMAN:  Objection.
9  Can I have a standing objection to
10  your use of documents that you
11  didn't use before --
12    MR. KLINE:  There's only
13  two, and they go directly, so I
14  have a record --
15    MR. GOLDMAN:  I'm sorry.
16  -- and that the witness has
17  never seen before.
18    MR. KLINE:  -- they go
19  directly to this.
20  BY MR. KLINE:
21    Q.   You've never seen these,
22  have you?
23    A.   I've not seen these, no.
24    Q.   I'm going to ask you if you

**KS-000281**

1  would have written that it was unexpected
2  in your New England Journal if Edward
3  Scolnick, Alise Reicin or Merck had shown
4  you what was really on their minds?  If
5  you want to -- if you think you had an
6  opinion about scientific misconduct
7  before, wait till you see this one.
8         MR. GOLDMAN:  Objection.
9  BY MR. KLINE:
10        Q.   And here it goes.  It says
11  here, right here, I'm on the "Hi Alise"
12  thing.
13        A.   Okay.
14        Q.   10:42 at night.  They were
15  working late those nights.
16         It says here, "I will tell
17  you," now, remember, this is after they
18  told everyone that it was the naproxen
19  hypothesis.
20        A.   Right.
21        Q.   Naproxen explains it.
22        A.   Right.
23        Q.   Did you know, sir --
24         MR. GOLDMAN:  Objection.

1  BY MR. KLINE:
2        Q.   -- that Edward Scolnick was
3  telling Alise Reicin at 11:00 at night
4  that he was in "minor agony" and that his
5  "worry quotient is high"?  Did you know
6  that when you wrote the article, sir?
7         MR. GOLDMAN:  Objection.
8         THE WITNESS:  No, I surely
9  didn't.
10  BY MR. KLINE:
11        Q.   And look what he said, sir.
12  He said, "What I really want to do is a
13  10,000 versus 10,000 patient study in
14  mild, moderate OA Tylenol versus Vioxx
15  with PRN low dose ASA for those judged
16  who need it.  Safety first, primary
17  endpoint and efficacy second or
18  co-primary."  All caps.  "WE WILL NOT
19  KNOW FOR SURE WHAT IS GOING ON UNTIL WE
20  DO THIS STUDY.  PLEASE THINK HARD ABOUT
21  THE DESIGN BEFORE THE PAC MEETING."
22         MR. GOLDMAN:  Objection.
23  BY MR. KLINE:
24        Q.   Did you have access to that

1  document when you said it was unexpected?
2        A.   I certainly had no access.
3        Q.   Do you think you would have
4  written that it was unexpected had you
5  seen that?
6        A.   It wouldn't have been
7  unexpected any longer --
8         MR. GOLDMAN:  Objection.
9         THE WITNESS:  -- and you
10  wonder why the trials to follow up
11  like Dr. Scolnick is suggesting
12  weren't mounted immediately.
13         MR. GOLDMAN:  Belated
14  objection, and objection, move to
15  strike, nonresponsive.
16  BY MR. KLINE:
17        Q.   Were these studies that you
18  were suggesting, sir?
19        A.   Well, this would have
20  helped.  In April 2000, to do a trial
21  like he's suggesting certainly would have
22  illuminated a lot of the problems that
23  were around then.
24         MR. GOLDMAN:  Objection,

1  move to strike as nonresponsive.
2  BY MR. KLINE:
3        Q.   They asked you questions
4  about whether you, sir, took Vioxx?
5        A.   Yes.
6        Q.   First of all, did you take
7  Vioxx regularly or did you just take it
8  intermittently?
9        A.   I took it once a week or
10  every couple, few weeks.  It was very
11  sporadic.  A single dose as needed for
12  knee pain.
13        Q.   Did you have any special
14  circumstances that you thought that you
15  could tolerate the risk?
16        A.   Well, I mean, I started
17  taking it when I was -- in '99, so, that
18  was -- I was 45.  I had had an exercise
19  stress test.  I had no risk factors for
20  coronary disease or heart disease.  I'm
21  fit, so, I didn't think that,
22  particularly as we learned more about the
23  risk profile of the drug, that I was one
24  of the people who would, I think, be

KS-000282

Page 598

1  worried about the risk of the drug
2  relative to an older person with any risk
3  factors for heart disease.
4         MR. GOLDMAN:  Objection,
5     move to strike as nonresponsive.
6  BY MR. KLINE:
7     Q.   By the way, does Merck
8  recommend that you get a stress test
9  before you take the drug?
10        MR. GOLDMAN:  Objection.
11        THE WITNESS:  No, no, not at
12    all.
13  BY MR. KLINE:
14    Q.   Are the common users of the
15  drug the chief of the cardiovascular
16  division at the number one institute for
17  hearts in America?
18        MR. GOLDMAN:  Objection.
19        THE WITNESS:  Well, there's
20    no recommendations because the
21    drug isn't available now, but, no.
22  BY MR. KLINE:
23    Q.   Okay, next.
24        I want to talk to you about,

Page 599

1  there was a mention in the testimony, it
2  was pointed out to you by the Merck
3  lawyer, that you suggested that it was --
4  that Vioxx, in your JAMA paper, could
5  have an anti-inflammatory effect for
6  patients who had known heart disease.  Do
7  you remember that?
8     A.   Yes.
9     Q.   I want to talk to you about
10  apples and oranges here for a minute
11  because I think you guys may have been
12  talking by each other.
13        Is there a difference when
14  you suggest that it has known -- that it
15  could be anti-inflammatory as opposed to
16  having these prothrombotic qualities
17  which really cause the problems, and
18  would you explain that whole concept
19  directly and simply, sir?
20        MR. GOLDMAN:  Objection.
21  BY MR. KLINE:
22    Q.   Please.
23    A.   So, the problem here,
24  there's this very important equilibrium

