Exhibit "33"

Confidential - Subject to Protective Order

Page 1

1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF LOUISIANA
2                     -   -   -
     IN RE:  VIOXX         :   MDL DOCKET NO.
3    LITIGATION            :   1657
4    ------------------------------------------
     SUPERIOR COURT OF THE STATE OF CALIFORNIA
5            COUNTY OF LOS ANGELES
               CENTRAL CIVIL WEST
6
     VIOXX CASES           :   JCCP NO. 4247
7                          :   ASSIGNED TO HON
                           :   VICTORIA CHEYNEY
8                     -   -   -
                    CONFIDENTIAL
9         SUBJECT TO PROTECTIVE ORDER
                      -   -   -
10                  May 9, 2006
                      -   -   -
11        Videotape deposition of DAVID J.
12   GRAHAM, M.D., M.P.H, held at The
13   Renaissance Mayflower Hotel, 1127
14   Connecticut Avenue, N.W., Washington,
15   D.C. 20036, commencing at 9:23 a.m., on
16   the above date, before Linda L. Golkow, a
17   Federally-Approved Registered Diplomate
18   Reporter and Certified Shorthand
19   Reporter.
                      -   -   -
20
21        GOLKOW LITIGATION TECHNOLOGIES
                Four Penn Center
22        1600 John F. Kennedy Boulevard
                   Suite 1210
23        Philadelphia, Pennsylvania 19103
                  877.DEPS.USA
24

**KS-000300**

Confidential - Subject to Protective Order

Page 2

```
1  A P P E A R A N C E S :
2
3     KLINE & SPECTER, P.C.
         BY:  THOMAS R. KLINE, ESQUIRE
4            and
         LEE B. BALEFSKY, ESQUIRE
5            and
         LISA DAGOSTINO, M.D., J.D.
6            and
         MICHELLE L. TIGER, ESQUIRE
7         (Via Telephone)
      19th Floor - 1525 Locust Street
8     Philadelphia, Pennsylvania 19102
      (215) 772-1000
9     Counsel for Plaintiffs
10
11    SEEGER WEISS LLP
         BY:  DAVID R. BUCHANAN, ESQUIRE
12           and
         MOSHE H. HORN, ESQUIRE
13           and
         JEFFREY GRAND, ESQUIRE
14        (Via Telephone)
      Suite 920 - 550 Broad Street
15    Newark, New Jersey 07102
      (973) 639-9100
16    Counsel for Plaintiffs
17
18    ASHCRAFT & GEREL
         BY:  CHRISTOPHER TISI, ESQUIRE
19           and
         MICHELLE A. PARFITT, ESQUIRE
20           and
         JENNIFER L. ORENDI, ESQUIRE
21    Suite 400 - 2000 L Street, N.W.
      Washington, D.C. 20036
22    (202) 783-6400
      Counsel for Plaintiffs
23
24         - - -
```

Page 3

```
1  A P P E A R A N C E S : (CONTINUED)
2
3     HERMAN, HERMAN, KATZ & COTLAR
         BY:  LEONARD A. DAVIS, ESQUIRE
4     201 St. Charles Avenue
      Suite 4310
5     New Orleans, Louisiana 70170
      (504) 581-4892
6     Counsel for the Plaintiffs
7
8     LEVIN SIMES & KAISER & GORNICK LLP
         BY:  STEVEN B. STEIN, ESQUIRE
9     14th Floor
      One Bush Street
10    San Francisco, California 94104
      (415) 646-7160
11    sbs@lskg-law.com
      Counsel for California Plaintiffs
12
13
14    BLIZZARD, McCARTHY & NABERS, LLP
         BY:  J. SCOTT NABERS, ESQUIRE
      Suite 1710
15    440 Louisiana Street
      Houston, Texas 77002
16    (713) 844-3750
      Counsel for Plaintiffs
17
18
19    LOPEZ, HODES, RESTAINO, MILMAN,
      SKIKOS & POLOS
         BY:  JOHN M. RESTAINO, JR., ESQ.
20    2nd Floor
      450 Newport Center Drive
21    Newport Beach, California 92660
      (949) 640-8222
22    Counsel for Plaintiffs
23
24         - - -
```

Page 4

```
1  A P P E A R A N C E S : (CONTINUED)
2
3     HAGENS BERMAN SOBOL SHAPIRO LLP
         BY:  HUGH E. MCNEELY, ESQUIRE
4     Fourth Floor - One Main Street
      Cambridge, Massachusetts 02142
5     (617) 482-3700
      hugh@hbsslaw.com
6     Counsel for California
      Plaintiffs
7
8
9     MARTIN & JONES
         BY:  MARTIN A. RAMEY, ESQUIRE
      Suite 200
10    410 Glenwood Avenue
      Raleigh, North Carolina 27603
11    (919) 821-0005
      mar@m-j.com
12    Counsel for New Jersey
      Plaintiffs
13
14
15    AYLSTOCK, WITKIN & SASSER
         BY:  KENNETH W. SMITH, ESQUIRE
      Suite 200
16    2121 Eisenhower Avenue
      Alexandria, Virginia 22314
17    (703) 778-5978
      ksmith@aws-law.com
18    Counsel for Plaintiffs
19
20    ALEXANDER HAWES & AUDET LLP
         BY:  SUSANNE N. SCOVERN, ESQUIRE
21    Suite 1460
      221 Main Street
22    San Francisco, California 94105
      Counsel for Plaintiffs
23
24         - - -
```

Page 5

```
1  A P P E A R A N C E S : (CONTINUED)
2
3     GOFORTH LEWIS SANFORD LLP
         BY:  SHELLY A. SANFORD, ESQUIRE
4     Suite 2200 - 1111 Bagby
      Houston, Texas 77002
5     (713) 650-0022
      Counsel for Plaintiffs
6      (Via Telephone)
7
8     THE O'QUINN LAW FIRM
         BY:  STEPHANIE SHAPIRO, ESQUIRE
9     2300 Lyric Centre Building
      Houston, Texas 77002
10    (713) 223-1000
      Counsel for the Plaintiffs
11     (Via Telephone)
12
13    BARTLIT BECK HERMAN
         BY:  PHILIP S. BECK, ESQUIRE
14           and
         SHAYNA COOK, ESQUIRE
15           and
         KEN BAUM, M.D., ESQUIRE
16    Courthouse Place
      54 West Hubbard Street
17    Chicago, Illinois 60610
      (312) 494-4451
18    Counsel for Merck and Co., Inc.
19
20    WILLIAMS & CONNOLLY LLP
         BY:  DOUGLAS R. MARVIN, ESQUIRE
21           and
         R. HACKNEY WIEGMANN, ESQUIRE
22    725 Twelfth Street, N.W.
      Washington, D.C. 20005
23    (202) 434-5400
      Counsel for Merck & Company, Inc.
24         - - -
```

**KS-000301**

Confidential - Subject to Protective Order

Page 6

1  a P P E A R A N C E S:  (CONTINUED)
2
3     STINNETT THIEBAUD & REMINGTON LLP
        BY:  RUSSELL G. THORNTON, ESQUIRE
4       Suite 2500
        1445 Ross Avenue
5       Dallas, Texas 75202
        (214) 954-2200
6       Counsel for Texas physicians
7
8     CRUSE, SCOTT, HENDERSON & ALLEN,
      LLP
9       BY:  VICTORIA A. FILIPPOV, ESQUIRE
        7th Floor
10      2777 Allen Parkway
        Houston, Texas 77019-2133
11      (713) 650-6600
        Counsel for Texas physicians
12
13              - - -
14
15  A L S O  P R E S E N T:
16
17    GOVERNMENT ACCOUNTABILITY PROJECT
        BY:  JOANNE ROYCE, ESQUIRE
18          and
          MARK COHEN, ESQUIRE
19      Suite 1100
        1612 K Street, N.W.
20      Washington, D.C. 20006
        (202) 408-0034
21      Counsel for David Graham,
        M.D., M.P.H.
22
23
24

Page 7

1  A L S O  P R E S E N T:  (CONTINUED)
2
3     U.S. DEPARTMENT OF HEALTH AND
      HUMAN SERVICES
4     OFFICE OF THE GENERAL COUNSEL
        BY:  MARC L. CADEN, ESQUIRE
5          and
        MICHAEL LEVY, ESQUIRE
6       Office of the Chief Counsel
        Food and Drug Administration
7       5600 Fishers Lane, GCF-1
        Rockville, Maryland 20857
8       (301) 827-7141
        Counsel for the Food & Drug
9       Administration
10
11    UNITED STATES DEPARTMENT OF
      JUSTICE
12      BY:  GERALD C. KELL, ESQUIRE
        Office of Consumer Litigation
13      P.O. Box 386
        Washington, D.C. 20044
14      (202) 514-1586
        Counsel for the Food & Drug
15      Administration
16
17    KIRKE D. WEAVER, ESQUIRE
        Merck & Co., Inc.
18      351 N. Sumneytown Pike
        North Wales, PA 19454-2505
19      (267) 305-6331
20
21    KLINE & SPECTER
      ROBERT ENGLERT, Legal Assistant
22
              - - -
23
24

Page 8

1              - - -
2            I N D E X
3  WITNESS              PAGE NO.
4
5  DAVID J. GRAHAM, M.D., MPH
6
7     By Mr. Kline        33, 460
8     By Mr. Beck         227
9
10             - - -
11           E X H I B I T S
12  NO.      DESCRIPTION     PAGE NO.
13
14  Graham-1    Curriculum Vitae of  47
              David Graham
15
16  Graham-2    "Drug Safety in     89
              America: A Nation
              Still at Risk,"
17            (Graham) Power
              Point Slides
18            DG000035 - DG000061
19
20  Graham-3    "Rofecoxib         172
              Diagnosis and
              Treatment: What
21            went wrong?  Can we
              avoid?" (Graham)
22            PowerPoint Slides,
              DG000014 - DG000034
23
24

Page 9

1   Graham-4    "Risk of acute     195
              myocardial
2             infarction and
              sudden cardiac
3             death in patients
              treated with
4             cyclo-oxygenase 2
              selective and
5             non-selective
              non-steroidal
6             anti-inflammatory
              drugs: nested
7             case-control study"
              (Graham, et al) The
8             Lancet 2-5-05 Vol.
              365, 475-481
9
10  Graham-5    "Review of         197
              Epidemiologic
11            Cardiovascular Risk
              with Selected
12            NSAIDs," (Graham)
              PowerPoint Slides,
13            2-17-05
              DG0000107-DG0000127
14
15  Graham-6    Letter 5-5-06      232
              (1 page)
16
17  Graham-7    E-mails            235
              (2 pages)
18
19  Graham-8    "COX-2 selective   253
              non-steroidal
20            anti-inflammatory
              drugs and
21            cardiovascular
              disease," (Ray, et
22            al) Pharmacology
              and Drug Safety
23            2003; 12: 67-70
24

KS-000302

Confidential - Subject to Protective Order

Page 10

1  Graham-9  "High frequency of  258
2          use of rofecoxib at
3          greater than
           recommended doses:
4          Cause for concern,"
           (Griffin, et al)
5          Pharmacoepidemiolog
           y and Drug Safety
6          2004; 13: 339-343
7  Graham-10  "Cohort Analysis  279
8          Myocardial
           Infarction Risk and
9          COX2 Use in the
           Kaiser Large
10         Observational
           Thrombosis Study
11         (KLOTS) (Levy, et
           al) ACR Abstract
12         (1 page)
13 Graham-11  "Risk of Acute  288
14         Cardiac Events
           Among Patients
15         Treated with
           Cycloxygenase-2
16         Selective and
           Non-Selective-
17         Nonsteroidal
           Anti-Inflammatory
18         Drugs Category: 06
           Osteoarthritis
19         clinical aspects"
           American College of
20         Rheumatology
           Abstract
21         (1 pages)
22 Graham-12  E-mail 5-25-04  292
23         KP002153
24

Page 11

1  Graham-13  "Risk of Acute  296
2          Myocardial
           Infarction and
3          Sudden Cardiac
           Death with Use of
4          COX-2 Selective and
           Non-Selective
5          NSAIDs" (Graham, et
           al)
6          KP001521 - KP001526
7  Graham-14  E-mails with  305
8          attachment
           "Comments on ISPE
9          Paper"
           FDACDER006048 -
10         FDACDER006049
11 Graham-15  E-mails  313
12         FDACDER011048 -
           FDACDER011049
13
14 Graham-16  E-mails  321
           FDACDER006056 -
15         FDACDER006058
16 Graham-17  E-mails  325
17         FDACDER021810 -
           FDACDER021811
18
19 Graham-18  E-mails  328
           FDACDER010352 -
20         FDACDER010353
21
22
23
24

Page 12

1  Graham-19  Memo 10-29-04  337
2          "Review of reports
           of FDA/Kaiser Vioxx
3          study: Questions
           about
4          Inconsistencies and
           Bias,"
5          FDACDER022462 -
           FDACDER022470
6
7  Graham-20  E-mails  349
           FDACDER022789
8
9  Graham-21  E-mails  353
           KP001136 - KP001138
10
11 Graham-22  E-mails  357
           FDACDER022247 -
12         FDACDER022249
13 Graham-23  E-mails  361
           TOPOLE0000333
14
15 Graham-24  E-mails  364
           FDACDER022681
16
17 Graham-25  Chart  374
           FDACDER005940
18
19 Graham-26  E-mail 10-23-04  392
           KP002315
20
21
22
23
24

Page 13

1  Graham-27  Memo 9-30-04 "Risk  406
2          of acute myocardial
           infarction and
3          sudden cardiac
           death in patients
4          treated with COX-2
           selective and
5          non-selective
           NSAIDs"
6          FDACDER022369 -
           FDACDER022388
7
8  Graham-28  E-mail 10-22-04  411
           FDACDER022409
9
10 Graham-29  E-mail with  413
           attachment "Risk of
11         Acute Myocardial
           Infarction and
12         Sudden Cardiac
           Death in Patients
13         Treated with COX-2
           Selective and
14         Non-Selective
           NSAIDs" (Graham, et
15         al)
           KP001133;
16         KP001133A -
           KP001133X
17
18 Graham-30  "FDA Medical  423
           Review:
19         Cardiovascular
           analysis for
20         Vioxx," (Targum)
           2-1-01
21         MRK-ABX0002367 -
           MRK-ABX0002404
22
23
24

**KS-000303**

Confidential - Subject to Protective Order

Page 14

1  Graham-31   "Cardiovascular     426
       Events Associated
2      with Rofecoxib in a
       Colorectal Adenoma
3      Chemoprevention
       Trial" (Bresalier,
4      et al) NEJM
       3-17-05, 352;11:
5      1092-1102
6
7  Graham-32   Memo 4-6-05     441
       "Analysis and
8      recommendations for
       Agency action
9      regarding
       non-steroidal
10     anti-inflammatory
       drugs and
11     cardiovascular
       risk"
12     (19 pages)
13 Graham-33   FDA Performance   476
       Evaluation Plan
14     (4 pages)
15
16 Graham-34   Memo 11-6-00     480
       "Consulting
17     agreement for Wayne
       A. Ray, Ph.D."
18     MRK-ABT0018298
19 Graham-35   E-mails     482
       MRK-ACV00363335
20
21 Graham-36   E-mails     490
       FDACDER011046 -
22     FDACDER011047
23
24

Page 15

1  Graham-37    E-mail 8-16-04 with  492
       attachment "ISPE
2      Poster"
       MRK-ACM0002855 -
3      MRK-ACM0002856
4
5  Graham-38   Handwritten notes    496
       MRK-GAR0016806 -
       MRK-GAR0016807
6
7  Graham-39   E-mails     548
       FDACDER023033 -
8      FDACDER023037
9
10 Graham-40   E-mail 11-14-04    553
       FDACDER022932 -
       FDACDER022933;
11     FDACDER021558 -
       FDACDER021577 with
12     attachment
13
14 Graham-41   E-mails     556
       FDACDER029127 -
       FDACDER029133
15
16
17
18
19
20
21
22
23
24

Page 16

1      DEPOSITION SUPPORT INDEX
2
3
   Direction to Witness Not To Answer
4  Page Line Page Line
   (None)
5
6
7
8
   Request For Production of Documents
9  Page Line Page Line
   (None)
10
11
12
13
   Stipulations
14 Page Line Page Line
   (None)
15
16
17
18
   Questions Marked
19 Page Line Page Line
   (None)
20
21
22         - - -
23
24

Page 17

1          - - -
2      MR. KLINE:  Before you go on
3  the record, a couple of things on
4  the stenographic record.
5      First of all, two things
6  that I know Mr. Beck and I will
7  agree on.
8      One, everybody turn their
9  cell phones off.  Make sure your
10 cell phones are off.
11     Number two, for those folks
12 who are on the phone, we've had
13 issues before on the phone.  If
14 there's feedback on the phone, if
15 somebody puts their phone on hold
16 or gets Muzak or some static,
17 we're going to have to cut the
18 whole line.  So, everybody should
19 know that in advance.  I'm just
20 going to ask Linda, whether it's
21 in my examination or Mr. Beck's,
22 to cut the line.
23     You have everybody on the
24 record, Linda?

**KS-000304**

5 (Pages 14 to 17)

Confidential - Subject to Protective Order

Page 18

1    THE COURT REPORTER:  Yes.
2    MR. KLINE:  Formally for the
3    plaintiffs, I'm here with Dr.
4    Dagostino to my left, also Lee
5    Balefsky, Chris Tisi, and Lenny
6    Davis, who are the lawyers
7    responsible for the deposition.
8    MR. BECK:  Tom, I'm having a
9    hard time hearing you right now.
10   So, people are going to have to
11   lean back or you're going to have
12   to speak up.
13   MR. KLINE:  Maybe I can get
14   the room mic closer.  Does that
15   help you?
16   MR. BECK:  No.
17   MR. KLINE:  Not really.  I
18   think both of us are going have
19   the same problem all day.  I will
20   speak up.  I'll speak up, and
21   you'll try to do so also.
22   Before we go on the video, a
23   couple more things.
24   The deposition of Dr. Graham

Page 19

1    is, of course, under subpoena.  It
2    was the subject of a court order.
3    There are a couple of counsel here
4    who may not be familiar with
5    certain things, and I just want to
6    make sure we all know the ground
7    rules.
8    The deposition is governed
9    by Pretrial Order Number 9, which
10   clearly states: "All objections
11   except to those as to form and
12   privilege are reserved until trial
13   or other use of the depositions."
14   So, there's no need for anybody to
15   interrupt.  It further says -- and
16   that includes everybody.
17   It says: "Counsel shall
18   refrain from engaging in colloquy
19   during deposition.  The phrase
20   objection to form or similar
21   language shall be sufficient to
22   preserve all objections as to the
23   form until the deposition is
24   sought to be used.  And only

Page 20

1    then," Judge Fallon said, "the
2    objecting party shall provide a
3    sufficient explanation if it's
4    requested by the questioner.
5    "Counsel shall not make
6    objections or statements which may
7    suggest an answer to the witness."
8    So, nobody needs to make any
9    objections.
10   MR. BECK:  Just expanding on
11   that, the last point, Counsel
12   should not -- could you read what
13   you just said there?
14   MR. KLINE:  I sure will.
15   "Counsel shall not make objections
16   or statements which might suggest
17   an answer to the witness."
18   MR. BECK:  So that the
19   record is clear on the approach
20   that I'll be taking to objections,
21   as I understand the rules in
22   Federal Court as well as the state
23   courts where this has been
24   noticed, leading questions are

Page 21

1    objectionable as to form.  So, I
2    would ask, Doctor, to give me time
3    to interpose an objection so we're
4    not talking over one another if,
5    in fact, Mr. Kline starts asking
6    leading questions.  Because I will
7    be objecting, Tom, on form grounds
8    as to any leading questions.
9    MR. KLINE:  And I will be,
10   too, if appropriate, on
11   cross-examination.
12   MR. BECK:  Right.
13   MR. KLINE:  So we're clear,
14   Phil, the rules are clear that
15   all you need to do if you have a
16   leading question is simply to
17   state objection as to form.  It's
18   preserved.  No speeches.
19   MR. BECK:  Right.
20   MR. KLINE:  And we'll all
21   get along fine.
22   All other objections are
23   preserved for both your side and
24   the plaintiffs' side.

Confidential - Subject to Protective Order

Page 22

1       MR. BECK:  I understand.
2       MR. KLINE:  There's no need
3   to raise those objections, and
4   there will be many, I would think.
5       MR. BECK:  I've been in
6   depositions before.
7       MR. KLINE:  I understand.
8   But I've also seen some of the
9   depositions already in this
10  litigation.  So, I just wanted to
11  make sure we all understood each
12  other.
13      MR. KELL:  Counsel, I'm
14  Gerald Kell from the Justice
15  Department.  I just want to make a
16  brief statement because I have not
17  been in one of these depositions
18  in this case before.
19      MR. KLINE:  Well, welcome.
20      MR. KELL:  The government in
21  this case does not represent Dr.
22  Graham, even though he is
23  subpoenaed as an FDA employee.  We
24  do assume that the protective

Page 23

1   order entered by The Court on July
2   20, 2005, particularly Paragraph
3   4, applies here.  I may be making
4   objections in one of those areas
5   that you mentioned, privilege.
6   There are certain governmental
7   privileges like deliberative
8   process and investigatory
9   privilege.  If the question calls
10  for that, I will make that
11  objection and simply state just
12  that simply, the basis for it.
13      I do want to say that,
14  without making a speech, every
15  time I make an objection, if I
16  make an objection on one of those
17  governmental privilege grounds,
18  it's the government's position
19  that the question should not be
20  answered.  We have no power or
21  authority to instruct the witness
22  not to answer.
23      MR. KLINE:  Understood.  And
24  I assume then that you'll take it

Page 24

1   up with Judge Fallon at some
2   point.
3       MR. BECK:  Tom, again, I do
4   this so that we can avoid
5   arguments once we start the
6   deposition.
7       MR. KLINE:  Sure.
8       MR. BECK:  The judge has
9   also entered orders when approving
10  this deposition restricting the
11  scope.
12      MR. KLINE:  Yes.
13      MR. BECK:  If, in fact,
14  either side asks questions outside
15  the scope as approved by the
16  judge, as far as I'm concerned,
17  that's an appropriate area to
18  raise an objection.
19      MR. KLINE:  Well, I would
20  think that those -- maybe we can
21  agree to agree.  I would think
22  those objections, since they do
23  not fall within Order Number 9,
24  Pretrial Order Number 9, that

Page 25

1   those would simply be preserved.
2       MR. BECK:  I feel compelled
3   to raise those.  Hopefully, we
4   won't have any, but if we do, that
5   will be one where I feel I need to
6   make a record as we go.
7       MR. KLINE:  Okay.  I
8   would --
9       MR. BECK:  The reason for
10  that is because we've done our
11  best to review Dr. Graham's public
12  statements on various issues and
13  feel like we have a decent handle
14  on them.  If he talks in an area
15  where he hasn't spoken publicly
16  before, we want to raise the
17  objection, and then if we can be
18  corrected and directed to where
19  he's raised this before, then I'll
20  want to cross-examine him on it.
21  But if not, then I won't.  So,
22  that's the reason why in that area
23  I may have an objection along the
24  way.

KS-000306

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 26

1       Another area is, if you
2   intend to use documents that were
3   informally produced by Dr. Graham
4   from FDA computers and files that
5   were not pursuant to the
6   plaintiffs' subpoena to the FDA in
7   this case, where Dr. Graham's
8   lawyers for some reason were
9   willing to have him provide a
10  couple hundred pages of documents
11  for plaintiffs' lawyers based on
12  an informal request, when we made
13  a similar request, we were told it
14  was against the rules for him to
15  produce documents from the FDA
16  computer files, we'll have an
17  objection to the use of any
18  documents that were obtained in
19  that manner.  But when you get
20  there, we can just divert, I can
21  state that, and we don't have to
22  have an argument.  But I want to
23  state it on the record.
24          MR. KLINE:  Sure.  You can

Page 27

1   consider it raised right now so
2   that you don't have to raise it
3   later.  I intend to work with some
4   of those documents, principally
5   the PowerPoints.  Your objection
6   is noted.  You don't have to
7   interrupt after that.
8           MR. BECK:  Well, I just need
9   to point out which documents they
10  are as we go unless you do --
11          MR. KLINE:  I can tell you
12  that the PowerPoints which were
13  produced --
14          MR. BECK:  -- when he starts
15  testifying -- this isn't good
16  enough.  When he starts testifying
17  and he gets to one of the
18  documents, I think you and I know
19  what the documents are, I'll
20  simply note for the record the
21  objection that I previously raised
22  concerning the use of documents
23  informally produced, and that will
24  be it.

Page 28

1           MR. KLINE:  Fine.  That's
2   fair enough.  But we do intend to
3   use those documents, and those
4   documents, there's a good record
5   as to when they were produced to
6   us and when they were immediately
7   turned over to you.  That's a
8   different issue for a different
9   day.  I understand.
10          MR. BECK:  Sure.
11          MR. KLINE:  Let me just
12  think of a few more things.
13      On the issue of those things
14  which you just raised on the
15  things that you might raise, my
16  view of the order is a simple one,
17  which is that -- and I understand
18  there are certain things you might
19  do, but my view of the order is
20  that the order means what it says.
21  So, I will consider our objections
22  preserved as to those things, for
23  example, that are outside of the
24  scope of public statements.  For

Page 29

1   example, if you cross-examine on
2   internal FDA documents, putting
3   aside the privilege issues that
4   there might be that the FDA might
5   raise, I'm just going to take
6   Judge Fallon's order at its word
7   and assume that those issues can
8   just be raised with the judge
9   later.  For example, if you
10  examine on hearsay documents that
11  were not within the ambit of Dr.
12  Graham documents that he's never
13  seen before, which clearly is the
14  way Judge Fallon rules that a
15  witness should not be shown those
16  documents -- here's my only point.
17  I assume that those are preserved
18  under the rule because I, for one,
19  don't want to be interrupting you
20  all the time.
21          MR. BECK:  That's fine.
22          MR. KLINE:  Last point.
23      This is more directed to FDA
24  counsel and Dr. Graham's counsel,

**KS-000307**

Confidential - Subject to Protective Order

Page 30

1    which is something that Mr. Beck
2    alluded to, which is that Judge
3    Fallon has an order, and I
4    expect to live up to it, I can
5    tell you in advance, and I would
6    expect that -- I would hope that
7    Mr. Beck would, but we'll see
8    where his cross-examination goes.
9    It says Dr. Graham can testify
10   about things that were public
11   before.  The judge specifically
12   cited to testimony before
13   Congress, on television, in print
14   and at professional meetings.  So,
15   he essentially laid out four
16   categories.  And then in his
17   opinion and in his Order, he said
18   that the deposition is "limited to
19   matters relevant to this
20   litigation and to which Dr. Graham
21   has previously addressed."  So,
22   that's where I intend to go with
23   my examination.  Unless you have
24   something else, Mr. Beck, I'm

Page 31

1    ready to start.
2        MR. BECK:  No, I'm ready.
3        MR. KLINE:  Okay.  Thank
4    you, sir.
5            - - -
6        (Whereupon, an
7    off-the-record discussion was
8    held.)
9            - - -
10       THE VIDEOTAPE TECHNICIAN:
11   We are now on the record.  My name
12   is Marck Reisbord.
13       Today's date is May 9, 2006,
14   and the video time is 9:23 a.m.
15       We are here in the matter of
16   In Re:  Vioxx litigation MDL
17   Number 1657.
18       The deponent is David
19   Graham, M.D.
20       The court reporter is Linda
21   Golkow and she will now swear in
22   the witness.
23           - - -
24       DAVID J. GRAHAM, M.D., MPH,

Page 32

1    after having been duly sworn, was
2    examined and testified as follows:
3        MR. KLINE:  Off the video
4    record.
5        THE VIDEOTAPE TECHNICIAN:
6    Stand by, 9:23.  Off the video
7    record.
8        MR. KLINE:  Last point, Mr.
9    Beck.  Last point, which is that
10   we have an agreement that we're
11   going to split the time equally,
12   seven hours of actual run time.
13   We're going to split it equally.
14   I'm going to take about
15   two-and-a-half hours and then take
16   an hour or so on redirect.  We've
17   also agreed in an e-mail exchange
18   between Mr. Mayer and Mr. Tisi
19   that pursuant to the way Judge
20   Fallon conducts things, there will
21   be no recross.  That's the
22   agreement.
23       MR. BECK:  The agreement is
24   also that that your redirect will

Page 33

1    be limited to the scope of my
2    cross-examination.
3        MR. KLINE:  Sure.  Yes.  I
4    understand.
5        MR. BECK:  There was talk
6    before about some other
7    plaintiffs' lawyers who said they
8    wanted to participate.
9        MR. KLINE:  No one else is
10   going to unless something happens
11   to me in between.
12           - - -
13       (Whereupon, an
14   off-the-record discussion was
15   held.)
16           - - -
17       THE VIDEOTAPE TECHNICIAN:
18   The time is 9:25.  We're back on
19   the record.
20           - - -
21       EXAMINATION
22           - - -
23   BY MR. KLINE:
24   Q.   Dr. Graham, good morning.

KS-000308

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 34

1    A.   Good morning.
2    Q.   My name is Tom Kline. I'm
3  here to question you on behalf of
4  thousands of Vioxx claimants.
5         Are you prepared to answer
6  questions today?
7    A.   Yes, I am.
8    Q.   You're here under subpoena.
9  Do you understand that, sir?
10   A.   Yes.
11   Q.   And also under a Court Order
12 by Judge Fallon of the Eastern District
13 of Louisiana.  Do you understand that?
14   A.   Yes.
15   Q.   And do you understand that
16 your testimony is limited in scope and
17 nature based on prior public statements,
18 including to Congress, the media, as well
19 as professional meetings?
20   A.   Yes.
21   Q.   I intend to examine you in
22 those areas.  I'm going to take about
23 two-and-a-half hours to start, pursuant
24 to a time agreement, and I want to move

Page 35

1  very efficiently through many different
2  areas, that includes your background,
3  your knowledge and views of the FDA, your
4  involvement and knowledge of Vioxx, your
5  involvement in the Kaiser study, as well
6  as to some other things of which you have
7  knowledge and have stated previously,
8  public positions in either professional
9  meetings or before the Congress or the
10 media.  You're prepared to do so?
11   A.   Yes, I am.
12   Q.   Okay.
13        I would like to know who you
14 are, sir.  What is your current title and
15 position at the FDA?
16   A.   I'm a medical officer and
17 the associate director for science and
18 medicine in the Office of Drug Safety.
19   Q.   What does that job involve,
20 sir?
21   A.   I'm the senior scientific
22 adviser for the office.  I mentor the
23 scientific staff.  I advise the office
24 director on all scientific and medical

Page 36

1  matters.  I oversee intramural and
2  extramural research programs within the
3  office and serve as a resource to the
4  center, the Center For Drug Evaluation on
5  epidemiologic matters as well.
6    Q.   You are an epidemiologist,
7  sir?
8    A.   Yes, I am.
9    Q.   And you're also a physician?
10   A.   That's correct.
11   Q.   So, you hold an M.D. degree
12 as well; is that correct?
13   A.   Yes.
14   Q.   And you're a long-time
15 employee of the FDA?
16   A.   Yes.
17   Q.   How many years, sir?
18   A.   About 22.
19   Q.   This deposition is about
20 many of your public statements.
21        One you made on November 18,
22 2004 to the United States Senate Finance
23 Committee.  You said, to quote you,
24 "Vioxx is a terrible tragedy and a

Page 37

1  profound regulatory failure.  I would
2  argue that the FDA as currently
3  configured is incapable of protecting
4  America against another Vioxx.  We are
5  virtually defenseless."  Did you make
6  that statement?
7    A.   Yes, I did.
8    Q.   You also made a statement on
9  November 18 before the United States
10 Senate where you said, "Vioxx is the
11 single greatest drug safety catastrophe
12 in the history of this country."  Did you
13 make that statement, sir?
14   A.   Yes, I did.
15   Q.   Do you stick by that
16 statement, sir?
17   A.   I do.
18   Q.   You also said, "The FDA, its
19 Center for Drug Evaluation and Research,
20 are broken."  Did you make that
21 statement, sir?
22   A.   Yes, I did.
23   Q.   Do you believe that and do
24 you stick to it today?

KS-000309

Confidential - Subject to Protective Order

Page 38

1    A.   Yes, I do.
2       Q.   Sir, have you devoted your
3  entire professional life to drug safety?
4    A.   Yes.
5       MR. BECK:  Objection, form.
6  BY MR. KLINE:
7       Q.   What have you devoted your
8  entire --
9          MR. BECK:  Please, can we
10         have a pause so that I can
11         interpose my objection, and then,
12         even if you answer over my
13         objection, if you can answer
14         again so that --
15         THE WITNESS:  I apologize.
16         MR. BECK:  -- when we edit
17         the videotape, we won't be talking
18         over one another.
19         So, my objection was to
20         form, and would you please answer
21         now.
22         THE WITNESS:  Please repeat
23         the question.
24         MR. KLINE:  He will be

Page 39

1        saying nothing more than objection
2     to form.  I will go back to the
3     question.
4  BY MR. KLINE:
5       Q.   I'm going to rephrase the
6  question based upon his suggestion.  Mr.
7  Beck is helping me today.
8          Sir, within the FDA, to what
9  have you devoted your entire professional
10 activities and professional life?
11      A.   Post-marketing drug safety
12 and public health.
13      Q.   What is post-marketing
14 safety, sir?
15      A.   It's examining the safety of
16 drug products once they've been approved
17 for marketing.
18      Q.   Do you have any interest of
19 any kind in the Vioxx litigation, sir?
20      A.   No.
21      Q.   Do you have any financial
22 interest in any drug company or any other
23 kind of conflict that you can think of
24 that you would disclose here?

Page 40

1        A.   I have none that I can think
2  of.
3       Q.   Today, sir, are you here on
4  behalf of the FDA as an FDA
5  representative or are you expressing your
6  own opinions?
7       A.   Well, I've been -- I
8  honestly don't know the answer.  I've
9  been subpoenaed as an FDA employee, but
10 undoubtedly some of my opinions will not
11 represent those of the agency.
12      Q.   I want to talk somewhat
13 about your background.  I want to do it
14 efficiently, but I do want the jury to
15 know about you.
16         You have -- I'm going to
17 walk through it.  Hopefully, Mr. Beck
18 won't consider some of it leading.  I
19 don't think it's controversial.
20         You have a Bachelor's Degree
21 from Johns Hopkins; is that correct?
22      A.   Yes.
23      Q.   In what year, sir?
24      A.   1976.

Page 41

1       Q.   You graduated Phi Beta
2  Kappa?
3       A.   Correct.
4       Q.   Meaning?
5       A.   That's a scholastic honorary
6  society that's awarded to people who
7  graduate in the top of their class.
8       Q.   Then you went to medical
9  school where, sir?
10      A.   Johns Hopkins University.
11      Q.   You graduated second in your
12 class?
13      A.   That's correct.
14      Q.   Do you know what the person
15 who was first in your class is doing?
16      A.   Yes.  He's the chairman of
17 surgery now at a major university.
18      Q.   You then went on to get a
19 Master's Degree in public health, is that
20 correct?
21      A.   Yes.
22      Q.   Tell us about that.  Where
23 did you get the Master in public health,
24 and what did that involve?

**KS-000310**

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 42

1      A.   I went to the Johns Hopkins
2   University School of Public Health and
3   spent eleven months studying
4   epidemiology, biostatistics and computer
5   science, as well as some course work in
6   general public health matters.  It was
7   part of a three-year fellowship in
8   epidemiology with the Public Health
9   Service.
10      Q.   That epidemiology fellowship
11   was actually at the Food & Drug
12   Administration?
13      A.   That's correct.
14      Q.   So, that's how you got your
15   first involvement at the FDA?
16      A.   Yes.
17      Q.   You're a career FDA person
18   then?
19      A.   Yes.
20      Q.   You did an internship and
21   residency at Yale first; is that correct?
22      A.   Yes.
23      Q.   Then you did a residency in
24   neurology?

Page 43

1      A.   Correct.
2      Q.   Which is a subspecialty of
3   medicine, of course, correct?
4      A.   Well, no.  It's independent
5   of internal medicine.  It's a separate
6   discipline.
7      Q.   Yes.  In other words, you
8   did an internship and residency in
9   internal medicine, then you did another
10   residency, correct?
11      A.   Correct.
12      Q.   A second residency?
13      A.   Yes.
14      Q.   That second residency being
15   at the University of Pennsylvania?
16      A.   Correct.
17      Q.   So, you have an internship
18   at Yale, residency at Penn in neurology
19   and then your training in epidemiology?
20      A.   Right.
21      Q.   Your epidemiology training
22   was three years?
23      A.   Three years.
24      Q.   What is the -- and if you

Page 44

1   could be precise, what is the study of
2   epidemiology?
3      A.   Epidemiology, I think, is
4   the study of the causes and distribution
5   of diseases in populations.  And in the
6   area of drug epidemiology, it is looking
7   at the distribution and causes of
8   drug-induced injuries, but you could also
9   be looking for the patterns of the way
10   drug products are used in the population.
11      Q.   Okay.
12      How have you used
13   epidemiology during your entire
14   professional life?
15      A.   It's been in the practice of
16   pharmacoepidemiology or drug safety.
17      Q.   And what is
18   pharmacoepidemiology, sir?
19      A.   It's a fancy word for drug
20   safety epidemiology, "pharmaco" referring
21   to drugs, "epidemiology," study of the
22   distribution and causes of disease.
23      Q.   Now, you've had in your
24   career at the FDA various positions; is

Page 45

1   that correct, sir?
2      A.   Yes.
3      Q.   Did those various positions,
4   as you moved from position to position,
5   involve promotions?
6      A.   Yes.  Although you have to
7   understand in the government that pay
8   promotions don't happen very often.
9   They're pretty much regimented.  But I
10   did receive my GS 15 as an expert, which
11   was a promotion based on expertise.  And
12   then I received a second promotion as a
13   master medical reviewer, which was also
14   based on performance and expertise.
15      Q.   You said a moment ago that
16   in the government, promotions aren't
17   sometimes financial?
18      A.   Correct.
19      Q.   Are you in your position and
20   do you do what you do based on financial
21   incentive largely?
22      A.   No.  There are people who
23   have the same pay scale as I do who
24   jobs with far less responsibility.

KS-000311

Confidential - Subject to Protective Order

Page 46

1      Q.   Are you motivated for any
2  reason to be in public service, sir, and
3  if so, why?
4          MR. BECK:  Object to form.
5          THE WITNESS:  I believe -- I
6      believe in public health, and I
7      believe that this is a way that I
8      can make a difference in patients'
9      lives.
10  BY MR. KLINE:
11     Q.   Do you believe you have,
12  sir, in the past 20 years, made a
13  difference in the lives of people?
14     A.   Yes.  It's my belief that
15  I've probably helped more people by
16  pursuing a public health career than I
17  would have had I gone a more traditional
18  route of being a practitioner and seeing
19  patients one at a time.
20     Q.   Tell us, how is that, sir?
21     A.   From the perspective, a
22  public health perspective, and sitting at
23  FDA where we're responsible for all drugs
24  marketed in the United States, I've come

Page 47

1  to view the U.S. population as my
2  patient.  So, essentially, I have 300
3  million patients, and I take that
4  responsibility very seriously.
5      Q.   That doesn't leave time for
6  house calls?
7      A.   No, it does not.
8      Q.   Along the way, sir, in your
9  career at the FDA, have you received many
10  different awards?
11     A.   Yes, I have.
12     Q.   As well as honors?  I think
13  it's called in your curriculum vitae
14  honors and awards; is that correct?
15     A.   Correct.
16         MR. KLINE:  I'm going to
17     mark your curriculum vitae as
18     Exhibit 1 so we have it as part of
19     this record.
20             - - -
21         (Whereupon, Deposition
22     Exhibit Graham-1, Curriculum
23     Vitae of David Graham, was marked
24     for identification.)

Page 48

1             - - -
2  BY MR. KLINE:
3      Q.   I'd like to discuss some of
4  them with you.
5      A.   Should I take this?
6      Q.   Yes.  I'm going to hand you
7  a copy.  I'm sure you're familiar with
8  it.
9          Would you confirm that
10  indeed that's your curriculum vitae?
11     A.   Yes, it is.
12     Q.   If you would turn to Page 3.
13     A.   Yes.
14     Q.   By my count, you have
15  something in the neighborhood of 25
16  different awards by the FDA.  Is that
17  approximately correct?
18     A.   Yes.  That's the
19  neighborhood.
20     Q.   And a further, sir, 18 of
21  those awards or roughly, that's my count,
22  were between the period of 1999 and 2004?
23     A.   Correct.
24     Q.   And these are -- an honor

Page 49

1  and an award is a decoration, correct?
2      A.   Yes.
3      Q.   So, you were decorated by
4  the FDA at least 18 times in the
5  five-year period before 2004 when your
6  Kaiser study was a matter of discussion
7  at the FDA?
8      A.   That's correct.
9          MR. BECK:  Objection, form.
10         THE WITNESS:  That is
11     correct.
12         MR. KLINE:  I will rephrase
13     the question.
14  BY MR. KLINE:
15     Q.   How many times, sir, in the
16  period leading up to 2004, in the
17  five-year period leading up to 2004, were
18  you decorated, namely, honors and awards
19  by the FDA?
20     A.   Numerous times.  You've used
21  the number 18, and I'll take your word
22  for it.  Otherwise, I'll waste time
23  counting them all.
24     Q.   Let me go back and discuss

KS-000312

Confidential - Subject to Protective Order

Page 50

1  with you some of those awards, what they
2  were for.  For example, if you look at
3  1999, starting in 1999, you got two
4  different awards, the FDA Special
5  Recognition Award.  Would you read that
6  for us, sir?
7        A.   "FDA Special Recognition
8  Award for troglitazone and risk of acute
9  liver failure."
10       Q.   And the other one in 1999,
11 sir?
12       A.   "FDA Group Honor Award for
13 trovafloxacin restriction due to acute
14 liver failure."
15       Q.   What did those awards
16 involve?
17       A.   You mean what was the work
18 that was behind them?
19       Q.   Yes.  And why did you get
20 the award?
21       A.   I did research with each of
22 these drugs that demonstrated that --
23 their association with acute liver
24 failure, that these drugs were

Page 51

1  responsible for causing acute liver
2  failure at rates much, much higher than
3  in the general population, rendering
4  these drugs unsafe.
5        Q.   What happened to the drugs?
6        A.   Rezulin was, or troglitazone
7  was removed from the market.
8             Trovafloxacin was removed
9  from the outpatient market.  Its use was
10 limited to in-hospital use only.
11       Q.   On how many different
12 occasions, sir, has your work contributed
13 to the withdrawal of a drug from the
14 market?
15       A.   At least ten, and, you know,
16 we could debate whether my work on
17 rofecoxib contributed in any way.  That
18 would be 11.
19       Q.   In 2000, you got another
20 award, the "FDA Group Commendable Service
21 Award," is that correct?
22       A.   Yes.
23       Q.   And you had a number of
24 awards in 2000 with similar titles,

Page 52

1  including Group Recognition Award, Group
2  Honor Award, Team Excellence Award; is
3  that correct?
4        A.   Yes.
5        Q.   In 2001, I see you got an
6  award by CDER.  Some of them are labeled
7  CDER Team Excellence Awards, some are
8  labeled FDA Group Recognition Awards.
9        A.   Correct.
10       Q.   Maybe what we can do is
11 display Page 3 of your curriculum vitae
12 while we have a discussion about this.
13            What is CDER?  We're going
14 to be talking about that at length today.
15       A.   CDER is the Center for Drug
16 Evaluation and Research.  It is the area
17 within FDA that's responsible for
18 reviewing, approving and regulating
19 marketed drugs.
20       Q.   I see here on a number of
21 occasions you received awards which are
22 called "Team Excellence Awards."  Do you
23 have to be a team player to get a Team
24 Excellence Award?

Page 53

1        A.   Yes, indeed.
2             MR. BECK:  Object to form.
3  BY MR. KLINE:
4        Q.   How do you get a Team
5  Excellence Award, sir?
6        A.   You have to be a good team
7  player and exercise team leadership.
8        Q.   How many times at the FDA
9  were you cited before 2004 for team
10 excellence, sir?
11       A.   If I may have a moment to
12 count.
13       Q.   Yes.
14       A.   Seven.
15       Q.   How many of these awards,
16 sir, and honors, these decorations that
17 you got from the FDA involve withdrawal
18 of dangerous drugs?
19       A.   I'll have to refer back to
20 this again.
21       Q.   Tell us which ones they are.
22       A.   Okay.
23            MR. BECK:  While you're
24            looking there, this is an area

KS-000313

Confidential - Subject to Protective Order

Page 54

1    that I believe is outside the
2    scope of the subjects that the
3    judge said were appropriate for
4    examination.
5  BY MR. KLINE:
6        Q.   You may answer, sir.
7        A.   Temafloxacin was withdrawn
8  from the market based in large part on
9  the work that I performed.
10       Q.   Did you get an award for it
11 by the FDA?
12       A.   Yes, I did.
13           Fenfluramine and
14 dexfenfluramine, these are the drugs
15 commonly referred to as fen-phen, and
16 dexfen was sort of a related drug.
17       Q.   You did work that led to the
18 withdrawal?
19       A.   Yes.  I spearheaded FDA's
20 activities in that area.
21       Q.   Okay.
22       A.   Cisapride in cardiac
23 ventricular arrhythmias.  I contributed
24 to the withdrawal of that product.

Page 55

1           Troglitazone and risk of
2  acute liver failure, contributed to the
3  withdrawal of that product.
4           Trovafloxacin, contributed
5  to the withdrawal of that product from
6  the outpatient market.
7           Phenylpropanolamine, PPA,
8  this is the Yale Hemorrhagic Stroke
9  Project.  This work contributed to the
10 withdrawal of phenylpropanolamine or PPA
11 from the market.
12          We have this outstanding
13 award for scientific and regulatory
14 assessment of actions regarding safety of
15 nonsteroidal anti-inflammatory drugs, and
16 that covers not only my work on
17 rofecoxib, but work on other nonsteroidal
18 pain relievers, and rofecoxib was
19 withdrawn from the market by the sponsor.
20       Q.   Now, all of these drugs,
21 sir, had all of these drugs previously
22 been approved by the FDA for marketing
23 and distribution to Americans and people
24 in the world?

Page 56

1        A.   Yes.
2        Q.   I want to turn to a couple
3  more things.
4           By the way, do you consider,
5  sir, what we've just gone over, these
6  honors and awards, as part of your
7  background and expertise in drug safety?
8        A.   There's no question that
9  they are.
10       Q.   Okay.
11          Now let's talk about some
12 other things.  You've published in the
13 medical literature, correct?
14       A.   Yes.
15       Q.   I see from your curriculum
16 vitae that you have something along the
17 order of 31 different publications in the
18 medical literature?
19       A.   Right.
20       Q.   And those would be in
21 peer-reviewed journals?
22       A.   Yes.
23       Q.   I'm sure by this time any
24 juror who hears this will know what

Page 57

1  peer-reviewed journal is, so, I'll simply
2  ask you, what journals have you peer
3  reviewed for?
4        A.   You mean what journals am I
5  a peer reviewer for?
6        Q.   Yes.  Either previously or
7  currently.
8        A.   I am a peer reviewer for the
9  Journal of the American Medical
10 Association, for The Lancet, for the Mayo
11 Clinic Proceedings, for Circulation, for
12 Pharmacoepidemiology and Drug Safety, for
13 Cardiovascular Drugs and Therapy, for
14 Clinical Practice Cardiovascular
15 Medicine.
16       Q.   Finally, at least in terms
17 of your qualifications and background,
18 sir, you've contributed to book chapters,
19 book chapters in books, in particular, a
20 textbook entitled Pharmacoepidemiology,
21 correct?
22       A.   Yes.
23       Q.   I believe there's a third
24 edition and a fourth edition; is that

KS-000314

15 (Pages 54 to 57)

Confidential - Subject to Protective Order

Page 58

1    correct?
2        A.   Correct.
3        Q.   In particular, what has been
4    your contribution in that book?
5        A.   In the third edition, I
6    wrote a chapter with colleagues from
7    European regulatory agencies describing
8    how drug safety and drug safety
9    epidemiology is practiced from a
10   government and public health perspective.
11           In the fourth edition, I
12   wrote a book chapter with colleagues from
13   the Office of Drug Safety examining risk
14   management and what does and doesn't work
15   in terms of managing the risks of drugs.
16   This actually represents the first book
17   chapter that we're aware of tackling this
18   topic.
19       Q.   An important topic, you
20   believe, sir?
21       A.   It's a very important topic.
22   It's important because with the evolution
23   of FDA over the past 10 or 12 years with
24   the introduction of the Prescription Drug

Page 59

1    User Fee Act, there's been a slow
2    transition within FDA to taking the tack
3    that risks of drug products can be
4    managed so that drugs that have
5    particular risks can remain on the
6    market, the proviso being that -- the
7    assumption being that these risk
8    management strategies actually then
9    render a drug that is unsafe or less
10   safe, that those risk management
11   strategies make the drug safe.  What we
12   show in this book chapter is that in
13   virtually every instance where risk
14   management efforts have been examined in
15   a scientific manner, that they've been
16   shown not to result in much or any
17   improvement in the safety profile of the
18   drug or in the way that the drugs are
19   used.
20       Q.   Is that a book, obviously,
21   something that's public and could be
22   purchased and read by anybody who was
23   interested?
24       A.   Yes.

Page 60

1        Q.   Do you have anything else
2    that you would want someone who is
3    listening to this tape, especially a
4    juror, to know about your background
5    before I go on to examine you about
6    questions of your substantive testimony?
7            MR. BECK:  Object to form.
8            THE WITNESS:  No.
9    BY MR. KLINE:
10       Q.   I would ask you, sir, do you
11   consider yourself an expert in drug
12   safety?
13       A.   Yes, I do.
14       Q.   Do you consider yourself an
15   expert in the workings of the Food & Drug
16   Administration insofar as understanding
17   the structure, the culture, the
18   background, the personnel?
19           MR. BECK:  Objection to
20       form.
21           THE WITNESS:  Yes, I
22       consider myself an expert on the
23       culture, structure, organization,
24       et cetera, of FDA, having lived

Page 61

1        through it for 22 years.
2            MR. KLINE:  Since Mr. Beck
3        objected, I will rephrase the
4        question.
5    BY MR. KLINE:
6        Q.   In what areas of FDA do you
7    consider yourself expert?
8        A.   I am an expert in areas of
9    post-marketing drug safety.  I am an
10   expert in areas of interaction between
11   the reviewing divisions, the preapproval
12   side of FDA and the postapproval side of
13   FDA.  I'm an expert on the culture of
14   FDA, on the ways that science is used
15   within FDA for -- as it relates to drug
16   safety in particular, but also as it
17   relates to efficacy.  I'm an expert in
18   the personnel practices of FDA in the
19   ways that it treats its medical officers,
20   and there's probably a host of other
21   areas that relate to life working within
22   FDA that I've become expert in.
23       Q.   You're a lifer there?
24       A.   Thus far, yes.

**KS-000315**

Confidential - Subject to Protective Order

Page 62

1     Q.   Let me -- do you have any
2  current intention of leaving the FDA?
3     A.   No, not unless I'm forced to
4  leave.  I love the work that I do.
5     Q.   Let me ask you some
6  questions about your public statements.
7          You testified before the
8  United States Senate, Senate Finance
9  Committee Hearing on drug safety and the
10 worldwide withdrawal of Merck & Company,
11 Inc. of Vioxx, November 18, '04; is that
12 correct?
13    A.   Yes.
14    Q.   You appeared on 60 Minutes
15 on February 16, '05; is that correct?
16    A.   Yes.
17    Q.   You appeared on February 17,
18 '05 before the joint meeting of the
19 Arthritis Advisory Committee of the Drug
20 Safety and Risk Management Advisory
21 Committee of the FDA; is that correct?
22    A.   Yes.
23    Q.   On the Today Show with Katie
24 Couric on December 21, '05 you were

Page 63

1  interviewed?
2     A.   Was it '05 or '04?
3     Q.   '04.  I'm sorry.  '04?
4     A.   Yes.
5     Q.   On Good Morning America with
6  Diane Sawyer on November 19, '04?
7     A.   Yes.
8     Q.   Did you appear on World News
9  Tonight with Peter Jennings on September
10 18 '04?
11    A.   I'm told that I did, but I
12 didn't see the show.
13    Q.   We have a tape.  I'm sure
14 that Merck does as well.
15         Did you also appear on ABC
16 Nightline with Ted Koppel on December 3,
17 '04?
18    A.   Yes, I did.
19    Q.   And in many other forums
20 relating to Vioxx, the withdrawal of
21 Vioxx; is that correct?
22    A.   Yes.
23    Q.   Do you believe Vioxx is an
24 unsafe drug, sir?

Page 64

1     A.   Yes I, do.
2     Q.   Do you believe that Merck
3  was correct in taking it off the market?
4     A.   Yes.
5     Q.   Should it ever have been on
6  the market in the first place?
7     A.   It is my professional
8  opinion, based on the evidence that I've
9  looked at, that Vioxx should not have
10 been approved at the time that it was
11 approved, that there were substantial
12 areas of concern relating to
13 cardiovascular safety that should have
14 been explored more fully and more
15 thoroughly prior to consideration of an
16 approval.
17         MR. BECK:  At this point I
18         would interpose an objection on
19         the ground that this is beyond
20         public statements that Dr. Graham
21         has previously made.
22 BY MR. KLINE:
23    Q.   The statements that you --
24 the statement that you just made, sir, is

Page 65

1  that something that in one way, shape or
2  form you have said in some public forum?
3     A.   Yes.
4     Q.   Is there anything new in
5  what you just expressed to the jury that
6  in your professional opinion Vioxx should
7  not have been approved at the time it was
8  approved and that there were substantial
9  areas of concern relating to
10 cardiovascular safety and should have
11 been more fully explored, anything new
12 there?
13    A.   No.
14    Q.   Okay.
15         Let's talk about the FDA
16 itself, area number two.
17         The FDA -- sir, on November
18 18, '04, before the United States
19 Congress you said, "The FDA culture uses
20 the pharmaceutical industry as its
21 client.  It overvalues the benefits of
22 the drugs it approves and seriously
23 undervalues, disregards and disrespects
24 drug safety."  Is that a view that you

**KS-000316**

17 (Pages 62 to 65)

Confidential - Subject to Protective Order

Page 66

1  stated before United States Senators
2  appearing in the Senate finance room?
3      A.   Yes.
4      Q.   Is that an opinion that you
5  still hold today?
6      A.   More strongly now than then.
7      Q.   Tell the members of the jury
8  why.
9      A.   Why what?
10     Q.   Why you believe it.  What is
11 the basis -- thank you for helping me.
12          What is the basis of that
13 opinion and view?
14     A.   That --
15     Q.   That the FDA culture views
16 pharmacy -- the pharmaceutical industry
17 as its client and that it overvalues the
18 benefits of drugs it approves and
19 seriously undervalues, disregards and
20 disrespects drug safety.
21     A.   Right.
22     Q.   Why do you say that, sir?
23 What is your basis?
24     A.   In the course of my career,

Page 67

1  I have participated in countless internal
2  meetings with the portion of FDA that
3  reviews and approves new drugs where drug
4  safety concerns that occurred either
5  premarketing or post-marketing were
6  brought up and many times were of a
7  serious nature.  And the virtually
8  uniform response was -- from these
9  divisions was to downplay or ignore the
10 work that we did and the statements that
11 we made.  This was confirmed quite
12 recently in a government accountability
13 office report.  The GAO issued a report
14 in which they found that the work product
15 of our office drops into, in quotes, a
16 black hole once we do our work.
17          Other evidence that I have
18 that led me to this point of view was a
19 previous office director of mine told me
20 and a colleague of mine when he was
21 trying to pressure us to change a
22 conclusion in a report that we had
23 written on another drug, not on Vioxx, he
24 told us that industry was our client.

Page 68

1  And he and I had a lively debate about
2  this.  And at the end we had to agree to
3  disagree.
4      Q.   From your observation -- do
5  you want to finish?
6      A.   I have another example that
7  I think is -- two examples that are very
8  telling.
9          One is that on September 11,
10 2003, our center director, a Dr. Steven
11 Galson, came to an all-hands meeting of
12 the Office of Drug Safety.  So, this is a
13 meeting that has about 50 members of our
14 office in attendance.  At that meeting,
15 he told us that we, our office, needed to
16 find a way to add value to the center
17 because what we were doing was not adding
18 value to the center.  So, my
19 interpretation of that was was that from
20 the point of view of center management,
21 they don't value the work that's done in
22 the Office of Drug Safety.
23          The final piece of evidence
24 was a CDER grand rounds that was held, I

Page 69

1  believe, on February 9, 2004 or 2005, but
2  I have the notes from the meeting.  And
3  they were talking about FDA and industry.
4  And we were told by a senior FDA official
5  that industry is our primary customer.
6  Of course, the American public is also
7  our customer, but the customer we really
8  have to worry about is industry.
9      Q.   Sir, from what you've
10 observed while you, from what I heard you
11 say, disagree with the concept that
12 industry should be the client, is that
13 indeed the way the FDA perceives it, that
14 industry is the client?
15     A.   Yes.  FDA perceives industry
16 as its client as customer number one.  It
17 is a point of view that I completely and
18 totally disagree with.
19          This is a very interesting
20 point to note.  Dr. Peter Honig, who is
21 now a senior vice president at Merck, was
22 formerly our office director.  He was the
23 one who promoted me to associate director
24 for science in the office.  When he was

KS-000317

Confidential - Subject to Protective Order

Page 70

1  leaving to go to Merck, when he was
2  leaving FDA to go to Merck, we had a
3  farewell luncheon.  At the farewell
4  luncheon, he mentioned to us that it was
5  so refreshing to work with people in the
6  Office of Drug Safety who actually
7  believed in their mission of helping the
8  public and that this was so very
9  different from what he had experienced in
10  the Office of New Drugs.
11      Q.   Is it your mission, sir, to
12  help the public?  Is that your view of
13  it?
14      A.   Yes.
15      Q.   Pure and simple?
16      A.   Pure and simple.
17      Q.   Straight up?
18      A.   We have no other reason for
19  existence.
20          MR. BECK:  Objection to
21  form.
22  BY MR. KLINE:
23      Q.   Okay.
24          Now, let me discuss a number

Page 71

1  of things.  Let's step back before we
2  move forward.
3          Some folks who watch this
4  videotape will be initiated, some will
5  not be, as to the structure of the FDA.
6  I want to keep it simple.
7          First of all, there is
8  something that you've referred to already
9  as CDER.  I'm going to do some very
10  basics, but I'm going to try to do it
11  efficiently and quickly so we don't take
12  up a lot of time.  CDER.  What does CDER
13  stand for?
14      A.   Center for Drug Evaluation
15  and Research.
16      Q.   Now, the Center for Drug
17  Evaluation and Research, do you work,
18  broadly speaking, under that umbrella in
19  CDER?
20      A.   Yes, I do.
21      Q.   Does CDER have various
22  divisions and compartmentalizations?
23      A.   Yes, it does.
24      Q.   Is there an elaborate

Page 72

1  organizational chart for CEDR and for the
2  FDA as a whole?
3      A.   Yes.  And it's available on
4  the web.
5      Q.   Now, CDER, is one division
6  of CDER the Office of New Drugs, OND?
7      A.   Yes.
8      Q.   And tell the listener, the
9  member of the jury, what OND stands for.
10      A.   OND stands for the Office of
11  New Drugs.
12      Q.   Now, is the Office of New
13  Drugs -- what is the job of the Office of
14  New Drugs?
15      A.   The Office of New Drugs
16  reviews drug applications when a drug
17  company wants to have a drug approved.
18  The Office of New Drugs reviews those
19  applications, decides whether or not the
20  drug should be approved in the United
21  States, and once a drug is approved,
22  continues to regulate that drug after
23  it's on the market.
24      Q.   In terms of how the FDA and

Page 73

1  CDER values OND, tell the members of the
2  jury how OND is valued.
3      A.   OND is highly valued within
4  the Center for Drug Evaluation and
5  Research.  OND has traditionally had far
6  larger budgets for travel and training of
7  its scientific staff and for the purchase
8  of office equipment and supplies.
9      Q.   OND, sir, is that the group
10  that approves drugs in terms of their
11  efficacy, we'll get to benefit, in terms
12  of whether they are effective?
13      A.   Yes.
14      Q.   Can Americans be confident
15  that drugs that are on the market by and
16  large are effective in terms of the way
17  that they're approved?  For example, if a
18  drug is a blood pressure drug, can we be
19  confident that that drug will lower your
20  blood pressure?
21      A.   I think, in general, we can
22  be.
23      Q.   Is there an emphasis on that
24  aspect of approval by office of new drug?

Confidential - Subject to Protective Order

Page 74

1      A.   Yes.  Clinical trials are
2  designed primarily to show the efficacy
3  of a drug.  They're not designed to show
4  the safety of a drug.  And when FDA does
5  its reviews, it spends most of its time
6  reviewing the efficacy.  And that's where
7  the largest teams of individuals are
8  gathered to examine the new drug
9  application.
10      Q.   Budgeting, sir.  Before we
11  get to budgeting, let's look at the other
12  side.
13           Is there this group called
14  Office of Drug Safety?
15      A.   Yes.
16      Q.   Is it -- in any way, shape
17  or form is it the size of, the shape of
18  or funded like the Office of New Drugs?
19      A.   No, in terms of funding for
20  the individual staff.  It has funding for
21  sort of obligatory FDA operations such as
22  its adverse event reporting system.  And
23  so if you were to look at budgetary
24  allocations for our office, you'll see

Page 75

1  large chunks of money going to these
2  various operations, but they are FDA
3  operations that FDA is obligated to
4  maintain.  They happen to be housed in
5  the Office of Drug Safety.  The actual
6  budget for the Office of Drug Safety for,
7  say, travel and training, its operating
8  budget, is small.
9      Q.   And in terms of overall,
10  what is the emphasis in the FDA and in
11  CDER, as you've described it, in terms of
12  development and approval of drugs versus
13  drug safety?
14      A.   The primary function of CDER
15  is to move the freight, that is, to
16  review and approve new drugs as quickly
17  as possible and to as large a number as
18  possible.
19      Q.   Is the Office of Drug
20  Safety, in your view, either under -- I
21  was going to say undermanned, but it
22  would be underpersoned or understaffed or
23  underfunded in terms of being able to
24  adequately assess drug safety?

Page 76

1           MR. BECK:  Objection to
2      form.
3  BY MR. KLINE:
4      Q.   You may answer.
5      A.   It is my opinion that the
6  Office of Drug Safety is tremendously
7  understaffed and underfunded.
8      Q.   Does the Office of Drug
9  Safety even come into play with a drug
10  until a drug is actually marketed and on
11  the market and already approved?
12      A.   In general, no, but there is
13  a recent development of asking drug --
14      Q.   How about -- if I may
15  interrupt you.
16           How about at the time in
17  2004?
18      A.   In 2004, what I was about to
19  say was still in play.  Companies are
20  being increasingly asked to develop what
21  are called risk management plans at the
22  time of approval that might relate to
23  areas of concern that the reviewing
24  divisions have, the OND has, about a drug

Page 77

1  product.  And the Office of Drug Safety
2  is asked to comment on those risk
3  management plans because they will be, in
4  effect, post-marketing.
5      Q.   Was that true in 1999, when
6  Vioxx was approved?
7      A.   No, it was not.
8      Q.   Was that a deficiency, sir?
9           MR. BECK:  Object to form.
10           THE WITNESS:  That's a
11      difficult question for me to
12      answer.  If you believe that risk
13      management plans have efficacy,
14      that they work, then, yes, it's a
15      deficiency.  It is my own view,
16      however, that risk management as
17      practiced by FDA has been a
18      mechanism to keep unsafe drugs on
19      the market, rather than dealing
20      with them head on.
21  BY MR. KLINE:
22      Q.   Let me ask you, have we
23  given --
24           From what you've heard, my

KS-000319

Confidential - Subject to Protective Order

Page 78

1  questions and your answers, would a
2  layperson have an understanding of the
3  overall mechanism of the FDA, CDER and
4  then the Office of New Drugs and Office
5  of Drug Safety and where they fit in?
6  Would there be something to add here so
7  that we understood it any better in broad
8  brush terms?
9       MR. BECK:  Object to form.
10      THE WITNESS:  I think --
11  BY MR. KLINE:
12      Q.   Go ahead, sir.
13      A.   I think it would be
14  important for people to understand that
15  in addition to the Office of New Drugs,
16  there are a number of other offices
17  within CDER whose purpose is to actually
18  assist in the review and approval of new
19  drugs.  So, you have the Office of New
20  Drugs, and that may have 7 or 800 people,
21  but you have these other offices, as
22  well, whose primary function is to work
23  on the premarketing, the preapproval side
24  of FDA's house, and without them, the

Page 79

1  drug couldn't be approved.  And when you
2  take those all together, you end up with
3  like about 13 or 1400 people whose focus
4  is getting drugs on the market; if you
5  compare that to the Office of Drug
6  Safety, where we have maybe in the
7  neighborhood of 100 or 110 people
8  responsible for the safety and monitoring
9  of the safety of all drug products in the
10  country.
11      Q.   What you're saying it's
12  lopsided?
13      A.   Yes.
14      MR. BECK:  I'm sorry, I
15  couldn't hear the question.
16  BY MR. KLINE:
17      Q.   I said, what you're saying
18  is that it is lopsided?
19      MR. BECK:  I object to the
20  form.
21  BY MR. KLINE:
22      Q.   Is it lopsided, sir?
23      MR. BECK:  I object to the
24  form.

Page 80

1  BY MR. KLINE:
2      Q.   Please.
3      A.   Yes, it is lopsided.
4      Q.   Now, in addition, sir, and
5  I'm going to mark -- let me ask you this.
6           You've given a number of
7  public --
8           How many drugs is the FDA
9  responsible for, sir, which would
10  translate into this staff of 110 safety
11  officers?
12      A.   I think there's somewhere --
13  I'm not an expert on this, but I have
14  read and heard numbers such as 6,000
15  marketed drug products, 10,000 marketed
16  drug products.  There's thousands of
17  drugs out there.  Not all of them are,
18  you know, widely used.
19      Q.   I've seen in a public
20  statement of yours that roughly says that
21  only five percent of the FDA's funding
22  goes into the Office of Drug Safety.  Is
23  that what you've said?
24      A.   Yes.

Page 81

1      Q.   And is that correct?
2      A.   That's what it has been in
3  the past based on numbers that were
4  obtained from the web.
5      Q.   And that would also include
6  all of the funding for adverse reaction
7  reports as well?
8      A.   There you've got me.  I
9  don't recall.
10      Q.   Let me ask you some more
11  questions about the FDA.
12           A common perception is that
13  the FDA has laboratories and test tubes,
14  and there are scientists there who test
15  the various drugs before they go on the
16  market.  Is that correct?
17      MR. BECK:  Object to form.
18  BY MR. KLINE:
19      Q.   Answer the question and then
20  I'll do a rephrased question to make sure
21  I have a correct record.
22      A.   FDA has a very small
23  laboratory research capacity and does not
24  test new drugs in patients, will

**KS-000320**

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 82

1    occasionally do some animal testing, but
2    it is for very selective drugs, for very
3    selective issues.  So, in general, I
4    think that would be a misperception on
5    the part of the public.
6        Q.   Is animal testing and other
7    kind of pharmacologic testing the
8    exception or the rule for drugs in OND?
9        A.   It is -- well, within OND,
10   it doesn't happen at all because the
11   Office of New Drugs' sole purpose is
12   relating to the development and review of
13   new drug applications.  Where any sort of
14   laboratory testing might occur would be
15   in some of these other components within
16   CDER.  And in that case there, it would
17   be the exception and not the rule.
18       Q.   What does OND largely rely
19   upon in approval of drugs?
20       A.   It relies on documents
21   supplied to it by a drug company seeking
22   approval of its drug.
23       Q.   Only as good as the
24   information provided?

Page 83

1            MR. BECK:  Object to form.
2            THE WITNESS:  Correct.
3    BY MR. KLINE:
4        Q.   Is the information
5    largely --
6            In fact, is the information
7    exclusively by and large and as the rule,
8    not the exception, information that comes
9    from the drug company?
10           MR. BECK:  Object to form.
11   BY MR. KLINE:
12       Q.   You can answer.
13       A.   Yes.  The information that
14   FDA scientists base their reviews and
15   decisions about approval on are based on
16   information supplied to it by the
17   pharmaceutical industry in an official
18   submission.  FDA scientists do not
19   themselves do independent studies or
20   independent work relating to the approval
21   of those drugs.
22       Q.   What has been the problems,
23   if any, with that kind of system and
24   situation?

Page 84

1        A.   You're dependent on the
2    honesty, integrity and truthfulness of
3    the drug company, that it will provide
4    you with all information, that
5    information which helps their cause in
6    getting their drug approved, information
7    that may call into question the
8    effectiveness, the efficacy or the safety
9    of their drug.  But it's based on trust
10   and -- it's based on trust.
11       Q.   Is that trust on some
12   occasions violated?
13       A.   That's an area that I'm
14   probably not really competent to talk
15   about in sort of anything in any direct
16   detail because my experience is really
17   post-marketing.  I have heard examples
18   and rumors and the like, but it's not
19   something that I'm really expert in.
20       Q.   You have said publicly in
21   statements that there is an institutional
22   bias in the FDA which prevents the FDA
23   from protecting Americans against unsafe
24   drugs.  Do you recall saying that?

Page 85

1        A.   Yes, I do.
2        Q.   Is that a correct statement?
3        A.   Yes.
4        Q.   Tell the members of the jury
5    what the basis is for that statement.
6        A.   Well, all you have to do
7    sort of to see it crystal clear is to
8    look at the drugs that have come off the
9    market.  These are drugs where FDA
10   approved them, and by approving them said
11   the drugs were safe and effective, and
12   then at some later date they come off the
13   market because, a-ha, they're not safe or
14   they are not as safe as we thought they
15   were.  If we examine how long it takes
16   from when the signal of the problem
17   emerges to when the drug comes off the
18   market, you will see that that is
19   measured in years, sometimes in decades.
20           With phenylpropanolamine,
21   PPA, a drug product present in virtually
22   every cough/cold preparation in the
23   country, it was in over-the-counter diet
24   aids to help people lose weight, was

Confidential - Subject to Protective Order

Page 86

1    associated with hemorrhagic stroke
2    primarily in young women, and this was
3    known since 1984. However, it wasn't
4    until about 2000 or 2001 that FDA finally
5    removed that product from the market. In
6    the meantime, the company that made PPA
7    or the companies that made PPA continued
8    to make profits, and patients continued
9    to be harmed.
10        Q.   I want to just provide a
11   schematic of the FDA insofar as where the
12   Office of Drug Safety fits in that you
13   actually presented in a PowerPoint
14   presentation. There was a PowerPoint
15   presentation that you apparently gave.
16   You gave many public PowerPoint
17   presentations, correct?
18        A.   Yes.
19            MR. KLINE:  Don't put it up
20        yet.
21   BY MR. KLINE:
22        Q.   One of the PowerPoint
23   presentations that you gave was at Johns
24   Hopkins, your alma mater?

Page 87

1        A.   Correct.
2        Q.   And I have in your
3    curriculum vitae June 4, 2005.
4        A.   Yes.
5        Q.   What was the occasion
6    briefly?
7        A.   It was -- there's a
8    biannual, so, every other year, meeting
9    of the medical school alumni, and they
10   celebrate the reunions of particular
11   classes that sort of end in fives or
12   zeros. And this was the 25th reunion for
13   my medical school class, and I was one of
14   four invited speakers to speak that day
15   in scientific session.
16        Q.   What you told them from what
17   I've seen from other PowerPoints was
18   essentially a compilation of things that
19   you had previously told others in other
20   places and other times? You used some of
21   the same slides?
22            MR. BECK:  Object to form.
23            THE WITNESS:  Yes. That is
24        correct.

Page 88

1    BY MR. KLINE:
2        Q.   I'll rephrase the question.
3            Was the PowerPoint you
4    presented similar or different from
5    PowerPoints that you had presented to
6    other professional organizations, Dr.
7    Graham?
8        A.   Very similar.
9        Q.   And the one thing that you
10   did, and I'll provide a copy of it --
11            MR. KLINE:  Do you need
12        these, Mr. Beck?  Do you want one
13        from me?  I know I provided them
14        to you.
15            MR. BECK:  Could you please
16        give me a copy.
17            MR. KLINE:  If I do, I'll
18        tell you in advance. I have them
19        numbered on the bottom with our
20        Bates Numbers so you'll be able to
21        follow along easier.
22            MR. BECK:  If you can supply
23        me a copy of these as the
24        numbers --

Page 89

1            MR. KLINE:  I'll be pleased
2        to supply a copy of everything
3        that I do so that it makes it easy
4        for you.
5            Here it goes. We're giving
6        you Exhibit Number 2 which I'm
7        going to ask the doctor to
8        identify, but I assume he's going
9        to tell me this is the PowerPoint
10       that he gave at Hopkins.
11            - - -
12            (Whereupon, Deposition
13        Exhibit Graham-2, "Drug Safety in
14        America: A Nation Still at Risk,"
15        (Graham) Power Point Slides,
16        DG000035 - DG000061, was marked
17        for identification.)
18            - - -
19   BY MR. KLINE:
20        Q.   Can we identify Exhibit 2,
21   please, sir?
22        A.   Yes. This is a copy of my
23   PowerPoint presentation.
24        Q.   And for Mr. Beck's help, the

KS-000322

Confidential - Subject to Protective Order

Page 90

1  bottom right-hand corner has numbers, and
2  that's what I'll refer to when I put up
3  any one of the slides.
4        MR. KLINE:  I hope that will
5  help you, Phil.
6        MR. BECK:  And this is a
7  document that, as I understand it,
8  was not produced pursuant to
9  plaintiffs' subpoena, but was
10  turned over by Dr. Graham's
11  private lawyers last week in
12  response to an oral request for
13  further documents by plaintiffs.
14  I understand that the numbers that
15  you're referring to on the bottom
16  right are numbers that were put on
17  there by plaintiffs' lawyers.
18  This is one of the documents that
19  I've previously indicated we would
20  object to any questions about
21  since they weren't produced to us
22  in a timely way.
23        MR. KLINE:  There are a
24  series of these documents.  We

Page 91

1        intend to use them today.  They
2        were not covered by the subpoena.
3        We can argue about that at some
4        later date.  We asked for
5        documents late last week.  We
6        turned them over immediately when
7        we got them.  Merck has had them
8        as long as we've had them, and I
9        intend to examine on them.  Here
10        goes.
11  BY MR. KLINE:
12        Q.   This was definitely -- I
13  want to meet Judge Fallon's order.
14        This was definitely a public
15  forum in which you presented this,
16  correct?
17        A.   That is correct.
18        Q.   Now, all I want to do for
19  now is to focus everyone where we are.
20  We are on the structure of the FDA and
21  the problems within the structure.  Are
22  you with me?
23        A.   Uh-huh.
24        Q.   And I want to go to the

Page 92

1  chart which we've labeled -- we've taken
2  the liberty of putting some numbers on
3  the bottom to help.  And number 40 is an
4  organizational chart.  And if we can
5  highlight in the middle, there's an
6  island in the middle.  That's the Office
7  of Drug Safety, correct?
8        A.   Correct.
9        Q.   What was the point that you
10  were making to your fellow physicians and
11  colleagues on that day that you would
12  make here upon my request?
13        A.   Everything else that is
14  circled on that organizational chart
15  plays some role in the preapproval
16  activities of the Center For Drug
17  Evaluation.  And what I was trying to
18  show is that the Office of Drug Safety is
19  this tiny little group that's being
20  swallowed by an amoeba, and so it's kind
21  of a medical joke that this big sprawling
22  mass is engulfing the Office of Drug
23  Safety, eating it up.
24        Q.   When you call it a, quote,

Page 93

1  medical joke, were you trying to make a
2  point?
3        A.   Yes.
4        Q.   And the point was?
5        A.   And the point is that the
6  Office of Drug Safety has little in the
7  way of resources, little in the -- no
8  authority and really no weight or respect
9  within the Center For Drug Evaluation,
10  that in essence, drug safety is
11  dominated -- the Center For Drug
12  Evaluation for research is dominated by
13  the mindset of review and approve new
14  drugs.  Safety is an afterthought.
15        Q.   How long have you observed
16  that?  How long has that been your
17  observation?
18        A.   Well, I observed it even
19  during my fellowship training, but it has
20  accelerated in terms of how forcefully
21  it's pursued and enforced by OND
22  management, CDER management, since the
23  introduction of the Prescription Drug
24  User Fee Act in 1992, and that is

Confidential - Subject to Protective Order

Page 94

1    referred to as PDUFA.  And it's by that
2    means -- Congress passed a law that was
3    specifically designed to speed up the
4    review times of drugs that FDA was asked
5    to look at by drug companies.  In return,
6    drug companies would pay money to FDA so
7    that FDA could hire more staff.  And so
8    we now have a situation where more than
9    50 percent of the Center For Drug
10   Evaluation's budget comes from monies
11   paid to it by regulated industry.
12       Q.   What you're saying is that
13   the FDA -- are you saying that the FDA is
14   not funded by the citizens of the United
15   States of America?
16       A.   I'm saying --
17           MR. BECK:  Objection to
18       form.
19           THE WITNESS:  I am saying
20       that the majority of funding for
21       the Center for Drug Evaluation and
22       Research comes from industry, not
23       from tax dollars.
24   BY MR. KLINE:

Page 95

1       Q.   Is that, to your
2    understanding, a well-known fact, sir,
3    outside of the pharmaceutical industry?
4           MR. BECK:  Object to form.
5           THE WITNESS:  I suspect that
6       the public doesn't appreciate
7       who's paying the bills at FDA.
8    BY MR. KLINE:
9       Q.   What is the impact on that,
10   sir?  What is the impact of 50 percent of
11   the budget coming under this PDUFA act,
12   which is the physician user --
13       A.   Prescription Drug User Fee
14   Act.
15       Q.   Prescription Drug User Fee
16   Act. 199 --
17       A.   2.
18       Q.   1992?
19       A.   It's been renewed, I think
20   we're on our third renewal, and they're
21   feverishly working to get the fourth
22   renewal.  The impact of this in my own
23   experience has been that the preapproval
24   people look for reasons to say yes to a

Page 96

1    drug.  So, I've been in internal meetings
2    where a drug company wanted an approval
3    for a drug maybe for six different
4    indications.  So, those would be things
5    that the drug could be officially
6    promoted for to treat conditions for.
7    And the reviewing division medical
8    officers say this drug shouldn't be
9    approved at all, and then the pressure
10   will be put on the medical officer to
11   say, well, can't we approve it for just
12   one indication, just one indication, a
13   narrow indication.  Because all they want
14   to do is to be able to say yes.
15           I've been at other meetings
16   where when safety concerns were expressed
17   and people from our office raised the
18   question of having things put into the
19   label that the FDA people in the Office
20   of New Drugs who have the final
21   authority, they approve the drug and they
22   have the authority to say what happens
23   after the drug is on the market, that
24   they have said we can't do that because

Page 97

1    the drug companies won't go along with it
2    or that will hurt the drug company's
3    profits.
4           These are remarks that have
5    been passed in internal meetings that I
6    have been present at.  And other
7    colleagues of mine have had similar
8    experiences.  And since I have gone
9    public with my Senate testimony, I have
10   been approached now by probably 10 or 15
11   medical reviewers from different
12   components of CDER with stories of being
13   pressured to change their reviews where
14   they thought a drug should not be
15   approved, but where management was
16   telling them you must now say yes to that
17   drug.
18           There was actually in The
19   Wall Street Journal just last week or the
20   week before an example of this with an
21   antibiotic called Ketek.  And in that
22   article, it describes a situation where a
23   clinical trial that FDA knew was
24   fraudulent and that the company knew was

**KS-000324**

Confidential - Subject to Protective Order

Page 98

1   fraudulent, FDA, it appears, based on
2   that newspaper article, accepted that
3   clinical trial and based its approval on
4   that trial and even cited it in a public
5   health announcement when recently three
6   cases of liver failure with this drug
7   were published in the medical literature,
8   and FDA issued a public health
9   announcement to say to the public, don't
10  worry, the drug is safe, look, we have
11  this clinical trial that shows us it's
12  safe even though FDA knew that that study
13  was fraudulent.
14       Q.   An example is what you've
15  just given us?
16       A.   Yes.
17           MR. KLINE:  For those folks
18      who are on the phone, we're going
19      to have to cut you off unless you
20      put your phones on mute.  I
21      repeat.  We're going to cut you
22      off unless you put your phones on
23      mute, period.
24           Can we go off the record for

Page 99

1       one minute.
2           THE VIDEOTAPE TECHNICIAN:
3       Stand by, please, 10:22.  Off the
4       record.
5              - - -
6           (Whereupon, a recess was
7       taken from 10:22 a.m. until 10:24
8       a.m.)
9              - - -
10          THE VIDEOTAPE TECHNICIAN:
11      Video time is 10:24.  We're back
12      on the record.
13  BY MR. KLINE:
14       Q.   All right.  Now, I want to
15  talk about -- I want to talk a minute
16  about industry's role, sir, the
17  pharmaceutical industry's role.
18           You mentioned one particular
19  fraudulent study.  When that kind of
20  thing occurs or when data is not provided
21  by a particular sponsor of a drug or
22  those kinds of things occur, are you
23  suggesting -- you're not suggesting that
24  that exonerates the pharmaceutical

Page 100

1   company itself who is furnishing the
2   data, are you?
3       A.   No.
4           MR. BECK:  Objection to the
5       form.
6   BY MR. KLINE:
7       Q.   Let me rephrase.
8           The kinds of problems that
9   you've identified, sir, what is the
10  pharmaceutical company, the sponsor's
11  responsibility under that particular
12  circumstance?
13      A.   They have -- the company has
14  a responsibility to supply all data in a
15  truthful manner, accurate and full, and
16  if they're aware of fraud or they're
17  aware of problems within their studies,
18  to fully disclose those.
19      Q.   Now, I'd like to move into a
20  couple of more FDA issues and cover FDA
21  in more detail.
22           You have said in public that
23  that there is an institutionalized bias
24  in the FDA.  Would you please -- and

Page 101

1   you've gone further to say in many forums
2   that there are structural, cultural,
3   scientific and personnel issues.  Would
4   you please -- and in particular, that
5   happens to be one of many places, on Page
6   38 of the PowerPoint you presented at
7   Hopkins.
8       A.   Right.
9           MR. KLINE:  I do not need it
10      up.
11          THE WITNESS:  Okay.  The --
12  BY MR. KLINE:
13      Q.   Would you explain to the
14  members of the jury what you mean when
15  you say there's an institutional bias at
16  the FDA?
17          MR. KELL:  Objection.  Any
18      specifics that the doctor might
19      give that would identify persons,
20      products, discussions within FDA
21      would violate his duty, in our
22      view, to maintain such information
23      on a confidential basis and the
24      deliberative process privilege.

Confidential - Subject to Protective Order

Page 102

1    That's my objection.
2   BY MR. KLINE:
3      Q.   My goal, sir, is to have you
4   in some broad --
5      A.   I can talk in general terms.
6      Q.    -- overarching terms
7   explain to us the structural, cultural,
8   scientific and personnel issues which
9   lead to an institutional bias at the FDA,
10  please, sir.
11     A.   Right.  The structural
12  issues are to some extent illustrated by
13  that amoeba graph that I showed where you
14  have this inequality of resources within
15  the center.  You also have sort of this
16  conflict of interest that the Office of
17  New Drugs that is responsible for
18  approving the drug also subsequently has
19  responsibility for, in a sense,
20  correcting its past mistakes, if you
21  will.  That a drug safety emerges
22  post-marketing, a drug is found to be
23  unsafe, and the people who approve the
24  drug are the ones who have to make the

Page 103

1   decision to do something about that.  And
2   that is a conflict of interest I maintain
3   that explains much of the structural
4   bias.  Because when a drug gets approved,
5   it's not just that an FDA medical officer
6   sees this pile of data that a drug
7   company gives it for the first time.
8   Usually a medical officer and a reviewing
9   division has worked with a drug company
10  for a number of years helping the company
11  to design the clinical trials that FDA
12  will subsequently come to review.  And so
13  by the time a drug gets to the approval
14  stage, the FDA people who have been
15  involved in the Office of New Drugs have
16  invested a fair amount of intellectual
17  capital in it, and it's not uncommon to
18  have medical officers refer to drugs that
19  are approved as their drugs.  They take
20  pride in the work that they've done in
21  bringing a drug to the public.  They're
22  not making profit from it the way a drug
23  company is, but they consider it their
24  drug because of the work that they've put

Page 104

1   into it.
2       Now a problem crops up with
3   their drug.  They've signed their name on
4   the line, this drug is safe and
5   effective.  It's gone to the division
6   director.  It's gone to the office
7   director.  It's gone to the super office
8   director.  It's gone to the Center
9   director.  They all have signed on it
10  saying this drug is safe and effective.
11  And now you come up with this problem
12  that says, no, it isn't.
13      And then what happens?  What
14  happens is delay.  Delay, delay, delay.
15  And as a result -- you can see it.  You
16  can see it with rofecoxib, with Vioxx,
17  that we have the results of the VIGOR
18  study showing a five-fold increased risk
19  of heart attack with Vioxx compared to
20  naproxen at the high dose, and it takes
21  almost two years for FDA to come up with
22  the label, a label, by the way, that in
23  my estimation, accomplished nothing of
24  utility to the public health.

Page 105

1       Why a two-year delay?  The
2   FDA was able to come up with a public
3   health announcement within a week of the
4   article appearing in the Annals of
5   Internal Medicine about liver failure
6   with Ketek.  So, if FDA can act that fast
7   on three cases of liver failure, why do
8   they have to take two years in reacting
9   to something as important as heart attack
10  with Vioxx.  And my answer is, it comes
11  down to this conflict of interest in
12  structural issues.
13      There's also the cultural
14  issues.
15     Q.   Before you go to the
16  cultural issue, let's stick with the
17  structural issue.  I'm going to do all
18  four.
19      On the structural issue,
20  let's pick up a couple points and move on
21  to others.  We've got a lot of things to
22  cover now in about an hour and a quarter,
23  and I want to do the Vioxx story and the
24  Kaiser story as well, so, we've got to

Confidential - Subject to Protective Order

Page 106

1  move quickly.
2          But on this, you mentioned
3  that the label didn't make a difference.
4  My question about the label is, is the
5  label something that the FDA tells the
6  drug company to do or is it something
7  else?
8      A.   Well, the FDA press office
9  recently made a statement that they have
10  the authority to force label changes, but
11  they prefer to negotiate with the
12  company.  My experience has been that, at
13  least since PDUFA, FDA does not impose
14  label changes on the company.
15  Basically -- well, let's give a typical
16  example.  We have a drug, we know it
17  causes a problem.  We have a meeting, a
18  premeeting of the OND people, the drug
19  safety people, we're talking about a
20  post-marketing safety issue, and we've
21  decided we're going to insist that this
22  problem belongs in the warnings on the
23  label.  We go in then, we have a meeting
24  with the company, and you come out with

Page 107

1  it's not in the warnings, it might not be
2  in the precautions.  It gets worked down
3  because the FDA capitulates.
4      Q.   Why is it important to the
5  drug companies not to warn about risks?
6  You'd think they would want to warn about
7  risks if there was any chance that there
8  was a risk?
9      A.   Well --
10          MR. BECK:  Object to form.
11  BY MR. KLINE:
12      Q.   Why do they not warn about
13  the risks?
14      A.   Companies, I believe,
15  have -- resist having safety issues
16  highlighted in the warnings because it
17  raises them to sort of a level of
18  significance in terms of importance in
19  the minds of physicians and patients.  It
20  could be used for -- as a competitive
21  advantage from a competitor marketing the
22  same product.  And if it has a box around
23  the warning, my understanding is that
24  that imposes then additional restraints

Page 108

1  on the company as to how they can go
2  about marketing the drug product to
3  consumers and also how it gets marketed
4  and detailed to physicians.  So, the
5  boxed warning sort of has the -- I think
6  the greatest potential impact on a drug
7  product in terms of how a company can go
8  about marketing it.
9      Q.   Is that something -- are you
10  saying that that's something that the
11  drug company would want to avoid for
12  financial reasons?
13      A.   Yes.
14          MR. BECK:  Object to form.
15  BY MR. KLINE:
16      Q.   Why would a drug company
17  want to avoid that kind of thing?
18      A.   A company would want to
19  avoid a boxed warning because it will
20  make it more difficult to market the
21  drug, it could interfere with the
22  profitability of the product.  It could
23  give their competitors a marketing
24  advantage, and it could call into

Page 109

1  question the safety of their product and
2  then perhaps give physicians or patients
3  pause to reconsider whether they want to
4  take that particular drug if there are
5  others available that don't have such a
6  warning.
7      Q.   I want to pick up in more
8  capsuled form.  You've covered the
9  structural issues of the FDA to your
10  satisfaction; is that correct?
11      A.   Yes.
12      Q.   And, by the way, if there's
13  something simply as a precaution on a
14  drug, is that different in terms of how
15  you understand the financial impact on a
16  potential drug or a marketed drug than,
17  say, a black box warning?
18      A.   Very different.
19          MR. BECK:  Object to form.
20  BY MR. KLINE:
21      Q.   How is that?  Either a
22  regular warning or a plain warning or a
23  precaution rather than a black box
24  warning?

KS-000327

Confidential - Subject to Protective Order

Page 110

1     A.   The others have no -- the
2  simple warning or precautions have no
3  consequence in terms of how a company can
4  go about marketing a product.
5     Q.   Is a precaution a lesser
6  thing than a warning?
7     A.   It was, but I believe FDA is
8  restructuring the label to have a section
9  now that will be called "warnings" and
10 "precautions."
11    Q.   Put aside the restructuring
12 and the new regulations.  How about back
13 in 2002?
14    A.   Precautions is a lower
15 level, a degree of information, of
16 warning than what was in the warning
17 statement.
18    Q.   Understood.
19        All right.  Now, cultural
20 issues, briefly.  A paragraph, not a
21 chapter.
22    A.   We've talked about it
23 before.  FDA views industry as its
24 primary customer, as its client.  And

Page 111

1  this gets transmitted to the management.
2  That's how management gets selected, by
3  how well they get along with industry.
4  And it filters downhill.  And so as a
5  result, you have this organization that
6  seeks to work, in quotes, collegially,
7  with industry, we're going to get along
8  with industry.  These are phrases that
9  are frequently used within FDA to
10 describe the relationship that is desired
11 between the regulator and the regulated.
12    Q.   By the way, back to
13 structural issues.
14        Are there not these
15 independent Advisory Committees?  We know
16 you testified in front of an Advisory
17 Committee.  Are these truly independent
18 Advisory Committees?
19    A.   In my opinion, no.  These
20 Advisory Committees are part of the
21 structural problem.  They are selected
22 by -- the members of those committees are
23 generally selected by the division
24 directors within the Office of New Drugs,

Page 112

1  whose drugs that committee will talk
2  about.  And so they pick people who they
3  know from the field and frequently can
4  talk with those people, will talk with
5  those people about upcoming Advisory
6  Committee meetings and the type of
7  direction that they wish that advisory
8  meeting to go in.
9        If you look at the Advisory
10 Committees in terms of their financial
11 attachments to industry, it's been in the
12 newspapers quite a bit that a third of
13 FDA committee members have financial ties
14 to industry, some large number.  And if
15 you were to look at the Advisory
16 Committee meeting from February of 2005
17 where we were talking about the
18 nonsteroidal pain relievers and the COX-2
19 drugs including Vioxx and Celebrex and
20 Bextra and the like --
21    Q.   Yes.
22    A.   -- the committee was asked
23 two questions.  It was asked one
24 question, should Vioxx be kept off the

Page 113

1  market or allowed to remain on the
2  market?
3        And it was asked a second
4  question, should Bextra be allowed to
5  stay on the market or should it be
6  withdrawn from the market.
7        And I believe in this
8  handout, I have a slide that combines the
9  votes, it's number 42, that combines the
10 votes --
11       MR. KLINE:  We can put it
12 up.
13       THE WITNESS:  -- from these
14 committees based on whether the
15 members of the committee had a
16 financial tie with companies that
17 make COX-2 selective NSAIDs or
18 were working to develop COX-2
19 selective NSAIDs.
20       And what you find is that if
21 you're a committee member who had
22 such a financial tie, you were 13
23 times more likely to vote to keep
24 Vioxx or Bextra on the market than

KS-000328

Confidential - Subject to Protective Order

Page 114

1    if you didn't.  And it's highly
2    statistically significant.  So,
3    the question is, well, are these
4    people being influenced -- you
5    know, is the financial tie causing
6    them to vote the way they vote.  I
7    can't answer that question.  But
8    what I can say is that the
9    financial ties, having that
10   financial relationship with the
11   company, is highly predictive of
12   how an individual will vote when
13   it comes to important decisions
14   such as should a drug stay on the
15   market or be removed from the
16   market.
17   BY MR. KLINE:
18       Q.   Let me move through -- you
19   believe you've covered -- I know we went
20   back to structural issues, and there are
21   many, as I think you're telling this
22   jury.
23       A.   Yes.
24       Q.   The Advisory Committee being

Page 115

1    part of it, is that correct?
2        A.   Correct.
3            MR. BECK:  Object to the
4    form.
5    BY MR. KLINE:
6        Q.   And now cultural issues,
7    sir.  Have we covered them?
8        A.   I think we've covered those
9    fairly well.
10       Q.   Is there a presumption that
11   a drug is safe until it is, as you say in
12   this public statement, proven guilty?
13       A.   Yes.  If you look at the way
14   that drug safety is evaluated in both
15   preapproval and postapproval, the --
16   what's called the null hypothesis, the
17   assumption is that the drug is safe.  And
18   then what is required is to have
19   overwhelming evidence that says, no, it's
20   not safe before you'll say that the drug
21   is not safe.  And this is done by using a
22   measure called the p-value, which is a
23   measure used by statisticians to talk
24   about how likely or unlikely something is

Page 116

1    to have occurred by chance.  And the
2    magic number is .05.  If something has a
3    5 percent or less chance of happening by
4    chance, that is, there's a 95 percent or
5    greater chance that it occurred because
6    of the study that you've done, that the
7    drug works or that it has safety, then
8    we'll believe it.  But if it's only -- if
9    you're only 90 percent sure, we're going
10   to say that the drug is safe.
11           So, for example, we can
12   have -- and we have examples of this in
13   actually the Vioxx NDA, in the new drug
14   application there, where the medical
15   officer saw evidence of increased
16   cardiovascular risk and said, but we
17   cannot be absolutely certain.  And so
18   it's because FDA insists on absolute
19   certainty about safety that it in my
20   estimation gives the companies a free
21   pass on safety.
22           Because no company -- here's
23   the situation.  If I'm going to get a
24   drug approved, well, the assumption that

Page 117

1    FDA makes is the drug doesn't work.  If
2    I'm a drug company, well, now I have an
3    incentive to do a really good study to
4    show FDA that the drug works.  So, the
5    incentives work in the right direction.
6    The company is going to try to do a
7    really good job to convince FDA to change
8    its mind about the drug because FDA
9    starts off saying the drug doesn't work.
10           On safety, it's just the
11   reverse.  The bigger and better a study
12   the company does, the more likely it's
13   going to find a problem.  And so
14   companies are actually rewarded for doing
15   small studies that aren't able to show a
16   problem because the assumption is that
17   the drug is safe.  And that is the way
18   FDA misuses statistics at FDA.
19           It could be analogized to
20   something called noninferiority trials.
21   Noninferiority trials are done in
22   situations where you have one drug and
23   what you want to do is you want to show
24   that it's no worse than another drug, but

KS-000329

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 118

1   it can actually be a little bit worse.
2   It could be 20 percent worse than the
3   other drug, and even if it's 20 percent
4   worse, we'll call it the same.  Now, FDA
5   has recognized for a long time that the
6   incentives for such a study are in the
7   wrong direction, that is, they encourage
8   poorly done studies because they give an
9   overwhelming advantage to industry in
10  terms of getting a drug approved.  Well,
11  that's exactly what we have with safety.
12  It's a noninferiority study.  We're
13  assuming that the drug has no problem.
14  And until we can show beyond a shadow of
15  a doubt basically, you know, with 95
16  percent or greater confidence, that we're
17  going to pretend like it never happened.
18       Q.   You analogized this in front
19  of the United States Senate to bullets in
20  a gun.
21       A.   Yes.
22       Q.   Would you tell the members
23  of the jury the same thing so they have
24  the benefit.

Page 119

1        A.   Right.  I was trying to get
2   the Senators to understand the statistics
3   of the matter, and I gave the analogy of
4   a gun with 100 chambers.  And I said,
5   let's play Russian roulette.  Now, we're
6   going to put 95 bullets in the gun, so we
7   are 95 percent certain that this drug
8   causes whatever adverse reaction we're
9   talking about.  Let's just say this drug
10  causes liver failure.  This drug causes
11  heart attacks.  We're 95 percent certain.
12       Q.   That's the current test?
13       A.   Right.  So, we put 95
14  bullets in, and we play Russian roulette.
15  And at that point, the FDA says, we
16  believe you, the gun is loaded, the drug
17  isn't safe.  Let's take five bullets out
18  of the chamber.  Now we have 90 bullets
19  in the chamber.  So there's only 90
20  percent chance that when I pull the
21  trigger, a bullet is going to come out of
22  the gun.  FDA says the gun is not loaded.
23  That's the misuse of statistics.
24       Q.   How can that be?

Page 120

1        A.   It's a historical artifact,
2   but it is one that is embedded in the way
3   FDA does business.
4        Q.   How should it be, sir?
5        A.   My belief is that it is
6   possible to design studies in advance in
7   which you prespecify a level of risk that
8   you would be willing to tolerate for the
9   anticipated benefit of a drug, and then
10  you design your study large enough to
11  exclude risks greater than that maximum
12  tolerable risk.
13       Q.   I want to move on.  I want
14  to move very quickly because I have to
15  get through your Vioxx study, I have to
16  get through your Kaiser study -- your
17  Vioxx opinions and your Kaiser study.
18            MR. KLINE:  I do want to
19       show Exhibit Number 44, if I may.
20       And if we can put it up.  44 to
21       the PowerPoint.
22  BY MR. KLINE:
23       Q.   Now, I know, sir, this is a
24  cartoon, but you did this at a

Page 121

1   professional meeting, correct?
2            MR. BECK:  Excuse me a
3       second.  Is this a new exhibit?
4            MR. KLINE:  No.  It's part
5       of the same exhibit.
6            MR. BECK:  Page 44?
7            MR. KLINE:  Yes.
8            MR. BECK:  I'm sorry.
9            MR. KLINE:  Page 44.
10           MR. BECK:  I have the same
11      objection.
12           MR. KLINE:  Sure.
13  BY MR. KLINE:
14       Q.   It's a cartoon.  On the left
15  side it's side effects.  On the right
16  side it says the lifeguard is the FDA,
17  "Hey, how am I supposed to hear his
18  request for a new drug approval with all
19  your screaming?"  And the pharmaceutical
20  company is to the right.  Were you making
21  a point, sir?
22       A.   Yes, I was.
23       Q.   What was the point?  Were
24  you making a serious point?

Confidential - Subject to Protective Order

Page 122

1      A.   I was making a very serious
2  point.  This, in my view, crystallizes
3  the situation that we have in the United
4  States today and why I said that the
5  United States was defenseless against
6  another Vioxx.
7      Q.   Sir, did we cover the
8  scientific and personnel issues, or do we
9  still have to go --
10     A.   We covered the science.  We
11 didn't cover personnel.
12     Q.   All right.
13          Before we get to personnel,
14 I want to show you another point that you
15 made in exhibit number 61 of the
16 PowerPoint that you showed to your
17 Hopkins medical colleagues.
18          MR. BECK:  Page 61?
19          MR. KLINE:  Page 61 of
20     Exhibit Number 2.
21          MR. BECK:  I assume that I
22     can have a continuing objection?
23     I don't need to --
24          MR. KLINE:  That was my

Page 123

1      point before we even got started,
2      that you don't even have to make
3      the objection under the rule of
4      Judge Fallon.
5  BY MR. KLINE:
6      Q.   Now, again, a cartoon, but
7  were you making a serious point to your
8  medical colleagues at that time and
9  place?
10     A.   Most definitely.
11     Q.   The cartoon shows a fox to
12 the right, and it shows the press corps
13 to the right and a lawyer, of all people,
14 apparently standing there.  And the
15 cartoon says, "Those responsible for
16 putting my client in charge of the
17 henhouse should be on trial here, not my
18 client who, as a fox, was only doing his
19 job."  Who is the fox in the cartoon as
20 you understood it?
21     A.   Is industry.
22     Q.   Pharmaceutical industry?
23     A.   Pharmaceutical industry.
24     Q.   What was the point, the

Page 124

1  serious point that you were making,
2  albeit in a humorous way?  You apparently
3  have a good sense of humor.
4      A.   I was trying to convey the
5  message that FDA is not functioning in
6  the independent and objective interests
7  of what's best for the public, that it is
8  really functioning first and foremost for
9  a service of its primary customer and
10 client, the industry.
11     Q.   And of course the industry
12 is in the end of the day the one who is
13 promoting, manufacturing and profiting
14 from the drug, correct?
15          MR. BECK:  Object to form.
16 BY MR. KLINE:
17     Q.   Who is the one who is
18 profiting by the drug?
19          MR. BECK:  Same objection.
20          THE WITNESS:  The companies
21     who manufacture and market these
22     drugs are the ones who profit from
23     them.
24 BY MR. KLINE:

Page 125

1      Q.   Let's carry one more point
2  before we move out of this area, and
3  that's the scientific problems, I
4  believe, that you have.  Scientific or
5  personnel issues?
6      A.   That's personnel.
7      Q.   What are the personnel
8  issues that lead to what you call an
9  institutional bias, sir?
10     A.   Within FDA, there have now
11 been at least four different surveys done
12 by various groups of the scientific
13 staff.  There was a survey done by
14 something called the Health Research
15 Group, which is a watchdog group in 1990
16 to 1999 surveying medical officers within
17 the Center for Drug Evaluation and
18 Research.  And what they learned was that
19 30 percent of the people who responded,
20 responded that they felt that they
21 couldn't express contrary scientific
22 opinions within FDA.  Now, the response
23 rate for that survey was very low, so,
24 you could say, well, it's not

Confidential - Subject to Protective Order

Page 126

1  representative.
2        The Center for Drug
3  Evaluation and Research then did its own
4  survey, and that survey also came back
5  with the figure of about 30 or 33 percent
6  saying that they feel they cannot express
7  contrary scientific opinions when
8  questions about drug approval and safety
9  come up.
10       Then the government
11  accountability office also did a survey
12  of medical -- well, scientific staff at
13  CDER, and it reported that 18 percent of
14  FDA scientists had reported that they had
15  been pressured by their supervisors to
16  change a recommendation from not approved
17  to approved.  Now, when that became
18  public, like I think it was in 2004, a
19  public interest group called PEER brought
20  this to light, FDA's official response
21  was, we don't want to talk about the 18
22  percent that had this problem, let's talk
23  about the 82 percent that didn't have the
24  problem, that weren't suppressed.

Page 127

1        And my answer to that is, is
2  that there's lies, there's damned lies
3  and there's statistics.  And this is an
4  example where I think that it's
5  manipulating statistics.  Because most
6  drug approvals that FDA is faced with
7  today are for drugs that are called "me-
8  too" drugs.  They're not the new
9  lifesaving drugs that everybody thinks
10  FDA is working on all the time.  Most of
11  what FDA approves is routine stuff.  It's
12  additional.  It's saying, well, this drug
13  is already in the market, and we're going
14  to allow you now to market it for another
15  disorder.  It's approved for sinus
16  infections.  Now we're going to allow you
17  to market it for ear infections.
18       If you were to take out all
19  that stuff and just boil it down to the
20  new drugs where there's a safety concern,
21  that 18 percent would come up closer to
22  100 percent.
23       We then finally have --
24  recently FDA did a culture survey.  They

Page 128

1  brought in an outside group to do an FDA
2  culture survey, and that survey found
3  that 30 percent of scientific staff felt
4  that they couldn't express altering
5  scientific views.
6        We also have the widely
7  publicized example of my colleague, Dr.
8  Andrew Mosholder at FDA, who was pretty
9  severely suppressed by both the Office of
10  New Drugs management and by management
11  within the Office of Drug Safety itself
12  who viewed their mission as doing what
13  Office of New Drugs told them to do.  And
14  so Dr. Mosholder's report on suicidiality
15  with antidepressants in children was kept
16  from the public.  He wasn't allowed to
17  speak in an open public Advisory
18  Committee meeting that was convened to
19  talk about that subject, and he was given
20  a script by my supervisors to read if
21  anyone on the committee asked him why he
22  wasn't presenting, a script that
23  basically tried to cover up the fact that
24  he was being suppressed.

Page 129

1        This is the environment, the
2  personnel environment that FDA medical
3  officers and scientists operate in, is
4  that if you buck the system, if you stand
5  in the way of a drug approval or you
6  threaten the marketability, the viability
7  of a drug, that you are severely,
8  severely reprimanded, pressured,
9  criticized and threatened.
10       Q.   And did you find that -- I'm
11  now pressing down to about an hour and 10
12  or 15 minutes of left time with you on
13  direct examination.
14       Did you find that to be the
15  case in your experience when you had
16  something to say about Vioxx in mid to
17  late 2004?
18       A.   Yes.  I experienced threats,
19  intimidation and actually what in my view
20  appears to have been a very organized and
21  orchestrated campaign to smear and
22  discredit me.
23       Q.   All right.
24       I want to go back to one

KS-000332

Confidential - Subject to Protective Order

Page 130

1  quick point and then move forward.
2          When you were talking about
3  95 bullets and the gun being loaded with
4  only 90 bullets, and then the FDA says,
5  well, it's still safe, that was sort of
6  what you were saying, is that --
7  ultimately is it the pharmaceutical
8  company that is looking at it that way as
9  well?
10         MR. BECK:  Object to form.
11  BY MR. KLINE:
12      Q.   Go ahead.
13      A.   My view is that the
14  pharmaceutical companies will comply with
15  whatever rules FDA chooses to enforce,
16  so, basically tell me what hoops to jump
17  through, and I as a drug company will
18  jump through those hoops because I want
19  to get my drug approved.
20      Q.   Does industry look at the
21  safety issue that same way?
22      A.   Oh, yes.
23      Q.   That's my point.
24      A.   Yes.  It is quite frequent

Page 131

1  that you'll be in a meeting with a
2  company, and you'll have the point
3  estimate of the risk will be elevated.
4  So, we'll have a situation where the risk
5  is elevated seven times.  There was a
6  seven times increased risk of something
7  bad.  But the p-value is greater than
8  .05.  So, we don't have 95 bullets in the
9  gun.  We only have 93 or 92.  And the
10  companies will say it's not statistically
11  significant, therefore, it's not real,
12  therefore, we don't have to worry about
13  it.  And FDA will go along with it.
14         The number one reason why
15  that happens is because the study that's
16  being talked about is too small to show
17  the problem.  So, actually, it's like
18  you've stacked the deck.  If I give you a
19  small study that has no possibility of
20  showing the effect we're interested in
21  examining and then I don't find that
22  effect, well...
23      Q.   Well, you told me that the
24  FDA wasn't doing the study.  If the deck

Page 132

1  is stacked, who's stacking the deck?
2      A.   The deck is stacked --
3         MR. BECK:  Object to form.
4         THE WITNESS:  The deck is
5      stacked by the misuse of science.
6      It's the misuse of statistics.
7      It's allowing companies to benefit
8      from doing studies that are too
9      small to show the safety problem.
10  BY MR. KLINE:
11      Q.   Who is doing the studies?
12      A.   The companies are doing the
13  studies, and they know that small studies
14  have low power.
15      Q.   So, then, who is stacking
16  the deck?
17         MR. BECK:  Object to form.
18         THE WITNESS:  Well, in that
19      case, I would say the companies
20      are stacking the deck, I would
21      have to say.
22  BY MR. KLINE:
23      Q.   Now, I want to talk about a
24  concept.  I want to do it in less than

Page 133

1  three minutes of a very complicated
2  subject.
3         By the way, if you see
4  statistical significance in one of these
5  small studies, does that -- is there
6  greater significance to that?  If there's
7  a study that's not powered to show a
8  problem and then you show it anyway, is
9  there more significance to that?
10      A.   In my view --
11         MR. BECK:  Object to form.
12         THE WITNESS:  In my view,
13      that is an alarming circumstance,
14      one that demands intensive
15      scrutiny and attention.
16  BY MR. KLINE:
17      Q.   Did that happen here in the
18  Vioxx story?
19      A.   Yes, it did.
20      Q.   Did the stacked deck that
21  you mentioned earlier in your testimony
22  happen in the Vioxx story?
23         MR. BECK:  Object to form.
24         THE WITNESS:  My view of the

KS-000333

Confidential - Subject to Protective Order

Page 134

1    evidence is that that indeed
2    happened.
3  BY MR. KLINE:
4       Q.   Now, I want to do a topic,
5  efficacy versus benefit. I'd like you to
6  explain to the members of the jury in
7  brief terms why efficacy, which is what
8  we sometimes hear, a drug is efficacious,
9  is different than benefit, and how those
10  two either equate, in your opinion, or
11  don't equate and what the significance
12  is, please.
13       A.   Okay. Efficacy is, does the
14  drug have a biological effect. So, if
15  the drug is supposed to treat high blood
16  pressure, the efficacy will be, does it
17  reduce your blood pressure. So, it's
18  reducing a body measurement. That's the
19  effect. And if it does that, we say that
20  it has efficacy.
21           Effectiveness is whether or
22  not that drug taken on a regular basis
23  will actually give you a health benefit
24  long-term. If the drug lowers your blood

Page 135

1  pressure, but doesn't prevent you from
2  having heart attacks, strokes, kidney
3  failure or dying at a young age, well,
4  then, you've spent a lot of money to have
5  a lower blood pressure number, but have
6  derived no benefit from it. So, what you
7  want is, really, when you talk about
8  benefit/risk, is you want to look at what
9  is sort of the health benefits, the real
10  certifiable health benefit that you're
11  deriving from a drug versus what are the
12  real risks.
13           But what FDA frequently
14  does, almost always does, is it takes the
15  efficacy -- when it says benefits exceed
16  the risks, what it's really saying is in
17  our estimation, the FDA's estimation, the
18  efficacy should lead to a benefit, and we
19  say that benefit exceeds the risk. But
20  FDA has never done a formal benefit
21  analysis on any drug product to my
22  knowledge. It certainly did not do one
23  with Vioxx when it said that the benefits
24  exceeded the risks.

Page 136

1       Q.   Why is it important in the
2  Vioxx story to understand that the FDA
3  did no risk/benefit analysis as you've
4  just said?
5       A.   It's because I think if you
6  look at the VIGOR study, you're
7  confronted with what at least in my read
8  is a startling revelation that for every
9  complicated perforated ulcer or bleed
10  that Vioxx prevented, there were almost
11  two thrombotic cardiovascular events that
12  were caused by the drug. And so if
13  you're talking about benefits and risks,
14  here we have a ratio of almost two to one
15  where the risks exceed the benefits.
16           Now, let's look at what the
17  case fatality rates are. Nationally,
18  about five percent of people with GI
19  bleeds die. And I learned that by going
20  to the National Centers For Health
21  Statistics and looking at death
22  certificate data and then going to the
23  National Hospital Discharge Survey and
24  looking at how many hospitalizations

Page 137

1  there are for GI bleed. So, you have a
2  five percent death rate from GI bleeding.
3  In other words, you can have a GI bleed,
4  that's a pretty serious thing, you get
5  hospitalized for it, but most of the time
6  you're not going to die. With heart
7  attack, it's about a 40 percent chance
8  that you're going to die. So, if what
9  we're really interested in is sort of
10  benefit/risk, and let's take it to what's
11  the most important thing, and that's do I
12  live or do I die, in my view, the scales
13  are tilted greatly against Vioxx in terms
14  of safety versus benefit.
15       Q.   Okay.
16           That risk/benefit analysis
17  was or was not done by FDA?
18       A.   It was not done by FDA.
19       Q.   In your opinion, had it been
20  done, it would have come out the way you
21  suggested if it had been correctly and
22  diligently and honestly done?
23       A.   Yes.
24       Q.   Is the risk --

KS-000334

Confidential - Subject to Protective Order

Page 138

1        MR. BECK:  I have to object
2   to form on that last question.
3   BY MR. KLINE:
4        Q.   I'm reminded to ask, was
5   that risk/benefit done by the company, by
6   Merck?
7        A.   To my knowledge, it was not.
8   And I could cite as evidence of that the
9   VIGOR study.  And in the VIGOR study,
10  there's no real mention of weighing the
11  benefits and the risks in that study.
12  It's kind of implied that the benefits
13  exceed the risks, but there's no formal
14  analysis of it.
15       And it's also very curious
16  that in that paper, the most likely
17  explanation for the finding wasn't
18  addressed, which is the effect of Vioxx
19  on prostacyclin, which is the chemical
20  made by the body that causes blood
21  vessels to dilate and keeps platelets
22  from clotting.  And what Vioxx does is,
23  it blocks the production of prostacyclin
24  and makes it more likely that a heart

Page 139

1   attack can happen.  And in that VIGOR
2   study, which was published in the New
3   England Journal of Medicine and got a lot
4   of press, there's not a single word or
5   mention or reference to this
6   pharmacologic fact that was well known
7   throughout the medical community by this
8   time and was published in the literature.
9   And it was well known to the FDA medical
10  officer in her NDA review which preceded
11  the publication of the VIGOR study.
12       Q.   Was it all the more
13  significant as to Vioxx, and I know
14  you've talked about this, sir, the fact
15  that there were, I think it's in your
16  article, the fact that there were 106
17  million prescriptions of Vioxx during the
18  lifetime of Vioxx from '99 to '04?
19       A.   In the United States,
20  correct.
21       Q.   What is the significance --
22  and used by how many people to your
23  understanding?
24       A.   Estimates that I've seen

Page 140

1   range to about 20 million in the United
2   States.
3        Q.   What is the significance of
4   this story -- in this story, we're going
5   to go into this in detail in a moment.
6   What's the significance in terms of all
7   of that usage, both premarketing and then
8   after the drug was marketed, the fact
9   that it was going to be used by --
10       A.   Well --
11       Q.   -- literally over a hundred
12  million prescriptions?
13       A.   Right.  The fact that the
14  drug was going to be used widely and that
15  it was used widely means that the
16  exposure to potential harm was very large
17  at a population level.  So, at a
18  population level, if we were saying, oh,
19  only 1,000 people or 10,000 people got
20  this drug, well, the number of people who
21  could be injured as a result, that
22  absolute number, would be relatively
23  small.  But when you give a drug to 20
24  million people, you multiply the numbers

Page 141

1   of people who can be affected.  So,
2   that's -- from a public health
3   perspective, that is why I considered
4   this to be a public health catastrophe.
5        Q.   Was it indeed -- was Vioxx
6   indeed a public health catastrophe?
7        MR. BECK:  Object to form.
8        THE WITNESS:  Yes.
9   BY MR. KLINE:
10       Q.   Why, sir?
11       A.   Vioxx, in my opinion, was a
12  public health catastrophe because, A, it
13  was a toxic drug that had severe
14  cardiovascular effects raising --
15  increasing the risk of heart attack.
16       Two, heart attack is like
17  one of the leading causes of death in the
18  United States, so, the rate of it is
19  pretty high.  If I have a drug that
20  increases the rate of something that
21  already happens at a high rate, I'm
22  multiplying two high numbers by each
23  other, and that's going to mean that lots
24  of people will probably have heart

KS-000335

Confidential - Subject to Protective Order

Page 142

1    attacks.
2          Three, the typical person
3    with osteoarthritis or rheumatoid
4    arthritis who was going to get Vioxx is
5    somebody who is older.  And older people
6    have other risk factors for heart
7    disease.  If your typical Vioxx user is
8    somebody in their 60s, well, if they are
9    male, they've got their gender is a risk
10   factor for heart attack, their age is a
11   risk factor for heart attack, and if you
12   look nationally at statistics on health
13   of Americans, they will also have at
14   least one of the following:  they'll have
15   high blood pressure, high cholesterol,
16   diabetes or they'll smoke.  So, right off
17   the bat, this drug is going to be
18   marketed -- my typical patient that is
19   getting this drug is going to be somebody
20   who has two or three risk factors for
21   heart disease already.  So, you put all
22   these things together and then you
23   multiply it by the fact that I'm giving
24   it to 20 million people, and it's just

Page 143

1    simple mathematics that you've got a
2    formula for disaster.
3          Q.   Sir, you have actually
4    quantified what you believe to be the
5    formula in your study paper -- your
6    Kaiser study paper published in Lancet.
7    Is Lancet a highly respected journal?
8          A.   Yes.
9          Q.   Published in Britain?
10         A.   Yes.
11         Q.   The equivalent of the New
12   England Journal of Medicine here in the
13   United States?
14         A.   Yes.
15         MR. BECK:  Object to form.
16   BY MR. KLINE:
17         Q.   What is it the equivalent of
18   in the United States?
19         MR. BECK:  Objection.
20         THE WITNESS:  It's the
21   equivalent of the New England
22   Journal of Medicine or the Journal
23   of the American Medical
24   Association.

Page 144

1    BY MR. KLINE:
2          Q.   You stated there, "88,000 to
3    140,000 excess cases of serious coronary
4    heart disease probably occurred in the
5    United States over the market life of
6    Vioxx." Did you make that statement?
7          A.   Yes, I did.
8          Q.   Is that a true statement?
9          A.   Yes, it is.
10         Q.   Tell us why "88,000 to
11   140,000 excess cases of serious coronary
12   heart disease probably occurred in the
13   United States over the market life of
14   Vioxx."
15         A.   It occurred because Vioxx is
16   unsafe at any dose.  In other words, all
17   doses of Vioxx can cause increased heart
18   attack risk.  Vioxx was used widely --
19         Q.   How about the timing of it?
20         A.   The timing begins with the
21   first dose, and there is lots of evidence
22   now that points to that.  In fact, on the
23   APPROVe study, which we used to help
24   formulate our estimate of heart attacks,

Page 145

1    was a study performed by Merck of
2    patients with colon polyps, and they were
3    giving them the 25 milligram strength of
4    Vioxx to see if they could prevent colon
5    polyps.  And the study found a roughly
6    twofold increase in heart attack risk in
7    patients who were treated with Vioxx
8    compared to people who are taking a sugar
9    pill, a placebo.
10         Now, in the paper that the
11   company published, they did what's called
12   a post hoc analysis.  And this is an
13   analysis that's done after the fact.  And
14   so FDA -- if this analysis had been
15   presented to FDA for an -- for some
16   statement to be put in their labeling,
17   FDA would have thrown it out because
18   they'd say it's post hoc, which means it
19   could have happened by accident.  In
20   clinical trials, you're supposed to
21   prespecify before the trial starts what
22   analyses you will do.  And the
23   prespecified analysis that Merck said
24   they would do showed a twofold increased

KS-000336

Confidential - Subject to Protective Order

Page 146

1  risk.  And the correct interpretation of
2  that is that the risk would be increased
3  from the start of the drug for as long as
4  you took the drug.  But Merck did a post
5  hoc analysis.  And the post hoc analysis
6  showed these two curves where they said
7  that the risk didn't begin until after
8  you are on the drug for 18 months.  And
9  as a result, there was a public
10  statement, a press release from Merck
11  that said that the risk doesn't begin
12  until after 18 months.  Newspapers put it
13  up.  It's in newspapers.  There was just
14  an editorial commentary in the Washington
15  Post last week of somebody saying how on
16  earth could a jury award money to a
17  victim who had taken the drug for less
18  than 18 months because we all know that
19  Vioxx can't cause heart attacks before 18
20  months.
21          Well, two things.  One, that
22  was the approved -- that was a post hoc
23  analysis, so it can't be accepted.  What
24  it can be used for is to raise a

Page 147

1  hypothesis, a question, hmm, maybe this
2  is something -- maybe it only works after
3  18 months.  Then you have to go back to
4  do a second study to prove that.  If you
5  look -- so, that's point one.
6          Point two is, if you look at
7  those two curves and you look at how many
8  patients they had in the study, how many
9  heart attacks they had in that study at
10  the time -- let's take six months, for
11  example.  At six months, there were about
12  five or six heart attacks total in the
13  APPROVe study.  And now they don't give
14  the figures in the paper, so, you've got
15  to kind of make these extrapolations from
16  proportions that are presented in the
17  paper.  Five or six.  In order to show a
18  relative risk of 2, which is what the
19  overall study showed, they would have to
20  have had --
21      Q.    VIGOR?
22      A.    No.  We're talking APPROVe.
23      Q.    I'm sorry.
24      A.    This is the 18 month.

Page 148

1          They would have had to have
2  had 95 patients, 95 heart attacks by six
3  months, when all they had was five or
4  six.  So, the study would have had to
5  have been almost 20 times larger in order
6  to have a chance of finding the problem.
7  As it is, with the five or six cases that
8  they had at six months, all that Merck
9  could say from a statistical perspective
10  is the risk of heart attack with Vioxx
11  can be no higher than about 200.
12      Q.    This is called power?
13      A.    This is power.  And what
14  we're seeing there is the absence of
15  evidence is not evidence of absence.
16  They're saying the truth is, we don't
17  have the power.  But Merck is using that
18  argument to say, ha-ha, because we don't
19  have the power, therefore there isn't a
20  risk, therefore, anybody with a heart
21  attack before then, it's their own bad
22  luck.
23          But I give you an analogy,
24  and the analogy is, we've got those two

Page 149

1  curves, and if you have a picture of
2  APPROVe, you could put it up and then we
3  could talk from the curve.  You've got
4  these two curves that come together, and
5  there's no power there in that first 18
6  months to show a difference.  And as I
7  just discussed, the study would have to
8  be 20 times larger in order to show a
9  twofold difference.  You talk about
10  stacking the deck.  That's a stacked
11  deck.
12          Here's the analogy.  The
13  company is saying to you, to me, to the
14  jury, the moon has no craters.  And they
15  say, look at the APPROVe study in the
16  first 18 months.  I don't see a
17  difference there.  I look at the moon.  I
18  don't see any craters.  I'm saying, wait
19  a second, here's a pair of binoculars.
20  Let's make that study 20 times bigger.
21  Let me give you binoculars that raises it
22  20 times.  Now you look at the moon and
23  you see there are craters.  You look
24  here, you would see this heart attack.

KS-000337

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 150

1    Now, there had been 11
2  published studies, observational studies.
3  So, you'll never get a clinical trial
4  that's that large to study this question.
5  So, it has to come from observational
6  studies.  The preponderance of the
7  evidence of observational studies, there
8  are now 11 published observational
9  studies.  Nine of those observational
10  studies found that Vioxx increases the
11  risk of heart attack.  Of those nine, all
12  nine of them, when you look at it, you
13  have to tease it out, but in the studies,
14  they make it clear that the risk of heart
15  attack that they found in that study
16  occurred within 12 months.  So, we're
17  already inside 18 months.  Seven of those
18  studies have the evidence present within
19  six months.  Four of those studies have
20  the evidence within the first
21  prescription.  So, in other words, what
22  we have is evidence that Vioxx increases
23  the risk of heart attack from the first
24  dose on.  And we have no evidence to

Page 151

1  suggest that the risk goes away with
2  time.
3     This follows precisely from
4  what we believed the underlying mechanism
5  is by which Vioxx and other COX-2
6  inhibitors might cause heart attack.  And
7  that is, suppressing prostacyclin so that
8  there's an excess of thromboxane.
9  Thromboxane causes platelets to clot and
10  can cause heart attacks.  And if you
11  disturb that balance, that disturbance in
12  balance is going to happen within the
13  first dose, and so -- the first couple
14  doses.  And so what you have is the
15  expectation that the risk should begin
16  early.  The only reason people don't find
17  it is because they don't have 10 million
18  patients in a clinical trial on the first
19  day that would let them see it.
20     Q.   You found it in your study?
21     A.   And we found it in our
22  study.
23     Q.   And was your study a large
24  scale observational study?

Page 152

1     A.   Yes.
2     Q.   And do large term
3  observational studies provide an
4  important -- are they an important piece
5  of information in the matrix of
6  information about drug safety?
7     A.   Yes, they are.  And in this
8  situation, particularly where we're
9  talking about this 18-month question, it
10  is the only information available.
11     Q.   Before we take a short
12  break, because then I'm going to have, I
13  think, about an hour left, I need to ask
14  you to wrap this part up.  I had, I
15  think, interrupted you at a point, I'm
16  going to plead guilty to that, when you
17  started to talk about the drug being
18  unsafe at any dose, and then I
19  interrupted you asking you what about at
20  the time of the first dose.
21     I want to go back to the
22  general question that was on the table at
23  the time, which was, as to your statement
24  about the Kaiser study, in the Kaiser

Page 153

1  study that 88 to 140,000 excess cases of
2  serious coronary heart disease probably
3  occurred in the United States over the
4  life of the drug Vioxx.  And I had
5  interrupted you.
6     What is the answer to that
7  question as to why you make that
8  statement, if you haven't already
9  explained it?
10     A.   Right.
11     Q.   You started off saying it's
12  unsafe at any dose.  It starts at the
13  initial dose.  Are there other factors?
14     A.   Well, just that --
15     MR. BECK:  Object to form.
16  BY MR. KLINE:
17     Q.   Please, sir.
18     A.   Just that it has wide use;
19  that lower doses and higher doses
20  increase the risk; that there's typical
21  patients who are going to get the drugs
22  have relatively high background rates for
23  heart disease.  And you take these
24  factors together and you multiply them

KS-000338

Confidential - Subject to Protective Order

Page 154

1  out, and you end up with large numbers.
2      Q.   While I don't want to do the
3  exact statistical computation in front of
4  the jury, have you done that to make that
5  kind of statement in the peer reviewed
6  medical literature?
7      A.   Yes, I have.
8      Q.   What is the construct there,
9  please, just briefly?
10     A.   Right.  Basically, what you
11  do is -- what we did was, we took the two
12  large published clinical trials that
13  Merck conducted, the VIGOR study, which
14  was at the higher doses of Vioxx, and the
15  APPROVe study, which was at the lower
16  doses of Vioxx, and we used those
17  studies, the relative risks from those
18  studies, five-fold increased risk in the
19  VIGOR study, a two-fold increased risk in
20  the APPROVe study for the lower dose, to
21  then apply that to the U.S. population in
22  terms of like about 18 percent of the
23  population got the high dose and 82
24  percent got the lower dose.  And you can

Page 155

1  do a series of calculations,
2  epidemiologic formulas that basically
3  just give you the answer, if you know how
4  long the prescriptions are, and we had
5  information that told us how long each
6  prescription was for.
7      Q.   You did that kind of
8  calculation?
9      A.   Yes.
10     Q.   That was your conclusion?
11     A.   Yes.
12         MR. KLINE:  When we come
13  back -- we're going to take a
14  five-minute break.  When we come
15  back, I am going to ask you
16  questions about the Vioxx story
17  and about your Kaiser study and
18  should be able to complete that in
19  roughly 45, 50 minutes, maybe 55
20  minutes.  That's my goal.  And I'm
21  going to ask you when you come
22  back to let's tighten up just a
23  little bit in terms of your
24  expansion of answers.  I

Page 156

1  appreciate it.
2         We'll be back in five
3  minutes.
4         THE VIDEOTAPE TECHNICIAN:
5  Stand by, please.  That concludes
6  Video Cassette Number 1.  The time
7  is 11:13.  We're going off the
8  record.
9           - - -
10        (Whereupon, a recess was
11  taken from 11:13 a.m. until
12  11:35 a.m.)
13           - - -
14        THE VIDEOTAPE TECHNICIAN:
15  This begins Video Number 2.  The
16  time is 11:35.  We're back on the
17  record.
18  BY MR. KLINE:
19     Q.   Dr. Graham, continuing your
20  deposition, I have at least three areas
21  that I need to cover, and I'd like to
22  cover them in 10, 15-minute segments.
23  So, I need your cooperation in narrowing
24  down and honing in on certain things so I

Page 157

1  can get everything covered.  I'd
2  appreciate your help.
3         MR. BECK:  I'm sorry, I
4  can't hear what you're saying.
5         MR. KLINE:  Yeah, I know,
6  because they're taking a break out
7  there.  I will start again.
8         I said I'm going to have two
9  or three areas of inquiry, and I
10  simply want to try to hone in on
11  those things.
12        Can I go off the record?
13        THE VIDEOTAPE TECHNICIAN:
14  Stand by, please.  11:36.  We are
15  off the record.
16           - - -
17        (Whereupon, a recess was
18  taken from 11:36 a.m. until
19  11:59 a.m.)
20           - - -
21        THE VIDEOTAPE TECHNICIAN:
22  The video time is 11:59.  We're
23  back on the record.
24  BY MR. KLINE:

KS-000339

Confidential - Subject to Protective Order

Page 158

1      Q.   Dr. Graham, going into the
2  specifics of the Vioxx story, there is
3  something that you called the, quote,
4  Vioxx story, correct, generally speaking?
5      A.   Well, there is a story to
6  it, yes.
7      Q.   Would you give us your
8  overview and your understanding of the
9  Vioxx story?
10      A.   Well, Vioxx was approved in
11  1999.  In November 2000, a study was
12  published in the New England Journal of
13  Medicine called VIGOR, which was a study
14  performed by Merck showing that Vioxx
15  reduced the occurrence of perforations,
16  ulcers and bleeds in the gastrointestinal
17  tract compared to naproxen therapy, but
18  also that it increased the risk of heart
19  attack by about a factor of five compared
20  to naproxen.
21      At that point then, the
22  article that got published in the New
23  England Journal of Medicine, rather than
24  talking about Vioxx increasing the risk

Page 159

1  of heart attack, it actually changed the
2  way it did the analysis.  And I thought
3  that this was really a misleading aspect
4  of the way they went about things.
5      When you do a scientific
6  study --
7      Q.   "They" being?
8      A.   "They" being Merck.
9      When you do a scientific
10  study --
11      MR. BECK:  Excuse me,
12      Doctor, before you continue on
13      with your answer, I'm going to
14      object to this as not being a
15      subject that Dr. Graham has
16      discussed previously.
17  BY MR. KLINE:
18      Q.   Dr. Graham, and I'm going to
19  let you continue your answer.  Everything
20  you've said so far, have you said in some
21  public forum one way or the other?
22      A.   Yes.  These things I've
23  discussed openly with others.
24      Q.   And to assure whatever judge

Page 160

1  is ruling on this, particularly Judge
2  Fallon in his court, would you continue
3  with your answer giving me those things
4  which you've said publicly as far as the,
5  quote, story about Vioxx.  Thank you,
6  sir, continue.
7      A.   Right.
8      Whenever you do a clinical
9  trial or a study, you have what's called
10  a reference group or a control group.
11  Frequently in a clinical trial, that will
12  be a placebo, which is a sugar pill.  In
13  the VIGOR study, it was naproxen, which
14  is another pain reliever.  When you have
15  a comparator and you have an experimental
16  treatment, in this case, Vioxx was the
17  experimental treatment, when you do your
18  analysis, you are supposed to put the
19  results for the experimental treatment,
20  in this case, Vioxx, in the numerator of
21  a ratio, and your reference, naproxen, in
22  the denominator.  When the evidence was
23  presented on perforations, ulcers and
24  bleeds, that's the way the information

Page 161

1  was presented.  It was presented in the
2  classically accepted way, and it showed
3  that the risk of ulcers, et cetera, was
4  about one half, about .5, 50 percent that
5  of naproxen.
6      When it came to presenting
7  the heart attack risks, it flipped it
8  around.
9      Q.   "It" being who?
10      A.   The company, Merck.  They
11  flipped it around, and they put -- and
12  now in talking about heart attacks, they
13  put the risk of heart attack in naproxen
14  patients, which is the comparator, the
15  reference group, they put that in the
16  numerator, and they put Vioxx in the
17  denominator, and it should have been the
18  other way around.  But by doing this,
19  then the number that you get is .2.  So,
20  what they could say was, oh, the heart
21  attack risk with naproxen is 20 percent
22  that of Vioxx, rather than having to say
23  the risk of heart attack with Vioxx is
24  five times higher than it was with

KS-000340

Confidential - Subject to Protective Order

Page 162

1    naproxen.
2         It may seem like a minor
3    point, but it's really, I think,
4    fundamental, at least in my
5    understanding, of the study, because by
6    misrepresenting that information, it then
7    flows into what I would call the naproxen
8    hypothesis.  And in the VIGOR study, what
9    Merck proposed was that naproxen
10   protected against heart attack.  Even
11   though Vioxx had five times higher rate
12   of heart attack than naproxen, what they
13   said was, is here's Vioxx, here's
14   naproxen, what they said is, well, Vioxx
15   is normal, there's no increased risk
16   here, what it is is naproxen protects
17   against heart attack.  And they cited one
18   reference to support that, and it was a
19   study that Merck itself had done in 22
20   patients where they had given them
21   naproxen, taken blood samples from them,
22   and then did experiments in test tubes to
23   see what effect it had on the way their
24   platelets worked.

Page 163

1         Well, this information,
2    subsequently the FDA basically said that
3    doesn't prove anything because there are
4    no controlled clinical trials to show
5    that naproxen protects against heart
6    attack.  But the argument was that
7    naproxen protects against heart attack.
8    And that was the argument in VIGOR.
9         To me, what was -- when I
10   read that, there were two things that
11   really sort of struck me.  One was that a
12   five-fold difference in heart attack risk
13   is something quite high and something
14   that you really have to pay attention to
15   because heart attack is such a serious
16   disorder, and it's so very common.
17        The second thing was that
18   just on the face of it, this notion of
19   naproxen being protective, I was highly
20   skeptical of it, and as a matter of fact,
21   so were my office leadership, including
22   Peter Honig, who is now at Merck, but was
23   my office director then, and Marty
24   Himmel, who is now at Merck, but was his

Page 164

1    deputy office director.  We were
2    skeptical of the naproxen hypothesis.  We
3    were skeptical for the following reasons
4    -- I was skeptical for the following
5    reasons:
6         1.  Naproxen has been on the
7    market for over 30 years.
8         2.  Naproxen had been used
9    in many, many, many clinical trials, and
10   nobody had ever reported this phenomenal
11   heart-protecting effect before.
12        3.  There were -- and we
13   talk about 100 million prescriptions or
14   106 million prescriptions for Vioxx.
15   There were probably way, way more of that
16   of naproxen over the 30 years that it's
17   been on the market, so, there's
18   widespread use.
19        And then, finally, if
20   naproxen had had that kind of protective
21   effect that Merck was claiming in the
22   VIGOR study, it would have had to have
23   been about three times better than
24   aspirin at preventing heart attacks.  And

Page 165

1    aspirin has been well studied in clinical
2    trials.  It reduces heart attack risks
3    probably on average about 25 percent, and
4    that's viewed pretty much as sort of a
5    wonder drug.  Aspirin is a wonder drug.
6         Well, here Merck comes with
7    the VIGOR study and says naproxen is
8    three times better than the wonder drug
9    aspirin.  And to me it just failed the
10   straight face test and so --
11       Q.   The straight face test?
12       A.   Yes.  Does it have sort of
13   face validity?  Can you believe it on its
14   face.  And on the face, to me as the
15   experienced drug safety scientist, I was
16   just highly skeptical of that.
17        Plus you have the underlying
18   biology of how Vioxx works that would
19   lead one to expect that it might increase
20   the risk of heart attack.  And, in fact,
21   it's really funny how the VIGOR study
22   words this.  You know, the argument that
23   is sort of commonly in the literature
24   talking about heart attack risk with the

KS-000341

Confidential - Subject to Protective Order

Page 166

1  COX-2 inhibitors talks about prostacyclin
2  being decreased by drugs like Vioxx,
3  leaving thromboxane, which causes
4  clotting, unopposed.  So, there's an
5  excess of it.  There's sort of a balance,
6  and now there's too much thromboxane.
7        In VIGOR, Merck said, well,
8  we were interested in cardiovascular
9  risk, but their argument was because
10 naproxen -- because Vioxx wouldn't affect
11 platelet clotting and so -- but naproxen
12 would.  And so we thought there might be
13 a difference.  So, they sort of took the
14 converse of what was sort of like
15 obviously on everybody -- this was
16 something that everybody was talking
17 about, at least in the literature.  And
18 subsequently it became sort of a real
19 focus of research.
20       In any event, it was based
21 on reading that study and being highly
22 skeptical of it and recognizing that if
23 the high doses caused heart attack at a
24 five-fold increase, well, this thing

Page 167

1  called dose response, well, there's a 25
2  milligram dose and a 12-and-a-half
3  milligram dose.  25 milligram dose is the
4  most commonly used dose.  With dose
5  response, if you get an effect with a
6  high dose, what dose response says is,
7  well, you might also have an effect with
8  the lower dose.  It won't be as big an
9  effect.  So, the question is, is there a
10 heart attack risk with lower dose.  And
11 that was something that wasn't even
12 addressed in the VIGOR study in the
13 discussion.  In the discussion, it was
14 something that one could have brought up,
15 but it wasn't brought up.  In my view,
16 the discussion was unbalanced.
17       In any event, taking all
18 those things together, I thought that it
19 was important that we try to do another
20 study to examine the heart attack risks
21 with Vioxx.
22       Q.   And that's how you got
23 involved?
24       A.   And that's how I got

Page 168

1  involved.
2        Q.   Okay.
3             Let me step back with a
4  couple of things by way of background
5  that you touched upon, but I want to make
6  sure that I understand.
7             In the PowerPoint
8  presentation which you presented to your
9  colleagues, on Page 97 you talked about
10 way back in 1999 there was a theoretical
11 concern.
12       A.   You said 97?  I don't have
13 that particular --
14       Q.   I'm sorry.  47.
15            Again, I don't want to wed
16 you to these pages.
17       A.   Yes, yes.
18       Q.   I'd rather talk to you, have
19 a conversation with you, but I wanted to
20 focus you on it.
21            You said that there was a
22 theoretical concern way back in 1999.
23       A.   Right.
24       Q.   Tell us briefly what was the

Page 169

1  theoretical concern, and I want to just
2  make an imposition on you.  I'd like to
3  have as brief an answer to every question
4  as possible because I have a lot of
5  territory to cover.
6        A.   I'll try.
7             MR. KELL:  I'm going to
8        object to that question only to
9        this extent.  If the story that
10       Dr. Graham is going to tell
11       involves internal agency
12       deliberations or discussions, it's
13       the government's position that it
14       would not be proper for him to
15       disclose those.
16 BY MR. KLINE:
17       Q.   So, you made -- you
18 presented this PowerPoint at numerous
19 professional meetings, correct --
20       A.   Right.  This is from --
21       Q.   -- including the ISPE
22 conference in 2005; is that correct?
23       A.   That's correct.
24       Q.   That's the International

KS-000342

Confidential - Subject to Protective Order

Page 170

1   Society of Pharmacoepidemiologists?
2       A.   Correct.
3       Q.   A worldwide organization; is
4   that correct?
5       A.   Yes.
6       Q.   And by the way, you've been
7   asked to publicly appear at conferences
8   like that in your professional capacity,
9   correct?
10      A.   Yes, I have.
11      Q.   A group of your colleagues,
12  international epidemiologists from all
13  over the world, would hear your views
14  that you're telling this jury, correct?
15      A.   Correct.
16      Q.   All right.
17          Now, the theoretical
18  concern.  What have you publicly said
19  about that before?
20      A.   The theoretical concern was
21  that Vioxx would reduce or inhibit
22  prostacyclin and lead to an excess of
23  thromboxane, which would result in a
24  tendency for blood clots and

Page 171

1   theoretically cardiovascular events such
2   as heart attack or stroke.
3       Q.   Known to Merck back in 1999?
4       A.   I would assume that it had
5   to have been.  If it's known to the
6   medical officer who did this review, it
7   most certainly would have had to have
8   been known to Merck.
9       Q.   And you looked at the
10  review, and once you got into -- you
11  looked into the history of it once you
12  got interested in the subject based on
13  naproxen, correct?
14      A.   Actually, this particular
15  slide that we're looking at -- actually,
16  I began looking at this subsequent.  At
17  the time that we were planning our study,
18  this wasn't something that I had focused
19  on.
20      Q.   In the early period, did the
21  FDA know and appreciate that there were
22  high-risk patients that were excluded
23  from the study?
24      A.   Yes, they did.

Page 172

1       MR. BECK:  Object to form.
2   BY MR. KLINE:
3       Q.   Did Merck understand that?
4       MR. BECK:  Object to the
5   form.
6       THE WITNESS:  It is clear
7   from the way the studies are
8   described that patients at high
9   risk of experiencing
10  cardiovascular events were
11  excluded from the study, and since
12  that's written in the VIGOR study,
13  I have to assume that Merck was
14  fully aware and that it was
15  intentional.
16          - - -
17      (Whereupon, Deposition
18  Exhibit Graham-3, "Rofecoxib
19  Diagnosis and Treatment: What
20  went wrong?  Can we avoid?"
21  (Graham) PowerPoint Slides,
22  DG000014 - DG000034, was marked
23  for identification.)
24          - - -

Page 173

1   BY MR. KLINE:
2       Q.   I'm going to mark another
3   Powerpoint which you presented to the
4   International Society of
5   Pharmacoepidemiologists.  They had their
6   conference in 2005 in Nashville,
7   Tennessee, correct?
8       A.   Yes.
9       Q.   I think on occasion they've
10  had their conferences at more exotic
11  places, correct?
12      A.   It alternates, Europe and
13  North America.
14      Q.   I see.  This time it was
15  Nashville.
16          Now, I want to focus you,
17  sir, on some things that you said to the
18  international academy of -- International
19  Society of Pharmacoepidemiologists.
20      MR. BECK:  Before you do, I
21  believe this is another document
22  that was turned over by Dr.
23  Graham's personal lawyers from the
24  FDA files last Friday not in

KS-000343

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 174

1    response to a subpoena, and we
2    have the same objection to the use
3    of this that we had for the Johns
4    Hopkins PowerPoint.
5    BY MR. KLINE:
6        Q.    Was everything that you
7    said, sir, at the International Society
8    of Pharmacoepidemiologists in a public
9    forum?
10       A.    Yes, it was.
11       Q.    And were Merck -- are Merck
12   representatives always at the
13   International Society of
14   Pharmacoepidemiology?
15       A.    Well, I know that at this
16   particular meeting, several people from
17   Merck were there because they're
18   professional colleagues.  So, we had
19   conversations during the meeting, and I
20   know that they attended this session.
21       Q.    And was your PowerPoint
22   available as part of it?
23       A.    The PowerPoint was
24   presented.

Page 175

1        Q.    Now, in it, and I just want
2    to focus you on the slide that's entitled
3    "VIGOR:  deja vu all over again," what
4    were you telling your fellow members of
5    the International Society of
6    Pharmacoepidemiologists?
7        A.    Which slide number are you
8    on?
9        Q.    Number 24.
10       A.    Oh, here what I was talking
11   about was trying to make a little joke
12   about Yogi Berra and deja vu, but what I
13   was trying to talk about here is the
14   evidence that was accruing on Vioxx and
15   heart attack risks and FDA's response,
16   which in my experience has been to
17   downplay or ignore those risks and to let
18   things get worse in a sense to, let the
19   problem continue unabated.  So, that's
20   basically what I was, I think, trying to
21   convey there.
22       Q.    Understood.
23           Now, if you'd go to slide
24   number 29, this is something I'd like to

Page 176

1    display.  And regardless of whether the
2    display is there or not, the fact of the
3    matter is that you have used and you've
4    given this jury an explanation of the
5    naproxen and whether it was a plausible
6    explanation for the VIGOR results.  That
7    is what you've done so far, correct?
8        A.    Correct.
9        Q.    What did you call it
10   publicly, sir, the naproxen --
11       A.    I called it an alibi.
12       Q.    What is an alibi, sir?
13       A.    Well, I'm not a lawyer, but
14   what I meant was, it's sort of an excuse
15   to explain away an uncomfortable
16   situation.
17       Q.    What did you mean when you
18   described -- and I assume you're talking
19   about Merck's explanation later published
20   in the New England Journal that naproxen
21   was cardioprotective and thereby
22   explained the results of the VIGOR trial.
23   Is that what you were talking about?
24       A.    That is correct.

Page 177

1            MR. BECK:  Object to the
2    form.
3    BY MR. KLINE:
4        Q.    That is just a predicate.
5            My question is, what in that
6    context did you mean by the "naproxen
7    alibi," sir?
8        A.    What I meant was that there
9    was -- it was much more likely based on
10   the available evidence at the time that
11   Vioxx was increasing the risk of heart
12   attack than that naproxen was protecting
13   against heart attack, but that pointing
14   to naproxen saying it protects against
15   heart attacks is an alibi.  It's
16   basically to say it's not Vioxx that's
17   causing the heart attacks, it's naproxen
18   that's protecting against heart attacks.
19           What I also said at this
20   meeting was that it resulted in a
21   two-year wild goose chase as people in
22   their research focused on addressing
23   naproxen and whether it affects the risk
24   of heart attack, rather than focusing on

KS-000344

Confidential - Subject to Protective Order

Page 178

1  Vioxx and on lower-dose Vioxx, which was
2  being used by increasing numbers of
3  patients.
4      Q.   That two-year wild goose
5  chase occurred roughly in what calendar
6  year?
7      A.   2001/2002.
8      Q.   That was the years that I
9  believe you described earlier when the
10 label wasn't changed?
11     A.   Correct.
12         MR. BECK:  Object to form.
13 BY MR. KLINE:
14     Q.   What was going on with
15 labeling in that same period of time,
16 sir?
17     A.   Nothing was happening with
18 labeling, at least nothing visible.
19     Q.   Was it your words when you
20 described it, those two years, as a wild
21 goose chase?
22         MR. BECK:  Object to form.
23         THE WITNESS:  My reference
24     to wild goose chase was to the

Page 179

1      efforts by the scientific
2      community to investigate what has
3      subsequently been shown, I think,
4      unequivocally to be an untruth,
5      which is that naproxen does not
6      protect against heart attack.
7      There are now, I think, 18 or 19
8      published observational studies
9      that have looked at this.  And
10     four of them say that naproxen is
11     protective.  Four of them say it
12     increases the risk.  And the
13     others say there's no difference.
14     If you look at the four that say
15     there's a risk, two of them were
16     funded by Merck and co-authored --
17     one of them was co-authored by
18     Merck scientists.  And those two
19     actually have come to
20     inappropriate conclusions because
21     the analyses that were done were
22     scientifically inappropriate.
23         In the paper by Rahme which
24     was done in Quebec which claimed

Page 180

1      that, I think, naproxen reduced
2      the risks of heart attack by like
3      21 percent compared to other
4      NSAIDs, that got captured in the
5      press and interpreted by the
6      medical community as naproxen
7      protected against heart attacks.
8      But what you want to do is know
9      what does naproxen do versus
10     nothing at all?  That's the
11     appropriate comparison.
12         What they did in the Rahme
13     study was they took naproxen, and
14     they compared it to another pain
15     reliever.  If you rearrange the
16     Rahme data and they present all
17     the data in the paper so you can
18     rearrange it and then do an
19     analysis of the Rahme paper
20     similar to what we did in our
21     Kaiser study, they come up with a
22     conclusion -- they would come up
23     with the result that shows that
24     naproxen increases the risk of

Page 181

1      heart attack by about 28 percent.
2          Now, the second paper done
3      by Watson, that's the paper that
4      was basically authored by Merck
5      employees.  In that study, they
6      claimed that -- they concluded
7      that naproxen reduced the risk of
8      heart attack by, you know, 35 or
9      40 percent.  And they showed a
10     variety of analyses to support
11     that.  But the analysis that they
12     did, that they based their
13     conclusion on, did not adjust for
14     cardiovascular disease.  So, if
15     I'm concerned about does a drug
16     increase my risk of heart attack,
17     well, I've got to do adjustment
18     for cardiovascular risk.  And
19     Merck didn't do it.  So, the
20     analyses where they did do it, the
21     results weren't statistically
22     significant.
23         And then there's also
24     problems with case ascertainment

KS-000345

Confidential - Subject to Protective Order

Page 182

1 because in this case, covering 4
2 million patients followed for 10
3 or 15 years, they only found 27
4 sudden deaths, when they should
5 have found thousands.
6 BY MR. KLINE:
7     Q.   What is the bottom line,
8 bottom, bottom line on the science of
9 whether naproxen is cardioprotective and
10 whether this was an alibi?
11     A.   Naproxen is not
12 cardioprotective, never was, and it
13 isn't.
14     Q.   And does the science show it
15 today?
16     A.   And the science shows that
17 today.
18     Q.   Did they have the science in
19 their possession when they made what you
20 call an alibi back at the time of the
21 publication of the VIGOR trial?
22     A.   The studies that I've
23 referred to hadn't been performed at that
24 time, but what was available was the

Page 183

1 knowledge about aspirin and the fact that
2 then this would have had to have been
3 three times better than aspirin in that
4 naproxen had been used in many, many
5 clinical trials, it had been used for 30
6 years, and nobody had reported this
7 before. So, that common-sense stuff was
8 known.
9     Q.   Did the --
10         What you now call the
11 naproxen alibi, is that what drew your
12 eye and your attention, that along with
13 the number of people who were using the
14 drug along with the VIGOR results showing
15 the multiple of increased relative risk?
16     A.   They were --
17         MR. BECK: Object to form.
18 BY MR. KLINE:
19     Q.   Please.
20     A.   They were all interrelated,
21 and so they were all of a concern.
22     Q.   Now, you then set about,
23 yourself, to do something about it as a
24 safety officer of the Office of Drug

Page 184

1 Safety of the Food & Drug Administration
2 of the United States of America, correct?
3         MR. BECK: Object to form.
4         THE WITNESS: Yes.
5 BY MR. KLINE:
6     Q.   What did you do?
7     A.   What we did was looked
8 around to see if there was a way that we
9 could do a study in which -- my hope was
10 to do a study where the playing field
11 would be level so that -- my biggest
12 concern was when we do a study, what if
13 we find out in our results that there is
14 -- we don't find an increased risk with
15 Vioxx. Let's say we do the study, and
16 the results come out that there's no
17 increased risk. I wanted to be sure by
18 the way we designed the study that we
19 could trust that result because you have
20 this problem of low power and the like.
21     Q.   Let me stop you for a
22 minute.
23         Would this study have some
24 usefulness as distinguished from -- as an

Page 185

1 observational study, namely an
2 epidemiology study, as distinguished from
3 the clinical trials of which Merck had
4 done?
5     A.   Yes. The advantage of the
6 observational studies is that they are
7 much larger and have far larger numbers
8 of cases of people who are exposed to the
9 drug, and that's what gives you your
10 power to see if there's a problem. What
11 I mentioned before about the APPROVe
12 study and having only like five or six
13 heart attacks in six months, they really
14 needed like 95 cases or more to be able
15 to see the risk. With an observational
16 study, we had over 8,000 heart attacks in
17 our study. Compare that to what was in
18 the VIGOR study or the APPROVe study
19 where they had 30 or 40 heart attacks or
20 50 maybe or 60 in the VIGOR study. The
21 numbers -- it's just economy of scale.
22 The bigger the study is, it's like a
23 microscope, the better you can see what
24 the problems are.

KS-000346

47 (Pages 182 to 185)

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 186

1      Q.   Now, did you get -- by the
2  way, in 2000, I think the 2002 report,
3  there's an FDA report -- I don't want to
4  have to dig out the document.  I hope
5  I'll be indulged here.
6           There's a report in which
7  Vioxx was -- there was a suspect drug
8  list in 2001 reported in 2002?
9      A.   Yes.
10     Q.   What drug was on the top of
11 the suspect drug list?
12     A.   Vioxx.
13     Q.   And was your study conceived
14 by you?
15     A.   Yes.
16     Q.   And was it conceived to
17 study this number one top suspect drug?
18         MR. BECK:  Object to form.
19 BY MR. KLINE:
20     Q.   Please.
21     A.   I wasn't aware at the time
22 that it was the number one drug.  In my
23 mind, it was the leading public health
24 safety question that needed to be focused

Page 187

1  on.  When we went to -- when we decided
2  to do the study, we had a teleconference,
3  videoconference with Merck that was
4  attended by myself, my office director,
5  Dr. Honig, his deputy, Dr. Himmel, both
6  of whom are now at Merck, and then people
7  from Kaiser.  And we had a list of five
8  or six drug safety questions that we were
9  going to discuss which of these we
10 thought was the most important one that
11 needed to be studied.  And the consensus,
12 hands down, of that group was that Vioxx
13 needed to be studied because that issue
14 affected more lives and the impact of
15 that was potentially greater than any of
16 the other drug safety questions we talked
17 about.
18     Q.   A side point.  Do many
19 people move from the FDA into the drug
20 companies?
21     A.   There's a fair number.
22 There's a fair number who do, yes.
23     Q.   Now, the study.  It was --
24 tell us what you did, what you went about

Page 188

1  doing.  It was funded by the FDA,
2  correct?
3      A.   It was funded -- this study,
4  I've been told various estimates, that
5  this study cost -- should have cost -- if
6  it was being done today, it would have
7  cost over $1 million.  That's what I was
8  told by people at the DSaRM committee in
9  February 2005.  FDA contributed a total
10 of $60,000, which was basically good
11 faith money, and Kaiser underwrote all
12 the other expenses associated with the
13 study.
14     Q.   For the uninitiated, who is
15 Kaiser?  They're going to hear about
16 Kaiser Permanente.
17     A.   It's Kaiser Permanente,
18 California.  It's a managed care
19 organization in California.  I believe
20 it's a not-for-profit organization, but I
21 could be wrong about that.  This study --
22     Q.   Is it a healthcare plan?
23     A.   It's a healthcare plan like
24 an HMO.

Page 189

1      Q.   Do they have large
2  numbers -- a big population database
3  which you're able to mine?
4      A.   Yes.  They have like 6
5  million patients.
6      Q.   Are they affiliated with
7  industry when they're involved in these
8  studies?
9      A.   There are some studies that
10 they can do with industry.  This study
11 was done without industry input.
12     Q.   You got approval, and you
13 got funding from the FDA, correct?
14     A.   Correct.
15         MR. BECK:  Object to form.
16 BY MR. KLINE:
17     Q.   Did you get approval?
18     A.   Yes.
19     Q.   From the FDA?
20     A.   Yes.
21     Q.   Did you get funding?
22     A.   Yes.
23     Q.   Did you go about your
24 business of conducting this study?

Confidential - Subject to Protective Order

Page 190

1    A.   Yes.
2    Q.   Did you do it with the kind
3  of scientific rigor that you would expect
4  from yourself and from others like you?
5    A.   Yes.
6        MR. BECK:  Object to form.
7  BY MR. KLINE:
8    Q.   Did you do it with
9  scientific rigor?
10       MR. BECK:  Object to form.
11       THE WITNESS:  Yes.
12 BY MR. KLINE:
13   Q.   How did you conduct it?
14   A.   Well, we assembled a study
15 team, and so we had a group of
16 investigators from Kaiser who were well
17 experienced with their database and
18 understood what different files were
19 needed to do the study that we were going
20 to do.  We had people from FDA who
21 participated as well, had a statistician,
22 someone from the medical review division.
23 Eventually those people dropped off the
24 study because they just never showed up

Page 191

1  at the study meetings.  So, there was no
2  point in carrying them on.
3        And then I recruited the
4  assistance of Dr. Wayne Ray from
5  Vanderbilt, because he -- well, two
6  reasons:  one, we had a cooperative
7  agreement program where we funded him to
8  do research in a collaborative fashion
9  with FDA drug safety scientists, so, we
10 already had a relationship with him; and
11 two, he was very experienced in studying
12 these nonsteroidal pain relievers.  And
13 so the first thing was to assemble a
14 study team.
15       The second thing was to work
16 on a study protocol which -- we came up
17 with a rough protocol, but it went under
18 frequent modifications as we encountered
19 problems during the course of the study
20 where the way we thought the files would
21 work and the data would be available
22 turned out not to be the case, and so we
23 had to come up with workarounds.
24       But all that said, by August

Page 192

1  of 2000, we had our data set and did our
2  analysis and went to -- wanted to present
3  them at the international conference on
4  pharmacoepidemiology in Bordeaux, France.
5    Q.   When was that?
6    A.   That was in August of 2004.
7    Q.   The study took a number of
8  years, obviously?
9    A.   Yes.  It took about three
10 years.
11   Q.   Is that unusual?
12   A.   The study probably could
13 have been more quickly if FDA had been
14 able to devote its -- my full time to it
15 and if Kaiser had been able to devote its
16 full time to it.  But Kaiser basically
17 had their patients to take care of, and
18 they were sort of adding this on to their
19 normal workload, and I had many other
20 assignments during this time.  So, I
21 think if we were trying to do the study
22 today, maybe we could have done it in a
23 year-and-a-half.
24   Q.   Now, you were the lead of

Page 193

1  the study?
2    A.   Yes.
3    Q.   And it was your baby; is
4  that correct?
5    A.   Correct.
6    Q.   Was that known by your
7  bosses at the FDA?
8    A.   Oh, yes.
9    Q.   And did they know that you
10 were studying in particular Vioxx?
11   A.   Yes.
12   Q.   And were you studying other
13 COX-2s as well?
14   A.   We looked at Celebrex.  We
15 were not able to look at Bextra because
16 it wasn't used in Kaiser at the time of
17 our study.  And we looked at other pain
18 relievers as well, most particularly,
19 naproxen, because we also, in addition to
20 wanting to study whether or not Vioxx
21 increased the risk of heart attack, we
22 wanted to know whether naproxen protected
23 against heart attack.  And so we were
24 going to test both of those questions.

Confidential - Subject to Protective Order

Page 194

1    Q.   Now, there's a story in
2    between, but at the end of the day, was
3    this study published in The Lancet?
4        A.   Yes, it was.
5        Q.   It was first on line January
6    25th of '05?
7        A.   Correct.
8        Q.   Was it peer reviewed by --
9    did it go through a peer review process
10   and was it peer reviewed?
11       A.   It went through peer review
12   twice.  A total of ten different peer
13   reviewers from The Lancet looked at this
14   paper, five on each of two occasions.  On
15   each occasion, the paper was accepted for
16   publication.
17       Q.   Was that unusual, that it
18   was peer reviewed twice and by that many
19   people?
20       A.   It was unusual, but it was
21   necessitated by efforts by the FDA to
22   suppress publication of the paper.
23       Q.   Yes, I'm going to have you
24   tell that story in a minute in your own

Page 195

1    words.
2            At the end of the day when
3    you published the article, the article
4    was entitled "Risk of acute myocardial
5    infarction and sudden cardiac death in
6    patients treated with..."  Is that
7    correct?  That's the study?
8        A.   Yes.
9            MR. KLINE:  And we have it
10   here.  We'll mark it as the next
11   Exhibit Number, 4.
12                   - - -
13           (Whereupon, Deposition
14   Exhibit Graham-4, "Risk of acute
15   myocardial infarction and sudden
16   cardiac death in patients treated
17   with cyclo-oxygenase 2 selective
18   and non-selective non-steroidal
19   anti-inflammatory drugs: nested
20   case-control study," (Graham, et
21   al) The Lancet 2-5-05 Vol. 365,
22   475-481, was marked for
23   identification.)
24                   - - -

Page 196

1    BY MR. KLINE:
2        Q.   This was the result, the
3    fruits of your four-year labor; is that
4    correct?
5        A.   Correct.
6        Q.   What was your bottom line of
7    your findings, sir?
8        A.   The bottom line was that
9    Vioxx at high dose increased the risk of
10   heart attack compared to basically nonuse
11   of the drug; that, compared to Celebrex,
12   which was the other leading COX-2 pain
13   reliever on the market, that Vioxx at
14   high dose and low dose increased the risk
15   of heart attack.  With low dose, it was
16   just a borderline statistical
17   significance, but the point estimate was
18   clearly there; and that naproxen did not
19   protect against heart attack, if
20   anything, it increased the risk
21   slightly.
22           MR. KLINE:  And if I may,
23           and let me find it, if I can mark
24           yet another exhibit, Lisa, the

Page 197

1    PowerPoint that he presented to
2    the FDA Advisory Committee,
3    please.
4            We'll mark it as Exhibit
5    Number 5.
6                   - - -
7            (Whereupon, Deposition
8    Exhibit Graham-5, "Review of
9    Epidemiologic Studies on
10   Cardiovascular Risk with Selected
11   NSAIDs," (Graham) PowerPoint
12   Slides, 2-17-05 DG0000107 -
13   DG0000127 , was marked for
14   identification.)
15                   - - -
16           MR. KLINE:  And we have them
17   numbered?  We do have them
18   numbered.
19   BY MR. KLINE:
20       Q.   You presented at the FDA
21   Advisory Committee on February 17, 2005?
22       A.   Correct.
23       Q.   And the purpose of this
24   Advisory Committee very briefly, sir, was

Confidential - Subject to Protective Order

Page 198

1    what?
2        A.    To review the evidence for
3    heart attack risk with the various
4    nonsteroidal pain relievers, so, both the
5    COX-2 type, the Vioxx-type drugs and the
6    traditional pain relievers like naproxen.
7        Q.    Vioxx was off the market as
8    of September 30, 2004?
9        A.    Correct.
10       Q.    So, this postdates the
11   withdrawal of the drug?
12       A.    Yes.
13       Q.    Did you have any doubt as to
14   your opinions which you had already --
15   which you had just published in the
16   Lancet and presented in many other
17   forums, sir?
18       A.    No.
19       Q.    Now, when you presented --
20   let me show the results.
21           MR. KLINE:  Do we have his
22       PowerPoint in front of him?
23           THE WITNESS:  Uh-huh.
24   BY MR. KLINE:

Page 199

1        Q.    If you look at the last two
2    pages, your conclusions.  I believe they
3    -- I want to ask you, do the conclusions
4    here mirror only in a PowerPoint form the
5    conclusions that you reached and stated
6    to the medical world at large in your
7    peer-reviewed Lancet journal article,
8    sir?
9           MR. BECK:  Before you
10       answer, please, same objection.
11       This is another document that Dr.
12       Graham's lawyers took from the FDA
13       files and turned over to the
14       plaintiffs' lawyers outside the
15       normal scope.
16           THE WITNESS:  It's also
17       available on the web.
18           MR. KLINE:  Yes.  We hear
19       your objection, Mr. Beck.  It's
20       also available on the web, it's
21       also available in Merck's files
22       where we first, I think, found it.
23   BY MR. KLINE:
24       Q.    Having said that, Exhibit

Page 200

1    Number -- Page 126 of Exhibit Number --
2           THE COURT REPORTER:  5.
3    BY MR. KLINE:
4        Q.    -- 5 --
5           MR. KLINE:  Thank you.
6       You're keeping track.  You're good
7       with numbers.  Better than me.
8    BY MR. KLINE:
9        Q.    -- is the conclusions you
10   reach regarding risk of MI, COX-2
11   selective NSAIDs, and I'd like to go to
12   rofecoxib, namely, Vioxx.
13       A.    Right.  The --
14       Q.    That's it.  Thank you, sir.
15       A.    The conclusions from our
16   study, this would mirror the conclusions.
17   The risk beginning early in therapy,
18   apparent during days 1-30 of use.  In our
19   study, we were only able to get at that
20   time event indirectly by looking at the
21   distribution of time of use of Vioxx.
22   And what we saw was that over 50 percent
23   of our patients used the drug for less
24   than four months.  And so that result

Page 201

1    would say that the risk with Vioxx begins
2    early in therapy.  And so with that sort
3    of explanation, I would say that these
4    conclusions here for rofecoxib are
5    similar to the ones in our paper.  Our
6    paper did not address valdecoxib, which
7    is Bextra.  And with celecoxib, in that
8    study, we didn't have a lot of high dose
9    use, and we found no risk with the low
10   dose.
11       Q.    You said as to Vioxx that
12   equal to or less than 25 milligrams, your
13   words are "probable increased risk"
14   correct?
15       A.    Correct.
16       Q.    And greater than 25
17   milligrams "definite increased risk"?
18       A.    Correct.
19       Q.    When you presented this
20   paper at the Advisory Committee meeting,
21   did you speak to anyone from Merck?
22       A.    I think I did.  I think I
23   spoke to Peter Honig, but it was
24   basically -- he just said hello, how are

KS-000350

Confidential - Subject to Protective Order

Page 202

1  you doing.  I said, hi Peter, how are you
2  doing.  And then the conversation kind of
3  shifted.  And I said to him, Peter, you
4  just need to understand one thing, that
5  everything I have been doing here with
6  these drugs has nothing to do with Merck.
7  So, in my mind I'm not making a target of
8  Merck.  It has to do with the safety of a
9  drug.  That's all I'm interested in.  His
10 response back to me was that I'm glad to
11 hear that.
12     Q.   I want to go to Page 127,
13 because on Page 127 of your PowerPoint to
14 the Food & Drug Administration Advisory
15 Committee, you told them after your study
16 that naproxen, in your view, if we can
17 highlight this, you said, "not" cardio
18 "protective," correct?
19     A.   Correct.
20     Q.   In fact, you said the exact
21 opposite?
22     A.   No.  I said there's a
23 possibility.
24     Q.   Or a gradation of the exact

Page 203

1  opposite?
2      A.   Correct.
3      Q.   Namely, sir?
4      A.   That the evidence supported
5  the possibility that naproxen increased
6  the risk.  Subsequently, I've done a
7  meta-analysis of this that hasn't been
8  published yet where the risk of naproxen
9  is slightly increased.  It confers about
10 a ten percent increase in heart attack
11 risk.
12     Q.   Not a decrease?
13     A.   Not a decrease.
14     Q.   And -- okay, now.  If you
15 look at the Advisory Committee meeting,
16 your PowerPoint number 1 -- let's see,
17 it's 114, Page 114.  We'll put it up very
18 briefly and try to work through this
19 stuff in our waning moments.
20          I see here, "Risk of AMI
21 with Celecoxib Or Rofecoxib."  I want to
22 focus on Vioxx, rofecoxib.  Okay?
23     A.   Uh-huh.
24     Q.   What you did here was to

Page 204

1  collect the data from the various
2  studies, correct?
3      A.   Correct.
4      Q.   At all doses, just focusing
5  on the "all doses," your study showed an
6  increased risk of -- what are you showing
7  increased risks of here to be clear?
8  What are you characterizing it?
9      A.   We showed an increased risk
10 of heart attack and sudden cardiac death
11 as a -- sort of considering those
12 together.
13     Q.   By the way, sir, and I hate
14 to do it this way, but I forgot earlier.
15 When you gave me your figures of 88,000
16 to 140,000 excess cases of serious
17 coronary heart disease in the life of
18 Vioxx in the United States, how many of
19 those -- did you do a calculation of how
20 many of those were deaths?
21     A.   Yes.  It's about 40 percent.
22 So, if you multiply .4 by each of the
23 numbers, you come up with a range that's
24 somewhere in the neighborhood of 40,000

Page 205

1  to 60,000.
2      Q.   40,000 to 60,000 excess
3  deaths over those that would have been
4  if --
5      A.   Patients had not used
6  rofecoxib, had not used Vioxx.
7      Q.   Back to the relative risks.
8  If we can just focus in on all doses of
9  Vioxx, we have relative risks which are
10 above 1 in the Graham study, is that
11 correct?
12     A.   Yes.
13     Q.   The Solomon study?
14     A.   Yes.
15     Q.   The Kimmel study?
16     A.   Yes.
17     Q.   The Ingenix study?
18     A.   Yes.
19     Q.   And the Medi-Cal study?
20     A.   Yes.
21     Q.   And you were involved in the
22 Medi-Cal study as well, correct?
23     A.   Correct.
24     Q.   Very briefly.  I'm going to

KS-000351

Confidential - Subject to Protective Order

Page 206

1    sort of bang at a couple points here.
2            50 milligram dosage, you
3    wrote a paper on it, correct, sir?
4        A.   Yes.  It hasn't been
5    published yet.
6        Q.   I thought you wrote an early
7    paper on 50 milligrams and its usage.
8        A.   Yes, we did.
9        Q.   What was your point?  You
10   can probably tell me in a sentence or
11   two.
12       A.   One, that the higher doses
13   are more toxic, there's a dose response,
14   so, the highest doses have the highest
15   toxicity; and that they're used
16   extensively, 18 percent of the
17   population; and people use them for long
18   periods of time, not for the short
19   periods of time that people at FDA say
20   it's only approved for five days of use.
21   But if you read the label closely, it
22   says it hasn't been studied for more than
23   five days of use, and then it says
24   "chronic use is discouraged."  It doesn't

Page 207

1    say that it can't be used.  So, what we
2    found is it's used much longer than what
3    people customarily thought, it's used
4    much more frequently than you would have
5    imagined, and that it has higher toxicity
6    than the other drugs.
7        Q.   What is the relative -- what
8    is the increased risk for a patient using
9    Vioxx at 50 milligrams according to your
10   epidemiological studies, sir?
11       A.   Okay.  Well, if you were --
12   let's say you're a 65 to 70-year-old --
13   74-year-old white male, which might be a
14   typical Vioxx user.  Your background risk
15   for heart attack in the next year is 2
16   percent, 1 in 50, 2 in 100.  That's from
17   the American Heart Association.  If I
18   were to increase your risk of heart
19   attack by a factor of 5 as occurred, say,
20   in the VIGOR study, you would go from a
21   risk of heart attack of 2 per 100 to 10
22   to 100.  So, that would be going from 1
23   in 50 to 1 in 10 if you used the drug
24   over a year.

Page 208

1        Q.   Now, when we see a relative
2    risk like in your study of 1.34, let me
3    understand something.  If there were
4    1,000 nonusers, that would be -- there
5    would be 1,340 who had an incident; is
6    that correct?
7        A.   Basically, what it's saying
8    is if the natural occurrence in some
9    population was 1,000 cases --
10       Q.   Yes.  That's how I wanted to
11   put it.
12       A.   -- that using Vioxx, you
13   would get another extra 340 over and
14   above the thousand that would have
15   occurred anyway.
16       Q.   Why did I know you'd say it
17   better than me.
18           Now, that was the point I
19   wanted to try to ask you.
20           Now, what I want to do in
21   the remaining direct examination is to
22   ask you about how this study came about
23   in the period in 2004 when you were ready
24   to present the study and its results.

Page 209

1    Tell us the background, the atmosphere,
2    and what occurred with your attempt to
3    present this as a paper, your attempt to
4    present it as a poster at the American
5    College of Rheumatology, your attempt to
6    present it at the International Society
7    of Pharmacoepidemiologists.
8            First of all, is there a
9    story there, sir?
10       A.   Yes, there's a story.
11       Q.   And what is -- would you
12   please tell the members of the jury the
13   story.
14       A.   Well, there's a couple of
15   stories.  One story relates to two
16   different abstracts, one for the American
17   College of Rheumatology or ACR and one
18   for ISPE.  The data in the two abstracts
19   are different.  This was a cause for
20   concern, but basically the way it came
21   about was, my making mistakes along the
22   way.
23           The ACR abstract reflected
24   an inaccurate, an incorrect analysis of

KS-000352

Confidential - Subject to Protective Order

Page 210

1  the data.  We had misclassified patients,
2  and we discovered it after we put that
3  abstract in for -- submitted it to the
4  meeting, that required that we correct
5  it.  Because to not correct it, that
6  would be scientific misconduct, because
7  we had a problem, we saw it, and we
8  couldn't allow it to go uncorrected.
9          The second problem that I
10  was actually much more concerned about
11  was that I had done the analysis
12  incorrectly.  In the ACR abstract, we
13  talked about a number of different drugs,
14  and I don't remember it right offhand
15  now, I'd need it in front of me, but
16  let's say there were like five different
17  drugs that we looked at.  That's probably
18  more or less what it is.  In that study,
19  I did what's called a regression analysis
20  for each drug separately, and then I came
21  up with an answer.  Well, that's the
22  wrong way to do the study because if I
23  focus on one drug, I'm leaving the data
24  for the other four drugs out of the

Page 211

1  regression.  What you need to do is do a
2  single analysis that includes all five
3  drugs together at the same time in one
4  place.  And when we learned about that
5  mistake, I was embarrassed, but I was
6  also kind of happy.  I was happy because,
7  well, A, we'd caught the mistake; and B,
8  because I learned something that I hadn't
9  known before, and so we corrected the
10  mistakes.  And so the corrected data, if
11  you will, the corrected analyses were
12  present in the ISPE poster.  So, now, the
13  ISPE poster --
14      Q.   Okay.  So, you had some
15  issues.  Is this uncommon, by the way,
16  sir?
17      A.   No, it's not uncommon.
18      Q.   Dr. Graham, did you deal
19  with this with openness and transparency?
20          MR. BECK:  Object to the
21  form.
22          THE WITNESS:  Yes.
23  BY MR. KLINE:
24      Q.   How did you deal with this?

Page 212

1      A.   We dealt with it with
2  openness and transparency.
3          MR. BECK:  Move to strike.
4  BY MR. KLINE:
5      Q.   How did you deal with it?
6      A.   Well, let's see.  We had a
7  blinded group that had to vote in a
8  unanimous way to change the way we had
9  classified a drug.  So, if any one person
10  in the group said no, I think this drug
11  should stay classified the way it was
12  before, we wouldn't change it.  When we
13  went about the analyses and I discovered
14  the analyses, I checked it with a number
15  of different statisticians around the
16  country, people at Stanford, people
17  within FDA.  I contacted Norm Breslow,
18  who is a statistician, I think he's at
19  the University of Washington and has
20  written sort of like the definitive
21  textbook on the analysis of case-control
22  studies because I wanted to make sure
23  that the way I'd done it was wrong and
24  that I needed to change it.  And then --

Page 213

1      Q.   You got it changed?
2      A.   We got it changed.
3          And when we went to publish
4  the paper, one of the first things that I
5  did was I sent an e-mail to the editor of
6  The Lancet and asked for the opportunity
7  to speak with him before they reviewed
8  our paper.  And he called me and we spoke
9  for about 45 minutes.  The purpose of it
10  was to explain the ACR abstract and what
11  our paper was, why the differences
12  occurred, where they occurred, how we
13  handled them.  And his response back to
14  me was twofold.  He said, thank you for
15  your candor and your honesty and your
16  openness.  This happens all the time, and
17  I'm not concerned at all.  This is the
18  scientific method.
19      Q.   Now, did you face -- I want
20  to get to this.  I'm going to try to do
21  it literally in about five minutes or ten
22  minutes.  I'm going to go a little bit
23  over.
24          Would you tell the members

Confidential - Subject to Protective Order

Page 214

1  of the jury who hear this tape what
2  barriers and obstacles you faced in the
3  publication -- the presentation of this
4  information and explain the background.
5      A.   Right.
6      Q.   Are you able to capsulize it
7  like you did in front of the United
8  States Senate?
9      A.   I can try.
10         When I presented my results
11 of the study for clearance for the
12 abstract for ISPE, the reaction from my
13 supervisor was, oh, this is an
14 excellently done study, I only have one
15 problem, that's with your conclusion.
16 And he wanted me to change my conclusion.
17 And my conclusion was that Vioxx at high
18 doses increases the risk of heart attack,
19 and it shouldn't be prescribed by
20 physicians or used by patients.  So,
21 basically, I'm saying that the high dose
22 should come off the market.  That's what
23 I'm saying.  But I can't say that
24 outright, because the way FDA is, if I

Page 215

1  had said that, they would have buried me.
2  As it is, they spent three days harassing
3  me to force me to change the abstract.
4  In the process, they said, well, we're
5  not going to let you go to ISPE, oh, we
6  want you to present our view of the truth
7  so you can present what you believe and
8  what you don't believe.  Oh, we have to
9  let Merck know.  That came from Dr. Anne
10 Trontell, who is deputy office director
11 and a close personal friend of Peter
12 Honig.  And I only mention that --
13     Q.   From Merck?
14     A.   From Merck.  And I only
15 mention that because when Peter Honig was
16 a division director and then an office
17 director in our office, he's the person
18 that brought Dr. Trontell in to work with
19 us, and so she felt a great sense of
20 loyalty.  And so she was talking about,
21 we have to -- it's all right.  I can't
22 present it at ISPE, but we have to let
23 Merck know about it.  And that was the
24 FDA response.

Page 216

1          And then from the director
2  of the Office of New Drugs, this
3  contradicts our policy because our policy
4  says that the high dose is safe and
5  effective so how can he say it's not.
6          So, those are basically the
7  obstacles I had to face just to present
8  it in France.
9      Q.   Did you have an original
10 poster presentation which you ran up the
11 line at the FDA?
12     A.   Yes.
13     Q.   And did you say in that what
14 you told this jury, that 50 milligrams
15 should be off the market?
16     A.   I didn't phrase it that way,
17 but that was the clear implication, and
18 that was my intent.  And obviously that
19 was, I think, the interpretation that my
20 superiors at FDA took about it as well.
21     Q.   Did you accept some
22 editorialization by them and changes by
23 them by the time you did the final
24 presentation?

Page 217

1      A.   The final presentation was,
2  the conclusions were changed slightly,
3  and I wasn't happy with having had to
4  change them.  But if I hadn't changed
5  them, I would not have been allowed to
6  present the paper, and I thought it was
7  more important to get the information out
8  than to get it out with the conclusion
9  that I completely --
10     Q.   Which you did, correct?
11     A.   -- trusted.  Which I did.
12     Q.   And you presented the paper?
13     A.   Yes.
14     Q.   Now, what was the next step
15 along the way?  Was it putting this
16 into -- did you then get any more flack
17 at the FDA?
18         MR. BECK:  Object to form.
19         THE WITNESS:  When I
20 returned --
21 BY MR. KLINE:
22     Q.   I'll rephrase the question.
23 I don't want to have a word that might be
24 a problem.

KS-000354

Confidential - Subject to Protective Order

Page 218

1      Did you run into any more
2  difficulties at the FDA as your process
3  went forward towards turning the poster
4  and the abstract into a paper?
5      MR. BECK:  Object to the
6  form.
7      THE WITNESS:  Yes.  I ran
8  into many obstacles.  The first
9  was almost as soon as I returned
10 from France, so, it was at the
11 very end of August or the very
12 beginning of September, that I was
13 verbally scolded by my supervisor.
14 Basically, he accused me of having
15 orchestrated a media campaign to
16 publicize my poster at ISPE.  It
17 was just a ridiculous accusation,
18 but he was quite heated and quite
19 angry at me, even though Dr.
20 Trontell had said in one of her
21 e-mails this is going to attract a
22 lot of media attention.
23 BY MR. KLINE:
24     Q.   Who is she?  Those that are

Page 219

1  listening might be uninitiated.
2      A.   Dr. Trontell is the deputy
3  office director and the person --
4      Q.   Is she your immediate boss?
5      A.   No.  She's not my supervisor
6  at all.
7      Q.   Where is she from?
8      A.   She's in the Office of Drug
9  Safety.  She originally came from the
10 Office of New Drugs and was brought to
11 drug safety by Dr. Peter Honig.
12     Q.   Is this an example in your
13 mind of the problems in the FDA more
14 generally?
15     A.   Yes.
16     MR. BECK:  Object to form.
17 BY MR. KLINE:
18     Q.   Tell us why.
19     A.   It's an example of FDA
20 suppressing its scientists, not allowing
21 for the free exchange of scientific
22 information or free expression of
23 scientific information.  It's an Office
24 of Drug Safety that doesn't act

Page 220

1  independently of what the Office of New
2  Drugs says it wants to have happen.
3      Q.   Is that what was happening
4  here?
5      A.   And that was what was
6  happening here.
7      MR. BECK:  Object to form.
8  BY MR. KLINE:
9      Q.   In what way specifically?
10     MR. BECK:  Same objection.
11     THE WITNESS:  Well, it's
12 coming specifically because they
13 don't want anything publicized
14 that would contradict FDA policy
15 or that would call into question
16 the legitimacy or the rationale
17 for that policy.  Remember, when
18 FDA made the -- eventually made a
19 labeling change on Vioxx with
20 Merck in April of 2002, what FDA
21 was saying at that point is by
22 doing this labeling change, we
23 have now altered the benefit/risk
24 equation for this drug into an

Page 221

1      acceptable range.  Before the
2      labeling change, it was
3      unacceptable.  Now it's
4      acceptable.
5  BY MR. KLINE:
6      Q.   Was it, in your view,
7  acceptable?
8      A.   Oh, clearly, no.
9          And what this poster's
10 conclusion was saying was that FDA's
11 policy should be more closely examined.
12         And you mentioned before
13 that I had appeared on Nightline and I
14 had the opportunity to debate Dr. Janet
15 Woodcock, who is now an associate
16 commissioner at FDA, and she had been the
17 center director at one time.  And I asked
18 her --
19     Q.   CDER director?
20     A.   CDER.  I asked her directly
21 on national television, tell America what
22 the benefit/risk analysis from FDA was on
23 Vioxx.  Tell them.  Because I haven't
24 seen one, and as far as I'm aware, none

Confidential - Subject to Protective Order

Page 222

1  exists.  And the truth is none exists.
2  And Ted Koppel got all over her case
3  because when he saw that it hadn't been
4  done, he was pretty upset, too, because
5  FDA said the benefits exceed the risks.
6      Q.  Couple more things.
7          In your view, the benefits
8  clearly did not exceed the risks?
9          MR. BECK:  Object to form.
10          THE WITNESS:  No.
11  BY MR. KLINE:
12      Q.  In your view, did the
13  benefits clearly exceed the risk or
14  exceed them at all?
15          MR. BECK:  Object to form.
16          THE WITNESS:  No.  The
17      benefits did not exceed the risks.
18  BY MR. KLINE:
19      Q.  In fact, was it the
20  opposite?
21          MR. BECK:  Object to form.
22          THE WITNESS:  This drug was
23      risky.  And the benefits that one
24      gained at a population level for

Page 223

1      the risks just weren't worth it.
2      The juice wasn't worth the
3      squeeze, and in my view, as I said
4      before, I think that Vioxx was
5      approved prematurely, and clearly
6      if more work had been done,
7      certainly the high dose shouldn't
8      have been approved.  And if it had
9      been approved, it should have been
10      withdrawn with the VIGOR study.
11      And at that point, intensive study
12      at the lower doses should have
13      been enacted with a very large
14      clinical trial done in a very
15      short space of time to nail down
16      the question.  And I'm not talking
17      about an APPROVe-like study that
18      takes four or five years to do and
19      has only five or six heart attacks
20      in six months.  I'm talking about
21      a really huge study that gives you
22      the opportunity, the power, to
23      answer the question definitively.
24      And that was not done.

Page 224

1  BY MR. KLINE:
2      Q.  Everything of what you just
3  said, sir, was it within the resources
4  and capability of Merck & Company?
5      A.  Yes, it was.
6          MR. BECK:  Object to form.
7          MR. KLINE:  Let's go off the
8  video record.
9          THE VIDEOTAPE TECHNICIAN:
10  Stand by, please.  The time is
11  12:53.  We're going off the video
12  record.
13          - - -
14      (Whereupon, a recess was
15  taken from 12:53 p.m. until 12:55
16  p.m.)
17          - - -
18      MR. KLINE:  Dr. Graham, I
19  have no additional questions at
20  this time.  I'm sure I'll have
21  questions for you after your
22  cross-examination.  Thank you,
23  sir.
24      THE WITNESS:  You're

Page 225

1  welcome.
2          THE VIDEOTAPE TECHNICIAN:
3  Stand by, please.  The time is
4  12:55.  We're going off the
5  record.
6          - - -
7      (Whereupon, a recess was
8  taken from 12:55 p.m. until
9  2:03 p.m.)
10          - - -
11      MS. ROYCE:  This is Joanne
12  Royce representing Dr. Graham, and
13  I just wanted to address an issue
14  that was raised a couple of times
15  by Mr. Beck regarding a document
16  production.
17      Last week we got a request
18  from the plaintiffs' documents for
19  a number -- from the plaintiffs'
20  attorneys for a number of
21  documents which were very
22  specific.  They were all public
23  documents or documents that we had
24  no reason to believe that the FDA

Confidential - Subject to Protective Order

Page 226

1    would have any confidentiality
2    issues with.  They were
3    post-subpoena documents, and we
4    did turn them over, and we
5    requested that they be immediately
6    turned over to the defendants as
7    well.  And so I understand that
8    you got the documents at the same
9    time that the plaintiffs did, and
10   we certainly had no intention to
11   slight the defendants.
12       We got your request for
13   documents one day before the
14   deposition when we were all
15   preparing for it yesterday.  It
16   was extremely broad.  We
17   considered that most of it was
18   covered by the subpoena that had
19   already gone to the FDA, and so we
20   contacted the FDA, and they
21   instructed us that we could not
22   release them -- should not release
23   them yet.
24       Thank you.

Page 227

1        THE VIDEOTAPE TECHNICIAN:
2    The video time is 2:04.  We are
3    back on the record.
4            - - -
5        CROSS-EXAMINATION
6            - - -
7    BY MR. BECK:
8        Q.   Dr. Graham, you talked a
9    little bit on direct examination about
10   your medical training as well as your
11   training as an epidemiologist.  Do you
12   practice medicine now?
13       A.   No, I do not.
14       Q.   Have you ever actively
15   practiced medicine?
16       A.   Yes, I did, if you count
17   residency training and then professional
18   development after I finished doing my
19   residency, during my fellowship, and then
20   while I was in my early years as a
21   medical officer at FDA.  So, during those
22   times I practiced, but I did that at
23   Walter Reed Army Medical Center.
24       Q.   How long ago would this have

Page 228

1    been?
2        A.   The last time that I saw
3    patients in active patient care was in
4    the realm of neurology.
5        Q.   How long, sir?
6        A.   15 years.
7        Q.   Okay.
8            And I'm going to make the
9    same request that Mr. Kline did, and that
10   is, that you keep your answers short.
11   For example, when I ask you how long, if
12   you could just tell me how long rather
13   than what hospital it was at and what
14   department you were in.  Okay?
15       A.   Sure.
16       Q.   So, for the last 15 years,
17   you have been focusing pretty much
18   exclusively on epidemiology and drug
19   safety rather than practicing medicine;
20   is that correct?
21       A.   Correct.
22       Q.   On direct examination, you
23   were asked whether you were subpoenaed to
24   appear here, and you said yes.  But do

Page 229

1    you understand that that's simply the FDA
2    rules, that an FDA employee cannot appear
3    to testify unless there's a subpoena
4    issued?
5        A.   I'm not a lawyer, so, I do
6    what I'm told.  I was served with a
7    subpoena, and I gave it to the FDA
8    lawyers.
9        Q.   Well, didn't you also tell
10   newspaper reporters or news reporters
11   that you welcomed the opportunity to give
12   deposition testimony?
13       A.   I don't recall what I said
14   to the press.
15       Q.   We spent a few minutes here
16   before I started, your lawyer made a
17   statement about the circumstances under
18   which you provided the plaintiffs with
19   some documents late last week.  You were
20   here when your lawyer made those
21   statements, correct?
22       A.   Yes.
23       Q.   Do you remember that a few
24   months ago the plaintiffs' lawyers served

KS-000357
Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 230

1   a document subpoena on the FDA, a formal
2   document subpoena?
3       A.   I'm not aware of that.
4       Q.   Well, did you know that the
5   FDA was collecting documents from
6   people's computers and files in order to
7   turn over in response to some sort of
8   formal request from the plaintiffs'
9   lawyers?
10      A.   Right.  And I turned over
11  documents at that time.  I think it was
12  like in October.
13      Q.   Okay.
14          So, way back in October you
15  were giving documents to the FDA lawyers,
16  I suppose, who were collecting them in
17  response to the subpoena from the
18  plaintiffs; is that right?
19      A.   I give them to an office
20  manager, and what happens to them after
21  that, I don't know.
22      Q.   And then last Friday, did
23  you collect another couple hundred pages
24  of documents from your computer at the

Page 231

1   FDA offices and from your FDA files and
2   give them to your lawyers to be turned
3   over to the plaintiffs?
4       A.   My attorneys asked for
5   specific documents, and I provided them
6   to them.  I wasn't told what would happen
7   with those documents.  Also, the
8   documents that I turned over, it wasn't
9   hundreds of pages as I recall, and the
10  documents in terms of like the PowerPoint
11  presentations, those were things that I
12  had actually done on my own time as
13  outside activities with FDA, and I had
14  copies of them at work as well.
15      Q.   You didn't have copies of
16  them at home, right?
17      A.   That's correct.
18      Q.   So, you only retained copies
19  in your office at work, right?
20      A.   Correct.
21          MR. BECK:  Let me show you
22  what we'll mark as Defendant's
23  Exhibit 1.  I guess I'll just go
24  in sequence from where he left off

Page 232

1       rather than defendant's exhibits.
2           We'll call this Graham
3       Exhibit 6.
4           -  -  -
5           (Whereupon, Deposition
6       Exhibit Graham-6, Letter 5-5-06
7       (1 page), was marked for
8       identification.)
9           -  -  -
10          MR. BECK:  And we'll put
11      this up on the screen that we've
12      been using.
13  BY MR. BECK:
14      Q.   Is this stationery, is this
15  from the lawyers who are here
16  representing you today?
17      A.   Repeat that, please, sir.
18  I'm sorry.
19      Q.   This stationery where this
20  letter is written on, is this from the
21  lawyers who are here representing you
22  today?
23      A.   Yes.
24      Q.   And do you see here where

Page 233

1   your lawyers, or Mark Cohen, one of them,
2   is writing to Mr. Tisi, who is one of the
3   plaintiffs' lawyers:  "Enclosed please
4   find documents responsive to your May 5,
5   2006 letter requesting certain
6   information in anticipating of the
7   deposition of Dr. Graham on May 9th.
8   Please understand that since these
9   documents were stored on Dr. Graham's FDA
10  computer or in his FDA office, Dr. Graham
11  did not consider them responsive to the
12  subpoena issued by Merck on April 3,
13  2006.  Please...make sure that these
14  documents are forwarded to counsel for
15  Merck and counsel for the FDA."
16          And is this accurate in
17  terms of you didn't consider those
18  PowerPoints and other documents to be
19  responsive to Merck's earlier subpoena
20  because they were retained in the FDA
21  files and on the FDA computer?
22      A.   I discussed this with Mike
23  Levy, who is --
24          MS. ROYCE:  Objection,

KS-000358

Confidential - Subject to Protective Order

Page 234

1    attorney-client privilege.
2  BY MR. BECK:
3        Q.   I don't want to know what
4  you and your lawyers talked about.  I
5  want to know whether this is an accurate
6  statement.
7             MS. ROYCE:  Objection, lack
8     of foundation.  Has he read it?
9  BY MR. BECK:
10       Q.   You just went over it with
11  me, didn't you, sir?
12       A.   I haven't read the letter
13  yet.  You asked me to look at the
14  letterhead and the name, and I did.
15       Q.   Well, I just read the letter
16  out loud.
17       A.   You did, you did -- okay.
18  You read it out loud to me.
19       Q.   Yes, and I read it out loud,
20  and the lawyer representing you said
21  that, "Please understand that since these
22  documents were stored on Dr. Graham's FDA
23  computer or in his FDA office, Dr. Graham
24  did not consider them responsive to the

Page 235

1  subpoena issued by Merck on April 3,
2  2006."
3             My only question is whether
4  that statement is true or not?
5        A.   I was told that the subpoena
6  on April 3rd excluded specifically
7  materials that were in my FDA office or
8  on my FDA computer, and so those things
9  then weren't responsive.
10       Q.   This letter from one of your
11  lawyers says that they're sending these
12  documents in response to a May 5th, 2006
13  letter.  Do you see that?
14       A.   Uh-huh.
15       Q.   Did anybody ever show you a
16  letter, May 5th letter, 2006 requesting
17  documents?
18       A.   No.  I may have had
19  something read to me over the telephone
20  by my attorney, but I honestly don't
21  recall.
22             - - -
23             (Whereupon, Deposition
24     Exhibit Graham-7, E-mails (2

Page 236

1     pages), was marked for
2     identification.)
3             - - -
4  BY MR. BECK:
5        Q.   I'm handing you what we've
6  marked as Exhibit 7.  Please take a look
7  at that top e-mail, and to set the stage,
8  someone from our office was asking about
9  the -- Shayna Cook from my office was
10  asking plaintiffs' lawyers for a copy of
11  a letter that was sent to Dr. Graham's
12  counsel requesting documents.
13             Do you see that?
14       A.   Uh-huh.
15             MR. KLINE:  Can we read the
16     whole thing for completeness under
17     the completeness doctrine, Rule
18     160?
19             MR. BECK:  What part do you
20     want read?
21             MR. KLINE:  The bottom part
22     that starts the e-mail train.
23             MR. BECK:  Sure.
24  BY MR. BECK:

Page 237

1        Q.   Start at the bottom, and
2  we'll charge this against Mr. Kline's
3  time.
4             MR. KLINE:  No, I don't
5     think so.
6  BY MR. BECK:
7        Q.   At the bottom, Ms. Dagostino
8  of Mr. Kline's office says, "Shayna, I
9  understand you e-mailed Chris Tisi
10  earlier re:  plans for document
11  presentation during the Graham dep on
12  Tuesday.  We will likely be utilizing
13  some combo of hard copies and Sanctions.
14  I hope that answers your question.
15             "Also - attached please find
16  some documents we received late today
17  from Dr. Graham's lawyers at the
18  Government Accountability Project.  This
19  will be the first of three emails.  Mr.
20  Kline wanted to make sure that your
21  office had them before the weekend."
22             And then right above that
23  Ms. Cook says please give us a copy of
24  the letter that you sent to Dr. Graham's

Confidential - Subject to Protective Order

Page 238

1    lawyers requesting documents.
2              And then what the
3    plaintiffs' lawyer said was that: "No
4    letter was sent, but an oral request was
5    made on Thursday to Dr. Graham's
6    counsel," et cetera.
7              Now, did you know that the
8    reason --
9              MS. ROYCE: Objection. Lack
10             of foundation. You're
11             cross-examining on something he's
12             probably never even read.
13             MR. BECK: Counsel, do you
14             consider yourself bound in any way
15             by the order from The Court about
16             what kind of objections are going
17             to be made?
18             MS. ROYCE: Yes, sir.
19             MR. BECK: Okay.
20   BY MR. BECK:
21        Q.   Now, did you have any
22   understanding of whether, in fact, a
23   request had even been put in writing or
24   whether it was just a phone call from the

Page 239

1    plaintiffs' lawyers to your lawyers
2    asking that you produce FDA documents on
3    one day's notice?
4         A.   I was asked by my attorneys
5    to --
6              MS. ROYCE: Objection,
7              attorney-client privilege. I'm
8              going to ask the witness and
9              instruct him not to answer.
10   BY MR. BECK:
11        Q.   Well, did you ever find out
12   that I then wrote a letter asking for
13   other documents related to the ones that
14   you turned over to the plaintiffs'
15   lawyers last Friday?
16        A.   I learned sometime yesterday
17   late morning that someone from Merck,
18   maybe it was you, had put in a request
19   for basically what I was told, a broad
20   range of documents that mirrored the
21   previous subpoena of my entire family's
22   e-mail history for the past seven years.
23        Q.   But they didn't show you the
24   actual letter?

Page 240

1         A.   I talked by telephone.
2         Q.   All right.
3              You turned over some
4    documents from your personnel file to the
5    plaintiffs' lawyers last Friday, didn't
6    you?
7         A.   Copies of performance
8    evaluations, yes.
9         Q.   Were you told that we asked
10   for any other documents that you had from
11   your personnel files?
12        A.   On Monday, it was mentioned,
13   among other things, that you wanted
14   everything from my personnel file, and I
15   said to my attorneys that --
16             MS. ROYCE: Objection,
17             attorney-client privilege.
18   BY MR. BECK:
19        Q.   Why did you turn over
20   documents voluntarily from your personnel
21   file to the plaintiffs' lawyers, but you
22   wouldn't turn over the other documents
23   from your personnel file to us?
24        A.   I turned them over to my

Page 241

1    attorneys, not to the plaintiffs'
2    attorneys.
3         Q.   Why did you do that in
4    response to a request by the plaintiffs'
5    attorneys, but then you wouldn't give us
6    the rest of the file when we asked for
7    it?
8              MS. ROYCE: Objection,
9              argumentative.
10             THE WITNESS: Do I answer?
11             MS. ROYCE: You can answer.
12             THE WITNESS: I was
13             following the instruction of my
14             attorneys.
15             MR. BECK: We can go off the
16             video record for a minute.
17             THE VIDEOTAPE TECHNICIAN:
18             Stand by.
19             The time is 2:18. Off the
20             video record.
21             MR. BECK: Let's stay on the
22             record.
23             Counsel, either you're going
24             to abide by the judge's rulings or

Confidential - Subject to Protective Order

Page 242

1  we're going to take a break and
2  call him up now. So, tell me how
3  you want to do it.
4      MS. ROYCE: What am I doing
5  wrong?
6      MR. BECK: You're making
7  objections other than objections
8  as to form, making objections as
9  to argumentative, making
10 objections as to foundation.
11     Mr. Kline read the Judge's
12 order about what counsel was
13 supposed to do and how they're
14 supposed to comport themselves
15 during the deposition. I didn't
16 hear a single objection from you
17 this morning, and my only question
18 is, if you intend to go beyond
19 form, I can't stop you. But at
20 some point, we'll have to take a
21 break and call Judge Fallon.
22     MR. KLINE: Respectfully,
23 Mr. Beck, form and privilege.
24     MR. BECK: Yeah, that

Page 243

1  doesn't have to do with
2  argumentative or foundation, and I
3  didn't raise any question about
4  privilege.
5      MR. KLINE: He and I agree.
6  Form and privilege are things that
7  you can object to.
8      MS. ROYCE: Okay. Sorry.
9          - - -
10     (Whereupon, an
11 off-the-record discussion was
12 held.)
13         - - -
14     MR. KLINE: May we go back
15 off the record for a second? I
16 apologize, Phil. Count it against
17 me. Don't count the optional
18 completeness against me, but --
19     MR. BECK: If you're going
20 to do it, I didn't do that to you.
21 You're going to have me reading
22 documents --
23     MR. KLINE: I just wanted
24 you to know. That was my way of

Page 244

1  saying that's a two-edged sword.
2      MR. BECK: I didn't do it to
3  you, so it is a one-edge sword.
4      MR. KLINE: You did it
5  during a whole trial, so it's a
6  two-edged sword.
7      The only issue that I raise
8  with you, which is something
9  different than we have among the
10 parties, and I don't know the
11 exact history behind it, has to do
12 with I don't know how she gets to
13 preserve -- a third party gets to
14 preserve an objection. Maybe they
15 come in later and argue. I assume
16 they have the right to argue that
17 sometime later when the deposition
18 is cut or the deposition is to be
19 played. My concern being for any
20 third party how we go about
21 interpreting that. And I don't
22 want to hold you up honestly,
23 Phil, but that's my problem that I
24 have with that.

Page 245

1      MR. BECK: Well, she doesn't
2  have any interest in whether
3  there's a lack of foundation or
4  not. That's not her concern.
5      MS. ROYCE: She did.
6      MR. BECK: She's here.
7      MR. DAVIS: If I may.
8      MR. KLINE: Len knows the
9  history.
10     MR. DAVIS: If I may.
11     MR. BECK: I take it we're
12 off the clock here --
13     MR. KLINE: Totally.
14     MR. BECK: -- while we're
15 getting lectured.
16     MR. KLINE: Totally.
17     MR. DAVIS: Having been
18 involved with Judge Fallon and
19 having seen the order, I think
20 that Judge Fallon would expect
21 professionalism and courtesy
22 throughout the deposition as he
23 expects throughout this
24 litigation.

**KS-000361**

Confidential - Subject to Protective Order

Page 246

1        I would think that if you
2   have an objection on behalf of the
3   witness, that you should make your
4   objection, but the intent is not
5   to obstruct the deposition and to
6   have colloquy, and I think you
7   need to preserve your record and I
8   think not waste time.
9        I think that if there's an
10   issue, then you guys ought to call
11   Judge Fallon if you think it needs
12   that.  Other than that, I think
13   you ought to get the show on the
14   road and go forward with the
15   deposition.
16        MR. BECK:  Well, that's
17   where we were, I think, five or
18   ten minutes ago.
19        So, are we ready to go back?
20        THE VIDEOTAPE TECHNICIAN:
21   The video time is 2:22.  We're
22   back on the record.
23   BY MR. BECK:
24        Q.   Last week when you were

Page 247

1   collecting documents that the plaintiffs
2   asked for, did you ask anybody from the
3   FDA whether it was okay with them to turn
4   over documents from the FDA computers and
5   the FDA files?
6        A.   That didn't cross my mind,
7   no.
8        Q.   And when I asked for
9   documents, did you ask anybody from the
10   FDA whether it was okay to turn them over
11   to me?
12        A.   No, I didn't.  I relied on
13   the advice of my counsel, FDA counsel and
14   personal counsel.
15        Q.   So, you did talk to the FDA
16   lawyer about --
17        A.   Well, no.  But I was told
18   that the FDA lawyer said that even --
19   that we couldn't produce those documents.
20   You're talking to a nonlawyer, so, you
21   know, it's getting translated.  That was
22   my understanding.
23        Q.   Somebody told you it was
24   okay to produce them last week to the

Page 248

1   plaintiffs, but not this week to us?
2        A.   Well, last week, what I
3   produced were things that I considered to
4   be actually in a sense my own property.
5   My performance evaluations are my
6   property.  The slides, the PowerPoint
7   presentations were PowerPoint
8   presentations for talks that I
9   constructed on my own time in my personal
10   capacity and had copies of them at FDA.
11        The letters of
12   recommendation are letters of
13   recommendation that -- those are not
14   official FDA documents.  Those are
15   personal documents relevant to me.  So, I
16   don't really see that these are, in
17   quotes, FDA documents, but I'm a
18   nonlawyer.
19        Q.   Let's move away from this.
20        On direct examination, you
21   gave some testimony about what you said
22   you thought was the mechanism by which
23   you thought that Vioxx increased the risk
24   of cardiovascular events.  Do you

Page 249

1   remember that?
2        A.   Yes.
3        Q.   And in summary, what you
4   said is that you thought that Vioxx
5   suppressed the body's production of
6   prostacyclin and that's what contributed
7   to these events; is that correct?
8        A.   Correct.
9        Q.   Would you agree with me,
10   sir, that determining this sort of a
11   mechanism is something that is outside of
12   your area of expertise?
13        A.   It is not outside of my area
14   of expertise to read the medical
15   literature, to attend medical meetings,
16   and to learn from other investigators who
17   are expert in the field.
18        Q.   But in terms of your area of
19   expertise, Dr. Graham, to make a
20   determination yourself as to the
21   mechanism is just outside of your area of
22   expertise, is it not?
23        A.   I am not a physiologist or a
24   biochemist.

KS-000362

Confidential - Subject to Protective Order

Page 250

1    Q.   Or a pharmacologist, right?
2    A.   I'm a clinical
3  pharmacologist.
4    Q.   Well, can you give me a yes
5  or no answer, whether making a
6  determination of mechanism by which you
7  think --
8       MS. ROYCE:  Objection to
9       form.
10 BY MR. BECK:
11   Q.   -- is whether it is inside
12 or outside of your expertise?
13      MR. KLINE:  Objection to
14      form.
15      THE WITNESS:  I think it is
16      within my area of expertise when
17      it is based on the available
18      evidence.  And there's additional
19      evidence that we haven't talked
20      about that relates to the effects
21      of aspirin on --
22 BY MR. BECK:
23   Q.   So, you can't give me a yes
24 or no answer, I guess; is that right?

Page 251

1    A.   Well, my answer is yes, it
2  is within my area of expertise when it's
3  based on the available evidence.
4    Q.   Do you remember telling the
5  2005 Advisory Committee that "As an
6  epidemiologist first, I try to report the
7  phenomenon I observe and leave it to
8  brighter minds to figure out why what I
9  observed happens"?
10   A.   Uh-huh.  That's true.
11   Q.   And when you said that, you
12 were talking about mechanisms, right?
13   A.   Yes.
14   Q.   Another subject that you
15 discussed on direct examination is what
16 you call the naproxen myth.  Do you
17 remember that?
18   A.   Uh-huh.
19   Q.   And that's a phrase that you
20 used in a couple of these PowerPoints
21 that were dated from 2005, right?
22   A.   It's possible.  I mean, I
23 don't have them in front of me, but it's
24 certainly possible.

Page 252

1    Q.   Well, you had one of them in
2  front of you before --
3    A.   That said "alibi," not myth.
4    Q.   Oh, I'm sorry, naproxen
5  alibi.  I stand corrected there.
6       Now, when you were writing
7  scientific articles in 2003 and 2004 and
8  you discussed this hypothesis of naproxen
9  being cardioprotective, you didn't call
10 it an alibi then, did you?
11   A.   No.  It's a different
12 audience.
13   Q.   In fact, well, the audience
14 that you are writing for in scientific
15 publications are other scientists and
16 doctors, right?
17   A.   Correct.
18   Q.   And when you were writing in
19 scientific publications for other
20 scientists and doctors, what you said was
21 that the naproxen hypothesis was one of
22 the possible explanations for the
23 difference that was seen in the VIGOR
24 trial between Vioxx and naproxen

Page 253

1  patients, isn't that right, sir?
2    A.   A very low possibility.
3    Q.   Let's look at what you
4  actually said.
5          -  -  -
6       (Whereupon, Deposition
7       Exhibit Graham-8, "COX-2
8       selective non-steroidal
9       anti-inflammatory drugs and
10      cardiovascular disease," (Ray, et
11      al) Pharmacology and Drug Safety
12      2003; 12: 67-70, was marked for
13      identification.)
14         -  -  -
15 BY MR. BECK:
16   Q.   I'll hand you what we've
17 marked as Exhibit 8.
18      Is Exhibit 8 a 2003
19 publication?
20   A.   Yes, based on a talk from
21 2002.
22   Q.   And the first named author
23 on here is Wayne Ray.  Do you see that?
24   A.   Yes.

Confidential - Subject to Protective Order

Page 254

1      Q.   He, I think, was the person
2  that you said you recruited to help on
3  the Kaiser Permanente study that you
4  headed up, right?
5      A.   Yes.
6      Q.   And then also you're listed
7  as an author; is that right?
8      A.   Correct.
9      Q.   If you go over to the second
10  page, I'm going to direct you down to the
11  bottom of the left-hand column, and I've
12  blown this up and put it on the board.
13  If you want to look at it on the board,
14  it might be a little easier.
15           In this 2003 article of
16  yours and Dr. Ray's and the others, I see
17  you say that "The VIGOR trial enrolled
18  8076 patients with rheumatoid arthritis,
19  who were randomly assigned to rofecoxib"
20  -- that's Vioxx, right?
21      A.   Uh-huh.
22      Q.   -- "(50 milligrams...) or
23  naproxen, an established non-selective
24  NSAID."  And then do you say, "MI --

Page 255

1  now, first of all, what does MI stand
2  for?
3      A.   That's myocardial
4  infarction.
5      Q.   Is that the same thing as a
6  heart attack in common language?
7      A.   Correct.  Yes.
8      Q.   Okay.
9           So, a heart attack "occurred
10  in .4 percent of patients receiving
11  rofecoxib compared to .1 percent of
12  patients receiving naproxen.  These data
13  may reflect an increased risk of" heart
14  attack "associated with rofecoxib;" being
15  Vioxx, "a decreased risk associated with
16  naproxen; or a combination of both
17  effects."
18           Do you see that?
19      A.   Uh-huh.
20      Q.   And then did you go on to
21  say that there were two recent published
22  studies that looked at "whether naproxen
23  has a protective effect on the risk of
24  coronary heart disease"?

Page 256

1      A.   Uh-huh.
2      Q.   And this thing that you
3  called an alibi today, back in 2003, did
4  you report that both of those studies
5  that you referred to there actually
6  reported a reduction in the risk of heart
7  attacks for people who were using
8  naproxen?
9      A.   Well, a couple of things.
10      Q.   Did you say that or not,
11  sir?
12      A.   That is not what I said.
13  This paper represented a combined
14  distillation of, I guess it was four
15  different talks presented at a symposium.
16  And they frequently -- what they do is
17  they have one session and they condense
18  them into a single paper, and then they
19  list everybody as an author.  And this
20  material was from someone other than me
21  in the section that I was presenting on.
22      Q.   Who was it from?
23      A.   I'd have to go back to the
24  topic headings of what the different

Page 257

1  people, the four different speakers had,
2  what their speaking assignment was.  My
3  speaking assignment at this meeting was
4  to talk about the association of
5  high-dose rofecoxib and hypertension.
6      Q.   Let me ask, when your name
7  is listed as an author on an article like
8  this, do you have a chance to review the
9  whole article and decide whether you want
10  to be associated with the comments that
11  are made in there?
12      A.   You get copies of articles
13  like this.  When I got it, I only really
14  read the section that was my purview, and
15  I really didn't read the other sections.
16      Q.   Is this the first time that
17  you understood or knew that your name was
18  on a scientific article that said that
19  heart attacks may reflect a decreased
20  risk associated with naproxen?
21      A.   Well, I mean, I knew my name
22  was on the paper.  I hadn't read that
23  closely.  The studies that are referenced
24  are studies that I talked about during

KS-000364

Confidential - Subject to Protective Order

Page 258

1  the previous part of the deposition that
2  are analyzed incorrectly and so really
3  don't show reductions in cardiovascular
4  risk with naproxen, but in any event.
5      Q.   Did you ever ask that your
6  name be removed from this article?
7      A.   No, I did not.
8          MR. BECK:  Okay.
9              - - -
10         (Whereupon, Deposition
11     Exhibit Graham-9, "High frequency
12     of use of rofecoxib at greater
13     than recommended doses: Cause for
14     concern," (Griffin, et al)
15     Pharmacoepidemiology and Drug
16     Safety 2004; 13: 339-343, was
17     marked for identification.)
18             - - -
19  BY MR. BECK:
20     Q.   Please take a look at what
21  we've marked as Exhibit 9.  Is Exhibit 9
22  a copy of a scientific article that has
23  your name on it as one of the authors?
24     A.   Yes.

Page 259

1      Q.   Now, before we get into
2  Exhibit 9, is this one -- well, Dr. Ray
3  is on this one also, right?
4      A.   Correct.
5      Q.   So, a bunch of other authors
6  and you and Dr. Ray.  Is this one where
7  everybody just gave speeches and you
8  didn't read it closely?
9      A.   No, no.  No.  This was a
10  real study.
11     Q.   This was a real study?
12     A.   Yes.
13     Q.   Okay.
14         Well, looking down then at
15  the first page of -- I'm sorry, we'll go
16  over to the fourth page of what you
17  called the real study that you and Dr.
18  Ray were both authors on.
19         This language that I've
20  blown up here from the right-hand column
21  at the bottom, did you and Dr. Ray say,
22  "The cause of the excess of serious
23  cardiovascular events in the VIGOR trial
24  is still a matter of debate"?  Is that

Page 260

1  what you said in the scientific study in
2  2004?
3      A.   Yes.
4      Q.   And it says, "A recent
5  observational study reported a higher
6  rate of cardiovascular events in
7  high-dose rofecoxib users."  That would
8  be the 50 milligrams; is that right?
9      A.   That's what -- well, I'm
10  just looking at the reference for that,
11  and that would be, I think, any dose that
12  was over 25 milligrams.  So, there are
13  people who take 37-and-a-half milligrams.
14     Q.   Okay.
15         Are there very many people
16  who take that?
17     A.   I don't know.  I don't know
18  the number.
19     Q.   Okay.
20         Anyway, over 25.
21         It says, "A recent
22  observational study recorded a higher
23  rate of cardiovascular events in
24  high-dose rofecoxib users compared to

Page 261

1  users of other NSAIDs and users of lower
2  doses of rofecoxib."  It says "To date,
3  lower doses" -- that's talking about
4  Vioxx, right?
5      A.   Uh-huh.
6      Q.   "To date," you and Dr. Ray
7  say, "lower doses" of Vioxx "have not
8  been associated with a statistically
9  significant excess of these types of
10  serious events."
11         Is that what you said to the
12  scientific and medical community in 2004?
13     A.   It's based on the published
14  literature, yes.
15     Q.   And then you go on to say,
16  "Since the 50 milligram dose has
17  clinically significant undesirable
18  effects and has not been shown to be more
19  effective from lower doses" -- that's
20  more effective than lower doses of Vioxx,
21  right?
22     A.   Uh-huh.
23     Q.   -- "chronic use of high-dose
24  rofecoxib should be discouraged."

Confidential - Subject to Protective Order

Page 262

1        Do you see that?
2     A.   Uh-huh.
3     Q.   Now, today what you said was
4  that back in 2004, you were clamoring
5  that 50 milligrams should be withdrawn
6  from the market.  Do you remember that?
7     A.   I don't remember using the
8  word "clamoring," but...
9     Q.   No.  That was my word.
10        You said you were urging
11  that 50 milligrams -- what you said today
12  was that back in 2004, Dr. Graham was
13  urging that 50 milligrams should be
14  withdrawn from the market, right?
15     A.   I don't think I used the
16  word "urge," but I thought that the
17  50-milligram strength should come off the
18  market, yes.
19     Q.   But in the actual scientific
20  publication that you and Dr. Ray authored
21  in 2004, what you said, all you said
22  about 50 milligrams was that chronic use
23  of high-dose Vioxx should be discouraged,
24  right?

Page 263

1     A.   Well, yes, but a couple
2  things.  One, the paper was published
3  online in July of 2003; and, two, that
4  the paper was submitted in November of
5  2002.  And basically -- and then the
6  third thing is, is I'm not the senior
7  author, and so for things like this, I
8  certainly couldn't disagree with the
9  statement that chronic use of high-dose
10  should be discouraged.  I would take it a
11  step further.
12        Back in 2002, I think that
13  the VIGOR study provided enough evidence
14  to seriously question Vioxx remaining on
15  the market.
16     Q.   But that's not what you said
17  in the article that you published two
18  years later in print and a year later
19  online, is it, sir?
20     A.   No, but I'm not the first
21  author.
22     Q.   All right.
23        And did you agree with the
24  first author on the lower dose, that the

Page 264

1  evidence that existed at the time did not
2  show a statistically significant excess
3  of adverse cardiovascular events?
4     A.   The published evidence.  But
5  the evidence available online within FDA
6  documents, Shari Targum, an FDA medical
7  officer who did a pretty nice review of
8  not only the VIGOR study, but study 085
9  and study 090, which were six-week
10  studies looking at the 12-and-a-half
11  milligram strength of Vioxx.  And if you
12  analyze those studies correctly, what you
13  see is that there is an increased risk
14  within six weeks at the 12-and-a-half
15  milligram dose of --
16     Q.   Well, you had --
17     A.   It's not a published study.
18  You can't reference it.  In the medical
19  literature, you are constrained to
20  reference pretty much what's in sort of
21  the commonly available medical
22  literature.  And the reference that they
23  cited was actually a meta-analysis that
24  was performed, I think, by a number of

Page 265

1  Merck employees.
2     Q.   You say "the reference that
3  they cited," by "they" you meant "we,"
4  right?
5     A.   Well, yes, that we cited,
6  yes.
7     Q.   Okay.
8        One of the PowerPoints that
9  you looked at today was marked as Exhibit
10  5.  I don't know if you still have that
11  in front of you or not.
12     A.   Uh-huh.
13     Q.   You do?
14     A.   Yes.
15     Q.   And you were directed to
16  this page that I put up on the screen.
17  Do you remember discussing this page of
18  your PowerPoint with Mr. Kline?
19     A.   Yes, yes, I do.  I'm just
20  sort of looking for it here.  Yes.
21     Q.   And I think I have the date
22  right.  This is one of the 2005
23  PowerPoints, right?
24     A.   This is from the Advisory

Confidential - Subject to Protective Order

Page 266

1  Committee presentation of 2005.
2      Q.   Okay.
3          So, this is the one that you
4  used when you met with the FDA Advisory
5  Committee and gave them your views
6  concerning the safety of Vioxx and
7  including the comparison of Vioxx with
8  Celebrex, right?
9      A.   Correct.
10      Q.   Okay.
11          Now, just focusing on this
12  one area over here on the rofecoxib, and
13  then underneath that is the 25 milligrams
14  and less.  Do you see that?
15      A.   Uh-huh.
16      Q.   And then the study over
17  here, this is Ray, that's your colleague,
18  Dr. Wayne Ray, right?
19      A.   Correct.
20      Q.   And then underneath that,
21  Graham, that's you, right?
22      A.   That's right.
23      Q.   So, on that one you are the
24  first author, right?

Page 267

1      A.   Yes.
2      Q.   And on the Ray article, were
3  you an author of the Ray article as well,
4  just not the first author?
5      A.   No.  I was not a co-author
6  on that article.
7      Q.   Okay.
8          So, your colleague, Dr. Ray,
9  who you later worked with on the Kaiser
10  study, he had done an epidemiological
11  study looking at the effects of taking
12  Vioxx, right?
13      A.   Uh-huh.
14      Q.   And focusing on the 25
15  milligrams and less, basically what he
16  found, when it's 1.02, a 1 would mean
17  that's just the same as not taking any
18  medicine at all, right?
19      A.   Right.
20      Q.   And 1.02, you'd agree with
21  me that that's not, you know, 90 bullets
22  with 100 chambers, that's 0 out of 100,
23  right?
24      A.   I would agree.

Page 268

1      Q.   And so that's --
2      A.   Although I have one caveat,
3  which is there's a confidence interval
4  around that.  And these data are
5  consistent with a risk that could be
6  elevated to 1.37.
7      Q.   Let me just hone in on that.
8          This confidence interval is
9  the thing that is in the parenthesis
10  here, right?
11      A.   Correct.
12      Q.   And I hope that at trial
13  somebody else will describe confidence
14  interval because I'm not going to take
15  the time to do it with you today.  But
16  you say it's consistent with being as
17  high as 1.37?
18      A.   Right.
19          Or as low as .76.
20      Q.   Or as low as .76.
21          So that this confidence
22  interval says that Vioxx 25 milligram, it
23  might be better than not taking any
24  medicine at all when it comes to heart

Page 269

1  attacks, or it might be a little worse
2  than not taking any medicine at all.
3  But, basically, the best analysis is,
4  it's the same thing as not taking any
5  medicine at all, right?
6      A.   That's the appropriate
7  interpretation of that study for that
8  dose.
9      Q.   And then in your study, the
10  Graham study, what year was this from?
11      A.   It was published in 2005,
12  but it was completed in 2004.
13      Q.   So, this is the Kaiser
14  Permanente study?
15      A.   This is the Kaiser
16  Permanente study.
17      Q.   And here you found a
18  relative risk of 1.23, and then this
19  confidence interval of going below 1,
20  which would make it better than no
21  medicine at all, up to 1.71.  And from a
22  statistical point of view, what this says
23  is that there is not a statistically
24  significant difference between a 25

KS-000367

Confidential - Subject to Protective Order

Page 270

1  milligram dose and not taking any
2  medicine at all, correct?
3      A.   Yes.  But the maximum
4  likelihood estimate, the most likely
5  value is that the risk is increased.  And
6  that's what that point -- the point
7  estimate's your maximum likelihood.
8          So, the preponderance of
9  evidence from this study would be that
10  there is -- the evidence is stronger that
11  the lower doses increase the risk of
12  heart attack, but it does not reach the
13  level of statistical significance.  So,
14  what this is basically saying is -- I
15  don't have the associated p-value on
16  this, but there may be 80 or 85 bullets
17  in the chamber, going back to the
18  previous analogy in terms of the
19  p-values.
20      Q.   85 for 1.23?
21      A.   The p-value for this could
22  be something like .15.
23      Q.   You mentioned before that
24  you wrote a chapter in a book on -- what

Page 271

1  was the subject of the book?
2      A.   Well, it's called
3  Pharmacoepidemiology.
4      Q.   Yeah.
5          And do you know that in that
6  book on pharmacoepidemiology, it is
7  stated that if you have a relative risk
8  of less than 2.0, that's a relatively
9  weak relationship?
10      A.   It's a view that I don't
11  subscribe to.
12      Q.   Do you know that that's the
13  view that's expressed in a book that you
14  wrote a chapter in?
15      A.   A, I haven't read a chapter
16  where that view is expressed; and, B,
17  that's one chapter written by one author
18  in a textbook where the editor pretty
19  much lets you write what your point of
20  view is.
21      Q.   Do you know whether your
22  colleague, Dr. Ray, has said under oath
23  that if the relative risk is less than 2,
24  then it's less likely than not for any

Page 272

1  particular person that Vioxx would have
2  contributed to a heart attack?
3      A.   I'm not aware of anything
4  that Dr. Ray has said under oath.
5      Q.   You spent a little bit of
6  time on direct examination concerning the
7  approval of Vioxx, as well as a
8  subsequent label change.  And I just
9  wanted to make sure that we were clear on
10  this.
11          Did you have any personal
12  role whatsoever in the FDA's review of
13  the application that led to the approval
14  of Vioxx?
15      A.   No.
16      Q.   And did you have any role
17  whatsoever in reviewing proposed label
18  changes for Vioxx?
19      A.   No.
20      Q.   Now, on the general question
21  of warnings and labels, am I correct,
22  sir, that your view is that warning
23  language really doesn't have any
24  significant impact on the decisions made

Page 273

1  by doctors whether to prescribe medicine?
2      A.   My view is, is that in
3  general, labeling changes don't influence
4  a physician or patient behavior.  But as
5  I pointed out before, in terms of
6  capacity to market the drug, there are
7  big differences in the eyes of FDA of
8  whether there's a boxed warning or not.
9          And with companies in
10  general, my experience has been that they
11  fight tooth and nail to keep things out
12  of the warning section because they don't
13  want to be at a competitive disadvantage
14  to other drug companies that have
15  competitor products that don't have such
16  a warning.
17      Q.   And you've added something
18  about what you think drug companies have
19  in mind.
20      A.   I shouldn't have done that.
21      Q.   Well, I appreciate that
22  statement.
23          So, just let me go back and
24  try to get a clean answer to my question.

KS-000368

Confidential - Subject to Protective Order

Page 274

1        And that is, is it your view
2   that warning language in labels does not
3   have a significant effect on the
4   decisions by doctors and whether to
5   prescribe the medicines that the warnings
6   accompany?
7        A.   It's my view that warnings
8   as implemented by FDA have been very
9   ineffective.  There are means, I believe,
10  whereby labeling could be constructed in
11  a fashion that it actually would
12  potentially influence physician behavior
13  and perhaps then find its way into
14  patient behavior.
15       Q.   Would that be a different
16  way of going about labeling than the FDA
17  currently does?
18       A.   It would actually just be
19  more straightforward about what the
20  problems are, using very bold and frank
21  and plain language, not sort of using
22  adjectives that kind of downplay it and
23  not burying it in tremendous amounts of
24  text so that when a physician looks at

Page 275

1   the label, they're confronted by three
2   paragraphs of warnings, and the warning
3   that really matters is kind of buried in
4   the midst of it.  I think that there's a
5   lot of room for experimentation where
6   these labeling interventions might
7   actually have an effect.  But as
8   practiced, the way FDA implements them,
9   they are not -- have not been, until now,
10  effective, in my view.
11       Q.   Okay.
12       And I'm not asking you --
13  I'm taking a little bit different
14  approach than Mr. Kline.  I'm not asking
15  you what you think is wrong with the
16  FDA's regime.
17       A.   No, I understand.
18       Q.   I'm asking that under the
19  labeling approach that the FDA takes, do
20  you agree, sir, that warning language
21  does not have a significant effect on the
22  decision by doctors whether to prescribe
23  the kind of medicine that's being
24  labeled?

Page 276

1        A.   I agree with that, but there
2   are explanatory factors.  It's such a
3   complex field.  You've got the label
4   which says what the warnings are, and
5   then you have the drug representatives
6   who come to the physicians' offices and
7   tell a very different story.  And so what
8   physicians end up coming away with at the
9   end of the day in terms of the message
10  about the safety of a product is anyone's
11  guess.
12       Q.   Did you say in a written
13  publication in 2002, co-authored with
14  Willy, that "The findings from this study
15  are consistent with the results from
16  other studies showing that product
17  labeling may not meaningfully affect
18  physician behavior"?
19       A.   Yes.
20       Q.   Did you say in a 2001
21  article written by you as the lead
22  author, "This study suggests that
23  labeling changes, including black box
24  warnings, and instructions to monitor

Page 277

1   patients closely, as well as repeated
2   'Dear Healthcare Professional' letters to
3   physicians cannot be assumed to be
4   effective means of risk management"?
5        A.   Yes, I said that.
6        Q.   I want to move now to the
7   Kaiser study.  I think you described that
8   this is an epidemiological study, not a
9   clinical trial, right?
10       A.   Correct.
11       Q.   And what that means is that
12  you and your colleagues examined the
13  medical records from thousands or even
14  more patients from the HMO, and you could
15  see what medicines they were prescribed
16  and you could see what problems they had
17  or didn't have in their healthcare; is
18  that right?
19       A.   That's correct.
20       Q.   And the outcome that you
21  were looking at was something that you
22  called serious coronary heart disease; is
23  that right?
24       A.   That is correct.

**KS-000369**

Confidential - Subject to Protective Order

Page 278

1    Q.   And serious coronary heart
2  disease was a category that you used, and
3  it combined myocardial infarctions or
4  heart attacks, right?
5    A.   Yes.
6    Q.   Plus it included another
7  category of events called sudden cardiac
8  death, right?
9    A.   Yes.  Because that's one of
10  the leading presentations of heart
11  attack, is basically sudden death.  So,
12  we combined the two.
13    Q.   And in your study at least,
14  you did not break down the analysis into
15  heart attacks on the one hand and sudden
16  cardiac death on the other hand, right?
17    A.   No, we did not.
18    Q.   Now, your deposition may be
19  used in cases involving MIs or heart
20  attacks.  Let me ask you, before you did
21  your study that combined heart attacks
22  and sudden cardiac deaths, did you know
23  that some of your co-authors, people who
24  worked with you from the Kaiser group,

Page 279

1  had done a study of the same patients
2  over the same time period, but looking
3  specifically at heart attacks?
4    A.   I was aware of a study that
5  I think they called KLOTS 1.  But I think
6  they sent me, it may have been a
7  PowerPoint description or something of
8  it.  But there were methodologic problems
9  as I recall with it, and it didn't cover
10  the same time period as the study that we
11  were doing, so, in any event, but I was
12  aware that they had tried to work on a
13  study like that, and the people who were
14  doing it were non-epidemiologists trying
15  to do epidemiology.
16        - - -
17       (Whereupon, Deposition
18       Exhibit Graham-10, "Cohort
19       Analysis Myocardial Infarction
20       Risk and COX2 Use in the Kaiser
21       Large Observational Thrombosis
22       Study (KLOTS) (Levy, et al) ACR
23       Abstract (1 page), was marked for
24       identification.)

Page 280

1        - - -
2  BY MR. BECK:
3    Q.   Let me hand you Exhibit 10.
4  Have you ever seen Exhibit 10 before?
5    A.   I don't believe that I have.
6    Q.   It appears to be a 2002
7  abstract from ACR; is that right?
8    A.   That's what it looks like to
9  me, yes.
10    Q.   What does ACR stand for?
11    A.   I think it's the American
12  College of Rheumatology.
13    Q.   And, in fact, you had an
14  abstract published, your study in the
15  ACR, didn't you?
16    A.   Yes.  Although FDA
17  ultimately forced me to remove my name
18  from that abstract.  But the abstract got
19  published before we were able to withdraw
20  it because of the data problems that I
21  described before, so -- but, yes.
22    Q.   And do you see here that
23  this is a "Cohort Analysis Myocardial
24  Infarction Risk in Cox-2 Use in the

Page 281

1  Kaiser Large Observational Thrombosis
2  Study (KLOTS)."  Is that what you were
3  referring to before?
4    A.   I would guess that it is,
5  yes.
6    Q.   And is that the same group
7  of patients that you looked at in your
8  study?
9    A.   I have to read the abstract.
10    Q.   Okay.
11    A.   (Witness reviewing
12  document.)
13    Q.   While you're reading it,
14  I'll blow it up so others can as well.
15    A.   (Witness reviewing
16  document.)
17       I don't think that this is
18  the same group of patients.  And the
19  reason why I say that is the number of
20  patients they say, "We identified 172,260
21  patients with 182" --
22    Q.   Where are you looking at?
23    A.   I'm in the first sentence of
24  the "Results" section.

KS-000370

Confidential - Subject to Protective Order

Page 282

1      Q.   Okay.
2           Let me just make sure that
3    I'm with you and that anybody else
4    watching it is.
5      A.   This is 172,000 patients
6    that they're saying received -- I'm just
7    sort of reading above now in the
8    methods -- this is my first time seeing
9    this.  Is that they received naproxen,
10   ibuprofen, celecoxib or rofecoxib.
11          Now, if you look at the
12   study that -- the Kaiser study that we
13   did, we ended up having 1.4 million
14   patients in our base population.  So,
15   where they have 172,000 who had used
16   NSAIDs, we had 1.4 million who had used
17   NSAIDs.  So, it doesn't say in this
18   abstract, and quite honestly, I don't
19   remember, but my guess is, is that this
20   study was done on a subset of the Kaiser
21   population, but it's clearly not the same
22   population that we studied.  It's the
23   same HMO, but it's a small subset of
24   patients.

Page 283

1      Q.   Well, were you aware that in
2    the study that some of your co-authors
3    had done in this subset that they found
4    that when either COX-2, and that would be
5    either Celebrex or Vioxx, right?
6      A.   Yes.
7      Q.   When either one of Celebrex
8    or Vioxx was compared to either one of
9    the other NSAIDs, there was no
10   statistically significant difference in
11   heart attack risk?
12     A.   Yes.  But I do also note
13   that the comparison of rofecoxib
14   versus -- well, two things.  One, they
15   show that naproxen and ibuprofen have the
16   same risk.  And then they show that the
17   risk of rofecoxib is elevated with
18   respect to naproxen --
19     Q.   Well, wait.  You skipped
20   over something here.
21          Do you see here where I'm
22   highlighting?
23          MR. KLINE:  Let him finish,
24   please.

Page 284

1          THE WITNESS:  Oh, I'm sorry.
2    I was looking down at this piece
3    of paper.  I wasn't looking at the
4    screen.
5    BY MR. BECK:
6      Q.   No.
7      A.   I'm sorry.
8      Q.   And I said when you were
9    looking at the piece of paper, you
10   skipped over something.
11          MR. KLINE:  But he was in
12   the middle of an answer.  Please.
13   BY MR. BECK:
14     Q.   Do you see where rofecoxib,
15   Vioxx --
16          MR. KLINE:  He was in the
17   middle of an answer.  Please.
18   BY MR. BECK:
19     Q.   Do you see where Vioxx
20   versus Celebrex is --
21     A.   Uh-huh.
22     Q.   -- essentially identical,
23   right?
24     A.   Right.

Page 285

1          MR. KLINE:  The witness was
2    in the middle of an answer.
3          THE WITNESS:  In this study.
4          MR. KLINE:  Please let him
5    finish.
6    BY MR. BECK:
7      Q.   So, Vioxx and Celebrex were
8    essentially identical, and then you
9    wanted to say something else?
10     A.   Yes.
11          That rofecoxib versus
12   naproxen, and rofecoxib versus ibuprofen
13   came very close to traditional
14   statistical significance, and if we were
15   to use the gun analogy again, what we
16   would be talking about here is I'm
17   guessing is 92 to 94 bullets in the
18   chamber.
19     Q.   When you say "close to
20   statistical significance" --
21     A.   It's because the .96 --
22     Q.   Is below 1?
23     A.   It's below 1, but it's
24   pretty close to 1.  And the .97 for the

KS-000371

Confidential - Subject to Protective Order

Page 286

1  next line, the rofecoxib versus
2  ibuprofen, is .97, which is almost 1 as
3  well.
4         So, if it was 1 or above, if
5  that lower bound was 1 or above, then
6  you'd say the p-value is .05 and you
7  would have 95 bullets in the chamber.
8  Here we're probably talking 94 or 93
9  bullets.
10        So, what I'm saying is, it's
11 borderline statistical significance.  And
12 what it says is, is that that's pretty --
13 there's pretty reasonable evidence that
14 there's a difference between the two, but
15 it doesn't reach that level of
16 conventional statistical significance.
17     Q.   And do you see where I'm
18 underlining that they say the same thing
19 about Celebrex?
20     A.   Yes, they do.
21     Q.   Is it fair to say that this
22 study reaches conclusions that are just
23 fundamentally inconsistent with the
24 conclusions that you later reached?

Page 287

1      A.   I would say that these
2  conclusions are at variance with the
3  conclusions that we reached in our much
4  larger study.  And as I mentioned, the
5  people doing -- none of the authors on
6  this study are epidemiologists.  And none
7  of them have ever conducted epidemiologic
8  studies, and so not having reviewed the
9  methods and the like, I would wonder
10 about the -- about how methodologically
11 well the study was performed.
12     Q.   I'd like to -- we started
13 out talking about your Kaiser study, and
14 I got diverted for a minute on this
15 earlier study by some of the same
16 authors.  Let's go back to the Kaiser
17 study.
18        And you described this
19 morning kind of a chronology of reports
20 that you made or public disclosures of
21 the results of the study.  And I want to
22 go through those same events with you, if
23 I could.
24        And I've prepared a chart,

Page 288

1  and what I want to do is talk with you
2  about different statements that you made
3  in different publications about the
4  significance of 25 milligrams or below,
5  whether that poses a statistically
6  significant increase for heart attacks,
7  whether -- and whether above 25 does.
8         Are you with me?
9      A.   Uh-huh.
10     Q.   Okay.
11        And I can go through the --
12     A.   Do you have a copy of the
13 ACR abstract that I could just refer to?
14     Q.   Sure.  Yeah.
15        MR. BECK:  We'll mark that
16 as Exhibit 11.
17              - - -
18        (Whereupon, Deposition
19 Exhibit Graham-11, "Risk of Acute
20 Cardiac Events Among Patients
21 Treated with Cycloxygenase-2
22 Selective and
23 Non-Selective-Nonsteroidal
24 Anti-Inflammatory Drugs Category:

Page 289

1  06 Osteoarthritis clinical
2  aspects" American College of
3  Rheumatology Abstract (1 pages),
4  was marked for identification.)
5              - - -
6         MR. BECK:  And I'm told that
7  they are going to need to change
8  the videotape.  So, while they're
9  doing that --
10        THE WITNESS:  Want to wait?
11        MR. BECK:  Yes.
12        What I'm thinking is that
13 why don't we break and let them
14 change the videotape, and while
15 they're doing it, if you could
16 just look at the abstract so
17 you'll be able to tell me what it
18 is you've said in the abstract
19 about these items that we have up
20 on the screen.  Okay?
21        THE WITNESS:  Uh-huh.
22        THE VIDEOTAPE TECHNICIAN:
23 Stand by, please.
24        That concludes Video

**KS-000372**

Confidential - Subject to Protective Order

Page 290

1    Cassette Number 2.  The time is
2    3:03.  We're going off the record.
3        MS. ROYCE:  Can we take a
4    five-minute break?
5        MR. BECK:  Sure.
6            - - -
7        (Whereupon, a recess was
8    taken from 3:03 p.m. until
9    3:17 p.m.)
10           - - -
11       THE VIDEOTAPE TECHNICIAN:
12   This begins Video Cassette Number
13   3.  The time is 3:17.  We're back
14   on the record.
15   BY MR. BECK:
16       Q.   Dr. Graham, what I want to
17   do now is fill in these blanks on the
18   chart I have on the screen for the
19   relative risk and confidence intervals in
20   these different categories.
21       So, with the May 2004 ACR
22   abstract, do I have that correct that the
23   relative risk that was reported was 1.02
24   for 25 milligrams or less, with the

Page 291

1    confidence intervals as I've indicated up
2    there?
3        A.   Yes, that's correct.
4        Q.   And that is not
5    statistically significant, correct?
6        A.   That's correct.
7        Q.   And then for the greater
8    than 25 milligrams, there's a high
9    relative risk of 5.04, but as a technical
10   matter on statistical significance, the
11   confidence interval is such that it would
12   not be statistically significant; is that
13   correct?
14       A.   There would be 94 bullets in
15   the chamber.
16       Q.   And I appreciate your
17   analogy, but you, yourself, recognized
18   that with these confidence intervals,
19   this would not be statistically
20   significant, correct?
21       A.   It wouldn't reach levels of
22   traditional statistical significance.
23       Q.   Okay.
24       Now, after this May 2004

Page 292

1    abstract, you went back and reclassified
2    some of the patients from the Kaiser
3    study who had been classified as low-dose
4    patients for the purposes of the analysis
5    that's shown in the abstract.  I think my
6    hand just snuck across the screen.
7    Excuse me.
8        You reclassified some
9    patients who had been counted as low-dose
10   patients, and then you counted them
11   instead as high-dose patients; is that
12   right?
13       A.   Yes.  And high-dose patients
14   who are reclassified as low dose.
15           - - -
16       (Whereupon, Deposition
17       Exhibit Graham-12, E-mail 5-25-04
18       KP002153, was marked for
19       identification.)
20           - - -
21   BY MR. BECK:
22       Q.   After you reclassified
23   patients, then I'm going to show you what
24   we marked as Exhibit 12.  Did you write

Page 293

1    an e-mail which is -- I'm looking for the
2    date.  Can you help me with the date?
3    Oh, it is also from May.  Up at the top
4    you will see your e-mail is May 25th,
5    2004?
6        A.   Uh-huh.
7        Q.   And then you report new
8    relative risks and confidence intervals
9    based on the reclassifications, right?
10       A.   Yes.
11       Q.   Okay.
12       And tell me if I have it
13   right up here.  The relative risk that
14   you reported after reclassifying people
15   for the 25 milligrams or less was .98,
16   correct?
17       A.   Yes.
18       Q.   With the confidence
19   intervals as I've indicated there, right?
20       A.   Yes.
21       Q.   And that is not
22   statistically significant, correct?
23       A.   Correct.
24       Q.   And we're talking here about

KS-000373

Confidential - Subject to Protective Order

Page 294

1  Vioxx 25 milligrams or less compared to
2  people who are not taking pain
3  medication, no difference in risk, right?
4      A.  Right.
5      Q.  And in your analogy of
6  bullets in chambers, there would be zero
7  bullets in the chambers for people who
8  were using 25 milligrams of Vioxx, right?
9      A.  Yeah.  They'd be pretty
10 close to zero.  There would be five or
11 six, but yes.
12     Q.  Well, there would be --
13     A.  The P is .91.  So, what that
14 means is that 91 out of 100 chances that
15 the answer lies between those confidence
16 intervals and that that .98 -- so, it's
17 the most likely answer.
18     Q.  The most likely thing is --
19 and when we say .98, that's actually a
20 little bit lower risk than someone who's
21 not taking any medicine at all.  I mean,
22 it doesn't -- it's so little that it
23 doesn't make any difference, but we're
24 talking about Vioxx 25 milligrams is

Page 295

1  basically indistinguishable from not
2  taking any medicine at all when it comes
3  to cardiovascular risk, right?
4      A.  Yes.
5      Q.  Okay.
6          And then after this
7  reclassification, the risk that you
8  reported, the relative risk for higher
9  dose goes up substantially, and then it
10 is statistically significant, correct?
11     A.  Yes.
12     Q.  Now, after the e-mail, did
13 you -- I think you said you did something
14 called a poster, you wrote up a poster?
15     A.  Right.  That was in August.
16     Q.  August of --
17     A.  Of 2004.
18     Q.  Of 2004?
19     A.  Correct.
20     Q.  And this poster, let me hand
21 you Exhibit 12 and ask you if that's the
22 poster you are referring to.
23          - - -
24          (Whereupon, Deposition

Page 296

1  Exhibit Graham-13, "Risk of Acute
2  Myocardial Infarction and Sudden
3  Cardiac Death with Use of COX-2
4  Selective and Non-Selective
5  NSAIDs" (Graham, et al)  KP001521
6  - KP001526, was marked for
7  identification.)
8          - - -
9  BY MR. BECK:
10     Q.  And I think I got it right.
11 Is it the ISPE poster that you talked
12 about on direct examination?
13     A.  Yes.
14     Q.  And this sets forth the
15 results after you reclassified some of
16 the formerly low-dose patients as
17 high-dose patients and some of the
18 formerly high-dose patients as low-dose
19 patients, right?
20     A.  That, and in the interim had
21 discovered that the way the regression
22 analysis was done for the first two, that
23 I had done it incorrectly.  This was what
24 I talked about before, the --

Page 297

1      Q.  I --
2          MR. KLINE:  Let him finish,
3  please.
4          MR. BECK:  Okay.
5          MR. KLINE:  He was
6  answering.
7          MR. BECK:  Yeah, I know.
8  But I don't want him just to
9  repeat what he talked about
10 before.
11         MR. KLINE:  But he was
12 answering.
13         MR. BECK:  Okay.
14         Go ahead.
15         THE WITNESS:  What I was
16 saying is, is that we had done the
17 regression analyses incorrectly by
18 treating each drug separately and
19 doing a separate regression
20 analysis, when everything should
21 have been combined together into
22 one regression analysis.
23         And so the August poster
24 reflects the appropriate analysis,

KS-000374

75 (Pages 294 to 297)

Confidential - Subject to Protective Order

Page 298

1    along with the reclassification of
2    patients who had been
3    misclassified previously.
4  BY MR. BECK:
5    Q.   And all I want you to do is
6  confirm for me, sir, after you
7  reclassified people and then changed the
8  regression analysis, is this the relative
9  risk that you recorded for 25 milligrams
10 or less?
11   A.   Yes, it is.
12   Q.   And that is under
13 traditional approach not statistically
14 significant, correct?
15   A.   It's elevated, that's
16 correct.
17   Q.   Correct that it's not
18 statistically significant?
19   A.   Yes, but -- yes.
20   Q.   And then the high dose
21 numbers came down somewhat, but still
22 elevated.  And after the reclassification
23 and change in methodology, they remained
24 statistically significant, right?

Page 300

1  programming that we had done throughout
2  the whole study to see if everybody in
3  the study belonged in the study.  What we
4  discovered were there were about 1,300
5  patients whose eligibility there,
6  membership in Kaiser, had lapsed for more
7  than one month.  And so what that meant
8  is, is we could be missing drug exposure
9  information.  So, we had to remove those.
10 To not do so would have been to
11 misrepresent the data.
12       So, we weren't manipulating
13 anything and we weren't changing our
14 methods.  We were doing quality control,
15 and that explains the change that you see
16 there.
17   Q.   All right.
18       So, after the
19 reclassification in May and the change in
20 methodology in August, and then the
21 quality control in 2005, your final
22 result for 25 milligrams and below was a
23 relative risk of 1.23 with a confidence
24 interval from below 1 to above 1, right?

Page 299

1    A.   Yes.
2    Q.   Now, finally you reported
3  these results in The Lancet article that
4  you testified about, right?
5    A.   Yes.
6    Q.   And that's already been
7  marked as an exhibit.  I don't know if
8  you still have it in front of you, but it
9  was marked, I believe, as Exhibit 4.
10   A.   Uh-huh.
11   Q.   And do I have up here -- you
12 can get this by going out to Table 3 on
13 Page 4, but just to save time, do I have
14 it correct on the chart here that in The
15 Lancet article, I guess after further
16 work, reclassifying patients and changing
17 the methodology, the 25 milligrams or
18 below the relative risk is 1.23, and the
19 confidence interval is as indicated
20 there.  Is that what you reported?
21   A.   That's what we reported, but
22 what happened here is that we did a final
23 quality control on our patients to see
24 if -- basically we went back over all the

Page 301

1    A.   Yes.
2    Q.   And under traditional
3  approach, that is not statistically
4  significant, correct?
5    A.   Correct.
6    Q.   And then the final numbers
7  for the high dose that you had were 3
8  with the confidence interval as
9  indicated, right?
10   A.   Yes.
11   Q.   And that under this analysis
12 remains statistically significant; is
13 that right?
14   A.   Yes.
15   Q.   So, just sort of a summary
16 question that in all four of your reports
17 as to the outcome of your study, the 25
18 milligrams and below, the relative risk
19 at all times remained under traditional
20 views as to statistical significance; is
21 that right?
22   A.   Compared to remote use, but
23 not compared to -- well, compared to
24 remote use.

KS-000375

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 302

1    Q.   Yeah.  I'm asking about
2  comparing it to remote use, which is --
3    A.   Basically nonuse.
4    Q.   Right.
5       So, in all four at 25
6  milligrams or below, there was no
7  statistically significant difference
8  between taking that dose of Vioxx and not
9  taking any medicine at all, right?
10    A.   Yes.
11    Q.   I want to focus a bit on, a
12  little bit more on how these changes came
13  about from the abstract to the poster and
14  also what people within the FDA were
15  saying about your analysis, because I
16  think you testified about that this
17  morning.  Do you remember that?
18    A.   Uh-huh.
19    Q.   The abstract itself, did you
20  have that reviewed by anybody from the
21  FDA before the abstract was published?
22    A.   What are we referring to?
23    Q.   We're referring to back up
24  on the screen, May of 2004 --

Page 303

1    A.   The ACR abstract.
2    Q.   -- ACR abstract.
3    A.   What happened with the ACR
4  abstract is that David Campen at Kaiser
5  was the first author, and I sent him the
6  quick analysis that we had done, and he
7  submitted the abstract, and I did not put
8  it through FDA clearance, and that was an
9  oversight on my part.
10    Q.   And then because there is a
11  procedure that you are supposed to follow
12  at FDA to show them studies and articles
13  and abstracts and posters that you intend
14  to have your name on, whether you're the
15  first author or second, third, fourth or
16  fifth, right?
17    A.   Yes.
18    Q.   Okay.
19       And then when it came to the
20  poster in August of 2004, after you've
21  reclassified people and changed the
22  methodology, did you submit that for
23  review by folks from the FDA?
24    A.   Yes, I did.

Page 304

1    Q.   And I think you indicated
2  that your supervisor reviewed that
3  poster; is that right?
4    A.   Yes.
5    Q.   And what was his name?
6    A.   Paul Seligman.
7    Q.   And at the time, was he the
8  acting head of the Office of the Drug
9  Safety?
10    A.   I think so, yes.
11    Q.   And you said something about
12  how he suggested a change in the
13  conclusion.  Was your -- did your initial
14  draft of the poster have a conclusion
15  that the high dose of Vioxx, the 50
16  milligram dose should not be prescribed
17  or used?
18    A.   Let me see what this one
19  says and then I can answer you.
20       (Witness reviewing
21  document.)
22       Yes.
23    Q.   Okay.
24       And then I think you said

Page 305

1  that Dr. Seligman did not agree with that
2  conclusion and said that you should take
3  out the conclusion that high dose 50
4  milligrams should not be prescribed or
5  used; is that right?
6    A.   Correct.
7    Q.   Let me hand you what I'm
8  going to mark as Exhibit 14.
9       - - -
10       (Whereupon, Deposition
11  Exhibit Graham-14, E-mails with
12  attachment "Comments on ISPE
13  Paper"  FDACDER006048 -
14  FDACDER006049, was marked for
15  identification.)
16       - - -
17    MR. BECK:  Let's put this up
18  on the screen.
19  BY MR. BECK:
20    Q.   Do you recognize Exhibit 14?
21    A.   Yes, I do.
22    Q.   What is Exhibit 14?
23    A.   It's an e-mail from Dr.
24  Seligman to me with his comments on the

Confidential - Subject to Protective Order

Page 306

1   poster.
2        Q.   All right.
3        And then the next page are
4   his comments, right?
5        A.   Right.
6        Q.   Was Mr. -- is it Dr.
7   Seligman?
8        A.   Dr. Seligman.
9        Q.   Dr. Seligman, is he one of
10  the people that you think was out to get
11  you at the FDA?
12       MS. ROYCE:  Objection to
13       form.
14       THE WITNESS:  Let's put it
15       this way.  Dr. Seligman ordered an
16       illegal criminal investigation in
17       early 2004 to identify the person
18       or persons who spoke to the media
19       about the fact that Dr. Andrew
20       Mossholder, an FDA medical officer
21       who had done a study looking at
22       SSRI antidepressants and
23       suicidality in children, that that
24       had been suppressed.

Page 307

1        Dr. Seligman, under oath
2        before the House subcommittee on
3        investigations and oversight for
4        FDA, admitted under oath that he
5        had ordered that illegal criminal
6        investigation to identify the
7        source of the leak and that he had
8        named me as a suspect, although he
9        had no grounds to do so, except
10       that he thought that this is the
11       kind of thing that I would do.
12       And so there is that past history
13       with Dr. Seligman to keep in mind.
14       At this point, I wasn't
15       interpreting his comments in that
16       regard except that the reason why
17       I hadn't said in the original
18       version was that high dose
19       rofecoxib should be removed from
20       the market was because I knew the
21       type of reaction it would get, and
22       toning it down a little bit still
23       elicited pretty much the same
24       response, and that's expressed

Page 308

1        here.
2   BY MR. BECK:
3        Q.   Well, this morning, didn't
4   you testify, in effect, that there were
5   several people at the FDA who were out to
6   get you?
7        MR. KLINE:  Objection to the
8        form.  I don't think those terms
9        were ever used.
10       THE WITNESS:  No, I never
11       used those, but I can --
12  BY MR. BECK:
13       Q.   No.  The terms you used were
14  that there was an "organized and
15  orchestrated campaign to smear and
16  discredit me."  Do you remember that
17  phrase?
18       A.   Yes.
19       MR. KLINE:  My objection is
20       only to form.
21       THE WITNESS:  And we can
22       talk about that in detail if you
23       would like.
24  BY MR. BECK:

Page 309

1        Q.   Okay.
2        My question right now is a
3   narrow one.  Is Dr. Seligman one of the
4   people that you were referring to this
5   morning as part of this organized and
6   orchestrated campaign that you thought
7   existed to smear and discredit you?
8        A.   Yes.  He would be part of
9   that group.
10       Q.   Okay.
11       So, let's look at what Dr.
12  Seligman said when you submitted the
13  poster to him.  He said, "In general an
14  excellent study and analysis of a complex
15  topic."
16       Do you see that?
17       A.   Yes.
18       Q.   And then he says, "As you
19  might expect, my only comment has to do
20  with the conclusion that 'higher-dose
21  rofecoxib should not be prescribed or
22  used.'"
23       That's the conclusion that
24  you and I were talking about a few

Confidential - Subject to Protective Order

Page 310

1  minutes ago, right?
2      A.   Right.
3      Q.   Then he went on to explain
4  why he was concerned with having a
5  conclusion like that, didn't he?
6      A.   Yes.
7      Q.   And then he said, "My
8  concern is based both on the small number
9  of cases (10) and the lack of information
10 inherent in such a study regarding the
11 'time-to-event.'"
12         Now, small number of cases
13 being ten, does that mean that there were
14 only ten cases in your study of thousands
15 and thousands of patients where somebody
16 taking high-dose Vioxx had either a heart
17 attack or sudden cardiac death?
18     A.   We had ten patients who were
19 currently exposed to high-dose rofecoxib
20 Vioxx at the time of their heart attack
21 or sudden death.
22     Q.   And the concern expressed by
23 Dr. Seligman, whether you believe him
24 today or not, was that that number is

Page 311

1  just too small to draw a meaningful
2  conclusion from, correct?
3      A.   That's what I think he's
4  driving at here, but that's what a
5  confidence interval is for.
6      Q.   Do you remember this morning
7  when you were saying that epidemiological
8  studies are better in many ways than
9  clinical trials, because in a clinical
10 trial like the ones that Merck performed,
11 I think you said in one of the clinical
12 trials, there were only 40 or 50 heart
13 attacks, and that's just not enough to
14 draw any meaningful conclusions from?  Do
15 you remember that testimony this morning?
16     A.   But you have to -- it's not
17 enough to draw a conclusion in the
18 specific area between 0 and 18 months
19 where there was insufficient power, so,
20 you had very wide confidence intervals.
21 That didn't apply here.
22         The confidence intervals
23 here were narrow enough that even though
24 the numbers are small, one can

Page 312

1  legitimately draw a conclusion.
2      Q.   But in any event, Dr.
3  Seligman disagreed and said the number of
4  cases is just so small that you cannot
5  legitimately draw such a conclusion,
6  correct?
7      A.   Yes.  But he's not referring
8  to the confidence intervals, and, you
9  know, if you ask him the same questions
10 you're asking me, he'd have to say that
11 the confidence intervals permit it.
12     Q.   Well, did others in the FDA
13 express similar concerns that Dr.
14 Seligman expressed about whether you
15 could draw conclusions from such a small
16 number --
17     A.   Yes, they did.
18     Q.   -- of people who used the
19 high-dose Vioxx?
20     A.   Yes, they did.
21     Q.   Who is Dr. John Jenkins?
22     A.   He's the director of the
23 Office of New Drugs.
24     Q.   And is Dr. Jenkins another

Page 313

1  one of the FDA people that you think was
2  out to get you?
3      A.   No.
4          -  -  -
5          (Whereupon, Deposition
6  Exhibit Graham-15, E-mails
7  FDACDER011048 - FDACDER011049,
8  was marked for identification.)
9          -  -  -
10 BY MR. BECK:
11     Q.   Let me show you Exhibit 15.
12     A.   (Witness reviewing
13 document.)
14     Q.   Exhibit 15 is an e-mail
15 string.  The last one appears to be dated
16 August 11, 2004.  They're all around that
17 time frame.
18         Do you see that the middle
19 e-mail on Page 1 is from Dr. Jenkins?
20     A.   Yes, I see it.  I've never
21 seen this e-mail before, the best I can
22 recollect.
23     Q.   Let's go through what Dr.
24 Jenkins said, focusing on the second

KS-000378

Confidential - Subject to Protective Order

Page 314

1  paragraph of his e-mail of August 11,
2  2004.
3      MR. KLINE:  Objection.  Only
4  to the extent that I would like
5  the witness to be able to identify
6  whether he has seen the document
7  before.
8      MR. BECK:  He just
9  testified.
10     THE WITNESS:  No.  I've
11 never seen this.
12     MR. KLINE:  I didn't hear
13 him say that.  I apologize.
14     MR. BECK:  He said that as
15 best he could recall, he didn't
16 remember seeing it.
17     MR. KLINE:  Okay.
18 Thank you.
19     THE WITNESS:  Not on the --
20     MR. KLINE:  I would just
21 like to create a record as to
22 whether he has seen it or not for
23 ruling purposes later.  That's my
24 only reason.

Page 315

1      Thank you.
2      MR. BECK:  Okay.
3  BY MR. BECK:
4      Q.  So, Dr. Jenkins here, he
5  says -- I put the little red marker where
6  I'm going to begin reading.  Second
7  paragraph, "I would also note that I find
8  the conclusions reached in the poster to
9  be far in excess of the available data.
10 For example, 'Rofecoxib use at a dose
11 over 25 milligrams increases the risk of
12 AMI or SCD' is the primary conclusion of
13 the poster.  This is a far too definitive
14 conclusion based on the data.  Similar
15 language appears in other parts of the
16 poster and implies that a causal
17 relationship has been confirmed."
18     Now, just stopping there.
19 Did you know back in 2004 that Dr.
20 Jenkins was of the same view that Dr.
21 Seligman expressed to you?
22     A.  There was one e-mail from
23 sometime after this date, but in the
24 teens of August, it was like a two-line

Page 316

1  e-mail in which Dr. Jenkins suggested
2  what he thought different wording for our
3  conclusions would be acceptable to him
4  were, and that's pretty much the extent
5  of what my knowledge of what Dr. Jenkins
6  thought.
7      Q.  Do you see where he goes on
8  to say:  "This is misleading at best and
9  deceptive at worst, since what has been
10 demonstrated as an association between
11 the use of the drug and the events in
12 question.  Yes, we have some priors and
13 randomized controlled clinical trials
14 that suggest rofecoxib may be associated
15 with an increased risk of MI, but those
16 priors do not support reaching such a
17 definitive conclusion about the findings
18 in the study"?
19     Were you aware that Dr.
20 Jenkins was expressing the view that the
21 conclusion that you had in your draft
22 poster was misleading at best and
23 deceptive at worst?
24     A.  Nope.  No idea.

Page 317

1      Q.  And then he goes on to say,
2  "These types of overstated conclusions
3  are typical of David's writing" -- David
4  is you, correct?
5      A.  Correct.
6      Q.  -- "and only serve to
7  undermine his credibility as an objective
8  evaluator of the data at hand."
9      And then he says, "It is
10 even more ridiculous for him to make
11 broad recommendations about not using the
12 drug based on the data from this study,
13 and such sweeping clinical/regulatory
14 conclusions represent the primary reason
15 for difficulties in the interactions
16 between David and staff in OND."
17     That would be Office of New
18 Drugs, right?
19     A.  Correct.
20     Q.  Then before I get to the
21 last couple of sentences, when you write
22 articles like you talked about this
23 morning and including this poster, do you
24 typically have a disclaimer on there that

Confidential - Subject to Protective Order

Page 318

1   says these are not necessarily the views
2   of the FDA, they're just the views of the
3   author, David Graham?
4        A.   Oh, we're pretty much
5   required to have that disclaimer.
6        Q.   And do you see here where
7   Dr. Jenkins says, "Perhaps the disclaimer
8   should read that 'The views expressed are
9   those of the author and DO NOT reflect
10  the views of the FDA.'"  And "Also,
11  perhaps, the COI statement" -- what's a
12  COI statement?
13       A.   I think that's probably
14  conflict of interest.
15       Q.   Okay.
16            And I think this morning you
17  said in response to questions from
18  counsel that you didn't have any
19  conflicts of interest.
20            Do you see where Dr. Jenkins
21  says that "perhaps the conflict of
22  interest statement should say 'Dr. Graham
23  has no FINANCIAL conflicts of interest,
24  but" systemic "bias in his viewpoints

Page 319

1   cannot be excluded."
2            Were you aware that that was
3   Dr. Jenkins' views as to the merits of
4   the poster conclusion?
5        A.   Dr. Jenkins is entitled to
6   his opinions.  I wasn't aware of them.
7   The same could be said of the FDA.
8        Q.   The same could be said of
9   the FDA.  I don't know --
10       A.   The same systemic --
11  systematic bias and viewpoints at FDA can
12  not be excluded.  FDA has systematic
13  biases.  Dr. Jenkins has systematic
14  biases.  So, he's entitled to his
15  opinion.  I wasn't aware of them.  But I
16  probably could have surmised them.
17            MR. KLINE: Can you read the
18       last e-mail right before just the
19       first paragraph for completeness,
20       please.
21            MR. BECK:  Sure.
22            MR. KLINE:  "Please see
23       Paul's message below."
24  BY MR. BECK:

Page 320

1        Q.   "Please see Paul's message
2   below which he kindly shared.  For the
3   record, Merck will likely not be happy so
4   this could well eventuate in calls to the
5   agency.  Should we involve...Temple?  He
6   historically has been one of the first
7   ones they complain to."
8            MR. KLINE:  That's fine.
9   BY MR. BECK:
10       Q.   "I am very concerned that
11  David Graham is lead author on this and
12  is identified as FDA staff.  This clearly
13  implies agency endorsement of his
14  presentation and this is the first we
15  have seen of it.  Paul's message below
16  for a presentation at a meeting coming up
17  later this month does not allow much time
18  to review or clear."  And that's from
19  Jonca Bull, correct?
20       A.   Correct.
21            MR. KLINE:  Thank you.
22  BY MR. BECK:
23       Q.   Who is Sharon Hertz?
24       A.   I think she's a deputy

Page 321

1   division director for the analgesic and
2   anti-inflammatory reviewing division, and
3   that would be the reviewing division
4   responsible for NSAID drugs, both
5   naproxen and drugs like Vioxx.
6                  - - -
7            (Whereupon, Deposition
8       Exhibit Graham-16, E-mails
9       FDACDER006056 - FDACDER006058,
10      was marked for identification.)
11                 - - -
12  BY MR. BECK:
13       Q.   I'm handing you what we've
14  marked as Exhibit 16, which I will put up
15  on the screen.  This is a document that
16  you've seen before, correct?
17       A.   That is correct.
18       Q.   And it's from Sharon Hertz.
19  Is it Dr. Hertz?
20       A.   Yes, it is.
21       Q.   And Dr. Hertz, and it's to
22  you and your boss, Dr. Seligman, right?
23       A.   Correct.
24       Q.   And it copies Dr. Bull, who

Confidential - Subject to Protective Order

Page 322

1  we just read an e-mail from, as well as
2  Dr. Jenkins and some others, right?
3      A.  Yes.
4      Q.  Did Dr. Hertz say to you
5  that "There is information to suggest
6  that use of aspirin may mitigate possible
7  CV risk associated with COX-2
8  inhibitors," and go on to ask "why would
9  you choose to study CV risk from a
10 database that does not collect
11 information on something as relevant as
12 aspirin use"?
13     A.  She said it, but she didn't
14 understand the study, the methods, or why
15 her question actually is not pertinent to
16 the analysis that we did because we
17 showed that aspirin is not a confounder
18 of any association between NSAID use and
19 heart attack risk.  And because she
20 doesn't understand epidemiology, she
21 wrote this, but this is a statement
22 that's coming from her lack of
23 understanding of epidemiology.
24     Q.  And she also referred to

Page 323

1  your conclusion concerning high-dose
2  Vioxx and the fact that that represented
3  "a very small subgroup of a large
4  population," correct?
5      A.  She says that, but high-dose
6  Vioxx represented 18 percent of all the
7  Vioxx use in the country.  So, it has
8  public health importance.
9      Q.  And did she tell you that
10 drawing conclusions about this subgroup
11 at all is inappropriate because of the
12 small size of it?
13     A.  She says that, but her
14 statement is incorrect, because the
15 confidence intervals permit that.  And it
16 was stated a priori at the beginning of
17 our study that we would do that analysis,
18 that we would take a look as best we
19 could at the effect of dose of rofecoxib,
20 of Vioxx, on heart attack risk.  So, she
21 can use words like it's inappropriate for
22 us to do that but the fact is that, she's
23 mistaken.  There's nothing inappropriate
24 about it.

Page 324

1      Q.  And you'll see at the bottom
2  of the paragraph she said, "This is
3  simply bad science."
4      A.  She's entitled to her
5  opinion.
6      Q.  I forgot to ask you.  Is
7  Dr. Hertz one of the people at the FDA
8  that you think was out to get you?
9      A.  I didn't use those terms,
10 but, no, she is not one of those people.
11     Q.  Is she one of the people,
12 who, to use your terms, was part of the
13 very organized and orchestrated campaign
14 to smear and discredit you?
15     A.  She is not a member of that
16 group.
17     Q.  She just disagreed with you
18 and thought you were using bad science,
19 right?
20     A.  That's what she says here.
21 But she's not an epidemiologist, and I'm
22 not sure that she would recognize good
23 epidemiology if she saw it.
24     Q.  And Dr. Jenkins, who we

Page 325

1  talked about a minute ago, who commented
2  on what he thought was the invalidity of
3  your analysis, do you think he knows what
4  he's talking about when it comes to
5  epidemiology?
6      A.  I think that Dr. Jenkins is
7  not an epidemiologist.  He's a
8  pulmonologist.  I think that he has broad
9  responsibilities for the approval of
10 drugs, and that it's his office, Office
11 of New Drugs, that approved Vioxx, and
12 that going back to the conflict of
13 interest that we talked about before,
14 that FDA has a vested interest in
15 maintaining the decisions that it's made
16 previously.  And that their biggest
17 concern here was that they had, in
18 quotes, done a labeling change in 2002,
19 and that solved the problem.  But I
20 contend that it didn't really accomplish
21 very much at all.
22          - - -
23          (Whereupon, Deposition
24          Exhibit Graham-17, E-mails

Confidential - Subject to Protective Order

Page 326

1    FDACDER021810 - FDACDER021811,
2    was marked for identification.)
3        - - -
4    BY MR. BECK:
5        Q.  I'm going to hand you what
6    we've marked as Exhibit 17.  Have you
7    seen Exhibit 17 before?
8        A.  No.  I have never seen this
9    before.
10       Q.  Who is -- I'm going to -- I
11   may mispronounce both halves of the name.
12   Lourdes -- you tell me how to pronounce
13   it.
14       A.  Lourdes Villalba.  I've done
15   it too.  No offense to Lourdes.
16   Villalba.
17       Q.  Lourdes Villalba.  Who is
18   Lourdes Villalba?
19       A.  She was the medical officer
20   who was responsible for Vioxx.  She may
21   have been the medical officer who
22   reviewed the original Vioxx NDA, but that
23   I'm not absolutely certain about, but she
24   had responsibility for it as the primary

Page 327

1    medical officer in the reviewing division
2    of the Office of New Drugs at this time.
3        So, she's the one who would
4    review -- well, actually, she did the
5    original review that we showed on the
6    slide.  So, any supplements or any
7    submissions from Merck regarding Vioxx,
8    they would come to her desk.
9        Q.  Was she one of the people
10   that was part of the organized and
11   orchestrated campaign to smear and
12   discredit you that you think existed at
13   the FDA?
14       A.  No, she was not.
15       Q.  At the bottom of this e-mail
16   string, Lourdes writes, "I learned of
17   this study a couple of weeks ago when
18   Jonca requested my opinion about the
19   abstract that was going to be presented
20   in France.  This study is not a good
21   study to address the cardiovascular
22   question.  The conclusions are not well
23   supported by the data."
24       Did you learn back in 2004

Page 328

1    that Lourdes Villalba felt that your
2    conclusions were not supported?
3        A.  No.  I was never told that,
4    but I'm not surprised.  This is the
5    typical response of people in the Office
6    of New Drugs to studies that are done in
7    the Office of Drug Safety that we talked
8    about earlier where -- and that would
9    lead Dr. Galson to say that our office
10   doesn't add value to the center.
11       Q.  Who is Anne Trontell?
12       A.  Dr. Trontell is the deputy
13   director for the Office of Drug Safety.
14       Q.  And is Dr. Trontell one of
15   the people that you were referring to
16   this morning when you said that within
17   the FDA there was a very organized and
18   orchestrated campaign to smear and
19   discredit you?
20       A.  Yes.
21       - - -
22       (Whereupon, Deposition
23   Exhibit Graham-18, E-mails
24   FDACDER010352 - FDACDER010353,

Page 329

1    was marked for identification.)
2        - - -
3    BY MR. BECK:
4        Q.  Please take a look at
5    Exhibit 18.
6        A.  (Witness reviewing
7    document.)
8        Q.  Incidentally, how long has
9    Dr. Trontell been at the FDA?
10       A.  Gee, I don't exactly know.
11   She's been with the Office of Drug Safety
12   for maybe five years.  She came from the
13   Office of New Drugs before that.
14       MR. KLINE:  Can we just
15   establish whether he's seen the
16   document or not?  That would help
17   me later with the record.  That's
18   all I ask.
19       MR. BECK:  Sure.
20       MR. KLINE:  On all of these?
21       MR. BECK:  Yes.
22       MR. KLINE:  Thanks.
23   BY MR. BECK:
24       Q.  Do you remember whether

Confidential - Subject to Protective Order

Page 330

1  you've seen this document before?
2      A.   No, I don't think that I
3  have seen this document before.
4      Q.   Do you see that Dr. Trontell
5  is writing to Dr. Seligman in the e-mail
6  on the top?
7      A.   Yes.
8      Q.   Starting with the second
9  paragraph, she says, "I understand John's
10  consternation, but let us all acknowledge
11  the problem arose when David Graham
12  overstepped the bounds of what anyone can
13  conclude from a brief poster of a complex
14  study.  He ignored advice from multiple
15  FDA sources by making a strong conclusion
16  without giving enough information or time
17  to others in FDA to evaluate it
18  rigorously."
19          Did Dr. Trontell communicate
20  those views to you even though you didn't
21  see this particular e-mail?
22      A.   She communicated views
23  similar to this.  She never said that I
24  overstepped my bounds, and she didn't use

Page 331

1  words like I ignored advice.  And at the
2  end of the day, the poster was cleared by
3  FDA, so that they can complain all they
4  want, but I didn't -- I stuck to what I
5  believed based on the data, and they
6  cleared it at the end of the day.  So, we
7  had honest disagreements about the data
8  and how to interpret it.
9      Q.   And as part of that
10  disagreement, do you see here where she
11  says that you "subverted FDA review as
12  well as the normal standards of peer
13  review by stating an
14  inadequately-supported conclusion based
15  upon the limited data" you "made
16  available for review"?  Again, did she
17  express those views to you in substance?
18      A.   No.  And that statement
19  actually makes absolutely no sense to me
20  as it's stated.  If she's talking about
21  the differences between the ACR abstract
22  and the ISPE abstract, those things I
23  described to both Dr. Seligman and Dr.
24  Trontell between the end of May and

Page 332

1  August, as we came upon each of the
2  problems and had to deal with them.  And
3  she doesn't recall that.
4          We had many, many
5  conversations.  And I had them with Dr.
6  Seligman as well.  And so looking at
7  this, that's the only thing that I can
8  guess she is -- she's saying from that,
9  but that's just a guess.
10      Q.   She says here, "To publicize
11  findings that have not been fully vetted
12  is irresponsible and professionally
13  suspect."
14      A.   Where are you?
15      Q.   If you look up on the
16  screen, I'm in the middle of the next
17  paragraph.
18      A.   Uh-huh.
19      Q.   Did she communicate those
20  views to you?
21      A.   No.  But the fact is, is
22  that I didn't communicate anything to the
23  public that hadn't been cleared by FDA.
24  So, this statement really, in my mind, is

Page 333

1  inaccurate and, you know, she's using a
2  lot of pejorative terms towards me, so,
3  she can be very critical of me, but the
4  fact is, is that the document was
5  cleared, and I have the signed clearance
6  form, and so she can have her opinion.
7      Q.   She refers in here to an
8  internal peer review process at the FDA.
9      A.   Where are you now?
10      Q.   Up in the first paragraph
11  right after she says you "subverted FDA
12  review."  It says, "as well as the normal
13  standards of peer review."
14      A.   There are no established
15  peer review standards within FDA, and, in
16  fact, for this poster -- actually, for
17  this poster they didn't do it, but for
18  our paper, they created a unique
19  once-only peer review process that had
20  never been used before within our office
21  and has not been used within our office
22  subsequently.
23          So, there's no MAP, which is
24  a manual of -- what is it -- manual of

KS-000383

Confidential - Subject to Protective Order

Page 334

1  policy and procedures.  There's no
2  standard operating procedure to describe
3  what she's saying.  This is something
4  that she made up, and they implemented it
5  for this paper and had never done it in
6  the 20 -- almost 20 years I'd been at FDA
7  before this, and they haven't done it
8  with any work that I've done or anyone
9  else in our office has done subsequently.
10     Q.   Let's focus on the peer
11  review process that was followed in this
12  case.
13         Again, I'm going to ask you
14  to keep your answers short.  Was your --
15         MR. KLINE:  I would ask him
16      to answer fully and completely as
17      he needs to.
18         MR. BECK:  Well, back
19      when --
20         THE WITNESS:  I'll try to
21      accommodate both requests.
22      Seriously.
23         MR. BECK:  I'm just making
24      exactly the same request that Mr.

Page 335

1      Kline did this morning.
2         MR. KLINE:  All I'm asking
3      is that he be responsive and
4      complete.
5  BY MR. BECK:
6      Q.   The peer review process that
7  you and I were just talking about, did
8  that -- or that you were describing as
9  this new process that had never been
10  implemented before, was that a peer
11  review process that was conducted for the
12  article that eventually was published in
13  The Lancet?
14      A.   Correct.
15      Q.   Okay.
16         And did Dr. Trontell review
17  your paper and give comments?
18      A.   Yes, she did.
19      Q.   And did the folks at the FDA
20  ask you for suggestions as to people who
21  could serve as good peer reviewers,
22  people that you would respect and trust?
23      A.   Yes.  And they were the same
24  names that they would have come up with

Page 336

1  as well.
2      Q.   And what were those names?
3      A.   Robert O'Neill, who is the
4  director of the office of biostatistics
5  at FDA.  Bruce Stadel, Dr. Bruce Stadel
6  who's, in my view, the best
7  epidemiologist at FDA and who is retired
8  now.  And then, I believe I had mentioned
9  the possibility of Dr. Curt Furberg from
10  Wake Forest and Dr. Brian Strom from the
11  University of Pennsylvania as a couple,
12  because they said they wanted to send it
13  not only to internal FDA people, but in a
14  complete breach of FDA policy and
15  protocol --
16      Q.   Now we're sort of getting
17  beyond the names of the other people that
18  I've asked you for.
19      A.   Well, they're sending it to
20  these people.  They were contemplating
21  sending this paper to people outside of
22  FDA, as well, for peer review.
23      Q.   My question is then, who did
24  you suggest --

Page 337

1      A.   Well, I gave those four
2  names.
3      Q.   Okay.  Good.
4         MR. BECK:  Mark this as
5      Exhibit 19.
6              - - -
7         (Whereupon, Deposition
8      Exhibit Graham-19, Memo 10-29-04
9      "Review of reports of FDA/Kaiser
10      Vioxx study: Questions about
11      Inconsistencies and Bias,"
12      FDACDER022462 - FDACDER022470,
13      was marked for identification.)
14              - - -
15  BY MR. BECK:
16      Q.   I'm going to hand you
17  Exhibit 19 here, which is a memorandum
18  from Dr. Trontell to Dr. Seligman.  Have
19  you seen this document before?
20      A.   Yes, I have.
21      Q.   Is this document --
22      A.   This isn't the complete
23  document.  The one that I recall
24  seeing -- well, maybe it's just different

Confidential - Subject to Protective Order

Page 338

1  typeface.  I thought it was much longer
2  than this, but in any event.
3      Q.   But you recall seeing this?
4  It may be part of a larger package --
5      A.   Right.
6      Q.   -- but you recall this
7  memorandum?
8      A.   Yes.  It was sent to me
9  after 5:00 on a Friday afternoon when I
10  was scheduled to go on a week's vacation,
11  the first vacation that I had had in like
12  eight months.  So, I was coming to work
13  at 7:00 in the morning, and 5:00 is way
14  past quitting time, especially when
15  you're headed for a vacation, and so I
16  saw this, read through the first couple
17  of pages of this and said, I have talked
18  to Anne, Dr. Trontell and Dr. Seligman
19  about these things on numerous occasions
20  in the past, and so concluded this could
21  wait until I got back from vacation,
22  because I didn't see anything new here
23  that I hadn't talked with them about
24  previously.

Page 339

1      Q.   And, sir, my question was,
2  do you recall seeing this piece of paper?
3      A.   Yes, I do.
4      Q.   Does Dr. Trontell in this
5  memorandum raise concerns with the
6  methodology used in the study that you
7  had done?
8      A.   She raises a number of
9  questions which we've actually discussed
10  and have the answers to, yes.
11      Q.   Over on Page 2 in the last
12  paragraph of the executive summary, did
13  Dr. Trontell state: "My review notes
14  several unexplained inconsistencies in
15  the conduct of the study and the
16  reporting of results.  Before the
17  findings and conclusions of the study
18  report can be accepted, the authors must
19  address all inconsistencies with adequate
20  documentation that clearly explains how
21  they occurred, in order to address the
22  potential appearance of data manipulation
23  and post hoc analyses."
24      Now, post hoc analysis, for

Page 340

1  the benefit of the jury, what that refers
2  to is somebody coming in after the fact
3  and kind of changing the rules of the
4  study --
5      A.   It's the same thing that
6  Merck did with the APPROVe study and its
7  18-month argument.  It is a post hoc
8  analysis.
9      Q.   So, now I'm starting to get
10  speeches before I've even asked the
11  question.
12      MR. KLINE:  Objection.
13      THE WITNESS:  I apologize.
14  BY MR. BECK:
15      Q.   Is a post hoc analysis where
16  somebody, after a study is conducted,
17  goes back and changes the rules of the
18  study, and the concern then is that the
19  results are invalid?  I'm not asking
20  whether you did it.  I'm asking whether
21  that's what the post hoc analysis is.
22      A.   When people talk about a
23  post hoc analysis, what they mean is
24  they're referring to an analysis that

Page 341

1  wasn't prespecified before the study
2  began or before the analysis began.
3      So, for example, in our
4  study, I know that Dr. Trontell kept
5  insisting that our comparison of Vioxx to
6  Celebrex was a post hoc analysis.  But it
7  was there from the beginning of our
8  protocol.  And so -- and I had explained
9  that to her multiple times.  But that's
10  what a post hoc analysis is.
11      Q.   And data manipulation,
12  again, not focusing on her concerns about
13  you, but what data manipulation is
14  generally is basically rigging the
15  numbers to come out the way you want
16  them?
17      A.   It's scientific misconduct.
18      Q.   And please turn over two
19  more pages.  Under, at the bottom,
20  "Recommendations," do you see where Dr.
21  Trontell says, "The authors should
22  document their methods in detail and
23  respond to questions raised in this
24  review in particular the noted

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 342

1 inconsistencies in the study objectives,
2 results and statistical findings of
3 significance of their published ACR
4 abstract and the August 2004 ISPE
5 poster." So, do you see there where
6 she's expressing concern that you've come
7 up with different conclusions and
8 different methodologies between that
9 original ACR abstract, and then your
10 later poster, like we saw in the chart
11 that I showed on the screen? Is that the
12 subject that's being addressed here?
13     A.    Uh-huh.  Yes.
14     Q.    And, in particular, what
15 she's saying is that before you submit
16 this article for publication, that you
17 should address these issues and explain
18 them, right?
19     A.    Dr. Trontell is saying that,
20 but Dr. Trontell is not my supervisor.
21 She wrote this to Dr. Seligman.  Dr.
22 Seligman, I believe, e-mailed it to me
23 with basically no instructions.  And so
24 Dr. Trontell can have her opinions about

Page 343

1 what it is I should do, but she's not my
2 supervisor, and, in fact, has never been
3 someone who reviews any of the work that
4 I do.
5     Q.    In any event, you submitted
6 the article to the Lancet without making
7 the responses that Dr. Trontell said you
8 should make, right?
9     A.    The responses were actually
10 included in the manuscript, A; B, we
11 submitted the manuscript with the
12 approval of my supervisors.  Because I
13 sent multiple e-mails to Dr. Seligman and
14 to Dr. Trontell giving them my
15 interpretation of FDA's clearance
16 policies and asking them to instruct me
17 if I had misinterpreted them in any way,
18 because I was anxious to -- I wanted to
19 be sure that I followed all of FDA's
20 rules and procedures.  And that if they
21 didn't get back to me, then I would
22 assume that I had interpreted them
23 correctly and that it is all right for me
24 to submit it.

Page 344

1         Dr. Trontell consulted with
2 the head lawyer for the Center for Drug
3 Evaluation and Research, Jane Axelrod,
4 who basically said to Dr. Trontell by way
5 of e-mail that it was fine, that I could
6 submit it.  And so Anne did not have a
7 written response to these questions, but
8 I had -- my understanding was I had the
9 permission of FDA to submit the paper.
10 And it was never my understanding, quite
11 honestly, that I was required to give
12 written responses to these questions, and
13 I tried to express that in an e-mail to
14 Dr. Paul Seligman somewhere around
15 November 10th or 9th or somewhere in that
16 neighborhood, because I was about to go
17 on a four-day weekend, because Veterans'
18 Day, which is November 11th, is a Federal
19 holiday, and I was going to take off the
20 12th and then I would have a four-day
21 weekend.
22         And on the 9th, Dr. Seligman
23 said that I could take leave on Friday,
24 but before I left, he needed written

Page 345

1 responses to these questions.  And I
2 e-mailed back that I hadn't understood
3 that that's what he wanted.  And he never
4 came back.  He had an entire day,
5 November 10th, Wednesday, the entire day
6 he had to disabuse me of my understanding
7 if he wanted to, and he never said to me
8 that, no, I misunderstood, I really do
9 want you to give a written response.  And
10 so I think that I acted reasonably and
11 tried to get management to communicate
12 with me, and management, in this case,
13 did not answer my e-mails, did not come
14 back to me to communicate with me in
15 clear, unambiguous instructions about
16 what it is that they wanted me to do.
17         MR. BECK:  For everyone's
18     benefit, yours as well as
19     plaintiffs' counsel, if I run out
20     of time on my cross-examination, I
21     may be going back to the judge,
22     because I'm getting long,
23     nonresponsive answers that I can't
24     cut off.

KS-000386

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 346

1    THE WITNESS: Can I disagree
2  with that for a moment? I think
3  that's very germane to the
4  question about what happened, and
5  I'm not trying --
6  BY MR. BECK:
7    Q.  I didn't ask you what
8  happened, sir. I asked you a specific
9  question, and you started telling me
10  about a four-day holiday you were going
11  on.
12    MS. ROYCE: He can't answer
13  a question unless he explains
14  things. He needs to be able to
15  put things in context.
16    MR. BECK: And I'm simply
17  putting everybody on notice,
18  including the witness, the
19  witness' counsel, and plaintiffs'
20  lawyers that I can't finish in
21  three-and-a-half hours because of
22  answers like this. We'll have to
23  be going back to the judge to see
24  about more time.

Page 347

1    MR. KLINE: Let's see if you
2  finish. I have full faith and
3  credit like the United States of
4  America. So, I think you'll
5  finish. My point being, let's
6  cross that bridge when we come to
7  it, if we come to it.
8    MR. COHEN: You're wasting
9  time.
10    MR. BECK: I'm sorry. What
11  did you say? Can I know what you
12  said?
13    MR. COHEN: I said he's just
14  wasting time.
15  BY MR. BECK:
16    Q.  Was it your view, sir, that
17  this peer review process that was
18  implemented was really some sort of smoke
19  screen by people at the FDA who were --
20  and what you think is this organized
21  campaign to smear and discredit you?
22    A.  No, no. My concerns with
23  the clearance process that they were
24  proposing was that in a situation where

Page 348

1  there was lots of active research going
2  on and many different people wanting to
3  publish articles and we were aware of
4  several articles that were under review
5  at the time, that their specific creation
6  of this new and unprecedented review
7  process would slow down and delay our
8  ability to submit this for publication.
9    And I had talked at length
10  with them, and Dr. Trontell has a long
11  history of holding up people's
12  manuscripts in the past, and I can give
13  you examples if you would like.
14    Q.  No thanks.
15    Was it your view that FDA
16  management had come up with a strategy to
17  block your paper and that that strategy
18  was the peer review process?
19    A.  I wasn't thinking of it in
20  those terms. I mean, I raised the
21  question that could have that
22  effect, but I didn't -- I don't think
23  that -- I don't think that I thought that
24  that was why they were doing that.

Page 349

1    - - -
2    (Whereupon, Deposition
3  Exhibit Graham-20, E-mails
4  FDACDER022789, was marked for
5  identification.)
6    - - -
7  BY MR. BECK:
8    Q.  All right.
9    I've handed you Exhibit 20.
10  Is this an e-mail from you to Richard
11  Horton, the editor of Lancet?
12    A.  Yes, it is.
13    Q.  October 29th, 2:03 p.m.?
14    A.  Yes.
15    Q.  So, that would be around the
16  time that we've got this memo from Dr.
17  Trontell; is that right?
18    A.  Correct.
19    Q.  And --
20    A.  Although it's before. It
21  actually precedes -- it precedes it. The
22  time on this is like 12:51, so, it's
23  about 1:00 in the afternoon. And as I
24  mentioned before, I was actually unaware

Confidential - Subject to Protective Order

Page 350

1  of Dr. Trontell's comments at this time.
2  What I was aware of was that they were
3  going to create a peer review process
4  involved -- and that peer review process
5  was going to involve Dr. O'Neill and
6  those people.
7       Q.   So, you were aware that they
8  were going to create a peer review
9  process, but you didn't have her
10  comments, and based on that, you told the
11  editor of Lancet -- well, let me get this
12  up on the screen here.
13       Based on the fact that they
14  were going to implement this peer review
15  process, you said, "I'm sorry to bother
16  you but is it still possible to speak
17  with you today.  FDA management has come
18  up with another strategy to block our
19  paper which I need to run by you."
20       Is that what you told the
21  editor of Lancet?
22       A.   Yes.
23       MR. KLINE:  Mr. Beck, may I
24  just raise one point respectfully?

Page 351

1       And, again, I'm operating under
2  the assumption, and I'll be brief,
3  and it doesn't count against your
4  time, the record should reflect
5  that --
6       MR. BECK:  Is this an
7  objection as to form?
8       MR. KLINE:  No, it's not an
9  objection as to form, but I want
10  to --
11       MR. BECK:  Is it going to be
12  alerting the witness that he ought
13  to be testifying in a certain way?
14       MR. KLINE:  No.  It is
15  nothing to alert the witness.  You
16  know better than that.  You know I
17  wouldn't do that.
18       My sole objection, I'm happy
19  to make it outside of the presence
20  of the witness, but I want to make
21  sure we have an understanding.
22       None of these documents go
23  to the public record, and I'm not
24  standing in your way and I'm not

Page 352

1       interfering, but I just want to
2       make sure, and then I'll be
3       totally out of your way the whole
4       rest of the time, that out of an
5       abundance of caution that we are
6       not agreeing to any of this
7       examination on two bases.  One --
8       MR. BECK:  You made this
9       speech this morning.  You don't
10       have to make it again.
11       MR. KLINE:  One, they're
12       loaded with hearsay -- and then
13       I'll be done.  I appreciate your
14       indulgence.  And two, they go
15       nowhere near or about or around
16       any public statements.  I'm done.
17       Thanks for your indulgence.
18  BY MR. BECK:
19       Q.   After your paper was
20  accepted for publication by Lancet but
21  before it actually was published, did you
22  learn that Dr. Steven Galson of the FDA
23  was in communication with The Lancet
24  about your paper?

Page 353

1       A.   Yes, I did.
2       Q.   And who is Dr. Steven
3  Galson?
4       A.   He is the Center director
5  for CEDR.
6       Q.   And I think you described
7  this morning that CDER, both the Office
8  of New Drugs and the Office For Drug
9  Safety are underneath CDER, which is the
10  Center for Drug Evaluation and Research,
11  right?
12       A.   Right.
13       Q.   And is Dr. Galson one of the
14  people that you think is part of this
15  very organized and orchestrated campaign
16  to smear and discredit you?
17       A.   Yes, he was.  He may have
18  been an unwitting participant.
19            - - -
20       (Whereupon, Deposition
21       Exhibit Graham-21, E-mails
22       KP001136 - KP001138, was marked
23       for identification.)
24            - - -

Confidential - Subject to Protective Order

Page 354

1  BY MR. BECK:
2      Q.   And let me show you Exhibit
3  21.
4          Have you seen Exhibit 21
5  before?  And I'm particularly interested
6  in actually whether you've seen the
7  e-mail that's on the second page of
8  Exhibit 21 from Dr. Galson to -- is it
9  Dr. Horton?
10     A.   Yes.  Dr. Horton forwarded
11 copies of these to me after he telephoned
12 me on November 12th to discuss the
13 concerns that Dr. Galson had raised in
14 his telephone conversation and in his
15 e-mail on the same day.
16     Q.   And the concerns that you're
17 referring to, those are the ones set
18 forth in this e-mail dated November 12th
19 from Dr. Galson to Dr. Horton?
20     A.   Yes.  This whole thing about
21 the different findings from the ACR
22 abstract and our ISPE poster and paper.
23     Q.   Okay.
24         So that, again, not to

Page 355

1  review the whole thing in detail again,
2  but he raises the issue with Dr. Horton
3  about whether he's been informed of an
4  earlier abstract from the same group, the
5  ACR abstract that had the different
6  conclusions, correct?
7      A.   Correct.
8      Q.   And he also raises a concern
9  about how the number of cases attributed
10 to high dose rofecoxib is different
11 between the ACR abstract and the poster,
12 as well as the article you submitted,
13 right?
14     A.   That's right.
15     Q.   And did he go on to say that
16 the draft manuscript that the FDA had
17 reviewed described "a process of
18 unanimous consensus by four Kaiser
19 collaborators for adjudicating uncertain
20 cases of high dose rofecoxib exposure.
21 It is not clear how the consensus process
22 resulted in two different published
23 numbers of high-dose rofecoxib cases and
24 controls in the ACR abstract and the

Page 356

1  draft manuscript."
2      A.   Yes.
3      Q.   You understood this as a
4  concern that Dr. Galson was expressing?
5      A.   Right.  It's the same
6  concern that Dr. Trontell had raised, and
7  it's the exact same questions that I had
8  spoken with Dr. Trontell and Dr. Seligman
9  with from May through August as those
10 issues came up, and I had explained each
11 of them to them in the past.
12     Q.   And then on the last page of
13 this, you understood at the time that Dr.
14 Galson said to the Lancet people, "We
15 would like Dr. Graham and his colleagues
16 to have an opportunity to address these
17 questions through the peer-review
18 process, and in no way wish to intrude or
19 otherwise advise the Lancet about its
20 scientific review and editorial policy."
21         You understood that that's
22 what he said at the time, didn't you?
23     A.   He said that here in the
24 e-mail.  There was a prior telephone

Page 357

1  conversation that Dr. Galson had had with
2  Dr. Horton, and if you read Dr. Horton's
3  response to Dr. Galson, you can pick up
4  threads of some of the things that Dr.
5  Galson expressed in that telephone
6  conversation that are probably toned down
7  in this follow-up e-mail.
8          - - -
9          (Whereupon, Deposition
10     Exhibit Graham-22, E-mails,
11     FDACDER022247 - FDACDER02249, was
12     marked for identification.)
13         - - -
14 BY MR. BECK:
15     Q.   Have you seen Exhibit 22
16 before?
17     A.   Yes.
18     Q.   Does Exhibit 22 include an
19 e-mail from you to Dr. Galson responding
20 to the e-mail that we just looked at?
21     A.   It responds, actually, to
22 the entire process, because attached to
23 this was a detailed response, basically
24 comment by -- phrase by phrase, paragraph

KS-000389

Confidential - Subject to Protective Order

Page 358

1  by paragraph to Dr. Trontell's October
2  29th memorandum and -- in which I address
3  each of her concerns and explain things
4  as best as I was able.
5       And explaining to Dr. Galson
6  that my managers, that Dr. Seligman and
7  then Dr. Trontell, who was not my
8  supervisor but who was involved in this
9  process, had opportunities to talk to me
10 to clarify things to improve
11 communication and didn't avail themselves
12 of that, and that I had been acting in
13 good faith.  And in any event, yes, it's
14 in response to the entire process.
15      Q.   And then including, as you
16 say, in the very first line of the e-mail
17 that we just looked at, right?  "Dr.
18 Horton forwarded to me your email back to
19 him last evening."
20           Is that the e-mail we were
21 just looking at?
22      A.   Well --
23      Q.   Well, that's okay.
24      A.   I honestly -- I honestly

Page 359

1  don't know.
2       Q.   Setting aside which e-mail
3  this refers to, because you said this
4  refers to the entire process, I just want
5  to focus on what you said to Dr. Galson
6  in the last paragraph of your e-mail.
7  You said, "You should know that this
8  entire episode has upset and intimidated
9  me greatly.  I was supposed to spend the
10 weekend working on my Senate testimony,
11 but I accomplished virtually nothing
12 because I was so distracted and afraid by
13 what was being done to me.  You can't
14 begin to imagine the toll this shameful
15 behavior has taken on my family and on
16 me.  And now I face the prospect that I
17 will be unable to complete my testimony
18 and say everything that I believe needs
19 to be brought into the clear light of
20 day."
21           Is that what you told Dr.
22 Galson, that you were afraid and
23 intimidated and scared?
24      A.   Yes.  My management had

Page 360

1  basically refused to communicate with me.
2  And I had gone to, I think, extraordinary
3  lengths with numerous e-mails asking them
4  to talk to me, to explain to me what the
5  rules and regulations were, what the
6  policies were, and received zero back in
7  return, just basically emptiness.  I
8  never got straight answers.
9       And even in this situation,
10 where Dr. Galson could have very simply
11 gotten on the telephone and called me and
12 said Dr. Seligman and Dr. Trontell are in
13 my office and they have raised some
14 serious questions, can we talk about it,
15 and I would have been very happy to do
16 so.
17      But Dr. Galson did not do
18 that, and he had the opportunity to do
19 that.  Instead, he chose to go ahead,
20 recognizing that I'd be testifying and
21 calling the editor of the Lancet.  I
22 mean, at this point they knew that our
23 paper would be published online the day
24 before I appeared before the Senate

Page 361

1  Finance Committee, and so you would have
2  basically a paper getting published and
3  attracting international attention,
4  followed by a Senate hearing that focused
5  on the same topic.
6       And so one effect of this
7  intervention is that it could block the
8  publication of the paper.  And in any
9  event, accusations of scientific
10 misconduct are very serious, and Dr.
11 Galson certainly should have spoken to me
12 about it, and he did not.
13      Q.   Despite what you claim was
14 this concerted effort to intimidate you,
15 and despite your claims to Dr. Galson
16 that you were distracted and afraid, you
17 went ahead and testified in front of the
18 Senate, right?
19      A.   Well, it was either do it
20 voluntarily or be subpoenaed.  So, yes, I
21 did.
22           - - -
23           (Whereupon, Deposition
24 Exhibit Graham-23, E-mails,

KS-000390

Confidential - Subject to Protective Order

Page 362

1    TOPOLE0000333, was marked for
2    identification.)
3        - - -
4  BY MR. BECK:
5      Q.   What's Exhibit 23?
6      A.   It looks like an e-mail
7  dated November 1st from me to Dr. Eric
8  Topol at the Cleveland Clinic.  And it's
9  -- it looks like it's kind of like in
10 response to an e-mail that he had sent to
11 me.  And there are several other e-mails
12 that went back and forth between Dr.
13 Topol and myself, dating back, I think,
14 to like the end of October when he first
15 telephoned me to ask if I knew who was in
16 FDA he could talk to about COX-2 pain
17 relievers and heart attack risk.  And I
18 referred him to Shari Targum, whose
19 review I spoke about earlier.
20     Q.   You referred to Dr. Topol as
21 at the Cleveland Clinic.  Is he still at
22 the Cleveland Clinic?
23     A.   My understanding is that
24 he's now at Case Western, but I'm not

Page 364

1  interpreted it, it was a meeting to
2  criticize and a meeting to say, you know,
3  why on earth did you do this study in the
4  first place.  We did a labeling change in
5  2002, and nothing more needs to be done.
6  There's no regulatory issue here.  So,
7  that's the type of stuff that I was
8  referring to, and it was quite stressful.
9        - - -
10      (Whereupon, Deposition
11   Exhibit Graham-24, E-mails,
12   FDACDER022681, was marked for
13   identification.)
14       - - -
15 BY MR. BECK:
16     Q.   What's Exhibit 24?
17     A.   This is an e-mail from me to
18 Dr. Horton, the editor of the Lancet.  He
19 had e-mailed me --
20     Q.   I just -- all I want is --
21     A.   Sorry.
22     Q.   -- for you to tell me that
23 that's an e-mail.
24        So, obviously you've seen it

Page 363

1  really -- it's basically what I read in
2  the newspaper.
3      Q.   And then did you complain to
4  Dr. Topol that "the last 2 weeks have
5  been absolute hell, and the efforts by
6  Anne Trontell and Paul Seligman to
7  intimidate and threaten me so as to block
8  the submission of our study to Lancet has
9  been intense and stressful to say the
10 least."
11     A.   Yes.  Dr. Trontell scheduled
12 a meeting on September 22nd in which five
13 or six senior managers from the Office of
14 New Drugs and my own management chain
15 spent an hour criticizing me, some of
16 them calling me names, some of them
17 raising their voices, many of them
18 talking in a disrespectful tone, knowing
19 that eight days later I was supposed to
20 have completed a report to FDA that would
21 summarize our study and that would
22 represent sort of basically my report on
23 the subject.  And the purpose of the
24 meeting, at least in my view, the way I

Page 365

1  because you wrote it and sent it to Dr.
2  Horton on October 6, 2004, correct?
3      A.   Correct.
4      Q.   I'm blowing up the paragraph
5  about two-thirds of the way down.  It
6  begins with, "Within FDA."  Do you see
7  that?
8      A.   Uh-huh.
9      Q.   And did you tell the editor
10 of The Lancet that "Within FDA, I was
11 ostracized upon my return from France,
12 and subsequently have been subjected to
13 veiled threats and intimidation by
14 managers within new drugs and drug
15 safety, because of the conclusions I
16 reached regarding rofecoxib.  They are
17 also trying to block the publication of
18 our manuscript."  And what's the next
19 word there?  "(it is currently undergoing
20 the 'FDA clearance') because it outlines
21 what is potentially a drug safety
22 catastrophe of enormous proportions."
23        And that's what you told the
24 editor of Lancet the FDA management was

Confidential - Subject to Protective Order

Page 366

1  up to, right?
2      A.  I told them that that was my
3  perception of what was happening.
4      Q.  And we talked about your
5  views that there was this group within
6  the FDA that was "a very organized and
7  orchestrated campaign to smear and
8  discredit" you.  You also have a theory,
9  do you not, sir, that there was some sort
10  of a conspiracy at the FDA concerning --
11      MS. ROYCE:  Objection, form.
12  BY MR. BECK:
13      Q.  -- concerning the timing of
14  the Vioxx withdrawal?
15      A.  I never used the word
16  "conspiracy."  What I said was that I
17  thought that FDA had shared with Merck
18  the date when my final report would be
19  completed.
20      Q.  And if we just look up at
21  the paragraph right above the one that we
22  just looked at, you were writing the
23  editor of Lancet, and you were saying,
24  "In any event, the landscape has changed

Page 367

1  dramatically since my last email to you.
2  Merck's withdrawal on September 30" --
3  and that's the withdrawal of Vioxx,
4  right?
5      A.  Right.
6      Q.  And what you said was that
7  "Merck's withdrawal on September 30th was
8  not, I believe, an accident.  I had been
9  ordered by FDA management to complete a
10  study report by that date, which I told
11  them was far too short a time frame, but
12  they were not sympathetic.  I feel
13  certain that this date was communicated
14  to Merck, and that Merck's analysis of
15  its colon polyp study was precipitated by
16  the publicity" of our study -- "by the
17  publicity our study attracted at Bordeaux
18  at the end of August."
19      Now, are you saying here
20  that you thought that Merck decided to
21  withdraw Vioxx on September 30 because
22  people at FDA management gave them a
23  heads up that your article was going to
24  be published, and Merck said we'd better

Page 368

1  get Vioxx off the market before that
2  article was published?
3      A.  No.  I was just pointing to
4  the coincidence of the dates.
5      Q.  Well, you said it wasn't a
6  coincidence, didn't you?
7      A.  Well, I don't think it was a
8  coincidence, but...
9      Q.  So, that's my question.
10      Do you think that Merck's
11  withdrawal on September 30 was timed
12  because people at the FDA told Merck that
13  Dr. Graham is going to publish an
14  article, and so Merck said we'd better
15  get this drug off the market?
16      MS. ROYCE:  Objection, form.
17      THE WITNESS:  No, I don't.
18  BY MR. BECK:
19      Q.  That's what you told Dr.
20  Horton --
21      A.  I know that.
22      Q.  -- though, isn't it?
23      A.  That's what I -- and at the
24  time, I think under the duress that I was

Page 369

1  under, that is what I believed.
2      Q.  That was kind of a wild and
3  crazy charge, don't you think?
4      MS. ROYCE:  Objection to
5  form.
6      Can we take a break now?
7  It's getting pretty late.
8      MR. BECK:  I want him to
9  answer the question.
10  BY MR. BECK:
11      Q.  That was kind of a wild and
12  crazy charge you made to the editor of
13  Lancet concerning --
14      A.  No.
15      Q.  -- FDA management, don't you
16  agree?
17      A.  It's not wild and crazy.  If
18  you experienced what I experienced, you
19  would understand -- you would understand
20  better.
21      MR. BECK:  Your counsel has
22  asked for a break, so, we'll take
23  one.
24      MS. ROYCE:  Thank you.

KS-000392

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 370

1    THE VIDEOTAPE TECHNICIAN:
2  Stand by, please.
3    The time is 4:39.  We're
4  going off the record.
5        - - -
6    (Whereupon, a recess was
7  taken from 4:39 p.m. until
8  4:58 p.m.)
9        - - -
10    THE VIDEOTAPE TECHNICIAN:
11  The video time is 4:58.  We're
12  back on the record.
13 BY MR. BECK:
14    Q.   Dr. Graham, as an
15 epidemiologist, do you deal with the
16 concept of incidence rates?
17    A.   Yes, I do.
18    Q.   And in a sentence or two,
19 can you describe what an incidence rate
20 is?
21    A.   It's the occurrence of an
22 outcome, a disease, in a defined
23 population over a specified period of
24 time.  So, you might express something as

Page 371

1  10 per 100,000 per year would be an
2  incidence rate.
3    Q.   I have created a chart that
4  I want to go over with you, and I want to
5  look at some numbers from the Kaiser
6  study that you did, and I understand that
7  an adjustment was applied for a
8  cardiovascular risk score that I'll get
9  to later in the examination, but I want
10 to look at the kind of raw numbers about
11 incidence rates of heart attacks and
12 sudden cardiac death for Vioxx and
13 Celebrex as you saw them in your study.
14 Okay?
15    So, if you will take out
16 Exhibit 4, which is your 2005 Lancet
17 publication, and if you'll look over at
18 the third page in the right column under
19 "Results," tell me if the numbers I
20 filled in on the screen there for number
21 of users for Vioxx of something over
22 26,000, and then for Celebrex, something
23 over 40,000, are those accurate numbers
24 --

Page 372

1    A.   Yes.
2    Q.   -- from your study?
3    A.   Yes.
4    Q.   And then if you'll look at
5  Table 3 on that same page or is -- Table
6  3, I guess it's the next page.  If you'll
7  look at Table 3, do I have it right that
8  the number of heart attacks and sudden
9  cardiac deaths, Vioxx was 68 and for
10 Celebrex was 126?
11    A.   Yes.
12    Q.   And when we're talking about
13 Vioxx here, that includes both low dose
14 and high dose, right?
15    A.   Correct.
16    Q.   And so just taking the
17 numbers that you report before the
18 adjustments are made, is this correct
19 that the incidence rate of heart attacks
20 and sudden cardiac deaths for Vioxx would
21 be about .25 percent, whereas for
22 Celebrex, it would actually be a little
23 higher, .31 percent?
24    A.   No.  That's not an incidence

Page 373

1  rate.  That is a proportion.  An
2  incidence rate would take into account
3  the amount of time that each of the users
4  was on the drug, and so then what you'd
5  end up having is years of exposure to
6  Vioxx in the denominator and number of
7  cases in the numerator and the same for
8  Celebrex.  So, these are proportions, but
9  they are not incidence rates.
10    Q.   Okay.
11    So, proportions.
12    And the proportions of
13 Celebrex users who experienced heart
14 attacks or sudden cardiac deaths was
15 actually slightly higher than the
16 proportion of Vioxx users, correct?
17    A.   That is correct.
18    Q.   And you said that in order
19 to do an incidence rate, you'd want to
20 know how long they were using the drugs,
21 so you'd take into account patient years;
22 is that right?
23    A.   Correct.
24    MR. BECK:  Let me mark for

KS-000393

Confidential - Subject to Protective Order

Page 374

1    you, please, Exhibit 25.
2                   - - -
3          (Whereupon, Deposition
4    Exhibit Graham-25, Chart
5    FDACDER005940, was marked for
6    identification.)
7                   - - -
8    BY MR. BECK:
9          Q.   And this Exhibit 25, do you
10   recognize this as a document or a page of
11   a longer document that was created as
12   part of your study?
13         A.   Yes.  I don't recall,
14   though, at what stage in the study that
15   this run was done, and so I don't know if
16   it included sort of the modifications
17   that we had to make because of
18   eligibility problems and the like.  But
19   it is from our study.  I'm not able here
20   to read the column on the right-hand side
21   because of it being smudged.
22         Q.   Yeah.  Well, this is the way
23   we got the document.
24         A.   Okay.

Page 375

1          I'm just letting you know
2    that I'm not able to read that, but I'm
3    able to read everything else.
4          Q.   Okay.
5          In the right-hand column,
6    while we may have to struggle with the
7    exact numbers, it does say, does it not,
8    "incidence rate per 1,000 patient years"?
9          A.   That's what it looks like
10   says to me, yes.
11         Q.   Okay.
12         I mean, there's no doubt it
13   says this?
14         A.   Right, no.  This table is
15   set up to calculate incidence rates, so,
16   there's no question about that.
17         Q.   Okay.
18         So, and then if we look down
19   at rofecoxib, that's Vioxx as we know,
20   correct?
21         A.   Right.
22         Q.   And then the rofecoxib
23   number is 7. something, right?
24         A.   Right.

Page 376

1          Q.   Again, we'll just blow it
2    up.  And does that look like 7.49 to you
3    once it's been blown up?
4          A.   Yes.  When I was looking at
5    this (indicating), I would have said
6    7.48, but it looks like 7.49 there
7    (indicating).
8          Q.   Okay.
9          Well, close enough for
10   government work.  It's 7.48 or 7.49,
11   right?
12         A.   Right.
13         Q.   And then if we look up at
14   Celebrex, celecoxib, it is like 7.8
15   something?
16         A.   Yes.  It looks like 7.84 to
17   me, but...
18         Q.   Okay.
19         Whatever it is, it's
20   actually the incidence rate taking into
21   account the patient years, as you said,
22   the incidence rate for heart attacks and
23   sudden cardiac death for Celebrex is
24   actually higher than the incidence rate

Page 377

1    for sudden cardiac death in heart attacks
2    for Vioxx, correct?
3          A.   It's a crude incidence rate,
4    and the number is higher.  They're
5    probably at this point with crude rates
6    not statistically different, but Celebrex
7    rate is higher than the rofecoxib or
8    Vioxx rate.
9          Q.   Yeah.  And I didn't mean to
10   suggest that there was a statistically
11   significant difference, but the Lancet
12   article, one of the conclusions is that
13   there is a statistically significant
14   difference between Vioxx and Celebrex and
15   that Vioxx has a statistically
16   significant higher risk of serious
17   coronary heart disease, right?
18         A.   Right.  And that's based on
19   odds ratios as opposed to incidence
20   rates.
21         Q.   But the incidence rates
22   would be basically the same?
23         A.   Yes.  The incidence rates
24   form the base of the data, but this is

Confidential - Subject to Protective Order

Page 378

1  before adjustments have been done for the
2  types of patients that are given these
3  different drugs.
4      Q.   And that's what I want to
5  get to now.
6          So, you start out with
7  actual numbers of users and how long they
8  use the drug and how many of them had
9  heart attacks, and Vioxx and Celebrex
10  look basically identical.  And then in
11  your analysis, you applied adjustments to
12  the Vioxx users and Celebrex users, and
13  the end result of those adjustments was
14  that Vioxx ended up appearing to have a
15  higher risk, right?
16      A.   Yes.
17      Q.   And the person who -- first
18  of all, these adjustments, at least one,
19  a significant one is called a cardiac
20  risk score, cardiovascular risk score,
21  right?
22      A.   Right.
23      Q.   Is that the main adjustment
24  that was applied?

Page 379

1      A.   That was the main
2  adjustment, and it represented basically
3  a collapsing of 25 or 30 other variables
4  into a single measure.
5      Q.   And the cardiovascular risk
6  score, basically that says, well, people
7  who take one type of medicine might have
8  a whole bunch of other factors that make
9  them prone to have heart attacks more
10  than people who take a different
11  medicine, and we want to take that into
12  account?
13      A.   Right.  They have to be
14  differential distribution of risk
15  factors.
16      Q.   And the person who developed
17  the methodology to come up with the
18  cardiovascular risk scores for Celebrex
19  and Vioxx in your study was Dr. Wayne
20  Ray, who you mentioned before, right?
21      A.   Well, actually, we reference
22  him as having used it, but the use of
23  this -- it's basically -- it's a
24  confounder's score.  The use of a

Page 380

1  confounder's score in case control
2  studies has been well described by Jim
3  Schlesselman in his textbook on case
4  control studies and then by Norman
5  Breslow in his textbook on case control
6  studies.  And so this is a technique
7  that's been described before.  It's a
8  technique that Dr. Ray has used, but he's
9  not the person who created it, developed
10  it.
11      Q.   Well, he didn't invent the
12  idea of a cardiovascular risk score, but
13  he's the one who came up with the formula
14  to account for all of these variables,
15  and he's the one who did the statistical
16  heavy lifting in order to implement that
17  idea in this case, right?
18      A.   In this case, he taught me
19  how to do it.  I was the one who did it,
20  working with him by telecon.
21      Q.   And Dr. Ray and you ended up
22  assigning a higher cardiovascular risk
23  score to the Celebrex users to the Vioxx
24  users, correct?

Page 381

1      A.   That's correct.
2      Q.   And the result of that then
3  was that even though the incidence rate
4  was the same --
5      A.   The crude incidence rate.
6      Q.   -- when you applied the
7  cardiovascular risk score that the two of
8  you came up with, that's what accounts
9  for the difference in your paper between
10  risks of Vioxx and risks of Celebrex,
11  right?
12      A.   It's not just the
13  cardiovascular risk score.  It's
14  adjusting for these risk factors.  And in
15  our paper, we showed that using all of
16  the variables, all of the risk factors in
17  our study to adjust for cardiovascular
18  risk or using the cardiovascular risk
19  score gave us virtually identical
20  answers.  But use of this confounder's
21  score was a more efficient, statistically
22  efficient way to deal with the data.
23      Q.   And, of course, Dr. Ray was
24  involved heavily in the confounder's

Confidential - Subject to Protective Order

Page 382

1   score also, right?
2       A.   He was the person who worked
3   with me in showing me how to derive that
4   score.
5       Q.   Okay.
6           And here I've put up on the
7   screen a copy of the article, the Lancet
8   article that's already been marked as an
9   exhibit.
10          When people write articles
11  in scientific journals, are they supposed
12  to disclose any financial conflicts of
13  interest that they have?
14      A.   They should, and I believe
15  that Dr. Ray did.
16      Q.   Okay.
17          Let's take a look at that.
18  If you'd go to Page 6.  The person who
19  came, who taught you how to make these
20  adjustments that resulted in Vioxx
21  looking like it had a higher risk than
22  Celebrex, he had two significant
23  conflicts of interest, didn't he?
24      A.   Well, he has two potential

Page 383

1   conflicts of interest, and I was unaware
2   of these when I invited him to
3   participate in our study, and I was
4   actually unaware of them until it came
5   time to do our poster, at which time then
6   you need to put on it, you know, the
7   conflict of interest statement, and I
8   had never crossed my mind to ask people
9   about it.  So, that was when I learned
10  about it.  And --
11      Q.   And I want you to complete
12  this, but before you do, this "WAR," this
13  thing I have up on the screen, that's
14  Wayne A. Ray, right?
15      A.   Yes.
16      Q.   And he's a consultant to
17  Pfizer, it says in this disclosure,
18  correct?
19      A.   Yes.
20      Q.   Who is it that makes
21  Celebrex?
22      A.   Pfizer.
23      Q.   And so he's got a financial
24  interest in making Celebrex look good,

Page 384

1   right?
2       A.   You could argue that he
3   does, but that didn't operate in our
4   study.
5       Q.   And then he's also -- under
6   the conflict of interest, they say that
7   he's a consultant to plaintiffs'
8   attorneys regarding Vioxx, right?
9       A.   Yes.
10      Q.   And did you know that he's
11  actually served as an expert witness in
12  Vioxx trials?
13      A.   I learned about that only
14  like within the last month or so, but I
15  didn't know that beforehand.
16      Q.   So, anyway, here is Dr. Ray
17  teaching you how to make these
18  adjustments, and these adjustments were
19  made by the time your poster was
20  published, right?
21      A.   Yes.
22      Q.   And it wasn't until after he
23  taught you how to make the adjustments
24  and all the adjustments were made that

Page 385

1   you even found out that he was a paid
2   consultant to the maker of Celebrex and
3   was being paid by plaintiffs' lawyers who
4   were suing Merck in Vioxx cases?  Is that
5   right?
6       A.   Yes.  But that didn't impact
7   the methodology that was used to derive
8   this adjustment, this confounder's score.
9   This is a way of adjusting for a
10  difference in distribution of risk
11  factors across exposure groups.  And so
12  he may have these associations, but that
13  doesn't --
14      Q.   "May have," what do you mean
15  "may have"?
16      A.   Well, he has those
17  associations.  They don't affect the way
18  statistics work.  They don't affect the
19  way, the methods of how one derives a
20  confounder's score.  They don't affect
21  the way one does a regression model and
22  what happens after the computer program
23  spits out the results.
24      Q.   Is there a book you can go

**KS-000396**

Confidential - Subject to Protective Order

Page 386

1  to or an article that says, here's the
2  formula, here's the exact way to
3  implement this idea of a confounder's
4  score in your study, or did it require
5  some judgment by Dr. Ray as to how he was
6  going to implement this idea when coming
7  up with a confounder's score and the
8  cardiovascular risk score?
9      A.   It's described in
10 Schlesselman's textbook and in Breslow's
11 textbook.  I don't recall that all the
12 methods are described there, but the
13 notion of how to do this is.
14     Q.   But you know, don't you,
15 that the methods are not described there
16 and that a whole lot of judgment is
17 required by the people who are
18 applying -- coming up with the formula
19 for a specific study for how to calculate
20 a cardiovascular risk score?
21     A.   No.  There's actually -- in
22 our case, there was basically almost no
23 judgment involved.  We had a list of what
24 all those cardiovascular risk factors

Page 387

1  were.  The ones that related to the
2  heart, we included those in the
3  regression model.  And the regression
4  model then gets run with all of these
5  variables in it.  It's a two-step
6  regression.  The first regression gets
7  run, and what it does is it gives you
8  these things called linear predictors.
9  And linear predictors are the probability
10 that a patient will have an event.  There
11 is a slight amount of judgment that
12 happens, because you've got to take the
13 predictors and sort them in ascending
14 order of probability, from like 0
15 probability to close to 100 percent
16 probability, and you have to divide them
17 into roughly equal-sized groups.  And so
18 the judgment that happens is, is that
19 there just tends to be a confluence -- if
20 I have hypertension, diabetes and high
21 cholesterol, there's going to be lots of
22 people with that constellation of
23 findings.  They are going to end up all
24 having the same probability score, the

Page 388

1  same predicted probability.  And so what
2  will happen is, is, let's say I wanted to
3  divide this into ten equal groups or nine
4  equal groups, well, I'm going to get this
5  node that has like 75 people in it, and
6  what I really need to do is be able to
7  break it in half -- okay, I'm sorry.
8      Q.   Okay.
9      A.   What I'm trying to say is,
10 is that the types of judgments you're
11 talking about don't apply here.  At least
12 when we were doing this, they didn't
13 apply here.
14     Q.   And you did say that the
15 fellow who taught you how to do it was
16 Dr. Ray, the guy with the two conflicts,
17 right?
18     A.   Yes, that is correct.
19     Q.   And I think you said this
20 morning that there are "lies, damned lies
21 and statistics," right?
22     A.   I said that, too.  It
23 doesn't apply here, but I did say that.
24     Q.   Let's move to another

Page 389

1  subject.
2          We talked about how from the
3  original abstract to the poster, the
4  number of high-dose patients changed.  Do
5  you remember that?
6      A.   Uh-huh.
7      Q.   So, you had a smaller number
8  of high-dose patients in the abstract
9  when you said there was no statistically
10 significant difference between high-dose
11 Vioxx and basically no use of medicine.
12 And then some people got changed, and the
13 net result was that there was a larger
14 number of high-dose patients when it came
15 time to write up the poster.  Do you
16 remember that?
17     A.   Yes.
18     Q.   And we looked at Dr.
19 Trontell's memo where she expressed
20 concern about that.  Do you recall that?
21     A.   Yes.
22     Q.   To try to save time, because
23 you may remember the numbers, I suspect
24 you do, in the abstract when you were

KS-000397

Confidential - Subject to Protective Order

Page 390

1  talking about high-dose people, am I
2  right that you had five people who had
3  experienced -- five so-called cases and
4  seven so-called controls?
5       A.   Correct.
6       Q.   And in one sentence, what is
7  a case and what's a control?
8       A.   A case is someone who had a
9  heart attack or sudden death.  And a
10  control was someone who was randomly
11  selected to compare to that person, who
12  on that date had not, as of that date,
13  had a heart attack or sudden death.
14       Q.   Okay.
15            And then sort of going
16  forward to by the time your article was
17  published in The Lancet, instead of five
18  cases with the same population group
19  after the reclassification, you now have
20  ten cases, right?
21       A.   Yes.
22       Q.   So, the number of heart
23  attacks and sudden cardiac deaths that
24  you were ascribing to the high-dose Vioxx

Page 391

1  users doubled from when you did the
2  abstract to when you did the article,
3  right?
4       A.   Correct.
5       Q.   And then you also, instead
6  of seven controls, you had eight
7  controls, right?
8       A.   Correct.
9       Q.   And was it your idea to do
10  this reclassification?
11       A.   What I noticed when we were
12  looking --
13       Q.   Before you say what you
14  noticed --
15       A.   Yes.
16       Q.   -- can you answer, was it
17  your idea to do the reclassification?
18       A.   Yes.
19       Q.   And then before -- I think
20  this is clear, but I want to make sure.
21            Before you did the
22  reclassification, even the high-dose
23  Vioxx users, the difference in risk
24  between them and people who didn't use

Page 392

1  any medicine was not statistically
2  significant, and then after you did the
3  reclassification, then it became
4  statistically significant, right?
5       A.   That's correct.
6       Q.   Now, did any of the authors,
7  your co-authors, express concern about
8  whether this reclassification was proper?
9       A.   Dr. Craig Cheetham from
10  Kaiser did express reservations about the
11  reclassification.  His concern was
12  primarily that it be adequately
13  described, and that eventually was done
14  to his satisfaction, and he was a
15  co-author on the published paper.
16            -  -  -
17            (Whereupon, Deposition
18        Exhibit Graham-26, E-mail
19        10-23-04 KP002315, was marked for
20        identification.)
21            -  -  -
22  BY MR. BECK:
23       Q.   Please take a look at
24  Exhibit 26.  Have you seen Exhibit 26

Page 393

1  before?
2       A.   Yes, I have.
3       Q.   And this is a -- is this an
4  e-mail from doctor -- how do you
5  pronounce his last name?
6       A.   Cheetham.
7       Q.   -- Cheetham to you and other
8  co-authors in the study?
9       A.   Yes, it is.
10       Q.   Does Dr. Cheetham say here
11  in the first paragraph, "I have never
12  been comfortable with the recoding of
13  Vioxx patients into the high dose
14  category.  However, it was done with the
15  full participation of five investigators.
16  The process by which this was done needs
17  to be fully disclosed in the methods
18  section.  Therefore, the methods section
19  needs to be clear on three points."  And
20  then his first point is the coding "was
21  done post hoc."  Do you see that?
22       A.   Uh-huh.
23       Q.   And that "post hoc," did you
24  understand that to mean that that was

Confidential - Subject to Protective Order

Page 394

1    after the fact?
2         A.   The fact that I think he's
3    talking about here is, is that we hadn't
4    planned on doing this at the start of the
5    study.
6         Q.   Okay.
7              So, this was something that
8    was not part of the original study plan,
9    but then the reclassification took place
10   after -- in fact, it was after you
11   learned of the results reported in the
12   abstract of no statistically significant
13   difference, right?
14        A.   That coincidence in timing
15   is correct.
16        Q.   Okay.
17             So, you learned no
18   statistically significant difference
19   based on the planned classification, and
20   then you changed the plan and
21   reclassified, right?
22        A.   We did that, and for a good
23   reason, because we had misclassification
24   of the exposure.  And to leave that

Page 395

1    misclassification of exposure in the
2    study would be to misrepresent the study,
3    and so it became necessary -- we were
4    trying to use a computerized algorithm to
5    classify dose.  And what we discovered
6    was that just because somebody was
7    getting a 50-milligram tablet didn't mean
8    they were taking 50 milligrams a day.
9    Sometimes it was cheaper for patients to
10   take the 50 milligram tablet and break it
11   in half and actually take 25 milligrams a
12   day or to take two 25s instead of 50.
13   So, we were obligated to correct that
14   misclassification once we discovered that
15   it was present.
16        Q.   And the second point he
17   makes is, "All five investigators
18   participated."  And then he has the
19   initials of the five investigators,
20   including "DG," and that's David Graham,
21   you, right?
22        A.   That's right.  And I was
23   part of the call that this took place in,
24   but I was not a voting member whose votes

Page 396

1    would determine whether or not
2    reclassification occurred.  For
3    reclassification to occur, these other
4    four people had to agree that based on
5    the evidence that they saw about how
6    Vioxx was being used, that the patients
7    should be reclassified.
8         Q.   And then his third point
9    was, "David Graham was not blinded to
10   cases and controls when the recoding was
11   done."
12             Now, you talked about cases
13   being -- that's where somebody had a
14   heart attack and controls being somebody
15   did not have a heart attack.  And when he
16   says that you were "not blinded to cases
17   and controls," does that mean that at the
18   time that individual patients were
19   reclassified from short-term users to
20   long-term users, you had access to the
21   information that would tell you whether,
22   in fact, patient A had a heart attack or
23   did not have a heart attack?
24        A.   That's correct, and that's

Page 397

1    why I wasn't a voting member.
2         Q.   So, what Dr. Cheetham said
3    was that, fine, we made these
4    adjustments, but our article needs to set
5    forth what we did and how we did it and
6    needs to say that it was not part of the
7    original plan, that all five
8    investigators, including Dr. Graham,
9    participated, and when Dr. Graham was
10   participating, he knew which patients had
11   heart attacks and which ones didn't.
12   That's what he wanted to be put forth in
13   the article as published in Lancet,
14   right?
15        A.   That's what he says in this
16   e-mail.
17        Q.   And, you didn't do -- in
18   fact, he says at the bottom of this
19   e-mail, "From my perspective this issue
20   is not negotiable," right?
21        A.   Yes.
22        Q.   But you did not make the
23   disclosure that Dr. Cheetham felt was
24   necessary, and, in fact, not even

Confidential - Subject to Protective Order

Page 398

1  negotiable, did you?
2      A.   We placed in the methods,
3  had a description of the process that we
4  used to reclassify these cases.  It
5  didn't meet with Dr. Cheetham's -- his
6  personal requirements, but the other
7  co-authors were quite comfortable, and
8  there's a lot of e-mail traffic about
9  that.
10          I will add that after this,
11  I had a conversation, after we submitted
12  the paper to the Lancet, with the editor
13  of the Lancet, Dr. Horton, in which I
14  described in detail all of these things.
15  And Dr. Horton had no problem with the
16  way that we had conducted this, and when
17  Dr. Cheetham learned that, his
18  reservations went away.
19      Q.   Well, when you say that it
20  wasn't done exactly the way he said it
21  should be done, the way that it was
22  actually done, the disclosures that were
23  made in the Lancet, they left you out
24  when it described who did the recoding,

Page 399

1  isn't that true?
2      A.   Because I didn't vote on the
3  recoding.  The recoding required the
4  unanimous vote to change of the four
5  people listed, and if even one of them
6  said that the case should not be recoded,
7  it wasn't recoded.  And --
8      Q.   Did the Lancet article
9  disclose that you were the one who
10  suggested the reclassification after you
11  already knew which patients had heart
12  attacks and which ones didn't?
13      A.   No.  But that wasn't -- the
14  editor didn't feel that that was
15  necessary.
16      Q.   Did the Lancet article
17  disclose that even though you say you
18  didn't have a vote, you wrote memos to
19  the other authors saying here's the
20  people I think ought to be reclassified?
21      A.   I did send a list of patient
22  IDs that I thought there was a
23  question about the reclassification, and
24  each of the members of the study team

Page 400

1  were asked to come up with a similar
2  list.  And then that composite list was
3  what the group voted on together, and
4  there were 29 or 30 patients in that
5  group that the four participants voted
6  upon.
7      Q.   Did the Lancet article
8  disclose that even though you didn't have
9  a vote, that you, knowing who had heart
10  attacks and who didn't, came up with a
11  list of people that you wanted the others
12  to look at and you suggested should be
13  reclassified?  Did the Lancet article
14  disclose that?
15      A.   No, it didn't.  But the
16  editor was fully aware of it and believed
17  that the process, the voting process was
18  sufficient and stringent enough.
19      Q.   You testified on direct
20  examination about this estimate of excess
21  heart attacks and sudden cardiac deaths
22  that you say are attributable to Vioxx.
23  Do you remember that?
24      A.   Yes.

Page 401

1      Q.   And the number that you used
2  was approximately 88,000 to 139,000,
3  correct?
4      A.   Right.
5      Q.   And you used that article
6  not only today, but -- or not article,
7  you used that estimate not only today,
8  but also in your Lancet article and in
9  your Congressional testimony and then all
10  those times you went on television that
11  you went through with Mr. Kline, right?
12      A.   Correct.
13      Q.   So, I want to talk with you
14  about how you came up with those numbers.
15          Even though they were
16  published in the Lancet article, which
17  was about the Kaiser Permanente study
18  that you did, those numbers didn't come
19  from the Kaiser Permanente study, did
20  they?
21      A.   No, they didn't.  They came
22  from two Merck -- they were based on
23  results from two clinical trials
24  conducted by Merck.

Confidential - Subject to Protective Order

Page 402

1        MR. BECK:  I'm told that
2    they need to change the tape
3    again, so, why don't we take a few
4    minutes here.
5        THE VIDEOTAPE TECHNICIAN:
6    Stand by, please.
7        The time is 5:31.  That
8    concludes Video Cassette Number 3.
9    We're off the record.
10            - - -
11       (Whereupon, a recess was
12    taken from 5:31 p.m. until
13    5:47 p.m.)
14            - - -
15       THE VIDEOTAPE TECHNICIAN:
16    This begins Video Cassette Number
17    4.  The time is 5:47.  We're back
18    on the record.
19 BY MR. BECK:
20    Q.   Before our break, Dr.
21    Graham, we started to discuss this
22    estimate of yours of excess heart attacks
23    and sudden cardiac deaths, your number of
24    88,000 to 139,000.

Page 403

1        And I think we covered this,
2    but am I correct that even though you
3    published this in your Kaiser study, the
4    numbers did not come from the work that
5    you did with the Kaiser information?
6    A.   That's correct.
7    Q.   And did you say that they
8    came from the VIGOR study and the APPROVe
9    study?
10    A.   Correct.
11    Q.   In fact, you had to take
12    some numbers from VIGOR and APPROVe and
13    then apply them to other numbers from
14    still other studies in order to come up
15    with this estimate, didn't you?
16    A.   We took the numbers from
17    VIGOR and APPROVe, which were the risks,
18    the estimates of relative risk, the five
19    for the high dose and two for the low
20    dose, and we applied that to the
21    estimates of how many people had high
22    dose or low dose.  And in the formula
23    that you use, you also need background
24    rates for what is the background rate in

Page 404

1    the population that you are dealing with.
2    Q.   When you did the background
3    rates, you took background rates from
4    still other studies, some of which didn't
5    have anything to do with Vioxx, right?
6    A.   We took background rates
7    from the CLASS study, using their control
8    group because they had an unexposed
9    control group, and so what we could do
10    is, is by doing that, we could get a
11    handle on the types of patients who might
12    be prescribed a COX-2 inhibitor and look
13    to see what their experience of heart
14    attacks were.
15       We didn't have that in the
16    VIGOR study, because the VIGOR study
17    compared two active treatments.
18       We also, because people who
19    get enrolled in clinical trial are, as a
20    rule, healthier than the patients who
21    ultimately get the drugs, we also took a
22    background incidence rate from another
23    study with a somewhat sicker population,
24    and so then we had a range.  And it was

Page 405

1    because of the range in those two
2    background rates that we end up with
3    ultimately the 88,000 and the 139 or the
4    140,000, that they relate to those rates.
5    Q.   At least one of the studies
6    that you picked the background rate from
7    didn't even involve Vioxx, right?
8    A.   That's correct.  But it
9    involved the types of patients who we had
10    every reason to believe would be
11    prescribed Vioxx in the real world.
12    Q.   Now, we talked before about
13    the peer review process and how you
14    submitted the manuscript that ended up
15    being published in Lancet to these peer
16    reviewers within the FDA.  Do you
17    remember that?
18    A.   Uh-huh.
19    Q.   Now, when you submitted your
20    article to the FDA peer reviewers, you
21    had a much different estimate of excess
22    cardiovascular events than you ended up
23    putting in the Lancet publication,
24    correct?

KS-000401

Confidential - Subject to Protective Order

Page 406

1    A.   That's correct.
2         MR. BECK:  I'm going to mark
3    the draft as it was submitted to
4    the FDA reviewers.  This is
5    Exhibit 27.
6              - - -
7         (Whereupon, Deposition
8    Exhibit Graham-27, Memo 9-30-04
9    "Risk of acute myocardial
10   infarction and sudden cardiac
11   death in patients treated with
12   COX-2 selective and non-selective
13   NSAIDs," FDACDER022369 -
14   FDACDER022388, was marked for
15   identification.)
16             - - -
17   BY MR. BECK:
18        Q.   Is that a copy of the
19   article that you gave to the FDA people
20   to review before it was sent on to
21   Lancet?
22        A.   Just let me quickly look
23   through this.  No.  There were two
24   documents at the time.  There was a

Page 407

1    report for the FDA, which this is a copy
2    of that report for the FDA, and there was
3    a companion document, which was a
4    manuscript that was based on the same
5    material that's in the report.  So, we
6    can talk about the materials here, but
7    this is not what those people were given.
8         Q.   Okay.
9         So, this is a report to the
10   FDA, and the manuscript reflected the
11   same information that's in this report?
12        A.   Right.  But it had to be
13   more concise and the like.
14        Q.   Okay.
15        Well, focusing on this
16   report, which I've put up on the screen,
17   if we go over to Page 10 -- actually, I'm
18   sorry.  I want to go to -- yes, Page 10.
19        And did you say in the
20   report to the FDA, as well as the
21   manuscript that you submitted for their
22   review, that combining -- that when you
23   looked at all of the data of Vioxx versus
24   Celebrex, that you came up with the

Page 408

1    excess of adverse cardiovascular events
2    of 27,785 cases?
3         A.   That's correct.
4         Q.   And so this was, when you
5    submitted it to FDA review, you were
6    comparing Vioxx to Celebrex, correct?
7         A.   Yes.
8         Q.   And that, in fact, is what
9    you compared in, one of the things you
10   compared in the Kaiser study, right?
11        A.   That's correct.
12        Q.   And then you had the number
13   27,000.  But then by the time it gets
14   published in Lancet, you've changed the
15   comparison from Vioxx to Celebrex, and
16   now it's to Vioxx versus --
17        A.   Nonuse.
18        Q.   Nonusers?
19        A.   Right.
20        Q.   And the number goes from
21   27,000 to those two numbers you put out
22   before, 88 to 139,000, right?
23        A.   Right.  And the reason for
24   the difference has to do with mainly two

Page 409

1    factors: one, this report was based only
2    on Vioxx use through 2003, and in the
3    Lancet paper, we took it through the end
4    of marketing through September of 2004,
5    so, there is additional exposure, if you
6    will; and the second is, is that in
7    looking at -- what we decided was is
8    that -- what was more important was to
9    talk in general terms about the
10   population impact, the potential
11   population impact of the use of Vioxx in
12   the general population.  And so we
13   realized that the background rates for
14   myocardial infarction in Kaiser are much,
15   much lower than the national average,
16   that that is a much healthier population
17   than the general U.S. population, and
18   that it would be better to use background
19   rates that were more reflective of the
20   types of people who were actually going
21   to get the drug.  And so those two
22   factors account for these differences and
23   the difference in the comparison between
24   Celebrex and between nonuse.

KS-000402

Confidential - Subject to Protective Order

Page 410

1       Q.   You indicated before that
2   there were two specific FDA employees
3   that you had suggested as peer reviewers,
4   right?
5       A.   Correct.
6       Q.   And I think it was Dr. Bruce
7   Stadel and Dr. Bob O'Neill?
8       A.   Stadel, yes.
9       Q.   Stadel is how to pronounce
10  it?
11      A.   Yes.
12      Q.   And they, in fact, looked at
13  your manuscript, the one that had the
14  27,000 number in it, Vioxx versus
15  Celebrex, as part of their peer review,
16  right?
17      A.   Correct.
18      Q.   And they told you, as part
19  of the people that you suggested as peer
20  reviewers, they told you that they didn't
21  think you should include that comparison
22  as a matter of sound science, right?
23      A.   That's correct.  And in the
24  manuscript that we submitted to the

Page 411

1   Lancet, that was removed.  The editors of
2   the Lancet came back and said that they
3   wanted us to have an estimate in the
4   discussion.  And so it was in response to
5   the editors of the Lancet that we put
6   them back into the paper.
7       Q.   Let's just stick, if we can,
8   with my question about what the people
9   who you said you respected their judgment
10  and wanted them to be the peer reviewers
11  and what -- let's see here.  I don't know
12  if I've identified this.  I don't think I
13  have.
14              - - -
15          (Whereupon, Deposition
16      Exhibit Graham-28, E-mail
17      10-22-04 FDACDER022409, was
18      marked for identification.)
19              - - -
20          MR. BECK:  I will mark it as
21      Exhibit 28, and I put it up on the
22      screen.
23  BY MR. BECK:
24      Q.   Is this an e-mail from you

Page 412

1   to Dr. Seligman and Dr. Trontell of the
2   FDA, as well as your co-authors dated
3   October 22nd, 2004?
4       A.   Yes, it is.
5       Q.   And the very first thing you
6   say is, "I reviewed the comments of Bob
7   and Bruce" --  that's Dr. Bruce Stadel
8   and Dr. Bob O'Neill, right?
9       A.   Yes.
10      Q.   -- "and discussed them with
11  the co-authors.  We" -- that's you and
12  the co-authors, right?
13      A.   Right.
14      Q.   "We changed the paper to
15  exclude our estimate of the actual number
16  of excess cases of heart attacks and
17  sudden cardiac deaths, suggested by both
18  Bob and Bruce," right?
19      A.   Yes.
20      Q.   Okay.
21          So, the manuscript that you
22  submitted to the Lancet took out that
23  27,000 estimate that the two peer
24  reviewers you suggested said was

Page 413

1   scientifically unsound, right?
2       A.   That's correct.
3       Q.   And then after it was
4   submitted to the Lancet, you put in a new
5   estimate of excess cardiovascular events,
6   right?
7       A.   At the request of the
8   editors, yes.
9       Q.   And let's take a look at
10  this.  And you used higher numbers, even
11  though you were still comparing Vioxx to
12  Celebrex, right?
13      A.   You have to show me the
14  documents because I honestly don't
15  recall.
16          MR. BECK:  Okay.
17          I put this on upside down,
18      but it is Exhibit 29.
19              - - -
20          (Whereupon, Deposition
21      Exhibit Graham-29, E-mail with
22      attachment "Risk of Acute
23      Myocardial Infarction and Sudden
24      Cardiac Death in Patients Treated

KS-000403

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 414

1    with COX-2 Selective and
2    Non-Selective NSAIDs," (Graham,
3    et al) KP001133; KP001133A -
4    KP001133X, was marked for
5    identification.)
6        - - -
7  BY MR. BECK:
8       Q.   Is Exhibit 29 a copy of an
9  e-mail from you to the Lancet folks
10 attaching a revised manuscript?  And all
11 of this is dated November 11, 2004.
12      A.   Yes.
13      Q.   Let me put that on the
14 screen here.
15           And so you say here on the
16 first page, "Dear Richard and Stuart,
17 Attached is our revised-revised
18 manuscript," right?
19      A.   (Witness nods.)
20      Q.   Correct?
21      A.   Yes.
22      Q.   And then if you'd turn over
23 to Page 12, this paragraph at the bottom
24 using the odds ratio?

Page 415

1       A.   Uh-huh.
2       Q.   The present study and
3  background incidence rate from U.S.
4  population?
5       A.   Right.
6       Q.   So, when Lancet says we kind
7  of like that comparison that the peer
8  reviewer said was scientifically unsound,
9  you put it back in, but this time you
10 increased it by 10,000 cases, right?
11      A.   That is -- I'm just trying
12 to look for -- oh, it's because --
13      Q.   First, before you get to the
14 reason why --
15      A.   Yes.
16      Q.   -- is it true?
17      A.   Yes.
18      Q.   Okay.
19      A.   And the reason is, is that
20 in the first one, we were using the odds
21 ratios that we got from our actual study
22 and applying those to the national drug
23 use numbers.  Here we were looking for
24 other populations that might have

Page 416

1  background rates that were more
2  appropriate, but we were still using the
3  relative risk estimates from our Kaiser
4  study.
5       Q.   Now, did Dr. Stadel and
6  Dr. O'Neill, the two peer reviewers that
7  you said you trusted, and who said that
8  the 27,000 figure was scientifically
9  unsound, did they have a chance to review
10 this 37,000 figure that you came up with
11 after you submitted the manuscript to
12 Lancet?
13      A.   No.  Once a paper goes into
14 a journal and you're dealing with the
15 journal and its peer reviewers, what
16 happens is between the author and the
17 journal.  So, there was no requirement
18 to, and I didn't.
19      Q.   And then the rest of this
20 paragraph, is that where you first came
21 up for the very first time with this
22 estimate of 88,000 to 138,000 excess
23 cases when you move away from Vioxx
24 compared to Celebrex and instead do your

Page 417

1  comparison of Vioxx to nonusers?
2       A.   Yes.  But the way we were
3  thinking of it is, is that we were moving
4  from relative risks that were derived
5  from observational studies to more solid
6  estimates of risk which came from
7  randomized controlled clinical trials.
8  And so that's why we chose, ended up
9  focusing on VIGOR and APPROVe and their
10 relative risks rather than the
11 observational study data from our Kaiser
12 study.  We thought that, being based on
13 clinical trials, that it had greater
14 credibility and would be more free of
15 potential biases.
16      Q.   And, of course, it's the --
17 those are the numbers that got all the
18 headlines and all the attention on 60
19 Minutes and Good Morning America and all
20 the news shows you appeared on, right?
21      A.   I suppose those numbers did
22 attract attention.
23      Q.   And did you ever give your
24 peer reviewers who told you that your

KS-000404

Confidential - Subject to Protective Order

Page 418

1  27,000 number was scientifically unsound,
2  did you ever give those peer reviewers
3  whom you recommended the chance to take a
4  look at these new comparison --
5        MS. ROYCE:  Objection, form.
6  BY MR. BECK:
7        Q.   -- and new numbers of 88,000
8  to 139,000?
9        A.   No.  There was no
10  requirement to.  Lancet has a very
11  extensive and exhaustive peer review
12  process.  Our paper was reviewed by five
13  peer reviewers, which is two more than
14  normally happens with the medical
15  journal.  And those peer reviewers and
16  the editors of the journal didn't happen
17  to agree with those two people from the
18  FDA.
19        Q.   Just so that we're clear,
20  nobody from the FDA during the peer
21  review process ever got a chance to look
22  at this new comparison that you did for
23  the first time and the revised-revised
24  manuscript, correct?

Page 419

1        A.   That's correct, and it
2  wasn't required.
3        Q.   Now, when you finally
4  published the paper in Lancet, did you
5  include the 37,000 number?
6        A.   No.  The numbers here --
7  actually, this all happens in November.
8        Q.   Can you just tell me whether
9  you included the 37,000 number in the
10  Lancet article?
11        A.   No.
12        Q.   And, in fact, by the time we
13  finally get to the published article in
14  Lancet, the only numbers that you include
15  were these 88 to 139,000 numbers that you
16  first came up with in the revised-revised
17  manuscript, right?
18        A.   That's correct.
19        Q.   Now, I want to see if we can
20  understand a little better how you came
21  up with them.  I think you said that you
22  used the relative risks from the VIGOR
23  study and the APPROVe study, right?
24        A.   That is correct.

Page 420

1        Q.   And the relative risk for
2  VIGOR was 5, right?
3        A.   Correct.
4        MR. BECK:  Somebody on the
5  phone is either going to have to
6  stop making noise or we're going
7  to hang up on you here.
8        MR. KLINE:  And I support
9  Mr. Beck.
10  BY MR. BECK:
11        Q.   And the relative risk from
12  APPROVe was 2.0, right?
13        A.   Correct.
14        Q.   And then you took those
15  relative risks and applied them to
16  background rates that you got from other
17  studies, right?
18        A.   Yes.  Actually, if we refer
19  to the document in my report, the method
20  is described there.  The numbers are
21  different because we used different
22  background rates, but the method is
23  described there.
24        Q.   Well, it is a completely

Page 421

1  different comparison, too.  It's --
2        A.   No.  But the underlying
3  method is described, so that I can tell
4  you accurately what it is that we did.
5        Q.   Well, in your article, you
6  state that "The background rate for acute
7  myocardial infarction among control
8  groups from studies of cardiovascular
9  risk and NSAID users varied from 7.9 per
10  1,000 person years in CLASS," one of the
11  studies you referred to, to 12.4 per
12  1,000 person years in what was called the
13  TennCare study, right?
14        A.   Correct.
15        Q.   So, the background rate that
16  you used when doing your calculation was
17  this range of 7.9 to 12.4, right?
18        A.   Correct.
19        Q.   And by "background rate,"
20  what we mean is people who aren't taking
21  any medicine at all.  For every 1,000
22  person years of people not taking
23  medicine, 7.9 to 12.4 people are going to
24  have an adverse cardiovascular event,

KS-000405

Confidential - Subject to Protective Order

Page 422

1   right?
2       A.   Right.  Within the age
3   groups that those populations came from,
4   right.
5       Q.   So, that's sort of what
6   you'd expect from someone taking no
7   medicine at all, is somewhere between 8
8   to 12 or so people per thousand are going
9   to have heart attacks just because that's
10  what happens in life, right?
11      A.   That's what happens.  Right.
12      Q.   What was the heart attack,
13  the CV rate for the Vioxx 50 milligrams
14  in the VIGOR study?
15      A.   Golly, we'd have to look at
16  it, because I didn't view things in terms
17  of incidence rates.  I focused on
18  relative risks.  So, I'm sure you have
19  the paper there and we can look at it and
20  we can figure it out.
21      Q.   You referred earlier in your
22  testimony to the Targum memorandum?
23      A.   Shari Targum, yes.
24      Q.   And that was a memorandum

Page 423

1   written in early --
2       A.   I think 2001.
3       Q.   -- 2001?
4       A.   It's available on the FDA
5   website.
6           MR. BECK:  We'll mark that
7       as Exhibit 30.
8               -   -   -
9           (Whereupon, Deposition
10      Exhibit Graham-30, "FDA Medical
11      Review: Cardiovascular analysis
12      for Vioxx," (Targum) 2-1-01
13      MRK-ABX0002367 - MRK-ABX0002404,
14      was marked for identification.)
15              -   -   -
16  BY MR. BECK:
17      Q.   And if you would go to, it
18  looks like Page 13, if I'm reading that
19  right.  13 of 37.
20      A.   Uh-huh.
21      Q.   In this FDA report, and this
22  is a memorandum about the VIGOR analysis,
23  right, about the VIGOR study?
24      A.   I believe it is.  Yes, it

Page 424

1   is.
2       Q.   Okay.
3           And does it say on this page
4   that the MI rate for Vioxx was .74?
5       A.   Yes, but I don't know what
6   the units are.
7       Q.   Okay.
8           If you go to the next page,
9   you'll see under the second footnote,
10  under the --
11      A.   Okay.
12          "Per 100 person years."
13      Q.   Okay.
14          And --
15      A.   So, that would be equivalent
16  to 7.4 per thousand person years.
17      Q.   So, the rate for myocardial
18  infarctions, heart attacks --
19      A.   Uh-huh.
20      Q.   -- for people who were
21  taking the high-dose Vioxx in the VIGOR
22  study was 7.4 per hundred -- per thousand
23  person years, right?
24      A.   Yes.

Page 425

1       Q.   And what you said before is
2   the normal population not taking any
3   medicine at all, the background rate that
4   you used was 7.9 heart attacks per
5   thousand person years, right?
6       A.   Yes.  And the patients
7   enrolled in the VIGOR study were selected
8   to be patients who were unlikely to have
9   cardiovascular disease.  So, there were a
10  number of exclusions that would exclude
11  patients who were at higher risk of
12  having myocardial infarction.  Those
13  patients weren't excluded from the CLASS
14  study.
15      Q.   So, I just want to make sure
16  that I understand the numbers, though.  I
17  put up something on the screen here.
18          You talked about the
19  background rate, people who aren't taking
20  any medicine at all, 7.9 to 12.4.  And in
21  VIGOR, unless you start making
22  adjustments, the actual real life rate of
23  people who had heart attacks taking the
24  50 milligram dose was actually lower than

Confidential - Subject to Protective Order

Page 426

1   what you said the background rate is,
2   right?
3       A.   That would be true if what
4   we were dealing with were patients who
5   had been screened for preexisting
6   cardiovascular disease. But the typical
7   patient who received Vioxx on the open
8   market post-marketing was not screened
9   for preexisting cardiovascular disease,
10  and the labeling never said that they
11  should be.
12      Q.   Let's now talk about
13  APPROVe.
14           What's the equivalent number
15  here for the APPROVe study which involved
16  a 25 milligram dose of Vioxx?
17      A.   You'll have to show me the
18  paper and we can derive that number.
19                 - - -
20           (Whereupon, Deposition
21      Exhibit Graham-31,
22      "Cardiovascular Events Associated
23      with Rofecoxib in a Colorectal
24      Adenoma Chemoprevention Trial,"

Page 427

1       (Bresalier, et al) NEJM 3-17-05,
2       352;11: 1092-1102, was marked for
3       identification.)
4            - - -
5   BY MR. BECK:
6       Q.   Have you seen Exhibit 31
7   before?
8       A.   Yes, I have read this paper
9   before.
10      Q.   And I'll put it on the
11  screen. Well, let's just you and I go to
12  Table 2 over on the fourth page.
13           Is this a paper that deals
14  with the APPROVe study?
15      A.   Yes.
16      Q.   Okay.
17           And in looking at Table 2,
18  can you see there that there were 21
19  heart attacks out of 3,059 person years?
20      A.   I don't see where you are
21  getting the person years from, but I --
22      Q.   Look in the little footnote
23  underneath the table.
24      A.   Oh, okay. Yes. Uh-huh.

Page 428

1       Q.   And if you -- in order to
2   come up with an equivalent number that
3   we've been talking about here for event
4   rates, you would divide 21 by that 3,000
5   -- or 3,059, right?
6       A.   Right. The 3,059 multiplied
7   by a thousand or the 3.0, yes.
8       Q.   And when you did it the
9   right way, you would come up with an
10  event rate in APPROVe of 6.9; is that
11  right?
12      A.   I'll trust your arithmetic.
13      Q.   And, again, the real life
14  heart attack rate in both VIGOR and
15  APPROVe was lower than what you say is
16  the normal background rate for people who
17  are not taking any medicine at all,
18  right?
19      A.   That's correct. But
20  background rates vary from study to
21  study. We could go, though, to --
22      Q.   Is it an important thing
23  then to the legitimacy --
24           MR. KLINE: He was finishing

Page 429

1       his answer.
2   BY MR. BECK:
3       Q.   Is it an important thing
4   then to the legitimacy of a statistical
5   study to focus on what kind of background
6   rate somebody picked?
7       A.   We picked what we thought
8   were representative background rates for
9   the types of patients who were likely to
10  be prescribed the drug. And those
11  background rates actually are the
12  national background rate for heart
13  attack. If you were to look at what's
14  the risk of heart attack in people who
15  are like 50 and older in the United
16  States, that background rate will fall in
17  the range of what our NSAID background
18  rate was. And you can do that in
19  numbers, just going to the American Heart
20  Association documents in the census and
21  just getting the number of heart attacks
22  and the number of people, and that will
23  come up with the background rate.
24           But background rates are

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 430

1  important because at the end of the day,
2  the background rate is what drives what
3  that actual estimate of numbers is.
4  Regardless of what background rate you
5  use, however, you still end up with a lot
6  of affected bodies.  And we put a number
7  in our paper, and what we were more
8  concerned with was the public health
9  impact of Vioxx exposure than we were
10 with what were the particular numbers,
11 recognizing that the particular numbers
12 could be different than the range that we
13 gave, but that was our best estimate at
14 what we thought was likely to be the
15 case.
16     Q.   Now, the patients involved
17 in the VIGOR study, these were rheumatoid
18 arthritis patients, right?
19     A.   Yes.
20     Q.   And rheumatoid arthritis
21 patients have a higher risk of heart
22 attack, all other things being equal,
23 than people who don't have rheumatoid
24 arthritis, right?

Page 431

1      A.   Some studies have found
2  that, and other studies have found that
3  there's no increase in risk.
4      Q.   Now, you mentioned that
5  CLASS was one of the studies that you
6  used to come up with your range.  Those
7  people had osteoarthritis, right?
8      A.   That's correct.
9      Q.   And that is not associated
10 with a higher heart attack risk, right?
11     A.   Not that we're aware of.
12     Q.   And the other study that you
13 used for the background rate was
14 TennCare?
15     A.   Yes.
16     Q.   And that's short for
17 Tennessee Care, right?
18     A.   Right.  It's a Medicaid
19 program.
20     Q.   And that's anybody who used
21 a prescription NSAID, regardless of what
22 their condition was, right?
23     A.   Right, but these were the
24 nonusers.

Page 432

1      Q.   So, these were nonusers in
2  Tenn Care, but they didn't have
3  rheumatoid arthritis or anything like
4  that?
5      A.   Some of them did, but most
6  of them didn't.
7      Q.   And VIGOR, people were not
8  -- they didn't include people who were
9  using low-dose aspirin, right?
10     A.   That is correct.
11     Q.   And people who were using
12 low-dose aspirin, that's generally going
13 to be cardioprotective and they'd have an
14 even lower rate if they had people with
15 low-dose aspirin?
16     A.   Well, the fear is it hadn't
17 been studied, and so you know that those
18 patients have underlying cardiovascular
19 disease, and so those patients are
20 theoretically at increased risk of having
21 a heart attack.
22     Q.   But even with all of that,
23 VIGOR and APPROVe both had lower rates
24 than your background rates, correct?

Page 433

1      A.   Yes.
2      Q.   I want to move on then to
3  the relative risks that you used.  They
4  came, as you said, from VIGOR and from
5  APPROVe.
6          Did you look at the event
7  rates of the people who took naproxen in
8  the VIGOR study?
9      A.   What I did was, is I looked
10 at the relative risks that was published
11 in the VIGOR study for the way it was
12 presented, was the ratio of Vioxx over
13 naproxen, and that ratio was given as .2.
14     Q.   No, no, I'm not asking about
15 relative risk now.  I'm asking about the
16 event rates for the naproxen patients.
17     A.   No.  And the reason why is,
18 is we wanted people who were unexposed,
19 and the VIGOR study didn't provide us
20 with an unexposed group to get a
21 background rate from.
22     Q.   Do you agree, sir, that if
23 you looked at the data from the Targum
24 memo where they've got the actual heart

KS-000408

Confidential - Subject to Protective Order

Page 434

1    attack rate for the people who use
2    naproxen in the VIGOR study, they were at
3    a super low rate of only 1.5?
4         A.   That shows you the wonders
5    of selection bias.  That if you pick
6    healthy patients into a study, you are
7    going to get low incidence rates, and the
8    VIGOR study selected relatively healthy
9    patients into it.  So, I'm not surprised
10   that the rates were lower.
11        Q.   Do you know that Dr. Graham
12   has estimated the United States
13   background rate to be approximately 6 per
14   thousand?
15        A.   And that is in people who
16   are 15 and older.  And one-third of the
17   population is between the ages of 15 and
18   40, and the occurrence of myocardial
19   infarction in that group is almost zero.
20   So, if you were to truncate those people
21   out and then calculate what the actual
22   rate is among the people who are most
23   likely to get the Vioxx, the number ends
24   up smack in the middle of that range.

Page 435

1         Q.   And I've referred to you in
2    the third person.  I'm sorry.  I'm trying
3    to get through.
4         A.   I took no offense.
5         Q.   I did not intend any.  I was
6    actually thinking of Dr. Topol when I
7    referred to Dr. Graham.
8              Dr. Topol, are you
9    acquainted with his publication where he
10   uses a placebo rate of 5.2?
11        A.   Yes.  And that was from
12   randomized clinical trials.  And
13   randomized clinical trials, no matter
14   what they are, they select patients who
15   are healthier than the real world
16   patients that get the drugs after they go
17   on the market.
18        Q.   And in APPROVe, as I just
19   put up there, the people who took
20   placebos in the APPROVe study, their rate
21   was only 2.7, right?
22        A.   Yes.  And they were younger
23   patients without cardiovascular disease,
24   but yes.

Page 436

1         Q.   And so when you have these
2    relative risks that come from VIGOR and
3    APPROVe, and you are taking the VIGOR
4    heart attacks number of 7.4 and you're
5    comparing it with this super low number
6    of naproxen, 1.5, and that's how you come
7    up with the -- that's how that high
8    number of relative risk of 5 is derived,
9    correct?
10        A.   Those are the results from
11   the VIGOR study.
12        Q.   And the same thing with
13   APPROVe.  The relative risk is 2, but it
14   is not because a lot of people had heart
15   attacks on Vioxx, it is because not very
16   many people had them on the placebo,
17   right?
18        A.   That I don't know the -- I
19   don't know the answer to that question.
20   If you have an odd placebo group that's
21   been selected that has an unusually low
22   background rate, that's a possibility.  I
23   can't answer that question.  I don't know
24   the answer to that question.

Page 437

1         Q.   You never looked into that
2    when doing your estimate?
3         A.   No.  Realize at the time
4    that we did our estimate, what we had to
5    work on were press announcements, because
6    none of these data --
7         Q.   If the answer is no, that's
8    fine.  I only have about ten minutes
9    left.
10        A.   Okay.
11             I'm sorry.
12             MR. KLINE:  Actually, you
13   are over.
14             MR. BECK:  Let's not use any
15   time on this.
16             MR. KLINE:  I agree.  You're
17   over.  But I'm not arguing with
18   you.  I've gotten four e-mails
19   about it and I haven't said a
20   word.  Go ahead.  Go.
21             THE WITNESS:  He's now said
22   ten words.
23             MR. KLINE:  Go.  He and I
24   are a model today of getting

KS-000409

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 438

1    along.  Go.
2         MR. BECK:  Ready?
3         MR. KLINE:  We're waiting
4    for the next question.
5         MR. BECK:  Okay.
6    BY MR. BECK:
7         Q.   When you wrote the Lancet
8    article, the revised-revised article, and
9    put in this estimate for excess
10   cardiovascular events that you said were
11   caused by Vioxx, did you do a similar
12   analysis for Celebrex to see how many
13   excess cardiovascular events were caused
14   by using your methodology, people who use
15   Celebrex instead of no medication at all?
16        A.   If we had done -- we did not
17   do that.  If we had done that, we would
18   have shown that Celebrex actually
19   prevented heart attacks, because the
20   point estimate was below 1.  And none of
21   the randomized clinical trials that we
22   had available showed an increased risk
23   with Vioxx.  If it would have come up, it
24   would have been a wash.

Page 439

1         Q.   How about traditional
2    NSAIDs, did you do that kind of analysis
3    to say how many excess cardiovascular
4    events are caused by traditional NSAIDs?
5         A.   We did not because there was
6    no available randomized controlled,
7    placebo controlled data that would give
8    us incidence rates and real relative
9    risks for traditional NSAIDs.  No such
10   studies had been done.
11        Q.   Are you familiar with the
12   APC study concerning Celebrex?
13        A.   I think so.  I think at the
14   time that we did our study, that also was
15   unpublished.
16        Q.   Does it show that, in fact,
17   Celebrex would have an increased risk?
18        A.   I don't believe the study
19   has ever been published.  If it has been
20   published, I would love to see the
21   publication because I don't recall seeing
22   it.  But my recollection from that study
23   is, is that it found that I think at the
24   higher doses of Celebrex, it was like 3.4

Page 440

1    or so relative risk, and maybe 2.5 for
2    the standard dose if I'm thinking of the
3    right -- am I thinking about the study
4    that you're thinking about?
5         Q.   Yes.
6         MS. ROYCE:  Can we have the
7    document?
8         MR. BECK:  I don't have it
9    handy.  I mean, I was surprised at
10   his answer claiming that
11   Celebrex --
12        THE WITNESS:  Well, no, no.
13   Understand.  When we wrote our
14   paper, this wasn't out there, and
15   all there was this one study,
16   and we don't know what it means.
17   BY MR. BECK:
18        Q.   Let's move on to my last
19   subject and I'll wind up.
20        You talked about how you
21   made a presentation in February of 2005
22   to the FDA Advisory Committee.  Do you
23   remember that?
24        A.   Yes, I do.

Page 441

1         Q.   And that was one of the
2    exhibits that you went over with Mr.
3    Kline with some of the pages from the
4    presentation that you made to the
5    Advisory Committee, right?
6         A.   Correct.
7         Q.   Then the Advisory Committee
8    made recommendations to the FDA, and the
9    FDA, in turn, reached some conclusions
10   concerning the safety of COX-2
11   inhibitors; is that correct?
12        A.   I believe it is.
13        MR. BECK:  We'll mark as
14   Exhibit 32 the April 6, 2005
15   memorandum.
16        - - -
17        (Whereupon, Deposition
18   Exhibit Graham-32, Memo 4-6-05
19   "Analysis and recommendations for
20   Agency action regarding
21   non-steroidal anti-inflammatory
22   drugs and cardiovascular risk,"
23   (19 pages), was marked for
24   identification.)

KS-000410

Confidential - Subject to Protective Order

Page 442

1            - - -
2    BY MR. BECK:
3        Q.   Do you recognize that
4    document, sir?
5        A.   Yes, I do.
6        Q.   Will you turn to the bottom
7    of the third page?  Do you see that
8    there's a listing of the entities from
9    the FDA, the different offices that
10   participated in the review that led to
11   this memorandum?
12       A.   Yes.
13       Q.   And here, I finally have it
14   up on the screen.
15            Is this the memorandum we've
16   been talking about?
17       A.   Yes, it is.
18       Q.   Okay.
19            And then on the bottom of
20   Page 3 where it lists the different
21   offices, did the division of
22   anti-inflammatories participate in this
23   review?
24       A.   Yes, it did.

Page 443

1        Q.   Did the --
2        A.   They were probably the major
3    participant, because they are the ones
4    who ultimately regulate these products.
5        Q.   Anti-inflammatories includes
6    NSAIDs and COX-2 inhibitors, right?
7        A.   Correct.
8        Q.   And the Division of
9    Over-the-Counter Drug Products also
10   participated, correct?
11       A.   Yes, because they're
12   over-the-counter NSAIDs.
13       Q.   And the Office of Drug
14   Evaluation II and V participated, right?
15       A.   Right.  Those are the parent
16   organizations of these other divisions.
17       Q.   And the Office of New Drugs
18   participated?
19       A.   Right.  That's the super
20   office over them.
21       Q.   Office of Drug Safety,
22   that's your office, right?
23       A.   Correct.
24       Q.   Office of Biostatistics.

Page 444

1    Does that include epidemiologists?
2        A.   No.  Epidemiologists are in
3    the Office of Drug Safety.  The Office of
4    Biostatistics is exclusively
5    statisticians.
6        Q.   And the Office of
7    Pharmacoepidemiology and Statistical
8    Science participated, right?
9        A.   Right.  That's the office
10   that contains both drug safety and
11   statistics.
12       Q.   The Office of Medical Policy
13   participated?
14       A.   Right, yes.
15       Q.   And the Office of Regulatory
16   Policy?
17       A.   Yes.
18       Q.   And the Office of the Center
19   Director, right?
20       A.   Correct.
21       Q.   And they looked at all kinds
22   of materials, including your PowerPoint
23   and your, I don't know if it's testimony
24   or remarks that were delivered to the

Page 445

1    Advisory Committee, correct?
2        A.   Presumably.  I wasn't part
3    of the internal decision-making, but
4    presumably that was part of what they
5    considered.
6        Q.   Then focusing on the first
7    page here, in terms of who authored this
8    memorandum from the FDA, I think you've
9    already identified John Jenkins, Dr. John
10   Jenkins, of the Office of New Drugs,
11   right?
12       A.   Correct.
13       Q.   And then also you've
14   identified your boss, Paul Seligman,
15   right?
16       A.   Correct.
17       Q.   And then it says "Through:
18   Steven Galson."  What does it mean when
19   it is from Drs. Jenkins and Seligman
20   through Dr. Galson?
21       A.   What it typically means is,
22   is the "froms" have written the report.
23   It goes to the "through" person, who can
24   edit it and ask for modifications and the

KS-000411

Confidential - Subject to Protective Order

Page 446

1  like.  And then after they've signed off
2  on it, it is sent off to whomever the
3  "to" is.
4      Q.  All right.
5          And the "to" is the NDA
6  files and has all these numbers, right?
7      A.  Correct.
8      Q.  So, if I understand it
9  correctly, they got input from all these
10  different groups, and then the head of
11  the Office of New Drugs and the director
12  of the Office of Pharmacoepidemiology and
13  Statistical Science got together and
14  wrote a draft that then was approved by
15  the director of the entire Center for
16  Drug Evaluation and Research, right?
17      A.  Correct.
18      Q.  Then I just want to go
19  through with you the first five bullet
20  points, and then I'll be done.
21          In the executive summary
22  here, do you see where the FDA says that
23  "Following a thorough review of the
24  available data we have reached the

Page 447

1  following conclusions regarding currently
2  approved COX-2 selective and
3  non-selective non-steroidal
4  anti-inflammatory drugs and the risk of
5  adverse cardiovascular events."  So
6  that's their setup.
7          Then the first point they
8  make is: "The three approved COX-2
9  selective NSAIDS (i.e. celebrex," Vioxx,
10  and what's the third one, "valdecoxib"?
11      A.  That would be Bextra.
12      Q.  So, they say that three
13  COX-2 selective NSAIDs "are associated
14  with an increased risk of serious adverse
15  CV events compared to placebo.  The
16  available data do not permit a rank
17  ordering of these drugs with regard to CV
18  risk."  Now, what they're saying here is
19  that any one of these COX-2 inhibitors
20  can increase CV risk, but there's no
21  basis on which to say that one is riskier
22  than another, right?
23      A.  What they're saying is, is
24  that the absence of evidence is evidence

Page 448

1  of absence.  They're basing --
2      Q.  Well, you would disagree
3  with them, I guess, right?
4          MR. KLINE:  Objection.  Let
5  him finish this answer.
6          THE WITNESS:  What they're
7  saying is, is they're basing this
8  on clinical trials data only.  At
9  FDA, they do not accept
10  epidemiologic data as having any
11  meaning or any relevance.  And so
12  then they go back to clinical
13  trials, and if the clinical trials
14  are too small and don't answer the
15  question, then you come up with a
16  situation where you say, we don't
17  have the evidence to allow us to
18  do a difference in the rank
19  ordering.  So, you end up, this
20  statement as it reads, is correct.
21  But the underlying reason -- it's
22  misleading because the reason why
23  you can't distinguish them from
24  the clinical trials is because the

Page 449

1  appropriate clinical trials were
2  never done.  They weren't large
3  enough and you didn't have
4  head-to-head comparisons, say, of
5  Celebrex to Vioxx to Bextra, where
6  that would have been the single
7  best way to answer that question
8  definitively.  So --
9  BY MR. BECK:
10      Q.  I wasn't asking you whether
11  you agreed.  I was asking what this means
12  to somebody who understands an FDA
13  memorandum.
14          Does it mean that the people
15  who wrote this memo and the person who
16  approved it, whether you agree with them
17  or not, what they're saying is that you
18  cannot draw a distinction between the
19  cardiovascular risks of Vioxx versus
20  Celebrex versus Bextra?
21      A.  That's what they are saying.
22      Q.  And they, it's probably
23  clear from your prior answer, but
24  basically they disagree with one of the

**KS-000412**

Confidential - Subject to Protective Order

Page 450

1  core conclusions that you set forth in
2  your Lancet article, correct?
3          MS. ROYCE:  Objection to
4  form.
5          THE WITNESS:  No.  Actually,
6  in internal meetings --
7  BY MR. BECK:
8      Q.  No.  I'm talking about what
9  they say in this memorandum.
10     A.  Well, they're not saying
11 anything in here about how many people
12 died or were injured as a result of using
13 Vioxx.
14     Q.  I'm sorry.
15     A.  They sidestepped that issue.
16     Q.  Your article, one of its
17 core conclusions, is that there is a
18 difference, statistically significant
19 difference between the risk of using
20 Vioxx versus Celebrex, correct?
21     A.  Correct.
22     Q.  And they disagree with you,
23 right?
24     A.  They're saying there are no

Page 451

1  clinical trials to show that, and so they
2  disagree.
3      Q.  Then the next point says,
4  "Data from large long-term controlled
5  clinical trials that have included a
6  comparison of COX-2 selective and
7  non-selective NSAIDs do not clearly
8  demonstrate that the COX-2 selective
9  agents confer a greater risk of serious
10 adverse...events than non-selective
11 NSAIDs."
12         Now, again, whether you
13 disagree or agree with them, are they
14 saying here that according to the
15 long-term controlled clinical trials, we
16 cannot say that COX-2 inhibitors have any
17 different risk than traditional NSAIDs?
18     A.  They're saying based on the
19 evidence they have from clinical trials
20 that they can't distinguish the two.
21 What one should recognize, however, is
22 that there's virtual absence of real
23 long-term data.  There's relatively very
24 small numbers for any of these things,

Page 452

1  and so if you have low power, you're not
2  going to be able to show things.  That's
3  why observational data is needed to
4  complement what is inadequate about
5  controlled clinical trials.
6      Q.  And then on the next page,
7  do they say on this first bullet,
8  "Long-term placebo controlled clinical
9  trial data are not available to
10 adequately assess the potential for the
11 non-selective NSAIDs to increase the risk
12 of serious adverse CV events."  Is that
13 the point you just made?
14     A.  Yes.
15     Q.  So, they recognized that,
16 didn't they?
17     A.  Yes, they did.
18     Q.  The next point they say,
19 "Pending the availability of the
20 additional long-term controlled clinical
21 trial data, the available data are best
22 interpreted as being consistent with a
23 class effect of an increased risk of
24 serious...cardiovascular events for COX-2

Page 453

1  selective and non- selective NSAIDs."
2          Now, does that mean that,
3  again, whether you agree or disagree,
4  that they're saying that the best
5  conclusion you can draw based on the data
6  that's available now is that all of these
7  medications, whether it's Vioxx, Celebrex
8  or the nonselective NSAIDs, all have the
9  same basic cardiovascular risk?
10     A.  They're saying that, and
11 they're also saying that observational
12 data is not something they're -- that
13 they're willing to consider.
14     Q.  Where do they say that?
15     A.  Because there is a plethora
16 of existing observational data that
17 show --
18     Q.  I'm sorry, do they say that
19 or are you just saying that they refuse
20 to look at it?
21     A.  Well, by not mentioning it,
22 then they are in essence discounting it.
23 There are, by last count, at least nine
24 published observational studies that

KS-000413

Confidential - Subject to Protective Order

Page 454

1   show, for example, an increased risk with
2   rofecoxib compared to nonuse.  And most
3   of those studies looking at celecoxib did
4   not find a difference in risk.  So,
5   there's a discordance, if you will,
6   between the evidence of observational
7   studies and the evidence of controlled
8   clinical trials.  The problem with the
9   controlled clinical trials is that
10  they're not designed to show safety
11  problems.  They're designed to show
12  efficacy.
13          So, as a result, we're back
14  to the analogy of does the moon have
15  craters or not.  And what FDA is saying
16  is that we don't have binoculars, we
17  don't have a telescope, and we don't want
18  binoculars or a telescope.  We're not
19  interested.  Based with our naked eye,
20  what we have available, we don't see a
21  difference.
22          Q.   You're aware, aren't you,
23  that there are six published
24  epidemiological studies that find no

Page 455

1   difference between Celebrex and Vioxx?
2          A.   No.  I mean, you could show
3   me the articles and I'm sure I'm familiar
4   with the articles, but I have not thought
5   about them in that way.
6          Q.   Well, let's just move to the
7   last point, and then Mr. Kline can ask
8   you anything he wants to about that
9   subject.
10          MR. KLINE:  Anything that is
11      within the scope of your direct,
12      which is about anything in the
13      world.
14          MR. BECK:  Last point.
15  BY MR. BECK:
16          Q.   "Short-term use of NSAIDs to
17  relieve acute pain, particularly at low
18  doses, does not appear to confer an
19  increased risk of serious adverse CV
20  events (with the exception of" -- what
21  was that one again?
22          A.   That's "valdecoxib," that's
23  Bextra.
24          Q.   -- Bextra.

Page 456

1          So, what the authors of this
2   paper and the reviewer concluded was that
3   "Short-term use of NSAIDs" including
4   Vioxx "particularly at low doses, does
5   not appear to confer an increased risk of
6   serious adverse CV events."  Isn't that
7   correct?
8          A.   That's what they're saying.
9   But once again, they have zero
10  statistical power to actually make this
11  statement.  What they really have is, is
12  uncertainty, because they haven't
13  adequately studied it.
14          Q.   I think you said that these
15  senior people from the FDA who wrote and
16  reviewed this consulted with lots and
17  lots of people from the FDA, but they
18  didn't consult with you, right?
19          A.   No.  That's not what I'm --
20  I wasn't part of the discussions that
21  happened internally.  What I would note
22  is, is that people from the Office of New
23  Drugs approved these drug products.  And
24  that if you look at the organizations

Page 457

1   that you have represented here, most of
2   them fall into the amoeba that I
3   described earlier and that are part of
4   the review and approval process and that
5   our own management in drug safety answers
6   to the people in the Center for Drug
7   Evaluation who have the controlling
8   power.  So, the Office of New Drugs is
9   the gorilla in the room.  So, in any
10  event, I'm not saying that at all.  I'm
11  not saying that I wasn't hurt.  What I'm
12  saying is that in constructing this
13  report, what FDA has done is, has said
14  that because we don't have data from
15  control trials, we can't be forced to say
16  that the drugs are different, even though
17  there's observational data that would
18  suggest that there are some differences
19  that can be made.
20          Q.   My question was, the senior
21  people at the FDA --
22          MS. ROYCE:  Objection, form.
23      It's over time.  We've given you
24      enough time.  You've asked him

KS-000414

115 (Pages 454 to 457)

Confidential - Subject to Protective Order

Page 458

1   already.  He gave you an answer.
2       MR. KLINE:  Let him ask one
3   more time.  I'm all for it.
4       THE WITNESS:  Repeat the
5   question, please.
6       MR. KLINE:  Senior people
7   versus bench scientists.
8       THE WITNESS:  Repeat the
9   question.
10      MR. KLINE:  Something like
11  that.  Like the real people versus
12  management.
13      THE WITNESS:  I don't know
14  what your question is, so, if you
15  would repeat it for me, please.
16  BY MR. BECK:
17      Q.   My question is the senior
18  people at the FDA, when they asked for
19  input from all of those groups that we
20  saw on Page 3, including drug safety
21  people, right, one person they didn't ask
22  for input from was Dr. David Graham.  Is
23  that true or false?
24      A.   They're listing offices

Page 459

1   here.  I can't tell you who the
2   individuals are that they asked for input
3   in this.  I was a participant in an open
4   public Advisory Committee meeting, and so
5   presumably that material is part of the
6   record.  I wrote an FDA report that I'm
7   sure is part of the record.  So, I would
8   imagine that the work that I did was
9   under consideration there.  But in the
10  actual writing of this memorandum, I
11  can't tell you who actually was consulted
12  to write it except John Jenkins and Paul
13  Seligman because they're the only -- oh,
14  and Steven Galson, because those are the
15  only names that appear.
16      Q.   Lastly, I just can't
17  remember, are all three of those
18  individuals included in the group that
19  you think was conspiring to smear your
20  name?
21      A.   No.  Dr. Jenkins was not
22  part of that group.
23      MR. BECK:  That's all that I
24  have.

Page 460

1       THE VIDEOTAPE TECHNICIAN:
2   Stand by, please.
3       The time is 6:45.  We're
4   going off the record.
5       - - -
6       (Whereupon, a recess was
7   taken from 6:45 p.m. until
8   7:07 p.m.
9       - - -
10      THE VIDEOTAPE TECHNICIAN:
11  The video time is 7:07.  We're
12  back on the record.
13      - - -
14      REDIRECT EXAMINATION
15      - - -
16  BY MR. KLINE:
17      Q.   Okay.
18      We're ready for a
19  redirect-examination.
20      Dr. Graham, do you get the
21  idea that Merck does not like your study?
22      MR. BECK:  Object to the
23  form of the question.
24      THE WITNESS:  Yes, I do.

Page 461

1   BY MR. KLINE:
2       Q.   And your study, sir, did it
3   pass peer review at the Lancet?
4       A.   It passed peer review at the
5   Lancet twice.  So, on two different
6   occasions, five independent peer
7   reviewers, and it passed.
8       Q.   Have you ever had any of
9   your publications or presentations
10  subjected to more scrutiny than this
11  particular presentation, article, study?
12      A.   Never in life.
13      MR. KLINE:  Let's go off the
14  video record.
15      THE VIDEOTAPE TECHNIC AN:
16  Stand by, please.
17      The time is 7:08.  Off the
18  video record.
19      - - -
20      (Whereupon, a recess was
21  taken from 7:08 p.m. until
22  7:14 p.m.)
23      - - -
24      THE VIDEOTAPE TECHNICIAN:

Confidential - Subject to Protective Order

Page 462

1    The time is 7:14.  We're back on
2  the record.
3       MR. KLINE:  We had a lot of
4  noise, so, I want to start again.
5  BY MR. KLINE:
6       Q.   Do you get the idea that
7  Merck still does not like your study?
8       MR. BECK:  I'll object to
9  the form.
10       THE WITNESS:  Definitely.
11  BY MR. KLINE:
12       Q.   Have you ever had any paper
13  or study that you have been involved in
14  in any capacity in the last 23 years that
15  has had more scrutiny than this paper
16  which was published in the Lancet?
17       A.   Never in life.
18       Q.   And have you ever had more
19  scrutiny brought to bear on you as a
20  scientist for your work in the last 20
21  some years at the FDA other than beyond
22  this work?
23       A.   Never in life.
24       Q.   I want to clean up a couple

Page 463

1  of little things and then move on.
2       The estimates that you have,
3  88,000 to 140,000?
4       A.   Yes.
5       Q.   First of all, are they lower
6  than some other folks' estimates of the
7  number of increased cardiovascular, both
8  deaths and incidents, that have occurred
9  as a result of the drug Vioxx?
10       A.   Yes, they are.
11       Q.   Is yours a conservative
12  estimate compared to others in the
13  published medical literature?
14       MR. BECK:  Object to the
15  form.
16       THE WITNESS:  I wouldn't say
17  that it is conservative.  I would
18  say that it is realistic.
19  BY MR. KLINE:
20       Q.   And, sir, after answering
21  all of Mr. Beck's questions about how you
22  went about getting to those numbers,
23  number one, do you stick by them?
24       A.   Oh, definitely.

Page 464

1       Q.   And, number two, is there a
2  logical and sound scientific basis for
3  having done these numbers in the way you
4  did them?
5       MR. BECK:  Object to the
6  form.
7       THE WITNESS:  Yes.  There's
8  an explanation, and I tried to
9  offer that explanation.  Basically
10  in doing, coming up with this
11  estimate, we were trying to do
12  something that had never been done
13  at FDA before, which was basically
14  to put into a population context
15  what the human costs were of a
16  severe serious adverse drug
17  reaction.
18       And what we needed to do was
19  to come up with what we thought
20  would be reasonable estimates of
21  what was actually happening among
22  the patients who were going to be
23  treated with Vioxx and who
24  actually were treated with Vioxx,

Page 465

1       and that's what we did.
2  BY MR. KLINE:
3       Q.   How many people from the
4  authors of the study through the peer
5  reviewers laid eyes on and gave input and
6  commentary into the process until it was
7  finally published in the Lancet, the
8  journal from Britain, that there were
9  88,000 to 140,000 excess CV events?
10  Approximately how many people saw that?
11       MR. BECK:  Object to the
12  form.
13       THE WITNESS:  Yes.
14       I'm guessing at least 25
15  different individuals examined
16  that.
17  BY MR. KLINE:
18       Q.   25 different individuals, is
19  that what you're saying?
20       A.   Yes.  That's my estimate.
21       Q.   And at the end of the day,
22  it ended up in the published medical
23  literature, in that exact number, that
24  exact estimate; is that correct?

KS-000416

Confidential - Subject to Protective Order

1          MR. BECK:  Object to the
2    form.
3          THE WITNESS:  That is
4    correct.  That is correct.
5          MR. BECK:  Just off the
6    record for a second.
7          THE WITNESS:  You want me to
8    pause, please?
9          MR. BECK:  Yes.
10          THE WITNESS:  I'm sorry.  I
11    apologize for that.
12          MR. BECK:  I appreciate it.
13    Thank you.
14    BY MR. KLINE:
15      Q.    And when you went to
16    Congress to testify, were you sworn in?
17      A.    Yes, I was.
18      Q.    Just as you were today?
19      A.    Actually, when I think back
20    on it, I don't think that I was sworn in,
21    which I was kind of surprised.  I
22    honestly don't remember.
23      Q.    All right.
24          In any event --

1      A.    I'm sorry.
2      Q.    In any event, you gave that
3    same testimony to the senators of the
4    finance committee of the United States
5    Senate of the United States Congress?
6      A.    That is correct.
7          MR. BECK:  Object to the
8    form.
9    BY MR. KLINE:
10      Q.    Where have you presented
11    these numbers, sir, the ones that you
12    were talking to Mr. Beck about for the
13    better part of a half an hour?
14      A.    I presented them at
15    international scientific meetings.  I
16    presented them at a variety of
17    universities throughout the United States
18    and at a number of other sort of
19    scientific colloquia within the United
20    States.  I've also discussed them in the
21    media, in newspapers and television, and
22    there's probably other places where I've
23    discussed them as well.
24      Q.    All right.

1          Now, let's talk just about
2    one short, small aspect of this, which
3    is, I think that the APPROVe data was in
4    a preliminary stage when you were making
5    these estimates for the Kaiser study; is
6    that correct?
7      A.    Yes, that is correct.
8      Q.    I'm just setting it up as a
9    predicate to my real question.
10      A.    Yes.
11      Q.    My real question is, would
12    the excess -- and you're not familiar now
13    with the published APPROVe data?
14      A.    Correct.
15      Q.    Would the estimate of excess
16    cardiovascular incidences change in any
17    significant way based upon what you now
18    know to be the final numbers?
19      A.    Unchanged.
20          MR. BECK:  I'm going to
21    object.  I don't think that is
22    proper redirect.
23    BY MR. KLINE:
24      Q.    Next question.

1          Sir, we've seen a lot of
2    e-mails today which, first of all, did
3    any of those e-mails that you spent the
4    better part of two-and-a-half hours with
5    with Mr. Beck, were any of those the
6    subject of public testimony, sir?
7          MR. BECK:  Object to the
8    form.
9          THE WITNESS:  No, they were
10    not.
11    BY MR. KLINE:
12      Q.    Were any of those -- any of
13    that elaborate examination that you were
14    given by Merck's counsel part of any
15    public statements or public scientific
16    meetings or testimony before Congress?
17      A.    No.
18          MR. BECK:  Object to the
19    form.
20          Please wait.
21          THE WITNESS:  No, they
22    weren't.
23          I really am trying.  I
24    apologize.

Confidential - Subject to Protective Order

Page 470

1          MR. BECK:  I know you are.
2      Let me object and then you answer.
3          I object to the form.
4  BY MR. KLINE:
5      Q.   Let me try to clean it up.
6  Let me see if I can ask it in a
7  non-leading way.
8          The e-mails that you
9  discussed at length and all those
10 internal documents -- let me ask it this
11 way.
12         Were those e-mails in the
13 FDA, to your knowledge, ever made public
14 or put out in the public forum or talked
15 about by you prior to today?
16     A.   No.
17     Q.   And you saw that Mr. Beck
18 had picked some out that said things that
19 either had scientific or personal
20 criticisms in them.  Do you recall those
21 questions?
22     A.   Yes, I do.
23     Q.   All right.
24         Now, let me go back to that

Page 471

1  area.  First of all, sir, you are in the
2  Office of Drug Safety?
3      A.   Yes.
4      Q.   Were you ever offered the
5  top job there?
6      A.   Not the top job in the
7  Office of Drug Safety, but I was asked by
8  the commissioner of FDA --
9      Q.   Who was that?
10     A.   It was Lester Crawford at
11 the time, he was the acting commissioner.
12 On November 9th, the acting commissioner
13 invited me to his office.
14     Q.   November 9th of what year?
15     A.   Of 2004.  It was the week
16 before my Senate testimony.  He invited
17 me to his office and offered me a
18 position overseeing the restructuring of
19 drug safety at FDA, and what he said to
20 me at the time was that he needed someone
21 who understood drug safety, and that if
22 he left it to the Center for Drug
23 Evaluation to oversee this, that nothing
24 would happen.

Page 472

1          And I told the commissioner
2  that I wasn't a manager, didn't enjoy
3  management and enjoyed science, and that
4  I could give him the names of 10 or 12
5  people who could do this job in an
6  excellent fashion after which he could
7  make them director for a center for
8  post-marketing regulation.  And so he
9  sent me an e-mail confirming our meeting
10 in which he outlined the job description
11 that he had in mind, and I sent him
12 e-mail back saying thanks very much, I'll
13 get in touch with you in a couple of days
14 and gave him a list of 10 or 12 names of
15 people who I thought would be excellent
16 for this position.
17         It's surprising, though,
18 that, you know, that here on November
19 9th, right before I go to give my Senate
20 testimony that the commissioner is
21 offering me this really high level job
22 with a lot of responsibility, and then
23 one week later, he's calling me all sorts
24 of names in an FDA public statement

Page 473

1  that's issued on the eve of my Senate
2  testimony.
3          And this ties in with what I
4  was talking about before about an
5  organized effort on the part of some
6  within FDA to intimidate me prior to my
7  Senate testimony.  And the commissioner
8  was part of that.  Why else would he
9  offer me this job and then turn around a
10 week later and say the things that he
11 said?
12     Q.   All right.
13         Now, I also want to ask you
14 something about how you were recognized
15 the following year.  In 2005, something I
16 didn't cover, but which I'm putting out
17 as redirect in response to the
18 questioning that was asked here.  You
19 were given in 2005, November of 2005 the
20 FDA outstanding service award for
21 scientific and regulatory assessment and
22 actions regarding safety of nonsteroidal
23 anti-inflammatory drugs.
24         MR. BECK:  I'm going to

KS-000418

Confidential - Subject to Protective Order

Page 474

1    object.  Improper redirect.  You
2    did ask him about that on direct,
3    and I didn't ask a single question
4    about his awards.
5         MR. KLINE:  We'll get an
6    ruling.  I don't think I asked him
7    about that.
8    BY MR. KLINE:
9         Q.   Did you get that award?
10        A.   I got that award.
11        Q.   You also got the American
12   Public Health Association award for
13   excellence in December 2005; is that
14   correct?
15        MR. BECK:  Objection.
16   Improper redirect.
17        THE WITNESS:  Yes.  And sir,
18   that's a very prestigious national
19   award that no one from the Food &
20   Drug Administration has ever been
21   awarded that award from the
22   American Public Health
23   Association.
24   BY MR. KLINE:

Page 475

1         Q.   Briefly, one sentence, what
2    is the American Public Health
3    Association?
4         A.   The American Public Health
5    Association is the professional
6    organization that represents public
7    health professionals within actually the
8    entire world, the United States and the
9    rest of the world.  I think it has over
10   35,000 members.
11        Q.   Sir, every year you as an
12   FDA employee are -- there's a performance
13   evaluation of you, correct?
14        A.   Yes.
15        Q.   You listened to Mr. Beck's
16   many questions about e-mails regarding
17   things that you did technically and
18   statistically and the like.  Do you
19   recall all those questions?
20        A.   Yes, I do.
21        Q.   There are categories of
22   technical competence in 2005, and I have
23   the document right here, a copy of which
24   we'll give to Mr. Beck.  We'll mark it as

Page 476

1    Exhibit 33.  I want to be very quick with
2    it, sir.
3              - - -
4         (Whereupon, Deposition
5    Exhibit Graham-33, FDA
6    Performance Evaluation Plan (4
7    pages), was marked for
8    identification.)
9              - - -
10        THE WITNESS:  Right.  This
11   covers --
12   BY MR. KLINE:
13        Q.   Yes.
14        A.   This covers the year of
15   2004.
16        MR. BECK:  Let me please
17   make an objection before you do
18   this.  Twofold.  One is improper
19   redirect.  I didn't ask about any
20   performance evaluations.
21        Second, this is one of the
22   documents that was provided last
23   week by Dr. Graham's counsel, and
24   we asked for the full package and

Page 477

1    evaluation materials.  I didn't
2    make an issue of it because you
3    didn't ask him any questions on
4    direct about evaluation materials,
5    and now it's redirect, and it
6    really is objectionable when we
7    have been denied access to all the
8    materials in the evaluation file
9    for you to use the stuff that he
10   gave you last week.
11        MS. ROYCE:  You asked for it
12   yesterday.
13        MR. KLINE:  You know what,
14   we'll withdraw it.  Let's move on.
15   I would rather not --
16        THE WITNESS:  Shucks.
17        MR. KLINE:  All right.
18        You know what?  Let's keep
19   it.
20        Is your objection done?
21        MR. BECK:  Yes.
22   BY MR. KLINE:
23        Q.   Okay.
24        Let's do it and we'll

KS-000419

Confidential - Subject to Protective Order

Page 478

1   eventually get a ruling on it.
2        A.   This evaluation is for --
3        Q.   Very briefly, sir.
4        A.   -- the year 2004, which
5   covers this entire period of our study.
6        Q.   That's my question.
7        A.   And I got "exceeds" in work
8   management, technical competency.  And
9   throughout my entire career, I've gotten
10  "exceeds" in technical competency.
11       Q.   That's what I want to focus
12  on.  Does the FDA in 2004 rate you as
13  exceeds knowledge, skills and abilities
14  on technical competency?
15       A.   Yes.
16            MR. BECK:  Object to form.
17  BY MR. KLINE:
18       Q.   Is that the highest level
19  that you could get?
20       A.   That's the highest level you
21  can get.
22       Q.   Next area to examine you on,
23  sir.
24            I would like to talk to you

Page 479

1   about that study that was done and your
2   involvement with Wayne Ray.  Do you
3   recall Mr. Beck making quite a -- let me
4   put it in a less pejorative way.
5            Do you remember Mr. Beck
6   making a point about conflict of interest
7   and the fact that Wayne Ray had consulted
8   for Pfizer and for plaintiffs' attorneys,
9   too?
10       A.   Yes, I do.
11       Q.   And, of course, those are in
12  drug product litigation, even you would
13  know or a novice or anyone would know
14  that those are the two opposite ends of
15  the spectrum, the plaintiffs and the drug
16  companies, correct?
17       A.   Correct.
18       Q.   You also told us earlier or
19  maybe you didn't.
20            Who is Harry Guess?
21       A.   Harry Guess is deceased now,
22  but he was, I think, like the lead
23  epidemiologist at Merck and a long-time
24  colleague, and maybe friend is a little

Page 480

1   too strong a word, but I had much respect
2   for Harry.
3        Q.   I see.
4            And he eventually was at
5   Merck?
6        A.   He worked for Merck, yes.
7        Q.   He worked for Merck.
8            - - -
9            (Whereupon, Deposition
10       Exhibit Graham-34, Memo 11-6-00
11       "Consulting agreement for Wayne
12       A. Ray, Ph.D." MRK-ABT0018298,
13       was marked for identification.)
14            - - -
15  BY MR. KLINE:
16       Q.   I'll show you Exhibit 34.
17  With reference to Wayne Ray, the man who
18  Mr. Beck showed you was conflicted.  May
19  we put it up, please?
20            THE WITNESS:  I have never
21       seen this document.
22  BY MR. KLINE:
23       Q.   Yes.  That's fine.  Mr. Beck
24  showed you a lot of things you didn't

Page 481

1   see.  It's a Merck document, by the way.
2        A.   Okay.  Yes.
3        Q.   It is right out of the Merck
4   files.
5        A.   Right.
6        Q.   And not only was Wayne Ray a
7   consultant for the plaintiffs in
8   litigation for Pfizer, but who else did
9   he have a consulting agreement with?
10       A.   With Merck.
11            MR. KLINE:  May we display
12       it, please?
13            Let's go off the video
14       record.
15            THE VIDEOTAPE TECHNICIAN:
16       Stand by, please.
17            The time is 7:29.  Off the
18       video record.
19            - - -
20            (Whereupon, a recess was
21       taken from 7:29 p.m. until
22       7:30 p.m.)
23            - - -
24            THE VIDEOTAPE TECHNICIAN:

KS-000420

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 482

1       7:30.  We're back on the record.
2   BY MR. KLINE:
3       Q.   We've marked it as Exhibit
4   Number --
5       A.   34.
6       Q.   -- 34.  Exhibit Number 34 is
7   -- your co-colleague was also a
8   consultant with Merck, correct?
9       A.   Yes.
10      Q.   What's Merck's complaint?
11      A.   That he was a plaintiffs'
12  attorney for rofecoxib or that he worked
13  for Pfizer.
14      Q.   Was the man at one point one
15  of their own consultants, your co-author?
16      A.   Yes, he was.
17          MR. KLINE:  Let's mark the
18      next exhibit number.
19              - - -
20          (Whereupon, Deposition
21      Exhibit Graham-35, E-mails
22      MRK-ACV00363335, was marked for
23      identification.)
24              - - -

Page 483

1   BY MR. KLINE:
2       Q.   This is also right out of
3   the Merck files.
4          MR. BECK:  And I'm going to
5      object to the colloquy, if this is
6      intended as a question.
7          MR. KLINE:  We can strike
8      that colloquy.
9   BY MR. KLINE:
10      Q.   This is in a different
11  context back in 2000.  You weren't
12  involved, you haven't seen this before,
13  correct?
14      A.   This is correct.
15      Q.   The first phrase from, it's
16  Dr. Guess, correct?
17      A.   Correct.
18      Q.   Epidemiologist?
19      A.   Senior epidemiologist at
20  Merck.
21      Q.   Senior epidemiologist at
22  Merck?
23      A.   He may have even been a vice
24  president.  You can ask the Merck folks.

Page 484

1       Q.   "I have known David Graham
2   well for a long time.  He has an
3   admirable concern for public health."
4          Do you see that?
5       A.   Yes, I do.
6       Q.   Did you know that that's how
7   the senior epidemiologist at Merck felt
8   about you, sir?
9       A.   No.  He never conveyed that
10  to me.
11      Q.   Well, now he has.
12          Next.
13      A.   Posthumously.
14          MR. BECK:  Objection, move
15      to strike the colloquy and
16      speeches.
17  BY MR. KLINE:
18      Q.   Next.  Let's talk about --
19          Let's talk just one or two
20  more things about Wayne Ray.  Wayne Ray.
21  Who ran last year's ISPE conference?
22      A.   Dr. Ray did.
23      Q.   Is Dr. Ray also a consultant
24  to the FDA?

Page 485

1       A.   He most definitely is.
2       Q.   So, your co-author was a
3   consultant to the FDA, former consultant
4   to Merck in addition to the things that
5   were pointed out by Mr. Beck; is that
6   correct?
7          MR. BECK:  Object to form.
8          THE WITNESS:  That is
9      correct.  The reason why we
10      asked -- why I asked Wayne to
11      participate in our study was
12      because of that FDA/Dr. Ray
13      relationship.
14  BY MR. KLINE:
15      Q.   Now, speaking of
16  relationships, that's the next place I
17  want to go.
18          There was a document that
19  was shown to you, and let me find it.  It
20  was exhibit -- it was the e-mail from
21  Jenkins to Jonca.  I know the Bates
22  Number.  I didn't mark the number on it.
23  FDA CDER 11048.  It is this document
24  here.

Confidential - Subject to Protective Order

Page 486

1      A.   Thank you for showing it to
2   me.
3      Q.   But if you can find it.
4           Do you recall seeing it in
5   your direct examination?
6      A.   Yes, I do.
7      Q.   Or I'm sorry, in your
8   cross-examination?
9      A.   Yes, I do.  I recall seeing
10  it.
11         MR. KLINE:  15.  Thank you
12     very much, Counsel.
13  BY MR. KLINE:
14     Q.   Now, Mr. Beck had asked you
15  about the e-mail from Jenkins to Jonca.
16  I had asked him to read for completeness
17  the first e-mail, the e-mail underneath
18  that, from Jenkins to Jonca.
19         And do you see the portion
20  of it that begins, "Please see Paul's
21  message below which he kindly shared."
22         That would be Paul of the
23  FDA sharing the e-mail with Merck,
24  correct?

Page 487

1      A.   I'm not sure with whom he
2   shared it.
3      Q.   Let me go further.  It says,
4   "For the record, Merck will likely not be
5   happy so this could well eventuate in
6   calls to the agency.  Should we involve
7   Bob Temple?"
8           Who is Bob Temple?
9      A.   Bob Temple is the director
10  of medical policy at FDA, and he's also
11  one of the senior office directors.
12     Q.   Senior office director?
13     A.   Yes.
14     Q.   That was where -- okay.
15         And it says, "He
16  historically has been the one of the
17  first ones they complained to."
18         "They" being who?
19     A.   "They" being Merck.
20     Q.   So, when Merck has their
21  complaints, who do they go and complain
22  to?
23     A.   According to this e-mail, to
24  Dr. Temple.

Page 488

1      Q.   Is this an example of what
2   you told me on direct in terms of who is
3   the real client of the FDA?
4           MR. BECK:  Object to the
5       form of the question.
6           THE WITNESS:  This would be
7       an example of that.
8   BY MR. KLINE:
9      Q.   Okay.
10         Let me ask it in a
11  non-leading question.
12         What is this an example of,
13  sir?
14         MR. BECK:  I'm going to
15     object to the form having given
16     him the answer.
17  BY MR. KLINE:
18     Q.   You can answer any way you
19  want or whatever you want to say.
20     A.   This is an example of the
21  way FDA views industry as its clients and
22  tries to please industry, its client.
23     Q.   Now, sir --
24         MR. BECK:  Before you leave,

Page 489

1   I would ask that the last
2   paragraph of that e-mail be read
3   for completeness.
4           MR. KLINE:  I will.  It was
5       read already, but we'll read it
6       again.
7   BY MR. KLINE:
8      Q.   "I am very concerned that
9   David Graham is lead author on this and
10  is identified as FDA staff.  This clearly
11  implies agency endorsement of his
12  presentation and this is the first we
13  have seen of it.  Paul's message below
14  for a presentation at a meeting coming up
15  later this month does not allow much time
16  to review or clear.  Jonca."
17         Is that along the same lines
18  as Merck will not likely to be happy?
19         MR. BECK:  I'm going to
20     object to the form of the
21     question.
22  BY MR. KLINE:
23     Q.   Please answer, sir.
24     A.   Yes.  That's consistent with

KS-000422

Confidential - Subject to Protective Order

Page 490

1    that.
2        Q.    Now, next I just want to do
3    a couple of more e-mails which were not
4    shown to you by Mr. Beck.
5            First of all, there's an
6    e-mail of Jonca to Hertz.  It has been
7    marked already.  We're not sure if it is
8    marked.  I'm going to just show it to
9    you.  It is Bates Number from the FDA
10   CDER file, 11046.  We'll give it another
11   number so we can move right along.
12                   -   -   -
13           (Whereupon, Deposition
14       Exhibit Graham-36, E-mails
15       FDACDER011046 - FDACDER011047,
16       was marked for identification.)
17                   -   -   -
18   BY MR. KLINE:
19       Q.    First sentence, sir.  Do you
20   see it?  It is the same folks that are
21   involved.  Again, remind the jury.  Who
22   is Bull Jon -- Jonca Bull her name was?
23       A.    Jonca Bull is -- was the
24   office director overseeing the reviewing

Page 491

1    division that approved and regulates
2    Vioxx.
3        Q.    And look what she says there
4    in the last sentence of the e-mail on the
5    top.  Do you see where it says, "Look
6    out"?
7        A.    Yes, yes, yes.
8        Q.    Who were they interested in
9    getting feedback from?  Who were they
10   worried about?
11           MR. BECK:  I'm sorry.  Where
12       are you?
13   BY MR. KLINE:
14       Q.    "Look out for feedback from
15   Merck in short order."
16       A.    Correct.  They are concerned
17   about what Merck will have to say about
18   this.
19       Q.    Okay.  Next.
20           MR. BECK:  I would like the
21       -- above that, the sentence that
22       begins "Thanks" to be read for
23       completeness.
24   BY MR. KLINE:

Page 492

1        Q.    For completeness, "Thanks
2    for confirming my concerns here as to the
3    leap between the methodology and
4    conclusions reached."
5            MR. KLINE:  Next e-mail.
6                   -   -   -
7            (Whereupon, Deposition
8        Exhibit Graham-37, E-mail 8-16-04
9        with attachment "ISPE Poster,"
10       MRK-ACM0002855 - MRK-ACM0002856,
11       was marked for identification.)
12                   -   -   -
13   BY MR. KLINE:
14       Q.    There's an e-mail between
15   Honig -- to Honig from Seligman.  Those
16   are people who we've talked about.  Honig
17   is where?
18       A.    Well, it depends on the date
19   of the e-mail.  If it is in 2004 or so --
20       Q.    Yes, it is.
21       A.    -- then Honig is at Merck;
22   Seligman is at FDA.
23       Q.    Let me understand this.  The
24   e-mail I'm going to show you is from Paul

Page 493

1    Seligman, the man we've talked about or
2    the man you talked about with Mr. Beck,
3    and Peter Honig.
4            Did you know, sir, that Mr.
5    or that Dr. Seligman was sending Dr.
6    Honig a copy of your poster so that, you
7    know, Merck had the heads up?  Are you
8    aware of that fact?
9        A.    No.  There was an e-mail
10   that I had seen from Dr. Trontell who had
11   said, oh, we can't let Dr. Graham present
12   this, but we need to let Merck know.  So,
13   I was aware of that, but I didn't know
14   that it had been shared with Merck.
15       Q.    In this period of time, sir,
16   when your scientific integrity was being
17   called into question, who was on the
18   minds of the brass at the FDA?
19           MR. BECK:  Objection to the
20       form.
21   BY MR. KLINE:
22       Q.    You may answer.
23       A.    They were concerned about
24   FDA and made that repeatedly clear.

KS-000423

124 (Pages 490 to 493)

Confidential - Subject to Protective Order

Page 494

1    Q.   Who was on the minds of the
2  FDA?
3         MR. BECK:  Objection.
4  BY MR. KLINE:
5    Q.   You said they were concerned
6  about FDA?
7         MR. BECK:  He just answered
8    your question.  I renew my
9    objection to the form.
10        MR. KLINE:  Yes, sir.
11        THE WITNESS:  The FDA
12   managers were concerned about what
13   Merck would think and about what
14   Merck, in their estimation, needed
15   to know I guess because they were
16   serving them.
17 BY MR. KLINE:
18   Q.   Who is Dr. Braunstein?
19   A.   I've seen the name before,
20 but I don't know who Dr. Braunstein is.
21   Q.   Who is Brian Harvey, sir?
22   A.   Brian Harvey is, I think
23 he's like -- he was the division director
24 for the analgesics and anti-inflammatory

Page 495

1  drugs.  He was the person who was
2  responsible for Vioxx, so, he --
3    Q.   In Office of New Drugs?
4    A.   Right.  He's in that
5  division of anti-inflammatory drugs, and
6  he's the director of that division where
7  Vioxx sits, and Jonca Bull is his boss.
8  And he's the boss of like Lourdes
9  Villalba, who is the medical officer who
10 did the Vioxx review.
11   Q.   They are all in the Office
12 of New Drugs?
13   A.   Correct.
14   Q.   The ones that you told us
15 earlier have the vested interest in
16 keeping the drug on the market?
17        MR. BECK:  Object to the
18   form of the question.
19 BY MR. KLINE:
20   Q.   Is that correct, to put it
21 in context?
22   A.   Yes.  These are people from
23 the Office of New Drugs, and the Office
24 of New Drugs has a vested interest in

Page 496

1  seeing that its prior decisions are not
2  changed.
3    Q.   Now, I want to show you some
4  handwritten notes, sir, if we may show
5  you the next document.
6              - - -
7         (Whereupon, Deposition
8    Exhibit Graham-38, Handwritten
9    notes, MRK-GAR0016806 -
10   MRK-GAR0016807, was marked for
11   identification.)
12             - - -
13 BY MR. KLINE:
14   Q.   Exhibit 38.  And see if you
15 can tell me if in the period of time,
16 this would be 10/13 and 10/14 of '04,
17 correct?
18        MR. BECK:  Excuse me.
19        MR. KLINE:  Yes, sir.
20        MR. BECK:  I'm going to
21   object to the form.  You're giving
22   a date that I don't see anywhere
23   on the document.
24 BY MR. KLINE:

Page 497

1    Q.   I want you to assume that
2  that's the date.
3    A.   Well, one can -- you can
4  derive it very clearly.  It says October
5  13, and down below it's talking about me
6  and our study.  It's talking about Graham
7  et al.
8    Q.   Sir, I want you to look at
9  the middle of the page, and I'd like it
10 highlighted with the word that starts
11 "Brian," Brian being Brian Harvey of the
12 FDA?
13   A.   Yes.
14        MR. BECK:  Object to the
15   form.
16 BY MR. KLINE:
17   Q.   "Brian suggests an official
18 rebuttal on Graham."  Do you see that?
19   A.   Yes, I do.
20   Q.   Did you know that was going
21 on, sir?
22   A.   No, I don't.  I don't know
23 what an official rebuttal means, but I
24 was not aware that it was going on.

Confidential - Subject to Protective Order

Page 498

1    Q.   Did you know, sir, that
2  Brian Harvey at the FDA -- look at the
3  last three lines.
4          This is an official of the
5  FDA.  Last three lines.  Brian told --
6  the author being Braunstein.  Braunstein
7  writes in his own handwriting, and we're
8  going to examine him on this in a
9  deposition.
10         "Brian - opportunity to get
11 message out on Graham et al."
12         MR. BECK:  I'm going to
13     object to the form of the
14     question.
15 BY MR. KLINE:
16     Q.   Did you know, sir, that
17 those discussions were going on between
18 the FDA and Merck, that they were looking
19 to get the message out on you?
20     A.   No, I didn't.
21     Q.   Did you know, sir, in the
22 last sentence that an FDA official was
23 suggesting to Merck that we provide
24 journalists with a copy of our critique

Page 499

1  on Graham?
2          MR. BECK:  Object to the
3      form.
4  BY MR. KLINE:
5      Q.   Did you know that that was
6  going on, sir?
7          MR. BECK:  Excuse me.
8      Object to the form.
9          MR. KLINE:  Yes, sir.
10         THE WITNESS:  No, I did not.
11 BY MR. KLINE:
12     Q.   How does this all strike
13 you, having seen this for the first time?
14         MR. BECK:  Object to the
15     form.
16         THE WITNESS:  Well, I'll
17     tell you, I'm quite shocked,
18     because what this is is this
19     actually demonstrates more clearly
20     just how widespread the organized
21     campaign to discredit and smear me
22     was, that I'm not crazy and
23     psychotic, that there was a
24     widespread, widespread concerted

Page 500

1      effort on the part of FDA
2      officials working in collaboration
3      hand in glove with --
4  BY MR. KLINE:
5      Q.   With whom?
6      A.   With Merck.
7      Q.   Next.
8          And by the way, sir, are you
9  aware of a letter that was written by a
10 doctor whose name was Fries?
11     A.   No.
12     Q.   Okay.  Let me ask you this
13 question.  Are you aware of the Merck --
14         Are you aware of any Merck
15 documents where they had a policy in
16 effect to neutralize people, scientists
17 who disagreed with them?
18         MR. BECK:  I'm going to
19     object as wildly outside the scope
20     of any cross-examination.
21 BY MR. KLINE:
22     Q.   Yes, sir.
23     A.   I'm fully aware of that,
24 actually, because one of the victims of

Page 501

1  these attempts was a colleague of mine,
2  Dr. Gurkipal Singh, who was at Stanford
3  and who described in great detail what he
4  had gone through at the hands of Merck
5  basically seeking to fire him because he
6  had questions about the safety of Vioxx.
7      Q.   For the record so it's clear
8  later on, this all flows from the e-mail
9  which was shown by Mr. Beck dated August
10 11 in which the part of that e-mail chain
11 said "For the record, Merck will likely
12 not be happy."  That's the basis for
13 having gone into all of this.
14         Next area of inquiry, sir.
15         By the way, is this -- was
16 there a practice at the FDA essentially
17 to give the sponsor of the drug, Merck,
18 in this case, both information and heads
19 up on things like this?
20         MR. BECK:  Object to the
21     form.
22         THE WITNESS:  No.  No.  This
23     would be uncommon and
24     unprecedented.

KS-000425

Confidential - Subject to Protective Order

Page 502

1  BY MR. KLINE:
2      Q.   Now, let's move into other
3  areas.
4          MR. BECK:  Doctor, can I ask
5  again if you would try to pause
6  because I don't want to be talking
7  over each other.
8          THE WITNESS:  Okay.  Yes.
9  And I'm not trying to dis you.
10         MR. BECK:  I know.  If you
11  get into a rhythm with somebody as
12  silver tongued as Mr. Kline, it is
13  hard to remember the rules.
14         MR. KLINE:  My mom used to
15  say to me, beware of people who
16  compliment you.
17         THE WITNESS:  Well, I
18  subscribe to that.  If people
19  agree with me, then I have to
20  wonder what am I doing wrong.
21  Right?
22         MR. KLINE:  Right.
23         But I appreciate it, Phil.
24  BY MR. KLINE:

Page 503

1      Q.   Next.
2          Mr. Beck talked about a
3  number of documents that were turned over
4  and processed and the lawyers -- do you
5  recall that whole first 15 or 20 minutes
6  of examination?
7      A.   Yes, I do.
8      Q.   Here's my question to you,
9  sir.  In this litigation, did Merck
10  subpoena and request your personal
11  e-mails for seven years?
12     A.   They requested not only
13  those e-mails, but the e-mails of all my
14  family members.
15     Q.   Next.  Next document, sir.
16  I'd like to go to a document which was
17  the very end of Mr. Beck's
18  cross-examination.  Let me see if I can
19  find it.  I know its number, I just don't
20  know where it is.
21         MR. BECK:  Can I know what
22  we are talking about?
23         THE WITNESS:  I think
24  they're talking number 32.

Page 504

1          MR. KLINE:  Let's go off the
2  video record.
3          THE VIDEOTAPE TECHNICIAN:
4  Off the record at 7:48.
5              - - -
6          (Whereupon, a recess was
7  taken from 7:48 p.m. until 7:49
8  p.m.)
9              - - -
10         THE VIDEOTAPE TECHNICIAN:
11  The time is 7:49.  We're back on
12  the video record.
13  BY MR. KLINE:
14     Q.   Let's put this in context,
15  sir.  There's an e-mail from Jenkins, the
16  director of Office of New Drugs, and
17  Seligman who's -- is he also in the
18  Office of New Drugs, technically?
19     A.   No.  He's in a separate
20  super office --
21     Q.   All right.
22     A.   -- but he's close personal
23  friends with Steven Galson, and Dr.
24  Galson brought Dr. Seligman into this

Page 505

1  position from outside.
2      Q.   Understood.
3          Now, Mr. Beck wanted to look
4  at the first five bullet points with you
5  in this document, including the no -- and
6  you had testified, to put it in context,
7  that there was -- no clinical trial had
8  yet shown the increased risk that they're
9  talking about here, but that it had been
10  shown in observational, namely,
11  epidemiology studies.  Correct?
12     A.   That is correct.
13         MR. BECK:  Object to the
14  form of the question.
15  BY MR. KLINE:
16     Q.   That's the predicate to the
17  question just to put it back in context
18  for a question now.
19         Sir, your study itself,
20  standing alone, did it show an increased
21  risk of Vioxx in causing cardiovascular
22  events?
23     A.   Yes, it did.
24     Q.   Was that both at the 25

KS-000426

Confidential - Subject to Protective Order

Page 506

1  milligram dose as well as the 50
2  milligram dose?
3      A.   At the 50 milligram dose,
4  the evidence was statistically
5  significant.  At the 25 milligram dose,
6  it was elevated, but it didn't reach
7  statistical significance.  In comparison
8  with Celebrex, it was marginally
9  statistically significant with a lower
10  dose.
11      Q.   And in this document which
12  is April 6, 2005, let's put it in
13  context, drug is off the market September
14  30 of '04, correct so far?
15      A.   Yes.
16      Q.   And I just want to get dates
17  out, so I appreciate Mr. Beck's
18  indulgence.
19          And then there's -- your
20  article is published online in January of
21  '05, correct?
22      A.   Yes.
23      Q.   There's a hearing on
24  February 17th of '05, correct?

Page 507

1      A.   Yes.
2      Q.   And then this report comes
3  along as part of that process.  It
4  basically is tying up the endpoint of
5  having had an Advisory Committee hearing
6  and having had an investigation?
7      A.   Yes.
8      Q.   What I don't believe you
9  were asked about was what was said about
10  Vioxx in this paper.  And let's look at
11  Vioxx on Page 18.  And then that will, I
12  think, lead us to a discussion of some
13  other things.
14          On Page 18, we have Vioxx,
15  Page 18.  There's a separate section on
16  Vioxx, isn't there?
17      A.   Yes, there is.
18      Q.   Have we discussed that yet?
19      A.   No, we have not.
20      Q.   It says here, second
21  sentence, "Should the sponsor seek to
22  resume marketing for rofecoxib, a
23  supplemental NDA with" -- what kind of
24  labeling, sir?

Page 508

1      A.   -- "revised labeling."
2      Q.   In other words, the drug
3  would have to be labeled different,
4  correct?
5      A.   Yes.
6      Q.   "The supplemental NDA would
7  require FDA review and approval prior to
8  implementation of the" -- what?
9      A.   "New labeling."
10      Q.   -- "new labeling since the
11  change would not be the type allowed
12  under FDA regulations ,"and they go on to
13  cite the regulations on labeling,
14  correct?
15      A.   Yes.
16          MR. BECK:  Will you just for
17      completeness read the rest of that
18      sentence.
19  BY MR. KLINE:
20      Q.   -- "new labeling since the
21  changes would not be the type allowed
22  under FDA regulations for a 'Changes
23  Being Effected (CBE)' labeling
24  supplement."  Did I read it correctly?

Page 509

1      A.   Yes.
2      Q.   So, the FDA, even the FDA in
3  this report, did the FDA conclude that
4  the drug was not properly labeled as it
5  had been marketed when it was on the
6  market?
7          MR. BECK:  Object to the
8      form of the question.
9  BY MR. KLINE:
10      Q.   You may answer.
11      A.   Yes.  That's clearly what's
12  been concluded here.
13      Q.   And, sir, the labeling, two
14  years you had mentioned about the
15  labeling, and you discussed labeling at
16  length with Mr. Beck, and I want to talk
17  to you a little bit about labeling in a
18  minute.
19          The labeling, two years.  Is
20  there anyone in those two years in
21  particular who dragged their feet?
22          MR. BECK:  Object to the
23      form of the question.  It's also
24      improper redirect.

KS-000427

Confidential - Subject to Protective Order

Page 510

1    MR. KLINE:  Yes, sir.  Go
2  ahead.
3    MR. BECK:  I didn't get into
4  this subject at all.
5    THE WITNESS:  The two-year
6  period for coming up with the
7  revised label for a problem as
8  serious as high risk of heart
9  attacks with Vioxx, this is an
10  extraordinary long period of time,
11  and the only explanation based on
12  my long experience at FDA is that
13  there was foot dragging by the
14  company.  I've seen this countless
15  times with other companies with
16  other serious drug-related adverse
17  reactions where FDA comes in
18  saying we want to put a boxed
19  warning on a drug, and the company
20  says basically no way, Jose, and
21  then FDA sort of banters back and
22  forth with the company, and things
23  just go on for months and months
24  and months and months.

Page 511

1    At the same time, companies
2  are free to voluntarily implement
3  labeling changes such as boxed
4  warnings, and in this case, I
5  imagine FDA would have gone along
6  with it.
7  BY MR. KLINE:
8    Q.   Now, I'd like to go --
9    MR. BECK:  I'm going to
10  object and move to strike and
11  renew the objection as outside the
12  scope.  I didn't ask anything on
13  this subject at all.
14    MR. KLINE:  You certainly
15  asked a whole ton of questions on
16  labeling, and I intend to go into
17  it.
18    MR. BECK:  I asked if he was
19  involved in the labeling decisions
20  and he said no.
21    MR. KLINE:  And then you
22  asked a series of opinions about
23  labeling.  Do you want to strike
24  all the labeling testimony?

Page 512

1    MR. BECK:  I have my
2  objection on the record.
3    MR. KLINE:  But I'm willing
4  to offer a compromise.
5    I don't hear a taker.
6  BY MR. KLINE:
7    Q.   Sir, I want to go back and
8  cover one more thing in this document,
9  the Jenkins report.  If you look on Page
10  18, right here, sir, where it says
11  "Second, concerns were expressed at the
12  recent advisory committee meeting" --
13    A.   Uh-huh.
14    Q.   "Second, concerns were
15  expressed at the recent advisory
16  committee meeting that Vioxx may be
17  associated with a higher risk of
18  increased blood pressure, fluid
19  retention, and congestive heart failure
20  than other COX-2 selective NSAIDs.  We
21  believe that these additional potential
22  serious risks of Vioxx need to be fully
23  explored through a public process before
24  a decision is made regarding resumed

Page 513

1  marketing."  Did I read it correctly?
2    A.   Yes, you did.
3    Q.   Is that, at least insofar as
4  that goes, sir, indeed was Vioxx
5  associated with all of these things that
6  are now known and shown in 2000 and are
7  now acknowledged by the FDA?
8    MR. BECK:  Object to the
9  form and the scope.
10  BY MR. KLINE:
11    Q.   Did the epidemiology studies
12  show these things, sir?
13    MR. BECK:  Object to the
14  form and to beyond the scope of
15  cross.
16    THE WITNESS:  Other
17  epidemiology studies have shown
18  these things.  Our study didn't
19  look at these things, but other
20  studies have, and it found these
21  effects with Vioxx.
22  BY MR. KLINE:
23    Q.   So, when Vioxx was on the
24  market, sir, by this own FDA document,

KS-000428

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 514

1  was it a drug that was associated with
2  the things that you've mentioned,
3  increased risk of heart attacks and
4  coronary events, as well as these other
5  heart-related ailments which are
6  acknowledged here by the FDA?
7          MR. BECK:  Object as beyond
8  the scope of the cross.
9          THE WITNESS:  Yes.
10 BY MR. KLINE:
11     Q.   And I might add for the
12 record, this is the exact document that
13 was examined on by -- do you remember --
14     A.   Yes, I do.
15     Q.   Do you recall being examined
16 on this very document by Mr. Beck?
17     A.   I do.
18     Q.   Do you recall any questions
19 about the specific area, the specific
20 part of the document that dealt with
21 Vioxx?
22     A.   No.
23     Q.   But is it in this document,
24 sir?

Page 515

1      A.   It certainly is.
2      Q.   And does the FDA speak about
3  the fact that Vioxx can't be on the
4  market unless it had a different label?
5          MR. BECK:  Object to the
6  form and to the scope.
7          THE WITNESS:  That's
8  correct.
9  BY MR. KLINE:
10     Q.   Let's talk about your
11 testimony, sir.
12         In response to questions by
13 Mr. Beck, you said -- I want to talk
14 label for a minute, labeling in response
15 to the questions that he asked you.
16 First of all, sir, you testified earlier
17 about how labels can make a difference.
18 You said that a straightforward -- I
19 actually have from Mrs. Golkow's
20 transcription here today instant access
21 to it on real time.  And it says here,
22 "It would actually just be more
23 straightforward about what the problems
24 are, using very bold and frank and plain

Page 516

1  language, not sort of using adjectives
2  that downplay it and not burying it in
3  tremendous amounts of text."  Your words.
4      Q.   Do you recall saying that to the jury
5  here today?
6      A.   Yes, I do.
7      Q.   Now, sir, can a
8  straightforward, bold, frank, plain
9  language label warning make a difference
10 in prescribing of drugs as you see and
11 know and understand it?
12     A.   It certainly can.  In the
13 case of Vioxx, I think had the warning
14 been very clear, had it been boxed, the
15 number of patients exposed to the drug
16 would have probably been much reduced,
17 and this would have resulted in a
18 substantial reduction in the number of
19 people who were injured by heart attacks
20 or killed by heart attacks.
21     Q.   Sir, in your testimony
22 before the United States Senate Finance
23 Committee before Senator Grassley and his
24 committee, you were asked the question --

Page 517

1  you were saying -- you were asked the
2  question by Senator Graham (sic):  "A
3  black box will catch everybody's
4  attention."  You said, "As I pointed out
5  before, I think the most effective thing
6  that this black box would have done is it
7  would have given prominence to the heart
8  attack risk of Vioxx and it would have
9  stopped direct-to-consumer advertising."
10         Do you recall making that
11 statement, sir, before the Congress?
12     A.   Yes, I do.
13         MR. BECK:  Object to the
14 form.
15 BY MR. KLINE:
16     Q.   My question is, do you abide
17 by and agree with that particular public
18 statement which was made then today?
19     A.   Oh, definitely.  There's no
20 question about that.
21         Could I add one other thing
22 since we're talking about labeling.
23 Shari Targum, whose review we talked
24 about earlier, in the very conclusion of

KS-000429

Confidential - Subject to Protective Order

Page 518

1  her review, I was really stunned, I only
2  saw this recently in rereading the
3  review, she wrote basically that this --
4  that Vioxx should have warnings.  And she
5  said "at least warnings."  And so I think
6  reading that and looking at her review,
7  the fact that here's the expert who
8  reviewed the drug, thought that it should
9  have been in warnings, and then
10  eventually we have it came out that it's
11  sort of, you know, buried in the fine
12  print, I was actually fairly surprised
13  because I hadn't realized that Dr. Targum
14  had actually stated that.
15      Q.   As to your opinions, sir,
16  before the United States Senate, putting
17  aside Dr. Targum, when you said that the
18  black box can be effective, have you
19  stated here today now a more complete
20  view of your opinions as I've asked you
21  here on redirect examination?
22      A.   Yes, I have.
23          MR. BECK:  Objection.
24      Somebody has to let me object.  I

Page 519

1      object to the form of the
2      question.
3          MR. KLINE:  Phil, I
4      apologize.  I'm really trying to
5      rush through it here at 8:00, but
6      I appreciate it, and I will really
7      try to be more deferential.
8  BY MR. KLINE:
9      Q.   Next.  Let's talk about --
10  yes.  I'd like you to go to Exhibit
11  Number 8 very briefly.
12          You were asked by Mr.
13  Beck -- I'm going to like make you work
14  while you talk because we're trying to
15  wrap up.
16          You had mentioned -- there
17  was an exchange where basically you said
18  you'll leave it to brighter minds to
19  determine mechanism, et cetera, correct?
20      A.   Yes.
21      Q.   Now, I also think I heard
22  you say that you understand mechanism
23  because you're a pharmacologist?
24      A.   I'm a clinical

Page 520

1  pharmacologist, board certified.
2      Q.   And you wrote an e-mail
3  that's part of the documents that I don't
4  think we've displayed it yet to the jury.
5  But let me ask you the concept, and
6  hopefully I won't be put to the task of
7  showing it.  You said, "Epidemiology
8  doesn't require or depend on a known
9  mechanism for its findings."  It's your
10  e-mail to David Campen, who is your
11  co-author on this study.
12      A.   (Witness nods.)
13      Q.   "Epidemiology doesn't
14  require or depend on a known mechanism.
15  What it does is seek to describe the way
16  things are and leave it to brighter minds
17  to figure out why."  Do you remember
18  that?
19      A.   Yes, I do.
20      Q.   Were you being facetious?
21      A.   I was being facetious.
22      Q.   But does it describe things
23  to put it the way you put it, the way
24  they are?

Page 521

1      A.   That's the whole purpose of
2  it.
3      Q.   Now, in your article -- in
4  the Wayne Ray article --
5      A.   Is this Number 8?
6      Q.   Yes.  This is Number 8.  Go
7  quickly, Number 8, Page 68.
8          I'm impressed by the work we
9  have in running this technical screen.
10  We're getting them right up here and I'm
11  rushing through a series of maybe eight,
12  ten more documents.
13          It says here -- do you
14  remember Mr. Beck got to sort of the
15  middle of the paragraph.  I wish I had a
16  laser pointer.  It was right there where
17  he was talking about the VIGOR trial,
18  enrolling these.  Remember that's what
19  you were dealing with?
20      A.   Yes.
21      Q.   But I'd like you to go to
22  the top of the next column -- and by the
23  way, you were talking there about whether
24  naproxen was cardioprotective, and Mr.

**KS-000430**

Confidential - Subject to Protective Order

Page 522

1  Beck in his questions was suggesting to
2  you, well, maybe you're not correct.  Do
3  you recall that?
4          MR. BECK:  I'm going to
5      object to the form.
6  BY MR. KLINE:
7      Q.   Do you recall that exchange?
8      A.   Yes, I do.
9      Q.   Is that how you interpreted
10 that exchange, sir?
11         MR. BECK:  Object to the
12     form of the question.
13 BY MR. KLINE:
14     Q.   Did you understand his
15 questions to suggest or challenge whether
16 you were correct on naproxen?
17         MR. BECK:  Same objection.
18         THE WITNESS:  Yes, I did.
19 BY MR. KLINE:
20     Q.   Here's my question to you,
21 sir.
22         In that very paragraph, not
23 in the article, not in the end, not in
24 the conclusions, in the very same

Page 523

1  paragraph at the end it says, "These
2  studies ,"referring to what studies?
3      A.   Studies above, the ones we
4  were talking about.
5      Q.   Which were what, VIGOR?
6      A.   Yes.  VIGOR and -- I guess
7  we're talking about VIGOR.  And it looks
8  like there are several other referenced
9  studies there which we'd have to go to
10 the bibliography to see what those refer
11 to.
12     Q.   These studies, including
13 VIGOR, which is what Mr. Beck was
14 focusing on with you, correct?
15     A.   Correct.
16         MR. BECK:  Object to form.
17     That's simply false,
18 BY MR. KLINE:
19     Q.   Maybe I should stand
20 corrected.  Was he referring, as you
21 understood it, to anything other than
22 VIGOR at the time when he was questioning
23 you?
24     A.   My understanding was he was

Page 524

1  referring to the entire paragraph.  VIGOR
2  is in that paragraph.  And VIGOR supplies
3  most of the data, and VIGOR is the most
4  reliable data because it is the biggest
5  study.
6      Q.   Look at what the last
7  sentence of the paragraph says.  "These
8  studies suggest that any potential
9  protective effect of naproxen does not
10 fully account for the findings in the
11 VIGOR study."  True?
12     A.   Definitely true.
13     Q.   That was published in 2003,
14 correct?
15     A.   Yes.  And it was based on a
16 symposium that occurred in August of
17 2002.
18     Q.   That's the other thing.  If
19 we can have the front of the article.
20 There was a lot of testimony about what
21 it was and what it wasn't.  It's up on
22 top, sir, IPSE commentary.  It doesn't
23 pretend to be a peer-reviewed journal
24 article, does it?

Page 525

1          MR. BECK:  Object to the
2      form of the question.
3          THE WITNESS:  Not to a
4      traditional scientific article,
5      but it does undergo some form of
6      peer review, but it's not as
7      stringent.
8  BY MR. KLINE:
9      Q.   Now, Next.
10         I'd like to put back up very
11 briefly the piece of your Advisory
12 Committee hearing, which is 114.  It's
13 the Advisory Committee document?
14         MR. BECK:  Can I see what
15     you are talking about?
16         MR. KLINE:  Yes, sure, Phil.
17     You used it.
18         THE WITNESS:  Is it number
19     5?
20 BY MR. KLINE:
21     Q.   Yes, sir.  Yes, it's the
22 PowerPoint.
23         Now, this PowerPoint was
24 given in 2005 over a year ago.  We now

KS-000431

Confidential - Subject to Protective Order

Page 526

1  see in front of us what Mr. Beck had
2  highlighted for the members of the jury,
3  correct?
4      A.  Yes.
5      Q.  Is that what we had
6  highlighted or he had highlighted?
7      A.  He highlighted a lot of
8  things.
9          MR. BECK:  I object, because
10     it's not what I highlighted.
11         MR. KLINE:  Okay, then I
12     stand corrected.
13 BY MR. KLINE:
14     Q.  Now, let's look at it in
15 totality.  Your testimony with him, I
16 believe you had a long discussion about
17 the Ray numbers, 1.02 with .76 to 1.37
18 confidence intervals.  Do you see that?
19     A.  Yes.
20     Q.  But let's look down the all
21 doses.  After all, the drug is taken at
22 all doses by -- over the whole
23 population, correct?
24         MR. BECK:  Object to the

Page 527

1      form.
2          THE WITNESS:  Yes.
3  BY MR. KLINE:
4      Q.  Is the drug taken at all
5  doses?
6      A.  Yes, it is.
7      Q.  Let's look.  The Graham
8  study, 1.34.  That means for every
9  thousand not on the drug, 1,340
10 statistically have an incidence, correct?
11     A.  Yes.  It's increased.
12     Q.  By a whisker it's not
13 statistically significant, correct?
14     A.  Right.  This is an example
15 of having 94 bullets in the chamber as
16 opposed to 95.
17     Q.  The Solomon study,
18 statistically significant increased risk,
19 correct?
20     A.  Yes.
21     Q.  The Kimmel study,
22 statistically significant increased risk,
23 correct?
24     A.  Umm.

Page 528

1      Q.  I'm sorry, no.
2      A.  It's not statistically
3  significant.
4      Q.  But it's showing a trend?
5      A.  The point estimate is
6  elevated.
7          MR. BECK:  Can we have for
8      completeness the one you just
9      skipped over in there?
10         MR. KLINE:  The Mamdani
11     study.
12         THE WITNESS:  The Mamdani.
13         MR. KLINE:  1.00, neutral.
14 BY MR. KLINE:
15     Q.  Ingenix, 1.41 with
16 statistically significant confidence
17 intervals at all doses, correct?
18     A.  Yes.  And this was a
19 Merck-funded study.
20     Q.  Merck-funded study?
21     A.  Yes.  The Ingenix study was
22 funded by Merck.  I don't -- I was told
23 that the publication of this study was
24 being held up by Merck because of some

Page 529

1  sort of contractual arrangement that it
2  had with the Ingenix company.  And as a
3  result, it sort of delayed the
4  publication of those results.  That was
5  what the scuttlebutt was in the academic
6  community, and that was where I was told
7  about it.
8          MR. BECK:  I can't help but
9      I have to move to strike no matter
10     what.
11 BY MR. KLINE:
12     Q.  Does the Ingenix/Merck study
13 demonstrate a statistically significant
14 increased risk of heart attacks and
15 cardiac events with the drug Vioxx, their
16 own funded epidemiology study?
17         MR. BECK:  Object, beyond
18     the scope of cross.
19         THE WITNESS:  Now, this
20     study shows an overall increased
21     risk and an increased risk with
22     the lower doses of Vioxx as well.
23     If you were to look at this study
24     in terms of the timing of when

KS-000432

Confidential - Subject to Protective Order

Page 530

1    heart attacks occurred, this is
2    one of the studies that you can
3    look at the data and see that the
4    risk is present in a time period
5    of one year or less.
6  BY MR. KLINE:
7    Q.   And, sir, that study
8  eventually was published.  Was it
9  published in the peer-reviewed medical
10 literature?
11   A.   Yes, it was.
12   Q.   Does that very study funded
13 by Merck support your very conclusion
14 that the drug is unsafe?
15        MR. BECK:  Object to form
16   and scope.
17 BY MR. KLINE:
18   Q.   You may.
19   A.   This study supports that
20 position.
21   Q.   When was it published, do
22 you know, the Ingenix study?
23   A.   Golly.  Was it 2005?  The
24 first author is, I think, the Valentgas.

Page 531

1    Q.   Next, the Medi-Cal study,
2  sir, were you involved in that study?
3    A.   Yes.
4    Q.   We haven't even touched that
5  study today.
6        MR. BECK:  Therefore, I
7    object as being beyond the scope
8    of cross.
9        MR. KLINE:  You put that
10   document in front and selected
11   from it.  How could it possibly be
12   beyond the scope?
13 BY MR. KLINE:
14   Q.   Here's my question.  From
15 the very document that Mr. Beck wanted to
16 examine you on partially, and in the
17 spirit of optional completeness, a
18 doctrine under Federal Rule 106 and
19 actually the Texas civil -- the Texas
20 criminal code, under that code in the
21 spirit of getting it all out in front of
22 everyone, I ask you the next question.
23 Here it goes.
24        The Medi-Cal study --

Page 532

1        MR. BECK:  Are you proposing
2    that that is part of anything that
3    gets played to the jury?
4        MR. KLINE:  No.  Of course
5    not.  I was just trying not to go
6    off the record and make my
7    argument in case I needed to
8    remember it.  Thanks for being
9    patient with me, everyone.  It's
10   late.  It is 8:00 at night.
11 BY MR. KLINE:
12   Q.   The Medi-Cal study, 1.32
13 relative risk with a 1.22 to 1.42
14 confidence interval, statistically
15 significant, sir?
16   A.   Yes, very much so.
17   Q.   Increased relative risk of
18 heart attacks and other coronary events
19 when you take the drug Vioxx?
20   A.   Yes.
21        MR. BECK:  Object to the
22   form and scope.
23        THE WITNESS:  One other
24   point on this study is we showed a

Page 533

1    dose response of increased risk
2    going from the 12-and-a-half
3    milligram dose, which is the
4    lowest dose, up through doses of
5    50 milligrams per day.
6        MR. BECK:  Now I'm going to
7    state something for the record.
8    That one of the reasons why this
9    is objectionable on scope grounds
10   is I'm hearing volunteer testimony
11   about scuttlebutt in addition to
12   little details that if you had
13   asked on direct, I could have
14   crossed him on.  And I can't cross
15   him because he's volunteering this
16   to questions that are beyond the
17   scope of the cross.
18 BY MR. KLINE:
19   Q.   Dr. Graham, as to anything
20 that you would be trying to say that
21 would be something that someone said or
22 scuttlebutt or something like that,
23 please just refrain.  I just want to get
24 these questions out, just like Mr. Beck

KS-000433

Confidential - Subject to Protective Order

Page 534

1    did, frankly.
2        A.   Okay.
3        Q.   On these particular
4    questions, I'm going to have no problem
5    in this area to try to extract that
6    testimony to get to the core of what
7    you're saying.
8            My purpose is to examine
9    this entire document, which Mr. Beck had
10   examined you on.
11           Now, taking the totality of
12   the studies, not just the Ray figures for
13   1.02 for 25 milligram dose that you were
14   examined on, but taking the totality of
15   the studies, first of all, are many of
16   these studies in any event underpowered?
17           MR. BECK:  Object to the
18       form.
19           THE WITNESS:  These studies
20       are -- have much more power than
21       clinical trials do.  Some of these
22       studies have more power than
23       others.
24   BY MR. KLINE:

Page 535

1        Q.   Taking the totality of the
2    data, do you as epidemiologists take,
3    rather than just looking at the Ray
4    statistic for picking one thing off of
5    the chart, taking the totality of the
6    data at all doses, what does it tell you
7    about the drug Vioxx?
8        A.   Vioxx increases the risk of
9    heart attack.
10       Q.   And, sir, in the Ingenix
11   study, to pick that study, 1.41, compare
12   it in thousands.  If there were 1,000
13   people who were not on Vioxx, how many
14   incidents would there be of someone on
15   Vioxx per thousand?
16           MR. BECK:  I'm going to
17       object.
18   BY MR. KLINE:
19       Q.   Please, sir.
20           MR. BECK:  Same grounds as
21       before.
22           THE WITNESS:  The way to
23       describe it is if you had 1,000
24       people who had a heart attack not

Page 536

1        taking Vioxx, not taking any drug,
2        there would be 1410, roughly, who
3        had heart attacks on Vioxx.  It
4        would be an additional 410 heart
5        attacks for every 1,000 heart
6        attacks.
7    BY MR. KLINE:
8        Q.   Moving to the next area that
9    was opened up by Mr. Beck.
10           MR. BECK:  I just move to
11       strike.  I mean, I'm sorry, I
12       can't let you give speeches
13       between each one.  I object and
14       move to strike the colloquy.
15   BY MR. KLINE:
16       Q.   Next question, next area of
17   examination, sir.
18       A.   Different document?
19       Q.   Yes.  Different document.
20           I want to go to your
21   article -- actually, I want you to get
22   your article out in the context, that's
23   Graham Exhibit Number 4.  I want you to
24   get it out in the context -- in front of

Page 537

1    us in the context of Mr. Beck's
2    questioning about -- he put up a chart,
3    he didn't mark it, and I don't have
4    access to it, but it was the less than 25
5    versus remote use, less than 25 or
6    greater than 25 remote use.  Do you
7    remember the questioning in that area?
8        A.   Yes, I do.
9        Q.   He was asking you questions
10   about whether the Kaiser study showed
11   statistically significant increases of
12   relative risks.  And he broke it down
13   into a chart which he then examined you
14   on, and there was the technological
15   capacity.  I kind of liked it, actually,
16   where he would flash up the different
17   numbers as you went along?
18       A.   Yes, I remember.
19       Q.   Here's what I'd like to do.
20   Eventually there were actual published
21   numbers in the Kaiser report, correct?
22       A.   Correct.
23       Q.   And I'd like to turn to the
24   table, sir.  It's Table Number 3 on Page

KS-000434

Confidential - Subject to Protective Order

Page 538

1    478.
2        And I'd like to, following
3    the line of questioning that I had opened
4    up, talk to you about rofecoxib at all
5    doses.  Do you see it there, sir?
6    Rofecoxib, all doses.
7        A.   Yes, I do.
8        Q.   When you looked at all
9    doses -- and did Mr. Beck discuss with
10   you rofecoxib at all doses in your Kaiser
11   study?
12       A.   I don't recall that he did.
13       MR. BECK:  I'm going to
14   object as beyond the scope of
15   cross-examination.
16       MR. KLINE:  That's the
17   point.  That's the point.
18   BY MR. KLINE:
19       Q.   Let's look at the rofecoxib
20   on all doses rather than selecting out,
21   and I'll ask you a question.
22       Sir, when you look at
23   rofecoxib all doses --
24       A.   Are we talking about the top

Page 539

1    against remote use or the bottom --
2        Q.   I'm going to do both.  First
3    again, remote use, rofecoxib, all doses,
4    has a 1.39 relative risk with
5    statistically significant confidence
6    intervals.  I'm going to show the
7    operator where to go.
8        A.   Well, when I read that, it's
9    just on the cusp of statistical
10   significance.
11       Q.   Yes.  It's 1.39, with 1.05
12   to 1.83.
13       A.   Those are the unadjusted
14   numbers.
15       Q.   Please explain.
16       A.   That's the crude odds ratio.
17   We had to take into account the
18   distribution of risk factors for heart
19   disease and do what's called adjustment,
20   and so the column on -- the one to the
21   right of that where it says adjusted odds
22   ratios, that's sort of the final answer.
23   And there it's 1.34, and the lower bound
24   of the confidence interval is below 1,

Page 540

1    so, technically it's not statistically
2    significant.  But there's a p-value next
3    to it.  And what that p-value says is
4    that there's a 6.6 percent chance that
5    this result could have occurred by
6    chance, a 93.4 percent chance that it
7    didn't.  So, in other words, we go back
8    to my analogy.  We have 93 bullets in the
9    gun.
10       Q.   Let's go down below, sir,
11   again, following the same examination
12   that Mr. Beck did, only using your table
13   itself.  Rofecoxib greater than 25
14   milligrams.  Let's just roll out the
15   whole thing.  It is two down.  Rofecoxib
16   greater than 25 milligrams, 5.03 relative
17   risk, correct?
18       A.   Okay.  This is, again, an
19   unadjusted --
20       Q.   Yes.  Then we go to the
21   adjusted, 3.0.
22       A.   Correct.
23       Q.   Statistically significant?
24       A.   Yes.

Page 541

1        Q.   Does that mean, sir, for
2    every thousand heart attacks that occur
3    without Vioxx, 3,000 occur on Vioxx at
4    over 50 milligrams?
5        A.   That's what that would mean.
6        Q.   I'm sorry.  Over 25
7    milligrams.
8        A.   Yes.  That's what that would
9    mean.
10       Q.   Let's go down to the all
11   doses compared to Celebrex.  And if,
12   again, you can point him to it,
13   "rofecoxib, all doses."  Again, I'm just
14   following the same format that he
15   followed in his presentation on cross.
16       MR. BECK:  I object.  I
17   didn't do this comparison at all.
18   BY MR. KLINE:
19       Q.   Here's the question, sir.
20   1.59 when you adjust it, 1.59 relative
21   risk with statistically significant
22   confidence intervals.  Do you see it?
23       A.   Yes, I do.
24       Q.   That would mean for every

Confidential - Subject to Protective Order

Page 542

1  1,000 heart attacks on Celebrex, there
2  would be 1,590 on Vioxx, correct?
3       MR. BECK:  Object to the
4       form.
5       THE WITNESS:  That's what
6       that would mean.
7  BY MR. KLINE:
8       Q.   And for rofecoxib over 25,
9  to complete the four corners, 3.58,
10  meaning for every 1,000, and it's
11  statistically significant, correct?
12      A.   Yes, it is.
13      Q.   And by the way, that would
14  mean that for every 1,000 heart attacks
15  on Celebrex, somebody that was on
16  Celebrex, 3,580 heart attacks and
17  cardiovascular events on Vioxx, correct?
18      MR. BECK:  Object to the
19      form.
20      THE WITNESS:  That is
21      correct.
22  BY MR. KLINE:
23      Q.   Staggering, correct?
24      MR. BECK:  Object to the

Page 543

1       form.
2       THE WITNESS:  It was
3       staggering to me.
4  BY MR. KLINE:
5       Q.   Sir, when you look at these
6  kinds of numbers, these were your bottom
7  line conclusions, correct?
8       MR. BECK:  Object to the
9       form.
10  BY MR. KLINE:
11      Q.   Were these your bottom line
12  conclusions?
13      MR. BECK:  Same objection.
14      THE WITNESS:  These were my
15      bottom line conclusions.
16  BY MR. KLINE:
17      Q.   Not only yours, they were
18  those of you, Campen, Hui.  Who is Hui?
19      A.   Rita Hui was one of our
20  computer programmers from Kaiser.
21      Q.   Michael -- Michelle Spence?
22      A.   She's another computer
23  programmer from Kaiser.
24      Q.   Craig Cheetham?

Page 544

1       A.   He's a clinical pharmacist
2  from Kaiser.
3       Q.   Gerald Levy?
4       A.   He's a board certified
5  rheumatologist from Kaiser.
6       Q.   Stanford Shoor?
7       A.   He's a board certified
8  rheumatologist from Stanford.
9       Q.   And Wayne Ray?
10      A.   From Kaiser, I mean.
11      Q.   And Wayne Ray, the former
12  Merck consultant, correct?
13      MR. BECK:  Object to the
14      form.
15      THE WITNESS:  Yes.  And also
16      from Vanderbilt University.
17  BY MR. KLINE:
18      Q.   A prestigious school?
19      A.   Yes, very.
20      Q.   In this field?
21      A.   Very.
22      Q.   Next.
23      That's why you had to go to
24  Nashville for the ISPE conference.

Page 545

1       A.   I enjoyed Nashville.
2       Q.   Next.
3       You must be a country music
4  fan.
5       MR. BECK:  You could
6       actually get a room here.  What's
7       going on?
8       MR. KLINE:  What did you
9       say?
10      MR. BECK:  Let's move along.
11      MR. KLINE:  We are.
12  BY MR. KLINE:
13      Q.   Next issue.
14      Sir, I do want to focus on
15  something that Seligman said.  Do you
16  recall Seligman called your study an
17  excellent study and analysis of a complex
18  topic?
19      A.   I do.
20      Q.   Is that a fair way to
21  describe the study, an excellent study
22  and analysis of a complex topic?
23      MR. BECK:  Object to the
24      form.

KS-000436

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 546

1      THE WITNESS:  I thought that
2   it was a fair and accurate
3   assessment.
4   BY MR. KLINE:
5      Q.   Now, do you recall Mr. Beck
6   showing you various internal criticisms
7   as the study progressed internally in the
8   FDA?  Do you recall those line of
9   e-mails?
10      A.   Yes, I do.
11      Q.   Well, sir, you also had
12   e-mails which were between you and Dr.
13   Horton, the editor-in-chief of Lancet,
14   correct?
15      A.   That's correct.
16      Q.   Do you know who Elliot
17   Curfman is?
18      A.   I believe he's like a deputy
19   editor for the New England Journal of
20   Medicine.
21      Q.   I thought he's the
22   editor-in-chief.  Gregory Curfman?
23      A.   Greg Curfman.  I think he's
24   the deputy editor.  I thought that --

Page 547

1      Q.   All right.  Let's move on.
2   Horton, sir.
3   Editor-in-Chief of Lancet, correct?
4      A.   Yes.
5      Q.   Now, I just want to -- while
6   this was all going on, eventually there's
7   an endpoint.  The endpoint is that the
8   study is published, correct?
9      A.   Correct.
10      Q.   And by the way, the endpoint
11   for Vioxx is the drug is removed from the
12   market, correct?
13      A.   Correct.
14      Q.   So, who was right about this
15   whole thing, sir?
16      MR. BECK:  Object to the
17   form of the question.
18   BY MR. KLINE:
19      Q.   At the end of the day, who
20   was right?
21      MR. BECK:  Object to the
22   form of the question.
23   BY MR. KLINE:
24      Q.   Please, sir.

Page 548

1      A.   At the end of the day, I was
2   right.
3      One other thing to add, and
4   you can decide whether to strike it or
5   not.  In those e-mails, Dr. Galson
6   actually said to Dr. Horton that he
7   looked forward to reading our paper in
8   the peer-reviewed literature.
9      Q.   All right.
10      Now, next point, sir.
11      As far as Dr. Horton was
12   concerned --
13      You were correct for 12
14   other drugs, as well, weren't you?
15      A.   Yes.  It depends how you
16   want to count Bextra and Vioxx, but
17   correct.
18         - - -
19      (Whereupon, Deposition
20      Exhibit Graham-39, E-mails
21      FDACDER023033 - FDACDER023037,
22      was marked for identification.)
23         - - -
24   BY MR. KLINE:

Page 549

1      Q.   Now, Dr. Horton, sir, he
2   sent you an e-mail dated December 6,
3   2004 -- I'm sorry, November 15, 2004.
4      November 15, 2004.
5      A.   Does that have a number?
6      Q.   We're going to give it a
7   number.  It's an FDA CDER document, and I
8   want to ask you a couple of questions
9   about it very quickly.
10      Now, Mr. Beck had a
11   discussion with you of how -- Dr. Galson
12   was having discussions with Dr. Horton,
13   Galson from the FDA, Horton from the
14   Lancet, correct?
15      A.   Correct.
16      Q.   I would like the jury to see
17   what Dr. Horton thought of you and your
18   paper, which would be in the top e-mail
19   saying "David - This email from SG seems
20   to suggest that he has been misled by
21   others about your so-called refusal to
22   respond to AT's review."
23      What is "AT's review"?
24      A.   Anne Trontell.

KS-000437

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 550

1    Q.   "I think your e-mail
2  corrects the record clearly.  I think
3  also that the FDA is backing away from a
4  full scale public confrontation with
5  you."  Do you see that?
6    A.   Yes, I do.
7    Q.   You've seen this e-mail
8  before because you received it, correct?
9    A.   Correct.
10   Q.   It says -- do we not display
11  it?
12       MR. KLINE:  We are having
13       technical problems.
14  BY MR. KLINE:
15   Q.   It says here, "They know you
16  are a serious scientist, that we have
17  carefully reviewed your work, and that
18  they have to, in the end" -- "and that
19  they have to, in the end, follow the
20  science and not bend to their internal
21  politics."  Did I read that e-mail which
22  you received correctly?  Did I read it
23  correctly?
24   A.   Yes, you did.

Page 551

1    Q.   I see a smile on your face.
2  Why, sir?
3    A.   Because it's true.  And
4  because it addresses directly what I was
5  saying before about an organized campaign
6  by FDA officials to smear and discredit
7  me that began with my direct supervisors
8  and went as high as the commissioner of
9  FDA offering me a promotion to his office
10  all in the one-week period of time
11  preceding my Senate testimony.
12   Q.   Now, sir, when Dr. Horton
13  said to you "they," meaning the FDA,
14  "know you are a serious scientist," that
15  "we," the Lancet, "have carefully
16  reviewed your work, and that they have
17  to, in the end, follow the science and
18  not bend to their internal politics," at
19  the end of the day when your article was
20  published, indeed did that all come true?
21   A.   Yes and no.  I mean, you
22  have some of the end products of what
23  happened, but then you get memoranda such
24  as the one that Dr. Jenkins and Dr.

Page 552

1  Seligman wrote, which you can look at it
2  from the point of view of it being an
3  apologia that gives -- basically says all
4  the drugs have the same risk, so,
5  therefore, we don't offend any drug
6  company because basically we say they're
7  all the same, so then nobody has a
8  particular way to complain.  So, this
9  sets some of the record straight, but
10  then you have these other things that
11  persist despite that.
12   Q.   Now, sir, next area that was
13  discussed.
14       MR. BECK:  How much longer
15       do you have?
16       MR. KLINE:  I would say 15
17       minutes.
18  BY MR. KLINE:
19   Q.   Next issue is, you were
20  shown the memorandum from Seligman and
21  Trontell dated October 29.  It had an
22  executive summary.  Mr. Beck pointed out
23  some things that were critical.  Do you
24  recall that e-mail?

Page 553

1    A.   Yes, I do.
2    Q.   Now, was there a point by
3  point response by you?
4    A.   Yes, there was.  I mentioned
5  it before.  It's not among these
6  documents.
7    Q.   The point by point wasn't
8  shown to the jury, correct?
9    A.   As far as I'm aware.
10   Q.   Was the point by point
11  refutation of the scientific criticisms
12  that were made internally at the FDA, was
13  that shown to the Lancet, sir?
14   A.   Oh, it certainly was.
15   Q.   And it's a quite lengthy
16  document, isn't it?
17   A.   Yes.  It took me eight hours
18  to write.
19       MR. BECK:  Can I have a copy
20       of this?
21       MR. KLINE:  Yes, sure.
22       - - -
23       (Whereupon, Deposition
24       Exhibit Graham-40, E-mail

Confidential - Subject to Protective Order

Page 554

1      11-14-04, FDACDER022932 -
2      FDACDER022933; FDACDER021558 -
3      FDACDER021577 with attachment,
4      was marked for identification.)
5      - - -
6  BY MR. KLINE:
7      Q.   And my only point here,
8  because it certainly would take a long
9  time to go through it, if one were to go
10 through the document in bold type, for
11 every technical concern and consideration
12 that was raised, including what Mr. Beck
13 had referred to as inconsistencies and
14 data issues, did you address each and
15 every single one of them?
16     A.   Each and every one was
17 carefully and exhaustively explained.
18     Q.   Sir, did you also write an
19 extensive and exhaustive e-mail to Steve
20 Galson copying Seligman and Trontell
21 explaining in detail -- in fact, you talk
22 about eight solid hours completing your
23 response to each one of them?
24     A.   Yes, I did.

Page 555

1      Q.   Did your response, sir, to
2  all of the criticisms of Seligman and
3  Trontell satisfy the Lancet peer
4  reviewers and the editor-in-chief of
5  Lancet who published your study?
6          MR. BECK:  Object to the
7      form.
8          THE WITNESS:  Oh, it more
9      than satisfied them.
10 BY MR. KLINE:
11     Q.   But did it satisfy Merck?
12         MR. BECK:  Object to the
13     form of the question.
14         THE WITNESS:  I don't know
15     about that.  It must have
16     eventually satisfied FDA, as well,
17     because they eventually allowed
18     the study to be published without
19     fear of being fired.
20 BY MR. KLINE:
21     Q.   Now, there was another FDA
22 internal --
23         MR. BECK:  I'm going to
24     object.  We're now way past time

Page 556

1      and --
2          MR. KLINE:  I have about
3      three or four more areas to cover,
4      Phil.  I would appreciate the same
5      courtesy.
6          MR. BECK:  I went over by
7      about 15 minutes.  I think you are
8      about 40 minutes over.
9          MR. KLINE:  I don't think we
10     are that far over, otherwise, I'd
11     be hungrier.
12         MR. BECK:  Well, it is 8:30.
13         MR. KLINE:  I'm going to be
14     done in 10 minutes.  I promise
15     you.
16         - - -
17         (Whereupon, Deposition
18     Exhibit Graham-41, E-mails
19     FDACDER029127 - FDACDER029133,
20     was marked for identification.)
21         - - -
22 BY MR. KLINE:
23     Q.   Here we go.  The next
24 document I'd like to talk about.  There

Page 557

1  was another internal review of your paper
2  which was not discussed by Mr. Beck,
3  correct?  The -- how do you pronounce his
4  name?
5      A.   Stadel.
6      Q.   Who is Bruce Stadel?
7      A.   Bruce Stadel was, in my
8  opinion, the leading, most experienced
9  epidemiologist in all of FDA.  He was the
10 person who -- I sort of a very senior
11 epidemiologist at FDA.  I'm now the most
12 senior epidemiologist at FDA.  This is
13 the guy I went to when I had questions
14 about I'm not being sure about how to
15 analyze something or -- I hold him in
16 high esteem.
17     Q.   At the end of the day, sir,
18 marking this as Graham Exhibit Number
19 42 --
20     A.   This says 41.
21         MS. DAGOSTINO:  We already
22     marked it.
23         MR. KLINE:  We already
24     marked it.

**KS-000439**

Confidential - Subject to Protective Order

Page 558

1  BY MR. KLINE:
2      Q.  Exhibit Number 41 and on
3  Page 4 under recommendations.
4      A.  Yes.
5      Q.  The most senior
6  epidemiologist at the FDA, not Anne
7  Trontell, not Paul Seligman, not Dr.
8  Galson, but the senior, most senior
9  epidemiologist at the FDA says -- what
10  did he say about your study, sir?
11          MR. BECK:  I'm going to
12      object to the form, long colloquy
13      introducing the question.
14          THE WITNESS:  Dr. Stadel
15      said, "I think this is a very good
16      and important study and that the
17      results should be submitted for
18      publication."
19          Should I continue to read?
20  BY MR. KLINE:
21      Q.  No.  I mean, I'm fine with
22  it unless there's some reason to complete
23  it.
24          And that's what was done,

Page 559

1  correct?
2      A.  Ultimately, yes.
3      Q.  Sir, back to Exhibit 27.
4  We're preciously close to being done.
5          MR. BECK:  What's Exhibit
6      27?
7          MR. KLINE:  Exhibit 27,
8      Phil, is the memorandum from
9      Graham to Seligman, September 30,
10      '04.  You used it briefly.
11          MR. BECK:  Yes.
12  BY MR. KLINE:
13      Q.  Mr. Beck had asked you
14  questions about combining this with data.
15  Remember, you had a long discussion about
16  whether at the time there were only
17  27,785 cases as distinguished from the
18  larger number which you got later on in
19  your estimates.  That was the context of
20  the questioning.  Do you recall?
21      A.  Yes, I do.
22      Q.  Now, the question that I
23  have for you, sir, is what do you say in
24  the very last paragraph in your

Page 560

1  conclusions on Page 13, your bottom,
2  bottom line?
3      A.  The very last paragraph or
4  sentence?
5      Q.  Well, paragraph.
6      A.  Beginning with "Prior"?
7      Q.  Yes, sir.  Bates Number
8  22381.  Give us one minute to get it up
9  on screen.  Take your time to review it.
10          MR. KLINE:  We had to go to
11      a different presentation by way of
12      an Elmo here to get this document
13      to you.
14  BY MR. KLINE:
15      Q.  But your bottom line, would
16  you read it to the jury, sir, the report
17  that Mr. Beck had put in front of you.
18      A.  "Prior to today, my
19  conclusions regarding rofecoxib were that
20  high-dose use of the drug should be ended
21  and that lower-dose rofecoxib should not
22  be used by physicians or patients.  If
23  lower-dose rofecoxib remained on the
24  market, physicians and patients needed to

Page 561

1  understand that the risk of AMI and SCD"
2  that's acute myocardial infarction and
3  sudden cardiac death, "was substantially
4  increased and that there were safer
5  alternatives."
6  BY MR. KLINE:
7      Q.  And that's, sir, the way you
8  can tell people if there's an increased
9  risk and safer alternatives, is to put
10  what on to the label?
11      A.  Put a huge warning on it
12  that says exactly that.
13      Q.  Last thing, sir.
14          Music to counsel's ears.
15          MR. BECK:  But I've heard
16      that song several times before.
17          MR. KLINE:  But I never said
18      it exactly that way.  I said
19      preciously close.
20          Here we go.
21          I just have a video clip to
22      show to you.
23          MR. BECK:  I'm going to
24      object to showing a video clip,

KS-000440

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 562

1  especially when I don't have any
2  idea what it is.
3      MR. KLINE:  I think you will
4  know what it is.
5      THE WITNESS:  So, look at
6  the screen?
7      MR. BECK:  This is sand
8  bagging of the rankest order to
9  end a redirect examination with a
10  video clip.
11     MR. KLINE:  It is a video
12  clip from the Senate hearings
13  exactly in conformance with Judge
14  Fallon's order.  I'm going to play
15  a video clip, and I'm going to ask
16  you a question that relates to
17  your questions that you answered
18  to Mr. Beck.
19     MR. BECK:  And I'm going to
20  object.
21     MR. KLINE:  Exactly relating
22  to the questions.
23     There's an objection.  I've
24  stated my purpose, I've stated my

Page 563

1  basis.  Here it goes.
2      (Whereupon the following was
3  played:
4      "Vioxx is a terrible tragedy
5  and a profound regulatory failure.
6  I would argue that the FDA as
7  currently configured is incapable
8  of protecting America against
9  another Vioxx.  We are virtually
10  defenseless."
11 BY MR. KLINE:
12     Q.   Was that you, sir?
13     A.   It certainly was.
14     Q.   Was that Mr. Raymond
15  Gilmartin, former CEO, in the background
16  over your right shoulder?
17     MR. BECK:  I'm going to
18  object.  This has nothing to do
19  with anything done on
20  cross-examination.
21     THE WITNESS:  Yes, it was.
22  I introduced myself to him before
23  my testimony.
24 BY MR. KLINE:

Page 564

1      Q.   Sir, having had an
2  opportunity to testify here today on
3  direct and cross-examination, is there
4  anything that you answered on
5  cross-examination to Mr. Beck which
6  changes that very opinion that you gave
7  to the United States Congress?
8      MR. BECK:  Object to form
9  and to scope.
10     THE WITNESS:  Nothing
11  whatsoever.
12     MR. KLINE:  Last clip, sir.
13     (Whereupon the following was
14  played:
15     "Today in 2004 we're faced
16  with what may be the single
17  greatest drug safety catastrophe
18  in the history of this country."
19 BY MR. KLINE:
20     Q.   Is there anything, sir,
21  having been subjected to lawyers'
22  questions here, sir, for over seven,
23  pushing eight hours that changes the
24  opinion that you gave publicly to the

Page 565

1  senators in that hearing?
2      MR. BECK:  Object to the
3  form and also beyond the scope of
4  cross-examination.
5      THE WITNESS:  Nothing
6  whatsoever.
7      MR. KLINE:  Thank you, sir.
8  You've been patient with us.
9  Thank you very much.  No further
10  questions.  We're finished.
11     THE WITNESS:  Thank you and
12  good riddance.
13     THE VIDEOTAPE TECHNICIAN:
14  Stand by, please.  The time is
15  8:40.  We're off the record.
16     - - -
17     (Whereupon, the deposition
18  concluded at 8:40 p.m.)
19     - - -

KS-000441

Confidential - Subject to Protective Order

Page 566

```
1      C E R T I F I C A T E
2
3      I, LINDA L. GOLKOW, a Notary
       Public and Certified Shorthand Reporter
4      of the State of New Jersey, do hereby
       certify that prior to the commencement of
5      the examination, DAVID J. GRAHAM, M.D.,
       MPH was duly sworn by me to testify to
6      the truth, the whole truth and nothing
       but the truth.
7
8      I DO FURTHER CERTIFY that the
       foregoing is a verbatim transcript of the
9      testimony as taken stenographically by
       and before me at the time, place and on
10     the date hereinbefore set forth, to the
       best of my ability.
11
12     I DO FURTHER CERTIFY that I am
       neither a relative nor employee nor
13     attorney nor counsel of any of the
       parties to this action, and that I am
14     neither a relative nor employee of such
       attorney or counsel, and that I am not
15     financially interested in the action.
16
17
18
19     _____
       LINDA L. GOLKOW, CSR
20     Notary Number: 1060147
       Notary Expiration: 1-2-08
21     CSR Number: 30XI176200
       Dated: May 16, 2006
22
23
24
```

Page 567

```
1      ACKNOWLEDGMENT OF DEPONENT
2
3      I,_____, do
       hereby certify that I have read the
4      foregoing pages, 1 -569, and that the
       same is a correct transcription of the
5      answers given by me to the questions
       therein propounded, except for the
6      corrections or changes in form or
       substance, if any, noted in the attached
7      Errata Sheet.
8
9
10
11     _____
       DAVID J. GRAHAM, M.D., MPH    DATE
12
13
14
15
16     Subscribed and sworn
       to before me this
17     day of        , 20  .
18     My commission expires:
19
20     Notary Public
21
22
23
24
```

Page 568

```
1      - - - - - -
         E R R A T A
2      - - - - - -
3      PAGE  LINE  CHANGE
4      ____  ____  _____
5      ____  ____  _____
...
```

Page 569

```
1      LAWYER'S NOTES
2      PAGE  LINE
3      ____  ____  _____
...
```

KS-000442

Golkow Litigation Technologies - 877.DEPS.USA