Exhibit "35"

Confidential - Subject to Protective Order

Page 869

1                    SUPERIOR COURT OF NEW JERSEY
                    LAW DIVISION - ATLANTIC COUNTY
2                          -   -   -
3    IN RE:   VIOXX LITIGATION : CASE NO. 619
4                          -   -   -
                     CONFIDENTIAL
5
              SUBJECT TO PROTECTIVE ORDER
6
7                          -   -   -
                      June 30, 2005
8                          -   -   -
9         Continued videotape deposition of DEBORAH
10   SHAPIRO, Dr.P.H., held in the offices of Morgan
11   Lewis, 1701 Market Street, Philadelphia,
12   Pennsylvania 19103, commencing at 9:20 a.m., on the
13   above date, before Linda L. Golkow, a
14   Federally-Approved Registered Diplomate Reporter and
15   Certified Shorthand Reporter.
16
17                         -   -   -
18
19
20
21
22
23             ESQUIRE DEPOSITION SERVICES
              1880 John F. Kennedy Boulevard
24                    15th Floor
              Philadelphia, Pennsylvania 19103
25                  (215) 988-9191

**KS-000445**

Confidential - Subject to Protective Order

Page 870

```
1   A P P E A R A N C E S :
2
3       KLINE & SPECTER, P.C.
        BY: SHANIN SPECTER, ESQUIRE
4           and
        THOMAS R. KLINE, ESQUIRE
5           and
        LISA DAGOSTINO, M.D, J.D.
6           and
        R. MATTHEW PLONA, ESQUIRE
7       19th Floor
        1525 Locust Street
8       Philadelphia, Pennsylvania 19102
        (215) 772-1000
9       Counsel for the Plaintiffs
10
11      LOCKS LAW FIRM PLLC
        BY:  MARK P. WEINGARTEN, ESQUIRE
12      110 East 55th Street
        New York, New YOrk 10022
13      (212) 838-3333
        Counsel for Plaintiffs
14
15
        GOFORTH LEWIS SANFORD LLP
16      BY:  CARLENE RHODES LEWIS, ESQUIRE
            and
17      SHELLY A. SANFORD, ESQUIRE
        Suite 2200
18      1111 Bagby
        Houston, Texas 77002
19      (713) 650-0022
        Counsel for Plaintiffs
20      (By Telephone)
21
22      KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
        BY:  BRIAN L. CONDON, ESQUIRE
23      1633 Broadway
        New York, New York 10019-6799
24      (212) 506-1700
        Counsel for Plaintiffs
25      (By Telephone)
```

Page 871

```
1   A P P E A R A N C E S :  (CONTINUED)
2
3       HUGHES HUBBARD & REED, LLP
        BY:  THEODORE V.H. MAYER, ESQUIRE
4           and
        LINDA B. EPSTEIN, ESQUIRE
5       One Battery Park Plaza
        New York, New York 10004-1482
6       (212) 837-6000
        Counsel for Merck & Co., Inc.
7       and the Witness, Deborah Shapiro, Dr.P.H.
8
9       WILLIAMS & CONNOLLY LLP
        BY: DAVID S. BLATT, ESQUIRE
10      725 Twelfth Street, N.W.
        Washington, D.C. 20005
11      (202) 434-5538
        Counsel for Merck & Company, Inc.
12      and the Witness, Deborah Shapiro, Dr.P.H.
13
14          - - -
15
16  A L S O  P R E S E N T :
17
18      SUZANNE M. GREGORY, ESQUIRE
        Merck & Co., Inc.
19      351 N. Sumneytown Pike
        North Wales, PA 19454-2505
20      (267) 305-6331
21
            - - -
22
23
24
25
```

Page 872

```
1           - - -
2        I N D E X
3   WITNESS               PAGE NO.
4   DEBORAH SHAPIRO, DR.P.H.
5     By Mr. Mayer           875
6     By Mr. Specter         964
7           - - -
8      E X H I B I T S
9   NO.     DESCRIPTION        PAGE NO.
10  Shapiro-78  Memo 10-4-99, "Interim    888
        Analysis of VIGOR -
11      Unblinded Minutes"
        MRK-CAI420369640 -
12      MRK-CAI420369641
13  Shapiro-79  Memo 11-18-99, "Interim   893
        Non-Endpoint Safety
14      Analysis of VIGOR -
        Unblinded Minutes"
15      LEH0114734 -
        LEH0114741
16
    Shapiro-80  E-mails            902
17      MRK-AAB060594 -
        MRK-AAB060595
18
    Shapiro-81  Memo 1-26-01       916
19      "Cardiovascular
        Meta-analysis: Examination
20      of Heterogeneity Among
        Studies"
21      MRK-AAB0095045 -
        MRK-AAB0095049
22
    Shapiro-82  Letter 1-8-01 with  918
23      attachments
        MRK-AGU0003701 -
24      MRK-AAB0003763
25  Shapiro-83  Letter 9-12-01     925
        MRK-AAB0009461
```

Page 873

```
1   Shapiro-84  "Risk of cardiovascular  926
        events and rofecoxib:
2       Cumulative meta-analysis,"
        (Juni, et al), Published
3       online November 5, 2004
        MRK-ABY0185233 -
4       MRK-ABY0185241
5   Shapiro-85  Memo 11-21-96 "Anticipated  936
        consequences of NSAID
6       antiplatelet effects on
        cardiovascular events and
7       effects of excluding
        low-dose aspirin use in the
8       Cox-2 GI Outcomes
        Megatrial"
9       MRK-AAX0002413 -
        MRK-AAX0002420
10
    Shapiro-86  "Standard Operating    946
11      Procedure for the
        Surveillance, Monitoring,
12      and Adjudication of Acute
        Thromboembolic Vascular
13      Events in Clinical Trials
        of COX-2 Specific
14      Inhibitors"
        MRK-AAB0029224 -
15      MRK-AAB0029273
16  Shapiro-87  Letter 5-10-02 with    963
        attachments
17      MRK-S0420000002 -
        MRK-S0420000008
18
    Shapiro-88  "Full Meta-Analysis"   972
19      MRK-ACF0000845 -
        MRK-ACF0000924
20
    Shapiro-89  E-mails            1008
21      MRK-ABH0017846 -
        MRK-ABH0017847
22
23
24
25
```

KS-000446

Confidential - Subject to Protective Order

Page 874

1            - - -
2            MR. MAYER:  I'm Ted Mayer with Hughes
3    Hubbard & Reed, here representing Merck.
4            With me is Linda Epstein also from
5    Hughes, Hubbard & Reed.
6            MR. BLATT:  David Blatt from Williams
7    & Connolly, representing Merck.
8            MS. GREGORY:  Sue Gregory from Merck.
9            MR. SPECTER:  Shanin Specter from
10   Kline & Specter, representing certain New Jersey
11   plaintiffs.
12           With me from Kline & Specter are Lisa
13   Dagostino and Matt Plona.
14           THE VIDEOTAPE TECHNICIAN:  We are now
15   on the record.  This is the continuation of the
16   deposition of Deborah Shapiro, Dr.P.H.
17           Today's date is June 30, 2005, and
18   the time is 9:20 a.m.
19           This is Videotape Number 1.
20           The court reporter will now swear in
21   the witness.
22           - - -
23           DEBORAH SHAPIRO, Dr.P.H., after
24        having been duly sworn, was
25        examined and testified as follows:

Page 875

1            - - -
2            EXAMINATION
3            - - -
4    BY MR. MAYER:
5        Q.   Good morning, Dr. Shapiro.  Could you
6    please introduce yourself.
7        A.   My name is Deborah Shapiro.
8        Q.   My name is Ted Mayer.  I'm a lawyer
9    representing Merck in this litigation.  I'm going to
10   ask you some questions this morning, starting with
11   where do you live, Dr. Shapiro?
12       A.   I live in Edison, New Jersey.
13       Q.   Are you married?
14       A.   Yes, I am.
15       Q.   Do you have children?
16       A.   Yes.
17       Q.   What do you have?
18       A.   I have two sons, aged 12 and 16.
19       Q.   Where do you work, Dr. Shapiro?
20       A.   I work at Merck in Rahway.
21       Q.   What do you do for Merck?
22       A.   I'm a biostatistician.
23       Q.   Could you tell us generally what
24   biostatisticians do?
25       A.   Biostatisticians design and analyze

Page 876

1    clinical trials, determining the results of those
2    studies.
3        Q.   Dr. Shapiro, let's step back for a
4    moment.  Could you tell us about your education
5    after high school?
6        A.   Sure.  I attended the University of
7    California and got a Bachelor's Degree there.  I did
8    a fifth year, which is required in California, to
9    obtain a secondary teaching credential for high
10   school math.  And then I attended Columbia
11   University, where I got both my Master's and
12   Doctorate in biostatistics.
13       Q.   How long have you worked at Merck?
14       A.   About 20 years.
15       Q.   How did you come to work at Merck?
16       A.   Well, I had worked at a
17   pharmaceutical company in California in a different
18   capacity, so, I was very interested in
19   pharmaceutical research.  When I started school my
20   first summer, I was looking for a summer job, and
21   Merck had an internship, so, I worked as an intern
22   there, and I thought it was a wonderful place.  I
23   returned the next summer, I worked part time there
24   while I was in school.  When I finished my
25   dissertation, they offered me a full-time job, and I

Page 877

1    was very happy to accept that.
2        Q.   What, if anything, attracted you to
3    the pharmaceutical industry as a place to work?
4        A.   To me it seemed to be, in my capacity
5    as a biostatistician, the perfect melding of science
6    and math.  I wanted to do something that was of
7    value to people that improved lives.  I enjoyed
8    thoroughly the research aspects and making a
9    contribution.
10       Q.   We're here today to talk primarily
11   about Vioxx, and you've worked on some Vioxx trials,
12   have you not?
13       A.   Yes.
14       Q.   Could you describe, have you worked
15   on any trials of other drugs besides Vioxx?
16       A.   Yes.
17       Q.   Could you describe briefly a couple
18   of the large clinical trials you may have worked on
19   that involved drugs other than Vioxx?
20       A.   Sure.  When I first started full time
21   at Merck, I worked on two drugs called Mevacor and
22   Zocor.  They are known as statin drugs, and they
23   were the first of their kind, and they made an
24   enormous difference in people's lives.  They prevent
25   cardiovascular morbidity and mortality, and they

KS-000447

Confidential - Subject to Protective Order

Page 878

1  have a very important effect. So, I led the Zocor
2  original filing, and I worked on a megatrial for
3  Mevacor that showed a 37 percent reduction in
4  cardiovascular events. Those were two important
5  drugs I worked on.
6      I also worked on Fosamax. Fosamax is
7  a drug for osteoporosis, and an analysis I did for
8  that showed a 50 percent reduction in fractures.
9  And for women, elderly women, fractures lead to a
10 great deal of morbidity and mortality. So, that was
11 another product I worked on.
12     Q.    How did you first become involved
13 with Vioxx?
14     A.    When the VIGOR study, which is the
15 GI, gastrointestinal outcomes study, was going to
16 begin, it needed an unblinded statistician. I was
17 in charge of resources for my department, so, I was
18 aware of the fact that it needed someone to work on
19 it, and there wasn't anyone really available at the
20 time, but it also seemed to be an interesting,
21 challenging, exciting assignment, so I volunteered
22 for it.
23     Q.    Did that study have a name?
24     A.    VIGOR.
25     Q.    Approximately when was it that you

Page 879

1  first became involved with the VIGOR trial?
2      A.    1998.
3      Q.    What drugs were to be compared in the
4  VIGOR study?
5      A.    Vioxx was being compared to
6  naproxen.
7      Q.    What was the purpose of comparing
8  those medicines in the VIGOR study?
9      A.    We wanted to verify and prove the
10 COX-2 hypothesis, which was that these very serious
11 gastrointestinal side effects that are known to be
12 associated with traditional NSAIDs, nonsteroidal
13 anti-inflammatory drugs like ibuprofen and naproxen
14 and so on, to verify that the COX-2 inhibitor Vioxx
15 actually reduced the events of these serious
16 perforations, ulcers, obstructions and bleeds.
17     Q.    So, what types of gastrointestinal
18 side effects were tested in the VIGOR study?
19     A.    The ones I mentioned, the
20 perforations, ulcers, obstructions and bleeds, also
21 symptoms, gastrointestinal symptoms.
22     Q.    Are those common side effects of
23 anti-inflammatory drugs?
24     A.    Yes, they are a known side effect.
25     Q.    Was there a data and safety

Page 880

1  monitoring board or DSMB for the VIGOR trial?
2      A.    Yes.
3      Q.    Can you tell us what a data safety
4  monitoring board, a DSMB, is?
5      A.    Data safety monitoring board is a
6  group of experts, and in this case, external
7  experts, who are in charge of monitoring the safety
8  of the patients in the trial as the trial is ongoing
9  and the data is coming in.
10     Q.    What do you mean by "external
11 experts"?
12     A.    They were not Merck employees.
13     Q.    Was there a DSMB for the VIGOR trial?
14     A.    Yes.
15     Q.    Were the members of the DSMB medical
16 doctors?
17     A.    Four of them were medical doctors,
18 and the statistician had a Ph.D.
19     Q.    Just to be clear, Dr. Shapiro, are
20 you a medical doctor?
21     A.    No.
22     Q.    What is your doctorate?
23     A.    My doctorate is in biostatistics.
24     Q.    Did the DSMB in VIGOR meet from time
25 to time?

Page 881

1      A.    Yes.
2      Q.    How many times did it meet?
3      A.    There were a total of four meetings.
4  The first one was kind of a setup meeting and an
5  open meeting, and then there were three other
6  meetings that were closed meetings.
7      Q.    Did you attend all of those meetings?
8      A.    Yes.
9      Q.    Could the DSMB make decisions or
10 recommendations regarding the VIGOR study?
11     A.    They could make recommendations.
12 They weren't charged with making the decisions.
13 They would refer any recommendations to a different
14 external group, but they were charged with making
15 any recommendations they wanted to alter the conduct
16 of the trial.
17     Q.    What kind of recommendations could
18 they make?
19     A.    They can recommend stopping a trial,
20 or they can recommend things as changing the entry
21 criteria of a trial or asking for different analyses
22 than were previously planned. Pretty much anything
23 they want to.
24     Q.    What role did you have in the VIGOR
25 study?

**KS-000448**

Confidential - Subject to Protective Order

Page 882

1     A.     I was a nonvoting member, and my role
2  was to perform analyses and to provide any
3  information that the DSMB required.
4     Q.     So, you were a non -- I asked you
5  what your role in the study was, but I think you
6  answered what your role in the DSMB was.
7     A.     I'm sorry.
8     Q.     Let me break that down to two
9  questions.
10          First, what was your role in the
11  VIGOR study as a whole?
12     A.     I was the unblinded statistician in
13  the VIGOR study, which meant that I performed
14  analyses.  And for the VIGOR trial, I was considered
15  to report to the DSMB and not to Merck for the
16  purposes of that trial.
17     Q.     What does it mean to be unblinded?
18     A.     That meant I was the only person at
19  Merck who knew what treatment people were taking.  I
20  knew the treatment assignments for all of the
21  individual patients.  No one else at Merck knew any
22  information at all about treatment assignment.  They
23  didn't know that this group of people was in one
24  treatment group and this group was in another.  They
25  just had no information at all.  Only I knew.

Page 883

1     Q.     You started to tell me about your
2  role with the DSMB specifically.  Could you explain
3  that again, please.
4     A.     Sure.  As I said, for the purposes of
5  the trial, I reported to the DSMB and did whatever
6  they needed me to do.  I performed analyses of the
7  interim data for their review, and if there was any
8  information that I was aware of, because I was at
9  Merck and knew what was going on with the rest of
10  the program, anything relevant to the trial, those
11  were things I informed them about.
12     Q.     Did you provide reports to the DSMB
13  of the data broken down by treatment group during
14  the course of the VIGOR trial?
15     A.     Yes, I did.
16     Q.     Did anyone else at Merck have access
17  to that data during the trial broken down by
18  treatment group?
19     A.     No one else did.
20     Q.     Did the DSMB ever vote on anything
21  while the VIGOR trial was ongoing?
22     A.     Yes.
23     Q.     What votes did they -- what did they
24  vote on?
25     A.     Typically in one of these situations,

Page 884

1  there will always be a vote on whether or not to
2  continue the trial as planned.  And so those were
3  the kinds of votes we had.
4     Q.     Now, were you still a Merck employee
5  during the VIGOR trial?
6     A.     Yes.
7     Q.     But who did you report to for
8  purposes of your analysis of the VIGOR data during
9  the VIGOR trial?
10     A.     It states in our guidelines and in my
11  training, when you serve in this role, special role
12  as unblinded statistician, you consider that you
13  report to the data safety monitoring board for that
14  trial, and you do not report to Merck.
15     Q.     Could you share the unblinded data
16  with anyone outside of the data safety monitoring
17  board?
18     A.     No.
19     Q.     Did you share it with anyone outside
20  the data safety monitoring board during the trial?
21     A.     No.
22     Q.     How did the DSMB learn of data from
23  the trial?
24     A.     I prepared written reports with
25  tables and figures and results of analyses, and I

Page 885

1  sent these out to them about a week before the
2  meeting so they had time to review them, and I sent
3  them with prepaid return FedEx envelopes so they
4  would come back to me after the meeting.
5     Q.     What sort of information was in those
6  data packages that you provided to the DSMB?
7     A.     Well, there was a certain amount of
8  information about patient status, how many patients
9  were enrolled and what age and gender and race, how
10  many patients had dropped out of the trial from the
11  different treatment groups, for what reason, and
12  then for the special analysis of the
13  gastrointestinal data, we only did that once, at a
14  planned formal interim analysis.  I provided all the
15  information, planned analyses of that data --
16          MR. CONDON:  Brian Condon, Kasowitz,
17  Benson, Torres & Friedman, New Jersey plaintiffs,
18  has joined the conference.
19          THE WITNESS:  So, I provided the
20  gastrointestinal information in that one report.  In
21  all the reports, I provided information on safety
22  data, adverse experience count data, blood pressure
23  data and so on.  So, many, many analyses of safety.
24  BY MR. MAYER:
25     Q.     Were those safety analyses broken

