Exhibit "36"

Confidential - Subject to Protective Order

```
 1                SUPERIOR COURT OF NEW JERSEY
                  LAW DIVISION - ATLANTIC COUNTY
 2                        -  -  -
    IN RE:   VIOXX LITIGATION : CASE NO. 619
 3  -----------------------------------------------------
        IN THE CIRCUIT COURT OF CLAY COUNTY, ALABAMA
 4
    CHERYL ROGERS, et al.     :   CASE NO.
 5          Plaintiff         :
            v.                :
 6  MERCK & CO., INC., et al.,:
            Defendants        :   CV-03-73
 7  -----------------------------------------------------
                  CAUSE NO. 19961*BH02
 8                        -  -  -
    CAROL ERNST, INDIVIDUALLY : IN THE DISTRICT COURT OF
 9  AND AS PERSONAL           :
    REPRESENTATIVE OF THE     :
10  ESTATE AND HEIRS OF ROBERT:
    CHARLES ERNST, DECEASED;  :
11  R. CHARLES ERNST;         :
    ANGELA F. ERNST           :   BRAZORIA COUNTY, TEXAS
12          v.                :
    MERCK & CO., INC.,        :
13  HARVEY RESNICK, M.D. AND  :
    R/D CLINICAL RESEARCH,    :
14  INC., BRENT H. WALLACE    :
    M.D.                      :   23RD JUDICIAL DISTRICT
15                        -  -  -
16                    CONFIDENTIAL
                  SUBJECT TO PROTECTIVE ORDER
17
                          -  -  -
18                    April 8, 2005
                          -  -  -
19
            Continued videotape deposition of PETER S.
20
    KIM, Ph.D.
21
                          -  -  -
22
23
                  ESQUIRE DEPOSITION SERVICES
24                1880 John F. Kennedy Boulevard
                          15th Floor
25             Philadelphia, Pennsylvania 19103
```

**KS-000483**

Confidential - Subject to Protective Order

Page 629

```
1   PHILIP & CYNTHIA DIPIETRO :  COURT OF COMMON PLEAS
        (h/w)        :  DELAWARE COUNTY
2        v.          :
    MERCK & CO., INC.     :
3        AND          :
    ROBERT F. CROWELL, D.O. :
4        AND          :
    BROOKHAVEN MEDICAL    :  CIVIL ACTION
5   ASSOCIATES        :  NO: 04-19198
6                - - -
7
8
9
10
11          Continued videotape deposition of PETER S.
12   KIM, Ph.D., held in the offices of Dechert, LLP,
13   1717 Arch Street, Philadelphia, Pennsylvania,
14   commencing at 9:04 a.m., on the above date, before
15   Linda L. Golkow, a Federally-Approved Registered
16   Diplomate Reporter and Certified Shorthand Reporter.
17
18                - - -
19
20
21
22
23
24
25
```

Page 631

```
1   A P P E A R A N C E S:  (CONTINUED)
2
3     GOFORTH LEWIS SANFORD LLP
        BY:  CARLENE RHODES LEWIS, ESQUIRE
4           and
            SHELLY A. SANFORD, ESQUIRE
5     Suite 2200
      1111 Bagby
6     Houston, Texas 77002
      (713) 650-0022
7     Counsel for Plaintiffs
      (By Telephone)
8
9     LOCKS LAW FIRM PLLC
        BY:  STEVEN P. KNOWLTON, ESQUIRE
10    110 East 55th Street
      New York, New York 10022
11    (212) 838-3333
      Counsel for Plaintiffs
12
13
      THE FERRARA LAW FIRM
14      BY:  MICHAEL A. FERRARA, JR., ESQ.
      601 Longwood Avenue
15    Route 38 & Longwood Avenue
      Cherry Hill, New Jersey 08002
16    (856) 779-9500
      Counsel for Plaintiffs
17
18
      KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
19      BY:  COURTNEY OZER DECRISTOFARO, ESQUIRE
      1633 Broadway
20    New York, New York 10019-6799
      (212) 506-1700
21    Counsel for Plaintiffs
22
23                - - -
24
25
```

Page 630

```
1   A P P E A R A N C E S:
2
3     KLINE & SPECTER, P.C.
        BY:  SHANIN SPECTER, ESQUIRE
4           and
            THOMAS R. KLINE, ESQUIRE
5           and
            LEE B. BALEFSKY, ESQUIRE
6           and
            LISA DAGOSTINO, M.D., J.D.
7           and
            MICHELLE L. TIGER, ESQUIRE
8     19th Floor
      1525 Locust Street
9     Philadelphia, Pennsylvania 19102
      (215) 772-1000
10    Counsel for Plaintiffs
11
12    SEEGER WEISS LLP
        BY:  DAVID R. BUCHANAN, ESQUIRE
13    Suite 920
      550 Broad Street
14    Newark, New Jersey 07102
      (973) 639-9100
15    Counsel for Plaintiffs
      (By Telephone)
16
17    THE BEASLEY FIRM LLC
        BY:  NANCY RHOADS, ESQUIRE
18    1125 Walnut Street
      Philadelphia, Pennsylvania 19107
19    (215) 592-1000
      Counsel for Plaintiffs
20
21
      THE LANIER LAW FIRM
22      BY:  RICHARD D. MEADOW, ESQUIRE
      6th Floor, Tower 56
23    126 East 56th Street
      New York, New York 10022
24    (212) 421-2800
      Counsel for Plaintiffs
25                - - -
```

Page 632

```
1   A P P E A R A N C E S:  (CONTINUED)
2
3     WEITZ & LUXENBERG
        BY:  JERRY KRISTAL, ESQUIRE
4           and
            JOSEPH P. WILLIAMS, ESQUIRE
5     180 Maiden Lane
      New York, New York 10038
6     (212) 558-5500
      Counsel for Plaintiffs
7
8
      WILLIAMS & CONNOLLY LLP
9       BY:  DAVID C. KIERNAN
            and
10          ANDREW W. RUDGE, ESQUIRE
      725 Twelfth Street, N.W.
11    Washington, D.C. 20005
      (202) 434-5000
12    Counsel for Merck & Company, Inc.
      and the Witness, Peter S. Kim, Ph.D.
13
14
      HUGHES HUBBARD & REED, LLP
15      BY:  JAMES C. FITZPATRICK, ESQUIRE
      One Battery Park Plaza
16    New York, New York 10004-1482
      (212) 837-6000
17    Counsel for Merck & Company, Inc.
      and the Witness, Peter S. Kim, Ph.D.
18
19
      O'BRIEN & RYAN, LLP
20      BY:  ANTHONY M. GALLO, ESQUIRE
      Suite 300, Hickory Pointe
21    2250 Hickory Road
      Plymouth Meeting, PA 19462-1047
22    (610) 834-8800
      Counsel for Dr. Crowell
23
24                - - -
25
```

**KS-000484**

Confidential - Subject to Protective Order

Page 633

1  A L S O   P R E S E N T :
2
3      JOANNE LAHNER, ESQUIRE
       Merck & Co., Inc.
4      351 N. Sumneytown Pike
       North Wales, PA 19454-2505
5      (267) 305-6331
6
7      ROBERT ZAUSNER
       Kline & Specter, P.C.
8      19th Floor
       1525 Locust Street
9      Philadelphia, Pennsylvania 19102
       (215) 772-1000
10
11
12
13
14
                - - -
15
16
17
18
19
20
21
22
23
24
25

Page 635

1                E X H I B I T S
2   NO.          DESCRIPTION          PAGE NO.
3
   Kim-48   "Comparison of Upper Gastro-    758
4            intestinal Toxicity of Rofecoxib
             and Naproxen in Patients with
5            Rheumatoid Arthritis"  The New
             England Journal of Medicine
6            November 23, 2000 (1520-1528)
             MRK-ABA0001301 -
7            MRK-ABA0001309
8   Kim-49   Letter 4-7-05 with Attachment   774
             Partially unredacted documents
9            MRK-AFJ0000282 -
             MRK-AFJ0000317
10
   Kim-50   E-mail 3-9-2002           825
11           MRK-AFJ0000576 -
             MRK-AFJ0000577
12
   Kim-51   PowerPoint Presentation     832
13           "Effects of NSAIDs on
             Thromboxane and Prostacyclin"
14           MRK-AFJ0009371
15  Kim-52   PowerPoint Presentation "Merck   834
             Research Laboratories Face-to-
16           Face Meeting Peter S. Kim"
             November 29-30, 2001
17           MRK-AFJ0009366 -
             MRK-AFJ0009379
18
   Kim-53   E-mail 11-21-2001          838
19           MRK-AAZ0003351
20  Kim-54   Vioxx label, April 2002      847
21  Kim-55   E-mails                854
             MRK-AFJ0000518 -
22           MRK-AFJ0000519
23
                - - -
24
25

Page 634

1              - - -
2          I N D E X
3   WITNESS                PAGE NO.
4   PETER S. KIM, Ph.D.
5      By Mr. Specter          640
6
7
8          - - -
9          E X H I B I T S
10  NO.      DESCRIPTION      PAGE NO.
11  Kim-43   "Section: A  Good Riddance   651
             To a Bad Drug" Eric J. Topol
12           New York Times 10/2/04
             (3 pages)
13
   Kim-44   New York Times Letter to the   652
14           Editor 10-8-04 (Peter S. Kim)
             Reprint (2 pages)
15
   Kim-45   "Discontinuation of Vioxx"    663
16           Kim/Reicin) Lancet vol. 365
             1-1-05 (23-28) January 3, 2005
17
   Kim-46   "Food and Drug Administration   704
18           Division of Anti-Inflammatory,
             Analgesic and Ophthalmic Drug
19           Products-HFD-550 Medical Officer
             Review NDA 21-042 and NDA 21-052"
20           (56 pages)
21  Kim-47   "Rofecoxib, Merck, and the FDA"   729
             Correspondence, The New England
22           Journal of Medicine 12-30-04,
             351;27 (2875-2878)
23
24           - - -
25

Page 636

1              E X H I B I T S
2   NO.        DESCRIPTION      PAGE NO.
3   Kim-56   US Patent & Trademark Office   860
            Patent Application Full Text
4           And Image Database
            #20020016342 2-7-02
5           "Combination therapy using
            Cox-2 selective inhibitor
6           and thromboxane inhibitor
            and compositions therefor"
7           (Scolnick)
            MRK-GAR0003079 -
8           MRK-GAR0003096
9
10
              - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**KS-000485**

Confidential - Subject to Protective Order

Page 637

1      DEPOSITION SUPPORT INDEX
2
3
    Direction to Witness Not To Answer
4   Page  Line  Page  Line
    (None)
5
6
7
8
    Request For Production of Documents
9   Page  Line  Page  Line
    691    25
10
11
12
13
14  Stipulations
    Page  Line  Page  Line
15   (None)
16
17
18  Questions Marked
    Page  Line  Page  Line
19  (None)
20
21
22
23
24
25

Page 638

1              - - -
2          PETER S. KIM, Ph.D.
3   after having been duly sworn, was examined and
4   testified as follows:
5              - - -
6          MR. SPECTER:  Dr. Kim, good morning.
7          THE WITNESS:  Good morning.
8          MR. SPECTER:  Shanin Specter again.
9   I want to remind you that you're still under oath.
10  You're aware of that, sir?
11         THE WITNESS:  Yes.
12         MR. SPECTER:  Before we get started,
13  off the video record let's identify who is here
14  today.
15         From my firm are myself, Lisa
16  Dagostino, Lee Balefsky, Robert Zausner, Tom Kline
17  and Michelle Tiger.
18         MR. MEADOW:  Rick Meadow from The
19  Lanier Law Firm, plaintiffs.
20         MS. DECRISTOFARO:  Courtney
21  DeCristofaro from Kasowitz, Benson, Torres &
22  Friedman for the New Jersey plaintiffs.
23         MR. KNOWLTON:  Steve Knowlton, Locks
24  Law Firm, New Jersey plaintiffs.
25         MR. GALLO:  Anthony Gallo for one of

Page 639

1   the New Jersey defendant doctors.
2          MS. RHOADS:  Nancy Rhoads from The
3   Beasley Firm for the plaintiffs.
4          MS. LAHNER:  Joanne Lahner from Merck
5   & Company.
6          MR. RUDGE:  Andrew Rudge, Williams &
7   Connolly, for Merck.
8          MR. FITZPATRICK:  James Fitzpatrick
9   from Hughes Hubbard & Reed for Merck.
10         MR. KIERNAN:  David Kiernan for
11  Merck.
12         Just on the record again, I'm
13  assuming everybody agrees to be bound by the
14  protective orders?
15         (No response.)
16         MR. SPECTER:  Who is on the phone?
17         MS. SANFORD:  Shelly Sanford and
18  Carlene Lewis, Goforth, Lewis Sanford, for
19  plaintiff.
20         THE VIDEOTAPE TECHNICIAN:  This is a
21  continuation of the videotape deposition of Peter S.
22  Kim, Ph.D.  Today's date is April 8, 2005, and the
23  video time is 9:04 a.m.
24         We're back on the record.
25              - - -

Page 640

1              EXAMINATION
2              - - -
3   BY MR. SPECTER:
4       Q.    Dr. Kim, good morning again.
5             Dr. Kim, yesterday the FDA announced
6   that it had asked Pfizer to withdraw Bextra from the
7   market, and Pfizer said that they had agreed to do
8   so.  Are you aware of that?
9       A.    Yes, I am.
10      Q.    Is Merck still planning to seek FDA
11  approval for the remarketing of Vioxx?
12      A.    Merck is going to be having
13  discussions with the FDA, and in those discussions
14  we will be discussing the current state of science,
15  where it is that the FDA's interpretation of the
16  science stands, and the benefits that Vioxx brings
17  that are unique to Vioxx.  And in those discussions,
18  we will see where that goes.  But we are interested
19  in having discussions with the FDA to understand
20  their position on the science and to explain our
21  position on the science.
22      Q.    Do you intend to have that last
23  answer be pretty much the same answer as you gave
24  when you were asked about it a couple of weeks ago?
25         MR. KIERNAN:  Objection, form.

KS-000486

Confidential - Subject to Protective Order

Page 641

1    THE WITNESS:  I'm not sure what you
2  mean.
3  BY MR. SPECTER:
4    Q.    Well, your answer sounds pretty much
5  the same as what you told us when you discussed it
6  with us a few weeks ago.  Is it your intention for
7  us to believe that your intentions are the same now
8  as they were a few weeks ago?
9    MR. KIERNAN:  Objection to form.
10    THE WITNESS:  As I've stated, the
11  intention is to go down there and have a discussion
12  with the FDA about their interpretation of the
13  science and our interpretation of the science.
14    Since we met last time, as you just
15  pointed out, the FDA has reached a decision on what
16  it wants to see happen with COX-2 inhibitors, as
17  well as with the nonsteroidal anti-inflammatory
18  drugs or NSAIDs, and so clearly their thinking has
19  evolved, and we are interested in understanding and
20  having those discussions with them to understand how
21  their thinking has evolved and to then enter into
22  discussions about Vioxx.
23  BY MR. SPECTER:
24    Q.    I'm asking something totally
25  different.  Do you understand that?

Page 642

1    A.    Why don't we try again.
2    Q.    Are your intentions any different now
3  than they were a few weeks ago when we discussed
4  this issue?
5    A.    Our intentions are not different.  We
6  want to go down there and have a discussion, a
7  scientific discussion with the FDA.
8    Q.    Have you discussed with your
9  colleagues in the last 24 hours at Merck the chances
10  of Vioxx being approved for remarketing?
11    A.    No.  We haven't discussed the chances
12  of that happening.  We've --
13    Q.    That's fine.  That's an answer to my
14  question.
15    Dr. Kim, do you know Alastair Wood?
16    A.    I met Alastair Wood at the Advisory
17  Committee meeting that was held recently.
18    Q.    The FDA asked him to chair the recent
19  Advisory Committee meeting?
20    A.    I don't know.  I assume so.  He was
21  the chair of the Advisory Committee meeting that the
22  FDA held on the COX-2 inhibitors, which also
23  included a substantial discussion on the NSAIDs that
24  was held in February.
25    Q.    What kind of doctor is Dr. Wood?

Page 643

1    A.    I actually am not sure what kind of
2  physician he is.
3    Q.    Does he hold a position with the New
4  England Journal of Medicine?
5    A.    I don't know.
6    Q.    Do you know what qualified him to
7  head that panel?
8    A.    I'm not familiar with the -- I don't
9  know the exact details of his background or his
10  qualifications.
11    Q.    Do you respect Dr. Wood?
12    A.    I certainly respect him based on what
13  I saw.  This was the first time that I have ever met
14  him or seen him, and I saw him oversee the Advisory
15  Committee meeting for the three days.  Certainly, I
16  have no reason to not respect him.
17    Q.    Do you recollect him saying anything
18  that you disagreed with?
19    MR. KIERNAN:  Objection to form.
20    THE WITNESS:  There were certainly
21  things that were said at the Advisory Committee
22  meeting, including said by Dr. Wood, that at the
23  time I didn't -- I would say I disagreed with.  I'm
24  not sure I could recollect them.  But, yes, there
25  were things that Dr. Wood said that I disagreed

Page 644

1  with.
2  BY MR. SPECTER:
3    Q.    Well, one thing he said was that
4  there were five placebo-controlled studies with
5  COX-2 inhibitors that showed a higher incidence of
6  cardiovascular events with the COX-2 inhibitor
7  versus the placebo.  Do you recollect that?
8    A.    Not specifically.
9    Q.    Do you think that that's a true
10  statement?
11    A.    I'd have -- I don't know.  I'd have
12  to sit down and work through it all.  Do you want me
13  to try?
14    Q.    Sure.  Let me see if I can help you
15  with that.
16    A.    Sure.
17    Q.    He said that there were two as to
18  Vioxx, two as to Bextra and one as to Celebrex.
19  Does that accord with your own recollection?
20    A.    I see.  Can you give the statement
21  again, please, of what he said?  There were five --
22    Q.    Five placebo-controlled studies that
23  showed a higher incidence of cardiovascular events
24  with the COX-2 inhibitor versus the placebo.
25    A.    Well, as we know, the APPROVe study,

KS-000487

Confidential - Subject to Protective Order

Page 645

1  in the case of Vioxx, was the study that Merck
2  conducted that ultimately led to the withdrawal, the
3  voluntary withdrawal of Vioxx by Merck & Company,
4  and that was a placebo-controlled study in patients
5  with a prior history of colon polyps which showed
6  that beginning after approximately 18 months, there
7  was an increased risk for patients that were taking
8  Vioxx as compared to placebo.  So, that would be
9  one.
10         We know, as well, that there was a
11 similar study with Celebrex, again, in patients with
12 a prior history of colon polyps, which showed
13 beginning after approximately 14 months an increased
14 cardiovascular risk in patients taking Celebrex
15 versus those taking placebo.
16         We know in the case of Bextra that
17 there are studies in patients post-CABG treatment in
18 which treatment with an IV formulation of Bextra
19 followed by the oral formulation of Bextra led to an
20 increased number of cardiovascular event rates --
21 excuse me, cardiovascular events as compared to
22 those on placebo.
23         In the case of Vioxx, he said that he
24 was referring to two with Vioxx.
25     Q.    Yes.

Page 646

1     A.    So, I don't know what he would be
2  referring to specifically.  If he's referring to --
3  well, I guess maybe he's referring to 090, which is
4  a study, a very small study, which numerically
5  showed a higher number of cardiovascular events for
6  patients taking Vioxx than those taking placebo, but
7  the study was small, the difference was not
8  statistically significant.
9         In the case of Celebrex, you said
10 there were two?
11     Q.    No, one.
12     A.    Okay.  In the case of Bextra you said
13 there were two?
14     Q.    I said he said there were two.
15     A.    I don't know for sure, but I would
16 imagine that he's referring to the two studies that
17 were done post -- in post-CABG patients with Bextra
18 or in the IV formulation of Bextra called
19 valdecoxib -- excuse me, the IV formulation of
20 Bextra and followed by Bextra in those patients.
21     Q.    Dr. Wood is quoted in this morning's
22 New York Times as saying that for his patients that
23 require pain relief, he recommends Aleve, and that
24 for those patients who take Aleve that have stomach
25 upset, he recommends that they add Prilosec to that

Page 647

1  Aleve.  Have you read that New York Times this
2  morning?
3     A.    I did read the New York Times article
4  very quickly this morning.
5     Q.    Did Merck ever maintain that Vioxx
6  was superior to Aleve for patients that did not have
7  stomach upset?
8     A.    It -- so, it depends what you mean by
9  "superior."
10     Q.    More safe and more efficacious.
11     A.    In terms of --
12     Q.    That is the test of what's better;
13 correct?
14     A.    Well, that certainly -- certainly
15 would be a major criteria.
16         In terms of efficacy, compared to
17 Aleve or -- actually, so, to be specific, Vioxx was
18 studied against prescription strength naproxen.
19 Naproxen is sold over-the-counter as Aleve, but at a
20 lower dose than what was used in the studies that
21 were conducted by Merck, comparing naproxen to
22 Vioxx.
23         And specifically in the studies that
24 Merck conducted looking at the efficacy of naproxen
25 versus Vioxx, the dose of naproxen that was used was

Page 648

1  500 milligrams twice a day, and at that dose, at
2  that prescription dose of naproxen, the efficacy is
3  generally comparable to the efficacy seen with Vioxx
4  at 25 milligrams.
5     Q.    And just so the jury understands,
6  efficacy, meaning relief of pain; correct?
7     A.    Correct.  Overall relief of pain as
8  measured in a clinical trial where you are looking
9  at over the average of the patients in that trial,
10 whether or not the pain relief is comparable between
11 the two groups, or in some cases, other symptoms
12 that are associated with the arthritis that the
13 patient feels.  That's not to say that for an
14 individual patient there might not be differences.
15 In fact, anecdotally, there are certainly reports of
16 some patients who respond better to one drug than
17 another.  But on an average over the group, when you
18 look at the efficacy, as you say, how well it
19 relieves pain or how well it relieves other
20 arthritis symptoms, there was not a significant
21 difference between the efficacy of Vioxx versus the
22 efficacy of prescription-strength naproxen.
23     Q.    Let's discuss safety for a moment.
24 Did Merck ever claim that Vioxx was safer than
25 Aleve?  I want you to focus on Aleve, sir.  That's

KS-000488

Confidential - Subject to Protective Order

Page 649

1 my question.
2     A.    If the question is whether Vioxx is
3 safer than Aleve, which is the over-the-counter form
4 of naproxen that's sold without a prescription --
5     Q.    Right.
6     A.    -- I am not aware of Merck saying
7 that.
8     Q.    Did Merck ever claim that Vioxx was
9 safer and more efficacious than Aleve combined with
10 Prilosec for people that have stomach problems?
11     A.    I'm sorry.  Did Merck ever say that
12 Vioxx is safer and more efficacious --
13     Q.    Correct.
14     A.    -- than Aleve with Prilosec?
15     Q.    Correct.
16         MR. KIERNAN:  Object to the form.
17 He's not here as a corporate designee, but if he has
18 any personal knowledge.
19         THE WITNESS:  Not to my knowledge.
20 BY MR. SPECTER:
21     Q.    Certainly it's a lot cheaper and
22 easier to get Aleve than to get Vioxx; right?
23     A.    So, again, we need to be careful.
24 And if we're speaking specifically about Aleve,
25 which is the over-the-counter dose of naproxen, that

Page 650

1 is available over-the-counter without a
2 prescription, and, therefore, for a patient, that's
3 something that a patient can walk into a drugstore
4 and just purchase over-the-counter.
5         In the case of Vioxx, that's a
6 prescription drug which requires a physician to
7 write a prescription.  In the case of
8 prescription-strength naproxen, it requires a
9 prescription.
10         I would also point out that Prilosec
11 is a prescription drug.
12     Q.    Do you have a recollection of my
13 question, Dr. Kim?
14     A.    Your most recent question?
15     Q.    Yes.
16     A.    I believe you asked me whether or not
17 it was easier for a patient to -- and cheaper for a
18 patient to obtain Aleve as compared to Vioxx.
19     Q.    What's the answer to my question?
20     A.    For a patient, it is easier to obtain
21 Aleve because it's an over-the-counter drug as
22 opposed to a prescription drug.  As far as cheaper,
23 I don't know.  I would imagine it depends on the
24 patient, what the patient's health plan is.
25     Q.    You don't know what Aleve costs in

Page 651

1 the drugstore per tablet, roughly?
2     A.    It costs -- I don't know.  Roughly?
3 It costs significantly less than, I would imagine, a
4 quarter a pill.
5     Q.    How about Vioxx?
6     A.    Again, I think it depends on what --
7 if you're asking me -- I believe you're asking me
8 for a patient, and so --
9     Q.    Roughly.
10     A.    I don't know.  I'm not familiar with
11 what different healthcare plans provide for in terms
12 of what's referred to as the co-pay that a patient
13 would have to contribute towards a prescription drug
14 like Vioxx.
15     Q.    Do you have some rough idea as to
16 what Merck charged for the sales of Vioxx to those
17 persons and entities who purchased Vioxx per tablet?
18     A.    I'm not sure, but I would hazard a
19 guess that it's approximately $1 to $2.
20     Q.    Per pill?
21     A.    Correct.
22     Q.    Is that an estimate?
23     A.    That's a guess.
24         - - -
25         (Whereupon, Deposition Exhibit Kim-43,

Page 652

1         "Section:  A Good Riddance to a Bad
2         Drug" Eric J. Topol, New York Times,
3         10/2/04 (3 pages), was marked for
4         identification.)
5         - - -
6 BY MR. SPECTER:
7     Q.    I've marked as Kim-43 a letter to the
8 editor that Dr. Topol sent that was published in the
9 New York Times back in October of 2004.  Do you have
10 a recollection of that letter, sir?
11     A.    I do, but I have not seen this really
12 since, I think, when it was published, so, give me a
13 chance to just look it over.
14     Q.    No problem.
15     A.    (Witness reviewing document.)
16         MR. SPECTER:  While we're at it, I'm
17 going to mark as Kim-44 the reply that you signed to
18 that letter.
19         - - -
20         (Whereupon, Deposition Exhibit Kim-44,
21         New York Times Letter to the Editor,
22         10-8-04, (Peter S. Kim) Reprint, (2
23         pages), was marked for identification.)
24         - - -
25         (Witness reviewing document.)

Confidential - Subject to Protective Order

Page 653

1    THE WITNESS:  Okay.
2  BY MR. SPECTER:
3    Q.    Dr. Kim, just so we have some
4  background here, Dr. Topol is a cardiologist; is
5  that correct?
6    A.    That's my understanding, yes.
7    Q.    He's out at the Cleveland Clinic; is
8  that right?
9    A.    That's correct.
10    Q.    That's a very famous place in medical
11  science; is that right?
12    A.    It has a good reputation, yes.
13    Q.    Dr. Topol, does he also enjoy a fine
14  reputation in the field?
15    A.    I think it's -- I think he has a --
16  he has a good reputation amongst many people, but
17  somewhat mixed amongst others.
18    Q.    How about with you?
19    A.    I don't have a strong opinion on Dr.
20  Topol's reputation.
21    Q.    Do you have any opinion?
22    A.    I certainly have disagreed with
23  statements that he has written.
24    Q.    Do you think he's well intentioned?
25    A.    I don't know.  I don't know him.

Page 654

1    Q.    Now, he wrote a letter to the New
2  York Times which they published on October 2nd, 2004
3  with respect to the withdrawal of Vioxx; correct?
4    A.    I assume that's correct, based on
5  what you've shown me here.
6    Q.    And you responded to that letter?
7    A.    I certainly responded to the letter,
8  yes.
9    Q.    And that response was published on
10  October 8th --
11    A.    Again, based on what you've shown me,
12  yes.
13    Q.    -- is that correct?  Well, do you
14  have any reason to doubt the accuracy of what I've
15  shown you?
16    A.    No.  But I just -- if you're asking
17  me if I recall that, I don't recall the dates.  I'm
18  just saying that based on what you've shown me, I am
19  assuming that that's the case.
20    Q.    Fair enough.
21    Now, do you recollect a letter being
22  published from Dr. Topol and it coming to pass that
23  you would sign a letter in reply?
24    A.    I recall a letter being published by
25  Dr. Topol in the New York Times and deciding to make

Page 655

1  -- to reply to this letter, yes.
2    Q.    Was that your decision?
3    A.    Yes, that was my decision.
4    Q.    Did you author the response?
5    A.    I certainly authored the response in
6  that what was submitted was what I wanted to submit
7  and was approved by me.
8    Q.    That sounds like you didn't write it,
9  but you signed it and thought that it was correct.
10  Would that be true?
11    A.    I don't recall who wrote the
12  original, the first draft of the letter, but
13  certainly it is my -- the way in which I work is, I
14  will take drafts of things that people will propose
15  or write, and then I will make -- either redraft it
16  or make changes.  I will certainly be, though -- I
17  am the one who's writing the letter in the sense
18  that I'm the one who is signing off on what's being
19  said here.
20    Q.    Did you intend your letter to be a
21  reasonably thorough response to Dr. Topol's letter
22  to the editor?
23    A.    When you say "reasonably thorough," I
24  think realistically, when one writes a response to a
25  letter that's published in the media, particularly

Page 656

1  in the media such as the New York Times, there are
2  severe space constraints that are imposed upon you
3  by the publisher, and so, therefore, it's,
4  unfortunately, not possible to -- or maybe it's
5  possible -- it's unfortunately not -- often it's,
6  unfortunately, not possible be thorough and as
7  thorough as one would like to be in response to a
8  letter that's published.
9    So, what I tried to accomplish here
10  was to hit what I thought were the high level main
11  points that I wanted to put out there in response to
12  the letter.
13    Q.    Did you sign a longer letter to the
14  New York Times that they required you to reduce
15  because of space reasons?
16    A.    I did.
17    Q.    You did?
18    A.    Yes.
19    Q.    So, this letter is not the letter
20  that was sent to the Times, something else was sent,
21  and then this was the product of editing; is that
22  correct?
23    A.    Well, I think we have to be careful.
24  When you say it's "the product of editing," it's the
25  product of the New York Times proposing edits or

KS-000490

Confidential - Subject to Protective Order

Page 657

1  proposing or requesting that we shorten the letter,
2  and then our attempts, and then ultimately what we
3  end up with after we've shortened the letter. But
4  the final letter that was sent off is one that I
5  signed off on.
6       Q.    So, there should be a record
7  someplace of a longer letter that was sent to the
8  New York Times, not this one; correct?
9       A.    There should be a longer version of
10  this response.
11      Q.    Do you recollect anything that was in
12  that longer version that's not in the shorter
13  version, as we sit here today?
14      A.    No, I'm sorry, I don't.
15           MR. SPECTER:  Now, just so counsel
16  knows, we'll obviously be sending this to you
17  formally, we're going to ask for a copy of that
18  original letter that Dr. Kim has referred to.
19  BY MR. SPECTER:
20      Q.    Dr. Topol stated in his letter to the
21  Times in the fifth paragraph, "There are two
22  important issues to consider here.  First, the risk
23  of heart attack or stroke found in the Merck study,
24  at 15 cases per 1,000 patients, may be greatly
25  underestimated.  Merck's trial did not include

Page 658

1  anyone with known heart disease -- patients who
2  might be expected to have the highest risk."  Did I
3  read that correctly?
4       A.    You read that correctly.
5       Q.    Is that a true statement?
6       A.    No, I don't think that's a true
7  statement.
8       Q.    Did you tell the readers of the New
9  York Times that that was a false statement?
10      A.    No.  In the response that's shown
11  here, I did not address that issue.
12      Q.    Did you tell the New York Times in
13  your original letter that that was a false
14  statement?
15      A.    I'm not sure.
16      Q.    Let us move to a different subject,
17  and that is the correspondence that you had with
18  respect to the article of Dr. Juni.  Do you have a
19  recollection of that?
20      A.    Yes, I do.
21      Q.    Now -- actually, before I get to that
22  Juni subject, what is there about that paragraph
23  that I read to you that's false?
24      A.    What's false is that -- the statement
25  that "Merck's trial did not include anyone with

Page 659

1  known heart disease."
2       Q.    Is the statement otherwise true?
3       A.    Well -- okay.  So, the first sentence
4  is not -- is a statement of opinion.  "There are two
5  important issues to consider here."  So, I don't
6  think it's true or false.  It's his opinion.
7           The second statement, "First, the
8  risk of heart attack or stroke...may be greatly
9  underestimated," is speculation.
10      Q.    Do you think it's false?
11      A.    Well, as I read the statement, "The
12  risk of heart attack or stroke found in the Merck
13  study...may be greatly underestimated," yes, I
14  believe that that's a false statement.  This was a
15  controlled clinical trial.  And "in the Merck study"
16  specifically, if I were to underline that, I would
17  disagree with a statement that said that the Merck
18  study greatly underestimated the risk of heart
19  attack, because that was a controlled clinical
20  trial.
21      Q.    Well, you know what he's saying here
22  is that the Merck study is not representative of the
23  patient population as a whole who may be taking
24  Vioxx; correct?
25           MR. KIERNAN:  Objection to form.

