34630674

E-SERVICE

Dec 2 2010
9:06AM

1          UNITED STATES DISTRICT COURT
2          EASTERN DISTRICT OF LOUISIANA

3    ****************************************************************

4
IN RE: VIOXX PRODUCTS
5    LIABILITY LITIGATION

6                         MDL DOCKET NO. 1657
                         SECTION L
7                         NEW ORLEANS, LOUISIANA
                         WEDNESDAY, OCTOBER 27, 2010, 1:00 P.M.
8
THIS DOCUMENT RELATES TO:
9
ATTORNEY FEE DISPUTE
10   ASSIGNED BY THE COURT TO
SPECIAL MASTER PATRICK A. JUNEAU
11   FOR RESOLUTION AND RECOMMENDATION
INVOLVING:
12
249 CLAIMANTS FOR WHOM SOL H. WEISS
13   IS REGISTERED AS PRIMARY COUNSEL
WITH THE CLAIMS ADMINISTRATOR
14
AND
15
31 CLAIMANTS FOR WHOM JAMES C. PETERSON
16   IS REGISTERED AS PRIMARY COUNSEL WITH
THE CLAIMS ADMINISTRATOR
17
****************************************************************
18
               TRANSCRIPT OF HEARING PROCEEDINGS
19          HEARD BEFORE SPECIAL MASTER PATRICK A. JUNEAU

20

21   APPEARANCES:

22

23   SPECIAL MASTER:        PATRICK A. JUNEAU
                         THE HARDING CENTER
24                         1018 HARDING ST.
                         SUITE 202
25                         P. O. DRAWER 51268
                         LAFAYETTE, LA 70505

EXHIBIT

7

```
 1   APPEARANCES CONTINUED:

 2

 3   FOR TERESA TORISEVA:              LEVICOFF SILKO & DEEMER
                                      BY:   AVRUM LEVICOFF, ESQUIRE
 4                                    650 SMITHFIELD STREET
                                      SUITE 1900
 5                                    PITTSBURGH PA   15222

 6
                                      TORISEVA LAW
 7                                    BY:   TERESA C. TORISEVA, ESQUIRE
                                      1446 NATIONAL ROAD
 8                                    WHEELING WV   26003

 9

10   FOR ANAPOL SCHWARTZ
     WEISS COHAN FELDMAN
11   & SMALLEY:                       ANAPOL SCHWARTZ WEISS
                                      COHAN FELDMAN & SMALLEY
12                                    BY:   BARRY HILL, ESQUIRE
                                            SOL H. WEISS, ESQUIRE
13                                    89   12TH STREET
                                      WHEELING WV   26003
14

15                                    ANAPOL SCHWARTZ
                                      BY:   GREGORY S. SPIZER, ESQUIRE
16                                    1040 KINGS HIGHWAY NORTH
                                      SUITE 304
17                                    CHERRY HILL NJ   08034

18

19   FOR HILL PETERSON
     CARPER BEE & DEITZLER:           HILL PETERSON CARPER BEE & DEITZLER
20                                    BY:    JAMES C. PETERSON, ESQUIRE
                                      NORTHGATE BUSINESS PARK
21                                    500 TRACY WAY
                                      CHARLESTON WV   25311
22

23
     FOR CLARK PERDUE & LIST:         CLARK PERDUE & LIST
24                                    BY:   D. ANDREW LIST, ESQUIRE
                                      471 EAST BROAD STREET
25                                    SUITE 1550
                                      COLUMBUS OH   43215
```

1  APPEARANCES CONTINUED:

2

3  OFFICIAL COURT REPORTER:         CATHY PEPPER, CCR, RMR, CRR
                                    CERTIFIED REALTIME REPORTER
4                                   500 POYDRAS STREET, ROOM B406
                                    NEW ORLEANS, LOUISIANA 70130
5                                   (504) 589-7779

6  PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
   PRODUCED BY COMPUTER.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **I N D E X**
2
3   EXAMINATIONS                                    PAGE
4
5   TERESA TORISEVA........................................  73
6
7
8                        **E X H I B I T S**
9   DESCRIPTION                                     PAGE
10
11  EXHIBIT SM-1 WAS ADMITTED..............................  84
12  EXHIBIT SM-2 WAS ADMITTED..............................  84
13  EXHIBIT BARRY HILL 1 WAS ADMITTED......................  84
14  EXHIBIT LIST 1 IS ADMITTED.............................  84
15  EXHIBIT TORISEVA 1 WAS ADMITTED........................  84
16  EXHIBIT PETERSON 1 WAS ADMITTED........................  84
17  EXHIBITS 4 AND 6 OF THE LIST 1 EXHIBIT WILL BE IN       85
18  EVIDENCE BUT UNDER SEAL................................
19
20
21
22
23
24
25

```
1              P-R-O-C-E-E-D-I-N-G-S

2              WEDNESDAY, OCTOBER 27, 2010

3           A F T E R N O O N   S E S S I O N

4                 (IN OPEN COURT)

5

6

7         THE DEPUTY CLERK:  Everyone rise.

8         SPECIAL MASTER JUNEAU:  Before I do the appearances, let

9  me just dictate this on the record.  We're here for the scheduled

10 hearing in this matter involving In re Vioxx Products Liability

11 Litigation, MDL Number 1657.  It involves the lien dispute

12 between Toriseva and the Anapol Schwartz firm, the Hill Peterson

13 firm, the Clark Purdue firm and Barry Hill.

14      Let's have counsel make their appearances.

15         MR. LEVICOFF:  I represent the lienor, Teresa Toriseva.

16 My name is Avrum Levicoff.  I'm with the Pittsburgh law firm of

17 Levicoff, Silko & Deemer.

18         SPECIAL MASTER JUNEAU:  Ms. Toriseva is here.

19         MS. TORISEVA:  Yes.

20         SPECIAL MASTER JUNEAU:  I'm looking at her.

21         MR. LEVICOFF:  Yes, Ms. Toriseva is here with me today.

22         SPECIAL MASTER JUNEAU:  Let me just get the other

23 appearances, please.

24         MR. HILL:  Barry Hill for myself.

25         MR. LIST:  Andy List for Clark, Purdue.
```

 1          MR. SPIZER:  Greg Spizer for Anapol Schwartz.

 2          SPECIAL MASTER JUNEAU:  How do you spell your last name,

 3   Mr. Spizer?

 4          MR. SPIZER:  It's S-P-I-Z-E-R.

 5          MR. PETERSON:  Your Honor, I'm James C. Peterson for

 6   Hill, Peterson, Carper, Bee and Deitzler.

 7          SPECIAL MASTER JUNEAU:  All right.  Just for the

 8   purposes of the record for counsel, I have here before me the

 9   respective books that have been issued before, but I know there

10   were some pending motions that were filed.  I want to see if we

11   can address those now.

12      And I think, Mr. Hill, that came from either your office or

13   your side of the fence.

14          MR. HILL:  Yes.

15          SPECIAL MASTER JUNEAU:  Do you want to address those

16   motions?

17          MR. HILL:  Well, I don't know that there is anything to

18   add that wasn't in the motions themselves.  I don't want to bore

19   you with repeating what's already been said in writing.

20      I would only draw the Court's attention to the fact that

21   the -- there are three motions.  Mr. Levicoff has not responded

22   in writing to any of those three.

23      That Local Rule 5.7 -- Local Rule 7.5(e) says that a

24   responsive motion is to be filed no later than the eighth

25   calendar day prior to the noticed hearing date; that the

1  opposition memorandum in duplicate must be in the hands of the

2  judge who will hear the motion no later than the day the

3  memorandum is due to be filed.

4      And, also, if we look to the Vioxx Master Settlement

5  Agreement, the time frame there under 8.1.2 is a responsive

6  memorandum is required within 15 days after the matter is

7  presented to the Court by the party bringing the motion.

8      Regardless of which of those we use, the first motion was

9  noticed for hearing by you on September 29.  The second motion

10 was noticed for hearing by you on October 5.  The third one was

11 noticed by hearing -- for hearing by you on October 18.  More

12 than eight days have passed, and nothing has been submitted or

13 served on us.

14     And they were served by us, sequentially, September 21,

15 September 28, and October 6; so, if we use the 15 days from the

16 Master Settlement Agreement, or the eight days from the local

17 rule, either way, there has been no response, and that entitles

18 the Court, should you wish to do so, to deem all three motions

19 unopposed.

20     As I say, I don't see any benefit to reiterating what's in

21 the motions.  You've seen those, and I'll let it go at that.

22         SPECIAL MASTER JUNEAU:  Do you want to reply, please?

23         MR. LEVICOFF:  Yes, thank you.  I will address the

24 substance of the motions briefly.

25         SPECIAL MASTER JUNEAU:  No, but I want to know about

1  the -- the first thing I want to address is the reply, the
2  question about the reply under the rule.

3      MR. LEVICOFF:  Candidly, I was not at all sure whether
4  or not motions for the entry of monetary sanctions were embraced
5  by the scope of the proceedings, number one.

6      Number two, the motions seek the entry of an order
7  compelling me to show cause.  My thought on this was that if we
8  appeared here, and if there was a recommendation and subsequently
9  an order requiring me to show cause, that that would be the
10  appropriate time to respond to the substance.

11      As far as the show cause order, again, I wasn't even sure if
12  that was within the scope of these proceedings.  Maybe I
13  misunderstood that; and, certainly, if there is a show cause
14  order entered, I would show cause why a monetary sanction would
15  be inappropriate.

16      But I actually -- I tended to view those motions as a
17  distraction from the focal point of what I thought the proceeding
18  was about, which was the viability of the lien.

19      SPECIAL MASTER JUNEAU:  Well, it is true that we have a
20  lot of material that's submitted with regard to the merits of the
21  thing; but, we have rules of court that are to be followed that
22  establish it pretty clear what those are.  I don't really know of
23  any ambiguity there.

24      I'm a little bit failing to understand why you didn't
25  comply.  You didn't understand it, or you didn't read it, or you

1  didn't know?

2         MR. LEVICOFF:  Well, the answer is I'm not familiar with

3  the local rule.

4         SPECIAL MASTER JUNEAU:  But that's your obligation.

5         MR. LEVICOFF:  It may well be.

6         SPECIAL MASTER JUNEAU:  Well, not very well, it is your

7  obligation.  And so what I'm struggling with now is it appears

8  that we have a situation where you did not comply with the rules

9  insofar as the motions are concerned.

10        With that statement, let me ask you a question, Mr. Hill,

11 please.

12        Thank you.

13        MR. HILL:  Yes, sir.

14        SPECIAL MASTER JUNEAU:  I want you, just briefly,

15 because, I mean, I have the background information already here,

16 Mr. Hill, I want you just to briefly articulate the three motions

17 that we have here, and then I'm going to make a decision how

18 we'll proceed.

19        MR. HILL:  Okay, I'll try to get them in the correct

20 order.

21        The first one -- the three are as follows:  Your June 18,

22 2010, letter order required the parties to exchange memoranda of

23 law and fact by July 29th.

24        SPECIAL MASTER JUNEAU:  That's correct.

25        MR. HILL:  On July 29th, I served a memorandum of law

1  and fact with probably 50 or 60 exhibits on Mr. Levicoff.

2      On the same day, the attorneys from Clark, Purdue and Hill,

3  Peterson also served memoranda on Mr. Levicoff.  We received

4  nothing from him.

5      The time period for depositions that you had allowed for in

6  your order came and went.  We didn't ask for any depositions

7  because, in the absence of any memoranda -- and you had made it

8  clear that the memorandum to be exchanged on July 29th must be

9  the same one you ultimately file here with you.

10     Having received nothing from him, we didn't proceed to take

11 any depositions.  We didn't know what his position was or his

12 client's position was on anything because we had nothing.

13     We then, some 38, 37 days, which you can count it two

14 different ways, it doesn't matter, in that time frame we received

15 it with an e-mail, which has been attached to the motion we

16 filed -- the memoranda in support of the motion, saying he

17 inadvertently forgot to do it.

18     Well, I know one thing.  I will bet you every year, when

19 Mr. Levicoff has to renew his attorney malpractice insurance,

20 there is a question on there from the company, do you maintain a

21 docket control system, and does it have a backup system with it,

22 and is it established on a computer network of some sort, and

23 I'll bet that question gets answered "yes" every year.  So, for

24 whatever reason, either neglect or indifference, this didn't get

25 on his system.

1      It's worse, though, because on the day he was supposed to

2  submit it, he wrote two letters to you regarding matters

3  involving the Hill, Peterson firm and the Clark, Purdue firm.  He

4  wrote those letters the same day he was supposed to be sending

5  out the memo.  So he had the file out, at least, to use that term

6  generally, on the very day the obligation was due.

7      Surely, it would have triggered something when he got ours.

8  If I'm getting this from the other side, is there perhaps

9  something I should be doing?  Nothing.  No explanation other than

10  "I forgot."

11      Now, the next one is the settlement conference.  And you

12  were very clear in your letter order, in bold type, underlined,

13  these timelines, these dates will be strictly enforced.

14      On the settlement conference, you required the parties to

15  meet and confer by a specific date.  If we couldn't agree on a

16  place, do it in New Orleans.

17      The day you sent the letter order out, June 18th, Attorney

18  List responded for all of us, checked with us, got dates we could

19  all be available.  Sent that in a letter to Mr. Levicoff saying

20  that we will come to Pittsburgh, where he is, one from Wheeling,

21  West Virginia; one from Charleston, West Virginia; one from

22  Philadelphia; one from Columbus, Ohio.  We'll come to you on any

23  of these dates you pick.  Let us know.  Nothing.  No answer.  No

24  response.

25      We are now six weeks later when there is almost no time left

 1  before the deadline.  We get an e-mail from Mr. Levicoff saying,
 2  oh, about that settlement conference, we can be available on this
 3  day or that day or late in the afternoon of the third day.
 4  Treats our letter like it was never written, doesn't address it,
 5  doesn't address the dates given in it that were still available.
 6  It just gives us new dates, none of which would work; but, now,
 7  it's too late.
 8      I was thinking, okay, let's give this another chance.  Maybe
 9  we can schedule it out of time.  Maybe we'll just tell you we
10  didn't get it done by the deadline, but we did get it done.
11      Then he writes a letter to you saying, please excuse me from
12  the obligation to meet and attempt to settle the case because
13  these guys are being mean to me.
14      And the last one is the least of the three, and I would not
15  have filed it but for the other two.  And that was, you made it
16  very clear that this is the date that everything you're going to
17  submit has to be in my possession, in the possession of the
18  Special Master.  No excuses.  This day.  It's a Monday.
19      He waits until Saturday to send it UPS, Fed Ex, or whichever
20  way he sent it.  And then it got delayed.  But that's like you
21  live a half an hour from the courthouse and you leave a half an
22  hour before your trial is going to start, and there is road
23  construction or a car wreck.  You have got to anticipate.  Things
24  go wrong sometimes, which is why you don't wait until the last
25  minute.

1    As I said, I would not have brought up the last one but for
2    the others, because it demonstrates this repeated pattern of
3    absolute indifference to the Court orders.
4    And as you can see, we didn't ask for anything for
5    ourselves.  We're not getting into prejudice, harm to our side of
6    the case.  This is something that relates only to the dignity of
7    the court orders and a duty of a lawyer to respond and respect
8    court orders, and we think that's worthy of notice and worthy of
9    a sanction.
10            SPECIAL MASTER JUNEAU:  Thank you.
11    Do you want to address either of those remarks, sir?
12            MR. LEVICOFF:  Yes.  Let me take the last one first, the
13    fact that the Fed Ex package was misrouted.  It has been my
14    experience over many years that putting a package in the hands of
15    Federal Express on a Saturday for Monday delivery is a reasonably
16    reliable method of getting the package to where it has to be on
17    the following Monday.
18    Candidly, I'm sure there may have been instances over
19    33 years that I've been in practice where a package has been
20    misrouted.  I can't really remember any.  But I think that's a
21    reasonably reliable method of achieving the objective, and I
22    would submit that that was a best effort at substantial
23    compliance.
24    Even if one were to conclude that it wasn't compliance, just
25    plain wasn't compliance, in order to enter a monetary sanction, I

 1  would submit that some sort of willfulness would have to be
 2  shown, and the circumstances of that particular issue connote an
 3  absence of willfulness.
 4       I actually did have my secretary, in my absence, contact
 5  your office on that Monday morning about this subject, and I
 6  believe we were told that as long as it wound up showing up in
 7  due course, that that would be all right.  I don't --
 8            SPECIAL MASTER JUNEAU:  Let me ask you a question.  I
 9  guess it would be argumentative one way or another about the
10  third motion.  I'm not so much concerned about the third motion
11  as I am about the other two --
12            MR. LEVICOFF:  Let me address those.
13            SPECIAL MASTER JUNEAU:  -- so I want you to address the
14  reply to those two.
15            MR. LEVICOFF:  The first motion, I simply missed the
16  date.  I have no excuse or explanation.
17       We do have a system in our office that normally will
18  assemble dates, due dates for things.  And it will tickle me
19  shortly before the due date, if I haven't already taken care of
20  it, and let me know that a matter is supposed to be filed.
21       For reasons that I am unable to explain, notwithstanding
22  that I inquired within my own office, the dates in your letter
23  didn't get into the system.
24       Now, I do remember getting the letter.  I remember looking
25  at the letter.  If I noticed the exchange date, I noticed the

1    exchange date; but, the letter came some weeks before.  In July,
2    when that exchange date came up, I just missed it.

3        Now, I'm not proud of that fact.  And, again, over many
4    years --

5        SPECIAL MASTER JUNEAU:  Let's address, then, the second
6    motion about the settlement conference.

7        MR. LEVICOFF:  The settlement conference is another
8    matter; and, here, there wasn't a matter of missing a date.

9        Here is the sequence of events, and it touches on what I
10   think is also an important substantive issue in this proceeding,
11   and that is, who all is involved in the dispute.

12       When your letter came out, you may or may not recall that
13   the first thing I did was I took a look at the parameters of it,
14   and I wrote back a letter, which I don't think was in late July,
15   maybe it was but I thought it was long before that, I think it
16   was shortly after I got the letter, in which I said, so far as
17   our lien is concerned, and we are indeed the lienor, we don't
18   think the dispute embraces anybody's rights or interests other
19   than Mr. Hill on the one hand and Ms. Toriseva on the other, who
20   used to be law partners.

21       And the dispute only relates to the apportionment of the
22   portion of the attorney's fees that would otherwise have been
23   payable to their former firm, Hill, Toriseva and Williams.  I
24   didn't think the other lawyers were involved in the dispute, and
25   I wrote that in the letter.

1     Several scathing responses came back which said, well, no,
2  Mr. Levicoff has misrepresented, and that was the term that was
3  used, the truth of the matter.  In fact, the letters went on to
4  point out that Ms. Toriseva's lien was actually holding up fees
5  due and payable to other attorneys.

6     Now, I will say that at the time I got those letters, that
7  came as a great surprise to me because since October of 2009,
8  within weeks after the lien was -- notice of the lien was first
9  filed in this court, we have been trying in every way we know to
10 limit the dispute to the fees that would otherwise be due and
11 payable to Hill, Toriseva and Williams, and to take the other
12 lawyers' fees out of the equation.

13    And I can go through the long history of our efforts to do
14 that, but we made that clear in a supplement to the notice of
15 lien that we filed in the case.  We made that clear in a
16 restatement of notice of lien.  I can present dozens of
17 communications where we made that clear.  We made that clear in
18 communications to the claim administrator repeatedly.

19    SPECIAL MASTER JUNEAU:  Let me interrupt you just a
20 minute.  I recall from some of the filings on that issue, I think
21 it was by Mr. Hill, to the effect that they had sent you
22 documentation for you just to sign to authorize the administrator
23 to pay the other firms that were involved, which, in essence,
24 would authorize the payment to those people, and the two of you
25 could have proceeded with your dispute; is that correct?

1    MR. LEVICOFF:  That is correct.

2    SPECIAL MASTER JUNEAU:  But you didn't sign that?

3    MR. LEVICOFF:  I signed them twice, October 13th -- 12th

4  or 13 of 2009 and November 17th of 2009.

5    The problem arose, and this -- I think this is very

6  important.  Here's what happened.  We reached agreement -- let me

7  start at the beginning.  When we filed the lien, because of an

8  order that had been entered quite a long time before, the claim

9  administrator held up all funds on each of these settlements; not

10  only the funds due and payable to attorneys, but also the funds

11  due and payable to the claimants.

12    As soon as that was brought up -- and that was brought to my

13  attention because the Court appointed Leonard Davis to intervene

14  and try and free up the money for the claimants.  So we had a

15  telephone conference with Mr. Davis during the first part of

16  October 2009.  He pointed that out.  And on that telephone

17  conversation, I immediately agreed to --

18    SPECIAL MASTER JUNEAU:  He pointed what out?

19    MR. LEVICOFF:  That the lien was going to hold up any

20  disbursement, even to the claimants.

21    We immediately agreed on that telephone call to limit the

22  lien to attorney's fees so that the claimants could get paid.

23    In that same telephone conversation, I, although that wasn't

24  the issue, I said, we'll even go further than that; we're willing

25  to limit the lien only to that portion of the attorney's fee

 1  portion that would otherwise be distributable to Barry Hill,
 2  because that's all that the lien ever was intended to embrace.

 3       Within some days after that, communications ensued,
 4  primarily between myself and Mr. Hill; and, by the 13th of
 5  October, 2009, we had a firm and definitive agreement that our
 6  lien would be limited only to the so-called Barry Hill fee
 7  portion of the funds.

 8       And the intent of that was to free up all the money for the
 9  claimants and free up all the money for the Hill, Peterson firm,
10  for Mr. List's firm, and for Anapol Schwartz.  And the only money
11  that was to be held back by the claim administrator was the
12  so-called Barry Hill portion of the fee.

13       The claim administrator needed to be notified of the amount.

14            SPECIAL MASTER JUNEAU:  Was that a written document?

15            MR. LEVICOFF:  Well, it was first a verbal agreement.
16  Then, it was memorialized in several written documents.  One of
17  them is a letter that I countersigned and was provided to the
18  claim administrator on or about October 12th or 13th, 2009, which
19  stated exactly that.

20       It was a letter drafted by Mr. Hill, sent to me.  I
21  countersigned it, sent it back to him, and he sent it to the
22  claim administrator.  That's dated October 12 or 13.

23       Now, what happened, and I've researched this in the last
24  several weeks extremely thoroughly to try and explain what
25  occurred, what happened is Mr. Hill then submitted spreadsheets

1  to the claim administrator that contained the column called the
2  Barry Hill fee.

3      Now, understand, I couldn't compute the Barry Hill fee
4  because it was a -- it was a calculation that had to be done
5  based on agreements with referring attorneys that I knew nothing
6  about.  It was based on an inner firm agreement that I know
7  something about.  There were costs and expense issues that had to
8  be included.  It was a fairly -- and I think Mr. List will
9  concede because he had to do it, that it was a fairly difficult
10  computation.

11      But Mr. Hill ultimately provided spreadsheets to the claim
12  administrator on or about October 12th or 13th, 2009, that had a
13  column, Barry Hill fee.  And the agreement, even as of that point
14  in time, was that that's the only amount of money on each case
15  that should be withheld; again, his calculation, his
16  spreadsheets, his statement as to the Barry Hill fee.  And I do
17  believe that that is all the monies that the claim administrator
18  has withheld since that date.

19      Apparently, and I say this apparently because I just get
20  this from subsequent communications that I got, they made an
21  error.  Perhaps, an understandable error.  I don't know what
22  accounts for the error, but they evidently made an error when
23  they calculated the Barry Hill fee amount on each case.

24      Initially, the error was explained to have been that on one
25  group of cases -- and I must point out there are two groups.

1   There are 31 cases on which Mr. Peterson, seated here, is the
2   primary attorney.   There are a hundred and -- or maybe 230 cases
3   on which the law firm of Anapol Schwartz are recorded as the
4   primary attorney.

5       This error that I'm about to describe, from what I can tell,
6   affected significantly the Anapol Schwartz cases, but not the
7   Hill, Peterson cases.   That's the best I can tell from what I was
8   sent.

9       In any event, the error that occurred is that in calculating
10  the Barry Hill fee portion on that one column on the spreadsheet
11  that they sent to the claim administrator, they neglected to
12  consider that on some of those cases, and I don't know how many
13  of them, but on some of them there was a referring attorney fee
14  that should have been included in the calculus and didn't make it
15  into the calculus.   So the consequence of that, allegedly, was
16  that what they had in the Barry Hill fee column was greater than
17  it should have been.

18      Now, again, I don't know how many cases that affected, but
19  it must have affected quite a number of the so-called Anapol
20  Schwartz 230.

21      The second thing that happened, and I didn't learn this
22  until this past summer, is evidently as follows:   Sometime prior
23  to the lien, there was an interim funding of some number of
24  settlements.   Again, I don't know how many of the cases received
25  interim funding, but there was some number.

1       When the interim funding occurred, monies were distributed,
2   I have to assume through the claim administrator, and attorney's
3   fees were distributed through that process.  Mr. Hill apparently
4   received some amount of fees out of those interim distributions.

5       I think, and I say I think because I'm not totally sure of
6   this even today as we sit here, stand here, but I think, when
7   they provided the spreadsheet to the claim administrator back in
8   October of 2009 that gave the amount to which the lien was
9   supposed to be limited, the so-called Barry Hill fee, I think on
10  some of the cases they gave the total Barry Hill fee instead of
11  only the Barry Hill fee share out of the money to be newly
12  distributed.

13      I'm not sure if I articulated that well enough.  But, again,
14  from what I've been told, that resulted in a statement in those
15  spreadsheets of the amount to be withheld that was larger than
16  the amount to be withheld.

17      Now, again, how this becomes our fault, I'm not sure.  I
18  think that's dogmatic on the part of our opponents.  It was their
19  calculation and their spreadsheet.

20      And we have consistently said, we're not in a position to
21  know whether their mathematics are correct.  We're not in a
22  position to know all the factors that affect this.

23      We have constantly taken the position, formally and
24  informally, that Ms. Toriseva's lien should only embrace monies
25  due and payable to Barry Hill.

1    Secondly, when we filed the lien in October, we obviously
2    couldn't lien funds that had been paid out before.  There was no
3    effort to do so.  There has never been an effort to do so.  They
4    were supposed to have done the mathematics and properly informed
5    the claim administrator, and they evidently made an error.

6        Now, I'm not complaining about the error, but I certainly
7    will say to persistently attempt to attribute this to fault on
8    the part of us is unfair, inappropriate, and not in accordance
9    with the evidence as to what occurred.

10       I'm leading up to the settlement meeting --

11           SPECIAL MASTER JUNEAU:  But let me ask you this:  As you
12   appreciate it, what impediment would it be, today, for that
13   taking place, that the payments be made to the other law firms?

14           MR. LEVICOFF:  None.  None at all.  In fact, when I
15   learned, by virtue of your letter, my response, and the vicious
16   kickback that I got on that, that Peterson's fees were being held
17   up, that fees to List and/or Anapol Schwartz were being held up,
18   I was troubled by that, because that was something we had never
19   attempted to accomplish.  And these are attorneys with whom I
20   deal, and I don't want to hold up their fees.  And we had never
21   intended to, and they know it.

22       So what I tried to -- I tried in several ways over this past
23   summer to try and resolve this.  And this plays into the
24   settlement meeting.

25       The first thing I did was in June -- I want to say it was

1  June, Mr. List sent a letter.  And he said, we have this problem
2  because of this original miscalculation, and we need to reduce
3  the amount being held by the claim administrator in order to free
4  up fees for these other attorneys.

5      His letter, and I'm going to paraphrase it, you know, for
6  fear of being recriminated against for doing so imprecisely,
7  essentially his letter suggested that actually computing the
8  amount of the funds that really represent the fees payable to
9  Mr. Hill is not easy.

10     So what Mr. List suggested was, let's take this gross
11 number, $1.3 million, which is about three hundred thousand less
12 than is currently being withheld.  And I think it was 1.3.  Maybe
13 it was 1.1.  He was saying, why don't we just agree that that
14 will be the number.

15     Well, the first thing we did was try to understand the 1.1.
16 I remember this extraordinarily well.  I happened to be on
17 vacation.  I didn't have any of the spreadsheets or any of that
18 material, and at that point I really still didn't even understand
19 what the problem had been, why there was that original
20 miscalculation.  I still don't understand it, candidly.  I don't
21 know how they could miss that.

22     But, anyway, I got -- and being on vacation and not having
23 my file, what I did is I got my client, who is a lawyer and who
24 knows a heck of a lot more about these fee divisions than I do,
25 and Mr. List on telephone conference, and I said, let's see if we

 1   can come to terms on this.  And the two of them then had
 2   dialogue, and I went back to vacation.

 3       I'm told by my client, and I do believe, that she couldn't
 4   understand what the figure of 1.1 was based on.  In any event,
 5   that didn't resolve the issue.

 6       So, in August, I started studying it again.  I got in touch
 7   with Mr. List sometime around mid-August of 2010.  And, again,
 8   this plays into the settlement meeting because they have proposed
 9   that we have a settlement meeting with four parties, their four
10   law firms -- or five parties -- and me.  And they all wanted to
11   come into Pittsburgh to do it, and I know saw no necessity to do
12   that.  They wanted to do it at the U.S. Air club and fly in.

13       And I never thought we had a dispute with anybody but
14   Mr. Hill, and Mr. Hill's office is 40 minutes from mine.  We
15   didn't need to have a summit meeting at the U.S. Air club for me
16   and Mr. Hill to sit down across a table and agree that we
17   couldn't agree, which I'll get into in a minute.

18       So in order to avoid this, to me, unnecessary, wasteful
19   summit conference, in August I called Mr. List.  And I said, try
20   and help me understand where the original error was, what you
21   need to do to figure out what amount of Barry Hill's fee really
22   is the correct computation, show me what I need to see to
23   understand it, and I'm sure we can agree.

24       We had a good conversation.  At that point, he explained to
25   me there was yet a second element to the calculation error they

1  had made, and that had to do with this interim fee.  That's the
2  first time I had ever heard that.

3      He explained that because Barry Hill had already gotten some
4  fees out of the interim distribution, if you now withheld out of
5  the new money the total fee, that would be an over withholding of
6  the new money.  Again, I know I'm not explaining that well, but
7  I'm doing the best I can.

8      So I said, all right.  Well, isn't there a way -- and it
9  seems to me to be a mathematical computation.  If the problem
10 starts out with the fees to referring attorneys, it seems to me
11 you have to know what are the agreements with the referring
12 attorneys, what percentage should they have gotten on which
13 cases.

14     And you start -- you're starting with 32 percent, which is
15 the court ordained attorneys' fee according to the order entered
16 back in 2008.  Eight percent of that goes to the common fund
17 attorneys, so you're left with 24 percent.

18     And then you take that 24 percent, and you apply to it
19 whatever agreements exist between the lawyers.  If there is a
20 referring attorney, he gets a percentage of that 24 percent
21 commensurate with whatever his agreement is.  I don't know what
22 they are.  They have them.  We don't.  But they ought to be able
23 to determine that.

