UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX | * | MDL NO. 1657 |
| | * | |
| PRODUCTS LIABILITY | * | |
| LITIGATION | * | SECTION L |
| | * | |
| THIS DOCUMENT RELATES | * | JUDGE FALLON |
| TO ALL CASES | * | MAG. JUDGE KNOWLES |
| | * | SPECIAL MASTER |
| FILER: Robert E. Arceneaux/Margaret Woodward | * | PATRICK A. JUNEAU |
| | * | May 18, 2011 |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## OPPOSITION TO MOTION TO EXCLUDE MARKOWITZ TESTIMONY

MAY IT PLEASE THE COURT:

This memorandum is respectfully submitted by co-lead counsel for Objectors in opposition to the FAC's Motion to Exclude from evidence testimony and a report prepared by Joey Markowitz While this pleading is being filed after the completion of trial, it was supplied to Special Master Juneau the morning of May 12, 2011, in time for him to consider it before he ruled on the admissibility of the Markowitz testimony. It is being filed now in order to make the record complete.

The FAC argues that Objectors' effort to interject Markowitz's "opinion" testimony comes at the eleventh hour, without the necessary report and without proper verification of the reliability of his opinions. The FAC also alleges that Objectors' supposed departure from the federal rules is sanctionable.

Objectors cannot fully brief the issues raised because the motion was served after close of

-1-

business on the day before Markowitz is scheduled to testify. If Objectors acted in the eleventh hour, the FAC's motion comes at 11:45. Objectors do not contend, however, that the FAC's brief is untimely, because Objectors understand, as must the Court and the FAC itself, that *everything* in this case has occurred on an extremely expedited schedule.

Absent a court order specifying the time for production of an expert report, FRCP 26 (a)(2)(D) provides that an expert report must be tendered at least ninety days before the hearing. In this case, the hearing date was not set until March 31, 2011, less than six weeks ago. To comply with the FAC's demands for punctuality, undersigned counsel would have to have filed an expert report a month-and-a-half before the scheduling order issued. This Court's scheduling order, when it did issue, did not provide for any witnesses besides the Objectors, one member of the FAC, and Mr. Garrett. *Only two weeks ago* did the Special Master rule that each side would be permitted to call a single "expert" witness; in making that decision, the Master did not call for expert reports, nor impose any deadline on the naming of witnesses or declaring the substance of their testimony. With several potential areas of expert testimony to address, Objectors could not determine until they took the deposition of Mr. Birchfield which of their potential experts they wished to call. The deposition was delayed by the Special Master until *the last business day before the commencement of the hearing.* On the following day, Objectors identified Mr. Markowitz as their additional witness. He was chosen because of the difficulties undersigned counsel had experienced in working with Mr. Garrett's spreadsheets.

Given the Fifth Circuit's interest in a lodestar calculation as the starting point of any fee allocation, *Forbush v. J.C. Penney Co.*, 98 F.3d 817 (5th Cir. 1996), *see also,* PTO 6(D), undersigned counsel had always intended to provide the Court with a workable lodestar calculation. They expected to use Mr. Garrett's spread sheets for this purpose, and the Special Master gave

undersigned counsel access to Mr. Garrett and his data with a full understanding of their objective. However, it soon became apparent that Mr. Garrett's work was not entirely adequate to the lodestar calculation. For example, Mr. Garrett's records for two periods of time were stored on two different systems that were not merged. Additionally, Mr. Garrett had not received hourly rates for numerous applicants and had entered an average rate for all timekeepers whose rates he lacked. For attorneys, this average rate was $332/hr, irrespective of location or seniority. The rates could not be easily adjusted by the Court (without the help of programmers) because half of Mr. Garrett's data is stored on a proprietary website, which requires special programming skills for utilization, and the information on the website would not have been admissible into evidence. Objectors needed a way to get the information from both databases, merge them, present the data (unchanged) in a single worksheet that the Court, or any counsel, could use to make any adjustments they felt appropriate in order to present a correct and appropriate lodestar.

To cope with these difficulties, undersigned counsel retained Joey Markowitz, a data miner and analyst with a degree in both hardware and software computer engineering, and many years of experience in working with the programs that would be necessary to produce the chart necessary for the Court. Efforts to understand and work with Mr. Garrett's programs continued into last week, when, with the hearing fast approaching and Mr. Garrett often unavailable, Mr. Markowitz determined that the best solution would be simply to import Mr. Garrett's data into Microsoft Excel, a commonly-used and well-understood program. When Mr. Markowitz effected that conversion, the newly-formatted rates data came within $.27 of Mr. Garrett's calculations, and the hours were an exact match. Mr. Garrett himself reviewed the work product, and while he admitted that it was beyond the scope of his programming knowledge, he stated in an e-mail that hit spot checks revealed its accuracy; he agreed that "your report ties in to my report." See Exhibit 1 hereto.

