UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX | * | MDL NO. 1657 |
| | * | |
| PRODUCTS LIABILITY | * | |
| LITIGATION | * | SECTION L |
| | * | |
| THIS DOCUMENT RELATES | * | JUDGE FALLON |
| TO ALL CASES | * | MAG. JUDGE KNOWLES |
| | * | SPECIAL MASTER |
| FILER: Robert E. Arceneaux/Margaret Woodward | * | PATRICK A. JUNEAU |
| | * | May 8, 2011 |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## Eric Weinberg and Cohen, Placitella and Roth's Joint Response to the Objections of the Recommended Common Benefit Fee Allocations

MAY IT PLEASE THE COURT:

This memorandum is respectfully submitted jointly by Cohen, Placitella and Roth, by Chris Placitella, and Eric Weinberg, in support of their request for significant common benefit fees. Under the recommendation made by the FAC, they are slated to receive fees in the former instance of less than a law clerk wages, and in the later, less than a baby-sitter's wages. This paper describes the contributions and work effort that these lawyers made to the over-all Vioxx effort, most of it in New Jersey state court, where they served at the direction of the co-lead counsel appointed by the court in that State on *de facto* committees and in most cases taking leadership roles. As explained at the Deposition of Andy Birchfield, the FAC's Grid system did not allocate points for work on state committees, and accordingly no such points were awarded Placitella or Weinberg. Yet, hundreds and hundreds of points were awarded for committee assignments and positions in the MDL, apparently unrelated to whether the lawyers who held these seats actually produced or not. Weinberg

-1-

and Placitella's commitment was to the Vioxx injured plaintiffs, and the hours that they worked, which were vastly underreported because they were only recorded for time that actually was supported by a physical record, such as a letter, e-mail, or other document, were ALL hours that should be compensated at the prevailing rate. A revised lodestar chart will be introduced at the hearing, showing the appropriate lodestar for these lawyers, which they believe will be the basis of all lawyers compensation, as the FAC grid and point system is an unlawful method of allocating fees that would result in an automatic reversal by the United States Fifth Circuit. As for multipliers, they do not ask for a specific number, because they realize that allocation is a matter of relativity. They only seek to be treated similarly to those firms who did work similar to the work they did, but got HUGE awards because they sat on committees, or were in favor of the MDL leadership. The record will show which firms did work similar to the work done by Placitella and Weinberg, and there were just a handful.  Placitella and Weinberg only ask that they be treated fairly in relation to their colleagues who did similar work with a fair and equitable multiplier on top of the lodestar to which they are absolutely entitled to receive.


## HISTORY

Shortly after the withdrawal of Vioxx, a small group of law firms representing over 7,500 plaintiffs decided to concentrate their efforts in the New Jersey consolidated the litigation before the Honorable Carol E. Higbee, J.S.C., and agreed to work together through discovery and trials for the common benefit of all.  This small group of firms was the most successful litigating group of law firms in the entire Vioxx litigation.  Of the six cases tried to verdict by firms, four cases resulted in consumer fraud verdicts and three cases resulted in personal injury verdicts.

While there was no formal membership in what can only be accurate described as a

"consortium" (apparently, the FAC has no problem with this term as it treated the VLC composed of four firms as a "consortium" and even made a single fee award to the four firms), it was headed formally by Chris Seeger and Sol Weiss, who were appointed by Judge Higbee as co-leaders of the New Jersey Consolidated Litigation. In turn, where there were no formal committees ever formed, various persons who participated in the effort were delegated various tasks and roles, either expressly by Seeger or Weiss or their delegates, or informally by being called upon by firms for their expertise and work in certain aspects of Vioxx, or in other previous pharmaceutical litigation.

Chris Placitella and Eric Weinberg were key members of the New Jersey group, integral to the success of the New Jersey effort, and their work benefitted all plaintiffs in the New Jersey Vioxx litigation, and perforce nationally as no doubt the New Jersey successes had much, if not more than any other work, to do with the national MSA. Their work product was "paradigm-shifting" work. "Paradigm-shifting" work is that which significantly alters the course of litigation in ways that benefit all plaintiffs. This phrase accurately describes the outstanding legal work and strategies designed and executed by Messrs. Placitella and Weinberg, and acknowledged as such by colleagues and key scientists in the litigation.

The work product generated by Placitella and Weinberg was shared with their colleagues in other jurisdictions, including the MDL and Texas, beyond the New Jersey consortium, without any written fee sharing agreements. It is a part of the MDL Trial package, or should be. Their work product has been used in MDL and State Court trials. Their work product on marketing fraud has been acknowledged as the very best evidence of fraud in the entire litigation and the key to the verdicts achieved for plaintiffs in both federal and state court trials. Their work on proof of risk in Merck's own clinical study data has been described as the best scientific analysis created in the entire Vioxx litigation by far, and has been so described in an article published in an esteemed peer

reviewed medical.

Placitella and Weinberg made the following contributions to the Vioxx Common Benefit:

1.  Participation in seven trials, one in Texas and six in New Jersey, in which plaintiffs won five consumer fraud verdicts and three personal injury verdicts.

2.  Leadership on expert witness development for the New Jersey litigation.

3.  Expended 9,834 hours on discovery in the Vioxx litigation which ranks them, combined, fourth in discovery hours among all firms in the litigation (after Seeger Weiss, The Lanier Law Firm, and the Law Firm of Daniel E. Becnel) – with a work product that is substantial and reflects total dedication to discovery of Merck's conduct.

4.  Leadership on paradigm shifting marketing discovery, including key depositions of Merck senior marketing executives and third parties, which developed evidence of marketing fraud offered in nearly every Vioxx case tried in the MDL and other jurisdictions.

5.  Collaboration with the trial team to make changes to the trial strategy after the defense verdict in *Humeston* I, leading with a victory in *Humeston* II, which helped to change the course of the litigation.

6.  Retainer of Dr. David  Madigan, a world class biostatistician, currently Chairman of the Department of Mathematics at Columbia University, who created an analysis of Merck's placebo controlled SAS data which was integral to the verdict in Hermans/Humeston II, was offered to plaintiffs' counsel in the MDL and other jurisdictions, is credited by Drs. Avorn and Krumholz, the MDL's own biostatistician,  as the best scientific analysis of Merck's conduct in the entire litigation, and has been published in the Archives of Internal Medicine.

7.  Retainer of Dr. John B. Kostis, a world class cardiologist, currently Chairman of Medicine at the University of Medicine and Dentistry of New Jersey, who created a scientifically based model to measure specific causation in the New Jersey litigation, and was provided to the Fee Allocation Committee at the outset of negotiations with Merck; Dr. Kostis also provided expert consultation to the Plaintiffs in trials in Texas and New Jersey, and provided critical insight into the development, marketing and clinical testing of Vioxx.

8.  Leadership nationally in pressing the litigation against Merck after a series of defense verdicts had discouraged most other counsel from proceeding with new and creative discovery to improve the evidence available to Plaintiffs to prevail at trials.

9.  Joining in the group of New Jersey firms in 2005 with several law firms, including the Lanier Law Firm, Weitz & Luxenberg, Anapol Schwartz, and Motley Rice, that agreed to work collaboratively on trials in New Jersey and jointly represented thousands of plaintiffs.

10.  Participating in ten trial cases initially set for trial in New Jersey in October 2007, rescheduled

for January 2008, and which were not tried as the result of the Settlement in November 2007..

11.  Representing Plaintiffs in 27 Wave One cases in the New Jersey litigation.

12.  Participating as first or second chair or in supporting roles in over thirty common benefit depositions.

13.  Leadership on FDA discovery including detailed analysis of the Vioxx Summary Approval Packages obtained via FOIA letters served by Weinberg on FDA beginning in October, 2004 thereafter;  and consultation between Weinberg and five retired FDA officials on FDA regulatory and scientific issues (Roy, Guerigian, Geller, Whetstone and Jones); all of which provided a direct benefit to Vioxx trials.

14.  Directed a consortium of law firms on review of documents of Merck contractor STI, related to contract publications and medical meetings designed to promote the benefits of Vioxx..

15.  Directed a consortium of law firms on a Public Relations Project that began to generate positive news coverage for plaintiffs, rebutting Merck's public relations spins, in 2007 while negotiations were ongoing.


I.     TRIALS

        Placitella and Weinberg were directly involved in five trials involving seven injured plaintiffs (two of the trials in New Jersey involved multiple plaintiffs.)  The narratives here are derived in part from written communications between Placitella, Weinberg and their colleagues. The evidence demonstrates clearly that Placitella and Weinberg were critically important principals of the New Jersey cases, and were considered, at the time fo the trials, to be virtually important to the trial effort, even though they were nto counsel of record.[1]  Notably, all of the time, work,

---

[1] Mr. Birchfield stated at his deposition that "trial" points were only awarded to those who were "actually" tried the case, or served as local counsel. In modern complex litigation such as Vioxx case, the role of the "trial" lawyer cannot be underestimated; but the work that goes on in the background and is never seen by the Court or the jury, is equally important. When trial counsel calls upon a colleague for assistance, or adopts and uses their work during the trial, it is simply wrong to exclude that colleague from being considered as part of a collaborative effort that constituted the trial team.  This is particularly true if trial points are going to be awarded merely because a firm served as local counsel, which of course does not necessarily mean it did anything to contribute to the result.

resources and expertise in these individual cases were provided by Placitella and Weinberg without recompense.  Where the plaintiffs were successful, and the cases were settled and legal fees were generated to the trial firms, Placitella and Weinberg shared none of those fees

What follows here is a brief summary of the support provided on an immediate basis, to enable the trial firms to present the best possible cases for the plaintiffs

**A.   Ernst Trial (July to August 2005)**

This was the first Vioxx personal injury case to be tried, and Chris Placitella was admitted to the Court as a part of the plaintiffs' trial team.  Placitella had already developed evidence of the sophisticated marketing fraud that Merck had perpetrated with Vioxx.  Placitella had discovered videotapes of Merck employees and consultants that had been retained by the video contracting firm that made the tapes.  While Merck sought to bar production of this evidence, Placitella prevailed and obtained this key evidence.  Placitella took a series of depositions of Merck marketing executives in order to develop the context of the marketing fraud.

Placitella provided a knowledge time line to the trial firm in the Ernst case, in order to assist them in presenting evidence of marketing fraud in the trial.  He provided the trial team with commercials he had obtained, which were discussed in a New York Times article on July 20, 2005. Placitella also provided trial counsel of a summary of the Dorothy Hammill interview with Larry King in Powerpoint form, as well as a video presentation Merck prepared and showed to physicians which was relevant to the fraudulent and misleading safety messages Merck was sending to the public and to physicians, patients and the FDA.

It is relevant that Placitella was the foremost attorney in the entire Vioxx litigation in taking the crucially important marketing discovery that was used by plaintiffs' counsel in most if not every case tried in this litigation.  Nobody – not one other lawyer or firm – did more to uncover Merck's

marketing fraud than Chris Placitella.  The lawyers who served on the Fee Allocation Committee, who tried cases, relied on Placitella's work to prove fraud in their cases; or failed to proffer the best evidence if they did not use this work product.

All of this evidence was developed into a cohesive powerful presentation, and provided, gratis, to the trial counsel in Ernst, Mark Lanier.  This was critically important evidence in the litigation.  Years later, Lanier taught trial tactics at a Continuing Legal Education seminar, and he told the attorneys attending the seminar that Chris Placitella had uncovered the most important evidence of marketing fraud in the entire case,  - evidence that helped Lanier obtain plaintiffs' verdicts in Vioxx.  This presentation was recorded and the  audio tape and transcript of it document Mr. Lanier's comments.

Both Placitella and Weinberg worked extensively before and during the Ernst trial with Dr. David Egilman, the key warnings and liability expert for the plaintiffs in this case.  Months before the trial, Weinberg provided Dr. Egilman with his extensive work product on the FDA.  Beginning in October of 2004, Weinberg had developed an extensive library on FDA issues related to Vioxx, had carefully analyzed thousands of pages of FDA Summary Approval Packages and other FDA documents he obtained through the Freedom of Information Act related to Vioxx, and had retained five FDA consultants, all former FDA employees in the regulatory, medical and legal areas. Weinberg's work was captured in several Powerpoint presentations, including a highly detailed and annotated 150 slide Powerpoint, all of which had been shared with other counsel and with experts such as Dr. Egilman.  (Exh. 5, FDA PPT)

The ongoing dialogue between Placitella, Weinberg, Dr. Egilman, and counsel for the plaintiffs began in early 2005.  In this e-mail, the Lanier firm documents the relationship between Egilman and Weinberg, and that the Lanier firm requested Weinberg's assistance in working with

and preparing Egilman for trial:

> ----Original Message-----
> **From:** Richard D. Meadow [mailto:RDM@lanierlawfirm.com]
> **Sent:** Monday, June 06, 2005 1:05 PM
> **To:** Eric H. Weinberg
> **Subject:** Egilman
>
> Would like the pleasure of your appearance at his deposition here on June 13th. Are
>
> you available?
>
> Rick Meadow
> The Lanier Law Firm, PC
> 126 East 56th Street 6th Floor
> New York, New York 10022
> 212-421-2800
> 212-421-2878 (fax)
> rdm@lanierlawfirm.com
>
> -----Original Message-----
> **From:** Eric H. Weinberg [mailto:ehw@erichweinberg.com]
> **Sent:** Monday, June 06, 2005 2:18 PM
> **To:** Richard D. Meadow
> **Subject:** RE: Egilman
>
> yes, he also asked me to attend the prep sessions at your office this Thursday and
> Friday.  Are they on?

Weinberg, who was second chair to Placitella in many of the key marketing depositions, retained

the eminent cardiologist Dr. John B. Kostis in October of 2004 to help him understand the medical

issues related to Vioxx.  Weinberg worked closely with Dr. Kostis throughout the litigation, and

time and time again, plaintiffs' counsel came to Weinberg to help them develop the medical

evidence necessary to win a Vioxx case.  In the Ernst case, Weinberg engaged Dr. Kostis to provide

assistance in proving medical causation.  The plaintiff's decedent had suffered sudden cardiac death

secondary to an arrhythmia, and Merck vigorously contested causation, arguing that there was no evidence in the clinical study data that Vioxx caused arrythmias.

Weinberg contacted Dr. Kostis, who reviewed the trial testimony of Drs Isaac Weiner and David Egilman regarding Vioxx and arrythmias. Dr. Kostis had already, by the summer of 2005, reviewed Merck's clinical study data in the context of the Framingham risk factors, and had a well informed understanding of the manner in which Vioxx interacted with pre-existing risk factors to increase the risk of cardiovascular thrombotic events in Vioxx patients. Dr. Kostis has published over three hundred papers in the peer reviewed literature, authored books and chapters, founded the Cardiovascular Institute of New Jersey, and is world renowned. Because Weinberg had retained him, and provided him with Merck data and other information, Dr. Kostis was in a unique position to advise on medical issues. He was able to provide advice to the Lanier firm concerning causation in the Ernst case, and to assist their experts as well.

From: Eric H. Weinberg
Sent: Tuesday, July 26, 2005 10:27 AM
To: 'Richard D. Meadow'; Chris Placitella (E-mail)
Subject: RE: Emailing: board

Kostis reviewed testimony of Egilman and Wiener.

he says they got it right but still need to nail down this simple story:
1. Pt. died
2. had coronary artery disease
3. Nothing else wrong with pt.
4. Most likely cause is clot
5. People with normal hearts dont die in their sleep--extremely rare
6. Clot far more likely cause than anything else (more common statistically in pts over 50 yrs)
7. Link between ventricular fibrillation and coronary artery disease is most likely a clot. It could happen electrically, with pt. with previous MI and scarring, but it is extremely rare. Clot is far more likely the cause.

For what it's worth....sounds like there may be literature on this. He also has nice pictures of clots; if you want I can get them to you.

-----Original Message-----
From: Richard D. Meadow [mailto:RDM@lanierlawfirm.com]
Sent: Saturday, July 23, 2005 11:08 AM
To: Eric H. Weinberg
Subject: Re: Emailing: board

Thanks Eric. I will pass this on to Mark.
--------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Eric H. Weinberg <ehw@erichweinberg.com>
To: Richard D. Meadow <RDM@lanierlawfirm.com>
Sent: Sat Jul 23 10:11:37 2005
Subject: RE: Emailing: board

Rick,

Just read the morning of Egilman. Saw M. is bringing Arrowsmith Lowe. In Baycol trials the defense marked the part of the summary approval packages and introduced all of the approval letters, but left out certain parts of the FDA packages, eg the pharmacology review which had highly critical comments about Baycol. She then identified the exhibit as the approval package and was never challenged.

So it would not be surprising if M. only introduced portions of the summary approval packages they like, and of course they will go over the labels and the approval letters in detail to show every time the FDA said the drug is safe.

I think you have my pp on the approval packages. There is lots of stuff in there, from the beginning, raising concerns about this drug. I know you will be able to ask her if M. should have given FDA the MI meta analysis, the things they did not give FDA, and how they played with death data etc. I also think that when FDA raises concerns it is incumbent on the manufacturer to get the data to answer the concerns; if they don't, even if FDA does not have the resources or wherewithal (see my comments re: Dan Troy) it is still the manufacturer's responsibility to prove the safety of the drug, and that continues all during the time the drug is on the market.

Jay Geller is my FDA legal expert and his cv and Baycol report are attached. You(all) might want to ask him if Vioxx was misbranded and if so use his background to cross Arrowsmith Lowe. Just talking about "misbranding" could be helpful -- it means they were lying.

Eric

Weinberg and Placitella had no fee interest whatsoever in the Ernst matter.  They recognized that it was important to all plaintiffs, their own clients included, and to Carol Ernst, that her lawyers have the best chance to win her case.  When called upon for help by their colleagues at the Lanier Law Firm, Weinberg and Placitella were able, due to their dedication to the case and ability to develop evidence, to provide assistance in the Ernst case. .

**B.  Humeston I Trial (September to October 2005)**

All of the work contributed to the Ernst case by Placitella and Weinberg was made available to Chris Seeger and Dave Buchanan at Seeger Weiss, counsel for Mr. Humeston, for use in the trial of his case in New Jersey in the fall of 2005.   Placitella developed an even more refined trial cut marketing work product and gave it to Chris Seeger for use at trial.

The impact of this work was reported on during the trial.  One key deposition of a Merck marketing representative taken by Placitella and played to the jury by plaintiffs' counsel in Humeston led to this story in the Associated Press, which refers to "Humeston lawyer Chris Placitella":

**Lawyers: Merck Touted Vioxx Despite Risks**

*(AP) ATLANTIC CITY, N.J.*

Lawyers for the Idaho postal worker who blames Vioxx for his 2001 heart attack sparred Wednesday with the Merck & Co. executive who promoted the arthritis drug.  In videotaped testimony, Charlotte McKines, executive director of integrated marketing for Merck, said she believed the drug to be free of heart-related risks when she co-authored an April 2000 press release declaring Vioxx to have a "favorable cardiovascular profile."

Jurors heard McKines' testimony at the trial's midpoint. Attorneys for Frederick "Mike" Humeston are expected to rest their case Wednesday afternoon.

-11-

Merck is to begin its defense Thursday morning.  Humeston says he was a healthy 56-year-old taking Vioxx occasionally for lingering pain from a Vietnam War knee injury when he suffered a heart attack at his Boise home the night of Sept. 18, 2001.  Whitehouse Station-based Merck counters that work-related stress or other health factors unrelated to Vioxx prompted the attack.

A popular medication because it was easier on the stomach than many other painkillers, Vioxx was pulled from the market a year ago by Merck after new research indicated 18 months of use could double the risk of heart attacks and stroke.  Humeston's case is the first to go to trial since a Texas jury hearing a similar lawsuit hit Merck with a $253 million verdict in August; that amount will be slashed under Texas' punitive damages cap. Humeston's case is one of about 5,000 pending Vioxx product liability lawsuits.

On the videotape played in the Atlantic City courtroom Wednesday, Humeston lawyer Chris Placitella needled McKines as to whether Merck's internal concerns about Vioxx's heart safety were conveyed to doctors and the public.  McKines said she learned about an internal Merck study, in which patients taking Vioxx were found five times more likely to suffer a heart attack than those taking the older, cheaper pain reliever naproxen, around March or April in 2000.  But as Merck officials have testified, McKines said she believed that was because naproxen offered extra protection against cardiovascular problems — not that Vioxx could cause those problems — a theory Merck never proved.

Placitella suggested doctors and the public still should have been made aware of those concerns.  "Is it important for a doctor to know whether a drug could kill people?" Placitella asked.  "Among other things," McKines replied. "As a patient, do you want to know if it could kill you or not?" he continued.  "That depends on the risks and benefits of the people involved," she answered.

Merck shares fell 20 cents to $27 in afternoon trading on the New York Stock Exchange. Its shares have traded in a 52-week range of $25.60 to $35.36.

© 2005 The Associated Press. All Rights Reserved.

During the trial, Buchanan and Seeger asked Weinberg to provide them with help on critical

FDA issues.  Weinberg had obtained and reviewed extensive FDA documents in the Vioxx litigation

before the MDL was formed, and by the time of the Humeston I trial, he had already retained Dr.

John Guerigian and Jay Geller, JD.  Dr. Guerigian had worked at FDA as a Medical Review Officer;

Weinberg had retained him in a different litigation years earlier, and then retained him in Vioxx

litigation. Mr. Geller had worked at FDA as an Assistant Director in the legal department, and was well versed in the regulatory law involved with pharmaceutical products. Both of these highly capable experts had been retained by Weinberg prior to the Humeston I trial to provide advise and consultation regarding the regulatory issues surrounding Vioxx.

