Exhibit "33"

Confidential - Subject to Protective Order

Page 1

1          UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF LOUISIANA
2                   -   -   -
    IN RE:  VIOXX         :   MDL DOCKET NO.
3   LITIGATION            :   1657
4   ------------------------------------------
    SUPERIOR COURT OF THE STATE OF CALIFORNIA
5            COUNTY OF LOS ANGELES
                CENTRAL CIVIL WEST
6
    VIOXX CASES           :   JCCP NO. 4247
7                         :   ASSIGNED TO HON
                          :   VICTORIA CHEYNEY
8                   -   -   -
                 CONFIDENTIAL
9       SUBJECT TO PROTECTIVE ORDER
                    -   -   -
10               May 9, 2006
                    -   -   -
11       Videotape deposition of DAVID J.
12  GRAHAM, M.D., M.P.H, held at The
13  Renaissance Mayflower Hotel, 1127
14  Connecticut Avenue, N.W., Washington,
15  D.C. 20036, commencing at 9:23 a.m., on
16  the above date, before Linda L. Golkow, a
17  Federally-Approved Registered Diplomate
18  Reporter and Certified Shorthand
19  Reporter.
                    -   -   -
20
21       GOLKOW LITIGATION TECHNOLOGIES
                Four Penn Center
22       1600 John F. Kennedy Boulevard
                  Suite 1210
23       Philadelphia, Pennsylvania 19103
                877.DEPS.USA
24

**KS-000300**

Confidential - Subject to Protective Order

Page 2

1  A P P E A R A N C E S :
2
3      KLINE & SPECTER, P.C.
         BY:  THOMAS R. KLINE, ESQUIRE
4            and
         LEE B. BALEFSKY, ESQUIRE
5            and
         LISA DAGOSTINO, M.D., J.D.
6            and
         MICHELLE L. TIGER, ESQUIRE
7         (Via Telephone)
      19th Floor - 1525 Locust Street
8      Philadelphia, Pennsylvania 19102
       (215) 772-1000
9       Counsel for Plaintiffs
10
11     SEEGER WEISS LLP
         BY:  DAVID R. BUCHANAN, ESQUIRE
12           and
         MOSHE H. HORN, ESQUIRE
13           and
         JEFFREY GRAND, ESQUIRE
14        (Via Telephone)
      Suite 920 - 550 Broad Street
15     Newark, New Jersey 07102
       (973) 639-9100
16      Counsel for Plaintiffs
17
18     ASHCRAFT & GEREL
         BY:  CHRISTOPHER TISI, ESQUIRE
19           and
         MICHELLE A. PARFITT, ESQUIRE
20           and
         JENNIFER L. ORENDI, ESQUIRE
21     Suite 400 - 2000 L Street, N.W.
       Washington, D.C. 20036
22     (202) 783-6400
        Counsel for Plaintiffs
23
24           - - -

Page 3

1  A P P E A R A N C E S :  (CONTINUED)
2
3      HERMAN, HERMAN, KATZ & COTLAR
         BY:  LEONARD A. DAVIS, ESQUIRE
4      201 St. Charles Avenue
       Suite 4310
5      New Orleans, Louisiana 70170
       (504) 581-4892
6       Counsel for the Plaintiffs
7
8      LEVIN SIMES & KAISER & GORNICK LLP
         BY:  STEVEN B. STEIN, ESQUIRE
9      14th Floor
       One Bush Street
10     San Francisco, California 94104
       (415) 646-7160
11     sbs@lskg-law.com
        Counsel for California Plaintiffs
12
13
14     BLIZZARD, McCARTHY & NABERS, LLP
         BY:  J. SCOTT NABERS, ESQUIRE
       Suite 1710
15     440 Louisiana Street
       Houston, Texas 77002
16     (713) 844-3750
        Counsel for Plaintiffs
17
18
19     LOPEZ, HODES, RESTAINO, MILMAN,
       SKIKOS & POLOS
         BY:  JOHN M. RESTAINO, JR., ESQ.
20     2nd Floor
       450 Newport Center Drive
21     Newport Beach, California 92660
       (949) 640-8222
22      Counsel for Plaintiffs
23           - - -
24

Page 4

1  A P P E A R A N C E S :  (CONTINUED)
2
3      HAGENS BERMAN SOBOL SHAPIRO LLP
         BY:  HUGH E. MCNEELY, ESQUIRE
4      Fourth Floor - One Main Street
       Cambridge, Massachusette 02142
5      (617) 482-3700
       hugh@hbsslaw.com
6       Counsel for California
       Plaintiffs
7
8
9      MARTIN & JONES
         BY:  MARTIN A. RAMEY, ESQUIRE
       Suite 200
10     410 Glenwood Avenue
       Raleigh, North Carolina 27603
11     (919) 821-0005
       mar@m-j.com
12      Counsel for New Jersey
       Plaintiffs
13
14
15     AYLSTOCK, WITKIN & SASSER
         BY:  KENNETH W. SMITH, ESQUIRE
       Suite 200
16     2121 Eisenhower Avenue
       Alexandria, Virginia 22314
17     (703) 778-5978
       ksmith@aws-law.com
18      Counsel for Plaintiffs
19
20     ALEXANDER HAWES & AUDET LLP
         BY:  SUSANNE N. SCOVERN, ESQUIRE
21     Suite 1460
       221 Main Street
22     San Francisco, California 94105
        Counsel for Plaintiffs
23
24           - - -

Page 5

1  A P P E A R A N C E S :  (CONTINUED)
2
3      GOFORTH LEWIS SANFORD LLP
         BY:  SHELLY A. SANFORD, ESQUIRE
4      Suite 2200 - 1111 Bagby
       Houston, Texas 77002
5      (713) 650-0022
        Counsel for Plaintiffs
6       (Via Telephone)
7
8      THE O'QUINN LAW FIRM
         BY:  STEPHANIE SHAPIRO, ESQUIRE
9      2300 Lyric Centre Building
       Houston, Texas 77002
10     (713) 223-1000
        Counsel for the Plaintiffs
11      (Via Telephone)
12
13     BARTLIT BECK HERMAN
         BY:  PHILIP S. BECK, ESQUIRE
14           and
         SHAYNA COOK, ESQUIRE
15           and
         KEN BAUM, M.D., ESQUIRE
16     Courthouse Place
       54 West Hubbard Street
17     Chicago, Illinois 60610
       (312) 494-4451
18      Counsel for Merck and Co., Inc.
19
20     WILLIAMS & CONNOLLY LLP
         BY:  DOUGLAS R. MARVIN, ESQUIRE
21           and
         R. HACKNEY WIEGMANN, ESQUIRE
22     725 Twelfth Street, N.W.
       Washington, D.C. 20005
23     (202) 434-5400
        Counsel for Merck & Company, Inc.
24           - - -

**KS-000301**

Confidential - Subject to Protective Order

Page 6

1  a P P E A R A N C E S:  (CONTINUED)
2
3     STINNETT THIEBAUD & REMINGTON LLP
        BY:  RUSSELL G. THORNTON, ESQUIRE
4       Suite 2500
        1445 Ross Avenue
5       Dallas, Texas 75202
        (214) 954-2200
6       Counsel for Texas physicians
7
8     CRUSE, SCOTT, HENDERSON & ALLEN,
        LLP
9     BY:  VICTORIA A. FILIPPOV, ESQUIRE
        7th Floor
10      2777 Allen Parkway
        Houston, Texas 77019-2133
11      (713) 650-6600
        Counsel for Texas physicians
12
13            - - -
14
15  A L S O  P R E S E N T:
16
17    GOVERNMENT ACCOUNTABILITY PROJECT
        BY:  JOANNE ROYCE, ESQUIRE
18         and
         MARK COHEN, ESQUIRE
19      Suite 1100
        1612 K Street, N.W.
20      Washington, D.C. 20006
        (202) 408-0034
21      Counsel for David Graham,
        M.D., M.P.H.
22
23
24

Page 7

1  A L S O  P R E S E N T:  (CONTINUED)
2
3     U.S. DEPARTMENT OF HEALTH AND
        HUMAN SERVICES
        OFFICE OF THE GENERAL COUNSEL
4     BY:  MARC L. CADEN, ESQUIRE
           and
5       MICHAEL LEVY, ESQUIRE
        Office of the Chief Counsel
6       Food and Drug Administration
        5600 Fishers Lane, GCF-1
7       Rockville, Maryland 20857
        (301) 827-7141
8       Counsel for the Food & Drug
        Administration
9
10
11    UNITED STATES DEPARTMENT OF
        JUSTICE
12    BY:  GERALD C. KELL, ESQUIRE
        Office of Consumer Litigation
        P.O. Box 386
13      Washington, D.C. 20044
        (202) 514-1586
14      Counsel for the Food & Drug
        Administration
15
16
17    KIRKE D. WEAVER, ESQUIRE
        Merck & Co., Inc.
18      351 N. Sumneytown Pike
        North Wales, PA 19454-2505
        (267) 305-6331
19
20
21    KLINE & SPECTER
        ROBERT ENGLERT, Legal Assistant
22
            - - -
23
24

Page 8

1            - - -
2         I N D E X
3  WITNESS            PAGE NO.
4
5  DAVID J. GRAHAM, M.D., MPH
6
7    By Mr. Kline        33, 460
8    By Mr. Beck         227
9
10           - - -
11        E X H I B I T S
12  NO.      DESCRIPTION     PAGE NO.
13
14  Graham-1    Curriculum Vitae of  47
              David Graham
15
16  Graham-2    "Drug Safety in     89
              America: A Nation
              Still at Risk,"
17            (Graham) Power
              Point Slides
18            DG000035 - DG000061
19
20  Graham-3    "Rofecoxib         172
              Diagnosis and
21            Treatment: What
              went wrong?  Can we
22            avoid?" (Graham)
              PowerPoint Slides,
              DG000014 - DG000034
23
24

Page 9

1  Graham-4    "Risk of acute     195
              myocardial
2             infarction and
              sudden cardiac
3             death in patients
              treated with
4             cyclo-oxygenase 2
              selective and
5             non-selective
              non-steroidal
6             anti-inflammatory
              drugs: nested
7             case-control study"
              (Graham, et al) The
8             Lancet 2-5-05 Vol.
              365, 475-481
9
10  Graham-5    "Review of         197
              Epidemiologic
11            Studies on
              Cardiovascular Risk
12            with Selected
              NSAIDs," (Graham)
13            PowerPoint Slides,
              2-17-05
14            DG0000107-DG0000127
15
16  Graham-6    Letter 5-5-06      232
              (1 page)
17
18  Graham-7    E-mails            235
              (2 pages)
19
20  Graham-8    "COX-2 selective   253
              non-steroidal
21            anti-inflammatory
              drugs and
              cardiovascular
22            disease," (Ray, et
              al) Pharmacology
23            and Drug Safety
              2003; 12: 67-70
24

**KS-000302**

Confidential - Subject to Protective Order

Page 10

1   Graham-9   "High frequency of   258
2       use of rofecoxib at
3       greater than
        recommended doses:
4       Cause for concern,"
        (Griffin, et al)
5       Pharmacoepidemiolog
        y and Drug Safety
6       2004; 13: 339-343
7   Graham-10   "Cohort Analysis   279
8       Myocardial
        Infarction Risk and
9       COX2 Use in the
        Kaiser Large
10      Observational
        Thrombosis Study
11      (KLOTS) (Levy, et
        al) ACR Abstract
12      (1 page)
13  Graham-11   "Risk of Acute   288
14      Cardiac Events
        Among Patients
15      Treated with
        Cycloxygenase-2
16      Selective and
        Non-Selective-
17      Nonsteroidal
        Anti-Inflammatory
18      Drugs Category: 06
        Osteoarthritis
19      clinical aspects"
        American College of
20      Rheumatology
        Abstract
21      (1 pages)
22  Graham-12   E-mail 5-25-04   292
23      KP002153
24

Page 11

1   Graham-13   "Risk of Acute   296
2       Myocardial
        Infarction and
3       Sudden Cardiac
        Death with Use of
4       COX-2 Selective and
        Non-Selective
5       NSAIDs" (Graham, et
        al)
6       KP001521 - KP001526
7   Graham-14   E-mails with   305
8       attachment
        "Comments on ISPE
9       Paper"
        FDACDER006048 -
10      FDACDER006049
11  Graham-15   E-mails   313
12      FDACDER011048 -
        FDACDER011049
13
14  Graham-16   E-mails   321
        FDACDER006056 -
15      FDACDER006058
16  Graham-17   E-mails   325
17      FDACDER021810 -
        FDACDER021811
18
19  Graham-18   E-mails   328
        FDACDER010352 -
        FDACDER010353
20
21
22
23
24

Page 12

1   Graham-19   Memo 10-29-04   337
2       "Review of reports
        of FDA/Kaiser Vioxx
3       study: Questions
        about
4       Inconsistencies and
        Bias,"
5       FDACDER022462 -
        FDACDER022470
6
7   Graham-20   E-mails   349
        FDACDER022789
8
9   Graham-21   E-mails   353
        KP001136 - KP001138
10
11  Graham-22   E-mails   357
        FDACDER022247 -
        FDACDER022249
12
13  Graham-23   E-mails   361
        TOPOLE0000333
14
15  Graham-24   E-mails   364
        FDACDER022681
16
17  Graham-25   Chart   374
        FDACDER005940
18
19  Graham-26   E-mail 10-23-04   392
        KP002315
20
21
22
23
24

Page 13

1   Graham-27   Memo 9-30-04 "Risk   406
2       of acute myocardial
        infarction and
3       sudden cardiac
        death in patients
4       treated with COX-2
        selective and
5       non-selective
        NSAIDs"
6       FDACDER022369 -
        FDACDER022388
7
8   Graham-28   E-mail 10-22-04   411
        FDACDER022409
9
10  Graham-29   E-mail with   413
        attachment "Risk of
11      Acute Myocardial
        Infarction and
12      Sudden Cardiac
        Death in Patients
13      Treated with COX-2
        Selective and
14      Non-Selective
        NSAIDs" (Graham, et
15      al)
        KP001133;
16      KP001133A -
        KP001133X
17
18  Graham-30   "FDA Medical   423
        Review:
19      Cardiovascular
        analysis for
20      Vioxx," (Targum)
        2-1-01
21      MRK-ABX0002367 -
        MRK-ABX0002404
22
23
24

Confidential - Subject to Protective Order

Page 14

1   Graham-31   "Cardiovascular   426
        Events Associated
2        with Rofecoxib in a
        Colorectal Adenoma
3        Chemoprevention
        Trial" (Bresalier,
4        et al) NEJM
        3-17-05, 352;11:
5        1092-1102
6
7   Graham-32   Memo 4-6-05   441
        "Analysis and
8        recommendations for
        Agency action
9        regarding
        non-steroidal
10       anti-inflammatory
        drugs and
11       cardiovascular
        risk"
12       (19 pages)
13   Graham-33   FDA Performance   476
        Evaluation Plan
14       (4 pages)
15
16   Graham-34   Memo 11-6-00   480
        "Consulting
17       agreement for Wayne
        A. Ray, Ph.D."
18       MRK-ABT0018298
19   Graham-35   E-mails   482
        MRK-ACV00363335
20
21   Graham-36   E-mails   490
        FDACDER011046 -
22       FDACDER011047
23
24

Page 16

1        DEPOSITION SUPPORT INDEX
2
3
    Direction to Witness Not To Answer
4   Page Line  Page  Line
    (None)
5
6
7
8
    Request For Production of Documents
9   Page Line  Page  Line
    (None)
10
11
12
13
    Stipulations
14  Page Line  Page  Line
    (None)
15
16
17
18
    Questions Marked
19  Page Line  Page  Line
    (None)
20
21
22        - - -
23
24

Page 15

1   Graham-37   E-mail 8-16-04 with   492
        attachment "ISPE
2        Poster"
        MRK-ACM0002855 -
3        MRK-ACM0002856
4
5   Graham-38   Handwritten notes   496
        MRK-GAR0016806 -
6        MRK-GAR0016807
7   Graham-39   E-mails   548
        FDACDER023033 -
8        FDACDER023037
9
10  Graham-40   E-mail 11-14-04   553
        FDACDER022932 -
11       FDACDER022933;
        FDACDER021558 -
12       FDACDER021577 with
        attachment
13
14  Graham-41   E-mails   556
        FDACDER029127 -
        FDACDER029133
15
16
17
18
19
20
21
22
23
24

Page 17

1        - - -
2        MR. KLINE:  Before you go on
3   the record, a couple of things on
4   the stenographic record.
5        First of all, two things
6   that I know Mr. Beck and I will
7   agree on.
8        One, everybody turn their
9   cell phones off.  Make sure your
10  cell phones are off.
11       Number two, for those folks
12  who are on the phone, we've had
13  issues before on the phone.  If
14  there's feedback on the phone, if
15  somebody puts their phone on hold
16  or gets Muzak or some static,
17  we're going to have to cut the
18  whole line.  So, everybody should
19  know that in advance.  I'm just
20  going to ask Linda, whether it's
21  in my examination or Mr. Beck's,
22  to cut the line.
23       You have everybody on the
24  record, Linda?

**KS-000304**

Confidential - Subject to Protective Order

Page 18

1      THE COURT REPORTER:  Yes.
2      MR. KLINE:  Formally for the
3   plaintiffs, I'm here with Dr.
4   Dagostino to my left, also Lee
5   Balefsky, Chris Tisi, and Lenny
6   Davis, who are the lawyers
7   responsible for the deposition.
8      MR. BECK:  Tom, I'm having a
9   hard time hearing you right now.
10  So, people are going to have to
11  lean back or you're going to have
12  to speak up.
13     MR. KLINE:  Maybe I can get
14  the room mic closer.  Does that
15  help you?
16     MR. BECK:  No.
17     MR. KLINE:  Not really.  I
18  think both of us are going have
19  the same problem all day.  I will
20  speak up.  I'll speak up, and
21  you'll try to do so also.
22     Before we go on the video, a
23  couple more things.
24     The deposition of Dr. Graham

Page 19

1   is, of course, under subpoena.  It
2   was the subject of a court order.
3   There are a couple of counsel here
4   who may not be familiar with
5   certain things, and I just want to
6   make sure we all know the ground
7   rules.
8      The deposition is governed
9   by Pretrial Order Number 9, which
10  clearly states: "All objections
11  except to those as to form and
12  privilege are reserved until trial
13  or other use of the depositions."
14  So, there's no need for anybody to
15  interrupt.  It further says -- and
16  that includes everybody.
17     It says: "Counsel shall
18  refrain from engaging in colloquy
19  during deposition.  The phrase
20  objection to form or similar
21  language shall be sufficient to
22  preserve all objections as to the
23  form until the deposition is
24  sought to be used.  And only

Page 20

1   then," Judge Fallon said, "the
2   objecting party shall provide a
3   sufficient explanation if it's
4   requested by the questioner.
5      "Counsel shall not make
6   objections or statements which may
7   suggest an answer to the witness."
8      So, nobody needs to make any
9   objections.
10     MR. BECK:  Just expanding on
11  that, the last point, Counsel
12  should not -- could you read what
13  you just said there?
14     MR. KLINE:  I sure will.
15  "Counsel shall not make objections
16  or statements which might suggest
17  an answer to the witness."
18     MR. BECK:  So that the
19  record is clear on the approach
20  that I'll be taking to objections,
21  as I understand the rules in
22  Federal Court as well as the state
23  courts where this has been
24  noticed, leading questions are

Page 21

1   objectionable as to form.  So, I
2   would ask, Doctor, to give me time
3   to interpose an objection so we're
4   not talking over one another if,
5   in fact, Mr. Kline starts asking
6   leading questions.  Because I will
7   be objecting, Tom, on form grounds
8   as to any leading questions.
9      MR. KLINE:  And I will be,
10  too, if appropriate, on
11  cross-examination.
12     MR. BECK:  Right.
13     MR. KLINE:  So we're clear,
14  Phil, the rules are clear that
15  all you need to do if you have a
16  leading question is simply to
17  state objection as to form.  It's
18  preserved.  No speeches.
19     MR. BECK:  Right.
20     MR. KLINE:  And we'll all
21  get along fine.
22     All other objections are
23  preserved for both your side and
24  the plaintiffs' side.

**KS-000305**

Confidential - Subject to Protective Order

Page 22

1    MR. BECK:  I understand.
2    MR. KLINE:  There's no need
3  to raise those objections, and
4  there will be many, I would think.
5    MR. BECK:  I've been in
6  depositions before.
7    MR. KLINE:  I understand.
8  But I've also seen some of the
9  depositions already in this
10  litigation.  So, I just wanted to
11  make sure we all understood each
12  other.
13    MR. KELL:  Counsel, I'm
14  Gerald Kell from the Justice
15  Department.  I just want to make a
16  brief statement because I have not
17  been in one of these depositions
18  in this case before.
19    MR. KLINE:  Well, welcome.
20    MR. KELL:  The government in
21  this case does not represent Dr.
22  Graham, even though he is
23  subpoenaed as an FDA employee.  We
24  do assume that the protective

Page 23

1  order entered by The Court on July
2  20, 2005, particularly Paragraph
3  4, applies here.  I may be making
4  objections in one of those areas
5  that you mentioned, privilege.
6  There are certain governmental
7  privileges like deliberative
8  process and investigatory
9  privilege.  If the question calls
10  for that, I will make that
11  objection and simply state just
12  that simply, the basis for it.
13    I do want to say that,
14  without making a speech, every
15  time I make an objection, if I
16  make an objection on one of those
17  governmental privilege grounds,
18  it's the government's position
19  that the question should not be
20  answered.  We have no power or
21  authority to instruct the witness
22  not to answer.
23    MR. KLINE:  Understood.  And
24  I assume then that you'll take it

Page 24

1  up with Judge Fallon at some
2  point.
3    MR. BECK:  Tom, again, I do
4  this so that we can avoid
5  arguments once we start the
6  deposition.
7    MR. KLINE:  Sure.
8    MR. BECK:  The judge has
9  also entered orders when approving
10  this deposition restricting the
11  scope.
12    MR. KLINE:  Yes.
13    MR. BECK:  If, in fact,
14  either side asks questions outside
15  the scope as approved by the
16  judge, as far as I'm concerned,
17  that's an appropriate area to
18  raise an objection.
19    MR. KLINE:  Well, I would
20  think that those -- maybe we can
21  agree to agree.  I would think
22  those objections, since they do
23  not fall within Order Number 9,
24  Pretrial Order Number 9, that

Page 25

1  those would simply be preserved.
2    MR. BECK:  I feel compelled
3  to raise those.  Hopefully, we
4  won't have any, but if we do, that
5  will be one where I feel I need to
6  make a record as we go.
7    MR. KLINE:  Okay.  I
8  would --
9    MR. BECK:  The reason for
10  that is because we've done our
11  best to review Dr. Graham's public
12  statements on various issues and
13  feel like we have a decent handle
14  on them.  If he talks in an area
15  where he hasn't spoken publicly
16  before, we want to raise the
17  objection, and then if we can be
18  corrected and directed to where
19  he's raised this before, then I'll
20  want to cross-examine him on it.
21  But if not, then I won't.  So,
22  that's the reason why in that area
23  I may have an objection along the
24  way.

Confidential - Subject to Protective Order

Page 26

1     Another area is, if you
2  intend to use documents that were
3  informally produced by Dr. Graham
4  from FDA computers and files that
5  were not pursuant to the
6  plaintiffs' subpoena to the FDA in
7  this case, where Dr. Graham's
8  lawyers for some reason were
9  willing to have him provide a
10  couple hundred pages of documents
11  for plaintiffs' lawyers based on
12  an informal request, when we made
13  a similar request, we were told it
14  was against the rules for him to
15  produce documents from the FDA
16  computer files, we'll have an
17  objection to the use of any
18  documents that were obtained in
19  that manner.  But when you get
20  there, we can just divert, I can
21  state that, and we don't have to
22  have an argument.  But I want to
23  state it on the record.
24     MR. KLINE:  Sure.  You can

Page 27

1  consider it raised right now so
2  that you don't have to raise it
3  later.  I intend to work with some
4  of those documents, principally
5  the PowerPoints.  Your objection
6  is noted.  You don't have to
7  interrupt after that.
8     MR. BECK:  Well, I just need
9  to point out which documents they
10  are as we go unless you do --
11     MR. KLINE:  I can tell you
12  that the PowerPoints which were
13  produced --
14     MR. BECK:  -- when he starts
15  testifying -- this isn't good
16  enough.  When he starts testifying
17  and he gets to one of the
18  documents, I think you and I know
19  what the documents are, I'll
20  simply note for the record the
21  objection that I previously raised
22  concerning the use of documents
23  informally produced, and that will
24  be it.

Page 28

1     MR. KLINE:  Fine.  That's
2  fair enough.  But we do intend to
3  use those documents, and those
4  documents, there's a good record
5  as to when they were produced to
6  us and when they were immediately
7  turned over to you.  That's a
8  different issue for a different
9  day.  I understand.
10     MR. BECK:  Sure.
11     MR. KLINE:  Let me just
12  think of a few more things.
13     On the issue of those things
14  which you just raised on the
15  things that you might raise, my
16  view of the order is a simple one,
17  which is that -- and I understand
18  there are certain things you might
19  do, but my view of the order is
20  that the order means what it says.
21  So, I will consider our objections
22  preserved as to those things, for
23  example, that are outside of the
24  scope of public statements.  For

Page 29

1  example, if you cross-examine on
2  internal FDA documents, putting
3  aside the privilege issues that
4  there might be that the FDA might
5  raise, I'm just going to take
6  Judge Fallon's order at its word
7  and assume that those issues can
8  just be raised with the judge
9  later.  For example, if you
10  examine on hearsay documents that
11  were not within the ambit of Dr.
12  Graham documents that he's never
13  seen before, which clearly is the
14  way Judge Fallon rules that a
15  witness should not be shown those
16  documents -- here's my only point.
17  I assume that those are preserved
18  under the rule because I, for one,
19  don't want to be interrupting you
20  all the time.
21     MR. BECK:  That's fine.
22     MR. KLINE:  Last point.
23     This is more directed to FDA
24  counsel and Dr. Graham's counsel,

KS-000307

Confidential - Subject to Protective Order

Page 30

1  which is something that Mr. Beck
2  alluded to, which is that Judge
3  Fallon has an order, and I
4  expect to live up to it, I can
5  tell you in advance, and I would
6  expect that -- I would hope that
7  Mr. Beck would, but we'll see
8  where his cross-examination goes.
9  It says Dr. Graham can testify
10 about things that were public
11 before.  The judge specifically
12 cited to testimony before
13 Congress, on television, in print
14 and at professional meetings.  So,
15 he essentially laid out four
16 categories.  And then in his
17 opinion and in his Order, he said
18 that the deposition is "limited to
19 matters relevant to this
20 litigation and to which Dr. Graham
21 has previously addressed."  So,
22 that's where I intend to go with
23 my examination.  Unless you have
24 something else, Mr. Beck, I'm

Page 31

1  ready to start.
2      MR. BECK:  No, I'm ready.
3      MR. KLINE:  Okay.  Thank
4  you, sir.
5          - - -
6      (Whereupon, an
7  off-the-record discussion was
8  held.)
9          - - -
10     THE VIDEOTAPE TECHNICIAN:
11 We are now on the record.  My name
12 is Marck Reisbord.
13     Today's date is May 9, 2006,
14 and the video time is 9:23 a.m.
15     We are here in the matter of
16 In Re:  Vioxx litigation MDL
17 Number 1657.
18     The deponent is David
19 Graham, M.D.
20     The court reporter is Linda
21 Golkow and she will now swear in
22 the witness.
23          - - -
24     DAVID J. GRAHAM, M.D., MPH,

Page 32

1  after having been duly sworn, was
2  examined and testified as follows:
3      MR. KLINE:  Off the video
4  record.
5      THE VIDEOTAPE TECHNICIAN:
6  Stand by, 9:23.  Off the video
7  record.
8      MR. KLINE:  Last point, Mr.
9  Beck.  Last point, which is that
10 we have an agreement that we're
11 going to split the time equally,
12 seven hours of actual run time.
13 We're going to split it equally.
14 I'm going to take about
15 two-and-a-half hours and then take
16 an hour or so on redirect.  We've
17 also agreed in an e-mail exchange
18 between Mr. Mayer and Mr. Tisi
19 that pursuant to the way Judge
20 Fallon conducts things, there will
21 be no recross.  That's the
22 agreement.
23     MR. BECK:  The agreement is
24 also that that your redirect will

Page 33

1  be limited to the scope of my
2  cross-examination.
3      MR. KLINE:  Sure.  Yes.  I
4  understand.
5      MR. BECK:  There was talk
6  before about some other
7  plaintiffs' lawyers who said they
8  wanted to participate.
9      MR. KLINE:  No one else is
10 going to unless something happens
11 to me in between.
12          - - -
13     (Whereupon, an
14 off-the-record discussion was
15 held.)
16          - - -
17     THE VIDEOTAPE TECHNICIAN:
18 The time is 9:25.  We're back on
19 the record.
20          - - -
21     EXAMINATION
22          - - -
23 BY MR. KLINE:
24     Q.   Dr. Graham, good morning.

KS-000308

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 34

1    A.   Good morning.
2    Q.   My name is Tom Kline. I'm
3  here to question you on behalf of
4  thousands of Vioxx claimants.
5         Are you prepared to answer
6  questions today?
7    A.   Yes, I am.
8    Q.   You're here under subpoena.
9  Do you understand that, sir?
10   A.   Yes.
11   Q.   And also under a Court Order
12 by Judge Fallon in the Eastern District
13 of Louisiana.  Do you understand that?
14   A.   Yes.
15   Q.   And do you understand that
16 your testimony is limited in scope and
17 nature based on prior public statements,
18 including to Congress, the media, as well
19 as professional meetings?
20   A.   Yes.
21   Q.   I intend to examine you in
22 those areas.  I'm going to take about
23 two-and-a-half hours to start, pursuant
24 to a time agreement, and I want to move

Page 35

1  very efficiently through many different
2  areas, that includes your background,
3  your knowledge and views of the FDA, your
4  involvement and knowledge of Vioxx, your
5  involvement in the Kaiser study, as well
6  as to some other things of which you have
7  knowledge and have stated previously,
8  public positions in either professional
9  meetings or before the Congress or the
10 media.  You're prepared to do so?
11   A.   Yes, I am.
12   Q.   Okay.
13        I would like to know who you
14 are, sir.  What is your current title and
15 position at the FDA?
16   A.   I'm a medical officer and
17 the associate director for science and
18 medicine in the Office of Drug Safety.
19   Q.   What does that job involve,
20 sir?
21   A.   I'm the senior scientific
22 adviser for the office.  I mentor the
23 scientific staff.  I advise the office
24 director on all scientific and medical

Page 36

1  matters.  I oversee intramural and
2  extramural research programs within the
3  office and serve as a resource to the
4  center, the Center For Drug Evaluation on
5  epidemiologic matters as well.
6    Q.   You are an epidemiologist,
7  sir?
8    A.   Yes, I am.
9    Q.   And you're also a physician?
10   A.   That's correct.
11   Q.   So, you hold an M.D. degree
12 as well; is that correct?
13   A.   Yes.
14   Q.   And you're a long-time
15 employee of the FDA?
16   A.   Yes.
17   Q.   How many years, sir?
18   A.   About 22.
19   Q.   This deposition is about
20 many of your public statements.
21        One you made on November 18,
22 2004 to the United States Senate Finance
23 Committee.  You said, to quote you,
24 "Vioxx is a terrible tragedy and a

Page 37

1  profound regulatory failure.  I would
2  argue that the FDA as currently
3  configured is incapable of protecting
4  America against another Vioxx.  We are
5  virtually defenseless."  Did you make
6  that statement?
7    A.   Yes, I did.
8    Q.   You also made a statement on
9  November 18 before the United States
10 Senate where you said, "Vioxx is the
11 single greatest drug safety catastrophe
12 in the history of this country."  Did you
13 make that statement, sir?
14   A.   Yes, I did.
15   Q.   Do you stick by that
16 statement, sir?
17   A.   I do.
18   Q.   You also said, "The FDA, its
19 Center for Drug Evaluation and Research,
20 are broken."  Did you make that
21 statement, sir?
22   A.   Yes, I did.
23   Q.   Do you believe that and do
24 you stick to it today?

**KS-000309**

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 38

1   A.   Yes, I do.
2        Q.   Sir, have you devoted your
3   entire professional life to drug safety?
4        A.   Yes.
5        MR. BECK:  Objection, form.
6   BY MR. KLINE:
7        Q.   What have you devoted your
8   entire --
9        MR. BECK:  Please, can we
10       have a pause so that I can
11       interpose my objection, and then,
12       even if you answer over my
13       objection, if you can answer
14       again so that --
15       THE WITNESS:  I apologize.
16       MR. BECK:  -- when we edit
17       the videotape, we won't be talking
18       over one another.
19       So, my objection was to
20       form, and would you please answer
21       now.
22       THE WITNESS:  Please repeat
23       the question.
24       MR. KLINE:  He will be

Page 39

1        saying nothing more than objection
2   to form.  I will go back to the
3   question.
4   BY MR. KLINE:
5        Q.   I'm going to rephrase the
6   question based upon his suggestion.  Mr.
7   Beck is helping me today.
8        Sir, within the FDA, to what
9   have you devoted your entire professional
10  activities and professional life?
11       A.   Post-marketing drug safety
12  and public health.
13       Q.   What is post-marketing
14  safety, sir?
15       A.   It's examining the safety of
16  drug products once they've been approved
17  for marketing.
18       Q.   Do you have any interest of
19  any kind in the Vioxx litigation, sir?
20       A.   No.
21       Q.   Do you have any financial
22  interest in any drug company or any other
23  kind of conflict that you can think of
24  that you would disclose here?

Page 40

1        A.   I have none that I can think
2   of.
3        Q.   Today, sir, are you here on
4   behalf of the FDA as an FDA
5   representative or are you expressing your
6   own opinions?
7        A.   Well, I've been -- I
8   honestly don't know the answer.  I've
9   been subpoenaed as an FDA employee, but
10  undoubtedly some of my opinions will not
11  represent those of the agency.
12       Q.   I want to talk somewhat
13  about your background.  I want to do it
14  efficiently, but I do want the jury to
15  know about you.
16       You have -- I'm going to
17  walk through it.  Hopefully, Mr. Beck
18  won't consider some of it leading.  I
19  don't think it's controversial.
20       You have a Bachelor's Degree
21  from Johns Hopkins; is that correct?
22       A.   Yes.
23       Q.   In what year, sir?
24       A.   1976.

Page 41

1        Q.   You graduated Phi Beta
2   Kappa?
3        A.   Correct.
4        Q.   Meaning?
5        A.   That's a scholastic honorary
6   society that's awarded to people who
7   graduate in the top of their class.
8        Q.   Then you went to medical
9   school where, sir?
10       A.   Johns Hopkins University.
11       Q.   You graduated second in your
12  class?
13       A.   That's correct.
14       Q.   Do you know what the person
15  who was first in your class is doing?
16       A.   Yes.  He's the chairman of
17  surgery now at a major university.
18       Q.   You then went on to get a
19  Master's Degree in public health, is that
20  correct?
21       A.   Yes.
22       Q.   Tell us about that.  Where
23  did you get the Master in public health,
24  and what did that involve?

KS-000310

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 42

1    A.   I went to the Johns Hopkins
2  University School of Public Health and
3  spent eleven months studying
4  epidemiology, biostatistics and computer
5  science, as well as some course work in
6  general public health matters.  It was
7  part of a three-year fellowship in
8  epidemiology with the Public Health
9  Service.
10    Q.   That epidemiology fellowship
11  was actually at the Food & Drug
12  Administration?
13    A.   That's correct.
14    Q.   So, that's how you got your
15  first involvement at the FDA?
16    A.   Yes.
17    Q.   You're a career FDA person
18  then?
19    A.   Yes.
20    Q.   You did an internship and
21  residency at Yale first; is that correct?
22    A.   Yes.
23    Q.   Then you did a residency in
24  neurology?

Page 43

1    A.   Correct.
2    Q.   Which is a subspecialty of
3  medicine, of course, correct?
4    A.   Well, no.  It's independent
5  of internal medicine.  It's a separate
6  discipline.
7    Q.   Yes.  In other words, you
8  did an internship and residency in
9  internal medicine, then you did another
10  residency, correct?
11    A.   Correct.
12    Q.   A second residency?
13    A.   Yes.
14    Q.   That second residency being
15  at the University of Pennsylvania?
16    A.   Correct.
17    Q.   So, you have an internship
18  at Yale, residency at Penn in neurology
19  and then your training in epidemiology?
20    A.   Right.
21    Q.   Your epidemiology training
22  was three years?
23    A.   Three years.
24    Q.   What is the -- and if you

Page 44

1  could be precise, what is the study of
2  epidemiology?
3    A.   Epidemiology, I think, is
4  the study of the causes and distribution
5  of diseases in populations.  And in the
6  area of drug epidemiology, it is looking
7  at the distribution and causes of
8  drug-induced injuries, but you could also
9  be looking for the patterns of the way
10  drug products are used in the population.
11    Q.   Okay.
12       How have you used
13  epidemiology during your entire
14  professional life?
15    A.   It's been in the practice of
16  pharmacoepidemiology or drug safety.
17    Q.   And what is
18  pharmacoepidemiology, sir?
19    A.   It's a fancy word for drug
20  safety epidemiology, "pharmaco" referring
21  to drugs, "epidemiology," study of the
22  distribution and causes of disease.
23    Q.   Now, you've had in your
24  career at the FDA various positions; is

Page 45

1  that correct, sir?
2    A.   Yes.
3    Q.   Did those various positions,
4  as you moved from position to position,
5  involve promotions?
6    A.   Yes.  Although you have to
7  understand in the government that pay
8  promotions don't happen very often.
9  They're pretty much regimented.  But I
10  did receive my GS 15 as an expert, which
11  was a promotion based on expertise.  And
12  then I received a second promotion as a
13  master medical reviewer, which was also
14  based on performance and expertise.
15    Q.   You said a moment ago that
16  in the government, promotions aren't
17  sometimes financial?
18    A.   Correct.
19    Q.   Are you in your position and
20  do you do what you do based on financial
21  incentive largely?
22    A.   No.  There are people who
23  have the same pay scale as I do who
24  jobs with far less responsibility.

**KS-000311**

Confidential - Subject to Protective Order

Page 46

1      Q.   Are you motivated for any
2   reason to be in public service, sir, and
3   if so, why?
4          MR. BECK:  Object to form.
5          THE WITNESS:  I believe -- I
6      believe in public health, and I
7      believe that this is a way that I
8      can make a difference in patients'
9      lives.
10  BY MR. KLINE:
11     Q.   Do you believe you have,
12  sir, in the past 20 years, made a
13  difference in the lives of people?
14     A.   Yes.  It's my belief that
15  I've probably helped more people by
16  pursuing a public health career than I
17  would have had I gone a more traditional
18  route of being a practitioner and seeing
19  patients one at a time.
20     Q.   Tell us, how is that, sir?
21     A.   From the perspective, a
22  public health perspective, and sitting at
23  FDA where we're responsible for all drugs
24  marketed in the United States, I've come

Page 47

1   to view the U.S. population as my
2   patient.  So, essentially, I have 300
3   million patients, and I take that
4   responsibility very seriously.
5      Q.   That doesn't leave time for
6   house calls?
7      A.   No, it does not.
8      Q.   Along the way, sir, in your
9   career at the FDA, have you received many
10  different awards?
11     A.   Yes, I have.
12     Q.   As well as honors?  I think
13  it's called in your curriculum vitae
14  honors and awards; is that correct?
15     A.   Correct.
16         MR. KLINE:  I'm going to
17     mark your curriculum vitae as
18     Exhibit 1 so we have it as part of
19     this record.
20            - - -
21         (Whereupon, Deposition
22     Exhibit Graham-1, Curriculum
23     Vitae of David Graham, was marked
24     for identification.)

Page 48

1             - - -
2   BY MR. KLINE:
3      Q.   I'd like to discuss some of
4   them with you.
5      A.   Should I take this?
6      Q.   Yes.  I'm going to hand you
7   a copy.  I'm sure you're familiar with
8   it.
9          Would you confirm that
10  indeed that's your curriculum vitae?
11     A.   Yes, it is.
12     Q.   If you would turn to Page 3.
13     A.   Yes.
14     Q.   By my count, you have
15  something in the neighborhood of 25
16  different awards by the FDA.  Is that
17  approximately correct?
18     A.   Yes.  That's the
19  neighborhood.
20     Q.   And a further, sir, 18 of
21  those awards or roughly, that's my count,
22  were between the period of 1999 and 2004?
23     A.   Correct.
24     Q.   And these are -- an honor

Page 49

1   and an award is a decoration, correct?
2      A.   Yes.
3      Q.   So, you were decorated by
4   the FDA at least 18 times in the
5   five-year period before 2004 when your
6   Kaiser study was a matter of discussion
7   at the FDA?
8      A.   That's correct.
9          MR. BECK:  Objection, form.
10         THE WITNESS:  That is
11     correct.
12         MR. KLINE:  I will rephrase
13     the question.
14  BY MR. KLINE:
15     Q.   How many times, sir, in the
16  period leading up to 2004, in the
17  five-year period leading up to 2004, were
18  you decorated, namely, honors and awards
19  by the FDA?
20     A.   Numerous times.  You've used
21  the number 18, and I'll take your word
22  for it.  Otherwise, I'll waste time
23  counting them all.
24     Q.   Let me go back and discuss

KS-000312

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 50

1  with you some of those awards, what they
2  were for. For example, if you look at
3  1999, starting in 1999, you got two
4  different awards, the FDA Special
5  Recognition Award. Would you read that
6  for us, sir?
7      A.  "FDA Special Recognition
8  Award for troglitazone and risk of acute
9  liver failure."
10     Q.  And the other one in 1999,
11 sir?
12     A.  "FDA Group Honor Award for
13 trovafloxacin restriction due to acute
14 liver failure."
15     Q.  What did those awards
16 involve?
17     A.  You mean what was the work
18 that was behind them?
19     Q.  Yes. And why did you get
20 the award?
21     A.  I did research with each of
22 these drugs that demonstrated that --
23 their association with acute liver
24 failure, that these drugs were

Page 51

1  responsible for causing acute liver
2  failure at rates much, much higher than
3  in the general population, rendering
4  these drugs unsafe.
5      Q.  What happened to the drugs?
6      A.  Rezulin was, or troglitazone
7  was removed from the market.
8          Trovafloxacin was removed
9  from the outpatient market. Its use was
10 limited to in-hospital use only.
11     Q.  On how many different
12 occasions, sir, has your work contributed
13 to the withdrawal of a drug from the
14 market?
15     A.  At least ten, and, you know,
16 we could debate whether my work on
17 rofecoxib contributed in any way. That
18 would be 11.
19     Q.  In 2000, you got another
20 award, the "FDA Group Commendable Service
21 Award," is that correct?
22     A.  Yes.
23     Q.  And you had a number of
24 awards in 2000 with similar titles,

Page 52

1  including Group Recognition Award, Group
2  Honor Award, Team Excellence Award; is
3  that correct?
4      A.  Yes.
5      Q.  In 2001, I see you got an
6  award by CDER. Some of them are labeled
7  CDER Team Excellence Awards, some are
8  labeled FDA Group Recognition Awards.
9      A.  Correct.
10     Q.  Maybe what we can do is
11 display Page 3 of your curriculum vitae
12 while we have a discussion about this.
13         What is CDER? We're going
14 to be talking about that at length today.
15     A.  CDER is the Center for Drug
16 Evaluation and Research. It is the area
17 within FDA that's responsible for
18 reviewing, approving and regulating
19 marketed drugs.
20     Q.  I see here on a number of
21 occasions you received awards which are
22 called "Team Excellence Awards." Do you
23 have to be a team player to get a Team
24 Excellence Award?

Page 53

1      A.  Yes, indeed.
2          MR. BECK: Object to form.
3  BY MR. KLINE:
4      Q.  How do you get a Team
5  Excellence Award, sir?
6      A.  You have to be a good team
7  player and exercise team leadership.
8      Q.  How many times at the FDA
9  were you cited before 2004 for team
10 excellence, sir?
11     A.  If I may have a moment to
12 count.
13     Q.  Yes.
14     A.  Seven.
15     Q.  How many of these awards,
16 sir, and honors, these decorations that
17 you got from the FDA involve withdrawal
18 of dangerous drugs?
19     A.  I'll have to refer back to
20 this again.
21     Q.  Tell us which ones they are.
22     A.  Okay.
23         MR. BECK: While you're
24         looking there, this is an area

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 54

1    that I believe is outside the
2    scope of the subjects that the
3    judge said were appropriate for
4    examination.
5  BY MR. KLINE:
6      Q.   You may answer, sir.
7      A.   Temafloxacin was withdrawn
8  from the market based in large part on
9  the work that I performed.
10     Q.   Did you get an award for it
11 by the FDA?
12     A.   Yes, I did.
13          Fenfluramine and
14 dexfenfluramine, these are the drugs
15 commonly referred to as fen-phen, and
16 dexfen was sort of a related drug.
17     Q.   You did work that led to the
18 withdrawal?
19     A.   Yes.  I spearheaded FDA's
20 activities in that area.
21     Q.   Okay.
22     A.   Cisapride in cardiac
23 ventricular arrhythmias.  I contributed
24 to the withdrawal of that product.

Page 55

1          Troglitazone and risk of
2  acute liver failure, contributed to the
3  withdrawal of that product.
4          Trovafloxacin, contributed
5  to the withdrawal of that product from
6  the outpatient market.
7          Phenylpropanolamine, PPA,
8  this is the Yale Hemorrhagic Stroke
9  Project.  This work contributed to the
10 withdrawal of phenylpropanolamine or PPA
11 from the market.
12          We have this outstanding
13 award for scientific and regulatory
14 assessment of actions regarding safety of
15 nonsteroidal anti-inflammatory drugs, and
16 that covers not only my work on
17 rofecoxib, but work on other nonsteroidal
18 pain relievers, and rofecoxib was
19 withdrawn from the market by the sponsor.
20     Q.   Now, all of these drugs,
21 sir, had all of these drugs previously
22 been approved by the FDA for marketing
23 and distribution to Americans and people
24 in the world?

Page 56

1      A.   Yes.
2      Q.   I want to turn to a couple
3  more things.
4          By the way, do you consider,
5  sir, what we've just gone over, these
6  honors and awards, as part of your
7  background and expertise in drug safety?
8      A.   There's no question that
9  they are.
10     Q.   Okay.
11          Now let's talk about some
12 other things.  You've published in the
13 medical literature, correct?
14     A.   Yes.
15     Q.   I see from your curriculum
16 vitae that you have something along the
17 order of 31 different publications in the
18 medical literature?
19     A.   Right.
20     Q.   And those would be in
21 peer-reviewed journals?
22     A.   Yes.
23     Q.   I'm sure by this time any
24 juror who hears this will know what

Page 57

1  peer-reviewed journal is, so, I'll simply
2  ask you, what journals have you peer
3  reviewed for?
4      A.   You mean what journals am I
5  a peer reviewer for?
6      Q.   Yes.  Either previously or
7  currently.
8      A.   I am a peer reviewer for the
9  Journal of the American Medical
10 Association, for The Lancet, for the Mayo
11 Clinic Proceedings, for Circulation, for
12 Pharmacoepidemiology and Drug Safety, for
13 Cardiovascular Drugs and Therapy, for
14 Clinical Practice Cardiovascular
15 Medicine.
16     Q.   Finally, at least in terms
17 of your qualifications and background,
18 sir, you've contributed to book chapters,
19 book chapters in books, in particular, a
20 textbook entitled Pharmacoepidemiology,
21 correct?
22     A.   Yes.
23     Q.   I believe there's a third
24 edition and a fourth edition; is that

**KS-000314**

Confidential - Subject to Protective Order

Page 58

1  correct?
2      A.   Correct.
3      Q.   In particular, what has been
4  your contribution in that book?
5      A.   In the third edition, I
6  wrote a chapter with colleagues from
7  European regulatory agencies describing
8  how drug safety and drug safety
9  epidemiology is practiced from a
10  government and public health perspective.
11         In the fourth edition, I
12  wrote a book chapter with colleagues from
13  the Office of Drug Safety examining risk
14  management and what does and doesn't work
15  in terms of managing the risks of drugs.
16  This actually represents the first book
17  chapter that we're aware of tackling this
18  topic.
19      Q.   An important topic, you
20  believe, sir?
21      A.   It's a very important topic.
22  It's important because with the evolution
23  of FDA over the past 10 or 12 years with
24  the introduction of the Prescription Drug

Page 59

1  User Fee Act, there's been a slow
2  transition within FDA to taking the tack
3  that risks of drug products can be
4  managed so that drugs that have
5  particular risks can remain on the
6  market, the proviso being that -- the
7  assumption being that these risk
8  management strategies actually then
9  render a drug that is unsafe or less
10  safe, that those risk management
11  strategies make the drug safe.  What we
12  show in this book chapter is that in
13  virtually every instance where risk
14  management efforts have been examined in
15  a scientific manner, that they've been
16  shown not to result in much or any
17  improvement in the safety profile of the
18  drug or in the way that the drugs are
19  used.
20      Q.   Is that a book, obviously,
21  something that's public and could be
22  purchased and read by anybody who was
23  interested?
24      A.   Yes.

Page 60

1      Q.   Do you have anything else
2  that you would want someone who is
3  listening to this tape, especially a
4  juror, to know about your background
5  before I go on to examine you about
6  questions of your substantive testimony?
7         MR. BECK:  Object to form.
8         THE WITNESS:  No.
9  BY MR. KLINE:
10      Q.   I would ask you, sir, do you
11  consider yourself an expert in drug
12  safety?
13      A.   Yes, I do.
14      Q.   Do you consider yourself an
15  expert in the workings of the Food & Drug
16  Administration insofar as understanding
17  the structure, the culture, the
18  background, the personnel?
19         MR. BECK:  Objection to
20      form.
21         THE WITNESS:  Yes, I
22      consider myself an expert on the
23      culture, structure, organization,
24      et cetera, of FDA, having lived

Page 61

1      through it for 22 years.
2         MR. KLINE:  Since Mr. Beck
3      objected, I will rephrase the
4      question.
5  BY MR. KLINE:
6      Q.   In what areas of FDA do you
7  consider yourself expert?
8      A.   I am an expert in areas of
9  post-marketing drug safety.  I am an
10  expert in areas of interaction between
11  the reviewing divisions, the preapproval
12  side of FDA and the postapproval side of
13  FDA.  I'm an expert on the culture of
14  FDA, on the ways that science is used
15  within FDA for -- as it relates to drug
16  safety in particular, but also as it
17  relates to efficacy.  I'm an expert in
18  the personnel practices of FDA in the
19  ways that it treats its medical officers,
20  and there's probably a host of other
21  areas that relate to life working within
22  FDA that I've become expert in.
23      Q.   You're a lifer there?
24      A.   Thus far, yes.

KS-000315

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 62

1    Q.   Let me -- do you have any
2  current intention of leaving the FDA?
3    A.   No, not unless I'm forced to
4  leave.  I love the work that I do.
5    Q.   Let me ask you some
6  questions about your public statements.
7         You testified before the
8  United States Senate, Senate Finance
9  Committee Hearing on drug safety and the
10  worldwide withdrawal of Merck & Company,
11  Inc. of Vioxx, November 18, '04; is that
12  correct?
13    A.   Yes.
14    Q.   You appeared on 60 Minutes
15  on February 16, '05; is that correct?
16    A.   Yes.
17    Q.   You appeared on February 17,
18  '05 before the joint meeting of the
19  Arthritis Advisory Committee of the Drug
20  Safety and Risk Management Advisory
21  Committee of the FDA; is that correct?
22    A.   Yes.
23    Q.   On the Today Show with Katie
24  Couric on December 21, '05 you were

Page 63

1  interviewed?
2    A.   Was it '05 or '04?
3    Q.   '04.  I'm sorry.  '04?
4    A.   Yes.
5    Q.   On Good Morning America with
6  Diane Sawyer on November 19, '04?
7    A.   Yes.
8    Q.   Did you appear on World News
9  Tonight with Peter Jennings on September
10  18 '04?
11    A.   I'm told that I did, but I
12  didn't see the show.
13    Q.   We have a tape.  I'm sure
14  that Merck does as well.
15         Did you also appear on ABC
16  Nightline with Ted Koppel on December 3,
17  '04?
18    A.   Yes, I did.
19    Q.   And in many other forums
20  relating to Vioxx, the withdrawal of
21  Vioxx; is that correct?
22    A.   Yes.
23    Q.   Do you believe Vioxx is an
24  unsafe drug, sir?

Page 64

1    A.   Yes I, do.
2    Q.   Do you believe that Merck
3  was correct in taking it off the market?
4    A.   Yes.
5    Q.   Should it ever have been on
6  the market in the first place?
7    A.   It is my professional
8  opinion, based on the evidence that I've
9  looked at, that Vioxx should not have
10  been approved at the time that it was
11  approved, that there were substantial
12  areas of concern relating to
13  cardiovascular safety that should have
14  been explored more fully and more
15  thoroughly prior to consideration of an
16  approval.
17         MR. BECK:  At this point I
18         would interpose an objection on
19         the ground that this is beyond
20         public statements that Dr. Graham
21         has previously made.
22  BY MR. KLINE:
23    Q.   The statements that you --
24  the statement that you just made, sir, is

Page 65

1  that something that in one way, shape or
2  form you have said in some public forum?
3    A.   Yes.
4    Q.   Is there anything new in
5  what you just expressed to the jury that
6  in your professional opinion Vioxx should
7  not have been approved at the time it was
8  approved and that there were substantial
9  areas of concern relating to
10  cardiovascular safety and should have
11  been more fully explored, anything new
12  there?
13    A.   No.
14    Q.   Okay.
15         Let's talk about the FDA
16  itself, area number two.
17         The FDA -- sir, on November
18  18, '04, before the United States
19  Congress you said, "The FDA culture uses
20  the pharmaceutical industry as its
21  client.  It overvalues the benefits of
22  the drugs it approves and seriously
23  undervalues, disregards and disrespects
24  drug safety."  Is that a view that you

**KS-000316**

Confidential - Subject to Protective Order

Page 66

1  stated before United States Senators
2  appearing in the Senate finance room?
3     A.  Yes.
4     Q.  Is that an opinion that you
5  still hold today?
6     A.  More strongly now than then.
7     Q.  Tell the members of the jury
8  why.
9     A.  Why what?
10    Q.  Why you believe it.  What is
11 the basis -- thank you for helping me.
12       What is the basis of that
13 opinion and view?
14    A.  That --
15    Q.  That the FDA culture views
16 pharmacy -- the pharmaceutical industry
17 as its client and that it overvalues the
18 benefits of drugs it approves and
19 seriously undervalues, disregards and
20 disrespects drug safety.
21    A.  Right.
22    Q.  Why do you say that, sir?
23 What is your basis?
24    A.  In the course of my career,

Page 67

1  I have participated in countless internal
2  meetings with the portion of FDA that
3  reviews and approves new drugs where drug
4  safety questions that occurred either
5  premarketing or post-marketing were
6  brought up and many times were of a
7  serious nature.  And the virtually
8  uniform response was -- from these
9  divisions was to downplay or ignore the
10 work that we did and the statements that
11 we made.  This was confirmed quite
12 recently in a government accountability
13 office report.  The GAO issued a report
14 in which they found that the work product
15 of our office drops into, in quotes, a
16 black hole once we do our work.
17       Other evidence that I have
18 that led me to this point of view was a
19 previous office director of mine told me
20 and a colleague of mine when he was
21 trying to pressure us to change a
22 conclusion in a report that we had
23 written on another drug, not on Vioxx, he
24 told us that industry was our client.

Page 68

1  And he and I had a lively debate about
2  this.  And at the end we had to agree to
3  disagree.
4     Q.  From your observation -- do
5  you want to finish?
6     A.  I have another example that
7  I think is -- two examples that are very
8  telling.
9        One is that on September 11,
10 2003, our center director, a Dr. Steven
11 Galson, came to an all-hands meeting of
12 the Office of Drug Safety.  So, this is a
13 meeting that has about 50 members of our
14 office in attendance.  At that meeting,
15 he told us that we, our office, needed to
16 find a way to add value to the center
17 because what we were doing was not adding
18 value to the center.  So, my
19 interpretation of that was was that from
20 the point of view of center management,
21 they don't value the work that's done in
22 the Office of Drug Safety.
23       The final piece of evidence
24 was a CDER grand rounds that was held, I

Page 69

1  believe, on February 9, 2004 or 2005, but
2  I have the notes from the meeting.  And
3  they were talking about FDA and industry.
4  And we were told by a senior FDA official
5  that industry is our primary customer.
6  Of course, the American public is also
7  our customer, but the customer we really
8  have to worry about is industry.
9     Q.  Sir, from what you've
10 observed while you, from what I heard you
11 say, disagree with the concept that
12 industry should be the client, is that
13 indeed the way the FDA perceives it, that
14 industry is the client?
15    A.  Yes.  FDA perceives industry
16 as its client as customer number one.  It
17 is a point of view that I completely and
18 totally disagree with.
19       This is a very interesting
20 point to note.  Dr. Peter Honig, who is
21 now a senior vice president at Merck, was
22 formerly our office director.  He was the
23 one who promoted me to associate director
24 for science in the office.  When he was

KS-000317

18 (Pages 66 to 69)

Confidential - Subject to Protective Order

Page 70

1  leaving to go to Merck, when he was
2  leaving FDA to go to Merck, we had a
3  farewell luncheon.  At the farewell
4  luncheon, he mentioned to us that it was
5  so refreshing to work with people in the
6  Office of Drug Safety who actually
7  believed in their mission of helping the
8  public and that this was so very
9  different from what he had experienced in
10  the Office of New Drugs.
11      Q.   Is it your mission, sir, to
12  help the public?  Is that your view of
13  it?
14      A.   Yes.
15      Q.   Pure and simple?
16      A.   Pure and simple.
17      Q.   Straight up?
18      A.   We have no other reason for
19  existence.
20          MR. BECK:  Objection to
21  form.
22  BY MR. KLINE:
23      Q.   Okay.
24          Now, let me discuss a number

Page 71

1  of things.  Let's step back before we
2  move forward.
3          Some folks who watch this
4  videotape will be initiated, some will
5  not be, as to the structure of the FDA.
6  I want to keep it simple.
7          First of all, there is
8  something that you've referred to already
9  as CDER.  I'm going to do some very
10  basics, but I'm going to try to do it
11  efficiently and quickly so we don't take
12  up a lot of time.  CDER.  What does CDER
13  stand for?
14      A.   Center for Drug Evaluation
15  and Research.
16      Q.   Now, the Center for Drug
17  Evaluation and Research, do you work,
18  broadly speaking, under that umbrella in
19  CDER?
20      A.   Yes, I do.
21      Q.   Does CDER have various
22  divisions and compartmentalizations?
23      A.   Yes, it does.
24      Q.   Is there an elaborate

Page 72

1  organizational chart for CEDR and for the
2  FDA as a whole?
3      A.   Yes.  And it's available on
4  the web.
5      Q.   Now, CDER, is one division
6  of CDER the Office of New Drugs, OND?
7      A.   Yes.
8      Q.   And tell the listener, the
9  member of the jury, what OND stands for.
10      A.   OND stands for the Office of
11  New Drugs.
12      Q.   Now, is the Office of New
13  Drugs -- what is the job of the Office of
14  New Drugs?
15      A.   The Office of New Drugs
16  reviews drug applications when a drug
17  company wants to have a drug approved.
18  The Office of New Drugs reviews those
19  applications, decides whether or not the
20  drug should be approved in the United
21  States, and once a drug is approved,
22  continues to regulate that drug after
23  it's on the market.
24      Q.   In terms of how the FDA and

Page 73

1  CDER values OND, tell the members of the
2  jury how OND is valued.
3      A.   OND is highly valued within
4  the Center for Drug Evaluation and
5  Research.  OND has traditionally had far
6  larger budgets for travel and training of
7  its scientific staff and for the purchase
8  of office equipment and supplies.
9      Q.   OND, sir, is that the group
10  that approves drugs in terms of their
11  efficacy, we'll get to benefit, in terms
12  of whether they are effective?
13      A.   Yes.
14      Q.   Can Americans be confident
15  that drugs that are on the market by and
16  large are effective in terms of the way
17  that they're approved?  For example, if a
18  drug is a blood pressure drug, can we be
19  confident that that drug will lower your
20  blood pressure?
21      A.   I think, in general, we can
22  be.
23      Q.   Is there an emphasis on that
24  aspect of approval by office of new drug?

KS-000318

Confidential - Subject to Protective Order

Page 74

1    A.   Yes.  Clinical trials are
2  designed primarily to show the efficacy
3  of a drug.  They're not designed to show
4  the safety of a drug.  And when FDA does
5  its reviews, it spends most of its time
6  reviewing the efficacy.  And that's where
7  the largest teams of individuals are
8  gathered to examine the new drug
9  application.
10    Q.   Budgeting, sir.  Before we
11 get to budgeting, let's look at the other
12 side.
13        Is there this group called
14 Office of Drug Safety?
15    A.   Yes.
16    Q.   Is it -- in any way, shape
17 or form is it the size of, the shape of
18 or funded like the Office of New Drugs?
19    A.   No, in terms of funding for
20 the individual staff.  It has funding for
21 sort of obligatory FDA operations such as
22 its adverse event reporting system.  And
23 so if you were to look at budgetary
24 allocations for our office, you'll see

Page 75

1  large chunks of money going to these
2  various operations, but they are FDA
3  operations that FDA is obligated to
4  maintain.  They happen to be housed in
5  the Office of Drug Safety.  The actual
6  budget for the Office of Drug Safety for,
7  say, travel and training, its operating
8  budget, is small.
9     Q.   And in terms of overall,
10 what is the emphasis in the FDA and in
11 CDER, as you've described it, in terms of
12 development and approval of drugs versus
13 drug safety?
14    A.   The primary function of CDER
15 is to move the freight, that is, to
16 review and approve new drugs as quickly
17 as possible and to as large a number as
18 possible.
19    Q.   Is the Office of Drug
20 Safety, in your view, either under -- I
21 was going to say undermanned, but it
22 would be underpersoned or understaffed or
23 underfunded in terms of being able to
24 adequately assess drug safety?

Page 76

1        MR. BECK:  Objection to
2     form.
3  BY MR. KLINE:
4     Q.   You may answer.
5     A.   It is my opinion that the
6  Office of Drug Safety is tremendously
7  understaffed and underfunded.
8     Q.   Does the Office of Drug
9  Safety even come into play with a drug
10 until a drug is actually marketed and on
11 the market and already approved?
12    A.   In general, no, but there is
13 a recent development of asking drug --
14    Q.   How about -- if I may
15 interrupt you.
16        How about at the time in
17 2004?
18    A.   In 2004, what I was about to
19 say was still in play.  Companies are
20 being increasingly asked to develop what
21 are called risk management plans at the
22 time of approval that might relate to
23 areas of concern that the reviewing
24 divisions have, the OND has, about a drug

Page 77

1  product.  And the Office of Drug Safety
2  is asked to comment on those risk
3  management plans because they will be, in
4  effect, post-marketing.
5     Q.   Was that true in 1999, when
6  Vioxx was approved?
7     A.   No, it was not.
8     Q.   Was that a deficiency, sir?
9        MR. BECK:  Object to form.
10       THE WITNESS:  That's a
11    difficult question for me to
12    answer.  If you believe that risk
13    management plans have efficacy,
14    that they work, then, yes, it's a
15    deficiency.  It is my own view,
16    however, that risk management as
17    practiced by FDA has been a
18    mechanism to keep unsafe drugs on
19    the market, rather than dealing
20    with them head on.
21 BY MR. KLINE:
22    Q.   Let me ask you, have we
23 given --
24       From what you've heard, my

KS-000319

Confidential - Subject to Protective Order

Page 78

1  questions and your answers, would a
2  layperson have an understanding of the
3  overall mechanism of the FDA, CDER and
4  then the Office of New Drugs and Office
5  of Drug Safety and where they fit in?
6  Would there be something to add here so
7  that we understood it any better in broad
8  brush terms?
9       MR. BECK:  Object to form.
10      THE WITNESS:  I think --
11  BY MR. KLINE:
12      Q.   Go ahead, sir.
13      A.   I think it would be
14  important for people to understand that
15  in addition to the Office of New Drugs,
16  there are a number of other offices
17  within CDER whose purpose is to actually
18  assist in the review and approval of new
19  drugs.  So, you have the Office of New
20  Drugs, and that may have 7 or 800 people,
21  but you have these other offices, as
22  well, whose primary function is to work
23  on the premarketing, the preapproval side
24  of FDA's house, and without them, the

Page 79

1  drug couldn't be approved.  And when you
2  take those all together, you end up with
3  like about 13 or 1400 people whose focus
4  is getting drugs on the market; if you
5  compare that to the Office of Drug
6  Safety, where we have maybe in the
7  neighborhood of 100 or 110 people
8  responsible for the safety and monitoring
9  of the safety of all drug products in the
10  country.
11      Q.   What you're saying it's
12  lopsided?
13      A.   Yes.
14      MR. BECK:  I'm sorry, I
15  couldn't hear the question.
16  BY MR. KLINE:
17      Q.   I said, what you're saying
18  is that it is lopsided?
19      MR. BECK:  I object to the
20  form.
21  BY MR. KLINE:
22      Q.   Is it lopsided, sir?
23      MR. BECK:  I object to the
24  form.

Page 80

1  BY MR. KLINE:
2       Q.   Please.
3       A.   Yes, it is lopsided.
4       Q.   Now, in addition, sir, and
5  I'm going to mark -- let me ask you this.
6       You've given a number of
7  public --
8       How many drugs is the FDA
9  responsible for, sir, which would
10  translate into this staff of 110 safety
11  officers?
12      A.   I think there's somewhere --
13  I'm not an expert on this, but I have
14  read and heard numbers such as 6,000
15  marketed drug products, 10,000 marketed
16  drug products.  There's thousands of
17  drugs out there.  Not all of them are,
18  you know, widely used.
19      Q.   I've seen in a public
20  statement of yours that roughly says that
21  only five percent of the FDA's funding
22  goes into the Office of Drug Safety.  Is
23  that what you've said?
24      A.   Yes.

Page 81

1       Q.   And is that correct?
2       A.   That's what it has been in
3  the past based on numbers that were
4  obtained from the web.
5       Q.   And that would also include
6  all of the funding for adverse reaction
7  reports as well?
8       A.   There you've got me.  I
9  don't recall.
10      Q.   Let me ask you some more
11  questions about the FDA.
12      A common perception is that
13  the FDA has laboratories and test tubes,
14  and there are scientists there who test
15  the various drugs before they go on the
16  market.  Is that correct?
17      MR. BECK:  Object to form.
18  BY MR. KLINE:
19      Q.   Answer the question and then
20  I'll do a rephrased question to make sure
21  I have a correct record.
22      A.   FDA has a very small
23  laboratory research capacity and does not
24  test new drugs in patients, will

**KS-000320**

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 82

1    occasionally do some animal testing, but
2    it is for very selective drugs, for very
3    selective issues.  So, in general, I
4    think that would be a misperception on
5    the part of the public.
6        Q.   Is animal testing and other
7    kind of pharmacologic testing the
8    exception or the rule for drugs in OND?
9        A.   It is -- well, within OND,
10   it doesn't happen at all because the
11   Office of New Drugs' sole purpose is
12   relating to the development and review of
13   new drug applications.  Where any sort of
14   laboratory testing might occur would be
15   in some of these other components within
16   CDER.  And in that case there, it would
17   be the exception and not the rule.
18       Q.   What does OND largely rely
19   upon in approval of drugs?
20       A.   It relies on documents
21   supplied to it by a drug company seeking
22   approval of its drug.
23       Q.   Only as good as the
24   information provided?

Page 83

1            MR. BECK:  Object to form.
2            THE WITNESS:  Correct.
3    BY MR. KLINE:
4        Q.   Is the information
5    largely --
6            In fact, is the information
7    exclusively by and large and as the rule,
8    not the exception, information that comes
9    from the drug company?
10           MR. BECK:  Object to form.
11   BY MR. KLINE:
12       Q.   You can answer.
13       A.   Yes.  The information that
14   FDA scientists base their reviews and
15   decisions about approval on are based on
16   information supplied to it by the
17   pharmaceutical industry in an official
18   submission.  FDA scientists do not
19   themselves do independent studies or
20   independent work relating to the approval
21   of those drugs.
22       Q.   What has been the problems,
23   if any, with that kind of system and
24   situation?

Page 84

1        A.   You're dependent on the
2    honesty, integrity and truthfulness of
3    the drug company, that it will provide
4    you with all information, that
5    information which helps their cause in
6    getting their drug approved, information
7    that may call into question the
8    effectiveness, the efficacy or the safety
9    of their drug.  But it's based on trust
10   and -- it's based on trust.
11       Q.   Is that trust on some
12   occasions violated?
13       A.   That's an area that I'm
14   probably not really competent to talk
15   about in sort of anything in any direct
16   detail because my experience is really
17   post-marketing.  I have heard examples
18   and rumors and the like, but it's not
19   something that I'm really expert in.
20       Q.   You have said publicly in
21   statements that there is an institutional
22   bias in the FDA which prevents the FDA
23   from protecting Americans against unsafe
24   drugs.  Do you recall saying that?

Page 85

1        A.   Yes, I do.
2        Q.   Is that a correct statement?
3        A.   Yes.
4        Q.   Tell the members of the jury
5    what the basis is for that statement.
6        A.   Well, all you have to do
7    sort of to see it crystal clear is to
8    look at the drugs that have come off the
9    market.  These are drugs where FDA
10   approved them, and by approving them said
11   the drugs were safe and effective, and
12   then at some later date they come off the
13   market because, a-ha, they're not safe or
14   they are not as safe as we thought they
15   were.  If we examine how long it takes
16   from when the signal of the problem
17   emerges to when the drug comes off the
18   market, you will see that that is
19   measured in years, sometimes in decades.
20           With phenylpropanolamine,
21   PPA, a drug product present in virtually
22   every cough/cold preparation in the
23   country, it was in over-the-counter diet
24   aids to help people lose weight, was

Confidential - Subject to Protective Order

Page 86

1  associated with hemorrhagic stroke
2  primarily in young women, and this was
3  known since 1984. However, it wasn't
4  until about 2000 or 2001 that FDA finally
5  removed that product from the market. In
6  the meantime, the company that made PPA
7  or the companies that made PPA continued
8  to make profits, and patients continued
9  to be harmed.
10      Q.   I want to just provide a
11  schematic of the FDA insofar as where the
12  Office of Drug Safety fits in that you
13  actually presented in a PowerPoint
14  presentation. There was a PowerPoint
15  presentation that you apparently gave.
16  You gave many public PowerPoint
17  presentations, correct?
18      A.   Yes.
19          MR. KLINE:  Don't put it up
20  yet.
21  BY MR. KLINE:
22      Q.   One of the PowerPoint
23  presentations that you gave was at Johns
24  Hopkins, your alma mater?

Page 87

1      A.   Correct.
2      Q.   And I have in your
3  curriculum vitae June 4, 2005.
4      A.   Yes.
5      Q.   What was the occasion
6  briefly?
7      A.   It was -- there's a
8  biannual, so, every other year, meeting
9  of the medical school alumni, and they
10  celebrate the reunions of particular
11  classes that sort of end in fives or
12  zeros. And this was the 25th reunion for
13  my medical school class, and I was one of
14  four invited speakers to speak that day
15  in scientific session.
16      Q.   What you told them from what
17  I've seen from other PowerPoints was
18  essentially a compilation of things that
19  you had previously told others in other
20  places and other times? You used some of
21  the same slides?
22          MR. BECK:  Object to form.
23          THE WITNESS:  Yes. That is
24  correct.

Page 88

1  BY MR. KLINE:
2      Q.   I'll rephrase the question.
3          Was the PowerPoint you
4  presented similar or different from
5  PowerPoints that you had presented to
6  other professional organizations, Dr.
7  Graham?
8      A.   Very similar.
9      Q.   And the one thing that you
10  did, and I'll provide a copy of it --
11          MR. KLINE:  Do you need
12  these, Mr. Beck? Do you want one
13  from me? I know I provided them
14  to you.
15          MR. BECK:  Could you please
16  give me a copy.
17          MR. KLINE:  If I do, I'll
18  tell you in advance. I have them
19  numbered on the bottom with our
20  Bates Numbers so you'll be able to
21  follow along easier.
22          MR. BECK:  If you can supply
23  me a copy of these as the
24  numbers --

Page 89

1          MR. KLINE:  I'll be pleased
2  to supply a copy of everything
3  that I do so that it makes it easy
4  for you.
5          Here it goes. We're giving
6  you Exhibit Number 2 which I'm
7  going to ask the doctor to
8  identify, but I assume he's going
9  to tell me this is the PowerPoint
10  that he gave at Hopkins.
11              - - -
12          (Whereupon, Deposition
13      Exhibit Graham-2, "Drug Safety in
14      America: A Nation Still at Risk,"
15      (Graham) Power Point Slides,
16      DG000035 - DG000061, was marked
17      for identification.)
18              - - -
19  BY MR. KLINE:
20      Q.   Can we identify Exhibit 2,
21  please, sir?
22      A.   Yes. This is a copy of my
23  PowerPoint presentation.
24      Q.   And for Mr. Beck's help, the

**KS-000322**

Confidential - Subject to Protective Order

Page 90

1   bottom right-hand corner has numbers, and
2   that's what I'll refer to when I put up
3   any one of the slides.
4         MR. KLINE:  I hope that will
5   help you, Phil.
6         MR. BECK:  And this is a
7   document that, as I understand it,
8   was not produced pursuant to
9   plaintiffs' subpoena, but was
10  turned over by Dr. Graham's
11  private lawyers last week in
12  response to an oral request for
13  further documents by plaintiffs.
14  I understand that the numbers that
15  you're referring to on the bottom
16  right are numbers that were put on
17  there by plaintiffs' lawyers.
18  This is one of the documents that
19  I've previously indicated we would
20  object to any questions about
21  since they weren't produced to us
22  in a timely way.
23        MR. KLINE:  There are a
24  series of these documents.  We

Page 91

1   intend to use them today.  They
2   were not covered by the subpoena.
3   We can argue about that at some
4   later date.  We asked for
5   documents late last week.  We
6   turned them over immediately when
7   we got them.  Merck has had them
8   as long as we've had them, and I
9   intend to examine on them.  Here
10  goes.
11  BY MR. KLINE:
12      Q.   This was definitely -- I
13  want to meet Judge Fallon's order.
14        This was definitely a public
15  forum in which you presented this,
16  correct?
17      A.   That is correct.
18      Q.   Now, all I want to do for
19  now is to focus everyone where we are.
20  We are on the structure of the FDA and
21  the problems within the structure.  Are
22  you with me?
23      A.   Uh-huh.
24      Q.   And I want to go to the

Page 92

1   chart which we've labeled -- we've taken
2   the liberty of putting some numbers on
3   the bottom to help.  And number 40 is an
4   organizational chart.  And if we can
5   highlight in the middle, there's an
6   island in the middle.  That's the Office
7   of Drug Safety, correct?
8       A.   Correct.
9       Q.   What was the point that you
10  were making to your fellow physicians and
11  colleagues on that day that you would
12  make here upon my request?
13      A.   Everything else that is
14  circled on that organizational chart
15  plays some role in the preapproval
16  activities of the Center For Drug
17  Evaluation.  And what I was trying to
18  show is that the Office of Drug Safety is
19  this tiny little group that's being
20  swallowed by an amoeba, and so it's kind
21  of a medical joke that this big sprawling
22  mass is engulfing the Office of Drug
23  Safety, eating it up.
24      Q.   When you call it a, quote,

Page 93

1   medical joke, were you trying to make a
2   point?
3       A.   Yes.
4       Q.   And the point was?
5       A.   And the point is that the
6   Office of Drug Safety has little in the
7   way of resources, little in the -- no
8   authority and really no weight or respect
9   within the Center For Drug Evaluation,
10  that in essence, drug safety is
11  dominated -- the Center For Drug
12  Evaluation for research is dominated by
13  the mindset of review and approve new
14  drugs.  Safety is an afterthought.
15      Q.   How long have you observed
16  that?  How long has that been your
17  observation?
18      A.   Well, I observed it even
19  during my fellowship training, but it has
20  accelerated in terms of how forcefully
21  it's pursued and enforced by OND
22  management, CDER management, since the
23  introduction of the Prescription Drug
24  User Fee Act in 1992, and that is

**KS-000323**

Confidential - Subject to Protective Order

Page 94

1  referred to as PDUFA. And it's by that
2  means -- Congress passed a law that was
3  specifically designed to speed up the
4  review times of drugs that FDA was asked
5  to look at by drug companies. In return,
6  drug companies would pay money to FDA so
7  that FDA could hire more staff. And so
8  we now have a situation where more than
9  50 percent of the Center For Drug
10  Evaluation's budget comes from monies
11  paid to it by regulated industry.
12      Q.   What you're saying is that
13  the FDA -- are you saying that the FDA is
14  not funded by the citizens of the United
15  States of America?
16      A.   I'm saying --
17          MR. BECK: Objection to
18      form.
19          THE WITNESS: I am saying
20      that the majority of funding for
21      the Center for Drug Evaluation and
22      Research comes from industry, not
23      from tax dollars.
24  BY MR. KLINE:

Page 95

1      Q.   Is that, to your
2  understanding, a well-known fact, sir,
3  outside of the pharmaceutical industry?
4          MR. BECK: Object to form.
5          THE WITNESS: I suspect that
6      the public doesn't appreciate
7      who's paying the bills at FDA.
8  BY MR. KLINE:
9      Q.   What is the impact on that,
10  sir? What is the impact of 50 percent of
11  the budget coming under this PDUFA act,
12  which is the physician user --
13      A.   Prescription Drug User Fee
14  Act.
15      Q.   Prescription Drug User Fee
16  Act. 199 --
17      A.   2.
18      Q.   1992?
19      A.   It's been renewed, I think
20  we're on our third renewal, and they're
21  feverishly working to get the fourth
22  renewal. The impact of this in my own
23  experience has been that the preapproval
24  people look for reasons to say yes to a

Page 96

1  drug. So, I've been in internal meetings
2  where a drug company wanted an approval
3  for a drug maybe for six different
4  indications. So, those would be things
5  that the drug could be officially
6  promoted for to treat conditions for.
7  And the reviewing division medical
8  officers say this drug shouldn't be
9  approved at all, and then the pressure
10  will be put on the medical officer to
11  say, well, can't we approve it for just
12  one indication, just one indication, a
13  narrow indication. Because all they want
14  to do is to be able to say yes.
15          I've been at other meetings
16  where when safety concerns were expressed
17  and people from our office raised the
18  question of having things put into the
19  label that the FDA people in the Office
20  of New Drugs who have the final
21  authority, they approve the drug and they
22  have the authority to say what happens
23  after the drug is on the market, that
24  they have said we can't do that because

Page 97

1  the drug companies won't go along with it
2  or that will hurt the drug company's
3  profits.
4          These are remarks that have
5  been passed in internal meetings that I
6  have been present at. And other
7  colleagues of mine have had similar
8  experiences. And since I have gone
9  public with my Senate testimony, I have
10  been approached now by probably 10 or 15
11  medical reviewers from different
12  components of CDER with stories of being
13  pressured to change their reviews where
14  they thought a drug should not be
15  approved, but where management was
16  telling them you must now say yes to that
17  drug.
18          There was actually in The
19  Wall Street Journal just last week or the
20  week before an example of this with an
21  antibiotic called Ketek. And in that
22  article, it describes a situation where a
23  clinical trial that FDA knew was
24  fraudulent and that the company knew was

KS-000324

Confidential - Subject to Protective Order

Page 98

1  fraudulent, FDA, it appears, based on
2  that newspaper article, accepted that
3  clinical trial and based its approval on
4  that trial and even cited it in a public
5  health announcement when recently three
6  cases of liver failure with this drug
7  were published in the medical literature,
8  and FDA issued a public health
9  announcement to say to the public, don't
10 worry, the drug is safe, look, we have
11 this clinical trial that shows us it's
12 safe even though FDA knew that that study
13 was fraudulent.
14      Q.   An example is what you've
15 just given us?
16      A.   Yes.
17           MR. KLINE:  For those folks
18      who are on the phone, we're going
19      to have to cut you off unless you
20      put your phones on mute.  I
21      repeat.  We're going to cut you
22      off unless you put your phones on
23      mute, period.
24           Can we go off the record for

Page 99

1      one minute.
2           THE VIDEOTAPE TECHNICIAN:
3      Stand by, please, 10:22.  Off the
4      record.
5               - - -
6           (Whereupon, a recess was
7      taken from 10:22 a.m. until 10:24
8      a.m.)
9               - - -
10          THE VIDEOTAPE TECHNICIAN:
11     Video time is 10:24.  We're back
12     on the record.
13 BY MR. KLINE:
14     Q.   All right.  Now, I want to
15 talk about -- I want to talk a minute
16 about industry's role, sir, the
17 pharmaceutical industry's role.
18          You mentioned one particular
19 fraudulent study.  When that kind of
20 thing occurs or when data is not provided
21 by a particular sponsor of a drug or
22 those kinds of things occur, are you
23 suggesting -- you're not suggesting that
24 that exonerates the pharmaceutical

Page 100

1  company itself who is furnishing the
2  data, are you?
3      A.   No.
4           MR. BECK:  Objection to the
5      form.
6  BY MR. KLINE:
7      Q.   Let me rephrase.
8           The kinds of problems that
9  you've identified, sir, what is the
10 pharmaceutical company, the sponsor's
11 responsibility under that particular
12 circumstance?
13      A.   They have -- the company has
14 a responsibility to supply all data in a
15 truthful manner, accurate and full, and
16 if they're aware of fraud or they're
17 aware of problems within their studies,
18 to fully disclose those.
19      Q.   Now, I'd like to move into a
20 couple of more FDA issues and cover FDA
21 in more detail.
22           You have said in public that
23 that there is an institutionalized bias
24 in the FDA.  Would you please -- and

Page 101

1  you've gone further to say in many forums
2  that there are structural, cultural,
3  scientific and personnel issues.  Would
4  you please -- and in particular, that
5  happens to be one of many places, on Page
6  38 of the PowerPoint you presented at
7  Hopkins.
8      A.   Right.
9           MR. KLINE:  I do not need it
10     up.
11          THE WITNESS:  Okay.  The --
12 BY MR. KLINE:
13     Q.   Would you explain to the
14 members of the jury what you mean when
15 you say there's an institutional bias at
16 the FDA?
17          MR. KELL:  Objection.  Any
18     specifics that the doctor might
19     give that would identify persons,
20     products, discussions within FDA
21     would violate his duty, in our
22     view, to maintain such information
23     on a confidential basis and the
24     deliberative process privilege.

KS-000325

Confidential - Subject to Protective Order

Page 102

1     That's my objection.
2   BY MR. KLINE:
3     Q.   My goal, sir, is to have you
4   in some broad --
5     A.   I can talk in general terms.
6     Q.    -- overarching terms
7   explain to us the structural, cultural,
8   scientific and personnel issues which
9   lead to an institutional bias at the FDA,
10  please, sir.
11    A.   Right.  The structural
12  issues are to some extent illustrated by
13  that amoeba graph that I showed where you
14  have this inequality of resources within
15  the center.  You also have sort of this
16  conflict of interest that the Office of
17  New Drugs that is responsible for
18  approving the drug also subsequently has
19  responsibility for, in a sense,
20  correcting its past mistakes, if you
21  will.  That a drug safety emerges
22  post-marketing, a drug is found to be
23  unsafe, and the people who approve the
24  drug are the ones who have to make the

Page 103

1   decision to do something about that.  And
2   that is a conflict of interest I maintain
3   that explains much of the structural
4   bias.  Because when a drug gets approved,
5   it's not just that an FDA medical officer
6   sees this pile of data that a drug
7   company gives it for the first time.
8   Usually a medical officer and a reviewing
9   division has worked with a drug company
10  for a number of years helping the company
11  to design the clinical trials that FDA
12  will subsequently come to review.  And so
13  by the time a drug gets to the approval
14  stage, the FDA people who have been
15  involved in the Office of New Drugs have
16  invested a fair amount of intellectual
17  capital in it, and it's not uncommon to
18  have medical officers refer to drugs that
19  are approved as their drugs.  They take
20  pride in the work that they've done in
21  bringing a drug to the public.  They're
22  not making profit from it the way a drug
23  company is, but they consider it their
24  drug because of the work that they've put

Page 104

1   into it.
2        Now a problem crops up with
3   their drug.  They've signed their name on
4   the line, this drug is safe and
5   effective.  It's gone to the division
6   director.  It's gone to the office
7   director.  It's gone to the super office
8   director.  It's gone to the Center
9   director.  They all have signed on it
10  saying this drug is safe and effective.
11  And now you come up with this problem
12  that says, no, it isn't.
13        And then what happens?  What
14  happens is delay.  Delay, delay, delay.
15  And as a result -- you can see it.  You
16  can see it with rofecoxib, with Vioxx,
17  that we have the results of the VIGOR
18  study showing a five-fold increased risk
19  of heart attack with Vioxx compared to
20  naproxen at the high dose, and it takes
21  almost two years for FDA to come up with
22  the label, a label, by the way, that in
23  my estimation, accomplished nothing of
24  utility to the public health.

Page 105

1        Why a two-year delay?  The
2   FDA was able to come up with a public
3   health announcement within a week of the
4   article appearing in the Annals of
5   Internal Medicine about liver failure
6   with Ketek.  So, if FDA can act that fast
7   on three cases of liver failure, why do
8   they have to take two years in reacting
9   to something as important as heart attack
10  with Vioxx.  And my answer is, it comes
11  down to this conflict of interest in
12  structural issues.
13        There's also the cultural
14  issues.
15    Q.   Before you go to the
16  cultural issue, let's stick with the
17  structural issue.  I'm going to do all
18  four.
19        On the structural issue,
20  let's pick up a couple points and move on
21  to others.  We've got a lot of things to
22  cover now in about an hour and a quarter,
23  and I want to do the Vioxx story and the
24  Kaiser story as well, so, we've got to

**KS-000326**

27 (Pages 102 to 105)

Confidential - Subject to Protective Order

Page 106

1   move quickly.
2           But on this, you mentioned
3   that the label didn't make a difference.
4   My question about the label is, is the
5   label something that the FDA tells the
6   drug company to do or is it something
7   else?
8       A.   Well, the FDA press office
9   recently made a statement that they have
10  the authority to force label changes, but
11  they prefer to negotiate with the
12  company.  My experience has been that, at
13  least since PDUFA, FDA does not impose
14  label changes on the company.
15  Basically -- well, let's give a typical
16  example.  We have a drug, we know it
17  causes a problem.  We have a meeting, a
18  premeeting of the OND people, the drug
19  safety people, we're talking about a
20  post-marketing safety issue, and we've
21  decided we're going to insist that this
22  problem belongs in the warnings on the
23  label.  We go in then, we have a meeting
24  with the company, and you come out with

Page 107

1   it's not in the warnings, it might not be
2   in the precautions.  It gets worked down
3   because the FDA capitulates.
4       Q.   Why is it important to the
5   drug companies not to warn about risks?
6   You'd think they would want to warn about
7   risks if there was any chance that there
8   was a risk?
9       A.   Well --
10          MR. BECK:  Object to form.
11  BY MR. KLINE:
12      Q.   Why do they not warn about
13  the risks?
14      A.   Companies, I believe,
15  have -- resist having safety issues
16  highlighted in the warnings because it
17  raises them to sort of a level of
18  significance in terms of importance in
19  the minds of physicians and patients.  It
20  could be used for -- as a competitive
21  advantage from a competitor marketing the
22  same product.  And if it has a box around
23  the warning, my understanding is that
24  that imposes then additional restraints

Page 108

1   on the company as to how they can go
2   about marketing the drug product to
3   consumers and also how it gets marketed
4   and detailed to physicians.  So, the
5   boxed warning sort of has the -- I think
6   the greatest potential impact on a drug
7   product in terms of how a company can go
8   about marketing it.
9       Q.   Is that something -- are you
10  saying that that's something that the
11  drug company would want to avoid for
12  financial reasons?
13      A.   Yes.
14          MR. BECK:  Object to form.
15  BY MR. KLINE:
16      Q.   Why would a drug company
17  want to avoid that kind of thing?
18      A.   A company would want to
19  avoid a boxed warning because it will
20  make it more difficult to market the
21  drug, it could interfere with the
22  profitability of the product.  It could
23  give their competitors a marketing
24  advantage, and it could call into

Page 109

1   question the safety of their product and
2   then perhaps give physicians or patients
3   pause to reconsider whether they want to
4   take that particular drug if there are
5   others available that don't have such a
6   warning.
7       Q.   I want to pick up in more
8   capsuled form.  You've covered the
9   structural issues of the FDA to your
10  satisfaction; is that correct?
11      A.   Yes.
12      Q.   And, by the way, if there's
13  something simply as a precaution on a
14  drug, is that different in terms of how
15  you understand the financial impact on a
16  potential drug or a marketed drug than,
17  say, a black box warning?
18      A.   Very different.
19          MR. BECK:  Object to form.
20  BY MR. KLINE:
21      Q.   How is that?  Either a
22  regular warning or a plain warning or a
23  precaution rather than a black box
24  warning?

**KS-000327**

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 110

1     A.   The others have no -- the
2 simple warning or precautions have no
3 consequence in terms of how a company can
4 go about marketing a product.
5     Q.   Is a precaution a lesser
6 thing than a warning?
7     A.   It was, but I believe FDA is
8 restructuring the label to have a section
9 now that will be called "warnings" and
10 "precautions."
11     Q.   Put aside the restructuring
12 and the new regulations.  How about back
13 in 2002?
14     A.   Precautions is a lower
15 level, a degree of information, of
16 warning than what was in the warning
17 statement.
18     Q.   Understood.
19        All right.  Now, cultural
20 issues, briefly.  A paragraph, not a
21 chapter.
22     A.   We've talked about it
23 before.  FDA views industry as its
24 primary customer, as its client.  And

Page 111

1 this gets transmitted to the management.
2 That's how management gets selected, by
3 how well they get along with industry.
4 And it filters downhill.  And so as a
5 result, you have this organization that
6 seeks to work, in quotes, collegially,
7 with industry, we're going to partner
8 with industry.  These are phrases that
9 are frequently used within FDA to
10 describe the relationship that is desired
11 between the regulator and the regulated.
12     Q.   By the way, back to
13 structural issues.
14        Are there not these
15 independent Advisory Committees?  We know
16 you testified in front of an Advisory
17 Committee.  Are these truly independent
18 Advisory Committees?
19     A.   In my opinion, no.  These
20 Advisory Committees are part of the
21 structural problem.  They are selected
22 by -- the members of those committees are
23 generally selected by the division
24 directors within the Office of New Drugs,

Page 112

1 whose drugs that committee will talk
2 about.  And so they pick people who they
3 know from the field and frequently can
4 talk with those people, will talk with
5 those people about upcoming Advisory
6 Committee meetings and the type of
7 direction that they wish that advisory
8 meeting to go in.
9        If you look at the Advisory
10 Committees in terms of their financial
11 attachments to industry, it's been in the
12 newspapers quite a bit that a third of
13 FDA committee members have financial ties
14 to industry, some large number.  And if
15 you were to look at the Advisory
16 Committee meeting from February of 2005
17 where we were talking about the
18 nonsteroidal pain relievers and the COX-2
19 drugs including Vioxx and Celebrex and
20 Bextra and the like --
21     Q.   Yes.
22     A.    -- the committee was asked
23 two questions.  It was asked one
24 question, should Vioxx be kept off the

Page 113

1 market or allowed to remain on the
2 market?
3        And it was asked a second
4 question, should Bextra be allowed to
5 stay on the market or should it be
6 withdrawn from the market.
7        And I believe in this
8 handout, I have a slide that combines the
9 votes, it's number 42, that combines the
10 votes --
11        MR. KLINE:  We can put it
12 up.
13        THE WITNESS:  -- from these
14 committees based on whether the
15 members of the committee had a
16 financial tie with companies that
17 make COX-2 selective NSAIDs or
18 were working to develop COX-2
19 selective NSAIDs.
20        And what you find is that if
21 you're a committee member who had
22 such a financial tie, you were 13
23 times more likely to vote to keep
24 Vioxx or Bextra on the market than

KS-000328

Confidential - Subject to Protective Order

Page 114

1   if you didn't.  And it's highly
2   statistically significant.  So,
3   the question is, well, are these
4   people being influenced -- you
5   know, is the financial tie causing
6   them to vote the way they vote.  I
7   can't answer that question.  But
8   what I can say is that the
9   financial ties, having that
10  financial relationship with the
11  company, is highly predictive of
12  how an individual will vote when
13  it comes to important decisions
14  such as should a drug stay on the
15  market or be removed from the
16  market.
17  BY MR. KLINE:
18      Q.   Let me move through -- you
19  believe you've covered -- I know we went
20  back to structural issues, and there are
21  many, as I think you're telling this
22  jury.
23      A.   Yes.
24      Q.   The Advisory Committee being

Page 115

1   part of it, is that correct?
2       A.   Correct.
3            MR. BECK:  Object to the
4   form.
5   BY MR. KLINE:
6       Q.   And now cultural issues,
7   sir.  Have we covered them?
8       A.   I think we've covered those
9   fairly well.
10      Q.   Is there a presumption that
11  a drug is safe until it is, as you say in
12  this public statement, proven guilty?
13      A.   Yes.  If you look at the way
14  that drug safety is evaluated in both
15  preapproval and postapproval, the --
16  what's called the null hypothesis, the
17  assumption is that the drug is safe.  And
18  then what is required is to have
19  overwhelming evidence that says, no, it's
20  not safe before you'll say that the drug
21  is not safe.  And this is done by using a
22  measure called the p-value, which is a
23  measure used by statisticians to talk
24  about how likely or unlikely something is

Page 116

1   to have occurred by chance.  And the
2   magic number is .05.  If something has a
3   5 percent or less chance of happening by
4   chance, that is, there's a 95 percent or
5   greater chance that it occurred because
6   of the study that you've done, that the
7   drug works or that it has safety, then
8   we'll believe it.  But if it's only -- if
9   you're only 90 percent sure, we're going
10  to say that the drug is safe.
11          So, for example, we can
12  have -- and we have examples of this in
13  actually the Vioxx NDA, in the new drug
14  application there, where the medical
15  officer saw evidence of increased
16  cardiovascular risk and said, but we
17  cannot be absolutely certain.  And so
18  it's because FDA insists on absolute
19  certainty about safety that it in my
20  estimation gives the companies a free
21  pass on safety.
22          Because no company -- here's
23  the situation.  If I'm going to get a
24  drug approved, well, the assumption that

Page 117

1   FDA makes is the drug doesn't work.  If
2   I'm a drug company, well, now I have an
3   incentive to do a really good study to
4   show FDA that the drug works.  So, the
5   incentives work in the right direction.
6   The company is going to try to do a
7   really good job to convince FDA to change
8   its mind about the drug because FDA
9   starts off saying the drug doesn't work.
10          On safety, it's just the
11  reverse.  The bigger and better a study
12  the company does, the more likely it's
13  going to find a problem.  And so
14  companies are actually rewarded for doing
15  small studies that aren't able to show a
16  problem because the assumption is that
17  the drug is safe.  And that is the way
18  FDA misuses statistics at FDA.
19          It could be analogized to
20  something called noninferiority trials.
21  Noninferiority trials are done in
22  situations where you have one drug and
23  what you want to do is you want to show
24  that it's no worse than another drug, but

KS-000329

Confidential - Subject to Protective Order

Page 118

1  it can actually be a little bit worse.
2  It could be 20 percent worse than the
3  other drug, and even if it's 20 percent
4  worse, we'll call it the same.  Now, FDA
5  has recognized for a long time that the
6  incentives for such a study are in the
7  wrong direction, that is, they encourage
8  poorly done studies because they give an
9  overwhelming advantage to industry in
10  terms of getting a drug approved.  Well,
11  that's exactly what we have with safety.
12  It's a noninferiority study.  We're
13  assuming that the drug has no problem.
14  And until we can show beyond a shadow of
15  a doubt basically, you know, with 95
16  percent or greater confidence, that we're
17  going to pretend like it never happened.
18      Q.   You analogized this in front
19  of the United States Senate to bullets in
20  a gun.
21      A.   Yes.
22      Q.   Would you tell the members
23  of the jury the same thing so they have
24  the benefit.

Page 119

1      A.   Right.  I was trying to get
2  the Senators to understand the statistics
3  of the matter, and I gave the analogy of
4  a gun with 100 chambers.  And I said,
5  let's play Russian roulette.  Now, we're
6  going to put 95 bullets in the gun, so we
7  are 95 percent certain that this drug
8  causes whatever adverse reaction we're
9  talking about.  Let's just say this drug
10  causes liver failure.  This drug causes
11  heart attacks.  We're 95 percent certain.
12      Q.   That's the current test?
13      A.   Right.  So, we put 95
14  bullets in, and we play Russian roulette.
15  And at that point, the FDA says, we
16  believe you, the gun is loaded, the drug
17  isn't safe.  Let's take five bullets out
18  of the chamber.  Now we have 90 bullets
19  in the chamber.  So there's only 90
20  percent chance that when I pull the
21  trigger, a bullet is going to come out of
22  the gun.  FDA says the gun is not loaded.
23  That's the misuse of statistics.
24      Q.   How can that be?

Page 120

1      A.   It's a historical artifact,
2  but it is one that is embedded in the way
3  FDA does business.
4      Q.   How should it be, sir?
5      A.   My belief is that it is
6  possible to design studies in advance in
7  which you prespecify a level of risk that
8  you would be willing to tolerate for the
9  anticipated benefit of a drug, and then
10  you design your study large enough to
11  exclude risks greater than that maximum
12  tolerable risk.
13      Q.   I want to move on.  I want
14  to move very quickly because I have to
15  get through your Vioxx study, I have to
16  get through your Kaiser study -- your
17  Vioxx opinions and your Kaiser study.
18      MR. KLINE:  I do want to
19  show Exhibit Number 44, if I may.
20  And if we can put it up.  44 to
21  the PowerPoint.
22  BY MR. KLINE:
23      Q.   Now, I know, sir, this is a
24  cartoon, but you did this at a

Page 121

1  professional meeting, correct?
2      MR. BECK:  Excuse me a
3  second.  Is this a new exhibit?
4      MR. KLINE:  No.  It's part
5  of the same exhibit.
6      MR. BECK:  Page 44?
7      MR. KLINE:  Yes.
8      MR. BECK:  I'm sorry.
9      MR. KLINE:  Page 44.
10      MR. BECK:  I have the same
11  objection.
12      MR. KLINE:  Sure.
13  BY MR. KLINE:
14      Q.   It's a cartoon.  On the left
15  side it's side effects.  On the right
16  side it says the lifeguard is the FDA,
17  "Hey, how am I supposed to hear his
18  request for a new drug approval with all
19  your screaming?"  And the pharmaceutical
20  company is to the right.  Were you making
21  a point, sir?
22      A.   Yes, I was.
23      Q.   What was the point?  Were
24  you making a serious point?

KS-000330

Confidential - Subject to Protective Order

Page 122

1      A.   I was making a very serious
2   point.  This, in my view, crystallizes
3   the situation that we have in the United
4   States today and why I said that the
5   United States was defenseless against
6   another Vioxx.
7      Q.   Sir, did we cover the
8   scientific and personnel issues, or do we
9   still have to go --
10      A.   We covered the science.  We
11   didn't cover personnel.
12      Q.   All right.
13          Before we get to personnel,
14   I want to show you another point that you
15   made in exhibit number 61 of the
16   PowerPoint that you showed to your
17   Hopkins medical colleagues.
18          MR. BECK:  Page 61?
19          MR. KLINE:  Page 61 of
20      Exhibit Number 2.
21          MR. BECK:  I assume that I
22      can have a continuing objection?
23      I don't need to --
24          MR. KLINE:  That was my

Page 123

1          point before we even got started,
2          that you don't even have to make
3          the objection under the rule of
4          Judge Fallon.
5   BY MR. KLINE:
6      Q.   Now, again, a cartoon, but
7   were you making a serious point to your
8   medical colleagues at that time and
9   place?
10      A.   Most definitely.
11      Q.   The cartoon shows a fox to
12   the right, and it shows the press corps
13   to the right and a lawyer, of all people,
14   apparently standing there.  And the
15   cartoon says, "Those responsible for
16   putting my client in charge of the
17   henhouse should be on trial here, not my
18   client who, as a fox, was only doing his
19   job."  Who is the fox in the cartoon as
20   you understood it?
21      A.   Is industry.
22      Q.   Pharmaceutical industry?
23      A.   Pharmaceutical industry.
24      Q.   What was the point, the

Page 124

1   serious point that you were making,
2   albeit in a humorous way?  You apparently
3   have a good sense of humor.
4      A.   I was trying to convey the
5   message that FDA is not functioning in
6   the independent and objective interests
7   of what's best for the public, that it is
8   really functioning first and foremost for
9   a service of its primary customer and
10   client, the industry.
11      Q.   And of course the industry
12   is in the end of the day the one who is
13   promoting, manufacturing and profiting
14   from the drug, correct?
15          MR. BECK:  Object to form.
16   BY MR. KLINE:
17      Q.   Who is the one who is
18   profiting by the drug?
19          MR. BECK:  Same objection.
20          THE WITNESS:  The companies
21      who manufacture and market these
22      drugs are the ones who profit from
23      them.
24   BY MR. KLINE:

Page 125

1      Q.   Let's carry one more point
2   before we move out of this area, and
3   that's the scientific problems, I
4   believe, that you have.  Scientific or
5   personnel issues?
6      A.   That's personnel.
7      Q.   What are the personnel
8   issues that lead to what you call an
9   institutional bias, sir?
10      A.   Within FDA, there have now
11   been at least four different surveys done
12   by various groups of the scientific
13   staff.  There was a survey done by
14   something called the Health Research
15   Group, which is a watchdog group in 1990
16   to 1999 surveying medical officers within
17   the Center for Drug Evaluation and
18   Research.  And what they learned was that
19   30 percent of the people who responded,
20   responded that they felt that they
21   couldn't express contrary scientific
22   opinions within FDA.  Now, the response
23   rate for that survey was very low, so,
24   you could say, well, it's not

KS-000331

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 126

1 representative.
2     The Center for Drug
3 Evaluation and Research then did its own
4 survey, and that survey also came back
5 with the figure of about 30 or 33 percent
6 saying that they feel they cannot express
7 contrary scientific opinions when
8 questions about drug approval and safety
9 come up.
10     Then the government
11 accountability office also did a survey
12 of medical -- well, scientific staff at
13 CDER, and it reported that 18 percent of
14 FDA scientists had reported that they had
15 been pressured by their supervisors to
16 change a recommendation from not approved
17 to approved. Now, when that became
18 public, like I think it was in 2004, a
19 public interest group called PEER brought
20 this to light, FDA's official response
21 was, we don't want to talk about the 18
22 percent that had this problem, let's talk
23 about the 82 percent that didn't have the
24 problem, that weren't suppressed.

Page 127

1     And my answer to that is, is
2 that there's lies, there's damned lies
3 and there's statistics. And this is an
4 example where I think that it's
5 manipulating statistics. Because most
6 drug approvals that FDA is faced with
7 today are for drugs that are called "me-
8 too" drugs. They're not the new
9 lifesaving drugs that everybody thinks
10 FDA is working on all the time. Most of
11 what FDA approves is routine stuff. It's
12 additional. It's saying, well, this drug
13 is already in the market, and we're going
14 to allow you now to market it for another
15 disorder. It's approved for sinus
16 infections. Now we're going to allow you
17 to market it for ear infections.
18     If you were to take out all
19 that stuff and just boil it down to the
20 new drugs where there's a safety concern,
21 that 18 percent would come up closer to
22 100 percent.
23     We then finally have --
24 recently FDA did a culture survey. They

Page 128

1 brought in an outside group to do an FDA
2 culture survey, and that survey found
3 that 30 percent of scientific staff felt
4 that they couldn't express altering
5 scientific views.
6     We also have the widely
7 publicized example of my colleague, Dr.
8 Andrew Mosholder at FDA, who was pretty
9 severely suppressed by both the Office of
10 New Drugs management and by management
11 within the Office of Drug Safety itself
12 who viewed their mission as doing what
13 Office of New Drugs told them to do. And
14 so Dr. Mosholder's report on suicidality
15 with antidepressants in children was kept
16 from the public. He wasn't allowed to
17 speak in an open public Advisory
18 Committee meeting that was convened to
19 talk about that subject, and he was given
20 a script by my supervisors to read if
21 anyone on the committee asked him why he
22 wasn't presenting, a script that
23 basically tried to cover up the fact that
24 he was being suppressed.

Page 129

1     This is the environment, the
2 personnel environment that FDA medical
3 officers and scientists operate in, is
4 that if you buck the system, if you stand
5 in the way of a drug approval or you
6 threaten the marketability, the viability
7 of a drug, that you are severely,
8 severely reprimanded, pressured,
9 criticized and threatened.
10     Q. And did you find that -- I'm
11 now pressing down to about an hour and 10
12 or 15 minutes of left time with you on
13 direct examination.
14     Did you find that to be the
15 case in your experience when you had
16 something to say about Vioxx in mid to
17 late 2004?
18     A. Yes. I experienced threats,
19 intimidation and actually what in my view
20 appears to have been a very organized and
21 orchestrated campaign to smear and
22 discredit me.
23     Q. All right.
24     I want to go back to one

KS-000332

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 130

1  quick point and then move forward.
2           When you were talking about
3  95 bullets and the gun being loaded with
4  only 90 bullets, and then the FDA says,
5  well, it's still safe, that was sort of
6  what you were saying, is that --
7  ultimately is it the pharmaceutical
8  company that is looking at it that way as
9  well?
10          MR. BECK:  Object to form.
11 BY MR. KLINE:
12     Q.   Go ahead.
13     A.   My view is that the
14 pharmaceutical companies will comply with
15 whatever rules FDA chooses to enforce,
16 so, basically tell me what hoops to jump
17 through, and I as a drug company will
18 jump through those hoops because I want
19 to get my drug approved.
20     Q.   Does industry look at the
21 safety issue that same way?
22     A.   Oh, yes.
23     Q.   That's my point.
24     A.   Yes.  It is quite frequent

Page 131

1  that you'll be in a meeting with a
2  company, and you'll have the point
3  estimate of the risk will be elevated.
4  So, we'll have a situation where the risk
5  is elevated seven times.  There was a
6  seven times increased risk of something
7  bad.  But the p-value is greater than
8  .05.  So, we don't have 95 bullets in the
9  gun.  We only have 93 or 92.  And the
10 companies will say it's not statistically
11 significant, therefore, it's not real,
12 therefore, we don't have to worry about
13 it.  And FDA will go along with it.
14          The number one reason why
15 that happens is because the study that's
16 being talked about is too small to show
17 the problem.  So, actually, it's like
18 you've stacked the deck.  If I give you a
19 small study that has no possibility of
20 showing the effect we're interested in
21 examining and then I don't find that
22 effect, well...
23     Q.   Well, you told me that the
24 FDA wasn't doing the study.  If the deck

Page 132

1  is stacked, who's stacking the deck?
2     A.   The deck is stacked --
3          MR. BECK:  Object to form.
4          THE WITNESS:  The deck is
5      stacked by the misuse of science.
6      It's the misuse of statistics.
7      It's allowing companies to benefit
8      from doing studies that are too
9      small to show the safety problem.
10 BY MR. KLINE:
11     Q.   Who is doing the studies?
12     A.   The companies are doing the
13 studies, and they know that small studies
14 have low power.
15     Q.   So, then, who is stacking
16 the deck?
17          MR. BECK:  Object to form.
18          THE WITNESS:  Well, in that
19      case, I would say the companies
20      are stacking the deck, I would
21      have to say.
22 BY MR. KLINE:
23     Q.   Now, I want to talk about a
24 concept.  I want to do it in less than

Page 133

1  three minutes of a very complicated
2  subject.
3          By the way, if you see
4  statistical significance in one of these
5  small studies, does that -- is there
6  greater significance to that?  If there's
7  a study that's not powered to show a
8  problem and then you show it anyway, is
9  there more significance to that?
10     A.   In my view --
11          MR. BECK:  Object to form.
12          THE WITNESS:  In my view,
13      that is an alarming circumstance,
14      one that demands intensive
15      scrutiny and attention.
16 BY MR. KLINE:
17     Q.   Did that happen here in the
18 Vioxx story?
19     A.   Yes, it did.
20     Q.   Did the stacked deck that
21 you mentioned earlier in your testimony
22 happen in the Vioxx story?
23          MR. BECK:  Object to form.
24          THE WITNESS:  My view of the

KS-000333

Confidential - Subject to Protective Order

Page 134

1      evidence is that that indeed
2      happened.
3  BY MR. KLINE:
4      Q.   Now, I want to do a topic,
5  efficacy versus benefit. I'd like you to
6  explain to the members of the jury in
7  brief terms why efficacy, which is what
8  we sometimes hear, a drug is efficacious,
9  is different than benefit, and how those
10  two either equate, in your opinion, or
11  don't equate and what the significance
12  is, please.
13      A.   Okay. Efficacy is, does the
14  drug have a biological effect. So, if
15  the drug is supposed to treat high blood
16  pressure, the efficacy will be, does it
17  reduce your blood pressure. So, it's
18  reducing a body measurement. That's the
19  effect. And if it does that, we say that
20  it has efficacy.
21          Effectiveness is whether or
22  not that drug taken on a regular basis
23  will actually give you a health benefit
24  long-term. If the drug lowers your blood

Page 135

1  pressure, but doesn't prevent you from
2  having heart attacks, strokes, kidney
3  failure or dying at a young age, well,
4  then, you've spent a lot of money to have
5  a lower blood pressure number, but have
6  derived no benefit from it. So, what you
7  want is, really, when you talk about
8  benefit/risk, is you want to look at what
9  is sort of the health benefits, the real
10  certifiable health benefit that you're
11  deriving from a drug versus what are the
12  real risks.
13          But what FDA frequently
14  does, almost always does, is it takes the
15  efficacy -- when it says benefits exceed
16  the risks, what it's really saying is in
17  our estimation, the FDA's estimation, the
18  efficacy should lead to a benefit, and we
19  say that benefit exceeds the risk. But
20  FDA has never done a formal benefit
21  analysis on any drug product to my
22  knowledge. It certainly did not do one
23  with Vioxx when it said that the benefits
24  exceeded the risks.

Page 136

1      Q.   Why is it important in the
2  Vioxx story to understand that the FDA
3  did no risk/benefit analysis as you've
4  just said?
5      A.   It's because I think if you
6  look at the VIGOR study, you're
7  confronted with what at least in my read
8  is a startling revelation that for every
9  complicated perforated ulcer or bleed
10  that Vioxx prevented, there were almost
11  two thrombotic cardiovascular events that
12  were caused by the drug. And so if
13  you're talking about benefits and risks,
14  here we have a ratio of almost two to one
15  where the risks exceed the benefits.
16          Now, let's look at what the
17  case fatality rates are. Nationally,
18  about five percent of people with GI
19  bleeds die. And I learned that by going
20  to the National Centers For Health
21  Statistics and looking at death
22  certificate data and then going to the
23  National Hospital Discharge Survey and
24  looking at how many hospitalizations

Page 137

1  there are for GI bleed. So, you have a
2  five percent death rate from GI bleeding.
3  In other words, you can have a GI bleed,
4  that's a pretty serious thing, you get
5  hospitalized for it, but most of the time
6  you're not going to die. With heart
7  attack, it's about a 40 percent chance
8  that you're going to die. So, if what
9  we're really interested in is sort of
10  benefit/risk, and let's take it to what's
11  the most important thing, and that's do I
12  live or do I die, in my view, the scales
13  are tilted greatly against Vioxx in terms
14  of safety versus benefit.
15      Q.   Okay.
16          That risk/benefit analysis
17  was or was not done by FDA?
18      A.   It was not done by FDA.
19      Q.   In your opinion, had it been
20  done, it would have come out the way you
21  suggested if it had been correctly and
22  diligently and honestly done?
23      A.   Yes.
24      Q.   Is the risk --

KS-000334

Confidential - Subject to Protective Order

Page 138

1       MR. BECK:  I have to object
2  to form on that last question.
3  BY MR. KLINE:
4      Q.   I'm reminded to ask, was
5  that risk/benefit done by the company, by
6  Merck?
7      A.   To my knowledge, it was not.
8  And I could cite as evidence of that the
9  VIGOR study.  And in the VIGOR study,
10  there's no real mention of weighing the
11  benefits and the risks in that study.
12  It's kind of implied that the benefits
13  exceed the risks, but there's no formal
14  analysis of it.
15      And it's also very curious
16  that in that paper, the most likely
17  explanation for the finding wasn't
18  addressed, which is the effect of Vioxx
19  on prostacyclin, which is the chemical
20  made by the body that causes blood
21  vessels to dilate and keeps platelets
22  from clotting.  And what Vioxx does is,
23  it blocks the production of prostacyclin
24  and makes it more likely that a heart

Page 139

1  attack can happen.  And in that VIGOR
2  study, which was published in the New
3  England Journal of Medicine and got a lot
4  of press, there's not a single word or
5  mention or reference to this
6  pharmacologic fact that was well known
7  throughout the medical community by this
8  time and was published in the literature.
9  And it was well known to the FDA medical
10  officer in her NDA review which preceded
11  the publication of the VIGOR study.
12      Q.   Was it all the more
13  significant as to Vioxx, and I know
14  you've talked about this, sir, the fact
15  that there were, I think it's in your
16  article, the fact that there were 106
17  million prescriptions of Vioxx during the
18  lifetime of Vioxx from '99 to '04?
19      A.   In the United States,
20  correct.
21      Q.   What is the significance --
22  and used by how many people to your
23  understanding?
24      A.   Estimates that I've seen

Page 140

1  range to about 20 million in the United
2  States.
3      Q.   What is the significance of
4  this story -- in this story, we're going
5  to go into this in detail in a moment.
6  What's the significance in terms of all
7  of that usage, both premarketing and then
8  after the drug was marketed, the fact
9  that it was going to be used by --
10      A.   Well --
11      Q.   -- literally over a hundred
12  million prescriptions?
13      A.   Right.  The fact that the
14  drug was going to be used widely and that
15  it was used widely means that the
16  exposure to potential harm was very large
17  at a population level.  So, at a
18  population level, if we were saying, oh,
19  only 1,000 people or 10,000 people got
20  this drug, well, the number of people who
21  could be injured as a result, that
22  absolute number, would be relatively
23  small.  But when you give a drug to 20
24  million people, you multiply the numbers

Page 141

1  of people who can be affected.  So,
2  that's -- from a public health
3  perspective, that is why I considered
4  this to be a public health catastrophe.
5      Q.   Was it indeed -- was Vioxx
6  indeed a public health catastrophe?
7      MR. BECK:  Object to form.
8      THE WITNESS:  Yes.
9  BY MR. KLINE:
10      Q.   Why, sir?
11      A.   Vioxx, in my opinion, was a
12  public health catastrophe because, A, it
13  was a toxic drug that had severe
14  cardiovascular effects raising --
15  increasing the risk of heart attack.
16      Two, heart attack is like
17  one of the leading causes of death in the
18  United States, so, the rate of it is
19  pretty high.  If I have a drug that
20  increases the rate of something that
21  already happens at a high rate, I'm
22  multiplying two high numbers by each
23  other, and that's going to mean that lots
24  of people will probably have heart

KS-000335

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 142

1   attacks.
2           Three, the typical person
3   with osteoarthritis or rheumatoid
4   arthritis who was going to get Vioxx is
5   somebody who is older.  And older people
6   have other risk factors for heart
7   disease.  If your typical Vioxx user is
8   somebody in their 60s, well, if they are
9   male, they've got their gender is a risk
10  factor for heart attack, their age is a
11  risk factor for heart attack, and if you
12  look nationally at statistics on health
13  of Americans, they will also have at
14  least one of the following:  they'll have
15  high blood pressure, high cholesterol,
16  diabetes or they'll smoke.  So, right off
17  the bat, this drug is going to be
18  marketed -- my typical patient that is
19  getting this drug is going to be somebody
20  who has two or three risk factors for
21  heart disease already.  So, you put all
22  these things together and then you
23  multiply it by the fact that I'm giving
24  it to 20 million people, and it's just

Page 143

1   simple mathematics that you've got a
2   formula for disaster.
3       Q.   Sir, you have actually
4   quantified what you believe to be the
5   formula in your study paper -- your
6   Kaiser study paper published in Lancet.
7   Is Lancet a highly respected journal?
8       A.   Yes.
9       Q.   Published in Britain?
10      A.   Yes.
11      Q.   The equivalent of the New
12  England Journal of Medicine here in the
13  United States?
14      A.   Yes.
15          MR. BECK:  Object to form.
16  BY MR. KLINE:
17      Q.   What is it the equivalent of
18  in the United States?
19          MR. BECK:  Objection.
20          THE WITNESS:  It's the
21      equivalent of the New England
22      Journal of Medicine or the Journal
23      of the American Medical
24      Association.

Page 144

1   BY MR. KLINE:
2       Q.   You stated there, "88,000 to
3   140,000 excess cases of serious coronary
4   heart disease probably occurred in the
5   United States over the market life of
6   Vioxx." Did you make that statement?
7       A.   Yes, I did.
8       Q.   Is that a true statement?
9       A.   Yes, it is.
10      Q.   Tell us why "88,000 to
11  140,000 excess cases of serious coronary
12  heart disease probably occurred in the
13  United States over the market life of
14  Vioxx."
15      A.   It occurred because Vioxx is
16  unsafe at any dose.  In other words, all
17  doses of Vioxx can cause increased heart
18  attack risk.  Vioxx was used widely --
19      Q.   How about the timing of it?
20      A.   The timing begins with the
21  first dose, and there is lots of evidence
22  now that points to that.  In fact, on the
23  APPROVe study, which we used to help
24  formulate our estimate of heart attacks,

Page 145

1   was a study performed by Merck of
2   patients with colon polyps, and they were
3   giving them the 25 milligram strength of
4   Vioxx to see if they could prevent colon
5   polyps.  And the study found a roughly
6   twofold increase in heart attack risk in
7   patients who were treated with Vioxx
8   compared to people who are taking a sugar
9   pill, a placebo.
10          Now, in the paper that the
11  company published, they did what's called
12  a post hoc analysis.  And this is an
13  analysis that's done after the fact.  And
14  so FDA -- if this analysis had been
15  presented to FDA for an -- for some
16  statement to be put in their labeling,
17  FDA would have thrown it out because
18  they'd say it's post hoc, which means it
19  could have happened by accident.  In
20  clinical trials, you're supposed to
21  prespecify before the trial starts what
22  analyses you will do.  And the
23  prespecified analysis that Merck said
24  they would do showed a twofold increased

Confidential - Subject to Protective Order

Page 146

1  risk.  And the correct interpretation of
2  that is that the risk would be increased
3  from the start of the drug for as long as
4  you took the drug.  But Merck did a post
5  hoc analysis.  And the post hoc analysis
6  showed these two curves where they said
7  that the risk didn't begin until after
8  you are on the drug for 18 months.  And
9  as a result, there was a public
10  statement, a press release from Merck
11  that said that the risk doesn't begin
12  until after 18 months.  Newspapers put it
13  up.  It's in newspapers.  There was just
14  an editorial commentary in the Washington
15  Post last week of somebody saying how on
16  earth could a jury award money to a
17  victim who had taken the drug for less
18  than 18 months because we all know that
19  Vioxx can't cause heart attacks before 18
20  months.
21        Well, two things.  One, that
22  was the approved -- that was a post hoc
23  analysis, so it can't be accepted.  What
24  it can be used for is to raise a

Page 147

1  hypothesis, a question, hmm, maybe this
2  is something -- maybe it only works after
3  18 months.  Then you have to go back to
4  do a second study to prove that.  If you
5  look -- so, that's point one.
6        Point two is, if you look at
7  those two curves and you look at how many
8  patients they had in the study, how many
9  heart attacks they had in that study at
10  the time -- let's take six months, for
11  example.  At six months, there were about
12  five or six heart attacks total in the
13  APPROVe study.  And now they don't give
14  the figures in the paper, so, you've got
15  to kind of make these extrapolations from
16  proportions that are presented in the
17  paper.  Five or six.  In order to show a
18  relative risk of 2, which is what the
19  overall study showed, they would have to
20  have had --
21     Q.   VIGOR?
22     A.   No.  We're talking APPROVe.
23     Q.   I'm sorry.
24     A.   This is the 18 month.

Page 148

1        They would have had to have
2  had 95 patients, 95 heart attacks by six
3  months, when all they had was five or
4  six.  So, the study would have had to
5  have been almost 20 times larger in order
6  to have a chance of finding the problem.
7  As it is, with the five or six cases that
8  they had at six months, all that Merck
9  could say from a statistical perspective
10  is the risk of heart attack with Vioxx
11  can be no higher than about 200.
12     Q.   This is called power?
13     A.   This is power.  And what
14  we're seeing there is the absence of
15  evidence is not evidence of absence.
16  They're saying the truth is, we don't
17  have the power.  But Merck is using that
18  argument to say, ha-ha, because we don't
19  have the power, therefore there isn't a
20  risk, therefore, anybody with a heart
21  attack before then, it's their own bad
22  luck.
23        But I give you an analogy,
24  and the analogy is, we've got those two

Page 149

1  curves, and if you have a picture of
2  APPROVe, you could put it up and then we
3  could talk from the curve.  You've got
4  these two curves that come together, and
5  there's no power there in that first 18
6  months to show a difference.  And as I
7  just discussed, the study would have to
8  be 20 times larger in order to show a
9  twofold difference.  You talk about
10  stacking the deck.  That's a stacked
11  deck.
12        Here's the analogy.  The
13  company is saying to you, to me, to the
14  jury, the moon has no craters.  And they
15  say, look at the APPROVe study in the
16  first 18 months.  I don't see a
17  difference there.  I look at the moon.  I
18  don't see any craters.  I'm saying, wait
19  a second, here's a pair of binoculars.
20  Let's make that study 20 times bigger.
21  Let me give you binoculars that raises it
22  20 times.  Now you look at the moon and
23  you see there are craters.  You look
24  here, you would see this heart attack.

KS-000337

Confidential - Subject to Protective Order

Page 150

1        Now, there had been 11
2   published studies, observational studies.
3   So, you'll never get a clinical trial
4   that's that large to study this question.
5   So, it has to come from observational
6   studies.  The preponderance of the
7   evidence of observational studies, there
8   are now 11 published observational
9   studies.  Nine of those observational
10  studies found that Vioxx increases the
11  risk of heart attack.  Of those nine, all
12  nine of them, when you look at it, you
13  have to tease it out, but in the studies,
14  they make it clear that the risk of heart
15  attack that they found in that study
16  occurred within 12 months.  So, we're
17  already inside 18 months.  Seven of those
18  studies have the evidence present within
19  six months.  Four of those studies have
20  the evidence within the first
21  prescription.  So, in other words, what
22  we have is evidence that Vioxx increases
23  the risk of heart attack from the first
24  dose on.  And we have no evidence to

Page 151

1   suggest that the risk goes away with
2   time.
3        This follows precisely from
4   what we believed the underlying mechanism
5   is by which Vioxx and other COX-2
6   inhibitors might cause heart attack.  And
7   that is, suppressing prostacyclin so that
8   there's an excess of thromboxane.
9   Thromboxane causes platelets to clot and
10  can cause heart attacks.  And if you
11  disturb that balance, that disturbance in
12  balance is going to happen within the
13  first dose, and so -- the first couple
14  doses.  And so what you have is the
15  expectation that the risk should begin
16  early.  The only reason people don't find
17  it is because they don't have 10 million
18  patients in a clinical trial on the first
19  day that would let them see it.
20       Q.   You found it in your study?
21       A.   And we found it in our
22  study.
23       Q.   And was your study a large
24  scale observational study?

Page 152

1        A.   Yes.
2        Q.   And do large term
3   observational studies provide an
4   important -- are they an important piece
5   of information in the matrix of
6   information about drug safety?
7        A.   Yes, they are.  And in this
8   situation, particularly where we're
9   talking about this 18-month question, it
10  is the only information available.
11       Q.   Before we take a short
12  break, because then I'm going to have, I
13  think, about an hour left, I need to ask
14  you to wrap this part up.  I had, I
15  think, interrupted you at a point, I'm
16  going to plead guilty to that, when you
17  started to talk about the drug being
18  unsafe at any dose, and then I
19  interrupted you asking you what about at
20  the time of the first dose.
21            I want to go back to the
22  general question that was on the table at
23  the time, which was, as to your statement
24  about the Kaiser study, in the Kaiser

Page 153

1   study that 88 to 140,000 excess cases of
2   serious coronary heart disease probably
3   occurred in the United States over the
4   life of the drug Vioxx.  And I had
5   interrupted you.
6            What is the answer to that
7   question as to why you make that
8   statement, if you haven't already
9   explained it?
10       A.   Right.
11       Q.   You started off saying it's
12  unsafe at any dose.  It starts at the
13  initial dose.  Are there other factors?
14       A.   Well, just that --
15            MR. BECK:  Object to form.
16  BY MR. KLINE:
17       Q.   Please, sir.
18       A.   Just that it has wide use;
19  that lower doses and higher doses
20  increase the risk; that there's typical
21  patients who are going to get the drugs
22  have relatively high background rates for
23  heart disease.  And you take these
24  factors together and you multiply them

KS-000338

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 154

1 out, and you end up with large numbers.
2     Q.   While I don't want to do the
3 exact statistical computation in front of
4 the jury, have you done that to make that
5 kind of statement in the peer reviewed
6 medical literature?
7     A.   Yes, I have.
8     Q.   What is the construct there,
9 please, just briefly?
10     A.   Right.  Basically, what you
11 do is -- what we did was, we took the two
12 large published clinical trials that
13 Merck conducted, the VIGOR study, which
14 was at the higher doses of Vioxx, and the
15 APPROVe study, which was at the lower
16 doses of Vioxx, and we used those
17 studies, the relative risks from those
18 studies, five-fold increased risk in the
19 VIGOR study, a two-fold increased risk in
20 the APPROVe study for the lower dose, to
21 then apply that to the U.S. population in
22 terms of like about 18 percent of the
23 population got the high dose and 82
24 percent got the lower dose.  And you can

Page 155

1 do a series of calculations,
2 epidemiologic formulas that basically
3 just give you the answer, if you know how
4 long the prescriptions are, and we had
5 information that told us how long each
6 prescription was for.
7     Q.   You did that kind of
8 calculation?
9     A.   Yes.
10     Q.   That was your conclusion?
11     A.   Yes.
12     MR. KLINE:  When we come
13 back -- we're going to take a
14 five-minute break.  When we come
15 back, I am going to ask you
16 questions about the Vioxx story
17 and about your Kaiser study and
18 should be able to complete that in
19 roughly 45, 50 minutes, maybe 55
20 minutes.  That's my goal.  And I'm
21 going to ask you when you come
22 back to let's tighten up just a
23 little bit in terms of your
24 expansion of answers.  I

Page 156

1 appreciate it.
2     We'll be back in five
3 minutes.
4     THE VIDEOTAPE TECHNICIAN:
5 Stand by, please.  That concludes
6 Video Cassette Number 1.  The time
7 is 11:13.  We're going off the
8 record.
9     - - -
10     (Whereupon, a recess was
11 taken from 11:13 a.m. until
12 11:35 a.m.)
13     - - -
14     THE VIDEOTAPE TECHNICIAN:
15 This begins Video Number 2.  The
16 time is 11:35.  We're back on the
17 record.
18 BY MR. KLINE:
19     Q.   Dr. Graham, continuing your
20 deposition, I have at least three areas
21 that I need to cover, and I'd like to
22 cover them in 10, 15-minute segments.
23 So, I need your cooperation in narrowing
24 down and honing in on certain things so I

Page 157

1 can get everything covered.  I'd
2 appreciate your help.
3     MR. BECK:  I'm sorry, I
4 can't hear what you're saying.
5     MR. KLINE:  Yeah, I know,
6 because they're taking a break out
7 there.  I will start again.
8     I said I'm going to have two
9 or three areas of inquiry, and I
10 simply want to try to hone in on
11 those things.
12     Can I go off the record?
13     THE VIDEOTAPE TECHNICIAN:
14 Stand by, please.  11:36.  We are
15 off the record.
16     - - -
17     (Whereupon, a recess was
18 taken from 11:36 a.m. until
19 11:59 a.m.)
20     - - -
21     THE VIDEOTAPE TECHNICIAN:
22 The video time is 11:59.  We're
23 back on the record.
24 BY MR. KLINE:

KS-000339

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 158

1    Q.   Dr. Graham, going into the
2  specifics of the Vioxx story, there is
3  something that you called the, quote,
4  Vioxx story, correct, generally speaking?
5    A.   Well, there is a story to
6  it, yes.
7    Q.   Would you give us your
8  overview and your understanding of the
9  Vioxx story?
10   A.   Well, Vioxx was approved in
11  1999.  In November 2000, a study was
12  published in the New England Journal of
13  Medicine called VIGOR, which was a study
14  performed by Merck showing that Vioxx
15  reduced the occurrence of perforations,
16  ulcers and bleeds in the gastrointestinal
17  tract compared to naproxen therapy, but
18  also that it increased the risk of heart
19  attack by about a factor of five compared
20  to naproxen.
21       At that point then, the
22  article that got published in the New
23  England Journal of Medicine, rather than
24  talking about Vioxx increasing the risk

Page 159

1  of heart attack, it actually changed the
2  way it did the analysis.  And I thought
3  that this was really a misleading aspect
4  of the way they went about things.
5       When you do a scientific
6  study --
7    Q.   "They" being?
8    A.   "They" being Merck.
9       When you do a scientific
10  study --
11       MR. BECK:  Excuse me,
12    Doctor, before you continue on
13    with your answer, I'm going to
14    object to this as not being a
15    subject that Dr. Graham has
16    discussed previously.
17  BY MR. KLINE:
18    Q.   Dr. Graham, and I'm going to
19  let you continue your answer.  Everything
20  you've said so far, have you said in some
21  public forum one way or the other?
22    A.   Yes.  These things I've
23  discussed openly with others.
24    Q.   And to assure whatever judge

Page 160

1  is ruling on this, particularly Judge
2  Fallon in his court, would you continue
3  with your answer giving me those things
4  which you've said publicly as far as the,
5  quote, story about Vioxx.  Thank you,
6  sir, continue.
7    A.   Right.
8       Whenever you do a clinical
9  trial or a study, you have what's called
10  a reference group or a control group.
11  Frequently in a clinical trial, that will
12  be a placebo, which is a sugar pill.  In
13  the VIGOR study, it was naproxen, which
14  is another pain reliever.  When you have
15  a comparator and you have an experimental
16  treatment, in this case, Vioxx was the
17  experimental treatment, when you do your
18  analysis, you are supposed to put the
19  results for the experimental treatment,
20  in this case, Vioxx, in the numerator of
21  a ratio, and your reference, naproxen, in
22  the denominator.  When the evidence was
23  presented on perforations, ulcers and
24  bleeds, that's the way the information

Page 161

1  was presented.  It was presented in the
2  classically accepted way, and it showed
3  that the risk of ulcers, et cetera, was
4  about one half, about .5, 50 percent that
5  of naproxen.
6       When it came to presenting
7  the heart attack risks, it flipped it
8  around.
9    Q.   "It" being who?
10   A.   The company, Merck.  They
11  flipped it around, and they put -- and
12  now in talking about heart attacks, they
13  put the risk of heart attack in naproxen
14  patients, which is the comparator, the
15  reference group, they put that in the
16  numerator, and they put Vioxx in the
17  denominator, and it should have been the
18  other way around.  But by doing this,
19  then the number that you get is .2.  So,
20  what they could say was, oh, the heart
21  attack risk with naproxen is 20 percent
22  that of Vioxx, rather than having to say
23  the risk of heart attack with Vioxx is
24  five times higher than it was with

KS-000340

Confidential - Subject to Protective Order

Page 162

1  naproxen.
2         It may seem like a minor
3  point, but it's really, I think,
4  fundamental, at least in my
5  understanding, of the study, because by
6  misrepresenting that information, it then
7  flows into what I would call the naproxen
8  hypothesis.  And in the VIGOR study, what
9  Merck proposed was that naproxen
10 protected against heart attack.  Even
11 though Vioxx had five times higher rate
12 of heart attack than naproxen, what they
13 said was, is here's Vioxx, here's
14 naproxen, what they said is, well, Vioxx
15 is normal, there's no increased risk
16 here, what it is is naproxen protects
17 against heart attack.  And they cited one
18 reference to support that, and it was a
19 study that Merck itself had done in 22
20 patients where they had given them
21 naproxen, taken blood samples from them,
22 and then did experiments in test tubes to
23 see what effect it had on the way their
24 platelets worked.

Page 163

1         Well, this information,
2  subsequently the FDA basically said that
3  doesn't prove anything because there are
4  no controlled clinical trials to show
5  that naproxen protects against heart
6  attack.  But the argument was that
7  naproxen protects against heart attack.
8  And that was the argument in VIGOR.
9         To me, what was -- when I
10 read that, there were two things that
11 really sort of struck me.  One was that a
12 five-fold difference in heart attack risk
13 is something quite high and something
14 that you really have to pay attention to
15 because heart attack is such a serious
16 disorder, and it's so very common.
17        The second thing was that
18 just on the face of it, this notion of
19 naproxen being protective, I was highly
20 skeptical of it, and as a matter of fact,
21 so were my office leadership, including
22 Peter Honig, who is now at Merck, but was
23 my office director then, and Marty
24 Himmel, who is now at Merck, but was his

Page 164

1  deputy office director.  We were
2  skeptical of the naproxen hypothesis.  We
3  were skeptical for the following reasons
4  -- I was skeptical for the following
5  reasons:
6         1.  Naproxen has been on the
7  market for over 30 years.
8         2.  Naproxen had been used
9  in many, many, many clinical trials, and
10 nobody had ever reported this phenomenal
11 heart-protecting effect before.
12        3.  There were -- and we
13 talk about 100 million prescriptions or
14 106 million prescriptions for Vioxx.
15 There were probably way, way more of that
16 of naproxen over the 30 years that it's
17 been on the market, so, there's
18 widespread use.
19        And then, finally, if
20 naproxen had had that kind of protective
21 effect that Merck was claiming in the
22 VIGOR study, it would have had to have
23 been about three times better than
24 aspirin at preventing heart attacks.  And

Page 165

1  aspirin has been well studied in clinical
2  trials.  It reduces heart attack risks
3  probably on average about 25 percent, and
4  that's viewed pretty much as sort of a
5  wonder drug.  Aspirin is a wonder drug.
6         Well, here Merck comes with
7  the VIGOR study and says naproxen is
8  three times better than the wonder drug
9  aspirin.  And to me it just failed the
10 straight face test and so --
11     Q.   The straight face test?
12     A.   Yes.  Does it have sort of
13 face validity?  Can you believe it on its
14 face.  And on the face, to me as the
15 experienced drug safety scientist, I was
16 just highly skeptical of that.
17        Plus you have the underlying
18 biology of how Vioxx works that would
19 lead one to expect that it might increase
20 the risk of heart attack.  And, in fact,
21 it's really funny how the VIGOR study
22 words this.  You know, the argument that
23 is sort of commonly in the literature
24 talking about heart attack risk with the

KS-000341

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 166

1   COX-2 inhibitors talks about prostacyclin
2   being decreased by drugs like Vioxx,
3   leaving thromboxane, which causes
4   clotting, unopposed.  So, there's an
5   excess of it.  There's sort of a balance,
6   and now there's too much thromboxane.
7          In VIGOR, Merck said, well,
8   we were interested in cardiovascular
9   risk, but their argument was because
10  naproxen -- because Vioxx wouldn't affect
11  platelet clotting and so -- but naproxen
12  would.  And so we thought there might be
13  a difference.  So, they sort of took the
14  converse of what was sort of like
15  obviously on everybody -- this was
16  something that everybody was talking
17  about, at least in the literature.  And
18  subsequently it became sort of a real
19  focus of research.
20         In any event, it was based
21  on reading that study and being highly
22  skeptical of it and recognizing that if
23  the high doses caused heart attack at a
24  five-fold increase, well, this thing

Page 167

1   called dose response, well, there's a 25
2   milligram dose and a 12-and-a-half
3   milligram dose.  25 milligram dose is the
4   most commonly used dose.  With dose
5   response, if you get an effect with a
6   high dose, what dose response says is,
7   well, you might also have an effect with
8   the lower dose.  It won't be as big an
9   effect.  So, the question is, is there a
10  heart attack risk with lower dose.  And
11  that was something that wasn't even
12  addressed in the VIGOR study in the
13  discussion.  In the discussion, it was
14  something that one could have brought up,
15  but it wasn't brought up.  In my view,
16  the discussion was unbalanced.
17         In any event, taking all
18  those things together, I thought that it
19  was important that we try to do another
20  study to examine the heart attack risks
21  with Vioxx.
22      Q.   And that's how you got
23  involved?
24      A.   And that's how I got

Page 168

1   involved.
2      Q.   Okay.
3          Let me step back with a
4   couple of things by way of background
5   that you touched upon, but I want to make
6   sure that I understand.
7          In the PowerPoint
8   presentation which you presented to your
9   colleagues, on Page 97 you talked about
10  way back in 1999 there was a theoretical
11  concern.
12      A.   You said 97?  I don't have
13  that particular --
14      Q.   I'm sorry.  47.
15         Again, I don't want to wed
16  you to these pages.
17      A.   Yes, yes.
18      Q.   I'd rather talk to you, have
19  a conversation with you, but I wanted to
20  focus you on it.
21         You said that there was a
22  theoretical concern way back in 1999.
23      A.   Right.
24      Q.   Tell us briefly what was the

Page 169

1   theoretical concern, and I want to just
2   make an imposition on you.  I'd like to
3   have as brief an answer to every question
4   as possible because I have a lot of
5   territory to cover.
6      A.   I'll try.
7          MR. KELL:  I'm going to
8      object to that question only to
9      this extent.  If the story that
10     Dr. Graham is going to tell
11     involves internal agency
12     deliberations or discussions, it's
13     the government's position that it
14     would not be proper for him to
15     disclose those.
16  BY MR. KLINE:
17      Q.   So, you made -- you
18  presented this PowerPoint at numerous
19  professional meetings, correct --
20      A.   Right.  This is from --
21      Q.   -- including the ISPE
22  conference in 2005; is that correct?
23      A.   That's correct.
24      Q.   That's the International

KS-000342

Confidential - Subject to Protective Order

Page 170

1  Society of Pharmacoepidemiologists?
2      A.   Correct.
3      Q.   A worldwide organization; is
4  that correct?
5      A.   Yes.
6      Q.   And by the way, you've been
7  asked to publicly appear at conferences
8  like that in your professional capacity,
9  correct?
10      A.   Yes, I have.
11      Q.   A group of your colleagues,
12  international epidemiologists from all
13  over the world, would hear your views
14  that you're telling this jury, correct?
15      A.   Correct.
16      Q.   All right.
17          Now, the theoretical
18  concern.  What have you publicly said
19  about that before?
20      A.   The theoretical concern was
21  that Vioxx would reduce or inhibit
22  prostacyclin and lead to an excess of
23  thromboxane, which would result in a
24  tendency for blood clots and

Page 171

1  theoretically cardiovascular events such
2  as heart attack or stroke.
3      Q.   Known to Merck back in 1999?
4      A.   I would assume that it had
5  to have been.  If it's known to the
6  medical officer who did this review, it
7  most certainly would have had to have
8  been known to Merck.
9      Q.   And you looked at the
10  review, and once you got into -- you
11  looked into the history of it once you
12  got interested in the subject based on
13  naproxen, correct?
14      A.   Actually, this particular
15  slide that we're looking at -- actually,
16  I began looking at this subsequent.  At
17  the time that we were planning our study,
18  this wasn't something that I had focused
19  on.
20      Q.   In the early period, did the
21  FDA know and appreciate that there were
22  high-risk patients that were excluded
23  from the study?
24      A.   Yes, they did.

Page 172

1          MR. BECK:  Object to form.
2  BY MR. KLINE:
3      Q.   Did Merck understand that?
4          MR. BECK:  Object to the
5  form.
6          THE WITNESS:  It is clear
7  from the way the studies are
8  described that patients at high
9  risk of experiencing
10  cardiovascular events were
11  excluded from the study, and since
12  that's written in the VIGOR study,
13  I have to assume that Merck was
14  fully aware and that it was
15  intentional.
16          -  -  -
17          (Whereupon, Deposition
18  Exhibit Graham-3, "Rofecoxib
19  Diagnosis and Treatment: What
20  went wrong?  Can we avoid?"
21  (Graham) PowerPoint Slides,
22  DG000014 - DG000034, was marked
23  for identification.)
24          -  -  -

Page 173

1  BY MR. KLINE:
2      Q.   I'm going to mark another
3  Powerpoint which you presented to the
4  International Society of
5  Pharmacoepidemiologists.  They had their
6  conference in 2005 in Nashville,
7  Tennessee, correct?
8      A.   Yes.
9      Q.   I think on occasion they've
10  had their conferences at more exotic
11  places, correct?
12      A.   It alternates, Europe and
13  North America.
14      Q.   I see.  This time it was
15  Nashville.
16          Now, I want to focus you,
17  sir, on some things that you said to the
18  international academy of -- International
19  Society of Pharmacoepidemiologists.
20          MR. BECK:  Before you do, I
21  believe this is another document
22  that was turned over by Dr.
23  Graham's personal lawyers from the
24  FDA files last Friday not in

KS-000343

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 174

1    response to a subpoena, and we
2    have the same objection to the use
3    of this that we had for the Johns
4    Hopkins PowerPoint.
5  BY MR. KLINE:
6      Q.   Was everything that you
7  said, sir, at the International Society
8  of Pharmacoepidemiologists in a public
9  forum?
10     A.   Yes, it was.
11     Q.   And were Merck -- are Merck
12 representatives always at the
13 International Society of
14 Pharmacoepidemiology?
15     A.   Well, I know that at this
16 particular meeting, several people from
17 Merck were there because they're
18 professional colleagues.  So, we had
19 conversations during the meeting, and I
20 know that they attended this session.
21     Q.   And was your PowerPoint
22 available as part of it?
23     A.   The PowerPoint was
24 presented.

Page 175

1      Q.   Now, in it, and I just want
2  to focus you on the slide that's entitled
3  "VIGOR:  deja vu all over again," what
4  were you telling your fellow members of
5  the International Society of
6  Pharmacoepidemiologists?
7      A.   Which slide number are you
8  on?
9      Q.   Number 24.
10     A.   Oh, here what I was talking
11 about was trying to make a little joke
12 about Yogi Berra and deja vu, but what I
13 was trying to talk about here is the
14 evidence that was accruing on Vioxx and
15 heart attack risks and FDA's response,
16 which in my experience has been to
17 downplay or ignore those risks and to let
18 things get worse in a sense to, let the
19 problem continue unabated.  So, that's
20 basically what I was, I think, trying to
21 convey there.
22     Q.   Understood.
23        Now, if you'd go to slide
24 number 29, this is something I'd like to

Page 176

1  display.  And regardless of whether the
2  display is there or not, the fact of the
3  matter is that you have used and you've
4  given this jury an explanation of the
5  naproxen and whether it was a plausible
6  explanation for the VIGOR results.  That
7  is what you've done so far, correct?
8      A.   Correct.
9      Q.   What did you call it
10 publicly, sir, the naproxen --
11     A.   I called it an alibi.
12     Q.   What is an alibi, sir?
13     A.   Well, I'm not a lawyer, but
14 what I meant was, it's sort of an excuse
15 to explain away an uncomfortable
16 situation.
17     Q.   What did you mean when you
18 described -- and I assume you're talking
19 about Merck's explanation later published
20 in the New England Journal that naproxen
21 was cardioprotective and thereby
22 explained the results of the VIGOR trial.
23 Is that what you were talking about?
24     A.   That is correct.

Page 177

1        MR. BECK:  Object to the
2  form.
3  BY MR. KLINE:
4      Q.   That is just a predicate.
5        My question is, what in that
6  context did you mean by the "naproxen
7  alibi," sir?
8      A.   What I meant was that there
9  was -- it was much more likely based on
10 the available evidence at the time that
11 Vioxx was increasing the risk of heart
12 attack than that naproxen was protecting
13 against heart attack, but that pointing
14 to naproxen saying it protects against
15 heart attacks is an alibi.  It's
16 basically to say it's not Vioxx that's
17 causing the heart attacks, it's naproxen
18 that's protecting against heart attacks.
19        What I also said at this
20 meeting was that it resulted in a
21 two-year wild goose chase as people in
22 their research focused on addressing
23 naproxen and whether it affects the risk
24 of heart attack, rather than focusing on

KS-000344

Confidential - Subject to Protective Order

Page 178

1  Vioxx and on lower-dose Vioxx, which was
2  being used by increasing numbers of
3  patients.
4      Q.    That two-year wild goose
5  chase occurred roughly in what calendar
6  year?
7      A.    2001/2002.
8      Q.    That was the years that I
9  believe you described earlier when the
10 label wasn't changed?
11     A.    Correct.
12         MR. BECK:  Object to form.
13 BY MR. KLINE:
14     Q.    What was going on with
15 labeling in that same period of time,
16 sir?
17     A.    Nothing was happening with
18 labeling, at least nothing visible.
19     Q.    Was it your words when you
20 described it, those two years, as a wild
21 goose chase?
22         MR. BECK:  Object to form.
23         THE WITNESS:  My reference
24     to wild goose chase was to the

Page 179

1      efforts by the scientific
2  community to investigate what has
3  subsequently been shown, I think,
4  unequivocally to be an untruth,
5  which is that naproxen does not
6  protect against heart attack.
7  There are now, I think, 18 or 19
8  published observational studies
9  that have looked at this.  And
10 four of them say that naproxen is
11 protective.  Four of them say it
12 increases the risk.  And the
13 others say there's no difference.
14 If you look at the four that say
15 there's a risk, two of them were
16 funded by Merck and co-authored --
17 one of them was co-authored by
18 Merck scientists.  And those two
19 actually have come to
20 inappropriate conclusions because
21 the analyses that were done were
22 scientifically inappropriate.
23     In the paper by Rahme which
24 was done in Quebec which claimed

Page 180

1  that, I think, naproxen reduced
2  the risks of heart attack by like
3  21 percent compared to other
4  NSAIDs, that got captured in the
5  press and interpreted by the
6  medical community as naproxen
7  protected against heart attacks.
8  But what you want to do is know
9  what does naproxen do versus
10 nothing at all?  That's the
11 appropriate comparison.
12     What they did in the Rahme
13 study was they took naproxen, and
14 they compared it to another pain
15 reliever.  If you rearrange the
16 Rahme data and they present all
17 the data in the paper so you can
18 rearrange it and then do an
19 analysis of the Rahme paper
20 similar to what we did in our
21 Kaiser study, they come up with a
22 conclusion -- they would come up
23 with the result that shows that
24 naproxen increases the risk of

Page 181

1  heart attack by about 28 percent.
2      Now, the second paper done
3  by Watson, that's the paper that
4  was basically authored by Merck
5  employees.  In that study, they
6  claimed that -- they concluded
7  that naproxen reduced the risk of
8  heart attack by, you know, 35 or
9  40 percent.  And they showed a
10 variety of analyses to support
11 that.  But the analysis that they
12 did, that they based their
13 conclusion on, did not adjust for
14 cardiovascular disease.  So, if
15 I'm concerned about does a drug
16 increase my risk of heart attack,
17 well, I've got to do adjustment
18 for cardiovascular risk.  And
19 Merck didn't do it.  So, the
20 analyses where they did do it, the
21 results weren't statistically
22 significant.
23     And then there's also
24 problems with case ascertainment

KS-000345

Confidential - Subject to Protective Order

Page 182

1    because in this case, covering 4
2    million patients followed for 10
3    or 15 years, they only found 27
4    sudden deaths, when they should
5    have found thousands.
6    BY MR. KLINE:
7        Q.   What is the bottom line,
8    bottom, bottom line on the science of
9    whether naproxen is cardioprotective and
10   whether this was an alibi?
11       A.   Naproxen is not
12   cardioprotective, never was, and it
13   isn't.
14       Q.   And does the science show it
15   today?
16       A.   And the science shows that
17   today.
18       Q.   Did they have the science in
19   their possession when they made what you
20   call an alibi back at the time of the
21   publication of the VIGOR trial?
22       A.   The studies that I've
23   referred to hadn't been performed at that
24   time, but what was available was the

Page 183

1    knowledge about aspirin and the fact that
2    then this would have had to have been
3    three times better than aspirin in that
4    naproxen had been used in many, many
5    clinical trials, it had been used for 30
6    years, and nobody had reported this
7    before. So, that common-sense stuff was
8    known.
9        Q.   Did the --
10       What you now call the
11   naproxen alibi, is that what drew your
12   eye and your attention, that along with
13   the number of people who were using the
14   drug along with the VIGOR results showing
15   the multiple of increased relative risk?
16       A.   They were --
17       MR. BECK: Object to form.
18   BY MR. KLINE:
19       Q.   Please.
20       A.   They were all interrelated,
21   and so they were all of a concern.
22       Q.   Now, you then set about,
23   yourself, to do something about it as a
24   safety officer of the Office of Drug

Page 184

1    Safety of the Food & Drug Administration
2    of the United States of America, correct?
3        MR. BECK: Object to form.
4        THE WITNESS: Yes.
5    BY MR. KLINE:
6        Q.   What did you do?
7        A.   What we did was looked
8    around to see if there was a way that we
9    could do a study in which -- my hope was
10   to do a study where the playing field
11   would be level so that -- my biggest
12   concern was when we do a study, what if
13   we find out in our results that there is
14   -- we don't find an increased risk with
15   Vioxx. Let's say we do the study, and
16   the results come out that there's no
17   increased risk. I wanted to be sure by
18   the way we designed the study that we
19   could trust that result because you have
20   this problem of low power and the like.
21       Q.   Let me stop you for a
22   minute.
23       Would this study have some
24   usefulness as distinguished from -- as an

Page 185

1    observational study, namely an
2    epidemiology study, as distinguished from
3    the clinical trials of which Merck had
4    done?
5        A.   Yes. The advantage of the
6    observational studies is that they are
7    much larger and have far larger numbers
8    of cases of people who are exposed to the
9    drug, and that's what gives you your
10   power to see if there's a problem. What
11   I mentioned before about the APPROVe
12   study and having only like five or six
13   heart attacks in six months, they really
14   needed like 95 cases or more to be able
15   to see the risk. With an observational
16   study, we had over 8,000 heart attacks in
17   our study. Compare that to what was in
18   the VIGOR study or the APPROVe study
19   where they had 30 or 40 heart attacks or
20   50 maybe or 60 in the VIGOR study. The
21   numbers -- it's just economy of scale.
22   The bigger the study is, it's like a
23   microscope, the better you can see what
24   the problems are.

KS-000346

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 186

1    Q.   Now, did you get -- by the
2  way, in 2000, I think the 2002 report,
3  there's an FDA report -- I don't want to
4  have to dig out the document. I hope
5  I'll be indulged here.
6         There's a report in which
7  Vioxx was -- there was a suspect drug
8  list in 2001 reported in 2002?
9    A.   Yes.
10   Q.   What drug was on the top of
11 the suspect drug list?
12   A.   Vioxx.
13   Q.   And was your study conceived
14 by you?
15   A.   Yes.
16   Q.   And was it conceived to
17 study this number one top suspect drug?
18      MR. BECK:  Object to form.
19 BY MR. KLINE:
20   Q.   Please.
21   A.   I wasn't aware at the time
22 that it was the number one drug. In my
23 mind, it was the leading public health
24 safety question that needed to be focused

Page 187

1  on. When we went to -- when we decided
2  to do the study, we had a teleconference,
3  videoconference with Merck that was
4  attended by myself, my office director,
5  Dr. Honig, his deputy, Dr. Himmel, both
6  of whom are now at Merck, and then people
7  from Kaiser. And we had a list of five
8  or six drug safety questions that we were
9  going to discuss which of these we
10 thought was the most important one that
11 needed to be studied. And the consensus,
12 hands down, of that group was that Vioxx
13 needed to be studied because that issue
14 affected more lives and the impact of
15 that was potentially greater than any of
16 the other drug safety questions we talked
17 about.
18   Q.   A side point. Do many
19 people move from the FDA into the drug
20 companies?
21   A.   There's a fair number.
22 There's a fair number who do, yes.
23   Q.   Now, the study. It was --
24 tell us what you did, what you went about

Page 188

1  doing. It was funded by the FDA,
2  correct?
3    A.   It was funded -- this study,
4  I've been told various estimates, that
5  this study cost -- should have cost -- if
6  it was being done today, it would have
7  cost over $1 million. That's what I was
8  told by people at the DSaRM committee in
9  February 2005. FDA contributed a total
10 of $60,000, which was basically good
11 faith money, and Kaiser underwrote all
12 the other expenses associated with the
13 study.
14   Q.   For the uninitiated, who is
15 Kaiser? They're going to hear about
16 Kaiser Permanente.
17   A.   It's Kaiser Permanente,
18 California. It's a managed care
19 organization in California. I believe
20 it's a not-for-profit organization, but I
21 could be wrong about that. This study --
22   Q.   Is it a healthcare plan?
23   A.   It's a healthcare plan like
24 an HMO.

Page 189

1    Q.   Do they have large
2  numbers -- a big population database
3  which you're able to mine?
4    A.   Yes. They have like 6
5  million patients.
6    Q.   Are they affiliated with
7  industry when they're involved in these
8  studies?
9    A.   There are some studies that
10 they can do with industry. This study
11 was done without industry input.
12   Q.   You got approval, and you
13 got funding from the FDA, correct?
14   A.   Correct.
15      MR. BECK: Object to form.
16 BY MR. KLINE:
17   Q.   Did you get approval?
18   A.   Yes.
19   Q.   From the FDA?
20   A.   Yes.
21   Q.   Did you get funding?
22   A.   Yes.
23   Q.   Did you go about your
24 business of conducting this study?

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

1      A.   Yes.
2      Q.   Did you do it with the kind
3   of scientific rigor that you would expect
4   from yourself and from others like you?
5      A.   Yes.
6          MR. BECK:  Object to form.
7   BY MR. KLINE:
8      Q.   Did you do it with
9   scientific rigor?
10         MR. BECK:  Object to form.
11         THE WITNESS:  Yes.
12  BY MR. KLINE:
13     Q.   How did you conduct it?
14     A.   Well, we assembled a study
15  team, and so we had a group of
16  investigators from Kaiser who were well
17  experienced with their database and
18  understood what different files were
19  needed to do the study that we were going
20  to do.  We had people from FDA who
21  participated as well, had a statistician,
22  someone from the medical review division.
23  Eventually those people dropped off the
24  study because they just never showed up

1   at the study meetings.  So, there was no
2   point in carrying them on.
3          And then I recruited the
4   assistance of Dr. Wayne Ray from
5   Vanderbilt, because he -- well, two
6   reasons:  one, we had a cooperative
7   agreement program where we funded him to
8   do research in a collaborative fashion
9   with FDA drug safety scientists, so, we
10  already had a relationship with him; and
11  two, he was very experienced in studying
12  these nonsteroidal pain relievers.  And
13  so the first thing was to assemble a
14  study team.
15         The second thing was to work
16  on a study protocol which -- we came up
17  with a rough protocol, but it went under
18  frequent modifications as we encountered
19  problems during the course of the study
20  where the way we thought the files would
21  work and the data would be available
22  turned out not to be the case, and so we
23  had to come up with workarounds.
24         But all that said, by August

1   of 2000, we had our data set and did our
2   analysis and went to -- wanted to present
3   them at the international conference on
4   pharmacoepidemiology in Bordeaux, France.
5      Q.   When was that?
6      A.   That was in August of 2004.
7      Q.   The study took a number of
8   years, obviously?
9      A.   Yes.  It took about three
10  years.
11     Q.   Is that unusual?
12     A.   The study probably could
13  have been more quickly if FDA had been
14  able to devote its -- my full time to it
15  and if Kaiser had been able to devote its
16  full time to it.  But Kaiser basically
17  had their patients to take care of, and
18  they were sort of adding this on to their
19  normal workload, and I had many other
20  assignments during this time.  So, I
21  think if we were trying to do the study
22  today, maybe we could have done it in a
23  year-and-a-half.
24     Q.   Now, you were the lead of

1   the study?
2      A.   Yes.
3      Q.   And it was your baby; is
4   that correct?
5      A.   Correct.
6      Q.   Was that known by your
7   bosses at the FDA?
8      A.   Oh, yes.
9      Q.   And did they know that you
10  were studying in particular Vioxx?
11     A.   Yes.
12     Q.   And were you studying other
13  COX-2s as well?
14     A.   We looked at Celebrex.  We
15  were not able to look at Bextra because
16  it wasn't used in Kaiser at the time of
17  our study.  And we looked at other pain
18  relievers as well, most particularly,
19  naproxen, because we also, in addition to
20  wanting to study whether or not Vioxx
21  increased the risk of heart attack, we
22  wanted to know whether naproxen protected
23  against heart attack.  And so we were
24  going to test both of those questions.

KS-000348

Confidential - Subject to Protective Order

1      Q.   Now, there's a story in
2  between, but at the end of the day, was
3  this study published in The Lancet?
4      A.   Yes, it was.
5      Q.   It was first on line January
6  25th of '05?
7      A.   Correct.
8      Q.   Was it peer reviewed by --
9  did it go through a peer review process
10  and was it peer reviewed?
11      A.   It went through peer review
12  twice.  A total of ten different peer
13  reviewers from The Lancet looked at this
14  paper, five on each of two occasions.  On
15  each occasion, the paper was accepted for
16  publication.
17      Q.   Was that unusual, that it
18  was peer reviewed twice and by that many
19  people?
20      A.   It was unusual, but it was
21  necessitated by efforts by the FDA to
22  suppress publication of the paper.
23      Q.   Yes, I'm going to have you
24  tell that story in a minute in your own

1  words.
2          At the end of the day when
3  you published the article, the article
4  was entitled "Risk of acute myocardial
5  infarction and sudden cardiac death in
6  patients treated with..."  Is that
7  correct?  That's the study?
8      A.   Yes.
9          MR. KLINE:  And we have it
10      here.  We'll mark it as the next
11      Exhibit Number, 4.
12          - - -
13          (Whereupon, Deposition
14      Exhibit Graham-4, "Risk of acute
15      myocardial infarction and sudden
16      cardiac death in patients treated
17      with cyclo-oxygenase 2 selective
18      and non-selective non-steroidal
19      anti-inflammatory drugs: nested
20      case-control study," (Graham, et
21      al) The Lancet 2-5-05 Vol. 365,
22      475-481, was marked for
23      identification.)
24          - - -

1  BY MR. KLINE:
2      Q.   This was the result, the
3  fruits of your four-year labor; is that
4  correct?
5      A.   Correct.
6      Q.   What was your bottom line of
7  your findings, sir?
8      A.   The bottom line was that
9  Vioxx at high dose increased the risk of
10  heart attack compared to basically nonuse
11  of the drug; that, compared to Celebrex,
12  which was the other leading COX-2 pain
13  reliever on the market, that Vioxx at
14  high dose and low dose increased the risk
15  of heart attack.  With low dose, it was
16  just a borderline statistical
17  significance, but the point estimate was
18  clearly there; and that naproxen did not
19  protect against heart attack, if
20  anything, it increased the risk
21  slightly.
22          MR. KLINE:  And if I may,
23      and let me find it, if I can mark
24      yet another exhibit, Lisa, the

1  PowerPoint that he presented to
2      the FDA Advisory Committee,
3      please.
4          We'll mark it as Exhibit
5      Number 5.
6          - - -
7          (Whereupon, Deposition
8      Exhibit Graham-5, "Review of
9      Epidemiologic Studies on
10      Cardiovascular Risk with Selected
11      NSAIDs," (Graham) PowerPoint
12      Slides, 2-17-05 DG0000107 -
13      DG0000127 , was marked for
14      identification.)
15          - - -
16          MR. KLINE:  And we have them
17      numbered?  We do have them
18      numbered.
19  BY MR. KLINE:
20      Q.   You presented at the FDA
21  Advisory Committee on February 17, 2005?
22      A.   Correct.
23      Q.   And the purpose of this
24  Advisory Committee very briefly, sir, was

KS-000349

Confidential - Subject to Protective Order

1  what?
2      A.   To review the evidence for
3  heart attack risk with the various
4  nonsteroidal pain relievers, so, both the
5  COX-2 type, the Vioxx-type drugs and the
6  traditional pain relievers like naproxen.
7      Q.   Vioxx was off the market as
8  of September 30, 2004?
9      A.   Correct.
10     Q.   So, this postdates the
11 withdrawal of the drug?
12     A.   Yes.
13     Q.   Did you have any doubt as to
14 your opinions which you had already --
15 which you had just published in the
16 Lancet and presented in many other
17 forums, sir?
18     A.   No.
19     Q.   Now, when you presented --
20 let me show the results.
21         MR. KLINE:  Do we have his
22     PowerPoint in front of him?
23         THE WITNESS:  Uh-huh.
24 BY MR. KLINE:

1      Q.   If you look at the last two
2  pages, your conclusions.  I believe they
3  -- I want to ask you, do the conclusions
4  here mirror only in a PowerPoint form the
5  conclusions that you reached and stated
6  to the medical world at large in your
7  peer-reviewed Lancet journal article,
8  sir?
9          MR. BECK:  Before you
10     answer, please, same objection.
11     This is another document that Dr.
12     Graham's lawyers took from the FDA
13     files and turned over to the
14     plaintiffs' lawyers outside the
15     normal scope.
16         THE WITNESS:  It's also
17     available on the web.
18         MR. KLINE:  Yes.  We hear
19     your objection, Mr. Beck.  It's
20     also available on the web, it's
21     also available in Merck's files
22     where we first, I think, found it.
23 BY MR. KLINE:
24     Q.   Having said that, Exhibit

1  Number -- Page 126 of Exhibit Number --
2          THE COURT REPORTER:  5.
3  BY MR. KLINE:
4      Q.   -- 5 --
5          MR. KLINE:  Thank you.
6      You're keeping track.  You're good
7      with numbers.  Better than me.
8  BY MR. KLINE:
9      Q.   -- is the conclusions you
10 reach regarding risk of MI, COX-2
11 selective NSAIDs, and I'd like to go to
12 rofecoxib, namely, Vioxx.
13     A.   Right.  The --
14     Q.   That's it.  Thank you, sir.
15     A.   The conclusions from our
16 study, this would mirror the conclusions.
17 The risk beginning early in therapy,
18 apparent during days 1-30 of use.  In our
19 study, we were only able to get at that
20 time event indirectly by looking at the
21 distribution of time of use of Vioxx.
22 And what we saw was that over 50 percent
23 of our patients used the drug for less
24 than four months.  And so that result

1  would say that the risk with Vioxx begins
2  early in therapy.  And so with that sort
3  of explanation, I would say that these
4  conclusions here for rofecoxib are
5  similar to the ones in our paper.  Our
6  paper did not address valdecoxib, which
7  is Bextra.  And with celecoxib, in that
8  study, we didn't have a lot of high dose
9  use, and we found no risk with the low
10 dose.
11     Q.   You said as to Vioxx that
12 equal to or less than 25 milligrams, your
13 words are "probable increased risk"
14 correct?
15     A.   Correct.
16     Q.   And greater than 25
17 milligrams "definite increased risk"?
18     A.   Correct.
19     Q.   When you presented this
20 paper at the Advisory Committee meeting,
21 did you speak to anyone from Merck?
22     A.   I think I did.  I think I
23 spoke to Peter Honig, but it was
24 basically -- he just said hello, how are

KS-000350

Confidential - Subject to Protective Order

Page 202

1  you doing.  I said, hi Peter, how are you
2  doing.  And then the conversation kind of
3  shifted.  And I said to him, Peter, you
4  just need to understand one thing, that
5  everything I have been doing here with
6  these drugs has nothing to do with Merck.
7  So, in my mind I'm not making a target of
8  Merck.  It has to do with the safety of a
9  drug.  That's all I'm interested in.  His
10  response back to me was that I'm glad to
11  hear that.
12      Q.   I want to go to Page 127,
13  because on Page 127 of your PowerPoint to
14  the Food & Drug Administration Advisory
15  Committee, you told them after your study
16  that naproxen, in your view, if we can
17  highlight this, you said, "not" cardio
18  "protective," correct?
19      A.   Correct.
20      Q.   In fact, you said the exact
21  opposite?
22      A.   No.  I said there's a
23  possibility.
24      Q.   Or a gradation of the exact

Page 203

1  opposite?
2      A.   Correct.
3      Q.   Namely, sir?
4      A.   That the evidence supported
5  the possibility that naproxen increased
6  the risk.  Subsequently, I've done a
7  meta-analysis of this that hasn't been
8  published yet where the risk of naproxen
9  is slightly increased.  It confers about
10  a ten percent increase in heart attack
11  risk.
12      Q.   Not a decrease?
13      A.   Not a decrease.
14      Q.   And -- okay, now.  If you
15  look at the Advisory Committee meeting,
16  your PowerPoint number 1 -- let's see,
17  it's 114, Page 114.  We'll put it up very
18  briefly and try to work through this
19  stuff in our waning moments.
20          I see here, "Risk of AMI
21  with Celecoxib Or Rofecoxib."  I want to
22  focus on Vioxx, rofecoxib.  Okay?
23      A.   Uh-huh.
24      Q.   What you did here was to

Page 204

1  collect the data from the various
2  studies, correct?
3      A.   Correct.
4      Q.   At all doses, just focusing
5  on the "all doses," your study showed an
6  increased risk of -- what are you showing
7  increased risks of here to be clear?
8  What are you characterizing it?
9      A.   We showed an increased risk
10  of heart attack and sudden cardiac death
11  as a -- sort of considering those
12  together.
13      Q.   By the way, sir, and I hate
14  to do it this way, but I forgot earlier.
15  When you gave me your figures of 88,000
16  to 140,000 excess cases of serious
17  coronary heart disease in the life of
18  Vioxx in the United States, how many of
19  those -- did you do a calculation of how
20  many of those were deaths?
21      A.   Yes.  It's about 40 percent.
22  So, if you multiply .4 by each of the
23  numbers, you come up with a range that's
24  somewhere in the neighborhood of 40,000

Page 205

1  to 60,000.
2      Q.   40,000 to 60,000 excess
3  deaths over those that would have been
4  if --
5      A.   Patients had not used
6  rofecoxib, had not used Vioxx.
7      Q.   Back to the relative risks.
8  If we can just focus in on all doses of
9  Vioxx, we have relative risks which are
10  above 1 in the Graham study, is that
11  correct?
12      A.   Yes.
13      Q.   The Solomon study?
14      A.   Yes.
15      Q.   The Kimmel study?
16      A.   Yes.
17      Q.   The Ingenix study?
18      A.   Yes.
19      Q.   And the Medi-Cal study?
20      A.   Yes.
21      Q.   And you were involved in the
22  Medi-Cal study as well, correct?
23      A.   Correct.
24      Q.   Very briefly.  I'm going to

KS-000351

Confidential - Subject to Protective Order

Page 206

1  sort of bang at a couple points here.
2          50 milligram dosage, you
3  wrote a paper on it, correct, sir?
4      A.   Yes.  It hasn't been
5  published yet.
6      Q.   I thought you wrote an early
7  paper on 50 milligrams and its usage.
8      A.   Yes, we did.
9      Q.   What was your point?  You
10 can probably tell me in a sentence or
11 two.
12     A.   One, that the higher doses
13 are more toxic, there's a dose response,
14 so, the highest doses have the highest
15 toxicity; and that they're used
16 extensively, 18 percent of the
17 population; and people use them for long
18 periods of time, not for the short
19 periods of time that people at FDA say
20 it's only approved for five days of use.
21 But if you read the label closely, it
22 says it hasn't been studied for more than
23 five days of use, and then it says
24 "chronic use is discouraged."  It doesn't

Page 207

1  say that it can't be used.  So, what we
2  found is it's used much longer than what
3  people customarily thought, it's used
4  much more frequently than you would have
5  imagined, and that it has higher toxicity
6  than the other drugs.
7      Q.   What is the relative -- what
8  is the increased risk for a patient using
9  Vioxx at 50 milligrams according to your
10 epidemiological studies, sir?
11     A.   Okay.  Well, if you were --
12 let's say you're a 65 to 70-year-old --
13 74-year-old white male, which might be a
14 typical Vioxx user.  Your background risk
15 for heart attack in the next year is 2
16 percent, 1 in 50, 2 in 100.  That's from
17 the American Heart Association.  If I
18 were to increase your risk of heart
19 attack by a factor of 5 as occurred, say,
20 in the VIGOR study, you would go from a
21 risk of heart attack of 2 per 100 to 10
22 to 100.  So, that would be going from 1
23 in 50 to 1 in 10 if you used the drug
24 over a year.

Page 208

1      Q.   Now, when we see a relative
2  risk like in your study of 1.34, let me
3  understand something.  If there were
4  1,000 nonusers, that would be -- there
5  would be 1,340 who had an incident; is
6  that correct?
7      A.   Basically, what it's saying
8  is if the natural occurrence in some
9  population was 1,000 cases --
10     Q.   Yes.  That's how I wanted to
11 put it.
12     A.   -- that using Vioxx, you
13 would get another extra 340 over and
14 above the thousand that would have
15 occurred anyway.
16     Q.   Why did I know you'd say it
17 better than me.
18          Now, that was the point I
19 wanted to try to ask you.
20          Now, what I want to do in
21 the remaining direct examination is to
22 ask you about how this study came about
23 in the period in 2004 when you were ready
24 to present the study and its results.

Page 209

1  Tell us the background, the atmosphere,
2  and what occurred with your attempt to
3  present this as a paper, your attempt to
4  present it as a poster at the American
5  College of Rheumatology, your attempt to
6  present it at the International Society
7  of Pharmacoepidemiologists.
8          First of all, is there a
9  story there, sir?
10     A.   Yes, there's a story.
11     Q.   And what is -- would you
12 please tell the members of the jury the
13 story.
14     A.   Well, there's a couple of
15 stories.  One story relates to two
16 different abstracts, one for the American
17 College of Rheumatology or ACR and one
18 for ISPE.  The data in the two abstracts
19 are different.  This was a cause for
20 concern, but basically the way it came
21 about was, my making mistakes along the
22 way.
23          The ACR abstract reflected
24 an inaccurate, an incorrect analysis of

KS-000352

Confidential - Subject to Protective Order

Page 210

1  the data.  We had misclassified patients,
2  and we discovered it after we put that
3  abstract in for -- submitted it to the
4  meeting, that required that we correct
5  it.  Because to not correct it, that
6  would be scientific misconduct, because
7  we had a problem, we saw it, and we
8  couldn't allow it to go uncorrected.
9      The second problem that I
10  was actually much more concerned about
11  was that I had done the analysis
12  incorrectly.  In the ACR abstract, we
13  talked about a number of different drugs,
14  and I don't remember it right offhand
15  now, I'd need it in front of me, but
16  let's say there were like five different
17  drugs that we looked at.  That's probably
18  more or less what it is.  In that study,
19  I did what's called a regression analysis
20  for each drug separately, and then I came
21  up with an answer.  Well, that's the
22  wrong way to do the study because if I
23  focus on one drug, I'm leaving the data
24  for the other four drugs out of the

Page 211

1  regression.  What you need to do is do a
2  single analysis that includes all five
3  drugs together at the same time in one
4  place.  And when we learned about that
5  mistake, I was embarrassed, but I was
6  also kind of happy.  I was happy because,
7  well, A, we'd caught the mistake; and B,
8  because I learned something that I hadn't
9  known before, and so we corrected the
10  mistakes.  And so the corrected data, if
11  you will, the corrected analyses were
12  present in the ISPE poster.  So, now, the
13  ISPE poster --
14      Q.  Okay.  So, you had some
15  issues.  Is this uncommon, by the way,
16  sir?
17      A.  No, it's not uncommon.
18      Q.  Dr. Graham, did you deal
19  with this with openness and transparency?
20      MR. BECK:  Object to the
21  form.
22      THE WITNESS:  Yes.
23  BY MR. KLINE:
24      Q.  How did you deal with this?

Page 212

1      A.  We dealt with it with
2  openness and transparency.
3      MR. BECK:  Move to strike.
4  BY MR. KLINE:
5      Q.  How did you deal with it?
6      A.  Well, let's see.  We had a
7  blinded group that had to vote in a
8  unanimous way to change the way we had
9  classified a drug.  So, if any one person
10  in the group said no, I think this drug
11  should stay classified the way it was
12  before, we wouldn't change it.  When we
13  went about the analyses and I discovered
14  the analyses, I checked it with a number
15  of different statisticians around the
16  country, people at Stanford, people
17  within FDA.  I contacted Norm Breslow,
18  who is a statistician, I think he's at
19  the University of Washington and has
20  written sort of like the definitive
21  textbook on the analysis of case-control
22  studies because I wanted to make sure
23  that the way I'd done it was wrong and
24  that I needed to change it.  And then --

Page 213

1      Q.  You got it changed?
2      A.  We got it changed.
3      And when we went to publish
4  the paper, one of the first things that I
5  did was I sent an e-mail to the editor of
6  The Lancet and asked for the opportunity
7  to speak with him before they reviewed
8  our paper.  And he called me and we spoke
9  for about 45 minutes.  The purpose of it
10  was to explain the ACR abstract and what
11  our paper was, why the differences
12  occurred, where they occurred, how we
13  handled them.  And his response back to
14  me was twofold.  He said, thank you for
15  your candor and your honesty and your
16  openness.  This happens all the time, and
17  I'm not concerned at all.  This is the
18  scientific method.
19      Q.  Now, did you face -- I want
20  to get to this.  I'm going to try to do
21  it literally in about five minutes or ten
22  minutes.  I'm going to go a little bit
23  over.
24      Would you tell the members

KS-000353

Confidential - Subject to Protective Order

Page 214

1  of the jury who hear this tape what
2  barriers and obstacles you faced in the
3  publication -- the presentation of this
4  information and explain the background.
5      A.   Right.
6      Q.   Are you able to capsulize it
7  like you did in front of the United
8  States Senate?
9      A.   I can try.
10         When I presented my results
11  of the study for clearance for the
12  abstract for ISPE, the reaction from my
13  supervisor was, oh, this is an
14  excellently done study, I only have one
15  problem, that's with your conclusion.
16  And he wanted me to change my conclusion.
17  And my conclusion was that Vioxx at high
18  doses increases the risk of heart attack,
19  and it shouldn't be prescribed by
20  physicians or used by patients.  So,
21  basically, I'm saying that the high dose
22  should come off the market.  That's what
23  I'm saying.  But I can't say that
24  outright, because the way FDA is, if I

Page 215

1  had said that, they would have buried me.
2  As it is, they spent three days harassing
3  me to force me to change the abstract.
4  In the process, they said, well, we're
5  not going to let you go to ISPE, oh, we
6  want you to present our view of the truth
7  so you can present what you believe and
8  what you don't believe.  Oh, we have to
9  let Merck know.  That came from Dr. Anne
10  Trontell, who is deputy office director
11  and a close personal friend of Peter
12  Honig.  And I only mention that --
13     Q.   From Merck?
14     A.   From Merck.  And I only
15  mention that because when Peter Honig was
16  a division director and then an office
17  director in our office, he's the person
18  that brought Dr. Trontell in to work with
19  us, and so she felt a great sense of
20  loyalty.  And so she was talking about,
21  we have to -- it's all right.  I can't
22  present it at ISPE, but we have to let
23  Merck know about it.  And that was the
24  FDA response.

Page 216

1          And then from the director
2  of the Office of New Drugs, this
3  contradicts our policy because our policy
4  says that the high dose is safe and
5  effective so how can he say it's not.
6          So, those are basically the
7  obstacles I had to face just to present
8  it in France.
9      Q.   Did you have an original
10  poster presentation which you ran up the
11  line at the FDA?
12     A.   Yes.
13     Q.   And did you say in that what
14  you told this jury, that 50 milligrams
15  should be off the market?
16     A.   I didn't phrase it that way,
17  but that was the clear implication, and
18  that was my intent.  And obviously that
19  was, I think, the interpretation that my
20  superiors at FDA took about it as well.
21     Q.   Did you accept some
22  editorialization by them and changes by
23  them by the time you did the final
24  presentation?

Page 217

1      A.   The final presentation was,
2  the conclusions were changed slightly,
3  and I wasn't happy with having had to
4  change them.  But if I hadn't changed
5  them, I would not have been allowed to
6  present the paper, and I thought it was
7  more important to get the information out
8  than to get it out with the conclusion
9  that I completely --
10     Q.   Which you did, correct?
11     A.   -- trusted.  Which I did.
12     Q.   And you presented the paper?
13     A.   Yes.
14     Q.   Now, what was the next step
15  along the way?  Was it putting this
16  into -- did you then get any more flack
17  at the FDA?
18         MR. BECK:  Object to form.
19         THE WITNESS:  When I
20  returned --
21  BY MR. KLINE:
22     Q.   I'll rephrase the question.
23  I don't want to have a word that might be
24  a problem.

KS-000354

Confidential - Subject to Protective Order

Page 218

1    Did you run into any more
2  difficulties at the FDA as your process
3  went forward towards turning the poster
4  and the abstract into a paper?
5        MR. BECK:  Object to the
6  form.
7        THE WITNESS:  Yes.  I ran
8  into many obstacles.  The first
9  was almost as soon as I returned
10  from France, so, it was at the
11  very end of August or the very
12  beginning of September, that I was
13  verbally scolded by my supervisor.
14  Basically, he accused me of having
15  orchestrated a media campaign to
16  publicize my poster at ISPE.  It
17  was just a ridiculous accusation,
18  but he was quite heated and quite
19  angry at me, even though Dr.
20  Trontell had said in one of her
21  e-mails this is going to attract a
22  lot of media attention.
23  BY MR. KLINE:
24     Q.   Who is she?  Those that are

Page 219

1  listening might be uninitiated.
2     A.   Dr. Trontell is the deputy
3  office director and the person --
4     Q.   Is she your immediate boss?
5     A.   No.  She's not my supervisor
6  at all.
7     Q.   Where is she from?
8     A.   She's in the Office of Drug
9  Safety.  She originally came from the
10  Office of New Drugs and was brought to
11  drug safety by Dr. Peter Honig.
12     Q.   Is this an example in your
13  mind of the problems in the FDA more
14  generally?
15     A.   Yes.
16        MR. BECK:  Object to form.
17  BY MR. KLINE:
18     Q.   Tell us why.
19     A.   It's an example of FDA
20  suppressing its scientists, not allowing
21  for the free exchange of scientific
22  information or free expression of
23  scientific information.  It's an Office
24  of Drug Safety that doesn't act

Page 220

1  independently of what the Office of New
2  Drugs says it wants to have happen.
3     Q.   Is that what was happening
4  here?
5     A.   And that was what was
6  happening here.
7        MR. BECK:  Object to form.
8  BY MR. KLINE:
9     Q.   In what way specifically?
10        MR. BECK:  Same objection.
11        THE WITNESS:  Well, it's
12  coming specifically because they
13  don't want anything publicized
14  that would contradict FDA policy
15  or that would call into question
16  the legitimacy or the rationale
17  for that policy.  Remember, when
18  FDA made the -- eventually made a
19  labeling change on Vioxx with
20  Merck in April of 2002, what FDA
21  was saying at that point is by
22  doing this labeling change, we
23  have now altered the benefit/risk
24  equation for this drug into an

Page 221

1  acceptable range.  Before the
2  labeling change, it was
3  unacceptable.  Now it's
4  acceptable.
5  BY MR. KLINE:
6     Q.   Was it, in your view,
7  acceptable?
8     A.   Oh, clearly, no.
9        And what this poster's
10  conclusion was saying was was that FDA's
11  policy should be more closely examined.
12        And you mentioned before
13  that I had appeared on Nightline and I
14  had the opportunity to debate Dr. Janet
15  Woodcock, who is now an associate
16  commissioner at FDA, and she had been the
17  center director at one time.  And I asked
18  her --
19     Q.   CDER director?
20     A.   CDER.  I asked her directly
21  on national television, tell America what
22  the benefit/risk analysis from FDA was on
23  Vioxx.  Tell them.  Because I haven't
24  seen one, and as far as I'm aware, none

Confidential - Subject to Protective Order

Page 222

1  exists.  And the truth is none exists.
2  And Ted Koppel got all over her case
3  because when he saw that it hadn't been
4  done, he was pretty upset, too, because
5  FDA said the benefits exceed the risks.
6       Q.   Couple more things.
7            In your view, the benefits
8  clearly did not exceed the risks?
9            MR. BECK:  Object to form.
10           THE WITNESS:  No.
11 BY MR. KLINE:
12      Q.   In your view, did the
13 benefits clearly exceed the risk or
14 exceed them at all?
15           MR. BECK:  Object to form.
16           THE WITNESS:  No.  The
17      benefits did not exceed the risks.
18 BY MR. KLINE:
19      Q.   In fact, was it the
20 opposite?
21           MR. BECK:  Object to form.
22           THE WITNESS:  This drug was
23      risky.  And the benefits that one
24      gained at a population level for

Page 223

1       the risks just weren't worth it.
2       The juice wasn't worth the
3       squeeze, and in my view, as I said
4       before, I think that Vioxx was
5       approved prematurely, and clearly
6       if more work had been done,
7       certainly the high dose shouldn't
8       have been approved.  And if it had
9       been approved, it should have been
10      withdrawn with the VIGOR study.
11      And at that point, intensive study
12      at the lower doses should have
13      been enacted with a very large
14      clinical trial done in a very
15      short space of time to nail down
16      the question.  And I'm not talking
17      about an APPROVe-like study that
18      takes four or five years to do and
19      has only five or six heart attacks
20      in six months.  I'm talking about
21      a really huge study that gives you
22      the opportunity, the power, to
23      answer the question definitively.
24      And that was not done.

Page 224

1  BY MR. KLINE:
2       Q.   Everything of what you just
3  said, sir, was it within the resources
4  and capability of Merck & Company?
5       A.   Yes, it was.
6            MR. BECK:  Object to form.
7            MR. KLINE:  Let's go off the
8  video record.
9            THE VIDEOTAPE TECHNICIAN:
10 Stand by, please.  The time is
11 12:53.  We're going off the video
12 record.
13           - - -
14      (Whereupon, a recess was
15 taken from 12:53 p.m. until 12:55
16 p.m.)
17           - - -
18           MR. KLINE:  Dr. Graham, I
19 have no additional questions at
20 this time.  I'm sure I'll have
21 questions for you after your
22 cross-examination.  Thank you,
23 sir.
24           THE WITNESS:  You're

Page 225

1  welcome.
2            THE VIDEOTAPE TECHNICIAN:
3  Stand by, please.  The time is
4  12:55.  We're going off the
5  record.
6            - - -
7       (Whereupon, a recess was
8  taken from 12:55 p.m. until
9  2:03 p.m.)
10           - - -
11           MS. ROYCE:  This is Joanne
12 Royce representing Dr. Graham, and
13 I just wanted to address an issue
14 that was raised a couple of times
15 by Mr. Beck regarding a document
16 production.
17      Last week we got a request
18 from the plaintiffs' documents for
19 a number -- from the plaintiffs'
20 attorneys for a number of
21 documents which were very
22 specific.  They were all public
23 documents or documents that we had
24 no reason to believe that the FDA

Confidential - Subject to Protective Order

Page 226

1     would have any confidentiality
2     issues with.  They were
3     post-subpoena documents, and we
4     did turn them over, and we
5     requested that they be immediately
6     turned over to the defendants as
7     well.  And so I understand that
8     you got the documents at the same
9     time that the plaintiffs did, and
10    we certainly had no intention to
11    slight the defendants.
12        We got your request for
13    documents one day before the
14    deposition when we were all
15    preparing for it yesterday.  It
16    was extremely broad.  We
17    considered that most of it was
18    covered by the subpoena that had
19    already gone to the FDA, and so we
20    contacted the FDA, and they
21    instructed us that we could not
22    release them -- should not release
23    them yet.
24        Thank you.

Page 227

1         THE VIDEOTAPE TECHNICIAN:
2     The video time is 2:04.  We are
3     back on the record.
4              -  -  -
5         CROSS-EXAMINATION
6              -  -  -
7     BY MR. BECK:
8         Q.   Dr. Graham, you talked a
9     little bit on direct examination about
10    your medical training as well as your
11    training as an epidemiologist.  Do you
12    practice medicine now?
13        A.   No, I do not.
14        Q.   Have you ever actively
15    practiced medicine?
16        A.   Yes, I did, if you count
17    residency training and then professional
18    development after I finished doing my
19    residency, during my fellowship, and then
20    while I was in my early years as a
21    medical officer at FDA.  So, during those
22    times I practiced, but I did that at
23    Walter Reed Army Medical Center.
24        Q.   How long ago would this have

Page 228

1     been?
2         A.   The last time that I saw
3     patients in active patient care was in
4     the realm of neurology.
5         Q.   How long, sir?
6         A.   15 years.
7         Q.   Okay.
8              And I'm going to make the
9     same request that Mr. Kline did, and that
10    is, that you keep your answers short.
11    For example, when I ask you how long, if
12    you could just tell me how long rather
13    than what hospital it was at and what
14    department you were in.  Okay?
15        A.   Sure.
16        Q.   So, for the last 15 years,
17    you have been focusing pretty much
18    exclusively on epidemiology and drug
19    safety rather than practicing medicine;
20    is that correct?
21        A.   Correct.
22        Q.   On direct examination, you
23    were asked whether you were subpoenaed to
24    appear here, and you said yes.  But do

Page 229

1     you understand that that's simply the FDA
2     rules, that an FDA employee cannot appear
3     to testify unless there's a subpoena
4     issued?
5         A.   I'm not a lawyer, so, I do
6     what I'm told.  I was served with a
7     subpoena, and I gave it to the FDA
8     lawyers.
9         Q.   Well, didn't you also tell
10    newspaper reporters or news reporters
11    that you welcomed the opportunity to give
12    deposition testimony?
13        A.   I don't recall what I said
14    to the press.
15        Q.   We spent a few minutes here
16    before I started, your lawyer made a
17    statement about the circumstances under
18    which you provided the plaintiffs with
19    some documents late last week.  You were
20    here when your lawyer made those
21    statements, correct?
22        A.   Yes.
23        Q.   Do you remember that a few
24    months ago the plaintiffs' lawyers served

KS-000357

Confidential - Subject to Protective Order

Page 230

1  a document subpoena on the FDA, a formal
2  document subpoena?
3      A.   I'm not aware of that.
4      Q.   Well, did you know that the
5  FDA was collecting documents from
6  people's computers and files in order to
7  turn over in response to some sort of
8  formal request from the plaintiffs'
9  lawyers?
10     A.   Right.  And I turned over
11 documents at that time.  I think it was
12 like in October.
13     Q.   Okay.
14          So, way back in October you
15 were giving documents to the FDA lawyers,
16 I suppose, who were collecting them in
17 response to the subpoena from the
18 plaintiffs; is that right?
19     A.   I give them to an office
20 manager, and what happens to them after
21 that, I don't know.
22     Q.   And then last Friday, did
23 you collect another couple hundred pages
24 of documents from your computer at the

Page 231

1  FDA offices and from your FDA files and
2  give them to your lawyers to be turned
3  over to the plaintiffs?
4      A.   My attorneys asked for
5  specific documents, and I provided them
6  to them.  I wasn't told what would happen
7  with those documents.  Also, the
8  documents that I turned over, it wasn't
9  hundreds of pages as I recall, and the
10 documents in terms of like the PowerPoint
11 presentations, those were things that I
12 had actually done on my own time as
13 outside activities with FDA, and I had
14 copies of them at work as well.
15     Q.   You didn't have copies of
16 them at home, right?
17     A.   That's correct.
18     Q.   So, you only retained copies
19 in your office at work, right?
20     A.   Correct.
21          MR. BECK:  Let me show you
22 what we'll mark as Defendant's
23 Exhibit 1.  I guess I'll just go
24 in sequence from where he left off

Page 232

1      rather than defendant's exhibits.
2          We'll call this Graham
3  Exhibit 6.
4              -  -  -
5          (Whereupon, Deposition
6  Exhibit Graham-6, Letter 5-5-06
7  (1 page), was marked for
8  identification.)
9              -  -  -
10         MR. BECK:  And we'll put
11 this up on the screen that we've
12 been using.
13 BY MR. BECK:
14     Q.   Is this stationery, is this
15 from the lawyers who are here
16 representing you today?
17     A.   Repeat that, please, sir.
18 I'm sorry.
19     Q.   This stationery where this
20 letter is written on, is this from the
21 lawyers who are here representing you
22 today?
23     A.   Yes.
24     Q.   And do you see here where

Page 233

1  your lawyers, or Mark Cohen, one of them,
2  is writing to Mr. Tisi, who is one of the
3  plaintiffs' lawyers:  "Enclosed please
4  find documents responsive to your May 5,
5  2006 letter requesting certain
6  information in anticipating of the
7  deposition of Dr. Graham on May 9th.
8  Please understand that since these
9  documents were stored on Dr. Graham's FDA
10 computer or in his FDA office, Dr. Graham
11 did not consider them responsive to the
12 subpoena issued by Merck on April 3,
13 2006.  Please...make sure that these
14 documents are forwarded to counsel for
15 Merck and counsel for the FDA."
16         And is this accurate in
17 terms of you didn't consider those
18 PowerPoints and other documents to be
19 responsive to Merck's earlier subpoena
20 because they were retained in the FDA
21 files and on the FDA computer?
22     A.   I discussed this with Mike
23 Levy, who is --
24         MS. ROYCE:  Objection,

Confidential - Subject to Protective Order

Page 234

1    attorney-client privilege.
2    BY MR. BECK:
3        Q.   I don't want to know what
4    you and your lawyers talked about.  I
5    want to know whether this is an accurate
6    statement.
7            MS. ROYCE:  Objection, lack
8        of foundation.  Has he read it?
9    BY MR. BECK:
10        Q.   You just went over it with
11    me, didn't you, sir?
12        A.   I haven't read the letter
13    yet.  You asked me to look at the
14    letterhead and the name, and I did.
15        Q.   Well, I just read the letter
16    out loud.
17        A.   You did, you did -- okay.
18    You read it out loud to me.
19        Q.   Yes, and I read it out loud,
20    and the lawyer representing you said
21    that, "Please understand that since these
22    documents were stored on Dr. Graham's FDA
23    computer or in his FDA office, Dr. Graham
24    did not consider them responsive to the

Page 235

1    subpoena issued by Merck on April 3,
2    2006."
3            My only question is whether
4    that statement is true or not?
5        A.   I was told that the subpoena
6    on April 3rd excluded specifically
7    materials that were in my FDA office or
8    on my FDA computer, and so those things
9    then weren't responsive.
10        Q.   This letter from one of your
11    lawyers says that they're sending these
12    documents in response to a May 5th, 2006
13    letter.  Do you see that?
14        A.   Uh-huh.
15        Q.   Did anybody ever show you a
16    letter, May 5th letter, 2006 requesting
17    documents?
18        A.   No.  I may have had
19    something read to me over the telephone
20    by my attorney, but I honestly don't
21    recall.
22            - - -
23            (Whereupon, Deposition
24    Exhibit Graham-7, E-mails (2

Page 236

1        pages), was marked for
2        identification.)
3            - - -
4    BY MR. BECK:
5        Q.   I'm handing you what we've
6    marked as Exhibit 7.  Please take a look
7    at that top e-mail, and to set the stage,
8    someone from our office was asking about
9    the -- Shayna Cook from my office was
10    asking plaintiffs' lawyers for a copy of
11    a letter that was sent to Dr. Graham's
12    counsel requesting documents.
13            Do you see that?
14        A.   Uh-huh.
15            MR. KLINE:  Can we read the
16        whole thing for completeness under
17        the completeness doctrine, Rule
18        160?
19            MR. BECK:  What part do you
20        want read?
21            MR. KLINE:  The bottom part
22        that starts the e-mail train.
23            MR. BECK:  Sure.
24    BY MR. BECK:

Page 237

1        Q.   Start at the bottom, and
2    we'll charge this against Mr. Kline's
3    time.
4            MR. KLINE:  No, I don't
5        think so.
6    BY MR. BECK:
7        Q.   At the bottom, Ms. Dagostino
8    of Mr. Kline's office says, "Shayna, I
9    understand you e-mailed Chris Tisi
10    earlier re:  plans for document
11    presentation during the Graham dep on
12    Tuesday.  We will likely be utilizing
13    some combo of hard copies and Sanctions.
14    I hope that answers your question.
15            "Also - attached please find
16    some documents we received late today
17    from Dr. Graham's lawyers at the
18    Government Accountability Project.  This
19    will be the first of three emails.  Mr.
20    Kline wanted to make sure that your
21    office had them before the weekend."
22            And then right above that
23    Ms. Cook says please give us a copy of
24    the letter that you sent to Dr. Graham's

KS-000359

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 238

1    lawyers requesting documents.
2            And then what the
3    plaintiffs' lawyer said was that: "No
4    letter was sent, but an oral request was
5    made on Thursday to Dr. Graham's
6    counsel," et cetera.
7            Now, did you know that the
8    reason --
9            MS. ROYCE: Objection. Lack
10           of foundation. You're
11           cross-examining on something he's
12           probably never even read.
13           MR. BECK: Counsel, do you
14           consider yourself bound in any way
15           by the order from The Court about
16           what kind of objections are going
17           to be made?
18           MS. ROYCE: Yes, sir.
19           MR. BECK: Okay.
20   BY MR. BECK:
21       Q.   Now, did you have any
22   understanding of whether, in fact, a
23   request had even been put in writing or
24   whether it was just a phone call from the

Page 239

1    plaintiffs' lawyers to your lawyers
2    asking that you produce FDA documents on
3    one day's notice?
4        A.   I was asked by my attorneys
5    to --
6            MS. ROYCE: Objection,
7            attorney-client privilege. I'm
8            going to ask the witness and
9            instruct him not to answer.
10   BY MR. BECK:
11       Q.   Well, did you ever find out
12   that I then wrote a letter asking for
13   other documents related to the ones that
14   you turned over to the plaintiffs'
15   lawyers last Friday?
16       A.   I learned sometime yesterday
17   late morning that someone from Merck,
18   maybe it was you, had put in a request
19   for basically what I was told, a broad
20   range of documents that mirrored the
21   previous subpoena of my entire family's
22   e-mail history for the past seven years.
23       Q.   But they didn't show you the
24   actual letter?

Page 240

1        A.   I talked by telephone.
2        Q.   All right.
3            You turned over some
4    documents from your personnel file to the
5    plaintiffs' lawyers last Friday, didn't
6    you?
7        A.   Copies of performance
8    evaluations, yes.
9        Q.   Were you told that we asked
10   for any other documents that you had from
11   your personnel files?
12       A.   On Monday, it was mentioned,
13   among other things, that you wanted
14   everything from my personnel file, and I
15   said to my attorneys that --
16           MS. ROYCE: Objection,
17           attorney-client privilege.
18   BY MR. BECK:
19       Q.   Why did you turn over
20   documents voluntarily from your personnel
21   file to the plaintiffs' lawyers, but you
22   wouldn't turn over the other documents
23   from your personnel file to us?
24       A.   I turned them over to my

Page 241

1    attorneys, not to the plaintiffs'
2    attorneys.
3        Q.   Why did you do that in
4    response to a request by the plaintiffs'
5    attorneys, but then you wouldn't give us
6    the rest of the file when we asked for
7    it?
8            MS. ROYCE: Objection,
9            argumentative.
10           THE WITNESS: Do I answer?
11           MS. ROYCE: You can answer.
12           THE WITNESS: I was
13           following the instruction of my
14           attorneys.
15           MR. BECK: We can go off the
16           video record for a minute.
17           THE VIDEOTAPE TECHNICIAN:
18           Stand by.
19           The time is 2:18. Off the
20           video record.
21           MR. BECK: Let's stay on the
22           record.
23           Counsel, either you're going
24           to abide by the judge's rulings or

Confidential - Subject to Protective Order

Page 242

1   we're going to take a break and
2   call him up now.  So, tell me how
3   you want to do it.
4        MS. ROYCE:  What am I doing
5   wrong?
6        MR. BECK:  You're making
7   objections other than objections
8   as to form, making objections as
9   to argumentative, making
10  objections as to foundation.
11       Mr. Kline read the Judge's
12  order about what counsel was
13  supposed to do and how they're
14  supposed to comport themselves
15  during the deposition.  I didn't
16  hear a single objection from you
17  this morning, and my only question
18  is, if you intend to go beyond
19  form, I can't stop you.  But at
20  some point, we'll have to take a
21  break and call Judge Fallon.
22       MR. KLINE:  Respectfully,
23  Mr. Beck, form and privilege.
24       MR. BECK:  Yeah, that

Page 243

1   doesn't have to do with
2   argumentative or foundation, and I
3   didn't raise any question about
4   privilege.
5        MR. KLINE:  He and I agree.
6   Form and privilege are things that
7   you can object to.
8        MS. ROYCE:  Okay.  Sorry.
9            - - -
10       (Whereupon, an
11  off-the-record discussion was
12  held.)
13           - - -
14       MR. KLINE:  May we go back
15  off the record for a second?  I
16  apologize, Phil.  Count it against
17  me.  Don't count the optional
18  completeness against me, but --
19       MR. BECK:  If you're going
20  to do it, I didn't do that to you.
21  You're going to have me reading
22  documents --
23       MR. KLINE:  I just wanted
24  you to know.  That was my way of

Page 244

1   saying that's a two-edged sword.
2        MR. BECK:  I didn't do it to
3   you, so it is a one-edge sword.
4        MR. KLINE:  You did it
5   during a whole trial, so it's a
6   two-edged sword.
7        The only issue that I raise
8   with you, which is something
9   different than we have among the
10  parties, and I don't know the
11  exact history behind it, has to do
12  with I don't know how she gets to
13  preserve -- a third party gets to
14  preserve an objection.  Maybe they
15  come in later and argue.  I assume
16  they have the right to argue that
17  sometime later when the deposition
18  is cut or the deposition is to be
19  played.  My concern being for any
20  third party how we go about
21  interpreting that.  And I don't
22  want to hold you up honestly,
23  Phil, but that's my problem that I
24  have with that.

Page 245

1        MR. BECK:  Well, she doesn't
2   have any interest in whether
3   there's a lack of foundation or
4   not.  That's not her concern.
5        MS. ROYCE:  She did.
6        MR. BECK:  She's here.
7        MR. DAVIS:  If I may.
8        MR. KLINE:  Len knows the
9   history.
10       MR. DAVIS:  If I may.
11       MR. BECK:  I take it we're
12  off the clock here --
13       MR. KLINE:  Totally.
14       MR. BECK:  -- while we're
15  getting lectured.
16       MR. KLINE:  Totally.
17       MR. DAVIS:  Having been
18  involved with Judge Fallon and
19  having seen the order, I think
20  that Judge Fallon would expect
21  professionalism and courtesy
22  throughout the deposition as he
23  expects throughout this
24  litigation.

KS-000361

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 246

1    I would think that if you
2  have an objection on behalf of the
3  witness, that you should make your
4  objection, but the intent is not
5  to obstruct the deposition and to
6  have colloquy, and I think you
7  need to preserve your record and I
8  think not waste time.
9    I think that if there's an
10  issue, then you guys ought to call
11  Judge Fallon if you think it needs
12  that.  Other than that, I think
13  you ought to get the show on the
14  road and go forward with the
15  deposition.
16    MR. BECK:  Well, that's
17  where we were, I think, five or
18  ten minutes ago.
19    So, are we ready to go back?
20    THE VIDEOTAPE TECHNICIAN:
21  The video time is 2:22.  We're
22  back on the record.
23  BY MR. BECK:
24    Q.   Last week when you were

Page 247

1  collecting documents that the plaintiffs
2  asked for, did you ask anybody from the
3  FDA whether it was okay with them to turn
4  over documents from the FDA computers and
5  the FDA files?
6    A.   That didn't cross my mind,
7  no.
8    Q.   And when I asked for
9  documents, did you ask anybody from the
10  FDA whether it was okay to turn them over
11  to me?
12    A.   No, I didn't.  I relied on
13  the advice of my counsel, FDA counsel and
14  personal counsel.
15    Q.   So, you did talk to the FDA
16  lawyer about --
17    A.   Well, no.  But I was told
18  that the FDA lawyer said that even --
19  that we couldn't produce those documents.
20  You're talking to a nonlawyer, so, you
21  know, it's getting translated.  That was
22  my understanding.
23    Q.   Somebody told you it was
24  okay to produce them last week to the

Page 248

1  plaintiffs, but not this week to us?
2    A.   Well, last week, what I
3  produced were things that I considered to
4  be actually in a sense my own property.
5  My performance evaluations are my
6  property.  The slides, the PowerPoint
7  presentations were PowerPoint
8  presentations for talks that I
9  constructed on my own time in my personal
10  capacity and had copies of them at FDA.
11    The letters of
12  recommendation are letters of
13  recommendation that -- those are not
14  official FDA documents.  Those are
15  personal documents relevant to me.  So, I
16  don't really see that these are, in
17  quotes, FDA documents, but I'm a
18  nonlawyer.
19    Q.   Let's move away from this.
20    On direct examination, you
21  gave some testimony about what you said
22  you thought was the mechanism by which
23  you thought that Vioxx increased the risk
24  of cardiovascular events.  Do you

Page 249

1  remember that?
2    A.   Yes.
3    Q.   And in summary, what you
4  said is that you thought that Vioxx
5  suppressed the body's production of
6  prostacyclin and that's what contributed
7  to these events; is that correct?
8    A.   Correct.
9    Q.   Would you agree with me,
10  sir, that determining this sort of a
11  mechanism is something that is outside of
12  your area of expertise?
13    A.   It is not outside of my area
14  of expertise to read the medical
15  literature, to attend medical meetings,
16  and to learn from other investigators who
17  are expert in the field.
18    Q.   But in terms of your area of
19  expertise, Dr. Graham, to make a
20  determination yourself as to the
21  mechanism is just outside of your area of
22  expertise, is it not?
23    A.   I am not a physiologist or a
24  biochemist.

KS-000362

Confidential - Subject to Protective Order

Page 250

1    Q.   Or a pharmacologist, right?
2    A.   I'm a clinical
3  pharmacologist.
4    Q.   Well, can you give me a yes
5  or no answer, whether making a
6  determination of mechanism by which you
7  think --
8        MS. ROYCE:  Objection to
9    form.
10 BY MR. BECK:
11   Q.   -- is whether it is inside
12 or outside of your expertise?
13       MR. KLINE:  Objection to
14   form.
15       THE WITNESS:  I think it is
16   within my area of expertise when
17   it is based on the available
18   evidence.  And there's additional
19   evidence that we haven't talked
20   about that relates to the effects
21   of aspirin on --
22 BY MR. BECK:
23   Q.   So, you can't give me a yes
24 or no answer, I guess; is that right?

Page 251

1    A.   Well, my answer is yes, it
2  is within my area of expertise when it's
3  based on the available evidence.
4    Q.   Do you remember telling the
5  2005 Advisory Committee that "As an
6  epidemiologist first, I try to report the
7  phenomenon I observe and leave it to
8  brighter minds to figure out why what I
9  observed happens"?
10   A.   Uh-huh.  That's true.
11   Q.   And when you said that, you
12 were talking about mechanisms, right?
13   A.   Yes.
14   Q.   Another subject that you
15 discussed on direct examination is what
16 you call the naproxen myth.  Do you
17 remember that?
18   A.   Uh-huh.
19   Q.   And that's a phrase that you
20 used in a couple of these PowerPoints
21 that were dated from 2005, right?
22   A.   It's possible.  I mean, I
23 don't have them in front of me, but it's
24 certainly possible.

Page 252

1    Q.   Well, you had one of them in
2  front of you before --
3    A.   That said "alibi," not myth.
4    Q.   Oh, I'm sorry, naproxen
5  alibi.  I stand corrected there.
6        Now, when you were writing
7  scientific articles in 2003 and 2004 and
8  you discussed this hypothesis of naproxen
9  being cardioprotective, you didn't call
10 it an alibi then, did you?
11   A.   No.  It's a different
12 audience.
13   Q.   In fact, well, the audience
14 that you are writing for in scientific
15 publications are other scientists and
16 doctors, right?
17   A.   Correct.
18   Q.   And when you were writing in
19 scientific publications for other
20 scientists and doctors, what you said was
21 that the naproxen hypothesis was one of
22 the possible explanations for the
23 difference that was seen in the VIGOR
24 trial between Vioxx and naproxen

Page 253

1  patients, isn't that right, sir?
2    A.   A very low possibility.
3    Q.   Let's look at what you
4  actually said.
5              - - -
6        (Whereupon, Deposition
7        Exhibit Graham-8, "COX-2
8        selective non-steroidal
9        anti-inflammatory drugs and
10       cardiovascular disease," (Ray, et
11       al) Pharmacology and Drug Safety
12       2003; 12: 67-70, was marked for
13       identification.)
14             - - -
15 BY MR. BECK:
16   Q.   I'll hand you what we've
17 marked as Exhibit 8.
18       Is Exhibit 8 a 2003
19 publication?
20   A.   Yes, based on a talk from
21 2002.
22   Q.   And the first named author
23 on here is Wayne Ray.  Do you see that?
24   A.   Yes.

Confidential - Subject to Protective Order

Page 254

1    Q.   He, I think, was the person
2  that you said you recruited to help on
3  the Kaiser Permanente study that you
4  headed up, right?
5    A.   Yes.
6    Q.   And then also you're listed
7  as an author; is that right?
8    A.   Correct.
9    Q.   If you go over to the second
10  page, I'm going to direct you down to the
11  bottom of the left-hand column, and I've
12  blown this up and put it on the board.
13  If you want to look at it on the board,
14  it might be a little easier.
15        In this 2003 article of
16  yours and Dr. Ray's and the others, I see
17  you say that "The VIGOR trial enrolled
18  8076 patients with rheumatoid arthritis,
19  who were randomly assigned to rofecoxib"
20  -- that's Vioxx, right?
21    A.   Uh-huh.
22    Q.   -- "(50 milligrams...) or
23  naproxen, an established non-selective
24  NSAID."  And then do you say, "MI" --

Page 255

1  now, first of all, what does MI stand
2  for?
3    A.   That's myocardial
4  infarction.
5    Q.   Is that the same thing as a
6  heart attack in common language?
7    A.   Correct.  Yes.
8    Q.   Okay.
9        So, a heart attack "occurred
10  in .4 percent of patients receiving
11  rofecoxib compared to .1 percent of
12  patients receiving naproxen.  These data
13  may reflect an increased risk of" heart
14  attack "associated with rofecoxib;" being
15  Vioxx, "a decreased risk associated with
16  naproxen; or a combination of both
17  effects."
18        Do you see that?
19    A.   Uh-huh.
20    Q.   And then did you go on to
21  say that there were two recent published
22  studies that looked at "whether naproxen
23  has a protective effect on the risk of
24  coronary heart disease"?

Page 256

1    A.   Uh-huh.
2    Q.   And this thing that you
3  called an alibi today, back in 2003, did
4  you report that both of those studies
5  that you referred to there actually
6  reported a reduction in the risk of heart
7  attacks for people who were using
8  naproxen?
9    A.   Well, a couple of things.
10    Q.   Did you say that or not,
11  sir?
12    A.   That is not what I said.
13  This paper represented a combined
14  distillation of, I guess it was four
15  different talks presented at a symposium.
16  And they frequently -- what they do is
17  they have one session and they condense
18  them into a single paper, and then they
19  list everybody as an author.  And this
20  material was from someone other than me
21  in the section that I was presenting on.
22    Q.   Who was it from?
23    A.   I'd have to go back to the
24  topic headings of what the different

Page 257

1  people, the four different speakers had,
2  what their speaking assignment was.  My
3  speaking assignment at this meeting was
4  to talk about the association of
5  high-dose rofecoxib and hypertension.
6    Q.   Let me ask, when your name
7  is listed as an author on an article like
8  this, do you have a chance to review the
9  whole article and decide whether you want
10  to be associated with the comments that
11  are made in there?
12    A.   You get copies of articles
13  like this.  When I got it, I only really
14  read the section that was my purview, and
15  I really didn't read the other sections.
16    Q.   Is this the first time that
17  you understood or knew that your name was
18  on a scientific article that said that
19  heart attacks may reflect a decreased
20  risk associated with naproxen?
21    A.   Well, I mean, I knew my name
22  was on the paper.  I hadn't read that
23  closely.  The studies that are referenced
24  are studies that I talked about during

KS-000364

Confidential - Subject to Protective Order

Page 258

1  the previous part of the deposition that
2  are analyzed incorrectly and so really
3  don't show reductions in cardiovascular
4  risk with naproxen, but in any event.
5      Q.   Did you ever ask that your
6  name be removed from this article?
7      A.   No, I did not.
8          MR. BECK:  Okay.
9          - - -
10         (Whereupon, Deposition
11     Exhibit Graham-9, "High frequency
12     of use of rofecoxib at greater
13     than recommended doses: Cause for
14     concern," (Griffin, et al)
15     Pharmacoepidemiology and Drug
16     Safety 2004; 13: 339-343, was
17     marked for identification.)
18         - - -
19  BY MR. BECK:
20     Q.   Please take a look at what
21  we've marked as Exhibit 9.  Is Exhibit 9
22  a copy of a scientific article that has
23  your name on it as one of the authors?
24     A.   Yes.

Page 259

1      Q.   Now, before we get into
2  Exhibit 9, is this one -- well, Dr. Ray
3  is on this one also, right?
4      A.   Correct.
5      Q.   So, a bunch of other authors
6  and you and Dr. Ray.  Is this one where
7  everybody just gave speeches and you
8  didn't read it closely?
9      A.   No, no.  No.  This was a
10  real study.
11     Q.   This was a real study?
12     A.   Yes.
13     Q.   Okay.
14         Well, looking down then at
15  the first page of -- I'm sorry, we'll go
16  over to the fourth page of what you
17  called the real study that you and Dr.
18  Ray were both authors on.
19         This language that I've
20  blown up here from the right-hand column
21  at the bottom, did you and Dr. Ray say,
22  "The cause of the excess of serious
23  cardiovascular events in the VIGOR trial
24  is still a matter of debate"?  Is that

Page 260

1  what you said in the scientific study in
2  2004?
3      A.   Yes.
4      Q.   And it says, "A recent
5  observational study reported a higher
6  rate of cardiovascular events in
7  high-dose rofecoxib users."  That would
8  be the 50 milligrams; is that right?
9      A.   That's what -- well, I'm
10  just looking at the reference for that,
11  and that would be, I think, any dose that
12  was over 25 milligrams.  So, there are
13  people who take 37-and-a-half milligrams.
14     Q.   Okay.
15         Are there very many people
16  who take that?
17     A.   I don't know.  I don't know
18  the number.
19     Q.   Okay.
20         Anyway, over 25.
21         It says, "A recent
22  observational study recorded a higher
23  rate of cardiovascular events in
24  high-dose rofecoxib users compared to

Page 261

1  users of other NSAIDs and users of lower
2  doses of rofecoxib."  It says "To date,
3  lower doses" -- that's talking about
4  Vioxx, right?
5      A.   Uh-huh.
6      Q.   "To date," you and Dr. Ray
7  say, "lower doses" of Vioxx "have not
8  been associated with a statistically
9  significant excess of these types of
10  serious events."
11         Is that what you said to the
12  scientific and medical community in 2004?
13     A.   It's based on the published
14  literature, yes.
15     Q.   And then you go on to say,
16  "Since the 50 milligram dose has
17  clinically significant undesirable
18  effects and has not been shown to be more
19  effective than lower doses" -- that's
20  more effective than lower doses of Vioxx,
21  right?
22     A.   Uh-huh.
23     Q.   -- "chronic use of high-dose
24  rofecoxib should be discouraged."

**KS-000365**

Confidential - Subject to Protective Order

Page 262

1    Do you see that?
2    A.   Uh-huh.
3    Q.   Now, today what you said was
4  that back in 2004, you were clamoring
5  that 50 milligrams should be withdrawn
6  from the market.  Do you remember that?
7    A.   I don't remember using the
8  word "clamoring," but...
9    Q.   No.  That was my word.
10   You said you were urging
11 that 50 milligrams -- what you said today
12 was that back in 2004, Dr. Graham was
13 urging that 50 milligrams should be
14 withdrawn from the market, right?
15   A.   I don't think I used the
16 word "urge," but I thought that the
17 50-milligram strength should come off the
18 market, yes.
19   Q.   But in the actual scientific
20 publication that you and Dr. Ray authored
21 in 2004, what you said, all you said
22 about 50 milligrams was that chronic use
23 of high-dose Vioxx should be discouraged,
24 right?

Page 263

1    A.   Well, yes, but a couple
2  things.  One, the paper was published
3  online in July of 2003; and, two, that
4  the paper was submitted in November of
5  2002.  And basically -- and then the
6  third thing is, is I'm not the senior
7  author, and so for things like this, I
8  certainly couldn't disagree with the
9  statement that chronic use of high-dose
10 should be discouraged.  I would take it a
11 step further.
12   Back in 2002, I think that
13 the VIGOR study provided enough evidence
14 to seriously question Vioxx remaining on
15 the market.
16   Q.   But that's not what you said
17 in the article that you published two
18 years later in print and a year later
19 online, is it, sir?
20   A.   No, but I'm not the first
21 author.
22   Q.   All right.
23   And did you agree with the
24 first author on the lower dose, that the

Page 264

1  evidence that existed at the time did not
2  show a statistically significant excess
3  of adverse cardiovascular events?
4    A.   The published evidence.  But
5  the evidence available online within FDA
6  documents, Shari Targum, an FDA medical
7  officer who did a pretty nice review of
8  not only the VIGOR study, but study 085
9  and study 090, which were six-week
10 studies looking at the 12-and-a-half
11 milligram strength of Vioxx.  And if you
12 analyze those studies correctly, what you
13 see is that there is an increased risk
14 within six weeks at the 12-and-a-half
15 milligram dose of --
16   Q.   Well, you had --
17   A.   It's not a published study.
18 You can't reference it.  In the medical
19 literature, you are constrained to
20 reference pretty much what's in sort of
21 the commonly available medical
22 literature.  And the reference that they
23 cited was actually a meta-analysis that
24 was performed, I think, by a number of

Page 265

1  Merck employees.
2    Q.   You say "the reference that
3  they cited," by "they" you meant "we,"
4  right?
5    A.   Well, yes, that we cited,
6  yes.
7    Q.   Okay.
8    One of the PowerPoints that
9  you looked at today was marked as Exhibit
10 5.  I don't know if you still have that
11 in front of you or not.
12   A.   Uh-huh.
13   Q.   You do?
14   A.   Yes.
15   Q.   And you were directed to
16 this page that I put up on the screen.
17 Do you remember discussing this page of
18 your PowerPoint with Mr. Kline?
19   A.   Yes, yes, I do.  I'm just
20 sort of looking for it here.  Yes.
21   Q.   And I think I have the date
22 right.  This is one of the 2005
23 PowerPoints, right?
24   A.   This is from the Advisory

KS-000366

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

1  Committee presentation of 2005.
2      Q.   Okay.
3          So, this is the one that you
4  used when you met with the FDA Advisory
5  Committee and gave them your views
6  concerning the safety of Vioxx and
7  including the comparison of Vioxx with
8  Celebrex, right?
9      A.   Correct.
10     Q.   Okay.
11         Now, just focusing on this
12 one area over here on the rofecoxib, and
13 then underneath that is the 25 milligrams
14 and less.  Do you see that?
15     A.   Uh-huh.
16     Q.   And then the study over
17 here, this is Ray, that's your colleague,
18 Dr. Wayne Ray, right?
19     A.   Correct.
20     Q.   And then underneath that,
21 Graham, that's you, right?
22     A.   That's right.
23     Q.   So, on that one you are the
24 first author, right?

1      A.   Yes.
2      Q.   And on the Ray article, were
3  you an author of the Ray article as well,
4  just not the first author?
5      A.   No.  I was not a co-author
6  on that article.
7      Q.   Okay.
8          So, your colleague, Dr. Ray,
9  who you later worked with on the Kaiser
10 study, he had done an epidemiological
11 study looking at the effects of taking
12 Vioxx, right?
13     A.   Uh-huh.
14     Q.   And focusing on the 25
15 milligrams and less, basically what he
16 found, when it's 1.02, a 1 would mean
17 that's just the same as not taking any
18 medicine at all, right?
19     A.   Right.
20     Q.   And 1.02, you'd agree with
21 me that that's not, you know, 90 bullets
22 with 100 chambers, that's 0 out of 100,
23 right?
24     A.   I would agree.

1      Q.   And so that's --
2      A.   Although I have one caveat,
3  which is there's a confidence interval
4  around that.  And these data are
5  consistent with a risk that could be
6  elevated to 1.37.
7      Q.   Let me just hone in on that.
8          This confidence interval is
9  the thing that is in the parenthesis
10 here, right?
11     A.   Correct.
12     Q.   And I hope that at trial
13 somebody else will describe confidence
14 interval because I'm not going to take
15 the time to do it with you today.  But
16 you say it's consistent with being as
17 high as 1.37?
18     A.   Right.
19         Or as low as .76.
20     Q.   Or as low as .76.
21         So that this confidence
22 interval says that Vioxx 25 milligram, it
23 might be better than not taking any
24 medicine at all when it comes to heart

1  attacks, or it might be a little worse
2  than not taking any medicine at all.
3  But, basically, the best analysis is,
4  it's the same thing as not taking any
5  medicine at all, right?
6      A.   That's the appropriate
7  interpretation of that study for that
8  dose.
9      Q.   And then in your study, the
10 Graham study, what year was this from?
11     A.   It was published in 2005,
12 but it was completed in 2004.
13     Q.   So, this is the Kaiser
14 Permanente study?
15     A.   This is the Kaiser
16 Permanente study.
17     Q.   And here you found a
18 relative risk of 1.23, and then this
19 confidence interval of going below 1,
20 which would make it better than no
21 medicine at all, up to 1.71.  And from a
22 statistical point of view, what this says
23 is that there is not a statistically
24 significant difference between a 25

KS-000367

Confidential - Subject to Protective Order

Page 270

1   milligram dose and not taking any
2   medicine at all, correct?
3       A.   Yes.  But the maximum
4   likelihood estimate, the most likely
5   value is that the risk is increased.  And
6   that's what that point -- the point
7   estimate's your maximum likelihood.
8           So, the preponderance of
9   evidence from this study would be that
10  there is -- the evidence is stronger that
11  the lower doses increase the risk of
12  heart attack, but it does not reach the
13  level of statistical significance.  So,
14  what this is basically saying is -- I
15  don't have the associated p-value on
16  this, but there may be 80 or 85 bullets
17  in the chamber, going back to the
18  previous analogy in terms of the
19  p-values.
20      Q.   85 for 1.23?
21      A.   The p-value for this could
22  be something like .15.
23      Q.   You mentioned before that
24  you wrote a chapter in a book on -- what

Page 271

1   was the subject of the book?
2       A.   Well, it's called
3   Pharmacoepidemiology.
4       Q.   Yeah.
5           And do you know that in that
6   book on pharmacoepidemiology, it is
7   stated that if you have a relative risk
8   of less than 2.0, that's a relatively
9   weak relationship?
10      A.   It's a view that I don't
11  subscribe to.
12      Q.   Do you know that that's the
13  view that's expressed in a book that you
14  wrote a chapter in?
15      A.   A, I haven't read a chapter
16  where that view is expressed; and, B,
17  that's one chapter written by one author
18  in a textbook where the editor pretty
19  much lets you write what your point of
20  view is.
21      Q.   Do you know whether your
22  colleague, Dr. Ray, has said under oath
23  that if the relative risk is less than 2,
24  then it's less likely than not for any

Page 272

1   particular person that Vioxx would have
2   contributed to a heart attack?
3       A.   I'm not aware of anything
4   that Dr. Ray has said under oath.
5       Q.   You spent a little bit of
6   time on direct examination concerning the
7   approval of Vioxx, as well as a
8   subsequent label change.  And I just
9   wanted to make sure that we were clear on
10  this.
11          Did you have any personal
12  role whatsoever in the FDA's review of
13  the application that led to the approval
14  of Vioxx?
15      A.   No.
16      Q.   And did you have any role
17  whatsoever in reviewing proposed label
18  changes for Vioxx?
19      A.   No.
20      Q.   Now, on the general question
21  of warnings and labels, am I correct,
22  sir, that your view is that warning
23  language really doesn't have any
24  significant impact on the decisions made

Page 273

1   by doctors whether to prescribe medicine?
2       A.   My view is, is that in
3   general, labeling changes don't influence
4   a physician or patient behavior.  But as
5   I pointed out before, in terms of
6   capacity to market the drug, there are
7   big differences in the eyes of FDA of
8   whether there's a boxed warning or not.
9           And with companies in
10  general, my experience has been that they
11  fight tooth and nail to keep things out
12  of the warning section because they don't
13  want to be at a competitive disadvantage
14  to other drug companies that have
15  competitor products that don't have such
16  a warning.
17      Q.   And you've added something
18  about what you think drug companies have
19  in mind.
20      A.   I shouldn't have done that.
21      Q.   Well, I appreciate that
22  statement.
23          So, just let me go back and
24  try to get a clean answer to my question.

Confidential - Subject to Protective Order

Page 274

1        And that is, is it your view
2  that warning language in labels does not
3  have a significant effect on the
4  decisions by doctors and whether to
5  prescribe the medicines that the warnings
6  accompany?
7        A.   It's my view that warnings
8  as implemented by FDA have been very
9  ineffective.  There are means, I believe,
10  whereby labeling could be constructed in
11  a fashion that it actually would
12  potentially influence physician behavior
13  and perhaps then find its way into
14  patient behavior.
15        Q.   Would that be a different
16  way of going about labeling than the FDA
17  currently does?
18        A.   It would actually just be
19  more straightforward about what the
20  problems are, using very bold and frank
21  and plain language, not sort of using
22  adjectives that kind of downplay it and
23  not burying it in tremendous amounts of
24  text so that when a physician looks at

Page 276

1        A.   I agree with that, but there
2  are explanatory factors.  It's such a
3  complex field.  You've got the label
4  which says what the warnings are, and
5  then you have the drug representatives
6  who come to the physicians' offices and
7  tell a very different story.  And so what
8  physicians end up coming away with at the
9  end of the day in terms of the message
10  about the safety of a product is anyone's
11  guess.
12        Q.   Did you say in a written
13  publication in 2002, co-authored with
14  Willy, that "The findings from this study
15  are consistent with the results from
16  other studies showing that product
17  labeling may not meaningfully affect
18  physician behavior"?
19        A.   Yes.
20        Q.   Did you say in a 2001
21  article written by you as the lead
22  author, "This study suggests that
23  labeling changes, including black box
24  warnings, and instructions to monitor

Page 275

1  the label, they're confronted by three
2  paragraphs of warnings, and the warning
3  that really matters is kind of buried in
4  the midst of it.  I think that there's a
5  lot of room for experimentation where
6  these labeling interventions might
7  actually have an effect.  But as
8  practiced, the way FDA implements them,
9  they are not -- have not been, until now,
10  effective, in my view.
11        Q.   Okay.
12        And I'm not asking you --
13  I'm taking a little bit different
14  approach than Mr. Kline.  I'm not asking
15  you what you think is wrong with the
16  FDA's regime.
17        A.   No, I understand.
18        Q.   I'm asking that under the
19  labeling approach that the FDA takes, do
20  you agree, sir, that warning language
21  does not have a significant effect on the
22  decision by doctors whether to prescribe
23  the kind of medicine that's being
24  labeled?

Page 277

1  patients closely, as well as repeated
2  'Dear Healthcare Professional' letters to
3  physicians cannot be assumed to be
4  effective means of risk management"?
5        A.   Yes, I said that.
6        Q.   I want to move now to the
7  Kaiser study.  I think you described that
8  this is an epidemiological study, not a
9  clinical trial, right?
10        A.   Correct.
11        Q.   And what that means is that
12  you and your colleagues examined the
13  medical records from thousands or even
14  more patients from the HMO, and you could
15  see what medicines they were prescribed
16  and you could see what problems they had
17  or didn't have in their healthcare; is
18  that right?
19        A.   That's correct.
20        Q.   And the outcome that you
21  were looking at was something that you
22  called serious coronary heart disease; is
23  that right?
24        A.   That is correct.

KS-000369

Confidential - Subject to Protective Order

Page 278

1     Q.   And serious coronary heart
2  disease was a category that you used, and
3  it combined myocardial infarctions or
4  heart attacks, right?
5     A.   Yes.
6     Q.   Plus it included another
7  category of events called sudden cardiac
8  death, right?
9     A.   Yes.  Because that's one of
10  the leading presentations of heart
11  attack, is basically sudden death.  So,
12  we combined the two.
13     Q.   And in your study at least,
14  you did not break down the analysis into
15  heart attacks on the one hand and sudden
16  cardiac death on the other hand, right?
17     A.   No, we did not.
18     Q.   Now, your deposition may be
19  used in cases involving MIs or heart
20  attacks.  Let me ask you, before you did
21  your study that combined heart attacks
22  and sudden cardiac deaths, did you know
23  that some of your co-authors, people who
24  worked with you from the Kaiser group,

Page 279

1  had done a study of the same patients
2  over the same time period, but looking
3  specifically at heart attacks?
4     A.   I was aware of a study that
5  I think they called KLOTS 1.  But I think
6  they sent me, it may have been a
7  PowerPoint description or something of
8  it.  But there were methodologic problems
9  as I recall with it, and it didn't cover
10  the same time period as the study that we
11  were doing, so, in any event, but I was
12  aware that they had tried to work on a
13  study like that, and the people who were
14  doing it were non-epidemiologists trying
15  to do epidemiology.
16             - - -
17          (Whereupon, Deposition
18       Exhibit Graham-10, "Cohort
19       Analysis Myocardial Infarction
20       Risk and COX2 Use in the Kaiser
21       Large Observational Thrombosis
22       Study (KLOTS) (Levy, et al) ACR
23       Abstract (1 page), was marked for
24       identification.)

Page 280

1             - - -
2  BY MR. BECK:
3     Q.   Let me hand you Exhibit 10.
4  Have you ever seen Exhibit 10 before?
5     A.   I don't believe that I have.
6     Q.   It appears to be a 2002
7  abstract from ACR; is that right?
8     A.   That's what it looks like to
9  me, yes.
10     Q.   What does ACR stand for?
11     A.   I think it's the American
12  College of Rheumatology.
13     Q.   And, in fact, you had an
14  abstract published, your study in the
15  ACR, didn't you?
16     A.   Yes.  Although FDA
17  ultimately forced me to remove my name
18  from that abstract.  But the abstract got
19  published before we were able to withdraw
20  it because of the data problems that I
21  described before, so -- but, yes.
22     Q.   And do you see here that
23  this is a "Cohort Analysis Myocardial
24  Infarction Risk in Cox-2 Use in the

Page 281

1  Kaiser Large Observational Thrombosis
2  Study (KLOTS)."  Is that what you were
3  referring to before?
4     A.   I would guess that it is,
5  yes.
6     Q.   And is that the same group
7  of patients that you looked at in your
8  study?
9     A.   I have to read the abstract.
10     Q.   Okay.
11     A.   (Witness reviewing
12  document.)
13     Q.   While you're reading it,
14  I'll blow it up so others can as well.
15     A.   (Witness reviewing
16  document.)
17          I don't think that this is
18  the same group of patients.  And the
19  reason why I say that is the number of
20  patients they say, "We identified 172,260
21  patients with 182" --
22     Q.   Where are you looking at?
23     A.   I'm in the first sentence of
24  the "Results" section.

**KS-000370**

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 282

1    Q.   Okay.
2         Let me just make sure that
3    I'm with you and that anybody else
4    watching it is.
5         A.   This is 172,000 patients
6    that they're saying received -- I'm just
7    sort of reading above now in the
8    methods -- this is my first time seeing
9    this. Is that they received naproxen,
10   ibuprofen, celecoxib or rofecoxib.
11        Now, if you look at the
12   study that -- the Kaiser study that we
13   did, we ended up having 1.4 million
14   patients in our base population. So,
15   where they have 172,000 who had used
16   NSAIDs, we had 1.4 million who had used
17   NSAIDs. So, it doesn't say in this
18   abstract, and quite honestly, I don't
19   remember, but my guess is, is that this
20   study was done on a subset of the Kaiser
21   population, but it's clearly not the same
22   population that we studied. It's the
23   same HMO, but it's a small subset of
24   patients.

Page 283

1    Q.   Well, were you aware that in
2    the study that some of your co-authors
3    had done in this subset that they found
4    that when either COX-2, and that would be
5    either Celebrex or Vioxx, right?
6         A.   Yes.
7         Q.   When either one of Celebrex
8    or Vioxx was compared to either one of
9    the other NSAIDs, there was no
10   statistically significant difference in
11   heart attack risk?
12        A.   Yes. But I do also note
13   that the comparison of rofecoxib
14   versus -- well, two things. One, they
15   show that naproxen and ibuprofen have the
16   same risk. And then they show that the
17   risk of rofecoxib is elevated with
18   respect to naproxen --
19        Q.   Well, wait. You skipped
20   over something here.
21        Do you see here where I'm
22   highlighting?
23        MR. KLINE: Let him finish,
24   please.

Page 284

1         THE WITNESS: Oh, I'm sorry.
2    I was looking down at this piece
3    of paper. I wasn't looking at the
4    screen.
5    BY MR. BECK:
6         Q.   No.
7         A.   I'm sorry.
8         Q.   And I said when you were
9    looking at the piece of paper, you
10   skipped over something.
11        MR. KLINE: But he was in
12   the middle of an answer. Please.
13   BY MR. BECK:
14        Q.   Do you see where rofecoxib,
15   Vioxx --
16        MR. KLINE: He was in the
17   middle of an answer. Please.
18   BY MR. BECK:
19        Q.   Do you see where Vioxx
20   versus Celebrex is --
21        A.   Uh-huh.
22        Q.   -- essentially identical,
23   right?
24        A.   Right.

Page 285

1         MR. KLINE: The witness was
2    in the middle of an answer.
3         THE WITNESS: In this study.
4         MR. KLINE: Please let him
5    finish.
6    BY MR. BECK:
7         Q.   So, Vioxx and Celebrex were
8    essentially identical, and then you
9    wanted to say something else?
10        A.   Yes.
11        That rofecoxib versus
12   naproxen, and rofecoxib versus ibuprofen
13   came very close to traditional
14   statistical significance, and if we were
15   to use the gun analogy again, what we
16   would be talking about here is I'm
17   guessing is 92 to 94 bullets in the
18   chamber.
19        Q.   When you say "close to
20   statistical significance" --
21        A.   It's because the .96 --
22        Q.   Is below 1?
23        A.   It's below 1, but it's
24   pretty close to 1. And the .97 for the

KS-000371

Confidential - Subject to Protective Order

Page 286

1  next line, the rofecoxib versus
2  ibuprofen, is .97, which is almost 1 as
3  well.
4        So, if it was 1 or above, if
5  that lower bound was 1 or above, then
6  you'd say the p-value is .05 and you
7  would have 95 bullets in the chamber.
8  Here we're probably talking 94 or 93
9  bullets.
10        So, what I'm saying is, it's
11  borderline statistical significance.  And
12  what it says is, is that that's pretty --
13  there's pretty reasonable evidence that
14  there's a difference between the two, but
15  it doesn't reach that level of
16  conventional statistical significance.
17        Q.   And do you see where I'm
18  underlining that they say the same thing
19  about Celebrex?
20        A.   Yes, they do.
21        Q.   Is it fair to say that this
22  study reaches conclusions that are just
23  fundamentally inconsistent with the
24  conclusions that you later reached?

Page 287

1        A.   I would say that these
2  conclusions are at variance with the
3  conclusions that we reached in our much
4  larger study.  And as I mentioned, the
5  people doing -- none of the authors on
6  this study are epidemiologists.  And none
7  of them have ever conducted epidemiologic
8  studies, and so not having reviewed the
9  methods and the like, I would wonder
10  about the -- about how methodologically
11  well the study was performed.
12        Q.   I'd like to -- we started
13  out talking about your Kaiser study, and
14  I got diverted for a minute on this
15  earlier study by some of the same
16  authors.  Let's go back to the Kaiser
17  study.
18        And you described this
19  morning kind of a chronology of reports
20  that you made or public disclosures of
21  the results of the study.  And I want to
22  go through those same events with you, if
23  I could.
24        And I've prepared a chart,

Page 288

1  and what I want to do is talk with you
2  about different statements that you made
3  in different publications about the
4  significance of 25 milligrams or below,
5  whether that poses a statistically
6  significant increase for heart attacks,
7  whether -- and whether above 25 does.
8        Are you with me?
9        A.   Uh-huh.
10        Q.   Okay.
11        And I can go through the --
12        A.   Do you have a copy of the
13  ACR abstract that I could just refer to?
14        Q.   Sure.  Yeah.
15        MR. BECK:  We'll mark that
16  as Exhibit 11.
17          - - -
18        (Whereupon, Deposition
19  Exhibit Graham-11, "Risk of Acute
20  Cardiac Events Among Patients
21  Treated with Cycloxygenase-2
22  Selective and
23  Non-Selective-Nonsteroidal
24  Anti-Inflammatory Drugs Category:

Page 289

1  06 Osteoarthritis clinical
2  aspects" American College of
3  Rheumatology Abstract (1 pages),
4  was marked for identification.)
5          - - -
6        MR. BECK:  And I'm told that
7  they are going to need to change
8  the videotape.  So, while they're
9  doing that --
10        THE WITNESS:  Want to wait?
11        MR. BECK:  Yes.
12        What I'm thinking is that
13  why don't we break and let them
14  change the videotape, and while
15  they're doing it, if you could
16  just look at the abstract so
17  you'll be able to tell me what it
18  is you've said in the abstract
19  about these items that we have up
20  on the screen.  Okay?
21        THE WITNESS:  Uh-huh.
22        THE VIDEOTAPE TECHNICIAN:
23  Stand by, please.
24        That concludes Video

KS-000372

Confidential - Subject to Protective Order

Page 290

1    Cassette Number 2.  The time is
2    3:03.  We're going off the record.
3         MS. ROYCE:  Can we take a
4    five-minute break?
5         MR. BECK:  Sure.
6              - - -
7         (Whereupon, a recess was
8    taken from 3:03 p.m. until
9    3:17 p.m.)
10             - - -
11        THE VIDEOTAPE TECHNICIAN:
12   This begins Video Cassette Number
13   3.  The time is 3:17.  We're back
14   on the record.
15   BY MR. BECK:
16        Q.   Dr. Graham, what I want to
17   do now is fill in these blanks on the
18   chart I have on the screen for the
19   relative risk and confidence intervals in
20   these different categories.
21        So, with the May 2004 ACR
22   abstract, do I have that correct that the
23   relative risk that was reported was 1.02
24   for 25 milligrams or less, with the

Page 291

1    confidence intervals as I've indicated up
2    there?
3         A.   Yes, that's correct.
4         Q.   And that is not
5    statistically significant, correct?
6         A.   That's correct.
7         Q.   And then for the greater
8    than 25 milligrams, there's a high
9    relative risk of 5.04, but as a technical
10   matter on statistical significance, the
11   confidence interval is such that it would
12   not be statistically significant; is that
13   correct?
14        A.   There would be 94 bullets in
15   the chamber.
16        Q.   And I appreciate your
17   analogy, but you, yourself, recognized
18   that with these confidence intervals,
19   this would not be statistically
20   significant, correct?
21        A.   It wouldn't reach levels of
22   traditional statistical significance.
23        Q.   Okay.
24        Now, after this May 2004

Page 292

1    abstract, you went back and reclassified
2    some of the patients from the Kaiser
3    study who had been classified as low-dose
4    patients for the purposes of the analysis
5    that's shown in the abstract.  I think my
6    hand just snuck across the screen.
7    Excuse me.
8         You reclassified some
9    patients who had been counted as low-dose
10   patients, and then you counted them
11   instead as high-dose patients; is that
12   right?
13        A.   Yes.  And high-dose patients
14   who are reclassified as low dose.
15             - - -
16        (Whereupon, Deposition
17        Exhibit Graham-12, E-mail 5-25-04
18        KP002153, was marked for
19        identification.)
20             - - -
21   BY MR. BECK:
22        Q.   After you reclassified
23   patients, then I'm going to show you what
24   we marked as Exhibit 12.  Did you write

Page 293

1    an e-mail which is -- I'm looking for the
2    date.  Can you help me with the date?
3    Oh, it is also from May.  Up at the top
4    you will see your e-mail is May 25th,
5    2004?
6         A.   Uh-huh.
7         Q.   And then you report new
8    relative risks and confidence intervals
9    based on the reclassifications, right?
10        A.   Yes.
11        Q.   Okay.
12        And tell me if I have it
13   right up here.  The relative risk that
14   you reported after reclassifying people
15   for the 25 milligrams or less was .98,
16   correct?
17        A.   Yes.
18        Q.   With the confidence
19   intervals as I've indicated there, right?
20        A.   Yes.
21        Q.   And that is not
22   statistically significant, correct?
23        A.   Correct.
24        Q.   And we're talking here about

KS-000373

Confidential - Subject to Protective Order

Page 294

1  Vioxx 25 milligrams or less compared to
2  people who are not taking pain
3  medication, no difference in risk, right?
4      A.   Right.
5      Q.   And in your analogy of
6  bullets in chambers, there would be zero
7  bullets in the chambers for people who
8  were using 25 milligrams of Vioxx, right?
9      A.   Yeah.  They'd be pretty
10  close to zero.  There would be five or
11  six, but yes.
12      Q.   Well, there would be --
13      A.   The P is .91.  So, what that
14  means is that 91 out of 100 chances that
15  the answer lies between those confidence
16  intervals and that that .98 -- so, it's
17  the most likely answer.
18      Q.   The most likely thing is --
19  and when we say .98, that's actually a
20  little bit lower risk than someone who's
21  not taking any medicine at all.  I mean,
22  it doesn't -- it's so little that it
23  doesn't make any difference, but we're
24  talking about Vioxx 25 milligrams is

Page 295

1  basically indistinguishable from not
2  taking any medicine at all when it comes
3  to cardiovascular risk, right?
4      A.   Yes.
5      Q.   Okay.
6          And then after this
7  reclassification, the risk that you
8  reported, the relative risk for higher
9  dose goes up substantially, and then it
10  is statistically significant, correct?
11      A.   Yes.
12      Q.   Now, after the e-mail, did
13  you -- I think you said you did something
14  called a poster, you wrote up a poster?
15      A.   Right.  That was in August.
16      Q.   August of --
17      A.   Of 2004.
18      Q.   Of 2004?
19      A.   Correct.
20      Q.   And this poster, let me hand
21  you Exhibit 12 and ask you if that's the
22  poster you are referring to.
23          - - -
24          (Whereupon, Deposition

Page 296

1  Exhibit Graham-13, "Risk of Acute
2  Myocardial Infarction and Sudden
3  Cardiac Death with Use of COX-2
4  Selective and Non-Selective
5  NSAIDs" (Graham, et al) KP001521
6  - KP001526, was marked for
7  identification.)
8          - - -
9  BY MR. BECK:
10      Q.   And I think I got it right.
11  Is it the ISPE poster that you talked
12  about on direct examination?
13      A.   Yes.
14      Q.   And this sets forth the
15  results after you reclassified some of
16  the formerly low-dose patients as
17  high-dose patients and some of the
18  formerly high-dose patients as low-dose
19  patients, right?
20      A.   That, and in the interim had
21  discovered that the way the regression
22  analysis was done for the first two, that
23  I had done it incorrectly.  This was what
24  I talked about before, the --

Page 297

1      Q.   I --
2          MR. KLINE:  Let him finish,
3  please.
4          MR. BECK:  Okay.
5          MR. KLINE:  He was
6  answering.
7          MR. BECK:  Yeah, I know.
8  But I don't want him just to
9  repeat what he talked about
10  before.
11          MR. KLINE:  But he was
12  answering.
13          MR. BECK:  Okay.
14          Go ahead.
15          THE WITNESS:  What I was
16  saying is, is that we had done the
17  regression analyses incorrectly by
18  treating each drug separately and
19  doing a separate regression
20  analysis, when everything should
21  have been combined together into
22  one regression analysis.
23          And so the August poster
24  reflects the appropriate analysis,

KS-000374

Confidential - Subject to Protective Order

Page 298

1     along with the reclassification of
2     patients who had been
3     misclassified previously.
4  BY MR. BECK:
5     Q.   And all I want you to do is
6  confirm for me, sir, after you
7  reclassified people and then changed the
8  regression analysis, is this the relative
9  risk that you recorded for 25 milligrams
10 or less?
11    A.   Yes, it is.
12    Q.   And that is under
13 traditional approach not statistically
14 significant, correct?
15    A.   It's elevated, that's
16 correct.
17    Q.   Correct that it's not
18 statistically significant?
19    A.   Yes, but -- yes.
20    Q.   And then the high dose
21 numbers came down somewhat, but still
22 elevated.  And after the reclassification
23 and change in methodology, they remained
24 statistically significant, right?

Page 300

1  programming that we had done throughout
2  the whole study to see if everybody in
3  the study belonged in the study.  What we
4  discovered were there were about 1,300
5  patients whose eligibility there,
6  membership in Kaiser, had lapsed for more
7  than one month.  And so what that meant
8  is, is we could be missing drug exposure
9  information.  So, we had to remove those.
10 To not do so would have been to
11 misrepresent the data.
12         So, we weren't manipulating
13 anything and we weren't changing our
14 methods.  We were doing quality control,
15 and that explains the change that you see
16 there.
17    Q.   All right.
18         So, after the
19 reclassification in May and the change in
20 methodology in August, and then the
21 quality control in 2005, your final
22 result for 25 milligrams and below was a
23 relative risk of 1.23 with a confidence
24 interval from below 1 to above 1, right?

Page 299

1     A.   Yes.
2     Q.   Now, finally you reported
3  these results in The Lancet article that
4  you testified about, right?
5     A.   Yes.
6     Q.   And that's already been
7  marked as an exhibit. I don't know if
8  you still have it in front of you, but it
9  was marked, I believe, as Exhibit 4.
10    A.   Uh-huh.
11    Q.   And do I have up here -- you
12 can get this by going out to Table 3 on
13 Page 4, but just to save time, do I have
14 it correct on the chart here that in The
15 Lancet article, I guess after further
16 work, reclassifying patients and changing
17 the methodology, the 25 milligrams or
18 below the relative risk is 1.23, and the
19 confidence interval is as indicated
20 there.  Is that what you reported?
21    A.   That's what we reported, but
22 what happened here is that we did a final
23 quality control on our patients to see
24 if -- basically we went back over all the

Page 301

1     A.   Yes.
2     Q.   And under traditional
3  approach, that is not statistically
4  significant, correct?
5     A.   Correct.
6     Q.   And then the final numbers
7  for the high dose that you had were 3
8  with the confidence interval as
9  indicated, right?
10    A.   Yes.
11    Q.   And that under this analysis
12 remains statistically significant; is
13 that right?
14    A.   Yes.
15    Q.   So, just sort of a summary
16 question that in all four of your reports
17 as to the outcome of your study, the 25
18 milligrams and below, the relative risk
19 at all times remained under traditional
20 views as to statistical significance; is
21 that right?
22    A.   Compared to remote use, but
23 not compared to -- well, compared to
24 remote use.

**KS-000375**

Confidential - Subject to Protective Order

Page 302

1    Q.    Yeah.  I'm asking about
2  comparing it to remote use, which is --
3    A.    Basically nonuse.
4    Q.    Right.
5        So, in all four at 25
6  milligrams or below, there was no
7  statistically significant difference
8  between taking that dose of Vioxx and not
9  taking any medicine at all, right?
10   A.    Yes.
11   Q.    I want to focus a bit on, a
12 little bit more on how these changes came
13 about from the abstract to the poster and
14 also what people within the FDA were
15 saying about your analysis, because I
16 think you testified about that this
17 morning.  Do you remember that?
18   A.    Uh-huh.
19   Q.    The abstract itself, did you
20 have that reviewed by anybody from the
21 FDA before the abstract was published?
22   A.    What are we referring to?
23   Q.    We're referring to back up
24 on the screen, May of 2004 --

Page 303

1    A.    The ACR abstract.
2    Q.    -- ACR abstract.
3    A.    What happened with the ACR
4  abstract is that David Campen at Kaiser
5  was the first author, and I sent him the
6  quick analysis that we had done, and he
7  submitted the abstract, and I did not put
8  it through FDA clearance, and that was an
9  oversight on my part.
10   Q.    And then because there is a
11 procedure that you are supposed to follow
12 at FDA to show them studies and articles
13 and abstracts and posters that you intend
14 to have your name on, whether you're the
15 first author or second, third, fourth or
16 fifth, right?
17   A.    Yes.
18   Q.    Okay.
19       And then when it came to the
20 poster in August of 2004, after you've
21 reclassified people and changed the
22 methodology, did you submit that for
23 review by folks from the FDA?
24   A.    Yes, I did.

Page 304

1    Q.    And I think you indicated
2  that your supervisor reviewed that
3  poster; is that right?
4    A.    Yes.
5    Q.    And what was his name?
6    A.    Paul Seligman.
7    Q.    And at the time, was he the
8  acting head of the Office of the Drug
9  Safety?
10   A.    I think so, yes.
11   Q.    And you said something about
12 how he suggested a change in the
13 conclusion.  Was your -- did your initial
14 draft of the poster have a conclusion
15 that the high dose of Vioxx, the 50
16 milligram dose should not be prescribed
17 or used?
18   A.    Let me see what this one
19 says and then I can answer you.
20       (Witness reviewing
21 document.)
22       Yes.
23   Q.    Okay.
24       And then I think you said

Page 305

1  that Dr. Seligman did not agree with that
2  conclusion and said that you should take
3  out the conclusion that high dose 50
4  milligrams should not be prescribed or
5  used; is that right?
6    A.    Correct.
7    Q.    Let me hand you what I'm
8  going to mark as Exhibit 14.
9        - - -
10       (Whereupon, Deposition
11 Exhibit Graham-14, E-mails with
12 attachment "Comments on ISPE
13 Paper"  FDACDER006048 -
14 FDACDER006049, was marked for
15 identification.)
16       - - -
17   MR. BECK:  Let's put this up
18 on the screen.
19 BY MR. BECK:
20   Q.    Do you recognize Exhibit 14?
21   A.    Yes, I do.
22   Q.    What is Exhibit 14?
23   A.    It's an e-mail from Dr.
24 Seligman to me with his comments on the

Confidential - Subject to Protective Order

Page 306

1  poster.
2      Q.   All right.
3          And then the next page are
4  his comments, right?
5      A.   Right.
6      Q.   Was Mr. -- is it Dr.
7  Seligman?
8      A.   Dr. Seligman.
9      Q.   Dr. Seligman, is he one of
10  the people that you think was out to get
11  you at the FDA?
12          MS. ROYCE:  Objection to
13      form.
14          THE WITNESS:  Let's put it
15      this way.  Dr. Seligman ordered an
16      illegal criminal investigation in
17      early 2004 to identify the person
18      or persons who spoke to the media
19      about the fact that Dr. Andrew
20      Mossholder, an FDA medical officer
21      who had done a study looking at
22      SSRI antidepressants and
23      suicidality in children, that that
24      had been suppressed.

Page 307

1          Dr. Seligman, under oath
2      before the House subcommittee on
3      investigations and oversight for
4      FDA, admitted under oath that he
5      had ordered that illegal criminal
6      investigation to identify the
7      source of the leak and that he had
8      named me as a suspect, although he
9      had no grounds to do so, except
10      that he thought that this is the
11      kind of thing that I would do.
12      And so there is that past history
13      with Dr. Seligman to keep in mind.
14          At this point, I wasn't
15      interpreting his comments in that
16      regard except that the reason why
17      I hadn't said in the original
18      version was that high dose
19      rofecoxib should be removed from
20      the market was because I knew the
21      type of reaction it would get, and
22      toning it down a little bit still
23      elicited pretty much the same
24      response, and that's expressed

Page 308

1          here.
2  BY MR. BECK:
3      Q.   Well, this morning, didn't
4  you testify, in effect, that there were
5  several people at the FDA who were out to
6  get you?
7          MR. KLINE:  Objection to the
8      form.  I don't think those terms
9      were ever used.
10          THE WITNESS:  No, I never
11      used those, but I can --
12  BY MR. BECK:
13      Q.   No.  The terms you used were
14  that there was an "organized and
15  orchestrated campaign to smear and
16  discredit me."  Do you remember that
17  phrase?
18      A.   Yes.
19          MR. KLINE:  My objection is
20      only to form.
21          THE WITNESS:  And we can
22      talk about that in detail if you
23      would like.
24  BY MR. BECK:

Page 309

1      Q.   Okay.
2          My question right now is a
3  narrow one.  Is Dr. Seligman one of the
4  people that you were referring to this
5  morning as part of this organized and
6  orchestrated campaign that you thought
7  existed to smear and discredit you?
8      A.   Yes.  He would be part of
9  that group.
10      Q.   Okay.
11          So, let's look at what Dr.
12  Seligman said when you submitted the
13  poster to him.  He said, "In general an
14  excellent study and analysis of a complex
15  topic."
16          Do you see that?
17      A.   Yes.
18      Q.   And then he says, "As you
19  might expect, my only comment has to do
20  with the conclusion that 'higher-dose
21  rofecoxib should not be prescribed or
22  used.'"
23          That's the conclusion that
24  you and I were talking about a few

**KS-000377**

Confidential - Subject to Protective Order

Page 310

1  minutes ago, right?
2      A.   Right.
3      Q.   Then he went on to explain
4  why he was concerned with having a
5  conclusion like that, didn't he?
6      A.   Yes.
7      Q.   And then he said, "My
8  concern is based both on the small number
9  of cases (10) and the lack of information
10  inherent in such a study regarding the
11  'time-to-event.'"
12          Now, small number of cases
13  being ten, does that mean that there were
14  only ten cases in your study of thousands
15  and thousands of patients where somebody
16  taking high-dose Vioxx had either a heart
17  attack or sudden cardiac death?
18      A.   We had ten patients who were
19  currently exposed to high-dose rofecoxib
20  Vioxx at the time of their heart attack
21  or sudden death.
22      Q.   And the concern expressed by
23  Dr. Seligman, whether you believe him
24  today or not, was that that number is

Page 311

1  just too small to draw a meaningful
2  conclusion from, correct?
3      A.   That's what I think he's
4  driving at here, but that's what a
5  confidence interval is for.
6      Q.   Do you remember this morning
7  when you were saying that epidemiological
8  studies are better in many ways than
9  clinical trials, because in a clinical
10  trial like the ones that Merck performed,
11  I think you said in one of the clinical
12  trials, there were only 40 or 50 heart
13  attacks, and that's just not enough to
14  draw any meaningful conclusions from?  Do
15  you remember that testimony this morning?
16      A.   But you have to -- it's not
17  enough to draw a conclusion in the
18  specific area between 0 and 18 months
19  where there was insufficient power, so,
20  you had very wide confidence intervals.
21  That didn't apply here.
22          The confidence intervals
23  here were narrow enough that even though
24  the numbers are small, one can

Page 312

1  legitimately draw a conclusion.
2      Q.   But in any event, Dr.
3  Seligman disagreed and said the number of
4  cases is just so small that you cannot
5  legitimately draw such a conclusion,
6  correct?
7      A.   Yes.  But he's not referring
8  to the confidence intervals, and, you
9  know, if you ask him the same questions
10  you're asking me, he'd have to say that
11  the confidence intervals permit it.
12      Q.   Well, did others in the FDA
13  express similar concerns that Dr.
14  Seligman expressed about whether you
15  could draw conclusions from such a small
16  number --
17      A.   Yes, they did.
18      Q.   -- of people who used the
19  high-dose Vioxx?
20      A.   Yes, they did.
21      Q.   Who is Dr. John Jenkins?
22      A.   He's the director of the
23  Office of New Drugs.
24      Q.   And is Dr. Jenkins another

Page 313

1  one of the FDA people that you think was
2  out to get you?
3      A.   No.
4          - - -
5          (Whereupon, Deposition
6  Exhibit Graham-15, E-mails
7  FDACDER011048 - FDACDER011049,
8  was marked for identification.)
9          - - -
10  BY MR. BECK:
11      Q.   Let me show you Exhibit 15.
12      A.   (Witness reviewing
13  document.)
14      Q.   Exhibit 15 is an e-mail
15  string.  The last one appears to be dated
16  August 11, 2004.  They're all around that
17  time frame.
18          Do you see that the middle
19  e-mail on Page 1 is from Dr. Jenkins?
20      A.   Yes, I see it.  I've never
21  seen this e-mail before, the best I can
22  recollect.
23      Q.   Let's go through what Dr.
24  Jenkins said, focusing on the second

KS-000378

Golkow Litigation Technologies - 877.DEPS.USA

Page 314

1  paragraph of his e-mail of August 11,
2  2004.
3       MR. KLINE:  Objection.  Only
4  to the extent that I would like
5  the witness to be able to identify
6  whether he has seen the document
7  before.
8       MR. BECK:  He just
9  testified.
10      THE WITNESS:  No.  I've
11 never seen this.
12      MR. KLINE:  I didn't hear
13 him say that.  I apologize.
14      MR. BECK:  He said that as
15 best he could recall, he didn't
16 remember seeing it.
17      MR. KLINE:  Okay.
18 Thank you.
19      THE WITNESS:  Not on the --
20      MR. KLINE:  I would just
21 like to create a record as to
22 whether he has seen it or not for
23 ruling purposes later.  That's my
24 only reason.

Page 315

1       Thank you.
2       MR. BECK:  Okay.
3  BY MR. BECK:
4       Q.  So, Dr. Jenkins here, he
5  says -- I put the little red marker where
6  I'm going to begin reading.  Second
7  paragraph, "I would also note that I find
8  the conclusions reached in the poster to
9  be far in excess of the available data.
10 For example, 'Rofecoxib use at a dose
11 over 25 milligrams increases the risk of
12 AMI or SCD' is the primary conclusion of
13 the poster.  This is a far too definitive
14 conclusion based on the data.  Similar
15 language appears in other parts of the
16 poster and implies that a causal
17 relationship has been confirmed."
18      Now, just stopping there.
19 Did you know back in 2004 that Dr.
20 Jenkins was of the same view that Dr.
21 Seligman expressed to you?
22      A.  There was one e-mail from
23 sometime after this date, but in the
24 teens of August, it was like a two-line

Page 316

1  e-mail in which Dr. Jenkins suggested
2  what he thought different wording for our
3  conclusions would be acceptable to him
4  were, and that's pretty much the extent
5  of what my knowledge of what Dr. Jenkins
6  thought.
7       Q.  Do you see where he goes on
8  to say:  "This is misleading at best and
9  deceptive at worst, since what has been
10 demonstrated as an association between
11 the use of the drug and the events in
12 question.  Yes, we have some priors and
13 randomized controlled clinical trials
14 that suggest rofecoxib may be associated
15 with an increased risk of MI, but those
16 priors do not support reaching such a
17 definitive conclusion about the findings
18 in the study"?
19      Were you aware that Dr.
20 Jenkins was expressing the view that the
21 conclusion that you had in your draft
22 poster was misleading at best and
23 deceptive at worst?
24      A.  Nope.  No idea.

Page 317

1       Q.  And then he goes on to say,
2  "These types of overstated conclusions
3  are typical of David's writing" -- David
4  is you, correct?
5       A.  Correct.
6       Q.  -- "and only serve to
7  undermine his credibility as an objective
8  evaluator of the data at hand."
9       And then he says, "It is
10 even more ridiculous for him to make
11 broad recommendations about not using the
12 drug based on the data from this study,
13 and such sweeping clinical/regulatory
14 conclusions represent the primary reason
15 for difficulties in the interactions
16 between David and staff in OND."
17      That would be Office of New
18 Drugs, right?
19      A.  Correct.
20      Q.  Then before I get to the
21 last couple of sentences, when you write
22 articles like you talked about this
23 morning and including this poster, do you
24 typically have a disclaimer on there that

Confidential - Subject to Protective Order

Page 318

1   says these are not necessarily the views
2   of the FDA, they're just the views of the
3   author, David Graham?
4        A.   Oh, we're pretty much
5   required to have that disclaimer.
6        Q.   And do you see here where
7   Dr. Jenkins says, "Perhaps the disclaimer
8   should read that 'The views expressed are
9   those of the author and DO NOT reflect
10  the views of the FDA.'"  And "Also,
11  perhaps, the COI statement" -- what's a
12  COI statement?
13       A.   I think that's probably
14  conflict of interest.
15       Q.   Okay.
16            And I think this morning you
17  said in response to questions from
18  counsel that you didn't have any
19  conflicts of interest.
20            Do you see where Dr. Jenkins
21  says that "perhaps the conflict of
22  interest statement should say 'Dr. Graham
23  has no FINANCIAL conflicts of interest,
24  but" systemic "bias in his viewpoints

Page 319

1   cannot be excluded."
2            Were you aware that that was
3   Dr. Jenkins' views as to the merits of
4   the poster conclusion?
5        A.   Dr. Jenkins is entitled to
6   his opinions.  I wasn't aware of them.
7   The same could be said of the FDA.
8        Q.   The same could be said of
9   the FDA.  I don't know --
10       A.   The same systemic --
11  systematic bias and viewpoints at FDA can
12  not be excluded.  FDA has systematic
13  biases.  Dr. Jenkins has systematic
14  biases.  So, he's entitled to his
15  opinion.  I wasn't aware of them.  But I
16  probably could have surmised them.
17            MR. KLINE: Can you read the
18       last e-mail right before just the
19       first paragraph for completeness,
20       please.
21            MR. BECK:  Sure.
22            MR. KLINE:  "Please see
23       Paul's message below."
24  BY MR. BECK:

Page 320

1        Q.   "Please see Paul's message
2   below which he kindly shared.  For the
3   record, Merck will likely not be happy so
4   this could well eventuate in calls to the
5   agency.  Should we involve...Temple?  He
6   historically has been one of the first
7   ones they complain to."
8            MR. KLINE:  That's fine.
9   BY MR. BECK:
10       Q.   "I am very concerned that
11  David Graham is lead author on this and
12  is identified as FDA staff.  This clearly
13  implies agency endorsement of his
14  presentation and this is the first we
15  have seen of it.  Paul's message below
16  for a presentation at a meeting coming up
17  later this month does not allow much time
18  to review or clear."  And that's from
19  Jonca Bull, correct?
20       A.   Correct.
21            MR. KLINE:  Thank you.
22  BY MR. BECK:
23       Q.   Who is Sharon Hertz?
24       A.   I think she's a deputy

Page 321

1   division director for the analgesic and
2   anti-inflammatory reviewing division, and
3   that would be the reviewing division
4   responsible for NSAID drugs, both
5   naproxen and drugs like Vioxx.
6            -  -  -
7            (Whereupon, Deposition
8       Exhibit Graham-16, E-mails
9       FDACDER006056 - FDACDER006058,
10      was marked for identification.)
11            -  -  -
12  BY MR. BECK:
13       Q.   I'm handing you what we've
14  marked as Exhibit 16, which I will put up
15  on the screen.  This is a document that
16  you've seen before, correct?
17       A.   That is correct.
18       Q.   And it's from Sharon Hertz.
19  Is it Dr. Hertz?
20       A.   Yes, it is.
21       Q.   And Dr. Hertz, and it's to
22  you and your boss, Dr. Seligman, right?
23       A.   Correct.
24       Q.   And it copies Dr. Bull, who

KS-000380

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 322

1  we just read an e-mail from, as well as
2  Dr. Jenkins and some others, right?
3      A.   Yes.
4      Q.   Did Dr. Hertz say to you
5  that "There is information to suggest
6  that use of aspirin may mitigate possible
7  CV risk associated with COX-2
8  inhibitors," and go on to ask "why would
9  you choose to study CV risk from a
10 database that does not collect
11 information on something as relevant as
12 aspirin use"?
13     A.   She said it, but she didn't
14 understand the study, the methods, or why
15 her question actually is not pertinent to
16 the analysis that we did because we
17 showed that aspirin is not a confounder
18 of any association between NSAID use and
19 heart attack risk.  And because she
20 doesn't understand epidemiology, she
21 wrote this, but this is a statement
22 that's coming from her lack of
23 understanding of epidemiology.
24     Q.   And she also referred to

Page 323

1  your conclusion concerning high-dose
2  Vioxx and the fact that that represented
3  "a very small subgroup of a large
4  population," correct?
5      A.   She says that, but high-dose
6  Vioxx represented 18 percent of all the
7  Vioxx use in the country.  So, it has
8  public health importance.
9      Q.   And did she tell you that
10 drawing conclusions about this subgroup
11 at all is inappropriate because of the
12 small size of it?
13     A.   She says that, but her
14 statement is incorrect, because the
15 confidence intervals permit that.  And it
16 was stated a priori at the beginning of
17 our study that we would do that analysis,
18 that we would take a look as best we
19 could at the effect of dose of rofecoxib,
20 of Vioxx, on heart attack risk.  So, she
21 can use words like it's inappropriate for
22 us to do that but the fact is that, she's
23 mistaken.  There's nothing inappropriate
24 about it.

Page 324

1      Q.   And you'll see at the bottom
2  of the paragraph she said, "This is
3  simply bad science."
4      A.   She's entitled to her
5  opinion.
6      Q.   I forgot to ask you.  Is
7  Dr. Hertz one of the people at the FDA
8  that you think was out to get you?
9      A.   I didn't use those terms,
10 but, no, she is not one of those people.
11     Q.   Is she one of the people,
12 who, to use your terms, was part of the
13 very organized and orchestrated campaign
14 to smear and discredit you?
15     A.   She is not a member of that
16 group.
17     Q.   She just disagreed with you
18 and thought you were using bad science,
19 right?
20     A.   That's what she says here.
21 But she's not an epidemiologist, and I'm
22 not sure that she would recognize good
23 epidemiology if she saw it.
24     Q.   And Dr. Jenkins, who we

Page 325

1  talked about a minute ago, who commented
2  on what he thought was the invalidity of
3  your analysis, do you think he knows what
4  he's talking about when it comes to
5  epidemiology?
6      A.   I think that Dr. Jenkins is
7  not an epidemiologist.  He's a
8  pulmonologist.  I think that he has broad
9  responsibilities for the approval of
10 drugs, and that it's his office, Office
11 of New Drugs, that approved Vioxx, and
12 that going back to the conflict of
13 interest that we talked about before,
14 that FDA has a vested interest in
15 maintaining the decisions that it's made
16 previously.  And that their biggest
17 concern here was that they had, in
18 quotes, done a labeling change in 2002,
19 and that solved the problem.  But I
20 contend that it didn't really accomplish
21 very much at all.
22          - - -
23          (Whereupon, Deposition
24          Exhibit Graham-17, E-mails

KS-000381

Confidential - Subject to Protective Order

Page 326

1       FDACDER021810 - FDACDER021811,
2       was marked for identification.)
3           - - -
4   BY MR. BECK:
5       Q.   I'm going to hand you what
6   we've marked as Exhibit 17.  Have you
7   seen Exhibit 17 before?
8       A.   No.  I have never seen this
9   before.
10      Q.   Who is -- I'm going to -- I
11  may mispronounce both halves of the name.
12  Lourdes -- you tell me how to pronounce
13  it.
14      A.   Lourdes Villalba.  I've done
15  it too.  No offense to Lourdes.
16  Villalba.
17      Q.   Lourdes Villalba.  Who is
18  Lourdes Villalba?
19      A.   She was the medical officer
20  who was responsible for Vioxx.  She may
21  have been the medical officer who
22  reviewed the original Vioxx NDA, but that
23  I'm not absolutely certain about, but she
24  had responsibility for it as the primary

Page 327

1   medical officer in the reviewing division
2   of the Office of New Drugs at this time.
3       So, she's the one who would
4   review -- well, actually, she did the
5   original review that we showed on the
6   slide.  So, any supplements or any
7   submissions from Merck regarding Vioxx,
8   they would come to her desk.
9       Q.   Was she one of the people
10  that was part of the organized and
11  orchestrated campaign to smear and
12  discredit you that you think existed at
13  the FDA?
14      A.   No, she was not.
15      Q.   At the bottom of this e-mail
16  string, Lourdes writes, "I learned of
17  this study a couple of weeks ago when
18  Jonca requested my opinion about the
19  abstract that was going to be presented
20  in France.  This study is not a good
21  study to address the cardiovascular
22  question.  The conclusions are not well
23  supported by the data."
24          Did you learn back in 2004

Page 328

1   that Lourdes Villalba felt that your
2   conclusions were not supported?
3       A.   No.  I was never told that,
4   but I'm not surprised.  This is the
5   typical response of people in the Office
6   of New Drugs to studies that are done in
7   the Office of Drug Safety that we talked
8   about earlier where -- and that would
9   lead Dr. Galson to say that our office
10  doesn't add value to the center.
11      Q.   Who is Anne Trontell?
12      A.   Dr. Trontell is the deputy
13  director for the Office of Drug Safety.
14      Q.   And is Dr. Trontell one of
15  the people that you were referring to
16  this morning when you said that within
17  the FDA there was a very organized and
18  orchestrated campaign to smear and
19  discredit you?
20      A.   Yes.
21          - - -
22          (Whereupon, Deposition
23          Exhibit Graham-18, E-mails
24          FDACDER010352 - FDACDER010353,

Page 329

1           was marked for identification.)
2           - - -
3   BY MR. BECK:
4       Q.   Please take a look at
5   Exhibit 18.
6       A.   (Witness reviewing
7   document.)
8       Q.   Incidentally, how long has
9   Dr. Trontell been at the FDA?
10      A.   Gee, I don't exactly know.
11  She's been with the Office of Drug Safety
12  for maybe five years.  She came from the
13  Office of New Drugs before that.
14          MR. KLINE:  Can we just
15          establish whether he's seen the
16          document or not?  That would help
17          me later with the record.  That's
18          all I ask.
19          MR. BECK:  Sure.
20          MR. KLINE:  On all of these?
21          MR. BECK:  Yes.
22          MR. KLINE:  Thanks.
23  BY MR. BECK:
24      Q.   Do you remember whether

Confidential - Subject to Protective Order

Page 330

1  you've seen this document before?
2      A.   No, I don't think that I
3  have seen this document before.
4      Q.   Do you see that Dr. Trontell
5  is writing to Dr. Seligman in the e-mail
6  on the top?
7      A.   Yes.
8      Q.   Starting with the second
9  paragraph, she says, "I understand John's
10  consternation, but let us all acknowledge
11  the problem arose when David Graham
12  overstepped the bounds of what anyone can
13  conclude from a brief poster of a complex
14  study.  He ignored advice from multiple
15  FDA sources by making a strong conclusion
16  without giving enough information or time
17  to others in FDA to evaluate it
18  rigorously."
19          Did Dr. Trontell communicate
20  those views to you even though you didn't
21  see this particular e-mail?
22      A.   She communicated views
23  similar to this.  She never said that I
24  overstepped my bounds, and she didn't use

Page 331

1  words like I ignored advice.  And at the
2  end of the day, the poster was cleared by
3  FDA, so that they can complain all they
4  want, but I didn't -- I stuck to what I
5  believed based on the data, and they
6  cleared it at the end of the day.  So, we
7  had honest disagreements about the data
8  and how to interpret it.
9      Q.   And as part of that
10  disagreement, do you see here where she
11  says that you "subverted FDA review as
12  well as the normal standards of peer
13  review by stating an
14  inadequately-supported conclusion based
15  upon the limited data" you "made
16  available for review"?  Again, did she
17  express those views to you in substance?
18      A.   No.  And that statement
19  actually makes absolutely no sense to me
20  as it's stated.  If she's talking about
21  the differences between the ACR abstract
22  and the ISPE abstract, those things I
23  described to both Dr. Seligman and Dr.
24  Trontell between the end of May and

Page 332

1  August, as we came upon each of the
2  problems and had to deal with them.  And
3  she doesn't recall that.
4          We had many, many
5  conversations.  And I had them with Dr.
6  Seligman as well.  And so looking at
7  this, that's the only thing that I can
8  guess she is -- she's saying from that,
9  but that's just a guess.
10      Q.   She says here, "To publicize
11  findings that have not been fully vetted
12  is irresponsible and professionally
13  suspect."
14      A.   Where are you?
15      Q.   If you look up on the
16  screen, I'm in the middle of the next
17  paragraph.
18      A.   Uh-huh.
19      Q.   Did she communicate those
20  views to you?
21      A.   No.  But the fact is, is
22  that I didn't communicate anything to the
23  public that hadn't been cleared by FDA.
24  So, this statement really, in my mind, is

Page 333

1  inaccurate and, you know, she's using a
2  lot of pejorative terms towards me, so,
3  she can be very critical of me, but the
4  fact is, is that the document was
5  cleared, and I have the signed clearance
6  form, and so she can have her opinion.
7      Q.   She refers in here to an
8  internal peer review process at the FDA.
9      A.   Where are you now?
10      Q.   Up in the first paragraph
11  right after she says you "subverted FDA
12  review."  It says, "as well as the normal
13  standards of peer review."
14      A.   There are no established
15  peer review standards within FDA, and, in
16  fact, for this poster -- actually, for
17  this poster they didn't do it, but for
18  our paper, they created a unique
19  once-only peer review process that had
20  never been used before within our office
21  and has not been used within our office
22  subsequently.
23          So, there's no MAP, which is
24  a manual of -- what is it -- manual of

KS-000383

Confidential - Subject to Protective Order

Page 334

1  policy and procedures.  There's no
2  standard operating procedure to describe
3  what she's saying.  This is something
4  that she made up, and they implemented it
5  for this paper and had never done it in
6  the 20 -- almost 20 years I'd been at FDA
7  before this, and they haven't done it
8  with any work that I've done or anyone
9  else in our office has done subsequently.
10      Q.   Let's focus on the peer
11  review process that was followed in this
12  case.
13          Again, I'm going to ask you
14  to keep your answers short.  Was your --
15          MR. KLINE:  I would ask him
16      to answer fully and completely as
17      he needs to.
18          MR. BECK:  Well, back
19      when --
20          THE WITNESS:  I'll try to
21      accommodate both requests.
22      Seriously.
23          MR. BECK:  I'm just making
24      exactly the same request that Mr.

Page 335

1      Kline did this morning.
2          MR. KLINE:  All I'm asking
3      is that he be responsive and
4      complete.
5  BY MR. BECK:
6      Q.   The peer review process that
7  you and I were just talking about, did
8  that -- or that you were describing as
9  this new process that had never been
10  implemented before, was that a peer
11  review process that was conducted for the
12  article that eventually was published in
13  The Lancet?
14      A.   Correct.
15      Q.   Okay.
16          And did Dr. Trontell review
17  your paper and give comments?
18      A.   Yes, she did.
19      Q.   And did the folks at the FDA
20  ask you for suggestions as to people who
21  could serve as good peer reviewers,
22  people that you would respect and trust?
23      A.   Yes.  And they were the same
24  names that they would have come up with

Page 336

1  as well.
2      Q.   And what were those names?
3      A.   Robert O'Neill, who is the
4  director of the office of biostatistics
5  at FDA.  Bruce Stadel, Dr. Bruce Stadel
6  who's, in my view, the best
7  epidemiologist at FDA and who is retired
8  now.  And then, I believe I had mentioned
9  the possibility of Dr. Curt Furberg from
10  Wake Forest and Dr. Brian Strom from the
11  University of Pennsylvania as a couple,
12  because they said they wanted to send it
13  not only to internal FDA people, but in a
14  complete breach of FDA policy and
15  protocol --
16      Q.   Now we're sort of getting
17  beyond the names of the other people that
18  I've asked you for.
19      A.   Well, they're sending it to
20  these people.  They were contemplating
21  sending this paper to people outside of
22  FDA, as well, for peer review.
23      Q.   My question is then, who did
24  you suggest --

Page 337

1      A.   Well, I gave those four
2  names.
3      Q.   Okay.  Good.
4          MR. BECK:  Mark this as
5      Exhibit 19.
6          - - -
7          (Whereupon, Deposition
8      Exhibit Graham-19, Memo 10-29-04
9      "Review of reports of FDA/Kaiser
10      Vioxx study: Questions about
11      Inconsistencies and Bias,"
12      FDACDER022462 - FDACDER022470,
13      was marked for identification.)
14          - - -
15  BY MR. BECK:
16      Q.   I'm going to hand you
17  Exhibit 19 here, which is a memorandum
18  from Dr. Trontell to Dr. Seligman.  Have
19  you seen this document before?
20      A.   Yes, I have.
21      Q.   Is this document --
22      A.   This isn't the complete
23  document.  The one that I recall
24  seeing -- well, maybe it's just different

KS-000384

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 338

1  typeface.  I thought it was much longer
2  than this, but in any event.
3      Q.   But you recall seeing this?
4  It may be part of a larger package --
5      A.   Right.
6      Q.   -- but you recall this
7  memorandum?
8      A.   Yes.  It was sent to me
9  after 5:00 on a Friday afternoon when I
10  was scheduled to go on a week's vacation,
11  the first vacation that I had had in like
12  eight months.  So, I was coming to work
13  at 7:00 in the morning, and 5:00 is way
14  past quitting time, especially when
15  you're headed for a vacation, and so I
16  saw this, read through the first couple
17  of pages of this and said, I have talked
18  to Anne, Dr. Trontell and Dr. Seligman
19  about these things on numerous occasions
20  in the past, and so concluded this could
21  wait until I got back from vacation,
22  because I didn't see anything new here
23  that I hadn't talked with them about
24  previously.

Page 339

1      Q.   And, sir, my question was,
2  do you recall seeing this piece of paper?
3      A.   Yes, I do.
4      Q.   Does Dr. Trontell in this
5  memorandum raise concerns with the
6  methodology used in the study that you
7  had done?
8      A.   She raises a number of
9  questions which we've actually discussed
10  and have the answers to, yes.
11      Q.   Over on Page 2 in the last
12  paragraph of the executive summary, did
13  Dr. Trontell state: "My review notes
14  several unexplained inconsistencies in
15  the conduct of the study and the
16  reporting of results.  Before the
17  findings and conclusions of the study
18  report can be accepted, the authors must
19  address all inconsistencies with adequate
20  documentation that clearly explains how
21  they occurred, in order to address the
22  potential appearance of data manipulation
23  and post hoc analyses."
24          Now, post hoc analysis, for

Page 340

1  the benefit of the jury, what that refers
2  to is somebody coming in after the fact
3  and kind of changing the rules of the
4  study --
5      A.   It's the same thing that
6  Merck did with the APPROVe study and its
7  18-month argument.  It is a post hoc
8  analysis.
9      Q.   So, now I'm starting to get
10  speeches before I've even asked the
11  question.
12          MR. KLINE:  Objection.
13          THE WITNESS:  I apologize.
14  BY MR. BECK:
15      Q.   Is a post hoc analysis where
16  somebody, after a study is conducted,
17  goes back and changes the rules of the
18  study, and the concern then is that the
19  results are invalid?  I'm not asking
20  whether you did it.  I'm asking whether
21  that's what the post hoc analysis is.
22      A.   When people talk about a
23  post hoc analysis, what they mean is
24  they're referring to an analysis that

Page 341

1  wasn't prespecified before the study
2  began or before the analysis began.
3          So, for example, in our
4  study, I know that Dr. Trontell kept
5  insisting that our comparison of Vioxx to
6  Celebrex was a post hoc analysis.  But it
7  was there from the beginning of our
8  protocol.  And so -- and I had explained
9  that to her multiple times.  But that's
10  what a post hoc analysis is.
11      Q.   And data manipulation,
12  again, not focusing on her concerns about
13  you, but what data manipulation is
14  generally is basically rigging the
15  numbers to come out the way you want
16  them?
17      A.   It's scientific misconduct.
18      Q.   And please turn over two
19  more pages.  Under, at the bottom,
20  "Recommendations," do you see where Dr.
21  Trontell says, "The authors should
22  document their methods in detail and
23  respond to questions raised in this
24  review in particular the noted

KS-000385

Confidential - Subject to Protective Order

Page 342

1  inconsistencies in the study objectives,
2  results and statistical findings of
3  significance of their published ACR
4  abstract and the August 2004 ISPE
5  poster." So, do you see there where
6  she's expressing concern that you've come
7  up with different conclusions and
8  different methodologies between that
9  original ACR abstract, and then your
10  later poster, like we saw in the chart
11  that I showed on the screen? Is that the
12  subject that's being addressed here?
13      A.   Uh-huh.  Yes.
14      Q.   And, in particular, what
15  she's saying is that before you submit
16  this article for publication, that you
17  should address these issues and explain
18  them, right?
19      A.   Dr. Trontell is saying that,
20  but Dr. Trontell is not my supervisor.
21  She wrote this to Dr. Seligman.  Dr.
22  Seligman, I believe, e-mailed it to me
23  with basically no instructions.  And so
24  Dr. Trontell can have her opinions about

Page 343

1  what it is I should do, but she's not my
2  supervisor, and, in fact, has never been
3  someone who reviews any of the work that
4  I do.
5      Q.   In any event, you submitted
6  the article to the Lancet without making
7  the responses that Dr. Trontell said you
8  should make, right?
9      A.   The responses were actually
10  included in the manuscript, A; B, we
11  submitted the manuscript with the
12  approval of my supervisors.  Because I
13  sent multiple e-mails to Dr. Seligman and
14  to Dr. Trontell giving them my
15  interpretation of FDA's clearance
16  policies and asking them to instruct me
17  if I had misinterpreted them in any way,
18  because I was anxious to -- I wanted to
19  be sure that I followed all of FDA's
20  rules and procedures.  And that if they
21  didn't get back to me, then I would
22  assume that I had interpreted them
23  correctly and that it is all right for me
24  to submit it.

Page 344

1          Dr. Trontell consulted with
2  the head lawyer for the Center for Drug
3  Evaluation and Research, Jane Axelrod,
4  who basically said to Dr. Trontell by way
5  of e-mail that it was fine, that I could
6  submit it.  And so Anne did not have a
7  written response to these questions, but
8  I had -- my understanding was I had the
9  permission of FDA to submit the paper.
10  And it was never my understanding, quite
11  honestly, that I was required to give
12  written responses to these questions, and
13  I tried to express that in an e-mail to
14  Dr. Paul Seligman somewhere around
15  November 10th or 9th or somewhere in that
16  neighborhood, because I was about to go
17  on a four-day weekend, because Veterans'
18  Day, which is November 11th, is a Federal
19  holiday, and I was going to take off the
20  12th and then I would have a four-day
21  weekend.
22          And on the 9th, Dr. Seligman
23  said that I could take leave on Friday,
24  but before I left, he needed written

Page 345

1  responses to these questions.  And I
2  e-mailed back that I hadn't understood
3  that that's what he wanted.  And he never
4  came back.  He had an entire day,
5  November 10th, Wednesday, the entire day
6  he had to disabuse me of my understanding
7  if he wanted to, and he never said to me
8  that, no, I misunderstood, I really do
9  want you to give a written response.  And
10  so I think that I acted reasonably and
11  tried to get management to communicate
12  with me, and management, in this case,
13  did not answer my e-mails, did not come
14  back to me to communicate with me in
15  clear, unambiguous instructions about
16  what it is that they wanted me to do.
17          MR. BECK:  For everyone's
18      benefit, yours as well as
19      plaintiffs' counsel, if I run out
20      of time on my cross-examination, I
21      may be going back to the judge,
22      because I'm getting long,
23      nonresponsive answers that I can't
24      cut off.

Confidential - Subject to Protective Order

Page 346

1    THE WITNESS:  Can I disagree
2  with that for a moment?  I think
3  that's very germane to the
4  question about what happened, and
5  I'm not trying --
6  BY MR. BECK:
7    Q.   I didn't ask you what
8  happened, sir.  I asked you a specific
9  question, and you started telling me
10  about a four-day holiday you were going
11  on.
12    MS. ROYCE:  He can't answer
13  a question unless he explains
14  things.  He needs to be able to
15  put things in context.
16    MR. BECK:  And I'm simply
17  putting everybody on notice,
18  including the witness, the
19  witness' counsel, and plaintiffs'
20  lawyers that I can't finish in
21  three-and-a-half hours because of
22  answers like this.  We'll have to
23  be going back to the judge to see
24  about more time.

Page 347

1    MR. KLINE:  Let's see if you
2  finish.  I have full faith and
3  credit like the United States of
4  America.  So, I think you'll
5  finish.  My point being, let's
6  cross that bridge when we come to
7  it, if we come to it.
8    MR. COHEN:  You're wasting
9  time.
10    MR. BECK:  I'm sorry.  What
11  did you say?  Can I know what you
12  said?
13    MR. COHEN:  I said he's just
14  wasting time.
15  BY MR. BECK:
16    Q.   Was it your view, sir, that
17  this peer review process that was
18  implemented was really some sort of smoke
19  screen by people at the FDA who were --
20  and what you think is this organized
21  campaign to smear and discredit you?
22    A.   No, no.  My concerns with
23  the clearance process that they were
24  proposing was that in a situation where

Page 348

1  there was lots of active research going
2  on and many different people wanting to
3  publish articles and we were aware of
4  several articles that were under review
5  at the time, that their specific creation
6  of this new and unprecedented review
7  process would slow down and delay our
8  ability to submit this for publication.
9    And I had talked at length
10  with them, and Dr. Trontell has a long
11  history of holding up people's
12  manuscripts in the past, and I can give
13  you examples if you would like.
14    Q.   No thanks.
15    Was it your view that FDA
16  management had come up with a strategy to
17  block your paper and that that strategy
18  was the peer review process?
19    A.   I wasn't thinking of it in
20  those terms.  I mean, I raised the
21  question that could have that
22  effect, but I didn't -- I don't think
23  that -- I don't think that I thought that
24  that was why they were doing that.

Page 349

1         - - -
2    (Whereupon, Deposition
3  Exhibit Graham-20, E-mails
4  FDACDER022789, was marked for
5  identification.)
6         - - -
7  BY MR. BECK:
8    Q.   All right.
9    I've handed you Exhibit 20.
10  Is this an e-mail from you to Richard
11  Horton, the editor of Lancet?
12    A.   Yes, it is.
13    Q.   October 29th, 2:03 p.m.?
14    A.   Yes.
15    Q.   So, that would be around the
16  time that we've got this memo from Dr.
17  Trontell; is that right?
18    A.   Correct.
19    Q.   And --
20    A.   Although it's before.  It
21  actually precedes -- it precedes it.  The
22  time on this is like 12:51, so, it's
23  about 1:00 in the afternoon.  And as I
24  mentioned before, I was actually unaware

KS-000387

Confidential - Subject to Protective Order

Page 350

1  of Dr. Trontell's comments at this time.
2  What I was aware of was that they were
3  going to create a peer review process
4  involved -- and that peer review process
5  was going to involve Dr. O'Neill and
6  those people.
7      Q.   So, you were aware that they
8  were going to create a peer review
9  process, but you didn't have her
10  comments, and based on that, you told the
11  editor of Lancet -- well, let me get this
12  up on the screen here.
13      Based on the fact that they
14  were going to implement this peer review
15  process, you said, "I'm sorry to bother
16  you but is it still possible to speak
17  with you today. FDA management has come
18  up with another strategy to block our
19  paper which I need to run by you."
20      Is that what you told the
21  editor of Lancet?
22      A.   Yes.
23      MR. KLINE:  Mr. Beck, may I
24  just raise one point respectfully?

Page 351

1      And, again, I'm operating under
2  the assumption, and I'll be brief,
3  and it doesn't count against your
4  time, the record should reflect
5  that --
6      MR. BECK:  Is this an
7  objection as to form?
8      MR. KLINE:  No, it's not an
9  objection as to form, but I want
10  to --
11      MR. BECK:  Is it going to be
12  alerting the witness that he ought
13  to be testifying in a certain way?
14      MR. KLINE:  No.  It is
15  nothing to alert the witness.  You
16  know better than that.  You know I
17  wouldn't do that.
18      My sole objection, I'm happy
19  to make it outside of the presence
20  of the witness, but I want to make
21  sure we have an understanding.
22      None of these documents go
23  to the public record, and I'm not
24  standing in your way and I'm not

Page 352

1      interfering, but I just want to
2  make sure, and then I'll be
3  totally out of your way the whole
4  rest of the time, that out of an
5  abundance of caution that we are
6  not agreeing to any of this
7  examination on two bases.  One --
8      MR. BECK:  You made this
9  speech this morning.  You don't
10  have to make it again.
11      MR. KLINE:  One, they're
12  loaded with hearsay -- and then
13  I'll be done.  I appreciate your
14  indulgence.  And two, they go
15  nowhere near or about or around
16  any public statements.  I'm done.
17  Thanks for your indulgence.
18  BY MR. BECK:
19      Q.   After your paper was
20  accepted for publication by Lancet but
21  before it actually was published, did you
22  learn that Dr. Steven Galson of the FDA
23  was in communication with The Lancet
24  about your paper?

Page 353

1      A.   Yes, I did.
2      Q.   And who is Dr. Steven
3  Galson?
4      A.   He is the Center director
5  for CEDR.
6      Q.   And I think you described
7  this morning that CDER, both the Office
8  of New Drugs and the Office For Drug
9  Safety are underneath CDER, which is the
10  Center for Drug Evaluation and Research,
11  right?
12      A.   Right.
13      Q.   And is Dr. Galson one of the
14  people that you think is part of this
15  very organized and orchestrated campaign
16  to smear and discredit you?
17      A.   Yes, he was.  He may have
18  been an unwitting participant.
19      - - -
20      (Whereupon, Deposition
21  Exhibit Graham-21, E-mails
22  KP001136 - KP001138, was marked
23  for identification.)
24      - - -

Confidential - Subject to Protective Order

Page 354

BY MR. BECK:
1   BY MR. BECK:
2       Q.   And let me show you Exhibit
3   21.
4           Have you seen Exhibit 21
5   before?  And I'm particularly interested
6   in actually whether you've seen the
7   e-mail that's on the second page of
8   Exhibit 21 from Dr. Galson to -- is it
9   Dr. Horton?
10      A.   Yes.  Dr. Horton forwarded
11  copies of these to me after he telephoned
12  me on November 12th to discuss the
13  concerns that Dr. Galson had raised in
14  his telephone conversation and in his
15  e-mail on the same day.
16      Q.   And the concerns that you're
17  referring to, those are the ones set
18  forth in this e-mail dated November 12th
19  from Dr. Galson to Dr. Horton?
20      A.   Yes.  This whole thing about
21  the different findings from the ACR
22  abstract and our ISPE poster and paper.
23      Q.   Okay.
24          So that, again, not to

Page 355

1   review the whole thing in detail again,
2   but he raises the issue with Dr. Horton
3   about whether he's been informed of an
4   earlier abstract from the same group, the
5   ACR abstract that had the different
6   conclusions, correct?
7       A.   Correct.
8       Q.   And he also raises a concern
9   about how the number of cases attributed
10  to high dose rofecoxib is different
11  between the ACR abstract and the poster,
12  as well as the article you submitted,
13  right?
14      A.   That's right.
15      Q.   And did he go on to say that
16  the draft manuscript that the FDA had
17  reviewed described "a process of
18  unanimous consensus by four Kaiser
19  collaborators for adjudicating uncertain
20  cases of high dose rofecoxib exposure.
21  It is not clear how the consensus process
22  resulted in two different published
23  numbers of high-dose rofecoxib cases and
24  controls in the ACR abstract and the

Page 356

1   draft manuscript."
2       A.   Yes.
3       Q.   You understood this as a
4   concern that Dr. Galson was expressing?
5       A.   Right.  It's the same
6   concern that Dr. Trontell had raised, and
7   it's the exact same questions that I had
8   spoken with Dr. Trontell and Dr. Seligman
9   with from May through August as those
10  issues came up, and I had explained each
11  of them to them in the past.
12      Q.   And then on the last page of
13  this, you understood at the time that Dr.
14  Galson said to the Lancet people, "We
15  would like Dr. Graham and his colleagues
16  to have an opportunity to address these
17  questions through the peer-review
18  process, and in no way wish to intrude or
19  otherwise advise the Lancet about its
20  scientific review and editorial policy."
21          You understood that that's
22  what he said at the time, didn't you?
23      A.   He said that here in the
24  e-mail.  There was a prior telephone

Page 357

1   conversation that Dr. Galson had had with
2   Dr. Horton, and if you read Dr. Horton's
3   response to Dr. Galson, you can pick up
4   threads of some of the things that Dr.
5   Galson expressed in that telephone
6   conversation that are probably toned down
7   in this follow-up e-mail.
8               - - -
9           (Whereupon, Deposition
10          Exhibit Graham-22, E-mails,
11          FDACDER022247 - FDACDER02249, was
12          marked for identification.)
13              - - -
14  BY MR. BECK:
15      Q.   Have you seen Exhibit 22
16  before?
17      A.   Yes.
18      Q.   Does Exhibit 22 include an
19  e-mail from you to Dr. Galson responding
20  to the e-mail that we just looked at?
21      A.   It responds, actually, to
22  the entire process, because attached to
23  this was a detailed response, basically
24  comment by -- phrase by phrase, paragraph

KS-000389

Confidential - Subject to Protective Order

Page 358

1  by paragraph to Dr. Trontell's October
2  29th memorandum and -- in which I address
3  each of her concerns and explain things
4  as best as I was able.
5          And explaining to Dr. Galson
6  that my managers, that Dr. Seligman and
7  then Dr. Trontell, who was not my
8  supervisor but who was involved in this
9  process, had opportunities to talk to me
10 to clarify things to improve
11 communication and didn't avail themselves
12 of that, and that I had been acting in
13 good faith.  And in any event, yes, it's
14 in response to the entire process.
15     Q.    And then including, as you
16 say, in the very first line of the e-mail
17 that we just looked at, right?  "Dr.
18 Horton forwarded to me your email back to
19 him last evening."
20          Is that the e-mail we were
21 just looking at?
22     A.    Well --
23     Q.    Well, that's okay.
24     A.    I honestly -- I honestly

Page 359

1  don't know.
2      Q.    Setting aside which e-mail
3  this refers to, because you said this
4  refers to the entire process, I just want
5  to focus on what you said to Dr. Galson
6  in the last paragraph of your e-mail.
7  You said, "You should know that this
8  entire episode has upset and intimidated
9  me greatly.  I was supposed to spend the
10 weekend working on my Senate testimony,
11 but I accomplished virtually nothing
12 because I was so distracted and afraid by
13 what was being done to me.  You can't
14 begin to imagine the toll this shameful
15 behavior has taken on my family and on
16 me.  And now I face the prospect that I
17 will be unable to complete my testimony
18 and say everything that I believe needs
19 to be brought into the clear light of
20 day."
21          Is that what you told Dr.
22 Galson, that you were afraid and
23 intimidated and scared?
24     A.    Yes.  My management had

Page 360

1  basically refused to communicate with me.
2  And I had gone to, I think, extraordinary
3  lengths with numerous e-mails asking them
4  to talk to me, to explain to me what the
5  rules and regulations were, what the
6  policies were, and received zero back in
7  return, just basically emptiness.  I
8  never got straight answers.
9          And even in this situation,
10 where Dr. Galson could have very simply
11 gotten on the telephone and called me and
12 said Dr. Seligman and Dr. Trontell are in
13 my office and they have raised some
14 serious questions, can we talk about it,
15 and I would have been very happy to do
16 so.
17          But Dr. Galson did not do
18 that, and he had the opportunity to do
19 that.  Instead, he chose to go ahead,
20 recognizing that I'd be testifying and
21 calling the editor of the Lancet.  I
22 mean, at this point they knew that our
23 paper would be published online the day
24 before I appeared before the Senate

Page 361

1  Finance Committee, and so you would have
2  basically a paper getting published and
3  attracting international attention,
4  followed by a Senate hearing that focused
5  on the same topic.
6          And so one effect of this
7  intervention is that it could block the
8  publication of the paper.  And in any
9  event, accusations of scientific
10 misconduct are very serious, and Dr.
11 Galson certainly should have spoken to me
12 about it, and he did not.
13     Q.    Despite what you claim was
14 this concerted effort to intimidate you,
15 and despite your claims to Dr. Galson
16 that you were distracted and afraid, you
17 went ahead and testified in front of the
18 Senate, right?
19     A.    Well, it was either do it
20 voluntarily or be subpoenaed.  So, yes, I
21 did.
22          - - -
23          (Whereupon, Deposition
24          Exhibit Graham-23, E-mails,

KS-000390

Confidential - Subject to Protective Order

Page 362

1    TOPOLE0000333, was marked for
2    identification.)
3         - - -
4  BY MR. BECK:
5       Q.   What's Exhibit 23?
6       A.   It looks like an e-mail
7  dated November 1st from me to Dr. Eric
8  Topol at the Cleveland Clinic.  And it's
9  -- it looks like it's kind of like in
10 response to an e-mail that he had sent to
11 me.  And there are several other e-mails
12 that went back and forth between Dr.
13 Topol and myself, dating back, I think,
14 to like the end of October when he first
15 telephoned me to ask if I knew who was in
16 FDA he could talk to about COX-2 pain
17 relievers and heart attack risk.  And I
18 referred him to Shari Targum, whose
19 review I spoke about earlier.
20      Q.   You referred to Dr. Topol as
21 at the Cleveland Clinic.  Is he still at
22 the Cleveland Clinic?
23      A.   My understanding is that
24 he's now at Case Western, but I'm not

Page 363

1  really -- it's basically what I read in
2  the newspaper.
3       Q.   And then did you complain to
4  Dr. Topol that "the last 2 weeks have
5  been absolute hell, and the efforts by
6  Anne Trontell and Paul Seligman to
7  intimidate and threaten me so as to block
8  the submission of our study to Lancet has
9  been intense and stressful to say the
10 least."
11      A.   Yes.  Dr. Trontell scheduled
12 a meeting on September 22nd in which five
13 or six senior managers from the Office of
14 New Drugs and my own management chain
15 spent an hour criticizing me, some of
16 them calling me names, some of them
17 raising their voices, many of them
18 talking in a disrespectful tone, knowing
19 that eight days later I was supposed to
20 have completed a report to FDA that would
21 summarize our study and that would
22 represent sort of basically my report on
23 the subject.  And the purpose of the
24 meeting, at least in my view, the way I

Page 364

1  interpreted it, it was a meeting to
2  criticize and a meeting to say, you know,
3  why on earth did you do this study in the
4  first place.  We did a labeling change in
5  2002, and nothing more needs to be done.
6  There's no regulatory issue here.  So,
7  that's the type of stuff that I was
8  referring to, and it was quite stressful.
9         - - -
10     (Whereupon, Deposition
11 Exhibit Graham-24, E-mails,
12 FDACDER022681, was marked for
13 identification.)
14      - - -
15 BY MR. BECK:
16      Q.   What's Exhibit 24?
17      A.   This is an e-mail from me to
18 Dr. Horton, the editor of the Lancet.  He
19 had e-mailed me --
20      Q.   I just -- all I want is --
21      A.   Sorry.
22      Q.   -- for you to tell me that
23 that's an e-mail.
24      So, obviously you've seen it

Page 365

1  because you wrote it and sent it to Dr.
2  Horton on October 6, 2004, correct?
3       A.   Correct.
4       Q.   I'm blowing up the paragraph
5  about two-thirds of the way down.  It
6  begins with, "Within FDA."  Do you see
7  that?
8       A.   Uh-huh.
9       Q.   And did you tell the editor
10 of The Lancet that "Within FDA, I was
11 ostracized upon my return from France,
12 and subsequently have been subjected to
13 veiled threats and intimidation by
14 managers within new drugs and drug
15 safety, because of the conclusions I
16 reached regarding rofecoxib.  They are
17 also trying to block the publication of
18 our manuscript."  And what's the next
19 word there?  "(it is currently undergoing
20 the 'FDA clearance') because it outlines
21 what is potentially a drug safety
22 catastrophe of enormous proportions."
23      And that's what you told the
24 editor of Lancet the FDA management was

Confidential - Subject to Protective Order

Page 366

1  up to, right?
2      A.   I told them that that was my
3  perception of what was happening.
4      Q.   And we talked about your
5  views that there was this group within
6  the FDA that was "a very organized and
7  orchestrated campaign to smear and
8  discredit" you.  You also have a theory,
9  do you not, sir, that there was some sort
10  of a conspiracy at the FDA concerning --
11      MS. ROYCE:  Objection, form.
12  BY MR. BECK:
13      Q.   -- concerning the timing of
14  the Vioxx withdrawal?
15      A.   I never used the word
16  "conspiracy."  What I said was that I
17  thought that FDA had shared with Merck
18  the date when my final report would be
19  completed.
20      Q.   And if we just look up at
21  the paragraph right above the one that we
22  just looked at, you were writing the
23  editor of Lancet, and you were saying,
24  "In any event, the landscape has changed

Page 367

1  dramatically since my last email to you.
2  Merck's withdrawal on September 30" --
3  and that's the withdrawal of Vioxx,
4  right?
5      A.   Right.
6      Q.   And what you said was that
7  "Merck's withdrawal on September 30th was
8  not, I believe, an accident.  I had been
9  ordered by FDA management to complete a
10  study report by that date, which I told
11  them was far too short a time frame, but
12  they were not sympathetic.  I feel
13  certain that this date was communicated
14  to Merck, and that Merck's analysis of
15  its colon polyp study was precipitated by
16  the publicity" of our study -- "by the
17  publicity our study attracted at Bordeaux
18  at the end of August."
19          Now, are you saying here
20  that you thought that Merck decided to
21  withdraw Vioxx on September 30 because
22  people at FDA management gave them a
23  heads up that your article was going to
24  be published, and Merck said we'd better

Page 368

1  get Vioxx off the market before that
2  article was published?
3      A.   No.  I was just pointing to
4  the coincidence of the dates.
5      Q.   Well, you said it wasn't a
6  coincidence, didn't you?
7      A.   Well, I don't think it was a
8  coincidence, but...
9      Q.   So, that's my question.
10          Do you think that Merck's
11  withdrawal on September 30 was timed
12  because people at the FDA told Merck that
13  Dr. Graham is going to publish an
14  article, and so Merck said we'd better
15  get this drug off the market?
16      MS. ROYCE:  Objection, form.
17      THE WITNESS:  No, I don't.
18  BY MR. BECK:
19      Q.   That's what you told Dr.
20  Horton --
21      A.   I know that.
22      Q.   -- though, isn't it?
23      A.   That's what I -- and at the
24  time, I think under the duress that I was

Page 369

1  under, that is what I believed.
2      Q.   That was kind of a wild and
3  crazy charge, don't you think?
4      MS. ROYCE:  Objection to
5  form.
6          Can we take a break now?
7  It's getting pretty late.
8      MR. BECK:  I want him to
9  answer the question.
10  BY MR. BECK:
11      Q.   That was kind of a wild and
12  crazy charge you made to the editor of
13  Lancet concerning --
14      A.   No.
15      Q.   -- FDA management, don't you
16  agree?
17      A.   It's not wild and crazy.  If
18  you experienced what I experienced, you
19  would understand -- you would understand
20  better.
21      MR. BECK:  Your counsel has
22  asked for a break, so, we'll take
23  one.
24      MS. ROYCE:  Thank you.

KS-000392

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 370

1     THE VIDEOTAPE TECHNICIAN:
2  Stand by, please.
3     The time is 4:39.  We're
4  going off the record.
5        - - -
6     (Whereupon, a recess was
7  taken from 4:39 p.m. until
8  4:58 p.m.)
9        - - -
10     THE VIDEOTAPE TECHNICIAN:
11  The video time is 4:58.  We're
12  back on the record.
13 BY MR. BECK:
14  Q.   Dr. Graham, as an
15 epidemiologist, do you deal with the
16 concept of incidence rates?
17  A.   Yes, I do.
18  Q.   And in a sentence or two,
19 can you describe what an incidence rate
20 is?
21  A.   It's the occurrence of an
22 outcome, a disease, in a defined
23 population over a specified period of
24 time.  So, you might express something as

Page 371

1  10 per 100,000 per year would be an
2  incidence rate.
3  Q.   I have created a chart that
4  I want to go over with you, and I want to
5  look at some numbers from the Kaiser
6  study that you did, and I understand that
7  an adjustment was applied for a
8  cardiovascular risk score that I'll get
9  to later in the examination, but I want
10 to look at the kind of raw numbers about
11 incidence rates of heart attacks and
12 sudden cardiac death for Vioxx and
13 Celebrex as you saw them in your study.
14 Okay?
15     So, if you will take out
16 Exhibit 4, which is your 2005 Lancet
17 publication, and if you'll look over at
18 the third page in the right column under
19 "Results," tell me if the numbers I
20 filled in on the screen there for number
21 of users for Vioxx of something over
22 26,000, and then for Celebrex, something
23 over 40,000, are those accurate numbers
24 --

Page 372

1  A.   Yes.
2  Q.   -- from your study?
3  A.   Yes.
4  Q.   And then if you'll look at
5  Table 3 on that same page or is -- Table
6  3, I guess it's the next page.  If you'll
7  look at Table 3, do I have it right that
8  the number of heart attacks and sudden
9  cardiac deaths, Vioxx was 68 and for
10 Celebrex was 126?
11  A.   Yes.
12  Q.   And when we're talking about
13 Vioxx here, that includes both low dose
14 and high dose, right?
15  A.   Correct.
16  Q.   And so just taking the
17 numbers that you report before the
18 adjustments are made, is this correct
19 that the incidence rate of heart attacks
20 and sudden cardiac deaths for Vioxx would
21 be about .25 percent, whereas for
22 Celebrex, it would actually be a little
23 higher, .31 percent?
24  A.   No.  That's not an incidence

Page 373

1  rate.  That is a proportion.  An
2  incidence rate would take into account
3  the amount of time that each of the users
4  was on the drug, and so then what you'd
5  end up having is years of exposure to
6  Vioxx in the denominator and number of
7  cases in the numerator and the same for
8  Celebrex.  So, these are proportions, but
9  they are not incidence rates.
10  Q.   Okay.
11     So, proportions.
12     And the proportions of
13 Celebrex users who experienced heart
14 attacks or sudden cardiac deaths was
15 actually slightly higher than the
16 proportion of Vioxx users, correct?
17  A.   That is correct.
18  Q.   And you said that in order
19 to do an incidence rate, you'd want to
20 know how long they were using the drugs,
21 so you'd take into account patient years;
22 is that right?
23  A.   Correct.
24     MR. BECK:  Let me mark for

KS-000393

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 374

1   you, please, Exhibit 25.
2                    - - -
3          (Whereupon, Deposition
4   Exhibit Graham-25, Chart
5   FDACDER005940, was marked for
6   identification.)
7                    - - -
8   BY MR. BECK:
9       Q.   And this Exhibit 25, do you
10  recognize this as a document or a page of
11  a longer document that was created as
12  part of your study?
13      A.   Yes.  I don't recall,
14  though, at what stage in the study that
15  this run was done, and so I don't know if
16  it included sort of the modifications
17  that we had to make because of
18  eligibility problems and the like.  But
19  it is from our study.  I'm not able here
20  to read the column on the right-hand side
21  because of it being smudged.
22      Q.   Yeah.  Well, this is the way
23  we got the document.
24      A.   Okay.

Page 375

1          I'm just letting you know
2   that I'm not able to read that, but I'm
3   able to read everything else.
4       Q.   Okay.
5          In the right-hand column,
6   while we may have to struggle with the
7   exact numbers, it does say, does it not,
8   "incidence rate per 1,000 patient years"?
9       A.   That's what it looks like it
10  says to me, yes.
11      Q.   Okay.
12         I mean, there's no doubt it
13  says this?
14      A.   Right, no.  This table is
15  set up to calculate incidence rates, so,
16  there's no question about that.
17      Q.   Okay.
18         So, and then if we look down
19  at rofecoxib, that's Vioxx as we know,
20  correct?
21      A.   Right.
22      Q.   And then the rofecoxib
23  number is 7. something, right?
24      A.   Right.

Page 376

1       Q.   Again, we'll just blow it
2   up.  And does that look like 7.49 to you
3   once it's been blown up?
4       A.   Yes.  When I was looking at
5   this (indicating), I would have said
6   7.48, but it looks like 7.49 there
7   (indicating).
8       Q.   Okay.
9          Well, close enough for
10  government work.  It's 7.48 or 7.49,
11  right?
12      A.   Right.
13      Q.   And then if we look up at
14  Celebrex, celecoxib, it is like 7.8
15  something?
16      A.   Yes.  It looks like 7.84 to
17  me, but...
18      Q.   Okay.
19         Whatever it is, it's
20  actually the incidence rate taking into
21  account the patient years, as you said,
22  the incidence rate for heart attacks and
23  sudden cardiac death for Celebrex is
24  actually higher than the incidence rate

Page 377

1   for sudden cardiac death in heart attacks
2   for Vioxx, correct?
3       A.   It's a crude incidence rate,
4   and the number is higher.  They're
5   probably at this point with crude rates
6   not statistically different, but Celebrex
7   rate is higher than the rofecoxib or
8   Vioxx rate.
9       Q.   Yeah.  And I didn't mean to
10  suggest that there was a statistically
11  significant difference, but the Lancet
12  article, one of the conclusions is that
13  there is a statistically significant
14  difference between Vioxx and Celebrex and
15  that Vioxx has a statistically
16  significant higher risk of serious
17  coronary heart disease, right?
18      A.   Right.  And that's based on
19  odds ratios as opposed to incidence
20  rates.
21      Q.   But the incidence rates
22  would be basically the same?
23      A.   Yes.  The incidence rates
24  form the base of the data, but this is

**KS-000394**

Confidential - Subject to Protective Order

Page 378

1  before adjustments have been done for the
2  types of patients that are given these
3  different drugs.
4       Q.   And that's what I want to
5  get to now.
6         So, you start out with
7  actual numbers of users and how long they
8  use the drug and how many of them had
9  heart attacks, and Vioxx and Celebrex
10  look basically identical.  And then in
11  your analysis, you applied adjustments to
12  the Vioxx users and Celebrex users, and
13  the end result of those adjustments was
14  that Vioxx ended up appearing to have a
15  higher risk, right?
16       A.   Yes.
17       Q.   And the person who -- first
18  of all, these adjustments, at least one,
19  a significant one is called a cardiac
20  risk score, cardiovascular risk score,
21  right?
22       A.   Right.
23       Q.   Is that the main adjustment
24  that was applied?

Page 379

1       A.   That was the main
2  adjustment, and it represented basically
3  a collapsing of 25 or 30 other variables
4  into a single measure.
5       Q.   And the cardiovascular risk
6  score, basically that says, well, people
7  who take one type of medicine might have
8  a whole bunch of other factors that make
9  them prone to have heart attacks more
10  than people who take a different
11  medicine, and we want to take that into
12  account?
13       A.   Right.  They have to be
14  differential distribution of risk
15  factors.
16       Q.   And the person who developed
17  the methodology to come up with the
18  cardiovascular risk scores for Celebrex
19  and Vioxx in your study was Dr. Wayne
20  Ray, who you mentioned before, right?
21       A.   Well, actually, we reference
22  him as having used it, but the use of
23  this -- it's basically -- it's a
24  confounder's score.  The use of a

Page 380

1  confounder's score in case control
2  studies has been well described by Jim
3  Schlesselman in his textbook on case
4  control studies and then by Norman
5  Breslow in his textbook on case control
6  studies.  And so this is a technique
7  that's been described before.  It's a
8  technique that Dr. Ray has used, but he's
9  not the person who created it, developed
10  it.
11       Q.   Well, he didn't invent the
12  idea of a cardiovascular risk score, but
13  he's the one who came up with the formula
14  to account for all of these variables,
15  and he's the one who did the statistical
16  heavy lifting in order to implement that
17  idea in this case, right?
18       A.   In this case, he taught me
19  how to do it.  I was the one who did it,
20  working with him by telecon.
21       Q.   And Dr. Ray and you ended up
22  assigning a higher cardiovascular risk
23  score to the Celebrex users to the Vioxx
24  users, correct?

Page 381

1       A.   That's correct.
2       Q.   And the result of that then
3  was that even though the incidence rate
4  was the same --
5       A.   The crude incidence rate.
6       Q.   -- when you applied the
7  cardiovascular risk score that the two of
8  you came up with, that's what accounts
9  for the difference in your paper between
10  risks of Vioxx and risks of Celebrex,
11  right?
12       A.   It's not just the
13  cardiovascular risk score.  It's
14  adjusting for these risk factors.  And in
15  our paper, we showed that using all of
16  the variables, all of the risk factors in
17  our study to adjust for cardiovascular
18  risk or using the cardiovascular risk
19  score gave us virtually identical
20  answers.  But use of this confounder's
21  score was a more efficient, statistically
22  efficient way to deal with the data.
23       Q.   And, of course, Dr. Ray was
24  involved heavily in the confounder's

Confidential - Subject to Protective Order

Page 382

1  score also, right?
2      A.   He was the person who worked
3  with me in showing me how to derive that
4  score.
5      Q.   Okay.
6          And here I've put up on the
7  screen a copy of the article, the Lancet
8  article that's already been marked as an
9  exhibit.
10          When people write articles
11 in scientific journals, are they supposed
12 to disclose any financial conflicts of
13 interest that they have?
14      A.   They should, and I believe
15 that Dr. Ray did.
16      Q.   Okay.
17          Let's take a look at that.
18 If you'd go to Page 6. The person who
19 came, who taught you how to make these
20 adjustments that resulted in Vioxx
21 looking like it had a higher risk than
22 Celebrex, he had two significant
23 conflicts of interest, didn't he?
24      A.   Well, he has two potential

Page 383

1  conflicts of interest, and I was unaware
2  of these when I invited him to
3  participate in our study, and I was
4  actually unaware of them until it came
5  time to do our poster, at which time then
6  you need to put on it, you know, the
7  conflict of interest statement, and I
8  had never crossed my mind to ask people
9  about it. So, that was when I learned
10 about it. And --
11      Q.   And I want you to complete
12 this, but before you do, this "WAR," this
13 thing I have up on the screen, that's
14 Wayne A. Ray, right?
15      A.   Yes.
16      Q.   And he's a consultant to
17 Pfizer, it says in this disclosure,
18 correct?
19      A.   Yes.
20      Q.   Who is it that makes
21 Celebrex?
22      A.   Pfizer.
23      Q.   And so he's got a financial
24 interest in making Celebrex look good,

Page 384

1  right?
2      A.   You could argue that he
3  does, but that didn't operate in our
4  study.
5      Q.   And then he's also -- under
6  the conflict of interest, they say that
7  he's a consultant to plaintiffs'
8  attorneys regarding Vioxx, right?
9      A.   Yes.
10      Q.   And did you know that he's
11 actually served as an expert witness in
12 Vioxx trials?
13      A.   I learned about that only
14 like within the last month or so, but I
15 didn't know that beforehand.
16      Q.   So, anyway, here is Dr. Ray
17 teaching you how to make these
18 adjustments, and these adjustments were
19 made by the time your poster was
20 published, right?
21      A.   Yes.
22      Q.   And it wasn't until after he
23 taught you how to make the adjustments
24 and all the adjustments were made that

Page 385

1  you even found out that he was a paid
2  consultant to the maker of Celebrex and
3  was being paid by plaintiffs' lawyers who
4  were suing Merck in Vioxx cases? Is that
5  right?
6      A.   Yes. But that didn't impact
7  the methodology that was used to derive
8  this adjustment, this confounder's score.
9  This is a way of adjusting for a
10 difference in distribution of risk
11 factors across exposure groups. And so
12 he may have these associations, but that
13 doesn't --
14      Q.   "May have," what do you mean
15 "may have"?
16      A.   Well, he has those
17 associations. They don't affect the way
18 statistics work. They don't affect the
19 way, the methods of how one derives a
20 confounder's score. They don't affect
21 the way one does a regression model and
22 what happens after the computer program
23 spits out the results.
24      Q.   Is there a book you can go

Confidential - Subject to Protective Order

Page 386

1  to or an article that says, here's the
2  formula, here's the exact way to
3  implement this idea of a confounder's
4  score in your study, or did it require
5  some judgment by Dr. Ray as to how he was
6  going to implement this idea when coming
7  up with a confounder's score and the
8  cardiovascular risk score?
9      A.   It's described in
10  Schlesselman's textbook and in Breslow's
11  textbook.  I don't recall that all the
12  methods are described there, but the
13  notion of how to do this is.
14      Q.   But you know, don't you,
15  that the methods are not described there
16  and that a whole lot of judgment is
17  required by the people who are
18  applying -- coming up with the formula
19  for a specific study for how to calculate
20  a cardiovascular risk score?
21      A.   No.  There's actually -- in
22  our case, there was basically almost no
23  judgment involved.  We had a list of what
24  all those cardiovascular risk factors

Page 387

1  were.  The ones that related to the
2  heart, we included those in the
3  regression model.  And the regression
4  model then gets run with all of these
5  variables in it.  It's a two-step
6  regression.  The first regression gets
7  run, and what it does is it gives you
8  these things called linear predictors.
9  And linear predictors are the probability
10  that a patient will have an event.  There
11  is a slight amount of judgment that
12  happens, because you've got to take the
13  predictors and sort them in ascending
14  order of probability, from like 0
15  probability to close to 100 percent
16  probability, and you have to divide them
17  into roughly equal-sized groups.  And so
18  the judgment that happens is, is that
19  there just tends to be a confluence -- if
20  I have hypertension, diabetes and high
21  cholesterol, there's going to be lots of
22  people with that constellation of
23  findings.  They are going to end up all
24  having the same probability score, the

Page 388

1  same predicted probability.  And so what
2  will happen is, is, let's say I wanted to
3  divide this into ten equal groups or nine
4  equal groups, well, I'm going to get this
5  node that has like 75 people in it, and
6  what I really need to do is be able to
7  break it in half -- okay, I'm sorry.
8      Q.   Okay.
9      A.   What I'm trying to say is,
10  is that the types of judgments you're
11  talking about don't apply here.  At least
12  when we were doing this, they didn't
13  apply here.
14      Q.   And you did say that the
15  fellow who taught you how to do it was
16  Dr. Ray, the guy with the two conflicts,
17  right?
18      A.   Yes, that is correct.
19      Q.   And I think you said this
20  morning that there are "lies, damned lies
21  and statistics," right?
22      A.   I said that, too.  It
23  doesn't apply here, but I did say that.
24      Q.   Let's move to another

Page 389

1  subject.
2          We talked about how from the
3  original abstract to the poster, the
4  number of high-dose patients changed.  Do
5  you remember that?
6      A.   Uh-huh.
7      Q.   So, you had a smaller number
8  of high-dose patients in the abstract
9  when you said there was no statistically
10  significant difference between high-dose
11  Vioxx and basically no use of medicine.
12  And then some people got changed, and the
13  net result was that there was a larger
14  number of high-dose patients when it came
15  time to write up the poster.  Do you
16  remember that?
17      A.   Yes.
18      Q.   And we looked at Dr.
19  Trontell's memo where she expressed
20  concern about that.  Do you recall that?
21      A.   Yes.
22      Q.   To try to save time, because
23  you may remember the numbers, I suspect
24  you do, in the abstract when you were

KS-000397

Confidential - Subject to Protective Order

Page 390

1  talking about high-dose people, am I
2  right that you had five people who had
3  experienced -- five so-called cases and
4  seven so-called controls?
5      A.  Correct.
6      Q.  And in one sentence, what is
7  a case and what's a control?
8      A.  A case is someone who had a
9  heart attack or sudden death.  A
10 control was someone who was randomly
11 selected to compare to that person, who
12 on that date had not, as of that date,
13 had a heart attack or sudden death.
14     Q.  Okay.
15         And then sort of going
16 forward to by the time your article was
17 published in The Lancet, instead of five
18 cases with the same population group
19 after the reclassification, you now have
20 ten cases, right?
21     A.  Yes.
22     Q.  So, the number of heart
23 attacks and sudden cardiac deaths that
24 you were ascribing to the high-dose Vioxx

Page 392

1  any medicine was not statistically
2  significant, and then after you did the
3  reclassification, then it became
4  statistically significant, right?
5      A.  That's correct.
6      Q.  Now, did any of the authors,
7  your co-authors, express concern about
8  whether this reclassification was proper?
9      A.  Dr. Craig Cheetham from
10 Kaiser did express reservations about the
11 reclassification.  His concern was
12 primarily that it be adequately
13 described, and that eventually was done
14 to his satisfaction, and he was a
15 co-author on the published paper.
16         - - -
17         (Whereupon, Deposition
18     Exhibit Graham-26, E-mail
19     10-23-04 KP002315, was marked for
20     identification.)
21         - - -
22 BY MR. BECK:
23     Q.  Please take a look at
24 Exhibit 26.  Have you seen Exhibit 26

Page 391

1  users doubled from when you did the
2  abstract to when you did the article,
3  right?
4      A.  Correct.
5      Q.  And then you also, instead
6  of seven controls, you had eight
7  controls, right?
8      A.  Correct.
9      Q.  And was it your idea to do
10 this reclassification?
11     A.  What I noticed when we were
12 looking --
13     Q.  Before you say what you
14 noticed --
15     A.  Yes.
16     Q.  -- can you answer, was it
17 your idea to do the reclassification?
18     A.  Yes.
19     Q.  And then before -- I think
20 this is clear, but I want to make sure.
21         Before you did the
22 reclassification, even the high-dose
23 Vioxx users, the difference in risk
24 between them and people who didn't use

Page 393

1  before?
2      A.  Yes, I have.
3      Q.  And this is a -- is this an
4  e-mail from doctor -- how do you
5  pronounce his last name?
6      A.  Cheetham.
7      Q.  -- Cheetham to you and other
8  co-authors in the study?
9      A.  Yes, it is.
10     Q.  Does Dr. Cheetham say here
11 in the first paragraph, "I have never
12 been comfortable with the recoding of
13 Vioxx patients into the high dose
14 category.  However, it was done with the
15 full participation of five investigators.
16 The process by which this was done needs
17 to be fully disclosed in the methods
18 section.  Therefore, the methods section
19 needs to be clear on three points."  And
20 then his first point is the coding "was
21 done post hoc."  Do you see that?
22     A.  Uh-huh.
23     Q.  And that "post hoc," did you
24 understand that to mean that that was

KS-000398

Confidential - Subject to Protective Order

Page 394

1 after the fact?
2     A.    The fact that I think he's
3 talking about here is, is that we hadn't
4 planned on doing this at the start of the
5 study.
6     Q.    Okay.
7           So, this was something that
8 was not part of the original study plan,
9 but then the reclassification took place
10 after -- in fact, it was after you
11 learned of the results reported in the
12 abstract of no statistically significant
13 difference, right?
14     A.    That coincidence in timing
15 is correct.
16     Q.    Okay.
17           So, you learned no
18 statistically significant difference
19 based on the planned classification, and
20 then you changed the plan and
21 reclassified, right?
22     A.    We did that, and for a good
23 reason, because we had misclassification
24 of the exposure.  And to leave that

Page 395

1 misclassification of exposure in the
2 study would be to misrepresent the study,
3 and so it became necessary -- we were
4 trying to use a computerized algorithm to
5 classify dose.  And what we discovered
6 was that just because somebody was
7 getting a 50-milligram tablet didn't mean
8 they were taking 50 milligrams a day.
9 Sometimes it was cheaper for patients to
10 take the 50 milligram tablet and break it
11 in half and actually take 25 milligrams a
12 day or to take two 25s instead of 50.
13 So, we were obligated to correct that
14 misclassification once we discovered that
15 it was present.
16     Q.    And the second point he
17 makes is, "All five investigators
18 participated."  And then he has the
19 initials of the five investigators,
20 including "DG," and that's David Graham,
21 you, right?
22     A.    That's right.  And I was
23 part of the call that this took place in,
24 but I was not a voting member whose votes

Page 396

1 would determine whether or not
2 reclassification occurred.  For
3 reclassification to occur, these other
4 four people had to agree that based on
5 the evidence that they saw about how
6 Vioxx was being used, that the patients
7 should be reclassified.
8     Q.    And then his third point
9 was, "David Graham was not blinded to
10 cases and controls when the recoding was
11 done."
12           Now, you talked about cases
13 being -- that's where somebody had a
14 heart attack and controls being somebody
15 did not have a heart attack.  And when he
16 says that you were "not blinded to cases
17 and controls," does that mean that at the
18 time that individual patients were
19 reclassified from short-term users to
20 long-term users, you had access to the
21 information that would tell you whether,
22 in fact, patient A had a heart attack or
23 did not have a heart attack?
24     A.    That's correct, and that's

Page 397

1 why I wasn't a voting member.
2     Q.    So, what Dr. Cheetham said
3 was that, fine, we made these
4 adjustments, but our article needs to set
5 forth what we did and how we did it and
6 needs to say that it was not part of the
7 original plan, that all five
8 investigators, including Dr. Graham,
9 participated, and when Dr. Graham was
10 participating, he knew which patients had
11 heart attacks and which ones didn't.
12 That's what he wanted to be put forth in
13 the article as published in Lancet,
14 right?
15     A.    That's what he says in this
16 e-mail.
17     Q.    And, you didn't do -- in
18 fact, he says at the bottom of this
19 e-mail, "From my perspective this issue
20 is not negotiable," right?
21     A.    Yes.
22     Q.    But you did not make the
23 disclosure that Dr. Cheetham felt was
24 necessary, and, in fact, not even

KS-000399

Confidential - Subject to Protective Order

Page 398

1  negotiable, did you?
2       A.   We placed in the methods,
3  had a description of the process that we
4  used to reclassify these cases.  It
5  didn't meet with Dr. Cheetham's -- his
6  personal requirements, but the other
7  co-authors were quite comfortable, and
8  there's a lot of e-mail traffic about
9  that.
10         I will add that after this,
11  I had a conversation, after we submitted
12  the paper to the Lancet, with the editor
13  of the Lancet, Dr. Horton, in which I
14  described in detail all of these things.
15  And Dr. Horton had no problem with the
16  way that we had conducted this, and when
17  Dr. Cheetham learned that, his
18  reservations went away.
19       Q.   Well, when you say that it
20  wasn't done exactly the way he said it
21  should be done, the way that it was
22  actually done, the disclosures that were
23  made in the Lancet, they left you out
24  when it described who did the recoding,

Page 399

1  isn't that true?
2       A.   Because I didn't vote on the
3  recoding.  The recoding required the
4  unanimous vote to change of the four
5  people listed, and if even one of them
6  said that the case should not be recoded,
7  it wasn't recoded.  And --
8       Q.   Did the Lancet article
9  disclose that you were the one who
10  suggested the reclassification after you
11  already knew which patients had heart
12  attacks and which ones didn't?
13       A.   No.  But that wasn't -- the
14  editor didn't feel that that was
15  necessary.
16       Q.   Did the Lancet article
17  disclose that even though you say you
18  didn't have a vote, you wrote memos to
19  the other authors saying here's the
20  people I think ought to be reclassified?
21       A.   I did send a list of patient
22  IDs that I thought that there was a
23  question about the reclassification, and
24  each of the members of the study team

Page 400

1  were asked to come up with a similar
2  list.  And then that composite list was
3  what the group voted on together, and
4  there were 29 or 30 patients in that
5  group that the four participants voted
6  upon.
7       Q.   Did the Lancet article
8  disclose that even though you didn't have
9  a vote, that you, knowing who had heart
10  attacks and who didn't, came up with a
11  list of people that you wanted the others
12  to look at and you suggested should be
13  reclassified?  Did the Lancet article
14  disclose that?
15       A.   No, it didn't.  But the
16  editor was fully aware of it and believed
17  that the process, the voting process was
18  sufficient and stringent enough.
19       Q.   You testified on direct
20  examination about this estimate of excess
21  heart attacks and sudden cardiac deaths
22  that you say are attributable to Vioxx.
23  Do you remember that?
24       A.   Yes.

Page 401

1       Q.   And the number that you used
2  was approximately 88,000 to 139,000,
3  correct?
4       A.   Right.
5       Q.   And you used that article
6  not only today, but -- or not article,
7  you used that estimate not only today,
8  but also in your Lancet article and in
9  your Congressional testimony and then all
10  those times you went on television that
11  you went through with Mr. Kline, right?
12       A.   Correct.
13       Q.   So, I want to talk with you
14  about how you came up with those numbers.
15         Even though they were
16  published in the Lancet article, which
17  was about the Kaiser Permanente study
18  that you did, those numbers didn't come
19  from the Kaiser Permanente study, did
20  they?
21       A.   No, they didn't.  They came
22  from Merck -- they were based on
23  results from two clinical trials
24  conducted by Merck.

KS-000400

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 402

1    MR. BECK:  I'm told that
2  they need to change the tape
3  again, so, why don't we take a few
4  minutes here.
5    THE VIDEOTAPE TECHNICIAN:
6  Stand by, please.
7    The time is 5:31.  That
8  concludes Video Cassette Number 3.
9  We're off the record.
10    - - -
11    (Whereupon, a recess was
12  taken from 5:31 p.m. until
13  5:47 p.m.)
14    - - -
15    THE VIDEOTAPE TECHNICIAN:
16  This begins Video Cassette Number
17  4.  The time is 5:47.  We're back
18  on the record.
19  BY MR. BECK:
20    Q.   Before our break, Dr.
21  Graham, we started to discuss this
22  estimate of yours of excess heart attacks
23  and sudden cardiac deaths, your number of
24  88,000 to 139,000.

Page 403

1    And I think we covered this,
2  but am I correct that even though you
3  published this in your Kaiser study, the
4  numbers did not come from the work that
5  you did with the Kaiser information?
6    A.   That's correct.
7    Q.   And did you say that they
8  came from the VIGOR study and the APPROVe
9  study?
10    A.   Correct.
11    Q.   In fact, you had to take
12  some numbers from VIGOR and APPROVe and
13  then apply them to other numbers from
14  still other studies in order to come up
15  with this estimate, didn't you?
16    A.   We took the numbers from
17  VIGOR and APPROVe, which were the risks,
18  the estimates of relative risk, the five
19  for the high dose and two for the low
20  dose, and we applied that to the
21  estimates of how many people had high
22  dose or low dose.  And in the formula
23  that you use, you also need background
24  rates for what is the background rate in

Page 404

1  the population that you are dealing with.
2    Q.   When you did the background
3  rates, you took background rates from
4  still other studies, some of which didn't
5  have anything to do with Vioxx, right?
6    A.   We took background rates
7  from the CLASS study, using their control
8  group because they had an unexposed
9  control group, and so what we could do
10  is, is by doing that, we could get a
11  handle on the types of patients who might
12  be prescribed a COX-2 inhibitor and look
13  to see what their experience of heart
14  attacks were.
15    We didn't have that in the
16  VIGOR study, because the VIGOR study
17  compared two active treatments.
18    We also, because people who
19  get enrolled in clinical trial are, as a
20  rule, healthier than the patients who
21  ultimately get the drugs, we also took a
22  background incidence rate from another
23  study with a somewhat sicker population,
24  and so then we had a range.  And it was

Page 405

1  because of the range in those two
2  background rates that we end up with
3  ultimately the 88,000 and the 139 or the
4  140,000, that they relate to those rates.
5    Q.   At least one of the studies
6  that you picked the background rate from
7  didn't even involve Vioxx, right?
8    A.   That's correct.  But it
9  involved the types of patients who we had
10  every reason to believe would be
11  prescribed Vioxx in the real world.
12    Q.   Now, we talked before about
13  the peer review process and how you
14  submitted the manuscript that ended up
15  being published in Lancet to these peer
16  reviewers within the FDA.  Do you
17  remember that?
18    A.   Uh-huh.
19    Q.   Now, when you submitted your
20  article to the FDA peer reviewers, you
21  had a much different estimate of excess
22  cardiovascular events than you ended up
23  putting in the Lancet publication,
24  correct?

Confidential - Subject to Protective Order

Page 406

1    A.   That's correct.
2         MR. BECK:  I'm going to mark
3    the draft as it was submitted to
4    the FDA reviewers.  This is
5    Exhibit 27.
6             - - -
7         (Whereupon, Deposition
8    Exhibit Graham-27, Memo 9-30-04
9    "Risk of acute myocardial
10   infarction and sudden cardiac
11   death in patients treated with
12   COX-2 selective and non-selective
13   NSAIDs," FDACDER022369 -
14   FDACDER022388, was marked for
15   identification.)
16            - - -
17   BY MR. BECK:
18        Q.   Is that a copy of the
19   article that you gave to the FDA people
20   to review before it was sent on to
21   Lancet?
22        A.   Just let me quickly look
23   through this.  No.  There were two
24   documents at the time.  There was a

Page 407

1    report for the FDA, which this is a copy
2    of that report for the FDA, and there was
3    a companion document, which was a
4    manuscript that was based on the same
5    material that's in the report.  So, we
6    can talk about the materials here, but
7    this is not what those people were given.
8         Q.   Okay.
9         So, this is a report to the
10   FDA, and the manuscript reflected the
11   same information that's in this report?
12        A.   Right.  But it had to be
13   more concise and the like.
14        Q.   Okay.
15        Well, focusing on this
16   report, which I've put up on the screen,
17   if we go over to Page 10 -- actually, I'm
18   sorry.  I want to go to -- yes, Page 10.
19        And did you say in the
20   report to the FDA, as well as the
21   manuscript that you submitted for their
22   review, that combining -- that when you
23   looked at all of the data of Vioxx versus
24   Celebrex, that you came up with the

Page 408

1    excess of adverse cardiovascular events
2    of 27,785 cases?
3         A.   That's correct.
4         Q.   And so this was, when you
5    submitted it to FDA review, you were
6    comparing Vioxx to Celebrex, correct?
7         A.   Yes.
8         Q.   And that, in fact, is what
9    you compared in, one of the things you
10   compared in the Kaiser study, right?
11        A.   That's correct.
12        Q.   And then you had the number
13   27,000.  But then by the time it gets
14   published in Lancet, you've changed the
15   comparison from Vioxx to Celebrex, and
16   now it's to Vioxx versus --
17        A.   Nonuse.
18        Q.   Nonusers?
19        A.   Right.
20        Q.   And the number goes from
21   27,000 to those two numbers you put out
22   before, 88 to 139,000, right?
23        A.   Right.  And the reason for
24   the difference has to do with mainly two

Page 409

1    factors: one, this report was based only
2    on Vioxx use through 2003, and in the
3    Lancet paper, we took it through the end
4    of marketing through September of 2004,
5    so, there is additional exposure, if you
6    will; and the second is, is that in
7    looking at -- what we decided was is
8    that -- what was more important was to
9    talk in general terms about the
10   population impact, the potential
11   population impact of the use of Vioxx in
12   the general population.  And so we
13   realized that the background rates for
14   myocardial infarction in Kaiser are much,
15   much lower than the national average,
16   that that is a much healthier population
17   than the general U.S. population, and
18   that it would be better to use background
19   rates that were more reflective of the
20   types of people who were actually going
21   to get the drug.  And so those two
22   factors account for these differences and
23   the difference in the comparison between
24   Celebrex and between nonuse.

KS-000402

Confidential - Subject to Protective Order

Page 410

1      Q.   You indicated before that
2  there were two specific FDA employees
3  that you had suggested as peer reviewers,
4  right?
5      A.   Correct.
6      Q.   And I think it was Dr. Bruce
7  Stadel and Dr. Bob O'Neill?
8      A.   Stadel, yes.
9      Q.   Stadel is how to pronounce
10  it?
11      A.   Yes.
12      Q.   And they, in fact, looked at
13  your manuscript, the one that had the
14  27,000 number in it, Vioxx versus
15  Celebrex, as part of their peer review,
16  right?
17      A.   Correct.
18      Q.   And they told you, as part
19  of the people that you suggested as peer
20  reviewers, they told you that they didn't
21  think you should include that comparison
22  as a matter of sound science, right?
23      A.   That's correct.  And in the
24  manuscript that we submitted to the

Page 411

1  Lancet, that was removed.  The editors of
2  the Lancet came back and said that they
3  wanted us to have an estimate in the
4  discussion.  And so it was in response to
5  the editors of the Lancet that we put
6  them back into the paper.
7      Q.   Let's just stick, if we can,
8  with my question about what the people
9  who you said you respected their judgment
10  and wanted them to be the peer reviewers
11  and what -- let's see here.  I don't know
12  if I've identified this.  I don't think I
13  have.
14              - - -
15      (Whereupon, Deposition
16  Exhibit Graham-28, E-mail
17  10-22-04 FDACDER022409, was
18  marked for identification.)
19              - - -
20      MR. BECK:  I will mark it as
21  Exhibit 28, and I put it up on the
22  screen.
23  BY MR. BECK:
24      Q.   Is this an e-mail from you

Page 412

1  to Dr. Seligman and Dr. Trontell of the
2  FDA, as well as your co-authors dated
3  October 22nd, 2004?
4      A.   Yes, it is.
5      Q.   And the very first thing you
6  say is, "I reviewed the comments of Bob
7  and Bruce" --  that's Dr. Bruce Stadel
8  and Dr. Bob O'Neill, right?
9      A.   Yes.
10      Q.   -- "and discussed them with
11  the co-authors.  We" -- that's you and
12  the co-authors, right?
13      A.   Right.
14      Q.   "We changed the paper to
15  exclude our estimate of the actual number
16  of excess cases of heart attacks and
17  sudden cardiac deaths, suggested by both
18  Bob and Bruce," right?
19      A.   Yes.
20      Q.   Okay.
21      So, the manuscript that you
22  submitted to the Lancet took out that
23  27,000 estimate that the two peer
24  reviewers you suggested said was

Page 413

1  scientifically unsound, right?
2      A.   That's correct.
3      Q.   And then after it was
4  submitted to the Lancet, you put in a new
5  estimate of excess cardiovascular events,
6  right?
7      A.   At the request of the
8  editors, yes.
9      Q.   And let's take a look at
10  this.  And you used higher numbers, even
11  though you were still comparing Vioxx to
12  Celebrex, right?
13      A.   You have to show me the
14  documents because I honestly don't
15  recall.
16      MR. BECK:  Okay.
17      I put this on upside down,
18  but it is Exhibit 29.
19              - - -
20      (Whereupon, Deposition
21  Exhibit Graham-29, E-mail with
22  attachment "Risk of Acute
23  Myocardial Infarction and Sudden
24  Cardiac Death in Patients Treated

KS-000403

Confidential - Subject to Protective Order

Page 414

1   with COX-2 Selective and
2   Non-Selective NSAIDs," (Graham,
3   et al) KP001133;  KP001133A -
4   KP001133X, was marked for
5   identification.)
6       - - -
7   BY MR. BECK:
8       Q.   Is Exhibit 29 a copy of an
9   e-mail from you to the Lancet folks
10  attaching a revised manuscript?  And all
11  of this is dated November 11, 2004.
12      A.   Yes.
13      Q.   Let me put that on the
14  screen here.
15           And so you say here on the
16  first page, "Dear Richard and Stuart,
17  Attached is our revised-revised
18  manuscript," right?
19      A.   (Witness nods.)
20      Q.   Correct?
21      A.   Yes.
22      Q.   And then if you'd turn over
23  to Page 12, this paragraph at the bottom
24  using the odds ratio?

Page 415

1       A.   Uh-huh.
2       Q.   The present study and
3   background incidence rate from U.S.
4   population?
5       A.   Right.
6       Q.   So, when Lancet says we kind
7   of like that comparison that the peer
8   reviewer said was scientifically unsound,
9   you put it back in, but this time you
10  increased it by 10,000 cases, right?
11      A.   That is -- I'm just trying
12  to look for -- oh, it's because --
13      Q.   First, before you get to the
14  reason why --
15      A.   Yes.
16      Q.   -- is it true?
17      A.   Yes.
18      Q.   Okay.
19      A.   And the reason is, is that
20  in the first one, we were using the odds
21  ratios that we got from our actual study
22  and applying those to the national drug
23  use numbers.  Here we were looking for
24  other populations that might have

Page 416

1   background rates that were more
2   appropriate, but we were still using the
3   relative risk estimates from our Kaiser
4   study.
5       Q.   Now, did Dr. Stadel and
6   Dr. O'Neill, the two peer reviewers that
7   you said you trusted, and who said that
8   the 27,000 figure was scientifically
9   unsound, did they have a chance to review
10  this 37,000 figure that you came up with
11  after you submitted the manuscript to
12  Lancet?
13      A.   No.  Once a paper goes into
14  a journal and you're dealing with the
15  journal and its peer reviewers, what
16  happens is between the author and the
17  journal.  So, there was no requirement
18  to, and I didn't.
19      Q.   And then the rest of this
20  paragraph, is that where you first came
21  up for the very first time with this
22  estimate of 88,000 to 138,000 excess
23  cases when you move away from Vioxx
24  compared to Celebrex and instead do your

Page 417

1   comparison of Vioxx to nonusers?
2       A.   Yes.  But the way we were
3   thinking of it is, is that we were moving
4   from relative risks that were derived
5   from observational studies to more solid
6   estimates of risk which came from
7   randomized controlled clinical trials.
8   And so that's why we chose, ended up
9   focusing on VIGOR and APPROVe and their
10  relative risks rather than the
11  observational study data from our Kaiser
12  study.  We thought that, being based on
13  clinical trials, that it had greater
14  credibility and would be more free of
15  potential biases.
16      Q.   And, of course, it's the --
17  those are the numbers that got all the
18  headlines and all the attention on 60
19  Minutes and Good Morning America and all
20  the news shows you appeared on, right?
21      A.   I suppose those numbers did
22  attract attention.
23      Q.   And did you ever give your
24  peer reviewers who told you that your

KS-000404

Confidential - Subject to Protective Order

Page 418

1   27,000 number was scientifically unsound,
2   did you ever give those peer reviewers
3   whom you recommended the chance to take a
4   look at these new comparison --
5           MS. ROYCE:  Objection, form.
6   BY MR. BECK:
7       Q.   -- and new numbers of 88,000
8   to 139,000?
9       A.   No.  There was no
10  requirement to.  Lancet has a very
11  extensive and exhaustive peer review
12  process.  Our paper was reviewed by five
13  peer reviewers, which is two more than
14  normally happens with the medical
15  journal.  And those peer reviewers and
16  the editors of the journal didn't happen
17  to agree with those two people from the
18  FDA.
19      Q.   Just so that we're clear,
20  nobody from the FDA during the peer
21  review process ever got a chance to look
22  at this new comparison that you did for
23  the first time and the revised-revised
24  manuscript, correct?

Page 419

1       A.   That's correct, and it
2   wasn't required.
3       Q.   Now, when you finally
4   published the paper in Lancet, did you
5   include the 37,000 number?
6       A.   No.  The numbers here --
7   actually, this all happens in November.
8       Q.   Can you just tell me whether
9   you included the 37,000 number in the
10  Lancet article?
11      A.   No.
12      Q.   And, in fact, by the time we
13  finally get to the published article in
14  Lancet, the only numbers that you include
15  were these 88 to 139,000 numbers that you
16  first came up with in the revised-revised
17  manuscript, right?
18      A.   That's correct.
19      Q.   Now, I want to see if we can
20  understand a little better how you came
21  up with them.  I think you said that you
22  used the relative risks from the VIGOR
23  study and the APPROVe study, right?
24      A.   That is correct.

Page 420

1       Q.   And the relative risk for
2   VIGOR was 5, right?
3       A.   Correct.
4           MR. BECK:  Somebody on the
5       phone is either going to have to
6       stop making noise or we're going
7       to hang up on you here.
8           MR. KLINE:  And I support
9       Mr. Beck.
10  BY MR. BECK:
11      Q.   And the relative risk from
12  APPROVe was 2.0, right?
13      A.   Correct.
14      Q.   And then you took those
15  relative risks and applied them to
16  background rates that you got from other
17  studies, right?
18      A.   Yes.  Actually, if we refer
19  to the document in my report, the method
20  is described there.  The numbers are
21  different because we used different
22  background rates, but the method is
23  described there.
24      Q.   Well, it is a completely

Page 421

1   different comparison, too.  It's --
2       A.   No.  But the underlying
3   method is described, so that I can tell
4   you accurately what it is that we did.
5       Q.   Well, in your article, you
6   state that "The background rate for acute
7   myocardial infarction among control
8   groups from studies of cardiovascular
9   risk and NSAID users varied from 7.9 per
10  1,000 person years in CLASS," one of the
11  studies you referred to, to 12.4 per
12  1,000 person years in what was called the
13  TennCare study, right?
14      A.   Correct.
15      Q.   So, the background rate that
16  you used when doing your calculation was
17  this range of 7.9 to 12.4, right?
18      A.   Correct.
19      Q.   And by "background rate,"
20  what we mean is people who aren't taking
21  any medicine at all.  For every 1,000
22  person years of people not taking
23  medicine, 7.9 to 12.4 people are going to
24  have an adverse cardiovascular event,

Confidential - Subject to Protective Order

Page 422

1 right?
2     A.   Right.  Within the age
3 groups that those populations came from,
4 right.
5     Q.   So, that's sort of what
6 you'd expect from someone taking no
7 medicine at all, is somewhere between 8
8 to 12 or so people per thousand are going
9 to have heart attacks just because that's
10 what happens in life, right?
11     A.   That's what happens.  Right.
12     Q.   What was the heart attack,
13 the CV rate for the Vioxx 50 milligrams
14 in the VIGOR study?
15     A.   Golly, we'd have to look at
16 it, because I didn't view things in terms
17 of incidence rates.  I focused on
18 relative risks.  So, I'm sure you have
19 the paper there and we can look at it and
20 we can figure it out.
21     Q.   You referred earlier in your
22 testimony to the Targum memorandum?
23     A.   Shari Targum, yes.
24     Q.   And that was a memorandum

Page 423

1 written in early --
2     A.   I think 2001.
3     Q.   -- 2001?
4     A.   It's available on the FDA
5 website.
6         MR. BECK:  We'll mark that
7 as Exhibit 30.
8             -  -  -
9         (Whereupon, Deposition
10 Exhibit Graham-30, "FDA Medical
11 Review: Cardiovascular analysis
12 for Vioxx," (Targum) 2-1-01
13 MRK-ABX0002367 - MRK-ABX0002404,
14 was marked for identification.)
15             -  -  -
16 BY MR. BECK:
17     Q.   And if you would go to, it
18 looks like Page 13, if I'm reading that
19 right.  13 of 37.
20     A.   Uh-huh.
21     Q.   In this FDA report, and this
22 is a memorandum about the VIGOR analysis,
23 right, about the VIGOR study?
24     A.   I believe it is.  Yes, it

Page 424

1 is.
2     Q.   Okay.
3         And does it say on this page
4 that the MI rate for Vioxx was .74?
5     A.   Yes, but I don't know what
6 the units are.
7     Q.   Okay.
8         If you go to the next page,
9 you'll see under the second footnote,
10 under the --
11     A.   Okay.
12         "Per 100 person years."
13     Q.   Okay.
14         And --
15     A.   So, that would be equivalent
16 to 7.4 per thousand person years.
17     Q.   So, the rate for myocardial
18 infarctions, heart attacks --
19     A.   Uh-huh.
20     Q.   -- for people who were
21 taking the high-dose Vioxx in the VIGOR
22 study was 7.4 per hundred -- per thousand
23 person years, right?
24     A.   Yes.

Page 425

1     Q.   And what you said before is
2 the normal population not taking any
3 medicine at all, the background rate that
4 you used was 7.9 heart attacks per
5 thousand person years, right?
6     A.   Yes.  And the patients
7 enrolled in the VIGOR study were selected
8 to be patients who were unlikely to have
9 cardiovascular disease.  So, there were a
10 number of exclusions that would exclude
11 patients who were at higher risk of
12 having myocardial infarction.  Those
13 patients weren't excluded from the CLASS
14 study.
15     Q.   So, I just want to make sure
16 that I understand the numbers, though.  I
17 put up something on the screen here.
18         You talked about the
19 background rate, people who aren't taking
20 any medicine at all, 7.9 to 12.4.  And in
21 VIGOR, unless you start making
22 adjustments, the actual real life rate of
23 people who had heart attacks taking the
24 50 milligram dose was actually lower than

Confidential - Subject to Protective Order

Page 426

1   what you said the background rate is,
2   right?
3       A.   That would be true if what
4   we were dealing with were patients who
5   had been screened for preexisting
6   cardiovascular disease.  But the typical
7   patient who received Vioxx on the open
8   market post-marketing was not screened
9   for preexisting cardiovascular disease,
10  and the labeling never said that they
11  should be.
12      Q.   Let's now talk about
13  APPROVe.
14          What's the equivalent number
15  here for the APPROVe study which involved
16  a 25 milligram dose of Vioxx?
17      A.   You'll have to show me the
18  paper and we can derive that number.
19              - - -
20          (Whereupon, Deposition
21      Exhibit Graham-31,
22      "Cardiovascular Events Associated
23      with Rofecoxib in a Colorectal
24      Adenoma Chemoprevention Trial,"

Page 427

1       (Bresalier, et al) NEJM 3-17-05,
2       352;11: 1092-1102, was marked for
3       identification.)
4           - - -
5   BY MR. BECK:
6       Q.   Have you seen Exhibit 31
7   before?
8       A.   Yes, I have read this paper
9   before.
10      Q.   And I'll put it on the
11  screen.  Well, let's just you and I go to
12  Table 2 over on the fourth page.
13          Is this a paper that deals
14  with the APPROVe study?
15      A.   Yes.
16      Q.   Okay.
17          And in looking at Table 2,
18  can you see there that there were 21
19  heart attacks out of 3,059 person years?
20      A.   I don't see where you are
21  getting the person years from, but I --
22      Q.   Look in the little footnote
23  underneath the table.
24      A.   Oh, okay.  Yes.  Uh-huh.

Page 428

1       Q.   And if you -- in order to
2   come up with an equivalent number that
3   we've been talking about here for event
4   rates, you would divide 21 by that 3,000
5   -- or 3.059, right?
6       A.   Right.  The 3,059 multiplied
7   by a thousand or the 3.0, yes.
8       Q.   And when you did it the
9   right way, you would come up with an
10  event rate in APPROVe of 6.9; is that
11  right?
12      A.   I'll trust your arithmetic.
13      Q.   And, again, the real life
14  heart attack rate in both VIGOR and
15  APPROVe was lower than what you say is
16  the normal background rate for people who
17  are not taking any medicine at all,
18  right?
19      A.   That's correct.  But
20  background rates vary from study to
21  study.  We could go, though, to --
22      Q.   Is it an important thing
23  then to the legitimacy --
24          MR. KLINE:  He was finishing

Page 429

1       his answer.
2   BY MR. BECK:
3       Q.   Is it an important thing
4   then to the legitimacy of a statistical
5   study to focus on what kind of background
6   rate somebody picked?
7       A.   We picked what we thought
8   were representative background rates for
9   the types of patients who were likely to
10  be prescribed the drug.  And those
11  background rates actually are the
12  national background rate for heart
13  attack.  If you were to look at what's
14  the risk of heart attack in people who
15  are like 50 and older in the United
16  States, that background rate will fall in
17  the range of what our NSAID background
18  rate was.  And you can do that in
19  numbers, just going to the American Heart
20  Association documents in the census and
21  just getting the number of heart attacks
22  and the number of people, and that will
23  come up with the background rate.
24          But background rates are

KS-000407

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 430

1   important because at the end of the day,
2   the background rate is what drives what
3   that actual estimate of numbers is.
4   Regardless of what background rate you
5   use, however, you still end up with a lot
6   of affected bodies.  And we put a number
7   in our paper, and what we were more
8   concerned with was the public health
9   impact of Vioxx exposure than we were
10  with what were the particular numbers,
11  recognizing that the particular numbers
12  could be different than the range that we
13  gave, but that was our best estimate at
14  what we thought was likely to be the
15  case.
16       Q.   Now, the patients involved
17  in the VIGOR study, these were rheumatoid
18  arthritis patients, right?
19       A.   Yes.
20       Q.   And rheumatoid arthritis
21  patients have a higher risk of heart
22  attack, all other things being equal,
23  than people who don't have rheumatoid
24  arthritis, right?

Page 431

1       A.   Some studies have found
2   that, and other studies have found that
3   there's no increase in risk.
4        Q.   Now, you mentioned that
5   CLASS was one of the studies that you
6   used to come up with your range.  Those
7   people had osteoarthritis, right?
8        A.   That's correct.
9        Q.   And that is not associated
10  with a higher heart attack risk, right?
11       A.   Not that we're aware of.
12       Q.   And the other study that you
13  used for the background rate was
14  TennCare?
15       A.   Yes.
16       Q.   And that's short for
17  Tennessee Care, right?
18       A.   Right.  It's a Medicaid
19  program.
20       Q.   And that's anybody who used
21  a prescription NSAID, regardless of what
22  their condition was, right?
23       A.   Right, but these were the
24  nonusers.

Page 432

1        Q.   So, these were nonusers in
2   Tenn Care, but they didn't have
3   rheumatoid arthritis or anything like
4   that?
5        A.   Some of them did, but most
6   of them didn't.
7        Q.   And VIGOR, people were not
8   -- they didn't include people who were
9   using low-dose aspirin, right?
10       A.   That is correct.
11       Q.   And people who were using
12  low-dose aspirin, that's generally going
13  to be cardioprotective and they'd have an
14  even lower rate if they had people with
15  low-dose aspirin?
16       A.   Well, the fear is it hadn't
17  been studied, and so you know that those
18  patients have underlying cardiovascular
19  disease, and so those patients are
20  theoretically at increased risk of having
21  a heart attack.
22       Q.   But even with all of that,
23  VIGOR and APPROVe both had lower rates
24  than your background rates, correct?

Page 433

1        A.   Yes.
2        Q.   I want to move on then to
3   the relative risks that you used.  They
4   came, as you said, from VIGOR and from
5   APPROVe.
6            Did you look at the event
7   rates of the people who took naproxen in
8   the VIGOR study?
9        A.   What I did was, is I looked
10  at the relative risk that was published
11  in the VIGOR study for the way it was
12  presented, was the ratio of Vioxx over
13  naproxen, and that ratio was given as .2.
14       Q.   No, no, I'm not asking about
15  relative risk now.  I'm asking about the
16  event rates for the naproxen patients.
17       A.   No.  And the reason why is,
18  is we wanted people who were unexposed,
19  and the VIGOR study didn't provide us
20  with an unexposed group to get a
21  background rate from.
22       Q.   Do you agree, sir, that if
23  you looked at the data from the Targum
24  memo where they've got the actual heart

Confidential - Subject to Protective Order

Page 434

1   attack rate for the people who use
2   naproxen in the VIGOR study, they were at
3   a super low rate of only 1.5?
4        A.   That shows you the wonders
5   of selection bias.  That if you pick
6   healthy patients into a study, you are
7   going to get low incidence rates, and the
8   VIGOR study selected relatively healthy
9   patients into it.  So, I'm not surprised
10  that the rates were lower.
11       Q.   Do you know that Dr. Graham
12  has estimated the United States
13  background rate to be approximately 6 per
14  thousand?
15       A.   And that is in people who
16  are 15 and older.  And one-third of the
17  population is between the ages of 15 and
18  40, and the occurrence of myocardial
19  infarction in that group is almost zero.
20  So, if you were to truncate those people
21  out and then calculate what the actual
22  rate is among the people who are most
23  likely to get the Vioxx, the number ends
24  up smack in the middle of that range.

Page 435

1        Q.   And I've referred to you in
2   the third person.  I'm sorry.  I'm trying
3   to get through.
4        A.   I took no offense.
5        Q.   I did not intend any.  I was
6   actually thinking of Dr. Topol when I
7   referred to Dr. Graham.
8             Dr. Topol, are you
9   acquainted with his publication where he
10  uses a placebo rate of 5.2?
11       A.   Yes.  And that was from
12  randomized clinical trials.  And
13  randomized clinical trials, no matter
14  what they are, they select patients who
15  are healthier than the real world
16  patients that get the drugs after they go
17  on the market.
18       Q.   And in APPROVe, as I just
19  put up there, the people who took
20  placebos in the APPROVe study, their rate
21  was only 2.7, right?
22       A.   Yes.  And they were younger
23  patients without cardiovascular disease,
24  but yes.

Page 436

1        Q.   And so when you have these
2   relative risks that come from VIGOR and
3   APPROVe, and you are taking the VIGOR
4   heart attacks number of 7.4 and you're
5   comparing it with this super low number
6   of naproxen, 1.5, and that's how you come
7   up with the -- that's how that high
8   number of relative risk of 5 is derived,
9   correct?
10       A.   Those are the results from
11  the VIGOR study.
12       Q.   And the same thing with
13  APPROVe.  The relative risk is 2, but it
14  is not because a lot of people had heart
15  attacks on Vioxx, it is because not very
16  many people had them on the placebo,
17  right?
18       A.   That I don't know the -- I
19  don't know the answer to that question.
20  If you have an odd placebo group that's
21  been selected that has an unusually low
22  background rate, that's a possibility.  I
23  can't answer that question.  I don't know
24  the answer to that question.

Page 437

1        Q.   You never looked into that
2   when doing your estimate?
3        A.   No.  Realize at the time
4   that we did our estimate, what we had to
5   work on were press announcements, because
6   none of these data --
7        Q.   If the answer is no, that's
8   fine.  I only have about ten minutes
9   left.
10       A.   Okay.
11            I'm sorry.
12            MR. KLINE:  Actually, you
13  are over.
14            MR. BECK:  Let's not use any
15  time on this.
16            MR. KLINE:  I agree.  You're
17  over.  But I'm not arguing with
18  you.  I've gotten four e-mails
19  about it and I haven't said a
20  word.  Go ahead.  Go.
21            THE WITNESS:  He's now said
22  ten words.
23            MR. KLINE:  Go.  He and I
24  are a model today of getting

KS-000409

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 438

1    along.  Go.
2          MR. BECK:  Ready?
3          MR. KLINE:  We're waiting
4    for the next question.
5          MR. BECK:  Okay.
6    BY MR. BECK:
7      Q.   When you wrote the Lancet
8    article, the revised-revised article, and
9    put in this estimate for excess
10   cardiovascular events that you said were
11   caused by Vioxx, did you do a similar
12   analysis for Celebrex to see how many
13   excess cardiovascular events were caused
14   by using your methodology, people who use
15   Celebrex instead of no medication at all?
16     A.   If we had done -- we did not
17   do that.  If we had done that, we would
18   have shown that Celebrex actually
19   prevented heart attacks, because the
20   point estimate was below 1.  And none of
21   the randomized clinical trials that we
22   had available showed an increased risk
23   with Vioxx.  If it would have come up, it
24   would have been a wash.

Page 439

1      Q.   How about traditional
2    NSAIDs, did you do that kind of analysis
3    to say how many excess cardiovascular
4    events are caused by traditional NSAIDs?
5      A.   We did not because there was
6    no available randomized controlled,
7    placebo controlled data that would give
8    us incidence rates and real relative
9    risks for traditional NSAIDs.  No such
10   studies had been done.
11     Q.   Are you familiar with the
12   APC study concerning Celebrex?
13     A.   I think so.  I think at the
14   time that we did our study, that also was
15   unpublished.
16     Q.   Does it show that, in fact,
17   Celebrex would have an increased risk?
18     A.   I don't believe the study
19   has ever been published.  If it has been
20   published, I would love to see the
21   publication because I don't recall seeing
22   it.  But my recollection from that study
23   is, is that it found that I think at the
24   higher doses of Celebrex, it was like 3.4

Page 440

1    or so relative risk, and maybe 2.5 for
2    the standard dose if I'm thinking of the
3    right -- am I thinking about the study
4    that you're thinking about?
5      Q.   Yes.
6          MS. ROYCE:  Can we have the
7    document?
8          MR. BECK:  I don't have it
9    handy.  I mean, I was surprised at
10   his answer claiming that
11   Celebrex --
12         THE WITNESS:  Well, no, no.
13   Understand.  When we wrote our
14   paper, this wasn't out there, and
15   all there was was this one study,
16   and we don't know what it means.
17   BY MR. BECK:
18     Q.   Let's move on to my last
19   subject and I'll wind up.
20         You talked about how you
21   made a presentation in February of 2005
22   to the FDA Advisory Committee.  Do you
23   remember that?
24     A.   Yes, I do.

Page 441

1      Q.   And that was one of the
2    exhibits that you went over with Mr.
3    Kline with some of the pages from the
4    presentation that you made to the
5    Advisory Committee, right?
6      A.   Correct.
7      Q.   Then the Advisory Committee
8    made recommendations to the FDA, and the
9    FDA, in turn, reached some conclusions
10   concerning the safety of COX-2
11   inhibitors; is that correct?
12     A.   I believe it is.
13         MR. BECK:  We'll mark as
14   Exhibit 32 the April 6, 2005
15   memorandum.
16         - - -
17         (Whereupon, Deposition
18   Exhibit Graham-32, Memo 4-6-05
19   "Analysis and recommendations for
20   Agency action regarding
21   non-steroidal anti-inflammatory
22   drugs and cardiovascular risk,"
23   (19 pages), was marked for
24   identification.)

KS-000410

Confidential - Subject to Protective Order

Page 442

1            - - -
2    BY MR. BECK:
3        Q.   Do you recognize that
4    document, sir?
5        A.   Yes, I do.
6        Q.   Will you turn to the bottom
7    of the third page?  Do you see that
8    there's a listing of the entities from
9    the FDA, the different offices that
10   participated in the review that led to
11   this memorandum?
12       A.   Yes.
13       Q.   And here, I finally have it
14   up on the screen.
15            Is this the memorandum we've
16   been talking about?
17       A.   Yes, it is.
18       Q.   Okay.
19            And then on the bottom of
20   Page 3 where it lists the different
21   offices, did the division of
22   anti-inflammatories participate in this
23   review?
24       A.   Yes, it did.

Page 443

1        Q.   Did the --
2        A.   They were probably the major
3    participant, because they are the ones
4    who ultimately regulate these products.
5        Q.   Anti-inflammatories includes
6    NSAIDs and COX-2 inhibitors, right?
7        A.   Correct.
8        Q.   And the Division of
9    Over-the-Counter Drug Products also
10   participated, correct?
11       A.   Yes, because they're
12   over-the-counter NSAIDs.
13       Q.   And the Office of Drug
14   Evaluation II and V participated, right?
15       A.   Right.  Those are the parent
16   organizations of these other divisions.
17       Q.   And the Office of New Drugs
18   participated?
19       A.   Right.  That's the super
20   office over them.
21       Q.   Office of Drug Safety,
22   that's your office, right?
23       A.   Correct.
24       Q.   Office of Biostatistics.

Page 444

1    Does that include epidemiologists?
2        A.   No.  Epidemiologists are in
3    the Office of Drug Safety.  The Office of
4    Biostatistics is exclusively
5    statisticians.
6        Q.   And the Office of
7    Pharmacoepidemiology and Statistical
8    Science participated, right?
9        A.   Right.  That's the office
10   that contains both drug safety and
11   statistics.
12       Q.   The Office of Medical Policy
13   participated?
14       A.   Right, yes.
15       Q.   And the Office of Regulatory
16   Policy?
17       A.   Yes.
18       Q.   And the Office of the Center
19   Director, right?
20       A.   Correct.
21       Q.   And they looked at all kinds
22   of materials, including your PowerPoint
23   and your, I don't know if it's testimony
24   or remarks that were delivered to the

Page 445

1    Advisory Committee, correct?
2        A.   Presumably.  I wasn't part
3    of the internal decision-making, but
4    presumably that was part of what they
5    considered.
6        Q.   Then focusing on the first
7    page here, in terms of who authored this
8    memorandum from the FDA, I think you've
9    already identified John Jenkins, Dr. John
10   Jenkins, of the Office of New Drugs,
11   right?
12       A.   Correct.
13       Q.   And then also you've
14   identified your boss, Paul Seligman,
15   right?
16       A.   Correct.
17       Q.   And then it says "Through:
18   Steven Galson."  What does it mean when
19   it is from Drs. Jenkins and Seligman
20   through Dr. Galson?
21       A.   What it typically means is,
22   is the "froms" have written the report.
23   It goes to the "through" person, who can
24   edit it and ask for modifications and the

**KS-000411**

Confidential - Subject to Protective Order

Page 446

1  like.  And then after they've signed off
2  on it, it is sent off to whomever the
3  "to" is.
4       Q.   All right.
5           And the "to" is the NDA
6  files and has all these numbers, right?
7       A.   Correct.
8       Q.   So, if I understand it
9  correctly, they got input from all these
10 different groups, and then the head of
11 the Office of New Drugs and the director
12 of the Office of Pharmacoepidemiology and
13 Statistical Science got together and
14 wrote a draft that then was approved by
15 the director of the entire Center for
16 Drug Evaluation and Research, right?
17      A.   Correct.
18      Q.   Then I just want to go
19 through with you the first five bullet
20 points, and then I'll be done.
21          In the executive summary
22 here, do you see where the FDA says that
23 "Following a thorough review of the
24 available data we have reached the

Page 447

1  following conclusions regarding currently
2  approved COX-2 selective and
3  non-selective non-steroidal
4  anti-inflammatory drugs and the risk of
5  adverse cardiovascular events."  So
6  that's their setup.
7           Then the first point they
8  make is: "The three approved COX-2
9  selective NSAIDS (i.e. celebrex," Vioxx,
10 and what's the third one, "valdecoxib"?
11      A.   That would be Bextra.
12      Q.   So, they say that three
13 COX-2 selective NSAIDs "are associated
14 with an increased risk of serious adverse
15 CV events compared to placebo.  The
16 available data do not permit a rank
17 ordering of these drugs with regard to CV
18 risk."  Now, what they're saying here is
19 that any one of these COX-2 inhibitors
20 can increase CV risk, but there's no
21 basis on which to say that one is riskier
22 than another, right?
23      A.   What they're saying is, is
24 that the absence of evidence is evidence

Page 448

1  of absence.  They're basing --
2       Q.   Well, you would disagree
3  with them, I guess, right?
4           MR. KLINE:  Objection.  Let
5  him finish this answer.
6           THE WITNESS:  What they're
7  saying is, is they're basing this
8  on clinical trials data only.  At
9  FDA, they do not accept
10 epidemiologic data as having any
11 meaning or any relevance.  And so
12 then they go back to clinical
13 trials, and if the clinical trials
14 are too small and don't answer the
15 question, then you come up with a
16 situation where you say, we don't
17 have the evidence to allow us to
18 do a difference in the rank
19 ordering.  So, you end up, this
20 statement as it reads, is correct.
21 But the underlying reason -- it's
22 misleading because the reason why
23 you can't distinguish them from
24 the clinical trials is because the

Page 449

1  appropriate clinical trials were
2  never done.  They weren't large
3  enough and you didn't have
4  head-to-head comparisons, say, of
5  Celebrex to Vioxx to Bextra, where
6  that would have been the single
7  best way to answer that question
8  definitively.  So --
9  BY MR. BECK:
10      Q.   I wasn't asking you whether
11 you agreed.  I was asking what this means
12 to somebody who understands an FDA
13 memorandum.
14          Does it mean that the people
15 who wrote this memo and the person who
16 approved it, whether you agree with them
17 or not, what they're saying is that you
18 cannot draw a distinction between the
19 cardiovascular risks of Vioxx versus
20 Celebrex versus Bextra?
21      A.   That's what they are saying.
22      Q.   And they, it's probably
23 clear from your prior answer, but
24 basically they disagree with one of the

**KS-000412**

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 450

1  core conclusions that you set forth in
2  your Lancet article, correct?
3        MS. ROYCE:  Objection to
4  form.
5        THE WITNESS:  No.  Actually,
6  in internal meetings --
7  BY MR. BECK:
8        Q.   No.  I'm talking about what
9  they say in this memorandum.
10       A.   Well, they're not saying
11 anything in here about how many people
12 died or were injured as a result of using
13 Vioxx.
14       Q.   I'm sorry.
15       A.   They sidestepped that issue.
16       Q.   Your article, one of its
17 core conclusions, is that there is a
18 difference, statistically significant
19 difference between the risk of using
20 Vioxx versus Celebrex, correct?
21       A.   Correct.
22       Q.   And they disagree with you,
23 right?
24       A.   They're saying there are no

Page 451

1  clinical trials to show that, and so they
2  disagree.
3        Q.   Then the next point says,
4  "Data from large long-term controlled
5  clinical trials that have included a
6  comparison of COX-2 selective and
7  non-selective NSAIDs do not clearly
8  demonstrate that the COX-2 selective
9  agents confer a greater risk of serious
10 adverse...events than non-selective
11 NSAIDs."
12       Now, again, whether you
13 disagree or agree with them, are they
14 saying here that according to the
15 long-term controlled clinical trials, we
16 cannot say that COX-2 inhibitors have any
17 different risk than traditional NSAIDs?
18       A.   They're saying based on the
19 evidence they have from clinical trials
20 that they can't distinguish the two.
21 What one should recognize, however, is
22 that there's virtual absence of real
23 long-term data.  There's relatively very
24 small numbers for any of these things,

Page 452

1  and so if you have low power, you're not
2  going to be able to show things.  That's
3  why observational data is needed to
4  complement what is inadequate about
5  controlled clinical trials.
6        Q.   And then on the next page,
7  do they say on this first bullet,
8  "Long-term placebo controlled clinical
9  trial data are not available to
10 adequately assess the potential for the
11 non-selective NSAIDs to increase the risk
12 of serious adverse CV events."  Is that
13 the point you just made?
14       A.   Yes.
15       Q.   So, they recognized that,
16 didn't they?
17       A.   Yes, they did.
18       Q.   The next point they say,
19 "Pending the availability of the
20 additional long-term controlled clinical
21 trial data, the available data are best
22 interpreted as being consistent with a
23 class effect of an increased risk of
24 serious...cardiovascular events for COX-2

Page 453

1  selective and non- selective NSAIDs."
2        Now, does that mean that,
3  again, whether you agree or disagree,
4  that they're saying that the best
5  conclusion you can draw based on the data
6  that's available now is that all of these
7  medications, whether it's Vioxx, Celebrex
8  or the nonselective NSAIDs, all have the
9  same basic cardiovascular risk?
10       A.   They're saying that, and
11 they're also saying that observational
12 data is not something they're -- that
13 they're willing to consider.
14       Q.   Where do they say that?
15       A.   Because there is a plethora
16 of existing observational data that
17 show --
18       Q.   I'm sorry, do they say that
19 or are you just saying that they refuse
20 to look at it?
21       A.   Well, by not mentioning it,
22 then they are in essence discounting it.
23 There are, by last count, at least nine
24 published observational studies that

**KS-000413**

Confidential - Subject to Protective Order

Page 454

1  show, for example, an increased risk with
2  rofecoxib compared to nonuse.  And most
3  of those studies looking at celecoxib did
4  not find a difference in risk.  So,
5  there's a discordance, if you will,
6  between the evidence of observational
7  studies and the evidence of controlled
8  clinical trials.  The problem with the
9  controlled clinical trials is that
10  they're not designed to show safety
11  problems.  They're designed to show
12  efficacy.
13          So, as a result, we're back
14  to the analogy of does the moon have
15  craters or not.  And what FDA is saying
16  is that we don't have binoculars, we
17  don't have a telescope, and we don't want
18  binoculars or a telescope.  We're not
19  interested.  Based with our naked eye,
20  what we have available, we don't see a
21  difference.
22          Q.   You're aware, aren't you,
23  that there are six published
24  epidemiological studies that find no

Page 455

1  difference between Celebrex and Vioxx?
2          A.   No.  I mean, you could show
3  me the articles and I'm sure I'm familiar
4  with the articles, but I have not thought
5  about them in that way.
6          Q.   Well, let's just move to the
7  last point, and then Mr. Kline can ask
8  you anything he wants to about that
9  subject.
10          MR. KLINE:  Anything that is
11       within the scope of your direct,
12       which is about anything in the
13       world.
14          MR. BECK:  Last point.
15  BY MR. BECK:
16          Q.   "Short-term use of NSAIDs to
17  relieve acute pain, particularly at low
18  doses, does not appear to confer an
19  increased risk of serious adverse CV
20  events (with the exception of" -- what
21  was that one again?
22          A.   That's "valdecoxib," that's
23  Bextra.
24          Q.   -- Bextra.

Page 456

1          So, what the authors of this
2  paper and the reviewer concluded was that
3  "Short-term use of NSAIDs" including
4  Vioxx "particularly at low doses, does
5  not appear to confer an increased risk of
6  serious adverse CV events."  Isn't that
7  correct?
8          A.   That's what they're saying.
9  But once again, they have zero
10  statistical power to actually make this
11  statement.  What they really have is, is
12  uncertainty, because they haven't
13  adequately studied it.
14          Q.   I think you said that these
15  senior people from the FDA who wrote and
16  reviewed this consulted with lots and
17  lots of people from the FDA, but they
18  didn't consult with you, right?
19          A.   No.  That's not what I'm --
20  I wasn't part of the discussions that
21  happened internally.  What I would note
22  is, is that people from the Office of New
23  Drugs approved these drug products.  And
24  that if you look at the organizations

Page 457

1  that you have represented here, most of
2  them fall into the amoeba that I
3  described earlier and that are part of
4  the review and approval process and that
5  our own management in drug safety answers
6  to the people in the Center for Drug
7  Evaluation who have the controlling
8  power.  So, the Office of New Drugs is
9  the gorilla in the room.  So, in any
10  event, I'm not saying that at all.  I'm
11  not saying that I wasn't hurt.  What I'm
12  saying is that in constructing this
13  report, what FDA has done is, has said
14  that because we don't have data from
15  control trials, we can't be forced to say
16  that the drugs are different, even though
17  there's observational data that would
18  suggest that there are some differences
19  that can be made.
20          Q.   My question was, the senior
21  people at the FDA --
22          MS. ROYCE:  Objection, form.
23       It's over time.  We've given you
24       enough time.  You've asked him

KS-000414

Confidential - Subject to Protective Order

Page 458

1    already.  He gave you an answer.
2        MR. KLINE:  Let him ask one
3    more time.  I'm all for it.
4        THE WITNESS:  Repeat the
5    question, please.
6        MR. KLINE:  Senior people
7    versus bench scientists.
8        THE WITNESS:  Repeat the
9    question.
10        MR. KLINE:  Something like
11    that.  Like the real people versus
12    management.
13        THE WITNESS:  I don't know
14    what your question is, so, if you
15    would repeat it for me, please.
16  BY MR. BECK:
17    Q.  My question is the senior
18  people at the FDA, when they asked for
19  input from all of those groups that we
20  saw on Page 3, including drug safety
21  people, right, one person they didn't ask
22  for input from was Dr. David Graham.  Is
23  that true or false?
24    A.  They're listing offices

Page 459

1    here.  I can't tell you who the
2    individuals are that they asked for input
3    in this.  I was a participant in an open
4    public Advisory Committee meeting, and so
5    presumably that material is part of the
6    record.  I wrote an FDA report that I'm
7    sure is part of the record.  So, I would
8    imagine that the work that I did was
9    under consideration there.  But in the
10    actual writing of this memorandum, I
11    can't tell you who actually was consulted
12    to write it except John Jenkins and Paul
13    Seligman because they're the only -- oh,
14    and Steven Galson, because those are the
15    only names that appear.
16    Q.  Lastly, I just can't
17    remember, are all three of those
18    individuals included in the group that
19    you think was conspiring to smear your
20    name?
21    A.  No.  Dr. Jenkins was not
22    part of that group.
23        MR. BECK:  That's all that I
24    have.

Page 460

1        THE VIDEOTAPE TECHNICIAN:
2    Stand by, please.
3        The time is 6:45.  We're
4    going off the record.
5            - - -
6        (Whereupon, a recess was
7    taken from 6:45 p.m. until
8    7:07 p.m.
9            - - -
10        THE VIDEOTAPE TECHNICIAN:
11    The video time is 7:07.  We're
12    back on the record.
13            - - -
14        REDIRECT EXAMINATION
15            - - -
16  BY MR. KLINE:
17    Q.  Okay.
18        We're ready for a
19    redirect-examination.
20        Dr. Graham, do you get the
21    idea that Merck does not like your study?
22        MR. BECK:  Object to the
23    form of the question.
24        THE WITNESS:  Yes, I do.

Page 461

1  BY MR. KLINE:
2    Q.  And your study, sir, did it
3    pass peer review at the Lancet?
4    A.  It passed peer review at the
5    Lancet twice.  So, on two different
6    occasions, five independent peer
7    reviewers, and it passed.
8    Q.  Have you ever had any of
9    your publications or presentations
10    subjected to more scrutiny than this
11    particular presentation, article, study?
12    A.  Never in life.
13        MR. KLINE:  Let's go off the
14    video record.
15        THE VIDEOTAPE TECHNIC AN:
16    Stand by, please.
17        The time is 7:08.  Off the
18    video record.
19            - - -
20        (Whereupon, a recess was
21    taken from 7:08 p.m. until
22    7:14 p.m.)
23            - - -
24        THE VIDEOTAPE TECHNICIAN:

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 462

1    The time is 7:14.  We're back on
2    the record.
3         MR. KLINE:  We had a lot of
4    noise, so, I want to start again.
5    BY MR. KLINE:
6         Q.   Do you get the idea that
7    Merck still does not like your study?
8         MR. BECK:  I'll object to
9    the form.
10        THE WITNESS:  Definitely.
11   BY MR. KLINE:
12        Q.   Have you ever had any paper
13   or study that you have been involved in
14   in any capacity in the last 23 years that
15   has had more scrutiny than this paper
16   which was published in the Lancet?
17        A.   Never in life.
18        Q.   And have you ever had more
19   scrutiny brought to bear on you as a
20   scientist for your work in the last 20
21   some years at the FDA other than beyond
22   this work?
23        A.   Never in life.
24        Q.   I want to clean up a couple

Page 463

1    of little things and then move on.
2         The estimates that you have,
3    88,000 to 140,000?
4         A.   Yes.
5         Q.   First of all, are they lower
6    than some other folks' estimates of the
7    number of increased cardiovascular, both
8    deaths and incidents, that have occurred
9    as a result of the drug Vioxx?
10        A.   Yes, they are.
11        Q.   Is yours a conservative
12   estimate compared to others in the
13   published medical literature?
14        MR. BECK:  Object to the
15   form.
16        THE WITNESS:  I wouldn't say
17   that it is conservative.  I would
18   say that it is realistic.
19   BY MR. KLINE:
20        Q.   And, sir, after answering
21   all of Mr. Beck's questions about how you
22   went about getting to those numbers,
23   number one, do you stick by them?
24        A.   Oh, definitely.

Page 464

1         Q.   And, number two, is there a
2    logical and sound scientific basis for
3    having done these numbers in the way you
4    did them?
5         MR. BECK:  Object to the
6    form.
7         THE WITNESS:  Yes.  There's
8    an explanation, and I tried to
9    offer that explanation.  Basically
10   in doing, coming up with this
11   estimate, we were trying to do
12   something that had never been done
13   at FDA before, which was basically
14   to put into a population context
15   what the human costs were of a
16   severe serious adverse drug
17   reaction.
18        And what we needed to do was
19   to come up with what we thought
20   would be reasonable estimates of
21   what was actually happening among
22   the patients who were going to be
23   treated with Vioxx and who
24   actually were treated with Vioxx,

Page 465

1         and that's what we did.
2    BY MR. KLINE:
3         Q.   How many people from the
4    authors of the study through the peer
5    reviewers laid eyes on and gave input and
6    commentary into the process until it was
7    finally published in the Lancet, the
8    journal from Britain, that there were
9    88,000 to 140,000 excess CV events?
10   Approximately how many people saw that?
11        MR. BECK:  Object to the
12   form.
13        THE WITNESS:  Yes.
14        I'm guessing at least 25
15   different individuals examined
16   that.
17   BY MR. KLINE:
18        Q.   25 different individuals, is
19   that what you're saying?
20        A.   Yes.  That's my estimate.
21        Q.   And at the end of the day,
22   it ended up in the published medical
23   literature, in that exact number, that
24   exact estimate; is that correct?

KS-000416

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

1    MR. BECK:  Object to the
2  form.
3    THE WITNESS:  That is
4  correct.  That is correct.
5    MR. BECK:  Just off the
6  record for a second.
7    THE WITNESS:  You want me to
8  pause, please?
9    MR. BECK:  Yes.
10    THE WITNESS:  I'm sorry.  I
11  apologize for that.
12    MR. BECK:  I appreciate it.
13  Thank you.
14  BY MR. KLINE:
15    Q.   And when you went to
16  Congress to testify, were you sworn in?
17    A.   Yes, I was.
18    Q.   Just as you were today?
19    A.   Actually, when I think back
20  on it, I don't think that I was sworn in,
21  which I was kind of surprised.  I
22  honestly don't remember.
23    Q.   All right.
24    In any event --

1    A.   I'm sorry.
2    Q.   In any event, you gave that
3  same testimony to the senators of the
4  finance committee of the United States
5  Senate of the United States Congress?
6    A.   That is correct.
7    MR. BECK:  Object to the
8  form.
9  BY MR. KLINE:
10    Q.   Where have you presented
11  these numbers, sir, the ones that you
12  were talking to Mr. Beck about for the
13  better part of a half an hour?
14    A.   I presented them at
15  international scientific meetings.  I
16  presented them at a variety of
17  universities throughout the United States
18  and at a number of other sort of
19  scientific colloquia within the United
20  States.  I've also discussed them in the
21  media, in newspapers and television, and
22  there's probably other places where I've
23  discussed them as well.
24    Q.   All right.

1    Now, let's talk just about
2  one short, small aspect of this, which
3  is, I think that the APPROVe data was in
4  a preliminary stage when you were making
5  these estimates for the Kaiser study; is
6  that correct?
7    A.   Yes, that is correct.
8    Q.   I'm just setting it up as a
9  predicate to my real question.
10    A.   Yes.
11    Q.   My real question is, would
12  the excess -- and you're familiar now
13  with the published APPROVe data?
14    A.   Correct.
15    Q.   Would the estimate of excess
16  cardiovascular incidences change in any
17  significant way based upon what you now
18  know to be the final numbers?
19    A.   Unchanged.
20    MR. BECK:  I'm going to
21  object.  I don't think that is
22  proper redirect.
23  BY MR. KLINE:
24    Q.   Next question.

1    Sir, we've seen a lot of
2  e-mails today which, first of all, did
3  any of those e-mails that you spent the
4  better part of two-and-a-half hours with
5  with Mr. Beck, were any of those the
6  subject of public testimony, sir?
7    MR. BECK:  Object to the
8  form.
9    THE WITNESS:  No, they were
10  not.
11  BY MR. KLINE:
12    Q.   Were any of those -- any of
13  that elaborate examination that you were
14  given by Merck's counsel part of any
15  public statements or public scientific
16  meetings or testimony before Congress?
17    A.   No.
18    MR. BECK:  Object to the
19  form.
20    Please wait.
21    THE WITNESS:  No, they
22  weren't.
23    I really am trying.  I
24  apologize.

Confidential - Subject to Protective Order

Page 470

1     MR. BECK:  I know you are.
2     Let me object and then you answer.
3     I object to the form.
4  BY MR. KLINE:
5     Q.   Let me try to clean it up.
6  Let me see if I can ask it in a
7  non-leading way.
8     The e-mails that you
9  discussed at length and all those
10  internal documents -- let me ask it this
11  way.
12     Were those e-mails in the
13  FDA, to your knowledge, ever made public
14  or put out in the public forum or talked
15  about by you prior to today?
16     A.   No.
17     Q.   And you saw that Mr. Beck
18  had picked some out that said things that
19  either had scientific or personal
20  criticisms in them.  Do you recall those
21  questions?
22     A.   Yes, I do.
23     Q.   All right.
24     Now, let me go back to that

Page 471

1  area.  First of all, sir, you are in the
2  Office of Drug Safety?
3     A.   Yes.
4     Q.   Were you ever offered the
5  top job there?
6     A.   Not the top job in the
7  Office of Drug Safety, but I was asked by
8  the commissioner of FDA --
9     Q.   Who was that?
10     A.   It was Lester Crawford at
11  the time, he was the acting commissioner.
12  On November 9th, the acting commissioner
13  invited me to his office.
14     Q.   November 9th of what year?
15     A.   Of 2004.  It was the week
16  before my Senate testimony.  He invited
17  me to his office and offered me a
18  position overseeing the restructuring of
19  drug safety at FDA, and what he said to
20  me at the time was that he needed someone
21  who understood drug safety, and that if
22  he left it to the Center for Drug
23  Evaluation to oversee this, that nothing
24  would happen.

Page 472

1     And I told the commissioner
2  that I wasn't a manager, didn't enjoy
3  management and enjoyed science, and that
4  I could give him the names of 10 or 12
5  people who could do this job in an
6  excellent fashion after which he could
7  make them director for a center for
8  post-marketing regulation.  And so he
9  sent me an e-mail confirming our meeting
10  in which he outlined the job description
11  that he had in mind, and I sent him
12  e-mail back saying thanks very much, I'll
13  get in touch with you in a couple of days
14  and gave him a list of 10 or 12 names of
15  people who I thought would be excellent
16  for this position.
17     It's surprising, though,
18  that, you know, that here on November
19  9th, right before I go to give my Senate
20  testimony that the commissioner is
21  offering me this really high level job
22  with a lot of responsibility, and then
23  one week later, he's calling me all sorts
24  of names in an FDA public statement

Page 473

1  that's issued on the eve of my Senate
2  testimony.
3     And this ties in with what I
4  was talking about before about an
5  organized effort on the part of some
6  within FDA to intimidate me prior to my
7  Senate testimony, and the commissioner
8  was part of that.  Why else would he
9  offer me this job and then turn around a
10  week later and say the things that he
11  said?
12     Q.   All right.
13     Now, I also want to ask you
14  something about how you were recognized
15  the following year.  In 2005, something I
16  didn't cover, but which I'm putting out
17  as redirect in response to the
18  questioning that was asked here.  You
19  were given in 2005, November of 2005 the
20  FDA outstanding service award for
21  scientific and regulatory assessment and
22  actions regarding safety of nonsteroidal
23  anti-inflammatory drugs.
24     MR. BECK:  I'm going to

KS-000418

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 474

1  object.  Improper redirect.  You
2  did ask him about that on direct,
3  and I didn't ask a single question
4  about his awards.
5      MR. KLINE:  We'll get an
6  ruling.  I don't think I asked him
7  about that.
8  BY MR. KLINE:
9      Q.   Did you get that award?
10     A.   I got that award.
11     Q.   You also got the American
12 Public Health Association award for
13 excellence in December 2005; is that
14 correct?
15     MR. BECK:  Objection.
16     Improper redirect.
17     THE WITNESS:  Yes.  And sir,
18 that's a very prestigious national
19 award that no one from the Food &
20 Drug Administration has ever been
21 awarded that award from the
22 American Public Health
23 Association.
24 BY MR. KLINE:

Page 475

1      Q.   Briefly, one sentence, what
2  is the American Public Health
3  Association?
4      A.   The American Public Health
5  Association is the professional
6  organization that represents public
7  health professionals within actually the
8  entire world, the United States and the
9  rest of the world.  I think it has over
10 35,000 members.
11     Q.   Sir, every year you as an
12 FDA employee are -- there's a performance
13 evaluation of you, correct?
14     A.   Yes.
15     Q.   You listened to Mr. Beck's
16 many questions about e-mails regarding
17 things that you did technically and
18 statistically and the like.  Do you
19 recall all those questions?
20     A.   Yes, I do.
21     Q.   There are categories of
22 technical competence in 2005, and I have
23 the document right here, a copy of which
24 we'll give to Mr. Beck.  We'll mark it as

Page 476

1  Exhibit 33.  I want to be very quick with
2  it, sir.
3               - - -
4      (Whereupon, Deposition
5  Exhibit Graham-33, FDA
6  Performance Evaluation Plan (4
7  pages), was marked for
8  identification.)
9               - - -
10     THE WITNESS:  Right.  This
11 covers --
12 BY MR. KLINE:
13     Q.   Yes.
14     A.   This covers the year of
15 2004.
16     MR. BECK:  Let me please
17 make an objection before you do
18 this.  Twofold.  One is improper
19 redirect.  I didn't ask about any
20 performance evaluations.
21     Second, this is one of the
22 documents that was provided last
23 week by Dr. Graham's counsel, and
24 we asked for the full package and

Page 477

1  evaluation materials.  I didn't
2  make an issue of it because you
3  didn't ask him any questions on
4  direct about evaluation materials,
5  and now it's redirect, and it
6  really is objectionable when we
7  have been denied access to all the
8  materials in the evaluation file
9  for you to use the stuff that he
10 gave you last week.
11     MS. ROYCE:  You asked for it
12 yesterday.
13     MR. KLINE:  You know what,
14 we'll withdraw it.  Let's move on.
15 I would rather not --
16     THE WITNESS:  Shucks.
17     MR. KLINE:  All right.
18     You know what?  Let's keep
19 it.
20     Is your objection done?
21     MR. BECK:  Yes.
22 BY MR. KLINE:
23     Q.   Okay.
24     Let's do it and we'll

**KS-000419**

120 (Pages 474 to 477)

Confidential - Subject to Protective Order

Page 478

1  eventually get a ruling on it.
2      A.   This evaluation is for --
3      Q.   Very briefly, sir.
4      A.   -- the year 2004, which
5  covers this entire period of our study.
6      Q.   That's my question.
7      A.   And I got "exceeds" in work
8  management, technical competency.  And
9  throughout my entire career, I've gotten
10 "exceeds" in technical competency.
11     Q.   That's what I want to focus
12 on.  Does the FDA in 2004 rate you as
13 exceeds knowledge, skills and abilities
14 on technical competency?
15     A.   Yes.
16         MR. BECK:  Object to form.
17 BY MR. KLINE:
18     Q.   Is that the highest level
19 that you could get?
20     A.   That's the highest level you
21 can get.
22     Q.   Next area to examine you on,
23 sir.
24         I would like to talk to you

Page 479

1  about that study that was done and your
2  involvement with Wayne Ray.  Do you
3  recall Mr. Beck making quite a -- let me
4  put it in a less pejorative way.
5         Do you remember Mr. Beck
6  making a point about conflict of interest
7  and the fact that Wayne Ray had consulted
8  for Pfizer and for plaintiffs' attorneys,
9  too?
10     A.   Yes, I do.
11     Q.   And, of course, those are in
12 drug product litigation, even you would
13 know or a novice or anyone would know
14 that those are the two opposite ends of
15 the spectrum, the plaintiffs and the drug
16 companies, correct?
17     A.   Correct.
18     Q.   You also told us earlier or
19 maybe you didn't.
20         Who is Harry Guess?
21     A.   Harry Guess is deceased now,
22 but he was, I think, like the lead
23 epidemiologist at Merck and a long-time
24 colleague, and maybe friend is a little

Page 480

1  too strong a word, but I had much respect
2  for Harry.
3      Q.   I see.
4          And he eventually was at
5  Merck?
6      A.   He worked for Merck, yes.
7      Q.   He worked for Merck.
8          - - -
9          (Whereupon, Deposition
10 Exhibit Graham-34, Memo 11-6-00
11 "Consulting agreement for Wayne
12 A. Ray, Ph.D." MRK-ABT0018298,
13 was marked for identification.)
14         - - -
15 BY MR. KLINE:
16     Q.   I'll show you Exhibit 34.
17 With reference to Wayne Ray, the man who
18 Mr. Beck showed you was conflicted.  May
19 we put it up, please?
20         THE WITNESS:  I have never
21 seen this document.
22 BY MR. KLINE:
23     Q.   Yes.  That's fine.  Mr. Beck
24 showed you a lot of things you didn't

Page 481

1  see.  It's a Merck document, by the way.
2      A.   Okay.  Yes.
3      Q.   It is right out of the Merck
4  files.
5      A.   Right.
6      Q.   And not only was Wayne Ray a
7  consultant for the plaintiffs in
8  litigation for Pfizer, but who else did
9  he have a consulting agreement with?
10     A.   With Merck.
11         MR. KLINE:  May we display
12 it, please?
13         Let's go off the video
14 record.
15         THE VIDEOTAPE TECHNICIAN:
16 Stand by, please.
17         The time is 7:29.  Off the
18 video record.
19         - - -
20         (Whereupon, a recess was
21 taken from 7:29 p.m. until
22 7:30 p.m.
23         - - -
24         THE VIDEOTAPE TECHNICIAN:

KS-000420

Confidential - Subject to Protective Order

Page 482

1     7:30.  We're back on the record.
2   BY MR. KLINE:
3       Q.   We've marked it as Exhibit
4   Number --
5       A.   34.
6       Q.   -- 34.  Exhibit Number 34 is
7   -- your co-colleague was also a
8   consultant with Merck, correct?
9       A.   Yes.
10      Q.   What's Merck's complaint?
11      A.   That he was a plaintiffs'
12  attorney for rofecoxib or that he worked
13  for Pfizer.
14      Q.   Was the man at one point one
15  of their own consultants, your co-author?
16      A.   Yes, he was.
17      MR. KLINE:  Let's mark the
18  next exhibit number.
19          - - -
20      (Whereupon, Deposition
21  Exhibit Graham-35, E-mails
22  MRK-ACV00363335, was marked for
23  identification.)
24          - - -

Page 483

1   BY MR. KLINE:
2       Q.   This is also right out of
3   the Merck files.
4       MR. BECK:  And I'm going to
5   object to the colloquy, if this is
6   intended as a question.
7       MR. KLINE:  We can strike
8   that colloquy.
9   BY MR. KLINE:
10      Q.   This is in a different
11  context back in 2000.  You weren't
12  involved, you haven't seen this before,
13  correct?
14      A.   This is correct.
15      Q.   The first phrase from, it's
16  Dr. Guess, correct?
17      A.   Correct.
18      Q.   Epidemiologist?
19      A.   Senior epidemiologist at
20  Merck.
21      Q.   Senior epidemiologist at
22  Merck?
23      A.   He may have even been a vice
24  president.  You can ask the Merck folks.

Page 484

1       Q.   "I have known David Graham
2   well for a long time.  He has an
3   admirable concern for public health."
4       Do you see that?
5       A.   Yes, I do.
6       Q.   Did you know that that's how
7   the senior epidemiologist at Merck felt
8   about you, sir?
9       A.   No.  He never conveyed that
10  to me.
11      Q.   Well, now he has.
12      Next.
13      A.   Posthumously.
14      MR. BECK:  Objection, move
15  to strike the colloquy and
16  speeches.
17  BY MR. KLINE:
18      Q.   Next.  Let's talk about --
19      Let's talk just one or two
20  more things about Wayne Ray.  Wayne Ray.
21  Who ran last year's ISPE conference?
22      A.   Dr. Ray did.
23      Q.   Is Dr. Ray also a consultant
24  to the FDA?

Page 485

1       A.   He most definitely is.
2       Q.   So, your co-author was a
3   consultant to the FDA, former consultant
4   to Merck in addition to the things that
5   were pointed out by Mr. Beck; is that
6   correct?
7       MR. BECK:  Object to form.
8       THE WITNESS:  That is
9   correct.  The reason why we
10  asked -- why I asked Wayne to
11  participate in our study was
12  because of that FDA/Dr. Ray
13  relationship.
14  BY MR. KLINE:
15      Q.   Now, speaking of
16  relationships, that's the next place I
17  want to go.
18      There was a document that
19  was shown to you, and let me find it.  It
20  was exhibit -- it was the e-mail from
21  Jenkins to Jonca.  I know the Bates
22  Number.  I didn't mark the number on it.
23  FDA CDER 11048.  It is this document
24  here.

**KS-000421**

Confidential - Subject to Protective Order

Page 486

1    A.   Thank you for showing it to
2  me.
3    Q.   But if you can find it.
4        Do you recall seeing it in
5  your direct examination?
6    A.   Yes, I do.
7    Q.   Or I'm sorry, in your
8  cross-examination?
9    A.   Yes, I do.  I recall seeing
10  it.
11       MR. KLINE:  15.  Thank you
12  very much, Counsel.
13  BY MR. KLINE:
14   Q.   Now, Mr. Beck had asked you
15  about the e-mail from Jenkins to Jonca.
16  I had asked him to read for completeness
17  the first e-mail, the e-mail underneath
18  that, from Jenkins to Jonca.
19       And do you see the portion
20  of it that begins, "Please see Paul's
21  message below which he kindly shared."
22       That would be Paul of the
23  FDA sharing the e-mail with Merck,
24  correct?

Page 487

1    A.   I'm not sure with whom he
2  shared it.
3    Q.   Let me go further.  It says,
4  "For the record, Merck will likely not be
5  happy so this could well eventuate in
6  calls to the agency.  Should we involve
7  Bob Temple?"
8        Who is Bob Temple?
9    A.   Bob Temple is the director
10  of medical policy at FDA, and he's also
11  one of the senior office directors.
12   Q.   Senior office director?
13   A.   Yes.
14   Q.   That was where -- okay.
15       And it says, "He
16  historically has been the one of the
17  first ones they complained to."
18       "They" being who?
19   A.   "They" being Merck.
20   Q.   So, when Merck has their
21  complaints, who do they go and complain
22  to?
23   A.   According to this e-mail, to
24  Dr. Temple.

Page 488

1    Q.   Is this an example of what
2  you told me on direct in terms of who is
3  the real client of the FDA?
4        MR. BECK:  Object to the
5        form of the question.
6        THE WITNESS:  This would be
7        an example of that.
8  BY MR. KLINE:
9    Q.   Okay.
10       Let me ask it in a
11  non-leading question.
12       What is this an example of,
13  sir?
14       MR. BECK:  I'm going to
15       object to the form having given
16       him the answer.
17  BY MR. KLINE:
18   Q.   You can answer any way you
19  want or whatever you want to say.
20   A.   This is an example of the
21  way FDA views industry as its clients and
22  tries to please industry, its client.
23   Q.   Now, sir --
24       MR. BECK:  Before you leave,

Page 489

1  I would ask that the last
2  paragraph of that e-mail be read
3  for completeness.
4        MR. KLINE:  I will.  It was
5        read already, but we'll read it
6        again.
7  BY MR. KLINE:
8    Q.   "I am very concerned that
9  David Graham is lead author on this and
10  is identified as FDA staff.  This clearly
11  implies agency endorsement of his
12  presentation and this is the first we
13  have seen of it.  Paul's message below
14  for a presentation at a meeting coming up
15  later this month does not allow much time
16  to review or clear.  Jonca."
17       Is that along the same lines
18  as Merck will not likely to be happy?
19       MR. BECK:  I'm going to
20       object to the form of the
21       question.
22  BY MR. KLINE:
23   Q.   Please answer, sir.
24   A.   Yes.  That's consistent with

KS-000422

Confidential - Subject to Protective Order

Page 490

1  that.
2       Q.   Now, next I just want to do
3  a couple of more e-mails which were not
4  shown to you by Mr. Beck.
5            First of all, there's an
6  e-mail of Jonca to Hertz.  It has been
7  marked already.  We're not sure if it is
8  marked.  I'm going to just show it to
9  you.  It is Bates Number from the FDA
10  CDER file, 11046.  We'll give it another
11  number so we can move right along.
12            - - -
13            (Whereupon, Deposition
14       Exhibit Graham-36, E-mails
15       FDACDER011046 - FDACDER011047,
16       was marked for identification.)
17            - - -
18  BY MR. KLINE:
19       Q.   First sentence, sir.  Do you
20  see it?  It is the same folks that are
21  involved.  Again, remind the jury.  Who
22  is Bull Jon -- Jonca Bull her name was?
23       A.   Jonca Bull is -- was the
24  office director overseeing the reviewing

Page 491

1  division that approved and regulates
2  Vioxx.
3       Q.   And look what she says there
4  in the last sentence of the e-mail on the
5  top.  Do you see where it says, "Look
6  out"?
7       A.   Yes, yes, yes.
8       Q.   Who were they interested in
9  getting feedback from?  Who were they
10  worried about?
11            MR. BECK:  I'm sorry.  Where
12       are you?
13  BY MR. KLINE:
14       Q.   "Look out for feedback from
15  Merck in short order."
16       A.   Correct.  They are concerned
17  about what Merck will have to say about
18  this.
19       Q.   Okay.  Next.
20            MR. BECK:  I would like the
21       -- above that, the sentence that
22       begins "Thanks" to be read for
23       completeness.
24  BY MR. KLINE:

Page 492

1       Q.   For completeness, "Thanks
2  for confirming my concerns here as to the
3  leap between the methodology and
4  conclusions reached."
5            MR. KLINE:  Next e-mail.
6            - - -
7            (Whereupon, Deposition
8       Exhibit Graham-37, E-mail 8-16-04
9       with attachment "ISPE Poster,"
10       MRK-ACM0002855 - MRK-ACM0002856,
11       was marked for identification.)
12            - - -
13  BY MR. KLINE:
14       Q.   There's an e-mail between
15  Honig -- to Honig from Seligman.  Those
16  are people who we've talked about.  Honig
17  is where?
18       A.   Well, it depends on the date
19  of the e-mail.  If it is in 2004 or so --
20       Q.   Yes, it is.
21       A.   -- then Honig is at Merck;
22  Seligman is at FDA.
23       Q.   Let me understand this.  The
24  e-mail I'm going to show you is from Paul

Page 493

1  Seligman, the man we've talked about or
2  the man you talked about with Mr. Beck,
3  and Peter Honig.
4            Did you know, sir, that Mr.
5  or that Dr. Seligman was sending Dr.
6  Honig a copy of your poster so that, you
7  know, Merck had the heads up?  Are you
8  aware of that fact?
9       A.   No.  There was an e-mail
10  that I had seen from Dr. Trontell who had
11  said, oh, we can't let Dr. Graham present
12  this, but we need to let Merck know.  So,
13  I was aware of that, but I didn't know
14  that it had been shared with Merck.
15       Q.   In this period of time, sir,
16  when your scientific integrity was being
17  called into question, who was on the
18  minds of the brass at the FDA?
19            MR. BECK:  Objection to the
20       form.
21  BY MR. KLINE:
22       Q.   You may answer.
23       A.   They were concerned about
24  FDA and made that repeatedly clear.

KS-000423

Confidential - Subject to Protective Order

Page 494

1    Q.   Who was on the minds of the
2  FDA?
3         MR. BECK:  Objection.
4  BY MR. KLINE:
5    Q.   You said they were concerned
6  about FDA?
7         MR. BECK:  He just answered
8    your question.  I renew my
9    objection to the form.
10        MR. KLINE:  Yes, sir.
11        THE WITNESS:  The FDA
12   managers were concerned about what
13   Merck would think and about what
14   Merck, in their estimation, needed
15   to know I guess because they were
16   serving them.
17 BY MR. KLINE:
18   Q.   Who is Dr. Braunstein?
19   A.   I've seen the name before,
20 but I don't know who Dr. Braunstein is.
21   Q.   Who is Brian Harvey, sir?
22   A.   Brian Harvey is, I think
23 he's like -- he was the division director
24 for the analgesics and anti-inflammatory

Page 495

1  drugs.  He was the person who was
2  responsible for Vioxx, so, he --
3    Q.   In Office of New Drugs?
4    A.   Right.  He's in that
5  division of anti-inflammatory drugs, and
6  he's the director of that division where
7  Vioxx sits, and Jonca Bull is his boss.
8  And he's the boss of like Lourdes
9  Villalba, who is the medical officer who
10 did the Vioxx review.
11   Q.   They are all in the Office
12 of New Drugs?
13   A.   Correct.
14   Q.   The ones that you told us
15 earlier have the vested interest in
16 keeping the drug on the market?
17        MR. BECK:  Object to the
18   form of the question.
19 BY MR. KLINE:
20   Q.   Is that correct, to put it
21 in context?
22   A.   Yes.  These are people from
23 the Office of New Drugs, and the Office
24 of New Drugs has a vested interest in

Page 496

1  seeing that its prior decisions are not
2  changed.
3    Q.   Now, I want to show you some
4  handwritten notes, sir, if we may show
5  you the next document.
6         - - -
7         (Whereupon, Deposition
8    Exhibit Graham-38, Handwritten
9    notes, MRK-GAR0016806 -
10   MRK-GAR0016807, was marked for
11   identification.)
12        - - -
13 BY MR. KLINE:
14   Q.   Exhibit 38.  And see if you
15 can tell me if in the period of time,
16 this would be 10/13 and 10/14 of '04,
17 correct?
18        MR. BECK:  Excuse me.
19        MR. KLINE:  Yes, sir.
20        MR. BECK:  I'm going to
21   object to the form.  You're giving
22   a date that I don't see anywhere
23   on the document.
24 BY MR. KLINE:

Page 497

1    Q.   I want you to assume that
2  that's the date.
3    A.   Well, one can -- you can
4  derive it very clearly.  It says October
5  13, and down below it's talking about me
6  and our study.  It's talking about Graham
7  et al.
8    Q.   Sir, I want you to look at
9  the middle of the page, and I'd like it
10 highlighted with the word that starts
11 "Brian," Brian being Brian Harvey of the
12 FDA?
13   A.   Yes.
14        MR. BECK:  Object to the
15   form.
16 BY MR. KLINE:
17   Q.   "Brian suggests an official
18 rebuttal on Graham."  Do you see that?
19   A.   Yes, I do.
20   Q.   Did you know that was going
21 on, sir?
22   A.   No, I don't.  I don't know
23 what an official rebuttal means, but I
24 was not aware that it was going on.

**KS-000424**

Confidential - Subject to Protective Order

Page 498

1    Q.   Did you know, sir, that
2  Brian Harvey at the FDA -- look at the
3  last three lines.
4          This is an official of the
5  FDA.  Last three lines.  Brian told --
6  the author being Braunstein.  Braunstein
7  writes in his own handwriting, and we're
8  going to examine him on this in a
9  deposition.
10          "Brian - opportunity to get
11  message out on Graham et al."
12          MR. BECK:  I'm going to
13      object to the form of the
14      question.
15  BY MR. KLINE:
16      Q.   Did you know, sir, that
17  those discussions were going on between
18  the FDA and Merck, that they were looking
19  to get the message out on you?
20      A.   No, I didn't.
21      Q.   Did you know, sir, in the
22  last sentence that an FDA official was
23  suggesting to Merck that we provide
24  journalists with a copy of our critique

Page 499

1  on Graham?
2          MR. BECK:  Object to the
3      form.
4  BY MR. KLINE:
5      Q.   Did you know that that was
6  going on, sir?
7          MR. BECK:  Excuse me.
8      Object to the form.
9          MR. KLINE:  Yes, sir.
10          THE WITNESS:  No, I did not.
11  BY MR. KLINE:
12      Q.   How does this all strike
13  you, having seen this for the first time?
14          MR. BECK:  Object to the
15      form.
16          THE WITNESS:  Well, I'll
17      tell you, I'm quite shocked,
18      because what this is is this
19      actually demonstrates more clearly
20      just how widespread the organized
21      campaign to discredit and smear me
22      was, that I'm not crazy and
23      psychotic, that there was a
24      widespread, widespread concerted

Page 500

1      effort on the part of FDA
2      officials working in collaboration
3      hand in glove with --
4  BY MR. KLINE:
5      Q.   With whom?
6      A.   With Merck.
7      Q.   Next.
8          And by the way, sir, are you
9  aware of a letter that was written by a
10  doctor whose name was Fries?
11      A.   No.
12      Q.   Okay.  Let me ask you this
13  question.  Are you aware of the Merck --
14          Are you aware of any Merck
15  documents where they had a policy in
16  effect to neutralize people, scientists
17  who disagreed with them?
18          MR. BECK:  I'm going to
19      object as wildly outside the scope
20      of any cross-examination.
21  BY MR. KLINE:
22      Q.   Yes, sir.
23      A.   I'm fully aware of that,
24  actually, because one of the victims of

Page 501

1  these attempts was a colleague of mine,
2  Dr. Gurkipal Singh, who was at Stanford
3  and who described in great detail what he
4  had gone through at the hands of Merck
5  basically seeking to fire him because he
6  had questions about the safety of Vioxx.
7      Q.   For the record so it's clear
8  later on, this all flows from the e-mail
9  which was shown by Mr. Beck dated August
10  11 in which the part of that e-mail chain
11  said "For the record, Merck will likely
12  not be happy."  That's the basis for
13  having gone into all of this.
14          Next area of inquiry, sir.
15          By the way, is this -- was
16  there a practice at the FDA essentially
17  to give the sponsor of the drug, Merck,
18  in this case, both information and heads
19  up on things like this?
20          MR. BECK:  Object to the
21      form.
22          THE WITNESS:  No.  No.  This
23      would be uncommon and
24      unprecedented.

**KS-000425**

Confidential - Subject to Protective Order

Page 502

1  BY MR. KLINE:
2      Q.   Now, let's move into other
3  areas.
4          MR. BECK:  Doctor, can I ask
5      again if you would try to pause
6      because I don't want to be talking
7      over each other.
8          THE WITNESS:  Okay.  Yes.
9      And I'm not trying to dis you.
10         MR. BECK:  I know.  If you
11     get into a rhythm with somebody as
12     silver tongued as Mr. Kline, it is
13     hard to remember the rules.
14         MR. KLINE:  My mom used to
15     say to me, beware of people who
16     compliment you.
17         THE WITNESS:  Well, I
18     subscribe to that.  If people
19     agree with me, then I have to
20     wonder what am I doing wrong.
21     Right?
22         MR. KLINE:  Right.
23         But I appreciate it, Phil.
24  BY MR. KLINE:

Page 503

1      Q.   Next.
2          Mr. Beck talked about a
3  number of documents that were turned over
4  and processed and the lawyers -- do you
5  recall that whole first 15 or 20 minutes
6  of examination?
7      A.   Yes, I do.
8      Q.   Here's my question to you,
9  sir.  In this litigation, did Merck
10  subpoena and request your personal
11  e-mails for seven years?
12     A.   They requested not only
13  those e-mails, but the e-mails of all my
14  family members.
15     Q.   Next.  Next document, sir.
16  I'd like to go to a document which was
17  the very end of Mr. Beck's
18  cross-examination.  Let me see if I can
19  find it.  I know its number, I just don't
20  know where it is.
21         MR. BECK:  Can I know what
22     we are talking about?
23         THE WITNESS:  I think
24     they're talking number 32.

Page 504

1          MR. KLINE:  Let's go off the
2  video record.
3          THE VIDEOTAPE TECHNICIAN:
4      Off the record at 7:48.
5          - - -
6          (Whereupon, a recess was
7      taken from 7:48 p.m. until 7:49
8      p.m.)
9          - - -
10         THE VIDEOTAPE TECHNICIAN:
11     The time is 7:49.  We're back on
12     the video record.
13  BY MR. KLINE:
14     Q.   Let's put this in context,
15  sir.  There's an e-mail from Jenkins, the
16  director of Office of New Drugs, and
17  Seligman who's -- is he also in the
18  Office of New Drugs, technically?
19     A.   No.  He's in a separate
20  super office --
21     Q.   All right.
22     A.   -- but he's close personal
23  friends with Steven Galson, and Dr.
24  Galson brought Dr. Seligman into this

Page 505

1  position from outside.
2      Q.   Understood.
3          Now, Mr. Beck wanted to look
4  at the first five bullet points with you
5  in this document, including the no -- and
6  you had testified, to put it in context,
7  that there was -- no clinical trial had
8  yet shown the increased risk that they're
9  talking about here, but that it had been
10  shown in observational, namely,
11  epidemiology studies.  Correct?
12     A.   That is correct.
13         MR. BECK:  Object to the
14     form of the question.
15  BY MR. KLINE:
16     Q.   That's the predicate to the
17  question just to put it back in context
18  for a question now.
19         Sir, your study itself,
20  standing alone, did it show an increased
21  risk of Vioxx in causing cardiovascular
22  events?
23     A.   Yes, it did.
24     Q.   Was that both at the 25

KS-000426

Confidential - Subject to Protective Order

Page 506

1  milligram dose as well as the 50
2  milligram dose?
3      A.   At the 50 milligram dose,
4  the evidence was statistically
5  significant.  At the 25 milligram dose,
6  it was elevated, but it didn't reach
7  statistical significance.  In comparison
8  with Celebrex, it was marginally
9  statistically significant with a lower
10  dose.
11      Q.   And in this document which
12  is April 6, 2005, let's put it in
13  context, drug is off the market September
14  30 of '04, correct so far?
15      A.   Yes.
16      Q.   And I just want to get dates
17  out, so I appreciate Mr. Beck's
18  indulgence.
19          And then there's -- your
20  article is published online in January of
21  '05, correct?
22      A.   Yes.
23      Q.   There's a hearing on
24  February 17th of '05, correct?

Page 507

1      A.   Yes.
2      Q.   And then this report comes
3  along as part of that process.  It
4  basically is tying up the endpoint of
5  having had an Advisory Committee hearing
6  and having had an investigation?
7      A.   Yes.
8      Q.   What I don't believe you
9  were asked about was what was said about
10  Vioxx in this paper.  And let's look at
11  Vioxx on Page 18.  And then that will, I
12  think, lead us to a discussion of some
13  other things.
14          On Page 18, we have Vioxx,
15  Page 18.  There's a separate section on
16  Vioxx, isn't there?
17      A.   Yes, there is.
18      Q.   Have we discussed that yet?
19      A.   No, we have not.
20      Q.   It says here, second
21  sentence, "Should the sponsor seek to
22  resume marketing for rofecoxib, a
23  supplemental NDA with" -- what kind of
24  labeling, sir?

Page 508

1      A.   -- "revised labeling."
2      Q.   In other words, the drug
3  would have to be labeled different,
4  correct?
5      A.   Yes.
6      Q.   "The supplemental NDA would
7  require FDA review and approval prior to
8  implementation of the" -- what?
9      A.   "New labeling."
10      Q.   -- "new labeling since the
11  change would not be the type allowed
12  under FDA regulations ,"and they go on to
13  cite the regulations on labeling,
14  correct?
15      A.   Yes.
16          MR. BECK:  Will you just for
17      completeness read the rest of that
18      sentence.
19  BY MR. KLINE:
20      Q.   -- "new labeling since the
21  changes would not be the type allowed
22  under FDA regulations for a 'Changes
23  Being Effected (CBE)' labeling
24  supplement."  Did I read it correctly?

Page 509

1      A.   Yes.
2      Q.   So, the FDA, even the FDA in
3  this report, did the FDA conclude that
4  the drug was not properly labeled as it
5  had been marketed when it was on the
6  market?
7          MR. BECK:  Object to the
8      form of the question.
9  BY MR. KLINE:
10      Q.   You may answer.
11      A.   Yes.  That's clearly what's
12  been concluded here.
13      Q.   And, sir, the labeling, two
14  years you had mentioned about the
15  labeling, and you discussed labeling at
16  length with Mr. Beck, and I want to talk
17  to you a little bit about labeling in a
18  minute.
19          The labeling, two years.  Is
20  there anyone in those two years in
21  particular who dragged their feet?
22          MR. BECK:  Object to the
23      form of the question.  It's also
24      improper redirect.

KS-000427

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 510

1     MR. KLINE:  Yes, sir.  Go
2  ahead.
3     MR. BECK:  I didn't get into
4  this subject at all.
5     THE WITNESS:  The two-year
6  period for coming up with the
7  revised label for a problem as
8  serious as high risk of heart
9  attacks with Vioxx, this is an
10  extraordinary long period of time,
11  and the only explanation based on
12  my long experience at FDA is that
13  there was foot dragging by the
14  company.  I've seen this countless
15  times with other companies with
16  other serious drug-related adverse
17  reactions where FDA comes in
18  saying we want to put a boxed
19  warning on a drug, and the company
20  says basically no way, Jose, and
21  then FDA sort of banters back and
22  forth with the company, and things
23  just go on for months and months
24  and months and months.

Page 511

1     At the same time, companies
2  are free to voluntarily implement
3  labeling changes such as boxed
4  warnings, and in this case, I
5  imagine FDA would have gone along
6  with it.
7  BY MR. KLINE:
8     Q.  Now, I'd like to go --
9     MR. BECK:  I'm going to
10  object and move to strike and
11  renew the objection as outside the
12  scope.  I didn't ask anything on
13  this subject at all.
14     MR. KLINE:  You certainly
15  asked a whole ton of questions on
16  labeling, and I intend to go into
17  it.
18     MR. BECK:  I asked if he was
19  involved in the labeling decisions
20  and he said no.
21     MR. KLINE:  And then you
22  asked a series of opinions about
23  labeling.  Do you want to strike
24  all the labeling testimony?

Page 512

1     MR. BECK:  I have my
2  objection on the record.
3     MR. KLINE:  But I'm willing
4  to offer a compromise.
5     I don't hear a taker.
6  BY MR. KLINE:
7     Q.  Sir, I want to go back and
8  cover one more thing in this document,
9  the Jenkins report.  If you look on Page
10  18, right here, sir, where it says
11  "Second, concerns were expressed at the
12  recent advisory committee meeting" --
13     A.  Uh-huh.
14     Q.  "Second, concerns were
15  expressed at the recent advisory
16  committee meeting that Vioxx may be
17  associated with a higher risk of
18  increased blood pressure, fluid
19  retention, and congestive heart failure
20  than other COX-2 selective NSAIDs.  We
21  believe that these additional potential
22  serious risks of Vioxx need to be fully
23  explored through a public process before
24  a decision is made regarding resumed

Page 513

1  marketing."  Did I read it correctly?
2     A.  Yes, you did.
3     Q.  Is that, at least insofar as
4  that goes, sir, indeed was Vioxx
5  associated with all of these things that
6  are now known and shown in 2000 and are
7  now acknowledged by the FDA?
8     MR. BECK:  Object to the
9  form and the scope.
10  BY MR. KLINE:
11     Q.  Did the epidemiology studies
12  show these things, sir?
13     MR. BECK:  Object to the
14  form and to beyond the scope of
15  cross.
16     THE WITNESS:  Other
17  epidemiology studies have shown
18  these things.  Our study didn't
19  look at these things, but other
20  studies have, and it found these
21  effects with Vioxx.
22  BY MR. KLINE:
23     Q.  So, when Vioxx was on the
24  market, sir, by this own FDA document,

KS-000428

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 514

1  was it a drug that was associated with
2  the things that you've mentioned,
3  increased risk of heart attacks and
4  coronary events, as well as these other
5  heart-related ailments which are
6  acknowledged here by the FDA?
7          MR. BECK:  Object as beyond
8  the scope of the cross.
9          THE WITNESS:  Yes.
10 BY MR. KLINE:
11     Q.    And I might add for the
12 record, this is the exact document that
13 was examined on by -- do you remember --
14     A.    Yes, I do.
15     Q.    Do you recall being examined
16 on this very document by Mr. Beck?
17     A.    I do.
18     Q.    Do you recall any questions
19 about the specific area, the specific
20 part of the document that dealt with
21 Vioxx?
22     A.    No.
23     Q.    But is it in this document,
24 sir?

Page 515

1      A.    It certainly is.
2      Q.    And does the FDA speak about
3  the fact that Vioxx can't be on the
4  market unless it had a different label?
5          MR. BECK:  Object to the
6  form and to the scope.
7          THE WITNESS:  That's
8  correct.
9  BY MR. KLINE:
10     Q.    Let's talk about your
11 testimony, sir.
12         In response to questions by
13 Mr. Beck, you said -- I want to talk
14 label for a minute, labeling in response
15 to the questions that he asked you.
16 First of all, sir, you testified earlier
17 about how labels can make a difference.
18 You said that a straightforward -- I
19 actually have from Mrs. Golkow's
20 transcription here today instant access
21 to it on real time.  And it says here,
22 "It would actually just be more
23 straightforward about what the problems
24 are, using very bold and frank and plain

Page 516

1  language, not sort of using adjectives
2  that downplay it and not burying it in
3  tremendous amounts of text."  Your words.
4      Do you recall saying that to the jury
5  here today?
6      A.    Yes, I do.
7      Q.    Now, sir, can a
8  straightforward, bold, frank, plain
9  language label warning make a difference
10 in prescribing of drugs as you see and
11 know and understand it?
12     A.    It certainly can.  In the
13 case of Vioxx, I think had the warning
14 been very clear, had it been boxed, the
15 number of patients exposed to the drug
16 would have probably been much reduced,
17 and this would have resulted in a
18 substantial reduction in the number of
19 people who were injured by heart attacks
20 or killed by heart attacks.
21     Q.    Sir, in your testimony
22 before the United States Senate Finance
23 Committee before Senator Grassley and his
24 committee, you were asked the question --

Page 517

1  you were saying -- you were asked the
2  question by Senator Graham (sic):  "A
3  black box will catch everybody's
4  attention."  You said, "As I pointed out
5  before, I think the most effective thing
6  that this black box would have done is it
7  would have given prominence to the heart
8  attack risk of Vioxx and it would have
9  stopped direct-to-consumer advertising."
10         Do you recall making that
11 statement, sir, before the Congress?
12     A.    Yes, I do.
13         MR. BECK:  Object to the
14 form.
15 BY MR. KLINE:
16     Q.    My question is, do you abide
17 by and agree with that particular public
18 statement which was made then today?
19     A.    Oh, definitely.  There's no
20 question about that.
21         Could I add one other thing
22 since we're talking about labeling.
23 Shari Targum, whose review we talked
24 about earlier, in the very conclusion of

KS-000429

Confidential - Subject to Protective Order

Page 518

1  her review, I was really stunned, I only
2  saw this recently in rereading the
3  review, she wrote basically that this --
4  that Vioxx should have warnings.  And she
5  said "at least warnings."  And so I think
6  reading that and looking at her review,
7  the fact that here's the expert who
8  reviewed the drug, thought that it should
9  have been in warnings, and then
10 eventually we have it came out that it's
11 sort of, you know, buried in the fine
12 print, I was actually fairly surprised
13 because I hadn't realized that Dr. Targum
14 had actually stated that.
15     Q.   As to your opinions, sir,
16 before the United States Senate, putting
17 aside Dr. Targum, when you said that the
18 black box can be effective, have you
19 stated here today now a more complete
20 view of your opinions as I've asked you
21 here on redirect examination?
22     A.   Yes, I have.
23          MR. BECK:  Objection.
24 Somebody has to let me object.  I

Page 519

1      object to the form of the
2      question.
3          MR. KLINE:  Phil, I
4      apologize.  I'm really trying to
5      rush through it here at 8:00, but
6      I appreciate it, and I will really
7      try to be more deferential.
8  BY MR. KLINE:
9      Q.   Next.  Let's talk about --
10 yes.  I'd like you to go to Exhibit
11 Number 8 very briefly.
12          You were asked by Mr.
13 Beck -- I'm going to like make you work
14 while you talk because we're trying to
15 wrap up.
16          You had mentioned -- there
17 was an exchange where basically you said
18 you'll leave it to brighter minds to
19 determine mechanism, et cetera, correct?
20     A.   Yes.
21     Q.   Now, I also think I heard
22 you say that you understand mechanism
23 because you're a pharmacologist?
24     A.   I'm a clinical

Page 520

1  pharmacologist, board certified.
2      Q.   And you wrote an e-mail
3  that's part of the documents that I don't
4  think we've displayed it yet to the jury.
5  But let me ask you the concept, and
6  hopefully I won't be put to the task of
7  showing it.  You said, "Epidemiology
8  doesn't require or depend on a known
9  mechanism for its findings."  It's your
10 e-mail to David Campen, who is your
11 co-author on this study.
12     A.   (Witness nods.)
13     Q.   "Epidemiology doesn't
14 require or depend on a known mechanism.
15 What it does is seek to describe the way
16 things are and leave it to brighter minds
17 to figure out why."  Do you remember
18 that?
19     A.   Yes, I do.
20     Q.   Were you being facetious?
21     A.   I was being facetious.
22     Q.   But does it describe things
23 to put it the way you put it, the way
24 they are?

Page 521

1      A.   That's the whole purpose of
2  it.
3      Q.   Now, in your article -- in
4  the Wayne Ray article --
5      A.   Is this Number 8?
6      Q.   Yes.  This is Number 8.  Go
7  quickly, Number 8, Page 68.
8          I'm impressed by the work we
9  have in running this technical screen.
10 We're getting them right up here and I'm
11 rushing through a series of maybe eight,
12 ten more documents.
13          It says here -- do you
14 remember Mr. Beck got to sort of the
15 middle of the paragraph.  I wish I had a
16 laser pointer.  It was right there where
17 he was talking about the VIGOR trial,
18 enrolling these.  Remember that's what
19 you were dealing with?
20     A.   Yes.
21     Q.   But I'd like you to go to
22 the top of the next column -- and by the
23 way, you were talking there about whether
24 naproxen was cardioprotective, and Mr.

KS-000430

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 522

1  Beck in his questions was suggesting to
2  you, well, maybe you're not correct.  Do
3  you recall that?
4            MR. BECK:  I'm going to
5       object to the form.
6  BY MR. KLINE:
7       Q.   Do you recall that exchange?
8       A.   Yes, I do.
9       Q.   Is that how you interpreted
10 that exchange, sir?
11           MR. BECK:  Object to the
12      form of the question.
13 BY MR. KLINE:
14      Q.   Did you understand his
15 questions to suggest or challenge whether
16 you were correct on naproxen?
17           MR. BECK:  Same objection.
18           THE WITNESS:  Yes, I did.
19 BY MR. KLINE:
20      Q.   Here's my question to you,
21 sir.
22           In that very paragraph, not
23 in the article, not in the end, not in
24 the conclusions, in the very same

Page 523

1  paragraph at the end it says, "These
2  studies ,"referring to what studies?
3       A.   Studies above, the ones we
4  were talking about.
5       Q.   Which were what, VIGOR?
6       A.   Yes.  VIGOR and -- I guess
7  we're talking about VIGOR.  And it looks
8  like there are several other referenced
9  studies there which we'd have to go to
10 the bibliography to see what those refer
11 to.
12      Q.   These studies, including
13 VIGOR, which is what Mr. Beck was
14 focusing on with you, correct?
15      A.   Correct.
16           MR. BECK:  Object to form.
17      That's simply false,
18 BY MR. KLINE:
19      Q.   Maybe I should stand
20 corrected.  Was he referring, as you
21 understood it, to anything other than
22 VIGOR at the time when he was questioning
23 you?
24      A.   My understanding was he was

Page 524

1  referring to the entire paragraph.  VIGOR
2  is in that paragraph.  And VIGOR supplies
3  most of the data, and VIGOR is the most
4  reliable data because it is the biggest
5  study.
6       Q.   Look at what the last
7  sentence of the paragraph says.  "These
8  studies suggest that any potential
9  protective effect of naproxen does not
10 fully account for the findings in the
11 VIGOR study." True?
12      A.   Definitely true.
13      Q.   That was published in 2003,
14 correct?
15      A.   Yes.  And it was based on a
16 symposium that occurred in August of
17 2002.
18      Q.   That's the other thing.  If
19 we can have the front of the article.
20 There was a lot of testimony about what
21 it was and what it wasn't.  It's up on
22 top, sir, IPSE commentary.  It doesn't
23 pretend to be a peer-reviewed journal
24 article, does it?

Page 525

1            MR. BECK:  Object to the
2       form of the question.
3            THE WITNESS:  Not to a
4       traditional scientific article,
5       but it does undergo some form of
6       peer review, but it's not as
7       stringent.
8  BY MR. KLINE:
9       Q.   Now, Next.
10           I'd like to put back up very
11 briefly the piece of your Advisory
12 Committee hearing, which is 114.  It's
13 the Advisory Committee document?
14           MR. BECK:  Can I see what
15      you are talking about?
16           MR. KLINE:  Yes, sure, Phil.
17      You used it.
18           THE WITNESS:  Is it number
19      5?
20 BY MR. KLINE:
21      Q.   Yes, sir.  Yes, it's the
22 PowerPoint.
23           Now, this PowerPoint was
24 given in 2005 over a year ago.  We now

KS-000431

132 (Pages 522 to 525)

Confidential - Subject to Protective Order

Page 526

1   see in front of us what Mr. Beck had
2   highlighted for the members of the jury,
3   correct?
4       A.   Yes.
5       Q.   Is that what we had
6   highlighted or he had highlighted?
7       A.   He highlighted a lot of
8   things.
9           MR. BECK:  I object, because
10      it's not what I highlighted.
11          MR. KLINE:  Okay, then I
12      stand corrected.
13  BY MR. KLINE:
14      Q.   Now, let's look at it in
15  totality.  Your testimony with him, I
16  believe you had a long discussion about
17  the Ray numbers, 1.02 with .76 to 1.37
18  confidence intervals.  Do you see that?
19      A.   Yes.
20      Q.   But let's look down the all
21  doses.  After all, the drug is taken at
22  all doses by -- over the whole
23  population, correct?
24          MR. BECK:  Object to the

Page 527

1       form.
2           THE WITNESS:  Yes.
3   BY MR. KLINE:
4       Q.   Is the drug taken at all
5   doses?
6       A.   Yes, it is.
7       Q.   Let's look.  The Graham
8   study, 1.34.  That means for every
9   thousand not on the drug, 1,340
10  statistically have an incidence, correct?
11      A.   Yes.  It's increased.
12      Q.   By a whisker it's not
13  statistically significant, correct?
14      A.   Right.  This is an example
15  of having 94 bullets in the chamber as
16  opposed to 95.
17      Q.   The Solomon study,
18  statistically significant increased risk,
19  correct?
20      A.   Yes.
21      Q.   The Kimmel study,
22  statistically significant increased risk,
23  correct?
24      A.   Umm.

Page 528

1       Q.   I'm sorry, no.
2       A.   It's not statistically
3   significant.
4       Q.   But it's showing a trend?
5       A.   The point estimate is
6   elevated.
7           MR. BECK:  Can we have for
8       completeness the one you just
9       skipped over in there?
10          MR. KLINE:  The Mamdani
11      study.
12          THE WITNESS:  The Mamdani.
13          MR. KLINE:  1.00, neutral.
14  BY MR. KLINE:
15      Q.   Ingenix, 1.41 with
16  statistically significant confidence
17  intervals at all doses, correct?
18      A.   Yes.  And this was a
19  Merck-funded study.
20      Q.   Merck-funded study?
21      A.   Yes.  The Ingenix study was
22  funded by Merck.  I don't -- I was told
23  that the publication of this study was
24  being held up by Merck because of some

Page 529

1   sort of contractual arrangement that it
2   had with the Ingenix company.  And as a
3   result, it sort of delayed the
4   publication of those results.  That was
5   what the scuttlebutt was in the academic
6   community, and that was where I was told
7   about it.
8           MR. BECK:  I can't help but
9       I have to move to strike no matter
10      what.
11  BY MR. KLINE:
12      Q.   Does the Ingenix/Merck study
13  demonstrate a statistically significant
14  increased risk of heart attacks and
15  cardiac events with the drug Vioxx, their
16  own funded epidemiology study?
17          MR. BECK:  Object, beyond
18      the scope of cross.
19          THE WITNESS:  Now, this
20      study shows an overall increased
21      risk and an increased risk with
22      the lower doses of Vioxx as well.
23      If you were to look at this study
24      in terms of the timing of when

Confidential - Subject to Protective Order

Page 530

1    heart attacks occurred, this is
2    one of the studies that you can
3    look at the data and see that the
4    risk is present in a time period
5    of one year or less.
6  BY MR. KLINE:
7        Q.   And, sir, that study
8  eventually was published.  Was it
9  published in the peer-reviewed medical
10 literature?
11       A.   Yes, it was.
12       Q.   Does that very study funded
13 by Merck support your very conclusion
14 that the drug is unsafe?
15           MR. BECK:  Object to form
16       and scope.
17 BY MR. KLINE:
18       Q.   You may.
19       A.   This study supports that
20 position.
21       Q.   When was it published, do
22 you know, the Ingenix study?
23       A.   Golly.  Was it 2005?  The
24 first author is, I think, the Valentgas.

Page 531

1        Q.   Next, the Medi-Cal study,
2  sir, were you involved in that study?
3        A.   Yes.
4        Q.   We haven't even touched that
5  study today.
6            MR. BECK:  Therefore, I
7        object as being beyond the scope
8        of cross.
9            MR. KLINE:  You put that
10       document in front and selected
11       from it.  How could it possibly be
12       beyond the scope?
13 BY MR. KLINE:
14       Q.   Here's my question.  From
15 the very document that Mr. Beck wanted to
16 examine you on partially, and in the
17 spirit of optional completeness, a
18 doctrine under Federal Rule 106 and
19 actually the Texas civil -- the Texas
20 criminal code, under that code in the
21 spirit of getting it all out in front of
22 everyone, I ask you the next question.
23 Here it goes.
24           The Medi-Cal study --

Page 532

1            MR. BECK:  Are you proposing
2        that that is part of anything that
3        gets played to the jury?
4            MR. KLINE:  No.  Of course
5        not.  I was just trying not to go
6        off the record and make my
7        argument in case I needed to
8        remember it.  Thanks for being
9        patient with me, everyone.  It's
10       late.  It is 8:00 at night.
11 BY MR. KLINE:
12       Q.   The Medi-Cal study, 1.32
13 relative risk with a 1.22 to 1.42
14 confidence interval, statistically
15 significant, sir?
16       A.   Yes, very much so.
17       Q.   Increased relative risk of
18 heart attacks and other coronary events
19 when you take the drug Vioxx?
20       A.   Yes.
21           MR. BECK:  Object to the
22       form and scope.
23           THE WITNESS:  One other
24       point on this study is we showed a

Page 533

1    dose response of increased risk
2    going from the 12-and-a-half
3    milligram dose, which is the
4    lowest dose, up through doses of
5    50 milligrams per day.
6            MR. BECK:  Now I'm going to
7        state something for the record.
8        That one of the reasons why this
9        is objectionable on scope grounds
10       is I'm hearing volunteer testimony
11       about scuttlebutt in addition to
12       little details that if you had
13       asked on direct, I could have
14       crossed him on.  And I can't cross
15       him because he's volunteering this
16       to questions that are beyond the
17       scope of the cross.
18 BY MR. KLINE:
19       Q.   Dr. Graham, as to anything
20 that you would be trying to say that
21 would be something that someone said or
22 scuttlebutt or something like that,
23 please just refrain.  I just want to get
24 these questions out, just like Mr. Beck

KS-000433

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 534

1    did, frankly.
2        A.   Okay.
3        Q.   On these particular
4    questions, I'm going to have no problem
5    in this area to try to extract that
6    testimony to get to the core of what
7    you're saying.
8            My purpose is to examine
9    this entire document, which Mr. Beck had
10   examined you on.
11           Now, taking the totality of
12   the studies, not just the Ray figures for
13   1.02 for 25 milligram dose that you were
14   examined on, but taking the totality of
15   the studies, first of all, are many of
16   these studies in any event underpowered?
17           MR. BECK:  Object to the
18       form.
19           THE WITNESS:  These studies
20       are -- have much more power than
21       clinical trials do.  Some of these
22       studies have more power than
23       others.
24   BY MR. KLINE:

Page 535

1        Q.   Taking the totality of the
2    data, do you as epidemiologists take,
3    rather than just looking at the Ray
4    statistic for picking one thing out of
5    the chart, taking the totality of the
6    data at all doses, what does it tell you
7    about the drug Vioxx?
8        A.   Vioxx increases the risk of
9    heart attack.
10       Q.   And, sir, in the Ingenix
11   study, to pick that study, 1.41, compare
12   it in thousands.  If there were 1,000
13   people who were not on Vioxx, how many
14   incidents would there be of someone on
15   Vioxx per thousand?
16           MR. BECK:  I'm going to
17       object.
18   BY MR. KLINE:
19       Q.   Please, sir.
20           MR. BECK:  Same grounds as
21       before.
22           THE WITNESS:  The way to
23       describe it is if you had 1,000
24       people who had a heart attack not

Page 536

1        taking Vioxx, not taking any drug,
2        there would be 1410, roughly, who
3        had heart attacks on Vioxx.  It
4        would be an additional 410 heart
5        attacks for every 1,000 heart
6        attacks.
7    BY MR. KLINE:
8        Q.   Moving to the next area that
9    was opened up by Mr. Beck.
10           MR. BECK:  I just move to
11       strike.  I mean, I'm sorry, I
12       can't let you give speeches
13       between each one.  I object and
14       move to strike the colloquy.
15   BY MR. KLINE:
16       Q.   Next question, next area of
17   examination, sir.
18       A.   Different document?
19       Q.   Yes.  Different document.
20           I want to go to your
21   article -- actually, I want you to get
22   your article out in the context, that's
23   Graham Exhibit Number 4.  I want you to
24   get it out in the context -- in front of

Page 537

1    us in the context of Mr. Beck's
2    questioning about -- he put up a chart,
3    he didn't mark it, and I don't have
4    access to it, but it was the less than 25
5    versus remote use, less than 25 or
6    greater than 25 remote use.  Do you
7    remember the questioning in that area?
8        A.   Yes, I do.
9        Q.   He was asking you questions
10   about whether the Kaiser study showed
11   statistically significant increases of
12   relative risks.  And he broke it down
13   into a chart which he then examined you
14   on, and there was the technological
15   capacity.  I kind of liked it, actually,
16   where he would flash up the different
17   numbers as you went along?
18       A.   Yes, I remember.
19       Q.   Here's what I'd like to do.
20   Eventually there were actual published
21   numbers in the Kaiser report, correct?
22       A.   Correct.
23       Q.   And I'd like to turn to the
24   table, sir.  It's Table Number 3 on Page

KS-000434

Confidential - Subject to Protective Order

Page 538

1  478.
2        And I'd like to, following
3  the line of questioning that I had opened
4  up, talk to you about rofecoxib at all
5  doses.  Do you see it there, sir?
6  Rofecoxib, all doses.
7        A.   Yes, I do.
8        Q.   When you looked at all
9  doses -- and did Mr. Beck discuss with
10  you rofecoxib at all doses in your Kaiser
11  study?
12        A.   I don't recall that he did.
13             MR. BECK:  I'm going to
14        object as beyond the scope of
15        cross-examination.
16             MR. KLINE:  That's the
17        point.  That's the point.
18  BY MR. KLINE:
19        Q.   Let's look at the rofecoxib
20  on all doses rather than selecting out,
21  and I'll ask you a question.
22             Sir, when you look at
23  rofecoxib all doses --
24        A.   Are we talking about the top

Page 539

1  against remote use or the bottom --
2        Q.   I'm going to do both.  First
3  again, remote use, rofecoxib, all doses,
4  has a 1.39 relative risk with
5  statistically significant confidence
6  intervals.  I'm going to show the
7  operator where to go.
8        A.   Well, when I read that, it's
9  just on the cusp of statistical
10  significance.
11        Q.   Yes.  It's 1.39, with 1.05
12  to 1.83.
13        A.   Those are the unadjusted
14  numbers.
15        Q.   Please explain.
16        A.   That's the crude odds ratio.
17  We had to take into account the
18  distribution of risk factors for heart
19  disease and do what's called adjustment,
20  and so the column on -- the one to the
21  right of that where it says adjusted odds
22  ratios, that's sort of the final answer.
23  And there it's 1.34, and the lower bound
24  of the confidence interval is below 1,

Page 540

1  so, technically it's not statistically
2  significant.  But there's a p-value next
3  to it.  And what that p-value says is
4  that there's a 6.6 percent chance that
5  this result could have occurred by
6  chance, a 93.4 percent chance that it
7  didn't.  So, in other words, we go back
8  to my analogy.  We have 93 bullets in the
9  gun.
10        Q.   Let's go down below, sir,
11  again, following the same examination
12  that Mr. Beck did, only using your table
13  itself.  Rofecoxib greater than 25
14  milligrams.  Let's just roll out the
15  whole thing.  It is two down.  Rofecoxib
16  greater than 25 milligrams, 5.03 relative
17  risk, correct?
18        A.   Okay.  This is, again, an
19  unadjusted --
20        Q.   Yes.  Then we go to the
21  adjusted, 3.0.
22        A.   Correct.
23        Q.   Statistically significant?
24        A.   Yes.

Page 541

1        Q.   Does that mean, sir, for
2  every thousand heart attacks that occur
3  without Vioxx, 3,000 occur on Vioxx at
4  over 50 milligrams?
5        A.   That's what that would mean.
6        Q.   I'm sorry.  Over 25
7  milligrams.
8        A.   Yes.  That's what that would
9  mean.
10        Q.   Let's go down to the all
11  doses compared to Celebrex.  And if,
12  again, you can point him to it,
13  "rofecoxib, all doses."  Again, I'm just
14  following the same format that he
15  followed in his presentation on cross.
16             MR. BECK:  I object.  I
17        didn't do this comparison at all.
18  BY MR. KLINE:
19        Q.   Here's the question, sir.
20  1.59 when you adjust it, 1.59 relative
21  risk with statistically significant
22  confidence intervals.  Do you see it?
23        A.   Yes, I do.
24        Q.   That would mean for every

KS-000435

Confidential - Subject to Protective Order

Page 542

1  1,000 heart attacks on Celebrex, there
2  would be 1,590 on Vioxx, correct?
3      MR. BECK:  Object to the
4      form.
5      THE WITNESS:  That's what
6      that would mean.
7  BY MR. KLINE:
8      Q.   And for rofecoxib over 25,
9  to complete the four corners, 3.58,
10 meaning for every 1,000, and it's
11 statistically significant, correct?
12     A.   Yes, it is.
13     Q.   And by the way, that would
14 mean that for every 1,000 heart attacks
15 on Celebrex, somebody that was on
16 Celebrex, 3,580 heart attacks and
17 cardiovascular events on Vioxx, correct?
18     MR. BECK:  Object to the
19     form.
20     THE WITNESS:  That is
21     correct.
22 BY MR. KLINE:
23     Q.   Staggering, correct?
24     MR. BECK:  Object to the

Page 543

1      form.
2      THE WITNESS:  It was
3      staggering to me.
4  BY MR. KLINE:
5      Q.   Sir, when you look at these
6  kinds of numbers, these were your bottom
7  line conclusions, correct?
8      MR. BECK:  Object to the
9      form.
10 BY MR. KLINE:
11     Q.   Were these your bottom line
12 conclusions?
13     MR. BECK:  Same objection.
14     THE WITNESS:  These were my
15     bottom line conclusions.
16 BY MR. KLINE:
17     Q.   Not only yours, they were
18 those of you, Campen, Hui.  Who is Hui?
19     A.   Rita Hui was one of our
20 computer programmers from Kaiser.
21     Q.   Michael -- Michelle Spence?
22     A.   She's another computer
23 programmer from Kaiser.
24     Q.   Craig Cheetham?

Page 544

1      A.   He's a clinical pharmacist
2  from Kaiser.
3      Q.   Gerald Levy?
4      A.   He's a board certified
5  rheumatologist from Kaiser.
6      Q.   Stanford Shoor?
7      A.   He's a board certified
8  rheumatologist from Stanford.
9      Q.   And Wayne Ray?
10     A.   From Kaiser, I mean.
11     Q.   And Wayne Ray, the former
12 Merck consultant, correct?
13     MR. BECK:  Object to the
14     form.
15     THE WITNESS:  Yes.  And also
16     from Vanderbilt University.
17 BY MR. KLINE:
18     Q.   A prestigious school?
19     A.   Yes, very.
20     Q.   In this field?
21     A.   Very.
22     Q.   Next.
23     That's why you had to go to
24 Nashville for the ISPE conference.

Page 545

1      A.   I enjoyed Nashville.
2      Q.   Next.
3      You must be a country music
4  fan.
5      MR. BECK:  You could
6      actually get a room here.  What's
7      going on?
8      MR. KLINE:  What did you
9      say?
10     MR. BECK:  Let's move along.
11     MR. KLINE:  We are.
12 BY MR. KLINE:
13     Q.   Next issue.
14     Sir, I do want to focus on
15 something that Seligman said.  Do you
16 recall Seligman called your study an
17 excellent study and analysis of a complex
18 topic?
19     A.   I do.
20     Q.   Is that a fair way to
21 describe the study, an excellent study
22 and analysis of a complex topic?
23     MR. BECK:  Object to the
24     form.

KS-000436

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 546

1    THE WITNESS:  I thought that
2  it was a fair and accurate
3  assessment.
4  BY MR. KLINE:
5    Q.   Now, do you recall Mr. Beck
6  showing you various internal criticisms
7  as the study progressed internally in the
8  FDA?  Do you recall those line of
9  e-mails?
10    A.   Yes, I do.
11    Q.   Well, sir, you also had
12  e-mails which were between you and Dr.
13  Horton, the editor-in-chief of Lancet,
14  correct?
15    A.   That's correct.
16    Q.   Do you know who Elliot
17  Curfman is?
18    A.   I believe he's like a deputy
19  editor for the New England Journal of
20  Medicine.
21    Q.   I thought he's the
22  editor-in-chief.  Gregory Curfman?
23    A.   Greg Curfman.  I think he's
24  the deputy editor.  I thought that --

Page 547

1    Q.   All right.  Let's move on.
2  Horton, sir.
3  Editor-in-Chief of Lancet, correct?
4    A.   Yes.
5    Q.   Now, I just want to -- while
6  this was all going on, eventually there's
7  an endpoint.  The endpoint is that the
8  study is published, correct?
9    A.   Correct.
10    Q.   And by the way, the endpoint
11  for Vioxx is the drug is removed from the
12  market, correct?
13    A.   Correct.
14    Q.   So, who was right about this
15  whole thing, sir?
16    MR. BECK:  Object to the
17  form of the question.
18  BY MR. KLINE:
19    Q.   At the end of the day, who
20  was right?
21    MR. BECK:  Object to the
22  form of the question.
23  BY MR. KLINE:
24    Q.   Please, sir.

Page 548

1    A.   At the end of the day, I was
2  right.
3    One other thing to add, and
4  you can decide whether to strike it or
5  not.  In those e-mails, Dr. Galson
6  actually said to Dr. Horton that he
7  looked forward to reading our paper in
8  the peer-reviewed literature.
9    Q.   All right.
10    Now, next point, sir.
11    As far as Dr. Horton was
12  concerned --
13    You were correct for 12
14  other drugs, as well, weren't you?
15    A.   Yes.  It depends how you
16  want to count Bextra and Vioxx, but
17  correct.
18    - - -
19    (Whereupon, Deposition
20    Exhibit Graham-39, E-mails
21    FDACDER023033 - FDACDER023037,
22    was marked for identification.)
23    - - -
24  BY MR. KLINE:

Page 549

1    Q.   Now, Dr. Horton, sir, he
2  sent you an e-mail dated December 6,
3  2004 -- I'm sorry, November 15, 2004.
4    November 15, 2004.
5    A.   Does that have a number?
6    Q.   We're going to give it a
7  number.  It's an FDA CDER document, and I
8  want to ask you a couple of questions
9  about it very quickly.
10    Now, Mr. Beck had a
11  discussion with you of how -- Dr. Galson
12  was having discussions with Dr. Horton,
13  Galson from the FDA, Horton from the
14  Lancet, correct?
15    A.   Correct.
16    Q.   I would like the jury to see
17  what Dr. Horton thought of you and your
18  paper, which would be in the top e-mail
19  saying "David - This email from SG seems
20  to suggest that he has been misled by
21  others about your so-called refusal to
22  respond to AT's review."
23    What is "AT's review"?
24    A.   Anne Trontell.

KS-000437

Confidential - Subject to Protective Order

Page 550

1    Q.   "I think your e-mail
2  corrects the record clearly.  I think
3  also that the FDA is backing away from a
4  full scale public confrontation with
5  you."  Do you see that?
6    A.  Yes, I do.
7    Q.   You've seen this e-mail
8  before because you received it, correct?
9    A.  Correct.
10    Q.   It says -- do we not display
11  it?
12       MR. KLINE:  We are having
13    technical problems.
14  BY MR. KLINE:
15    Q.   It says here, "They know you
16  are a serious scientist, that we have
17  carefully reviewed your work, and that
18  they have to, in the end" -- "and that
19  they have to, in the end, follow the
20  science and not bend to their internal
21  politics."  Did I read that e-mail which
22  you received correctly?  Did I read it
23  correctly?
24    A.   Yes, you did.

Page 551

1    Q.   I see a smile on your face.
2  Why, sir?
3    A.   Because it's true.  And
4  because it addresses directly what I was
5  saying before about an organized campaign
6  by FDA officials to smear and discredit
7  me that began with my direct supervisors
8  and went as high as the commissioner of
9  FDA offering me a promotion to his office
10  all in the one-week period of time
11  preceding my Senate testimony.
12    Q.   Now, sir, when Dr. Horton
13  said to you "they," meaning the FDA,
14  "know you are a serious scientist," that
15  "we," the Lancet, "have carefully
16  reviewed your work, and that they have
17  to, in the end, follow the science and
18  not bend to their internal politics," at
19  the end of the day when your article was
20  published, indeed did that all come true?
21    A.   Yes and no.  I mean, you
22  have some of the end products of what
23  happened, but then you get memoranda such
24  as the one that Dr. Jenkins and Dr.

Page 552

1  Seligman wrote, which you can look at it
2  from the point of view of it being an
3  apologia that gives -- basically says all
4  the drugs have the same risk, so,
5  therefore, we don't offend any drug
6  company because basically we say they're
7  all the same, so then nobody has a
8  particular way to complain.  So, this
9  sets some of the record straight, but
10  then you have these other things that
11  persist despite that.
12    Q.   Now, sir, next area that was
13  discussed.
14       MR. BECK:  How much longer
15    do you have?
16       MR. KLINE:  I would say 15
17    minutes.
18  BY MR. KLINE:
19    Q.   Next issue is, you were
20  shown the memorandum from Seligman and
21  Trontell dated October 29.  It had an
22  executive summary.  Mr. Beck pointed out
23  some things that were critical.  Do you
24  recall that e-mail?

Page 553

1    A.   Yes, I do.
2    Q.   Now, was there a point by
3  point response by you?
4    A.   Yes, there was.  I mentioned
5  it before.  It's not among these
6  documents.
7    Q.   The point by point wasn't
8  shown to the jury, correct?
9    A.   As far as I'm aware.
10    Q.   Was the point by point
11  refutation of the scientific criticisms
12  that were made internally at the FDA, was
13  that shown to the Lancet, sir?
14    A.   Oh, it certainly was.
15    Q.   And it's a quite lengthy
16  document, isn't it?
17    A.   Yes.  It took me eight hours
18  to write.
19       MR. BECK:  Can I have a copy
20    of this?
21       MR. KLINE:  Yes, sure.
22       - - -
23       (Whereupon, Deposition
24    Exhibit Graham-40, E-mail

Confidential - Subject to Protective Order

Page 554

```
1        11-14-04, FDACDER022932 -
2     FDACDER022933; FDACDER021558 -
3     FDACDER021577 with attachment,
4     was marked for identification.)
5        - - -
6  BY MR. KLINE:
7        Q.   And my only point here,
8  because it certainly would take a long
9  time to go through it, if one were to go
10 through the document in bold type, for
11 every technical concern and consideration
12 that was raised, including what Mr. Beck
13 had referred to as inconsistencies and
14 data issues, did you address each and
15 every single one of them?
16       A.   Each and every one was
17 carefully and exhaustively explained.
18       Q.   Sir, did you also write an
19 extensive and exhaustive e-mail to Steve
20 Galson copying Seligman and Trontell
21 explaining in detail -- in fact, you talk
22 about eight solid hours completing your
23 response to each one of them?
24       A.   Yes, I did.
```

Page 555

```
1        Q.   Did your response, sir, to
2  all of the criticisms of Seligman and
3  Trontell satisfy the Lancet peer
4  reviewers and the editor-in-chief of
5  Lancet who published your study?
6        MR. BECK:  Object to the
7        form.
8        THE WITNESS:  Oh, it more
9        than satisfied them.
10 BY MR. KLINE:
11       Q.   But did it satisfy Merck?
12       MR. BECK:  Object to the
13       form of the question.
14       THE WITNESS:  I don't know
15       about that.  It must have
16       eventually satisfied FDA, as well,
17       because they eventually allowed
18       the study to be published without
19       fear of being fired.
20 BY MR. KLINE:
21       Q.   Now, there was another FDA
22 internal --
23       MR. BECK:  I'm going to
24       object.  We're now way past time
```

Page 556

```
1        and --
2        MR. KLINE:  I have about
3  three or four more areas to cover,
4  Phil.  I would appreciate the same
5  courtesy.
6        MR. BECK:  I went over by
7  about 15 minutes.  I think you are
8  about 40 minutes over.
9        MR. KLINE:  I don't think we
10 are that far over, otherwise, I'd
11 be hungrier.
12       MR. BECK:  Well, it is 8:30.
13       MR. KLINE:  I'm going to be
14 done in 10 minutes.  I promise
15 you.
16       - - -
17       (Whereupon, Deposition
18 Exhibit Graham-41, E-mails
19 FDACDER029127 - FDACDER029133,
20 was marked for identification.)
21       - - -
22 BY MR. KLINE:
23       Q.   Here we go.  The next
24 document I'd like to talk about.  There
```

Page 557

```
1  was another internal review of your paper
2  which was not discussed by Mr. Beck,
3  correct?  The -- how do you pronounce his
4  name?
5        A.   Stadel.
6        Q.   Who is Bruce Stadel?
7        A.   Bruce Stadel was, in my
8  opinion, the leading, most experienced
9  epidemiologist in all of FDA.  He was the
10 person who -- I'm sort of a very senior
11 epidemiologist at FDA.  I'm now the most
12 senior epidemiologist at FDA.  This is
13 the guy I went to when I had questions
14 about I'm not being sure about how to
15 analyze something or -- I hold him in
16 high esteem.
17       Q.   At the end of the day, sir,
18 marking this as Graham Exhibit Number
19 42 --
20       A.   This says 41.
21       MS. DAGOSTINO:  We already
22 marked it.
23       MR. KLINE:  We already
24 marked it.
```

KS-000439

Confidential - Subject to Protective Order

Page 558

1  BY MR. KLINE:
2       Q.   Exhibit Number 41 and on
3  Page 4 under recommendations.
4       A.   Yes.
5       Q.   The most senior
6  epidemiologist at the FDA, not Anne
7  Trontell, not Paul Seligman, not Dr.
8  Galson, but the senior, most senior
9  epidemiologist at the FDA says -- what
10  did he say about your study, sir?
11          MR. BECK:  I'm going to
12       object to the form, long colloquy
13       introducing the question.
14          THE WITNESS:  Dr. Stadel
15       said, "I think this is a very good
16       and important study and that the
17       results should be submitted for
18       publication."
19          Should I continue to read?
20  BY MR. KLINE:
21       Q.   No.  I mean, I'm fine with
22  it unless there's some reason to complete
23  it.
24          And that's what was done,

Page 559

1  correct?
2       A.   Ultimately, yes.
3       Q.   Sir, back to Exhibit 27.
4  We're preciously close to being done.
5          MR. BECK:  What's Exhibit
6       27?
7          MR. KLINE:  Exhibit 27,
8       Phil, is the memorandum from
9       Graham to Seligman, September 30,
10       '04.  You used it briefly.
11          MR. BECK:  Yes.
12  BY MR. KLINE:
13       Q.   Mr. Beck had asked you
14  questions about combining this with data.
15  Remember, you had a long discussion about
16  whether at the time there were only
17  27,785 cases as distinguished from the
18  larger number which you got later on in
19  your estimates.  That was the context of
20  the questioning.  Do you recall?
21       A.   Yes, I do.
22       Q.   Now, the question that I
23  have for you, sir, is what do you say in
24  the very last paragraph in your

Page 560

1  conclusions on Page 13, your bottom,
2  bottom line?
3       A.   The very last paragraph or
4  sentence?
5       Q.   Well, paragraph.
6       A.   Beginning with "Prior"?
7       Q.   Yes, sir.  Bates Number
8  22381.  Give us one minute to get it up
9  on screen.  Take your time to review it.
10          MR. KLINE:  We had to go to
11       a different presentation by way of
12       an Elmo here to get this document
13       to you.
14  BY MR. KLINE:
15       Q.   But your bottom line, would
16  you read it to the jury, sir, the report
17  that Mr. Beck had put in front of you.
18       A.   "Prior to today, my
19  conclusions regarding rofecoxib were that
20  high-dose use of the drug should be ended
21  and that lower-dose rofecoxib should not
22  be used by physicians or patients.  If
23  lower-dose rofecoxib remained on the
24  market, physicians and patients needed to

Page 561

1  understand that the risk of AMI and SCD"
2  that's acute myocardial infarction and
3  sudden cardiac death, "was substantially
4  increased and that there were safer
5  alternatives."
6  BY MR. KLINE:
7       Q.   And that's, sir, the way you
8  can tell people if there's an increased
9  risk and safer alternatives, is to put
10  what on to the label?
11       A.   Put a huge warning on it
12  that says exactly that.
13       Q.   Last thing, sir.
14          Music to counsel's ears.
15          MR. BECK:  But I've heard
16       that song several times before.
17          MR. KLINE:  But I never said
18       it exactly that way.  I said
19       preciously close.
20          Here we go.
21          I just have a video clip to
22       show to you.
23          MR. BECK:  I'm going to
24       object to showing a video clip,

KS-000440

Golkow Litigation Technologies - 877.DEPS.USA

Confidential - Subject to Protective Order

Page 562

1    especially when I don't have any
2    idea what it is.
3          MR. KLINE:  I think you will
4    know what it is.
5          THE WITNESS:  So, look at
6    the screen?
7          MR. BECK:  This is sand
8    bagging of the rankest order to
9    end a redirect examination with a
10   video clip.
11         MR. KLINE:  It is a video
12   clip from the Senate hearings
13   exactly in conformance with Judge
14   Fallon's order.  I'm going to play
15   a video clip, and I'm going to ask
16   you a question that relates to
17   your questions that you answered
18   to Mr. Beck.
19         MR. BECK:  And I'm going to
20   object.
21         MR. KLINE:  Exactly relating
22   to the questions.
23         There's an objection.  I've
24   stated my purpose, I've stated my

Page 563

1    basis.  Here it goes.
2          (Whereupon the following was
3    played:
4          "Vioxx is a terrible tragedy
5    and a profound regulatory failure.
6    I would argue that the FDA as
7    currently configured is incapable
8    of protecting America against
9    another Vioxx.  We are virtually
10   defenseless."
11   BY MR. KLINE:
12   Q.   Was that you, sir?
13   A.   It certainly was.
14   Q.   Was that Mr. Raymond
15   Gilmartin, former CEO, in the background
16   over your right shoulder?
17         MR. BECK:  I'm going to
18   object.  This has nothing to do
19   with anything done on
20   cross-examination.
21         THE WITNESS:  Yes, it was.
22   I introduced myself to him before
23   my testimony.
24   BY MR. KLINE:

Page 564

1    Q.   Sir, having had an
2    opportunity to testify here today on
3    direct and cross-examination, is there
4    anything that you answered on
5    cross-examination to Mr. Beck which
6    changes that very opinion that you gave
7    to the United States Congress?
8          MR. BECK:  Object to form
9    and to scope.
10         THE WITNESS:  Nothing
11   whatsoever.
12         MR. KLINE:  Last clip, sir.
13         (Whereupon the following was
14   played:
15         "Today in 2004 we're faced
16   with what may be the single
17   greatest drug safety catastrophe
18   in the history of this country."
19   BY MR. KLINE:
20   Q.   Is there anything, sir,
21   having been subjected to lawyers'
22   questions here, sir, for over seven,
23   pushing eight hours that changes the
24   opinion that you gave publicly to the

Page 565

1    senators in that hearing?
2          MR. BECK:  Object to the
3    form and also beyond the scope of
4    cross-examination.
5          THE WITNESS:  Nothing
6    whatsoever.
7          MR. KLINE:  Thank you, sir.
8    You've been patient with us.
9    Thank you very much.  No further
10   questions.  We're finished.
11         THE WITNESS:  Thank you and
12   good riddance.
13         THE VIDEOTAPE TECHNICIAN:
14   Stand by, please.  The time is
15   8:40.  We're off the record.
16         - - -
17         (Whereupon, the deposition
18   concluded at 8:40 p.m.)
19         - - -
20
21
22
23
24

KS-000441

Confidential - Subject to Protective Order

Page 566

```
1        C E R T I F I C A T E
2
3      I, LINDA L. GOLKOW, a Notary
    Public and Certified Shorthand Reporter
4   of the State of New Jersey, do hereby
    certify that prior to the commencement of
5   the examination, DAVID J. GRAHAM, M.D.,
    MPH was duly sworn by me to testify to
6   the truth, the whole truth and nothing
    but the truth.
7
8      I DO FURTHER CERTIFY that the
    foregoing is a verbatim transcript of the
9   testimony as taken stenographically by
    and before me at the time, place and on
10  the date hereinbefore set forth, to the
    best of my ability.
11
12     I DO FURTHER CERTIFY that I am
    neither a relative nor employee nor
13  attorney nor counsel of any of the
    parties to this action, and that I am
14  neither a relative nor employee of such
    attorney or counsel, and that I am not
15  financially interested in the action.
16
17
18
19  _____
    LINDA L. GOLKOW, CSR
20  Notary Number: 1060147
    Notary Expiration: 1-2-08
21  CSR Number: 30XI176200
    Dated: May 16, 2006
22
23
24
```

Page 568

```
1      - - - - - -
         E R R A T A
2      - - - - - -
3   PAGE  LINE  CHANGE
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
```

Page 567

```
1      ACKNOWLEDGMENT OF DEPONENT
2
3      I,_____, do
    hereby certify that I have read the
4   foregoing pages,  1 -569, and that the
    same is a correct transcription of the
5   answers given by me to the questions
    therein propounded, except for the
6   corrections or changes in form or
    substance, if any, noted in the attached
7   Errata Sheet.
8
9
10
11  _____
    DAVID J. GRAHAM, M.D., MPH      DATE
12
13
14
15
16  Subscribed and sworn
    to before me this
17        day of       , 20  .
18  My commission expires:
19
20  Notary Public
21
22
23
24
```

Page 569

```
1       LAWYER'S NOTES
2   PAGE  LINE
3   ____  ____  _____
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
```

KS-000442

143 (Pages 566 to 569)

Exhibit "34"

**Dagostino, Lisa S.**

| | |
|---|---|
| **From:** | Seeger, Chris [cseeger@seegerweiss.com] |
| **Sent:** | Wednesday, May 10, 2006 9:59 AM |
| **To:** | Kline, Thomas R.; Buchanan, David; SW Vioxx; cvtisi@aol.com; Dagostino, Lisa S.; Vioxx Small Group |
| **Subject:** | RE: Graham: My Take (12 hours later) |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

thanks to Tom, Chris, Lisa and all others who got us through this.   sounds like we've got stuff to work with.

-----Original Message-----
**From:** Kline, Thomas R. [mailto:Tom.Kline@KlineSpecter.com]
**Sent:** Wednesday, May 10, 2006 9:46 AM
**To:** Buchanan, David; SW Vioxx; cvtisi@aol.com; Dagostino, Lisa S.; Vioxx Small Group
**Subject:** Re: Graham: My Take (12 hours later)

Excellent report. And, thanks for the kind words. I would add that we should not designate the one or two questions I asked him on what was the story on Kaiser in the FDA. Then, there is no conceivable basis for about  2 hours of cross on Kaiser study showing Graham's paranoid side.
I agree with DRB's assessment that we got a lot more than Merck out of this deposition. Unfortunately, David Graham is no Eric Topol. When bootstraped behind Topol and if cut well, this will add to our artillery.

--------------------------
Sent from my BlackBerry Wireless Device

-----Original Message-----
From: Buchanan, David <dbuchanan@seegerweiss.com>
To: SW Vioxx <SWVioxx@seegerweiss.com>; Kline, Thomas R.; cvtisi@aol.com <cvtisi@aol.com>; Dagostino, Lisa S.
Sent: Wed May 10 09:42:20 2006
Subject: Graham: My Take (12 hours later)

The room was somewhat split at the end of the day on the dep.  It isn't one of those deps that can easily be called a homerun or an out.  For the most part, it was as expected.  However, there were some surprises.

On substance, we got the better of the hits.  He clearly conveyed that: (a) FDA is not a patient watchdog and far from the police Merck portrays them as, rather they're more like the "inside" man who looks for ways to get things approved and looks out for industry interests (he may have been a bit scary on this point though); (b) Vx was unsafe at all doses from short term use to long term use; (c) it never should have been approved and should have been taken off (I think he said these last two points); (d) a black box would have limited Merck's ability to do DTC and that a proper label could have been written to convey the risks and effect doctor behavior; (e) his study showed increased risk and he's never been subjected to this kind of abuse for expressing scientific opinion; (f) numbers and drug catastrophe—he affirmed and didn't waver on the number harmed by the drug (88,000 to 140,000 MIs and deaths) and said it was a reasonable or best estimate of the harm due to the drug.

In terms of cross, Beck painted him as a sloppy scientist (using the multiple iterations of Kaiser data and conclusions from it), with significant bias (he, Ray, and Topol are the Merck haters) who himself never even concluded that the 25mg dose was unsafe or should have been pulled.  He also painted him as a paranoid outlier scientist who thinks everyone is out to get him…actually, Graham painted himself as such, repeatedly saying that FDA engaged is a systematic campaign and conspiracy to smear and discredit him.  If he said that once, he said it 10 times.  Tom came nicely to the rescue on re-direct to deal with these, however.  Beck also went way, way beyond the scope of Fallon's order and if Fallon holds to his order Beck's 4 hour cross will get cut in half (or less).

KS-000443

Atmospherically, Graham generally lacked the passion in his positions and was very, very, VERY reluctant to turn the gun at Merck.  Merck was always identified passively.  It was, at times, a tooth extraction to get him to admit that it was the company who failed to study, failed to draft a proper label, dragged their feet, etc.  Kudos to Tom for finessing him on these points.  More generally, Tom did an excellent job on the dep both substantively and keeping Beck in check.  Tisi, Lisa, and Moshe—great job at every level on this, from getting it, working it up from every angle, and identifying, and to the extent possible, diffusing the landmines.  It was obvious to all who were there how much work went into this project at every level.  Beck was nicely surprised by some documents that Lisa found that his crew hadn't seen.

In the end, whether and how this plays will depend on the rulings from Fallon, Higbee, et al.  We should get a team together to cut it; it should also be focused.  We should also look at what needs to be cut and shown for experts.  There's plenty in there for our experts and some for there's.

**KS-000444**

Exhibit "35"

Confidential - Subject to Protective Order

Page 869

1                SUPERIOR COURT OF NEW JERSEY

                 LAW DIVISION - ATLANTIC COUNTY

2                        -   -   -

3      IN RE:   VIOXX LITIGATION : CASE NO. 619

4                        -   -   -

                     CONFIDENTIAL

5

                 SUBJECT TO PROTECTIVE ORDER

6

7                        -   -   -

                     June 30, 2005

8                        -   -   -

9           Continued videotape deposition of DEBORAH

10     SHAPIRO, Dr.P.H., held in the offices of Morgan

11     Lewis, 1701 Market Street, Philadelphia,

12     Pennsylvania 19103, commencing at 9:20 a.m., on the

13     above date, before Linda L. Golkow, a

14     Federally-Approved Registered Diplomate Reporter and

15     Certified Shorthand Reporter.

16

17                       -   -   -

18

19

20

21

22

23                ESQUIRE DEPOSITION SERVICES

                  1880 John F. Kennedy Boulevard

24                      15th Floor

                  Philadelphia, Pennsylvania 19103

25                    (215) 988-9191

**KS-000445**

Confidential - Subject to Protective Order

---

Page 870

```
1   A P P E A R A N C E S :
2
3       KLINE & SPECTER, P.C.
        BY: SHANIN SPECTER, ESQUIRE
4           and
        THOMAS R. KLINE, ESQUIRE
5           and
        LISA DAGOSTINO, M.D, J.D.
6           and
        R. MATTHEW PLONA, ESQUIRE
7       19th Floor
        1525 Locust Street
8       Philadelphia, Pennsylvania 19102
        (215) 772-1000
9       Counsel for the Plaintiffs
10
11      LOCKS LAW FIRM PLLC
        BY: MARK P. WEINGARTEN, ESQUIRE
12      110 East 55th Street
        New York, New York 10022
13      (212) 838-3333
        Counsel for Plaintiffs
14
15
        GOFORTH LEWIS SANFORD LLP
16      BY: CARLENE RHODES LEWIS, ESQUIRE
            and
17        SHELLY A. SANFORD, ESQUIRE
        Suite 2200
18      1111 Bagby
        Houston, Texas 77002
19      (713) 650-0022
        Counsel for Plaintiffs
20      (By Telephone)
21
22      KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
        BY: BRIAN L. CONDON, ESQUIRE
23      1633 Broadway
        New York, New York 10019-6799
24      (212) 506-1700
        Counsel for Plaintiffs
25      (By Telephone)
```

---

Page 871

```
1   A P P E A R A N C E S :  (CONTINUED)
2
3       HUGHES HUBBARD & REED, LLP
        BY: THEODORE V.H. MAYER, ESQUIRE
4           and
        LINDA B. EPSTEIN, ESQUIRE
5       One Battery Park Plaza
        New York, New York 10004-1482
6       (212) 837-6000
        Counsel for Merck & Co., Inc.
7       and the Witness, Deborah Shapiro, Dr.P.H.
8
9       WILLIAMS & CONNOLLY LLP
        BY: DAVID S. BLATT, ESQUIRE
10      725 Twelfth Street, N.W.
        Washington, D.C. 20005
11      (202) 434-5538
        Counsel for Merck & Company, Inc.
12      and the Witness, Deborah Shapiro, Dr.P.H.
13
14          - - -
15
16  A L S O  P R E S E N T :
17
18      SUZANNE M. GREGORY, ESQUIRE
        Merck & Co., Inc.
19      351 N. Sumneytown Pike
        North Wales, PA 19454-2505
20      (267) 305-6331
21
            - - -
22
23
24
25
```

---

Page 872

```
1           - - -
2       I N D E X
3   WITNESS                         PAGE NO.
4   DEBORAH SHAPIRO, DR.P.H.
5       By Mr. Mayer                 875
6       By Mr. Specter               964
7           - - -
8       E X H I B I T S
9   NO.         DESCRIPTION          PAGE NO.
10  Shapiro-78  Memo 10-4-99, "Interim    888
                Analysis of VIGOR -
11              Unblinded Minutes"
                MRK-CAI420369640 -
12              MRK-CAI420369641
13  Shapiro-79  Memo 11-18-99, "Interim   893
                Non-Endpoint Safety
14              Analysis of VIGOR -
                Unblinded Minutes"
15              LEH0114734 -
                LEH0114741
16
    Shapiro-80  E-mails               902
17              MRK-AAB060594 -
                MRK-AAB060595
18
    Shapiro-81  Memo 1-26-01          916
19              "Cardiovascular
                Meta-analysis: Examination
20              of Heterogeneity Among
                Studies"
21              MRK-AAB0095045 -
                MRK-AAB0095049
22
    Shapiro-82  Letter 1-8-01 with    918
23              attachments
                MRK-AGU0003701 -
24              MRK-AGU0003763
25  Shapiro-83  Letter 9-12-01        925
                MRK-AAB0009461
```

---

Page 873

```
1   Shapiro-84  "Risk of cardiovascular   926
                events and rofecoxib:
2               Cumulative meta-analysis,"
                (Juni, et al), Published
3               online November 5, 2004
                MRK-ABY0185233 -
4               MRK-ABY0185241
5   Shapiro-85  Memo 11-21-96 "Anticipated  936
                consequences of NSAID
6               antiplatelet effects on
                cardiovascular events and
7               effects of excluding
                low-dose aspirin use in the
8               Cox-2 GI Outcomes
                Megatrial"
9               MRK-AAX0002413 -
                MRK-AAX0002420
10
    Shapiro-86  "Standard Operating   946
11              Procedure for the
                Surveillance, Monitoring,
12              and Adjudication of Acute
                Thromboembolic Vascular
13              Events in Clinical Trials
                of COX-2 Specific
14              Inhibitors"
                MRK-AAB0029224 -
15              MRK-AAB0029273
16  Shapiro-87  Letter 5-10-02 with   963
                attachments
17              MRK-S0420000002 -
                MRK-S0420000008
18
    Shapiro-88  "Full Meta-Analysis"  972
19              MRK-ACF0000845 -
                MRK-ACF0000924
20
    Shapiro-89  E-mails               1008
21              MRK-ABH0017846 -
                MRK-ABH0017847
22
23
24
25
```

KS-000446

2 (Pages 870 to 873)

Confidential - Subject to Protective Order

Page 874

1           - - -
2           MR. MAYER:  I'm Ted Mayer with Hughes
3   Hubbard & Reed, here representing Merck.
4           With me is Linda Epstein also from
5   Hughes, Hubbard & Reed.
6           MR. BLATT:  David Blatt from Williams
7   & Connolly, representing Merck.
8           MS. GREGORY:  Sue Gregory from Merck.
9           MR. SPECTER:  Shanin Specter from
10  Kline & Specter, representing certain New Jersey
11  plaintiffs.
12          With me from Kline & Specter are Lisa
13  Dagostino and Matt Plona.
14          THE VIDEOTAPE TECHNICIAN:  We are now
15  on the record.  This is the continuation of the
16  deposition of Deborah Shapiro, Dr.P.H.
17          Today's date is June 30, 2005, and
18  the time is 9:20 a.m.
19          This is Videotape Number 1.
20          The court reporter will now swear in
21  the witness.
22          - - -
23          DEBORAH SHAPIRO, Dr.P.H., after
24          having been duly sworn, was
25          examined and testified as follows:

Page 875

1           - - -
2           EXAMINATION
3           - - -
4   BY MR. MAYER:
5       Q.   Good morning, Dr. Shapiro.  Could you
6   please introduce yourself.
7       A.   My name is Deborah Shapiro.
8       Q.   My name is Ted Mayer.  I'm a lawyer
9   representing Merck in this litigation.  I'm going to
10  ask you some questions this morning, starting with
11  where do you live, Dr. Shapiro?
12      A.   I live in Edison, New Jersey.
13      Q.   Are you married?
14      A.   Yes, I am.
15      Q.   Do you have children?
16      A.   Yes.
17      Q.   What do you have?
18      A.   I have two sons, aged 12 and 16.
19      Q.   Where do you work, Dr. Shapiro?
20      A.   I work at Merck in Rahway.
21      Q.   What do you do for Merck?
22      A.   I'm a biostatistician.
23      Q.   Could you tell us generally what
24  biostatisticians do?
25      A.   Biostatisticians design and analyze

Page 876

1   clinical trials, determining the results of those
2   studies.
3       Q.   Dr. Shapiro, let's step back for a
4   moment.  Could you tell us about your education
5   after high school?
6       A.   Sure.  I attended the University of
7   California and got a Bachelor's Degree there.  I did
8   a fifth year, which is required in California, to
9   obtain a secondary teaching credential for high
10  school math.  And then I attended Columbia
11  University, where I got both my Master's and
12  Doctorate in biostatistics.
13      Q.   How long have you worked at Merck?
14      A.   About 20 years.
15      Q.   How did you come to work at Merck?
16      A.   Well, I had worked at a
17  pharmaceutical company in California in a different
18  capacity, so, I was very interested in
19  pharmaceutical research.  When I started school my
20  first summer, I was looking for a summer job, and
21  Merck had an internship, so, I worked as an intern
22  there, and I thought it was a wonderful place.  I
23  returned the next summer, I worked part time there
24  while I was in school.  When I finished my
25  dissertation, they offered me a full-time job, and I

Page 877

1   was very happy to accept that.
2       Q.   What, if anything, attracted you to
3   the pharmaceutical industry as a place to work?
4       A.   To me it seemed to be, in my capacity
5   as a biostatistician, the perfect melding of science
6   and math.  I wanted to do something that was of
7   value to people that improved lives.  I enjoyed
8   thoroughly the research aspects and making a
9   contribution.
10      Q.   We're here today to talk primarily
11  about Vioxx, and you've worked on some Vioxx trials,
12  have you not?
13      A.   Yes.
14      Q.   Could you describe, have you worked
15  on any trials of other drugs besides Vioxx?
16      A.   Yes.
17      Q.   Could you describe briefly a couple
18  of the large clinical trials you may have worked on
19  that involved drugs other than Vioxx?
20      A.   Sure.  When I first started full time
21  at Merck, I worked on two drugs called Mevacor and
22  Zocor.  They are known as statin drugs, and they
23  were the first of their kind, and they made an
24  enormous difference in people's lives.  They prevent
25  cardiovascular morbidity and mortality, and they

KS-000447

Confidential - Subject to Protective Order

Page 878

1 have a very important effect.  So, I led the Zocor
2 original filing, and I worked on a megatrial for
3 Mevacor that showed a 37 percent reduction in
4 cardiovascular events.  Those were two important
5 drugs I worked on.
6         I also worked on Fosamax.  Fosamax is
7 a drug for osteoporosis, and an analysis I did for
8 that showed a 50 percent reduction in fractures.
9 And for women, elderly women, fractures lead to a
10 great deal of morbidity and mortality.  So, that was
11 another product I worked on.
12     Q.    How did you first become involved
13 with Vioxx?
14     A.    When the VIGOR study, which is the
15 GI, gastrointestinal outcomes study, was going to
16 begin, it needed an unblinded statistician.  I was
17 in charge of resources for my department, so, I was
18 aware of the fact that it needed someone to work on
19 it, and there wasn't anyone really available at the
20 time, but it also seemed to be an interesting,
21 challenging, exciting assignment, so I volunteered
22 for it.
23     Q.    Did that study have a name?
24     A.    VIGOR.
25     Q.    Approximately when was it that you

Page 879

1 first became involved with the VIGOR trial?
2     A.    1998.
3     Q.    What drugs were to be compared in the
4 VIGOR study?
5     A.    Vioxx was being compared to
6 naproxen.
7     Q.    What was the purpose of comparing
8 those medicines in the VIGOR study?
9     A.    We wanted to verify and prove the
10 COX-2 hypothesis, which was that these very serious
11 gastrointestinal side effects that are known to be
12 associated with traditional NSAIDs, nonsteroidal
13 anti-inflammatory drugs like ibuprofen and naproxen
14 and so on, to verify that the COX-2 inhibitor Vioxx
15 actually reduced the events of these serious
16 perforations, ulcers, obstructions and bleeds.
17     Q.    So, what types of gastrointestinal
18 side effects were tested in the VIGOR study?
19     A.    The ones I mentioned, the
20 perforations, ulcers, obstructions and bleeds, also
21 symptoms, gastrointestinal symptoms.
22     Q.    Are those common side effects of
23 anti-inflammatory drugs?
24     A.    Yes, they are a known side effect.
25     Q.    Was there a data and safety

Page 880

1 monitoring board or DSMB for the VIGOR trial?
2     A.    Yes.
3     Q.    Can you tell us what a data safety
4 monitoring board, a DSMB, is?
5     A.    Data safety monitoring board is a
6 group of experts, and in this case, external
7 experts, who are in charge of monitoring the safety
8 of the patients in the trial as the trial is ongoing
9 and the data is coming in.
10     Q.    What do you mean by "external
11 experts"?
12     A.    They were not Merck employees.
13     Q.    Was there a DSMB for the VIGOR trial?
14     A.    Yes.
15     Q.    Were the members of the DSMB medical
16 doctors?
17     A.    Four of them were medical doctors,
18 and the statistician had a Ph.D.
19     Q.    Just to be clear, Dr. Shapiro, are
20 you a medical doctor?
21     A.    No.
22     Q.    What is your doctorate?
23     A.    My doctorate is in biostatistics.
24     Q.    Did the DSMB in VIGOR meet from time
25 to time?

Page 881

1     A.    Yes.
2     Q.    How many times did it meet?
3     A.    There were a total of four meetings.
4 The first one was kind of a setup meeting and an
5 open meeting, and then there were three other
6 meetings that were closed meetings.
7     Q.    Did you attend all of those meetings?
8     A.    Yes.
9     Q.    Could the DSMB make decisions or
10 recommendations regarding the VIGOR study?
11     A.    They could make recommendations.
12 They weren't charged with making the decisions.
13 They would refer any recommendations to a different
14 external group, but they were charged with making
15 any recommendations they wanted to alter the conduct
16 of the trial.
17     Q.    What kind of recommendations could
18 they make?
19     A.    They can recommend stopping a trial,
20 or they can recommend things as changing the entry
21 criteria of a trial or asking for different analyses
22 than were previously planned.  Pretty much anything
23 they want to.
24     Q.    What role did you have in the VIGOR
25 study?

**KS-000448**

Confidential - Subject to Protective Order

Page 882

1    A.    I was a nonvoting member, and my role
2  was to perform analyses and to provide any
3  information that the DSMB required.
4    Q.    So, you were a non -- I asked you
5  what your role in the study was, but I think you
6  answered what your role in the DSMB was.
7    A.    I'm sorry.
8    Q.    Let me break that down to two
9  questions.
10        First, what was your role in the
11  VIGOR study as a whole?
12    A.    I was the unblinded statistician in
13  the VIGOR study, which meant that I performed
14  analyses.  And for the VIGOR trial, I was considered
15  to report to the DSMB and not to Merck for the
16  purposes of that trial.
17    Q.    What does it mean to be unblinded?
18    A.    That meant I was the only person at
19  Merck who knew what treatment people were taking.  I
20  knew the treatment assignments for all of the
21  individual patients.  No one else at Merck knew any
22  information at all about treatment assignment.  They
23  didn't know that this group of people was in one
24  treatment group and this group was in another.  They
25  just had no information at all.  Only I knew.

Page 883

1    Q.    You started to tell me about your
2  role with the DSMB specifically.  Could you explain
3  that again, please.
4    A.    Sure.  As I said, for the purposes of
5  the trial, I reported to the DSMB and did whatever
6  they needed me to do.  I performed analyses of the
7  interim data for their review, and if there was any
8  information that I was aware of, because I was at
9  Merck and knew what was going on with the rest of
10  the program, anything relevant to the trial, those
11  were things I informed them about.
12    Q.    Did you provide reports to the DSMB
13  of the data broken down by treatment group during
14  the course of the VIGOR trial?
15    A.    Yes, I did.
16    Q.    Did anyone else at Merck have access
17  to that data during the trial broken down by
18  treatment group?
19    A.    No one else did.
20    Q.    Did the DSMB ever vote on anything
21  while the VIGOR trial was ongoing?
22    A.    Yes.
23    Q.    What votes did they -- what did they
24  vote on?
25    A.    Typically in one of these situations,

Page 884

1  there will always be a vote on whether or not to
2  continue the trial as planned.  And so those were
3  the kinds of votes we had.
4    Q.    Now, were you still a Merck employee
5  during the VIGOR trial?
6    A.    Yes.
7    Q.    But who did you report to for
8  purposes of your analysis of the VIGOR data during
9  the VIGOR trial?
10    A.    It states in our guidelines and in my
11  training, when you serve in this role, special role
12  as unblinded statistician, you consider that you
13  report to the data safety monitoring board for that
14  trial, and you do not report to Merck.
15    Q.    Could you share the unblinded data
16  with anyone outside of the data safety monitoring
17  board?
18    A.    No.
19    Q.    Did you share it with anyone outside
20  the data safety monitoring board during the trial?
21    A.    No.
22    Q.    How did the DSMB learn of data from
23  the trial?
24    A.    I prepared written reports with
25  tables and figures and results of analyses, and I

Page 885

1  sent these out to them about a week before the
2  meeting so they had time to review them, and I sent
3  them with prepaid return FedEx envelopes so they
4  would come back to me after the meeting.
5    Q.    What sort of information was in those
6  data packages that you provided to the DSMB?
7    A.    Well, there was a certain amount of
8  information about patient status, how many patients
9  were enrolled and what age and gender and race, how
10  many patients had dropped out of the trial from the
11  different treatment groups, for what reason, and
12  then for the special analysis of the
13  gastrointestinal data, we only did that once, at a
14  planned formal interim analysis.  I provided all the
15  information, planned analyses of that data --
16        MR. CONDON:  Brian Condon, Kasowitz,
17  Benson, Torres & Friedman, New Jersey plaintiffs,
18  has joined the conference.
19        THE WITNESS:  So, I provided the
20  gastrointestinal information in that one report.  In
21  all the reports, I provided information on safety
22  data, adverse experience count data, blood pressure
23  data and so on.  So, many, many analyses of safety.
24  BY MR. MAYER:
25    Q.    Were those safety analyses broken

Confidential - Subject to Protective Order

Page 886

1    down by treatment group, in other words, by which
2    medicine the events occurred in?
3        A.    They were broken down by treatment
4    group. They were labeled treatments A and B.
5        Q.    How did you obtain that data?
6        A.    There were different sources for the
7    data. The treatment group assignment -- only I had,
8    and I had it on a password protected disk that I
9    used and kept locked when it wasn't in use. So,
10   that's where the treatment assignments were. I
11   combined that with information from the official
12   Merck database and also from this WAES database that
13   we mentioned the other day, it is called WAES. It
14   is worldwide adverse experience reporting system for
15   doing prompt reports. It's more up to date than the
16   official database in terms of adverse experience
17   data, so, I used that data, the official database
18   data and the treatment group assignments and merged
19   that together.
20       Q.    Did the DSMB know which group was
21   Vioxx and which group was naproxen?
22       A.    They did. They had stated early on
23   that they didn't want to be told that, but the first
24   analysis was of the gastrointestinal data, and it
25   showed very strong beneficial effects of treatment

Page 887

1    A, which they assumed was Vioxx and rightly assumed
2    was Vioxx. If they were assuming incorrectly, it
3    would have been important for me to tell them that
4    they were incorrect because it was showing an
5    important benefit. So, they assumed all the way
6    through that treatment A was Vioxx and treatment B
7    was naproxen.
8        Q.    Was that assumption correct?
9        A.    Yes.
10       Q.    When was the first meeting where data
11   from the trial was discussed?
12       A.    It was in October of 1999.
13       Q.    About how long had the VIGOR trial
14   been going on at that point?
15       A.    I believe the first patient had been
16   entered in January of that year, and there was a
17   data cutoff in September for that October meeting,
18   so, it had been going on for about nine months.
19       Q.    Dr. Shapiro, I'm going to hand you a
20   document that's been marked -- that we will ask be
21   marked as Shapiro Exhibit 78. We provided a copy
22   also to the plaintiff's counsel.
23            MR. MAYER: Would the reporter mark
24   this as Exhibit 78, please.
25                   - - -

Page 888

1            (Whereupon, Deposition Exhibit
2        Shapiro-78, Memo 10-4-99, "Interim
3        Analysis of VIGOR - Unblinded Minutes,"
4        MRK-CAI420369640 - MRK-CAI420369641, was
5        marked for identification.)
6                   - - -
7    BY MR. MAYER:
8        Q.    Dr. Shapiro, could you identify
9    Exhibit 78 for the record, please?
10       A.    Yes. It's the minutes from the first
11   meeting where we had data to present and review, and
12   it's the meeting where we discussed the
13   gastrointestinal analysis.
14       Q.    This document bears Bates Number
15   MRK-CAI420369640 to 41.
16            What's the date of the minutes?
17       A.    October 4, 1999.
18       Q.    When did the meeting take place?
19       A.    The previous day, October 3rd.
20       Q.    Did you attend that meeting, Dr.
21   Shapiro?
22       A.    Yes.
23       Q.    Had there been any reports of
24   gastrointestinal events by that time?
25       A.    Yes.

Page 889

1        Q.    Did you provide that data to the
2    DSMB?
3        A.    Yes, I did.
4        Q.    How would you characterize those
5    results?
6        A.    They were very positive. When you do
7    this type of analysis, you set up some criteria for
8    what might cause you to stop a trial for early --
9    for strong and dramatic benefit for the primary
10   endpoint, which was called confirmed PUBs, and those
11   are those perforations, ulcers and bleeds. The
12   primary endpoint of confirmed PUBs had actually
13   crossed that boundary and met the criteria for
14   stopping the trial. But we had another criteria
15   which was for confirmed complicated PUBs. The FDA
16   was very interested in this endpoint, and we also
17   needed strong evidence on that endpoint, and while
18   it was close, it didn't cross the boundary and meet
19   the criteria for stopping the trial. So, there was
20   about a 50 percent reduction in events.
21       Q.    Why would you stop a trial based on
22   the benefit of a medicine?
23       A.    If a medicine is having a strong
24   benefit, you would stop the trial because the
25   patients in the other treatment group aren't getting

Confidential - Subject to Protective Order

Page 890

1  that benefit, and you want to be able to make it
2  available to them, but also because you want to make
3  that information known to the public so they also
4  can benefit from that effect.
5      Q.   Had there been any reports of
6  cardiovascular events in patients in the VIGOR trial
7  by October 1999?
8      A.   Yes.
9      Q.   Did you provide that data to the DSMB
10  as well?
11      A.   Yes, I did.
12      Q.   Was there a difference at that point
13  in the rate of cardiovascular events or the number
14  of cardiovascular events between people taking Vioxx
15  and people taking naproxen?
16      A.   Yes, there was.
17      Q.   At the October 1999 meeting, did
18  anyone on the DSMB express any concern about the
19  cardiovascular results?
20          MR. SPECTER:  Objection.
21  BY MR. MAYER:
22      Q.   You may answer.
23      A.   No, they didn't.
24      Q.   In your experience, are the early
25  results in a trial always the same as what ends up

Page 891

1  being the final results?
2      A.   No.  As a matter of fact, they are
3  often quite different.  What you see early on often
4  changes in the course of a trial.  Early events
5  often are not indicative of what will happen later.
6      Q.   Did the members of the DSMB take a
7  vote at the October 1999 meeting as to whether the
8  trial should continue?
9      A.   Yes, they did.
10      Q.   What was that vote?
11      A.   It was a unanimous vote, five to
12  zero, to continue the trial as designed.
13      Q.   Did you have any say in that vote?
14      A.   No.
15      Q.   Did anyone at Merck have any say in
16  that vote?
17      A.   No.
18      Q.   When was the DSMB's next meeting?
19      A.   In November of 1999.
20      Q.   Did you provide any data to the DSMB
21  prior to that November 1999 meeting?
22      A.   Yes.
23      Q.   What did you provide to them?
24      A.   The focus of this was now on safety,
25  not the gastrointestinal events, which are also

Page 892

1  safety, but it was exclusive of the gastrointestinal
2  events, so, it was general safety in addition to the
3  same kinds of information I described earlier about
4  discontinuations and demographics, baseline
5  characteristics, but the focus was on safety.
6      Q.   Was that part of any plan that had
7  been arrived at in advance?
8      A.   Yes.
9      Q.   Between the October and -- so, what
10  did you provide to the DSMB prior to the meeting?
11      A.   I provided another report with
12  updated information.  It had the adverse experience
13  data, blood pressure data, et cetera.
14      Q.   Before that meeting, did anyone at
15  the DSMB ask you to do anything?
16      A.   Yes.
17      Q.   Who asked you?
18      A.   Dr. Jim Neaton.  He was the
19  statistician, the external statistician on the
20  board.
21      Q.   What did he ask you to do?
22          MR. SPECTER:  Objection, calls for
23  hearsay.
24  BY MR. MAYER:
25      Q.   You may answer.

Page 893

1      A.   He asked me to perform a number of
2  additional analyses of the cardiovascular data.
3      Q.   What analyses did you prepare, if
4  any?
5      A.   I prepared all the analyses that he
6  requested.
7                 - - -
8          (Whereupon, Deposition Exhibit
9      Shapiro-79, Memo 11-18-99, "Interim
10      Non-Endpoint Safety Analysis of VIGOR -
11      Unblinded Minutes," LEH0114734 -
12      LEH0114741, was marked for
13      identification.)
14                 - - -
15  BY MR. MAYER:
16      Q.   Let me show you a document that we've
17  marked Shapiro Exhibit 79.  It bears Bates Number
18  LEH0114734 through 741 and ask if you can identify
19  that, please.
20      A.   Yes.  These are the minutes from the
21  November 17 meeting.
22      Q.   I noticed that after the first two
23  pages of minutes there are some charts or data,
24  several pages of charts that are attached.  Could
25  you identify what those are?

**KS-000451**

Confidential - Subject to Protective Order

Page 894

1      A.     Those are the additional analyses
2   that Dr. Neaton asked me to perform.  I attached
3   them for the benefit of the members who had not yet
4   seen them because they came after the report.
5      Q.     Were the cardiovascular events in the
6   VIGOR trial a subject of discussion in the November
7   1999 DSMB meeting?
8      A.     Yes.
9      Q.     Could you characterize briefly what
10  was covered in the DSMB's discussion of the data?
11         MR. SPECTER:  Objection, calls for
12  hearsay.
13  BY MR. MAYER:
14     Q.     You may answer.
15     A.     The focus of the discussion was on
16  the cardiovascular events and the difference between
17  treatments A and B for that data.  There were more
18  events on treatment A.
19     Q.     What was the difference at that point
20  in time?
21     A.     There were 52 patients on Vioxx and
22  29 patients on naproxen who had serious
23  cardiovascular adverse experiences.
24     Q.     Were these confirmed events?
25     A.     No.

Page 895

1      Q.     How would you characterize them?
2      A.     These are events that are reported by
3   the study investigators, and they were part of this
4   prompt reporting system to make them more up to
5   date.  They were considered serious by the
6   investigator based on various criteria for judging
7   that.  They were their opinion of what the event had
8   been.  They weren't -- they had not yet been
9   reviewed by outside expert adjudicators.  They were
10  the investigator's opinion of what the event was.
11     Q.     What was the reaction of the DSMB
12  members to the difference in the number of
13  cardiovascular events as of this November 1999
14  meeting?
15         MR. SPECTER:  Objection, calls for
16  hearsay.
17  BY MR. MAYER:
18     Q.     You may answer.
19     A.     They were, of course, concerned about
20  the events and wanted to investigate them.  But they
21  also expressed the belief that this could well be
22  due to what the clinicians felt was a known
23  cardioprotective effect of naproxen and noted that
24  you couldn't distinguish in this trial the benefit
25  of one drug versus harm from another drug.

Page 896

1      Q.     Who raised the possibility that
2   naproxen could be cardioprotective?
3          MR. SPECTER:  Objection, calls for
4   hearsay.
5   BY MR. MAYER:
6      Q.     You may answer, Doctor.
7      A.     To the best of my recollection, it
8   was Dr. Weinblatt.
9      Q.     Did you, yourself, raise this idea or
10  this topic with the DSMB at any time?
11     A.     No, I did not.
12     Q.     Before this meeting with the VIGOR
13  DSMB in November of 1999, did you have any
14  information about naproxen being potentially
15  cardioprotective?
16     A.     No, other than I'm not positive when
17  I read that memo from Dr. Musliner that raised the
18  possibility.  I don't recall when I first read it,
19  but I know at this meeting that I did not know that
20  that was a possibility.  If I had read it, I didn't
21  remember it.
22     Q.     Did you mention anything about that
23  in this meeting?
24     A.     No.
25     Q.     Did you mention anything about that

Page 897

1   at any time to the members of the DSMB or any member
2   of the DSMB?
3      A.     No.
4      Q.     The minutes say, I'm referring to
5   Exhibit 79, "there is no ability in this trial to
6   distinguish between a potentially harmful effect of
7   Treatment A and the cardiovascular protective effect
8   of Treatment B due to its anti-platelet effects."
9   Do you see that?
10     A.     Yes.
11         MR. SPECTER:  Objection, failure to
12  read the entire sentence.
13  BY MR. MAYER:
14     Q.     Does that reflect what was said at
15  the meeting?
16     A.     Yes.
17     Q.     Let me just address Mr. Specter's
18  objection.  I will read this again.
19         "However, it was also noted that
20  there is no ability in this trial to distinguish
21  between a potentially harmful effect of Treatment A
22  and a cardioprotective effect of Treatment B due to
23  its anti-platelet effects."  Is that what the
24  minutes reflect?
25     A.     Yes.

**KS-000452**

Confidential - Subject to Protective Order

Page 898

1      Q.    Does that reflect the discussion of
2   the members of the DSMB at the meeting?
3      A.    Yes.
4      Q.    Did the DSMB vote at this November
5   1999 meeting on whether to stop the VIGOR trial?
6      A.    It doesn't record a vote, but there
7   was also concurrence by all members that they wanted
8   to, and it does reflect that the members wanted to
9   continue the trial.
10          MR. SPECTER:  Objection,
11   nonresponsive.
12   BY MR. MAYER:
13      Q.    Did you or anyone at Merck have any
14   say in that decision of the DSMB?
15      A.    No.
16      Q.    After the November 1999 meeting, did
17   the DSMB take any other action with respect to the
18   difference in the number of cardiovascular events
19   between the two treatment groups in the VIGOR trial?
20      A.    Yes.  They decided that they wanted
21   to do an additional analysis in about a month to
22   further examine the data, and they requested certain
23   additional analyses be done at that time.
24      Q.    Did they make any request of you, Dr.
25   Shapiro?

Page 899

1      A.    Yes.
2      Q.    What did they ask you to do?
3          MR. SPECTER:  Objection, calls for
4   hearsay.
5          THE WITNESS:  They asked me to
6   perform those analyses.  They wanted to look at
7   several subgroups of patients who were at higher
8   versus lower risk, and they had certain specific
9   requests of what kinds of endpoints they wanted me
10   to look at.  And so I did those analyses and
11   provided it to them.
12   BY MR. MAYER:
13      Q.    What was the next meeting of the
14   DSMB?
15      A.    I believe it was December -- yes, it
16   was December 20.
17      Q.    Those analyses you referred to, did
18   you provide those in advance of the meeting to the
19   members of the DSMB?
20      A.    Yes.
21      Q.    Let me show you a document that's
22   been marked Shapiro Exhibit 20, bearing Bates
23   Numbers MRK-AFL0000899 through 92 and ask if you can
24   identify it, Dr. Shapiro.
25      A.    Yes.  These are the minutes of the

Page 900

1   December 20th meeting.
2      Q.    Did the DSMB members discuss at this
3   December 1999 meeting the cardiovascular results for
4   the VIGOR trial?
5      A.    Yes.
6      Q.    What in particular was discussed?
7          MR. SPECTER:  Objection, calls for
8   hearsay.
9   BY MR. MAYER:
10      Q.    You may answer.
11      A.    They discussed the various analyses I
12   had performed.  They discussed the subgroup results
13   that noted that patients at higher risk have, as you
14   would expect, higher rates of events, but that the
15   relative risk, the difference between the
16   treatments, was similar whether you were at higher
17   or lower risk.  They discussed what they wanted to
18   have done next.
19      Q.    What did they want to have done next?
20      A.    Well, I told them about certain
21   things that were going on at Merck and the fact that
22   these data were being adjudicated and that there was
23   a plan for their analysis that had not yet been
24   written.  They wanted to make sure that plan was
25   written before any unblinding.  They wanted to make

Page 901

1   sure there was a separate analysis of the VIGOR data
2   from any other pooled analyses, and that without
3   doing something, that was not going to happen --
4   well, a separate analysis was going to happen, but
5   this plan was not being written.
6      Q.    Did they take any steps to ensure
7   that that would be done?
8      A.    Yes.
9      Q.    I'll come back to that in a moment,
10   but focusing first on these minutes, did the members
11   of DSMB express a view as to whether the trial
12   should be stopped based on the results?
13      A.    They did not believe the trial should
14   be stopped based on the results, and they also
15   expressed the belief that the differences they saw
16   might be due to a cardioprotective effect of
17   treatment B.
18      Q.    What was treatment B?
19      A.    I'm sorry, naproxen.
20      Q.    Was that the last meeting of the
21   DSMB, Dr. Shapiro?
22      A.    Yes.
23      Q.    Did the trial continue until its
24   conclusion?
25      A.    Yes.

KS-000453

9 (Pages 898 to 901)

Confidential - Subject to Protective Order

Page 902

1    Q.    I'm going to show you a document
2  that's been marked as Shapiro Exhibit 80.
3              - - -
4         (Whereupon, Deposition Exhibit
5         Shapiro-80, E-mails, MRK-AAB0060594 -
6         MRK-AAB0060595, was marked for
7         identification.)
8              - - -
9  BY MR. MAYER:
10   Q.    It bears Bates Numbers MRK-AAB0060594
11 to 595 and ask you if you can identify that
12 document, Dr. Shapiro.
13   A.    Yes.
14   Q.    What is it?
15   A.    It's an e-mail between one of the
16 members of the DSMB, Dr. David Bjorkman, and myself,
17 and it refers to the unblinding that we did with the
18 steering committee.  We invited the members of the
19 DSMB to attend by teleconference the unblinding of
20 the steering committee.
21   Q.    When did that take place?
22   A.    March 22nd.
23   Q.    Was the VIGOR trial concluded at that
24 time?
25   A.    Yes.

Page 903

1    Q.    Did Dr. Bjorkman say anything in that
2  e-mail whether the VIGOR cardiovascular results
3  could be explained by a protective effect of
4  naproxen?
5    A.    Yes.
6    Q.    What does he say?
7    A.    He said, "I think that the VIGOR
8  study unmasked the antithrombotic effects of
9  naproxen."
10   Q.    How did that square with the
11 discussion among the clinicians at the DSMB meetings
12 in November and December 1999?
13   A.    It confirmed their beliefs at that
14 time.
15   Q.    Now, you mentioned, getting back to
16 the December -- I'm done with that exhibit --
17 getting back to the December 1999 meeting, that the
18 DSMB wanted to take certain steps to ensure certain
19 analyses were done.  Is that a fair summary of what
20 you said?
21   A.    Yes.
22   Q.    What steps did the DSMB take to
23 communicate their desires?
24   A.    Dr. Weinblatt wrote a letter, he
25 dictated it, and I typed it, that was addressed to

Page 904

1  Drs. Reicin and Capizzi.
2    Q.    What was that letter about?
3    A.    The letter asked that a plan for how
4  the analysis of the adjudicated data would be
5  conducted would be provided.
6    Q.    What was the response?
7    A.    Dr. Reicin assured me and to tell him
8  that, yes, it would be developed.
9         MR. SPECTER:  Objection, calling for
10 hearsay.
11 BY MR. MAYER:
12   Q.    Was there any further response from
13 Dr. Reicin after that?
14   A.    Yes.  Because of the logistic
15 difficulties of getting the adjudicators together,
16 there were three different committees, there was a
17 lot of source documentation that are from outside
18 hospitals, not necessarily ones that are part of the
19 trial, it's not easy to put together all the
20 information for the adjudication, so, there was
21 concern about being able to do that in time.  And
22 there was also the feeling that VIGOR by itself was
23 underpowered to do an analysis just in VIGOR.  So,
24 there was a change to this assurance about getting
25 them adjudicated right away.

Page 905

1    Q.    How did the DSMB respond to that
2  change?
3    A.    They wrote another letter.
4    Q.    What did that -- what was the -- in
5  substance, what was that letter saying?
6    A.    It basically said that the
7  adjudications could take place later as long as the
8  plan was developed before unblinding and repeated
9  that they wanted a separate analysis of VIGOR.
10   Q.    Did Merck agree to do what the DSMB
11 asked?
12   A.    Yes.
13   Q.    Did Merck, in fact, wind up doing
14 that separate analysis of the VIGOR CV data as the
15 DSMB had asked?
16   A.    Yes.
17   Q.    Who wrote those two letters that you
18 described to Dr. Reicin?
19   A.    Dr. Weinblatt wrote them.  The first
20 one, the content was discussed at the meeting, and
21 the members derived what they wanted to be stated.
22 Then after the meeting, Dr. Weinblatt and I were on
23 the phone, and he dictated and I typed the letter.
24 The subsequent letter wasn't conferred among the
25 whole group.  Dr. Weinblatt took it upon himself to

Confidential - Subject to Protective Order

Page 906

1  speak for the group and dictated, and, again, I
2  typed the letter.
3      Q.    Was there any concern among the DSMB
4  that those letters might cause people at Merck to
5  learn something about the VIGOR data before the
6  unblinding?
7          MR. SPECTER:  Objection, calls for
8  hearsay.
9          THE WITNESS:  The first letter was
10  written in a manner that made it -- kept the level
11  very low key and talked about theoretical concerns,
12  so, purposely not to raise alarm bells.
13  BY MR. MAYER:
14      Q.    To your knowledge, was Dr. Reicin
15  unblinded by these letters?
16      A.    No, she was not.
17      Q.    What's your basis for saying that?
18      A.    Her surprise when she was truly
19  unblinded.
20      Q.    Doctor, with regard to the
21  unblinding, were you contacted by anyone at Merck
22  about the VIGOR results while the results were still
23  blinded to the company?
24      A.    Yes.
25      Q.    Who contacted you?

Page 907

1      A.    Dr. Scolnick.
2      Q.    Who was Dr. Scolnick at that time?
3      A.    He was the president of Merck
4  Research Labs.
5      Q.    How did Dr. Scolnick contact you?
6      A.    He sent me an e-mail.
7      Q.    I'm going to show you a document
8  that's marked as Shapiro Exhibit 28, it bears Bates
9  Numbers MRK-NJ0130083 to 87, and ask if you can
10  identify that.
11      A.    Yes.
12      Q.    What is that?
13      A.    It's the e-mail that Dr. Scolnick
14  wrote me and contains my replies and his replies.
15      Q.    What's the date of that exchange?
16      A.    February 11th of 2000.
17      Q.    Was the VIGOR trial close to
18  completion at that point?
19      A.    Yes.
20      Q.    What did you understand Dr. Scolnick
21  to be asking?
22      A.    Well, Dr. Scolnick does not state
23  that he wants me to tell him the results of VIGOR,
24  but one could infer that he meant that, and it's a
25  possibility that he meant that.  He talked about me

Page 908

1  contacting him confidentially and gave me phone
2  numbers and so on to do that.
3      Q.    What did you do, if anything, in
4  response to this e-mail?
5      A.    I wrote him a reply that reiterated
6  our standard operating procedure that I reported to
7  the VIGOR DSMB and not to Merck during the course of
8  the trial, that as such, no one could know the
9  results, that the unblinding would take place on
10  March 9th or March 22nd to this small team in the
11  next -- to the steering committee, and that he was
12  welcome to join one of the official unblindings.
13      Q.    How did he respond to that?
14      A.    He accepted immediately.
15      Q.    Did you ever unblind him or anyone
16  else to the results prior to the official unblinding
17  on March 9th?
18      A.    No, I did not.
19      Q.    Thank you.  I'm done with that
20  exhibit.
21          Let me change topics a bit.
22          Did there come a time after the
23  conclusion of the VIGOR study when you were involved
24  in conducting a pooled analysis of cardiovascular
25  thrombotic events in Vioxx clinical trials?

Page 909

1      A.    Yes.
2      Q.    What is a pooled analysis?
3      A.    It's an analysis that combines, after
4  properly accounting for the differences in protocols
5  and blocks, but it combines analysis from many
6  trials in order to get a full picture of what had
7  happened, to get more precise estimates, to evaluate
8  all the information as opposed to pieces of the
9  information.
10      Q.    Do you have an understanding as to
11  why Merck conducted a pooled analysis of
12  cardiovascular data in the Vioxx program?
13      A.    Yes.
14      Q.    What's that understanding?
15      A.    When we observed the results in VIGOR
16  and also looked at some of the other large trials
17  that were going on or had completed, we sent that
18  information out to a number of consultants to get
19  their feedback, their ideas, et cetera, on how to
20  proceed.  One of them, Dr. Rory Collins, suggested
21  that we do a formal meta-analysis, and also it is
22  the natural thing to do in such a circumstance when
23  you have a piece of information like this, to look
24  at the rest of your data to see what it tells you.
25      Q.    Who is Rory Collins?

KS-000455

11 (Pages 906 to 909)

Confidential - Subject to Protective Order

1    A.    Rory Collins is a clinician who -- a
2  well-known clinical trialist with Oxford University.
3  He's been involved in a number of very large
4  cardiovascular studies.
5    Q.    Did outside consultants advise Merck
6  with regard to the conduct of the pooled analysis?
7    A.    Yes.
8    Q.    How did Merck become aware of the
9  advice of outside consultants?
10    A.    We had a meeting in October of 2000
11  with these consultants.
12    Q.    Were you present at the meeting?
13    A.    Yes.
14    Q.    Let me show you a document that has
15  been marked as Shapiro Number 53 and ask you if you
16  can identify that.
17    A.    Yes.
18    Q.    Can you identify it?  This is a
19  document that bears Bates Numbers MRK-NJ0070364 to
20  397.  Can you identify for us what this is?
21    A.    It's a PowerPoint presentation of the
22  results of a preliminary version of the
23  cardiovascular meta-analysis that I performed for
24  Vioxx.
25    Q.    Did you prepare and present this

1  presentation?
2    A.    Yes.
3    Q.    On what day?
4    A.    October 18th, 2000.
5    Q.    To whom did you present it?
6    A.    To the cardiovascular consultants and
7  the other Merck employees that were present.
8    Q.    Why did you prepare it?
9    A.    To get their feedback on what we were
10  seeing and any ideas they had, opinions.
11    Q.    Do you remember which consultants
12  were present at that meeting in person or by phone?
13    A.    Yes.  Dr. Robert Califf, Dr. Rory
14  Collins, Dr. Konstam and Dr. Weisfeldt, I believe,
15  were the four consultants.
16    Q.    What was your role with regard to the
17  pooled analysis for Vioxx?
18    A.    Along with my programmer, I did the
19  analyses, I performed them, I created summary
20  tables.
21    Q.    Do you have training and experience
22  concerning data from how various trials can be
23  pooled together for scientific analysis?
24    A.    Yes, I do.
25    Q.    Did you also seek advice of others

1  within the company and outside experts with regard
2  to how to do that in this case?
3    A.    Yes, I did.
4    Q.    Is it scientifically legitimate to
5  combine data from different trials that may have
6  different protocols?
7    A.    Yes, but you need to perform certain
8  tests to assure that it's appropriate to do so.
9    Q.    What are some of the tests that you
10  use to ensure that you were pooling data in a manner
11  that was statistically appropriate?
12    A.    We looked at tests that looked for
13  something that's called heterogeneity, which really
14  just simply means differences that are so drastic
15  that you can be masking something if you combine
16  them.  So, we do a test like that that we looked at
17  over patients by various disease indications and
18  patients by trial protocol.
19    Q.    It's a test for heterogeneity.  What
20  does it mean if you pass the test for heterogeneity?
21    A.    If you pass the test, it means that
22  you can legitimately combine those data.
23    Q.    Can you draw meaningful comparisons
24  or conclusions from comparisons that fail the test
25  of heterogeneity?

1    A.    No.
2    Q.    Did you prepare for this consultants
3  meeting a pooled analysis of heart attack data
4  relative to Vioxx?
5    A.    Yes.
6    Q.    Can you please turn to the page
7  marked NJ0070396 with the header "MI Endpoint,
8  Rofecoxib Versus NSAIDs"?
9    A.    Yes.
10    Q.    Does this page relate to the pooled
11  analyses you prepared comparing rofecoxib to all
12  NSAIDs with a heart attack endpoint?
13    A.    Yes.
14    Q.    What analysis in particular is
15  reflected here?
16    A.    The most important one -- there's
17  several that show that the trials should not be
18  combined.  The most important one looked at the
19  difference between the trials that used naproxen and
20  the trials that used other NSAIDs.  There was a
21  highly significant, important difference between
22  those trials that means that you should not be
23  combining those trials and making summary inferences
24  based on that.
25    Q.    What does that say about whether a

KS-000456

Confidential - Subject to Protective Order

Page 914

1 comparison of Vioxx versus all NSAIDs including
2 naproxen for the heart attack endpoint was
3 meaningful?
4        A.    It means if you put all those trials
5 together, it is not meaningful to look at that
6 estimate.
7        Q.    If you'd turn the page, I guess back
8 a page to the page that has Bates Numbers ending in
9 395, you see at the top there is -- is this page
10 also part of the pooled heart attack analysis?
11       A.    Yes.
12       Q.    Do you see that at the top there
13 there's a comparison with all patients, rofecoxib
14 versus NSAIDS?
15       A.    Yes.
16       Q.    Is that a statistically meaningful
17 comparison based on everything you've just said?
18       A.    No.
19       Q.    Why not?
20       A.    Because it's combining the trials
21 where rofecoxib was compared to naproxen and the
22 trials where rofecoxib was compared to other NSAIDs.
23       Q.    Dr. Shapiro, please turn to, again,
24 earlier in the same exhibit, the page ending with
25 Bates Number -- the Bates Number ending with 390.

Page 915

1 It has the heading "MI Endpoint - Rofecoxib versus
2 Placebo."
3        A.    Yes.
4        Q.    Did you also conduct a comparison
5 between Vioxx and placebo with regard to heart
6 attack rates?
7        A.    Yes.
8        Q.    What did that comparison show or not
9 show?
10       A.    What it showed was that the trials
11 were combinable, there weren't differences that
12 meant you couldn't combine them, and it showed no
13 significant difference between rofecoxib and
14 placebo.
15       Q.    What feedback did your consultants
16 give you about your analyses?
17              MR. SPECTER: Objection, calls for
18 hearsay.
19              THE WITNESS: Well, the one that --
20 the feedback that was most important to me was from
21 Rory Collins, who felt that the way we were
22 arranging the patients in blocks was not the most
23 meaningful or useful way to arrange them, and he
24 suggested a different grouping and certain kinds of
25 modeling.

Page 916

1 BY MR. MAYER:
2        Q.    Did you follow --
3              MR. SPECTER: Objection,
4 nonresponsive.
5 BY MR. MAYER:
6        Q.    Did you follow that advice?
7        A.    Yes.
8        Q.    Did you redo the analysis taking into
9 account the advice of Dr. Collins?
10       A.    Yes.
11       Q.    Was that analysis as redone submitted
12 to the FDA?
13       A.    Yes.
14       Q.    When was that, approximately?
15       A.    January of 2001.
16       Q.    Let me show you a document that we'll
17 mark as -- are we up to 80 now?
18              MS. EPSTEIN: Yes, 81.
19               -  -  -
20              (Whereupon, Deposition Exhibit
21              Shapiro-81, Memo 1-26-01,
22              "Cardiovascular Meta-analysis:
23              Examination of Heterogeneity Among
24              Studies," MRK-AAB0095045 -
25              MRK-AAB0095049, was marked for

Page 917

1              identification.)
2               -  -  -
3 BY MR. MAYER:
4        Q.    Shapiro-81.  It bears Bates Numbers
5 MRK-AAB0095045 through 049.
6              Dr. Shapiro, could you identify this
7 Exhibit 81, please?
8        A.    Yes.  It's a memo that I wrote to Dr.
9 Silverman containing the results of two different
10 ways of looking at heterogeneity in the various
11 comparisons.
12       Q.    Briefly, what were you conveying to
13 Dr. Silverman in this memo?
14       A.    What we found was, we did a test of
15 heterogeneity among the blocks of patients, blocks
16 being disease indication, but we also did another
17 test that looked at a finer division, a division by
18 protocol.  And what it found was, with all cases
19 except for one, they were all very consistent.  The
20 one case where they were not consistent referred to
21 protocol 090 being the one that was driving the
22 difference.  090 went against Vioxx, and so despite
23 the lack -- or close to -- close to significant
24 heterogeneity, it was conservative to leave it in
25 because it went against Vioxx.  So, in that case we

KS-000457

Confidential - Subject to Protective Order

Page 918

1   left it in.
2       Q.    Let me show you a document that we'll
3   mark as Shapiro 82. It bears Bates Numbers
4   MRK-AGU0003701 through 3763.
5                   - - -
6           (Whereupon, Deposition Exhibit
7           Shapiro-82, Letter 1-8-01, with
8           attachments, MRK-AGU0003701 -
9           MRK-AGU0003763, was marked for
10          identification.)
11                  - - -
12  BY MR. MAYER:
13      Q.    I'd ask you if you can identify this
14  document, please.
15      A.    Yes. This is the meta-analysis that
16  was sent to the FDA in January of 2001.
17      Q.    Were all of the heart attack events
18  that you analyzed as part of the meta-analysis
19  included in this submission?
20      A.    Yes.
21      Q.    Can you show us where in this
22  document the heart attack data was provided?
23      A.    Yes. There was a section of the
24  document for each of the major comparisons, the
25  comparison to naproxen, the comparison to

Page 919

1   nonnaproxen NSAIDs, and the comparison to placebo.
2   Table 4 on Page 19 or the Bates Number ends in 3721,
3   that has in it a counts table that includes all the
4   heart attacks in the rofecoxib versus naproxen
5   comparison. Then if you go on to the other
6   comparisons, there are similar tables for each of
7   them. There's Table 8 for the comparison to
8   placebo, there's Table 6 for the comparison to
9   nonnaproxen NSAIDs, and in each one of these, it
10  shows all the heart attack data.
11      Q.    Is there also heart attack data
12  reflected --
13      A.    There might be more.
14      Q.    -- on Table 10 on Page 33?
15      A.    Yes. Let me see if there's another
16  one. And in Table 12, which is against any
17  comparison at all, any NSAID, any placebo.
18      Q.    Doctor, could you please turn to Page
19  4 of this document. The Bates Number ends in 706.
20      A.    I did.
21      Q.    Looking at the third paragraph on
22  this page, Doctor, what did Merck tell the FDA was
23  the driver of the difference in thrombotic events
24  between Vioxx and naproxen?
25      A.    Yes. The second sentence says, "This

Page 920

1   difference in thrombotic events was mostly
2   attributable to a difference in the incidence of
3   myocardial infarction (MI) between the groups."
4       Q.    What was the endpoint that you use
5   for purposes of the pooled analyses?
6       A.    It was called the APTC endpoint.
7       Q.    What does that stand for?
8       A.    Anti-platelet trialist collaborative.
9       Q.    What is that endpoint?
10      A.    It's an endpoint that has been used
11  in the literature by the investigators who are
12  conducting trials to show benefit of -- or to show
13  how aspirin works and also some other anti-platelet
14  drugs. It consists of heart attacks, strokes and
15  some other related events.
16      Q.    How did you come to select that as
17  the endpoint for the pooled analysis?
18      A.    It was our consultants, both
19  internally and externally, advised us that this was
20  the appropriate endpoint to use.
21          MR. SPECTER: Objection, hearsay.
22  BY MR. MAYER:
23      Q.    Was Merck in any way trying to hide
24  the MI results by conducting a pooled analysis with
25  the APTC endpoint?

Page 921

1       A.    No, we were not.
2           MR. MAYER: Off the record.
3           THE VIDEOTAPE TECHNICIAN: Off the
4   record at 10:15.
5                   - - -
6           (Whereupon, a recess was taken from
7           10:15 a.m. until 10:32 a.m.)
8                   - - -
9           THE VIDEOTAPE TECHNICIAN: Back on
10  the record at 10:32.
11  BY MR. MAYER:
12      Q.    Dr. Shapiro, was the pooled analysis
13  that you worked on of cardiovascular events across
14  Vioxx trials ever published?
15      A.    Yes.
16      Q.    Did you have a role in preparing the
17  published paper?
18      A.    Yes.
19      Q.    What was your role?
20      A.    I did all of the analyses that were
21  contained in the paper, and I wrote the statistical
22  methodology section, reviewed all the other parts.
23      Q.    Let me show you a document that's
24  been marked as Shapiro Number 68 and ask if you can
25  identify that document, Dr. Shapiro. It bears Bates

KS-000458

Confidential - Subject to Protective Order

Page 922

1 Numbers MRK-ABK02269182 --
2     A.     Mine doesn't have any Bates Numbers.
3     Q.     -- through 190.
4     A.     Ted, mine doesn't have Bates Numbers.
5     Q.     All right.  It is marked as Exhibit
6 68 --
7     A.     Yes.
8     Q.     -- and I'd ask you if you can
9 identify it.
10     A.     It is the paper that we wrote on the
11 meta-analysis, the pooled analysis.
12     Q.     Where was that published?
13     A.     In Circulation.
14     Q.     Who was the lead author of the paper?
15     A.     Dr. Marvin Konstam.
16     Q.     Is Dr. Konstam a Merck employee?
17     A.     No.
18     Q.     Who was Dr. Konstam?
19     A.     He was an external expert.
20     Q.     Does this paper reflect the
21 conclusions of your pooled analysis?
22     A.     Yes.
23     Q.     How many clinical trials involving
24 Vioxx did that pooled analysis include?
25     A.     23.

Page 923

1     Q.     How many patients were involved in
2 those trials?
3     A.     More than 28,000.
4     Q.     Was any trial of more than four weeks
5 in duration excluded from that analysis?
6     A.     No.
7     Q.     What conclusions did you and your
8 co-authors set forth in this paper concerning Vioxx?
9     A.     The conclusions we set forth were
10 that the differences that we observed with naproxen
11 were likely due to its anti-platelet effects, that
12 we found no evidence of an excess risk of CV events
13 when we compared rofecoxib to placebo or to
14 nonnaproxen NSAIDs.
15     Q.     What does that mean with regard to
16 the VIGOR study, if anything?
17     A.     The VIGOR study compared rofecoxib to
18 naproxen, and if naproxen was being protective, the
19 implication was that rofecoxib was having no effect
20 on the cardiovascular system.
21     Q.     When you say "rofecoxib," do you
22 mean --
23     A.     Vioxx.
24     Q.     On what data did you base those
25 conclusions, you and your co-authors in this paper?

Page 924

1     A.     Those 23 trials that we examined.
2     Q.     What did you look at with regard to
3 those 23 trials?
4     A.     We looked at the APTC endpoint and
5 its components.
6     Q.     Was this paper peer reviewed before
7 it was published?
8     A.     Yes, it was.
9     Q.     What does it mean to be peer reviewed
10 in general terms?
11     A.     The paper was sent by the editor of
12 the journal that we submitted it to to people that
13 work as experts for them and get their review and
14 comments on the acceptability of the paper and, if
15 acceptable, what changes they may want.
16     Q.     When was the paper first submitted to
17 Circulation?
18     A.     Either late August or early -- August
19 or September of 2001.
20     Q.     Let me show you a document that's
21 been marked Shapiro Exhibit 83 and ask you if you
22 can identify this document.  It bears Bates Number
23 MRK-AAB0009461.
24             - - -
25         (Whereupon, Deposition Exhibit

Page 925

1         Shapiro-83, Letter 9-12-01
2         MRK-AAB0009461, was marked for
3         identification.)
4             - - -
5         THE WITNESS:  Yes.  It's a letter
6 from the editor of Circulation to Dr. Konstam from
7 September 12th of 2000 discussing the manuscript and
8 that there were comments from reviewers on the
9 manuscript.
10 BY MR. MAYER:
11     Q.     Does this letter indicate whether the
12 pooled analysis article was subject to peer review?
13     A.     Yes.
14     Q.     What does it indicate in regard to
15 that?
16     A.     It states that "Your manuscript has
17 been reviewed by two reviewers and the editors."
18     Q.     Did you and the other authors revise
19 the paper to address the comments of the peer
20 reviewers and the editors?
21     A.     Yes, we did.
22     Q.     Was the manuscript resubmitted to
23 Circulation after that?
24     A.     Yes.
25     Q.     Directing your attention back to

KS-000459

Confidential - Subject to Protective Order

Page 926

1  Exhibit 68, which is the first page of the article,
2  there's an indication at the bottom of the first
3  page that the article was received on October 2,
4  2001.  Do you see that?
5       A.    Yes.
6       Q.    Does that accurately reflect when the
7  paper was first submitted to Circulation?
8       A.    No, it doesn't.
9       Q.    Dr. Shapiro, are you familiar with a
10  meta-analysis that was conducted by a Dr. Peter
11  Juni, J-U-N-I, or Juni and others and published in
12  the Lancet journal in November 2004?
13       A.    Yes.
14              - - -
15              (Whereupon, Deposition Exhibit
16         Shapiro-84, "Risk of cardiovascular
17         events and rofecoxib: Cumulative
18         meta-analysis," (Juni, et al), Published
19         online November 5, 2004, MRK-ABY0185233
20         - MRK-ABY0185241, was marked for
21         identification.)
22              - - -
23  BY MR. MAYER:
24       Q.    Let me show you a document that's
25  been marked as Exhibit Number 84 and ask if you can

Page 927

1  identify that.  It bears Bates Numbers
2  MRK-ABY0185233 through 241.
3       A.    Yes.  This is the publication by Juni
4  of his meta-analysis of Vioxx cardiovascular events.
5       Q.    Are there differences between the
6  meta-analysis you conducted in 2000 and 2001 and Dr.
7  Juni's meta-analysis that's published in 2004?
8       A.    Yes.
9       Q.    Could you describe some of the main
10  differences?
11       A.    Sure.  The main and major difference
12  is that Dr. Juni omitted the very large body of
13  placebo-controlled information that we had from the
14  Alzheimer's trials.  So, he did not include any of
15  that data.  In fact, when you look at his changing
16  relative risk over time, it's clear that it's
17  completely driven by the naproxen trials starting
18  with VIGOR and then continuing with ADVANTAGE, and
19  it's all the trials after that are driven by that
20  data.  And it doesn't include the data that goes the
21  opposite way.
22       Q.    Do you agree with Dr. Juni's decision
23  not to include the Alzheimer's data?
24       A.    No, I do not.
25       Q.    Why not?

Page 928

1       A.    Alzheimer's patients are at high risk
2  for cardiovascular events.  They're elderly, there
3  are many more males than in arthritis populations,
4  which tend to be mostly female, and males are at
5  higher risk of cardiovascular events, so, they are
6  actually an excellent population to look at this
7  effect.  And there's no reason that this effect
8  would only be in arthritis patients and not in
9  elderly patients who are being examined for effects
10  on Alzheimer's disease.
11       Q.    Dr. Shapiro, as you sit here today,
12  do you stand behind the analysis and conclusions of
13  your pooled analysis?
14       A.    I do.
15       Q.    Dr. Shapiro, Mr. Specter has
16  questioned you for several days in this deposition
17  before I had a chance to question you; is that
18  correct?
19       A.    Yes.
20       Q.    And some of those sessions go back
21  several months?
22       A.    That's right.
23       Q.    Do you recall towards the beginning
24  of the deposition Mr. Specter asked you about a FDA
25  investigational new drug application regulation or

Page 929

1  guideline?
2       A.    Yes.
3       Q.    I'm going to show you a document that
4  was previously marked as Shapiro Number 2 and ask if
5  you can identify that as the document that Mr.
6  Specter questioned you about previously.
7       A.    Yes, it is.
8       Q.    Now, this regulation talks about the
9  responsibilities of the sponsor of a drug if the
10  sponsor determines that its investigational drug
11  presents an unreasonable and significant risk to
12  subjects.
13       A.    Yes.
14       Q.    At the time Mr. Specter asked you
15  whether this document and this standard applied to
16  the work you were doing with the DSMB on the VIGOR
17  study.  Do you remember that?
18       A.    Yes.
19       Q.    He quoted to you a line from the
20  November 1999 DSMB minutes which said that the focus
21  of the discussions were the excess deaths and
22  cardiovascular adverse experiences in group A
23  compared to group B, and he asked you whether you
24  gave this IND regulation to the members of the DSMB.
25  Do you recall that?

KS-000460

Confidential - Subject to Protective Order

Page 930

1    A.    Yes, I recall.
2    Q.    Did the DSMB members, did any of them
3  at any time indicate to you at that meeting or at
4  any other meeting that Vioxx posed an unreasonable
5  and significant risk?
6    A.    No, they did not.
7    Q.    Did you discuss the cardiovascular
8  events in the VIGOR trial with the DSMB members in
9  the November and December meetings?
10   A.    Yes, we did.
11   Q.    Did the DSMB members express any
12 views about the causation of cardiovascular events
13 in the VIGOR trial at those meetings?
14         MR. SPECTER:  Objection, calls for
15 hearsay.
16         THE WITNESS:  Yes, they did.
17 BY MR. MAYER:
18   Q.    Directing your attention to the --
19 focusing specifically on the December meeting, what
20 did the DSMB members say about causation of those
21 cardiovascular events at that meeting?
22   A.    They stated that they believed that
23 they may well be due to a cardioprotective effect of
24 naproxen.
25   Q.    Did the DSMB members have the ability

Page 931

1  to recommend stopping the trial at the November
2  meeting and again at the December meeting?
3    A.    Yes, they did.
4    Q.    Did they choose to do so?
5    A.    No, they didn't.
6    Q.    Did the members of the DSMB ever
7  conclude that the cardiovascular events in VIGOR
8  were caused by Vioxx?
9          MR. SPECTER:  Objection, calls for
10 hearsay.
11         THE WITNESS:  No, they didn't.
12 BY MR. MAYER:
13   Q.    Did they ever express to you any
14 conclusion or belief that Vioxx posed an
15 unreasonable and significant risk to patients in
16 that trial?
17         MR. SPECTER:  Objection, calls for
18 hearsay.
19         THE WITNESS:  No, they did not.
20 BY MR. MAYER:
21   Q.    Dr. Shapiro, Mr. Specter also asked
22 you about portions of a document, Exhibit 8 to your
23 deposition, that was the FDA's May 1999 review of
24 Vioxx authored by Dr. Villalba in connection with
25 the initial approval of Vioxx.  Do you remember

Page 932

1  that?
2    A.    Yes.
3    Q.    I'm going to show you the document
4  that Mr. Specter previously marked as Shapiro-8.  I
5  think he was asking you some questions about
6  discussion on Page 104, and that discussion carries
7  over to Page 105 of the document.  Do you see where
8  I am?
9    A.    Yes.
10   Q.    During Mr. Specter's questioning, you
11 were trying to say something about patient exposure
12 with Vioxx versus placebo, and he didn't give you a
13 chance to finish.  What did you want to say?
14         MR. SPECTER:  Objection to the
15 statement and the characterizations.
16 BY MR. MAYER:
17   Q.    Did you want to say something
18 additional about this document during the time Mr.
19 Specter was questioning you, Dr. Shapiro?
20   A.    Yes, I did.
21   Q.    Would you like to say it now?
22   A.    Yes.
23         In addition to the six-week studies
24 that Dr. Specter -- Mr. Specter asked me about,
25 there were also six-month trials of placebo versus

Page 933

1  rofecoxib where there were approximately one percent
2  event rates in both groups even though the placebo
3  patients had much shorter time exposure than the
4  rofecoxib patients.  There's also a discussion about
5  the other NSAIDs -- I'm sorry, I lost my page, but
6  the summary and the conclusion was that -- it says
7  that "it is impossible to answer with complete
8  certainty whether the risk...is increased in
9  patients."  There was longer term data in the other
10 trials that showed no increase in event rates.
11   Q.    Directing your attention to the
12 sentence that carries over from Page 104 to 105, did
13 Dr. Villalba say anything about the rates of events
14 in six month studies comparing placebo to rofecoxib?
15   A.    She said that in six-month trials,
16 there were 3 events in placebo group, approximately
17 1 percent, and also 23, which is approximately 1
18 percent because there were many more rofecoxib
19 patients.  That was even though placebo patients
20 were only exposed up to 18 weeks.
21   Q.    And directing your attention to the
22 last --
23         MR. SPECTER:  Objection.  Excuse me.
24 Let me get my objection on the record, please.
25         That's not what the document says.

KS-000461

17 (Pages 930 to 933)

Confidential - Subject to Protective Order

Page 934

BY MR. MAYER:
1
2     Q.    You want to read the sentence that
3  you were referring to, Dr. Shapiro?
4     A.    "In 6-month studies there were 3
5  events in placebo (approximately 1%) and 23
6  (approximately 1%) in the total rofecoxib group,
7  even though placebo patients were only exposed for
8  up to 18 weeks."
9     Q.    Directing your attention to the last
10  sentence of that paragraph, did Dr. Villalba have
11  anything to say about the incidence of
12  thromboembolic events with Vioxx compared to other
13  anti-inflammatory drugs?
14     A.    Yes.
15     Q.    What did she have to say?
16     A.    "The incidence of thromboembolic
17  events with rofecoxib appears to be similar to
18  comparator NSAIDs."
19     Q.    Is there anything in Dr. Villalba's
20  report that gave you reason to be concerned about
21  the safety of Vioxx versus placebo in the
22  development program as it relates to thromboembolic
23  events?
24     A.    No.
25     Q.    Dr. Shapiro, one of the other topics

Page 935

1  that Mr. Specter asked you about was the hypothesis
2  or theory that NSAIDs or naproxen could be
3  cardioprotective. Do you recall that?
4     A.    Yes.
5     Q.    You told him that you were aware that
6  there was a hypothesis discussed by scientists at
7  Merck prior to the VIGOR results that said that
8  NSAIDs could be -- or naproxen could be
9  cardioprotective; is that correct?
10     A.    Yes.
11        MR. SPECTER: Objection to the
12  statement.
13        MR. MAYER: That's a question, and
14  the witness has answered it.
15        MR. SPECTER: Objection to the
16  leading question then, if it's a question.
17  BY MR. MAYER:
18     Q.    Dr. Shapiro, Mr. Specter asked if you
19  had ever seen a single piece of paper authored by
20  any Merck employee before the results of VIGOR
21  became evident saying that naproxen could be
22  cardioprotective. Do you recall that question?
23     A.    Yes.
24     Q.    At the time you couldn't recall a
25  specific document; is that correct?

Page 936

1     A.    That's right.
2     Q.    I'm going to show you a document that
3  has been marked as Exhibit 85 to your deposition.
4            - - -
5        (Whereupon, Deposition Exhibit
6        Shapiro-85, Memo 11-21-96, "Anticipated
7        consequences of NSAID antiplatelet
8        effects on cardiovascular events and
9        effects of excluding low-dose aspirin
10       use in the Cox-2 GI Outcomes Megatrial,"
11       MRK-AAX0002413 - MRK-AAX0002420, was
12       marked for identification.)
13           - - -
14  BY MR. MAYER:
15     Q.    It bears Bates Numbers MRK-AAX0002413
16  through 2420. Can you identify this?
17     A.    Yes. It's a memo from Dr. Thomas
18  Musliner, dated November 21st, 1996.
19     Q.    Who was it addressed to?
20     A.    It was addressed to Drs. Friedman,
21  Nies and Spector.
22     Q.    Who were they?
23     A.    Dr. Friedman was, I believe, in
24  charge of the coxib program in the clinical
25  department. Dr. Nies was her superior -- well, I'm

Page 937

1  not sure if he was at the time, and so was Dr.
2  Spector.
3     Q.    What's the date of the document?
4     A.    November 21st, 1996.
5     Q.    Is that before the VIGOR trial?
6     A.    Yes.
7     Q.    Dr. Shapiro, can you please turn to
8  Page 4 of the document and read into the record from
9  the last paragraph starting on the fourth line where
10  it says "Assumptions."
11     A.    I'm sorry. Fourth line on the second
12  paragraph under number 3?
13     Q.    Yes.
14     A.    "Assumptions underlying these numbers
15  include the following:
16        "(a) Patients treated with standard
17  NSAIDs will experience antiplatelet effects and
18  resultant CV protection similar to that produced by
19  aspirin. (There are good theoretical arguments, as
20  well as limited clinical data to support this
21  assumption.)
22        "(b) The degree of reduction in
23  fatal and non-fatal CV events in the NSAID group
24  will be comparable to that observed with aspirin
25  treatment (i.e. 25% -- see above).

KS-000462

Confidential - Subject to Protective Order

Page 938

1        "(c)  Patients treated with the
2   selective COX-2 inhibitor will experience neither a
3   reduction nor an increase in cardiovascular events
4   associated with this therapy.
5        "(d) --
6        Q.    Just stopping there, can you explain
7   to us what this means?
8        A.    Yes.  What it is saying is that in a
9   trial that compared a COX-2 inhibitor to a
10  traditional NSAID, the traditional NSAID, patients
11  will experience the cardioprotective effects,
12  anti-platelet effects that would be similar to
13  aspirin, while the patients treated with the COX-2
14  inhibitor would have neither a reduction nor an
15  increase in cardiovascular events.  That would give
16  you a difference that was due to a benefit of the
17  traditional NSAID.
18       Q.    Does this refresh your recollection
19  as to what document you had in mind when you were
20  answering Mr. Specter's question regarding
21  discussion at Merck of the theory that NSAIDs could
22  be cardioprotective?
23       A.    Yes, it does.
24       Q.    Was it this document?
25       A.    Yes.

Page 939

1        Q.    Dr. Shapiro, Mr. Specter spent some
2   time earlier in your deposition questioning you
3   about a slide presentation entitled "VIGOR
4   Post-Mortem."
5        A.    Yes.
6        Q.    It's Exhibit 11 to your deposition.
7   Do you recall that?
8        A.    Yes.
9        Q.    Did you prepare that slide
10  presentation?
11       A.    Yes, I did.
12       Q.    What was your goal in preparing it?
13       A.    Typically, when we have a large
14  program, we like to review what went well and what
15  we could improve upon so that the next time around,
16  we're sure to continue to do the things that were
17  good, and we correct the things that didn't go as
18  well.
19       Q.    Let me show you Exhibit 11.
20            When you say things that could be
21  improved upon, what do you mean by that?
22       A.    Anything that caused a difficulty or
23  could have impacted timelines that we want to do
24  better the next time.
25       Q.    Did any of those issues that you

Page 940

1   identified as matters that could be improved on or
2   could do better next time, did any of those affect
3   your ability in VIGOR to report and analyze the data
4   accurately?
5        A.    No, they didn't.
6        Q.    Have you worked on other large
7   clinical trials, Dr. Shapiro?
8        A.    Yes, I have.
9        Q.    Were the types of issues that arose
10  in VIGOR any different in severity or kind from the
11  types of issues that arose in other megatrials that
12  you've worked on?
13       A.    No, they were not.
14       Q.    On the second page of the document
15  which has Bates Numbers 18, you have a slide
16  entitled "What Worked Well."  Were there things that
17  worked well in the VIGOR trial?
18       A.    Yes, there were.
19       Q.    What were some of those?
20       A.    The ones I listed were:  Dedication
21  of all the team members; communication excellent
22  between most groups; planning - the data analysis
23  plan laid out clearly what was needed; there was
24  good lead time for programming efforts; and we only
25  got reasonable ad hoc requests.

Page 941

1        Q.    On the page that bears Bates numbers
2   ending in 31, you have a slide entitled "Review/
3   Approval."
4        A.    Yes.
5        Q.    Can you explain what those points
6   mean?
7        A.    We "got first priority from
8   confirmatory reviewers early."  Did you want me to
9   stop and explain what that meant --
10       Q.    I think you can go on.
11       A.    Okay.
12            Reviewed and approved mock clinical
13  study report before we had results.
14       Q.    What does that mean?
15       A.    We created a mock document before we
16  had the results that contained table shells, that
17  is, empty tables.  It figured out the placement
18  where we were going to put figures, where we were
19  going to address each item.
20       Q.    What was the purpose of that?
21       A.    The purpose of that was to gather
22  agreement from all parties ahead of time of the
23  format and content of the document so that when we
24  had the data, we could very quickly approve and
25  release the document.

KS-000463

ESQUIRE DEPOSITION SERVICES

Confidential - Subject to Protective Order

Page 942

```
1        Q.    What are the other points that are
2   listed on that?
3        A.    "Smooth at end.  Worked well for
4   critical clinical study report, couldn't be
5   implemented for other situations."
6        Q.    Why couldn't it be implemented for
7   other situations?
8        A.    It took a lot of dedicated time.
9   People had to make it their first priority and put
10  aside other work, and you can't always put aside
11  other work for each and every thing, or you couldn't
12  get anything done.
13       Q.    But in the case of the VIGOR trial,
14  did people put aside their other work in order to
15  make sure that the data got reported promptly and
16  accurately?
17       A.    Yes, they did.
18       Q.    Now, on the page before that that
19  ends in 30 in the numbering, there's a mention on a
20  slide that the unblinding had the "potential to go
21  badly."  Do you see that?
22       A.    Yes.
23       Q.    Did the unblinding, in fact, go
24  badly?
25       A.    No.
```

Page 943

```
1        Q.    Did the way the trial was unblinded
2   affect the accuracy of the analysis of the data?
3        A.    No, it didn't.
4        Q.    Speaking of unblinding, on that same
5   page, on that same slide you wrote "Need realistic
6   plan, eg, unblind Dr. S early."
7        A.    Yes.
8        Q.    I think you identified "Dr. S." as
9   Dr. Scolnick?
10       A.    Yes.
11       Q.    Mr. Specter asked you why Dr.
12  Scolnick could not have been unblinded earlier in
13  November 1999, or what bad thing would have
14  happened, would have occurred, if anything?
15       A.    Yes.
16       Q.    And you weren't sure of the answer at
17  the time; is that correct?
18       A.    Yes.
19       Q.    Let me show you a document that was
20  used earlier in the deposition and marked as Exhibit
21  10.
22       A.    This has something else attached to
23  it.  This one is kind of coming apart.
24       Q.    Let me show you Exhibit 10.  Can you
25  identify this document for the jury, please?
```

Page 944

```
1        A.    Yes.  It's an appendix to one of our
2   standard policies and procedures that has to do with
3   guidelines for data safety monitoring boards.
4        Q.    What is it an appendix to?
5        A.    It is an appendix to a standard
6   procedure about megatrials.
7        Q.    What's that standard procedure called
8   or numbered?
9        A.    It's Medical Affairs Policy and
10  Procedure Number 23, Collaborative Research Efforts
11  and Megatrials.
12       Q.    Would the guidelines laid out here
13  apply to the VIGOR study?
14       A.    Yes.
15       Q.    Directing your attention to Page
16  1732, does it say anything there about the
17  obligations of the unblinded statistician with
18  respect to the confidentiality?
19       A.    Yes.
20       Q.    What does it say?
21       A.    It says, "the unblinded Merck
22  statistician is the only individual within Merck who
23  is aware of the interim results, and must adhere to
24  the same confidentiality requirements as the DSMB
25  members."
```

Page 945

```
1        Q.    Does this bear on whether you could
2   have told Dr. Scolnick about the VIGOR results prior
3   to the official unblinding?
4        A.    It does.
5        Q.    How does it bear on that?
6        A.    It states that no one but me could
7   have known any results before the unblinding or was
8   to be told any results.
9        Q.    Did you follow those guidelines in
10  your conduct as unblinded statistician on the VIGOR
11  trial, Dr. Shapiro?
12       A.    Yes, I did.
13       Q.    Why?
14       A.    It's expected to follow a standard
15  operating procedure, it's the ethical thing to do,
16  it was my responsibility.  I had agreed to do such a
17  thing, and I did it.
18       Q.    Dr. Shapiro, earlier in your
19  deposition you mentioned that the DSMB had received
20  the cardiovascular standard operating procedure,
21  adjudication standard operating procedure as part of
22  the protocol for the VIGOR study; is that correct?
23       A.    Yes.
24       Q.    You also testified that the
25  adjudication standard operating procedure provided
```

Confidential - Subject to Protective Order

Page 946

1  DSMB with background on the hypotheses regarding
2  cardiovascular issues with Vioxx; is that correct?
3       A.   Yes.
4               - - -
5           (Whereupon, Deposition Exhibit
6       Shapiro-86, "Standard Operating
7       Procedure for the Surveillance,
8       Monitoring, and Adjudication of Acute
9       Thromboembolic Vascular Events in
10      Clinical Trials of COX-2 Specific
11      Inhibitors," MRK-AAB0029224 -
12      MRK-AAB0029273, was marked for
13      identification.)
14              - - -
15  BY MR. MAYER:
16      Q.   I'm going to show you a document
17  that's been marked as Exhibit 86 to your deposition.
18  Can you identify this for the jury?  It bears Bates
19  Numbers MRK-AAB0029224 through 273.
20      A.   Yes.  This is the standard operating
21  procedure on the adjudication of cardiovascular
22  events in the COX-2 trials.
23      Q.   Was the standard -- was the
24  adjudication procedure provided to the DSMB?
25      A.   Yes, it was.

Page 947

1       Q.   Later in your deposition --
2           MR. MAYER:  Let's go off the record
3  for a second.
4           THE VIDEOTAPE TECHNICIAN:  Off the
5  record at 11:01.
6               - - -
7           (Whereupon, a recess was taken from
8       11:01 a.m. until 11:12 a.m.)
9               - - -
10          THE VIDEOTAPE TECHNICIAN:  Back on
11  the record at 11:12.
12  BY MR. MAYER:
13      Q.   Dr. Shapiro, we're back from a short
14  break, and before the break I had asked you some
15  questions about the cardiovascular standard
16  operating procedures.
17      A.   Yes.
18      Q.   You recall that Mr. Specter asked you
19  some questions about a revised version of that
20  standard operating procedure?
21      A.   Yes.
22      Q.   Let me show you a document that has
23  been previously marked as Shapiro Number 51 bearing
24  Bates Numbers MRK-ABC0000027 through 040.  That's a
25  document dated January 4, 2000 from Douglas Watson

Page 948

1  to Linda Nelsen to a distribution list; is that
2  correct?
3       A.   Yes.
4       Q.   Could you read the subject line?
5       A.   "Revised version of the Standard
6  Operating Procedures For the Surveillance,
7  Monitoring and Adjudication of Thrombotic/embolic
8  Vascular Events in Clinical Trials of Cox-2 Specific
9  Inhibitors."
10      Q.   Directing your attention to the
11  distribution list on Page 2, does your name appear
12  on that distribution list?
13      A.   No.
14      Q.   Did you receive that document at that
15  time?
16      A.   No.
17      Q.   Did you have any part, Dr. Shapiro,
18  in the revision of the standard operating procedures
19  that's reflected in this document?
20      A.   No.
21      Q.   Mr. Specter asked you questions about
22  some events that had been eliminated from the
23  standard operating procedure.  Do you remember that?
24      A.   Yes.
25      Q.   He asked you about the date when that

Page 949

1  occurred?
2       A.   Yes.
3       Q.   Dr. Shapiro, could you read into the
4  record Paragraph 2 on the first page of Shapiro
5  Exhibit 51, please.
6       A.   "Appendix B has been modified.  At
7  the request of the project team, Cardiovascular
8  Clinical Sciences reviewed the list of CRISP Broader
9  terms eligible for case adjudication.  Terms which,
10  in the absence of other events identifying adverse
11  experiences (which are likely to be serious events)
12  have a low likelihood of being thromboembolic events
13  were eliminated from Appendix B; Vascular Serious
14  Adverse Terms (CRISP Broader Term) eligible for case
15  adjudication.  Events which have been eliminated
16  from Appendix B, (i.e. congestive heart failure,
17  atrial fibrillation) and were not adjudicated prior
18  to the decision to revise this list (3 October 1999)
19  will not be adjudicated."
20      Q.   Does that paragraph suggest to you
21  anything about when the decision was made to revise
22  the list?
23      A.   Yes.
24          MR. SPECTER:  Objection, calls for
25  speculation.

Confidential - Subject to Protective Order

Page 950

BY MR. MAYER:
1 Q.    What does it suggest to you?
3 A.    It says that the decision to revise
4 the list was made on October 3rd of 1999.
5 Q.    Directing your attention to Page 5 of
6 this memorandum bearing Bates Numbers ending in 033,
7 could you read into the record the language that
8 appears in bold type at the end of the first full
9 paragraph?
10 A.    "Effective October 3, 1999 in
11 consultation with Cardiovascular Clinical Sciences,
12 a revised list of eligible events is in effect
13 (Appendix B)."
14 Q.    Does that suggest anything to you
15 about when the revised list of eligible events went
16 into effect?
17 MR. SPECTER:  Objection, calls for
18 speculation.
19 THE WITNESS:  Yes.
20 BY MR. MAYER:
21 Q.    What does it suggest?
22 A.    It suggests it went into effect as of
23 October 3rd, 1999.
24 Q.    Dr. Shapiro, I'm going to show you a
25 document that's previously been marked in this

Page 951

1 deposition as Shapiro Exhibit 74.  I think you
2 previously identified this as a slide presentation
3 that you prepared for statisticians at Merck; is
4 that correct?
5 A.    That's correct.
6 Q.    Do you recall that Mr. Specter
7 directed your attention to a section entitled
8 "Constancy of Rates and Relative Risk."  It starts
9 on Page 23, and he asked you to read into the record
10 some language on Page 24.
11 A.    Yes.
12 Q.    And you said at the time it would be
13 only fair to allow you to go on reading?
14 A.    Yes.
15 MR. SPECTER:  Objection to the
16 statement.
17 BY MR. MAYER:
18 Q.    The section goes on for several pages
19 after that, so, I'm not going to ask you to read the
20 whole section into the record, but could you
21 summarize for us the additional points that you
22 wanted to make then with reference to this specific
23 section of the document?
24 A.    Yes.  It goes on to say that we
25 performed many, many analyses to evaluate whether or

Page 952

1 not there was a departure from constant relative
2 risk or constant rates.  All of those examinations,
3 a number of tests that we performed, some suggested
4 by a consultant to the FDA, all of those tests found
5 no evidence of a departure from constant relative
6 risk.  There was one that was particularly telling
7 about why that plot looks the way it does.  That was
8 also suggested by an outside consultant who
9 suggested we look at these treatment group
10 comparisons over time.  What we found was that
11 shortly before month eight, things actually flipped
12 in favor of Vioxx, and the effect that had was to
13 draw the curves together, and after that they go
14 back to the way they were.  And it gives the
15 appearance of increasing, when, in fact, it is
16 drawing together and going back to what it was
17 before that time.  So, we did not just that
18 analysis, but as I said, many, many analyses, and
19 they all show the same thing, that there was not a
20 change in the relative risk or the rates over time.
21 Q.    Is that conclusion reflected anywhere
22 in this document?
23 A.    Yes.
24 Q.    I direct your attention to Page 25.
25 It bears the Bates Numbers ending 218.  You look at

Page 953

1 the second to last sentence.
2 A.    Yes.
3 Q.    Would you read that into the record?
4 A.    "All of those showed no evidence of
5 a departure from constant relative risk over time
6 and constant rates in the rofecoxib group."
7 Q.    Did that reflect the conclusion of
8 all of the analyses you've just described?
9 A.    That's right.
10 Q.    I'm done with that exhibit, Dr.
11 Shapiro.
12 Mr. Specter also asked you questions
13 about Merck's choice of the APTC endpoint for the
14 pooled analysis.  Do you recall that?
15 A.    Yes.
16 Q.    And specifically about the issue that
17 the APTC endpoint included certain bleeding events?
18 Do you recall that?
19 A.    Yes.
20 Q.    Did you consider that issue in
21 connection with selecting the APTC endpoint and also
22 in connection with how you wrote up the paper, you
23 and your co-authors wrote up the paper for
24 publication?
25 A.    Yes.

Confidential - Subject to Protective Order

Page 954

1    Q.    What did you consider with regard to
2  -- or selecting the APTC endpoint?
3    A.    As I said, we selected the APTC
4  endpoint because it's a standard used by the people
5  who are evaluating drugs that have effects on
6  platelets, and that was the basis of that decision.
7    Q.    When you wrote, you and your
8  co-authors, wrote the Circulation paper that was
9  ultimately published, how did you deal with the fact
10  that there was some bleeding events included in the
11  APTC endpoints that you analyzed?
12    A.    We enumerated them in the footnotes
13  to the table, and we listed that there were five
14  total in the text. This number is very small, and,
15  therefore, doesn't impact the conclusions. But
16  actually, if you looked at those footnotes, you will
17  see that there are a few more on Vioxx than on the
18  comparators, so, it did not actually act as a
19  benefit to Vioxx to include them. It went against
20  Vioxx. And it was the standard -- we were adhering
21  to the standard, and it didn't benefit us in any way
22  by leaving them in or make things appear to be less
23  different.
24    Q.    I'm going to show you Shapiro Exhibit
25  68 which was previously marked. Is that the

Page 955

1  published Circulation article by Dr. Konstam and
2  other authors, including yourself?
3    A.    Yes, it is.
4    Q.    Mr. Specter asked you a series of
5  questions about whether you could add up certain
6  columns in Table 6 of the pooled analysis. Do you
7  remember that?
8    A.    Yes.
9    Q.    Specifically about comparisons of
10  numbers of heart attacks on Vioxx versus other
11  NSAIDs. Do you remember that?
12    A.    Yes.
13    Q.    Is it statistically valid to compare
14  -- would it have been statistically valid in this
15  analysis to draw a comparison between the number of
16  heart attacks on Vioxx versus the number of heart
17  attacks on all other anti-inflammatory drugs?
18    A.    No.
19    Q.    Why is that?
20    A.    The test that we did evaluated
21  whether or not the effects of Vioxx compared to
22  naproxen, and when you compare that to the effects
23  of Vioxx and other NSAIDs, they are significantly
24  heterogeneous, meaning they are different, and they
25  should not be combined.

Page 956

1    Q.    If despite that, somebody wanted to
2  know what the counts looked like comparing the group
3  of all the anti-inflammatories other than Vioxx
4  versus Vioxx, what, if anything, could they tell
5  from Table 6 in this paper?
6    A.    That there were roughly two times as
7  many on rofecoxib as on any other NSAID. There's an
8  issue in terms of adding things up, but you can add
9  rofecoxib events from the latter two columns, from
10  nonnaproxen NSAIDs and naproxen, because none of
11  those were in the same trial. We didn't study both
12  naproxen and other NSAIDs in the same trial. So,
13  you can add those. You can't necessarily add the
14  placebo columns, but you can add the two NSAID
15  columns. We have fatal MIs, and we have nonfatal
16  cardiac events which consists of MIs and
17  resuscitated cardiac arrest. So, if you add those
18  up, you get 50 versus 21, and if you account for the
19  number of patients, it comes out to being roughly
20  two to one.
21    Q.    So, is that 50 to 21 an accurate
22  count?
23    A.    Yes.
24    Q.    But for purposes of statistical
25  analysis, you did not combine those?

Page 957

1    A.    That's right.
2    Q.    Why was that?
3    A.    Because of the significant
4  heterogeneity in the trials that used naproxen
5  compared to the trials that did not.
6    Q.    Mr. Specter asked you a series of
7  questions about an article published by several
8  authors including yourself in the American Journal
9  of Cardiology. Do you remember that?
10    A.    Yes.
11    Q.    I'm going to show you a couple of
12  documents that were marked during the course of that
13  questioning. They bear Exhibit Numbers 58 and 60.
14          Could you identify first what Exhibit
15  58 is. It bears Bates Numbers MRK-ABK0438579
16  through 604.
17    A.    That's a draft of the manuscript that
18  went through our standard procedure for clearance of
19  a release of a manuscript.
20    Q.    Mr. Specter asked you a series of
21  questions, didn't he, about how certain language and
22  tables from this draft came not to be included in
23  the published version of this paper; correct?
24    A.    Yes, he did.
25    Q.    What is Exhibit 60, which bears Bates

Confidential - Subject to Protective Order

Page 958

1  Numbers MRK-NJ0068744 through 776?
2      A.    This is the reply from the American
3  Journal of Cardiology that stated they would like to
4  publish it, but also had many comments on what they
5  wanted done before they would publish the paper.
6      Q.    I'm directing your attention
7  specifically to what's the third page of Exhibit 60.
8  It bears Bates Numbers MRK-NJ0068746.  What is that?
9      A.    This is the letter from William
10 Roberts, who was an editor at the American Journal
11 of Cardiology, to Dr. Sperling as one of the authors
12 of the manuscript, describing what he wanted done,
13 he and the other reviewers wanted done before they
14 would publish the paper.
15     Q.    Is there an attachment to that
16 letter?
17     A.    Yes.
18     Q.    What is that?
19     A.    It enumerates all the changes they
20 wanted made to the document.  It stated very clearly
21 what they wanted done.
22     Q.    Now, looking back at Exhibit 58, Mr.
23 Specter asked you about Page 3 of that document, the
24 second paragraph of the introduction of the draft of
25 the article that was prepared by authors at Merck

Page 959

1  and which discussed patterns of inhibition of
2  eicosanoids and other matters.  He asked you how
3  that came to be omitted from the published version
4  of the article.  Do you remember that?
5      A.    Yes.
6      Q.    When he showed you Exhibit 60, did he
7  point out to you pages 4 and 5 of that exhibit
8  bearing Bates Numbers MRK-NJ0068752 to 753?
9      A.    No, he didn't.
10     Q.    What, if anything, do those pages
11 reflect with regard to the paragraph Mr. Specter
12 asked you about?
13     A.    They crossed out that paragraph and
14 told us to remove it from the manuscript.
15     Q.    Who did that?
16     A.    That was done by William Roberts.
17     Q.    Who is he again?
18     A.    The editor of the American Journal of
19 Cardiology.
20     Q.    Mr. Specter also asked you about a
21 discussion in the draft article that the Merck
22 authors prepared regarding speculation that COX-2
23 inhibitors might affect the hemostatic balance.  Do
24 you recall that questioning?
25     A.    Yes, I do.

Page 960

1      Q.    He asked you how that paragraph came
2  to be omitted from the published paper.  Do you
3  recall that?
4      A.    Yes.
5      Q.    In the course of that questioning,
6  did he direct your attention to, when he showed you
7  Exhibit 60, to Page 13 of Exhibit 60 bearing Bates
8  Number MRK-NJ0068761?
9      A.    No, he didn't.
10     Q.    Directing your attention to that
11 page, what does it tell you about how that paragraph
12 came to be omitted from the published paper?
13     A.    The editor of the journal crossed it
14 out and told us to omit it.
15     Q.    Did Mr. Specter also ask you how
16 Table 1 of the draft report came to be omitted from
17 the published paper?
18     A.    Yes.
19     Q.    When he showed you Exhibit 60, did he
20 ask you about the first paragraph of Dr. Roberts'
21 letter that appears at the page bearing Bates
22 Numbers ending in 746?
23     A.    No, he didn't.
24     Q.    What, if anything, does Dr. Roberts
25 say about Table 1 in that letter?

Page 961

1      A.    It says, "eliminate table 1."
2      Q.    Does reviewing these sections of
3  Exhibit 60 refresh your recollection as to why those
4  particular sections that Mr. Specter asked about
5  came out of the draft paper that the Merck authors
6  prepared when the paper was published?
7      A.    Yes.  They were all required by the
8  editor of the journal to be omitted before they
9  would publish our paper.
10     Q.    Dr. Shapiro, Mr. Specter also asked
11 some questions about power in regard to the APPROVe
12 study and your level of curiosity about what the
13 power was with regard to detecting a difference in
14 the first 18 months.  Do you want to expand a little
15 bit on the answer that you gave to Mr. Specter?
16     A.    Yes, I would.
17     Q.    Specifically with regard to whether
18 or not you were curious about that issue?
19     A.    Yes.  I am, of course, interested in
20 APPROVe.  It's had a dramatic effect on what
21 happened with Vioxx.  However, I'm not the
22 statistician assigned to APPROVe.  We have several
23 highly qualified people working on APPROVe and
24 analyzing the data from APPROVe.  So, they are
25 examining all these issues of power, et cetera.

Confidential - Subject to Protective Order

Page 962

1   But to expand again upon power, if you have a
2   dramatic effect, that you will -- you can find a
3   dramatic effect.  If you have no effect, which is
4   what you see when you look at the first 18 months of
5   APPROVe, it doesn't matter how large a trial is.
6   You can't find something that's completely the same.
7        Q.    Mr. Specter asked you some questions
8   about some sites, some VIGOR sites in Argentina,
9   three sites that failed a review, investigator
10  sites, out of all the sites that were involved in
11  the VIGOR trial.  Do you recall that?
12       A.    Yes.
13       Q.    He asked you whether revised data was
14  submitted to the FDA.  Do you recall that?
15       A.    Yes.
16       Q.    And at the time you expressed a
17  belief, but not a certainty, as to what was done; is
18  that correct?
19       A.    Yes.
20       Q.    Let me show you a document that's
21  been marked as Shapiro Exhibit 87.  It bears Bates
22  Numbers MRK-S0420000002 through 08 and ask if you
23  can identify that document, please.
24            - - -
25            (Whereupon, Deposition Exhibit

Page 963

1        Shapiro-87, Letter 5-10-02, with
2        attachments, MRK-S0420000002 -
3        MRK-S0420000008, was marked for
4        identification.)
5            - - -
6        THE WITNESS:  Yes.  It's a document
7   that's sent from our regulatory department to the
8   FDA providing them with the revised analysis of
9   VIGOR, removing the three sites.
10  BY MR. MAYER:
11       Q.    Directing your attention to the
12  second paragraph on Page 1 and beginning about
13  halfway through, does it describe to the FDA whether
14  or not the reanalysis of the data showed any
15  significant differences?
16       A.    Yes.
17       Q.    What does it say?
18       A.    "The results of this reanalysis
19  (Attachment 1) disclosed only slight numeric changes
20  in statistical parameters without meaningful
21  implications for the interpretation of the study
22  results or currently approved product labeling that
23  describes the study results."  Do you want me to
24  read the next sentence?
25       Q.    Yes, please.

Page 964

1        A.    "Therefore, MRL believes the results
2   from the original analysis remain appropriate for
3   assessment of the study."
4        MR. MAYER:  Thank you.
5        Off the record.
6        THE VIDEOTAPE TECHNICIAN:  Off the
7   record at 11:36.
8            - - -
9        (Whereupon, a recess was taken from
10       11:36 a.m. until 11:56 a.m.)
11           - - -
12       THE VIDEOTAPE TECHNICIAN:  We are now
13  back on the record.  This is the beginning of
14  Videotape Number 2.  The time is 11:56.
15           - - -
16           EXAMINATION
17           - - -
18  BY MR. SPECTER:
19       Q.    Dr. Shapiro, I want to ask you some
20  questions about some of the things that were touched
21  on today by your lawyer questioning you.
22       I want to start with the last thing
23  that was discussed in the direct examination a few
24  minutes ago, which is the issue of these Argentinian
25  sites.  Your lawyer gave you a document which was

Page 965

1   marked Shapiro 87, which is the correspondence to
2   the FDA concerning the three sites in Argentina that
3   were deemed to be unreliable.  Do you recollect
4   that?
5        A.    Yes.
6        Q.    This letter says that -- in an
7   earlier letter, this letter is dated May 10, 2002,
8   and it says in the second paragraph:  "In
9   correspondence to the Agency dated February 21,
10  2002, MRL provided a re-analysis of the primary and
11  secondary endpoints of VIGOR without data from Dr.
12  Di Giorgio's sites.  Having identified 2 additional
13  sites whose data have been called into question, MRL
14  is now providing a final re-analysis of the VIGOR
15  endpoints excluding data from all three sites
16  referenced above."
17       Did I read that correctly?
18       A.    It didn't sound exact.  It might be
19  the gist of it, but it didn't seem like that
20  followed it, unless I'm in the wrong place.
21       Q.    We're looking at MRK-S042000002?
22       MR. MAYER:  Where are you reading,
23  from what paragraph?
24  BY MR. SPECTER:
25       Q.    Second full paragraph.  You were

Confidential - Subject to Protective Order

Page 966

1   looking at the first full paragraph, weren't you,
2   Doctor?
3       A.   Yes.
4       Q.   I'm talking about the second full
5   paragraph.
6       A.   I'm sorry.
7            (Witness reviewing document.)
8            Okay.
9   BY MR. SPECTER:
10      Q.   Does it now appear to you that I've
11  read that correctly?
12      A.   Yes.
13      Q.   All right.
14           So, this letter says "MRL is now
15  providing a final re-analysis of the VIGOR endpoints
16  excluding data from all three sites referenced
17  above." Right?
18      A.   Yes.
19      Q.   And the VIGOR endpoints included
20  cardiovascular endpoints; correct?
21      A.   We talked about primary and secondary
22  endpoints in the previous paragraph. Those are
23  referring to gastrointestinal endpoints.
24      Q.   That's not what the letter says.
25      A.   Yes, it is.

Page 967

1       Q.   Excuse me. It doesn't say that it
2   only refers to gastrointestinal endpoints. It says,
3   the "primary and secondary endpoints." The primary
4   and secondary endpoints would include cardiovascular
5   endpoints, wouldn't it?
6       A.   No. They are very clearly stated in
7   the protocol and the data analysis plans, that the
8   primary and secondary endpoints, they are referring
9   to the ones for which we had hypotheses, specific
10  hypotheses, and those were all gastrointestinal.
11  And if sometimes we use shorthand referring to it,
12  that doesn't change the fact that that's what we
13  meant.
14      Q.   Doctor, was the data recalculated
15  looking at the cardiovascular endpoints excluding
16  the Argentinian sites?
17      A.   I believe it was. I don't see it
18  here.
19      Q.   Show me in this exhibit that your
20  lawyer gave to you a few minutes ago where there's a
21  recalculation of the cardiovascular data.
22      A.   I can't show you that because I don't
23  see that.
24      Q.   That's because it's not there; right?
25      A.   It's not in this.

Page 968

1       Q.   Well, is it someplace else?
2       A.   If you look on Page 1, the Bates
3   Number ends in 6, it discusses the reanalysis of
4   cardiovascular events. It says "With respect to
5   vascular events amongst these 259 patients, there
6   was 1 patient with a confirmed fatal hemorrhagic
7   stroke in the naproxen group (Allocation Number
8   6703). Fatal hemorrhagic strokes do not contribute
9   to the endpoint 'confirmed thrombotic cardiovascular
10  serious adverse experiences' or to thrombotic
11  deaths, but are included in the APTC combined
12  endpoint. Thus, exclusion of the data from these
13  sites would not change counts of confirmed
14  thrombotic events reported in VIGOR."
15      Q.   Right. It wouldn't change the
16  counts, but it would change the rates; correct?
17      A.   The --
18      Q.   Yes or no?
19      A.   It might change them slightly. There
20  were very few patients total, 130 and 129, so, it
21  could not have changed them much. We did do those
22  analyses to confirm that. And because it didn't
23  change anything much, it was not needed to provide
24  that data. We described it --
25      Q.   The rates for the cardiovascular --

Page 969

1       A.   We described --
2       Q.   Can I finish my question, please.
3            MR. MAYER: She was --
4            MR. SPECTER: You weren't finished
5   with your answer?
6            THE WITNESS: I wasn't finished.
7            MR. MAYER: The witness wasn't
8   finished the answer.
9   BY MR. SPECTER:
10      Q.   I thought you were. Excuse me.
11      A.   No.
12           We described the implications of
13  removing them, and because there was no important
14  effect on anything else, we didn't feel it was
15  necessary to provide rates that had changed only in
16  a minuscule way.
17      Q.   Well, let's talk about whether it's
18  minuscule.
19           There were how many patients in the
20  VIGOR trial?
21      A.   8,076.
22      Q.   How many patients stayed in long
23  enough to be counted in the final analysis?
24      A.   They're all included in the final
25  analysis.

KS-000470

Confidential - Subject to Protective Order

Page 970

1    Q.    There were about 28 percent who
2  dropped out, weren't there, Doctor?
3    A.    They still contribute to the final
4  analysis.  We did followup on them.
5    Q.    And the group in which the data was
6  considered to be unreliable involved 259 patients;
7  correct?
8    A.    Yes.
9    Q.    That's roughly three percent of
10  8,000; is that correct?
11    A.    Roughly.  And also --
12    Q.    Doctor, I asked you a mathematical
13  question --
14    A.    Approximately.
15    Q.    -- which is, is 259 roughly three
16  percent of 8,000?  Is the answer yes to that
17  question?
18    A.    Roughly.
19    Q.    Thank you.
20        Now, let me ask you about what you
21  gave to the FDA in terms of the meta-analysis.  And
22  that was Exhibit 82, and I will put that in front of
23  you.
24        Now, this document has 61 numbered
25  pages; is that correct?  Actually, it has two pages

Page 971

1  at the start that constitute the cover letter to the
2  FDA from Merck and then a form as the second page,
3  and then the document entitled "Interim
4  Cardiovascular Meta-Analysis" has 61 numbered pages.
5    A.    Yes.
6    Q.    Is that all fair?
7    A.    Yes.
8    Q.    Now, I want to talk about how this is
9  organized for a minute, if we could.
10        Section Roman numeral IV which is on
11  Page 12 is titled "Results."  Is that correct?
12    A.    Yes.
13    Q.    The first thing that appears there is
14  A, which is "Summary."  Correct?
15    A.    Yes.
16    Q.    And then three pages later at Page 15
17  we have Section B of results, which are "APTC
18  Endpoint."  Correct?
19    A.    Yes.
20    Q.    Then the remainder of the Results
21  section discusses the APTC endpoint; correct?
22    A.    Even the introductory part does.  It
23  is just a summary of all those analyses.
24    Q.    Was there a part C?
25    A.    There's parts A and B.

Page 972

1    Q.    I know.  I see there are parts A and
2  B.  I'm asking a different question now.  Was there
3  a part C?
4    A.    No.
5    Q.    Was there ever a part C?
6    A.    I don't recall.
7    Q.    Let's see if I can refresh your
8  recollection.
9        MR. SPECTER:  Mark this as
10  Shapiro-88.  A copy for you, a copy for your lawyer.
11        (Handing over documents.)
12          - - -
13        (Whereupon, Deposition Exhibit
14        Shapiro-88, "Full Meta-Analysis,"
15        MRK-ACF0000845 - MRK-ACF0000924, was
16        marked for identification.)
17          - - -
18        (Witness reviewing document.)
19  BY MR. SPECTER:
20    Q.    Please tell us what you're looking
21  at.
22    A.    I just need to look through it to
23  figure it out.
24    Q.    Go ahead.
25    A.    (Witness reviewing document.)

Page 973

1    Q.    Doctor, what are you looking at right
2  now?
3    A.    Can you let me finish looking,
4  please?
5    Q.    I want to know what you are looking
6  at.  What are you looking at?
7    A.    I'm looking at a section C.  I would
8  like to continue looking, please.
9    Q.    Fine.  What page is it on?
10    A.    Bates Number ending 909.
11    Q.    Thank you.
12    A.    (Witness reviewing document.)
13    Q.    Let's compare these two documents.
14  Let's start off first with the question I left off
15  with, which is, is there a section C?  Is there a
16  section C?
17    A.    There's a section C.  It is not
18  reflected on the table of contents, I believe.  No,
19  it's not in the table of contents, so, there's a
20  section labeled C with a blank page in between it.
21    Q.    Right.  And this entire exhibit
22  that's been marked as Shapiro-88 is consecutively
23  Bates numbered; correct?
24    A.    Seems to be.
25    Q.    Let's compare the two documents,

Confidential - Subject to Protective Order

Page 974

1  Exhibit 82, which is the one that your lawyer showed
2  you that was sent to the FDA, and Exhibit 88, which
3  is the one that I put in front of you.
4          If we start off on numbered Page 1 of
5  the document your lawyer gave you, that's titled
6  "Interim Cardiovascular Meta-Analysis correct?
7      A.    Yes.
8      Q.    And if we look at numbered Page 1 on
9  what I just gave you, it says the same thing,
10 "Interim Cardiovascular Meta-Analysis."
11     A.    Yes.
12     Q.    Is that correct?
13     A.    Yes.
14     Q.    And then the documents are identical
15 for the first 61 pages; correct?
16     A.    I haven't reviewed all 61 pages.  If
17 you say they are identical, I'm hoping they are, but
18 it would take me a long time to compare them.
19     Q.    Well, you sort of went through them
20 somewhat quickly just now; is that correct?
21     A.    Yes, I did, very quickly.
22     Q.    Did you see any differences in the
23 first 61 pages?
24          MR. MAYER:  You can answer the
25 question whether you saw any differences.

Page 975

1          THE WITNESS:  I didn't see any
2  differences, but I didn't read them thoroughly, so,
3  it is hard for me to say there's no differences.
4  BY MR. SPECTER:
5      Q.    That's fine.  However, on the
6  document I just showed you, there is a page before
7  the statement that appears "Interim Cardiovascular
8  Meta-Analysis," and that page is labeled "Full
9  Meta-Analysis."  Correct?
10     A.    No.  Where?  What page number?
11     Q.    Just before the page labeled "Interim
12 Cardiovascular Meta-Analysis," there's a page and
13 all that's on it is "Full Meta-Analysis."  Right
14 here.  (Indicating.)
15     A.    Can you tell me what page number you
16 are on, Bates Number, please.
17     Q.    It is literally -- Bates Number
18 MRK-ACF0000845.
19     A.    Thank you.
20     Q.    It is literally the first page of the
21 exhibit; right?
22     A.    Yes.
23     Q.    What does it say?
24     A.    "Full Meta-analysis."
25     Q.    "Full Meta-analysis."

Page 976

1          Now, the thing given to the FDA, has
2  that got a page before the page that says "Interim
3  Cardiovascular Meta-Analysis"?  Does that have a
4  page before that that says "Full Meta-Analysis"?
5      A.    No.
6      Q.    But the one I just gave you has that;
7  correct?
8      A.    Yes.
9      Q.    It has that page that says "Full
10 Meta-Analysis."  Right?
11     A.    Yes.
12     Q.    Then it's got a section C, and the
13 title of section C is "MI Endpoint - Secondary."
14 Correct?
15     A.    Yes.
16     Q.    And then there is discussion and then
17 a whole bunch of tables analyzing the data from the
18 standpoint of the MI endpoint; correct?
19     A.    Yes.
20     Q.    There is no section C in what was
21 given to the FDA; correct?
22     A.    Yes.
23     Q.    In fact, the bottom line of the page,
24 the first page of the discussion of the MI endpoint,
25 the last sentence is, "Whereas there was a

Page 977

1  borderline significant difference in treatment
2  effects between comparisons with naproxen and other
3  NSAIDs for the APTC endpoint, this difference was
4  significant for the MI endpoint."
5      A.    I believe that's --
6          MR. MAYER:  Object to the form.
7          THE WITNESS:  -- referring to
8  heterogeneity, which is more apparent for MI.  So,
9  that's actually stronger evidence of not combining.
10 But you will have to give me a couple of minutes to
11 look at that to make sure that's what it is
12 referring to.  That's my initial belief, that it's
13 the heterogeneity significance that that's referring
14 to.
15 BY MR. SPECTER:
16     Q.    What question are you answering now,
17 Dr. Shapiro?
18     A.    Yours.
19     Q.    What question was that?  What was the
20 question?
21     A.    That one had a borderline and one had
22 a significant.
23     Q.    I just read to you what it said;
24 correct?
25     A.    Okay.

KS-000472

Confidential - Subject to Protective Order

Page 978

1    Q.    Is that correct?
2    A.    I was going beyond and interpreting.
3  And I'm sorry.
4    Q.    Did I read what appears there
5  correctly?
6    A.    I would have to hear you read it
7  again, but I think so.
8    Q.    I'll read it again for you.  "Whereas
9  there was a borderline significant difference in
10  treatment effects between comparisons with naproxen
11  and other NSAIDs for the APTC endpoint, this
12  difference was significant for the MI endpoint."
13  Did I read it correctly?
14    A.    Yes.
15    Q.    Thank you.
16         Then we have a whole bunch of tables
17  on this subject; correct?
18    A.    Yes.
19    Q.    Do these tables appear in what was
20  given to the FDA?
21    A.    These tables do not appear.
22    Q.    Did that sentence I just read appear
23  in what was given to the FDA?
24    A.    No.
25    Q.    For example, looking at Appendix 1.3,

Page 979

1  which appears at Bates Number 923 where it talks
2  about "Meta-Analysis of MI Endpoint Vioxx versus
3  Comparator Agents," and it goes to the VIGOR trial,
4  and it has 20 heart attacks in the Vioxx group and 4
5  on the comparator with a relative risk of 5.0.  Did
6  I read that correctly?
7    A.    Yes.
8    Q.    And then in combining one, two,
9  three, four, five, six studies of people with
10  rheumatoid arthritis with the meta-analysis of the
11  MI endpoint, the relative risk is 4.16.  Is that
12  what it says?
13    A.    Yes.  That's the analysis where the
14  heterogeneity means you can't combine it, and I
15  believe it was footnoted in one of these tables,
16  that you can't combine it because that was any NSAID
17  versus placebo.
18    Q.    I'm looking, yeah, at that, Doctor.
19  Where is that footnote on that page that says you
20  can't combine it?  Show me where that footnote
21  appears there.
22    A.    It doesn't appear there, but if you
23  actually repeat the sentence that you said to me,
24  that's talking about heterogeneity, and
25  heterogeneity implies the inability to combine.

Page 980

1    Q.    Doctor, the sentence that I read to
2  you, where does the word "heterogeneity" appear in
3  that sentence?
4    A.    You have to understand that a
5  comparison between naproxen and nonnaproxen reflects
6  an interaction in heterogeneity.  So, it's something
7  that the FDA would understand.  It doesn't say
8  heterogeneity, but that's the implication.
9    Q.    So, this Appendix 1.3 "Meta-Analysis
10  of MI Endpoint Vioxx versus Comparator Agents," was
11  this table given to the FDA with the meta-analysis?
12    A.    No, it's not provided --
13    Q.    Right.
14    A.    -- but MI information was provided
15  for each and every comparison.  The MI information
16  is in each table that breaks out results for each
17  comparison.
18    Q.    Oh, you mean that Table 4 that you
19  talked about in answering your lawyer's questions;
20  right?
21         MR. MAYER:  Object to the form.
22         THE WITNESS:  Tables 4, 6, 8, 10 and
23  12.
24  BY MR. SPECTER:
25    Q.    Let's go to Table 4.

Page 981

1    A.    (Witness complies.)
2    Q.    So, Table 4, "Cardiac Events," "Acute
3  Myocardial Infarction," that's a heart attack;
4  right?
5    A.    Yes.
6    Q.    28 people taking Vioxx, 6 people
7  taking naproxen; right?
8    A.    Yes.
9    Q.    Where is the statement there about
10  relative risk?  Is there a statement of relative
11  risk there?
12    A.    There's not a statement of relative
13  risk, but there are and --
14    Q.    Doctor, don't "but" me.  Just answer
15  my question.
16         MR. MAYER:  Objection.
17  BY MR. SPECTER:
18    Q.    Is there a statement of relative
19  risk?
20         MR. MAYER:  Let her finish her
21  answer.
22  BY MR. SPECTER:
23    Q.    Is there -- please answer the
24  question, Dr. Shapiro.
25         Is there a statement of relative risk

Confidential - Subject to Protective Order

Page 982

1 in the table?
2      A.     While there's not a statement of
3 relative risk, one can take that plus the row that
4 says myocardial infarction and derive a relative
5 risk estimate from the percentages. The data is not
6 hidden. It is very clearly there.
7      Q.     Dr. Shapiro, in order to determine a
8 valid relative risk, you would have to have the
9 information as to patient years; correct? Correct?
10      A.     You -- well, you don't -- yes, in a
11 form, but you still can --
12      Q.     Doctor, don't "but" me.
13            You have to have the patient years to
14 have relative risk; correct?
15            MR. MAYER: I object to the continued
16 interruptions of the witness' answers. Let her
17 answer the question and ask the question you want to
18 ask her.
19            THE WITNESS: There's more than one
20 way to derive a relative risk. One uses patient
21 years, that assumption there that risk is constant
22 over time. There are several other ways to derive
23 relative risk. You can derive relative risk from a
24 COX model. You can derive relative risk from a
25 ratio of rates, and that is often done. One can

Page 983

1 take the percentages and divide them, and that is
2 also considered a relative risk.
3 BY MR. SPECTER:
4      Q.     And neither was done for the FDA in
5 what was sent to them? You didn't give them the
6 relative risks either with or without patient years;
7 correct? Yes or no?
8      A.     We provided the raw ingredients that
9 anyone can derive a relative risk from. It's quite
10 simple.
11      Q.     Anyone can do it?
12      A.     Yes.
13      Q.     Do you think I can?
14      A.     I would hope so. You did some pretty
15 good math before.
16      Q.     Do you think the jurors can in this
17 case?
18      A.     I think they can get a pretty good
19 idea.
20      Q.     You think the jurors can take 0.31
21 and 0.08 and determine relative risk from that?
22            MR. MAYER: Object to the form.
23            THE WITNESS: I think they can
24 certainly get an estimate of one being higher and by
25 how much from that. I'm sure they are capable of

Page 984

1 looking at those numbers and seeing a difference.
2 BY MR. SPECTER:
3      Q.     Okay. Well, we'll see if they agree
4 with that.
5            Looking at Appendix 1.3, though,
6 Doctor, in what you didn't give the FDA, you had the
7 relative risks there, didn't you?
8            MR. MAYER: Object to the form.
9            THE WITNESS: We had the relative
10 risks.
11 BY MR. SPECTER:
12      Q.     And you had the patient years there,
13 don't you?
14      A.     Yes.
15      Q.     Doctor, when I handed you Exhibit 88
16 a few minutes ago, and you saw there was a section
17 C, were you surprised to see that? Yes or no?
18      A.     I didn't remember it.
19      Q.     Please answer my question.
20            When I showed it to you and showed
21 you that there was a section C with an MI endpoint,
22 were you surprised to see it? Yes or no?
23      A.     Well, I know I had looked at MIs and
24 had analyzed them. So, hard to say whether I was
25 surprised. I didn't recall writing it up, but I

Page 985

1 recall doing the analyses. So...
2      Q.     Doctor, whether or not it would be
3 hard to say whether you were surprised, were you, in
4 fact, surprised to see this document with a section
5 C?
6      A.     No. I -- the APTC endpoint
7 encompasses it. The results in terms of
8 heterogeneity were stronger for the MI endpoint.
9 It's one piece of the APTC. We weren't hiding the
10 MI results. We provided the APTC endpoint because
11 you can get more precision with more events, the
12 events track together. We pointed out to the FDA
13 that what was driving it were the MI results. It's
14 all there, and it's all listed. It's --
15      Q.     It's all there, and it's all listed?
16      A.     Yes.
17      Q.     I see. The relative risks are listed
18 and there for the FDA in the meta-analysis; is that
19 correct?
20      A.     The FDA can very easily divide two
21 numbers.
22      Q.     And these tables that appear at the
23 back of the section on results of the MI endpoint in
24 what you at Merck label a, quote, Full
25 meta-analysis, that's there for the FDA in what you

Confidential - Subject to Protective Order

Page 986

1  gave them as the meta-analysis?  Yes or no?
2            MR. MAYER:  Objection to the form.
3            THE WITNESS:  Section C is not
4  included --
5  BY MR. SPECTER:
6       Q.    Right.
7       A.    -- but all the information to
8  evaluate drug effects and the different comparators
9  is there for them.
10      Q.    Dr. Shapiro, did you ever see Exhibit
11 88 before I just handed it to you?
12      A.    Well, considering I wrote it, yes.
13      Q.    So, you'd expect that it would be in
14 your custodial file; correct?
15      A.    I don't know.
16      Q.    Well, would you expect that it would
17 be in your custodial file?
18      A.    Not necessarily.
19      Q.    Well, so you had it, but you think
20 you threw it away?
21      A.    I don't recall.
22      Q.    So, it might be there, and it might
23 not be there?  Is that what you're saying?
24            MR. MAYER:  Objection to the form.
25 That's not what she said.

Page 987

1            THE WITNESS:  If we -- I don't know
2  the timing of whether we were holding all documents
3  at that point in time or not, so, I don't know if it
4  would be in my file or not.
5  BY MR. SPECTER:
6       Q.    Dr. Shapiro, do you think that a
7  document titled "Full Meta-Analysis" is the kind of
8  thing you would throw away?
9            MR. MAYER:  Object to the form.
10           THE WITNESS:  If I had something
11 electronically, I may not keep the hard copy.  I
12 don't write sideways, so, I never wrote "Full
13 Meta-Analysis."  That's someone else's opinion
14 because I don't write on documents sideways.  I
15 don't know how --
16 BY MR. SPECTER:
17      Q.    Would it surprise you to learn that
18 this document is not in the custodial file produced
19 from you by Merck?  Would that surprise you?
20      A.    No.
21      Q.    No, it wouldn't?
22      A.    No.
23      Q.    Let's go on to something else.
24            Would you put Exhibit 85 in front of
25 you, please?

Page 988

1       A.    (Witness complies.)
2       Q.    Now, this is that Musliner memo from
3  November of '96 that your lawyer questioned you
4  about a little while ago, and I think he pointed you
5  to Page 4, the bottom paragraph.  Do you recollect
6  that?
7       A.    I need to see what you are talking
8  about, please.
9       Q.    I'm sorry.  I thought -- excuse me.
10 I was looking at it myself and didn't know you
11 didn't have it in front of you, so I'll get it in
12 front of you.
13           Here you are.
14           (Handing over document.)
15           I think that your lawyer was asking
16 you about Page 4, the last paragraph?
17      A.    Yes.
18      Q.    Would that be right?
19      A.    Yes.
20      Q.    You read at his request certain
21 assumptions; correct?
22      A.    Yes.
23      Q.    And you read assumptions (a), (b),
24 and (c); is that correct?
25      A.    Yes.

Page 989

1       Q.    And do you recollect that he
2  interrupted you after you read (c)?  Do you
3  recollect that?
4       A.    I don't know if I'd count it as an
5  interruption, but I did stop at that point.
6       Q.    Well, you stopped because he spoke;
7  correct?
8       A.    Right.
9       Q.    So, keep reading, please, read (d)
10 and read the next sentence.
11      A.    "(d)  Equal numbers of patients will
12 be treated with NSAIDs and COX-2 inhibitor over the
13 course of the study.  Some of these assumptions
14 involve gross oversimplification, but are adopted
15 for the sake of simplicity and because greater
16 sources of error are likely to be introduced by
17 other factors in any case."
18      Q.    I wanted to read (d) and the next
19 sentence.  If you want to read something else, you
20 may.
21      A.    Well, I'd like to look through.
22           (Witness reviewing document.)
23      Q.    The pending question is, do you want
24 to read something else?
25      A.    Yes.

KS-000475

Confidential - Subject to Protective Order

Page 990

1    Q.    What else do you want to read to the
2  jury?
3    A.    Starting at the bottom of Page 5,
4  "While one could argue that the differences are not
5  unexpected due to the absence of antiplatelet effect
6  for the selective COX-2 inhibitor, it would create a
7  negative aspect to the results and leave open the
8  question (reasonable or unreasonable) whether the
9  drug might in some other way be contributing to such
10  events."  The point being that one thing having a
11  beneficial effect creates a negative impression that
12  it was likely to be unreasonable.
13    Q.    And that's if aspirin weren't
14  permitted; correct?  In the study?  If people taking
15  aspirin prophylactically weren't permitted, this
16  could occur; right?  That's the context for what you
17  just read; right?
18    A.    I don't know if that's the context or
19  not.
20    Q.    Well, Doctor, you picked out a
21  sentence --
22    A.    Yes, but --
23    Q.    Can I finish my question, please.
24       You picked out a sentence from the
25  bottom of Page 5 and the start of that paragraph

Page 991

1  says, "If aspirin prophylaxis is not permitted,
2  there is a substantial chance that significantly
3  higher rates of CV adverse events (MIs, angina,
4  strokes, TIAs, et cetera) will be observed in the
5  selective COX-2 inhibitor group compared to the
6  standard NSAID group, as summarized in the preceding
7  section."
8       And then what follows is the sentence
9  that you just read; correct?
10    A.    Yes.
11    Q.    Right.
12       So, the way that Merck dealt with
13  that was, Merck attempted to minimize between group
14  differences by excluding patients at high risk, that
15  is, patients with things like prior heart attacks,
16  angina, stroke, TIA, atrial fibrillation, valvular
17  heart disease, peripheral vascular disease, et
18  cetera; correct?
19    A.    No.  I disagree.  The reason why you
20  would not want to have patients at high risk in a
21  trial that does not allow aspirin is that they need
22  to be treated with aspirin.  And you can't test the
23  GI hypothesis if patients in both groups are
24  receiving a drug that causes GI effects.  So, you
25  would not include these high risk patients because

Page 992

1  you're not allowed to treat them appropriately.
2    Q.    I see.
3       Doctor, you say that, but look at the
4  very next page of this document.  It says, "The
5  following options are listed as potential ways to
6  deal with these risks; none of them appear ideal."
7  The first option that's listed is:  "Prohibit use of
8  low-dose aspirin and accept the risk of observing
9  significant differences in CV event rates."  Have I
10  read this correctly so far?
11    A.    Yes.
12    Q.    What follows immediately after that
13  is, "One could attempt to minimize between-group
14  differences by excluding patients at high risk (i.e.
15  with prior MI, angina, stroke, TIA, atrial
16  fibrillation, valvular heart disease, peripheral
17  vascular disease et cetera)."  Did I read that
18  correctly, Dr. Shapiro?
19    A.    Yes.
20    Q.    Thank you.  I'm now finished with
21  that document.
22       Let's move to Shapiro-51 which your
23  lawyer asked you about earlier today.
24       Now, I believe that the questioning
25  here revolved around the issue of when the

Page 993

1  cardiovascular SOP was amended.  Do you recollect
2  that?
3    A.    Yes.
4    Q.    Was it your point essentially in
5  answering the questions from your lawyer that the
6  cardiovascular SOP was amended in October of '99 and
7  not in December of '99?
8       MR. MAYER:  Objection to the form.
9       THE WITNESS:  As it states and as I
10  read, the decision to revise the list is October
11  3rd, and then it goes on to say that the changes had
12  been made -- I'd like to find the exact page.
13  BY MR. SPECTER:
14    Q.    I think it's 5.
15    A.    It was effective October 3rd, 1999.
16  So, while the formal plan appears not to have come
17  through for approval until somewhat later, it
18  actually went into effect earlier.
19    Q.    Well, that's just what I wanted to
20  ask you about.
21       For example, when was congestive
22  heart failure taken off the list of events?
23    A.    I can't tell you exactly, but I have
24  seen a version of these tables that had dates next
25  to the various items that were crossed through, and

Confidential - Subject to Protective Order

Page 994

1  that version would give you more information.
2      Q.    Well, I'm just dealing with the
3  document that your lawyer was questioning you about
4  this morning.  What does this document indicate, if
5  anything, as to when, for example, congestive heart
6  failure was taken off the list?
7      A.    My read of this document says that
8  that was as of October 3rd.
9      Q.    Now, can you show me where congestive
10  heart failure is listed in this document, if
11  anywhere, as something that was taken off the list
12  as of October 3rd?
13     A.    The statement on Page 5 says,
14  "Effective October 3, 1999, in consultation with
15  Cardiovascular Clinical Sciences, a revised list of
16  eligible events is in effect (Appendix B)," and the
17  next page has Appendix B with "congestive heart
18  failure" struck through.
19     Q.    Exactly.
20           What's the date of Appendix B?
21     A.    The date of Appendix B is not -- you
22  can't infer from the date at the top of the document
23  that that's the date that it got crossed through.
24  That's the date of this document.
25     Q.    Doctor, tell the jury --

Page 995

1      A.    If you look at the page before --
2      Q.    Just tell the jury what the date is
3  on the document, please.  My only question is,
4  what's the date on the document?
5      A.    The date on the document is December
6  29, 1999, and as you see, if you look at all the
7  other pages, that's part of the title, and the
8  header -- the header of the document.  So, it's on
9  every page.
10     Q.    It is on the header of every page,
11  December 29?
12     A.    Yes.
13     Q.    Is it on the header of the page of
14  this document, 027?
15     A.    Typically, you don't put a header on
16  the cover letter --
17     Q.    Please, just tell me, is it on there?
18     A.    It is not on there.
19     Q.    Is it on there or not?
20     A.    Starting on Page 1, which is Bates
21  Number 31, it says revised December 29 1999, it says
22  it on the next page, it says it on the rest of the
23  body, it says it on Appendix B, it says it on
24  Appendix G, it says it on adjudication worksheet,
25  which was likely not revised on December 29, but it

Page 996

1  is included for information.
2      Q.    Do you know that?
3      A.    Well, I'd have to read through and
4  ask people, but it says it on Appendix J.  It says
5  it on the next page of Appendix J.  It says it on
6  the final adjudication form.  It looks to me,
7  knowing how to use Word, that that's in the header
8  of the Word document.
9      Q.    So, what was the revision on December
10  29, 1999, do you know?
11     A.    I don't know, but the inference --
12     Q.    Please, don't "but" me, Doctor.  Just
13  answer my question.
14           Do you know what the revision was on
15  that day?
16           MR. MAYER:  Object to constantly
17  interrupting the witness.
18           MR. SPECTER:  I object to the witness
19  not answering the question over and over and over
20  again.  I ask her a question, she doesn't answer it
21  and then they "buts" me.  I just want to know what
22  the answer is to my question.
23           MR. MAYER:  I object to the speech.
24           MR. SPECTER:  Let me ask the
25  question.  Well, I object to your statements.

Page 997

1  BY MR. SPECTER:
2      Q.    Now, let me ask the question again.
3  It is a simple question.  Yes or no?
4           Do you know what was revised about
5  this document, if anything, on December 29 of '99?
6  Do you know?
7      A.    I don't know, but -- and I would like
8  to proceed -- a person looking at the contents of
9  the document would deduce based on the statements in
10  the document that Appendix B was revised on October
11  3rd, and that this document is a summary that's
12  going in for approval that has a header dated
13  December 29.
14     Q.    Doctor, as part of your approach to
15  this deposition, do you have it in mind to use the
16  word "but" as often as possible in your answers?
17           MR. MAYER:  Objection to the form.
18           THE WITNESS:  I'm trying to be
19  accurate, and I'm trying to be thorough and --
20  BY MR. SPECTER:
21     Q.    Doctor --
22     A.    -- sometimes a simple answer is
23  inaccurate and misleading.
24     Q.    Doctor, congestive heart failure, yes
25  or no, do you know when congestive heart failure was

KS-000477

Confidential - Subject to Protective Order

Page 998

1 crossed off the list?
2      A.    On or before October 3rd based on
3 what this says.
4      Q.    On or before October 3rd?
5      A.    It says "Effective October 3rd."
6      Q.    Now, let's move to Shapiro-8, which
7 is the FDA medical officer's review that you talked
8 about with your lawyer this morning.  Do you
9 recollect that?
10      A.    Yes.
11      Q.    You read some sections of what she
12 had to say, is it Ms. Villalba or Dr. Villalba?
13      A.    It is Dr. Villalba.
14      Q.    You read some sections of that?
15      A.    Yes.
16      Q.    I want to go to the summary section,
17 if we could, page 105 of the document.
18      A.    Page 105?
19      Q.    Upper right-hand corner, 105.  Does
20 it say "In summary:  With the available data, it is
21 impossible to answer with complete certainty whether
22 the risk of cardiovascular and thromboembolic events
23 is increased in patients on Vioxx.  A larger
24 database will be needed to answer this and other
25 safety comparison questions."  Did I read that

Page 999

1 correctly?
2      A.    Yes.
3      Q.    Did you ever figure out how many
4 patients were on Vioxx for longer than a year from
5 which you could make a determination about CV and
6 thromboembolic events?
7            MR. MAYER:  Objection to the form.
8 BY MR. SPECTER:
9      Q.    Do you recall we discussed that
10 yesterday?  Do you remember?
11      A.    I --
12            MR. MAYER:  I think you asked that
13 question, she answered it several times.
14 BY MR. SPECTER:
15      Q.    Let me make my question more clear
16 because I think it was an unclear question.
17            Since you said yesterday that
18 question -- strike that also.
19            When I asked you that question
20 yesterday, you didn't know the answer to it; is that
21 correct?
22      A.    I do not have at hand how many
23 patients were studied at one year.
24      Q.    Right.  Did you check last night or
25 this morning?

Page 1000

1      A.    No.
2      Q.    Did you check last night or this
3 morning how many patients were studied who were on
4 Vioxx for more than 18 months?
5      A.    No.
6      Q.    For more than six months?
7      A.    No.
8      Q.    Do you recall we asked you those
9 questions yesterday, and those were things that you
10 didn't know the answer to; is that correct?
11      A.    Yes.
12      Q.    Now, I want to ask you about Exhibit
13 80, which was that letter you got from one of your
14 DSMB colleagues, Dr. Bjorkman; correct?
15      A.    Yes.
16      Q.    And you read some sections of that in
17 response to questions from your lawyer; is that
18 correct?
19      A.    Yes.
20      Q.    I want to ask you some things that
21 you did not read from in that letter.
22            He tells you that "I realize that our
23 decision to allow the trial to continue will be put
24 under the microscope."
25      A.    Can you tell me where you are?

Page 1001

1      Q.    I'm at the third paragraph.
2      A.    Yes.
3      Q.    Is that correct?
4      A.    Yes.
5      Q.    And then he says, "Good luck.  It is
6 a shame we have never met in person."  Correct?
7      A.    Yes.  Other than you didn't read all
8 of that other sentence, but yes.
9      Q.    So, this man who Merck hired to be on
10 the VIGOR trial DSMB never came to a single one of
11 your meetings; correct?  He participated by
12 telephone; is that correct?
13      A.    He participated by telephone.
14      Q.    And you wanted these DSMB members to
15 be there in person; correct?
16      A.    It states in our guidelines that that
17 would be ideal.  However, we would not have been
18 able to schedule meetings in a timely fashion if we
19 required that.  These experts are very busy, and
20 some of it requires extensive travel.  He was in
21 Salt Lake City, I believe, so, no, he did not attend
22 in person, but he was a very active and involved
23 participant.
24      Q.    Do you agree with him that it was a
25 shame that you and he had not met in person ever?

KS-000478

Confidential - Subject to Protective Order

Page 1002

1    A.    Do I agree it was a shame?
2    Q.    Yes.
3    A.    He seems like a wonderful person.  I
4 liked him, so I would have liked to have met him,
5 and I have since.
6    Q.    Doctor, you had some discussion with
7 your lawyer concerning your work with Dr. Scolnick;
8 is that correct?
9    A.    Well, on the e-mail from Dr.
10 Scolnick, yes.  Is that what you are referring to?
11    Q.    There was discussion about the
12 e-mails with Dr. Scolnick concerning his interests
13 in having a, quote, confidential meeting, unquote,
14 with you; is that correct?
15    A.    Yes.
16    Q.    There was discussion between you and
17 your lawyer this morning concerning whether Dr.
18 Scolnick could have been told about the results of
19 the VIGOR trial as it was ongoing.  Do you recollect
20 that?
21    A.    Yes.
22    Q.    Did you continue to talk to Dr.
23 Scolnick about his views concerning the VIGOR trial
24 after the results were known to him?
25         MR. MAYER:  Objection to the form.

Page 1003

1         THE WITNESS:  When you say "talk,"
2 can you be more --
3 BY MR. SPECTER:
4    Q.    I really should have said
5 communicate.  Did you communicate with Dr. Scolnick
6 or he with you concerning his views of the results
7 of the VIGOR trial after the results became known to
8 him?
9    A.    I received e-mails from him and many
10 other people that I was copied on that talked about
11 the results of VIGOR and the other trials.
12         MR. MAYER:  I object to this line of
13 questioning as outside the scope of direct, but also
14 we've been over at length before in this deposition.
15 BY MR. SPECTER:
16    Q.    Dr. Shapiro, do you recollect telling
17 us on direct examination words to the effect that by
18 late March of 2000, it was the views of the various
19 people who were working on the VIGOR trial that the
20 five to one difference in heart attack rates seen in
21 people on Vioxx versus people on naproxen was due to
22 a cardioprotective effect of naproxen?
23         MR. MAYER:  On direct examination?
24 Is that your question?
25         MR. SPECTER:  Yes.

Page 1004

1         THE WITNESS:  We didn't talk about
2 that today, I don't think, but --
3         MR. SPECTER:  When you said "direct,"
4 Ted, what I meant to say was by way of my direct of
5 you as opposed to your direct of her.
6 BY MR. SPECTER:
7    Q.    In any event, let me start the
8 question over again.
9         Do you recollect that when I
10 questioned you over the days that we've been
11 together we had discussion about the views of Merck
12 personnel who evaluated the VIGOR results in March
13 of 2000?
14    A.    Yes.
15    Q.    And you were one of those persons; is
16 that correct?
17    A.    Can you excuse me.
18              - - -
19         (Whereupon, an off-the-record
20 discussion was held between the witness and her
21 attorney.)
22              - - -
23         MR. MAYER:  Let's finish the
24 question, and I'll register an objection.  The
25 witness can answer that question, and the witness

Page 1005

1 has asked whether we can break for lunch at some
2 time.
3         MR. SPECTER:  We can break for lunch,
4 but I'm on the last document I have.  I have five
5 minutes or less --
6         MR. MAYER:  Are you okay with that?
7         MR. SPECTER:  So, if you want to come
8 back, we can come back.
9         THE WITNESS:  Five minutes is fine.
10 I just didn't know how long it was going to be.
11         MR. MAYER:  Do you have the question
12 in mind, Dr. Shapiro?
13         THE WITNESS:  Yes.
14         MR. SPECTER:  What I'd like to do --
15         MR. MAYER:  I object as beyond the
16 scope of my direct examination.
17         MR. SPECTER:  What I would like to do
18 is, I'd like to have one of the many people here
19 from Merck go next door and ask them to pipe down so
20 that the Doctor is able to answer without having the
21 interruption of noise and so that I can ask my
22 questions without the interruption of noise.
23         Let's go off the video record for
24 just a moment, please.
25         MR. MAYER:  Let the record reflect

Confidential - Subject to Protective Order

Page 1006

1  there are more people here for plaintiffs than for
2  Merck.
3          MR. SPECTER:  We'll do it, too.
4  We'll do it.
5          THE VIDEOTAPE TECHNICIAN:  Off the
6  record at 12:49 p.m.
7                    - - -
8          (Whereupon, there was a recess from
9          12:49 p.m. until 12:49 p.m.)
10                   - - -
11         THE VIDEOTAPE TECHNICIAN:  Back on
12  the record at 12:49.
13  BY MR. SPECTER:
14      Q.    I think the pending question was
15  whether you recollect there was discussion among
16  various people at Merck in March of 2000 when the
17  VIGOR results became known as to the significance of
18  those results?
19      A.    Yes.
20      Q.    You were part of that; is that
21  correct?
22      A.    Yes.
23      Q.    You told us that you reached the view
24  that the excess heart attacks in the Vioxx group
25  were due to a cardioprotective effect of naproxen?

Page 1007

1       A.    Yes.
2       Q.    Is that correct?
3       A.    Yes.
4       Q.    And what did Dr. Scolnick think about
5  that?
6       A.    After we had seen the data from the
7  Alzheimer's trials and the other trials we brought
8  in and after we had seen the pharmacokinetic data,
9  we were all in agreement with what that conclusion
10  was by the end of March.
11      Q.    And that conclusion was what?
12      A.    That naproxen had cardioprotective
13  effects, and that explained the results of VIGOR
14  compared to the results with nonnaproxen NSAIDs and
15  placebo.
16      Q.    So, the view was that the results
17  were not explainable by the prostacyclin/thromboxane
18  hypothesis?  That's your testimony; correct?
19          MR. MAYER:  Objection to the form.
20  I'll object again to this line of questioning as
21  retreading old ground and outside the scope of my
22  examination.
23  BY MR. SPECTER:
24      Q.    Is that correct, Doctor?
25      A.    Based on all the evidence we had,

Page 1008

1  that was most consistent with the data we had.
2       Q.    You and your colleagues did not think
3  that the data was explainable by the
4  prostacyclin/thromboxane hypothesis; is that
5  correct?
6       A.    That's right --
7          MR. MAYER:  Same objection.
8          THE WITNESS:  -- because the placebo
9  data and the nonnaproxen NSAIDs data didn't support
10  it, neither did the pharmacokinetic data.
11                   - - -
12         (Whereupon, Deposition Exhibit
13         Shapiro-89, E-mails, MRK-ABH0017846 -
14         MRK-ABH0017847, was marked for
15         identification.)
16                   - - -
17  BY MR. SPECTER:
18      Q.    I would like to show you an e-mail
19  that was sent to you dated April 1st, 2000 from Dr.
20  Scolnick.  Take a minute and look at it, if you
21  would, please.
22      A.    (Witness reviewing document.)
23      Q.    All set?
24      A.    Yes.
25      Q.    What had happened was that on March

Page 1009

1  31st of 2000, you as the statistician for the VIGOR
2  trial had sent to a whole group of people at Merck,
3  including upper management, updated results on the
4  adjudicated thromboembolic events; correct?
5          MR. MAYER:  Objection, outside the
6  scope of direct.
7          You may answer, Doctor.
8          THE WITNESS:  Yes.
9  BY MR. SPECTER:
10      Q.    Then Dr. Reicin had asked you, again,
11  copying a lot of people in upper management, "How
12  many MIs and CVAs" -- CVA would be a stroke;
13  correct?
14          MR. MAYER:  Same objection.
15          THE WITNESS:  Cerebrovascular
16  accident.  I guess that's the same as a stroke.
17  BY MR. SPECTER:
18      Q.    Right.  "How many MIs and CVAs in
19  each group?  Alise."  Correct?
20          MR. MAYER:  Same objection.
21          THE WITNESS:  Yes.
22  BY MR. SPECTER:
23      Q.    Her to you; right?
24          MR. MAYER:  Same objection.
25          THE WITNESS:  Yes.

KS-000480

Confidential - Subject to Protective Order

Page 1010

1  BY MR. SPECTER:
2      Q.     And then you gave her that data; is
3  that correct?
4          MR. MAYER:  Same objection.
5          THE WITNESS:  Yes.
6  BY MR. SPECTER:
7      Q.     And you said to her and others
8  including Dr. Scolnick, "The breakout is below.  The
9  results are somewhat surprising.  I'll work on a
10  table that shows all adjudicated events by type of
11  event."  Is that correct?
12      A.     Yes.
13          MR. MAYER:  Same objection.
14  BY MR. SPECTER:
15      Q.     You felt the results were surprising,
16  otherwise, you wouldn't have said that; correct?
17          MR. MAYER:  Same objection.
18          THE WITNESS:  Yes.
19  BY MR. SPECTER:
20      Q.     Then Dr. Scolnick writes back to you,
21  copying only Dr. Reicin, and he says, "Deborah, This
22  is really interesting.  In fact the results are NOT
23  surprising."  Did I read that correctly so far?
24          MR. MAYER:  Same objection.
25          THE WITNESS:  Yes.

Page 1011

1  BY MR. SPECTER:
2      Q.     And he put the word "not" in all
3  capital letters; correct?
4          MR. MAYER:  Same objection.
5          THE WITNESS:  Yes.
6  BY MR. SPECTER:
7      Q.     He says, "All the low dose aspirin
8  data says that low dose aspirin had beneficial
9  effects on MIs but hardly clear on cerebral events.
10  This data is perfectly in line with that.  The
11  prostacyclin/thromboxane hypothesis is further
12  strengthened by this data."  Did I read that
13  correctly so far?
14      A.     Yes.
15          MR. MAYER:  Same objection.
16  BY MR. SPECTER:
17      Q.     Then he says, "Whether naproxen
18  lowers in RA patients is issue.  Only more work will
19  clarify this aspect/Ed Scolnick."  Did I read that
20  correctly?
21          MR. MAYER:  Same objection.
22          THE WITNESS:  Yes.
23          MR. SPECTER:  Thank you.  Nothing
24  further, Doctor.
25          MR. MAYER:  Let's take two minutes.

Page 1012

1          THE VIDEOTAPE TECHNICIAN:  Off the
2  record at 12:56.
3          - - -
4          (Whereupon, the deposition concluded
5      at 12:56 p.m.)
6          - - -
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 1013

1              CERTIFICATE
2
3          I, LINDA L. GOLKOW, a Notary Public
4  and Certified Shorthand Reporter of the State of New
5  Jersey, do hereby certify that prior to the
6  commencement of the examination, DEBORAH SHAPIRO,
7  DR.P.H. was duly sworn by me to testify to the
8  truth, the whole truth and nothing but the truth.
9          I DO FURTHER CERTIFY that the
10  foregoing is a verbatim transcript of the testimony
11  as taken stenographically by and before me at the
12  time, place and on the date hereinbefore set forth,
13  to the best of my ability.
14          I DO FURTHER CERTIFY that I am
15  neither a relative nor employee nor attorney nor
16  counsel of any of the parties to this action, and
17  that I am neither a relative nor employee of such
18  attorney or counsel, and that I am not financially
19  interested in the action.
20  _____
21      LINDA L. GOLKOW, CSR
        Notary Number:  1060147
22      Notary Expiration:  1-2-08
        CSR Number:  30XI176200
23      Dated:  July 6, 2005
24
25

KS-000481
57 (Pages 1010 to 1013)

Confidential - Subject to Protective Order

Page 1014

1        ACKNOWLEDGMENT OF DEPONENT
2
3        I,_____, do hereby
certify that I have read the foregoing pages,  869 -
4  1016, and that the same is a correct transcription
of the answers given by me to the questions therein
5  propounded, except for the corrections or changes in
form or substance, if any, noted in the attached
6  Errata Sheet.
7
8  _____
DEBORAH SHAPIRO, DR.P.H.              DATE
9
10
11  Subscribed and sworn
to before me this
12      day of        , 20  .
13  My commission expires:
14
15  Notary Public
16
17
18
19
20
21
22
23
24
25

Page 1016

1        LAWYER'S NOTES
2  PAGE  LINE
3  ____  ____  _____
4  ____  ____  _____
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
25  ____  ____  _____

Page 1015

1          - - - - - -
          E R R A T A
2          - - - - - -
3  PAGE   LINE   CHANGE
4  ____   ____   _____
5  ____   ____   _____
6  ____   ____   _____
7  ____   ____   _____
8  ____   ____   _____
9  ____   ____   _____
10  ____   ____   _____
11  ____   ____   _____
12  ____   ____   _____
13  ____   ____   _____
14  ____   ____   _____
15  ____   ____   _____
16  ____   ____   _____
17  ____   ____   _____
18  ____   ____   _____
19  ____   ____   _____
20  ____   ____   _____
21  ____   ____   _____
22  ____   ____   _____
23  ____   ____   _____
24  ____   ____   _____
25

KS-000482

58 (Pages 1014 to 1016)

Exhibit "36"

```
 1              SUPERIOR COURT OF NEW JERSEY
                LAW DIVISION - ATLANTIC COUNTY
 2                      -  -  -
    IN RE:   VIOXX LITIGATION : CASE NO. 619
 3  ----------------------------------------------------
        IN THE CIRCUIT COURT OF CLAY COUNTY, ALABAMA
 4
    CHERYL ROGERS, et al.    :   CASE NO.
 5          Plaintiff        :
            v.               :
 6  MERCK & CO., INC., et al.,:
            Defendants       :   CV-03-73
 7  ----------------------------------------------------
                CAUSE NO. 19961*BH02
 8                      -  -  -
    CAROL ERNST, INDIVIDUALLY : IN THE DISTRICT COURT OF
 9  AND AS PERSONAL          :
    REPRESENTATIVE OF THE    :
10  ESTATE AND HEIRS OF ROBERT:
    CHARLES ERNST, DECEASED;  :
11  R. CHARLES ERNST;        :
    ANGELA F. ERNST          :   BRAZORIA COUNTY, TEXAS
12          v.               :
    MERCK & CO., INC.,       :
13  HARVEY RESNICK, M.D. AND  :
    R/D CLINICAL RESEARCH,   :
14  INC., BRENT H. WALLACE   :
    M.D.                     :   23RD JUDICIAL DISTRICT
15                      -  -  -
16                  CONFIDENTIAL
                SUBJECT TO PROTECTIVE ORDER
17
                        -  -  -
18                  April 8, 2005
                        -  -  -
19
            Continued videotape deposition of PETER S.
20
    KIM, Ph.D.
21
                        -  -  -
22
23
                ESQUIRE DEPOSITION SERVICES
24          1880 John F. Kennedy Boulevard
                    15th Floor
25          Philadelphia, Pennsylvania 19103
```

**KS-000483**

Confidential - Subject to Protective Order

Page 629

1 PHILIP & CYNTHIA DIPIETRO : COURT OF COMMON PLEAS
     (h/w)        : DELAWARE COUNTY
2     v.        :
   MERCK & CO., INC.     :
3     AND        :
   ROBERT F. CROWELL, D.O. :
4     AND        :
   BROOKHAVEN MEDICAL    : CIVIL ACTION
5 ASSOCIATES      : NO: 04-19198
6            - - -
7
8
9
10
11     Continued videotape deposition of PETER S.
12 KIM, Ph.D., held in the offices of Dechert, LLP,
13 1717 Arch Street, Philadelphia, Pennsylvania,
14 commencing at 9:04 a.m., on the above date, before
15 Linda L. Golkow, a Federally-Approved Registered
16 Diplomate Reporter and Certified Shorthand Reporter.
17
18            - - -
19
20
21
22
23
24
25

Page 631

1 A P P E A R A N C E S :  (CONTINUED)
2
3    GOFORTH LEWIS SANFORD LLP
       BY:  CARLENE RHODES LEWIS, ESQUIRE
4          and
       SHELLY A. SANFORD, ESQUIRE
5    Suite 2200
     1111 Bagby
6    Houston, Texas 77002
     (713) 650-0022
7    Counsel for Plaintiffs
     (By Telephone)
8
9    LOCKS LAW FIRM PLLC
       BY:  STEVEN P. KNOWLTON, ESQUIRE
10   110 East 55th Street
     New York, New York 10022
11   (212) 838-3333
     Counsel for Plaintiffs
12
13
     THE FERRARA LAW FIRM
14     BY:  MICHAEL A. FERRARA, JR., ESQ.
     601 Longwood Avenue
15   Route 38 & Longwood Avenue
     Cherry Hill, New Jersey 08002
16   (856) 779-9500
     Counsel for Plaintiffs
17
18
19   KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
       BY:  COURTNEY OZER DECRISTOFARO, ESQUIRE
20   1633 Broadway
     New York, New York 10019-6799
20   (212) 506-1700
21   Counsel for Plaintiffs
22
23            - - -
24
25

Page 630

1 A P P E A R A N C E S :
2
3    KLINE & SPECTER, P.C.
       BY:  SHANIN SPECTER, ESQUIRE
4          and
       THOMAS R. KLINE, ESQUIRE
5          and
       LEE B. BALEFSKY, ESQUIRE
6          and
       LISA DAGOSTINO, M.D., J.D.
7          and
       MICHELLE L. TIGER, ESQUIRE
8    19th Floor
     1525 Locust Street
9    Philadelphia, Pennsylvania 19102
     (215) 772-1000
10   Counsel for Plaintiffs
11
12   SEEGER WEISS LLP
       BY:  DAVID R. BUCHANAN, ESQUIRE
13   Suite 920
     550 Broad Street
14   Newark, New Jersey 07102
     (973) 639-9100
15   Counsel for Plaintiffs
     (By Telephone)
16
17   THE BEASLEY FIRM LLC
       BY:  NANCY RHOADS, ESQUIRE
18   1125 Walnut Street
     Philadelphia, Pennsylvania 19107
19   (215) 592-1000
     Counsel for Plaintiffs
20
21
     THE LANIER LAW FIRM
22     BY:  RICHARD D. MEADOW, ESQUIRE
     6th Floor, Tower 56
23   126 East 56th Street
     New York, New York 10022
24   (212) 421-2800
     Counsel for Plaintiffs
25            - - -

Page 632

1 A P P E A R A N C E S :  (CONTINUED)
2
3    WEITZ & LUXENBERG
       BY:  JERRY KRISTAL, ESQUIRE
4          and
       JOSEPH P. WILLIAMS, ESQUIRE
5    180 Maiden Lane
     New York, New York 10038
6    (212) 558-5500
     Counsel for Plaintiffs
7
8
     WILLIAMS & CONNOLLY LLP
9      BY:  DAVID C. KIERNAN
           and
10       ANDREW W. RUDGE, ESQUIRE
     725 Twelfth Street, N.W.
11   Washington, D.C. 20005
     (202) 434-5000
12   Counsel for Merck & Company, Inc.
     and the Witness, Peter S. Kim, Ph.D.
13
14
     HUGHES HUBBARD & REED, LLP
15     BY:  JAMES C. FITZPATRICK, ESQUIRE
     One Battery Park Plaza
16   New York, New York 10004-1482
     (212) 837-6000
17   Counsel for Merck & Company, Inc.
     and the Witness, Peter S. Kim, Ph.D.
18
19
     O'BRIEN & RYAN, LLP
20     BY:  ANTHONY M. GALLO, ESQUIRE
     Suite 300, Hickory Pointe
21   2250 Hickory Road
     Plymouth Meeting, PA 19462-1047
22   (610) 834-8800
     Counsel for Dr. Crowell
23
24
25            - - -

**KS-000484**

2 (Pages 629 to 632)

Esquire Deposition Services

Confidential - Subject to Protective Order

Page 633

1  A L S O   P R E S E N T :
2
3     JOANNE LAHNER, ESQUIRE
      Merck & Co., Inc.
4     351 N. Sumneytown Pike
      North Wales, PA 19454-2505
5     (267) 305-6331
6
7     ROBERT ZAUSNER
      Kline & Specter, P.C.
8     19th Floor
      1525 Locust Street
9     Philadelphia, Pennsylvania 19102
      (215) 772-1000
10
11
12
13
14
              - - -
15
16
17
18
19
20
21
22
23
24
25

Page 635

1              E X H I B I T S
2  NO.        DESCRIPTION        PAGE NO.
3
Kim-48  "Comparison of Upper Gastro-    758
4       intestinal Toxicity of Rofecoxib
        and Naproxen in Patients with
5       Rheumatoid Arthritis"  The New
        England Journal of Medicine
6       November 23, 2000 (1520-1528)
        MRK-ABA0001301 -
7       MRK-ABA0001309
8  Kim-49  Letter 4-7-05 with Attachment  774
        Partially unredacted documents
9       MRK-AFJ0000282 -
        MRK-AFJ0000317
10
11 Kim-50  E-mail 3-9-2002         825
        MRK-AFJ0000576 -
        MRK-AFJ0000577
12
13 Kim-51  PowerPoint Presentation  832
        "Effects of NSAIDs on
        Thromboxane and Prostacyclin"
14      MRK-AFJ0009371
15 Kim-52  PowerPoint Presentation "Merck  834
        Research Laboratories Face-to-
16      Face Meeting Peter S. Kim"
        November 29-30, 2001
17      MRK-AFJ0009366 -
        MRK-AFJ0009379
18
19 Kim-53  E-mail 11-21-2001      838
        MRK-AAZ0003351
20 Kim-54  Vioxx label, April 2002  847
21 Kim-55  E-mails               854
        MRK-AFJ0000518 -
22      MRK-AFJ0000519
23
              - - -
24
25

Page 634

1              - - -
2            I N D E X
3  WITNESS            PAGE NO.
4  PETER S. KIM, Ph.D.
5     By Mr. Specter        640
6
7
8            - - -
9         E X H I B I T S
10 NO.     DESCRIPTION     PAGE NO.
11 Kim-43  "Section: A  Good Riddance  651
        To a Bad Drug" Eric J. Topol
12      New York Times 10/2/04
        (3 pages)
13
Kim-44    New York Times Letter to the  652
14      Editor 10-8-04 (Peter S. Kim)
        Reprint (2 pages)
15
Kim-45    "Discontinuation of Vioxx"  663
16      Kim/Reicin) Lancet vol. 365
        1-1-05 (23-28) January 3, 2005
17
Kim-46    "Food and Drug Administration  704
18      Division of Anti-Inflammatory,
        Analgesic and Ophthalmic Drug
19      Products-HFD-550 Medical Officer
        Review NDA 21-042 and NDA 21-052"
20      (56 pages)
21 Kim-47    "Rofecoxib, Merck, and the FDA"  729
        Correspondence, The New England
22      Journal of Medicine 12-30-04,
        351;27 (2875-2878)
23
24            - - -
25

Page 636

1              E X H I B I T S
2  NO.          DESCRIPTION        PAGE NO.
3  Kim-56  US Patent & Trademark Office   860
        Patent Application Full Text
4       And Image Database
        #20020016342 2-7-02
5       "Combination therapy using
        Cox-2 selective inhibitor
6       and thromboxane inhibitor
        and compositions therefor"
7       (Scolnick)
        MRK-GAR0003079 -
8       MRK-GAR0003096
9
10
              - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

KS-000485

3 (Pages 633 to 636)

Confidential - Subject to Protective Order

Page 637

DEPOSITION SUPPORT INDEX

Direction to Witness Not To Answer
Page  Line  Page  Line
(None)

Request For Production of Documents
Page  Line  Page  Line
691    25

Stipulations
Page  Line  Page  Line
(None)

Questions Marked
Page  Line  Page  Line
(None)

---

Page 638

                    - - -
          PETER S. KIM, Ph.D.
after having been duly sworn, was examined and
testified as follows:
                    - - -
          MR. SPECTER:  Dr. Kim, good morning.
          THE WITNESS:  Good morning.
          MR. SPECTER:  Shanin Specter again.
I want to remind you that you're still under oath.
You're aware of that, sir?
          THE WITNESS:  Yes.
          MR. SPECTER:  Before we get started,
off the video record let's identify who is here
today.
          From my firm are myself, Lisa
Dagostino, Lee Balefsky, Robert Zausner, Tom Kline
and Michelle Tiger.
          MR. MEADOW:  Rick Meadow from The
Lanier Law Firm, plaintiffs.
          MS. DECRISTOFARO:  Courtney
DeCristofaro from Kasowitz, Benson, Torres &
Friedman for the New Jersey plaintiffs.
          MR. KNOWLTON:  Steve Knowlton, Locks
Law Firm, New Jersey plaintiffs.
          MR. GALLO:  Anthony Gallo for one of

---

Page 639

the New Jersey defendant doctors.
          MS. RHOADS:  Nancy Rhoads from The
Beasley Firm for the plaintiffs.
          MS. LAHNER:  Joanne Lahner from Merck
& Company.
          MR. RUDGE:  Andrew Rudge, Williams &
Connolly, for Merck.
          MR. FITZPATRICK:  James Fitzpatrick
from Hughes Hubbard & Reed for Merck.
          MR. KIERNAN:  David Kiernan for
Merck.
          Just on the record again, I'm
assuming everybody agrees to be bound by the
protective orders?
          (No response.)
          MR. SPECTER:  Who is on the phone?
          MS. SANFORD:  Shelly Sanford and
Carlene Lewis, Goforth, Lewis Sanford, for
plaintiff.
          THE VIDEOTAPE TECHNICIAN:  This is a
continuation of the videotape deposition of Peter S.
Kim, Ph.D.  Today's date is April 8, 2005, and the
video time is 9:04 a.m.
          We're back on the record.
                    - - -

---

Page 640

                    EXAMINATION
                    - - -
BY MR. SPECTER:
     Q.    Dr. Kim, good morning again.
     Q.    Dr. Kim, yesterday the FDA announced
that it had asked Pfizer to withdraw Bextra from the
market, and Pfizer said that they had agreed to do
so.  Are you aware of that?
     A.    Yes, I am.
     Q.    Is Merck still planning to seek FDA
approval for the remarketing of Vioxx?
     A.    Merck is going to be having
discussions with the FDA, and in those discussions
we will be discussing the current state of science,
where it is that the FDA's interpretation of the
science stands, and the benefits that Vioxx brings
that are unique to Vioxx.  And in those discussions,
we will see where that goes.  But we are interested
in having discussions with the FDA to understand
their position on the science and to explain our
position on the science.
     Q.    Do you intend to have that last
answer be pretty much the same answer as you gave
when you were asked about it a couple of weeks ago?
          MR. KIERNAN:  Objection, form.

KS-000486

Confidential - Subject to Protective Order

Page 641

1        THE WITNESS:  I'm not sure what you
2   mean.
3   BY MR. SPECTER:
4        Q.    Well, your answer sounds pretty much
5   the same as what you told us when you discussed it
6   with us a few weeks ago.  Is it your intention for
7   us to believe that your intentions are the same now
8   as they were a few weeks ago?
9        MR. KIERNAN:  Objection to form.
10       THE WITNESS:  As I've stated, the
11  intention is to go down there and have a discussion
12  with the FDA about their interpretation of the
13  science and our interpretation of the science.
14       Since we met last time, as you just
15  pointed out, the FDA has reached a decision on what
16  it wants to see happen with COX-2 inhibitors, as
17  well as the nonsteroidal anti-inflammatory
18  drugs or NSAIDs, and so clearly their thinking has
19  evolved, and we are interested in understanding and
20  having those discussions with them to understand how
21  their thinking has evolved and to then enter into
22  discussions about Vioxx.
23  BY MR. SPECTER:
24       Q.    I'm asking something totally
25  different.  Do you understand that?

Page 642

1        A.    Why don't we try again.
2        Q.    Are your intentions any different now
3   than they were a few weeks ago when we discussed
4   this issue?
5        A.    Our intentions are not different.  We
6   want to go down there and have a discussion, a
7   scientific discussion with the FDA.
8        Q.    Have you discussed with your
9   colleagues in the last 24 hours at Merck the chances
10  of Vioxx being approved for remarketing?
11       A.    No.  We haven't discussed the chances
12  of that happening.  We've --
13       Q.    That's fine.  That's an answer to my
14  question.
15       Dr. Kim, do you know Alastair Wood?
16       A.    I met Alastair Wood at the Advisory
17  Committee meeting that was held recently.
18       Q.    The FDA asked him to chair the recent
19  Advisory Committee meeting?
20       A.    I don't know.  I assume so.  He was
21  the chair of the Advisory Committee meeting that the
22  FDA held on the COX-2 inhibitors, which also
23  included a substantial discussion on the NSAIDs that
24  was held in February.
25       Q.    What kind of doctor is Dr. Wood?

Page 643

1        A.    I actually am not sure what kind of
2   physician he is.
3        Q.    Does he hold a position with the New
4   England Journal of Medicine?
5        A.    I don't know.
6        Q.    Do you know what qualified him to
7   head that panel?
8        A.    I'm not familiar with the -- I don't
9   know the exact details of his background or his
10  qualifications.
11       Q.    Do you respect Dr. Wood?
12       A.    I certainly respect him based on what
13  I saw.  This was the first time that I have ever met
14  him or seen him, and I saw him oversee the Advisory
15  Committee meeting for the three days.  Certainly, I
16  have no reason to not respect him.
17       Q.    Do you recollect him saying anything
18  that you disagreed with?
19       MR. KIERNAN:  Objection to form.
20       THE WITNESS:  There were certainly
21  things that were said at the Advisory Committee
22  meeting, including said by Dr. Wood, that at the
23  time I didn't -- I would say I disagreed with.  I'm
24  not sure I could recollect them.  But, yes, there
25  were things that Dr. Wood said that I disagreed

Page 644

1   with.
2   BY MR. SPECTER:
3        Q.    Well, one thing he said was that
4   there were five placebo-controlled studies with
5   COX-2 inhibitors that showed a higher incidence of
6   cardiovascular events with the COX-2 inhibitor
7   versus the placebo.  Do you recollect that?
8        A.    Not specifically.
9        Q.    Do you think that that's a true
10  statement?
11       A.    I'd have -- I don't know.  I'd have
12  to sit down and work through it all.  Do you want me
13  to try?
14       Q.    Sure.  Let me see if I can help you
15  with that.
16       A.    Sure.
17       Q.    He said that there were two as to
18  Vioxx, two as to Bextra and one as to Celebrex.
19  Does that accord with your own recollection?
20       A.    I see.  Can you give the statement
21  again, please, of what he said?  There were five --
22       Q.    Five placebo-controlled studies that
23  showed a higher incidence of cardiovascular events
24  with the COX-2 inhibitor versus the placebo.
25       A.    Well, as we know, the APPROVe study,

KS-000487

5 (Pages 641 to 644)

Confidential - Subject to Protective Order

Page 645

1  in the case of Vioxx, was the study that Merck
2  conducted that ultimately led to the withdrawal, the
3  voluntary withdrawal of Vioxx by Merck & Company,
4  and that was a placebo-controlled study in patients
5  with a prior history of colon polyps which showed
6  that beginning after approximately 18 months, there
7  was an increased risk for patients that were taking
8  Vioxx as compared to placebo.  So, that would be
9  one.
10          We know, as well, that there was a
11  similar study with Celebrex, again, in patients with
12  a prior history of colon polyps, which showed
13  beginning after approximately 14 months an increased
14  cardiovascular risk in patients taking Celebrex
15  versus those taking placebo.
16          We know in the case of Bextra that
17  there are studies in patients post-CABG treatment in
18  which treatment with an IV formulation of Bextra
19  followed by the oral formulation of Bextra led to an
20  increased number of cardiovascular event rates --
21  excuse me, cardiovascular events as compared to
22  those on placebo.
23          In the case of Vioxx, he said that he
24  was referring to two with Vioxx.
25      Q.    Yes.

Page 646

1      A.    So, I don't know what he would be
2  referring to specifically.  If he's referring to --
3  well, I guess maybe he's referring to 090, which is
4  a study, a very small study, which numerically
5  showed a higher number of cardiovascular events for
6  patients taking Vioxx than those taking placebo, but
7  the study was small, the difference was not
8  statistically significant.
9          In the case of Celebrex, you said
10  there were two?
11      Q.    No, one.
12      A.    Okay.  In the case of Bextra you said
13  there were two?
14      Q.    I said he said there were two.
15      A.    I don't know for sure, but I would
16  imagine that he's referring to the two studies that
17  were done post -- in post-CABG patients with Bextra
18  or in the IV formulation of Bextra called
19  valdecoxib -- excuse me, the IV formulation of
20  Bextra and followed by Bextra in those patients.
21      Q.    Dr. Wood is quoted in this morning's
22  New York Times as saying that for his patients that
23  require pain relief, he recommends Aleve, and that
24  for those patients who take Aleve that have stomach
25  upset, he recommends that they add Prilosec to that

Page 647

1  Aleve.  Have you read that New York Times this
2  morning?
3      A.    I did read the New York Times article
4  very quickly this morning.
5      Q.    Did Merck ever maintain that Vioxx
6  was superior to Aleve for patients that did not have
7  stomach upset?
8      A.    It -- so, it depends what you mean by
9  "superior."
10      Q.    More safe and more efficacious.
11      A.    In terms of --
12      Q.    That is the test of what's better;
13  correct?
14      A.    Well, that certainly -- certainly
15  would be a major criteria.
16          In terms of efficacy, compared to
17  Aleve or -- actually, so, to be specific, Vioxx was
18  studied against prescription strength naproxen.
19  Naproxen is sold over-the-counter as Aleve, but at a
20  lower dose than what was used in the studies that
21  were conducted by Merck, comparing naproxen to
22  Vioxx.
23          And specifically in the studies that
24  Merck conducted looking at the efficacy of naproxen
25  versus Vioxx, the dose of naproxen that was used was

Page 648

1  500 milligrams twice a day, and at that dose, at
2  that prescription dose of naproxen, the efficacy is
3  generally comparable to the efficacy seen with Vioxx
4  at 25 milligrams.
5      Q.    And just so the jury understands,
6  efficacy, meaning relief of pain; correct?
7      A.    Correct.  Overall relief of pain as
8  measured in a clinical trial where you are looking
9  at over the average of the patients in that trial,
10  whether or not the pain relief is comparable between
11  the two groups, or in some cases, other symptoms
12  that are associated with the arthritis that the
13  patient feels.  That's not to say that for an
14  individual patient there might not be differences.
15  In fact, anecdotally, there are certainly reports of
16  some patients who respond better to one drug than
17  another.  But on an average over the group, when you
18  look at the efficacy, as you say, how well it
19  relieves pain or how well it relieves other
20  arthritis symptoms, there was not a significant
21  difference between the efficacy of Vioxx versus the
22  efficacy of prescription-strength naproxen.
23      Q.    Let's discuss safety for a moment.
24  Did Merck ever claim that Vioxx was safer than
25  Aleve?  I want you to focus on Aleve, sir.  That's

**KS-000488**

Confidential - Subject to Protective Order

Page 649

1  my question.
2       A.    If the question is whether Vioxx is
3  safer than Aleve, which is the over-the-counter form
4  of naproxen that's sold without a prescription --
5       Q.    Right.
6       A.    -- I am not aware of Merck saying
7  that.
8       Q.    Did Merck ever claim that Vioxx was
9  safer and more efficacious than Aleve combined with
10 Prilosec for people that have stomach problems?
11      A.    I'm sorry.  Did Merck ever say that
12 Vioxx is safer and more efficacious --
13      Q.    Correct.
14      A.    -- than Aleve with Prilosec?
15      Q.    Correct.
16           MR. KIERNAN:  Object to the form.
17 He's not here as a corporate designee, but if he has
18 any personal knowledge.
19           THE WITNESS:  Not to my knowledge.
20 BY MR. SPECTER:
21      Q.    Certainly it's a lot cheaper and
22 easier to get Aleve than to get Vioxx; right?
23      A.    So, again, we need to be careful.
24 And if we're speaking specifically about Aleve,
25 which is the over-the-counter dose of naproxen, that

Page 650

1  is available over-the-counter without a
2  prescription, and, therefore, for a patient, that's
3  something that a patient can walk into a drugstore
4  and just purchase over-the-counter.
5           In the case of Vioxx, that's a
6  prescription drug which requires a physician to
7  write a prescription.  In the case of
8  prescription-strength naproxen, it requires a
9  prescription.
10          I would also point out that Prilosec
11 is a prescription drug.
12      Q.    Do you have a recollection of my
13 question, Dr. Kim?
14      A.    Your most recent question?
15      Q.    Yes.
16      A.    I believe you asked me whether or not
17 it was easier for a patient to -- and cheaper for a
18 patient to obtain Aleve as compared to Vioxx.
19      Q.    What's the answer to my question?
20      A.    For a patient, it is easier to obtain
21 Aleve because it's an over-the-counter drug as
22 opposed to a prescription drug.  As far as cheaper,
23 I don't know.  I would imagine it depends on the
24 patient, what the patient's health plan is.
25      Q.    You don't know what Aleve costs in

Page 651

1  the drugstore per tablet, roughly?
2       A.    It costs -- I don't know.  Roughly?
3  It costs significantly less than, I would imagine, a
4  quarter a pill.
5       Q.    How about Vioxx?
6       A.    Again, I think it depends on what --
7  if you're asking me -- I believe you're asking me
8  for a patient, and so --
9       Q.    Roughly.
10      A.    I don't know.  I'm not familiar with
11 what different healthcare plans provide for in terms
12 of what's referred to as the co-pay that a patient
13 would have to contribute towards a prescription drug
14 like Vioxx.
15      Q.    Do you have some rough idea as to
16 what Merck charged for the sales of Vioxx to those
17 persons and entities who purchased Vioxx per tablet?
18      A.    I'm not sure, but I would hazard a
19 guess that it's approximately $1 to $2.
20      Q.    Per pill?
21      A.    Correct.
22      Q.    Is that an estimate?
23      A.    That's a guess.
24           - - -
25           (Whereupon, Deposition Exhibit Kim-43,

Page 652

1           "Section:  A Good Riddance to a Bad
2           Drug" Eric J. Topol, New York Times,
3           10/2/04 (3 pages), was marked for
4           identification.)
5           - - -
6  BY MR. SPECTER:
7       Q.    I've marked as Kim-43 a letter to the
8  editor that Dr. Topol sent that was published in the
9  New York Times back in October of 2004.  Do you have
10 a recollection of that letter, sir?
11      A.    I do, but I have not seen this really
12 since, I think, when it was published, so, give me a
13 chance to just look it over.
14      Q.    No problem.
15      A.    (Witness reviewing document.)
16           MR. SPECTER:  While we're at it, I'm
17 going to mark as Kim-44 the reply that you signed to
18 that letter.
19           - - -
20           (Whereupon, Deposition Exhibit Kim-44,
21           New York Times Letter to the Editor,
22           10-8-04, (Peter S. Kim) Reprint, (2
23           pages), was marked for identification.)
24           - - -
25           (Witness reviewing document.)

KS-000489

Confidential - Subject to Protective Order

Page 653

1          THE WITNESS:  Okay.
2    BY MR. SPECTER:
3          Q.    Dr. Kim, just so we have some
4    background here, Dr. Topol is a cardiologist; is
5    that correct?
6          A.    That's my understanding, yes.
7          Q.    He's out at the Cleveland Clinic; is
8    that right?
9          A.    That's correct.
10         Q.    That's a very famous place in medical
11   science; is that right?
12         A.    It has a good reputation, yes.
13         Q.    Dr. Topol, does he also enjoy a fine
14   reputation in the field?
15         A.    I think it's -- I think he has a --
16   he has a good reputation amongst many people, but
17   somewhat mixed amongst others.
18         Q.    How about with you?
19         A.    I don't have a strong opinion on Dr.
20   Topol's reputation.
21         Q.    Do you have any opinion?
22         A.    I certainly have disagreed with
23   statements that he has written.
24         Q.    Do you think he's well intentioned?
25         A.    I don't know.  I don't know him.

Page 654

1          Q.    Now, he wrote a letter to the New
2    York Times which they published on October 2nd, 2004
3    with respect to the withdrawal of Vioxx; correct?
4          A.    I assume that's correct, based on
5    what you've shown me here.
6          Q.    And you responded to that letter?
7          A.    I certainly responded to the letter,
8    yes.
9          Q.    And that response was published on
10   October 8th --
11         A.    Again, based on what you've shown me,
12   yes.
13         Q.    -- is that correct?  Well, do you
14   have any reason to doubt the accuracy of what I've
15   shown you?
16         A.    No.  But I just -- if you're asking
17   me if I recall that, I don't recall the dates.  I'm
18   just saying that based on what you've shown me, I am
19   assuming that that's the case.
20         Q.    Fair enough.
21              Now, do you recollect a letter being
22   published from Dr. Topol and it coming to pass that
23   you would sign a letter in reply?
24         A.    I recall a letter being published by
25   Dr. Topol in the New York Times and deciding to make

Page 655

1    -- to reply to this letter, yes.
2          Q.    Was that your decision?
3          A.    Yes, that was my decision.
4          Q.    Did you author the response?
5          A.    I certainly authored the response in
6    that what was submitted was what I wanted to submit
7    and was approved by me.
8          Q.    That sounds like you didn't write it,
9    but you signed it and thought that it was correct.
10   Would that be true?
11         A.    I don't recall who wrote the
12   original, the first draft of the letter, but
13   certainly it is my -- the way in which I work is, I
14   will take drafts of things that people will propose
15   or write, and then I will make -- either redraft it
16   or make changes.  I will certainly be, though -- I
17   am the one who's writing the letter in the sense
18   that I'm the one who is signing off on what's being
19   said here.
20         Q.    Did you intend your letter to be a
21   reasonably thorough response to Dr. Topol's letter
22   to the editor?
23         A.    When you say "reasonably thorough," I
24   think realistically, when one writes a response to a
25   letter that's published in the media, particularly

Page 656

1    in the media such as the New York Times, there are
2    severe space constraints that are imposed upon you
3    by the publisher, and so, therefore, it's,
4    unfortunately, not possible to -- or maybe it's
5    possible -- it's unfortunately not -- often it's,
6    unfortunately, not possible be thorough and as
7    thorough as one would like to be in response to a
8    letter that's published.
9              So, what I tried to accomplish here
10   was to hit what I thought were the high level main
11   points that I wanted to put out there in response to
12   the letter.
13         Q.    Did you sign a longer letter to the
14   New York Times that they required you to reduce
15   because of space reasons?
16         A.    I did.
17         Q.    You did?
18         A.    Yes.
19         Q.    So, this letter is not the letter
20   that was sent to the Times, something else was sent,
21   and then this was the product of editing; is that
22   correct?
23         A.    Well, I think we have to be careful.
24   When you say it's "the product of editing," it's the
25   product of the New York Times proposing edits or

**KS-000490**

8 (Pages 653 to 656)

Confidential - Subject to Protective Order

Page 657

1  proposing or requesting that we shorten the letter,
2  and then our attempts, and then ultimately what we
3  end up with after we've shortened the letter.  But
4  the final letter that was sent off is one that I
5  signed off on.
6      Q.    So, there should be a record
7  someplace of a longer letter that was sent to the
8  New York Times, not this one; correct?
9      A.    There should be a longer version of
10  this response.
11      Q.    Do you recollect anything that was in
12  that longer version that's not in the shorter
13  version, as we sit here today?
14      A.    No, I'm sorry, I don't.
15          MR. SPECTER:  Now, just so counsel
16  knows, we'll obviously be sending this to you
17  formally, we're going to ask for a copy of that
18  original letter that Dr. Kim has referred to.
19  BY MR. SPECTER:
20      Q.    Dr. Topol stated in his letter to the
21  Times in the fifth paragraph, "There are two
22  important issues to consider here.  First, the risk
23  of heart attack or stroke found in the Merck study,
24  at 15 cases per 1,000 patients, may be greatly
25  underestimated.  Merck's trial did not include

Page 658

1  anyone with known heart disease -- patients who
2  might be expected to have the highest risk."  Did I
3  read that correctly?
4      A.    You read that correctly.
5      Q.    Is that a true statement?
6      A.    No, I don't think that's a true
7  statement.
8      Q.    Did you tell the readers of the New
9  York Times that that was a false statement?
10      A.    No.  In the response that's shown
11  here, I did not address that issue.
12      Q.    Did you tell the New York Times in
13  your original letter that that was a false
14  statement?
15      A.    I'm not sure.
16      Q.    Let us move to a different subject,
17  and that is the correspondence that you had with
18  respect to the article of Dr. Juni.  Do you have a
19  recollection of that?
20      A.    Yes, I do.
21      Q.    Now -- actually, before I get to that
22  Juni subject, what is there about that paragraph
23  that I read to you that's false?
24      A.    What's false is that -- the statement
25  that "Merck's trial did not include anyone with

Page 659

1  known heart disease."
2      Q.    Is the statement otherwise true?
3      A.    Well -- okay.  So, the first sentence
4  is not -- is a statement of opinion.  "There are two
5  important issues to consider here."  So, I don't
6  think it's true or false.  It's his opinion.
7          The second statement, "First, the
8  risk of heart attack or stroke...may be greatly
9  underestimated," is speculation.
10      Q.    Do you think it's false?
11      A.    Well, as I read the statement, "The
12  risk of heart attack or stroke found in the Merck
13  study...may be greatly underestimated," yes, I
14  believe that that's a false statement.  This was a
15  controlled clinical trial.  And "in the Merck study"
16  specifically, if I were to underline that, I would
17  disagree with a statement that said that the Merck
18  study greatly underestimated the risk of heart
19  attack, because that was a controlled clinical
20  trial.
21      Q.    Well, you know what he's saying here
22  is that the Merck study is not representative of the
23  patient population as a whole who may be taking
24  Vioxx; correct?
25          MR. KIERNAN:  Objection to form.

Page 660

1          THE WITNESS:  I do not -- I do not
2  know that's what he's saying.  Let me read what he's
3  saying.
4  BY MR. SPECTER:
5      Q.    Fine.  You told me that you don't
6  think that's what he's saying.  Let me ask a
7  different question now.
8          Is it true that the Merck study may
9  greatly underestimate the risk of heart attack or
10  stroke as compared to the patient population as a
11  whole who may have been taking Vioxx?
12      A.    No idea.  That would be pure
13  speculation.
14      Q.    You can't say that's false, can you?
15      A.    I have no reason to think it's false
16  or true.
17      Q.    That's not my question.
18          My question is, can you say that what
19  I just said is false?
20      A.    Well, the risk of heart attack or
21  stroke in a particular patient population is going
22  to vary tremendously with that patient population.
23      Q.    Do you recollect my question?
24      A.    You're asking me whether or not a
25  statement that you made, whether I can rule it out.

**KS-000491**

Confidential - Subject to Protective Order

Page 661

1    Q.    Yes.  Can you rule it out?
2    A.    No, I can't rule out anything in that
3  regard.
4    Q.    Thank you.
5          Let me move on to the next question,
6  and this regards Dr. Juni.
7          Do you recollect that Dr. Juni had
8  commented with respect to the APPROVe trial that the
9  trial's power to detect a clinically relevant
10  difference in rates of myocardial infarction -- now
11  we're talking about APPROVe again.  Let me start
12  over again, and let me back up for a second.
13         Dr. Juni, who is he?
14    A.    I don't know Dr. Juni, but Dr. Juni
15  is the first author on an article that was published
16  in the Lancet regarding -- well, he's published
17  probably other articles, but the particular article
18  that I believe you're referring to was published in
19  the Lancet having to do with his group's assertion
20  that there was a risk associated with Vioxx.
21    Q.    He wrote an article, and then you
22  wrote or you signed a reply; correct?
23    A.    He wrote an article -- he and others
24  wrote an article that was published in the Lancet
25  having to do with cardiovascular risk in studies

Page 662

1  with Vioxx, and Dr. Alise Reicin and I wrote a
2  letter in response to that article.
3    Q.    At least you signed it; correct?
4    A.    I signed it, and I participated in
5  the writing of it as well.
6    Q.    Who wrote the first draft?
7    A.    I'm not sure who wrote the first
8  draft.
9    Q.    So, you wrote a reply, and then he
10  wrote a rejoinder to your reply; correct?
11    A.    I believe that's correct, but I don't
12  -- I don't remember exactly.
13    Q.    Now, in his rejoinder to the reply of
14  you and Dr. Reicin, he wrote, and I'm quoting, "Kim
15  and Reicin reiterate that there was no evidence for
16  a difference in cardiovascular risk between
17  rofecoxib" -- Vioxx; correct?
18    A.    Rofecoxib is the name for Vioxx, yes.
19    Q.    -- "and placebo during the first 18
20  months of the unpublished APPROVe trial, but do not
21  acknowledge that the trial's power to detect a
22  clinically relevant difference in rates of
23  myocardial infarction (a relative risk of 2) during
24  the first 18 months was 20% or less."
25          Now, let me ask you first, do you

Page 663

1  recollect reading that statement of Dr. Juni's in
2  reply to your response to his --
3    A.    I don't recollect --
4    Q.    -- article?
5    A.    I don't recollect that exact
6  statement, no.
7    Q.    Is that statement a true statement?
8    A.    I -- well, can you read it again or
9  show me the statement?
10    Q.    I can certainly read it again, and I
11  can show it to you if you want to see it?
12    A.    Sure.  I'd like to see it actually.
13    Q.    All right.
14         MR. SPECTER:  I think we're up to 45.
15  We'll mark this as 45.
16              -  -  -
17         (Whereupon, Deposition Exhibit Kim-45,
18         "Discontinuation of Vioxx"
19         Correspondence, (Kim/Reicin) Letter to
20         the Editor, Lancet, vol. 365 1-1-05
21         (23-28), was marked for identification.)
22              -  -  -
23         THE WITNESS:  Thank you.
24  BY MR. SPECTER:
25    Q.    You're welcome.  And the statement

Page 664

1  appears, Dr. Kim, if I may help you with this, at
2  Page 27.
3    A.    Page 27?
4    Q.    In the first column in the first
5  paragraph.
6    A.    (Witness reviewing document.)
7          Okay.  I'm sorry.
8          So, your question again?
9    Q.    Is Dr. Juni, or I should say are Dr.
10  Juni and his colleagues who authored this reply to
11  your response, are they correct in saying that you
12  and Dr. Reicin did not acknowledge that the power of
13  the APPROVe trial to "detect a clinically relevant
14  difference in rates of myocardial infarction (a
15  relative risk of 2) during the first 18 months was
16  20% or less"?
17    A.    To my recollection, and we have it
18  right here so we can check, but to my recollection,
19  the letter that Dr. Reicin and I sent to the Lancet
20  did not address the issue of power of a clinical
21  trial.
22    Q.    Is the statement true that the
23  APPROVe "trial's power to detect a clinically
24  relevant difference in rates of myocardial
25  infarction (a relative risk of 2) during the first

KS-000492

Confidential - Subject to Protective Order

Page 665

1    18 months was 20% or less"?
2        A.    I'm not sure if that's a true
3    statement or not. I'd have to check with my
4    statisticians.
5        Q.    Well, when you read this in the
6    Lancet, did you check with your statisticians to see
7    if it was correct?
8        A.    No, I did not.
9        Q.    Does it strike you as being clearly
10   wrong?
11       A.    It doesn't strike me as being
12   outrageous, but, again, you know, if you're asking
13   me whether or not this is a correct statement, I'm
14   not in a position to answer that question right now.
15       Q.    Do you know if APPROVe had the
16   power -- well, let me just back up for a second.
17            Do you know enough about the design
18   of studies to know what is the concept of
19   statistical power as it concerns the design of the
20   study?
21       A.    I know at a high level, in general
22   terms, the relevance for statistical power to the
23   ability to detect something in a clinical study.
24       Q.    Is there a generally accepted power
25   to which clinical trials are designed to test the

Page 666

1    primary endpoints of the study?
2        A.    Oh, no. To the contrary. The power
3    by which one designs a clinical trial is one that
4    depends on what it is that one is looking for, what
5    degree of efficacy or safety one is trying to either
6    rule in or rule out, the background rates of what it
7    is that one is investigating, and the size,
8    therefore, of the trial that one would need to
9    conduct in order to have a conclusion within certain
10   limits, and the magnitude of the response that one
11   is expecting, either positive or negative.
12       Q.    Dr. Kim, have you heard that it's
13   generally accepted, at least as concerns clinical
14   research, that reliable analysis should have a power
15   of at least 80 percent?
16       A.    I haven't heard that explicit
17   statement.
18       Q.    Do you understand what that statement
19   means?
20       A.    Well, I think what -- what that
21   statement is meant to convey is that in general
22   terms, one would like to be able to address a
23   question within the limits of confidence of plus or
24   minus 20 percent.
25       Q.    Do you agree that that statement

Page 667

1    means that a study powered at 80 percent will detect
2    the effect at least four times out of five?
3        A.    Say that again, please.
4        Q.    Do you understand that a study
5    powered at 80 percent will detect the effect at
6    least four times out of five if the effect really
7    exists?
8        A.    Yes. But we have to be careful here
9    because one has to -- that statement is incomplete
10   without defining the magnitude of the effect. And
11   so, for example, in Juni's statement here, the
12   statement has in parentheticals, in parenthesis, "a
13   relative risk of 2." So, they're defining the
14   magnitude of the risk that they're looking for.
15            If the magnitude of the risk was
16   smaller than that, then one would need to have a
17   larger study in order to get the confidence interval
18   within the 20 percent limits that you're referring
19   to, or one would have a decreased ability to -- one
20   would not be at a 20 percent confidence interval.
21            So, the statement that you made is an
22   incomplete statement in the absence of saying what
23   is the size of the risk, or, if one is looking for a
24   benefit, the benefit that one is looking for.
25       Q.    What were the APPROVe primary

Page 668

1    endpoints?
2        A.    The APPROVe study, per se, had as its
3    primary endpoint an investigation of the recurrence
4    of colon polyps. Now, the -- but the APPROVe study
5    was also part of a cardiovascular endpoint which was
6    prespecified by Merck which included three
7    placebo-controlled studies, of which APPROVe was
8    one. And it was the specific endpoint,
9    cardiovascular endpoint that was prespecified was
10   one that included the cardiovascular outcomes for --
11   that were seen in APPROVe, as well as two other
12   placebo-controlled studies, one called VICTOR and
13   one called VIP.
14       Q.    Dr. Kim, you know that the term
15   "primary endpoint" is a term of science; correct?
16       A.    Primary endpoint is a term of
17   science, yes.
18       Q.    You know that as that term of science
19   is supposed to be used, the only primary endpoints
20   in APPROVe were the recurrence of colon cancer;
21   correct?
22            MR. KIERNAN: Objection to form.
23            THE WITNESS: No, that's incorrect.
24   The primary endpoint was a recurrence of colon
25   polyps.

**KS-000493**

11 (Pages 665 to 668)

Confidential - Subject to Protective Order

Page 669

BY MR. SPECTER:
1  
2      Q.    I'm sorry.  A recurrence of colon
3  polyps.  I misspoke.
4      A.    Correct.  In patients with a prior
5  history of colon polyps.
6          And a second -- another primary --
7  another endpoint was prespecified at a later date
8  after the trial was started, but before Merck knew
9  anything about the results of the trial, which was a
10 cardiovascular outcome prespecified that included
11 the results of three clinical trials, of which
12 APPROVe was one.
13     Q.    You know my question only referred to
14 primary endpoints; correct?
15     A.    I'm stating that the primary endpoint
16 of APPROVe was for the recurrence of colon polyps,
17 but APPROVe also had another very specific purpose.
18     Q.    My question is only whether you know
19 what my question concerned.  Do you know my question
20 concerned what were the primary endpoints in
21 APPROVe?  Do you understand that?
22     A.    Yes, I do.
23     Q.    And the only primary endpoints in
24 APPROVe were for the recurrence of colon polyps;
25 correct?

Page 670

1      A.    That's correct.
2      Q.    Now --
3      A.    But as I say, there were other
4  purposes of this trial -- of this trial.
5      Q.    Okay.
6          MR. SPECTER:  At the appropriate time
7  we'll move to strike the last part of that answer as
8  being nonresponsive.
9  BY MR. SPECTER:
10     Q.    Now, Dr. Kim, was APPROVe 80 percent
11 powered to confirm to the 95 percent confidence
12 interval the presence or absence of an effect by
13 Vioxx on the recurrence of colon polyps?
14     A.    Again, I don't know.  I would not
15 know the -- I don't know the answer to that question
16 without checking with the clinical trialist who
17 designed it or the statistician.
18     Q.    Do you know what a Type II error is?
19     A.    No.  I'm not sure what a Type II
20 error is.
21     Q.    Have you heard the term "Type II
22 error" before?
23     A.    I've heard it used.
24     Q.    When you heard it used, did you know
25 what it meant then?

Page 671

1      A.    I don't know whether I -- I don't
2  know.  I've asked probably what it means, but I
3  don't know what it means.
4      Q.    Let me see if I can refresh your
5  recollection.
6          Is a Type II error the presentation
7  of an absence of a finding in a study that is not
8  adequately powered to see an effect?
9      A.    Again, I would not want to say what
10 it is without checking with a statistician.
11     Q.    Would you agree that it would be an
12 error to present the absence of a finding in a study
13 that was not adequately powered to see an effect?
14     A.    Say that again, please.
15     Q.    Do you agree that it would be an
16 error to present as an absence of a finding in a
17 study a finding that was not adequately powered -- a
18 study that was not adequately powered to see an
19 effect?
20     A.    As you stated it, no.  If you said
21 that the study did not find an effect, then you're
22 stating a statement of fact.
23     Q.    Let me go over this with you again to
24 be sure we're on the same page.
25     A.    Okay.

Page 672

1      Q.    Is it an error to present an absence
2  of a finding when the study was not adequately
3  powered to see an effect?
4      A.    Again, the statement is incomplete
5  because when you say "an effect," one has to define
6  the magnitude of the effect.
7      Q.    Well, that's my point.  If the
8  magnitude of the effect -- if the study was not
9  adequately powered to detect the magnitude of the
10 effect that you're seeking, then would it be an
11 error to say that the study demonstrated the absence
12 of a finding in that circumstance?
13     A.    I do not think it would be an error
14 to state that a study did not find an effect.  I
15 think that if one -- but then the subsequent
16 question that could be asked there is what is the
17 magnitude of the effect that one is looking for and
18 how adequately powered was the study for that
19 magnitude of effect?  But without defining the
20 magnitude of the effect that one wants to rule out,
21 that statement that you made is incomplete.  But
22 it's certainly not a wrong statement.  You're
23 stating what it is that the study did or did not
24 show.
25     Q.    All right.  Dr. Kim, I want you to

KS-000494

12 (Pages 669 to 672)

Confidential - Subject to Protective Order

Page 673

1  assume for the next question that a Type II error is
2  the presentation of an absence of a finding in a
3  study that was not adequately powered to see an
4  effect. All right? I want you to assume that for
5  the next question.
6      A.    That the Type II error is
7  presentation of a finding that was not observed in a
8  study that was not adequately powered to observe
9  that effect?
10     Q.    Correct.
11     A.    Okay.
12     Q.    Now, a claim that APPROVe found that
13  patients taking Vioxx 25 milligrams or less --
14  pardon me. Let me start over again.
15         A claim that APPROVe found that
16  patients taking Vioxx 25 milligrams for less than 18
17  months suffered from no increased risk for
18  cardiovascular events would be subject to Type II
19  error; correct?
20     A.    Just the last part again, please.
21     Q.    A claim that APPROVe found that
22  patients taking Vioxx 25 milligrams or less for less
23  than 18 months suffered from no increased risk of
24  cardiovascular events would be subject to Type II
25  error; correct?

Page 674

1      A.    Okay. So, assuming that a Type II
2  error is a statement that one -- the absence of a
3  finding in a study that was inadequately powered to
4  detect that finding, and assuming that one
5  specified, which you didn't, the magnitude of the
6  effect that one is looking for, then it is certainly
7  possible that a conclusion that was made in a study
8  based on the APPROVe results would be subject to a
9  Type II error, again, with the explicit notion that
10  the magnitude of the effect has to be specified
11  here.
12     Q.    Have you asked anybody at Merck
13  whether APPROVe was sufficiently powered to detect
14  an increased risk of cardiovascular events in
15  patients who were taking Vioxx for less than 18
16  months?
17     A.    Again, the statement that you're
18  making, or the question, rather, is an incomplete --
19  would be an incomplete question in the absence of
20  stating what the magnitude of the risk is that one
21  is looking for.
22     Q.    Sir, I'm asking a question about what
23  you've done. I want to know whether you've asked
24  anybody at Merck whether APPROVe was adequately
25  powered to detect an increased risk of

Page 675

1  cardiovascular events in people taking Vioxx for
2  less than 18 months. Have you asked that question?
3      A.    I have not asked that question, and I
4  think it's an incomplete -- it would be an
5  incomplete question.
6      Q.    Well, have you asked any question
7  that relates to that question?
8      A.    What do you mean by "relates to that
9  question"?
10     Q.    Well, sir, you're talking about at
11  what level of relative risk. So, have you asked
12  that question using any degree of relative risk
13  associated with it?
14     A.    No. I've looked at the results of
15  the APPROVe study, and I know that the results of
16  the APPROVe study were such that the difference in
17  cardiovascular risk was not discernible until
18  beginning after 18 months, and that did not reach
19  statistical significance until approximately 30
20  months after the trial started.
21     Q.    But that statement only has value to
22  the extent that the study was powered to see such a
23  risk before 18 months; correct?
24     A.    No. I think that statement is a
25  statement of fact. There was no difference observed

Page 676

1  in the APPROVe trial in the cardiovascular risk
2  rates for patients on Vioxx versus placebo for the
3  first 18 months, and that beginning after 18 months,
4  the difference was discernible, and it became
5  statistically significant at 30 months. Those are
6  the facts. That's what I can say about the results
7  of the APPROVe study.
8      Q.    I'm asking you about the value of
9  what you just said. The value of what you just said
10  is dependent, at least in part, upon the power of
11  the study; correct?
12     A.    The value?
13     Q.    The value of the statement to
14  science.
15     A.    Oh, I think the statement is very
16  valuable to science, and I think it's actually --
17  it's what led Merck to withdraw the drug from
18  market. And it's what led -- it's certainly one of
19  the major things that led to the events that you
20  referred to yesterday from the FDA.
21     Q.    But in order to assess the value of
22  the statement, one would have to know whether the
23  study was adequately powered to detect an increased
24  risk of cardiovascular events in the first 18
25  months; correct?

Confidential - Subject to Protective Order

Page 677

1     A.    Absolutely.  And explicitly in my
2  statement, namely the fact that it became
3  statistically significant at approximately 30
4  months, lies the value.
5     Q.    I'm talking about what occurred
6  before 18 months, Dr. Kim.  In order to assess the
7  value of that statement, one would have to know
8  whether the study was adequately powered to detect
9  an increased risk of cardiovascular events in those
10  first 18 months; correct?
11     A.    Again, it depends on the magnitude of
12  the risk that one is trying to assess.  And what we
13  can say is that the difference in cardiovascular
14  risk became statistically significant in the APPROVe
15  study at approximately 30 months.
16     Q.    At "a relative risk of 2," was
17  APPROVe adequately powered to detect that risk in
18  the first 18 months?  Yes or no?
19     A.    I don't know the answer to that
20  question.
21     Q.    How many hours have you spent looking
22  at the APPROVe results or discussing them with your
23  colleagues at Merck?
24     A.    I don't know.
25     Q.    Has the subject that I just asked you

Page 678

1  about ever come up in any of those conversations; to
2  wit, was APPROVe adequately powered to determine an
3  increased risk of cardiovascular events during the
4  first 18 months at a relative risk of two?
5     A.    To my knowledge, or I should say to
6  my recollection, I have not participated in
7  discussions that -- in which that question has been
8  addressed.
9     Q.    Do you recollect the last time we got
10  together I asked you what documents you had reviewed
11  in preparation for the deposition over the night
12  before?  We met on two consecutive days.  Do you
13  recollect that?
14     A.    I do.
15     Q.    And you told me that you had reviewed
16  a briefing paper that had been prepared for Mr.
17  Gilmartin for his testimony in front of the U.S.
18  Senate.  Do you recollect that?
19     A.    I recollect saying that to you, too,
20  yes.
21     Q.    Can you describe for me or identify
22  for me in any other manner so that I can locate that
23  document, what that document was?
24     A.    So, after we met last time, there was
25  discussion about that document and a request, a

Page 679

1  specific request from the Merck lawyers for me to
2  provide them with that document, and so I, the next
3  day, provided that document to the Merck lawyers,
4  and so that was sent over to them.
5         I was informed yesterday that the
6  document that --
7         MR. KIERNAN:  Well, don't disclose
8  any conversations with counsel.
9         THE WITNESS:  Okay.
10         MR. KIERNAN:  I will state for the
11  record the document that he is referring to --
12         MR. SPECTER:  Wait, wait, wait.  I
13  want to ask this witness my questions.
14         MR. KIERNAN:  Sure.
15         MR. SPECTER:  My question didn't call
16  for him disclosing conversations with counsel.
17  BY MR. SPECTER:
18     Q.    Do you have the question in mind,
19  Doctor?
20     A.    No.  Why don't you repeat it, then.
21     Q.    I want you to identify the document
22  that you're referring to.
23     A.    Well, what I was trying to say is
24  that it's my understanding, it's my belief, that I
25  was mistaken last time when I said that I had read

Page 680

1  the briefing document for Mr. Gilmartin's testimony
2  before the Senate.  And instead, what it now appears
3  is that what I had reviewed was a briefing document
4  for Mr. Gilmartin in advance of an October media
5  briefing, October 2004 media briefing.
6     Q.    Is there a document that meets the
7  characteristics of what you identified the last time
8  we spoke?
9     A.    Yes, I believe there is.
10     Q.    Have you read it?
11     A.    I have read it a long time ago.
12     Q.    This is a briefing document prepared
13  for Mr. Gilmartin's testimony in front of the U.S.
14  Senate; is that correct?
15         MR. KIERNAN:  Objection, form.
16  That's not what he testified to.
17         THE WITNESS:  Sorry.  The question
18  is, did this --
19  BY MR. SPECTER:
20     Q.    How would you --
21     A.    So --
22     Q.    There's no current pending question,
23  so, let me see if I can get a question out to you.
24         As I understand your testimony,
25  you're telling me that when we met before, you had

KS-000496

Confidential - Subject to Protective Order

Page 681

1  thought that you had seen the night before a
2  briefing document that Mr. Gilmartin read the night
3  before he testified in front of the U.S. Senate.
4  Now you believe that that's not what you saw the
5  night before, but, rather, you saw a document that
6  was labeled something like questions and answers
7  briefing document from October of 2004. Is that a
8  fair summary of where we are right now?
9      A.    Not exactly, but close. There was or
10  there is a document that was prepared for Mr.
11  Gilmartin in advance of his Senate testimony, and I
12  thought that that's the document that I'd reviewed
13  before coming for the second day of questioning by
14  you, when you asked me what I had reviewed.
15          It is now my understanding that, in
16  fact, that was not the document that I reviewed,
17  but, instead, the document that I reviewed was a
18  briefing document from Mr. Gilmartin in advance of
19  the October 2004 media briefing.
20      Q.    Okay. When did you come to this
21  subsequent belief?
22      A.    Yesterday.
23      Q.    Yesterday. So, let me understand
24  this, if I can.
25          You told me -- we got together on

Page 682

1  what date? What was the date of the second
2  deposition?
3          MR. MEADOW: The 16th.
4  BY MR. SPECTER:
5      Q.    The 16th of March. Okay.
6          On the 16th of March, you told me
7  that on the night of the 15th of March --
8          On the 16th of March you told me that
9  on the night of the 15th of March you read what
10  we'll call the Gilmartin briefing document. Correct
11  so far?
12      A.    Yes. Well, I don't know the exact
13  dates, but I'll take your word for the dates.
14      Q.    Then on the 7th of April, you decided
15  that you were wrong about that, and that it was some
16  document from October of 2004; is that correct?
17      A.    Yes.
18      Q.    Well, how could you be wrong about
19  what you had seen the night before in March and be
20  right now as to what you'd seen, sir?
21          MR. KIERNAN: Objection to form. I
22  think he's already testified that it's --
23          MR. SPECTER: I'll ask a different
24  question.
25          MR. KIERNAN: Okay.

Page 683

1  BY MR. SPECTER:
2      Q.    How did you come to make this
3  mistake, sir, and have it corrected yesterday?
4          MR. KIERNAN: Objection to form. I
5  don't think it's a mistake. You're
6  mischaracterizing what he's saying. He's merely
7  identified the date of the briefing document. Now
8  you want to characterize it as a mistake, and I
9  think that's improper.
10          MR. FERRARA: I object to counsel's
11  comments. Counsel, please don't offer your
12  opinions.
13          MR. KIERNAN: Would you state your
14  name for the record, sir?
15          MR. FERRARA: Yes, it's Michael
16  Ferrara.
17          MR. KIERNAN: Thank you, Mr. Ferrara.
18  BY MR. SPECTER:
19      Q.    Dr. Kim, are you saying that these
20  are the same documents, they just have different
21  titles?
22      A.    These are not the same document.
23      Q.    How do the documents differ?
24      A.    One document is a document that was
25  prepared for Mr. Gilmartin in advance of his

Page 684

1  testimony to the Senate, and another document was a
2  document that was prepared for Mr. Gilmartin in
3  advance of a media briefing in October.
4      Q.    Do the contents differ?
5      A.    I would imagine they differ, yes.
6      Q.    Have you read both documents?
7      A.    I certainly have read both documents
8  at one time, yes.
9      Q.    When most recently have you read
10  them?
11      A.    So, again, I believe that I read the
12  October media briefing document the evening before
13  the second day of questioning by you. And I believe
14  that I read the Gilmartin Senate prep document a
15  long time ago, in other words, at around the time --
16  around the time when we were prepping Mr. Gilmartin
17  for his Senate testimony.
18      Q.    What fact or facts caused you to
19  believe that you were wrong as to what you told me
20  before was the document you had read?
21          MR. KIERNAN: Don't include any
22  discussions with counsel. If you can --
23  BY MR. SPECTER:
24      Q.    I'm not asking you to identify where
25  you got information from.

KS-000497

15 (Pages 681 to 684)

Confidential - Subject to Protective Order

Page 685

1    A.    Okay.
2    Q.    I just want to know what facts you
3  have available to you --
4    A.    Okay.
5    Q.    -- that tells you you were wrong in
6  your previous testimony.
7    A.    Okay.
8          MR. KIERNAN:  Objection to the
9  characterization.  Go ahead.
10         THE WITNESS:  Following our
11  discussion last time, I was asked to provide the
12  document that I referred to, which at the time I
13  referred to as the Gilmartin briefing document for
14  the Senate testimony, to the Merck legal department.
15  And I did that.  And yesterday I was informed that
16  that document --
17         MR. KIERNAN:  All right.  Don't
18  discuss any conversations --
19  BY MR. SPECTER:
20    Q.    You don't need to tell us where you
21  got the information.  The only issue is what makes
22  you believe you were wrong before?
23         MR. KIERNAN:  Objection to the
24  characterization.
25  BY MR. SPECTER:

Page 686

1    Q.    Well, you say you were wrong before;
2  right?  You say you gave incorrect testimony --
3    A.    I'm saying --
4    Q.    -- is that right?
5    A.    I'm saying that I believe that the
6  document that I referred to that I thought was the
7  Gilmartin prep document for the Senate hearings I
8  now believe was a Gilmartin prep document for the
9  October 2004 briefing.
10    Q.    Well, why do you believe that you
11  were wrong before?  Let me ask a different question.
12         Answer that one now and then I'll ask
13  you a different question.
14    A.    Because I was -- because I was told
15  that.
16    Q.    Well, do you know it to be true from
17  your own personal knowledge?
18    A.    No.  I -- as I said, this was
19  something that I was informed of yesterday.
20    Q.    Dr. Kim, don't you know what you read
21  March 15th overnight in preparation for March 16th,
22  the next day?
23    A.    I thought I did.
24    Q.    Well, do you think -- do you now
25  think you're wrong?

Page 687

1    A.    Oh, I think I -- I don't know, but I
2  think I could be mistaken.
3    Q.    You could be, but you don't know;
4  correct?
5          MR. KIERNAN:  Counsel, you're just
6  badgering the witness.
7          MR. SPECTER:  I'm not badgering the
8  witness.  He says he could be wrong.  I want to know
9  if he's wrong.
10  BY MR. SPECTER:
11    Q.    Can you say under oath that you are
12  wrong now about what you said on March 16th?
13         MR. KIERNAN:  Well, with respect to
14  which briefing document he looked at?  Is that the
15  question?
16         MR. SPECTER:  Yes.
17         MR. KIERNAN:  All right.  I think
18  he's already asked and answered that three --
19         MR. SPECTER:  He's answered, and
20  three different ways at that.  So let's see if we
21  can get a firm answer --
22         MR. KIERNAN:  Three or four --
23         MR. SPECTER:  -- to the question.
24         MR. KIERNAN:  Three or four times now
25  the same way, but, go ahead.

Page 688

1  BY MR. SPECTER:
2    Q.    Can you say under oath that you know
3  what document you reviewed the night of March 15th?
4    A.    What I can say under oath is on the
5  morning that you asked me the question what
6  documents or if I reviewed documents or what
7  documents they were, I was under the impression that
8  I had reviewed a document which related to Mr.
9  Gilmartin's testimony in front of the Senate.  And I
10  now believe that I was mistaken, that that document
11  was, in fact, a media briefing for Mr. Gilmartin in
12  October of 200 --
13    Q.    Because somebody told you that
14  yesterday?
15    A.    Correct.
16    Q.    Was that person with you when you
17  looked at the document the night of March 15th?
18    A.    No.
19    Q.    Where were you when you saw the
20  document?
21    A.    I was in a hotel room.
22    Q.    What basis could you have for
23  trusting what you were told yesterday about what
24  document that you reviewed the night of March 15th
25  when that person wasn't with you four weeks ago or

KS-000498

16 (Pages 685 to 688)

Confidential - Subject to Protective Order

Page 689

1  three weeks ago in the hotel room when you saw it?
2          MR. KIERNAN:  Well, let me just
3  object to any conversations with counsel --
4          MR. SPECTER:  I'm asking --
5          MR. KIERNAN:  Let me say for the
6  record the document has been produced to you
7  already, and I think you have it.  So, I think --
8          MR. SPECTER:  Which one?
9          MR. KIERNAN:  The document he's
10 referring to.
11         MR. SPECTER:  The Gilmartin briefing
12 document?
13         MR. KIERNAN:  Yes.  For the October
14 2004 media briefing document --
15         MR. SPECTER:  No, no.  No.  What I
16 don't have, Mr. --
17         MR. KIERNAN:  Kiernan.
18         MR. SPECTER:  -- Kiernan.  Excuse me.
19 There's so many Merck lawyers, I have to try to keep
20 them all straight.
21         Mr. Kiernan, what I don't have is
22 this Gilmartin briefing document.  Do you think I
23 have that document?
24         MR. KIERNAN:  I don't know.  We're
25 trying to separate documents --

Page 690

1          MR. SPECTER:  Fine.
2          MR. KIERNAN:  -- and I don't think
3  you are being fair to the witness about what
4  documents were, because you already have the October
5  2004 briefing document.
6          MR. SPECTER:  I agree.  I do have
7  that.
8          MR. KIERNAN:  Okay.
9          MR. SPECTER:  It's an October 13th
10 document.  I agree I have that.
11         MR. KIERNAN:  It has a date on it,
12 which was --
13         MR. SPECTER:  I agree.  October 13th.
14 I was told yesterday that's a document that Dr. Kim
15 saw the night before.  That's what I was told
16 yesterday by e-mail from one of your colleagues.
17         MR. KIERNAN:  Okay.
18         MR. SPECTER:  But I don't have the
19 Gilmartin briefing document, and this witness said
20 that's what he reviewed the night before his
21 testimony on March 16th.
22         MR. KIERNAN:  That's not correct.
23 That's not what he's testified to.
24         MR. SPECTER:  Well, that's not what
25 he said today in answer to my first questions on the

Page 691

1  subject.
2          MR. KIERNAN:  No, I think --
3          MR. SPECTER:  Wait, let me finish my
4  sentence.
5          I don't have the Gilmartin briefing
6  document.  It's not been produced.  Do you disagree
7  with that.
8          MR. KIERNAN:  I don't know.  I don't
9  know the answer to that question.
10         MR. SPECTER:  I'm going to ask my
11 questions on the subject, but I want to tell you
12 something, I don't have the Gilmartin briefing
13 document.  We're entitled to it.  If you're going to
14 assert a privilege as to this document, you need to
15 do so.  So, let's go on to something else, but I'd
16 like to get an answer to the question, if we can,
17 before the end of the day, as to whether that
18 document is going to get produced.
19         MR. KIERNAN:  Well, if you want a
20 Request for Production, please make it formally.  I
21 do know --
22         MR. SPECTER:  I did.  I did.  I made
23 a request --
24         MR. KIERNAN:  Well --
25         MR. SPECTER:  Let me finish.  I made

Page 692

1  a request through Mr. Buchanan, who is liaison
2  counsel, in writing to you, "you" being Merck, that
3  the document be produced in advance of the
4  deposition of Dr. Kim this morning.  Some of the
5  documents that we asked for were produced.
6          The Gilmartin briefing document, we
7  were told, was not the document that Dr. Kim relied
8  upon, it was this document of October 13, 2004, and
9  we've never gotten the Gilmartin briefing document.
10 We believe we're entitled to it.  If there's an
11 assertion of privilege, you have an obligation to
12 assert the basis for the privilege.  We haven't had
13 that basis asserted yet.  So, I'd like to get that
14 issue straightened out.
15         So, since Linda is typing all this
16 up, you're now going to have an additional request
17 for that document, and we'll confirm it again in
18 writing.  Let's go on to something else, if we
19 could.  All right?
20         MR. KIERNAN:  Do you want to take a
21 short break?
22         MR. SPECTER:  I don't want to, but if
23 you want to leave and do that, that's okay with me.
24         MR. KIERNAN:  Well, we've been going
25 over an hour.

KS-000499

Confidential - Subject to Protective Order

Page 693

1      MR. SPECTER:  I'm not complaining.
2  Go ahead.
3      THE VIDEOTAPE TECHNICIAN:  Stand by,
4  please.  The time is 10:10.  We're going off the
5  record.
6          - - -
7      (Whereupon, a recess was taken from
8      10:10 a.m. until 10:24 a.m.)
9          - - -
10      THE VIDEOTAPE TECHNICIAN:  The time
11  is 10:24.  We're back on the record.
12  BY MR. SPECTER:
13      Q.    Dr. Kim, a question or two more about
14  this document issue.
15      Do you have any explanation as to how
16  somebody else could know what document you reviewed
17  in your hotel room?
18      A.    Yes.
19      Q.    May I hear it, please?
20      A.    Following the last set of questioning
21  on that day, I provided the document that I had
22  reviewed the night before to the Merck legal
23  department, and I was shown a copy of that document
24  yesterday, and that document is the October 2004
25  media briefing document that was prepared for Mr.

Page 694

1  Gilmartin.
2      MR. KIERNAN:  For the record, I think
3  that document was provided to you, Mr. Specter,
4  yesterday or the day before.
5      MR. SPECTER:  We've had that document
6  for months and months and months.
7      MR. KIERNAN:  Okay.
8      MR. SPECTER:  It was identified for
9  us yesterday.  It was provided many months ago.
10  BY MR. SPECTER:
11      Q.    Do you know if the document you were
12  shown yesterday is the same document you reviewed on
13  the evening of March 15th?
14      A.    What I know is that I took the
15  document that I reviewed the night before we last
16  met and provided it to the legal department, and I
17  was shown a copy of that yesterday, which was the
18  October 13th media prep for Mr. Gilmartin.
19      Q.    Please try to focus on my question.
20      Do you know if the document that you
21  were shown yesterday was the same document that you
22  reviewed on the evening of March 15th?
23      A.    I believe that I've answered your
24  question in terms of what it is that I know.  I know
25  that I took that document that I reviewed the night

Page 695

1  before, provided it to the legal department, and was
2  shown a copy of that yesterday.
3      Q.    Well, my question is, do you know
4  those documents to be one and the same?
5      A.    To the extent of what I just told
6  you, I know --
7      Q.    I don't want to mince words here,
8  sir.  Do you know those documents to be the same
9  document?
10      A.    I mean, yes, to the extent that I
11  provided the document to the department and was
12  shown a copy --
13      Q.    I don't know what this "yes, to the
14  extent" part means, sir.  Do you know those
15  documents to be the same document?  Yes or no?
16      A.    Again, the only way I can answer that
17  question is what I did.
18      Q.    Sir, you told me that you saw a
19  document in your hotel room on March 15th.  You then
20  identified it as the Gilmartin briefing document the
21  next morning.  You were then asked for -- you say
22  you were asked for a copy of that document.
23      A.    I -- excuse me.  I was asked for that
24  document.
25      Q.    You were asked for that document.

Page 696

1  You say you sent it to legal.  Correct so far?
2      A.    Correct.
3      Q.    Then yesterday morning you were shown
4  a document which you were told was the document that
5  you had sent; correct?
6      A.    Yesterday afternoon --
7      Q.    Yesterday afternoon.
8      A.    -- I was shown a copy of the document
9  that I was told was a copy of the document that I
10  had sent.
11      Q.    But my question is, do you know those
12  documents to be the same documents, a copy or
13  otherwise?
14      A.    I know --
15      Q.    In other words, did you remember
16  yesterday afternoon, when you looked at the
17  documents, that that was the same document that you
18  had sent over to legal?
19      A.    Did I remember that that was the same
20  document that I sent over to legal?
21      Q.    Yes.  That's the question.
22      A.    No.  I just took the document that I
23  reviewed, I sent it over to legal, and I was shown a
24  copy yesterday.
25      Q.    But that's my question, sir.  Do you

Confidential - Subject to Protective Order

Page 697

1  know, do you remember whether what you were shown
2  yesterday was the same document that you say you
3  sent to legal?
4      A.    When you say "remember," no, I didn't
5  study the document before I sent it over to legal.
6  I grabbed the document, I sent it over to legal.
7      Q.    So, you don't know if what you were
8  shown yesterday was the same document that you sent
9  to legal; correct?
10      A.    I don't know.  I mean, I took the
11  document, I sent it over to legal, and I was shown
12  the document.
13      Q.    Please, sir.  This question is very
14  simple.  You don't know that what you sent over to
15  legal, was the same document that you saw yesterday
16  afternoon; correct?
17      A.    Well, let's put it this way.  I
18  didn't study the document before I sent it over to
19  legal, and I didn't look at the title of that and
20  verify everything and then look at it again
21  yesterday to recollect whether it was the same.
22      Q.    So, the answer is, Mr. Specter, I
23  don't know; isn't that correct?
24      A.    The answer is what I know is what I
25  told you.

Page 698

1      Q.    The answer is, you don't know if the
2  same document that you sent to legal is the document
3  that you were shown yesterday; correct?
4      A.    I know what I said I know.  And that
5  is, I took the document --
6      Q.    Sir, I'm not asking you about
7  something else that you know.  I'm asking you what
8  the answer to my question is.
9          My question is, you don't know that
10  what you sent to legal is the same document that you
11  were shown yesterday; right?
12      A.    I can't be 100 percent sure that
13  that's right.
14      Q.    Now, when is the last time you saw
15  the Gilmartin briefing document?
16          MR. KIERNAN:  Counsel, if you could
17  just clarify.  I think we have two.
18          MR. SPECTER:  Whatever it is he
19  referred to.  He called it a Gilmartin briefing
20  document for the Senate.  So, I'm just using his
21  appellation for it.
22          MR. KIERNAN:  All right.  We're all
23  clear there are two documents that you're talking
24  about now, and I think you're just trying to confuse
25  it.

Page 699

1          MR. SPECTER:  Yes.  You don't really
2  think I'm trying to confuse it, do you?
3          MR. KIERNAN:  Yes, I do, actually.
4          MR. SPECTER:  I find that very hard
5  to believe.
6  BY MR. SPECTER:
7      Q.    Now, Dr. Kim, when is the last time
8  you saw the Gilmartin briefing document?  And by the
9  way --
10          MR. KIERNAN:  Same objection.
11          MR. SPECTER:  By the way, not only do
12  I find it hard to believe, but I find it also hard
13  to believe that you would make such an offensive
14  statement like that, especially in light of the
15  circumstances of this questioning, which has been
16  painstakingly polite.
17  BY MR. SPECTER:
18      Q.    Now, let me ask the question again.
19          When is the last time you saw the
20  Gilmartin briefing document?
21          MR. KIERNAN:  Same objection.
22          THE WITNESS:  Well -- the last
23  time -- I don't know the last time that I saw the
24  Gilmartin briefing document for the Senate hearing,
25  to be clear about what document we're talking about.

Page 700

1  BY MR. SPECTER:
2      Q.    When is the last time you know you
3  saw it?
4      A.    Oh, when we were -- when I was
5  participating in prep sessions for Mr. Gilmartin.
6      Q.    Is there a copy in your office?
7      A.    I don't know.
8      Q.    Was there once a copy in your office?
9      A.    I don't -- I don't know.  I --
10      Q.    You told me -- I'm sorry.  Were you
11  finished?
12      A.    Yes.  I don't know.
13      Q.    You told me on March 16th that there
14  had been a copy in your office, going back to when
15  Mr. Gilmartin testified in front of the Senate.  Do
16  you recollect telling me that?
17      A.    No.  I don't recollect telling you
18  that.  I certainly reviewed a copy and had a copy in
19  the time period when -- when we were -- when Mr.
20  Gilmartin was preparing for his Senate testimony.
21      Q.    How long is that document?
22      A.    Oh, I don't -- I mean, it's several
23  pages.  It's approximately -- I don't know, it's
24  been a long time.
25      Q.    Who prepared the document?

KS-000501

Confidential - Subject to Protective Order

Page 701

1    A.    I'm not sure.
2    Q.    Was it prepared by legal?
3    A.    I believe it's been prepared by
4  legal, but -- yes.
5    Q.    Was the Q&A from October 13th of 2004
6  prepared by legal?
7    A.    I don't know.
8    Q.    What other documents did you review
9  yesterday in preparation for your deposition today?
10       MR. KIERNAN:  Object to form.  I
11 don't think he said he's reviewed those documents.
12 So, to the extent your question seems to imply that
13 he reviewed those two documents yesterday --
14       MR. SPECTER:  It doesn't imply that.
15 He told me he reviewed yesterday the Q&A document
16 from --
17       THE WITNESS:  Oh, no.  Excuse me.
18 BY MR. SPECTER:
19   Q.    Well, you saw it; correct?
20   A.    Yes.
21   Q.    What other documents have you seen
22 regarding this case in preparing for today's
23 deposition?
24   A.    I don't believe there were any other
25 documents that I saw.

Page 702

1    Q.    So, yesterday you were shown one
2  document, and that's the Gilmartin Q&A?  I'm sorry.
3  I misspoke.
4         Yesterday you were shown one
5  document, and that was the October 13 Q&A document;
6  correct?
7    A.    Yes.  I don't -- if I was shown
8  another, I don't recall it, but, yes, I was not -- I
9  did not review documents yesterday.
10   Q.    Let's go back to the Juni article, if
11 we could, please.
12   A.    Okay.
13   Q.    Which has been marked previously as,
14 I think, 45.  Let's go to the first page.
15   A.    First page.
16   Q.    The first page is the Kim/Reicin
17 reply to Juni; correct?
18   A.    That is correct.
19   Q.    The first sentence is, "The analysis
20 by Peter Juni and colleagues contravenes the basic
21 principle of meta-analyses to combine like with
22 like, and thus arrives at flawed conclusions."  Did
23 I read that correctly?
24   A.    Yes.
25   Q.    Is that what Merck did when they did

Page 703

1  their own meta-analysis?  Did they combine like with
2  like, or did they combine like with unlike?
3    A.    Whether or not one combines --
4  whether or not one concludes scientifically that one
5  is concluding like with like is something that is
6  subject to statistical analyses to see.  And the
7  point that's being made here is that the analysis by
8  Juni and colleagues included data which compared
9  Vioxx to naproxen when the statistical test for
10 whether or not there's what's called a homogeneity
11 in the combination was not passed.
12       And so, therefore, we stated that the
13 analysis that Juni and colleagues did went against
14 the basic principle of combining like with like as
15 judged by -- it's not explicitly stated here, but
16 the scientific context of this is that that's judged
17 by statistical methods.
18   Q.    Dr. Kim, the basic principle of
19 meta-analysis is to combine like with like -- let's
20 start over again.
21       The basic principle of meta-analysis
22 is to combine like with like; correct?
23   A.    That's correct.
24   Q.    Was Merck criticized for not
25 combining like with like in their own meta-analysis?

Page 704

1    A.    Oh, I don't know.
2    Q.    Well, do you know what the FDA said
3  about Merck's meta-analysis?
4    A.    I don't remember what they said.
5    Q.    Well, did you once know?
6    A.    I imagine I once read it.
7    Q.    Did you read the medical officer's
8  review of the FDA of Merck's meta-analysis?
9    A.    I'm not sure.  What date is that?
10   Q.    The 28th of November of 2001.
11   A.    I'm not sure if I read that.
12   Q.    Well, would it have been your custom
13 to have read a document of that nature?
14       Well, let me withdraw the question
15 and do it this way if I could.  I'll show you the
16 document, and you can tell me if you think you saw
17 it.
18   A.    Okay.
19            - - -
20       (Whereupon, Deposition Exhibit Kim-46,
21       "Food and Drug Administration, Division
22       of Anti-Inflammatory, Analgesic and
23       Ophthalmic Drug Products -- HFD-550,
24       Medical Officer Review NDA 21-042 and
25       NDA 21-052," (56 pages), was marked for

Confidential - Subject to Protective Order

Page 705

1          identification.)
2                - - -
3   BY MR. SPECTER:
4          Q.     We'll mark it as Kim-46, and I've
5   tabbed it to the relevant page regarding criticisms
6   of Merck's meta-analysis.  The first question is,
7   have you seen this document before?
8          A.     If I did, I don't remember it.
9          Q.     Do you think that your ordinary
10  practice would have included reading the document?
11         A.     Oh, my ordinary practice would not be
12  -- would not include reading documents like this.
13         Q.     Just so we're clear, this is -- may I
14  have it again, Lisa, please.  This document is the
15  medical officer's review -- unfortunately, the only
16  copies that exist of it right now in this room are
17  over on your side of the table.  So, would you read
18  the title of the document, please, for the record?
19         A.     Sure.  It's the, "Food & Drug
20  Administration Division of Anti-inflammatory
21  Analgesic and Ophthalmic Drug Products...Medical
22  Officer Review (Rofecoxib tablets and rofecoxib oral
23  solution)" regarding the "Complete response to
24  Approvable letter for," and then it gives the
25  numbers of the applications.

Page 706

1          Q.     You know that after Vioxx was on the
2   market, the VIGOR trial occurred, and after VIGOR
3   occurred, Merck sent to the FDA information
4   regarding VIGOR which included a meta-analysis.  Do
5   you know those facts?
6          A.     Yes.
7          Q.     You were present some nine months
8   earlier at the FDA's arthritis conference regarding
9   COX-2 inhibitors; correct?
10         A.     Well, specifically I was present at
11  the FDA Advisory Committee meeting regarding Merck's
12  application for a change in the label as a result of
13  the VIGOR study.
14         Q.     Right.  And Merck wanted there to be
15  a more favorable label with respect to
16  gastrointestinal problems; correct?
17         A.     Merck wanted to have changes to the
18  label which indicated the results of the VIGOR
19  study.
20         Q.     And that involved a hope that it
21  would be a more attractive label for health care
22  providers and patients with respect to
23  gastrointestinal problems; correct?
24                MR. KIERNAN:  Object to form.
25                THE WITNESS:  Merck -- so, as we

Page 707

1   discussed last time --
2   BY MR. SPECTER:
3          Q.     I'm going to withdraw the question.
4                 You then succeeded to the presidency
5   of Merck Research Laboratories not quite a
6   year-and-a-half after this document was written;
7   correct?
8          A.     I became president of Merck Research
9   Labs on January 1st of 2003.
10         Q.     So, a little less than a
11  year-and-a-half, a year and a month after this
12  document was written; correct?
13         A.     Correct.
14         Q.     Now, let's go to the page that I
15  wanted to ask you about, which I put a yellow sticky
16  on.
17         A.     Okay.
18         Q.     This document doesn't have page
19  numbers; does it?
20         A.     This doesn't appear to have page
21  numbers.
22         Q.     We're not going to blame Merck for
23  that, we're going to blame the FDA.  Or at least I
24  am.
25                But for anybody wanting to find it,

Page 708

1   it's section 2, small paragraph a; correct?
2          A.     Correct.  In the "Clinical Review
3   Section."
4          Q.     It's about a third of the way through
5   the document; correct?
6          A.     It's about ten pages in or so.
7          Q.     Okay.  Thank you.
8                 It talks about how --
9          A.     Can you just give me a second?
10         Q.     Yes, sure.
11         A.     Thank you.
12                (Witness reviewing document.)
13                Okay.  Thank you.
14         Q.     So, in subparagraph A, the FDA says
15  that, "Studies that compared" Vioxx "to non-naproxen
16  NSAIDs in the original new drug application database
17  and subsequently, involved too few patients to
18  adequately assess differences in cardiovascular
19  safety between" Vioxx "and each NSAID."  Correct so
20  far?
21         A.     That's what it says, yes.
22         Q.     And it says that "Studies with" --
23         A.     Nabumetone.
24         Q.     -- "nabumetone," thank you, "were of
25  6 weeks duration; studies with ibuprofen were of 6

KS-000503

Confidential - Subject to Protective Order

Page 709

1  weeks to 6 months duration; studies with diclofenac
2  were of one year duration.  Some of these studies
3  have blinded extensions, but the actual number of
4  patients exposed for a year or longer is very
5  limited."  Did I read that correctly?
6      A.    You read that correctly.
7      Q.    Are those true statements?
8      A.    I don't know for sure, but I have no
9  reason to doubt the accuracy of those statements.
10     Q.    It then says, and this next part is
11 in bold black letters, "Meta-analyses of small
12 studies of different duration, different size and
13 different design, involving different patient
14 populations and different doses of" Vioxx "can not
15 adequately assess the cardiovascular safety of Vioxx
16 "compared to individual NSAIDs."  Did I read that
17 correctly?
18     A.    You did.
19     Q.    Is that a true statement?
20     A.    That's a statement which is a
21 statement of opinion.  And it has -- the reason why
22 I say that is it's related to the question -- the
23 issue that we were discussing before, and that is
24 what one means by adequate assessment of safety.
25 And that, again, refers to the magnitude of the

Page 710

1  effect that one is trying to, in this case, rule out
2  and the power by which one can make that statement.
3      Q.    Were you aware of this statement back
4  in November of 2001?
5      A.    I don't know if I was aware of this
6  statement in 2001.
7      Q.    Did you know the FDA was critical of
8  Merck's meta-analysis?
9      A.    No, I didn't really pay much
10 attention to the meta-analysis discussions that were
11 ongoing at the time.
12     Q.    After you became president of Merck
13 Research Laboratories, did you read this statement?
14     A.    No, not that I recall.
15     Q.    Were you aware after you became
16 president of Merck Research Laboratories that FDA
17 was critical of Merck's meta-analysis?
18     A.    If I was, it didn't register or it
19 didn't stay with me.
20     Q.    Before I showed you this statement
21 today, do you think you ever saw it before?
22     A.    I don't recall seeing it before.
23     Q.    Do you think you ever knew that Merck
24 was criticized by the FDA for the meta-analysis?
25     A.    Oh, I know there were substantial

Page 711

1  discussions in the scientific field on the
2  meta-analyses and how the meta-analyses should be
3  done.
4      Q.    That's not my question, sir.
5            My question is, did you know before
6  this minute that FDA was critical of Merck's
7  meta-analysis?
8            MR. KIERNAN:  Objection to form.
9            THE WITNESS:  If I did, I don't
10 recall it.  What I do know is that there was
11 substantial discussion around how to do
12 meta-analyses to address this question in the
13 scientific field.
14 BY MR. SPECTER:
15     Q.    Did you ever know before this minute
16 that FDA believed that Merck's meta-analysis could
17 not adequately assess the cardiovascular safety of
18 Vioxx compared to individual NSAIDs?
19     A.    Well, I wouldn't put it that way, but
20 I certainly was aware of discussions that were
21 ongoing between Merck and the FDA about what
22 conclusions could be reached about cardiovascular
23 safety.
24     Q.    And then in 2004, in your writing to
25 the Lancet to criticize Dr. Juni, you criticized him

Page 712

1  for not combining like with like; correct?
2      A.    That's correct.
3      Q.    And that's pretty much the same
4  criticism that FDA leveled at Merck; correct?
5      A.    No, that's not correct.  The
6  criticism that you're pointing to here that FDA made
7  of Merck's meta-analyses, specifically as you read,
8  is addressing the fact that they are concerned about
9  the studies having different duration, different
10 size and different design and involving different
11 patient populations and different doses of Vioxx.
12           The concern which was raised by
13 myself and Dr. Reicin in our response to the article
14 published by Dr. Juni and his colleagues had to do
15 with the fact that they combined in their
16 meta-analysis studies that compared Vioxx to placebo
17 and Vioxx to non-naproxen NSAIDs.  They combined
18 with that studies which compared Vioxx to naproxen.
19 And as we have discussed, there is a substantial
20 difference with naproxen than with the non-naproxen
21 NSAIDs.  So, in fact, the criticism that is
22 contained in this first sentence which we authored
23 is of a fundamentally different nature than the
24 statement that you just read me.
25     Q.    They both involve criticisms of

KS-000504

Confidential - Subject to Protective Order

Page 713

1  comparing like with unlike, it's just that the
2  unlikes are different; correct?
3        A.    No.  And the reason why I say no is
4  that the FDA statement is a generic statement saying
5  that studies of different duration, size and design
6  cannot adequately assess.  They're not saying that
7  these studies are demonstrably unlike, whereas what
8  our statement specifically points to is the
9  principle of meta-analysis to combine like with
10  like --
11        Q.    Sir --
12        A.    -- which is -- if I can just finish.
13             -- which is subject to a statistical
14  test.
15        Q.    Sir, in common English language, does
16  the word "different" mean to you something similar
17  to the word "unlike"?
18        A.    Oh, in the common English language,
19  different is certainly meant to be unlike, but in
20  the statement that we're making here about basic
21  principle of meta-analysis to combine like with
22  like, we're referring to a principle, a scientific
23  principle of meta-analysis which is subject to
24  statistical verification.
25        Q.    And FDA criticized Merck for

Page 714

1  combining "studies of different duration, different
2  size and different design involving different
3  patient populations and different doses of" Vioxx;
4  correct?
5             MR. KIERNAN:  Objection to the form.
6             THE WITNESS:  I don't think it was a
7  criticism of our studies.
8  BY MR. SPECTER:
9        Q.    Well, they said that those studies
10  "can not adequately assess the cardiovascular safety
11  of Vioxx compared to individual NSAIDs."  Correct?
12        A.    The statement is that meta-analyses
13  of such studies, in their opinion, can not
14  adequately address the cardiovascular safety.
15        Q.    Can you say that the FDA was wrong?
16        A.    The statement, as I said before, is a
17  statement of opinion that is related to the question
18  of what one means by "adequate cardiovascular
19  safety."
20        Q.    Well, for your definition of what
21  would mean "adequate cardiovascular safety," can you
22  say that FDA was wrong?
23        A.    My definition of adequate
24  cardiovascular safety relates to the studies that
25  have been done and what it is that we know about

Page 715

1  them.  And in this case, the second, part 2.b, which
2  has to do with the Alzheimer's data, is in my
3  opinion very relevant.
4        Q.    What power and relative risk do you
5  think would be adequate to assess cardiovascular
6  safety of Vioxx?
7        A.    You know, the cardiovascular safety
8  profile of any NSAID, with the exception of aspirin,
9  has not been well studied until we actually
10  conducted extensive cardiovascular safety studies
11  with Vioxx.  And so the answer to your question is
12  that one obviously would like to get as much safety
13  data as possible.  In the case of Vioxx, there's
14  more placebo-controlled data, cardiovascular safety
15  data than for any other NSAID or COX-2 inhibitor.
16        Q.    Do you recollect my question, sir?
17        A.    Yes.
18        Q.    What was the question?
19        A.    The question was asking my opinion
20  about what I consider to be adequate cardiovascular
21  safety.
22        Q.    No, sir.
23             The question was, what do you regard
24  as being the adequate power and relative risk in
25  order to assess the cardiovascular safety of Vioxx?

Page 716

1        A.    I don't have -- I don't have an
2  answer to that question, because one is dealing with
3  issues in terms of clinical trial design that make
4  it difficult to assess this particularly versus a
5  placebo, and that's because patients that are taking
6  Vioxx or any NSAID are in pain and need relief from
7  pain and inflammation, so, you can't do long-term
8  placebo-controlled studies.
9        Q.    Has anybody at Merck told you that
10  they have an opinion as to what is the necessary
11  power and relative risk for a clinical study in
12  order to determine the cardiovascular safety profile
13  of Vioxx?
14        A.    Not that I'm aware of.
15        Q.    Now, sir, as to naproxen, you're
16  aware that yesterday FDA said that they're going to
17  require warning information on naproxen products
18  with respect to cardiovascular risk; correct?
19        A.    Yes.  The FDA said that they would
20  require black box warnings on all prescription
21  NSAIDs, including prescription naproxen, and that
22  they want to strengthen the cardiovascular warning
23  on over-the-counter drugs, including Advil, which is
24  the over-the-counter formula of ibuprofen, and
25  Aleve, which is the over-the-counter formulation or

KS-000505

23 (Pages 713 to 716)

Confidential - Subject to Protective Order

Page 717

1  dosage of naproxen.
2      Q.    So, apparently FDA thinks that Aleve
3  is bad for your heart; correct?
4          MR. KIERNAN:  Objection to form.
5          THE WITNESS:  No.  The way I read the
6  statements was that FDA was concerned that there was
7  insufficient data and that there was concern about
8  the cardiovascular risks associated with long-term
9  use of any NSAID.
10 BY MR. SPECTER:
11     Q.    Apparently, FDA thinks the people who
12 take Aleve are at increased risk for heart problems;
13 correct?
14     A.    I don't think that's what the FDA is
15 saying.  I think if we were to read those
16 statements, we would see that FDA has concern about
17 potential cardiovascular risks --
18     Q.    Do you --
19     A.    -- and that concern is large enough
20 that they would like to see the potential of
21 cardiovascular risks explicitly stated.
22     Q.    Well, do you think that FDA is going
23 to require the manufacturers of Aleve to communicate
24 to users that if you take Aleve, you are going to be
25 at increased risk for a heart attack?

Page 718

1      A.    I don't know what FDA is going to
2  require.  I do know what FDA has said.  At least I
3  know what I've read about what FDA has said.  And
4  that is that they do not think that short-term use
5  of over-the-counter NSAIDs is associated with a
6  significant increased cardiovascular risk, but they
7  want to caution patients against using these
8  over-the-counter drugs for longer than what is
9  stated on the label.  And in particular, when you
10 buy an over-the-counter drug, the information that's
11 provided with that over-the-counter drug tells you
12 not to use the drug for long periods of time.
13     Q.    Do you believe that FDA's views as to
14 the cardiovascular risk associated with Aleve are
15 wrong?
16     A.    I'm sorry, can you state that again?
17     Q.    Do you believe that FDA's views with
18 respect to cardiovascular risk of people taking
19 Aleve are wrong?
20         MR. KIERNAN:  Objection to form.
21         THE WITNESS:  I respect what the FDA
22 has said, and that is that the cardiovascular risks
23 associated with the nonsteroidal anti-inflammatory
24 drugs, including ibuprofen and naproxen or Aleve,
25 are unknown, but that the -- that their -- because

Page 719

1  of their concerns, that they want to make patients
2  and physicians aware of the possibility.
3  BY MR. SPECTER:
4      Q.    You agree that the CV risks with
5  Aleve are unknown?
6      A.    I think that whether or not there is
7  an effect of the COX-2 inhibition by Aleve or
8  naproxen on cardiovascular safety is unanswered.  I
9  do know or I do believe that naproxen, when dosed
10 500 milligrams twice a day, that is, at prescription
11 strength in a controlled clinical trial in which
12 patients are regularly taking this drug twice a day
13 every day, that is -- that the results of our
14 clinical studies and other clinical studies versus
15 other COX-2 inhibitors indicate that naproxen has a
16 cardioprotective effect.
17     Q.    Sir, do you recollect telling me just
18 a moment ago in answer to the question before the
19 last one that the CV risks with Aleve are unknown?
20     A.    I recollect saying that that was the
21 FDA's --
22     Q.    No, sir.
23     A.    -- statement.
24     Q.    No, sir.
25         MR. SPECTER:  Lisa, let's go backward

Page 720

1  if we could.
2  BY MR. SPECTER:
3      Q.    You said, "I respect what the FDA has
4  said, and that is that the cardiovascular risks
5  associated with the nonsteroidal anti-inflammatory
6  drugs, including ibuprofen and naproxen or Aleve,
7  are unknown."  Do you recollect saying that?
8      A.    Yes.  And to be clear, I was
9  referring to what the FDA said.
10     Q.    Right.
11     A.    Which is what I respect.
12     Q.    Right.  So, when you say you
13 "respect" it, you agree with it; correct?
14     A.    I respect it.
15     Q.    Do you agree with it, sir?
16     A.    I think -- so, again, you're going to
17 have to let me answer the question in the way in
18 which I'm thinking about this, which is that I think
19 that the effects of COX-2 inhibition by naproxen,
20 the effects of that on cardiovascular safety are
21 unknown, but I think that the -- when naproxen is
22 used at prescription strength twice a day in
23 controlled clinical trials, it demonstrates a
24 cardioprotective effect.
25     Q.    Sir, you told us not five minutes

Confidential - Subject to Protective Order

Page 721

1 ago, "I respect what the FDA has said, and that is
2 that the cardiovascular risks associated with the
3 nonsteroidal anti-inflammatory drugs, including
4 ibuprofen and naproxen or Aleve, are unknown."
5          Now, do you want to take that back?
6     A.    No.  I respect that statement.
7     Q.    Do you think it's wrong?  Yes or no?
8          MR. KIERNAN:  Objection to the form.
9          THE WITNESS:  Do I think it's wrong?
10 It's unknown.
11 BY MR. SPECTER:
12     Q.    No.  No.  When you say, "I respect,"
13 do you mean I agree with or do you mean I don't
14 agree with?
15     A.    It means that I respect it.  In
16 science, one has data, one tries to take different
17 accounts into view, and one tries to come up with
18 opinion.  The FDA has come up with opinion here.
19 They've studied the issue.  They had an Advisory
20 Committee meeting.  They've had discussions
21 internally, I presume, and they've come out with a
22 statement.
23     Q.    Sir, when you say, "I respect what
24 the FDA has said, and that is that the
25 cardiovascular risks associated with the

Page 722

1 nonsteroidal anti-inflammatory drugs, including
2 ibuprofen and naproxen or Aleve, are unknown," when
3 you say that, do you mean I agree with it or do you
4 mean I disagree with it?
5     A.    I don't mean either.  I mean I
6 respect it.
7     Q.    I respect it.  So, somebody listening
8 to you should not infer that when you say, "I
9 respect" something means that you agree with it;
10 correct?
11     A.    Oh, no, not at all.
12     Q.    Now, do you believe that an alleged
13 cardiovascular protective effect of naproxen was the
14 sole factor that explained the difference in
15 cardiovascular events between naproxen and Vioxx in
16 the VIGOR trial?
17     A.    In the VIGOR study, yes.
18     Q.    So, every one of the 58 percent
19 difference is attributable to a cardioprotective
20 effect of naproxen?  Is that what you want us to
21 believe?
22          MR. KIERNAN:  Objection to form.
23          THE WITNESS:  I believe that the
24 difference in the cardiovascular event rates seen in
25 the VIGOR trial between naproxen and Vioxx are

Page 723

1 attributable to the cardioprotective effect of
2 naproxen.
3 BY MR. SPECTER:
4     Q.    All 58 percent?
5          MR. KIERNAN:  Objection to form.
6          THE WITNESS:  Again, it's the
7 difference that's observed, and when you say, "all
8 58 percent," as you know, I think there are error
9 limits, confidence boundaries, to that statistical
10 number.  What I'm saying is that the difference
11 that's observed there is due to the cardioprotective
12 effect of naproxen.
13 BY MR. SPECTER:
14     Q.    Well, the difference was 58 percent;
15 correct?
16     A.    The numeric -- I don't know what the
17 difference was exactly.
18     Q.    Do you recollect that being the
19 figure that's been used?
20     A.    No.  But I do recollect it is
21 approximately that.
22     Q.    You don't wish to quarrel with that
23 figure, do you?
24     A.    I don't wish to quarrel with it.  I
25 just don't know the exact figure.

Page 724

1     Q.    Well, assuming that it was 58
2 percent, do you attribute all of that 58 percent to
3 cardioprotective effects of naproxen?
4     A.    So, again, without getting into 58
5 percent, I do attribute all of the effect that was
6 seen in the VIGOR trial in the difference between
7 Vioxx and naproxen.
8     Q.    This is despite the fact that you
9 testified not ten minutes ago that you respect the
10 FDA's statements with regard to -- let me find it
11 now -- that you respect what the FDA has said, and
12 that is that the "Cardiovascular risks associated
13 with the NSAIDs including...Aleve are unknown."
14 Right?
15     A.    Correct.
16     Q.    Well, you appear to know them; right?
17     A.    No.  What I know is the net effect on
18 cardioprotection seen with naproxen taken twice a
19 day at prescription strength.
20     Q.    Now, let's go back to the Juni
21 article, if we could, sir.
22     A.    (Witness reviewing document.)
23     Q.    Taking a look at page 27 in the
24 second column, the first paragraph, he says, "A
25 crucial lesson that should be learned from our

Confidential - Subject to Protective Order

Page 725

1  meta-analysis is that data on adverse events from
2  industry-sponsored randomised trials are trustworthy
3  only if an independent endpoints committee is
4  involved."  Did I read that correctly?
5      A.    You read that correctly.
6      Q.    Do you agree with it?
7      A.    Absolutely not.
8      Q.    He goes on to say, "We are frustrated
9  by Merck's assertion that we should have included
10 trials in patients with Alzheimer's disease; these
11 trials neither met our prespecified inclusion
12 criteria, nor had the data presented on the FDA's
13 website been reviewed by an independent endpoints
14 committee."  Did I read that correctly?
15     A.    You read it correctly.
16     Q.    Is that a true statement?
17     A.    That is not a true statement.
18     Q.    Is it true that the data --
19     A.    Well, excuse me.  Let me say what I
20 think is untrue, just to be clear here.
21     Q.    Please.
22     A.    The assertion here is that the
23 endpoints were not reviewed by someone independent
24 of Merck.  And, in fact, as we discussed before, all
25 of the cardiovascular events in Merck's trials

Page 726

1  beginning, I believe, in 1999, were adjudicated,
2  that is, that they were evaluated and determined as
3  to whether or not they were true cardiovascular
4  events by an independent adjudication committee.
5      Q.    Did the criteria for what to include
6  and not include change during the trial in VIGOR?
7      A.    In VIGOR?
8      Q.    Yes.
9      A.    Not that I'm aware of.  Not that I
10 recall.
11     Q.    Do you know?
12     A.    I am not aware of any change in the
13 inclusion criteria for patients in VIGOR.
14     Q.    Congestive heart failure, can that be
15 due to a heart attack?
16     A.    Congestive heart failure is in
17 general due to -- well, it can be caused by many,
18 many causes, but it's associated with increased
19 fluid retention and is seen as a mechanism-based
20 side effect with all NSAIDs, including the
21 nonsteroidal NSAIDs that inhibit both COX-1 and
22 COX-2.
23     Q.    Can congestive heart failure be seen
24 in people that have had a heart attack, sir?
25     A.    Can congestive heart failure be seen

Page 727

1  in patients that have had a heart attack?
2  Congestive heart failure is a diagnosis that's made
3  by a physician and certainly can be made in patients
4  that have had a heart attack.
5      Q.    Was congestive heart failure part of
6  the SOP for VIGOR?
7      A.    I'm not sure what you mean by that.
8      Q.    What's an SOP?
9      A.    It's a standard operating procedure.
10     Q.    Do you know what the VIGOR SOP was?
11     A.    I mean, there are many SOPs.  I'm not
12 sure what you are referring to.
13     Q.    Do you know whether --
14     A.    For the inclusion criteria?
15     Q.    Yes.
16     A.    Is that what you're asking me?
17     Q.    Yes.
18     A.    I do not recall what was done in
19 terms of the inclusion criteria for congestive heart
20 failure, if that's your question.
21     Q.    Do you know whether congestive heart
22 failure was originally in as part of the SOP and
23 then later taken out of VIGOR?
24     A.    Oh, as I just said, I don't know what
25 the inclusion criteria for VIGOR said with regard to

Page 728

1  congestive heart failure.
2      Q.    Continuing with Dr. Juni's article,
3  he writes, "We included all trials in patients who
4  had chronic musculoskeletal pain, thus reflecting
5  the indications" Vioxx "was licensed for, and the
6  patients taking the drug in routine clinical
7  practice."  Did I read that correctly?
8      A.    You read that correctly.
9      Q.    Is that a true statement?
10     A.    I don't know.
11     Q.    Can you say it's false?
12     A.    I cannot say it's false, but I don't
13 know if it's true.
14     Q.    Skipping down to the next paragraph.
15     A.    Okay.
16     Q.    He says, "Including the data of the
17 three trials in patients with Alzheimer's disease
18 and those from the APPROVe trial in patients with a
19 history of colorectal adenomas, the risk of
20 myocardial infarction is increased in trials with an
21 external endpoint committee (relative risk 2-50, 95%
22 confidence interval 1-26 to 4-97), but not in trials
23 without such a committee (0.67, 0.32-1.43. p for
24 interaction 0.012)."  Did I read that correctly?
25     A.    Yes, you did.

KS-000508

Confidential - Subject to Protective Order

Page 729

1   Q.    Do you agree with that statement?
2   A.    No.  And, again, it has to do with
3   the fact that in the Alzheimer's studies, as well as
4   in the VIGOR study, as well as in the APPROVe study,
5   the -- all of the cardiovascular endpoints, which is
6   exactly what we're talking about here, were
7   adjudicated by an external group, independent of
8   Merck.
9   Q.    Is the statement otherwise a true
10  statement?
11  A.    I don't know.
12  Q.    Can you say it's false?
13  A.    No.
14  Q.    Let's go to another writing, if we
15  may.
16          MR. SPECTER:  I've marked this as
17  Kim-47.
18              -  -  -
19      (Whereupon, Deposition Exhibit Kim-47,
20      "Rofecoxib, Merck, and the FDA"
21      Correspondence, The New England Journal
22      of Medicine, 11-30-04, 351; 27
23      (2875-2878) was marked for
24      identification.)
25              -  -  -

Page 730

1   BY MR. SPECTER:
2   Q.    This is correspondence from you and
3   the New England Journal of Medicine; is that
4   correct?
5   A.    That's correct.
6   Q.    Did you author this?
7   A.    I did.
8   Q.    Did you write the first draft?
9   A.    I don't remember, but I don't think
10  so.
11  Q.    Did you assure yourself that the
12  statements contained in this letter were true?
13  A.    I assured myself that I agreed with
14  the statements, and I wanted to write the statements
15  in this article.
16  Q.    Is that different in some way from
17  the way I asked the question?
18  A.    Only in the sense that true versus
19  false -- certainly statements of fact here are true
20  to the best of my knowledge, but this correspondence
21  also includes opinions.
22  Q.    Well, I'm going to deal with facts,
23  not with opinions, if we could.
24          Did you assure yourself personally
25  that the statements were true?

Page 731

1   A.    To the best of my ability.
2   Q.    Okay.
3   A.    To the best of my knowledge, the
4   statements in here are true.
5   Q.    And you assured yourself to the best
6   of your ability that the statements in here were
7   true?
8   A.    Yes.
9   Q.    Let's look at the first paragraph,
10  and about halfway down the first paragraph you
11  wrote, "Because the literature suggested a
12  hypothetical possibility of" --
13  A.    I'm sorry.  Where are you?
14  Q.    Let's see, one, two, three, four,
15  five, six, seven, eight, nine, ten lines down.
16  A.    From the beginning?
17  Q.    Yes, sir.  The very first paragraph
18  of the letter to the editor.
19  A.    Oh, yes, okay.  "Nevertheless."
20  Q.    Right.  "Nevertheless" was modifying
21  something that came before it; correct?
22  A.    Yes.  Yes.
23  Q.    I just want to deal with the
24  "because" part.  Just so we're clear, this is a
25  letter to the editor in the New England Journal of

Page 732

1   Medicine, December 30, 2004; right?
2   A.    Correct.
3   Q.    Signed by you and Dr. Reicin;
4   correct?
5   A.    Correct.
6   Q.    So, you wrote, "because the
7   literature suggested a hypothetical possibility of
8   both cardioprotective effect and prothrombotic
9   effects of (COX-2) inhibitors, Merck initiated
10  adjudication of cardiovascular events by an external
11  expert panel at the end of 1998 (i.e., before
12  the...[VIGOR] trial began) for future studies of
13  Merck's COX-2 inhibitors."  Did I read that
14  correctly?
15  A.    Yes.
16  Q.    Is that a true statement?
17  A.    To the best of my knowledge, that is
18  a true statement.
19  Q.    Well, do you know it to be true?
20  A.    So, again, to the best of my
21  knowledge, this is a true statement.  This decision
22  was made before I joined Merck.
23  Q.    Right.  That's what I want to find
24  out.  I want to know whether before you made the
25  statement you made sure that it was true?

KS-000509

Confidential - Subject to Protective Order

Page 733

1    A.    I talked to people who made a
2  decision who told me that this is why they made that
3  decision.
4    Q.    Well, was it just because the
5  literature suggested this hypothetical possibility?
6  Is that the only reason why Merck initiated
7  adjudication of cardiovascular events by external
8  expert panels?
9    A.    I don't know if it was the only.  I
10  mean, science is something which is discussed
11  verbally at meetings, in telephone conferences and
12  ultimately in the literature.  And it's what's in
13  the literature that is peer reviewed that is
14  generally regarded as what people follow.
15    Q.    Yes, but there were a lot more
16  factors in Merck's decision to initiate adjudication
17  of cardiovascular events than what the literature
18  said; correct?
19    A.    Again, science is something that, you
20  know, you spend time discussing.  You go to
21  meetings, you talk to people, you talk on the phone.
22  Ultimately, science gets distilled down to the
23  literature, which is the record of peer-reviewed
24  discussions and observations and experiments that
25  are done.

Page 734

1    Q.    But it wasn't just the literature
2  that suggested this possibility; correct?
3    A.    Oh, that's certainly true.
4    Q.    Right.  It was people within Merck
5  who said that could be the case; correct?
6    A.    I don't know.  I think it's -- this
7  was something that was being discussed in the
8  scientific community, which would include people at
9  Merck --
10    Q.    Do you know --
11    A.    -- outside of Merck.
12    Q.    Do you know if people within Merck
13  before 1998 said that there was a possibility that
14  COX-2 inhibitors could cause cardiovascular events?
15    A.    Say that again.  Did I know before?
16    Q.    Did you know if people with -- when
17  you authored this letter to the editor, did you know
18  whether people within Merck prior to the end of '98
19  had said that there was a possibility that COX-2
20  inhibitors could cause cardiovascular events?
21    A.    I do know that -- so, the original
22  studies that were done that led to what's commonly
23  referred to as the FitzGerald hypothesis were
24  experiments that were done comparing administration
25  of a COX-2 inhibitor against placebo or -- well, it

Page 735

1  included studies of a COX-2 inhibitor, Vioxx, in
2  another study, Celebrex, versus placebo.  And those
3  studies demonstrated that through urinary
4  metabolites that there was inhibition of
5  prostacyclin and not inhibition of thromboxane,
6  which led to a hypothesis that there could be an
7  imbalance in those two, which could lead to an
8  increase in the cardiovascular events.
9    There was also, before this
10  observation, and before anyone had come up with the
11  hypothesis that a prostacyclin/thromboxane imbalance
12  might cause a cardiovascular -- increase in
13  cardiovascular risk, there was also considerations
14  of the fact that unlike aspirin and unlike the
15  NSAIDs which inhibit both COX-1 and COX-2, that by
16  virtue of the fact that the COX-2 inhibitors did not
17  inhibit COX-1, there might be a difference in the
18  cardiovascular event rates seen between Vioxx and an
19  NSAID, because the NSAID might be cardioprotective.
20  That certainly was discussed by people both inside
21  and outside of Merck.
22    There was also discussion around the
23  possibility that because of the anti-inflammatory
24  properties that Vioxx or a COX-2 inhibitor might
25  actually increase cardiovascular health, that is, to

Page 736

1  decrease the overall rates of cardiac events.
2    Q.    Dr. Kim, do you have a recollection
3  of my question?
4    A.    Your question had to do with whether
5  or not there was discussion at Merck prior to 1998
6  about the potential cardiovascular risk.
7    Q.    Of COX-2 inhibitors?
8    A.    Of COX-2 inhibitors.
9    Q.    And the answer to that question is
10  yes; correct?
11    A.    The answer to that question is yes in
12  the way that I just described, which included
13  different hypotheses, in one case, a
14  prostacyclin/thromboxane imbalance.  In other cases,
15  it says a lack of inhibition of COX-1.
16    MR. SPECTER:  Let's change the tape.
17    THE VIDEOTAPE TECHNICIAN:  Stand by,
18  please.  That concludes Video Cassette Number 1.
19  The time is 11:17.  We're going off the record.
20    - - -
21    (Whereupon, a recess was taken from
22    11:17 a.m. until 11:18 a.m.)
23    - - -
24    THE VIDEOTAPE TECHNICIAN:  This
25  begins Video Cassette Number 2.  The time is 11:18.

Confidential - Subject to Protective Order

Page 737

1  We're back on the record.
2  BY MR. SPECTER:
3      Q.    Now, Dr. Kim, in addition to people
4  within Merck, isn't it true that prior to the end of
5  '98, which is the date that you were referring to
6  here in your letter, that people outside of Merck
7  who advised Merck, specifically people on Merck's
8  scientific board of advisors, had told Merck that
9  there was a possibility that COX-2 inhibitors caused
10  cardiovascular events?
11     A.    I don't know that.
12     Q.    Well, when you were writing what the
13  reason was that Merck initiated adjudication of
14  cardiovascular outcomes, you were saying what the
15  reason was that they did that, and you said that it
16  was the literature that suggested this, did you
17  inquire of your colleagues at Merck whether others
18  had said so both within Merck, Merck employees and
19  also members of the outside board of advisors?
20     A.    No, I did not. And, again, in the
21  scientific fields, what one does is to have
22  extensive discussions, go to scientific meetings,
23  discuss data results, interpretations, but
24  ultimately what gets recorded in science is the
25  way -- the traditional way in which things are

Page 738

1  recorded in science is in the literature. And then
2  people go on to reference the literature when they
3  are supporting certain statements.
4      Q.    Well, that which is recorded in the
5  literature is dependent upon that which is submitted
6  to peer-reviewed journals; correct?
7      A.    Well, in general, yes.
8      Q.    Merck doesn't submit everything to
9  peer-reviewed journals that it discusses internally;
10  correct?
11     A.    Certainly not. Merck --
12     Q.    Merck doesn't cause the disclosure to
13  peer-reviewed journals of everything that they're
14  told by their outside board of advisors; correct?
15     A.    That's correct.
16     Q.    Now, continuing on this exhibit, sir,
17  if you would, please, with me. Dr. Topol responded
18  to your letter; correct?
19     A.    Yes.
20     Q.    And he discussed the VIGOR trial and
21  also study 090, which you have discussed with us
22  today and also on a previous day; correct?
23     A.    It is correct that he refers to 090,
24  and it's correct that we have discussed 090.
25     Q.    And one thing he had to say about 090

Page 739

1  that we've not discussed previously appears at the
2  bottom of Page 2877, and he says, I'm looking at the
3  very bottom, the last line. "Not only was Study 090
4  never published and available solely through a
5  subsequent FDA memorandum, but the data presented in
6  the VIGOR article also suffered from errors of
7  omission, along with erroneous information and lack
8  of completeness." Did I read that correctly?
9      A.    You read it correctly.
10     Q.    Is that a true statement?
11     A.    No, this is not a true statement.
12     Q.    What's false about it?
13     A.    Well, the first thing was that the
14  results of study 090 were published by Dr. Topol
15  himself.
16     Q.    Well, he was critical of Merck as to
17  where Merck published it; correct?
18     A.    No. He says, "Not only was Study 090
19  never published." It was published by himself.
20     Q.    Right. But he had to go get it in
21  order to publish it; correct? Merck didn't publish
22  it?
23     A.    You're asking me if this statement
24  correct, "Not only was Study 090 never published."
25  That statement is incorrect.

Page 740

1      Q.    Did Merck ever publish 090?
2      A.    Merck made study 090 available to the
3  public through the FDA on -- or certainly submitted
4  to the FDA, and the FDA made it available. And Dr.
5  Topol published the results of study 090.
6      Q.    Please, sir, let's not fence over
7  this.
8          Did Merck publish 090?
9      A.    Merck did not publish in the
10  scientific peer-reviewed journal a study -- excuse
11  me, the results of study 090.
12     Q.    Thank you.
13          Let's go to the next thing that you
14  say is false about this statement, if anything.
15  What is that?
16     A.    Well, excuse me, if I could just come
17  back to the previous statement. He references the
18  exact website where study 090 was made available.
19     Q.    You know he's criticizing Merck for
20  not publishing 090, don't you?
21     A.    He's trying to criticize Merck for
22  not publishing study 090. What I find remarkable
23  about the statement is that he published study 090
24  himself.
25     Q.    Right. He's criticizing Merck for

Confidential - Subject to Protective Order

Page 741

1  not publishing 090, and he's right, it wasn't
2  published by Merck; correct?
3        MR. KIERNAN:  Object to the form.
4        THE WITNESS:  No, that's not what
5  he's saying.  He's saying the fact of the matter is,
6  he's stating, if I read it, please, "Not only was
7  study 90 never published."  That's an incorrect
8  statement.
9  BY MR. SPECTER:
10       Q.    You just told me a moment ago that
11  he's trying to criticize Merck for not publishing
12  090.  Remember that, sir?  Do you remember saying
13  that, sir?
14       A.    Yes.
15       Q.    He was right about that; wasn't he?
16       A.    He was right about -- he is right
17  that Merck did not publish study 090.  What is
18  remarkable is that he himself published it, and it
19  was available through an FDA website that he
20  references here.
21       Q.    Let's go to the next thing that you
22  want to criticize about this sentence, if anything.
23       MR. KIERNAN:  Objection to form.
24  BY MR. SPECTER:
25       Q.    Is there any other part of this

Page 742

1  sentence that's incorrect, according to you?  Let me
2  read it again so we have a clear context.
3        "Not only was Study 090 never
4  published and available solely through a subsequent
5  FDA memorandum, but the data presented in the VIGOR
6  article also suffered from errors of omission, along
7  with erroneous information and lack of
8  completeness."
9        A.    Without knowing what it is that he's
10  referring to, and without a subjective discussion or
11  an understanding of what is considered "errors," if
12  it's a typographical error that he's referring to or
13  what, it's difficult to know what to make of this
14  statement.
15       Q.    This is the letter that was published
16  in the New England Journal of Medicine; correct?
17       A.    This is a correspondence.  So,
18  correspondences, just to be clear, are not peer
19  reviewed, I don't think.
20       Q.    I said letter.
21       A.    Letter?
22       Q.    I said letter; right?
23       A.    It's -- I don't know what the New
24  England Journal calls -- yes, they call them
25  letters.

Page 743

1        Q.    It's a letter.  It was published in
2  the New England Journal of Medicine December 30,
3  2004; correct?
4        A.    Correct.
5        Q.    You were engaged in a back and forth
6  with Dr. Topol in these very pages on the subject of
7  the safety of Vioxx; correct?
8        A.    Well, I wrote, together with Dr.
9  Reicin, a letter in response to a Perspective
10  article that he published, and then he responded to
11  my letter.
12       Q.    He replied to your response; correct?
13       A.    Correct.
14       Q.    So, he said this -- he wrote this
15  sentence that I've just read a couple of times;
16  right?
17       A.    He wrote this sentence, and it was
18  published, that you just referred to.
19       Q.    And, surely, you read it; correct?
20       A.    Yes.
21       Q.    When you read it, you were the
22  president of Merck Research Laboratories; correct?
23       A.    Correct.
24       Q.    And you still are?
25       A.    Correct.

Page 744

1        Q.    And you're thinking about bringing
2  Vioxx back on the market.  Thinking about it;
3  correct?
4        A.    We're interested in discussions with
5  the FDA.
6        Q.    Now, sir, wouldn't it be part of your
7  job to find out whether these statements that appear
8  in this letter from Dr. Topol of the Cleveland
9  Clinic are true or false?
10       A.    Well, I told you that I think the
11  first part of the statement is false.
12       Q.    Yes.  How about the rest of it?
13       A.    And I said that the rest of it is a
14  question of what it is that he's referring to.
15       Q.    Well, did you ask anybody at Merck
16  whether "the data presented in the VIGOR article
17  suffered from errors of omission, along with
18  erroneous information and lack of completeness"?
19       A.    No.
20       Q.    Let's go to the next sentence.  It
21  says, "In Table 1, the data from the FDA report for
22  VIGOR are presented."  You've got a table here;
23  correct?
24       A.    He does have a table.
25       Q.    And it says, "In the VIGOR article,

KS-000512

Confidential - Subject to Protective Order

Page 745

1  the actual deaths were not reported, but it is
2  stated in the article in three places that the
3  overall mortality rate was similar in the two
4  groups." Did I read that correctly?
5      A.    You read that correctly.
6      Q.    Is that a true statement?
7      A.    I'm sorry, is what a true statement?
8      Q.    What I just read. I'll read it
9  again.
10          "In the VIGOR article, the actual
11 deaths were not reported, but it is stated in the
12 article in three places that the overall mortality
13 rate was similar in the two groups."
14      A.    I don't know if that's a correct
15 statement.
16      Q.    Isn't it part of your job to see if
17 that's true or false?
18      A.    I don't know if that's a correct
19 statement.
20      Q.    You don't know if what's a correct
21 statement?
22      A.    That what was explicitly stated in
23 the article.
24      Q.    No, no. My question is, isn't it
25 part of your job to find out if Dr. Topol publishing

Page 746

1  in the New England Journal of Medicine criticizing
2  Merck as to its analysis of the VIGOR trial, whether
3  he's right or he's wrong? Is that part of your job?
4      A.    I don't think it's an important part
5  of my job.
6      Q.    No, sir. I'm not asking if it's an
7  important part of your job. I'm asking, sir, is it
8  part of your job?
9      A.    I do not consider it part of my job
10 to take every statement that is made that's critical
11 of Merck and dig down into whether or not it's true
12 or not.
13      Q.    Is it somebody's job?
14      A.    Again, I don't really consider that
15 an important part of our job.
16      Q.    An important part of whose job?
17      A.    Our job.
18      Q.    Our job.
19          Is it part of your job at Merck,
20 whether important or not, to see if what Dr. Topol
21 is saying is true or false?
22      A.    Is it a part of my job, important or
23 not?
24      Q.    No, sir, no.
25          Is it part of the job of Merck to see

Page 747

1  if what Dr. Topol is saying is true or false?
2      A.    I think the job of people at Merck is
3  to discover and develop drugs and medicines and
4  vaccines that help people and to be aware of the
5  scientific literature, which would include
6  literature that includes articles written by Dr.
7  Topol, and to assess the validity or not of those
8  statements that are contradictory -- either
9  contradictory or critical of things that Merck is
10 doing. Yes, I believe that's part of our job.
11      Q.    So, whose job is it to see if what we
12 just read is true or false? Who is the person
13 that's supposed to do that?
14      A.    There's not a specific person that's
15 assigned.
16      Q.    Was it done?
17      A.    I don't know.
18      Q.    Are you going to find out?
19      A.    I'm not -- I don't think so.
20      Q.    Why not?
21      A.    It's -- what's important to me is
22 what we know about Vioxx and what we've learned
23 about Vioxx and the totality of the data here.
24      Q.    What you know about Vioxx is
25 dependent upon the veracity and integrity of the

Page 748

1  information that's presented to you; correct?
2      A.    Absolutely.
3      Q.    And if somebody criticizes the
4  veracity and the integrity of information that's
5  being presented in the medical literature, that's a
6  very serious charge; correct?
7          MR. KIERNAN: Object to the form.
8          THE WITNESS: Again, it's -- this is
9  something that is part of the overall mission that
10 we have. And I am confident that people have looked
11 into these issues. And one of the things that we
12 really take great pride in is the scientific
13 excellence that we pursue these efforts to try and
14 discover and develop medicines.
15 BY MR. SPECTER:
16      Q.    Right. One of Merck's slogans is
17 that they're a data-driven company; correct?
18      A.    I don't know if it's a slogan, but we
19 certainly are a data-driven organization.
20      Q.    You've seen that appellation used to
21 describe Merck by Merck itself; correct?
22      A.    I don't know. I've certainly used
23 it.
24      Q.    So, you've used it.
25          So, in order to know that it's true,

KS-000513

Confidential - Subject to Protective Order

Page 749

1 you'd have to know that accusations that Merck has
2 not been straight about data, that those accusations
3 are false; correct?
4     A.    Merck is straight about data.
5     Q.    In order to know that -- in order to
6 know that accusations that Merck has not been
7 straight are false, you'd have to look into the
8 issue; correct?
9     A.    No. I know what Merck does. I know
10 that Merck provides our data in a completely
11 transparent manner to the FDA and that our
12 discussions are one that are open, scientifically
13 driven, and I'm confident about that.
14     Q.    The next sentence in the article from
15 Dr. Topol says, "The heart-attack rate for Vioxx was
16 erroneous," referring again to the VIGOR article;
17 correct?
18     A.    That's what it states.
19     Q.    Is that a false statement?
20     A.    I'm not sure what he's referring to
21 here. He might be referring, but now I'm
22 speculating, to the fact that the VIGOR article was
23 written based on a preliminary assessment of --
24 excuse me. The article that was published that he's
25 referring to was written based on an analysis of the

Page 750

1 interim, that is, not the complete data set, whereas
2 as he states at the end of this paragraph, the
3 complete data set was provided to the FDA
4 subsequently, subsequent to submission of the paper
5 that was published that he's referring to.
6     Q.    Having looked --
7     A.    So, if I can just finish.
8     Q.    Take your time. I thought you were
9 finished.
10     A.    So that if by his statement the heart
11 attack rate was erroneous, if he's referring to the
12 fact that the data that was published in the New
13 England Journal is different than the final data,
14 and, again, I'm speculating, then I would say that
15 the statement is very misleading, because the
16 article, as he should know, was based on the interim
17 analysis.
18     Q.    Dr. Kim, do you know what he's
19 referring to when he says "The heart-attack rate for
20 Vioxx was erroneous"?
21     A.    I do not know.
22     Q.    That's a pretty serious charge, isn't
23 it?
24     A.    I know that the data that was
25 presented in the VIGOR data was data that was

Page 751

1 prepared by responsible, diligent, honest scientists
2 who took the interim data of the VIGOR trial and
3 published a paper based on that data.
4     Q.    Sir, the charge of Dr. Topol is
5 serious, isn't it?
6         MR. KIERNAN: Objection to form.
7         THE WITNESS: The accusation is
8 certainly one that is a serious accusation.
9 BY MR. SPECTER:
10     Q.    And you're not sure what he's talking
11 about; correct?
12     A.    I gave you my speculation of what
13 he's talking about.
14     Q.    It would be speculation as to what
15 he's talking about; correct?
16     A.    It would be speculation.
17     Q.    You don't know what he's talking
18 about; correct?
19     A.    I don't, but my speculation is based
20 on the subsequent sentence in this paragraph, which
21 concludes with a comparison of the data that was the
22 final data and the data published in the VIGOR
23 study.
24     Q.    You don't make decisions based upon
25 speculation, do you, sir?

Page 752

1     A.    No. I make decisions based on data,
2 and I know that the data that was published in the
3 VIGOR trial was published by scientists who are
4 honest, who are diligent, and who analyzed this data
5 in the appropriate manner.
6     Q.    Did you read Dr. Topol's letter when
7 it was published?
8     A.    Which letter are you referring to?
9     Q.    The one we're looking at right now.
10     A.    Yes.
11     Q.    Did you say to somebody at Merck, I'm
12 not sure what Dr. Topol meant here by saying "The
13 heart-attack rate for Vioxx was erroneous," would
14 you please tell me if you know what it is, and if
15 you don't know, would you please ask him what he's
16 talking about?
17     A.    I did not ask anyone that question.
18         MR. KIERNAN: Mr. Specter, can we
19 take a short break?
20         MR. SPECTER: Sure.
21         THE VIDEOTAPE TECHNICIAN: The time
22 is 11:35. Off the record.
23         - - -
24         (Whereupon, a recess was taken from
25     11:35 a.m. until 11:46 a.m.)

KS-000514

Confidential - Subject to Protective Order

Page 753

1                    - - -
2           THE VIDEOTAPE TECHNICIAN:  The time
3   is 11:46.  We're back on the record.
4   BY MR. SPECTER:
5       Q.     Dr. Kim, I want to continue with this
6   discussion about Dr. Topol's letter to the New
7   England Journal of Medicine from a couple of months
8   ago, but let me ask you first, before we get back to
9   it, about transparency.  You talked about
10  transparency with the FDA.  Do you recollect that?
11      A.     Yes.
12      Q.     You have told us that Merck is
13  transparent with the FDA; correct?
14      A.     I believe I said that, yes.
15      Q.     And "transparency" means what to you?
16      A.     It means that we present the data in
17  its raw and accurate form, and that we present our
18  interpretations of that.  And so that basically it
19  means that we disclose what it is that we have found
20  in an open manner.
21      Q.     Let's go with that definition,
22  "disclose what...we have found in an open manner."
23             Now, would you say that Merck has the
24  same level of transparency that you say they have
25  with the FDA with the medical community in general?

Page 754

1       A.     So, Merck certainly has -- do we have
2   the same level of transparency?  Yes, I think we
3   have the same level of transparency in the sense
4   that we present the data.  That is something -- in
5   an open way.  There is a difference in terms of the
6   timing of presenting data in that the FDA very often
7   receives data in a preliminary form.  The FDA often
8   receives data before it is that we announce it
9   publicly or before it is that we publish it.
10      Q.     Well, "disclose what...we have found
11  in an open manner."  You know that most doctors
12  don't read what gets sent to the FDA; correct?
13      A.     Most doctors do not read what's sent
14  to the FDA.
15      Q.     In fact, you've been frank to tell us
16  that you haven't read a lot of the things that were
17  sent to the FDA regarding Vioxx; correct?
18      A.     Oh, yeah.  No, I have not read many
19  of the things that have been sent to the FDA.  I
20  have people that are extremely well qualified that I
21  trust that are taking care of those documents.
22      Q.     Right.  You figure that doctors are
23  going to rely upon what's in the medical literature
24  primarily; correct?
25      A.     Doctors rely on information that they

Page 755

1   receive from different sources, which includes, as
2   you just mentioned, the medical literature.  It also
3   includes scientific meetings.  It includes the
4   label.  And it includes informal discussions, as we
5   discussed earlier, namely in conversations between
6   physicians and scientists and between physicians and
7   physicians.
8       Q.     Let's talk about whether Merck
9   disclosed what Merck had found in an open manner in
10  the medical literature.  Okay?
11      A.     Okay.
12      Q.     Now, Dr. Topol writes in the very
13  next sentence from what we read before we took a
14  break, "More than half of the thrombotic events are
15  not presented in the VIGOR article but appear in the
16  FDA report."  Did I read that sentence correctly?
17      A.     I'm sorry.  Where are you?  Here we
18  go.  Sorry.
19      Q.     Let's read it again.  "More than half
20  of the thrombotic events are not presented in the
21  VIGOR article but appear in the FDA report."
22      A.     Oh, but one has to --
23      Q.     Did I read the sentence correctly?
24      A.     Oh, you read the sentence correctly,
25  but --

Page 756

1       Q.     I haven't gotten to my next question
2   yet.  I'll get there.  I'll give you a chance to say
3   whatever it is you want to say.  All right?
4       A.     Fine.
5       Q.     Now, is that a correct statement?
6       A.     I don't know because it's a
7   quantitative statement.  I don't know the exact
8   numbers here.  What I do know is --
9       Q.     Let's just stick with whether it's a
10  true statement or not.  Do you know if it's true?
11      A.     I don't know if it's true.
12      Q.     Have you asked anybody if it's true?
13      A.     No, I've not asked anybody if it's
14  true.  What I do know is that the VIGOR article was
15  based on interim analysis of the VIGOR trial.  And
16  the FDA report that he's referring to, as he clearly
17  states in the next -- in the parenthetical statement
18  that follows, is based on the complete data of the
19  VIGOR trial.
20      Q.     Yes, but that's the point, Doctor.
21  Look at the next sentence.  It says, "The updated
22  cardiovascular-event data from VIGOR were submitted
23  to the FDA on October 13, 2000, six weeks before the
24  VIGOR study was published."  Did I read it
25  correctly?

KS-000515

Confidential - Subject to Protective Order

Page 757

1    A.    You read that correctly.
2    Q.    So, what happened was, was that the
3  VIGOR data was published in the New England Journal
4  of Medicine; correct?
5    A.    An interim analysis of the VIGOR data
6  was published in the New England Journal of
7  Medicine.
8    Q.    And -- well, that's not what the
9  title of it was, was it?  The title of the article
10  was, "Comparison of Upper Gastrointestinal Toxicity
11  of," Vioxx, "and Naproxen in Patients With
12  Rheumatoid Arthritis"; correct?  That was the title
13  of the article?
14    A.    That is the title of the article.
15    Q.    It wasn't titled interim analysis;
16  correct?
17    A.    The title of the article is the
18  article -- is the title that you just read.
19    Q.    That was published six weeks after
20  more complete data was submitted to the FDA on the
21  very same clinical trial; correct?
22    A.    I don't know that for a fact.  That's
23  what Dr. Topol states here.
24    Q.    Well, that's a pretty serious charge;
25  isn't it?

Page 758

1    A.    Oh, not at all.  I don't think that's
2  a serious charge at all.  The article --
3    Q.    Well --
4    A.    Excuse me.  The article was submitted
5  to the New England Journal of Medicine based on the
6  interim analysis.  It was peer reviewed.  And after
7  the peer review, it was sent back presumably, I was
8  not involved in this process, but the typical
9  process is that one has an article, it's peer
10  reviewed, and then there are revisions that are
11  made, and sometimes that process can go back and
12  forth, and then the article is published.
13                   - - -
14          (Whereupon, Deposition Exhibit Kim-48,
15          "Comparison of Upper Gastrointestinal
16          Toxicity of Rofecoxib and Naproxen in
17          Patients with Rheumatoid Arthritis," The
18          New England Journal of Medicine,
19          November 23, 2000, (1520-1528)
20          MRK-ABA0001301 - MRK-ABA0001309 was
21          marked for identification.)
22                   - - -
23  BY MR. SPECTER:
24    Q.    Here's the article.  I've marked it
25  as Kim-48.  Show me where in the article it says

Page 759

1  it's interim data?
2    A.    I don't know.  Do you want me to read
3  the article?
4    Q.    Well, you told me a moment ago that
5  the article was interim data.  So, tell me where it
6  says that.  I'm just going from what you said, sir.
7    A.    (Witness reviewing document.)
8          I don't know if the article says it's
9  based on interim data.  I know that the article was
10  based on interim data.
11    Q.    That's just the point.  Practitioners
12  reading the article in the New England Journal of
13  Medicine wouldn't know that the article involved
14  incomplete data; correct?
15    A.    It's not incomplete --
16    Q.    All right.  "Interim."  Fine.  I'll
17  go with your term, "interim."  Correct?
18    A.    I don't know if that's correct or
19  not.
20          (Witness reviewing document.)
21    Q.    Well, let me just say this to you,
22  Dr. Kim.  I just did a word search of the article on
23  one of our trusted computers, I'd be happy to show
24  it to you if you'd like to see it if you don't want
25  to trust me on this.  The word "interim" appears

Page 760

1  nowhere in the article.  Will you trust me on that?
2    A.    (Witness reviewing document.)
3    Q.    I guess the answer is, no, you won't
4  trust me.
5    A.    (Witness reviewing document.)
6          I can trust -- I will -- well, it
7  doesn't matter what I trust.  I don't know whether
8  or not the article, whether it uses the word
9  "interim" or not, whether the article specifically
10  states that this was based on an interim analysis of
11  the data.  I do know that the data that was analyzed
12  in this paper and presented in this paper was based
13  on an interim analysis of the VIGOR results.
14    Q.    I want to know whether some other
15  person who's a doctor who would get this article in
16  the mail, because they subscribe to the New England
17  Journal of Medicine and they want to be careful with
18  prescribing Vioxx, whether they would be able to
19  tell from that article that it was, as you say,
20  interim data?
21    A.    In order to answer that question, I
22  would want to read this article again.
23    Q.    Well, sir, wouldn't an indication of
24  whether the data is interim appear in a certain
25  section of the article?  Isn't that the rigor with

Confidential - Subject to Protective Order

Page 761

1   which articles are prepared for scientific
2   publications, that that kind of a statement would
3   appear at a particular place in the article?
4       A.      The analysis of the VIGOR data that
5   was carried out here was carried out with the
6   patient groups and the data that are explicitly,
7   explicitly referenced here in terms of what the
8   results were.  That analysis led to conclusions, and
9   in particular, the group did -- included statistical
10  analyses of the significance of the data so that a
11  scientist, a medical doctor in reading this paper
12  could evaluate the strength of the conclusions based
13  on the statistical analysis.
14          The point that I'm making is in
15  reference to the sentences that you're referring to
16  from Dr. Topol, the simple statement that he makes
17  needs to be understood in the context that the data
18  that was analyzed here, which was properly analyzed
19  and thoroughly analyzed by the Merck scientists and
20  by their collaborators, was based on an interim
21  analysis, which is different than the final data
22  that was published -- that was submitted to the FDA
23  at a subsequent date.
24      Q.      Do you know what question I just
25  asked you?

Page 762

1       A.      I'm not sure what question you just
2   asked me.  But I'm saying that the data --
3       Q.      No, no, no, no.  Answer my question.
4           Do you know what question I just
5   asked you?
6       A.      Why don't you try me again.
7       Q.      The question is, don't you know that
8   articles like this one would have in a certain place
9   in the article, in a certain section, whether the
10  data was interim?
11      A.      Oh, I don't know.  I don't know if
12  that's standard practice.  What I do know is that
13  the statistical analyses are what scientists will
14  pay attention to.
15      Q.      Well, we're going to have a lunch
16  break, and my first question to you after the lunch
17  break is going to be, is there any place in that
18  article that tells us that the data was interim?
19  But before we take our lunch break, because we're a
20  ways away from that, according to my watch, let me
21  ask you this:
22          Is "disclosing what we found in an
23  open manner," which is part of what you told me
24  transparency means, telling people that this data is
25  interim?  Is that part of transparency?

Page 763

1       A.      Oh, I think we have told people that
2   this was based on interim data.
3       Q.      Well, I'm saying in the article.
4       A.      Again, I don't know if it's in the
5   article.
6       Q.      In order for -- in order for this to
7   have been a transparent communication to medical
8   doctors, you would have to have told people this is
9   interim data; correct?
10      A.      Well, again, you know,
11  transparency -- the transparency here is in the
12  presentation of the data in an open way and in a
13  proper and thorough analysis of the statistical
14  significance of the data and conclusions, which was
15  done here.
16      Q.      What's the opposite of interim data?
17      A.      What's the opposite of interim data?
18  I don't know what the opposite is, but what we are
19  talking about is the difference --
20      Q.      Final data?
21      A.      -- between interim and final data.
22      Q.      Thank you.
23          Final data, is that the opposite of
24  interim data?
25      A.      I don't know if it's an opposite, but

Page 764

1   it's what we are talking about.  It's the difference
2   between interim and final data.
3       Q.      Don't health care providers deserve
4   to know if the data is interim or final?  Isn't that
5   part of transparency, sir?
6       A.      Well, I don't think -- I don't think
7   -- it's often the standard practice -- it's often
8   practice in medicine that one publishes data,
9   particularly data, new data, based on an interim
10  analysis when the data are of sufficient statistical
11  strength to justify conclusions that are being
12  drawn.
13      Q.      Can you answer my question directly?
14  And that is, isn't it part of transparency to tell
15  people that the data is interim or final?
16          MR. KIERNAN:  Objection, asked and
17  answered.
18          THE WITNESS:  I think that -- I think
19  that it's good to tell people if a data analysis is
20  interim or final.  I think that in terms of what
21  we're talking about in transparency, the question
22  is, is the data completely shown here and is it
23  analyzed properly, and it was.
24  BY MR. SPECTER:
25      Q.      Well, sir, when this was published on

KS-000517

Confidential - Subject to Protective Order

Page 765

1  October 13, 2000, there was updated cardiovascular
2  data, wasn't there?
3      A.    So --
4      Q.    Not in the article.
5      A.    First of all, the article was
6  published November 23rd, 2000.
7      Q.    I misspoke. I apologize for that.
8          The article was published on November
9  23rd of 2000, but six weeks earlier on October 13,
10 2000, the data that appears in this article was
11 updated to the FDA; correct?
12     A.    I don't know that for a fact. That's
13 what Dr. Topol asserts here.
14     Q.    Well, that's an important issue;
15 isn't it?
16     A.    I don't see that as an important
17 issue. Why do you think that's an important issue?
18     Q.    I'll move on to the next question,
19 sir.
20          Look at the next column in this
21 article.
22          MR. KIERNAN: Are you referring to
23 the letter to the editor?
24          MR. SPECTER: Yes, I am. Thank you.
25 BY MR. SPECTER:

Page 766

1      Q.    Second full paragraph. I think it's
2  like the third sentence -- not like, it is the third
3  sentence. "There were no differences in the rate of
4  perforation," again, talking about VIGOR, "(0.1
5  percent in both the" Vioxx "and naproxen groups)."
6  Did I read that correctly?
7      A.    You've read the sentence correctly.
8  Let me just get the context here.
9      Q.    Take your time.
10     A.    Thank you.
11          (Witness reviewing document.)
12          This is referring to Dr. Villalba and
13 Dr. Witter's comment.
14     Q.    Let's just provide some context, if
15 we could. One issue is the degree to which naproxen
16 versus Vioxx causes problems with the stomach;
17 correct?
18     A.    Serious gastrointestinal bleeds and
19 ulcers, yes.
20     Q.    Right. So, what Dr. Topol said in
21 his letter to the editor in December of 2004 is that
22 in the VIGOR trial, "There were no differences in the
23 rate of perforation (0.1 percent in both the"
24 Vioxx "and naproxen groups." Did I read that
25 correctly?

Page 767

1      A.    You've read it correctly.
2      Q.    Is it a true statement?
3      A.    Oh, I don't know if that's a true
4  statement. What I do know is that there was a
5  very -- there was a statistically significant
6  difference in serious GI ulcers and bleeds between
7  the group that took naproxen and the group that took
8  Vioxx in the VIGOR study, and that those serious GI
9  ulcers and bleeds were estimated to be -- to account
10 for approximately 16,000 deaths per year in the
11 United States due to NSAID use.
12     Q.    Let's talk about that 16,000 figure,
13 sir. Is that a reliable figure?
14     A.    It's an estimate.
15     Q.    No, sir, please. Is that a reliable
16 figure?
17     A.    Again, it's an estimate. I don't --
18     Q.    You know that I'm asking you a
19 different question than the one you're answering;
20 right? You're saying "estimate," and I'm asking if
21 it's "reliable." That calls for a yes or no. Is it
22 reliable? Or an I don't know. Yes, no, I don't
23 know?
24          MR. KIERNAN: Objection to the form.
25

Page 768

1  BY MR. SPECTER:
2      Q.    Let me give it to you again.
3          This figure of 16,000, you told it to
4  me a couple of weeks ago, you're telling it to me
5  again now. Is that a reliable figure?
6      A.    I don't know.
7      Q.    Well, are you going to stop saying it
8  then, if you don't know?
9          MR. KIERNAN: Counsel, if you have an
10 appropriate question.
11          MR. SPECTER: It's an appropriate
12 question.
13 BY MR. SPECTER:
14     Q.    You use a figure to describe how many
15 people die a year of gastrointestinal bleeds, and
16 you don't know if it's reliable, so, are you going
17 to stop using it?
18     A.    No. I do know that it's a figure
19 that is an estimate that has been attained by
20 experts in the field.
21     Q.    Is there a figure that you regard as
22 being reliable?
23     A.    I think this is the best estimate
24 that's available.
25     Q.    Please try to focus on my question,

KS-000518

Confidential - Subject to Protective Order

Page 769

1  sir.
2         Is there a figure that you know of
3  that you regard as being reliable?
4         MR. KIERNAN:  Objection, asked and
5  answered.
6         THE WITNESS:  Yes.  I think this is
7  the figure that I use.  I use this figure because
8  it's the best estimate that I know about.
9  BY MR. SPECTER:
10    Q.   Is there a figure that you know of
11 that you regard as being reliable?
12    A.   Depends what you mean by "reliable."
13    Q.   What do you mean by "reliable"?
14    A.   I think this is the best estimate.
15    Q.   Sir, I want to know, is there a
16 figure for deaths occurring per year in the U.S. for
17 gastrointestinal bleeds that you regard as being
18 reliable, any figure?
19    A.   The most reliable figure that I know
20 about is the 16,000.
21    Q.   I want to know, is there a figure
22 that you regard as being reliable?
23    A.   Again, the most reliable figure I
24 know is the 16,000.
25    Q.   Please, sir.  Is there a figure that

Page 770

1  you regard as being reliable?
2     A.   I mean, "reliable" is a subjective
3  thing.  I'm not trying to -- I'm not trying to be
4  difficult here.  It's a subjective thing, so,
5  therefore, as a scientist, I'm going to use the most
6  reliable figure that I know about.
7     Q.   Sir, is there a figure that exists
8  that you regard as being scientifically reliable as
9  to the number of deaths from gastrointestinal bleeds
10 per year in the U.S.?
11        MR. KIERNAN:  Objection, asked and
12 answered several times.
13        THE WITNESS:  You know, I'm not sure
14 what is meant by the term "scientifically reliable."
15 What I will say is that I don't think that the
16 16,000 figure is one that I can say is absolutely
17 accurate, but what I can say is it's the most
18 reliable figure that I think is out there.
19 BY MR. SPECTER:
20    Q.   Sir, what is your definition of
21 "scientifically reliable"?
22    A.   Well, that's what I'm having trouble
23 with here.
24    Q.   What's your definition for it?
25    A.   I don't know.  I don't know.  I mean,

Page 771

1  scientifically reliable in the strictest sense would
2  be one in which one actually conducts controlled
3  clinical trials and can get an evaluation of an
4  answer to a question, if this is the sort of thing
5  we're talking about.
6     Q.   And there is no answer to that
7  question for the number of people that are dying in
8  the U.S. from gastrointestinal bleeds; correct?
9     A.   There's not been a clinical --
10 controlled clinical trial to answer the question
11 that way, yes.
12    Q.   It's all retrospective observational;
13 correct?
14    A.   I'm not sure, actually, on what basis
15 those estimates are made, whether it's all
16 retrospective observational or not.
17    Q.   Well, you've used the figure 16,000 a
18 couple of times under oath.  Did you know where it
19 came from?
20    A.   I don't know exactly where it comes
21 from.  I do know --
22    Q.   Well, did you know where it came from
23 approximately?
24    A.   I know that experts in the field
25 think that this is the best estimate.

Page 772

1     Q.   So, somebody else says it, therefore,
2  you're going to say it under oath as being the most
3  reliable estimate that exists?
4         MR. KIERNAN:  Counsel, did you --
5         MR. SPECTER:  I'll withdraw the
6  question.
7         MR. KIERNAN:  All right.  I've had
8  enough of under oath stuff.  We're just talking
9  about scientific literature here.  You're just
10 trying to intimidate the witness.  Please move on.
11 BY MR. SPECTER:
12    Q.   What expert uses that figure, sir?
13    A.   What expert used that figure?
14    Q.   Right.
15    A.   I don't know.  I wouldn't be able to
16 quote exactly what expert uses that figure.
17    Q.   Where did you get it?
18    A.   I got it from folks in the -- from
19 scientists in the -- in Merck Research Laboratories
20 that are familiar with these issues.
21    Q.   Who?
22    A.   From Dr. Gertz, probably.  And I
23 believe Dr. Reicin.
24    Q.   What do you think of observational
25 studies?

KS-000519

Confidential - Subject to Protective Order

Page 773

1    A.    I think that observational studies
2  are studies that are useful, they have a useful
3  place in generating hypotheses, and those hypotheses
4  then, if possible, need to be investigated, if
5  possible, through controlled clinical trials.
6    Q.    So, if the figure of 16,000 came from
7  an observational study, the most that could be said
8  about it is that it's useful in generating a
9  hypothesis; correct?
10    A.    I think -- well, I don't know about
11  the most that can be said, but that's what they're
12  most useful for.
13    Q.    Now, let's go back to this Topol
14  letter to the editor.
15    A.    Okay.
16    Q.    The statement that "the rate of
17  perforation" was "(0.1 percent in both the Vioxx and
18  naproxen groups, do you know one way or the other
19  whether that statement is true or false?
20    A.    I do not know and --
21    Q.    Have you asked anyone?
22    A.    No. I do not know, and I have not
23  asked anyone.  The rate of perforation is not what
24  in general is most relevant to the issues that we're
25  talking about here.

Page 774

1    Q.    Now, do you know how many people die
2  from perforations as opposed to ulcerations or
3  bleeds?
4    A.    Perforation is -- perforation is a
5  less severe, or can be less severe than an ulcer or
6  bleed, and I do not know how many people die from
7  perforations.
8    Q.    Are you able to estimate that in any
9  manner?
10    A.    No, I am not.
11    Q.    Sir, you recognize this as your
12  notebook from back in the time period when the
13  discussions were ongoing about taking Vioxx off the
14  market; correct?
15    A.    I recognize these as notes from my
16  notebook.
17    Q.    And --
18    A.    Oh, yes, I see.
19    Q.    And I've marked that as P-49, and I
20  think it's been marked previously.
21           - - -
22           (Whereupon, Deposition Exhibit Kim-49,
23           Letter 4-7-05 with Attachment,
24           MRK-AFJ0000282 - MRK-AFJ0000317 was
25           marked for identification.)

Page 775

1           - - -
2  BY MR. SPECTER:
3    Q.    Tell us, sir, this notebook that you
4  prepared, how did it come to be prepared?
5    A.    What do you mean, "how did it come to
6  be prepared"?
7    Q.    That's a good question.
8           You've got sort of a reporter size
9  notebook in your office?
10    A.    This is a --
11    Q.    Five --
12    A.    -- stenographic notebook that I carry
13  with me.
14    Q.    5 by 9 type of thing?
15    A.    This is real size here, yes.
16    Q.    It could fit into a suit jacket
17  pocket if you were very careful?
18    A.    It is a little bit big for that.
19    Q.    Okay.  Close to that?
20    A.    It's a little bit -- it's this size
21  here.  (Indicating.)
22    Q.    So, a little bit big for that.
23           Do you have a bunch of them in your
24  office?
25    A.    I do, yes.

Page 776

1    Q.    Do you use them, grouping them by
2  topic area, or do you do it chronologically, or how
3  do you do it exactly?
4    A.    It's chronologically.
5    Q.    So, these notebooks, did this all
6  involve the discussions that were going on
7  concerning taking Vioxx off the market, broadly
8  conceived?
9    A.    Did this all involve --
10    Q.    Did these notebooks that we're
11  looking at, do they -- do the contents all relate to
12  the issues surrounding the discussions about taking
13  Vioxx off the market?
14    A.    If your question is whether or not
15  the notebook concerns only Vioxx during this time
16  period, the answer is no.  The notebook contains
17  information on many different things.
18    Q.    How do you know that?
19    A.    Because I keep the notebook.
20    Q.    When did you last look at it in
21  original form?
22    A.    This notebook?
23    Q.    Yes.
24    A.    Oh, I don't know.  A long time ago.
25    Q.    So, how do you know that it involved

KS-000520

Confidential - Subject to Protective Order

Page 777

1    things other than the discussions about Vioxx?
2        A.    Oh, because I write in it practically
3    every day, and I know that there were things other
4    than Vioxx that were going on at this time.
5        Q.    Now, we asked that certain documents,
6    certain information be unredacted.  And yesterday at
7    5:00 we got some of this information from Merck's
8    lawyers, and three pages were unredacted that I want
9    to talk about with you, which are pages 304 to 306.
10       A.    Okay.
11       Q.    And for the record, those were not
12   previously in unredacted form, they were redacted
13   for the previous exhibit that contains that
14   notebook.
15       A.    Just give me a minute to get
16   oriented.
17             (Witness reviewing document.)
18             Okay.
19       Q.    Let's just read this, if we could,
20   together.  I will surely interrupt you.
21       A.    Okay.
22             "Arcoxia.  [Edge-1]."
23       Q.    What's that?
24       A.    That's a clinical trial in which we
25   compared Arcoxia to another nonsteroidal

Page 778

1    anti-inflammatory drug called diclofenac.
2        Q.    Was it completed?
3        A.    EDGE 1 is a completed study, yes.
4        Q.    How many people were in the trial?
5        A.    Oh, I don't remember the exact
6    number.
7        Q.    Keep going, please.
8        A.    "RR = 1.07."
9        Q.    What's that refer to?
10       A.    That refers to the relative risk for
11   confirmed -- the relative risk, and since on the
12   right-hand side it says, "C. Thrombotic," I assume
13   that refers to the relative risk of confirmed
14   thrombotic events in the EDGE 1 study, comparing
15   patients that took Arcoxia once a day versus
16   patients that took diclofenac.  And the indication
17   here would be that the relative risk is very close
18   to one, is 1.07, which would indicate that there's
19   not a significant difference in the cardiovascular
20   event rates between patients taking Arcoxia and
21   patients taking diclofenac.
22       Q.    Continue, please.
23       A.    Below that is "0.68" and "0.42."  And
24   then "RR = 1.5 MI."
25       Q.    What is 1.5?  That's a relative risk?

Page 779

1        A.    I assume that's correct.
2        Q.    Does that concern you?
3        A.    Does that concern me?  I pay -- as
4    we're reviewing this data, I pay attention to all of
5    these data.  Whether it's concern or not is
6    something that we evaluate based on what else we
7    know.
8        Q.    I'm not asking if you pay attention
9    to it, Dr. Kim.  I'm asking if it concerns you;
10   right?
11       A.    It is -- does it concern me?  It
12   doesn't in and of -- in and of itself, this relative
13   risk of 1.5 for MI does not concern me.  It is
14   something that needs to be included in the
15   evaluation of the totality of the data here.
16       Q.    What was the confidence interval at
17   that 1.5 relative risk?
18       A.    I don't know exactly.
19       Q.    Did you compare Arcoxia to placebo?
20   Have you?
21       A.    There have been studies comparing
22   Arcoxia to placebo.  Fairly -- in the earlier
23   studies with Arcoxia, there are some studies that
24   compare Arcoxia to placebo.
25       Q.    What have they shown?

Page 780

1        A.    I don't recall.  I don't recall
2    precisely what they've shown.
3        Q.    Do they show relative risk above 1?
4        A.    I don't -- I don't remember.
5        Q.    Does this data look out of line from
6    what you've seen in other data with respect to 1.5
7    relative risk for MIs?
8        A.    Well, EDGE 1 is a relatively small
9    study.  And so, therefore, the evaluation of the
10   cardiovascular risk of Arcoxia is something which is
11   going to be dependent, again, in a prespecified
12   notion, on an analysis of the combined events in
13   EDGE 1, EDGE 2, which is a larger study, and a very
14   large study which we call MEDAL.  And those three --
15   those three studies, when combined, will address the
16   issue of the cardiovascular safety of Arcoxia.
17       Q.    Has the FDA been told about these
18   results?
19       A.    I certainly -- I don't know for sure,
20   but I certainly would think so, yes.
21       Q.    Has an NDA been filed for Arcoxia?
22       A.    Yes, an NDA was filed for Arcoxia.
23       Q.    So, you'd expect this to be part of
24   the NDA or SNDA?
25       A.    I'm actually not sure about that,

KS-000521

Confidential - Subject to Protective Order

Page 781

1  because what we have done is we've obviously been --
2  not obviously, we've been in extensive discussions
3  with the FDA on Arcoxia, and we have received a
4  request from them and we, as I say, have
5  prespecified that we're going to take the results of
6  EDGE 1, EDGE 2 and MEDAL in a combined analysis for
7  the cardiovascular safety.
8      Q.    Have you --
9      A.    So, that plan has been discussed.
10     Q.    Have you reported all of the clinical
11 trials in Arcoxia to the FDA?
12     A.    I don't know.  I don't know.  I
13 haven't asked that specific question, so, I don't
14 know.
15     Q.    Are you required to report all
16 clinical trials that you do for the purpose of
17 evaluating the safety of a pharmaceutical if the
18 pharmaceuticals tested are not one of those that are
19 being sought to be studied?
20         Let me give you an example of that so
21 that you understand what I'm talking about.
22     A.    Okay.
23     Q.    Merck manufactured Vioxx; correct?
24     A.    Yes.
25     Q.    It did not manufacture Celebrex;

Page 782

1  correct?
2      A.    Correct.
3      Q.    If Merck were to test Celebrex versus
4  naproxen, would it be required to tell the FDA those
5  results?
6      A.    I do not know the answer to that
7  question in terms of the requirements.
8      Q.    Did Merck test Celebrex versus
9  naproxen?
10     A.    To my knowledge, Merck has not tested
11 Celebrex versus naproxen.
12     Q.    Do you recollect Dr. Scolnick
13 proposing it as a good idea?
14     A.    No, I don't recollect that.
15     Q.    Do you recollect him saying that
16 Celebrex has no cardiovascular risks, so, we should
17 test Celebrex versus naproxen?
18     A.    No, I don't recollect that.
19     Q.    That would be an interesting test,
20 wouldn't it?  If you assumed that Celebrex had no
21 cardiovascular risk, that would be an interesting
22 test, to test Celebrex versus naproxen; correct?
23     A.    Well, first of all, the "if" part of
24 your question we now know is not true.
25     Q.    Well, not everybody agrees with that;

Page 783

1  correct?
2      A.    Okay.
3      Q.    Am I right about that?
4      A.    I don't know.
5      Q.    Well, what do you think Pfizer thinks
6  about that?
7          MR. KIERNAN:  Object to form.
8          THE WITNESS:  I --
9  BY MR. SPECTER:
10     Q.    Pfizer does not agree that Celebrex
11 is associated with an increased risk for CV events;
12 correct?
13     A.    I don't know what Pfizer thinks.
14     Q.    Do you think it is?
15     A.    I think that Celebrex is associated
16 with increased cardiovascular risk?
17     Q.    That's my question.
18     A.    I think that Celebrex, when compared
19 to placebo, is associated with increased
20 cardiovascular risk beginning after approximately 14
21 months in the patient population that was studied,
22 namely, those with a prior history of colon polyps.
23     Q.    Let's go backward for a second.
24         MR. FERRARA:  I'm sorry, Doctor.
25         Linda, can you read his answer back?

Page 784

1  I missed it.
2          - - -
3          (Whereupon, the requested portion of
4          the notes of testimony was read by the
5          court reporter.)
6          - - -
7  BY MR. SPECTER:
8      Q.    If Merck had done a study, Celebrex
9  versus naproxen, in the context of learning about
10 Vioxx, would they have reported that to the FDA?
11     A.    If Merck had done a study comparing
12 Celebrex to naproxen, would they have reported the
13 results of that study to the FDA?  Absolutely.
14     Q.    Is that because they're required to
15 do so or because they would choose to do so or both?
16     A.    I don't know what were required in
17 terms of that.  Going back to your earlier question
18 --
19     Q.    Yes.
20     A.    -- which I answered that I didn't
21 know, I don't know if we're required to do that, but
22 would we do that?  Absolutely.
23     Q.    Were there any studies that were done
24 that related to the safety of Vioxx that did not
25 include Vioxx as a drug that was being studied in a

KS-000522

Confidential - Subject to Protective Order

Page 785

1   clinical trial?
2       A.    In humans?
3       Q.    Yes.
4       A.    I don't know.  There might have been.
5   I don't know.  Right.  If they were, they were
6   done -- I would -- if they were done, it's my guess
7   that they would have been done early before I joined
8   the company.
9       Q.    Have you asked that question?
10      A.    No, I've not asked that question.  I
11  do know that we've studied Vioxx and Celebrex in
12  pharmacological -- in what are called clinical
13  pharmacology experiments, which are different than
14  clinical trials where one looks for an outcome.
15      Q.    Okay.
16      A.    And I should specify that earlier I
17  was speaking to clinical trial data.  We certainly
18  don't tell the FDA about every clinical pharmacology
19  study we do.
20      Q.    Let's continue, please, if we could.
21      A.    Okay.
22            "19/3500, 11/3500, on + 14 days."
23      Q.    What's that refer to?
24      A.    I believe that what it refers to are
25  the results for MIs or myocardial infarctions, and

Page 786

1   that it's referring to the number of patients that
2   had MIs.  That is, 19 of them had MIs out of 35 --
3   approximately 3,500 patients that were in that arm
4   of the trial versus the other arm of the trial which
5   had 11 over 3,500, 11 patients out of 3,500 that
6   were in the trial that had an MI while the patient
7   was on the drug, on therapy, and up to 14 days after
8   discontinuation of the therapy.
9       Q.    Keep going, please.
10      A.    Then I write, "19" and "15 on + 28
11  days."  Then I write "3" and "6 strokes ischemic."
12      Q.    Then you have discontinuation because
13  of hypertension?
14      A.    Correct.  On the left is "Discon" due
15  to "hypertension 2.3, 0.7, p<0.001."
16      Q.    So, there were a little more than
17  three times as many people who discontinued on
18  Arcoxia versus diclofenac; is that correct?
19      A.    That's my interpretation of what I
20  wrote here.
21      Q.    And the "p" is how confident we are?
22      A.    It has to do with the statistical
23  significance, correct.
24      Q.    What is the p-value that you have to
25  attain in order for it to be significant

Page 787

1   statistically in your mind, sir?
2       A.    Well, generally speaking, the
3   scientific community accepts p of less than .05 as
4   being statistically significant.
5       Q.    In order for it to be significant
6   statistically?
7       A.    Yes, but then it's required that that
8   be repeated, or that a single study show a
9   statistical significance greater than that.  But,
10  yes, the answer to your question is, in general,
11  it's accepted that statistical significance is p
12  less than .05.
13      Q.    .05.  That study, 090, that we looked
14  at before, you told us that that was not significant
15  statistically; correct?
16      A.    If I did say that, I shouldn't have.
17  I said -- what I should have said is that the study
18  was small.  And although numerically there was a
19  difference, I don't think that it was statistically
20  significant.  If it was, that is in terms of the
21  0.05?
22      Q.    Yes.
23      A.    I don't actually recall whether or
24  not it was .05 or not, but it was a small study, and
25  it was numerical --

Page 788

1       Q.    Well, it's right in front of you,
2   isn't it?
3       A.    I don't know that.  Is it?
4       Q.    Yes.  It's in that chart in Dr.
5   Topol's article; right?
6       A.    (Witness reviewing document.)
7             There is a chart here in front of me
8   in which Dr. Topol is reporting on study 090.
9       Q.    What's the p-value?
10      A.    The p-value that he quotes here is
11  0.03.
12      Q.    That's less than 0.05; correct?
13      A.    That's correct.
14      Q.    And if that is accurately reported,
15  that would be statistically significant; correct?
16      A.    Yes.  Formally speaking, this is
17  statistically significant.  The point that I was
18  referring to is that the number of events is very
19  small, 5 versus 1.
20      Q.    But it is formally statistically
21  significant; correct?
22      A.    Yes.
23      Q.    By the .05 figure that is customarily
24  accepted; correct?
25      A.    Yes, that is formally correct.

KS-000523

Confidential - Subject to Protective Order

Page 789

1   Q.   Now, let's go back to the Arcoxia.
2   A.   Okay.
3   Q.   We had three times as many people
4   discontinued because of hypertension on Arcoxia
5   versus diclofenac, and there was three to four
6   millimeters systolic increase.  Would that be
7   correct?  That was the change?
8   A.   That's -- that's my interpretation of
9   what I wrote here, yes.
10   Q.   That's among which group of people?
11   A.   I wrote "Arcoxia" next to it.
12   Q.   And of those who discontinued or of
13   all comers, by way of an average, or do you know?
14   A.   I don't recall exactly.  My guess is
15   it's of the overall group.
16   Q.   The overall group?
17   A.   That's my guess.
18   Q.   That fits pretty closely to what we
19   saw in the VIGOR trial, with increase in blood
20   pressure systolically among people taking Vioxx;
21   right?
22   A.   I don't remember the exact number,
23   but it's approximately that magnitude.
24   Q.   That was four millimeters of mercury;
25   correct?

Page 790

1   A.   I don't remember the exact number.
2   Q.   Do you remember discussing it with me
3   a couple of weeks ago?
4   A.   I remember discussing a lot of things
5   with you.
6   Q.   Okay.  And then people taking
7   diclofenac had 1 to 1.5 millimeters of mercury on
8   average increased, correct, systolically?
9   A.   Again, that would be my
10   interpretation of what I wrote here.
11   Q.   Is that significant to you?  That's a
12   factor of between two and three times?
13   A.   Is what significant?
14   Q.   The greater increase in systolic
15   blood pressure.
16   A.   Again, I think significance is a
17   scientific term.  I would have to see
18   the statistical --
19   Q.   Well, you're a scientist; right?
20   A.   Right.  And I'd have to see the
21   statistical analysis of these increases to know
22   whether or not it's statistically significant.  What
23   I would say is that all NSAIDs in a mechanism-based
24   way cause increases in blood pressure, and that
25   increase in blood pressure is dose-dependent.

Page 791

1   Q.   Well, you say that they all cause
2   increases in blood pressure, but some are better
3   than others when it comes to that subject, isn't
4   that true?
5   A.   Well, that's act -- that's actually a
6   tricky subject, because it depends on the dose, and
7   that's to say, if you take an NSAID -- so the reason
8   why NSAIDs increase blood pressure has to do with
9   their effects primarily in the kidneys.  But the
10   effect on increasing in blood pressure is something
11   that is dose-dependent.  So, if you take a higher
12   dose of an NSAID, then the increase in blood
13   pressure is going to be higher.
14   Q.   How many milligrams of NSAIDs were
15   people taking in VIGOR who were taking Aleve?
16   A.   Okay.  So, the patients in Aleve --
17   excuse me.  The patients in VIGOR were not taking
18   Aleve --
19   Q.   I misspoke.  Naproxen.
20   A.   -- which is over-the-counter
21   formulation.
22   Q.   Naproxen.
23   A.   But they were taking naproxen at a
24   prescription strength, which is 500 milligrams twice
25   a day.

Page 792

1   Q.   So, they were taking 1,000 milligrams
2   twice a day?
3   A.   No, no, they were taking 500
4   milligrams twice a day.
5   Q.   I'm sorry.  It's the lack of food.
6   MR. KIERNAN:  Do you want to take a
7   lunch break?
8   MR. SPECTER:  So, we're going to take
9   a lunch break.
10   THE VIDEOTAPE TECHNICIAN:  Stand by,
11   please.  The time is 12:30.  We're going off the
12   record.
13   - - -
14   (Whereupon, a luncheon recess was
15   taken from 12:30 p.m. until 1:30 p.m.)
16   - - -
17   MR. SPECTER:  Before we go back on
18   the video record, before we broke for lunch at
19   12:35, counsel wanted to go to 1:30, I said if he
20   comes back early, I'd be ready.  He came back early,
21   which I never thought he'd do, I didn't come back
22   early, so, I apologize to counsel for not being here
23   and to the witness, Dr. Kim.  And counsel would like
24   to break at 4:45, and that's fine with me.
25   Let's go back on the video record.

Confidential - Subject to Protective Order

Page 793

1    THE VIDEOTAPE TECHNICIAN:  Stand by,
2  please.  The time is 1:31.  We're back on the
3  record.
4    MR. SPECTER:  We're back on the
5  record after a delicious lunch.
6    Who just joined us on the telephone
7  that wasn't on before?
8    MR. BUCHANAN:  Dave Buchanan, Seeger
9  Weiss.
10    MR. SPECTER:  Okay.  Dave Buchanan.
11  Anybody else?
12    (No response.)
13  BY MR. SPECTER:
14    Q.    Dr. Kim, this morning I promised you
15  that after lunch I would start off by asking you a
16  question about the article published in the New
17  England Journal of Medicine authored by Merck folks
18  which you characterized as an interim analysis a
19  couple of times before lunch.  I told you I would
20  ask you if the word "interim" appears anywhere in
21  there or if the article otherwise indicated that it
22  was interim.  Does it?
23    A.    I was not able to find any indication
24  to that -- stating that.
25    Q.    Do you think you made a reasonable

Page 794

1  enough search of the article to tell us if it was
2  there?
3    A.    Yes, I believe I did.
4    Q.    Do you recollect, Dr. Kim, that
5  Pfizer was heavily criticized with respect to their
6  publication of the class data for publishing what
7  was interim data without saying so?
8    A.    I don't recollect that specific
9  charge.  I do recollect that there was criticism
10  aimed at Pfizer for publishing the results of an
11  interim analysis, that when the final analysis came
12  in, led to a difference in the interpretation of the
13  results.
14    Q.    Well, now, did Merck ever publish in
15  the medical literature the final results from the
16  VIGOR trial?
17    A.    The final results, to my knowledge,
18  have not been published in the medical literature
19  per se.  They have been posted on the FDA website.
20  And in the literature, when you read the literature
21  around Vioxx, that website is explicitly referenced
22  by many authors.
23    Q.    But we've agreed previously that we
24  wouldn't expect medical doctors to go into the FDA
25  website, at least Merck doesn't; correct?

Page 795

1    A.    So, I think when a reference is made
2  in the medical literature to an FDA website, then I
3  would assume that physicians and scientists, who are
4  interested in the subject, would refer to the FDA
5  website.  Earlier we were discussing whether or not
6  -- or I was answering the question of whether or not
7  one would expect people to go to the FDA website to
8  find scientific results in general.
9    Q.    Do you believe that rheumatologists
10  and others who prescribe Vioxx for pain have gone
11  into the FDA website to look at Merck studies that
12  have been sent to the FDA in any serious numbers?
13    A.    When you say "in...serious numbers,"
14  I do believe that rheumatologists and other
15  physicians who are interested in this general
16  subject and who are thought leaders in the area
17  would certainly have gone to the FDA website to
18  reference -- in particular where this website has
19  been referred to in the medical literature as a
20  reference, as an explicit reference.
21    Q.    Now, let's go back, if we could, to
22  the portions of your notebook that were unredacted
23  yesterday afternoon.
24    A.    Okay.
25    Q.    And I think we had left off with the

Page 796

1  discussions concerning blood pressure; correct?
2    A.    Right.  Can you remind me what page
3  we're on?
4    Q.    It's the first -- it's 304.
5    A.    Okay.  Right.
6    Q.    And the hypertension seen in Arcoxia
7  was similar to the hypertension seen in the VIGOR
8  trial with respect to Vioxx, approximately; correct?
9    A.    Approximately, yes.
10    Q.    And you said earlier that all NSAIDs
11  increase systolic blood pressure.  Do you recollect
12  that?
13    A.    I'm not sure I said exactly that.
14  But I will say, though, that it is a mechanism-based
15  phenomenon, and it's well established that NSAIDs
16  do, in a dose-dependent manner, increase blood
17  pressure.
18    Q.    But Vioxx increases blood pressure
19  more than certain other NSAIDs; correct?
20    A.    So, in order to answer that question,
21  one has to be considering the dose and the extent of
22  inhibition of the enzymes that we're talking about
23  in terms of the mechanism that's causing blood
24  pressure increases.  So, it is true that at some
25  doses of Vioxx, the blood pressure increases are

Confidential - Subject to Protective Order

Page 797

1  greater than in some -- at some doses of comparator
2  agents -- of some comparator agents.
3      Q.    What's the next thing in your notes
4  here?
5      A.    The next thing in my notes refers to
6  a study that was done in patients with ankylosing
7  spondylitis, which is a chronic inflammatory disease
8  of the spine. It's an inflammatory disease of the
9  spine. And I list then "Arcoxia" and "naproxen."
10  And I list "2x" under Arcoxia and "1x" under
11  naproxen.
12      Q.    That's at 52 weeks?
13      A.    I wrote down "52 weeks. 90/120, 5,"
14  and "0," and then, again, an indication of confirmed
15  thrombotic.
16      Q.    What does this mean?
17      A.    Okay. So, what this means is that in
18  the study with -- in which we studied patients with
19  ankylosing spondylitis over a period of 52 weeks,
20  using doses of Arcoxia at 90 milligrams and 120
21  milligrams versus naproxen, that there were five
22  confirmed thrombotic events on patients who were
23  taking Arcoxia and none in patients who were taking
24  naproxen, but that the number of patients that were
25  in the Arcoxia arm of the study was approximately

Page 798

1  two times the number of patients that were in the
2  naproxen arm.
3      Q.    Did you consider these numbers to be
4  significant statistically?
5      A.    The numbers are so small that --
6  well, I don't know -- first of all, I don't know
7  what the statistical analysis of this is. I think
8  it would be very difficult, given the actual numbers
9  here and the fact that one arm has a zero, to reach
10  anything significant -- to do that calculation.
11      Q.    What was the purpose of this study of
12  people with ankylo --
13      A.    Ankylosing spondylitis.
14      Q.    -- ankylosing spondylitis?
15      A.    The purpose was to evaluate the
16  efficacy and the safety of Arcoxia versus naproxen
17  in patients with this chronic inflammatory disease.
18      Q.    What kind of safety?
19      A.    In all of our studies with potential
20  new drugs, what we're looking at is overall safety.
21  In the case of the COX-2 inhibitors, as we've
22  discussed, going back to '99, cardiovascular safety
23  was looked at specifically with an independent
24  adjudication procedure.
25      Q.    What were the primary endpoints in

Page 799

1  this study?
2      A.    I don't recall exactly, but they had
3  to do with efficacy in ankylosing spondylitis.
4  There're certain measures of efficacy in the
5  ankylosing spondylitis population.
6      Q.    What's next here?
7      A.    Next says, "Arcoxia placebo 12 weeks,
8  7, 4," relative risk apparently "1.," I'm not sure
9  if I didn't finish that or what. And then
10  underneath that is a "2" and a "0" and "MI."
11      Q.    So, again, we had more MIs in the
12  Arcoxia group than the naproxen group; correct?
13      A.    No. This is placebo.
14      Q.    Excuse me. You're right.
15          We had more in the Arcoxia group than
16  the comparator, which, I guess, in this case
17  was placebo; correct?
18      A.    Numerically that's correct. What I
19  can't tell from my notes here, because the relative
20  risk is cut off, is whether -- is what the relative
21  risk here was.
22      Q.    So, you had three studies in Arcoxia.
23  One compared Arcoxia to diclofenac; one compared it
24  to naproxen; and one compared it to placebo, and in
25  all three, there were more cardiovascular events in

Page 800

1  the Arcoxia arm than in the comparator arm; correct?
2      A.    Yes. With the understanding that the
3  number -- I don't know if it's numerically greater
4  in the case of EDGE 1. It's just the relative risk
5  is 1.07 for confirmed thrombotic.
6      Q.    You had the numbers below that?
7      A.    That's for MIs.
8      Q.    Yes.
9      A.    You said confirmed thrombotic. Or
10  you said cardiovascular, I think. If we're talking
11  about MIs --
12      Q.    Well, you had strokes also? So, if
13  you add them all together, there's more -- either
14  way, there's more MI --
15      A.    No, to the contrary. For strokes,
16  for ischemic strokes, there are fewer --
17      Q.    Okay.
18      A.    -- on Arcoxia.
19      Q.    Let's take what I just said. If you
20  take them all together, there were more
21  cardiovascular events in the EDGE study in people
22  taking Arcoxia than people taking the comparator
23  drug; correct?
24      A.    Well, again, I'm not trying to
25  quibble. I just don't know what the numbers are for

KS-000526

Confidential - Subject to Protective Order

Page 801

1  cardiovascular here.  I do know the relative risk is
2  1.07.  Just explaining it, it depends on the
3  denominator as well.
4      Q.    It was 22 -- it was 22 versus either
5  21 or 17; correct?
6      A.    Umm --
7      Q.    I'll withdraw the question and go to
8  something else.
9      A.    Yeah.
10     Q.    Let's go to the next page.
11     A.    Okay.  "Arcoxia" and then a note that
12  says, "Looking through the prism that Approve
13  creates."
14     Q.    "Arcoxia:  Looking through the prism
15  that Approve creates."
16     A.    Well, I don't know if I would link
17  those two the way you just did, but those are both
18  written down on this page.
19     Q.    Well, at the top of the page you
20  wrote, "Arcoxia," and the next thing that you wrote
21  was, "Looking through the prism that Approve
22  creates."
23     A.    Right.  Well, excuse me.  That's the
24  next thing that's on the page.  I'm not sure that's
25  the order in which I wrote it.

Page 802

1      Q.    What's the next thing?
2      A.    "Approve, GI data, EDGE 1, parecoxib,
3  Target" and "VIGOR."
4      Q.    Are all of these things related to
5  each other, "Approve, GI data, EDGE 1, parecoxib,
6  Target, VIGOR"?  Are all of these things related to
7  each other?  You had them all surrounded by a big
8  bracket; correct?
9      A.    Yes.  These are all things that have
10  to do with the subject we're discussing, COX-2
11  inhibitors.
12     Q.    So, you thought that the Arcoxia
13  results -- pardon me.  You thought that the Arcoxia
14  results were relevant to the Vioxx results, correct,
15  in terms of interpretation?
16     A.    I thought that the Arcoxia results
17  were relevant for the Vioxx results?
18     Q.    Yes.  In terms of interpreting the
19  Vioxx results, you felt that the Arcoxia results
20  were relevant?
21     A.    I think -- yes.  I think that studies
22  with all the COX-2 inhibitors need to be taken into
23  account as we try to interpret the results with each
24  of the individual ones, bearing in mind that one is
25  trying to distinguish between molecule-specific

Page 803

1  effects and class-specific effects, where the class
2  is defined as COX-2 inhibitors, and class-specific
3  effects where the class is defined as NSAIDs.
4      Q.    So, the Celebrex results are relevant
5  in considering whether Vioxx is safe?
6      A.    The Celebrex results are relevant to
7  trying to interpret data on Vioxx because Celebrex
8  is also a COX-2 inhibitor.  What one needs to
9  distinguish and figure out is whether or not you
10  think that something is a class effect or a
11  molecule-specific effect.
12     Q.    And --
13     A.    So, there's not an automatic
14  connection, but certainly one should try to
15  understand the totality of the data in that context?
16     Q.    The same thing is true with Bextra.
17  The Bextra results are relevant to the Vioxx results
18  in terms of the analysis?
19     A.    Again, Bextra is a COX-2 specific
20  inhibitor, and so, therefore, results that come out
21  with Bextra are something that one wants to be
22  cognizant about as one is trying to interpret
23  results for another COX-2 inhibitor.  But part of
24  that process needs to include considerations as to
25  whether the results in this case that you just --

Page 804

1  you know, the results with Bextra are specific for
2  Bextra or whether they are part of a class effect.
3      Q.    And you have followed the results
4  that have been published regarding Celebrex and
5  Bextra; correct?
6      A.    I've not followed all the results,
7  but I have followed some of the key results.
8      Q.    You've discussed those with us over
9  the last couple of days, sitting in this room or the
10  room adjacent to it; correct?
11     A.    Some of those results we have
12  certainly discussed.
13     Q.    That's in part because it's relevant
14  to you in your own considerations about Vioxx;
15  correct?
16     A.    Yes.  And several of those results
17  are quite recent.
18     Q.    Now, let's go through what's in this
19  bracket for a moment, if we could.
20     A.    Okay.
21     Q.    "Approve," we've discussed that.
22     "GI data."  Were you talking about
23  VIGOR there or something else?
24     A.    I don't really know.
25     Q.    "EDGE 1."  Well, that's on the

Confidential - Subject to Protective Order

Page 805

1  previous page?
2      A.   Correct.
3      Q.   "Parecoxib."  What's parecoxib?
4      A.   Parecoxib is the IV, intravenous
5  formulation of Bextra.  Actually, specifically, it
6  is the intravenous formulation of what's called the
7  pro drug of Bextra.  So, it's injected
8  intravenously, and then it gets converted in the
9  body to Bextra.
10     Q.   And then "TARGET"?
11     A.   TARGET is a large study that
12 compared -- that was investigating another COX-2
13 inhibitor that Novartis has under development called
14 Prexige.  And it was a study that compared Prexige
15 to naproxen and Prexige to, I believe, ibuprofen.
16 I'm not sure about that last one.  And one of the
17 relevant pieces of data there is that in that study,
18 there was a difference in the cardiovascular event
19 rate between Prexige, Novartis' COX-2 inhibitor, and
20 naproxen, with naproxen showing fewer cardiovascular
21 -- a lower cardiovascular event rate than Prexige.
22     Q.   And that could mean that Prexige may
23 be associated with an increased risk of
24 cardiovascular events, or it could mean that
25 naproxen is cardioprotective, or it could mean

Page 806

1  there's some combination of both, or it could be
2  chance; correct?
3      A.   Correct, based on the information I
4  gave you.  The other piece of information that's
5  relevant there is in that same study, Prexige was
6  compared to another NSAID, I believe it was
7  Ibuprofen, and there was not a difference in the
8  cardiovascular event rate between Prexige and
9  ibuprofen, or the NSAID that was used as a
10 comparator.
11     Q.   What's the next one?  The next one is
12 "VIGOR"; correct?
13     A.   Correct.
14     Q.   So, next to that bracket you wrote,
15 "Real answer:  Don't know."
16     A.   Right.  Specifically what I
17 wrote is --
18     Q.   Let me ask you this:
19         Read it for me in whatever order you
20 think you wrote it.  I can't tell from this.  So,
21 tell me what order you think you wrote it.
22     A.   Okay.  So, I'm guessing now.  Next to
23 "TARGET" you see the word "Naproxen."  Then in
24 brackets you see, "also Arcoxia."  And I believe
25 that -- I don't know if this is the order in which I

Page 807

1  wrote it, but that's -- the reason why the
2  "naproxen, also Arcoxia" is written on the line of
3  "TARGET" is because of what I just told you about in
4  the TARGET study, the Novartis COX-2 inhibitor
5  showing a difference in cardiovascular event rates
6  as compared to naproxen, but not when compared to
7  another non-naproxen NSAID.
8          And that, of course, is consistent
9  with the observation in VIGOR and consistent with
10 the interpretation that naproxen has a
11 cardioprotective effect.  So, the reason why
12 naproxen also" -- and then bracket "also Arcoxia" is
13 written next to that is that in studies with
14 Arcoxia, yet a third COX-2 inhibitor, when it was
15 compared to naproxen, there was a difference in the
16 cardiovascular event rate with the event rate being
17 different such that naproxen had fewer events than
18 Arcoxia.  Again --
19     Q.   58 percent fewer?
20     A.   I don't recall the magnitude, but
21 qualitatively, it was a lower event rate on
22 naproxen.  So, that with three different COX-2
23 inhibitors as compared to naproxen, this difference
24 was seen.
25     Q.   Keep going, please.

Page 808

1      A.   Okay.  And then it appears as though
2  what I was trying to do here was create a list of
3  points having to do with what it is that we thought
4  about Arcoxia, given the results that at this time
5  we had learned about recently, namely, the APPROVe
6  results.  That's why I think at the top, whether I
7  wrote it immediately after or whatever, I wrote,
8  "Looking for the prism that Approve creates."  So,
9  now that we know about APPROVe, what do we think
10 about Arcoxia.
11         And I don't think this is the order
12 in which I wrote it, but the order in which I listed
13 the considerations here, you notice that I put a
14 "0," so, I probably added that towards the end.  I
15 had already listed one, 1, 2, 3, 4, 5, but then I
16 put 0, which is that the real answer is that we
17 don't know.
18     Q.   That's the bottom line?
19     A.   That is the real answer about what it
20 is that we can say about Arcoxia "looking through
21 the prism that Approve creates."
22     Q.   When you say "real answer:  don't
23 know," about Arcoxia, you're talking about
24 cardiovascular risk?
25     A.   That's correct.

KS-000528

Confidential - Subject to Protective Order

Page 809

1    Q.    You've got people in Europe taking
2  Arcoxia, and you don't know if it's causing a
3  cardiovascular risk?  That's the real answer?
4    A.    No.  Let's be specific here.  The
5  real answer is that I don't know whether or not
6  Arcoxia has an increased cardiovascular risk
7  compared to placebo, the way in which for Vioxx that
8  was seen with the APPROVe study.
9    Q.    Have you written a letter to the
10  European regulators and told them that?
11    A.    We have discussed with the European
12  regulators all of this data and these
13  considerations.
14    Q.    Have you told them that the real
15  answer is "don't know"?
16    A.    I don't know exactly what's been
17  said.  I do know that we, at this point in time,
18  felt as though it was not possible to ascertain
19  whether compared to placebo, Arcoxia would be
20  associated with an increased cardiovascular event
21  rate.
22    Q.    Do you intend to submit this piece of
23  paper to the European regulators?
24    A.    As I said -- I do not.  But as I've
25  said, we've had numerous discussions and ongoing

Page 810

1  discussions with the regulators in a very open way.
2    Q.    Do you think that the principle of
3  transparency, as you articulated it, would be
4  advanced by giving them this piece of paper?
5    A.    I don't think there would be much
6  point in giving them this paper.  We have had very
7  extensive -- my group, the group that's working on
8  this and working with the regulatory agencies in
9  Europe, has had extensive discussions.
10    Q.    Have the European regulators been
11  told what you think personally, Dr. Kim?
12    A.    I don't know, but I think that -- but
13  I do know that they've had extensive discussions
14  with scientists that are very well informed on all
15  of these issues at Merck.
16    Q.    Do you object to my supplying this to
17  them?
18    MR. KIERNAN:  Any request along those
19  lines would be directed to Merck.
20    MR. SPECTER:  No.  This is not a
21  discovery request in this litigation.  This is a
22  request whether he, as president of Merck Research
23  Labs, objects to me, as a citizen of the world,
24  giving this document to the European regulators.
25    MR. KIERNAN:  Well, let me object to

Page 811

1  the question, because you're here as a plaintiff's
2  counsel taking a deposition in personal injury
3  lawsuits.
4    MR. SPECTER:  That's true, I am.  But
5  I'm also a citizen.  So, I'd like to know whether he
6  has an objection to my giving this to European
7  regulators.
8    MR. KIERNAN:  Well, you know, all of
9  these documents are produced pursuant to protective
10  order.
11    MR. SPECTER:  That's true.  And I'm
12  not allowed --
13    MR. KIERNAN:  If you want to deviate
14  from the protective order, you ought to follow the
15  rules of The Court and submit a formal request to do
16  that.  So, I don't think it's appropriate to start
17  with this, "I'm a citizen of the world, Doctor," you
18  know, on a drug that's not at issue in this
19  litigation, would you mind if I give this to
20  regulatory agencies.  If you have a proper question,
21  please ask it.
22  BY MR. SPECTER:
23    Q.    Okay.  So, what's written here as
24  number 1 beneath the bottom line of number 0?
25    A.    What's written as number 1 is the

Page 812

1  importance of keeping the ongoing trials with
2  Arcoxia going.
3    Q.    Number 1 is, "Keeping the trials
4  going."  And next to that is, "Plausible"
5  hypotheses; correct?
6    A.    "Plausible hypothesis."
7    Q.    Number 2 is, "Potential risk."
8    Number 3 is, "Multiple short term -
9  not risk."  Is that correct?
10    A.    That's correct.
11    Q.    Next thing that's written is, "One
12  long-term - risk (APPROVe)"; correct?
13    A.    Correct.
14    Q.    And then an arrow to, "COX-2."
15    A.    Correct.
16    Q.    And then, number 5 is, "At present,
17  don't know how applicable it is to other members of
18  the class"; correct?
19    A.    Correct.
20    Q.    Number 6 is, "Long-term" -- I'm
21  sorry.  "Significant long-term safety data not
22  publicly available for other NSAIDs or COX-2."
23    A.    Correct.
24    Q.    Is that a true statement?
25    A.    At the time that this was written, I

KS-000529

Confidential - Subject to Protective Order

Page 813

1  was not -- we were not aware of any significant
2  long-term safety data that was publicly available
3  for other NSAIDs or COX-2 inhibitors with the
4  exception of aspirin.
5      Q.    What's the next thing that's written?
6      A.    "Data CHMP."  CHMP refers to the
7  European regulatory agencies.
8      Q.    What's written next to that?
9      A.    I'm not sure exactly, but
10 "Questions" -- something -- I can't read my own
11 handwriting.  Maybe it says -- I don't know what it
12 says.  Something about, "Questions - engage
13 discussion."  And then, "Issues."
14     Q.    Yes.  Well, it said something before
15 it said "issues."  It said, "difficult issues," and
16 then you crossed out the word "difficult"; right?
17     A.    That appears to be correct.
18     Q.    These are difficult issues, aren't
19 they?
20     A.    These are difficult issues and the
21 point of this bullet was that we needed to provide
22 the data to the European regulatory agencies and
23 engage in a discussion with them about these
24 difficult issues and these data.
25     Q.    Arcoxia is currently being sold in

Page 814

1  Europe; correct?
2      A.    That's correct.  And that's -- that
3  was the point of this bullet.
4      Q.    Okay.  What's next?
5      A.    Okay.  What's next is, "What's
6  unknown?"  And, what is unknown, is, as we've
7  discussed, there's no long-term safety data for the
8  NSAIDs.  So, we don't know --
9      Q.    No.  I just want to deal with what's
10 written.  I don't want your explanation quite yet.
11 What's written?
12     A.    "What's unknown?  NSAIDs, long-term."
13 And then "DSMB - not necessary to move up the
14 meeting (Nov. 6)."
15     Q.    Keep going, please.
16     A.    "Updated 10/8.  Closed CHMP 10/18
17 week, (10/18 presentation).  Expect" I would imagine
18 that meant to be "engaged in discussions via list of
19 questions, London - 11/22 week.  FDA:  10/30 PDUFA."
20     Q.    What's that?
21     A.    That's the date in which under the
22 Prescription Drug Act, the FDA, the regulatory
23 agency has as a target date to inform us as to the
24 status of our application to get Arcoxia approved.
25     Q.    Did they?

Page 815

1      A.    They came back and asked us -- they
2  gave us what's called an approvable letter, which
3  means that in principle, they're prepared to approve
4  the drug for marketing, but they had additional
5  requests before they did so.  That approvable letter
6  spelled out those additional requests.
7      Q.    What's next?
8      A.    "4A - MRL thinks that it would be" --
9  oh, here.  "MRL thinks that it would be appropriate
10 to include labeling changes, including APPROVe data,
11 in the labels for all COX-2 inhibitors, including
12 Arcoxia."  There's an arrow there that says, "EU ref
13 number state."  And there's an arrow there that
14 connects all the way up to the top that says, "Will
15 be" -- I assume means we "will be engaging," them in
16 "how to appropriately reflect these data in the
17 labels for COX-2 inhibitors" including "Arcoxia."
18     Q.    MRL is Merck Research Laboratories?
19     A.    That's correct.
20     Q.    Of which you were president?
21     A.    That's correct.
22     Q.    Did you agree with that statement?
23     A.    I did.
24     Q.    Is the label change for Arcoxia to
25 include the APPROVe data?

Page 816

1      A.    So, first of all, we have engaged --
2  we did engage with the European regulatory agencies,
3  and we did make labeling changes to the label for
4  Arcoxia.  Our proposal included the including the
5  APPROVe data.  I don't know specifically -- I don't
6  know exactly what the final label that the European
7  regulatory agency agreed to -- says regarding
8  Arcoxia, that is, I don't know if the APPROVe data
9  per se are in that final label.
10     Q.    Well, does the final label for Europe
11 say anything to the effect of "Real Answer:  Don't
12 know"?
13     A.    Not that I'm aware of.  What the
14 issue is here, and the European regulatory agencies
15 are in agreement with this, is that it's important
16 to keep the ongoing studies with Arcoxia going
17 forward, because the big question is, that's
18 unknown, is whether or not compared to other NSAIDs
19 there's an increased cardiovascular risk with the
20 COX-2 inhibitors.
21     Q.    You testified that the FDA told you
22 on or around October 30th that they wanted some more
23 information?
24     A.    Correct.
25     Q.    Regarding Arcoxia?

KS-000530

Confidential - Subject to Protective Order

Page 817

1    A.    Regarding Arcoxia, yes.
2    Q.    Did that involve CV data,
3  cardiovascular data?
4    A.    Yes, it did.  In particular, what it
5  requested was the data in the ongoing cardiovascular
6  safety studies that I referred to in which there's a
7  prespecified analysis combining the cardiovascular
8  results from EDGE 1, EDGE 2 and the MEDAL study,
9  which are -- the MEDAL study being a very large
10  study comparing Arcoxia to diclofenac.
11    Q.    And that's not finished yet; is that
12  correct?
13    A.    That's not finished.
14    Q.    I want to go back briefly, hopefully,
15  to Exhibit 40 from the last deposition.
16    A.    40 is this one?
17    Q.    It is, Dr. Kim.  It has the band
18  around it.  To refresh your recollection, this is
19  something that came from your custodial file.
20    A.    Excuse me.  This came from my file?
21    Q.    You said the same thing the last time
22  we were together, and the answer was yes then, and
23  it's still yes.
24    A.    Okay.
25    Q.    It has a date on it of June 21st,

Page 818

1  2001.
2    A.    I see that.  And it also has some, it
3  looks like initials, which I do not recognize.
4    Q.    It's headed, "Future plans"; correct?
5    A.    That's what it's headed, yes.
6    Q.    There's a question underneath that is
7  -- there's a question underneath "Future plans," and
8  the question is, "Is Vioxx prothrombotic?"  Did I
9  read it correctly?
10    A.    Yes.
11    Q.    Was it an unsettled issue at Merck as
12  of June of 2001 whether Vioxx was prothrombotic?
13    A.    Was it an unsettled issue?  It was a
14  hypothesis.
15    Q.    Was it an unsettled issue as to
16  whether Vioxx was prothrombotic?
17    A.    It was an unsettled issue in the
18  sense that it was a hypothesis.
19    Q.    Taking a look at page -- well, let me
20  ask you this first, if I could.
21        Do you recollect there being issues
22  raised about whether VIGOR was an ethical trial?
23    A.    Whether VIGOR was an ethical trial?
24  I don't remember -- I don't remember anything
25  specific in that regard.

Page 819

1    Q.    VIGOR was a safety trial; correct?
2    A.    VIGOR was an outcomes trial looking
3  at cardio -- excuse me -- looking at
4  gastrointestinal safety, while also monitoring
5  through an adjudicated procedure cardiovascular
6  safety.
7    Q.    I'm simply saying it was a safety
8  trial versus an efficacy trial.  It was a safety
9  trial; correct?
10    A.    Yes.
11    Q.    It was not an efficacy trial?
12    A.    Yes.  You could say that.  It was
13  looking at gastrointestinal safety and monitoring
14  cardiovascular safety.
15    Q.    Taking a look at page -- well, this
16  thing isn't paginated, but it has a Bates Number of
17  013.  It's headed -- are you with me?
18    A.    Just a second.
19    Q.    Okay.
20    A.    (Witness reviewing document.)
21    Q.    Are you with me?
22    A.    Which page are we --
23    Q.    013.
24    A.    I'm sorry, I don't see the pages.
25    Q.    They're hard to spot.  It's in the

Page 820

1  corner.
2    A.    Oh, okay.  Sorry.  Okay.  I have the
3  page.  Let me just read it here.
4        (Witness reviewing document.)
5        Okay.
6    Q.    This is titled, "Coxib+aspirin versus
7  Ibuprofen+aspirin Issues."  Correct?
8    A.    That's correct.
9    Q.    This is talking about doing a study
10  of a coxib like Vioxx with aspirin versus ibuprofen,
11  which has a trade name of what, sir?
12    A.    Advil.
13    Q.    Advil plus aspirin; correct?
14    A.    That's what appears to be at hand
15  here, yes.
16    Q.    Was such a study done?
17    A.    Not that I'm aware of.
18    Q.    Did Merck ever tell people who were
19  on Motrin and aspirin that Vioxx was a better idea
20  for them with or without aspirin?
21    A.    I'm sorry.  Did Merck tell patients
22  who were on Motrin plus aspirin that Vioxx was a
23  better alternative for them?  Not that I know about.
24    Q.    Do you have any reason to think that
25  ibuprofen plus aspirin would be better for people

Confidential - Subject to Protective Order

Page 821

1 than Vioxx plus aspirin?
2     A.    Do I have any reason to think that
3 people on ibuprofen plus aspirin would be better
4 than Vioxx plus aspirin?
5     Q.    Let me ask it the other way around.
6         Do you have any reason to think that
7 Vioxx plus aspirin would be better for people than
8 Motrin plus aspirin?
9     A.    It's possible.
10     Q.    Can you be any more certain than
11 that?
12     A.    Well, it was certainly something
13 that -- it was certainly something that I was
14 interested in as a testable hypothesis that I
15 thought, yes, had a reasonable chance of being true
16 with regard to GI safety.
17     Q.    Well, did you ever come up with any
18 basis for concluding that Vioxx plus aspirin was
19 better for people than Motrin plus aspirin?
20     A.    Did I ever come up with a reason?
21     Q.    No.  A basis for concluding in
22 science.
23     A.    A basis for concluding, oh.
24     Q.    In science.
25     A.    Yes.

Page 822

1     Q.    That Vioxx plus aspirin was better
2 for people than Motrin plus aspirin?
3     A.    Yes.  So, the issue is this: As
4 we've discussed, the whole idea behind the
5 development of the COX-2 inhibitors was to inhibit
6 COX-2 without inhibiting COX-1, and thereby, to
7 reduce the incidence of serious GI ulcers and bleeds
8 that's associated with the use of the nonsteroidal
9 anti-inflammatory drugs.
10         When one adds aspirin, aspirin
11 further exacerbates the gastrointestinal side
12 effects that are seen with the nonselective
13 anti-inflammatory drugs.  So, if you were to look,
14 for example, at the number of ulcers in patients who
15 were taking, let's say, ibuprofen versus patients
16 taking ibuprofen plus aspirin, there would be a
17 worst GI outcome in those patients taking ibuprofen
18 plus aspirin.
19         We already knew that Vioxx or a COX-2
20 inhibitor would show fewer GI events than an NSAID.
21 Certainly we knew that for naproxen.  And based on
22 other studies, we knew that to be true for other
23 NSAIDs.  And so, the question was, if you added
24 aspirin to a COX-2 inhibitor or to Vioxx, whether
25 you would have fewer GI events than if you compared

Page 823

1 it to ibuprofen plus aspirin, and there certainly
2 was a good rationale, scientific rationale for
3 thinking that that might be the case.
4     Q.    Well --
5     A.    But it was not proven.  We didn't
6 know that.
7     Q.    Was it ever proven?
8     A.    You know, I think that the closest it
9 came -- well, there was a study with Celebrex which
10 compared Celebrex plus aspirin to an NSAID, and I
11 don't recall which one it was plus aspirin.
12     Q.    Well, would --
13     A.    I believe there were fewer events
14 there.
15     Q.    Would this test of Vioxx versus
16 aspirin versus ibuprofen versus aspirin have
17 answered an important GI question?
18     A.    Would this -- see, I'm not familiar
19 with exactly what's being proposed here.  But let me
20 say this, could it be -- if your question is, could
21 it be that a study of this sort could address that
22 question?
23     Q.    An important GI question.
24     A.    Certainly a study comparing a coxib
25 plus an aspirin to ibuprofen plus aspirin could

Page 824

1 answer an important GI safety question.
2     Q.    But it was not done?
3     A.    It was not done at Merck.  There was
4 a study that was done with Celebrex.
5     Q.    And then it says, "Is it ethical to
6 put patients with CV risk (that is can tolerate a
7 bleeding event) on ibuprofen plus aspirin without
8 the use of a proton pump inhibitor?"  Then it says,
9 "- Ethics of VIGOR already challenged."  Do you see
10 that, sir?
11     A.    Yes.
12     Q.    Did I read it correctly?
13     A.    Yes.
14     Q.    Does that refresh your recollection
15 that the ethics of VIGOR were challenged?
16     A.    No, it does not.  And as we've
17 discussed, I was not here when VIGOR was designed
18 and when it was, when -- if it was challenged, it
19 was challenged.
20     Q.    Do you recollect there being a debate
21 at Merck with respect to doing a CV outcomes trial?
22 That question calls for a yes or no answer.
23     A.    Sorry.  Say that again.  Do I recall
24 the debate around whether or not to do a CV outcomes
25 trial?

Confidential - Subject to Protective Order

Page 825

1    Q.    Yes.
2    A.    I recollect substantial discussion
3  around how to do a CV outcomes trial.
4          - - -
5         (Whereupon, Deposition Exhibit Kim-50,
6         E-mails 3-9-2002, MRK-AFJ0000576 -
7         MRK-AFJ0000577 was marked for
8         identification.)
9          - - -
10  BY MR. SPECTER:
11    Q.    I'm handing you Kim-50.  This is an
12  e-mail from Dr. DiBattiste to Dr. Gertz, copying you
13  and many other senior people at Merck with regard to
14  doing a CV outcomes trial.
15    A.    Okay.  Can you just give me a minute
16  to look it over?
17    Q.    Yes.  For the record, it's dated
18  March 9, 2002; correct?
19    A.    Yes.
20         Just let me read it over.
21         (Witness reviewing document.)
22         Okay.  Thank you.
23    Q.    Are you with me?
24    A.    Yes.
25    Q.    Do you recollect this e-mail from Dr.

Page 826

1  or Mr. DiBattiste?  I'm not sure if he's a Dr. or --
2    A.    It's Dr. DiBattiste.
3    Q.    Thank you.
4         What kind of doctor is he?
5    A.    I believe that Dr. DiBattiste is a
6  cardiologist.  And do I recollect the e-mail?  I
7  don't recollect the e-mail specifically, but I do
8  recollect, as I said earlier to you, a substantial
9  discussion.
10    Q.    What does the term "ACS" stand for?
11    A.    ACS stands for acute coronary
12  syndrome.
13    Q.    So, Dr. DiBattiste, who is a
14  cardiologist, was he one of the most senior
15  cardiologists at Merck?
16    A.    No.  But he was a member of our
17  clinical group.
18    Q.    Well, these other men and women who
19  are listed here, maybe they're all men -- actually,
20  they're not.
21    A.    No, they're not.
22    Q.    There are a couple of women here,
23  maybe three.  There's Gertz, DiBattiste, Sabbaj,
24  Scolnick, Greene, Reicin, Nies, Goldmann, Guess,
25  you, Demopoulos, Honig, Stoner; correct?

Page 827

1    A.    Correct.
2    Q.    Who are the recipients.
3         Any other cardiologists in this
4  group?
5    A.    I believe that Demopoulos is a
6  cardiologist.
7    Q.    So, Dr. DiBattiste is writing to
8  Dr. Gertz and he says, "Thanks for the opportunity
9  to provide feedback on the proposed study options."
10  Then he says, "While I am admittedly biased by my
11  involvement in the development of the post ACS
12  trial," and that would be acute coronary syndrome
13  trial; correct?
14    A.    Yes.  And specifically post ACS, so,
15  that is patients who have ACS.
16    Q.    He says, "I remain convinced that
17  this study is an essential component of our
18  comprehensive clinical" research "to the current
19  challenges we face in the coxib" area.  Did I read
20  it correctly?
21    A.    Yes.
22    Q.    This subject matter is, "RE:  RMC
23  options for CV outcomes trials"; correct?
24    A.    That's correct.  That's the subject
25  line.

Page 828

1    Q.    RMC stands for what?
2    A.    RMC stands for research management
3  committee.
4    Q.    He says, "The only way to
5  definitively answer the question regarding a
6  potential prothrombotic effect of Vioxx is to do a
7  placebo controlled trial."  Did I read that
8  correctly?
9    A.    Yes.
10    Q.    Then he says two paragraphs down,
11  "Furthermore, by virtue of our statements to the
12  analysts, extensive discussions with Drs. Braunwald
13  and Cannon of the TIMI group" -- what's that?
14    A.    I forget what that acronym stands
15  for, but it's a group of cardiovascular physicians,
16  I believe.
17    Q.    These are outside people?
18    A.    That's correct.  These are
19  external -- these are non-Merck physician.
20    Q.    So, he says, "Furthermore, by virtue
21  of our statements to the analysts, extensive
22  discussions with Drs. Braunwald and Cannon of the
23  TIMI group, preliminary discussions with the FDA,
24  and protocol review with Steering Committee members
25  and cardiovascular thought leaders from 18 countries

KS-000533

Confidential - Subject to Protective Order

Page 829

1  around the world, we have declared our interest and
2  intent to initiate this study and confront this
3  challenge head on. Any reversal of the decision to
4  go forward with this trial will certainly
5  communicate a message of lack of confidence,
6  uncertainty and concern that may have important and
7  untoward consequences." Did I read that correctly?
8      A.   You did.
9      Q.   And then he says, "For all of the
10 above reasons, I feel strongly that the VIOXX ACS
11 trial is both the most scientifically sound design
12 to approach the most pressing questions, and is
13 likely to have a favorable outcome." Did I read
14 that correctly?
15     A.   You did.
16     Q.   What was the design of the VIOXX ACS
17 trial?
18     A.   Oh, I don't recall exactly, but the
19 issue here was to do -- was to take a patient
20 population that was post acute coronary syndrome,
21 that is, they had -- these were patients that had
22 what's referred to as unstable angina, and so
23 they're symptomatic for cardiovascular disease, and
24 to put some of them on Vioxx and to put some of them
25 on placebo and to monitor the number of

Page 830

1  cardiovascular events over time.
2      Q.   Was this study done?
3      A.   No, it was not.
4      Q.   Dr. DiBattiste said in the first
5  paragraph in advocating for this test, he said,
6  "('if it's safe in high risk patients, it's probably
7  safe in everyone')." Correct?
8      A.   Right. In quotations, he says, "'if
9  it's safe in high risk patients, it's probably safe
10 in everyone')."
11     Q.   Well, let's read the whole sentence,
12 just so we're clear. He writes, "A
13 placebo-controlled trial in a post ACS population
14 addresses both issues squarely, and is most likely
15 to be extrapolated to a broader population ('if it's
16 safe in high risk patients, it's probably safe in
17 everyone')." Did I read it correctly?
18     A.   You're not sure if the
19 reference to the quotes there isn't to the preceding
20 sentence or not.
21     Q.   Now, did you tell FDA that Dr.
22 DiBattiste had this view?
23     A.   I don't know. That is, I don't know
24 what Merck told FDA in this regard. I do know that
25 Dr. DiBattiste was actively involved in these

Page 831

1  discussions, not just through e-mail exchange, but
2  also in discussions, some of which I participated
3  in.
4      Q.   Was there some article in the medical
5  literature authored by somebody at Merck or someone
6  else that described DiBattiste's advocacy for this
7  trial?
8      A.   I'm not aware of any article in the
9  medical literature that advocated for Dr.
10 DiBattiste's view to do this trial.
11     Q.   You recollect that it's been the
12 position of Merck in public statements that when
13 clinical trials have been warranted, we've done
14 them; correct?
15     A.   I don't know that exact statement.
16     Q.   Is that your position?
17     A.   I think when clinical trials are
18 warranted is a subjective statement. I have a team
19 of people that are extremely experienced in these
20 things, and we weigh the different factors and then
21 decide what clinical trials to do to best answer the
22 medical questions at hand in a safe manner.
23     Q.   I have a chart I want to show you, a
24 diagram, which is titled, "Effects of NSAIDs on
25 Thromboxane and Prostacyclin," which I've marked as

Page 832

1  P-51.
2                    - - -
3           (Whereupon, Deposition Exhibit Kim-51,
4           PowerPoint Presentation, "Effects of
5           NSAIDs on Thromboxane and Prostacyclin,"
6           MRK-AFJ0009371, was marked for
7           identification.)
8                    - - -
9  BY MR. SPECTER:
10     Q.   I'd like to show it to you. And I'd
11 like to ask you if you believe it is accurate?
12     A.   (Witness reviewing document.)
13          This figure, which is taken from --
14 well, I don't know if it's taken from, but this
15 figure which has as a reference on the bottom a PNAS
16 paper, 1999, which I believe is the FitzGerald
17 paper, lays out the hypothesis that inhibition of
18 COX-2 in the endothelial cells with a COX-2 specific
19 inhibitor could lead to an imbalance in the
20 prostacyclin to thromboxane ratio, which would not
21 be observed, according to this hypothesis, with a
22 nonselective NSAID.
23          If you're asking me do I agree that
24 this is the hypothesis summarized that was proposed
25 in this paper, then the answer is yes. If you're

KS-000534

Confidential - Subject to Protective Order

Page 833

1  asking me whether I agree with what's on this
2  figure, the answer is no. I think it's speculation.
3      Q.     Well, I'm very grateful to you for
4  asking the questions and answering them. It saves
5  me a lot of time.
6          You would agree that this is not said
7  to be a hypothesis on this chart, it says
8  declaratively at the top, "Effects of NSAIDs on
9  Thromboxane and Prostacyclin"; correct?
10     A.     That's what it says.
11     Q.     It doesn't say, "Hypothesis of
12 effects on NSAIDs on thromboxane and prostacyclin";
13 correct?
14     A.     It doesn't say that, but I assure you
15 it's a hypothesis.
16     Q.     As opposed to a declarative statement
17 of what, in fact, occurs?
18     A.     Correct.
19     Q.     Well, if you were to present on this,
20 you would want to denominate this as a hypothesis;
21 correct?
22     A.     Absolutely. And when I have shown
23 slides like this, I have always -- I have always
24 tried to remember to state this as FitzGerald's
25 hypothesis.

Page 834

1      Q.     Well, if that's what you really were
2  aiming to do, then you would type on the top of it,
3  "Hypothesis of Effects of NSAIDs on Thromboxane and
4  Prostacyclin" --
5      A.     Well --
6      Q.     Let me just finish my question.
7          -- and not leave it, "Effects of
8  NSAIDs on Thromboxane and Prostacyclin"; correct?
9      A.     No, not necessarily, particularly
10 since the reference is given down at the bottom.
11     Q.     This is part of one of your
12 presentations; isn't it?
13     A.     It could be. I don't know. Do you
14 want to show me the whole presentation?
15     Q.     Sure.
16         MR. SPECTER: I'll mark it as Kim-52.
17             - - -
18         (Whereupon, Deposition Exhibit Kim-52,
19         PowerPoint Presentation, "Merck Research
20         Laboratories Face-to-Face Meeting, Dr.
21         Peter S. Kim," November 29 - 30, 2001,
22         MRK-AFJ0009366 - MRK-AFJ0009379 was
23         marked for identification.)
24             - - -
25 BY MR. SPECTER:

Page 835

1      Q.     It's dated November 29th and 30th of
2  2001. The cover pages says, "Merck Research
3  Laboratories, Face-to-Face Meeting, Dr. Peter S.
4  Kim"; correct?
5      A.     Yes, that's correct.
6      Q.     This would have been a PowerPoint or
7  a presentation where you would have handed out a
8  folder or a binder with these slides; is that
9  correct?
10     A.     I wouldn't have handed it out, but
11 this is a PowerPoint presentation.
12     Q.     It's a PowerPoint. All right.
13         Then six pages in is this diagram?
14     A.     Absolutely. And it's in the context
15 of the results of VIGOR, which precedes it, and the
16 results of the Alzheimer's study, which immediately
17 follow it.
18     Q.     Does the term "hypothesis" appear
19 anywhere on that document?
20     A.     On the document? Yes. On Page 375.
21     Q.     That's a different section.
22     A.     I know.
23     Q.     That regards, "Vioxx Cardiovascular
24 Safety Data Hypotheses from Observations." And then
25 you're talking about the FDA approved "Dear

Page 836

1  Healthcare Provider" letter; correct? Not the
2  diagram describing the "Effects of NSAIDs on
3  Thromboxane and Prostacyclin"; correct?
4      A.     This is speaking to hypotheses from
5  clinical data, including the results that we've
6  talked about earlier, the VIGOR data and the
7  Alzheimer's data.
8      Q.     Just so we're clear, Dr. Kim, this
9  diagram that --
10     A.     This diagram? (Indicating.)
11     Q.     Yes, that we've been talking about.
12 This diagram is not in the article to which you just
13 referred; correct?
14     A.     Oh, I don't know that. That -- this
15 is the essence of the FitzGerald hypothesis.
16     Q.     This diagram was created by someone
17 at Merck, and you presented it as it stands in this
18 exhibit; correct?
19     A.     This diagram was produced by someone
20 at Merck, and I had presented it, yes.
21         MR. SPECTER: I'm told that we need
22 to change the tape, so, let's do so.
23         THE VIDEOTAPE TECHNICIAN: Stand by,
24 please. That concludes Video Cassette Number 2.
25 The time is 2:27. We're going off the record.

KS-000535

Confidential - Subject to Protective Order

Page 837

1           - - -
2         (Whereupon, a recess was taken from
3     2:27 p.m. until 2:36 p.m.)
4           - - -
5         THE VIDEOTAPE TECHNICIAN: This
6     begins Video Cassette Number 3. The time is 2:36.
7     We're back on the record.
8     BY MR. SPECTER:
9         Q.    Okay.
10              Sir, did the issue about whether
11    Vioxx was safe for cardiovascular outcomes, was that
12    an open issue at Merck in the fall of 2001?
13        A.    I'm not sure I'd put it exactly the
14    way you did.
15              So, let me hear the question again,
16    please.
17          - - -
18        (Whereupon, the requested portion of
19        the notes of testimony was read by the
20        court reporter.)
21          - - -
22        THE WITNESS: I think that there was
23    a significant amount of discussion around this
24    issue, and there was interest in trying to conduct
25    the study that would address this issue in as

Page 838

1     definitive a manner as possible.
2     BY MR. SPECTER:
3         Q.    So, does that mean that whether Vioxx
4     was safe for CV outcomes was an open issue at Merck
5     in the fall of 2001?
6         A.    I mean, when you say Vioxx is "safe,"
7     that's a question that has to be done in a relative
8     sense. But certainly we were interested in the
9     cardiovascular safety profile of Vioxx and in doing
10    studies that would more definitively address the
11    questions that were at hand.
12        Q.    But I'm looking for a direct answer
13    to my question, whether Vioxx is safe for CV
14    outcomes was an open issue at Merck in the fall of
15    2001. Was it?
16        A.    Yes. I think we were interested in
17    the cardiovascular safety profile of Vioxx.
18          - - -
19        (Whereupon, Deposition Exhibit Kim-53,
20        E-mail 11-21-2001, MRK-AAZ0003351 was
21        marked for identification.)
22          - - -
23    BY MR. SPECTER:
24        Q.    And taking a look at Kim-53, which is
25    an e-mail from Dr. Scolnick to you, among others,

Page 839

1     and I'll give you a chance to read this before you
2     answer my question.
3         A.    Okay. Thank you.
4         Q.    But just to get my question out so
5     you have it in mind as you are looking at it, he
6     apparently believed that whether Vioxx was safe for
7     CV outcomes was an open question in the fall of
8     2001, looking at the first sentence of his e-mail?
9     Take your time and read it.
10        A.    (Witness reviewing document.)
11              Okay.
12        Q.    Do you want to hear the question
13    again?
14        A.    Yes, please.
15        Q.    Apparently, Dr. Scolnick also
16    believed that whether Vioxx was safe for CV outcomes
17    was an open question in the fall of 2001; correct?
18        A.    Oh, again, I think that Dr. Scolnick
19    was certainly very interested in seeing Merck
20    conduct a cardiovascular outcomes study that would
21    address the concerns that were out there regarding
22    COX-2 inhibitors in a more definitive manner.
23        Q.    It was an open question for Dr.
24    Scolnick whether Vioxx is safe for CV outcomes in
25    the fall of 2001; correct?

Page 840

1         A.    Oh, I don't know whether I would call
2     that an open question. There was certainly, and I
3     don't really -- I don't really think I can speak for
4     Dr. Scolnick, but he was certainly very interested
5     in seeing Merck do a cardiovascular outcomes study
6     that would further address the cardiovascular safety
7     profile of Vioxx.
8         Q.    In fact, Dr. Scolnick in the fall of
9     2001 thought that Vioxx increased the risk of CV
10    events; correct?
11        A.    I don't know that to be true.
12        Q.    Do you know it to be false?
13        A.    I had discussions with Dr. Scolnick
14    during that time period, and we discussed the Vioxx
15    cardiovascular issues and the hypotheses that were
16    out there. We also discussed the wealth of data
17    indicating that there was not a difference between
18    Vioxx and placebo and Vioxx and non-naproxen NSAIDs.
19    And we discussed the naproxen hypothesis. I think
20    that what Dr. Scolnick was most interested in at
21    that time period was in getting Merck to do a
22    cardiovascular outcomes study to more definitively
23    address that question.
24        Q.    And he never let that go, did he?
25        A.    He -- well, when you say, "he never

KS-000536

Confidential - Subject to Protective Order

Page 841

1  let that go," he --
2      Q.    I should say, he pushed that very
3  hard?
4      A.    Oh, yes.  He was very interested in
5  seeing us conduct studies that would more
6  definitively address this question.
7      Q.    And he was disappointed that there
8  never was a study in which CV outcomes were a
9  primary endpoint; wasn't he?
10          MR. KIERNAN:  Object to form.
11          THE WITNESS:  I don't know that I
12  could say that.  I certainly don't recall that from
13  Dr. Scolnick.
14  BY MR. SPECTER:
15      Q.    Well, look at this e-mail, Doctor.
16  He says, "I think the question we should answer now
17  is NOT whether Vioxx or any Coxib is safe for CV
18  outcomes.  I think the question NOW is what is the
19  best antiplatelet regimen is to use with a Coxib."
20  Correct?
21      A.    Well, that's what this states.
22      Q.    Right.  He's saying we've got to use
23  some anti-platelet regimen, whether it's aspirin or
24  something else, to counteract the platelet clotting
25  effects of the coxib; correct?

Page 842

1      A.    Oh, no, I would not say that's
2  correct.  To the contrary.  These issues are quite
3  complicated, and I'm happy to start to go into them
4  if you want.  But, no, the issue here was not as you
5  stated.
6      Q.    He writes, "I think the question we
7  should answer now is NOT whether Vioxx or any Coxib
8  is safe for any CV outcomes.  I think the question
9  NOW is what is the best antiplatelet regimen to use
10  with a Coxib.  I think that is THE medical
11  question," all capital letters, "and if we answer
12  it, the problem will dissipate."  Did I read it
13  correctly?
14      A.    You read those sentences correctly.
15      Q.    What problem is he talking about?
16      A.    I'm not sure.  What I can say --
17      Q.    No.  The only question is, what
18  problems is he talking about?  Your answer is you're
19  not sure; correct?
20      A.    Yes.
21      Q.    Now, when you read this and you
22  weren't sure what he was talking about, did you say
23  to him, hey, Dr. Scolnick, I got your e-mail, and
24  did you write him back and say, I'm not sure what
25  you're talking about regarding "the problem"?

Page 843

1      A.    I don't recall asking him that
2  specifically, but I did have numerous conversations
3  with him.
4      Q.    Well, don't you think, sir, that the
5  problem that he was talking about was the perception
6  out there in the medical community that Vioxx might
7  be dangerous from a CV perspective?
8      A.    No, I don't know that.
9      Q.    Well, do you think that may be what
10  he's talking about, sir?  That is my question.  Not
11  whether that's what you know, it's whether what you
12  think may be the case?
13      A.    I don't think so.  I think at this
14  point in time in the exchange, this e-mail was
15  addressing a major issue that we had wrestled with,
16  and that is how to get anti-platelet effects in
17  combination with a coxib, given that there is a
18  population of patients, namely -- well, there was a
19  population of patients, namely, those that have a
20  higher cardiovascular risk, who required
21  anti-platelet therapy.  And the answer to this
22  question is nontrivial.
23      Q.    But this did not end up getting
24  studied; correct?
25      A.    What did not get studied, the best

Page 844

1  anti-platelet treatment to use with a coxib?
2      Q.    Right.
3      A.    I think that is still a difficult
4  question to answer, yes.
5      Q.    No, no.  It's not whether the
6  question is hard to answer.  The question is whether
7  you actually tried to do it.  You didn't do it, you
8  didn't do a test with Vioxx and aspirin; correct?
9      A.    A test of what?
10      Q.    Anything.  You didn't --
11      A.    Oh, no, that's not true at all.
12      Q.    After this e-mail was done, did you
13  test Vioxx with some anti-platelet regimen, sir?
14      A.    Absolutely.  Patients in the APPROVe
15  study, a significant percentage, something like 20,
16  25 percent, I can't remember exactly, were on
17  aspirin, and they were at higher risk of
18  cardiovascular events, and a subanalysis of that
19  group was done, to just give you one example.
20      Q.    Did that have an 80 percent power to
21  a relative risk of 2, sir?
22      A.    It did not.
23      Q.    Right.
24          Now, in the package insert, the
25  warning label for Vioxx, doctors and patients were

KS-000537

53 (Pages 841 to 844)

Confidential - Subject to Protective Order

Page 845

1  not told that they should take aspirin with Vioxx.
2  They were only told they should take it if it was
3  otherwise indicated; correct?
4       A.    I don't remember the exact wording.
5  I believe it's something to the effect that for
6  patients for whom aspirin prophylaxis is
7  recommended, that they should not discontinue that
8  aspirin while taking Vioxx.  And the reason behind
9  that is that Vioxx does not inhibit COX-1.
10       Q.    Did you feel like the warning label
11  was an accurate statement?
12       A.    Did I feel as though the warning
13  label for Vioxx is an accurate statement?
14       Q.    Yes.
15       A.    Yes.
16       Q.    So, do you agree with the statement
17  that appears under "Cardiovascular Effects" that
18  with respect to VIGOR and the Alzheimer's trials
19  that "The significance of the cardiovascular
20  findings from these 3 studies...is unknown"?
21       A.    I believe that that is a
22  representation -- that is a representation of the
23  data.  That is what the FDA concluded was a
24  representation of the data.
25       Q.    Dr. Kim, you know my question didn't

Page 846

1  relate to what somebody else thinks, don't you?  My
2  question related to what you think; correct?
3       A.    Okay.
4       Q.    So, my question, again, is, do you
5  agree with the statement in the warning label that
6  "The significance of the cardiovascular findings
7  from these 3 studies," referring to VIGOR and the
8  Alzheimer's trials, "is unknown"?
9       A.    Actually, is that exactly what it
10  says?
11       Q.    I'll tell you what it says exactly.
12  It says, "The significance of the cardiovascular
13  findings from these 3 studies (VIGOR and 2
14  placebo-controlled studies) is unknown."  And
15  they're talking -- when they talk about the two
16  placebo-controlled studies, they're talking about
17  the Alzheimer's trials, aren't they, sir?
18       A.    Yes.
19       Q.    Do you want to see it?
20       A.    Sure, that would be great.  Thank
21  you.
22       Q.    Only if you want to see it.  Do you
23  want to see it?
24       A.    Yes, please.
25       Q.    I'll show it to you.

Page 847

1            Have you read this document cover to
2  cover before, sir, the warning label for Vioxx?
3       A.    I've read the label for the
4  prescribing information, which is commonly referred
5  to as the label for Vioxx.
6       Q.    Cover to cover?
7       A.    Yes.
8            MR. SPECTER:  So, we'll mark this as
9  Kim-54.
10            - - -
11            (Whereupon, Deposition Exhibit Kim-54,
12            Vioxx label, April 2002, was marked for
13            identification.)
14            - - -
15            THE WITNESS:  Thank you.
16  BY MR. SPECTER:
17       Q.    Sure.
18            And I'm looking now on the second
19  page, last column "Cardiovascular Effects."  Second
20  paragraph, next to last sentence.
21       A.    (Witness reviewing document.)
22            Okay.
23       Q.    Did I read it correctly?
24       A.    Yes, you did.
25       Q.    Do you agree with it?

Page 848

1       A.    Yes, I agree with it in that the
2  results did not lead to a definitive conclusion.
3  And the next sentence which says, "Prospective
4  studies specifically designed to compare the
5  incidence of serious CV events in patients taking
6  VIOXX versus NSAID comparators or placebo have not
7  been performed," which is the way in which the
8  interpretation of the data above could be
9  definitively known.
10       Q.    Nowhere in the warning label was
11  there a statement that the results from VIGOR of the
12  increased numbers of cardiovascular events in people
13  taking Vioxx was due to a cardioprotective effect of
14  naproxen; correct?
15       A.    That is correct.
16       Q.    Merck wanted to say that, and the FDA
17  wouldn't let them; correct?
18       A.    I don't remember the exact details,
19  but certainly it was Merck's interpretation of those
20  results that naproxen was cardioprotective.
21       Q.    If Merck had had its way, this
22  paragraph would have said something to the effect,
23  with regard that sentence, that the cardiovascular
24  findings from VIGOR were due to a cardioprotective
25  effect of naproxen; correct?  Something like that?

KS-000538

56 (Pages 845 to 848)

Confidential - Subject to Protective Order

Page 849

1    A.    I don't -- I don't know that it would
2  be stated in that way.
3    Q.    Well, that's your position, isn't it,
4  Dr. Kim?
5    A.    My position is that the difference in
6  cardiovascular events in the VIGOR trial are
7  attributable to the cardioprotective effect of
8  naproxen.
9    Q.    But that's not what Merck's label for
10  Vioxx says.  Merck's label for Vioxx says that the
11  cardiovascular findings' significance is unknown;
12  correct?
13    A.    It says that the significance of
14  these findings is unknown.
15    Q.    And that's different from your
16  position; correct?
17    A.    That is different than what I think
18  is the best interpretation of these data, yes.
19    Q.    So, the truth of the matter is that
20  you really don't agree with the warning label, do
21  you, sir?
22    A.    I do agree with the warning label in
23  the sense, as I said earlier, that the following
24  statement -- the following sentence puts the
25  statement -- the sentence that you were reading to

Page 850

1  me in context, which is the "Prospective studies
2  specifically designed to compare the incidence of
3  serious CV events in patients taking VIOXX versus
4  NSAID comparators or placebo have not been
5  performed."  And that is -- that would be a
6  more rigorous way to reach that conclusion.
7    Q.    Certainly a lot more rigorous than
8  concluding that naproxen is cardioprotective;
9  correct?
10    A.    Again, my interpretation of the data
11  is in its totality, not just VIGOR alone, all of the
12  data that we have been talking about, including data
13  for Vioxx against placebo, data for Vioxx against
14  non-naproxen NSAIDs, data on naproxen and its known
15  anti-platelet properties.  My interpretation of the
16  results of the VIGOR study with regard to
17  cardiovascular events is that they are best
18  explained by a cardioprotective effect of naproxen.
19  However, I do agree that prospective studies
20  designed, specifically designed to compare the
21  incidence in patients taking Vioxx versus NSAID or
22  placebo have not been performed at the time that we
23  wrote this label.
24    Q.    How many studies have been done
25  comparing naproxen to placebo for the purpose of

Page 851

1  assessing cardiovascular safety, Dr. Kim?
2    A.    I'm not aware of any studies that
3  have been done comparing naproxen to placebo with a
4  cardiovascular endpoint specifically.
5    Q.    Let's talk about what the FDA has
6  said about Arcoxia and CV safety.  Have you read the
7  summary of CV safety done by the FDA?
8    A.    I'm not sure what you're referring
9  to.
10    Q.    Well, there was a briefing package
11  for NDA 21-389, which is Arcoxia.  And this is part
12  of the briefing materials for what occurred in
13  February.  Did you read that material?
14    A.    I don't know, because -- I certainly
15  don't know without looking at what you're referring
16  to.
17    Q.    Well, let me read you from my screen.
18  I don't have the document with me, but you're
19  certainly free to look at the screen with me if
20  you'd like to.  I'd ask you if it refreshes your
21  recollection.  "For CV related deaths, there appears
22  to be an excess of cases in Arcoxia compared to
23  placebo, although the exposure to placebo is
24  limited.  However, the data related to naproxen
25  clearly shows an excess of CV mortality related to

Page 852

1  Arcoxia (and this is consistent with comparisons of
2  naproxen to Vioxx in other studies)."  Do you
3  recollect reading that now, sir?
4    A.    Not specifically.
5    Q.    Do you have any impression, as you
6  sit here today, what the FDA's views were as to the
7  CV safety of Arcoxia?
8    A.    Well, just based on what you just
9  read me, it sounds as though they are saying that
10  there's a numerical imbalance, but that the numbers
11  are very small.
12    Q.    And they say --
13    A.    Excuse me.  You asked me whether --
14  what their opinion was on cardiovascular safety of
15  Arcoxia?
16    Q.    Basically.
17    A.    Yes.  So, let me answer the question
18  differently then, and let me add to the answer to
19  that question, that is, that they gave us, they
20  wrote to us with an approvable letter spelling out
21  what it is that they would like to see in terms of
22  additional studies or the completion of ongoing
23  studies, I should say.
24    Q.    Right.  They want more CV data;
25  correct?

Confidential - Subject to Protective Order

Page 853

1    A.    Yes, they do.
2    Q.    They haven't told you that they'll
3  give you the right to sell Arcoxia to the general
4  public in the absence of that CV data, have they?
5    A.    No.  They have laid out in an
6  approvable letter that they are willing to approve
7  the drug for -- they're willing to approve the drug,
8  provided that the following additional data are
9  included in the package, one piece of which includes
10  the additional cardiovascular safety data from the
11  studies that we discussed before, EDGE 1, EDGE 2 and
12  MEDAL.
13    Q.    Do you recall FDA saying that the
14  results appear to demonstrate that Arcoxia is worse
15  than each comparator, for example, comparisons to
16  naproxen demonstrate that an increase in events
17  relative to Arcoxia or comparisons to placebo, there
18  is again an increase in events related to Arcoxia?
19  Do you recollect that, sir?
20    A.    No.  I don't recollect the exact
21  sentences that you're reading.
22    Q.    Back in 2001, did you ask Merck
23  Frosst in Montreal to do some work for you with
24  respect to an understanding of the prostacyclin
25  hypothesis?

Page 854

1    A.    It's certainly possible.  I don't
2  know about the date.  If there's something you want
3  to show me, that would be fine.
4    Q.    Sure.
5        - - -
6        (Whereupon, Deposition Exhibit Kim-55,
7        E-mails, MRK-AFJ0000518 - MRK-AFJ0000519
8        was marked for identification.)
9        - - -
10  BY MR. SPECTER:
11    Q.    Kim-55, this is an e-mail from you to
12  Kathleen Metters?
13    A.    Okay.
14    Q.    This is actually January 27, 2002;
15  correct?
16    A.    Yes.  My original e-mail was 2002.
17    Q.    So, it's a couple of months after the
18  e-mail with Dr. Scolnick that we talked about a few
19  minutes ago; correct?
20    A.    Yes.  Let me just read this.
21    Q.    Go ahead, take a look at it.
22    A.    Thank you.
23        (Witness reviewing document.)
24        Okay.
25    Q.    So, this was an e-mail to her

Page 855

1  following up on your brief discussion in Montreal
2  asking her to "coordinate an effort to understand
3  where prostacyclin is made."  Is that correct?
4    A.    That's correct.
5    Q.    You're telling her, "this will
6  require substantial effort by you, and other members
7  of Merck Frosst and the rest of MRL.  But, gaining a
8  good understanding of" it -- "of how to respond to
9  the" -- let me start over.
10        "But, gaining a good understanding of
11  how to respond to the CV issues surrounding Coxibs
12  is the most important short-term need of the company
13  (by far!) and we need to do this thoroughly and
14  rapidly.  It is very likely that we are going to
15  have an Arcoxia FDA advisory meeting on the subject
16  in April/May."  Did I read that correctly?
17    A.    Yes, you did.
18    Q.    Now, did she get all these questions
19  answered for you?
20    A.    She did not.
21    Q.    Well, were you correct that this was
22  "the most important short-term need of the company
23  (by far!)"  At that point in time?
24    A.    I don't know if I was correct.  I
25  certainly was -- that was my impression at the time.

Page 856

1    Q.    That's what you thought; correct?
2    A.    That is what I wrote here, yes.
3    Q.    And you put an exclamation point
4  after the words "By far"; correct?
5    A.    Yes.
6    Q.    Well, how much money was spent to get
7  these answers to the most important issues facing
8  the company?
9    A.    Oh, I don't know.
10    Q.    How many people were working on it?
11    A.    I don't know, but I can tell you what
12  we did learn.
13    Q.    Well, sir, I think you told us about
14  that the last time we met, didn't you?
15    A.    It's possible I did, yes.
16    Q.    I think you did.
17    A.    What we've learned, just to restate
18  it, was --
19    Q.    I'm not asking you that question.
20  Your counsel can ask you that when I've finished my
21  questions.  I think I've already asked you that or
22  you've already told me that, whether I asked you or
23  not.
24        The first sentence of this e-mail is,
25  "I would like you to coordinate an effort to

Page 857

1 understand where prostacyclin is made." Correct?
2 That's the first sentence; correct?
3     A.     Correct.
4     Q.     That was three years and
5 two-and-a-half months ago; right?
6     A.     Correct.
7     Q.     You sold a lot of Vioxx in the
8 intervening time; correct?
9     A.     Merck did.
10     Q.     You're still selling Arcoxia;
11 correct?
12     A.     Yes, we are.
13     Q.     And sitting here today, April --
14         MR. KIERNAN:  8th.
15 BY MR. SPECTER:
16     Q.     8th, thank you, 2005, you don't know
17 where prostacyclin is made today; correct?
18     A.     Correct.  And, in fact, we've not
19 been able to demonstrate any evidence, despite
20 looking very hard for it, that it's made in the
21 endothelial cells, which is the whole basis of the
22 FitzGerald hypothesis.
23     Q.     Well, you know it exists somewhere;
24 correct?
25     A.     That's the interpretation, but the

Page 858

1 issue at hand is that --
2     Q.     Sir, the only current question is,
3 you know prostacyclin exists somewhere; correct?
4 That's the only current question.
5     A.     That is certainly the current
6 thinking in the field, yes.
7     Q.     Now, do you recollect, I think you
8 told me before that you were at that -- well, let me
9 skip over that issue for a moment, in the interest
10 of time, for the patience of anyone unfortunate
11 enough to have to watch this film.
12         Let me ask you a different question,
13 again, about prostacyclin.
14         What is altered
15 prostacyclin/thromboxane A.sub.2 homeostasis?
16     A.     Sorry.  What is altered
17 prostacyclin/thromboxane A2?
18     Q.     A.sub.2 homeostasis.
19     A.     That -- homeostasis is the term, a
20 scientific term that is used to refer to the
21 balance, in this case, the balance between two
22 substances, one of them called thromboxane and the
23 other called thromboxane A2.  So, it's the balance
24 between two different substances that is being
25 referred to there.

Page 859

1     Q.     What is your position as to whether
2 people who have an altered prostacyclin/thromboxane
3 A.sub.2 homeostasis are at risk of developing
4 thromboembolic events?
5     A.     My opinion, my scientific opinion on
6 that issue, first, is that such a state that's
7 relevant for cardiovascular events has not been
8 established, despite extensive efforts by Merck and
9 scientists outside of Merck to try and establish it,
10 and, therefore, it is a hypothesis.  And that
11 hypothesis is one that is referred to as the
12 FitzGerald hypothesis, but has not been
13 demonstrated.  And I know of no evidence to support
14 it.
15     Q.     So, you're not satisfied that it's
16 true.  Is that fair?
17     A.     To the -- yes -- I'm not satisfied it
18 is true, and I also think that the underlying
19 fundamental basis, that is, the set of assumptions
20 that go into that hypothesis, have not
21 been verified, despite efforts to try to do so by
22 ourselves and others.
23     Q.     Let me give you a document that was
24 filed with the U.S. Patent Office by your colleague,
25 Dr. Scolnick.  And this was previously marked in Dr.

Page 860

1 Scolnick's deposition as Scolnick-6, and I have
2 marked it as Kim-5 -- you have the original.
3     A.     56.
4         - - -
5         (Whereupon, Deposition Exhibit Kim-56,
6         US Patent & Trademark Office Patent
7         Application Full Text and Image
8         Database, #20020016342 2-7-02,
9         "Combination therapy using Cox-2
10         selective inhibitor and thromboxane
11         inhibitor and composition therefor,"
12         (Scolnick) MRK-GAR0003079 -
13         MRK-GAR0003096 was marked for
14         identification.)
15         - - -
16         THE WITNESS:  Just give me a minute to read
17     the abstract here.
18 BY MR. SPECTER:
19     Q.     Sure.
20     A.     (Witness reviewing document.)
21     Q.     Are you with me?
22     A.     Yes.
23     Q.     Have you seen this before?
24     A.     No, I have not.
25     Q.     Can we agree this is a Merck

Confidential - Subject to Protective Order

Page 861

1  document?
2      A.    Excuse me?
3      Q.    Can we agree this is a Merck
4  document?
5      A.    Oh, I don't know.  It is a US patent
6  application.
7      Q.    Do you see at the bottom it says the
8  inventors are Scolnick, Edward, it lists some other
9  people as well, Kathleen Metters, the woman we just
10 talked about from Merck Frosst; correct?
11     A.    Yes.
12     Q.    And it says to send correspondence
13 regarding this to Merck & Co. on the first page?
14     A.    Okay.
15     Q.    This would appear to be a Merck
16 application; correct?
17     A.    Yes.
18     Q.    It defines on Page 5 in the paragraph
19 which is numbered 15, it defines patients who are at
20 risk for developing thromboembolic events; correct?
21     A.    I see what you're reading, yes.
22     Q.    And among those people who are at
23 risk of developing thromboembolic events, according
24 to this patent application, are "patients with
25 altered prostacyclin/thromboxane A.sub.2

Page 862

1  homeostasis."  Correct?
2      A.    I see what you're reading, yes.
3      Q.    You think that's wrong, don't you?
4      A.    What I think is --
5      Q.    Do you think that's wrong, sir?
6      A.    Do I think that it's wrong that
7  patients with altered prostacyclin/thromboxane
8  A.sub.2 homeostasis are -- should be classified as
9  patients who are at risk of developing
10 thromboembolic events?
11     Q.    That is the question.
12     A.    Okay.  I don't think it's wrong.  I
13 think it's unknown.
14     Q.    Well, this doesn't say that it's
15 unknown?
16     A.    It doesn't.  I agree it doesn't.
17     Q.    This says that affirmatively these
18 people are "at risk of developing thromboembolic
19 events."  Correct?
20     A.    Is your question what this says or
21 what I think?
22     Q.    Now my question is what this says.
23     A.    What this says is what you read.
24     Q.    Right.  This is a Merck document, and
25 it's telling the U.S. Patent Office regarding a

Page 863

1  proposal for a "Combination therapy using COX-2
2  selective inhibitor and thromboxane inhibitor and
3  compositions therefor," in other words, a request to
4  get a patent on a potential new drug, that among
5  other things that "'Patients who are at risk of
6  developing thromboembolic events'" are people that
7  have a family history of or are predisposed
8  genetically to "thromboembolic disorders, who have
9  had ischemic stroke," who have had, "transient
10 ischemic stroke," who have had a heart attack, those
11 people who have "unstable angina or chronic stable
12 angina" and "patients with altered
13 prostacyclin/thromboxane A.sub.2 homeostasis" as
14 well as people that have "higher than normal
15 thromboxane A.sub.2 levels leading to increase risk
16 for thromboembolism, including patients with
17 diabetes and rheumatoid arthritis."  Did I
18 paraphrase that paragraph reasonably correctly, sir?
19     A.    Yes, you did.
20     Q.    On this document I have no further
21 questions.
22           Now, sir, why don't we do this.
23 Let's take three minutes, and let me get my notes
24 together.  I'm almost finished.
25     A.    Okay.

Page 864

1      Q.    You'll be happy to hear.
2      A.    Okay.
3            THE VIDEOTAPE TECHNICIAN:  Stand by,
4  please.  The time is 3:12.  We are going off the
5  record.
6                  - - -
7           (Whereupon, a recess was taken from
8        3:12 p.m. until 3:22 p.m.)
9                  - - -
10          THE VIDEOTAPE TECHNICIAN:  The time
11 is 3:22.  We're back on the record.
12 BY MR. SPECTER:
13     Q.    Okay.  Dr. Kim, thank you for your
14 patience.  I have just a couple of other areas.  I
15 think I'll be able to get everybody out of here
16 before the 4:45 time that we agreed at the lunch
17 hour.
18          MR. SPECTER:  What's the matter?
19 Anybody else is free to go, by the way.  No one has
20 to stay, except for Dr. Kim.
21 BY MR. SPECTER:
22     Q.    Dr. Kim, I want to talk to you for a
23 couple of minutes about your efforts to reconcile
24 VIGOR with APPROVe.  I'm sure you've thought about
25 that a lot.

KS-000542

Confidential - Subject to Protective Order

Page 865

1        A.      My efforts to reconcile VIGOR with
2   APPROVe?
3        Q.      Yes.
4        A.      Okay.
5        Q.      Would that be true?  You've thought
6   about it a lot?
7        A.      I've thought about VIGOR, I've
8   thought about APPROVe a lot, I've thought about the
9   relationship, if any, between the two, yes.
10       Q.      Are you able to reconcile them?
11       A.      When you say "reconcile them" --
12       Q.      Well, have you been able to reconcile
13  the results of one trial with the results of the
14  other trial?
15       A.      Well, I think that, first of all, one
16  needs to understand or one needs to recognize that
17  the trials were done in different patient
18  populations.  VIGOR was done in a patient population
19  where patients had rheumatoid arthritis, whereas
20  APPROVe was done in a patient population with
21  patients with a prior history of colon polyps, as we
22  discussed.  And the --
23       Q.      Is that one possible explanation as
24  to why we saw an increased incidence of CV events at
25  six weeks in VIGOR but not in APPROVe?

Page 866

1            MR. KIERNAN:  Objection to form.
2            THE WITNESS:  I don't think that's
3   the reason why we saw a difference in cardiovascular
4   events at six weeks in VIGOR versus in APPROVe.  I
5   think the reason for that is that the anti-platelet
6   effects of naproxen has an effect on the
7   cardiovascular outcomes from the beginning, that is,
8   it decreases the cardiovascular event rate from the
9   beginning.
10           In fact, one of the things that we
11  discussed internally, as well as with the external
12  experts when we were discussing the APPROVe results,
13  where there was not a difference in the
14  cardiovascular event rate between Vioxx and placebo
15  that was discernible for the first 18 months of the
16  trial, is the comment made both internally and by
17  several external experts that such a result was not
18  consistent with the FitzGerald hypothesis, with the
19  simple FitzGerald hypothesis that speculated on an
20  imbalance of prostacyclin to thromboxane.  So that
21  one of the key differences between the two studies,
22  in my opinion, as well as in the opinion of
23  outside -- or the opinion of others, is that there
24  was a difference that was observed, as you say,
25  early on in the VIGOR trial, which was not observed

Page 867

1   in the APPROVe trial, and that in the VIGOR trial,
2   such an immediate or an early difference in the
3   cardiovascular event rate was consistent with an
4   effect on thrombosis, that is, the aggregation of
5   the platelets, whereas the difference in the
6   cardiovascular event rate in the APPROVe trial for
7   the first 18 months was not consistent with a simple
8   hypothesis that was based upon a
9   prostacyclin/thromboxane imbalance or any other
10  hypothesis that relates to thrombosis of platelets
11  per se.
12  BY MR. SPECTER:
13       Q.      Have you considered the issue of
14  cumulative dose in APPROVe compared to VIGOR, and
15  that is to say, that the dosage of Vioxx in APPROVe
16  was 25 milligrams, and you began to see a difference
17  in the event rates at 18 months, and the dosage in
18  VIGOR was --
19       A.      50 milligrams.
20       Q.      -- 50 milligrams, was twice that, and
21  there appears to be an acceleration of the CV events
22  at about eight or nine months, so that in both
23  clinical trials, there appears to be an acceleration
24  of CV events in Vioxx versus the comparator at about
25  the same cumulative dosage?  Have you considered

Page 868

1   that?  First of all, do you agree that that's true?
2        A.      So, what you're referring to is that
3   in the APPROVe study, there was no difference
4   between Vioxx and placebo for the first 18 months,
5   and then beginning after 18 months, there was a
6   difference that was discernible in the event rates
7   between the two groups.  Whereas, in the VIGOR
8   trial, although as we've discussed, there was a very
9   early separation of the event rates between Vioxx
10  and naproxen, that there is a numerical -- or that
11  there is an apparent increase in the cardiovascular
12  event rates when one plots this on what's called a
13  Kaplan-Meier plot that's seen, and I don't remember
14  exactly where it was, but later on in the trial.
15  That apparent increase in the cardiovascular event
16  rate in that Kaplan-Meier plot I do remember was
17  very carefully analyzed by the Merck statisticians,
18  and in particular, analyzed for whether or not the
19  data on a statistical basis were consistent with a
20  -- with a constant, with what's called a constant
21  hazard rate over the time of the trial versus a
22  non-constant hazard rate.  And I remember that in a
23  very careful and thorough analysis, the
24  statisticians -- and we showed this to the FDA, and
25  we had numerous discussions with the FDA around this

Confidential - Subject to Protective Order

Page 869

1 issue, that there was not evidence for a
2 non-constant hazard ratio in the VIGOR trial,
3 whereas, in the APPROVe study, a similar sort of
4 statistical analysis, when done, definitely
5 demonstrates a non-constant hazard ratio.
6          So, in conclusion, the relationship
7 that -- the proposed relationship that you're
8 referring to between the time dependence and the
9 non-constant hazard ratio in the APPROVe study and
10 the appearance of an increase rate in the
11 Kaplan-Meier plot of the VIGOR study does not stand
12 up to a statistical -- a scientific analysis.
13       Q.    How much stock do you hold in Merck?
14       A.    I believe that at the end of 2004 I
15 held approximately 16,000 shares of Merck stock.
16       Q.    How many options to purchase stock do
17 you own?
18       A.    I believe, again, at the end of 2004
19 that I have been issued approximately 500,000
20 options to purchase Merck stock.
21       Q.    So, your financial condition could be
22 significantly affected by the value of Merck stock;
23 correct?
24       A.    Yes.
25       Q.    Do you have the right to sell your

Page 870

1 stock while still a Merck employee?
2       A.    Do I have a right to sell my stock?
3       Q.    Yes.
4       A.    Yes, although -- yes, I do have a
5 right to sell, and it's subject to all sorts of
6 restrictions, but, yes, I have a right to sell my
7 stock.
8       Q.    When you say "all sorts of
9 restrictions," you're not allowed to sell your stock
10 on inside information?
11       A.    That's correct.
12       Q.    Is there some other restriction?
13       A.    I'm not familiar with all the details
14 of it, to be honest, but certainly --
15       Q.    That's the main one; isn't it?
16       A.    Certainly a major consideration is --
17       Q.    You don't know of any others, do you?
18       A.    Not that I know of.
19       Q.    You're allowed to purchase your
20 options and then sell the stock -- I should say
21 you're allowed to purchase the stock that you're
22 permitted to buy because of your options whenever
23 you want; is that correct?
24       A.    I believe that's correct, but I
25 actually don't know.

Page 871

1       Q.    Then you're permitted to sell the
2 stock while you're still an employee of Merck; is
3 that correct?
4       A.    Yes, I believe that's correct.
5       Q.    And Merck stock is trading at around
6 what dollar value currently?
7       A.    I believe it's around $32 a share.
8       Q.    So, your current stock in Merck is
9 worth around $500,000; is that correct?
10       A.    Correct.
11       Q.    And if you were to exercise all of
12 your options to buy Merck stock, the stock would be
13 worth, if you bought it today, around $16 million?
14       A.    No, that's not correct.  And the
15 reason why that's not correct is that I believe all
16 of the options that I'm referring to that I had at
17 the end of 2004 have an option exercise price that's
18 higher than the current trading value of the stock.
19       Q.    Maybe you're slightly out of your
20 field here.
21       A.    Okay.
22       Q.    But my question was, what would the
23 stock be worth if you purchased it?  And the stock
24 would be worth 32 times 500,000; correct?  Not what
25 it would cost you to purchase, but what it would be

Page 872

1 worth?
2       A.    I see.
3             MR. KIERNAN:  Object to the
4 characterization, "out of his field."  I think he
5 was answering it correctly.
6             THE WITNESS:  Yes.
7 BY MR. SPECTER:
8       Q.    Are you a little out of your field
9 talking about stock price, Dr. Kim?
10       A.    I certainly could be, but let me just
11 try and answer your question, but do so in a way
12 that I feel is complete.
13             The value of the stock, were I to
14 exercise my options, after I exercised them would be
15 $32 times 500,000 shares, but the amount --
16       Q.    And that was my question, wasn't it?
17       A.    But the purchase price would be
18 substantially greater than that.
19       Q.    Sure.  And if you can get Merck stock
20 to go up through your work and that of your
21 colleagues, then you could end up purchasing Merck
22 stock for less than what it's worth on the day you
23 purchase it; correct?
24             MR. KIERNAN:  Object to the form.
25             THE WITNESS:  Say that again, I'm

KS-000544

Confidential - Subject to Protective Order

Page 873

1  sorry.  If I can get the Merck stock to go up?
2  BY MR. SPECTER:
3      Q.   Yes.
4      A.   Yes, then?
5      Q.   Then it may be the case that when you
6  buy your Merck stock, when you exercise your
7  options, it will be worth more than what you paid
8  for it?
9      A.   If the Merck stock goes up, yes, I
10  can exercise -- and it goes above the option
11  exercise price, then when I purchase the stock, it
12  would then be worth -- unlike now, it would be worth
13  more than what I paid for the -- to exercise my
14  options.
15     Q.   What's the option exercise price?
16     A.   Oh, it varies.
17     Q.   What's the blended price?
18     A.   Oh, I don't know the blended price as
19  you're referring to it.  It's approximately -- there
20  are options at $45, and they go all the way up to
21  options at around $80 per share.
22     Q.   You haven't done the math on the
23  blended price?
24     A.   No, I have not.
25     Q.   Somewhere between 45 and $80?

Page 874

1      A.   Those are the --
2      Q.   Somewhere between that is where the
3  blended price would be; correct?
4      A.   Correct.
5      Q.   Can you buy some options and not
6  others?
7      A.   I'm sorry?
8      Q.   Can you buy some of the stock
9  pursuant to your options and not others?
10     A.   Yes.
11     Q.   So, you could buy the stock at 45 if
12  you chose to?
13     A.   Yes, if the options have what's
14  referred to as vested.  Because not all these
15  options that I'm referring to have, in fact, vested.
16     Q.   That's a matter of time; correct?
17     A.   That's a matter of time, in terms of
18  when I have the right to exercise those options.
19     Q.   Have you taken any formal training in
20  ethics while at Merck?
21     A.   Have I taken any formal training in
22  ethics while at Merck?  No, I have not.
23     Q.   Do you recollect --
24     A.   Oh, actually -- well, there may be an
25  ethics -- there's probably -- well, I don't -- I

Page 875

1  don't remember exactly.  There might have been an
2  online ethics question -- form or questionnaire in
3  instructions that I may have participated in.
4      Q.   Was that training or was that just
5  some questions about --
6      A.   No.  I think -- well, I don't
7  remember exactly, so, I'd better not say, because I
8  don't remember exactly.
9      Q.   But you don't recall taking any
10  formal training in ethics at Merck; correct?
11     A.   I don't recall it right now, no.
12     Q.   Have you given thought to potential
13  conflicts of interest that exist for you in your
14  position as president of Merck Research
15  Laboratories?
16     A.   Have I given thought to it?
17     Q.   Yes.
18     A.   Not terribly much, no.  I think that
19  there was a potential for all sorts of conflict of
20  interest, but I haven't given it much thought.
21     Q.   Well, as part of doing your job
22  correctly, need you be sensitive to those potential
23  conflicts?
24     A.   Absolutely.
25     Q.   Have you thought about this issue --

Page 876

1  have you thought about the issue -- let me back up.
2          We've discussed before, just to set
3  the background on this, that you played a pivotal
4  role in the withdrawal of Vioxx; correct?
5      A.   Yes.
6      Q.   And Mr. Gilmartin, he's not a
7  scientist, he relied upon you; correct?
8      A.   Mr. Gilmartin is not a scientist, and
9  Mr. Gilmartin relied on me, yes.
10     Q.   And you knew from when you took over
11  as president of Merck Research Labs in January of
12  2003, that you, one day, might have to recommend
13  that a blockbuster drug like Vioxx be taken off the
14  market; correct?
15     A.   I was aware of that possibility, yes.
16     Q.   And you know that the decision to
17  take a drug like Vioxx off the market could have a
18  very negative effect on the stock price of Merck
19  stock; correct?
20     A.   Yes.
21     Q.   It wasn't a surprise to you that the
22  stock in Merck went down when Vioxx was withdrawn;
23  correct?
24     A.   No, it was not.
25     Q.   Have you considered this potential

Confidential - Subject to Protective Order

Page 877

1  issue at Merck with you as president, either with
2  Vioxx or some other pharmaceutical, and that is that
3  you are significantly in control of the decision
4  whether or not to withdraw a bad drug before you
5  make a decision on selling your stock while a Merck
6  employee?
7          MR. KIERNAN: Object to form.
8          THE WITNESS: I'm sorry, have I
9  considered the situation where I am in the position
10 to make a recommendation about withdrawing a drug
11 before selling my stock?
12 BY MR. SPECTER:
13     Q.    Correct.
14     A.    Have I considered that is the
15 question?
16     Q.    Correct.
17     A.    No, I haven't considered that.
18     Q.    Well, because you have the right to
19 sell your stock while at Merck, at least as a
20 theoretical matter, you have the power to sell your
21 stock and thereafter recommend that a bad drug be
22 withdrawn; correct?
23         MR. KIERNAN: Object to form.
24         THE WITNESS: I have the power -- I
25 mean, if you're asking me whether that is a possible

Page 878

1  thing to do --
2  BY MR. SPECTER:
3      Q.    Yes.
4      A.    -- it is a possible thing to do. But
5  it would be unethical, and it would be a violation
6  of the guidelines -- not guidelines, regulations on
7  trading on the basis of insider information.
8      Q.    Well, whether it would be or not, the
9  decision by the company to withdraw the drug would
10 not have been made under that hypothetical at the
11 time that you sold your stock under that
12 hypothetical; correct?
13         MR. KIERNAN: Object to form.
14         THE WITNESS: I'm losing you, sir.
15 I'm sorry.
16 BY MR. SPECTER:
17     Q.    Well, since you make the decision or
18 you've got a big part in it about whether to
19 recommend the withdrawal of a drug, if you don't
20 communicate your view that a drug should be
21 withdrawn, then the decision has not been made to
22 withdraw the drug at the time the stock is sold, at
23 least under that hypothetical; correct?
24         MR. KIERNAN: Object to form.
25         THE WITNESS: I don't know what the

Page 879

1  regulations are around what constitutes a decision
2  being made in that regard.
3  BY MR. SPECTER:
4      Q.    Have you thought about a mechanism at
5  Merck where that scenario, and let me repeat the
6  scenario so that we're clear on what it is, the
7  scenario where the president of Merck Research
8  Laboratories has the capability of selling his stock
9  before a bad drug is withdrawn, how that scenario
10 could be prevented?
11     A.    I've not considered this -- the
12 issues that you are raising right here.
13     Q.    Well, I'd like you to consider it
14 with me for a moment. And could that be prevented,
15 Dr. Kim, by not permitting the president of Merck
16 Research Laboratories to sell his stock while he is
17 an employee of Merck?
18         MR. KIERNAN: Object to form.
19 Counsel, he's not here to entertain securities
20 hypotheticals.
21         MR. SPECTER: This is not a
22 securities hypothetical. This is a question about
23 whether he has or he's operating under a procedure
24 at Merck that is appropriate under the
25 circumstances.

Page 880

1  BY MR. SPECTER:
2      Q.    And I want to know, sir, whether you
3  think it would be more appropriate for you not to be
4  permitted to sell your stock while you're a Merck
5  employee?
6      A.    I don't think that that's -- I think
7  that the key issue here is whether or not one is
8  acting ethically in terms of when one sells stock or
9  performs any other aspect of a financial
10 transaction.
11     Q.    Have there been discussions at Merck
12 that you've been a party to or that you've heard
13 about, with respect to not permitting the president
14 of Merck Research Laboratories or other persons at a
15 high executive level to be able to sell their stock
16 while a Merck employee?
17     A.    No, I've not been party to any of
18 those discussions, or if they existed.
19         MR. SPECTER: Sir, I have no further
20 questions for you. Thank you for being here today.
21         MR. KIERNAN: Thank you. I
22 understand that counsel for Texas, who is scheduled
23 to go next is no longer here; is that correct?
24         MR. KRISTAL: He had some sort of
25 emergency.

KS-000546

64 (Pages 877 to 880)

Confidential - Subject to Protective Order

Page 881

1        MR. SPECTER:  Let's go off the video.
2        THE VIDEOTAPE TECHNICIAN:  Stand by,
3   please.  3:43, off the video record.
4        MR. SPECTER:  Just to protect the
5   record for a moment, we had a discussion, I'm not
6   sure if it was on the record or off the record,
7   before we got started with Dr. Kim today where it
8   was acknowledged that Texas has a different day to
9   go.  It's not that Texas was supposed to start
10  today, and they're not here to start.
11       MR. KIERNAN:  All right.  Putting
12  that issue aside, we're ready to go with Texas.  If
13  they're not here, then we can revisit that and
14  potentially start another day, after which we intend
15  to do a direct examination.
16       MR. SPECTER:  Sure.
17       MR. KIERNAN:  So, we'll, I guess,
18  reconvene this deposition and leave it open until
19  that time.
20       MS. RHOADS:  That's not true.  I told
21  you that I have some questions.
22       MR. KIERNAN:  If you'd state your
23  name on the record and the law firm that you
24  represent, because we do not agree with your view of
25  Judge Higbee's order.

Page 882

1        We understand you to be from The
2   Beasley Firm here in Philadelphia, and that you have
3   cases in New Jersey, as well as Delaware, and that
4   you're now contending that because you have a case
5   in Delaware, you're allowed to be a third examiner
6   here today before Texas.  We respectfully disagree
7   with that position.  If I've misstated your
8   position, let me know.
9        MS. RHOADS:  Yes, you have misstated
10  it.
11       MR. KIERNAN:  Okay.  Would you state
12  your name for the record?
13       MS. RHOADS:  I'm here to ask
14  questions because we served a Notice of Deposition
15  which was not quashed.  You made no effort to do
16  anything with The Court with regard to that Notice
17  of Deposition, which was in line with Judge Higbee's
18  order that our office could ask questions.  Our
19  office has asked questions at other depositions
20  following the Notice of Deposition, which, by the
21  way, you have in your hands right now, which I've
22  passed down the table.
23       MR. KIERNAN:  And just so the record
24  is clear, you're referring to "our office" being The
25  Beasley Firm here in Philadelphia; correct?

Page 883

1        MS. RHOADS:  Yes.
2        MR. KIERNAN:  And you have cases in
3   New Jersey pending now; correct?
4        MS. RHOADS:  Yes.
5        MR. KIERNAN:  We contend that you are
6   subject to Judge Higbee's order regarding the order
7   of this deposition, how it's to be handled.  And we
8   may disagree about what that order means, but it is
9   our view that Texas is to go next and then Merck
10  then gets a chance to ask questions on direct
11  examination.
12       MS. RHOADS:  There's no order that
13  sets out this.  And besides that, sir, we're wasting
14  time.  I just have ten minutes of questions.  If I
15  can just proceed on my ten minutes of questions --
16       MR. KIERNAN:  No, we're going to --
17       MS. RHOADS:  -- pursuant to the
18  Notice of Deposition.
19       MR. KIERNAN:  We're going to follow
20  The Court's order and limit it to two examiners from
21  New Jersey and not get into this just a few more
22  questions from various attorneys.
23       MS. RHOADS:  Sir, I can show you
24  other transcripts in which there are more than two
25  examiners.  There have been three examiners in other

Page 884

1   depositions, and that's what I want to do, sir, for
2   ten minutes.
3        MR. KIERNAN:  For purposes of today,
4   we're going to follow what we understand to be Judge
5   Higbee's order.  I understand you have a different
6   view.  If there's anything else you want to say on
7   the record, please do.  Other than that, we're going
8   to adjourn until Texas is ready to ask their
9   questions.
10       MR. KRISTAL:  May I just say
11  something?
12       For the record, I think you may have
13  misspoken when you were looking at the deposition
14  notice.  It is not a Delaware case, it's a Delaware
15  County, Pennsylvania case.  I don't know if that
16  makes a difference.
17       MR. KIERNAN:  Okay.  I don't think it
18  makes any difference to the analysis, but I
19  appreciate the clarification.
20       MS. RHOADS:  Sir, I'd just ask that
21  you allow me to ask the witness ten minutes of
22  questions.
23       MR. KIERNAN:  I think we've already
24  made it clear that we are not in a position of
25  allowing multiple examiners at this time.

KS-000547

63 (Pages 881 to 884)

Confidential - Subject to Protective Order

Page 885

1          MS. RHOADS: Other plaintiffs'
2   counsel, there have been other times when three
3   people have asked questions.
4          Shanin, is that true?
5          MR. SPECTER:  I have not been a party
6   to that.  Since you've asked me, you're making me
7   answer, and I have not been a party to that.
8          MS. RHOADS:  Where three attorneys
9   have asked questions?
10          MR. SPECTER:  I have not been a party
11   to that.
12          MR. KIERNAN:  No, I don't think
13   that's what we've been doing.
14          MS. RHOADS:  The last time it was The
15   Lanier Firm and The Beasley Firm and the Kline &
16   Specter Firm, it most certainly was.  It was three
17   people several times.
18          MR. KRISTAL:  I don't know the answer
19   to the question you're asking --
20          MR. SPECTER:  But Mark is asking
21   questions in the Texas litigation.
22          MR. KIERNAN:  All right.  Are we all
23   set to adjourn?  Thank you.
24          (Whereupon, Mr. Kiernan and the
25   witness left the room.)

Page 886

1          MS. RHOADS:  That's just improper.
2   Can I just note that the witness said he was
3   available until 4:45, and it is now 3:50.
4                - - -
5          (Whereupon, the deposition adjourned
6          at 3:50 p.m.)
7                - - -
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 887

1          CERTIFICATE
2
3          I, LINDA L. GOLKOW, a Notary Public
4   and Certified Shorthand Reporter of the State of New
5   Jersey, do hereby certify that prior to the
6   commencement of the examination, PETER S. KIM was
7   duly sworn by me to testify to the truth, the whole
8   truth and nothing but the truth.
9          I DO FURTHER CERTIFY that the
10   foregoing is a verbatim transcript of the testimony
11   as taken stenographically by and before me at the
12   time, place and on the date hereinbefore set forth,
13   to the best of my ability.
14          I DO FURTHER CERTIFY that I am
15   neither a relative nor employee nor attorney nor
16   counsel of any of the parties to this action, and
17   that I am neither a relative nor employee of such
18   attorney or counsel, and that I am not financially
19   interested in the action.
20   _____
21          LINDA L. GOLKOW, CSR
            Notary Number:  1060147
22          Notary Expiration:  1-2-08
            CSR Number:  30XI176200
23          Dated:  April 14, 2005
24
25

Page 888

1          ACKNOWLEDGMENT OF DEPONENT
2
3          I,_____, do hereby
    certify that I have read the foregoing pages, 628 TO
4   890, and that the same is a correct transcription of
    the answers given by me to the questions therein
5   propounded, except for the corrections or changes in
    form or substance, if any, noted in the attached
6   Errata Sheet.
7
8   _____
    PETER S. KIM                    DATE
9
10
11   Subscribed and sworn
    to before me this
12      day of          , 20   .
13   My commission expires:
14
15   Notary Public
16
17
18
19
20
21
22
23
24
25

KS-000548

66 (Pages 885 to 888)

Confidential - Subject to Protective Order

Page 889

1               - - - - - -
                E R R A T A
2               - - - - - -
3    PAGE   LINE   CHANGE
4    ____   ____   _____
5    ____   ____   _____
6    ____   ____   _____
7    ____   ____   _____
8    ____   ____   _____
9    ____   ____   _____
10   ____   ____   _____
11   ____   ____   _____
12   ____   ____   _____
13   ____   ____   _____
14   ____   ____   _____
15   ____   ____   _____
16   ____   ____   _____
17   ____   ____   _____
18   ____   ____   _____
19   ____   ____   _____
20   ____   ____   _____
21   ____   ____   _____
22   ____   ____   _____
23   ____   ____   _____
24   ____   ____   _____
25

Page 890

1              LAWYER'S NOTES
2    PAGE  LINE
3    ____  ____   _____
4    ____  ____   _____
5    ____  ____   _____
6    ____  ____   _____
7    ____  ____   _____
8    ____  ____   _____
9    ____  ____   _____
10   ____  ____   _____
11   ____  ____   _____
12   ____  ____   _____
13   ____  ____   _____
14   ____  ____   _____
15   ____  ____   _____
16   ____  ____   _____
17   ____  ____   _____
18   ____  ____   _____
19   ____  ____   _____
20   ____  ____   _____
21   ____  ____   _____
22   ____  ____   _____
23   ____  ____   _____
24   ____  ____   _____
25   ____  ____   _____

KS-000549

Exhibit "37"

**Dagostino, Lisa S.**

| | |
|---|---|
| **From:** | Beach Lawyer [beachlawyer51@hotmail.com] |
| **Sent:** | Saturday, July 01, 2006 9:54 AM |
| **To:** | Kline, Thomas R.; cseeger@seegerweiss.com; cvtisi@aol.com; twacker@rcrlaw.net; abirchfield@beasleyallen.com; LDavis@hhkc.com; RHerman@hhkc.com |
| **Cc:** | Dbuchanan@seegerweiss.com; trafferty@levinlaw.com; shellysanford@goforthlewis.com; jrestaino@lopez-hodes.com; mparf@aol.com; jgrand@seegerweiss.com; Vioxx Small Group |
| **Subject:** | Re: Barnett/ Avorn |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Chris
Sounds like Congratulations are in order...I look forward to reading your depo of Avorn..We focused Graham and Topol yesterday in New Orleans..Many jurors were upset with the FDA and its relationship with Merck..Overall Graham got higher marks than Topol on believability , however both did well,
  especially  with Plaintiff jurors.. ...I will send  the results from Decision Quest to the PSC when I get them..Give me a call re Avorn and Daubert.. I will be in my office all weekend at 9497203652..Beck told me he was focusing on keeping out Avorn's  opinions that go to Merck state of mind, which probably would be alternatively admissable on risk-benefit and what was knowable by Merck..Also since I have a concealment cause of action, I believe Merck's intent to deceive and motivations to deceive are admissable anyway..
Mark


>From: "Kline, Thomas R." <Tom.Kline@KlineSpecter.com>
>To:
><cseeger@seegerweiss.com>,<cvtisi@aol.com>,<twacker@rcrlaw.net>,<abirch
>field@beasleyallen.com>,<beachlawyer51@hotmail.com>,<LDavis@hhkc.com>,<
>RHerman@hhkc.com>
>CC:
><Dbuchanan@seegerweiss.com>,<trafferty@levinlaw.com>,<shellysanford@gof
>orthlewis.com>,<jrestaino@lopez-hodes.com>,<mparf@aol.com>,<jgrand@seeg
>erweiss.com>,"Vioxx Small Group" <VioxxSmallGroup@KlineSpecter.com>
>Subject: Re: Barnett/ Avorn
>Date: Sat, 1 Jul 2006 08:21:50 -0400
>
>As someone who was there and saw it first hand, let me say that
>yesterday's deposition was compelling and  is a major addition to our trial package.
>Chris Tisi did a phenomenal  job on direct and redirect with Avorn, a
>very impressive witness. Combined with Topol and Graham, we need little
>but case specific experts to carry any  case to the jury.
>Congratulations to Chris on a great  effort, from conception to conclusion....  Tom.
>
>-----Original Message-----
>From: Seeger, Chris <cseeger@seegerweiss.com>
>To: cvtisi@aol.com <cvtisi@aol.com>; twacker@rcrlaw.net
><twacker@rcrlaw.net>; abirchfield@beasleyallen.com
><abirchfield@beasleyallen.com>; beachlawyer51@hotmail.com
><beachlawyer51@hotmail.com>; ldavis@hhkc.com <ldavis@hhkc.com>;
>rherman@hhkc.com <rherman@hhkc.com>
>CC: Buchanan, David <dbuchanan@seegerweiss.com>; Kline, Thomas R.;
>trafferty@levinlaw.com <trafferty@levinlaw.com>;
>shellysanford@goforthlewis.com <shellysanford@goforthlewis.com>;
>jrestaino@lopez-hodes.com <jrestaino@lopez-hodes.com>; mparf@aol.com

**KS-000550**

><mparf@aol.com>; Grand, Jeff <JGrand@seegerweiss.com>
>Sent: Sat Jul 01 08:09:36 2006
>Subject: Re: Barnett/ Avorn
>
>Chris, I heard a lot of this........you did an outstanding job (as usual).
>-------------------------
>Sent from my BlackBerry Wireless Handheld
>
>
>-----Original Message-----
>From: Cvtisi@aol.com <Cvtisi@aol.com>
>To: NJRT - twacker@rcrlaw.net <twacker@rcrlaw.net>;
>abirchfield@beasleyallen.com <abirchfield@beasleyallen.com>;
>beachlawyer51@hotmail.com <beachlawyer51@hotmail.com>; ldavis@hhkc.com
><ldavis@hhkc.com>; Seeger, Chris <cseeger@seegerweiss.com>;
>rherman@hhkc.com <rherman@hhkc.com>
>CC: Buchanan, David <dbuchanan@seegerweiss.com>;
>tom.kline@klinespecter.com <tom.kline@klinespecter.com>; NJRT -
>trafferty@levinlaw.com <trafferty@levinlaw.com>;
>shellysanford@goforthlewis.com <shellysanford@goforthlewis.com>; NJRT -
>jrestaino@lopez-hodes.com <jrestaino@lopez-hodes.com>; MParf@aol.com
><MParf@aol.com>; Grand, Jeff <JGrand@seegerweiss.com>
>Sent: Sat Jul 01 07:13:53 2006
>Subject: Barnett/ Avorn
>
>Please find attached te rough of Day 1 of Avorn.  Day 2 should come soon.
>
>From my perspective (though I ask Dave, Jeff, Lisa and Tom to correct
>me if I am overstating), I think he did a fantastic job on Direct and
>was not really damaged on cross.  He is both a "fact" and "Expert
>witness"  In many ways, his fact testimony is the best--it confirms all
>that we say about Merck.  I think this is a very important deposition,
>not only for Barnett but also for future cases.  I think that Phil Beck
>agrees that the day went very well for us.
>
>I spoke to Phil about the Dauber hearings this upcoming week.  He
>agrees that the motion is not ripe since we now have a deposition to
>work from--no just his report.  (We framed his deposition differently
>than his report was framed to deal with any Daubert issues) I think we
>should put the argument of this back to the status conference if
>possible.  I think that Judge Fallon would (or should) find the bulk of
>his testimony admissible but he world have to read it.  Cannot be done by Wednesday!.
>
>In a separate front, I think that this deposition will be used in the
>California trial.  My impression is that Judge Cheney would let in most
>of this under Calif Law (Mark, Red, tell me if I am wrong).  If that is
>the case, it would probably be  to our benefit to get the state court
>rulings first.  Thoughts?
>
>In any event, I cannot be there on the 6th and would very much like to
>argue this--or be part of the team that does.  Can we put this off--by
>consent--to the status conference?
>
>Chris

KS-000551

Exhibit "38"

## Dagostino, Lisa S.

| | |
|---|---|
| **From:** | Mark Lanier [WML@lanierlawfirm.com] |
| **Sent:** | Wednesday, April 12, 2006 7:44 AM |
| **To:** | Specter, Shanin; Richard D. Meadow |
| **Cc:** | Vioxx Small Group; cseeger@seegerweiss.com; dbuchanan@seegerweiss.com |

**Subject:** RE: Punies

You were played in closing puni argument....  Great find and delivery form you and Lisa both!!!!!

-----Original Message-----
**From:** Specter, Shanin [mailto:Shanin.Specter@KlineSpecter.com]
**Sent:** Friday, April 07, 2006 12:42 PM
**To:** Richard D. Meadow
**Cc:** Vioxx Small Group; Mark Lanier; cseeger@seegerweiss.com; dbuchanan@seegerweiss.com
**Subject:** Re: Punies

Lisa Dagostino deserves the credit.  She found the document, recognized and gave it to me.

I "had the luck to give the roar" -- WSC

-----Original Message-----
From: Richard D. Meadow
To: Specter, Shanin
Sent: Fri Apr 07 12:12:11 2006
Subject: Punies

We got to punies because of you.  Judge denied motion to dismiss!!!!
--------------------------
Sent from my BlackBerry Wireless Handheld

**KS-000552**

Exhibit "39"

**Dagostino, Lisa S.**

| | |
|---|---|
| From: | Specter, Shanin |
| Sent: | Friday, April 14, 2006 10:16 AM |
| To: | Dagostino, Lisa S. |
| Cc: | Vioxx Small Group |
| Subject: | Fw: Today |

-----Original Message-----
From: Specter, Shanin
To: 'WML@lanierlawfirm.com'
Sent: Fri Apr 14 10:15:02 2006
Subject: Re: Today

Mark -- thanks for your email.

It has to be a group effort to beat these folks...

Happy Easter to you and your family.


-----Original Message-----
From: Mark Lanier
To: Specter, Shanin
Sent: Fri Apr 14 09:34:45 2006
Subject: RE: Today

Shanin...

Thanks again for the great job you did on Shapiro...  Made all the difference in the
world...

-----Original Message-----
From: Specter, Shanin [mailto:Shanin.Specter@KlineSpecter.com]
Sent: Thursday, April 06, 2006 7:54 AM
To: Richard D. Meadow; Mark Lanier
Cc: Kline, Thomas R.; Dagostino, Lisa S.
Subject: Today


Congrats!  I'm very happy for you, me and our clients...

If you need to prove fraud on the FDA, you may wish to confront Gilmartin with Shapiro's
testimony that they didn't give the MI-injury-only charts to the FDA.  They did give FDA
the data, but in a different form...

**KS-000553**

1

Exhibit "40"

**From:**          Richard D. Meadow [RDM@lanierlawfirm.com]
**Sent:**          Tuesday, April 11, 2006 10:53 AM
**To:**            Dagostino, Lisa S.
**Subject:**       Re: CONGRATULATIONS

**Follow Up Flag:**   Follow up
**Flag Status:**      Flagged

Your firm a big part of this win.
-------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Dagostino, Lisa S. <Lisa.Dagostino@KlineSpecter.com>
To: Richard D. Meadow <RDM@lanierlawfirm.com>
Sent: Tue Apr 11 09:47:39 2006
Subject: CONGRATULATIONS

Please send my congrats to your whole team on an amazing, amazing job!


Lisa S. Dagostino, MD, JD, MBE

Kline and Specter, PC

The Nineteenth Floor

1525 Locust Street

Philadelphia, PA  19102

215.772.2488 (direct dial)

215.772.1005 (facsimile)

lisa.dagostino@klinespecter.com


This message is intended only for the use of the individual or entity to which it is
addressed and contains information that is privileged (protected by the attorney-client
privilege and the work-product privilege), confidential and exempt from disclosure under
applicable law.  If the reader of this message is not the intended recipient or the employee
or agent responsible for delivering the message to the intended recipient you are hereby
notified that any dissemination, distribution, or copying of this communication is strictly
prohibited.  If you receive this message in error, please notify us immediately via return e-
mail and delete the original message from your files.

**KS-000554**

Exhibit "41"

**Specter, Shanin**

---

| | |
|---|---|
| **From:** | Michael Ferrara [mferrara@ferraralawfirm.com] |
| **Sent:** | Friday, April 08, 2005 3:16 PM |
| **To:** | Buchanan, David; Bill Audet; Grand, Jeff; ????ya????????h; A Sweeney; A. Scuder; Alan Sklarsky; Alex Krasnitsky; Andrew Carboy; Anthony Cifaldi; Anthony Marchetti; B. Morelli; Bruce Nagel; Carlene Lewis (E-mail); Chris Tisi; Christine Klimczuck; Christopher Johnson; D Binnick; D Sanford; D. Ratner; D. Weinstock; Daniel Fetterman; Dave Owens; Dave Vermont; David Beekman; David Cohen; David Jacoby (E-mail); Deborah Baird; E. Goldis; Edward Milstein; Elizabeth Cabraser; Elizabeth Fegan; WL - Relkin, Ellen; Esther Berezofsky; Evan Janush; Frank Floriani; Frederick E. Gerson (E-mail); G. Williams; Gene Locks; Glen Zuckerman; Greg Shaffer; Gregory Spizer (E-mail); J Heisler; J. Paul Sizemore (E-mail); Jacqueline DeCarlo; James McHugh; James Pettit; Jeffrey Kodroff; Jennifer Young; WL - Kristal, Jerry; Jessica Sanford; John Baldante; Joshua Ezrin; John Schepisi; K. Jardine; Kevin Haverty; Lee Balefsky; Lisa Dagostino; Marc Weingarten; Mark Hoffman; Michael Coren; Michael Galpern; Michael London; Michael Weinkowitz; Michelle L. Tiger (E-mail); Michelle Parf; Burg, Michael; Moira Lopez; Moshe Horn; Nan Parfitt; Niki Trunk; P. Burg; Patrick Randazzo; WL - Pennock, Paul; Paulina do Amaral; R Jonas; Richard Meadows; Rob Dassow; Robert Sachs; Rodney Villazor; S Wittels; Samuel Davis; Scott Eldredge; Scott Levensten; Seeger, Chris; Shanin Specter (E-mail); Shelley Sanford (E-mail); Simcha Schonfeld; Sol Weiss (E-mail); Steve Berman; Steve Knowlton; Susanne Scovern; Ted Lieverman; Terrence Smith (E-mail); Theresa Corson; Thomas Kline (E-mail); Thomas Sobol; Tobias Millrood; Tracy Finken; Wagner, Michael; Walter Burrell; Wayne Greenstone; Wendy Fleishman |
| **Subject:** | Dr. Kim - good news |

I  am sitting here at Dr. Kim's deposition.   Based on my observations
after 33 years of practice, the job that Shanin Specter is doing is
nothing short of spectacular.   He's forcing Kim to answer questions,
he's following up when tries to hide,  and he's forcing him to respond to the tough
questions.  It's ashame you can't see the body language of
Merck's lawyers.    They know they are dead.  Reading this transcript and
viewing this video tape will make all of your very very happy.   As good
as this case was before today, it now has improved 100 fold.   Thanks to
Shanin and his partners for being so well prepared and doing such a
wonderful job.

KS-000555

1

Exhibit "42"

**Dagostino, Lisa S.**

| | |
|---|---|
| **From:** | Steve Knowlton [SKnowlton@LocksLawny.com] |
| **Sent:** | Tuesday, June 27, 2006 7:36 PM |
| **To:** | Dagostino, Lisa S. |
| **Subject:** | RE: An Open Letter From Peter Kim |

My colleagues tell me I destroyed Tyberg.  I have no feeling about it at all.

didn't use Merck letter--got antsy at the last minute.  Introduced Correction form NEJM. but Tyberg said he'd never seen it, so I let it pass after the jury heard it was published in the NEJM yesterday about APPROVe.

Arrack tomorrow. WE move to strike her. They've threatened to bring in Morrison for an hour.  I'm going to ask for a proffer, and then move to strike as cumulative.

**LISA:  THANK YOU.  PLEASE TELL TOM THANKS FOR ME.  YOUR WORK, AS A FIRM, HAS BEEN AN ESSENTIAL PART OF OUR CASE.  WIN OR LOSE, IF THERE IS ANYTHING I CAN DO FOR YOU GUYS, ALL YOU HAVE TO DO IS ASK.**

Please pass on my thanks to Tom and Shanin.

Steve

---

**From:** Dagostino, Lisa S. [mailto:Lisa.Dagostino@KlineSpecter.com]
**Sent:** Tue 6/27/2006 7:22 AM
**To:** Steve Knowlton
**Subject:** RE: An Open Letter From Peter Kim

Have fun!

---

**From:** Steve Knowlton [mailto:SKnowlton@LocksLawny.com]
**Sent:** Tuesday, June 27, 2006 7:11 AM
**To:** Dagostino, Lisa S.
**Subject:** RE: An Open Letter From Peter Kim

Got.  I'm going to use it today as a party admission re: the appropriateness of sub-group analyses in APPROVe.

---

**From:** Dagostino, Lisa S. [mailto:Lisa.Dagostino@KlineSpecter.com]
**Sent:** Tue 6/27/2006 6:47 AM
**To:** Steve Knowlton
**Subject:** FW: An Open Letter From Peter Kim

FYI

---

**From:** Dagostino, Lisa S.
**Sent:** Tuesday, June 27, 2006 6:47 AM
**To:** Vioxx Small Group
**Subject:** FW: An Open Letter From Peter Kim

Berry Readable version below—this was issued in addition to the statement yesterday

**KS-000556**

**From:** Lisa Dagostino [mailto:doclsd@gmail.com]
**Sent:** Tuesday, June 27, 2006 6:45 AM
**To:** Dagostino, Lisa S.
**Subject:** An Open Letter From Peter Kim


Peter S. Kim Merck & Co., Inc.
President, Merck Research Laboratories Whitehouse Station, NJ 08889-0100
An Open Letter from Merck


Dear Valued Colleague:


At Merck, we are committed to rigorous scientific research conducted under high standards of ethical behavior. This is at the heart of who we are and how we do business. When we identified an error in the description of one of the statistical methods used to analyze certain data in the APPROVe study, we promptly notified the study authors and the New England Journal of Medicine (NEJM), which had published the study in 2005. We explained the basis for the correction and set forth our view that the correction did not change the result that, in the APPROVe study, an increased relative risk for confirmed thrombotic cardiovascular (CV) events for VIOXX compared to placebo was first observed beginning after 18 months of ongoing daily treatment. NEJM published its own correction notice regarding the APPROVe study on June 26, 2006. As that correction does not reflect our view of the data and the results of the study, we are providing our assessment as part of the on-going scientific discussion of this issue.


Merck recently identified the need for a correction in the description of one of the statistical methods used to analyze certain data in the APPROVe study (NEJM, 2005). Merck communicated this finding to the study authors, the Journal, regulatory authorities and the public in a timely and transparent manner on May 30, 2006. When we first identified the need for a correction to the article, we carefully assessed whether the error in describing one of the statistical methods affected the scientific results reported in the article. The CV data from the APPROVe trial were to be analyzed as part of a combined analysis with 2 additional placebocontrolled trials (ViP and VICTOR). The CV Data Analysis Plan (DAP) for this combined analysis specified a battery of statistical assessments to evaluate whether the relative risk of confirmed thrombotic CV events on VIOXX compared with on placebo was constant over time. Within this battery of statistical assessments, the use of the variable, logarithm of time, was the primary method specified.


In the manuscript submitted to NEJM, the methods section referred to the use of the logarithm of time. This description of the method used for the report of the p-value for the test of proportionality of hazards was in error. The reported result (p-value = 0.01) came from a method using linear time, not logarithm of time. Results of diagnostic analyses indicate that a model using linear time is more representative of the data than one using logarithm of time. Thus, the linear time analysis is an appropriate method to assess the changes in relative risk over time. Recent tests show that the result using logarithm of time has a p-value = 0.07. Even this borderline significant result justifies concern regarding changes in relative risk over time.

**KS-000557**

The battery of statistical assessments together indicate that the relative risk was not constant over time. The APPROVe article showed this non-constant relative risk in Figure 2 and Table 3. These data are separate from and not subject to the correction in the description from log to linear time. Further, these results have not changed. As indicated in the original paper, there was an increased relative risk for confirmed thrombotic cardiovascular events for VIOXX compared to placebo observed in the APPROVe study beginning after 18 months of ongoing daily treatment. Therefore, we conclude that this correction to the description of the statistical method does not change the results of the APPROVe study. A correction notice and rationale based on this assessment was submitted by all of the authors to the Journal on June 9, 2006. We reaffirm our assessments that the correction does not change the results of the APPROVe study. A detailed assessment of this statistical issue by scientists within Merck is attached for your review.

We hope this letter and the attached detailed assessment have addressed any questions you may have had about the correction in the description of one of the statistical methods used to analyze certain data in the APPROVe study. We know that you and the scientific community expect Merck to adhere to high scientific and ethical standards and we intend to continue to work hard to meet those expectations.

Sincerely,

Peter S. Kim

President, Merck Research Laboratories

APPROVe: ASSESSMENT

Background

As recommended by its safety monitoring board, the APPROVe trial was unexpectedly stopped before completion because of an increase in risk of CV events for rofecoxib compared to placebo. The DAP for the APPROVe trial referred to the DAP for the combined CV data from APPROVe plus that from 2 additional trials (ViP and VICTOR), known as Protocol 203. Protocol 203 was designed to demonstrate non-inferiority of CV risk for rofecoxib in comparison to placebo; the primary analysis to demonstrate non-inferiority was based on the 95% CI on hazard ratio (HR) from a Cox proportional hazards model. That model requires the assumption of constant HR over time. To test that assumption, the DAP for Protocol 203 called for numerous statistical and graphical methods to assess the relative risk (RR) of rofecoxib compared to placebo over time -- that is, to show whether the data were consistent with a null hypothesis of no difference from constant HR over time. Although the results of a single test may be consistent with this null hypothesis of constant HR over time, it is common statistical practice to conduct more than one assessment because no single test alone can prove that null hypothesis. Rather, the purpose of the analyses testing proportionality of HR over time in the DAP is to determine whether there is evidence to challenge the assumption of constant HR over time. For this reason, any test result demonstrating non-constant HR is relevant. In that context, the term "primary" as ascribed to the treatment-by-log(time) interaction test in the Protocol 203 DAP means that it is the initial approach, but not the only approach, to assessing proportional hazards. Thus, the aim of the Protocol 203 DAP was to demonstrate that a battery of statistical assessments yielded no substantial evidence of departure from the assumption of constant HR over time.

In the absence of a specific plan for the analysis of CV event HR over time in APPROVe alone, the analysis of the proportional hazards assumption for the APPROVe CV data proceeded in a manner consistent with good statistical practice and consistent with the DAP for Protocol 203.

Detailed Summary of Review and Findings

Merck performed numerous statistical analyses on the preliminary APPROVe data which led to the withdrawal of VIOXX. The CV results from this preliminary data showing significantly **KS-000558**

3

greater risk on VIOXX than on placebo in the APPROVe trial were surprising. Therefore, consistent with good statistical practice, many post hoc analyses aimed at understanding and appropriately describing those results were carried out on those preliminary data. These analyses were consistent with the Protocol 203 DAP, and included the K-M plot, the test for treatment-bylog( time) interaction in the Cox proportional hazards model, and computations of HR by time interval. Examination of the K-M plot showed similar cumulative incidence rates over the first 18 months and higher rates on rofecoxib than on placebo beginning after 18 months, suggesting non-constant hazard ratio over time. The test for interaction yielded a statistically significant departure from constant HR over time (p=0.006). While analyzing the newly obtained, off-drug follow-up data, it was observed that the latter result for the preliminary data was from a test using linear time; the test for treatment-by-log(time) interaction on the preliminary data yielded p=0.048. Time interval computations revealed RR close to 1 and CI encompassing 1 over the first 18 months, and RR > 4 with 95% CI > 1 over the > 18-month time period. Over the 36 month period of the study, the RR was lowest in the first 3 six-month time intervals and highest in the last 3 six-month time intervals. All of these analyses yielded evidence of non-constant hazard ratio over time.

The CV DAP specified splitting the three year study period into time intervals with approximately equal numbers of events in order to assess the HR over time. The CV DAP also specified computing HR in successive 6-month intervals, that is, equally spaced on the linear time axis; this latter analysis yielded approximately equal numbers of events in those intervals. Thus the distribution of observed events was approximately evenly distributed on a linear time axis; the distribution of events was heavily skewed on the log-time access. However, as previously mentioned, the RR was lowest in the first 3 six-month time intervals and highest in the last 3 six-month time intervals. In order to statistically test whether the observed differential HR in the 6-month intervals were proportional, the treatment-by-(linear)time interaction test was carried out. Thus use of the linear time proportionality test derived from the analysis strategy set in the CV DAP.

While preparation of the final data set and its analysis was ongoing, additional assessments aimed at modeling the HR over time proceeded on the preliminary APPROVe dataset. The modeling effort proceeded since the initial results strongly supported non-constant HR over time. Results of the modeling showed that a Cox model with terms for treatment and treatment-by-(linear)time interaction fit the HR over time data better than one with terms for treatment and treatment-by-log(time). In addition, a piece-wise model, with a constant HR over the first 18 months and terms for treatment and treatment-by-(linear)time interaction beginning at 18 months, fit the data better than both of those models. These modeling results provide additional evidence for non-constant HR over time.

The finalized APPROVe locked dataset for the 2005 publication contained 72 CV events, 2 more than the preliminary dataset on which the extensive analyses of HR over time were carried out. The K-M plot, a statistical test of proportional hazards, and time-interval RR computations were repeated on the locked dataset. All these supported a conclusion of non-constant HR over time; these results were reported in the NEJM paper.

Overall Assessment

We recently discovered the error in the description of the test of proportional hazards reported in the publication. The reference to treatment-by-log(time) interaction should have been to treatment-by-(linear)time interaction. The reported p-value = 0.01 came from that test using linear time, not logarithm of time. Recent tests show that the result using logarithm of time based on the locked dataset has a p-value = 0.07. The other assessments relating to proportionality of hazards, which were carried out consistent with the DAP, remain unchanged: the K-M plot remains unchanged; the time-interval RR's and CI's remain unchanged; the better fit of the Cox model with linear time rather than logarithm of time remains unchanged; and the statistical significance of treatment-by-(linear)time interaction test remains unchanged. Thus

KS-000559

null hypothesis of constant HR over time still remains unsupportable since all these analyses carried out on the locked dataset are consistent with non-constant HR over time. Even the treatment-by-log(time) interaction p-value 0.07 approaches statistical significance, consistent with all the other analyses, which support a conclusion of non-constant HR over time.

Conclusion

We conclude, based on these facts, that the correction to the description of the statistical method does not change the result that, in the APPROVe study, the relative risk for confirmed thrombotic cardiovascular events was not constant over time, and that an increased relative risk for confirmed thrombotic cardiovascular events for VIOXX compared to placebo was observed beginning after 18 months of continuous daily treatment. We provide our views here as part of the on-going scientific discourse on these issues.

**KS-000560**

Exhibit "43"

**Dagostino, Lisa S.**

| | |
|---|---|
| **From:** | Richard D. Meadow [RDM@lanierlawfirm.com] |
| **Sent:** | Friday, February 02, 2007 3:09 PM |
| **To:** | Kline, Thomas R.; Dagostino, Lisa S. |
| **Cc:** | Mark Lanier |
| **Subject:** | Re: is there an afternoon session? |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

```
I seem to play a lot of your stuff....
-------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Kline, Thomas R. <Tom.Kline@KlineSpecter.com>
To: Dagostino, Lisa S. <Lisa.Dagostino@KlineSpecter.com>
CC: Richard D. Meadow <RDM@lanierlawfirm.com>
Sent: Fri Feb 02 14:05:51 2007
Subject: Re: is there an afternoon session?


I'll gladly take Glen Reicin or Loren Laine's depos.. We are now well under their skin..


-----Original Message-----
From: Dagostino, Lisa S.
To: Kline, Thomas R.; Balefsky, Lee; Tiger, Michelle
Sent: Fri Feb 02 14:59:07 2007
Subject: FW: is there an afternoon session?

Looks like the Glenn Reicin stuff went over well!

-----Original Message-----
From: Richard D. Meadow [mailto:RDM@lanierlawfirm.com]
Sent: Friday, February 02, 2007 2:40 PM
To: Dagostino, Lisa S.
Subject: Re: is there an afternoon session?

She freaked-blood left her face. Wonder if he is being investigated.
-------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Dagostino, Lisa S. <Lisa.Dagostino@KlineSpecter.com>
To: Richard D. Meadow <RDM@lanierlawfirm.com>
Sent: Fri Feb 02 13:38:42 2007
Subject: RE: is there an afternoon session?

Excellent.

I love that he was able to get the glenn Reicin stuff in yesterday---how
did she react to that?

We need to take his dep!

-----Original Message-----
```

**KS-000561**

From: Richard D. Meadow [mailto:RDM@lanierlawfirm.com]
Sent: Friday, February 02, 2007 2:36 PM
To: Dagostino, Lisa S.
Subject: Re: is there an afternoon session?

Finish Reicin and start Krumholz on Monday.
--------------------------
Sent from my BlackBerry Wireless Handheld

KS-000562

Exhibit "44"

| | |
|---|---|
| **From:** | Dagostino, Lisa S. |
| **Sent:** | Thursday, August 04, 2005 9:43 AM |
| **To:** | 'shellysanford@goforthlewis.com'; Hoffman, Mark A. |
| **Cc:** | K&S Vioxx Attorneys; 'Maura' |
| **Subject:** | RE: PGI2 Inhibition |
| **Attachments:** | Nies Depo Sum 3-2-05.wpd; Nies Depo Sum 4-1-05.wpd |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Here's the text from the Nies dep at issue (April 1, 2005) (p. 394-395--Raber's direct)
(Shelly, thanks for pointing me in the right direction...):

                                                            394
Q     Well, if prostacyclin was being reduced, why wouldn't that be enough to cause this
imbalance problem?

A.   Well, in the prostaglandin area, with the thromboxane and with prostacyclin, you
generally have to inhibit their formation by more than 90 percent in order to have an effect.
This is true for thromboxane on the platelets, it has to be a 95 percent inhibition.  And
it's been estimated that it's also true for prostacyclin, that is, 10 percent of the normal
amount will allow the body to function normally.  And the reduction in this metabolite in the
urine, which is a very indirect way of looking at what's going on, was in the range of 50 to
60 percent.  So, we were nowhere near an inhibition that would cause something that would
normally be a concern.

Thoughts:
This is one of the carefully constructed and scripted Merck answers that leaves lots of
holes, and juxtaposes apples next to oranges to imply things that aren't necessarily true.

1.   Need to start out with the premise that the entire prostaglandin cascade is a super-
complicated pathway (that every medical student HATES when you hit physiology and pathology)
with, as Mark put it, lots of redundancies built in. You don't need to understand the
details, but just need to understand that you can't make broad generalizations about
anything--you have to be very precise in your statements and conclusions.  Merckspeak tends
to be very precise when it suits the Merck purpose (arguing where the source of prostacyclin
is), but Nies is noticeably very general in his statements here.

2.   The 95% figure with respect to thromboxane and platelets--I have seen that one before--
it has substantial support because it has been studied extensively in the aspirin literature-
-leave the substantive portion of this sentence alone with respect to any cross.  BUT note
that he narrowly refers to the effect on a specific cell--platelets, and in a specific
context (in the blood vessels).

BUT that does not mean that the same premise is true if you substitute the word
'prostacyclin' for 'thromboxane' and the super-general context 'body' for the super-specific
'platelets.'  He generalized a very narrow statement (effect of thromboxane on a specific
cell) to a very broad statement (effect of prostacyclin in the entire body).

The question is not whether you need 90% inhibition of prostacyclin for the 'body' to
'function' properly...the question is what PERCENTAGE of inhibition of endothelial blood
vessel derived prostacyclin (narrowly tailored question) would be necessary to create enough
of a prothromboic state in a small caliber blood vessel like a coronary artery to cause clots
to form (NOTE--I don't know if anyone knows the answer to that question--please check with

KS-000563

Lucchesi. If we don't have an answer to that, all the better, but that means that he can't reach the conclusion that he did).  For all we know, you only need 40% inhibition of prostacyclin derived from the endothelium to create blood clots big enough to clog that little itty bitty artery.

3.    He's also clear that his figure of 90% is an ESTIMATE.  If that's so, then that's another reason he can't make a conclusory statement like "we were nowhere near [a level of inhibition] that would cause something that would normally be a concern."  SCIENTISTS DO NOT MAKE CONCLUSIONS BASED ON ESTIMATES.

If they didn't know what percentage was necessary--why didn't they didn't they design an experiment to check it out?

And where the heck does this ESTIMATE come from?  Context?  Puppy studies? (BTW--did they designate him as an expert?)

4.    The 50-60% reduction in the urinary prostaglandin metabolite.  Mark H and I have been hashing this out for the past few days--we've never said that that metabolite was derived SOLELY from endothelial derived prostacyclin.  In fact, it is likely that it is not--that metabolite may reflect a combination of prostacyclin from lung AND endothelium, etc.  Point is, 50-60% is reflective again of the total body prostacyclin...you can't take that and extrapolate backward...

Sanity check, MAH?

Per SS's request, our summaries of the two deps are attached.


-----Original Message-----
From: Shelly Sanford [mailto:shellysanford@goforthlewis.com]
Sent: Wednesday, August 03, 2005 9:09 PM
To: Hoffman, Mark A.; Dagostino, Lisa S.; 'shellysanford@goforthlewis.com'
Cc: K&S Vioxx Attorneys; Maura
Subject: Re: PGI2 Inhibition

Thanks guys. Very common sense approach and they just throw this stuff out as true whether it is or isn't. Thanks very much. We will pass on to mark. Nies will be their first witness.
-----Original Message-----
From: "Hoffman, Mark A." <Mark.Hoffman@KlineSpecter.com>
Date: Wed, 3 Aug 2005 21:01:00
To:"Dagostino, Lisa S." <Lisa.Dagostino@KlineSpecter.com>,
"'shellysanford@goforthlewis.com'" <shellysanford@goforthlewis.com>
Cc:K&S Vioxx Attorneys <K&SVioxxAttorneys@KlineSpecter.com>
Subject: Re: PGI2 Inhibition

I would echo Lisa's warning.  The vascular endothelial system has protective redundancy built in through the nitrous oxide system.  It's important that the claim be put into some context. As a general statement, it really depends upon the patient, underlying risk factors, etc. Clearly, in settings of up-regulated TxA2 such as smokers, advanced atherosclerosis, the balance is what is important.  I DON'T SEE HOW THE STATEMENT JIBES WITH THE NOTION OF A "BALANCE"--IT SEEMS TO ME IF YOU TAKE SOMETHING OFF ON ONE SIDE OF THE SEESAW, THEN THE BALANCE IS IMMEDIATELY DISTURBED.  HE IS CLAIMING THAT YOU HAVE TO TAKE 95 PERCENT OF THE WEIGHT OFF OF ONE SIDE BEFORE THE SEESAW TIPS--NOT BELIEVABLE.
--------------------------
Sent from my BlackBerry Wireless Handheld

**KS-000564**

-----Original Message-----
From: Dagostino, Lisa S. <Lisa.Dagostino@KlineSpecter.com>
To: Hoffman, Mark A. <Mark.Hoffman@KlineSpecter.com>; 'shellysanford@goforthlewis.com'
<shellysanford@goforthlewis.com>
CC: K&S Vioxx Attorneys <K&SVioxxAttorneys@KlineSpecter.com>
Sent: Wed Aug 03 20:52:52 2005
Subject: RE: PGI2 Inhibition

Shelly

Just at first blush, the statement about 95% of prostacyclin inhibition seems too general...
We've been narrowly focusing on the prostacyclin produced by the endothelium (because that's
what we care about), but prostacyclin serves many functions in the body and is produced by
many different sources and different pathways (including cox-1).  To generally say "95%
inhibition" systemwide without an effect just does not seem right, but without context, I'm a
little at a loss to figure the best way to attack it.  Was the statement qualifed somehow
with a specific site?  It would be helpful to see precisely what he said in context (they are
VERY careful about parsing their words on this topic) in order to figure out a way to refute
it...when are they putting him up?

PS--assume you have these, but attached please find the NJ Nies depos.


-----Original Message-----
From: Hoffman, Mark A.
Sent: Wednesday, August 03, 2005 8:23 PM
To: 'shellysanford@goforthlewis.com'
Cc: K&S Vioxx Attorneys
Subject: PGI2 Inhibition

Shelly,

I am responding to your email to Tom Kline as follows:

Mark needs to find a study that will refute this:  Nies says that your body functions just
the same until 95+% of your prostacyclin is inhibited.no effect until you get to >95%
inhibition.

This is a bald statement without proof.  I would obviously ask him if he brought the articles
making those claims to the courtroom.

Aside from that: the Merck-sters have been spending the better part of 2 years trying to
figure out where PGI2 even comes from, and now they want to make this ridiculous claim.
Maybe Lisa can follow on with the documents which basically demonstrate them running from the
vascular endothelium as the source of prostacyclin.  How do they now claim to know the effect
of graduated depression of prostacyclin levels when they don't even know where it is made or
where it acts.

Second-Garrett FitzGerald did some work in COX-2 -/- IP receptor knockout mice, and found an
increased risk of thrombosis in the face of vascular trauma.  The Mercksters didn't like the
implications of this for obviousl reasons, and wanted to see results from the heterozygotes,
which would have had less prostacyclin inhibition.  Therefore, they did not know what partial
inhibition of prostacyclin would cause.  Maybe Lisa has the sites or documents for these
items.

I have not read the Neis deposition, so I am no help on that score.

**KS-000565**

Also, Mark wants Lucchesi to read over Nies depo and help him find some things to get him on.
Do you have the Nies depo?
-------------------------
Sent from my BlackBerry Wireless Handheld

Shelly A. Sanford
Goforth Lewis Sanford LLP
1111 Bagby, Suite 2200
Houston, Texas 77002
(713) 650-0022
(713) 650-1669 (fax)
Sent via Blackberry

**KS-000566**

Exhibit "45"

| | |
|---|---|
| **From:** | Kline, Thomas R. |
| **Sent:** | Wednesday, November 30, 2005 11:47 PM |
| **To:** | 'frank.woodson@beasleyallen.com' |
| **Cc:** | 'Dbuchanan@seegerweiss.com'; 'Cvtisi@aol.com'; Dagostino, Lisa S. |
| **Subject:** | Re: Topol |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

1.  Fallon excluded evidence of it relating to Merck.
2. It is irrelevant to his opinions.
3 it is not even established when he took vioxx.
4. His personal medical decisions about his health are unrelated to his opinions about vioxx and the conduct of Merck.

-------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Frank Woodson <frank.woodson@beasleyallen.com>
To: tom.kline@klinespecter.com <tom.kline@klinespecter.com>; dbuchanan@seegerweiss.com <dbuchanan@seegerweiss.com>
Sent: Wed Nov 30 22:18:04 2005
Subject: Fw: Topol

What are best arguments to keep out topol taking vioxx? Fallon exclude jurors and not allow employees to say they took???
o had taken - just consistent with fallon

-----Original Message-----
From: Goetz, Richard <RGoetz@OMM.com>
To: Frank Woodson <frank.woodson@beasleyallen.com>
Sent: Wed Nov 30 21:10:06 2005
Subject: RE: Topol

Why isn't the designated testimony relevant to credibility?

-----Original Message-----
From: Frank Woodson [mailto:frank.woodson@beasleyallen.com]
Sent: Wednesday, November 30, 2005 6:27 PM
To: Frank Woodson; tarek.ismail@bartlit-beck.com; Goetz, Richard
Cc: tom.kline@klinespecter.com; dbuchanan@seegerweiss.com; Leigh O'Dell;
beachlawyer51@hotmail.com
Subject: Re: Topol

As to Merck's counterdesignations for the Topol deposition plaintiff objects to page 318 line 6 thru page 321 line 16.  Plaintiff objects to page 394 line 23 thru page 404 line 19 which we do not see in your counterdesignations.  With only 1 objection I hope to hear back quickly.
Does Merck agree to remove the couple of lines plaintiff objects to?
Thanks

-----Original Message-----

**KS-000567**

From: Frank Woodson <frank.woodson@beasleyallen.com>
To: Frank Woodson <frank.woodson@beasleyallen.com>; 'tarek.ismail@bartlit-beck.com'
<tarek.ismail@bartlit-beck.com>; 'rgoetz@omm.com' <rgoetz@omm.com>
CC: 'tom.kline@klinespecter.com' <tom.kline@klinespecter.com>; 'dbuchanan@seegerweiss.com'
<dbuchanan@seegerweiss.com>; Leigh O'Dell <leigh.odell@beasleyallen.com>;
'beachlawyer51@hotmail.com'
<beachlawyer51@hotmail.com>
Sent: Wed Nov 30 20:02:40 2005
Subject: Re: Topol

Rich, I forgot to add you to email. When do you expect to have the transcript marked and
deliver to us at Abraham Watkins? Thanks

-----Original Message-----
From: Frank Woodson <frank.woodson@beasleyallen.com>
To: Frank Woodson <frank.woodson@beasleyallen.com>; 'tarek.ismail@bartlit-beck.com'
<tarek.ismail@bartlit-beck.com>
CC: 'tom.kline@klinespecter.com' <tom.kline@klinespecter.com>; 'dbuchanan@seegerweiss.com'
<dbuchanan@seegerweiss.com>; Leigh O'Dell <leigh.odell@beasleyallen.com>;
'beachlawyer51@hotmail.com'
<beachlawyer51@hotmail.com>
Sent: Wed Nov 30 19:56:12 2005
Subject: Re: Topol

Tarek, Rich has agreed to provide us with objections written in the margins of the transcript
tonight. We will reviewto determine if we agree to any. We have the counter designations and
are reviewing. We will let you know if we have objections to Merck designation.

-----Original Message-----
From: Frank Woodson <frank.woodson@beasleyallen.com>
To: 'tarek.ismail@bartlit-beck.com' <tarek.ismail@bartlit-beck.com>
CC: 'tom.kline@klinespecter.com' <tom.kline@klinespecter.com>; 'dbuchanan@seegerweiss.com'
<dbuchanan@seegerweiss.com>; Leigh O'Dell <leigh.odell@beasleyallen.com>;
'beachlawyer51@hotmail.com'
<beachlawyer51@hotmail.com>; Frank Woodson <frank.woodson@beasleyallen.com>
Sent: Wed Nov 30 14:41:57 2005
Subject: Topol

Tom Kline is working with your designated objector on this. Tom does not agree to any of the
objections. We understand Fallon will want Merck to provide a printout of the cuts with Merck
objections in the margin like we did on Anstice. Merck needs to have this to Fallon by end of
day.

**KS-000568**

Exhibit "46"

ABC Amber BlackBerry Converter Trial version, http://www.processtext.com/abcblackberry.html

**From:** Lisa DagostinoLSD• Lisa.Dagostino@klinespecter.com
**To:** Paul Sizemore paul.sizemore@beasleyallen.com, Andy Birchfield
andy.birchfield@beasleyallen.com
**Subject:** RE:
**Date:** 12/3/2005 10:12:16 PM
**Folder:** Inbox

Thanks paul--glad we could help.

-----Original Message-----
From: Paul Sizemore [mailto:paul.sizemore@beasleyallen.com]
Sent: Saturday, December 03, 2005 10:10 PM
To: Dagostino, Lisa S.; Andy Birchfield
Subject: RE:

doc, thank you so much for your help. you were great. topol would not have
gotten done without you. thanks again

        -----Original Message-----
        From: Dagostino, Lisa S. [mailto:Lisa.Dagostino@KlineSpecter.com]
        Sent: Fri 12/2/2005 3:28 PM
        To: Paul Sizemore; Andy Birchfield
        Cc:
        Subject: Fw:


        Article from bmj that cox-2s no benefit over trad NSaids for GI
effects.
        Courtesy dave Buchannan

        --------------------------
        Sent from my BlackBerry Wireless Handheld

        -----Original Message-----
        From: Byrne, Diane <Diane.Byrne@KlineSpecter.com>
        To: Dagostino, Lisa S. <Lisa.Dagostino@KlineSpecter.com>
        Sent: Fri Dec 02 15:40:11 2005
        Subject:

         <<BMJ-COX2-GISafety.pdf>>

**KS-000569**

Page 1

Exhibit "47"

ABC Amber BlackBerry Converter Trial version, http://www.processtext.com/abcblackberry.html

**From**: Shanin Specter shanin.specter@klinespecter.com
**To**: Tom KlineK&S email tom.kline@klinespecter.com, Lisa DagostinoLSD•
Lisa.Dagostino@klinespecter.com
**Subject**: Fw: Irvin
**Date**: 12/4/2005 5:00:50 PM
**Folder**: Inbox

Note Birchfield's response.  I think Lisa should be on the first flight
tomorrow.

-----Original Message-----
From: Andy Birchfield <andy.birchfield@beasleyallen.com>
To: Specter, Shanin <Shanin.Specter@KlineSpecter.com>
Sent: Sun Dec 04 15:11:30 2005
Subject: RE: Irvin

yes - if that is not too much of an imposition. Lisa is a tremendous help.

    -----Original Message-----
    From: Specter, Shanin [mailto:Shanin.Specter@KlineSpecter.com]
    Sent: Sun 12/4/2005 1:06 PM
    To: Andy Birchfield; Kline, Thomas R.
    Cc: 'cseeger@seegerweiss.com'; 'dbuchanan@seegerweiss.com';
'RHerman@hhkc.com'; Dagostino, Lisa S.
    Subject: Re: Irvin


    Andy -- Tom and I are about to begin separate trials.  Do you want Lisa
back
    down in Houston, participating in the 8pm sessions and otherwise
helping?


    -----Original Message-----
    From: Andy Birchfield <andy.birchfield@beasleyallen.com>
    To: Kline, Thomas R. <Tom.Kline@KlineSpecter.com>
    CC: Specter, Shanin <Shanin.Specter@KlineSpecter.com>;
    cseeger@seegerweiss.com <cseeger@seegerweiss.com>;
Dbuchanan@seegerweiss.com
    <Dbuchanan@seegerweiss.com>; RHerman@hhkc.com <RHerman@hhkc.com>
    Sent: Sun Dec 04 14:01:47 2005
    Subject: RE: Irvin

    we are in reasonably good shape with the shadow jury at this stage.
David
    Silver will be Merck's first witness. Help from any of you is welcome
and
    would be appreciated. We will meet for one hour every night in my suite
    (Room 1212 at the Icon) at 8:00 p.m. to discuss stategy and make
    assignments.

        -----Original Message-----
        From: Kline, Thomas R. [mailto:Tom.Kline@KlineSpecter.com]
        Sent: Sat 12/3/2005 10:02 PM
        To: Andy Birchfield
        Cc: Specter, Shanin; 'cseeger@seegerweiss.com';

**KS-000570**

ABC Amber BlackBerry Converter Trial version, http://www.processtext.com/abcblackberry.html

'Dbuchanan@seegerweiss.com'; 'RHerman@hhkc.com'
         Subject: Re: Irvin


         Andy--

         Would you let me know how the case is going in the eyes of the
     shadow jury,
         and your assessment after the first week, and where we stand?

         You have a tough week ahead. Do we know Merck's lineup, and what
is
     the plan
         of attack for cross examination? I assume you may face
Morrison,
     Oakes,
         Reicin, and/or other tough company witnesses and the Merck
outside
     experts.
         There are a few of us who, like you and Paul,  know the lines
of
     cross
         examination well--Lisa Dagostino, Chris Seeger, and Dave
Buchanan,
     in
         particular, all of whom are available to you.  (I'll be on
trial).
     You
         should consider taking advantage of the resources,and,  in my
view,
     should
         integrate them into your "inner circle" in week 2.

          I'll be happy to send Lisa back down to work on cross
examinations,
     if you
         want her there to work directly with you and Paul.     She has
been
     Shanin
         and my  main preparer  of many cross examinations in this
litigation
     (Kim,
         Reicin, Shapiro, Skolnick, Gertz, Gillmartin etc.)  and for the
     direct
         examination of   Topol,and knows the data base very well.

           Respectfully, it is my view (widely shared) that Jere should
not
     be
         cross-examining the  Merck witnesses..

         I emailed you earlier today, and I know you are swamped, but
please
     let me
         hear from you.

         Tom.

**KS-000571**

Page 2

ABC Amber BlackBerry Converter Trial version, http://www.processtext.com/abcblackberry.html

--------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Dagostino, Lisa S. <Lisa.Dagostino@KlineSpecter.com>
To: Paul Sizemore <paul.sizemore@beasleyallen.com>; Andy
Birchfield
<andy.birchfield@beasleyallen.com>
CC: Kline, Thomas R. <Tom.Kline@KlineSpecter.com>
Sent: Sat Dec 03 22:12:22 2005
Subject: RE:

Thanks paul--glad we could help.

-----Original Message-----
From: Paul Sizemore [mailto:paul.sizemore@beasleyallen.com]
Sent: Saturday, December 03, 2005 10:10 PM
To: Dagostino, Lisa S.; Andy Birchfield
Subject: RE:

doc, thank you so much for your help. you were great. topol
would
    not have
gotten done without you. thanks again

            -----Original Message-----
            From: Dagostino, Lisa S.
    [mailto:Lisa.Dagostino@KlineSpecter.com]
            Sent: Fri 12/2/2005

**KS-000572**

Exhibit "48"

**Dagostino, Lisa S.**

---

| | |
|---|---|
| **From:** | Mark Lanier [WML@lanierlawfirm.com] |
| **Sent:** | Tuesday, February 06, 2007 6:18 PM |
| **To:** | jgrand@seegerweiss.com; Dagostino, Lisa S.; Harlan.Krumholz@yale.edu |
| **Subject:** | Re: arm laceration |

Dara. Run this out please. Beautiful find lisa. Multi thanks.


-----Original Message-----
From: Grand, Jeff <JGrand@seegerweiss.com>
To: Lisa.Dagostino@KlineSpecter.com <Lisa.Dagostino@KlineSpecter.com>; Mark Lanier
<WML@lanierlawfirm.com>; harlan.krumholz@yale.edu <harlan.krumholz@yale.edu>
Sent: Tue Feb 06 17:06:38 2007
Subject: Re: arm laceration


Thanks.  You're the best.


-----Original Message-----
From: Dagostino, Lisa S. <Lisa.Dagostino@KlineSpecter.com>
To: Mark Lanier <WML@lanierlawfirm.com>; Grand, Jeff; Harlan.Krumholz@yale.edu
<Harlan.Krumholz@yale.edu>
Sent: Tue Feb 06 17:45:44 2007
Subject: RE: arm laceration


To continue from previous email chain with jeff...


Prostacyclin can be formed by several other different pathways.   What
we may be seeing in these capillaries is a reduction in prostacylin derived from one of those
other pathways, such as cox-1 derived
prostacyclin (see the very last line of the paper).   They're not
testing the same conditions you would see in a coronary artery with atherosclerotic disease
where cox-2 would be 'upregulated' and therefore
present.


The attached internal email (labeled 'arm laceration 2') between Dibattiste and another Merck
scientist makes it clear that even they recognized the difference in situations and called
the results a little 'bizarre'--"I thought that was bizarre as well-he argues that local
prostaglandins are all cox-1 and not cox-2--maybe so in healthies, I am not so sure in
diseased vessels where the endotheliums [sic] dysfunctional and protective mechanisms have
been activated."
Exactly the point--the protective mechanism being cox-2 derived
prostacyclin.   'Healthies' not the same thing as those with disease.


Also attached see another email on this study (the one Jeff referred to labeled 'arm
laceration')--Merck scientists say the study is 'not a perfect study,' note that "the meaning
of such a study is less clear"
and that "what happens in larger vessels is not known from this study."
They also note that the conclusions are "debatable" and even that the naproxen data is "a bit
overstated."


This all may be way beyond most jurors, but I'll leave that to you all   **KS-000573**
to figure out if you want to use it.   The key points are:

1.     All these folks are healthy and young.    Apples and oranges.
Doesn't tell us what's going on with people at risk for CV disease.

2.     They are looking at capillaries, not at coronary vessels.
Apples and oranges.  Merck scientists admitted that 'what happens in larger vessels'
(coronary arteries v. capillaries) is not clear from this study.

3.     The conditions inside each vessel are different.  One is a
healthy capillary.  The vessels that we care about are disease coronary
arteries.   Apples and oranges. Even Merck scientists noted that the
fact that this was done in 'healthies' doesn't mean that it corresponds
to what happens in diseased vessels.

4.     The study was funded by Merck (MSD).

-----Original Message-----
From: Mark Lanier [mailto:WML@lanierlawfirm.com]
Sent: Tuesday, February 06, 2007 4:30 PM
To: jgrand@seegerweiss.com; Harlan.Krumholz@yale.edu; Dagostino, Lisa S.
Subject: Re: arm laceration

I was thinking this also but got stumped on why the study did show a reduction in
prostacyclim for the other drugs. What's our answer?

-----Original Message-----
From: Grand, Jeff <JGrand@seegerweiss.com>
To: harlan.krumholz@yale.edu <harlan.krumholz@yale.edu>; Mark Lanier <WML@lanierlawfirm.com>
Sent: Tue Feb 06 15:31:04 2007
Subject: Fw: arm laceration

Dagostino on arm bleed study.
See below.

-----Original Message-----
From: Dagostino, Lisa S. <Lisa.Dagostino@KlineSpecter.com>
To: Grand, Jeff
Sent: Tue Feb 06 16:17:36 2007
Subject: RE: arm laceration

Yes---funding.   MSD (Merck Sharp Dohme).   See the disclosure part at
the back.

Arm laceration tests capillaries bleeding, not arteries.   Certainly not
coronary arteries, certainly not coronary arteries with atherosclerosis.
In essence, they fixed the study by testing a blood vessel that has not been shown to release
cox-2 derived prostacyclin, which is not present
in normal arteries (to say nothing of capillaries).   They (the
researchers funded by Merck) defined a study group and tested a vessel
where you wouldn't expect there to be any cox-2 derived prostacyclin.

-----Original Message-----
From: Grand, Jeff [mailto:JGrand@seegerweiss.com]
Sent: Tuesday, February 06, 2007 4:21 PM
To: Dagostino, Lisa S.
Subject: Re: arm laceration

**KS-000574**

Do you have something else? Or anything on this Thelayo study she's talking about.


-----Original Message-----
From: Dagostino, Lisa S. <Lisa.Dagostino@KlineSpecter.com>
To: Grand, Jeff
Sent: Tue Feb 06 16:10:52 2007
Subject: RE: arm laceration

Right after I sent the email.....jumped the gun.

She's awful.

-----Original Message-----
From: Grand, Jeff [mailto:JGrand@seegerweiss.com]
Sent: Tuesday, February 06, 2007 4:19 PM
To: Dagostino, Lisa S.
Subject: Re: arm laceration

You just heard it.


-----Original Message-----
From: Dagostino, Lisa S. <Lisa.Dagostino@KlineSpecter.com>
To: David Egilman <degilman@egilman.com>; Grand, Jeff
Sent: Tue Feb 06 16:08:29 2007
Subject: arm laceration

Is he prepped on how to get around the arm laceration study?


Lisa S. Dagostino, MD, JD, MBE

Kline and Specter, PC

1525 Locust Street

The Nineteenth Floor

Philadelphia, PA 19102

215.772.2488 (direct line)

215.735.0957 (facsimile)

lisa.dagostino@klinespecter.com


This message is intended only for the use of the individual or entity to which it is
addressed and contains information that is privileged (protected by the attorney-client
privilege and the work-product privilege), confidential and exempt from disclosure under
applicable law.  If the reader of this message is not the intended recipient or the employee
or agent responsible for delivering the message to the intended recipient you are hereby
notified that any dissemination, distribution, or copying of this communication is strictly
prohibited.
If you receive this message in error, please notify us immediately via

KS-000575

return e-mail and delete the original message from your files.

KS-000576

Exhibit "49"

**Dagostino, Lisa S.**

| | |
|---|---|
| **From:** | Richard D. Meadow [RDM@lanierlawfirm.com] |
| **Sent:** | Friday, April 07, 2006 12:56 PM |
| **To:** | Specter, Shanin |
| **Cc:** | Vioxx Small Group; Mark Lanier; cseeger@seegerweiss.com; dbuchanan@seegerweiss.com |
| **Subject:** | RE: Punies |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

All you guys delivered. Thanks. Mark was brilliant in the argument. Higbee gave a great ruling-weel thought out. Everyone has to read it.

-----Original Message-----
**From:** Specter, Shanin [mailto:Shanin.Specter@KlineSpecter.com]
**Sent:** Friday, April 07, 2006 12:42 PM
**To:** Richard D. Meadow
**Cc:** Vioxx Small Group; Mark Lanier; cseeger@seegerweiss.com; dbuchanan@seegerweiss.com
**Subject:** Re: Punies

Lisa Dagostino deserves the credit.  She found the document, recognized and gave it to me.

I "had the luck to give the roar" -- WSC

-----Original Message-----
From: Richard D. Meadow
To: Specter, Shanin
Sent: Fri Apr 07 12:12:11 2006
Subject: Punies

We got to punies because of you.  Judge denied motion to dismiss!!!!
-------------------------
Sent from my BlackBerry Wireless Handheld

**KS-000577**

Exhibit "50"

# TRIALS WHERE KLINE & SPECTER PROVIDED DIRECT SUPPORT AND ASSISTANCE

| DATE | EVENT |
|------|-------|
| Summer 2005 | Ernst |
| Fall 2005 | Humeston I |
| Fall 2005 | Irvin I |
| Winter 2005-6 | Irvin II |
| Spring 2006 | Cona/McDarby trial |
| Spring 2006 | Grossberg trial |
| Summer 2006 | Barnett trial |
| Fall 2006 | Dedrick trial |
| Winter 2007 | Hermans/Humeston II trial |

KS-000578

Exhibit "51"

**From:** CAS        Chris Seeger cseeger@seegerweiss.com
**To:** Tom KlineK&S email tom.kline@klinespecter.com, Chris Tisi Cvtisi@aol.com
**Subject:** Re: sent on behalf of Philip Yannella
**Date:** 12/21/2005 8:20:04 AM
**Folder:** Inbox

No idea.  This is the reason for the trial school.  Many of the people on this psc
have no idea what this case is about.  Those of us who do know need to protect
this case by speaking up when we see a screw up about to occur......as the 3 of us
have.
--------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Kline, Thomas R. <Tom.Kline@KlineSpecter.com>
To: 'Cvtisi@aol.com' <Cvtisi@aol.com>
CC: Seeger, Chris <cseeger@seegerweiss.com>
Sent: Wed Dec 21 08:17:47 2005
Subject: Re: sent on behalf of Philip Yannella

Who was going to go half cocked off and take discovery on this? Russ?

--------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Chris Tisi <cvtisi@aol.com>
To: Tom.Kline@KlineSpecter.com <Tom.Kline@KlineSpecter.com>;
cseeger@seegerweiss.com <cseeger@seegerweiss.com>
CC: 'dbuchanan@seegerweiss.com' <dbuchanan@seegerweiss.com>;
shanin.specter@klinespecter.com <shanin.specter@klinespecter.com>; Troy
Rafferty <trafferty@levinlaw.com>; RHerman@hhkc.com <RHerman@hhkc.com>;
LDavis@hhkc.com <LDavis@hhkc.com>; Lee.balefsky@klinespecter.com
<Lee.balefsky@klinespecter.com>
Sent: Wed Dec 21 08:00:30 2005
Subject: Re: sent on behalf of Philip Yannella

I agree with Tom
Sent wirelessly via BlackBerry from T-Mobile.

-----Original Message-----
From: "Kline, Thomas R." <Tom.Kline@KlineSpecter.com>
Date: Wed, 21 Dec 2005 07:37:41
To:"'cseeger@seegerweiss.com'" <cseeger@seegerweiss.com>
Cc:"'Dbuchanan@seegerweiss.com'" <Dbuchanan@seegerweiss.com>,
"Specter, Shanin" <Shanin.Specter@KlineSpecter.com>,
"'Cvtisi@aol.com'" <Cvtisi@aol.com>,        "'trafferty@levinlaw.com'"
<trafferty@levinlaw.com>,        "'RHerman@hhkc.com'" <RHerman@hhkc.com>,
"'LDavis@hhkc.com'" <LDavis@hhkc.com>,        "Balefsky, Lee"
<Lee.Balefsky@KlineSpecter.com>
Subject: Re: sent on behalf of Philip Yannella

Hey, Chris, on another matter--I heard on the conf call reference to
proposed Cleveland Clinic discovery re:Topol's  dismissal. In my view that's
a mistake. We are going to create testimony that Merck can play afterTopol
at all our trials, when they trash him in testimony. We are well served to
be satisfied with the depo we have at a point in time when Topol was  the
Provost and resist any discovery about it ever.my view: The Cleveland Clinic
is misguided.

--------------------------

**KS-000579**

Exhibit "52"

**From:** Specter, Shanin
**Sent:** Friday, December 17, 2004 8:34 AM
**To:** 'jronca@srklaw.com'
**Cc:** Kline, Thomas R.; Balefsky, Lee; Tiger, Michelle; Hoffman, Mark A.; Dagostino, Lisa S.
**Subject:** Status report

**Follow Up Flag:** Follow up
**Flag Status:** Flagged

We've been asked by Seeger Weiss and Beasley Allen to take on what I think is the most important assignment: to put together the causation case.

Mark Hoffman in our firm is in charge, seconded by Lisa Dagostino. Mark in an Ivy League trained pediatric transplant surgeon turned trial lawyer. Lisa is a similarly educated ob/gyn.

Mark has developed the outline of a theory that I am forwarding to you in a separate e-mail. It has been accepted by the group as the working theory. He is now getting about the task of developing the medical literature support for same.

I would be grateful if you would give consideration to helping to recruit experts. We need cardiologists, neurologists and epidemiologists/biostatisticians. My preference would be for experts on the East Coast.

By the way, Perelman ends up being right (at least for now), but for the wrong reasons.
--------------------------
Sent from my BlackBerry Wireless Handheld

**KS-000580**

Exhibit "53"

Joyce Romano

| | |
|---|---|
| **From:** | Kline, Thomas R. [Tom.Kline@KlineSpecter.com] |
| **Sent:** | Wednesday, April 20, 2005 9:27 PM |
| **To:** | Christopher Seeger; 'andy.birchfield@beasleyallen.com'; Russ Herman |
| **Subject:** | Discovery committee |

I recommend Lisa Dagostino, JD,MD of our firm to the Discovery Committee
and, in particular, to any subcommittee which deals with science issues and
FDA discovery.
This is in lieu of the request for Shanin Specter to serve on the Discovery
Committee.

Also, I recommend that Mark Hoffman, JD, MD of our firm be on the
subcommittee of the Science Committee which deals with experts.

Thanks.

---------------------------
Sent from my BlackBerry Wireless Handheld

*Chris this looks like inept addition to Science committee & Discovery to me!*

cc Tom
Andy
Restate
Carlene

**KS-000581**

1

Exhibit "54"

**Dagostino, Lisa S.**

| | |
|---|---|
| **From:** | Troy Rafferty [TRafferty@levinlaw.com] |
| **Sent:** | Monday, June 06, 2005 12:54 PM |
| **To:** | Kline, Thomas R.; Dbuchanan@seegerweiss.com |
| **Cc:** | cseeger@seegerweiss.com; K&S Vioxx Attorneys; andy.birchfield@beasleyallen.com; RHerman@hhkc.com |
| **Subject:** | RE: memo |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

That is authorized work.

-----Original Message-----
From: Kline, Thomas R. [mailto:Tom.Kline@KlineSpecter.com]
Sent: Monday, June 06, 2005 10:20 AM
To: 'Dbuchanan@seegerweiss.com'; Troy Rafferty
Cc: 'cseeger@seegerweiss.com'; K&S Vioxx Attorneys; 'andy.birchfield@beasleyallen.com';
'RHerman@hhkc.com'
Subject: Fw: memo


Dave/Troy.

Unless I hear to the contrary, I assume that the scientific and discovery development work
being done by our firm, including  Lisa DagostinoMD, JD and Mark Hoffman, MD, JD , is
considered authorized. As Chris and Dave especially know,  we  at K and S are on a daily
basis working the scientific and discovery issues and preparing extensively for depos such as
Kim, Gillmartin, Reicin, Scolnick etc, much of which has and will be common development work.
I trust I am correct that our work  is  fully authorized.


Tom

--------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Dagostino, Lisa S. <Lisa.Dagostino@KlineSpecter.com>
To: Kline, Thomas R. <Tom.Kline@KlineSpecter.com>
CC: Specter, Shanin <Shanin.Specter@KlineSpecter.com>
Sent: Mon Jun 06 11:07:43 2005
Subject: FW: memo


FYI


  _____


From: Taxie Sierra [mailto:TSierra@levinlaw.com]
Sent: Monday, June 06, 2005 10:32 AM
To: Alexander, Brian; Alvarez, Alex; Andrus, Vance; Andry, John; Andry, John Assistant;
Arsenault, Richard; Bailey, Jack; Bailey, Jack Assistant; Balefsky, Lee; Balser, Brian;

**KS-000582**

242

Barnow, Ben??; Barrett, Don; Barrios, Dawn; Becnel, Daniel; Bencomo, Raul; Berger, Allan??;
Binstock, Bob; Birchfield, Andy ??; Blisard, Brandy; Blizzard, Ed??; Boomhauer, Amy; Bossier,
Shiela; Branch, Margaret ; Branch, Turner; Brandi, Tom; Brantley, Rick; Brantley, Ricky;
Breit, Jeffery; Breit, Jeffery Assistant; Broussard Baloney, Geri; Bruno, Joe; Bruno, Joe;
Bryan, Leslie; Bubalo, Greg; Buchanan, David; Buck, Robert; Burg, Mike; Chalos, Mark;
Chesley, Stanley??; Childers, Andy; Climaco, John; Cory, Ernie; Cunard, Rebecca; Cunningham,
William; Dagostino, Lisa; Davis, Lenny; DeSue, Christine; do Amaral, Paulina; Dumas, Walter;
Egdorf, Eugene??; Escobedo, Jose; Etheridge, Scott Assistant; Exnicios, Val Patrick; Fibich,
Tommy; Fields, Cleo; Fleishman, Wendy; Fodera, Lenonard; Garrison, E. Lewis; Garrison, E.
Lewis Assistant; Gertler, Louis; Gisleson, Soren??; Grand, Jeffery??; Green, Jim; Gulas, Ike;
Hahn, Blair??; Haklar, Tom; Haklar, Tom Assistant; Hall, Jim??; Hatch, Patti; Heaviside,
Mike; Herman, Russ; Herman, Steve; Hildre, Donald; Hildre, Donald; Honnold, Bradley??;
Houssiere, Charles??; Hugo, Mike; Irpino, Anthony; Irpiro, Anthony; Jacobs, Julie; Janecek,
Frank??; Kanner, Alan; Kaufman, Pete; Kebodeaux, Keith??; Kristal, Jerry; Kuhune, McCall;
Leger, Walter; Levin, Daniel??; Lewis, Carlene; Lodon, Mike; Lopez, Ramon??; Lukei, Shannon;
Lundy, Matt; Lynch, Mike; Matthews, David??; McHugh, Jim; Meunier, Jerry; Millrod, Tobia;
Moreland, Matthew; Murray, Jr., Steve; Myer, Lexi; Nast, Diane; Nieves, Tina; O'Callahan,
Jim; O'Connor, Kathlen; Parfitt, Michelle; Parfitt, Michelle Assistant (Nan); Parker, Jerry;
Parr, Ted; Pennock, Paul; Penton, Ronnie; Piper, Robert; Placitella, Chris; Prietto, Chris;
Quetglas Joran, Eric; Rafferty, Troy; Raymon, Rachael; Rice, Joe; Ritter, Ann; Ritter, Ann
assistant; Robinson, Mark; Robinson, Mark; Rogers, Tom; Roy, Jim; Ryan, Mike; Sandoval,
Richard; Sanford, Shelly; Seeger, Chris; Sierra, Taxie; Skikos, Steve; Snapka, Kathryn;
Stratton, Michael ; Sulzer, Deborah; Swanson, Lynn; Sweezer, Diane; Thomas, Vernon; Thompson,
Fred; Tisi, Chris; Wacker, Ted; Wilson, Gary; Wilson, Kimberly; Witkin, Justin; Woodson,
Frank; Zimmerman, Bucky; Zink, Diane; Zoll, David assistant; Zoll, Dvid
Subject: memo


TO:          Discovery Committee Members

FROM:    Troy Rafferty and Dave Buchanan, Committee Chairs

SUBJECT:  Memo from PEC regarding authorized/unauthorized work from
committee members

DATE:       June 6, 2005




Please review the memo below from the PEC (Chris Seeger, Andy Birchfield and Russ Herman):


"The PEC has noticed lately that people on committees have taken it upon themselves to
involve themselves in work assignments where they have not received authority to do so.
While we understand that many of you are anxious to be involved and help out, we cannot have
people just assigning
themselves to work on briefs or show up at meetings.   If anyone takes on or
performs any work that is not expressly authorized by the PEC or their Comm Chair(s), they
will NOT be compensated for their time and expenses in doing such unauthorized work.  It is
critical in a litigation like this that we have order and organization.  Additionally, if
anyone performs unauthorized work that in any way hurts this case or positions that have been

KS-000583

taken with the defendant, that person may be discharged from their committee.  This rule will
be strictly enforced.  If there's any confusion on this rule or the points I've made here,
I'd like to know about it asap.  I hope you all
appreciate the need for us to be unified and organized.  Thank you."

**KS-000584**

Exhibit "55"

**Subject:** RE: [44SW88] - Fw: Genes explain some heart risk from COX drugs: study - Found word(s) drugs in the subject

**Date:** Sunday, January 8, 2006 9:43:12 AM ET

**From:** Buchanan, David

**To:** Kline, Thomas R.

Got it and read it.  I agree that Lisa does a great job on it.  One of the things that I'd like to do in Miami is make sure that Lisa gets together with Jeff and Pete Kaufman to sync up on all the hot docs.  We have a very good trial doc database project that she should be involved in directly.

-----Original Message-----
From: Kline, Thomas R. [mailto:Tom.Kline@KlineSpecter.com]
Sent: Sunday, January 08, 2006 8:56 AM
To: Buchanan, David
Subject: [44SW88] - Fw: Genes explain some heart risk from COX drugs: study - Found word(s) drugs in the subject

Just wanted to make sure you got this and read it. I think LSD does a good
job analyzing Fitzgerald's upcoming article and how we should use it.

-------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Kline, Thomas R. <Tom.Kline@KlineSpecter.com>
To: 'cseeger@seegerweiss.com' <cseeger@seegerweiss.com>;
'Dbuchanan@seegerweiss.com' <Dbuchanan@seegerweiss.com>
CC: Vioxx Small Group <VioxxSmallGroup@KlineSpecter.com>
Sent: Sat Jan 07 22:14:58 2006
Subject: Fw: Genes explain some heart risk from COX drugs: study

See Lisa's analysis below. You may want to consider some form of presentation of this in Miami.

-------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Dagostino, Lisa S. <Lisa.Dagostino@KlineSpecter.com>
To: Fortucci, Lisa <Lisa.Fortucci@KlineSpecter.com>; Vioxx Small Group <VioxxSmallGroup@KlineSpecter.com>
Sent: Fri Jan 06 11:22:10 2006
Subject: RE: Genes explain some heart risk from COX drugs: study

<<Gastro Fitzgerald Pharmacogenomics.pdf>> Attached is the article referenced below.  Note that it has not yet been published--it is a pre-publication copy of a "forthcoming" article in Gastroenterology by

**KS-000585**

Fitzgerald etc.

As usual, the media reports distort what the article actually says. Should
the defense try to use this, we actually have some good rebuttal points.


First off, the intro to the article has some good language for us with
respect to HIGH-RISK individuals (eggshell plaintiffs)--"Three
structurally
different coxibs, rofecoxib, valdecoxib and celecoxib increased the
incidence of myocardial infarction and stroke in randomized trials,
suggesting that selectivity for inhibition of cox-2 may confer a
cardiovascular hazard....PGI2 acts as a constraint on all agonists which
elevate blood pressure, activate platelets and stimulate atherogenesis.
Thus drug selectivity for inhibition of cox-2 is through to contribute
to
the likelihood of hypertension, myocardial infarction and stroke
resulting
from treatment with coxibs. The detection of cardiovascular
complications
attributable to coxibs RELATES IN PATIENTS TO THEIR UNDERLYING RISK OF
CARDIOVASCULAR DISEASE.  Thus, it seems rational that patients with
identifiable cardiovascular risk factors will be excluded from
treatemetn
with selective cox-2 inhibitors." (emphasis mine).

This paragraph is great for the following reasons:
1.   One of the randomized trials that Fitzgerald references that
"suggest[ed] selectivity for cox-2" INCREASED the risk of MIs was VIGOR.
Not staying on Merck message.  They'll revoke his advisor payment for
that.

2.   Acknowledges that inhibition of cox-2 is througt to contribute
to
HTN, MI and CVA.   Merck still won't acknowledge this.

3.   Puts out again the trio that Fitzgerald thinks is
responsible--the
imbalance (the fact that PGI serves as a constraint on an agonist
[thromboxane] that activates platelets), the separate increase in HTN
and
stimulation of atherogenesis.   We really need to emphasize these other
aspects.  This is what he said at the FDA hearings, and really is the
state
of the art--emphasizing the imbalance alone is not enough to get us
through
most of these cases.

4.   States the eggshell plaintiff theory perfectly.

The remainder of the article that focuses on genes playing a factor is
focused on LOW-RISK or HEALTHY patients--the question is how to identify
to

**KS-000586**

low risk patients who should take the drugs.  They assume that high risk
patients won't be taking it all.

What the substance of the article suggests is that even though in the
lab,
there Vioxx has more selectivity than Celebrex for cox-2, that may not
be
true in certain individuals with certain gene patterns.  It also suggest
that some individuals with particular genetic variants may be more
susceptible to the CV effect of cox-2s.

Should Merck try to use this paper as a defense--"this individual didn't
have the genetic variant identified by Dr. Fitzgerald so it must have
been
something other than Vioxx"--that would be an overstatement of the
results.

-----Original Message-----
From: Fortucci, Lisa
Sent: Wednesday, January 04, 2006 8:47 PM
To: Vioxx Small Group
Subject: Fw: Genes explain some heart risk from COX drugs: study

--------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: April Thomson <athomson@scientific-evidence.com>
To: April Thomson <athomson@scientific-evidence.com>
Sent: Wed Jan 04 20:38:06 2006
Subject: Genes explain some heart risk from COX drugs: study

Genes explain some heart risk from COX drugs: study
Wed Jan 4, 2006 11:36 PM GMT

By Maggie Fox, Health and Science Correspondent

WASHINGTON (Reuters) - Genetics may explain as much as 30 percent of the
differences in how people respond to painkillers like COX-2 inhibitors,
but
they paint only part of the picture, researchers said on Wednesday.

A study of 50 people given the drugs showed a surprising number of
differences in how their bodies reacted to them, the researchers
reported in
the journal Gastroenterology.

The findings could eventually help scientists predict who should not
take

**KS-000587**

**Page 3 of 6**

the COX-2 inhibitors, some of which have been shown to greatly raise the
risk of heart attacks, said University of Pennsylvania School of
Medicine
researcher Dr. Garret FitzGerald, who led the study.

"Up until now we have chronically underestimated the very substantial
differences in the way individuals respond to the same dose of the same
drug," FitzGerald said in a telephone interview.

The COX-2 inhibitors were originally designed to be a safer long-term
treatment for arthritis and similar pain than aspirin and other
analgesics.
But they fell under a cloud when it was found they could raise the risk
of
heart problems.

Merck and Co. pulled its drug Vioxx from the market in September 2004
after
a study showed it doubled the risk of heart attack and stroke in people
who
took Vioxx for at least 18 months.

The New Jersey-based drug maker has since been sued by more than 7,000
people who claim to have been harmed by Vioxx. The first trial ended in
a
hung jury last year.

In April, Pfizer Inc. suspended sales of its COX-2 inhibitor Bextra and
now
includes a strong "black box" warning for its COX-2 Celebrex.

FitzGerald has been studying the effects of the drugs and has found in
the
past they can cause long-term changes in the blood vessels, which may
explain their heart disease risk. But he noted that only 1 percent to 2
percent of people who took the drugs were adversely affected.

INDIVIDUAL DIFFERENCES

He figured there must be individual differences that make some people
more
susceptible than others.

He and colleagues tested 50 healthy adult volunteers, giving them either
a
placebo, Celebrex or Vioxx and then testing their blood, blood pressure
and
other reactions.

"One of the surprises in this study, where we put some of the people
through
the same protocol five times, is that there is substantial variation
with a
person on how they respond day to day. That can be due to a lot of

**KS-000588**

potential
sources, including environmental factors, that we don't understand,"
FitzGerald said.

He estimated 30 percent of the effects were due to genetic differences.

"Lots of genes could be important -- genes that determine how you absorb a
drug, variations in one gene involved in breaking down the drugs, variations
in the way that you excrete a drug," FitzGerald said.

"It would be foolish to think we could, for example, just have a test for
one gene change and that would be enough to say 'this drug's for you' or
'you should avoid it.'"

It is more likely that scientists will devise a series of genetic and
biochemical tests to see which drug a patient should take and which drug
patients should avoid.

The crisis caused by the COX-2 inhibitors could finally spark the revolution
in pharmacogenomics -- the development of tailored drug treatments -- that
has been promised for years, he said.

"We are talking about selling a cheaper drug with the diagnostic tests that
will say 'This drug is for you.'"

_____

(c) Reuters 2006. All rights reserved. Republication or redistribution of
Reuters content, including by caching, framing or similar means, is
expressly prohibited without the prior written consent of Reuters. Reuters
and the Reuters sphere logo are registered trademarks and trademarks of the
Reuters group of companies around the world.

Don't forget: Add us to your address book or "approved senders list" to
ensure our messages are not blocked and you receive future issues or notices
in a timely and consistent manner.

April K. Thomson
Vice President
Scientific Evidence, Inc.
2476 Bolsover # 554
Houston, TX 77005
www.scientific-evidence.com < http://www.scientific-evidence.com/>
713-935-0744

**KS-000589**

FAX  281-489-6065

_____CONFIDENTIALITY NOTICE_____
This e-mail and any files transmitted with it is confidential and is
intended solely for the use of the individual or entity to whom they are
addressed. If you are not the intended recipient or the person
responsible
for delivering the e-mail to the intended recipient, be advised that you
have received this e-mail in error and that any use, dissemination,
forwarding, printing, or copying of this e-mail is strictly prohibited.
If
you have received this e-mail in error, please immediately return this
e-mail to the sender or info@scientific-evidence.com.  Thank you.


_____

KS-000590