In re: Vioxx Litigation

Cast of Characters

Red = Key individuals

| Name | Category | Title(s) | Role in Vioxx case | Custodial file produced? | Interviewed For Martin Report? | Deposition testimony? | Trial testimony? |
|---|---|---|---|---|---|---|---|
| Sharpe, Eileen | Plaintiff | — | Plaintiff in a NJ action. | N/A | N/A | 12/16/05 | N/A |
| Sharpe, Eric | Merck employee | ? Professional rep | ? Professional rep | Yes | No | N/A | N/A |
| Sharpe, Grady | Plaintiff | — | Plaintiff in a NJ action | N/A | N/A | 12/016/05 | N/A |
| Seavelinse, MD. Ronald | Fact witness (case specific) | — | Treater in the Forland case (NJ) | N/A | N/A | 4/5/06 | N/A |
| Shaw, MD, Richard | Fact witness (case specific) | — | Treater in the Greasberg (CA) case | N/A | N/A | 5/18/06 | N/A |
| Shay t, PhD, MPH, India | Third party | Assistant Professor, Department of Pharmaceutical Health Research, Associate Director, Center of Drugs and Public Policy, University of Maryland School of Pharmacy and School of Medicine | Pharmacoepidemiologist who performed an epi study (published 2003) that did not show an increased CV risk with Coxibs compared to non-selective NSAIDs. Co-author on the study was Matthew Weir, MD, one of Merck's advocates and preferred Speaker | No | No | N/A | N/A |
| Simon, Bradley | Merck executive | President: US Human Health (Jan 1, 2003 - present) | Along with Margie McGlynn, took over from Austin as co-President of the US Human Health in 2003; according to RGG answers Sheara and McGlynn had ultimate responsibility for the sale of Vioxx in the United States from January 1, 2003 until withdrawal. [...] | Yes | Yes | N/A | N/A |
| Sherwood, MD, Louis (deceased) | Merck employee | Senior VP, Medical Affairs | Sherwood headed the division that handled scientific communications with doctors and dispatched "dear doctor" letters, but his most notable role (infamous) involvement in this case was his part in intimidation of researchers who sounded early warnings about Vioxx   His actions caused James Fries, a noted Stanford rheumatologist, to write a pointed letter to Gilmartin, Merck's CEO, regarding Sherwood's actions, including his own personal experiences [see Fries].   Apparently took Vioxx himself.   Died from an MI in early 2005 | Yes | Yes | 9/30/04 12/14/04 | N/A |

Kline and Specter, PC
Attorney Work Product -- Privileged and Confidential—DO NOT PRODUCE

KS-001144

In re: Vioxx Litigation

Cast of Characters

Red = Key individuals

| Name | Category | Title(s) | Role in Vioxx case | Custodial file produced? | Interviewed for Martin Report? | Deposition testimony? | Trial testimony? |
|---|---|---|---|---|---|---|---|
| Shrosen, DO, Thomas | Fact witness (case specific) | -- | Treater in the Levinson (NJ) case | N/A | N/A | 10/14/05 | N/A |
| Sigmon, Nicole | Merck employee | Promotion manager ("Vioxx Official") | Mid-level marketing manager. Worked under Rick Roberts and Charlotte McKines. | No | No | N/A | N/A |
| Silman, MD Alan | Merck consultant | Department of Epidemiology, University of Manchester | Epidemiologist. Merck consultant and member of the VIGOR DSMB | No | No | N/A | N/A |
| Silver, MD, David | Defense expert witness | Assistant Clinical Professor of Medicine, UCLA | Rheumatologist and defense expert witness who testified that Vioxx was a useful drug for the treatment of pain in rheumatology patients without the GI risk. Report has been produced in NJ and the MDL. | N/A | N/A | 8/3/05 10/10/05 2/21/06 | Irvin ? |

KS-001145

In re: Vioxx Litigation

Cast of Characters

Red = Key individuals

| Name | Category | Title(s) | Role in Vioxx case | Custodial file produced? | Interviewed For Martin Report? | Deposition testimony? | Trial testimony? |
|---|---|---|---|---|---|---|---|
| Silverman, MD, Robert | Merck employee | Senior Director, Regulatory Affairs—domestic | Hands on manager of the FDA approval process for Vioxx and one of the key figures in the label negotiation process of 2002. Had primary responsibility for interacting with FDA on Merck's behalf (re: Vioxx) from December 1994 (filing of IND) – July 1999, and then from August 2000 – April 2002 (during the eleven month interval between these periods, communications with FDA re: Vioxx were handled by Eric Playit.) Dr. Silverman was no medical leave during the critical period involving the VIOOR findings and label negotiation. Thus, any affidavit he writes for Merck for this time period lacks any personal knowledge. | Yes | Yes | 11/19/04 | N/A |
| Silverstein, Leonard | Merck employee | Senior Director, Medical Services, US Medical and Scientific Affairs | Authored or is the named author on various Vioxx PIRs. | Yes | No | 6/10/04 | N/A |
| Sim, MD, David | Fact witness (case specific) | — | Trustee in the Humeston case. | N/A | N/A | 8/5/05 | N/A |
| Simms, MD, Lee | Third party/Plaintiff consultant | Associate Clinical Professor of Medicine, Harvard Medical School, Beth Israel Deaconess Medical Center | Another one of Silverwood's "victims." Consultant for Pfizer who lectured on the risks of Vioxx. Sherwood allegedly called him and told him that if he continued to lecture on the risks of Vioxx, his career would be ruined | No | No | N/A | N/A |

Kline and Specter, PC
Attorney Work Product — Privileged and Confidential—DO NOT PRODUCE

**KS-001146**

In re: Vioxx Litigation

Cast of Characters

Red – Key individuals

| Name | Category | Title(s) | Role in Vioxx case | Custodial file produced? | Interviewed for Mintz Report? | Deposition testimony? | Trial testimony? |
|---|---|---|---|---|---|---|---|
| Simon, M.D., Thomas | Merck employee | Senior Director, Clinical Research | Gastroenterologist whose knowledge, urge to facilitate matters, and action appears to give him a large role in pushing Vioxx abroad / Named author on publication of protocols 009, 841, 044/045, 052, 059, 083/053, and 136 | Yes | Yes | 1/9/05; 1/19/05 | N/A |
| Simpson, Sandra | Merck employee | Senior Director, Regulatory Affairs, International | Worked on international regulatory issues. | Yes | No | N/A | N/A |
| Singer, Irwin | Merck employee | Senior Research Director, Immuno-Labeling Studies, MRL | Possible role unclear.  Custodial file has not been produced. | No | Yes | N/A | N/A |
| Singh, M.D. Amar J. | Fact witness (case specific) | -- | Treater in the Plunkett case (NJ) | N/A | N/A | 5/23/06 | N/A |

Kline and Specter, PC
Attorney Work Product -- Privileged and Confidential—DO NOT PRODUCE

**KS-001147**

Cast of Characters

Red = Key individuals

In re: Vioxx Litigation

| Name | Category | Title(s) | Role in Vioxx case | Custodial File produced? | Interviewed for Martin Report? | Deposition testimony? | Trial testimony? |
|---|---|---|---|---|---|---|---|
| Singh, MD Gurkirpal  | Fact witness (plaintiffs)/Merck consultant/Pfizer consultant | Department of Rheumatology, Stanford University | Dr. Singh is also the main subject of the infamous "Fries letter." He had been recruited by Merck to be a consultant, but following the press release announcing the VIGOR results, began to publicly question the potential CV risk of the drug. He tried, but was unable to get the data from Merck, and inserted slides into his speeches that implied Merck was attempting to hide the data. Singh also began speaking on behalf of Pfizer's Celebrex.<br><br>Baumgartner and his team watched him carefully and recorded that his talks were becoming "inflammatory." Lou Sherwood was brought in to deal with Singh and called James Fries, Singh's superior at Stanford, to complain about his behavior. That conversation led to the infamous Fries Letter. (see Fries, Sherwood).<br><br>Merck eventually associated things over with Singh, dispatching more conciliatory doctors to give him the data he wanted. He eventually testified before Congress about his experiences with Merck and Vioxx (Senate Finance Committee, November 2004).<br><br>Dr. Singh is the author of the NEJM article in 1999 that set forth the 16,500 number as the number of deaths from all NSAIDs. | No | No | N/A | N/A |

Kline and Specter, PC
Attorney Work Product — Privileged and Confidential—DO NOT PRODUCE

KS-001148

In re: Vioxx Litigation

Cast of Characters

Red = Key individuals

| Name | Category | Title(s) | Role in Vioxx case | Custodial File produced? | Interviewed For Martin Report? | Deposition testimony? | Trial testimony? |
|---|---|---|---|---|---|---|---|
| Slezer, M.D. Eve | Merck employee | Senior VP, Regulatory Affairs—Domestic | Left Merck in 2001 to become assistant secretary of Health under Tommy Thompson. Lasted only a year, and is now on faculty at Columbia University.  Has been quoted in the lay press making a few less than flattering comments about Merck—"All of us who truly had faith in the company are very sad at we what's become of it," says Eve Slezer, a senior researcher in research and then public affairs at Merck from 1983 to 2001, and now an associate professor at Columbia University. "It's damaged itself, and it's damaged the industry"...  (see "Merck's Fall from Grace," The Scientist, Vol. 25, Issue 5, page 20).  Declined to be interviewed for the Martin report. | Yes | No | N/A | N/A |
| Slaughter, PhD, Donald | Merck employee | MRL | Biochemist deposed in the patent litigation. | No | N/A | N/A [2] | N/A |
| Siebodnik, Michael | Merck employee | Unclear at this time | Unclear at this time. Appears to have had some involvement with the communication/MVX system. | Yes | No | N/A | N/A |
| Smith, M.D., Arthur Neil | Fact witness (case specific) | --- | Testifier to the Persona (LA) case | N/A | N/A | 9/11/06 | N/A |
| Smith, M.D., James O. | Fact witness (case specific) | --- | Treats in the Kozic (FL) case | N/A | N/A | 1/12/06 | N/A |
| Smith, Robert | Plaintiff | --- | Plaintiff in the Smith case (MDL) | N/A | N/A | 6/15/06, 9/13/06, 9/14/06 | Smith |
| Smith, Stacey | Merck employee | USHH Integrated Marketing and Communications, Promotion Manager, Managed Care | Worked with Integrated Marketing and Communications to help get Vioxx on formularies in hospitals. | Yes | No | N/A | N/A |

Kline and Specter, PC
Attorney Work Product -- Privileged and Confidential—DO NOT PRODUCE

Last modified on 8/3/2007 at 8:29:43 AM

KS-001149

In re: Vioxx Litigation                                    Cast of Characters                                    Red = Key individuals

| Name | Category | Title(s) | Role in Vioxx case | Custodial File produced? | Interview Month Report? | Deposition Testimony? | Trial Testimony? |
|---|---|---|---|---|---|---|---|
| Sragnm, Steven | Merck employee | Senior Director, Cardiovascular Group, Biostatistics and Research Division Sciences, MRL | Precise role unclear. – Custodial file has not been produced. | No | Yes | N/A | N/A |
| Scratch, Judy | Fact witness (case specific) | --- | Fact witness in the Schwartz case (NJ) | N/A | N/A | 10/13/05 | N/A |
| Sofinolewski, MD, Edward | Fact witness (case specific) | --- | Treater in the Williams-McCfee case (NJ) | N/A | N/A | 2/7/06 | N/A |
| Soldinger, MD, Steven | Fact witness (case specific) | --- | Treater in the Grossberg case (CA) | N/A | N/A | 5/19/06 | N/A |
| Solomon, MD, MPH, Daniel | Merck consultant | Associate Professor of Medicine at Harvard Medical School, Division of Pharmacoepidemiology and Pharmacoeconomics, Brigham and Women's. | With Jerry Avorn (his boss), performed and published two important epidemiologic studies on CV risks of nonselective NSAIDs and Cox-2 inhibitors.  The first paper is frequently misrepresented by Merck to support their contention that cardioprotective qualities of naproxen accounted for the VIGOR results (See Avorn Inc. dkd 2002 16.1 1999).  The second paper was done in conjunction with Merck (and supported by a grant from Merck). (See Circulation 2004; 109: 2068-2073).  After the results became available, and Drs. Avorn/Solomon refused to soften their conclusions in the paper submitted for publication, Merck withdrew the name of their employee/co-scientist (one Carolyn Cannuscio—who worked on the project) with Drs. Avorn and Solomon) from publication in the journal Circulation, and then proceeded to mount a campaign to make it clear that the company "disagreed" with the paper's conclusion that Vioxx carried a CV risk. (See also, Avorn Comment.) | No | No | N/A | N/A |
| Sopinka, Viktor | Merck employee | Sales rep | Sales rep | N/A | N/A | 3/24/06 | N/A |
| Sorici, Mary | Plaintiff | --- | Plaintiff in a NJ action | N/A | N/A | 9/10/05 | N/A |

Kline and Specter, PC
Attorney Work Product — Privileged and Confidential—DO NOT PRODUCE

KS-001150

In re: Vioxx Litigation

Cast of Characters

Red = Key individuals

| Name | Category | Title(s) | Role in Vioxx case | Custodial file produced? | Interviewed For Martin Report? | Deposition testimony? | Trial testimony? |
|---|---|---|---|---|---|---|---|
| Spector, Reynolds | Merck employee | Executive Vice President, MRL | Precise role unclear.  Custodial file has not been produced. | No | Yes | N/A | N/A |
| Sperling, MD Renáte | Merck employee | Associate Director, Medical Communications-Immunology, MRL | Merck medical writer who actually did the heavy duty writing for many of the Merck Vioxx articles.  Was named author on the publications of the following protocols: 069, 126/122, and combination publication of 010, 029, 033, 034, 040, 044, 045, and 058.<br><br>Was also named author on a review article on Vioxx and CV data for the American Heart Journal.<br><br>Was also able to eek an entire article out of 090 CV data—causing Reicin to congratulate her with the inference line "amazing feat to develop an entire paper out of little data." (1.1225).  Has extensive custodial file.<br><br>Declined to be interviewed for the "Martin Report" | Yes | No | N/A | N/A |
| Sri Rose, Emil | Merck employee | Project Liaison, Clinical Research Operations | Worked on Vioxx for JRA.  Co-author on JRA abstracts. | Yes | No | N/A | N/A |
| Stamme, Michael | Merck employee | Marketing Manager, A&A Franchise | Worked under Bob McMahon | Yes | No | N/A | N/A |
| Staples, Della | Plaintiff | — | Plaintiff in a NJ action | N/A | N/A | 3/28/06 | N/A |
| Stark, Kevin | Merck employee | Senior Promotion Manager, Integrated Marketing Communications | Precise role unclear.  Appears to have worked on promotion of the franchise. | Yes | No | N/A | N/A |
| Steffen, Daniel | Merck employee | Specialty rep., A&A | Professional rep | Yes | No | N/A | N/A |
| Steinhagler, Kathryn | Merck employee | Assistant General Counsel | Precise role unclear.  Interviewed for Martin Report | No | Yes | N/A | N/A |

KS-001151

*In re: Vioxx Litigation*

*Cast of Characters*

*Red = Key Individuals*

| Name | Category | Title(s) | Role in Vioxx case | Custodial file produced? | Interviewed for Martin Report? | Deposition testimony? | Trial testimony? |
|---|---|---|---|---|---|---|---|
| Siejbala, Mark | Merck employee | Senior Director, A&A Franchise Business Group | Worked under Adam Schechter | Yes | No | N/A | N/A |
| Stambaugh, Deitti, Antonio | Third party/former Merck employee | Covance—VP, Strategic Development Services (1994-2005) | Non-voting member of the 2005 Advisory Committee who had worked for Merck as an epidemiologist in the early 90s (1991-1994). Although she was a non-voting member of the AC, she was in the middle of a stint as the "industry representative" to the FDA Drug Safety and Risk Management Committee when the 2005 AC was called. After leaving Merck, she had two stints with Covance, the CRO that Merck employed to run the VIGOR trial. Was employed by Covance in risk management at the time the VIGOR trial was being run (1999-2000) and at the time of the 2005 Advisory committee. | No | No | N/A | N/A |
| Stevens, MD, Laurie | Defense expert | --- | Defense expert deposed in the Alsidz-Midek case (NJ) | N/A | N/A | 9/28/05 | N/A |
| Stone, DO, Donald | Fact witness (case specific) | --- | Treater in the Barditzski case (NJ) | N/A | N/A | 11/17/05 | N/A |
| Stone, Sandra | Plaintiff | --- | Plaintiff in a TX action | N/A | N/A | 4/19/06 | N/A |
| Stoner, Elizabeth | Merck employee | VP, Clinical Research, Endo/Metabolism Group, MRL | Precise role unclear. Was interviewed for the Martin report, custodial file has not been produced | No | Yes | N/A | N/A |
| Stovey, Richard | Third party | Senior analyst, Arthold & Bleichroeder, Inc. | Market analyst for the investment community; Scolnick wanted to 'boil [him] in oil' for an unfavorable analyst report on the CV risks of Vioxx | No | No | N/A | N/A |
| Straus, MD, MPH, Walter | Merck employee | Director, Outcome Research and Management, US Medical and Scientific Affairs | Worked in publicity studies to support Vioxx marketing | Yes | No | N/A | N/A |

**KS-001152**

In re: Vioxx Litigation

Case of Characters

Red = Key individuals

| Name | Category | Title(s) | Role in Vioxx case | Custodial file produced? | Interview for Marsh Report? | Deposition testimony? | Trial testimony? |
|---|---|---|---|---|---|---|---|
| Serono, MD, MPH, Brian | Merck consultant | Professor of Public Health, Medicine and Pharmacology, University of Pennsylvania | Merck consultant and author of a well-known Pharmacoepidemiology textbook. Strom's writings are frequently used as cross examination material with plaintiff experts and Pharmacoepidemiologists such as Ray and Avorn. | Yes | No | N/A | N/A |
| Stuart, Andrea | Merck employee | Professional rep | Sales rep | Yes | No | N/A | N/A |
| Sturrock, MD Roger | Merck consultant | University of Medicine, Glasgow Royal | Rheumatologist, Merck consultant and member of the VIGOR DSMB | No | No | N/A | N/A |
| Styfner, Angela | Merck employee | Biologist, Dept of Biochemistry and Molecular Biology, Merck Frosst | Merck Frosst scientist who did Cox-2 assays on whole blood. Her custodial file consists completely of lab results (no emails (no) or other writings that can be found in other custodial files. | Yes | No | N/A | N/A |
| Summers, Scott | Merck employee | Associate Marketing Director, A&A Franchise Business Group; Associate Director, Vioxx Editorial, Integrated Marketing Communications | Worked on a variety of different marketing projects for the franchise under Charlotte McKines, then later Bob McMahan. | Yes | No | N/A | N/A |

**KS-001153**

In re: Vioxx Litigation

Case of Characters

Red = Key Individuals

| Name | Category | Title(s) | Role in Vioxx case | Custodial File Produced? | For Maria/Interviewed Report | Deposition testimony? | Trial testimony? |
|---|---|---|---|---|---|---|---|
| Sutherland, Laurie | Merck employee | Senior Manager, Business Analysis and Decision Support; Manager, Managed Care Marketing | Part of the managed care marketing team. | Yes | No | N/A | N/A |
| Suthwitz, Elizabeth | Merck employee | Regional Business Group VP—Central, USHH | Part of the senior level sales management team. | Yes | No | 12/1/06 | N/A |
| Symkowiak, MD, Gary | Fact witness (case specific) | — | Treater in the Mason case. | N/A | N/A | 7/10/06 | N/A |
| Tacconi, Leonard | Merck employee | Executive Director, Integrated Marketing Communications, US Human Health | Ran the DTC program with Janet Brooks. Authored a provocative document entitled "Pharmaceuticals—the new consumer marketing frontier" in which he writes that Merck essentially invented DTC advertising. Goal of DTC is to convince the consumer to ask for the drug by name. Doc comes in through Charlotte McKines dep. (4/20/2200d) | Yes | Yes | 04/28/04 | N/A |
| Tassett, Ph.D., Randall | Plaintiff expert [22] | Clinical and Administrative Pharmacy, University of Georgia | Plaintiff pharmacology/pharmacy expert. | N/A | N/A | 7/7/06 | N/A |
| Tifley, PhD, John | Merck employee | Unknown | Basic scientist deposed in the context of patent litigation. | No | No | N/A [23] | N/A |
| Tessito, PhD, Wesley | Merck employee | Clinical Development, Laboratory Head | Co-author on the "Van Hecken paper" (J. Clin Pharm 2000; 40: 1109-1120). Did lab work on prostacyclin, worked with Reicheln. | Yes | No | N/A | N/A |

Kline and Specter, PC
Attorney Work Product – Privileged and Confidential—DO NOT PRODUCE

Last modified on 8/3/2007 at 8:29:43 AM

**KS-001154**

In re: Vioxx Litigation

Cast of Characters

Red – Key individuals

| Name | Category | Title(s) | Role in Vioxx case | Custodial file produced? | Interviewed for Martha Report? | Deposition/Investigation? | Total testimony? |
|---|---|---|---|---|---|---|---|
| Targum, MD, Sean | FDA employee | Medical Officer, Division of Cardio-Renal Drug Products | Cardiologist/cardiovascular specialist who reviewed Vioxx after the VIGOR trial (the "Targum Report," dated Feb 1, 2001—see 1.0235). Recommended a CV warning be placed on the Vioxx label | FDA products etc | No | N/A | N/A |
| Tancer, Carolyn | Plaintiff | — | Plaintiff in a NJ case | N/A | No | 6/20/06 | N/A |
| Taylor, Mary | Merck employee | ? Sales rep | ? Sales rep. From notes in file, appears to have been hospital based | Yes | No | N/A | N/A |
| Taylor, MD, George | Defense expert | — | Defense cardiology expert in the Doherty case | N/A | No | 5/19/06 | N/A |
| Teeple, Kathleen | Merck employee | ? Sales rep | ? Sales rep | Yes | No | N/A | N/A |
| Temple, MD, Robert | FDA employee | Associate Director for Medical Policy, CDER, FDA; Director of Drug Evaluation I, Centre for Disease Evaluation and Research (CDER), FDA | FDA official well known to Merck and Scolnick, who threatened to go upstairs to him at one point; After Topol's article was published in JAMA in 2001, Temple wrote a letter to the editor of JAMA that published, critiquing Topol's analysis on behalf of FDA. Topol responded to his letter proximity, and in response, Temple assured him that "it was not a devotion of the" approach is good, we're not bad" hypothesis" but told Topol that a portion of his analysis was "beyond inappropriate"; Presented at 2005 FDA Advisory Committee – "Clinical Trial Design and Patient Safety; Future Directions for cox-2 selective NSAIDs" | FDA products etc | No | N/A | N/A |
| Terrill, MD, Paul | Fact witness | — | Deposed in the personal injury class action case | N/A | No | 1/5/06 | N/A |
| Terry, Pharm D, PhD, Leon Cass | Fact witness | — | Trustee in the Younger case in Ala state court | N/A | No | 2/27/04 | N/A |
| Tredakovec, MD, Andrew | Merck employee | Medical Director, Clinical Development, USHH | Worked on a study looking at acute pain in post-op hysterectomy patients | Yes | No | N/A | N/A |

Kline and Specter, PC
Attorney Work Product – Privileged and Confidential—DO NOT PRODUCE

**KS-001155**

Cast of Characters

| Name | Category | Title(s) | Role in Vioxx case | Custodial file produced? | Interviewed/For Martin Report | Deposition testimony? | Trial testimony? |
|---|---|---|---|---|---|---|---|
| Teal, MD, Lemi J (deceased) | Merck consultant | Chair, Department of Neurosciences, USCD | Merck consultant, and lead author on the 078 paper, published in an obscure journal after the withdrawal of Vioxx from the market. Died in a plane crash, February 2005. | No | No | N/A | N/A |
| Therien, Michel | Merck employee | Merck France | Merck France scientist who performed some of the early work on Vioxx. Name is on some of the patents and early pharmacology papers. | Yes | No | N/A [?] | N/A |
| Thier, MD Samuel | Merck director | Member Board of Directors, Member, Special Committee of Merck and Co, Inc | Former Chairman of Internal Medicine at Yale, former President of Brandeis and Institute of Medicine, and former President/CEO of Partners Healthcare system (affiliated with Harvard/Mass General) | No | Yes | N/A | N/A |
| Thomas, Eddie | Plaintiff | — | Plaintiff in a NJ case | N/A | N/A | 11/14/05 11/15/05 | N/A |
| Thomas, Janet | Plaintiff | — | Plaintiff in a NJ case | N/A | N/A | 11/15/05 | N/A |
| Thompson, Andrea | Merck employee | ?Sales rep | ?Sales rep | Yes | No | N/A | N/A |
| Thompson, Kathleen | Merck employee | Unknown | Precise role unknown at this time. Only five documents produced. Incomplete production? | Yes [?] | No | N/A | N/A |
| Tigoc, MD, John | Fact witness (case specific) | — | Treater in Lemme case in NJ | N/A | N/A | 9/23/05 | N/A |

KS-001156

In re: Vioxx Litigation

Cast of Characters

Red = Key individuals

| Name | Category | Title(s) | Role in Vioxx case | Custodial File produced? | Interviewed for Martin Report? | Deposition Testimony? | Trial Testimony? |
|---|---|---|---|---|---|---|---|
| Tomico-Tryhon, Maria, Gina | Fact witness (case specific) | -- | Trustee in the Williams-McRae case in NJ | N/A | No | 11/14/05 | N/A |
| Tolleson, Dinesh | Merck employee | MBL Financial Services | Precise role unclear. Appears to have performed financial projections for the never-approved Rapid disc formation of Vioxx | Yes | No | N/A | N/A |
| Tomlin, April | Plaintiff | -- | Plaintiff in a FL state case | N/A | No | 8/12/05 | N/A |
| Tomlin, Mark | Plaintiff | -- | Plaintiff in a FL state case | N/A | No | 8/10/05 8/11/05 | N/A |

Kline and Specter, PC
Attorney Work Product -- Privileged and Confidential—DO NOT PRODUCE

KS-001157

In re: Vioxx Litigation

Cast of Characters

Red = Key Individuals

| Name | Category | Title(s) | Role in Vioxx case | Custodial file produced? | Interviewed For Marian Report? | Deposition testimony? | Trial testimony? |
|---|---|---|---|---|---|---|---|
| Topol, MD, Eric  | Third party/fact witness/non-retained expert | Chief Academic Officer and Chief of Genomic Medicine, Scripps Health, San Diego (2006–present) Chief Academic Officer, Cleveland Clinic Foundation, Provost and Founder, Case Western Reserve Medical School, Chairman of Cleveland Clinic Department of Cardiovascular Medicine (2003–2005) | World-renowned cardiologist and one of the most cited researchers in medical literature. Along with Steve Nissen, authored an analysis of the VIGOR and CLASS data and raised the question of whether there was a CV risk with Cox-2 inhibitors. Prior to publication of the article, Topol contacted Merck's Laura Demopoulos in an effort to obtain VIGOR data and to clarify why the published NEJM article said the subsequent FDA submission. He offered an early peek at the manuscript to Merck. Once Merck officials had a look at the manuscript, Reicin was sent out to Cleveland to see Topol. He has testified that she told him he would be "embarrassed" if the published his paper. Topol went ahead and published the paper anyway, and Merck staged a strong campaign to discredit the paper and its conclusions. Topol has published several opinion pieces in the medical literature about the CV risk of Cox-2s, the lack of FDA oversight, and the effect of OTC advertising. He became even more vocal following the withdrawal of Vioxx from the market, publishing strong opinion pieces in the NY Times and the NEJM. These actions prompted Gilmartin to call his old Harvard Business School buddy, Bill Mixon, the Chairman of the Board at the Cleveland Clinic, to complain about Topol. Topol was deposed by the MDL in November 2005. His testimony is extremely strong, and he accuses Merck of "scientific misconduct." This testimony was first played publicly during the Irvin I trial. On the next business day, he was removed from his post at the Cleveland Clinic. He has since moved on to head the Scripps Health Clinic in San Diego. | Yes | No | 11/22/05 | Via video/Deposition: —Irvin I (MDL) —Irvin II (MDL) —Cona/McGarrity (NJ) —Dedrick (MDL) —Grossberg (CA) — Hermans/Humeston II —Mason (MDL) —Smith (MDL) |
| Trimbel, PhD, Land | Merck employee | Merck Fmwit | Scientist who did early lab work on Vioxx. | Yes | No | N/A[23] | N/A |

KS-001158

In re: Vioxx Litigation

Cast of Characters

Red = Key individuals

| Name | Category | Title(s) | Role in Vioxx case | Custodial file produced? | Interviewed for report? | Deposition testimony? | Trial testimony? |
|---|---|---|---|---|---|---|---|
| Trussell MD, Anne | FDA employee | Deputy Director, Office of Drug Safety, Office of Pharmacoepidemiology and Statistical Science, Center for Drug Evaluation and Research, Food and Drug Evaluation | Hired by Peter Hoerig (who eventually left FDA to work for Merck—see attorney). Trussell was the primary FDA critic of David Graham's Kaiser study (see, generally, Graham deposition). Most of her comments were internal FDA documents, and were improperly used by Merck counsel during the Graham deposition (in direct violation of Judge Fallon's order) | FDA Production | No | N/A | N/A |
| Trout, PhD, Barry | Merck employee | Unknown | Unknown at this time. Was deposed in the context of patent litigation with Searle. | No | N/A | N/A** | N/A |
| Trussell, Bonnie | Plaintiff | -- | Plaintiff in a NJ case | N/A | No | 6/30/05 | N/A |
| Truitt, Kenneth | Merck employee | Director, Pulmonary-Immunology Group, Clinical Sciences, MRL | Author of memo outlining duration of use by patients who suffered MIs during protocol 090 (see 1.1.5991). Prepared a similar study for VIGOR (1.1630). Both indicate that patients in these trials were suffering events in the first 30 days of use.  Frequently copied on adjudication packets.  Created a +/- table (with pros and cons) for performing a CV outcomes study.  Named author on publications of protocols 058, 068, 097, and poster presentations of 096, 103, 1091102, 1341135. | Yes | Yes | N/A | N/A |
| Tuckiga, Bill Frank | Plaintiff | -- | Plaintiff in a NJ case | N/A | No | 5/23/06 | N/A |
| Tu, Michael | Merck employee | Business manager | Precise role unclear. Appears to have been involved in managed care. | Yes | No | N/A | N/A |
| Tucker, William | Merck employee | Unknown at this time | Precise role unclear at this time. Appears to have been involved in HEL programs. | Yes | No | N/A | N/A |

Kline and Specter, PC
Attorney Work Product -- Privileged and Confidential—DO NOT PRODUCE

**KS-001159**

*In re: Vioxx Litigation*

Cast of Characters

Rod – Key individuals

| Name | Category | Title(s) | Role in Vioxx case | Custodial file produced? | For Martin Interview Report? | Deposition testimony? | Trial testimony? |
|---|---|---|---|---|---|---|---|
| Taleza, Ewa | Merck consultant | Department of Medicine, Jagellonian University School of Medicine, Krakow, Poland | First author on the Merck-funded arm lacunidom study. See *Arteriosclerosis Thrombosis and Vascular Biology* 2004; 23:1111 | No | No | N/A | N/A |
| Turner, Mervyn | Merck employee | Senior VP, Basic Research, Merck Frosst Centre for Therapeutic Research, MRL | Involved in the basic science/protocyclin end of things, including efforts to combine Vioxx with another drug to reduce risk of MIs. Custodial file particularly thin and notably devoid of emails authored by him that can be found in other custodial files (7 incomplete production) | Yes | Yes | N/A | N/A |
| Tytberg, Theodore | Defense expert | Clinical Associate Professor of Medicine | Defense cardiology expert in the Humeston and Doherty cases. | N/A | No | 7/29/05, 3/10/06 | Humeston I |
| Ulkovern, Sheila Ann | Merck employee | Sales rep | Sales rep in the Anderson (Chockraw tribal court) case | No[14] | No | 5/10/06 | N/A |
| Umberger, Douglas | Plaintiff | --- | Plaintiff in a NJ case | N/A | No | 6/15/06 | N/A |
| Umberger, Patsy | Plaintiff | --- | Plaintiff in a NJ case | N/A | No | 6/14/06 | N/A |
| Ulstinann, Herman | Fact witness (case-specific) | --- | Trustee in the Anderson case (Choctaw Tribal Court) | No | No | 7/3/06 | N/A |
| Valdez, Lisa | Merck employee | Assistant to Alise Reicin | --- | No | No | N/A | N/A |
| Valunzuela, Colleen | Merck employee | Associate Medical Program Coordinator | Proction role unclear. Appears to have worked on some of the clinical development studies. | Yes | No | N/A | N/A |
| Van Arsdale, MD Jaime | Merck employee | Associate Director of Clinical Research | Was the clinical representative to the LEADS task force (charged with preparing Vioxx circulars for possible reintroduction to the market). Also clinical and medical liaison to Oxford for the VICTOR trial. Has extensive custodial file. Named author on publication of protocols 134, and the posters of 068, 090, 134 | Yes | No | N/A | N/A |

KS-001160

In re: Vioxx Litigation

Cast of Characters

Red = Key individuals

| Name | Category | Title(s) | Role in Vioxx case | Custodial file produced? | Interviewed For Martin Report? | Deposition testimony? | Trial testimony? |
|---|---|---|---|---|---|---|---|
| Van Hecken, PhD, Anne | Merck consultant | Department of Pharmacology, University of Leuven, School of Medicine, Leuven, Belgium | Pharmacologist who worked with Merck on early clinical pharmacology studies of Vioxx. Also lead author on the "Van Hecken" paper, a clin pharm paper frequently used by Merck to defend these cases (J Clin Pharm 2000; 40: 1109-1120). Is named author on publications of protocols 002/004/005/061 | No | No | N/A | N/A |
| Van Ireedal, Fred | Fact witness (case specific) | -- | Treater in the McFarland case | N/A | No | N/A | N/A |
| Vandesbloosne, Edward | Plaintiff | -- | Plaintiff in a NJ case | N/A | No | 2/24/06 | N/A |
| Vandesbloosne, Mary | Plaintiff | -- | Plaintiff in a NJ case | N/A | No | 10/7/05 | N/A |
| Vangerven, June | Merck employee | Unknown at this time | Unknown at this time | Yes | No | 10/7/05 | N/A |
| Vanjohn, Jill | Merck employee | ? sales rep | ? Sales rep | Yes | No | N/A | N/A |
| Venkataraman, Kalpana | Merck employee | Regulatory Writer, Worldwide Product Labeling | Involved in drafting label language | Yes | No | N/A | N/A |
| Verastegui, Juan | Merck employee | Associate Director, Regulatory Operations, Clinical Development | Precise role unclear at this time | Yes | No | N/A | N/A |
| Vetrovec, MD, George | Merck consultant | Chairman, Division of Cardiology, Medical College of Virginia | Merck consultant and member of the cardiology adjudication committee | No | No | N/A | N/A |
| Vilardo, Laura | Merck employee | RESS Associate Vioxx | Precise role unclear at this time | Yes | No | N/A | N/A |

