UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX | * | MDL NO. 1657 |
| | * | |
| PRODUCTS LIABILITY | * | |
|  LITIGATION | * | SECTION  L |
| | * | |
| THIS DOCUMENT RELATES | * | JUDGE FALLON |
| TO ALL CASES | * | MAG. JUDGE KNOWLES |
| | * | SPECIAL MASTER |
| FILER: Robert E. Arceneaux/Margaret Woodward | * | PATRICK A. JUNEAU |
| | * | May 24, 2011 |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

# OBJECTORS' APPEAL FROM CERTAIN RULINGS OF
# SPECIAL MASTER JUNEAU MADE DURING THE MAY 9-13, 20011 HEARING

**MAY IT PLEASE THE COURT:**

Objectors hereby appeal from certain rulings made by the Special Master during the hearing held from May 9 to May 13, 2011.

**I.       Reversal of the  Order to Produce FAC Minutes**

At the conclusion of Andy Birchfield's deposition on May 6, 2011, Special Master Juneau ordered production of the minutes of all FAC meetings.  The ruling came after a full day of testimony about the conclusions and deliberations that produced the FAC's allocation recommendation.

```
1     SPECIAL MASTER JUNEAU:
2        Okay.  Let me make these two
3     observations.  I think those
4     minutes that you're seeking, in
```

```
 5      my -- based on everything I've
 6      heard, is going to really lead to
 7      nothing.  I just can't see that as
 8      being productive, but I'm --
 9      I'm -- I'm going to request -- I'm
10       going to order that those minutes
11       be produced and, Mr. Birchfield, I
12       know y'all are heavily, heavily
13       engaged, this is a burden, we're
14       talking about Friday afternoon,
15       the hearings start Monday, I
16       totally understand that.  But I
17       want that produced.  You won't be
18       on the stand until the latter part
19       of next week, as I understand it.
20       So, at least give y'all time
21       within your staff to do that, I
22       would say, by late Tuesday, that
23       those documents be produced.
```

*See* Exhibit 1 hereto.

    Two days later, on the evening before trial was to commence, Russ Herman directed a letter to Master Juneau asking that he reconsider the ruling because the minutes were "attorney work product."*See,* Exhibit 2 hereto.  Co-Lead counsel for Objectors immediately responded to this specious assertion, showing that the minutes had not been prepared in anticipation of litigation on behalf of a "client," and therefore did not fall within the work product doctrine. *See,* Exhibit 3 hereto.

    On the evening after the first day of trial, Special Master Juneau issued the ruling attached as Exhibit 4 hereto, reversing himself and relieving the FAC from the obligation of producing its minutes.  The Special Master's rationale was that he had previously denied further discovery and wished to be consistent with his previous rulings.  He also stated that the deliberations of the FAC were private, and should remain so.

    Given that Mr. Bichfield's deposition contains his extensive recitation of the deliberations

of the FAC, including what was allegedly discussed and decided at various meetings (to the extent that he could remember), it was error for Special Master Juneau to reverse his ruling. Whatever the merits of his pre-trial discovery rulings, discovery was no longer at issue; the only question was whether the discovery would be complete and accurate. The required production was in keeping the Fifth Circuit's requirement of "transparency" expressed in the *In Re High Sulphur* line of cases, was totally correct, and should not have been reversed. Due process and the 'transparency' required by the Fifth Circuit require production of the written documents that are behind Mr. Birchfield's lengthy oral testimony about the deliberations and conclusions that Special Master Juneau now says are protected.

The minutes are particularly relevant and important because the Special Master restricted Objectors' discovery to a single deposition of a single FAC member. That designee, Mr. Birchfield, was understandably unable to recall everything that transpired in the meetings, making the minutes all the more important to fill in the gaps.

Moreover, the request for the minutes came only after Mr. Birchfield revealed yet another secret side deal, committing $25,000,000[1] of the common benefit fund to the Texas Litigation Consortium in exchange for that group's abandonment of its jurisdiction-challenging appeal to the Fifth Circuit. The FAC had previously, in briefs and oral statements to the Special Master, vehemently denied the existence of any other side agreements beyond the Stratton settlement. Such

---

[1] The $25,000,000 sum was premised upon an 8% assessment. When this Court decided on a 6.5% assessment, the deal with the VLC was proportionately reduced to just over $20,000,000, as recommended by the FAC to this Court in its "final" grid. Further post-hearing revisions to the proposed VLC allocation, now reduced to some $18,000,000, reveal that those claimants have a yet-undisclosed agreement with the FAC to share in the proportionate reductions required by settlements with Objectors.

