UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX | * | MDL NO. 1657 |
| | * | |
| PRODUCTS LIABILITY | * | SECTION  L |
| LITIGATION | * | JUDGE ELDON FALLON |
| | * | SPECIAL MASTER |
| THIS DOCUMENT RELATES | * | PAT A. JUNEAU |
| TO ALL CASES | * | MAG. JUDGE KNOWLES |
| | * | |
| FILER: Robert E. Arceneaux/Margaret Woodward | * | May 25, 2011 |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## OBJECTORS' POST-HEARING MEMORANDUM

MAY IT PLEASE THE COURT:

This memorandum is respectfully submitted by Robert E. Arceneaux and Margaret E. Woodward, co-Lead Counsel for Objectors, on the issues common to those who have not yet settled their differences with the Fee Allocation Committee("FAC")[1].

## I.    INTRODUCTION

This memorandum does not advocate for a specific amount to be awarded to any particular claimant based upon an assessment of his, her, or its relative contribution to the common benefit. Rather, it demonstrates that the FAC has proposed an allocation which**, *as a matter of law*, is unusable in the fee allocation process.  The FAC's point system approach is highly subjective both in its design and in its application; and consequently it has produced recommendations which are essentially meaningless as a matter of both law and fact.

At a minimum, each claimant should receive compensation at a lodestar amount, adjusted in

---

[1] Kline & Specter does not join in this memorandum.

accordance with the *Johnson* factors, for all of the hours which they reported; their hours were audited by Wegmann Dazet, were vouched for by the PSC in its application for common benefit fees, and were accepted by this Court as "common benefit hours" in its Order of October 19, 2010.

While the FAC has argued that these hours were not audited for "common benefit status," the testimony from Mr. Garrett  at trial showed that he worked closely with the FAC to screen the hours, and the FAC did not object to the inclusion of any of the hours contained in his final report. The FAC then used those hours (some of which it now claims were either not common benefit or overstated) to justify a fee pot, and seeks to keep the fees assessed by the Court for itself, not for the attorneys who reported the time.   No court should sanction such a shell game with the audited hours.   The hours "belong" to the attorneys who reported them, or to no one at all.

The *Johnson*-adjusted lodestar amount will be due to claimants based upon specific showings made by them.

## II.    DISCUSSION

The hearing conducted on May 9-13, 2011, together with the incorporated deposition of the FAC designee, Andy Birchfield, confirmed what Objectors have long believed to be true: the FAC's point system is a bankrupt approach to fee allocation, unreliable by design, unreliable by application, and unsustainable in law.

### A.    The point system does not offer an appropriate alternative to a lodestar/*Johnson* calculation.

On September 15, 2008, the Court issued Pretrial Order 6(D) establishing the following fee allocation guidelines:

> Substantively, the committee should look to general fee jurisprudence to identify the factors that should be applied in making appropriate allocations.  The *Johnson* factors

are applicable to this litigation and should be considered in addition to other matters considered by the courts to evaluate fee allocations.  (Citation omitted).

According to Mr. Birchfield, the Court's oft-expressed misgivings about the reliability of attorneys' reported hours cast doubt upon the utility of the commonly-accepted lodestar approach, which the FAC therefore rejected as the primary tool in fashioning its recommendations.  In its stead, the FAC in October of 2010 adopted the Point System Guide.  Common Exhibit CD 1, 7; Common Exh. 29, Birchfield depo., p. 91.  Despite the FAC's efforts to portray its point system as an objective alternative to lodestar– mostly just by saying so over and over again– a close look at the system reveals that it simply provides a means for rewarding the efforts of the MDL leadership at the expense of all other claimants.  The deficits in the point system are legion; they equal the number of claimants times the subcategories of the guide.  Notwithstanding the FAC's efforts to obscure the actual workings of its point system by concealing its work papers and deliberations, and notwithstanding the limitations on cross-examination, which prevented close questioning of the approach, certain obvious inequities sufficiently illuminate the failure of the system to warrant its abandonment.

**1.     The points were improperly weighted throughout the guide.**

Even assuming that a value-based point system might be contrived as an appropriate alternative to a lodestar/*Johnson* calculation, the FAC has not successfully done so in this case.  As Objectors showed in prior filings, the point system is not weighted to evaluate the claimants' contributions to the common benefit across a broad spectrum of effort, but rather, gives undue value to the work of the FAC.

Mr. Birchfield testified that the FAC's point system followed Judge Fallon's indications that he accorded great weight to contributions such as trials, leadership, and settlement.  Objectors do not

dispute the value of such contributions.  However, Mr. Birchfield admitted that Judge Fallon did not direct precisely how such contributions were to be compensated in relation to others; the FAC reached its own conclusions about the relative merits of different tasks.  Birchfield depo., pp. 333-334.  The FAC's assignment of points elevates certain contributions into a stratosphere beyond reason.

The unreasonably high point allocations were invariably assigned to the work the FAC reserved to itself.  While the Court anticipated that any claimant who wanted to contribute to the common benefit would be afforded an opportunity to do so, *see,* PTO 6 and 6C, in practice this is not what happened at all.  The PSC liberally bestowed committee assignments on its friends and shut out those who did not occupy the inner circle.  For example, Becnel testified that he was told that he would have to do document work to earn the right to take depositions, and would have to take depositions in order to place his cases in line for trial.  Yet, even after he did extensive document work, he was never permitted to take any depositions.  Tr., p. *.

