UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX | * | MDL NO. 1657 |
| | * | |
| PRODUCTS LIABILITY | * | SECTION: L |
| LITIGATION | * | |
| | * | JUDGE FALLON |
| THIS DOCUMENT RELATES | * | MAG. JUDGE KNOWLES |
| TO ALL CASES | * | |
| | * | |
| FILER: Daniel E. Becnel, Jr., | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**BRIEF ON BEHALF OF DANIEL E. BECNEL, JR., and THE
BECNEL LAW FIRM, LLC IN CONNECTION WITH THE
FEE DISPUTE CONCERNING COMMON BENEFIT FEES**

By its own admission, the FAC used a different method of compensating lawyers for common benefit work than had ever been used prior---a method which does not comport with the Fifth Circuit's "Johnson Factors" methodology. The FAC used a number of criteria to reach its conclusion, such as: 1) work done prior to the formation of the MDL; 2) work done in connection with the multidistrict litigation and/or state court actions; 3) work done in connection with discovery; 4) work done in connection with science and/or experts; 5) work done in connection with trial(s); and 6) work done in connection with settlements. One could also be given credit for contributing to the trial package; however, insofar as the trial package has never been used in any trial, in either state or federal court, I will not address this issue.

1

In this case, there is no dispute that Daniel E. Becnel, Jr. was involved in the Vioxx litigation at least two years before the drug was recalled. Exhibit 27 of the Becnel Exhibit Book, a letter sent to Joe Cotchett dated October 6, 2004, stating, "I have been involved with this drug over the last two years and have just filed for the MDL," illustrates this fact. Joe Cotchett is someone with whom I have worked since the Swine Flu MDL 330, one of the first large civil MDL's in the country, when he and I both served on the Plaintiffs' Committee. In addition, I produced two sample boxes of Vioxx with expiration dates of 2002 and 2001, which verified the fact that our office had been looking into this drug years before Vioxx was taken off the market (these sample boxes were given to Special Master Juneau and verified by the sworn testimony of Daniel E. Becnel, Jr. during the fee dispute hearing).

As per my testimony, Parker Waichman Alonso, with offices in New York and Florida, was one of the first firms in the U.S. to begin acquiring Vioxx cases. He referred these cases to the Papantonio Law Firm who did not think it was a good case and, therefore, suggested he send these cases to Chris Seeger, which he did. Other firms and attorneys that were involved prior to the MDL were Carlene Lewis/Mark Lanier from Texas, Beasley Allen from Alabama and Chris Seeger from New York. Before the drug was withdrawn from the market, almost all of the cases were filed in state court, with Andy Birchfield's case being removed to federal court in Alabama.

Carlene Lewis spoke to me extensively about Vioxx as she was one of the first people to promote cooperation among lawyers prior to the withdrawal of the drug. As per my testimony, two of my real estate venture partners are primary care physicians and I obtained information from drug representatives that were detailing Vioxx, a Merck product, to these business partners. I would sit in on some of their sales and marketing meetings and, therefore, I learned a lot about Vioxx prior to the recall.

On October 1, 2004, my office filed a class action complaint against Merck in the U.S. District Court in New Orleans, Civil Action number 04-2726, *see* Exhibit 1 in the Becnel Exhibit Book. Seven days later, my office filed a Motion to Transfer and Consolidate Cases before the MDL. When that motion was filed, there were only a few pending cases nationwide. One was filed by Zimmerman Reed, with whom I have worked since the Breast Implant case. In fact, I financed that firm extensively over the years in a number of cases including but not limited to Fen-Phen MDL No. 1203, Welding Rod MDL No. 1535, Guidant MDL No. 1708, Medtronics MDL No. 1726 and Baycol MDL No. 1431. Our firms also worked closely together organizing many MDL's and in many chemical cases in Minnesota, North Dakota and Arizona. Prior to MDL No. 1657 forming, there were few, if any, cases filed in federal court. Most cases were filed in state courts in Texas, California, New Jersey and Alabama.

