**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

|  |  |
|---|---|
| In Re:  VIOXX<br><br>**PRODUCTS LIABILITY LITIGATION<br>      SECTION L**<br><br>This document relates to:<br><br>**ALL COMMON<br>BENEFIT FEE APPLICANTS** | **MDL Docket No. 1657**<br><br><br><br><br><br>**JUDGE FALLON<br>MAG. JUDGE KNOWLES** |

**FEE ALLOCATION COMMITTEE**
**POST-HEARING BRIEF IN SUPPORT**
**OF PROPOSED ALLOCATION**

The Fee Allocation Committee urges the Special Master to accept the recommendation of

the Fee Allocation Committee for each common benefit fee applicant as reflected in Exhibit A.

The Committee's recommendation is the product of diligent and extensive effort, first, to follow

Judge Fallon's direction in implementing a fair, objective approach for evaluating and

compensating the common benefit contribution of each applicant and, second, to heed the

Court's admonition in accord with prevailing jurisprudence for lawyers to resolve fee matters

among themselves.[1]   The process followed in arriving at this recommendation afforded ample

notice and numerous opportunities for applicants to be heard.   Moreover, the Committee's

recommended allocation is based on a thorough analysis of all time submissions, affidavits

---

[1] Objectors have made much about "side deals." However, the only agreements reached by the Fee Allocation Committee regarding common benefit fee awards pertain to amounts to be **recommended** to Judge Fallon.  Such efforts are in keeping with well-established jurisprudence. See *Johnson v. Georgia Highway Express,* 488 F.2d 714, 720 (5th Cir. 1974) ("[W]e encourage counsel on both sides to utilize their best efforts to understandingly, sympathetically, and professionally arrive at a settlement as to attorney's fees"); see also *Blum v. Stenson,* 465 U.S. 886, 904 (1984) ("Parties . . . should make a conscientious effort, where a fee award is to be made, to resolve any differences."); *Forbush v. J.C. Penny Co., et al.,* 98 F.3d 817, 821 (5th Cir. 1996) ("The Court had hoped that counsel could work this out amongst themselves."); *Turner v. Murphy Oil,* 582 F.Supp.2d 797, 802 (E.D. La. 2008) (Fallon, J.) ("attorneys were unable to agree on a proposed allocation").

submitted by applicants, presentations made by applicants, and the Committee's knowledge of the common benefit work performed in every aspect of the litigation.

In this brief, the Fee Allocation Committee will address several overarching objections and then address its position regarding each of the five remaining Objectors.[2]

## I.      Objectors Afforded Full Measure of Due Process

The Objectors' contention that the fee allocation process violates due process is without merit. In *In re High Sulfur*, No. 09-30313 (5th Cir. June 21, 2010) (High Sulfur II), the Circuit Court of Appeals for the Fifth Circuit addressed the issue of adequate due process in a fee allocation dispute.  In that case, like here, Daniel Becnel complained of a lack of due process. See Tr. of May 12, 2011, at 60-78.  The fee allocation process in *High Sulfur II* afforded each fee applicant an opportunity to submit a three-page affidavit and a 25-page memorandum.   In addition, however, Becnel sought an evidentiary hearing to advance his position.  Because he was denied an opportunity for an evidentiary hearing, Becnel appealed. The Circuit Court denied the appeal finding that the district court acted within its discretion in declining to hold an evidentiary hearing and that the procedure provided the minima of due process: notice and opportunity to be heard.

In the case *sub judice*, fee applicants have clearly been afforded ample notice and opportunity to be heard:

- Article IX of the Master Settlement Agreement describes the general procedure to be followed in the allocation of common benefit fees:  Judge Fallon to determine the appropriate common benefit assessment not to exceed 8%; appointment by Judge Fallon of a Fee Allocation Committee; the Fee Allocation Committee to make its allocation recommendation to Judge Fallon; Judge Fallon to determine the appropriate allocation, with consultation from Judges Chaney, Higbee and Wilson.[3]

---

[2] The Committee has reached agreements regarding its recommendation with thirteen of the eighteen Objectors. While it is peculiar that these thirteen objectors join the remaining Objectors in pleadings, the Committee presumes they honor their agreement to withdraw their objections based upon the Committee's amended recommendation.

[3] All common benefit fee applicants represented clients whose claims were enrolled, evaluated, and compensated in

- Applicants were afforded an opportunity to submit time records, reconstructed if necessary, to support common benefit fee claim. <u>See</u> Pretrial Order 6C.

- Applicants were informed of factors to be considered by the Court in allocating fees. <u>See</u> Pretrial Order 6D, at 2-3; <u>see also</u> Tr. of December 19, 2008 Status Conf., at 51-53 (Ex. B); Tr. of January 6, 2011 Status Conf., at 14-19 (Ex. C).

- Applicants were afforded an opportunity to submit a three-page affidavit in support of common benefit fee claim. <u>See</u> Pretrial Order 6D, at 4-5.  The affidavits are part of the record.

- Applicants were afforded an opportunity to make a presentation under oath to the Fee Allocation Committee. <u>See</u> Pretrial Order 6D, at 5-6.  Transcripts of these presentations are part of the record.

- Each applicant was advised of the Fee Allocation Committee's preliminary recommendation and afforded an opportunity to object in writing, stating the basis of the objection and outlining the amount sought.  Each applicant was also afforded an additional opportunity to meet with members of the Fee Allocation Committee.

- The Court published the Fee Allocation Committee's recommendation and granted all applicants an opportunity to object and be heard regarding the basis of their objection.

- The Court appointed leadership for Objectors and a Special Master to preside over discovery issues.

- The Special Master granted Objectors' request for discovery, ordering that Objectors have access to the Court-appointed certified public accountant, Philip Garrett, and his data and that Objectors be allowed to depose the Fee Allocation Committee designee.

- The Special Master conducted a full, week-long evidentiary hearing[4] allowing each Objector an opportunity to testify and offer evidence.[5]

The procedures instituted by the Court here far exceed those utilized in *High Sulfur*.  All common benefit applicants have received adequate notice and multiple opportunities to be heard.

The lack of due process argument advanced by the Objectors is baseless.

---

accordance with the Master Settlement Agreement.

[4] The hearing took place May 9-13, 2011.

