```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2   *********************************************************************

 3   IN RE:  VIOXX PRODUCTS              MDL-1657
     LIABILITY LITIGATION               New Orleans, Louisiana
 4                                      Monday, May 9, 2011

 5
     *********************************************************************
 6

 7               TRANSCRIPT OF FEE ALLOCATION PROCEEDINGS
             HEARD BEFORE THE HONORABLE PATRICK A. JUNEAU
 8                          SPECIAL MASTER

 9

10   APPEARANCES:

11   FOR THE FEE
     ALLOCATION COMMITTEE:              HERMAN, HERMAN, KATZ & COTLAR
12                                      BY:  RUSS M. HERMAN, ESQ.
                                        820 O'Keefe Avenue
13                                      New Orleans, LA 70113

14                                      BEASLEY ALLEN
                                        BY:  ANDY D. BIRCHFIELD, ESQ.
15                                      218 Commerce Street
                                        Montgomery, AL 36104
16
                                        SEEGER WEISS
17                                      BY:  CHRISTOPHER A. SEEGER, ESQ.
                                        One William Street
18                                      New York, NY 10004

19                                      LEVIN, FISHBEIN, SEDRAN & BERMAN
                                        BY:  ARNOLD LEVIN, ESQ.
20                                      510 Walnut Street, Suite 500
                                        Philadelphia, PA 19106-3697
21
                                        GIRARDI KEESE
22                                      BY:  THOMAS V. GIRARDI, ESQ.
                                        1126 Wilshire Boulevard
23                                      Los Angeles, CA 90017

24                                      THE LANIER LAW FIRM
                                        BY:  W. MARK LANIER, ESQ.
25                                      6810 FM 1960 West
                                        Houston, TX 77069
```

```
 1                                    LEVIN PAPANTONIO
 2                                    BY:  TROY RAFFERTY, ESQ.
                                      316 South Baylen Street, Suite 600
 3                                    Pensacola, FL 32502

 4                                    WEITZ & LUXENBERG
                                      BY:  PERRY WEITZ, ESQ.
 5                                    700 Broadway
                                      New York, NY 10003
 6

 7    FOR COHEN, PLACITELLA & ROTH
      AND ERIC WEINBERG:             MARGARET E. WOODWARD, ESQ.
 8                                    3701 Canal Street, Suite C
                                      New Orleans, LA 70119
 9
                                      ROBERT E. ARCENEAUX, ESQ.
10                                    47 Beverly Garden Drive
                                      Metairie, LA 70001
11
                                      AJUBITA, LEFTWICH & SALZER
12                                    BY:  PASCAL F. CALOGERO, JR. ESQ.
                                      1500 Energy Centre
13                                    1100 Poydras Street
                                      New Orleans, LA 70163-1950
14
      FOR ESCOBEDO,
15    TIPPIT & CARDENAS:             HOCKEMA & LONGORIA
                                      BY:  DAVID H. HOCKEMA, ESQ.
16                                    600 E Nolana Avenue, Suite 202
                                      McAllen, TX 78501
17
      FOR ANAPOL SCHWARTZ:           ANAPOL SCHWARTZ
18                                    BY:  SOL H. WEISS, ESQ.
                                      1710 Spruce Street
19                                    Philadelphia, PA 19103

20
      FOR CATHERINE SNAPKA:          BEIRNE, MAYNARD & PARSONS
21                                    BY:  JACK E. URQUHART, ESQ.
                                      1300 Post Oak Blvd., 25th Floor
22                                    Houston, TX 77056

23                                    BECNEL LAW FIRM
                                      BY:  KEVIN P. KLIBERT, ESQ.
24                                    106 W. 7th Street, #B
                                      Reserve, LA 70084
25
```

```
1    FOR KLINE & SPECTER:          KING, KREBS & JURGENS
                                   BY:  HENRY KING, ESQ.
2                                       REBECCA DIETZ, ESQ.
                                   201 St. Charles Avenue, 45th Floor
3                                  New Orleans, LA 70170

4

5    Official Court Reporter:      Karen A. Ibos, CCR, RPR, CRR
                                   500 Poydras Street, Room HB-406
6                                  New Orleans, Louisiana 70130
                                   (504) 589-7776
7

8

9      Proceedings recorded by mechanical stenography, transcript
     produced by computer.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1

2                          I N D E X

3

4    WITNESS:                                    PAGE/LINE:

5

6    PROCEEDINGS RELATED TO ESCOBEDO, TIPPIT & CARDENAS

7

8    JOE ESCOBEDO, JR.

9

10      Direct Examination by Mr. Hockema         20/2

11      Cross-Examination by Mr. Blizzard         55/5

12      Redirect Examination by Mr. Hockema       79/4

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2                   (MONDAY, MAY 9, 2011)

 3                     (MORNING SESSION)

 4

 5        (OPEN COURT.)

 6             SPECIAL MASTER JUNEAU:  Let me just put this on the

 7    record, Mr. Herman.  We're here to conduct a hearing that is

 8    ordered in a scheduling order by the Special Master in re:  Vioxx

 9    Product Liabilities Litigation.  These hearings are held pursuant

10    to the authority given to me by the designated judge, Judge Fallon,

11    to conduct whatever proceedings I deemed necessary regarding the

12    fee dispute that has arisen in this case.  A scheduling order was

13    issued, and in a minute I'll put some general exhibits into

14    evidence.  But we're here to commence the hearings, which were set

15    out in the scheduling order that I previously produced.

16             Let's first of all make some appearances for the record.

17    From Mr. Herman.

18             MR. HERMAN:  Yes, your Honor.  May it please the court,

19    every member of the court-appointed Fee Allocation Committee as

20    appointed by Judge Fallon is present.  We'll call on each one of

21    them to state their appearance.

22             MR. BLIZZARD:  This is Ed Blizzard from Blizzard,

23    McCarthy & Nabers in Houston, Texas.

24             MR. GIRARDI:  Tom Girardi from Girardi & Keese in Los

25    Angeles.
```

```
 1              MR. BIRCHFIELD:  Andy Birchfield, Beasley Allen.

 2              MR. SEEGER:  Good morning, Special Master Juneau, Chris

 3    Seeger from Seeger, Weiss.

 4              MR. WEITZ:  Perry Weitz, Weitz & Luxenberg.

 5              MR. RAFFERTY:  Troy Rafferty with Levin, Papantonio.

 6              MR. LEVIN:  Arnold Levin, Levin Fishbein.

 7              MR. LANIER:  Mark Lanier with the Lanier Law Firm.

 8              MR. HERMAN:  Your Honor, without having to repeat any

 9    names, every member of the Plaintiffs Negotiating Committee as

10    appointed by Judge Fallon also, and with the advice and

11    recommendation of Judge Higbee, Judge Chaney, and Judge Wilson, who

12    also advised Judge Fallon in the appointment of the Fee Allocation

13    Committee.

14              SPECIAL MASTER JUNEAU:  Let me have the appearances from

15    the other side.

16              MR. HOCKEMA:  Master Juneau, David Hockema, Hockema &

17    Longoira for ETC objector.

18              SPECIAL MASTER JUNEAU:  I know we have some --

19    Ms. Woodward.

20              MS. WOODWARD:  Margaret Woodward on behalf of the nine

21    remaining objectors.  With me is --

22              MR. ARCENEAUX:  Robert Arceneaux.

23              MS. WOODWARD:  And Pascal Calogero, liaison counsel for

24    the objectors.  The three of us also appear on behalf of Cohen,

25    Placitella & Roth, and the firm of Eric Weinberg.
```

1          SPECIAL MASTER JUNEAU:  All right.

2          MR. KING:  Henry King and Rebecca Deitz on behalf of

3    Kline & Specter, and we also have Mr. Shane Specter from that firm.

4          MR. URQUHART:  Jack Urquhart for Kathryn Snapka, who is

5    also present.

6          SPECIAL MASTER JUNEAU:  Thank you.

7          MR. HERMAN:  Your Honor, there is some difficulty in the

8    back --

9          SPECIAL MASTER JUNEAU:  Hearing?

10          MR. HERMAN:  Yes.  May it please the court, the record

11    should reflect not Mr. Calogero, but Chief Justice Calogero

12    retired.

13          Your Honor, we have reached -- we have presented you with

14    minutes, I'm sorry, with briefs, letter briefs, they're up there,

15    from myself and Ms. Woodward as to the minute issue, and I believe

16    that, as relates to a witness, Mr. Markowitz, that objectors intend

17    to call, Ms.  Woodward has a statement to make regarding that

18    witness, and also has indicated she has a statement to make as

19    regards time limitations.

20          After she concludes, I have a very brief statement to

21    make as regards time limitations.

22          SPECIAL MASTER JUNEAU:  Ms. Woodward.

23          MS. WOODWARD:  Thank you, your Honor.  Your Honor, as you

24    know, because it's already a matter of record, we have objected to

25    the length of this proceeding, to the dearth of discovery leading

1   up to this proceeding.

2          Prior to this proceeding, every objector was held to an

3   affidavit of three pages in length, to a 30-minute presentation to

4   the facts, which was not adequate to explain or describe the work

5   of dozens of attorneys and staff conducted over a period of years

6   and many cases involving hundreds of cases.  And for that reason,

7   we believe that this one-week proceeding, which you have outlined,

8   allowing each of the objectors one and a half hours of direct

9   testimony will not suffice to have them explain the full scope of

10  their activities for the common benefit, which is, of course, the

11  issue that's before the court.

12         Having said that, though, I understand that that is the

13  court's ordered proceeding.  We will abide by it.  We are prepared

14  to comply with it, and I just note my objection for the record.

15  However --

16         SPECIAL MASTER JUNEAU:  Before you go on, let me, just so

17  we'll have a complete record.  I want the record to reflect that

18  I've indicated to all counsel that all of their briefs and all of

19  their submissions that they have made will be made part of the

20  record, which are very, very extensive I might add.

21         The second thing is that pursuant to a meeting I had with

22  counsel, there was a concern or an interest in obtaining a meeting

23  or meeting with Mr. Philip Garrett, who was the court-appointed CPA

24  in this matter.  I permitted that.  It's my understanding that was,

25  in fact, performed by either you, Ms. Woodward, or someone on your

1    behalf.

2            Additionally, I had ordered that we have hearings in this

3    matter, which are, in fact, scheduled, I'll discuss that at length

4    amongst the parties.  I think I indicated my clear intent to afford

5    people their opportunity to explore the issues that we have here.

6            I also permitted and allowed and it was, in fact,

7    conducted, an extensive, very extensive deposition of the

8    designated member of the FAC, which was conducted this past Friday,

9    that was done here in New Orleans.  I've indicated to the parties

10   that unless there's some specific objection on having to do with an

11   objection that was made at the time of the hearing, it would be my

12   intent to allow that deposition into evidence.  And that, in

13   essence, I want to put that in the record because that totally

14   completes what we have done and what we are trying to do in this

15   proceeding we have here before the court.

16           Now, excuse me, you wanted to say something?

17           MS. WOODWARD:  I was only going to add that due to the

18   time constraints in testimony, which we will abide by, a number of

19   the objectors are going to have to make out a good part of their

20   case with additional documentary evidence.  And by that, I mean

21   documentary evidence that is not already contained in the record,

22   in some cases, hundreds of e-mails and other documents, which in an

23   hour and a half will not even be able to be individually

24   identified, marked, and we're just going to shove them at the court

25   and I want to --

 1            SPECIAL MASTER JUNEAU:  I'll take them.

 2            MS. WOODWARD:  Thank you very much.

 3            Finally, this morning after we left chambers another

 4  issue has arisen with the fact.  As I noted a moment ago, half of

 5  the original 18 objectors whom we represented have reached an

 6  agreement with the FAC.  On Friday at the conclusion of

 7  Mr. Birchfield's deposition, we had asked that Mr. Herman provide

 8  us with the details of those agreements; specifically, we want to

 9  know how much each of those accepters, each of those now accepters

10  has agreed to take in the FAC's recommendation.  Mr. Herman said at

11  that time that he would provide that information.

12            This morning he advised me that he wants written approval

13  from each of the accepters.  We don't have time to collect that,

14  and I don't believe it should be required that we collect it.  This

15  is not a settlement, understand, this is simply a recommendation by

16  the FAC to the court, not unlike every other recommendation it has

17  made for every other accepter.  And all of those acceptance forms

18  by order of Judge Fallon have been accumulated at Exhibit K in the

19  FAC exhibits.  So we have them for everybody but our former

20  clients, and we would like to have it for everybody.

21            SPECIAL MASTER JUNEAU:  Let me hear Mr. Herman address

22  that issue.