Page 600

1  between so-called prostacyclin and
2  thromboxane.  And we've known about this
3  for 40 years in medicine.  And if you tip
4  that balance and you inhibit thromboxane,
5  you can inhibit clotting, or you rev up
6  thromboxane, you can have more clotting.
7  On the other hand, if you tip
8  prostacyclin production or expression,
9  you could have just the opposite with
10  inflammation.  So, this is this balance.
11  And the question is, where would one of
12  those COX-2 inhibitors in a trial of
13  patients with heart disease, where would
14  that balance be?  Would it be that in
15  some patients there would be a prevention
16  of heart attack, and in others there
17  would be a promotion of heart attack?
18  This is what we didn't know.
19        But we also knew, and I
20  tried to make this point earlier but I
21  was suppressed, that millions of people
22  with established heart disease were
23  taking Vioxx and were taking Celebrex
24  every day.  We had this information from

Page 601

1  the Ray paper in Lancet, we had it from
2  other papers that I've cited in my
3  writings, and the important point is that
4  if we have millions of people taking a
5  drug, it's already out there and it is
6  being done in a random way, so, we need
7  to study this, and we need to get that
8  information as quickly as possible.
9         MR. GOLDMAN:  Objection,
10    move to strike, nonresponsive.
11  BY MR. KLINE:
12    Q.   Okay.  Now, and, in fact, in
13  that regard, you were asked about --
14        MR. KLINE:  How much time?
15        THE VIDEOTAPE TECHNICIAN:  A
16    little under 15 minutes.
17        MR. KLINE:  Okay.
18        I've got to hustle here.
19             - - -
20    (Whereupon, Deposition
21    Exhibit Topol-51, E-mails, TOPOLE
22    000149 - TOPOLE 000150, was
23    marked for identification.)
24             - - -

**KS-000283**

151 (Pages 598 to 601)

Page 602

BY MR. KLINE:
1
2    Q.   You were asked about this
3  Alastair Wood memo?
4    A.   Yes, yes.
5    Q.   Again, I've got about a
6  dozen things to cover here.  Each one is
7  going to get a minute.  That's just the
8  way the rules break down.
9    A.   Fine.
10    Q.   There is this Alastair Wood
11  thing, and let me just put my hand on
12  what I want to point out to you.  You may
13  know other stuff.
14       What was the discussion you
15  were having with defense counsel about,
16  as you understood it?
17       MR. GOLDMAN:  Objection.
18       THE WITNESS:  Yeah, I wanted
19  to bring out the point that one of
20  the highest regarded trialists,
21  and in this field in particular,
22  Dr. Wood, probably the most
23  revered pharmacologist and
24  trialists in the country, he

Page 603

1  completely agreed and said that --
2  about the fact that we needed a
3  trial and the fact that his
4  statement he had was really quite
5  perfect.
6       Basically he's saying it was
7  unethical not to do a trial, and
8  the statement here, he says, "Such
9  a study would have been undoable
10  because of the size and time
11  requirements."  This is what Merck
12  has been saying.  And "I am
13  surprised that gets repeated so
14  frequently without challenge from
15  the data."  And he basically in
16  this back and forth e-mail agrees
17  that there's so many patients that
18  are getting the therapy today,
19  Vioxx, with heart disease, that we
20  have to resolve this problem.
21       MR. GOLDMAN:  Objection.
22       THE WITNESS:  And it was
23  only -- the irony is that it's
24  only ethical to do the trial, not

Page 604

1  to back off from not doing it.
2       MR. GOLDMAN:  Objection,
3  move to strike as nonresponsive.
4  Can I have a standing objection --
5  BY MR. KLINE:
6    Q.   Back to the point --
7       MR. GOLDMAN:  Tom, let me
8  just make an objection?  Can I
9  have a standing objection?
10       MR. KLINE:  Not on my time
11  on the record.
12       Yes, you have a standing
13  objection.  Yes, sir.
14       MR. GOLDMAN:  Standing
15  objection to using documents you
16  haven't used before?
17       MR. KLINE:  Yes, sir, you
18  do.
19  BY MR. KLINE:
20    Q.   The fact of the matter is,
21  that if I can go back to the -- with
22  Wood, you and he were back and forth
23  having a discussion, a scientific
24  discussion; is that correct?

Page 605

1    A.   That's right.
2    Q.   Anything sinister going on,
3  anything critical going on that was
4  putting you down or anything bad going
5  on?
6       MR. GOLDMAN:  Objection.
7       THE WITNESS:  Not at all.
8  Not at all.  We were in total
9  agreement about what should be
10  done here.
11  BY MR. KLINE:
12    Q.   Now, Wood chaired the
13  Advisory Committee in 2005, I believe,
14  the FDA Advisory Committee?
15    A.   That's right.  He's chaired
16  all the over-the-counter,
17  anti-inflammatory, aspirin panels.  He's
18  chaired most of the FDA panels related to
19  this topic.
20       MR. GOLDMAN:  Objection,
21  move to strike as nonresponsive.
22  BY MR. KLINE:
23    Q.   Did the anti-inflammatory
24  effects which you described and wrote

KS-000284

1  about at length in the article, picking
2  that out, Merck's lawyer picking that
3  out, how does that -- is that an
4  explanation to say -- were you saying to
5  the world, I think Vioxx is safe?
6        MR. GOLDMAN:  Objection.
7        THE WITNESS:  No, no, no.
8     What we were saying is that there
9     was a good rationale to do the
10    trial.  There were, you know,
11    millions of people taking Vioxx
12    with arthritis and heart disease,
13    and there was potential benefit
14    that should have been studied, and
15    there was, of course, this worry,
16    significant worry about potential
17    harm.  All of these things
18    factored into the call, the
19    mandate for a trial.
20 BY MR. KLINE:
21    Q.   Next.
22         Labeling.
23         You've told us the label is
24 inadequate; correct?