KS-000449

Confidential - Subject to Protective Order

Page 886

1  down by treatment group, in other words, by which
2  medicine the events occurred in?
3      A.     They were broken down by treatment
4  group.  They were labeled treatments A and B.
5      Q.     How did you obtain that data?
6      A.     There were different sources for the
7  data.  The treatment group assignment -- only I had,
8  and I had it on a password protected disk that I
9  used and kept locked when it wasn't in use.  So,
10  that's where the treatment assignments were.  I
11  combined that with information from the official
12  Merck database and also from this WAES database that
13  we mentioned the other day, it is called WAES.  It
14  is worldwide adverse experience reporting system for
15  doing prompt reports.  It's more up to date than the
16  official database in terms of adverse experience
17  data, so, I used that data, the official database
18  data and the treatment group assignments and merged
19  that together.
20      Q.     Did the DSMB know which group was
21  Vioxx and which group was naproxen?
22      A.     They did.  They had stated early on
23  that they didn't want to be told that, but the first
24  analysis was of the gastrointestinal data, and it
25  showed very strong beneficial effects of treatment

Page 887

1  A, which they assumed was Vioxx and rightly assumed
2  was Vioxx.  If they were assuming incorrectly, it
3  would have been important for me to tell them that
4  they were incorrect because it was showing an
5  important benefit.  So, they assumed all the way
6  through that treatment A was Vioxx and treatment B
7  was naproxen.
8      Q.     Was that assumption correct?
9      A.     Yes.
10      Q.     When was the first meeting where data
11  from the trial was discussed?
12      A.     It was in October of 1999.
13      Q.     About how long had the VIGOR trial
14  been going on at that point?
15      A.     I believe the first patient had been
16  entered in January of that year, and there was a
17  data cutoff in September for that October meeting,
18  so, it had been going on for about nine months.
19      Q.     Dr. Shapiro, I'm going to hand you a
20  document that's been marked -- that we will ask be
21  marked as Shapiro Exhibit 78.  We provided a copy
22  also to the plaintiff's counsel.
23      MR. MAYER:  Would the reporter mark
24  this as Exhibit 78, please.
25            - - -

Page 888

1      (Whereupon, Deposition Exhibit
2  Shapiro-78, Memo 10-4-99, "Interim
3  Analysis of VIGOR - Unblinded Minutes,"
4  MRK-CAI420369640 - MRK-CAI420369641, was
5  marked for identification.)
6            - - -
7  BY MR. MAYER:
8      Q.     Dr. Shapiro, could you identify
9  Exhibit 78 for the record, please?
10      A.     Yes.  It's the minutes from the first
11  meeting where we had data to present and review, and
12  it's the meeting where we discussed the
13  gastrointestinal analysis.
14      Q.     This document bears Bates Number
15  MRK-CAI420369640 to 41.
16            What's the date of the minutes?
17      A.     October 4, 1999.
18      Q.     When did the meeting take place?
19      A.     The previous day, October 3rd.
20      Q.     Did you attend that meeting, Dr.
21  Shapiro?
22      A.     Yes.
23      Q.     Had there been any reports of
24  gastrointestinal events by that time?
25      A.     Yes.

Page 889

1      Q.     Did you provide that data to the
2  DSMB?
3      A.     Yes, I did.
4      Q.     How would you characterize those
5  results?
6      A.     They were very positive.  When you do
7  this type of analysis, you set up some criteria for
8  what might cause you to stop a trial for early --
9  for strong and dramatic benefit for the primary
10  endpoint, which was called confirmed PUBs, and those
11  are those perforations, ulcers and bleeds.  The
12  primary endpoint of confirmed PUBs had actually
13  crossed that boundary and met the criteria for
14  stopping the trial.  But we had another criteria
15  which was for confirmed complicated PUBs.  The FDA
16  was very interested in this endpoint, and we also
17  needed strong evidence on that endpoint, and while
18  it was close, it didn't cross the boundary and meet
19  the criteria for stopping the trial.  So, there was
20  about a 50 percent reduction in events.
21      Q.     Why would you stop a trial based on
22  the benefit of a medicine?
23      A.     If a medicine is having a strong
24  benefit, you would stop the trial because the
25  patients in the other treatment group aren't getting

KS-000450

Confidential - Subject to Protective Order

Page 890

1 that benefit, and you want to be able to make it
2 available to them, but also because you want to make
3 that information known to the public so they also
4 can benefit from that effect.
5     Q.    Had there been any reports of
6 cardiovascular events in patients in the VIGOR trial
7 by October 1999?
8     A.    Yes.
9     Q.    Did you provide that data to the DSMB
10 as well?
11    A.    Yes, I did.
12    Q.    Was there a difference at that point
13 in the rate of cardiovascular events or the number
14 of cardiovascular events between people taking Vioxx
15 and people taking naproxen?
16    A.    Yes, there was.
17    Q.    At the October 1999 meeting, did
18 anyone on the DSMB express any concern about the
19 cardiovascular results?
20          MR. SPECTER:  Objection.
21 BY MR. MAYER:
22    Q.    You may answer.
23    A.    No, they didn't.
24    Q.    In your experience, are the early
25 results in a trial always the same as what ends up

Page 891

1 being the final results?
2     A.    No.  As a matter of fact, they are
3 often quite different.  What you see early on often
4 changes in the course of a trial.  Early events
5 often are not indicative of what will happen later.
6     Q.    Did the members of the DSMB take a
7 vote at the October 1999 meeting as to whether the
8 trial should continue?
9     A.    Yes, they did.
10    Q.    What was that vote?
11    A.    It was a unanimous vote, five to
12 zero, to continue the trial as designed.
13    Q.    Did you have any say in that vote?
14    A.    No.
15    Q.    Did anyone at Merck have any say in
16 that vote?
17    A.    No.
18    Q.    When was the DSMB's next meeting?
19    A.    In November of 1999.
20    Q.    Did you provide any data to the DSMB
21 prior to that November 1999 meeting?
22    A.    Yes.
23    Q.    What did you provide to them?
24    A.    The focus of this was now on safety,
25 not the gastrointestinal events, which are also

Page 892

1 safety, but it was exclusive of the gastrointestinal
2 events, so, it was general safety in addition to the
3 same kinds of information I described earlier about
4 discontinuations and demographics, baseline
5 characteristics, but the focus was on safety.
6     Q.    Was that part of any plan that had
7 been arrived at in advance?
8     A.    Yes.
9     Q.    Between the October and -- so, what
10 did you provide to the DSMB prior to the meeting?
11    A.    I provided another report with
12 updated information.  It had the adverse experience
13 data, blood pressure data, et cetera.
14    Q.    Before that meeting, did anyone at
15 the DSMB ask you to do anything?
16    A.    Yes.
17    Q.    Who asked you?
18    A.    Dr. Jim Neaton.  He was the
19 statistician, the external statistician on the
20 board.
21    Q.    What did he ask you to do?
22          MR. SPECTER:  Objection, calls for
23 hearsay.
24 BY MR. MAYER:
25    Q.    You may answer.

Page 893

1     A.    He asked me to perform a number of
2 additional analyses of the cardiovascular data.
3     Q.    What analyses did you prepare, if
4 any?
5     A.    I prepared all the analyses that he
6 requested.
7               - - -
8          (Whereupon, Deposition Exhibit
9          Shapiro-79, Memo 11-18-99, "Interim
10         Non-Endpoint Safety Analysis of VIGOR -
11         Unblinded Minutes," LEH0114734 -
12         LEH0114741, was marked for
13         identification.)
14              - - -
15 BY MR. MAYER:
16    Q.    Let me show you a document that we've
17 marked Shapiro Exhibit 79.  It bears Bates Number
18 LEH0114734 through 741 and ask if you can identify
19 that, please.
20    A.    Yes.  These are the minutes from the
21 November 17 meeting.
22    Q.    I noticed that after the first two
23 pages of minutes there are some charts or data,
24 several pages of charts that are attached.  Could
25 you identify what those are?

KS-000451

Confidential - Subject to Protective Order

Page 894

1     A.     Those are the additional analyses
2  that Dr. Neaton asked me to perform.  I attached
3  them for the benefit of the members who had not yet
4  seen them because they came after the report.
5     Q.     Were the cardiovascular events in the
6  VIGOR trial a subject of discussion in the November
7  1999 DSMB meeting?
8     A.     Yes.
9     Q.     Could you characterize briefly what
10 was covered in the DSMB's discussion of the data?
11        MR. SPECTER:  Objection, calls for
12 hearsay.
13 BY MR. MAYER:
14    Q.     You may answer.
15    A.     The focus of the discussion was on
16 the cardiovascular events and the difference between
17 treatments A and B for that data.  There were more
18 events on treatment A.
19    Q.     What was the difference at that point
20 in time?
21    A.     There were 52 patients on Vioxx and
22 29 patients on naproxen who had serious
23 cardiovascular adverse experiences.
24    Q.     Were these confirmed events?
25    A.     No.

Page 895

1     Q.     How would you characterize them?
2     A.     These are events that are reported by
3  the study investigators, and they were part of this
4  prompt reporting system to make them more up to
5  date.  They were considered serious by the
6  investigator based on various criteria for judging
7  that.  They were their opinion of what the event had
8  been.  They weren't -- they had not yet been
9  reviewed by outside expert adjudicators.  They were
10 the investigator's opinion of what the event was.
11    Q.     What was the reaction of the DSMB
12 members to the difference in the number of
13 cardiovascular events as of this November 1999
14 meeting?
15        MR. SPECTER:  Objection, calls for
16 hearsay.
17 BY MR. MAYER:
18    Q.     You may answer.
19    A.     They were, of course, concerned about
20 the events and wanted to investigate them.  But they
21 also expressed the belief that this could well be
22 due to what the clinicians felt was a known
23 cardioprotective effect of naproxen and noted that
24 you couldn't distinguish in this trial the benefit
25 of one drug versus harm from another drug.

Page 896

1     Q.     Who raised the possibility that
2  naproxen could be cardioprotective?
3        MR. SPECTER:  Objection, calls for
4  hearsay.
5  BY MR. MAYER:
6     Q.     You may answer, Doctor.
7     A.     To the best of my recollection, it
8  was Dr. Weinblatt.
9     Q.     Did you, yourself, raise this idea or
10 this topic with the DSMB at any time?
11    A.     No, I did not.
12    Q.     Before this meeting with the VIGOR
13 DSMB in November of 1999, did you have any
14 information about naproxen being potentially
15 cardioprotective?
16    A.     No, other than I'm not positive when
17 I read that memo from Dr. Musliner that raised the
18 possibility.  I don't recall when I first read it,
19 but I know at this meeting that I did not know that
20 that was a possibility.  If I had read it, I didn't
21 remember it.
22    Q.     Did you mention anything about that
23 in this meeting?
24    A.     No.
25    Q.     Did you mention anything about that

Page 897

1  at any time to the members of the DSMB or any member
2  of the DSMB?
3     A.     No.
4     Q.     The minutes say, I'm referring to
5  Exhibit 79, "there is no ability in this trial to
6  distinguish between a potentially harmful effect of
7  Treatment A and the cardiovascular protective effect
8  of Treatment B due to its anti-platelet effects."
9  Do you see that?
10    A.     Yes.
11        MR. SPECTER:  Objection, failure to
12 read the entire sentence.
13 BY MR. MAYER:
14    Q.     Does that reflect what was said at
15 the meeting?
16    A.     Yes.
17    Q.     Let me just address Mr. Specter's
18 objection.  I will read this again.
19        "However, it was also noted that
20 there is no ability in this trial to distinguish
21 between a potentially harmful effect of Treatment A
22 and a cardioprotective effect of Treatment B due to
23 its anti-platelet effects."  Is that what the
24 minutes reflect?
25    A.     Yes.

KS-000452

Confidential - Subject to Protective Order

Page 898

1    Q.    Does that reflect the discussion of
2  the members of the DSMB at the meeting?
3    A.    Yes.
4    Q.    Did the DSMB vote at this November
5  1999 meeting on whether to stop the VIGOR trial?
6    A.    It doesn't record a vote, but there
7  was also concurrence by all members that they wanted
8  to, and it does reflect that the members wanted to
9  continue the trial.
10          MR. SPECTER:  Objection,
11  nonresponsive.
12  BY MR. MAYER:
13    Q.    Did you or anyone at Merck have any
14  say in that decision of the DSMB?
15    A.    No.
16    Q.    After the November 1999 meeting, did
17  the DSMB take any other action with respect to the
18  difference in the number of cardiovascular events
19  between the two treatment groups in the VIGOR trial?
20    A.    Yes.  They decided that they wanted
21  to do an additional analysis in about a month to
22  further examine the data, and they requested certain
23  additional analyses be done at that time.
24    Q.    Did they make any request of you, Dr.
25  Shapiro?

Page 899

1    A.    Yes.
2    Q.    What did they ask you to do?
3          MR. SPECTER:  Objection, calls for
4  hearsay.
5          THE WITNESS:  They asked me to
6  perform those analyses.  They wanted to look at
7  several subgroups of patients who were at higher
8  versus lower risk, and they had certain specific
9  requests of what kinds of endpoints they wanted me
10  to look at.  And so I did those analyses and
11  provided it to them.
12  BY MR. MAYER:
13    Q.    What was the next meeting of the
14  DSMB?
15    A.    I believe it was December -- yes, it
16  was December 20.
17    Q.    Those analyses you referred to, did
18  you provide those in advance of the meeting to the
19  members of the DSMB?
20    A.    Yes.
21    Q.    Let me show you a document that's
22  been marked Shapiro Exhibit 20, bearing Bates
23  Numbers MRK-AFL0000899 through 92 and ask if you can
24  identify it, Dr. Shapiro.
25    A.    Yes.  These are the minutes of the

Page 900

1  December 20th meeting.
2    Q.    Did the DSMB members discuss at this
3  December 1999 meeting the cardiovascular results for
4  the VIGOR trial?
5    A.    Yes.
6    Q.    What in particular was discussed?
7          MR. SPECTER:  Objection, calls for
8  hearsay.
9  BY MR. MAYER:
10    Q.    You may answer.
11    A.    They discussed the various analyses I
12  had performed.  They discussed the subgroup results
13  that noted that patients at higher risk have, as you
14  would expect, higher rates of events, but that the
15  relative risk, the difference between the
16  treatments, was similar whether you were at higher
17  or lower risk.  They discussed what they wanted to
18  have done next.
19    Q.    What did they want to have done next?
20    A.    Well, I told them about certain
21  things that were going on at Merck and the fact that
22  these data were being adjudicated and that there was
23  a plan for their analysis that had not yet been
24  written.  They wanted to make sure that plan was
25  written before any unblinding.  They wanted to make

Page 901

1  sure there was a separate analysis of the VIGOR data
2  from any other pooled analyses, and that without
3  doing something, that was not going to happen --
4  well, a separate analysis was going to happen, but
5  this plan was not being written.
6    Q.    Did they take any steps to ensure
7  that that would be done?
8    A.    Yes.
9    Q.    I'll come back to that in a moment,
10  but focusing first on these minutes, did the members
11  of DSMB express a view as to whether the trial
12  should be stopped based on the results?
13    A.    They did not believe the trial should
14  be stopped based on the results, and they also
15  expressed the belief that the differences they saw
16  might be due to a cardioprotective effect of
17  treatment B.
18    Q.    What was treatment B?
19    A.    I'm sorry, naproxen.
20    Q.    Was that the last meeting of the
21  DSMB, Dr. Shapiro?
22    A.    Yes.
23    Q.    Did the trial continue until its
24  conclusion?
25    A.    Yes.

KS-000453

Confidential - Subject to Protective Order

Page 902

1    Q.    I'm going to show you a document
2  that's been marked as Shapiro Exhibit 80.
3              - - -
4         (Whereupon, Deposition Exhibit
5         Shapiro-80, E-mails, MRK-AAB0060594 -
6         MRK-AAB0060595, was marked for
7         identification.)
8              - - -
9  BY MR. MAYER:
10    Q.    It bears Bates Numbers MRK-AAB0060594
11 to 595 and ask you if you can identify that
12 document, Dr. Shapiro.
13    A.    Yes.
14    Q.    What is it?
15    A.    It's an e-mail between one of the
16 members of the DSMB, Dr. David Bjorkman, and myself,
17 and it refers to the unblinding that we did with the
18 steering committee.  We invited the members of the
19 DSMB to attend by teleconference the unblinding of
20 the steering committee.
21    Q.    When did that take place?
22    A.    March 22nd.
23    Q.    Was the VIGOR trial concluded at that
24 time?
25    A.    Yes.

Page 903

1    Q.    Did Dr. Bjorkman say anything in that
2  e-mail whether the VIGOR cardiovascular results
3  could be explained by a protective effect of
4  naproxen?
5    A.    Yes.
6    Q.    What does he say?
7    A.    He said, "I think that the VIGOR
8  study unmasked the antithrombotic effects of
9  naproxen."
10    Q.    How did that square with the
11 discussion among the clinicians at the DSMB meetings
12 in November and December 1999?
13    A.    It confirmed their beliefs at that
14 time.
15    Q.    Now, you mentioned, getting back to
16 the December -- I'm done with that exhibit --
17 getting back to the December 1999 meeting, that the
18 DSMB wanted to take certain steps to ensure certain
19 analyses were done.  Is that a fair summary of what
20 you said?
21    A.    Yes.
22    Q.    What steps did the DSMB take to
23 communicate their desires?
24    A.    Dr. Weinblatt wrote a letter, he
25 dictated it, and I typed it, that was addressed to

Page 904

1  Drs. Reicin and Capizzi.
2    Q.    What was that letter about?
3    A.    The letter asked that a plan for how
4  the analysis of the adjudicated data would be
5  conducted would be provided.
6    Q.    What was the response?
7    A.    Dr. Reicin assured me and to tell him
8  that, yes, it would be developed.
9         MR. SPECTER:  Objection, calling for
10 hearsay.
11 BY MR. MAYER:
12    Q.    Was there any further response from
13 Dr. Reicin after that?
14    A.    Yes.  Because of the logistic
15 difficulties of getting the adjudicators together,
16 there were three different committees, there was a
17 lot of source documentation that are from outside
18 hospitals, not necessarily ones that are part of the
19 trial, it's not easy to put together all the
20 information for the adjudication, so, there was
21 concern about being able to do that in time.  And
22 there was also the feeling that VIGOR by itself was
23 underpowered to do an analysis just in VIGOR.  So,
24 there was a change to this assurance about getting
25 them adjudicated right away.