Page 660

1           THE WITNESS:  I do not -- I do not
2  know that's what he's saying.  Let me read what he's
3  saying.
4  BY MR. SPECTER:
5       Q.    Fine.  You told me that you don't
6  think that's what he's saying.  Let me ask a
7  different question now.
8           Is it true that the Merck study may
9  greatly underestimate the risk of heart attack or
10  stroke as compared to the patient population as a
11  whole who may have been taking Vioxx?
12      A.    No idea.  That would be pure
13  speculation.
14      Q.    You can't say that's false, can you?
15      A.    I have no reason to think it's false
16  or true.
17      Q.    That's not my question.
18           My question is, can you say that what
19  I just said is false?
20      A.    Well, the risk of heart attack or
21  stroke in a particular patient population is going
22  to vary tremendously with that patient population.
23      Q.    Do you recollect my question?
24      A.    You're asking me whether or not a
25  statement that you made, whether I can rule it out.

KS-000491

Confidential - Subject to Protective Order

Page 661

1  Q.  Yes. Can you rule it out?
2  A.  No, I can't rule out anything in that
3  regard.
4  Q.  Thank you.
5  Let me move on to the next question,
6  and this regards Dr. Juni.
7  Do you recollect that Dr. Juni had
8  commented with respect to the APPROVe trial that the
9  trial's power to detect a clinically relevant
10 difference in rates of myocardial infarction -- now
11 we're talking about APPROVe again. Let me start
12 over again, and let me back up for a second.
13 Dr. Juni, who is he?
14 A.  I don't know Dr. Juni, but Dr. Juni
15 is the first author on an article that was published
16 in the Lancet regarding -- well, he's published
17 probably other articles, but the particular article
18 that I believe you're referring to was published in
19 the Lancet having to do with his group's assertion
20 that there was a risk associated with Vioxx.
21 Q.  He wrote an article, and then you
22 wrote or you signed a reply; correct?
23 A.  He wrote an article -- he and others
24 wrote an article that was published in the Lancet
25 having to do with cardiovascular risk in studies

Page 662

1  with Vioxx, and Dr. Alise Reicin and I wrote a
2  letter in response to that article.
3  Q.  At least you signed it; correct?
4  A.  I signed it, and I participated in
5  the writing of it as well.
6  Q.  Who wrote the first draft?
7  A.  I'm not sure who wrote the first
8  draft.
9  Q.  So, you wrote a reply, and then he
10 wrote a rejoinder to your reply; correct?
11 A.  I believe that's correct, but I don't
12 -- I don't remember exactly.
13 Q.  Now, in his rejoinder to the reply of
14 you and Dr. Reicin, he wrote, and I'm quoting, "Kim
15 and Reicin reiterate that there was no evidence for
16 a difference in cardiovascular risk between
17 rofecoxib" -- Vioxx; correct?
18 A.  Rofecoxib is the name for Vioxx, yes.
19 Q.  -- "and placebo during the first 18
20 months of the unpublished APPROVe trial, but do not
21 acknowledge that the trial's power to detect a
22 clinically relevant difference in rates of
23 myocardial infarction (a relative risk of 2) during
24 the first 18 months was 20% or less."
25 Now, let me ask you first, do you

Page 663

1  recollect reading that statement of Dr. Juni's in
2  reply to your response to his --
3  A.  I don't recollect --
4  Q.  -- article?
5  A.  I don't recollect that exact
6  statement, no.
7  Q.  Is that statement a true statement?
8  A.  I -- well, can you read it again or
9  show me the statement?
10 Q.  I can certainly read it again, and I
11 can show it to you if you want to see it?
12 A.  Sure. I'd like to see it actually.
13 Q.  All right.
14 MR. SPECTER: I think we're up to 45.
15 We'll mark this as 45.
16 - - -
17 (Whereupon, Deposition Exhibit Kim-45,
18 "Discontinuation of Vioxx"
19 Correspondence, (Kim/Reicin) Letter to
20 the Editor, Lancet, vol. 365 1-1-05
21 (23-28), was marked for identification.)
22 - - -
23 THE WITNESS: Thank you.
24 BY MR. SPECTER:
25 Q.  You're welcome. And the statement

Page 664

1  appears, Dr. Kim, if I may help you with this, at
2  Page 27.
3  A.  Page 27?
4  Q.  In the first column in the first
5  paragraph.
6  A.  (Witness reviewing document.)
7  Okay. I'm sorry.
8  So, your question again?
9  Q.  Is Dr. Juni, or I should say are Dr.
10 Juni and his colleagues who authored this reply to
11 your response, are they correct in saying that you
12 and Dr. Reicin did not acknowledge that the power of
13 the APPROVe trial to "detect a clinically relevant
14 difference in rates of myocardial infarction (a
15 relative risk of 2) during the first 18 months was
16 20% or less"?
17 A.  To my recollection, and we have it
18 right here so we can check, but to my recollection,
19 the letter that Dr. Reicin and I sent to the Lancet
20 did not address the issue of power of a clinical
21 trial.
22 Q.  Is the statement true that the
23 APPROVe "trial's power to detect a clinically
24 relevant difference in rates of myocardial
25 infarction (a relative risk of 2) during the first

KS-000492

Confidential - Subject to Protective Order

Page 665

1  18 months was 20% or less"?
2      A.   I'm not sure if that's a true
3  statement or not. I'd have to check with my
4  statisticians.
5      Q.   Well, when you read this in the
6  Lancet, did you check with your statisticians to see
7  if it was correct?
8      A.   No, I did not.
9      Q.   Does it strike you as being clearly
10 wrong?
11     A.   It doesn't strike me as being
12 outrageous, but, again, you know, if you're asking
13 me whether or not this is a correct statement, I'm
14 not in a position to answer that question right now.
15     Q.   Do you know if APPROVe had the
16 power -- well, let me just back up for a second.
17          Do you know enough about the design
18 of studies to know what is the concept of
19 statistical power as it concerns the design of the
20 study?
21     A.   I know at a high level, in general
22 terms, the relevance for statistical power to the
23 ability to detect something in a clinical study.
24     Q.   Is there a generally accepted power
25 to which clinical trials are designed to test the

Page 666

1  primary endpoints of the study?
2      A.   Oh, no. To the contrary. The power
3  by which one designs a clinical trial is one that
4  depends on what it is that one is looking for, what
5  degree of efficacy or safety one is trying to either
6  rule in or rule out, the background rates of what it
7  is that one is investigating, and the size,
8  therefore, of the trial that one would need to
9  conduct in order to have a conclusion within certain
10 limits, and the magnitude of the response that one
11 is expecting, either positive or negative.
12     Q.   Dr. Kim, have you heard that it's
13 generally accepted, at least as concerns clinical
14 research, that reliable analysis should have a power
15 of at least 80 percent?
16     A.   I haven't heard that explicit
17 statement.
18     Q.   Do you understand what that statement
19 means?
20     A.   Well, I think what -- what that
21 statement is meant to convey is that in general
22 terms, one would like to be able to address a
23 question within the limits of confidence of plus or
24 minus 20 percent.
25     Q.   Do you agree that that statement

Page 667

1  means that a study powered at 80 percent will detect
2  the effect at least four times out of five?
3      A.   Say that again, please.
4      Q.   Do you understand that a study
5  powered at 80 percent will detect the effect at
6  least four times out of five if the effect really
7  exists?
8      A.   Yes. But we have to be careful here
9  because one has to -- that statement is incomplete
10 without defining the magnitude of the effect. And
11 so, for example, in Juni's statement here, the
12 statement has in parentheticals, in parenthesis, "a
13 relative risk of 2." So, they're defining the
14 magnitude of the risk that they're looking for.
15          If the magnitude of the risk was
16 smaller than that, then one would need to have a
17 larger study in order to get the confidence interval
18 within the 20 percent limits that you're referring
19 to, or one would have a decreased ability to -- one
20 would not be at a 20 percent confidence interval.
21          So, the statement that you made is an
22 incomplete statement in the absence of saying what
23 is the size of the risk, or, if one is looking for a
24 benefit, the benefit that one is looking for.
25     Q.   What were the APPROVe primary

Page 668

1  endpoints?
2      A.   The APPROVe study, per se, had as its
3  primary endpoint an investigation of the recurrence
4  of colon polyps. Now, the -- but the APPROVe study
5  was also part of a cardiovascular endpoint which was
6  prespecified by Merck which included three
7  placebo-controlled studies, of which APPROVe was
8  one. And it was the specific endpoint,
9  cardiovascular endpoint that was prespecified was
10 one that included the cardiovascular outcomes for --
11 that were seen in APPROVe, as well as two other
12 placebo-controlled studies, one called VICTOR and
13 one called VIP.
14     Q.   Dr. Kim, you know that the term
15 "primary endpoint" is a term of science; correct?
16     A.   Primary endpoint is a term of
17 science, yes.
18     Q.   You know that as that term of science
19 is supposed to be used, the only primary endpoints
20 in APPROVe were the recurrence of colon cancer;
21 correct?
22          MR. KIERNAN: Objection to form.
23          THE WITNESS: No, that's incorrect.
24 The primary endpoint was a recurrence of colon
25 polyps.

**KS-000493**

11 (Pages 665 to 668)

Confidential - Subject to Protective Order

Page 669

BY MR. SPECTER:
1  Q.  I'm sorry.  A recurrence of colon
3  polyps.  I misspoke.
4  A.  Correct.  In patients with a prior
5  history of colon polyps.
6  And a second -- another primary --
7  another endpoint was prespecified at a later date
8  after the trial was started, but before Merck knew
9  anything about the results of the trial, which was a
10  cardiovascular outcome prespecified that included
11  the results of three clinical trials, of which
12  APPROVe was one.
13  Q.  You know my question only referred to
14  primary endpoints; correct?
15  A.  I'm stating that the primary endpoint
16  of APPROVe was for the recurrence of colon polyps,
17  but APPROVe also had another very specific purpose.
18  Q.  My question is only whether you know
19  what my question concerned.  Do you know my question
20  concerned what were the primary endpoints in
21  APPROVe?  Do you understand that?
22  A.  Yes, I do.
23  Q.  And the only primary endpoints in
24  APPROVe were for the recurrence of colon polyps;
25  correct?

Page 670

1  A.  That's correct.
2  Q.  Now --
3  A.  But as I say, there were other
4  purposes of this trial -- of this trial.
5  Q.  Okay.
6  MR. SPECTER:  At the appropriate time
7  we'll move to strike the last part of that answer as
8  being nonresponsive.
9  BY MR. SPECTER:
10  Q.  Now, Dr. Kim, was APPROVe 80 percent
11  powered to confirm to the 95 percent confidence
12  interval the presence or absence of an effect by
13  Vioxx on the recurrence of colon polyps?
14  A.  Again, I don't know.  I would not
15  know the -- I don't know the answer to that question
16  without checking with the clinical trialist who
17  designed it or the statistician.
18  Q.  Do you know what a Type II error is?
19  A.  No.  I'm not sure what a Type II
20  error is.
21  Q.  Have you heard the term "Type II
22  error" before?
23  A.  I've heard it used.
24  Q.  When you heard it used, did you know
25  what it meant then?

Page 671

1  A.  I don't know whether I -- I don't
2  know.  I've asked probably what it means, but I
3  don't know what it means.
4  Q.  Let me see if I can refresh your
5  recollection.
6  Is a Type II error the presentation
7  of an absence of a finding in a study that is not
8  adequately powered to see an effect?
9  A.  Again, I would not want to say what
10  it is without checking with a statistician.
11  Q.  Would you agree that it would be an
12  error to present the absence of a finding in a study
13  that was not adequately powered to see an effect?
14  A.  Say that again, please.
15  Q.  Do you agree that it would be an
16  error to present as an absence of a finding in a
17  study a finding that was not adequately powered -- a
18  study that was not adequately powered to see an
19  effect?
20  A.  As you stated it, no.  If you said
21  that the study did not find an effect, then you're
22  stating a statement of fact.
23  Q.  Let me go over this with you again to
24  be sure we're on the same page.
25  A.  Okay.

Page 672

1  Q.  Is it an error to present an absence
2  of a finding when the study was not adequately
3  powered to see an effect?
4  A.  Again, the statement is incomplete
5  because when you say "an effect," one has to define
6  the magnitude of the effect.
7  Q.  Well, that's my point.  If the
8  magnitude of the effect -- if the study was not
9  adequately powered to detect the magnitude of the
10  effect that you're seeking, then would it be an
11  error to say that the study demonstrated the absence
12  of a finding in that circumstance?
13  A.  I do not think it would be an error
14  to state that a study did not find an effect.  I
15  think that if one -- but then the subsequent
16  question that could be asked there is what is the
17  magnitude of the effect that one is looking for and
18  how adequately powered was the study for that
19  magnitude of effect?  But without defining the
20  magnitude of the effect that one wants to rule out,
21  that statement that you made is incomplete.  But
22  it's certainly not a wrong statement.  You're
23  stating what it is that the study did or did not
24  show.
25  Q.  All right.  Dr. Kim, I want you to

KS-000494

Confidential - Subject to Protective Order

Page 673

1  assume for the next question that a Type II error is
2  the presentation of an absence of a finding in a
3  study that was not adequately powered to see an
4  effect. All right? I want you to assume that for
5  the next question.
6      A.    That the Type II error is
7  presentation of a finding that was not observed in a
8  study that was not adequately powered to observe
9  that effect?
10     Q.    Correct.
11     A.    Okay.
12     Q.    Now, a claim that APPROVe found that
13 patients taking Vioxx 25 milligrams or less --
14 pardon me. Let me start over again.
15          A claim that APPROVe found that
16 patients taking Vioxx 25 milligrams for less than 18
17 months suffered from no increased risk for
18 cardiovascular events would be subject to Type II
19 error; correct?
20     A.    Just the last part again, please.
21     Q.    A claim that APPROVe found that
22 patients taking Vioxx 25 milligrams or less for less
23 than 18 months suffered from no increased risk of
24 cardiovascular events would be subject to Type II
25 error; correct?

Page 674

1      A.    Okay. So, assuming that a Type II
2  error is a statement that one -- the absence of a
3  finding in a study that was inadequately powered to
4  detect that finding, and assuming that one
5  specified, which you didn't, the magnitude of the
6  effect that one is looking for, then it is certainly
7  possible that a conclusion that was made in a study
8  based on the APPROVe results would be subject to a
9  Type II error, again, with the explicit notion that
10 the magnitude of the effect has to be specified
11 here.
12     Q.    Have you asked anybody at Merck
13 whether APPROVe was sufficiently powered to detect
14 an increased risk of cardiovascular events in
15 patients who were taking Vioxx for less than 18
16 months?
17     A.    Again, the statement that you're
18 making, or the question, rather, is an incomplete --
19 would be an incomplete question in the absence of
20 stating what the magnitude of the risk is that one
21 is looking for.
22     Q.    Sir, I'm asking a question about what
23 you've done. I want to know whether you've asked
24 anybody at Merck whether APPROVe was adequately
25 powered to detect an increased risk of

Page 675

1  cardiovascular events in people taking Vioxx for
2  less than 18 months. Have you asked that question?
3      A.    I have not asked that question, and I
4  think it's an incomplete -- it would be an
5  incomplete question.
6      Q.    Well, have you asked any question
7  that relates to that question?
8      A.    What do you mean by "relates to that
9  question"?
10     Q.    Well, sir, you're talking about at
11 what level of relative risk. So, have you asked
12 that question using any degree of relative risk
13 associated with it?
14     A.    No. I've looked at the results of
15 the APPROVe study, and I know that the results of
16 the APPROVe study were such that the difference in
17 cardiovascular risk was not discernible until
18 beginning after 18 months, and that did not reach
19 statistical significance until approximately 30
20 months after the trial started.
21     Q.    But that statement only has value to
22 the extent that the study was powered to see such a
23 risk before 18 months; correct?
24     A.    No. I think that statement is a
25 statement of fact. There was no difference observed

Page 676

1  in the APPROVe trial in the cardiovascular risk
2  rates for patients on Vioxx versus placebo for the
3  first 18 months, and that beginning after 18 months,
4  the difference was discernible, and it became
5  statistically significant at 30 months. Those are
6  the facts. That's what I can say about the results
7  of the APPROVe study.
8      Q.    I'm asking you about the value of
9  what you just said. The value of what you just said
10 is dependent, at least in part, upon the power of
11 the study; correct?
12     A.    The value?
13     Q.    The value of the statement to
14 science.
15     A.    Oh, I think the statement is very
16 valuable to science, and I think it's actually --
17 it's what led Merck to withdraw the drug from
18 market. And it's what led -- it's certainly one of
19 the major things that led to the events that you
20 referred to yesterday from the FDA.
21     Q.    But in order to assess the value of
22 the statement, one would have to know whether the
23 study was adequately powered to detect an increased
24 risk of cardiovascular events in the first 18
25 months; correct?

KS-000495

13 (Pages 673 to 676)

Confidential - Subject to Protective Order

Page 677

1    A.    Absolutely.  And explicitly in my
2  statement, namely the fact that it became
3  statistically significant at approximately 30
4  months, lies the value.
5    Q.    I'm talking about what occurred
6  before 18 months, Dr. Kim.  In order to assess the
7  value of that statement, one would have to know
8  whether the study was adequately powered to detect
9  an increased risk of cardiovascular events in those
10 first 18 months; correct?
11   A.    Again, it depends on the magnitude of
12 the risk that one is trying to assess.  And what we
13 can say is that the difference in cardiovascular
14 risk became statistically significant in the APPROVe
15 study at approximately 30 months.
16   Q.    At "a relative risk of 2," was
17 APPROVe adequately powered to detect that risk in
18 the first 18 months?  Yes or no?
19   A.    I don't know the answer to that
20 question.
21   Q.    How many hours have you spent looking
22 at the APPROVe results or discussing them with your
23 colleagues at Merck?
24   A.    I don't know.
25   Q.    Has the subject that I just asked you

Page 678

1  about ever come up in any of those conversations; to
2  wit, was APPROVe adequately powered to determine an
3  increased risk of cardiovascular events during the
4  first 18 months at a relative risk of two?
5    A.    To my knowledge, or I should say to
6  my recollection, I have not participated in
7  discussions that -- in which that question has been
8  addressed.
9    Q.    Do you recollect the last time we got
10 together I asked you what documents you had reviewed
11 in preparation for the deposition over the night
12 before?  We met on two consecutive days.  Do you
13 recollect that?
14   A.    I do.
15   Q.    And you told me that you had reviewed
16 a briefing paper that had been prepared for Mr.
17 Gilmartin for his testimony in front of the U.S.
18 Senate.  Do you recollect that?
19   A.    I recollect saying that to you, too,
20 yes.
21   Q.    Can you describe for me or identify
22 for me in any other manner so that I can locate that
23 document, what that document was?
24   A.    So, after we met last time, there was
25 discussion about that document and a request, a

Page 679

1  specific request from the Merck lawyers for me to
2  provide them with that document, and so I, the next
3  day, provided that document to the Merck lawyers,
4  and so that was sent over to them.
5          I was informed yesterday that the
6  document that --
7          MR. KIERNAN:  Well, don't disclose
8  any conversations with counsel.
9          THE WITNESS:  Okay.
10         MR. KIERNAN:  I will state for the
11 record the document that he is referring to --
12         MR. SPECTER:  Wait, wait, wait.  I
13 want to ask this witness my questions.
14         MR. KIERNAN:  Sure.
15         MR. SPECTER:  My question didn't call
16 for him disclosing conversations with counsel.
17 BY MR. SPECTER:
18   Q.    Do you have the question in mind,
19 Doctor?
20   A.    No.  Why don't you repeat it, then.
21   Q.    I want you to identify the document
22 that you're referring to.
23   A.    Well, what I was trying to say is
24 that it's my understanding, it's my belief, that I
25 was mistaken last time when I said that I had read

Page 680

1  the briefing document for Mr. Gilmartin's testimony
2  before the Senate.  And instead, what it now appears
3  is that what I had reviewed was a briefing document
4  for Mr. Gilmartin in advance of an October media
5  briefing, October 2004 media briefing.
6    Q.    Is there a document that meets the
7  characteristics of what you identified the last time
8  we spoke?
9    A.    Yes, I believe there is.
10   Q.    Have you read it?
11   A.    I have read it a long time ago.
12   Q.    This is a briefing document prepared
13 for Mr. Gilmartin's testimony in front of the U.S.
14 Senate; is that correct?
15         MR. KIERNAN:  Objection, form.
16 That's not what he testified to.
17         THE WITNESS:  Sorry.  The question
18 is, did this --
19 BY MR. SPECTER:
20   Q.    How would you --
21   A.    So --
22   Q.    There's no current pending question,
23 so, let me see if I can get a question out to you.
24         As I understand your testimony,
25 you're telling me that when we met before, you had

KS-000496

14 (Pages 677 to 680)

Confidential - Subject to Protective Order

Page 681

1  thought that you had seen the night before a
2  briefing document that Mr. Gilmartin read the night
3  before he testified in front of the U.S. Senate.
4  Now you believe that that's not what you saw the
5  night before, but, rather, you saw a document that
6  was labeled something like questions and answers
7  briefing document from October of 2004.  Is that a
8  fair summary of where we are right now?
9      A.    Not exactly, but close.  There was or
10  there is a document that was prepared for Mr.
11  Gilmartin in advance of his Senate testimony, and I
12  thought that that's the document that I'd reviewed
13  before coming for the second day of questioning by
14  you, when you asked me what I had reviewed.
15          It is now my understanding that, in
16  fact, that was not the document that I reviewed,
17  but, instead, the document that I reviewed was a
18  briefing document from Mr. Gilmartin in advance of
19  the October 2004 media briefing.
20      Q.    Okay.  When did you come to this
21  subsequent belief?
22      A.    Yesterday.
23      Q.    Yesterday.  So, let me understand
24  this, if I can.
25          You told me -- we got together on

Page 682

1  what date?  What was the date of the second
2  deposition?
3          MR. MEADOW:  The 16th.
4  BY MR. SPECTER:
5      Q.    The 16th of March.  Okay.
6          On the 16th of March, you told me
7  that on the night of the 15th of March --
8          On the 16th of March you told me that
9  on the night of the 15th of March you read what
10  we'll call the Gilmartin briefing document.  Correct
11  so far?
12      A.    Yes.  Well, I don't know the exact
13  dates, but I'll take your word for the dates.
14      Q.    Then on the 7th of April, you decided
15  that you were wrong about that, and that it was some
16  document from October of 2004; is that correct?
17      A.    Yes.
18      Q.    Well, how could you be wrong about
19  what you had seen the night before in March and be
20  right now as to what you'd seen, sir?
21          MR. KIERNAN:  Objection to form.  I
22  think he's already testified that it's --
23          MR. SPECTER:  I'll ask a different
24  question.
25          MR. KIERNAN:  Okay.

Page 683

1  BY MR. SPECTER:
2      Q.    How did you come to make this
3  mistake, sir, and have it corrected yesterday?
4          MR. KIERNAN:  Objection to form.  I
5  don't think it's a mistake.  You're
6  mischaracterizing what he's saying.  He's merely
7  identified the date of the briefing document.  Now
8  you want to characterize it as a mistake, and I
9  think that's improper.
10          MR. FERRARA:  I object to counsel's
11  comments.  Counsel, please don't offer your
12  opinions.
13          MR. KIERNAN:  Would you state your
14  name for the record, sir?
15          MR. FERRARA:  Yes, it's Michael
16  Ferrara.
17          MR. KIERNAN:  Thank you, Mr. Ferrara.
18  BY MR. SPECTER:
19      Q.    Dr. Kim, are you saying that these
20  are the same documents, they just have different
21  titles?
22      A.    These are not the same document.
23      Q.    How do the documents differ?
24      A.    One document is a document that was
25  prepared for Mr. Gilmartin in advance of his

Page 684

1  testimony to the Senate, and another document was a
2  document that was prepared for Mr. Gilmartin in
3  advance of a media briefing in October.
4      Q.    Do the contents differ?
5      A.    I would imagine they differ, yes.
6      Q.    Have you read both documents?
7      A.    I certainly have read both documents
8  at one time, yes.
9      Q.    When most recently have you read
10  them?
11      A.    So, again, I believe that I read the
12  October media briefing document the evening before
13  the second day of questioning by you.  And I believe
14  that I read the Gilmartin Senate prep document a
15  long time ago, in other words, at around the time --
16  around the time when we were prepping Mr. Gilmartin
17  for his Senate testimony.
18      Q.    What fact or facts caused you to
19  believe that you were wrong as to what you told me
20  before was the document you had read?
21          MR. KIERNAN:  Don't include any
22  discussions with counsel.  If you can --
23  BY MR. SPECTER:
24      Q.    I'm not asking you to identify where
25  you got information from.

KS-000497

Confidential - Subject to Protective Order

Page 685

1      A.    Okay.
2      Q.    I just want to know what facts you
3  have available to you --
4      A.    Okay.
5      Q.    -- that tells you you were wrong in
6  your previous testimony.
7      A.    Okay.
8            MR. KIERNAN:  Objection to the
9  characterization.  Go ahead.
10           THE WITNESS:  Following our
11 discussion last time, I was asked to provide the
12 document that I referred to, which at the time I
13 referred to as the Gilmartin briefing document for
14 the Senate testimony, to the Merck legal department.
15 And I did that.  And yesterday I was informed that
16 that document --
17           MR. KIERNAN:  All right.  Don't
18 discuss any conversations --
19 BY MR. SPECTER:
20     Q.    You don't need to tell us where you
21 got the information.  The only issue is what makes
22 you believe you were wrong before?
23           MR. KIERNAN:  Objection to the
24 characterization.
25 BY MR. SPECTER:

Page 686

1      Q.    Well, you say you were wrong before;
2  right?  You say you gave incorrect testimony --
3      A.    I'm saying --
4      Q.    -- is that right?
5      A.    I'm saying that I believe that the
6  document that I referred to that I thought was the
7  Gilmartin prep document for the Senate hearings I
8  now believe was a Gilmartin prep document for the
9  October 2004 briefing.
10     Q.    Well, why do you believe that you
11 were wrong before?  Let me ask a different question.
12           Answer that one now and then I'll ask
13 you a different question.
14     A.    Because I was -- because I was told
15 that.
16     Q.    Well, do you know it to be true from
17 your own personal knowledge?
18     A.    No.  I -- as I said, this was
19 something that I was informed of yesterday.
20     Q.    Dr. Kim, don't you know what you read
21 March 15th overnight in preparation for March 16th,
22 the next day?
23     A.    I thought I did.
24     Q.    Well, do you think -- do you now
25 think you're wrong?

Page 687

1      A.    Oh, I think I -- I don't know, but I
2  think I could be mistaken.
3      Q.    You could be, but you don't know;
4  correct?
5            MR. KIERNAN:  Counsel, you're just
6  badgering the witness.
7            MR. SPECTER:  I'm not badgering the
8  witness.  He says he could be wrong.  I want to know
9  if he's wrong.
10 BY MR. SPECTER:
11     Q.    Can you say under oath that you are
12 wrong now about what you said on March 16th?
13           MR. KIERNAN:  Well, with respect to
14 which briefing document he looked at?  Is that the
15 question?
16           MR. SPECTER:  Yes.
17           MR. KIERNAN:  All right.  I think
18 he's already asked and answered that three --
19           MR. SPECTER:  He's answered, and
20 three different ways at that.  So let's see if we
21 can get a firm answer --
22           MR. KIERNAN:  Three or four --
23           MR. SPECTER:  -- to the question.
24           MR. KIERNAN:  Three or four times now
25 the same way, but, go ahead.

Page 688

1  BY MR. SPECTER:
2      Q.    Can you say under oath that you know
3  what document you reviewed the night of March 15th?
4      A.    What I can say under oath is on the
5  morning that you asked me the question what
6  documents or if I reviewed documents or what
7  documents they were, I was under the impression that
8  I had reviewed a document which related to Mr.
9  Gilmartin's testimony in front of the Senate.  And I
10 now believe that I was mistaken, that that document
11 was, in fact, a media briefing for Mr. Gilmartin in
12 October of 200 --
13     Q.    Because somebody told you that
14 yesterday?
15     A.    Correct.
16     Q.    Was that person with you when you
17 looked at the document the night of March 15th?
18     A.    No.
19     Q.    Where were you when you saw the
20 document?
21     A.    I was in a hotel room.
22     Q.    What basis could you have for
23 trusting what you were told yesterday about what
24 document that you reviewed the night of March 15th
25 when that person wasn't with you four weeks ago or

KS-000498

Confidential - Subject to Protective Order

Page 689

1  three weeks ago in the hotel room when you saw it?
2           MR. KIERNAN: Well, let me just
3  object to any conversations with counsel --
4           MR. SPECTER: I'm asking --
5           MR. KIERNAN: Let me say for the
6  record the document has been produced to you
7  already, and I think you have it. So, I think --
8           MR. SPECTER: Which one?
9           MR. KIERNAN: The document he's
10 referring to.
11          MR. SPECTER: The Gilmartin briefing
12 document?
13          MR. KIERNAN: Yes. For the October
14 2004 media briefing document --
15          MR. SPECTER: No, no. No. What I
16 don't have, Mr. --
17          MR. KIERNAN: Kiernan.
18          MR. SPECTER: -- Kiernan. Excuse me.
19 There's so many Merck lawyers, I have to try to keep
20 them all straight.
21          Mr. Kiernan, what I don't have is
22 this Gilmartin briefing document. Do you think I
23 have that document?
24          MR. KIERNAN: I don't know. We're
25 trying to separate documents --

Page 690

1           MR. SPECTER: Fine.
2           MR. KIERNAN: -- and I don't think
3  you are being fair to the witness about what
4  documents were, because you already have the October
5  2004 briefing document.
6           MR. SPECTER: I agree. I do have
7  that.
8           MR. KIERNAN: Okay.
9           MR. SPECTER: It's an October 13th
10 document. I agree I have it.
11          MR. KIERNAN: It has a date on it,
12 which was --
13          MR. SPECTER: I agree. October 13th.
14 I was told yesterday that's a document that Dr. Kim
15 saw the night before. That's what I was told
16 yesterday by e-mail from one of your colleagues.
17          MR. KIERNAN: Okay.
18          MR. SPECTER: But I don't have the
19 Gilmartin briefing document, and this witness said
20 that's what he reviewed the night before his
21 testimony on March 16th.
22          MR. KIERNAN: That's not correct.
23 That's not what he's testified to.
24          MR. SPECTER: Well, that's not what
25 he said today in answer to my first questions on the

Page 691

1  subject.
2           MR. KIERNAN: No, I think --
3           MR. SPECTER: Wait, let me finish my
4  sentence.
5           I don't have the Gilmartin briefing
6  document. It's not been produced. Do you disagree
7  with that.
8           MR. KIERNAN: I don't know. I don't
9  know the answer to that question.
10          MR. SPECTER: I'm going to ask my
11 questions on the subject, but I want to tell you
12 something, I don't have the Gilmartin briefing
13 document. We're entitled to it. If you're going to
14 assert a privilege as to this document, you need to
15 do so. So, let's go on to something else, but I'd
16 like to get an answer to the question, if we can,
17 before the end of the day, as to whether that
18 document is going to get produced.
19          MR. KIERNAN: Well, if you want a
20 Request for Production, please make it formally. I
21 do know --
22          MR. SPECTER: I did. I did. I made
23 a request --
24          MR. KIERNAN: Well --
25          MR. SPECTER: Let me finish. I made

Page 692

1  a request through Mr. Buchanan, who is liaison
2  counsel, in writing to you, "you" being Merck, that
3  the document be produced in advance of the
4  deposition of Dr. Kim this morning. Some of the
5  documents that we asked for were produced.
6           The Gilmartin briefing document, we
7  were told, was not the document that Dr. Kim relied
8  upon, it was this document of October 13, 2004, and
9  we've never gotten the Gilmartin briefing document.
10 We believe we're entitled to it. If there's an
11 assertion of privilege, you have an obligation to
12 assert the basis for the privilege. We haven't had
13 that basis asserted yet. So, I'd like to get that
14 issue straightened out.
15          So, since Linda is typing all this
16 up, you're now going to have an additional request
17 for that document, and we'll confirm it again in
18 writing. Let's go on to something else, if we
19 could. All right?
20          MR. KIERNAN: Do you want to take a
21 short break?
22          MR. SPECTER: I don't want to, but if
23 you want to leave and do that, that's okay with me.
24          MR. KIERNAN: Well, we've been going
25 over an hour.