24     Then, there are some cost adjustments that have to be paid
25 out of that remainder, and then you get to a net.  And as I

1  understand, the agreement between the Hill, Peterson firm; Hill,

2  Toriseva and Williams; Anapol Schwartz; and, the Purdue firm,

3  they agreed to divide the net three ways.  At least that's what

4  I'm told the agreement was.

5      That's a mathematical computation, which they should be able

6  to do.  And in August, when I had a good conversation with

7  Mr. List, I suggested that why don't we just do that and see what

8  it shows.

9      Mr. List felt that was difficult.  I'm not sure why, but

10  that's what he said.  So then he said, why don't we just agree to

11  this 1.1 number, to which I said, well, if we can't do the

12  computation, okay.

13      I sent an e-mail to that effect, and I got back an e-mail

14  that responded to that overture like this:  You have the burden

15  of proof.  Your lien did this, your lien did that.  It castigated

16  the lienor for making the lien in the first place.  And then it

17  said, you can take unilateral action to correct this, which, as I

18  stand here today, I don't know what unilateral action that could

19  possibly be.

20      I mean, I can't imagine that I can call the claim

21  administrator and unilaterally tell the claim administrator what

22  to withhold and what not to withhold; but, that's the e-mail I

23  got back.  And that was after how many efforts to reach agreement

24  on this.

25          SPECIAL MASTER JUNEAU:  Let me see if I can get this

1  straight.  That had to do with -- at that point, did he agree to
2  the 1.1; is that correct?

3         MR. LEVICOFF:  As I remember.  I would have to get it
4  out and look at it.  Mr. List may remember the number.

5         SPECIAL MASTER JUNEAU:  Well, you were asked to respond
6  to the lien administrator that if that was the number, then
7  whatever the percentage would go to Hill, I guess the 24 percent,
8  that whatever the division was of that number, that that's the
9  only thing that you were signaling a lien on.  And did you follow
10 up with the administrator on that?  That's what I'm just trying
11 to find out.

12        MR. LEVICOFF:  No.  There was -- I couldn't follow up on
13 that for any number of reasons.  For one thing, I don't know if
14 that 1.1 number is right, wrong or indifferent.

15     Number two, as I looked at all of these communications back
16 and forth with the claim administrator, they don't want a gross
17 number.  They need a particular amount on each case.  They need a
18 precise breakdown on each case.

19     Again, we can't make that computation.  And if there is a
20 breakdown of an amount to be withheld on each case, it seems to
21 me they have to be the ones to submit it to the claim
22 administrator.

23        SPECIAL MASTER JUNEAU:  I understand what you're saying.
24 Go ahead.

25        MR. LEVICOFF:  If any event -- but, again, there has

1  never been any doubt that we are agreeable to an accurate

2  statement of the fees payable to Barry Hill being submitted to

3  the claim administrator and limiting the fee to that number.

4  It's only ever been a question of getting accurate information on

5  that to the claim administrator.

6      So, by virtue of the fact that from June through August I

7  was trying to limit this to a two-party debate, two parties whose

8  offices are -- in fact, my client and Mr. Hill are in the same

9  county in West Virginia, avoiding the necessity of a summit

10  conference involving parties with whom we don't think we have a

11  dispute.  It's just this mathematical issue.

12      And then ultimately, when it became apparent to me that we

13  weren't going to be able to agree on anything, that conciliation

14  just wasn't in the cards -- I couldn't even resolve an undisputed

15  issue with these other firms, much less Mr. Hill, and I had no

16  doubt that we were never going to be able to settle anything with

17  Mr. Hill -- is what prompted me to write the letter.

18      Now, in terms of the dates, at the end of the day, after

19  trying, again, to limit it down to a two-party negotiation and

20  failing that, I did send an e-mail that said -- there was two --

21  in the last week before the September 20th deadline, they had

22  proposed two days, a Monday and a Friday -- or it might have been

23  a Monday and a Thursday, and my client was unavailable on those

24  two dates; but, I proposed the Tuesday, Wednesday -- I think it

25  was they had a Monday and a Friday, I proposed Tuesday, Wednesday

1 and Thursday. And certainly not trying not to have the meeting,
2 although, again, I think the meeting clearly was not going to be
3 productive, and they were unavailable on the Tuesday, Wednesday,
4 Thursday.

5 SPECIAL MASTER JUNEAU: Let me do this. I'm going to
6 bifurcate this a little bit. I would like to ask Mr. List and
7 from Mr. Peterson's standpoint their appreciation of why the
8 payment has not been made to their firm. Let me see if I can get
9 their version.

10 Just identify for the record who you are.

11 MR. LIST: Andy List, Your Honor. I appreciate the
12 opportunity to speak.

13 Your Honor, in a nutshell, what you've just seen for the
14 last 15 or so minutes represents precisely what we have been
15 dealing with for more than a year.

16 Mr. Levicoff and his client continually say that they are
17 not making a claim against me or Mr. Peterson, but they take no
18 action to alleviate the fact that as we stand here today there is
19 more than a million dollars of fees owed to my firm and
20 Mr. Peterson's firm that is being held up by this lien.

21 Now, the one thing that I will agree with Mr. Levicoff on is
22 that he and his client do not understand what they've done.
23 That's very clear to me. They have filed the lien, and just a
24 few moments ago he even represented to this Court that he now
25 understands that this lien originally held up all the money,

1  including the clients' money; and, the Court knows under the
2  terms of the Vioxx settlement agreement that isn't true.
3  Originally, 32 percent of the money was held up, 24 percent for
4  the private lawyers.

5      Mr. Levicoff is correct, the lien did attach to previous
6  distributions that had been made to Mr. Hill.  And I have taken
7  full responsibility, Your Honor, since last October for the
8  calculation in error in my office that failed to account for
9  other lawyers who had referred cases into our consortium.

10     We brought that error on my part to Mr. Levicoff's attention
11 last fall, and nothing was done about it other than what you .
12 heard here today.  Golly gee, Andy, we don't mean to hold up your
13 fees.  Gee, our fee dispute is only with Mr. Hill.  Gosh, I don't
14 know why you and Jim Peterson are even in the case.  And yet,
15 here we are.

16     Your Honor, I respectfully submit that you can put all the
17 history you've just heard behind you and look at one simple
18 exhibit, and it's Exhibit 4 --

19         SPECIAL MASTER JUNEAU:  That's attached to whose
20 submission?

21         MR. LIST:  -- to the memorandum, Your Honor, that I
22 submitted to this Court.

23     Exhibit 4 is a letter from me to Mr. Levicoff.

24         SPECIAL MASTER JUNEAU:  Exhibit what number?

25         MR. LIST:  Exhibit 4.  It's a letter of July 1st, 2010.

1          SPECIAL MASTER JUNEAU:   I have it.

2          MR. LIST:   And Mr. Levicoff was paraphrasing my
3   language, but it's very short here.   And it provides precisely
4   the calculation as to these cases, and I think there is 169 of
5   them at the time of this letter.

6          If he would have signed this letter, as we asked him to do,
7   we could have faxed this to the claims administrator; and, under
8   the agreement that was reached between Mr. Hill and Mr. Levicoff
9   last fall, the claims administrator would have immediately
10  released these funds that are indisputably owed to me and to
11  Mr. Hill.

12         Mr. Levicoff did not sign this letter.   Instead, we had more
13  phone calls.   Golly gee, Andy, we don't understand the
14  calculation.   We don't know why you're participating in this
15  lien.

16         We've given them our spreadsheets, we've done the
17  calculation, and yet today they come into this courtroom and they
18  say, we don't understand what we've done.   We don't know why
19  we've held up Andy's money or Jim's money.   But the fact of the
20  matter is, Your Honor, they have.   They have withheld our money.

21         And the other thing that Mr. Levicoff doesn't appreciate,
22  and I know this Court appreciates this, having been
23  Special Master in this litigation for some time, is the timing of
24  their original lien created a tremendous problem here.

25         Ms. Toriseva, as I understand it, left Mr. Hill's firm in

1  the spring of 2006 sometime. They waited until about three weeks

2  prior to the distribution of the final payments in the heart

3  attack cases, in September of 2009 or October of 2009, I forget

4  the exact date, to file this lien. And then, when this dispute

5  blew up, Mr. Levicoff said, well, just tell me, Andy, tell me

6  what your fee is in every case, and we'll release that.

7      Well, as the Court knows, at that time cases were still

8  tracking through the settlement agreement. Final stroke payments

9  weren't made until this summer.

10     And I explained to Mr. Levicoff, although he admittedly

11 doesn't understand it, that we couldn't give him a final number

12 because the final number didn't exist. Their lien is like a

13 giant parasite in a harbor; and, any boat that comes through, it

14 just latches onto it. And we have to wait for the boat to get

15 into the harbor before we can do the calculation.

16     But we did it on July 1. And actions speak louder than

17 words, Your Honor. He didn't sign the letter. As we stand here

18 today, frankly, I can't figure out why he hasn't signed the

19 letter. And I really don't know what else to say, Your Honor.

20         SPECIAL MASTER JUNEAU:  Thank you very much. Anybody

21 else?  Mr. Hill.

22         MR. HILL:  Really quick.

23     The whole idea of having a settlement conference, in

24 addition to hoping you'll get everything settled, is certainly to

25 get things resolved without having to bring them to the court.

1    Mr. Levicoff explained to you at length how he now gets it.
2  He's understanding it at this point because he's put some
3  considerable amount of study into it just lately.

4    Well, that's why you wanted us to have the settlement
5  conference, get prepared, understand your own case and what
6  you've done so that you can talk intelligently with the other
7  side.

8    He knew that there was a dispute with the other firms and
9  they had money tied up in this.  And the settlement -- and to say
10  to you today, I didn't want to have the settlement conference
11  because it would involve the lawyers from these other firms that
12  I don't want to have a dispute with, well, you have a dispute
13  with them.

14    It's his responsibility to make sure when you file a lien
15  that it's not an overreaching lien, and he's taken the position
16  that somehow he's then become the defendant in the thing, and
17  these fellows have to prove their way out of the noose he put
18  around them.

19    Now, they've done what they could; but, if we'd have had the
20  settlement meeting the way you wanted, I would hope that they
21  wouldn't need to be here today.  That's why we have these
22  mandatory supplement conferences, so people can sit down in a
23  room, do their homework in advance, and try to get it resolved.

24    If he can come in here and explain this articulately to you
25  today, he can get it.  And he could have gotten it back in

1  September.   They could have met at a settlement conference, and
2  they could have resolved their differences, as opposed to
3  burdening you with it, as now this retrospective excuse for not
4  having the settlement conference.   Had he done what he did today,
5  they probably could have gotten it settled.

6      The other thing is how to do this unilaterally, how to do it
7  simply.   Here is how tough it would be.   Let's see, it's a
8  million one.   Mr. Levicoff told you 15 minutes ago, I agreed to
9  that number.

10     Okay.   Take that million one, divide it by the total number
11 of dollars being withheld on all of the claims that are subject
12 to this lien.   The claims administrator can give us that number;
13 how much are you withholding on account of this lien, total
14 dollar number.   Divide that into a million one, you get a
15 percentage.   And then you simply say to the claims administrator,
16 I agree to release that percentage on each claim that's subject
17 to this.

18     You never have to go down and figure each claim out.   You
19 can do it from the top down with a percentage.   He did have a
20 unilateral way to fix it, and it's not one that would take a
21 genius to figure out.

22         MR. LEVICOFF:   Could I have a brief --

23         SPECIAL MASTER JUNEAU:   If there's something you want to
24 add briefly, yes, because I'm fixing to make comments about the
25 three motions; but, go ahead, if you want to say something.

1     MR. LEVICOFF: Well, I just, I want to make this clear.
2 This past summer, in August, we did agree to the million one.
3 What they constantly do is overlook things like this.

4     I sent an e-mail to Mr. List on August 27th, doing what they
5 just argued I should have done. I said -- this is the last
6 paragraph -- "Miss Toriseva is willing to participate in
7 rectifying the situation. It seems to me there are two ways to
8 accomplish this. One way would be to provide new revised reports
9 to the claim administrator which restate the amount of fees
10 payable to Barry Hill in a lesser amount." That was one way.
11 "We would certainly agree to that. I am just not sure that any
12 of the spreadsheets that I have seen accomplish that."

13     Now, I have gotten a dozen spreadsheets from our opponents.
14 Not a single one of them that I have seen accurately computes the
15 Barry Hill fee, and they will not represent that they do. This
16 last one makes an estimate.

17     But I went on in this e-mail to say, if there is a
18 spreadsheet that accomplishes that, if you will send it to me I
19 will be happy to examine it, and provided it limits the amount to
20 be withheld to the full amount that Mr. Hill would otherwise
21 receive out of any new distribution of attorney's fees, we will
22 agree to it." That's what I said. That was one way.

23     "The other alternative, and the one that you seemed to favor
24 when we spoke on Wednesday," now this is that August
25 conversation, "is simply to pick a lump sum amount to be withheld

1  relative to Ms. Toriseva's lien.  I am not sure the claims
2  administrator will accept that approach since I have always been
3  under the impression that the claims administrator needed a
4  specific breakdown of the amount to withhold on each particular
5  case.  Nonetheless, if you feel that a lump sum approach will
6  solve this problem, then we will go along with it."  That's what
7  I told him in August.

8      "When we spoke on Wednesday," and then we get into the
9  numbers -- and the number, I'm now refreshed, it's $1,367,479.43.
10  I go on in this e-mail to tell them, if they insist on a lump sum
11  treatment, we'll agree to it.  Now, that's what I said in August.

12      Here is what I got back.  September 2nd.  "You and your
13  client have, with respect to action you and she filed in federal
14  court in New Orleans claiming a share of Vioxx attorneys' fees,
15  one, the obligation to make a claim upon which relief may be
16  granted; the obligation to understand the impact of the claim;
17  the obligation not to make an overreaching claim; four, the
18  burden of proof.  With respect to your e-mail of August 27th, it
19  tries to make what you and your client have done not look as bad
20  as it really is."  Certainly not conducive to resolution.

21      "Two, you and your client have a variety of ways in which
22  you can take unilateral action that would release the money
23  owed."

24          SPECIAL MASTER JUNEAU:  Let me ask you this question,
25  why didn't you sign the letter of July 1, 2010, that was referred

1  to by Mr. List in his Exhibit 4?

2       MR. LEVICOFF:  Well, ultimately we did agree.

3       SPECIAL MASTER JUNEAU:  No, but I mean this was sent to

4  you in July.

5       MR. LEVICOFF:  Why didn't I sign it in July?

6       SPECIAL MASTER JUNEAU:  Yes.

7       MR. LEVICOFF:  Because the numbers in it didn't match up

8  with any numbers we had ever seen.  And it's not just the

9  original spreadsheet sent to the claims administrator.  The only

10  information we ever really had -- well, I should say the first

11  information we ever had about what the Barry Hill fee amount

12  should have been actually came with a letter that Mr. Hill sent

13  me on October 12, 2009, that had spreadsheets on it, that had

14  numbers representing the Barry Hill fee amount, and they didn't

15  match up with what Mr. List sent me in July.

16     Now, I understand that there were factors that entered into

17  it, referring attorney fees, other computations, but they just

18  didn't match.

19       SPECIAL MASTER JUNEAU:  Mr. List testified that you had

20  discussed the matter with him on other occasions, and he told you

21  he couldn't make the final calculation, but if he could make it,

22  he would make it, and he said he will make that calculation and

23  provide you with that information.

24     My understanding was that's what he did when he sent you

25  this letter on July 1, and my understanding was you had agreed,

1  make the calculation, whatever it is, I will agree to that
2  calculation. I think that's what I heard.

3      MR. LEVICOFF: It actually went like this. He sent me
4  the thing on July 1. Again, I was on vacation. I had a
5  telephone conference with my client, Mr. List and me.

6      I was not in a position, being away on vacation, to look at
7  spreadsheets. I didn't have them. I don't get e-mail.

8      So I asked my client to go back and forth with Mr. List and
9  see if they could come to terms. They were unable to for the
10 reason that we didn't have any information that would allow us to
11 look at the numbers in that spreadsheet he sent on July 1 and
12 make sense of them. They were just numbers that didn't
13 correspond to anything.

14     SPECIAL MASTER JUNEAU: As we sit and stand here today,
15 do you have any dispute with that number today?

16     MR. LEVICOFF: Well, again, I don't know if it's an
17 accurate calculation of Mr. Hill's fee, but we would agree to it
18 just to get the thing done. And that's what I told him in
19 August, we'll agree to it. It's close enough. If the thing is
20 that difficult to calculate, we'd agree to it.

21     SPECIAL MASTER JUNEAU: Well, I'm getting precisely
22 about -- the figure, when it says Barry Hill's share of this is
23 1,367,479.43, do you have any dispute with that today?

24     MR. LEVICOFF: We're willing to agree to it to resolve
25 the issue and to make computation unnecessary.

1       SPECIAL MASTER JUNEAU:  Now, but you didn't agree to
2   it -- that's what I'm trying to figure out.
3           MR. LEVICOFF:  August, we did.
4           SPECIAL MASTER JUNEAU:  No.  In July, you didn't agree
5   to it --
6           MR. LEVICOFF:  That is correct.  It took until August.
7           SPECIAL MASTER JUNEAU:  What's different between then
8   and now, why you're agreeing to that number?
9           MR. LEVICOFF:  Well, two -- three reasons.  One is
10  because it just -- it's -- the effort to calculate the amounts
11  accurately appears to be so difficult.  What I thought in July
12  should have been easily calculable, apparently not easily
13  calculable, one.
14      Two, we spent time in July talking about this.  I spent time
15  talking to Mr. List about it in August.  And, ultimately, as of
16  August, it just didn't seem worth the continuing effort to spend
17  time trying to compute something precisely, even though it still
18  seems like a mathematical problem, so we're willing to agree.
19      And, ultimately, at the end of the day, the amount being
20  withheld, the million three, probably as a practical matter is
21  enough to protect Ms. Toriseva's interest, I would hope.
22          SPECIAL MASTER JUNEAU:  All right.  Thank you very much.
23      I'm at this time going to deny the motion, the third motion
24  you referred to, Mr. Hill.  I say deny.  I'm going to report to
25  the Court that I would recommend it be denied about the

1  Federal Express. I'm certainly not impressed by the fact that
2  somebody would wait on Saturday to send it; but, the fact it
3  didn't get to us on Monday, that's for somebody else to decide.

4      With regard to the other two motions that have to do with
5  the settlement conference and the exchange of memorandum, I'm
6  going to refer those to the merits of this hearing, I'm going to
7  incorporate the statements and exhibits that I've had, and I will
8  make the definitive recommendations to the Court about what
9  actions to take with respect to those two actions.

10     Those two matters being considered now, I want to move now
11  to the merits of the issue that we have before us here today.
12  And I guess we'll start, since a lien has been filed, I'll give
13  your side the chance to make a presentation.

14     And by the way, so both sides will know, I have all the
15  exhibit books here before me. And what I would suggest to the
16  parties, that we will label those exhibit books and file those in
17  evidence on behalf of both sides, and I'll label them
18  accordingly.

19     And I'll make a few other offerings. One will be the
20  scheduling order that I issued in this matter. The second is
21  I'll have an exhibit which is the claims administrator file which
22  I obtained so that we'd have a complete record.

23     Whatever additional records or documents you may want to
24  introduce, they probably won't be admitted because they weren't
25  submitted, but you would have to address that to me at that time.

1    Now, you can proceed, sir.

2         MR. LEVICOFF:  Thank you, sir.

3    I trust that the discussion over the past hour has been
4    useful, at least to this degree --

5         SPECIAL MASTER JUNEAU:  I think I indicated I've
6    incorporated that in the merit discussion we're going to be
7    having here.

8         MR. LEVICOFF:  Yes.  The lien, from the perspective of
9    the lienor, is narrowly focused.  It only involves one narrow
10   issue, and it always has, and let me just restate it this way:
11   The lienor takes the position and asserts a claim that the net
12   share of attorneys' fees that would otherwise have been due and
13   payable to the law firm of Hill, Toriseva and Williams should be
14   prorated between her and Mr. Hill, and that that amount should be
15   prorated between them based upon their comparative contribution
16   to the production of that portion of the fee.

17        And I state it with some degree of care because when you
18   realize that that's the portion of the fee that we're talking
19   about, it substantially changes the standard that ought to be
20   brought to bear on how to resolve that issue.

21        For instance, certainly the lienor claims no part of the fee
22   that would otherwise be due and payable to common fund attorneys.
23   Certainly the lienor claims no part of the fee that may be
24   available for referring attorneys, and similarly claims no part
25   of the fee that would be due and payable to the other three law

1  firms that were in the so-called consortium.

2      Because of that, the analysis of the comparative
3  contribution of efforts that led to the fee becomes a lot
4  simpler.  We needn't address the comparative contribution of
5  Ms. Toriseva to the production of the fee with all of those other
6  interested parties.  We only need to compare her relative
7  contribution with that of Mr. Hill, because those are the only
8  two parties that we contend that ought to share in that part of
9  the fee.

10     The principles that ought to guide this -- well, let me
11  start this way.  There shouldn't be a dispute about whether or
12  not Ms. Toriseva's labor and efforts as an attorney were
13  instrumental in producing this particular part of the fee.

14     There shouldn't be any doubt that Ms. Toriseva labored
15  countless hours to perform the services that were provided in
16  this situation in toto by the law firm of Hill, Toriseva and
17  Williams.  They didn't file motions, they didn't take discovery,
18  they didn't do any of the activities that lawyers frequently do
19  in civil litigation; but, then again, the fee that we're talking
20  about attributable to that firm isn't a result of any of those
21  services.  That was done by others.

22     What the firm actually did that results in it being entitled
23  to a fee at all is secure the representation of the client,
24  screen the cases so as to assure that they were bona fide
25  potentially meritorious cases, conduct the process of determining

1 whether or not they were appropriate lawsuits to be brought, pin
2 down the representation, create the consortium, and get them to
3 the point where they represented some number of claimants whose
4 claims might ultimately have merit.

5 And that's essentially what the law firm did. Then, at a
6 much later stage, once the mass settlement had been reached,
7 there was the registration process and monitoring them through
8 the funding stage.

9 And there really shouldn't be a dispute over whether my
10 client's participation in the part of this that the Hill,
11 Toriseva and Williams law firm performed was substantial. The
12 documents that we've submitted with our memorandum, which,
13 admittedly two days late, hopefully made it to you, are just
14 replete with documentary evidence that shows that she was the
15 person at Hill, Toriseva and Williams who was actually the lead
16 attorney in the firm on the Vioxx project, that she was the
17 liaison person for claimants, potential clients and referring
18 attorneys.

19 She managed the database that the law firm maintained. She
20 was the point person for interactions with the Purdue, Clark firm
21 and with, to the extent they were involved, the Anapol Schwartz
22 firm in Philadelphia and Mr. Peterson's firm in Charleston,
23 West Virginia. She was the person who handled the communications
24 with the point people in those other law firms. She was the
25 person that went to the seminars and learned the science of Vioxx

1   back in 2004, when the recall first occurred.

2       She was the person in the Hill, Toriseva and Williams firm
3   that typically presented seminars to which potentially
4   referring -- potential referring attorneys were invited who
5   might -- and it was as a marketing effort, to persuade them to
6   refer potential clients that they had to the so-called
7   consortium.

8       She was -- her name appears throughout the marketing
9   literature.  Her name appears on the web site that was posted
10  regarding the securing of clients to represent in the Vioxx
11  cases.

12      As is mentioned in her affidavit, when the necessity arose
13  to secure a contingent fee agreement from a claimant or to
14  provide a form of contingent fee agreement to a referring
15  attorney to have it signed by the claimant, she was the person
16  who handled that.  Now -- her affidavit so states.  We don't have
17  the documents themselves because my opponent, Mr. Hill, has them.
18  It's interesting that he does not submit them as exhibits.

19      My client suggests in her affidavit that if those documents
20  were produced and examined, she would be the counter-signing
21  attorney on the substantial number of contingent fee agreements
22  out of the group that the Hill, Toriseva and Williams firm
23  handled.

24      In short, the evidence is overwhelming that Ms. Toriseva's
25  efforts, labor and efforts, countless hours, was instrumental in

1  putting this law firm in the consortium and putting her firm,
2  with the other consortium law firms, in a position where they had
3  pinned down the representation of several hundred potential
4  claimants, which ultimately, through the efforts of the common
5  benefit attorneys, resulted in the production of the fee.

6      There really shouldn't be any dispute on that.  And I'm not
7  sure that there is a real dispute on whether or not she labored
8  extensively to accomplish this back in the period 2004 to
9  March 2006, when she was ushered out the door by Mr. Hill.

10      The real controversy, I would suggest, is very narrow, and
11  it presents a clear credibility problem.  Ms. Toriseva says that
12  she did this with the reasonable expectation that she would share
13  in the fees when and if any were earned.

14      She contends that for basically three related reasons.  One
15  is she contends she was a member in the law firm, Hill, Toriseva
16  and Williams.

17          SPECIAL MASTER JUNEAU:  What do you mean by a member?
18          MR. LEVICOFF:  Well, it's an LLC.  It's a limited
19  liability company --

20          SPECIAL MASTER JUNEAU:  Right.

21          MR. LEVICOFF:  -- that was formed by filing of articles
22  of organization in 2002, November 6, 2002.  The articles of
23  organization named three members, Barry Hill, Teresa Toriseva and
24  Mary Williams.  And that was filed -- that created the law firm
25  and, hence, the name.

1    It's interesting that Mr. Hill responds to that by
2  submitting an affidavit of his secretary for the past decade or
3  more, Kathi Eastham, who says, in effect, that was all a mistake.
4    Why it's interesting that Ms. Eastham's affidavit would be
5  offered as evidence that it was a mistake is that, if you will
6  look at the application for the articles of formation for that
7  LLC, Hill, Toriseva and Williams, the application is notarized by
8  none other than Kathi Eastham.  So if it was a mistake, as she
9  states in her current affidavit, she certainly was party to the
10  mistake.

11    In any event, those articles were never altered during the
12  entire time from the time of filing in 2002 up until May of 2006,
13  which is two months after my client was ushered out the door by
14  Mr. Hill.  So from 2002 through March of 2006, when my client and
15  Mr. Hill practiced law together, they practiced law in an LLC, of
16  which the two of them and another person were the members, under
17  the name Hill, Toriseva and Williams.

18    Mr. Hill, I assume, claims that he didn't know about that,
19  but he sure as heck knew about the name and did nothing to change
20  it until after he threw my client out.

21    SPECIAL MASTER JUNEAU:  Are you aware that there was,
22  for lack of a better word, a correction made in those documents
23  as made by the secretary of state that said that the original
24  filing needed to be corrected, and that Mr. Hill was a sole
25  proprietor, and that on June 4, 2003, the secretary of state sent

1  a certificate of correction recognizing Mr. Hill as a sole
2  proprietor?  That would have been long before any discharge.
3  That's the reason I'm asking that question.
4           MR. LEVICOFF:  I'm not aware of that.
5           SPECIAL MASTER JUNEAU:  We'll get to that then.
6           MR. LEVICOFF:  Secondly, apart from the LLC and the
7  formation of it, my client contends, for a variety of reasons,
8  that she was recognized and held out as a partner.
9       Now, I say the word "partner" in quotes, because, again,
10  there was no definitive partnership agreement.  I use the term
11  "partner" somewhat euphemistically, but I use it to distinguish
12  between a salaried employee, which is what Mr. Hill claims my
13  client was, and a different relationship, one that would connote
14  a reasonable expectation of sharing profits and incoming fees.
15      My client maintains that she occupied that status for
16  several reasons.  One is the law firm name connotes it.  But, two
17  is, in the documentation that we've submitted, we've submitted
18  several written manifestations by Mr. Hill describing my client
19  as a partner.  And I can be more specific, if need be, as to the
20  exhibit number, but among the documents -- and I think the
21  heading in our exhibits is headed partnership.  Would you like me
22  to --
23           SPECIAL MASTER JUNEAU:  No, no, I'm listening.
24           MR. LEVICOFF:  -- wherein Mr. Hill makes written
25  representations to others on several occasions about his partner,

1  referring to Ms. Toriseva.

2      Thirdly, but possibly overarchingly, without regard to the
3  structure of the business, the membership status of Ms. Toriseva,
4  or the fact that she was represented by Mr. Hill to be his
5  partner on numerous occasions, even if she was simply an
6  employee, the circumstances of this situation suggest that it is
7  implausible that she would do the work that she did, perform the
8  service that she performed over the period of time that she did
9  it, in other words, spend countless hours developing a project as
10 significant as the Vioxx claim project for this law firm, be the
11 lead person that she was in that endeavor, with the expectation
12 at the law firm that this could generate millions of dollars in
13 fees, and that she would do that for a nominal salary and not
14 share in the presumed millions of dollars of fees to the extent
15 of one red cent, which is the position that Mr. Hill advances.

16     I would suggest that under all of those circumstances, in a
17 firm like this, with three lawyers, the revenue from which is
18 derived substantially from contingent fees, getting involved in a
19 project like this, the firm entrusting to my client the principal
20 role in putting this together, that the only reasonable
21 conclusion is that there must have been a consensus and an
22 understanding that if, in fact, it did produce millions of
23 dollars in fee revenue, that she would share to some degree.

24     Now, in her affidavit she says that, in a broader sense, the
25 understanding that she had with Mr. Hill was that when fees were

1  generated, there would be a division, roughly a third, a third, a
2  third; a third to whoever originated it, a third to whoever put
3  the time and effort into working it up, and a third for the
4  finance.

5      The finance part unquestionably came from Mr. Hill.  I would
6  submit that the investment of finance is not all that substantial
7  in light of the amount of the fee.  I think, from the
8  documentation I saw, it looks like his investment was $150,000.
9  In any event, I saw that figure in one of his documents.  The fee
10  is upwards of a million and a half, so the actual investment is
11  only, at best, 10 percent of the fee.

12      In terms of the work, there is no question, as I've
13  indicated, that my client worked the cases up significantly.
14  And, as far as origination, to the extent that these were
15  originated, she was a major player.

16      So under the arrangement that she describes in her affidavit
17  of a third, a third, a third, under those circumstances she would
18  have had a reasonable expectation to share to some degree in the
19  fees.

20      That arrangement applied to this situation comports with
21  what I submit is the only plausible conclusion under the
22  circumstances.  Even if she weren't a partner, even if it weren't
23  an LLC, as the person charged with the duty, it would be
24  implausible to suggest that she wouldn't share in this great
25  project producing these fees given the degree of her work.

1        SPECIAL MASTER JUNEAU: Okay.

2        MR. LEVICOFF: Mr. Hill contends, as I read his papers,

3   his principal contention is she did the work, but she did it as

4   an employee.  I've already addressed that.  He submits the

5   affidavit from Kathi Eastham.

6        SPECIAL MASTER JUNEAU: Let me ask you, so at the root

7   is it not the issue here is your client, at the time in 2002,

8   2003, through the time of discharge, which was on April 23rd,

9   '06, do I understand that it is your client's position and your

10  position that she was not an employee, she was a partner or a

11  member of an LLC?  That's what I'm trying to figure out.