Therefore, Mr. Markwotiz has produced a chart that reflects nothing more than the Garrett data, simply in a different format. There is no opinion, no statistical analysis, no judgment call, involved. He simply used programs that millions of programmers use world-wide, and which are the industry standard, to gather the data, input into Microsoft Excel – the Rolls Royce of spread sheet programs – and organize the data in a chart that could be meaningful for the Court.

Mr. Markowitz thereafter made a second chart with mathematical adjustments to the data *as directed by undersigned counsel.* His changes were purely mathematical and clerical. He does not know why undersigned counsel directed him to change certain rates, and he will offer no opinion concerning the reasonableness or legitimacy of the changes he was asked to make. He will simply explain the mathematical reliability of the revisions, which is subject to simple verification. For example, undersigned counsel instructed Mr. Markowitz to adjust Eric Weinberg's rate upwards from the average rate of $332/hr used by Mr. Garrett to the $600/hr rate which the testimony has indicated to be an appropriate rate. All Mr. Markowitz knows of this– and of the other adjustments he was asked to make– is that he entered the new rate and instructed Excel, by the push of a computer key, to provide a new lodestar for Mr. Weinberg. He will offer no opinion on the essential inquiries of whether– and if so, how– Mr. Weinberg's rates ought to be adjusted; Mr. Markowitz will only say that he did it. The reliability of each of his adjustments is subject to immediate verification with a calculator– or if that is too scientific for the FAC, they can do it longhand.

The ministerial tasks performed by Mr. Markowitz– sophisticated though they might be– do not call for an expert report nor for a *Daubert* analysis of Mr. Markowitz's methodology, any more than the introduction of an email requires a *Daubert* investigation of the technology underlying electronic transmission of text. The Excel program has been around for long enough and its scientific underpinnings have been sufficiently tested by extensive use that Mr. Markowitz's work

amounts to the present-day usage of an adding machine.

Indeed, if any method were subject to inquiry, it would be Mr. Garrett's unusual and rather clunky program, which is uniquely user-unfriendly, the origins of which are unknown, which has not been peer-reviewed and which is used by no one other than himself. We do not know who wrote the program, or whether that person has any credentials whatsoever.  Had Mr. Garrett entered the data into a standardized program like Excel in the first place, Mr. Markowitz's work would have been completely unnecessary.  Objectors have not complained, however, about Mr. Garrett's use of a program familiar to and workable by him.  They only seek to provide a lodestar calculation that can be used by the Court or anyone with basic Excel knowledge, with all the data gathered in one place, and useable to calculate an appropriate lodestar.  For that, they required the assistance of Mr. Markowitz.

The FAC's classification of Mr. Markowitz's work as "opinion" fundamentally misunderstands Mr. Markowitz's role.  However, the confusion can easily be cleared up by reference to the case the FAC cites for the proposition that Mr. Markowitz's spreadsheet is "precisely the type of [opinion] testimony contemplated by Rule 702."  *Cooper v. Southern Company,* 390 F. 3d 695, 728 (11th Cir. 2004), *cert. denied*, 546 U.S. 960, *reversed on other grounds, Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006).  *Cooper* held that a data analyst who extracted data *and* performed statistical probability calculations *and* expressed opinions about the significance of those calculations  had utilized techniques and presented opinions which "require the kind of technical or specialized knowledge that is the hallmark of expert evidence."  *Id.*  The court did not say that every data analyst is an expert who must be *Daubert*-qualified.   Mr. Markowitz, who did nothing remotely akin to the analysis undertaken the *Cooper* witness, is not in the same category.