> -----Original Message-----
> From: Buchanan, David [mailto:dbuchanan@seegerweiss.com]
> Sent: Thursday, March 31, 2005 4:45 PM
> To: Eric H. Weinberg
> Subject: RE: if you show this to reicin it will be the first time she has seen it
>
>
> Eric, how did we make out on a regulatory expert, btw?
>
> -----Original Message-----
> From: Eric H. Weinberg [mailto:ehw@erichweinberg.com]
> Sent: Thursday, March 31, 2005 4:58 PM
> To: Buchanan, David
> Subject: RE: if you show this to reicin it will be the first time she has seen it
>
> We have Guerigian on medicine and Geller on law, I am trying to get Bill Schultz on law and I am meeting with Whetstone and Jones (recently retired compliance people) week after next in DC. Also Krimsky can address conflicts in Advisory Committees, he has written books on the subject.
>
> It would be good to have another medical person and I will explore that with Whetstone and Jones. They are the ones who told me Dan Troy shut down DDMAC (which might help explain why FDA rolled over after 2001.)
>
> My concern is not to be in the situation that developed in Baycol when the expert was burned. The dynamics here make it tricky. I am hoping Egilman is on to something with the Alzheimer's data.
>
> What do you say when the regulator sees the VIGOR data and lets the company promote the bullshit theory ad nauseum? I think we really need to test this in focus group.

Weinberg and Placitella also requested assistance from another expert they had retained, Thomas Nesi, a former senior marketing executive for a global pharmaceutical firm, to provide

advice to Seeger Weiss during the Humeston I trial.  Mr. Nesi also responded immediately to Weinberg and Placitella's request for advice and counsel.  He provided the Seeger lawyers with relevant FDA Guidances and Regulations.  Again, this critical information, obtained at the request of the Seeger Weiss lawyers, was provided to them promptly.  It should be noted that Mr. Nesi had been listed by Seeger as an expert witness in their case.  Weinberg and Placitella had originally retained Nesi, and had provided him with the documents and evidence necessary to his careful evaluation of Merck's conduct with respect to the marketing of Vioxx.  Mr. Nesi's insights were a crucial component of Placitella's marketing fraud discovery strategy.  Weinberg defended Mr. Nesi's trial discovery deposition.  Ultimately Seeger elected not to call Nesi as a witness at the trial, but Weinberg and Placitella contributed substantial time and effort to working with Nesi – who, as noted, came through during the trial with assistance to the Seeger firm.

Seeger asked Placitella and Weinberg for help in preparing for the cross examination of Merck's FDA expert, Lisa Rarick.  Weinberg reviewed Rarick's report in depth and provided his own detailed analysis of the report and recommendations for cross examination of the witness, as well as the comments and recommendations of his retained FDA experts.  Weinberg had the benefit of having studied the Merck – FDA interactions on Vioxx since October of 2004.  The following email string is one of many on this subject – and one of many exchanges of emails and information with counsel in New Jersey, and across the country, as they requested and received in depth, detailed advice and counsel from Placitella and Weinberg, together with documents, analyses, and expert advice and consultation:

-----Original Message-----
From: Seeger, Chris [mailto:cseeger@seegerweiss.com]
Sent: Tuesday, September 27, 2005 4:37 PM

To: Chris Placitella
Subject: Re: anstice

Could use some help for Rarick....their FDA expert.
--------------------------
-----Original Message-----
From: Chris Placitella <cplacitella@cprlaw.com>
To: Seeger, Chris <cseeger@seegerweiss.com>
CC: Eric Weinberg (E-mail) <ehw@erichweinberg.com>
Sent: Tue Sep 27 16:35:23 2005
Subject: RE: anstice

Get us his depo and we will go to work on it. Eric will help. Also
copies of our exhibits in evidence will help for preparing a cross. We
should also discuss rebuttle witness if we need it. Eric has one in the
wings.

Chris Placitella


-----Original Message-----
From: Seeger, Chris
Sent: Tuesday, September 27, 2005 4:30 PM
To: 'cplacitella@cprlaw.com'
Cc: 'ehw@erichweinberg.com'; Grand, Jeff
Subject: Re: anstice

Jeff, please email Rarick's dep to Chris and Eric.  Guys, get me
whatever you can by Friday.  Thanks for your help.


From: Grand, Jeff
Sent: Tuesday, September 27, 2005 7:31 PM
To: 'Eric H. Weinberg'; Seeger, Chris; cplacitella@cprlaw.com; Wagner,
Michael
Subject: RE: anstice

Mike, please send Chris and Eric Rarick's Expert Report and deposition
exhibits.


----Original Message-----
From: Eric H. Weinberg [mailto:ehw@erichweinberg.com]
Sent: Tuesday, September 27, 2005 9:24 PM
To: Grand, Jeff; Seeger, Chris; cplacitella@cprlaw.com

-15-

Subject: RE: anstice

Jeff please send her report and exhibits to depo as well.  Will get towork on this tomorrow. Thanks, Eric

From: Wagner, Michael [mailto:MWagner@seegerweiss.com]
Sent: Tuesday, September 27, 2005 10:34 PM
To: Grand, Jeff; Eric Weinberg; Seeger, Chris; Chris Placitella
Subject: RE: anstice

Attached is the report.

-----Original Message-----
From: Eric H. Weinberg <ehw@erichweinberg.com>
To: Seeger, Chris <cseeger@seegerweiss.com>; cplacitella@cprlaw.com <cplacitella@cprlaw.com>; Wagner, Michael <MWagner@seegerweiss.com>; Grand, Jeff <JGrand@seegerweiss.com>
CC: Tanya Tayts <ttayts@erichweinberg.com>
Sent: Wed Sep 28 09:14:06 2005
Subject: RE: anstice

I read the report late last night and quickly went through it this morning.  My (very) preliminary comments are saved on the PDF.  There is some follow up to do depending on whether you want to go in certain directions here.  Let me know.

I can forward to Geller and Guerigian for feedback if you want me to.

I doubt she reviewed NJ Supreme Court law on the responsibility of a pharmaceutical company to be the expert on their product.  NJ law does not apply that burden to FDA.  Only help they get in the statute on punitives if they fully disclose risk.  There is excellent language in Feldman v. Lederle you can talk to her about and the jury will hear it in the charge.

Frankly I would shove the VNRs, the CV Card and the Hamill stuff up her pitooty.  Nothing about CV risk of Vioxx communicated to patients or physicians there and "Be THe Power" tells the sales people to kill the obstacles on CV risk.

Is this how a responsible company should behave in the face of potential deadly risk?

Does anyone have her writings, especially the chapter she wrote "Understanding the Organization and Function of the FDA"?  If not, Tanya please get from UMDNJ or RU library or elsewhere.

I will keep going on this.  When will she testify?


-----Original Message-----
From: Seeger, Chris [mailto:cseeger@seegerweiss.com]
Sent: Wednesday, September 28, 2005 9:17 AM
To: Eric H. Weinberg; cplacitella@cprlaw.com; Wagner, Michael; Grand, Jeff
Cc: Tanya Tayts
Subject: Re: anstice


Thanks Eric.
--------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Eric H. Weinberg <ehw@erichweinberg.com>
To: Seeger, Chris <cseeger@seegerweiss.com>; cplacitella@cprlaw.com <cplacitella@cprlaw.com>; Wagner, Michael <MWagner@seegerweiss.com>; Grand, Jeff <JGrand@seegerweiss.com>
CC: Tanya Tayts <ttayts@erichweinberg.com>
Sent: Wed Sep 28 15:56:36 2005
Subject: RE: anstice

Chris,

When you have a chance please let me know if we need to find her book chapter, etc.

Also let me know if you want Guerigian/Geller to review report/deposition.  I think yes.  May have insights, regs to cite with her, etc.

Someone should go through Feldman with highlighter and construct questions using language in opinion, same language should be included in jury charge requests.  Do you want me to do this?

I know you want stuff by Friday.  We'll get you what we can but we will keep working beyond Friday and something useful may come up later.  So please let us know when Rarick is likely to testify.

Thank you.


-----Original Message-----

-17-

From: Seeger, Chris [mailto:cseeger@seegerweiss.com]
Sent: Wednesday, September 28, 2005 5:48 PM
To: Eric H. Weinberg; cplacitella@cprlaw.com; Wagner, Michael; Grand, Jeff
Cc: Tanya Tayts
Subject: Re: anstice


Do it

-----Original Message-----
**From:** Eric Weinberg
**Sent:** Thu 9/29/2005 7:24 AM
**To:** Seeger, Chris; Chris Placitella; Wagner, Michael; Grand, Jeff
**Cc:** Tanya Tayts; Terry Longo
**Subject:** RE: anstice

Tanya:  please try to get Rarick book chapter and articles from Medline, UMDNJ etc.  (Her CV is attached to her report)

Teri:  please try to send me Feldman v. Lederle as a PDF.

I will forward Rarick report/depo to Guerigian and Geller for review.

Thanks.


**From:** Chris Placitella [mailto:cplacitella@cprlaw.com]
**Sent:** Thursday, September 29, 2005 7:49 AM
**To:** Eric H. Weinberg; Seeger, Chris; Wagner, Michael; Grand, Jeff; Chris Placitella
**Cc:** Tanya Tayts; Terry Longo
**Subject:** RE: anstice

Geller should be asked as follows in addtion to your stuff.

1. can manufacturer supplement label without fda approval
2. are there different rules for press releases and tv shows than paid advertising
3. can merck put whatever they want in the detailing materials like the cv card so long as the material is constructed from a study mentioned in the label. send him mckines.
4. what deos merck do with 2253 forms after they are filed? are they ever reviewed? how long does it take? how many 2253 forms will the fda receive per year?
5. Was merck obligated to submit shapiro meta analysis
6. was it proper to imply to doctor that merck studies showed vioxx was safe when they had contrary information.

-18-

7. should the fries situation have been disclosed to the FDA.
8. was it proper to tell the fda half truths in response to warning letter and the hammil situation?

Citations will be helpful.

-----Original Message-----
From: Eric H. Weinberg <ehw@erichweinberg.com>
To: Tanya Tayts <ttayts@erichweinberg.com>; Terry Longo <tlongo@erichweinberg.com>
CC: Chris Placitella (E-mail) <cplacitella@cprlaw.com>; Buchanan, David <dbuchanan@seegerweiss.com>; Seeger, Chris <cseeger@seegerweiss.com>
Sent: Thu Sep 29 08:04:08 2005
Subject: FDA cross

Let's get an outline together for the FDA expert cross.

I will be sending notes and thoughts which you will need to organize for me by topic. Once we've got a reasonable amount of stuff we'll fine tune it and get it out to Chris and David so they can decide what if anything they want to use.

So for example, here is my thought of the morning:

Rarick makes a big deal about how FDA has various kinds of experts who review drug applications, etc.  You know from my comments that one "theme" is the resources of the FDA v. the resources at Merck.  Money resonates.  FDA total budget $1.2 million (we need to check and get proof of this); Merck spends $500 million on advertising for Vioxx alone.  How can FDA possibly compete?

Ok -- so on the various kinds of experts claim, how about this:  the cardiovascular specialists who were called in to consult on the cv risks -- Targum and Pelayo -- were the most vocal critics at FDA about the cardiovascular toxicity of Vioxx.  They wanted more data, they wanted a CV warning.  But others -- eg. DeLap, who we need to do some research on, run a Medline, etc. -- ignored their concerns.

I want to be able to play to the Assistant Prosecutor and his friends on the jury that the FDA scientists who were best qualified to understand CV risk saw the problems with the drug, but that FDA management was tied in to Merck and took care of their friends at Merck.  This is a tricky point, because we do not want to make the case about the FDA failures.

So this note should be filed under a topic called "FDA scientists"

-19-

And by the way let's find out what we can about Targum and Pelayo.

Thanks.

-----Original Message-----
From: Seeger, Chris [mailto:cseeger@seegerweiss.com]
Sent: Thursday, September 29, 2005 8:07 AM
To: Eric H. Weinberg; Tanya Tayts; Terry Longo
Cc: cplacitella@cprlaw.com; Buchanan, David
Subject: Re: FDA cross

Eric, I love you. Thanks.
-------------------------
Sent from my BlackBerry Wireless Handheld


**From:** Eric H. Weinberg
**Sent:** Thursday, September 29, 2005 8:19 AM
**To:** 'Chris Placitella'
**Cc:** Jay Geller (E-mail)
**Subject:** RE: anstice
Jay,

Please review the questions posed by my colleague Chris Placitella. By the way, the Rarick report I sent you has my annotations on it. You will need Acrobat 6.0 to view them. As I noted earlier, we would like to posterboard the regulations that undercut Merck's apparent theory that FDA and not Merck is responsible for the company's decisions.

Attached is Feldman v. Lederle. Very good language on FDA and manufacturer as the expert on their product.

Eric

-----Original Message-----
From: jhgeller@aol.com [mailto:jhgeller@aol.com]
Sent: Thursday, September 29, 2005 6:41 PM
To: Eric H. Weinberg
Subject: Re: Vioxx

I've read through her report and your comments, and the questions raised by your colleague. It may be easier to talk about her report than me submit a report right now and then see where you want to take this. I've put my comments after my responses to the questions raised by your colleague. Here are some comments on the one's I can comment on. For an interesting overview on the process as well as post-

marketing   surveillance   you   can   look   at
http://www.fda.gov/cder/present/DrugReviewProcess.ppt#1.

1. Can the manufacturer supplement without FDA approval?  Yes.  See 21 CFR
314.70(c)(1), (3) and (6)(iii).  Contrary to what is popularly asserted, this regulation
does not deem a rejected amendment to misbrand the drug.  21 CFR 314.70(c)(7)
states that "if the agency disapproves the supplemental application, it may order the
manufacturer to cease distribution of the drug products(a) made with the
manufacturing change." The FDA does not, therefore, automatically deem a rejected
labeling change a misbranding of the drug.

2. Are there different rules for press relesaes and tv shows than paid advertising?
I suggest you review the following:
http://www.fda.gov/cder/handbook/adverdef.htm.  This publication
states:  21 CFR 202.1(l)1 states that advertisements subject to Section
502(n) of the Food, Drug, and Cosmetic Act (FD&C Act) include advertisements
published in journals, magazines, other periodicals, and newspapers; and broadcast
through media such as radio, television, and telephone communications systems.
This is not a comprehensive list of advertising media subject to regulation. For
example, FDA also regulates advertising conducted by sales representatives, on
computer programs, through fax machines, or on electronic bulletin boards.
Specifically the regulation defines "advertisement" as:

(l)(1) Advertisements subject to section 502(n) of the act include advertisements in
published   journals,   magazines,   other   periodicals,   and   newspapers,   and
advertisements broadcast through media such as radio, television, and telephone
communication systems.
    (2) Brochures, booklets, mailing pieces, detailing pieces, file cards, bulletins,
calendars, price lists, catalogs, house organs, letters, motion picture films, film strips,
lantern slides, sound recordings, exhibits, literature, and reprints and similar pieces
of printed, audio, or visual matter descriptive of a drug and references published (for
example, the ``Physicians Desk Reference'') for use by medical practitioners,
pharmacists, or nurses, containing drug information supplied by the manufacturer,
packer, or distributor of the drug and which are disseminated by or on behalf of its
manufacturer, packer, or distributor are hereby determined to be labeling as defined
in section 201(m) of the act.

I also suggest your review
http://www.fda.gov/cder/ddmac/Presentations/FDLImmm903/FDLImmm903_files/
frame.htm  which  has  some  statistics  through  2003.   The  website
http://www.fda.gov/cder/ddmac/Presentations/DIA/DIA%20022604%20Slides_fi
les/frame.htm contains an updated report but not statistics.  You can also look at
http://www.fda.gov/cder/ddmac/FAQS.HTM.

3. Can Merck put whatever they want in the detailing materials like the CF card so

long as them aterial is constructed from a study mentioned in the label (send him Mckines).  I do not have or know what McKines is so I cannot comment on that). As to the question, the answer is no.  The detailing material has to be consistent with the labeling and can only relate to the labeling (i.e., safe and effective use).  I don't know what the actual subject of this is, so I can't opine beyond that at the present time.

4.  Whad does Merck do with 2235 forms after they are filed?  (I think that the writer means what does the FDA do with the forms). http://www.fda.gov/cder/handbook/index.htm gives you the roadmap for what happens to the Forms 2253 after they are submitted to the FDA.  I have not been able to find anywhere a specific time frame within which these forms must be reviewed by the FDA.   I don't have the statistics on how many are received each year but I am sure this information is available from the FDA (just not by next week!).

5.  Was Merck obligated to submit Shapiro meta analysis.  I do not know what this is and can't comment.  If it affected the safety or effectiveness of the product, the answer is yes.

6.  Was it proper to imply to doctors that Merck studies showed Vioxx was safe when they had contrary information? OF COURSE NOT.

7.  Should the Fries situation have been disclosed to FDA?  (See response to 5 above)

8.  Was it proper to tell the FDA half truths in response to the warning letter and the Hammill situation? On the former, OF COURSE NOT.  I don't know what the latter is so I cannot comment.

ON THE RARICK REPORT:

Page 4, last paragraph she says:  "FDA, which often has data not aviailable to an individual pharmaceutical company".  This makes no sense.  FDA cannot use information from one NDA to apply to another. If there is a "drug class" problem, it has the obligation to make that information public.  As you correctly point out, the company often has data not available to the FDA!

In the same paragraph she states that "FDA continously reevaluates the prescribing information ...".  This is ridiculous.  With the number of approved drugs FDA is not in any position to continuously do anything. If something is brought to it's attention, it may follow up (and then again may not). This implies that the agency has a team of employees who are out there combing the internet and literature looking for things.  This is patently ridiculous.

-22-

Page 5, first paragraph she says:   "If FDA determines that the prescribing information is no longer current ...." - and where will the FDA get this information? Either from the manufacturer or from studies published in journals.  Again she implies that there is this vast bureaucracy at the FDA doing nothing but checking and rechecking prescribing information for thousands of drugs.  This is ridiculous. The label change review is long and arduous (as she later attests to!) and how many times has this been done?  She should have some feel - she's been around a long time.  The usual response is a voluntary withdrawal.  FDA rarely goes to court on Rx drug labeling issues.  Note that she says at the end of this paragraph what the FDA "can" do, not what it "will" do or is required by law "to do."

On page 5, second paragraph she talks about what was submitted.  The important point to note here is that the FDA acts only on what the company submits and if the company omits something, the FDA cannot review it!  While Merck may well have "performed extensive investigation and analyses prior to seeking FDA approval", that does not mean that everything was submitted or that an accurate description of a study was submitted.

On page 5, at the bottom, she talks about the volume of material submitted trying to make Merck look good.  This is silly.  A company submits what it needs to submit and the FDA reviews it.  Some drugs need more documentation than others.  This is just nonsense.  She should be hammered on this.  At the top of page 6 she cites the ICH Harmonised Tripartite Guideline which I downloaded - it's dated October 27, 1994 and I don't even know if the FDA has signed on to this.  I didn't have time yet to do an extensive review of its status and don't know if you want me to.  It says "At Step 4 of the Process the final draft is recommended for adoption to the regulatory bodies of the European Union, Japan and USA."  Her report does not indicate that the FDA has signed on to this.   You can find it at http://www.ich.org/MediaServer.jser?@_ID=435&@_MODE=GLB.  What she left out, of course, is found on page one of the ICH document:  "The safety evaluation during clinical drug development is not expected to characterise rare events, for example, those occurring in less than 1 in 1000 patients."  One would think with the prescribing potential of Vioxx that it would be obvious that a study with less than 1000 patients would be inadequate to ferret out the potential safety problems in widespread marketing.  The document is quite intersting and I think she can be effectively cross-examined with respect to it.

On page 6 , last paragraph she states that "FDA and the medical community understand that all drugs have risks, and that not all risks are known at the time of the approval of a drug."  This is true but if a company knowns of a risk and does not disclose it to the FDA, the FDA will not be able to adequately determine what type of labeling is required.

On page 7 at the top, she states that "this indicates that FDA concluded form the

information in the NDA for VIOXX that there wre no specific safety concerns that required immediate investigation."  This would be correct probably based on the information submitted to the FDA (presuming that the FDA reviewed it properly (which is a BIG BIG BIG question mark)).  If information affecting safety was in Merck's possession but not submitted to the FDA, the FDA would have no basis upon which to review it and request labeling in accordance with that data.

She concludes this paragraph on page 7 that "in my opnion, Merck's post-marketing investigatyion of the safety profile of VIOXX was responsible and appropriate.  She has ABSOLUTELY no basis upon which to make this statement.  She can say what they did but she has no way of knowing whether it was either responsible or appropriate.

She states on page, second full paragraph that "Merck communicated information regarding the safety and efficacy of VIOXX to FDA as required."  My question is did it?  How would she know?  You seem to know better that Merck in fact did NOT do this.

At the botom of page 8 she states that in spite of Merck's request for expedited review, the FDA assigned the VIGOR information a standard review.  And she seems to think this was just peachy.  Merck had the duty to not only do a concurrent submission label change, it should have DEMANDED that the FDA IMMEDIATELY review this and allow the label change.  What a dereliction of duty on the part of the FDA and she seems to think it was just fine.  This clearly shows her bias in favor
of the agency (not to mention Merck).   Based upon Mercks' request, the change should have been made - we all know what the FDA has done - on SSRI's, Accutane, Hormone Replacement Products - the list goes on and on - who do they think they are kidding when they say they are the arbiters of what should be on labeling?  It is a CORRUPT expert agency and court's need to know that!

At the bottom of page 9 she notes that the new labeling was approved TWO YEARS after the request was submitted.  This is unconscionable on the part of the FDA and totally irresponsible on the part of Merck.
How many people died as a result of this two year delay?