Kline and Specter, PC
Attorney Work Product – Privileged and Confidential—DO NOT PRODUCE

Last modified on 8/3/2007 at 8:29:43 AM

**KS-001161**

In re: Vioxx Litigation

Cast of Characters

Red = Key individuals

| Name | Category | Title(s) | Role in Vioxx case | Custodial file produced? | Fort Martin Interview Report? | Deposition testimony? | Trial testimony? |
|---|---|---|---|---|---|---|---|
| Villalba, MD, Mara Lourdes | FDA employee | Medical Officer | Primary FDA medical officer who reviewed the Vioxx NDA and interpreted all the material from specialists. (see e.g. 1.0353) Continued to review incoming submissions from Merck after Vioxx was on the market and authored updates (of note are her reviews of the initial NDA, VIGOR, and ADVANTAGE). Presented at the 2001 and 2005 FDA Advisory Committee Conferences. Merck had little respect for her (see 1.0361) | FDA produced on | No | N/A | N/A |
| Vittitli, Kim | Merck employee | Assistant to Brett Seidenberg | --- | No | No | N/A | N/A |
| Vitek, Suzanne | Merck employee | Unknown | Precise role unclear. Was deposed in the context of TX marketing litigation. Transcript mostly redacted | No | No | 11/15/01 | N/A |
| Vorgia, MD, Douglas | Fact witness (case specific) | -- | Treater in the Mason case | No | No | 7/26/06, 8/30/06 | Mason |
| Vorderosten, Linda | Plaintiff | -- | Plaintiff in a NJ case | No | No | 8/12/06 | N/A |
| Vorchheimer, MD, David | Defense expert | Associate professor, Mt Sinai | Defense cardiology expert in the Abdel-Malla and Hermans cases in NJ | N/A | N/A | 10/24/05 | N/A |
| Vyas, PhD, Kartlaub | Merck employee | Unknown | Merck scientist who did early work on the development of Vioxx. Named author on the publication of protocols 012, 018, and 077 | No | No | N/A[?] | N/A |
| Wagner, Mark | Merck employee | Sales rep | Sales rep in the Kurtn case in FL state court | No | No | 4/24/06 | N/A |

Kline and Spector, PC
Attorney Work Product — Privileged and Confidential—DO NOT PRODUCE

Last modified on 8/1/2007 at 8:29:43 AM

KS-001162

In re: Vioxx Litigation

Cast of Characters

Red = Key individuals

| Name | Category | Title(s) | Role in Vioxx case | Custodial File produced? | Report for Merritt Interviewed? | Deposition testimony? | Trial testimony? |
|---|---|---|---|---|---|---|---|
| Wagner, MD, PhD, John | Merck employee | Executive Director, Clinical Pharmacology, MRL | Worked on Protocol 171 | Yes | No | N/A | N/A |
| Weitswright, Joan | Merck employee | Vice President, Public Affairs | Precise role not clear in this juncture; title places her under Ken Frazier in the corporate public affairs organizational scheme. Took over her position from Linda Distreseli in 2001. Was interviewed for the Martin report. | Yes | Yes | N/A | N/A |
| Wallace, MD, Brett | Fact witness (case specific) | -- | Treating physician in Ernst | No | No | 6/9/05 | N/A |
| Walters, Donna | Merck employee | Clinical Associate, Clinical Immunology & Analgesia | Precise role unclear. Worked under Alise Reicin. | Yes | No | N/A | N/A |
| Wambold, Deb | Merck employee | Senior Secretary, USHHI Public Affairs | Precise role unclear, but worked on Jan Weiner's team. | Yes | No | N/A | N/A |
| Wang, Hongwei | Merck employee | CBARDS | Statistician. Precise role unclear at present. Custodial file contains same analyses of BP and CV events. | Yes | No | N/A | N/A |
| Wang, Wenjie | Merck employee | CBARDS | Statistician. Precise role unclear at present. | Yes | No | N/A | N/A |
| Wang, Zhaoyin | Merck employee | Merck Frosst | Merck Frosst scientist; precise role unknown | Yes | No | N/A | N/A |
| Wasserman, MD, Alan Gary | Defense Expert witness | Professor of Medicine, Chairman, Department of Medicine, George Washington University | Cardiology defense expert in Cona/McCherby | N/A | No | 2/23/06 | Cona/McCherby |

KS-001163

*In re: Vioxx Litigation*

**Cast of Characters**

*Red = Key individuals*

| Name | Category | Title(s) | Role in Vioxx case | Custodial file produced? | Interviewed for Martin Report? | Deposition testimony? | Trial testimony? |
|---|---|---|---|---|---|---|---|
| Watson, PhD, MSPH, Douglas | Merck employee | Director, Epidemiology Group, Biostatistics and Research Decision Sciences, Merck Research Laboratories | Epidemiologist (and former student of Harry Guess's) at UNC) who was initially hired at Merck to work on epidemiology projects relating to cardiovascular disease. In 1998, after Oates, Fitzgerald and the Merck Board of Scientific Advisors advised that there was a theoretical possibility that Vioxx could cause CV events, Watson performed what has been colloquially referred to in this litigation as the "Watson analysis." The analysis is controversial—the methods have been the subject of much criticism. Merck claims that this analysis alleviated their fears regarding any CV risk for Vioxx prior to the drug's approval. Helped to develop the CV SOP. Performed the analysis for protocol 069 for the NDA and was a named author on the 069 paper. Published an analysis of CV disease rates in patients with RA on naproxen that concluded that these patients are at lower risk; to develop a CV event study funded by Merck, used to bolster naproxen hypothesis; see Jack Jamar Abd 2002; 163: 1105). Co-author on the naprox study. Also co-author on some unknown research/utilization studies re: Vioxx. | Yes | Yes | 2/9/05; 8/4/05 | N/A |
| Waymack, MD, ScD, Paul | Defense expert | Independent Drug Development Consultant | Trained as a surgeon, former medical reviewer for the FDA, now provides consulting services to pharmaceutical companies. Identified as an expert in regulation in Humeston I. | N/A | No | 7/21/05 | N/A |
| Weaver, Shari | Merck employee | Unknown | Custodial file relates to the MVX system. | Yes | No | N/A | N/A |
| Webb, James | Merck employee | Unknown | ? Sales rep | Yes | No | N/A | N/A |
| Weeks, John | Fact witness (state specific) | -- | Fact witness in the Irvin case. | No | No | 9/29/05 | Irvin I (tape) |

Kline and Specter, PC
Attorney Work Product — Privileged and Confidential—DO NOT PRODUCE

KS-001164

Last modified on 8/3/2007 at 8:29:45 AM

*In re: Vioxx Litigation*

**Cast of Characters**

*Red = Key individuals*

| Name | Category | Title(s) | Role in Vioxx case | Custodial File produced? | For Martin Interviewed Report? | Deposition testimony? | Trial testimony? |
|---|---|---|---|---|---|---|---|
| Weiss, Mary Lou | Fact witness (case specific) | – | Fact witness in the Irvin case | No | No | N/A | N/A |
| Weinblatt, MD, Michael | Merck consultant | Director of Clinical Rheumatology, Brigham and Women's Hospital (HMS) | Chairman of the VIGOR DSMB and paid Merck consultant. Attended the FDA Advisory Meeting in 1999 as a consultant for Merck and served on Merck's Vioxx Multi-Disciplinary Advisory Board. Upon review of the imbalance in CV events (in his role of DSMB chair) he nominated Alise Reicin, the clinical monitor, to request that there be an analysis performed of the CV events following the trial. When Reicin attempted responded that there was an SOP in place to collect and adjudicate CV events of all trials, he responded with a period of communications telling her that was not sufficient, and that an analysis of the VIGOR CV data alone needed to be performed. Although Dr. Reicin was technically still blinded at this point to the results of the VIGOR trial, the series of unusual communications between the unblinded Chair of the DSMB and the Merck clinical monitor gave Merck a "heads up" that there was potentially a problem with the results of VIGOR from a CV perspective. Following these communications, Reicin set cut-off dates different than for CV and GI events, and finalized a data-analysis plan. | Yes | Yes | 9/23/05 | N/A |
| Weiner, Ian | Merck employee | Executive Director, Public Affairs Asia, Japan, Australia and New Zealand (2003-present). Executive Director, Global Product Communications (2001-2003). Executive Director, Public Affairs Domestic (1998-2001). | Spin doctor in the executive team; her group was the media and public face of Vioxx. Developed communications plan, press releases, Q+As, and materials for scientific presentations re: Vioxx. Admitted that there is not a single Press Release advising the public that one of the explanations for VIGOR was that Vioxx was causing MI. Also has admitted that Vioxx had ever free billion media hits in 2000. Dep. can also be used to get the Video News Release admitted. | Yes | Yes | 8/10/05; 8/11/05; 8/12/05 | By Vioxx: –Arrighi (CA) –Barnett (MDL) –Ernst (TX) –Humeston 1 (NJ) –Irvin II (MDL) –Smith (MDL) –Dedrick (MDL); –Schwaller (ILL) |

**KS-001165**

In re: Vioxx Litigation

Cast of Characters

Red = Key individuals

| Name | Category | Title(s) | Role in Vioxx case | Custodial file produced? | Interviewed for Martin Report | Deposition testimony? | Trial testimony? |
|---|---|---|---|---|---|---|---|
| Weiner, MD, Issac | Plaintiff's case specific cardiology expert | Clinical Professor of Medicine at UCLA | Case specific cardiology expert who testified in the Ernst case (TX). Also produced a report in the Mason (MDL) case, but did not testify at trial. | N/A | No | 5/13/05; 8/24/06 | Live –Ernst (TX) |
| Weir, MD, Matthew | Merck consultant | Professor, Division of Nephrology, University of Maryland | Nephrologist and Merck consultant. Member of the Merck Vioxx multidisciplinary advisory board. On Merck's list of "preferred" external speakers (see MRK-AFI0015160 at 65). Co-author on the Konstam meta-analysis (Circulation 2001) and, with Reicin and Sperling, the "CV review article" (American Heart Journal 2001). Was a co-author on an spol study (first author Shpiro that showed Vioxx was not associate with increase risk of CV thrombotic events relative to non-selective NSAIDs. Merck classified Weir as a "strong advocate" (see MRK-AFI0072491). | No | No | N/A | N/A |
| Weisfeldt, MD, Myron | Merck consultant | Professor of Medicine, Johns Hopkins, Physician-in-chief, Director of Medicine | Cardiologist, paid Merck consultant and member of the Merck Board of Scientific Advisors. On Merck's list of "preferred" external spokesperson MRK–AFI0015160 at 65). Attended the October 2000 Cardiology Consultants meeting for VIGOR | Yes | No | N/A | N/A |
| Wells, Mildred | Fact witness | -- | Plaintiff's wife in the Wells case in NJ | N/A | No | 8/26/05 | N/A |
| Wentworth, Marian | Merck employee | Marketing Director, A&A Franchise Business Group | Worked on marketing for managed care | Yes | No | N/A | N/A |

KS-001166

In re: Vioxx Litigation

Cast of Characters

Red = Key individuals

| Name | Category | Title(s) | Role in Vioxx case | Custodial file produced? | Report for Interview/Reviewed | Deposition testimony? | Trial testimony? |
|---|---|---|---|---|---|---|---|
| Westrick, Ellen | Merck employee | Executive Director, Office of Medical/Legal, US Human Health | Non-physician/non-scientist/non-lawyer, long-time Merck employee and former sales representative whose office was the liaison between Merck and FDA's DDMAC. (Note: Westrick's office's title of "Medical/Legal" appears to have just been meaning Merck-speak.) Had responsibility for submitting promotional materials to FDA. / No longer works for Merck. | Yes | Yes | 8/30/05; 11/9/05 | N/A |
| Wetherby, MD, Graham | Fact witness (case specific) | -- | Treater in the Humeston case. | N/A | No | 6/24/05 | Humeston I and II |
| Wheeler MD, Thomas | Defense pathology expert | Professor of Pathology, Baylor School of Medicine | Defense pathology expert who testified in Ernst, Irvin I and Irvin II. | N/A | No | 6/23/05; 10/13/05; 1/12/06 | Live -Ernst (TX) -Irvin I (MDL) -Irvin II (MDL) |

KS-001167

*In re: Vioxx Litigation*

## Cast of Characters

Red = Key Individuals

| Name | Category | Title(s) | Role in Vioxx case | Custodial file produced? | For Martin Interviewed Reports | Deposition testimony? | Trial testimony? |
|---|---|---|---|---|---|---|---|
| Whelton, MD, Andrew [photo] | Third party/Pfizer consultant | Adjunct Clinical Professor at Johns Hopkins University | Nephrologist and Pfizer consultant who performed and published an api study in the *American Journal of Therapeutics* that concluded Vioxx caused more hypertension and edema than Celebrex (note: Merck had performed a clinical trial comparing the two drugs, found results that confirmed Whelton's conclusions, but did not publish it). This piece was heavily used by Pfizer reps in the ongoing war between Pfizer and Merck for control of the Coxes? battlefield. Was targeted by Shamugavelu/Sherwood's swat teams as a "viewpoint shift." (see 1.0469) Sherwood bemoaned the fact that Whelton had left academia (previously full-time at JHU) and was now in private practice—noting that he left Merck with little "leverage" over him (see 1.0160) | No | No | N/A | N/A |
| Whipple, Heather Lee | Merck employee | Promotion manager, ("Views/ethical"), integrated marketing communications team, USHH | Mid level marketing manager who worked under Rick Roberts and Charlene McMains. | Yes | No | N/A | N/A |
| Whitfield, Stephen | Merck employee | Sales rep | Sales rep in the Times Case | No* | No | 4/22/05 | N/A |
| Wicks, Nancy | Merck employee | Executive Director, Business Analysis and Decision Support | High level in the BADS division; worked on all sorts of business analyses, business plans, and pricing issues. | Yes | No | N/A | N/A |
| Wilholm, MD, PhD, Bengt-Erik | Merck employee | Unknown at this time | Precise role unclear, but appears to have been an epidemiologist. Authored an epidemiologic study on the rate of sulfonamide reactions in Celebrex (presumably to aid marketing with Vioxx). Custodial file contains multiple references to drug related risks and pregnancy. Appears to have monitored epidemiologic literature and possibly databases for adverse events. | Yes | No | N/A | N/A |

Kline and Specter, PC
Attorney Work Product – Privileged and Confidential – DO NOT PRODUCE

*Last modified on 8/3/2007 at 8:29:43 AM*

**KS-001168**

In re: Vioxx Litigation

Cast of Characters

Red = Key Individuals

| Name | Category | Title(s) | Role in Vioxx case | Custodial file produced? | Interviewed Per Martin Report? | Deposition testimony? | Trial testimony? |
|---|---|---|---|---|---|---|---|
| Williams, Jr. MD, James | Third party | Rheumatologist, University of Utah | Member of the 2001 FDA Advisory Committee that reviewed VIGOR. The FDA noted at the beginning of the meeting that he had unspecified conflicts, but that a waiver was granted so he could participate. | No | No | N/A | N/A |
| Williams, Matt | Merck employee | Medical Education Manager, Medical Strategic Group, A&A Therapeutics Group | Worked with consultants on 'education' and lectures. Appears to have worked closely with Susan Baumgartner. | Yes | No | N/A | N/A |
| Williams, PhD, George | Merck employee | Senior VP, Biostatistics and Research Data Systems | Senior Merck researcher able to weigh in on how VIGOR and other studies are written and presented. | Yes | Yes | N/A | N/A |
| Williams, Richard | Plaintiff | -- | Plaintiff in the Williams case in NJ | N/A | N/A | 1/24/06 | N/A |
| Williams-Boyle, Karree | Merck employee | ? sales rep | ? Sales rep | Yes | No | N/A | N/A |
| Willoughby, Nicole | Merck employee | ? sales rep | ? Sales rep | Yes | No | N/A | N/A |
| Wilson, Gwendolyn | Fact witness (case specific) | -- | Treater in the Hensley case in NJ | N/A | No | N/A | N/A |
| Wilson, MD, Merlin | Defense expert witness | Clinical Professor of Medicine at LSU and Tulane | Rheumatologist/immunologist who provides defense liability and causation testimony. | N/A | No | 10/23/02; 4/8/04; 1/14/05; 4/13/05; 7/7/05; 8/17/05 | N/A |
| Winn, Deborah | Merck employee | Unknown | Precise role unclear. Was deposed in the context of TX marketing litigation. Transcript mostly redacted. | No | No | 8/31/04 | N/A |
| Wiseman, Rebecca | Merck employee | Unknown | Precise role unclear. Was deposed in the context of TX marketing litigation. Transcript mostly redacted. | No | No | 8/19/04 | N/A |

**KS-001169**

In re: Vioxx Litigation

Cast of Characters

Red = Key individuals

| Name | Category | Title(s) | Role in Vioxx case | Custodial file produced? | Interviewed for Martin Report? | Deposition testimony? | Trial testimony? |
|---|---|---|---|---|---|---|---|
| Wiesner, Tim | Merck employee | Associate Director—Managed Care Field Implementation Team | Worked on team selling to managed care plans and pharmacies | Yes | No | N/A | N/A |
| Wold-Olsen, Per | Merck executive | President, Foreign Human Health Units | Supervised foreign operations outside the Northern hemisphere. Part of the senior management team. | Select docs. | No | N/A | N/A |
| Wolfe, MD, M. Michael | Merck consultant | Section of Gastroenterology, Boston University School of Medicine. | Member of the 2001 FDA Advisory Committee that reviewed VIGOR. Received a waiver from FDA (re: his conflicts) so he could sit on the committee. (See transcript of Feb 8, 2001 FDA Advisory Meeting.)  Merck has him classified in their marketing documents as an "Advocate" (See MRK–AFI00724491).  Also, Dr. Wolfe is listed on Merck's list of preferred speakers (See MRK–AFI00515160 at 63). | No | No | N/A | N/A |
| Wolkoff, Eugene | Merck employee | Executive Director, USHH Business Development | Worked on "Project Music Line"—sales of Vioxx in the Dental world | Yes | No | N/A | N/A |
| Wong, Jonathan | Merck employee | Sales rep | Sales rep in the Cona/McDarby case | No[34] | No | 2/3/06 | N/A |
| Wong, Peggy | Merck employee | Statistician | Statistician on some of the early clinical pharm studies.  Co-author on some of the publications, including one on the lack of inhibition of the anti-platelet effects of aspirin.  Also worked on JRA studies | Yes | No | N/A | N/A |

KS-001170

In re: Vioxx Litigation

Cast of Characters

Red – Key individuals

| Name | Category | Title(s) | Role in Vioxx case | Custodial File Produced? | Interviewed For Report? | Deposition Testimony? | Trial Testimony? |
|------|----------|----------|--------------------|--------------------------|-------------------------|-----------------------|------------------|
| Wood, MB, ChB, Alistair J. | Third Party | Managing Director, Symphony Capital (Sept 2006-present)<br><br>Professor of Medicine and Professor of Pharmacology, Cornell Weill Medical School (2006-present)<br><br>Associate Dean for External Affairs, Attending Physician and Professor of Medicine, Vanderbilt University (??-2006)<br><br>Reviewer, JOM report on Drug Safety in America (Sept 2006)<br><br>Chair of the 2005 FDA Joint Arthritis and Drug Safety Advisory Committee on Cox-2 Inhibitors (Feb 2005)<br><br>Editor of the "Drug Therapy" section of the New England Journal of Medicine (1993-2004). | Would-be retained physician, pharmacologist, and drug safety expert; former candidate for the position of FDA commissioner in 2001 until his name was pulled from consideration (never was that pharma industry interviewed).<br><br>Best known for his highly visible role as the Chair of the FDA Advisory Committee that looked at the CV safety of Vioxx, Celebrex, Bextra and other NSAIDs in February 2005. Bluntly pointed out what he felt to be inadequacies in the 2005 Vioxx label:<br><br>The second question I have, which has always worried me, is when you go back to the [2002 Vioxx label], you know, when you changed the label to say caution should be exercised when Vioxx is used in patients with a medical history of ischemic heart disease, as a physician what am I supposed to do with that? And I suppose to say to patients take the drug slowly, or swallow it with milk, or only take it with the lights on? Tell me what I am supposed to do with that information. I am not being facetious here because as we go through this process we are going to have to decide how we make whatever labeling changes we make, if that is the decision we make, and that doesn't seem to me to have been helpful. [Source: Transcript of the FDA's Joint Meeting of the Arthritis Advisory and Drug Safety Monitoring Committee, Feb 16, 2005]<br><br>Has expressed the view that drug labeling, as a practical matter, doesn't work: "It's like the sticker on the back of a sun visor in an SUV – It doesn't make the vehicle any safer." [Source: "Details of a Wig picture," – Alastair Wood (almost) named as top FDA post." Drug Reporter, Vanderbilt Medical Center, May 31, 2002]<br><br>After more than 30 years as a straight academic, in 2006 he joined a private equity firm that specializes in biopharmaceutical work. | No | No | N/A | N/A |

Kline and Specter, PC
Attorney Work Product -- Privileged and Confidential—DO NOT PRODUCE

KS-001171

In re: Vioxx Litigation.

Cast of Characters

Red = Key Individuals

| Name | Category | Title(s) | Role in Vioxx case | Custodial file produced? | Interviewed For Atty/Report? | Deposition (testimony)? | Trial (testimony)? |
|---|---|---|---|---|---|---|---|
| Woodcock, MD, Janet | FDA official | Director, Center for Drug Evaluation and Research | Frequent face of the FDA on the news, and overall head of drug approval at FDA until being moved up/down to the commissioner's office. "Name" and the senior Mercksters were on a first name basis (see eg, 1/0001, 1/0202, 1/8300). | FDA produced etc | No | N/A | N/A |
| Woodfield, Jennifer | Merck employee | Sales rep | Sales rep | Yes | No | N/A | N/A |
| Wyles, Stanley | Plaintiff | -- | Plaintiff in the NJ litigation | No | No | 9/21/08 | N/A |
| Wyod, Doug | Merck employee | Marketing Manager, Vioxx Marketing Team | Appears to have had a fairly high level position in the marketing team with respect to Vioxx, but the "custodial file" that was produced has only about ten documents in it—all standard documents (journal articles, etc). Production clearly incomplete as emails authored by him can be found in other custodial files | Yes (partial) | No | N/A | N/A |
| Xu, Bridel | Merck employee | Unknown | Precise role unclear. Appears to have worked on statistics for several Vioxx projects. | Yes | No | N/A | N/A |
| Yacik Carol | Merck employee | Clinical Research, Endocrine | Precise role unclear at this time. Appears to have had some involvement in VIP. | Yes | No | N/A | N/A |
| Yarosi, Wendy | Merck employee | USHH | Precise role unclear at this time, but appears to have worked in USHH | Yes | No | N/A | N/A |
| Yates, MD, John | Merck employee | Senior VP, Medical and Scientific Affairs, US Human Health | Author of the "Dear Doctor" letter that was supposedly sent to all physicians in the US (note: the distribution of this letter to ALL physicians has not been confirmed) in April 2002 when the Vioxx label was changed | No | Yes | N/A | N/A |

KS-001172

*In re: Vioxx Litigation*

*Cast of Characters*

Red = Key individuals

| Name | Category | Title(s) | Role in Vioxx case | Confidential - Privileged? | Interviewed for Martin Report? | Deposition testimony? | Trial testimony - Key individuals |
|---|---|---|---|---|---|---|---|
| Yocum, MD, David | Third party | University of Arizona | Rheumatologist and member of the 1999 FDA Advisory Committee that recommended approval for Vioxx. | No | No | N/A | N/A |
| Young, Gloria | Fact witness (case specific) | -- | Comparison to Plaintiff in the Grossberg litigation in CA | No | No | 5/4/06 | N/A |
| Young, PhD, Robert | Merck employee | Merck Frosst | Chemist who did early work on Vioxx compound | Yes | No | N/A | N/A |
| Young, Robert | Merck employee | -- | Deposed as part of marketing case in TX (In re: Temi Amrosi). Most of transcript is confidential. | No | No | 8/18/04 | N/A |
| Yu, Qinlee | Merck employee | Clinical biostatistics | SAS programmer who aided Deborah Shapiro | Yes (SAS) | No | N/A | N/A |
| Zarebood, PhD, Robert | Merck employee | Merck Frosst | Organic chemist who did early work on the Vioxx compound and is named author on some of the early pharma papers. | Yes | No | N/A | N/A |
| Zavod, PhD, Carole | Fact witness (area specific) | -- | Treating therapist in the Levinson case in NJ | N/A | No | 8/10/05 | N/A |
| Zdobak, MD, James | Fact witness (case specific) | -- | Fact witness and treating physician in the Mason case | N/A | No | 8/30/06 | Via video -Mason |

**KS-001173**

*In re: Vioxx Litigation*

## Cast of Characters

Red = Key individuals

| Name | Category | Title(s) | Role in Vioxx case | Custodial file produced? | Reports for Marius reviewed? | Deposition (testimony)? | Trial (testimony)? |
|---|---|---|---|---|---|---|---|
| Zeger, PhD, Scott | Merck consultant | Chair, Department of Biostatistics, Johns Hopkins University | Paid Merck consultant and member of the Merck Board of Scientific Advisors (1995-?). Attended the FDA Advisory Meeting in 1999 as a consultant for Merck. Participated in November 2000 consultant meeting to analyze the results of VIGOR. Analyzed the FDA's review of VIGOR for Merck prior to the 2001 FDA Advisory meeting. Attended the FDA Advisory Meeting in 2001 as a consultant for Merck. Following the withdrawal of Vioxx in Sept 2004, wrote to Peter Kim assuring him that Merck had made the right decision and that the "evidence to make [your] decision was only apparent after the 30 months of follow-up in APPROVe." Also early advocate of the 18 month hype. Reviewed the Merck's backgrounder for the 2005 ACM meeting. | No | Yes | N/A | N/A |
| Zeid, DO, Randy | Fact witness (case specific) | Treating physician | Treating physician in the LaFerriere case in NJ | N/A | No | 11/16/04 | N/A |
| Zhang, MD, PhD, Jingfeng | Third party | Renal Division, Brigham and Women's | Performed a meta-analysis of clinical trials which demonstrated that Vioxx was associated with increased renal and arrhythmia events.   No class effect was noted (JAMA 2006;296:1619-1632). | No | No | N/A | N/A |

Kline and Specter, PC
Attorney Work Product — Privileged and Confidential—DO NOT PRODUCE

KS-001174

_In re: Vioxx Litigation_

Cast of Characters

Red = Key individuals

| Name | Category | Title(s) | Role in Vioxx case | Custodial file produced? | Interviewed for Martin Report? | Deposition testimony? | Trial testimony? |
|---|---|---|---|---|---|---|---|
| Ziegler, Paul | Merck employee | Unknown at this time | Unknown at this time. Only one document attributed to him in the database as a "custodian," and it consists of a list of medical journals | Yes[118] | No | N/A | N/A |
| Zipes, MD, Douglas | Plaintiff's cardiology expert[119] | Distinguished Professor Emeritus, Indiana University School of Medicine | Specialist on research and treatment of cardiac arrhythmias who testified for the plaintiffs on general and case specific causation in the Barnett case. Also served expert report in the Mauzo case. | N/A | No | 6/29/06; 7/10/06 | Live —Barnett (MDL) |
| Zovin, MD Janice A. | Merck consultant | Professor of Neuroscience, University of California, San Diego | Merck consultant and member of the mortality adjudication committee | No | No | N/A | N/A |
| Zuckman, RN, August | Merck employee | Senior osteoporosis specialist | Precise role unclear at this time | Yes[120] | No | N/A | N/A |
| Zwicker, Dianne | Plaintiff's expert [a] | Cardiologist, WI | Case specific cardiology expert witness | N/A | No | 6/7/06; 8/29/06 | N/A |

[1] This column is not an all-inclusive list — titles given generally encompass the time frame at issue (late 1990s until today). If a specific title was not available, but a department or division of Merck where the individual at question worked was available (e.g. Merck Frosst, Biostatistics, USHH), that was provided instead.

[2] Production of documents from FDA was limited. Access to FDA officials for deposition purposes, with the exception of Dr. David Graham, was not permitted by the Court.

[3] At this time this document was prepared, limited information was available as to the witnesses called in the Garza (TX), Schwaller (IL), Albright (AL) and the Doherty (NJ) trials. Should that information become available, it will be included in subsequent editions of this document.

_Nine and Specter, PC_
_Attorney Work Product — Privileged and Confidential—DO NOT PRODUCE_

**KS-001175**

Page 165 of 169
Last modified on 1/2/2007 at 8:28:43 AM

In re: Vioxx Litigation

## Cast of Characters

[1] Unfortunately, following the Manni and Smith trials, Merck elected testimony from a necessary independent third party in this case ((Gregory Curfman MD, executive editor of the New England Journal of Medicine) that damaged Dr. Abramson's credibility.  Therefore, the PSC no longer recommends his use as an expert in this litigation.

[2] See Transcript of April 3RL, 1999 FDA Arthritis Advisory Committee on Vioxx.

[3] See MRK-ACZ0012625 at 2626.

[4] See http://www.applied.org/case/700602251.html (referencing "Food and Drug Administration Center for Drug Evaluation and Research." Congressional Hearing Transcripts, 7/20/99)

[5] See Stroke 2007: 38: 1655-1711

[6] Only two documents produced

[7] Custodial file is not in the depository database, but like many of the sales reps may have been produced directly to counsel involved in the Crook case

[8] Dr. Anticoli is NOT an MDL expert.  Questions should be directed to Gregory Spitzer, Esq.

[9] Source: Response of defendant Merck and Co to PSC's first set of ROGS, answer to ROG 4(b)

[10] Source: Response of defendant Merck and Co to PSC's first set of ROGS, answer to ROG 8.

[11] Dr. Argati is an MDL expert witness.  Questions should be directed to Andy Birchfield, Esq and Leigh O'Dell, Esq.

[12] See MRK-AFI0175H1

[13] Dr. Avorn is an MDL expert witness.  Trial preservation testimony may be obtained through the MDL; Dr. Avorn is not available for live testimony.  Questions contact Chris Tisi, Esq.

[14] Was deposed in the matter of patent litigation between Merck and Scarle—has not been deposed in this litigation.

[15] Dr. Baldwin is NOT an MDL expert.  Questions should be directed to Andy Birchfield, Esq and Leigh O'Dell, Esquire

[16] See http://www.applied.org/case/700602251.html

[17] Was deposed in the context of patent litigation between Merck and Searle—has not been deposed in this litigation.

[18] Custodial file is not in the depository database, but like many of the sales reps may have been produced directly to counsel involved in the McDurby case

[19] Custodial file is not in the depository database, but like many of the sales reps may have been produced directly to counsel involved in the Doherty case

[20] Custodial file is not in the depository database, but like many of the sales reps may have been produced directly to counsel involved in the Young case

[21] Dr. Bloom is an MDL expert witness, but is no longer being offered as an MDL witness.  Questions should be directed to John Restaino, Esq. or Shelly Sanford, Esq.

[22] Source: Response of defendant Merck and Co to PSC's first set of ROGS, answer to ROG 4(d).

[23] Exhibit M to the Graham Deposition.

[24] Dr. Burton is NOT an MDL expert.  Questions should be directed to Andy Birchfield, Esq or Leigh O'Dell, Esq.

[25] Custodial file is not in the depository database, but like many of the sales reps may have been produced directly to counsel involved in the Kozic case

[26] Dr. Carter is NOT an MDL expert.  Questions should be directed to Shelly Sanford, Esq

[27] Custodial file from Merck employed years only is under the name "Francesca Lawson" in the database.

[28] Dr. Chalmes is NOT an MDL expert witness.  Questions should be directed to Girardi and Keefe.

[29] Was deposed in the context of patent litigation between Merck and Searle—has not been deposed in this litigation.

[30] Dr. Cleland is an MDL expert witness.  Questions should be directed to John Restaino, Esq. or Shelly Sanford, Esq.

[31] From the job description, this appears to be a different John Cook than the John Cook whose custodial file is in the database.  Assuming this is true, the custodial file for this John Cook is not in the depository database, but like many of the sales reps may have been produced directly to counsel involved in the Leonan case

[32] See http://www.applied.org/case/700602251.html

[33] See http://www.applied.org/case/700602251.html    See also, http://www.fdlic.org/immmls03A252/index.cfm

[34] See http://www.applied.org/case/700602251.html

[35] See http://www.applied.org/case/700602251.html

[36] Custodial file is not in the depository database, but like many of the sales reps may have been produced directly to counsel involved in the Garza case

[37] Dr. DeFino is NOT an MDL expert witness.

[38] Source: Response of defendant Merck and Co to PSC's first set of ROGS, answer to ROG 4(g) and (i).

Kline and Specter, PC
Attorney Work Product – Privileged and Confidential—DO NOT PRODUCE

KS-001176

In re: Vioxx Litigation

Cast of Characters

Red = Key individuals

[1] Was deposed in the context of patent litigation between Merck and Searle – has not been deposed in this litigation.

[2] Custodial file is not in the depository database, but like many of the sales reps may have been produced directly to counsel involved in the Younger case.
See http://www.siprnet.org/new/200502211.html

[3] Dr. Epplinus is NOT an MDL expert. Questions should be directed to the Linder Law Firm.
See http://www.siprnet.org/new/200502211.html

[4] Source: Response of defendant Merck and Co to PSC's first set of ROGS, answer to ROG 4(d).

[5] Only four documents

[6] Was deposed in the context of patent litigation between Merck and Searle – has not been deposed in this litigation.

[7] Dr. Farquhar is an MDL expert witness. Questions should be directed to Don Arbittier, Esq.

[8] Custodial file is not in the depository database, but like many of the sales reps may have been produced directly to counsel involved in the case

[9] Custodial file is not in the depository database, but like many of the sales reps may have been produced directly to counsel involved in the Younger case

[10] Custodial file is sub-coded in the database as belonging to "Gary Fitzgerald"
See http://www.siprnet.org/new/200502211.html

[11] Source: Response of defendant Merck and Co to PSC's first set of ROGS, answer to ROG 4(d).

[12] Custodial file is not in the depository database, but like many of the sales reps may have been produced directly to counsel involved in the case

[13] Was deposed in the context of patent litigation between Merck and Searle – has not been deposed in this litigation

[14] Only three documents produced

[15] Dr. Fossliin is an MDL expert witness.   Questions should be directed to John Kenston, Esq.

[16] Custodial file is not at the depository database, but like many of the sales reps may have been produced directly to counsel involved in the case

[17] Dr. Funk is an MDL expert witness.   Obedience should be directed to Shelly Sanford, Esq.

[18] Dr. Furmoum is NOT an MDL expert. Questions should be directed to Andy Birchfield, Esq.
See http://www.siprnet.org/new/200502211.html

[19] Dr. Generli is an MDL expert.   Please contact the PSC for information.