-3-

agreements and decisions are likely recorded in the FAC's minutes.

The notion that such deliberations are "private" fails on two fronts. First, the FAC's appointed task was to recommend an allocation of the common benefit fund in which all claimants have an obvious interest, supposedly acting on behalf of the claimants and the Court. Second, this Court specifically directed the PSC to keep minutes or transcripts of its meetings in PTO 6, and PTO 6D directed the FAC to comply with the procedural guidelines established in PTO 6. The minutes, then, kept in accordance with Court order, cannot be considered private. They serve no purpose whatsoever if they are not transparent.

## II. Refusal to Make Fac Produce Records Relating to Contributions Made by All Applicants to the Common Benefit Fund.

During the cross examination Chris Placitella, the FAC asked him questions, and displayed a chart attached as Exhibit 5 hereto, concerning contributions made by his firm in the form of assessments to the Common Benefit Fund, and pointedly asked whether he sought to receive more in his award that he put into the fund. Several other objectors were asked similar questions.

This revives an issue that was the subject of a discovery request previously denied by Master Juneau – records relating to the contributions made by all applicants, most importantly FAC members, to the Common Benefit Fund. In Mr. Birchfield's deposition, he stated that the contribution amounts had not been calculated, pp. 348-349. A few days later at the hearing, however, the FAC showed that the contributions had not only been calculated, but considered in reducing claimants' awards. Undersigned counsel promptly objected, renewing the discovery request on the ground that the FAC had opened the door to that issue and could not fairly use for its own purposes data denied to Objectors.

Master Juneau ordered that the FAC be prepared to produce the data during Mr. Birchfield's

testimony later in the week. However, curtailment Mr. Birchfield's examination prohibited the promised production. Undersigned counsel thereupon reiterated their request for production of the data, but Master Juneau denied it because the hearing had by then been concluded. He observed that the matter now rested with this Court.

Instead of ordering Mr. Birchfield to have the information at hand for cross-examination, the Special Master should have simply ordered the FAC immediately to produce documents which it clearly had available. Given that the FAC made this the subject of cross-examination in an attempt to justify its recommendation, it can hardly contend that the information is not relevant and should not have been produced initially. Having broached the subject at the hearing, it waived its early victory in the discovery skirmish, and the documents should have been ordered produced forthwith.

**III.   Exclusion of Testimony of Joseph Markowitz**

The day before the hearing commenced, Russ Herman sent an e-mail asking for an "expert report." Master Juneau had only recently reversed his earlier scheduling order and given Objectors leave to call a single expert. Of several potential experts, Objector could not determine which they would choose until after they concluded the deposition of Mr. Birchfield; the deposition was postponed by the Master to the Friday before the Monday commencement of the hearing.

Because of deficiencies in Mr. Garrett's firm-by-firm lodestar report, which was obviously critical to the allocation analysis, Objectors selected Joseph Markowitz, a highly trained, educated and experienced software engineer with skills in data analysis, mining, and work with Microsoft and Excel, Access, and every other database format commonly used. *See* Exhibit 6 hereto. Mr. Markowitz was to testify that he had taken the two databases in which all of Phil Garrett's records were stored (one in Microsoft Access and one in a proprietary web program maintained by Mr. Garrett, and imported this data into a new "shell" – an Excel spreadsheet workbook that allowed its

viewer to see every level of detail available for each time keeper, including date work was done, category of work, hours, case, rates, as well as see firm by firm lodestar data. His work would have permitted the Court to make adjustments to any factor it choose in order to adjust the lodestars to the formulas and values it felt appropriate.  For example, Mr. Garrett had improperly entered rates of $332/hr. for a number of attorneys entitled to higher rates; Mr. Herman had submitted a rate for himself of $850/hr., which testimony suggested was not in keeping with local rates.

Of course, no expert report was due.  Rule 24 specifically contemplates situations where expert reports need not be provided, and in this case, Master Juneau's order had not called for the filing of an expert report. Moreover, Mr. Markowitz's chart had been provided to Phil Garrett on May 5, more than 4 days prior to the commencement of trial. So, the FAC had access to the actual work product – a "report" was meaningless.

Nonetheless, the day before he was to testify, as he was preparing to travel from New York to New Orleans, the FAC filed a motion to exclude Mr. Markowitz's testimony, which motion was granted by Master Juneau. The FAC, in a pretrial conference, had convinced Master Juneau that since no report had been filed, Mr. Markowitz could only be called as a "lay" witness.  Objectors did not take issue with the point since in truth Mr. Markowitz was not going to be offering opinion testimony, but was only going to be testifying as to how he took the data from two databases, merged them into one, and formatted it in a new way.