The jealously-guarded work of the MDL top leadership earned points grossly disproportionate to the actual common benefit.  Nowhere is the inequity more evident than in a comparison of the categories of "settlement administration" and "discovery/science/experts."

In a pharmaceutical case, the science invariably occupies center stage.  In the Vioxx case, Mr. Birchfield admitted, Merck mounted multiple vigorous scientific defenses on issues of both liability and causation.  The issues were complex and challenging, and as claimant after claimant testified, they created the principle battleground of the litigation. *See e.g.,* Lief, Cabraser, Dec. 2008, p. 4;

_____

* The trial transcript has not yet been prepared

-4-

Birchfield depo., p. 328.  Moreover to arm themselves for battle on this field, the litigants had to fight

for, then review tens of thousands of pages of documents.  They had to analyze those documents with

the assistance of multiple experts, whose reports had to be prepared and depositions defended, while

they countered Merck's experts through analysis, more document discovery, and deposition.

For reasons known only to itself and never explained in any fashion on the record, the FAC

chose to mash all discovery, all science, and all work with experts into a single category.  It then

chose to award a maximum of 50 points to that category.  That meant that no matter how many hours

a claimant devoted to such critically important tasks, and no matter what fruits those efforts yielded,

the most points any claimant (outside the leadership, as discussed below) could earn for his

contribution was 50.  Although Mr. Birchfield said that the FAC considered the number of hours

devoted to a task in determining how many points to award, depo., pp 98-99,  the establishment of

a 50-point *ceiling* for all of discovery, science, and experts placed an obvious and indefensible

limitation on the allocation recommendation for some of the most important work in the case.

By contrast, the FAC accorded twice the value to the category of post-settlement and

settlement administration by allowing up to 100 points for such work.  In practice, this means that the

FAC would recommend twice the allocation to a firm which spent X hours on settlement

administration as it would to a firm which spent an equal number of hours on science, discovery, and

administration.  And, such a result obtained in the case of multiple FAC members.

Mr. Birchfield attempted to justify this disparity by noting that Judge Fallon specifically

emphasized the importance of settlement.  However, in PTO 6D the Court also emphasized the

importance of "Discovery (motions, depositions); . . . Science and experts; Document review and

selection. . .," p. 5, n. 4.  Nothing in that declaration suggests that all such efforts should be combined

into one undervalued category.   Additionally,  settlement "administration" is an entirely different function than "settlement," for which the FAC allows yet *another* 100 points.   Settlement administration is a predominantly clerical function, requiring  considerably  less  skill  than discovery/science/experts.  But under the FAC's system, an hour spent filling out or filing a form is worth twice as much as an hour spent in taking an expert's deposition.  Moreover, because the FAC did not base its recommendations on lodestar, it assigned double value to hours spent by paralegals on settlement administration as compared to hours spent by seasoned trial counsel on the most challenging work in the case.

Not only is discovery/science/expert work more difficult to perform, it comes at a time of substantially greater risk.  By its very nature, settlement administration work is done with settlement in hand and a concomitant assurance of payment.  Work on science, experts, and discovery, on the other hand, often involves a commitment of both time and money at a stage when the outcome of the litigation– and accordingly, the prospect of payment, too–  is uncertain.

The FAC's irrational elevation of settlement administration over the work on science, discovery and experts which made settlement possible is but one example of a point system that elevates the work of the FAC itself over that of almost all other claimants to the common benefit fund.

### 2.      The point system guide promotes double- and triple-dipping by leadership.

Exacerbating the unfairness of its improperly weighted categories, the FAC multiplied the categories under which the MDL leadership– and it alone–  could be compensated.  It allowed 125 points for "key leadership roles" and awarded the maximum points to the FAC's co-lead and liaison counsel: Beasley, Allen; Seeger Weiss; and Herman, Herman.  *See,* Allocation Grid, 1/13/11, from 2/17/11 Production CD.  Only the "key leadership" was appointed to the NPC, and the FAC allowed

another 100 points for work on settlement, again awarding the full measure to each of co-lead and liaison counsel (less 5 for Seeger).  *Id.*  The same three firms earned close to the top 100 points additionally provided for settlement administration.  They also each earned another 40-45 out of 50 possible points for occupying the committee leadership positions to which they appointed themselves.  Seeger and Beasley each earned another 75 points for "funding," and  Herman, Herman got 25 points for providing the capital that earned them a seat on the PSC to begin with.  Each received yet another 25 points for the "case management" they performed in their leadership roles.  *Id.*

The FAC awarded these points to itself for *leadership alone,* completely apart from any contribution to the discovery, science, experts, trials, law and briefing which underlay and supported the work of the leadership, and without which there would have been no litigation to "lead."  Needless to say, the FAC racked up many more points in these other categories as well; but *leadership alone accounted for 450 of the total 775 available under the FAC's point system.*  Beasley and Seeger each earned a full 675 of the total points allowed, most of them for leadership; Herman, Herman earned 545 total points, with another 185 going to its partner Ashcraft & Gerel, for a total of 730 points, most earned for leadership.

Considering that each point was worth close to $50,000, the allowance of 450 points for leadership alone amounted to *$22,500,000,* which the FAC leadership awarded to itself almost in full.