An example of my working cooperatively with many of the leaders in the Vioxx Litigation is a letter from Carlene Rhodes Lewis, *see* Exhibit 3 of the Becnel Exhibit Book. Ms. Lewis was involved in the first major case in Texas state court, along with Mark Lanier, which resulted in a $250 million verdict. This drove Merck's stock down by billions of dollars and resulted in the defendants wanting to discuss settlement. Ms. Lewis was appointed by Judge Fallon to the Plaintiffs' Steering Committee and shortly thereafter died from cancer and was replaced by her legal partner, Shelly Sanford.

Not only was I coordinating efforts with some of the members of the major law firms throughout the country, the Court should note Exhibit 29 of the Becnel Exhibit Book which makes reference to my coordinating efforts with Troy Rafferty of the Papantonio Firm, a member of the FAC, Elizabeth Cabraser, a member of the PSC in Vioxx, Bucky Zimmerman, Paul Rheingold, Motley Rice, Calvin Fayard, Steve Murray and others.

The Becnel Law Firm was given no points and/or common benefit fee for work done prior to the MDL for almost two years. Hundreds of hours were expended by the Becnel Law Firm coordinating experts, as well as reviewing medical literature, public citizens reports and adverse events reports to the FDA. I also spoke at Mass Torts Made Perfect to lawyers around the country about Cox 2 drugs and its side effects on the American population. Other than Beasely Allen, Carlene Lewis, Mark Lanier, Seeger Weiss and Parker Waichman Alonso, no one else was doing this type of work during these early days of the litigation. The Becnel Law Firm therefore deserves some credit or lodestar for not only investigating and promoting this litigation, but further deserves some enhancement over its lodestar in light of the fact that this work was undertaken on a contingency basis, with no guarantee of even recouping expenses if the case proved unsuccessful. It is unquestioned that no one did more than the Becnel Law Firm to organize and promote the MDL.

Richard Arsenault also investigated Vioxx prior to its withdrawal and because Richard Arsenault and I have worked together since the M/V George Prince Ferry Disaster and on numerous other complex cases including train derailments, plant explosions, drugs, product liability, *inter alia*, we decided to hire a few lawyers to "jump start" the litigation and review the documents produced in the early cases. We both were aware that there was a trial setting in the Alabama case, and we agreed to share the costs of this investigation, prior to the MDL. We then made a few lawyers available for document review.

The Seeger Weiss Law Firm also had pending trials in New Jersey state court. Both Beasley Allen and Chris Seeger obtained Vioxx documents from the defendants, but they did not have time to review all of the documents in advance of their pending state trials. Because Michael Breinin and Will Percy worked for the Castano Group (of which Daniel E. Becnel, Jr. was also a member), Daniel E. Becnel, Jr. immediately contacted Will Percy and Michael Breinin to find out if they were

available to review documents in New York and Montgomery, Alabama. At this time, there was no MDL depository. In fact, the PSC had not even been appointed. Daniel E. Becnel, Jr. agreed to maintain a checking account, maintain all hours as well as expenses, and provide cars for Breinin and Percy to go to Montgomery. Again, these tasks were assumed at significant financial risk because the cars had to be fully covered with a million dollar policy of insurance. Becnel provided fuel, expenses and made arrangements for hotel accommodations in Montgomery, Alabama.

Daniel E. Becnel, Jr. also contacted Rebecca Todd, who worked for the Becnel Law Firm for years but was working for the Third Circuit Court of Appeal in Lake Charles, Louisiana. Because the Vioxx project appeared to be complex and possibly lucrative, with thousands of clients, I asked Rebecca to resign from the Third Circuit and relocate to LaPlace where I provided her with my guesthouse to live for well over a year. I also had her furniture placed in storage at my expense. I provided all meals to her when she returned to LaPlace. Ms. Todd was asked to head the project in Montgomery and New York since she had worked for my firm in all aspects of law practice, i.e. secretary, paralegal, law clerk and lawyer. Due to the demand for more attorney document reviewers, I sent Ms. Todd and other attorneys to Montgomery and provided two cars, fully insured, to drive 300 miles each way or 600 miles round trip to review the documents in Montgomery, Alabama. As many as eight lawyers at a time would commute on a weekly basis to Montgomery. These lawyers would leave at 3:00 a.m. on a Monday and arrive at approximately 8:00 a.m. to begin work, and would work through 5:00 p.m. each day, returning back to LaPlace on Friday at approximately 10:00 p.m. or 11:00 p.m. Rebecca Todd and I would meet each Saturday to discuss the results of the review for the prior week, i.e. whether any "hot documents" were located. When she and our team agreed, the documents would be reported to Chris Seeger and Andy Birchfield, as co-lead counsel for the MDL. Daniel E. Becnel, Jr. also hired Darla Sanderson. Darla Sanderson