[5] Contrary to the position taken by Objectors, the Committee understood that the Court ordered the evidentiary hearing for the purpose of providing Objectors with an additional opportunity to be heard regarding their common benefit claim.  Thus, the burden of proof was borne by the Objectors.

## II.     Lodestar Is Properly Used as a Cross-Check

Objectors have also argued that the lodestar method should control the calculation of the appropriate amount of common benefit fees.  The Court has addressed in depth the issue of the proper application of the lodestar method.  Most notably, the Court pointed out the method's flaws, listing the drawbacks as reported by the Third Circuit Task Force, which include: increased workload on the judiciary; inconsistent application of the approach and widely varied fee awards; illusory mathematical precision unwarranted by the realities of the practice of law; potential for manipulation; and, reward of wasteful and excessive attorney effort.[6]  The concerns regarding lodestar expressed by the Third Circuit Task Force and acknowledged by the Court were realized during the hearing before the Special Master.

Objectors acknowledged time submissions that were duplicative, excessive, or included time which was not expended for the common benefit of all claimants.  During his testimony, for example, Becnel acknowledged that his firm had submitted time for contract lawyers performing document review that had also been submitted by another law firm.  A comparison of the firms' time records revealed that more than 3,000 duplicate hours were submitted.[7]  Additionally, Becnel submitted approximately 1,025 hours for work on individual case files, such as client calls, review of medical records, preparation and updating of plaintiff fact sheets, and preparation of settlement claims packages.  These individual cases were not set for trial and clearly the work performed could not be characterized as common benefit time.  Becnel's submissions also contained mathematical errors.  For example, the November 2005 submission included a

---

[6] See *In re Vioxx Prod. Liab.  Litig.,* No. MDL 1657, Order of Oct. 19, 2010, at 16 (E.D. La. Oct. 19, 2010) (quoting *Vaughn R. Walker & Ben Horwich, The Ethical Imperative of a Lodestar Cross-Check:  Judicial Misgivings About "Reasonable Percentage" Fees in Common Fund Cases,* 19 Geo. J. Lethal Ethics 1453, 1456 (2005) (summarizing *Court Awarded Attorney Fees, Report of the Third Circuit Task Force,* 108 F.R.D. 237 (1985)).
[7] Compare Ex. D (Becnel Law Firm time submissions for the period January 2005 until May 2005) and Ex. E (Neblett, Beard, & Arsenault time submissions for the same period).  The duplicate hours totaled 3,054.75 hours.

4

summary statement listing Darla Sanderson as having performed 140.75 hours of common benefit work, but documentation was submitted for only 85.75 hours.[8]  Additionally, Becnel submitted over 500 hours for a lawyer that, according to his sworn testimony in open court, he has never employed and does not even know.[9]

Kathryn Snapka testified at the hearing that her firm reconstructed its time submissions during the same time period that settlement claims packages were due and that her emphasis was not on hours spent on the litigation.  See Tr. of May 11, 2011, at 146.  During her testimony, Snapka withdrew time submitted for the *Benavidez* case or approximately 30.25 hours, acknowledging that work performed on the case was not common benefit work.  *Id.* at 204. Similarly, Snapka submitted approximately 175 hours in relation to the *Eller* and *Nettles* cases, cases which were also not set for trial.   The Fee Allocation Committee found that work performed in relation to these cases did not inure to the benefit of all claimants and therefore, that the hours were not properly characterized as common benefit time.[10]  Furthermore, Snapka on cross examination conceded that errors were made in the firm's time submissions, testifying "I was trying to do the best I could." *Id.* at 213.  It should be noted that Snapka is opposed to a pure lodestar analysis. *Id.* at 191.

The Branch Law Firm's submissions further demonstrate why lodestar should not be the prevailing consideration in this litigation.  The firm submitted more than 7,000 hours, yet a large majority of these hours are clearly not common benefit time.  For example, the firm submitted approximately 4,300 hours for such tasks as reviewing individual case files, preparing and filing

---

[8] See Ex. F (Becnel Law Firm submission for November 2005).
[9] On cross-examination, Becnel testified that "I don't know who Margaret Parker is . . . I don't know Margaret Parker." See Tr. of May 12, 2011, at 112.  Again, on re-direct, Mr. Becnel was asked: "Q. Did you submit any common benefit time sheets on behalf of any attorney with the last name Parker? A. No. I don't know who that is." *Id.* at 127.  In fact, Mr. Becnel submitted more than 500 hours for Margaret Parker in submissions for the time period January 2005 to May 2005. See Ex. D, at 1, 6, 11, & 16 (Becnel also submitted expenses for reimbursement in relation to Ms. Parker at p. 29, 31, 38, 45, 52, 62, 70, 86, 96, 112, 126, &139).
[10] See Ex. G (all submissions or the *Eller* case); Ex. H (all submissions for the *Nettles* case).

complaints, internal staff meetings of various types including strategy discussions as to the most advantageous venues in which to file their cases, and reviewing documents related to individual cases.  In another glaring illustration, the firm submitted more than 1,000 hours that were devoted to evaluating the settlement, registering and enrolling their clients, and preparing claims packages for submission.  In terms of duplication, the firm's submission for December 2005 is illuminating in that no less than 8 persons billed 1 hour on December 16, 2005 for the review of the "aftermath of the NEJM editorial and effect on litigation," despite the fact that the Branch firm had no involvement in the *New England Journal of Medicine* matter and no ongoing responsibilities in the litigation at that time except to their own clients.[11]   According to Cynthia Zedalis who testified during the hearing on behalf of the firm, Branch's submission of approximately 7,000 hours of common benefit time or 1.25% of all submitted hours entitles the firm to a common benefit fee of 1.25% of the entire common benefit fund, or $3,947,875.75. See Tr. of May 11, 2011, at 16.[12]

Joe Escobedo on behalf of Escobedo, Tippet & Cardenas acknowledged submitting more than 250 hours for the review of the *Ernst v. Merck & Co.* trial transcript, more time than it took to try the *Ernst* case. See Tr. of May 9, 2011, at 77.  Escobedo acknowledged multiple duplicate entries in his firm's time submissions. *Id.* at 68-70, 71, 72, 73, 73-74.  In addition, Escobedo concurred that an entry involving the recording of time spent sending a letter and pleading to the *New York Times* was not properly submitted as common benefit time. *Id.* at 77.