23            MR. HERMAN:  May it please the court, learned counsel

24  opposite misunderstood me.  I said all that learned counsel has to

25  do is tell me that she has received consent from the clients that

```
 1     she represented up until last week.  I don't want to be in a
 2     position of a 4.2 violation or any other violation.  I am not
 3     asking for anything in writing, I'll take counsel's word for it.
 4     And when counsel tells me that her clients approve releasing the
 5     information, no problem.  We'll be happy to do that.  I can't speak
 6     for those people, I don't represent them.
 7              So the issue is not getting anything in writing.  All
 8     counsel has to do is say, look, my former clients say that you can
 9     give me the information and we'll give it.
10              Now, as to other issues, I'll try to make this brief.
11     Not an easy task for me, your Honor.
12              November 17th, 2007, there was a contract entered between
13     Merck and those attorneys wishing to avail themselves of a Master
14     Settlement Agreement.  It's been in existence then, now and ever
15     since, it's been posted on three Web sites:  The PSC Web site, the
16     BrownGreer Web site and the court's Web site.  The court, Judge
17     Fallon has made it clear numerous times on the record and in order
18     that he wants and will insist upon a transparency and due process,
19     which the Special Master has utilized both transparency and due
20     process.
21              There is more transparency and due process in the MSA
22     which governs these activities, along with your directive and the
23     court's directive, than in any case I know about heretofore.
24              In addition to the matters that your Honor mentioned,
25     immediately following the MSA in December, members of the
```

1  negotiating committee traveled to a number of states answering

2  questions about the application of the MSA.  99.9 percent of all

3  eligible folks went through the MSA, including clients of every

4  objector.

5        In addition to that, the court directed that the Fee

6  Allocation Committee should get affidavits from each objector and

7  each applicant, which was done.  Every applicant was given an

8  opportunity for an oral presentation with a court reporter.  That

9  was done.  The Fee Committee has followed the process directed by

10 Judge Fallon to the letter, and we just want to indicate that the

11 objectors had an eight and a half hour deposition, which was

12 extended beyond the Federal Rules of Civil Procedure, that's fine.

13 Your Honor certainly has discretion to do that.  They have

14 submitted multiple briefs, including since Friday.  They have been

15 given a very fair opportunity.

16       The last comment that I have to make, your Honor, that is

17 again on the record, that there are no mini trials in fee disputes

18 of this type, and that is why there has been transparency, there

19 has been due process, and there's been fair opportunity which will

20 conclude with the hearings this week.

21       The last thing that I would like to say is that

22 Ms. Woodward should state on the record that Mr. Markowitz, on

23 behalf of all objectors, will only be a fact witness, if he is

24 called, and not an opinion witness.  And I'd like that statement on

25 the record before we commence.

1          SPECIAL MASTER JUNEAU:  All right.  Ms. Woodward, let's

2    address that and the other issue.

3          Before we get to that, Mr. Herman said that you simply

4    say, get someone to speak on behalf of all of the objectors who

5    have disposed of their issues that they authorize the release of

6    that information.  Can you say that?

7          MS. WOODWARD:  I cannot say that, your Honor, and we have

8    not been required to get consent from the rest of the universe of

9    accepters.  That is a public record.  It is part of the

10   court-ordered transparency.  We have it for the rest of the

11   accepters, we only don't have it for our clients.  And I don't see

12   any reason for us to be required to produce that.

13         SPECIAL MASTER JUNEAU:  This is going to be my ruling in

14   this regard:  We went through an extensive objection process, these

15   objectors objected, I am concerned, that seems to me one step

16   removed from what has taken place thus far.  I don't see the big

17   difficulty in getting a consent agreement for these people to

18   release the information, and he says they'll make that available.

19   I can understand the reluctance not to give it, not having the

20   consent of those people.  We don't want further litigation, we

21   don't want further protraction of these issues.

22         So my ruling is, I would ask you to seek to get that

23   authority because I am not going to release it without some

24   indication from people that that information ought to be released,

25   and I understand what your argument is.

```
 1              MS. WOODWARD:  I understand.  I object, and we will
 2      attempt to comply.
 3              SPECIAL MASTER JUNEAU:  The second thing has to do with
 4      Markowitz.
 5              MS. WOODWARD:  Yes, the fact witness.
 6              SPECIAL MASTER JUNEAU:  No --
 7              MS. WOODWARD:  On behalf of all objectors whom I
 8      represent and my clients, Cohen, Placitella & Roth and the law firm
 9      of Eric Weinberg, Mr. Markowitz, if called at all, will be called
10      only to testify on subjects of data analysis and without offering
11      an opinion.
12              MR. ARCENEAUX:  I would like to explain that further --
13              SPECIAL MASTER JUNEAU:  You have to speak up.
14              MR. ARCENEAUX:  I've been the one -- I just don't want
15      there to be any confusion because sometimes the difference between
16      fact and opinion can get blurred.
17              What Mr. Markowitz is going to testify to is that he took
18      the two databases that Mr. Garrett used, one is an access file
19      database, one is on Mr. Garrett's Web site.  Through his skill and
20      training as a data analyst and programmer, he merged those two
21      databases into a single database and has constructed an Excel
22      spreadsheet that contains all of the information that's in
23      Mr. Garrett's two separate databases in one Excel spread table.
24      And he is going to testify that if you want to say -- use the word
25      opinion, in his opinion, what he's done is a correct representation
```

1    of everything that's in those two databases.

2            I don't happen to think that's a matter of opinion, I

3    think that's a matter of fact.  He is a programmer, he is subject

4    to cross-examination on whether the programming skills that he

5    brought to bear on the task were adequate.  But he is not going to

6    be opining about conclusions of any sort whatsoever, he is simply

7    going to testify about the process he used to take these two

8    databases and combined them into one single, huge Excel spreadsheet

9    that contains all of the information, all of the Garrett data in

10   one place.  That's the sum and substance of Mr. Markowitz.

11           SPECIAL MASTER JUNEAU:  Counsel, if you want to --

12           MR. ARCENEAUX:  That's the sum and substance, and I just

13   want to make clear --

14           SPECIAL MASTER JUNEAU:  This is not rocket scientist

15   stuff I am talking about.  Are you finished and Mr. Herman, do you

16   want to address that?

17           MR. HERMAN:  I want to let the court reporter know this

18   is Mr. Robert Arceneaux, with an X.

19           Okay.  Counsel, I did not understand Ms. Woodward's

20   statement or this qualification.  Is it stated on this record that

21   Mr. Markowitz is only a fact witness and that Ms. Woodward makes

22   that statement for all objectors?  I don't want to be caught down

23   the road where some objector says, well, Ms. Woodward doesn't speak

24   for me.  So I'd like the record to be clear.

25           MR. ARCENEAUX:  I think, your Honor, I've been very clear

```
 1    about the sum and substance of Mr. Markowitz's testimony.  We do
 2    not consider that expert opinion evidence, but he will be qualified
 3    as an expert given his extensive --
 4              SPECIAL MASTER JUNEAU:  Let me interrupt you --
 5              MR. ARCENEAUX:  But he is not going to be offering an
 6    opinion.  He is going to merely be telling you what he did to bring
 7    these two databases together into one database and presented in a
 8    different format.
 9              SPECIAL MASTER JUNEAU:  Mr. Arceneaux, you weren't in
10    chambers where it was very clearly told me, because I asked a
11    precise question, I said, all I need to know is:  In what capacity
12    is this gentleman going to be called?  And I was specifically told
13    he would not be called as an expert.  I am quoting the exact words
14    that were used.
15              Now, the purpose, obviously, of an expert witness, it
16    allows you the ability to ask for an opinion.  Now, either he is or
17    is not, I mean, going to be called as an expert.  That's all I need
18    to know.
19              MR. ARCENEAUX:  He will not offer an opinion as
20    classically thought of as an opinion, but he will state on the
21    record that his work product in his opinion, but based upon his
22    work product, is a correct representation of everything in the
23    Garrett database.  I don't think that's an opinion and I don't
24    think he needs to be qualified as an expert, but to the extent that
25    you need his assurance, that's the only slight qualification I
```

1  would make.  The sum and substance of his testimony will be as a

2  programmer about the work that he did to merge these two databases

3  into one so that we can present it to your Honor in a usable form.

4        SPECIAL MASTER JUNEAU:  I cannot make a ruling on

5  something that is not before me, but I will tell you, based on what

6  you're saying, is that you're treading very close to what I

7  consider expert testimony; and if it is, then I am going to say

8  that's excluded.  That's for your own determination.  He may be

9  presented where that's not an expert opinion you're asking, and if

10 that's the case, we're going to allow it.

11       MR. ARCENEAUX:  I suggest we deal with that issue when it

12 arises.

13       SPECIAL MASTER JUNEAU:  That's exactly what I just said.

14       MR. HERMAN:  On behalf of the Fee Allocation Committee,

15 we do not think the representation made on the record complies with

16 Rule 26, we haven't been provided what Rule 26 says that an opinion

17 witness must provide.  This is very ambiguous.  We still don't know

18 whether Mr. Arceneaux, with all due respect, and Ms. Woodward speak

19 for all objectors or just for their clients.

20       And with all due respect to learned counsel opposite, I

21 don't know what he means when he says it's not classical expert

22 opinion evidence.  We need to prepare for whatever it is, and I've

23 been told in writing and I was told in chambers that this witness

24 would only be a fact witness and that learned counsel opposite was

25 speaking for all objectors, not just her own clients.  Expert

1   testimony is always critical, I just want to know -- we don't want

2   to wait until Mr. Markowitz is called to the stand to find out in

3   what capacity he is being called.  Thank you.

4           SPECIAL MASTER JUNEAU:  Do you want to address the court?

5           MR. URQUHART:  Jack Urquhart for Kathryn Snapka.  And,

6   your Honor, actually, I am not dealing with this same issue, so if

7   we're not completed with that.

8           SPECIAL MASTER JUNEAU:  Let me make it very clear.  I

9   just asked Ms. Woodward.

10          Ms. Woodward, I understand you're speaking for not only

11  the people you represent but all objectors in these proceedings; is

12  that correct?

13          MS. WOODWARD:  Correct, your Honor, I attempted to make

14  that clear.

15          SPECIAL MASTER JUNEAU:  The ruling is going to be, I am

16  not going to allow expert testimony, I can't address that issue

17  until it's before me.  When it comes before me, if I construe that

18  to be expert testimony based on the representations that are made,

19  I am not going to allow the testimony.

20          MS. WOODWARD:  I understand.

21          SPECIAL MASTER JUNEAU:  Now, the second issue before we

22  get to the hearing.

23          MR. URQUHART:  Jack Urquhart on behalf of Kathryn Snapka,

24  and I want to re-address the minute issue just to state our

25  position on the record.

1      We are an objector.  Those folks who have recently

2  settled, I use that term, by having a new recommendation made, we

3  feel that we are entitled to see what that new recommendation is

4  regardless of this issue of consent.  I think we're entitled to

5  that for basic principles of transparency.

6      SPECIAL MASTER JUNEAU:  Okay.  Are we ready to proceed?

7  I am going to address now the matter, and we have divided up these

8  issues amongst the various objectors, and we'll take up the

9  Escobedo matter now, and I'll first ask counsel for Mr. Escobedo to

10  appear.

11      MR. HOCKEMA:  Thank you, your Honor.  For the record,

12  your Honor, David Hockema for the objector ETC, Escobedo, Tippit &

13  Cardenas, successor firm of Hockema Tippit & Escobedo, which tried

14  and handled the Felicia Garza case.

15      We would call as a witness Mr. Joe Escobedo.

16      THE WITNESS:  Take the witness stand, your Honor?

17      SPECIAL MASTER JUNEAU:  Yes, take the witness stand.

18      MR. HOCKEMA:  And if I could, your Honor, if I could not

19  question him from the lectern but question him from the table so

20  that I can use the PowerPoint?

21      SPECIAL MASTER JUNEAU:  Absolutely.

22      Raise your right hand, please, sir.

23     (WHEREUPON, JOE ESCOBEDO, JR., WAS SWORN IN AND TESTIFIED AS

24     FOLLOWS:)

25      SPECIAL MASTER JUNEAU:  Please be seated.

```
1                        DIRECT EXAMINATION
2    By MR. HOCKEMA:
3    Q.  Please state your name.
4    A.  Joe Escobedo, Jr.
5    Q.  And, Mr. Escobedo, where do you live?
6    A.  I live in McAllen, Texas.
7    Q.  And how old a man are you?
8    A.  Forty-seven.
9    Q.  What do you do for a living?
10   A.  I am a lawyer.
11   Q.  And who do you practice with at the present time?
12   A.  I'm a partner in the firm of Escobedo, Tippit & Cardenas in
13   McAllen.
14   Q.  And, Mr. Escobedo, what was the name of your former law firm
15   that you were with to try the Felicia Garza case?
16   A.  It was the law firm of Hockema, Tippit & Escobedo.
17   Q.  And, Mr. Escobedo, we have prepared -- or not prepared, we have
18   labeled and provided to opposing counsel with the FAC some 22
19   exhibits.
20            MR. HOCKEMA:  And, your Honor, we would like to offer ETC
21   Exhibits 1 through 22.  We have filed an exhibit list which has 24
22   listed.  The difference between those 22 and the 24 is, we wanted
23   to include the deposition of Mr. Birchfield, which we do not have
24   at this time, and the minutes of the FAC that the court ordered
25   produced during Mr. Birchfield's deposition.  But we do not have
```

1   those, so we would like to offer the 22 exhibits that we do have at

2   this time.

3          SPECIAL MASTER JUNEAU:  So this is the 22 that you have

4   in your possession at this time?