1        MR. GOLDMAN:  Objection.
2        THE WITNESS:  Yes.
3  BY MR. KLINE:
4     Q.   I think you had a question
5  about whether you were a, quote, labeling
6  expert.  So, you're a practicing
7  cardiologist; correct?
8     A.   That's correct.
9     Q.   As a practicing
10 cardiologist, and as a clinician and a
11 researcher, have you learned and
12 determined what the facts are about
13 Vioxx?
14       MR. GOLDMAN:  Objection.
15       THE WITNESS:  I certainly
16    have.
17 BY MR. KLINE:
18    Q.   And have you made a
19 determination as to whether the words
20 contained in the document that is given
21 to physicians who prescribe it called a
22 label, whether those words are
23 inadequate?
24       MR. GOLDMAN:  Objection.

1        THE WITNESS:  I -- they
2     didn't have any heart risk in '99,
3     and then in 2002, when the label
4     was revised, the package insert
5     revised, it was not adequately
6     incorporated.
7  BY MR. KLINE:
8     Q.   Do you have the expertise
9  and background to make that
10 determination?  I would think you would,
11 and if so, would you tell us?
12       MR. GOLDMAN:  Objection.
13       THE WITNESS:  Well, I don't
14    know.  There is a group at the
15    FDA, the label group, package
16    insert group, but outside of that
17    small sphere, I don't know that
18    there's anybody who is better
19    equipped to review this sort of
20    information than the actual
21    practicing physician.
22 BY MR. KLINE:
23    Q.   Who do they go to, the,
24 quote labeling group, who do they ask,

1  who do they consult with?
2        MR. GOLDMAN:  Objection.
3        THE WITNESS:  They do talk
4     to physicians.  And, you know, I
5     don't think that there's any
6     differentiation in the medical
7     community.
8  BY MR. KLINE:
9     Q.   People like yourself?
10       MR. GOLDMAN:  Objection.
11       THE WITNESS:  I would think
12    so, yes.
13 BY MR. KLINE:
14    Q.   All right.
15         Now, you told me Demopoulos
16 was concerned about the COX-2 program.
17 Do you remember?
18    A.   Yes, yes.
19    Q.   She was an important person
20 at Merck, and she told you she was
21 concerned about the COX-2 program at
22 Merck.  Briefly, do it in a minute,
23 because then I can save more time.
24       MR. GOLDMAN:  Objection.

KS-000285

Page 610

1    THE WITNESS:  Well, she left
2  Merck.  She went back to the
3  University of Pennsylvania.  She
4  was very upset about how this
5  whole thing was handled, and she
6  told me that.
7    Dr. DiBattiste also left
8  Merck, he was also concerned about
9  how all this was handled with the
10  COX-2 Vioxx program.
11    So, both of them related to
12  me in conversations that they were
13  not pleased about this whole
14  clinical development of Vioxx.
15 BY MR. KLINE:
16    Q.  You were asked repeatedly --
17    MR. GOLDMAN:  Objection,
18  move to strike.
19 BY MR. KLINE:
20    Q.  You were asked repeatedly
21  what you knew, what you saw, what you
22  didn't have access to.  Was your problem
23  you were having, pure and simply, you
24  never had full and complete access to the

Page 611

1  data?
2    MR. GOLDMAN:  Objection.
3    THE WITNESS:  That's right.
4  BY MR. KLINE:
5    Q.  Did you ask for it?
6    A.  Well, I certainly did.  But,
7  you know, we only were smart enough to
8  ask for it at times like -- for example,
9  when we wrote the JAMA paper, I wish we
10  had been smart enough to get all the data
11  on study 090 at that time.  But we just
12  didn't know what was lurking in there.
13    Q.  Next, the Konstam paper.
14    You told the Merck lawyer
15  that you could review the Konstam paper,
16  you didn't get to talk about it.  I have
17  it here.  Is there a minute or two way
18  through it?
19    A.  Yeah.  Well, this --
20    MR. GOLDMAN:  Objection.
21    THE WITNESS:  This paper,
22  the actual reprint I have, this
23  has very significant problems in
24  trying to interpret it.  So, for

Page 612

1  example, here, study 090, the data
2  are included in this amalgamation
3  --
4    MR. KLINE:  I've marked it
5  as the next exhibit.  Number?
6  What is it?
7    MR. HAMELINE:  52, 52.
8    MR. KLINE:  52.
9    - - -
10    (Whereupon, Deposition
11  Exhibit Topol-52, "Cardiovascular
12  Thrombotic Events in Controlled,
13  Clinical Trials of Rofecoxib,"
14  (Konstam, et al), Circulation
15  2001;104:r15-r23, was marked for
16  identification.)
17    - - -
18    THE WITNESS:  Yes.  This was
19  published shortly after our --
20  there's a lot of interesting
21  things about this paper.  It was
22  received on October 2nd and
23  accepted the next day and
24  published very rapidly.  But the