Page 905

1    Q.    How did the DSMB respond to that
2  change?
3    A.    They wrote another letter.
4    Q.    What did that -- what was the -- in
5  substance, what was that letter saying?
6    A.    It basically said that the
7  adjudications could take place later as long as the
8  plan was developed before unblinding and repeated
9  that they wanted a separate analysis of VIGOR.
10    Q.    Did Merck agree to do what the DSMB
11 asked?
12    A.    Yes.
13    Q.    Did Merck, in fact, wind up doing
14 that separate analysis of the VIGOR CV data as the
15 DSMB had asked?
16    A.    Yes.
17    Q.    Who wrote those two letters that you
18 described to Dr. Reicin?
19    A.    Dr. Weinblatt wrote them.  The first
20 one, the content was discussed at the meeting, and
21 the members derived what they wanted to be stated.
22 Then after the meeting, Dr. Weinblatt and I were on
23 the phone, and he dictated and I typed the letter.
24 The subsequent letter wasn't conferred among the
25 whole group.  Dr. Weinblatt took it upon himself to

ESQUIRE DEPOSITION SERVICES

Confidential - Subject to Protective Order

Page 906

1  speak for the group and dictated, and, again, I
2  typed the letter.
3      Q.   Was there any concern among the DSMB
4  that those letters might cause people at Merck to
5  learn something about the VIGOR data before the
6  unblinding?
7          MR. SPECTER:  Objection, calls for
8  hearsay.
9          THE WITNESS:  The first letter was
10 written in a manner that made it -- kept the level
11 very low key and talked about theoretical concerns,
12 so, purposely not to raise alarm bells.
13 BY MR. MAYER:
14     Q.   To your knowledge, was Dr. Reicin
15 unblinded by these letters?
16     A.   No, she was not.
17     Q.   What's your basis for saying that?
18     A.   Her surprise when she was truly
19 unblinded.
20     Q.   Doctor, with regard to the
21 unblinding, were you contacted by anyone at Merck
22 about the VIGOR results while the results were still
23 blinded to the company?
24     A.   Yes.
25     Q.   Who contacted you?

Page 907

1      A.   Dr. Scolnick.
2      Q.   Who was Dr. Scolnick at that time?
3      A.   He was the president of Merck
4  Research Labs.
5      Q.   How did Dr. Scolnick contact you?
6      A.   He sent me an e-mail.
7      Q.   I'm going to show you a document
8  that's marked as Shapiro Exhibit 28, it bears Bates
9  Numbers MRK-NJ0130083 to 87, and ask if you can
10 identify that.
11     A.   Yes.
12     Q.   What is that?
13     A.   It's the e-mail that Dr. Scolnick
14 wrote me and contains my replies and his replies.
15     Q.   What's the date of that exchange?
16     A.   February 11th of 2000.
17     Q.   Was the VIGOR trial close to
18 completion at that point?
19     A.   Yes.
20     Q.   What did you understand Dr. Scolnick
21 to be asking?
22     A.   Well, Dr. Scolnick does not state
23 that he wants me to tell him the results of VIGOR,
24 but one could infer that he meant that, and it's a
25 possibility that he meant that.  He talked about me

Page 908

1  contacting him confidentially and gave me phone
2  numbers and so on to do that.
3      Q.   What did you do, if anything, in
4  response to this e-mail?
5      A.   I wrote him a reply that reiterated
6  our standard operating procedure that I reported to
7  the VIGOR DSMB and not to Merck during the course of
8  the trial, that as such, no one could know the
9  results, that the unblinding would take place on
10 March 9th or March 22nd to this small team in the
11 next -- to the steering committee, and that he was
12 welcome to join one of the official unblindings.
13     Q.   How did he respond to that?
14     A.   He accepted immediately.
15     Q.   Did you ever unblind him or anyone
16 else to the results prior to the official unblinding
17 on March 9th?
18     A.   No, I did not.
19     Q.   Thank you.  I'm done with that
20 exhibit.
21          Let me change topics a bit.
22          Did there come a time after the
23 conclusion of the VIGOR study when you were involved
24 in conducting a pooled analysis of cardiovascular
25 thrombotic events in Vioxx clinical trials?

Page 909

1      A.   Yes.
2      Q.   What is a pooled analysis?
3      A.   It's an analysis that combines, after
4  properly accounting for the differences in protocols
5  and blocks, but it combines analysis from many
6  trials in order to get a full picture of what had
7  happened, to get more precise estimates, to evaluate
8  all the information as opposed to pieces of the
9  information.
10     Q.   Do you have an understanding as to
11 why Merck conducted a pooled analysis of
12 cardiovascular data in the Vioxx program?
13     A.   Yes.
14     Q.   What's that understanding?
15     A.   When we observed the results in VIGOR
16 and also looked at some of the other large trials
17 that were going on or had completed, we sent that
18 information out to a number of consultants to get
19 their feedback, their ideas, et cetera, on how to
20 proceed.  One of them, Dr. Rory Collins, suggested
21 that we do a formal meta-analysis, and also it is
22 the natural thing to do in such a circumstance when
23 you have a piece of information like this, to look
24 at the rest of your data to see what it tells you.
25     Q.   Who is Rory Collins?

**KS-000455**

Confidential - Subject to Protective Order

Page 910

1     A.     Rory Collins is a clinician who -- a
2   well-known clinical trialist with Oxford University.
3   He's been involved in a number of very large
4   cardiovascular studies.
5     Q.     Did outside consultants advise Merck
6   with regard to the conduct of the pooled analysis?
7     A.     Yes.
8     Q.     How did Merck become aware of the
9   advice of outside consultants?
10     A.     We had a meeting in October of 2000
11   with these consultants.
12     Q.     Were you present at the meeting?
13     A.     Yes.
14     Q.     Let me show you a document that has
15   been marked as Shapiro Number 53 and ask you if you
16   can identify that.
17     A.     Yes.
18     Q.     Can you identify it?  This is a
19   document that bears Bates Numbers MRK-NJ0070364 to
20   397.  Can you identify for us what this is?
21     A.     It's a PowerPoint presentation of the
22   results of a preliminary version of the
23   cardiovascular meta-analysis that I performed for
24   Vioxx.
25     Q.     Did you prepare and present this

Page 911

1   presentation?
2     A.     Yes.
3     Q.     On what day?
4     A.     October 18th, 2000.
5     Q.     To whom did you present it?
6     A.     To the cardiovascular consultants and
7   the other Merck employees that were present.
8     Q.     Why did you prepare it?
9     A.     To get their feedback on what we were
10   seeing and any ideas they had, opinions.
11     Q.     Do you remember which consultants
12   were present at that meeting in person or by phone?
13     A.     Yes.  Dr. Robert Califf, Dr. Rory
14   Collins, Dr. Konstam and Dr. Weisfeldt, I believe,
15   were the four consultants.
16     Q.     What was your role with regard to the
17   pooled analysis for Vioxx?
18     A.     Along with my programmer, I did the
19   analyses, I performed them, I created summary
20   tables.
21     Q.     Do you have training and experience
22   concerning data from how various trials can be
23   pooled together for scientific analysis?
24     A.     Yes, I do.
25     Q.     Did you also seek advice of others

Page 912

1   within the company and outside experts with regard
2   to how to do that in this case?
3     A.     Yes, I did.
4     Q.     Is it scientifically legitimate to
5   combine data from different trials that may have
6   different protocols?
7     A.     Yes, but you need to perform certain
8   tests to assure that it's appropriate to do so.
9     Q.     What are some of the tests that you
10   use to ensure that you were pooling data in a manner
11   that was statistically appropriate?
12     A.     We looked at tests that looked for
13   something that's called heterogeneity, which really
14   just simply means differences that are so drastic
15   that you can be masking something if you combine
16   them.  So, we do a test like that that we looked at
17   over patients by various disease indications and
18   patients by trial protocol.
19     Q.     It's a test for heterogeneity.  What
20   does it mean if you pass the test for heterogeneity?
21     A.     If you pass the test, it means that
22   you can legitimately combine those data.
23     Q.     Can you draw meaningful comparisons
24   or conclusions from comparisons that fail the test
25   of heterogeneity?

Page 913

1     A.     No.
2     Q.     Did you prepare for this consultants
3   meeting a pooled analysis of heart attack data
4   relative to Vioxx?
5     A.     Yes.
6     Q.     Can you please turn to the page
7   marked NJ0070396 with the header "MI Endpoint,
8   Rofecoxib Versus NSAIDs"?
9     A.     Yes.
10     Q.     Does this page relate to the pooled
11   analyses you prepared comparing rofecoxib to all
12   NSAIDs with a heart attack endpoint?
13     A.     Yes.
14     Q.     What analysis in particular is
15   reflected here?
16     A.     The most important one -- there's
17   several that show that the trials should not be
18   combined.  The most important one looked at the
19   difference between the trials that used naproxen and
20   the trials that used other NSAIDs.  There was a
21   highly significant, important difference between
22   those trials that means that you should not be
23   combining those trials and making summary inferences
24   based on that.
25     Q.     What does that say about whether a

KS-000456

ESQUIRE DEPOSITION SERVICES

Confidential - Subject to Protective Order

Page 914

1  comparison of Vioxx versus all NSAIDs including
2  naproxen for the heart attack endpoint was
3  meaningful?
4       A.    It means if you put all those trials
5  together, it is not meaningful to look at that
6  estimate.
7       Q.    If you'd turn the page, I guess back
8  a page to the page that has Bates Numbers ending in
9  395, you see at the top there is -- is this page
10  also part of the pooled heart attack analysis?
11      A.    Yes.
12      Q.    Do you see that at the top there
13  there's a comparison with all patients, rofecoxib
14  versus NSAIDS?
15      A.    Yes.
16      Q.    Is that a statistically meaningful
17  comparison based on everything you've just said?
18      A.    No.
19      Q.    Why not?
20      A.    Because it's combining the trials
21  where rofecoxib was compared to naproxen and the
22  trials where rofecoxib was compared to other NSAIDs.
23      Q.    Dr. Shapiro, please turn to, again,
24  earlier in the same exhibit, the page ending with
25  Bates Number -- the Bates Number ending with 390.

Page 915

1  It has the heading "MI Endpoint - Rofecoxib versus
2  Placebo."
3       A.    Yes.
4       Q.    Did you also conduct a comparison
5  between Vioxx and placebo with regard to heart
6  attack rates?
7       A.    Yes.
8       Q.    What did that comparison show or not
9  show?
10      A.    What it showed was that the trials
11  were combinable, there weren't differences that
12  meant you couldn't combine them, and it showed no
13  significant difference between rofecoxib and
14  placebo.
15      Q.    What feedback did your consultants
16  give you about your analyses?
17           MR. SPECTER: Objection, calls for
18  hearsay.
19           THE WITNESS: Well, the one that --
20  the feedback that was most important to me was from
21  Rory Collins, who felt that the way we were
22  arranging the patients in blocks was not the most
23  meaningful or useful way to arrange them, and he
24  suggested a different grouping and certain kinds of
25  modeling.

Page 916

1  BY MR. MAYER:
2       Q.    Did you follow --
3           MR. SPECTER: Objection,
4  nonresponsive.
5  BY MR. MAYER:
6       Q.    Did you follow that advice?
7       A.    Yes.
8       Q.    Did you redo the analysis taking into
9  account the advice of Dr. Collins?
10      A.    Yes.
11      Q.    Was that analysis as redone submitted
12  to the FDA?
13      A.    Yes.
14      Q.    When was that, approximately?
15      A.    January of 2001.
16      Q.    Let me show you a document that we'll
17  mark as -- are we up to 80 now?
18           MS. EPSTEIN: Yes, 81.
19           -  -  -
20           (Whereupon, Deposition Exhibit
21           Shapiro-81, Memo 1-26-01,
22           "Cardiovascular Meta-analysis:
23           Examination of Heterogeneity Among
24           Studies," MRK-AAB0095045 -
25           MRK-AAB0095049, was marked for

Page 917

1           identification.)
2           -  -  -
3  BY MR. MAYER:
4       Q.    Shapiro-81. It bears Bates Numbers
5  MRK-AAB0095045 through 049.
6           Dr. Shapiro, could you identify this
7  Exhibit 81, please?
8       A.    Yes. It's a memo that I wrote to Dr.
9  Silverman containing the results of two different
10  ways of looking at heterogeneity in the various
11  comparisons.
12      Q.    Briefly, what were you conveying to
13  Dr. Silverman in this memo?
14      A.    What we found was, we did a test of
15  heterogeneity among the blocks of patients, blocks
16  being disease indication, but we also did another
17  test that looked at a finer division, a division by
18  protocol. And what it found was, with all cases
19  except for one, they were all very consistent. The
20  one case where they were not consistent referred to
21  protocol 090 being the one that was driving the
22  difference. 090 went against Vioxx, and so despite
23  the lack -- or close to -- close to significant
24  heterogeneity, it was conservative to leave it in
25  because it went against Vioxx. So, in that case we

KS-000457

Confidential - Subject to Protective Order

Page 918

1 left it in.
2      Q.    Let me show you a document that we'll
3 mark as Shapiro 82.  It bears Bates Numbers
4 MRK-AGU0003701 through 3763.
5                - - -
6          (Whereupon, Deposition Exhibit
7          Shapiro-82, Letter 1-8-01, with
8          attachments, MRK-AGU0003701 -
9          MRK-AGU0003763, was marked for
10         identification.)
11               - - -
12 BY MR. MAYER:
13     Q.    I'd ask you if you can identify this
14 document, please.
15     A.    Yes.  This is the meta-analysis that
16 was sent to the FDA in January of 2001.
17     Q.    Were all of the heart attack events
18 that you analyzed as part of the meta-analysis
19 included in this submission?
20     A.    Yes.
21     Q.    Can you show us where in this
22 document the heart attack data was provided?
23     A.    Yes.  There was a section of the
24 document for each of the major comparisons, the
25 comparison to naproxen, the comparison to

Page 919

1 nonnaproxen NSAIDs, and the comparison to placebo.
2 Table 4 on Page 19 or the Bates Number ends in 3721,
3 that has in it a counts table that includes all the
4 heart attacks in the rofecoxib versus naproxen
5 comparison.  Then if you go on to the other
6 comparisons, there are similar tables for each of
7 them.  There's Table 8 for the comparison to
8 placebo, there's Table 6 for the comparison to
9 nonnaproxen NSAIDs, and in each one of these, it
10 shows all the heart attack data.
11     Q.    Is there also heart attack data
12 reflected --
13     A.    There might be more.
14     Q.    -- on Table 10 on Page 33?
15     A.    Yes.  Let me see if there's another
16 one.  And in Table 12, which is against any
17 comparison at all, any NSAID, any placebo.
18     Q.    Doctor, could you please turn to Page
19 4 of this document.  The Bates Number ends in 706.
20     A.    Yes.
21     Q.    Looking at the third paragraph on
22 this page, Doctor, what did Merck tell the FDA was
23 the driver of the difference in thrombotic events
24 between Vioxx and naproxen?
25     A.    Yes.  The second sentence says, "This

Page 920

1 difference in thrombotic events was mostly
2 attributable to a difference in the incidence of
3 myocardial infarction (MI) between the groups."
4     Q.    What was the endpoint that you use
5 for purposes of the pooled analyses?
6     A.    It was called the APTC endpoint.
7     Q.    What does that stand for?
8     A.    Anti-platelet trialist collaborative.
9     Q.    What is that endpoint?
10     A.    It's an endpoint that has been used
11 in the literature by the investigators who are
12 conducting trials to show benefit of -- or to show
13 how aspirin works and also some other anti-platelet
14 drugs.  It consists of heart attacks, strokes and
15 some other related events.
16     Q.    How did you come to select that as
17 the endpoint for the pooled analysis?
18     A.    It was our consultants, both
19 internally and externally, advised us that this was
20 the appropriate endpoint to use.
21         MR. SPECTER: Objection, hearsay.
22 BY MR. MAYER:
23     Q.    Was Merck in any way trying to hide
24 the MI results by conducting a pooled analysis with
25 the APTC endpoint?

Page 921

1     A.    No, we were not.
2         MR. MAYER:  Off the record.
3         THE VIDEOTAPE TECHNICIAN:  Off the
4 record at 10:15.
5                - - -
6          (Whereupon, a recess was taken from
7          10:15 a.m. until 10:32 a.m.)
8                - - -
9         THE VIDEOTAPE TECHNICIAN:  Back on
10 the record at 10:32.
11 BY MR. MAYER:
12     Q.    Dr. Shapiro, was the pooled analysis
13 that you worked on of cardiovascular events across
14 Vioxx trials ever published?
15     A.    Yes.
16     Q.    Did you have a role in preparing the
17 published paper?
18     A.    Yes.
19     Q.    What was your role?
20     A.    I did all of the analyses that were
21 contained in the paper, and I wrote the statistical
22 methodology section, reviewed all the other parts.
23     Q.    Let me show you a document that's
24 been marked as Shapiro Number 68 and ask if you can
25 identify that document, Dr. Shapiro.  It bears Bates

KS-000458

Confidential - Subject to Protective Order

Page 922

1  Numbers MRK-ABK02269182 --
2      A.     Mine doesn't have any Bates Numbers.
3      Q.     -- through 190.
4      A.     Ted, mine doesn't have Bates Numbers.
5      Q.     All right.  It is marked as Exhibit
6  68 --
7      A.     Yes.
8      Q.     -- and I'd ask you if you can
9  identify it.
10     A.     It is the paper that we wrote on the
11  meta-analysis, the pooled analysis.
12     Q.     Where was that published?
13     A.     In Circulation.
14     Q.     Who was the lead author of the paper?
15     A.     Dr. Marvin Konstam.
16     Q.     Is Dr. Konstam a Merck employee?
17     A.     No.
18     Q.     Who was Dr. Konstam?
19     A.     He was an external expert.
20     Q.     Does this paper reflect the
21  conclusions of your pooled analysis?
22     A.     Yes.
23     Q.     How many clinical trials involving
24  Vioxx did that pooled analysis include?
25     A.     23.