KS-000499

Confidential - Subject to Protective Order

Page 693

1    MR. SPECTER:  I'm not complaining.
2  Go ahead.
3    THE VIDEOTAPE TECHNICIAN:  Stand by,
4  please.  The time is 10:10.  We're going off the
5  record.
6    - - -
7    (Whereupon, a recess was taken from
8    10:10 a.m. until 10:24 a.m.)
9    - - -
10    THE VIDEOTAPE TECHNICIAN:  The time
11  is 10:24.  We're back on the record.
12  BY MR. SPECTER:
13    Q.    Dr. Kim, a question or two more about
14  this document issue.
15    Do you have any explanation as to how
16  somebody else could know what document you reviewed
17  in your hotel room?
18    A.    Yes.
19    Q.    May I hear it, please?
20    A.    Following the last set of questioning
21  on that day, I provided the document that I had
22  reviewed the night before to the Merck legal
23  department, and I was shown a copy of that document
24  yesterday, and that document is the October 2004
25  media briefing document that was prepared for Mr.

Page 694

1  Gilmartin.
2    MR. KIERNAN:  For the record, I think
3  that document was provided to you, Mr. Specter,
4  yesterday or the day before.
5    MR. SPECTER:  We've had that document
6  for months and months and months.
7    MR. KIERNAN:  Okay.
8    MR. SPECTER:  It was identified for
9  us yesterday.  It was provided many months ago.
10  BY MR. SPECTER:
11    Q.    Do you know if the document you were
12  shown yesterday is the same document you reviewed on
13  the evening of March 15th?
14    A.    What I know is that I took the
15  document that I reviewed the night before we last
16  met and provided it to the legal department, and I
17  was shown a copy of that yesterday, which was the
18  October 13th media prep for Mr. Gilmartin.
19    Q.    Please try to focus on my question.
20    Do you know if the document that you
21  were shown yesterday was the same document that you
22  reviewed on the evening of March 15th?
23    A.    I believe that I've answered your
24  question in terms of what it is that I know.  I know
25  that I took that document that I reviewed the night

Page 695

1  before, provided it to the legal department, and was
2  shown a copy of that yesterday.
3    Q.    Well, my question is, do you know
4  those documents to be one and the same?
5    A.    To the extent of what I just told
6  you, I know --
7    Q.    I don't want to mince words here,
8  sir.  Do you know those documents to be the same
9  document?
10    A.    I mean, yes, to the extent that I
11  provided the document to the department and was
12  shown a copy --
13    Q.    I don't know what this "yes, to the
14  extent" part means, sir.  Do you know those
15  documents to be the same document?  Yes or no?
16    A.    Again, the only way I can answer that
17  question is what I did.
18    Q.    Sir, you told me that you saw a
19  document in your hotel room on March 15th.  You then
20  identified it as the Gilmartin briefing document the
21  next morning.  You were then asked for -- you say
22  you were asked for a copy of that document.
23    A.    I -- excuse me.  I was asked for that
24  document.
25    Q.    You were asked for that document.

Page 696

1  You say you sent it to legal.  Correct so far?
2    A.    Correct.
3    Q.    Then yesterday morning you were shown
4  a document which you were told was the document that
5  you had sent; correct?
6    A.    Yesterday afternoon --
7    Q.    Yesterday afternoon.
8    A.    -- I was shown a copy of the document
9  that I was told was a copy of the document that I
10  had sent.
11    Q.    But my question is, do you know those
12  documents to be the same documents, a copy or
13  otherwise?
14    A.    I know --
15    Q.    In other words, did you remember
16  yesterday afternoon, when you looked at the
17  documents, that that was the same document that you
18  had sent over to legal?
19    A.    Did I remember that that was the same
20  document that I sent over to legal?
21    Q.    Yes.  That's the question.
22    A.    No.  I just took the document that I
23  reviewed, I sent it over to legal, and I was shown a
24  copy yesterday.
25    Q.    But that's my question, sir.  Do you

KS-000500

Confidential - Subject to Protective Order

Page 697

1  know, do you remember whether what you were shown
2  yesterday was the same document that you say you
3  sent to legal?
4      A.   When you say "remember," no, I didn't
5  study the document before I sent it over to legal.
6  I grabbed the document, I sent it over to legal.
7      Q.   So, you don't know if what you were
8  shown yesterday was the same document that you sent
9  to legal; correct?
10     A.   I don't know.  I mean, I took the
11 document, I sent it over to legal, and I was shown
12 the document.
13     Q.   Please, sir.  This question is very
14 simple.  You don't know that what you sent over to
15 legal, was the same document that you saw yesterday
16 afternoon; correct?
17     A.   Well, let's put it this way.  I
18 didn't study the document before I sent it over to
19 legal, and I didn't look at the title of that and
20 verify everything and then look at it again
21 yesterday to recollect whether it was the same.
22     Q.   So, the answer is, Mr. Specter, I
23 don't know; isn't that correct?
24     A.   The answer is what I know is what I
25 told you.

Page 698

1      Q.   The answer is, you don't know if the
2  same document that you sent to legal is the document
3  that you were shown yesterday; correct?
4      A.   I know what I said I know.  And that
5  is, I took the document --
6      Q.   Sir, I'm not asking you about
7  something else that you know.  I'm asking you what
8  the answer to my question is.
9           My question is, you don't know that
10 what you sent to legal is the same document that you
11 were shown yesterday; right?
12     A.   I can't be 100 percent sure that
13 that's right.
14     Q.   Now, when is the last time you saw
15 the Gilmartin briefing document?
16          MR. KIERNAN:  Counsel, if you could
17 just clarify.  I think we have two.
18          MR. SPECTER:  Whatever it is he
19 referred to.  He called it a Gilmartin briefing
20 document for the Senate.  So, I'm just using his
21 appellation for it.
22          MR. KIERNAN:  All right.  We're all
23 clear there are two documents that you're talking
24 about now, and I think you're just trying to confuse
25 it.

Page 699

1          MR. SPECTER:  Yes.  You don't really
2  think I'm trying to confuse it, do you?
3          MR. KIERNAN:  Yes, I do, actually.
4          MR. SPECTER:  I find that very hard
5  to believe.
6  BY MR. SPECTER:
7      Q.   Now, Dr. Kim, when is the last time
8  you saw the Gilmartin briefing document?  And by the
9  way --
10          MR. KIERNAN:  Same objection.
11          MR. SPECTER:  By the way, not only do
12 I find it hard to believe, but I find it also hard
13 to believe that you would make such an offensive
14 statement like that, especially in light of the
15 circumstances of this questioning, which has been
16 painstakingly polite.
17 BY MR. SPECTER:
18     Q.   Now, let me ask the question again.
19          When is the last time you saw the
20 Gilmartin briefing document?
21          MR. KIERNAN:  Same objection.
22          THE WITNESS:  Well -- the last
23 time -- I don't know the last time that I saw the
24 Gilmartin briefing document for the Senate hearing,
25 to be clear about what document we're talking about.

Page 700

1  BY MR. SPECTER:
2      Q.   When is the last time you know you
3  saw it?
4      A.   Oh, when we were -- when I was
5  participating in prep sessions for Mr. Gilmartin.
6      Q.   Is there a copy in your office?
7      A.   I don't know.
8      Q.   Was there once a copy in your office?
9      A.   I don't -- I don't know.  I --
10     Q.   You told me -- I'm sorry.  Were you
11 finished?
12     A.   Yes.  I don't know.
13     Q.   You told me on March 16th that there
14 had been a copy in your office, going back to when
15 Mr. Gilmartin testified in front of the Senate.  Do
16 you recollect telling me that?
17     A.   No.  I don't recollect telling you
18 that.  I certainly reviewed a copy and had a copy in
19 the time period when -- when we were -- when Mr.
20 Gilmartin was preparing for his Senate testimony.
21     Q.   How long is that document?
22     A.   Oh, I don't -- I mean, it's several
23 pages.  It's approximately -- I don't know, it's
24 been a long time.
25     Q.   Who prepared the document?

KS-000501

Confidential - Subject to Protective Order

Page 701

1    A.   I'm not sure.
2    Q.   Was it prepared by legal?
3    A.   I believe it's been prepared by
4  legal, but -- yes.
5    Q.   Was the Q&A from October 13th of 2004
6  prepared by legal?
7    A.   I don't know.
8    Q.   What other documents did you review
9  yesterday in preparation for your deposition today?
10         MR. KIERNAN:  Object to form.  I
11  don't think he said he's reviewed those documents.
12  So, to the extent your question seems to imply that
13  he reviewed those two documents yesterday --
14         MR. SPECTER:  It doesn't imply that.
15  He told me he reviewed yesterday the Q&A document
16  from --
17         THE WITNESS:  Oh, no.  Excuse me.
18  BY MR. SPECTER:
19    Q.   Well, you saw it; correct?
20    A.   Yes.
21    Q.   What other documents have you seen
22  regarding this case in preparing for today's
23  deposition?
24    A.   I don't believe there were any other
25  documents that I saw.

Page 702

1    Q.   So, yesterday you were shown one
2  document, and that's the Gilmartin Q&A?  I'm sorry.
3  I misspoke.
4         Yesterday you were shown one
5  document, and that was the October 13 Q&A document;
6  correct?
7    A.   Yes.  I don't -- if I was shown
8  another, I don't recall it, but, yes, I was not -- I
9  did not review documents yesterday.
10    Q.   Let's go back to the Juni article, if
11  we could, please.
12    A.   Okay.
13    Q.   Which has been marked previously as,
14  I think, 45.  Let's go to the first page.
15    A.   First page.
16    Q.   The first page is the Kim/Reicin
17  reply to Juni; correct?
18    A.   That is correct.
19    Q.   The first sentence is, "The analysis
20  by Peter Juni and colleagues contravenes the basic
21  principle of meta-analyses to combine like with
22  like, and thus arrives at flawed conclusions."  Did
23  I read that correctly?
24    A.   Yes.
25    Q.   Is that what Merck did when they did

Page 703

1  their own meta-analysis?  Did they combine like with
2  like, or did they combine like with unlike?
3    A.   Whether or not one combines --
4  whether or not one concludes scientifically that one
5  is concluding like with like is something that is
6  subject to statistical analyses to see.  And the
7  point that's being made here is that the analysis by
8  Juni and colleagues included data which compared
9  Vioxx to naproxen when the statistical test for
10  whether or not there's what's called a homogeneity
11  in the combination was not passed.
12         And so, therefore, we stated that the
13  analysis that Juni and colleagues did went against
14  the basic principle of combining like with like as
15  judged by -- it's not explicitly stated here, but
16  the scientific context of this is that that's judged
17  by statistical methods.
18    Q.   Dr. Kim, the basic principle of
19  meta-analysis is to combine like with like -- let's
20  start over again.
21         The basic principle of meta-analysis
22  is to combine like with like; correct?
23    A.   That's correct.
24    Q.   Was Merck criticized for not
25  combining like with like in their own meta-analysis?

Page 704

1    A.   Oh, I don't know.
2    Q.   Well, do you know what the FDA said
3  about Merck's meta-analysis?
4    A.   I don't remember what they said.
5    Q.   Well, did you once know?
6    A.   I imagine I once read it.
7    Q.   Did you read the medical officer's
8  review of the FDA of Merck's meta-analysis?
9    A.   I'm not sure.  What date is that?
10    Q.   The 28th of November of 2001.
11    A.   I'm not sure if I read that.
12    Q.   Well, would it have been your custom
13  to have read a document of that nature?
14         Well, let me withdraw the question
15  and do it this way if I could.  I'll show you the
16  document, and you can tell me if you think you saw
17  it.
18    A.   Okay.
19            - - -
20         (Whereupon, Deposition Exhibit Kim-46,
21         "Food and Drug Administration, Division
22         of Anti-Inflammatory, Analgesic and
23         Ophthalmic Drug Products -- HFD-550,
24         Medical Officer Review NDA 21-042 and
25         NDA 21-052," (56 pages), was marked for

Confidential - Subject to Protective Order

Page 705

1          identification.)
2                - - -
3   BY MR. SPECTER:
4          Q.    We'll mark it as Kim-46, and I've
5   tabbed it to the relevant page regarding criticisms
6   of Merck's meta-analysis.  The first question is,
7   have you seen this document before?
8          A.    If I did, I don't remember it.
9          Q.    Do you think that your ordinary
10  practice would have included reading the document?
11         A.    Oh, my ordinary practice would not be
12  -- would not include reading documents like this.
13         Q.    Just so we're clear, this is -- may I
14  have it again, Lisa, please.  This document is the
15  medical officer's review -- unfortunately, the only
16  copies that exist of it right now in this room are
17  over on your side of the table.  So, would you read
18  the title of the document, please, for the record?
19         A.    Sure.  It's the, "Food & Drug
20  Administration Division of Anti-inflammatory
21  Analgesic and Ophthalmic Drug Products...Medical
22  Officer Review (Rofecoxib tablets and rofecoxib oral
23  solution)" regarding the "Complete response to
24  Approvable letter for," and then it gives the
25  numbers of the applications.

Page 706

1          Q.    You know that after Vioxx was on the
2   market, the VIGOR trial occurred, and after VIGOR
3   occurred, Merck sent to the FDA information
4   regarding VIGOR which included a meta-analysis.  Do
5   you know those facts?
6          A.    Yes.
7          Q.    You were present some nine months
8   earlier at the FDA's arthritis conference regarding
9   COX-2 inhibitors; correct?
10         A.    Well, specifically I was present at
11  the FDA Advisory Committee meeting regarding Merck's
12  application for a change in the label as a result of
13  the VIGOR study.
14         Q.    Right.  And Merck wanted there to be
15  a more favorable label with respect to
16  gastrointestinal problems; correct?
17         A.    Merck wanted to have changes to the
18  label which indicated the results of the VIGOR
19  study.
20         Q.    And that involved a hope that it
21  would be a more attractive label for health care
22  providers and patients with respect to
23  gastrointestinal problems; correct?
24              MR. KIERNAN:  Object to form.
25              THE WITNESS:  Merck -- so, as we

Page 707

1   discussed last time --
2   BY MR. SPECTER:
3          Q.    I'm going to withdraw the question.
4          You then succeeded to the presidency
5   of Merck Research Laboratories not quite a
6   year-and-a-half after this document was written;
7   correct?
8          A.    I became president of Merck Research
9   Labs on January 1st of 2003.
10         Q.    So, a little less than a
11  year-and-a-half, a year and a month after this
12  document was written; correct?
13         A.    Correct.
14         Q.    Now, let's go to the page that I
15  wanted to ask you about, which I put a yellow sticky
16  on.
17         A.    Okay.
18         Q.    This document doesn't have page
19  numbers; does it?
20         A.    This doesn't appear to have page
21  numbers.
22         Q.    We're not going to blame Merck for
23  that, we're going to blame the FDA.  Or at least I
24  am.
25         But for anybody wanting to find it,

Page 708

1   it's section 2, small paragraph a; correct?
2          A.    Correct.  In the "Clinical Review
3   Section."
4          Q.    It's about a third of the way through
5   the document; correct?
6          A.    It's about ten pages in or so.
7          Q.    Okay.  Thank you.
8          It talks about how --
9          A.    Can you just give me a second?
10         Q.    Yes, sure.
11         A.    Thank you.
12         (Witness reviewing document.)
13         Okay.  Thank you.
14         Q.    So, in subparagraph A, the FDA says
15  that, "Studies that compared" Vioxx "to non-naproxen
16  NSAIDs in the original new drug application database
17  and subsequently, involved too few patients to
18  adequately assess differences in cardiovascular
19  safety between" Vioxx "and each NSAID."  Correct so
20  far?
21         A.    That's what it says, yes.
22         Q.    And it says that "Studies with" --
23         A.    Nabumetone.
24         Q.    -- "nabumetone," thank you, "were of
25  6 weeks duration; studies with ibuprofen were of 6

Confidential - Subject to Protective Order

Page 709

1  weeks to 6 months duration; studies with diclofenac
2  were of one year duration.  Some of these studies
3  have blinded extensions, but the actual number of
4  patients exposed for a year or longer is very
5  limited."  Did I read that correctly?
6      A.    You read that correctly.
7      Q.    Are those true statements?
8      A.    I don't know for sure, but I have no
9  reason to doubt the accuracy of those statements.
10     Q.    It then says, and this next part is
11 in bold black letters, "Meta-analyses of small
12 studies of different duration, different size and
13 different design, involving different patient
14 populations and different doses of" Vioxx "can not
15 adequately assess the cardiovascular safety of Vioxx
16 "compared to individual NSAIDs."  Did I read that
17 correctly?
18     A.    You did.
19     Q.    Is that a true statement?
20     A.    That's a statement which is a
21 statement of opinion.  And it has -- the reason why
22 I say that is it's related to the question -- the
23 issue that we were discussing before, and that is
24 what one means by adequate assessment of safety.
25 And that, again, refers to the magnitude of the

Page 710

1  effect that one is trying to, in this case, rule out
2  and the power by which one can make that statement.
3      Q.    Were you aware of this statement back
4  in November of 2001?
5      A.    I don't know if I was aware of this
6  statement in 2001.
7      Q.    Did you know the FDA was critical of
8  Merck's meta-analysis?
9      A.    No, I didn't really pay much
10 attention to the meta-analysis discussions that were
11 ongoing at the time.
12     Q.    After you became president of Merck
13 Research Laboratories, did you read this statement?
14     A.    No, not that I recall.
15     Q.    Were you aware after you became
16 president of Merck Research Laboratories that FDA
17 was critical of Merck's meta-analysis?
18     A.    If I was, it didn't register or it
19 didn't stay with me.
20     Q.    Before I showed you this statement
21 today, do you think you ever saw it before?
22     A.    I don't recall seeing it before.
23     Q.    Do you think you ever knew that Merck
24 was criticized by the FDA for the meta-analysis?
25     A.    Oh, I know there were substantial

Page 711

1  discussions in the scientific field on the
2  meta-analyses and how the meta-analyses should be
3  done.
4      Q.    That's not my question, sir.
5            My question is, did you know before
6  this minute that FDA was critical of Merck's
7  meta-analysis?
8            MR. KIERNAN:  Objection to form.
9            THE WITNESS:  If I did, I don't
10 recall it.  What I do know is that there was
11 substantial discussion around how to do
12 meta-analyses to address this question in the
13 scientific field.
14 BY MR. SPECTER:
15     Q.    Did you ever know before this minute
16 that FDA believed that Merck's meta-analysis could
17 not adequately assess the cardiovascular safety of
18 Vioxx compared to individual NSAIDs?
19     A.    Well, I wouldn't put it that way, but
20 I certainly was aware of discussions that were
21 ongoing between Merck and the FDA about what
22 conclusions could be reached about cardiovascular
23 safety.
24     Q.    And then in 2004, in your writing to
25 the Lancet to criticize Dr. Juni, you criticized him

Page 712

1  for not combining like with like; correct?
2      A.    That's correct.
3      Q.    And that's pretty much the same
4  criticism that FDA leveled at Merck; correct?
5      A.    No, that's not correct.  The
6  criticism that you're pointing to here that FDA made
7  of Merck's meta-analyses, specifically as you read,
8  is addressing the fact that they are concerned about
9  the studies having different duration, different
10 size and different design and involving different
11 patient populations and different doses of Vioxx.
12           The concern which was raised by
13 myself and Dr. Reicin in our response to the article
14 published by Dr. Juni and his colleagues had to do
15 with the fact that they combined in their
16 meta-analysis studies that compared Vioxx to placebo
17 and Vioxx to non-naproxen NSAIDs.  They combined
18 with that studies which compared Vioxx to naproxen.
19 And as we have discussed, there is a substantial
20 difference with naproxen than with the non-naproxen
21 NSAIDs.  So, in fact, the criticism that is
22 contained in this first sentence which we authored
23 is of a fundamentally different nature than the
24 statement that you just read me.
25     Q.    They both involve criticisms of

Confidential - Subject to Protective Order

Page 713

1  comparing like with unlike, it's just that the
2  unlikes are different; correct?
3      A.   No.  And the reason why I say no is
4  that the FDA statement is a generic statement saying
5  that studies of different duration, size and design
6  cannot adequately assess.  They're not saying that
7  these studies are demonstrably unlike, whereas what
8  our statement specifically points to is the
9  principle of meta-analysis to combine like with
10 like --
11     Q.   Sir --
12     A.   -- which is -- if I can just finish.
13          -- which is subject to a statistical
14 test.
15     Q.   Sir, in common English language, does
16 the word "different" mean to you something similar
17 to the word "unlike"?
18     A.   Oh, in the common English language,
19 different is certainly meant to be unlike, but in
20 the statement that we're making here about basic
21 principle of meta-analysis to combine like with
22 like, we're referring to a principle, a scientific
23 principle of meta-analysis which is subject to
24 statistical verification.
25     Q.   And FDA criticized Merck for

Page 714

1  combining "studies of different duration, different
2  size and different design involving different
3  patient populations and different doses of" Vioxx;
4  correct?
5          MR. KIERNAN:  Objection to the form.
6          THE WITNESS:  I don't think it was a
7  criticism of our studies.
8  BY MR. SPECTER:
9      Q.   Well, they said that those studies
10 "can not adequately assess the cardiovascular safety
11 of Vioxx compared to individual NSAIDs."  Correct?
12     A.   The statement is that meta-analyses
13 of such studies, in their opinion, can not
14 adequately address the cardiovascular safety.
15     Q.   Can you say that the FDA was wrong?
16     A.   The statement, as I said before, is a
17 statement of opinion that is related to the question
18 of what one means by "adequate cardiovascular
19 safety."
20     Q.   Well, for your definition of what
21 would mean "adequate cardiovascular safety," can you
22 say that FDA was wrong?
23     A.   My definition of adequate
24 cardiovascular safety relates to the studies that
25 have been done and what it is that we know about

Page 715

1  them.  And in this case, the second, part 2.b, which
2  has to do with the Alzheimer's data, is in my
3  opinion very relevant.
4      Q.   What power and relative risk do you
5  think would be adequate to assess cardiovascular
6  safety of Vioxx?
7      A.   You know, the cardiovascular safety
8  profile of any NSAID, with the exception of aspirin,
9  has not been well studied until we actually
10 conducted extensive cardiovascular safety studies
11 with Vioxx.  And so the answer to your question is
12 that one obviously would like to get as much safety
13 data as possible.  In the case of Vioxx, there's
14 more placebo-controlled data, cardiovascular safety
15 data than for any other NSAID or COX-2 inhibitor.
16     Q.   Do you recollect my question, sir?
17     A.   Yes.
18     Q.   What was the question?
19     A.   The question was asking my opinion
20 about what I consider to be adequate cardiovascular
21 safety.
22     Q.   No, sir.
23          The question was, what do you regard
24 as being the adequate power and relative risk in
25 order to assess the cardiovascular safety of Vioxx?

Page 716

1      A.   I don't have -- I don't have an
2  answer to that question, because one is dealing with
3  issues in terms of clinical trial design that make
4  it difficult to assess this particularly versus a
5  placebo, and that's because patients that are taking
6  Vioxx or any NSAID are in pain and need relief from
7  pain and inflammation, so, you can't do long-term
8  placebo-controlled studies.
9      Q.   Has anybody at Merck told you that
10 they have an opinion as to what is the necessary
11 power and relative risk for a clinical study in
12 order to determine the cardiovascular safety profile
13 of Vioxx?
14     A.   Not that I'm aware of.
15     Q.   Now, sir, as to naproxen, you're
16 aware that yesterday FDA said that they're going to
17 require warning information on naproxen products
18 with respect to cardiovascular risk; correct?
19     A.   Yes.  The FDA said that they would
20 require black box warnings on all prescription
21 NSAIDs, including prescription naproxen, and that
22 they want to strengthen the cardiovascular warning
23 on over-the-counter drugs, including Advil, which is
24 the over-the-counter formula of ibuprofen, and
25 Aleve, which is the over-the-counter formulation or

KS-000505

Confidential - Subject to Protective Order

Page 717

1  dosage of naproxen.
2       Q.    So, apparently FDA thinks that Aleve
3  is bad for your heart; correct?
4            MR. KIERNAN:  Objection to form.
5            THE WITNESS:  No.  The way I read the
6  statements was that FDA was concerned that there was
7  insufficient data and that there was concern about
8  the cardiovascular risks associated with long-term
9  use of any NSAID.
10  BY MR. SPECTER:
11       Q.    Apparently, FDA thinks the people who
12  take Aleve are at increased risk for heart problems;
13  correct?
14       A.    I don't think that's what the FDA is
15  saying.  I think if we were to read those
16  statements, we would see that FDA has concern about
17  potential cardiovascular risks --
18       Q.    Do you --
19       A.    -- and that concern is large enough
20  that they would like to see the potential of
21  cardiovascular risks explicitly stated.
22       Q.    Well, do you think that FDA is going
23  to require the manufacturers of Aleve to communicate
24  to users that if you take Aleve, you are going to be
25  at increased risk for a heart attack?

Page 718

1       A.    I don't know what FDA is going to
2  require.  I do know what FDA has said.  At least I
3  know what I've read about what FDA has said.  And
4  that is that they do not think that short-term use
5  of over-the-counter NSAIDs is associated with a
6  significant increased cardiovascular risk, but they
7  want to caution patients against using these
8  over-the-counter drugs for longer than what is
9  stated on the label.  And in particular, when you
10  buy an over-the-counter drug, the information that's
11  provided with that over-the-counter drug tells you
12  not to use the drug for long periods of time.
13       Q.    Do you believe that FDA's views as to
14  the cardiovascular risk associated with Aleve are
15  wrong?
16       A.    I'm sorry, can you state that again?
17       Q.    Do you believe that FDA's views with
18  respect to cardiovascular risk of people taking
19  Aleve are wrong?
20            MR. KIERNAN:  Objection to form.
21            THE WITNESS:  I respect what the FDA
22  has said, and that is that the cardiovascular risks
23  associated with the nonsteroidal anti-inflammatory
24  drugs, including ibuprofen and naproxen or Aleve,
25  are unknown, but that the -- that their -- because

Page 719

1  of their concerns, that they want to make patients
2  and physicians aware of the possibility.
3  BY MR. SPECTER:
4       Q.    You agree that the CV risks with
5  Aleve are unknown?
6       A.    I think that whether or not there is
7  an effect of the COX-2 inhibition by Aleve or
8  naproxen on cardiovascular safety is unanswered.  I
9  do know or I do believe that naproxen, when dosed
10  500 milligrams twice a day, that is, at prescription
11  strength in a controlled clinical trial in which
12  patients are regularly taking this drug twice a day
13  every day, that that is -- that the results of our
14  clinical studies and other clinical studies versus
15  other COX-2 inhibitors indicate that naproxen has a
16  cardioprotective effect.
17       Q.    Sir, do you recollect telling me just
18  a moment ago in answer to the question before the
19  last one that the CV risks with Aleve are unknown?
20       A.    I recollect saying that that was the
21  FDA's --
22       Q.    No, sir.
23       A.    -- statement.
24       Q.    No, sir.
25            MR. SPECTER:  Lisa, let's go backward

Page 720

1  if we could.
2  BY MR. SPECTER:
3       Q.    You said, "I respect what the FDA has
4  said, and that is that the cardiovascular risks
5  associated with the nonsteroidal anti-inflammatory
6  drugs, including ibuprofen and naproxen or Aleve,
7  are unknown."  Do you recollect saying that?
8       A.    Yes.  And to be clear, I was
9  referring to what the FDA said.
10       Q.    Right.
11       A.    Which is what I respect.
12       Q.    Right.  So, when you say you
13  "respect" it, you agree with it; correct?
14       A.    I respect it.
15       Q.    Do you agree with it, sir?
16       A.    I think -- so, again, you're going to
17  have to let me answer the question in the way in
18  which I'm thinking about this, which is that I think
19  that the effects of COX-2 inhibition by naproxen,
20  the effects of that on cardiovascular safety are
21  unknown, but I think that the -- when naproxen is
22  used at prescription strength twice a day in
23  controlled clinical trials, it demonstrates a
24  cardioprotective effect.
25       Q.    Sir, you told us not five minutes

KS-000506

Confidential - Subject to Protective Order

Page 721

1  ago, "I respect what the FDA has said, and that is
2  that the cardiovascular risks associated with the
3  nonsteroidal anti-inflammatory drugs, including
4  ibuprofen and naproxen or Aleve, are unknown."
5          Now, do you want to take that back?
6      A.   No.  I respect that statement.
7      Q.   Do you think it's wrong?  Yes or no?
8          MR. KIERNAN:  Objection to the form.
9          THE WITNESS:  Do I think it's wrong?
10 It's unknown.
11 BY MR. SPECTER:
12     Q.   No.  No.  When you say, "I respect,"
13 do you mean I agree with or do you mean I don't
14 agree with?
15     A.   It means that I respect it.  In
16 science, one has data, one tries to take different
17 accounts into view, and one tries to come up with
18 opinion.  The FDA has come up with opinion here.
19 They've studied the issue.  They had an Advisory
20 Committee meeting.  They've had discussions
21 internally, I presume, and they've come out with a
22 statement.
23     Q.   Sir, when you say, "I respect what
24 the FDA has said, and that is that the
25 cardiovascular risks associated with the

Page 722

1  nonsteroidal anti-inflammatory drugs, including
2  ibuprofen and naproxen or Aleve, are unknown," when
3  you say that, do you mean I agree with it or do you
4  mean I disagree with it?
5      A.   I don't mean either.  I mean I
6  respect it.
7      Q.   I respect it.  So, somebody listening
8  to you should not infer that when you say, "I
9  respect" something means that you agree with it;
10 correct?
11     A.   Oh, no, not at all.
12     Q.   Now, do you believe that an alleged
13 cardiovascular protective effect of naproxen was the
14 sole factor that explained the difference in
15 cardiovascular events between naproxen and Vioxx in
16 the VIGOR trial?
17     A.   In the VIGOR study, yes.
18     Q.   So, every one of the 58 percent
19 difference is attributable to a cardioprotective
20 effect of naproxen?  Is that what you want us to
21 believe?
22         MR. KIERNAN:  Objection to form.
23         THE WITNESS:  I believe that the
24 difference in the cardiovascular event rates seen in
25 the VIGOR trial between naproxen and Vioxx are

Page 723

1  attributable to the cardioprotective effect of
2  naproxen.
3  BY MR. SPECTER:
4      Q.   All 58 percent?
5          MR. KIERNAN:  Objection to form.
6          THE WITNESS:  Again, it's the
7  difference that's observed, and when you say, "all
8  58 percent," as you know, I think there are error
9  limits, confidence boundaries, to that statistical
10 number.  What I'm saying is that the difference
11 that's observed there is due to the cardioprotective
12 effect of naproxen.
13 BY MR. SPECTER:
14     Q.   Well, the difference was 58 percent;
15 correct?
16     A.   The numeric -- I don't know what the
17 difference was exactly.
18     Q.   Do you recollect that being the
19 figure that's been used?
20     A.   No.  But I do recollect it is
21 approximately that.
22     Q.   You don't wish to quarrel with that
23 figure, do you?
24     A.   I don't wish to quarrel with it.  I
25 just don't know the exact figure.