12       MR. LEVICOFF: Three separate but related contentions.

13  One is she was a member.  Two is she was held out as a partner.

14       This wasn't a partnership.  There was no expressed

15  partnership agreement, so the legally precise term partnership

16  doesn't apply to it.  But when Mr. Hill referred to Ms. Toriseva

17  as his partner, I would suggest that that suggests and evidences

18  an intent to treat her as someone who was entitled to earn a

19  share of the profits of the business.

20       And third, whether she was an employee or not, under the

21  unique circumstances of this program, and given her testimony

22  that they had an agreement to share fees, even though she may

23  have been an employee.  Under all of those circumstances --

24       SPECIAL MASTER JUNEAU: My question is, then, during the

25  relevant period of time that I mentioned, what documents or what

1  reference can I make to what that agreement was about the sharing
2  of fees or what the situation would have been if she would have
3  been an employee?

4          MR. LEVICOFF:   There is no express written agreement
5  that was ever formed between these individuals.  There are some
6  number of communications talking about arrangements.  There is
7  one of them in Mr. Hill's papers that mentions if we earn fees
8  beyond a certain level, you'll get a share.  It's all very vague
9  in terms of the written expressions of the fee arrangements.

10         I would submit that the conclusion to be reached is there is
11 no express written agreement there.  There is the verbal
12 agreement alluded to in my client's affidavit of the rough
13 one-third, one-third, one-third division.

14         SPECIAL MASTER JUNEAU:   Let me ask a follow-up to that
15 question.  The day before discharge, what is your contention as
16 to what the status was of your client vis-a-vis Mr. Hill, and
17 what if -- it was a -- if it was an employee status, what was the
18 arrangement at that time insofar as pay?

19         MR. LEVICOFF:   I think she was obtaining a draw of
20 75,000 a month, with the understanding --

21         SPECIAL MASTER JUNEAU:   75,000 a month?

22         MR. LEVICOFF:   I'm sorry, 75,000 a year.  My apology.
23 And, certainly, the figure is important.  I would suggest that
24 that is a salary, had that been the full, total amount of her
25 compensation, if that's all there was, and no expectation of

1   deriving a share of fees earned on something as big as Vioxx,
2   that would be an overwhelmingly undercompensated lawyer.
3       She was a 10-year lawyer at the time, quite capable, very
4   knowledgeable about mass tort litigation.  And I think that that
5   suggests, as well, that the idea that that's all the money she
6   was anticipated to earn is not plausible.  It's not credible.
7       SPECIAL MASTER JUNEAU:  What is your position about if
8   someone has a share -- you're talking about a third, third, and
9   third arrangement --
10      MR. LEVICOFF:  A rough consensus, yes.
11      SPECIAL MASTER JUNEAU:  -- under that circumstance, what
12  was the deal, if you will, if someone left the employment?
13      MR. LEVICOFF:  I think that part is fairly easy.  If her
14  efforts were instrumental in producing a fee, if not earned at
15  that point or prior but at some later time, but if her efforts
16  were instrumental, she would still be entitled to share.
17      Much like an attorney, and we alluded to this in our papers,
18  much like an attorney who is discharged from a case, if an
19  attorney works a case from September 2004 up to March of 2006, no
20  resolution is yet achieved, but the attorney's labor and services
21  have been devoted.  The attorney is discharged.  Suppose two
22  years later, in 2008, that case goes to settlement and there are
23  proceeds derived.  That attorney who had been discharged two
24  years earlier is still entitled to apply for and is entitled to
25  be paid some portion of the total fee based on the services that

1   had been performed two years earlier.  I would analogize that to

2   this situation.

3       If, by virtue of her work during the period September 2004

4   to March 2006, if those labors on her part were part and parcel

5   of a fee actually not realized until 2009 or 2010, we would

6   submit that she is still entitled to a portion of the fee, just

7   like the discharged attorney.

8           SPECIAL MASTER JUNEAU:  I had asked you earlier about a

9   certificate of correction had been issued by the West Virginia

10  secretary of state, and the letter in connection therewith to the

11  secretary of state is dated May 29, 2003.  And where I got these

12  documents was on Exhibits 7 and 8 of the list of the exhibits

13  that have been provided by Barry Hill.  Do you have those list of

14  exhibits?

15          MR. LEVICOFF:  I do.  And I think your question was did

16  my client have knowledge of that, and she did not.

17          SPECIAL MASTER JUNEAU:  Well, two questions:  Did your

18  client have knowledge of that, number one; number two, what is

19  your response to that, what bearing does that have on what your

20  argument is?

21          MR. LEVICOFF:  May I have a moment?

22          SPECIAL MASTER JUNEAU:  Yes, certainly.

23          MR. LEVICOFF:  Thank you.

24      Let me reaffirm that, after discussing this with my client,

25  she has no memory of being aware of that letter that talks about

1  the sole proprietorship.  She was certainly not aware that that
2  letter would manifest any change in her reasonable expectation
3  that fees on cases that she was instrumental in bringing in and
4  working up, that she would share in those fees.

5      SPECIAL MASTER JUNEAU:  Was she aware of the act of
6  correction that had been issued that's Exhibit 8, issued by the
7  secretary of state?

8      MR. LEVICOFF:  Well, the correction -- I'm not sure what
9  the significance of the correction is.  There is a certificate of
10  correction, but I don't perceive what is changed.

11      SPECIAL MASTER JUNEAU:  Well, I'm not the secretary of
12  state of West Virginia, but it clearly means to me that the
13  status of the corporation, that he was a sole proprietorship,
14  they are acknowledging that act of correction in the original
15  filing.

16      MR. LEVICOFF:  I don't see that in the certificate.
17  That certainly is in the letter, and that is in the -- that's in
18  the attachment to the certificate which in this exhibit is an
19  annual report; but, my client was not aware of the annual report
20  changing this to a sole proprietorship.

21      SPECIAL MASTER JUNEAU:  What about at the time shortly
22  before the discharge in April of 2006, was she issued a W2 form
23  from this entity or not; or, do you know?

24      MR. LEVICOFF:  I believe so, and I believe that she
25  recognized income derived from the firm.  So -- and I'm not

1  suggesting she wasn't paid any money apart from a share of fees.

2          SPECIAL MASTER JUNEAU:  Well, the reason I'm asking, I'm

3  just trying to get the status of the parties here.  You would

4  expect deductions, insurance, reported as an employee on a tax

5  return.  You get one.  The income you get beyond that from a firm

6  is not reported as would the income to a partner in a

7  partnership, for example, or a director as part of a shareholder

8  interest or something of that nature.

9          MR. LEVICOFF:  Well, there are -- just because I have

10  some knowledge since having been in it for a long time, there are

11  any number of arrangements.  Just for -- to respond to the

12  question, take Levicoff, Silko and Deemer, for instance.  We

13  happen to be a corporation.  I draw a salary, if you will, from

14  the corporation, so I get a W2 that shows wages, tips and salary.

15      If the law firm has some terrific good fortune and earns

16  money that is over and above what is needed to pay everyone's

17  regular salary, at some point during the year we typically

18  distribute it.  We may treat that as a --

19          SPECIAL MASTER JUNEAU:  K-1.

20          MR. LEVICOFF:  Right.  Or we may pay it out in some

21  other fashion; but, we -- by the end of the year, we typically

22  distribute that.  And I get some; if I work hard, I get more.  If

23  I brought it in, if it is a case that I brought in, I get more.

24  But, nonetheless, I still get my W2 earnings, God willing, each

25  and every year.

1        SPECIAL MASTER JUNEAU:  So --

2            MR. LEVICOFF:  Now, we have other -- I've had other

3    arrangements in my career.  You probably have, too.  Sometimes

4    you're a straight partnership where nobody gets a salary.  You

5    just look at your profit and periodically, whether it's every

6    week, every month, every six months, divide profit and distribute

7    it to -- that's a straight partnership.  Or you have a draw,

8    where everybody, in order so they can pay their bills and their

9    lease cars, gets a payment every month; but, at the end of the

10   year, you net that out against some share of the profit.  There

11   are all sorts of arrangements.

12           In this particular instance, my client's position is that

13   she, during some years, not all years, but during some years of

14   her association with Mr. Hill, received periodic pay, probably

15   took it on a W2, but that certainly was never presented to her to

16   be to the exclusion of sharing fees on cases she brought in and

17   worked up, is the point I was trying to make.

18           So even if she were not a partner, not a member, was just an

19   employee, she still had the understanding throughout the time she

20   was there that if she brought in a case and it produced a

21   substantial fee, she would get a portion.

22           And, again, I would submit that that is -- that any other

23   conclusion is virtually implausible.  That lawyers and law firms

24   like this one, even though they may get a draw, even though they

25   may get a biweekly pay, are almost invariably afforded a share of

1  any substantial fees they bring in and work up and are successful
2  in bringing in to the firm.

3         SPECIAL MASTER JUNEAU: Again, I'm just going through
4  the exhibits which have been filed. As an Exhibit A, it's under
5  11A that was filed with the Hill exhibit, it's an attorney
6  liability protection and has to do with, I presume, malpractice
7  insurance. And it's listed -- apparently signed by various
8  people in the firm.

9       This one apparently was signed by your client on
10  September 1, '04, and she signs it. And it's attesting whether
11  they had any prior claims, what the nature of the practice was.
12  And she lists herself as -- they have a block for partner,
13  associate, of counsel, and she has checked employee. Were you
14  aware of that document?

15         MR. LEVICOFF: May I have just a moment to confer?
16         SPECIAL MASTER JUNEAU: Certainly, certainly.

17         MR. LEVICOFF: Yes, she was aware that she checked that
18  and signed it.

19         SPECIAL MASTER JUNEAU: Was that correct?

20         MR. LEVICOFF: Yes.

21         SPECIAL MASTER JUNEAU: So she was not a partner, she
22  was an employee?

23         MR. LEVICOFF: Again, I don't think -- certainly, she --
24  it was not a partnership, so she wouldn't be technically legally
25  a partner. She believed she was a member and an employee. They

1 were all employees. She also believed Mr. Hill was an employee,
2 for that matter.

3 But, again, since it's not a partnership, she could not be a
4 partner -- in the technical legal sense a partner.

5 SPECIAL MASTER JUNEAU: Give me just a minute. I want
6 to go through some of these documents.

7 Okay, sir. If there's anything else you want to add, I'll
8 take it.

9 MR. LEVICOFF: I think the thrust of our position has
10 been adequately explained. There is a comment that I would like
11 to make on a couple of Mr. Hill's submissions.

12 One is, again, he submits the affidavit of Kathi Eastham,
13 his long-time secretary. As a credibility matter, I would
14 suggest that that affidavit has to be considered in light of
15 the -- what I would suggest is an undeniable likely bias in favor
16 of Mr. Hill and against Ms. Toriseva.

17 Secondly, he submits an affidavit of an accountant who,
18 ironically enough, is well known to my client. The accountant
19 says that Mr. Hill filed a tax return in which he treats Hill,
20 Toriseva and Williams as a sole business proprietorship, and I'd
21 like to make two observations about that, possibly three.

22 One is that, once again, even if that organization is a sole
23 proprietorship, that certainly doesn't necessarily mean that an
24 attorney working there who brings in a big case or a group of big
25 cases on which the firm makes millions of dollars wouldn't have a

1  reasonable expectation to share in that, especially in light of
2  the fact that the firm is called Hill, Toriseva and Williams, at
3  least at one point she was named as a member; that she is
4  referred to by Mr. Hill repeatedly as his partner, in euphemistic
5  terms; and, under the circumstances in which she avers that she
6  had that understanding.  So the mere fact that he treats this as
7  a proprietorship isn't really controlling to any degree.

8         Secondly, even if it were controlling, how he files his tax
9  return certainly can't govern my client's rights and interests.
10  That's a private matter between Mr. Hill and the IRS.  For all
11  anyone knows, he could be a shareholder in a corporation and file
12  a tax return treating his dividends from it as a business
13  proprietorship.  That just isn't -- that's not the standard by
14  which to determine what the rights between these parties may be.

15         And the third point is, even if it were on both counts, my
16  client has no knowledge of this; so, if she's not told at some
17  point, by the way, you can work your tail off on these Vioxx
18  cases, but if we make millions of dollars, you're not going to
19  get a penny.

20         And I submit, at the end of the day, that really is the
21  governing criteria is if under these circumstances, investing
22  Teresa Toriseva with the role and responsibility of work --
23  bringing this in, working it up, putting the firm in a position
24  to make enormous fees, if Mr. Hill, at the end of the day, either
25  while she was still there or even after he threw her out, was

1  going to take the position that she wasn't entitled to benefit by
2  virtue of a single red cent, he really had the obligation to tell
3  her that explicitly.

4      And what the Court will not find in any of the wads of paper
5  that have been submitted is any explicit statement by Mr. Hill
6  warning Ms. Toriseva as she put in the hours, by the way, you're
7  not going to get a penny, you're going to get your draw and
8  that's it.  Not a single word.

9      If anything, these vague compensation memoranda that he sent
10 out with no agreement are exactly to the contrary.  They really
11 suggest that if millions are earned, she will share it.

12     And the problem with his position and the reason the
13 equities favor her position in this situation is he let her work
14 and work and work.  He let her help achieve a terrific -- which,
15 under the circumstances, I have to say, to earn a million five or
16 more in fees on these cases is a remarkable result that she
17 helped bring about.  If he wasn't going to share a single red
18 cent with her, he needed to tell her that, and he didn't.

19         SPECIAL MASTER JUNEAU:  Thank you, sir.

20         MR. LEVICOFF:  Thank you.

21         SPECIAL MASTER JUNEAU:  Mr. Hill.

22         MR. HILL:  Well, you know, that makes it a lot easier
23 than I would have thought because --

24         SPECIAL MASTER JUNEAU:  Mr. Hill, get to the microphone.

25         MR. HILL:  I'm coming.

1    -- up until today, I thought there was going to be a

2  contention that somehow the PLLC conferred some sort of

3  entitlement to income by originally having been listed as a

4  member.

5    It's interesting.  You know, I sent this material to them

6  July 29th, when a memoranda had to be exchanged.  I sent this

7  stuff showing --

8    SPECIAL MASTER JUNEAU:  You said "this stuff," you're

9  talking about the bench book material?

10    MR. HILL:  I'm talking about the -- ask that again.

11    SPECIAL MASTER JUNEAU:  You said, I sent this to them.

12  I just want to get for the record, you're talking about the

13  material contained in the bench book?

14    MR. HILL:  The change on the PLLC that happened six

15  months --

16    SPECIAL MASTER JUNEAU:  But that's in the bench book;

17  that's what I'm saying?

18    MR. HILL:  It's in the bench book, but I sent the bench

19  book materials, other than the ones that were generated a little

20  bit later, to them July 29th.  And at that time, the PLLC change

21  letter and the certificate of change from the secretary of state

22  were attached.  So when they tell you today, I haven't seen that,

23  all that tells me and tells you is they didn't bother to look at

24  what they were sent.

25    They also got everything that was submitted to you in the

1  bench book a month ago. Apparently, no one chose to look at it
2  to see that that was in there because the representation to you
3  today is, I've never seen that, and they have had it.

4      I also thought up until today that apparently we can put
5  behind us a contention that there was a -- she was a partner.
6  The reason that the tax information is in there, the reason that
7  we have an affidavit from the accountant is up until today there
8  was a contention that she was a partner.  So I was disputing that
9  claim, only to now have Mr. Levicoff say, I have no idea why
10 Mr. Hill is putting this stuff in here from his accountant
11 because we're not claiming that she was ever really a partner.
12 Yes, they were.  Up until today, up until you called them on it
13 and they had to take it back, couldn't support it.  There is no
14 agreement like that.

15     And it's really interesting to hear someone say that I was
16 vague, that I wasn't specific, that I led people on.

17     Judge, if you will look at tab 46 --

18          SPECIAL MASTER JUNEAU:  46?

19          MR. HILL:  -- 46 in my bench book, it starts out -- this
20 was sent to both of the attorneys who worked for me at that time,
21 November 2005.  It recited their history, that Attorney Toriseva
22 started in 2002 and continued in 2003 as an independent
23 contractor.

24     She was being given office space.  I put her on the
25 malpractice insurance, and we had a deal on how she would get

1  paid on her cases. That was ones that she got on her own and I
2  had nothing to do with them. She had no share in my cases
3  whatsoever. She was getting rent and the use of the office and
4  no salary. All she was getting was $3,000 a month I was lending
5  her because she was short on meeting her monthly bills.

6      So in the end of 2003, she asked me, can I become an
7  employee? I want on the health insurance, and I want to be in on
8  the pension plan. Okay. I'll do that, but I can't pay you any
9  more than I'm paying Attorney Mary Williams, which at that time
10 was $75,000 a year plus benefits. The next year, I increased it
11 for both of them to $100,000.

12          SPECIAL MASTER JUNEAU: That would have been what year?
13          MR. HILL: That would have been -- it was $75,000 for
14 2004. I increased it to $100,000 a year to each of them starting
15 in 2005, then 105,000, 2006.

16     On this Exhibit 46, this is not -- the best that I can
17 explain it is I sensed trouble between the two of them. They
18 didn't get along very well, that is, Attorney Williams and
19 Attorney Toriseva, and I wanted to make sure that neither of them
20 had some notion that I had said something to one that I had not
21 said to the other.

22     So I wrote it all out in the Exhibit 46, recite the history
23 of the business, recite how the lawyers -- Attorney Williams and
24 Attorney Toriseva came to be working for me.

25     Page 2, Number 5, base salary, a hundred thousand, to be

1 increased to 105 the following year in 2006, to 110 in 2007.
2 This particular policy only went through 2007.

3 Fixed percentage bonus.  If the business makes a profit in a
4 calendar year, Mary and Teresa are to be paid, in addition to
5 base salary, a fixed bonus of 22 and a half percent each of the
6 profit of $1 through one million.

7 It wasn't that I expected them not to share in profits if we
8 had profits.  I made it clear, you will share, but not just in
9 fees, in profits.

10 This business did nothing but lose business -- I mean,
11 excuse me, lose money after 2003.  And in 2003, Attorney Toriseva
12 was an independent contractor.  2004, '5, '6, '7 -- and I've --
13 there is another exhibit in here -- and these weren't small
14 losses, these were hundreds of thousands of dollars a year.  They
15 are getting paid their salaries, Attorneys Toriseva and Williams.
16 I'm getting nothing.  I'm drawing down a line of credit for a
17 million dollars to keep this operation going.

18 Neither one of them are on the line for a cent, this is my
19 own personal assets and my wife's assets, to borrow this money to
20 make sure they get paid.

21 And what work are they doing?  They are working on cases in
22 litigation that I had decided to get involved in, and I gave them
23 each different parts of it to work on.

24 Did she work on Vioxx?  Of course, she did, but that was her
25 job.  She was getting paid to do that.  And if there would have

1 been a profit, she would have shared in that profit.

2 And I also have there discretionary bonus, on page 3, but

3 that's pretty clear, too, that bonuses above a million are

4 discretionary with Barry. There is no promise or other basis to

5 reasonable believe or assume that a bonus will be paid on a

6 profit in excess of one million.

7 If bonuses are paid on profit exceeding one million, they

8 will not necessarily be on a percentage basis, nor will they

9 necessarily be equal, meaning equal between Williams and

10 Toriseva. Bonuses on profit exceeding one million paid in one

11 year do not represent a basis, pattern or formula for the

12 existence, amount or allocation of future discretionary bonuses.

13 So I promised, if we had profits, they would each get 22 and

14 a half percent of the first million, but we never had a profit in

15 any of those years so there was nothing to give out to anybody.

16 We were just losing money.

17 In the end, there was the entire million dollar line of

18 credit, plus I had to start putting in approximately $50,000 a

19 month of my own money for over a year to keep this thing afloat.

20 Mr. Levicoff said I was vague. I don't think this is vague.

21 Page 5 of Exhibit 46, and Exhibit 46 is the definitive statement

22 of the conditions of employment for Attorney Toriseva, "To be as

23 clear as possible, this document is all there is to determine who

24 gets what money and everything else associated with employment.

25 If it's not in this document, it does not exist.

1    "Similar things are said in other parts of this document.
2    The blanket statements in this section do not detract from or
3    conflict with the other statements, but, rather, are intended to
4    catch anything anyone can think of that's not covered by them."

5    I don't know how much clearer a person is capable of being.
6    This is it.  This is what you can look forward to.  If you do not
7    like this, you don't have to keep working here.

8    It's just extraordinarily interesting to see that this is
9    all directed towards fees, money that came in -- '7, '8, '9 --
10   three years, four years after she's gone, but no consideration
11   for all the losses the business continued to incur.

12   And this idea of comparing her time with my time, I owned
13   the business.  I didn't have to do any work.  I paid her to do
14   the work.

15   I did do a lot.  I designed almost everything she worked
16   with.  Who cares who signed the contracts with the clients.  They
17   were signed for the PLLC.

18   The marketing for all of these cases was done by these
19   gentlemen and me.  She didn't do it.  She didn't pay for the
20   newspaper ads.  She didn't pay for the television ads.  She never
21   paid anything into that firm or shared one expense on one item
22   ever.

23   When we did these seminars, she likes to present herself at
24   this point as being some kind of a superstar in mass torts.
25   Special Master Juneau, she had never been involved in anything at

1   that point.  She was only a few months from having been an
2   independent contractor with me.

3       She was interested in becoming involved and wanted to learn
4   the mass tort world, and I said, fine, this is going to be a
5   great opportunity to do it, and I'm going to let you do it.

6       So it wasn't that she brought some special expertise from
7   the job.  She got her expertise from on-the-job training with me.

8       The idea that an employee, a lawyer or otherwise, who does a
9   lot of work on something somehow has an entitlement if that pays
10  off some day to go back to the business, you would probably be
11  shocked and I think the other lawyers here would be shocked and
12  Mr. Levicoff would be shocked if one of his employee lawyers
13  comes back to him three years later and says, oh, gee, I hear
14  that case that I worked on for you paid off, where is mine?  It
15  doesn't work that way.  It never has.

16      The burden of proof to establish entitlement to anything
17  rests on Attorney Toriseva.  And all Mr. Levicoff is saying is
18  there must have been an agreement; otherwise, she wouldn't have
19  done what she did, she wouldn't have worked those hours on Vioxx.

20      We don't infer contracts.  There have to be -- there has to
21  be terms.  There has to be, when was this made, who said what,
22  how did we come up with this; not, there must have been an
23  agreement, or otherwise she wouldn't have done what she did.

24      This idea of a third, a third, a third is absolutely
25  bizarre.  It never happened.  There was never anything like that.

1    One thing you haven't heard is any suggestion as to when
2  that agreement might have been made.  The only agreement I had
3  with her that looked anything like that, where there was a part
4  of the fee went for getting the case, a part of the fee for
5  financing the case, and a part of the fee allocated for working
6  on the case, was when she was an independent contractor.

7    It makes sense in that context because I could get the case
8  and give it to her to work on, I'd get the one-third for getting
9  the case.  She could get the case and bring it in to the firm,
10 not work on it, she'd get the one-third.  But she was independent
11 then.

12   After January 2004, she was an employee, and that agreement
13 was completely gone.  Now she was getting paid a salary with a
14 guaranteed percentage bonus.

15   So it's just bizarre to suggest that any form of that
16 agreement could have survived the transition from independent
17 contractor to employee because that makes no sense in the
18 employee context.  Plus, where is there any document to support
19 that?

20   It really would have been helpful to know that she was going
21 to come in here and concede today that she wasn't a partner,
22 concede today that the PLLC agreement didn't give her any right
23 to money.  There would have been an awful lot of these exhibits,
24 a lot of affidavits that I had to -- for instance, to go get from
25 my accountant to try to demonstrate the form of ownership, it

1 wouldn't have been necessary if I'd have had any idea that as
2 soon as there was a question asked they were going to fold the
3 tent on those arguments.

4     So now we're down to she was an employee. And the terms of
5 that employment were very well spelled out in Exhibit 46. She
6 has shown you no exhibit, nothing. And even when she suggests
7 this one-third, a third, a third thing in her affidavit, it says,
8 this is how attorney, Mr. Hill, and I generally shared profits.

9     Well, that should be the key to understanding how
10 unacceptable this representation is. There never were any
11 profits. We didn't generally do it, couldn't have generally done
12 it. There was never a profit a day in that law firm when she was
13 there after 2003, and that's when she was an independent
14 contractor. To suggest otherwise is just ridiculous. I mean, we
15 have all the numbers in here showing that those were loser years.

16     SPECIAL MASTER JUNEAU: Mr. Hill, let me ask you a
17 question.

18     MR. HILL: Yes, sir.

19     SPECIAL MASTER JUNEAU: I'm looking on page 6 of your
20 affidavit which is part of the required bench book. It's
21 under --

22     MR. HILL: Tab 1?

23     SPECIAL MASTER JUNEAU: -- tab 1 --

24     MR. HILL: Yes.

25     SPECIAL MASTER JUNEAU: -- page 6.

1          MR. HILL: 6. I'm going there. Yes.

2          SPECIAL MASTER JUNEAU: And I'm going to read for you

3   under paragraph 18, "In May 2003, Toriseva told Hill that she had

4   set up the PLLC wrong by listing herself, Williams and Hill as

5   organizing members. It should have been done with Hill as the

6   owner and organizer and member."

7       19, "Toriseva drafted a letter for Hill's signature,

8   addressed to the West Virginia secretary of state and dated

9   May 29, '09, stating," in essence, I'm going to paraphrase here,

10  but that it was actually sole proprietorship, and you were the

11  sole proprietor.

12      Now, my question is, it's very clear here you're saying the

13  letter to which I had referenced earlier in one of the exhibits,

14  you're saying here she drafted that letter?

15          MR. HILL: Correct.

16          SPECIAL MASTER JUNEAU: And are you swearing under oath

17  that that's, in fact, what happened?

18          MR. HILL: Absolutely.

19      I have a very distinct memory. And when Mr. Levicoff

20  mentions that my long-time employee, Kathi Eastham, was involved

21  in this and she also made a mistake, that's true.

22      This was the simplest thing. I was -- I brought up the

23  subject and said I was reading about PLLCs. Keep in mind, at

24  this point I had been the owner of my own firm for about a month.

25  I had been in multiple partnerships, but on my own, just getting

1  started. I started with that one employee, that one long-time
2  secretary.

3      I would like to -- I think there would be some advantages in
4  becoming a PLLC. And Attorney Toriseva said, I have done that
5  before, I'll take care of it. Great. Go ahead and do it.

6      At that point, she was an independent contractor, but I
7  thought, for the benefit of her and the benefit of Attorney Mary
8  Williams, that if I got the PLLC I could put their names up there
9  and it would make them look more important and would make them
10 feel better about themselves. Good.

11     So Attorney Toriseva did the paperwork, signed it as a
12 member, took it over to Attorney Williams, she signed it as
13 member. It listed me as the third member, but it only required
14 the signature of two. So Attorney Williams signed it,
15 Attorney Toriseva signed it, I did not. And Kathi Eastham
16 notarized it. But Kathi is doing what she's told by
17 Attorney Toriseva, who has told us all she knows how to do this.

18     All right. Fast forward six months. Attorney Toriseva and
19 Kathi Eastham came into my office and said, we made a mistake on
20 the PLLC. It should -- we made a mistake by listing Attorney
21 Williams and Attorney Toriseva as members. It should only be you
22 because you're the owner. And we -- we cannot be members.

23     Okay. Can you fix it, I said to Attorney Toriseva. Sure.
24 Okay, go ahead, fix it.

25     So she drafts this letter. It's brought in to me. I sign

 1 it.  Send it to the secretary of state.  We get the certificate
 2 of correction.

 3     And there never was a first year of filing with the
 4 secretary of state where it would have shown others as a member
 5 because this was -- this correction was done in six months.

 6     So every single annual report to the secretary of state
 7 lists, this is Barry Hill, sole proprietor, doing business as
 8 Hill, Toriseva and Williams, PLLC.  It was never anything
 9 different from that.

10         SPECIAL MASTER JUNEAU:  Okay, you've answered my
11 question.  I didn't mean to cut you off.

12         MR. HILL:  I think I can be finished.  I bet you would
13 like me to be finished.

14         SPECIAL MASTER JUNEAU:  Counselor, I do have a question
15 for you.  I want to give you a chance -- I'm just concentrating
16 on what's been said here today and what's in these briefs.  We
17 have a very sharp difference of testimony here, obviously, about
18 what is known -- what is known and what the involvement is.

19     I might have to swear your client in, but is it your
20 client's sworn testimony that she did not draft that letter, she
21 had no knowledge of that letter?

22         MR. LEVICOFF:  Has no memory of drafting the letter or
23 seeing the letter.

24         SPECIAL MASTER JUNEAU:  Ms. Toriseva, would you get up
25 on the stand?

1        MS. TORISEVA: Absolutely.

2        SPECIAL MASTER JUNEAU: I have got him under oath, so

3   I'm going to ask you the same thing.

4        Do you swear to tell the truth, nothing but the truth, so

5   help you God?

6        MS. TORISEVA: I do.

7                         **TERESA TORISEVA**

8   was called as a witness and, after being first duly sworn by the

9   Special Master, was examined and testified on her oath as

10  follows:

11       SPECIAL MASTER JUNEAU: Now, you understand the issue

12  that I'm concerned about --

13       MS. TORISEVA: I do.

14       SPECIAL MASTER JUNEAU: -- in view of the controversy.

15       MS TORISEVA: Yes, sir.

16       SPECIAL MASTER JUNEAU: Are you saying that you -- first

17  of all, did you or did you not draft the letter to which we

18  refer, that's the May 29, 2009 letter to the secretary of state

19  regarding act of correction?

20       MS. TORISEVA: I have no memory of that, Judge.

21       SPECIAL MASTER JUNEAU: You're not saying you did or did

22  not; you just don't have any memory?

23       MS. TORISEVA: I have no idea. And when my counsel

24  asked me at the table, after the Court asked him and he

25  approached me and we conferred, I certainly saw the documents

1  produced in this litigation.  I know what the position is.  And I
2  know it now.

3      I have no memory of that actually occurring then.  And the
4  reason -- I mean, Judge, it just wasn't a big deal.  There wasn't
5  a lot of weight placed on it.  I don't have any basis to dispute
6  it, but I certainly can't confirm it.  I don't recall drafting
7  the letter, no.

8      I do recall being involved in the formation of the PLLC, and
9  I do recall doing the work related to it.  What all I did is only
10 refreshed by looking at documents.

11     SPECIAL MASTER JUNEAU:  Let me put the question another
12 way:  Before you got the bench book in this matter which would
13 have contained this exhibit, were you aware that there was an act
14 of correction that had been filed with the secretary of state
15 relating to who was the proprietor of that particular business?

16     MS. TORISEVA:  I don't recall it.  If it happened, it's
17 not something I placed any significance on or remember, no, sir.

18     SPECIAL MASTER JUNEAU:  Let me put it this way, second
19 question:  You said you read the bench book.  You did see these
20 two exhibits to which I refer, correct?