Distinguishing *Cooper,* courts have properly held that the sorts of clerical calculations performed by Mr. Markowitz do not constitute opinion evidence. Thus, the Court in *Chao v. Tyson Foods, Inc.,* 568 F.Supp.2d 1300 (N.D. Al. 2008), expressly distinguishing *Cooper*, held that a 15,000- page spreadsheet of employees' time-punches did not contain "opinions," within the meaning of the federal rules, even though they contained "inferences, assumptions, and derivations that arguably exceed simple arithmetic." Similarly, in *United States v. Hamaker,* 455 F.3d 1316 (11th Cir.2006), the Eleventh Circuit held that, pursuant to Rule 701, a financial expert could testify as a lay witness where the witness prepared for his testimony simply by "add[ing] and subtract[ing] numbers from a long catalogue of [the defendant's] records and then compared those numbers in a straightforward fashion." Rule 701 establishes that

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Mr. Markowitz's expertise, which is extensive, came into use only in his conversion of Mr. Garrett's data into a useable format. At the point where he succeeded in moving the data into a new program, his "expert" work had been completed, and he had created nothing more than workable spreadsheet based on data *identical to Mr. Garrett's.* .

The only difference between the two spreadsheets is that now undersigned counsel– or the Court– can adjust timekeepers' hourly rates to those more accurately reflecting rates applicable in the communities where the claimants practice. As for the chart with adjustments, undersigned counsel provided the new rates; Mr. Markowitz did nothing more than enter them. He has no opinion about the appropriate rate to be assigned to any timekeeper; his only "opinion," if it can be called that, will be that if one enters a new rate of $600/hr. for Mr. Weinberg, Excel will reliably

recalculate a new lodestar. If the Special Master, Judge Fallon, or, indeed, the FAC wishes to assign different rates to any timekeeper, they will now all have in hand a tool for accomplishing that. Indeed, anyone with a working knowledge of Excel can now use the spreadsheet created by Mr. Markowitz. Undersigned counsel should not, at this stage of cyber-development, be asked to call Bill Gates to establish that the Excel program works as intended.

Moreover, the spreadsheet created by Mr. Markowitz is necessary to the lodestar calculations required by Judge Fallon and the Fifth Circuit. Mr. Markowitz should therefore be allowed to explain his reformatting of the Garrett data into a useable chart, and that chart should be received into evidence.

Respectfully submitted

/s/ Robert E. Arceneaux                          /s/ Margaret E. Woodward

Robert E. Arceneaux, La Bar No. 01199       MARGARET E. WOODWARD, La. Bar
ROBERT E. ARCENEAUX LLC                     No.13677
47 Beverly Garden Drive                     3701 Canal Street, Suite C
Metairie, LA 70001                          New Orleans, Louisiana  70119
(504) 833-7533 office                       (504) 301-4333 office
(504) 833-7612 fax                          (504) 301-4365 fax
rea7001@cox.net                             mewno@aol.com

**CO-LEAD COUNSEL FOR OBJECTORS IDENTIFIED IN FEB. 8 ORDER**

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail, and by upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre Trial Order No.8, on this date, May 18, 2011

/s/ Robert Arceneaux
_____

**Subject:** Re: vioxx -- MDL
**From:** Philip Garrett <pgarrett@garrettco.com>
**Date:** Mon, 9 May 2011 17:44:38 -0700 (PDT)
**To:** rea7001@cox.net

Did check a few personnel and all was well. The report agrees (close enough for me). I cannot vouch for Joey but I am reluctant to use pivot tables only because they are a programming tool and can move data and sometimes your answer in a new report is not correct because you lost a variable or gained one. So I will leave the programming to Joey and yourself and I will agree your report ties in to my report.


Philip A. Garrett, CPA
117 Fairgrounds Blvd

Bush, La 70431

office - 985-746-9165
Cell - 985-635-1500
pgarrett@garrettco.com


**From:** robert <rea7001@cox.net>
**To:** Philip Garrett <pgarrett@garrettco.com>
**Sent:** Mon, May 9, 2011 2:45:33 PM
**Subject:** vioxx -- MDL

Mr Garrett

Just wanted to confirm your testimony Thursday morning. I will let you know when I think you can plan on arriving, as I think you are second, so mid morning will probably be okay but I will confirm.

Also, I wanted to follow up on our last discussion. I understand from it that the Excel Pivot Table that Joey prepared was beyond your ability to verify from a programing level, but that you had no doubt that Joey was up the task of doing the work that is represented in the chart accurately and competently. He is a bright young man indeed, and knows his stuff, doesn't he?

You were going to sample a few firms to see if there were discrepancies between his work and your numbers. I am assuming since I have not heard that there are any, that the samples matched.

I will let you know precisely when you need to be at the hearing on Thursday as soon as I see the master calendar, which will be later this afternoon.

Robert Arceneaux

Case 2:05-md-01657-EEF-DEK   Document 62963   Filed 05/18/11   Page 10 of 10