On page 10, in the middle she notes that the "FDA asked for additional analyses ...".  The FDA asks and asks and asks so that it can AVOID making a decision.  Merck should have not only insisted on a decision, but dared the FDA to go after it if it made the label change.  FDA would have done NOTHING.

On page 11 she again praises Merck for requesting expedited action.
MERCK SHOULD HAVE INSISTED ON EXPEDITED ACTION and gone ahead and done what it needed to do and worried about the FDA later.  To whom does Merck owe allegiance - the consuming public or the FDA?  The fact that the FDA

-24-

was derelict and AWOL does NOT excuse Merck from adequately labeling VIOXX.

On page 12, addressing the promotional materials, she states that "in my experience, the fact that FDA closed this matter without requiring or taking further action indicates that FDA was satisfied with Merck's explanation and planned corrective actions." Is she serious? This is a joke! No hearing from the FDA means nothing - look how long it took the FDA to make a decision on the labeling. FDA may have just decided it wasn't worth pursuing or pushed it to the back burner and forgot it was there. Unless Merck received a letter saying it's explanation was adequate, it had (and she) have no way of knowing what the FDA thought.
  And just what kind of experience does she have with promotional material for Rx drugs?

Talking about the APPROVe material, she states on page 13 and "In my opinion, Merck could haev continued to market VIOXX with appropriate labeling." I think she may be right - and had Merck marketed the product FROM THE GET-GO with appropriate labeling, the drug would still be on the market but Merck would not have made 10 billion dollars.

I'll try to go through the deposition transcript by tomorrow.   Let me know if you want to discuss any of this or how I can help in other ways.

Jay H. Geller
West Tower, Suite 4000
2425 W. Olympic Bl.
Santa Monica, CA  90404
310-449-1399 P
310-449-1394 F

-----Original Message-----
From: Eric H. Weinberg <ehw@erichweinberg.com>
To: JHGELLER@aol.com
Sent: Thu, 29 Sep 2005 10:09:20 -0400
Subject: RE: Vioxx

  great, thanks Jay


    While Weinberg and Placitella were giving assistance to Seeger on the FDA regulatory

issues,  and consulting with FDA experts Geller and Guerigian, David Buchanan also emailed to

Weinberg, indicating that he wanted to take up Weinberg's offer to help on the Jury Charge in the

Humeston Case.  Weinberg suggested that it would be helpful for him to have a better understanding

-25-

of the marketing facts of the matter as proven by the plaintiffs.    As will be discussed *infra*, the careful crafting of the Jury Charges in Vioxx litigation became a key part of the New Jersey Consortium's successful record in Vioxx trials.  The difficulty for the Plaintiff in this case was that the marketing evidence that had been developed carefully by Placitella in discovery was not introduced in the form developed by Placitella.  This would be corrected by the next New Jersey trial, the Cona/McDarby cases.

The following string of emails relates to Buchanan's request of Weinberg for help on the Charge:

-----Original Message-----
From: Buchanan, David [mailto:dbuchanan@seegerweiss.com]
Sent: Thursday, September 29, 2005 12:52 AM
To: Eric H. Weinberg
Cc: Farkas, Michael
Subject: Jury Charge


Eric, I'd like to take you up on your offer of giving our proposed jury charges the once over.  Given that we have a prosecutor on the jury, I suspect that the charge and verdict sheet could make the difference on the case.  If you have time to work them over, Mike can send you an electronic copy of ours that could be supplemented.  Let me know if you think you'll have time to give them a look.  Thanks.


-----Original Message-----
From: Eric H. Weinberg <ehw@erichweinberg.com>
To: Buchanan, David <dbuchanan@seegerweiss.com>
CC: Farkas, Michael <mfarkas@seegerweiss.com>
Sent: Thu Sep 29 07:02:45 2005
Subject: RE: Jury Charge


Yes of course.  Send them and I will get to work.

Can you give me a sense of when the FDA expert will testify?

-----Original Message-----
From: Buchanan, David [mailto:dbuchanan@seegerweiss.com]

Sent: Thursday, September 29, 2005 7:21 AM
To: Eric H. Weinberg
Cc: Farkas, Michael
Subject: Re: Jury Charge


I suspect that their FDA expert will testify sometime next week.

-----Original Message-----
From: Eric H. Weinberg
Sent: Thursday, September 29, 2005 3:19 PM
To: 'Buchanan, David'
Cc: Farkas, Michael; Chris Placitella (E-mail)
Subject: RE: Jury Charge

David,

To do this right -- to get a charge that may matter -- I need your help understanding
the case you've put on.   Vioxx is the most heavily marketed drug in history.  The
court approved charge on direct to consumer marketing has not really been authored
yet, far as I know (not just in Humeston -- I mean generally.)

The reason Feldman v. Lederle has long been one of my favorite opinions is that the
Supreme Court considered what happens in the real world of pharmaceutical
marketing and warning and crafted the law to fit that reality.  We have an
opportunity here, I think, to draft new charges, based on existing precedents, that will
account for the overwhelming advances in pharmaceutical marketing, including
direct to consumer marketing, and how those deeply funded and strategized
marketing plans impact on duty of care.  Chris P. has constructed the framework of
what Merck did and how they did it in a form that is direct and is easy to understand.
As you did with Scolnick, he built his concept of the marketing case using key
documents in context of time and place that prove that Merck committed multiple
frauds -- indeed, billions of frauds -- in selling Vioxx.

If you can, get down and dirty with Chris on Weiner and MacKines, and see what
they can say, what evidence comes in with their testimony, on the marketing fraud.

So please get us your exhibits and the cuts you introduced right away.  We can tie
evidence in the case to the specific charges.  It does not make sense for us to work
on the charges ignorant of what is in evidence, because we may end up writing
charges the judge won't give because they're not supported by evidence.

The transcripts are important too.  Example is Anstice, because his testimony will
be relevant to what evidence you offer on marketing, and it will be relevant on the
FDA cross. If Anstice understood that Merck's duty was such and such, and he was

-27-

wrong, and Geller/Guerigian tell us specifically why (citations to regs) then we may cross Rarick with Anstice's testimony, and the law.

Thanks for reaching out. We are on this to back you up, what friends do for friends.

 Let's get it done really right.

Eric


Weinberg's experts provided Seeger with the FDA regulations he would read to the Humeston jury.

-----Original Message-----
From: Buchanan, David <dbuchanan@seegerweiss.com>
To: Farkas, Michael <mfarkas@seegerweiss.com>; Ecklund, Donald <DEcklund@seegerweiss.com>; Eric H. Weinberg <ehw@erichweinberg.com>; Grand, Jeff <JGrand@seegerweiss.com>; Moshe Horn <moshehorn@earthlink.net>; Chris Tisi (cvtisi@aol.com) <cvtisi@aol.com>; Troy Rafferty (trafferty@levinlaw.com) <trafferty@levinlaw.com>; Seeger, Chris <cseeger@seegerweiss.com>; Thomas J. Moore (Thomas J. Moore [tjm@thomasjmoore.com]) <tjm@thomasjmoore.com>
Sent: Sat Oct 08 23:19:40 2005
Subject: FDA Regs

Guys, the judge asked us to submit copies of any regs that we want her to read to the jury by cob Tues, Wed at the latest. Eric, I know that you've been speaking with the FDA expert. Also, Tom and Chris T, I know that you have quite a bit of experience in this arena. We obviously want to get the labeling regs...we should also get the CBE regs...and anything that tells them how to conduct their marketing appropriately.

-----Original Message-----
From: Seeger, Chris [mailto:cseeger@seegerweiss.com]
Sent: Saturday, October 08, 2005 11:49 PM
To: Buchanan, David; Farkas, Michael; Ecklund, Donald; Eric H. Weinberg; Grand, Jeff; MosheHorn@Earthlink.net; Cvtisi@aol.com; trafferty@levinlaw.com; tjm@thomasjmoore.com
Subject: Re: FDA Regs

Dave, I have these....geller sent them to us.
------------------
Sent from my BlackBerry Wireless Handheld

-28-

In short, here is a summary of Placitella's and Weinberg's contribution to the Humeston trial, with the direct request of the Seeger

(1)   Developing key marketing fraud evidence for the trial and helping present the evidence to the jury;

(2)   Collaboration/preparation of Dr. Egilman;

(3)   Collaboration/Preparation Mr. Nesi;

(4)   Cross examination preparation for Merck FDA expert Rarick;

(5)   Providing access to FDA experts Guerigian and Geller for advice and guidance;

(6)   Providing access to marketing expert Nesi for advice and guidance;

(7)   Research, review and advice on drafting of the Jury Charge to incorporate the law as it related to the marketing evidence;

(8)   Providing Seeger the FDA regulations Judge Higbee wanted to be submitted to read to the jury;

(9)   Being available on a moment's notice to stand shoulder to shoulder with their  colleagues in arms at Seeger Weiss.

### C.  Cona/McDarby Trial (February to March 2006)

This was the first case tried as a collaborative multi-firm effort by the New Jersey Consortium.  The results of the joint effort were extraordinary.

The marketing fraud evidence developed by Placitella came t full fruition in this case.  Some of the results of Placitella's discovery strategy were video out takes of Merck personnel and consultants, which Merck's videography contractor had kept, unbeknownst to Merck.  Merck fought to keep this evidence out of Placitella's hands, but was unsuccessful.  The day after New Year's Day of 2006, a month before the Cona/McDarby case was scheduled to begin, Placitella received the discovery he had fought for, and began to review it.  The following emails are the real time reports from Placitella to the New Jersey Consortium, and a response from Rob Gordon of Weitz &

-29-

Luxenberg, who summarized the value of Placitella's work product accurately and succinctly.

> From: Chris Placitella [mailto:cplacitella@cprlaw.com]
> Sent: Monday, January 02, 2006 3:31 PM
> To: Ann Ritter (E-mail); Benedict Morelli; Dara Hegar; Jacoby, David; David Ratner; Ellen Relkin; Eric Weinberg (E-mail); Harry M. Roth (E-mail); Jeff Cooper; Jeff Thompson (E-mail); Jerry Kristal; jrice@motleyrice.com; jrm@lanierlawfirm.com; Juana Martinez; M. Branch; Paul Pennock; Perry Weitz; Richard D. Meadow; Rick Sandoval; Robert Gordon; RPlacitella; Scott, Carmen S; Weiss, Sol; Stewart Cohen (E-mail); Thompson F. (E-mail); Turner Branch; WML
> Cc: Chris Placitella
>
> Subject: sit down for this. then stand up and cheer for the truth.
>
>  First, happy new year.
>
> I finally received the lane vnr rehearsal tape for vigor this morning. sit down now.
>
> As you are aware, Merck as part of the risk benefit argument to justify VIOXX often states that NSAIDS are responsible for approximately 16,000 deaths and 100,000 hospitalizations every year. I even think they told the jury this in the humeston case.
>
> During the VNR rehearsal, Laine tells Merck that the 100,000 hospitalizations and the 16,000 annual death numbers from NSAIDS frequently quoted by Merck is absolutely wrong. " I can give you 5 different reasons why...[that is] totally bogus." He laughs when he explains that although wrong the numbers make a  "good sound bite." He goes on to use those very numbers anyway . Laine clears his conscience by saying  "some people estimate" or "it is estimated that" 16,0000 deaths and 100,0000 hospitalizations.......which is ok because he is not personally vouching for the numbers.
>
> Chris Placitella
>
> -----Original Message-----
> From: "Chris Placitella" <cplacitella@cprlaw.com>
> Date: Mon, 2 Jan 2006 16:57:49
> Subject: Vioxx $2 per pill the deomopoulis out takes -priceless.
>
> Now watching the Demopolis out takes which I have been anxiously awaiting. I am not disappointed. Vioxx $2 per pill the Demopoulos out takes -priceless.
>
> I will let you watch for your self  but some sound bites include " don't  pay too much homage to Topal & Nissan." Her description of the issue of heart attacks " is a lingering question" was cut out. Now we want you to try it again and go after topol the way Wendy Dixon would like you to.(paraphrase by me). The meta analysis

showed no increase in heart attack. " we did show an increased risk versus naproxen." " that was vigor." "Is this being recorded" "I want to push the envelope a little with legal"

Chris Placitella

-----Original Message-----
From: Rob Gordon [mailto:rgordon@weitzlux.com]
Sent: Monday, January 02, 2006 8:41 PM
To: Chris Placitella; Weiss, Sol; Ann Ritter (E-mail); Benedict Morelli; Dara Hegar; Jacoby,David; David Ratner; Ellen Relkin; Eric H. Weinberg; Harry M. Roth; JeffCooper; Jeff Thompson(E-mail); Jerry Kristal; Joseph F. Rice; jrm@lanierlawfirm.com; JuanaMartinez; M.Branch; Paul Pennock; Perry Weitz; Rick Meadow; Rick Sandoval; Robert Gordon; RPlacitella; Scott,Carmen S; StewartCohen; Thompson F. (E-mail); Turner Branch; Mark Lanier
Subject: Re: Vioxx $2 per pill the deomopoulis out takes -priceless.

**Chris: this is sounding like the best stuff out there.**

(Emphasis added).

Prior to the trial, counsel for both Mr. Cona (Lanier) and Mr. McDarby (Weitz & Luxenberg) asked Weinberg, once again, to consult with the world class cardiologist he had retained, Dr. Kostis, on issues of specific causation. Counsel for both plaintiffs sent medical records and summaries to Weinberg, and asked him to provide them to Dr. Kostis, which was done.[2] In Mr. McDarby's case, Dr. Kostis actually reviewed all of the blood pressure elevation records provided to him by the Weitz firm through Weinberg, and prepared a detailed Powerpoint analyzing the blood pressure records. Counsel for plaintiffs consulted directly with Dr. Kostis; with Dr. Anthony Altobelli, another cardiologist retained by Weinberg; and with FDA experts Jay Geller and John Guerigian, who had also been retained by Weinberg and made available by him to counsel for the plaintiffs in these cases.

-----Original Message-----

_____

[2] This pattern would continue in the Hermans case tried in 2007, when the Lanier firm asked Weinberg for Dr. Kostis's input on their client's Vioxx-related death.

From:   Eric H. Weinberg [mailto:ehw@erichweinberg.com]
Sent:   Fri 1/6/2006 11:52 AM
To:     Relkin, Ellen
Cc:     Chris Placitella (E-mail); Tanya Tayts
Subject:        RE: McDArby BP's

These are slides prepared by Merck for the 2005 Advisory Committees but not shown (there are others I am in the process of reviewing, but these are the greatest hits so far.)  The first slide is especially relevant as your man had two qualifying events, maybe three (Dec 2001 and 2003 and during the event in 2004) so his rr vs. Pla was 3.82.

In APPROVe the ESMB was concerned in 2002 that the protocol for the study excluded patients over 160/100 but was silent as to patients who were below that level at study entry but went over on drug.  Merck sent a letter in September 2002 to the site investigators -- but not a Dear Doctor letter to treating docs -- telling them that if patients has clinically significant elevations of bp they should initiate or modify antihypertensive therapy.  Not take them off the drug.  By the way Merck sells a billion dollars' worth of antihypertensive drugs every year.

In February 2004 the ESMB chairman, James Neaton suggested to the ESMB that the study should be stopped because the evidence that Vioxx was dangerous was "damning."  A Merck biostatistician, Hui Quan, was on the email.  Konstam, who was also on the ESMB, basically persuaded Neaton to keep going.  They were all paid by Merck.

And McDarby suffers his HA in April 2004.

Chris has good stuff on Merck's marketing strategy to "de-link" the connection between hypertension/elevations and cardiovascular events during the time your clients' blood pressure was going up on Vioxx.  Tanya in my office is working on a blood pressure powerpoint covering these issues and others related to Vioxx related elevations, etc.

-----Original Message-----
From: Relkin, Ellen [mailto:ERelkin@weitzlux.com]
Sent: Tuesday, January 10, 2006 7:13 AM
To: Eric H. Weinberg
Subject: RE: McDArby BP's/Kostos and FDA expert

Eric,

   **Jerry suggested that I talk to you about a phone call with Dr. Kostis to get the benefit of his analysis on the McDArby diabtetes issues and the BP.**  I was very excited on the BP issue in light of the slides you sent, but Rob and Paul think that

-32-

given that most BP's were ok, the few elevations would be too hard to associate with the Vioxx, and then we would like like we were stretching - a point well taken. However, if you have other data suggesting that Vioxx can cause only intermittent spikes with some OK BPs, then maybe it makes sense.  We basicaly need to determine if we have to hustle to get a BP expert, separate from a cardiologist. **Could we try to set up a call with Kostis today or tomorrow?**  Todasy I am in Atlatic County in the AM for the Bextra/Hignee conference but I would be available for a call in mid-afternoon or in the evening if he could do it - I am avaailable all day tomorrow and this AM I will be checking my Blackberry.

**Also, on the FDA issue, you were right - they ended up not calling Rarick - she came and testified but only voir dire, and after Higbee's rulings which severely constrained what she could say, they decided not to call her.  I am sending the excerpts on that ruling and the FDA warning presumptin issue and would ask, if you havetime for your thoughts as to whether it makes sense to get an FDA expert in light of the rulings.**  I think that GEller, as a lawyer would be basically preculded since she was adamant that only she instructs on the law, so the question is whther we get Guerigian or someone else to discuss the limited resouirces of the FDA, and the fact that the FDA does truly want to get the company's internal concerns (Sullivan's opening was the FDA does not want the company memos and spins - they would be imnnundated...).  ALso in light of her rulings, I wonder how much Nesi could discuss.

Are you around later?  I could conceivably stop at your office on my way back from AC.  Let me know.

Ellen

 (Emphasis added).

Weinberg responded to his colleague, and provided the help requested on the critically

important issue of Mr. McDarby's diabetes, and how it related to both causation and warning.

-----Original Message-----
From: Eric H. Weinberg
Sent: Tuesday, January 10, 2006 7:53 AM
To: John Kostis MD (E-mail)
Subject: FW: McDArby BP's/Kostos and FDA expert
Importance: High

Dr. Kostis,

Attached are emails to and from Ellen Relkin, an attorney with Weitz & Luxenberg, who represent Mr. McDarby.  I previously sent you his blood pressure and other

readings from his medical records.  His case is set for trial in Atlantic City beginning on February 27.

As you can see, the attorneys (Rob and Paul are other lawyers in her firm) are struggling with the bp issue, given the relative few readings that are htn.  Prior to Vioxx (25mg daily from 2000 through 2004) he did have some high readings.
So the question they are trying to answer is whether bp elevations are evidence, to a reasonable degree of medical probability, that Vioxx caused Mr. McDarby's MI.

I suggested to the lawyers that the ACM slides prepared by Merck seem pretty straightfoward, but their concern is that Merck will say (a) his readings were up and down, and (b) he had elevations over 160 before taking Vioxx.  I would be very interested in your take on this question:  whether, to a reasonable degree of medical probability, Vioxx elevated Mr. McDarby's bp and was a substantial contributing factor to his MI?

I have reviewed the transcript of the Advisory Committee meeting to confirm whether Merck actually showed their bp slides to the ACM.  They did not, though there were very specific questions about bp were posed by panelists and representatives of FDA.

Dr. Villalba, the FDA reviewer told the 2001 panel that there was a signal in the NDA data for hypertension, fluid retention and edema.  By the February 2005 hearing she had concluded that there were no signals in the NDA database though she did concede that FDA was confused about the safety of Vioxx and that is why they let Merck continue to sell it.

The attachments to Ellen's email are interesting perspective on the FDA approval and warning law as interpreted by Judge Higbee.

Thank you,

Eric Weinberg

-----Original Message-----
From: Eric H. Weinberg
Sent: Sunday, January 15, 2006 3:34 PM
To: 'erelkin@weitzlux.com'
Subject: FW:


Ellen,

FYI slides and comments from Dr. Kostis re: McDarby BP readings.  Can you get the requested information to me this week?

Thanks,

Eric

-----Original Message-----
From: kostiskosmos.com - John B. Kostis [mailto:jbk@kostiskosmos.com]
Sent: Sunday, January 15, 2006 3:13 PM
To: Eric H. Weinberg; cplacitella@cprlaw.com
Subject:


Attached is the file.
I fixed the spelling errors  think)

We analyzed the data in detail.  I am attaching a powerpoint file with the average
values by day, month and year as well the raw data.
The following additional information would help clarify the picture.
Are all hospital data from inpatient admissions or some are from outpatient visits?
What blood pressure medications was the patient taking at different times if any?
What was the diagnosis of each inpatient admission?
What were the dates of vioxx administration?
What was the dose of vioxx?
I will show the data on Thursday.
Best wishes,
John
_____

**From:** Richard D. Meadow [mailto:RDM@lanierlawfirm.com]
**Sent:** Wednesday, January 11, 2006 5:20 PM
**To:** Meredith P. Gursky; Karen M. Hoffmire
**Cc:** Eric H. Weinberg
**Subject:** Cona Meds

Please send Eric a complete set of the Cona medical records. Thanks.
Eric-where should they send the records?

Rick

Rick Meadow
The Lanier Law Firm, PC
126 East 56th Street 6th Floor
New York, New York 10022
212-421-2800
212-421-2878 (fax)

rdm@lanierlawfirm.com

Weinberg helped Mr. McDarby's attorneys with evidence related to specific causation, related to the fact that the plaintiff was a diabetic who used Vioxx over an extended period of time. While Merck contended that diabetes was a risk factor that preexisted and negated his use of Vioxx, Weinberg had worked with Dr. Kostis to gain an in-depth understanding of why diabetics were at greater risk on Vioxx, and how the issue should be framed for a trier of fact.  On the eve of the deposition of the Plaintiffs' key liability expert, Weitz lawyers realized that they needed Weinberg's help to frame the issue so that it could be argued effectively in the trial of the case.  Weinberg exchanged a series of emails with the Weitz lawyers.  One such email from Weitz advised Weinberg that the "diabetes issue has become urgent…can you shed any light?"  Another email asked, "Eric, We need the source and data for the diabetes/MI rates on Vx from Approve and /or other studies since McDarby was diabetic.  Are these in one place?  We'd like our experts to re-review."  Yet another email from Weitz lawyers said; "Eric Weinberg knows the sources, etc. and we should learn more to better educate our experts on this."