[20] Dr. Geib is NOT an MDL expert.   Please contact Andy Birchfield, Esq, or Leigh O'Dell, Esq for more information.
See http://www.siprnet.org/new/200502211.html   See also, http://www.hhs.com/consuimbl0420/index.cfm

[21] Not in the generic database.   Possible the file was produced in the context of case specific discovery

[22] Dr. Michael Graham is NOT an MDL expert, questions should be directed to Andy Birchfield, Esq or Leigh O'Dell, Esq

[23] Dr. Gustingius is an MDL expert witness.   Questions should be directed to Chris Seeger, Esq, David Buchanan, Esq, or Chris Tisi, Esq

[24] Not in the generic database.   Possible the file was produced in the context of case specific discovery

[25] Exhibit 38 in the Graham Deposition.

[26] Not at the generic database.   Possible the file was produced in the context of case specific discovery
See http://www.siprnet.org/new/200502211.html

[27] Only three documents produced

[28] Not in the generic database.   Possible the file was produced in the context of case specific discovery.

[29] Dr. Kaph is an MDL expert.   Questions should be addressed to Shelly Sanford, Esq, and John Ranisier, Esq

[30] Dr. King is NOT an MDL expert.

[31] Only three documents produced

[32] Only three documents produced

Kline and Specter, PC

Attorney Work Product – Privileged and Confidential – DO NOT PRODUCE

[33] Custodial file is not at the depository database, but like many of the sales reps may have been produced directly to counsel involved in the case.   The email distribution lists and subject lines ("Vioxx litigation") are visible, but the text of the emails has been completely

KS-001177

*In re: Vioxx Litigation*

*Cast of Characters*

*Red = Key Individuals*

- Was deposed in the context of patent litigation between Merck and Searle and Searle—has been deposed in this litigation.
- Dr. Scolnick is an MDL expert. Question should be directed in this litigation.
- Dr. Kronheim is NOT an MDL expert. Questions should be directed to the Lanier Law Firm and Seeger Weiss.
- Certain of Lanier's documents have been produced, and the issue of what other documents are privileged or not privileged or not privileged is currently before the Special Master appointed by Judge Fallon.
- Only one document produced.
- Summary Response of defendant Merck and Co to PSC's first set of ROGS, answer to ROG 4(d).
- Dr. Leonard is an MDL expert. Questions should be directed John Restaino, Esq and Shelly Sanford, Esq.
- Dr. McCoin is NOT an MDL expert. Questions should be directed to Shelly Sanford, Esq.
- Source: Response of defendant Merck and Co to PSC's first set of ROGS, answer to ROG 4(b).
- Source: Response of defendant Merck and Co to PSC's first set of ROGS, answer to ROG 4(g) and (i).
- Custodial file is not in the depository database, but like many of the sales reps may have been produced directly to counsel involved in the Kozic case.
- See http://www.aafprs.org/new/2006/02711.html and http://www.facialplasticsurgery.org/biography.pdf
- Dr. Morrison is NOT an MDL expert. Questions should be directed to Jerry Kristal, Esq.
- Dr. Moye is NOT an MDL expert. Questions should be directed to Scientific Evidence.
- The PSC recommends using the Mueller memo with caution, as it actually can support a key tenet of the defense case—that they considered the fact that other NSAIDs could offer cardioprotection.
- Source: Response of defendant Merck and Co to PSC's first set of ROGS, answer to ROG 8(f).
- Custodial file is labeled "Lerm" in the database.
- Dr. Pace-Asciak is an MDL expert. Questions should be directed to Shelly Sanford, Esq or John Restaino, Esq.
- See http://www.circ.ahajournal.com/cgi/DO0000/ABSHPD.htm
- Was deposed in the context of patent litigation between Merck and Searle—has not been deposed in this litigation.
- Dr. Parvizi is NOT an MDL expert. Question should be directed to Steve Knowlton, Esq.
- Dr. Flechtman is an MDL expert. Questions should be directed to Shelly Sanford, Esq, or Mark Robinson, Esq.
- See http://www.cspinet.org/new/200402711.html
- Dr. Plunkett is NOT an MDL expert. Question should be directed to Scientific Evidence.
- Was deposed in the context of patent litigation between Merck and Searle—has not been deposed in this litigation.
- Dr. Ray is an MDL expert witness. Questions should be directed to David Buchanan, Esq and Chris Tisi, Esq.
- Was deposed in the context of patent litigation between Merck and Searle—has not been deposed in this litigation.
- Custodial file is not in the depository database, but like many of the sales reps may have been produced directly to counsel involved in this litigation.
- Was deposed in the context of patent litigation between Merck and Searle—has not been deposed in this litigation.
- Dr. Reicin is NOT an MDL expert.
- Dr. Ressner is NOT an MDL expert. Questions should be directed to Rick Meadow, Esq.
- Source: Response of defendant Merck and Co to PSC's first set of ROGS, answer to ROG 4(g) and (i).
- Custodial file is not in the depository database, but take many of the sales reps may have been produced directly to counsel taking the deposition.
- See http://www.cspinet.org/new/200402151.html
- See http://www.cspinet.org/new/200402151.html
- Source: Response of defendant Merck and Co to PSC's first set of ROGS, answer to ROG 8(f).
- Source: Response of defendant Merck and Co to PSC's first set of ROGS, answer to ROG 4(b).
- Source: Response of defendant Merck and Co to PSC's first set of ROGS, answer to ROG 4(d).
- Was deposed in the context of patent litigation between Merck and Searle—has not been deposed in this litigation.
- Dr. Tackett is NOT an MDL expert. Questions should be directed to Scientific Evidence.
- Was deposed in the context of patent litigation between Merck and Searle—has not been deposed in this litigation.

Kline and Specter, PC

*Attorney Work Product – Privileged and Confidential – DO NOT PRODUCE*

KS-001178

In re: Vioxx Litigation

Cast of Characters

[139] Was deposed in the context of patent litigation between Merck and Searle—has not been deposed in this litigation.

[130] Only five documents produced.

[131] Was deposed in the context of patent litigation between Merck and Searle—has not been deposed in this litigation.

[122] Was deposed in the context of patent litigation between Merck and Searle—has not been deposed in this litigation.

[123] Custodial file is not in the depository database, but like many of the sales reps may have been produced directly to counsel involved in the Anderson case.

[134] Alternately, "Villndo"

[135] Was deposed in the context of patent litigation between Merck and Searle—has not been deposed in this litigation.

[136] Dr. Weiner is NOT an MDL expert. Questions should be directed to Ed Blizzard, Esq.

[137] Custodial file is not in the depository database, but like many of the sales reps may have been produced directly to counsel involved in the Ernst case.

[138] Custodial file is not in the depository database, but like many of the sales reps may have been produced directly to counsel involved in the McDarby case.

[139] Only about ten non-specific documents produced.  Documents produced in other custodial files that the authored are available and suggest that production on his behalf was incomplete.

[140] Was deposed in the context of patent litigation between Merck and Searle—has not yet been deposed in this litigation.

[141] Was deposed in the context of patent litigation between Merck and Searle—has not yet been deposed in this litigation.

[147] So overly guilty and effusive with praise for what a heavenly organization Merck is for "doing the right thing" that at lunshit shot is necessary to read the intro paragraphs.

[149] Only nine documents produced.

[143] Dr. Zipes is NOT an MDL expert.  Questions should be directed to Mark Robinson, Esq.

[149] Only three documents produced.

[140] Dr. Zwicke is NOT an MDL witness.  Questions should be directed to Andy Birchfield, Esq and Leigh O'Dell, Esq.

Kline and Specter, PC
Attorney Work Product -- Privileged and Confidential—DO NOT PRODUCE

KS-001179

Exhibit "62"

# IN RE: VIOXX® LITIGATION

# DICTIONARY OF TERMS

### ATTORNEY WORK PRODUCT

### PRIVILEGED AND CONFIDENTIAL

### *** DO NOT PRODUCE ***

Authors: David Buchanan (Seeger Weiss), Lisa Dagostino (Kline and Specter), Jeffrey Grand (Seeger Weiss), Tom Moore, John Restaino (Burg Simpson), Shelly Sanford (Goforth, Lewis, and Sanford), Christopher Tisi (Ashcraft and Gerel).

The information contained in this Dictionary is not intended to be used in any manner in motions, pleadings, memorandums, reports, analyses, or any part of any litigation, and is intended for the personal use of the lawyer only who is preparing himself or herself to begin to learn the case. This document is the sole property of the Vioxx MDL 1657 PSC and the authors expressly disclaim any assertion that the facts or information contained herein, or referenced, in whole or in part is accurate. This document is not for distribution to any third party, including, without limitation, an agent, assign, expert, consultant, representative, employee, or someone otherwise affiliated with the MDL participating lawyer to whom it was provided

**KS-001180**

NOTE—this dictionary is adapted from numerous sources, including the original backgrounder produced by Seeger Weiss early in the litigation, the Martin report, *Steadman's Medical Dictionary*, the database of documents produced by Merck, deposition testimony, expert witnesses, and the personal knowledge of attorneys who have been involved in the prep of the generic Vioxx litigation. **Except where specifically indicated, these definitions are NOT necessarily Merck definitions. Unsourced definitions are meant for the contextual and background use of the practitioner ONLY, and should not be considered to be authoritative.**

| TERM | DEFINITION |
|---|---|
| **18-Month Hypothesis** | Merck-promoted hypothesis that the increased risk of serious coronary heart disease, including sudden cardiac death, conferred by 25 mg of Rofecoxib was confined to persons who used rofecoxib for more than 18 months. This claim was based upon an analysis of the subgroup of APPROVe patients who had used rofecoxib for no more than 18 months.   The analysis upon which the hypothesis was based was later shown to have a methodological error.    As a result, the NEJM (not Merck) published a correction to the original article.<br>*See* "**APPROVe**" below. |
| **A&A TBG** | *See* "**Arthritis and Analgesia Therapeutic Business Group**." |
| **Abstract** | Summary of a scientific study's findings or of a published journal article.   May also be presented at a scientific conference. |
| **Academic and Professional Affairs** | A subdivision of Merck's Medical and Scientific Affairs Department that administered the Continuing Medical Education (CME) program. |
| **ACC** | *See* "**American College of Cardiology**" |
| **Acetaminophen** | Pain reliever and fever reducer developed by McNeil Consumer Products under the brand name Tylenol (now available generically). Acetaminophen is recommended by ACR as the first line treatment for arthritis.  It is often recommended for patients with chronic musculoskeletal disease who are at high risk of NSAID gastropathy and was the rescue remedy for patients in the ADVANTAGE study. |
| **ACM** | Jargon for FDA advisory committee meeting.  See also "Advisory Committee." |
| **ACR** | *See* "**American College of Rheumatology**" |
| **ACRs** | *See* "**Acute Care Representatives**" |
| **ACS** | *See* "**Acute Coronary Syndrome**" |
| **Acute Care Representatives (ACRs)** | Merck sales representatives who targeted healthcare professionals in hospitals. |

**KS-001181**

| TERM | DEFINITION |
|---|---|
| **Acute Coronary Syndrome (ACS)** | Umbrella term covering a variety of conditions, all characterized by symptoms relating to a decrease in blood supply to the heart (e.g., angina, MI). |
| **Acute myocardial infarction (AMI)** | Sudden myocardial infarction; see also "**Myocardial infarction**"; Acute myocardial infarction (also MI) is the medical term for "heart attack," meaning a sudden blockage of the coronary arteries that supply the heart muscle (the myocardium) with oxygen and nutrients.  The lack of oxygen and nutrients causes the death of heart muscle cells from lack of oxygen or nutrients (infarction). |
| **AD** | See "**Alzheimer's disease**" |
| **Adenomatous colon polyps** | Benign neoplastic tissue originating in the glandular epithelium of the colon |
| **Adenosine diphosphate receptor antagonist** | Antiplatelet agent that blocks adenosine diphosphate from binding to its receptor site on platelets and thereby decreases platelet activation and aggregation. |
| **Adjudication** | In the context of a clinical trial, the process through which investigator-reported adverse events are re- evaluated by a blinded "independent panel" according to pre-specified criteria to yield more accurate and consistent diagnoses. |
| **ADVANTAGE** | Acronym for Protocol 102 (in the US) and Protocol 903 (outside of the US)—"Assessment of Differences Between Vioxx and Naproxen to Ascertain Gastrointestinal Tolerability and Effectiveness"– Double-blind 12-week clinical trial conducted by the Clinical Development Program (see "**CDP**") in the marketing division of Merck.  The stated and public purpose of this study was to assess the comparative "gastrointestinal tolerability" (a rather fuzzily defined term) of Vioxx and naproxen; however, internal documents suggest this was actually a 'seeding' study performed by marketing to encourage practitioners to get in the habit of using the drug (see "**seeding study**"). <br> *See*, Lisse, J, et al., Gastrointestinal Tolerability and Effectiveness of Rofecoxib Verses Naproxen in the Treatment of Osteoarthritis, *Ann Int Med* 2003; 139:  539-546. |
| **Adverse event (AE)** | Injury suffered by a patient while on a drug treatment that may or may not be caused by the treatment. Term also refers to a section in the label/product circular that lists adverse events regardless of causality. |
| **Advisory Board** | Any of a number of groups of physicians/scientists (usually paid consultants) with whom Merck officials met to discuss data from the Vioxx clinical program; the boards could include physicians with a shared specialty or could be multidisciplinary. <br> (Note:  distinguish from "**Advisory Committee**," which was a committee of outside experts meant to advise the FDA—see below) |

**KS-001182**

| TERM | DEFINITION |
|---|---|
| **Advisory Committee** | Committee of experts (physicians, statisticians, patient advocates and industry representatives) that advise the FDA on matters within a defined medical area. The committee makes recommendations to the FDA based on pre-defined questions.  These recommendations are influential, but not binding on the FDA.   Often these committees hold public hearings (*see* "**ACM**").  There were three advisory committee meetings related to Vioxx, 1999, 2001, and 2005.  (Note:  distinguish from **Advisory Board**," which was a group of paid consultants <u>to Merck</u>—see above). |
| **Advocate** | (Merck definition)—an individual who is a thought leader AND is in alignment with one or more of Merck scientific or business positions for a given brand or franchise.  (Source:  MRK-AFI0094664) |
| **Advocate Development** | (Merck definition)—the process by which a thought leader is identified and converted into an Advocate through which the degree of advocacy is strengthened/increased/maintained. (Source:  MRK-AFI0094664). |
| **AE** | *See* "**Adverse event**" |
| **AERT** | *See* "**Vioxx Adverse Experience Review Team**" |
| **African green monkey study (AGM)** | A Merck study conducted in African green monkey species to study the thrombotic effect of several drugs (including naproxen and Vioxx).  The FDA found the study and its results to be of little to no utility in answering the relevant questions of Vioxx's thrombotic effects (*see* FDA review of AGM, and deposition of Joe Lynch and Exhibits 1-4).  Merck never published the results of this study because Merck scientists, including Briggs Morrison, felt it was "not flattering" to Vioxx. |
| **Aggrastat** | Merck drug (tirofiban hydrochloride injection) that inhibits platelet aggregation. |
| **AGM** | *See* "**African green monkey study**" |
| **AHA** | *See*, "**American Heart Association**" |
| **Alzheimer's disease (AD)** | A chronic, progressive disorder that accounts for more than 50% of all dementias.  In an effort to expand its market, Merck conducted clinical trials to determine if Vioxx could delay onset or progression of this disorder (see Protocols 078, 091, and 126). The progression trials (091 and 126) were terminated early, and the results suggested that Vioxx could *increase* the progression of Alzheimer's.  Protocol 078 was published only *after* Vioxx was withdrawn and was intentionally published in a low-impact journal.  *See*, *Neuropharmacology*, 2005; 30: 1204-1214.  Merck uses the results of the AD trials to support its contention that, there was no increase in CV events in placebo controlled trials.   There are several problems with this contention—among them the fact that the dropout rate was high and compliance was low.  The key argument to be made from these studies is that various Merck analyses showed that Vioxx increased the risk of death compared to placebo. |

**KS-001183**

| TERM | DEFINITION |
|------|------------|
| **American College of Cardiology (ACC)** | Professional organization of cardiologists and associated healthcare providers.<br>(Note:  distinguish from the **American Heart Association**—a more general association, not limited to professionals). |
| **American College of Rheumatology (ACR)** | Professional organization of rheumatologists and associated healthcare providers that hosts an annual scientific meeting and publishes several peer-reviewed journals, including *Arthritis and Rheumatism*. |
| **American Heart Association (AHA)** | National voluntary health agency whose mission is: "Building healthier lives, free of cardiovascular diseases and stroke."<br>(Note:  distinguish from the **American College of Cardiology**—a professional organization of cardiologists) |
| **AMI** | *See* "**Acute myocardial infarction**" |
| **Analgesia** | Absence of a normal sense of pain. |
| **Analgesic** | A drug that relieves pain e.g., NSAIDs. |
| **Angina pectoris** | Severe pain around the heart resulting from inadequate delivery of oxygen to the heart. |
| **Angioplasty** | Alteration of a blood vessel, either surgically or by dilating the vessel using a balloon inside the lumen. |
| **Anticoagulant** | An agent that prevents or delays the process of blood clot formation. |
| **Antiphospholipid syndrome** | A disorder affecting coagulation due to the abnormal production of antibodies against cell membrane constituents and characterized by a tendency to develop thromboses. |
| **Antiplatelet** | Substance that interferes with platelet activity. |
| **Antiplatelet Trialists Collaborative (APTC) composite cardiovascular endpoint** | A composite cardiovascular endpoint, commonly used in clinical trials of antiplatelet agents, that includes all cardiac death, non-fatal myocardial infarction, and stroke (including both thrombotic and hemorrhagic strokes, and deaths with an unknown cause); see also "**Endpoint**."<br>Although this endpoint was not prespecified, Merck uses it to present the VIGOR data as it has the effect of 'diluting' the results and making the difference in MIs seem less evident to the casual observer. |
| **Antithrombotic** | Preventing or interfering with thrombosis or blood coagulation. |
| **Approvable letter** | In the context of a New Drug Application or supplemental New Drug Application, a letter sent by the FDA to the applicant indicating that the new indication and/or label changes requested are "approvable" subject to the submission of additional data. |

**KS-001184**

| TERM | DEFINITION |
|---|---|
| **APPROVe** | Acronym for Protocol 122—'Adenomatous Polyp Prevention Vioxx,' and one of the three cancer studies included in Protocol 203. Placebo-controlled study of the efficacy of Vioxx in preventing adenomas in patients with a history of colorectal adenomas. After the External Safety Monitoring Board recommended stopping the trial on the basis of cardiovascular data, MRL discontinued the study and withdrew Vioxx from the market.<br>The APPROVe study was also the source of the 18 month hypothesis.   *See*, "**18 Month Hypothesis**."<br>*See*, Bresalier, et al., Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Prevention Trial, NEJM 2005; 352(11): 1092.   *See also*, APPROVe Correction, NEJM 2006; 355:2. |
| **APTC composite cardiovascular endpoint** | *See* "**Antiplatelet Trialists Collaborative composite cardiovascular endpoint**." |
| **APTC event** | Any cardiovascular adverse event that is among those included in the APTC composite cardiovascular endpoint. |
| **Arachidonic Acid (AA)** | An essential fatty acid formed from unsaturated acids of plants and present in, for example, peanuts; a precursor of prostaglandins.  AA is contained in lipid membranes in virtually all cells of the body.   Prostaglandins are derived from AA.   *See*, **Prostaglandin**. |
| **Arcoxia** | Trade name for Merck's second-generation selective Cox-2 inhibitor (generic name:  Etoricoxib), approved by regulatory agencies in several foreign countries.  Arcoxia was the subject of a recent FDA Advisory committee, and in a major blow to Merck, the FDA advisors overwhelming recommended that FDA NOT approve the drug for use in the US in April 2007. |
| **Arm Laceration study** | Term used in the litigation to refer to a study performed by Tejada (and sponsored by Merck) that failed to demonstrate any thrombotic effect of Vioxx in the blood vessels of the forearms of healthy twenty-something men.<br>*See*, Tuleja et al., Effects of Cyclooxygenases Inhibitors on Vasoactive Prostanoids and Thrombin Generation at the Site of Microvascular Injury in Healthy Men, *Arteriosclerosis, Thrombosis, and Vascular Biology*. 2003; 23:1111. |
| **Arteriosclerosis** | A disease of the arterial vessels marked by thickening, hardening, and loss of elasticity in the arterial walls, which may affect the functions of tissues and organs.<br>(Note—**atherosclerosis** is a form of **arteriosclerosis**) |
| **Arthritis** | Inflammation of a joint, usually accompanied by pain, swelling, and, frequently, changes in structure. |
| **Arthritis and Analgesia Franchise Business Group** | *See* "Arthritis and Analgesia Therapeutic Business Group" |

**KS-001185**

| TERM | DEFINITION |
|---|---|
| **Arthritis and Analgesia Therapeutic Business Group (A&A TBG)** | Subdivision of Merck's Marketing Department that developed marketing strategies and messages for Vioxx; later known as the "Arthritis and Analgesia Franchise Business Group." |
| **ASA** | Common medical abbreviation for aspirin. *See* "**Aspirin**" |
| **Aspirin (ASA)** | Non-selective NSAID that is a potent inhibitor of Cox-1 and is associated with cardioprotection. |
| **Aspirin-indicated subgroup analysis** | MRL post-hoc analysis of cardiovascular data from the VIGOR trial that compared the number of cardiovascular events occurring among patients for whom aspirin prophylaxis was indicated (according to FDA criteria) with those for whom it was not; the analysis suggested that patients for whom aspirin prophylaxis was indicated (i.e. those at higher risk) suffered a disproportionate number of the cardiovascular adverse events in the study. (*See also*, "**Post-hoc**") |
| **Association** | A means by which two items are linked. For example, a link between an exposure (such as to a drug) and an outcome. Association alone does not establish a "cause-and effect" relationship |
| **Atherogenesis** | Formation of atheroma in the walls of the arteries. |
| **Atheroma** | Collection of fatty plaque in the arteries. |
| **Atherosclerosis** | The most common form of arteriosclerosis, marked by cholesterol-lipid-calcium deposits in arterial linings. |
| **Attributable Proportion of the Risk** | An epidemiologic term meaning the generally accepted method of answering the question of what is the likelihood that a drug was the cause of the disease at issue. This quantity is also known as the attributable fraction, the attributable risk, and the etiologic fraction. |
| **Banyu** | Japanese pharmaceutical company that was entry point for Merck products in Japan.  In 2004, Merck bought the remaining shares of Banyu it did not already own, and Banyu became a wholly owned Merck subsidiary (source: Merck website). |
| **BARDS** | See "Biostatistics and Research Decision Sciences" |
| **Be The Power** | A training term and ridiculously campy training video used to train Merck sales representatives after VIGOR. The "Be the Power" video can be introduced into evidence through the testimony of Jim Dunn. The portion of the video training most often played during trial includes a Merck sales trainee responding to an obstacle (*see* "**obstacle**") about Vioxx causing MIs by saying  "that's not true!" |
| **Bextra** | Pfizer's second-generation selective Cox-2 inhibitor (generic name:  Valdecoxib). Pfizer withdrew Bextra from the market on April 7, 2005, because of links to cardiovascular adverse events, and adverse skin reactions. |

KS-001186

| TERM | DEFINITION |
|---|---|
| **Bias** | The systematic over- or under-estimation of a parameter, usually unknowingly and unintentionally. |
| **Biostatistics** | The application of statistical theory and methods in the biological and medical sciences. |
| **Biostatistics and Research Decision Sciences (BARDS)** | Subdivision of MRL that provided statistical support to Merck's clinical researchers. |
| **Biosynthesis** | The formation of chemical compounds by a living organism. |
| **BMS** | *See* "**Bristol-Myers Squibb**" |
| **Board of Scientific Advisors (BSA)** | A group of approximately eighteen outside scientists who met annually to provide advice to MRL on issues regarding its clinical development programs.   Among the things considered are potential for positive or negative clinical results of various study medications, potential new indication and studies to be performed.  In Vioxx, the BSA identified potential pro-thrombotic mechanisms that should have been studied in the clinical trial program. |
| **Bristol-Myers Squibb (BMS)** | A worldwide manufacturer of pharmaceuticals. |
| **BSA** | *See* "**Board of Scientific Advisors**" |
| **Bulletins** | Internal communication tool drafted by the Market Integration Team to aid communication between Merck's Marketing and Sales Departments. Bulletins were used to implement marketing strategies, scripts, talking points, etc. Sales representatives would receive these and be given their marching orders with respect to how to handle Vioxx and 'obstacles' in their discussions with physicians. |
| **CABG** | *See* "**Coronary artery bypass grafting**" |
| **Cardiac prophylaxis** | *See* "**Cardiovascular prophylaxis**" |
| **Cardioprotection** | An antithrombotic effect. |
| **Cardiovascular (CV)** | Pertaining to the heart and blood vessels. |
| **Cardiovascular Adjudication SOP** | See "Cardiovascular Adjudication Standard Operating Procedure" |
| **Cardiovascular Adjudication Standard Operating Procedure (SOP)** | Merck's standardized procedure for the collection and adjudication of cardiovascular adverse events occurring in clinical trials in Merck's selective Cox-2 inhibitor program. |

**KS-001187**

| TERM | DEFINITION |
|---|---|
| **Cardiovascular Card (CV Card)** | A misleading promotional item for Vioxx containing a summary of cardiovascular data from the Phase IIb/IIl studies of Vioxx in an osteoarthritis patient population.  No data from the VIGOR trial was present in the promotional piece.  Used by reps to answer physician questions re:  CV risk of Vioxx after the VIGOR study but before the April 2002 label change. |
| **Cardiovascular prophylaxis** | A treatment intended to prevent the occurrence of cardiovascular events – e.g., a regimen of low-dose aspirin. |
| **Case-control study** | A type of epidemiological study used for evaluating the causes of a particular disease. A group of patients with a disease (the cases) are compared with another group of subjects who do not have the disease (the controls). Their lifestyles, previous exposure to potential hazards, demographics, etc., are compared to try to distinguish which of those features predisposes a patient to have the disease in question. |
| **Causal relationship** | A relationship that is observed when one variable is a consequence of another.

The "gold" standard for determining cause and effect is a randomized placebo controlled clinical trial where the outcome that is considered was the primary, pre-specified endpoint.  Among other factors to be considered are the Bradford Hill criteria.  *See, Judicial Manual for Scientific Evidence.* |
| **CBARDS** | *See* "**Clinical Biostatistics and Research Decision Sciences**" OR "**Clinical Biostatistical and Research Development Sciences**" |
| **CBE** | *See* "**Change Being Effected**" |
| **CDER** | *See* "**Center for Drug Evaluation and Research**" |
| **CDOC** | *See* "**Clinical Development Oversight Committee**" |
| **CDP** | *See* "**Clinical Development Program**" |
| **Celebrex** | Selective Cox-2 inhibitor developed and marketed by Searle/Pfizer that was Vioxx's major competitor. Celebrex is less COX 2 selective than either Vioxx or Bextra. |
| **Celecoxib** | Scientific name for Celebrex. |
| **Center for Drug Evaluation and Research (CDER)** | Division of the Food and Drug Administration responsible for all over-the-counter and prescription drugs. |

**KS-001188**

| TERM | DEFINITION |
|---|---|
| **Cerebrovascular accident (CVA)** | Cerebrovascular accident or stroke, which has two subtypes 1) A cerebral infarction in which a blood vessel is blocked, usually by a blood clot depriving an area of the brain of oxygen and nutrients leading to cell death;  2) a hemorrhagic stroke in which a blood vessel bursts, leaking blood into the brain damaging cells from pressure against the skull. |
| **Change Being Effected (CBE)** | Mechanism by which a pharmaceutical company can simultaneously change the label of a marketed product and submit the supplemental New Drug Application seeking approval for the change to the FDA for review and approval. |
| **CHD** | *See* "Coronary heart disease" |
| **Chemotaxis** | Chemotaxis is an innate behavioral response by an organism to a directional stimulus in which bodily cells, bacteria, and other single-cell or <u>multicellular</u> organisms direct their movements according to certain chemicals in their environment. |
| **CHF** | *See* "Congestive heart failure" |
| **CIB** | *See* "**Clinical Investigator's Brochure**" |
| *Circulation* | Major cardiology medical journal published by the American Heart Association.  The "**Konstam meta-analysis**," as well as many pharmacology studies relevant to the litigation, have been published in *Circulation*. |
| **Class effect** | Effect shared by related or similar drugs that is not specific to any particular molecule of the class. In this litigation, Merck contends that all NSAIDS (with the exception of Naproxen) carry a cardiovascular risk. |
| **CLASS Study** | Celecoxib Arthritis Safety Study – Searle/Pfizer- sponsored study to assess the gastrointestinal safety of Celebrex relative to diclofenac and ibuprofen.  *See, JAMA* 2000 284:1247-55.   Essentially, Searle/Pfizer's analog to the VIGOR study.  The CLASS study did not demonstrate a statistically significant difference in either GI or CV effects between Celebrex and its comparators, in part likely due to the permitted use of aspirin among trial participants.[1] |
| **CLIC** | *See* "**Clinical Information Center**" |
| **Clinical and Regulatory Review Committee (CRRC)** | *See* "**Clinical Development Oversight Committee**" |
| **Clinical Biostatistical and Research Development Sciences (CBARDS)** | Subdivision of BARDS that provided statistical support to clinical researchers and created data analysis plans for clinical trials. |

**KS-001189**

| TERM | DEFINITION |
|---|---|
| **Clinical Development Oversight Committee (CDOC)** | Merck committee that reviewed clinical development strategies and plans from a safety compliance and quality assurance perspective, determined whether and how study protocols should proceed; later known as "**Clinical and Regulatory Review Committee**" and currently the "**Late Development Review Committee**." |
| **Clinical Development Program (CDP)** | Subdivision of Merck's Medical and Scientific Affairs Department that designed, implemented, and published post-marketing studies on the Company's products, including Vioxx.  Despite the scientific sounding title, this division was actually under US Human Health, the marketing division headed by a non-scientist, David Anstice. |
| **Clinical Information Center (CLIC)** | Resource within Merck Research Labs for journal articles, medical literature, etc. |
| **Clinical Investigator** | A physician who sees patients in a clinical trial, oversees any interventions, such as drug administration, and records outcomes. |
| **Clinical Investigator's Brochure (CIB)** | Background document sent to all clinical investigators in Merck trials.  Gives background of the drug, results of studies known to date, and information about what side effects/risks for which the investigators should be on alert.  Updated on a regular basis. |
| **Clinical Monitor** | The Merck scientist responsible for all medical aspects of a clinical trial, including the medical aspects of designing the trial and interpreting the results.  Example—the clinical monitor for VIGOR was Alise Reicin. |
| **Clinical Risk Management and Safety Surveillance (CRESS)** | Acronym for Clinical Risk Management and Safety Surveillance, the division that monitored spontaneous adverse event reports.  Previously, the division was called the "Report Evaluation and Safety Surveillance"  or "RESS"; See "**RESS**" and "**Report Evaluation and Safety Surveillance**" |
| **Clinical Sciences** | Subdivision of MRL responsible for the development, design, and implementation of clinical studies. |
| **Clinical Study Report (CSR)** | Document detailing the procedures and results of a clinical trial prepared by the company sponsoring the trial and submitted to the FDA. Company jargon for "clinical study report," or the lengthy final research report that most completely describes the result of a clinical study. |
| **Clinical trial or study** | Study conducted in human beings for the purpose of determining a drug's safety and/or efficacy for a particular use. |
| **Clinical Trials System (CTS)** | Computer system that contained the data, forms and reports from Merck clinical trials. |
| **Clopidogrel** | A potent oral antiplatelet agent marketed by Bristol-Myers Squibb and Sanofi-Aventis under the trade name Plavix. |
| **CME** | *See* "**Continuing Medical Education**" |

**KS-001190**

| TERM | DEFINITION |
|---|---|
| Cohort study | The study of a group of subjects over time. |
| Collateral Circulation | This is a process in which small (normally closed) arteries open up and connect two larger arteries or different parts of the same artery. They can serve as alternate routes of blood supply. |
| Colocalization | Presence of two or more objects or substances in a limited defined area. |
| Combination therapy | Any of several proposed combinations in a single pill or capsule of Vioxx and an antiplatelet (e.g., aspirin, Clopidogrel) or gastroprotective agent for the purpose of adding or allowing patients to add cardioprotection to Vioxx without compromising its gastroprotective qualities. |
| Comorbidity | The presence of one or more diseases or conditions in addition to the disease of interest in a clinical trial. |
| Comparator | The drug, placebo, or treatment (or other medical intervention) to which a new or experimental drug is being compared in the context of a clinical trial. |
| Complicated PUBs | Gastrointestinal perforations, obstructions, and complicated upper-gastrointestinal bleeds; the secondary endpoint in the VIGOR Trial. Also known in this Report as "Perforations, obstructions, and bleeds" or "POBs." |
| Composite Endpoint | A group of several specific diseases that share a common etiology. Composite endpoints are used to improve the power of clinical trials to detect differences. According to experts, findings for a composite endpoint are presumed to apply to all of the endpoints, unless there is scientifically reliable evidence to the contrary. |
| Confidence interval | A range of values likely to encompass the true magnitude of a studied effect. A 95% confidence interval means that the statistical methodology used to perform the calculation at issue can be expected, 95 times out of 100, to generate a range of values that encompasses the true magnitude of the effect being measured. |
| Confounding variable | A variable, other than the variable of primary interest, that may affect the outcome measure in the course of a trial and that may or may not be known to investigators. |
| Congestive heart failure (CHF) | Condition characterized by weakness, breathlessness, abdominal discomfort, and edema in the lower portions of the body resulting from venous stasis and reduced outflow of blood from the left side of the heart. |
| Constitutive | Of or relating to the synthesis of a protein or an enzyme at a constant rate regardless of physiological demand or the concentration of a substrate (contrast with "**upregulated**"). |
| Consultants' Meeting | At Merck, a meeting of outside experts hosted by MRL to seek advice about particular scientific issues or by the Marketing Department to obtain market research. |