The Special Master erroneously excluded Mr. Markowitz's testimony as impermissible "opinion" testimony. Given the Fifth Circuit's interest in a lodestar calculation as the starting point of any fee allocation, *Forbush v. J.C. Penney Co.*, 98 F.3d 817 (5th Cir. 1996), *see also,* PTO 6(D), undersigned counsel had always intended to provide the Court with a workable lodestar calculation. They expected to use Mr. Garrett's spread sheets for this purpose, and the Special Master gave

undersigned counsel access to Mr. Garrett and his data with a full understanding of their objective. However, it soon became apparent that Mr. Garrett's work was not entirely adequate to the lodestar calculation. For example, Mr. Garrett's records for two periods of time were stored on two different systems that were not merged. Additionally, Mr. Garrett had not received hourly rates for numerous applicants and had entered an average rate for all timekeepers whose rates he lacked. For attorneys, this average rate was $332/hr, irrespective of location or seniority. The rates could not be easily adjusted by the Court (without the help of programmers) because half of Mr. Garrett's data is stored on a proprietary website, which requires special programming skills for utilization, and the information on the website would not have been admissible into evidence. Objectors needed a way to get the information from both databases, merge them, present the data (unchanged) in a single worksheet that the Court, or any counsel, could use to make any adjustments they felt appropriate in order to present a correct and appropriate lodestar.

To cope with these difficulties, undersigned counsel retained Mr. Markowitz to produce the chart necessary for the Court. Efforts to understand and work with Mr. Garrett's programs continued into the week before the hearing, when, with Mr. Garrett often unavailable, Mr. Markowitz determined that the best solution would be simply to import Mr. Garrett's data into Microsoft Excel, a commonly-used and well-understood program. When Mr. Markowitz effected that conversion, the newly-formatted rates data came within $.27 of Mr. Garrett's calculations, and the hours were an exact match. Mr. Garrett himself reviewed the work product, and while he admitted that it was beyond the scope of his programming knowledge, he stated in an e-mail that hit spot checks revealed its accuracy; he agreed that "your report ties in to my report." *See* Exhibit 7 hereto.

Mr. Markowitz produced a chart that reflects nothing more than the Garrett data, only in a

different format. There was no opinion, no statistical analysis, and no judgment call involved. He simply used programs that millions of programmers use world-wide, and which are the industry standard, to gather the data, input into Microsoft Excel – the Rolls Royce of spread sheet programs – and organize the data in a chart that could be meaningful for the Court.

Mr. Markowitz thereafter made a second chart with mathematical adjustments to the data *as directed by undersigned counsel.* His changes were purely mathematical and clerical. He does not know why undersigned counsel directed him to change certain rates, and he offered no opinion concerning the reasonableness or legitimacy of the changes he was asked to make. He simply offered to verify the mathematical reliability of the revisions, which would be subject to cross-checking by any computer-literate layperson. For example, undersigned counsel instructed Mr. Markowitz to adjust Eric Weinberg's rate upwards from the average rate of $332/hr used by Mr. Garrett to the $600/hr rate which the testimony has indicated to be an appropriate rate. All Mr. Markowitz knows of this– and of the other adjustments he was asked to make– is that he entered the new rate and instructed Excel, by the push of a computer key, to provide a new lodestar for Mr. Weinberg. He would have offered no opinion on the essential inquiries of whether– and if so, how– Mr. Weinberg's rates ought to be adjusted; Mr. Markowitz would only say that he did it. The reliability of each of his adjustments was subject to immediate verification with a calculator– or if that were too scientific for the FAC, they could have done it longhand.

The ministerial tasks performed by Mr. Markowitz– sophisticated though they might be– did not call for an expert report nor for a *Daubert* analysis of Mr. Markowitz's methodology, any more than the introduction of an email requires a *Daubert* investigation of the technology underlying electronic transmission of text. The Excel program has been around for long enough and its scientific underpinnings have been sufficiently tested by extensive use that Mr. Markowitz's work

-8-

amounts to the present-day usage of an adding machine.