The FAC then gave the leadership– and the leadership only– a "*Johnson* and PTO6D criteria*"* multiplier of up to 1.25.  Standing alone, a 1.25 multiplier might not appear so large, but considering that almost all claimants save the leadership received a *negative* multiplier, ranging in most instances from .15 to .6, the multiplier the FAC bestowed upon its leadership amounted to more than a tenfold increase over the lower-ranking claimants.  The FAC never explained how one earned either a positive

or a negative multiplier, but a glance at the grid shows that the positive multiplier was given to those whose "*Johnson* and PTO 6D*"* contributions had already been handsomely rewarded by the allocation of points; conversely, claimants who did not occupy leadership roles appear to have been *penalized* for working outside the loop, however hard they worked, with whatever results, and for however long.

Courts have looked with disfavor on such self-serving allocations.  Perhaps the leading case on common benefit fee division, and certainly the most cited, is the First Circuit's decision in *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litigation*, 56 F.3d 295 (1st Cir. 1995), a mass-disaster case arising from a hotel fire when it awarded 70% of the fees to members of the plaintiffs' steering committee (PSC) and 30% to the individually retained plaintiffs' attorneys (IRPAs). The court of appeals was uneasy with the way in which the lower court "cut the fee pie, and the size and shape of the resultant wedges":

> First, we are troubled by the implications of a scheme in which the trial judge selects a chosen few from many lawyers who volunteer, assigns legal tasks to those few (thereby dictating, albeit indirectly, the scope of the work remaining to be done by the many), and then, in awarding fees, heavily penalizes the very lawyers to whom he has relegated the "lesser" duties. Courts must recognize that while such an arrangement may be a necessary concomitant to skillful case management of mass tort suits, it nevertheless significantly interferes with an attorney's expectations regarding the fees that his or her client has agreed to pay. Conversely, lead counsel are typically volunteers, as in this case, and, as such, they have no right to harbor any expectation beyond a fair day's pay for a fair day's work if a fee fund develops     . We believe a trial court should take these differing expectations into account in allocating fees. Here, the judge's rescript does not suggest that he factored these expectations into the decisional calculus.
> Courts must also be sensitive to a second facet of economic reality: the power to appoint lead counsel gives the trial judge an unusual degree of control over the livelihood of the lawyers who practice before the court. Though such appointments are often an administrative necessity in complex litigation, and disproportionate fees are at times an unavoidable consequence of the classic common fund "free rider" problem,
>      the judge must attempt to avoid any perception of favoritism.

56 F.3d 295 at 309–12 (footnotes omitted).[2]  How much more concerned would the court have been had lead counsel not been court-appointed "volunteers" but, as here, a leadership which itself controlled the assignment of common benefit work and the initial allocation recommendations.

More than any other factor, the grossly disproportionate award of points to the MDL leadership accounts for the fact that the MDL leadership was the only group to be compensated at or above lodestar under the point system.

### 3.       The guide is completely subjective and gestalt.

Mr. Birchfield described the point system as a means of assigning "objective" value to common benefit contributions; and he held up the FAC's approach as fundamentally reliable because, he said, the FAC was composed of members who knew the contributions of the various claimants.  Such "objective" valuation, of course, must depend upon the complete good faith of FAC members who were competing for a share of the same limited fund and who were therefore in obvious conflict with all other claimants.  Without attributing any bad faith to the FAC, its assignments of points across the grid shows that in fact it either did not know or forgot the contributions of most claimants to the

_____

[2]The perfidy of committee assignments, and how they can be and perhaps were, used as a method of rewarding favored persons with the possibility of higher fees, or punishing those in disfavor, is illustrated by an example: Claimant Harry Roth *was slated for a seat on the AG litigation negotiating committee,* which presumably would have earned him some points for both committee membership and settlement work (and more importantly assured that his client's unique claims would be given voice); but he was summarily evicted from the proposed committee post because his firm hired the undersigned, who filed the first request for information that was granted by this Court pursuant to *In re High Sulfur I.* In fact, he was told in writing that his "objection" to the allocation had caused "problems" that cost him his seat, even though no allocation had yet been made that could be the subject of an objection. All that had been done was to request information. As an aside, after the preliminary allocation was released, and Mr. Roth's firm did object, his allocation decreased from $533,920.74 to $500,000 in the final allocation that was submitted to the Court. As of this point a committee has not yet been assigned given the pending stay.

common benefit fund.  This inequity will be addressed in connection with the FAC's flawed *application* of its point system in Section B, below.  In this section, we address the gestalt *design* of the point system.

The lumping together of science, discovery, and experts into one category worth a maximum of 50 points, and the allowance of a possible 100 points for settlement administration betrays the sort of fundamentally subjective judgment the FAC made throughout its analysis. As noted above, the point system categories themselves might appear reasonably objective, but the distribution of points among the categories, and the doubling and redoubling of overlapping categories rests upon subjective determinations.   The subjectivity of the FAC's choices in the framing of categories would not be so disturbing were they not also so obviously self-dealing and flat-out *wrong*.

The point system breaks down even further *within* each category.  With the exception of "trials" for which the guide describes (though the FAC did not equitably apportion) a concrete number of points according to the number of cases tried and the outcome(s) achieved,  every other category awards points based upon a subjective determination whether a given contribution was "high,""very high," or  "highest," or "substantial," or "significant," or perhaps (at the lowest levels) merely involving the expenditure of time.  Mr. Birchfield acknowledged that there was no further breakdown of the labors or contributions distinguishing one such level from the next, depo., pp. 334-337, and therefore *no* objective criteria to guide the decision whether a contribution was merely time-consuming or "significant."   Asked how many points one might earn for developing a report, deposing an expert witness, or creating a trial exhibit, Mr. Birchfield gave his stock response that such an allocation would depend on the FAC's assessment of the claimant's overall contribution.  *Id.*  In other words, virtually every task performed by every claimant was assessed according to the FAC's intrinsically subjective

-10-

evaluation of its worth.