was hired because not only did she have a law degree from California, but also had a great deal of medical training in her experiences as a respiratory therapist.

An email to Dave Buchanan references Michael Breinin, Will Percy, Darla Sanderson and Rebecca Todd. These attorneys were hired by me to work full time and were associates of my firm and/or independent contractors of Richard Arsenault's firm. This included only four attorneys. The Becnel Law Firm provided the above referenced attorneys with legal malpractice insurance, paid their salaries, kept their time and supervised their work on the Vioxx litigation. Chris Seeger's law partner, Michael Wagner, requested that Rebecca Todd and Holly Lamarche, another associate at my firm, travel to New York along with Will Percy to review documents. An email to Chris Seeger's partner, Dave Buchanan makes reference to this fact. *See* Exhibit 30 of the Becnel Exhibit Book. Because of our firm's experience with document review, our office was continuously asked to send additional people to the depositories to work on the Vioxx case—all prior to the MDL formation. Therefore, when Mike Wagner requested that Rebecca Todd, Holly Lamarche and Will Percy go to New York, they were immediately sent. *See* Exhibit 20 of the Becnel Exhibit Book. Daniel E. Becnel, Jr. would take time to make flight arrangements, make hotel accommodations, and provide credit cards for meals and transportation in New York as well as related expenses, similar to what he was doing when these lawyers worked in Montgomery, Alabama. The coordination of all of this effort required a great deal of time by Daniel E. Becnel, Jr. in order to get the cheapest airfare and hotel accommodations. Because of the high risk involved with this case, I required the lawyers to share rooms at hotels in New York and Montgomery. Daniel E. Becnel, Jr. had performed similar functions in the Breast Implant case, the Fen-Phen case, the Medtronics case, the Guidant case and the Baycol case. The Becnel Law Firm only supplied lawyers with experience to perform document review and did not provide paralegals and/or other law office personnel to do this most important

work. My office continued to supply people to review documents throughout the case, even when other firms throughout the country did not. All of the people that my office sent to review documents had experience in multiple MDL's reviewing documents. Exhibit 26 of the Becnel Exhibit Book lists all of the lawyers who worked on this case on my behalf and several who worked for Richard Arsenault and me. They consist of 18 lawyers, plus myself, with CV's of some of the lawyers attached in Exhibit 5 of the Becnel Exhibit Book. Michael Breinin was a staff attorney reviewing documents for the Castano Plaintiffs' Committee from 1996 to 1998. I was one of the people supervising the team of the Castano lawyers working for the 50 law firms who made up the initial Tobacco Litigation (*see* also Exhibit 24 - H in the Becnel Exhibit Book). Mike Breinin and Will Percy worked not only for the Castano Litigation, but also for Herman, Herman, Katz & Cotlar on the Scott Tobacco Litigation, for the Scott Team, which included my office.

It was always understood and repeatedly stated at meetings that if you did the hard work of reviewing documents, in a depository, that deposition assignments would be given to the law firms who performed this initial task.

It should be noted that Mr. Arsenault's office flooded and sustained significant damage from Hurricane Rita, and because communications were down in the Alexandria area, including telephone, email, etc., there was a communication breakdown between the Arsenault Law Firm and the Becnel Law Firm about time reporting. Apparently Mr. Arsenault's office reported a few time sheets of lawyers from his office, even though I was reporting everything to Mr. Garrett. This was done as called for under the reporting requirements because my office was not affected by any of the hurricanes, including Hurricane Katrina. The auditor did not report the apparent duplication of submissions of a few lawyers by both Mr. Arsenault and myself. Most accountants, if they were

7

working full time on a project, would have caught this error immediately but, apparently it was not caught or was somehow overlooked.