Moreover, several Objectors who reconstructed their time in accordance with Pretrial Order 6C testified that the reconstruction of time resulted in an imperfect work product that may

---

[11] It is assumed that this is a reference to the Expression of Concern published in the *New England Journal of Medicine* in relation to misrepresentations made in regard to the VIGOR publication. See Ex. I (Branch submission for December 2005).
[12] The Branch Law Firm does not make a claim based on lodestar, but rather seeks a percentage of the common benefit fund.

either overstate or understate the time expended.  Chris Placitella of Cohen, Placitella & Roth testified that his time records were reconstructed in accordance with Pretrial Order 6C, but were not complete and should only be one factor in considering the appropriate compensation. See Tr. of May 10, 2011, at 105-107.   Eric Weinberg testified he did the best he could to reconstruct time by analyzing documents, emails, etc., but that he did not keep contemporaneous records and had to backfill the information.  *Id.* at 195.  While Weinberg testified he did the best he could to "backfill" time submissions, the submission can hardly be considered to be completely accurate in light of the difficulties of reconstructing time submission years after the work was performed. *Id.* at 212-213.

Testimony from Objectors underscores the drawbacks and inadequacies of the lodestar method.  Objectors submitted duplicate hours, excessive hours, and hours for work not properly categorized as common benefit work.  Further, Objectors who reconstructed their time admitted that even good faith efforts to re-create time records for work performed years prior results in an imprecise work product that could best be used as an "estimate" rather than a sum certain.  The Court directed the Fee Allocation Committee to pursue a value-driven not hour-driven approach in evaluating common benefit contributions, and the Committee has endeavored to do so.  The hearing before the Special Master only underscored that this was the most equitable and reasonable approach.

### III.    Work in Non-Trial Cases Does Not Rise to the Level of Common Benefit Work

Anapol Schwartz, Weiss, Cohan, Feldman & Smalley, P.C., the Branch Law Firm, Escobedo, Tippet & Cardenas, and the Snapka Law Firm argue that they are entitled to common benefit fees for hours expended on individual cases that did not proceed to trial.  The Fee Allocation Committee acknowledges that preparing cases for trial or, in other words, advancing

the docket, contributes to the advancement of the overall litigation.   The Fee Allocation Committee, however, also recognizes that case specific matters such as completing plaintiff profile forms, producing client medical records, preparing for and defending clients depositions, taking the depositions of the prescribing and treating doctors, and perhaps deposing relevant sales representatives are tasks that are to be reasonably expected to take place in every pharmaceutical case where a firm undertakes to represent a client.   In its preliminary recommendation, the Fee Allocation Committee attempted to give partial common benefit credit for discovery performed in individual cases.

But, as objections to the Fee Allocation Committee's preliminary recommended allocation were received, it became clear that firms were not amenable to partial credit for such work.  Instead, the firms demanded full value for such time with no offset for the fact that the firms were receiving compensation for such work by way of contingency agreements with their clients.  Therefore, the Fee Allocation Committee reevaluated its approach.  As a result of this analysis, the Fee Allocation Committee reached the following conclusion.

In this litigation, the total fee for plaintiffs' lawyers has been established by Judge Fallon. By virtue of the Court's order of August 27, 2008 capping the contingency fees at 32%, the Court established the total aggregate attorneys' fee for all Vioxx cases resolved in the settlement program.  The Court further determined that this fee should be divided as follows:  20% for common benefit work and the remaining 80% for work on individual cases.[13]  Given this fee division and the strident objections to giving partial credit for advancing the docket in its preliminary recommendation, the Fee Allocation Committee decided that the better approach

---

[13]  Order and Reasons entered by the Court on October 19, 2010, established 6.5% or $315,250,000 as the appropriate amount for common benefit fees. Thus, the common benefit portion of the total attorneys' fee is 20.3125% ($315,250,000 / $1,552,000,000). The remaining portion of the fee, or 79.6875%, is for case individual case work as opposed to common benefit work.

would be to draw a more definitive line between common benefit tasks and case specific tasks. Activities such as client communication, completion of plaintiff profile forms, case-specific depositions (such as plaintiff depositions, family member depositions, prescribing doctor depositions, treating physician depositions, and sales representative depositions) were determined to be case specific work. Common benefit work, on the other hand, was considered to include all tasks necessary for developing and advancing the general liability case and other non-case specific work that inured to the common good. Because general liability is a substantial part of trials, trials were deemed to be common benefit work. However, work done on individual cases which were not tried was considered by the Fee Allocation Committee to be compensated by the case-specific 80% established by the Court.

## IV.    Reimbursement of Costs Does Not Entitle Firm to Common Benefit Fees

The Branch Law Firm argues that reimbursement of costs for cases in which discovery was conducted entitles them to common benefit fees for work done on those cases. According to Cynthia Zedalis who gave testimony on behalf of the Branch Law Firm, "[T]he Fee Allocation Committee cannot have it both ways. They cannot say yes, you did common benefit work, we'll give you $400,000 in costs, but we're not going to give you any fees for the work." See Tr. of May 11, 2011, at 23. Branch's views on this issue are incorrect and out-of-step with the Court's directives.

Reimbursement for discovery costs on individual cases was for the benefit of clients, not to create an entitlement for lawyers. This fact is made clear from the Court's Pretrial Order 51.[14] Case specific discovery was stayed in all but a small portion of Vioxx cases. In cases where discovery was ordered, substantial costs were incurred in comparison to cases where discovery was stayed with the exception of the preparation of plaintiff profile forms. Since costs are

---

[14] *In re Vioxx Prod. Liab. Litig.*, Pretrial Order 51, at 1 (E.D. La. Sept. 23, 2009).

deducted from a client's portion of a recovery, if the costs related to discovery were not reimbursed from the Common Benefit Cost Fund, claimants whose cases were selected for discovery would pay a disproportionate amount of the costs associated with the litigation. Therefore, the Fee Allocation Committee determined that costs associated with discovery should be reimbursed for all cases in which discovery took place and for which common benefit expenses were submitted.  The reimbursement of costs associated with court-ordered discovery, however, did not render the hours expended on such work appropriate for common benefit fees. Fees for that work were covered by individual contingency fee contracts as outlined above, *supra* section III.