5          MR. HOCKEMA:  Yes, your Honor.

6          SPECIAL MASTER JUNEAU:  Any objection?

7          MR. BLIZZARD:  We don't have any objections to their use

8   during the hearing, to the exhibits used during the hearing.  To

9   the extent that there are newspaper articles or other things that

10  are in there that we haven't really had a chance to go through it

11  completely, we would like to reserve the ability to object later.

12  But since we don't think we are going to have any objection, we

13  certainly don't object to them using these with the witness.

14         MR. HOCKEMA:  And we are not going to use each one of

15  them with the witness, we just want them in for the record.  And

16  the things he referred to are three Beasley Allen Web site

17  references to the Garza case.  We have no newspaper articles, but

18  we do have three Web sites from Beasley Allen talking about the

19  Garza case.

20         SPECIAL MASTER JUNEAU:  Ms. Woodward.

21         MS. WOODWARD:  For the record, your Honor, I just want a

22  clarification on who is representing the FAC in this proceeding.

23  It was my understanding that the FAC had two co-lead counsel, we've

24  just heard from another member of the FAC.  I just want an

25  understanding --

```
 1              SPECIAL MASTER JUNEAU:  I am only allowing one counsel to

 2    examine a witness, I am not allowing duplicate questions by

 3    counsel.  Now, there's eight objectors I am going to allow; if they

 4    want to designate one objector, a different objector, that's fine.

 5              MS. WOODWARD:  I understand that ruling and we are fine

 6    with that.  But does that mean that the counsel who is handling the

 7    cross-examination will also be handling all of the objections?  We

 8    are not going to hear objections from anybody who might want to

 9    jump up?

10              SPECIAL MASTER JUNEAU:  He will handle the objections.

11              MS. WOODWARD:  I understand, thank you.

12              MR. BLIZZARD:  Your Honor, if all we're talking about is

13    the Beasley Allen Web site, they are based on some newspaper

14    article, but we have no objection.

15              SPECIAL MASTER JUNEAU:  Then let Exhibits 1 through 22

16    in.  They're labeled ETC?

17              MR. HOCKEMA:  They are just labeled plaintiff's exhibits

18    because that's the only kind of labels we have.  That's all we do.

19              SPECIAL MASTER JUNEAU:  Well, in a minute we can just

20    mechanically do this because I am going to be dealing with

21    different objectors.  Why don't you put the initials ETC, the

22    initials of the objector.

23              In a minute if you would just change those to reflect

24    that ETC 1 through 22 so I can identify these by separate

25    objectors.
```

1        But let those exhibits be received into evidence.

2   BY MR. HOCKEMA:

3   Q.  Mr. Escobedo, in the limited time we have, I would like to take

4   you through what our firm did in the Garza case, and we have a

5   PowerPoint that, for the use of the court, opposing counsel and

6   you, may simplify going through.

7        And before we go through it, though, we have in evidence

8   Exhibit 18, which is the brochure from our law firm HTE, and I

9   think it sets forth the number of verdicts that we had in excess of

10  $10 million in product liability jury trial prior to the Garza

11  case, does it not?

12  A.  That's correct.

13  Q.  And in your experience as a lawyer -- are you board certified?

14  A.  Yes, I am board certified in personal injury trial law.

15  Q.  And, Mr. Escobedo, just summarize for the court your education

16  and experience.

17  A.  Graduated University of Texas Law School in 1989, started with

18  a civil defense firm Addison Hall doing primarily products

19  liability defense for about five years.  After that, I went --

20  started doing the same thing on the plaintiff's side, and for the

21  most part since then, for the last 15, 16 years, I've been involved

22  in the plaintiff's side personal injury, primarily products

23  liability cases.

24  Q.  And prior to the Garza case, what type of product liability

25  cases did our firm deal with?

1   A.  Primarily we did auto product liability cases.  We also did

2   household, but primarily --

3   Q.  Industrial machinery, all types of products?

4   A.  Right.

5   Q.  I believe we had only done two pharmaceutical cases prior to

6   Garza?

7   A.  That's correct.

8   Q.  Now, do you recall when you first met Mrs. Garza?

9   A.  I met -- I first met Ms. Garza, I was a defense lawyer when I

10  first met Ms. Garza, she was assisting you.  You were on the

11  opposite side of the case that I had and she was assisting you as a

12  jury facilitator.

13  Q.  She was helping me pick a jury in the case of *Lopez v.*

14  *Westinghouse*?

15  A.  That's correct.

16  Q.  Unfortunately, you were on the defense side, but that was

17  another verdict in excess of eight figures, correct?

18  A.  Unfortunately, yes, that's correct.

19  Q.  And after that I hired you away?

20  A.  Yes, that's correct.

21  Q.  Now, when did you first become involved with Vioxx litigation?

22  A.  We were hired by the Garza family in 2002.  One of the sons,

23  Leo Garza, had heard, seen something on TV.  Their father had died

24  and they knew that he had been prescribed Vioxx.  They didn't know

25  what it was, but they knew he had been prescribed Vioxx but didn't

1   think anything of it until they had seen something on a news show

2   like a *20/20* or something like that.

3   Q.  And how many people were in our firm at the time?

4   A.  We were five lawyers.

5   Q.  And are those five lawyers and the support staff and their work

6   on the Garza case reflected in the time records that we have

7   submitted here in the MDL?

8   A.  Yes.  Eventually all -- initially, I was primarily involved in

9   the Garza case, but when it came to trial, all -- everybody in the

10  firm was involved.

11  Q.  And tell us specifically what the firm did after we were

12  retained by the Garza family in 2002.

13  A.  After we were retained in 2002, we just hatched our

14  investigating the claim, started looking up Vioxx, started getting

15  all of the FDA documents.  We came across an article that had been

16  written by a gentleman by the name of David Miceli, which I believe

17  was the Beasley Allen firm at the time.  And I believe the title of

18  that article was, "Vioxx - Should We Litigate This Drug," or

19  something like that.

20          We traveled to his office, we met with him.  He was very

21  helpful and provided us information.  So that was part of it.  And

22  then we had to start looking for experts.

23          At the time, at this time frame there weren't that many

24  cases, there weren't that many people working on Vioxx.  I mean, as

25  far as I know, there was maybe a handful.  Mr. Miceli, as I

1   mentioned; Sanford, Shelly Sanford in Houston.

2   Q.   Shelly Sanford and Carlene Lewis?

3   A.   Yes.  In Houston, so we talked to them as well.  And we started

4   the process of investigating whether or not there was a claim.

5   Q.   And did you hire experts?

6   A.   We did.

7   Q.   And was one of the experts that you hired Americo Simonini?

8   A.   Yes, Americo Simonini from Los Angeles, that's correct, he's a

9   cardiologist.

10  Q.   And did he ultimately testify in the Garza case?

11  A.   He did.

12  Q.   And did Mr. Girardi ultimately use him in a case in California?

13  A.   Yes.  After the Garza case, I got -- received a call from

14  Mr. Simonini basically to inquire, telling me that other lawyers

15  were asking to hire him and wanted to know what I felt about it.  I

16  said, "Go do the work."  I thought he did a great job in our case,

17  and I thought he would do an equally good job in everybody else's

18  cases.

19  Q.   When was the Garza case filed?

20  A.   In 2003, I believe.

21  Q.   And is the original petition in the Garza case in evidence as

22  Exhibit No. 7?

23  A.   It is.

24  Q.   And what did Merck do after the Garza case was filed?

25  A.   In our part of the country, defendants, if they can, they will

1  remove cases to federal court.  They'll do anything to try to get

2  the case to federal court.  They removed us to federal court

3  claiming that we had fraudulently joined the doctors, the defendant

4  doctors.

5  Q.  And what was the outcome of that removal eventually?

6  A.  We eventually got it remanded and got it back in state court.

7  Q.  And after getting the case back into state court, did we start

8  engaging in discovery?

9  A.  Yes, we did.  Like I said, we already had some information that

10  we had gotten both from our own research and also some research

11  that Mr. Miceli had provided to us, and documentation that

12  Mr. Miceli provided to us.  So at that point we began the discovery

13  process.

14          And as anybody that's ever litigated one of these cases

15  I'm sure can attest to, it wasn't easy.  It look ten motions to

16  compel, I believe, total.  Finally millions of pages were produced

17  by Merck.

18          What we did at that time, and we still do, we have data

19  summation software and we kept -- all of them were Bates stamped.

20  If they weren't Bates stamped, we Bates stamped them ourselves.

21  And we kept track of them through summation.

22          I read every document that was produced.  At that time, I

23  was primarily involved along with one of my associates and read

24  every document, annotated them on summation, and when I thought I

25  was ready to start depositions, I requested depositions.

1   Q.  And were you the one in our firm that took all of the

2   depositions of the Merck corporate representatives in three

3   different rounds of depositions?

4   A.  I was.

5   Q.  And you and Mr. Ruiz of our firm were the ones that primarily

6   reviewed all of the documents, correct?

7   A.  At that time, that is correct.

8   Q.  And you and Mr. Ruiz reviewed all of the documents, assembled

9   them, and I guess for lack of a better word, culled them into the

10  usual documents?

11  A.  Yeah.  I mean, obviously there was consultations where we have

12  our firm meetings, we would consult with all of the other lawyers

13  and keep them apprised of what was going on with the case.  But at

14  that point, that's correct, I was the one reviewing the documents,

15  Mr. Ruiz was the one that was helping me when we'd go up to New

16  York to do depositions.

17  Q.  And during the discovery phase, were you also consulting with

18  Mr. Miceli and Ms. Sanford on the documents that Merck produced to

19  us to make sure they were producing the same things they were

20  producing to everyone?

21  A.  Right.  The way we did that was, we knew the depositions that

22  were being taken, Mr. Miceli had taken some, and there were some I

23  think -- actually, at that point in time, him and Ms. Sanford's

24  firm, I think, had taken almost all of them, except for one, if I

25  remember correctly.  So we got those depositions, obviously part of

1    my work in that case was reading them.

2           So the way we kept track of everything was, we just --

3    they were producing -- at one point Merck said, we got them to be

4    producing, everything was being produced in all of the other cases,

5    including the depositions.

6    Q.  Merck at one point of the discovery sought to produce the same

7    thing to everyone to not get caught on these motions to compel with

8    hiding the ball?

9    A.  That's correct.  And that's why you see the Bates numbers.

10   Some of the documents that are produced to us have Bates numbers

11   that relate to other cases because that's the way they were

12   produced by Merck.

13   Q.  And the early documents produced, they wouldn't produce them on

14   Bates numbers and we gave them our own Bates numbers, HTE?

15   A.  The first batch of documents produced by Merck, they were

16   produced on CDs and, yeah, they didn't have, they did not have

17   Bates numbers.  They were just all -- actually, what they were at

18   that point was just a bunch of junk that they were producing

19   initially.

20   Q.  And how many Merck cooperate representatives' depositions did

21   you take personally?

22   A.  I think around -- close to ten.

23   Q.  And were those shared with the other plaintiff lawyers?

24   A.  Sure, yes.

25   Q.  And were there some Merck corporate representatives that you

1    deposed that had never been deposed before?

2    A.   There were a number of them.  One of them was Thomas Bold, he

3    was in charge of the physicians group; and they had produced a lady

4    by the name of Ms. Nancy Santanello.  And when I reviewed her

5    deposition, it was very apparent that there was something else

6    there.  She wasn't able to testify as to this particular group.

7    She would make reference to it in her deposition, but she wasn't

8    able to testify to it.  So I got Merck to produce Mr. Bold, and I

9    was the first one to depose him.

10   Q.   Was he subsequently deposed by someone else?

11   A.   He was subsequently deposed by -- in the Vioxx litigation, by a

12   lawyer with the Girardi firm.

13   Q.   Mr. Escobedo, the depositions of people like Alise Reicin,

14   Deborah Shapiro, people that you deposed that had also been deposed

15   on prior occasions by other lawyers, were those depositions that

16   you took, as well as the other depositions, used in our Garza

17   trial?

18   A.   Yes.  I mean, a number -- basically, what was happening is,

19   everybody was asking for corporate rep depositions.  And you said I

20   think in federal court you set the areas of examination you want

21   the witness to produce, so obviously Merck was producing the same

22   witnesses over and over again.

23            You can advance the PowerPoint if you want.  Those are

24   our answers that we talked about.

25   Q.   These are the experts we hired?

1    A.  Yes, Mr. Edwards and then two cardiologists.  The lawsuit was

2    filed -- or not the lawsuit but the remand.  That's what we did.

3    Our first trial setting was November 8th, 2004.

4    Q.  Now, coming up to the first trial setting, were we -- had we

5    completed most of our discovery with Merck with the exception of

6    trying to get their documents on Arcoxia?

7    A.  Well, at that point, I believe at the next trial setting we

8    certainly had.  That's the very first trial setting.

9    Q.  And on this trial setting did it go to trial on this day?

10   A.  No, we did not.  It got continued at that point.  So it was

11   before the deposition, so that's why it got continued.  Those are

12   the depositions that I took in this case.

13   Q.  First round, the second round.

14   A.  Right.  Ms. Reicin was obviously a very important witness.  I

15   filed a motion with the court for -- so I could have more time with

16   her.  In Texas we're limited to six hours; I asked for eight.

17   Richard Josephson called me and said I will give you seven, so I am

18   not going to fight about an hour.  So I deposed her for seven

19   hours.