Page 613

1  paper includes the trials of Vioxx
2  that were available, and what it
3  does is it never reports the
4  actual individualized data of the
5  trial.
6    So, for example, here's a
7  chance that since Merck hadn't
8  published the data for study 090,
9  why not present it here.
10    MR. GOLDMAN:  Objection,
11  move to strike.
12 BY MR. KLINE:
13    Q.  They're his consultant, he's
14  their consultant; right?
15    MR. GOLDMAN:  I'm sorry.
16  Objection, move to strike,
17  nonresponsive.
18    THE WITNESS:  All the other
19  doctors are Merck employees on the
20  paper except for Dr. Konstam, who
21  is a consultant.  But the
22  important thing is, they don't
23  present the individual trial data.
24  And this is the thing that's

KS-000286

Page 614

1    grossly overlooked.
2        They present, just as Mr.
3    Goldman reviewed earlier, that
4    1.69 risk, that's 169 percent,
5    comparing Vioxx with naproxen.
6    So, what's striking here is that
7    they show statistical
8    significance, they basically
9    confirm the VIGOR paper, they
10   confirm study 090, and they
11   basically are then trying to
12   conclude that there isn't a
13   problem, when it's statistically
14   significant, 169 percent excess of
15   risk.
16   BY MR. KLINE:
17       Q.   How do you do that?  How do
18   you do tat?
19       MR. GOLDMAN:  Objection.
20   BY MR. KLINE:
21       Q.   How do you get to that
22   result?
23       MR. GOLDMAN:  Objection.
24       THE WITNESS:  I just can't

Page 615

1    imagine.
2    BY MR. KLINE:
3        Q.   And this is the same Dr.
4    Konstam who was an independent consultant
5    and -- I'm sorry, Dr. Konstam, who was a
6    consultant, and a member of the DSMB,
7    which is supposed to be neutral?
8        MR. GOLDMAN:  Objection.
9        THE WITNESS:  That's
10   correct.  On the approved DSMB.
11   BY MR. KLINE:
12       Q.   How can that be?
13       MR. GOLDMAN:  Objection.
14       THE WITNESS:  I don't know.
15   BY MR. KLINE:
16       Q.   Is that, once again, like
17   the coach from one team wearing the
18   striped shirt?
19       MR. GOLDMAN:  Objection.
20       THE WITNESS:  It's certainly
21   in my mind irregular.
22   BY MR. KLINE:
23       Q.   Sir, I want to again --
24       MR. KLINE:  How much time do

Page 616

1        I have, sir?
2        THE VIDEOTAPE TECHNICIAN:
3    Four minutes.
4        MR. KLINE:  Four minutes.
5    Anyone who is watching this will
6    be happy to know that, probably
7    Dr. Topol the most, who is not
8    watching, but participating.
9    BY MR. KLINE:
10       Q.   I want to do something
11   quick.
12       This whole issue about they
13   gave you, whether you received or
14   remembered getting comments from Merck,
15   and it appears that you now do now that
16   you were shown a document from four years
17   ago.  Does that change anything here,
18   sir?
19       MR. GOLDMAN:  Objection.
20       THE WITNESS:  Well, I mean,
21   I think the important thing is the
22   reason I had forgotten ever
23   getting the comments was because
24   it was after we had already

Page 617

1    finalized the paper and the galley
2    proofs, and so I just never
3    factored any of that in.  And so I
4    forgot it because I probably never
5    even opened up the e-mail, the
6    attachment, frankly.
7    BY MR. KLINE:
8        Q.   Does it change your opinions
9    or your views?
10       MR. GOLDMAN:  Objection,
11   move to strike, nonresponsive.
12       THE WITNESS:  It doesn't
13   change my views whatsoever.  That
14   is completely immaterial.
15   BY MR. KLINE:
16       Q.   Did they come out to see you
17   anyway, met you face-to-face?  Did you
18   give them an audience?
19       A.   I certainly gave them --
20       Q.   Did you get an audience with
21   Ray Gilmartin when you asked for one?
22       A.   No.  Mr. Gilmartin never
23   returned the calls.
24       Q.   But you gave them an

KS-000287

Page 618

```
1   audience?
2       A.   I even offered to go to
3   Whitehouse Station and meet with Mr.
4   Gilmartin, meet with Dr. Kim.  They
5   wouldn't even allow me to go visit.
6       Q.   Maybe they were busy.
7           MR. GOLDMAN:  Objection.
8   BY MR. KLINE:
9       Q.   Do you think so?
10      A.   I don't know.  They didn't
11  want to talk about it.
12      Q.   Two more areas, and they are
13  going to both be about two minutes, I
14  promised counsel.
15          The first one is Temple.
16      A.   Yes.
17      Q.   They showed you one letter,
18  that letter that the editor -- where
19  Temple was critical of you.  Do you
20  remember?
21      A.   Yes.
22      Q.   All right.
23          First of all, that letter
24  was submitted to JAMA; correct?
```

Page 619

```
1       A.   And it was rejected by JAMA.
2       Q.   It wasn't even an article?
3           MR. GOLDMAN:  Objection,
4       move to strike, nonresponsive.
5   BY MR. KLINE:
6       Q.   It was a letter; correct?
7       A.   That's right.
8               - - -
9           (Whereupon, Deposition
10      Exhibit Topol-53, Letter
11      12-17-01, TOPOLE 0000511, was
12      marked for identification.)
13              - - -
14  BY MR. KLINE:
15      Q.   He sends a letter to JAMA,
16  and JAMA sends him back a polite letter
17  saying no thanks; correct?
18      A.   That's right.
19          MR. GOLDMAN:  Objection.
20  BY MR. KLINE:
21      Q.   It takes a lot to get an
22  article published in a medical journal
23  like JAMA; correct?
24      A.   That's correct.
```