Page 923

1      Q.     How many patients were involved in
2  those trials?
3      A.     More than 28,000.
4      Q.     Was any trial of more than four weeks
5  in duration excluded from that analysis?
6      A.     No.
7      Q.     What conclusions did you and your
8  co-authors set forth in this paper concerning Vioxx?
9      A.     The conclusions we set forth were
10  that the differences that we observed with naproxen
11  were likely due to its anti-platelet effects, that
12  we found no evidence of an excess risk of CV events
13  when we compared rofecoxib to placebo or to
14  nonnaproxen NSAIDs.
15     Q.     What does that mean with regard to
16  the VIGOR study, if anything?
17     A.     The VIGOR study compared rofecoxib to
18  naproxen, and if naproxen was being protective, the
19  implication was that rofecoxib was having no effect
20  on the cardiovascular system.
21     Q.     When you say "rofecoxib," do you
22  mean --
23     A.     Vioxx.
24     Q.     On what data did you base those
25  conclusions, you and your co-authors in this paper?

Page 924

1      A.     Those 23 trials that we examined.
2      Q.     What did you look at with regard to
3  those 23 trials?
4      A.     We looked at the APTC endpoint and
5  its components.
6      Q.     Was this paper peer reviewed before
7  it was published?
8      A.     Yes, it was.
9      Q.     What does it mean to be peer reviewed
10  in general terms?
11     A.     The paper was sent by the editor of
12  the journal that we submitted it to to people that
13  work as experts for them and get their review and
14  comments on the acceptability of the paper and, if
15  acceptable, what changes they may want.
16     Q.     When was the paper first submitted to
17  Circulation?
18     A.     Either late August or early -- August
19  or September of 2001.
20     Q.     Let me show you a document that's
21  been marked Shapiro Exhibit 83 and ask you if you
22  can identify this document.  It bears Bates Number
23  MRK-AAB0009461.
24              - - -
25         (Whereupon, Deposition Exhibit

Page 925

1         Shapiro-83, Letter 9-12-01
2         MRK-AAB0009461, was marked for
3         identification.)
4              - - -
5         THE WITNESS:  Yes.  It's a letter
6  from the editor of Circulation to Dr. Konstam from
7  September 12th of 2000 discussing the manuscript and
8  that there were comments from reviewers on the
9  manuscript.
10  BY MR. MAYER:
11     Q.     Does this letter indicate whether the
12  pooled analysis article was subject to peer review?
13     A.     Yes.
14     Q.     What does it indicate in regard to
15  that?
16     A.     It states that "Your manuscript has
17  been reviewed by two reviewers and the editors."
18     Q.     Did you and the other authors revise
19  the paper to address the comments of the peer
20  reviewers and the editors?
21     A.     Yes, we did.
22     Q.     Was the manuscript resubmitted to
23  Circulation after that?
24     A.     Yes.
25     Q.     Directing your attention back to

KS-000459

Confidential - Subject to Protective Order

Page 926

1  Exhibit 68, which is the first page of the article,
2  there's an indication at the bottom of the first
3  page that the article was received on October 2,
4  2001.  Do you see that?
5       A.    Yes.
6       Q.    Does that accurately reflect when the
7  paper was first submitted to Circulation?
8       A.    No, it doesn't.
9       Q.    Dr. Shapiro, are you familiar with a
10 meta-analysis that was conducted by a Dr. Peter
11 Juni, J-U-N-I, or Juni and others and published in
12 the Lancet journal in November 2004?
13      A.    Yes.
14                      - - -
15            (Whereupon, Deposition Exhibit
16            Shapiro-84, "Risk of cardiovascular
17            events and rofecoxib: Cumulative
18            meta-analysis," (Juni, et al), Published
19            online November 5, 2004, MRK-ABY0185233
20            - MRK-ABY0185241, was marked for
21            identification.)
22                      - - -
23 BY MR. MAYER:
24      Q.    Let me show you a document that's
25 been marked as Exhibit Number 84 and ask if you can

Page 927

1  identify that.  It bears Bates Numbers
2  MRK-ABY0185233 through 241.
3       A.    Yes.  This is the publication by Juni
4  of his meta-analysis of Vioxx cardiovascular events.
5       Q.    Are there differences between the
6  meta-analysis you conducted in 2000 and 2001 and Dr.
7  Juni's meta-analysis that's published in 2004?
8       A.    Yes.
9       Q.    Could you describe some of the main
10 differences?
11      A.    Sure.  The main and major difference
12 is that Dr. Juni omitted the very large body of
13 placebo-controlled information that we had from the
14 Alzheimer's trials.  So, he did not include any of
15 that data.  In fact, when you look at his changing
16 relative risk over time, it's clear that it's
17 completely driven by the naproxen trials starting
18 with VIGOR and then continuing with ADVANTAGE, and
19 it's all the trials after that are driven by that
20 data.  And it doesn't include the data that goes the
21 opposite way.
22      Q.    Do you agree with Dr. Juni's decision
23 not to include the Alzheimer's data?
24      A.    No, I do not.
25      Q.    Why not?

Page 928

1       A.    Alzheimer's patients are at high risk
2  for cardiovascular events.  They're elderly, there
3  are many more males than in arthritis populations,
4  which tend to be mostly female, and males are at
5  higher risk of cardiovascular events, so, they are
6  actually an excellent population to look at this
7  effect.  And there's no reason that this effect
8  would only be in arthritis patients and not in
9  elderly patients who are being examined for effects
10 on Alzheimer's disease.
11      Q.    Dr. Shapiro, as you sit here today,
12 do you stand behind the analysis and conclusions of
13 your pooled analysis?
14      A.    I do.
15      Q.    Dr. Shapiro, Mr. Specter has
16 questioned you for several days in this deposition
17 before I had a chance to question you; is that
18 correct?
19      A.    Yes.
20      Q.    And some of those sessions go back
21 several months?
22      A.    That's right.
23      Q.    Do you recall towards the beginning
24 of the deposition Mr. Specter asked you about a FDA
25 investigational new drug application regulation or

Page 929

1  guideline?
2       A.    Yes.
3       Q.    I'm going to show you a document that
4  was previously marked as Shapiro Number 2 and ask if
5  you can identify that as the document that Mr.
6  Specter questioned you about previously.
7       A.    Yes, it is.
8       Q.    Now, this regulation talks about the
9  responsibilities of the sponsor of a drug if the
10 sponsor determines that its investigational drug
11 presents an unreasonable and significant risk to
12 subjects.
13      A.    Yes.
14      Q.    At the time Mr. Specter asked you
15 whether this document and this standard applied to
16 the work you were doing with the DSMB on the VIGOR
17 study.  Do you remember that?
18      A.    Yes.
19      Q.    He quoted to you a line from the
20 November 1999 DSMB minutes which said that the focus
21 of the discussions were the excess deaths and
22 cardiovascular adverse experiences in group A
23 compared to group B, and he asked you whether you
24 gave this IND regulation to the members of the DSMB.
25 Do you recall that?

KS-000460

Confidential - Subject to Protective Order

Page 930

1    A.    Yes, I recall.
2    Q.    Did the DSMB members, did any of them
3  at any time indicate to you at that meeting or at
4  any other meeting that Vioxx posed an unreasonable
5  and significant risk?
6    A.    No, they did not.
7    Q.    Did you discuss the cardiovascular
8  events in the VIGOR trial with the DSMB members in
9  the November and December meetings?
10    A.    Yes, we did.
11    Q.    Did the DSMB members express any
12  views about the causation of cardiovascular events
13  in the VIGOR trial at those meetings?
14        MR. SPECTER: Objection, calls for
15  hearsay.
16        THE WITNESS: Yes, they did.
17  BY MR. MAYER:
18    Q.    Directing your attention to the --
19  focusing specifically on the December meeting, what
20  did the DSMB members say about causation of those
21  cardiovascular events at that meeting?
22    A.    They stated that they believed that
23  they may well be due to a cardioprotective effect of
24  naproxen.
25    Q.    Did the DSMB members have the ability

Page 931

1  to recommend stopping the trial at the November
2  meeting and again at the December meeting?
3    A.    Yes, they did.
4    Q.    Did they choose to do so?
5    A.    No, they didn't.
6    Q.    Did the members of the DSMB ever
7  conclude that the cardiovascular events in VIGOR
8  were caused by Vioxx?
9        MR. SPECTER: Objection, calls for
10  hearsay.
11        THE WITNESS: No, they didn't.
12  BY MR. MAYER:
13    Q.    Did they ever express to you any
14  conclusion or belief that Vioxx posed an
15  unreasonable and significant risk to patients in
16  that trial?
17        MR. SPECTER: Objection, calls for
18  hearsay.
19        THE WITNESS: No, they did not.
20  BY MR. MAYER:
21    Q.    Dr. Shapiro, Mr. Specter also asked
22  you about portions of a document, Exhibit 8 to your
23  deposition, that was the FDA's May 1999 review of
24  Vioxx authored by Dr. Villalba in connection with
25  the initial approval of Vioxx. Do you remember

Page 932

1  that?
2    A.    Yes.
3    Q.    I'm going to show you the document
4  that Mr. Specter previously marked as Shapiro-8. I
5  think he was asking you some questions about
6  discussion on Page 104, and that discussion carries
7  over to Page 105 of the document. Do you see where
8  I am?
9    A.    Yes.
10    Q.    During Mr. Specter's questioning, you
11  were trying to say something about patient exposure
12  with Vioxx versus placebo, and he didn't give you a
13  chance to finish. What did you want to say?
14        MR. SPECTER: Objection to the
15  statement and the characterizations.
16  BY MR. MAYER:
17    Q.    Did you want to say something
18  additional about this document during the time Mr.
19  Specter was questioning you, Dr. Shapiro?
20    A.    Yes, I did.
21    Q.    Would you like to say it now?
22    A.    Yes.
23        In addition to the six-week studies
24  that Dr. Specter -- Mr. Specter asked me about,
25  there were also six-month trials of placebo versus

Page 933

1  rofecoxib where there were approximately one percent
2  event rates in both groups even though the placebo
3  patients had much shorter time exposure than the
4  rofecoxib patients. There's also a discussion about
5  the other NSAIDs -- I'm sorry, I lost my page, but
6  the summary and the conclusion was that -- it says
7  that "it is impossible to answer with complete
8  certainty whether the risk...is increased in
9  patients." There was longer term data in the other
10  trials that showed no increase in event rates.
11    Q.    Directing your attention to the
12  sentence that carries over from Page 104 to 105, did
13  Dr. Villalba say anything about the rates of events
14  in six month studies comparing placebo to rofecoxib?
15    A.    She said that in six-month trials,
16  there were 3 events in placebo group, approximately
17  1 percent, and also 23, which is approximately 1
18  percent because there were many more rofecoxib
19  patients. That was even though placebo patients
20  were only exposed up to 18 weeks.
21    Q.    And directing your attention to the
22  last --
23        MR. SPECTER: Objection. Excuse me.
24  Let me get my objection on the record, please.
25        That's not what the document says.

KS-000461

Confidential - Subject to Protective Order

Page 934

BY MR. MAYER:

1  Q.   You want to read the sentence that
2  you were referring to, Dr. Shapiro?
3  A.   "In 6-month studies there were 3
4  events in placebo (approximately 1%) and 23
5  (approximately 1%) in the total rofecoxib group,
6  even though placebo patients were only exposed for
7  up to 18 weeks."
8  Q.   Directing your attention to the last
9  sentence of that paragraph, did Dr. Villalba have
10  anything to say about the incidence of
11  thromboembolic events with Vioxx compared to other
12  anti-inflammatory drugs?
13  A.   Yes.
14  Q.   What did she have to say?
15  A.   "The incidence of thromboembolic
16  events with rofecoxib appears to be similar to
17  comparator NSAIDs."
18  Q.   Is there anything in Dr. Villalba's
19  report that gave you reason to be concerned about
20  the safety of Vioxx versus placebo in the
21  development program as it relates to thromboembolic
22  events?
23  A.   No.
24  Q.   Dr. Shapiro, one of the other topics

Page 935

1  that Mr. Specter asked you about was the hypothesis
2  or theory that NSAIDs or naproxen could be
3  cardioprotective. Do you recall that?
4  A.   Yes.
5  Q.   You told him that you were aware that
6  there was a hypothesis discussed by scientists at
7  Merck prior to the VIGOR results that said that
8  NSAIDs could be -- or naproxen could be
9  cardioprotective; is that correct?
10  A.   Yes.
11  MR. SPECTER: Objection to the
12  statement.
13  MR. MAYER: That's a question, and
14  the witness has answered it.
15  MR. SPECTER: Objection to the
16  leading question then, if it's a question.
17  BY MR. MAYER:
18  Q.   Dr. Shapiro, Mr. Specter asked if you
19  had ever seen a single piece of paper authored by
20  any Merck employee before the results of VIGOR
21  became evident saying that naproxen could be
22  cardioprotective. Do you recall that question?
23  A.   Yes.
24  Q.   At the time you couldn't recall a
25  specific document; is that correct?

Page 936

1  A.   That's right.
2  Q.   I'm going to show you a document that
3  has been marked as Exhibit 85 to your deposition.
4       - - -
5       (Whereupon, Deposition Exhibit
6       Shapiro-85, Memo 11-21-96, "Anticipated
7       consequences of NSAID antiplatelet
8       effects on cardiovascular events and
9       effects of excluding low-dose aspirin
10       use in the Cox-2 GI Outcomes Megatrial,"
11       MRK-AAX0002413 - MRK-AAX0002420, was
12       marked for identification.)
13       - - -
14  BY MR. MAYER:
15  Q.   It bears Bates Numbers MRK-AAX0002413
16  through 2420. Can you identify this?
17  A.   Yes. It's a memo from Dr. Thomas
18  Musliner, dated November 21st, 1996.
19  Q.   Who was it addressed to?
20  A.   It was addressed to Drs. Friedman,
21  Nies and Spector.
22  Q.   Who were they?
23  A.   Dr. Friedman was, I believe, in
24  charge of the coxib program in the clinical
25  department. Dr. Nies was her superior -- well, I'm

Page 937

1  not sure if he was at the time, and so was Dr.
2  Spector.
3  Q.   What's the date of the document?
4  A.   November 21st, 1996.
5  Q.   Is that before the VIGOR trial?
6  A.   Yes.
7  Q.   Dr. Shapiro, can you please turn to
8  Page 4 of the document and read into the record from
9  the last paragraph starting on the fourth line where
10  it says "Assumptions."
11  A.   I'm sorry. Fourth line on the second
12  paragraph under number 3?
13  Q.   Yes.
14  A.   "Assumptions underlying these numbers
15  include the following:
16       "(a) Patients treated with standard
17  NSAIDs will experience antiplatelet effects and
18  resultant CV protection similar to that produced by
19  aspirin. (There are good theoretical arguments, as
20  well as limited clinical data to support this
21  assumption.)
22       "(b) The degree of reduction in
23  fatal and non-fatal CV events in the NSAID group
24  will be comparable to that observed with aspirin
25  treatment (i.e. 25% -- see above).

KS-000462

18 (Pages 934 to 937)

Confidential - Subject to Protective Order

Page 938

1      "(c)  Patients treated with the
2  selective COX-2 inhibitor will experience neither a
3  reduction nor an increase in cardiovascular events
4  associated with this therapy.
5      "(d)" --
6      Q.    Just stopping there, can you explain
7  to us what this means?
8      A.    Yes.  What it is saying is that in a
9  trial that compared a COX-2 inhibitor to a
10  traditional NSAID, the traditional NSAID, patients
11  will experience the cardioprotective effects,
12  anti-platelet effects that would be similar to
13  aspirin, while the patients treated with the COX-2
14  inhibitor would have neither a reduction nor an
15  increase in cardiovascular events.  That would give
16  you a difference that was due to a benefit of the
17  traditional NSAID.
18      Q.    Does this refresh your recollection
19  as to what document you had in mind when you were
20  answering Mr. Specter's question regarding
21  discussion at Merck of the theory that NSAIDs could
22  be cardioprotective?
23      A.    Yes, it does.
24      Q.    Was it this document?
25      A.    Yes.

Page 939

1      Q.    Dr. Shapiro, Mr. Specter spent some
2  time earlier in your deposition questioning you
3  about a slide presentation entitled "VIGOR
4  Post-Mortem."
5      A.    Yes.
6      Q.    It's Exhibit 11 to your deposition.
7  Do you recall that?
8      A.    Yes.
9      Q.    Did you prepare that slide
10  presentation?
11      A.    Yes, I did.
12      Q.    What was your goal in preparing it?
13      A.    Typically, when we have a large
14  program, we like to review what went well and what
15  we could improve upon so that the next time around,
16  we're sure to continue to do the things that were
17  good, and we correct the things that didn't go as
18  well.
19      Q.    Let me show you Exhibit 11.
20           When you say things that could be
21  improved upon, what do you mean by that?
22      A.    Anything that caused a difficulty or
23  could have impacted timelines that we want to do
24  better the next time.
25      Q.    Did any of those issues that you

Page 940

1  identified as matters that could be improved on or
2  could do better next time, did any of those affect
3  your ability in VIGOR to report and analyze the data
4  accurately?
5      A.    No, they didn't.
6      Q.    Have you worked on other large
7  clinical trials, Dr. Shapiro?
8      A.    Yes, I have.
9      Q.    Were the types of issues that arose
10  in VIGOR any different in severity or kind from the
11  types of issues that arose in other megatrials that
12  you've worked on?
13      A.    No, they were not.
14      Q.    On the second page of the document
15  which has Bates Numbers 18, you have a slide
16  entitled "What Worked Well."  Were there things that
17  worked well in the VIGOR trial?
18      A.    Yes, there were.
19      Q.    What were some of those?
20      A.    The ones I listed were:  Dedication
21  of all the team members; communication excellent
22  between most groups; planning - the data analysis
23  plan laid out clearly what was needed; there was
24  good lead time for programming efforts; and we only
25  got reasonable ad hoc requests.