Page 724

1      Q.   Well, assuming that it was 58
2  percent, do you attribute all of that 58 percent to
3  cardioprotective effects of naproxen?
4      A.   So, again, without getting into 58
5  percent, I do attribute all of the effect that was
6  seen in the VIGOR trial in the difference between
7  Vioxx and naproxen.
8      Q.   This is despite the fact that you
9  testified not ten minutes ago that you respect the
10 FDA's statements with regard to -- let me find it
11 now -- that you respect what the FDA has said, and
12 that is that the "Cardiovascular risks associated
13 with the NSAIDs including...Aleve are unknown."
14 Right?
15     A.   Correct.
16     Q.   Well, you appear to know them; right?
17     A.   No.  What I know is the net effect on
18 cardioprotection seen with naproxen taken twice a
19 day at prescription strength.
20     Q.   Now, let's go back to the Juni
21 article, if we could, sir.
22     A.   (Witness reviewing document.)
23     Q.   Taking a look at page 27 in the
24 second column, the first paragraph, he says, "A
25 crucial lesson that should be learned from our

KS-000507

Confidential - Subject to Protective Order

Page 725

1  meta-analysis is that data on adverse events from
2  industry-sponsored randomised trials are trustworthy
3  only if an independent endpoints committee is
4  involved." Did I read that correctly?
5        A.    You read that correctly.
6        Q.    Do you agree with it?
7        A.    Absolutely not.
8        Q.    He goes on to say, "We are frustrated
9  by Merck's assertion that we should have included
10  trials in patients with Alzheimer's disease; these
11  trials neither met our prespecified inclusion
12  criteria, nor had the data presented on the FDA's
13  website been reviewed by an independent endpoints
14  committee." Did I read that correctly?
15        A.    You read it correctly.
16        Q.    Is that a true statement?
17        A.    That is not a true statement.
18        Q.    Is it true that the data --
19        A.    Well, excuse me. Let me say what I
20  think is untrue, just to be clear here.
21        Q.    Please.
22        A.    The assertion here is that the
23  endpoints were not reviewed by someone independent
24  of Merck. And, in fact, as we discussed before, all
25  of the cardiovascular events in Merck's trials

Page 726

1  beginning, I believe, in 1999, were adjudicated,
2  that is, that they were evaluated and determined as
3  to whether or not they were true cardiovascular
4  events by an independent adjudication committee.
5        Q.    Did the criteria for what to include
6  and not include change during the trial in VIGOR?
7        A.    In VIGOR?
8        Q.    Yes.
9        A.    Not that I'm aware of. Not that I
10  recall.
11        Q.    Do you know?
12        A.    I am not aware of any change in the
13  inclusion criteria for patients in VIGOR.
14        Q.    Congestive heart failure, can that be
15  due to a heart attack?
16        A.    Congestive heart failure is in
17  general due to -- well, it can be caused by many,
18  many causes, but it's associated with increased
19  fluid retention and is seen as a mechanism-based
20  side effect with all NSAIDs, including the
21  nonsteroidal NSAIDs that inhibit both COX-1 and
22  COX-2.
23        Q.    Can congestive heart failure be seen
24  in people that have had a heart attack, sir?
25        A.    Can congestive heart failure be seen

Page 727

1  in patients that have had a heart attack?
2        Congestive heart failure is a diagnosis that's made
3  by a physician and certainly can be made in patients
4  that have had a heart attack.
5        Q.    Was congestive heart failure part of
6  the SOP for VIGOR?
7        A.    I'm not sure what you mean by that.
8        Q.    What's an SOP?
9        A.    It's a standard operating procedure.
10        Q.    Do you know what the VIGOR SOP was?
11        A.    I mean, there are many SOPs. I'm not
12  sure what you are referring to.
13        Q.    Do you know whether --
14        A.    For the inclusion criteria?
15        Q.    Yes.
16        A.    Is that what you're asking me?
17        Q.    Yes.
18        A.    I do not recall what was done in
19  terms of the inclusion criteria for congestive heart
20  failure, if that's your question.
21        Q.    Do you know whether congestive heart
22  failure was originally in as part of the SOP and
23  then later taken out of VIGOR?
24        A.    Oh, as I just said, I don't know what
25  the inclusion criteria for VIGOR said with regard to

Page 728

1  congestive heart failure.
2        Q.    Continuing with Dr. Juni's article,
3  he writes, "We included all trials in patients who
4  had chronic musculoskeletal pain, thus reflecting
5  the indications" Vioxx "was licensed for, and the
6  patients taking the drug in routine clinical
7  practice." Did I read that correctly?
8        A.    You read that correctly.
9        Q.    Is that a true statement?
10        A.    I don't know.
11        Q.    Can you say it's false?
12        A.    I cannot say it's false, but I don't
13  know if it's true.
14        Q.    Skipping down to the next paragraph.
15        A.    Okay.
16        Q.    He says, "Including the data of the
17  three trials in patients with Alzheimer's disease
18  and those from the APPROVe trial in patients with a
19  history of colorectal adenomas, the risk of
20  myocardial infarction is increased in trials with an
21  external endpoint committee (relative risk 2-50, 95%
22  confidence interval 1-26 to 4-97), but not in trials
23  without such a committee (0.67, 0.32-1.43. p for
24  interaction 0.012)." Did I read that correctly?
25        A.    Yes, you did.

KS-000508

Confidential - Subject to Protective Order

Page 729

1   Q.    Do you agree with that statement?
2   A.    No.  And, again, it has to do with
3 the fact that in the Alzheimer's studies, as well as
4 in the VIGOR study, as well as in the APPROVe study,
5 the -- all of the cardiovascular endpoints, which is
6 exactly what we're talking about here, were
7 adjudicated by an external group, independent of
8 Merck.
9   Q.    Is the statement otherwise a true
10 statement?
11   A.    I don't know.
12   Q.    Can you say it's false?
13   A.    No.
14   Q.    Let's go to another writing, if we
15 may.
16        MR. SPECTER:  I've marked this as
17 Kim-47.
18            - - -
19        (Whereupon, Deposition Exhibit Kim-47,
20        "Rofecoxib, Merck, and the FDA"
21        Correspondence, The New England Journal
22        of Medicine, 11-30-04, 351; 27
23        (2875-2878) was marked for
24        identification.)
25            - - -

Page 730

1 BY MR. SPECTER:
2   Q.    This is correspondence from you and
3 the New England Journal of Medicine; is that
4 correct?
5   A.    That's correct.
6   Q.    Did you author this?
7   A.    I did.
8   Q.    Did you write the first draft?
9   A.    I don't remember, but I don't think
10 so.
11   Q.    Did you assure yourself that the
12 statements contained in this letter were true?
13   A.    I assured myself that I agreed with
14 the statements, and I wanted to write the statements
15 in this article.
16   Q.    Is that different in some way from
17 the way I asked the question?
18   A.    Only in the sense that true versus
19 false -- certainly statements of fact here are true
20 to the best of my knowledge, but this correspondence
21 also includes opinions.
22   Q.    Well, I'm going to deal with facts,
23 not with opinions, if we could.
24        Did you assure yourself personally
25 that the statements were true?

Page 731

1   A.    To the best of my ability.
2   Q.    Okay.
3   A.    To the best of my knowledge, the
4 statements in here are true.
5   Q.    And you assured yourself to the best
6 of your ability that the statements in here were
7 true?
8   A.    Yes.
9   Q.    Let's look at the first paragraph,
10 and about halfway down the first paragraph you
11 wrote, "Because the literature suggested a
12 hypothetical possibility of" --
13   A.    I'm sorry.  Where are you?
14   Q.    Let's see, one, two, three, four,
15 five, six, seven, eight, nine, ten lines down.
16   A.    From the beginning?
17   Q.    Yes, sir.  The very first paragraph
18 of the letter to the editor.
19   A.    Oh, yes, okay.  "Nevertheless."
20   Q.    Right.  "Nevertheless" was modifying
21 something that came before it; correct?
22   A.    Yes.  Yes.
23   Q.    I just want to deal with the
24 "because" part.  Just so we're clear, this is a
25 letter to the editor in the New England Journal of

Page 732

1 Medicine, December 30, 2004; right?
2   A.    Correct.
3   Q.    Signed by you and Dr. Reicin;
4 correct?
5   A.    Correct.
6   Q.    So, you wrote, "because the
7 literature suggested a hypothetical possibility of
8 both cardioprotective effect and prothrombotic
9 effects of (COX-2) inhibitors, Merck initiated
10 adjudication of cardiovascular events by an external
11 expert panel at the end of 1998 (i.e., before
12 the...[VIGOR] trial began) for future studies of
13 Merck's COX-2 inhibitors."  Did I read that
14 correctly?
15   A.    Yes.
16   Q.    Is that a true statement?
17   A.    To the best of my knowledge, that is
18 a true statement.
19   Q.    Well, do you know it to be true?
20   A.    So, again, to the best of my
21 knowledge, this is a true statement.  This decision
22 was made before I joined Merck.
23   Q.    Right.  That's what I want to find
24 out.  I want to know whether before you made the
25 statement you made sure that it was true?

KS-000509

Confidential - Subject to Protective Order

Page 733

1     A.    I talked to people who made a
2  decision who told me that this is why they made that
3  decision.
4     Q.    Well, was it just because the
5  literature suggested this hypothetical possibility?
6  Is that the only reason why Merck initiated
7  adjudication of cardiovascular events by external
8  expert panels?
9     A.    I don't know if it was the only. I
10 mean, science is something which is discussed
11 verbally at meetings, in telephone conferences and
12 ultimately in the literature. And it's what's in
13 the literature that is peer reviewed that is
14 generally regarded as what people follow.
15    Q.    Yes, but there were a lot more
16 factors in Merck's decision to initiate adjudication
17 of cardiovascular events than what the literature
18 said; correct?
19    A.    Again, science is something that, you
20 know, you spend time discussing. You go to
21 meetings, you talk to people, you talk on the phone.
22 Ultimately, science gets distilled down to the
23 literature, which is the record of peer-reviewed
24 discussions and observations and experiments that
25 are done.

Page 734

1     Q.    But it wasn't just the literature
2  that suggested this possibility; correct?
3     A.    Oh, that's certainly true.
4     Q.    Right. It was people within Merck
5  who said that could be the case; correct?
6     A.    I don't know. I think it's -- this
7  was something that was being discussed in the
8  scientific community, which would include people at
9  Merck --
10    Q.    Do you know --
11    A.    -- outside of Merck.
12    Q.    Do you know if people within Merck
13 before 1998 said that there was a possibility that
14 COX-2 inhibitors could cause cardiovascular events?
15    A.    Say that again. Did I know before?
16    Q.    Did you know if people with -- when
17 you authored this letter to the editor, did you know
18 whether people within Merck prior to the end of '98
19 had said that there was a possibility that COX-2
20 inhibitors could cause cardiovascular events?
21    A.    I do know that -- so, the original
22 studies that were done that led to what's commonly
23 referred to as the FitzGerald hypothesis were
24 experiments that were done comparing administration
25 of a COX-2 inhibitor against placebo or -- well, it

Page 735

1  included studies of a COX-2 inhibitor, Vioxx, in
2  another study, Celebrex, versus placebo. And those
3  studies demonstrated that through urinary
4  metabolites that there was inhibition of
5  prostacyclin and not inhibition of thromboxane,
6  which led to a hypothesis that there could be an
7  imbalance in those two, which could lead to an
8  increase in the cardiovascular events.
9           There was also, before this
10 observation, and before anyone had come up with the
11 hypothesis that a prostacyclin/thromboxane imbalance
12 might cause a cardiovascular -- increase in
13 cardiovascular risk, there was also considerations
14 of the fact that unlike aspirin and unlike the
15 NSAIDs which inhibit both COX-1 and COX-2, that by
16 virtue of the fact that the COX-2 inhibitors did not
17 inhibit COX-1, there might be a difference in the
18 cardiovascular event rates seen between Vioxx and an
19 NSAID, because the NSAID might be cardioprotective.
20 That certainly was discussed by people both inside
21 and outside of Merck.
22           There was also discussion around the
23 possibility that because of the anti-inflammatory
24 properties that Vioxx or a COX-2 inhibitor might
25 actually increase cardiovascular health, that is, to

Page 736

1  decrease the overall rates of cardiac events.
2     Q.    Dr. Kim, do you have a recollection
3  of my question?
4     A.    Your question had to do with whether
5  or not there was discussion at Merck prior to 1998
6  about the potential cardiovascular risk.
7     Q.    Of COX-2 inhibitors?
8     A.    Of COX-2 inhibitors.
9     Q.    And the answer to that question is
10 yes; correct?
11    A.    The answer to that question is yes in
12 the way that I just described, which included
13 different hypotheses, in one case, a
14 prostacyclin/thromboxane imbalance. In other cases,
15 it says a lack of inhibition of COX-1.
16          MR. SPECTER: Let's change the tape.
17          THE VIDEOTAPE TECHNICIAN: Stand by,
18 please. That concludes Video Cassette Number 1.
19 The time is 11:17. We're going off the record.
20          - - -
21          (Whereupon, a recess was taken from
22          11:17 a.m. until 11:18 a.m.)
23          - - -
24          THE VIDEOTAPE TECHNICIAN: This
25 begins Video Cassette Number 2. The time is 11:18.

KS-000510

Confidential - Subject to Protective Order

Page 737

1  We're back on the record.
2  BY MR. SPECTER:
3      Q.   Now, Dr. Kim, in addition to people
4  within Merck, isn't it true that prior to the end of
5  '98, which is the date that you were referring to
6  here in your letter, that people outside of Merck
7  who advised Merck, specifically people on Merck's
8  scientific board of advisors, had told Merck that
9  there was a possibility that COX-2 inhibitors caused
10 cardiovascular events?
11     A.   I don't know that.
12     Q.   Well, when you were writing what the
13 reason was that Merck initiated adjudication of
14 cardiovascular outcomes, you were saying what the
15 reason was that they did that, and you said that it
16 was the literature that suggested this, did you
17 inquire of your colleagues at Merck whether others
18 had said so both within Merck, Merck employees and
19 also members of the outside board of advisors?
20     A.   No, I did not.  And, again, in the
21 scientific fields, what one does is to have
22 extensive discussions, go to scientific meetings,
23 discuss data results, interpretations, but
24 ultimately what gets recorded in science is the
25 way -- the traditional way in which things are

Page 738

1  recorded in science is in the literature.  And then
2  people go on to reference the literature when they
3  are supporting certain statements.
4      Q.   Well, that which is recorded in the
5  literature is dependent upon that which is submitted
6  to peer-reviewed journals; correct?
7      A.   Well, in general, yes.
8      Q.   Merck doesn't submit everything to
9  peer-reviewed journals that it discusses internally;
10 correct?
11     A.   Certainly not.  Merck --
12     Q.   Merck doesn't cause the disclosure to
13 peer-reviewed journals of everything that they're
14 told by their outside board of advisors; correct?
15     A.   That's correct.
16     Q.   Now, continuing on this exhibit, sir,
17 if you would, please, with me.  Dr. Topol responded
18 to your letter; correct?
19     A.   Yes.
20     Q.   And he discussed the VIGOR trial and
21 also study 090, which you have discussed with us
22 today and also on a previous day; correct?
23     A.   It is correct that he refers to 090,
24 and it's correct that we have discussed 090.
25     Q.   And one thing he had to say about 090

Page 739

1  that we've not discussed previously appears at the
2  bottom of Page 2877, and he says, I'm looking at the
3  very bottom, the last line.  "Not only was Study 090
4  never published and available solely through a
5  subsequent FDA memorandum, but the data presented in
6  the VIGOR article also suffered from errors of
7  omission, along with erroneous information and lack
8  of completeness."  Did I read that correctly?
9      A.   You read it correctly.
10     Q.   Is that a true statement?
11     A.   No, this is not a true statement.
12     Q.   What's false about it?
13     A.   Well, the first thing was that the
14 results of study 090 were published by Dr. Topol
15 himself.
16     Q.   Well, he was critical of Merck as to
17 where Merck published it; correct?
18     A.   No.  He says, "Not only was Study 090
19 never published." It was published by himself.
20     Q.   Right.  But he had to go get it in
21 order to publish it; correct?  Merck didn't publish
22 it?
23     A.   You're asking me if this statement
24 correct, "Not only was Study 090 never published."
25 That statement is incorrect.

Page 740

1      Q.   Did Merck ever publish 090?
2      A.   Merck made study 090 available to the
3  public through the FDA on -- or certainly submitted
4  to the FDA, and the FDA made it available.  And Dr.
5  Topol published the results of study 090.
6      Q.   Please, sir, let's not fence over
7  this.
8          Did Merck publish 090?
9      A.   Merck did not publish in the
10 scientific peer-reviewed journal a study -- excuse
11 me, the results of study 090.
12     Q.   Thank you.
13         Let's go to the next thing that you
14 say is false about this statement, if anything.
15 What is that?
16     A.   Well, excuse me, if I could just come
17 back to the previous statement.  He references the
18 exact website where study 090 was made available.
19     Q.   You know he's criticizing Merck for
20 not publishing 090, don't you?
21     A.   He's trying to criticize Merck for
22 not publishing study 090.  What I find remarkable
23 about the statement is that he published study 090
24 himself.
25     Q.   Right.  He's criticizing Merck for

Confidential - Subject to Protective Order

Page 741

1   not publishing 090, and he's right, it wasn't
2   published by Merck; correct?
3          MR. KIERNAN: Object to the form.
4          THE WITNESS: No, that's not what
5   he's saying. He's saying the fact of the matter is,
6   he's stating, if I read it, please, "Not only was
7   study 90 never published." That's an incorrect
8   statement.
9   BY MR. SPECTER:
10     Q.    You just told me a moment ago that
11  he's trying to criticize Merck for not publishing
12  090. Remember that, sir? Do you remember saying
13  that, sir?
14     A.    Yes.
15     Q.    He was right about that; wasn't he?
16     A.    He was right about -- he is right
17  that Merck did not publish study 090. What is
18  remarkable is that he himself published it, and it
19  was available through an FDA website that he
20  references here.
21     Q.    Let's go to the next thing that you
22  want to criticize about this sentence, if anything.
23         MR. KIERNAN: Objection to form.
24  BY MR. SPECTER:
25     Q.    Is there any other part of this

Page 742

1   sentence that's incorrect, according to you? Let me
2   read it again so we have a clear context.
3          "Not only was Study 090 never
4   published and available solely through a subsequent
5   FDA memorandum, but the data presented in the VIGOR
6   article also suffered from errors of omission, along
7   with erroneous information and lack of
8   completeness."
9      A.    Without knowing what it is that he's
10  referring to, and without a subjective discussion or
11  an understanding of what is considered "errors," if
12  it's a typographical error that he's referring to or
13  what, it's difficult to know what to make of this
14  statement.
15     Q.    This is the letter that was published
16  in the New England Journal of Medicine; correct?
17     A.    This is a correspondence. So,
18  correspondences, just to be clear, are not peer
19  reviewed, I don't think.
20     Q.    I said letter.
21     A.    Letter?
22     Q.    I said letter; right?
23     A.    It's -- I don't know what the New
24  England Journal calls -- yes, they call them
25  letters.

Page 743

1      Q.    It's a letter. It was published in
2   the New England Journal of Medicine December 30,
3   2004; correct?
4      A.    Correct.
5      Q.    You were engaged in a back and forth
6   with Dr. Topol in these very pages on the subject of
7   the safety of Vioxx; correct?
8      A.    Well, I wrote, together with Dr.
9   Reicin, a letter in response to a Perspective
10  article that he published, and then he responded to
11  my letter.
12     Q.    He replied to your response; correct?
13     A.    Correct.
14     Q.    So, he said this -- he wrote this
15  sentence that I've just read a couple of times;
16  right?
17     A.    He wrote this sentence, and it was
18  published, that you just referred to.
19     Q.    And, surely, you read it; correct?
20     A.    Yes.
21     Q.    When you read it, you were the
22  president of Merck Research Laboratories; correct?
23     A.    Correct.
24     Q.    And you still are?
25     A.    Correct.

Page 744

1      Q.    And you're thinking about bringing
2   Vioxx back on the market. Thinking about it;
3   correct?
4      A.    We're interested in discussions with
5   the FDA.
6      Q.    Now, sir, wouldn't it be part of your
7   job to find out whether these statements that appear
8   in this letter from Dr. Topol of the Cleveland
9   Clinic are true or false?
10     A.    Well, I told you that I think the
11  first part of the statement is false.
12     Q.    Yes. How about the rest of it?
13     A.    And I said that the rest of it is a
14  question of what it is that he's referring to.
15     Q.    Well, did you ask anybody at Merck
16  whether "the data presented in the VIGOR article
17  suffered from errors of omission, along with
18  erroneous information and lack of completeness"?
19     A.    No.
20     Q.    Let's go to the next sentence. It
21  says, "In Table 1, the data from the FDA report for
22  VIGOR are presented." You've got a table here;
23  correct?
24     A.    He does have a table.
25     Q.    And it says, "In the VIGOR article,

KS-000512

Confidential - Subject to Protective Order

Page 745

1  the actual deaths were not reported, but it is
2  stated in the article in three places that the
3  overall mortality rate was similar in the two
4  groups." Did I read that correctly?
5      A.     You read that correctly.
6      Q.     Is that a true statement?
7      A.     I'm sorry, is what a true statement?
8      Q.     What I just read. I'll read it
9  again.
10         "In the VIGOR article, the actual
11  deaths were not reported, but it is stated in the
12  article in three places that the overall mortality
13  rate was similar in the two groups."
14      A.     I don't know if that's a correct
15  statement.
16      Q.     Isn't it part of your job to see if
17  that's true or false?
18      A.     I don't know if that's a correct
19  statement.
20      Q.     You don't know if what's a correct
21  statement?
22      A.     That what was explicitly stated in
23  the article.
24      Q.     No, no. My question is, isn't it
25  part of your job to find out if Dr. Topol publishing

Page 746

1  in the New England Journal of Medicine criticizing
2  Merck as to its analysis of the VIGOR trial, whether
3  he's right or he's wrong? Is that part of your job?
4      A.     I don't think it's an important part
5  of my job.
6      Q.     No, sir. I'm not asking if it's an
7  important part of your job. I'm asking, sir, is it
8  part of your job?
9      A.     I do not consider it part of my job
10  to take every statement that is made that's critical
11  of Merck and dig down into whether or not it's true
12  or not.
13      Q.     Is it somebody's job?
14      A.     Again, I don't really consider that
15  an important part of our job.
16      Q.     An important part of whose job?
17      A.     Our job.
18      A.     Our job.
19         Is it part of your job at Merck,
20  whether important or not, to see if what Dr. Topol
21  is saying is true or false?
22      A.     Is it a part of my job, important or
23  not?
24      Q.     No, sir, no.
25         Is it part of the job of Merck to see

Page 747

1  if what Dr. Topol is saying is true or false?
2      A.     I think the job of people at Merck is
3  to discover and develop drugs and medicines and
4  vaccines that help people and to be aware of the
5  scientific literature, which would include
6  literature that includes articles written by Dr.
7  Topol, and to assess the validity or not of those
8  statements that are contradictory -- either
9  contradictory or critical of things that Merck is
10  doing. Yes, I believe that's part of our job.
11      Q.     So, whose job is it to see if what we
12  just read is true or false? Who is the person
13  that's supposed to do that?
14      A.     There's not a specific person that's
15  assigned.
16      Q.     Was it done?
17      A.     I don't know.
18      Q.     Are you going to find out?
19      A.     I'm not -- I don't think so.
20      Q.     Why not?
21      A.     It's -- what's important to me is
22  what we know about Vioxx and what we've learned
23  about Vioxx and the totality of the data here.
24      Q.     What you know about Vioxx is
25  dependent upon the veracity and integrity of the

Page 748

1  information that's presented to you; correct?
2      A.     Absolutely.
3      Q.     And if somebody criticizes the
4  veracity and the integrity of information that's
5  being presented in the medical literature, that's a
6  very serious charge; correct?
7         MR. KIERNAN: Object to the form.
8         THE WITNESS: Again, it's -- this is
9  something that is part of the overall mission that
10  we have. And I am confident that people have looked
11  into these issues. And one of the things that we
12  really take great pride in is the scientific
13  excellence that we pursue these efforts to try and
14  discover and develop medicines.
15  BY MR. SPECTER:
16      Q.     Right. One of Merck's slogans is
17  that they're a data-driven company; correct?
18      A.     I don't know if it's a slogan, but we
19  certainly are a data-driven organization.
20      Q.     You've seen that appellation used to
21  describe Merck by Merck itself; correct?
22      A.     I don't know. I've certainly used
23  it.
24      Q.     So, you've used it.
25         So, in order to know that it's true,

KS-000513

31 (Pages 745 to 748)

Confidential - Subject to Protective Order

Page 749

1  you'd have to know that accusations that Merck has
2  not been straight about data, that those accusations
3  are false; correct?
4      A.    Merck is straight about data.
5      Q.    In order to know that -- in order to
6  know that accusations that Merck has not been
7  straight are false, you'd have to look into the
8  issue; correct?
9      A.    No. I know what Merck does. I know
10 that Merck provides our data in a completely
11 transparent manner to the FDA and that our
12 discussions are one that are open, scientifically
13 driven, and I'm confident about that.
14     Q.    The next sentence in the article from
15 Dr. Topol says, "The heart-attack rate for Vioxx was
16 erroneous," referring again to the VIGOR article;
17 correct?
18     A.    That's what it states.
19     Q.    Is that a false statement?
20     A.    I'm not sure what he's referring to
21 here. He might be referring, but now I'm
22 speculating, to the fact that the VIGOR article was
23 written based on a preliminary assessment of --
24 excuse me. The article that was published that he's
25 referring to was written based on an analysis of the

Page 750

1  interim, that is, not the complete data set, whereas
2  as he states at the end of this paragraph, the
3  complete data set was provided to the FDA
4  subsequently, subsequent to submission of the paper
5  that was published that he's referring to.
6      Q.    Having looked --
7      A.    So, if I can just finish.
8      Q.    Take your time. I thought you were
9  finished.
10     A.    So that if by his statement the heart
11 attack rate was erroneous, if he's referring to the
12 fact that the data that was published in the New
13 England Journal is different than the final data,
14 and, again, I'm speculating, then I would say that
15 the statement is very misleading, because the
16 article, as he should know, was based on the interim
17 analysis.
18     Q.    Dr. Kim, do you know what he's
19 referring to when he says "The heart-attack rate for
20 Vioxx was erroneous"?
21     A.    I do not know.
22     Q.    That's a pretty serious charge, isn't
23 it?
24     A.    I know that the data that was
25 presented in the VIGOR data was data that was

Page 751

1  prepared by responsible, diligent, honest scientists
2  who took the interim data of the VIGOR trial and
3  published a paper based on that data.
4      Q.    Sir, the charge of Dr. Topol is
5  serious, isn't it?
6          MR. KIERNAN: Objection to form.
7          THE WITNESS: The accusation is
8  certainly one that is a serious accusation.
9  BY MR. SPECTER:
10     Q.    And you're not sure what he's talking
11 about; correct?
12     A.    I gave you my speculation of what
13 he's talking about.
14     Q.    It would be speculation as to what
15 he's talking about; correct?
16     A.    It would be speculation.
17     Q.    You don't know what he's talking
18 about; correct?
19     A.    I don't, but my speculation is based
20 on the subsequent sentence in this paragraph, which
21 concludes with a comparison of the data that was the
22 final data and the data published in the VIGOR
23 study.
24     Q.    You don't make decisions based upon
25 speculation, do you, sir?

Page 752

1      A.    No. I make decisions based on data,
2  and I know that the data that was published in the
3  VIGOR trial was published by scientists who are
4  honest, who are diligent, and who analyzed this data
5  in the appropriate manner.
6      Q.    Did you read Dr. Topol's letter when
7  it was published?
8      A.    Which letter are you referring to?
9      Q.    The one we're looking at right now.
10     A.    Yes.
11     Q.    Did you say to somebody at Merck, I'm
12 not sure what Dr. Topol meant here by saying "The
13 heart-attack rate for Vioxx was erroneous," would
14 you please tell me if you know what it is, and if
15 you don't know, would you please ask him what he's
16 talking about?
17     A.    I did not ask anyone that question.
18         MR. KIERNAN: Mr. Specter, can we
19 take a short break?
20         MR. SPECTER: Sure.
21         THE VIDEOTAPE TECHNICIAN: The time
22 is 11:35. Off the record.
23              - - -
24         (Whereupon, a recess was taken from
25     11:35 a.m. until 11:46 a.m.)

KS-000514

Confidential - Subject to Protective Order

Page 753

1              - - -
2         THE VIDEOTAPE TECHNICIAN:  The time
3    is 11:46.  We're back on the record.
4    BY MR. SPECTER:
5         Q.    Dr. Kim, I want to continue with this
6    discussion about Dr. Topol's letter to the New
7    England Journal of Medicine from a couple of months
8    ago, but let me ask you first, before we get back to
9    it, about transparency.  You talked about
10   transparency with the FDA.  Do you recollect that?
11        A.    Yes.
12        Q.    You have told us that Merck is
13   transparent with the FDA; correct?
14        A.    I believe I said that, yes.
15        Q.    And "transparency" means what to you?
16        A.    It means that we present the data in
17   its raw and accurate form, and that we present our
18   interpretations of that.  And so that basically it
19   means that we disclose what it is that we have found
20   in an open manner.
21        Q.    Let's go with that definition,
22   "disclose what...we have found in an open manner."
23        Now, would you say that Merck has the
24   same level of transparency that you say they have
25   with the FDA with the medical community in general?

Page 754

1         A.    So, Merck certainly has -- do we have
2    the same level of transparency?  Yes, I think we
3    have the same level of transparency in the sense
4    that we present the data.  That is something -- in
5    an open way.  There is a difference in terms of the
6    timing of presenting data in that the FDA very often
7    receives data in a preliminary form.  The FDA often
8    receives data before it is that we announce it
9    publicly or before it is that we publish it.
10        Q.    Well, "disclose what...we have found
11   in an open manner."  You know that most doctors
12   don't read what gets sent to the FDA; correct?
13        A.    Most doctors do not read what's sent
14   to the FDA.
15        Q.    In fact, you've been frank to tell us
16   that you haven't read a lot of the things that were
17   sent to the FDA regarding Vioxx; correct?
18        A.    Oh, yeah.  No, I have not read many
19   of the things that have been sent to the FDA.  I
20   have people that are extremely well qualified that I
21   trust that are taking care of those documents.
22        Q.    Right.  You figure that doctors are
23   going to rely upon what's in the medical literature
24   primarily; correct?
25        A.    Doctors rely on information that they

Page 755

1    receive from different sources, which includes, as
2    you just mentioned, the medical literature.  It also
3    includes scientific meetings.  It includes the
4    label.  And it includes informal discussions, as we
5    discussed earlier, namely in conversations between
6    physicians and scientists and between physicians and
7    physicians.
8         Q.    Let's talk about whether Merck
9    disclosed what Merck had found in an open manner in
10   the medical literature.  Okay?
11        A.    Okay.
12        Q.    Now, Dr. Topol writes in the very
13   next sentence from what we read before we took a
14   break, "More than half of the thrombotic events are
15   not presented in the VIGOR article but appear in the
16   FDA report."  Did I read that sentence correctly?
17        A.    I'm sorry.  Where are you?  Here we
18   go.  Sorry.
19        Q.    Let's read it again.  "More than half
20   of the thrombotic events are not presented in the
21   VIGOR article but appear in the FDA report."
22        A.    Oh, but one has to --
23        Q.    Did I read the sentence correctly?
24        A.    Oh, you read the sentence correctly,
25   but --

Page 756

1         Q.    I haven't gotten to my next question
2    yet.  I'll get there.  I'll give you a chance to say
3    whatever it is you want to say.  All right?
4         A.    Fine.
5         Q.    Now, is that a correct statement?
6         A.    I don't know because it's a
7    quantitative statement.  I don't know the exact
8    numbers here.  What I do know is --
9         Q.    Let's just stick with whether it's a
10   true statement or not.  Do you know if it's true?
11        A.    I don't know if it's true.
12        Q.    Have you asked anybody if it's true?
13        A.    No, I've not asked anybody if it's
14   true.  What I do know is that the VIGOR article was
15   based on interim analysis of the VIGOR trial.  And
16   the FDA report that he's referring to, as he clearly
17   states in the next -- in the parenthetical statement
18   that follows, is based on the complete data of the
19   VIGOR trial.
20        Q.    Yes, but that's the point, Doctor.
21   Look at the next sentence.  It says, "The updated
22   cardiovascular-event data from VIGOR were submitted
23   to the FDA on October 13, 2000, six weeks before the
24   VIGOR study was published."  Did I read it
25   correctly?

KS-000515

Confidential - Subject to Protective Order

Page 757

1        A.      You read that correctly.
2        Q.      So, what happened was, was that the
3    VIGOR data was published in the New England Journal
4    of Medicine; correct?
5        A.      An interim analysis of the VIGOR data
6    was published in the New England Journal of
7    Medicine.
8        Q.      And -- well, that's not what the
9    title of it was, was it?  The title of the article
10   was, "Comparison of Upper Gastrointestinal Toxicity
11   of," Vioxx, "and Naproxen in Patients With
12   Rheumatoid Arthritis"; correct?  That was the title
13   of the article?
14       A.      That is the title of the article.
15       Q.      It wasn't titled interim analysis;
16   correct?
17       A.      The title of the article is the
18   article -- is the title that you just read.
19       Q.      That was published six weeks after
20   more complete data was submitted to the FDA on the
21   very same clinical trial; correct?
22       A.      I don't know that for a fact.  That's
23   what Dr. Topol states here.
24       Q.      Well, that's a pretty serious charge;
25   isn't it?