21     MS. TORISEVA:  Oh, yes.

22     SPECIAL MASTER JUNEAU:  Correct?

23     MS. TORISEVA:  Yes.  I think that I may have seen them
24 prior to that, but I don't remember exactly when I saw them.  I
25 know it was in the course of this litigation, yes.

1      SPECIAL MASTER JUNEAU:  When you saw them, in view of
2   all the testimony that took place here today, did that surprise
3   you?

4      MS. TORISEVA:  It did.

5      SPECIAL MASTER JUNEAU:  Did it surprise you to say,
6   that's something that I would have never done, or I never knew
7   that, or that's contrary to everything that I believe was
8   established?  There is something not adding up here.

9      MS. TORISEVA:  Oh, I understand, Your Honor.  If I may,
10  I always understood that I was drawing a minimum salary as an
11  employee.  I always understood that for IRS purposes Mr. Hill was
12  a sole proprietor.  So that didn't surprise me.

13     There are a lot things in this that have been disclosed, in
14  fact, did surprise me, including that I was never a partner or a
15  member.

16     Now, was there a partnership agreement, like I now
17  understand most people who are doing business together ought to
18  have?  No.  But when lawyers, and I think mistakenly so, I've
19  certainly learned a lot about that, but we refer to each other as
20  partners, we mean we are sharing fees on cases.  And we use the
21  term, perhaps, very loosely, but we were Hill, Toriseva and
22  Williams.  I was the partner in charge of the Vioxx litigation
23  team and marketing materials.

24     We always referred to each other as partners.  And what I
25  understood that to mean -- I certainly understood I was getting a

1 W2. That was not a surprise.

2            SPECIAL MASTER JUNEAU: But my question to you, you just

3 said a minute ago that it was clearly your understanding that

4 this name of the three individuals was a sole proprietorship, and

5 the sole proprietor of that was Mr. Hill? I thought that's what

6 you said.

7            MS. TORISEVA: In terms of how the IRS defines a sole

8 proprietorship, yes, sir, that was my understanding. It never,

9 ever defined the business relationship as between the lawyers in

10 terms of how we would share fees.

11     In fact, the one-third, one-third, one-third general

12 parameters were designed to take into account, and there has

13 never been any dispute by me, that Mr. Hill did fund the

14 practice. He paid the overhead, the rent. Those are the

15 things -- that was our understanding, and certainly our

16 agreement, and he did that.

17     So it was a sole proprietorship in the sense that I

18 understood that that was how he was characterized by the IRS, and

19 we called it a partnership in the sense that we were sharing

20 fees.

21     In other words, I understood I was getting a W2, I

22 understood what my minimum salary was, but I also always

23 understood that that's what it was, a minimum salary.

24            SPECIAL MASTER JUNEAU: One last question.

25            MS. TORISEVA: Yes, sir.

1          SPECIAL MASTER JUNEAU:  Mr. Hill referred to an
2   Exhibit 46, which is dated November 18, 2005.  It's called an
3   attorney compensation policy.  It's under tab 46.  Had you seen
4   that document and read that document in November of 2005?

5          MS. TORISEVA:  Yes, sir, I had.  Yes.  It was e-mailed
6   to me.  It was contrary to the conversations that we had had.  It
7   was contrary to my understanding of our financial arrangement.

8          After receiving that document, I approached Barry --
9   Mr. Hill.  I don't mean to be disrespectful.  I approached him,
10  said, you know, we need to talk.  This doesn't comply with my
11  understanding.  You know, I'm away from my kids three to five
12  nights a week.  I'm working -- you know, who knows -- and he did,
13  too.  I certainly don't mean to suggest I was the only one
14  working hard.  I think it's the nature of the beast in mass
15  torts.  But it was not consistent with our understanding.

16         He would write that document.  It was never signed by me or
17  anyone else.  He would circulate it, and he would say something
18  to the effect that it was designed to make sure he had control of
19  Ms. Williams or --

20         And then I would say, well, you know what, that's fine.
21  Let's talk about what our understanding is.  We even had a
22  specific conversation.  I remember it.  It was over dinner in
23  Minnesota for another mass tort project that we were engaging in.
24  And it was -- you know -- and I was very concerned specifically
25  about Vioxx fees because it was all I did.  For a period of time,

1  it was the only thing I did.

2      And we had a conversation after that document was, of

3  course, you'll share in fees, in Vioxx.  You know, and he even

4  propounded a hypothetical where the firm would make, you know, a

5  two to three, $4 million fee, that I would have a seven figure

6  payday.  I was fine with that.  There was trust, there was

7  cooperation, and I took him at his word.

8      SPECIAL MASTER JUNEAU:  Are you saying that he verbally

9  altered your arrangement after this?

10      MS. TORISEVA:  I'm saying that was never our

11  arrangement.  Parts of it are accurate; but, yes, I'm saying --

12  yes, sir, and I don't mean to quibble, but, yeah, I just want to

13  be clear -- yes, after that was sent, we had further specific

14  discussions because I was alarmed by that document when I got it

15  by e-mail.

16      And I even remember him joking because he'd sent it in an

17  e-mail right before he went out of town, sort of like, you know,

18  dropping a bomb.  And it did.  It absolutely had that effect.

19      We had conversations after it that were specifically

20  contrary on the issue of fee sharing, and specific to Vioxx,

21  because that was really, at that time, it was the main thing.

22      SPECIAL MASTER JUNEAU:  What were the specifics of that

23  conversation?

24      MS. TORISEVA:  That I would have a seven-figure payday,

25  if, hypothetically, the firm made three to four million.

1    And it's -- I'm -- I've wracked my brain trying to remember
2  exactly, I don't remember have it tape recorded, I certainly as I
3  stand here wish I did, but it was always understood that there
4  would be -- and we talked about -- we always talked about
5  different ranges.  The range was always somewhere from, you know,
6  the third, a third, a third, that we talked about and, in fact,
7  operated under in some respects at different time periods.

8    We also talked about -- there was an understanding that
9  Mr. Hill was to be compensated for his financial contribution,
10  and that he was, my term, but a senior partner of sorts.  He
11  certainly had more experience, more time in the business, all
12  that kind of thing, and more money to fund it at that point in
13  time.

14    But there was that 22 and a half percent, you know, times
15  two is 45.  It still gave him a 55 percent interest in fees.  So,
16  in my mind, it was always that was sort of the minimum that would
17  happen, and that it could be better, and that we would work that
18  out when the fees came in based in a way that made sense for
19  everybody's respective contributions, including financial.

20    But we had specific conversations about what if Vioxx paid
21  three million, I'd have a seven-figure payday.  I remember him
22  looking at me and smiling over a glass of wine at dinner in the
23  restaurant in the hotel in Minnesota after that 2005, what he
24  called attorney compensation agreement that was drafted
25  unilaterally by him and dropped like a bomb and was contrary to

1  my entire understanding.

2      And it was shortly after that, Judge, four or five months,

3  that I was locked out of the practice with no advance notice.

4  And, I mean, that's the backdrop that I think is missing is I was

5  locked out of the practice while I was in Miami on business for

6  the firm.

7      He and I drove to the airport together having conversations

8  about what would happen when he retired and how I would take

9  over, and he and I would cut a deal so that his contribution to

10 the firm could still be recognized even in his retirement.

11     .Things were good.  We trusted each other.  I trusted him, at

12 least.  And then -- and that just was a few months before was

13 that document, and then we had conversations.  So I think that it

14 was laying groundwork, frankly, for future fee disputes because

15 he was anticipating locking me out of the practice, contrary to

16 every discussion we had had.

17          SPECIAL MASTER JUNEAU:  Thank you very much.

18     Mr. Levicoff, I didn't mean to cut you off, but we had to

19 address that issue with your client.  Something else you want to

20 add?  I'm going to give you the opportunity.

21          MR. LEVICOFF:  I must say, I couldn't have handled it as

22 comprehensively as that.

23     I just want to add this postscript.  Once again, what I

24 heard my opponents say is, they have said she was a partner.

25     I tried to be very careful in my remarks when I was up here

1   the first time. I said over and over again, in a technical legal
2   sense, there was no partnership. In order to be a partnership,
3   there has been to be a partnership agreement. These lawyers did
4   not have one.

5       What I said is that they treated it as though she were a
6   partner in the sense that there was an understanding to share.
7   She was referred to by Mr. Hill in his remarks to others as "my
8   partner, Teresa."

9       I certainly did not mean to represent that there was a
10  partnership in a scenario where I said at the outset, there is no
11  partnership agreement. They probably should have had one. They
12  didn't.

13          SPECIAL MASTER JUNEAU: Okay.

14          MR. LEVICOFF: That's all I have. Thank you.

15          SPECIAL MASTER JUNEAU: Mr. Hill, I would like you to
16  address one small issue --

17          MR. HILL: Yes, sir.

18          SPECIAL MASTER JUNEAU: -- and that's the issue of what
19  discussions, if any, happened that you had with Ms. Toriseva
20  after November 18, 2005, specifically saying that there is --
21  what is your testimony as to what occurred, if any change in this
22  policy that I'm looking at, in November 18, 2005?

23          MR. HILL: No change.

24      I do know the dinner she's speaking about. It was
25  January 2006 in Minnesota. It might have been late December, but

1  it was right in there.  And that was shortly before I discharged
2  her.

3      So it would have been -- to the extent she's relying on that
4  -- and I will get to what I said, but to the extent she's relying
5  on that, that didn't happen until her involvement with Vioxx had
6  already been going on since the fall of 2004, so there wasn't any
7  way there was any reliance being placed on anything that was
8  said.

9      And I'm not sure how she interpreted it, but here is what I
10  said.  I said, if we make a lot of money in Vioxx -- and this was
11  either the end of 2004, beginning of 2005 -- if we make a lot of
12  money in Vioxx, I believe that probably the discretionary bonuses
13  will blow up the firm.

14      How do you mean that, was her response.  I said, that's
15  something you'll have to wait to see.  She might have interpreted
16  it differently; but, what I said was that I believed that the
17  discretionary bonus, and that would be what I would pay to whom
18  in my discretion, if there would be over a million dollars in
19  profit, would probably blow up the firm.

20      And I can tell you right now, I didn't know which way I was
21  going to go on that because the two of them were so much -- were
22  so -- disliked each other so much, I knew one of them was
23  eventually going to have to go, or I was going to have to go
24  because it was just very unpleasant having them.

25      So the message that I was conveying was that I was going to

1  do something fairly dramatic if and when we ever got the money.
2  But there was no promise to do a specific thing other than it
3  would be something that would probably end the law firm.

4      But to dispel the idea that the Exhibit 46 we were just
5  talking about was the first time any of this had ever been
6  discussed, that's wrong.  If you look at Exhibit 44, this is a
7  year earlier, not in as much detail, but e-mail from me to
8  Attorneys Toriseva and Williams, the issue of the form in which
9  the business will operate for the upcoming year and thereafter
10  until change has been decided.  Well, forget about the cheese
11  part.  For calendar year 2005, the first million dollars in
12  profit will be paid as employee bonuses, 22 and a half percent to
13  each you.  Distribution of profit over a million will be
14  discretionary and based on no fixed formula.  And salaries will
15  be increased to $100,000.

16      This wasn't new.  The Exhibit 46 that came a year later was
17  a more detailed version of exactly the same thing that both of
18  these attorneys had consented to work under a year before that.

19          SPECIAL MASTER JUNEAU:  Do you have anything else to
20  add?

21          MR. HILL:  Not unless you have some more questions.
22          SPECIAL MASTER JUNEAU:  No.

23      Just for purposes of the record, I'm going to mark as SM,
24  Special Master, 1, the scheduling order and identify it as such.
25              (WHEREUPON, at this point in the proceeding,

1    Exhibit SM-1 was admitted.)

2              SPECIAL MASTER JUNEAU:  I'm going to mark as SM-2 the

3    actual file of the claims administrator.

4              (WHEREUPON, at this point in the proceeding,

5    Exhibit SM-2 was admitted.)

6              SPECIAL MASTER JUNEAU:  I have marked as -- the bench

7    book of Barry Hill -- I'll just put Barry Hill 1 and Anapol 1, it

8    will be the same document -- is 1.

9              (WHEREUPON, at this point in the proceeding, Exhibit

10   Barry Hill 1 was admitted.)

11             SPECIAL MASTER JUNEAU:  The bench book submitted by

12   Mr. List is List 1.

13             (WHEREUPON, at this point in the proceeding, Exhibit

14   List 1 is admitted.)

15             SPECIAL MASTER JUNEAU:  The next one is a bench book on

16   behalf of Ms. Toriseva.  I've marked that as Toriseva 1.

17             (WHEREUPON, at this point in the proceeding, Exhibit

18   Toriseva 1 was admitted.)

19             SPECIAL MASTER JUNEAU:  And, finally, the bench book

20   that was submitted on behalf of Mr. Peterson, I'll mark that as

21   Peterson 1.

22             (WHEREUPON, at this point in the proceeding, Exhibit

23   Peterson 1 was admitted.)

24             SPECIAL MASTER JUNEAU:  I will put all of these

25   documents into evidence, which include the totality of your

1   submissions.

2       Now, are there any other comments or submissions the parties

3   want to make?  Sir?

4       MR. LIST:  Your Honor, just a housekeeping matter.

5   Exhibits 4 and 6 in the Clark, Purdue bench book, can those be

6   filed under seal?  I believe it's marked List 1.  It's the Clark,

7   Purdue bench book.

8       SPECIAL MASTER JUNEAU:  I do recall, and it must have

9   been in your brief, you mentioned something under seal, and I

10  understood at that time.  Which --

11      MR. LIST:  It's Exhibits 4 and 6, Your Honor, because

12  they contain client spreadsheets which have the client names and

13  Vioxx settlement claim numbers, which we had to give to our

14  opponent so that they could try to understand what we were

15  talking about.

16      SPECIAL MASTER JUNEAU:  Let's see if we can identify and

17  make sure we've got the right document.  4 and 6 do include the

18  individual spreadsheets, which I do think contains confidential

19  information related to individual clients.

20      MR. LIST:  Correct, Your Honor.

21      SPECIAL MASTER JUNEAU:  Unless there is an objection to

22  the contrary, Exhibits 4 and 6 of the List 1 exhibit will be in

23  evidence but under seal.

24      MR. LIST:  Thank you, Your Honor.

25      SPECIAL MASTER JUNEAU:  Thank you.

1    Sir?

2         MR. LEVICOFF:  No objection.  Just wanted to add,

3    because there was so much emphasis on it, there is, in our

4    submission under tab F --

5         SPECIAL MASTER JUNEAU:  F.

6         MR. LEVICOFF:  -- it's actually the third to the last

7    document in that section, there is an e-mail exchange between

8    Mr. Hill and Ms. Toriseva on December 12th.

9         SPECIAL MASTER JUNEAU:  If you'll wait just a minute, I

10   want to get that document.  It's under tab F, right?

11        MR. LEVICOFF:  Yes.  I think it's the third to the last

12   document in that section.

13        SPECIAL MASTER JUNEAU:  Wait a minute.  I want to get

14   there.

15        I'm looking at an e-mail from your client to, it says, a Sol

16   Weiss and others.

17        MR. LEVICOFF:  Maybe it's the one before that.  Let me

18   check.

19        I'm not sure where it is.  It's in F.  It's an e-mail

20   exchange between Mr. Hill and Ms. Toriseva on December 12th.

21        SPECIAL MASTER JUNEAU:  It's an e-mail from Hill?

22        MR. LEVICOFF:  Well, there is one from Hill to Toriseva

23   that responds to one from Toriseva to Hill, December 12th, 2005.

24        SPECIAL MASTER JUNEAU:  Let me see.  What's the date of

25   it?

1          MR. LEVICOFF:  December 12th, 2005.

2      It pertains to this exchange that they had about that

3  compensation memo, and it -- actually, it confirms that they did

4  discuss that in Minneapolis at that time over dinner.

5          SPECIAL MASTER JUNEAU:  If you would just give me -- I

6  just want to make sure I'm looking at the correct e-mail.  The

7  date is December?

8          MR. LEVICOFF:  December 12, 2005.

9          MR. HILL:  That's what I just said.  I agree with that.

10          MR. LEVICOFF:  We agree.

11          SPECIAL MASTER JUNEAU:  Counsel, I just want to see the

12  document to which y'all are referring.  I have a December e-mail

13  from Toriseva to Sol Weiss.

14      Do you have that in front of you?

15          MR. LEVICOFF:  I do.  And it's an extra copy.  May I

16  just pass that up?

17          SPECIAL MASTER JUNEAU:  It's not in order here.

18      Okay.  I've read the document.  Thank you very much.

19      If there are no other submissions at this time, the matter

20  will be taken under advisement, and I will, in fact, issue --

21  prepare and issue a formal report and recommendation to the Court

22  pursuant to the Court's instructions.  I will identify in there

23  the exhibits to which we have referred to here, and I intend to

24  get to that pretty quickly.

25      With that being said and done, that will conclude the

1  matter.

2      MS. TORISEVA:  I'm sorry, I didn't want to interrupt.

3  If I could add one thing.  May I approach the podium?

4      SPECIAL MASTER JUNEAU:  Yes.

5      MS. TORISEVA:  Thank you, Your Honor.  I assume that I'm

6  still under oath.

7      There was an argument made by my counsel as to the

8  ridiculousness of an arrangement where I'd work and labor under

9  $75,000 a year.

10     When I joined -- when Barry Hill and I formed Hill, Toriseva

11 and Williams, I had left a firm making $250,000 a year plus a

12 percentage of profits based on the work I did.  And I did,

13 contrary to Mr. Hill's assertions, have extensive experience in

14 mass torts prior to joining the firm, in asbestos, breast implant

15 and tobacco litigation.

16     And I don't know that that's been addressed in any of the

17 papers, and I wanted to offer that, since I've already been sworn

18 today.  Thank you, Judge.

19     SPECIAL MASTER JUNEAU:  Thank you very much.

20     MR. HILL:  Now, I've got to say something else.

21     SPECIAL MASTER JUNEAU:  Say it.

22     MR. HILL:  She had already quit that job that paid her

23 whatever she said it was paying her and was fishing around for a

24 new job in Wheeling, West Virginia.

25     I didn't to go her.  She came to me.  She was looking at the

1  partnership I was in before to see if they would give her an

2  independent contractor/office sharing agreement.  They decided

3  not to.  I decided I would do it.

4      I certainly didn't ask her to come with me.  She sought me

5  out looking for a place to go.

6          SPECIAL MASTER JUNEAU:  All right, sir.

7      With that, that will conclude the testimony.  Thank you very

8  much, all of you, for appearing.

9          MR. LIST:  Thank you, Your Honor.

10         (WHEREUPON, at 3:26 p.m., the proceedings were

11 concluded.)

12                          *    *    *

13

14

15                    REPORTER'S CERTIFICATE

16

17      I, Cathy Pepper, Certified Realtime Reporter, Registered
   Merit Reporter, Registered Professional Reporter, Certified Court
   Reporter of the State of Louisiana, Official Court Reporter for
18 the United States District Court, Eastern District of Louisiana,
   do hereby certify that the foregoing is a true and correct
19 transcript, to the best of my ability and understanding, from the
   record of the proceedings in the above-entitled and numbered
20 matter.

21

22                         s/Cathy Pepper
                           Cathy Pepper, CRR, RMR, CCR
                           Official Court Reporter
23                         United States District Court

24

25

**$**

$1,367,479.43 [1] - 36:9
$100,000 [3] - 63:11, 63:14, 83:15
$150,000 [1] - 49:8
$250,000 [1] - 88:11
$3,000 [1] - 63:4
$50,000 [1] - 65:18
$75,000 [3] - 63:10, 63:13, 88:9

**'**

'04 [1] - 57:10
'06 [1] - 50:9
'09 [1] - 70:9

**0**

08034 [1] - 2:17

**1**

1 [27] - 4:13, 4:14, 4:15, 4:16, 4:17, 32:16, 36:25, 37:25, 38:4, 38:11, 57:10, 64:6, 69:22, 69:23, 83:24, 84:7, 84:8, 84:10, 84:12, 84:14, 84:16, 84:18, 84:21, 84:23, 85:6, 85:22
1,367,479.43 [1] - 38:23
1.1 [6] - 23:13, 23:15, 24:4, 26:11, 27:2, 27:14
1.3 [2] - 23:11, 23:12
10 [1] - 49:11
10-year [1] - 52:3
1018 [1] - 1:24
1040 [1] - 2:16
105 [1] - 64:1
105,000 [1] - 63:15
110 [1] - 64:1
11A [1] - 57:5
12 [3] - 18:22, 37:13, 87:8
12th [7] - 17:3, 18:18, 19:12, 86:8, 86:20, 86:23, 87:1
12TH [1] - 2:13
13 [2] - 17:4, 18:22
13th [4] - 17:3, 18:4, 18:18, 19:12

1446 [1] - 2:7
27 [2] - 1:7, 5:2
27th [2] - 35:4, 36:18
28 [1] - 7:15
29 [4] - 7:9, 53:11, 70:9, 73:18
29th [5] - 9:23, 9:25, 10:8, 61:6, 61:20
2nd [1] - 36:12

**3**

3 [1] - 65:2
304 [2] - 2:16
31 [2] - 1:15, 20:1
32 [2] - 25:14, 30:3
33 [1] - 13:19
37 [1] - 10:13
38 [1] - 10:13
3:26 [1] - 89:10

**4**

4 [11] - 4:17, 30:18, 30:23, 30:25, 37:1, 46:25, 78:5, 85:5, 85:11, 85:17, 85:22
40 [1] - 24:14
43215 [1] - 2:25
44 [1] - 83:6
45 [1] - 79:15
46 [12] - 62:17, 62:18, 62:19, 63:16, 63:22, 65:21, 69:5, 77:2, 77:3, 83:4, 83:16
471 [1] - 2:24

**5**

5 [4] - 7:10, 63:25, 64:12, 65:21
5.7 [1] - 6:23
50 [1] - 10:1
500 [2] - 2:21, 3:4
504 [1] - 3:5
51268 [1] - 1:25
55 [1] - 79:15
589-7779 [1] - 3:5

**6**

6 [11] - 4:17, 7:15, 45:22, 64:12, 69:19, 69:25, 70:1, 85:5, 85:11, 85:17, 85:22
60 [1] - 10:1
650 [1] - 2:4

1550 [1] - 2:25
1657 [2] - 1:6, 5:11
169 [1] - 31:4
17th [1] - 17:4
18 [6] - 7:11, 9:21, 70:3, 77:2, 81:20, 81:22
18th [1] - 11:17
19 [1] - 70:7
1900 [1] - 2:4
1:00 [1] - 1:7
1st [1] - 30:25

**2**

2 [1] - 63:25
2002 [6] - 45:22, 46:12, 46:14, 50:7, 62:22
2003 [9] - 46:25, 50:8, 53:11, 62:22, 63:6, 64:11, 69:13, 70:3
2004 [9] - 44:1, 45:8, 52:19, 53:3, 63:14, 64:12, 68:12, 82:6, 82:11
2005 [12] - 62:21, 63:15, 77:2, 77:4, 79:23, 81:20, 81:22, 82:11, 83:11, 86:23, 87:1, 87:8
2006 [10] - 32:1, 45:9, 46:12, 46:14, 52:19, 53:4, 54:22, 63:15, 64:1, 81:25
2007 [2] - 64:1, 64:2
2008 [2] - 25:16, 52:22
2009 [13] - 16:7, 17:4, 17:16, 18:5, 18:18, 19:12, 21:8, 32:3, 37:13, 53:5, 73:18
2010 [7] - 1:7, 5:2, 9:22, 24:7, 30:25, 36:25, 53:5
202 [1] - 1:24
20th [1] - 28:21
21 [1] - 7:14
22 [4] - 64:5, 65:13, 79:14, 83:12
230 [2] - 20:2, 20:20
23rd [1] - 50:8
24 [5] - 25:17, 25:18, 25:20, 27:7, 30:3
249 [1] - 1:12
25311 [1] - 2:21

26003 [2] - 2:8, 2:13

**7**

7 [3] - 53:12, 64:12, 66:9
7.5 [2] - 6:23
70130 [1] - 3:4
70505 [1] - 1:25
73 [1] - 4:5
75,000 [3] - 51:20, 51:21, 51:22

**8**

8 [3] - 53:12, 54:6, 66:9
8.1.2 [1] - 7:5
84 [6] - 4:11, 4:12, 4:13, 4:14, 4:15, 4:16
85 [1] - 4:17
89 [1] - 2:13

**9**

9 [1] - 66:9

**A**

ability [1] - 89:19
able [4] - 25:22, 26:5, 28:13, 28:16
above-entitled [1] - 89:19
absence [3] - 10:7, 14:3, 14:4
absolute [1] - 13:3
absolutely [4] - 67:24, 70:18, 73:1, 78:18
accept [1] - 36:2
accomplish [4] - 22:19, 35:8, 35:12, 45:8
accomplishes [1] - 35:18
accordance [1] - 22:8
according [2] - 25:15
accordingly [1] - 40:18
account [2] - 30:8, 34:13, 76:12
accountant [5] - 58:17, 58:18, 62:7, 62:10, 68:25
accounts [1] - 19:22
accurate [4] - 28:1, 28:4, 38:17, 78:11
accurately [2] - 35:14,

39:11
achieve [1] - 60:14
achieved [1] - 52:20
achieving [1] - 13:21
acknowledging [1] - 54:14
act [4] - 54:5, 54:14, 73:19, 74:13
action [5] - 26:17, 26:18, 29:18, 36:13, 36:22
actions [3] - 32:16, 40:9
activities [1] - 42:18
actual [2] - 49:10, 84:3
add [8] - 6:18, 34:24, 58:7, 80:20, 80:23, 83:20, 86:2, 88:3
adding [1] - 75:8
addition [2] - 32:24, 64:4
additional [1] - 40:23
address [14] - 6:11, 6:15, 7:23, 8:1, 12:4, 12:5, 13:11, 14:12, 14:13, 15:5, 40:25, 42:4, 80:19, 81:16
addressed [2] - 50:4, 70:8, 88:16
adequately [1] - 58:10
adjustments [1] - 25:24
administrator [33] - 16:18, 16:22, 17:9, 18:11, 18:13, 18:18, 18:22, 19:1, 19:12, 19:17, 20:11, 21:2, 21:7, 22:5, 23:3, 26:21, 27:6, 27:10, 27:16, 27:22, 28:3, 28:5, 31:7, 31:9, 34:12, 34:15, 35:9, 36:2, 36:3, 37:9, 40:21, 84:3
ADMINISTRATOR [2] - 1:13, 1:16
admitted [7] - 40:24, 84:1, 84:5, 84:10, 84:14, 84:18, 84:23
ADMITTED............... ..... [1] - 4:13
ADMITTED............... ....... [2] - 4:15, 4:16
ADMITTED............... ........... [1] - 4:14
ADMITTED............... ........... [2] - 4:11, 4:12
admittedly [2] - 32:10, 43:13

**ads** [2] - 66:20
**advance** [2] - 33:23, 80:3
**advances** [1] - 48:15
**advantages** [1] - 71:3
**advisement** [1] - 87:20
**affect** [1] - 21:22
**affected** [3] - 20:6, 20:18, 20:19
**affidavit** [16] - 44:12, 44:16, 44:19, 46:2, 46:4, 46:9, 48:24, 49:16, 50:5, 51:12, 58:12, 58:14, 58:17, 62:7, 69:7, 69:20
**affidavits** [1] - 68:24
**afforded** [1] - 56:25
**afloat** [1] - 65:19
**afternoon** [1] - 12:3
**ago** [4] - 29:24, 34:8, 62:1, 76:3
**agree** [25] - 11:15, 23:13, 24:16, 24:17, 24:23, 26:10, 27:1, 28:13, 29:21, 34:16, 35:2, 35:11, 35:22, 36:11, 37:2, 38:1, 38:17, 38:19, 38:20, 38:24, 39:1, 39:4, 39:18, 87:9, 87:10
**agreeable** [1] - 28:1
**agreed** [5] - 17:17, 17:21, 26:3, 34:8, 37:25
**agreeing** [1] - 39:8
**Agreement** [2] - 7:5, 7:16
**agreement** [36] - 17:6, 18:5, 18:15, 19:6, 19:13, 25:21, 26:1, 26:4, 26:23, 30:2, 31:8, 32:8, 44:13, 44:14, 47:10, 50:15, 50:22, 51:1, 51:4, 51:11, 51:12, 60:10, 62:14, 67:18, 67:23, 68:2, 68:12, 68:16, 68:22, 75:16, 76:16, 79:24, 81:3, 81:11, 89:2
**agreements** [4] - 19:5, 25:11, 25:19, 44:21
**ahead** [4] - 27:24, 34:25, 71:5, 71:24
**Air** [2] - 24:12, 24:15
**airport** [1] - 80:7
**alarmed** [1] - 78:14
**allegedly** [1] - 20:15
**alleviate** [1] - 29:18

**allocated** [1] - 68:5
**allocation** [1] - 65:12
**allow** [1] - 38:10
**allowed** [1] - 10:5
**alluded** [2] - 51:12, 52:17
**almost** [3] - 11:25, 56:25, 66:15
**altered** [2] - 46:11, 78:9
**alternative** [1] - 35:23
**ambiguity** [1] - 8:23
**amount** [26] - 18:13, 19:14, 19:23, 21:4, 21:8, 21:15, 21:16, 23:3, 23:8, 24:21, 27:17, 27:20, 33:3, 35:9, 35:10, 35:19, 35:20, 35:25, 36:4, 37:11, 37:14, 39:19, 41:14, 49:7, 51:24, 65:12
**amounts** [1] - 39:10
**analogize** [1] - 53:1
**analysis** [1] - 42:2
**Anapol** [10] - 5:12, 6:1, 18:10, 20:3, 20:6, 20:19, 22:17, 26:2, 43:21, 84:7
**ANAPOL** [3] - 2:10, 2:11, 2:15
**AND** [3] - 1:11, 1:14, 4:17
**ANDREW** [1] - 2:24
**Andy** [5] - 5:25, 29:11, 30:12, 31:13, 32:5
**Andy's** [1] - 31:19
**annual** [1] - 54:19, 72:6
**answer** [2] - 9:2, 11:23
**answered** [1] - 10:23, 72:10
**anticipate** [1] - 12:23
**anticipated** [1] - 52:6
**anticipating** [1] - 80:15
**anyway** [1] - 23:22
**apart** [2] - 47:6, 55:1
**apology** [1] - 51:22
**apparent** [1] - 28:12
**APPEARANCES** [3] - 1:21, 2:1, 3:1
**appearances** [3] - 5:8, 5:14, 5:23
**appeared** [1] - 8:8
**appearing** [1] - 89:8
**application** [2] - 46:6, 46:7
**applied** [1] - 49:20
**apply** [1] - 25:18,