-----Original Message-----
**From:** Relkin, Ellen
**Sent:** Friday, February 03, 2006 12:17 PM
**To:** Kristal, Jerry; Gordon, Robert; Pennock, Paul; Forrey, Gabriel; Wilkins, Carrie

**Subject:** How to count the months

Jerry - look at the last few slides - thrombotic events RR is over 12 for greater than 30 months... does slicing and dicing the exposure time hurt our ability to use these kind of #s?  **These were slides that Merck prepared but did not present per Eric Weinberg.**

-----Original Message-----
**From:** Kristal, Jerry
**Sent:** Friday, February 03, 2006 12:27 PM
**To:** Relkin, Ellen; Gordon, Robert; Pennock, Paul; Forrey, Gabriel; Wilkins, Carrie

**Subject:** RE: How to count the months

**You are right. The greater than 30 month use is staggering RR and statistically significant. We need our experts to have seen these slides.** A 12-fold risk is thru the roof. In fact, of all purported risk factor I can't imagine any that are that high.

If we separate the two periods he took Vioxx for 29 months and 5 days the second time. This gets him mighty close to the greater than 30 months and since the dose-response curve is fairly linear at that point the RR was certainly double digits at 29 months . In any event, our experts need to be aware of the one month gap and need to be able to handle Qs re; what effect it may have played. Personally, the 29 months/5 days is so close it may help to break it up rather than hurt.

-----Original Message-----
**From:** Relkin, Ellen [mailto:ERelkin@weitzlux.com]
**Sent:** Friday, February 03, 2006 12:34 PM
**To:** Kristal, Jerry; Gordon, Robert; Pennock, Paul; Forrey, Gabriel; Wilkins, Carrie
**Cc: Eric H. Weinberg**

**Subject:** RE: How to count the months

I agree.  This was put on the exhibit list.  **Eric Weinberg knows the sources,etc.. and we should learn more to better educate our experts on this** - but these are Merck calculations as far as I understand it. I  Don't know if this was addressed in any dep.  Now the 12 fold is for all thrombotic and it is 4.45 for MI (slide 750) but see how it jumps once it goes over 18 months.    **Eric can you shed some light on the background of these slides?**

-----Original Message-----
**From:** Eric H. Weinberg [mailto:ehw@erichweinberg.com]
**Sent:** Friday, February 03, 2006 1:05 PM
**To:** Relkin, Ellen; Kristal, Jerry; Gordon, Robert; Pennock, Paul; Forrey, Gabriel; Wilkins, Carrie

**Subject:** RE: How to count the months

**They were prepared for the Feb 05 ACM.**  They are part of a large set of slides, about 1600 in total.  Braunstein presented 57 slides at the Advisory Committee but not these, even after questions by committee members asking for data.  Some of these were sent to FDA in the June 05 CSR under cover of letter signed by Philip Huang, Director of Regulatory.  Braunstein was involved in the preparation of the slides.  His dep had been noticed in the MDL in January and then it was adjourned by Dave Buchanan.

The Feb 16 transcript is interesting.  All the Feb 05 stuff is available on the FDA

website.  Just go to Advisory Committees.

-----Original Message-----
**From:** Relkin, Ellen
**Sent:** Friday, February 03, 2006 1:11 PM
**To:** 'Eric H. Weinberg'; Kristal, Jerry; Gordon, Robert; Pennock, Paul; Forrey, Gabriel; Wilkins, Carrie

**Subject:** RE: How to count the months

any relation to the Seth Braunstein diabetes expert they just designated?  Worth asking I guess

-----Original Message-----
**From:** Kristal, Jerry [mailto:Jkristal@weitzlux.com]
**Sent: Friday, February 03, 2006 1:16 PM**
**To:** Relkin, Ellen; Eric H. Weinberg; Gordon, Robert; Pennock, Paul; Forrey, Gabriel; Wilkins, Carrie

**Subject:** RE: How to count the months

**Eric**

**We need the source and data for the diabetes/MI rates on Vx from Approve and/or other studies since McDarby was diabetic. Are these in one place. We'd like our experts to re-review.**

------Original Message-----
**From:** Eric H. Weinberg [mailto:ehw@erichweinberg.com]
**Sent:** Friday, February 03, 2006 1:44 PM
**To:** Kristal, Jerry; Relkin, Ellen; Gordon, Robert; Pennock, Paul; Forrey, Gabriel; Wilkins, Carrie

**Subject:** RE: How to count the months

look at p.1097

there were no diabetics in VIGOR

I have not seen diabetes sub group analyses from other studies.

You know Patrono told them to study risk in diabetics in 1998?

From: Kristal, Jerry [mailto:Jkristal@weitzlux.com]

**Sent:** Friday, February 03, 2006 1:45 PM
**To:** Eric H. Weinberg
**Subject:** RE: How to count the months

**u da man**

_____

-----Original Message-----
From: "Relkin, Ellen" <ERelkin@weitzlux.com>
**Date: Mon, 20 Feb 2006 18:47:47**
To:"Gordon,    Robert"    <RGordon@weitzlux.com>,    "Kristal,    Jerry"
<Jkristal@weitzlux.com>,    "Tarr, Sheri" <Starr@weitzlux.com>,"Pennock, Paul"
<PPennock@weitzlux.com>
Cc:"Wilkins,    Carrie"    <CWilkins@weitzlux.com>,"Forrey,    Gabriel"
<Gforrey@weitzlux.com>

Subject: INFO on VIOXX INCREASING DIABETES RISK TO GET TO
KRUMHOLZ BEFORE EARLY AM

Ken Soh called me with expert questions on Krumholz.  They have not prep
Krumholz and he does not have the data showing that Diabetics on Vioxx have a
dramatically increased risk.  Don't we want him to be able to testify to that since this
is really positive epi for us?  What is the best data on this?  We need to get it to Ken
immediately so he can show it to Krumholz at 7:30 AM  before the dep in the
morning.  I do not know the nuances of this data or where it is.

Ellen Relkin, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, New York  10038
212-558-5715
Fax: 212-363-2721
erelkin@weitzlux.com

-----Original Message-----
From: Sheri Tarr [mailto:starr@weitzlux.com]
Sent: Monday, February 20, 2006 7:43 PM
To: Eric H. Weinberg

Subject: Fw: INFO on VIOXX INCREASING DIABETES RISK TO GET TO
KRUMHOLZ BEFORE EARLY AM
Importance: High

**Eric,**

**This diabetes issue has become urgent--see below. I don't mean to or want to pester you about this.  I know you are busy with everything else on your plate. Can you shed anymore light on this issue for purposes of our expert deps?**  I tried to connect w/ you this weekend re: Huan.  I'm still available, although this week is tightening up.  Thanks for any help.

-----Original Message-----
From: Eric H. Weinberg
Sent: Monday, February 20, 2006 8:15 PM
To: 'Sheri Tarr'

Subject: RE: INFO on VIOXX INCREASING DIABETES RISK TO GET TO KRUMHOLZ BEFORE EARLY AM

I am trying to get some other things done, so sorry not to have gotten back to you.

I began to cover some of this with Demopoulos.  I will have another shot at her on Friday and hopefully will get some good testimony though she has been schooled to deny that Vioxx causes heart attacks.

Diabetics are at risk patients for heart attacks, generally.
Merck was told to study the effects of Vioxx in diabetics by Patrono in 1998.
Merck declined to do any study of the effects of Vioxx in diabetics at the time.
In VIGOR the RR for diabetics was 2.0 but the numbers were very small -- 2 HAs in Diabetic pts. v. 1 HA in Napr. pts.
Merck never incorporated any warning whatsoever about diabetics.
APPROVe study -- first patient in, late 2000; early trends against Vioxx; by February 2004 Quan and Neaton agree the evidence is damning and will likely not change over the next six months, but the study continues.
APPROVe data in Bresalier paper -- shows 610% increased risk for diabetics for HAs on Vioxx.

Feldman v. Lederle requires mfr to be an expert and to investigate risks associated with products.

The RR in APPROVe is not time or study design dependant -- ie had the risk been studied when Merck was told to (and was required by law to) do it, the RR would have been 6.1 at that time.

So -- the drug would and should have been contraindicated for diabetics long before McDarby's HA.

-40-

Under the law Merck was on CONSTRUCTUVE NOTICE of the risk of harm to diabetics.

You win.  Failure to warn, heeding presumption regarding contraindication, etc.

If Merck had done what the civil and regulatory law required them to do McDarby never would have been on Vioxx.

And while his diabetes and other risk factors certainly played a role in his overall cardiovascular health the likelihood was that without Vioxx he would not have had the HA.  In other words, Vioxx was a substantial contributing factor to his HA.

**This approach to proving specific causation was presented at your office several months ago (Kostis's model.)**

Ok?

 (Emphasis added).

It was no coincidence that it was Weinberg to whom the Weitz lawyers turned for help on the critically important specific causation evidence related to diabetes, which was a cornerstone of Mr. McDarby's case.  His colleagues at Weitz & Luenberg knew that Weinberg had an exceptional understanding of the medical issues in the case and that he had access to exceptional experts and consultants and would make them available to his colleagues without any request for a fee.

Likewise, they knew that Placitella had the best handle on the marketing fraud evidence that was crucial to the success of the failure to warn case .  And, just like Weinberg, he would share his knowledge and work product with his colleagues without having his hand out demanding a fee for it.[3]

In the fall of 2005, after the verdict in Humeston I, Placitella and Weinberg worked

---

[3]    Of interest to this fact is that the Fee Allocation Committee has taken the position that trial work that resulted in a recovery of case specific fees does not merit full common benefit fee consideration, because trial counsel have received handsome fees for the wins, of which there were few.  As the compensatory verdict of $4.5 million was affirmed, it is likely that Trial Counsel in McDarby were paid a fee in excess of a million dollars.

collaboratively with colleagues in New Jersey to develop a successful strategy to rewrite the Jury

Charge for the New Jersey Consortium. The first trial to utilize the Jury Charge that resulted from

this project was Cona/McDarby, and the charge would be used thenceforth in the New Jersey

litigation.  Weinberg and Placitella played a leading role in developing a creative and thoughtful

strategy, designed specifically to incorporate the law and factual bases of two New Jersey Supreme

Court precedential opinions in pharmaceutical drug litigation called *Feldman v. Lederle* and Perez.

The November 16, 2005 email from Weinberg, below, makes clear how he and Placitella had

framed the strategy which incorporated the marketing fraud evidence that Placitella had discovered:

> From: Eric H. Weinberg
> Sent: Wednesday, November 16, 2005 8:11 PM
> To: 'Kristal, Jerry'; Relkin, Ellen; Thompson, Fred; ChrisPlacitella; JerryKristal;
> Ritter, Ann; BenedictMorelli; DavidJacoby(E-mail); DavidRatner; HarryM.Roth;
> Thompson, Jeff; Rice,Joe; jrm@lanierlawfirm.com; JuanaMartinez; M.Branch;
> Pennock,Paul; PerryWeitz; RichardD.Meadow; "Rick S
> Cc: David Lenrow; Littlejohn, Joshua C; Leventis, Henry; Scott,CarmenS;
> wml@lanierlawfirm.com; Tarr, Sheri; Broaddus, John
> Subject: RE: NJ liability
>
> Thanks.
>
> Here is 2A:58C-4, which Perez addresses:

> **(UPDATED THROUGH P.L. 2005, c.238 AND JR6.)**
>
> **TITLE 2A      ADMINISTRATION OF CIVIL AND CRIMINAL JUSTICE**
>
> **2A:58C-4.    No liability if warning provided**

>> In any product liability action the manufacturer or seller shall not be
>> liable for harm caused by a failure to warn if the product contains an
>> adequate warning or instruction or, in the case of dangers a
>> manufacturer or seller discovers or reasonably should discover after
>> the product leaves its control, if the manufacturer or seller provides
>> an adequate warning or instruction. An adequate product warning or
>> instruction is one that a reasonably prudent person in the same or
>> similar circumstances would have provided with respect to the danger
>> and that communicates adequate information on the dangers and safe

use of the product, taking into account the characteristics of, and the ordinary knowledge common to, the persons by whom the product is intended to be used, or in the case of prescription drugs, taking into account the characteristics of, and the ordinary knowledge common to, the prescribing physician. If the warning or instruction given in connection with a drug or device or food or food additive has been approved or prescribed by the federal Food and Drug Administration under the "Federal Food, Drug, and Cosmetic Act," 52 Stat. 1040, 21 U.S.C. s. 301 et seq. or the "Public Health Service Act," 58 Stat. 682, 42 U.S.C. s. 201 et seq., a rebuttable presumption shall arise that the warning or instruction is adequate.  For purposes of this section, the terms "drug", "device", "food", and "food additive" have the meanings defined in the "Federal Food, Drug, and Cosmetic Act."

The presumption is rebuttable, as to the primary failure to warn claim, though Perez sets the bar very high.   Reading the charge, and the law, and Perez, seems to get us to the issue of whether the communication of information in the form of warnings or claims about safety were (a) approved by FDA, (b) less than adequate if they were, a very tough argument to win in light of Perez; or  (c) not approved by FDA, and (d) if not approved, and not adequate, then no presumption and we win.

**Here is where the work Chris has been doing on the marketing and communication strategies employed by Merck are critical to winning these cases.  To the extent we can prove non-FDA approved communications that were misleading, or even better failed to comply with FDA regulations, we overcome the presumption.**

I would argue that any communications by Merck or their agents to the public about the drug are related to labeling and therefore fall within this section.

Merck accused Pfizer of breaking the CFR by failing to provide fair balance in their counter marketing strategies based on the VIGOR data.  Merck, therefore, broke the same law by advancing only the interpretation of the VIGOR data that benefitted their marketing scheme.   Merck's non-approved communications about VIGOR lacked fair balance, therefore violated CFR, therefore did not adequately warn or instruct users of the risks of using their product.

**We get here and we win the failure to warn case.**

We do need to put a bunch of time and effort into identifying these kinds of communications.  We also have to screen cases to the extent we can so that we can argue the clients (or the physicians) actually saw these non-approved communications.

No question this is the key to the warnings case in NJ. No question we need to put a sharp point on this issue right now.

I propose a two day work session very soon, maybe the week of November 28, to frame out this evidence in the context of the case law and likely jury charge. It will take more than two days ultimately, but this session will give us a good sense of what we have and what we need.

We will need to have multiple accesses to the database, someone with a good handle on the PLA on retainer (eg Dreier or someone of his caliber) and someone expert on the science available to help identify scientific fraud in communications (Egilman?)

Thoughts please.

(Emphasis added).

This was classic common benefit work by two lawyers without a fee interest in the case at bar, but who, based upon their experience, their knowledge, and their understanding of the key facts of the case, understood that it was critically important for all plaintiffs that the law of the case incorporate the crucial facts of the case on fraud in order to permit the failure to warn case to succeed – facts Placitella had developed, in consultation with Weinberg and with Dr. Kostis and Mr. Nesi, a retired pharmaceutical company marketing executive (who subsequently published a book about the Vioxx debacle and credited Weinberg and Placitella with important contributions and acknowledged their deep dedication to their clients in the litigation.)

It is fair to say that the crafting of the New Jersey Jury Charge to fit the facts of the fraudulent marketing of Vioxx and the limitations of the FDA in assuring the safety of drugs was a turning point in the Vioxx litigation

-----Original Message-----
From: Eric H. Weinberg [mailto:ehw@erichweinberg.com]
Sent: Wed 2/22/2006 6:28 PM
To: Gordon, Robert; Wilkins, Carrie; Tarr, Sheri;
Kristal, Jerry; Pennock, Paul; Relkin, Ellen
Cc:

Subject: RE: Huan


Rob here's the Nies note I mentioned yesterday.  Eric

-----Original Message-----
From: Relkin, Ellen [mailto:ERelkin@weitzlux.com]
Sent: Friday, February 24, 2006 1:38 AM
To: Eric H. Weinberg; Gordon, Robert; Wilkins, Carrie; Tarr,
Sheri;
Kristal, Jerry; Pennock, Paul
Subject: RE: Huan

**Great document!! Carrie - is this on our exhibit list?  If not,
we should add it**

**Do we need to play the NEis depo clip piece authenticating i
(and thus designate it) to get it in?**

-----Original Message-----
From: Eric H. Weinberg [mailto:ehw@erichweinberg.com]
Sent: Fri 2/24/2006 8:32 AM
To: Relkin, Ellen; Gordon, Robert; Wilkins, Carrie; Tarr, Sheri;
Kristal, Jerry; Pennock, Paul
Cc:
Subject: RE: Huan

Do you have the jury charge from Humeston?

Having gone through the prep for Demopoulos I believe the
evidence of failure to research the risk to diabetics in particular and
high risk patients in general is strong.  I know this is a major theme
in your case.  Perhaps there is thematic language we could incorporate
in the charge (eg Feldman) that would be a good touchstone during the
trial (ie the jury would hear the themes expressed by Rob and witnesses
over and over again and then in the charge.)

**I've attached an annotated version of Feldman.  Good quotes on
duty to research, to seek out answers to risk questions, be an expert in
the product etc. from p.14 on.**

Thanks.

-----Original Message-----
From: Eric H. Weinberg [mailto:ehw@erichweinberg.com]

Sent: Wednesday, March 01, 2006 8:21 AM
To: Relkin, Ellen; Gordon, Robert; Wilkins, Carrie; Tarr, Sheri; Kristal, Jerry;
Pennock, Paul
Cc: Tanya Tayts; Chris Placitella
Subject: Important Warning document


**The attached must be on your exhibit list.  It confirms what Chris has
been developing as a major failure to warn theme in this case -- that
Merck broke the law by failing to disclose the possible interpretation
of VIGOR that VIOXX was prothrombotic and doctors should have been told
that up front**.

In this document, which is the letter Merck sent in response to the FDA
September 2001 Warning Letter, Sherwood writes only to the doctors who
saw the fraudulent presentations.  We know that Merck accomplished
billions of media impressions with their bullshit message that omitted
mention of the prothrombotic effects.  Here, in this letter, Merck
confirms that FDA considers the failure to explain that possible
interpretation of VIGOR as a violation of the federal law.

Equally important is the handwritten comment from Scolnick at the bottom
of the page -- that "This should be the language also in our label."  He
means the legally required explanation that VIGOR meant VIOXX could be
prothrombotic.

Of course we know that the language Scolnick says here should be in our
label never got there.

This ties in with Merck's letter to FDA in 2000 complaining that Pfizer
broke the law by counter detailing on VIGOR and telling doctors only
Pfizer's interpretation of VIGOR (that Vioxx was prothrombotic.)  So in
2000 Merck said the law required Pfizer to tell both (or all) reasonable
interpretations of the data; in 2001 this Merck letter confirms that FDA
found Merck's one sided claims to be violative of federal law; and
Scolnick tells us what needed to be in the Vioxx label, but never got
there.

Another issue relates to the failure to answer the question of safety in
high risk patients, which was the primary purpose of the VALOR study
that was terminated in March 2002 after Merck found out they were
getting the CV Precaution label.

At Demopoulos depo, we received the documents Merck provided to the
witness to review.  Among the docs is a summary of the VALOR trial by

Dr. DiBAttiste.  He makes it very clear that the trial was designed to answer a large and important unanswered question -- whether patients at high risk for cv events were at risk on Vioxx.  He also confirms that the so-called SOP for reviewing cardiovascular events was instituted for post-Phase III studies -- i.e., that the studies submitted as part of the NDA did not include a CV SOP review.

This is important for at least two reasons.  (1) Because the only real CV analysis done by FDA of those studies was done by Juan Carlos Pelayo, the FDA cardiorenal reviewer, who in 1999 concluded that cardiovascular and renal toxicities were higher in Vioxx than in all comparators (the Signal of CV toxicity that Merck never really studied); and (2) the inclusion of those studies in the Konstam meta analysis was practically irrelevant to getting to the bottom of the CV risk issues, because in those studies CV events were not adjudicated.

I will send this to you later today.  Tanya, please see me regarding this document.

Ellen, when you get back, send me the charge.  We can work with Judge Pressler to beef it up.

(Emphasis added). This e-mail thread documents class collaboration in overcoming a difficult problem in the case, and the information supplied by Weinberg was stated to be a "great" document that needed to be on the plaintiffs' exhibit list.

The jury returned a verdict for Mr. McDarby on the product liability count of his complaint, and awarded compensatory and punitive damages.  The jury returned verdicts for both Mr. McDarby and Mr. Cona on the Consumer Fraud Counts of their Complaints.  Merck appealed the verdict to the Appellate Division of the Superior Court.  In a published opinion, the Appellate Division affirmed the verdict and endorsed the strategy that Placitella and Weinberg, together with their colleagues, had first articulated in writing in the fall of 2005, in response to the defense verdict in the Humeston I trial.

Weinberg and Placitella received the acknowledgement of their colleagues for their contributions

to the Cona/McDarby cases:

-----Original Message-----
From: "Mark Lanier" <WML@lanierlawfirm.com>
Subject: RE: Trial Update

**Thank you for the kudo's Chris...  Also thanks to all your hard work going into this...  You, Eric**, Sol, Dave Jacobi (and his son!), Seeger, Jeff Grand, Lisa Blue and so many others make it possible for "vintage Lanier" to go at it....  Needless to say, Rob Gordon, Jerry Krystal, Ellen and all of Perry's crew (not to mention Perry's own prep help and behind the scenes work for which he takes no credit but was immeasurably helpful) did PHENOMENAL and were such a joy to work with.  And Morelli was the usual big brother I needed!  Not to mention my own folks (Dr. Bob, Rick Meadow, Dara, Meredith, Maura, Ken, Evan, and others...) who work all night for me to get the limelight....