**KS-001191**

| TERM | DEFINITION |
|---|---|
| **Continuing Medical Education (CME)** | Programs designed to provide ongoing medical education to physicians and through which physicians maintain their certification by accumulating credits from attendance at such lectures. <br> Notably, Merck defines 'Medical Education' as "a tactic or program to provide information relating to the science and practice of medicine or the treatment of disease.  MERCK CAVEAT—the content always includes science and some varying degree of emphasis on brand messages.  The output communicates Merck's point of view in relevant scientific areas." (Source: MRK-AFI0010582 at 86). <br> Simply put, Merck viewed "medical education" as simply another marketing opportunity. |
| **Contract Research Organization (CRO)** | Refers to an outside organization contracted to run clinical trials and duties with a sponsor (eg Covance was the CRO for VIGOR). |
| **Coronary artery bypass grafting (CABG)** | Surgical procedure by which narrowed arteries in the heart are bypassed with veins or arteries from outside the heart. |
| **Coronary heart disease (CHD)** | See "**Ischemic heart disease**."  Generally refers to diseases related to the narrowing or obstruction of the coronary arteries, which supply blood to the myocardium, or muscle of the heart. Among the most serious manifestations of coronary heart disease are myocardial infarction, sudden cardiac death, and unstable angina. It is standard practice in clinical trials and epidemiologic studies to use serious coronary heart disease as an endpoint. In many studies this is defined as myocardial infarction and sudden cardiac death. |
| **Covance** | CRO for VIGOR.  See "**CRO**" and "**Contract Research Organization**" |
| **COX** | Abbreviation for "Cyclooxygenase," the enzyme involved in many critical body functions that is the target of all NSAIDs.   Cyclooxygenase has two forms: COX-1 and COX-2. Until 1989, researchers thought there was only one COX enzyme or isoform (COX-1) that was cloned in sheep and humans. In 1991-92 investigators started referring to the two prostaglandin synthase enzymes known as Cox-1 and Cox-2. By this time both human platelet Cox-1 and human endothelial cell Cox-2 sequences were cloned and expressed. |
| **Cox proportional hazards model** | A statistical method for comparing the survival times between two or more groups of subjects that allows for adjustment for covariates and assumes a constant hazard rate over time. One of the applications of the model is to test whether the hazard rates are proportional over time. The test produces a p-value indicating the strength of the evidence in favor of rejecting the model's assumption of constant hazards. |
| **Cox-2** | Cyclooxygenase-2 Enzyme responsible for causing pain and inflammation and mediating the production of certain prostaglandins, including prostacyclin. Cox-2 was first cloned in HUVEC (Human Umbilical Vein Endothelium Cells) in 1991. Cox-2 is less stable than Cox-1 and undergoes profound regulation by many factors including cytokines, tumor promoters, inflammatory stimuli, glucocorticoids, etc., and is called the "inducible" or "regulable" form. |

KS-001192

| TERM | DEFINITION |
|---|---|
| **Cox-2 hypothesis** | Hypothesis underlying the development of selective Cox-2 inhibitors, including Vioxx, which posited that selective inhibition of the Cox-2 enzyme without inhibition of the Cox-1 enzyme, would relieve pain and inflammation without causing gastrointestinal injury. |
| **Coxib Task Force** | At MRL, team created by Dr. Peter Kim in early 2001 to study the cardiovascular effects of Vioxx and Arcoxia. |
| **Coxibs** | A subclass of NSAIDs that were first introduced into clinical practice in 1998 that selected for the Cox-2 enzyme. These include such drugs as Vioxx, Celebrex, Bextra and Arcoxia. The only coxib remaining on market in the United States is Celebrex, which carries a black-box warning for cardiovascular and gastrointestinal risks. |
| **Cox-l** | Cyclooxygenase-1 enzyme that plays a role in protecting the lining of the stomach and mediates the production of certain prostaglandins, including thromboxane and perhaps also prostacyclin. More stable than COX-2, in most experimental systems the COX-1 gene does not undergo large changes in gene expression and is often called the "housekeeping" or "constitutive" COX. |
| **Cozaar** | Merck drug (Losartan potassium) to reduce the risk of stroke in certain patients. |
| **C-reactive protein (CRP)** | A marker of inflammation that is present in increased concentrations in the blood during the active phase of many inflammatory diseases. Since some disease states that predispose to heart disease are now considered to be inflammatory processes (eg atherosclerosis, diabetes), basal CRP testing has come to be seen somewhat representative of baseline cardiac risk.<br>(Note: test is not specific for cardiac disease; the presence of concomitant and unrelated infection/inflammation, such as a sinus infection, could raise CRP levels). |
| **Creatinine concentration** | Indicator of renal function. |
| **CRESS** | *See* "**Clinical Risk Management and Safety Surveillance**" |
| **CRO** | *See* "**Contract Research Organization**" |
| **Cross-sectional study** | A study that examines all data at one particular point in time and does not consider within subject effects (i.e., changes from the baseline). |
| **CRP** | *See* "**C-Reactive Protein**" |
| **CRRC** | *See* "**Clinical and Regulatory Review Committee**" |
| **Crude event rate** | In the context of a clinical trial, the rate of events per patient without regard to the patients' length of treatment. |

**KS-001193**

| TERM | DEFINITION |
|------|------------|
| CSR | *See* "**Clinical Study Report**" |
| CST | Commercialization (or new medical use) team, usually the "CST" or "Vioxx CST." |
| CTS | *See* "**Clinical Trials System**" |
| CV | Abbreviation for "cardiovascular."   However, in many Merck emails and less formal communications "CV" was used as a synonym for "thromboembolic" cardiovascular events, those caused by blood clots.  *See* "**Cardiovascular**" |
| CV Card | *See* "**Cardiovascular Card**" |
| CV Outcome Study | A human study with cardiovascular events as the primary endpoint. On September 13, 2001, Ed Scolnick wrote an email that said for Vioxx the only essential study was the CV outcome study. On March 13, 2002 (simultaneous with notice that the VIGOR label change would be in the precautions verses warnings section), Anna Esposito sent an email to Merck employees notifying them that the Vioxx CV outcome study was placed on hold by upper management. Source MRK-ABA0028398. |
| CVA | *See* "**Cerebrovascular accident**" |
| Cyclooxygenase | Endogenous enzyme that mediates the production of prostaglandins, including thromboxane and prostacyclin.  *See* "**COX**." |
| DAAODP | *See* "**Division of Anti-Inflammatory, Analgesic and Ophthalmic Drug Products**" |
| DAP | *See* "**Data analysis plan**" |
| Data Analysis Plan (DAP) | Set of written procedures that describe how the results of a clinical trial are to be tabulated and analyzed and are supposed to specify in advance of unblinding; also sometimes referred to as a "statistical data analysis plan" (SDAP). |
| Data dredging | Analyzing data without regard to accepted scientific and statistical principles in order to find some aspect that will be of interest. |
| Data Safety Monitoring Board (DSMB) | In the context of a clinical trial, a panel of medical experts, with relevant expertise (generally physicians and biostatisticians) responsible for reviewing unblinded or partially unblinded interim study data to ensure patient safety; also known as an "External Safety Monitoring Board" (ESMB). Theoretically, this group should be independent from the company, but Merck 'advocates' (such as Marv Konstam) have been placed on Merck DSMBs/ESMBs. |
| DDMAC | *See* "**Division of Drug Marketing, Advertising and Communications**" |

**KS-001194**

| TERM | DEFINITION |
|---|---|
| **DDW** | *See* "**Digestive Disease Week**" |
| **Detail** | In the context of pharmaceutical sales, a visit from a pharmaceutical sales representative to a doctor. |
| **Detail aid** | In the context of pharmaceutical sales, product pamphlet containing a drug's labeling information used by pharmaceutical sales representatives in conversations with doctors. |
| **Diclofenac** | A non-selective NSAID developed by Ciba under the brand name Voltaren (now available generically). |
| **Digestive Disease Week (DDW)** | Annual medical conference on gastrointestinal diseases. |
| **Direct-to-consumer advertising (DTC)** | Advertising directed at the general public, including television and magazine ads. |
| **Division of Anti-Inflammatory, Analgesic and Ophthalmic Drug Products (DAAODP)** | Subdivision of the FDA's Center for Drug Evaluation and Research (CDER) responsible for regulating the class of drugs to which Vioxx belongs. The division was responsible for reviewing the supplemental New Drug Application that Merck submitted following the VIGOR Trial. |
| **Division of Drug Marketing, Advertising and Communications (DDMAC)** | Subdivision of the FDA's Center for Drug Evaluation and Research that reviews prescription drug advertisements and promotional pieces; empowered to issue Warning Letters regarding such materials or refer issues regarding such materials to the FDA's legal division for possible enforcement action. |
| **Dodgeball** | A training term used to train Merck Sales Staff post-VIGOR on how to answer physician questions about general and cardiovascular safety of Vioxx. The sales representative who was able to "dodge" advanced to the next round. See Training Term. |
| **Dosage creep** | A phenomenon whereby patients consume higher than prescribed doses of a medication over time under the potentially mistaken belief that the higher doses will be more efficacious. |
| **Dose response relationship** | How the effect of a drug changes with dose. |
| **Dose-ranging study** | Clinical trial to determine the effective dose of a medication for a specific indication. |
| **Double-blind trial** | Clinical trial in which both the patients and the investigators are ignorant (or "blinded") throughout the course of the trial as to whether any individual patient is receiving the study drug or a comparator. |
| **DSMB** | *See* "**Data Safety Monitoring Board**" |

**KS-001195**

| TERM | DEFINITION |
|---|---|
| **DTC** | *See* "**Direct-to-consumer advertising**" |
| **Dual-Cox inhibitors** | NSAIDs that inhibit both Cox-1 and Cox-2; also called non-selective NSAIDs. |
| **Duration** | The term used to define the length of ingestion of a drug in days, months, or years. |
| **Duration-effect** | Effect of drug treatment that varies depending on the length of treatment |
| **Dyspepsia** | Imperfect or painful digestion that is not a disease itself, but is symptomatic of a disease. |
| **Edema** | A local or generalized condition in which the body tissues contain an excessive amount of tissue fluid.  Sometimes associated with congestive heart failure or hypertension. |
| **EDGE Trial** | *See* "**Etoricoxib Diclofenac Gastrointestinal Evaluation**" trial |
| **Educational Program Integration (EPI)** | *See* "**Health Education Liaison**" |
| **Eicosanoid** | Umbrella term that describes the arachidonic acid derived signaling molecules involved in complex biochemical and physiological processes, including inflammation.  Prostaglandins, prostacyclins, thromboxanes and leukotrienes are all eicosanoids. |
| **Endogenous** | Produced or originating from within a cell or organism. |
| **Endoscopy study** | A clinical trial in which an instrument known as an endoscope is used to examine the stomach lining and/or gastrointestinal tract for the presence of endoscopically detectible gastrointestinal injuries. |
| **Endothelium** | Layer of cells that lines many areas of the body, including the cavities of the heart and blood vessels. |
| **Endpoint** | A variable, which may relate to efficacy or safety, that is one of the primary interests in a study. |
| **Enteric aspirin** | Aspirin tablet with a special coating that protects the stomach. |
| **Enzyme** | Protein molecule produced by living organisms that catalyses chemical reactions of other substances without itself being destroyed or altered upon completion of the reactions. |
| **EOC** | *See* "**Expression of Concern**" |
| **EPI** | *See* "**Educational Program Integration**" |

KS-001196

| TERM | DEFINITION |
|---|---|
| **Epidemiology** | The study of health and disease in populations, including etiology, natural course, and treatments through the collection and analysis of statistical data concerning exposures to potential and known risk factors for diseases. |
| **Epidemiology Department** | Subdivision of Merck's Biostatistics and Research Science Development Department that drafted data analysis plans for epidemiological studies and coordinated the adjudication of cardiovascular events. |
| **ESMB** | *See* "**External Safety Monitoring Board**" |
| **Etodolac** | A traditional non-selective NSAID developed by American Home Products under the brand name Lodine XL (now available generically). |
| **Etoricoxib** | Scientific name for Arcoxia. |
| **Etoricoxib Diclofenac Gastrointestinal Evaluation trial (EDGE Trial)** | Acronym for the "Etoricoxib Diclofenac Gastrointestinal Evaluation" trial; a one-year study by MRL comparing Arcoxia to diclofenac in osteoarthritis patients; a second trial using the same design, known as the EDGE II Trial, has been recently published. |
| **EULAR** | *See* "**European League Against Rheumatism**" |
| **European League Against Rheumatism (EULAR)** | British professional association for rheumatologists that hosts an annual scientific meeting. |
| **Ex vivo** | Outside of the living body; generally used to describe the study outside of the body of that which normally exists inside the body – e.g., drawn blood. |
| **Exogenous** | Originating outside an organ or part. |
| **Expedited review** | In the context of FDA submissions, a procedure through which the FDA approves New Drug Applications and/or supplemental New Drug Applications on an abbreviated review schedule.  Vioxx was approved through an expedited review, although there was no demonstrable 'need' for it. |

**KS-001197**

| TERM | DEFINITION |
|---|---|
| **Expression of Concern (EOC)** | Term of art in the medical journal community—somewhat different than a 'correction' in function but (like a correction) becomes part of the scientific record and part of the article itself.  An EOC is a label that medical editors place on an already published article to indicate they have concerns about the data/substance of an article itself.  After an EOC is placed, the authors are given a chance to respond to the editors' concerns.  If the response is considered satisfactory, the EOC is lifted.  The editors of the NEJM placed an EOC on the VIGOR article when they learned that Merck had access to data re:  MIs available in 2000 while the article was being written, but failed to include it in the final product.  Since the response offered by both the Merck and non-Merck authors was considered unsatisfactory by the NEJM editors, instead of lifting it, the EOC was 'reaffirmed' and is now part of the scientific record of the VIGOR article (*see, generally*, Deposition of Gregory Curfman, Jan 2007). |
| **External Safety Monitoring Board (ESMB)** | *See* "**Data Safety Monitoring Board**" |
| **Exxpert** | Rebate and educational program for Vioxx consumers. |
| **FDA** | *See* "**Food and Drug Administration**" |
| **FDCA** | *See* "**Food, Drug, and Cosmetic Act**" |
| **FF** | *See* "**Frozen File**" |
| **Field Implementation Team (FIT)** | Team Merck cross-functional team that coordinated the implementation of marketing strategies through the Company's sales force; formerly known as the Market Integration Team. |
| **First patient in (FPI)** | Date on which the first patient enters a clinical trial. |
| **FIT** | *See* "**Field Implementation Team**" |
| **FitzGerald prostacyclin hypothesis** | Hypothesis generated by Dr. Garret FitzGerald in 1997 that selective Cox-2 inhibitors might increase the risk of thrombotic cardiovascular events, based on his assumption that selective Cox-2 inhibitors suppressed vascular synthesis of prostacyclin (an antiplatelet agent and vasodilator) without concurrent suppression of thromboxane (known to induce platelet aggregation and vasoconstriction). |
| **Flurbiprofen** | A non-selective NSAID developed by Upjohn under the brand name Ansaid (now available generically) and one of two NSAIDs with a purported cardioprotective effect that was used by Merck to bolster argument that naproxen was cardioprotective. |

**KS-001198**

| TERM | DEFINITION |
|---|---|
| **Food and Drug Administration (FDA)** | Federal agency within the Department of Health and Human Services responsible for regulating pharmaceutical products (among other things) in the United States. |
| **Food, Drug, and Cosmetic Act (FDCA)** | The federal statute that created the FDA and gives it the authority to regulate, among other things, pharmaceuticals. |
| **Fosamax** | Merck drug (alendronate sodium) for the treatment and prevention of osteoporosis. |
| **FPI** | *See* "**First patient in**" |
| **Framingham Study** | Well-known, long running (since 1948) and ongoing (now following its third generation) cohort study of cardiovascular risk based on the population in Framingham, MA.  Much of what we know about heart disease and patterns of risk attributable to lifestyle factors and medical conditions comes from this study. |
| **Franchise Business Group** | Subdivision of Merck's Marketing Department responsible for developing marketing strategies for a particular drug; formerly called Therapeutic Business Group. |
| **Frozen File (FF)** | At a specified date or event all the data from a clinical trial was "frozen" into a single unblinded data set that could be used by anyone in the large team that was analyzing the results and writing reports. |
| **Gastric mucosa** | Layer of moist tissue that lines the stomach. |
| **Gastroenterologist** | Physician specializing in the study of the physiology and pathology of the stomach, intestines, and related structures, such as the esophagus, liver, gallbladder, and pancreas. |
| **Gastrointestinal (GI)** | Pertaining to the stomach and intestine. |
| **Generalizability** | The extent to which conclusions ~ of a clinical trial) can be applied to a wide population. |
| **GI** | *See* "**Gastrointestinal**" |
| **GP IIb/IIIa receptor antagonist** | Antiplatelet agent that operates by interrupting the final pathway of platelet aggregation, the binding of fibrinogen (or Von Willenbrand factor) to its platelet membrane GpIIb/IIIa receptor; identified in a 1998 Merck patent for potential combination with Vioxx or another selective Cox-2 inhibitor in a single pill. |
| **Half-life** | Time required by the body, tissue, or organ to metabolize or inactivate half the amount of a substance taken in. |
| **HAS** | *See* "**Health Science Associate**" |
| **Hazard rate** | Probability of a given event occurring at a particular point in time, given that the event has not yet occurred. |

KS-001199

| TERM | DEFINITION |
|---|---|
| **Hazard ratio** | Ratio of two hazard rates either at a particular point in time or averaged over a long period. |
| **Health Education Liaison (HEL)** | Merck promotional program consisting of presentations by Merck personnel or other parties that educated doctors about the Company's products, including Vioxx. |
| **Health Science Associate (HSA)** | Merck sales representatives specially trained to discuss scientific information concerning the Company's products with thought leaders. |
| **HEL** | *See* "**Health Education Liaison**" |
| **Hepatic** | Pertaining to the liver |
| **Heterogeneous** | Consisting of elements that are not of the same kind or nature |
| **HHBT** | *See* "**Human Health Business Team**" |
| **HHPAC** | *See* "**Human Health Product Approval Committee**" |
| **High Density Lipoprotein** | High-density lipoproteins (HDL) form a class of lipoproteins, varying somewhat in their size (8–11 nm in diameter), that carry cholesterol from the body's tissues to the liver. About thirty percent of blood cholesterol is carried by HDL. It is hypothesized that HDL can remove cholesterol from atheroma within arteries and transport it back to the liver for excretion or re-utilization—which is the main reason why HDL-bound cholesterol is sometimes called "good cholesterol," or HDL-C. A high level of HDL-C seems to protect against cardiovascular diseases, and low HDL cholesterol levels (less than 40 mg/dL) increase the risk for heart disease. When measuring cholesterol, any contained in HDL particles is considered as protection to the body's cardiovascular health, in contrast to "bad" LDL cholesterol. |
| **Homeostasis** | The state of dynamic equilibrium of the internal environment of the body that is maintained by the ever-changing processes of feedback and regulation in response to external or internal changes. |
| **Hormone** | A substance originating in an organ, gland, or body part that is conveyed through the blood to another body part, chemically stimulating that part to increase or decrease functional activity or to increase or decrease secretion of another hormone. |
| **Human Health Business Team (HHBT)** | Believed to be a group of the most senior Merck executives and probably called the "Human Health Business Team." |
| **Human Health Product Approval Committee (HHPAC)** | Merck's second-highest ranking cross-functional committee, that included senior executives (vice president and above) from clinical research, regulatory affairs, marketing and the business side.  Reviewed and approved the clinical development program |

**KS-001200**

| TERM | DEFINITION |
|---|---|
| **Hypertension** | A condition in which a patient has higher than normal blood pressure |
| **Hypothesis** | A tentative theory or postulated explanation of an observed phenomenon that may be a likely explanation, but requires further investigation for verification |
| **Hyzaar** | Merck drug (Losartan potassium-hydrochlorothiazide) for the treatment of hypertension. |
| **Ibuprofen** | A non-selective NSAID developed by The Boots Co. under the brand name Nurofen (now available generically). Current trade names include Motrin and Advil. |
| **ICH** | *See* "**International Committee on Harmonisation**" |
| **ICMJE** | *See* "**International Committee of Medical Journal Editors**" |
| **IHD** | *See* "**Ischemic heart disease**" |
| **IMS** | Company that specializes in "market intelligence" for the pharmaceutical industry; among other things, gathers data on physician prescribing habits that is used by the marketing divisions of pharma companies to target their 'messages' to the individual prescriber's prescription habits. |
| **In vitro** | In the context of a scientific experiment or trial, pertaining to a test done in a test tube or other artificial environment (literally, within a glass) of a biological process or reaction that would normally occur in a human being or other organism. |
| **In vivo** | In the context of a scientific experiment or trial, pertaining to a test done inside a living body of a biological process or reaction. |
| **IND** | *See* "**Investigational New Drug**" |
| **Indication** | Disease or condition for which the FDA has approved a treatment. |
| **Indobufen** | A non-selective NSAID and one of two NSAIDs with a purported cardioprotective effect that was used by Merck to bolster argument that naproxen was cardioprotective. |
| **Indomethacin** | A non-selective NSAID developed by Merck under the brand name Indocid (now available generically). |
| **Ingenix** | Outside organization that contracted with Merck to run an epidemiology study on the CV risks of Vioxx.  Merck received the results (which were unfavorable to Vioxx) in 2003, yet did not publish them until after the drug was withdrawn. |

**KS-001201**

| TERM | DEFINITION |
|---|---|
| **Institute of Medicine (IOM)** | Non-profit that is part of the National Academies of Science.  Purpose is to provide independent, national advice on health care issues.  Best known for issuing reports on medical errors.  In this litigation, issued a report on deficiencies in the FDA's drug safety review process (at the request of FDA). |
| **Integrated Summary of Safety (ISS)** | Section of New Drug Application that comprehensively analyzes safety data for the proposed drug. |
| **Intention-to-treat analysis (ITT)** | Strategy for analyzing study data, which says that any subject randomized to treatment must be followed throughout the intended treatment period included in the analysis, even if the subject discontinues the trial prematurely. |
| **International Committee of Medical Journal Editors (ICMJE)** | Organization of editors of major medical journals that set standards and guidelines ("Uniform Requirements for Manuscripts Submitted to Biomedical Journals."  Includes the editors of *NEJM, Annals of Internal Medicine, JAMA* and the *Lancet*, among others.<br>Published a landmark editorial in September 2001 regarding sponsorship, authorship and accountability (*see* NEJM 2001; 345 (11): 825-827).  Also set the definition and standards for corrections and 'expressions of concern' to published medical articles. |
| **International Committee on Harmonisation (ICH)** | Collaborative of regulatory agencies and pharmaceutical experts throughout the world dedicated to the improvement of the drug development process. |
| **International Society for Pharmacoepidemiology (ISPE)** | International professional organization in the field of pharmacoepidemiology, including pharmacovigilance, drug utilization research, and therapeutic risk management |
| **Interviewer bias** | In a clinical trial including data collected by means of interviews with study participants, bias caused by the manner in which an interviewer elicited or recorded such information. |
| **Investigational New Drug (IND)** | "Investigational New Drug" application allows drug companies to give humans unapproved new drugs for purposes of obtaining FDA approval.  Reports and documents for preclinical and testing for as-yet unapproved uses are filed to the "IND" at the Food and Drug Administration. |
| **IOM** | *See* "**Institute of Medicine**" |
| **Ischemic heart disease (IHD)** | (Merck definition)—coronary artery disease; lack of blood to the heart resulting from narrowing of the arteries (atherosclerotic disease).  (*Source*:  MRK-AAR0068035 at 54). [2] |
| **Isoform** | A protein that serves a similar function to, but takes a slightly different form from, another protein. |

**KS-001202**

| TERM | DEFINITION |
|---|---|
| **ISPE** | *See* "**International Society for Pharmacoepidemiology**" |
| **ISS** | *See* "**Integrated Summary of Safety**" |
| **ITT** | *See* "**Intention-to-treat analysis**" |
| ***JACC*** | *See* "***Journal of the American College of Cardiology***" |
| ***JAMA*** | *See* "***Journal of American Medical Association***" |
| **Jenkins memo** | Name used during the litigation to refer to the controversial April 6, 2005 memo issued by two Staff Members of the FDA after the February 16-18, 2005 FDA Advisory Committee Meeting wherein the AC voted 32-0 Vioxx was cardiotoxic. The Jenkins Memo subject matter re line is "Analysis and recommendations for Agency action regarding non-steroidal anti-inflammatory drugs and cardiovascular risks." The authors are John Jenkins, M.D., Director of the Office of New Drugs and Paul J. Seligman, M.D., Director of the Office of Pharmacoepidemiology and Statistical Science (OPaSS). This memorandum purports to review all of the available data to April 6, 2005 and necessarily does not consider later published documents or information such as the NEJM Expression of Concern or APPROVe correction in NEJM. The memorandum has never been officially adopted by FDA or at any FDA Advisory Committee. |
| ***Journal of American Medical Association (JAMA)*** | Major general medical journal published by the American Medical Association.  Topol and Nissen published their pooled analysis of the VIGOR and CLASS data in JAMA in August 2001 (*See* "**Topol article**") |
| ***Journal of the American College of Cardiology (JACC)*** | Major clinical cardiology journal published by the American College of Cardiology. |
| ***JPET*** | *See* "***The Journal of Pharmacology and Experimental Therapeutics***" |
| **JRA** | *See* "**Juvenile rheumatoid arthritis**" |
| **Juni meta-analysis** | Term used in the litigation to refer to a meta-analysis published in Lancet in 2004 by a team from Switzerland of the published Vioxx data to date. |
| **Juvenile rheumatoid arthritis (JRA)** | Rheumatoid arthritis occurring in children. |
| **Kaiser study** | Term used in the litigation to refer to FDA's David Graham's epidemiologic study (performed in conjunction with physicians from Kaiser Permanente) re:  CV risks of Vioxx and Celebrex.  Although FDA sponsored the study, when senior FDA officials became aware of the results, they attempted to interfere with its publication in *Lancet*.  (*See*, *Lancet* 2005; 365: 475-481.   *See also, generally*, deposition of David Graham). |

**KS-001203**

| TERM | DEFINITION |
|------|------------|
| **Kaplan-Meier curve** | A graph showing the cumulative incidence of an outcome of interest over time. |
| **Knockout mice** | Mice bred without a given gene or receptor for scientific purposes; as used in this Report, mice bred without prostacyclin receptors that Murata ET AL. studied to determine the effects of selectively and completely inhibiting prostacyclin. |
| **Konstam meta-analysis** | Term used in the litigation to refer to a Merck sponsored (and largely Merck authored) meta-analysis published in Circulation in 2001, to ease fears re:  Vioxx's CV risks.  Analysis has been criticized for omissions of certain studies, misleading presentation of data, and use of endpoints that were not pre-specified in the original trials. Marvin Konstam is an outside consultant for Merck. |
| **L-748731** | Early internal Merck designation for Vioxx. |
| **Label** | Complete prescribing information for a drug, including warnings and precautions developed by pharmaceutical companies in consultation with the FDA and approved by the FDA. |
| ***Lancet*** | Leading general British medical journal; some refer to it as the British analogue of the *New England Journal of Medicine*.  The Juni Meta-analysis was published here in 2004 after the withdrawal of Vioxx from the market, along with a strongly worded editorial from the Lancet's editors, indicating they believed that Vioxx should have been pulled from the market years earlier (*see* "**Juni meta-analysis**").  *See*, *Lancet*, 2004, <br> The *Lancet* also published David Graham's Kaiser study (*see* "**Kaiser study**"). *See*, *Lancet* 2005; 365: 475-481. |
| **Large Simple Trial** | A trial where treatment is administered in a naturalistic setting that is intended to mirror standard practice, and the outcomes measured are simple and available in the typical practice setting. |
| **Last patient out (LPO)** | Date on which last patient in a clinical trial completes his or her course of treatment. |
| **Late Development Review Committee (LDRC)** | *See* "**Clinical Development Oversight Committee**" |
| **LDRC** | *See* "**Late Development Review Committee**" |
| **LEAD** | Acronym (full name unknown) for task force that prepared product circulars for potential reintroduction of Vioxx to marketplace in 2005.[3] |
| **Licensing Management Committee (LMC)** | Cross-functional Merck committee that met regularly to consider licensing the products of other companies; this committee considered licensing several products for use in combination with Vioxx. *See also* "**Combination therapy**" and "**NO-Coxib**." |

**KS-001204**

| TERM | DEFINITION |
|---|---|
| **Linear Time Test** | Test of the proportional hazards assumption using the Cox proportional hazards model including terms for the main treatment effect and time*treatment. |
| **LMC** | *See* "**Licensing Management Committee**" |
| **log(time)*treatment** | As stated in the published version of the APPROVe Trial article, interaction term included in the Cox proportional hazards model used to test the assumption of proportional hazards; a version of the model using the logarithm of time. |
| **Logarithm of Time Test** | Test of the proportional hazards assumption using the Cox proportional hazards model including terms for the main treatment effect and log (time)*treatment. |
| **Low density lipoprotein (LDL)** | Low-density lipoprotein (LDL) belongs to the <u>lipoprotein</u> particle family. LDL transports cholesterol and triglycerides from the liver and small intestine to cells and tissues which are taking up cholesterol and triglycerides.  Because LDLs transport cholesterol to the arteries and can be retained there by arterial proteoglycans starting the formation of plaques, increased levels are associated with atherosclerosis, and thus heart attack, stroke and peripheral vascular disease. This is why cholesterol inside LDL lipoproteins is called *bad* cholesterol. Still, it is not the cholesterol that is *bad*; it is instead *how* and *where* it is being transported, and in what amounts over time. |
| **Low-dose aspirin** | Daily dose of approximately 80 mg of aspirin taken for cardioprotection by patients at-risk for cardiovascular events. |
| **LPO** | *See* "**Last patient out.**" |
| **Lumiracoxib** | Scientific name for Prexige. |
| **Management Committee** | Senior-most Merck Committee, comprising the Chief Executive Officer and his direct reports. |
| **MAP** | *See* "**Merck Adherence Program**" |
| **Market Integration Team (MIT)** | *See* "**Field Implementation Team**" |
| **Marketing Services** | Subdivision of Merck's United States Human Health Division that implemented the strategies developed by the Company's Marketing Department. |

**KS-001205**

| TERM | DEFINITION |
|---|---|
| **Martin Report** | Board of Directors authorized-review of Merck's conduct in the development and marketing of Vioxx by a supposedly 'independent' team at Debevoise and Plimpton (led by a former Judge).  The firm (which doe s pharma defense work) was paid by Merck to conduct this investigation, the report of which was released publicly on the eve of the Smith trial and, in Merck's eyes 'exonerates' them from misconduct.  Although Merck has made the report public, they are strenuously resisting attempts by the PSC for discovery surrounding this report, claiming that it is privileged.  The report itself essentially reads like a playbook of Merck's defenses and defense arguments. |
| **Maxalt** | Merck drug (rizatriptan benzoate) for the acute treatment of migraine attacks. |
| **MEDAL** | Acronym for "Multinational Etoricoxib and Diclofenac Arthritis Long-term study;" CV outcomes study performed comparing Arcoxia to diclofenac |
| **MEDAL Trial** | See "Multi-National Etoricoxib Diclofenac Arthritis Kong-Term Trial" |
| **Medical and Scientific Affairs (MEDSA)** | Subdivision of Merck's United States Human Health Division that conducted scientific research and programs to support marketing and sales efforts. |
| **Medical School Grant Program  (MSGP)** | Program through which Merck funded studies of Vioxx by unaffiliated researchers. |
| **Medical Services** | Subdivision of Merck's Medical and Scientific Affairs Department that responded to questions about Merck products from doctors and other health care providers. |
| **Medical/Legal Division** | A Division of Merck headed by Tom Casola that is responsible for interface with FDA and oversight of advertising and promotion. This Division interfaces with MLRB, but no person in this division is a doctor or a lawyer. It is part of marketing. Compare with MLRB below. *See* "**Office of Medical Legal**." |
| **Medical/Legal Review Board (MLRB)** | Also referred to as medical/legal board. Brand- or franchise-specific committee often including one lawyer, one clinical scientist or MIEDSA physician, and one regulatory scientist that was responsible for ensuring Merck's promotional and other released materials concerning a particular drug or drugs complied with federal regulations and Company policies. MLRB is distinguished from the division of Medical/Legal at MRL, Upper Gwynedd, Pa., which has no lawyers or doctors and is responsible for interface with the FDA for oversight of advertising and promotion. At various times, members of MLRB included JoAnne Lahner (legal), Kathy O'Connor (legal), Robert Silverman (Regulatory Physician), Susanne Gregory (Legal), and an unnamed physician from U.S. Human Health Medical Services Group. All training terms used to train sales staff for Vioxx were reviewed and approved by MLRB. *Source*: Tom Casola deposition. |
| **Medication compliance** | Extent to which patients in a study followed a prescribed dosing regimen.     **KS-001206** |

| TERM | DEFINITION |
|------|------------|
| **MEDSA** | *See* "**Medical and Scientific Affairs**" |
| **Merck Adherence Program (MAP)** | Retention program for Vioxx. |
| **Merck Frosst** | Merck's basic research laboratory in Montreal, Canada.  Most of the initial lab development for Vioxx was done here. |
| **Merck Research Laboratories (MRL)** | Division of Merck responsible for conducting clinical studies necessary to obtain regulatory approvals, specific labeling, and new indications.  Merck Research Laboratories is the entity of Merck that develops and tests new drugs. |
| **Merck Sharpe & Dohme (MSD)** | Name of Merck's European subsidiary. |
| **Merck Voice Exchange (MVX)** | Abbreviation for Merck voice mail (short for "Merck Voice Exchange").  Broadcast voicemail messages drafted by the Field Implementation Team and used by senior sales executives to communicate with the Merck's sales force. |
| **Merlin** | Computer program through which sales associates could access information about which drugs a physician prescribed. |
| **Meta-analysis** | A statistical procedure for combining results from a number of studies and investigations in order to analyze the therapeutic effectiveness of specific treatment and plan future studies. |
| **Metabolic syndrome** | (a/k/a insulin resistance syndrome).  Cluster of conditions that increase one's risk for CV disease and diabetes.  Usually characterized by some combo of the following:  fasting hyperglycemia, hypertension, central obesity, decreased HDL, and increased triglycerides. |
| **Metabolism** | The sum of all physical and chemical changes that take place within an organism; all energy and material transformations that occur within living cells. |
| **Metabolite** | A byproduct of metabolism detectible in bodily excretions and a potential indicator of the presence and quantity of the metabolized substance in the body. |
| **MI** | *See* "**Myocardial infarction**" |
| **MIT** | *See* "**Market Integration Team**" |
| **MK-0663** | Merck designation for the Arcoxia molecule. |
| **MK-0966** | Merck designation for the Vioxx molecule. |
| **MLRB** | *See* "**Medical/Legal Review Board**" |

**KS-001207**

| TERM | DEFINITION |
|---|---|
| **Mortality rate** | In a clinical trial, the proportion of subjects who have died at any given point in time. |
| **MPGES-1** | Prostaglandin involved as an inflammation pain mediator downstream of the PGI-2 (prostacyclin) pathway. See Prostaglandin Synthesis. |
| **MRL** | *See* **"Merck Research Laboratories"** |
| **MSD** | *See* "**Merck Sharpe & Dohme**" |
| **MSGP** | *See* "**Medical School Grant Program**" |
| **Multi-National Etoricoxib Diclofenac Arthritis Kong-Term Trial  (MEDAL Trial)** | Multi-National Etoricoxib Diclofenac Arthritis Kong-Term Trial. A long-term clinical trial by MRL studying the cardiovascular effects of Arcoxia versus diclofenac in over 20,000 osteoarthritis patients. |
| **MVX** | *See* "**Merck Voice Exchange**" |
| **Myocardial infarction (MI)** | Myocardial infarction is the medical term for "heart attack," meaning a sudden blockage of the tiny arteries that supply the heart that causes the death of heart muscle cells from lack of oxygen or nutrients (also acute myocardial infarction or AMI). |
| **Nabumetone** | A non-selective NSAID developed by SmithKline Beecham under the brand name Relafen (now available generically); used as a comparator drug in several Vioxx trials, including Protocols 085 and 090. |
| **Naproxen** | A non-selective NSAID developed by Syntex Laboratories, Inc. under the brand name Anaprox (now available generically). Naproxen is characterized by a long half-life and high degree of Cox-1 inhibition. |
| **Naproxen cardioprotection hypothesis** | Also referred to as the "Naproxen Hypothesis." This hypothesis is advanced by MRL scientists in the aftermath of the VIGOR Trial that the non-selective NSAID naproxen, when taken in a sustained manner, provides cardioprotection through potent and long-lasting inhibition of Cox-1. According to experts, a protective effect of a magnitude sufficient to explain the VIGOR findings would be manifested as relative risks of 0.20 and 0.35 for myocardial infarctions and serious coronary heart disease, respectively. This is a much more pronounced effect than that of aspirin, which was seen in epidemiologic studies long before clinical trials were conducted. Thus, if naproxen had a cardioprotective effect of sufficient magnitude to explain the VIGOR findings, epidemiologic studies would be capable of detecting it.  None have shown such a significant effect. |
| **National Institutes of Health (NIH)** | The primary federal agency (part of the U.S. Department of Health and Human Services) for conducting and supporting medical research. |

**KS-001208**

| TERM | DEFINITION |
|---|---|
| **NDA** | *See* "**New Drug Application**" |
| **NEJM** | *See* "*New England Journal of Medicine*" |
| **Nested case-control study** | In epidemiology, case-control study performed in the course of a cohort study. |
| **Neutralize** | Term used by Merck marketing in conjunction with physicians/thought leaders who were expressing negative opinions re: Vioxx. |
| **New Drug Application (NDA)** | Application submitted to the FDA in support of a request for authorization to market a new drug in the United States for the treatment of a specified disease state or symptom in humans. New Drug Application is the formal document under which a drug company seeks marketing approval of a new drug for a specified medical use. After initial marketing approval the company files "supplements" to the NDA that contain information about labeling changes or applications for new medical uses. |
| ***New England Journal of Medicine (NEJM)*** | "Weekly top-line clinical medical journal published by the Massachusetts Medical Society. Widely considered to be the most prestigious medical journal in the world. The VIGOR study was published here in 2000, and the editors placed an Expression of Concern on the VIGOR study in 2005. The APPROVe study was also published here in 2005; the editors published a Correction in 2006." |
| **New users** | In epidemiology, members of a cohort who have not received a certain treatment within a specified period of time prior to the beginning of an observational study; *see also* "**Cohort study**." |
| **NIH** | *See* "**National Institutes of Health**" |
| **Nitric oxide (NO)** | Vasodilator that was considered by Merck for possible combination with Vioxx. A combination drug that consisted of this vasodilator NO with Vioxx would theoretically have a safer cardiac profile. Merck's official explanation for the program was that NO would helps prevent gastrointestinal ulcers (which frequently are caused by constricted blood vessels in the stomach)—essentially arguing that they were trying to make their 'safe for the stomach' drug safer. *See also*, "**Combination therapy**" and "**NO-Coxib**." |
| **Nitromed** | Massachusetts-based company that was partnering with Merck to develop an NO-Coxib (*see* "**No-Coxib**") |
| **NO** | *See* "**Nitric oxide**" |

**KS-001209**

| TERM | DEFINITION |
|---|---|
| **NO-Coxib** | Combination therapy Merck was seeking to develop with Nitromed—a combination of nitric oxide and Vioxx (or Arcoxia).