Indeed, if any method were subject to inquiry, it would be Mr. Garrett's unusual and rather clunky program, which is uniquely user-unfriendly, the origins of which are unknown, which has not been peer-reviewed, and which is used by no one other than himself. We do not know who wrote the program, or whether that person has any credentials whatsoever. Had Mr. Garrett entered the data into a standardized program like Excel in the first place, Mr. Markowitz's work would have been completely unnecessary. Objectors did not complain, however, about Mr. Garrett's use of a program familiar to and workable by him. They only sought to provide a lodestar calculation that could be used by the Court or anyone with basic Excel knowledge, with all the data gathered in one place, and useable to calculate an appropriate lodestar. For that, they required the assistance of Mr. Markowitz.

The FAC's classification of Mr. Markowitz's work as "opinion" fundamentally misunderstood Mr. Markowitz's role. However, the confusion can easily be cleared up by reference to the case the FAC cites for the proposition that Mr. Markowitz's spreadsheet is "precisely the type of [opinion] testimony contemplated by Rule 702." *Cooper v. Southern Company,* 390 F. 3d 695, 728 (11th Cir. 2004), *cert. denied*, 546 U.S. 960, *reversed on other grounds, Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006). *Cooper* held that a data analyst who extracted data *and* performed statistical probability calculations *and* expressed opinions about the significance of those calculations had utilized techniques and presented opinions which "require the kind of technical or specialized knowledge that is the hallmark of expert evidence." *Id.* The court did not say that every data analyst is an expert who must be *Daubert*-qualified. Mr. Markowitz, who did nothing remotely akin to the analysis undertaken the *Cooper* witness, was not in the same category.

Distinguishing *Cooper,* courts have properly held that the sorts of clerical calculations

performed by Mr. Markowitz do not constitute opinion evidence. Thus, the Court in *Chao v. Tyson Foods, Inc.,* 568 F.Supp.2d 1300 (N.D. Al. 2008), expressly distinguishing *Cooper*, held that a 15,000- page spreadsheet of employees' time-punches did not contain "opinions," within the meaning of the federal rules, even though they contained "inferences, assumptions, and derivations that arguably exceed simple arithmetic." Similarly, in *United States v. Hamaker,* 455 F.3d 1316 (11th Cir.2006), the Eleventh Circuit held that, pursuant to Rule 701, a financial expert could testify as a lay witness where the witness prepared for his testimony simply by "add[ing] and subtract[ing] numbers from a long catalogue of [the defendant's] records and then compared those numbers in a straightforward fashion." Rule 701 establishes that

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Mr. Markowitz's expertise, which is extensive, came into use only in his conversion of Mr. Garrett's data into a useable format. At the point where he succeeded in moving the data into a new program, his "expert" work had been completed, and he had created nothing more than workable spreadsheet based on data *identical to Mr. Garrett's.* .

The only difference between the two spreadsheets is that now undersigned counsel– or the Court– can adjust timekeepers' hourly rates to those more accurately reflecting rates applicable in the communities where the claimants practice. As for the chart with adjustments, undersigned counsel provided the new rates in accordance with testimony offered without objection or dispute at trial; Mr. Markowitz did nothing more than enter those rates. He had no opinion about the appropriate rate to be assigned to any timekeeper; his only "opinion," if it can be called that, would have been that if one enters a new rate of $600/hr. for Mr. Weinberg, Excel will reliably recalculate

a new lodestar. If the Special Master, Judge Fallon, or, indeed, the FAC wishes to assign different rates to any timekeeper, they would have, in the Markowitz chart, a tool for accomplishing that. Indeed, anyone with a working knowledge of Excel can now use the spreadsheet created by Mr. Markowitz. Undersigned counsel should not, at this stage of cyber-development, be asked to call Bill Gates to establish that the Excel program works as intended.

Moreover, the spreadsheet created by Mr. Markowitz is necessary to the lodestar calculations required by Judge Fallon and the Fifth Circuit. Mr. Markowitz should have been allowed to explain his reformatting of the Garrett data into a useable chart, and that chart should have been received into evidence.

Respectfully submitted

/s/ Robert E. Arceneaux            /s/ Margaret E. Woodward

Robert E. Arceneaux, La Bar No. 01199    Margaret E. Woodward, La. Bar No.13677
ROBERT E. ARCENEAUX LLC          3701 Canal Street, Suite C
47 Beverly Garden Drive                New Orleans, Louisiana 70119
Metairie, LA 70001                     (504) 301-4333 office
(504) 833-7533 office                  (504) 301-4365 fax
(504) 833-7612 fax                     mewno@aol.com
rea7001@cox.net

**CO-LEAD COUNSEL FOR OBJECTORS IDENTIFIED IN FEB. 8 ORDER**

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail, and by upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre Trial Order No.8, on this date, May 25, 2011

　　/s/ Robert Arceneaux　　
_____