This watery system enabled the FAC to award whatever points it liked to any and every claimant.  And as Section B demonstrates, the FAC's subjective application of its subjective point system led to wildly inconsistent results throughout its completed grids.

> **4.     The abandonment of lodestar led to inaccurate guesswork by the FAC about claimants' contributions to the common benefit.**

The only way a point system might work objectively would be to assign a specific point value to every conceivable task.  For example, the system might award so many points for the taking of a half-day expert deposition that could be used at trial, so many points for the taking of an unuseable deposition, so many points for a full-day deposition, depending on utility, so many points for a two or three-day deposition depending on utility, so many points for the required documentary preparation for such a deposition, etc.  In order to award truly objective points across the vast array of work undertaken in complex litigation, the FAC would have to develop a rating system with as many subcategories as tasks.  It could not have assigned points in the even multiples of 5 and 10 that dominate the FAC grid and total no more than 150 in any given category.  A truly objective point system would have awarded thousands of points.  It would, in fact, have resembled nothing so much as a lodestar calculation with the base criteria consisting of task x value, instead of hour x rate.  It would have been impossibly cumbersome to construct or to apply.  Which might explain why nobody else has ever attempted such a thing.

But the FAC insists that it developed its point system as a reasonable alternative to lodestar because of the unreliability of claimants' reported hours.  Tr., p. *.  One of the most disturbing aspects of the FAC's dismissal of lodestar is the fact that it *relied* upon lodestar to justify a sizeable

assessment.  Having *used* every audited hour of the claimants' time to enlarge the size of the common benefit fund, the FAC now maintains that the hours which produced the fund should be discounted in the allocation of it.

In the hearing, the FAC made a great show of demonstrating errors in certain claimants' time submissions.  Most of these mistakes added up to only a few hours out of thousands entered.  The greatest difficulty appeared in several thousand hours duplicatively submitted by both Becnel and a non-objecting firm with whom he had a cost-sharing arrangement.  In the FAC's view, it showed through these duplicative submissions that hours– and therefore the lodestar methodology– could not be trusted.

But there is another way to view the proven errors: the system of checks and balances put in place by Judge Fallon was working precisely as intended– to correct mistakes in the lodestar.  One such check was the Court's requirement that claimants to the common benefit fund verify their submissions by affidavit.  Another was the oversight provided by Phil Garrett, who audited the time submissions.  And finally, the FAC, with its claimed knowledge of attorneys' contributions, added another level of scrutiny and protection.  Tr., p. *

The FAC's point system, by comparison, had *no* checks or balances.  And while the court-appointed accounting firm and the FAC scrutinized every claimants' time records, none of the claimants were given even to *see*, much less scrutinize the FAC's calculations[3].  They only saw the end result: a grid awarding  72% of the common benefit fund to 10% of the claimants.

Asked by the Special Master whether they wouldn't agree that attorneys' recorded hours were

---

[3] Indeed, Objectors were not even permitted to see the minutes of the FAC's deliberations, a matter currently on appeal to Judge Fallon.

inherently unreliable, lending some credence to the point system approach, the Objectors demurred. David Jacobi of the Anapol firm put it best, describing a duck placidly visible above water, the real work accomplished by his invisible paddling feet. Tr., p. *.   Objectors cannot deny that the lodestar approach has its weaknesses.  These have been routinely noted by courts which nonetheless utilize a lodestar calculation as a starting point for fee allocations, for the simple reason that no better approach has presented itself.

To be sure, the FAC has not invented a better mousetrap here.

**B.      The FAC's routine departures from the Point System reveal it as a sham.**

The FAC's handling of its allocation recommendations shows that the point system was nothing more than a pretense of objectivity, reverse-engineered to justify any sums it chose to award to any claimant.  The FAC did not bother to calculate the points to which most claimants were actually entitled, much less make the recommendations the point system would have dictated.  Furthermore, the FAC clearly determined numerous allocations before the point system had even been created, and routinely dismissed the point system altogether as it confected deal after deal in an effort to preserve its own claim to the lion's share of the common benefit fund.

**1.      Most of the FAC's recommended allocations were achieved by settlement, not by the point system.**

As Common Exhibit 19  shows, between the promulgation of the December, 2010 "penciled-in" grid and the publication of the "final" grid, the FAC substantially adjusted its recommendations for 32 claimants, some by more than 400 %.  After the publication of the "final" grid, but before objections to its recommendations were due, the FAC modified its recommendations for another 12 claimants, some this time by nearly 600 %.  In the period surrounding the Special Master's hearing,

-13-

the FAC amended its recommendations for another 13 claimants, this time in even greater amounts of up to 700 %.  All told, nearly *one-half* of the claimants to the common benefit fund have bargained for and received significant alterations of their FAC-recommended allocations.  And those are only the deals that are *visible.*

In deposition, Mr. Birchfield revealed that two years ago, the FAC entered into a side deal with the Texas Litigation Consortium, committing $25,000,000 of the common benefit fund in exchange for that group's abandonment of its jurisdiction-challenging appeal to the Fifth Circuit.  Depo., pp.53-54.  The FAC had previously, in briefs and oral statements to the Special Master, vehemently denied the existence of any other side agreements beyond the Stratton settlement.  *See e.g.,* FAC Response to Objctors' Supplemental Memorandum in Support of Additional Discovery, 3/15/11, p. 2. ("The Fee Allocation Committee did not enter into any 'side deals' with any applicant firms.").