As per my testimony, I have reviewed documents and supervised lawyers for over 20 years on major MDL's including Breast Implant MDL No. 926, Fen-Phen MDL No. 1203, Welding Rod MDL No. 1535, Guidant MDL No. 1708, Medtronics MDL No. 1905, Baycol MDL No. 1431, Swine Flu MDL No. 330, etc. My experience has allowed me to take some of the most important depositions in the country, including the CEO of Dow Corning in Breast Implant as well as Dr. George and Kip Viscusi in Tobacco. I have taken weeks of depositions in Pedicle Screw MDL No. 1014 in France; Baycol MDL No. 1431 in Amsterdam; Propulsid MDL No. 1355 in Brussels; Viagra MDL No. 1724 in London and Sulzer Orthopedics MDL No. 1401 in Vienna, Austria.

I practice law full-time and have owned my own firm since September of 1969. My experiences include winning the first million dollar verdict in the south shortly after law school and being involved in some of the biggest cases that were tried to verdict and/or settled, including the Shell Oil Norco Refinery case (seven people killed). I personally took or defended most of the depositions in that case. In the Ferry M/V Frosta case (77 people killed), my office had the largest number of death claims in that case. I personally tried the Mother's Day Bus Crash case (17 people killed) to verdict on both liability and damages and handled all of the appeals in the Fourth Circuit Court of Appeals and the Louisiana and U.S. Supreme Court. The Gaylord case was tried to verdict by Ronnie Penton, Gerald Meunier, Stephen Murray and Daniel E. Becnel, Jr. Daniel E. Becnel, Jr. secured most of the experts in that trial. I have also settled and/or been involved in numerous single accident cases with million dollar verdicts in federal and state courts, including Jefferson Parish, as well as other courts.

It is very seldom that I do not argue at JPML hearings on one case or another. I have argued at numerous JPML hearings throughout the country, as recently as May 23, 2011. Many of the major advertising lawyers in the country refer cases to me. My experience as a hard worker and experienced trial lawyer is unquestioned, and the three MDL's over which Judge Eldon Fallon presides were promoted and argued by me before the JPML: Propulsid, Vioxx and Chinese Drywall. In all three cases, I was the only one that argued that these case should be transferred to Judge Fallon. In Propulsid, Roy Amedee, of my office, and I tried the first and only federal case while trying the Tobacco case simultaneously in Civil District Court. This trial was, however, not successful, even though the client was offered a good settlement but refused to take it after it was recommended. In both Propulsid and Chinese Drywall, I was appointed to the Plaintiffs' Steering Committee; however, in Vioxx I was not. Nevertheless, I worked as hard as anyone on the Vioxx case as hard as anyone and accepted any assignments offered. Because I had referral lawyers from throughout the country and had been promoting Vioxx prior to the MDL and prior to the formation of the Plaintiffs' Committee, our office made arrangements to accept referrals which numbered over 2,000 cases.

When I was not appointed to the Plaintiffs' Steering Committee, the advertising lawyers migrated to other firms who were appointed to the PSC because of the perception that if you are a member of the Plaintiffs' Steering Committee you would get special treatment and have your cases settled in an inventory settlement, as is often the case. In the end I had 144 cases.

Because I knew that Seeger, Birchfield, Lanier and others would have large inventories of cases, it was at my suggestion that the common benefit fee be limited. It was agreed that there would be a 2% common benefit fee and a 1% cost assessment in order to encourage people to file their

cases into the MDL and that people without cases should not receive large common benefit fees. Apparently this was changed when the common benefit fee was raised from 2% to as much as 8% and, ultimately 6.5%, as ordered by Judge Fallon. Because I objected to the 8%, I again have been penalized in my fee request. I was repeatedly asked by Mr. Herman and Mr. Levin to drop my appeals, which I refused to do. No money was offered, they simply wanted me to drop my appeals. It has always been the policy in MDL's that the lawyers assigned to review documents are allowed to take and/or participate in depositions. It was always understood and repeatedly stated at meetings that if you did the hard work of reviewing documents, not in your office but in a depository, deposition assignments would be given to the law firms who performed this critical task.