## V.   CPA Approval Does Not Render Time Approved for Purposes of Common Benefit Compensation

Objectors assert that "acceptance" by the Court-appointed CPA, Philip Garrett, resulted in the hours being "compensable" for common benefit purposes.[15]  Philip Garrett, CPA, of Wegmann Dazet & Company was appointed by the Court to receive, compile, and report the common benefit time and expense submissions of counsel.  Mr. Garrett reviewed the submissions for purposes of determining if the submissions complied with Pretrial Order 6 as well as other orders of the Court.  Mr. Garrett made no findings as to whether the hours submitted were expended on efforts that benefitted all claimants.

During his testimony before the Special Master, Mr. Garrett made his role abundantly clear – to ensure that hours were submitted procedurally in accordance with the Court's orders, but that no determination was made about whether the work was for the common benefit of all claimants, authorized, or of a certain quality. See Tr. of May 12, 2011, at 147-148.   Mr. Garrett testified that if a firm conveyed to him that the work was common benefit that it was not his

---

[15]  See Tr. of May 9, 2011, at 73 (Escobedo, Tippit & Cardenas) and Tr. of May 11, 2011, at 16 (Branch);

10

responsibility to make a determination as to whether that work qualified or not, but rather his role was to leave that determination to the "eventual Steering Committee or whoever." *Id.* at 150. Mr. Garrett testified:

> Q. Now, in terms of the review of the hours was it your job, did you view your responsibility to make a subjective judgment as to the value or quality of those hours?
>
> A. Absolutely not, no. It was talked to the court about it as long as the attorneys about it that I *do not have the ability to judge what -- I really am not that involved in the case*, I am really the score keeper on the sideline.
>
> Q. *And you never made a subjective investigation or determination as to the hours and common benefit or whether there were common benefit, correct?*
>
> A. *Whether they were very effective hours, ineffective hours, that wasn't my job.*
>
> Q. Did you actually do any analysis was to whether or not the work was necessary?
>
> A. Not at all.

*Id.* at 176-177 (emphasis added).

The Court in its order of October 19, 2010, affirmed the view that approval of hours by Mr. Garrett did not preempt the Fee Allocation Committee from substantively reviewing submissions for purposes of determining if the hours were incurred for the common benefit. The Court found that the number of hours submitted in Mr. Garrett's affidavit of July 30, 2010 was "reliable and supported in light of the procedures put in place by PTO 6 and implemented by Mr. Garrett." See Order of Oct. 19, 2010, at 33. The Court expressed its views in footnote 22, "This finding is sufficient for a rough lodestar cross-check. This finding *does not preclude the Allocation Committee or the Court from disallowing any particular submissions of common benefit time when allocating the common benefit fee award." Id.* at 33, n. 22 (emphasis added).

11

The Court charged the Fee Allocation Committee with the responsibility of reviewing the time submissions made by all common benefit fee applicants and in light of their expansive knowledge of the litigation, to make determinations as to what time was expended for the common benefit of all and what time was not.  The Fee Allocation Committee has endeavored to do that.  Objectors' assertion that once accepted by Mr. Garrett, the Fee Allocation Committee has no authority to review the time submitted for purposes of determining if it was expended for the common benefit is erroneous.

### VI.    Bellwether Trials Were Essential to the Litigation

Objectors throughout the hearing attempted to diminish the importance of trials, particularly those that did not result in a plaintiff's verdict.  Objectors repeatedly asserted the "losing" trials should not be viewed as contributing to the litigation. See Tr. of May 10, 2011, at 61, 63-64; Tr. of May 12, 2011, at 69-70.  In the view of the Fee Allocation Committee, Objectors' comments are misguided.  As the Court has noted, bellwether trials play a central role in assisting both plaintiffs and defendants in evaluating the strength and weaknesses of their particular positions in litigation.

> Bellwether trials thus assist in the maturation of any given dispute by providing an opportunity for coordinating counsel to organize the products of pretrial common discovery, evaluate the strengths and weaknesses of their arguments and evidence, and understand the risks and costs associated with the litigation.  Indeed, the utilization of bellwether jury trials can enhance and accelerate the MDL process in two key respects.  First, bellwether trials allow coordinating counsel to hone their presentation for subsequent trials and can lead to the development of "trial packages" for use by local counsel upon the dissolution of MDLs. Second, and perhaps more importantly, bellwether trials can precipitate and inform settlement negotiations by indicating future trends, that is, by providing guidance on how similar claims may fare before subsequent juries.

See Fallon, et al., "Bellwether Trials in Multidistrict Litigation," 82 Tulane L. Rev. 2323, 2338 (2008) (citations omitted).   Trials allow both parties to objectively evaluate the litigation for

purposes of determining strategic ways to advance their interests and for purposes of resolution. Specifically, in the Vioxx litigation, bellwether trials whether in the MDL or state court were invaluable in assisting the parties in evaluating the strengths and weaknesses of their respective cases and formed the foundation upon which settlement discussions took place.

### VII.  Responses to Individual Objectors

#### A.  Anapol, Schwartz, Weiss, Cohan, Feldman & Smalley, P.C.

The Fee Allocation Committee recognizes the Anapol firm's contributions to the Vioxx Litigation.[16]  Anapol Schwartz lawyers attended organizational meetings as early as 2001.  Dave Jacoby served as Co-Liaison Counsel for the New Jersey coordinated action, and Sol Weiss assisted in the negotiation of draft complaints and initial orders and participated in document review and certain depositions.

Anapol Schwartz, however, did not take a deposition in the Vioxx litigation prior to the withdrawal of the drug from the market. See Tr. of May 10, 2011, at 42.  The firm did not try a Vioxx case. Id. at 48.  Though the firm worked with generic experts such as Drs. DePace, Eisenberg, Kostis, Madigan, Nessie, and Rich, none of these experts testified in a trial case.

Sol Weiss of Anapol Schwartz was appointed to the MDL State Liaison Committee. Weiss resigned his position on the Committee in an effort to disassociate the firm from the MDL and avoid paying a common benefit fee assessment. Id. at 44-45.