20   Q.  Did she testify in the *Garza* case?

21   A.  She did not.  She had testified in the *Ernst* case, but for some

22   reason they made a decision not to bring her in the *Garza* case.

23   Q.  And we designated our experts?

24   A.  That's correct.

25   Q.  Third round of corporate depositions?

1    A.  Right.  There was Mr. Silverstein was deposed, the PIRs were

2    being sent to doctors, this was information we had discovered in

3    the previous depositions, what Merck was telling the doctors

4    through these Physician Information Requests, which ended up to be

5    very important.

6            And then the other one was Nancy Santanello.  There was

7    an issue relating to the circulation article, and Carolyn Cannuscio

8    with Merck scheduled the information in the article.  Merck

9    required Ms. Cannuscio's name be withdrawn from the article.  And

10   Nancy Santanello ended up being the corporate rep at trial for

11   Merck.

12   Q.  And I believe we put her on as the first witness, correct?

13   A.  We did.  We had her on -- she was actually almost on the stand

14   for the first week of trial.

15   Q.  Now, the progress of the Garza case up until trial, I am going

16   to bring you through 2004 and when Merck designated their expert

17   witnesses in late 2004.  What was significant about that?

18   A.  The significance of the Merck designation was the fact that

19   they produced reports as well, and their experts basically opined

20   in their reports there was absolutely no evidence whatsoever that

21   Vioxx had any prothrombotic tendency or Vioxx caused clots.  And as

22   a result of that, obviously subsequent to that, the drug was

23   withdrawn for having those prothrombotic tendencies and Merck had

24   to get new experts.

25   Q.  They had to kind of eat those reports?

1    A.  Yes.

2    Q.  Then Merck asked for a continuance, and they moved the trial to

3    February of '05?

4    A.  Yes, that's correct.  And at that point we were ready to go, we

5    were trial ready at that point.

6    Q.  And after they moved it to February, we then were litigating in

7    the Court of Appeals until they filed a writ of mandamus against

8    our trial judge because he had ordered them to produce unredacted

9    copies of their Arcoxia data?

10   A.  Arcoxia was the other COX-2 drug that Merck had manufactured.

11   We made the argument, as did the MDL later on, that we were

12   entitled to all of the Arcoxia data because it was just another

13   COX-2, and we needed to see if what the data was as to Arcoxia and

14   whether Arcoxia had prothrombotic tendencies as well.

15   Q.  And at this time Merck was still denying that it had any

16   prothrombotic tendencies?

17   A.  Right, both Arcoxia and Vioxx.

18   Q.  Then we went to the Court of Appeals in San Antonio on Merck's

19   mandamus, and was Merck successful in their mandamus in keeping us

20   from getting the Arcoxia data?

21   A.  Unfortunately, yes.  The San Antonio Court of Appeals granted

22   Merck's mandamus, and we were not allowed to do discovery on the

23   Arcoxia drug.

24   Q.  And I think it is an exhibit, I don't recall the exhibit

25   number, of the San Antonio Court of Appeals opinion in re:  Merck,

1    but it is a public record.  And this was on September the 15th of

2    2004, correct?

3    A.  That's correct.

4    Q.  And in the opinion, the San Antonio Court of Appeals said -- I

5    want to ask you if you agree with this statement -- apparently,

6    significant discovery has already occurred in the underlying case,

7    and we commend all of the parties on the professional and courteous

8    manner in which they have handled the discovery requests and

9    challenges?

10   A.  Yes.  As I just mentioned, we had done extensive discovery in

11   this case by this time.

12   Q.  Were you ready to go to trial at that point?

13   A.  We were.

14   Q.  Then 15 days after this opinion Vioxx was removed from the

15   market?

16   A.  That's correct.

17   Q.  Merck filed another motion for continuance in our case?

18   A.  At that point, Merck filed a motion for continuance claiming

19   that they needed more time to analyze the data of the APPROVe

20   study, which was the study that resulted in the removal of the drug

21   from the market.

22   Q.  And at that time Merck, when they removed the drug, had stopped

23   the APPROVe study?

24   A.  I believe so, yes.

25   Q.  And their motion for continuance was that they wanted to finish

1  analyzing the data before we went to trial?

2  A.  Right.  At that point, it was the 18-month argument that they

3  made.

4  Q.  They were saying Vioxx doesn't hurt anybody except for 18

5  months?

6  A.  After 18 months, yes, sir.

7  Q.  In 2005, in January, right before we were ready to go to trial,

8  Merck filed their first motion for legislative continuance?

9  A.  Right.  The previous motion for continuance was denied, but the

10  additional motion for continuance asking for more time as a result

11  of the APPROVe study was denied.

12       In Texas, if a member of your team is a member of the

13  legislature, they can -- and the legislature is in session, they

14  can file what's known as a motion for legislative continuance.  As

15  often happens in Texas, this is abused.

16       This first motion for legislative continuance, there was,

17  I believe, a senator named Hinojosa filed this.  He had never been

18  involved in the case.  And basically, what happened was, after the

19  local media started asking him questions, he withdrew it.  He just

20  withdrew the motion for legislative continuance.

21  Q.  Did they find another legislature willing to do their bidding?

22  A.  They found another legislature and they filed their second

23  motion for continuance, and this time he wouldn't withdraw it.  We

24  filed a motion for an evidentiary hearing claiming that it was

25  fraudulent because this guy -- again, this lawyer had never been

1    involved in the litigation before, it's a last-minute thing to get

2    a continuance.  We never had that hearing because Merck didn't wait

3    for that hearing, Merck removed it to federal court anyhow.

4    Q.  Before we could have our hearing to question the representative

5    on his motion for being lead counsel, it was removed?

6    A.  That's correct.

7    Q.  On the second removal to federal court what happened?

8    A.  We immediately tried to get the case remanded because we were

9    again trial ready, we were ready to go to trial.  The local federal

10   judge down there, even though he could, he could have remanded it,

11   he chose instead to send it to the MDL.  So essentially, we were --

12   at that point we had to deal with Judge Fallon.

13   Q.  And when you refer to the MDL in January of '05 and the MDL was

14   here under Judge Fallon?

15   A.  Right.

16   Q.  And then in late '05, and I think it is Exhibit 3 in our

17   package, Judge Fallon remanded the *Garza* case with a very lengthy

18   opinion.

19   A.  Yeah.  Ten months later Judge Fallon remanded the *Garza* case,

20   and at that point and maybe even to this day, certainly at that

21   point it was the only case that he had remanded.

22          And we had a hearing, and basically Judge Fallon asked

23   me, why is your case different?  Because he wasn't hearing the

24   remands at that point.  And I said, "It's different, Judge, because

25   we're trial ready."  This is the second motion for -- the second

1    removal.  It was just done to do away with the trial setting.  At

2    that point they had been successful, the trial setting was gone.

3    Judge Fallon remanded the case back to state court in Texas, and he

4    did write a lengthy opinion where he referred to Merck's actions as

5    curious, at best.

6    Q.  Referring to their five different attempts to continue the

7    case?

8    A.  Yes, sir.

9    Q.  And were we the only ones that wanted Garza remanded for trial

10   from the MDL?

11   A.  No, sir.  We were being encouraged by people in the MDL.

12   Mr. Herman was helpful.  We needed just to get heard, number one.

13   And Kathy and I, Ms. Snapka, she was -- we got her involved in the

14   case, and we were basically trying to get heard, to have our motion

15   for remand heard.  We were supported in that endeavor by

16   Mr. Herman, by other leaders in the MDL --

17   Q.  You mean the Plaintiff Steering Committee?

18   A.  Yes.  I mean, we were trial ready, everybody knew we were trial

19   ready, and everybody was encouraging us to go and get it back to

20   state court and hopefully get the big verdict.  At that point, I

21   don't believe the MDL was in any position to be trying cases at

22   that point.

23   Q.  Had Mr. Lanier already tried his *Ernst* case at this point?

24   A.  At that point, I don't remember.  Certainly I think it was

25   pretty close.  I mean, yeah, I think so.

1   Q.  I think he tried it before we got remanded?

2   A.  Yes, I believe so.

3   Q.  And did the *Garza* case go to trial?

4   A.  Yes, it did, in January of 2006.

5   Q.  And when we began the trial, was it being followed by the

6   Plaintiff Steering Committee and people in the MDL?

7   A.  Yes, there were people down there.  I believe somebody with

8   Ms. Sanford's office was down there.  And they were also helpful.

9   We needed to get -- there was a couple of depositions that we had

10  not been able to get because we were stayed.

11          At that point, the stuff -- what happened with the *New*

12  *England Journal of Medicine* article that came up, and there were a

13  couple of depositions, Topol, I believe, is one of them, and there

14  is another one that we needed, we wanted to use.  And we were

15  allowed to use those depositions that had been taken by -- in the

16  MDL.

17  Q.  But -- and we used the MDL's material on all of the *New England*

18  *Journal*, Topol, Curfman, and that controversy, where Merck was

19  involved in the *New England Journal of Medicine*, correct?

20  A.  Right.  That all happened while we were basically -- couldn't

21  do anything.  We were trying to get it remanded back.  They had

22  taken those depositions and they allowed us to use them.

23  Q.  Basically, we used the 2005 depositions from the MDL to

24  supplement all of the discovery which we had done for a year and a

25  half?

1    A.  Right.

2    Q.  Now, and when we went to trial, and I think Exhibits 8, 11 and

3    22 reflect Beasley Allen Web site's report on the Garza trial as it

4    went along and the verdict when it was finished, correct?

5    A.  Right.  I mean, it was being -- we were -- it was obviously

6    being followed by the MDL, and Judge Fallon was reporting on it on

7    some minute entries that I believe are in the exhibits.  We were

8    talking to people, leadership in the MDL; it was being followed,

9    yes.

10   Q.  And how many trials have you been involved in, Mr. Escobedo?

11   A.  Too many.  More than -- I can't count.  More than 30, I don't

12   know.

13   Q.  How would you judge the complexity and difficulty of this trial

14   compared to our usual product liability cases against auto

15   manufacturers and industrial equipment manufacturers?

16   A.  Well, those cases are complex.  All products liability cases

17   tend to be complex.  The difference here was, as I mentioned

18   before, we had primarily done -- been involved in auto cases, as

19   well as household product cases, industrial product cases.  We had

20   done a little bit of work in the drug pharmaceutical side but not

21   that much.

22          At some point, I believe, Ms. Snapka talked to you, and

23   we knew that she had tried cases involving pharmaceutical

24   litigation so we got her involved.

25          But to answer your question, this is the hardest trial

1    we've ever been involved in.  We're five lawyers and we're going up

2    against the very large firms from Houston and from New York.  What

3    we did basically is tried to get the best trial team we could.  All

4    of our lawyers, Kathy Snapka as well, we hired an appellate counsel

5    Kevin Dubose out of Houston to be there basically because every day

6    we were met with motions from Merck and we needed -- so we had

7    lawyers that were just in charge of motions that had to be argued

8    that morning before we got to the substance of the trial.

9            And the other thing that made it very difficult was just

10   the way the case was tried.  It was tried once a week -- one week a

11   month.  In other words, it was the first week of every month, it

12   took four weeks to try.  That's why it started in January but it

13   didn't end until April.

14   Q.  Now, Mr. Escobedo, the trial itself didn't last, as you said,

15   four full months, but it was a one week a month for about four

16   months, correct?

17   A.  That's correct.

18   Q.  Ultimately, the verdict came down in April of 2006, I believe,

19   correct?

20   A.  That's correct.

21   Q.  And before we get to the verdict, though, during the trial

22   itself, were we in contact from time to time with the

23   representatives of the PSC that were there monitoring the trial?

24   A.  Yes.  I mean, there was a gentleman there that was from

25   Ms. Sanford's firm, I forget his name, he was sort of our contact.

1    And if we needed anything, like, for example, there were things --

2    things came up during the trial and we did need things, and we

3    would talk to him.  Kathy knew some lawyers better than I did and

4    she would get -- she was kind of the contact, the "go-to" person

5    for me to go do that.

6    Q.  Now, did we ultimately get a verdict?

7    A.  We did.

8    Q.  And -- well, let me ask you this:  In evidence are various

9    minute entries by Judge Fallon which track the *Garza* case from its

10   inception up until the verdict.

11   A.  Yes.

12   Q.  And in the minute entry by Judge Fallon, he notes that Merck is

13   going to appeal because the $32 million verdict was subject to a

14   statutory cap.

15   A.  Right.

16   Q.  Tort reform cap in our state.

17   A.  Right.  The jury returned a $32 million verdict, exemplary

18   damages are capped in Texas.  We tried to get the judge to find an

19   exception to that but we were unsuccessful.  So I believe the

20   judgment was seven, I believe, seven million.

21   Q.  Seven million, a little over.

22        But the -- what was the significance of the Garza trial

23   in the Vioxx litigation?

24   A.  Well, it was significant for a number of reasons.  No. 1, it

25   was one of the first cases; No. 2, it was the only case involving

1    what I would call short-term use.  At that point we were talking,

2    their defense was this doesn't happen, it only happens after the 18

3    months.  Mr. Garza had only used it for 30 days.  Our experts were

4    opined that the problem with Vioxx was the effect you felt almost

5    immediately.  So it was first short-term use.