Page 620

```
1       Q.   It takes much less to get a
2   letter published; correct?
3       A.   Less, but it's still not
4   easy, yes.
5       Q.   They didn't publish his
6   letter?
7       A.   That's right.
8       Q.   Now, what you weren't shown
9   by Merck -- by the way, have you ever
10  heard the term, sir, "cherry picking
11  data"?
12          MR. GOLDMAN:  Objection.
13          THE WITNESS:  Yes, I
14      certainly have.
15  BY MR. KLINE:
16      Q.   And "cherry picking
17  documents"?
18      A.   Yes.
19      Q.   When you were examined here
20  today, sir, did you see some of that
21  right before your eyes?
22          MR. GOLDMAN:  Objection.
23          THE WITNESS:  Some of the
24      best examples I've seen in my
```

Page 621

```
1       career were today, yes.
2   BY MR. KLINE:
3       Q.   When you were asked
4   questions by Merck; correct?
5       A.   That's correct.
6           MR. GOLDMAN:  Objection.
7   BY MR. KLINE:
8       Q.   Was that exemplar of the
9   kind of conduct that you also saw with
10  them in their clinical trials, sir?
11          MR. GOLDMAN:  Objection.
12          THE WITNESS:  Well, what it
13      is is an ice pick view of the data
14      and not looking at the texture and
15      the whole pattern.  That's what
16      being an open minded, objective
17      clinical trialist and clinical
18      development is all about.
19  BY MR. KLINE:
20      Q.   And in fact, early on, sir,
21  were you about as tepid and about as --
22  tepid is the wrong word.
23          Were you about as open
24  minded as you can be when you wrote that
```

**KS-000288**

156 (Pages 618 to 621)

Page 622

1    JAMA article in 2001?
2        A.   Basically we tried to tone
3    it down.  We didn't want to engender any
4    scare.  We just basically wanted to
5    register the concern.  And we actually
6    thought, because in the prior year of
7    Merck they had been quite diligent, we
8    thought they would follow up and do the
9    right trial and do the right thing.
10          MR. GOLDMAN:  Objection,
11   move to strike, nonresponsive.
12   BY MR. KLINE:
13       Q.   Temple wrote to you -- I
14   have this, and I have one more document
15   and I'm done.
16               -  -  -
17          (Whereupon, Deposition
18       Exhibit Topol-54, Letter 1-7-02,
19       TOPOLE 0000456 - TOPOLE 0000457,
20       was marked for identification.)
21               -  -  -
22   BY MR. KLINE:
23       Q.   Temple wrote to you a
24   letter, correspondence, and you wrote

Page 623

1    back to him?
2        A.   Yes.
3        Q.   You had a good relationship
4    with Temple?
5        A.   An excellent relationship
6    with Dr. Temple.
7        Q.   Do you still?
8        A.   I haven't talked to him in a
9    while, but I hope so, yes.
10       Q.   Did you have a healthy,
11   constructive-type, scientific dialogue
12   with him?
13       A.   Yes, we did.
14       Q.   And was it an open dialogue?
15       A.   Yes, it was.
16          MR. GOLDMAN:  Tom, can I
17   have a standing objection to the
18   use --
19          MR. KLINE:  Yes.
20          MR. GOLDMAN:  I'm sorry.
21       -- to the use of a document
22   that you never used before.
23          MR. KLINE:  Yes.  But it's
24   the document that he asked to see

Page 624

1        when you -- in his testimony, and
2    you wouldn't show it to him, but
3    you have an objection.
4    BY MR. KLINE:
5        Q.   Yes, sir.
6          Tell us what this document
7    said and what the gist of this was --
8        A.   Well, I was --
9        Q.   -- what I call the full
10   story?
11       A.   Right.  I had tried to
12   introduce this earlier, because it was
13   that ice picked view, if you want to talk
14   about cherry picking one letter or one
15   sentence.  But here was a letter of my
16   response to Dr. Temple addressing all of
17   his concerns.  And then he responded to
18   me yet again.
19       Q.   Oh, yeah.
20          MR. GOLDMAN:  Objection.
21          THE WITNESS:  And this was a
22   very important short letter that
23   he sent me.
24   BY MR. KLINE:

Page 625

1        Q.   Is that the letter where he
2    said, "Dear Eric," Exhibit Number --
3          MS. DAGOSTINO:  55.
4               -  -  -
5          (Whereupon, Deposition
6       Exhibit Topol-55, Letter 2-5-02,
7       TOPOLE 0000452, was marked for
8       identification.)
9               -  -  -
10   BY MR. KLINE:
11       Q.   -- 55.  "Thanks for the
12   note.  I assure you I am not a devotee of
13   the 'naproxen is good, we're not bad'
14   hypothesis.  But as a card-carrying
15   empiricist, I am not prepared to
16   guarantee that all COX-2 selective agents
17   are the same, any more than all
18   non-selective NSAIDs are.  I just thought
19   using the meta-analytic placebo data was
20   beyond 'strained' and inappropriate.  I
21   still do."
22          So, you and he have a
23   difference of agreement?
24       A.   Yes.