Page 941

1      Q.    On the page that bears Bates numbers
2  ending in 31, you have a slide entitled "Review/
3  Approval."
4      A.    Yes.
5      Q.    Can you explain what those points
6  mean?
7      A.    We "got first priority from
8  confirmatory reviewers early."  Did you want me to
9  stop and explain what that meant --
10      Q.    I think you can go on.
11      A.    Okay.
12           Reviewed and approved mock clinical
13  study report before we had results.
14      Q.    What does that mean?
15      A.    We created a mock document before we
16  had the results that contained table shells, that
17  is, empty tables.  It figured out the placement
18  where we were going to put figures, where we were
19  going to address each item.
20      Q.    What was the purpose of that?
21      A.    The purpose of that was to gather
22  agreement from all parties ahead of time of the
23  format and content of the document so that when we
24  had the data, we could very quickly approve and
25  release the document.

KS-000463

ESQUIRE DEPOSITION SERVICES

Confidential - Subject to Protective Order

Page 942

1        Q.     What are the other points that are
2    listed on that?
3        A.     "Smooth at end.  Worked well for
4    critical clinical study report, couldn't be
5    implemented for other situations."
6        Q.     Why couldn't it be implemented for
7    other situations?
8        A.     It took a lot of dedicated time.
9    People had to make it their first priority and put
10   aside other work, and you can't always put aside
11   other work for each and every thing, or you couldn't
12   get anything done.
13       Q.     But in the case of the VIGOR trial,
14   did people put aside their own work in order to
15   make sure that the data got reported promptly and
16   accurately?
17       A.     Yes, they did.
18       Q.     Now, on the page before that that
19   ends in 30 in the numbering, there's a mention on a
20   slide that the unblinding had the "potential to go
21   badly."  Do you see that?
22       A.     Yes.
23       Q.     Did the unblinding, in fact, go
24   badly?
25       A.     No.

Page 943

1        Q.     Did the way the trial was unblinded
2    affect the accuracy of the analysis of the data?
3        A.     No, it didn't.
4        Q.     Speaking of unblinding, on that same
5    page, on that same slide you wrote "Need realistic
6    plan, eg, unblind Dr. S early."
7        A.     Yes.
8        Q.     I think you identified "Dr. S." as
9    Dr. Scolnick?
10       A.     Yes.
11       Q.     Mr. Specter asked you why Dr.
12   Scolnick could not have been unblinded earlier in
13   November 1999, or what bad thing would have
14   happened, would have occurred, if anything?
15       A.     Yes.
16       Q.     And you weren't sure of the answer at
17   the time; is that correct?
18       A.     Yes.
19       Q.     Let me show you a document that was
20   used earlier in the deposition and marked as Exhibit
21   10.
22       A.     This has something else attached to
23   it.  This one is kind of coming apart.
24       Q.     Let me show you Exhibit 10.  Can you
25   identify this document for the jury, please?

Page 944

1        A.     Yes.  It's an appendix to one of our
2    standard policies and procedures that has to do with
3    guidelines for data safety monitoring boards.
4        Q.     What is it an appendix to?
5        A.     It is an appendix to a standard
6    procedure about megatrials.
7        Q.     What's that standard procedure called
8    or numbered?
9        A.     It's Medical Affairs Policy and
10   Procedure Number 23, Collaborative Research Efforts
11   and Megatrials.
12       Q.     Would the guidelines laid out here
13   apply to the VIGOR study?
14       A.     Yes.
15       Q.     Directing your attention to Page
16   1732, does it say anything there about the
17   obligations of the unblinded statistician with
18   respect to the confidentiality?
19       A.     Yes.
20       Q.     What does it say?
21       A.     It says, "the unblinded Merck
22   statistician is the only individual within Merck who
23   is aware of the interim results, and must adhere to
24   the same confidentiality requirements as the DSMB
25   members."

Page 945

1        Q.     Does this bear on whether you could
2    have told Dr. Scolnick about the VIGOR results prior
3    to the official unblinding?
4        A.     It does.
5        Q.     How does it bear on that?
6        A.     It states that no one but me could
7    have known any results before the unblinding or was
8    to be told any results.
9        Q.     Did you follow those guidelines in
10   your conduct as unblinded statistician on the VIGOR
11   trial, Dr. Shapiro?
12       A.     Yes, I did.
13       Q.     Why?
14       A.     It's expected to follow a standard
15   operating procedure, it's the ethical thing to do,
16   it was my responsibility.  I had agreed to do such a
17   thing, and I did it.
18       Q.     Dr. Shapiro, earlier in your
19   deposition you mentioned that the DSMB had received
20   the cardiovascular standard operating procedure,
21   adjudication standard operating procedure as part of
22   the protocol for the VIGOR study; is that correct?
23       A.     Yes.
24       Q.     You also testified that the
25   adjudication standard operating procedure provided

Confidential - Subject to Protective Order

Page 946

1  DSMB with background on the hypotheses regarding
2  cardiovascular issues with Vioxx; is that correct?
3       A.    Yes.
4              - - -
5            (Whereupon, Deposition Exhibit
6       Shapiro-86, "Standard Operating
7       Procedure for the Surveillance,
8       Monitoring, and Adjudication of Acute
9       Thromboembolic Vascular Events in
10      Clinical Trials of COX-2 Specific
11      Inhibitors," MRK-AAB0029224 -
12      MRK-AAB0029273, was marked for
13      identification.)
14             - - -
15  BY MR. MAYER:
16      Q.    I'm going to show you a document
17  that's been marked as Exhibit 86 to your deposition.
18  Can you identify this for the jury?  It bears Bates
19  Numbers MRK-AAB0029224 through 273.
20      A.    Yes.  This is the standard operating
21  procedure on the adjudication of cardiovascular
22  events in the COX-2 trials.
23      Q.    Was the standard -- was the
24  adjudication procedure provided to the DSMB?
25      A.    Yes, it was.

Page 947

1       Q.    Later in your deposition --
2            MR. MAYER:  Let's go off the record
3  for a second.
4            THE VIDEOTAPE TECHNICIAN:  Off the
5  record at 11:01.
6              - - -
7            (Whereupon, a recess was taken from
8       11:01 a.m. until 11:12 a.m.)
9              - - -
10           THE VIDEOTAPE TECHNICIAN:  Back on
11  the record at 11:12.
12  BY MR. MAYER:
13      Q.    Dr. Shapiro, we're back from a short
14  break, and before the break I had asked you some
15  questions about the cardiovascular standard
16  operating procedures.
17      A.    Yes.
18      Q.    You recall that Mr. Specter asked you
19  some questions about a revised version of that
20  standard operating procedure?
21      A.    Yes.
22      Q.    Let me show you a document that has
23  been previously marked as Shapiro Number 51 bearing
24  Bates Numbers MRK-ABC0000027 through 040.  That's a
25  document dated January 4, 2000 from Douglas Watson

Page 948

1  to Linda Nelsen to a distribution list; is that
2  correct?
3       A.    Yes.
4       Q.    Could you read the subject line?
5       A.    "Revised version of the Standard
6  Operating Procedures For the Surveillance,
7  Monitoring and Adjudication of Thrombotic/embolic
8  Vascular Events in Clinical Trials of Cox-2 Specific
9  Inhibitors."
10      Q.    Directing your attention to the
11  distribution list on Page 2, does your name appear
12  on that distribution list?
13      A.    No.
14      Q.    Did you receive that document at that
15  time?
16      A.    No.
17      Q.    Did you have any part, Dr. Shapiro,
18  in the revision of the standard operating procedures
19  that's reflected in this document?
20      A.    No.
21      Q.    Mr. Specter asked you questions about
22  some events that had been eliminated from the
23  standard operating procedure.  Do you remember that?
24      A.    Yes.
25      Q.    He asked you about the date when that

Page 949

1  occurred?
2       A.    Yes.
3       Q.    Dr. Shapiro, could you read into the
4  record Paragraph 2 on the first page of Shapiro
5  Exhibit 51, please.
6       A.    "Appendix B has been modified.  At
7  the request of the project team, Cardiovascular
8  Clinical Sciences reviewed the list of CRISP Broader
9  terms eligible for case adjudication.  Terms which,
10  in the absence of other events identifying adverse
11  experiences (which are likely to be serious events)
12  have a low likelihood of being thromboembolic events
13  were eliminated from Appendix B; Vascular Serious
14  Adverse Terms (CRISP Broader Term) eligible for case
15  adjudication.  Events which have been eliminated
16  from Appendix B, (i.e. congestive heart failure,
17  atrial fibrillation) and were not adjudicated prior
18  to the decision to revise this list (3 October 1999)
19  will not be adjudicated."
20      Q.    Does that paragraph suggest to you
21  anything about when the decision was made to revise
22  the list?
23      A.    Yes.
24           MR. SPECTER:  Objection, calls for
25  speculation.

KS-000465

Page 950

BY MR. MAYER:
Q.    What does it suggest to you?
A.    It says that the decision to revise the list was made on October 3rd of 1999.
Q.    Directing your attention to Page 5 of this memorandum bearing Bates Numbers ending in 033, could you read into the record the language that appears in bold type at the end of the first full paragraph?
A.    "Effective October 3, 1999 in consultation with Cardiovascular Clinical Sciences, a revised list of eligible events is in effect (Appendix B)."
Q.    Does that suggest anything to you about when the revised list of eligible events went into effect?
MR. SPECTER: Objection, calls for speculation.
THE WITNESS: Yes.
BY MR. MAYER:
Q.    What does it suggest?
A.    It suggests it went into effect as of October 3rd, 1999.
Q.    Dr. Shapiro, I'm going to show you a document that's previously been marked in this

Page 951

deposition as Shapiro Exhibit 74. I think you previously identified this as a slide presentation that you prepared for statisticians at Merck; is that correct?
A.    That's correct.
Q.    Do you recall that Mr. Specter directed your attention to a section entitled "Constancy of Rates and Relative Risk." It starts on Page 23, and he asked you to read into the record some language on Page 24.
A.    Yes.
Q.    And you said at the time it would be only fair to allow you to go on reading?
A.    Yes.
MR. SPECTER: Objection to the statement.
BY MR. MAYER:
Q.    The section goes on for several pages after that, so, I'm not going to ask you to read the whole section into the record, but could you summarize for us the additional points that you wanted to make then with reference to this specific section of the document?
A.    Yes. It goes on to say that we performed many, many analyses to evaluate whether or

Page 952

not there was a departure from constant relative risk or constant rates. All of those examinations, a number of tests that we performed, some suggested by a consultant to the FDA, all of those tests found no evidence of a departure from constant relative risk. There was one that was particularly telling about why that plot looks the way it does. That was also suggested by an outside consultant who suggested we look at these treatment group comparisons over time. What we found was that shortly before month eight, things actually flipped in favor of Vioxx, and the effect that had was to draw the curves together, and after that they go back to the way they were. And it gives the appearance of increasing, when, in fact, it is drawing together and going back to what it was before that time. So, we did not just that analysis, but as I said, many, many analyses, and they all show the same thing, that there was not a change in the relative risk or the rates over time.
Q.    Is that conclusion reflected anywhere in this document?
A.    Yes.
Q.    I direct your attention to Page 25. It bears the Bates Numbers ending 218. You look at

Page 953

the second to last sentence.
A.    Yes.
Q.    Would you read that into the record?
A.    "All of these showed no evidence of a departure from constant relative risk over time and constant rates in the rofecoxib group."
Q.    Did that reflect the conclusion of all of the analyses you've just described?
A.    That's right.
Q.    I'm done with that exhibit, Dr. Shapiro.
Mr. Specter also asked you questions about Merck's choice of the APTC endpoint for the pooled analysis. Do you recall that?
A.    Yes.
Q.    And specifically about the issue that the APTC endpoint included certain bleeding events? Do you recall that?
A.    Yes.
Q.    Did you consider that issue in connection with selecting the APTC endpoint and also in connection with how you wrote up the paper, you and your co-authors wrote up the paper for publication?
A.    Yes.

Confidential - Subject to Protective Order

Page 954

1    Q.    What did you consider with regard to
2  -- or selecting the APTC endpoint?
3    A.    As I said, we selected the APTC
4  endpoint because it's a standard used by the people
5  who are evaluating drugs that have effects on
6  platelets, and that was the basis of that decision.
7    Q.    When you wrote, you and your
8  co-authors, wrote the Circulation paper that was
9  ultimately published, how did you deal with the fact
10 that there was some bleeding events included in the
11 APTC endpoints that you analyzed?
12   A.    We enumerated them in the footnotes
13 to the table, and we listed that there were five
14 total in the text. This number is very small, and,
15 therefore, doesn't impact the conclusions. But
16 actually, if you looked at those footnotes, you will
17 see that there are a few more on Vioxx than on the
18 comparators, so, it did not actually act as a
19 benefit to Vioxx to include them. It went against
20 Vioxx. And it was the standard -- we were adhering
21 to the standard, and it didn't benefit us in any way
22 by leaving them in or make things appear to be less
23 different.
24   Q.    I'm going to show you Shapiro Exhibit
25 68 which was previously marked. Is that the

Page 955

1  published Circulation article by Dr. Konstam and
2  other authors, including yourself?
3    A.    Yes, it is.
4    Q.    Mr. Specter asked you a series of
5  questions about whether you could add up certain
6  columns in Table 6 of the pooled analysis. Do you
7  remember that?
8    A.    Yes.
9    Q.    Specifically about comparisons of
10 numbers of heart attacks on Vioxx versus other
11 NSAIDs. Do you remember that?
12   A.    Yes.
13   Q.    Is it statistically valid to compare
14 -- would it have been statistically valid in this
15 analysis to draw a comparison between the number of
16 heart attacks on Vioxx versus the number of heart
17 attacks on all other anti-inflammatory drugs?
18   A.    No.
19   Q.    Why is that?
20   A.    The test that we did evaluated
21 whether or not the effects of Vioxx compared to
22 naproxen, and when you compare that to the effects
23 of Vioxx and other NSAIDs, they are significantly
24 heterogeneous, meaning they are different, and they
25 should not be combined.

Page 956

1    Q.    If despite that, somebody wanted to
2  know what the counts looked like comparing the group
3  of all the anti-inflammatories other than Vioxx
4  versus Vioxx, what, if anything, could they tell
5  from Table 6 in this paper?
6    A.    That there were roughly two times as
7  many on rofecoxib as on any other NSAID. There's an
8  issue in terms of adding things up, but you can add
9  rofecoxib events from the latter two columns, from
10 nonnaproxen NSAIDs and naproxen, because none of
11 those were in the same trial. We didn't study both
12 naproxen and other NSAIDs in the same trial. So,
13 you can add those. You can't necessarily add the
14 placebo columns, but you can add the two NSAID
15 columns. We have fatal MIs, and we have nonfatal
16 cardiac events which consists of MIs and
17 resuscitated cardiac arrest. So, if you add those
18 up, you get 50 versus 21, and if you account for the
19 number of patients, it comes out to being roughly
20 two to one.
21   Q.    So, is that 50 to 21 an accurate
22 count?
23   A.    Yes.
24   Q.    But for purposes of statistical
25 analysis, you did not combine those?

Page 957

1    A.    That's right.
2    Q.    Why was that?
3    A.    Because of the significant
4  heterogeneity in the trials that used naproxen
5  compared to the trials that did not.
6    Q.    Mr. Specter asked you a series of
7  questions about an article published by several
8  authors including yourself in the American Journal
9  of Cardiology. Do you remember that?
10   A.    Yes.
11   Q.    I'm going to show you a couple of
12 documents that were marked during the course of that
13 questioning. They bear Exhibit Numbers 58 and 60.
14        Could you identify first what Exhibit
15 58 is. It bears Bates Numbers MRK-ABK0438579
16 through 604.
17   A.    That's a draft of the manuscript that
18 went through our standard procedure for clearance of
19 a release of a manuscript.
20   Q.    Mr. Specter asked you a series of
21 questions, didn't he, about how certain language and
22 tables from this draft came not to be included in
23 the published version of this paper; correct?
24   A.    Yes, he did.
25   Q.    What is Exhibit 60, which bears Bates

KS-000467

Confidential - Subject to Protective Order

Page 958

1  Numbers MRK-NJ0068744 through 776?
2      A.    This is the reply from the American
3  Journal of Cardiology that stated they would like to
4  publish it, but also had many comments on what they
5  wanted done before they would publish the paper.
6      Q.    I'm directing your attention
7  specifically to what's the third page of Exhibit 60.
8  It bears Bates Numbers MRK-NJ0068746.  What is that?
9      A.    This is the letter from William
10  Roberts, who was an editor at the American Journal
11  of Cardiology, to Dr. Sperling as one of the authors
12  of the manuscript, describing what he wanted done,
13  he and the other reviewers wanted done before they
14  would publish the paper.
15      Q.    Is there an attachment to that
16  letter?
17      A.    Yes.
18      Q.    What is that?
19      A.    It enumerates all the changes they
20  wanted made to the document.  It stated very clearly
21  what they wanted done.
22      Q.    Now, looking back at Exhibit 58, Mr.
23  Specter asked you about Page 3 of that document, the
24  second paragraph of the introduction of the draft of
25  the article that was prepared by authors at Merck

Page 959

1  and which discussed patterns of inhibition of
2  eicosanoids and other matters.  He asked you how
3  that came to be omitted from the published version
4  of the article.  Do you remember that?
5      A.    Yes.
6      Q.    When he showed you Exhibit 60, did he
7  point out to you pages 4 and 5 of that exhibit
8  bearing Bates Numbers MRK-NJ0068752 to 753?
9      A.    No, he didn't.
10      Q.    What, if anything, do those pages
11  reflect with regard to the paragraph Mr. Specter
12  asked you about?
13      A.    They crossed out that paragraph and
14  told us to remove it from the manuscript.
15      Q.    Who did that?
16      A.    That was done by William Roberts.
17      Q.    Who is he again?
18      A.    The editor of the American Journal of
19  Cardiology.
20      Q.    Mr. Specter also asked you about a
21  discussion in the draft article that the Merck
22  authors prepared regarding speculation that COX-2
23  inhibitors might affect the hemostatic balance.  Do
24  you recall that questioning?
25      A.    Yes, I do.