Page 758

1        A.      Oh, not at all.  I don't think that's
2    a serious charge at all.  The article --
3        Q.      Well --
4        A.      Excuse me.  The article was submitted
5    to the New England Journal of Medicine based on the
6    interim analysis.  It was peer reviewed.  And after
7    the peer review, it was sent back presumably, I was
8    not involved in this process, but the typical
9    process is that one has an article, it's peer
10   reviewed, and then there are revisions that are
11   made, and sometimes that process can go back and
12   forth, and then the article is published.
13                         -  -  -
14              (Whereupon, Deposition Exhibit Kim-48,
15              "Comparison of Upper Gastrointestinal
16              Toxicity of Rofecoxib and Naproxen in
17              Patients with Rheumatoid Arthritis," The
18              New England Journal of Medicine,
19              November 23, 2000, (1520-1528)
20              MRK-ABA0001301 - MRK-ABA0001309 was
21              marked for identification.)
22                         -  -  -
23   BY MR. SPECTER:
24       Q.      Here's the article.  I've marked it
25   as Kim-48.  Show me where in the article it says

Page 759

1    it's interim data?
2        A.      I don't know.  Do you want me to read
3    the article?
4        Q.      Well, you told me a moment ago that
5    the article was interim data.  So, tell me where it
6    says that.  I'm just going from what you said, sir.
7        A.      (Witness reviewing document.)
8              I don't know if the article says it's
9    based on interim data.  I know that the article was
10   based on interim data.
11       Q.      That's just the point.  Practitioners
12   reading the article in the New England Journal of
13   Medicine wouldn't know that the article involved
14   incomplete data; correct?
15       A.      It's not incomplete --
16       Q.      All right.  "Interim."  Fine.  I'll
17   go with your term, "interim."  Correct?
18       A.      I don't know if that's correct or
19   not.
20              (Witness reviewing document.)
21       Q.      Well, let me just say this to you,
22   Dr. Kim.  I just did a word search of the article on
23   one of our trusted computers, I'd be happy to show
24   it to you if you'd like to see it if you don't want
25   to trust me on this.  The word "interim" appears

Page 760

1    nowhere in the article.  Will you trust me on that?
2        A.      (Witness reviewing document.)
3        Q.      I guess the answer is, no, you won't
4    trust me.
5        A.      (Witness reviewing document.)
6              I can trust -- I will -- well, it
7    doesn't matter what I trust.  I don't know whether
8    or not the article, whether it uses the word
9    "interim" or not, whether the article specifically
10   states that this was based on an interim analysis of
11   the data.  I do know that the data that was analyzed
12   in this paper and presented in this paper was based
13   on an interim analysis of the VIGOR results.
14       Q.      I want to know whether some other
15   person who's a doctor who would get this article in
16   the mail, because they subscribe to the New England
17   Journal of Medicine and they want to be careful with
18   prescribing Vioxx, whether they would be able to
19   tell from that article that it was, as you say,
20   interim data?
21       A.      In order to answer that question, I
22   would want to read this article again.
23       Q.      Well, sir, wouldn't an indication of
24   whether the data is interim appear in a certain
25   section of the article?  Isn't that the rigor with

Confidential - Subject to Protective Order

Page 761

1  which articles are prepared for scientific
2  publications, that that kind of a statement would
3  appear at a particular place in the article?
4      A.    The analysis of the VIGOR data that
5  was carried out here was carried out with the
6  patient groups and the data that are explicitly,
7  explicitly referenced here in terms of what the
8  results were.  That analysis led to conclusions, and
9  in particular, the group did -- included statistical
10  analyses of the significance of the data so that a
11  scientist, a medical doctor in reading this paper
12  could evaluate the strength of the conclusions based
13  on the statistical analysis.
14          The point that I'm making is in
15  reference to the sentences that you're referring to
16  from Dr. Topol, the simple statement that he makes
17  needs to be understood in the context that the data
18  that was analyzed here, which was properly analyzed
19  and thoroughly analyzed by the Merck scientists and
20  by their collaborators, was based on an interim
21  analysis, which is different than the final data
22  that was published -- that was submitted to the FDA
23  at a subsequent date.
24      Q.    Do you know what question I just
25  asked you?

Page 762

1      A.    I'm not sure what question you just
2  asked me.  But I'm saying that the data --
3      Q.    No, no, no, no.  Answer my question.
4          Do you know what question I just
5  asked you?
6      A.    Why don't you try me again.
7      Q.    The question is, don't you know that
8  articles like this one would have in a certain place
9  in the article, in a certain section, whether the
10  data was interim?
11      A.    Oh, I don't know.  I don't know if
12  that's standard practice.  What I do know is that
13  the statistical analyses are what scientists will
14  pay attention to.
15      Q.    Well, we're going to have a lunch
16  break, and my first question to you after the lunch
17  break is going to be, is there any place in that
18  article that tells us that the data was interim?
19  But before we take our lunch break, because we're a
20  ways away from that, according to my watch, let me
21  ask you this:
22          Is "disclosing what we found in an
23  open manner," which is part of what you told me
24  transparency means, telling people that this data is
25  interim?  Is that part of transparency?

Page 763

1      A.    Oh, I think we have told people that
2  this was based on interim data.
3      Q.    Well, I'm saying in the article.
4      A.    Again, I don't know if it's in the
5  article.
6      Q.    In order for -- in order for this to
7  have been a transparent communication to medical
8  doctors, you would have to have told people this is
9  interim data; correct?
10      A.    Well, again, you know,
11  transparency -- the transparency here is in the
12  presentation of the data in an open way and in a
13  proper and thorough analysis of the statistical
14  significance of the data and conclusions, which was
15  done here.
16      Q.    What's the opposite of interim data?
17      A.    What's the opposite of interim data?
18  I don't know what the opposite is, but what we are
19  talking about is the difference --
20      Q.    Final data?
21      A.    -- between interim and final data.
22      Q.    Thank you.
23          Final data, is that the opposite of
24  interim data?
25      A.    I don't know if it's an opposite, but

Page 764

1  it's what we are talking about.  It's the difference
2  between interim and final data.
3      Q.    Don't health care providers deserve
4  to know if the data is final or interim?  Isn't that
5  part of transparency, sir?
6      A.    Well, I don't think -- I don't think
7  -- it's often the standard practice -- it's often
8  practice in medicine that one publishes data,
9  particularly data, new data, based on an interim
10  analysis when the data are of sufficient statistical
11  strength to justify conclusions that are being
12  drawn.
13      Q.    Can you answer my question directly?
14  And that is, isn't it part of transparency to tell
15  people that the data is interim or final?
16          MR. KIERNAN:  Objection, asked and
17  answered.
18          THE WITNESS:  I think that -- I think
19  that it's good to tell people if a data analysis is
20  interim or final.  I think that in terms of what
21  we're talking about in transparency, the question
22  is, is the data completely shown here and is it
23  analyzed properly, and it was.
24  BY MR. SPECTER:
25      Q.    Well, sir, when this was published on

KS-000517

Confidential - Subject to Protective Order

Page 765

1  October 13, 2000, there was updated cardiovascular
2  data, wasn't there?
3       A.    So --
4       Q.    Not in the article.
5       A.    First of all, the article was
6  published November 23rd, 2000.
7       Q.    I misspoke.  I apologize for that.
8            The article was published on November
9  23rd of 2000, but six weeks earlier on October 13,
10  2000, the data that appears in this article was
11  updated to the FDA; correct?
12       A.    I don't know that for a fact.  That's
13  what Dr. Topol asserts here.
14       Q.    Well, that's an important issue;
15  isn't it?
16       A.    I don't see that as an important
17  issue.  Why do you think that's an important issue?
18       Q.    I'll move on to the next question,
19  sir.
20            Look at the next column in this
21  article.
22            MR. KIERNAN:  Are you referring to
23  the letter to the editor?
24            MR. SPECTER:  Yes, I am.  Thank you.
25  BY MR. SPECTER:

Page 766

1       Q.    Second full paragraph.  I think it's
2  like the third sentence -- not like, it is the third
3  sentence.  "There were no differences in the rate of
4  perforation," again, talking about VIGOR, "(0.1
5  percent in both the" Vioxx "and naproxen groups)."
6  Did I read that correctly?
7       A.    You've read the sentence correctly.
8  Let me just get the context here.
9       Q.    Take your time.
10       A.    Thank you.
11            (Witness reviewing document.)
12            This is referring to Dr. Villalba and
13  Dr. Witter's comment.
14       Q.    Let's just provide some context, if
15  we could.  One issue is the degree to which naproxen
16  versus Vioxx causes problems with the stomach;
17  correct?
18       A.    Serious gastrointestinal bleeds and
19  ulcers, yes.
20       Q.    Right.  So, what Dr. Topol said in
21  his letter to the editor in December of 2004 is that
22  in the VIGOR trial, "There were no differences in
23  the rate of perforation (0.1 percent in both the"
24  Vioxx "and naproxen groups."  Did I read that
25  correctly?

Page 767

1       A.    You've read it correctly.
2       Q.    Is it a true statement?
3       A.    Oh, I don't know if that's a true
4  statement.  What I do know is that there was a
5  very -- there was a statistically significant
6  difference in serious GI ulcers and bleeds between
7  the group that took naproxen and the group that took
8  Vioxx in the VIGOR study, and that those serious GI
9  ulcers and bleeds were estimated to be -- to account
10  for approximately 16,000 deaths per year in the
11  United States due to NSAID use.
12       Q.    Let's talk about that 16,000 figure,
13  sir.  Is that a reliable figure?
14       A.    It's an estimate.
15       Q.    No, sir, please.  Is that a reliable
16  figure?
17       A.    Again, it's an estimate.  I don't --
18       Q.    You know that I'm asking you a
19  different question than the one you're answering;
20  right?  You're saying "estimate," and I'm asking if
21  it's "reliable."  That calls for a yes or no.  Is it
22  reliable?  Or an I don't know.  Yes, no, I don't
23  know?
24            MR. KIERNAN:  Objection to the form.
25

Page 768

1  BY MR. SPECTER:
2       Q.    Let me give it to you again.
3            This figure of 16,000, you told it to
4  me a couple of weeks ago, you're telling it to me
5  again now.  Is that a reliable figure?
6       A.    I don't know.
7       Q.    Well, are you going to stop saying it
8  then, if you don't know?
9            MR. KIERNAN:  Counsel, if you have an
10  appropriate question.
11            MR. SPECTER:  It's an appropriate
12  question.
13  BY MR. SPECTER:
14       Q.    You use a figure to describe how many
15  people die a year of gastrointestinal bleeds, and
16  you don't know if it's reliable, so, are you going
17  to stop using it?
18       A.    No.  I do know that it's a figure
19  that is an estimate that has been attained by
20  experts in the field.
21       Q.    Is there a figure that you regard as
22  being reliable?
23       A.    I think this is the best estimate
24  that's available.
25       Q.    Please try to focus on my question,

KS-000518

Confidential - Subject to Protective Order

Page 769

1  sir.
2        Is there a figure that you know of
3  that you regard as being reliable?
4        MR. KIERNAN:  Objection, asked and
5  answered.
6        THE WITNESS:  Yes.  I think this is
7  the figure that I use.  I use this figure because
8  it's the best estimate that I know about.
9  BY MR. SPECTER:
10       Q.   Is there a figure that you know of
11  that you regard as being reliable?
12       A.   Depends what you mean by "reliable."
13       Q.   What do you mean by "reliable"?
14       A.   I think this is the best estimate.
15       Q.   Sir, I want to know, is there a
16  figure for deaths occurring per year in the U.S. for
17  gastrointestinal bleeds that you regard as being
18  reliable, any figure?
19       A.   The most reliable figure that I know
20  about is the 16,000.
21       Q.   I want to know, is there a figure
22  that you regard as being reliable?
23       A.   Again, the most reliable figure I
24  know is the 16,000.
25       Q.   Please, sir.  Is there a figure that

Page 770

1  you regard as being reliable?
2        A.   I mean, "reliable" is a subjective
3  thing.  I'm not trying to -- I'm not trying to be
4  difficult here.  It's a subjective thing, so,
5  therefore, as a scientist, I'm going to use the most
6  reliable figure that I know about.
7        Q.   Sir, is there a figure that exists
8  that you regard as being scientifically reliable as
9  to the number of deaths from gastrointestinal bleeds
10  per year in the U.S.?
11       MR. KIERNAN:  Objection, asked and
12  answered several times.
13       THE WITNESS:  You know, I'm not sure
14  what is meant by the term "scientifically reliable."
15  What I will say is that I don't think that the
16  16,000 figure is one that I can say is absolutely
17  accurate, but what I can say is it's the most
18  reliable figure that I think is out there.
19  BY MR. SPECTER:
20       Q.   Sir, what is your definition of
21  "scientifically reliable"?
22       A.   Well, that's what I'm having trouble
23  with here.
24       Q.   What's your definition for it?
25       A.   I don't know.  I don't know.  I mean,

Page 771

1  scientifically reliable in the strictest sense would
2  be one in which one actually conducts controlled
3  clinical trials and can get an evaluation of an
4  answer to a question, if this is the sort of thing
5  we're talking about.
6        Q.   And there is no answer to that
7  question for the number of people that are dying in
8  the U.S. from gastrointestinal bleeds; correct?
9        A.   There's not been a clinical --
10  controlled clinical trial to answer the question
11  that way, yes.
12       Q.   It's all retrospective observational;
13  correct?
14       A.   I'm not sure, actually, on what basis
15  those estimates are made, whether it's all
16  retrospective observational or not.
17       Q.   Well, you've used the figure 16,000 a
18  couple of times under oath.  Did you know where it
19  came from?
20       A.   I don't know exactly where it comes
21  from.  I do know --
22       Q.   Well, did you know where it came from
23  approximately?
24       A.   I know that experts in the field
25  think that this is the best estimate.

Page 772

1        Q.   So, somebody else says it, therefore,
2  you're going to say it under oath as being the most
3  reliable estimate that exists?
4        MR. KIERNAN:  Counsel, did you --
5        MR. SPECTER:  I'll withdraw the
6  question.
7        MR. KIERNAN:  All right.  I've had
8  enough of under oath stuff.  We're just talking
9  about scientific literature here.  You're just
10  trying to intimidate the witness.  Please move on.
11  BY MR. SPECTER:
12       Q.   What expert uses that figure, sir?
13       A.   What expert used that figure?
14       Q.   Right.
15       A.   I don't know.  I wouldn't be able to
16  quote exactly what expert uses that figure.
17       Q.   Where did you get it?
18       A.   I got it from folks in the -- from
19  scientists in the -- in Merck Research Laboratories
20  that are familiar with these issues.
21       Q.   Who?
22       A.   From Dr. Gertz, probably.  And I
23  believe Dr. Reicin.
24       Q.   What do you think of observational
25  studies?

Confidential - Subject to Protective Order

Page 773

1    A.    I think that observational studies
2  are studies that are useful, they have a useful
3  place in generating hypotheses, and those hypotheses
4  then, if possible, need to be investigated, if
5  possible, through controlled clinical trials.
6    Q.    So, if the figure of 16,000 came from
7  an observational study, the most that could be said
8  about it is that it's useful in generating a
9  hypothesis; correct?
10    A.    I think -- well, I don't know about
11  the most that can be said, but that's what they're
12  most useful for.
13    Q.    Now, let's go back to this Topol
14  letter to the editor.
15    A.    Okay.
16    Q.    The statement that "the rate of
17  perforation" was "(0.1 percent in both the Vioxx and
18  naproxen groups, do you know one way or the other
19  whether that statement is true or false?
20    A.    I do not know and --
21    Q.    Have you asked anyone?
22    A.    No. I do not know, and I have not
23  asked anyone. The rate of perforation is not what
24  in general is most relevant to the issues that we're
25  talking about here.

Page 774

1    Q.    Now, do you know how many people die
2  from perforations as opposed to ulcerations or
3  bleeds?
4    A.    Perforation is -- perforation is a
5  less severe, or can be less severe than an ulcer or
6  bleed, and I do not know how many people die from
7  perforations.
8    Q.    Are you able to estimate that in any
9  manner?
10    A.    No, I am not.
11    Q.    Sir, you recognize this as your
12  notebook from back in the time period when the
13  discussions were ongoing about taking Vioxx off the
14  market; correct?
15    A.    I recognize these as notes from my
16  notebook.
17    Q.    And --
18    A.    Oh, yes, I see.
19    Q.    And I've marked that as P-49, and I
20  think it's been marked previously.
21          - - -
22          (Whereupon, Deposition Exhibit Kim-49,
23          Letter 4-7-05 with Attachment,
24          MRK-AFJ0000282 - MRK-AFJ0000317 was
25          marked for identification.)

Page 775

1          - - -
2  BY MR. SPECTER:
3    Q.    Tell us, sir, this notebook that you
4  prepared, how did it come to be prepared?
5    A.    What do you mean, "how did it come to
6  be prepared"?
7    Q.    That's a good question.
8          You've got sort of a reporter size
9  notebook in your office?
10    A.    This is a --
11    Q.    Five --
12    A.    -- stenographic notebook that I carry
13  with me.
14    Q.    5 by 9 type of thing?
15    A.    This is real size here, yes.
16    Q.    It could fit into a suit jacket
17  pocket if you were very careful?
18    A.    It is a little bit big for that.
19    Q.    Okay. Close to that?
20    A.    It's a little bit -- it's this size
21  here. (Indicating.)
22    Q.    So, a little bit big for that.
23          Do you have a bunch of them in your
24  office?
25    A.    I do, yes.

Page 776

1    Q.    Do you use them, grouping them by
2  topic area, or do you do it chronologically, or how
3  do you do it exactly?
4    A.    It's chronologically.
5    Q.    So, these notebooks, did this all
6  involve the discussions that were going on
7  concerning taking Vioxx off the market, broadly
8  conceived?
9    A.    Did this all involve --
10    Q.    Did these notebooks that we're
11  looking at, do they -- do the contents all relate to
12  the issues surrounding the discussions about taking
13  Vioxx off the market?
14    A.    If your question is whether or not
15  the notebook concerns only Vioxx during this time
16  period, the answer is no. The notebook contains
17  information on many different things.
18    Q.    How do you know that?
19    A.    Because I keep the notebook.
20    Q.    When did you last look at it in
21  original form?
22    A.    This notebook?
23    Q.    Yes.
24    A.    Oh, I don't know. A long time ago.
25    Q.    So, how do you know that it involved

Confidential - Subject to Protective Order

Page 777

1    things other than the discussions about Vioxx?
2         A.    Oh, because I write in it practically
3    every day, and I know that there were things other
4    than Vioxx that were going on at this time.
5         Q.    Now, we asked that certain documents,
6    certain information be unredacted.  And yesterday at
7    5:00 we got some of this information from Merck's
8    lawyers, and three pages were unredacted that I want
9    to talk about with you, which are pages 304 to 306.
10        A.    Okay.
11        Q.    And for the record, those were not
12   previously in unredacted form, they were redacted
13   for the previous exhibit that contains that
14   notebook.
15        A.    Just give me a minute to get
16   oriented.
17              (Witness reviewing document.)
18              Okay.
19        Q.    Let's just read this, if we could,
20   together.  I will surely interrupt you.
21        A.    Okay.
22              "Arcoxia.  [Edge-1]."
23        Q.    What's that?
24        A.    That's a clinical trial in which we
25   compared Arcoxia to another nonsteroidal

Page 778

1    anti-inflammatory drug called diclofenac.
2         Q.    Was it completed?
3         A.    EDGE 1 is a completed study, yes.
4         Q.    How many people were in the trial?
5         A.    Oh, I don't remember the exact
6    number.
7         Q.    Keep going, please.
8         A.    "RR = 1.07."
9         Q.    What's that refer to?
10        A.    That refers to the relative risk for
11   confirmed -- the relative risk, and since on the
12   right-hand side it says, "C. Thrombotic," I assume
13   that refers to the relative risk of confirmed
14   thrombotic events in the EDGE 1 study, comparing
15   patients that took Arcoxia once a day versus
16   patients that took diclofenac.  And the indication
17   here would be that the relative risk is very close
18   to one, is 1.07, which would indicate that there's
19   not a significant difference in the cardiovascular
20   event rates between patients taking Arcoxia and
21   patients taking diclofenac.
22        Q.    Continue, please.
23        A.    Below that is "0.68" and "0.42."  And
24   then "RR = 1.5 MI."
25        Q.    What is 1.5?  That's a relative risk?

Page 779

1         A.    I assume that's correct.
2         Q.    Does that concern you?
3         A.    Does that concern me?  I pay -- as
4    we're reviewing this data, I pay attention to all of
5    these data.  Whether it's concern or not is
6    something that we evaluate based on what else we
7    know.
8         Q.    I'm not asking if you pay attention
9    to it, Dr. Kim.  I'm asking if it concerns you;
10   right?
11        A.    It is -- does it concern me?  It
12   doesn't in and of -- in and of itself, this relative
13   risk of 1.5 for MI does not concern me.  It is
14   something that needs to be included in the
15   evaluation of the totality of the data here.
16        Q.    What was the confidence interval at
17   that 1.5 relative risk?
18        A.    I don't know exactly.
19        Q.    Did you compare Arcoxia to placebo?
20   Have you?
21        A.    There have been studies comparing
22   Arcoxia to placebo.  Fairly -- in the earlier
23   studies with Arcoxia, there are some studies that
24   compare Arcoxia to placebo.
25        Q.    What have they shown?

Page 780

1         A.    I don't recall.  I don't recall
2    precisely what they've shown.
3         Q.    Do they show relative risk above 1?
4         A.    I don't -- I don't remember.
5         Q.    Does this data look out of line from
6    what you've seen in other data with respect to 1.5
7    relative risk for MIs?
8         A.    Well, EDGE 1 is a relatively small
9    study.  And so, therefore, the evaluation of the
10   cardiovascular risk of Arcoxia is something which is
11   going to be dependent, again, in a prespecified
12   notion, on an analysis of the combined events in
13   EDGE 1, EDGE 2, which is a larger study, and a very
14   large study which we call MEDAL.  And those three --
15   those three studies, when combined, will address the
16   issue of the cardiovascular safety of Arcoxia.
17        Q.    Has the FDA been told about these
18   results?
19        A.    I certainly -- I don't know for sure,
20   but I certainly would think so, yes.
21        Q.    Has an NDA been filed for Arcoxia?
22        A.    Yes, an NDA was filed for Arcoxia.
23        Q.    So, you'd expect this to be part of
24   the NDA or SNDA?
25        A.    I'm actually not sure about that,

KS-000521

Confidential - Subject to Protective Order

Page 781

1 because what we have done is we've obviously been --
2 not obviously, we've been in extensive discussions
3 with the FDA on Arcoxia, and we have received a
4 request from them and we, as I say, have
5 prespecified that we're going to take the results of
6 EDGE 1, EDGE 2 and MEDAL in a combined analysis for
7 the cardiovascular safety.
8 Q. Have you --
9 A. So, that plan has been discussed.
10 Q. Have you reported all of the clinical
11 trials in Arcoxia to the FDA?
12 A. I don't know. I don't know. I
13 haven't asked that specific question, so, I don't
14 know.
15 Q. Are you required to report all
16 clinical trials that you do for the purpose of
17 evaluating the safety of a pharmaceutical if the
18 pharmaceuticals tested are not one of those that are
19 being sought to address?
20 Let me give you an example of that so
21 that you understand what I'm talking about.
22 A. Okay.
23 Q. Merck manufactured Vioxx; correct?
24 A. Yes.
25 Q. It did not manufacture Celebrex;

Page 782

1 correct?
2 A. Correct.
3 Q. If Merck were to test Celebrex versus
4 naproxen, would it be required to tell the FDA those
5 results?
6 A. I do not know the answer to that
7 question in terms of the requirements.
8 Q. Did Merck test Celebrex versus
9 naproxen?
10 A. To my knowledge, Merck has not tested
11 Celebrex versus naproxen.
12 Q. Do you recollect Dr. Scolnick
13 proposing it as a good idea?
14 A. No, I don't recollect that.
15 Q. Do you recollect him saying that
16 Celebrex has no cardiovascular risks, so, we should
17 test Celebrex versus naproxen?
18 A. No, I don't recollect that.
19 Q. That would be an interesting test,
20 wouldn't it? If you assumed that Celebrex had no
21 cardiovascular risk, that would be an interesting
22 test, to test Celebrex versus naproxen; correct?
23 A. Well, first of all, the "if" part of
24 your question we now know is not true.
25 Q. Well, not everybody agrees with that;

Page 783

1 correct?
2 A. Okay.
3 Q. Am I right about that?
4 A. I don't know.
5 Q. Well, what do you think Pfizer thinks
6 about that?
7 MR. KIERNAN: Object to form.
8 THE WITNESS: I --
9 BY MR. SPECTER:
10 Q. Pfizer does not agree that Celebrex
11 is associated with an increased risk for CV events;
12 correct?
13 A. I don't know what Pfizer thinks.
14 Q. Do you think it is?
15 A. I think that Celebrex is associated
16 with increased cardiovascular risk?
17 Q. That's my question.
18 A. I think that Celebrex, when compared
19 to placebo, is associated with increased
20 cardiovascular risk beginning after approximately 14
21 months in the patient population that was studied,
22 namely, those with a prior history of colon polyps.
23 Q. Let's go backward for a second.
24 MR. FERRARA: I'm sorry, Doctor.
25 Linda, can you read his answer back?

Page 784

1 I missed it.
2 - - -
3 (Whereupon, the requested portion of
4 the notes of testimony was read by the
5 court reporter.)
6 - - -
7 BY MR. SPECTER:
8 Q. If Merck had done a study, Celebrex
9 versus naproxen, in the context of learning about
10 Vioxx, would they have reported that to the FDA?
11 A. If Merck had done a study comparing
12 Celebrex to naproxen, would they have reported the
13 results of that study to the FDA? Absolutely.
14 Q. Is that because they're required to
15 do so or because they would choose to do so or both?
16 A. I don't know what were required in
17 terms of that. Going back to your earlier question
18 --
19 Q. Yes.
20 A. -- which I answered that I didn't
21 know, I don't know if we're required to do that, but
22 would we do that? Absolutely.
23 Q. Were there any studies that were done
24 that related to the safety of Vioxx that did not
25 include Vioxx as a drug that was being studied in a

KS-000522

Confidential - Subject to Protective Order

Page 785

1  clinical trial?
2       A.    In humans?
3       Q.    Yes.
4       A.    I don't know.  There might have been.
5  I don't know.  Right.  If they were, they were
6  done -- I would -- if they were done, it's my guess
7  that they would have been done early before I joined
8  the company.
9       Q.    Have you asked that question?
10      A.    No, I've not asked that question.  I
11 do know that we've studied Vioxx and Celebrex in
12 pharmacological -- in what are called clinical
13 pharmacology experiments, which are different than
14 clinical trials where one looks for an outcome.
15      Q.    Okay.
16      A.    And I should specify that earlier I
17 was speaking to clinical trial data.  We certainly
18 don't tell the FDA about every clinical pharmacology
19 study we do.
20      Q.    Let's continue, please, if we could.
21      A.    Okay.
22            "19/3500, 11/3500, on + 14 days."
23      Q.    What's that refer to?
24      A.    I believe that what it refers to are
25 the results for MIs or myocardial infarctions, and

Page 786

1  that it's referring to the number of patients that
2  had MIs.  That is, 19 of them had MIs out of 35 --
3  approximately 3,500 patients that were in that arm
4  of the trial versus the other arm of the trial which
5  had 11 over 3,500, 11 patients out of 3,500 that
6  were in the trial that had an MI while the patient
7  was on the drug, on therapy, and up to 14 days after
8  discontinuation of the therapy.
9       Q.    Keep going, please.
10      A.    Then I write, "19" and "15 on + 28
11 days."  Then I write "3" and "6 strokes ischemic."
12      Q.    Then you have discontinuation because
13 of hypertension?
14      A.    Correct.  On the left is "Discon" due
15 to "hypertension 2.3, 0.7, p<0.001."
16      Q.    So, there were a little more than
17 three times as many people who discontinued on
18 Arcoxia versus diclofenac; is that correct?
19      A.    That's my interpretation of what I
20 wrote here.
21      Q.    And the "p" is how confident we are?
22      A.    It has to do with the statistical
23 significance, correct.
24      Q.    What is the p-value that you have to
25 attain in order for it to be significant

Page 787

1  statistically in your mind, sir?
2       A.    Well, generally speaking, the
3  scientific community accepts p of less than .05 as
4  being statistically significant.
5       Q.    In order for it to be significant
6  statistically?
7       A.    Yes, but then it's required that that
8  be repeated, or that a single study show a
9  statistical significance greater than that.  But,
10 yes, the answer to your question is, in general,
11 it's accepted that statistical significance is p
12 less than .05.
13      Q.    .05.  That study, 090, that we looked
14 at before, you told us that that was not significant
15 statistically; correct?
16      A.    If I did say that, I shouldn't have.
17 I said -- what I should have said is that the study
18 was small.  And although numerically there was a
19 difference, I don't think that it was statistically
20 significant.  If it was, that is in terms of the
21 0.05?
22      Q.    Yes.
23      A.    I don't actually recall whether or
24 not it was .05 or not, but it was a small study, and
25 it was numerical --

Page 788

1       Q.    Well, it's right in front of you,
2  isn't it?
3       A.    I don't know that.  Is it?
4       Q.    Yes.  It's in that chart in Dr.
5  Topol's article; right?
6       A.    (Witness reviewing document.)
7            There is a chart here in front of me
8  in which Dr. Topol is reporting on study 090.
9       Q.    What's the p-value?
10      A.    The p-value that he quotes here is
11 0.03.
12      Q.    That's less than 0.05; correct?
13      A.    That's correct.
14      Q.    And if that is accurately reported,
15 that would be statistically significant; correct?
16      A.    Yes.  Formally speaking, this is
17 statistically significant.  The point that I was
18 referring to is that the number of events is very
19 small, 5 versus 1.
20      Q.    But it is formally statistically
21 significant; correct?
22      A.    Yes.
23      Q.    By the .05 figure that is customarily
24 accepted; correct?
25      A.    Yes, that is formally correct.

Confidential - Subject to Protective Order

Page 789

1    Q.    Now, let's go back to the Arcoxia.
2    A.    Okay.
3    Q.    We had three times as many people
4  discontinued because of hypertension on Arcoxia
5  versus diclofenac, and there was three to four
6  millimeters systolic increase.  Would that be
7  correct?  That was the change?
8    A.    That's -- that's my interpretation of
9  what I wrote here, yes.
10    Q.    That's among which group of people?
11    A.    I wrote "Arcoxia" next to it.
12    Q.    And of those who discontinued or of
13  all comers, by way of an average, or do you know?
14    A.    I don't recall exactly.  My guess is
15  it's of the overall group.
16    Q.    The overall group?
17    A.    That's my guess.
18    Q.    That fits pretty closely to what we
19  saw in the VIGOR trial, with increase in blood
20  pressure systolically among people taking Vioxx;
21  right?
22    A.    I don't remember the exact number,
23  but it's approximately that magnitude.
24    Q.    That was four millimeters of mercury;
25  correct?

Page 790

1    A.    I don't remember the exact number.
2    Q.    Do you remember discussing it with me
3  a couple of weeks ago?
4    A.    I remember discussing a lot of things
5  with you.
6    Q.    Okay.  And then people taking
7  diclofenac had 1 to 1.5 millimeters of mercury on
8  average increased, correct, systolically?
9    A.    Again, that would be my
10  interpretation of what I wrote here.
11    Q.    Is that significant to you?  That's a
12  factor of between two and three times?
13    A.    Is what significant?
14    Q.    The greater increase in systolic
15  blood pressure.
16    A.    Again, I think significance is a
17  scientific term.  I would have to see
18  the statistical --
19    Q.    Well, you're a scientist; right?
20    A.    Right.  And I'd have to see the
21  statistical analysis of these increases to know
22  whether or not it's statistically significant.  What
23  I would say is that all NSAIDs in a mechanism-based
24  way cause increases in blood pressure, and that
25  increase in blood pressure is dose-dependent.

Page 791

1    Q.    Well, you say that they all cause
2  increases in blood pressure, but some are better
3  than others when it comes to that subject, isn't
4  that true?
5    A.    Well, that's act -- that's actually a
6  tricky subject, because it depends on the dose, and
7  that's to say, if you take an NSAID -- so the reason
8  why NSAIDs increase blood pressure has to do with
9  their effects primarily in the kidneys.  But the
10  effect on increasing in blood pressure is something
11  that is dose-dependent.  So, if you take a higher
12  dose of an NSAID, then the increase in blood
13  pressure is going to be higher.
14    Q.    How many milligrams of NSAIDs were
15  people taking in VIGOR who were taking Aleve?
16    A.    Okay.  So, the patients in Aleve --
17  excuse me.  The patients in VIGOR were not taking
18  Aleve --
19    Q.    I misspoke.  Naproxen.
20    A.    -- which is over-the-counter
21  formulation.
22    Q.    Naproxen.
23    A.    But they were taking naproxen at a
24  prescription strength, which is 500 milligrams twice
25  a day.

Page 792

1    Q.    So, they were taking 1,000 milligrams
2  twice a day?
3    A.    No, no, they were taking 500
4  milligrams twice a day.
5    Q.    I'm sorry.  It's the lack of food.
6    MR. KIERNAN:  Do you want to take a
7  lunch break?
8    MR. SPECTER:  So, we're going to take
9  a lunch break.
10    THE VIDEOTAPE TECHNICIAN:  Stand by,
11  please.  The time is 12:30.  We're going off the
12  record.
13    - - -
14    (Whereupon, a luncheon recess was
15    taken from 12:30 p.m. until 1:30 p.m.)
16    - - -
17    MR. SPECTER:  Before we go back on
18  the video record, before we broke for lunch at
19  12:35, counsel wanted to go to 1:30, I said if he
20  comes back early, I'd be ready.  He came back early,
21  which I never thought he'd do, I didn't come back
22  early, so, I apologize to counsel for not being here
23  and to the witness, Dr. Kim.  And counsel would like
24  to break at 4:45, and that's fine with me.
25    Let's go back on the video record.