50:16, 52:24
**appointed** [1] - 17:13
**apportionment** [1] - 15:21
**appreciate** [3] - 22:12, 29:11, 31:21
**appreciates** [1] - 31:22
**appreciation** [1] - 29:7
**approach** [3] - 36:2, 36:5, 88:3
**approached** [1] - 73:25, 77:8, 77:9
**appropriate** [2] - 8:10, 43:1
**April** [2] - 50:8, 54:22
**argued** [1] - 35:5
**argument** [2] - 53:20, 88:7
**argumentative** [1] - 14:9
**arguments** [1] - 69:3
**arose** [2] - 17:5, 44:12
**arrangement** [8] - 49:16, 49:20, 51:18, 52:9, 77:7, 78:9, 78:11, 88:8
**arrangements** [5] - 51:6, 51:9, 55:11, 56:3, 56:11
**articles** [4] - 45:21, 45:22, 46:6, 46:11
**articulate** [1] - 9:16
**articulated** [1] - 21:13
**articulately** [1] - 33:24
**AS** [2] - 1:13, 1:16
**asbestos** [1] - 88:14
**assemble** [1] - 14:18
**assertions** [1] - 88:13
**asserts** [1] - 41:11
**assets** [2] - 64:19
**ASSIGNED** [1] - 1:10
**associate** [1] - 57:13
**associated** [1] - 65:24
**association** [1] - 56:14
**assume** [4] - 21:2, 46:18, 65:5, 88:5
**assure** [1] - 42:24
**attach** [1] - 30:5
**attached** [3] - 10:15, 30:19, 61:22
**attachment** [1] - 54:18
**attack** [1] - 32:3
**attempt** [2] - 12:12, 22:7
**attempted** [1] - 22:19
**attention** [2] - 6:20, 17:13, 30:10
**attesting** [1] - 57:10

**Attorney** [20] - 11:17, 62:21, 63:9, 63:18, 63:19, 63:23, 63:24, 64:11, 65:22, 67:17, 71:4, 71:7, 71:11, 71:12, 71:14, 71:15, 71:17, 71:20, 71:21, 71:23
**attorney** [22] - 10:19, 20:2, 20:4, 20:13, 25:20, 37:17, 42:12, 43:16, 44:15, 44:21, 52:17, 52:18, 52:19, 52:21, 52:23, 53:7, 57:5, 58:24, 69:8, 71:18, 77:3, 79:24
**ATTORNEY** [1:9
**attorney's** [6] - 15:22, 17:22, 17:25, 21:2, 35:21, 52:20
**Attorneys** [2] - 64:15, 83:8
**attorneys** [16] - 10:2, 16:5, 17:10, 19:5, 22:19, 23:4, 25:10, 25:12, 25:17, 41:22, 41:24, 43:18, 44:4, 45:5, 62:20, 83:18
**attorneys'** [3] - 25:15, 36:14, 41:12
**attributable** [1] - 42:20
**attribute** [1] - 22:7
**August** [16] - 24:6, 24:7, 24:19, 26:6, 28:6, 35:2, 35:4, 35:24, 36:7, 36:11, 36:18, 38:19, 39:3, 39:6, 39:15, 39:16
**authorize** [2] - 16:22, 16:24
**available** [4] - 11:19, 12:2, 12:5, 41:24
**avers** [1] - 59:5
**avoid** [1] - 24:18
**avoiding** [1] - 28:9
**AVRUM** [1] - 2:3
**Avrum** [1] - 5:16
**aware** [9] - 46:21, 47:4, 53:25, 54:1, 54:5, 54:19, 57:14, 57:17, 74:13
**awful** [1] - 68:23

---

**B**

---

**B406** [1] - 3:4
**backdrop** [1] - 80:4
**background** [1] - 9:15

**backup** [1] - 10:21
**bad** [1] - 36:19
**Barry** [33] - 5:13, 5:24, 18:1, 18:6, 18:12, 19:2, 19:3, 19:13, 19:16, 19:23, 20:10, 20:16, 21:9, 21:10, 21:11, 21:25, 24:21, 25:3, 28:2, 35:10, 35:15, 37:11, 37:14, 38:22, 45:23, 53:13, 65:4, 72:7, 77:8, 84:7, 84:10, 88:10
**BARRY** [2] - 2:12, 4:13
**base** [2] - 63:25, 64:5
**based** [8] - 19:5, 19:6, 24:4, 41:15, 52:25, 79:18, 83:14, 88:12
**basis** [4] - 65:4, 65:8, 65:11, 74:5
**BE** [1] - 4:17
**bear** [1] - 41:20
**bearing** [1] - 53:19
**beast** [1] - 77:14
**became** [1] - 28:12
**become** [2] - 33:16, 63:6
**becomes** [2] - 21:17, 42:3
**becoming** [2] - 67:3, 71:4
**Bee** [1] - 6:6
**BEE** [2] - 2:19
**BEFORE** [1] - 1:19
**beginning** [2] - 17:7, 82:11
**behalf** [3] - 40:17, 84:16, 84:20
**behind** [2] - 30:17, 62:5
**bench** [16] - 61:9, 61:13, 61:16, 61:18, 62:1, 62:19, 69:20, 74:12, 74:19, 84:6, 84:11, 84:15, 84:19, 85:5, 85:7
**benefit** [5] - 7:20, 45:5, 60:1, 71:7
**benefits** [1] - 63:10
**best** [6] - 13:22, 20:7, 25:7, 49:11, 63:16, 89:19
**bet** [3] - 10:18, 10:23, 72:12
**better** [3] - 46:22, 71:10, 79:17
**between** [17] - 5:12, 18:4, 25:19, 26:1, 31:8, 39:7, 41:14,

41:15, 47:12, 51:5,
59:10, 59:14, 63:17,
65:9, 76:9, 86:7,
86:20
**beyond** [2] - 51:8,
55:5
**bias** [1] - 58:15
**bifurcate** [1] - 29:6
**big** [4] - 52:1, 58:24,
74:4
**bills** [2] - 56:8, 63:5
**bit** [3] - 8:24, 29:6,
61:20
**biweekly** [1] - 56:25
**bizarre** [2] - 67:25,
68:15
**blanket** [1] - 66:2
**blew** [1] - 32:5
**block** [1] - 57:12
**blow** [2] - 82:13, 82:19
**boat** [2] - 32:13, 32:14
**bold** [1] - 11:12
**bomb** [1] - 78:18,
79:25
**bona** [1] - 42:24
**bonus** [6] - 64:3, 64:5,
65:2, 65:5, 68:14,
82:17
**bonuses** [6] - 65:3,
65:7, 65:10, 65:12,
82:12, 83:12
**book** [16] - 61:9,
61:13, 61:16, 61:18,
61:19, 62:1, 62:19,
69:20, 74:12, 74:19,
84:7, 84:11, 84:15,
84:19, 85:5, 85:7
**books** [3] - 6:9, 40:15,
40:16
**bore** [1] - 6:18
**borrow** [1] - 64:19
**bother** [1] - 61:23
**brain** [1] - 79:1
**breakdown** [3] -
27:18, 27:20, 36:4
**breast** [1] - 88:14
**brief** [2] - 34:22, 85:9
**briefly** [4] - 7:24, 9:14,
9:16, 34:24
**briefs** [1] - 72:16
**bring** [4] - 32:25, 57:1,
60:17, 68:9
**bringing** [4] - 7:7,
54:3, 57:2, 59:23
**brings** [1] - 58:24
**BROAD** [1] - 2:24
**broader** [1] - 48:24
**brought** [13] - 13:1,
17:12, 30:10, 41:20,
43:1, 55:23, 56:16,

56:20, 67:6, 70:22,
71:25
**burden** [3] - 26:14,
36:18, 67:16
**burdening** [1] - 34:3
**BUSINESS** [1] - 2:20
**business** [18] - 48:3,
50:19, 58:20, 59:12,
62:23, 64:3, 64:10,
66:11, 66:13, 67:10,
72:7, 74:15, 75:17,
76:9, 79:11, 80:5,
83:9
**BUT** [1] - 4:18
**BY** [9] - 1:10, 2:3, 2:7,
2:12, 2:15, 2:20,
2:24, 3:6, 3:6

## C

**calculable** [2] - 39:12,
39:13
**calculate** [2] - 38:20,
39:10
**calculated** [1] - 19:23
**calculating** [1] - 20:9
**calculation** [14] - 19:4,
19:15, 21:19, 24:25,
30:8, 31:4, 31:14,
31:17, 32:15, 37:21,
37:22, 38:1, 38:2,
38:17
**calculus** [2] - 20:14,
20:15
**calendar** [3] - 6:25,
64:4, 83:11
**candidly** [3] - 8:3,
13:18, 23:20
**cannot** [1] - 71:22
**capable** [2] - 52:3,
66:5
**car** [1] - 12:23
**cards** [1] - 28:14
**care** [3] - 14:19, 41:17,
71:5
**career** [1] - 56:3
**careful** [1] - 80:25
**cares** [1] - 66:16
**Carper** [1] - 6:6
**CARPER** [2] - 2:19
**cars** [1] - 56:9
**case** [25] - 12:12, 13:6,
16:15, 19:14, 19:23,
27:17, 27:18, 27:20,
30:14, 32:6, 33:5,
36:5, 52:18, 52:19,
52:22, 55:23, 56:20,
58:24, 67:14, 68:4,
68:5, 68:6, 68:7,

68:9
**cases** [28] - 19:25,
20:1, 20:2, 20:6,
20:7, 20:12, 20:18,
20:24, 21:10, 25:13,
30:9, 31:4, 32:3,
32:7, 42:24, 42:25,
44:11, 49:13, 54:3,
56:16, 58:25, 59:18,
60:16, 63:1, 63:2,
64:21, 66:18, 75:20
**castigated** [1] - 26:15
**catch** [1] - 66:4
**Cathy** [2] - 89:16,
89:22
**CATHY** [1] - 3:3
**CCR** [2] - 3:3, 89:22
**cent** [4] - 48:15, 60:2,
60:18, 64:18
**CENTER** [1] - 1:23
**certain** [1] - 51:8
**certainly** [30] - 8:13,
22:6, 29:1, 32:24,
35:11, 36:20, 40:1,
41:21, 41:23, 46:9,
51:23, 53:22, 54:1,
54:17, 56:15, 57:16,
57:23, 58:23, 59:9,
73:25, 74:6, 75:19,
75:25, 76:15, 77:13,
79:2, 79:11, 81:9,
89:4
**CERTIFICATE** [1] -
89:15
**certificate** [7] - 47:1,
53:9, 54:9, 54:16,
54:18, 61:21, 72:1
**CERTIFIED** [1] - 3:3
**Certified** [2] - 89:16,
89:17
**certify** [1] - 89:18
**chance** [2] - 12:8,
40:13, 72:15
**change** [8] - 46:19,
54:2, 61:14, 61:20,
61:21, 81:21, 81:23,
83:10
**changed** [1] - 54:10
**changes** [1] - 41:19
**changing** [1] - 54:20
**characterized** [1] -
76:18
**charge** [1] - 75:22
**charged** [1] - 49:23
**CHARLESTON** [1] -
2:21
**Charleston** [2] -
11:21, 43:22
**check** [1] - 86:18
**checked** [3] - 11:18,

57:13, 57:17
**cheese** [1] - 83:10
**CHERRY** [1] - 2:17
**chose** [1] - 62:1
**circulate** [1] - 77:17
**circumstance** [1] -
52:11
**circumstances** [10] -
14:2, 48:6, 48:16,
49:17, 49:22, 50:21,
50:23, 59:5, 59:21,
60:15
**civil** [1] - 42:19
**claim** [31] - 16:18,
17:8, 18:11, 18:13,
18:18, 18:22, 19:1,
19:11, 19:17, 20:11,
21:2, 21:7, 22:5,
23:3, 26:20, 26:21,
27:16, 27:21, 28:3,
28:5, 29:17, 34:16,
34:18, 35:9, 36:15,
36:16, 36:17, 41:11,
48:10, 62:9, 85:13
**claimant** [2] - 44:13,
62:11
**CLAIMANTS** [2] -
1:12, 1:15
**claimants** [8] - 17:11,
17:14, 17:20, 17:22,
18:9, 43:3, 43:17,
45:4
**claiming** [2] - 36:14,
62:11
**CLAIMS** [2] - 1:13,
1:16
**claims** [17] - 31:7,
31:9, 34:11, 34:12,
34:15, 36:1, 36:3,
37:9, 40:21, 41:21,
41:23, 41:24, 43:4,
46:18, 47:12, 57:11,
84:3
**CLARK** [2] - 2:23
**Clark** [7] - 5:13, 5:25,
10:2, 11:3, 43:20,
85:5, 85:6
**clear** [16] - 8:22, 10:8,
11:12, 12:16, 16:14,
16:15, 16:17, 29:23,
35:1, 45:11, 64:8,
65:3, 65:23, 70:12,
78:13
**clearer** [1] - 66:5
**clearly** [3] - 29:2,
54:12, 76:3
**CLERK** [1] - 5:7
**client** [36] - 23:23,
24:3, 28:8, 28:23,
29:16, 29:22, 36:13,

36:19, 36:21, 38:5,
38:8, 42:23, 44:19,
46:13, 46:14, 46:20,
47:7, 47:13, 47:15,
47:18, 48:19, 49:13,
50:7, 51:16, 53:16,
53:18, 53:24, 54:19,
57:9, 58:18, 59:16,
72:19, 80:19, 85:12,
86:15
**client's** [7] - 10:12,
43:10, 50:9, 51:12,
56:12, 59:9, 72:20
**clients** [5] - 43:17,
44:6, 44:10, 66:16,
85:19
**clients'** [1] - 30:1
**close** [1] - 38:19
**club** [2] - 24:12, 24:15
**COHAN** [2] - 2:10,
2:11
**Columbus** [1] - 11:22
**COLUMBUS** [1] - 2:25
**column** [4] - 19:1,
19:13, 20:10, 20:16
**coming** [1] - 60:25
**commensurate** [1] -
25:21
**comment** [1] - 58:10
**comments** [2] - 34:24,
85:2
**common** [3] - 25:16,
41:22, 45:4
**communications** [7] -
16:17, 16:18, 18:3,
19:20, 27:15, 43:23,
51:6
**company** [2] - 10:20,
45:19
**comparative** [3] -
41:15, 42:2, 42:4
**compare** [1] - 42:6
**comparing** [1] - 66:12
**compelling** [1] - 8:7
**compensated** [1] -
79:9
**compensation** [6] -
51:25, 60:9, 77:3,
79:24, 87:3
**complaining** [1] - 22:6
**complete** [1] - 40:22
**completely** [1] - 68:13
**compliance** [3] -
13:23, 13:24, 13:25
**comply** [3] - 8:25, 9:8,
77:10
**comports** [1] - 49:20
**comprehensively** [1] -
80:22
**computation** [7] -

19:10, 24:22, 25:9,
26:5, 26:12, 27:19,
38:25
**computations** [1] -
37:17
**compute** [2] - 19:3,
39:17
**computer** [1] - 10:22
**COMPUTER** [1] - 3:6
**computes** [1] - 35:14
**computing** [1] - 23:7
**concede** [3] - 19:9,
68:21, 68:22
**concentrating** [1] -
72:15
**concerned** [5] - 9:9,
14:10, 15:17, 73:12,
77:24
**conciliation** [1] -
28:13
**conclude** [3] - 13:24,
87:25, 89:7
**concluded** [1] - 89:11
**conclusion** [4] -
48:21, 49:21, 51:10,
56:23
**conditions** [1] - 65:22
**conducive** [1] - 36:20
**conduct** [1] - 42:25
**confer** [2] - 11:15,
57:15
**conference** [16] -
11:11, 11:14, 12:2,
15:6, 15:7, 17:15,
23:25, 24:19, 28:10,
32:23, 33:5, 33:10,
34:1, 34:4, 38:5,
40:5
**conferences** [1] -
33:22
**conferred** [2] - 61:2,
73:25
**confidential** [1] -
85:18
**confirm** [1] - 74:6
**confirms** [1] - 87:3
**conflict** [1] - 66:3
**connection** [1] - 53:10
**connote** [2] - 14:2,
47:13
**connotes** [1] - 47:16
**consensus** [2] -
48:21, 52:10
**consented** [1] - 83:18
**consequence** [1] -
20:15
**consider** [1] - 20:12
**considerable** [1] -
33:3
**consideration** [1] -

66:10
**considered** [2] -
40:10, 58:14
**consistent** [1] - 77:15
**consistently** [1] -
21:20
**consortium** [6] - 30:9,
42:1, 43:2, 44:7,
45:1, 45:2
**constantly** [2] - 21:23,
35:3
**construction** [1] -
12:23
**contact** [1] - 14:4
**contain** [1] - 85:12
**contained** [3] - 19:1,
61:13, 74:13
**contains** [1] - 85:18
**contend** [1] - 42:8
**contends** [4] - 45:14,
45:15, 47:7, 50:2
**contention** [5] - 50:3,
51:15, 61:2, 62:5,
62:8
**contentions** [1] -
50:12
**context** [2] - 68:7,
68:18
**contingent** [4] - 44:13,
44:14, 44:21, 48:18
**continually** [1] - 29:16
**CONTINUED** [2] - 2:1,
3:1
**continued** [2] - 62:22,
66:11
**continuing** [1] - 39:16
**contractor** [7] - 62:23,
64:12, 67:2, 68:6,
68:17, 69:14, 71:6
**contractor/office** [1] -
89:2
**contracts** [2] - 66:16,
67:20
**contrary** [9] - 60:10,
75:7, 77:6, 77:7,
78:20, 79:25, 80:15,
85:22, 88:13
**contribution** [6] -
41:15, 42:3, 42:4,
42:7, 79:9, 80:9
**contributions** [1] -
79:19
**control** [2] - 10:21,
77:18
**controlling** [2] - 59:7,
59:8
**controversy** [2] -
45:10, 73:14
**conversation** [8] -
17:17, 17:23, 24:24,

26:6, 35:25, 77:22,
78:2, 78:23
**conversations** [5] -
77:6, 78:19, 79:20,
80:7, 80:13
**conveying** [1] - 82:25
**cooperation** [1] - 78:7
**copy** [1] - 87:15
**corporation** [4] -
54:13, 55:13, 55:14,
59:11
**correct** [17] - 9:19,
9:24, 16:25, 17:1,
21:21, 24:22, 26:17,
27:2, 30:5, 39:6,
57:19, 70:15, 74:20,
74:22, 85:20, 87:6,
89:18
**corrected** [1] - 46:24
**correction** [12] -
46:22, 47:1, 53:9,
54:6, 54:8, 54:9,
54:10, 54:14, 72:2,
72:5, 73:19, 74:14
**correspond** [1] -
38:13
**cost** [1] - 25:24
**costs** [1] - 19:7
**counsel** [6] - 5:14,
6:8, 57:13, 73:23,
87:11, 88:7
**COUNSEL** [2] - 1:13,
1:16
**counselor** [1] - 72:14
**count** [1] - 10:13
**counter** [1] - 44:20
**counter-signing** [1] -
44:20
**countersigned** [2] -
18:17, 18:21
**countless** [3] - 42:15,
44:25, 48:9
**counts** [1] - 59:15
**county** [1] - 28:9
**couple** [1] - 58:11
**course** [4] - 14:7,
64:24, 74:25, 78:3
**Court** [19] - 7:7, 7:18,
13:3, 17:13, 29:24,
30:1, 30:22, 31:22,
32:7, 39:25, 40:8,
60:4, 73:24, 87:21,
89:17, 89:17, 89:18,
89:22, 89:23
**COURT** [4] - 1:1, 1:10,
3:3, 5:4
**court** [7] - 8:21, 13:7,
13:8, 16:9, 25:15,
32:25, 36:14
**Court's** [2] - 6:20,

87:22
**courthouse** [1] -
12:21
**courtroom** [1] - 31:17
**covered** [1] - 66:4
**create** [1] - 43:2
**created** [2] - 31:24,
45:24
**credibility** [2] - 45:11,
58:13
**credible** [1] - 52:6
**credit** [2] - 64:16,
65:18
**criteria** [1] - 59:21
**CRR** [2] - 3:3, 89:22
**current** [1] - 46:9
**cut** [2] - 72:11, 80:9,
80:18

## D

**database** [1] - 43:19
**date** [13] - 6:25, 11:15,
12:16, 14:16, 14:19,
14:25, 15:1, 15:2,
15:8, 19:18, 32:4,
86:24, 87:7
**dated** [4] - 18:22,
53:11, 70:8, 77:2
**dates** [10] - 11:13,
11:18, 11:23, 12:5,
12:6, 14:18, 14:22,
28:18, 28:24
**Davis** [2] - 17:13,
17:15
**days** [8] - 7:6, 7:12,
7:15, 7:16, 10:13,
18:3, 28:22, 43:13
**deadline** [3] - 12:1,
12:10, 28:21
**deal** [5] - 22:20, 52:12,
62:25, 74:4, 80:9
**dealing** [1] - 29:15
**debate** [1] - 28:7
**decade** [1] - 46:2
**December** [8] - 81:25,
86:8, 86:20, 86:23,
87:1, 87:7, 87:8,
87:12
**decide** [1] - 40:3
**decided** [4] - 64:22,
83:10, 89:2, 89:3
**decision** [1] - 9:17
**deductions** [1] - 55:4
**deem** [1] - 7:18
**DEEMER** [1] - 2:3
**Deemer** [2] - 5:17,
55:12
**defendant** [1] - 33:16

**defined** [1] - 76:9
**defines** [1] - 76:7
**definitive** [4] - 18:5,
40:8, 47:10, 65:21
**degree** [6] - 41:4,
41:17, 48:23, 49:18,
49:25, 59:7
**Deitzler** [1] - 6:6
**DEITZLER** [2] - 2:19
**delayed** [1] - 12:20
**delivery** [1] - 13:15
**demonstrate** [1] -
68:25
**demonstrates** [1] -
13:2
**denied** [1] - 39:25
**deny** [2] - 39:23, 39:24
**depositions** [3] - 10:5,
10:6, 10:11
**DEPUTY** [1] - 5:7
**derived** [3] - 48:18,
52:23, 54:25
**deriving** [1] - 52:1
**describe** [1] - 20:5
**describes** [1] - 49:16
**describing** [1] - 47:18
**DESCRIPTION** [1] -
4:9
**designed** [3] - 66:15,
76:12, 77:18
**detail** [1] - 83:7
**detailed** [1] - 83:17
**determine** [3] - 25:23,
59:14, 65:23
**determining** [1] -
42:25
**detract** [1] - 66:2
**developing** [1] - 48:9
**devoted** [1] - 52:21
**dialogue** [1] - 24:2
**dictate** [1] - 5:9
**difference** [1] - 72:17
**differences** [1] - 34:2
**different** [7] - 10:14,
39:7, 47:13, 64:23,
72:9, 79:5, 79:7
**differently** [1] - 82:16
**difficult** [4] - 19:9,
26:9, 38:20, 39:11
**dignity** [1] - 13:6
**dinner** [4] - 77:22,
79:22, 81:24, 87:4
**directed** [1] - 66:9
**director** [1] - 55:7
**disbursement** [1] -
17:20
**discharge** [4] - 47:2,
50:8, 51:15, 54:22
**discharged** [5] -

52:18, 52:21, 52:23, 53:7, 82:1
**disclosed** [1] - 75:13
**discovery** [1] - 42:17
**discretion** [1] - 82:18
**discretionary** [6] - 65:2, 65:4, 65:12, 82:12, 82:17, 83:14
**discuss** [1] - 87:4
**discussed** [2] - 37:20, 83:6
**discussing** [1] - 53:24
**discussion** [3] - 41:3, 41:6, 80:16
**discussions** [2] - 78:14, 81:19
**disliked** [1] - 82:22
**dispel** [1] - 83:4
**dispute** [22] - 5:11, 15:11, 15:18, 15:21, 15:24, 16:10, 16:25, 24:13, 28:11, 30:13, 32:4, 33:8, 33:12, 38:15, 38:23, 42:11, 43:9, 45:6, 45:7, 74:5, 76:13
**DISPUTE** [1] - 1:9
**disputes** [1] - 80:14
**disputing** [1] - 62:8
**disrespectful** [1] - 77:9
**distinct** [1] - 70:19
**distinguish** [1] - 47:11
**distraction** [1] - 8:17
**distributable** [1] - 18:1
**distribute** [3] - 55:18, 55:22, 56:6
**distributed** [3] - 21:1, 21:3, 21:12
**distribution** [4] - 25:4, 32:2, 35:21, 83:13
**distributions** [2] - 21:4, 30:6
**DISTRICT** [2] - 1:1, 1:1
**District** [3] - 89:18, 89:23
**divide** [4] - 26:3, 34:10, 34:14, 56:6
**dividends** [1] - 59:12
**division** [3] - 27:8, 49:1, 51:13
**divisions** [1] - 23:24
**DOCKET** [1] - 1:6
**docket** [1] - 10:21
**document** [20] - 18:14, 57:14, 65:23, 65:25, 66:1, 68:18, 77:4, 77:8, 77:16, 78:2, 78:14, 80:13,

84:8, 85:17, 86:7, 86:10, 86:12, 87:12, 87:18
**DOCUMENT** [1] - 1:8
**documentary** [1] - 43:14
**documentation** [3] - 16:22, 47:17, 49:8
**documents** [14] - 18:16, 40:23, 43:12, 44:17, 44:19, 46:22, 47:20, 49:9, 50:25, 53:12, 58:6, 73:25, 74:10, 84:25
**dogmatic** [1] - 21:18
**dollar** [2] - 34:14, 65:17
**dollars** [11] - 29:19, 34:11, 48:12, 48:14, 48:23, 58:25, 59:18, 64:14, 64:17, 82:18, 83:11
**done** [24] - 12:10, 19:4, 22:4, 29:22, 30:11, 31:16, 31:18, 33:6, 33:19, 34:4, 35:5, 36:19, 38:18, 42:21, 66:18, 67:19, 67:23, 69:11, 70:5, 71:4, 72:5, 75:6, 87:25
**door** [2] - 45:9, 46:13
**doubt** [3] - 28:1, 28:16, 42:14
**down** [9] - 24:16, 28:19, 33:22, 34:18, 34:19, 43:2, 45:3, 64:16, 69:4
**dozen** [1] - 35:13
**dozens** [1] - 16:16
**draft** [2] - 72:20, 73:17
**drafted** [4] - 18:20, 70:7, 70:14, 79:24
**drafting** [2] - 72:22, 74:6
**drafts** [1] - 71:25
**dramatic** [1] - 83:1
**draw** [6] - 6:20, 51:19, 55:13, 56:7, 56:24, 60:7
**DRAWER** [1] - 1:25
**drawing** [2] - 64:16, 75:10
**dropped** [1] - 79:25
**dropping** [1] - 78:18
**drove** [1] - 80:7
**due** [13] - 7:3, 11:6, 14:7, 14:18, 14:19, 16:5, 16:10, 17:10, 17:11, 21:25, 41:12,

41:22, 41:25
**duly** [1] - 73:8
**duplicate** [1] - 7:1
**during** [7] - 17:15, 46:11, 50:24, 53:3, 55:17, 56:13
**duty** [2] - 13:7, 49:23

## E

**e-mail** [20] - 10:15, 12:1, 26:13, 26:22, 28:20, 35:4, 35:17, 36:10, 36:18, 38:7, 78:15, 78:17, 83:7, 86:7, 86:15, 86:19, 86:21, 87:6, 87:12
**e-mailed** [1] - 77:5
**earn** [4] - 50:18, 51:7, 52:6, 60:15
**earned** [4] - 45:13, 52:1, 52:14, 60:11
**earnings** [1] - 55:24
**earns** [1] - 55:15
**easier** [1] - 60:22
**easily** [2] - 39:12
**EAST** [1] - 2:24
**Eastern** [1] - 89:18
**EASTERN** [1] - 1:1
**Eastham** [7] - 46:3, 46:8, 50:5, 58:12, 70:20, 71:15, 71:19
**eastham's** [1] - 46:4
**easy** [2] - 23:9, 52:13
**effect** [5] - 16:21, 26:13, 46:3, 77:18, 78:18
**effort** [7] - 13:22, 22:3, 39:10, 39:16, 44:5, 49:3
**efforts** [9] - 16:13, 26:23, 42:3, 42:12, 44:25, 45:4, 52:14, 52:15
**eight** [3] - 7:12, 7:16, 25:16
**eighth** [1] - 6:24
**either** [6] - 6:12, 7:17, 10:24, 13:11, 59:24, 82:11
**element** [1] - 24:25
**embrace** [2] - 18:2, 21:24
**embraced** [1] - 8:4
**embraces** [1] - 15:18
**emphasis** [1] - 86:3
**employee** [25] - 47:12, 48:6, 50:4, 50:10, 50:20, 50:23, 51:3,

51:17, 55:4, 56:19, 57:13, 57:22, 57:25, 58:1, 63:7, 67:8, 67:12, 68:12, 68:17, 68:18, 69:4, 70:20, 71:1, 75:11, 83:12
**employees** [1] - 58:1
**employment** [4] - 52:12, 65:22, 65:24, 69:5
**end** [10] - 28:18, 39:19, 55:21, 56:9, 59:20, 59:24, 63:6, 65:17, 82:11, 83:3
**endeavor** [1] - 48:11
**enforced** [1] - 11:13
**engaging** [1] - 77:23
**enormous** [1] - 59:24
**ensued** [1] - 18:3
**enter** [1] - 13:25
**entered** [4] - 8:14, 17:8, 25:15, 37:16
**entire** [3] - 46:12, 65:17, 80:1
**entitled** [8] - 42:22, 50:18, 52:16, 52:24, 53:6, 60:1, 89:19
**entitlement** [3] - 61:3, 67:9, 67:16
**entitles** [1] - 7:17
**entity** [1] - 54:23
**entrusting** [1] - 48:19
**entry** [2] - 8:4, 8:6
**equal** [1] - 65:9
**equation** [1] - 16:12
**equities** [1] - 60:13
**error** [13] - 19:21, 19:22, 19:24, 20:5, 20:9, 22:5, 22:6, 24:20, 24:25, 30:8, 30:10
**especially** [1] - 59:1
**ESQUIRE** [7] - 2:3, 2:7, 2:12, 2:12, 2:15, 2:20, 2:24
**essence** [2] - 16:23, 70:9
**essentially** [2] - 23:7, 43:5
**establish** [2] - 8:22, 67:16
**established** [2] - 10:22, 75:8
**estimate** [1] - 35:16
**euphemistic** [1] - 59:4
**euphemistically** [1] - 47:11
**event** [5] - 20:9, 24:4, 27:25, 46:11, 49:9
**events** [1] - 15:9