In other words, thanks to all ... win, lose or draw, **we've got something special in the legal community working on this...**

Lanier


From: Rob Gordon [mailto:rgordon@weitzlux.com]
Subject: Re: Trial Update

I share that gratitude. This was the **largest multi-firm effort I have ever seen in presenting a case**. Never before has a lawyer examining a witness been able to get real-time advice from around the country from lawyers watching on tv who were blackberrying in. **Each witness had the mark of another attorney outside the courtroom**: Tom on the Topol video, Chris on the Lane video, Eric on all things scientific, Dave with Atlantic County intelligence, Sol with DePace, Jeff with all things regarding liability, Paul on the Crisitiello video, Sam and Terry with Braun, and Chris S. and Dave in virtually everything Vioxx and smoothing the way with the judge.

Inside the courthouse, amazing work by Mark, Jerry, Ellen, Ben, Rick, Dara and Dr. Bob. All of the people in Mark's organization, Ken, Evan, Maura, Meredith and everyone who stayed up all night. And all of our people who worked around the clock: Sheri, Carrie, Gabe. Caitlyn and Tim.

Thankfully, Merck didn't make as good a closing as Perry did for them in the mock trial. Whatever happens, it has been an honor to be part of this.

Rob Gordon

### D. Doherty v. Merck (June-July 2006)

This case was tried in New Jersey.  The Plaintiff was represented by the Locks Law Firm.  Weinberg and Placitella offered their assistance to their colleagues at the Locks Law Firm.  The Locks Law Firm generally had decided to go their own way in preparing and presenting evidence in this case.

The marketing evidence developed by Placitella was, however, presented to the jury.  Indeed, counsel for Doherty lauded this evidence under oath in a written transcript, and credited it with the successful result on the Direct to Consumer count of their Complaint.  That is, evidence of the overwhelming Direct to Consumer campaign by Merck regarding Vioxx was presented to the Doherty jury, which found by a vote of 7-0 that Merck had, in fact, misled consumers directly about Vioxx.

### E.  Hermans/Humeston II trial (February/March 2007)

This was the second New Jersey Consortium supported trial, and the second in which Plaintiffs obtained two favorable verdicts on the Consumer Fraud Counts and one favorable verdict on the Product Liability Counts.  Weinberg's and Placitella's work was extensively used, and integral to the result.

Weinberg had retained Dr. David Madigan in December of 2005 and by December of 2006 Dr. Madigan's data analyses had revealed compelling new evidence of cardiovascular thrombotic risk with Vioxx at a far earlier date than any other expert had determined

The Madigan project was led by Weinberg.  At his invitation other law firms in New Jersey had participated in funding Dr. Madigan's work.  Weinberg had offered Dr. Madigan as an expert to the MDL in April 2006, but the MDL Science Committee had refused the offer.  Weinberg assembled clinical study data, called SAS, for Dr. Madigan's analyses.  Dr. Madigan cleaned up and

organized the SAS data into a more easily readable form.  His analyses were novel.

Dr. Krumholz was deeply impressed by Dr. Madigan's work.  They engaged in an ongoing scientific dialogue for two months, from December to February, in order that Dr. Krumholz could testify about Dr. Madigan's analyses in the trial.  The evidence of their collaboration is documented in writing and available in the summaries provided in connection with this submission.  Drs. Krumholz and Madigan together with colleagues published an article concerning Vioxx in the Archives of Internal Medicine.

These emails are representative of many more communications in which a scientific dialogue between Drs. Krumholz, Madigan and their colleagues resulted in the introduction of Dr. Madigan's evidence in the Hermans/Humeston II trial.

From: Ken S. Soh [mailto:KSS@lanierlawfirm.com]
Sent: Friday, November 10, 2006 5:19 PM
To: Eric H. Weinberg
Cc: Harlan.Krumholz@yale.edu; Joe Ross
**Subject:** Krumholz and Madagan

Eric,

Thanks for your assistance with Dr. Madigan.  TO the extent that Harlan needs to look at the Approve follow-up data, I'd like to get him hooked up with Dr. Madigan. We're gonna meet on Tuesday and I'll let you know what Harlan would need.

_____

At 04:04 PM 12/12/2006, David Egilman wrote:

**In this trial Dr. Madigan has noted differential adjudication rates between placebo and treated patients.  You may want to look at this.**

Harlan Krumholz wrote:

David:

Could you explain that.

-50-

HK

At 09:47 PM 12/13/2006, David Madigan wrote:

I've attached an excerpt from a report I prepared for Eric Weinberg.

The excerpt discusses anomalies in the adjudication process for

the AD studies. D.

From: Harlan Krumholz [mailto:harlan.krumholz@yale.edu]
Sent: Thursday, December 14, 2006 8:59 PM
To: David Madigan
Cc: David Egilman; Ross, Joseph; Yongfei Wang; gregory.mulvey@yale.edu;
stephen.cha@yale.edu; cfurberg@wfubmc.edu; Amos Presler; Ken S. Soh; Eric H.
Weinberg
**Subject:** Re: all-cause death rates in vioxx studies

**very interesting - what was your primary source for this document. I would like
to refer to this** discrepancy if they throw the Alz trials at me. And is there evidence
that they were not blinded in the adjudication?

Leave this email and reply in the text:

-----Original Message-----
From: Eric H. Weinberg [ mailto:ehw@erichweinberg.com]
Sent: Sunday, December 31, 2006 1:45 PM
To: Sigelman, Daniel; David Madigan; aaltobelli3@yahoo.com;
jbk@kostiskosmos.com; Harlan Krumholz
Cc: mayer james
Subject: RE: a curious thing about approve

Happy New Year.

What follows is a work product discussion, as this is truly a work in progress.  We
have more to do to understand the data so that an analysis could be offered at trial.
Dan Sigelman and Jim Mayer developed perspectives on the Alzheimer's studies that
David Madigan has been exploring in the SAS data, collaboratively with Dan, Jim
and I.  Attached are three documents prepared by David related to the Alzheimer's
studies.
The attached spreadsheet describes RR calculations for CVT events (as defined in

the Definition pdf) for the three Alzheimer's studies at 3 points in time. David has indicated in red which of the calculations are statistically significant. Please note the reductions of IR events by way of adjudication for both Vioxx and placebo in all of these studies.

{What is not in this spreadsheet is David's analysis of Merck's earlier decisions about which adverse event reports from the study sites to Merck were sent by Merck for adjudication. That is, Merck made the decisions about which cases should be adjudicated ab initio. It appears from David's analysis that while 67% of the IR placebo events were sent for adjudication, only 50% of the IR Vioxx events were sent for adjudication. David, would you please send around your findings on this issue?}

The Definition pdf shows the definitions David used in the spreadsheet analysis he has done; as well as the definitions Merck has used over time in various analyses of their Alzheimer's data. It was not atypical for Merck's terms to change even within the same study.

The Endpoint pdf shows the rather remarkable statistically significant RR of patients with Mild Cognitive Impairment developing Alzheimer's Disease on Vioxx. Of note is the fact that contrary to the DAP for this study, there was no DSMB appointed to monitor the safety of patients. Even though Merck knew or should have known by late 1999 that patients with MCI were at risk, it would seem they decided not to tell the study monitors and the patients enrolled in the study about this risk once it emerged.

This all goes to benefit and risk and truth about data. In the context of our work in this area, we have been talking about the definitions of CVT events – which should or should not be counted. We want to be as medically correct as possible in the decision about which terms should be included; I also believe we need to analyze the data using each of Merck's definition sets, and so I have asked David to run the SAS numbers for each of the Merck term sets set out in the Definition pdf attached.

It would be helpful to have some feedback on this issue.

Thanks and best wishes.


Harlan Krumholz [mailto:harlan.krumholz@yale.edu]
Sent: Monday, January 01, 2007 10:35 AM
To: Sigelman, Daniel; Eric H. Weinberg; David Madigan; aaltobelli3@yahoo.com; jbk@kostiskosmos.com
Cc: mayer james; Yongfei Wang; Joseph Ross; Kevin P. Hill; Greg Mulvey
Subject: RE: a curious thing about approve

**Extraordinary data and work -- and we must quickly nail this down by the trial -- and we are pleased to help do that in any way we can. I agree with Dan and Eric -- we should know the issues about the adjudication -- but even allowing for their adjudication strategy the data are compelling.**

**This is a story that must be told** -- but we it must be so clear.

(Emphasis added).

Here is another string, equally as telling of Weinberg's contribution to the case:

From: Harlan Krumholz [mailto:harlan.krumholz@yale.edu]
Sent: Wednesday, January 31, 2007 1:47 PM
To: David Madigan
**Cc:** Yongfei Wang; 'Ross, Joseph'; 'Jeff Grand'; 'Ken S. Soh'; Eric H. Weinberg;
Amos Presler; David Egilman
Subject: Re: one more thing
Joe/Kevin/Greg/Amos (work it out among you):

We should do the same -- and not only hand enter but copy the source pages and put
together in a packet so it is clear. And the spreadsheet we hand enter should have
study, subject, allocation and date and adjudication.

**David M: anything more -- we just want to replicate what you have. So I can say
I (we) did that.**

HK

At 01:42 PM 1/31/2007, David Madigan wrote:

Yes, I hand entered it from the CSRs. D.


Harlan Krumholz wrote:

and you hand entered from the CSRs? **I want to repeat here so, if asked, we can
say we did it.** That will give it more force.

At 06:38 PM 1/29/2007, David Madigan wrote:

I have not found any complete and usable adjudication

data on the Merck hard drives. I have hand-entered it for

88-89, 78-91-126, and 122. D.

From: David Madigan [mailto:dmadigan@rutgers.edu]
Sent: Thursday, February 01, 2007 9:06 PM
To: Ross, Joseph

**Cc:** Yongfei Wang; Harlan Krumholz; gregory.mulvey@yale.edu; Kevin P. Hill; Eric H. Weinberg; Sigelman, Daniel
Subject: Re: the rest

078-158 is an interesting one - the adjudication documents apparently indicate quite clearly the 2 of the three votes were in favor of confirmation. D.

Ross, Joseph wrote:

David, I am very happy with this. Essentially, **what we needed to do is verify everything you've done, so that when Harlan testifies, he can say that he's looked at everything himself (or by extension through me).** So now we are confident that the Alz deaths add up and the adjudication is correct (except the difference vis a vis 078-796 -- interestingly, when you read the footnote of table 89, 078-796 is considered to have multiple events; my guess is that the patient had an MI, but didn't die from it, and then at some point later on died from the subarachnoid hemorrhage; so technically they should be counted as a TCVSAE endpoint, but not as a TCV death -- and I did not know the details of 078-158, its just listed as insufficient data).

The only challenge is that we can not verify the deaths in the 091 extension, since I do not have any paperwork on it.

(Emphasis added).

During the trial, Dr. Egilman, who had testified in the successful Ernst trial, and had consulted to plaintiffs' counsel in the New Jersey trials, recognized the importance of getting Dr. Madigan's analyses to Dr. Krumholz.  Trial Counsel from Seeger Weiss followed Dr. Egilman's advice.  Weinberg was in Atlantic City during the trial, and had been working collaboratively in support of the trial team on a consistent basis.   They reached out, once again to Eric Weinberg for assistance, this time in an effort to bring Dr. Madigan's evidence into the trial.   Weinberg responded immediately; as he typically did when requests for help were sent his way.


-----Original Message-----
From: Horn, Moshe
Sent: Tuesday, February 06, 2007 8:17 AM
To: Buchanan, David; Grand, Jeff; Seeger, Chris

Subject: Weinberg

Egilman wants to get madigan's MI analysis for krumholtz. Does annyone
have weinberg"s contact info?

-----Original Message-----
From: Buchanan, David [mailto:dbuchanan@seegerweiss.com]
Sent: Tuesday, February 06, 2007 8:18 AM
To: Horn, Moshe; Grand, Jeff; Seeger, Chris; Eric H. Weinberg
Subject: RE: Weinberg
Eric was here last night. I don't know specifically what Egilman is
looking for, but Eric is copied on this now. Eric do you know what
David is talking about?

-----Original Message-----
From: Eric H. Weinberg
Sent: Tuesday, February 06, 2007 8:14 AM
To: Buchanan, David; Horn, Moshe; Grand, Jeff; Seeger, Chris
Subject: RE: Weinberg

Working on it.

   Dr. Krumholz acknowledged Weinberg's role in the collaboration leading to the introduction of

important scientific evidence in the Hermans/Humeston case in an email in February 2007:


   Eric,

   I have been meaning to tell you how impressed I am with your knowledge of this
   case.

Harlan
   In this trial the Lanier firm was also concerned about medical issues related to Mr. Hermans, who

had died.  Rick Meadow, a senior partner at the firm, contacted Weinberg and asked to speak with

Drs. Kostis and Altobelli about Mr. Hermans.  Meadow sent Weinberg the expert reports and

depositions of the Lanier Law Firms' expert witnesses, and asked if Drs. Kostis and Altobelli would

review the materials and offer any thoughts they had related causation, and specifically with respect

to the evidence of trace amounts of methadone in Mr. Hermans' blood.  Weinberg, as usual, did the

work requested of him, as confirmed in this e-mail string:

> -----Original Message-----
> From: Eric H. Weinberg <ehw@erichweinberg.com>
> To: Richard D. Meadow <RDM@lanierlawfirm.com>
> Sent: Sat Feb 10 07:57:15 2007
> Subject: RE:
>
> Thanks.  Did Altobelli help? Kostis said he could get to the stuff this weekend so you might touch base with him next week if necessary.
>
> -----Original Message-----
> From: Richard D. Meadow [mailto:RDM@lanierlawfirm.com]
> Sent: Saturday, February 10, 2007 8:54 AM
> To: Eric H. Weinberg
> Subject: Re:
>
> **Altobelli was a help**. We won't argue this motion for awhile so **I would love Kostis to give me input**. A win would be huge.
> --------------------------
> Sent from my BlackBerry Wireless Handheld
>
>
> **From:** Richard D. Meadow [mailto:RDM@lanierlawfirm.com]
> **Sent:** Monday, February 12, 2007 4:06 PM
> **To:** Eric H. Weinberg
> **Subject:** Hermans Autopsy
> Eric,
> **Had a nice chat with Dr. Kostis. What a great guy. He wanted to look at the autopsy report. I have attached that for his review. He also wanted my cell number which is 516-524-9088. I think he wants you to just forward this e-mail so all my contact info is there. Thanks for the intro.**
> Rick <<Complete Coroner File.pdf>>
>
> Rick Meadow
> The Lanier Law Firm
> 126 East 56th Street
> New York, New York 10028
> 212-421-2800
> 212-421-2878
> rdm@lanierlawfirm.com


The jury in returned a verdict for Mr. Humeston on the Product Liability count of his Complaint,

and for both Mr. Hermans and Mr. Humeston on the Consumer Fraud counts of their Complaints. The Jury Charge was informed by the marketing fraud evidence developed by Placitella. As in every New Jersey trial in which Placitella's work product was presented to a jury, except for the first trial, juries in New Jersey found for the Plaintiffs on the Consumer Fraud Count of their Complaints. This is remarkable testimony to the power and persuasiveness of the marketing evidence for which Placitella was directly, and completely, responsible.

## II. PROVIDING EXPERT CONSULTATION ON CASE SPECIFIC ISSUES AND EXPERT CONSULTATION ON BELLWETHER TRIALS IN NEW JERSEY – WITHOUT ANY FEE INTEREST IN COLLEAGUES' CASES.

Three cases had been selected as bellwether trials in April 2006. Weinberg was asked by trial counsel in two of those cases to provide a cardiology expert. He did. Dr. Altobelli was retained by Seeger Weiss to prepare an expert report in the matter of McFarland .v Merck. Dr. Altobelli was retained by Anapol Schwartz to prepare an expert report in the matter of Hatch v. Merck. In both cases Dr. Altobelli prepared expert reports which were served upon Merck. In both cases Dr. Altobelli gave deposition testimony regarding the :Plaintiffs. Weinberg had spent considerable time and effort educating Dr. Altobelli about Vioxx. Dr. Altobelli had the benefit of working with other experts retained by Weinberg – in particular Dr. Kostis and Dr. Madigan. Note that e-mails fro Seeger Weiss to Eric asking for his input in preparing Seeger's own expert, Dr. Altobelli – it is a good indication that Seeger considered Weinberg's input and work critical to the presentation of its own expert at trial (if that doesn't make Weinberg part of the trial team, it has hard to imagine what would).

-----Original Message-----
From: Eric H. Weinberg [mailto:ehw@erichweinberg.com]
Sent: Thursday, March 16, 2006 9:46 AM

To: Buchanan, David; Grand, Jeff
Subject: RE: Robert McFarland v. Merck

**Ok, I just spoke to Dr. Altobelli and we will add the list of materials he reviewed, and his CV, as attachments.**

Is form/content otherwise ok?

I will call him late this afternoon, so please let me know by then.

-----Original Message-----
From: Buchanan, David [mailto:dbuchanan@seegerweiss.com]
Sent: Thursday, March 16, 2006 10:38 AM
To: Eric H. Weinberg; Grand, Jeff
Subject: RE: Robert McFarland v. Merck

Will get you comments by our lunch break here.

-----Original Message-----
From: Eric H. Weinberg [mailto:ehw@erichweinberg.com]
Sent: Friday, March 17, 2006 8:27 AM
To: Buchanan, David; Grand, Jeff
Subject: RE: Robert McFarland v. Merck

Here is the Scolnick comment.

-----Original Message-----
From: Grand, Jeff [mailto:JGrand@seegerweiss.com]
Sent: Friday, March 17, 2006 10:28 AM
To: Eric H. Weinberg
Subject: RE: Robert McFarland v. Merck

**Have you heard back from Altobelli?  Are we okay on his report if we take out the statements regarding the samples?**  Also, what's his hourly fee?

-----Original Message-----
From: Eric H. Weinberg [mailto:ehw@erichweinberg.com]
Sent: Friday, March 17, 2006 10:30 AM
To: Grand, Jeff
Subject: RE: Robert McFarland v. Merck

waiting to hear, I will call him around lunchtime.

-----Original Message-----
From: Grand, Jeff [mailto:JGrand@seegerweiss.com]

Sent: Friday, March 17, 2006 6:02 PM
To: Eric H. Weinberg
Subject: RE: Robert McFarland v. Merck

We've just learned that our expert report deadline will be extended until Monday.
**Although I would still like to get Dr. Altobelli's report and related materials as
soon as possible, anytime over the weekend will be fine**.

Thanks,

Jeff

-----Original Message-----
From: Eric H. Weinberg [mailto:ehw@erichweinberg.com]
Sent: Sunday, March 19, 2006 10:35 PM
To: Grand, Jeff
Subject: RE: Robert McFarland v. Merck

Did Mr. McFarland visit with Dr. Altobelli?

-----Original Message-----
From: Grand, Jeff [mailto:JGrand@seegerweiss.com]
Sent: Monday, March 20, 2006 10:12 AM
To: Eric H. Weinberg
Subject: RE: Robert McFarland v. Merck

Not that I know of.  We can certainly arrange it and have him supplement his report
down the road.
We haven't received his CV or list of materials relied on yet.  Hope things have
improved for you mom.

-----Original Message-----
From: Eric H. Weinberg [mailto:ehw@erichweinberg.com]
Sent: Monday, March 20, 2006 10:24 AM
To: Grand, Jeff
Cc: Terry Longo
Subject: RE: Robert McFarland v. Merck

Thanks, we'll know more today and tomorrow.

Teri, **would you make sure we get Jeff the list of materials Dr. Altobelli was sent
to review, and his CV (which I will forward to both of you.)  Also, it probably
makes sense to arrange a visit by Mr. McFarland to see Dr. Altobelli, so would
you coordinate with Jeff or his designee on this?**

-59-

Thanks.

-----Original Message-----
From: Grand, Jeff [mailto:JGrand@seegerweiss.com]
Sent: Monday, March 20, 2006 10:41 AM
To: Eric H. Weinberg
Subject: RE: Robert McFarland v. Merck

Thanks.  I've just learned that Judge Higbee is rescheduling the McFarland/Hatch trial for September.  She had a scheduling conflict with the April date.  Can you pass this info. on to Dr.Altobelli and see whether he has any availability for September? Thanks.

----Original Message-----
From: Eric H. Weinberg [mailto:ehw@erichweinberg.com]
Sent: Monday, March 20, 2006 10:41 AM
To: Grand, Jeff
Subject: RE: Robert McFarland v. Merck

Yes will do.  Deadlines for reports still the same?

-----Original Message-----
From: Grand, Jeff [mailto:JGrand@seegerweiss.com]
Sent: Monday, March 20, 2006 11:52 AM
To: Eric H. Weinberg
Subject: RE: Robert McFarland v. Merck

No.  We had the report ready to go, but obviously, there will now be time to schedule an IME and revise the report.
I'll let you know what the new dates are as soon as they're set.  **Thanks for your help on this**.

(Emphasis added).

   The following pertains to Weinberg's work with Dr. Altobelli on the Hatch case with his

colleague Sol Weiss:

From: Eric H. Weinberg [mailto:ehw@erichweinberg.com]
Sent: Tuesday, April 04, 2006 11:06 PM
To: Anthony Altobelli III
Cc: Weiss, Sol; Jacoby, David
Subject: RE: Hatch - Infarction/Ischemia/Arrhythmia

-60-

Anthony,

Fitzgerald addresses this kind of scenario in the last page of the JCI
paper.  I think the present medical consensus attributes causation to
one or more of imbalance, atherogenesis, and blood pressure elevations,
as Fitzgerald et als note on the first page of the abstract.  So we
would expect to see these different processes in cases.