NO is a vasodilator, and the combination of it with the Vioxx molecule would counteract the vasoconstrictive effect of unopposed cox-1 derived thromboxane (essentially, the NO would substitute for the prostacyclin that was inhibited by Vioxx).  Documents from Nitromed suggest that this was the purpose of the development of the combo-compound—to create a Vioxx that was not cardio-toxic.  However, Merck has spun the program as an attempt to add NO to Vioxx to increase its already established gastroprotective qualities. |
| **Nonparticipation bias** | Bias caused by a potential study participant's decision not to participate in a given study. |
| **Nonselective NSAID** | A non-steroidal anti-inflammatory drug that appreciably inhibits both Cox-1 and Cox-2. |
| **Non-steroidal anti-inflammatory drug (NSAID)** | Any of a class of commonly used drugs that relieve pain and inflammation by inhibiting cyclooxygenase; examples include aspirin and ibuprofen (traditional NSAIDs that inhibit both Cox-1 and Cox-2), and Vioxx (which selectively inhibits Cox-2).  Non-Steroidal Anti-Inflammatory Drugs include aspirin, naproxen, ibuprofen, diclofenac, indomethacin and several others.  Called "non-steroidals" to distinguish them from the cortisone-like drugs, which are in the steroid (or sex hormone) family. |
| **NSAID** | *See* "**Non-steroidal anti-inflammatory drug**" |
| **NSAID cardioprotection hypothesis** | Hypothesis, articulated in a memorandum written by MRL's Dr. Thomas Musliner in 1996, that NSAIDs other than aspirin may provide antiplatelet effects and resultant cardioprotection by inhibiting Cox-1 |
| **NSAID GI warning** | FDA-mandated Warning in the label of all NSAIDs (including Cox-2 inhibitors) indicating that this class of drugs may cause gastrointestinal adverse events. |
| **Null hypothesis** | The assumption that there is no difference between groups.  When used, the null hypothesis is presumed true until statistical evidence in the form of a hypothesis test indicates otherwise. In classical science, the null hypothesis is used to test differences in treatment and control groups, and the assumption at the outset of the experiment is that no difference exists between the two groups for the variable being compared. |
| **OA** | *See* "**Osteoarthritis**" |
| **Observational study** | A study that has no experimental intervention, but rather evaluates a hypothesis through the collection and analysis of existing statistical data; see also "Epidemiology."  Examples include the cohort study and the case-control study. |

**KS-001210**

| TERM | DEFINITION |
|---|---|
| **Obstacle handlers** | Scripts prepared by the Arthritis and Analgesia Therapeutic Business Group and the Marketing Integration Team for use by the sales representatives in responding to "questions" by physicians about a drug that relate to safety or other concerns. |
| **Obstacles** | Training term used in the sales division to represent a barrier to selling the product to physicians.  However, in this litigation, Merck has spun the work "obstacle" to mean a "question" about a drug in the context of a conversation between a sales representative and physician. See "**Training Term**" below. |
| **Odds** | The probability of an event's occurring divided by the probability of it not occurring. |
| **Odds ratio (OR)** | The ratio of two odds, often used as a summary of the size of a treatment effect. *See* "**Odds**" |
| **ODS** | *See* "**Office of Drug Safety**" |
| **Off-drug analysis** | A statistical analysis of outcomes occurring after the patients in a clinical trial have ceased treatment. |
| **Office of Drug Safety (ODS)** | Subdivision of FDA's CDER devoted to post-market drug safety.  Much smaller and not nearly as well funded as OND (see, generally, deposition of David Graham). |
| **Office of Medical/Legal (OML)** | Subdivision of Merck's Marketing Services Department responsible for communicating with the FDA's Division of Drug Marketing, Advertising, and Communications and coordinating meetings of the Medical/Legal Review Boards. *See* "**Medical/Legal Division**." |
| **Office of New Drugs (OND)** | Subdivision of FDA's CDER that was responsible for approving new drugs. |
| **OML** | *See* "**Office of Medical/Legal**" |
| **Once daily dosing** | Type of regimen in which a patient must take only one dose of a medication each day. |
| **OND** | *See* "**Office of New Drugs**" |
| **On-drug analysis** | A statistical analysis of outcomes occurring during or close to the time that patients in a clinical trial are receiving treatment. |
| **OR** | *See* "**Odds ratio**" |
| **Osteoarthritis (OA)** | A type of arthritis marked by progressive cartilage deterioration in synovial joints and vertebrae and, potentially, overgrowth of bony tissue beyond the joint margins.  Osteoarthritis is one of the most common diseases of aging involving progressive degeneration of the bone and cartilage. |

**KS-001211**

| TERM | DEFINITION |
|---|---|
| Outcome | *See* "**Endpoint**" |
| Outcomes Research | At Merck, Subdivision of Medical and Scientific Affairs Department that studied health policy issues and the economics of health care.  Studies performed by this division were designed to highlight the 'need' (both medical and economic) for Merck products and were then used to leverage managed care accounts and hospitals to place Merck drugs on formulary. |
| Outlier | In the context of a scientific experiment or study, a data value that does not seem to be true, given all the other data values, usually because it is very extreme (either too large or too small). |
| Oxaprozin | A non-selective NSAID developed by Searle under the brand name Daypro (now available generically). |
| Package insert | *See* "**Label**" |
| Parecoxib | Intravenous version of Valdecoxib (Bextra), a selective Cox-2 inhibitor produced by Pfizer. |
| Patent and Trademark Office (PTO) | A federal agency within the U.S. Department of Commerce that secures to inventors, for a limited time, the right to exclusive use of their inventions. |
| Pathogenesis | The production of damage (pathology) in a tissue. |
| Patient years at risk (PYR) | In the context of a clinical trial, measure of total time that patients enrolled in the trial collectively were on a given treatment, calculated by summing the duration of each particular patient's period of treatment. |
| PDUFA | *See* "**Prescription Drug User Fee Act**" |
| Percutaneous transcoronary angioplasty (PTCA) | Catheter-based procedure used to widen narrowed coronary arteries. |
| Perforations, obstructions and Bleeds (POBs) | Gastrointestinal perforations, obstructions, and complicated upper-gastrointestinal bleeds; the secondary endpoint in the VIGOR Trial. |
| Perforations, Ulcers or Bleeds (PUBs) | Perforations (of the stomach), Ulcers or Bleeds (gastrointestinal) the abbreviation for the most serious GI complications of NSAID drugs.  Merck hoped Vioxx would reduce these problems.  The most severe and life-threatening PUBs were called "Complicated PUBs." Primary endpoint in the VIGOR Trial. |
| Periodic Safety Update Report (PSUR) | Update Report containing safety data on marketed pharmaceuticals submitted by drug-makers to the FDA and foreign regulatory agencies every six months. |

**KS-001212**

| TERM | DEFINITION |
|---|---|
| **Peripheral edema** | Edema in the extremities ~ the hands or feet), which causes swelling of the extremities. |
| **PGD-2** | The prostaglandin that is involved in sleep regulation and allergic reactions. See Prostaglandin Synthesis. |
| **PGF-2** | The prostaglandin that is involved in controlling uterus contractions. *See* **"Prostaglandin Synthesis."** |
| **PGI2** | *See* "Prostacyclin" |
| **PGI-M (PGI-M)** | Prostacyclin metabolite measurable in the urine and hypothesized to reflect the body's production of prostacyclin. |
| **Pharmacoepidemiology** | The study of drug usage and results (positive and negative) in broad populations with a view to a better understanding of beneficial drug usage. |
| **Pharmacology** | The study of drugs (including uses, benefits, harmful effects, and stability). |
| **Phase I study** | In the FDA-regulated drug development process, the earliest types of studies that are carried out in humans, typically done using small numbers (often less than 20) of healthy subjects and are to investigate toxicity, as well as the action of the drug on the physiology of the body and the action of the body on the drug. |
| **Phase II study** | Clinical trials carried out in patients, rather than healthy subjects, usually to find the best dose of the drug and to investigate safety and efficacy. |
| **Phase III study** | Generally, major clinical trials aimed at conclusively demonstrating the safety and efficacy of a drug for a particular use. |
| **Phase IV/V study** | Clinical trials carried out after a drug receives approval from the FDA; often conducted for marketing purposes as well as to gain broader experience with the new product. |
| **Physician Information Request (PIR)** | As used at Merck, physician questions relayed by sales representatives to Medical and Scientific Affairs for response, which sometimes included information which the sales representatives were not permitted to discuss or information for which Merck wanted to give a coordinated and set response.  In response to these queries (example—does Vioxx cause heart attacks?), pre-packaged materials containing the standard Merck spin were produced to the physician. |
| **Pill-splitting** | Practice of dividing a pill into halves and taking the divided doses.  After Vioxx was on the market, Merck sought to reformulate the drug so that patients (read:  elderly patients with arthritic conditions) would not buy the higher dosage and 'split' the pills to save money. |
| **Pilot study** | A small study for help in designing a further, confirmatory study. |

**KS-001213**

| TERM | DEFINITION |
|---|---|
| Pipeline | In the pharmaceutical industry, a term referring to the products under development that may be marketable in the foreseeable future. |
| PIR | *See* "**Physician Information Request**" |
| Placebo | Inert treatment administered to a control group in a clinical trial to establish a baseline against which effects of any drug under study may be evaluated. |
| Plaque | A yellow swollen area of the lining of an artery, formed by the accumulation of lipids and inflammatory cells in arterial walls.  MIs are sometimes caused by the rupture of atherosclerotic plaques, leading to a thrombus. |
| Platelets | Microscopic round or oval disks found in the blood of human beings that play an important role in blood coagulation, hemostasis, and blood thrombus formation. |
| PN | *See* "**Protocol number**" |
| *PNAS* | *See **Proceedings of the National Academy of Sciences of the United States of America*** |
| POBs | *See* "**Complicated PUBs**" and "**Perforations, obstructions, and bleeds**" |
| Policy letters | Memoranda issued to Merck sales representatives outlining Company policies governing the content of communications between representatives and physicians and related matters. |
| Pooled analysis | Analysis of combined patient-level data drawn from different studies. |
| Positive predictive value | In a diagnostic test, the probability that a person with a positive result does actually have the disease |
| Post hoc analysis | Any analysis of clinical trial data conceived with knowledge of other results of the clinical trial, and also an analysis that was not specified before the clinical trial data was known.  Example—Merck's analysis of CV rates in the subgroups of "aspirin-indicated" and "non-aspirin indicated" in the VIGOR trial was a post-hoc analysis. |
| Post-ACS | Condition of having suffered one of the diseases included with the category of Acute Coronary Syndrome. |
| Poster | Summary from clinical trials or other scientific studies presented at conferences. |

**KS-001214**

| TERM | DEFINITION |
|---|---|
| **Power** | Power refers to the capacity of a statistical analysis to detect an effect, given that it truly exists. Power is also defined as the probability that the analysis will detect a true effect. It is a generally accepted precept of clinical research that reliable analyses should have a power of at least 80% or better. That is, given that an effect exists, the analysis will detect it at least 4 times out of 5. Analyses that have low power often will make the error of finding that no effect is present when one actually is. Thus, they are considered unreliable. The analysis of patients who had less than 18 months of rofecoxib use in the APPROVe study is an example of an underpowered subgroup analysis. See APPROVe above, and 18-Month Hypothesis. |
| **PPI** | *See* "**Proton Pump Inhibitor**" |
| **Prescription Drug User Fee Act (PDUFA)** | First enacted in 1992 and reauthorized twice (referred to as PDUFA II and PDUFA III), the Act gives the Food and Drug Administration (FDA) a revenue source -- fees paid by the pharmaceutical manufacturers -- to supplement, direct appropriations.  In recent years, the percentage of the budget of FDA's CDER that comes from these "user fees" has exceeded the percentage the FDA receives from appropriations.  Critics, including Dr. David Graham and Dr. Jerry Avorn, have alleged that this funding structure creates a conflict of interests and an environment in which FDA considers industry to be its 'client.' |
| **Prexige** | Selective Cox-2 inhibitor developed and marketed by Novartis.  Not approved for use in the United States. |
| **Primary dysmenorrhea** | Pain associated with menstruation that is not caused by a known pathological condition.  One of the initial indications for which Vioxx was approved. |
| ***Proceedings of the National Academy of Sciences of the United States of America (PNAS)*** | Medical journal, the full name of which is *Proceedings of the National Academy of Sciences of the United States of America.* |
| **Product circular** | *See* "**Label**" |
| **Professional Information Request** | *See* "**Physician Information Request**" |
| **Project Axxeleration** | A Merck marketing program to attempt to increase Vioxx market share and sales. |
| **Project Offense** | A Merck sales department program run by James Dunn in response to VIGOR and Eric Topol's *JAMA* article. |
| **Prostacyclin (PGI2)** | A prostaglandin existing in the vascular endothelium, kidney, lung, brain and in other parts of the body believed to be the most potent antiplatelet agent and a vasodilator/vaso-relaxer. |

**KS-001215**

| TERM | DEFINITION |
|---|---|
| **Prostacyclin hypothesis** | *See* "**Fitzgerald prostacyclin hypothesis**" and "**Prostacyclin Synthesis**." |
| **Prostacyclin Synthesis** | Cox-1 and Cox-2 convert Arachidonic Acid to an intermediate chemical (PGH-2, or Prostaglandins) from which thromboxane (TXA-2) and prostacyclin (PGI-2) are derived. The blocking of the PGH-2 pathway is the derivation of the imbalance theory, which is that blocking prostacyclin and leaving thromboxane unopposed creates a pro-thrombotic environment in the human blood vessel. Other prostaglandins not involved in the imbalance include MPGES-1, PGD-2 and PGF-2. See definitions of each. |
| **Prostaglandin** | Compound derived from arachidonic acid that mediates a variety of processes, including vasodilatation and vasoconstriction (for example, prostacyclin). John Vane, Bengt Samuelsson and Sune Bergstrom were awarded the Nobel Prize in 1982 for the discovery of prostaglandins and related molecules which included the mechanism of action of NSAIDs. The term prostaglandin was coined by von Eular based upon his and other studies in the early 1930s when he identified a fatty acid substance. There are 5 major biologically active prostaglandins – PGD, PGE, PGF, PGI-2 and TXA-2. |
| **Prostanoids** | Collective term for prostaglandins and thromboxanes. |
| **Prothrombotic** | Tending to cause or increase the risk of thrombosis. |
| **Protocol** | A written document describing all the important details of how a study will be conducted (including the products used, study rationale, procedures to be carried out on the subjects, number of subjects, and study design) and describing how the data will be analyzed. |
| **Protocol 010** | Merck Phase IIa study comparing the effects of Vioxx 25 mg, Vioxx 125 mg, and placebo in osteoarthritis patients. |
| **Protocol 017** | Merck Phase IIa study comparing the effects of Vioxx in patients with RA. |
| **Protocol 023** | Merck pharmacology study of renal effects of Vioxx, which demonstrated that Vioxx was associated with a reduction in the prostacyclin urinary metabolite but not the thromboxane urinary metabolite, which suggested that some prostacyclin production may be mediated by Cox-2, and inspired the FitzGerald prostacyclin hypothesis. |
| **Protocol 059** | Proposed Merck "megatrial"/GI outcomes study of Vioxx versus ibuprofen and diclofenac intended to prove the Cox-2 hypothesis; cancelled before any patients were enrolled.  Much of the work done to design this trial was resurrected a year or so later and morphed into the VIGOR trial (Protocol 088/089). |
| **Protocol 061** | Merck pharmacological study demonstrating that naproxen significantly impeded blood clotting in $\tau \sim \tau$ assays. |

**KS-001216**

| TERM | DEFINITION |
|---|---|
| **Protocol 068** | A year-long Merck study comparing the efficacy of Vioxx 25 mg versus naproxen 1000 mg for the treatment of rheumatoid arthritis. |
| **Protocol 069** | Merck's pooled analysis of gastrointestinal safety outcomes from all Phase IIb/III Vioxx clinical trials in osteoarthritis patients. |
| **Protocol 078** | Merck placebo-controlled clinical trial of the efficacy of Vioxx 25 mg in preventing the onset of Alzheimer's disease. |
| **Protocol 085** | Three-arm, six-week study conducted by Merck's Clinical Development Program in osteoarthritis patients comparing Vioxx 12.5 mg, nabumetone, and placebo; twin study to Protocol 090. |
| **Protocol 088/089** | The VIGOR study.  *See* "**VIGOR**." |
| **Protocol 090** | Three-arm, six-week study conducted by Merck's Clinical Development Program in osteoarthritis patients comparing Vioxx 12.5 mg, nabumetone, and placebo; twin study to Protocol 085.  This study showed an increased risk of MIs on Vioxx compared to the comparators (Nabumetone and placebo).  The results became available at approximately the same time as the VIGOR study and confirmed Vioxx's CV risk (*see, generally*, deposition of Dr. Eric Topol). |
| **Protocol 091** | Merck placebo-controlled clinical trial of the efficacy of Vioxx 25 mg in slowing the progression of Alzheimer's disease. |
| **Protocol 096** | One of two studies comparing the use of Vioxx and naproxen for the treatment of rheumatoid arthritis that was ongoing at the time the results of the VIGOR Trial became available. |
| **Protocol 097** | One of two studies comparing the use of Vioxx and naproxen for the treatment of rheumatoid arthritis that was ongoing at the time the results of the VIGOR Trial became available. |
| **Protocol 102** | The ADVANTAGE study.  *See* "**ADVANTAGE**." |
| **Protocol 122** | The APPROVe study.  *See* "**APPROVe**." |
| **Protocol 126** | Merck placebo-controlled clinical trial of the efficacy of Vioxx in slowing the progression of Alzheimer's disease; cancelled after Protocol 091 demonstrated a lack of efficacy. |
| **Protocol 136** | Merck three-arm endoscopy study comparing the effect on the stomach of (i) Vioxx 25 mg and aspirin; (ii) aspirin alone; and (iii) ibuprofen alone. |
| **Protocol 145** | The VICTOR study.  *See* "**VICTOR**." |

**KS-001217**

| TERM | DEFINITION |
|---|---|
| **Protocol 158** | Merck-planned two-arm endoscopy study comparing the effect on the stomach of (i) Vioxx 25 mg and aspirin and (ii) a non-selective NSAID and aspirin; cancelled in August 2003 before any patients enrolled. |
| **Protocol 201** | The ViP study.  *See* "**VIP**." |
| **Protocol 203** | Merck "cardiovascular outcomes study" designed to pool and analyze cardiovascular event data from three ongoing or planned placebo-controlled trials of the efficacy of Vioxx in the treatment or prevention of various forms of cancer (Protocols 122--APPROVe, 145--VICTOR, and 201--VIP).  Although all three protocols were stopped on September 30, 2004 with the withdrawal of Vioxx from the market, this study has yet to be completed or published.  The trio of cancer studies included APPROVe, VICTOR and VIP. |
| **Protocol 906** | Comparative study of Vioxx and Celebrex done by marketing that was never published or given to FDA.  Results indicated a higher rate of HTN and edema among Vioxx users compared to Celebrex |
| **Protocol number (PN)** | A number assigned by Merck to a particular study. |
| **Proton pump inhibitor (PPI)** | A drug that blocks the production of stomach acid, and therefore is used to heal stomach and duodenal ulcers.  Example—Nexium, Prilosec, Prevacid.  An argument can be made that, in combination with a traditional NSAID such as naproxen, PPIs offer GI protection such that drugs like Cox-2 inhibitors (with their inherent CV risks) are not necessary. |
| **PSUR** | *See* "**Periodic safety update report**" |
| **PTCA** | *See* "**Percutaneous transcoronary angioplasty**" |
| **PTO** | *See* "**Patent and Trademark Office**" |
| **Public Affairs** | Department of Merck that interacted with the media and developed press releases and other public statements about the Company and its products. |
| **PUBs** | *See* "**Perforations, ulcers, and bleeds**" |
| **P-value** | The probability of getting a result at least as extreme as that observed if the null hypothesis is true. (1) A p-value equal to or less than 0.05 is generally understood to mean that the result is statistically significant. |
| **PYR** | *See* "**Patient years at risk**" |
| **Qualified/targeted speaker** | An advocate who has been identified and qualified by the field as being in alignment with Merck's scientific and business positions and there is a mutual interest in speaking on Merck's behalf.  (Source:  MRK **KS-001218** |

| TERM | DEFINITION |
|------|------------|
| **RA** | *See* "**Rheumatoid arthritis**" |
| **Randomized clinical trial (RCT)** | A clinical trial in which patients are randomly assigned to different treatment groups, including a control group that serves as the basis for comparison with the treatment of interest. |
| **Rapid disc (RPD)** | A different delivery system for Vioxx—a rapid, "melt-in-you-mouth" disc that Merck was in the process of developing |
| **RCT** | *See* "**Randomized clinical trial**" |
| **Regulatory Affairs** | Subdivision of MIRL responsible for developing and communicating MRL's positions on regulatory issues to regulatory agencies, including the FDA. |
| **Relative risk (RR)** | Estimate of comparative risk, which is calculated by dividing the incidence rate for a given adverse event MIs) in one group by the incidence rate or such events in another group. |
| **Renal** | Of or relating to the kidney |
| **Report Evaluation and Safety Surveillance (RESS)** | Subdivision of Merck's Worldwide Product Safety and Epidemiology Department responsible for monitoring and evaluating post-marketing adverse event data to determine whether the data warranted a safety-related modification to the product label or a safety-related notification to healthcare professionals.  Division that monitored spontaneous adverse events reports (post-marketing safety surveillance).  Name later changed to CRESS (Clinical Risk Management and Safety Surveillance). |
| **Reporting bias** | In epidemiology, bias caused by a study participant's failure to accurately report which drugs he or she has used or his or her risk factors for developing disease. |
| **Reprints** | Copies of published scientific articles distributed to physicians and/or used to "educate" (read: market) representatives or other constituencies.<br>Example—Merck purchased up to 800,000 reprints of the VIGOR article (with all its shortcomings) to distribute to physicians and use in marketing practices. |
| **RESS** | *See* "**Report Evaluation and Safety Surveillance**" |
| **Rheumatoid arthritis (RA)** | Rheumatoid arthritis is a less common form of arthritis (the other is osteoarthritis), more severe, has an earlier age of onset (between 36 and 50) and is much more common in females.  This is a very serious degenerative autoimmune disease that begins with inflammatory process in the fluid and tissue that line body joints and involves progressive joint degeneration. |

**KS-001219**

| TERM | DEFINITION |
|---|---|
| **Rheumatologist** | Physician who specializes in acute or chronic diseases characterized by inflammation, muscle soreness and stiffness, and pain in joints and associated structures. |
| **Risk ratio (RR)** | *See* "**Relative risk**" |
| **Rofecoxib** | Scientific (generic) name for Vioxx |
| **RPD** | See "**Rapid disc**" |
| **RR** | *See* "**Risk ratio**" and "**Relative risk**" |
| **SAE** | *See* "**Serious adverse experience**" |
| **Safety Update Report (SUR)** | Periodic report containing data on drug safety required by the FDA for all marketed drugs. |
| **Sales Training and Professional Development (STPD)** | At Merck, the unit within Sales Department that trained sales representatives. |
| **SDAP** | *See* "**Statistical data analysis plan**" |
| **Secondary prophylaxis** | Measures to prevent recurrence of a disease– e.g., daily treatment with low-dose aspirin to prevent successive cardiac events. |
| **Seeding study** | A controversial marketing practice where pharma companies sponsor a drug trial that is a thinly veiled attempt to entice doctors to prescribe a new drug being marketed by the company.  These trials often serve little or no scientific purpose.  David Kessler, MD, former FDA commissioner, authored an article in the New England Journal of Medicine in 1994 that defines seeding trials, and lays out general features of them.  (Source:  David Kessler, et al., "Therapeutic-Class Wars—Drug Promotion in a Competitive Marketplace;" *New England Journal of Medicine*, November 17, 1994, 1350-1353). Although Merck denies it, there are documents produced in this litigation that indicate that the ADVANTAGE study, conducted by the marketing division of Merck, was, in fact, a seeding study. |
| **Selection bias** | The bias caused by the fact that the types of subjects who take part in studies are not a random sample of the population from which they are drawn. |
| **Selective Cox-2 inhibitor** | NSAID that selectively inhibits the Cox-2 enzyme, but only minimally inhibits the Cox-1 enzyme. |

**KS-001220**

| Term | Definition |
|---|---|
| **Serious adverse experience (SAE)** | In the context of a clinical trial, a life-threatening adverse event, or one resulting in death, inpatient hospitalization or prolongation of existing hospitalization, a persistent or significant disability/incapacity, or a congenital anomaly/birth defect.  Serious adverse events, defined by the FDA as those involving death, disability, hospitalization (initial or prolonged) a life-threatening event or one that required intervention to prevent harm. |
| **Sheer stress** | A fluid dynamics term that, in this context, means a change in pressure on the endothelial wall of a blood vessel (likely caused by hypertension) that upregulates or increases the production of Cox-2 from baseline. |
| **Signal** | Controversial term (with no generally defined or accepted meaning) for data in a clinical trial that suggests there may be a link between the drug at issue and an adverse event. |
| **Singulair** | Merck drug (montelukast sodium) for the treatment of indoor and outdoor allergies. |
| **Site monitor** | In a clinical trial, one who visits investigators to help with study management, ensures that all data are being recorded as they should be and that all supplies are available on site, and who often returns completed case record forms (including documentation of adverse events) to the data management office. |
| **SLE** | *See* "**Systemic lupus erythematosus**" |
| **sNDA** | *See* "**Supplemental New Drug Application**" |
| **SOP** | *See* "**Standard operating procedure**" |
| **Standard operating procedure  (SOP)** | Unified procedure for accomplishing a specific task adopted throughout Merck.  Example—the CV adjudication SOP. |
| **Statistical data analysis plan (SDAP)** | See "Data analysis plan" |
| **Statistical power** | In statistical significance tests, the probability that the null hypothesis, which states that there is no difference between the groups being compared, will be rejected if it is not true. |
| **Statistical significance** | The claim that is generally made when the calculated p-value from a statistical significance test is less than a prespecified significance level (often meaning $P < 0.05$) so that the null hypothesis can be rejected. |
| **Statistics** | The science of using statistical methods to design, manage, analyze and draw conclusions from studies. |
| **STPD** | **See** "**Sales Training and Professional Development**" |

KS-001221

| TERM | DEFINITION |
|---|---|
| **Stroke** | *See* "**Cerebrovascular accident**" |
| **Subgroup analysis** | An analysis of the results of a clinical trial with respect to a subsample of all randomized patients rather than all patients randomized. |
| **SUCCESS VI & VII** | Trials sponsored by Searle/Pfizer comparing the renal safety of Vioxx 25 mg and Celebrex 200 mg. Both studies concluded that Celebrex had the superior renal safety profile. |
| **Sudden Cardiac Death** | Usually defined as a sudden death from cardiac causes in the absence of any other immediate factor (e.g. external trauma) that would explain the death.  It is standard practice in randomized clinical trials and epidemiologic studies to study sudden cardiac death as part of a composite endpoint. An example of this standard practice is seen in the Targum analysis of the VIGOR study as well as the Bressalier et al report of the APPROVe trial. In each of these, the category "cardiac disease" includes fatal and non-fatal myocardial infarction, sudden cardiac death (or, synonymously sudden death from cardiac causes), and unstable angina. |
| **Supplemental New Drug Application (sNDA)** | Supplemental New Drug Application refers to applications to the FDA after initial approval that  either seeks a new indication (medical use) or other labeling change, such as to include new safety findings or the results of later clinical trials.  Submission of scientific data to the FDA in support of a change in a drug's labeling. |
| **SUR** | See "Safety Update Report" |
| **Synthesis** | Process by which constituent elements are combined to form a new substance. |
| **Systemic lupus erythematosus (SLE)** | A chronic autoimmune inflammatory disease involving multiple organ systems and marked by periods of exacerbation and remission. |
| **Systemic prostacyclin** | Prostacyclin synthesized in a part of the body other than the kidney. |
| **Systolic blood pressure** | Measure of blood pressure based on tension exerted by blood against the arterial walls during contraction of the ventricle. |
| **TARGET** | 1. A Novartis trial to assess safety (including cardiovascular safety), tolerability, and efficacy of its selective Cox-2 inhibitor, Prexige, as compared to ibuprofen and naproxen.<br>2. Not to be confused with a Merck study of a similar name that |

**KS-001222**

| TERM | DEFINITION |
|---|---|
| **"Targum Report"** | Term used in the litigation that references the FDA Review document prepared by Shari Targum for FDA as part of the briefing package for the February 2001 Advisory Committee Meeting.   Targum analyzed the cardiovascular events in rofecoxib and celecoxib.<br>The original version released in December 2001 had a typo in it that the DSMB members expressed "relief" when it was supposed to be "belief." Do not use this document for that reference. |
| **TCE** | *See* "**Thromboembolic cardiovascular event**" |
| **TCVSAE** | *See* "**thrombotic cardiovascular serious adverse events**" |
| ***The Journal of Pharmacology and Experimental Therapeutics (JPET)*** | Pharmacology journal (not mainstream clinical) published by the American Society for Pharmacology and Experimental Therapeutics.  Protocol 023 was published in this journal (*See* "**Protocol 023**") |
| **Thought leader** | (Merck definition)—an individual who, by virtue of their status among their peers, influences treatment patterns, understanding of disease and/or healthcare delivery.  That person may or may not be in alignment with Merck's positions. (Source:  MRK-AFI0094664)<br>Note:  All advocates are thought leaders.  Not all thought leaders are advocates.  (*See* "**Advocate**"). |
| **Thromboembolic** | Medical disorders that are related to a "thrombus" (blood clot) or embolism (blood clot or other piece of circulating solid matter getting caught in lung or brain). |
| **Thromboembolic cardiovascular event (TCE)** | A cardiovascular adverse event related to, caused by, or characterized by obstruction or occlusion of a vessel by a detached thrombus or blood clot; examples include: myocardial infarction, sudden death, or cerebrovascular event. |
| **Thrombogenesis** | The 'genesis', or development of, a clot or thrombosis |
| **Thrombosis** | The formation, development, or existence of a blood clot or thrombus within the vascular system. |
| **Thrombotic Cardiovascular Serious Adverse Events (TCSAE)** | CV endpoint used in Merck clinical trials, including APPROVe   Includes:<br>  a. Cardiac events (acute MI, fatal acute MI, unstable angina, sudden or unexplained death, resuscitated cardiac arrest, and cardiac thrombus);<br>  b. Peripheral vascular events (pulmonary embolus, fatal pulmonary embolus, peripheral arterial thrombosis, fatal peripheral arterial thrombosis, peripheral venous thrombosis;<br>  c. Cerebrovascular events (ischemic cerebrovascular stroke, fatal ischemic cerebrovascular stroke, cerebrovascular venous thrombosis, transient ischemic attack).   (Source:  MRK-AFK-0352291 at 23). |