The VLC agreement was confected nearly two years before the FAC had developed the point system, but when the FAC promulgated its grid, it dutifully entered the precise number of points necessary to support its agreed-upon recommendation for those firms.  Similarly, when the FAC substantially altered its recommendations between the first and second grids, it contemporaneously altered the points that supposedly yielded the recommended amounts, although the revisions were obviously driven by dollars.

Revelation of the $25,000,000 VLC deal offered a deeper insight into the FAC's workings than a willingness to manipulate the point system, enter into side deals, or misrepresent its deal-making.  It also showed that the FAC had premised its allocation recommendations on an 8% assessment.  When this Court decided on a 6.5% assessment, the deal with the VLC was proportionately reduced to $20,600,000, as recommended by the FAC to this Court in its "final" grid.      Likewise, the

-14-

allocations to the FAC top leadership appear to have been proportionately reduced.  Mr. Birchfield refused to concede that the $40,900,000 recommended for each of his firm and Seeger Weiss would have amounted to a cool $50 million apiece under an 8% assessment, but the math speaks for itself.[4] Depo., pp. 254-257

Needless to say, the presence of so much visible deal-making calls into question whether *any* of the FAC's recommendations were determined by the point system.  The actual application of points to known contributions suggests not.

> **2.     The FAC inconsistently applied its own guidelines and appears to have applied the point system backwards to justify its recommendations for a favored few.**

As noted previously in this and other memoranda, the FAC's application of the point system is marked by a notable roundness of numbers that appears mathematically inconsistent with its objective application.  How is it, for example, that virtually every claimant's every contribution was delivered in multiples of 5 (until the FAC reached the bottom feeders who were  allegedly not entitled to the $250,000 that 5 points would have warranted)?   Wouldn't one expect to find some leadership contribution of the few briefs, depositions, or documents that would yield a middling award of points?

Equally significant is the FAC's failure to award any points for indisputably significant contributions by legions of claimants.   For example, the FAC noted repeatedly (and properly) during the claimants' December 2008 presentations to the FAC that time and money spent working cases up for trial constituted a contribution to the common benefit.  *See, e.g.,* 2/17/11 CD, remarks made to Ashcraft & Gerel, pp. 29-30, and remarks made to Texas VLC, pp. 133-134.  Indeed, those favored

---

[4] Likely, Mr. Herman stood to receive the same amount, but the calculation cannot be made with the same mathematical nicety because many of his points/dollars were shunted to his partner firm, Ashcraft & Gerel.

claimants received substantial points in both the funding and trial categories.  The Branch firm, by contrast, which devoted even more time and money to working two cases up for trial in the New Jersey queue, received no points for its work.  The Locks firm, which fought a difficult motion practice to take its case to trial and won the first-ever direct-to-consumer jury charge received no points for law and briefing.  Lynne Swanson, who did extensive privilege log briefing at the PSC's request, received no points for law or briefing.   The Sheller firm, which worked in the New York and New Orleans document depositories, sending extra attorneys at the PSC's request, received no points for discovery.

Danny Becnel, who turned in 10,000 undisputed hours for the depository work the PSC begged him to perform, received points that compensated his staff at less than $40/hr.  Eric Weinberg, who pursued FOIA litigation against the FDA and an entire action exploring Merck's development of a safer substitute for Vioxx, yielding substantial materials for the MDL trial packet, received no points for law or briefing.  Escobedo/Tippitt and Snapka, who together tried the winning bellwether Garza case did not between them receive the minimal points the guide describes for a losing effort.

Examples abound.   Obviously, the FAC had to shave points from the great majority of claimants to double them up for themselves and justify the enormous awards it recommended for the leadership.

### 3.    The FAC improperly favored MDL work over state court work.

The preceding section shows a particular bias against those claimants who worked outside the MDL.  That bias existed both in the design and application of the point system.  For example, the FAC liberally awarded points to all firms appointed by the PSC to MDL committees and positions of "committee leadership."  Within the MDL there were countless committees and subcommittees, and "Committee Leadership and Participation" could earn up to 50 points– compensable by $2,500,000.

Outside the MDL, however, the FAC recognized only the few state liaison counsel as occupying leadership or committee positions.  In New Jersey alone, where tens of thousands of cases were pending, dozens were queued up for trial, and as many bellwether cases tried as in the entire MDL, there were no formal committees established.  Therefore, although there was a clearly-defined allocation of work, Weinberg, who was the unquestioned head of "Science," and Placitella, who was the unquestioned head of "Marketing," received no points for their leadership roles.  The FAC replayed this bias in almost every category of its grid.

Mr. Birchfield stunningly testified in the hearing that no trial points were awarded to Weinberg and Placitella , who worked on every case that went to trial in New Jersey, because they had made a decision to "go their own way."  Tr., p.*.  The facts flatly contradicted the FAC's judgment:  the evidence showed that those counsel contributed to the trial effort despite having no fee interest in any of the bellwether cases; they operated solely from the quintessential common benefit premise that "a rising tide lifts all boats."  Tr., p.*.   Branch, too, was considered less of a team player because the cases he worked up for trial were in Judge Higbee's queue.