In Vioxx, I was appointed to the Experts Team. I accumulated and consulted with experts about Vioxx long before the MDL was formed. For example, I spoke to Dr. Cyril Wecht, who testified for me in various cases for over 30 years; Dr. Suzanne Parisian, a FDA Expert, who testified for me previously in a case before Judge Fallon and testified this week in a Heparin case in the Northern District of Ohio (I am a member of the Plaintiffs' Steering Committee); Dr. John Stirling, Director of Cardiovascular Research Laboratory at Michael Debakey Medical Facility, who was recruited by me for stroke cases; Dr. Lawson Bernstein; Dr. Augustine Aruna, a Pharmacologist from Xavier; Dr. Daniel Acosta, a Toxicologist and Pharmacologist was recruited by me; Dr. Nachman Brautbar, a Toxicologist, as well as Dr. John Markis, a Cardiologist from Harvard (*see* Exhibit 31 of the Becnel Exhibit Book). I also located someone who had intimate knowledge of Cox 2 Clinical Trials--- Dr. Michael Snabes.

I testified that during a Vioxx mock trial, I was asked to be the judge and rate 40 lawyers on their presentation, themes, etc. I brought Drs. Markis, Acosta, Aruna and Brautbar there to evaluate

not only the scientific issues but also the presentation and themes used by the lawyers. Carlene Lewis and Mark Lanier participated in this mock trial to help Carlene and Mark prepare for their case which Carlene Lewis and Mark Lanier tried in Houston, Texas to a $250 million verdict. This was especially important because I was requested to rate the lawyers making presentations; Mark Lanier and Carlene Lewis had one of the best presentations I have ever seen in a Vioxx trial.

I participated in this mock trial for a number of days at the Westin Hotel in New Orleans at the request of all of the lawyers in state and federal court, to evaluate themes, oral presentations, science and the quality of legal talent. Though Andy Birchfield did not participate in this exercise, Paul Sizemore from his firm did and he was immediately hired away from the Beasley Allen firm by Mr. Girardi, another member of the FAC. They then tried a case in California, which was lost. Andy Birchfield admitted he did not participate in a mock trial, nor in a Focus Group, but continued to try cases, losing one after another.

Andy Birchfield acknowledged that he did not participate in the mock trial or a Focus Group. For that reason, I was in Houston, Texas when the first Vioxx trial was being tried and because there was a great deal of controversy on trial tactics and the way the case was being tried, I left Houston so as to not become entangled in this controversy. Evidence of this controversy is detailed in emails from Tommy Fibich, Mr. Kline and Chris Seeger, which were not used or admitted by the Special Master, but were offered as a proffer.

It should be noted that most of the time that I spent prior to the formation of the MDL is not reflected in the reduced submitted time by the FAC despite the fact that the FAC gave people credit for being involved in Vioxx prior to the drug's withdrawal. I, on the other hand, was given no credit. The FAC credited other firms with developing experts, which I also did, including Dr. Michael

11

Snabes who worked as a Medical Advisor and Associate Director of Cox-2, Phase I-IV, Global Research and Development for Pfizer in developing their competing drugs. Dr. Snabes knew more about Cox-2 drugs than almost anyone in the country, yet the FAC gave no credit for this expert because only the lead counsel on the case that was being tried could pick the experts he or she wanted to use. This was so, even though some lost as many as five cases in a row.

Daniel E. Becnel, Jr. organized the first meeting of counsel after the JPML sent the case to Judge Eldon Fallon. For some reason Mr. Herman did not attend the meeting at Antoine's, for which I paid and at which I nominated Chris Seeger and Andy Birchfield to be co-lead counsels. It was during this meeting of approximately 50 lawyers from across the country that Daniel E. Becnel, Jr. made the recommendation that Chris Seeger and Andy Birchfield be Co-Lead Counsel because of the number of cases they had and the discovery that they conducted through the state court litigation. This would allow the MDL to use their work product, moving cases quickly to trial. No credit was given to me for this work.