Anapol's objections and arguments in favor of an increased common benefit fee allocation rely on two factors.  First, Anapol argues that its common-benefit allocation should be driven primarily by lodestar.  Second, Anapol argues that the work it conducted in connection

---

[16] Based on the firms' submissions, it is evident that Anapol, along with Cohen, Placitella, & Roth, Weinberg, and Motley Rice, worked outside the New Jersey Coordinated Litigation and the MDL to devise their own settlement protocol for their own inventory, and now seek common benefit compensation for that failed effort.  Such work was contrary to and detracted from the common good and is not appropriate for common benefit consideration.

with individual cases should be deemed as having benefited the litigation as a whole. For the period of December 2001-May 2008, Anapol submitted 8,430 hours and claimed a lodestar of $3,306,026.20. That submission included hours expended working up the *Hatch* matter, a discovery-pool case in New Jersey.[17] Additionally, in January 2009, Anapol submitted 4,617.50 hours, seeking lodestar fees of $1,373,875. As acknowledged by Anapol, the latter submission was for hours spent developing eight of the nine individual cases that Anapol worked up for potential trial in New Jersey.

The time submitted in January 2009 was not included in the Fee Allocation Committee's common benefit fee allocation for Anapol nor should it have been. For the reasons explained above, the Committee concluded that work conducted in furtherance of individual cases that were not tried would not be deemed common benefit work. Indeed, the Anapol firm has already recovered for such work from the attorney fees awarded in the individual cases. In sum, the Fee Allocation Committee has reviewed Anapol's submissions and the relevant records and maintains that its common benefit fee recommendation is fair and reasonable. Anapol Schwartz submitted over 12,000 hours of which 8,430 hours did not relate to work on individual, non-trial cases. Based on their submitted hourly rates, the lodestar is $3,309,025. Considering the close alignment of the value yielded by the point system and the lodestar cross-check, the Fee Allocation Committee contends that its recommendation of $3,400,000 is appropriate.

### B. Becnel Law Firm

Becnel submitted 16,167.50 hours, which included approximately 404 hours for him and 15,763 hours for contract lawyers. For this, Becnel claims that he is entitled to $4,041,875 in common benefit fees based on lodestar. As discussed above, the lodestar method is not suitable

---

[17] Ultimately, this case was not selected as a trial candidate because it was determined that the plaintiff was not prescribed Vioxx.

as the primary method of allocation in this litigation.  Becnel's submissions provide telling examples of the inadequacies of the lodestar method in this particular litigation. First, his common benefit time submissions include over 3,000 hours for contract lawyers that were also submitted by another common benefit fee applicant. See Tr. of May 12, 2011, at 106-108.[18] Secondly, Becnel submitted over 500 hours for a lawyer that, according to his sworn testimony in open court, he has never employed and does not even know.[19]

Becnel failed to comply with Pretrial Order 6D regarding contract lawyers.  Pretrial Order 6D states: "Where work was performed by contract lawyers, those counsel are required to disclose the salary/wage of such contract lawyers to avoid paying windfall profits to such counsel." See Pretrial Order 6D, at 7.  In an affidavit submitted pursuant to Pretrial Order 6D, Becnel failed to disclose this information.  At the hearing conducted by Special Master Juneau, Becnel acknowledged that all lawyers for whom he submitted time, except himself, were contract lawyers.  But even when questioned by Special Master Juneau, Becnel refused to provide the information regarding salary/wage that Pretrial Order 6D required.[20]  From the affidavit of Richard Arsenault which did comply with Pretrial Order 6D, the Fee Allocation Committee learned that some of the contract lawyers hired by Becnel were also hired by Arsenault.  According to Arsenault's affidavit, the highest paid contract lawyer was Will Percy, a lawyer with 26 years experience, and he was paid $3750 per month or $22.50 per hour.[21]

---

[18] Compare Ex. D (Becnel Law Firm time submissions for the period January 2005 until May 2005) and Ex. E (Neblett, Beard, & Arsenault time submissions for the same period).  The duplicate hours totaled 3,054.75 hours.

[19] On cross-examination, Mr. Becnel testified that "I don't know who Margaret Parker is . . . I don't know Margaret Parker." See Tr. of May 12, 2011, at 112.  Again, on re-direct, Mr. Becnel was asked: "Q. Did you submit any common benefit time sheets on behalf of any attorney with the last name Parker? A. No. I don't know who that is." Id. at 127.  In fact, Mr. Becnel submitted more than 500 hours for Margaret Parker in submissions for the time period January 2005 to May 2005. See Ex. D, at 1, 6, 11, & 16 (Becnel also submitted expenses for reimbursement in relation to Ms. Parker at p. 29, 31, 38, 45, 52, 62, 70, 86, 96, 112, 126, &139).

[20] In the Bextra litigation, Becnel failed to provide time records in a timely fashion which resulted in the denial of common benefit fee consideration.  See In re Bextra and Celebrex, No. 09-16928 (9th Cir. June 25, 2010).

[21] See Ex. J, at 3 (Aff. Richard Arsenault).  Based on 50 weeks per year and 40 hours per week, the average monthly

15

Further, Becnel submitted time for work on individual cases, such as client calls, review of medical records, preparation and updating of plaintiff fact sheets, and preparation of settlement claims packages.   These non-common benefit hours totaled approximately 1,025 hours.   In addition, according the Fee Allocation Committee's review of Becnel's hours, 38 hours or nearly 10% of the time he submitted on his own behalf were not common benefit hours. Rather, the hours were devoted to reading newspaper articles, phones calls with lawyers, and reviewing pleadings in cases for his own clients or in cases where he had no common benefit responsibility.

The Fee Allocation Committee recognizes that document review is a common benefit task.   The Fee Allocation Committee also recognizes that there are different levels of document review that require different levels of skill and experience.   Based on the level of work done by the contract lawyers submitted by the Becnel Law Firm, the Fee Allocation Committee contends that its recommendation of a common benefit award of $455,000 is generous.

### C.  Branch Law Firm

The Branch Law Firm's claim for common benefit fees is based on work done on 11 individual cases that did not proceed to trial.  See Tr. of May 11, 2011, at 19-21.  In fact, the only depositions taken in those 11 cases were the depositions of the plaintiffs or family members of the plaintiffs.  This work does not rise to the level of providing a common benefit and, therefore does not entitle the Branch Law Firm to common benefit fees.

In its August 27, 2008 Order and Reasons the Court capped contingency fee contracts at 32%.  In doing so, the Court noted the "economies of scale" at work in this litigation.  The Branch Law Firm provides a prime example of this principle.  While the Branch Law Firm represented over 2200 claimants who chose to participate in the settlement program, it was

---

hours would be 166.66 hours. $3750.00 divided by 166.66 yields an hourly rate of $22.50.

necessary for the firm to defend only 11 plaintiffs in depositions. The Branch Law Firm had 988 claimants paid an aggregate of over $117 million in the settlement program.