6            Mr. Garza had a lot of cardiovascular problems and a lot

7    of people didn't think we would be successful because of that, that

8    he did have cardiovascular problems, but the way we dealt with it

9    was we didn't hide the cardiovascular problems.  We just said this

10   is the last person in the world that should have been on Vioxx, and

11   why in the world is -- are Merck sales reps visiting cardiologists

12   when Merck knew that Vioxx had caused heart problems?

13   Q.  And Mr. Garza, being 71 years old and having an extensive

14   history of heart problems, was sort of the proverbial eggshell

15   plaintiff?

16   A.  That's correct.

17   Q.  And was the significance of the Garza trial noted in the

18   various Web sites and various statements made by members of the

19   PSC?

20   A.  Right.  I believe one of the Beasley Allen headlines is "First

21   Short-Term Use Verdict".  I mean, it was significant for a number

22   of reasons, it was a good verdict.  And at that point it was my

23   understanding of what was needed in this litigation, verdicts for

24   the plaintiff.

25   Q.  Did you summarize what you just testified to in your

1    presentation to the FAC when you came and testified before the

2    members of the FAC?

3    A.  I did.

4    Q.  During your presentation to the FAC, did anyone question you on

5    the extensive preparation or question the fact that we had done all

6    of the discovery for a year and a half and tried the case

7    essentially on our own and financed the case entirely on our own,

8    except for the *New England Journal of Medicine* stuff that we

9    utilized?

10   A.  Right.  As noted in our reply to their recommendation, there

11   was a number of comments.  Mr. Birchfield congratulated us and said

12   basically y'all did a great job, it was a great verdict.

13   Mr. Herman talked about how good a verdict it was and how -- he

14   also talked about how supportive the members of the PSC or the

15   leadership of the MDL was in getting the case remanded.  So, yeah,

16   there was no discussion at that point trying to minimize or

17   diminish the work that we had done in the case.

18   Q.  Mr. Escobedo, did Merck appeal?

19   A.  Yes, they did.

20   Q.  And what were the results of the appeal?

21   A.  The first result was what's called a reverse and render, and

22   they basically cited causation grounds.  There was so much of an

23   uproar because basically they had turned, produced and caused

24   something to turn on its head and totally done away with cause.

25   There was an amicus brief, filed a motion for reconsideration.

1          The Court of Appeals did reconsider, and they did what's

2    called a reverse and render.  They remanded it based upon -- remand

3    for a new trial based upon what they say appeared to be some

4    allegation of jury misconduct.  But in its opinion, they found that

5    we had sufficient evidence of general causation, Vioxx caused the

6    heart attacks, specific causation that Vioxx caused Mr. Garza's

7    heart attack; and failure to warn, that Merck knew it and didn't

8    warn, had not provided an adequate warning.

9          And I believe that's the only Court of Appeals opinion

10   that has held that Vioxx causes heart attacks and caused this heart

11   attack and Merck failed to warn.

12   Q.  Now, what happened -- what's the current status of the *Garza*

13   case?

14   A.  Merck appealed the Court of Appeals decision to the Supreme

15   Court.  It has been argued, it has been briefed, and we are

16   waiting.

17   Q.  And there has been no decision in either the *Garza* case or the

18   *Ernst* case from the Texas Supreme Court, correct?

19   A.  I am not familiar with the appellate history of the *Ernst* case.

20   But as far as the *Garza* case, no, we're waiting.

21   Q.  And in all honesty, Mr. Escobedo, given the number of

22   eight-figure verdicts that we've had, the Supreme Court reverse and

23   render after courts of appeals have affirmed them, do you think

24   that this Texas Supreme Court is going to do anything different in

25   these product cases or any other product cases that all of a sudden

1    rule for the plaintiffs?

2    A.  I've had three verdicts in excess of $10 million taken away by

3    our Texas Supreme Court, and I believe that would be the same

4    result for that one.

5    Q.  And do you know of anybody, any experienced lawyer -- well, I

6    am not going to mention that.

7           Now, calling your attention to 2009.  Mr. Herman filed an

8    affidavit in support of common benefit fees of 8 percent, and in

9    the affidavit he noted that the *Garza* and *Ernst* cases were

10   significant verdicts and praised the lawyers in those cases for

11   helping drive the settlement.  Do you recall that?

12   A.  Right.  And we obviously made significant victories or made a

13   lot of significant discovery, won a lot of significant discovery

14   battles, and the verdicts were basically instrumental or certainly

15   have been significant in driving the case to settlement.

16   Q.  And we didn't object at all to the motion to have 8 percent

17   common benefit fees assessed in the MDL, did we?

18   A.  No, we didn't object.  The cases that we did have in the MDL,

19   which weren't very many, but the cases that we did have in the MDL,

20   that's what happened to them.  And certainly because of our -- we

21   had used information from the MDL, like the Topol deposition, that

22   was our intent as far as the *Garza* case is concerned, it just never

23   happened because Garza is never going to result in any kind of

24   settlement from Vioxx.

25   Q.  I understand.  But we put all of our other cases, including

1  *Garza*, in the MDL at one time, correct?

2  A.  That's correct.

3  Q.  And if we ever got any money on *Garza* were we prepared to pay

4  our six and a half percent of our fee in the MDL?

5  A.  As I mentioned, yes.  We used information from the MDL, so it

6  was the only right thing to do.

7  Q.  And we thought that was our ethical obligation if we get any

8  money?

9  A.  Sure.

10  Q.  Now, the trial package that was developed by the people on the

11  Plaintiff Steering Committee, we never got to use the trial

12  package; is that correct?

13  A.  No.  I mean, that happened years after *Garza* was tried.

14  Q.  And let me go back to the MDL.  When it was formed in February

15  of 2005, were we trial ready in our case at that time?

16  A.  Yes.

17  Q.  Had we done all of the year and a half worth of discovery and

18  the millions of documents and assembled and annotated them all?

19  A.  Yes.

20  Q.  We had all of our witnesses ready?

21  A.  Expert witnesses, yes, and all witnesses, yeah.

22  Q.  Both our expert witnesses in general and our case-specific

23  experts?

24  A.  Everybody had been deposed, we were ready to go.

25  Q.  Did you apply to be on the PSC?

1    A.  I did.

2    Q.  And you were not put on the PSC, but were you on other

3    committees?

4    A.  I was on the discovery committee.  There were some phone

5    conferences that related to the discovery committee.  Yes.

6    Q.  And had we already given all of our documents and copies of

7    depositions to Mr. Miceli and anybody else that requested them from

8    the plaintiff's side?

9    A.  Certainly before even the MDL was formed, that's correct.  Once

10   the MDL was formed and these committees were formed, I inquired

11   about -- at that point I had taken a lot of depositions and I had a

12   lot of documents.  As other lawyers.  And basically, I inquired

13   about, we have all of these depositions, I want to make sure you

14   have them.  And they did because, basically, Merck was producing

15   all of the depositions to everybody that was involved in the

16   litigation.

17   Q.  Now, when did you first learn that Merck had settled the MDL

18   cases, or the Master Settlement Agreement took place?

19   A.  Heard about it in the press, I'm sure, first time I had heard

20   about it.

21   Q.  When did we learn that *Garza* was one of the seven cases

22   excluded from the MSA?

23   A.  When I read about it, when I read the MSA, it's the last

24   exhibit, I believe, which I know was one of our exhibits here.  The

25   *Garza* case, as well as the *Ernst* case, as well as some of the other

1    cases that had been tried and at that point were on appeal, I

2    believe, were specifically excluded from the MSA.

3    Q.  And when you learned that we had been listed there and excluded

4    from the MSA, did you have a conversation with Mr. Mayer with

5    Hughes Hubbard, who we have been dealing with and negotiating with

6    for a couple of years?

7    A.  Yes.  Actually, the way it happened was, I called Richard

8    Josephson and Richard said, "I am not going to talk to you about

9    that, you need to call Ted Mayer."  I called Ted and I asked why

10   are we specifically excluded, that's the first time I ever heard

11   about it.  All he said was, "The cases that have been tried and are

12   on appeal are excluded."

13   Q.  Merck wanted to carry those appeals forward?

14   A.  He said Merck wanted those cases excluded.

15   Q.  Did we submit our time and expenses for common benefit

16   consideration?

17   A.  We did.

18   Q.  And are those some of the exhibits that we've put into evidence

19   here?

20   A.  Yes, our submissions, our time and expenses are in the exhibits

21   here today.

22   Q.  And is one of the exhibits also just a breakout of Phil

23   Garrett's lodestar calculations for each firm; we put our firm in

24   for our five members and our support staff?

25   A.  It is.

1   Q.  Who was responsible for submitting our firm's expenses and

2   hours?

3   A.  I was.

4   Q.  Were you told or directed to assign any hourly rates to the

5   people in our firm and the support staff?

6   A.  No.  We were told specifically by somebody with Mr. Garrett's

7   firm, I believe, not to assign, so we were not -- we did not assign

8   rates to our submissions.

9   Q.  So the rates that are reflected in Mr. Garrett's firm-by-firm

10  calculations and total of hours are rates that Mr. Garrett or

11  someone that we don't know assigned to us?

12  A.  I don't know who did it, but we did not put those rates in

13  there.

14  Q.  And we don't really have any complaints about the rates.  I

15  mean, we are not going to nitpick on the rates.

16  A.  We do not.

17  Q.  The expenses that we submitted were the expenses paid?

18  A.  Yes.  The expenses that were submitted on behalf of the *Garza*

19  case were submitted to common benefit and those were paid.

20  Q.  Now, in the reply that Mr. Birchfield filed to your objections

21  that you filed, he puts our case as an example.  And I am just

22  going to try to paraphrase.  He said that our 14,000 hours for our

23  one trial looks like a lot compared to Mr. Blizzard's 9,000 for one

24  trial.  And I just need to ask you, did our 14,000 hours include

25  just all attorneys' time in the trial, or did it include the year

1    and a half of discovery, too?

2            SPECIAL MASTER JUNEAU:  Do you have an objection?

3            MR. BLIZZARD:  I do have a slight objection since the

4    paraphrasing includes me.  The 9,000 hours included my trial time

5    and my settlement time negotiations, plus my post settlement work,

6    plus other work.  And that was the comparison that was being made.

7            MR. HOCKEMA:  I didn't know if in there it just compared

8    your time to Mr. Blizzard's.

9    BY MR. HOCKEMA:

10   Q.  And did our 14,000 hours reflect a couple of years of

11   discovery, as well as all of the trial time?

12   A.  14,000 hours reflected work, really, from day one from the

13   moment we got hired, all of the investigation, all of the discovery

14   and the trial, that's correct.

15   Q.  Now, Mr. Birchfield testified Friday, I think you had to leave,

16   but he said that he had no quarrel with the fact that all of our

17   stuff from the *Garza* trial, discovery and a lot of the trial

18   testimony, went into the time package that was assembled by the

19   PSC.

20   A.  Yes, I read the deposition, that's what it said.

21   Q.  And we submitted it, we sent everything that we had.  We held

22   nothing back, did we?

23   A.  No.  And also you have to remember Merck was producing

24   everything that was being done -- that they were producing

25   depositions, things like that, Merck was producing that to

1    everybody involved in the litigation.  I know the transcripts of

2    the *Garza* trial were in there as well.

3    Q.  In our submission that included those 14,000 hours leading up

4    to the verdict, the factor that was listed in 6D that says

5    activities surrounding trials of individual Vioxx claimants,

6    including bellwether trials and non-MDL trials that impacted

7    proceedings on a common benefit level.  Did you feel that you were

8    proper in submitting those 14,000 hours under that category?

9    A.  Yes.  And we were told and there's -- there are writings,

10   Mr. Herman in his affidavit refers to our case as a bellwether

11   trial, we were told that our case was a bellwether trial.  And

12   certainly if you look at 6D, it is a non-MDL trial that was

13   significant, that's the reason why we submitted our common benefit

14   requests.

15        As we made it very clearly known, we are not MDL lawyers,

16   we had no idea what this process was about, but we were told that

17   this was a significant case and that we should submit our hours and

18   expenses.

19   Q.  And also, I think the fact of whether counsel was already

20   involved in Vioxx litigation prior to the withdrawal of Vioxx from

21   the market on September the 30th, 2004, were we involved for a long

22   time before?

23   A.  Clearly, yes.

24   Q.  Now, I want to take you back to the trial, just briefly.  You

25   had mentioned the involvement of Kathy Snapka prior to the case

1    being tried, and I think she came on board some months before we

2    got to go to trial.  And during the trial, Ms. Snapka did, I think,

3    individual voir dire after I did general?

4    A.  Right, she did individual voir dire.  She cross-examined one of

5    the experts, Wheeler, and she put -- she did the direct examination

6    of one of our liability witnesses, Americo Simonini.

7    Q.  And also I believe she did the direct examination of two of the

8    decedent's sons also.

9    A.  My memory is hazy on that, but you may be right.

10   Q.  And I believe she was also going to cross-examine Alise Reicin,

11   if Merck brought her?

12   A.  Right.  We didn't know, we weren't told until late in the game

13   that they were not going to bring Ms. Reicin.  She was supposed to

14   cross-examine her.

15   Q.  But Ms. Snapka had come on board after we did all of the

16   discovery?