**KS-000289**

157 (Pages 622 to 625)

Page 626

```
1        And he goes on to say,
2   "You're correct, of course, about the
3   Merck study," which is the VIGOR trial we
4   wrote about.
5        And Dr. Temple has said to
6   me before he wrote this letter, since
7   this letter, that he was very worried
8   about the VIGOR trial, and I had
9   expressed to him I was surprised that the
10  FDA didn't do more, knowing their
11  concerns.
12       MR. GOLDMAN: Objection,
13       move to strike, nonresponsive.
14  BY MR. KLINE:
15       Q.   Hang on a second.  He said
16  -- put that right back in front of you.
17  It's now up in front of the jury.
18       He said two things to you.
19  He is "not a devotee of the 'naproxen is
20  good, we're not bad'" thing.  That's one
21  thing he told you; correct?
22       MR. GOLDMAN:  Objection.
23       THE WITNESS:  That is
24       basically like I was saying, the
```

Page 627

```
1   naproxen hypotheses is untenable.
2   BY MR. KLINE:
3        Q.   Right.  Is it a correct
4   position to be a devotee of the naproxen
5   hypothesis, sir?
6        MR. GOLDMAN:  Objection.
7        THE WITNESS:  I was
8        surprised by the term.
9   BY MR. KLINE:
10       Q.   Would those people be
11  somewhere in the -- if you're a devotee,
12  would that be someone who is looking in
13  the wrong direction for the answer?
14       MR. GOLDMAN:  Objection.
15       THE WITNESS:  Well, I mean,
16       that's certainly one
17       interpretation.
18  BY MR. KLINE:
19       Q.   And he says here, "You're
20  correct...about the Merck study."  The
21  bottom line of the bottom line of the
22  answer back to you is, "You're correct...
23  about the Merck study."  Correct?
24       MR. GOLDMAN:  Objection.
```

Page 628

```
1        THE WITNESS:  Right.  And I
2   was --
3   BY MR. KLINE:
4        Q.   And your bottom line was,
5   "Only more data will get the answer," and
6   that was his bottom line?
7        MR. GOLDMAN:  Objection.
8        THE WITNESS:  That's right.
9        But he had more of a way to push
10       for it than I did.
11  BY MR. KLINE:
12       Q.   Yes, because he's in the
13  FDA?
14       MR. GOLDMAN:  Objection.
15       THE WITNESS:  Yes.
16  BY MR. KLINE:
17       Q.   You're sitting out here in
18  Cleveland?
19       A.   Right.  And we have no
20  authority, and we did the best we could.
21       Q.   Right.  Voice in the
22  wilderness?
23       MR. GOLDMAN:  Objection.
24  BY MR. KLINE:
```

Page 629

```
1        Q.   Correct?
2        A.   That's correct.
3        Q.   Voice in the wilderness.
4        MR. GOLDMAN:  Objection.
5   BY MR. KLINE:
6        Q.   Last point, very last point.
7   This is the last thing, I promise.  It's
8   four, five, six questions, and I go over
9   a half a minute, and here it goes.
10       You talked about Pasternak,
11  you were cross-examined about Pasternak.
12  Remember that?
13       MR. GOLDMAN:  No, he wasn't.
14       MR. KLINE:  Yeah.  It came
15  up during the examination.
16       MR. GOLDMAN:  No, it didn't.
17       MS. DAGOSTINO:  He mentioned
18  it during direct.  It took --
19       MR. GOLDMAN:  You mentioned
20  it, I didn't.
21       MS. DAGOSTINO:  We could not
22  get this document.
23       THE VIDEOTAPE TECHNICIAN: I
24  need to change the tape.
```

**KS-000290**

Page 630

1      MR. KLINE: Oh, this is the
2  document we couldn't get. This is
3  the document we couldn't get.
4      Yes, change the tape,
5  please.
6      THE VIDEOTAPE TECHNICIAN:
7  Off the record at 7:09.
8      - - -
9      (Whereupon, a recess was
10  taken from 7:09 p.m. until 7:11
11  p.m.)
12      - - -
13      THE VIDEOTAPE TECHNICIAN:
14  Back on the record at 7:11.
15      MR. KLINE: Here we go.
16  We'll give it to you in a second.
17  We'll give it to you like when
18  Merck would give it to you. Same
19  thing.
20  BY MR. KLINE:
21      Q.  Sir, do you remember that
22  you testified -- this is my last area of
23  questioning. I've heard cheers.
24      You testified on direct

Page 631

1  examination, and we couldn't find this
2  document, that on the day of the
3  withdrawal of the drug, September 30,
4  '04, you received a call from Richard
5  Pasternak at Merck, and he said to you,
6  you were right.
7      MR. GOLDMAN: Objection.
8  BY MR. KLINE:
9      Q.  Do you remember?
10      A.  I remember it very well.
11      Q.  Okay.
12      Did you know whether there
13  was actually confirmation of what he told
14  you in Merck documents?
15      MR. GOLDMAN: Objection.
16      THE WITNESS: I would never
17  have known that. I wouldn't have
18  any access to Merck documents.
19  BY MR. KLINE:
20      Q.  Okay.
21      Now, your editorial in the
22  New York Times, sir, was forwarded around
23  at Merck. Did you know that?
24      A.  I had no idea of that.