Page 960

1      Q.    He asked you how that paragraph came
2  to be omitted from the published paper.  Do you
3  recall that?
4      A.    Yes.
5      Q.    In the course of that questioning,
6  did he direct your attention to, when he showed you
7  Exhibit 60, to Page 13 of Exhibit 60 bearing Bates
8  Number MRK-NJ0068761?
9      A.    No, he didn't.
10      Q.    Directing your attention to that
11  page, what does it tell you about how that paragraph
12  came to be omitted from the published paper?
13      A.    The editor of the journal crossed it
14  out and told us to omit it.
15      Q.    Did Mr. Specter also ask you how
16  Table 1 of the draft report came to be omitted from
17  the published paper?
18      A.    Yes.
19      Q.    When he showed you Exhibit 60, did he
20  ask you about the first paragraph of Dr. Roberts'
21  letter that appears at the page bearing Bates
22  Numbers ending in 746?
23      A.    No, he didn't.
24      Q.    What, if anything, does Dr. Roberts
25  say about Table 1 in that letter?

Page 961

1      A.    It says, "eliminate table 1."
2      Q.    Does reviewing these sections of
3  Exhibit 60 refresh your recollection as to why those
4  particular sections that Mr. Specter asked about
5  came out of the draft paper that the Merck authors
6  prepared when the paper was published?
7      A.    Yes.  They were all required by the
8  editor of the journal to be omitted before they
9  would publish our paper.
10      Q.    Dr. Shapiro, Mr. Specter also asked
11  some questions about power in regard to the APPROVe
12  study and your level of curiosity about what the
13  power was with regard to detecting a difference in
14  the first 18 months.  Do you want to expand a little
15  bit on the answer that you gave to Mr. Specter?
16      A.    Yes, I would.
17      Q.    Specifically with regard to whether
18  or not you were curious about that issue?
19      A.    Yes.  I am, of course, interested in
20  APPROVe.  It's had a dramatic effect on what
21  happened with Vioxx.  However, I'm not the
22  statistician assigned to APPROVe.  We have several
23  highly qualified people working on APPROVe and
24  analyzing the data from APPROVe.  So, they are
25  examining all these issues of power, et cetera.

KS-000468

Confidential - Subject to Protective Order

Page 962

1  But to expand again upon power, if you have a
2  dramatic effect, that you will -- you can find a
3  dramatic effect.  If you have no effect, which is
4  what you see when you look at the first 18 months of
5  APPROVe, it doesn't matter how large a trial is.
6  You can't find something that's completely the same.
7       Q.     Mr. Specter asked you some questions
8  about some sites, some VIGOR sites in Argentina,
9  three sites that failed a review, investigator
10  sites, out of all the sites that were involved in
11  the VIGOR trial.  Do you recall that?
12      A.     Yes.
13      Q.     He asked you whether revised data was
14  submitted to the FDA.  Do you recall that?
15      A.     Yes.
16      Q.     And at the time you expressed a
17  belief, but not a certainty, as to what was done; is
18  that correct?
19      A.     Yes.
20      Q.     Let me show you a document that's
21  been marked as Shapiro Exhibit 87.  It bears Bates
22  Numbers MRK-S0420000002 through 08 and ask if you
23  can identify that document, please.
24             -  -  -
25             (Whereupon, Deposition Exhibit

Page 963

1          Shapiro-87, Letter 5-10-02, with
2          attachments, MRK-S0420000002 -
3          MRK-S0420000008, was marked for
4          identification.)
5             -  -  -
6          THE WITNESS:  Yes.  It's a document
7  that's sent from our regulatory department to the
8  FDA providing them with the revised analysis of
9  VIGOR, removing the three sites.
10 BY MR. MAYER:
11      Q.     Directing your attention to the
12 second paragraph on Page 1 and beginning about
13 halfway through, does it describe to the FDA whether
14 or not the reanalysis of the data showed any
15 significant differences?
16      A.     Yes.
17      Q.     What does it say?
18      A.     "The results of this reanalysis
19 (Attachment 1) disclosed only slight numeric changes
20 in statistical parameters without meaningful
21 implications for the interpretation of the study
22 results or currently approved product labeling that
23 describes the study results."  Do you want me to
24 read the next sentence?
25      Q.     Yes, please.

Page 964

1       A.     "Therefore, MRL believes the results
2  from the original analysis remain appropriate for
3  assessment of the study."
4             MR. MAYER:  Thank you.
5             Off the record.
6             THE VIDEOTAPE TECHNICIAN:  Off the
7  record at 11:36.
8             -  -  -
9             (Whereupon, a recess was taken from
10            11:36 a.m. until 11:56 a.m.)
11            -  -  -
12            THE VIDEOTAPE TECHNICIAN:  We are now
13 back on the record.  This is the beginning of
14 Videotape Number 2.  The time is 11:56.
15            -  -  -
16            EXAMINATION
17            -  -  -
18 BY MR. SPECTER:
19      Q.     Dr. Shapiro, I want to ask you some
20 questions about some of the things that were touched
21 on today by your lawyer questioning you.
22            I want to start with the last thing
23 that was discussed in the direct examination a few
24 minutes ago, which is the issue of these Argentinian
25 sites.  Your lawyer gave you a document which was

Page 965

1  marked Shapiro 87, which is the correspondence to
2  the FDA concerning the three sites in Argentina that
3  were deemed to be unreliable.  Do you recollect
4  that?
5       A.     Yes.
6       Q.     This letter says that -- in an
7  earlier letter, this letter is dated May 10, 2002,
8  and it says in the second paragraph:  "In
9  correspondence to the Agency dated February 21,
10 2002, MRL provided a re-analysis of the primary and
11 secondary endpoints of VIGOR without data from Dr.
12 Di Giorgio's sites.  Having identified 2 additional
13 sites whose data have been called into question, MRL
14 is now providing a final re-analysis of the VIGOR
15 endpoints excluding data from all three sites
16 referenced above."
17            Did I read that correctly?
18      A.     It didn't sound exact.  It might be
19 the gist of it, but it didn't seem like that
20 followed it, unless I'm in the wrong place.
21      Q.     We're looking at MRK-S042000002?
22            MR. MAYER:  Where are you reading,
23 from what paragraph?
24 BY MR. SPECTER:
25      Q.     Second full paragraph.  You were

Confidential - Subject to Protective Order

Page 966

1  looking at the first full paragraph, weren't you,
2  Doctor?
3      A.    Yes.
4      Q.    I'm talking about the second full
5  paragraph.
6      A.    I'm sorry.
7          (Witness reviewing document.)
8          Okay.
9  BY MR. SPECTER:
10     Q.    Does it now appear to you that I've
11  read that correctly?
12     A.    Yes.
13     Q.    All right.
14         So, this letter says "MRL is now
15  providing a final re-analysis of the VIGOR endpoints
16  excluding data from all three sites referenced
17  above." Right?
18     A.    Yes.
19     Q.    And the VIGOR endpoints included
20  cardiovascular endpoints; correct?
21     A.    We talked about primary and secondary
22  endpoints in the previous paragraph. Those are
23  referring to gastrointestinal endpoints.
24     Q.    That's not what the letter says.
25     A.    Yes, it is.

Page 967

1      Q.    Excuse me. It doesn't say that it
2  only refers to gastrointestinal endpoints. It says,
3  the "primary and secondary endpoints." The primary
4  and secondary endpoints would include cardiovascular
5  endpoints, wouldn't it?
6      A.    No. They are very clearly stated in
7  the protocol and the data analysis plans, that the
8  primary and secondary endpoints, they are referring
9  to the ones for which we had hypotheses, specific
10  hypotheses, and those were all gastrointestinal.
11  And if sometimes we use shorthand referring to it,
12  that doesn't change the fact that that's what we
13  meant.
14     Q.    Doctor, was the data recalculated
15  looking at the cardiovascular endpoints excluding
16  the Argentinian sites?
17     A.    I believe it was. I don't see it
18  here.
19     Q.    Show me in this exhibit that your
20  lawyer gave to you a few minutes ago where there's a
21  recalculation of the cardiovascular data.
22     A.    I can't show you that because I don't
23  see that.
24     Q.    That's because it's not there; right?
25     A.    It's not in this.

Page 968

1      Q.    Well, is it someplace else?
2      A.    If you look on Page 1, the Bates
3  Number ends in 6, it discusses the reanalysis of
4  cardiovascular events. It says "With respect to
5  vascular events amongst these 259 patients, there
6  was 1 patient with a confirmed fatal hemorrhagic
7  stroke in the naproxen group (Allocation Number
8  6703). Fatal hemorrhagic strokes do not contribute
9  to the endpoint 'confirmed thrombotic cardiovascular
10  serious adverse experiences' or to thrombotic
11  deaths, but are included in the APTC combined
12  endpoint. Thus, exclusion of the data from these
13  sites would not change counts of confirmed
14  thrombotic events reported in VIGOR."
15     Q.    Right. It wouldn't change the
16  counts, but it would change the rates; correct?
17     A.    The --
18     Q.    Yes or no?
19     A.    It might change them slightly. There
20  were very few patients total, 130 and 129, so, it
21  could not have changed them much. We did do those
22  analyses to confirm that. And because it didn't
23  change anything much, it was not needed to provide
24  that data. We described it --
25     Q.    The rates for the cardiovascular --

Page 969

1      A.    We described --
2      Q.    Can I finish my question, please.
3          MR. MAYER: She was --
4          MR. SPECTER: You weren't finished
5  with your answer?
6          THE WITNESS: I wasn't finished.
7          MR. MAYER: The witness wasn't
8  finished the answer.
9  BY MR. SPECTER:
10     Q.    I thought you were. Excuse me.
11     A.    No.
12         We described the implications of
13  removing them, and because there was no important
14  effect on anything else, we didn't feel it was
15  necessary to provide rates that had changed only in
16  a minuscule way.
17     Q.    Well, let's talk about whether it's
18  minuscule.
19         There were how many patients in the
20  VIGOR trial?
21     A.    8,076.
22     Q.    How many patients stayed in long
23  enough to be counted in the final analysis?
24     A.    They're all included in the final
25  analysis.

**KS-000470**

26 (Pages 966 to 969)

Confidential - Subject to Protective Order

Page 970

1   Q.   There were about 28 percent who
2   dropped out, weren't there, Doctor?
3   A.   They still contribute to the final
4   analysis. We did followup on them.
5   Q.   And the group in which the data was
6   considered to be unreliable involved 259 patients;
7   correct?
8   A.   Yes.
9   Q.   That's roughly three percent of
10  8,000; is that correct?
11  A.   Roughly. And also --
12  Q.   Doctor, I asked you a mathematical
13  question --
14  A.   Approximately.
15  Q.   -- which is, is 259 roughly three
16  percent of 8,000? Is the answer yes to that
17  question?
18  A.   Roughly.
19  Q.   Thank you.
20       Now, let me ask you about what you
21  gave to the FDA in terms of the meta-analysis. And
22  that was Exhibit 82, and I will put that in front of
23  you.
24       Now, this document has 61 numbered
25  pages; is that correct? Actually, it has two pages

Page 971

1   at the start that constitute the cover letter to the
2   FDA from Merck and then a form as the second page,
3   and then the document entitled "Interim
4   Cardiovascular Meta-Analysis" has 61 numbered pages.
5   A.   Yes.
6   Q.   Is that all fair?
7   A.   Yes.
8   Q.   Now, I want to talk about how this is
9   organized for a minute, if we could.
10       Section Roman numeral IV which is on
11  Page 12 is titled "Results." Is that correct?
12  A.   Yes.
13  Q.   The first thing that appears there is
14  A, which is "Summary." Correct?
15  A.   Yes.
16  Q.   And then three pages later at Page 15
17  we have Section B of results, which are "APTC
18  Endpoint." Correct?
19  A.   Yes.
20  Q.   Then the remainder of the Results
21  section discusses the APTC endpoint; correct?
22  A.   Even the introductory part does. It
23  is just a summary of all those analyses.
24  Q.   Was there a part C?
25  A.   There's parts A and B.

Page 972

1   Q.   I know. I see there are parts A and
2   B. I'm asking a different question now. Was there
3   a part C?
4   A.   No.
5   Q.   Was there ever a part C?
6   A.   I don't recall.
7   Q.   Let's see if I can refresh your
8   recollection.
9       MR. SPECTER: Mark this as
10  Shapiro-88. A copy for you, a copy for your lawyer.
11       (Handing over documents.)
12       - - -
13       (Whereupon, Deposition Exhibit
14       Shapiro-88, "Full Meta-Analysis,"
15       MRK-ACF0000845 - MRK-ACF0000924, was
16       marked for identification.)
17       - - -
18       (Witness reviewing document.)
19  BY MR. SPECTER:
20  Q.   Please tell us what you're looking
21  at.
22  A.   I just need to look through it to
23  figure it out.
24  Q.   Go ahead.
25  A.   (Witness reviewing document.)

Page 973

1   Q.   Doctor, what are you looking at right
2   now?
3   A.   Can you let me finish looking,
4   please?
5   Q.   I want to know what you are looking
6   at. What are you looking at?
7   A.   I'm looking at a section C. I would
8   like to continue looking, please.
9   Q.   Fine. What page is it on?
10  A.   Bates Number ending 909.
11  Q.   Thank you.
12  A.   (Witness reviewing document.)
13  Q.   Let's compare these two documents.
14  Let's start off first with the question I left off
15  with, which is, is there a section C? Is there a
16  section C?
17  A.   There's a section C. It is not
18  reflected on the table of contents, I believe. No,
19  it's not in the table of contents, so, there's a
20  section labeled C with a blank page in between it.
21  Q.   Right. And this entire exhibit
22  that's been marked as Shapiro-88 is consecutively
23  Bates numbered; correct?
24  A.   Seems to be.
25  Q.   Let's compare the two documents,

Confidential - Subject to Protective Order

Page 974

1  Exhibit 82, which is the one that your lawyer showed
2  you that was sent to the FDA, and Exhibit 88, which
3  is the one that I put in front of you.
4          If we start off on numbered Page 1 of
5  the document your lawyer gave you, that's titled
6  "Interim Cardiovascular Meta-Analysis correct?
7      A.    Yes.
8      Q.    And if we look at numbered Page 1 on
9  what I just gave you, it says the same thing,
10 "Interim Cardiovascular Meta-Analysis."
11     A.    Yes.
12     Q.    Is that correct?
13     A.    Yes.
14     Q.    And then the documents are identical
15 for the first 61 pages; correct?
16     A.    I haven't reviewed all 61 pages.  If
17 you say they are identical, I'm hoping they are, but
18 it would take me a long time to compare them.
19     Q.    Well, you sort of went through them
20 somewhat quickly just now; is that correct?
21     A.    Yes, I did, very quickly.
22     Q.    Did you see any differences in the
23 first 61 pages?
24          MR. MAYER:  You can answer the
25 question whether you saw any differences.

Page 975

1          THE WITNESS:  I didn't see any
2  differences, but I didn't read them thoroughly, so,
3  it is hard for me to say there's no differences.
4  BY MR. SPECTER:
5      Q.    That's fine.  However, on the
6  document I just showed you, there is a page before
7  the statement that appears "Interim Cardiovascular
8  Meta-Analysis," and that page is labeled "Full
9  Meta-Analysis."  Correct?
10     A.    No.  Where?  What page number?
11     Q.    Just before the page labeled "Interim
12 Cardiovascular Meta-Analysis," there's a page and
13 all that's on it is "Full Meta-Analysis."  Right
14 here.  (Indicating.)
15     A.    Can you tell me what page number you
16 are on, Bates Number, please.
17     Q.    It is literally -- Bates Number
18 MRK-ACF0000845.
19     A.    Thank you.
20     Q.    It is literally the first page of the
21 exhibit; right?
22     A.    Yes.
23     Q.    What does it say?
24     A.    "Full Meta-analysis."
25     Q.    "Full Meta-analysis."

Page 976

1          Now, the thing given to the FDA, has
2  that got a page before the page that says "Interim
3  Cardiovascular Meta-Analysis"?  Does that have a
4  page before that that says "Full Meta-Analysis"?
5      A.    No.
6      Q.    But the one I just gave you has that;
7  correct?
8      A.    Yes.
9      Q.    It has that page that says "Full
10 Meta-Analysis."  Right?
11     A.    Yes.
12     Q.    Then it's got a section C, and the
13 title of section C is "MI Endpoint - Secondary."
14 Correct?
15     A.    Yes.
16     Q.    And then there is discussion and then
17 a whole bunch of tables analyzing the data from the
18 standpoint of the MI endpoint; correct?
19     A.    Yes.
20     Q.    There is no section C in what was
21 given to the FDA; correct?
22     A.    Yes.
23     Q.    In fact, the bottom line of the page,
24 the first page of the discussion of the MI endpoint,
25 the last sentence is, "Whereas there was a

Page 977

1  borderline significant difference in treatment
2  effects between comparisons with naproxen and other
3  NSAIDs for the APTC endpoint, this difference was
4  significant for the MI endpoint."
5      A.    I believe that's --
6          MR. MAYER:  Object to the form.
7          THE WITNESS:  -- referring to
8  heterogeneity, which is more apparent for MI.  So,
9  that's actually stronger evidence of not combining.
10 But you will have to give me a couple of minutes to
11 look at that to make sure that's what it is
12 referring to.  That's my initial belief, that it's
13 the heterogeneity significance that that's referring
14 to.
15 BY MR. SPECTER:
16     Q.    What question are you answering now,
17 Dr. Shapiro?
18     A.    Yours.
19     Q.    What question was that?  What was the
20 question?
21     A.    That one had a borderline and one had
22 a significant.
23     Q.    I just read to you what it said;
24 correct?
25     A.    Okay.