KS-000524

Confidential - Subject to Protective Order

Page 793

1    THE VIDEOTAPE TECHNICIAN: Stand by,
2  please. The time is 1:31. We're back on the
3  record.
4    MR. SPECTER: We're back on the
5  record after a delicious lunch.
6    Who just joined us on the telephone
7  that wasn't on before?
8    MR. BUCHANAN: Dave Buchanan, Seeger
9  Weiss.
10    MR. SPECTER: Okay. Dave Buchanan.
11  Anybody else?
12    (No response.)
13  BY MR. SPECTER:
14    Q.    Dr. Kim, this morning I promised you
15  that after lunch I would start off by asking you a
16  question about the article published in the New
17  England Journal of Medicine authored by Merck folks
18  which you characterized as an interim analysis a
19  couple of times before lunch. I told you I would
20  ask you if the word "interim" appears anywhere in
21  there or if the article otherwise indicated that it
22  was interim. Does it?
23    A.    I was not able to find any indication
24  to that -- stating that.
25    Q.    Do you think you made a reasonable

Page 794

1  enough search of the article to tell us if it was
2  there?
3    A.    Yes, I believe I did.
4    Q.    Do you recollect, Dr. Kim, that
5  Pfizer was heavily criticized with respect to their
6  publication of the class data for publishing what
7  was interim data without saying so?
8    A.    I don't recollect that specific
9  charge. I do recollect that there was criticism
10  aimed at Pfizer for publishing the results of an
11  interim analysis, that when the final analysis came
12  in, led to a difference in the interpretation of the
13  results.
14    Q.    Well, now, did Merck ever publish in
15  the medical literature the final results from the
16  VIGOR trial?
17    A.    The final results, to my knowledge,
18  have not been published in the medical literature
19  per se. They have been posted on the FDA website.
20  And in the literature, when you read the literature
21  around Vioxx, that website is explicitly referenced
22  by many authors.
23    Q.    But we've agreed previously that we
24  wouldn't expect medical doctors to go into the FDA
25  website, at least Merck doesn't; correct?

Page 795

1    A.    So, I think when a reference is made
2  in the medical literature to an FDA website, then I
3  would assume that physicians and scientists, who are
4  interested in the subject, would refer to the FDA
5  website. Earlier we were discussing whether or not
6  -- or I was answering the question of whether or not
7  one would expect people to go to the FDA website to
8  find scientific results in general.
9    Q.    Do you believe that rheumatologists
10  and others who prescribe Vioxx for pain have gone
11  into the FDA website to look at Merck studies that
12  have been sent to the FDA in any serious numbers?
13    A.    When you say "in...serious numbers,"
14  I do believe that rheumatologists and other
15  physicians who are interested in this general
16  subject and who are thought leaders in the area
17  would certainly have gone to the FDA website to
18  reference -- in particular where this website has
19  been referred to in the medical literature as a
20  reference, as an explicit reference.
21    Q.    Now, let's go back, if we could, to
22  the portions of your notebook that were unredacted
23  yesterday afternoon.
24    A.    Okay.
25    Q.    And I think we had left off with the

Page 796

1  discussions concerning blood pressure; correct?
2    A.    Right. Can you remind me what page
3  we're on?
4    Q.    It's the first -- it's 304.
5    A.    Okay. Right.
6    Q.    And the hypertension seen in Arcoxia
7  was similar to the hypertension seen in the VIGOR
8  trial with respect to Vioxx, approximately; correct?
9    A.    Approximately, yes.
10    Q.    And you said earlier that all NSAIDs
11  increase systolic blood pressure. Do you recollect
12  that?
13    A.    I'm not sure I said exactly that.
14  But I will say, though, that it is a mechanism-based
15  phenomenon, and it's well established that NSAIDs
16  do, in a dose-dependent manner, increase blood
17  pressure.
18    Q.    But Vioxx increases blood pressure
19  more than certain other NSAIDs; correct?
20    A.    So, in order to answer that question,
21  one has to be considering the dose and the extent of
22  inhibition of the enzymes that we're talking about
23  in terms of the mechanism that's causing blood
24  pressure increases. So, it is true that at some
25  doses of Vioxx, the blood pressure increases are

KS-000525

Confidential - Subject to Protective Order

Page 797

1  greater than in some -- at some doses of comparator
2  agents -- of some comparator agents.
3      Q.    What's the next thing in your notes
4  here?
5      A.    The next thing in my notes refers to
6  a study that was done in patients with ankylosing
7  spondylitis, which is a chronic inflammatory disease
8  of the spine.  It's an inflammatory disease of the
9  spine.  And I list then "Arcoxia" and "naproxen."
10  And I list "2x" under Arcoxia and "1x" under
11  naproxen.
12      Q.    That's at 52 weeks?
13      A.    I wrote down "52 weeks.  90/120, 5,"
14  and "0," and then, again, an indication of confirmed
15  thrombotic.
16      Q.    What does this mean?
17      A.    Okay.  So, what this means is that in
18  the study with -- in which we studied patients with
19  ankylosing spondylitis over a period of 52 weeks,
20  using doses of Arcoxia at 90 milligrams and 120
21  milligrams versus naproxen, that there were five
22  confirmed thrombotic events on patients who were
23  taking Arcoxia and none in patients who were taking
24  naproxen, but that the number of patients that were
25  in the Arcoxia arm of the study was approximately

Page 798

1  two times the number of patients that were in the
2  naproxen arm.
3      Q.    Did you consider these numbers to be
4  significant statistically?
5      A.    The numbers are so small that --
6  well, I don't know -- first of all, I don't know
7  what the statistical analysis of this is.  I think
8  it would be very difficult, given the actual numbers
9  here and the fact that one arm has a zero, to reach
10  anything significant -- to do that calculation.
11      Q.    What was the purpose of this study of
12  people with ankylo --
13      A.    Ankylosing spondylitis.
14      Q.    -- ankylosing spondylitis?
15      A.    The purpose was to evaluate the
16  efficacy and the safety of Arcoxia versus naproxen
17  in patients with this chronic inflammatory disease.
18      Q.    What kind of safety?
19      A.    In all of our studies with potential
20  new drugs, what we're looking at is overall safety.
21  In the case of the COX-2 inhibitors, as we've
22  discussed, going back to '99, cardiovascular safety
23  was looked at specifically with an independent
24  adjudication procedure.
25      Q.    What were the primary endpoints in

Page 799

1  this study?
2      A.    I don't recall exactly, but they had
3  to do with efficacy in ankylosing spondylitis.
4  There're certain measures of efficacy in the
5  ankylosing spondylitis population.
6      Q.    What's next here?
7      A.    Next says, "Arcoxia placebo 12 weeks,
8  7, 4," relative risk apparently "1.," I'm not sure
9  if I didn't finish that or what.  And then
10  underneath that is a "2" and a "0" and "MI."
11      Q.    So, again, we had more MIs in the
12  Arcoxia group than the naproxen group; correct?
13      A.    No.  This is placebo.
14      Q.    Excuse me.  You're right.
15            We had more in the Arcoxia group than
16  the comparator, which, I guess, in this case
17  was placebo; correct?
18      A.    Numerically that's correct.  What I
19  can't tell from my notes here, because the relative
20  risk is cut off, is whether -- is what the relative
21  risk here was.
22      Q.    So, you had three studies in Arcoxia.
23  One compared Arcoxia to diclofenac; one compared it
24  to naproxen; and one compared it to placebo, and in
25  all three, there were more cardiovascular events in

Page 800

1  the Arcoxia arm than in the comparator arm; correct?
2      A.    Yes.  With the understanding that the
3  number -- I don't know if it's numerically greater
4  in the case of EDGE 1.  It's just the relative risk
5  is 1.07 for confirmed thrombotic.
6      Q.    You had the numbers below that?
7      A.    That's for MIs.
8      Q.    Yes.
9      A.    You said confirmed thrombotic.  Or
10  you said cardiovascular, I think.  If we're talking
11  about MIs --
12      Q.    Well, you had strokes also?  So, if
13  you add them all together, there's more -- either
14  way, there's more MI --
15      A.    No, to the contrary.  For strokes,
16  for ischemic strokes, there are fewer --
17      Q.    Okay.
18      A.    -- on Arcoxia.
19      Q.    Let's take what I just said.  If you
20  take them all together, there were more
21  cardiovascular events in the EDGE study in people
22  taking Arcoxia than people taking the comparator
23  drug; correct?
24      A.    Well, again, I'm not trying to
25  quibble.  I just don't know what the numbers are for

KS-000526

44 (Pages 797 to 800)

Confidential - Subject to Protective Order

Page 801

1 cardiovascular here. I do know the relative risk is
2 1.07. Just explaining it, it depends on the
3 denominator as well.
4     Q.     It was 22 -- it was 22 versus either
5 21 or 17; correct?
6     A.     Umm --
7     Q.     I'll withdraw the question and go to
8 something else.
9     A.     Yeah.
10     Q.     Let's go to the next page.
11     A.     Okay. "Arcoxia" and then a note that
12 says, "Looking through the prism that Approve
13 creates."
14     Q.     "Arcoxia: Looking through the prism
15 that Approve creates."
16     A.     Well, I don't know if I would link
17 those two the way you just did, but those are both
18 written down on this page.
19     Q.     Well, at the top of the page you
20 wrote, "Arcoxia," and the next thing that you wrote
21 was, "Looking through the prism that Approve
22 creates."
23     A.     Right. Well, excuse me. That's the
24 next thing that's on the page. I'm not sure that's
25 the order in which I wrote it.

Page 802

1     Q.     What's the next thing?
2     A.     "Approve, GI data, EDGE 1, parecoxib,
3 Target" and "VIGOR."
4     Q.     Are all of these things related to
5 each other, "Approve, GI data, EDGE 1, parecoxib,
6 Target, VIGOR"? Are all of these things related to
7 each other? You had them all surrounded by a big
8 bracket; correct?
9     A.     Yes. These are all things that have
10 to do with the subject we're discussing, COX-2
11 inhibitors.
12     Q.     So, you thought that the Arcoxia
13 results -- pardon me. You thought that the Arcoxia
14 results were relevant to the Vioxx results, correct,
15 in terms of interpretation?
16     A.     I thought that the Arcoxia results
17 were relevant for the Vioxx results?
18     Q.     Yes. In terms of interpreting the
19 Vioxx results, you felt that the Arcoxia results
20 were relevant?
21     A.     I think -- yes. I think that studies
22 with all the COX-2 inhibitors need to be taken into
23 account as we try to interpret the results with each
24 of the individual ones, bearing in mind that one is
25 trying to distinguish between molecule-specific

Page 803

1 effects and class-specific effects, where the class
2 is defined as COX-2 inhibitors, and class-specific
3 effects where the class is defined as NSAIDs.
4     Q.     So, the Celebrex results are relevant
5 in considering whether Vioxx is safe?
6     A.     The Celebrex results are relevant to
7 trying to interpret data on Vioxx because Celebrex
8 is also a COX-2 inhibitor. What one needs to
9 distinguish and figure out is whether or not you
10 think that something is a class effect or a
11 molecule-specific effect.
12     Q.     And --
13     A.     So, there's not an automatic
14 connection, but certainly one should try to
15 understand the totality of the data in that context?
16     Q.     The same thing is true with Bextra.
17 The Bextra results are relevant to the Vioxx results
18 in terms of the analysis?
19     A.     Again, Bextra is a COX-2 specific
20 inhibitor, and so, therefore, results that come out
21 with Bextra are something that one wants to be
22 cognizant about as one is trying to interpret
23 results for another COX-2 inhibitor. But part of
24 that process needs to include considerations as to
25 whether the results in this case that you just --

Page 804

1 you know, the results with Bextra are specific for
2 Bextra or whether they are part of a class effect.
3     Q.     And you have followed the results
4 that have been published regarding Celebrex and
5 Bextra; correct?
6     A.     I've not followed all the results,
7 but I have followed some of the key results.
8     Q.     You've discussed those with us over
9 the last couple of days, sitting in this room or the
10 room adjacent to it; correct?
11     A.     Some of those results we have
12 certainly discussed.
13     Q.     That's in part because it's relevant
14 to you in your own considerations about Vioxx;
15 correct?
16     A.     Yes. And several of those results
17 are quite recent.
18     Q.     Now, let's go through what's in this
19 bracket for a moment, if we could.
20     A.     Okay.
21     Q.     "Approve," we've discussed that.
22           "GI data." Were you talking about
23 VIGOR there or something else?
24     A.     I don't really know.
25     Q.     "EDGE 1." Well, that's on the

KS-000527

Confidential - Subject to Protective Order

Page 805

1  previous page?
2      A.    Correct.
3      Q.    "Parecoxib."  What's parecoxib?
4      A.    Parecoxib is the IV, intravenous
5  formulation of Bextra.  Actually, specifically, it
6  is the intravenous formulation of what's called the
7  pro drug of Bextra.  So, it's injected
8  intravenously, and then it gets converted in the
9  body to Bextra.
10     Q.    And then "TARGET"?
11     A.    TARGET is a large study that
12  compared -- that was investigating another COX-2
13  inhibitor that Novartis has under development called
14  Prexige.  And it was a study that compared Prexige
15  to naproxen and Prexige to, I believe, ibuprofen.
16  I'm not sure about that last one.  And one of the
17  relevant pieces of data there is that in that study,
18  there was a difference in the cardiovascular event
19  rate between Prexige, Novartis' COX-2 inhibitor, and
20  naproxen, with naproxen showing fewer cardiovascular
21  -- a lower cardiovascular event rate than Prexige.
22     Q.    And that could mean that Prexige may
23  be associated with an increased risk of
24  cardiovascular events, or it could mean that
25  naproxen is cardioprotective, or it could mean

Page 806

1  there's some combination of both, or it could be
2  chance; correct?
3      A.    Correct, based on the information I
4  gave you.  The other piece of information that's
5  relevant there is in that same study, Prexige was
6  compared to another NSAID, I believe it was
7  Ibuprofen, and there was not a difference in the
8  cardiovascular event rate between Prexige and
9  ibuprofen, or the NSAID that was used as a
10  comparator.
11     Q.    What's the next one?  The next one is
12  "VIGOR"; correct?
13     A.    Correct.
14     Q.    So, next to that bracket you wrote,
15  "Real answer:  Don't know."
16     A.    Right.  Specifically what I
17  wrote is --
18     Q.    Let me ask you this:
19          Read it for me in whatever order you
20  think you wrote it.  I can't tell from this.  So,
21  tell me what order you think you wrote it.
22     A.    Okay.  So, I'm guessing now.  Next to
23  "TARGET" you see the word "Naproxen."  Then in
24  brackets you see, "also Arcoxia."  And I believe
25  that -- I don't know if this is the order in which I

Page 807

1  wrote it, but that's -- the reason why the
2  "naproxen, also Arcoxia" is written on the line of
3  "TARGET" is because of what I just told you about in
4  the TARGET study, the Novartis COX-2 inhibitor
5  showing a difference in cardiovascular event rates
6  as compared to naproxen, but not when compared to
7  another non-naproxen NSAID.
8          And that, of course, is consistent
9  with the observation in VIGOR and consistent with
10  the interpretation that naproxen has a
11  cardioprotective effect.  So, the reason why
12  naproxen also" -- and then bracket "also Arcoxia" is
13  written next to that is that in studies with
14  Arcoxia, yet a third COX-2 inhibitor, when it was
15  compared to naproxen, there was a difference in the
16  cardiovascular event rate with the event rate being
17  different such that naproxen had fewer events than
18  Arcoxia.  Again --
19     Q.    58 percent fewer?
20     A.    I don't recall the magnitude, but
21  qualitatively, it was a lower event rate on
22  naproxen.  So, that with three different COX-2
23  inhibitors as compared to naproxen, this difference
24  was seen.
25     Q.    Keep going, please.

Page 808

1      A.    Okay.  And then it appears as though
2  what I was trying to do here was create a list of
3  points having to do with what it is that we thought
4  about Arcoxia, given the results that at this time
5  we had learned about recently, namely, the APPROVe
6  results.  That's why I think at the top, whether I
7  wrote it immediately after or whatever, I wrote,
8  "Looking for the prism that Approve creates."  So,
9  now that we know about APPROVe, what do we think
10  about Arcoxia.
11          And I don't think this is the order
12  in which I wrote it, but the order in which I listed
13  the considerations here, you notice that I put a
14  "0," so, I probably added that towards the end.  I
15  had already listed one, 1, 2, 3, 4, 5, but then I
16  put 0, which is that the real answer is that we
17  don't know.
18     Q.    That's the bottom line?
19     A.    That is the real answer about what it
20  is that we can say about Arcoxia "looking through
21  the prism that Approve creates."
22     Q.    When you say "real answer: don't
23  know," about Arcoxia, you're talking about
24  cardiovascular risk?
25     A.    That's correct.

KS-000528

Confidential - Subject to Protective Order

Page 809

1    Q.    You've got people in Europe taking
2  Arcoxia, and you don't know if it's causing a
3  cardiovascular risk?  That's the real answer?
4    A.    No.  Let's be specific here.  The
5  real answer is that I don't know whether or not
6  Arcoxia has an increased cardiovascular risk
7  compared to placebo, the way in which for Vioxx that
8  was seen with the APPROVe study.
9    Q.    Have you written a letter to the
10  European regulators and told them that?
11    A.    We have discussed with the European
12  regulators all of this data and these
13  considerations.
14    Q.    Have you told them that the real
15  answer is "don't know"?
16    A.    I don't know exactly what's been
17  said.  I do know that we, at this point in time,
18  felt as though it was not possible to ascertain
19  whether compared to placebo, Arcoxia would be
20  associated with an increased cardiovascular event
21  rate.
22    Q.    Do you intend to submit this piece of
23  paper to the European regulators?
24    A.    As I said -- I do not.  But as I've
25  said, we've had numerous discussions and ongoing

Page 810

1  discussions with the regulators in a very open way.
2    Q.    Do you think that the principle of
3  transparency, as you articulated it, would be
4  advanced by giving them this piece of paper?
5    A.    I don't think there would be much
6  point in giving them this paper.  We have had very
7  extensive -- my group, the group that's working on
8  this and working with the regulatory agencies in
9  Europe, has had extensive discussions.
10    Q.    Have the European regulators been
11  told what you think personally, Dr. Kim?
12    A.    I don't know, but I think that -- but
13  I do know that they've had extensive discussions
14  with scientists that are very well informed on all
15  of these issues at Merck.
16    Q.    Do you object to my supplying this to
17  them?
18    MR. KIERNAN:  Any request along those
19  lines would be directed to Merck.
20    MR. SPECTER:  No.  This is not a
21  discovery request in this litigation.  This is a
22  request whether he, as president of Merck Research
23  Labs, objects to me, as a citizen of the world,
24  giving this document to the European regulators.
25    MR. KIERNAN:  Well, let me object to

Page 811

1  the question, because you're here as a plaintiff's
2  counsel taking a deposition in personal injury
3  lawsuits.
4    MR. SPECTER:  That's true, I am.  But
5  I'm also a citizen.  So, I'd like to know whether he
6  has an objection to my giving this to European
7  regulators.
8    MR. KIERNAN:  Well, you know, all of
9  these documents are produced pursuant to protective
10  order.
11    MR. SPECTER:  That's true.  And I'm
12  not allowed --
13    MR. KIERNAN:  If you want to deviate
14  from the protective order, you ought to follow the
15  rules of The Court and submit a formal request to do
16  that.  So, I don't think it's appropriate to start
17  with this, "I'm a citizen of the world, Doctor," you
18  know, on a drug that's not at issue in this
19  litigation, would you mind if I give this to
20  regulatory agencies.  If you have a proper question,
21  please ask it.
22  BY MR. SPECTER:
23    Q.    Okay.  So, what's written here as
24  number 1 beneath the bottom line of number 0?
25    A.    What's written as number 1 is the

Page 812

1  importance of keeping the ongoing trials with
2  Arcoxia going.
3    Q.    Number 1 is, "Keeping the trials
4  going."  And next to that is, "Plausible"
5  hypotheses; correct?
6    A.    "Plausible hypothesis."
7    Q.    Number 2 is, "Potential risk."
8    Number 3 is, "Multiple short term -
9  not risk."  Is that correct?
10    A.    That's correct.
11    Q.    Next thing that's written is, "One
12  long-term - risk (APPROVe)"; correct?
13    A.    Correct.
14    Q.    And then an arrow to, "COX-2."
15    A.    Correct.
16    Q.    And then, number 5 is, "At present,
17  don't know how applicable it is to other members of
18  the class"; correct?
19    A.    Correct.
20    Q.    Number 6 is, "Long-term" -- I'm
21  sorry.  "Significant long-term safety data not
22  publicly available for other NSAIDs or COX-2."
23    A.    Correct.
24    Q.    Is that a true statement?
25    A.    At the time that this was written, I

Confidential - Subject to Protective Order

Page 813

1  was not -- we were not aware of any significant
2  long-term safety data that was publicly available
3  for other NSAIDs or COX-2 inhibitors with the
4  exception of aspirin.
5      Q.    What's the next thing that's written?
6      A.    "Data CHMP."  CHMP refers to the
7  European regulatory agencies.
8      Q.    What's written next to that?
9      A.    I'm not sure exactly, but
10  "Questions" -- something -- I can't read my own
11  handwriting.  Maybe it says -- I don't know what it
12  says.  Something about, "Questions - engage
13  discussion."  And then, "Issues."
14      Q.    Yes.  Well, it said something before
15  it said "issues."  It said, "difficult issues," and
16  then you crossed out the word "difficult"; right?
17      A.    That appears to be correct.
18      Q.    These are difficult issues, aren't
19  they?
20      A.    These are difficult issues and the
21  point of this bullet was that we needed to provide
22  the data to the European regulatory agencies and
23  engage in a discussion with them about these
24  difficult issues and these data.
25      Q.    Arcoxia is currently being sold in

Page 814

1  Europe; correct?
2      A.    That's correct.  And that's -- that
3  was the point of this bullet.
4      Q.    Okay.  What's next?
5      A.    Okay.  What's next is, "What's
6  unknown?"  And, what is unknown, is, as we've
7  discussed, there's no long-term safety data for the
8  NSAIDs.  So, we don't know --
9      Q.    No.  I just want to deal with what's
10  written.  I don't want your explanation quite yet.
11  What's written?
12      A.    "What's unknown?  NSAIDs, long-term."
13  And then "DSMB - not necessary to move up the
14  meeting (Nov. 6)."
15      Q.    Keep going, please.
16      A.    "Updated 10/8.  Closed CHMP 10/18
17  week, (10/18 presentation).  Expect" I would imagine
18  that meant to be "engaged in discussions via list of
19  questions, London - 11/22 week.  FDA:  10/30 PDUFA."
20      Q.    What's that?
21      A.    That's the date in which under the
22  Prescription Drug Act, the FDA, the regulatory
23  agency has as a target date to inform us as to the
24  status of our application to get Arcoxia approved.
25      Q.    Did they?

Page 815

1      A.    They came back and asked us -- they
2  gave us what's called an approvable letter, which
3  means that in principle, they're prepared to approve
4  the drug for marketing, but they had additional
5  requests before they did so.  That approvable letter
6  spelled out those additional requests.
7      Q.    What's next?
8      A.    "4A - MRL thinks that it would be" --
9  oh, here.  "MRL thinks that it would be appropriate
10  to include labeling changes, including APPROVe data,
11  in the labels for all COX-2 inhibitors, including
12  Arcoxia."  There's an arrow there that says, "EU ref
13  number state."  And there's an arrow there that
14  connects all the way up to the top that says, "Will
15  be" -- I assume means we "will be engaging," them in
16  "how to appropriately reflect these data in the
17  labels for COX-2 inhibitors" including "Arcoxia."
18      Q.    MRL is Merck Research Laboratories?
19      A.    That's correct.
20      Q.    Of which you were president?
21      A.    That's correct.
22      Q.    Did you agree with that statement?
23      A.    I did.
24      Q.    Is the label change for Arcoxia to
25  include the APPROVe data?

Page 816

1      A.    So, first of all, we have engaged --
2  we did engage with the European regulatory agencies,
3  and we did make labeling changes to the label for
4  Arcoxia.  Our proposal included the changing the
5  APPROVe data.  I don't know specifically -- I don't
6  know exactly what the final label that the European
7  regulatory agency agreed to -- says regarding
8  Arcoxia, that is, I don't know if the APPROVe data
9  per se are in that final label.
10      Q.    Well, does the final label for Europe
11  say anything to the effect of "Real Answer:  Don't
12  know"?
13      A.    Not that I'm aware of.  What the
14  issue is here, and the European regulatory agencies
15  are in agreement with this, is that it's important
16  to keep the ongoing studies with Arcoxia going
17  forward, because the big question is, that's
18  unknown, is whether or not compared to other NSAIDs
19  there's an increased cardiovascular risk with the
20  COX-2 inhibitors.
21      Q.    You testified that the FDA told you
22  on or around October 30th that they wanted some more
23  information?
24      A.    Correct.
25      Q.    Regarding Arcoxia?

KS-000530

48 (Pages 813 to 816)

Confidential - Subject to Protective Order

Page 817

1    A.    Regarding Arcoxia, yes.
2    Q.    Did that involve CV data,
3 cardiovascular data?
4    A.    Yes, it did.  In particular, what it
5 requested was the data in the ongoing cardiovascular
6 safety studies that I referred to in which there's a
7 prespecified analysis combining the cardiovascular
8 results from EDGE 1, EDGE 2 and the MEDAL study,
9 which are -- the MEDAL study being a very large
10 study comparing Arcoxia to diclofenac.
11    Q.    And that's not finished yet; is that
12 correct?
13    A.    That's not finished.
14    Q.    I want to go back briefly, hopefully,
15 to Exhibit 40 from the last deposition.
16    A.    40 is this one?
17    Q.    It is, Dr. Kim.  It has the band
18 around it.  To refresh your recollection, this is
19 something that came from your custodial file.
20    A.    Excuse me.  This came from my file?
21    Q.    You said the same thing the last time
22 we were together, and the answer was yes then, and
23 it's still yes.
24    A.    Okay.
25    Q.    It has a date on it of June 21st,

Page 818

1 2001.
2    A.    I see that.  And it also has some, it
3 looks like initials, which I do not recognize.
4    Q.    It's headed, "Future plans"; correct?
5    A.    That's what it's headed, yes.
6    Q.    There's a question underneath that is
7 -- there's a question underneath "Future plans," and
8 the question is, "Is Vioxx prothrombotic?"  Did I
9 read it correctly?
10    A.    Yes.
11    Q.    Was it an unsettled issue at Merck as
12 of June of 2001 whether Vioxx was prothrombotic?
13    A.    Was it an unsettled issue?  It was a
14 hypothesis.
15    Q.    Was it an unsettled issue as to
16 whether Vioxx was prothrombotic?
17    A.    It was an unsettled issue in the
18 sense that it was a hypothesis.
19    Q.    Taking a look at page -- well, let me
20 ask you this first, if I could.
21         Do you recollect there being issues
22 raised about whether VIGOR was an ethical trial?
23    A.    Whether VIGOR was an ethical trial?
24 I don't remember -- I don't remember anything
25 specific in that regard.

Page 819

1    Q.    VIGOR was a safety trial; correct?
2    A.    VIGOR was an outcomes trial looking
3 at cardio -- excuse me -- looking at
4 gastrointestinal safety, while also monitoring
5 through an adjudicated procedure cardiovascular
6 safety.
7    Q.    I'm simply saying it was a safety
8 trial versus an efficacy trial.  It was a safety
9 trial; correct?
10    A.    Yes.
11    Q.    It was not an efficacy trial?
12    A.    Yes.  You could say that.  It was
13 looking at gastrointestinal safety and monitoring
14 cardiovascular safety.
15    Q.    Taking a look at page -- well, this
16 thing isn't paginated, but it has a Bates Number of
17 013.  It's headed -- are you with me?
18    A.    Just a second.
19    Q.    Okay.
20    A.    (Witness reviewing document.)
21    Q.    Are you with me?
22    A.    Which page are we --
23    Q.    013.
24    A.    I'm sorry, I don't see the pages.
25    Q.    They're hard to spot.  It's in the

Page 820

1 corner.
2    A.    Oh, okay.  Sorry.  Okay.  I have the
3 page.  Let me just read it here.
4         (Witness reviewing document.)
5    A.    Okay.
6    Q.    This is titled, "Coxib+aspirin versus
7 Ibuprofen+aspirin Issues."  Correct?
8    A.    That's correct.
9    Q.    This is talking about doing a study
10 of a coxib like Vioxx with aspirin versus ibuprofen,
11 which has a trade name of what, sir?
12    A.    Advil.
13    Q.    Advil plus aspirin; correct?
14    A.    That's what appears to be at hand
15 here, yes.
16    Q.    Was such a study done?
17    A.    Not that I'm aware of.
18    Q.    Did Merck ever tell people who were
19 on Motrin and aspirin that Vioxx was a better idea
20 for them with or without aspirin?
21    A.    I'm sorry.  Did Merck tell patients
22 who were on Motrin plus aspirin that Vioxx was a
23 better alternative for them?  Not that I know about.
24    Q.    Do you have any reason to think that
25 ibuprofen plus aspirin would be better for people

Confidential - Subject to Protective Order

Page 821

1   than Vioxx plus aspirin?
2        A.     Do I have any reason to think that
3   people on ibuprofen plus aspirin would be better
4   than Vioxx plus aspirin?
5        Q.     Let me ask it the other way around.
6             Do you have any reason to think that
7   Vioxx plus aspirin would be better for people than
8   Motrin plus aspirin?
9        A.     It's possible.
10       Q.     Can you be any more certain than
11  that?
12       A.     Well, it was certainly something
13  that -- it was certainly something that I was
14  interested in as a testable hypothesis that I
15  thought, yes, had a reasonable chance of being true
16  with regard to GI safety.
17       Q.     Well, did you ever come up with any
18  basis for concluding that Vioxx plus aspirin was
19  better for people than Motrin plus aspirin?
20       A.     Did I ever come up with a reason?
21       Q.     No.  A basis for concluding in
22  science.
23       A.     A basis for concluding, oh.
24       Q.     In science.
25       A.     Yes.

Page 822

1        Q.     That Vioxx plus aspirin was better
2   for people than Motrin plus aspirin?
3        A.     Yes.  So, the issue is this: As
4   we've discussed, the whole idea behind the
5   development of the COX-2 inhibitors was to inhibit
6   COX-2 without inhibiting COX-1, and thereby, to
7   reduce the incidence of serious GI ulcers and bleeds
8   that's associated with the use of the nonsteroidal
9   anti-inflammatory drugs.
10            When one adds aspirin, aspirin
11  further exacerbates the gastrointestinal side
12  effects that are seen with the nonselective
13  anti-inflammatory drugs.  So, if you were to look,
14  for example, at the number of ulcers in patients who
15  were taking, let's say, ibuprofen versus patients
16  taking ibuprofen plus aspirin, there would be a
17  worst GI outcome in those patients taking ibuprofen
18  plus aspirin.
19            We already knew that Vioxx or a COX-2
20  inhibitor would show fewer GI events than an NSAID.
21  Certainly we knew that for naproxen.  And based on
22  other studies, we knew that to be true for other
23  NSAIDs.  And so, the question was, if you added
24  aspirin to a COX-2 inhibitor or to Vioxx, whether
25  you would have fewer GI events than if you compared

Page 823

1   it to ibuprofen plus aspirin, and there certainly
2   was a good rationale, scientific rationale for
3   thinking that that might be the case.
4        Q.     Well --
5        A.     But it was not proven.  We didn't
6   know that.
7        Q.     Was it ever proven?
8        A.     You know, I think that the closest it
9   came -- well, there was a study with Celebrex which
10  compared Celebrex plus aspirin to an NSAID, and I
11  don't recall which one it was plus aspirin.
12       Q.     Well, would --
13       A.     I believe there were fewer events
14  there.
15       Q.     Would this test of Vioxx versus
16  aspirin versus ibuprofen versus aspirin have
17  answered an important GI question?
18       A.     Would this -- see, I'm not familiar
19  with exactly what's being proposed here.  But let me
20  say this, could it be -- if your question is, could
21  it be that a study of this sort could address that
22  question?
23       Q.     An important GI question.
24       A.     Certainly a study comparing a coxib
25  plus an aspirin to ibuprofen plus aspirin could

Page 824

1   answer an important GI safety question.
2        Q.     But it was not done?
3        A.     It was not done at Merck.  There was
4   a study that was done with Celebrex.
5        Q.     And then it says, "Is it ethical to
6   put patients with CV risk (that is can tolerate a
7   bleeding event) on ibuprofen plus aspirin without
8   the use of a proton pump inhibitor?"  Then it says,
9   "- Ethics of VIGOR already challenged."  Do you see
10  that, sir?
11       A.     Yes.
12       Q.     Did you read it correctly?
13       A.     Yes.
14       Q.     Does that refresh your recollection
15  that the ethics of VIGOR were challenged?
16       A.     No, it does not.  And as we've
17  discussed, I was not here when VIGOR was designed
18  and when it was, when -- if it was challenged, it
19  was challenged.
20       Q.     Do you recollect there being a debate
21  at Merck with respect to doing a CV outcomes trial?
22  That question calls for a yes or no answer.
23       A.     Sorry.  Say that again.  Do I recall
24  the debate around whether or not to do a CV outcomes
25  trial?