**eventually** [1] - 82:23
**EVIDENCE** [1] - 4:18
**evidence** [7] - 22:9, 40:17, 43:14, 44:24, 46:5, 84:25, 85:23
**evidences** [1] - 50:17
**evidently** [3] - 19:22, 20:22, 22:5
**Ex** [2] - 12:19, 13:13
**exact** [1] - 32:4
**exactly** [5] - 18:19, 60:10, 74:24, 79:2, 83:17
**EXAMINATIONS** [1] - 4:3
**examine** [1] - 35:19
**examined** [2] - 44:20, 73:9
**example** [1] - 55:7
**exceeding** [2] - 65:7, 65:10
**excess** [1] - 65:6
**exchange** [8] - 9:22, 14:25, 15:1, 15:2, 40:5, 86:7, 86:20, 87:2
**exchanged** [2] - 10:8, 61:6
**exclusion** [1] - 56:16
**excuse** [4] - 12:11, 14:16, 34:3, 64:11
**excuses** [1] - 12:18
**exhibit** [12] - 30:18, 30:24, 40:15, 40:16, 40:21, 47:20, 54:18, 57:5, 64:13, 69:6, 74:13, 85:22
**EXHIBIT** [7] - 4:11, 4:12, 4:13, 4:14, 4:15, 4:16, 4:17
**Exhibit** [21] - 30:18, 30:23, 30:25, 37:1, 54:6, 57:4, 63:16, 63:22, 65:21, 69:5, 77:2, 83:4, 83:6, 83:16, 84:1, 84:5, 84:9, 84:13, 84:17, 84:22
**Exhibits** [3] - 53:12, 85:11, 85:22
**EXHIBITS** [1] - 4:17
**exhibits** [12] - 10:1, 40:7, 44:18, 47:21, 53:12, 53:14, 57:4, 68:23, 70:13, 74:20, 85:5, 87:23
**exist** [3] - 25:19, 32:12, 65:25
**existence** [1] - 65:12
**expect** [1] - 55:4

**expectation** [7] - 45:12, 47:14, 48:11, 49:18, 51:25, 54:2, 59:1
**expected** [1] - 64:7
**expense** [2] - 19:7, 66:21
**experience** [3] - 13:14, 79:11, 88:13
**expertise** [2] - 67:6, 67:7
**explain** [4] - 14:21, 18:24, 33:24, 63:17
**explained** [6] - 19:24, 24:24, 25:3, 32:10, 33:1, 58:10
**explaining** [1] - 25:6
**explanation** [2] - 11:9, 14:16
**explicit** [1] - 60:5
**explicitly** [1] - 60:3
**Express** [2] - 13:15, 40:1
**express** [2] - 51:4, 51:11
**expressed** [1] - 50:14
**expressions** [1] - 51:9
**extensive** [1] - 88:13
**extensively** [1] - 45:8
**extent** [5] - 43:21, 48:14, 49:14, 82:3, 82:4
**extra** [1] - 87:15
**extraordinarily** [2] - 23:16, 66:8
**extremely** [1] - 18:24

**F**

**fact** [22] - 6:20, 9:23, 10:1, 13:13, 15:3, 16:3, 22:14, 28:6, 28:8, 29:18, 31:19, 40:1, 40:2, 48:4, 48:22, 59:2, 59:6, 70:17, 75:14, 76:11, 79:6, 87:20
**factors** [2] - 21:22, 37:16
**failed** [1] - 30:8
**failing** [2] - 8:24, 28:20
**fairly** [4] - 19:8, 19:9, 52:13, 83:1
**fall** [3] - 30:11, 31:9, 82:6
**familiar** [1] - 9:2
**far** [3] - 8:11, 15:16, 49:14

**fashion** [1] - 55:21
**fast** [1] - 71:18
**fault** [2] - 21:17, 22:7
**favor** [3] - 35:23, 58:15, 60:13
**faxed** [1] - 31:7
**fear** [1] - 23:6
**Fed** [2] - 12:19, 13:13
**federal** [1] - 36:13
**Federal** [2] - 13:15, 40:1
**fee** [57] - 17:25, 18:6, 18:12, 19:2, 19:3, 19:13, 19:16, 19:23, 20:10, 20:13, 20:16, 21:9, 21:10, 21:11, 23:24, 24:21, 25:1, 25:5, 25:15, 28:3, 30:13, 32:6, 35:15, 37:11, 37:14, 38:17, 41:16, 41:18, 41:21, 41:23, 41:25, 42:3, 42:5, 42:9, 42:13, 42:19, 42:23, 44:13, 44:14, 44:21, 45:5, 48:23, 49:7, 49:9, 49:11, 51:9, 52:14, 52:25, 53:5, 53:6, 56:21, 68:4, 68:5, 78:5, 78:20, 80:14
**FEE** [1] - 1:9
**fees** [50] - 15:22, 16:4, 16:10, 16:12, 17:22, 21:3, 21:4, 22:16, 22:17, 22:20, 23:4, 23:8, 25:4, 25:10, 28:2, 29:19, 30:13, 35:9, 35:21, 36:14, 37:17, 41:12, 45:13, 47:14, 48:13, 48:14, 48:18, 48:25, 49:19, 49:25, 50:22, 51:2, 51:7, 52:1, 54:3, 54:4, 55:1, 56:16, 57:1, 59:24, 60:16, 64:9, 66:9, 75:20, 76:10, 76:20, 77:25, 78:3, 79:15, 79:18
**FELDMAN** [2] - 2:10, 2:11
**fellows** [1] - 33:17
**felt** [1] - 26:9
**fence** [1] - 6:13
**few** [4] - 29:24, 40:19, 67:1, 80:12
**fide** [1] - 42:24
**figure** [13] - 24:4, 24:21, 32:18, 34:18, 34:21, 38:22, 39:2, 49:9, 50:11, 51:23,

78:5, 78:24, 79:21
**file** [10] - 10:9, 11:5, 15:23, 32:4, 33:14, 40:16, 40:21, 42:17, 59:11, 84:3
**filed** [19] - 6:10, 6:24, 7:3, 10:16, 12:15, 14:20, 16:9, 16:15, 17:7, 22:1, 29:23, 36:13, 40:12, 45:24, 57:4, 57:5, 58:19, 74:14, 85:6
**files** [1] - 59:8
**filing** [5] - 45:21, 46:12, 46:24, 54:15, 72:3
**filings** [1] - 16:20
**final** [5] - 32:2, 32:8, 32:11, 32:12, 37:21
**finally** [1] - 84:19
**finance** [2] - 49:4, 49:5, 49:6
**financial** [2] - 77:7, 79:9, 79:19
**financing** [1] - 68:5
**fine** [3] - 67:4, 77:20, 78:6
**finished** [2] - 72:12, 72:13
**firm** [61] - 5:12, 5:13, 5:16, 11:3, 15:23, 18:5, 18:9, 18:10, 19:6, 20:3, 26:1, 26:2, 29:8, 29:19, 29:20, 31:25, 41:13, 42:16, 42:20, 42:22, 43:5, 43:11, 43:16, 43:19, 43:20, 43:22, 44:2, 44:22, 45:1, 45:15, 45:24, 47:16, 48:10, 48:12, 48:17, 48:19, 54:25, 55:5, 55:15, 57:2, 57:8, 58:25, 59:2, 59:23, 66:21, 68:9, 69:12, 70:24, 78:4, 78:25, 80:6, 80:10, 82:13, 82:19, 83:3, 88:11, 88:14
**firms** [10] - 16:23, 22:13, 24:10, 28:15, 33:8, 33:11, 42:1, 43:24, 45:2, 56:23
**first** [22] - 7:8, 8:1, 9:21, 13:12, 14:15, 15:13, 16:8, 17:15, 18:15, 22:25, 23:11, 25:2, 26:16, 37:10, 44:1, 65:14, 72:3, 73:8, 73:16, 81:1,

83:5, 83:11
**fishing** [1] - 88:23
**five** [4] - 24:10, 60:15, 77:11, 80:2
**fix** [3] - 34:20, 71:23, 71:24
**fixed** [3] - 64:3, 64:5, 83:14
**fixing** [1] - 34:24
**fly** [1] - 24:12
**focal** [1] - 8:17
**focused** [1] - 41:9
**fold** [1] - 69:2
**follow** [3] - 27:9, 27:12, 51:14
**follow-up** [1] - 51:14
**followed** [1] - 8:21
**following** [2] - 13:17, 64:1
**follows** [3] - 9:21, 20:22, 73:10
**FOR** [7] - 1:11, 1:12, 1:15, 2:3, 2:10, 2:19, 2:23
**foregoing** [1] - 89:18
**forget** [2] - 32:3, 83:10
**forgot** [2] - 10:17, 11:10
**form** [5] - 44:14, 54:22, 68:15, 68:25, 83:8
**formal** [1] - 87:21
**formally** [1] - 21:23
**formation** [2] - 46:6, 47:7, 74:8
**formed** [3] - 45:21, 51:5, 88:10
**former** [1] - 15:23
**formula** [2] - 65:11, 83:14
**forth** [2] - 27:16, 38:8
**fortune** [1] - 55:15
**forward** [2] - 66:6, 71:18
**four** [6] - 24:9, 36:17, 66:10, 78:25, 80:2
**frame** [2] - 7:5, 10:14
**frankly** [2] - 32:18, 80:14
**free** [4] - 17:14, 18:8, 18:9, 23:3
**frequently** [1] - 42:18
**Friday** [2] - 28:22, 28:25
**front** [1] - 87:14
**full** [3] - 30:7, 35:20, 51:24
**fund** [4] - 25:16, 41:22, 76:13, 79:12
**funding** [4] - 20:23,

20:25, 21:1, 43:8
**funds** [7] - 17:9, 17:10, 18:7, 22:2, 23:8, 31:10
**future** [2] - 65:12, 80:14

**G**

**gee** [4] - 30:12, 30:13, 31:13, 67:13
**general** [1] - 76:11
**generally** [4] - 11:6, 69:8, 69:11
**generate** [1] - 48:12
**generated** [2] - 49:1, 61:19
**genius** [1] - 34:21
**gentlemen** [1] - 66:19
**giant** [1] - 32:13
**given** [6] - 12:5, 31:16, 49:25, 50:21, 62:24
**glass** [1] - 79:22
**God** [2] - 55:24, 73:5
**golly** [2] - 30:12, 31:13
**gosh** [1] - 30:13
**govern** [1] - 59:9
**governing** [1] - 59:21
**granted** [1] - 36:16
**great** [4] - 16:7, 49:24, 67:5, 71:5
**greater** [1] - 20:16
**Greg** [1] - 6:1
**GREGORY** [1] - 2:15
**gross** [2] - 23:10, 27:16
**groundwork** [1] - 80:14
**group** [3] - 19:25, 44:22, 58:24
**groups** [1] - 19:25
**guaranteed** [1] - 68:14
**guess** [3] - 14:9, 27:7, 40:12
**guide** [1] - 42:10
**guys** [1] - 12:13

**H**

**half** [7] - 12:21, 49:10, 64:5, 65:14, 79:14, 83:12
**hand** [1] - 15:19
**handled** [4] - 43:23, 44:16, 44:23, 80:21
**hands** [2] - 7:1, 13:14
**happy** [1] - 35:19
**harbor** [2] - 32:13,

32:15
**hard** [2] - 55:22, 77:14
**HARDING** [2] - 1:23, 1:24
**harm** [1] - 13:5
**headed** [1] - 47:21
**heading** [1] - 47:21
**health** [1] - 63:7
**hear** [3] - 7:2, 62:15, 67:13
**HEARD** [1] - 1:19
**heard** [6] - 25:2, 30:12, 30:17, 38:2, 68:1, 80:24
**HEARING** [1] - 1:18
**hearing** [7] - 5:10, 6:25, 7:9, 7:10, 7:11, 40:6
**heart** [1] - 32:2
**heck** [2] - 23:24, 46:19
**held** [11] - 17:9, 18:11, 22:16, 22:17, 23:3, 29:20, 29:25, 30:3, 31:19, 47:8, 50:13
**help** [3] - 24:20, 60:14, 73:5
**helped** [1] - 60:17
**helpful** [1] - 68:20
**hence** [1] - 45:25
**hereby** [1] - 89:18
**herself** [3] - 57:12, 66:23, 70:4
**HIGHWAY** [1] - 2:16
**Hill** [128] - 5:12, 5:13, 5:24, 6:6, 6:12, 9:10, 9:16, 10:2, 11:3, 15:19, 15:23, 16:11, 16:21, 18:1, 18:4, 18:6, 18:9, 18:12, 18:20, 18:25, 19:2, 19:3, 19:11, 19:13, 19:16, 19:23, 20:7, 20:10, 20:16, 21:3, 21:9, 21:10, 21:11, 21:25, 23:9, 24:14, 24:16, 25:3, 26:1, 27:7, 28:2, 28:8, 28:15, 28:17, 30:6, 30:13, 31:8, 31:11, 32:21, 35:10, 35:15, 35:20, 37:11, 37:12, 37:14, 39:24, 41:13, 41:14, 42:7, 42:16, 43:10, 43:15, 44:22, 44:17, 44:22, 45:9, 45:15, 45:23, 46:1, 46:7, 46:14, 46:15, 46:17, 46:18, 46:24, 47:1, 47:12, 47:18, 47:24, 48:4, 48:15,

48:25, 49:5, 50:2, 50:16, 51:16, 53:13, 56:14, 57:5, 58:1, 58:16, 58:19, 59:2, 59:4, 59:10, 59:24, 60:5, 60:21, 60:24, 62:10, 69:8, 69:16, 70:3, 70:4, 70:5, 72:7, 72:8, 75:11, 75:21, 76:5, 76:13, 77:1, 77:9, 79:9, 81:7, 81:15, 84:7, 84:10, 86:8, 86:20, 86:21, 86:22, 86:23, 88:10
**HILL** [32] - 2:12, 2:17, 2:19, 2:19, 4:13, 5:24, 6:14, 6:17, 9:13, 9:19, 9:25, 32:22, 60:22, 60:25, 61:10, 61:14, 61:18, 62:19, 63:13, 69:18, 69:22, 69:24, 70:1, 70:15, 70:18, 72:12, 81:17, 81:23, 83:21, 87:9, 88:20, 88:22
**Hill's** [9] - 24:14, 24:21, 31:25, 38:17, 38:22, 51:7, 58:11, 70:7, 88:13
**history** [4] - 16:13, 30:17, 62:21, 63:22
**hold** [3] - 17:19, 22:20, 30:12
**holding** [1] - 16:4
**homework** [1] - 33:23
**Honor** [16] - 6:5, 29:11, 29:13, 30:7, 30:16, 30:21, 31:20, 32:17, 32:19, 75:9, 85:4, 85:11, 85:20, 85:24, 88:5, 89:9
**hope** [2] - 33:20, 39:21
**hopefully** [1] - 43:13
**hoping** [1] - 32:24
**hotel** [1] - 79:23
**hour** [3] - 12:21, 12:22, 41:3
**hours** [5] - 42:15, 44:25, 48:9, 60:6, 67:19
**housekeeping** [1] - 85:4
**hundred** [4] - 20:2, 23:11, 45:3, 63:25
**hundreds** [1] - 64:14
**hypothetical** [1] - 78:4
**hypothetically** [1] - 78:25

## I

**idea** [9] - 32:23, 52:5, 62:9, 66:12, 67:8, 67:24, 69:1, 73:23, 83:4
**identify** [4] - 29:10, 83:24, 85:16, 87:22
**imagine** [1] - 26:20
**immediately** [3] - 17:17, 17:21, 31:9
**impact** [1] - 36:16
**impediment** [1] - 22:12
**implant** [1] - 88:14
**implausible** [3] - 48:7, 49:24, 56:23
**important** [4] - 15:10, 17:6, 51:23, 71:9
**imprecisely** [1] - 23:6
**impressed** [1] - 40:1
**impression** [1] - 36:3
**IN** [3] - 1:4, 4:17, 5:4
**inadvertently** [1] - 10:17
**inappropriate** [2] - 8:15, 22:8
**include** [2] - 84:25, 85:17
**included** [2] - 19:8, 20:14
**including** [3] - 30:1, 75:14, 79:19
**income** [4] - 54:25, 55:5, 55:6, 61:3
**incoming** [1] - 47:14
**incorporate** [1] - 40:7
**incorporated** [1] - 41:6
**increased** [4] - 63:10, 63:14, 64:1, 83:15
**incur** [1] - 66:11
**indeed** [1] - 15:17
**independent** [9] - 62:22, 64:12, 67:2, 68:6, 68:10, 68:16, 69:13, 71:6, 89:2
**indicated** [2] - 41:5, 49:13
**indifference** [2] - 10:24, 13:3
**indifferent** [1] - 27:14
**indisputably** [1] - 31:10
**individual** [2] - 85:18, 85:19
**individuals** [2] - 51:5, 76:4
**infer** [1] - 67:20

**informally** [1] - 21:24
**information** [8] - 9:15, 28:4, 37:10, 37:11, 37:23, 38:10, 62:6, 85:19
**informed** [1] - 22:4
**inner** [1] - 19:6
**inquired** [1] - 14:22
**insist** [1] - 36:10
**insofar** [2] - 9:9, 51:18
**instance** [4] - 41:21, 55:12, 56:12, 68:24
**instances** [1] - 13:18
**instead** [2] - 21:10, 31:12
**instructions** [1] - 87:22
**instrumental** [5] - 42:13, 44:25, 52:14, 52:16, 54:3
**insurance** [5] - 10:19, 55:4, 57:7, 62:25, 63:7
**Intelligently** [1] - 33:6
**intend** [1] - 87:23
**intended** [3] - 18:2, 22:21, 66:3
**intent** [2] - 18:8, 50:18
**interactions** [1] - 43:20
**interest** [3] - 39:21, 55:8, 79:15
**interested** [2] - 42:6, 67:3
**interesting** [6] - 44:18, 46:1, 46:4, 61:5, 62:15, 66:8
**interests** [2] - 15:18, 59:9
**interim** [6] - 20:23, 20:25, 21:1, 21:4, 25:1, 25:4
**interpreted** [2] - 82:9, 82:15
**interrupt** [2] - 16:19, 88:2
**intervene** [1] - 17:13
**introduce** [1] - 40:24
**invariably** [1] - 56:25
**investing** [1] - 59:21
**investment** [3] - 49:6, 49:8, 49:10
**invited** [1] - 44:4
**involve** [1] - 33:11
**involved** [10] - 15:11, 15:24, 16:23, 43:21, 48:18, 64:22, 66:25, 67:3, 70:20, 74:8
**involvement** [2] - 72:18, 82:5

**involves** [2] - 5:11, 41:9
**INVOLVING** [1] - 1:11
**involving** [3] - 5:10, 11:3, 28:10
**ironically** [1] - 58:18
**IRS** [4] - 59:10, 75:11, 76:7, 76:18
**IS** [3] - 1:13, 1:16, 4:14
**issue** [20] - 14:2, 15:10, 16:20, 17:24, 24:5, 28:11, 28:15, 38:25, 40:11, 41:10, 41:20, 50:7, 73:11, 78:20, 80:19, 81:16, 81:18, 83:8, 87:20, 87:21
**issued** [6] - 6:9, 40:20, 53:9, 54:6, 54:22
**issues** [1] - 19:7
**item** [1] - 66:21

## J

**James** [1] - 6:5
**JAMES** [2] - 1:15, 2:20
**January** [2] - 68:12, 81:25
**Jim** [1] - 30:14
**Jim's** [1] - 31:19
**job** [5] - 64:25, 67:7, 88:22, 88:24
**joined** [1] - 88:10
**joining** [1] - 88:14
**joking** [1] - 78:16
**judge** [2] - 7:2, 62:17
**Judge** [4] - 73:20, 74:4, 80:2, 88:18
**July** [19] - 9:23, 9:25, 10:8, 15:1, 15:14, 30:25, 32:16, 36:25, 37:4, 37:5, 37:15, 37:25, 38:4, 38:11, 39:4, 39:11, 39:14, 61:6, 61:20
**June** [6] - 9:21, 11:17, 22:25, 23:1, 28:6, 46:25
**JUNEAU** [132] - 1:10, 1:19, 1:23, 5:8, 5:18, 5:20, 5:22, 6:2, 6:7, 6:15, 7:22, 7:25, 8:19, 9:4, 9:6, 9:14, 9:24, 13:10, 14:8, 14:13, 15:5, 16:19, 17:2, 17:18, 18:14, 22:11, 26:25, 27:5, 27:23, 29:5, 30:19, 30:24, 31:1, 32:20,

34:23, 36:24, 37:3,
37:6, 37:19, 38:14,
38:21, 39:1, 39:4,
39:7, 39:22, 41:5,
45:17, 45:20, 46:21,
47:5, 47:23, 50:1,
50:6, 50:24, 51:14,
51:21, 52:7, 52:11,
53:8, 53:17, 53:22,
54:5, 54:11, 54:21,
55:2, 55:19, 56:1,
57:3, 57:16, 57:19,
57:21, 58:5, 60:19,
60:21, 60:24, 61:8,
61:11, 61:16, 62:18,
63:12, 69:16, 69:19,
69:23, 69:25, 70:2,
70:16, 72:10, 72:14,
72:24, 73:2, 73:11,
73:14, 73:16, 73:21,
74:11, 74:18, 74:22,
75:1, 75:5, 76:2,
76:24, 77:1, 78:8,
78:22, 80:17, 81:13,
81:15, 81:18, 83:19,
83:22, 84:2, 84:6,
84:11, 84:15, 84:19,
84:24, 85:8, 85:16,
85:21, 85:25, 86:5,
86:9, 86:13, 86:21,
86:24, 87:5, 87:11,
87:17, 88:4, 88:19,
88:21, 89:6
**Juneau** [1] - 66:25

**K**

**K-1** [1] - 55:19
**Kathi** [8] - 46:3, 46:8,
50:5, 58:12, 70:20,
71:15, 71:16, 71:19
**keep** [3] - 64:17,
65:19, 66:7
**Keep** [1] - 70:23
**key** [1] - 69:9
**kickback** [1] - 22:16
**kids** [1] - 77:11
**kind** [2] - 66:24, 79:12
**KINGS** [1] - 2:16
**knowledge** [5] -
53:16, 53:18, 55:10,
59:16, 72:21
**knowledgeable** [1] -
52:4
**known** [3] - 58:18,
72:18
**knows** [6] - 23:24,
30:1, 32:7, 59:11,
71:17, 77:12

**L**

**LA** [1] - 1:25
**label** [2] - 40:16, 40:17
**labor** [4] - 42:12,
44:25, 52:20, 88:8
**labored** [2] - 42:14,
45:7
**labors** [1] - 53:4
**lack** [1] - 46:22
**LAFAYETTE** [1] - 1:25
**language** [1] - 31:3
**larger** [1] - 21:15
**last** [16] - 6:2, 12:14,
12:24, 13:1, 13:12,
18:23, 28:21, 29:14,
30:7, 30:11, 31:9,
35:5, 35:16, 76:24,
86:6, 86:11
**latches** [1] - 32:14
**late** [5] - 12:3, 12:7,
15:14, 43:13, 81:25
**lately** [1] - 33:3
**LAW** [1] - 2:6
**law** [27] - 5:16, 9:23,
9:25, 15:20, 20:3,
22:13, 24:10, 41:13,
41:25, 42:16, 43:5,
43:11, 43:19, 43:24,
45:1, 45:2, 45:15,
45:24, 46:15, 47:16,
48:10, 48:12, 55:15,
56:23, 69:12, 83:3
**lawsuits** [1] - 43:1
**lawyer** [5] - 13:7,
23:23, 52:2, 52:3,
67:8
**lawyers** [14] - 15:24,
25:19, 30:4, 30:9,
33:11, 42:18, 48:17,
56:23, 63:23, 67:11,
67:12, 75:18, 76:9,
81:3
**lawyers'** [1] - 16:12
**laying** [1] - 80:14
**lead** [2] - 43:15, 48:11
**leading** [1] - 22:10
**learn** [2] - 20:21, 67:3
**learned** [2] - 22:15,
43:25, 75:19
**lease** [1] - 56:9
**least** [8] - 11:5, 12:14,
26:3, 41:4, 59:3,
80:12
**leave** [1] - 12:21
**led** [2] - 42:3, 62:16
**left** [5] - 11:25, 25:17,
31:25, 52:12, 88:11
**legal** [2] - 58:4, 81:1
**legally** [2] - 50:15,
57:24
**lending** [1] - 63:4
**length** [1] - 33:1
**Leonard** [1] - 17:13
**less** [2] - 23:11, 28:15
**lesser** [1] - 35:10
**letter** [47] - 9:22,
11:12, 11:17, 11:19,
12:4, 12:11, 14:22,
14:24, 14:25, 15:1,
15:12, 15:14, 15:16,
15:25, 18:17, 18:20,
22:15, 23:1, 23:5,
23:7, 28:17, 30:23,
30:25, 31:5, 31:6,
31:12, 32:17, 32:19,
36:25, 37:12, 37:25,
53:10, 53:25, 54:2,
54:17, 61:21, 70:7,
70:13, 70:14, 71:25,
72:20, 72:21, 72:22,
72:23, 73:17, 73:18,
74:7
**letters** [4] - 11:2, 11:4,
16:3, 16:6
**level** [1] - 51:8
**LEVICOFF** [72] - 2:3,
2:3, 5:15, 5:21, 7:23,
8:3, 9:2, 9:5, 13:12,
14:12, 14:15, 15:7,
17:1, 17:3, 17:19,
18:15, 22:14, 27:3,
27:12, 27:25, 34:22,
35:1, 37:2, 37:5,
37:7, 38:3, 38:16,
38:24, 39:3, 39:6,
39:9, 41:2, 41:8,
45:18, 45:21, 47:4,
47:6, 47:24, 50:2,
50:12, 51:4, 51:19,
51:22, 52:10, 52:13,
53:15, 53:21, 53:23,
54:8, 54:16, 54:24,
55:9, 55:20, 56:2,
57:15, 57:17, 57:20,
57:23, 58:9, 60:20,
72:22, 80:21, 81:14,
86:2, 86:6, 86:11,
86:17, 86:22, 87:1,
87:8, 87:10, 87:15
**Levicoff** [28] - 5:16,
5:17, 6:21, 10:1,
10:3, 10:19, 11:19,
12:1, 16:2, 29:16,
29:21, 30:5, 30:23,
31:2, 31:8, 31:12,
31:21, 32:5, 32:10,
33:1, 34:8, 55:12,
62:9, 65:20, 67:12,
67:17, 70:19, 80:18
**Levicoff's** [1] - 30:10
**LIABILITY** [1] - 1:5
**Liability** [1] - 5:10
**liability** [2] - 45:19,
57:6
**liaison** [1] - 43:17
**lien** [39] - 5:11, 8:18,
15:17, 16:4, 16:8,
16:15, 16:16, 17:7,
17:19, 17:22, 17:25,
18:2, 18:6, 20:23,
21:8, 21:24, 22:1,
22:2, 26:15, 26:16,
27:6, 27:9, 29:20,
29:23, 29:25, 30:5,
31:15, 31:24, 32:4,
32:12, 33:14, 33:15,
34:12, 34:13, 36:1,
40:12, 41:8
**lienor** [7] - 5:15,
15:17, 28:16, 41:9,
41:11, 41:21, 41:23
**light** [3] - 49:7, 58:14,
59:1
**likely** [1] - 58:15
**limit** [5] - 16:10, 17:21,
17:25, 28:7, 28:19
**limited** [2] - 18:6,
21:9, 45:18
**limiting** [1] - 28:3
**limits** [1] - 35:19
**line** [3] - 64:16, 64:18,
65:17
**LIST** [16] - 2:23, 2:24,
4:14, 4:17, 5:25,
29:11, 30:21, 30:25,
31:2, 85:4, 85:11,
85:20, 85:24, 89:9
**List** [8] - 5:25, 11:18,
22:17, 29:11, 84:12,
84:14, 85:6, 85:22
**list** [20] - 19:8, 23:1,
23:10, 23:25, 24:7,
24:19, 26:7, 26:9,
27:4, 29:6, 35:4,
37:1, 37:15, 37:19,
38:5, 38:8, 39:15,
53:12, 53:13, 84:12
**list's** [1] - 18:10
**listed** [3] - 57:7, 61:3,
71:13
**listening** [1] - 47:23
**listing** [2] - 70:4,
71:20
**lists** [2] - 57:12, 72:7
**literature** [1] - 44:9
**litigation** [8] - 31:23,
42:19, 52:4, 64:22,
74:1, 74:25, 75:22,
67:17, 70:19, 80:18
**Levicoff's** [1] - 30:10
**LIABILITY** [1] - 1:5
**Liability** [1] - 5:10
**liability** [2] - 45:19,
57:6
**liaison** [1] - 43:17
**lien** [39] - 5:11, 8:18,
15:17, 16:4, 16:8,
16:15, 16:16, 17:7,
17:19, 17:22, 17:25,
18:2, 18:6, 20:23,
21:8, 21:24, 22:1,
22:2, 26:15, 26:16,
27:6, 27:9, 29:20,
29:23, 29:25, 30:5,
31:15, 31:24, 32:4,
32:12, 33:14, 33:15,
34:12, 34:13, 36:1,
40:12, 41:8
**lienor** [7] - 5:15,
15:17, 28:16, 41:9,
41:11, 41:21, 41:23
**light** [3] - 49:7, 58:14,
59:1
**likely** [1] - 58:15
**limit** [5] - 16:10, 17:21,
17:25, 28:7, 28:19
**limited** [2] - 18:6,
21:9, 45:18
**limiting** [1] - 28:3
**limits** [1] - 35:19
**line** [3] - 64:16, 64:18,
65:17
**LIST** [16] - 2:23, 2:24,
4:14, 4:17, 5:25,
29:11, 30:21, 30:25,
31:2, 85:4, 85:11,
85:20, 85:24, 89:9
**List** [8] - 5:25, 11:18,
22:17, 29:11, 84:12,
84:14, 85:6, 85:22
**list** [20] - 19:8, 23:1,
23:10, 23:25, 24:7,
24:19, 26:7, 26:9,
27:4, 29:6, 35:4,
37:1, 37:15, 37:19,
38:5, 38:8, 39:15,
53:12, 53:13, 84:12
**list's** [1] - 18:10
**listed** [3] - 57:7, 61:3,
71:13
**listening** [1] - 47:23
**listing** [2] - 70:4,
71:20
**lists** [2] - 57:12, 72:7
**literature** [1] - 44:9
**litigation** [8] - 31:23,
42:19, 52:4, 64:22,
74:1, 74:25, 75:22,
88:15
**LITIGATION** [1] - 1:5
**Litigation** [1] - 5:11
**live** [1] - 12:21
**LLC** [6] - 45:18, 46:7,
46:15, 47:6, 49:23,
50:11
**Local** [2] - 6:23
**local** [2] - 7:16, 9:3
**locked** [2] - 80:3, 80:5
**locking** [1] - 80:15
**long-time** [3] - 58:13,
70:20, 71:1
**look** [15] - 7:4, 15:13,
27:4, 30:17, 36:19,
38:6, 38:11, 46:6,
56:5, 61:23, 62:1,
62:17, 66:6, 71:9,
83:6
**looked** [2] - 27:15,
68:3
**looking** [10] - 5:20,
14:24, 69:19, 74:10,
79:22, 81:22, 86:15,
87:6, 88:25, 89:5
**looks** [1] - 49:8
**loosely** [1] - 75:21
**lose** [2] - 64:10, 64:11
**loser** [1] - 69:15
**losing** [1] - 65:16
**losses** [2] - 64:14,
66:11
**louder** [1] - 32:16
**Louisiana** [2] - 89:17,
89:18
**LOUISIANA** [3] - 1:1,
1:7, 3:4
**lump** [3] - 35:25, 36:5,
36:10