Dr. Kostis has been advocating this kind of thinking about causation
since we first started talking about Vioxx.  I think a meeting with him
would be helpful all around.
 What's also interesting in these papers is the understanding that the
drug was overprescribed to patients not at GI risk (especially given the
CV risk issues.)

I've copied Dave and Sol on this.

Regards,

Eric

---- Original Message ----
From: "Weiss, Sol" <sweiss@anapolschwartz.com>
Date: 4/5/06 1:45 pm
To: "Eric H. Weinberg" <ehw@erichweinberg.com>
Subj: RE: Hatch - Infarction/Ischemia/Arrhythmia

Thanks for your hard work and setting up the meeting. Dr. A is all that you promised
and then some

---Original Message-----
From: Eric H. Weinberg
Sent: Wednesday, April 05, 2006 2:27 PM
To: Weiss; Sol; Eric H. Weinberg
Subject: RE: Hatch - Infarction/Ischemia/Arrhythmia

**My pleasure.  More to come.**

Sent with Wireless Sync from Verizon Wireless


(Emphasis added).

    Weinberg's colleagues at The Lanier Law Firm also called upon him to help with medical

causation issues in their cases:

-----Original Message-----
From: Meredith P. Gursky [mailto:MPG@lanierlawfirm.com]
Sent: Monday, May 01, 2006 2:40 PM
To: Eric H. Weinberg
Subject: Cases in need of your opinion/advice

Eric,

I know we discussed going over some of our Vioxx cases where it is debatable if we should file. Because our schedules are all so packed, I thought it best to email you synopses of these cases and leave it to you if you want me to forward you copies of the files and or any more information. I will try to give you as much information as I have.

Thanks for your time and help!
--------------------------------------------------------------
Colleen Scharberg
Injury - Congestive Heart Failure (in general we are unsure about taking cases with this injury)
Although the client claimed that she had heart attack in October of 2001, review of the medical records shows Saint Patrick Hospital diagnosis is myocarditis/congestive heart failure on 10/25/2001. She received Vioxx on March, April and May of 2001 - 34 day quantity, (with 3 refills). Doctor's note on 7/2001 shows Vioxx. Client claims to have taken samples from the doctor's office she worked at. We have a note from Dr. Susan Selbach where client worked stating that samples were give to client during 6/2000 to 6/2002.

I would not file

Burthe Koschalk
Injury - Congestive Heart Failure

Plaintiff given samples of Vioxx only one month prior to her injury, suffered congestive heart failure in August 1999 and then passed away in March 2000. She continued to take Vioxx up until her death on March 11, 2000

I would not file

Deneen Legg
Injury - Subarachnoid Hemorrhage
Based on the pharmacy information provided to us, we cannot verify continuous use of Vioxx. The hospital records indicate that Mrs. Legg sustained a subarachnoid hemorrhage in April 2004.

-62-

Madeline Bratter
Injury - Renal Failure (Loss of 50% Kidney Function)
She took Vioxx from 2001-2004 and suffered Renal Failure in 2004. We are unsure if it is wise to pursue a renal failure case and wondering your thoughts.

We have stroke cases that I may want your input on as well, but for now, the above are cases that Rick suggested I email you about to discuss if you would pursue any of them.

thanks so much,

Meredith P. Gursky, Esq.
Associate Attorney
The Lanier Law Firm, PLLC
Tower 56
126 East 56th Street, 6th Floor
New York, NY 10022
212-421-2800

-----Original Message-----
From: Eric H. Weinberg <ehw@erichweinberg.com>
To: Meredith P. Gursky <MPG@lanierlawfirm.com>
Sent: Mon May 01 14:29:47 2006
Subject: RE: Cases in need of your opinion/advice

I've forwarded to Drs. Kostis (cardiologist) Altobelli (cardiologist) and Madigan (biostatistician) and will meet with them to discuss these and other matters in the next week or two.

----Original Message-----
From: Meredith P. Gursky [mailto:MPG@lanierlawfirm.com]
Sent: Monday, May 01, 2006 3:23 PM
To: Eric H. Weinberg
Subject: Re: Cases in need of your opinion/advice

Thanks so much!

Meredith P. Gursky, Esq.
    Associate Attorney
    The Lanier Law Firm, PLLC
    126 East 56th Street, 6th Fl.
    New York, NY 10022
-------------------------
Sent from my BlackBerry Wireless Handheld

-63-

--- Original Message ----
From: "Meredith P. Gursky"
Date: 5/10/06 12:07 pm
To: "Eric Weinberg"
Subj: Status

Hi Eric,
I hope you are well, I was wondering if you ever had the chance to
review those cases I forwarded to you with your experts.

-----Original Message-----
From: Eric Weinberg [mailto:ehw@erichweinberg.com]
Sent: Wednesday, May 10, 2006 1:30 PM
To: Meredith P. Gursky
Subject: RE: Status


Was supposed to get with docs tomorrow but it is off. We should talk
later. I think CHF cases can be good.

Sent with Wireless Sync from Verizon Wireless

-----Original Message-----
From: Meredith P. Gursky [mailto:MPG@lanierlawfirm.com]
Sent: Wednesday, May 10, 2006 1:34 PM
To: Eric H. Weinberg
Subject: RE: Status

ok, I will be in the office today until 5:30pm and then all day tomorrow
please call when you have time
thanks

*"Eric H. Weinberg" <ehw@erichweinberg.com> wrote:*
Could you give me your initial reaction? The CHF data seems strong generally with
proof of use, but the facts of these cases are concerning.

Thanks.

{PS One reason I am interested in getting together with you and Dr. Kostis is that I
would like to discuss a broad case review strategy. Do you think any of your partners
would be willing to do preliminary reviews of files for screening purposes? We may
have several hundred potential matters for review in the next few months and I do
not want anyone to be crunched for time. We could certainly set up a system of
review that would/would not involve testimony, summary reports, detailed reports,

-64-

etc.}

-----Original Message-----
**From:** Anthony Altobelli III [mailto:aaltobelli3@yahoo.com]
**Sent:** Wednesday, May 10, 2006 3:32 PM
**To:** Eric H. Weinberg
**Subject:** Re: FW: Status
I was planning to attend the meeting tomorrow, Thursday the 11th at RWJUH.  Are we planning to meet?

Regarding the cases I have several opinions but thought we would discuss them.  In general they fall under broad adverse drug reactions seen with <u>both coxibs and traditional non-selective non-steroidals</u>.  Reduction in glomerular filtration rate leading to renal insufficiency and secondarily sodium and fluid retention is well established. Complications of congestive heart failure are seen with both classes of drugs.   Bleeding risk has also been well established with both classes.  Patients are monitored for these adverse reactions and I not sure clinician were misled by the data in any way.  Therefore,  I would say cases outside of the realm of "thrombotic complications, ischemic injury and sudden death" should not be tried as these effects are not generally mediated by thrombotic events.

Look forward to your thoughts.  I also want to know if I should forward to billing to the respectice law offices.  I believe I gave you an initial statement and I have subsequently read the documents forwarded to me by Greg Spizer from Anapol et al.

Anthony

-----Original Message-----
From: Eric H. Weinberg [mailto:ehw@erichweinberg.com]
Sent: Thursday, May 11, 2006 11:38 AM
To: Meredith P. Gursky
Subject: FW: FW: Status
fyi

From: Meredith P. Gursky [mailto:MPG@lanierlawfirm.com]
Sent: Thursday, May 11, 2006 11:33 AM
To: Eric H. Weinberg
Subject: RE: FW: Status

**that is incredibly helpful thanks!**

(Emphasis added).

 Weinberg was asked by his colleagues at Motley Rice to provide a cardiologist to review their

cases set for trial.  Once again, Weinberg helped his colleagues:

-----Original Message-----
**From:** Scott, Carmen S [mailto:cscott@motleyrice.com]
**Sent:** Thursday, August 17, 2006 11:02 AM
**To:** Eric H. Weinberg
**Cc:** Thompson, Fred; Leventis, Henry; Finkelstein, Connie
**Subject:** Dr. Altabello
Eric:

**We are anxious to send the records on our four trial cases to Dr. Altabello (sp?)
for review.  Please forward me his information and CV as soon as possible.**
Many thanks.

Carmen

Carmen Sessions Scott
Associate
Motley Rice LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Office - 843-216-9160
Fax - 843-216-9430
cscott@motleyrice.com

"Eric H. Weinberg" <ehw@erichweinberg.com> wrote:
Anthony,

My colleagues at Motley Rice have several cases in the next group listing for trials
(January.)  **We are working together to prepare these cases for trial.  I am
hopeful that you will be able to work with us on these cases.**

When Tanya returns from vacation I will make sure we have an updated list of
materials we provided to you.  In the meantime, if you are able to review these
matters with respect to causation would you let us know?

I have unfortunately been preoccupied with a family matter but I hope you and I can
get together soon, to chat.

Today's news includes a verdict against Merck in a case tried in New Orleans.  The
jury has awarded the plaintiff $50 million in compensatory damages.

Regards,

-66-

Eric Weinberg

**From:** Anthony Altobelli III [mailto:aaltobelli3@yahoo.com]
**Sent:** Thursday, August 17, 2006 12:58 PM
**To:** Eric H. Weinberg
**Cc:** Tanya Tayts
**Subject:** RE: Dr. Altabello

Eric,

All is well.  **I would be happy to review the records from MotleyRice**.

I also forwarded the literature on nitric oxide tagged Cox-II inhibitors....hope you are in receipt.

I saw the federal ruling this morning on the Web.

Regards,
Anthony

(Emphasis added).

Dr. Altobelli was in a position to offer opinions about Vioxx causation because he had studied materials Weinberg provided to him, met with and discussed the medical and scientific facts with other experts, including Dr. Kostis and Dr. Madigan, and took the time to identify and work thoughtfully through many issues of causation with Weinberg.  If entitlement to common benefit fees in this litigation is based upon sharing expert work product – for example when an attorney finds, retains, educates and offers an expert witness to his colleagues without requesting fees from his colleagues -- then Weinberg is entitled to consideration for Common Benefit fees for finding, retaining, educating, and offering Dr. Altobelli to his colleagues at Seeger Weiss and Anapol Schwartz for their bellwether trials.  That Weinberg was the lawyer his colleagues went to for help is further confirmed by the introduction of Dr. Altobelli by Weinberg to his colleagues at The Lanier Law Firm and the Motley Rice Firm – work he offered in the spirit of common benefit and without

-67-

the requirement of a fee sharing agreement for his help.

## III.    PARADIGM SHIFTING DISCOVERY OF MERCK'S MARKETING FRAUD IN THE VIOXX LITIGATION

Chris Placitella carefully crafted what was perhaps the most effective strategy ever employed in a pharmaceutical drug product liability action, to define and expose the marketing fraud surrounding Vioxx.  Seconded by Eric Weinberg in this project, Placitella  worked with experts Thomas Nesi, former Director of Marketing at Bristol Myers Squibb Corporation, and Dr. John B. Kostis, Chief of Medicine and the Robert Wood Johnson University Hospital in New Brunswick, New Jersey, and Chairman of Medicine at the University of Medicine and Dentistry of New Jersey, and one of the most highly respected cardiologists in the world today, to define the scope and goals of this critically important project.

The marketing evidence developed by Placitella became crucial to the crafting of the Jury Charge developed in the New Jersey litigation that helped to overcome a major obstacle to the plaintiffs' cases – the presumption of adequacy of the labeling of Vioxx as provided for in the New Jersey Product Liability Act.   The evidence developed in this project ultimately persuaded the trial judge, Judge Higbee, and the Appellate Division of the Superior Court of New Jersey, that the Merck was not entitled to the presumption of adequacy in the labeling, and permitted the jury verdicts finding failure to warn in five verdicts to stand.

In formulating and implementing this strategy, Placitella took a series of depositions to develop a story line of marketing fraud evidence that was unique – perhaps, as noted, the best developed marketing fraud story in any pharmaceutical drug case.  Placitella's strategy was not, however, confined to taking discovery from Merck to prove the fraud.  He also identified and then,

using carefully crafted subpoenaes, creatively discovered evidence from contractors who were hired by Merck to put marketing campaigns together.  He identified that Merck used VNRs (video news releases), and took discovery of the VNR process that established a new and important strategy in pharmaceutical drug litigation. Placitella identified the fact that New Jersey companies filmed Merck employees and consultants for use in VNRs, highly professional video clips that look like news when they are shown on television newscasts, but are actually sophisticated marketing pieces. Merck moved to quash the subpoenaes, but their Motion was denied by Judge Higbee.  As a result, Placitella was able to obtain out-takes from the filming sessions that included evidence highly damaging to Merck.

The evidence Placitella developed was dynamite. There is nothing as compelling as video and Chris found, on his own, a treasure trove of videotaped evidence that demonstrated Merck's willingness to subvert science to marketing.  The evidence that Chris, on his own initiative and at his own time and expense, developed and made available to all plaintiffs in Vioxx litigation, was subsequently used in every trial, including New Jersey and MDL trials. A picture is worth a thousands words, and the result of this innovative, groundbreaking, and incredibly important evidence against Merck, which was all eventually produced into a short video clip that could simply be paid at trial (as it was so often), will be sufficient to demonstrate one of the most compelling pieces of evidence developed in the entire Vioxx litigation.

IV.     CRAFTING THE NEW JERSEY VIOXX JURY CHARGE TO OVERCOME PEREZ
        PRESUMPTION OF ADEQUACY OF LABELING BASED UPON MARKETING
        FRAUD

In October of 2005, a defense verdict was returned in the first case to be tried in New Jersey,

Humeston I. As noted elsewhere, counsel for the Plaintiff had asked Weinberg and Placitella for assistance during the trial on the regulatory issues involved in the case. Weinberg and Placitella took the lead in New Jersey to review the losing strategy, and write a Jury Charge that would incorporate Placitella's paradigm-shifting marketing evidence to tie the marketing evidence into the case. . Evidence was emerging in the form of official government reports that criticized the FDA for its inability to monitor drug safety and therefore ensure adequate safety labeling of approved drugs, in an era of explosive pharmaceutical marketing. Placitella and Weinberg worked closely with colleagues Ellen Relkin and Jerry Kristal from Weitz & Luxenberg firm, another firm in the New Jersey Consortium, who had the McDarby case set for trial in early 2006.

Placitella and Weinberg were asked by Relkin to work with retired Appellate Judge Sylvia Pressler, to craft a revised Jury Charge incorporating the evidence that they had developed in discovery. It is important to recognize that the work that informed the revised Charge was originated by Placitella and Weinberg. No other lawyers in this litigation had developed the evidence that became essential to revising the Charge between Humeston I and Cona/McDarby. Relkin drafted the charge with their help. The Cona/McDarby jury returned verdicts for both plaintiffs on the Consumer Fraud Counts of their complaints, and for Mr. McDarby on the product liability count of his complaint. They jury also returns a punitive damages verdict for Mr. McDarby.. Placitella and Weinberg had no fee interest in the Cona or McDarby matters.

Merck appealed the verdict in Cona/McDarby to the Appellate Division of the Superior Court of New Jersey. While the appeal was pending, two more trials took place in New Jersey – the Doherty case and the consolidated Hermans/Humeston II matter. The marketing fraud evidence developed by Placitella was introduced to both juries. Both juries were charged on the marketing fraud evidence, and both found for the plaintiffs. In March of 2008, the Appellate Division affirmed

the Cona/McDarby cases in part, and fully endorsed the strategies first developed by Placitella and Weinberg in November of 2005 to develop jury charges that would incorporate the critical fraud evidence and overcome the *Perez* presumption of adequacy.

## V.     PARADIGM SHIFTING WORK WITH DR. MADIGAN TO ESTABLISH EARLY EVIDENCE OF RISK IN PLACEBO CONTROLLED STUDIES

Weinberg retained Dr. Madigan in December of 2005.  At the time, Dr. Madigan was Dean of Mathematics and Physical Sciences at Rutgers University in New  Brunswick, New Jersey.  He had formerly served as Director of the Rutgers Institute of Biostatistics.  (Dr. Madigan is currently Chairman of the Department of Statistics at Columbia University.)  Dr. Madigan is one of the foremost experts in the world in the field of data safety mining – writing complex algorithms that could be used to explore evidence of risk and benefit in clinical study data.  Dr. Madigan is frequently called upon by the pharmaceutical industry to consult and teach industry biostatisticians data safety mining techniques.

Dr. Madigan, unlike any of the other experts retained in this litigation, collected ALL of Merck's placebo-controlled data, called SAS data.  He cleaned it up and organized it.  He wrote the algorithms necessary to read it.  Then, he answered this simple question: "When did evidence of cardiovascular thrombotic risk FIRST occur in Merck's own data?"

 Dr. Madigan's approach and report were unique, different and more quantitatively and qualitatively advanced than any other report authored in the litigation.  In addition, Dr. Madigan was available to the New Jersey Consortium firms to testify at trial without an assessment.

Dr. Madigan's work was lauded not just by lawyers in this litigation.  Dr. Jerome Avorn of Harvard University, the leading drug safety expert in the world, and the **MDL's chosen expert**

**witness in Vioxx litigation**, described Dr. Madigan's Vioxx litigation report for Weinberg as: "**the most comprehensive depiction of their mis-statement and mis-interpretation of these data that I have seen.**" Here is the e-mail:

> From: Avorn, Jerome Lewis,M.D. [mailto:JAVORN@PARTNERS.ORG]
> Sent: Wednesday, December 19, 2007 4:15 PM
> To: Sigelman, Daniel
> Subject: RE: VIOXX Report
>
> Dan -- Yes, I have gone over Dr. Madigan's report. **It is a VERY impressive piece of work. The general contours of his conclusions are all compatible with my own review of the much more limited clinical trial evidence I was able to see over the years through my work on behalf of the plaintiffs**: the early emergence of worrisome signals, the distorted presentation of the VIGOR and APPROVe data, the alarming risk findings in the Alzheimer's studies. **His review is far more detailed, more quantitatively sophisticated, and appears to be based on a more complete collection of trial data than I have seen before.** He's done an excellent job of providing a rigorous explication to answer the question -- to use the Watergate phrase -- of What did Merck know, and when did they know it? **It is the most comprehensive depiction of their mis-statement and mis-interpretation of these data that I have seen.**
>
> **Makes me wonder whether the prior cases and the settlement would have come out the same way if this compelling analysis had been seen earlier.** In any case, he really ought to seek publication of a much-condensed version of this in the medical literature, since it is a remarkable case study of how a company can manipulate data to hide an important emerging safety problem. **Even people who think they know 'the whole Vioxx story' will be astonished at some of his analyses.**
>
> Thanks for letting me see this.
>
> Best wishes to you, Rich, and your colleagues for a healthy and fulfilling new year.
>
> --Jerry
>
> Jerry Avorn, M.D.
> Professor of Medicine, Harvard Medical School
> Chief, Division of Pharmacoepidemiology and Pharmacoeconomics
> Brigham and Women's Hospital
> 1620 Tremont Street
> suite 3030

Boston, MA 02120
tel: (617) 278-0930
fax: (617) 232-8602
division website: www.DrugEpi.org
book website: www.PowerfulMedicines.org

Dr. Harlan Krumholz of Yale University described as Dr. Madigan's Vioxx litigation report as the:

"**Best report yet. By far**." Here is the e-mail:

From: Harlan Krumholz [mailto:harlan.krumholz@yale.edu]
Sent: Tuesday, October 09, 2007 8:12 AM
To: Eric H. Weinberg; John B. Kostis
Cc: David Madigan; Sigelman Daniel; Joseph Ross; Ken S. Soh
Subject: Re: super job

Great job! Best report yet. By far.

Thinking about this going forward -- the only other thing that seems really important is the timing of what was submitted to the FDA -- say around the labeling time -- and what was available from the data -- we are close to that here. And the other thing is that with these raw data we can show what happens if you use APTC and on-drug -- so, for example, you can show the cumulative rates with the alternative approaches and clearly state why it is important to, at the very least, look at it both ways -- and there is a strong argument for doing it the way we did -- with a focus on CV events and ITT.

Harlan

As the "Madigan project" evolved, it became clear that one critical aspect of the litigation that needed to be addressed was the failure to warn claim in post label change cases.  This was a difficult issue for the Plaintiffs.  Dr. Madigan's work was, in part, directed to that very issue.  Weinberg had developed a strategy to discover evidence about Merck's Alzheimer's Studies.  These Studies were the primary defense of the safety of Vioxx for Merck at the time the drug was on the market, and the primary defense for Merck in trials.  The MDL had tried, and failed, to attack the Alzheimer's Studies.  Weinberg was more successful, and part of his strategy was premised upon

the work he was doing with Dr. Madigan to uncover the truth of the scientific data in the Alzheimer's Studies.

What they did was to develop evidence that the revised product label that the FDA approved in 2002 was a lie. It was a lie with respect to the Alzheimer's Studies data that Merck provided to FDA and which FDA permitted Merck to include in the label. Weinberg, with Dr. Madigan and Sigelman, uncovered this fraud. This was the point of Weinberg's attack on the Alzheimer's Studies in New Jersey – an attack Merck tried, and failed, to quash.    In order for Dr. Madigan to do his work, he needed Merck's clinical study data. Weinberg and Sigelman agreed that Dr. Madigan would be protected from *Daubert* and credibility challenges if he could say that the data sets he used in his work were Merck's own datasets, and the analyses he did included Merck's own prespecified analyses for safety. Weinberg collected all of Merck's placebo controlled clinical study data, which was organized in a software program called SAS. These data had been turned over to liason counsel in New Jersey, but they were, as liason counsel noted, "a mess."