**KS-001223**

| TERM | DEFINITION |
|------|------------|
| **Thrombotic event** | An adverse event related to, caused by, or characterized by formation or presence of a thrombus or blood clot; examples include: myocardial infarction, ischemic stroke, and venous events such as pulmonary embolism. |
| **Thromboxane** | An eicosanoid belonging to the group of prostanoids, biochemically related to the prostaglandins, that is synthesized by platelets, and promotes platelet aggregation (i.e., coagulation) and vasoconstriction; its synthesis is mediated by predominantly the Cox-1 isoform, but some thromboxane appears to be Cox-2 dependent. <br> Thromboxane is a potent stimulator for platelet aggregation and clot formation and also plays a role in vascular tone. |
| **Thromboxane receptor** | The thromboxane receptor is a protein on the surface of cells in the endothelium of blood vessels and in the placenta which interacts with the eicosanoid lipid thromboxane. |
| **Thromboxane receptor antagonist (TRA)** | Antiplatelet agent that functions by interfering with the binding of thromboxane to its receptor sites, thereby blocking platelet activation and aggregation. |
| **Thromboxane synthase inhibitor (TSI)** | Antiplatelet agent that impedes the formation of thromboxane and thereby decreases the total amount of thromboxane available to bind to its receptor sites, blocking platelet activation and aggregation. |
| **TIA** | See "Transient ischemic attack" |
| **Time to occlusion (TTO)** | Measure of the rate at which blood clots form and block a blood vessel. |
| **time*treatment** | Interaction covariate included in the Cox proportional hazards model used to test the assumption of proportional hazards in the published article on the APPROVe Trial; a version of the model using linear time |
| **Time-to-event plot** | Plot of study data showing the cumulative number of events on different treatments at different stages over the course of a study. |
| **"Topol article"** | Term used in the litigation to refer to JAMA article published by Steve Nissen and Eric Topol in August 2001.  This article was the first publication to raise questions about the risk of CV events with Vioxx. <br> Following the release of this article, Merck went into a defensive mode, issuing press releases saying they "stood behind" the CV safety of Vioxx, publishing flawed pooled analyses to bolster their argument that Vioxx wasn't cardiotoxic, announcing a CV outcomes study at an investor's meeting, and generally downplaying the potential CV risks of Vioxx.  Merck's latest strategy is to embrace this article and say that it informed the medical community of the potential dangers of Vioxx (overlooking the fact that the burden is on them, as the manufacturer, to disseminate information about risks). |
| **Toxicity** | The extent, quality, or degree of being poisonous. |

KS-001224

| TERM | DEFINITION |
|---|---|
| TRA | *See* "**Thromboxane Receptor Antagonist**" |
| Training Term | Terms used to train sales staff at Merck. Training terms are reviewed and approved by the medical/legal board. See MLRB. Source: Tom Casola deposition |
| Tramadol | Non-NSAID analgesic marketed by Ortho-McNeil Johnson & Johnson under the brand name Ultram (now available generically). |
| Transient ischemic attack (TIA) | Transient ischemic attack describes a stroke-like event in which a cerebral blood vessel is blocked, producing symptoms, but circulation is restored before permanent, irreversible harm occurs. |
| TSI | *See* "**Thromboxane Synthase Inhibitor**" |
| TTO | *See* "**Time to occlusion**" |
| TX-M | Metabolite of thromboxane excreted from the body in urine; a potential indicator of the level of thromboxane in the body. |
| Tylenol | *See* "**Acetaminophen**" |
| UKGPD | *See* "**United Kingdom General Practitioner Database**" |
| Ultram | *See* "**Tramadol**" |
| Unblinding | Process through which clinical investigators become aware of the treatment assignments for individual patients. If unblinding occurs before the final data is analyzed, there is the potential for bias to be introduced into the study |
| United Kingdom General Practitioner Database (UKGPD) | Healthcare database in the United Kingdom. |
| United States Human Health (USHH) | Organization within Merck responsible for the domestic marketing and sales of the Company's products. |
| Upregulated | In this context, increase in production in response to a stimulus.  Example-- the endothelial cells of blood vessels do not normally produce Cox-2, however, when a stimulus (like "sheer stress" from high blood pressure) is present, the cells produce Cox-2 in response. |
| USHH | *See* "**United States Human Health**" |

**KS-001225**

| TERM | DEFINITION |
|---|---|
| Valdecoxib | Scientific name for Bextra, a selective Cox-2 inhibitor developed and marketed by Pfizer. |
| VALOR | Acronym for "Vioxx-Aspirin Long-term Outcomes Research."  *See* "**Vioxx-Aspirin Long-term Outcomes Research**" |
| Vasculature | The arrangement of blood vessels in the body or any part of it, including their relationship and functions. |
| Vasoconstriction | Decrease in the diameter of a blood vessel that impairs blood flow through the vessel. |
| Vasodilation | Increase in the diameter of a blood vessel due to relaxation of the smooth muscle within the vessel wall that permits greater blood flow. |
| Vasodilator | Agent that causes dilation of the blood vessels. |
| VICTOR | Acronym for "Vioxx in Colorectal Cancer Therapy Optimal Regime."  *See* "**Vioxx in Colorectal Cancer Therapy Optimal Regime**" |
| Video News Release (VNR) | A publicity device intentionally designed to look and sound like a legitimate television news story. The publicist prepares a 60- to 90-second news release on videotape, which can then be used by television stations as is or after further editing, and often appear to be a normal part of the news broadcast. <br><br> Critics of VNRs (sometimes called "fake news") have called the practice deceptive and liken it to propaganda technique, particularly in cases in which the segment is not explicitly identified to the viewers as a VNR.  Firms producing VNRs (including Merck) equate their use to a press release in video form. <br> Merck made frequent use of this publicity technique for VIOXX, producing VNRs to go along with release of the trial results or positions they wanted to promote.  The VNRs were often given the air of authority by strategic placement of either a Merck physician or a Merck consultant in them, giving catchy little medical soundbites to reinforce the Merck position.  The most infamous of these VNRs was one Merck produced to promote the November 2000 publication of the VIGOR trial; while the difference in GI events (in Vioxx's favor) was prominently featured, not a word was mentioned about the difference in CV events or hypertension.[4] |
| VIGOR | *See* "**Vioxx Gastrointestinal Outcomes Research Study**" |
| Vioxx Adverse Experience Review Team (AERT) | A three-person cross-functional team that met every six months to review spontaneously reported post-marketing adverse events among patients on Vioxx. |
| Vioxx Commercialization Team (Vioxx CST) | A cross-functional Merck committee that participated in developing the commercialization strategy for Vioxx. |

KS-001226

| TERM | DEFINITION |
|---|---|
| **Vioxx CST** | *See* "**Vioxx Commercialization Team**" |
| **Vioxx Gastrointestinal Outcomes Research Study (VIGOR)** | Acronym for "Vioxx Gastrointestinal Outcomes Research Study," the double blind GI outcomes study that in 2000 produced evidence of Vioxx's cardiovascular risks.  Also known as protocol 088/089.  The trial was designed to assess the comparative efficacy and gastrointestinal safety of Vioxx 50 mg and naproxen 1000 mg; found a statistically significant decrease in PUBs among patients on Vioxx.  FPI was on January 6, 1999 and LPO on March 17, 2000.  (MRK-AFK0333000.  Study was conducted in multiple countries and was published in the NEJM on November 23, 2000.   An important finding of VIGOR was a statistically significant increased risk of serious coronary heart disease, cardiovascular disease and myocardial infarction in the rofecoxib group. |
| **Vioxx in Colorectal Cancer Therapy Optimal Regime (VICTOR)** | Placebo-controlled study run by Oxford University of the efficacy of Vioxx in preventing colorectal cancer; also known as Protocol 145. One of three studies that comprised Protocol 203. Although the study was discontinued on September 30, 2004 when Vioxx was withdrawn from the market, final VICTOR results have yet to be released, nor has the study been published.  Preliminary results available through the litigation are similar to the APPROVe study, and indicate increased CV risk for Vioxx v. placebo. |
| **Vioxx in Prostate Cancer Prevention Study (VIP)** | Placebo-controlled study of the efficacy of Vioxx 25 mg in reducing the risk of prostate cancer; also called Protocol 201. One of three studies that comprised Protocol 203. |
| **Vioxx-Aspirin Long-term Outcomes Research (VALOR)** | Cardiovascular outcomes study of Vioxx plus aspirin versus aspirin alone in patients with a recent history of acute coronary syndromes; cancelled in March 2002 before any patients were enrolled. |
| **VIP** | Acronym for "Vioxx in Prostate Cancer Prevention Study."  *See*, "**VIOXX in Prostate Cancer Prevention Study.**" |
| **VNR** | *See* "**Video News Release**" |
| **WAES** | *See* "**Worldwide Adverse Event System**" |
| **Watson analysis** | Controversial analysis of Vioxx CV data to date performed by Doug Watson in 1998.  Analysis was never given to FDA, and experts maintain it contains numerous flaws, but Merck frequently uses it to bolster argument that they looked at the data before the drug was approved and did not see any evidence of increased CV risk. |
| **WBST** | *See* "**Worldwide Business Strategy Team**" |
| **WCDMO** | *See* "**Worldwide Clinical Data Management Operations**" |
| **WCQAR** | *See* "**Worldwide Clinical Quality Assurance Resources**"                    **KS-001227** |

| TERM | DEFINITION |
|---|---|
| **WHHM** | *See* "**Worldwide Human Health Marketing**" |
| **WMA** | *See* "**Worldwide Marketing Application**" |
| **Worldwide Adverse Experience System (WAES)** | Merck database of all adverse events experienced by patients on Merck drugs that are spontaneously reported post-marketing or that arise in the course of a Merck-sponsored clinical trial. Worldwide Adverse Event Reporting System, the information system used to collect and report on all spontaneously reported adverse events, as well as serious events that occurred during clinical studies. |
| **Worldwide Business Strategy Team (WBST)** | Merck cross-functional committee charged with formulating development and marketing strategies for the Company's products. |
| **Worldwide Clinical Data Management Operations (WCDMO)** | Merck department that maintains the Clinical Trial System. |
| **Worldwide Clinical Quality Assurance Resources (WCQAR)** | Subdivision of MRL responsible for auditing Merck's clinical trials to ensure compliance with Merck's SOPs; department merged into Worldwide Product Safety and Epidemiology in early 2004. |
| **Worldwide Human Health Marketing (WHHM)** | Organization within Merck responsible for marketing Vioxx and other Merck products abroad. |
| **Worldwide Marketing Application (WMA)** | Standardized application accepted by many different regulatory authorities around the world for permission to market a drug for use on humans for treatment of a given disease state or symptoms. |
| **Worldwide Product Circular Review Team (WPCRC)** | Merck team that considered and proposed changes to product label. |
| **Worldwide Product Safety and Epidemiology (WPS&E)** | Subdivision of MRL responsible for analyzing and reporting post-marking adverse events. |
| **WPCRC** | See "Worldwide Product Circular Review Team" |
| **WPS&E** | See "Worldwide Product Safety and Epidemiology" |
| **Zocor** | Merck drug (simvastatin) for the treatment of high cholesterol. |

**KS-001228**

[1] There was some controversy re:  the publication of this study.  Searle published only 6 months of flattering data in JAMA, and hid the remaining 6 months of data from the JAMA editors, which eventually caused a major ruckus in the medical journal committee.  Take-home point is that the published CLASS study in JAMA is NOT representative of the CLASS data and should not be taken as such by the practitioner.

[2] The document this definition comes from was produced as part of the Sales Training custodial file and is labeled "for background use only."  This definition is important to use as the language "a history of ischemic heart disease" appears in the 2002 label CV precaution.  Read literally, the "precaution" then only applies to those patients with a known history of atherosclerotic disease.

[3] Source:  Deposition of Thomas Bold, MD, PhD, 3/11/05, 25-27.

[4] Outtakes from the filming of this VNR (featuring Merck consultant Loren Laine) reveal a marketing/PR consultant (off screen) attempting to tailor Dr. Laine's remarks and soundbites to Merck talking points.  Dr. Laine makes several off-hand comments (on camera) that have proved useful.  Outtakes from Merck's Dr. Demopolous's filming of a VNR to respond to Dr. Topol and Nissen's JAMA article have also proved useful.

**KS-001229**

Exhibit "63"

# KLINE AND SPECTER
# CONTRIBUTIONS TO TRIAL PACKAGE

- Cast of Characters--a comprehensive guide to the over 700 Merck employees, third parties, and experts involved in the litigation

- Dictionary--a comprehensive guide to over 500 scientific terms and the alphabet soup of the Merck corporate structure

- 3200 articles from the database/medical literature

- Refinement of theme grid (with Pete Kaufman and Jeff Grand)

- Documents we discovered during extensive document review (Merck, FDA, third party)

- Depositions of Merck scientists, executives, and Third Parties

- Deposition cuts

- Work on modules (groupthink with Chris Tisi and Leigh O'Dell)

- Expert reports, depositions, prep

- Development of stroke package

KS-001230

Exhibit "64"

**Spurka, Kathleen**

| | |
|---|---|
| From: | Pete Kaufman [PKaufman@levinlaw.com] |
| Sent: | Wednesday, August 15, 2007 12:26 PM |
| To: | Dagostino, Lisa S.; ssanford@ssrlawyers.com; leigh.odell@beasleyallen.com; gmeunier@gainsben.com; JGrand@seegerweiss.com; MWeinkowitz@lfsblaw.com; dbuchanan@seegerweiss.com; cvtisi@aol.com; LDAVIS@hhkc.com; TShrack@lfsblaw.com |
| Cc: | Kline, Thomas R.; Spurka, Kathleen; Balefsky, Lee; Tiger, Michelle |
| Subject: | RE: Final Vioxx Database - List of Articles |

Lisa,

What an incredible resource.

Your contributions to the trial package have been astonishing.  If I knew knew a word better than "astonishing," I would use it.

And Kathy, thank you very much.  It's almost painful to think of how much work went into this.

---

**From:** Dagostino, Lisa S. [mailto:Lisa.Dagostino@KlineSpecter.com]
**Sent:** Wednesday, August 15, 2007 9:23 AM
**To:** Pete Kaufman; ssanford@ssrlawyers.com; leigh.odell@beasleyallen.com; gmeunier@gainsben.com; JGrand@seegerweiss.com; MWeinkowitz@lfsblaw.com; dbuchanan@seegerweiss.com; cvtisi@aol.com; LDAVIS@hhkc.com; TShrack@lfsblaw.com
**Cc:** Kline, Thomas R.; Spurka, Kathleen; Balefsky, Lee; Tiger, Michelle
**Subject:** Fw: Final Vioxx Database - List of Articles

The med lit compilation is finally complete.  We have 3200+ articles in a ref manager database.  The pdfs of the articles are named by medical citation and the articles have been sorted by journal.   Attached for reference please find a listing of the articles we've compiled arranged by journal and also arranged by last name of the first author.

Kathy Spurka of our office did a ton of work putting this all together and built the ref manager database from the medline citations.  Where medline citations were not available (for abstracts and posters), she created them.

We've augmented the keywords in the citations so that it will be possible to search using the protocol numbers and common acronyms for the studies and come up with all publications related to that study (example:  entering 'protocol 88,' '88,' or 'Vigor' will come up with the original VIGOR publication, the VIGOR methods paper, the EOC, the responses to the EOC and the EOC reaffirmed).

As we previously discussed, Kathy is sending the pdfs of all articles and the ref manager database to Mike W and Tom Shrack for conversion to Access for general distribution in the package, along with the 'compendium' of selected key articles identified by Chris and Leigh.

We have NOT assigned ref numbers yet--the ones that are in the database were randomly assigned by the ref manager program--I would suggest that we NOT use those or convert that field to access.   Tom, Mike, Shelly--we should discuss how to deal with number assignment--anyone available for a call?

The identical package of all 3200 pdfs and ref manager database is also being shipped to Pete.   If you own Ref Manager or Endnote (the Ref Manager database is compatible with Endnote) and want the RM database please let Kathy know and she'll get it out to you.  If you want the 3200 pdfs--we're also happy to get them out to you.  All fits on one handy-dandy DVD.


-----Original Message-----
From: Spurka, Kathleen
To: Dagostino, Lisa S.
Sent: Tue Aug 14 19:29:51 2007
Subject: Final Vioxx Database - List of Articles

**KS-001231**

T <<Vioxx Database - List of Articles.pdf>> he attached .pdf of Articles is a combination of 2 parts: database of articles sorted by 1) Journal and 2) Author.

Kathleen M. Spurka, Legal Assistant

_____

Kline & Specter
A Professional Corporation
1525 Locust Street, 19th Floor
Philadelphia, PA 19102-3712
215-772-1000 telephone
215-772-1398 direct dial
215-735-0957 direct facsimile

**KS-001232**

Exhibit "65"

**Spurka, Kathleen**

| | |
|---|---|
| **From:** | Dagostino, Lisa S. |
| **Sent:** | Wednesday, August 15, 2007 2:06 PM |
| **To:** | 'cvtisi@aol.com'; 'pkaufman@levinlaw.com'; 'ssanford@ssrlawyers.com'; 'leigh.odell@beasleyallen.com'; 'gmeunier@gainsben.com'; 'JGrand@seegerweiss.com'; 'MWeinkowitz@lfsblaw.com'; 'dbuchanan@seegerweiss.com'; 'LDAVIS@hhkc.com'; 'TShrack@lfsblaw.com' |
| **Cc:** | Kline, Thomas R.; Spurka, Kathleen; Balefsky, Lee; Tiger, Michelle |
| **Subject:** | Re: Final Vioxx Database - List of Articles |

Thanks, everyone.

I think using the same (2.xxx) system is going to create unnecessary confusion between the old set and the new.  Want to discourage use of the old set for a number of reasons that we've discussed previously.   I would suggest a completely new numbering system that will not be confused with the old ones (9.xxx perhaps?).   To address your concerns, Chris, maybe we can try to keep the .xxx part of the key articles the same....that way it's a simple substitution of a 9 for the prefix instead of a 2 in the documents you refer to......

Shelly had an auto response to this email indicating she's out this week....and I know Leigh's out as well....early next week for a call?   Chris/Lenny---could we use the HM bridge if we can nail down a convenient time for everyone?

-----Original Message-----
From: Cvtisi@aol.com <Cvtisi@aol.com>
To: PKaufman@levinlaw.com <PKaufman@levinlaw.com>; Dagostino, Lisa S.;
ssanford@ssrlawyers.com <ssanford@ssrlawyers.com>; leigh.odell@beasleyallen.com
<leigh.odell@beasleyallen.com>; gmeunier@gainsben.com <gmeunier@gainsben.com>;
JGrand@seegerweiss.com <JGrand@seegerweiss.com>; MWeinkowitz@lfsblaw.com
<MWeinkowitz@lfsblaw.com>; dbuchanan@seegerweiss.com <dbuchanan@seegerweiss.com>;
LDAVIS@hhkc.com <LDAVIS@hhkc.com>; TShrack@lfsblaw.com <TShrack@lfsblaw.com>
CC: Kline, Thomas R.; Spurka, Kathleen; Balefsky, Lee; Tiger, Michelle
Sent: Wed Aug 15 13:47:27 2007
Subject: Re: Final Vioxx Database - List of Articles

Wow!  Lisa and Kathy..this is great to have.  You are fantastic.  For a change, Pete's observations are dead on.  You guys are the best.  I particularly want to thank Kathy who has done a lot of work for this case.

I do have time for a call on the numbering issue.  For the core articles, I think we should use strive to use the same "P 2.--" numbers that we have used before, if that is at all possible..  Not only have these been used in some trials and in some of the preservation depositions, they have been referred to in other elements of the trail package that way.  For those 20-40 core articles, can we use the same P numbers?

In a message dated 8/15/2007 10:28:38 A.M. Mountain Daylight Time, PKaufman@levinlaw.com writes:

      Lisa,

    What an incredible resource.

    Your contributions to the trial package have been astonishing.  If I knew knew a word better than "astonishing," I would use it.

    And Kathy, thank you very much.  It's almost painful to think of how much work went into this.

_____

    From: Dagostino, Lisa S. [mailto:Lisa.Dagostino@KlineSpecter.com]
    Sent: Wednesday, August 15, 2007 9:23 AM
    To: Pete Kaufman; ssanford@ssrlawyers.com; leigh.odell@beasleyallen.com; gmeunier@gainsben.com; JGrand@seegerweiss.com; MWeinkowitz@lfsblaw.com; dbuchanan@seegerweiss.com; cvtisi@aol.com; LDAVIS@hhkc.com; TShrack@lfsblaw.com
    Cc: Kline, Thomas R.; Spurka, Kathleen; Balefsky, Lee; Tiger, Michelle
    Subject: Fw: Final Vioxx Database - List of Articles

    The med lit compilation is finally complete.   We have 3200+ articles in a ref manager database.   The pdfs of the articles are named by medical citation and the articles have been sorted by journal.    Attached for reference please find a listing of the articles we've compiled arranged by journal and also arranged by last name of the first author.

    Kathy Spurka of our office did a ton of work putting this all together and built the ref manager database from the medline citations.   Where medline citations were not available (for abstracts and posters), she created them.

    We've augmented the keywords in the citations so that it will be possible to search using the protocol numbers and common acronyms for the studies and come up with all publications related to that study (example:  entering 'protocol 88,' '88,' or 'Vigor' will come up with the original VIGOR publication, the VIGOR methods paper, the EOC, the responses to the EOC and the EOC reaffirmed).

    As we previously discussed, Kathy is sending the pdfs of all articles and the ref manager database to Mike W and Tom Shrack for conversion to Access for general distribution in the package, along with the 'compendium' of selected key articles identified by Chris and Leigh.

    We have NOT assigned ref numbers yet--the ones that are in the database were randomly assigned by the ref manager program--I would suggest that we NOT use those or convert that field to access.   Tom, Mike, Shelly--we should discuss how to deal with number assignment--anyone available for a call?

    The identical package of all 3200 pdfs and ref manager database is also being shipped to Pete.  If you own Ref Manager or Endnote (the Ref Manager database is compatible with Endnote)

KS-000234

and want the RM database please let Kathy know and she'll get it out to you.    If you want the 3200 pdfs--we're also happy to get them out to you.  All fits on one handy-dandy DVD.


-----Original Message-----
From: Spurka, Kathleen
To: Dagostino, Lisa S.
Sent: Tue Aug 14 19:29:51 2007
Subject: Final Vioxx Database - List of Articles

T <<Vioxx Database - List of Articles.pdf>> he attached .pdf of Articles is a combination of 2 parts: database of articles sorted by 1) Journal and 2) Author.


Kathleen M. Spurka, Legal Assistant

_____

Kline & Specter
A Professional Corporation
1525 Locust Street, 19th Floor
Philadelphia, PA 19102-3712
215-772-1000 telephone
215-772-1398 direct dial
215-735-0957 direct facsimile


_____

Get a sneak peek of the all-new AOL.com
<http://discover.aol.com/memed/aolcom30tour/?ncid=AOLAOF00020000000982> .

KS-001235

Exhibit "66"

| | |
|---|---|
| **From:** | Dagostino, Lisa S. |
| **To:** | Kline, Thomas R.; Specter, Shanin |
| **Cc:** | Spurka, Kathleen |
| **Subject:** | Fw: Barbour and Daniels |
| **Date:** | Thursday, August 16, 2007 7:12:49 AM |

Fyi

-----Original Message-----
From: Russ Herman <RHERMAN@hhkc.com>
To: Dagostino, Lisa S.
CC: Russ Herman <RHERMAN@hhkc.com>
Sent: Thu Aug 02 13:36:45 2007
Subject: RE: Barbour and Daniels

Lisa:  Thanks for the memo - excellent work as usual.  Russ

-----Original Message-----
From: Dagostino, Lisa S. [mailto:Lisa.Dagostino@KlineSpecter.com]
Sent: Monday, July 30, 2007 8:21 AM
To: Russ Herman
Cc: Lenny Davis
Subject: RE: Barbour and Daniels

This is the response to Merck's statement of material facts and our
counterstatement of facts from the preemption motion.  The part that you
want to look at is paragraphs 54-59 of the Counterstatement (and the
footnotes).   This lays out exactly what we found on the FDA docket re:
notice and comment (or lack thereof) for the preemption language--all
leading up to the 'consultation' with Barbour and Daniels.

Your office will have the exhibits cited in those paragraphs and can
pull those for you...they all came from the internet docket for the FDA
and it's often not clear from the document itself when the document was
posted to the docket (especially true in the case of the memo re:
Barbour and Daniels)...that's why I brought up getting the official
dockets from the FDA for your use during the dep.....

As for the press...I saw an AP story on Friday that quoted Arnold Levin,
and another story from earlier in the week that quoted you.   Based on
my Google Newsreader--it appears that those stories were both widely
picked up in various outlets.

-----Original Message-----
From: Russ Herman [mailto:rherman@hhkc.com]
Sent: Saturday, July 28, 2007 5:19 PM
To: Dagostino, Lisa S.
Subject: RE: Barbour and Daniels

Please send me press and all info on this issue we also need Foia
request I am going to prepare talkin points and dep ouyline fot review
bychris andy tom arnold Iwill be in trial e mths begin aug 15th But I
want to keep heat on Wil personaly monitor and have this group actively
involved in fighting for and taking these deps Ipersonaly appreciate
your continuous work at alevel of excellence Trial package and
everything you have touched has been top notch Take care and thanks Russ

[Message delivered by NotifyLink]

**KS-001236**

----------Original Message----------

From: "Dagostino, Lisa S." <Lisa.Dagostino@KlineSpecter.com>
Sent: Sat, July 28, 2007 7:19 AM
To: <FLonger@lfsblaw.com>, "Levin, A" <alevin@lfsblaw.com>,
<RHerman@hhkc.com>, <LDAVIS@hhkc.com>
Cc: "Specter, Shanin" <Shanin.Specter@KlineSpecter.com>, "Kline, Thomas
R." <Tom.Kline@KlineSpecter.com>
Subject: Barbour and Daniels

I see the potential depos of Barbour and Daniels are getting lots of
press.  Just wanted to remind you that I pulled that document (re
conversations between fda and Barbour/Daniels) off the FDA's internet
docket.  At the time we were writing the brief we didn't think we had
had the time to go through the process of getting an official copy from
the fda (red ribbon?).   For evidentiary purposes and for the
record--should we revisit that issue so that if the deps go forward
whoever takes them has the 'official' certified document from the FDA
docket to mark as an exhibit?   If so, should get process rolling.....

KS-001237

Exhibit "67"

| | |
|---|---|
| **From:** | Seeger, Chris [cseeger@seegerweiss.com] |
| **Sent:** | Thursday, July 06, 2006 12:01 PM |
| **To:** | Kline, Thomas R.; Specter, Shanin; Dagostino, Lisa S.; Caputo, David |
| **Cc:** | Buchanan, David |
| **Subject:** | RE: Preemption motion |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

yes.  that's what my call to him was about.  i told him that the team has to be you guys with Arnold.  I told Arnold too.

-----Original Message-----
**From:** Kline, Thomas R. [mailto:Tom.Kline@KlineSpecter.com]
**Sent:** Thursday, July 06, 2006 11:50 AM
**To:** Seeger, Chris; Specter, Shanin; Dagostino, Lisa S.; Caputo, David
**Cc:** Buchanan, David
**Subject:** Re: Preemption motion

This is teriffic. I am sitting here with Russ in New Orleans. Does he know this?

-----Original Message-----
From: Seeger, Chris <cseeger@seegerweiss.com>
To: Specter, Shanin; Dagostino, Lisa S.; Caputo, David
CC: Kline, Thomas R.; Buchanan, David <dbuchanan@seegerweiss.com>
Sent: Thu Jul 06 11:33:19 2006
Subject: RE: Preemption motion

Thanks team.   Shanin, I'll have Arnold reach out to you.

-----Original Message-----
From: Specter, Shanin [mailto:Shanin.Specter@KlineSpecter.com]
Sent: Thursday, July 06, 2006 11:23 AM
To: Dagostino, Lisa S.; Caputo, David
Cc: Kline, Thomas R.; Seeger, Chris; Buchanan, David
Subject: Re: Preemption motion


I just spoke to Chris Seeger.  He has asked Dave and I to head up the preemption project in light of the upcoming motion to be filed by Merck and for me to argue.  I, of course, agreed on behalf of our firm.  He wants us to collaborate with Arnold Levin and Fred Longer, which I told him would be our pleasure.

-----Original Message-----
From: Dagostino, Lisa S.
To: Caputo, David
CC: Specter, Shanin; Kline, Thomas R.
Sent: Thu Jul 06 11:12:10 2006
Subject: Preemption motion

Trk and I are with russ herman now re:  prepping for a Vioxx motion this evening.  He just gave us a heads up that Merck will be filing their preemption motion today.   I do not have access to the office remotely from here--per trk's request, can you send me the briefing that you've done?

--------------------------
Sent from my BlackBerry Wireless Handheld

**KS-001238**

Exhibit "68"

**Subject:** Re: Judge Fallon's Ruling

**Date:** Thursday, July 5, 2007 2:00:32 PM ET

**From:** Seeger, Chris

**To:** Buchanan, David, FLonger@lfsblaw.com, trafferty@levinlaw.com, Cvtisi@aol.com, Lisa.Dagostino@KlineSpecter.com, Tom.Kline@KlineSpecter.com, rherman@hhkc.com, ldavis@hhkc.com, alevin@lfsblaw.com

The private responses I received re my email and Dave's suggest that Black has been neutralized.  :).  Seriously, they all now know Black's an idiot.
---------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Buchanan, David
To: 'Fred Longer' <FLonger@lfsblaw.com>; NJRT - trafferty@levinlaw.com; cvtisi@aol.com <cvtisi@aol.com>; Seeger, Chris; Lisa.Dagostino@KlineSpecter.com <Lisa.Dagostino@KlineSpecter.com>; Tom.Kline@KlineSpecter.com <Tom.Kline@KlineSpecter.com>; rherman@hhkc.com <rherman@hhkc.com>; ldavis@hhkc.com <ldavis@hhkc.com>; Arnold Levin <ALevin@lfsblaw.com>
Sent: Thu Jul 05 14:56:27 2007
Subject: RE: Judge Fallon's Ruling

It's unfortunate we had to troll in the gutter on this one, but some people don't know well enough and could be tempted to buy into Black's drivel.


_____

From: Fred Longer [mailto:FLonger@lfsblaw.com]
Sent: Thursday, July 05, 2007 1:33 PM
To: NJRT - trafferty@levinlaw.com; Buchanan, David; cvtisi@aol.com; Seeger, Chris; Lisa.Dagostino@KlineSpecter.com; Tom.Kline@KlineSpecter.com; rherman@hhkc.com; ldavis@hhkc.com; Arnold Levin
Subject: RE: Judge Fallon's Ruling


Dave, Now I know how you made All-American.  FSL


_____

From: Troy Rafferty [mailto:TRafferty@levinlaw.com]
Sent: Thursday, July 05, 2007 1:17 PM
To: dbuchanan@seegerweiss.com; cvtisi@aol.com; cseeger@seegerweiss.com; Fred Longer; Lisa.Dagostino@KlineSpecter.com; Tom.Kline@KlineSpecter.com; rherman@hhkc.com; ldavis@hhkc.com; Arnold Levin
Subject: Re: Judge Fallon's Ruling

Excellent response Dave.

-----Original Message-----
From: Buchanan, David <dbuchanan@seegerweiss.com>

**KS-001239**

To: cvtisi@aol.com <cvtisi@aol.com>; Seeger, Chris <cseeger@seegerweiss.com>; flonger@lfsblaw.com
<flonger@lfsblaw.com>; Dagostino, Lisa S. <Lisa.Dagostino@KlineSpecter.com>; Troy Rafferty;
Tom.Kline@KlineSpecter.com <Tom.Kline@KlineSpecter.com>; RHerman@hhkc.com <RHerman@hhkc.com>;
ldavis@hhkc.com <ldavis@hhkc.com>; alevin@lfsblaw.com <alevin@lfsblaw.com>
Sent: Thu Jul 05 11:31:37 2007
Subject: FW: Judge Fallon's Ruling

fyi

-----Original Message-----
From: Buchanan, David
Sent: Thursday, July 05, 2007 12:01 PM
To: 'mikeferrara@comcast.net'; 'ntrunk@ferraralawfirm.com';
'WFLEISHMAN@lchb.com'; 'BPMorelli@morellilaw.com'; Seeger, Chris;
'DJacoby@anapolschwartz.com'; 'erelkin@weitzlux.com';
'ehw@erichweinberg.com'; 'Mgrossman@ssbwlaw.com';
'RGordon@weitzlux.com'; 'SWeiss@anapolschwartz.com';
'RDM@lanierlawfirm.com'; 'cplacitella@cprlaw.com';
'david@800injured.com'; 'mferrara@ferraralawfirm.com'
Subject: Re: Judge Fallon's Ruling

I couldn't disagree more w/ Bert's characterization or concerns about
the state of the record.  The MDL briefed and positioned this
beautifully.  The 56(f) footnote gives Fallon and plaintiffs more
protection then a few more facts do.  It was a brilliant play by
Fallon...the result of a well-considered 56(f) affidavit by plaintiffs.
Parenthetically, I'd point out that much of what Bert complains about
has been known (e.g., when FDA abandoned Warning, roll of Alz), but
specifically undermines any preemption opp by plaintiffs.  I guess I'm
just surprised that people aren't delighted by an incredible result
achieved for the benefit of all plaintiffs by the lawyers who worked
tirelessly on this project.  As someone whose office has written a lot
of paper in this litigation for the benefit of many, it seems to me that
congratulations are a more appopropriate sentiment then bemoaning how
much better it would have been if someone else had done it.

As for Bert's specific accusation that the MDL was too dumb to do the
needed discovery, those are the statements of an uninformed fool.  Those
people in the MDL that are apparently too dumb to do the discovery have
done the discovery in NJ too...Buchanan/Seeger/Grand, Kline Specter,
Sizemore, Rafferty/Pap/Kaufman, Tisi, Carlene/Sanford, Arbitblit, etc.,
etc.  Those are the same people who have pressed for the bulk of the 30
million pages that have been produced.  Who knew to press for, pressed
for, and got the SAS data people seem to love (even before the drug was
pulled, I note).  Who developed and/or took the stat, epi, and liability
experts that have been trial MVPs (Topol, Avorn, Nissen, Ray) or served
as a platform for other experts and analyses (Kronmal, Farqhuar, etc.).
They even built the theme grid/hot doc database that contains many of
the documents that were apparently not shown to the FDA expert who Bert
claims was not properly prepared (someone might want to ask Bert who was
responsible for that expert).  Oh, and all of that was done by fall of
2005, when SW tried Humeston I.

That is not to discount the contributions of the many non-MDL folks who

**KS-001240**

have done much for the litigation, some of whom are on this email,
others who are not.  All, however, are apparently equally dumb.  After
all, WL and Lanier briefed this issue in Cona-McDarby and got a great
decision from Higbee.  Of course, that record is devoid of the same
facts that the stupid MDL lawyers didn't include in their papers.  All
stupid, stupid, stupid.