By not being "team players," Mr. Birchfield explained, he was referring to the New Jersey consortium's decision not to join the MDL because they did not want to pay an MDL assessment.  Tr., p. *.[5]  Nonetheless, the state players freely shared their work product with the MDL, despite the fact that the MDL refused to share its own product.  When the settlement was confected, though, the state claimants were required to agree to an assessment in order to participate in the MSA.  The MSA, in ¶ 9.2.4, and this Court in multiple rulings and statements recognized that payments into the common

---

[5] Mr. Herman made similar remarks in the December 2008 presentations that firms simply had to pull together within the MDL. 2/17/11 Production CD, Audet, p. 46; Motley Rice, p. 16.

benefit fund also warranted compensation for the common benefit contributions of firms prosecuting their claims in state courts.   As Anapol showed in its trial memorandum, New Jersey cases undoubtedly contributed substantially to the fund; yet the FAC recommended disproportionately meager allocations to the New Jersey firms who contributed to the common benefit.  Tr., p. * and Exh. *.

The FAC's penalization of state firms for their failure to join in the MDL ran counter to the requirements of the MSA and this Court.

### 4.    The FAC's methods have been anything but transparent.

At every opportunity, the FAC talks about the "transparency" of its operation, as if repetition could make it so.  The FAC repeated its transparency claims on the first day of the hearing, while arguing, almost in the same breath, that Objectors were not entitled to receive its minutes or the amounts it had agreed to recommend as allocations for the recently-settled Objectors.  (The Special Master ordered production of the allocation recommendations but denied production of the minutes, which ruling Objectors have appealed to Judge Fallon).  Indeed, the FAC has refused to cooperate in any discovery that did not seek public records, has opposed every discovery motion and request, and has even failed to produce documents whose production was ordered by Judge Fallon.

In the hearing it used in its cross-examination of certain Objectors materials previously requested of it[6], and when Objectors protested the unfairness of such unequal access to the

---

[6] The FAC sought to show that certain Objectors sought to recover from the common benefit fund more than they had contributed to that fund; this is undoubtedly true in spades of many members of the FAC as well, but Objectors have been denied the means of proving it.  Even after the selective use of this data demonstrated that the FAC had obtained it from BrownGreer and considered it relevant, the Special Master refused to order its production.  He ruled instead that undersigned counsel could question Mr. Birchfield on the subject.  Tr., p.*.  However, the questioning of Mr.

(continued...)

documentary record, the FAC refused to produce the material.  The FAC's secretiveness, lack of

cooperation, and outright obstruction of discovery has been the subject of numerous motions and

memoranda, and the arguments will not be repeated here, but are incorporated by reference.

> **C.    The FAC did not demonstrate any factual basis for its recommended allocations for any claimant.**

Despite the fact that Judge Fallon charged the Special Master to make an independent

recommendation of allocations for all claimants to the common benefit fund, at the hearing the FAC

offered no testimony whatsoever in support of its recommendations for any claimant.  It used the

hearing solely for the purpose of defending its point system methodology and challenging the

entitlements of Objectors.  It then shoved toward the Special Master boxes of exhibits containing

affidavits, time records, and transcripts.  It did not offer a single example of the application of the point

system to a single claimant, or give the Court any basis, beyond a skimming summary of its loosely-

conceived point system method, for adopting, adjusting, or applying that method to the facts at hand.

The FAC's claimed lodestar cross-check demonstrates more emphatically than any criticism

might how far the point system strayed from established allocation methods.  Common Exhibit 18

reveals an unprecedented range of hourly rates for *audited* hours from $0 to $2205/hr., with a FAC

member's paralegal compensated at the $2000/hr. rate while an experienced trial attorney might be

awarded $20/hr- or nothing at all.  This followed from the FAC's assignment of points for categories

of *work* without any consideration of categories of *worker*.   According to the FAC's calculus, a

paralegal sorting settlement documents was no less valuable than a seasoned trial attorney taking an

---

[6](...continued)
Birchfield was curtailed before the matter could be reached.  This ruling, too, has been appealed to
Judge Fallon.

expert deposition.  This explains why only members of  the PSC and the FAC, who claimed for themselves 73% of the total declared common benefit fee fund, received their lodestar.  In the hearing, the FAC gave no explanation for the recommendation of $2000/hr. for paralegal time, or for any of the other bizarre discrepancies its point system produced.

Because the FAC's method is innately false and unworkable, Objectors urge the Court to return to the lodestar/*Johnson* approach mandated by the jurisprudence.

**D.    The time-tested lodestar/*Johnson* analysis remains the best approach to fee allocation.**

The Fifth Circuit requires using lodestar as a starting point, and modifying the lodestar up or down by Johnson factors.  *See, In re High Sulfur Content Gasoline Prods. Liab. Litig.* (*"High Sulfur I"*), 517 F.3d 220, 224-27 (5th Cir.2008), and *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 528 (5th Cir.2000). *See also Cobb v. Miller*, 818 F.2d 1227, 1232 (5th Cir.1987) ("[W]hile our cases indicate that the district court must utilize the *Johnson* factors in its analysis on the issue of attorney's fees, we are not required to reverse summarily a district court finding which omits discussion of one of the *Johnson* factors so long as the record clearly indicates that the district court has utilized the *Johnson* framework as the basis of its analysis, has not proceeded in a summary fashion, and has arrived at an amount that can be said to be just compensation.")