Liaison Counsel was not picked at that time due to the fact that there were three people interested in the position: Gerald Meunier (whom Richard Arsenault and I supported); Russ Herman (whom we understood was to retire after Tobacco); and one other person who was little known in the field of complex litigation. We were aware that the Liaison Counsel should come from New Orleans and Russ Herman was ultimately selected. Because Arsenault and I did not support Russ Herman for Liaison Counsel initially, we were both limited in the work that would be assigned to each of us.

The FAC does not contest the key facts which form the basis of the Becnel Law Firm objection. In fact, Andy Birchfield acknowledged that the Becnel Law Firm had people working

continuously at the depositories in Montgomery, New York and in New Orleans. All of this work was requested by the PSC and this work was directed at reviewing the documents and other information needed for trial and discovery purposes. Will Percy worked on the Vioxx case for 23 consecutive months. *See* Exhibit 24-G of the Becnel Exhibit Book. He still works for me on many major MDL's.

It should be noted that every single attorney I sent to any of the depositories were required to sign in and sign out and, therefore, the time sheets should never have been questioned because Beasley Allen and Chris Seeger's firms were in control of these documents and very few firms in the entire country, whether state or federal, were doing this important work.

As in the Propulsid case, where the depository was located in my office in LaPlace, I was asked to allow Carlis Griffin to be an administrator. Carlis Griffin worked for me prior to the Propulsid and Vioxx litigation and when Vioxx terminated, she again returned to my office. Because of her vast experience, she was highly regarded by all of the lawyers and was involved in tracking the reviewing attorney's time sheets and giving assignments on document reviews. *See* Affidavit of Carlis Griffin, Exhibit 24-F of the Becnel Exhibit Book, as well as a letter from Penny Herman Grisamore, Exhibit 24-E. Certainly I could have said no and been given credit for her time; however, in a group effort you do what is requested of you even if it means you ultimately suffer financially for that decision. Many of the lawyers who work for me not only worked as law clerks in state court and/or federal court, but have extensive trial experience and litigation experience in complex cases in both state and federal courts, as well as in MDL settings.

When my office was requested to do page and line summaries of approximately one-third of the depositions taken, we immediately dropped everything and did this assignment. This was very time consuming and disrupted our office from other projects we were working on. We put Vioxx

first, and we were given no credit for that work either.

The FAC does not contest that the work that the Becnel Law Firm performed was done at the direction of the PSC, nor does the FAC assert that the Becnel Law Firm failed to complete any task assigned by the PSC. The FAC simply contends that they changed the rules and the work that was performed by others was not as important as work that they assigned to themselves and thus they recommend that they be awarded over 70% of the common benefit fee by taking away hours from the Becnel Law Firm and/or reducing its value.

The FAC also took credit for every hour performed by the Becnel Law Firm at a rate in excess of $300.00 per hour, but when dividing the fee, took this value away. The FAC does not contest that it had access to all of the sign-in sheets that was required for all depository work, nor does the FAC question that the lawyers assigned by the Becnel Law Firm to do this work were competent, sitting in rooms in New York, Montgomery or New Orleans, eight hours per day or more doing nothing but Vioxx work, undisturbed by any incoming calls, other assignments or other disturbances of normal law practice. All of their time and effort was directed to Vioxx. Carlis Griffin's Affidavit even states that other than the Becnel Law Firm, very few firms sent people to work in the MDL depository.

This fee dispute has been an amazing process. For example, the FAC's original recommendation for Kline and Specter was $4,000,000 which turned into $15,000,000. Similarly, the Morelli Rattner amount of $750,000 turned into $2,250,000. The Motley Rice allocation was $195,000 and turned into $1,250,000, and the Placitella/Weinberg allocation of $720,000 turned into $7,000,000. *See* attached sheet of similar allocations by the FAC, marked Exhibit 32 of the Becnel Exhibit Book. This all occurred during the fee dispute hearing, without ever using the *Johnson*

*Factors* to justify any increase. Instead, the FAC simply offered money to objectors with no justification.