As described above, by capping attorneys' at 32% the Court established the total attorneys' fees in this litigation at $1,552,000,000.  By setting the common benefit assessment at 6.5% or $315,250,000, the Court established that 80% of the total fee would be for handling individual client matters while 20% of the total fee would be for common benefit work.  In light of the economies of scale that inured to the benefit of the Branch Law Firm and given the fact that the Branch Law Firm did no other work for which it claims a common benefit fee, it is the position of the Fee Allocation Committee that the Branch Law Firm's work in defending 11 depositions as described above is adequately compensated by the 80% of the total attorneys' fees allotted for case-specific work and that the firm is not entitled common benefit fees.

Common benefit fees are designed as compensation for common benefit contributions. The Branch Law Firm chose not to work for the common good, but rather took action to enhance the firm's position at the expense of the common effort.  Turner Branch was appointed to serve on the MDL State Liaison Committee, a committee designed to foster cooperation and communication between lawyers litigating primarily in state court and those litigating primarily in the MDL.  Turner Branch resigned his post as a member of the MDL State Liaison Committee and severed ties with the MDL Court.  Many lawyers who litigated primarily in state court venues worked cooperatively with the MDL Court and the PSC and are therefore entitled to common benefit fees.  A few other lawyers, Turner Branch being one, made carefully calculated decisions to avoid cooperation with the MDL Plaintiffs' Steering Committee. While not disqualifying a firm from common benefit fees, such counter-common efforts were considered by the Fee Allocation Committee in making its recommendation.

### D.  Escobedo, Tippit & Cardenas

It is undisputed that all claimed common benefit work performed by Escobedo, Tippit & Cardenas, LLC ("Escobedo") or 14,866.75 hours was done in furtherance of *Garza v. Merck & Co.*  See Tr. of May 9, 2011, at 55.  The *Garza* case was tried in state court in Texas.  A jury returned a verdict in favor of plaintiffs.  While the decision was on appeal,[22] the settlement was announced.  The *Garza* case was excluded from the settlement.  Thereafter, while the *Garza* case was being mediated per appellate court rules, Merck offered to allow the *Garza* plaintiffs to enroll in the settlement program.  Escobedo[23] refused this offer. *Id.* at 63-64.  The *Garza* case, therefore, made no contribution to the Common Benefit Fund.  Presumably, Escobedo decided the firm and their client could get a "better deal" outside the settlement program. *Id.*  Opting out of the settlement program also meant that any recovery would not be subject to a common benefit assessment.

While there is plenty of evidence that Escobedo utilized common benefit work to progress the *Garza* trial, there is no evidence Escobedo provided any assistance to the common benefit of the litigation.  A careful review of the *Garza* trial record reveals that the opening statement largely quoted the opening statement in *Ernst v. Merck & Co. Id.* at 59-61.  During the trial, Escobedo utilized depositions of key Merck witnesses that were taken by lawyers integral to the federal MDL and New Jersey Vioxx proceedings. *Id.* at 57-59.  While Escobedo identifies 10 depositions of Vioxx employees (including 2 South Texas sales representatives), these depositions were not used by any non-Escobedo lawyer.

Escobedo had no role in any other trials in New Orleans, New Jersey or California.  Escobedo had no role in the Texas Vioxx MDL. *Id.* at 55-56.  Escobedo did not take any MDL

---

[22] The judgment in *Garza* remains on appeal to the Texas Supreme Court.
[23] Though Snapka played a limited role during the *Garza* trial, the Snapka Law Firm does not have a fee interest in the case.  See Tr. of May 9, 2011, at 53; Tr. of May 11, 2011, at 200-201.

depositions; researched no non-*Garza* legal issues; wrote no non-*Garza* briefs; did not serve on any committee or have leadership in any jurisdiction including his home state of Texas; assumed no risk outside the *Garza* case; did not work up any cases in the federal MDL, New Jersey, California or Texas subsequent to *Garza*; offered no novel contribution; and did not participate in settlement negotiations or implementation.

Escobedo's time submissions were reconstructed as provided by Pretrial Order 6C. *Id.* at 68. As is often the case with time records reconstructed some years after work was performed, overstatements of time related to certain work for the *Garza* case were apparent. There were numerous duplications in the submissions. *Id.* at 68-76.

The Fee Allocation Committee initially recommended an award of $1,164,918 to Escobedo. Escobedo objected and sought a common benefit award of $31 million for his firm and the Snapka Law Firm. The Committee engaged in further review of Escobedo's submissions and objection. Following the post-objection review, the Fee Allocation Committee reduced Escobedo's recommended fee from $1,164,918 to $0. Escobedo now challenges the Committee's second recommended allocation, and in doing so, Escobedo requests a $19 million common benefit award for his firm alone.

The decision to award Escobedo $0 after his objection to the initial award of $1,164,917.97 was a direct consequence of the fact that counsel chose not to participate in the settlement program. The common benefit fund established by the Court is derived from the Master Settlement Agreement, the very agreement that expressly excludes the *Garza* case as plaintiff's counsel requested.[24] In other words, plaintiff's counsel eschewed the agreement when it would have meant making a contribution to the common benefit fund, but now when there is no risk of having to pay any amount into the fund, the firm claims $19 million.

---

[24] See Ex. K (17.1.23 of the MSA).

Escobedo claims no other common benefit contribution apart from the work in *Garza*. Therefore, based upon the absence of common benefit contributions, the Fee Allocation Committee determined that a common benefit fee award was not appropriate.

### E.  Snapka Law Firm

The Snapka Law Firm claims common benefit fees for work performed in relation to *Garza v. Merck & Co.*, the Texas MDL, reputed contributions to preemption-related briefing done in the MDL, and various objections.   Snapka submitted approximately 3,000 hours. Approximately 1,273 of these hours were expended on the *Garza* case.  Snapka did not have a fee interest in the *Garza* case and had only a limited role in the trial. See Tr. of May 11, 2011, at 200-201.  As outlined above, the *Garza* case was excluded from the settlement program and did not contribute to the Common Benefit Fund.   The Fee Allocation Committee, therefore, concluded that common benefit fees are not warranted for the work performed in relation to the *Garza* case.