17   A.  That's correct.

18   Q.  I just want to ask you about -- well, and I don't think we need

19   to go through for Magistrate Juneau all of the Johnson factors.

20   But let me just ask you, Mr. Escobedo, the initial correspondence,

21   I guess, we got from the Fee Allocation Committee had an award of

22   fees, I think a little over $1 million or something?

23   A.  I believe close to 1.2 for our fee, yes, the fees for our time.

24   Q.  And that would have been for a total of 14,000 hours?

25   A.  That's correct.

1    Q.  And our significant win in a bellwether case?

2    A.  Right.

3    Q.  And we objected to that?

4    A.  We did.

5    Q.  And subsequent to our objection the recommended fee award was

6    changed to what?

7    A.  Zero.

8    Q.  And what do you understand the basis of changing our award to

9    zero was?

10   A.  Well, I don't know if I understand it.  Basically, when we --

11   it was time to make our objection, I get a call from

12   Mr. Birchfield, and basically he tells me, don't object or it may

13   be bad.  It was bad, it went to zero.  My understanding of what

14   they're saying is that somehow we asked Merck -- or actually, not

15   us, but Kathy Snapka asked them while they're negotiating the MSA

16   with Merck to exclude *Garza*.  And we know it's excluded, it's one

17   of the exhibits in our case, as are all of the other cases because

18   they were tried and were on appeal.  But their argument is that

19   we -- actually, that we, through Cathy, asked our case to be

20   excluded.  That is not true.

21   Q.  Did you ever ask or have any authority to exclude our case in

22   any way from consideration of common benefit fees?

23   A.  I know that Cathy didn't do it, but she has no fee interest in

24   the case so she wouldn't have had the authority to do that.  I

25   mean, yeah, no one did that.

1          The first time that we ever found out that Cathy -- or

2    found out that we were excluded from the MSA was when we read it,

3    when we saw it.  And I printed it out and I looked at the exhibit.

4    Which, quite frankly, prompted the saying in our firm that Merck's

5    position as to *Garza* was $4.5 billion but not a penny more, as far

6    as *Garza* was concerned.

7    Q.  Mr. Escobedo, speaking to the supposed wishes by us to exclude

8    *Garza* from any consideration of common benefit, when was the first

9    time that we heard that supposedly we had excluded it somehow, or

10   somebody on our team, whether they even had authority or not, had

11   somehow tried to exclude it?

12   A.  The first time we heard that argument was when Mr. Birchfield

13   filed his reply to all of the objectors' responses, or all of the

14   objectors', I guess their objections.  He filed a reply and that's

15   the first time we had ever heard that argument.

16   Q.  Is that true at all?

17   A.  That is not true.  We did not ever ask, we had nothing to do

18   with that.  We weren't privy to the negotiations, and it's just the

19   idea that somehow *Garza*, when you look at the other excluded cases,

20   what they share in common is that they were tried cases and were up

21   on appeal, I believe; they were for sure tried.  Merck, for

22   whatever reason, decided they wanted it excluded.  We did not ever

23   ask, imply, suggest, or direct in any way to anybody that to

24   exclude *Garza* from the MSA.

25          MR. HOCKEMA:  Your Honor, subject to being able to

```
 1    supplement with the deposition of Mr. Birchfield and the minutes of

 2    the FAC as exhibits, we would pass the witness.

 3                    SPECIAL MASTER JUNEAU:  All right.  FAC.

 4                              CROSS-EXAMINATION

 5    BY MR. BLIZZARD:

 6    Q.  I guess it's still morning.  Good morning.

 7    A.  Good morning.

 8    Q.  We had met a couple of times before and I called you Joe, but

 9    do you mind if for the purposes of this examination I do it a

10    little bit more formally and call you Mr. Escobedo?

11    A.  Not at all.

12    Q.  Mr. Escobedo, as you know, my name is Ed Blizzard.  I am also a

13    Texas trial lawyer, and I am here to ask some questions today on

14    behalf of the FAC.  I hope to try to clarify some of the things

15    that you've testified about.

16                    First of all, without trying to diminish the -- I know

17    the hard work that you put into the *Garza* trial, the *Garza* work is

18    the only work that you are saying is common benefit work for Vioxx

19    that you performed, correct?

20    A.  That I submitted, that's correct.  I did not submit any hours

21    relating to discovery, and I mentioned that in the testimony, I

22    believe.

23    Q.  You didn't have any leadership roles in any of the consolidated

24    proceedings, including Texas, right?

25    A.  That's correct.
```

1  Q.  You didn't engage in any discovery in the consolidated

2  proceedings, such as taking depositions of witnesses that were

3  noticed in the consolidated proceedings, right?

4  A.  I wasn't asked to, but that's correct.

5  Q.  And you didn't argue any motions in any of the consolidated

6  proceedings other than the motion to remand that you argued in

7  front of Judge Fallon?

8  A.  Again, I wasn't asked to, but that's correct.

9  Q.  Now, you mentioned you worked with some other lawyers,

10  including Mr. Miceli from Beasley Allen, but there were other

11  lawyers besides Mr. Miceli in 2002 that were actually doing work,

12  discovery work, and other significant work against Merck in the

13  Vioxx litigation, wasn't there?

14  A.  Yes.  I believe I mentioned Mr. Miceli's firm, Ms. Sanford's

15  firm, I believe.

16  Q.  In fact, in 2001, there was some work that was being done in

17  California against Merck on Vioxx, right?

18  A.  I am not sure about that.  I've heard that before, but as far

19  as the depositions that had been taken, those are the lawyers that

20  had taken the depositions.

21  Q.  And in terms of the trial, you mentioned that your trial was

22  one of the first, but actually -- and I think you said that the MDL

23  lawyers weren't ready for trial as of the time that you were asking

24  for remand?

25  A.  I didn't mean to say that.  I was saying -- I didn't say that

1    at all.  What I was saying was that I didn't know whether Judge

2    Fallon at that point was ready to have trials in the MDL itself.

3    Q.  Didn't the *Irwin* trial occur before the *Garza* trial?

4    A.  I believe so, I am not sure.

5    Q.  And didn't the *Ernst* trial that Mr. Lanier tried in Brazoria

6    County also occur before yours?

7    A.  Right, but that's not an MDL trial.

8    Q.  Didn't the *Humeston* trial in New Jersey occur before *Garza*?

9    A.  It was during the trial that we were trying to remand it, yes.

10   Q.  So it was before *Garza*?

11   A.  Yes, sir.

12   Q.  So there were several trials that occurred before *Garza*.

13   A.  I didn't mean to imply that there weren't, I was saying as far

14   as the MDL itself.  At some point Judge Fallon obviously decided he

15   was going to have bellwether trials in the MDL itself, that's what

16   I meant.

17   Q.  Okay.  Maybe I misheard.

18          One thing I thought I heard you say is that it was the

19   first short-term use case that went to trial?

20   A.  Not the first, certainly one of the first.

21   Q.  Do you know *Humeston* was a short-term use trial?

22   A.  I'm not that familiar with it.

23   Q.  Are you familiar with the fact that *Irvin* was a short-term use

24   case?

25   A.  Again, I'll take your word for it, I am not that familiar with

1    it.  I said that it was significant for short-term use verdict.

2    Q.  Do you know if *Ernst* was a short-term use case?

3    A.  I am familiar with the *Ernst* case, and I know there was an

4    allegation of whether or not *Ernst* was even, whether it was a heart

5    attack.  So as far as short-term -- I don't remember it being a

6    short-term of 30 days, but it may have been.

7    Q.  You indicated that you took, I think, about ten depositions in

8    the *Garza* case, correct?

9    A.  Well, ten corporate rep depositions.  There were others.

10   Q.  Right.  When it came time to actually play and read the

11   depositions during the *Garza* trial, you presented a number of

12   depositions that you hadn't taken, right?

13   A.  The depositions that I mentioned before, the Topol depo, I

14   believe, and there was another I can't remember.

15   Q.  Didn't you play the Skolnick deposition at trial?

16   A.  Skolnick, no, I don't believe so.  A lot of the depositions we

17   had taken were discovery depositions.  We were getting documents.

18   Q.  So your testimony is, if we look at the transcript, the only

19   deposition that you played was Topol?

20   A.  No, sir.  No, not at all.

21   Q.  Okay.  Were there other --

22   A.  Go ahead, sorry.

23   Q.  Were there other MDL or New Jersey-related depositions besides

24   Topol that were played in the *Garza* trial?

25   A.  I believe there were two, but, I'm sorry, I don't remember the

```
 1    name of the other person.
 2    Q.  Were the videos played of those?
 3    A.  Yes, sir.
 4    Q.  Were any of the videos or depositions -- were any videos played
 5    or depositions read for the corporate witnesses that you took?
 6    A.  I don't recall, sir.  I mean, most of those were discovery.  We
 7    were getting the documents; essentially the documents we discovered
 8    and used in those depositions were.
 9    Q.  So insofar as use of testimony at trial from Merck witnesses, I
10    understand there was a live witness, Ms. Santanello, that was on
11    the stand.
12    A.  Right.  She was -- I deposed her, yes, sir.
13    Q.  But as for the depositions of Merck witnesses that were
14    actually played in the trial, those were not the ones you took,
15    those were the ones that you took, those were the ones who lawyers
16    who needed the MDL or in either New Jersey took?
17    A.  I don't remember -- I remember specifically because they
18    were -- I was asked about depositions that I had not taken, and I
19    do know that we used those, we used those two.
20    Q.  And you also borrowed heavily from Mr. Lanier's presentation in
21    Ernst, didn't you?
22    A.  I don't know what that means.
23    Q.  Well, didn't you follow the road map of his opening very
24    closely?
25    A.  It was a Vioxx case.  I mean, we knew, we certainly had been
```

1    discovering the information relating to Vioxx and the blockbuster

2    drug, and there was going to be similarities because they're the

3    same case.

4    Q.  Have you seen some filings that actually track the opening

5    statement that you gave versus the one that Mr. Lanier gave --

6    A.  I have not -- I'm sorry, I didn't mean to interrupt.

7    Q.  Did you spend a lot of time summarizing and reviewing the *Ernst*

8    transcript?

9    A.  We got it before the trial.  I did not completely review it.  I

10   mean, I reviewed some of it, absolutely.  Yes, sir, we got it

11   sometime before the trial.

12   Q.  So you didn't spend a significant amount of time reviewing it?

13   A.  No, we reviewed it; I mean, I did review it.  I'm sorry, what

14   was your question?

15   Q.  The question is:  Did you spend a significant amount of time

16   reviewing it?

17   A.  Yes, I did review the *Ernst* trial.  I don't know what you mean

18   by significant, but I did review it.

19   Q.  Hundreds and hundreds of hours?

20   A.  I don't know, sir.  I mean, if that's what my submissions say,

21   then yes.

22   Q.  Do you specifically remember spending 250 hours reviewing and

23   summarizing the *Ernst* transcript?

24   A.  I don't remember the exact hours.  I did spend, obviously, a

25   significant amount of time reviewing it, yes.

1  Q.  Okay.  Well, if it's 250 hours, that's over four weeks of time,

2  isn't it?

3  A.  If you say so, sir.

4  Q.  Okay.  Well, would you expect to remember spending four weeks

5  reviewing a transcript?

6  A.  Yes, but I was doing a lot of other things at the time.  I did

7  review it; I did say that, yes.

8  Q.  Now, as I understand it, you know, you were removed several

9  times to federal court.

10 A.  Yes.

11 Q.  You had the case remanded for the second time in November of

12 2005; is that right?

13 A.  I believe the date's right, yes, sir.

14 Q.  And not only -- by getting the case remanded, not only would

15 you be able to go to trial quick, and potentially have a case tried

16 in a plaintiff-friendly jurisdiction.

17 A.  Right.

18 Q.  But, in addition, by having the case not connected with the MDL

19 you wouldn't have to pay a common benefit fee on that case, right?

20 A.  No, that's not the case.  We were using documentation from

21 depositions from the MDL, so we certainly intended to do that.

22 Q.  So you say that because you used something from the MDL, you

23 used the deposition from the MDL, that you were subject to the

24 common benefit fee?

25 A.  We certainly thought that that would be the case, yes, sir.

1    Q.   So based upon this -- let me make sure I understand.

2    A.   Yes, sir.

3    Q.   The initial verdict was for $32 million, correct?

4    A.   Yes.

5    Q.   It was reversed, I'm sorry, it was reduced to approximately $7

6    million, right?

7    A.   As a result of the damage cap, yes, sir.

8    Q.   Went up to the Court of Appeals who initially reversed and

9    rendered.

10   A.   That's correct.

11   Q.   But later reversed and remanded for a new trial.

12   A.   That's correct, that's correct.

13   Q.   And now it's pending before the Supreme Court as to whether

14   it's reversed and remanded or reversed and rendered?

15   A.   That's correct.

16   Q.   If it's reversed and remanded, you get to try the case again,

17   correct?

18   A.   That's right.

19   Q.   You get to make a big attorney's fee potentially, right?

20   A.   I don't know, sir.

21   Q.   Well, I mean --

22   A.   We haven't yet.

23   Q.   If you get a $7 million verdict, you would make a big

24   attorney's fee, wouldn't you?