Page 632

1      Q.  It wouldn't surprise you,
2  would it?
3      MR. GOLDMAN: Objection.
4      THE WITNESS: I guess not.
5  BY MR. KLINE:
6      Q.  And you got the attention of
7  everyone from Ken Frazier, the legal
8  counsel, to Peter Kim, the chief of the
9  Merck Laboratories. See, they were
10  reading. How about that?
11      A.  (Witness nods.)
12      MR. GOLDMAN: Objection.
13      - - -
14      (Whereupon, Deposition
15  Exhibit Topol-56, E-mails,
16  MRK-AAC0152575 - MRK-AAC0152576,
17  was marked for identification.)
18      - - -
19  BY MR. KLINE:
20      Q.  And then there was an e-mail
21  to -- an e-mail from a woman, Elizabeth
22  Stoner, to Pasternak, and then from
23  Pasternak back to Stoner.
24      MR. KLINE: We can give it

Page 633

1  to you, and we'll give it to the
2  Merck lawyer.
3      MR. GOLDMAN: Can I have an
4  objection to you using a document
5  that was never used before?
6      MR. KLINE: No. It was used
7  on direct, and we had said and
8  agreed that it was part of the
9  Pasternak thing. We couldn't get
10  it printed or found.
11      MR. GOLDMAN: During your
12  direct, not on my direct.
13      MR. KLINE: Yes, I agree
14  with you. I will take my changes
15  that a judge will --
16      MS. DAGOSTINO: You brought
17  the name up during direct.
18      MR. KLINE: I did. We
19  couldn't find the document then.
20  It's one document.
21  BY MR. KLINE:
22      Q.  Here goes, sir.
23      The e-mail says -- this is a
24  couple of days after you talked to him.

KS-000291

Page 634

1    "The wrath" --
2         By the way, the e-mails, Dr.
3 Topol, are very colorful at Merck.  They
4 pride themselves on colorful e-mails.
5         MR. GOLDMAN:  Tom --
6 BY MR. KLINE:
7    Q.   And --
8         MR. GOLDMAN:  Tom --
9         MR. KLINE:  Yes, sir.
10         MR. GOLDMAN:  Let me
11 interrupt you.  You are six
12 minutes over.
13         MR. KLINE:  Yes.
14         MR. GOLDMAN:  And are you
15 going to do me the courtesy of
16 allowing me to ask some followup
17 questions?
18         MR. KLINE:  No, sir.
19         MR. GOLDMAN:  What?
20         MR. KLINE:  No.
21         MR. GOLDMAN:  Then you are
22 not going to ask any questions --
23 BY MR. KLINE:
24    Q.   "The wrath of a lover" --

Page 635

1         MR. GOLDMAN:  Your time is
2 up.
3 BY MR. KLINE:
4    Q.   "The wrath of a lover"
5 scorned.
6         MR. GOLDMAN:  Tom, your time
7 is up.  It's six minutes over.
8 BY MR. KLINE:
9    Q.   "The wrath of a lover"
10 scorned.  "Instead of starting at
11 baseline (with Eric), I'll have to start
12 in the basement.  Nevertheless, I think
13 it is worth starting again with him for
14 two reasons:  (1) people listen to him."
15 That's you?
16         MR. GOLDMAN:  Objection.
17 BY MR. KLINE:
18    Q.   "(2) we," Merck, "have
19 something to learn."
20    A.   Uh-huh.
21         MR. GOLDMAN:  Objection.
22 BY MR. KLINE:
23    Q.   Did you know that existed?
24    A.   I had no idea.  It's

Page 636

1 gratifying to see that at least one
2 person at Merck was positive and open-
3 minded.
4         MR. GOLDMAN:  Objection,
5 move to strike.
6 BY MR. KLINE:
7    Q.   They didn't listen to you
8 before the drug was withdrawn, did they?
9         MR. GOLDMAN:  Tom, you are
10 over.
11         THE WITNESS:  They didn't
12 listen to our concerns for years.
13         MR. KLINE:  Thank you, sir.
14 Thank you --
15         MR. GOLDMAN:  Objection,
16 move to strike as nonresponsive.
17         MR. KLINE:  Thank you for
18 being of assistance.
19         MR. GOLDMAN:  Because Mr.
20 Kline asked questions about
21 documents and brought up issues
22 that were not brought up on my
23 cross, I do have some questions
24 about Mr. Kline's additional

Page 637

1 areas.  Can I ask --
2         MR. KLINE:  The only area
3 that I brought up that you didn't
4 cover was this area with
5 Pasternak, and you are correct,
6 that you have -- that at least in
7 my view, I don't know what Merck's
8 counsel's view is, you have a
9 right to cross-examine there.
10 Everything else was within right
11 square in the scope of redirect.
12         But I do agree on the
13 Pasternak memo, the lover scorned
14 memo, the "you were right memo,"
15 that you have a right to question
16 if you'd like to.
17         MR. GOLDMAN:  Is that the
18 only area you're going to allow me
19 to --
20         MR. KLINE:  Yes, absolutely.
21         MR. GOLDMAN:  -- ask some
22 questions about?
23         MR. KLINE:  Yes, absolutely.
24         MR. GOLDMAN:  Is that true

**KS-000292**

Page 638

| | |
|---|---|
| 1 | for Dr. Topol's counsel too? |
| 2 | MR. HAMELINE: We're here |
| 3 | because we were subpoenaed. We're |
| 4 | not part and parcel of the rules |
| 5 | and regulations in the MDL. If |
| 6 | you want to go ahead and ask about |
| 7 | Exhibit 56, why don't you go |
| 8 | ahead. Let's get those questions |
| 9 | on the record, and then we'll take |
| 10 | a break and talk about whatever |
| 11 | else you want to ask about. But |
| 12 | it is 7:15. It's been a very long |
| 13 | day. |
| 14 | MR. GOLDMAN: I'm not going |
| 15 | to talk about Exhibit 57 or |
| 16 | whatever the -- |
| 17 | MR. HAMELINE: 56. |
| 18 | MR. GOLDMAN: 56. But there |
| 19 | are several other documents and |
| 20 | several other things that Dr. |
| 21 | Topol said that I would like to |
| 22 | get into, and we can raise this |
| 23 | with the judge later, but I'm |
| 24 | going to object to most of Mr. |