KS-000472

28 (Pages 974 to 977)

Confidential - Subject to Protective Order

Page 978

1     Q.    Is that correct?
2     A.    I was going beyond and interpreting.
3  And I'm sorry.
4     Q.    Did I read what appears there
5  correctly?
6     A.    I would have to hear you read it
7  again, but I think so.
8     Q.    I'll read it again for you.  "Whereas
9  there was a borderline significant difference in
10 treatment effects between comparisons with naproxen
11 and other NSAIDs for the APTC endpoint, this
12 difference was significant for the MI endpoint."
13 Did I read it correctly?
14    A.    Yes.
15    Q.    Thank you.
16          Then we have a whole bunch of tables
17 on this subject; correct?
18    A.    Yes.
19    Q.    Do these tables appear in what was
20 given to the FDA?
21    A.    These tables do not appear.
22    Q.    Did that sentence I just read appear
23 in what was given to the FDA?
24    A.    No.
25    Q.    For example, looking at Appendix 1.3,

Page 979

1  which appears at Bates Number 923 where it talks
2  about "Meta-Analysis of MI Endpoint Vioxx versus
3  Comparator Agents," and it goes to the VIGOR trial,
4  and it has 20 heart attacks in the Vioxx group and 4
5  on the comparator with a relative risk of 5.0.  Did
6  I read that correctly?
7     A.    Yes.
8     Q.    And then in combining one, two,
9  three, four, five, six studies of people with
10 rheumatoid arthritis with the meta-analysis of the
11 MI endpoint, the relative risk is 4.16.  Is that
12 what it says?
13    A.    Yes.  That's the analysis where the
14 heterogeneity means you can't combine it, and I
15 believe it was footnoted in one of these tables,
16 that you can't combine it because that was any NSAID
17 versus placebo.
18    Q.    I'm looking, yeah, at that, Doctor.
19 Where is that footnote on that page that says you
20 can't combine it?  Show me where that footnote
21 appears there.
22    A.    It doesn't appear there, but if you
23 actually repeat the sentence that you said to me,
24 that's talking about heterogeneity, and
25 heterogeneity implies the inability to combine.

Page 980

1     Q.    Doctor, the sentence that I read to
2  you, where does the word "heterogeneity" appear in
3  that sentence?
4     A.    You have to understand that a
5  comparison between naproxen and nonnaproxen reflects
6  an interaction in heterogeneity.  So, it's something
7  that the FDA would understand.  It doesn't say
8  heterogeneity, but that's the implication.
9     Q.    So, this Appendix 1.3 "Meta-Analysis
10 of MI Endpoint Vioxx versus Comparator Agents," was
11 this table given to the FDA with the meta-analysis?
12    A.    No, it's not provided --
13    Q.    Right.
14    A.    -- but MI information was provided
15 for each and every comparison.  The MI information
16 is in each table that breaks out results for each
17 comparison.
18    Q.    Oh, you mean that Table 4 that you
19 talked about in answering your lawyer's questions;
20 right?
21          MR. MAYER:  Object to the form.
22          THE WITNESS:  Tables 4, 6, 8, 10 and
23 12.
24 BY MR. SPECTER:
25    Q.    Let's go to Table 4.

Page 981

1     A.    (Witness complies.)
2     Q.    So, Table 4, "Cardiac Events," "Acute
3  Myocardial Infarction," that's a heart attack;
4  right?
5     A.    Yes.
6     Q.    28 people taking Vioxx, 6 people
7  taking naproxen; right?
8     A.    Yes.
9     Q.    Where is the statement there about
10 relative risk?  Is there a statement of relative
11 risk there?
12    A.    There's not a statement of relative
13 risk, but there are and --
14    Q.    Doctor, don't "but" me.  Just answer
15 my question.
16          MR. MAYER:  Objection.
17 BY MR. SPECTER:
18    Q.    Is there a statement of relative
19 risk?
20          MR. MAYER:  Let her finish her
21 answer.
22 BY MR. SPECTER:
23    Q.    Is there -- please answer the
24 question, Dr. Shapiro.
25          Is there a statement of relative risk

Confidential - Subject to Protective Order

Page 982

1 in the table?
2      A.     While there's not a statement of
3 relative risk, one can take that plus the row that
4 says myocardial infarction and derive a relative
5 risk estimate from the percentages.  The data is not
6 hidden.  It is very clearly there.
7      Q.     Dr. Shapiro, in order to determine a
8 valid relative risk, you would have to have the
9 information as to patient years; correct?  Correct?
10      A.     You -- well, you don't -- yes, in a
11 form, but you still can --
12      Q.     Doctor, don't "but" me.
13            You have to have the patient years to
14 have relative risk; correct?
15            MR. MAYER:  I object to the continued
16 interruptions of the witness' answers.  Let her
17 answer the question and ask the question you want to
18 ask her.
19            THE WITNESS:  There's more than one
20 way to derive a relative risk.  One uses patient
21 years, that assumption there that risk is constant
22 over time.  There are several other ways to derive
23 relative risk.  You can derive relative risk from a
24 COX model.  You can derive relative risk from a
25 ratio of rates, and that is often done.  One can

Page 983

1 take the percentages and divide them, and that is
2 also considered a relative risk.
3 BY MR. SPECTER:
4      Q.     And neither was done for the FDA in
5 what was sent to them?  You didn't give them the
6 relative risks either with or without patient years;
7 correct?  Yes or no?
8      A.     We provided the raw ingredients that
9 anyone can derive a relative risk from.  It's quite
10 simple.
11      Q.     Anyone can do it?
12      A.     Yes.
13      Q.     Do you think I can?
14      A.     I would hope so.  You did some pretty
15 good math before.
16      Q.     Do you think the jurors can in this
17 case?
18      A.     I think they can get a pretty good
19 idea.
20      Q.     You think the jurors can take 0.31
21 and 0.08 and determine relative risk from that?
22            MR. MAYER:  Object to the form.
23            THE WITNESS:  I think they can
24 certainly get an estimate of one being higher and by
25 how much from that.  I'm sure they are capable of

Page 984

1 looking at those numbers and seeing a difference.
2 BY MR. SPECTER:
3      Q.     Okay.  Well, we'll see if they agree
4 with that.
5            Looking at Appendix 1.3, though,
6 Doctor, in what you didn't give the FDA, you had the
7 relative risks there, didn't you?
8            MR. MAYER:  Object to the form.
9            THE WITNESS:  We had the relative
10 risks.
11 BY MR. SPECTER:
12      Q.     And you had the patient years there,
13 don't you?
14      A.     Yes.
15      Q.     Doctor, when I handed you Exhibit 88
16 a few minutes ago, and you saw there was a section
17 C, were you surprised to see that?  Yes or no?
18      A.     I didn't remember it.
19      Q.     Please answer my question.
20            When I showed it to you and showed
21 you that there was a section C with an MI endpoint,
22 were you surprised to see it?  Yes or no?
23      A.     Well, I know I had looked at MIs and
24 had analyzed them.  So, hard to say whether I was
25 surprised.  I didn't recall writing it up, but I

Page 985

1 recall doing the analyses.  So...
2      Q.     Doctor, whether or not it would be
3 hard to say whether you were surprised, were you, in
4 fact, surprised to see this document with a section
5 C?
6      A.     No.  I -- the APTC endpoint
7 encompasses it.  The results in terms of
8 heterogeneity were stronger for the MI endpoint.
9 It's one piece of the APTC.  We weren't hiding the
10 MI results.  We provided the APTC endpoint because
11 you can get more precision with more events, the
12 events track together.  We pointed out to the FDA
13 that what was driving it were the MI results.  It's
14 all there, and it's all listed.  It's --
15      Q.     It's all there, and it's all listed?
16      A.     Yes.
17      Q.     I see.  The relative risks are listed
18 and there for the FDA in the meta-analysis; is that
19 correct?
20      A.     The FDA can very easily divide two
21 numbers.
22      Q.     And these tables that appear at the
23 back of the section on results of the MI endpoint in
24 what you at Merck label a, quote, Full
25 meta-analysis, that's there for the FDA in what you

KS-000474

Confidential - Subject to Protective Order

Page 986

1  gave them as the meta-analysis?  Yes or no?
2          MR. MAYER:  Objection to the form.
3          THE WITNESS:  Section C is not
4  included --
5  BY MR. SPECTER:
6      Q.    Right.
7      A.    -- but all the information to
8  evaluate drug effects and the different comparators
9  is there for them.
10     Q.    Dr. Shapiro, did you ever see Exhibit
11 88 before I just handed it to you?
12     A.    Well, considering I wrote it, yes.
13     Q.    So, you'd expect that it would be in
14 your custodial file; correct?
15     A.    I don't know.
16     Q.    Well, would you expect that it would
17 be in your custodial file?
18     A.    Not necessarily.
19     Q.    Well, so you had it, but you think
20 you threw it away?
21     A.    I don't recall.
22     Q.    So, it might be there, and it might
23 not be there?  Is that what you're saying?
24          MR. MAYER:  Objection to the form.
25 That's not what she said.

Page 987

1          THE WITNESS:  If we -- I don't know
2  the timing of whether we were holding all documents
3  at that point in time or not, so, I don't know if it
4  would be in my file or not.
5  BY MR. SPECTER:
6      Q.    Dr. Shapiro, do you think that a
7  document titled "Full Meta-Analysis" is the kind of
8  thing you would throw away?
9          MR. MAYER:  Object to the form.
10         THE WITNESS:  If I had something
11 electronically, I may not keep the hard copy.  I
12 don't write sideways, so, I never wrote "Full
13 Meta-Analysis."  That's someone else's opinion
14 because I don't write on documents sideways.  I
15 don't know how --
16 BY MR. SPECTER:
17     Q.    Would it surprise you to learn that
18 this document is not in the custodial file produced
19 from you by Merck?  Would that surprise you?
20     A.    No.
21     Q.    No, it wouldn't?
22     A.    No.
23     Q.    Let's go on to something else.
24         Would you put Exhibit 85 in front of
25 you, please?

Page 988

1      A.    (Witness complies.)
2      Q.    Now, this is that Musliner memo from
3  November of '96 that your lawyer questioned you
4  about a little while ago, and I think he pointed you
5  to Page 4, the bottom paragraph.  Do you recollect
6  that?
7      A.    I need to see what you are talking
8  about, please.
9      Q.    I'm sorry.  I thought -- excuse me.
10 I was looking at it myself and didn't know you
11 didn't have it in front of you, so I'll get it in
12 front of you.
13         Here you are.
14         (Handing over document.)
15         I think that your lawyer was asking
16 you about Page 4, the last paragraph?
17     A.    Yes.
18     Q.    Would that be right?
19     A.    Yes.
20     Q.    You read at his request certain
21 assumptions; correct?
22     A.    Yes.
23     Q.    And you read assumptions (a), (b),
24 and (c); is that correct?
25     A.    Yes.

Page 989

1      Q.    And do you recollect that he
2  interrupted you after you read (c)?  Do you
3  recollect that?
4      A.    I don't know if I'd count it as an
5  interruption, but I did stop at that point.
6      Q.    Well, you stopped because he spoke;
7  correct?
8      A.    Right.
9      Q.    So, keep reading, please, read (d)
10 and read the next sentence.
11     A.    "(d) Equal numbers of patients will
12 be treated with NSAIDs and COX-2 inhibitor over the
13 course of the study.  Some of these assumptions
14 involve gross oversimplification, but are adopted
15 for the sake of simplicity and because greater
16 sources of error are likely to be introduced by
17 other factors in any case."
18     Q.    I wanted to read (d) and the next
19 sentence.  If you want to read something else, you
20 may.
21     A.    Well, I'd like to look through.
22         (Witness reviewing document.)
23     Q.    The pending question is, do you want
24 to read something else?
25     A.    Yes.

KS-000475

Confidential - Subject to Protective Order

Page 990

1    Q.    What else do you want to read to the
2  jury?
3    A.    Starting at the bottom of Page 5,
4  "While one could argue that the differences are not
5  unexpected due to the absence of antiplatelet effect
6  for the selective COX-2 inhibitor, it would create a
7  negative aspect to the results and leave open the
8  question (reasonable or unreasonable) whether the
9  drug might in some other way be contributing to such
10  events." The point being that one thing having a
11  beneficial effect creates a negative impression that
12  it was likely to be unreasonable.
13    Q.    And that's if aspirin weren't
14  permitted; correct? In the study? If people taking
15  aspirin prophylactically weren't permitted, this
16  could occur; right? That's the context for what you
17  just read; right?
18    A.    I don't know if that's the context or
19  not.
20    Q.    Well, Doctor, you picked out a
21  sentence --
22    A.    Yes, but --
23    Q.    Can I finish my question, please.
24        You picked out a sentence from the
25  bottom of Page 5 and the start of that paragraph

Page 991

1  says, "If aspirin prophylaxis is not permitted,
2  there is a substantial chance that significantly
3  higher rates of CV adverse events (MIs, angina,
4  strokes, TIAs, et cetera) will be observed in the
5  selective COX-2 inhibitor group compared to the
6  standard NSAID group, as summarized in the preceding
7  section."
8        And then what follows is the sentence
9  that you just read; correct?
10    A.    Yes.
11    Q.    Right.
12        So, the way that Merck dealt with
13  that was, Merck attempted to minimize between group
14  differences by excluding patients at high risk, that
15  is, patients with things like prior heart attacks,
16  angina, stroke, TIA, atrial fibrillation, valvular
17  heart disease, peripheral vascular disease, et
18  cetera; correct?
19    A.    No. I disagree. The reason why you
20  would not want to have patients at high risk in a
21  trial that does not allow aspirin is that they need
22  to be treated with aspirin. And you can't test the
23  GI hypothesis if patients in both groups are
24  receiving a drug that causes GI effects. So, you
25  would not include these high risk patients because

Page 992

1  you're not allowed to treat them appropriately.
2    Q.    I see.
3        Doctor, you say that, but look at the
4  very next page of this document. It says, "The
5  following options are listed as potential ways to
6  deal with these risks; none of them appear ideal."
7  The first option that's listed is: "Prohibit use of
8  low-dose aspirin and accept the risk of observing
9  significant differences in CV event rates." Have I
10  read this correctly so far?
11    A.    Yes.
12    Q.    What follows immediately after that
13  is, "One could attempt to minimize between-group
14  differences by excluding patients at high risk (i.e.
15  with prior MI, angina, stroke, TIA, atrial
16  fibrillation, valvular heart disease, peripheral
17  vascular disease et cetera)." Did I read that
18  correctly, Dr. Shapiro?
19    A.    Yes.
20    Q.    Thank you. I'm now finished with
21  that document.
22        Let's move to Shapiro-51 which your
23  lawyer asked you about earlier today.
24        Now, I believe that the questioning
25  here revolved around the issue of when the

Page 993

1  cardiovascular SOP was amended. Do you recollect
2  that?
3    A.    Yes.
4    Q.    Was it your point essentially in
5  answering the questions from your lawyer that the
6  cardiovascular SOP was amended in October of '99 and
7  not in December of '99?
8        MR. MAYER: Objection to the form.
9        THE WITNESS: As it states and as I
10  read, the decision to revise the list is October
11  3rd, and then it goes on to say that the changes had
12  been made -- I'd like to find the exact page.
13  BY MR. SPECTER:
14    Q.    I think it's 5.
15    A.    It was effective October 3rd, 1999.
16  So, while the formal plan appears not to have come
17  through for approval until somewhat later, it
18  actually went into effect earlier.
19    Q.    Well, that's just what I wanted to
20  ask you about.
21        For example, when was congestive
22  heart failure taken off the list of events?
23    A.    I can't tell you exactly, but I have
24  seen a version of these tables that had dates next
25  to the various items that were crossed through, and

KS-000476

Confidential - Subject to Protective Order

Page 994

1 that version would give you more information.
2     Q.    Well, I'm just dealing with the
3 document that your lawyer was questioning you about
4 this morning.  What does this document indicate, if
5 anything, as to when, for example, congestive heart
6 failure was taken off the list?
7     A.    My read of this document says that
8 that was as of October 3rd.
9     Q.    Now, can you show me where congestive
10 heart failure is listed in this document, if
11 anywhere, as something that was taken off the list
12 as of October 3rd?
13     A.    The statement on Page 5 says,
14 "Effective October 3, 1999, in consultation with
15 Cardiovascular Clinical Sciences, a revised list of
16 eligible events is in effect (Appendix B)," and the
17 next page has Appendix B with "congestive heart
18 failure" struck through.
19     Q.    Exactly.
20         What's the date of Appendix B?
21     A.    The date of Appendix B is not -- you
22 can't infer from the date at the top of the document
23 that that's the date that it got crossed through.
24 That's the date of this document.
25     Q.    Doctor, tell the jury --

Page 995

1     A.    If you look at the page before --
2     Q.    Just tell the jury what the date is
3 on the document, please.  My only question is,
4 what's the date on the document?
5     A.    The date on the document is December
6 29, 1999, and as you see, if you look at all the
7 other pages, that's part of the title, and the
8 header -- the header of the document.  So, it's on
9 every page.
10     Q.    It is on the header of every page,
11 December 29?
12     A.    Yes.
13     Q.    Is it on the header of the page of
14 this document, 027?
15     A.    Typically, you don't put a header on
16 the cover letter --
17     Q.    Please, just tell me, is it on there?
18     A.    It is not on there.
19     Q.    Is it on there or not?
20     A.    Starting on Page 1, which is Bates
21 Number 31, it says revised December 29 1999, it says
22 it on the next page, it says it on the rest of the
23 body, it says it on Appendix B, it says it on
24 Appendix G, it says it on adjudication worksheet,
25 which was likely not revised on December 29, but it

Page 996

1 is included for information.
2     Q.    Do you know that?
3     A.    Well, I'd have to read through and
4 ask people, but it says it on Appendix J.  It says
5 it on the next page of Appendix J.  It says it on
6 the final adjudication form.  It looks to me,
7 knowing how to use Word, that that's in the header
8 of the Word document.
9     Q.    So, what was the revision on December
10 29, 1999, do you know?
11     A.    I don't know, but the inference --
12     Q.    Please, don't "but" me, Doctor.  Just
13 answer my question.
14         Do you know what the revision was on
15 that day?
16         MR. MAYER:  Object to constantly
17 interrupting the witness.
18         MR. SPECTER:  I object to the witness
19 not answering the question over and over and over
20 again.  I ask her a question, she doesn't answer it
21 and then they "buts" me.  I just want to know what
22 the answer is to my question.
23         MR. MAYER:  I object to the speech.
24         MR. SPECTER:  Let me ask the
25 question.  Well, I object to your statements.