Confidential - Subject to Protective Order

Page 825

1    Q.    Yes.
2    A.    I recollect substantial discussion
3  around how to do a CV outcomes trial.
4              - - -
5          (Whereupon, Deposition Exhibit Kim-50,
6          E-mails 3-9-2002, MRK-AFJ0000576 -
7          MRK-AFJ0000577 was marked for
8          identification.)
9              - - -
10 BY MR. SPECTER:
11   Q.    I'm handing you Kim-50.  This is an
12 e-mail from Dr. DiBattiste to Dr. Gertz, copying you
13 and many other senior people at Merck with regard to
14 doing a CV outcomes trial.
15   A.    Okay.  Can you just give me a minute
16 to look it over?
17   Q.    Yes.  For the record, it's dated
18 March 9, 2002; correct?
19   A.    Yes.
20         Just let me read it over.
21         (Witness reviewing document.)
22         Okay.  Thank you.
23   Q.    Are you with me?
24   A.    Yes.
25   Q.    Do you recollect this e-mail from Dr.

Page 826

1  or Mr. DiBattiste?  I'm not sure if he's a Dr. or --
2    A.    It's Dr. DiBattiste.
3    Q.    Thank you.
4          What kind of doctor is he?
5    A.    I believe that Dr. DiBattiste is a
6  cardiologist.  And do I recollect the e-mail?  I
7  don't recollect the e-mail specifically, but I do
8  recollect, as I said earlier to you, a substantial
9  discussion.
10   Q.    What does the term "ACS" stand for?
11   A.    ACS stands for acute coronary
12 syndrome.
13   Q.    So, Dr. DiBattiste, who is a
14 cardiologist, was he one of the most senior
15 cardiologists at Merck?
16   A.    No.  But he was a member of our
17 clinical group.
18   Q.    Well, these other men and women who
19 are listed here, maybe they're all men -- actually,
20 they're not.
21   A.    No, they're not.
22   Q.    There are a couple of women here,
23 maybe three.  There's Gertz, DiBattiste, Sabbaj,
24 Scolnick, Greene, Reicin, Nies, Goldmann, Guess,
25 you, Demopoulos, Honig, Stoner; correct?

Page 827

1    A.    Correct.
2    Q.    Who are the recipients.
3          Any other cardiologists in this
4  group?
5    A.    I believe that Demopoulos is a
6  cardiologist.
7    Q.    So, Dr. DiBattiste is writing to
8  Dr. Gertz and he says, "Thanks for the opportunity
9  to provide feedback on the proposed study options."
10 Then he says, "While I am admittedly biased by my
11 involvement in the development of the post ACS
12 trial," and that would be acute coronary syndrome
13 trial; correct?
14   A.    Yes.  And specifically post ACS, so,
15 that is patients who have ACS.
16   Q.    He says, "I remain convinced that
17 this study is an essential component of our
18 comprehensive clinical" research "to the current
19 challenges we face in the coxib" area.  Did I read
20 it correctly?
21   A.    Yes.
22   Q.    This subject matter is, "RE:  RMC
23 options for CV outcomes trials"; correct?
24   A.    That's correct.  That's the subject
25 line.

Page 828

1    Q.    RMC stands for what?
2    A.    RMC stands for research management
3  committee.
4    Q.    He says, "The only way to
5  definitively answer the question regarding a
6  potential prothrombotic effect of Vioxx is to do a
7  placebo controlled trial."  Did I read that
8  correctly?
9    A.    Yes.
10   Q.    Then he says two paragraphs down,
11 "Furthermore, by virtue of our statements to the
12 analysts, extensive discussions with Drs. Braunwald
13 and Cannon of the TIMI group" -- what's that?
14   A.    I forget what that acronym stands
15 for, but it's a group of cardiovascular physicians,
16 I believe.
17   Q.    These are outside people?
18   A.    That's correct.  These are
19 external -- these are non-Merck physician.
20   Q.    So, he says, "Furthermore, by virtue
21 of our statements to the analysts, extensive
22 discussions with Drs. Braunwald and Cannon of the
23 TIMI group, preliminary discussions with the FDA,
24 and protocol review with Steering Committee members
25 and cardiovascular thought leaders from 18 countries

KS-000533

Page 829

1    around the world, we have declared our interest and
2    intent to initiate this study and confront this
3    challenge head on. Any reversal of the decision to
4    go forward with this trial will certainly
5    communicate a message of lack of confidence,
6    uncertainty and concern that may have important and
7    untoward consequences." Did I read that correctly?
8        A.    You did.
9        Q.    And then he says, "For all of the
10   above reasons, I feel strongly that the VIOXX ACS
11   trial is both the most scientifically sound design
12   to approach the most pressing questions, and is
13   likely to have a favorable outcome." Did I read
14   that correctly?
15       A.    You did.
16       Q.    What was the design of the VIOXX ACS
17   trial?
18       A.    Oh, I don't recall exactly, but the
19   issue here was to do -- was to take a patient
20   population that was post acute coronary syndrome,
21   that is, they had -- these were patients that had
22   what's referred to as unstable angina, and so
23   they're symptomatic for cardiovascular disease, and
24   to put some of them on Vioxx and to put some of them
25   on placebo and to monitor the number of

Page 830

1    cardiovascular events over time.
2        Q.    Was this study done?
3        A.    No, it was not.
4        Q.    Dr. DiBattiste said in the first
5    paragraph in advocating for this test, he said,
6    "('if it's safe in high risk patients, it's probably
7    safe in everyone')." Correct?
8        A.    Right. In quotations, he says, "'if
9    it's safe in high risk patients, it's probably safe
10   in everyone')."
11       Q.    Well, let's read the whole sentence,
12   just so we're clear. He writes, "A
13   placebo-controlled trial in a post ACS population
14   addresses both issues squarely, and is most likely
15   to be extrapolated to a broader population ('if it's
16   safe in high risk patients, it's probably safe in
17   everyone')." Did I read it correctly?
18       A.    You did. I'm not sure if the
19   reference to the quotes there isn't to the preceding
20   sentence or not.
21       Q.    Now, did you tell FDA that Dr.
22   DiBattiste had this view?
23       A.    I don't know. That is, I don't know
24   what Merck told FDA in this regard. I do know that
25   Dr. DiBattiste was actively involved in these

Page 831

1    discussions, not just through e-mail exchange, but
2    also in discussions, some of which I participated
3    in.
4        Q.    Was there some article in the medical
5    literature authored by somebody at Merck or someone
6    else that described DiBattiste's advocacy for this
7    trial?
8        A.    I'm not aware of any article in the
9    medical literature that advocated for Dr.
10   DiBattiste's view to do this trial.
11       Q.    You recollect that it's been the
12   position of Merck in public statements that when
13   clinical trials have been warranted, we've done
14   them; correct?
15       A.    I don't know that exact statement.
16       Q.    Is that your position?
17       A.    I think when clinical trials are
18   warranted is a subjective statement. I have a team
19   of people that are extremely experienced in these
20   things, and we weigh the different factors and then
21   decide what clinical trials to do to best answer the
22   medical questions at hand in a safe manner.
23       Q.    I have a chart I want to show you, a
24   diagram, which is titled, "Effects of NSAIDs on
25   Thromboxane and Prostacyclin," which I've marked as

Page 832

1    P-51.
2                     - - -
3            (Whereupon, Deposition Exhibit Kim-51,
4        PowerPoint Presentation, "Effects of
5        NSAIDs on Thromboxane and Prostacyclin,"
6        MRK-AFJ0009371, was marked for
7        identification.)
8                     - - -
9    BY MR. SPECTER:
10       Q.    I'd like to show it to you. And I'd
11   like to ask you if you believe it is accurate?
12       A.    (Witness reviewing document.)
13       This figure, which is taken from --
14   well, I don't know if it's taken from, but this
15   figure which has as a reference on the bottom a PNAS
16   paper, 1999, which I believe is the FitzGerald
17   paper, lays out the hypothesis that inhibition of
18   COX-2 in the endothelial cells with a COX-2 specific
19   inhibitor could lead to an imbalance in the
20   prostacyclin to thromboxane ratio, which would not
21   be observed, according to this hypothesis, with a
22   nonselective NSAID.
23       If you're asking me do I agree that
24   this is the hypothesis summarized that was proposed
25   in this paper, then the answer is yes. If you're

Confidential - Subject to Protective Order

Page 833

1 asking me whether I agree with what's on this
2 figure, the answer is no. I think it's speculation.
3      Q.    Well, I'm very grateful to you for
4 asking the questions and answering them. It saves
5 me a lot of time.
6           You would agree that this is not said
7 to be a hypothesis on this chart, it says
8 declaratively at the top, "Effects of NSAIDs on
9 Thromboxane and Prostacyclin"; correct?
10     A.    That's what it says.
11     Q.    It doesn't say, "Hypothesis of
12 effects on NSAIDs on thromboxane and prostacyclin";
13 correct?
14     A.    It doesn't say that, but I assure you
15 it's a hypothesis.
16     Q.    As opposed to a declarative statement
17 of what, in fact, occurs?
18     A.    Correct.
19     Q.    Well, if you were to present on this,
20 you would want to denominate this as a hypothesis;
21 correct?
22     A.    Absolutely. And when I have shown
23 slides like this, I have always -- I have always
24 tried to remember to state this as FitzGerald's
25 hypothesis.

Page 834

1      Q.    Well, if that's what you really were
2 aiming to do, then you would type on the top of it,
3 "Hypothesis of Effects of NSAIDs on Thromboxane and
4 Prostacyclin" --
5      A.    Well --
6      Q.    Let me just finish my question.
7           -- and not leave it, "Effects of
8 NSAIDs on Thromboxane and Prostacyclin"; correct?
9      A.    No, not necessarily, particularly
10 since the reference is given down at the bottom.
11     Q.    This is part of one of your
12 presentations; isn't it?
13     A.    It could be. I don't know. Do you
14 want to show me the whole presentation?
15     Q.    Sure.
16           MR. SPECTER: I'll mark it as Kim-52.
17           - - -
18           (Whereupon, Deposition Exhibit Kim-52,
19           PowerPoint Presentation, "Merck Research
20           Laboratories Face-to-Face Meeting, Dr.
21           Peter S. Kim," November 29 - 30, 2001,
22           MRK-AFJ0009366 - MRK-AFJ0009379 was
23           marked for identification.)
24           - - -
25 BY MR. SPECTER:

Page 835

1      Q.    It's dated November 29th and 30th of
2 2001. The cover pages says, "Merck Research
3 Laboratories, Face-to-Face Meeting, Dr. Peter S.
4 Kim"; correct?
5      A.    Yes, that's correct.
6      Q.    This would have been a PowerPoint or
7 a presentation where you would have handed out a
8 folder or a binder with these slides; is that
9 correct?
10     A.    I wouldn't have handed it out, but
11 this is a PowerPoint presentation.
12     Q.    It's a PowerPoint. All right.
13           Then six pages in is this diagram?
14     A.    Absolutely. And it's in the context
15 of the results of VIGOR, which precedes it, and the
16 results of the Alzheimer's study, which immediately
17 follow it.
18     Q.    Does the term "hypothesis" appear
19 anywhere on that document?
20     A.    On the document? Yes. On Page 375.
21     Q.    That's a different section.
22     A.    I know.
23     Q.    That regards, "Vioxx Cardiovascular
24 Safety Data Hypotheses from Observations." And then
25 you're talking about the FDA approved "Dear

Page 836

1 Healthcare Provider" letter; correct? Not the
2 diagram describing the "Effects of NSAIDs on
3 Thromboxane and Prostacyclin"; correct?
4      A.    This is speaking to hypotheses from
5 clinical data, including the results that we've
6 talked about earlier, the VIGOR data and the
7 Alzheimer's data.
8      Q.    Just so we're clear, Dr. Kim, this
9 diagram that --
10     A.    This diagram? (Indicating.)
11     Q.    Yes, that we've been talking about.
12 This diagram is not in the article to which you just
13 referred; correct?
14     A.    Oh, I don't know that. That -- this
15 is the essence of the FitzGerald hypothesis.
16     Q.    This diagram was created by someone
17 at Merck, and you presented it as it stands in this
18 exhibit; correct?
19     A.    This diagram was produced by someone
20 at Merck, and I had presented it, yes.
21           MR. SPECTER: I'm told that we need
22 to change the tape, so, let's do so.
23           THE VIDEOTAPE TECHNICIAN: Stand by,
24 please. That concludes Video Cassette Number 2.
25 The time is 2:27. We're going off the record.

Confidential - Subject to Protective Order

Page 837

1             - - -
2          (Whereupon, a recess was taken from
3     2:27 p.m. until 2:36 p.m.)
4             - - -
5          THE VIDEOTAPE TECHNICIAN:  This
6     begins Video Cassette Number 3.  The time is 2:36.
7     We're back on the record.
8     BY MR. SPECTER:
9          Q.    Okay.
10               Sir, did the issue about whether
11    Vioxx was safe for cardiovascular outcomes, was that
12    an open issue at Merck in the fall of 2001?
13         A.    I'm not sure I'd put it exactly the
14    way you did.
15               So, let me hear the question again,
16    please.
17            - - -
18          (Whereupon, the requested portion of
19          the notes of testimony was read by the
20          court reporter.)
21            - - -
22          THE WITNESS:  I think that there was
23    a significant amount of discussion around this
24    issue, and there was interest in trying to conduct
25    the study that would address this issue in as

Page 838

1     definitive a manner as possible.
2     BY MR. SPECTER:
3          Q.    So, does that mean that whether Vioxx
4     was safe for CV outcomes was an open issue at Merck
5     in the fall of 2001?
6          A.    I mean, when you say Vioxx is "safe,"
7     that's a question that has to be done in a relative
8     sense.  But certainly we were interested in the
9     cardiovascular safety profile of Vioxx and in doing
10    studies that would more definitively address the
11    questions that were at hand.
12         Q.    But I'm looking for a direct answer
13    to my question, whether Vioxx is safe for CV
14    outcomes was an open issue at Merck in the fall of
15    2001.  Was it?
16         A.    Yes.  I think we were interested in
17    the cardiovascular safety profile of Vioxx.
18            - - -
19          (Whereupon, Deposition Exhibit Kim-53,
20          E-mail 11-21-2001, MRK-AAZ0003351 was
21          marked for identification.)
22            - - -
23    BY MR. SPECTER:
24         Q.    And taking a look at Kim-53, which is
25    an e-mail from Dr. Scolnick to you, among others,

Page 839

1     and I'll give you a chance to read this before you
2     answer my question.
3          A.    Okay.  Thank you.
4          Q.    But just to get my question out so
5     you have it in mind as you are looking at it, he
6     apparently believed that whether Vioxx was safe for
7     CV outcomes was an open question in the fall of
8     2001, looking at the first sentence of his e-mail?
9     Take your time and read it.
10         A.    (Witness reviewing document.)
11               Okay.
12         Q.    Do you want to hear the question
13    again?
14         A.    Yes, please.
15         Q.    Apparently, Dr. Scolnick also
16    believed that whether Vioxx was safe for CV outcomes
17    was an open question in the fall of 2001; correct?
18         A.    Oh, again, I think that Dr. Scolnick
19    was certainly very interested in seeing Merck
20    conduct a cardiovascular outcomes study that would
21    address the concerns that were out there regarding
22    COX-2 inhibitors in a more definitive manner.
23         Q.    It was an open question for Dr.
24    Scolnick whether Vioxx is safe for CV outcomes in
25    the fall of 2001; correct?

Page 840

1          A.    Oh, I don't know whether I would call
2     that an open question.  There was certainly, and I
3     don't really -- I don't really think I can speak for
4     Dr. Scolnick, but he was certainly very interested
5     in seeing Merck do a cardiovascular outcomes study
6     that would further address the cardiovascular safety
7     profile of Vioxx.
8          Q.    In fact, Dr. Scolnick in the fall of
9     2001 thought that Vioxx increased the risk of CV
10    events; correct?
11         A.    I don't know that to be true.
12         Q.    Do you know it to be false?
13         A.    I had discussions with Dr. Scolnick
14    during that time period, and we discussed the Vioxx
15    cardiovascular issues and the hypotheses that were
16    out there.  We also discussed the wealth of data
17    indicating that there was not a difference between
18    Vioxx and placebo and Vioxx and non-naproxen NSAIDs.
19    And we discussed the naproxen hypothesis.  I think
20    that what Dr. Scolnick was most interested in at
21    that time period was in getting Merck to do a
22    cardiovascular outcomes study to more definitively
23    address that question.
24         Q.    And he never let that go, did he?
25         A.    He -- well, when you say, "he never

Confidential - Subject to Protective Order

Page 841

1  let that go," he --
2      Q.    I should say, he pushed that very
3  hard?
4      A.    Oh, yes.  He was very interested in
5  seeing us conduct studies that would more
6  definitively address this question.
7      Q.    And he was disappointed that there
8  never was a study in which CV outcomes were a
9  primary endpoint; wasn't he?
10          MR. KIERNAN:  Object to form.
11          THE WITNESS:  I don't know that I
12  could say that.  I certainly don't recall that from
13  Dr. Scolnick.
14  BY MR. SPECTER:
15     Q.    Well, look at this e-mail, Doctor.
16  He says, "I think the question we should answer now
17  is NOT whether Vioxx or any Coxib is safe for CV
18  outcomes.  I think the question NOW is what is the
19  best antiplatelet regimen is to use with a Coxib."
20  Correct?
21     A.    Well, that's what this states.
22     Q.    Right.  He's saying we've got to use
23  some anti-platelet regimen, whether it's aspirin or
24  something else, to counteract the platelet clotting
25  effects of the coxib; correct?

Page 842

1      A.    Oh, no, I would not say that's
2  correct.  To the contrary.  These issues are quite
3  complicated, and I'm happy to start to go into them
4  if you want.  But, no, the issue here was not as you
5  stated.
6      Q.    He writes, "I think the question we
7  should answer now is NOT whether Vioxx or any Coxib
8  is safe for any CV outcomes.  I think the question
9  NOW is what is the best antiplatelet regimen to use
10  with a Coxib.  I think that is THE medical
11  question," all capital letters, "and if we answer
12  it, the problem will dissipate."  Did I read it
13  correctly?
14     A.    You read those sentences correctly.
15     Q.    What problem is he talking about?
16     A.    I'm not sure.  What I can say --
17     Q.    No.  The only question is, what
18  problems is he talking about?  Your answer is you're
19  not sure; correct?
20     A.    Yes.
21     Q.    Now, when you read this and you
22  weren't sure what he was talking about, did you say
23  to him, hey, Dr. Scolnick, I got your e-mail, and
24  did you write him back and say, I'm not sure what
25  you're talking about regarding "the problem"?

Page 843

1      A.    I don't recall asking him that
2  specifically, but I did have numerous conversations
3  with him.
4      Q.    Well, don't you think, sir, that the
5  problem that he was talking about was the perception
6  out there in the medical community that Vioxx might
7  be dangerous from a CV perspective?
8      A.    No, I don't know that.
9      Q.    Well, do you think that may be what
10  he's talking about, sir?  That is my question.  Not
11  whether that's what you know, it's whether what you
12  think may be the case?
13     A.    I don't think so.  I think at this
14  point in time in the exchange, this e-mail was
15  addressing a major issue that we had wrestled with,
16  and that is how to get anti-platelet effects in
17  combination with a coxib, given that there is a
18  population of patients, namely -- well, there was a
19  population of patients, namely, those that have a
20  higher cardiovascular risk, who required
21  anti-platelet therapy.  And the answer to this
22  question is nontrivial.
23     Q.    But this did not end up getting
24  studied; correct?
25     A.    What did not get studied, the best

Page 844

1  anti-platelet treatment to use with a coxib?
2      Q.    Right.
3      A.    I think that is still a difficult
4  question to answer, yes.
5      Q.    No, no.  It's not whether the
6  question is hard to answer.  The question is whether
7  you actually tried to do it.  You didn't do it, you
8  didn't do a test with Vioxx and aspirin; correct?
9      A.    A test of what?
10     Q.    Anything.  You didn't --
11     A.    Oh, no, that's not true at all.
12     Q.    After this e-mail was done, did you
13  test Vioxx with some anti-platelet regimen, sir?
14     A.    Absolutely.  Patients in the APPROVe
15  study, a significant percentage, something like 20,
16  25 percent, I can't remember exactly, were on
17  aspirin, and they were at higher risk of
18  cardiovascular events, and a subanalysis of that
19  group was done, to just give you one example.
20     Q.    Did that have an 80 percent power to
21  a relative risk of 2, sir?
22     A.    It did not.
23     Q.    Right.
24          Now, in the package insert, the
25  warning label for Vioxx, doctors and patients were

KS-000537

55 (Pages 841 to 844)

Confidential - Subject to Protective Order

Page 845

1  not told that they should take aspirin with Vioxx.
2  They were only told they should take it if it was
3  otherwise indicated; correct?
4      A.    I don't remember the exact wording.
5  I believe it's something to the effect that for
6  patients for whom aspirin prophylaxis is
7  recommended, that they should not discontinue that
8  aspirin while taking Vioxx.  And the reason behind
9  that is that Vioxx does not inhibit COX-1.
10     Q.    Did you feel like the warning label
11 was an accurate statement?
12     A.    Did I feel as though the warning
13 label for Vioxx is an accurate statement?
14     Q.    Yes.
15     A.    Yes.
16     Q.    So, do you agree with the statement
17 that appears under "Cardiovascular Effects" that
18 with respect to VIGOR and the Alzheimer's trials
19 that "The significance of the cardiovascular
20 findings from these 3 studies...is unknown"?
21     A.    I believe that that is a
22 representation -- that is a representation of the
23 data.  That is what the FDA concluded was a
24 representation of the data.
25     Q.    Dr. Kim, you know my question didn't

Page 846

1  relate to what somebody else thinks, don't you?  My
2  question related to what you think; correct?
3      A.    Okay.
4      Q.    So, my question, again, is, do you
5  agree with the statement in the warning label that
6  "The significance of the cardiovascular findings
7  from these 3 studies," referring to VIGOR and the
8  Alzheimer's trials, "is unknown"?
9      A.    Actually, is that exactly what it
10 says?
11     Q.    I'll tell you what it says exactly.
12 It says, "The significance of the cardiovascular
13 findings from these 3 studies (VIGOR and 2
14 placebo-controlled studies) is unknown."  And
15 they're talking -- when they talk about the two
16 placebo-controlled studies, they're talking about
17 the Alzheimer's trials, aren't they, sir?
18     A.    Yes.
19     Q.    Do you want to see it?
20     A.    Sure, that would be great.  Thank
21 you.
22     Q.    Only if you want to see it.  Do you
23 want to see it?
24     A.    Yes, please.
25     Q.    I'll show it to you.

Page 847

1          Have you read this document cover to
2  cover before, sir, the warning label for Vioxx?
3      A.    I've read the label for the
4  prescribing information, which is commonly referred
5  to as the label for Vioxx.
6      Q.    Cover to cover?
7      A.    Yes.
8          MR. SPECTER:  So, we'll mark this as
9  Kim-54.
10         - - -
11         (Whereupon, Deposition Exhibit Kim-54,
12         Vioxx label, April 2002, was marked for
13         identification.)
14         - - -
15         THE WITNESS:  Thank you.
16 BY MR. SPECTER:
17     Q.    Sure.
18         And I'm looking now on the second
19 page, last column "Cardiovascular Effects."  Second
20 paragraph, next to last sentence.
21     A.    (Witness reviewing document.)
22         Okay.
23     Q.    Did I read it correctly?
24     A.    Yes, you did.
25     Q.    Do you agree with it?

Page 848

1      A.    Yes, I agree with it in that the
2  results did not lead to a definitive conclusion.
3  And the next sentence which says, "Prospective
4  studies specifically designed to compare the
5  incidence of serious CV events in patients taking
6  VIOXX versus NSAID comparators or placebo have not
7  been performed," which is the way in which the
8  interpretation of the data above could be
9  definitively known.
10     Q.    Nowhere in the warning label was
11 there a statement that the results from VIGOR of the
12 increased numbers of cardiovascular events in people
13 taking Vioxx was due to a cardioprotective effect of
14 naproxen; correct?
15     A.    That is correct.
16     Q.    Merck wanted to say that, and the FDA
17 wouldn't let them; correct?
18     A.    I don't remember the exact details,
19 but certainly it was Merck's interpretation of those
20 results that naproxen was cardioprotective.
21     Q.    If Merck had had its way, this
22 paragraph would have said something to the effect,
23 with regard that sentence, that the cardiovascular
24 findings from VIGOR were due to a cardioprotective
25 effect of naproxen; correct?  Something like that?

KS-000538

Confidential - Subject to Protective Order

Page 849

1    A.    I don't -- I don't know that it would
2  be stated in that way.
3    Q.    Well, that's your position, isn't it,
4  Dr. Kim?
5    A.    My position is that the difference in
6  cardiovascular events in the VIGOR trial are
7  attributable to the cardioprotective effect of
8  naproxen.
9    Q.    But that's not what Merck's label for
10 Vioxx says.  Merck's label for Vioxx says that the
11 cardiovascular findings' significance is unknown;
12 correct?
13   A.    It says that the significance of
14 these findings is unknown.
15   Q.    And that's different from your
16 position; correct?
17   A.    That is different than what I think
18 is the best interpretation of these data, yes.
19   Q.    So, the truth of the matter is that
20 you really don't agree with the warning label, do
21 you, sir?
22   A.    I do agree with the warning label in
23 the sense, as I said earlier, that the following
24 statement -- the following sentence puts the
25 statement -- the sentence that you were reading to

Page 850

1  me in context, which is the "Prospective studies
2  specifically designed to compare the incidence of
3  serious CV events in patients taking VIOXX versus
4  NSAID comparators or placebo have not been
5  performed."  And that that is -- that would be a
6  more rigorous way to reach that conclusion.
7    Q.    Certainly a lot more rigorous than
8  concluding that naproxen is cardioprotective;
9  correct?
10   A.    Again, my interpretation of the data
11 is in its totality, not just VIGOR alone, all of the
12 data that we have been talking about, including data
13 for Vioxx against placebo, data for Vioxx against
14 non-naproxen NSAIDs, data on naproxen and its known
15 anti-platelet properties.  My interpretation of the
16 results of the VIGOR study with regard to
17 cardiovascular events is that they are best
18 explained by a cardioprotective effect of naproxen.
19 However, I do agree that prospective studies
20 designed, specifically designed to compare the
21 incidence in patients taking Vioxx versus NSAID or
22 placebo have not been performed at the time that we
23 wrote this label.
24   Q.    How many studies have been done
25 comparing naproxen to placebo for the purpose of

Page 851

1  assessing cardiovascular safety, Dr. Kim?
2    A.    I'm not aware of any studies that
3  have been done comparing naproxen to placebo with a
4  cardiovascular endpoint specifically.
5    Q.    Let's talk about what the FDA has
6  said about Arcoxia and CV safety.  Have you read the
7  summary of CV safety done by the FDA?
8    A.    I'm not sure what you're referring
9  to.
10   Q.    Well, there was a briefing package
11 for NDA 21-389, which is Arcoxia.  And this is part
12 of the briefing materials for what occurred in
13 February.  Did you read that material?
14   A.    I don't know, because -- I certainly
15 don't know without looking at what you're referring
16 to.
17   Q.    Well, let me read you from my screen.
18 I don't have the document with me, but you're
19 certainly free to look at the screen with me if
20 you'd like to.  I'd ask you if it refreshes your
21 recollection.  "For CV related deaths, there appears
22 to be an excess of cases in Arcoxia compared to
23 placebo, although the exposure to placebo is
24 limited.  However, the data related to naproxen
25 clearly shows an excess of CV mortality related to

Page 852

1  Arcoxia (and this is consistent with comparisons of
2  naproxen to Vioxx in other studies)."  Do you
3  recollect reading that now, sir?
4    A.    Not specifically.
5    Q.    Do you have any impression, as you
6  sit here today, what the FDA's views were as to the
7  CV safety of Arcoxia?
8    A.    Well, just based on what you just
9  read me, it sounds as though they are saying that
10 there's a numerical imbalance, but that the numbers
11 are very small.
12   Q.    And they say --
13   A.    Excuse me.  You asked me whether --
14 what their opinion was on cardiovascular safety of
15 Arcoxia?
16   Q.    Basically.
17   A.    Yes.  So, let me answer the question
18 differently then, and let me add to the answer to
19 that question, that is, that they gave us, they
20 wrote to us with an approvable letter spelling out
21 what it is that they would like to see in terms of
22 additional studies or the completion of ongoing
23 studies, I should say.
24   Q.    Right.  They want more CV data;
25 correct?

Esquire Deposition Services

Confidential - Subject to Protective Order

Page 853

1    A.    Yes, they do.
2    Q.    They haven't told you that they'll
3  give you the right to sell Arcoxia to the general
4  public in the absence of that CV data, have they?
5    A.    No.  They have laid out in an
6  approvable letter that they are willing to approve
7  the drug for -- they're willing to approve the drug,
8  provided that the following additional data are
9  included in the package, one piece of which includes
10  the additional cardiovascular safety data from the
11  studies that we discussed before, EDGE 1, EDGE 2 and
12  MEDAL.
13    Q.    Do you recall FDA saying that the
14  results appear to demonstrate that Arcoxia is worse
15  than each comparator, for example, comparisons to
16  naproxen demonstrate that an increase in events
17  relative to Arcoxia or comparisons to placebo, there
18  is again an increase in events related to Arcoxia?
19  Do you recollect, sir?
20    A.    No.  I don't recollect the exact
21  sentences that you're reading.
22    Q.    Back in 2001, did you ask Merck
23  Frosst in Montreal to do some work for you with
24  respect to an understanding of the prostacyclin
25  hypothesis?

Page 854

1    A.    It's certainly possible.  I don't
2  know about the date.  If there's something you want
3  to show me, that would be fine.
4    Q.    Sure.
5        - - -
6        (Whereupon, Deposition Exhibit Kim-55,
7        E-mails, MRK-AFJ0000518 - MRK-AFJ0000519
8        was marked for identification.)
9        - - -
10  BY MR. SPECTER:
11    Q.    Kim-55, this is an e-mail from you to
12  Kathleen Metters?
13    A.    Okay.
14    Q.    This is actually January 27, 2002;
15  correct?
16    A.    Yes.  My original e-mail was 2002.
17    Q.    So, it's a couple of months after the
18  e-mail with Dr. Scolnick that we talked about a few
19  minutes ago; correct?
20    A.    Yes.  Let me just read this.
21    Q.    Go ahead, take a look at it.
22    A.    Thank you.
23        (Witness reviewing document.)
24        Okay.
25    Q.    So, this was an e-mail to her

Page 855

1  following up on your brief discussion in Montreal
2  asking her to "coordinate an effort to understand
3  where prostacyclin is made."  Is that correct?
4    A.    That's correct.
5    Q.    You're telling her, "this will
6  require substantial effort by you, and other members
7  of Merck Frosst and the rest of MRL.  But, gaining a
8  good understanding of" it -- "of how to respond to
9  the" -- let me start over.
10        "But, gaining a good understanding of
11  how to respond to the CV issues surrounding Coxibs
12  is the most important short-term need of the company
13  (by far!) and we need to do this thoroughly and
14  rapidly.  It is very likely that we are going to
15  have an Arcoxia FDA advisory meeting on the subject
16  in April/May."  Did I read that correctly?
17    A.    Yes, you did.
18    Q.    Now, did she get all these questions
19  answered for you?
20    A.    She did not.
21    Q.    Well, were you correct that this was
22  "the most important short-term need of the company
23  (by far!)"  At that point in time?
24    A.    I don't know if I was correct.  I
25  certainly was -- that was my impression at the time.