**M**

**mail** [20] - 10:15, 12:1,
26:13, 26:22, 28:20,
35:4, 35:17, 36:10,
36:18, 38:7, 78:15,
78:17, 83:7, 86:7,
86:15, 86:19, 86:21,
87:6, 87:12
**mailed** [1] - 77:5
**main** [1] - 78:21
**maintain** [1] - 10:20
**maintained** [1] - 43:19
**maintains** [1] - 47:15
**major** [1] - 49:15
**malpractice** [2] -
10:19, 57:6, 62:25
**managed** [1] - 43:19
**mandatory** [1] - 33:22

**manifest** [1] - 54:2
**manifestations** [1] - 47:18
**March** [4] - 45:9, 46:14, 52:19, 53:4
**mark** [3] - 83:23, 84:2, 84:20
**marked** [3] - 84:6, 84:16, 85:6
**marketing** [4] - 44:5, 44:8, 66:18, 75:23
**Mary** [4] - 45:24, 63:9, 64:4, 71:7
**mass** [7] - 43:6, 52:4, 66:24, 67:4, 77:14, 77:23, 88:14
**Master** [7] - 7:4, 7:16, 12:18, 31:23, 66:25, 73:9, 83:24
**MASTER** [132] - 1:10, 1:19, 1:23, 5:8, 5:18, 5:20, 5:22, 6:2, 6:7, 6:15, 7:22, 7:25, 8:19, 9:4, 9:6, 9:14, 9:24, 13:10, 14:8, 14:13, 15:5, 16:19, 17:2, 17:18, 18:14, 22:11, 26:25, 27:5, 27:23, 29:5, 30:19, 30:24, 31:1, 32:20, 34:23, 36:24, 37:3, 37:6, 37:19, 38:14, 38:21, 39:1, 39:4, 39:7, 39:22, 41:5, 45:17, 45:20, 46:21, 47:5, 47:23, 50:1, 50:6, 50:24, 51:14, 51:21, 52:7, 52:11, 53:8, 53:17, 53:22, 54:5, 54:11, 54:21, 55:2, 55:19, 56:1, 57:3, 57:16, 57:19, 57:21, 58:5, 60:19, 60:21, 60:24, 61:8, 61:11, 61:16, 62:18, 63:12, 69:16, 69:19, 69:23, 69:25, 70:2, 70:16, 72:10, 72:14, 72:24, 73:2, 73:11, 73:14, 73:16, 73:21, 74:11, 74:18, 74:22, 75:1, 75:5, 76:2, 76:24, 77:1, 78:8, 78:22, 80:17, 81:13, 81:15, 81:18, 83:19, 83:22, 84:2, 84:6, 84:11, 84:15, 84:19, 84:24, 85:8, 85:16, 85:21, 85:25, 86:5, 86:9, 86:13, 86:21,

86:24, 87:5, 87:11, 87:17, 88:4, 88:19, 88:21, 89:6
**match** [3] - 37:7, 37:15, 37:18
**material** [5] - 8:20, 23:18, 61:5, 61:9, 61:13
**materials** [2] - 61:19, 75:23
**mathematical** [4] - 25:9, 26:5, 28:11, 39:18
**mathematics** [2] - 21:21, 22:4
**matter** [19] - 5:10, 7:6, 10:14, 14:20, 15:8, 16:3, 31:20, 37:20, 39:20, 40:20, 58:2, 58:13, 59:10, 74:12, 85:4, 87:19, 88:1, 89:20
**matters** [2] - 11:2, 40:10
**MDL** [2] - 1:6, 5:11
**mean** [20] - 9:15, 12:13, 26:20, 30:12, 37:3, 45:17, 58:23, 64:10, 69:14, 72:11, 74:4, 75:20, 75:25, 77:9, 77:13, 78:12, 80:4, 80:18, 81:9, 82:14
**meaning** [1] - 65:9
**means** [1] - 54:12
**MECHANICAL** [1] - 3:6
**meet** [2] - 11:15, 12:12
**meeting** [9] - 22:10, 22:24, 24:8, 24:9, 24:15, 29:1, 29:2, 33:20, 63:5
**member** [14] - 45:15, 45:17, 50:11, 50:13, 56:18, 57:25, 59:3, 61:4, 70:6, 71:12, 71:13, 72:4, 75:15
**members** [5] - 45:23, 46:16, 70:5, 71:21, 71:22
**membership** [1] - 48:3
**memo** [2] - 11:5, 87:3
**memoranda** [8] - 9:22, 10:3, 10:7, 10:16, 60:9, 61:6
**memorandum** [8] - 7:1, 7:3, 7:6, 9:25, 10:8, 30:21, 40:5, 43:12
**memorialized** [1] -

18:16
**memory** [6] - 53:25, 70:19, 72:22, 73:20, 73:22, 74:3
**mentioned** [3] - 44:12, 50:25, 85:9
**mentions** [2] - 51:7, 70:20
**mere** [1] - 59:6
**merit** [2] - 41:6, 43:4
**Merit** [1] - 89:17
**meritorious** [1] - 42:25
**merits** [3] - 8:20, 40:6, 40:11
**message** [1] - 82:25
**met** [1] - 34:1
**method** [2] - 13:16, 13:21
**Miami** [1] - 80:5
**microphone** [1] - 60:24
**mid** [1] - 24:7
**mid-August** [1] - 24:7
**might** [7] - 28:22, 43:4, 44:5, 68:2, 72:19, 81:25, 82:15
**million** [23] - 23:11, 29:19, 34:8, 34:10, 34:14, 35:2, 39:20, 49:10, 60:15, 64:6, 64:17, 65:3, 65:6, 65:7, 65:10, 65:14, 65:17, 78:5, 78:25, 79:21, 82:18, 83:11, 83:13
**millions** [6] - 48:12, 48:14, 48:22, 58:25, 59:18, 60:11
**mind** [2] - 70:23, 79:16
**mine** [2] - 24:14, 67:14
**minimum** [4] - 75:10, 76:22, 76:23, 79:16
**Minneapolis** [1] - 87:4
**Minnesota** [3] - 77:23, 79:23, 81:25
**minute** [7] - 12:25, 16:20, 24:17, 58:5, 76:3, 86:9, 86:13
**minutes** [3] - 24:14, 29:14, 34:8
**miscalculation** [2] - 23:2, 23:20
**misrepresented** [1] - 16:2
**misrouted** [2] - 13:13, 13:20
**Miss** [1] - 35:6
**miss** [1] - 23:21

**missed** [2] - 14:15, 15:2
**missing** [2] - 15:8, 80:4
**mistake** [7] - 46:3, 46:5, 46:8, 46:10, 70:21, 71:19, 71:20
**mistakenly** [1] - 75:18
**misunderstood** [1] - 8:13
**moment** [2] - 53:21, 57:15
**moments** [1] - 29:24
**Monday** [8] - 12:18, 13:15, 13:17, 14:5, 28:22, 28:23, 28:25, 40:3
**monetary** [3] - 8:4, 8:14, 13:25
**money** [30] - 17:14, 18:8, 18:9, 18:10, 19:14, 21:11, 25:5, 25:6, 29:25, 30:1, 30:3, 31:19, 31:20, 33:9, 36:22, 52:5, 55:1, 55:16, 64:11, 64:19, 65:16, 65:19, 65:24, 66:9, 68:23, 79:12, 82:10, 82:12, 83:1
**monies** [3] - 19:17, 21:1, 21:24
**monitoring** [1] - 43:7
**month** [8] - 51:20, 51:21, 56:6, 56:9, 62:1, 63:4, 65:19, 70:24
**monthly** [1] - 63:5
**months** [8] - 46:13, 56:6, 61:15, 67:1, 71:18, 72:5, 80:2, 80:12
**morning** [1] - 14:5
**most** [1] - 75:17
**motion** [13] - 6:24, 7:2, 7:7, 7:8, 7:9, 10:15, 10:16, 14:10, 14:15, 15:6, 39:23
**motions** [15] - 6:10, 6:16, 6:18, 6:21, 7:18, 7:21, 7:24, 8:4, 8:6, 8:16, 9:9, 9:16, 34:25, 40:4, 42:17
**move** [1] - 40:10
**MR** [110] - 5:15, 5:21, 5:24, 5:25, 6:1, 6:4, 6:5, 6:14, 6:17, 7:23, 8:3, 9:2, 9:5, 9:13, 9:19, 9:25, 13:12, 14:12, 14:15, 15:7,

17:1, 17:3, 17:19, 18:15, 22:14, 27:3, 27:12, 27:25, 29:11, 30:21, 30:25, 31:2, 32:22, 34:22, 35:1, 37:2, 37:5, 37:7, 38:3, 38:16, 38:24, 39:3, 39:6, 39:9, 41:2, 41:8, 45:18, 45:21, 47:4, 47:6, 47:24, 50:2, 50:12, 51:4, 51:19, 51:22, 52:10, 52:13, 53:15, 53:21, 53:23, 54:8, 54:16, 54:24, 55:9, 55:20, 56:2, 57:15, 57:17, 57:20, 57:23, 58:9, 60:20, 60:22, 60:25, 61:10, 61:14, 61:18, 62:19, 63:13, 69:18, 69:22, 69:24, 70:1, 70:15, 70:18, 72:12, 72:22, 80:21, 81:14, 81:17, 81:23, 83:21, 85:4, 85:11, 85:20, 85:24, 86:2, 86:6, 86:11, 86:17, 86:22, 87:1, 87:8, 87:9, 87:10, 87:15, 88:20, 88:22, 89:9
**MS** [19] - 5:19, 73:1, 73:6, 73:13, 73:15, 73:20, 73:23, 74:16, 74:21, 74:23, 75:4, 75:9, 76:7, 76:25, 77:5, 78:10, 78:24, 88:2, 88:5
**multiple** [1] - 70:25
**must** [9] - 7:1, 10:8, 19:25, 20:19, 48:21, 67:18, 67:22, 80:21, 85:8

## N

**name** [9] - 5:16, 6:2, 44:8, 44:9, 45:25, 46:17, 46:19, 47:16, 76:4
**named** [2] - 45:23, 59:3
**names** [2] - 71:8, 85:12
**narrow** [2] - 41:9, 45:10
**narrowly** [1] - 41:9
**NATIONAL** [1] - 2:7
**nature** [3] - 55:8, 57:11, 77:14
**necessarily** [3] -

58:23, 65:8, 65:9
**necessary** [1] - 69:1
**necessity** [3] - 24:11, 28:9, 44:12
**need** [10] - 23:2, 24:15, 24:21, 24:22, 27:17, 33:21, 42:6, 47:19, 77:10
**needed** [5] - 18:13, 36:3, 46:24, 55:16, 60:18
**needn't** [1] - 42:4
**neglect** [1] - 10:24
**neglected** [1] - 20:11
**negotiation** [1] - 28:19
**net** [4] - 25:25, 26:3, 41:11, 56:10
**network** [1] - 10:22
**never** [28] - 12:4, 22:3, 22:18, 22:20, 24:13, 28:1, 28:16, 34:18, 46:11, 56:15, 62:3, 65:14, 66:20, 66:25, 67:15, 67:25, 69:10, 69:12, 72:3, 72:8, 75:6, 75:14, 76:8, 76:13, 77:16, 78:10
**NEW** [2] - 1:7, 3:4
**New** [2] - 11:16, 36:14
**new** [7] - 12:6, 25:5, 25:6, 35:8, 35:21, 83:16, 88:24
**newly** [1] - 21:11
**newspaper** [1] - 66:20
**next** [3] - 11:11, 63:10, 84:15
**nights** [1] - 77:12
**NJ** [1] - 2:17
**NO** [1] - 1:6
**nobody** [1] - 56:4
**nominal** [1] - 48:13
**none** [4] - 12:6, 22:14, 46:8
**nonetheless** [2] - 36:5, 55:24
**noose** [1] - 33:17
**normally** [1] - 14:17
**NORTH** [1] - 2:16
**NORTHGATE** [1] - 2:20
**notarized** [2] - 46:7, 71:16
**nothing** [15] - 7:12, 10:4, 10:10, 10:12, 11:9, 11:23, 19:5, 30:11, 46:19, 63:2, 64:10, 64:16, 65:15, 69:6, 73:4
**notice** [5] - 13:8, 16:8, 16:14, 16:16, 80:3

**noticed** [6] - 6:25, 7:9, 7:10, 7:11, 14:25
**notified** [1] - 18:13
**notion** [1] - 63:20
**notwithstanding** [1] - 14:21
**November** [7] - 17:4, 45:22, 62:21, 77:2, 77:4, 81:20, 81:22
**Number** [4] - 5:11, 8:6, 27:15, 63:25
**number** [31] - 8:5, 20:19, 20:23, 20:25, 23:11, 23:14, 26:11, 27:4, 27:6, 27:8, 27:13, 27:14, 27:17, 28:3, 30:24, 32:11, 32:12, 34:9, 34:10, 34:12, 34:14, 36:9, 38:15, 39:8, 43:3, 44:21, 47:20, 51:6, 53:18, 55:11
**numbered** [1] - 89:19
**numbers** [8] - 36:9, 37:7, 37:8, 37:14, 38:11, 38:12, 69:15, 85:13
**numerous** [1] - 48:5
**nutshell** [1] - 29:13

## O

**oath** [4] - 70:16, 73:2, 73:9, 88:6
**objection** [2] - 85:21, 86:2
**objective** [1] - 13:21
**obligation** [8] - 9:4, 9:7, 11:6, 12:12, 36:15, 36:16, 36:17, 60:2
**observations** [1] - 58:21
**obtained** [1] - 40:22
**obtaining** [1] - 51:19
**obviously** [2] - 22:1, 72:17
**occasions** [3] - 37:20, 47:25, 48:5
**occupied** [1] - 47:15
**occurred** [6] - 18:25, 20:9, 21:1, 22:9, 44:1, 81:21
**occurring** [1] - 74:3
**October** [15] - 7:10, 7:11, 7:15, 16:7, 17:3, 17:16, 18:5, 18:18, 18:22, 19:12, 21:8, 22:1, 30:7,

32:3, 37:13
**OCTOBER** [2] - 1:7, 5:2
**OF** [3] - 1:1, 1:18, 4:17
**offer** [1] - 88:17
**offered** [1] - 46:5
**offerings** [1] - 40:19
**office** [9] - 6:12, 14:5, 14:17, 14:22, 24:14, 30:8, 62:24, 63:3, 71:19
**offices** [1] - 28:8
**Official** [2] - 89:17, 89:22
**OFFICIAL** [1] - 3:3
**OH** [1] - 2:25
**Ohio** [1] - 11:22
**on-the-job** [1] - 67:7
**once** [3] - 43:6, 58:22, 80:23
**one** [87] - 7:10, 8:5, 9:21, 10:9, 10:18, 11:11, 11:20, 11:21, 11:22, 12:14, 13:1, 13:12, 13:24, 14:9, 15:19, 18:16, 19:24, 20:10, 27:13, 29:21, 30:17, 34:8, 34:10, 34:14, 34:20, 35:2, 35:8, 35:10, 35:14, 35:16, 35:22, 35:23, 36:15, 39:9, 39:13, 40:19, 41:9, 45:14, 47:13, 47:16, 48:15, 49:9, 50:13, 51:7, 51:13, 53:18, 55:5, 56:24, 57:9, 58:12, 58:22, 59:3, 62:1, 63:20, 64:6, 64:18, 65:6, 65:7, 65:10, 66:21, 67:12, 68:1, 68:8, 68:10, 69:7, 70:13, 71:1, 76:11, 76:24, 77:13, 81:4, 81:11, 81:16, 82:22, 84:15, 86:17, 86:22, 86:23, 88:3
**one-third** [9] - 51:13, 68:8, 68:10, 69:7, 76:11
**ones** [3] - 27:21, 61:19, 63:1
**OPEN** [1] - 5:4
**operate** [1] - 83:9
**operated** [1] - 79:7
**operation** [1] - 64:17
**opponent** [2] - 44:17, 85:14
**opponents** [3] - 21:18, 35:13, 80:24

**opportunity** [3] - 29:12, 67:5, 80:20
**opposed** [1] - 34:2
**opposition** [1] - 7:1
**ordained** [1] - 25:15
**order** [19] - 8:6, 8:9, 8:11, 8:14, 9:20, 9:22, 10:6, 11:12, 11:17, 13:25, 17:8, 23:3, 24:18, 25:15, 40:20, 56:8, 81:2, 83:24, 87:17
**orders** [3] - 13:3, 13:7, 13:8
**organization** [3] - 45:22, 45:23, 58:22
**organizer** [1] - 70:6
**organizing** [1] - 70:5
**original** [7] - 23:2, 23:19, 24:20, 31:24, 37:9, 46:23, 54:14
**originally** [3] - 29:25, 30:3, 61:3
**originated** [2] - 49:2, 49:15
**origination** [1] - 49:14
**Orleans** [2] - 11:16, 36:14
**ORLEANS** [2] - 1:7, 3:4
**otherwise** [10] - 15:22, 16:10, 18:1, 35:20, 41:12, 41:22, 67:8, 67:18, 67:23, 69:14
**ought** [5] - 25:22, 41:19, 42:8, 42:10, 75:17
**ourselves** [1] - 13:5
**outset** [1] - 81:10
**overarchingly** [1] - 48:2
**overhead** [1] - 76:14
**overlook** [1] - 35:3
**overreaching** [2] - 33:15, 36:17
**overture** [1] - 26:14
**overwhelming** [1] - 44:24
**overwhelmingly** [1] - 52:2
**owed** [3] - 29:19, 31:10, 36:23
**own** [7] - 14:22, 33:5, 63:1, 64:19, 65:19, 70:24, 70:25
**owned** [1] - 66:12
**owner** [3] - 70:6, 70:24, 71:22
**ownership** [1] - 68:25

## P

**p.m** [1] - 89:10
**P.M** [1] - 1:7
**PA** [1] - 2:5
**package** [4] - 13:13, 13:14, 13:16, 13:19
**PAGE** [2] - 4:3, 4:9
**page** [5] - 63:25, 65:2, 65:21, 69:19, 69:25
**paid** [21] - 17:22, 22:2, 25:24, 52:25, 55:1, 63:1, 64:4, 64:15, 64:20, 64:25, 65:5, 65:7, 65:10, 66:13, 66:21, 67:14, 68:13, 76:14, 79:20, 83:12, 88:22
**paper** [1] - 60:4
**papers** [4] - 50:2, 51:7, 52:17, 88:17
**paperwork** [1] - 71:11
**paragraph** [2] - 35:6, 70:3
**parameters** [2] - 15:13, 76:12
**paraphrase** [2] - 23:5, 70:9
**paraphrasing** [1] - 31:2
**parasite** [1] - 32:13
**parcel** [1] - 53:4
**PARK** [1] - 2:20
**part** [20] - 17:15, 21:18, 22:8, 30:10, 41:21, 41:23, 41:24, 42:8, 42:13, 43:10, 49:5, 52:13, 53:4, 55:7, 68:3, 68:4, 68:5, 69:20, 83:11
**participate** [1] - 35:6
**participating** [1] - 31:14
**participation** [1] - 43:10
**particular** [7] - 14:2, 27:17, 36:4, 42:13, 56:12, 64:2, 74:15
**parties** [12] - 9:22, 11:14, 24:9, 24:10, 28:7, 28:10, 40:16, 42:6, 42:8, 55:3, 59:14, 85:2
**partner** [28] - 47:8, 47:9, 47:11, 47:19, 47:25, 48:5, 49:22, 50:10, 50:13, 50:17, 55:6, 56:18, 57:12, 57:21, 57:25, 58:4,

59:4, 62:5, 62:8,
62:11, 68:21, 75:14,
75:22, 79:10, 80:24,
81:6, 81:8
**partners** [3] - 15:20,
75:20, 75:24
**partnership** [18] -
47:10, 47:21, 50:14,
50:15, 55:7, 56:4,
56:7, 57:24, 58:3,
75:16, 76:19, 81:2,
81:3, 81:10, 81:11,
89:1
**partnerships** [1] -
70:25
**parts** [3] - 64:23, 66:1,
78:11
**party** [4] - 7:7, 28:7,
28:19, 46:9
**pass** [1] - 87:16
**passed** [1] - 7:12
**past** [5] - 20:22, 22:22,
35:2, 41:3, 46:2
**PATRICK** [3] - 1:10,
1:19, 1:23
**pattern** [2] - 13:2,
65:11
**pay** [11] - 16:23,
51:18, 55:16, 55:20,
56:8, 56:14, 56:25,
63:8, 66:19, 66:20,
82:17
**payable** [12] - 15:23,
16:5, 16:11, 17:10,
17:11, 21:25, 23:8,
28:2, 35:10, 41:13,
41:22, 41:25
**payday** [3] - 78:6,
78:24, 79:21
**paying** [2] - 63:9,
88:23
**payment** [3] - 16:24,
29:8, 56:9
**payments** [3] - 22:13,
32:2, 32:8
**pays** [1] - 67:9
**pending** [1] - 6:10
**penny** [2] - 59:19, 60:7
**pension** [1] - 63:8
**people** [6] - 16:24,
33:22, 43:24, 57:8,
62:16, 75:17
**Pepper** [3] - 89:16,
89:21, 89:22
**PEPPER** [1] - 3:3
**perceive** [1] - 54:10
**percent** [14] - 25:14,
25:16, 25:17, 25:18,
25:20, 27:7, 30:3,
49:11, 64:5, 65:14,

79:14, 79:15, 83:12
**percentage** [10] -
25:12, 25:20, 27:7,
34:15, 34:16, 34:19,
64:3, 65:8, 68:14,
88:12
**PERDUE** [2] - 2:23
**perform** [2] - 42:15,
48:7
**performed** [3] - 43:11,
48:8, 53:1
**perhaps** [3] - 11:8,
19:21, 75:21
**period** [6] - 10:5, 45:8,
48:8, 50:25, 53:3,
77:25
**periodic** [1] - 56:14
**periodically** [1] - 56:5
**periods** [1] - 79:7
**persistently** [1] - 22:7
**person** [1] - 43:15,
43:17, 43:20, 43:23,
43:25, 44:2, 44:15,
46:16, 48:11, 49:23,
66:5
**personal** [1] - 64:19
**perspective** [1] - 41:8
**persuade** [1] - 44:5
**pertains** [1] - 87:2
**Peterson** [14] - 5:12,
6:5, 6:6, 10:3, 11:3,
18:9, 20:1, 20:7,
26:1, 29:17, 30:14,
84:20, 84:21, 84:23
**PETERSON** [6] - 1:15,
2:19, 2:19, 2:20,
4:16, 6:5
**Peterson's** [4] - 22:16,
29:7, 29:20, 43:22
**Philadelphia** [2] -
11:22, 43:22
**phone** [1] - 31:13
**pick** [2] - 11:23, 35:25
**pin** [1] - 43:1
**pinned** [1] - 45:3
**PITTSBURGH** [1] - 2:5
**Pittsburgh** [3] - 5:16,
11:20, 24:11
**place** [5] - 11:16,
22:13, 26:16, 75:2,
89:5
**placed** [3] - 74:5,
74:17, 82:7
**plain** [1] - 13:25
**plan** [1] - 63:8
**plausible** [2] - 49:21,
52:6
**player** [1] - 49:15
**plays** [2] - 22:23, 24:8
**PLLC** [11] - 61:2,

61:14, 61:20, 66:17,
68:22, 70:4, 71:4,
71:8, 71:20, 72:8,
74:8
**PLLCs** [1] - 70:23
**plus** [4] - 63:10, 65:18,
68:18, 88:11
**podium** [1] - 88:3
**point** [28] - 8:17, 16:4,
19:13, 19:25, 23:18,
24:24, 27:1, 33:2,
43:3, 43:20, 43:24,
52:15, 55:17, 56:17,
59:3, 59:15, 59:17,
66:24, 67:1, 70:24,
71:6, 79:12, 83:25,
84:4, 84:9, 84:13,
84:17, 84:22
**pointed** [2] - 17:16,
17:18
**policy** [3] - 64:2, 77:3,
81:22
**portion** [11] - 15:22,
17:25, 18:1, 18:7,
18:12, 20:10, 41:16,
41:18, 52:25, 53:6,
56:21
**position** [20] - 10:11,
10:12, 21:20, 21:22,
21:23, 33:15, 38:6,
41:11, 45:2, 48:15,
50:9, 50:10, 52:7,
56:12, 58:9, 59:23,
60:1, 60:12, 60:13,
74:1
**possession** [2] -
12:17
**possible** [1] - 65:23
**possibly** [3] - 26:19,
48:2, 58:21
**posted** [1] - 44:9
**postscript** [1] - 80:23
**potential** [4] - 43:17,
44:4, 44:6, 45:3
**potentially** [2] - 42:25,
44:3
**POYDRAS** [1] - 3:4
**practical** [1] - 39:20
**practice** [6] - 13:19,
57:11, 76:14, 80:3,
80:5, 80:15
**practiced** [2] - 46:15
**precise** [2] - 27:18,
50:15
**precisely** [4] - 29:14,
31:3, 38:21, 39:17
**prejudice** [1] - 13:5
**prepare** [1] - 87:21
**prepared** [1] - 33:5
**present** [2] - 16:16,

66:23
**presentation** [1] -
40:13
**presented** [3] - 7:7,
44:3, 56:15
**presents** [1] - 45:11
**presume** [1] - 57:6
**presumed** [1] - 48:14
**pretty** [3] - 8:22, 65:3,
87:24
**previous** [1] - 30:5
**primarily** [1] - 18:4
**PRIMARY** [2] - 1:13,
1:16
**primary** [2] - 20:2,
20:4
**principal** [2] - 48:19,
50:3
**principles** [1] - 42:10
**private** [2] - 30:4,
59:10
**problem** [9] - 17:5,
23:1, 23:19, 25:9,
31:24, 36:6, 39:18,
45:11, 60:12
**proceed** [3] - 9:18,
10:10, 41:1
**proceeded** [1] - 16:25
**proceeding** [6] - 8:17,
15:10, 83:25, 84:4,
84:9, 84:13, 84:17,
84:22
**PROCEEDINGS** [3] -
1:18, 3:6, 5:1
**proceedings** [4] - 8:5,
8:12, 89:10, 89:19
**proceeds** [1] - 52:23
**process** [3] - 21:3,
42:25, 43:7
**produce** [1] - 48:22
**PRODUCED** [1] - 3:6
**produced** [3] - 44:20,
56:20, 74:1
**producing** [3] - 42:13,
49:25, 52:14
**production** [3] -
41:16, 42:5, 45:5
**productive** [1] - 29:3
**Products** [1] - 5:10
**PRODUCTS** [1] - 1:4
**Professional** [1] -
89:17
**profit** [15] - 56:5, 56:6,
56:10, 64:3, 64:6,
65:1, 65:6, 65:7,
65:10, 65:14, 69:12,
82:19, 83:12, 83:13
**profits** [9] - 47:14,
50:19, 64:7, 64:8,
64:9, 65:13, 69:8,

69:11, 88:12
**program** [1] - 50:21
**project** [6] - 43:16,
48:9, 48:10, 48:19,
49:25, 77:23
**promise** [2] - 65:4,
83:2
**promised** [1] - 65:13
**prompted** [1] - 28:17
**proof** [3] - 26:15,
36:18, 67:16
**properly** [1] - 22:4
**proposed** [4] - 24:8,
28:22, 28:24, 28:25
**propounded** [1] - 78:4
**proprietor** [7] - 46:25,
47:2, 70:11, 72:7,
74:15, 75:12, 76:5
**proprietorship** [11] -
54:1, 54:13, 54:20,
58:20, 58:23, 59:7,
59:13, 70:10, 76:4,
76:8, 76:17
**prorated** [2] - 41:14,
41:15
**protect** [1] - 39:21
**protection** [1] - 57:6
**proud** [1] - 15:3
**prove** [1] - 33:17
**provide** [3] - 35:8,
37:23, 44:14
**provided** [6] - 18:17,
19:11, 21:7, 35:19,
42:15, 53:13
**provides** [1] - 31:3
**Purdue** [8] - 5:13,
5:25, 10:2, 11:3,
26:2, 43:20, 85:5,
85:7
**purposes** [3] - 6:8,
75:11, 83:23
**pursuant** [1] - 87:22
**put** [12] - 30:16, 33:2,
33:17, 49:2, 60:6,
62:4, 62:24, 71:8,
74:11, 74:18, 84:7,
84:24
**putting** [7] - 13:14,
45:1, 48:20, 59:23,
62:10, 65:18

---

## Q

**questions** [2] - 53:17,
83:21
**quibble** [1] - 78:12
**quick** [1] - 32:22
**quickly** [1] - 87:24
**quit** [1] - 88:22

quite [3] - 17:8, 20:19, 52:3
quotes [1] - 47:9

# R

range [1] - 79:5
ranges [1] - 79:5
rather [1] - 66:3
RE [1] - 1:4
re [1] - 5:10
reach [1] - 26:23
reached [4] - 17:6, 31:8, 43:6, 51:10
read [6] - 8:25, 50:2, 70:2, 74:19, 77:4, 87:18
reading [1] - 70:23
reaffirm [1] - 53:24
real [2] - 45:7, 45:10
realize [1] - 41:18
realized [1] - 53:5
really [19] - 8:22, 13:20, 23:8, 23:18, 24:21, 32:19, 32:22, 36:20, 37:10, 43:9, 45:6, 59:7, 59:20, 60:2, 60:10, 62:11, 62:15, 68:20, 78:21
Realtime [1] - 89:16
REALTIME [1] - 3:3
reason [8] - 10:24, 38:10, 47:3, 55:2, 60:12, 62:6, 74:4
reasonable [7] - 45:12, 47:14, 48:20, 49:18, 54:2, 59:1, 65:5
reasonably [2] - 13:15, 13:21
reasons [6] - 14:21, 27:13, 39:9, 45:14, 47:7, 47:16
receive [1] - 35:21
received [6] - 10:3, 10:10, 10:14, 20:24, 21:4, 56:14
receiving [1] - 77:8
recite [2] - 63:22, 63:23
recited [1] - 62:21
recognized [3] - 47:8, 54:25, 80:10
recognizing [1] - 47:1
recommend [1] - 39:25
recommendation [2] - 8:8, 87:21
RECOMMENDATION