From the time Weinberg first requested the SAS production from liason counsel, until they were delivered to Dr. Madigan, took nearly six months. In June of 2006, Weinberg sent his IT technician, Joseph Laico, to the Seeger Weiss offices in New York City, to copy the data onto hard drives. Laico obtained the data, brought the drives to Weinberg, who then delivered them to Dr. Madigan. Dr. Madigan spent several hours cleaning up the data; this work enabled him to work with the data and was available to other scientists who were interested in it (for example, a set of the data were sent to Dr. Egilman.)

Weinberg organized a consortium of law firms to fund and share Dr. Madigan's work, beginning in 2006. No common benefit fees were charged for the project. The funding went to pay Dr. Madigan, not Weinberg. This was important to the New Jersey litigation, as no other attorneys

in New Jersey were working with a biostatistician to analyze Merck's clinical study data. The biostatistician retained by Seeger Weiss, Dr. Richard Kronmal was turned over to the MDL in 2005 and was no longer available for New Jersey counsel unless an assessment was paid to the MDL PSC.[4]

In April of 2006, Weinberg communicated another offer to collaborate with the MDL with Dr. Madigan. He authorized his colleague Dan Sigelman to make the offer to the MDL Chairs of the Science Expert Committees, John Restaino and Shelly Sanford. Despite the high praise Madigan has received from the MDL's own experts, and his obvious value to the litigation effort, the MDL PSC refused collaboration because they refused to allow the New Jersey lawyers any "bite" at the MDL apple, and instead hypothesized that instead of cooperating, they would just get their experts to do what Dr. Madigan had already done (presumably in order that they could just recreate the work product Weinberg had invented without having to pay for it):

> From: Sigelman, Daniel [mailto:dsigelman@CMHT.com]
> Sent: Tue 4/18/2006 8:49 AM
> To: John Restaino
> Cc: mayer james
> Subject: JOHN: I NEED YOUR GUIDANCE ASAP
>
> As you know, Jim and I have been doing a great deal of work on the clinical trials. We have numerous ideas that we would like to implement through a statistician with access to SAS data. **Eric Weinberg, with whom I also work on NJ litigation, is working with an excellent statistician, David Madigan, who has the SAS database.** Eric would like me to go up to NJ on Thursday to meet with Dr. Madigan to discuss the possibility of running several analyses Jim and I have been working on. **Eric is interested in the possibility of sharing Dr. Madigan with the MDL. I would like to know if you thought it would be all right for me to go to New Jersey to visit with Dr. Madigan on behalf of the MDL to explore the possibility of his serving in the future as a MDL expert.**

---

[4]In January 2006 there were discussions between New Jersey counsel and MDL leadership regarding a collaboration between New Jersey and the MDL that would eliminate assessments for some New Jersey firms; all MDL firms would not have to pay any assessments to New Jersey for work product. This offer to collaborate was rejected by the MDL.

By the way, Dr. Madigan knows and has worked with Dick Kronmal.

I strongly believe that we need to retain additional statistical experts to do work on the clinical trials that will strengthen our liability as well as causation cases. And I have some ideas which I am quite confident could do that. My concern right now is that people like Dick Kronmal have limited time to take on new projects. He has made that clear to others.

What say ye?

Daniel W. Sigelman

-----Original Message-----
From: John Restaino [mailto:jrestaino@lopez-hodes.com]
Sent: Tuesday, April 18, 2006 2:18 PM
To: Sigelman, Daniel
Cc: mayer james; shellysanford@goforthlewis.com
Subject: RE: JOHN: I NEED YOUR GUIDANCE ASAP

Gentlemen....

I apologize for the delay in responding - I wanted to hear from my counter-part, Shelly Sanford.

The issue which is in front of us is that the MDL has already retained, at great expense, two statisticians, Kronmall and Jewell...I know not if they have the SAS database but we can find out. How do we justify to the PSC another statistician and one which will also prove to be quite expensive? **Can we not have Kronmall and/or Jewell, both previously approved by the PSC, to do that which Dr. Madigan would do???**

----------------
-----Original Message-----
From: "Sigelman, Daniel" <dsigelman@CMHT.com>
Date: Tue, 18 Apr 2006 14:30:27
To:"John   Restaino"   <jrestaino@lopez-hodes.com>   Cc:"mayer   james" <mjw13@qwest.net>, <shellysanford@goforthlewis.com>
Subject: RE: JOHN:  I NEED YOUR GUIDANCE ASAP

I believe that Kronmal has limited time although he does have considerable amounts of SAS data.

And while I don't know much about Jewell, I believe that he has been centrally occupied with causation issues.  I may be mistaken, because I have had no

-76-

involvement with him.  I believe that Don has been working with him.  My concern is that there are many important liability issues for which SAS data would be helpful that have not been explored.

**Furthermore, Dr. Madigan has already been doing considerable work.  We are not starting from scratch with him (e.g., getting him SAS data, etc.)**

Jim and I have ideas that involve datasets we are confident are not being explored at this time by any statistician.

Jim, do you have anything to add?

From: Shelly Sanford [mailto:shellysanford@goforthlewis.com]
Sent: Tuesday, April 18, 2006 2:47 PM
To: Sigelman, Daniel; John Restaino
Cc: mayer james; shellysanford@goforthlewis.com
Subject: Re: JOHN: I NEED YOUR GUIDANCE ASAP

**Dan, one issue is some of these guys do considerable work for someone in a state court case and then the mdl winds up with the whole bill and frankly not all of the work product or incentive to non mdl lawyers to buy into the mdl  package because they also get the same guy in NJ or other state litigation.** I know you guys have legitimate liability issues to address, but we need to make sure our approved experts aren't duplicating the same data and don't plan to and that there is a reason we need to buy into it. That said, I told John if we can get a form completed and some good reasons we will take the expert through the process ...... Has to clear the science committee and then the administrative committe and then the pSC.

Restaino, do you have access to a form to get to Dan? And Dan, it is a little slow in the process but mostly only due to the fact that it is hard to get a psc quorum and the admin cttee all available for a call.

I am sorry for the inconvenience of this guys. I do think better to have it right than not though.

Shelly A. Sanford
Goforth Lewis Sanford LLP
1111 Bagby, Suite 2200
Houston, Texas 77002
(713) 650-0022
(713) 650-1669 (fax)

(emphasis added).

Despite the MDL's rejection of the offer of cooperation as purely a matter of money – who

would buy their trial package of they could get better evidence for free? –   Drs. Kronmal and Jewell did not replicate Dr. Madigan's work.  Dr. Madigan's unique and comprehensive analyses remain the most outstanding scientific analyses of Merck's data in the entire Vioxx litigation.  The work would clearly have been available to the MDL PSC had they wanted to work with Weinberg. It was the MDL – not Weinberg – who rejected the opportunity to share this critically important work product, at a time when the MDL PSC was struggling to win a case at trial.

Throughout 2006 and 2007, Dr. Madigan worked closely with Drs. Kostis and Altobelli on general and specific causation issues in the Vioxx litigation.  This work informed both cardiologists' understanding of causation and enabled them to provide opinions about individual cases.  As noted previously, several law firms called upon Drs. Kostis and Altobelli for help in reviewing client files, authoring case specific expert reports, and screening cases for filing or dismissal in this litigation, including Seeger Weiss, The Lanier Law Firm, Anapol Schwartz and Weitz & Luxenberg.  Drs. Kostis and Altobelli were, indeed, called upon to provide expert advice and counsel in several cases that went to trial, including Ernst, Cona, McDarby and Hermans.

Despite the MDL PCS's rejection of cooperation on grounds of putting their financial self intrest over the interest of the injured Vioxx plaintiffs, Weinberg communicated directly with Lanier in January of 2007 regarding Dr. Madigan's work with Dr. Krumholz, and shared, an offer which Lanier, at least, was willing to admit was a very valuable work contribution:

-----Original Message-----
From: David Madigan [mailto:dmadigan@rutgers.edu]
Sent: Friday, December 29, 2006 3:06 PM
To: Eric H. Weinberg
Cc: Sigelman@CMHT.com
Subject: deaths and CVT in AD

Attached is a spreadsheet with the AD studies examined in various ways.
There was some manual entry involved in creating this so let me know if

anything looks odd. There are slight differences with some of the numbers I sent yesterday. Also, there are still unresolved arguments about whether certain cases are confirmed deaths or not. D.


-----Original Message-----
From: Eric H. Weinberg [mailto:ehw@erichweinberg.com]
Sent: Friday, December 29, 2006 5:29 PM
To: Mark Lanier
Subject: FW: deaths and CVT in AD

Mark,

Here are two holiday presents for you since you have been good.

One is Madigan's work on Alzheimer's.  Pull column B wider for the yellow and the green columns; the dates of the data sets known to Merck are there.  Red column is ITT; red numbers are statistically significant RRs.  What is striking is the way Merck adjudicated its way out of trouble in order to use Alzheimer's affirmatively on cardiovascular risk.

It would be very helpful to look at the adjudication packages to be sure this is what it seems to be.

Also, what is not in here yet is the fact that in the original adverse event reporting on these studies, the Merck gatekeeper sent 67% of the placebo related adverse events for adjudication, but only 50% of the Vioxx related adverse events.  Madigan has calculated the difference as statistically significant. If the numbers were equal there would have been a bunch more Vioxx adjudicated events ab initio.

I asked Madigan to play around with making the original adjudications 67% for both Vioxx and placebo, and run the event numbers assuming 1/3 more Vioxx events were confirmed, just for fun.  Again, review of the adjudication packages is key.  But my sense is the overall data would not get any better for Merck and in fact would be worse.

The second document is Madigan's six month interim analyses of the primary endpoint data (conversion to Alzheimer's from MCI)in 078.  Page six is a summary of the data.  This is pretty compelling evidence that the drug was not good for patients on MCI and the lack of a ESMB meant Merck was not blinded to this data.  Yet they kept the patients on Vioxx.  (Madigan picked six months because that is typically how often ESMBs meet to discuss these kinds of data.)

I will make sure Krumholz and Egilman are informed.

Eric

-----Original Message-----
From: Mark Lanier [mailto:WML@lanierlawfirm.com]
Sent: Friday, December 29, 2006 10:38 PM
To: Eric H. Weinberg
Subject: RE: deaths and CVT in AD

**Thanks!!!!  A nice addition to our armory!**

(Emphasis added).

Weinberg invited the MDL to share Dr. Madigan's work product once again in June of 2007. There were cases pending trial in New Jersey, and Weinberg was interested in working with one MDL expert, Dr. Douglas Zipes, a cardiologist who testified in the sole MDL case in which a plaintiffs' verdict was returned.  Dr. Krumholz had advised counsel that he was not available to testify.  Weinberg knew that the MDL biostatistics experts (referenced in the 2006 email from Shelly Sanford, above) were no longer usable, and so the MDL needed a biostatistics expert and Dr. Madigan could clearly help them.

At a meeting in Philadelphia on June 14, 2007, Weinberg brought Drs. Madigan and David Egilman to share work product.  The meeting was attended by MDL lawyers Mark Robinson of Robinson Calcagnie Robinson, and Don Arbitblit and Jenny Gross of MDL firm Lieff Cabraser. Also in attendance were Texas lawyers John Boundas and Amy Carter, who had cases on the New Jersey trial list; Jerry Kristal from Weitz & Luxenberg and Sol Weiss of Anapol Schwartz, members of the New Jersey Consortium

Robinson had agreed to bring Dr. Zipes to the meeting.  However, the evening prior to the meeting, Russ Herman sent an email to the PSC.  Herman's basic message was that even though the

MDL had lost most of their trials, Herman and the MDL leadership were more concerned about

assessments than changing the course of the litigation by winning clients' cases.  This is the same

concern expressed by Sanford in her April 2006 email regarding collaborating with Weinberg and

Dr. Madigan:

> -----Original Message-----
>
> From: Russ Herman <RHERMAN@hhkc.com>
> Sent: Fri Jun 15 12:50:58 2007
> Subject: Vioxx - Divulging  PSC Information
>
> It has come to my attention that there is a meeting this date involving New Jersey
> counsel and certain members of the PSC.  The facts that I have are slim and I do not
> want to make any accusations that are untrue.  However, you should be aware that
> PTO No. 9 prohibits any divulging of PSC work product to attorneys who have not
> signed coordinating agreements.  Be particularly mindful that sharing information
> where the PSC has paid for and/or developed the same or you anticipate requesting
> the PSC to reimburse for the same is prohibited.  In order to protect the integrity of
> the PSC work product, Judge Fallon will take any infraction seriously.  This is a
> particular caution to PSC appointed members and the members of the PSC firms.
>
> Russ M. Herman

Dr. Madigan was designated as an expert in New Jersey Consortium firm trials scheduled

in January 2008, and his expert report was served upon Merck counsel on October 9, 2007.  The

MDL Trial Package, according to materials submitted to the MDL Court, was completed one week

earlier, on October 3, 2007, and was not included, despite Weinberg's repeated offers to share it.

Dr. Madigan's expert report has been commended, as noted previously, by Drs. Harlan Krumholz

and Dr. Jerome Avorn of Harvard, two of the leading drug safety experts in the world, who both

testified for Plaintiffs in the Vioxx litigation as MDL Witnesses!.

Weinberg advised the Fee Allocation Committee on December 1, 2008, that Dr. Madigan's

report and other of Weinberg's work product should be in the MDL Trial Package.  Weinberg had

provided Dr. Madigan's report in October 2007 to MDL attorney Don Arbitblit and David Buchanan at Seeger Weiss, who was New Jersey Liason Counsel and whose partner Chris Seeger was Lead Counsel in the MDL.  Weinberg advised the FAC that Drs. Avorn and  Krumholz had endorsed the report as the best analysis of science in the litigation.  Weinberg sent Russ Herman (and the entire Vioxx MDL PSC) Dr. Madigan's report on December 12, 2008 in the litigation.  (Weinberg also sent Herman documents and indeces relating to the effect of Vioxx on human bone, at Herman's request.)

Dr. Madigan's analyses and report integrating his methods of analyzing SAS data have shifted the paradigm of pharmaceutical drug litigation, and certainly provided new and compelling evidence to plaintiffs in Vioxx litigation.  Dr. Madigan worked with Dr. Krumholz in the February 2007 Hermans/Humeston II trial, and they later published together.  Dr. Madigan's approaches were shared with counsel.  Dr. Madigan did much to advance the scientific understanding of the Vioxx case and his work product was made available to plaintiffs' counsel in the United States and internationally.[5]  Dr. Madigan's approach to analyzing Merck's data to ascertain the dates upon which relevant risks became statistically significant has become the sine qua non of pharmaceutical drug litigation in the United States.[6]

---

[5] Weinberg was advised in late 2008 by Ken Soh of the Lanier Law Firm that an Australian law firm, Slater Gordon, was interested in retaining Dr. Madigan to prepare a report and testify in a Class Action litigation in Australia on behalf of all persons who took Vioxx and suffered heart attacks and strokes.  Weinberg agreed, so long as he participated in the matter, since Dr. Madigan's evidence in Vioxx was still relevant to non-injury Vioxx cases in which Weinberg was involved.  Weinberg met with Australian counsel and Dr. Madigan in New Brunswick, New Jersey in January 2009.  Weinberg worked with Dr. Madigan and Australian counsel to revise Dr. Madigan's report to a suitable format for the Australian litigation.  In May 2009, Weinberg accompanied Dr. Madigan to Melbourne, at his own expense, where Dr. Madigan testified for the Plaintiffs, who prevailed.

[6] MDL PSC firm Lieff Cabraser retained Madigan, with Weinberg's permission, in a medical monitoring class action case captioned Sinclair v. Merck in 2007.  Dr. Madigan was retained by FAC firms Seeger Weiss and Weitz & Luxenberg in Celebrex/Bextra securities and personal injury

(continued...)

One further point is in order.  At the time of the settlement, there were ten cases pending trial in New Jersey.  Weinberg and Placitella were to participate in those trials, as they had in earlier trials, as a part of the New Jersey Consortium.  Weitz & Luxenberg had cases in the trial mix, as did Anapol Schwartz.  Weinberg's expert, Dr. Madigan, was the key liability expert for both firms. Weitz & Luxenberg partner Jerry Kristal had written to Weinberg in June of 2007 to express his regard for Weinberg's work with Dr. Madigan and his interest in offering Dr. Madigan's evidence at the trials:

> -----Original Message-----
> From: Kristal, Jerry [mailto:Jkristal@weitzlux.com]
> Sent: Monday, June 18, 2007 4:27 PM
> To: Eric H. Weinberg; Chris Placitella; Pennock, Paul; Gordon, Robert
> Subject: Madigan
>
> **I was very impressed by your and his work on the SAS data.** There has been ongoing discussions for almost a year re: our helping defray the cost of his retention. Have we chipped in yet? If so, is there more that is needed? If not, how much to get in now?
>
> I presume he will be issuing a report and then will be deposed. He seemed very bright, straightforward and a tad upset at Merck's manipulation of the data. We would like to list him as an expert in our cases coming up, so if that is possible please let me know how we get there.
>
> My suggestion for a report would be to articulate both when a "reasonable association" first arose from the data Merck had and the significance of his analyses to causation. As always, I am probably stating the obvious.

Likewise, Anapol Schwartz also intended to offer Dr. Madigan, as well as Weinberg's Dr. Altobelli,

---

[6](...continued)
litigation cases in 2008 and 2009.   Jerry Kristal from Weitz & Luxenberg asked Weinberg if he objected to Dr. Madigan's work on Celebrex/Bextra cases and Weinberg responded that he did not (Weinberg did not have any Celebrex/Bextra cases.)  The Weitz firm also retained Dr. Madigan in Seroquel personal injury litigation cases.  Weitz & Luxenberg has recently obtained the Seroquel SAS data, following the strategic lead developed by Weinberg and his colleague Dan Sigelman in the Vioxx litigation.

in their cases.  Thus, at the time of the settlement, there were trials scheduled where Merck would have had to confront new evidence that the MDL's experts had called the "best" evidence developed so far. This new evidence was all developed under the guidance of Weinberg, the head of the New Jersey science and expert "committee" in that state's consortium.

If the success in New Jersey had anything to do with the settlement, it was not just the cases in which Plaintiffs obtained verdicts.  It was the cases that were pending trial in November of 2007, and the thousands of cases behind them.  These cases were all supported by the paradigm-shifting work product accomplished by Placitella and Weinberg.  The marketing fraud evidence would only get better.  The scientific approach taken by Weinberg was driven by Merck's own data, and was a novel departure and expansion of any scientific evidence that had been offered previously.

One month passed between service of Dr. Madigan's report which established new evidence, and the publication of information regarding the Vioxx Settlement.  Based upon information from third parties, substantial progress was made in the last month of the negotiations, including as to financial terms.  We have no direct knowledge of this, as we were not party to the negotiations.  If true, however, the import of the paradigm shifting work of Dr. Madigan is apparent.

## VI.    HELP WITH MDL EXPERTS AND DEPOSITIONS

Weinberg was asked by David Buchanan for assistance with respect to the expert reports authored by MDL experts Dr. Wayne Ray and Dr. Richard Kronmal.

### Dr. Wayne Ray

On March 10, 2005, David Buchanan asked Weinberg to provide insights and comments upon the draft expert report of Wayne Ray, PhD,, who became an MDL expert.  Weinberg knew Dr. Ray very well.  He had retained Dr. Ray in the Baycol litigation in September 2002 - before anyone had

retained Dr. Ray to provide expert consultation in the Vioxx litigation.  Dr. Ray's report in the Baycol litigation, dated January 30, 2003, was addressed to Weinberg.  The report is a masterful analysis of post market surveillance and signal generation in the pharmaceutical industry.  The draft report Dr. Ray had authored for Vioxx followed a similar outline to the report he had authored in the Baycol litigation.

   On March 14, 2005, Weinberg sent Buchanan a version of Dr. Ray's draft report which included Weinberg's annotated comments.  Weinberg and Buchanan had a conference call to discuss these comments on March 15, 2005, and then had a conference call with Dr. Ray, to go over the report and discuss Weinberg's insights and comments. On March 15, 2005, Weinberg sent Buchanan another annotated version of Dr. Ray's draft report with further insights and comments.  On March 22, 2005, Buchanan sent the next draft of Dr. Ray's report to Weinberg.  On March 29, 2005, Weinberg sent Buchanan additional comments.  Weinberg was never provided with a final version of Dr. Ray's report, which is in the MDL Trial Package.

### Dr. Richard Kronmal

   Weinberg arranged, at Buchanan's request, a consultation on the medicine between Drs. Kronmal and Kostis:

> -----Original Message-----
> From: Buchanan, David [mailto:dbuchanan@seegerweiss.com]
> Sent: Friday, March 25, 2005 11:20 AM
> To: Eric H. Weinberg
> Subject: Kronmal/Kostice
>
>
> Eric, as discussed yesterday, I'd like to arrange a call between Kostice and Kronmal to discuss some CV issues for use in Kronmal's report.  Kronmal  was looking for some guidance on some clinical type points.

   Weinberg also arranged a conference call between Drs. Kronmal and Madigan.  Weinberg

and Buchanan participated in the call.  The scientists had already begun a dialogue, and Weinberg and Buchanan agreed that a mutual peer review process would be helpful, and so it began in 2005.

### Dr. John Guerigian

Weinberg's work with Dr. Guerigian is discussed in the context of the Humeston I trial. Weinberg had worked with him previously, in the Baycol litigation.  Weinberg retained and worked with Dr. Guerigian before he became an MDL expert and Dr. Guerigian provided insight and help in Humeston I.