And while I find Bert's email incredibly disrespectful and insulting to
many, should Bert have an opportunity to try a Vioxx case, I would
encourage him to disregard the work of all the stupid people who are too
dumb to do proper discovery.  Wonder what that trial package looks like?


Mike, while I initially copied Bert on this, I removed him bc I wanted
to confirm that he was aware you were sharing his email with this group.
I would like him on this thread and ask that you do so.  While some may
feel comfortable casting stones in private, I'm not.

-----Original Message-----
From: Mike Ferrara <mikeferrara@comcast.net>
To: ntrunk@ferraralawfirm.com <ntrunk@ferraralawfirm.com>; Wendy
Fleishman; Ben Morelli <bpmorelli@morellilaw.com>; Seeger, Chris;
Buchanan, David; Dave Jacoby <djacoby@anapolschwartz.com>; WL - Relkin,
Ellen; Eric Weinberg <ehw@erichweinberg.com>; Marc Grossman
<mgrossman@ssbwlaw.com>; Rob Gordon <rgordon@weitzlux.com>; Sol Weiss
<sweiss@anapolschwartz.com>; 'Rick Meadow' <rdm@lanierlawfirm.com>;
'Chris Placitella' <cplacitella@cprlaw.com>; 'David Eisbrouch'
<david@800injured.com>; 'Mike Ferrara' <mferrara@ferraralawfirm.com>
Sent: Wed Jul 04 15:36:23 2007
Subject: Judge Fallon's Ruling

Dear Selected NJ Vioxx Counsel:  I am taking the liberty of sending you
an email I got from Bert Black in response to Judge Fallon's preemption
ruling.

Mike just sent around a news clip on Fallon's rejection of preemption in
Vioxx.  Oh joy, we say.  But not so fast.  I'm sad to report the
decision will not get appealed on a very good record.  According to
what's on the Court's Vioxx website, the preemption motion was filed on
July 5, 2006, with opposition filed on September 15, 2006.  Merck
replied in October and the motion was argued in October.

Why do I rattle off all these dates?  Because I know for dead certain
the MDL was completely unaware of important facts about the April 2002
label at that time.  They did not know when the FDA dropped its
opposition to a precaution instead of a warning (actually very early on
in the negotiations); did not know about hypertension data apparently
NEVER reported to the FDA (finding out for sure would require discovery
they're too dumb to take); and did not know that it was the Alzheimers
data that finally changed the FDA's "mind" -- for reasons that remain
very unclear (again, inadequate discovery).

I know all this because in January of THIS year I was asked to do a memo
on the history of the April 2002 label, which had not been done before.

**KS-001241**

As a result we lost at least one FDA expert when he got asked questions on the label history he couldn't answer because the MDL had never found the right documents.

My point here is that the appeal may go up on a record that is devoid of things withheld from the FDA, which makes it far less likely a court like the Fifth Circuit will affirm Fallon.  Perhaps the MDL will figure out how to supplement the record on appeal.  Not easy, but maybe possible here because it will be additional support for what the lower court did, and not an effort to argue new facts in an effort to reverse. That's an interesting little appellate point I hope they have the brains to research.

**KS-001242**

Exhibit "69"

**Subject:** Re: Judge Fallon's Ruling

**Date:** Thursday, July 5, 2007 10:16:41 AM ET

**From:** Cvtisi@aol.com

**To:** Tom.Kline@KlineSpecter.com, DMurphy@lfsblaw.com, cseeger@seegerweiss.com, Dbuchanan@seegerweiss.com, alevin@lfsblaw.com, RHerman@hhkc.com, LDavis@hhkc.com, trafferty@levinlaw.com

**CC:** FLonger@lfsblaw.com

Thanks Tom for the Reminder about what is actually in the record. The fact is that from an appellate perspective, this is one of the best records and briefs that I have ever seen and I would challenge anybody who has actually read it to say otherwise. Those you who have actually worked on this issue in the MDL have given us and all of those who do this kind of litigation our best chance in a hostile 5th Cir and Supreme Court.

I think that our big mistake is that a.) We have not called the malcontents on the carpet and challenged them to answer what they would have us do that we are not doing and b.) we have not been very good at blowing our own horn as to what has actually come out of the MDL firms. I guess that we have been too busy working up discovery, experts, trials, appeals to play the PR game amongst our peers.

To say that I am angry about this is an understatement. This guy works for us!

In a message dated 7/5/2007 9:00:00 A.M. Mountain Daylight Time, Tom.Kline@KlineSpecter.com writes:

I asked Lisa Dagostino for her initial reaction to Black's criticisms, which are found in the following 5 points:

1.    Our reply to Merck's motion was so detailed, and included FDA material that was confidential, so it was filed under seal and is not available on Lexis.   Unless Bert went through the trouble of requesting a copy of it from either Lenny or Arnold, he has no idea what the record is like and is making an assumption about the state of the factual record based on Fallon's skimpy (on the facts) opinion.    The truth is that the record is much more complete re: factual issues than he is suggesting--there is a page response to Merck's statement of facts and we provided an extremely detailed counterstatement of facts (which Merck never responded to, by the way).

2.    Not only were we extremely detailed with facts of the Vioxx case itself, the counterstatement includes factual issues such as the dates when PhARMA proposed the FDA include preemption language (June 14, 2001) in their proposed labeling rule, and factual background that the FDA delayed posting that request on the FDA docket until AFTER the comment period had expired (giving the public no time for notice and comment at all).   The counterstatement of facts also contains a record of what is on the docket AFTER the rule was issued--an undated CYA (in terms of notice and comment) memo describing that FDA spoke to a few governors who had no opposition to preemption.

3.    The precise issue of 'when' FDA dropped their opposition to the warning is, in my opinion, much less important than how we phrased it in the Counterstatement of Facts--the FDA wanted a warning, Scolnick said "I will not sign off on it" and it eventually disappeared. That's the key issue--that Merck refused it and Merck COULD refuse it.   The precise 'when' that Bert is so upset about is much less important compared to the fact that Merck refused to accept the warning (we even have a full section in the counterstatement of facts on precisely this point).

4.    As for the Alz data--there is material in the counterstatement of facts on Alz.   There is also material on ADVANTAGE.   There is also material on the MI-only meta analysis (Shapiro).

5.    As for the data on HTN--I assume he is referring to 906 (HTN study comparing Vioxx to Celebrex) that was kept from the FDA.    We did not know about this at the time we wrote the brief--in fact, no one realized it until Jeff Grand and David Egilman (NOT Bert Black) discovered it during the Hermans/Humeston trial (March 2007) and Lanier used it very effectively with Lisa Rarick.   That may be something worth supplementing.

-----Original Message-----
From: Cvtisi@aol.com <Cvtisi@aol.com>
To: DMurphy@lfsblaw.com <DMurphy@lfsblaw.com>; cseeger@seegerweiss.com <cseeger@seegerweiss.com>; dbuchanan@seegerweiss.com <dbuchanan@seegerweiss.com>; Levin, A; rherman@hhkc.com <rherman@hhkc.com>; ldavis@hhkc.com <ldavis@hhkc.com>; trafferty@levinlaw.com <trafferty@levinlaw.com>; Kline, Thomas R.
CC: FLonger@lfsblaw.com <FLonger@lfsblaw.com>
Sent: Thu Jul 05 10:43:26 2007
Subject: Re: Judge Fallon's Ruling

Arnold:

He is a guy who, I am sure, has put literally THOUSANDS of hours into the MDL and who expects to be paid by this "too dumb" MDL and who will say, at the end of the day, that he contributed to this great work product.. Does he **KS-001243** recognize that 90% of the useable discovery that has been done has been done by those firms on this e-mail and others

on the PSC (while at the same time conducting 5 federal trials and several state court trials)?

I am getting very tired of these malcontents.

Oh, and by the way, the "FDA expert that we lost" was a guy who Bert prepped and wrote the expert report for.  Too bad that he did not share his stellar work with his own expert.

Chris


In a message dated 7/5/2007 6:21:55 A.M. Mountain Daylight Time, DMurphy@lfsblaw.com writes:

The following is an e-mail from Arnold Levin -

Who is Bert Black?  Did he see the 56(f) footnote?


Debbie Murphy
Levin, Fishbein, Sedran & Berman
Counsellors at Law and Proctors in Admiralty
510 Walnut Street - Suite 500
Philadelphia, PA 19106-3697
Tele: 215-592-1500 - Fax: 215-592-4663
www.lfsblaw.com
CONFIDENTIALITY NOTE: This e-mail message contains information belonging
to the law firm of Levin, Fishbein, Sedran & Berman and may be
privileged, confidential and/or protected from disclosure. The
information is intended only for the use of the individual or entity
named above. If you think that you have received this message in error,
please e-mail the sender. If you are not the intended recipient, please
delete the message and understand that any dissemination, distribution
or copying is strictly prohibited.

-----Original Message-----
From: Seeger, Chris [mailto:cseeger@seegerweiss.com]
Sent: Wednesday, July 04, 2007 7:07 PM
To: Buchanan, David; Arnold Levin; rherman@hhkc.com; ldavis@hhkc.com;
Cvtisi@aol.com; trafferty@levinlaw.com; Tom.Kline@KlineSpecter.com
Subject: Re: Judge Fallon's Ruling

Is this guy a retard?
--------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: Buchanan, David
To: 'alevin@lfsblaw.com' <alevin@lfsblaw.com>; Seeger, Chris;
'RHerman@hhkc.com' <RHerman@hhkc.com>; 'ldavis@hhkc.com'
<ldavis@hhkc.com>; 'cvtisi@aol.com' <cvtisi@aol.com>; NJRT -
trafferty@levinlaw.com; 'Tom.Kline@KlineSpecter.com'
<Tom.Kline@KlineSpecter.com>
Sent: Wed Jul 04 19:00:23 2007
Subject: Fw: Judge Fallon's Ruling

See below email forwarded to NJ counsel.  It purports to be an email
from Bert Black.

-----Original Message-----
From: Mike Ferrara <mikeferrara@comcast.net>
To: ntrunk@ferraralawfirm.com <ntrunk@ferraralawfirm.com>; Wendy
Fleishman; Ben Morelli <bpmorelli@morellilaw.com>; Seeger, Chris;
Buchanan, David; Dave Jacoby <djacoby@anapolschwartz.com>; WL - Relkin,
Ellen; Eric Weinberg <ehw@erichweinberg.com>; Marc Grossman
<mgrossman@ssbwlaw.com>; Rob Gordon <rgordon@weitzlux.com>; Sol Weiss
<sweiss@anapolschwartz.com>; 'Rick Meadow' <rdm@lanierlawfirm.com>;
'Chris Placitella' <cplacitella@cprlaw.com>; 'David Eisbrouch'
<david@800injured.com>; 'Mike Ferrara' <mferrara@ferraralawfirm.com>
Sent: Wed Jul 04 15:36:23 2007
Subject: Judge Fallon's Ruling

Dear Selected NJ Vioxx Counsel:  I am taking the liberty of sending you
an email I got from Bert Black in response to Judge Fallon's preemption

**KS-001244**

ruling.

Mike just sent around a news clip on Fallon's rejection of preemption in
Vioxx.  Oh joy, we say.  But not so fast.  I'm sad to report the
decision will not get appealed on a very good record.  According to
what's on the Court's Vioxx website, the preemption motion was filed on
July 5, 2006, with opposition filed on September 15, 2006.  Merck
replied in October and the motion was argued in October.

Why do I rattle off all these dates?  Because I know for dead certain
the MDL was completely unaware of important facts about the April 2002
label at that time.  They did not know when the FDA dropped its
opposition to a precaution instead of a warning (actually very early on
in the negotiations); did not know about hypertension data apparently
NEVER reported to the FDA (finding out for sure would require discovery
they're too dumb to take); and did not know that it was the Alzheimers
data that finally changed the FDA's "mind" -- for reasons that remain
very unclear (again, inadequate discovery).

I know all this because in January of THIS year I was asked to do a memo
on the history of the April 2002 label, which had not been done before.
As a result we lost at least one FDA expert when he got asked questions
on the label history he couldn't answer because the MDL had never found
the right documents.

My point here is that the appeal may go up on a record that is devoid of
things withheld from the FDA, which makes it far less likely a court
like the Fifth Circuit will affirm Fallon.  Perhaps the MDL will figure
out how to supplement the record on appeal.  Not easy, but maybe
possible here because it will be additional support for what the lower
court did, and not an effort to argue new facts in an effort to reverse.
That's an interesting little appellate point I hope they have the brains
to research.

See what's free at AOL.com.

**KS-001245**

Exhibit "70"

# POINT SYSTEM GUIDE

## Key Leadership – 125 maximum points

- High level positions and responsibilities in overall litigation
- 125 points – MDL PEC (Co-leads and Liaison)
- 75 points – exemplary leadership of key coordinated venue; key guidance to PEC
- 50 points – substantial leadership and advancement of litigation in key coordinated venue
- 25 points – PEC member; key leadership position in key coordinated venue
- 15 points – co-leadership role in Texas coordinated litigation
- 10 points – MDL-Texas coordination

## Trials – 150 maximum points

- 150 points – 5 trials; 3 trials with exceptional results
- 120 points – 2 trials, one with good plaintiff verdict
- 80 points – 2 trials; one trial with excellent result at trial level and appellate level
- 60 points – 1 bellwether trial with excellent result
- 40 points – one trial
- 5-10 points – local counsel or similar role

## Settlement Negotiations – 100 maximum points

- 100 points – highest level of contribution
- 95 points – very high level of contribution
- 90 points – high level of contribution
- 85 points – substantial contribution

## Law and Briefing – 100 maximum points

- 100 points – highest level of overall contribution
- 90 points – very high level of contribution on most significant issues
- 75 points – high level of contribution on significant issues at trial and appellate levels
- 70 points and less – weighted based on significance of issues and time expended

**KS-001246**

<u>**Settlement Implementation and Post-Settlement Issues – 100 maximum points**</u>

- 100 points – highest level of contribution
- 90 points – very high level of contribution
- 85 points – high level of contribution
- 80 points and less – weighted based on significance of issues and time expended

<u>**Discovery, Science and Experts – 50 maximum points**</u>

- 50 points – highest level of contribution
- 40 points – very high level of contribution (substantial and significant work relating to discovery, scientific issues and/or experts)
- 35 points – high level of contribution (substantial time and resources expended doing discovery and advancing the docket)
- 30 points and less – substantial contribution (weighted based on significance of issue and amount of time expended)

<u>**Committee Leadership and Participation - 50 maximum points**</u>

- 50 points – highest level of contribution
- 40 points – very high level of contribution (Chairs of key committees) *Restaino is split between Lopez Hodes and Burg Simpson.
- 35 points and less – high level of contribution (weighted by significance of committee; degree of leadership and participation; amount of time expended)

<u>**Funding – 75 maximum points (PSC assessment and case contributions)**</u>

- Up to 75 points for Case Contribution
- 25 points for PSC Assessment
- Points added for exceptional trial costs borne by firm

<u>**Case Management – 25 maximum points**</u>

- Attending Status Conferences, hearings, meetings, etc.
- Reviewing email, pleadings, etc.
- Case administration

**KS-001247**

FAC Resp. Exhibit F – 3

| Firm | Key Leadership Roles (125) | Trials (150) | Settlement (100) | Law & Briefing (100) | Settlement Implementation / Post Settlement Matters (100) | Discovery / Science (50) | Committee Leadership and Participation (50) | Funding (75) | Case Management (25) | Net Points | Factor for Johnson and PTO 6D criteria (.01-1.25) | Total Points | Allocation based on Points Calculation |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alley, Clark, Greiwe & Fulmer | | | | | | | | | | | | | |
| Alvarez Law Firm | | | | | | | | | | | | | |
| Anapol, Schwartz, Weiss, Cohan, Feldman & Smalley, P.C. | | | | | | | | | | | | | |
| Anastopoulo & Crate, LLC | | | | | | | | | | | | | |
| Andrews & Thornton | | | | | | | | | | | | | |
| Ashcraft & Gerel LLP | | | | | | | | | | | | | |
| Audet & Partners, LLP | | | | | | | | | | | | | |
| Aylstock, Witkin, Kreis & Overholtz, LLC | | | | | | | | | | | | | |
| Ballin & Eidcouch | | | | | | | | | | | | | |
| Balser, Brian S., Co., LPA | | | | | | | | | | | | | |
| Barnow | | | | | | | | | | | | | |
| Barrios, Kingsdorf & Casteix, LLP | | | | | | | | | | | | | |
| Bartimus, Frickleton, Robertson & Gorny | | | | | | | | | | | | | |
| Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. | | | | | | | | | | | | | |
| Becnel Law Firm, LLC | | | | | | | | | | | | | |
| Benromo | | | | | | | | | | | | | |
| Blizzard, McCarthy & Nabers, LLP | | | | | | | | | | | | | |
| Bossier & Associates, PLLC | | | | | | | | | | | | | |
| Branch Law Firm | | | | | | | | | | | | | |
| Brandi Law Firm | | | | | | | | | | | | | |
| Brown & Crouppen, PC | | | | | | | | | | | | | |
| Bruce C. Dean | | | | | | | | | | | | | |
| Burg, Simpson, Eldredge, Hersh & Jardine, PC | | | | | | | | | | | | | |
| Cafferty Faucher | | | | | | | | | | | | | |
| Capshaw Goss | | | | | | | | | | | | | |
| Carey & Danis, LLC | | | | | | | | | | | | | |
| Chaffios | | | | | | | | | | | | | |
| Childers, Buck & Schlueter | | | | | | | | | | | | | |
| Cohen Milstein | | | | | | | | | | | | | |
| Cohen, Placitella & Roth, PC | | | | | | | | | | | | | |
| Cunard Law Firm | | | | | | | | | | | | | |
| Cuneo, Gilbert & LaDuca LLP | | | | | | | | | | | | | |
| Davis, Champ & Associates, Inc. | | | | | | | | | | | | | |
| Morgan & Browne | | | | | | | | | | | | | |

KS-001246

FAC Resp. Exhibit F -- 4

| Firm | Key Leadership Roles (125) | Trials (150) | Settlement (100) | Law & Briefing (100) | Settlement Implementation / Post Settlement Matters (100) | Discovery / Science (50) | Committee Leadership and Participation (50) | Funding (75) | Case Management (25) | Net Points | Factor for Johnson and PTO 6D criteria (.01-1.25) | Total Points | Allocation based on Points Calculation |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mazeloevs & Associates | | | | | | | | | | | | | |
| Mithoff Law Firm | | | | | | | | | | | | | |
| Morelli Ratner PC | | | | | | | | | | | | | |
| Motley, Rice LLC | | | | | | | | | | | | | |
| Murray Law Firm 1 | | | | | | | | | | | | | |
| Neblett, Beard & Arsenault | | | | | | | | | | | | | |
| Parish & Shea | | | | | | | | | | | | | |
| Price Waicukauski & Riley, LLC | | | | | | | | | | | | | |
| Richardson, Patrick, Westbrook & Brickman | | | | | | | | | | | | | |
| Robert J. DeBry | | | | | | | | | | | | | |
| Robert M. Becnel | | | | | | | | | | | | | |
| Robers, Kaplan, Miller & Ciresi L.L.P. | | | | | | | | | | | | | |
| Robinson, Calcagnie & Robinson | | | | | | | | | | | | | |
| Roda Nast, P.C. | | | | | | | | | | | | | |
| Sanders Viener Grossman, LLP | | | | | | | | | | | | | |
| Sanford, Shelly A., PLLC | | | | | | | | | | | | | |
| Seeger Weiss LLP | | | | | | | | | | | | | |
| Shelier, P.C. | | | | | | | | | | | | | |
| Silverman & Fodera | | | | | | | | | | | | | |
| Singleton Law Firm | | | | | | | | | | | | | |
| Snapka, Turman & Waterhouse, L.L.P | | | | | | | | | | | | | |
| Ted Zonner | | | | | | | | | | | | | |
| Texas Consortium (Ranier, Gayle & Elliot, L.L.C.; Williams Kherkher; Provost Umphrey; Watts Law Firm; Grant Kaiser) | | | | | | | | | | | | | |
| The Holman Law Firm | | | | | | | | | | | | | |
| Ury & Mochav LLC | | | | | | | | | | | | | |
| Weinberg, Eric H., Law Firm of | | | | | | | | | | | | | |
| Weitz & Luxenberg, P.C. | | | | | | | | | | | | | |
| White Meany & Wetherall | | | | | | | | | | | | | |
| Whitehead Law Firm | | | | | | | | | | | | | |
| Williamson & Williams | | | | | | | | | | | | | |
| ...old | | | | | | | | | | | | | |
| ...immerman, Reed PLLP | | | | | | | | | | | | | |
| ..., Diane K. | | | | | | | | | | | | | |

KS-001249

4

FAC Resp. Exhibit F -- 5

| Firm | Key Leadership Roles (125) | Trials (150) | Settle-ment (100) | Law & Briefing (100) | Settlement-implemen-tation/Post Settlement Matters (100) | Discovery/ Science (50) | Committee Leadership and Participation (50) | Funding (75) | Case Manage-ment (25) | Net Points | Factor for Johnson and PTO 6D criteria (.01-1.25) | Total Points | Allocation based on Points Calculation |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Engstrom, Lipscomb & Lack | | | | | | | | | | | | | |
| Escobedo Tippet | | | | | | | | | | | | | |
| Fayard & Honeycutt | | | | | | | | | | | | | |
| Fibich, Hampton & Leebron, LLP | | | | | | | | | | | | | |
| Freese & Goss, PLLC | | | | | | | | | | | | | |
| Gainsburgh, Benjamin, Davis, Meunier & Warshauer, LLC | | | | | | | | | | | | | |
| Gallagher Law Firm (TX) | | | | | | | | | | | | | |
| Gancedo & Nieves LLP | | | | | | | | | | | | | |
| Gianni-Petoyan, Attorneys at Law | | | | | | | | | | | | | |
| Girardi & Keese | | | | | | | | | | | | | |
| Goldenberg Heller | | | | | | | | | | | | | |
| Hagens Berman | | | | | | | | | | | | | |
| Heninger Garrison Davis, LLC | | | | | | | | | | | | | |
| Herman, Herman, Katz & Cotlar, LLP | | | | | | | | | | | | | |
| Hovde Dassow & Deets, LLC | | | | | | | | | | | | | |
| Irpino | | | | | | | | | | | | | |
| Jacobs Burns | | | | | | | | | | | | | |
| John Hornbeck | | | | | | | | | | | | | |
| Johnston & Parkinson | | | | | | | | | | | | | |
| Jones Verras | | | | | | | | | | | | | |
| Kasowitz, Benson, Torres & Friedman LLP | | | | | | | | | | | | | |
| Kline & Specter, PC | | | | | | | | | | | | | |
| Labaton Sucharow | | | | | | | | | | | | | |
| Lanier Law Firm, PC | | | | | | | | | | | | | |
| Levin Fishbein Sedran & Berman | | | | | | | | | | | | | |
| Levin Simes Kaiser & Gornick, LLP | | | | | | | | | | | | | |
| Levin, Papantonio, Thomas, Mitchell, Echsner & Proctor P.A. | | | | | | | | | | | | | |
| Lewis & Roberts, PLLC | | | | | | | | | | | | | |
| K Colonzor, Heenann & Bernstein, LLP | | | | | | | | | | | | | |
| Lidge, Grindal, Nauen PLLP | | | | | | | | | | | | | |
| Law Firm, LLC | | | | | | | | | | | | | |
| Hodes, Razdaina, Milman & Solkos | | | | | | | | | | | | | |
| & Davis | | | | | | | | | | | | | |
| in S. Jones | | | | | | | | | | | | | |

KS-001250

5

FAC Resp. Exhibit F -- 6

Exhibit "71"

**Dagostino, Lisa S.**

---

| | |
|---|---|
| **From:** | Kline, Thomas R. |
| **Sent:** | Sunday, February 11, 2007 7:56 AM |
| **To:** | Dagostino, Lisa S. |
| **Cc:** | Specter, Shanin |
| **Subject:** | Fw: Flavahan |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Just FYI..

-----Original Message-----
From: Mark Lanier <WML@lanierlawfirm.com>
To: Kline, Thomas R.
Sent: Sun Feb 11 07:31:43 2007
Subject: RE: Flavahan

Praise from you is high praise indeed!  Thank you!

Seeger and his crew are a wonderful compliment to us.  They are working so hard behind the scenes to make days like Friday possible.  Of course you and your folks (especially Lisa!) are huge in all this as well...  This is a great cooperative effort where I get to do the fun part!  What a job!

Take care...

     -----Original Message-----
     From: Kline, Thomas R. [mailto:Tom.Kline@KlineSpecter.com]
     Sent: Sunday, February 11, 2007 7:27 AM
     To: Mark Lanier
     Subject: Flavahan


     Mark

     From the peanut gallery-

     I thought you had as good a day as possible to have with any  witness on Fri  with Flavahan..It was a cross exam clinic deconstructing the heart of their scientific defense...I know what it takes to accomplish what you did...I'm learning a lot watching..Keep it up, brother...

     Tom

**KS-001251**

Exhibit "72"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: VIOXX<br>   PRODUCTS LIABILITY LITIGATION | MDL NO. 1657<br>SECTION L |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | JUDGE FALLON<br>MAG. JUDGE KNOWLES |

### AFFIDAVIT OF THOMAS R. KLINE

I, Thomas R. Kline, aver as follows:

1.      I am a founding partner, with Shanin Specter, of the law firm of Kline & Specter, P.C. ("Kline & Specter"). I am a member of the Pennsylvania Bar since 1978.

2.      This Affidavit is based upon my personal knowledge and information provided by others in my firm at my request.

3.      On April 8, 2005, the Honorable Eldon Fallon entered an Order appointing me to the Plaintiffs' Steering Committee ("PSC"). The PSC had numerous responsibilities in the Vioxx MDL as set forth in the April 8 Order, a copy of which is attached as Exhibit "A." The Court charged the PSC with managing and overseeing Vioxx litigation for the MDL plaintiffs. Its responsibilities included conducting discovery, examining witness, submitting or opposing motions, entering into stipulations, negotiating settlement with Merck, and maintaining appropriate files of all pretrial matters. *See* Exhibit "A." It was authorized to organize subcommittees of plaintiffs' counsel not on the PSC and to assign them tasks consistent with the PSC's duties. *See id.* The Order appointed Christopher Seeger, Esq. and Andy Birchfield, Esq. as co-lead counsel of the PSC. The Order also appointed Russ Herman, Esq. as Plaintiffs' Liaison Counsel.

4.      I was appointed to be co-chair of the Trial Committee, with Mr. Seeger. In that capacity, I and my firm reviewed and vetted the medical records of available potential cases for trial as bellwether cases in front of the Honorable Eldon Fallon. Unfortunately, as this was early in the litigation and individual case specific discovery had yet to be performed, many of the cases were provided to us with incomplete information, which made the vetting process extremely difficult. Nevertheless, the Irvin trial was ultimately set to be the first bellwether trial in the MDL.

**KS-001252**

5.   I volunteered to be lead trial counsel for Irving case.  In August 2005, I began to made preparations and worked with Mr. Birchfield on development of the case.

6.   On August 24, 2005, I attended a meeting at the office of Mr. Herman with Mr. Birchfield.  I was informed the Beasley Allen firm would be taking the lead role and that Mr. Beasley had been "knighted" to try the first case.  I was very disappointed, and expressed that at the time.

7.   In September 2005, after this Court had been temporarily moved to Houston due to the devastating effects of Hurricane Katrina, I volunteered two potential cases from my own firm for the second bellweather trial—the Abrams case and the Reece case.  Merck picked the Abrams case in on or about October 27, 2005.

8.   After consultation with the PSC, particularly those members who were based in New Orleans, in early November 2005, I asked for a change of venue for the trial of this case to Philadelphia.  It was the PSC leadership consensus was that the trial of a bellweather case in New Orleans five months after Hurricane Katrina, when potential jurors had recently suffered catastrophic losses, was not in the best interest of either my clients, the Abrams family, or the best interests of the other Vioxx litigants.  The Abrams family was also based in Philadelphia and did not want to have the case tried in New Orleans.  Many of potential Merck witnesses were based in the Philadelphia or New Jersey area.  The Honorable Eldon Fallon, who at this time was still temporarily based in Houston at this time, agreed to this request, and made special arrangements for the case to be heard in front of him in Philadelphia. Meanwhile, discovery continued in the Abrams case.  After the case had been selected as a potential bellweather trial, medical records were obtained that indicated that my client's decedent, Dr. Abrams, had been prescribing to himself twice the recommended dose of Vioxx, and that he had been specifically advised by his physicians to discontinue the drug because it was having a deleterious effect on his blood pressure. *See*, relevant medical record attached as Exhibit "B."  Unfortunately, he did not follow medical advice, and suffered his fatal heart attack.  Upon learning this information, I notified the PSC leadership, including Messers. Seeger, Birchfield, and Herman.  They agreed with the decision to withdrawn the case.  This was a difficult decision, but in my experience, I felt it was in the best interests of my client and all Vioxx litigants.  The Abrams case was withdrawn as a potential bellweather trial on or about November 22, 2005.

9.   I continued to extensively work on Vioxx matters following the November 22, 2005 withdrawal of the Abrams case.  I deposed three key third party witnesses for the MDL, Dr.

2                                         **KS-001253**

Eric Topol, Mr. Mal Mixon, Dr. David Graham, and Dr. Gregory Curfman. I assisted counsel that was at trial with strategy advice and crafted cross examinations. I worked on the teams that deposed third parties Dr. Steve Nissen and Dr. Jerome Avorn. I was asked by both co-leads, Mr. Birchfield and Mr. Seeger to come down to New Orleans and argue motions in front of Judge Fallon regarding the admissibility of the Topol and Graham depositions for an upcoming MDL trial during the July 4th week of 2006. Mr. Herman asked me to defer the argument of the Graham motion to him, so I did so. The argument for the Topol deposition, as I understand it, happened on a future date.

10.     Kline & Specter was named liaison counsel in the Philadelphia Coordinated Litigation, and deadlines and trial dates were established for a number of cases. The first case involved the death of a man named Joel McCool. As discovery proceeded in this case, it more and more became apparent that trial of this case would be damaging to the litigation. Mr. McCool had multiple risk factors for a heart attack outside of Vioxx, including high blood pressure, a caloric intake of 8-10,000 calories a day, along with an excessive caffeine intake and morbid obesity. *See*, relevant medical record attached as Exhibit "C." During discovery, his treating physician told us that he intended to testify in a way that would be fatal to the case-that the risk to Mr. McCool of a heart attack was outweighed by the therapeutic benefits of the drug. As a matter of law and fact, the case could not be won and in order not to damage the litigation by trial of a case that had no merit, so it was properly dismissed.

11.     Following the withdrawal of the McCool case, my firm specifically requested that a number of cases be consolidated for trial. This process was ongoing when the litigation settled in November 2007.

Dated: May _5_ , 2011

**THOMAS R. KLINE**

Sworn to and subscribed before
me this _____ 5ᵗʰ _____ day
of _____ May _____, 2011.

Notary Public

My commission expires on:

**COMMONWEALTH OF PENNSYLVANIA**
NOTARIAL SEAL
KATHLEEN M. SPURKA, Notary Public
City of Philadelphia, Phila. County
My Commission Expires January 8, 2012

3

**KS-001254**

# EXHIBIT "A"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| IN RE: VIOXX | : | MDL NO. 1657 |
|     PRODUCTS LIABILITY LITIGATION | : | SECTION: L |
|  | : |  |
|  | : | JUDGE FALLON |
|  | : | MAG. JUDGE KNOWLES |

.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. :

**THIS DOCUMENT RELATES TO ALL CASES**

**PRETRIAL ORDER #6**

Numerous applications/nominations for the Plaintiffs' Steering Committee (PSC)

positions have been filed in accordance with the procedures set forth in Pretrial Order #1. The

Court, after having reviewed the applications and carefully considered the matter, hereby

appoints the following members to the PSC:

Andy D. Birchfield, Jr. (Co-Lead Counsel)
Post Office Box 4160
Montgomery, AL 36103

Christopher A. Seeger (Co-Lead Counsel)
One William Street
New York, NY 10004

Richard J. Arsenault
P.O. Box 1190
Alexandria, LA 71309

Elizabeth J. Cabraser
Embarcadero Center West
275 Battery St., 30th Floor
San Francisco, CA 94111

Thomas R. Kline
1525 Locust St., Suite 1900
Philadelphia, PA 19102

Arnold Levin
510 Walnut Street, Suite 500
Philadelphia, PA 19106-3875

Carlene Rhodes Lewis
1111 Bagby, Suite 2200
Houston, TX 77002

Gerald E. Meunier
2800 Energy Centre
1100 Poydras St.
New Orleans, LA 70163

**KS-001419**

Troy A. Rafferty                              Mark P. Robinson, Jr.
P.O. Box 12308                                620 Newport Center Dr., 7th Floor
Pensacola, FL 32591                           Newport Beach, CA 92660

Drew Ranier                                   Christopher V. Tisi
1419 Ryan St.                                 2000 L St. NW, Suite 400
Lake Charles, LA 70601                        Washington, DC 20036

Additionally, the Court appoints Plaintiff's Liaison Counsel, Russ Herman, and Co-Lead

Counsel, Christopher Seeger and Andy Birchfield, to comprise the PSC Executive Committee. It

shall be the Executive Committee's duty to coordinate the responsibilities of the PSC, schedule

PSC meetings, keep minutes or transcripts of these meetings, appear at periodic court noticed

status conferences, perform other necessary administrative or logistic functions of the PSC and

carry out any other duty as the Court may order.

The appointment to the PSC is of a personal nature. Accordingly, the above appointees

cannot be substituted by other attorneys, including members of the appointee's law firm, to

perform the PSC's exclusive functions, such as committee meetings and court appearances,

except with prior approval of the Court.

The PSC will have the following responsibilities:

Discovery

    (1)    Initiate, coordinate, and conduct all pretrial discovery on behalf of
           plaintiffs in all actions which are consolidated with the instant multi
           district litigation.

    (2)    Develop and propose to the Court schedules for the commencement,
           execution, and completion of all discovery on behalf of all plaintiffs.

    (3)    Cause to be issued in the name of all plaintiffs the necessary discovery
           requests, motions, and subpoenas pertaining to any witnesses and
           documents needed to properly prepare for the pretrial of relevant issues
           found in the pleadings of this litigation. Similar requests, notices, and
           subpoenas may be caused to be issued by the PSC upon written request

**KS-001420**

by an individual attorney in order to assist him/her in the preparation of the
pretrial stages of his/her client's particular claims.

(4)     Conduct all discovery in a coordinated and consolidated manner on behalf
and for the benefit of all plaintiffs.

Hearings and Meetings

(1)     Call meetings of counsel for plaintiffs for any appropriate purpose,
including coordinating responses to questions of other parties or of the
Court.  Initiate proposals, suggestions, schedules, or joint briefs, and any
other appropriate matter(s) pertaining to pretrial proceedings.