In all cases within the Fifth Circuit, including allocation of common fund fees, the starting point of any proper analysis must be a "lodestar" calculation:

> This Circuit utilizes the "lodestar method" to calculate attorneys' fees. Initially, the district court must determine the reasonable number of hours expended on the litigation and the reasonable hourly rate for the participating lawyer. *Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319, 324 (5th Cir.), *cert. denied*, 516 U.S. 862, 116 S.Ct. 173, 133 L.Ed.2d 113 (1995). The lodestar is then computed by multiplying the number of hours reasonably expended by the reasonable hourly rate. *Id.*

-20-

*Forbush v. J.C. Penney Co.*, 98 F.3d 817 (5th Cir. 1996).

While attorneys' submissions of hourly rates may not be certain or perfect, the Fifth Circuit has determined that "There exists a strong presumption of the reasonableness of the lodestar amount." *Saizan v. Delta Concrete Products Co., Inc.*, 448 F.3d 795, 800 (5th Cir.2006), citing *Heidtman v. County of El Paso*, 171 F.3d 1038, 1043 (5th Cir.1999).   By application of the *Johnson* factors, the court may make subjective adjustments that take into account the relative risks and merits of attorneys' contributions: "The district court may. . . adjust the lodestar upward or downward depending on the respective weights of the twelve factors," but failure to base an award (or allocation) of fees upon a lodestar calculation in the first instance is reversible error.  *See Riley v. City of Jackson, Miss.*, 99 F.3d 757, 760 (5th Cir.1996) ("A review of the district court's decision awarding the Appellants a token amount of attorneys' fees discloses that the court bypassed considering each of the factors enunciated in *Johnson*. Nor did the district court make any attempt to determine a reasonable number of hours or a reasonable hourly fee for each of the Appellants' attorneys involved in this case. Consequently, we find the district court erred in avoiding this analysis.").

The *Johnson* factors referred to in *High Sulfur II* and *Forbus*h are those expressed in  *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir.1974), abrogated on other grounds by *Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989):

> (1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the political "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*High Sulfur II*, at *1 n.3.

Since the original formulation, the *Johnson* factors have undergone some adjustment. "The Supreme Court has limited greatly the use of the second, third, eighth, and ninth factors" because these factors are already presumably reflected in the lodestar, either in the hours reported or the rate charged. *Walker v. U.S. Dept. of Housing and Urban Development*, 99 F.3d 761, 771 n. 12  (5th Cir. 1996), citing *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 565, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986), quoting  *Shipes v. Trinity Indus.*, 987 F.2d 311, 320 (5th Cir.) (*Shipes II*), *cert. denied*, 510 U.S. 991, 114 S.Ct. 548, 126 L.Ed.2d 450 (1993) (" '[N]ovelty [and] complexity of the issues,' 'the special skill and experience of counsel,' the 'quality of representation,' and the 'results obtained' from the litigation are presumably fully reflected in the lodestar amount, and thus cannot serve as independent bases for increasing the basic fee award.").  The lodestar cannot be adjusted due to a consideration that is already reflected in the lodestar itself, because any other result would result in double-dipping.

> After calculating the lodestar, the court may decrease or enhance the amount based on the relative weights of the twelve factors set forth in Johnson. "[O]f the Johnson factors, the court should give special heed to the time and labor involved, the customary fee, the amount involved and the result obtained, and the experience, reputation and ability of counsel." The lodestar may not be adjusted due to a Johnson factor, however, if the creation of the lodestar amount already took that factor into account; to do so would be impermissible double counting.

*Saizan v. Delta Concrete Products Co., Inc*., 448 F.3d 795, 800 (5th Cir.2006), citing *Heidtman v. County of El Paso*, 171 F.3d 1038,  1043 (5th Cir.1999), which contains a good summary of the applicable rules:

> This Court uses the "lodestar" method to calculate attorney's fees. *Fender v. Zapata Partnership, Ltd.*, 12 F.3d 480, 487 (5th Cir.1994). A lodestar is calculated by multiplying the number of hours reasonably expended by an appropriate hourly rate in

the community for such work. *Shipes v. Trinity Industries*, 987 F.2d 311, 319-20 (5th Cir.1993). After making this calculation, the district court may decrease or enhance the lodestar based on the relative weights of the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir.1974). The lodestar may not be adjusted due to a *Johnson* factor, however, if the creation of the lodestar award already took that factor into account. *Shipes*, 987 F.2d at 319-20. Such reconsideration is impermissible double-counting. *Id.*

171 F.3d at 1043.

Objectors offered into evidence the firm-by-firm lodestar produced by Mr. Garrett. Common Exh. 23. They have also proffered Mr. Markowitz's calculation, which substitutes appropriate hourly rates for those simply estimated by Mr. Garrett or unduly inflated by claimants such as Herman, Herman. Objectors' Proffer 1. Either of these documents will permit the Court to begin its allocation in the right place.

Objectors also offered sufficient testimony to permit the application of *Johnson* factors to their lodestars, as argued in their individual briefs.

However, the FAC offered this Court no assistance in the application of the *Johnson* factors to any other claimant. The multiplier used by the FAC to adjust the points it awarded was nothing more than a second subjective readjustment of the already subjectively-awarded points based upon considerations and factors that are completely undisclosed.