There is simply no justification under the formula used by the FAC to explain these vast differences in the original and modified recommendations. *See* Exhibit 32 showing the Johnson Factors have not been followed, nor was the point system followed. These vast differences in the original FAC recommendation and the recommended allocations during the fee dispute would not occur had those established methods been used. The Becnel Law Firm was given $97,000 which was raised to $455,000, without the Becnel Law Firm even appearing before the FAC and without the FAC even discussing the matter with the Becnel Law Firm. When I was asked to report to the Herman Law Firm to discuss my objection, I told them I would be amendable to an amount using the reduced hourly rate determined by Phil Garrett and therefore, had nothing else to say. For some unknown reason, they changed my allocation without even talking to me to $455,000, which amounts to approximately $35 per hour worked by attorneys that work for me.

Despite the fact that I was requested repeatedly to bring my cases to state court, as many of the lawyers were doing, I refused and continually promoted the MDL which I have always done throughout my career.

It is unquestioned that the Becnel Law Firm never abandoned this litigation. In fact, when requested by Mark Robinson, the Becnel Law Firm sent Rebecca Todd, at my expense, to California to work with Mr. Robinson on the documents. She was part of the Trial Team in the only successful case tried in federal court. She was assigned to review documents and to help prepare the plaintiffs' widow for trial. She spent the entire time working 15 to 18 hours per day during this trial, all under the direction of Mark Robinson, a member of the Plaintiffs' Steering Committee. Yet, despite this

involvement in the only successful federal trial in the MDL, the Becnel Law Firm was given no credit for a successful trial. Yet, the FAC gave itself enhanced points for losing every single case tried in federal court and most of the state court trials. But for the hours put in by the Becnel Law Firm reviewing documents, working with experts and in trying cases in federal court, there would not have been a successful outcome.

All of the Becnel time records were sent in as required by the PSC and Judge Fallon. For some reason or another, thousands of hours were not counted even though the sheets existed. Sign-in and sign-out sheets were available to the FAC, but not examined.

The per hour rate given to all of the lawyers who worked for the Becnel Law firm was less than the standard rate given to a paralegal in Louisiana. Daniel E. Becnel, Jr. did not even bill for the large amount of time each week that he spent reviewing the work of all of the people he would send to the document depositories in order to build a more proficient case should he been called upon to try one. Despite making a number of recommendations on experts, on documents and trial techniques, none of these recommendations were given any remuneration, much less played any role in the FAC's fee allocation process.

It should be noted that during my questioning of Andy Birchfield, he admitted that the only people who were working on documents were the Seeger Law Firm, Beasley Allen, Mark Robinson from California, Carlene Lewis and Mark Lanier (both from Texas), as well as Richard Arsenault and Daniel E. Becnel, Jr. (both from Louisiana). Virtually none of the FAC members had filed a lawsuit in Vioxx prior to the drug being withdrawn, other than Seeger, Birchfield and Lewis/Lanier.

Should this Court not grant the Becnel Law Firm the substantial funds justified in this case, it will render the Becnel Law Firm unable to handle other cases and projects, such as Welding Rods

MDL No. 1535, where the Becnel Law Firm lost over $2 million, the FEMA MDL No. 1873, where the Becnel Law Firm lost over $1 million and the Mississippi River Dredging case and the Levee Failure case, where the Becnel Law Firm took on over 90,000 client, pro bono, and has lost over $2 million. When the Vioxx case started it was just as risky as those cases however, after pouring time and effort into the case, the Becnel Law Firm should be entitled to the rewards justified by the time and effort put into the case.

No one works harder than Daniel E. Becnel, Jr. and the attorneys that work with him. The office opens at 7:00 a.m., six days a week, and a full staff is available even on Saturdays.

Based upon all the work done in Vioxx by Daniel E. Becnel, Jr. and the Becnel Law Firm, LLC, much of it done prior to the MDL, the fee request made herein is both justified and supported by application of the *Johnson Factors*.

Respectfully submitted,
BECNEL LAW FIRM, LLC
106 West Seventh Street
P. O. Drawer H
Reserve, Louisiana 70084
Telephone No. (985) 536-1186
Fax No. (985) 536-6445

/s/Daniel E. Becnel, Jr.
DANIEL E. BECNEL, JR. (#2926)
TRIAL ATTORNEY