Snapka submitted approximately 300 hours for work performed in relation to her limited role as liaison in the Texas MDL.  This work is appropriate for common benefit compensation and served as the basis for the Committee's recommended allocation.

Approximately 1,146.25 hours were submitted in relation to other individual, non-trial cases, *Zajicek, Nettles* and *Eller.*  These cases were not bellwether trial cases.  For the reasons noted above, *supra* section III, these hours were considered non-common benefit hours.

Ms. Snapka submitted 153.50 hours[25] in relation to the *Gomez* case, a case pending in the

---

[25] Of these hours, 1.25 hours were submitted for time spent reviewing the answer filed in the case, a telephone conference with co-counsel, and review of a letter from co-counsel. See Ex. L (Snapka submission for *Gomez* for 2005).  These hours were expended prior to Merck's motion and are not common benefit hours.  Snapka withdrew these hours during her testimony before the Special Master. See Tr. of May 11, 2011, at 212.   90.75 hours were submitted for Snapka's associate and 58.75 hours were submitted for Snapka.  To the degree hours were spent researching applicable law regarding preemption and modifying other preemption briefing for use in *Gomez*, this work product was not authorized or utilized as the MDL Law and Briefing Committee under Arnold Levin's

MDL.  Merck filed a motion in *Gomez* and *Arnold v. Merck & Co.*, seeking summary judgment based on preemption.  The motion regarding preemption had far-reaching implications, far beyond the *Gomez* and *Arnold* cases.  The decision regarding preemption would impact all claimants pending in MDL, as well as other jurisdictions.  The *Gomez* and *Arnold* cases served merely as platforms for Merck to present their preemption dispositive motion; the cases in and of themselves were not unique and presented a factual pattern common to all claimants.  For these reasons, the Plaintiffs' Steering Committee, and specifically the Law and Briefing Committee under Arnold Levin's leadership, took the lead in marshalling the plaintiffs' opposition to these motions.  Snapka contends that she made substantial contributions to the briefing in opposition to the motion.  See Tr. of May 11, 2011, at 208.  Snapka makes this claim despite the fact that the Law and Briefing Committee prepared all briefing in opposition to the motion and handled the grand majority of the oral argument in relation to the motion.  Ms. Snapka overstates her contribution to this effort.  Indeed, Snapka's contributions were limited to a review of the final draft opposition to which she made no substantive suggestions or contributions and to a brief presentation of the facts during the hearing before the MDL Court.

Moreover, Snapka's mode of operation has been to work against the common effort, not for it.  At a time when the Court was seeking cases to be tried as bellwether cases in the MDL and seeking lawyers willing to try them, Snapka persistently sought remand of *Garza* and other cases.  Snapka sought to leverage her limited role in *Garza* to exempt all of her cases from a common benefit fee assessment.  See Tr. of May 11, 2011, at 164-176.[26]

Snapka also seeks common benefit compensation for raising "ethical considerations" in

---

leadership drafted all legal arguments in the opposition to the motion for summary judgment.   Moreover, time spent in conferences with co-counsel, reviewing co-counsel correspondence, providing co-counsel with *Ernst* exhibits, and reviewing newspaper articles were not considered to be common benefit time.

[26] See Ex. N (November 2, 2005 letter from Snapka to Herman).

relation to counsel recommending the settlement program to all of clients. *Id.* at 136-140. Snapka maintains that her efforts brought to light an ethical problem that ultimately was addressed and eliminated by an amendment to the Master Settlement Agreement.[27]   The ethical challenge raised by Snapka was illusory.   The MDL Court, Judges Chaney, Higbee and Wilson, as well as three nationally known ethics experts approved the settlement agreement, including the language requiring lawyers to evaluate the settlement and recommend the settlement to each of their clients. *Id.* at 163-165.   These learned jurists and experts did not perceive any difficulty with this provision of the settlement agreement. *Id.*   Despite the intense scrutiny already applied to the provision, Snapka persisted claiming that the rules of professional conduct in Texas were somehow different from the rest of the country.   Yet, Snapka was aware that Texas had adopted the Model Rules of Professional Conduct and Texas law did not present a unique circumstance. *Id.* at 165-166.   She persisted yet never spoke to the experts hired by the Negotiating Plaintiffs' Committee, specifically Professor Lynn Baker, a recognized expert in mass tort settlements and a member of the Texas bar, to assuage her concerns. *Id.* at 167.   At the time of the hearing before the Special Master, Snapka yet again persisted in asserting her belief that she conferred a benefit as a result of raising "ethical considerations," but she could not name one ethical rule that formed the basis of her concerns.   In the end, the "solution" that Snapka touts was the inclusion in the settlement agreement of language that lawyers should "exercise their independent judgment" in recommending the settlement program. *Id.* at 164-171.   Of course, lawyers are always charged with the responsibility of exercising their independent judgment on behalf of their clients.   No substantive change in the Master Settlement Agreement was made.   This ethical challenge was no more than an attempt to undermine the settlement program in hopes of achieving a better deal for herself and her clients.   The Fee Allocation Committee did not give weight to these efforts.

---

[27] See Ex. M (Amendment to the Master Settlement Agreement).

22

Another, and perhaps the most striking, example of Snapka's strategy occurred when Ms. Snapka raised in the Court's hearing of February 17, 2011, the issue of a settlement reached with percentage-fee objectors.  Feigning confusion and alarm, Snapka accused the Fee Allocation Committee of malfeasance.  Snapka followed her remarks with a motion seeking a ruling that the compromise with percentage-fee objectors was unauthorized. *Id.* at 183-184.  Furthermore, she joined in papers seeking a ruling that the agreement was a fraud on the Court. *Id.*

A detailed review of the facts is illuminating.  Plaintiffs' Liaison Counsel filed a motion for an award of 8% in common benefit fees in January 2009.  On May 7, 2009, Snapka objected, joined with other objectors, and in sum, sought a reduction in the Common Benefit Fund to less than one-third its current size, the fund from which she now seeks $12 million.  Thereafter, Michael Stratton was appointed to serve as Liaison Counsel on behalf of all objectors, including Snapka.  After discovery and extensive negotiations, an agreement was reached to resolve all objections.  Stratton represented on the record that he had authority from all objectors to enter into the agreement.  Part of the agreement called for each objector to be refunded any holdback from their firm's cases in excess of 4%.  On July 28, 2010, Stratton submitted a letter to Judge Eldon E. Fallon withdrawing all objections with prejudice, including Snapka's.