25   A.   I don't know what Merck's position is going to be as far as

1    settling the case; so far they've offered me zero.

2    Q.  Actually, there was a time where you had an opportunity to put

3    the case in the settlement, wasn't there?

4    A.  No.

5    Q.  Wasn't there a mediation that took place before the Court of

6    Appeals made its decision?

7    A.  There was a mediation, yes.

8    Q.  And in that mediation, didn't Merck offer to include the case

9    in the settlement?

10   A.  There was some discussions about it, but, I mean -- well, we

11   have -- we had always been told by Mr. Mayer that it was not going

12   to be included.

13   Q.  But didn't -- Kevin Dubose called me from that mediation --

14   A.  Okay.

15   Q.  -- and indicated to me that Merck wanted to put the case in the

16   settlement but that you guys didn't.  Isn't that the accurate

17   position, that you didn't want it in the settlement because

18   Mr. *Garza* wouldn't qualify for much money in the settlement?

19   A.  No, I don't know what Mr. Dubose called you to tell you.  The

20   reason why Mr. Dubose was there and I was not was because I was

21   told that Merck was not going to offer a dime, and basically we

22   needed to go through the process itself, we needed to go through

23   the mediation.  So, basically, we decided to send our appellate

24   lawyer to mediation.

25   Q.  And Mr. Dubose was at the mediation?

1    A.  If I remember, yes.

2    Q.  And did Mr. Dubose tell you about Merck proposing to put the

3    case in the settlement?

4    A.  I have never heard about Merck proposing to put the *Garza* case

5    in settlement.  The only thing I ever heard is from Mr. Mayer said

6    that we don't want it in the settlement.

7    Q.  So what is your claim for common benefit that you make?

8    A.  I'm sorry, I don't understand the question.

9    Q.  I'm sorry, there was a $32 million verdict, reduced to seven.

10   A.  Right.

11   Q.  What is your claim that you're entitled to for common benefit?

12   A.  Well, as far as what we've requested?

13   Q.  Yes.

14   A.  I don't understand the question.

15   Q.  Yes, what have you requested?

16   A.  I would have to look at the reply.  I would have to look at the

17   response to the objection.

18   Q.  You don't know?

19   A.  I've looked at a lot of things, you're talking about the actual

20   number.

21   Q.  Can you give me a ballpark?

22   A.  Like 20, 20 million, something like that.

23   Q.  So, and that 20 million is just for your firm?

24   A.  For our firm and the work that we did in the *Garza* case.

25   Q.  And Ms. Snapka is also asking for common benefit fee relating

1    to the *Garza* work, correct?

2    A.  That's my understanding, yes.

3    Q.  And do you know how much she is asking for?

4    A.  I do not.

5    Q.  Do you know how much total is being requested for the *Garza*

6    verdict by you and Ms. Snapka?

7    A.  I don't know the number from Ms. Snapka, so I guess the answer

8    to that is no.

9    Q.  Is it close to the total verdict in the *Garza* case?

10   A.  I don't know -- I don't know what Ms. Snapka is asking, so I

11   don't know.

12   Q.  Now, you mentioned your time records.

13   A.  Yes, sir.

14   Q.  The time records, were those records that were kept in the

15   ordinary course of your business?

16   A.  Sir, those are records that I recreated.  We're a plaintiff

17   firm, we don't keep time records.

18   Q.  So these were reconstructed, as we're calling them, records,

19   right?

20   A.  As I understand other firms in this litigation did, yes.

21   Q.  And who was in charge of reconstructing the records?

22   A.  I was.

23   Q.  So you were the one who ultimately signed off that these were

24   accurate and reliable records as reconstructed?

25   A.  That's correct.

1    Q.  And have you reviewed them before today?

2    A.  I reviewed them, yes.  I reviewed all of the exhibits.  I

3    didn't review them in detail, but, yes, I have.

4    Q.  And these records actually were introduced by you as Exhibit

5    16, correct?

6    A.  I don't know the exhibit number, but we did introduce them,

7    yes, sir.

8    Q.  We've seen -- we've seen a lot of briefing from the objectors

9    that says that the only analysis that can be used for common

10   benefit awards is a lodestar analysis.  Have you seen some of those

11   briefs?

12   A.  I have, sir.

13   Q.  I guess a lodestar analysis is only usable if you have reliable

14   records reflecting work actually done, right?

15   A.  Yeah.  And I believe some of the cases that have reviewed the

16   lodestar analysis says it also applies to properly constructed

17   time.

18   Q.  Right.  Again, it has to be properly reconstructed, correct?

19   A.  Sure.

20   Q.  And you mentioned awhile ago that trying one of these

21   pharmaceutical cases can be daunting; I don't think you used that

22   word, but I think you described it that way, right?

23   A.  Yes, sir, it was very difficult.

24   Q.  Merck has a lot of resources that it devotes to these trials

25   and they have you running every which way, don't they?

1    A.  Yes, sir, that's correct.

2    Q.  You can't afford to duplicate effort, can you?

3    A.  Yeah, you shouldn't, but sometimes it can't be avoided.

4    Q.  Right, sometimes it can't be avoided, but you shouldn't be

5    having the same four different lawyers bill for the same task,

6    should you, over and over again?

7    A.  Well, it just depends on the circumstances.  I can't answer

8    that in a vacuum.  Certainly in a law firm setting, I mean, we --

9    things are reviewed by other lawyers.

10   Q.  Do you have your Exhibit 16 in front of you?

11   A.  No, sir, I do not.

12            MR. HOCKEMA:  I believe it's 18.

13            MR. BLIZZARD:  Sixteen, I believe this is Exhibit 16.

14            THE WITNESS:  Yes, sir.

15   BY MR. BLIZZARD:

16   Q.  If we could go to page 125.

17   A.  Okay.

18   Q.  So if you look at the time entry, the first ones I've

19   highlighted up there for this date of August the 7th of 2006, do

20   you see that?

21   A.  Yes, sir.

22   Q.  Now, there's some initials out to the side.  Are those initials

23   JE; that's you, correct?

24   A.  That's correct.

25   Q.  LC is who?

1    A.   Luis Cardenas, he was an associate.

2    Q.   MR is who?

3    A.   Mario Ruiz, he was an associate.

4    Q.   And the DHH is Mr. Hockema?

5    A.   That's correct, sir.

6    Q.   So there's 1.5 hours billed four different times on this page,

7    right?

8    A.   Yes, sir, that's correct.

9    Q.   The first one says receive/review letter from Baker Botts.

10   That was a defense firm, correct?

11   A.   That was a defense firm.

12   Q.   And it says receive and review letter from Stephen Tipps, do

13   you see that?

14   A.   Right, I think they're all the same thing except it was a

15   matter of reconsideration as noted in the last one.

16   Q.   I'm sorry, I didn't hear you.

17   A.   I think the letter is the matter of reconsideration.  I mean,

18   there was at that point that was -- I'm sorry, it was a letter

19   relating to a reconsideration motion, I believe.

20   Q.   So this is the same letter that is being referred to in each of

21   the time entries here, correct?

22   A.   I think so, yeah.

23   Q.   Well, Stephen Tipps is a lawyer at Baker Botts, isn't he?

24   A.   He is the appellate lawyer, yes, sir.

25   Q.   And he is also Merck defense, correct?

1    A.  Yes, sir.

2    Q.  And the substance of the letter is matter of reconsideration,

3    correct?

4    A.  Yes, sir.

5    Q.  So although this is the same letter, it's described four

6    different ways, isn't it?

7    A.  Well, right.  But I don't think it's just the letter.

8    Q.  If somebody was going to reconstruct the time records, they

9    would describe it the same way, wouldn't they?

10   A.  I don't understand that question.

11   Q.  Well, if these records were made simultaneously with work being

12   done, then you might have this described four different ways by the

13   lawyers that made the entries.

14   A.  Oh, I understand, oh, okay.

15   Q.  But these are reconstructed records, correct?

16   A.  Right.  But I was the one primarily involved in it, but I had

17   assistance in reconstructing it.

18   Q.  Right.  This looks like somebody is trying to disguise the fact

19   that this is the same letter, right?

20   A.  No one is trying to disguise it, sir, because I had assistance

21   in reconstructing the time records and somebody must have just

22   described it differently.

23   Q.  So let's go to the bottom of the same page.  Again, do we see a

24   time entry here for one hour for receiving and reviewing

25   defendant's motion for leave to conduct, and it says, receive and

1    review letter from Baker Botts; that's the first time entry, right?

2    A.  That's correct.

3    Q.  And then the second time entry describes it a little bit

4    different and says, receive and review letter from sales re:

5    motion for leave.  And sales is not capitalized, is it?

6    A.  I'm sorry, where are you?

7    Q.  I'm sorry, the second time entry, Mr. Hockema's time entry.

8    A.  That would be Travis Sales.

9    Q.  That's not sales as in a small cap, that's the name of a lawyer

10   at Baker Botts, correct?

11   A.  Right, it says from sales, right.  It was Travis Sales, it was

12   supposed to be capitalized.

13   Q.  Actually Travis Sales' full name was mentioned in the next time

14   entry, correct?

15   A.  That's correct.

16   Q.  And so, again, this is four different time entries for the same

17   task described a little bit differently each time, isn't it?

18   A.  Again, it's described differently because I had people helping

19   me.  We were not trying to disguise or cheat anything.  Obviously,

20   if you get that we would put on here different dates, but, yeah,

21   that's correct.

22   Q.  If you go to page 135.

23   A.  Yes, sir.

24   Q.  Is this another example of what we've been talking about where

25   we have the same entry made four different times, described each

1    time a little bit differently?  The time entry is on March the

2    29th, 2007.

3    A.  Right.  I mean, I don't know if that's the exact same letter,

4    if that's what you're asking me.

5    Q.  Stephen Tipps is with Baker Botts, correct?

6    A.  Right.  But we were getting letters from other lawyers at Baker

7    Botts at the time.

8    Q.  And he is the Merck attorney, correct?

9    A.  One of the Merck attorneys, correct.

10   Q.  We go to the bottom of the same page.

11   A.  Okay.

12   Q.  Do we again have an entry that's multiplied by four dated

13   4/25/2007, again, a letter from Baker Botts, letter from Stephen

14   Tipps, letter re:  Civil docketing statement; letter from defense

15   re:  Docketing statement; letter from Baker Botts re:  Civil

16   document statement -- actually, there's five entries there,

17   correct?

18   A.  That's correct.

19   Q.  And do those again appear to be all for the same thing?

20   A.  Sir, certainly the last three are, yes, sir.

21   Q.  And the first two, again, Mr. Tipps is with Baker Botts, right?

22   A.  That's correct.

23   Q.  Okay.  And if we go to the entry just below that.

24   A.  What page, sir?

25   Q.  Same page, I'm sorry.

1   A.  Okay.

2   Q.  So we see here reviewing a letter from the Court of Appeals;

3   then the second entry says letter from appeals; third entry says

4   letter re:  Docketing statement; fourth entry says letter from

5   Janie Murphy.  Janie Murphy was the clerk of the Court of Appeals,

6   wasn't she?

7   A.  I don't know, sir, probably.  I don't remember.

8   Q.  And then a letter from the Court of Appeals.  So, again, we

9   have five entries for the same letter, right?

10  A.  It appears so.

11  Q.  If you'll go over to page 137.  Starting at the top of the

12  page.

13  A.  Okay.

14  Q.  136, I'm sorry.  I think this is a continuation from the bottom

15  of 136.

16          Do you see, again, starting on May the 8th there's again

17  a letter from the Court of Appeals; a letter from Janie Murphy, who

18  I think the records will show is the deputy clerk of the Court of

19  Appeals; letter from appeals; and letter re:  Notice of filing.  Do

20  those again appear to be the same work described a little bit

21  differently each time?

22  A.  Well, the letter comes in, it gets reviewed by all of the

23  lawyers in the firm, so, yes.

24  Q.  So essentially during this period of time, you do have a lot of

25  lawyers duplicating the work?

1    A.  Lawyers reviewing the information that comes into the case.

2    Q.  So all -- it looks like here -- so all four lawyers that worked

3    on this case were reviewing the same thing?

4    A.  At some point, yeah.  At the time of the trial and beyond,

5    yeah, all five of the lawyers were working on the case, yes, sir.

6    We needed to do it that way.

7    Q.  Let's look at page 137.  If you look at the top of the page,

8    the July 13th time entry.  Is that just more of the same about

9    receiving and reviewing letters from the Court of Appeals?

10   A.  Say your question again, sir.

11   Q.  Yes, I'm sorry.  It's the July 13, 2007, time entry.  Does that

12   appear again to be multiple entries regarding the same letter?

13   A.  It could be, yes, because it all has to do with the Court of

14   Appeals, yes.

15   Q.  And if we move down to the 7/16.

16   A.  I'm sorry, what page?

17   Q.  Do we again have Mr. Tipps, Baker Botts, Merck attorney, letter

18   from defense?

19   A.  What page are you on, sir?

20   Q.  I'm sorry, 137.  Entry for July 16th, 2007.

21   A.  Okay.

22   Q.  Do you see where all four lawyers in the firm record time for

23   reviewing a letter from a Baker Botts lawyer, but they word it a

24   little bit differently each time?