Page 639

| | |
|---|---|
| 1 | Kline's examination as beyond the |
| 2 | scope, and until I have an |
| 3 | opportunity to do recross, and |
| 4 | that may have to happen at a later |
| 5 | time, so, I'm going to leave the |
| 6 | deposition open. |
| 7 | MR. KLINE: I'll take my |
| 8 | chances with the judge. |
| 9 | Everything is within the fair |
| 10 | scope of cross-examination -- |
| 11 | redirect. We're done. |
| 12 | MR. HAMELINE: Do you want |
| 13 | to make a proffer as to what |
| 14 | documents you would ask about or |
| 15 | what topics they are? |
| 16 | MS. VANCE: Let's have a |
| 17 | list of what the -- |
| 18 | MR. GOLDMAN: Each of the |
| 19 | exhibits that Mr. Kline used in |
| 20 | his redirect that he did not use |
| 21 | in his direct examination. |
| 22 | MR. KLINE: Those exhibits |
| 23 | were clearly -- |
| 24 | MR. HAMELINE: Let him |

Page 640

| | |
|---|---|
| 1 | finish. |
| 2 | MR. KLINE: I'm sorry. I |
| 3 | thought you were done, Andy. I |
| 4 | apologize. |
| 5 | MR. GOLDMAN: No. |
| 6 | And testimony about those. |
| 7 | MR. KLINE: Those exhibits |
| 8 | were merely redirect of areas |
| 9 | which were left wide open, and |
| 10 | each occasion I basically said, |
| 11 | Dr. Topol, you were shown this but |
| 12 | you weren't shown that. |
| 13 | In the case of the Temple |
| 14 | letter, he himself said, may I |
| 15 | show you the Temple letter. |
| 16 | In the case of the Targum |
| 17 | memo, he said, I want to talk |
| 18 | about the Targum memo. |
| 19 | In the case of -- you made a |
| 20 | big point that he, himself, |
| 21 | conceded that they were |
| 22 | unexpected, and the fact of the |
| 23 | matter is, that they were |
| 24 | documents that Merck had that he |

Page 641

| | |
|---|---|
| 1 | had never seen, which, frankly, I |
| 2 | had to impeach him on and change |
| 3 | his opinion that he would have |
| 4 | known -- he only wishes he knew |
| 5 | differently. |
| 6 | So, I respectfully, Andy, |
| 7 | disagree with you. In my view, |
| 8 | we're done. If you think you can |
| 9 | convince a judge to the contrary, |
| 10 | I guess it will be on my dime to |
| 11 | come back to Cleveland. But I'm |
| 12 | done. |
| 13 | Dr. Topol, thank you, sir. |
| 14 | MS. VANCE: Is there |
| 15 | anything else, Andy? |
| 16 | MR. GOLDMAN: Nothing else. |
| 17 | MR. HAMELINE: Again, we're |
| 18 | here because we were subpoenaed. |
| 19 | We're a third party. I don't want |
| 20 | to be involved in the dispute over |
| 21 | timing and issues. I see what's |
| 22 | in the court order, and I guess |
| 23 | it's an issue of whether the judge |
| 24 | is going to let the additional |

KS-000293

Page 642

1    redirect in or not.  That's the
2    way I look at this.  So,
3    therefore, I think we're done.
4    It's been a very long day.
5         MR. KLINE:  Thank you, sir.
6         MR. HAMELINE:  Thank you
7    very much.
8         MR. KLINE:  Thank you for
9    your cooperation.  Dr. Topol,
10   thank you.
11        We're off the video record.
12        THE VIDEOTAPE TECHNICIAN:
13   Off the record at 7:18.
14             - - -
15        (Whereupon, the deposition
16   concluded at 7:18 p.m.)
17             - - -
18
19
20
21
22
23
24

Page 644

1         ACKNOWLEDGMENT OF DEPONENT
2         I,_____, do
3    hereby certify that I have read the
4    foregoing pages,  1 - 642, and that the
5    same is a correct transcription of the
6    answers given by me to the questions
7    therein propounded, except for the
8    corrections or changes in form or
9    substance, if any, noted in the attached
10   Errata Sheet.
11
12
13
14   _____
15   ERIC J. TOPOL, M.D.              DATE
16
17   Subscribed and sworn
18   to before me this
19      day of        , 20   .
20
21   My commission expires:
22
23
24   Notary Public

Page 643

1    C E R T I F I C A T E
2
3
4         I, LINDA L. GOLKOW, a Notary
     Public and Certified Shorthand Reporter
5    of the State of New Jersey, do hereby
     certify that prior to the commencement of
6    the examination, ERIC J. TOPOL, M.D. was
     duly sworn by me to testify to the truth,
7    the whole truth and nothing but the
     truth.
8
9
         I DO FURTHER CERTIFY that the
10   foregoing is a verbatim transcript of the
     testimony as taken stenographically by
11   and before me at the time, place and on
     the date hereinbefore set forth, to the
12   best of my ability.
13
14        I DO FURTHER CERTIFY that I am
     neither a relative nor employee nor
15   attorney nor counsel of any of the
     parties to this action, and that I am
16   neither a relative nor employee of such
     attorney or counsel, and that I am not
17   financially interested in the action.
18
19
20
     _____
21   LINDA L. GOLKOW, CSR
     Notary Number:  1060147
22   Notary Expiration:  1-2-08
     CSR Number:  30XI176200
23
24

Page 645

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

KS-000294

Page 646

```
1        - - - - - -
           E R R A T A
2        - - - - - -
3   PAGE  LINE  CHANGE
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
```

Page 647

```
1        LAWYER'S NOTES
2   PAGE  LINE
3   ____  ____  _____
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
```

KS-000295