Page 997

1 BY MR. SPECTER:
2     Q.    Now, let me ask the question again.
3 It is a simple question.  Yes or no?
4         Do you know what was revised about
5 this document, if anything, on December 29 of '99?
6 Do you know?
7     A.    I don't know, but -- and I would like
8 to proceed -- a person looking at the contents of
9 the document would deduce based on the statements in
10 the document that Appendix B was revised on October
11 3rd, and that this document is a summary that's
12 going in for approval that has a header dated
13 December 29.
14     Q.    Doctor, as part of your approach to
15 this deposition, do you have it in mind to use the
16 word "but" as often as possible in your answers?
17         MR. MAYER:  Objection to the form.
18         THE WITNESS:  I'm trying to be
19 accurate, and I'm trying to be thorough and --
20 BY MR. SPECTER:
21     Q.    Doctor --
22     A.    -- sometimes a simple answer is
23 inaccurate and misleading.
24     Q.    Doctor, congestive heart failure, yes
25 or no, do you know when congestive heart failure was

KS-000477

Confidential - Subject to Protective Order

Page 998

1  crossed off the list?
2      A.    On or before October 3rd based on
3  what this says.
4      Q.    On or before October 3rd?
5      A.    It says "Effective October 3rd."
6      Q.    Now, let's move to Shapiro-8, which
7  is the FDA medical officer's review that you talked
8  about with your lawyer this morning.  Do you
9  recollect that?
10     A.    Yes.
11     Q.    You read some sections of what she
12  had to say, is it Ms. Villalba or Dr. Villalba?
13     A.    It is Dr. Villalba.
14     Q.    You read some sections of that?
15     A.    Yes.
16     Q.    I want to go to the summary section,
17  if we could, page 105 of the document.
18     A.    Page 105?
19     Q.    Upper right-hand corner, 105.  Does
20  it say "In summary:  With the available data, it is
21  impossible to answer with complete certainty whether
22  the risk of cardiovascular and thromboembolic events
23  is increased in patients on Vioxx.  A larger
24  database will be needed to answer this and other
25  safety comparison questions."  Did I read that

Page 999

1  correctly?
2      A.    Yes.
3      Q.    Did you ever figure out how many
4  patients were on Vioxx for longer than a year from
5  which you could make a determination about CV and
6  thromboembolic events?
7            MR. MAYER:  Objection to the form.
8  BY MR. SPECTER:
9      Q.    Do you recall we discussed that
10  yesterday?  Do you remember?
11     A.    I --
12           MR. MAYER:  I think you asked that
13  question, she answered it several times.
14  BY MR. SPECTER:
15     Q.    Let me make my question more clear
16  because I think it was an unclear question.
17           Since yesterday that
18  question -- strike that also.
19           When I asked you that question
20  yesterday, you didn't know the answer to it; is that
21  correct?
22     A.    I do not have at hand how many
23  patients were studied at one year.
24     Q.    Right.  Did you check last night or
25  this morning?

Page 1000

1      A.    No.
2      Q.    Did you check last night or this
3  morning how many patients were studied who were on
4  Vioxx for more than 18 months?
5      A.    No.
6      Q.    For more than six months?
7      A.    No.
8      Q.    Do you recall we asked you those
9  questions yesterday, and those were things that you
10  didn't know the answer to; is that correct?
11     A.    Yes.
12     Q.    Now, I want to ask you about Exhibit
13  80, which was that letter you got from one of your
14  DSMB colleagues, Dr. Bjorkman; correct?
15     A.    Yes.
16     Q.    And you read some sections of that in
17  response to questions from your lawyer; is that
18  correct?
19     A.    Yes.
20     Q.    I want to ask you some things that
21  you did not read from in that letter.
22           He tells you that "I realize that our
23  decision to allow the trial to continue will be put
24  under the microscope."
25     A.    Can you tell me where you are?

Page 1001

1      Q.    I'm at the third paragraph.
2      A.    Yes.
3      Q.    Is that correct?
4      A.    Yes.
5      Q.    And then he says, "Good luck.  It is
6  a shame we have never met in person."  Correct?
7      A.    Yes.  Other than you didn't read all
8  of that other sentence, but yes.
9      Q.    So, this man who Merck hired to be on
10  the VIGOR trial DSMB never came to a single one of
11  your meetings; correct?  He participated by
12  telephone; is that correct?
13     A.    He participated by telephone.
14     Q.    And you wanted these DSMB members to
15  be there in person; correct?
16     A.    It states in our guidelines that that
17  would be ideal.  However, we would not have been
18  able to schedule meetings in a timely fashion if we
19  required that.  These experts are very busy, and
20  some of it requires extensive travel.  He was in
21  Salt Lake City, I believe, so, no, he did not attend
22  in person, but he was a very active and involved
23  participant.
24     Q.    Do you agree with him that it was a
25  shame that you and he had not met in person ever?

Confidential - Subject to Protective Order

Page 1002

1    A.    Do I agree it was a shame?
2    Q.    Yes.
3    A.    He seems like a wonderful person.  I
4  liked him, so I would have liked to have met him,
5  and I have since.
6    Q.    Doctor, you had some discussion with
7  your lawyer concerning your work with Dr. Scolnick;
8  is that correct?
9    A.    Well, on the e-mail from Dr.
10  Scolnick, yes.  Is that what you are referring to?
11    Q.    There was discussion about the
12  e-mails with Dr. Scolnick concerning his interests
13  in having a, quote, confidential meeting, unquote,
14  with you; is that correct?
15    A.    Yes.
16    Q.    There was discussion between you and
17  your lawyer this morning concerning whether Dr.
18  Scolnick could have been told about the results of
19  the VIGOR trial as it was ongoing.  Do you recollect
20  that?
21    A.    Yes.
22    Q.    Did you continue to talk to Dr.
23  Scolnick about his views concerning the VIGOR trial
24  after the results were known to him?
25        MR. MAYER:  Objection to the form.

Page 1003

1        THE WITNESS:  When you say "talk,"
2  can you be more --
3  BY MR. SPECTER:
4    Q.    I really should have said
5  communicate.  Did you communicate with Dr. Scolnick
6  or he with you concerning his views of the results
7  of the VIGOR trial after the results became known to
8  him?
9    A.    I received e-mails from him and many
10  other people that I was copied on that talked about
11  the results of VIGOR and the other trials.
12        MR. MAYER:  I object to this line of
13  questioning as outside the scope of direct, but also
14  we've been over at length before in this deposition.
15  BY MR. SPECTER:
16    Q.    Dr. Shapiro, do you recollect telling
17  us on direct examination words to the effect that by
18  late March of 2000, it was the views of the various
19  people who were working on the VIGOR trial that the
20  five to one difference in heart attack rates seen in
21  people on Vioxx versus people on naproxen was due to
22  a cardioprotective effect of naproxen?
23        MR. MAYER:  On direct examination?
24  Is that your question?
25        MR. SPECTER:  Yes.

Page 1004

1        THE WITNESS:  We didn't talk about
2  that today, I don't think, but --
3        MR. SPECTER:  When you said "direct,"
4  Ted, what I meant to say was by way of my direct of
5  you as opposed to your direct of her.
6  BY MR. SPECTER:
7    Q.    In any event, let me start the
8  question over again.
9        Do you recollect that when I
10  questioned you over the days that we've been
11  together we had discussion about the views of Merck
12  personnel who evaluated the VIGOR results in March
13  of 2000?
14    A.    Yes.
15    Q.    And you were one of those persons; is
16  that correct?
17    A.    Can you excuse me.
18          - - -
19        (Whereupon, an off-the-record
20  discussion was held between the witness and her
21  attorney.)
22          - - -
23        MR. MAYER:  Let's finish the
24  question, and I'll register an objection.  The
25  witness can answer that question, and the witness

Page 1005

1  has asked whether we can break for lunch at some
2  time.
3        MR. SPECTER:  We can break for lunch,
4  but I'm on the last document I have.  I have five
5  minutes or less --
6        MR. MAYER:  Are you okay with that?
7        MR. SPECTER:  So, if you want to come
8  back, we can come back.
9        THE WITNESS:  Five minutes is fine.
10  I just didn't know how long it was going to be.
11        MR. MAYER:  Do you have the question
12  in mind, Dr. Shapiro?
13        THE WITNESS:  Yes.
14        MR. SPECTER:  What I'd like to do --
15        MR. MAYER:  I object as beyond the
16  scope of my direct examination.
17        MR. SPECTER:  What I would like to do
18  is, I'd like to have one of the many people here
19  from Merck go next door and ask them to pipe down so
20  that the Doctor is able to answer without having the
21  interruption of noise and so that I can ask my
22  questions without the interruption of noise.
23        Let's go off the video record for
24  just a moment, please.
25        MR. MAYER:  Let the record reflect

KS-000479

55 (Pages 1002 to 1005)

Confidential - Subject to Protective Order

Page 1006

1  there are more people here for plaintiffs than for
2  Merck.
3       MR. SPECTER:  We'll do it, too.
4  We'll do it.
5       THE VIDEOTAPE TECHNICIAN:  Off the
6  record at 12:49 p.m.
7                - - -
8       (Whereupon, there was a recess from
9       12:49 p.m. until 12:49 p.m.)
10               - - -
11      THE VIDEOTAPE TECHNICIAN:  Back on
12  the record at 12:49.
13  BY MR. SPECTER:
14      Q.   I think the pending question was
15  whether you recollect there was discussion among
16  various people at Merck in March of 2000 when the
17  VIGOR results became known as to the significance of
18  those results?
19      A.   Yes.
20      Q.   You were part of that; is that
21  correct?
22      A.   Yes.
23      Q.   You told us that you reached the view
24  that the excess heart attacks in the Vioxx group
25  were due to a cardioprotective effect of naproxen?

Page 1007

1       A.   Yes.
2       Q.   Is that correct?
3       A.   Yes.
4       Q.   And what did Dr. Scolnick think about
5  that?
6       A.   After we had seen the data from the
7  Alzheimer's trials and the other trials we brought
8  in and after we had seen the pharmacokinetic data,
9  we were all in agreement with what that conclusion
10  was by the end of March.
11      Q.   And that conclusion was what?
12      A.   That naproxen had cardioprotective
13  effects, and that explained the results of VIGOR
14  compared to the results with nonnaproxen NSAIDs and
15  placebo.
16      Q.   So, the view was that the results
17  were not explainable by the prostacyclin/thromboxane
18  hypothesis?  That's your testimony; correct?
19      MR. MAYER:  Objection to the form.
20  I'll object again to this line of questioning as
21  retreading old ground and outside the scope of my
22  examination.
23  BY MR. SPECTER:
24      Q.   Is that correct, Doctor?
25      A.   Based on all the evidence we had,

Page 1008

1  that was most consistent with the data we had.
2       Q.   You and your colleagues did not think
3  that the data was explainable by the
4  prostacyclin/thromboxane hypothesis; is that
5  correct?
6       A.   That's right --
7       MR. MAYER:  Same objection.
8       THE WITNESS:  -- because the placebo
9  data and the nonnaproxen NSAIDs data didn't support
10  it, neither did the pharmacokinetic data.
11               - - -
12      (Whereupon, Deposition Exhibit
13      Shapiro-89, E-mails, MRK-ABH0017846 -
14      MRK-ABH0017847, was marked for
15      identification.)
16               - - -
17  BY MR. SPECTER:
18      Q.   I would like to show you an e-mail
19  that was sent to you dated April 1st, 2000 from Dr.
20  Scolnick.  Take a minute and look at it, if you
21  would, please.
22      A.   (Witness reviewing document.)
23      Q.   All set?
24      A.   Yes.
25      Q.   What had happened was that on March

Page 1009

1  31st of 2000, you as the statistician for the VIGOR
2  trial had sent to a whole group of people at Merck,
3  including upper management, updated results on the
4  adjudicated thromboembolic events; correct?
5       MR. MAYER:  Objection, outside the
6  scope of direct.
7       You may answer, Doctor.
8       THE WITNESS:  Yes.
9  BY MR. SPECTER:
10      Q.   Then Dr. Reicin had asked you, again,
11  copying a lot of people in upper management, "How
12  many MIs and CVAs" -- CVA would be a stroke;
13  correct?
14      MR. MAYER:  Same objection.
15      THE WITNESS:  Cerebrovascular
16  accident.  I guess that's the same as a stroke.
17  BY MR. SPECTER:
18      Q.   Right.  "How many MIs and CVAs in
19  each group?  Alise."  Correct?
20      MR. MAYER:  Same objection.
21      THE WITNESS:  Yes.
22  BY MR. SPECTER:
23      Q.   Her to you; right?
24      MR. MAYER:  Same objection.
25      THE WITNESS:  Yes.

KS-000480

Confidential - Subject to Protective Order

Page 1010

1   BY MR. SPECTER:
2      Q.    And then you gave her that data; is
3   that correct?
4           MR. MAYER:  Same objection.
5           THE WITNESS:  Yes.
6   BY MR. SPECTER:
7      Q.    And you said to her and others
8   including Dr. Scolnick, "The breakout is below.  The
9   results are somewhat surprising.  I'll work on a
10  table that shows all adjudicated events by type of
11  event."  Is that correct?
12     A.    Yes.
13          MR. MAYER:  Same objection.
14  BY MR. SPECTER:
15     Q.    You felt the results were surprising,
16  otherwise, you wouldn't have said that; correct?
17          MR. MAYER:  Same objection.
18          THE WITNESS:  Yes.
19  BY MR. SPECTER:
20     Q.    Then Dr. Scolnick writes back to you,
21  copying only Dr. Reicin, and he says, "Deborah, This
22  is really interesting.  In fact the results are NOT
23  surprising."  Did I read that correctly so far?
24          MR. MAYER:  Same objection.
25          THE WITNESS:  Yes.

Page 1011

1   BY MR. SPECTER:
2      Q.    And he put the word "not" in all
3   capital letters; correct?
4           MR. MAYER:  Same objection.
5           THE WITNESS:  Yes.
6   BY MR. SPECTER:
7      Q.    He says, "All the low dose aspirin
8   data says that low dose aspirin had beneficial
9   effects on MIs but hardly clear on cerebral events.
10  This data is perfectly in line with that.  The
11  prostacyclin/thromboxane hypothesis is further
12  strengthened by this data."  Did I read that
13  correctly so far?
14     A.    Yes.
15          MR. MAYER:  Same objection.
16  BY MR. SPECTER:
17     Q.    Then he says, "Whether naproxen
18  lowers in RA patients is issue.  Only more work will
19  clarify this aspect/Ed Scolnick."  Did I read that
20  correctly?
21          MR. MAYER:  Same objection.
22          THE WITNESS:  Yes.
23          MR. SPECTER:  Thank you.  Nothing
24  further, Doctor.
25          MR. MAYER:  Let's take two minutes.

Page 1012

1           THE VIDEOTAPE TECHNICIAN:  Off the
2   record at 12:56.
3               - - -
4           (Whereupon, the deposition concluded
5   at 12:56 p.m.)
6               - - -
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 1013

1               CERTIFICATE
2
3           I, LINDA L. GOLKOW, a Notary Public
4   and Certified Shorthand Reporter of the State of New
5   Jersey, do hereby certify that prior to the
6   commencement of the examination, DEBORAH SHAPIRO,
7   DR.P.H. was duly sworn by me to testify to the
8   truth, the whole truth and nothing but the truth.
9           I DO FURTHER CERTIFY that the
10  foregoing is a verbatim transcript of the testimony
11  as taken stenographically by and before me at the
12  time, place and on the date hereinbefore set forth,
13  to the best of my ability.
14          I DO FURTHER CERTIFY that I am
15  neither a relative nor employee nor attorney nor
16  counsel of any of the parties to this action, and
17  that I am neither a relative nor employee of such
18  attorney or counsel, and that I am not financially
19  interested in the action.
20  _____
21  LINDA L. GOLKOW, CSR
    Notary Number:  1060147
22  Notary Expiration:  1-2-08
    CSR Number:  30XI176200
23  Dated:  July 6, 2005
24
25

KS-000481

Confidential - Subject to Protective Order

Page 1014

1        ACKNOWLEDGMENT OF DEPONENT
2
3        I,_____, do hereby
         certify that I have read the foregoing pages,  869 -
4        1016, and that the same is a correct transcription
         of the answers given by me to the questions therein
5        propounded, except for the corrections or changes in
         form or substance, if any, noted in the attached
6        Errata Sheet.
7
8        _____
         DEBORAH SHAPIRO, DR.P.H.              DATE
9
10
11       Subscribed and sworn
         to before me this
12          day of         , 20   .
13       My commission expires:
14
15       Notary Public
16
17
18
19
20
21
22
23
24
25

Page 1016

1        LAWYER'S NOTES
2   PAGE  LINE
3   ____  ____  _____
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
25  ____  ____  _____

Page 1015

1            - - - - - -
             E R R A T A
2            - - - - - -
3   PAGE   LINE   CHANGE
4   ____   ____   _____
5   ____   ____   _____
6   ____   ____   _____
7   ____   ____   _____
8   ____   ____   _____
9   ____   ____   _____
10  ____   ____   _____
11  ____   ____   _____
12  ____   ____   _____
13  ____   ____   _____
14  ____   ____   _____
15  ____   ____   _____
16  ____   ____   _____
17  ____   ____   _____
18  ____   ____   _____
19  ____   ____   _____
20  ____   ____   _____
21  ____   ____   _____
22  ____   ____   _____
23  ____   ____   _____
24  ____   ____   _____
25

KS-000482

58 (Pages 1014 to 1016)