Page 856

1    Q.    That's what you thought; correct?
2    A.    That is what I wrote here, yes.
3    Q.    And you put an exclamation point
4  after the words "By far"; correct?
5    A.    Yes.
6    Q.    Well, how much money was spent to get
7  these answers to the most important issues facing
8  the company?
9    A.    Oh, I don't know.
10    Q.    How many people were working on it?
11    A.    I don't know, but I can tell you what
12  we did learn.
13    Q.    Well, sir, I think you told us about
14  that the last time we met, didn't you?
15    A.    It's possible I did, yes.
16    Q.    I think you did.
17    A.    What we've learned, just to restate
18  it, was --
19    Q.    I'm not asking you that question.
20  Your counsel can ask you that when I've finished my
21  questions.  I think I've already asked you that or
22  you've already told me that, whether I asked you or
23  not.
24        The first sentence of this e-mail is,
25  "I would like you to coordinate an effort to

KS-000540

Page 857

1  understand where prostacyclin is made." Correct?
2  That's the first sentence; correct?
3      A.    Correct.
4      Q.    That was three years and
5  two-and-a-half months ago; right?
6      A.    Correct.
7      Q.    You sold a lot of Vioxx in the
8  intervening time; correct?
9      A.    Merck did.
10      Q.    You're still selling Arcoxia;
11  correct?
12      A.    Yes, we are.
13      Q.    And sitting here today, April --
14          MR. KIERNAN:  8th.
15  BY MR. SPECTER:
16      Q.    8th, thank you, 2005, you don't know
17  where prostacyclin is made today; correct?
18      A.    Correct.  And, in fact, we've not
19  been able to demonstrate any evidence, despite
20  looking very hard for it, that it's made in the
21  endothelial cells, which is the whole basis of the
22  FitzGerald hypothesis.
23      Q.    Well, you know it exists somewhere;
24  correct?
25      A.    That's the interpretation, but the

Page 858

1  issue at hand is that --
2      Q.    Sir, the only current question is,
3  you know prostacyclin exists somewhere; correct?
4  That's the only current question.
5      A.    That is certainly the current
6  thinking in the field, yes.
7      Q.    Now, do you recollect, I think you
8  told me before that you were at that -- well, let me
9  skip over that issue for a moment, in the interest
10  of time, for the patience of anyone unfortunate
11  enough to have to watch this film.
12          Let me ask you a different question,
13  again, about prostacyclin.
14          What is altered
15  prostacyclin/thromboxane A.sub.2 homeostasis?
16      A.    Sorry.  What is altered
17  prostacyclin/thromboxane A2?
18      Q.    A.sub.2 homeostasis.
19      A.    That -- homeostasis is the term, a
20  scientific term that is used to refer to the
21  balance, in this case, the balance between two
22  substances, one of them called thromboxane and the
23  other called thromboxane A2.  So, it's the balance
24  between two different substances that is being
25  referred to there.

Page 859

1      Q.    What is your position as to whether
2  people who have an altered prostacyclin/thromboxane
3  A.sub.2 homeostasis are at risk of developing
4  thromboembolic events?
5      A.    My opinion, my scientific opinion on
6  that issue, first, is that such a state that's
7  relevant for cardiovascular events has not been
8  established, despite extensive efforts by Merck and
9  scientists outside of Merck to try and establish it,
10  and, therefore, it is a hypothesis.  And that
11  hypothesis is one that is referred to as the
12  FitzGerald hypothesis, but has not been
13  demonstrated.  And I know of no evidence to support
14  it.
15      Q.    So, you're not satisfied that it's
16  true.  Is that fair?
17      A.    To the -- yes -- I'm not satisfied it
18  is true, and I also think that the underlying
19  fundamental basis, that is, the set of assumptions
20  that go into that hypothesis, have not
21  been verified, despite efforts to try to do so by
22  ourselves and others.
23      Q.    Let me give you a document that was
24  filed with the U.S. Patent Office by your colleague,
25  Dr. Scolnick.  And this was previously marked in Dr.

Page 860

1  Scolnick's deposition as Scolnick-6, and I have
2  marked it as Kim-5 -- you have the original.
3      A.    56.
4          - - -
5          (Whereupon, Deposition Exhibit Kim-56,
6          US Patent & Trademark Office Patent
7          Application Full Text and Image
8          Database, #20020016342 2-7-02,
9          "Combination therapy using Cox-2
10          selective inhibitor and thromboxane
11          inhibitor and composition therefor,"
12          (Scolnick) MRK-GAR0003079 -
13          MRK-GAR0003096 was marked for
14          identification.)
15          - - -
16          THE WITNESS:  Just give me a minute to read
17      the abstract here.
18  BY MR. SPECTER:
19      Q.    Sure.
20      A.    (Witness reviewing document.)
21      Q.    Are you with me?
22      A.    Yes.
23      Q.    Have you seen this before?
24      A.    No, I have not.
25      Q.    Can we agree this is a Merck

Confidential - Subject to Protective Order

Page 861

1  document?
2      A.    Excuse me?
3      Q.    Can we agree this is a Merck
4  document?
5      A.    Oh, I don't know.  It is a US patent
6  application.
7      Q.    Do you see at the bottom it says the
8  inventors are Scolnick, Edward, it lists some other
9  people as well, Kathleen Metters, the woman we just
10  talked about from Merck Frosst; correct?
11      A.    Yes.
12      Q.    And it says to send correspondence
13  regarding this to Merck & Co. on the first page?
14      A.    Okay.
15      Q.    This would appear to be a Merck
16  application; correct?
17      A.    Yes.
18      Q.    It defines on Page 5 in the paragraph
19  which is numbered 15, it defines patients who are at
20  risk for developing thromboembolic events; correct?
21      A.    I see what you're reading, yes.
22      Q.    And among those people who are at
23  risk of developing thromboembolic events, according
24  to this patent application, are "patients with
25  altered prostacyclin/thromboxane A.sub.2

Page 862

1  homeostasis."  Correct?
2      A.    I see what you're reading, yes.
3      Q.    You think that's wrong, don't you?
4      A.    What I think is --
5      Q.    Do you think that's wrong, sir?
6      A.    Do I think that it's wrong that
7  patients with altered prostacyclin/thromboxane
8  A.sub.2 homeostasis are -- should be classified as
9  patients who are at risk of developing
10  thromboembolic events?
11      Q.    That is the question.
12      A.    Okay.  I don't think it's wrong.  I
13  think it's unknown.
14      Q.    Well, this doesn't say that it's
15  unknown?
16      A.    It doesn't.  I agree it doesn't.
17      Q.    This says that affirmatively these
18  people are "at risk of developing thromboembolic
19  events."  Correct?
20      A.    Is your question what this says or
21  what I think?
22      Q.    Now my question is what this says.
23      A.    What this says is what you read.
24      Q.    Right.  This is a Merck document, and
25  it's telling the U.S. Patent Office regarding a

Page 863

1  proposal for a "Combination therapy using COX-2
2  selective inhibitor and thromboxane inhibitor and
3  compositions therefor," in other words, a request to
4  get a patent on a potential new drug, that among
5  other things that "'Patients who are at risk of
6  developing thromboembolic events'" are people that
7  have a family history of or are predisposed
8  genetically to "thromboembolic disorders, who have
9  had ischemic stroke," who have had, "transient
10  ischemic stroke," who have had a heart attack, those
11  people who have "unstable angina or chronic stable
12  angina" and "patients with altered
13  prostacyclin/thromboxane A.sub.2 homeostasis" as
14  well as people that have "higher than normal
15  thromboxane A.sub.2 levels leading to increase risk
16  for thromboembolism, including patients with
17  diabetes and rheumatoid arthritis."  Did I
18  paraphrase that paragraph reasonably correctly, sir?
19      A.    Yes, you did.
20      Q.    On this document I have no further
21  questions.
22          Now, sir, why don't we do this.
23  Let's take three minutes, and let me get my notes
24  together.  I'm almost finished.
25      A.    Okay.

Page 864

1      Q.    You'll be happy to hear.
2      A.    Okay.
3          THE VIDEOTAPE TECHNICIAN:  Stand by,
4  please.  The time is 3:12.  We are going off the
5  record.
6              - - -
7          (Whereupon, a recess was taken from
8      3:12 p.m. until 3:22 p.m.)
9              - - -
10          THE VIDEOTAPE TECHNICIAN:  The time
11  is 3:22.  We're back on the record.
12  BY MR. SPECTER:
13      Q.    Okay.  Dr. Kim, thank you for your
14  patience.  I have just a couple of other areas.  I
15  think I'll be able to get everybody out of here
16  before the 4:45 time that we agreed at the lunch
17  hour.
18          MR. SPECTER:  What's the matter?
19  Anybody else is free to go, by the way.  No one has
20  to stay, except for Dr. Kim.
21  BY MR. SPECTER:
22      Q.    Dr. Kim, I want to talk to you for a
23  couple of minutes about your efforts to reconcile
24  VIGOR with APPROVe.  I'm sure you've thought about
25  that a lot.

KS-000542

Confidential - Subject to Protective Order

Page 865

1    A.    My efforts to reconcile VIGOR with
2  APPROVe?
3    Q.    Yes.
4    A.    Okay.
5    Q.    Would that be true?  You've thought
6  about it a lot?
7    A.    I've thought about VIGOR, I've
8  thought about APPROVe a lot, I've thought about the
9  relationship, if any, between the two, yes.
10   Q.    Are you able to reconcile them?
11   A.    When you say "reconcile them" --
12   Q.    Well, have you been able to reconcile
13 the results of one trial with the results of the
14 other trial?
15   A.    Well, I think that, first of all, one
16 needs to understand or one needs to recognize that
17 the trials were done in different patient
18 populations.  VIGOR was done in a patient population
19 where patients had rheumatoid arthritis, whereas
20 APPROVe was done in a patient population with
21 patients with a prior history of colon polyps, as we
22 discussed.  And the --
23   Q.    Is that one possible explanation as
24 to why we saw an increased incidence of CV events at
25 six weeks in VIGOR but not in APPROVe?

Page 866

1         MR. KIERNAN:  Objection to form.
2         THE WITNESS:  I don't think that's
3  the reason why we saw a difference in cardiovascular
4  events at six weeks in VIGOR versus in APPROVe.  I
5  think the reason for that is that the anti-platelet
6  effects of naproxen has an effect on the
7  cardiovascular outcomes from the beginning, that is,
8  it decreases the cardiovascular event rate from the
9  beginning.
10        In fact, one of the things that we
11 discussed internally, as well as with the external
12 experts when we were discussing the APPROVe results,
13 where there was not a difference in the
14 cardiovascular event rate between Vioxx and placebo
15 that was discernible for the first 18 months of the
16 trial, is the comment made both internally and by
17 several external experts that such a result was not
18 consistent with the FitzGerald hypothesis, with the
19 simple FitzGerald hypothesis that speculated on an
20 imbalance of prostacyclin to thromboxane.  So that
21 one of the key differences between the two studies,
22 in my opinion, as well as in the opinion of
23 outside -- or the opinion of others, is that there
24 was a difference that was observed, as you say,
25 early on in the VIGOR trial, which was not observed

Page 867

1  in the APPROVe trial, and that in the VIGOR trial,
2  such an immediate or an early difference in the
3  cardiovascular event rate was consistent with an
4  effect on thrombosis, that is, the aggregation of
5  the platelets, whereas the difference in the
6  cardiovascular event rate in the APPROVe trial for
7  the first 18 months was not consistent with a simple
8  hypothesis that was based upon a
9  prostacyclin/thromboxane imbalance or any other
10 hypothesis that relates to thrombosis of platelets
11 per se.
12 BY MR. SPECTER:
13   Q.    Have you considered the issue of
14 cumulative dose in APPROVe compared to VIGOR, and
15 that is to say, that the dosage of Vioxx in APPROVe
16 was 25 milligrams, and you began to see a difference
17 in the event rates at 18 months, and the dosage in
18 VIGOR was --
19   A.    50 milligrams.
20   Q.    -- 50 milligrams, was twice that, and
21 there appears to be an acceleration of the CV events
22 at about eight or nine months, so that in both
23 clinical trials, there appears to be an acceleration
24 of CV events in Vioxx versus the comparator at about
25 the same cumulative dosage?  Have you considered

Page 868

1  that?  First of all, do you agree that that's true?
2    A.    So, what you're referring to is that
3  in the APPROVe study, there was no difference
4  between Vioxx and placebo for the first 18 months,
5  and then beginning after 18 months, there was a
6  difference that was discernible in the event rates
7  between the two groups.  Whereas, in the VIGOR
8  trial, although as we've discussed, there was a very
9  early separation of the event rates between Vioxx
10 and naproxen, that there is a numerical -- or that
11 there is an apparent increase in the cardiovascular
12 event rates when one plots this on what's called a
13 Kaplan-Meier plot that's seen, and I don't remember
14 exactly where it was, but later on in the trial.
15 That apparent increase in the cardiovascular event
16 rate in that Kaplan-Meier plot I do remember was
17 very carefully analyzed by the Merck statisticians,
18 and in particular, analyzed for whether or not the
19 data on a statistical basis were consistent with a
20 -- with a constant, with what's called a constant
21 hazard rate over the time of the trial versus a
22 non-constant hazard rate.  And I remember that in a
23 very careful and thorough analysis, the
24 statisticians -- and we showed this to the FDA, and
25 we had numerous discussions with the FDA around this

KS-000543

61 (Pages 865 to 868)

Confidential - Subject to Protective Order

Page 869

1  issue, that there was not evidence for a
2  non-constant hazard ratio in the VIGOR trial,
3  whereas, in the APPROVe study, a similar sort of
4  statistical analysis, when done, definitely
5  demonstrates a non-constant hazard ratio.
6          So, in conclusion, the relationship
7  that -- the proposed relationship that you're
8  referring to between the time dependence and the
9  non-constant hazard ratio in the APPROVe study and
10  the appearance of an increase rate in the
11  Kaplan-Meier plot of the VIGOR study does not stand
12  up to a statistical -- a scientific analysis.
13      Q.    How much stock do you hold in Merck?
14      A.    I believe that at the end of 2004 I
15  held approximately 16,000 shares of Merck stock.
16      Q.    How many options to purchase stock do
17  you own?
18      A.    I believe, again, at the end of 2004
19  that I have been issued approximately 500,000
20  options to purchase Merck stock.
21      Q.    So, your financial condition could be
22  significantly affected by the value of Merck stock;
23  correct?
24      A.    Yes.
25      Q.    Do you have the right to sell your

Page 870

1  stock while still a Merck employee?
2      A.    Do I have a right to sell my stock?
3      Q.    Yes.
4      A.    Yes, although -- yes, I do have a
5  right to sell, and it's subject to all sorts of
6  restrictions, but, yes, I have a right to sell my
7  stock.
8      Q.    When you say "all sorts of
9  restrictions," you're not allowed to sell your stock
10  on inside information?
11      A.    That's correct.
12      Q.    Is there some other restriction?
13      A.    I'm not familiar with all the details
14  of it, to be honest, but certainly --
15      Q.    That's the main one; isn't it?
16      A.    Certainly a major consideration is --
17      Q.    You don't know of any others, do you?
18      A.    Not that I know of.
19      Q.    You're allowed to purchase your
20  options and then sell the stock -- I should say
21  you're allowed to purchase the stock that you're
22  permitted to buy because of your options whenever
23  you want; is that correct?
24      A.    I believe that's correct, but I
25  actually don't know.

Page 871

1      Q.    Then you're permitted to sell the
2  stock while you're still an employee of Merck; is
3  that correct?
4      A.    Yes, I believe that's correct.
5      Q.    And Merck stock is trading at around
6  what dollar value currently?
7      A.    I believe it's around $32 a share.
8      Q.    So, your current stock in Merck is
9  worth around $500,000; is that correct?
10      A.    Correct.
11      Q.    And if you were to exercise all of
12  your options to buy Merck stock, the stock would be
13  worth, if you bought it today, around $16 million?
14      A.    No, that's not correct.  And the
15  reason why that's not correct is that I believe all
16  of the options that I'm referring to that I had at
17  the end of 2004 have an option exercise price that's
18  higher than the current trading value of the stock.
19      Q.    Maybe you're slightly out of your
20  field here.
21      A.    Okay.
22      Q.    But my question was, what would the
23  stock be worth if you purchased it?  And the stock
24  would be worth 32 times 500,000; correct?  Not what
25  it would cost you to purchase, but what it would be

Page 872

1  worth?
2      A.    I see.
3          MR. KIERNAN:  Object to the
4  characterization, "out of his field."  I think he
5  was answering it correctly.
6          THE WITNESS:  Yes.
7  BY MR. SPECTER:
8      Q.    Are you a little out of your field
9  talking about stock price, Dr. Kim?
10      A.    I certainly could be, but let me just
11  try and answer your question, but do so in a way
12  that I feel is complete.
13          The value of the stock, were I to
14  exercise my options, after I exercised them would be
15  $32 times 500,000 shares, but the amount --
16      Q.    And that was my question, wasn't it?
17      A.    But the purchase price would be
18  substantially greater than that.
19      Q.    Sure.  And if you can get Merck stock
20  to go up through your work and that of your
21  colleagues, then you could end up purchasing Merck
22  stock for less than what it's worth on the day you
23  purchase it; correct?
24          MR. KIERNAN:  Object to the form.
25          THE WITNESS:  Say that again, I'm

KS-000544

Confidential - Subject to Protective Order

Page 873

1  sorry.  If I can get the Merck stock to go up?
2  BY MR. SPECTER:
3      Q.    Yes.
4      A.    Yes, then?
5      Q.    Then it may be the case that when you
6  buy your Merck stock, when you exercise your
7  options, it will be worth more than what you paid
8  for it?
9      A.    If the Merck stock goes up, yes, I
10 can exercise -- and it goes above the option
11 exercise price, then when I purchase the stock, it
12 would then be worth -- unlike now, it would be worth
13 more than what I paid for the -- to exercise my
14 options.
15     Q.    What's the option exercise price?
16     A.    Oh, it varies.
17     Q.    What's the blended price?
18     A.    Oh, I don't know the blended price as
19 you're referring to it, it's approximately -- there
20 are options at $45, and they go all the way up to
21 options at around $80 per share.
22     Q.    You haven't done the math on the
23 blended price?
24     A.    No, I have not.
25     Q.    Somewhere between 45 and $80?

Page 874

1      A.    Those are the --
2      Q.    Somewhere between that is where the
3  blended price would be; correct?
4      A.    Correct.
5      Q.    Can you buy some options and not
6  others?
7      A.    I'm sorry?
8      Q.    Can you buy some of the stock
9  pursuant to your options and not others?
10     A.    Yes.
11     Q.    So, you could buy the stock at 45 if
12 you chose to?
13     A.    Yes, if the options have what's
14 referred to as vested.  Because not all these
15 options that I'm referring to have, in fact, vested.
16     Q.    That's a matter of time; correct?
17     A.    That's a matter of time, in terms of
18 when I have the right to exercise those options.
19     Q.    Have you taken any formal training in
20 ethics while at Merck?
21     A.    Have I taken any formal training in
22 ethics while at Merck?  No, I have not.
23     Q.    Do you recollect --
24     A.    Oh, actually -- well, there may be an
25 ethics -- there's probably -- well, I don't -- I

Page 875

1  don't remember exactly.  There might have been an
2  online ethics question -- form or questionnaire in
3  instructions that I may have participated in.
4      Q.    Was that training or was that just
5  some questions about --
6      A.    No.  I think -- well, I don't
7  remember exactly, so, I'd better not say, because I
8  don't remember exactly.
9      Q.    But you don't recall taking any
10 formal training in ethics at Merck; correct?
11     A.    I don't recall it right now, no.
12     Q.    Have you given thought to potential
13 conflicts of interest that exist for you in your
14 position as president of Merck Research
15 Laboratories?
16     A.    Have I given thought to it?
17     Q.    Yes.
18     A.    Not terribly much, no.  I think that
19 there was a potential for all sorts of conflict of
20 interest, but I haven't given it much thought.
21     Q.    Well, as part of doing your job
22 correctly, need you be sensitive to those potential
23 conflicts?
24     A.    Absolutely.
25     Q.    Have you thought about this issue --

Page 876

1  have you thought about the issue -- let me back up.
2           We've discussed before, just to set
3  the background on this, that you played a pivotal
4  role in the withdrawal of Vioxx; correct?
5      A.    Yes.
6      Q.    And Mr. Gilmartin, he's not a
7  scientist, he relied upon you; correct?
8      A.    Mr. Gilmartin is not a scientist, and
9  Mr. Gilmartin relied on me, yes.
10     Q.    And you knew from when you took over
11 as president of Merck Research Labs in January of
12 2003, that you, one day, might have to recommend
13 that a blockbuster drug like Vioxx be taken off the
14 market; correct?
15     A.    I was aware of that possibility, yes.
16     Q.    And you know that the decision to
17 take a drug like Vioxx off the market could have a
18 very negative effect on the stock price of Merck
19 stock; correct?
20     A.    Yes.
21     Q.    It wasn't a surprise to you that the
22 stock in Merck went down when Vioxx was withdrawn;
23 correct?
24     A.    No, it was not.
25     Q.    Have you considered this potential

KS-000545

Confidential - Subject to Protective Order

Page 877

1  issue at Merck with you as president, either with
2  Vioxx or some other pharmaceutical, and that is that
3  you are significantly in control of the decision
4  whether or not to withdraw a bad drug before you
5  make a decision on selling your stock while a Merck
6  employee?
7           MR. KIERNAN:  Object to form.
8           THE WITNESS:  I'm sorry, have I
9  considered the situation where I am in the position
10  to make a recommendation about withdrawing a drug
11  before I sell my stock?
12  BY MR. SPECTER:
13      Q.    Correct.
14      A.    Have I considered that is the
15  question?
16      Q.    Correct.
17      A.    No, I haven't considered that.
18      Q.    Well, because you have the right to
19  sell your stock while at Merck, at least as a
20  theoretical matter, you have the power to sell your
21  stock and thereafter recommend that a bad drug be
22  withdrawn; correct?
23           MR. KIERNAN:  Object to form.
24           THE WITNESS:  I have the power -- I
25  mean, if you're asking me whether that is a possible

Page 878

1  thing to do --
2  BY MR. SPECTER:
3      Q.    Yes.
4      A.    -- it is a possible thing to do.  But
5  it would be unethical, and it would be a violation
6  of the guidelines -- not guidelines, regulations on
7  trading on the basis of insider information.
8      Q.    Well, whether it would be or not, the
9  decision by the company to withdraw the drug would
10  not have been made under that hypothetical at the
11  time that you sold your stock under that
12  hypothetical; correct?
13           MR. KIERNAN:  Object to form.
14           THE WITNESS:  I'm losing you, sir.
15  I'm sorry.
16  BY MR. SPECTER:
17      Q.    Well, since you make the decision or
18  you've got a big part in it about whether to
19  recommend the withdrawal of a drug, if you don't
20  communicate your view that a drug should be
21  withdrawn, then the decision has not been made to
22  withdraw the drug at the time the stock is sold, at
23  least under that hypothetical; correct?
24           MR. KIERNAN:  Object to form.
25           THE WITNESS:  I don't know what the

Page 879

1  regulations are around what constitutes a decision
2  being made in that regard.
3  BY MR. SPECTER:
4      Q.    Have you thought about a mechanism at
5  Merck where that scenario, and let me repeat the
6  scenario so that we're clear on what it is, the
7  scenario where the president of Merck Research
8  Laboratories has the capability of selling his stock
9  before a bad drug is withdrawn, how that scenario
10  could be prevented?
11      A.    I've not considered this -- the
12  issues that you are raising right here.
13      Q.    Well, I'd like you to consider it
14  with me for a moment.  And could that be prevented,
15  Dr. Kim, by not permitting the president of Merck
16  Research Laboratories to sell his stock while he is
17  an employee of Merck?
18           MR. KIERNAN:  Object to form.
19  Counsel, he's not here to entertain securities
20  hypotheticals.
21           MR. SPECTER:  This is not a
22  securities hypothetical.  This is a question about
23  whether he has or he's operating under a procedure
24  at Merck that is appropriate under the
25  circumstances.

Page 880

1  BY MR. SPECTER:
2      Q.    And I want to know, sir, whether you
3  think it would be more appropriate for you not to be
4  permitted to sell your stock while you're a Merck
5  employee?
6      A.    I don't think that that's -- I think
7  that the key issue here is whether or not one is
8  acting ethically in terms of when one sells stock or
9  performs any other aspect of a financial
10  transaction.
11      Q.    Have there been discussions at Merck
12  that you've been a party to or that you've heard
13  about, with respect to not permitting the president
14  of Merck Research Laboratories or other persons at a
15  high executive level to be able to sell their stock
16  while a Merck employee?
17      A.    No, I've not been party to any of
18  those discussions, or if they existed.
19           MR. SPECTER:  Sir, I have no further
20  questions for you.  Thank you for being here today.
21           MR. KIERNAN:  Thank you.  I
22  understand that counsel for Texas, who is scheduled
23  to go next is no longer here; is that correct?
24           MR. KRISTAL:  He had some sort of
25  emergency.

KS-000546

Confidential - Subject to Protective Order

Page 881

1        MR. SPECTER:  Let's go off the video.
2        THE VIDEOTAPE TECHNICIAN:  Stand by,
3    please.  3:43, off the video record.
4        MR. SPECTER:  Just to protect the
5    record for a moment, we had a discussion, I'm not
6    sure if it was on the record or off the record,
7    before we got started with Dr. Kim today where it
8    was acknowledged that Texas has a different day to
9    go.  It's not that Texas was supposed to start
10   today, and they're not here to start.
11       MR. KIERNAN:  All right.  Putting
12   that issue aside, we're ready to go with Texas.  If
13   they're not here, then we can revisit that and
14   potentially start another day, after which we intend
15   to do a direct examination.
16       MR. SPECTER:  Sure.
17       MR. KIERNAN:  So, we'll, I guess,
18   reconvene this deposition and leave it open until
19   that time.
20       MS. RHOADS:  That's not true.  I told
21   you that I have some questions.
22       MR. KIERNAN:  If you'd state your
23   name on the record and the law firm that you
24   represent, because we do not agree with your view of
25   Judge Higbee's order.

Page 882

1        We understand you to be from The
2    Beasley Firm here in Philadelphia, and that you have
3    cases in New Jersey, as well as Delaware, and that
4    you're now contending that because you have a case
5    in Delaware, you're allowed to be a third examiner
6    here today before Texas.  We respectfully disagree
7    with that position.  If I've misstated your
8    position, let me know.
9        MS. RHOADS:  Yes, you have misstated
10   it.
11       MR. KIERNAN:  Okay.  Would you state
12   your name for the record?
13       MS. RHOADS:  I'm here to ask
14   questions because we served a Notice of Deposition
15   which was not quashed.  You made no effort to do
16   anything with The Court with regard to that Notice
17   of Deposition, which was in line with Judge Higbee's
18   order that our office could ask questions.  Our
19   office has asked questions at other depositions
20   following the Notice of Deposition, which, by the
21   way, you have in your hands right now, which I've
22   passed down the table.
23       MR. KIERNAN:  And just so the record
24   is clear, you're referring to "our office" being The
25   Beasley Firm here in Philadelphia; correct?

Page 883

1        MS. RHOADS:  Yes.
2        MR. KIERNAN:  And you have cases in
3    New Jersey pending now; correct?
4        MS. RHOADS:  Yes.
5        MR. KIERNAN:  We contend that you are
6    subject to Judge Higbee's order regarding the order
7    of this deposition, how it's to be handled.  And we
8    may disagree about what that order means, but it is
9    our view that Texas is to go next and then Merck
10   then gets a chance to ask questions on direct
11   examination.
12       MS. RHOADS:  There's no order that
13   sets out this.  And besides that, sir, we're wasting
14   time.  I just have ten minutes of questions.  If I
15   can just proceed on my ten minutes of questions --
16       MR. KIERNAN:  No, we're going to --
17       MS. RHOADS:  -- pursuant to the
18   Notice of Deposition.
19       MR. KIERNAN:  We're going to follow
20   The Court's order and limit it to two examiners from
21   New Jersey and not get into this just a few more
22   questions from various attorneys.
23       MS. RHOADS:  Sir, I can show you
24   other transcripts in which there are more than two
25   examiners.  There have been three examiners in other

Page 884

1    depositions, and that's what I want to do, sir, for
2    ten minutes.
3        MR. KIERNAN:  For purposes of today,
4    we're going to follow what we understand to be Judge
5    Higbee's order.  I understand you have a different
6    view.  If there's anything else you want to say on
7    the record, please do.  Other than that, we're going
8    to adjourn until Texas is ready to ask their
9    questions.
10       MR. KRISTAL:  May I just say
11   something?
12       For the record, I think you may have
13   misspoken when you were looking at the deposition
14   notice.  It is not a Delaware case, it's a Delaware
15   County, Pennsylvania case.  I don't know if that
16   makes a difference.
17       MR. KIERNAN:  Okay.  I don't think it
18   makes any difference to the analysis, but I
19   appreciate the clarification.
20       MS. RHOADS:  Sir, I'd just ask that
21   you allow me to ask the witness ten minutes of
22   questions.
23       MR. KIERNAN:  I think we've already
24   made it clear that we are not in a position of
25   allowing multiple examiners at this time.

Confidential - Subject to Protective Order

Page 885

1        MS. RHOADS: Other plaintiffs'
2   counsel, there have been other times when three
3   people have asked questions.
4        Shanin, is that true?
5        MR. SPECTER:  I have not been a party
6   to that.  Since you've asked me, you're making me
7   answer, and I have not been a party to that.
8        MS. RHOADS:  Where three attorneys
9   have asked questions?
10        MR. SPECTER:  I have not been a party
11   to that.
12        MR. KIERNAN:  No, I don't think
13   that's what we've been doing.
14        MS. RHOADS:  The last time it was The
15   Lanier Firm and The Beasley Firm and the Kline &
16   Specter Firm, it most certainly was.  It was three
17   people several times.
18        MR. KRISTAL:  I don't know the answer
19   to the question you're asking --
20        MR. SPECTER:  But Mark is asking
21   questions in the Texas litigation.
22        MR. KIERNAN:  All right.  Are we all
23   set to adjourn?  Thank you.
24        (Whereupon, Mr. Kiernan and the
25   witness left the room.)

Page 886

1        MS. RHOADS:  That's just improper.
2   Can I just note that the witness said he was
3   available until 4:45, and it is now 3:50.
4              - - -
5        (Whereupon, the deposition adjourned
6        at 3:50 p.m.)
7              - - -
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 887

1              CERTIFICATE
2
3        I, LINDA L. GOLKOW, a Notary Public
4   and Certified Shorthand Reporter of the State of New
5   Jersey, do hereby certify that prior to the
6   commencement of the examination, PETER S. KIM was
7   duly sworn by me to testify to the truth, the whole
8   truth and nothing but the truth.
9        I DO FURTHER CERTIFY that the
10   foregoing is a verbatim transcript of the testimony
11   as taken stenographically by and before me at the
12   time, place and on the date hereinbefore set forth,
13   to the best of my ability.
14        I DO FURTHER CERTIFY that I am
15   neither a relative nor employee nor attorney nor
16   counsel of any of the parties to this action, and
17   that I am neither a relative nor employee of such
18   attorney or counsel, and that I am not financially
19   interested in the action.
20        _____
21        LINDA L. GOLKOW, CSR
        Notary Number:  1060147
22        Notary Expiration:  1-2-08
        CSR Number:  30XI176200
23        Dated:  April 14, 2005
24
25

Page 888

1        ACKNOWLEDGMENT OF DEPONENT
2
3        I,_____, do hereby
   certify that I have read the foregoing pages, 628 TO
4   890, and that the same is a correct transcription of
   the answers given by me to the questions therein
5   propounded, except for the corrections or changes in
   form or substance, if any, noted in the attached
6   Errata Sheet.
7
8   _____
   PETER S. KIM                DATE
9
10
11   Subscribed and sworn
   to before me this
12      day of        , 20   .
13   My commission expires:
14
15   Notary Public
16
17
18
19
20
21
22
23
24
25

KS-000548

66 (Pages 885 to 888)

Esquire Deposition Services

Confidential - Subject to Protective Order

Page 889

1      - - - - -
        E R R A T A
2      - - - - -
3    PAGE   LINE   CHANGE
4    ____   ____   _____
5    ____   ____   _____
6    ____   ____   _____
7    ____   ____   _____
8    ____   ____   _____
9    ____   ____   _____
10   ____   ____   _____
11   ____   ____   _____
12   ____   ____   _____
13   ____   ____   _____
14   ____   ____   _____
15   ____   ____   _____
16   ____   ____   _____
17   ____   ____   _____
18   ____   ____   _____
19   ____   ____   _____
20   ____   ____   _____
21   ____   ____   _____
22   ____   ____   _____
23   ____   ____   _____
24   ____   ____   _____
25

Page 890

1          LAWYER'S NOTES
2    PAGE  LINE
3    ____  ____  _____
4    ____  ____  _____
5    ____  ____  _____
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
25   ____  ____  _____

KS-000549