[1] - 1:11
recommendations [1] - 40:8
record [7] - 5:9, 6:8, 29:10, 40:22, 61:12, 83:23, 89:19
recorded [2] - 20:3, 79:2
RECORDED [1] - 3:6
records [1] - 40:23
recriminated [1] - 23:6
rectifying [1] - 35:7
red [3] - 48:15, 60:2, 60:17
reduce [1] - 23:2
refer [5] - 40:6, 44:6, 73:18, 74:20, 75:19
reference [1] - 51:1
referenced [1] - 70:13
referred [9] - 30:9, 36:25, 39:24, 50:16, 59:4, 75:24, 77:1, 81:7, 87:23
referring [13] - 19:5, 20:13, 25:10, 25:11, 25:20, 37:17, 41:24, 43:17, 44:4, 44:14, 48:1, 87:12
refreshed [2] - 36:9, 74:10
regard [3] - 8:20, 40:4, 48:2
regarding [5] - 11:2, 44:10, 73:19
regardless [1] - 7:8
REGISTERED [2] - 1:13, 1:16
Registered [2] - 89:16, 89:17
registration [1] - 43:7
regular [1] - 55:17
reiterating [1] - 7:20
related [4] - 45:14, 50:12, 74:9, 85:19
relates [2] - 13:6, 15:21
RELATES [1] - 1:8
relating [1] - 74:15
relationship [2] - 47:13, 76:9
relative [2] - 36:1, 42:6
release [3] - 32:6, 34:16, 36:22
released [1] - 31:10
relevant [1] - 50:25
reliable [2] - 13:16, 13:21
reliance [1] - 82:7
relief [1] - 36:15
relying [2] - 82:3, 82:4

remainder [1] - 25:25
remarkable [1] - 60:16
remarks [3] - 13:11, 80:25, 81:7
remember [13] - 13:20, 14:24, 23:16, 27:3, 27:4, 74:17, 74:24, 77:22, 78:16, 79:1, 79:2, 79:21
renew [1] - 10:19
rent [2] - 63:3, 76:14
repeated [1] - 13:2
repeatedly [2] - 16:18, 59:4
repeating [1] - 6:19
replete [1] - 43:14
reply [4] - 7:22, 8:1, 8:2, 14:14
report [5] - 39:24, 54:19, 72:6, 87:21
reported [2] - 55:4, 55:6
REPORTER [2] - 3:3, 3:3
Reporter [6] - 89:16, 89:17, 89:17, 89:22
REPORTER'S [1] - 89:15
reports [1] - 35:8
represent [6] - 5:15, 23:8, 35:15, 44:10, 65:11, 81:9
representation [5] - 42:23, 43:2, 45:3, 62:2, 69:10
representations [1] - 47:25
represented [3] - 29:24, 43:3, 48:4
representing [1] - 37:14
represents [1] - 29:14
required [5] - 7:6, 9:22, 11:14, 69:20, 71:13
requiring [1] - 8:9
researched [1] - 18:23
RESOLUTION [1] - 1:11
resolution [2] - 36:20, 52:20
resolve [5] - 22:23, 24:5, 28:14, 38:24, 41:20
resolved [3] - 32:25, 33:23, 34:2
respect [4] - 13:7, 36:13, 36:18, 40:9
respectfully [1] - 30:16

respective [2] - 6:9, 79:19
respects [1] - 79:7
respond [4] - 8:10, 13:7, 27:5, 55:11
responded [3] - 6:21, 11:18, 26:14
responds [2] - 46:1, 86:23
response [5] - 7:17, 11:24, 22:15, 53:19, 82:14
responses [1] - 16:1
responsibility [3] - 30:7, 33:14, 59:22
responsive [2] - 6:24, 7:5
restate [2] - 35:9, 41:10
restatement [1] - 16:16
restaurant [1] - 79:23
rests [1] - 67:17
result [2] - 42:20, 60:16
resulted [2] - 21:14, 45:5
results [1] - 42:22
retired [1] - 80:8
retirement [1] - 80:10
retrospective [1] - 34:3
return [4] - 55:5, 58:19, 59:9, 59:12
revenue [2] - 48:17, 48:23
revised [1] - 35:8
ridiculous [1] - 69:14
ridiculousness [1] - 88:8
rights [3] - 15:18, 59:9, 59:14
rise [1] - 5:7
RMR [2] - 3:3, 89:22
ROAD [1] - 2:7
road [1] - 12:22
role [2] - 48:20, 59:22
room [1] - 33:23
ROOM [1] - 3:4
root [1] - 50:6
rough [2] - 51:12, 52:10
roughly [1] - 49:1
Rule [2] - 6:23
rule [3] - 7:17, 8:2, 9:3
rules [2] - 8:21, 9:8

# S

S-P-I-Z-E-R [1] - 6:4
s/Cathy [1] - 89:21
salaried [1] - 47:12
salaries [2] - 64:15, 83:14
salary [13] - 48:13, 51:24, 55:13, 55:14, 55:17, 56:4, 63:4, 63:25, 64:5, 68:13, 75:10, 76:22, 76:23
sanction [3] - 8:14, 13:9, 13:25
sanctions [1] - 8:4
Saturday [3] - 12:19, 13:15, 40:2
saw [6] - 24:11, 49:8, 49:9, 73:25, 74:24, 75:1
scathing [1] - 16:1
scenario [1] - 81:10
schedule [1] - 12:9
scheduled [1] - 5:9
scheduling [2] - 40:20, 83:24
SCHWARTZ [3] - 2:10, 2:11, 2:15
Schwartz [9] - 5:12, 6:1, 18:10, 20:3, 20:6, 20:20, 22:17, 26:2, 43:21
science [1] - 43:25
scope [2] - 8:5, 8:12
screen [1] - 42:24
seal [3] - 85:6, 85:9, 85:23
SEAL........................
........ [1] - 4:18
seated [1] - 20:1
second [6] - 7:9, 15:5, 20:21, 24:25, 40:20, 74:18
secondly [4] - 22:1, 47:6, 58:17, 59:8
secretary [17] - 14:4, 46:2, 46:23, 46:25, 53:10, 53:11, 54:7, 54:11, 58:13, 61:21, 70:8, 71:2, 72:1, 72:4, 72:6, 73:18, 74:14
SECTION [1] - 1:6
section [3] - 66:2, 86:7, 86:12
secure [2] - 42:23, 44:13
securing [1] - 44:10
see [19] - 6:10, 7:20,

13:4, 23:25, 24:22,
26:7, 26:25, 29:8,
34:7, 38:9, 54:16,
62:2, 66:8, 74:19,
82:15, 85:16, 86:24,
87:11, 89:1
**seeing** [1] - 72:23
**seek** [1] - 8:6
**seem** [1] - 39:16
**seminars** [3] - 43:25,
44:3, 66:23
**send** [5] - 12:19,
28:20, 35:18, 40:2,
72:1
**sending** [1] - 11:4
**senior** [1] - 79:10
**sense** [10] - 38:12,
48:24, 58:4, 68:7,
68:17, 76:17, 76:19,
79:18, 81:2, 81:6
**sensed** [1] - 63:17
**sent** [29] - 11:17,
11:19, 12:20, 16:21,
18:20, 18:21, 20:8,
20:11, 23:1, 26:13,
35:4, 37:3, 37:9,
37:12, 37:15, 37:24,
38:3, 38:11, 46:25,
60:9, 61:5, 61:6,
61:11, 61:18, 61:24,
62:20, 78:13, 78:16
**separate** [1] - 50:12
**September** [10] - 7:9,
7:14, 7:15, 28:21,
32:3, 34:1, 36:12,
52:19, 53:3, 57:10
**sequence** [1] - 15:9
**sequentially** [1] - 7:14
**served** [4] - 7:13, 7:14,
9:25, 10:3
**service** [1] - 48:8
**services** [4] - 42:15,
42:21, 52:20, 52:25
**set** [1] - 70:4
**settle** [2] - 12:12,
28:16
**settled** [2] - 32:24,
34:5
**settlement** [22] -
11:11, 11:14, 12:2,
15:6, 15:7, 22:10,
22:24, 24:8, 24:9,
30:2, 32:8, 32:23,
33:4, 33:9, 33:10,
33:20, 34:1, 34:4,
40:5, 43:6, 52:22,
85:13
**Settlement** [2] - 7:4,
7:16
**settlements** [2] - 17:9,

20:24
**seven** [3] - 78:5,
78:24, 79:21
**seven-figure** [2] -
78:24, 79:21
**several** [8] - 16:1,
18:16, 18:24, 22:22,
45:3, 47:16, 47:18,
47:25
**share** [29] - 21:11,
36:14, 38:22, 41:12,
42:8, 45:12, 48:14,
48:23, 49:18, 49:24,
50:19, 50:22, 51:8,
52:1, 52:8, 52:16,
54:4, 55:1, 56:10,
56:25, 59:1, 60:11,
60:17, 63:2, 64:7,
64:8, 76:10, 78:3,
81:6
**shared** [3] - 65:1,
66:21, 69:8
**shareholder** [2] -
55:7, 59:11
**sharing** [7] - 47:14,
51:1, 56:16, 75:20,
76:19, 78:20, 89:2
**sharp** [1] - 72:17
**shocked** [3] - 67:11,
67:12
**short** [3] - 31:3, 44:24,
63:5
**shortly** [5] - 14:19,
15:16, 54:21, 80:2,
82:1
**show** [6] - 8:7, 8:9,
8:11, 8:13, 8:14,
24:22
**showing** [3] - 14:6,
61:7, 69:15
**shown** [3] - 14:2, 69:6,
72:4
**shows** [3] - 26:8,
43:14, 55:14
**side** [5] - 6:13, 11:8,
13:5, 33:7, 40:13
**sides** [2] - 40:14,
40:17
**sign** [7] - 16:22, 17:2,
31:12, 32:17, 36:25,
37:5, 71:25
**signaling** [1] - 27:9
**signature** [2] - 70:7,
71:14
**signed** [14] - 17:3,
31:6, 32:18, 44:15,
57:7, 57:9, 57:18,
66:16, 66:17, 71:11,
71:12, 71:14, 71:15,
77:16

**significance** [2] -
54:9, 74:17
**significant** [1] - 48:10
**significantly** [2] -
20:6, 49:13
**signing** [1] - 44:20
**signs** [1] - 57:10
**Silko** [2] - 5:17, 55:12
**SILKO** [1] - 2:3
**similar** [1] - 66:1
**similarly** [1] - 41:24
**simple** [1] - 30:17
**simpler** [1] - 42:4
**simplest** [1] - 70:22
**simply** [5] - 14:15,
34:7, 34:15, 35:25,
48:5
**single** [6] - 35:14,
60:2, 60:8, 60:17,
72:6
**sit** [4] - 21:6, 24:16,
33:22, 38:14
**site** [1] - 44:9
**situation** [8] - 9:8,
35:7, 42:16, 48:6,
49:20, 51:2, 53:2,
60:13
**six** [5] - 11:25, 56:6,
61:14, 71:18, 72:5
**SM** [1] - 83:23
**SM-1** [2] - 4:11, 84:1
**SM-2** [3] - 4:12, 84:2,
84:5
**small** [2] - 64:13,
81:16
**SMALLEY** [2] - 2:11,
2:11
**smiling** [1] - 79:22
**SMITHFIELD** [1] - 2:4
**so-called** [6] - 18:6,
18:12, 20:19, 21:9,
42:1, 44:6
**SOL** [2] - 1:12, 2:12
**Sol** [2] - 86:15, 87:13
**sole** [16] - 46:24, 47:1,
54:1, 54:13, 54:20,
58:20, 58:22, 70:10,
70:11, 72:7, 75:12,
76:4, 76:5, 76:7,
76:17
**solve** [1] - 36:6
**someone** [4] - 50:18,
52:8, 52:12, 62:15
**sometime** [3] - 20:22,
24:7, 32:1
**sometimes** [2] -
12:24, 56:3
**somewhat** [1] - 47:11
**somewhere** [1] - 79:5
**soon** [2] - 17:12, 69:2

**sorry** [2] - 51:22, 88:2
**sort** [5] - 10:22, 14:1,
61:2, 78:17, 79:16
**sorts** [2] - 56:11,
79:10
**sought** [1] - 89:4
**space** [1] - 62:24
**speaking** [1] - 81:24
**Special** [2] - 12:18,
31:23, 66:25, 73:9,
83:24
**SPECIAL** [132] - 1:10,
1:19, 1:23, 5:8, 5:18,
5:20, 5:22, 6:2, 6:7,
6:15, 7:22, 7:25,
8:19, 9:4, 9:6, 9:14,
9:24, 13:10, 14:8,
14:13, 15:5, 16:19,
17:2, 17:18, 18:14,
22:11, 26:25, 27:5,
27:23, 29:5, 30:19,
30:24, 31:1, 32:20,
34:23, 36:24, 37:3,
37:6, 37:19, 38:14,
38:21, 39:1, 39:4,
39:7, 39:22, 41:5,
45:17, 45:20, 46:21,
47:5, 47:23, 50:1,
50:6, 50:24, 51:14,
51:21, 52:7, 52:11,
53:8, 53:17, 53:22,
54:5, 54:11, 54:21,
55:2, 55:19, 56:1,
57:3, 57:16, 57:19,
57:21, 58:5, 60:19,
60:21, 60:24, 61:8,
61:11, 61:16, 62:18,
63:12, 69:16, 69:19,
69:23, 69:25, 70:2,
70:16, 72:10, 72:14,
72:24, 73:2, 73:11,
73:14, 73:16, 73:21,
74:11, 74:18, 74:22,
75:1, 75:5, 76:2,
76:24, 77:1, 78:8,
78:22, 80:17, 81:13,
81:15, 81:18, 83:19,
83:22, 84:2, 84:6,
84:11, 84:15, 84:19,
84:24, 85:8, 85:16,
85:21, 85:25, 86:5,
86:9, 86:13, 86:21,
86:24, 87:5, 87:11,
87:17, 88:4, 88:19,
88:21, 89:6
**special** [1] - 67:6
**specific** [9] - 11:15,
36:4, 47:19, 62:16,
77:22, 78:13, 78:20,
79:20, 83:2

**specifically** [3] -
77:24, 78:19, 81:20
**specifics** [1] - 78:22
**spell** [1] - 6:2
**spelled** [1] - 69:5
**spend** [2] - 39:16,
48:9
**spent** [2] - 39:14
**SPIZER** [3] - 2:15, 6:1,
6:4
**Spizer** [2] - 6:1, 6:3
**spreadsheet** [6] -
20:10, 21:7, 21:19,
35:18, 37:9, 38:11
**spreadsheets** [12] -
18:25, 19:11, 19:16,
21:15, 23:17, 31:16,
35:12, 35:13, 37:13,
38:7, 85:12, 85:18
**spring** [1] - 32:1
**ST** [1] - 1:24
**stage** [2] - 43:6, 43:8
**stand** [7] - 21:6,
26:18, 29:18, 32:17,
38:14, 72:25, 79:3
**standard** [2] - 41:19,
59:13
**standpoint** [1] - 29:7
**start** [6] - 12:22, 17:7,
25:14, 40:12, 42:11,
65:18
**started** [4] - 24:6,
62:22, 71:1
**starting** [2] - 25:14,
63:14
**starts** [2] - 25:10,
62:19
**state** [14] - 41:17,
46:23, 46:25, 53:10,
53:11, 54:7, 54:12,
61:21, 70:8, 72:1,
72:4, 72:6, 73:18,
74:14
**State** [1] - 89:17
**statement** [6] - 9:10,
19:16, 21:14, 28:2,
60:5, 65:21
**statements** [3] - 40:7,
66:2, 66:3
**states** [2] - 44:16, 46:9
**States** [2] - 89:18,
89:23
**STATES** [1] - 1:1
**stating** [1] - 70:9
**status** [6] - 47:15,
48:3, 51:16, 51:17,
54:13, 55:3
**STENOGRAPHY** [1] -
3:6
**still** [14] - 12:5, 23:18,

23:20, 32:7, 39:17,
52:16, 52:24, 53:6,
55:24, 56:19, 59:25,
79:15, 80:10, 88:6
**straight** [3] - 27:1,
56:4, 56:7
**STREET** [4] - 2:4,
2:13, 2:24, 3:4
**strictly** [1] - 11:13
**stroke** [1] - 32:8
**structure** [1] - 48:3
**struggling** [1] - 9:7
**study** [1] - 33:3
**studying** [1] - 24:6
**stuff** [3] - 61:7, 61:8,
62:10
**subject** [4] - 14:5,
34:11, 34:16, 70:23
**submission** [2] -
30:20, 86:4
**submissions** [4] -
58:11, 85:1, 85:2,
87:19
**submit** [13] - 11:2,
12:17, 13:22, 14:1,
27:21, 30:16, 44:18,
49:6, 49:21, 51:10,
53:6, 56:22, 59:20
**submits** [3] - 50:4,
58:12, 58:17
**submitted** [13] - 7:12,
8:20, 18:25, 28:2,
30:22, 40:25, 43:12,
47:17, 60:5, 61:25,
84:11, 84:20
**submitting** [1] - 46:2
**subsequent** [1] -
19:20
**subsequently** [1] - 8:8
**substance** [2] - 7:24,
8:10
**substantial** [4] -
13:22, 43:11, 44:21,
49:6, 56:21, 57:1
**substantially** [2] -
41:19, 48:18
**substantive** [1] -
15:10
**successful** [1] - 57:1
**suggest** [13] - 40:15,
45:10, 48:6, 48:16,
49:24, 50:17, 51:23,
58:14, 58:15, 60:11,
68:15, 69:14, 77:13
**suggested** [3] - 23:7,
23:10, 26:7
**suggesting** [1] - 55:1
**suggestion** [1] - 68:1
**suggests** [4] - 44:19,
50:17, 52:5, 69:6

**SUITE** [4] - 1:24, 2:4,
2:16, 2:25
**sum** [3] - 35:25, 36:5,
36:10
**summer** [4] - 20:22,
22:23, 32:9, 35:2
**summit** [3] - 24:15,
24:19, 28:9
**superstar** [1] - 66:24
**supplement** [2] -
16:14, 33:22
**support** [3] - 10:16,
62:13, 68:18
**suppose** [1] - 52:21
**supposed** [5] - 11:1,
11:4, 14:20, 21:9,
22:4
**surely** [1] - 11:7
**surprise** [6] - 16:7,
75:2, 75:5, 75:12,
75:14, 76:1
**survived** [1] - 68:16
**swear** [2] - 72:19, 73:4
**swearing** [1] - 70:16
**sworn** [3] - 72:20,
73:8, 88:17
**system** [5] - 10:21,
10:25, 14:17, 14:23

**T**

**tab** [6] - 62:17, 69:22,
69:23, 77:3, 86:4,
86:10
**table** [2] - 24:16, 73:24
**tail** [1] - 59:17
**talks** [1] - 53:25
**tape** [1] - 79:2
**tax** [5] - 55:4, 58:19,
59:8, 59:12, 62:6
**team** [1] - 75:23
**technical** [2] - 58:4,
81:1
**technically** [1] - 57:24
**telephone** [6] - 17:15,
17:16, 17:21, 17:23,
23:25, 38:5
**television** [1] - 66:20
**tended** [1] - 8:16
**tent** [1] - 69:3
**Teresa** [5] - 5:15,
45:23, 59:22, 64:4,
81:8
**TERESA** [4] - 2:3, 2:7,
4:5, 73:7
**term** [6] - 11:5, 16:2,
47:10, 50:15, 75:21,
79:10
**terms** [11] - 24:1,

28:18, 30:2, 38:9,
49:12, 51:9, 59:5,
67:21, 69:4, 76:7,
76:10
**terrific** [2] - 55:15,
60:14
**testified** [2] - 37:19,
73:9
**testimony** [6] - 50:21,
72:17, 72:20, 75:2,
81:21, 89:7
**THE** [6] - 1:10, 1:13,
1:16, 1:23, 4:17, 5:7
**themselves** [3] - 6:18,
44:17, 71:10
**thereafter** [1] - 83:9
**therewith** [1] - 53:10
**they've** [2] - 29:22,
33:19
**thinking** [1] - 12:8
**third** [39] - 7:10, 12:3,
14:10, 39:23, 49:1,
49:2, 49:3, 49:17,
50:20, 51:13, 52:8,
52:9, 59:15, 67:24,
68:8, 68:10, 69:7,
71:13, 76:11, 79:6,
86:6, 86:11
**thirdly** [1] - 48:2
**THIS** [1] - 1:8
**thoroughly** [1] - 18:24
**thousand** [2] - 23:11,
63:25
**thousands** [1] - 64:14
**three** [25] - 6:21, 6:22,
7:18, 9:16, 9:21,
12:14, 23:11, 26:3,
32:1, 34:25, 39:9,
39:20, 41:25, 45:14,
45:23, 48:17, 50:12,
52:21, 66:10, 67:13,
76:4, 77:11, 78:5,
78:25, 79:21
**threw** [2] - 46:20,
59:25
**throughout** [2] - 44:8,
56:19
**thrust** [1] - 58:9
**Thursday** [3] - 28:23,
29:1, 29:4
**tickle** [1] - 14:18
**tied** [1] - 33:9
**timelines** [1] - 11:13
**timing** [1] - 31:23
**tips** [1] - 55:14
**TO** [2] - 1:8, 1:10
**tobacco** [1] - 88:15
**today** [27] - 5:21, 21:6,
22:12, 26:18, 29:18,
30:12, 31:17, 32:18,

33:10, 33:21, 33:25,
34:4, 38:14, 38:15,
38:23, 40:11, 61:1,
61:22, 62:3, 62:4,
62:7, 62:12, 68:21,
68:22, 72:16, 75:2,
88:18
**together** [4] - 46:15,
48:20, 75:17, 80:7
**took** [6] - 15:13, 39:6,
56:15, 71:12, 75:2,
78:7
**top** [1] - 34:19
**TORISEVA** [24] - 2:3,
2:6, 2:7, 4:15, 5:19,
73:1, 73:6, 73:7,
73:13, 73:15, 73:20,
73:23, 74:16, 74:21,
74:23, 75:4, 75:9,
76:7, 76:25, 77:5,
78:10, 78:24, 88:2,
88:5
**Toriseva** [62] - 5:12,
5:15, 5:18, 5:21,
15:19, 15:23, 16:11,
26:2, 31:25, 35:6,
41:13, 42:5, 42:14,
42:16, 43:11, 43:15,
44:2, 44:22, 45:11,
45:15, 45:23, 46:7,
46:17, 48:1, 48:3,
50:16, 58:16, 58:20,
59:2, 59:22, 60:6,
62:21, 63:19, 63:24,
64:11, 64:15, 65:10,
65:22, 67:17, 70:3,
70:7, 71:4, 71:11,
71:15, 71:17, 71:18,
71:21, 71:23, 72:8,
72:24, 75:21, 81:19,
83:8, 84:16, 84:18,
86:8, 86:20, 86:22,
86:23, 87:13, 88:10
**Toriseva's** [6] - 16:4,
21:24, 36:1, 39:21,
42:12, 44:24
**TORISEVA...............**
**...........................** [1] -
4:5
**tort** [3] - 52:4, 67:4,
77:23
**torts** [3] - 66:24,
77:15, 88:14
**total** [6] - 21:10, 25:5,
34:10, 34:13, 51:24,
52:25
**totality** [1] - 84:25
**totally** [1] - 21:5
**toto** [1] - 42:16
**touch** [1] - 24:6

**touches** [1] - 15:9
**tough** [1] - 34:7
**towards** [1] - 66:9
**town** [1] - 78:17
**tracking** [1] - 32:8
**TRACY** [1] - 2:21
**training** [1] - 67:7
**TRANSCRIPT** [2] -
1:18, 3:6
**transcript** [1] - 89:19
**transition** [1] - 68:16
**treat** [2] - 50:18, 55:18
**treated** [1] - 81:5
**treating** [1] - 59:12
**treatment** [1] - 36:11
**treats** [2] - 12:4,
58:19, 59:6
**tremendous** [1] -
31:24
**trial** [1] - 12:22
**tried** [3] - 22:22, 80:25
**tries** [1] - 36:19
**triggered** [1] - 11:7
**trouble** [1] - 63:17
**troubled** [1] - 22:18
**true** [4] - 8:19, 30:2,
70:21, 89:18
**trust** [2] - 41:3, 78:6
**trusted** [2] - 80:11
**truth** [3] - 16:3, 73:4
**try** [8] - 9:19, 17:14,
18:24, 22:23, 23:15,
24:19, 33:23, 68:25,
85:14
**trying** [11] - 16:9,
27:10, 28:7, 28:19,
29:1, 39:2, 39:17,
50:11, 55:3, 56:17,
79:1
**Tuesday** [3] - 28:24,
28:25, 29:3
**twice** [1] - 17:3
**two** [41] - 8:6, 10:13,
11:2, 12:15, 14:11,
14:14, 16:24, 19:25,
24:1, 27:15, 28:7,
28:19, 28:20, 28:22,
28:24, 35:7, 36:21,
39:9, 39:14, 40:4,
40:9, 40:10, 42:8,
43:13, 46:13, 46:16,
47:16, 50:13, 52:21,
52:23, 53:1, 53:17,
53:18, 58:21, 63:17,
71:14, 74:20, 78:5,
79:15, 82:21
**two-party** [2] - 28:7,
28:19
**type** [1] - 11:12
**typically** [3] - 44:3,

55:17, 55:21

# U

U.S [2] - 24:12, 24:15
ultimately [8] - 10:9, 19:11, 28:12, 37:2, 39:15, 39:19, 43:4, 45:4
unable [2] - 14:21, 38:9
unacceptable [1] - 69:10
unavailable [2] - 28:23, 29:3
undeniable [1] - 58:15
under [32] - 7:5, 8:2, 30:1, 31:7, 36:3, 46:16, 48:16, 49:16, 49:17, 49:21, 50:20, 50:23, 52:11, 57:4, 59:5, 59:21, 60:15, 69:21, 70:3, 70:16, 73:2, 77:3, 79:7, 83:18, 85:6, 85:9, 85:23, 86:4, 86:10, 87:20, 88:6, 88:8
UNDER [1] - 4:18
undercompensated [1] - 52:2
underlined [1] - 11:12
understandable [1] - 19:21
understood [10] - 75:10, 75:11, 75:25, 76:18, 76:21, 76:22, 76:23, 79:3, 85:10
undisputed [1] - 28:14
unfair [1] - 22:8
unilateral [4] - 26:17, 26:18, 34:20, 36:22
unilaterally [3] - 26:21, 34:6, 79:25
unique [1] - 50:21
UNITED [1] - 1:1
United [2] - 89:18, 89:23
unless [2] - 83:21, 85:21
unnecessary [2] - 24:18, 38:25
unopposed [1] - 7:19
unpleasant [1] - 82:24
unquestionably [1] - 49:5
up [51] - 13:1, 14:6, 15:2, 16:4, 17:9, 17:12, 17:14, 17:19, 18:8, 18:9, 22:10,

22:17, 22:20, 23:4, 27:10, 27:12, 29:20, 29:25, 30:3, 30:12, 31:19, 32:5, 33:9, 37:7, 37:15, 46:12, 49:3, 49:13, 51:14, 52:19, 54:4, 56:17, 57:1, 59:23, 61:1, 62:4, 62:7, 62:12, 67:22, 70:4, 70:22, 71:8, 72:24, 75:8, 80:25, 82:13, 82:19, 87:16
upcoming [1] - 83:9
UPS [1] - 12:19
upwards [1] - 49:10
useful [1] - 41:4
ushered [2] - 45:9, 46:13

# V

vacation [5] - 23:17, 23:22, 24:2, 38:4, 38:6
vague [5] - 51:8, 60:9, 62:16, 65:20
variety [2] - 36:21, 47:7
various [1] - 57:7
verbal [2] - 18:15, 51:11
verbally [1] - 78:8
version [2] - 29:9, 83:17
viability [1] - 8:18
vicious [1] - 22:15
view [3] - 8:16, 73:14, 75:1
Vioxx [21] - 5:10, 7:4, 30:2, 36:14, 43:16, 43:25, 44:10, 48:10, 52:1, 59:17, 64:24, 67:19, 75:22, 77:25, 78:3, 78:20, 79:20, 82:5, 82:10, 82:12, 85:13
VIOXX [1] - 1:4
Virginia [8] - 11:21, 28:9, 43:23, 53:9, 54:12, 70:8, 88:24
virtually [1] - 56:23
virtue [4] - 22:15, 28:6, 53:3, 60:2
vis [2] - 51:16
vis-a-vis [1] - 51:16

# W

W2 [6] - 54:22, 55:14, 55:24, 56:15, 76:1, 76:21
wads [1] - 60:4
wages [1] - 55:14
wait [6] - 12:24, 32:14, 40:2, 82:15, 86:9, 86:13
waited [1] - 32:1
waits [1] - 12:19
warning [1] - 60:6
WAS [5] - 4:11, 4:12, 4:13, 4:15, 4:16
wasteful [1] - 24:18
WAY [1] - 2:21
ways [5] - 10:14, 22:22, 26:3, 35:7, 36:21
web [1] - 44:9
Wednesday [5] - 28:24, 28:25, 29:3, 35:24, 36:8
WEDNESDAY [2] - 1:7, 5:2
week [3] - 28:21, 56:6, 77:12
weeks [5] - 11:25, 15:1, 16:8, 18:24, 32:1
weight [1] - 74:5
WEISS [4] - 1:12, 2:10, 2:11, 2:12
Weiss [2] - 86:16, 87:13
West [8] - 11:21, 28:9, 43:23, 53:9, 54:12, 70:8, 88:24
whatsoever [1] - 63:3
WHEELING [2] - 2:8, 2:13
Wheeling [2] - 11:20, 88:24
wherein [1] - 47:24
WHEREUPON [7] - 83:25, 84:4, 84:9, 84:13, 84:17, 84:22, 89:10
whichever [1] - 12:19
whole [1] - 32:23
WHOM [2] - 1:12, 1:15
wife's [1] - 64:19
WILL [1] - 4:17
willfulness [2] - 14:1, 14:3
Williams [30] - 15:23, 16:11, 26:2, 41:13, 42:17, 43:11, 43:15,

44:2, 44:22, 45:16, 45:24, 46:7, 46:17, 58:20, 59:2, 63:9, 63:18, 63:23, 64:15, 65:9, 70:4, 71:8, 71:12, 71:14, 71:21, 72:8, 75:22, 77:19, 83:8, 88:11
willing [5] - 17:24, 35:6, 38:24, 39:18, 55:24
wine [1] - 79:22
wish [2] - 7:18, 79:3
WITH [2] - 1:13, 1:16
withheld [2] - 19:15, 19:18, 21:15, 21:16, 23:12, 25:4, 27:20, 31:20, 34:11, 35:20, 35:25, 39:20
withhold [3] - 26:22, 36:4
withholding [2] - 25:5, 34:13
witness [1] - 73:8
word [4] - 46:22, 47:9, 60:8, 78:7
words [3] - 32:17, 48:9, 76:21
works [1] - 52:19
world [1] - 67:4
worse [1] - 11:1
worth [1] - 39:16
worthy [2] - 13:8
wound [1] - 14:6
wracked [1] - 79:1
wreck [1] - 12:23
write [2] - 28:17, 77:16
writes [1] - 12:11
writing [2] - 6:19, 6:22
written [8] - 12:4, 18:14, 18:16, 47:18, 47:24, 51:4, 51:9, 51:11
wrote [5] - 11:2, 11:4, 15:14, 15:25, 63:22
WV [3] - 2:8, 2:13, 2:21

# Y

y'all [1] - 87:12
year [25] - 10:18, 10:23, 29:15, 51:22, 55:17, 55:21, 55:25, 56:10, 63:10, 63:12, 63:14, 64:1, 64:4, 64:14, 65:11, 65:19, 72:3, 83:7, 83:9, 83:11, 83:16, 83:18,

88:9, 88:11
years [14] - 13:14, 13:19, 15:4, 52:22, 52:24, 53:1, 56:13, 65:15, 66:10, 67:13, 69:15