### Curfman Deposition

Weinberg prepared to depose Dr. Gregory Curfman in January of 2007.   He stepped up to take the deposition when it was critical that someone do so:

> -----Original Message-----
> From: Buchanan, David [mailto:dbuchanan@seegerweiss.com]
> Sent: Wednesday, January 03, 2007 2:17 AM
> To:  WML@lanierlawfirm.com; Lisa.Dagostino@KlineSpecter.com; Grand, Jeff;
> Horn, Moshe; Seeger, Chris; cvtisi@aol.com; RDM@lanierlawfirm.com; Eric H.
> Weinberg;  DARBITBLIT@lchb.com;  erelkin@weitzlux.com;
> ppennock@weitzlux.com; jgross@lchb.com; Tom.Kline@KlineSpecter.com
> Subject: Re: Urgent: Curfman and EOC
>
> Who can step forward and take lead in examination if we are forced to go forward?

Weinberg prepared for the deposition.  He prepared a fourteen page outline and had exhibits including documents and video cuts in folders ready to go.

However, there was a miscommunication.  Tom Kline would take Dr. Curfman's deposition. Weinberg was disappointed, having prepared carefully for the deposition.  But he recognized that the litigation was a team effort, and so he supported Kline at the deposition in Boston.

From: Kline, Thomas R. <Tom.Kline@KlineSpecter.com>

To: ehw@erichweinberg.com <ehw@erichweinberg.com>; Wml@lanierlawfirm.com <Wml@lanierlawfirm.com>; cplacitella@cprlaw.com <cplacitella@cprlaw.com>; Dagostino, Lisa S. <Lisa.Dagostino@KlineSpecter.com>; sweiss@anapolschwartz.com <sweiss@anapolschwartz.com>
CC: Buchanan, David <dbuchanan@seegerweiss.com>; Seeger, Chris <cseeger@seegerweiss.com>
Sent: Tue Jan 16 14:27:40 2007
Subject: Re: curfman

Eric and I have already spoken and will work closely together tonight to make this come out right for everyone... Tom.

His colleagues, who made the error, deeply apologized, and in the processs acknowledged

Weinberg's major contribution to the Vioxx Litigation effort:

From: Mark Lanier [mailto:WML@lanierlawfirm.com]
Sent: Tuesday, January 16, 2007 12:05 PM
To: Eric H. Weinberg; Dagostino, Lisa S.; Chris Placitella; sweiss@anapolschwartz.com
Cc: Buchanan, David; Kline, Thomas R.; Seeger, Chris
Subject: RE: curfman

Eric...

After all you've done, my apology is VERY inadequate... Tom will use the Laine cut. You are right.. It should be used. Thank you for all you have done and all you do and all you will do.... I owe you major. Sorry I have screwed up this process (to borrow Placitello's correct wording!)

Thank you for being who you are...

Lanier

Likewise, Chris Seeger, co-lead of both the MDL and the consolidated New Jersey Litigation,

expressed his appreciation of Weinberg's contributions:

-----Original Message-----
From: Seeger, Chris [mailto:cseeger@seegerweiss.com]
Sent: Tuesday, January 16, 2007 2:45 PM
To: Eric H. Weinberg; WML@lanierlawfirm.com; cplacitella@cprlaw.com; Lisa.Dagostino@KlineSpecter.com; SWeiss@anapolschwartz.com

Cc: Buchanan, David; Tom.Kline@KlineSpecter.com
Subject: Re: curfman

I second Mark's sentiments.  **Eric, your work in this case has been outstanding. Thanks.**

(Emphasis added).

## VII.  CONTINUED COMMMITMENT AND EFFORT AFTER THE LAST MERCK VERDICT

The last MDL Vioxx trial, Dedrick v. Merck, was tried in December 2006 and resulted in another verdict for Merck.  There were no further trials in the MDL.  The Court has indicated that lawyers whose commitment to the litigation did not ebb after a number of verdicts went in Merck's favor should be awarded common benefit fees.

The following is Weinberg's work in 2007, following the Merck verdict in Dedrick.  The list includes projects that developed trial useable evidence, participating in putting key evidence into the Hermans/Humeston trial, organizing consortiums of firms on scientific projects, trial preparation, and case specific discovery, suing the FDA over FOIA violations, and other work that clearly evidences that Weinberg's commitment to the litigation did not ebb whatsoever.  Indeed, it would be difficult to find an attorney in the Vioxx litigation who ranks higher in this category than Weinberg.

- Ongoing development of statistical analyses and causation model in collaboration with Dr. John Kostis, Dr. David Madigan, Dr. Curt Furberg, and collaborating firms

- Ongoing intensive document search and review with respect to the Alzheimers Studies

- Ongoing intensive document search and review with respect to the NitroMed/Merck collaboration

- Ongoing intensive document search and review with respect to the Placebo Study database provided to Dr. Madigan

- January 2007, Deposition of Dr. Gregory Curfman, Second Chair (Boston)

- February/March 2007 Trial participation in the Hermans/Humeston trial including putting Dr. Madigan's work into evidence through Dr. Krumholz

- Alzheimer's project: proof of fraud in the label and how it got there

- Motion filed for Commission for NitroMed corporate deposition

- April 2007 filed suit (Weinberg v. FDA) for failure to comply with FOIA

- April 2007 served Notice of Deposition for Merck Alzheimers witness

- April 2007 consulted with Drs. Alderman/Psaty/Furberg/Krumholz on causation issues

- May 2007 Organized case specific discovery meeting in Philadelphia

- June 2007 Organized trial preparation meeting inviting MDL collaboration for January 2008 New Jersey trials with Drs. Madigan & Egilman in Philadelphia

- Organized renewal of work on STI project

- July to August 2007, Receipt of FDA Motion to Stay FOIA Complaint and Response

- July 2007 Preparation for and Deposition of Gordon Letts PhD of NitroMed in Boston

- July/August 2007 Preparation for and Deposition of Gilbert Block MD in Philadelphia

- July to November 2007 Preparation for New Jersey trials in Jan 2008

- August 2007 Creation of NJ expert expense fund

- August/September 2007 collaboration with Drs. Kostis and Krumholz to define CVT terms for Dr. Madigan's analysis

- October 2007 Organized meeting of New Jersey counsel to help develop uniformity in responses to case specific discovery from Merck; in Philadelphia, PA.

- October 2007, Organized meeting of counsel on New Jersey trials set for January 2008

- October 2007 Service of Dr. Madigan's report on Merck in NJ trials

- October 2007 Denial in USDC NJ of FDA's Motion to Stay proceedings on FOIA

- October 2007 Order entered in USDC NJ for Mediation on FDA FOIA

- October 2007 Merck request to compel production of FDA documents obtained pursuant to FOIA action denied by Judge Higbee

- October 2007 Preparation of Dr. Madigan for deposition

- August to October 2007 Preparation for and Deposition of Gilbert Block MD in Philadelphia

- Preparation of Summary of Alzheimer's Study analysis

Because the MDL had effectively stopped working on new discovery in Vioxx, and there was little else going on across the country, Weinberg was for all intents and purposes the lawyer conducting the most discovery, and implementing more different strategies, and organizing more of his colleagues, than any other lawyer much less law firm in the country.

## VIII.   THE JOANNE LAHNER MOTION AND PRIVILEGED DOCUMENTS

Placitella led a team of lawyers who challenged Merck's refusal to produce a key witness for deposition.  The witness was Joanne Lahner, Esq, a Merck in-house attorney.  Placitella

recognized that Merck's claims of privilege as to many documents was based upon Lahner's participation. Placitella developed the argument that Lahner was not acting as an attorney in these discussions, as reflected in the documents. Rather, Merck was using Lahner as a shield to protect against discovery of documents that reflected fraudulent marketing strategies, not legal decisions that might properly be privileged.

The MDL has represented to the Court that it did substantial work on uncovering privileged documents. It has recently become clear, however, that the work was incomplete. While a sampling of documents with privilege claims were submitted to and reviewed by the Special Master, and rulings were made that some documents were not entitled to privilege in whole or in part, and the deprivileged documents were sent by Merck to Herman, Herman and Seeger Weiss, it turns out that (a) the documents, sent in the summer of 2007, were never reviewed by the MDL PSC; (b) the documents were sent in a format that is highly difficult to review; and (c) the documents were not coded to permit them to be searched by word topic.

## IX.    PREPERATION OF AND PARTICIPATION IN WAVE ONE CASES

The New Jersey Consortium had 126 out of 298 cases in Wave One, representing 42% of all of the cases in Wave One. As with the cases pending trial in the summer of 2007, Weinberg and Placitella were working in support of all of the New Jersey Consortium cases with respect to evidence and experts and would have been supported by their colleagues in the Consortium had their cases been selected for trials in the next group of cases. Personally, Placitella and Weinberg were working up 23 individual cases for trial in the in the summer of 2007. They had trial responsibility for the Wilentz Goldman and Spitzer cases as well, bringing their total to 27 cases.

| Firm | # of cases |
|---|---|
| Seeger Weiss | 44 |
| Anapol | 42 |
| Weitz | 37 |
| Lewis and Roberts | 18 |
| Rheingold | 16 |
| Weinberg | 15 |
| Branch | 11 |
| Jones Martin Parris & Tessner | 11 |
| Motley Rice | 9 |
| Cohen Placitella | 8 |
| Levin Fishbein | 7 |
| Levin Pap | 7 |
| Locks | 7 |
| Ferrara Law Firm | 6 |
| Kaiser | 6 |
| Miller and Associates | 6 |
| Kline and Specter | 5 |
| Sanders Viener | 5 |
| Williams Bailey | 5 |
| Wilentz Goldman and Spizer | 4 |
| Ashcraft and Gerel | 3 |
| Audet and Partner | 3 |
| Hovde Dassow and Deets | 3 |
| Levin Simes and Kaiser | 3 |
| Matthews | 3 |
| Morelli Ratner | 3 |
| The Lanier Law Firm | 3 |
| Douglas and London | 2 |
| Jeffrey Lowe PC | 1 |
| Kasowitz | 1 |
| Parker and Waichman | 1 |
| Randazzo | 1 |
| Sheller Ludwig | 1 |
| Whitehead | 1 |

## X.    FIGHTING THE FOIA FIGHT

Much is made in by the MDL PSC about their work on FDA issues.  Weinberg had

obtained and analyzed the FDA Summary Approval Packages, and had retained five FDA

experts, before the MDL was started.  While the MDL apparently negotiated with FDA and

obtained some FDA documents, there is a paucity of evidence that the MDL PSC actually analyzed the FDA issues in a manner that was helpful at trials.

Weinberg continued to press the FDA issues in this litigation. As noted previously, it was Weinberg to whom Seeger Weiss turned for help on FDA issues in the first Humeston trial. It was Weinberg and Placitella to whom Weitz & Luxenberg turned for help on FDA issues in the McDarby trial. Weinberg and Placitella, working with Relkin and Kristal, framed the issues that incorporated the evidence that persuaded the Appellate Division to affirm McDarby on the presumption issue.

In April of 2007 Weinberg filed suit against the FDA in the United States District Court for New Jersey. FDA filed a Motion to Stay Weinberg's Complaint. Weinberg filed opposition to the Motion. In October the Motion was denied by Judge Hochberg. Merck counsel then wrote to Weinberg asking for all documents Weinberg had ever obtained from FDA related to Vioxx through the Freedom of Information Act:

Weinberg refused to agree to provide all of his work product to Merck. Merck brought the matter to Judge Higbee and it was discussed at a status conference in Atlantic County in October 2007. Following discussion, during which Weinberg objected to Merck's efforts to compel production, Judge Higbee rejected Merck's contention.

From start to finish in the Vioxx litigation there was not another lawyer on the Plaintiffs side who did more to learn about Merck's interactions with FDA, to review FDA documents and find and circulate key portions of the documents to experts and colleagues, to retain and educate FDA experts and make them available to colleagues, and to litigate discovery issues with FDA, than Weinberg.

XI.   DEPOSITIONS TAKEN, SECOND CHAIRED AND ATTENDED BY
        PLACITELLA AND WEINBERG

| Date & Time | Fact Text | Source(s) |
|---|---|---|
| Wed<br><br>01/19/2005 | Chris Placitella participates in Wendy Dixon deposition | |
| Thu<br><br>01/20/2005 | Chris Placitella participates in Wendy Dixon deposition | |
| Wed<br><br>03/02/2005 | Eric Weinberg attends Reicin deposition. Witness examined<br><br>by others. | |
| Tue<br><br>03/22/2005 | Dr Edward Scolnick deposed by David  Buchanan<br><br>Eric Weinberg attended | |
| Thu<br><br>03/24/2005 | Chris Placitella and Eric Weinberg attend Gilmartin<br><br>deposition. Seeger is lead | |
| Mon<br><br>06/13/2005 | Placitella defends David Egilman deposition | |
| Wed<br><br>08/03/2005 | Chris Placitella takes lead on McKinnes deposition | |
| Thu<br><br>08/04/2005 | Chris Placitella takes lead on McKinnes deposition | |
| Fri<br><br>08/05/2005 | Chris Placitella takes lead on Dixon deposition for NJ | |
| Mon<br><br>08/08/2005 | Eric Weinberg second chair on Honig Deposition, Tisi is<br><br>lead | |
| Wed | Placitella takes lead on Jan Weiner deposition | |

| 08/10/2005 | Eric Weinberg second chair | |
|---|---|---|
| Thu 08/11/2005 | Placitella takes lead on Jan Weiner deposition Eric Weinberg second chair | |
| Fri 08/12/2005 | Placitella takes lead on Jan Weiner deposition Eric Weinberg second chair | |
| Tue 08/30/2005 | Chris Placitella second chair at Westrick deposition. Motley lead | |
| Thu 09/01/2005 | Eric Weinberg defends Tom Nesi deposition | |
| Fri 09/09/2005 | Chris Placitella first chair Charlotte McKines deposition | |
| Fri 11/14/2005 | Eric Weinberg second chair Gregory J. Coram deposition, Jerry Kristal first chair | |
| Tue 11/29/2005 | Mary Elizabeth Blake deposed by Chris Placitella as lead Eric Weinberg second chair | |
| Tue 01/24/2006 | Curfman deposition by Don Arbitblit. Eric Weinberg present for NJ | |
| Wed 01/25/2006 | Jo Jerman deposed. Lead by Papantonio. Chris Placitella second chair for NJ | |

| | | |
|---|---|---|
| Thu<br><br>02/09/2006 | Mary Elizabeth Blake deposed by Chris Placitella as lead<br><br>Eric Weinberg second chair | |
| Mon<br><br>02/13/2006 | Laura Demopoulos deposed. Lanier Law Firm and Eric<br><br>Weinberg are lead Chris Placitella second chair. | |
| Fri<br><br>02/17/2006 | Laura Demopoulos deposed. Eric Weinberg lead.<br><br> Chris Placitella second chair. | |
| Tue<br><br>03/14/2006 | Eric Weinberg first chair deposition of Dr Hui Quan | |
| Thu<br><br>05/25/2006 | Laura Demopoulos deposed. Lanier Law Firm lead. Chris<br><br>Placitella and Eric Weinberg second chair. | |
| Tue<br><br>07/18/2006 | Eric Weinberg second chair Dr Ned Braunstein, Dan<br><br>Sigelman first chair | |
| Wed<br><br>07/19/2006 | Eric Weinberg second chair Dr Ned Braunstein, Dan<br><br>Sigelman first chair | |
| Thu<br><br>10/12/2006 | Eric Weinberg first chair deposition of Donald Nicholson | |
| Wed<br><br>01/17/2007 | Curfman deposition by Tom Kline, Eric Weinberg present<br><br>for HJ | |
| Wed<br><br>07/18/2007 | Eric Weinberg first chair deposition of L Gordon Letts | |

| Tue 08/07/2007 | Eric Weinberg first chair deposition of Gilbert Block MD | |
|---|---|---|
| Tue 10/30/2007 | Eric Weinberg first chair deposition of Gilbert Block MD | |

## XII.   THE ALZHEIMERS STUDIES DEPOSITIONS AND DISCOVERY – UNCOVERING CRITICAL NEW EVIDENCE OF EARLY RISK AND FRAUD IN THE 2002 LABEL

The discovery of information related to Merck's Alzheimer's Studies was critical, becuase those studies had figured prominently in the early defense verdicts.  The MDL had investigated the Alzheimer's Studies in 2005.  Weinberg communicated with MDL PSC lawyer Chris Tisi about the deposition he took of Merck's Clinical Monitor for Protocols 078 and 091, the two Alzheimer's Studies mentioned in Merck's 2002 revised label.  There were several emails between Weinberg and Tisi on this subject; essentially Tisi acknowledged that his deposition of Dr. Block had been non-productive and frustrating.

Weinberg, however, had a different strategy, different documents, and thanks to his work with Dr. Madigan a much deeper understanding of the truth about the Alzheimer's Studies data.  Weinberg had already developed a strategy designed to overcome representations about the Alzheimer's Studies, both because the Studies lacked integrity and Merck violated confidentiality rules by unblinding data improperly; and that based upon Merck;s own prespecified standards, the data demonstrated a risk of cardiovascular thrombotic events on Vioxx as early as 2000, or four years before Merck pulled Vioxx off the market.

As a result, Weinberg's deposition of Dr. Block produced trial useable evidence, according to

Dr. Egilman, who has consulted with Plaintiffs' counsel on more cases resulting in Plaintiffs's verdicts than any other consultant in the entire litigation.   Dr. Egilman attended Weinberg's deposition of Block.

## CONCLUSION

Weinberg and Placitella had significant and critical roles in the successful New Jersey Consortium that supported every trial in New Jersey.   Time and again their colleagues called upon them for help, and they responded.   Placitella created what is perhaps the most strategically creative marketing discovery strategy ever employed in a mass tort litigation, and the evidence that resulted was without question dynamite.   MDL lawyers, in a pathetic attempt at imitation, and solely in an effort to protect their fees, tried to replicate Placitella's work.   They failed.   His work supported every case tried in New Jersey – Humeston I, Cona/McDarby, Doherty, and Hermans/Humeston II. His work was also used in the MDL cases, and cases tried in state courts across the country.   It was acclaimed by the leading trial lawyer in this litigation, Mark Lanier, as the most important evidence of fraud in the entire litigation.   It was shared without compromise or demand that fees of the lawyers who used it be taxed.

Weinberg and Placitella were called upon by Seeger Weiss, The Lanier Law Firm and Weitz & Luxenberg, in every case they tried in New Jersey, to provide assistance.   In each case – Humeston I, Cona, McDarby, Hermans and Humeston II – experts in FDA regulation and the science and medicine of Vioxx that Weinberg had recruited, retained and educated provided critical guidance, advice and analyses to these firms.   In Humeston I it was FDA consultants Jay Geller JD and Dr. John Guerigian, and Thomas Nesi, the retired marketing expert.   In Cona/McDarby it was the FDA

-98-

experts and Dr. John Kostis.  In Hermans/Humeston it was Dr. David Madigan, Dr. Kostis, and Dr. Anthony Altobelli.

The ability of these experts to consult, advise and shape the course of the regulatory and scientific proofs that ultimately led to successful verdicts for New Jersey Plaintiffs was derived from their long standing working relationships with Weinberg and Placitella, who recruited them, retained them, educated them, and guided them to the key issues of concern in this litigation.  It was no accident that, for example, when Seeger Weiss desperately needed help in Humeston I on FDA regulatory issues and on the cross examination of Merck's FDA expert, they turned to Eric Weinberg.  It was known by them and others that Weinberg was the lead lawyer in the New Jersey litigation on the regulatory law and science and medicine of the case.  Similarly, Placitella was the lead lawyer – indeed, the only lawyer – in New Jersey who could build the sophisticated, elegant and damning marketing fraud case that won cases and turned the litigation around for the Plaintiffs.

There is an injustice in the way the MDL PSC, whose record in trials speaks for itself, and who refused offers from Weinberg and Placitella to adapt and improve the work product available to lawyers to try their cases solely due to their own selfish financial interests, have treated two outstanding lawyers whose colleagues called upon them, again and again, for help in winning cases at trial.  When the correct legal principles of fee allocation are applied, and the FAC's self-serving allocation is rejected as failing miserably to comport with prevailing law, Weinberg and Placitella will be awarded their lodestars at the rates prevailing for similarly skilled and experienced lawyers in their area. It will then be up to this Court to compare their work to the work of firms who were awarded HUGE fees with HUGE multipliers who did far less work for the common benefit, although they might have been in favor with MDL leadership and as a result sat on numerous

committees scoring points under the grid system. Much good work was done by all involved in the

Vioxx collaborative effort. Weinberg and Placitella only ask for their fair share.


/s/ Robert E. Arceneaux                                    /s/ Margaret E. Woodward
_____          _____
Robert E. Arceneaux, La Bar No. 01199      MARGARET E. WOODWARD, La. Bar
ROBERT E. ARCENEAUX LLC                  No.13677
47 Beverly Garden Drive                          3701 Canal Street, Suite C
Metairie, LA 70001                                  New Orleans, Louisiana  70119
(504) 833-7533 office                                (504) 301-4333 office
(504) 833-7612 fax                                   (504) 301-4365 fax
rea7001@cox.net                                      mewno@aol.com


Pascal F. Calogero, Jr., La. Bar No. 03802
AJUBITA, LEFTWICH & SALZER, L.L.C.
1100 Poydras Street
New Orleans LA 70163-1950
(504)582-2300 office
(504) 582-2310 fax
pcalogero@alsfirm.com


COUNSEL FOR ERIC WEINBERG AND COHEN, PLACITELLA AND ROTH

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail, and by upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre Trial Order No.8, on this date, May 8, 2011

/s/ Robert Arceneaux

_____