(2)     Examine witnesses and introduce evidence at hearings on behalf of
plaintiffs.

(3)     Act as spokesperson for all plaintiffs at pretrial proceedings and in
response to any inquiries by the Court, subject of course to the right of any
plaintiff's counsel to present non-repetitive individual or different
positions.

Miscellaneous

(1)     Submit and argue any verbal or written motions presented to the Court or
Magistrate on behalf of the PSC as well as oppose when necessary any
motions submitted by the defendant or other parties which involve matters
within the sphere of the responsibilities of the PSC.

(2)     Negotiate and enter into stipulations with Defendants regarding this
litigation.  All stipulations entered into by the PSC, except for strictly
administrative details such as scheduling, must be submitted for Court
approval and will not be binding until the Court has ratified the
stipulation.  Any attorney not in agreement with a non-administrative
stipulation  shall file with the Court a written objection thereto within five
(5) days after he/she knows or should have reasonably become aware of
the stipulation.  Failure to object within the term allowed shall be deemed
a waiver and the stipulation will automatically be binding on that party.

(3)     Explore, develop, and pursue all settlement options pertaining to any claim
or portion thereof of any case filed in this litigation.

(4)     Maintain adequate files of all pretrial matters, including establishing and
maintaining a document or exhibit depository, in either real or virtual
format, and having those documents available, under reasonable terms and

-3-                                    **KS-001421**

conditions, for examination by all MDL Plaintiffs or their attorneys.

(5)    Perform any task necessary and proper for the PSC to accomplish its responsibilities as defined by the Court's orders., including organizing sub-committees comprised of plaintiffs' attorneys not on the PSC and assigning them tasks consistent with the duties of the PSC.

(6)    Perform such other functions as may be expressly authorized by further orders of this Court.

## Plaintiffs' Counsel's Time and Expense Submissions

Reimbursement for costs and/or fees for services of all plaintiff s' counsel performing functions in accordance with this order will be set at a time and in a manner established by the Court after due notice to all counsel and after a hearing. The following standards and procedures are to be utilized by any counsel seeking fees and/or expense reimbursement.

### General Standards

(1)    All time and expenses submitted must be incurred only for work authorized by the Plaintiffs' Steering Committee.

(2)    These Time and Expense Guidelines are intended for all activities performed and expenses incurred by counsel that relate to matters common to all claimants in MDL 1657.

(3)    Time and expense submissions must be submitted on the forms prepared by Plaintiffs' Liaison Counsel (PLC) and approved by the Court. The forms may be obtained from PLC or from the Court's website.

(4)    Plaintiffs' Liaison Counsel has retained and the Court approves the retention of Philip Garrett, CPA, of the accounting firm of Wegmann-Dazet to assist and provide accounting services to Plaintiffs' Liaison Counsel, the Plaintiff's Steering Committee, and the Court in MDL 1657. Wegmann-Dazet will be assisting in compiling submissions and will provide reports to Plaintiff's Liaison Counsel who shall file them with the Court on a monthly basis. These reports will include both time and expenses and will summarize, with back-up detail, the submissions of all firms. Submission of time and expense records to Wegmann-Dazet and the Court shall be considered as if filed under seal.

(5)    Time and expense submissions must be submitted timely, on a monthly basis, to Plaintiffs' Liaison Counsel, Russ M. Herman, c/o Herman, Herman, Katz & Cotlar, L.L.P., 820 O'Keefe Avenue, New Orleans,

**KS-001422**

Louisiana 70113, (504) 581-4892, Fax: (504) 561-6024, e-mail: VioxxMDL@hhkc.com so they can be compiled and submitted to Wegmann-Dazet and the Court. It is therefore essential that each firm, on a monthly basis, timely submit its records for the preceding month.

(6)     All submissions shall be transmitted electronically or in hard copy to Plaintiffs' Liaison Counsel. If hard copy submissions are made, an original and one duplicate copy must be provided.

(7)     The first submission is due on June 15, 2005 and should include all time through May 31, 2005. Thereafter, time records shall be submitted on the 15th of each month and shall cover the time period through the end of the preceding month.

Time Reporting

(1)     Only time spent on matters common to all claimants in MDL 1657 will be considered in determining fees. No time spent on developing or processing any case for an individual client (claimant) will be considered or should be submitted.

(2)     All time must be accurately and contemporaneously maintained. Time shall be kept according to these guidelines and specifically in accordance with the Litigation Task Definitions as outlined in Attachment "A". All counsel shall keep a daily record of their time spent in connection with this litigation, indicating with specificity the hours, location and particular activity (such as "conduct of deposition of A.B."). The failure to maintain such records, as well as insufficient description of the activity may result in a forfeiture of fees.

(3)     All time for each firm shall be maintained in quarter-of-an-hour increments. Failure to do so may result in time being disallowed.

(4)     All time records shall be submitted together with a form summarizing the total of member firm time broken down by each separate name of time keeper and Litigation Task Definition the time spent during the preceding month and the accumulated total of all time incurred by the firm during the particular reporting period. The summary report form may be obtained from Plaintiffs' Liaison Counsel or from the Court's website.

(5)     The summary report form shall be certified by a senior partner each month attesting to the accuracy and correctness of the monthly submission.

KS-001423

Expense Reporting

(1)    Advanced costs will be deemed as either "Shared" or "Held."

        a.    Shared Costs are costs that will be paid out of a separate Plaintiffs' Steering Committee MDL 1657 Fund account to be established by Plaintiffs' Liaison Counsel and to be funded by all members of the PSC and others as determined by the PSC. The PSC MDL 1657 Fund account will be administered by Herman, Herman, Katz & Cotlar, L.L.P.

        b.    Held Costs are those that will be carried by each attorney in MDL 1657 and reimbursed as and when determined by the PSC.

(2)    Each member of the PSC and any others as set forth in section (1) above will contribute to the Plaintiffs' Steering Committee MDL 1657 Fund at times and in amounts sufficient to cover the administration of the MDL. The timing and amount of each assessment will be determined by the PSC.

Shared Costs

(1)    Shared Costs are costs incurred for the common benefit of the MDL as a whole. No client-related costs can be considered as Shared Costs. All costs of a substantial nature that meet these requirements and fall under the following categories shall be considered Shared Costs and qualify to be submitted and paid directly from the MDL account. All Shared Costs must be approved by Plaintiffs' Liaison Counsel prior to payment. Shared Costs include:

        a.    Court, filing and service costs
        b.    Deposition and court reporter costs
        c.    Document Depository: creation, operation, staffing, equipment and administration
        d.    Plaintiffs' Liaison Counsel administrative matters (e.g., expenses for equipment, technology, courier services, long distance, telecopier, electronic service, photocopy and printing, secretarial/temporary staff, etc.)
        e.    PSC group administration matters such as meetings and conference calls
        f.    Legal and accountant fees
        g.    Expert witness and consultant fees and expenses
        h.    Printing, copying, coding, scanning (out of house or extraordinary firm cost)
        I.    Research by outside third party vendors/consultants/attorneys
        j.    Common witness expenses including travel
        k.    Translation costs
        l.    Bank or financial institution charges

**KS-001424**

m.    Investigative services

(2)    Plaintiffs' Liaison Counsel shall prepare and be responsible for distributing to the appropriate plaintiffs' counsel and the PSC reimbursement procedures and the forms associated therewith. Request for payments should include sufficient information to allow Plaintiffs' Liaison Counsel and the CPA to account properly for costs and to provide adequate detail to the Court. All requests shall be subject to review and approval by Plaintiffs' Liaison Counsel.

Held Costs

(1)    Held Costs are costs incurred for the global benefit of the MDL. Held costs are those that do not fall into the above Shared Costs categories but are incurred for the benefit of all plaintiffs in general. No specific client-related costs can be considered as Held Costs. All costs of a substantial nature that meet these requirements and fall under the following categories shall be considered Held Costs and qualify to be submitted for consideration by the PSC and the Court for future reimbursement.

        a.    Telefax charges
        b.    Postage, shipping, courier, certified mail
        c.    Printing and photocopying (in-house)
        d.    Computerized research - Lexis/Westlaw
        e.    Telephone - long distance (actual charges only)
        f.    Travel - (following the travel expense guidelines set forth in Section 5)
            - for attorney for deposition, court or legislative including:
            i.    Airfare
            ii.    Reasonable ground transportation
            iii.    Hotel
            iv.    Reasonable meals and entertainment
            v.    Reasonable other (parking)
            vi.    Car rental, cabs, etc.
        g.    Secretarial and clerical overtime

(2)    Held Cost records shall be submitted to Plaintiffs' Liaison Counsel on a monthly basis.

Travel Limitations

Except in extraordinary circumstances approved by Plaintiffs' Liaison Counsel or the PSC, all travel reimbursements are subject to the following limitations:

(1)    Airfare. Only the lowest-priced available coach airfare at time of booking (either at restricted coach rates or rates which allow the reservation to rebooked without surcharge and other agency fees) for a reasonable itinerary will be reimbursed.

**KS-001425**

Notwithstanding the foregoing, first class airfare shall be allowed for cross-country flights that are in excess of four hours non-stop flight time or international flights.

(2)     <u>Hotel</u>.  Hotel room charges will be reimbursed up to the greater of (a) $250 per night excluding taxes, or (b) the average available room rate of the Hyatt, Hilton, and Marriott hotels in that city.

(3)     <u>Meals</u>.  Meal expenses must be reasonable.

(4)     <u>Cash Expenses</u>.  Miscellaneous cash expenses for which receipts generally are not available (tips, luggage handling, pay telephone, etc.) will be reimbursed up to $50.00 per trip, as long as the expenses are properly itemized.

(5)     <u>Rental Automobiles</u>.  Luxury automobile rentals will not be fully reimbursed, unless only luxury automobiles were available.  If luxury automobiles are selected when non-luxury vehicles are available, then the difference between the luxury and non-luxury vehicle rates must be shown on the travel reimbursement form, and only the non-luxury rate may be claimed.

(6)     <u>Mileage</u>.  Mileage claims must be documented by stating origination point, destination, total actual miles for each trip, and the rate per mile paid by the member's firm.  The maximum allowable rate will be the maximum rate allowed by the IRS (currently 40.5 cents per mile).

<u>Non-Travel Limitations</u>

The following apply:

(1)     <u>Long Distance and Cellular Telephone</u>:  Long distance and cellular telephone charges must be documented.  Copies of the telephone bills must be submitted with notations as to which charges relate to the Vioxx litigation.

(2)     <u>Shipping, Courier, and Delivery Charges</u>:  All claimed expenses must be documented with bills showing the sender, origin of the package, recipient, and destination of the package.

(3)     <u>Postage Charges</u>:  A contemporaneous postage log or other supporting documentation must be maintained and submitted.  Postage charges are to be reported at actual cost.

(4)     <u>Telefax Charges</u>:  Contemporaneous records should be maintained and submitted showing faxes sent and received.  The per-fax charge shall not exceed $1.00 per page.

-8-

KS-001426

(5)    In-House Photocopy: A contemporaneous photocopy log or other supporting documentation must be maintained and submitted. The maximum copy charge is 25¢ per page.

(6)    Secretarial and Clerical Overtime: An itemized description of the task and time spent must be submitted for secretarial and clerical time. All such overtime must be approved before submission by Plaintiffs' Liaison Counsel or the PSC.

(7)    Computerized Research - Lexis/Westlaw: Claims for Lexis, Westlaw, and other computerized legal research expenses should be in the exact amount charged to the firm for these research services.

Procedures To Be Established by Plaintiffs' Liaison Counsel

Plaintiffs' Liaison Counsel shall establish forms and procedures to implement and carry out the time and expense submissions required by the Court and necessary to compile and maintain the records. These forms may be obtained from Plaintiff's Liaison Counsel or from the Court's website. The forms shall be certified by a senior partner in each frm attesting to the accuracy and correctness fo the submissions.

Questions regarding the guidelines or procedures or the completion of any forms should be directed to Plaintiffs' Liaison Counsel, Russ M. Herman, or Philip Garrett, CPA, or the Court.

New Orleans, Louisiana, this _8th_ day of April, 2005.

          /s/ Eldon E. Fallon
          ELDON E. FALLON
          UNITED STATES DISTRICT JUDGE

**KS-001427**

Attachment "A"

## Litigation Task Code Definitions

The Litigation Code Set is intended for use in all adversarial matters including litigation, binding arbitrations, and regulatory/administrative proceedings. The following definitions elaborate on the intended scope of each phase and task and should guide attorneys in coding time.

### Case Assessment, Development and Administration

Focuses on the case as a whole, the "forest" rather than the "trees".

**Fact Investigation/Development.** All actions to investigate and understand the facts of a matter. Covers interviews of client personnel and potential witnesses, review of documents to learn the facts of the case (but not for document production), work with an investigator, and all related communications and correspondence.

**Analysis/Strategy.** The thinking, strategizing, and planning for a case, including discussions, writing, and meetings on case strategy. Also includes initial legal research for case assessment purposes and legal research for developing a basic case strategy. Most legal research will be under the primary task for which the research is conducted. Once concrete trial preparation begins, use "Other Trial Preparation and Support."

**Experts/Consultants.** Identifying and interviewing experts and consultants (testifying or non-testifying), working with them, and developing expert reports. Does not include preparing for expert depositions, see "Expert Discovery" or time spent with experts/consultants during trial preparation and trial, see "Expert Witnesses."

**Document/File Management.** A narrowly defined task that comprises only the processes of creating and populating document and other databases or filing systems. Includes the planning, design, and overall management of this process. Work of outside vendors in building litigation support databases should be an Expense.

**Budgeting.** Covers developing, negotiating, and revising the budget for a matter.

**Settlement/Non-Binding ADR** All activities directed specifically to settlement. Encompasses planning for and participating in settlement discussions, conferences, and hearings and implementing a settlement. Covers pursuing and participating in mediation and other non-binding Alternative Dispute Resolution (ADR) procedures. Also includes pre-litigation demand letters and ensuing discussions.

**CLE.** Continuing Legal Education related specifically to this matter.

Page 1 of 4

**Other Case Assessment, Development and Administration.** Time not attributable to any other overall task. Specific use in a given matter often may be pre-determined jointly by the client and law firm.

## Pre-Trial Pleadings and Motions

Covers all pleadings and all pretrial motions and procedures other than discovery.

**Pleadings.** Developing (researching, drafting, editing, filing) and reviewing complaints, answers, counter-claims and third party complaints. Also embraces motions directed at pleadings such as motions to dismiss, motions to strike, and jurisdictional motions.

**Preliminary Injunctions/Provisional Remedies.** Developing and discussing strategy for these remedies, preparing motions, affidavits and briefs, reviewing opponent's papers, preparing for and attending court hearing, preparing witnesses for the hearing, and effectuating the remedy.

**Court Mandated Conferences.** Preparing for and attending hearings and conferences required by court order or procedural rules (including Rule 16 sessions) other than settlement conferences. Dispositive Motions. Developing and discussing strategy for or opposing motions for judgment on the pleadings and motions for complete or partial summary judgment, preparing papers, reviewing opponent's papers, defensive motions (e.g., motion to strike affidavit testimony, Rule 56(f) motion), and preparing for and attending the hearing.

**Other Written Motions/Submissions.** Developing, responding to, and arguing all motions other than dispositive motions, pleadings, and discovery, such as motions to consolidate, to bifurcate, to remand, to stay, to compel arbitration, for MDL treatment and for change of venue.

**Class Action Certification and Notice.** Proceedings unique to class action litigation and derivative suits such as class certification and notice.

## Discovery

Includes all work pertaining to discovery according to court or agency rules.

**Written Discovery.** Developing, responding to, objecting to, and negotiating interrogatories and requests to admit. Includes mandatory meet-and-confer sessions. Also covers mandatory written disclosures as under Rule 26(a).

**Document Production.** Developing, responding to, objecting to, and negotiating document requests, including the mandatory meet-and-confer sessions to resolve objections. Includes identifying documents for production, reviewing documents for privilege, effecting production, and preparing requested privilege lists. (While a general review of documents produced by other parties falls under this task, coding and entering produced documents into a data base is "Document/File Management"

Page 2 of 4

**KS-001429**

and reviewing documents primarily to understand the facts is "Fact Investigation/Development."

**Depositions.** All work concerning depositions, including determining the deponents and the timing and sequence of depositions, preparing deposition notices and subpoenas, communicating with opposing or other party's counsel on scheduling and logistics, planning for and preparing to take the depositions, discussing deposition strategy, preparing witnesses, reviewing documents for deposition preparation, attending depositions, and drafting any deposition summaries.

**Expert Discovery.** Same as "Depositions," but for expert witnesses.

**Discovery Motions.** Developing, responding to, and arguing all motions that arise out of the discovery process. Includes the protective order process.

**Other Discovery.** Less frequently used forms of discovery, such as medical examinations and on-site inspections.

## Trial Preparation and Trial

Commences when lawyer and client determine that trial is sufficiently likely and imminent so that the process of actually preparing for trial begins. It continues through the trial and post-trial proceedings in the trial court. Once trial begins, lawyers who appear in court presumptively should bill their court time to "Trial and Hearing Attendance." Litigation work outside the courtroom during this phase (e.g., evenings, weekends and the time of other attorneys and support personnel), should continue to be classified using "Other Trial Preparation and Support."

**Fact Witnesses.** Preparing for examination and cross-examination of non-expert witnesses.

**Expert Witnesses.** Preparing for examination and cross-examination of expert witnesses.

**Written Motions/Submissions.** Developing, responding to and arguing written motions during preparation for trial and trial, such as motions in limine and motions to strike proposed evidence. Also includes developing other written pre-trial and trial filings, such as jury instructions, witness lists, proposed findings of fact and conclusions of law, and trial briefs.

**Other Trial Preparation and Support.** All other time spent in preparing for and supporting a trial, including developing overall trial strategy, preparing opening and closing arguments, establishing an off-site support office, identifying documents for use at trial, preparing demonstrative materials, etc.

**Trial and Hearing Attendance.** Appearing at trial, at hearings and at court-mandated conferences, including the pre-trial conferences to prepare for trial. For scheduling conferences that are denominated as "Pre-Trial Conferences", but not directed toward conduct of the trial, use "Court Mandated Conferences."

Page 3 of 4

**Post-Trial Motions and Submissions.** Developing, responding to and arguing all post-verdict matters in the trial court, such as motions for new trial or j.n.o.v., for stay pending appeal, bills of costs, and requests for attorney's fees.

**Enforcement.** All work performed in enforcing and collecting judgments and asserting or addressing defenses thereto.

<u>Appeal</u>

Covers all work on appeal or before a reviewing body.

**Appellate Motions and Submissions.** Developing, responding to and arguing motions and other filings before a reviewing body, such as motions and other filings for stay pending appeal.

**Appellate Briefs.** Preparing and reviewing appellate briefs.

**Oral Argument.** Preparing for and arguing an appeal before a reviewing body.

**KS-001431**

# EXHIBIT "B"

RE: PATIENT: _Abrams, Leonard_

_BELOW IS A BRIEF IMPRESSION AND RECOMMENDATIONS FOR YOUR PATIENT_

SERVICE PROVIDED:   CONSULT   FOLLOW UP   PROCEDURE

IMPRESSION:

. RLS → much impvn.

Spinal stenosis

Vioxx → ↑ BP, edema

RECOMMENDATIONS:

① Cont Ketamine IX - 26 mg
② Trial of ULTRAM
③ Taper NTN
④ D/C Vioxx

**KS-001255**

# EXHIBIT "C"

**CONTINUATION SHEET**

Joel McCool

5/22/98  First visit for this gentleman who is an exterminator, a hard working guy, probably works 18 hrs. a day, sleeps 3 to 4 hrs. and I don't know how he does it but he works 7 days a week.  He says he feels fine except for some aches and pains in some joints.  Denies chest pain, shortness of breath.  He does drink all day long, something like 25 mugs of tea with caffeine and feels he has to do that to keep him going.  He eats probably 8-10,000 calories a day too.  He is a heavy guy, his BP is 130/94, taken twice.  Eyes ears nose and throat are normal other than this red raised lesion on the left side of his face, to me it looks like an actinic keratoses, it is rough.  We cryosurgerized it.  His heart, lungs, abdomen normal.  External genitalia and rectal examination are normal.  He just is very solid, a lot of fluid and fat in his abdominal wall.   We suggested blood studies to re-evaluate for diabetes and that we wanted to have him get blood work and check back with us after the blood work is done and we may need to do a stress test, we may need to do another group of tests.  We did send him to the G.I. guy because he was told he has some pre-malignant lesion in his stomach and he has a strong family history of cancer.  We will see him back in a month.  He will lose 25 lbs.  RS ps

Exhibit "73"

RE: PATIENT: _Abrams, Leonard_

BELOW IS A BRIEF IMPRESSION AND RECOMENDATIONS FOR YOUR PATIENT

SERVICE PROVIDED:   CONSULT     FOLLOW UP     PROCEDURE

IMPRESSION:

. RLS → mild improv.

Spinal stenosis

Vioxx → ↑BP, edema

RECOMMENDATIONS:

① Cont ketamine TX - 25 mg

② Trial of WBTRAW

③ Taper NTN

④ D/C Vioxx

**KS-001255**

Exhibit "74"

ABC Amber BlackBerry Converter Trial version, http://www.processtext.com/abcblackberry.html

**From:** Lee Balefsky Lee.Balefsky@KlineSpecter.com
**To:** Tom KlineK&S email tom.kline@klinespecter.com, Shanin Specter
shanin.specter@klinespecter.com
**Subject:** Abrams
**Date:** 11/21/2005 1:18:08 PM
**Folder:** Inbox

I spoke to Russ Herman. He agrees we cant go forward with the case. He will
send the letter and speak to Fallon privately tommorow.


Lee B. Balefsky, Esquire
Kline & Specter, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA  19102
(215) 772-0420 direct dial
(215) 772-1359 fax
(800) 597-9585 toll free number
lee.balefsky@klinespecter.com

**KS-001256**

Exhibit "75"

4/13/05 Montgomery Advert. (Ala.) A1
2005 WLNR 27102718

Montgomery Advertiser (AL)
Copyright © 2005 Gannett

April 13, 2005

Section: A

Merck wants Vioxx case dismissed

April 13, 2005

dway@gannett.com

The Vioxx pills that an Alabama widow claims caused her husband's death Sept. 4, 2001, were not on the market until a half year later, attorneys for Merck Pharmaceutical said Tuesday in asking Clay County Circuit Court to dismiss the wrongful death case as bogus.

"This evidence demonstrates, at minimum, that plaintiff's claim is predicated on an impossibility," the motion contends in asking the judge to throw out the first U.S. trial involving the popular arthritis painkiller. Trial is scheduled for next month.

The motion says Cheryl Rogers of Talladega "has given demonstrably false evidence under oath and committed a fraud on both Merck and the court" in written briefs and depositions about events surrounding the death of her husband, Howard Bradley Rogers, a television technician who volunteered as a paramedic in Anniston.

Merck lawyers said company records prove that the lot numbers on the boxes of Vioxx that Rogers presented as the samples taken by her husband were not on the market until six months after his death.

Pre-trial testimony by the Rogers' doctor indicated it was unlikely they would have been given the volume of samples Cheryl Rogers said they obtained.

"Merck has in its possession medical records that show Brad Rogers was prescribed Vioxx within a month of his death and separate medical records showing that he had taken Vioxx within two weeks of his death," said Andy Birchfield of the Beasley Allen law firm in Montgomery, which represents Rogers.

"This is clearly hardball tactics on behalf of Merck," Birchfield said. "I guess it's not surprising considering they have set aside nearly $700 million just to defend the case and what they have at stake here, but nonetheless it's hardball tactics."

James Fitzpatrick of Hughes, Hubbard and Reed, a New York law firm defending Merck, dismissed the allegations.

"Merck intends to vigorously defend these cases," Fitzpatrick said. "The facts that we learned, Merck felt it was necessary to bring those to the attention of the court."

Merck voluntarily recalled the popular arthritis painkiller last September after studies showed it caused elevated risk of strokes and heart attacks. As many as 20 million Americans were prescribed the medication, whose sales tipped $2.5 billion worldwide.

Thousands of Vioxx personal injury cases are expected to go to trial in federal and state courts. Birchfield has been named co-lead counsel for plaintiffs attorneys in litigation that consolidates preliminary matters from all federal court cases nationwide in U.S. District Court in New Orleans.

**KS-001257**

But even as the court cases proceed, a U.S. Food and Drug Administration panel recommended last week to allow Vioxx sales to resume.

Wilbur Colom, a plaintiffs attorney practicing in Columbus, Miss., who was involved in successful Phen-fen product liability litigation and has several Vioxx cases pending, was interested in the developments of the Clay County case.

"If it's true, if it's manufactured after his death, they face a problem," Colom said.

"The thing about it is Beasley Allen are extremely good lawyers and if they brought that kind of case, that man took the prescription," Colom said. "This is just not the kind of firm to be involved in some kind of irresponsible allegation like that. You're talking about a premier firm."

He said it will be necessary for Beasley Allen to get more information on how Merck identified the batch numbers of the samples in question in the Rogers case. And he questions Merck's legal tactics.
"Do you think if they had something that ironclad they would wait until the weeks before the trial to bring it up? It sounds to me like they're just trying to avoid the day of reckoning," Colom said.

"You can see that's a very legitimate legal argument, but it totally sidesteps the medical and scientific issues," John Lehmann, a pharmacologist of Wayne, Pa., said of Merck's claims about the dates on the Vioxx samples. His company, DrugIntel.com, provides expert testimony at trial.

Lehmann was fired by the French pharmaceutical company Servier after his research showed some of its drugs could cause damage to neurons in the brain. Those drugs were used in the manufacture of the diet pill Phen-fen, which was proven to cause serious health injuries and was subject to massive litigation. He is convinced studies done on Vioxx before it was recalled by Merck proved there were cardiovascular risks but the drugmaker ignored them.

"There's a nod and a wink between the industry and the FDA" in this case and others, he said.

"It is a real shame that the way that we have to recover from ultimately what is bad regulation of drugs getting on the market is this terrible dogfight between attorneys, because what's going to court is not at all the medical or scientific merits of the case," Lehmann said.

In the motion filed Tuesday, Merck lawyers said Cheryl Rogers changed her responses several times to pretrial questions about the sequence of events related to her husband's use of Vioxx.

Rogers gave different answers at different times about the length of time her husband had taken Vioxx and how many samples were given to him by Dr. William Clancy, according to the motion.

At one point, the motion states, she said additional boxes of Vioxx she was asked to produce for the Merck lawyers to examine were at home in a safe. When she returned a few days later, she said she had placed the boxes in a book bag, which she left in a car in Duluth, Ga., while she was there purchasing a new vehicle. When her old car was returned, she said, the boxes were missing.

In his deposition, Clancy said normal procedure in his office is to note when and how many samples are given to a patient. No such notations existed for Rogers' husband, according to the Merck motion.

Clancy said his office didn't keep large volumes of the samples on hand, and doubted that anyone in his office would give 96 sample tablets to Rogers, as his widow claimed, when that was three times the amount written on his prescription.

---- Index References ----

Company: US FOOD AND DRUG ADMINISTRATION

**KS-001258**

News Subject: (Legal (1LE33); Products Liability (1PR53); Major Corporations (1MA93); Liability (1LI55); Health & Family (1HE30))

Industry: (Pharmaceuticals & Biotechnology (1PH13); Pain Management (1PA72); Analgesics (1AN10); Arthritis (1AR77); Pharmaceuticals Research & Development (1PH57))

Region: (Alabama (1AL90); North America (1NO39); USA (1US73); Americas (1AM92))

Language: EN

Other Indexing: (BEASLEY ALLEN; CLAY COUNTY; CLAY COUNTY CIRCUIT COURT; FDA; MERCK; MERCK PHARMACEUTICAL; US DISTRICT COURT; US FOOD AND DRUG ADMINISTRATION; VIOXX) (Andy Birchfield; Birchfield; Brad Rogers; Cheryl Rogers; Clancy; Colom; Fitzpatrick; Howard Bradley Rogers; James Fitzpatrick; John Lehmann; Lehmann; Pre; Reed; Rogers; Wilbur Colom; William Clancy)

Edition: 01

Word Count: 1205

**End of Document**                                                      © 2011 Thomson Reuters. No claim to original U.S. Government Works.

**KS-001259**

4/22/05 Oster Dow Jones Select 02:03:02

OsterDowJones Select
Copyright © 2005 Comtex News Network, Inc. All Rights Reserved.

April 22, 2005

WSJ(4/22) Merck Vows To Fight Each Vioxx Case

```
(From THE WALL STREET JOURNAL) By Barbara Martinez
```
Apr 21, 2005 (Dow Jones Commodities News Select via Comtex) --ASHLAND, Ala. -- Merck & Co. calls 33-year-old widow
Cheryl Rogers a liar.

At a deposition, Mrs. Rogers presented packages of the Merck painkiller Vioxx that she said her late husband used just before
dying suddenly of a heart attack. Merck says those packages left the factory six months after Mr. Rogers died. The widow "has
given demonstrably false evidence under oath and committed a fraud on both Merck and the court," said a Merck filing last
week in the Circuit Court of Clay County here.

As Merck faces Vioxx liability that some analysts have estimated could top $20 billion, it says it is committed to fighting every
case against it with a legal war chest of $675 million. That includes the case filed by Mrs. Rogers, which next month has a good
chance of becoming the first in the nation to go to trial. Mrs. Rogers says she made an honest mistake mixing up her husband's
package with one used by another family member.

Vioxx was withdrawn from the market last Sept. 30 after a Merck study suggested it doubled the risk of heart attack and stroke
in those taking the drug for more than 18 months. In the lawsuits, Merck is now combing patients' pasts for evidence that their
unhealthy habits, not the drug, caused heart problems. And its lawyers have won some important procedural victories, driving
up the costs for plaintiffs' lawyers.

Merck still faces a daunting task in winning over juries. Plaintiff lawyers plan to stress how multiple studies suggested Vioxx
was a problem years before the withdrawal. Many experts who raised questions have said Merck tried to squash their views.
At one point, the Food and Drug Administration sent a warning letter telling Merck to stop making unsupported claims about
Vioxx's cardiovascular safety.

Merck is hoping for better results than some other corporations that have faced mass litigation. Drug maker Wyeth originally
allotted $3.75 billion in 1999 to settle a class-action case involving its "fen-phen" diet pills but costs have spiraled to $21.1
billion as new claims emerged and tens of thousands of plaintiffs opted out of the agreement.

Bayer Corp. took another approach, settling claims from those who suffered serious harm from its anticholesterol drug Baycol
but aggressively contesting others. Its settlement payments totaled $1.11 billion as of this February.

Merck has a third way: "We intend to defend each case one at a time," says its general counsel, Kenneth Frazier. Unlike Wyeth's
case, the Vioxx plaintiffs may not gain class status. At the same time, Merck faces a much larger group of potential plaintiffs:
More than 20 million Americans are thought to have taken Vioxx. James Tyrrell, a defense lawyer at Latham & Watkins, says
Merck had little choice but to fight because setting up a settlement fund now "would attract so many more plaintiffs."

"Some companies try to enter into early global settlements in hopes that will bring an end to the controversy," said Mr. Tyrrell,
who isn't involved in Vioxx litigation. "The problem with that is like in asbestos -- you were never able to settle your way
into a final resolution."

**KS-001260**

Many lawyers agree that the first five or 10 cases of the nearly 2,500 that have been filed are crucial. If Merck scores consecutive victories, it could scare off other plaintiffs and limit its financial damage. That would do wonders for Merck's stock price, which is already up more than 20% since the beginning of February but is still well below its level prior to Merck's withdrawal of Vioxx. But a few losses could embolden thousands of other plaintiffs to sue, and the result could be a broad and costly settlement. The uncertainty has been a factor in slowing Merck's search for a successor to Chief Executive Raymond Gilmartin, who is scheduled to retire in March 2006. One of several internal candidates to succeed Mr. Gilmartin is Mr. Frazier, Merck's general counsel, who declined to discuss the company's Vioxx strategy in detail.

One of Merck's legal defenses will be that it is extremely difficult to know in any individual case whether Vioxx caused a heart attack or stroke because the diseases are so common. Many patients took the drug for only a few months, and the Merck study that led to the withdrawal suggested that the damage only starts after 18 months. Even if patients took the drug for longer than 18 months, Merck intends to fight by showing that other factors could have been responsible.

Merck has hired some of the best-known defense lawyers in the country including the powerhouse Washington firm of Williams & Connolly. Also on the team is John Beisner, a Washington-based partner at O'Melveny & Myers. In 2002, Mr. Beisner helped Ford Motor Co. block a class-action suit involving Ford Explorers that rolled over.

The cases coming up this summer were already in the works before Merck withdrew Vioxx, a $2.5 billion-a-year drug. Starting in 2001, several doctors raised questions about the drug's effect on the heart. But the company continued advertising Vioxx heavily as a first-line treatment for pain until the trial results last year precipitated the drug's removal.

The first test may come in Alabama, where Cheryl Rogers is suing over her husband's death in 2001. A trial is set for May 23 -- the earliest trial date of any Vioxx case. If the verdict is also the first, it is likely to receive nationwide attention and could set the tone for future litigation.

Brad Rogers was a 42-year-old ambulance dispatcher who collapsed and died after finishing a night shift. Both sides agree Mr. Rogers had risk factors for a heart attack. He was overweight and had high blood pressure and high cholesterol. That's why he shouldn't have been taking Vioxx, says Mrs. Rogers's lawyer, who adds that he only has to prove Vioxx was a contributing factor in Mr. Rogers's death to win his case.

Mrs. Rogers says her husband was taking Vioxx from a package of samples he got from his doctor. At a deposition, she brought the sample package she said her husband was taking. But Merck analyzed the serial number on the package and said in a court filing last week that it left the factory six months after Mr. Rogers died.

Mrs. Rogers's lawyer, Andy Birchfield, was taken off guard. He learned about the Merck filing from a reporter's call. Minutes later, as he fidgeted with a rubber band, Mr. Birchfield called a colleague at his firm and asked: "Do we have a copy of the original prescription? What do we have?"

It turns out that Mr. Rogers received a prescription for Vioxx a few weeks before his death, but never filled it. Nonetheless, Mr. Birchfield says there's plenty of evidence that Mr. Rogers was taking Vioxx. His widow, sister-in-law and son have stated that they witnessed him swallowing the drug. Two weeks before he died, Mr. Rogers saw a doctor and said he was taking Vioxx, according to the doctor's notes.
Mr. Birchfield describes Mrs. Rogers as a "poor country girl" and says she made an honest mistake in assuming the samples she found had been her husband's instead of those used by another relative. The Rogers family lives in a trailer next to the house of Mrs. Rogers's parents.

In February, Mr. Rogers's body was exhumed for an autopsy by medical examiners from both sides. The plaintiff's examiner said Vioxx likely caused Mr. Rogers's death by causing a fatal blood clot to form. Merck's examiner said Mr. Rogers showed evidence of longstanding cardiovascular problems.

**KS-001261**