It should be noted that *Johnson* factor number one is "time and labor involved," which is of course the basis of any lodestar calculation- and which is completely missing from the FAC's formula. If the FAC's delineations represent its conception of the *Johnson* categories, then double dipping occurred when it awarded points under its categories, and then additionally applied a *Johnson*-like multiplier to adjust the points awarded in these categories.

The reality is that when the FAC tossed out the hours, it also tossed out many of the *Johnson*

-23-

factors which are supposed to weigh into the lodestar that attaches to those hours, such as, "the customary hourly rate," and "the experience, reputation, and ability of the attorneys" logging the hours.

The failure of the FAC's categories to represent any *Johnson* factors is best proved by the result achieved.  No proper application of the *Johnson* criteria could support the multipliers of 100 and greater applied by the FAC.  Multipliers of 2 and 3 appear commonplace in the case law, and have been approved up to 5.  There has never been a case that used the *Johnson* factors to produce a range of multipliers that is more than 100:1.[7] In fact, in its request for common benefit fees, the PLC contemplated a tight range of multipliers:

> This [claimed 8%] percentage represents a multiple of 1.21 to 1.79 times the composite lodestars of the several common benefit counsel participating in this petition (using the highest billing rate standard and actual billing rate standards, respectively).

Memorandum, at 51.  How this narrow range moved to the a range of .04 for Johnson and Perkins to 4.9 for Gainsburg, Benjamin (this excludes the 24 firms that received a multiplier of "0" because they received no recommended award at all) remains a mystery.  However, it shows that the FAC's *Johnson* criteria must be discarded along with the rest of its point system.

E.     The Lodestar plus appropriate multipliers is the only method available for this Court to award fees.

The FAC did not call any witnesses, and instead relied solely upon the cross examination of other witnesses, most notably, Andy Birchfield, and boxes of time records, fee affidavits and court-ordered presentations before the FAC, to support its case.  But in none of that material is there any evidence of how any of the work of any applicant was evaluated by the FAC, except in the conclusions

---

[7]*Murphy Oil II, supra,* approved a high to low ratio of 5 to 1  for an excellent result achieved by a small core of laboring oarsmen.  Nothing warrants the yawning gulf the FAC has established between its members and Objectors.

reflected in the points awarded on the grid.  Nor is there is any explanation of why the FAC applied the multipliers it did to the point totals. Accordingly, if this Court were to sit down with a blank grid, and try to fill in the numbers itself, it could not do so because the FAC failed to produce the evidence necessary for it to do so.  Nor is there any chance that if it tried to ink in points on a blank grid, without looking at the FAC's completed one, the numbers would remotely resemble the FAC's eventual conclusions (given the subjectivity discussed above).

The FAC has failed to carry its burden of proof to justify the grid or its recommended allocation. The Special Master's charge, repeated several times by Judge Fallon, was to make an "independent allocation" of the common fee fund. All the FAC gave this Court by way of evidence was a purported defense of its own allocation.  It did not provide the Court with ANYTHING to make an independent allocation, other than the boxes of time records compiled by Phil Garrett into the lodestar figures and accepted by Judge Fallon in its fee award.  The Court also has the benefit of testimony from several Objectors, who outlined in detail the work they contributed to the common benefit. But, the Court has NOTHING about the work of the FAC other than the numbers, their affidavits, their brief presentations, and Andy Birchfield's brief, subjective, and conclusory testimony. This is not sufficient evidence upon which an "independent" allocation can be based.  Judge Fallon has additional, personally-observed information about the FAC's contributions, though it suffers from a lack of comparability to the other claimants' unseen activities; and the Special Master lacks even that.  Consequently, Objectors suggest that the Special Master must base his recommended allocation upon a lodestar, adjusted in accordance with *Johnson* factors for those Objectors who testified.

Respectfully submitted:

-25-

/s/ Robert E. Arceneux                        /s/ Margaret E. Woodward

_____      _____
Robert E. Arceneaux, La Bar No. 01199        Margaret E. Woodward, La. Bar No. #13677
ROBERT E. ARCENEAUX LLC                      3701 Canal Street, Suite C
47 Beverly Garden Drive                      New Orleans, Louisiana  70119
Metairie, LA 70001                           (504) 301-4333 office
(504) 833-7533 office                        (504) 301-4365 fax
(504) 833-7612 fax                           mewno@aol.com
rea7001@cox.net


CO-LEAD COUNSEL FOR OBJECTORS IDENTIFIED IN FEB. 8, 2011 ORDER

Pascal F. Calogero, Jr., La. Bar No. 03802
AJUBITA, LEFTWICH & SALZER, L.L.C.
1100 Poydras Street
New Orleans LA 70163-1950
(504) 582-2300 office
(504) 582-2310 fax
pcalogero@alsfirm.com


LIAISON COUNSEL FOR OBJECTORS IDENTIFIED IN FEB. 8, 2011 ORDER

-26-

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Memorandum in Support has been served on Liaison

Counsel, Russ Herman, Co-Lead counsel Andy Birchfield and Christohper Seeer,  and Defendant's

Liaison counsel Phillip Wittmann, by U.S. Mail and e-mail, and by upon all parties by electronically

uploading the same to LexisNexis File & Serve Advanced in accordance with Pre Trial Order No.8,

on this 24 day of May, 2011.

Robert E. Arceneaux

_____