Snapka received a letter from Stratton, dated September 2, 2010, along with a check in the amount of $336,492.14, representing the return of funds previously withheld from her firm's Vioxx cases in excess of 4%. *Id.* at 187-189.[28]  Snapka claims not to have known the terms of the settlement with percentage-fee objectors. *Id.* at 155.  Yet, the September 2, 2010 letter from Stratton makes the terms of the agreement clear.  Snapka claims not to have authorized Stratton to act on her behalf either to enter into the settlement or ostensibly, to withdraw her objection. See Tr. of May 11, 2011, at 155.  Yet, Snapka remained silent.  Though she was in attendance,

---

[28] See Ex. O.

Snapka did not raise the issue either in the October, November or December 2010 status conferences. *Id.* at 188-189.  Snapka did not speak to any Fee Allocation Committee members to ask questions or to discuss the matter. *Id.* at 189-190.  Nor did Snapka attempt to re-assert her objection to the 8% motion or to alert the Court that Stratton was not authorized to enter into an agreement on her behalf.  For nearly six months, Snapka remained silent.  Then, on February 17, 2011 after the Fee Allocation Committee published its recommendation, a recommendation with which she was dissatisfied, Snapka presented the matter for the first time and in open court.

The Fee Allocation Committee originally recommended an award to Snapka of $582,458.99.  She objected and, in conjunction with Escobedo, claimed entitlement to $31 million in common benefit fees.  Subsequent review of the Snapka submissions resulted in the reduction of the Fee Allocation Committee's recommended award to $75,000.00. The Fee Allocation Committee's decision was based upon the fact that the *Garza* case did not contribute to the Common Benefit Fund and that the primary common benefit work performed by Snapka was associated with the Texas MDL for which she submitted approximately 300 hours.  The Fee Allocation Committee also noted that while all other applicants, except Becnel, contributed to the common benefit fund at a rate of 6.5%, Snapka contributed at only 4%.   Snapka continues to seek an award of $12 million.

Based upon Snapka's common benefit contributions, the Fee Allocation Committee contends that its recommendation of a common benefit award in the amount of $75,000 is appropriate.

## VIII.    Conclusion

Objectors' smear tactics and unfounded attacks on individual members of the Fee Allocation Committee are attempts to obscure the issues before the Court.  The Fee Allocation

Committee's recommended allocation is based on a thorough, measured analysis of all time submissions, applicant affidavits, applicant presentations to the Fee Allocation Committee, and the Committee's knowledge of the common benefit work performed. Objectors have been afforded a full measure of due process.  For these reasons, the Fee Allocation Committee urges the Special Master to find that the recommended allocation is reasonable and adopt the recommendation as to each common benefit fee applicant.

Respectfully submitted,

Date:   May 27, 2011              By: _____ /s/ Russ M. Herman _____

**Russ M. Herman (Bar No. 6819)**
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
***Herman, Herman, Katz & Cotlar, L.L.P.***
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Telephone: (504) 581-4892

**PLAINTIFFS' LIAISON COUNSEL,
CHAIR OF THE FEE ALLOCATION
COMMITTEE, AND LIAISON COUNSEL
FOR COMMON BENEFIT COUNSEL**

By: _____ /s/ Andy D. Birchfield, Jr., _____

**Andy D. Birchfield, Jr**.
***Beasley, Allen, Crow, Methvin,
Portis & Miles, P.C.***
P. O. Box 4160
Montgomery, AL  36103-4160
Telephone: (334) 369-2343

**PLAINTIFFS' CO-LEAD COUNSEL,
SECRETARY OF THE FEE
ALLOCATION COMMITTEE, AND CO-
LEAD COUNSEL FOR COMMON
BENEFIT COUNSEL**

By: _____ /s/ Christopher A. Seeger

**Christopher A. Seeger**
*Seeger Weiss*
One William Street
New York, NY 10004
Telephone: (212) 584-0700

**PLAINTIFFS' CO-LEAD COUNSEL AND
CO-LEAD COUNSEL FOR COMMON
BENEFIT COUNSEL**

Russ M. Herman, Esq.
HERMAN, HERMAN, KATZ & COTLAR, LLP
820 O'Keefe Avenue
New Orleans, LA 70113
(504) 581-4892 (telephone)
(504) 561-6024 (telecopier)

Andy D. Birchfield, Jr., Esquire
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
P.O. Box 4160
234 Commerce Street
Montgomery, AL 36103-4160
(800) 898-2034 (telephone)
(334) 954-7555 (telecopier)

Christopher A. Seeger, Esquire
SEEGER WEISS
One William Street
New York, NY 10004
(212) 584-0700 (telephone)
(212) 584-0799 (telecopier)

Troy Rafferty, Esquire
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
ECHSNER & PROCTOR, PA
316 S. Baylen Street, Suite 400
Pensacola, FL 32502
(850) 435-7000 (telephone)
(850) 497-7059 (telecopier)

Thomas V. Girardi, Esq.
GIRARDI & KEESE
1126 Wilshire Blvd.
Los Angeles, CA 90017-1904
(213) 977-0211 (telephone)

Mark Lanier, Esq.
LANIER LAW FIRM, PC
6810 FM 1960 West
Houston, TX 77069
(713) 659-5200 (telephone)
(713) 659-2204 (telecopier)

Edward F. Blizzard, Esq.
BLIZZARD, MCCARTHY & NABERS, LLP
Lyric Centre, 440 Louisiana
Suite 1710
Houston, TX 77002-1689
(713) 844-3750 (telephone)
(713) 844-3755 (telecopier)

Perry Weitz, Esq.
WEITZ & LUXENBERG
180 Maiden Lane
New York, NY 10038
(212) 558-5500 (telephone)
(212) 344-5461 (telecopier)

Arnold Levin, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (telephone)
(215) 592-4663 (telecopier)

**FEE ALLOCATION COMMITTEE**

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Motion has been served on Liaison Counsel, Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and email, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 27th day of May, 2011.

 /s/ Andy D. Birchfield, Jr.,
**Andy D. Birchfield, Jr**.
*Beasley, Allen, Crow, Methvin,*
*Portis & Miles, P.C.*
P. O. Box 4160
Montgomery, AL  36103-4160
Telephone: (334) 369-2343
Facsimile: (334) 954-7555