25   A.  Yeah.  And, again, I don't know if it was the same letter.  But

1    we were getting letters from different Baker Botts lawyers.

2    Q.  So let's move on.  I've given you some examples of this.

3    But -- these are letters, but in addition to the letters, can we go

4    to page 88.  Do you know who Janet Arrowsmith-Lowe is?

5    A.  Yes.

6    Q.  Do you know who Janet Arrowsmith-Lowe is?

7    A.  I'm sorry, I answered yes.

8    Q.  She was an expert, a regulatory expert that's used by Merck and

9    some other pharmaceutical companies over the years?

10   A.  That's correct.

11   Q.  She's been pretty prolific?

12   A.  Yes, sir.

13   Q.  So she has some prior depositions out there that have been

14   taken of her?

15   A.  That is correct.

16   Q.  Now, this is dated 12/23/2005, if you'll find those time

17   entries.  This was less than a month before trial, correct?

18   A.  That's correct.

19   Q.  So this was during the mad scramble that we all had who tried

20   these cases, right?

21   A.  That's right.

22   Q.  This has all four lawyers reviewing old reports of expert

23   Arrowsmith-Lowe, correct?

24   A.  That's right.

25   Q.  So nine and three-quarters hours is charged by you, six and

```
 1   three-quarters hours are charged by one of the associates, nine

 2   hours charged by one of the other associates, four and

 3   three-quarters hours by Mr. Hockema, and nine and a half hours by a

 4   paralegal, all for reviewing the old reports of Arrowsmith-Lowe,

 5   correct?

 6   A.  That's not correct.  That was partially time.  There were other

 7   things that were being billed for at this time.

 8   Q.  Right, there were some other things that were mentioned there

 9   that were part of the time entries, correct?

10   A.  Right.

11   Q.  But the time entries show that all four lawyers are reviewing

12   Arrowsmith-Lowe reports, correct?

13   A.  That's correct.

14   Q.  Who was actually assigned to examine Ms. Lowe?

15   A.  I believe I was.

16   Q.  So only one of you was given the assignment of cross-examining

17   her.

18   A.  Right.

19   Q.  If we go to page 84.  The bottom of page 84.  So this -- you

20   remember earlier I asked whether you recall reviewing the *Ernst*

21   transcript and relying heavily on it.  So this is a charge or a

22   couple of charges listed here, one is seven and three-quarters

23   hours for reviewing the *Ernst* trial transcript, draft summary of

24   closing arguments, correct?

25   A.  Right.
```

1    Q.  And then the next one involves looking at the Wheeler direct

2    and cross and write a summary, and that's eight hours, right?

3    A.  That's correct.

4    Q.  So that one day, 15 hours spent reviewing the closing argument

5    and a direct and cross of one witness, right?

6    A.  Well, I believe the top one may have been the closing

7    arguments.

8    Q.  Right, the top one is seven and three-quarters hours for

9    reviewing the closing arguments.  Does that seem a little high to

10   you?

11   A.  I don't know if it was just that, I don't know.

12   Q.  Well, if we go over to the next page, which is page -- I'm

13   sorry, not page 85 -- 86.  Do you see on December 15, 2005, there

14   is an entry by you for, again, review *Angelton* trial transcripts,

15   draft summary of closing argument in *Ernst* trial?

16   A.  Yes.

17   Q.  That's an additional eight and a half hours, correct?

18   A.  Right.

19   Q.  And if you go down and if you go down just below that, I

20   believe, 12/16/2005, it says, phone conference with Kathy Snapka,

21   e-mail s to and from paralegal, complete summary of closing

22   arguments in *Ernst*; seven and a half hours for that.

23   A.  That's correct.

24   Q.  So if you total those up, that's almost 24 hours for reviewing

25   and summarizing the closing arguments in the *Ernst* case, correct?

1    A.  I mean, if that's -- it says closing arguments, that's correct.

2    I was reviewing the entire *Ernst* trial.  I don't know at that point

3    which part of the trial I was reading, but that's what this says,

4    yes.

5    Q.  If you look, if we just kind of pan to this page 86, you can

6    just see that there are numerous references to reviewing and

7    summarizing the transcript of the *Ernst* trial.  I counted them up

8    to be over 250 hours.

9    A.  Okay.

10   Q.  That's almost as long as the *Ernst* trial took to try it, isn't

11   it?

12   A.  I don't know, sir, I don't know how long it took to try.

13   Q.  Does that seem like an excessive amount of time a month before

14   trial to be spending reviewing transcripts?

15   A.  Not with all of the people we had on the job, no.

16   Q.  If we go to page 70.  This is 4/27/2005, this is an entry that

17   has been submitted for common benefit for preparing and sending a

18   letter with pleadings to the *New York Times;* do you see that?

19   A.  It says that, yes.

20   Q.  And do you know what common benefit was being performed in

21   sending a letter to the *New York Times*?

22   A.  Well, we submitted all of this time, sir.  My understanding

23   was, if there was problems with it, we would have been told at that

24   point.  For example, if there was a problem with it, we would have

25   deleted it.  My understanding was that all of that time had been

1    accepted.

2    Q.  Well, do you know what -- independent of that, do you know what

3    this was about, and why it took four hours to draft a letter to the

4    *New York Times*?

5    A.  No, sir.

6    Q.  There's been a lot of talk about lodestar and just taking the

7    hours and putting the hourly rate next to it and multiplying it.

8    Going through some of these individual time record examples that we

9    have gone through today, do you understand why the committee or the

10   Special Master or the court might have some pause in just

11   pencilling in an hourly rate next to each of these time entries?

12   A.  No.  My understanding was, we submitted the time, we were told

13   that all of the time was accepted as common benefit work, time, and

14   that our hours were used in coming up with the amount of common

15   benefit fund.  And if there was any problems at that point, that

16   was the time to tell us about it.  We did not receive any

17   indication there was any problems with our time submissions.

18   Q.  So today, having seen some of these entries, do you have any

19   question about them?

20   A.  No.  I mean, we were a small firm trying to deal with a monster

21   piece of litigation, and the only way to do that was to make sure

22   that everybody on the team knew everything that was going on.

23           MR. BLIZZARD:  I don't have any additional questions.

24           SPECIAL MASTER JUNEAU:  Thank you.

25           MR. HOCKEMA:  Brief redirect, your Honor?

1          SPECIAL MASTER JUNEAU:  Very brief.

2          MR. HOCKEMA:  Very brief, promise.

3                       REDIRECT EXAMINATION

4     BY MR. HOCKEMA:

5     Q.  Mr. Blizzard asked you about the short-term uses trials that

6     occurred possibly before *Garza*.  Our Exhibit No. 11 from the

7     Beasley Allen firm is headlined, "Plaintiffs Win First Short-Term

8     Use Vioxx Lawsuit."  Is that the headline?

9     A.  That is the headline, yes.

10    Q.  And was that what you were relying on from the Beasley Allen

11    firm when you said the significance was that we won the first

12    short-term lawsuit?

13    A.  That, among other things, yes.

14    Q.  And Mr. Blizzard asked you a whole lot about time and the time

15    reconstruction that you did.  I just want to ask you one example,

16    and that is the deposition that you took, I believe of a Mr. Bold?

17    A.  Yes, sir.

18    Q.  Were you the first one to take Mr. Bold's deposition?

19    A.  I was.

20    Q.  How much time did you submit for the taking of Mr. Bold's

21    deposition?

22    A.  I don't know.  The deposition took, you know, five hours, and

23    there were certainly a number of hours to prepare for it.

24    Q.  That was a five-hour deposition, correct?

25    A.  Approximately, yes, sir.

```
 1    Q.  Have you seen the submission from another member of the FAC

 2    regarding the deposition of Mr. Bold?

 3    A.  I have.

 4    Q.  How many hours did this other member of the Plaintiff Steering

 5    Committee submit for reading your five-hour deposition of Mr. Bold?

 6    A.  The deposition, the second deposition of Mr. Bold was taken by

 7    somebody with Mr. Girardi's firm.  No one asked me if they could,

 8    no one called me, no one asked me anything about it.  They just

 9    took my deposition and they read it, and they submitted about nine

10    hours of time for what took me five hours to take a deposition, but

11    they submitted about nine hours of time to review it.

12    Q.  Well, nine hours of time to review a deposition that took you

13    five hours to take?

14    A.  That's correct.

15    Q.  Do we ever go through and criticize anyone else's time that

16    took more to review our stuff than we did to do it, like

17    Mr. Blizzard criticized your time for review?

18    A.  We never have.  No one up to this date has ever criticized our

19    time.

20            MR. HOCKEMA:  No more questions, your Honor.

21            SPECIAL MASTER JUNEAU:  Counsel, let me ask you a couple

22    of questions.  Mr. Mayer, what is his name and who is he?

23            MR. BIRCHFIELD:  It's Ted Mayer with Hughes Hubbard and

24    Reed, Merck's counsel.  He's Merck's counsel with Hughes Hubbard

25    and Reed in New York.
```

```
 1            SPECIAL MASTER JUNEAU:  How do you spell it?

 2            MR. BIRCHFIELD:  M-A-Y-E-R.

 3            SPECIAL MASTER JUNEAU:  And the name of the firm is what?

 4            MR. BIRCHFIELD:  Hughes Hubbard and Reed.

 5            SPECIAL MASTER JUNEAU:  And there was another name

 6    mentioned in this discussion having to do with the exclusion.  It

 7    was Bold -- what was the name?

 8            MR. BIRCHFIELD:  Bold, the last deposition?

 9            THE WITNESS:  Bold, your Honor.

10            SPECIAL MASTER JUNEAU:  No, I am talking about testimony

11    regarding the exclusion of the Garza case.

12            MR. BLIZZARD:  Dubose, Kevin Dubose, D-U-B-O-S-E.

13            SPECIAL MASTER JUNEAU:  And the first name is what?

14            MR. BLIZZARD:  Kevin.

15            SPECIAL MASTER JUNEAU:  And he is with whom?

16            THE WITNESS:  He was our appellate lawyer.

17            MR. HOCKEMA:  He is the appellate lawyer in Houston, and

18    he's changed his firm name because they split and I don't know the

19    current name.

20            SPECIAL MASTER JUNEAU:  He is in Houston, though?

21            MR. BLIZZARD:  Yes.

22            SPECIAL MASTER JUNEAU:  Okay.  That will complete the

23    testimony regarding this, and thank you for the presentation.

24    You're excused, sir.

25            We are going to reconvene at nine o'clock tomorrow, and I
```

 1    will consider the two matters that are before me today and issue a

 2    ruling with respect to *Garza*.

 3              MR. ARCENEAUX:  Briefly a housekeeping matter, your

 4    Honor.  We submitted two different common exhibit lists on behalf

 5    of all objectors, and the reason I did it in two lists was because

 6    one of them is quite lengthy, it's 100-and-something pages long,

 7    but, in reality, all it is -- it shouldn't be daunting -- all it is

 8    is, it's a list of every file on the DVDs of discovery that were

 9    produced by the FAC.  So you'll just see it's just a list of file

10    after file after file, PDF file.  But in order for the record to be

11    complete, we wanted to provide a complete index.

12              So at this time I am going to give Mr. Herman a copy of

13    common objectors documents 100 and 102, which are the documents in

14    this list, which are the things that you actually gave me, I'm just

15    giving it back to you.

16              MR. HERMAN:  I appreciate that.

17              MR. ARCENEAUX:  And then on the other exhibit list which

18    is much shorter, we have 28, 29 common exhibits listed, and those

19    are on this CD which I am giving to Mr. Herman now.

20              You notice I put a yellow X.  That's because 28 and 29 we

21    don't have yet, 29 is the deposition of Mr. Birchfield.  As soon as

22    we get that I'll burn you a new disc.

23              MR. HERMAN:  That won't be necessary.

24              MR. ARCENEAUX:  Well, you'll want to see 28.  I am

25    producing those to Mr. Herman at this time.

```
 1          MR. HERMAN:  I appreciate that.  And I also appreciate --
 2          MR. ARCENEAUX:  And also one more thing.  Also, your
 3  Honor, I have a copy, if you would like it, of the memorandum in
 4  support of Eric Weinberg and Cohen Placitella & Roth's claim, which
 5  was filed this weekend.  You said you would like hard copies of
 6  things.  Thank you very much.
 7          MR. HERMAN:  I do want to thank professionally learned
 8  counsel's offer.  Also, the offer of Ms. Snapka's attorney who will
 9  provide us the exhibits later.  And in addition to that, the Kline
10  Spector files that Rebecca mentioned in chambers.
11          Thank you very much, we appreciate your cooperation.
12          SPECIAL MASTER JUNEAU:  The matter will be reconvened
13  tomorrow morning at nine o'clock.
14      (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED FOR THE DAY.)
15
16                    *  *  *  *  *  *
17
18                REPORTER'S CERTIFICATE
19
20      I, Karen A. Ibos, CCR, Official Court Reporter, United
    States District Court, Eastern District of Louisiana, do hereby
21  certify that the foregoing is a true and correct transcript, to the
    best of my ability and understanding, from the record of the
22  proceedings in the above-entitled and numbered matter.
23
24
25  Karen A. Ibos, CCR, RPR, CRR
    Official Court Reporter
```