```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
 2    ***********************************************************

 3    IN RE:  VIOXX PRODUCTS              MDL-1657
      LIABILITY LITIGATION               New Orleans, Louisiana
 4                                       Tuesday, May 10, 2011

 5    ***********************************************************

 6

              TRANSCRIPT OF FEE ALLOCATION PROCEEDINGS
 7        HEARD BEFORE THE HONORABLE PATRICK A. JUNEAU
                          SPECIAL MASTER
 8


 9
      APPEARANCES:
10
      FOR THE FEE
11    ALLOCATION COMMITTEE:          HERMAN, HERMAN, KATZ & COTLAR
                                     BY:  RUSS M. HERMAN, ESQ.
12                                   820 O'Keefe Avenue
                                     New Orleans, LA 70113
13
                                     BEASLEY ALLEN
14                                   BY:  ANDY D. BIRCHFIELD, ESQ.
                                     218 Commerce Street
15                                   Montgomery, AL 36104

16                                   SEEGER WEISS
                                     BY:  CHRISTOPHER A. SEEGER, ESQ.
17                                   One William Street
                                     New York, NY 10004
18
                                     LEVIN, FISHBEIN, SEDRAN & BERMAN
19                                   BY:  ARNOLD LEVIN, ESQ.
                                     510 Walnut Street, Suite 500
20                                   Philadelphia, PA 19106-3697

21                                   GIRARDI KEESE
                                     BY:  THOMAS V. GIRARDI, ESQ.
22                                   1126 Wilshire Boulevard
                                     Los Angeles, CA 90017
23
                                     THE LANIER LAW FIRM
24                                   BY:  W. MARK LANIER, ESQ.
                                     6810 FM 1960 West
25                                   Houston, TX 77069
```

```
 1                                  LEVIN PAPANTONIO
                                    BY:  TROY RAFFERTY, ESQ.
 2                                  316 South Baylen Street, Suite 600
                                    Pensacola, FL 32502
 3
                                    WEITZ & LUXENBERG
 4                                  BY:  PERRY WEITZ, ESQ.
                                    700 Broadway
 5                                  New York, NY 10003

 6
        FOR COHEN, PLACITELLA & ROTH
 7      AND ERIC WEINBERG:          MARGARET E. WOODWARD, ESQ.
                                    3701 Canal Street, Suite C
 8                                  New Orleans, LA 70119

 9                                  ROBERT E. ARCENEAUX, ESQ.
                                    47 Beverly Garden Drive
10                                  Metairie, LA 70001

11                                  AJUBITA, LEFTWICH & SALZER
                                    BY:  PASCAL F. CALOGERO, JR. ESQ.
12                                  1500 Energy Centre
                                    1100 Poydras Street
13                                  New Orleans, LA 70163-1950

14      FOR ESCOBEDO,
        TIPPIT & CARDENAS:          HOCKEMA & LONGORIA
15                                  BY:  DAVID H. HOCKEMA, ESQ.
                                    600 E Nolana Avenue, Suite 202
16                                  McAllen, TX 78501

17      FOR ANAPOL SCHWARTZ:        ANAPOL SCHWARTZ
                                    BY:  SOL H. WEISS, ESQ.
18                                  1710 Spruce Street
                                    Philadelphia, PA 19103
19

20      FOR CATHERINE SNAPKA:       BEIRNE, MAYNARD & PARSONS
                                    BY:  JACK E. URQUHART, ESQ.
21                                  1300 Post Oak Blvd., 25th Floor
                                    Houston, TX 77056
22

23      FOR BECNEL LAW FIRM:        BECNEL LAW FIRM
                                    BY:  KEVIN P. KLIBERT, ESQ.
24                                  425 W. Airline Highway, #B
                                    LaPlace, LA 70068
25
```

```
 1   FOR KLINE & SPECTER:        KING, KREBS & JURGENS
                                 BY:  HENRY KING, ESQ.
 2                                    REBECCA DIETZ, ESQ.
                                 201 St. Charles Avenue, 45th Floor
 3                               New Orleans, LA 70170

 4

 5

 6   Official Court Reporter:    Karen A. Ibos, CCR, RPR, CRR
                                 500 Poydras Street, Room HB-406
 7                               New Orleans, Louisiana 70130
                                 (504) 589-7776
 8

 9

10     Proceedings recorded by mechanical stenography, transcript
     produced by computer.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                         I N D E X

2

3    WITNESS:                                    PAGE/LINE:

4

5    **PROCEEDINGS RELATED TO THE ANAPOL LAW FIRM**

6    DAVID JACOBY

7      Direct Examination by Mr. Weiss            9/13

8      Cross-Examination by Mr. Seeger            41/6

9      Redirect Examination by Mr. Weiss          59/24

10     Recross-Examination by Mr. Seeger          61/20

11                      * * * * * *

12

13   **PROCEEDINGS RELATED TO COHEN, PLACITELLA & ROTH**

14   CHRIS PLACITELLA

15     Direct Examination by Ms. Woodward         69/13

16     Cross-Examination by Mr. Herman           118/15

17     Redirect Examination by Ms. Woodward      147/9

18                      * * * * * *

19

20   **PROCEEDINGS RELATED TO THE LAW OFFICE OF ERIC H. WEINBERG**

21   ERIC H. WEINBERG

22     Direct Examination by Ms. Woodward        152/8

23     Cross-Examination by Mr. Seeger           195/24

24     Redirect Examination by Ms. Woodward      216/2

25

<u>P R O C E E D I N G S</u>

(TUESDAY, MAY 10, 20)

(MORNING SESSION)


1      (OPEN COURT.)

2           SPECIAL MASTER JUNEAU:  We are going to proceed with the

3      second day of the hearings in this matter *in re:  Vioxx Products*

4      *Liability Litigation 1657*.  We had the hearing yesterday, completed

5      the hearing of yesterday, and now I am moving to the second day of

6      the hearing.  I'll ask counsel for the Anapol firm.

7           MR. WEISS:  Good morning, Sol Weiss.

8           SPECIAL MASTER JUNEAU:  Mr. Weiss, how are you doing this

9      morning?  If you will, I am going to allow you to make your

10     presentation now.

11          MS. WOODWARD:  Your Honor, before we proceed with that

12     may I --

13          SPECIAL MASTER JUNEAU:  Step to the podium, please.

14          MS. WOODWARD:  May I address housekeeping.  Margaret

15     Woodward on behalf of the objectors.  We've had a request from one

16     of the objectors who is scheduled to make a presentation on

17     Thursday, the Murray firm.  The court is already aware that

18     Mr. Murray is ill, that his son was going to appear in his stead,

19     he is in the courtroom today and his inquiry is whether he will be

20     permitted to submit his presentation on the papers rather than

21     testifying live?

```
 1              SPECIAL MASTER JUNEAU:  I will certainly accommodate that

 2   request, whatever, I am aware.

 3              MS. WOODWARD:  Any need for cross-examination?

 4              MR. SEEGER:  We're fine.

 5              SPECIAL MASTER JUNEAU:  Submit it on the brief.

 6              MS. WOODWARD:  Okay.  Thank you very much.

 7              SPECIAL MASTER JUNEAU:  Thank you, Mr. Murray.

 8              MR. SEEGER:  Anybody else who wants to do that as well

 9   should feel free.

10              SPECIAL MASTER JUNEAU:  Yes, sir.

11              MR. WEISS:  Your Honor, the Anapol firm is going to call

12   David Jacoby as its witness, my former partner.  And I have a few

13   housekeeping issues.  I would like to reserve about five minutes at

14   the end for a closing statement on behalf of the Anapol objection

15   if that's okay.

16              SPECIAL MASTER JUNEAU:  That's fine.

17              MR. WEISS:  And I would like to know whether you did

18   receive our exhibits?

19              SPECIAL MASTER JUNEAU:  I did.

20              MR. WEISS:  And will I need to put them into evidence?

21              SPECIAL MASTER JUNEAU:  Yes.  Counsel, were you here

22   yesterday?

23              MR. WEISS:  No, I was not.

24              SPECIAL MASTER JUNEAU:  What I had indicated to all

25   counsel of record, so that you'll have a complete record of this
```

1    matter, I was going to allow the parties to put in their exhibits,

2    including the brief that was submitted, so I am going to allow you

3    to do that now if you would like.

4         The way we did that, I am going to do it by objectors.

5    If you'll have a numbering call it Anapol and however you want to

6    identify it so I can identify it by objector, Anapol Exhibits 1

7    through 50, whatever the number is.

8         MR. WEISS:  Okay.  Let me offer as Anapol 1, it's a CD

9    ROM of every exhibit which we sent to you in the binder and we sent

10   copies to the FAC.

11        SPECIAL MASTER JUNEAU:  Any objection?

12        MR. SEEGER:  No.

13        SPECIAL MASTER JUNEAU:  Let the exhibit be received.

14   Counsel, let me ask you, does that exhibit include your brief?

15        MR. WEISS:  No, that's going to be Anapol 2.

16        MR. SEEGER:  Excuse me, Special Master Juneau.  We have

17   no objection to any exhibit of Anapol, but I believe there are a

18   couple of demonstratives that have been created using data we are

19   not clear on, but that would be the only objection we have.

20        SPECIAL MASTER JUNEAU:  All right, Mr. Weiss.

21        MR. WEISS:  Anapol 2 will be a copy of our final brief in

22   response to the FAC's comments about the Anapol tentative award

23   with all of the exhibits, and we'll call that Anapol 2.

24        SPECIAL MASTER JUNEAU:  Yes, that will be fine.  Let it

25   be received.

```
 1          MR. WEISS:  I understand, Special Master, that our lead

 2     counsel had asked for information regarding what the total amount

 3     of the assessments were that were paid from cases filed in New

 4     Jersey and I don't think we have an answer to that, just what were

 5     paid through the MDL or Texas and California, and I would just like

 6     to on behalf of the Anapol firm lodge an objection, we don't have

 7     that information, I think it's relevant for your determination.

 8          SPECIAL MASTER JUNEAU:  Let me see if I can hone down on

 9     it.  You said you previously asked for information on the total

10     amount paid to New Jersey?

11          MR. WEISS:  No, paid from New Jersey filed cases into the

12     common benefit fund.

13          SPECIAL MASTER JUNEAU:  Oh, into the common benefit fund.

14          MR. WEISS:  The same thing for California, Texas, and the

15     MDL.  And I believe our examiner was told they don't have the

16     information.  I think it's important and to have that information

17     for you to have it and Anapol has an objection because we don't

18     have the information.

19          SPECIAL MASTER JUNEAU:  Do you want to address that,

20     Mr. Seeger?

21          MR. SEEGER:  This is just kind of another, it's another

22     opportunity to ask for information that they have been, you know,

23     that this has been ruled on by yourself as to what they get and

24     don't get.  And there are numerous objections as to why we would

25     provide that, so rather than waste the court's time at this moment,
```

```
 1    we'll just object and perhaps we can talk about it.  I think you're
 2    just noting it for record?
 3              MR. WEISS:  That's exactly right.
 4              SPECIAL MASTER JUNEAU:  And the objection is noted.
 5              MR. WEISS:  I am just doing record objections.
 6              SPECIAL MASTER JUNEAU:  Sure.
 7              MR. WEISS:  At this time the Anapol firm time would like
 8    to call Dave Jacoby on the witness stand.
 9              SPECIAL MASTER JUNEAU:  Come up and I'll swear you in,
10    please, sir.
11        (WHEREUPON, DAVID JACOBY, WAS SWORN IN AND TESTIFIED AS
12        FOLLOWS:)
13                          DIRECT EXAMINATION
14    BY MR. WEISS:
15    Q.  Mr. Jacoby, would you give the Special Master a brief synopsis
16    of who you are and what you've done in your legal career.
17    A.  My name is David Jacoby, I have been an attorney since 1972.
18    In 1977 I began my career in mass tort beginning with asbestos.  It
19    went through asbestos litigation, breast implant litigation, lead
20    litigation, diet drug litigation, last litigation that I was
21    involved in prior to my retirement three years ago was the Vioxx
22    litigation.
23              In all of those prior mass torts, I've done nothing but
24    mass tort essentially since 1977, I was lead counsel on several
25    cases, liaison counsel of the court.  In regard to Propulsid, I was
```

1    a liaison counsel here in New Orleans for the New Jersey state

2    plaintiffs with the federal bar.  And that's essentially what I've

3    done over my career in a nutshell.

4    Q.  And when did you join the Anapol firm?

5    A.  I joined in the summer of 2003.

6    Q.  And what was your primary responsibility -- and you were a

7    partner of the firm?

8    A.  I was.

9    Q.  What was your primary responsibility in the years you were in

10   Anapol?

11   A.  From 2003 till the end of the Vioxx litigation, I retired

12   several months after the settlement, my primary, really my sole

13   obligation was the Vioxx litigation.

14            MR. WEISS:  Can I approach the witness, your Honor?

15            SPECIAL MASTER JUNEAU:  Yes, sure.

16   BY MR. WEISS:

17   Q.  Mr. Jacoby, I have before you a hard copy of the first binder

18   of exhibits that have been offered into evidence in this case.

19   A.  Okay.

20   Q.  And can you basically explain to the Special Master how items

21   one and two, that is the time submissions, the general litigation

22   and the time submissions for the *Hatch* case were generated?

23   A.  Yeah.  Beginning with item one time submission for December 5,

24   2001 through May 31st, 2008, again with the understanding I came to

25   the firm in June of 2003, when I joined the Vioxx team the

```
 1   litigation, the Anapol office was already pretty well involved in
 2   the litigation.  After the results of VIGOR had come out and
 3   significantly prior to the drug being withdrawn from the market,
 4   people at the Anapol, Mr. Weiss specifically, became very trouble
 5   by the findings of VIGOR, started investigating the matter,
 6   contacting other counsel in New Jersey, and started the development
 7   of a structure for litigation.
 8           Started developing the beginnings of questionnaires, the
 9   beginnings of work assignments, the overall structure that was
10   really carried through throughout the litigation.  Beginnings of
11   investigation into the science and knowledge and looking at
12   documents, looking at sales rep material, and the beginnings of
13   document production, which even at that point prior to the drug
14   being withdrawn from the market, prior to the onslaught of some
15   16,000 cases was quite substantial.
16           MR. WEISS:  Let me ask you this question.  By the way, is
17   there any objection the FAC has to the hours that were submitted in
18   Exhibit 1?
19           MR. SEEGER:  I just don't think we're prepared -- I am
20   not sure what you mean by an objection.  What did you mean, did I
21   go through them line by line?
22           MR. WEISS:  Is the FAC contesting the hours submitted?
23           MR. SEEGER:  Would you like me to?
24           MR. WEISS:  I just asked you.
25           SPECIAL MASTER JUNEAU:  Counsel, we are going to handle
```

```
 1   that, you have an allotted time to cross-examine, he either does or

 2   does not have to examine that.

 3        MR. WEISS:  If there's no real contest I would like to

 4   move on; if there is, I have to go through it.

 5        MR. SEEGER:  Counsel can do as he wants, and if I choose

 6   to I'll cross.

 7        MR. WEISS:  Well, since we don't have an answer.

 8   BY MR. WEISS:

 9   Q.  Mr. Jacoby, let me try it this way.  From the procedural

10   matter, how were the hours kept that are all in Exhibit 1?

11   A.  The hours that were kept really as a matter of protocol in the

12   office over numerous prior mass torts has carried through in this

13   as always your time has to be kept contemporaneously.  At the end

14   of the day, certainly by the beginning of the next day you put your

15   hours in.  We had separate designations for general liability time

16   and separate designations for case specific time.

17        The way the case was structured, the way we structured it

18   in our office, Mr. Weiss and myself spent a great preponderance of

19   our time with regard to general liability.  We had three or four

20   other attorneys that worked on the case specific.  If you worked on

21   the general liability you had a separate designation, you'll have

22   to excuse me I am going back, I believe it was 73 with 0000.  I

23   believe it was 73 with 0000.  And of course the case specific we

24   put that in the case file.  And those were submitted monthly,

25   reviewed by Mr. Weiss and filed.
```

```
 1   Q.  So Exhibit 1 is what we referred to as the common benefit time

 2   only, correct?

 3   A.  That's correct.

 4   Q.  And if someone worked on an individual case, that would not be

 5   included in that, correct?

 6   A.  No, it would not.  It would have no bearing in this litigation.

 7   Q.  And is an example of an individual case in Exhibit 2, the Hatch

 8   file?

 9   A.  Yes.

10   Q.  While you're talking about Exhibit 2, can you explain to the

11   Special Master what the Hatch case was about?

12   A.  The Hatch case was a case that was trial listed.  It was a case

13   that interested us very much.  It was a case where Mr. Hatch had

14   died of an MI, his wife worked for a physician, he was given many,

15   many samples in big bags and took them home, he was on vacation in

16   the Caribbean, had gone surfing and a blister pack that we believe

17   contained Vioxx was found in his suitcase.

18          As we got into the case and we got it trial ready, we did

19   everything that is implied by the words trial ready, had everything

20   up to speed, we had met with the witnesses, we had met with

21   Mrs. Hatch -- and when I say we, I mean Mr. Weiss, Mr. Spizer,

22   myself drove to Toms River -- we got her ready, she was deposed,

23   got our experts ready.

24          As we got into the case, and I mean deep into the case,

25   we were presented with some material that apparently Mr. Hatch in
```

1   applying for life insurance had listed Celebrex as one of the drugs

2   that he took.  We were totally unaware of it.  What we did, we

3   had -- and we focused this case being unaware of that information.

4   We had and we assigned Ms. Racine, a young attorney in our office,

5   to really drop everything and get to the bottom of this, look

6   through everything you could get your hands on and see if Celebrex

7   comes up in any way.  She did, she spent a lot of time, couldn't

8   find anything.

9          We were then presented with another document that

10  apparently Mr. Hatch had seen another physician that he didn't tell

11  us about and that physician -- and on his prior medication

12  questionnaire on its initial visit had also put down Celebrex.  At

13  that point we made a decision that we were not, for many reasons,

14  being unfair to Mrs. Hatch, being unfair to the court, being unfair

15  to the litigation in a position to really go forward with that case

16  based upon what we found.  So notwithstanding the fact that we had

17  put a ton of time, a ton of effort, a ton of money into the case,

18  right thing to do, the proper thing to do was to walk away from it,

19  which is what we did

20  Q.  So the case was pulled out?

21  A.  It was.

22  Q.  The third exhibit is our time submissions on trial cases

23  Abdel-Malek, Kimmelman, Ortiz, Levinson, Groff, DiTrolio, Biehls,

24  Rodemoyer, Williams-McCray?

25  A.  Right.

1   Q.  Tell the Special Master what those cases were about.

2   A.  These nine cases were trial listed and trial ready.  Way back

3   at the beginning when *Humeston I* was selected for trial we had also

4   presented Abdel-Malek and Kimmelman that were two cases that were

5   trial ready, we wanted to be aggressive, we tried to push those

6   cases for trial; Judge Higbee made the decision that *Humeston I*

7   would be tried and that's fine, and as you know that one went

8   forward.  And we had those two cases really in a position to be

9   ready to go to trial.

10  Q.  Let me ask this question.  Were there case specific experts?

11  A.  Absolutely.

12  Q.  Were the generic experts?

13  A.  Yes.

14  Q.  Were the case specific experts cross-examined by Merck's

15  lawyers in New Jersey?

16  A.  Yes, they were.  All that needed to be done on those cases was

17  just put together your final witness list and go argue the case.

18  Q.  Now, they were prepared in concert with the *Humeston* case?

19  A.  That's correct.

20  Q.  And another case that Seeger Weiss had, correct?

21  A.  That's correct.

22  Q.  So four cases were prepared for trial and one was selected?

23  A.  That's correct.

24  Q.  After the preparation was completed?

25  A.  That's correct.

1    Q.   And that was Humeston?

2    A.   Yes.

3    Q.   There came a time when in New Jersey another group of cases

4    were getting ready for trial, correct, 37 cases, a group?

5    A.   A tranche of 37 cases.

6    Q.   And which one of the Anapol cases were in that?

7    A.   I believe, I'm going back a little bit, but I believe in that

8    with that tranche of 37 cases was Abermallette and Kimall.

9    Q.   Rodemoyer and Biels?

10   A.   I'm sorry, I'm thinking of a different time frame.  Rodemoyer

11   and Biels were in that tranche of case.

12   Q.   And as a result of that process, were case specific expert

13   reports prepared?

14   A.   Yes.

15   Q.   Were experts deposed?

16   A.   Yes.  I mean, I went to Pittsburgh three times just to meet

17   with Ms. Rodemoyer.

18   Q.   Were generic expert reports prepared by the Anapol firm for

19   those cases?

20   A.   Yes, they were.

21   Q.   Am I correct that Cona/McDarby were the two cases that were

22   selected from that group?

23   A.   Yes.  Again we tried to push the cases as much as you can, you

24   want to be aggressive, you want to move it forward, you want to put

25   your hand in the air and say judge pick us.  The judge in her

1    wisdom selected Cona/McDarby to go to trial, and again, that's

2    litigation and we live with it.

3    Q.  Now, there were another tranche of cases, correct?

4    A.  That is correct.

5    Q.  And they were supposed to be tried, I believe, in summer or

6    fall of 2007?

7    A.  Yes.

8    Q.  And tell Special Master about those cases in New Jersey.

9    A.  Well, again, these cases were given to us, they were from

10   another tranche of cases, Judge Higbee's approach, which we were

11   very happy with throughout was to be as aggressive as she could, to

12   push cases.  We had several cases in that tranche of 37 that were

13   listed for trial.  And again, we got those cases ready.

14   Q.  I'm talking about the cases that were getting ready for trial

15   when the settlement announced?

16   A.  Okay.  That was in -- those cases were -- at that point in the

17   summer of '07 -- is that when you're talking about?

18   Q.  I believe so.

19   A.  Yeah.  In the summer of '07 Judge Higbee decided that we were

20   going to go forward in four courtrooms, four jurisdictions in the

21   state of New Jersey.  From the plaintiffs' point of view, from the

22   New Jersey point of view, we were thrilled.

23           SPECIAL MASTER JUNEAU:  Excuse me, what?

24           THE WITNESS:  Pardon me?

25           SPECIAL MASTER JUNEAU:  You said, you -- I didn't

1    understand.

2              THE WITNESS:  From our point of view, from Anapol's point

3    of view and from New Jersey's plaintiffs point of view, we were

4    thrilled with the idea of going forward in four jurisdictions with

5    ten individual discrete cases.

6              Now, in that I believe the jurisdictions were New York,

7    North Carolina, New Jersey and Pennsylvania.  The Anapol firm, our

8    firm had responsibility for three Pennsylvania and three New Jersey

9    cases.  In addition to that, spent a great deal of time doing

10   everything we could to help the North Carolina plaintiffs, spent a

11   lot of time with them.

12             But from the summer of '07 until the time of the

13   settlement, the only way I can describe it -- and I think I don't

14   have to describe it to any trial lawyer in this room -- is that you

15   go dark.  I mean, at that point you're getting three cases ready

16   for trial, your colleague is getting three cases ready for trial.

17   You've given experts to other people in jurisdictions, you're

18   helping them get ready.

19             While this was going on there was a tranche of another

20   250 cases for active aggressive discovery.  We had 15 of those

21   cases.  You can't ignore those but you get your six cases ready for

22   trial.  And this litigation, this is complex litigation.  This is

23   involved litigation.  These are not left-hand turn cases.  To get a

24   case, one case ready for trial really takes a substantial effort.

25   To get three was quite an experience.  And, you know, as I look

1    back on it now from June till November, it was nightmarish, there

2    is no such thing as weekends or nights or days.  You go dark, you

3    get ready for trial.

4    Q.  Were generic experts prepared for trial in those cases?

5    A.  Prepared, deposed.

6    Q.  Were case specific experts done?

7    A.  Yeah, deposed, prepared.

8    Q.  Did Anapol have its list of liability documents done?

9    A.  Yeah, we had everything in order.

10   Q.  And that had been done over a period of time for trial,

11   correct?

12   A.  That's correct.

13   Q.  Let me talk about that for a second.  Let me backtrack.

14   A.  All right.

15   Q.  Was there a time before the *Humeston* case was selected to be

16   the first tried case in New Jersey where Anapol and Seeger Weiss

17   spent two weeks putting together a liability case?

18   A.  Yeah.

19   Q.  And where did that take place?

20   A.  It took place under the guidance and I guess as a facilitator

21   Mr. Rodney Jew, who is jury consultant, who was an expert, world

22   renowned, written a lecture all over the world, his offices were in

23   Palo Alto, California.  And we went out there for five days and

24   some period of time passed and we went out there for five days and

25   discussed everything from graphics to how jurors think, what he

1    called the preloads, how to approach litigation skills.  But mostly

2    what we did was we broke down this litigation and we did it in a

3    way, if you remember from school, your Honor, when you diagram

4    sentences and you have the one thing coming out and the one thing,

5    we had different ideas coming out and you take it and that leads to

6    two more, and you break it down and that leads to more.

7            We diagramed and mind-scaped these cases in great detail

8    witness by witness by witness, document by document that had

9    relevance, and we broke these cases down in two five day very

10   intensive sessions.  But what came out of that, in addition to a

11   greater understanding of juries and so on, but what came out of

12   that were essential theories in regard to how we decided, how

13   Anapol decided was the best way to go about trying these cases, the

14   best way to present these cases.

15           It didn't necessarily was agreed to by other counsel, I

16   mean we had a certain view of the role of sales representatives in

17   this case, we had a certain view that we would not present this as

18   some sort of a global conspiracy by the Merck Company that

19   everybody was in cahoots, that everybody knew what was going on, we

20   as a result of meeting with Dr. Jew and our own discussion between

21   the Seeger office and us and going back and forth came up with what

22   I considered to be a very significant, a very workable, a very

23   believable factually based trial plan, a theory to try these cases,

24   and that's what we were prepared to do.  But for the settlement.

25   Q.  Now, you're not saying that Seeger Weiss wasn't an active

1   participant, are you?

2   A.  No, of course not, they were very active.

3   Q.  They were very active, correct, it was a collaboration at that

4   point in time?

5   A.  Absolutely, yeah.

6   Q.  Now, in addition to that two-week period in which we developed

7   themes why marketing would trump science, am I correct?

8   A.  That's correct.

9   Q.  And was it decided in that session that it would be better not

10  to vilify the company Merck in New Jersey but to talk about a few

11  executives at Merck who agreed?

12  A.  Yeah.  We talked about it at great length because it's a

13  significant decision, you're setting down the blueprint, you're

14  setting down how this trial is going to look like, you're setting

15  down what you're probably going to say in the first five minutes of

16  your opening.  So you better be right, it better make sense, and

17  you better be able to prove it.

18          And we felt that this was the way to go, that we talked

19  about at one point I threw out like almost, you can run this whole

20  trial through Scolnick, you can run everything through Scolnick.

21  What we came up with is that there were three individuals who were

22  very significant individuals in this litigation, we would focus on

23  them, we would focus on the implications on what they had written

24  and what they had said, it was marketing, it was regulatory, it was

25  science.  And with all of that we could put a real, I hesitate to

1   use the word story, it's not a story, but we could put a real case

2   together that would make sense to the jury and that we could prove.

3   Q.  I want to move along because we have a time limitation.

4                I want you to go to Exhibit 23 in your binder.  And could

5   you remove that from the binder, Mr. Jacoby, 23.

6   A.  Yes.  Okay.

7   Q.  Do you need help?

8   A.  I am fighting the thing.  Go ahead.

9   Q.  I want you to give 23 to the Special Master.

10  A.  Okay.  Here you go, sir.

11  Q.  What is Exhibit 23?

12  A.  Exhibit 23 comes in two forms, the form that the Special Master

13  is a hard copy calendar, and that calendar is a time line that we

14  put together and shared with all counsel who were interested and it

15  was used as a template in numerous depositions of sales reps.  Also

16  in addition to that it came in CD form where you could click on the

17  actual document.

18  Q.  So as I understand it, that was a calendar that was generated

19  by the Anapol firm, correct?

20  A.  That's correct, it was our work product.

21  Q.  And it had every relevant sales, electronic sales bulletin?

22  A.  Every bulletin.

23  Q.  And all of the information that Merck supplied to the detail

24  people?

25  A.  That's correct.

1   Q.  About Vioxx, correct?

2   A.  That's correct and when.

3   Q.  And it was put in a date when the document was issued, correct?

4   A.  That's correct.

5   Q.  And the doc was actually imbedded so if you clicked on the

6   calendar the doc would come up?

7   A.  The document would come up.

8   Q.  And how long did it take to prepare that document?

9   A.  I don't know how many -- I can't tell you hours worth that we

10   spent, but I'm sure it was in the hundreds, it was a very large

11   undertaking.

12   Q.  Do you recall how we disseminated that document to the lawyers

13   in New Jersey?

14   A.  Yeah.  Several of us, we made it known when we were working on

15   it that it would be available, we gave them an estimated time of

16   completion, we told counsel, we had repositories in Philadelphia

17   and New Jersey for all documents, but we told them when it was a

18   finalized document they were more than welcome to use it.  We

19   thought it was an excellent road map, an excellent template for the

20   taking of a certain class of witness; and it was a class of witness

21   that I believed then, I believe now and our office believed, I

22   think probably most people in this courtroom would agree, these

23   sales representatives were central to this litigation in terms of

24   what they were told, what they knew, what they didn't know, how

25   they presented what they were told.  So this was really a

1    significant integral part of what these trials were going to be.

2    Q.  Now, in addition to being useful for taking the sales rep

3    depositions, was it also useful in preparing your treating

4    physician and your prescriber --

5    A.  Oh, absolutely.

6    Q.  -- with respect to what they were provided by Merck --

7    A.  Yeah.

8    Q.  -- regarding the cardiovascular risk of Vioxx?

9    A.  I used it repeatedly.  I had been told by a number of lawyers

10   that they used it.  It takes you through the experience of Merck,

11   it takes you through elements of marketing, of regulatory, nicely

12   brings in a lot of the elements of this trial.  And it was very

13   informative for the physicians.

14   Q.  Did we also in the Anapol firm in addition to taking sales rep

15   depositions take prescribing/treating doctor depositions?

16   A.  Yes.

17   Q.  How many?

18   A.  Treating doctor physicians, I didn't look, I have no idea, I

19   couldn't even estimate.

20   Q.  Now, did we also offer and disseminate to lawyers in New Jersey

21   who asked deposition transcripts of the depositions the Anapol firm

22   took of the doctors and the sales reps?

23   A.  Yes, right.  It was our policy when we would meet at various

24   committee meetings and meet with other counsel when the depositions

25   come in, I'm sure a lot of offices do this, you don't let it sit at

1    the edge of your desk, you cut them down, you take what's relevant,

2    you take what's useful, and you mark them up and take line and page

3    and take what you're going to need for trial.  And we did that with

4    every deposition that came in.

5    Q.  With respect to protecting patient confidentiality, what did we

6    do?

7    A.  We redacted.  It was very sensitive obviously to that

8    confidentiality and that was done.

9    Q.  Do you remember paralegals in our office just sending out the

10   questions and not the answers?

11   A.  Yes, of course.

12   Q.  When we talk about a repository, do you recall approximately 20

13   million documents of sales reps?

14   A.  Yes.

15   Q.  Information being provided by Merck in New Jersey only,

16   correct?

17   A.  That is correct.

18   Q.  And did Anapol host that?

19   A.  Yes.

20   Q.  And did we not log in all of those documents?

21   A.  We did.

22   Q.  And did we not at meetings, monthly meetings in New Jersey with

23   the court admonish Merck when they claimed they couldn't produce

24   these detail notes quick enough showing them that they had produced

25   the same detailed records before in another case for the same

1    representative?

2    A.  I was sitting right there.  I don't recall offhand how many

3    judicial conferences we had, I believe it was on the order of 36,

4    but I recall that issue coming up several times when Merck was

5    somewhat hesitant to produce documents pointing out to them that

6    they, in fact, did have the capacity to do just so.

7    Q.  After one or two sales rep depositions that the Anapol firm

8    took, and we shared it with other people, we had meetings where?

9    A.  Meetings took place all over.  They took place predominantly

10   because the way it broke up, we had a lot of meetings at Weitz &

11   Luxenberg, we had a lot of meetings at Seeger Weiss, we had some

12   meetings in Philadelphia; but because of logistics, the way it

13   breaks down, it's totally unfair to ask eight lawyers go this way

14   as opposed to two lawyers going this way, so it was just incumbent

15   upon us to hop on the train, which we did, and go to those offices

16   which was easier.

17          Not to say we didn't host our meetings, we certainly did,

18   but by in large I can recall, I couldn't count the number of trips

19   to New York to attend these various meetings.

20   Q.  What law firms were there at the meetings?

21   A.  I'm sorry?

22   Q.  What law firms were at the meetings?

23   A.  Oh, my goodness.  Weiss & Luxenberg, Seeger Weiss,

24   Mr. Placitella's office, Eric Weinberg would be there, we did have

25   sign-ins, I'm trying to think of who else would be there, I think

1   Mr. Lanier showed up on occasion or people from his office would

2   show up.

3   Q.  So we did have meetings for New Jersey lawyers?

4   A.  Yes, of course.

5   Q.  And New Jersey litigation?

6   A.  Yes.

7   Q.  And there were assignments given out?

8   A.  Yeah.  The meetings were not, I mean, I don't want it to sound

9   in any way that these meetings were an afterthought or sort of an

10  ad hoc thing, these meetings were laid out, attendance was

11  mandatory, you had to show up with you work assignments in tact.

12  The cases were discussed in great detail, spent a part of the

13  meeting going over the usual where are we going.  But we broke down

14  assignments for various law firms to complete for this litigation,

15  give you a couple of examples --

16  Q.  Who was taking the laboring oar in New Jersey on marketing?

17  A.  That was Chris Placitella.  We had known each other for a long

18  time, we knew that he had a real interest - and more than a real

19  interest, a real ability on this issue of marketing, and both you

20  and I, I presume other lawyers, I don't mean ever to exclude any

21  other lawyers, our thoughts aren't original, they are not only our

22  thoughts, anybody had them, but we felt very strongly that

23  marketing, in depositions marketing was a huge part of this case,

24  and not only the "in it to win it" stuff.

25          And Chris got into it, he developed Mr. Nesi who was an

1   expert, very capable expert, got his report ready, got all of the

2   commercial time and all of the things to make what I thought, and

3   we were going to use that in our trial in January of '08, to put

4   this marketing piece because the marketing piece, as I looked at

5   the litigation, dovetailed with the regulatory, dovetailed with the

6   science, to look at the doctor as a man of science and not a man of

7   marketing is not to me an understanding of the litigation.

8   Q.  Well, there were other firms besides Mr. Placitella, correct,

9   the Lanier firm helped in marketing?

10  A.  I'm sorry?

11  Q.  The Lanier firm helped in marketing?

12  A.  Tremendous.

13  Q.  The Seeger Weiss firm helped in marketing?

14  A.  Tremendous.  You can call Chris or you can call David any time

15  you needed something and you always knew you were going to get

16  them.

17  Q.  Now, with regard to science and experts, who helped develop a

18  lot of the experts in the New Jersey litigation?

19  A.  That was primarily, we were involved but that was really in the

20  vanguard of that was Mr. Weinberg.  Mr. Weinberg helped us

21  tremendously with Dr. Kostis, he developed Dr. Kostis, with our

22  help, he developed him, he developed an algorithm for trying to

23  assess the quanitative, the damage done in regard to causation with

24  MIs caused by Vioxx.

25          He developed Madigan who is a biostatistician, who was a

1    marvelous expert who prepared very complex stuff, it's really not

2    for everybody.  As I sit here I think 50 percent of it was over my

3    head.  But it was effective, we knew it was going to be effective

4    in trial, he spent I can't tell you how many hours with

5    Dr. Madigan, we would go up numerous times to New Brunswick to sit

6    and help and do what we could.

7              He also in my case, he was tremendously helpful with

8    Dr. Altobelli who was going to testify in January for me in three

9    cases.

10   Q.  Dr. Antobelli was a treating cardiologist?

11   A.  He was kind of a hybrid, he was a treating cardiologist but

12   also very knowledgeable in regard to general liability and we were

13   going to use him in a kind of a hybrid fashion.

14   Q.  In addition to those people, there was also other generic

15   experts, Dr. Rich?

16   A.  Yeah.  Dr. Rich from -- who was a marvelous expert from

17   Rochester, New York, very credentialed.

18   Q.  Was he -- and Dr. Rich, Special Master, they are tab 7, 8 and

19   9.  Dr. Rich was extensively cross-examined by Merck's lawyers in

20   the New Jersey cases?

21   A.  For days.

22   Q.  Dr. Rich passed Landrigan and Kemp which is New Jersey's

23   standard for Daubert?

24   A.  That's correct.  He was qualified by the court as an expert.

25   Q.  And who developed Dr. Rich?

1    A.  We did.

2    Q.  Was Dr. Rich offered to use by anybody in the country who

3    wanted to use him?

4    A.  Yeah.  We offered Dr. Rich.  As a matter of fact, we were taken

5    up on that offer by the North Carolina attorneys who listed

6    Dr. Rich as an expert in the cases again that I referred to that

7    were scheduled for trial in '08.

8    Q.  Dr. DePace, a cardiologist?

9    A.  Correct.

10   Q.  Cardiologist testified and consulted with Anapol for many years

11   before Vioxx?

12   A.  Yeah.

13   Q.  And was Dr. DePace utilized by other law firms?

14   A.  Yeah.  I mean, it's a sharing process.  That's what this is all

15   about, that's how you go forward, you don't go forward by yourself,

16   you go forward with your colleagues.  And when colleagues said,

17   hey, listen, we could use a cardiologist, we would like somebody

18   from South Jersey, we want somebody with that flavor, this is what

19   we want.  I know we offered him to Seeger office, I believe they

20   testified in McDarby.  Sometimes you're a little hesitant because

21   you're a little protective of your experts, they don't grow on

22   trees, but in this litigation that's not how get it done, you get

23   it done by sharing all you have.

24   Q.  Did we spend a lot of time with Dr. DePace educating him?

25   A.  Yeah.  I mean, this is I think for anybody that's done this,

1    I'm sure everybody in this room has, experts are high maintenance

2    people and if they haven't been involved in litigation, you have to

3    bring them along, you have to nurse them, you have to sometimes

4    hold their hand, you have to show them what they need to look at,

5    you have to show them things that hurt your case as well as help

6    your case; because the last thing you ever want to do is put an

7    expert on the witness stand who is not capable of defending

8    himself.  And what does that do, hurt your client.

9    Q.  Now to be fair, other firms like Seeger Weiss did help in the

10   preparation of Dr. DePace?

11   A.  Of course, sure, they -- absolutely.

12   Q.  Anapol was also looking at stroke victims, correct?

13   A.  That's right, that's correct.

14   Q.  Would you pull out of the binder Exhibit 6 and hand it to the

15   Special Master.

16   A.  Sure.

17   Q.  Who was Mark Eisenberg?

18   A.  Dr. Eisenberg was a doctor in Canada who we consulted with.

19   Actually if I recall properly, I didn't know Dr. Eisenberg

20   originally but he was brought to our attention when we knew we had

21   to get stroke cases ready and we needed a very competent, qualified

22   generic expert.  And one of our partners Jim Ronca, said, listen, I

23   know this individual, he is tremendously well credentialed, you

24   need to talk to him, you need to go up and run it past him, very

25   knowledgeable, and see what his interests are, which I believe you

1    did.

2              We went up, cultivated him, we nursed him along.  To my

3    knowledge, if I'm wrong I'll humbly apologize, I never read another

4    generic general liability report in regard to stroke causation.

5    Dr. Eisenberg prepared what I thought was an excellent, excellent

6    report that dealt with this issue.  And extensive bibliography, he

7    put in a tremendous amount of time that we put in with him, but the

8    final product was worth it.

9    Q.  Was the New Jersey court system contemplating having a stroke

10   trial come up after the January trials in 2008?

11   A.  Yeah, Judge Higbee indicated that after we finished the four

12   jurisdictions, the ten days, that she wanted to get a stroke case

13   up and ready.

14   Q.  So Anapol was ready to try a stroke case?

15   A.  Well, we wanted to be.  After we finished our six trials, if

16   there was an opening and we were happy to fill it and try a stroke

17   case.

18   Q.  Now, we could spend hours talking about what else was done

19   specifically in New Jersey, I just want to point a few things out.

20   Did we prevent any other jurisdiction from using information and

21   data that was collected by the New Jersey lawyers working outside

22   the MDL, can anyone else use it?

23   A.  Of course.  I mean, I was running the Cherry Hill office, we

24   had a repository of all documents.  I can't tell you how many

25   times, I would come into the office and there would be attorneys

1   sitting in the library or conference room looking over documents,

2   that's what it was for.  That's how you succeed in this litigation.

3   Q.  And it was not limited just to New Jersey lawyers, as it?

4   A.  It was limited to our colleagues.  Your colleagues, there's not

5   a geographical border, there is not a borderline to prevent

6   something, in my view, not to sound cheesy, to prevent somebody

7   from being your colleague.  If we could help somebody and come in,

8   please, help yourself.  Happy to do it.

9        MR. WEISS:  For the record, Special Master, Exhibits 10

10  through 22 have all of the case specific reports by Dr. DePace you

11  could get a look at them, for all of the cases that he was prepared

12  to testify about, some of which were not Anapol cases but Anapol

13  allowed Dr. DePace to work with those lawyers for their clients.

14  BY MR. WEISS:

15  Q.  Was all of the time you spent on Vioxx recorded on time sheets?

16  A.  No, no.

17  Q.  What type of time wasn't recorded in the time sheets and what

18  did you do?

19  A.  Well, one of the, you know, banes of my existence and I'm sure

20  that Chris Seeger and David Buchanan would say the same thing, we

21  were co-lead liaison counsel; so we would get phone calls every

22  day, without exception, every day.  I have a question, they said I

23  had a deficiency, I don't think it's a deficiency, let's talk about

24  it.  I'm thinking you're using such and so an expert, what's on the

25  agenda next week, you name the question.  I had one guy call me

1    three times to ask me if I thought he could get back for a dental

2    appointment.  That's what you called me for three times.

3    Everything from the trivial to the heart of the litigation.

4           And what I would do, because, look, we consented to be

5    liaison counsel, that comes with a responsibility, these calls

6    should not be going to the court or anywhere else.  As I viewed it,

7    we were there to take pressure off the court.

8           So at the end of the day my habit was my secretary would

9    keep the telephone slips of all of these people would call and had

10   all various questions that were all over the lot, she handed me the

11   slips of paper, eight, ten, whatever.  I go in, close the door,

12   and the best way to get a lawyer I found a long time ago is between

13   4:30 and six in the evening, back from whatever they're doing, they

14   don't have to chase me, I don't have to chase them.  I spent an

15   hour and a half, two hours returning every phone call because the

16   last thing I wanted, I mean there's sort of a personal element is

17   for somebody to come to a conference in Atlantic City and hold up

18   his hand and say, Judge, I tried to get a hold of liaison counsel,

19   I had this legitimate question and the guy never called me back.

20   That's not going to make us look very good.

21          So you call them back, you answer their questions, you

22   try to keep it focused and relevant.  And that was a daily

23   occurrence.  Thank goodness for cell phones.

24   Q.  Is there any other time that you didn't record time sheets?

25   A.  Oh, I think so, sure.  You know, I think you try, we were very

1    cognizant, very sensitive to this idea that we would be held

2    accountable for our time, as we should be, and you try to do it

3    contemporaneously.  You're not infallible, I am not infallible by

4    any means, there are times when you attend something and you come

5    back and you didn't get it in.  You want to because you know that

6    would translate into compensation, but it doesn't get there.  You

7    get on the phone with somebody not having to do with the liaison

8    stuff talking to somebody about one of the people on our committees

9    or whatever and you spend a half hour, you don't run to put a half

10   hour down, you just do it and get on with it.  And I think any

11   attorney would tell you that.

12   Q.  Did you also freely give your time whenever asked to help other

13   law firms?

14   A.  Absolutely.

15   Q.  Did you give any guidance or help in *Humeston I*?

16   A.  Yeah.  I mean, what happened on *Humeston I*, the way it

17   happened, we had a meeting in Mr. Seeger's office way back when and

18   I think we were just becoming aware that *Humeston* was one of the

19   cases that may be called.  And it came out, as I recall and I'm

20   pretty sure I remember, it came out that I was born and raised just

21   outside of Atlantic City and I tried numerous cases in Atlantic

22   County.  And just in the course of talking I said, listen, I know

23   Atlantic County, I know every town, I know every township, I think

24   I know, let me not pat myself on the back too much, where you would

25   want jurors, where you wouldn't want jurors.

1          And also, Atlantic County has a very arcane jury

2     selection system that's been in existence for 150 years.  For

3     instance, when you strike a juror, you don't draw a line through

4     the juror's name on the sheet, you stand up and you excuse the

5     juror.  Now, all of the people, all of the people in the panel, all

6     of the people in the jury box know who is striking them.  That can

7     be very awkward for somebody who has to kind of live with that.

8          And I was mentioning it to David and Chris, you have to

9     be aware of this, and I told them how the way I would strike

10    somebody, we thank you and what to say; because the jurors are

11    immediately seeing why did they strike that guy, they didn't like

12    the way he looked, and they start getting a lot of thoughts that

13    you don't necessarily need them to have.

14          So I started talking about it and Chris said it me,

15    listen, if you could come down and go through jury selection with

16    us, I would really appreciate it.  I would be happy to.  I'll learn

17    something, I'll participate.  I sat there on the side, not at the

18    counsel table but on the side off to the right of Judge Higbee, and

19    watched the selection of the jury.

20          Did I agree with everything, no, it wasn't my place to

21    agree.  I had some issues that I particularly one juror I did have

22    trouble with, I expressed it.  And the jury was selected.  I did

23    everything I could to participate, you know, because I wasn't trial

24    counsel, it wasn't my trial.  Somebody says, hey, you were there,

25    you lived down there, you know what's going on, help.  What do you

1    want to say?  No, to a colleague, to somebody you like and respect?

2    You go down and help.

3    Q.  Did you also have any interaction with the Seeger Weiss firm

4    with regard to the charging of the jury?

5    A.  Yeah.  Well, throughout the trial we would go back and if there

6    were meetings in the 15 minute breaks, hour and a half at lunch and

7    throw my two cents in just to help, to talk, did you think about

8    this.  People in trial don't want a lot of discussion, they're

9    focused.  Whatever you can do, the idea was let me help.

10            At the end of the trial David Buchanan came to me and

11    said, listen, we're going to have charge conferences, they're going

12    to start five o'clock and they went to like one, I would really

13    like you to be there.  Again, I don't have to spend any time with

14    anybody in this room telling them how important the charges to the

15    juries are, you want certain words in certain places brought out in

16    a charge conference.  And I said, yeah, I would be happy to.

17            They sent over to me Merck's proposed jury charges, and I

18    spent a lot of time, I was up to two o'clock in the morning the one

19    night just trying to break down the jury charges.  This was the

20    first trial in Jersey, this was going to be a template for what

21    happened in the future.  So you want to make sure you get the

22    charges you want.  It's a vitally important part, it's a vitally

23    important part of the trial.

24            And just as an aside, for years I taught at Rutgers Law

25    School and I taught trial advocacy, and I would spend days on jury

1   charges because you can win or lose a case there.  I sat with David

2   and we yelled and screamed at Merck and they yelled and screamed at

3   us, and it was day after day, and we got the charges, we got a

4   charge and we walked out and shook hands and said, you know

5   something, I think we got something we can live with.

6   Q.  Did you work also from time to time with Jerry Kristal and

7   others at Weitz & Luxenberg?

8   A.  Of course, they were very accommodating always.  Al, Jerry,

9   Rob, anybody you called and said, hey, what about this, what about

10   that, it was a pleasure.  I mean, you never had to say, you know

11   you told me you were going to do this and you didn't.  Jerry, I've

12   known him back since asbestos, he is a magnificent attorney.  And

13   they were all very helpful.

14           MR. WEISS:  I know our time is running close, Special

15   Master, I have one or two more questions.

16           SPECIAL MASTER JUNEAU:  Go ahead.

17   BY MR. WEISS:

18   Q.  These are personal questions.

19   A.  Okay.

20   Q.  Can you tell the Special Master, let's talk about working day

21   and night and going dark to get the last batch of cases ready for

22   trial.

23   A.  Right.

24   Q.  How was your health then?

25   A.  Let me say at the outset I would discuss it, it's a little

1   awkward for me, I do not want my comments perceived as mawkish or

2   cheesy but rather just strictly as dispassionate and factual.

3          During the course of the litigation I started developing

4   very significant chest pains radiating into my left arm and jaw and

5   we all know what that means, so I had a heart catheretization and

6   they put me in right away and I had numerous stints put into

7   several of my coronary arteries.  As we were in the midst of

8   getting ready for trial.

9   Q.  Now, did you tell your partners at Anapol the extent and nature

10  of your heart condition?

11  A.  I did not.

12  Q.  Why not?

13  A.  There were a number of reasons.  We had spent years telling the

14  judge, we are ready, judge, we want to try cases.  Put us up.

15  Because of case selection, you know, you can't win all the time, we

16  didn't get cases to get to stand up in a trial, we had cases ready;

17  but we were pushing those cases, we tried to be as vocal as we

18  could.  To now come up to the eve of trial, forget not being fair

19  to the plaintiffs, not being fair to the court, not being fair to

20  you, to say, you know what, Judge, forget everything we said,

21  forget how much I'm yelling for trials, I need to go on the

22  disabled list now.  Thank you very much.

23          I wasn't going to do that, I just wasn't going to do

24  that.  There are things you can live with in this world and things

25  that you can't, and the thought of the time and the effort and the

 1  money and everything that we put our heart and soul into these

 2  cases to get up and back out at that point, you know, not to use

 3  platitudes, but sometimes the best alternative is just to shut up

 4  and keep punching.  And it was a nightmare but we got through it,

 5  and I was very happy in November when I heard those cases settled.

 6  Q.  Did you retire from the firm?

 7  A.  Yes, I did.  Not too long after.

 8  Q.  What was the basis for your retirement from the firm?

 9  A.  Cardiac.  You know, had a very direct conversations with my

10  physicians telling me it was time to hang it up.

11  Q.  So you're not prohibited -- or you are prohibited from actually

12  practicing law, aren't you?

13  A.  I am on disability, I am not permitted to practice law.  I hope

14  this doesn't count as practicing law.

15          MR. WEISS:  I have no further questions at this time.

16          SPECIAL MASTER JUNEAU:  Mr. Weiss, I am, depending on the

17  circumstances, allow some latitude to the parties, give you some

18  additional time if there's something else you want to cover.  I

19  understand you tried condensing it and I appreciate it.

20          MR. WEISS:  As I think, Special Master, a lot of the

21  other things that we will bring out it's in our brief, it's on the

22  exhibits.

23          SPECIAL MASTER JUNEAU:  I have it.

24          MR. WEISS:  I just want to give you a highlight.

25          SPECIAL MASTER JUNEAU:  I appreciate that.

```
 1            MR. WEISS:  And I have some time in rebuttal, so thank
 2   you very much.
 3            SPECIAL MASTER JUNEAU:  Thank you very much.
 4   Cross-examine.
 5                      CROSS-EXAMINATION
 6   BY MR. SEEGER:
 7   Q.  Dave, would you like a little break?
 8   A.  No, I'm good, I'm fine.  Thank you.
 9   Q.  I just want to say on a personal note, Dave, I have a very high
10   regard for you and the work you do.
11   A.  Thank you.
12   Q.  But I have to touch on a couple of matters.
13   A.  Please.
14   Q.  Frankly, I wish it was this guy in the chair rather than you,
15   but I don't get it pick I guess.
16            MR. WEISS:  We'll change places if it makes you feel
17   better.
18            MR. SEEGER:  Can we do that?  I would love it.
19            THE WITNESS:  That would be unique.
20   BY MR. SEEGER:
21   Q.  If you start, if I get you upset, forgive me in advance, I'll
22   try not to.
23   A.  I'll try to remain calm.
24   Q.  Dave, I want to talk a little bit about the prewithdrawal time
25   frame, because in the papers you guys had indicated that you were
```

1    involved in Vioxx before September of 2004, correct?

2    A.  That's correct.

3    Q.  Just to be clear on the work done, prior to September of 2004

4    you personally had not taken any depositions in the Vioxx case; is

5    that right?

6    A.  Prior to?

7    Q.  September of 2004.

8    A.  That could be right.  If it's a matter of record I'll

9    certainly -- I don't know when I took my first Vioxx deposition, if

10   that's what it says, that's what it says.

11   Q.  Do you know if anybody at Anapol had taken any depositions of

12   any Merck witnesses prior to September of 2004?

13   A.  Oh, sure.  Sure.

14        MR. WEISS:  Do you want this?

15        MR. SEEGER:  Sure.

16   BY MR. SEEGER:

17   Q.  Do you know which ones they are, do you have it in front of

18   you?

19   A.  No.  I know the general areas of which Merck people were

20   deposed after we got involved in the litigation beginning in 2001.

21   Some names I'll know, some I won't.  Let me be clear I didn't take

22   any of those.

23   Q.  In terms of motion practice, you know, there were some pretty

24   substantial motions to compel prior to the withdrawal of the drug

25   in New Jersey, do you recall that?

1    A.  Sure.

2    Q.  Most of that was handled by Seeger Weiss, isn't that fair to

3    say?

4    A.  I would say that, I would say that's a fair comment.

5    Q.  It was also pretty significant motion on confidentiality

6    disputes that was taken to Judge Higbee prior to the withdrawal of

7    the drug was also handled by Dave Buchanan and us at Seeger Weiss.

8    A.  In regard to confidentiality disputes?

9    Q.  Yes.

10   A.  Sure, I recall discussing them, you guys absolutely had the

11   laboring oar, I don't think there's any question about that.

12   Q.  Now, Dave, at the outset of the MDL when it was created I

13   believe in May of 2005 --

14        MR. SEEGER:  Special Master Juneau, is it okay if I refer

15   to the witness by his first name?

16        SPECIAL MASTER JUNEAU:  Yes.

17   BY MR. SEEGER:

18   Q.  I believe your firm wanted to play a role in the MDL; is that

19   your recollection?

20   A.  That I cannot answer.  I can tell you this, I never discussed

21   our participation in the MDL, I never heard anything about us

22   wanting to be in the MDL.  I would gladly answer your question if I

23   had any basis or knowledge to answer it, but I really don't.

24        All I know is from the get go as far as I was concerned,

25   I was not privy to any MDL work product, never asked for it, never

1   looked at it.  I had been down this road in prior litigations, I

2   know the rules, I play by the rules and that was really the extent

3   of my universe.  I had more than enough on my plate in the state of

4   New Jersey and the MDL was there but not there.

5   Q.  Very separate?

6   A.  Yeah, sure.  As it should be.

7   Q.  Dave, you're aware though, that Mr. Weiss had sought a

8   leadership position in the MDL, aren't you?

9   A.  You know, I recall one conversation where it came up in some

10  sort of form, I would gladly give you details, I just don't know

11  them.

12  Q.  Let me just try to trigger your recollection.

13  A.  If you're right I am going to agree with you.

14  Q.  I am just asking the questions.  You're aware that Sol was

15  actually appointed at one point, Sol Weiss, to a state federal

16  liaison committee by Judge Fallon, right?

17  A.  I am aware -- I recall vaguely when it happened, but frankly my

18  recollection is refreshed when I look at our submissions, some of

19  our submissions.  And he withdrew from that if I remember.

20  Q.  Would you have any recollection sitting here today as the

21  witness testifying for Anapol, I have to ask you these questions,

22  as the reason why, are you aware that the reason Sol had actually

23  resigned from the state-federal liaison committee is because he

24  didn't want to pay an MDL assessment, do you recall that?

25  A.  No, I think -- I don't know if it's accurate, that may very

1    well be accurate.

2    Q.  And, Dave, the appointment of coliaison counsel in New Jersey,

3    you were actually personally the representative for your firm in

4    Judge Higbee's order, correct?

5    A.  That's correct.

6    Q.  Would it be fair to say that Dave Buchanan or somebody from

7    Seeger Weiss attended every single one of those CMCs in front of

8    Judge Higbee based on your recollection of how that went down?

9    A.  Oh, yeah.

10   Q.  You're saying, oh, yeah?

11   A.  It's very fair, absolutely.

12   Q.  And Dave, I understand what you said about your health and,

13   believe me this is difficult for me to even ask you these

14   questions.

15   A.  Go ahead, Chris, just ask the question.

16   Q.  You didn't attend every single one of those meetings, did you?

17   A.  I missed one or two, but I was pretty good.  Many times would

18   send three lawyers down and we had the whole routine.  Am I saying

19   I was 36 or 36, I don't think I was, but I was batting pretty good

20   and you guys were there.  I think we had presence every time but it

21   wasn't me.

22   Q.  Would you be okay if we relied upon the time records?

23   A.  Of course that's what we should do.

24   Q.  Dave, you also had a pretty busy trial docket during the time

25   you were working on Vioxx, didn't you?

1    A.  Well, two things:  When I started working on Vioxx -- as a

2    matter of fact, the day I found out that the product was withdrawn

3    from the market, I was on trial in New Jersey, I had just gotten a

4    verdict that day.  I had a trial scheduled when I joined, but when

5    I joined the Anapol firm it was with the understanding that I was

6    going to get ease into Vioxx, and as quickly as possible get up to

7    speed and devote myself to it.  Did I try a case after Vioxx and I

8    promised a lawyer in Atlantic County, it was his wife, and I tried

9    that.

10          But the Vioxx litigation, Chris, was, as you know, so all

11   consuming.  I made reference to it before, I was a professor at

12   Rutgers in trial advocacy since 1993 and I love it, I love it, I

13   love being with the kids.  But after my first year in Vioxx I was

14   missing classes, I was getting -- you don't do that to law

15   students, maybe they were happy I didn't show up; but I was missing

16   classes and I wasn't preparing the way I felt I needed to.  And

17   after one year I just went to the department head and said you have

18   to accept my resignation here, give me a leave of absence, I can't

19   do the Vioxx and I can't take one night a week and teach these law

20   students.

21          And I did give up a number of trials that were assigned

22   to me, they were reassigned.  A lot of work that I had was

23   reassigned.  Did I devote 100 percent of my time every year since

24   2003 to November of 2007 to Vioxx, no.  No.  Did I devote the

25   overwhelming majority of it, of course.

1    Q.  And, Dave, you would agree, wouldn't you, that the depository

2    that was made available to all New Jersey litigants was created,

3    funded and maintained and hosted by Seeger Weiss; isn't that right?

4    A.  That's correct.

5    Q.  In terms of handling the discovery, and I am talking about the

6    entire time that Vioxx was being litigated in New Jersey and

7    elsewhere, the discovery process, the meet and confers, the effort

8    to round discovery, you would agree that Seeger Weiss took the

9    laboring oar on that?

10   A.  I will.  Let me go back and amplify a question previously

11   asked.  You guys were very active in the repository.  You guys were

12   very active in the repository financially, time and effort.  I

13   would never deny that.  I think hopefully I am making it clear

14   that, and I say this with an open heart, even I would never under

15   any circumstances demean another attorney or denigrate another

16   attorney, that's not how I was taught and trained in this

17   profession.

18          You guys were all very clear and was a leadership

19   position, although I know we submitted a lot of documents in the

20   repository, gave a lot of time when people would come and avail

21   themselves.  I don't want to make it sound like on the one hand

22   Jacoby is saying they had the repository and helping everybody, and

23   as soon as he's cross-examined, and say we didn't do that.  We were

24   very active but that doesn't in any way take away from your

25   participation.

1  Q.  And just in terms of because we're at a point in this Vioxx

2  litigation where we're talking about money and fees.  In terms of

3  your role and contributions by your firm in the New Jersey

4  litigation, would you say it is fair that Judge Higbee, who oversaw

5  the litigation, would have an accurate view of the contributions

6  made by Anapol?

7  A.  Not necessarily.

8  Q.  You don't think the judge would have an accurate view?

9  A.  I think she would have a view but the judge wasn't there, you

10  know, the judge is not necessarily there when it's eleven o'clock

11  at night and you're there.  She sees you at meetings, she sees what

12  you're doing, she didn't see us try cases.  It's really like you

13  can look at a duck but you can't see the feet moving underneath.

14          And to say that her view is the "end all be all" and her

15  assessment as to who really participated and how, no, Chris, I

16  don't buy that, I don't accept that.  I think she can make that

17  judgment on people that perhaps were more visible, but being

18  visible isn't necessarily the "end all be all" in successful

19  litigation.  There's a lot of background stuff, there's a lot of

20  meetings, there's a lot of airports at eleven o'clock at night that

21  we all do, and she is not privy to that.

22  Q.  Dave, part of your answer, and I just want to be clear, part of

23  your answer was she didn't see you try cases.  Your firm did not

24  try cases in the Vioxx litigation, correct?

25  A.  No.  Of course not.

1   Q.   Just because I am just responding to your answer.

2   A.   Let's establish that then in case there was any

3   misunderstanding.

4   Q.   And with regard to any of the trials that went forward in New

5   Jersey and that would include *Humeston I*, Cona/McDarby,

6   Humeston/Hermans, you didn't second chair any of those trials

7   either, you or anyone in your firm?

8   A.   No, I did not.   Trial counsel, when you were trying Humeston,

9   David was your second chair.

10  Q.   Right.

11  A.   And so on and so forth.   I participated.   I don't want that to

12  be misconstrued that I am patting myself on the back and say look

13  at me, I want to be part of something in a way that I wasn't.   I

14  helped in every way that I could.   I spent time, I spent a lot of

15  hours, Chris, I spent a lot of hours breaking down your jury

16  charges.   And I would bet you I spent more time than you did

17  breaking down the jury charges.

18  Q.   I would make that bet, too, since I was trying the case.

19  A.   You weren't in those charge conferences, Buddy, I was.   The

20  idea is you help, let me break my arm patting myself on the back.

21  The idea is, not to sound cheesy, when you help other clients, you

22  help other lawyers you're helping the clients, you're helping the

23  litigation.

24          Ultimately if you do it right, you're going to be

25  successful.   And to withhold that from pettiness or for whatever

1    reasons, to me violates the spirit of an oath all of us took a long

2    time ago, that's the way I see it.  I'm sorry.

3    Q.  Let me talk to you about trials a little bit, and we'll go on

4    to that since you made a couple of comments about it.

5            Dave, you would not say with regard to any of the trials

6    that I listed that occurred in New Jersey that you were a part of

7    the daily trial in any of those cases, would you?

8    A.  No.  Was I part of the daily trial team, no.  The one that I

9    spent a lot of time on *Humeston* and you know what I was talking

10   about and you and I talked Atlantic County and how arcane it was.

11   I was thinking to myself, so much has happened to this guy in the

12   last eight years, probably flew out of his head, who can remember

13   every conversation, it's impossible.  Either you do or you don't.

14           But in *Humeston* I tried to be there because you made it

15   clear to me that I am not really that familiar with Judge Higbee, I

16   am not that familiar with Atlantic County, I wouldn't mind a little

17   help.  And I was happy to do it.  Did I take a witness, did I argue

18   motions, no, I just helped any way I could.  I spent a lot of time

19   down there in *Humeston* ending with the closings after we had the

20   charge conferences.  Cona and McDarby I was in and out, I didn't

21   really participate in any way.  If you can help, you help.  Like

22   any lawyer.

23           But I don't want that to -- that's really the tail

24   wagging the dog in all due respect, Chris.  Coming down to those

25   trials and helping and doing, you know, I don't want that to be

1    people's perception of my participation in this entire litigation

2    and my contribution to this entire litigation.  That was just

3    something that you do.  Of course it takes your time, a lot of

4    times you rather be spending the time doing something else, but you

5    do it.

6    Q.  And, Dave, the truth is if I had called you as a colleague and

7    as a friend about any case I was trying in Atlantic County and

8    asked you the kind of questions that I asked you, Judge Higbee's

9    procedures, what are some of the nuances with Atlantic County, you

10   would have give me an answer, you wouldn't have sent me a bill for

11   it, right?

12   A.  Of course not.  Might have bought me a drink or something but

13   that's about it.

14   Q.  Let me talk to you about the *Hatch* case.

15   A.  Sure.

16   Q.  Look, Dave, at the end of the day Hatch was not taking Vioxx;

17   isn't that fair?

18   A.  That seems to be, yeah.  I mean, it was contrary to what we

19   originally thought obviously, we thought we had a Vioxx case; as it

20   turned out after extensive discovery, that's probably an accurate

21   statement.

22   Q.  And you never had a prescription anywhere in the records, a

23   prescription from the doctor saying that Hatch took Vioxx, did you?

24   A.  That was kind of the whole point, we wanted to present a case

25   that was a samples case, that's, you know, and it was a very, very

1    strong samples case.  Like I said, his wife was the office manager

2    for a doctor and the wife and the doctor would testify, I would

3    tell her to go back in there, load up your brown bag with Vioxx and

4    she would go home with brown bags full of the stuff.  We thought it

5    was an excellent case to bring out a lot of issues of the samples;

6    but, no, he didn't have a prescription.

7    Q.  But when you say we, Dave, you're talking about you and Sol,

8    you and Sol thought it was a good idea to bring a samples case,

9    right?

10   A.  Yes.  Absolutely we told the judge up front this is a samples

11   case, that's what we want to try.

12   Q.  At lot of the testimony you gave earlier -- I don't know where

13   my time is on this, but I think I have some time left -- a lot of

14   testimony you gave earlier about working on case specific experts,

15   generic experts, you do that every single day in your practice on

16   behalf of your clients and you're paid under your retainer?

17   A.  I understand that there was some sort of an understanding that

18   work on case specific which is why we didn't put it in.  It's

19   something that is in a different baliwick.  And I sit here and

20   complain about the hours you put in, that's what you did, that's

21   what you're retained for and that's what you do.

22        What we were concerned about in this proceeding was the

23   time that we spent not with case specific but developing generic --

24   and you have some hybrids, like I said, it's a shame Anthony

25   Altobelli never got a chance to testify, I really think he would

1  have been pretty cool.  He was a hybrid.  Credibly knowledge,

2  personable, engaging guy.

3          And I would, DePace, I think the way you used DePace, I

4  thought that was an excellent one, that was a really good lawyer,

5  not to throw bouquets at you.

6  Q.  Throw them.  But you lead to a very important question.

7  A.  But you used DePace kind of a touch some bases.

8  Q.  You led to another point I wanted to make.  Dr. Rich that you

9  guys take credit and working up, never testified in a New Jersey

10 trial, did he?

11 A.  He did not.

12 Q.  And Nicholas DePace, who is an expert I believe that was found

13 by your firm, did testify in New Jersey but not for the Anapol

14 firm, right?

15 A.  No.  Chris we established we didn't try any cases, consequently

16 we didn't call any witness, so he did not testify for us.  But that

17 doesn't take away from our effort of developing this person,

18 presenting him, sharing him, and you know as well as anybody what

19 it takes to get an expert, get him ready.

20 Q.  That's my point, Dave, who actually presented Nicholas DePace

21 first in New Jersey and in a trial?

22 A.  You're talking about who put him on the witness stand and who

23 got him ready?  You did.

24 Q.  Yes, thank you.

25 A.  There's no dispute there, there's no dispute there, Chris.

1    Q.  Let me ask you a little bit, again, getting back to the idea

2    that you worked up a number of cases for trial and you had case

3    specific experts and generic experts, I want to ask you a few

4    questions about that.

5    A.  Okay.

6    Q.  Your firm participated in the master settlement program, right,

7    Dave, the one that was negotiated by the Negotiating Committee

8    appointed by the various judges?

9    A.  Yes.

10   Q.  And I take it that you would agree that that was a pretty good

11   settlement program?

12   A.  Yes, I have no problem.

13   Q.  And again, it was negotiated by a committee appointed by

14   various judges -- including Judge Fallon, Judge Higbee, Judge

15   Chaney and Judge Wilson -- for the common benefit of all of the

16   participants in the Vioxx litigation, correct?

17   A.  That's my understanding, right.

18   Q.  And your firm actually put a number of cases through that

19   settlement, isn't that fair?

20   A.  Yes, that's correct.

21   Q.  And you had gross settlements I believe about 118, $119

22   million, is that your recollection?

23   A.  I will tell you that since my retirement I haven't gotten that

24   involved in that part of it, but that sounds accurate.

25   Q.  I would think in retirement you would want to be very involved.

1    A.  I do have a mild interest.

2    Q.  And you don't have any complaints as a witness on behalf of

3    your firm with the settlement program, the compensation levels,

4    anything like that?

5    A.  No.  I think if we had had a problem we would have raised it at

6    appropriate time.  Not come here 20/20 hindsight and try to raise

7    things and go back, you don't do that to people, you just don't do

8    that.

9    Q.  With regard to all of the clients you put through there, there

10   are a number of those clients that I belive you testified in

11   response to Mr. Weiss's questions where you had retained experts,

12   both generic and case specific, but those cases settled through the

13   settlement and you've been compensated for that work; isn't that

14   fair?

15   A.  Yeah, a number of cases I think we discussed, we can go back

16   over the names if you want, were ultimately put through the

17   settlement program and ultimately compensated, no question about

18   that.

19   Q.  I think you answered yes, but I want to make sure.  You would

20   agree that that settlement program provided a common benefit to

21   both you and your clients, fair?

22   A.  I am not sure, Chris, I am not sure how you're using, are you

23   using common benefit as a term of art as we're using it here, or

24   just using it as something to benefit a couple of people?

25   Q.  You and your clients benefited from the settlement program

1    negotiated by the Negotiating Committee, fair enough?

2    A.  You're getting paid, that's a benefit.

3    Q.  Now, the fee that you've asked for, the firm has asked for is

4    $9 million; is that your recollection?

5    A.  Well, I think we said at least $9 million, that's correct.

6    Q.  And you have paid into the common benefit fund, do you recall

7    what your number is?

8    A.  I'm sorry, I don't know.

9    Q.  Seven million and change?

10          MR. WEISS:  Seven seven and it's in one of our pleadings.

11          MR. SEEGER:  It is what it is.

12   BY MR. SEEGER:

13   Q.  So it's the position of the firm that you have provided --

14   you're essentially saying that you shouldn't provide anything to

15   the common benefit because your work, the work that you provided

16   exceeded that, is that your position?

17   A.  Well, it's not my position, I didn't really get involved in any

18   of this, but I think we did pay an assessment.

19   Q.  But you want more than you paid into the common benefit fund?

20   A.  Of course we do, absolutely.

21          MR. SEEGER:  Give me a second.

22          SPECIAL MASTER JUNEAU:  Mr. Seeger, I want to just get a

23   clarification from my standpoint.  Is your question, are you saying

24   by the question you asked that they did not contribute to the

25   common benefit fund?

1          MR. SEEGER:  The firm did contribute to the common

2     benefit fund, but the amount of fees that they seek back from the

3     fund exceeds the amount of their contribution.

4     BY MR. SEEGER:

5     Q.  On stroke cases, let me ask you a couple of quick questions

6     about that.  There were no stroke cases tried anywhere, fair

7     enough?

8     A.  I'm certain that's accurate.

9     Q.  The case settled before any stroke cases were tried?

10    A.  Yes.

11    Q.  The stroke material that you worked up in response to

12    Mr. Weiss' questions, was that provided to the MDL, is that in the

13    stroke package, as that package exists today?

14    A.  I cannot answer that question if it was provided to the MDL.

15    I'll abide by whatever the truth of the matter is, but I just don't

16    have personal knowledge.

17    Q.  And would it be fair to say early on in the questioning that

18    Sol was asking you, you talked about developing theories like

19    marketing over science?

20    A.  Right.

21    Q.  The marketing over science theory, isn't that fair to say that

22    Mark Lanier had advanced that in the very first trial?

23    A.  Oh, absolutely.  That was one of the things I really wasn't

24    sold on it and that doesn't mean anything; but when Mark tried his

25    case, I thought he was masterful in how he presented the marketing

1   aspect, right from the get go, if you look at his first opening

2   within five minutes he was bringing in this, you know, I don't want

3   to call it sinister element, but this we are not going to let you

4   guys put white coats on, present yourselves as men of science and

5   humanitarians, we're going to establish right off the bat what you

6   really were in this case, that you're all businessman from your

7   topsiders on down.  And he did that, I thought he did a masterful

8   job.

9         We approached it in some different ways, we looked at it

10  some different ways.  I am not going to sit here, if I sat here for

11  three days and tell you I ever had an original thought in my life,

12  okay.

13  Q.  I know that's not true.

14  A.  There's no such thing as an original thought.  We came to it,

15  there's a process, you were across the table, and we went back and

16  forth and I like this, I don't like that, that's what being

17  colleagues is, that's what being in litigation is.  When you hear

18  somebody else saying it out loud no matter how good you think it

19  is, you say, geez, the guy is right, especially when Buchanan said

20  it, that's not going to play.  But when we came out of those two

21  weeks with Rodney Jew and he really, if you remember all of those,

22  remember those diagramming sentencing stuff.

23  Q.  I have nightmares about them.

24  A.  And honest to God.  You come out with some clarity of thought,

25  you come out of it I know how I want to present this case, I know

1    how I'm going to present this case and I'm going to be able to

2    prove and I know how I'm going to prove it.  It was worth the two

3    weeks, it really was, for me, I can't speak for anybody else, but

4    for me.

5              And I am not saying that anything came out of there was

6    original, that somebody else hadn't done it.  May well have.  But

7    we brought our approach to it.

8              MR. SEEGER:  Thanks, Dave, you look great.  I'm glad

9    you're feeling well.  Thank you Special Master.

10             THE WITNESS:  Thanks, Chris.

11             MR. WEISS:  May I have a minute or so?

12             Very briefly I am going to mark as Exhibit 3, since

13   Mr. Seeger raised the issue, the compendium of first pages of

14   transcripts where Anapol participated in one way or another in the

15   general liability depositions.

16             SPECIAL MASTER JUNEAU:  Let the document be received into

17   evidence.

18             MR. WEISS:  That's Exhibit 3, Special Master.

19             SPECIAL MASTER JUNEAU:  Thank you very much.

20             MR. WEISS:  I want to show this to Mr. Jacoby for a

21   minute.

22             SPECIAL MASTER JUNEAU:  Sure.

23                         REDIRECT EXAMINATION

24   BY MR. WEISS:

25   Q.  Looking at Exhibit 3, Mr. Jacoby, can you tell the Special

1    Master what it is?

2    A.  Exhibit 3?

3    Q.  Anapol 3, I gave you a compendium.

4    A.  This what you just handed me?

5    Q.  Yes.

6    A.  This is a listing on the first page of numerous general

7    liability Merck witnesses, general liability witnesses,

8    depositions, who took the depositions, who was the questioner,

9    pages in the transcript and so on.  And it's an enumeration of

10   beginning with four depositions of David Anstice going down all the

11   way to David Vorchheimer and it lists who took the deposition.

12   Q.  And the date of the deposition, correct?

13   A.  And the date of the deposition, correct.

14            MR. WEISS:  Move that into evidence.

15   BY MR. WEISS:

16   Q.  I just want to ask you a couple of things.  Has Anapol ever

17   sought to take credit for work that it didn't perform?

18   A.  No.

19   Q.  Were people given proposed common benefit awards but never

20   tried a case?

21   A.  Oh, clearly.

22   Q.  Were people given common benefit awards on the MDL side for

23   working behind the scenes?

24   A.  Sure.

25   Q.  Getting exhibits ready for deposition?

1    A.   Sure.

2    Q.   Calling out documents so the examiner could do more effectively

3    cross-examine in a deposition?

4    A.   Of course, that's part and parcel of what we do.

5    Q.   Do you think it's fair that Anapol received no credit for that?

6    A.   No, not at all.  And another thing is, you know, I think it's a

7    little troubling to me credit is given for losing cases.  I'm an

8    old trial lawyer.  What good comes out of losing a case other than

9    making the defendants brief.  I had tremendous difficulty

10   understanding that, I still can't understand it.  It's not Little

11   League, it's not hey, you really played great but you lost.  You

12   lost, you lost, nothing good comes out of it.  If somebody wants to

13   see some good come out of that, it isn't comprehensible to me.  But

14   you can find good in losing a case, power to you, but I don't.

15           MR. WEISS:  I have no further questions.

16           MR. SEEGER:  Special Master Juneau, to clarify the record

17   may I have two follow-up?

18           SPECIAL MASTER JUNEAU:  Yes, I'll allow that.

19                         RECROSS-EXAMINATION

20   BY MR. SEEGER:

21   Q.   Dave, just to be clear when you say no credit, the firm was

22   offered by the fee committee $3.4 million in common benefit, you're

23   not happy with it, but there was an offer of 3.4 million, a

24   recommendation I should say?

25   A.   Understood, right.  Right.

1   Q.  Now, Dave, of all of the depositions that your firm was

2   involved with where somebody either first, second chaired, asked

3   questions, do you know of any trial of all 17, 18 trials anywhere

4   in the country where even, you know, any clip of any of those

5   depositions was used?  I mean, sitting here as a witness do you

6   know that?

7   A.  I know that when I took a deposition Mr. Nora (PHONETIC) who

8   was a sales rep who I was very pleased with and I shared with a

9   number of attorneys, I know Jerry Kristal also took, we talked

10  about it at length for hours, took a very telling deposition, those

11  reviews I was asked for those transcripts with those reviews, we

12  took four depositions of Dr. Anstice.  Did somebody use it, Chris,

13  the record is what it is and whatever it is I'll abide by it.

14  Q.  Just to be clear, Jerry Kristal is with Weitz & Luxenberg?

15  A.  Who is one outstanding trial lawyer.

16          MR. SEEGER:  Okay.  Thank you.

17          MR. WEISS:  Thank you, Mr. Jacoby.

18          SPECIAL MASTER JUNEAU:  Thank you very much.

19          MR. WEISS:  I just have some closing remarks, Special

20  Master.

21          SPECIAL MASTER JUNEAU:  Yes.

22          MR. WEISS:  We did respond in a brief to the FAC's reply

23  to our objection, and in it we did go through the fact that we were

24  not awarded any points, therefore, no money, common benefit for

25  working on science, on marketing or experts, that's because the

1    response says or the testimony was there were no committees in New

2    Jersey, which there were.

3           And I would like to draw your attention to the fact that

4    for whatever reason, which some are explained in our brief, the New

5    Jersey litigation lawyers didn't want to be part of the MDL.  They

6    weren't going to use the MDL work product and they weren't going to

7    pay the assessment, they were going to actually build their own

8    work product.  And that's the rules of the game.  But to say that

9    16,000 cases that were filed in New Jersey didn't put pressure on

10   Merck and didn't contribute to the rest of this case I think is

11   false.  And I think it's misleading.

12          We understood in New Jersey that we were not going to use

13   the MDL work product because we weren't going to pay for it, which

14   is okay.  But we did have our own experts, we did have our own

15   science, we developed our own marketing and witnesses.  And it

16   added to the common benefit of all Vioxx claimants who took from

17   the fund, because the fund just wasn't for the MDL, the $4.8

18   billion was to cover the entire litigation, of which I think New

19   Jersey was probably one third.  And that is the flaw, we believe,

20   in the allocation as we understand was being made to determine

21   common benefit.

22          I have a hard time thinking that trying a case and losing

23   confers common benefit, furthers litigations; but as we've attached

24   to our pleadings and exhibits, being selected in a group of three

25   or four to get cases ready for trial and one trial is picked that

1    the other three cases that were in that group that did all of the

2    workup, that doesn't further litigation.

3           Forcing Merck to disgorge 20 million pages of sales rep

4    information was a burden on Merck, and we believe in New Jersey

5    that did help drive the litigation.  And for those reasons, we

6    believe that methodology was flawed and we believe we're entitled

7    to the award we sought.  Thank you very much for your time.

8           THE COURT:  Can I ask you a couple of questions if you

9    don't mind.  All of the cases that your firm was involved in, did

10   they participate in the settlement program?

11          MR. WEISS:  Absolutely.  And as a matter of fact, we

12   pushed that.  And when we had a couple of people who were on the

13   fence about the settlement, we were one of the first firms down in

14   front of Judge Higbee setting up a protocol for withdrawing as

15   counsel if a client didn't want me to settle it.  And there is an

16   ethical issue in New Jersey and we did that through Judge Higbee,

17   and she informed the client that if the client really insisted we

18   wouldn't withdraw and we would pursue their case.

19          SPECIAL MASTER JUNEAU:  The second question I have is:

20   You kind of indicated, at least this is my interpretation of what

21   you were saying, is that in early stages New Jersey litigation

22   decided to chart its own course in terms of discovery and experts

23   and things like that.  And you did not use any of the material

24   developed from the MDL?

25          MR. WEISS:  No, sir, other than material that we

1    contributed to the MDL, whatever it is, and we didn't keep track of

2    it, no, we did not.  We had our own set of case specific and own

3    set of generic experts.  And by the way, people were free to use

4    them in the MDL as well.

5         SPECIAL MASTER JUNEAU:  The question is really this:  If,

6    in fact, you made the decision to not utilize the MDL, I'm talking

7    about the early stage, chart its own course insofar as protocol and

8    development of the cases, it just seems to me, you did that to

9    foster the individual case that you had.  That's my question.

10        MR. WEISS:  Well, I think there's a philosophical answer

11   to that question, Special Master.  I've been involved in mass torts

12   for many, many years.  Sometimes I'm in an MDL, a lot of times I'm

13   outside the MDL because I practice in Pennsylvania and New Jersey

14   where a lot of the drug companies are located so we can have state

15   court litigation.

16        It's my philosophy and belief that you need to have more

17   than one forum to fully force a defendant to a table.  If there's

18   only one center of litigation, it's much easier for a defendant to

19   defend itself in one litigation, they don't have to worry about

20   different rules and different issues from different judges.  And I

21   think that's a benefit to all claimants.  And there is a belief by

22   many lawyers, including myself, that verdicts are higher in state

23   court than they normally are in federal court.  Litigation can

24   resolve faster in state court than federal court because of the

25   burdens that MDL judges have, and I guess it's a lexicon ruling

1  which limits the kind of cases that can be tried without an

2  agreement of both parties.

3          So for that reason I am always an advocate of having a

4  separate state court litigation in addition to a consolidated

5  litigation in the MDL.

6          And by the way, New Jersey is a consolidated litigation

7  because plaintiffs in all 48, 50 states filed suit in New Jersey.

8  It's just consolidated into one county before one judge.  I hope I

9  answered your question.

10          SPECIAL MASTER JUNEAU:  Yes, you answered the question.

11          MR. WEISS:  Thank you very much for your time, Special

12  Master, privilege to be in front of you.

13          SPECIAL MASTER JUNEAU:  Mr. Jacoby, if you run low on

14  blood pressure medicine I have some in the back.

15          Let's take about a five minute break, five minutes sharp,

16  and we'll come back and start the matter on Mr. Placitella.  Thank

17  you.

18          (WHEREUPON, A RECESS WAS TAKEN.)

19          (OPEN COURT.)

20          THE COURT:  Ms. Woodward.

21          MS. WOODWARD:  Your Honor, before I appear as

22  Mr. Placitella's attorney, I would like to appear as the objectors'

23  attorney and renew our request for records previously sought in

24  discovery and requested in Mr. Birchfield's deposition, which has

25  been denied to us.  And those are materials concerning the amount

1     of the contribution by each firm and the amount of the assessments

2     by each state.

3          We had asked for it, we have been denied it, but I noted

4     in Mr. Seeger's cross-examination of Mr. Jacoby, he specifically

5     inquired into his firm's contribution to the common benefit fund.

6          SPECIAL MASTER JUNEAU:  I think he asked about his

7     individual contribution.

8          MS. WOODWARD:  Yes, he did.  And he asked about the

9     firm's individual contribution.  And this we have always known is

10    information in the FAC's possession, it's been computed, it has

11    been told to us on many occasions as being part of the FAC's

12    consideration, but we have never been privy to that information on

13    the other side.  And now that it has come back to be used against

14    us in this proceeding, I want to renew our request for all of it.

15         SPECIAL MASTER JUNEAU:  Let me just hear the argument.

16         MR. HERMAN:  May it please the court, good morning, your

17    Honor, I'm Russ Herman of Herman, Herman, Katz & Cotlar in New

18    Orleans, I'll respond on behalf of the Fee Allocation Committee.

19         I am not sure I understand the request because learned

20    counsel opposite already knows for the objectors that she

21    represented what they contributed to the common benefit.  So I am

22    not sure that I understand, but if -- I have no objection and

23    neither does the committee, if your Honor wants to rule now, that

24    we should provide all of the objectors' contributions to common

25    benefit, the fees that they made, and what their clients recovered

```
 1    and the number of cases they put through.

 2              SPECIAL MASTER JUNEAU:  This matter was previously

 3    considered and I listened to the question by Mr. Seeger and he

 4    asked about the specific firm's contribution as I recall.  I think

 5    that that information is within the privity and knowledge of the

 6    objectors in this case, and I am going to deny the request.

 7              MR. HERMAN:  Yes, your Honor.

 8              MS. WOODWARD:  If the court please, I'd like to note that

 9    obviously we had the information about the objectors put in, but we

10    don't have the information about what the FAC members put in, which

11    if it's relevant for the FAC cross-examination of the objectors

12    should be equally relevant for the objectors cross-examination of

13    the FAC.

14              THE COURT:  What on that precise point you want to

15    address that, Mr. Herman?  You're talking, Ms. Woodward to FAC

16    members contribution.

17              MR. HERMAN:  Mr. Birchfield is our representative, he

18    will be subject to cross-examine, he can be cross-examined on it.

19              MS. WOODWARD:  We asked him and he said he didn't know.

20              MR. HERMAN:  Who didn't know?

21              MS. WOODWARD:  In his deposition I asked the information.

22    We know it's been calculated by BrownGreer.

23              MR. HERMAN:  You issued a request?  May it please the

24    court, they issued a request for production from BrownGreer.  They

25    never proceeded with that request, Mr. Birchfield said he didn't
```

 1   know the individual members contributions to the common benefit.

 2   But when he is on direct examination, we'll provide that and he can

 3   be crossed on it.

 4           SPECIAL MASTER JUNEAU:  I am going to rule that, I am

 5   going to allow Ms. Woodward to ask that question on the

 6   cross-examination of Mr. Birchfield.  I am also indicating to

 7   counsel like Mr. Birchfield to be in a position to respond to that

 8   question specifically as to the amount.

 9           Let's move on, counsel.

10           MR. HERMAN:  We won't have a problem with that.

11           MS. WOODWARD:  Thank you, your Honor.

12                        DIRECT EXAMINATION

13   BY MS. WOODWARD:

14   Q.  Mr. Placitella, state your name --

15           SPECIAL MASTER JUNEAU:  Let me swear him in.

16       (WHEREUPON, CHRIS PLACITELLA, HAVING BEEN DULY SWORN,

17       TESTIFIED AS FOLLOWS:)

18                        DIRECT EXAMINATION

19   BY MS. WOODWARD:

20   Q.  Please state your name and address for the record.

21   A.  Chris Placitella, 15 Goose Point Drive, Colds Neck, New Jersey.

22   Q.  When and where did you obtain your law degree?

23   A.  I have an undergraduate from Fordham University and I attained

24   my law degree from Syracuse University College of Law in 1981.

25   Q.  What's the nature of your law practice?

1    A.  My law practice historically has been in the mass tort area.  I

2    cut my teeth and still have a few teeth left related to asbestos, I

3    moved into pharmaceutical litigation, ground water pollution cases,

4    and various class actions I've been involved with over the course

5    of my career.

6    Q.  Do you serve in any professional organizations?

7    A.  Yes.  I am currently on the Board of Governors on the New

8    Jersey Trial Lawyers, we now call it the New Jersey Association of

9    Justice.  I am a former president of that organization.  I serve on

10   the New Jersey Public Interest Law Center, I am obviously a member

11   of all of the local bar associations in my county and in my state.

12           I was part of the trial lawyers group when I was

13   president that started Trial Lawyers Care, which was a nonprofit

14   organization for lawyers nationally to represent people who lost

15   loved ones in 911.  Probably the best thing I ever did in my

16   career, by the way.

17   Q.  How did you get involved in the Vioxx litigation?

18   A.  In around 19 -- around about 2004 at or about the time of

19   recall, at that time I was in a big firm and we got a lot of

20   telephone calls from people who saw media accounts and read things

21   in the newspapers, and that's originally how we got involved in the

22   cases.  We began to investigate the cases, we ultimately filed a

23   number of cases in state court in New Jersey in Atlantic County

24   before Judge Higbee.

25           But we clearly weren't the first people or lawyers

1    involved in Vioxx litigation in New Jersey, it had been going on

2    for at least a couple of years before that.

3    Q.  Who did the reach of your involvement come to extend beyond

4    your individual cases?

5    A.  When I started prosecuting the cases I tried to figure out a

6    way to make a positive contribution to the litigation.  I did not

7    want to be one of those people who took, just took advantage of

8    everybody else's good work.  And prior to my getting into the

9    litigation, our office getting into the litigation, there was good

10   work that had already taken place, people had devoted significant

11   resources and significant money to do -- perform certain tasks.

12          So I looked at the case in three ways.  There was:  What

13   did Merck know, could we prove that Vioxx caused heart attacks and

14   strokes, and then what was done in response to that information by

15   Merck.  It was my judgment that a tremendous amount of work had

16   already been done on whether Vioxx causes heart attacks, a fair

17   amount of work had already been done on what did Merck know and

18   when did they know it, although there was some work that still

19   needed to be done, but the one area where I thought I could make

20   the greatest contribution was what did Merck do in response to the

21   information they had.

22          And although there was some work that was done already,

23   from my perspective, my examination of the facts, that looked where

24   I could make the greatest contribution, and that was based on a lot

25   of research, talking to lawyers who had been in the litigation,

1    reading depositions that had already been taken, reviewing key

2    documents that had already been unearthed.  So that's the

3    perspective I had in I say late 2004.

4    Q.  Okay.  And did you come up with a plan for how you might become

5    more deeply involved in the case?

6    A.  I did.  And that plan was not by me alone.  What happened was

7    when I looked at the documents and the depositions and spoke to the

8    lawyers, I decided that I should come up with a discovery plan on

9    how we were going to go about exploring things, because one of the

10   things that we determined was that labelling, the labelling

11   regulations by the FDA extended beyond what was just in the package

12   insert.  But the regulations also touched what Merck was telling

13   the world about the drug.  In other words, what were they putting

14   in their press releases, what were they doing at medical

15   conferences, what were they doing when they had people go on TV.

16   All of those things, most of which had not been explored up to that

17   point in time.

18          So I based upon reviewing a number of documents, talking

19   to the lawyers, and I came up with a list of what I thought still

20   needed to be done.  And I discussed that list with other lawyers in

21   the litigation, we met, on more than one occasion.  Some people

22   added to the list, some people talked me out of certain things.

23   But I came up with basically a strategy for implementing what I

24   call the marketing and public relation side of the discovery for

25   New Jersey.

1          I really wasn't -- in the beginning there was no MDL and

2     I -- so it was for New Jersey at that time point in time, and

3     that's how we structured what we were doing.

4     Q.  Now, we heard from Anapol a minute ago about their role as

5     leadership in New Jersey.  Were they included in your discussions

6     about where you wanted to go and what you wanted to do?

7     A.  Yes.  We had a structure where we all met, we went to Weitz &

8     Luxenberg a number of times, we went to Seeger Weiss a number of

9     times, we went to Anapol's office a number of times.  Anapol's

10    office and the Seeger Weiss firm had been in this litigation for at

11    least two years before I got in it, they had done a fair, you know,

12    a good, fair amount of work, they had invested time, money,

13    resources.

14         So there was no really reason to duplicate that.  What we

15    did, we got together, all of us, and we agreed upon a plan.  And

16    that plan had a number of facets to it, one was how we were going

17    to get cases to trial, how we were going to select cases for trial,

18    and there were thousands of cases.  The other was how we were going

19    to support the trials and what we were going to do during the

20    discovery to keep the pressure on Merck.  So we really had a

21    multi-facet plan.

22         And at that point we were all rowing in the same boat.

23    We were colleagues, we knew each other, most of us knew each other

24    very well from a long time, we had a lot of trust in one another.

25    It's actually pretty hard to sit at this table when I have so many

 1    friends at that table.

 2            So we came up with a plan.  I was asked to direct from

 3    that point forward the marketing and public relations side of the

 4    discovery, with the help of many other people, it wasn't me alone,

 5    none of this was me alone.  And there was work that was done that

 6    was really a base from which we operated.  I did not start from

 7    scratch by any means.

 8    Q.  Turning to your value added contributions to this group effort,

 9    did you identify and then bring in experts that you thought would

10    contribute something to the common good?

11    A.  Right.  Well, it was clear to me that I had to kind of get up

12    to speed and there were areas that I wanted to explore that perhaps

13    were not explored before in prior pharmaceutical litigation.  Some

14    of them went to FDA regulatory issues specifically as to labelling

15    and commercials and things like that.  So we consulted FDA experts.

16            On the public relations side of things, which have never

17    really been looked at, I hired the former public relations director

18    for Bristol-Myers Squibb to basically teach me what happens in that

19    context.

20    Q.  What was the name of that expert, if you remember?

21    A.  Thomas Nesi.

22    Q.  That's the one that Mr. Jacoby talked about a moment ago?

23    A.  Correct.  And we worked up an expert report, he was supposed to

24    testify in trial, he actually didn't testify in trial, and that was

25    a trial counsel's decision; but throughout the trials he was

1    advising and giving information on how to approach things.

2            So I consulted with Dr., Mr. Nesi, Dr. Kostis, who is the

3    head of medicine at one of the premier hospitals in New Jersey,

4    Robert Wood Johnson, world famous cardiologist, actually a

5    consultant to Merck on other issues as I understood it.  And I

6    would read information and documents that even though they were

7    public relations and marketing information that I still needed a

8    medical explanation for.  So I spent a fair amount of time with

9    Dr. Kostis.

10           There was another expert who was a brilliant expert David

11   Egilman who I had known for many, many years going way back in the

12   Vioxx litigation, he was already a consultant to Mark Lanier in the

13   cases.  But I took advantage because David had a base knowledge at

14   that point having already done work for Mark, and he helped get me

15   up to speed on certain issues when things came up in the marketing

16   and public relations context.

17   Q.  You've spoken about a broad base of documentary evidence that

18   was available to you as you came in or educating yourself.  Did you

19   subsequently seek to expand that base of documentary evidence?

20   A.  There were I can't even tell you the amount of pages.  There

21   were two document repositories at that time that we had access to,

22   one at Seeger Weiss and one at Anapol.  And they were roughly

23   clones of one another, although they probably had differences at

24   different points of time.  And of course there were the documents

25   that were already attached to other depositions which was a base to

1    look at because someone had made a decision they were important.

2           But I spent untold hours, as I'm sure others did, going

3    through the document databases for search terms like public

4    relations and specific people we were looking at.  So we expanded

5    our base of knowledge significantly.

6           The other thing we did was we tried to create a time line

7    of what did Merck know and when did they know it.  And some of that

8    work was already done, in fact, a good piece of it was done.  But I

9    had to create the time line because my objective was to take the

10   marketing and public relations information and overlay it on top of

11   the time line.  So if they knew something in September of 2001, I

12   wanted to see what the response to it was to that knowledge.  So I

13   had to assemble all of that in a time line and then what we did is

14   we actually hired a third-party vendor to go out and collect all of

15   the commercials that ever related to Vioxx because it hadn't been

16   done to my knowledge at that point.  And every print advertisement

17   that appeared anywhere as it related to Vioxx and coordinate first

18   the print advertisements and how they dovetailed into the media

19   advertisements and then overlay that on top of what I call the

20   Merck top knowledge time line.

21          So that was the base research we did before we got deep

22   into the depositions and deep into the hard core discovery.  And we

23   shared that information, by the way, freely.  When I put those

24   commercials together, I sent them to anybody who wanted them.

25   People I thought would want them, I made discs, sent it to them,

1    that's how we did it

2          SPECIAL MASTER JUNEAU:  How did you come up with that

3    list of who to send it to?

4          THE WITNESS:  People I knew who had cases, we had a list

5    of lawyers in New Jersey, they got access to that information.  I

6    also at some point the MDL started, I don't know whether it was

7    spring of 2005, I have not a perfect recollection.  After that

8    happened I sent some of that material to the MDL.  It really didn't

9    matter because Chris Seeger, who was liaison counsel in New Jersey,

10   was also working closely with the MDL, so I just made the

11   assumption that anything that came up that was really good, he

12   would make sure they had access to it.  I think he actually did

13   that.

14   BY MS. WOODWARD:

15   Q.  Can we talk about some of the documents you came up with that

16   were really good?

17   A.  I mean, on the documentary evidence, we came up with some, I

18   thought, really important documents:  One was the Merck 2001 profit

19   plan which showed how they actually forecasted how much they would

20   make or lose depending on if the word got out; their plan, overall

21   plan to neutralize safety concerns about Vioxx; the public

22   relations plan, which the mantra was first do no harm to Vioxx,

23   which I had kind of trouble with from a moral perspective; the

24   label sensitivity analysis showing how much it would cost in sales

25   based upon what the label would say.  These are the things that we

1    found in the New Jersey litigation, this is just some examples.

2            I have no knowledge, frankly, whether they were ever

3    found in a parallel way in the MDL because we were never really

4    given access to that information.  So some of that actually could

5    have been discovered in a parallel way, they had access to the same

6    database as I did, I just know what we unearthed and used the power

7    of video, which was a high camp *Star Wars* thing made fun of the

8    doctors to a degree.  I think we were the first to use that in the

9    context of depositions.  My guess is that similar findings were

10   happening in the MDL, but I wasn't there to know that.

11   Q.  For every document that you found that was significant and

12   trial usable, how many other documents would you say you went

13   through?

14   A.  Oh, I know you know this for a long time, but for every prince

15   that you find, you kiss 1,000 frogs; and I spent many, many hours,

16   especially during the summer of 2005, till the wee hours of the

17   morning look at and kissing a lot of frogs.  So I couldn't tell how

18   many thousands of documents you had to look at before you found a

19   really good one, but the good ones were really helpful.

20   Q.  The Special Master asked you some questions about how you

21   shared it and what your distribution list was.  Did you create a

22   database for this material as well?

23   A.  Well, actually I did two things:  One was I created my own kind

24   of hot DOS database and then it was done in collaboration with

25   others, other people joined in, the Anapol joined in, and we

1  synched the documents back and forth, Mr. Weinberg, others.  I made

2  that database available when the Cona/McDarby case was going to be

3  tried, I actually gave the entire database to the Weitz & Luxenberg

4  firm.

5          The other thing we did, we paid and had constructed a Web

6  site password, it was Vioxx something .com where anybody could go

7  on who would get the password, could go on and get the information.

8  And really the philosophy was we held nothing, we held nothing

9  back.  It was kind of pay it forward, what goes around comes

10  around.  And for the common good, that was philosophically where we

11  were.

12          And that wasn't just my law firm.  At that point in time

13  I think everybody had that philosophy, whether it was Mark Lanier

14  or Chris Seeger or Sol Weiss or Eric Weinberg, everybody was really

15  in this together.

16  Q.  Is this the kind of litigation that any single firm can handle

17  alone?

18  A.  That's kind of a non-secular -- obviously not, at least not a

19  firm like mine could handle it all alone.  I had just left after 25

20  years a big firm where I was vice-president of a big firm and I

21  started out on my own, I joined a couple of other lawyers, so this

22  for me was a risk.  I didn't bring any real resources with me at

23  that point, I had my partners who had four or five lawyers in the

24  firm at that point.  So we needed help and I thought we provided

25  real help.

1   Q.  In what time period did you conceive and then embark upon your

2   marketing discovery plan?

3   A.  I think that started really early 2005.  I would say I spent

4   the early part of 2005 from, say, January through the spring

5   getting up to speed, look at thousands of documents, reading

6   depositions.  I attended depositions where I did not participate

7   that were going on at the time:  One to learn; two to understand

8   the cast of characters on the other side to try to get a sense of

9   worth what Merck's philosophies were and how they approached these

10  things.

11          But my efforts in earnest aggressively going forward

12  where I thought I was making a significant contribution probably

13  began sometime in the late spring of 2005.

14  Q.  At that time, Chris, had anybody else, to your knowledge,

15  embarked upon such a marketing discovery plan?

16  A.  Well, I think people had done marketing work.  I mean, there

17  were things like dodge ball and people had done things and I'm sure

18  they continued to, I wasn't the only thing, as Mr. Jacoby said with

19  an original thought; but I came up with a plan and that plan was

20  endorsed by the rest of the New Jersey consortium.  And with their

21  assistance we executed that plan.

22          That plan started with sending out deposition notices,

23  document discovery.  And that plan was really two phased:  One was

24  going after the information that Merck had in its possession; the

25  other part of the plan was going after what we thought was out

1    there in the context of third parties.  You know, I had learned a

2    long time ago that you get some of the best stuff by looking under

3    rocks that nobody else had decided to look under because sometimes

4    people leave things behind.

5            So we sent out subpoenas to the public relations firms,

6    the firms that were involved in organizing medical conferences,

7    third party witnesses, even the company that was in charge of

8    videotaping the commercials that Merck was making.  And some of

9    that work bore a lot of significant fruit for the litigation.

10   Q.  Did you have to fight any legal battles to get the materials

11   that you sought and discovered?

12   A.  We had a number of battles.  One of the things we did was when

13   we subpoenaed what we called the video outtakes from the

14   commercials, there was something called a video news release which

15   I knew nothing about and that was when something happened

16   significant in the life of the drug, Merck would go into a studio

17   and record with scientists or public relations people their

18   perspective of what happened.  And they would bring their

19   scientists in for that and the public relations people were there

20   and they would actually rehearse that information.  And then like

21   *60 Minutes* would come up with a little clip at the end and that

22   would be sent to all of the news organizations all over the world

23   and that's what everyone would end up seeing.

24           What we did is we subpoenaed all of the tape that ended

25   up on the cutting room floor, and there was a lot of information on

1    that tape that probably would have never seen the light of day.

2         The other thing --

3    Q.  Just for fun, why don't we take a break and show one of the

4    Loren Laine outtakes that came off the cutting room floor.  That

5    would be slide 20.  I think you have some more at --

6    A.  For some context for the slide.

7    Q.  Let's talk about who he was.

8    A.  Loren Laine was one of the principal scientists for Merck in

9    their, doing their outside work.  And he was actually interviewed,

10   I found out later on, by John Restaino who was part of the MDL, he

11   was head of the MDL science committee, as a potential witness; and

12   Mr. Restaino actually determined he would not be a good witness, he

13   would probably be a great Merck witness.  And they actually thought

14   he was going to come testify for Merck at some point, so they

15   brought --

16         After the study was published they brought Dr. Laine into

17   the studio, and one of the justifications for selling Vioxx was

18   that it was safer on the stomach than other NSAIDs.  And his

19   purpose was to go into the studio, at least Merck's purpose, and

20   tell the world that you needed Vioxx because if you didn't take it

21   you would get hospitalized and you would die.  A certain percentage

22   of people would get hospitalized and die from taking traditional

23   NSAIDS and that's why you needed Vioxx.  So the Merck public

24   relations people brought him into the studio and said this is what

25   we need you to say on national television, and this is what we

 1   found on the cutting room floor.

 2   Q.  Okay.

 3       (VIDEO CLIP PLAYED AS FOLLOWS:)

 4       FEMALE SPEAKER:  In this study -- how many patients are

 5       hospitalized and how many die each year as a result of GI side

 6       effects associated with NSAIDs?

 7       LOREN LAINE:  No, I know the numbers, they're just totally

 8       wrong.

 9       (CLIP STOPPED.)

10           THE WITNESS:  Now, what happens next, there were many

11   hours, what happens next is they go and they ask him a whole bunch

12   of other questions to try to divert his attention, but they really

13   want this piece so they come back to it.  These people were pros, I

14   learned a lot.  So they came back maybe hours later and said, okay.

15   Let's try to get him to do it again, so this is what they did the

16   second time.

17       (VIDEO CLIP PLAYED AS FOLLOWS:)

18       LOREN LAINE:  I'm sorry, if you want to go over this again you

19       can do whatever you want.

20       FEMALE SPEAKER:  Let's just take another quick crack at the

21       hospitalizations for DNR.  All right?

22       LOREN LAINE:  The reason I ask because those numbers, by the

23       way, that people use are totally incorrect and they're based

24       on just extreme totally incorrect data, but everybody uses

25       them because they sound good.  No, they sound good, but it's

1    the same person that keeps putting them out, but I have

2    recalculated -- so the only way you can do it is subtract

3    those who do from those who don't and those number doesn't

4    take it into account, so to say it is due to NSAIDs is

5    incorrect.  So there's about five reasons why those numbers

6    are totally bogus.

7         But I agree it's out there in the Konstam and everybody

8    uses those numbers, it's a very impressive sound bite.

9    FEMALE SPEAKER: (UNINTELLIGIBLE).

10   LOREN LAINE:  No, I mean because the issue is it's, part of

11   the issue is you just don't have -- I am not actually say it's

12   wrong, the death rate is probably wrong, the hospitalization

13   may be right.  Just the death rate is probably wrong but

14   anyway.  But as long as you say it's estimated or reported

15   it's not me saying it.

16   FEMALE SPEAKER:  Can you give me the estimates on

17   hospitalizations and death rates?

18   LOREN LAINE:  Okay.

19   (VIDEO CLIP ENDED.)

20        THE WITNESS:  So what we did is we went and found the

21   actual commercial that was played to millions of people all over

22   the world, and this is what we said.

23   (CLIP PLAYED AS FOLLOWS:)

24   People who take anti-inflammatory drugs, it's been estimated

25   that over 100,000 people are hospitalized every year for

 1           stomach problems such as internal bleeding, but over 16,000

 2           people die every year due to these stomach problems.

 3    BY MS. WOODWARD:

 4    Q.  So the first couple of clips are what you found from the

 5    cutting room floor?

 6    A.  Correct.

 7    Q.  The numbers that were totally bogus, the numbers that were just

 8    wrong, those were Merck's numbers --

 9    A.  That's correct.

10    Q.  -- they were trying to feed to him, right?

11    A.  That's correct.

12    Q.  Then he comes up with the notion that if they ask him about

13    estimated numbers, well, maybe he can hedge on that.  And then

14    you're able to overlay that against the commercial where he

15    actually says that, yes, scientists have estimated, that's why the

16    drug is necessary?

17    A.  There's probably something I actually a little more sinister

18    even than that.  He actually admitted on the cutting room floor not

19    telling the truth to a medical journal, which I found concerning as

20    a lawyer.

21    Q.  Do you have that one?

22    A.  And that's this clip.

23    Q.  Okay.

24           (VIDEO CLIP PLAYED AS FOLLOWS:)

25           FEMALE SPEAKER:  ...find these in the study?

1          LOREN LAINE:  Well, that's actually not going to be -- I mean,

2          the only thing that's in the *New England Journal* article says

3          there's no difference in renal failure or renal dysfunction.

4          So I don't think you really want to go there, do you, because

5          there are no data on blood pressure -- excuse me, blood

6          pressure or edema in the study.  And the only thing it says

7          specifically, and we were cagey about this, was related to

8          renal failure, renal dysfunction, and that's how you're

9          looking at it.

10              So I would actually take that out, I would suggest

11          anything that you do, as an aside, I'll talk for at least an

12          hour, but you don't want to talk about it because if you bring

13          up edema, it's nowhere in the study.  So if you bring it up,

14          it's not what's in the article.

15          (VIDEO CLIP ENDED.)

16     BY MS. WOODWARD:

17     Q.  Now, I heard you say that this was someone the MDL had

18     identified as a principal Merck witness.  What happened after you

19     came up with this material?

20     A.  Well, I understand, at least from what I read in the trial

21     package or in the submission package, made the determination that

22     he was going to be potentially an important witness for Merck, and

23     after this information came out then it was played in multiple

24     trials, these clips, Dr. Laine never made his way into a courtroom.

25              The other thing in the context of this same exercise, we

1    found a clip from a Merck cardiologist who was also called to make

2    a statement to the world about how safe Vioxx was, and because

3    there was articles coming out in the public's literature about the

4    problems with Vioxx.

5              So they brought her into the studio to try to get her to

6    say things.  And she wouldn't do it either, and that -- her name is

7    Laura Demopoulos.  I believe ultimately -- and for these clips, by

8    the way, Merck tried to stop us from getting them.  We had to fight

9    to get them.  They were privileged, they were work product.  And

10   then with respect to Laura Demopoulos, who I'll show your Honor in

11   a second, we wanted to take her deposition.  They fought her

12   deposition.  We had to go and like partners into Philadelphia court

13   to allow us to get the deposition, and then after we got the

14   deposition they -- we had a fight before Judge Higbee about how

15   Merck wanted to hire and supply her the lawyers so they could have

16   this code of silence around what she was going to say.  Ultimately

17   Mr. Weinberg and Mr. Lanier took her deposition, but this is a clip

18   which became key.

19   Q.  Wait.  Before you play the clip.  In just follow-up on what you

20   just said.  Mr. Weinberg, Mr. Lanier took the deposition.  Who

21   found these clips?

22   A.  I found the clips and I helped with the prep.  Mark had the

23   first trial after these clips were found, so we made a decision as

24   a group --

25              SPECIAL MASTER JUNEAU:  That trial was where?

```
 1              THE WITNESS:  In New Jersey.  We made a decision as a

 2     group together that since Mark was going to be the trial counsel,

 3     that it was better to have his -- he's a great lawyer as everyone

 4     knows -- that it would make the most sense at that point to have

 5     him on the videotape.  So he prepared and he went and took the

 6     deposition, I second chaired the deposition, and Mr. Weinberg did

 7     follow-up on second chair for that.  But here is a clip.

 8          (VIDEO CLIP PLAYED AS FOLLOWS:)

 9          FEMALE SPEAKER:  Now ideally, what we need from you is, you

10          know, Merck stands behind the safety, whatever you feel

11          comfortable saying and then give your reasons for why.

12          (UNINTELLIGIBLE) or reasons we didn't have and that is that

13          Vioxx, millions of people, we studied, we continue monitoring

14          it, you know, we reported things, IRs from physicians.

15              So whatever makes you comfortable and say that Merck

16          stands behind the safety.

17          LAURA DEMOPOULOS:  Do you think it's useful that -- you know,

18          I think, in fairness and in our own stand-by statements and

19          the PIR's and our own (UNINTELLIGIBLE) , we say that one

20          possible explanation for the VIGOR results is a prothrombotic

21          effect of Vioxx, we say it ourselves.  We say it in lots of

22          different places and it's in there and they raise that.  And

23          there isn't a single person in the company who isn't going to

24          say that isn't a possible explanation.

25              So to say that, you know, to make an answer an absolute
```

1        and say we stand behind the safety, it's unassailable, you

2        know, is probably too much of a generalization at least.

3        (VIDEO CLIP ENDED.)

4            THE WITNESS:  The significance at this point in time was

5    twofold:  One, it was an acknowledgment internally that they

6    understood that one explanation for what was going on was Vioxx

7    causing heart attacks; but, two, this cardiologist, their chief

8    cardiologist says we can't say we stand behind the safety of Vioxx.

9    Within a week of her, of that recording being made and ended up on

10   the cutting room floor, the press releases started entitled, "Merck

11   stands behind the safety of Vioxx."  And that went on, you know,

12   multiple times, that was their mantra for years until the drug was

13   ultimately taken off the market entirely.

14           And what happened was, we then, we took the public

15   relations, because this is now in the public relations realm.  We

16   went and took the depositions of the public relations people, the

17   people who were in charge of the Merck message to the world, and

18   they basically said we told the world that Vioxx did not cause

19   heart attacks, and that's the decision we made.  And I actually

20   asked the head of worldwide public relations for Merck, how many

21   people got that message?  And she estimated, and I have the clips

22   if the court is interested, but she actually estimated that, and

23   you can see even up here Merck confirmed that cardio safety profile

24   of Vioxx, Merck is confident in the safety of Vioxx, we stand

25   behind the efficacy of Vioxx.  This is their plan, this goes on and

1    on and on for a long, long time.

2    BY MS. WOODWARD:

3    Q.  And you prepared all of this correlation and cross-referencing

4    of what they were saying in private that you had discovered against

5    what they were saying on the public record?

6    A.  Yes.  So what we asked the people inside public relations, what

7    were you telling people giving this information?  And so I took Jan

8    Weiner who was the head --

9    Q.  I want to interrupt you for a minute, because you were saying

10   "we, we, we".  Who do you mean by "we" when you say "we" pursued

11   this deposition of Jan Weiner?

12   A.  I mean, it was at that point mostly my effort.  But I always

13   say and I'm always going to say we because this was a joint effort

14   by a lot of people and the psychology was we were all in it

15   together.  So even when I mean me, I am going to keep saying we.

16   That's just the way it's going to come out.

17   Q.  Just for your common benefit application, I am going to

18   continue sometimes to pull your back into your specific role.

19   A.  Right.

20   Q.  And with respect to Jan Weiner you've identified her as a

21   worldwide head of PR.  How long did her deposition take?

22   A.  It was taken over multiple days, it probably took weeks to

23   prepare.  But we got some very important information out of her.

24   Q.  Let's talk about your preparation.

25   A.  Sure.

1  Q.  What did you do in weeks of preparation for the Weiner

2  deposition?

3  A.  Reviewed her custodial file, went into the database anywhere

4  her name was mentioned, looked at that.  It's hard -- it was a lot

5  of work.  Talk to other people, talk to our public relations

6  advisor, talk to the medical doctors, talk to other lawyers.

7          I will say that, you know, a lot of these discussions

8  with other lawyers, they never ended up on time sheets, this is not

9  usually how personal injury lawyers usually do our work, we just

10  kind of pitch in and do it together.

11  Q.  Did you come up with some good material in the Weiner

12  deposition?

13  A.  Well, the one thing that was key in the Weiner deposition was

14  how far reaching was Merck's message to the world that Vioxx does

15  not cause heart attack?  Was it just to the doctors, was it to just

16  medical conferences, or was this the mantra that everybody was

17  meant to understand.  So there is one small clip here that goes to

18  that issue.

19  Q.  Play it, please.

20      (VIDEO CLIP PLAYED AS FOLLOWS:)

21      MALE SPEAKER:  Of your outreach program, a billion stories in

22      a year, it would be extremely important to make sure that

23      what's in your press releases would accurately reflect the

24      truth of the information disclosed in the net of the studies

25      sponsored by Merck, true?

```
 1              Some of the two billion impressions means that based on

 2         Merck's calculations, their message would have reached people

 3         in the United States two billion times.

 4         SPEAKER:  Object to the form.

 5         FEMALE SPEAKER:  It would have meant that two billion people

 6         in the course of a year potentially would have seen the

 7         message.

 8         MALE SPEAKER:  Okay.  But we don't have two billion people in

 9         the United States.

10         FEMALE SPEAKER:  That is correct.

11         MALE SPEAKER:  So if you breakdown the math, it would mean

12         that every person in the United States would have seen your

13         message at least ten times, correct?

14         FEMALE SPEAKER:  That is the way the math would work.

15         MALE SPEAKER:  And you, Merck, never told the people taking

16         your products and your public relations material that you were

17         aware that one of the explanations for the results in VIGOR

18         was that Vioxx was causing the heart attacks, right?

19         MALE SPEAKER:  Objection to the form.

20         FEMALE SPEAKER:  The specific words that -- to that effect are

21         not reflected in the press releases.

22         MALE SPEAKER:  Thank you for your time.

23         (VIDEO CLIP ENDED.)

24    BY MS. WOODWARD:

25    Q.  Did you depose any other Merck PR people?
```

```
 1    A.  We deposed Mary Blake, she was head of Vioxx public relations

 2    inside the United States.

 3    Q.  And again, when you say we, who took Mary Blake's deposition?

 4    A.  I took the deposition, Mr. Weinberg was there helping me.

 5    There were other people at these depositions, the rooms were

 6    usually full.  During breaks people would give me -- really, I kind

 7    of keep saying we because it was we when I took those.

 8    Q.  How many days was Mary Blake's deposition?

 9    A.  It was a number of days, it was very productive.  Her

10    testimony -- she discussed what she was told to say and what she

11    was told to say was that Vioxx doesn't cause heart attacks, even

12    though she knew that that was not the case.  And those clips and

13    those depositions were used thereafter in a number of trials.

14    Q.  How did you prepare for Mary Blake's deposition?

15    A.  Same way, looked at thousands of documents.

16    Q.  Well, when you say the same way, did you look at the same

17    thousands of documents?

18    A.  We would look for Mary Blake, and at one time her name was Mary

19    Bassaman, so I had to look for Mary Bassaman (PHONETIC), and then

20    cull through everything and it was the normal procedure you would

21    go through.

22    Q.  How many documents were you going through to do this procedure?

23    A.  They're ultimately thousands.

24    Q.  Can you show the court a clip of some of what you got out of

25    Mary Blake.
```

1    A.  The clip on the left, for sake of time, she just basically says

2    that she knew -- what we found out happened was when the VIGOR

3    results came out, I think they came out on a Thursday or a Friday,

4    there was an emergency meeting at Merck headquarters.  And the call

5    to the emergency meeting was not just the doctors but the marketing

6    people, the public relations people, and they actually came up with

7    a plan how were we going to handle this issue.

8          So she says in her deposition basically, yeah, we knew

9    that one of the things you could say about the studies was causing

10   heart attacks.  So we had to come up with a plan of how we were

11   going to deal with that.  So this is what she says.

12        (VIDEO CLIP PLAYED AS FOLLOWS:)

13        MALE SPEAKER:  So the answer to my question is then one of

14        your admissions was to convince the world there was no reason

15        to believe that Vioxx caused heart attacks, that was your job,

16        part of your job, right?

17        MALE SPEAKER:  Objection, you can respond.

18        FEMALE SPEAKER:  It was part of my job to convey Merck's

19        perspective on the data and that was their perspective.

20        (VIDEO CLIP ENDED.)

21          THE WITNESS:  And then what they did is they actually set

22   up what they called a SWAT team we found out, and the SWAT team was

23   made up of public relations people -- and they called it the SWAT

24   team -- the public relations people, the marketing people, the

25   executives, the lawyers, and they had one doctor.

1           And the SWAT team actually went to medical conferences

2    shortly after these things transpired, and at the medical

3    conferences the SWAT team had a plan on how they were going to deal

4    with the doctors and the doctors' questions.  And it was a SWAT

5    team that was there to convince the doctors that there was no

6    problem with Vioxx.

7    BY MS. WOODWARD:

8    Q.  Now, did you also take any marketing depositions of people who

9    helped shape Vioxx's marketing message?

10   A.  We did.  One of the principal depositions I took was a

11   deposition of the person in charge of framing the marketing

12   message, her name was Charlotte McKines who worked for Merck.  Her

13   deposition was very revealing; I was involved in a number of other

14   marketing depositions, another was by Joe German, I was there for

15   New Jersey that deposition was actually taken by my good friend and

16   colleague Mike Papantonio, he was there for the MDL, he took the

17   lead.  We worked together throughout the deposition, consulted,

18   that bore some significant fruit as well.  So there was some

19   crossover.  But the McKines deposition I did.

20   Q.  You took the lead on the McKines deposition?

21   A.  Yes.

22   Q.  And how long did that deposition take?

23   A.  Again, multiple days of deposition and multiple days, if not

24   weeks, of preparation.

25   Q.  And review of documents in preparation for McKines deposition?

1    A.   Yes.

2    Q.   About how many?

3    A.   Probably tens of thousands.  If I wasn't doing it physically

4    myself, I had clerks I would say go run this search, find this for

5    me.  That's how I would do it.

6    Q.   Can you show a clip of some of what you got out of the McKines

7    deposition?

8    A.   I think one of the significant issues was from the McKines

9    deposition was that was that Merck came up with this whole

10   marketing campaign for Dorothy Hamill, she was a central figure in

11   the campaign; and what we discovered was that using Dorothy Hamill

12   in the campaign was probably borderline, let's just say not

13   necessarily ethical because Dorothy Hamill was contraindicated for

14   the drug and the Merck marketing people never knew that until the

15   deposition.  And this is one of the clips here.

16        (VIDEO CLIP PLAYED AS FOLLOWS:)

17        It's a beautiful morning.  Ask your doctor about Vioxx, a

18        prescription medicine from Merck, and find out if Vioxx is

19        right for you.  Vioxx.

20        MALE SPEAKER:  Do you believe that it is appropriate to use as

21        a spokesperson for your product someone who was

22        contraindicated for this very product that they're promoting?

23        CHARLOTTE McKINES:  Do I --

24        MALE SPEAKER:  Yes.

25        CHARLOTTE McKINES:  -- personally?

1       MALE SPEAKER:  Yes.

2       CHARLOTTE McKINES:  No, I don't think that's appropriate.

3       MALE SPEAKER:  That would be against Merck ethics, don't you

4       think?

5       FEMALE SPEAKER:  Object to the form.

6       CHARLOTTE McKINES:  It would be -- I think, yes, I think it

7       would be.

8       MALE SPEAKER:  Would it shock you to find out that Dorothy

9       Hamill had a bleeding ulcer before she took Vioxx?

10      CHARLOTTE McKINES:  I was not aware of that.

11      (VIDEO CLIP ENDED.)

12          THE WITNESS:  I think she was as shocked as anybody else

13  frankly.  And again, multiple clips from her deposition were shown

14  in multiple trials thereafter.

15  BY MS. WOODWARD:

16  Q.  Let's talk about that.  I mean, you extracted from Merck's

17  files numbers of central documents and taken depositions with some

18  very significant information in them.  What use was made of the

19  material that you secured?

20  A.  Well, it was -- as the trials were ongoing -- and a lot of this

21  discovery was happening as the trials were ongoing, so some of it

22  made it into some trials and some later on.  It was actually very

23  effective because it was like every time Merck was looking over her

24  shoulder, there was another wave of new information coming at them.

25          So pretty much all of these depositions ended up in every

1    subsequent trial that I am aware of, at least in New Jersey,

2    although I think maybe in the *Humeston II* trial, the Laine and

3    Demopoulos stuff were in but not Weiner and McKines, I am not sure.

4    But they were used --

5          I also subsequently found out that all of these

6    depositions made their way into the MDL trial package.  I was never

7    told that but after these proceedings started I was given the trial

8    package and found the information there.

9          I also now understand that many of these clips and

10   depositions were used in MDL trials because of information I saw in

11   the various submissions.

12         I think it's probably worth noting that this information

13   was shared freely with the MDL.  The head of the marking committee

14   for the MDL was a very fine lawyer by the name of Mark Robinson,

15   and I provided this information to him.  They had a marketing

16   expert, I think it was Pachman I think her name might have been.

17   They had a marketing expert and I actually spent some time with her

18   on the phone with Mr. Robinson, explained to her what I found,

19   bringing her up to speed to help her do her report, and we shared

20   this information pretty freely.

21         It's probably worth noting that at one point I was

22   concerned that if I would be sending this information back and

23   forth that somehow I might get hit with the MDL assessment, because

24   we were very concerned about whether if we were getting, if the

25   work product got intertwined that somehow my New Jersey state cases

1   would get assessed, and I was assured that if I provided the work

2   to the MDL, my marketing work, that my case would not be assessed.

3   Obviously it ultimately didn't happen.

4          SPECIAL MASTER JUNEAU:  First of all, you were assured by

5   whom?

6          THE WITNESS:  Mr. Robinson who was part of the Plaintiff

7   Steering Committee sent me an e-mail saying, don't worry, if we

8   share information back and forth, you don't have to worry about

9   getting your cases assessed.

10  BY MS. WOODWARD:

11  Q.  I know it's in the exhibits, do you have a slide for that

12  e-mail?

13  A.  Sure.

14         SPECIAL MASTER JUNEAU:  Before you go there, let me

15  pursue this question a little bit more.  It was your understanding

16  that any of your cases wouldn't be assessed by the MDL for the work

17  you did?

18         THE WITNESS:  I was never concerned about the cases being

19  assessed because we were prosecuting cases in New Jersey.

20         SPECIAL MASTER JUNEAU:  Right.

21         THE WITNESS:  And there was no assessment in New Jersey,

22  and as long as there was a division and we didn't use any of the

23  MDL work product, we would have no danger of being assessed

24  basically.

25         SPECIAL MASTER JUNEAU:  The reason I am asking, it sounds

1   to me like, and I understand that, it came up in earlier testimony

2   that it kind of chartered the New Jersey course with the

3   development of discovery and evidence and everything were

4   proceeding on a track to try cases in New Jersey under the system

5   that was developed there by the lawyer.

6              THE WITNESS:  Correct.

7              SPECIAL MASTER JUNEAU:  It looks kind of separate and

8   distinct from whatever was going on by the MDL court, there was no

9   interplay or interchange of information.  It sounds to me like you

10  were developing the work and the cases that were going to be tried

11  in New Jersey, not the MDL case, that's what I am hearing from you.

12             THE WITNESS:  That was the intent.  However, I never held

13  the information back.

14             SPECIAL MASTER JUNEAU:  I understand that.

15             THE WITNESS:  I never said it wasn't go to the MDL, it

16  did go to the MDL, it ended up in their trial packages.  My concern

17  was that I was having discussions with Mr. Robinson about market

18  and that in our exchange I never wanted to be said that if he was

19  talking to me about what they were doing that somehow that was

20  going to come back as an assessment for my case.

21             So I said, please, do me a favor, put my mind at ease,

22  just send me some correspondence that says if we work

23  collaboratively on the marking piece, I am not going to get my

24  cases assessed basically.  So that's the e-mail that he had sent me

25  in September of 2005.

BY MS. WOODWARD:

Q.  September 11th of 2005, you've got it up on the screen, it's also an exhibit, your Honor, and who is beach lawyer?

A.  Beach lawyer is Mr. Robinson who is on the Plaintiff Steering Committee for the MDL and who, as I understand, was head of marketing and tried one of the MDL cases to success.

SPECIAL MASTER JUNEAU:  What's that exhibit number?

MS. WOODWARD:  They're in chronological order in our e-mail binder.  It would be binder No. 1.

BY MS. WOODWARD:

Q.  Now, Mr. Placitella, you say that you shared your material freely with the MDL.  Did the MDL share the material freely with you?

A.  No.  That kind of never really happened.  It was pretty much a one-way street.  The only way I would say that it was really shared with us is if, like for instance, Chris Seeger and Dave Buchanan had a base of knowledge.  And I am certain that he couldn't separate one side of his brain from the other side of his brain, so to the extent that he knew something and he knew it from the MDL, we had a conversation I would know that information.

But in terms of actual work product, it was not a two-way street, it was pretty much a one-way street.

SPECIAL MASTER JUNEAU:  Mr. Placitella, it sounds to me, correct me if I'm wrong, it's kind of we will they do what we're doing over here in New Jersey, you have an MDL thing, you do what

```
 1   you're doing over here that's what it sounds like; is that right?

 2            THE WITNESS:  I think that's correct.  But our work did

 3   end up in the MDL trials and in the MDL trial package.  We had no

 4   objection to that.  If that was helpful to win cases, that was okay

 5   by us.

 6   BY MS. WOODWARD:

 7   Q.  Addressing that issue, have you prepared a time line of all of

 8   your contributions to the state litigation, to the MDL litigation

 9   in terms of common benefit?

10   A.  I tried to create a snapshot and it was very hard because what

11   we were asked to do after the settlement happened for this purpose

12   was to recreate our time, and what we did, which was a very, very

13   difficult process because I was not keeping time records as I was

14   going.  So what I did is I went back through basically the old

15   e-mails and tried to construct a time line.

16            I then also looked in submissions by others to see if

17   that would help me create a time line.  So I did create a time line

18   of help that we provided in the context of trials, help we provided

19   generally, and actual contributions that were made to the MDL that

20   frankly I really didn't know about until after these proceedings

21   started because I never had access to what was inside the MDL trial

22   package but now I know.

23            So there's a chart about that as well.  For example, I

24   know that people submitted time as part of their common benefit

25   applications here for reviewing the materials that I did in the
```

1    state court, and they made that part of their MDL common benefit

2    application.  So obviously the work we were doing in state court,

3    not just myself, Mr. Weinberg, Mr. Lanier, Mr. Weiss, you know, our

4    work was being used.

5              SPECIAL MASTER JUNEAU:  Was the reverse true, did you get

6    any benefit from the conversation with Robinson or anybody else

7    regarding what their knowledge, their information, their

8    development documents, was that any benefit to the New Jersey

9    litigation?

10             THE WITNESS:  I think there was some limited benefit.  I

11   think I got tremendous benefit from my discussions with people like

12   Dave Buchanan, Jeff Grant, Chris Seeger, and I don't think they can

13   separate the MDL half of their brain from the state court.  So I

14   did get some tremendous benefit from that.

15             But in terms of actual hard work product, not that much.

16   BY MS. WOODWARD:

17   Q.  Let's go back to your contribution charts, because you prepared

18   charts for contributions to the MDL, for contributions to the

19   state, for leadership roles, for depositions, and because we don't

20   have time to go through all of this today, for all of the

21   acknowledgments that were made of your work and the thanks for your

22   work, and is every entry of those charts, which have been submit as

23   exhibits, backed up by a physical document?

24   A.  Yes.  They're in there and it's really a slight, it's really

25   only what I could end up finding, it doesn't reflect all of the

  1   phone calls.

  2           When this case was being prosecuted it was very

  3   collegial.  The lawyers were standing shoulder to shoulder with one

  4   another.  When I found something like the Laine videotapes, Rob

  5   Gordon at the Weitz firm would be the first one to say this is

  6   great, this is awesome, this is going to help us in a trial; Mark

  7   Lanier would say, Chris, this is awesome; Chris Seeger would say

  8   something this is.

  9           When they did something great, I would be the first one

 10   to high five them for the victories they had in their trials.  I

 11   guess the one thing I might disagree with is I think even the

 12   losses helped that, you know, we learned from our mistakes, we

 13   learned from our losses, and not every loss is a loss if you learn.

 14   And I've been around long enough to know that you might have done

 15   everything you could possibly do, but a jury on that particular

 16   day, in that particular week.

 17           So we high fived each other through this whole process.

 18   We were very supportive of one another.  We had a genuine affection

 19   for one another, that's what makes this proceeding particularly

 20   awkward and to some degree upsetting.

 21   Q.  Let's return to your time reconstruction.  You say you went

 22   back through e-mails and everything.  I understand you didn't keep

 23   contemporaneous time records and that you reviewed this material to

 24   enter your time.  Did you have a document to support every inch of

 25   your reconstructed time?

 1    A.  What I tried to do was I tried to find e-mail, an appointment,

 2    a deposition, a letter, something physically that I could touch and

 3    ascribe a time value to that.  And that was the basis for the

 4    majority of my time that's submitted.  So, for example, if Rob

 5    Gordon or Perry Weitz called me on the phone and we had an hour

 6    conversation about a find or a case, that would never have made it

 7    into my time records.

 8    Q.  And did you embellish your time records to try to reconstruct

 9    that?

10    A.  I was, I think, pretty conservative because I thought at some

11    point, maybe it will happen today --

12              SPECIAL MASTER JUNEAU:  Let me ask you a question.

13    You're obviously a very experienced trial lawyer, had a lot of

14    experience in litigation, as most lawyers in this courtroom have

15    had.  Would you agree with the statement that time records and

16    recollection of records, it's just -- is that -- should be the sole

17    criteria in determining compensation or is that just a factor that

18    should be considered, things we know you were in litigation talk

19    about effort, time, importance of task, and innovative notions that

20    you've already expressed some of those here today, which of those

21    two sides do you come down to?

22              THE WITNESS:  I think we're all considered together, the

23    time records --

24              THE COURT:  It's a factor?

25              THE WITNESS:  It's a factor, it's an indication of

1    effort.  You know, you can't put in a submission passion, you can't

2    put in a submission, you know, how much of your heart or your

3    health in Mr. Jacoby's instance goes into a case.

4              SPECIAL MASTER JUNEAU:  And also, sir, an hour for one

5    person may be ten minutes to another person or something else to

6    another person, right?

7              THE WITNESS:  I think that's fair.  But you have to use

8    it, it's important.

9              SPECIAL MASTER JUNEAU:  It's a factor.

10             THE WITNESS:  It's clearly a factor.  But the

11   productivity of time is important.  I think it matters whether I am

12   doing it or Chris or Andy Birchfield, if it's their time versus

13   somebody who is not as up to speed and because there's that base of

14   knowledge that goes into every minute, you know, when you're doing

15   something.  So there's no real value to time like this.

16             SPECIAL MASTER JUNEAU:  I didn't mean to interrupt, go

17   ahead.

18   BY MS. WOODWARD:

19   Q.  That's okay.  Just speaking about your firm, would you consider

20   every time entered in your time record to have been a productive

21   hour?

22   A.  Okay.  I would hope so, but I have my unproductive moments, but

23   I think generally we work pretty hard at -- I know everybody does.

24   Q.  And was it part of the effort of reconstructing your time

25   records so that you could demonstrate exactly what you had done?

1   A.  That was what we tried to do but it really is not -- it's not

2   complete, it's a good effort.

3   Q.  It may not be complete, but everything that is entered there

4   reflects a task that you actually performed?

5   A.  Well, sure.

6   Q.  Okay.  And you heard Mr. Jacoby testified a bit ago you see the

7   duck but you may not see the feet paddling under the water.  Would

8   another person know what you did without looking at your time

9   submissions?

10  A.  I would say probably not.  I think it's even hard for people to

11  know who are with you every day in the trenches what you're doing.

12  I am convinced that one of the reasons that I am here is because

13  people just forgot, you know.

14          When you're going day to day, fighting in the trenches,

15  helping each other out, that doesn't end up in submissions and

16  people when they make decisions and who are frankly there are a lot

17  of people in the MDL that were part of making the decisions about

18  what happened with state court lawyers, and as much as they could

19  do from just looking at stuff, they're never going to get a

20  complete picture because they weren't there, they weren't elbow to

21  elbow, shoulder to shoulder.

22  Q.  Now, when you submitted that common benefit time, did you

23  include in your submission any of the hours that were worked on

24  individual cases?

25  A.  No.  The way we dedicated the work in my office was I was

1   really the common benefit lawyer with some staff assistance.  My

2   partner Harry Roth handled all of the individual cases; David

3   Lenrow of my office, who is a doctor and head of rehab medicine at

4   the University of Pennsylvania currently, he was my medical

5   sounding board.  But all of the individual medical -- I am not

6   saying some one or two entries couldn't have leaked in but we tried

7   to segregate it out.

8   Q.  And how many hours did you submit for common benefit?

9   A.  I always forget this, I think it was about 4,000 hours total

10  for the firm.

11  Q.  And who did most of that work?

12  A.  The majority of it came from me.

13  Q.  And in the interest of adhering to the Special Master's

14  schedule, we have picked some of the greatest hits of the Chris

15  Placitella's firm work, is that correct?  But can you just give

16  some high points of the other work that you did for the common

17  benefit?

18  A.  Well, for example, it's not reflected anywhere, after the

19  settlement came down and I got on board with the settlement --

20          SPECIAL MASTER JUNEAU:  What do you mean you got on

21  board?

22          THE WITNESS:  We were fighting to the very end.  I wish I

23  would have known a little bit earlier, I probably would have saved

24  a few hairs.  But, for example, right up to the very end when the

25  case was almost resolved, I was in court cross-examining at an

1    in-camera hearing Merck's in-house lawyer over privilege issues on

2    a crime fraud exception to try to unearth documents that we thought

3    were significant.

4            So we kept the pressure on all the way to the very end.

5    Probably we were keeping the pressure on when the deal was 95

6    percent done.

7            But after the deal was struck, in the context of New

8    Jersey law, we had a serious ethical issue with one of the

9    provisions of the settlement, and I had a number of cocounsel from

10   around the country who filed cases through me who had concerns.

11           So at that point we made a determination that the

12   Negotiating Committee had done a good job for our clients, that

13   this was the right time to resolve the case, and for the majority

14   of people it was a good settlement.

15           But we had to get by these ethical issues, so I hired an

16   outside ethicist to look at the circumstances and to give me an

17   opinion that would allow not only my office to go forward with the

18   settlement, but other firms to go forward with the settlement.  And

19   I shared that with other lawyers in the same, not just cocounsel, I

20   think we actually had conversations, if my recollection is correct,

21   with the judge about it on the telephone.

22           And in terms of getting the cases implemented in New

23   Jersey and having the settlement secure, I think that played an

24   important role.  I won't say it was a be all end all, but we did

25   support the settlement, we worked hard to try to get it to become a

```
 1   reality in our state.

 2   BY MS. WOODWARD:

 3   Q.  Prior to settlement, did you --

 4   A.  And I am very grateful, by the way, to the lawyers in this room

 5   that did that for my clients because a lot of them would still be

 6   waiting in line.

 7   Q.  Prior to the settlement, did you provide assistance to other

 8   New Jersey firms that were trying cases?

 9   A.  We had a one for all, all for one philosophy.  And during the

10   trials, sometimes on a daily basis, even if we were not in the

11   courtroom, we were sending information -- and it would take a long

12   time to segregate it out trial by trial, but we hired experts

13   during the course of the trial to answer questions that came up in

14   trials, we worked on jury charges like Mr. Jacoby says during

15   trials, we did the actual cuts that were shown in the trials, we

16   participated in focus groups, we were really there in a supportive

17   role.

18           We wanted them to win and we felt we were part of

19   anything to make them win.  We had great -- these were, it wasn't

20   hard, these were people I knew and adored my entire career as

21   lawyers, as human beings, and that's how we did things together.

22   We were there day in, day out together, sometimes more trials than

23   others.  But it was really a group effort.

24           And for my small role, you know, I didn't try a case, I

25   didn't get the verdict, but I would like to think that some of my
```

1   efforts and some of the things that we did made a difference.

2   Q.  Now, when you submitted your time records, did you submit fees?

3   A.  I'm sorry, I don't understand.

4   Q.  Did you submit hourly rates?

5   A.  I don't think I did.

6   Q.  Are you familiar with the range of hourly rates that are

7   charged for mass tort lawyers in New Jersey?

8   A.  Well, I kind of look at the northeast and probably look at --

9   mass tort is kind of a weird thing because most lawyers don't keep

10  time.  But in a class action context, which we do a lot of, which

11  sometimes spills over into mass torts, the range for senior

12  lawyers -- and I guess with the amount of hair that I have left

13  that qualifies -- probably is somewhere, depending on the case,

14  somewhere around the five to $800 range depending.

15  Q.  So are you aware that Mr. Phil Garrett because you did not

16  submit an hourly rate plugged you in with every other lawyer with a

17  rate of $332?  Would that be appropriate for your range of

18  experience and involvement in this case?

19  A.  Well, you know, I would have I have a value more than I

20  ultimately got valued at $100 an hour.  So I guess Garrett's

21  numbers would have been better than that.  At the end of the day

22  for the work we did we were valued at $100 per hour.

23  Q.  Robert has just corrected me that actually your rates were not

24  entered at 332, so that would -- I was confusing my two clients,

25  I'm sorry.  Note the correction, please, your Honor.

1          What did you consider to be your major contribution to

2    this litigation?

3    A.  Well, I think that we explored some new ground on the

4    marketing/public relations end.  I thought my major contribution,

5    other than the specifics day to day, was being part of a team of

6    lawyers who were passionate, committed, and who together moved the

7    ball forward and put a lot of pressure on Merck.

8          So I think my major contribution is I was part of a team.

9    It was a great team of probably some of the greatest lawyers I'll

10   ever know in my lifetime.  I brought my children to watch them

11   work, and to be part of that team to me was probably my greatest

12   contribution.

13   Q.  What role did Mr. Lanier play in this case?

14   A.  Mr. Lanier, you know, his reputation precedes him.  He charted

15   new ground.  He actually taught me, I'll never forget, right, Mark,

16   "beyond bolts", he brought the litigation in general, I actually

17   teach that now, I gave a lecture to the, all of the New Jersey

18   Attorney Generals on how you use "beyond bullets" in a courtroom

19   and I learned that in the context of this case from Mark Lanier.

20   Q.  Did he occupy a position in this case?

21   A.  Well, he was trial counsel, he was a leader, a brother in arms,

22   and that's how I see him.

23   Q.  Did he serve in the PSC?

24   A.  I don't think he ever served on the PSC.

25   Q.  I am going to ask you to show the Mark Lanier clip.

```
 1    A.  Okay.

 2              MR. LANIER:  I may object, your Honor, not knowing what

 3    it says.

 4              MS. WOODWARD:  There you go, do you recognize that guy?

 5              MR. LANIER:  Not really.

 6        (VIDEO CLIP PLAYED AS FOLLOWS:)

 7        MARK LANIER:  In the cases that (UNINTELLIGIBLE)

 8        pharmaceuticals especially, I would urge you in this burning

 9        question number two of what, to take the following into

10        consideration:  The most important thing you can do is look at

11        marketing because marketing is marketing is marketing.

12              And the guys may not dress like that but that's who

13        they are in their soul.  And they work for the pharmaceutical

14        companies and in their soul that's them.  And it eeks out

15        through the pores.  Oh, they can dress it up in nice suits,

16        they can lose the cigar and the sunglasses, they can take a

17        little of the swagger out, but it's oozing out the pores.  And

18        you have to get your documents and you got to get the

19        marketing.  The marketing the, the marketing, the marketing.

20              I get very frustrated in cases in which I get involved

21        where people have not developed the marketing as fully as they

22        should.  I threw a hissy fit in the Avandia litigation

23        recently because the marketing is not getting developed.  How

24        on earth are you going to take these depositions when you

25        don't have the marketing?  The reason we won three Vioxx
```

1    trials more than anything else is because we put the marketing

2    part of the case first.  First witness out of the box,

3    marketing.  That's what turns the jurors stomach.  That's what

4    scares the pants off the jurors because the jurors are sitting

5    there as the guinea pig in Prada of all of the shabby

6    marketing that goes on.

7         And it's not just marketing by the pharmaceutical

8    company.  Chris Placitella's here.  Have Chris tell you about

9    the third-party marketing discovery he did in the Vioxx wars.

10   Chris found a third party PR firm that Merck hired to do

11   marketing and Merck produced this real polished video,

12   informative video where they're talking to a UCLA gutt doctor,

13   whatever, gastroenterologist.  And he talks about the 16,000

14   people who die each year for a GI bleed.  And how Vioxx is a

15   wonder drug that's going to save those lives.

16        Well, Chris goes back and subpoenas the original bean

17   real of the stuff that didn't make it and found the one

18   section where Merck, where the guy says there are 12,000

19   estimated, and the person says time out, time out, doctor.

20   We've been using the figure 16,000, could you use that figure.

21   And the doctor says, well, that's bogus.  Merck says, well,

22   there's this one study that says 16,000, and the doctor says,

23   well, yeah, but everybody knows that's a bogus study.  He says

24   I don't want to do that because I'll look like an idiot to

25   anybody in the know.  He said, well, I guess I could say one

1    study has indicated 16,000, that would be honest.  Okay.  I'll

2    do that.

3         So I am able to cross-examine the Merck witness on the

4    stand and have that Merck witness that I am cross-examining on

5    something totally unrelated, but I get in, I start laying the

6    track about the benefits and the da, da, da, and the witness

7    says to me, well, you know, we're saving 16,000 lies.  I said

8    that's bogus.  Objection, your Honor, Mr. Lanier is being

9    argumentative.  I said, I didn't finish it, Judge, I said

10   that's bogus, isn't it?  It's a question now.  That's

11   outrageous, he can't use the word bogus, it's an argumentative

12   word.  Judge, that's not my word, that's theirs, that's what

13   their witness says.

14        And the lawyer who didn't read all of the discovery and

15   watch all of the discovery said that's absurd your Honor, our

16   witnesses never said that.  I said, your Honor, we need to

17   play a video clip right now.  Bam.  It comes up, witness,

18   that's bogus, everybody knows that's bogus.  Merck, well,

19   yeah, but go ahead and use it anyway because it's the figure

20   we've been using.  Stop the video clip.  Me, the jury, the

21   witness, the judge, we all look at the Merck lawyer.  That's

22   discovery done outside custodial files.  You have to get

23   custodial files.

24   (VIDEO CLIP CONCLUDED.)

25        MS. WOODWARD:  Thank you.

1    BY MS. WOODWARD:

2    Q.  And you weren't part of the trial team in which Mr. Lanier used

3    that work, were you?

4    A.  I wasn't physically at counsel table.

5    Q.  But did you feel part of that team?

6    A.  I hope he considered me as part of that team, and I think he

7    did.

8    Q.  And the record will reflect that the FAC initial recommendation

9    for your firm was $533,921.  I believe you indicate a minute ago

10   that that works out to about $100 an hour?

11   A.  An hour.

12   Q.  What was your reaction to that recommendation?

13   A.  I was hurt.

14   Q.  You hired counsel and once you got your lawyers on the team,

15   what happened to that recommendation between the grid No. 1 of

16   December where you were at 533,000 and grid No. 2 in January?

17   A.  My number went down, so thanks for the good job that you did.

18   Q.  Thank you very much.  And were there any other consequences of

19   your objection?

20   A.  There were but I would rather not talk about them.

21          MS. WOODWARD:  All right.  I have no further questions.

22          MR. HERMAN:  May it please the court, I have a half hour

23   for cross, it's been my experience that if you delay cross after

24   direct, particularly if you go to lunch and come back, people are

25   down, I would really like to get my half hour of cross in right

 1   now.  If you would permit to take a five minute break, I'll be

 2   ready to cross and we'll set up.  And I don't think it will delay

 3   anybody's problem.

 4          SPECIAL MASTER JUNEAU:  I am going to handle that this

 5   way, Mr. Herman.  I am going to ask, Mr. Placitella, do you want to

 6   take a break and come back or do you have an objection to

 7   proceeding?

 8          THE WITNESS:  I am fine if that's convenient to counsel.

 9   He seems eager.

10          SPECIAL MASTER JUNEAU:  We'll proceed.

11          MR. HERMAN:  Great.

12          THE WITNESS:  As long as he's not too eager.

13          MR. HERMAN:  I would like to take a five minute break

14   while we set the PowerPoint up and remove this material, and while

15   I go to the men's room, if that's permissible, and I'll come back

16   and I'll cross.  Thank you.

17          (WHEREUPON, A RECESS WAS TAKEN.)

18          (OPEN COURT.)

19          MR. HERMAN:  May it please your Honor, and Chris

20   Placitella, whom I know and I respect, but I am going to refer to

21   you as Mr. Placitella, okay?

22          THE WITNESS:  Chris is okay if it's easy.

23          MR. HERMAN:  Your Honor, we are going to offer 20 boxes

24   of time records of every one of the individuals that applied for

25   common benefit.  We're going to offer already in the record the 64

1   status conference transcripts in the MDL, as well as the conference

2   reports and Judge Fallon's PTO's.  I have furnished learned counsel

3   witness and counsel opposite three documents, which are already in

4   the record, and they are the two briefs filed by Mr. Placitella and

5   Mr. Weinberg in opposition, as well as Mr. Placitella's appearance

6   before the Fee Allocation Committee.

7          Sometime after 5:30 and up to this morning, I was served

8   with these exhibits of Mr. Placitella and Mr. Weinberg, they're

9   here if you need them.  We have no objection to them, I didn't stay

10  up until three reading them.  If there's anything from

11  Mr. Markowitz or anything from relating to Mr. Stratton, we object

12  to those; other than that, you need anything in there, please help

13  yourself.

14                          CROSS-EXAMINATION

15  BY MR. HERMAN:

16  Q.  Have you read before it was filed the two briefs that were

17  filed on your behalf?

18  A.  I am not sure what you're referring to.

19  Q.  They're right in front of you, sir.

20  A.  We filed a lot of briefs.

21  Q.  Yes, sir.

22          SPECIAL MASTER JUNEAU:  Give him a moment.  First of all,

23  Mr. Herman, have you, all of those boxes, labeled by exhibit

24  number?

25          MR. HERMAN:  They're labeled by name, your Honor, and by

 1   box number.  So that if you wanted to find my time records, you'd

 2   look under H, they are in alphabetical order.

 3           SPECIAL MASTER JUNEAU:  What I am looking for purposes of

 4   the record to show that we can have something that's identified

 5   with these records?

 6           MR. HERMAN:  We will put exhibit labels on them, your

 7   Honor, before we conclude on Friday.

 8           SPECIAL MASTER JUNEAU:  Mr. Arceneaux.

 9           MR. ARCENEAUX:  Your Honor, remember when I gave you the

10   115 page list at the very beginning of the trial, that is, in fact,

11   a list of what's in those boxes.  Because what's in those boxes

12   we're producing it as well on DVD.  You can actually ask Mr. Herman

13   to keep those boxes because everything in there is on one disc and

14   I have given you a complete index of everything.

15           SPECIAL MASTER JUNEAU:  This is not of a light moment.

16   But I came here in a vehicle, my truck is in the Atchafalaya basin,

17   so I cannot haul that stuff back with me.

18           MR. ARCENEAUX:  I suggest you take this disc.

19           THE COURT:  Mr. Arceneaux, that will be in evidence, the

20   disc?

21           MR. ARCENEAUX:  The disc will be in evidence and a

22   complete list of every single file that's in those boxes.

23           THE COURT:  That's good.

24   BY MR. HERMAN:

25   Q.  Mr. Placitella, the two oppositions which you filed to the Fee

1    Application Committee's recommendations you have before you,

2    correct?

3    A.  Yes, I do.

4    Q.  And you read those, sir?

5    A.  I think you asked me did I see them before they were filed.

6    Q.  That's a good question, did you see them before they were

7    filed?

8    A.  The one that was filed in the last couple of days, I did not

9    see before it was filed.

10   Q.  Have you seen it since, have you read it?

11   A.  I've read most of it.

12   Q.  So you've read these briefs filed on behalf of you and

13   Mr. Weinberg at some point by your attorneys, correct?

14   A.  The one I have in my hand, which is the one in the last couple

15   of days, I think I read for the first --

16   Q.  And you've authorized them --

17              SPECIAL MASTER JUNEAU:  Let him finish the answer,

18   Mr. Herman.  Proceed.

19              THE WITNESS:  I read this one I think yesterday on my

20   iPad on the plane, but I was having a hard time but I read most of

21   it.  The other brief, which was the initial filing, I am not sure

22   that I read before it was served, and the reason for that is I had

23   a personal tragedy --

24   BY MR. HERMAN:

25   Q.  Sir, have you read it since?

```
 1    A.  Well, you asked my question first was --

 2              SPECIAL MASTER JUNEAU:  Go ahead and answer your

 3    question.

 4              THE WITNESS:  No, I'm not sure I got to see it

 5    beforehand, but at some point subsequent to it being filed I read

 6    it.

 7    BY MR. HERMAN:

 8    Q.  Before you testified today you read it, correct?

 9    A.  Yes.

10    Q.  And what's the date on the top of it?

11    A.  Which one?

12    Q.  The one you read before you testified completely.

13    A.  Well, there's two, there's --

14              SPECIAL MASTER JUNEAU:  It would be the first brief.

15              THE WITNESS:  The first one is entitled joint objection

16    February 2nd, 2011, and the second one is May 8th, 2011.

17    BY MR. HERMAN:

18    Q.  Thank you.  Now, the Master Settlement Agreement went into

19    effect by contract between the plaintiff lawyers who had Vioxx

20    cases and Merck on November 9th, 2007.  Did you read the Master

21    Settlement Agreement?

22    A.  The entirety of it?

23    Q.  Yes, sir.

24    A.  Probably at some point in time, but I couldn't tell you when.

25    Q.  You did what a good lawyer would do in order to advise your
```

1   clients about the settlement, you read it, correct?

2   A.  I think I just answered your question.

3   Q.  Well good.  Now, it was posted on the court's Web site, that is

4   Judge Fallon's Web site, and it's been there for 89 weeks, are you

5   aware of that?

6   A.  If you say so.

7   Q.  Are you aware that it was posted on the BrownGreer Web site?

8   A.  If you say so.

9   Q.  Were you aware that it was posted on the PSC Web site?

10  A.  I've never been to the PSC Web site.  I don't think I've ever

11  been to the BrownGreer Web site either.  I mean, others of my firm

12  might have been but I don't think I've ever been there.

13  Q.  Were you aware that the PNC was directed to go to six different

14  cities, and went to New York, Philadelphia, Atlanta, Houston,

15  Denver, Los Angeles and New Orleans in order to explain to more

16  than a thousand lawyers representing 50,000 clients what was in the

17  MSA and to answer questions?

18  A.  I am not aware of all of the facts that you indicate in your

19  question.  I am aware that people went through great lengths in

20  that process.

21  Q.  The MSA contract itself, that is that agreement called the

22  contract, that's how I'll refer to it, indicated that Judge Fallon

23  could assess up to an 8 percent hold back from common benefit fees

24  for common benefit fees; isn't that correct?

25  A.  That's my understanding.

1   Q.  And you read it, correct?

2   A.  At some point I did, sir, that's what I said.

3   Q.  And you did not file an objection to it, did you?

4   A.  I did not file an objection.

5   Q.  Then on January 20th, 2009, Judge Fallon entertained a motion

6   for 8 percent hold back and objectors were to file by May 8th,

7   2009, and neither you nor Mr. Weinberg filed an objection, did you?

8   A.  I would speak on behalf of my firm, and I don't -- we did not

9   file an objection.

10  Q.  Then on October 19th, 2010, the court decreed that the common

11  benefit fee hold back for those people entering the MSA contract

12  would be six and a half percent, which would go to common benefit,

13  correct?

14  A.  That's my understanding.  I am taking your word at the dates

15  and things, but that's my general understanding.

16  Q.  I appreciate that.  The Master Settlement Agreement, or MSA,

17  99.9 percent of all eligible claimants, those with asserting MI,

18  ischemic stroke, and sudden cardiac, SCD, went through the process,

19  that is they registered and enrolled to go through the process;

20  isn't that true?

21  A.  I take you at your word.

22  Q.  And you enrolled your cases, you went into the contract, did

23  you not?

24  A.  Yes, I did, sir, I --

25  Q.  So at that --

1  A.  Am I allowed to finish my answer?

2  Q.  Yes.

3  A.  As a compliment to you, Mr. Herman, I thought that for my

4  clients you had done a good thing.

5  Q.  And so you entered and recommended your clients that they enter

6  this MSA, as you did yourself?

7  A.  Yes.  And I thank you for that.

8  Q.  And at every stage, Judge Fallon directed due process and

9  transparency, did he not?

10  A.  He is one of the most respected jurist in the country, I am

11  assuming that's how he did everything; but I did not read every

12  order, so I don't know how to answer that question.  I have no

13  reason to doubt what you say.

14  Q.  Did you understand that every order that Judge Fallon produced

15  was posted on the court's Web site?

16  A.  Sir, I don't have a detailed explanation, knowledge of that

17  because I was not involved in the MDL.  I didn't know what was

18  published during the course of litigation.  If you say so, I take

19  you at your word.

20  Q.  Sir, within the contract that your clients entered and that you

21  entered, there was due process, first BrownGreer looked at the

22  claims, correct?

23  A.  I am not sure how to answer your question when you say due

24  process.  Due process is sometimes in the minds of the people

25  either receiving it or not receiving.

1    Q.  Without regard to the words, "due processing", BrownGreer

2    looked at every claim, did they not?

3    A.  I believe that's correct.

4    Q.  And they looked at every claim based upon a grid formulated by

5    Merck and the Plaintiffs Negotiating Committee; isn't that correct?

6    A.  I am assuming that that's correct.

7    Q.  And if you didn't like what you got from BrownGreer, then you

8    could submit your cases internally, I won't use the words due

9    process, to a Gates Committee composed of Plaintiffs Negotiating

10   Committee lawyers and Merck; isn't that correct?

11   A.  Yes.  I said the answer to that was yes.  I didn't object to

12   the process and I thanked you for the process that you put in

13   place.  I am not sure why you're asking me these questions.

14   Q.  Then if that appeal failed you could appeal to Special Masters

15   that were appointed, correct?

16   A.  The appeal of what, the determination by --

17   Q.  The determination of your client's opportunity to receive

18   compensation.

19   A.  I am not trying to fight with you, but if you would just let me

20   finish my answer we'll be on the same page.

21   Q.  Of course.  Sure.

22   A.  If you're asking me -- why don't you ask your question again,

23   let me finish the answer, and if you don't like it you can ask me

24   another one.

25   Q.  Didn't the agreement provide that if you weren't satisfied with

```
 1   BrownGreer, then you could go to the Gates Committee; and if you
 2   weren't satisfied with the Gates Committee, there were three
 3   Special Masters that had been appointed to review your claimant's
 4   opportunity to recover?
 5   A.  I think that's generally what my understanding was, yes.
 6   Q.  Your understand --
 7            SPECIAL MASTER JUNEAU:  Just a minute.  Is there anything
 8   more?  I want to give you the opportunity to fully answer the
 9   question, I assume that's your answer?
10            THE WITNESS:  Yeah, that's my understanding that there
11   was a procedure in place for appeals, people didn't like their
12   settlement I fully understood that the procedure was in place.  I
13   recommended to my clients that it was fair and maybe a couple
14   didn't avail themselves of it, I am not positive.  But generally
15   understood it, I recommended it, I thought it was good work, and I
16   have no quarrel with it.
17   BY MR. HERMAN:
18   Q.  You understood that Judge Fallon appointed Special Master
19   Juneau, that Judge Higbee recommended former Judge Corodemus, and
20   that Judge Chaney recommended Justice Trotter as the final
21   appellate review?
22   A.  I am not sure I remember all of those names, but I know most of
23   the people, and if say it's so, it's so.  I know Judge Corodemus
24   for many, many years; Judge Higbee I obviously have great respect
25   for; Judge Juneau I met today.
```

1   Q.  You had no objection to the appointment of Judge Corodemus, did

2   you, by Judge Higbee?

3   A.  Absolutely not.  She is a -- she is a tremendous judge, she

4   always was, she ran the mass tort calendar for many years in New

5   Jersey, and I have the utmost faith in her ability.

6   Q.  Now, as a result of the contract you submitted 217 claims and

7   every one of them was paid; isn't that correct?

8   A.  It's partially correct.  If you would like me to explain.

9           SPECIAL MASTER JUNEAU:  Sure.  Go ahead.

10          MR. HERMAN:  Sure.

11          THE WITNESS:  In the context of the cases that we

12  prosecuted in New Jersey, I had my firm's own individual cases,

13  that is that there was nobody involved but my firm, and then I had

14  cocounsel agreements where we worked jointly on cases with lawyers

15  from all over the country.  So just for completeness, it was more

16  than 217 claims, it was probably multiples of that, if I counted in

17  all of the people who I had joint arrangements with with the other

18  claims.

19  BY MR. HERMAN:

20  Q.  Would you put up slide 1, please.  This slide is taken directly

21  from BrownGreer's records.  It shows that 217 claims that you

22  submitted were paid --

23          MS. WOODWARD:  Your Honor, I am going to object to any

24  line of questioning.  This is part of the documentation that we

25  sought in discovery.  We have been denied this documentation, I

1   have never seen this document before, and I do not believe it's

2   appropriate for our client to be asked questions about material

3   that was denied to us in discovery.

4           MR. HERMAN:  Excuse me, Ms. Woodward.  These are your

5   clients, they had the information.  They know how many cases were

6   submitted and what they were paid on those cases.  I can't do

7   defense counsel's work -- I mean, objector's work.

8           SPECIAL MASTER JUNEAU:  Just a minute, do you want to

9   address that?  I am ready to rule.

10          MS. WOODWARD:  I have two issues:  One is sauce for the

11  good is sauce for the gander, he is using it for my client, we have

12  no access to it to use in their case, we have requested it for a

13  long time and been denied it.  And having never seen this document

14  before, after requesting and being denied it, I don't believe that

15  this is the time for me to be confronted with this.

16          SPECIAL MASTER JUNEAU:  Well, I am going to allow the

17  question.  The reason I am going to allow the question is the

18  question was a lot broader than the actual material than what's

19  contained on here.  What's contained on here is information

20  regarding the objectors to the actual objections in this case as I

21  understand it.

22          MR. HERMAN:  That's correct.

23          SPECIAL MASTER JUNEAU:  And for that reason, I am going

24  to allow it in.

25  BY MR. HERMAN:

1   Q.  Do you dispute that 217 cases that you put through for your

2   firm were paid?

3             SPECIAL MASTER JUNEAU:  He's already admitted that.

4             MR. HERMAN:  Okay.  I'll move on.  I will offer Exhibit,

5   I am going to call it Placitella 1 in connection with this hearing.

6             SPECIAL MASTER JUNEAU:  Just a minute, Mr. Herman.  I am

7   going to admit the exhibit insofar as it applies to his firm.  He

8   wouldn't know necessarily what the other firms are, so I don't

9   think he can attest to that or not.  He can do it here in sequence,

10  but as pertains this witness only thing that's relevant as far as

11  I'm concerned is what pertains to his exact firm.

12            MR. HERMAN:  Yes, sir, I understand that.

13  BY MR. HERMAN:

14  Q.  Let's go to the February 2nd, 2011, at page 42 brief that you

15  did file.  "There is no basis for this court's --" that means Judge

16  Fallon's -- "exercise of jurisdiction over the contractually paid

17  assessments emanating from state court cases."

18            Do you still contend, as you sit here today, that Judge

19  Fallon has no jurisdiction in this matter, even though you and your

20  clients availed yourselves of the MSA?

21            MS. WOODWARD:  Objection.

22            SPECIAL MASTER JUNEAU:  Just a minute, objection.

23            MS. WOODWARD:  Objection.  I would like to object to the

24  witness being questioned about his legal opinion on a legal

25  argument advanced by his counsel.

1          MR. HERMAN:  May it please the court, I'll respond.  This

2    is a lawyer involved in a case, read the brief, the lawyers speak

3    for him, I am entitled to know if he believes that Judge Fallon

4    doesn't have jurisdiction.

5          SPECIAL MASTER JUNEAU:  Well, let me address that issue.

6    This was, in fact, raised in the briefs because I read it.  And if

7    the parties will look at the report and scheduling order that I had

8    issued in this case, I addressed the jurisdictional issue and I

9    drew a conclusion as to my report.  And that is the same ruling I

10   would make here today.  So in view of that, I don't think it's

11   germane to go beyond that at this point.

12         If they want to object, that's fine, they can raise that

13   at some other point at some other level, that's fine.

14         MR. HERMAN:  I'll move on given the ruling.

15         THE COURT:  Okay.

16   BY MR. HERMAN:

17   Q.  Let's look at page 26 of Judge Fallon's order of October 19,

18   2010, approving and discussing what happened in the case.  Counsel,

19   "counsel met and exceeded --

20   A.  Excuse me, I'm sorry.  Is there something you want me to read?

21   Q.  No.  I am going to read it and then I am going to ask you a

22   question.

23   A.  Is that the whole order?

24   Q.  That is page 26 of the order as it states:  "Counsel met and

25   exceeded this court's desire for expedited resolution of this

1    matter.  Following the formal appointment of the PLC and the PSC,

2    the attorneys committed to intensive discovery and pretrial

3    efforts.  The PSC operated on many fronts, preparing pleadings and

4    master class action complaints, taking over 2,000 depositions,

5    reviewing and compiling 50,000 documents, briefing and arguing over

6    1,000 discovery motions, assembling a trial package, conducting

7    bellwether trials, negotiating the global Settlement Agreement, and

8    implementing the payout under the agreement.  The time and labor

9    expended in this effort is impressive."

10            Do you agree with this assessment of the work that was

11   done in the MDL?

12   A.  Does that include my depositions, too?

13   Q.  I'm sorry?

14   A.  The depositions that you're quoting in there, does that include

15   my depositions, too?  The ones I took.

16   Q.  I am asking if you agree with this statement?

17   A.  Well, in order for me to totally answer it --

18   Q.  Sir, you took three deponents, didn't you, as first chair?

19   A.  No, sir.

20   Q.  Sir, you submitted an exhibit yesterday, I am going to go

21   through it later on in, which it shows that you only first chaired

22   three depositions.

23   A.  There were multiple days of depositions.  All I'm asking you

24   is, is my work included in your statement?  That's all I'm asking.

25   Q.  Let's includes it.  Let's include it.  And when we get to it,

1    given let's assume --

2              SPECIAL MASTER JUNEAU:  Let's just assume it's included

3    and ask do you agree with the statement if it's included?

4              THE WITNESS:  This was a finding by a federal judge, a

5    respected jurist whom everybody respects.  I would never disagree

6    with it in terms of that.

7    BY MR. HERMAN:

8    Q.  Did you understand as a corollary to the contract through which

9    you submitted claims and your clients were paid and you made fees,

10   that there had to be a trial package for folks that didn't put

11   their cases through a Settlement Agreement, did you understand

12   that?

13   A.  I think the answer is yes.

14   Q.  Do you understand that actually the clips that you played that

15   you say you saw in the trial package were not submitted by you,

16   they were submitted by Mr. Weitz, Mr. Lanier, and Mr. Seeger who

17   were involved in New Jersey trials?

18   A.  I would have to say you're correct because until these

19   proceedings, I never knew what was in the trial package, even

20   though I asked multiple times to find out what was in the trial

21   package.

22   Q.  And, sir, did you understand that Judge Higbee and Judge Chaney

23   had input into who they wanted on the Plaintiffs Negotiating

24   Committee?

25   A.  That was my understanding and I don't think they made bad

1    choices.  These are excellent lawyers with excellent reputations.

2    Some of them very close friends for many years.

3    Q.  Judge Wilson recommended Mr. Blizzard, Judge Chaney recommended

4    Tom Girardi and Judge Higbee represented and recommended Chris

5    Seeger.  You don't quarrel with Judge Higbee's recommendation, do

6    you?

7    A.  Of recommending Chris Seeger?

8    Q.  That's correct.

9    A.  He just walked in so, do you want to ask the question again so

10   he can hear it?

11          SPECIAL MASTER JUNEAU:  I think he's already answered the

12   question, he doesn't disagree.

13          THE WITNESS:  These are fine lawyers, I know Ed Blizzard

14   since the day of breast implants, he's a principled, honest, worthy

15   advocate.  Chris Seeger.  I don't know Tom Girardi that well but I

16   know his reputation precedes him.  I have no quarrel with any of

17   these people.  These people I would trust my own case with, my own

18   family with.

19   BY MR. HERMAN:

20   Q.  And so you don't quarrel with Judge Higbee's recommendations of

21   three lawyers that participated in the New Jersey cases to be

22   members of the Fee Allocation Committee, Mr. Lanier, Mr. Seeger and

23   Mr. Perry Weitz, you don't quarrel with those recommendations, do

24   you?

25   A.  Same answer.  I've known these gentlemen for most of my career.

1    I don't quarrel with it.  I fully support them, principled people.

2    Just because I don't quarrel with them doesn't mean that I don't

3    quarrel with their decisions.  But as people of principle, good

4    human beings, something that I would trust and know I could turn my

5    back and not worry, I don't quarrel with them.

6    Q.  And they were members --

7             MS. WOODWARD:  Excuse me, may I enter an opposing

8    objection.  I just want to note for the record that Mr. Herman's 30

9    minutes --

10            SPECIAL MASTER JUNEAU:  You have to speak up.

11            MS. WOODWARD:  -- his 30 minutes for cross-examination

12   has elapsed.

13            SPECIAL MASTER JUNEAU:  I am going to allow some latitude

14   especially with him being under cross.

15            THE WITNESS:  I guess I wish I was there too, but.

16   BY MR. HERMAN:

17   Q.  You do understand though that these gentleman that served on

18   the Fee Allocation Committee were very much aware of your

19   contribution?

20   A.  I don't believe that's so.

21   Q.  Well, do you understand that they applaud what you did in

22   marketing?

23   A.  I would hope they did.

24   Q.  And as do I.

25   A.  I appreciate that.

1   Q.  Let's look --

2   A.  I guess you don't want me to answer.

3              SPECIAL MASTER JUNEAU:  So we can get some time frame and

4   keep this thing in perspective.  What do you have left?

5              MR. HERMAN:  I have about 20 minutes left.

6              SPECIAL MASTER JUNEAU:  Let's go 15 minutes and we'll

7   shut it down.

8   BY MR. HERMAN:

9   Q.  Let's just go through the slides.  We can do that.  Let's go

10  through the slide No. 3.  This appears in your brief at page 22,

11  "committee membership and leadership are commonly overvalued."  You

12  served in no leadership position; isn't that correct?

13  A.  I don't believe that's correct.

14  Q.  Let's look at --

15  A.  Would you like me to explain?

16             SPECIAL MASTER JUNEAU:  Go ahead.

17             MR. HERMAN:  Sure, you want to explain, fine.

18             THE WITNESS:  I served in New Jersey.  We had no official

19  committees.  We had a liaison counsel, and in the context of New

20  Jersey mass tort, a liaison counsel is somebody who is charged

21  interfacing with the court.  In the context of this case, I believe

22  the liaison counsel Mr. Seeger and Mr. Weiss did more than that.

23  They kind of were defacto lead counsel.  We had no official

24  committees but we had committees defacto where the people who were

25  doing the work in the trenches got together and split up

1    responsibility.

2           So in that sense I believe I was the leader of the

3    marketing and public relations committee.  My problem with the

4    whole process was that because there were committees in the MDL,

5    the way the settlement was structured you got points for being on

6    an MDL committee, regardless of your position on the committee you

7    got points whether you were a leader or not is the way I understand

8    it.

9           But if you worked in New Jersey since there were no

10   official committees, only lawyers working together for the common

11   good, if I ran the entire portion of the litigation under the

12   settlement -- under the FAC methodology I got no credit.  So in

13   other words, it did not matter if I put in 40,000 hours and had

14   something used at every trial, I was only going to get, as I

15   understand it, 50 points.  And because I was not an official

16   committee head, because we had none, it's our position and one of

17   the reasons we think it's not fair is that we did not get the same

18   kind of credit for people who did the same kind of work in the MDL.

19          Good work that they did, I am not here to degrade

20   anything that anybody else did, I just don't think that the New

21   Jersey lawyers as a group were put on the same plane.  And I don't

22   believe that was Judge Higbee's intention when she kind of agreed

23   to this process.  I thought she thought the New Jersey lawyers were

24   going to be treated similarly and there wouldn't be criteria

25   crafted that would be unfairly classify them, for lack of a better

1    word.  Thank you for the opportunity to explain.

2              MR. HERMAN:  Fine.

3    BY MR. HERMAN:

4    Q.  Judge Higbee did appoint folks to leadership, many of them in

5    this room; isn't that correct?

6    A.  No.  She appointed Mr. Seeger as liaison counsel.  She then in

7    terms of negotiating the fees, as I understand it, appointed

8    Mr. Lanier and Mr. Weitz as well.  But their role had nothing to do

9    with the prosecution of the litigation.  The litigation was over at

10   that point.  The only thing -- the only appointment of somebody in

11   this room by Judge Higbee was Chris Seeger.  And he did a good job.

12   Q.  Well, I thank you for the narrative.  Let's put up page 28,

13   trial participation and success were overvalued.  This appears in

14   your brief at page 29 -- 28.  And you never sat as a first chair or

15   a second chair in any trial; isn't that correct?

16   A.  That is correct.

17   Q.  And there were 17 cases tried, isn't that correct?

18   A.  I'll take your word for that.

19   Q.  And folks like Andy Birchfield who tried six cases, most of

20   them Merck picks, expended -- as did Mr. Blizzard and others --

21   between $1 million to $2 million to try these cases; isn't that

22   correct?

23   A.  I don't know what they spent.  But can I say, you see this

24   title here, success was overvalued, that's exactly what I was

25   saying before.  That being that Andy might have tried a case and

1   lost but that didn't mean that his work was not valued.  Okay.  He

2   did, from what I understand, I wasn't doing the MDL, I understand

3   on the MDL side he put his heart and soul into those cases just

4   like we did on the state side.

5           So when I say success overvalued, and I don't have the

6   whole thing in front of me, I believe that even losses had value.

7   Q.  And you in your brief said settlement was overvalued, do you

8   remember that?  Page 29?

9           MS. WOODWARD:  Objection, I would like to see the quote

10  because I don't believe that that's the same.  You need to show it

11  in context of the brief because we're talking about the point

12  system.

13          THE WITNESS:  Just show me the page.

14          SPECIAL MASTER JUNEAU:  Do you have the actual brief?

15          MR. HERMAN:  It's up there, it's page 29.

16          MS. WOODWARD:  I just want the witness to have a chance

17  to look at the statement in the context in which it was made.

18  BY MR. HERMAN:

19  Q.  While you're looking at that, isn't it true that --

20          THE WITNESS:  Russ.

21          MS. WOODWARD:  Yes, just a moment, because I want him to

22  be able to correct what's shown on the screen.

23          SPECIAL MASTER JUNEAU:  Let's get focused.  Read that

24  page and then we'll finish the question.

25          THE WITNESS:  The problem he is asking me questions, it's

```
1    a heading on the page and then there's a full page after it.  So am

2    I supposed to read the whole page or does he just want to ask me

3    questions?

4         SPECIAL MASTER JUNEAU:  Well, I see quotation marks that

5    says "settlement work was overvalued".

6         THE WITNESS:  But then there's a whole explanation

7    underneath about that.  Do you want me to read that whole thing?

8    BY MR. HERMAN:

9    Q.  No, I didn't ask you that question.  The question is, that's in

10   your brief, didn't you go pay a former governor of New Jersey to

11   attempt to settle your inventory and the inventory of others?

12   A.  I don't know about the inventory of others.  We met with

13   Governor Whitman because of her past relationships and the respect

14   that she has in our state about how to get her advice on how to go

15   about trying to resolve the cases, yes, that's happened.

16   Q.  And you didn't get a settlement, did you, of your inventory

17   through Governor Whitman or anyone else?

18   A.  The thing with Governor Whitman never went beyond discussions

19   with Governor Whitman.

20   Q.  But you know that the Negotiating Committee was charged, met

21   more than 50 times face to face, 100 conversations, over 11 months

22   to come up with a Master Settlement Agreement that you read, you

23   put your clients through, and you were paid, correct?

24   A.  Which part of that question --

25   Q.  Do you overvalue settlement considering what happened in this
```

1   case?

2   A.   That's not the context of how this was written in this brief.

3   The context and the reason it was written this way, as I understand

4   it, is what we were saying was that you put values on settlement

5   and settlement administration way higher than you did other things.

6          For example, the work that we did.  Although we toiled

7   and I gave up the better part of my practice for two years, I was

8   maxed out on the points that I could get because of the criteria

9   that the MDL had established and they gave, from our perspective,

10  disproportioned value to work on a settlement in that even if you

11  did work on a settlement after a settlement was reached and there

12  was very little risk involved at that point, you still got more

13  credit from the committee for that than what, say, we did where

14  risk was on the line, money was on the line, revenues, other

15  revenues were not coming in.

16         So if that answers your question, the answer is I can't

17  take that one word, it's a relative issue.  That's my explanation.

18         SPECIAL MASTER JUNEAU:  I understand.

19  BY MR. HERMAN:

20  Q.   Isn't it true that it wasn't the Fee Allocations Committee that

21  weighted this, it was Judge Fallon on January 6th, 2011, at page 16

22  of a transcript when he said, "trials in my opinion are probably

23  the most significant, trials and settlement that bring a case to

24  conclusion."  Do you disagree with what Judge Fallon's directive to

25  us was?

```
 1    A.  I don't have the transcript in front of me.  I don't disagree

 2    that trials were important.  I don't disagree that settlement was

 3    important.  If there was no settlement, we would not be here.

 4    Everybody had their role here.  We had a team, at least in New

 5    Jersey.  We take issues with these things, my issue is that you

 6    severely undervalued what we did as part of the team.

 7              And that, frankly, when you came to your conclusion for

 8    that, about what my firm was entitled to, you did not know, you

 9    Russ Herman I'm assuming, what I actually did day to day in trials

10    as part of the team.  So I agree with the statement, I don't have

11    the whole statement, but I think it's -- I am just saying that

12    there was more to it.  It was a team.

13    Q.  I just have three more questions.  Would you put up slide 9,

14    this is from Judge Fallon's October 19th, 2010, pages 16 to 17

15    where Judge Fallon goes through the drawbacks of a lodestar.  Are

16    you familiar with the Third Circuit's criticism of lodestar?

17              MS. WOODWARD:  Again, your Honor, I am going to object to

18    questioning the witness on a legal conclusion or opinion.  What he

19    thinks has no relevancy to the law.  Legal argument is to be made

20    by counsel in briefs.  The witness's opinion about the law simply

21    is not a relevant inquiry.

22              SPECIAL MASTER JUNEAU:  Well, let me just stress that a

23    minute.  There is an argument, as I understand it, Ms. Woodward,

24    that the proper methodology consistent with law was not used in

25    this case.  My understanding was that's being raised as a position
```

```
 1    of the objectors in this case.  Am I in error about that?

 2            MS. WOODWARD:  We have raised it.  We've raised it in the

 3    context of the fee allocation.  The slide that he is showing has to

 4    do with the use of lodestar, which is misspelled, in fee

 5    assessment.

 6            SPECIAL MASTER JUNEAU:  I am going to allow limited

 7    discovery.  That's an issue that myself and anyone in this

 8    unfortunate position will have to decide.  So limit the scope of

 9    that question.

10    BY MR. HERMAN:

11    Q.  Are you familiar --

12            SPECIAL MASTER JUNEAU:  He can ask him if he's familiar

13    with those comments --

14            MR. HERMAN:  This was a published comment --

15            THE WITNESS:  Never seen these comments before.

16    BY MR. HERMAN:

17    Q.  This was a published order on the court's Web site on October

18    19th, 2010, and you have never seen Judge Fallon's criticism of

19    lodestar before I asked you the question, correct?

20    A.  I have not seen this before.  Is this part of a larger

21    document?

22    Q.  Yes, it is, it says pages 16 to 17.

23    A.  Without seeing the whole document, I can't answer the question.

24            MS. WOODWARD:  At this time I would note, Special Master,

25    that the extended 15 minute period for cross-examination is
```

 1   expired.

 2          SPECIAL MASTER JUNEAU:  The pain is beginning to end in a

 3   minute.

 4          MR. HERMAN:  I have two questions.  I have two questions,

 5   your Honor.

 6          SPECIAL MASTER JUNEAU:  Okay.

 7          MR. HERMAN:  It's not painful for me but it will be

 8   because I am cutting this short.

 9   BY MR. HERMAN:

10   Q.  Here are the two questions:  You note in your exhibits a

11   deposition of Dr. David Egilman and in various filings.  Who was

12   Dr. David Egilman?

13   A.  He is a physician I have known, I think I mentioned him before,

14   many years, internal medicine, I think he has a masters of public

15   health at Harvard.

16   Q.  Didn't he fire you in the middle of a deposition from being his

17   lawyer?

18   A.  He absolutely did.  And the reason for that is he wanted me to

19   make -- no, I wasn't.  First of all, I was not his lawyer.  I was

20   asked to defend a deposition by Mr. Lanier for trial preparation.

21   He wanted me to make objections to the questions that I thought

22   were improper objections and I refused to make because I thought

23   the rules would not provide for them, that even though he wanted me

24   to make the objection, I as a lawyer had my own ethical

25   responsibility to do the right thing.  And I refused to do it.

1       He then in the middle of the deposition had me -- I

2   called -- I had Mr. Meadow (PHONETIC) take over, who I think also

3   refused to do it.  And thereafter -- and it's not saying that he

4   knew that they were improper, he was a lay witness, I knew what I

5   could do and not do.  He wanted me to take positions with the

6   defense lawyer that I didn't want to take, I didn't think the rules

7   provided for them, they don't provide for speaking objections so I

8   wouldn't do it.  He got upset with me.

9       And I will tell you that after that deposition was over,

10  he still called my house Sunday nights, Monday nights, Tuesday

11  mornings until the litigation was over.

12  Q.  Now, the last question I have for you, you've read the first

13  brief that was filed on your behalf and the other.  Have you read

14  allegations on your behalf and did you endorse them that your

15  friends and these people that you've known for so long committed a

16  fraud on the court and committed unethical behavior, do you endorse

17  that?

18  A.  I went back and reread all of the stuff when this came up.  I

19  thought that the words were carefully put there, issues were

20  raised, I didn't see an allegation of fraud.  I was, without

21  breaking privilege, took certain positions within the objectors

22  about my feelings about that.  These are my friends.  I have great

23  respect for them.  And more than that, I can't comment on it

24  because there are privilege issues involving many other lawyers on

25  many different fields.

```
 1               MR. HERMAN:  Thank you very much.

 2               SPECIAL MASTER JUNEAU:  Let me talk to the court

 3   reporter --

 4               MS. WOODWARD:  I have some brief redirect.  I still have

 5   some time remaining I believe.

 6               SPECIAL MASTER JUNEAU:  I can't hear you, what?

 7               MS. WOODWARD:  I still have some time remaining and I

 8   would like to redirect --

 9               SPECIAL MASTER JUNEAU:  I am going to allow you latitude

10   as I've done for everybody.

11               THE WITNESS:  Can I say one thing?

12               SPECIAL MASTER JUNEAU:  Sure.

13               THE WITNESS:  To the extent that anybody was hurt or

14   offended by things that were in briefs, that I didn't personally

15   write, I apologize for that.  I feel bad about it.

16               SPECIAL MASTER JUNEAU:  Ms. Woodward.

17               MS. WOODWARD:  First I want to make sure that our

18   exhibits are introduced into evidence.

19               SPECIAL MASTER JUNEAU:  I was going to bring that to your

20   attention.

21               MS. WOODWARD:  I would like to offer the multiple binders

22   which contain the charts, all of the e-mails that have been

23   referenced.  There is no way that we can go through those e-mails

24   one by one, but they all relate to the client's work.  At this time

25   some of them, because we've done combined exhibits for Placitella
```

 1    and Weinberg, are not properly admitted.

 2           But I just want to make sure that while I had

 3    Mr. Placitella on the stand that if there are any questions about

 4    any documents that we're offering on his behalf, they will be

 5    addressed now.

 6           MR. HERMAN:  I haven't had the chance to read them, as I

 7    said before they were delivered late, I even got some this morning.

 8    I am not objecting to anything as long as it does not relate to the

 9    Stratton issue or Mr. Markowitz.  Other than that, whatever they

10    want to put in is okay with me.

11           MS. WOODWARD:  There is in binder 2, tab 5 a chart which

12    has been generated by Mr. Markowitz.  We will just withhold that

13    for introduction for later.  We'll hold it for Mr. Markowitz.

14           SPECIAL MASTER JUNEAU:  Is that labeled, for example?

15           MS. WOODWARD:  It's binder 2 --

16           SPECIAL MASTER JUNEAU:  I would like to keep it by

17    objector if I can.  So give us a name Placitella, however you want.

18           MS. WOODWARD:  Oh, I misunderstood your question, they're

19    labeled Placitella and Weinberg.

20           SPECIAL MASTER JUNEAU:  Placitella and Weinberg No. 1

21    includes multiple documents, but we'll list that as Placitella and

22    Weinberg 1.

23           MS. WOODWARD:  Okay.  But this is in binder 2, tab 5 is

24    this specific document at issue, which is not being introduced at

25    this time.

1          SPECIAL MASTER JUNEAU:  With the exclusion of that

2    document at this time.

3          MS. WOODWARD:  Thank you.  And all of the rest of our

4    exhibits which are contained in multiple binders, we would offer at

5    this time.

6          SPECIAL MASTER JUNEAU:  They are received in evidence.

7          MS. WOODWARD:  Thank you.

8                         REDIRECT EXAMINATION

9    BY MS. WOODWARD:

10   Q.  Do you have your New Jersey MDL slides on your PowerPoint?

11   A.  Probably.

12   Q.  Would you look for those?

13   A.  I have to plug it in.  What is it you want me to find?

14   Q.  I want you to find the closing comparisons of how New Jersey

15   counsel were treated by the recommended allocations as opposed to

16   the way the MDL lawyers were treated in the recommended allocation.

17   A.  I guess I have to explain the slide.

18   Q.  Can you put it up?  Okay, here we go.

19   A.  I have to explain how I got to this, this is just my own

20   analysis.

21   Q.  Yes.

22   A.  What I tried to do to be fair was to segregate the firms by

23   tier 1 and tier 2.  Tier 1 firms were the firms, in my mind, that

24   tried multiple -- maybe I have this wrong because I don't know

25   exactly everything that went on in the MDL, but tier 1 for the

1    firms that tried multiple cases or they were leaders in the

2    litigation.  So, for example, Mr. Herman I say was a tier 1 firm

3    because he was liaison, Mr. Birchfield was a tier 1 firm because he

4    was lead counsel, Mr. Seeger was tier 1 because he was lead

5    counsel --

6    Q.  Do you have the slide for tier 1?

7    A.  I think I took it out.  So tier 2 was just a comparison of

8    firms that seemed to have done similar work between the MDL in New

9    Jersey and how they were treated comparatively in terms of awards.

10   Then the next slide was compensation per hour, which I thought was

11   more telling.

12          If you look at the compensation per hour for MDL given

13   the criteria that were applied, for example, committee leadership

14   that we discussed, your Honor, that we didn't have the benefit of,

15   their not knowing what our real participation in trial was.  I

16   think it's, you know, the figures speak for themselves, it's pretty

17   distorted.

18   Q.  And just so I understand.  The slide that you put up first

19   shows the MDL -- the FAC's recommended allocations for the tier 2

20   firms in New Jersey as opposed to the MDL?

21   A.  Correct.

22   Q.  And the slide that we have on the screen now shows if you

23   divide those hours by the recommendations, what the hourly rates

24   would be for those firms if you accepted the FAC's recommendation?

25   A.  Right.  So, for example, in New Jersey we broke it down by the

```
 1   hour, I was compensated $100 an hour, Mr. Locks's firm who tried a

 2   case in New Jersey, got a verdict on consumer fraud, did not win on

 3   the compensatory damages but got a verdict on consumer fraud, their

 4   efforts were compensated at a rate of $65 an hour; and

 5   Mr. Weinberg, who gave up the better part of two years of his

 6   practice at significant risk, he was compensated at $21 per hour.

 7            And it's our contention that that's the result of an

 8   analysis of factors that were ascribed that although they might

 9   have been fair to the MDL lawyers, they were unfair to the state

10   court lawyers because the state court lawyers did not have the same

11   structure as the MDL lawyers.  And because we did not have the same

12   structure, we were severely penalized in the ultimate way we were

13   assessed.

14            MS. WOODWARD:  Thank you I have no further questions.

15            MR. HERMAN:  I would like to say this, I've known

16   Mr. Placitella a number of years, he's been a leader in the New

17   Jersey trial bar, he is an excellent trial lawyer, and I appreciate

18   you coming here and submitting to cross-examination.  I know it's

19   not been easy.

20            THE WITNESS:  It won't be the most memorable day of my

21   life.

22            SPECIAL MASTER JUNEAU:  You can step down.  Let me have a

23   moment with the court reporter.

24            We are going to recess until 2:20 and we'll come back and

25   start sharply on the next matter.
```

1     (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

2     (OPEN COURT.)

3

4                    P R O C E E D I N G S

5                    (AFTERNOON SESSION)

6

7          SPECIAL MASTER JUNEAU:  Are you ready to proceed?

8          MS. WOODWARD:  We're ready for Mr. Weinberg.  Your Honor,

9     before I examine Mr. Weinberg, I want to clear up what may or may

10    not be some confusion on the part of counsel with the common

11    benefit contributions.  There was the MDL, when the settlement was

12    confected, under the settlement all of the state proceedings were

13    drawn in to the settlement.

14         SPECIAL MASTER JUNEAU:  All of what?

15         MS. WOODWARD:  All of the state proceedings were drawn

16    into the settlement.  And at that time when they were drawn in to

17    the MSA, Judge Fallon worked with Judges Higbee, Chaney, you've

18    heard the names, but it was agreed that all of this work that had

19    been done in the states, which was common benefit work, to the

20    extent that it was common benefit work, would be considered for

21    common benefit fees.

22         So when we in our presentations talk about exhibits or

23    documents or depositions that were used in the MDL, we don't mean

24    to suggest to you that that inclusion is a prerequisite to those

25    hours, documents, whatever, being considered common benefit.  Under

1   Judge Fallon's orders, it is clear that the work done in the state

2   courts, even if it was never brought into the MDL on the form of an

3   exhibit or a document or a witness or anything else, is still

4   eligible for consideration for an award and allocation of common

5   benefit fees.  And I just want to make sure that that's clear.

6   It's on the face of a number of rows.

7           SPECIAL MASTER JUNEAU:  I am taking face value of what

8   you're saying and I am not disputing that.  I think the issue

9   really is what's an individual case, what's not an individual case,

10  what the participation is or is not, and the personal participation

11  in the MDL, I understand it's all considered.  It's a very complex

12  issue, but I understand exactly what you've said.  It's not the

13  exclusion automatically going out of the outside of the MDL, I

14  understand that.  We wouldn't even be here if that were the case.

15          MR. HERMAN:  On behalf of the Fee Allocation Committee,

16  your Honor, we always understood that if somebody did work that

17  promoted the conclusion that we came to wherever it was done it

18  would be considered, and we did consider it; because 6D, PTO 6D

19  governs what we were supposed to do, and in 6D the court uses words

20  like significant contributions, substantial contribution, the

21  quality of the work, those ultimately were the deciders, along with

22  the other things in 6D, whether the work was done in the New Jersey

23  coordination or a California coordination or Texas, for whatever

24  length of time it was.

25              So to the extent that work was significant, was

1    substantial, was quality work, it was considered and was to be

2    considered by the FAC, and that's what we did.

3              SPECIAL MASTER JUNEAU:  Good afternoon Mr. Weinberg.  Do

4    you want to raise your right hand, please, sir.

5         (WHEREUPON, ERIC WEINBERG, WAS SWORN IN AND TESTIFIED AS

6         FOLLOWS:)

7                         DIRECT EXAMINATION

8    BY MS. WOODWARD:

9    Q.  State your name and address for the record, please.

10   A.  Eric Weinberg, 81 Harrison Avenue, Hines Park, New Jersey.

11   Q.  Would you describe your educational background.

12   A.  Yes, I graduated from Rutgers University in 1977 --

13             SPECIAL MASTER JUNEAU:  Let me interrupt, Rutgers?

14             THE WITNESS:  Rutgers College, yes, sir.

15             SPECIAL MASTER JUNEAU:  I took six hours of credit at

16   Rutgers University when I was in the United States Army in 1960.

17   Now, that wouldn't conflict me out of this case, would it?  A

18   lighter moment.

19             THE WITNESS:  That would be on the Banks of the Old

20   Raritan.

21             THE COURT:  That's exactly correct.

22   BY MS. WOODWARD:

23   Q.  And moving on to your postgraduate work.

24   A.  I attended Boston University School of Law and graduated in

25   1980.

```
 1   Q.  Have you previously worked in pharmaceutical litigation?

 2   A.  I have.

 3   Q.  Can you describe your background in that?

 4   A.  I was involved in a single case involving a medical device

 5   which was related to the death of an infant, that was back in the

 6   late --

 7        SPECIAL MASTER JUNEAU:  You have to speak up, they're

 8   having a little difficulty hearing you.

 9        THE WITNESS:  I was involved in representing clients

10   whose infant died in connection with a defective what we alleged

11   was a defective baby monitor that was an FDA regulated product, and

12   that litigation was in late 1980s, early 1990s.

13        I then spent about a decade representing people with

14   hemophilia and HIV in litigation against the manufacturers of

15   clotting factor concentrates that were contaminated with HIV, and

16   that litigation, I brought cases in New York and New Jersey,

17   individual cases; I was appointed to PSC by Judge John Grady in

18   Chicago, I was a member of the executive committee in that

19   litigation.  We obtained legislative success in extending the

20   statutes of limitation for victims in New York and New Jersey,

21   which are still on the books.

22        When that case concluded, shortly after that case

23   concluded I was involved in a litigation involving a pharmaceutical

24   drug called Baycol, which was a statin drug that was pulled off the

25   market because it caused severe liver injuries, rhabdomyolysis.
```

 1   That case was concentrated in state court in Philadelphia, and I
 2   was very much involved in developing that case and working up the
 3   issues in that case.
 4          And then I became involved in the Vioxx litigation in
 5   2004.
 6   BY MS. WOODWARD:
 7   Q.  As a result of that prior experience, did you bring scientific
 8   knowledge and relationships with experts into the Vioxx litigation?
 9   A.  Yes.
10   Q.  Can you describe some of the science and experts that you
11   imported?
12   A.  Well, there were always significant regulatory issues in these
13   cases, understanding the dynamic between the company and the FDA
14   and what the company reported and what the FDA knew is, can be
15   critical to the success of the case.  And over the years of
16   litigating these cases, I had met, retained, developed, and worked
17   with experts in FDA, and several of them became consultants and
18   experts in Vioxx.
19          I also developed a working relationship with Dr. John
20   Kostis, whose name we heard, your Honor, today.  Dr. Kostis is
21   chief of medical services at Robert Wood Johnson University
22   Hospital in New Brunswick and chairman of medicine at the medical
23   school.  He is both a world renowned cardiologist and
24   pharmacologist who has done many, many major clinical studies, and
25   so he was someone whose expertise I called on within the week after

1    Vioxx was withdrawn from the market.  Those are just two examples.

2    Q.  And what's the name of your firm?

3    A.  I am a solo practitioner, it's the Law Offices of Eric H.

4    Weinberg.

5    Q.  Did you represent individual Vioxx claimants?

6    A.  I did.

7    Q.  About how many?

8    A.  I think we filed 274 cases initially and then about another 12

9    or so after that, I think those are the numbers.

10   Q.  And how did your work in the case extend beyond your efforts on

11   behalf of individual claimants to something that you view as common

12   benefit work?

13   A.  When Vioxx was pulled off the market, first I learned who of my

14   colleagues were involved in the litigation, and Chris Seeger and

15   Andy Birchfield and I had worked closely in the Baycol litigation

16   and Sol Weiss also had worked in the Baycol litigation.  So I knew

17   them, I reached out to them to get an understanding of what they

18   had done.  As has been said here before, often we stand on the

19   shoulders of our colleagues who have been sort of going down that

20   road already, and that happened here, you know, for me.

21          I am going to reiterate what has been said here before.

22   I have tremendous respect for Chris, for Andy, for Sol, I met Mark

23   Lanier, Rick Meadow and others in his firm in this case.  You know,

24   there's no question that, you know, these are great lawyers, I

25   didn't know they had been in the case, but I learned about that.

1    And Baycol I also worked with Ed Blizzard.  And again, you know,

2    you learn from what other people have done and that's what I did

3    here.

4    Q.  Specifically what contributions did you make?  And I know you

5    prepared a PowerPoint, can you put up the first slide?

6    A.  Sure.  So the first thing I did was the day after the

7    withdrawal I contacted a former FDA field officer who I had

8    retained in Baycol, a senior level guy who had retired, and I

9    prepared Freedom of Information Act requests to the FDA to obtain

10   the summary approval packages, that's a term of art, that the FDA

11   had prepared when it had considered Merck's approval for a new drug

12   application for Vioxx.  I sent the FOIA letter to, FOIA letter to

13   this consultant a fella named seizer Roy and asked him to expedite

14   the process of getting a response, because sometimes FOIA can take

15   a lot of time.

16          Within a week or so I had about 5,000 pages of documents

17   from the FDA that comprised their summary approval package.  I

18   spent the next several months going through that summary approval

19   package to get an understanding of how the FDA looked at the new

20   drug application, what their concerns were, whether there was

21   evidence of risk, of cardiovascular risk in the data that had been

22   submitted, whether there was theoretically a duty on the

23   manufacturer's part to do more, the manufacturers always under the

24   regulations, the owner of the drug has responsibility to not only

25   submit data but to understand and explore potential risks of which

 1    they're aware, that is the sponsor or manufacturer's

 2    responsibility, not the FDA's responsibility.

 3            So I spent a good amount of time learning that

 4    information.

 5            I also went to meet with Dr. Kostis in the week after the

 6    withdrawal.  The first thing that I asked him was whether he felt

 7    that Vioxx was an unsafe drug, and he told me a story about his

 8    experience with it and that he encouraged me to investigate the

 9    case.  He thought that Merck had, you know, had put a bad drug on

10    the market.

11            With Dr. Kostis I set up a project so that I could better

12    understand and share information, as I did with the FDA work that I

13    did, about risk factors and specific causation.  The difficulty,

14    one of the main difficulties in any pharmaceutical drug litigation

15    is you may have evidence that the drug is unsafe, generally

16    speaking as we did here from the VIGOR study, but to prove that an

17    individual case caused the injury, prove the specific causation can

18    be difficult particularly when you don't have a significant injury.

19    So in the Baycol case the injury was a signature injury, it

20    happened very rarely other than in patients that took Baycol.  But

21    in Vioxx you're talking about heart attacks and strokes.

22            So that was a project that I began within the first week

23    of the withdrawal of the drug, and that really continued, that

24    process, that learning process and educational process continued to

25    increase.

1          Those were the two main starting points for me I would

2    say in the last six months to nine months of my work in Vioxx.

3    Q.  We're talking about October 2005, right?

4    A.  October 2004 into 2005.

5    Q.  Gotcha.  At that point the MDL hadn't even been formed yet?

6    A.  Correct.

7    Q.  To your knowledge was anybody else doing this work with

8    defining FDA issues that you embarked upon?

9    A.  I was not aware that anyone had extensively reviewed the FDA

10   summary approval packages, I didn't see any work product on that.

11   It may have been done, it may have been done in whole or in part.

12   I know that there were -- again, the lawyers who were working on

13   this case are good lawyers, so -- but I wanted to learn and know

14   and develop this work product on my own because I feel, and I still

15   feel, that this is something that I do as well as anybody.  And

16   that I would share with my colleagues because that's also my style.

17   Q.  Let's go to the next slide.  I think you've already described?

18   A.  Yeah.  So within the first six months of the withdrawal I

19   retained five different consultants, one was Caesar Roy the former

20   field officer, I retained John Guerigian who was a retired medical

21   review officer, an MBA, Ph.D. with whom I had worked in the Baycol

22   case.  I retained Jay Geller, a retired FDA attorney who I had

23   worked with on the Baycol case, and I retained two senior retired

24   FDA compliance officers Betty Jones and Sandra Whetstone (PHONETIC)

25   who also helped give me perspective on sort of this overall project

1    of understanding the relationship between FDA and Merck with

2    respect to Vioxx.

3    Q.  You note that you sued the FDA on Vioxx under the Freedom of

4    Information Act request.  When did you file that suit?

5    A.  I filed suit against the FDA in April of 2007.  I had continued

6    to serve Freedom of Information Act requests through the

7    litigation.  Freedom of information is sometimes arcane, so when

8    you're submitting a Freedom of Information Act to the FDA, they are

9    they going to look at what you write and respond as narrowly as

10   possible.  As we in any case go through the case and learn about

11   what happened, it becomes clear that there are things that we don't

12   have or don't know and so I continued to serve FOIA requests on

13   FDA.

14        At some point the responses from the FDA came to a

15   grinding fault and I was not getting any information from them, and

16   so it reached the point where I brought suit in my name as a

17   citizen against the FDA and commissioner of April of 2007 to force

18   them to comply with their obligation under the Freedom of

19   Information Act.

20   Q.  When you brought suit in your name as a citizen, were you still

21   seeking Vioxx materials?

22   A.  Absolutely.

23   Q.  And what was the outcome of that action?

24   A.  The FDA moved to stay my complaint basically, you know, based

25   logistical and resource issues as a defense to complying with the

1    freedom of information.  I responded to that in a pleading and in

2    October of 2007 a federal judge in New Jersey, Judge Faith Hopper

3    denied the FDA's motion to stay and ordered them to mediate my FOIA

4    request and appointed a retired state court judge, Judge Humphries

5    as the mediator.

6    Q.  And among the plaintiffs bar who have been working on Vioxx,

7    what was the response to that ruling?

8    A.  I got a lot of congratulatory e-mails.  Actually, one of my

9    colleagues sent an e-mail around to the New Jersey list of all of

10   the Vioxx lawyers saying Eric is too modest to brag, but, you know,

11   this is what he did.  And then a bunch of people sent me e-mails,

12   you know, thanking me for doing the work, which is always nice to

13   be complimented.

14   Q.  And then of course the case settled in the following month?

15   A.  The case settled a month after Judge Hopper entered her order.

16   We did proceed through mediation because the process had already

17   started, but sort of the critical mass had kind of dissipated with

18   the settlement.  And eventually I did negotiate a resolution with

19   them, with the mediator and was provided with documents from FDA in

20   2008.

21   Q.  Let's go to the next slide.

22   A.  This is just the first page of a PowerPoint summary that I had

23   prepared in March of 2005 based upon my review of the FDA approval

24   packages from October 2004 when I first got them through March of

25   2005.

1   Q.  And you know that, you reviewed thousands of pages of FDA

2   documents for many of those that you had obtained through your FOIA

3   request at that point?

4   A.  The vast majority were FOIA.

5   Q.  Let's go to the next slide, which I think is an example.  This

6   is one of the 117 sought that was in your FDA PowerPoint; is that

7   correct?

8   A.  That's correct.

9   Q.  What was the purpose of this approval summary that you

10  prepared?

11  A.  This was to educate lawyers and experts about what was in the

12  FDA summary approval packages.  There were interesting and

13  important comments from the FDA reviewers.  When the FDA reviews a

14  manufacturer's new drug application, there are several different

15  reviewers depending on the type of drug, what the pathophysiology

16  of the drug, what it's for, you know, what the potential side

17  effects are, and so I went through all of those reviewers' comments

18  and reports and pulled out and highlighted what I thought could be

19  helpful, things like, for example, in this slide, that in the

20  M.D. -- in the data that were submitted to the FDA there were

21  already what I consider signals of cardiovascular risk that put a

22  demand on the manufacturer to do more than what they did.

23  Q.  At the time that you put this PowerPoint together, had you seen

24  any work that anyone else had done to assemble and present this FDA

25  material?

```
 1    A.  I am not sure.  I don't recall having seen anything detailed at
 2    that time.
 3    Q.  And how did you disseminate this PowerPoint?
 4    A.  I gave it to attorneys that I was working with in the New
 5    Jersey consortium, I gave it to experts that we were dealing with.
 6    Q.  Did you withhold it from anybody that asked for it?
 7    A.  No.
 8    Q.  Did you charge anything for this distribution of your work
 9    product?
10    A.  I didn't charge anything.  I think I also showed some slides at
11    a meeting of attorneys interested in Vioxx litigation in 2005 when
12    I made a preparation to the group.
13    Q.  And is this single slide representative of the depth of
14    analysis that you undertook throughout this PowerPoint
15    presentation?
16    A.  I believe it is.
17    Q.  Let's go to the next slide.  Before we leave that latter one,
18    how long did it take you to put that document together?
19    A.  It was hundreds of hours of time.
20    Q.  This slide that's up now is what you've already described, so
21    we can go to the next one, that's the order allowing you your FOIA
22    discovery.
23            In addition to your FDA work were you pursuing other
24    broad areas of discovery in Vioxx?
25    A.  Yes.
```

1  Q.  Can we go to the next slide.  Says Weinberg led on the science,

2  risk factors and specific causation with Dr. Kostis.  When you say

3  you lead on science, to what role are you claiming there?

4  A.  Well, in New Jersey a group of lawyers who knew each other and

5  worked together before first loosely and then in meetings formed a

6  consortium to work together.  And it was my part of the case, I

7  worked very closely with Chris Placitella and so supported Chris in

8  his marketing.  But my part of the case was more focused on science

9  and experts and the FDA issues and bringing expertise and

10  information to bear.  And in doing that in a way that was inclusive

11  and open.

12  Q.  What exactly did Dr. Kostis do?

13  A.  Dr. Kostis and I discussed how we might prove specific

14  causation with the scientifically viable model.  And our initial

15  discussions were that this would be useful in educating testifying

16  cardiologists.  He had worked for me as a testifying expert in

17  Baycol and I don't think he was totally comfortable with that so he

18  didn't want to be a testifying expert in Vioxx, at least at that

19  time.  But he was willing to help educate me on the objective

20  science.  This was a science based objective analysis of specific

21  causation that would help us get over the issues of, well, that guy

22  took Vioxx and had a heart attack but he was overweight, was a

23  smoker, or had other risk factors.

24        The other part of the project was, the idea was that by

25  doing this we might create a matrix for settlement down the road

 1   that would be helpful.  Because I had been involved in two mass

 2   tort cases previously, I knew that there was always, there's always

 3   an ending strategy, there's always a way to resolve the case.  And

 4   I thought that if we developed a model that Merck would accept that

 5   was scientifically based that could prove specific causation and

 6   give you basically what Dr. Kostis did was create sort of a

 7   logistic regression analysis, sort of an analysis of all risk

 8   factors combined, that at the end of the analysis would give you a

 9   percentage of causation of Vioxx patient by patient.  And our

10   thinking was, my thinking was that could be a useful way of

11   approaching a potential settlement.

12            And so we took off on this path of developing this

13   understanding of risk factors both for proving specific issues at

14   trial and for using it potentially in the settlement matrix.

15   Q.  And to what extent did you support Dr. Kostis's efforts?  We've

16   all worked with experts where you just tell them this is what I

17   want and they do it.  In Dr. Kostis's case, what role did you play

18   in the development of the model that you're describing?

19   A.  Dr. Kostis is a brilliant man and also a very humble and

20   accessible guy.  The role that I played with him was to spend a lot

21   of time talking through this project, asking him how we might do

22   it, looking at his sort of modeling of this as it evolved over

23   time, and getting to the point where he had a model that I felt was

24   very useful.

25            At some point later I engaged or retained other really

1   world class scientists to review and peer review Dr. Kostis's work

2   and critique it.  And so by the time you were done with this

3   process -- and I opened this up to the entire New Jersey

4   litigation, all of my cases were filed in New Jersey, I decided not

5   to go into the MDL --

6           So I invited everybody, we had a list that are

7   participating, and ultimately about a dozen law firms in New Jersey

8   submitted cases to Dr. Kostis, individual cases of theirs,

9   submitted them by using a form that Dr. Kostis had created to

10  elicit information key information to plug into the model.  He then

11  reviewed, I think, by the end of 2006, five or six, I forget which.

12  He had reviewed about 500 individual cases, and wrote a report.  He

13  created a PowerPoint to kind of explain how this algorithm worked,

14  and he was advising each individual counsel on their individual

15  cases in terms as to how they might prove scientific causation at

16  trial.

17  Q.  We heard testimony earlier today about Sol Weiss's role in the

18  New Jersey consortium and his being a leader in the New Jersey

19  litigation.  Did he participate in this Kostis modelling effort?

20  A.  He did.

21  Q.  And did he supply data and cases for review?

22  A.  Yes.

23  Q.  So he was aware of and approved your work as New Jersey

24  leadership?

25  A.  Right.  Sol Weiss was very supportive and interested in the

1    model.  There were costs involved in this, of course for

2    Dr. Kostis' time.  And what we worked out was that counsel who,

3    lawyers who joined in this project and submitted their cases where

4    they would pay Dr. Kostis, I didn't take any money or ask for any

5    money to do this.  I was doing it to support my clients, my

6    colleague's clients and the overall litigation.  Thought this would

7    be effective at some point in moving the ball forward on this case.

8    Q.  Let's go to the next slide.

9    A.  This is a picture of Dr. Kostis.

10   Q.  A little excerpt of his CV?

11   A.  He is the founding director of the Cardiovascular Institute in

12   New Jersey, and just a wonderful doctor and someone I consider as a

13   friend at this point, as well.

14   Q.  The next slide.

15   A.  So early on in the case I had discussions with Chris Seeger and

16   his partner Dave Buchanan, who is also a terrific lawyer and a

17   friend and a colleague.  It was known that I had a good working

18   relationship with Dr. Kostis, and David, this references an expert

19   biostatistician that Dave Buchanan had been working with very

20   intensely, Dr. Richard Kronmal, who is a very good expert from the

21   University of Washington, and I just include this because there was

22   this interaction and sharing going on and I wanted to be clear that

23   I am a sharer, I work hard, I was raised to be a hard-working

24   person.  I think I do good work and I share my work because it's to

25   my client's benefit.  I think people say a rising tide lifts all

1    boats and I believe in that in pharmaceutical drug litigation.

2           So early on Dave asked me if his expert can get some

3    cardiology ideas or information from Dr. Kostis because Dr. Kronmal

4    was a biostatistician, I don't think he is an M.D.

5    Q.  Next slide.

6    A.  This is an e-mail from Sol in March of 2007 we were already far

7    down the road on this project and the lawyers that were copied in

8    this e-mail were all participating in the project, send cases to

9    Kostis, had meetings, regular meetings to go over what he had been

10   working on, he came to my office and lawyers came to my office in

11   New Brunswick, and there was a good interplay, a good feedback and

12   the process played itself out and very excited because it was a

13   good project.

14   Q.  When Dr. Kostis completed this model, did it support your

15   anticipated conclusions that Vioxx was a contributing factor, a

16   significant contributing factor in the medical issues that you were

17   investigating?

18   A.  It did.  Dr. Altobelli, has been mentioned today, Anthony

19   Altobelli is a cardiologist in New Brunswick who I obtained, very

20   smart, young cardiologist who was going to testify in the cases

21   that were lined up for trial in New Jersey in 2007.

22           He also reviewed records that other bellwether cases that

23   were not yet listed for trial, some of Sol Weiss's files, he had

24   reviewed Mr. Seeger's client's case.  And Dr. Antobelli based on

25   his -- so I put Dr. Antobelli and Dr. Kostis together so that

1   Dr. Altobelli had the benefit of seeing what Mr. Kostis had done

2   and using that and testifying about specific causation at trials.

3           One of the better things that I think we were going to be

4   able to introduce was that in this 500 patient analysis, so we had

5   a good representative sample of individuals on Vioxx, it turned out

6   that the attributable risk of Vioxx to heart attacks and strokes

7   was higher than smoking.  So why would you give somebody the drug?

8   That was the benefit of his work.

9   Q.  Did you share that around?

10  A.  Yes.  There were a bunch of lawyers working on this project and

11  it was open to anybody who wanted to be involved in it.

12  Q.  Next slide.  This shows that you collaborated with trial

13  counsel in six trials.  Were all of those trials in New Jersey?

14  A.  The *Ernst* trial was in Texas and the rest were in New Jersey.

15  Q.  And what role did you play in each of those?  Let's go to the

16  next slide.

17  A.  This is actually related to Mr. Weiss's testimony about my work

18  as reading and science and experts, which I think has been covered

19  today, so can I just --

20  Q.  Yes, move on.

21  A.  First of all, I am a good teammate.  I'm a lawyer who works

22  well with others.  I am not here to take credit for anybody else's

23  work.  My respect for Mark Lanier and Rick Meadow and the lawyers

24  who tried the *Ernst* case is as high as it can be.  And the same

25  goes for Chris Seeger and his firm and the same goes for Perry

1  Weitz and Rob Gordon and Jerry Kristal.

2         So when I am talking about what I did in these trials,

3  I've heard the term moving the ball in this litigation, you know

4  who moved the ball in this litigation.  If you play ball, any kind

5  of team sport, you know that if it's Drew Brees versus the worst

6  defense in the NFL, Drew is not moving the ball up the field, it's

7  got to be a team.

8         So in these cases when my colleagues talk to me about the

9  work I've been doing and ask for help or some advice on different

10  issues, I was there immediately.  As Chris had said, there were day

11  by day interactions in these trials.  I did what I could to help

12  them win their cases as a colleague and as a team mate.

13  Q.  We already reviewed your work on the FDA regulatory issues.

14  You contributed that to the *Ernst* trial, we already talked about

15  your work with Dr. Kostis, and you contributed that to the trial.

16  You say you shared work product on cardiovascular risk issues and

17  listed it as expert opinion.  Is that something independent of the

18  Kostis work?

19  A.  No.  I think there were two main areas where I was able to find

20  some help and these lawyers achieved a remarkable result, and my

21  piece of this was small.  But the two areas where I helped was:

22  One, I had met -- I think the key expert in their case at that time

23  Dr. David Egilman, his name has come up, in February of 2005.

24  Dr. Egilman who's sort of got a personality where if he thinks that

25  you're somebody who is somewhat interesting or have information

1    that could be useful to him, he kind of lathes on to you.  And as

2    Chris Placitella said, he will call you at all hours of the day and

3    night.  I'm sure that Rick Meadow, who is sitting here, will attest

4    to the veracity of that statement.

5         So Dr. Engilman was interested in my work, the work that

6    I had done on FDA documents, and we spent a lot of time talking

7    about that.  I gave him information just so that he had it, so that

8    he could use it and have it in his back pocket if he needed it at

9    trial.

10        What Mr. Kostis did was basically Mr. Ernst had died of

11   an arrhythmia, there were issues, serious issues in the case as to

12   whether the data showed that Vioxx caused arrhythmia as opposed to

13   myocardial infarction.  And Dr. Kostis because of his raw based

14   knowledge of medicine, cardiovascular medicine, was able to give

15   some input into why there was a connection between Vioxx and

16   Mr. Ernst's death.  He didn't testify in the case but he helped.

17   Q.  What was the outcome?

18   A.  Mark and Rick achieved a verdict, I think it was $253 million

19   for their client in that case.

20   Q.  Did you receive any fee or compensation for your contribution?

21   A.  I didn't receive a fee, I didn't ask for a fee, I wasn't

22   interested in a fee.  I did this because -- first of all, I got to

23   know the lawyers and liked them and respected them and I wanted to

24   see them win.  I thought whatever I could do would help everybody.

25   Q.  Next slide.

1  A.  So Rick had asked me, you know, because Dr. Egilman had done

2  this kind of latching on to come and be at his deposition and so I

3  worked with him.

4  Q.  Next one.

5  A.  This is just an e-mail from Dr. Egilman's assistant asking me

6  for some more information from me about, that Dr. Egilman was

7  interested in.

8  Q.  Let's go to the next one, we have some time.

9  A.  I sent him stuff.  And this is just an e-mail to Rick.

10  Q.  Next slide.  What did you do in Humeston?

11  A.  In the *Humeston I* trial, that was the first trial in New

12  Jersey, it was Chris Seeger's trial.  As the trial progressed,

13  there were issues that came up involving, first of all, involving

14  Merck's FDA expert and Chris reached out, Chris Seeger initially

15  reached out Chris Placitella and then to me to work on the

16  cross-examination of Dr. Rarick, which I did, I went through her

17  report, I went through the report and I sent it to Chris.  I'm sure

18  there were other people who had input into this, but, you know, I

19  did what I was asked to do and gave them feedback.

20  Q.  What other contributions did you make to the trial?

21  A.  The regulatory issues in the case were challenging, as they

22  always are, and so in order to do what I could to help Chris and

23  his team, his firm, I reached out to Dr. Guerigian, the former

24  medical review officer at the FDA who I had on retainer, and to

25  Mr. Geller, the FDA attorney who I had on retainer, and brought

1   them in to the case in a consulting fashion, ran questions that had

2   been posed by them, got there counsel advice and framed issues for

3   them and then shared that information with Chris and his team.

4          I think at some point Mr. Geller, the FDA lawyer,

5   supplied the regulations to be read to the jury.  Chris -- again

6   there may have been other people involved in helping, but this is

7   stuff that we did.  They had printed out the jury charge, you heard

8   Dave Jacoby talk about the jury charge this morning, and I had

9   some -- I was asked by Dave Buchanan to look over the jury charge

10  and give some, you know, advice about that and I did that as well.

11  Q.  Okay.  Next slide.

12  A.  These are just basically e-mails that cover --

13  Q.  Right, we won't have time to talk about all of these.

14          MR. SEEGER:  And I still do love you.

15          THE JUROR:  Thank you.

16  BY MS. WOODWARD:

17  Q.  This I love you e-mail relates to your assistance --

18          THE WITNESS:  If I could just make a point about this.

19  This was -- Vioxx is a very interesting case and, you know, we're

20  all here because intellectually we as lawyers are challenged by the

21  challenge of making this kind of a case, particularly against a

22  global pharmaceutical company, taking on the big bear for some

23  people is what gets their juices flowing.  And I think really what

24  this is about is that we were working together, we had this dynamic

25  that was really positive.

1       And I think this is just Chris's you know, in his, he was

2   in the middle of trial, his adrenaline was flowing, and, you know,

3   he was, the way I read this, was he was just appreciative that I

4   had stepped up as a colleague to help.

5   BY MS. WOODWARD:

6   Q.  And again, you didn't have any fee interest or you weren't paid

7   for this work?

8   A.  No.

9   Q.  Okay.  Next slide.  Next slide.  Let's keep going,

10  Cona/McDarby, who is the trial team there?

11  A.  In this trial Mark Lanier and Rick Meadow and their firm

12  representing Mr. Cona and Perry Weitz, Weitz & Luxenberg, Rob

13  Gordon, Jerry Kristal were counsel for Mr. McDarby.  I think prior

14  to the trial I had been contacted about the fact that Mr. McDarby

15  was diabetic, so he had a risk factor that was a substantial risk

16  factor for heart attack.  And the defense was going to be his heart

17  attack was caused not by Vioxx but by his diabetes.

18      And I had spent a lot of time, obviously, with Dr. Kostis

19  on risk factor issues and I had a pretty good knowledge base about

20  what the issues were that would help plaintiffs prove both that for

21  diabetics there was an increased risk of causation of Vioxx, and

22  that Merck didn't warn people with diabetes about this risk.  There

23  was data in the published literature, there was data in the

24  documents, I'm sure that I am not the only one who knew about this

25  stuff, but I knew about it.  So when I was asked to give input on

1    this issue, I did.  Again, I was in no way the laboring oar, I did

2    not mean to imply that at all, this is just an example of while I

3    was doing other work, plenty of other work on developing issues in

4    this case, during these trials when called upon by the team I was a

5    team player.

6    Q.  Next slide.  Let's skip this one and go to the next one.  And

7    the next one.  And the next one.  I think you covered all of these.

8            Jerry Kristal, who is Jerry Kristal?

9    A.  Jerry Kristal is a lawyer I respect as much as anybody I've

10   ever met.  He is a terrific trial lawyer, he is a friend, he is a

11   good man.  And, you know, this was sort of again, we had this

12   relationship which up until this -- and, you know, I don't know

13   anything about Jerry's involvement in the fee issues and I am not

14   casting any -- I am not suggesting anything, but during the time

15   that we were in the trenches together, this is the kind of sort of

16   collegial relationship, serious but collegial relationship that I

17   had with many of the lawyers that were involved.

18   Q.  Was he part of the trial team?

19   A.  Yes, oh, yes.

20   Q.  Is this e-mail in reference to work that you contributed to the

21   trial preparation?

22   A.  This has to do with Mr. McDarby's diabetes and where was the

23   evidence in the case that could help win the day on causation and

24   failure to warn.

25   Q.  Next slide.

1    A.  As the trial progressed, the issue became somewhat more acute.

2    I believe Dr. Kronmal who was the testifying expert was going to

3    testify or be deposed, and this was just an e-mail saying what can

4    you get us that we can use to give the experts some context so that

5    we have a record that's usable, an expert who can address this

6    particular risk factor.

7            And this was just one area of risk factors that was a

8    part of a much bigger project that took me a lot of time to put

9    together.

10   Q.  Next slide.

11   A.  Can I just say something about these e-mails?

12   Q.  Sure.

13   A.  I am extremely uncomfortable putting these e-mails up on the

14   screen.  These were never meant to be put up on the screen.  This

15   was all in working with colleagues, so I apologize for having to do

16   this.

17   Q.  All right.  Let's look at the next one.

18   A.  The jury was out and --

19   Q.  The jury was out in what case?

20   A.  This is on Cona/McDarby.  On April the 4th, the jury was out.

21   And I think this e-mail was in response to something that Chris

22   Placitella sent to Mark and to Rob Gordon who were the lead guys,

23   you know, basically saying, you know, expressing our respect and

24   admiration for what they had done.

25   Q.  You're the Eric, and would the Sol be Sol Weiss we had earlier

1    today?

2    A.  Right.

3    Q.  Dave Jacoby we also heard from earlier today?

4    A.  Right.

5    Q.  Chris Seeger who is sitting here, and the e-mail is directed to

6    Chris Placitella?

7    A.  Yes.

8    Q.  So this is just reflective of that team approach that you've

9    been talking about?

10   A.  I thought Mark's last line there, "we have something special in

11   the legal community working on this" is about as concise a summary

12   of what was going on in this litigation in New Jersey as you could

13   construct.

14   Q.  Now, when the *Humeston II* went to trial, was it just a replay

15   of *Humeston I*?

16   A.  This is the Cona/McDarby case.

17   Q.  Oh, we're still on Cona/McDarby.  Let's go to the next one.

18   A.  This is an e-mail from Rob Gordon.  When I received it I

19   appreciated it very much.  Rob Gordon is one of the best -- he is

20   just one of the best trial lawyers around and, you know, and to be

21   part of a team and to be acknowledged was an honor.

22   Q.  And this was the Cona/McDarby team?

23   A.  It was.

24   Q.  And he is crediting you on all things scientific?

25   A.  Right.

1   Q.  Let's go to the next one.  Okay.  *Hermans/Humeston*.  I was

2   asking you a minute ago whether this was just reading the same

3   script of *Humeston I*?

4   A.  No.  The *Humeston*, the first *Humeston* trial was a defense

5   verdict; but Chris and his team, there was some very good work done

6   to overturn the verdict and get the case back for retrial.  And I

7   was not involved in any of that.  So that case was lined up with

8   Chris Seeger and Seeger Weiss represented Mr. Humeston again a

9   second time, and Mr. Hermans was represented by Mark Lanier.

10  Q.  Next one.

11  A.  This is just an e-mail leading up to --

12  Q.  Expressing thanks for your work?

13  A.  Yes.

14  Q.  Which is described as outstanding by whom?

15  A.  This is from Chris Seeger.

16  Q.  Go on.

17  A.  So I had been -- I retained another expert who was mentioned

18  earlier today in David Madigan.  The time I retained Dr. Madigan in

19  December of 2005 he was dean of mathematics and physical sciences

20  at Rutgers and had been director of the biostatistical institute at

21  Rutgers.  He is a mathematician and a biostatistician.  He is

22  currently chairman of statistics at Columbia University.

23  Dr. Madigan was born and educated in Dublin, a brilliant young

24  biostatistician whose expertise is in data safety mining.

25          Data safety mining was right on point in these cases.

 1   When pharmaceutical companies do clinical studies, their data are

 2   organized in exquisite detail using a software package called SAS.

 3   So if someone has the ability to write an algorithm to read the

 4   data, they can find evidence of anything in the data.  So if you

 5   have a group of patients on placebo and a group of patients on

 6   Vioxx and you want to know how many patients had hangnails and

 7   when, if ever, there was a difference and when the difference was

 8   statistically significant, which is a term of art, if you have the

 9   ability to write the algorithm to search the database, you can find

10   that.

11         And that was what Dr. Madigan sort of focused on, not as

12   an academic but as a consultant to the pharmaceutical industry.  So

13   I reached out to him in December of 2005, he was in New Brunswick,

14   he came down the street from my office and I retained him.  We from

15   that point forward developed a team, Dr. Egilman was involved,

16   Dr. Kronmal who was a testifying expert was involved, a lawyer

17   named Dan Seigelman who I got to know and had great respect for was

18   involved.  Later on in the project a lawyer named Don Arbitblit who

19   was involved in the MDL but was interested in the work Dr. Madigan

20   was doing, and Don came in and worked with us.

21         So we got this SAS data -- actually I think Chris

22   Seeger's firm had taking the lead on forcing Merck to turn it over.

23   And it took us sometime to get all of the data, and the format of

24   the data was, it was messy.  And so what Dr. Madigan did was to

25   clean up the data so that it could be usable and readable not just

1    by him, but by anyone.

2            And Dr. Kronmal, who I had a mentioned, had done a lot of

3    this work, too.  We took a different direction but that's not to

4    say that there wasn't really valuable work done on Dr. Kronmal.

5    And, in fact, Dr. Kronmal and Dr. Madigan had been colleagues at

6    the University of Washington and they interacted in this case, they

7    talked to each other, they sort of peer reviewed each other's work.

8            But our project, my project with Dr. Madigan, which I

9    directed from start to finish, was to basically as it turned out

10   analyze this SAS data in all of the placebo studies that Merck had

11   done of Vioxx.  And the reason why we did this was that Merck's,

12   one of the Merck's defenses was that they didn't have any knowledge

13   of risk of Vioxx until the very end in the study called APPROVe

14   where there was a disparity in heart attacks and the cardiovascular

15   thrombotic events between the Vioxx group and the placebo group.

16   And we had reason to believe that was not so.

17           So Madigan went through this analysis in great detail.

18   So by the time of the *Hermans/Humeston* trial in January, February

19   of 2007, Dr. Krumholz who had testified in the Cona/McDarby trial

20   learned about the work that I had been doing with Dr. Madigan, one

21   of Rick Meadow's colleagues had contacted me, we put them together

22   and Dr. Krumholz liked what Madigan was doing and wanted to use it.

23           But Dr. Madigan at that point was not a designated expert

24   in the trial.  So basically Dr. Krumholz asked Dr. Madigan to help

25   his biostatistician run through the data and come up with the

1    results that Dr. Madigan had done so that Dr. Krumholz could

2    testify honestly that they had done it and kind of double checked

3    and that's what this e-mail was about.  He did testify in that

4    trial and used, you know, a lot of this information.  There were

5    other things he testified about.

6           Again, Dr. Krumholz was somebody else's expert, somebody

7    else worked him up for trial, somebody else spent a lot of time

8    with him, primarily Mark and his team, but there was this

9    interaction that was in this trial that ended up in a verdict for

10   the plaintiff.

11   Q.  Eric, again, did you have a fee interest in it?

12   A.  No.

13   Q.  You've described at some length the work of Drs. Krumholz and

14   Madigan.  You said you directed Madigan.  I want to understand

15   specifically what you did in pushing Madigan's work forward and

16   advancing Dr. Krumholz's understanding.  You.

17   A.  Well, basically it was to starting off with Dr. Madigan to sort

18   of pose to him questions, what do you think the approach should be.

19   We were interested in different aspects of what was in the data.

20   And as time went on and I invited other people got involved in this

21   project, I came to believe that the best use of our time was to

22   focus on the placebo data.

23          So essentially my role was to sort of frame the issues,

24   scientific issues so that they could be used in a court room.  That

25   was my role.  I was not doing a statistical analyses, these are

 1   very sophisticated types of things that are, you know, way beyond

 2   my ability or understanding.

 3          But in terms of framing it and making decisions about

 4   what the underlying data would be, for example, if you're

 5   comparing, if you want to look at data in two groups and you want

 6   to say, okay.  When did the cardiovascular thrombotic risk become

 7   statistically significant?  Well, to do that you have to know what

 8   the terms are that you searched in the records because

 9   investigators when we're entering data in the records they're using

10   different terminology.

11   Q.  Eric, I hate to interrupt you, I know you can talk about this

12   for days and we're in a limited time, so thank you very much.

13          SPECIAL MASTER JUNEAU:  I'll give you some latitude.

14          THE WITNESS:  So I'll make it quick.  Judge, the point I

15   was getting at when I realized that that was something that we

16   needed to do, I called upon both Dr. Krumholz and Dr. Kostis, who

17   Dr. Krumholz is at Yale and he's one of leading cardiologist in the

18   world, Dr. Kostis, they're colleagues and friends.  I said can you

19   help us define the terms that Dr. Madigan will use.  And I did that

20   because I said to Dr. Madigan, when you're doing this kind of work

21   for a pharmaceutical company in the real world, how do you define

22   terms?  He said I work with medical experts in that given field.

23          So basically my -- the construct of the work with Madigan

24   was always I want you to do what you do as a consultant and I want

25   you to tell me what you would have told Merck had you been retained

1   by them to study the data.  And so he told me that he was, he would

2   work with cardiologists, I went out and asked two of the best

3   cardiologists in the world to help be involved in this project.

4   And ended up being a very useful collaboration.

5   Q.  Okay.  Was that collaborative work made available to anybody

6   who wanted it?

7   A.  Yes.  Dr. Madigan's report -- so we're talking about a trial

8   here in early 2007, from that point forward we continued to obtain

9   more and more SAS data, it was a struggle to get the data, there

10  were a lot of studies, we wanted to be able to say if you look at

11  whole universe of studies, this is what it's going to teach you.

12          So Dr. Madigan had all of this SAS data I think by June

13  of 2007 and wrote his report, his report was served in I think ten

14  cases that were pending trial in New Jersey; and on October 9th,

15  2007, I sent the report that day to Chris Seeger and to Dave

16  Buchanan, it was given to Don Arbitblit who was in the MDL, it was

17  coordinated its way around, and Dr. Madigan was going to testify in

18  those cases but for the settlement that occurred, the large

19  settlement that occurred a month later.

20  Q.  Okay.  Let's go to the next slide.  Now, this is from

21  Dr. Krumholz to you talking about how he is impressed with your

22  knowledge of this case.  Who had Dr. Krumholz been working with?

23  A.  Dr. Krumholz had been retained initially, I believe, by Mark

24  Lanier and his firm.  He is a terrific doctor, a wonderful expert.

25  Again, you can't do -- you couldn't do better work in a

1    pharmaceutical drug case than the Lanier firm did with Dr. Krumholz

2    and I think, I may be wrong about this, that they called him to

3    testify, actually in four cases, so there were two trials of two

4    cases each, and I think he is the only expert who testified in two

5    plaintiffs' verdicts, I may be wrong, but I think that's true.  And

6    all of that credit, all of that credit as far as I'm concerned goes

7    to the Lanier firm because they worked him up.

8             But I got to know him.  We were going through this

9    dialogue, he was very intrigued by the work, he was intrigued by

10   the way that I had framed the issues.  And as we were sort of

11   moving forward towards informing him to testify, he just -- I sent

12   him a long e-mail saying I think this is how we need to go.  It's

13   in the evidence and he wrote me this note.  Again, you get a note

14   like this and it validates, it validates you as a lawyer that

15   you're on the right track.  So I really appreciate it.

16   Q.  Have you had occasion to either write or lecture about your

17   knowledge on the science in Vioxx?

18   A.  Yeah.  Well, before Vioxx I taught a senior honors at Rutgers,

19   at Cook College which was the science college, Rutgers now merged,

20   at the time it was the science college.  So for three years out of

21   my experience in hemophilia litigation I taught a course to seniors

22   who were actually in the science school and likely perhaps to go

23   into the pharmaceutical industry because that's a major industry in

24   New Jersey and it had to do with the intersection of regulation and

25   drug development and science.  And based on the tragedy of

 1    hemophilia cases, which is a story into itself.

 2           In Vioxx, as far as Vioxx I was invited to teach a course

 3    at the Rutgers School of Management and Business Relations by the

 4    dean of the school and taught Ph.D. candidates, many of whom were

 5    drug industry people, the Vioxx story.  And it was, you know,

 6    probably not the most receptive audience to telling a story that

 7    basically says the company failed, but at the end of the course

 8    students were staying, hey, people from Enron went to jail, what's

 9    happening with people from Merck.  So we had framed the issues

10    pretty well.  So that was an opportunity to teach it and get some

11    feedback.

12    Q.  Let's go to the next slide.

13    A.  This is just, you know, people that I retained and/or worked

14    with.  So Dr. Kostis and Dr. Madigan, I retained; Dr. Wright was

15    the gastroenterologist I retained; Dr. Guerigian was the FDA

16    medical officer you heard about; Governor Whitman, I retained her

17    to try and interact with Merck to try to get them to sit at the

18    table with us.  Didn't work but it was worth it.

19           Dr. Krumholz was not my expert, as I said, but I did work

20    with him.  And Dr. Ray and Dr. Kronmal, I had interactions with

21    Dr. Ray is one of the MDL experts, he is a pharmacoepidemiologist

22    at Vanderbilt and one of the leading scientists in the world.  I

23    had retained him I think for the first time he had ever been

24    retained as an expert in the Baycol litigation, and he wrote a

25    brilliant report for me in the Baycol case.

1          In Vioxx Chris Seeger had retained Dr. Ray and Dave

2     Buchanan had asked me for input on Dr. Ray's report, I did that, we

3     got on the phone with Dr. Ray and talked through some of the

4     issues.

5          So again, I can't -- I am not taking credit for retaining

6     him or spending all of the time or the money, they spent the time

7     and they spent the money.  But in terms of just being a team player

8     when I was asked to have input on his report and to interact with

9     him, he and I had a relationship already, I did that.  Dr. Kronmal

10    I was on the phone with him and he and Dr. Madigan kind of helped

11    each other in a very useful way.

12         So this is just experts that I as someone who was sort of

13    charged with developing experts in the New Jersey litigation either

14    retained and developed or had some role, even a limited role in

15    working with them.

16         I did make efforts to reach out to the MDL, first time

17    was in January of 2006 and then in April of 2006 and then again in

18    June of 2007 to share my work product with them.  I felt that it

19    would be to everybody's benefit to make the best case possible.

20    And those efforts at collaborating and outreach were not accepted.

21         SPECIAL MASTER JUNEAU:  Were not what?

22         THE WITNESS:  Were not accepted.  They didn't want it for

23    whatever reasons and so I said, okay.  And I continued to do my

24    work in New Jersey but I did try.

25    BY MS. WOODWARD:

1  Q.  Let's go to the next slide.

2  A.  This is just an e-mail from Dave Buchanan --

3  Q.  Okay.  We can skip that.  Directed discovery on search for a

4  safer alternative.  Now, is this another broad area of scientific

5  inquiry that you're describing here?

6  A.  Yes.

7  Q.  What did you do?

8  A.  I took on a lot of different projects in this case and pushed

9  them all forward.  This project is in the MDL's PSC trial package

10  submission, the summary document.  So as far as I know I did most

11  of it -- I don't know of anybody else who took that position or did

12  document review on this project.  I thought I should include it

13  because it's work that I did and I spent a lot of time doing it.

14        Basically Merck learned sometime in 2002 in a study

15  called Protocol 136 that patients who needed to take aspirin who

16  were on Vioxx lost all of the gastrointestinal benefit of Vioxx.

17  That is that if you were somebody that needed to take aspirin if

18  you had risk factors and on Vioxx you got no benefit at all because

19  the gastrointestinal risk went up.

20        So Merck was motivated to find a way to let people who

21  had to take Vioxx and aspirin regain the gastrointestinal benefit.

22  And one of the things they thought they could do was to combine

23  Vioxx with a compound, it's called nitric oxide, and they found a

24  company called NitroMed up in Boston that owned a whole bunch of

25  patents on nitric oxide, and they entered into a contract with

1   NitroMed to develop this safer Vioxx.

2         I thought this was a potentially productive area of

3   inquiry.  So I investigated, I reviewed documents, I took a

4   deposition of the Merck scientists actually up the Merck Frosst in

5   Canada where the basic research was done on this project, and then

6   I obtained a commission from Judge Higbee to serve a subpoena on

7   the chief science officer at NitroMed in Boston and subpoenaed him

8   to a deposition, which I took up in Boston in the summer of 2007.

9   And I brought Dr. Egilman with me to work on that deposition.

10  Q.  And again, you shared the deposition work with anyone who

11  wanted it?

12  A.  They were lawyers from Texas there, I think it was cross

13  noticed in the MDL; but, yeah, it was work that I did that was open

14  to everybody.

15  Q.  Okay.  Let's look the at next slide.

16  A.  This is just one document as an example, I have a PowerPoint

17  that I have prepared that sort of summarized this work.  And this

18  was the chief science officer, I think he was the president of

19  Merck research labs at the time, Peter Kim writing to the board of

20  directors endorsing this project and sort of making a concession

21  that they could develop a safer Vioxx.  Again, this is just one

22  slide out of a summary of what I thought were the highlights of the

23  story.

24  Q.  Next slide.

25  A.  This is really, we kind of covered this, this is Dr. Madigan.

1    Again as I did with Dr. Kostis, I reached out to the New Jersey

2    litigation, to the lawyers in the litigation and there were several

3    firms that were interested in what, in participating in this

4    project.  Nobody was excluded from it, but there were a few firms

5    that wanted to contribute to it financially.  I had retained

6    Dr. Madigan myself, but as we proceeded through this I formed this

7    working consortium.  Dr. Madigan came to meetings where we would

8    give presentations about the work that he was doing to the lawyers

9    who were involved in the project --

10   Q.  How was Dr. Madigan's work received?

11   A.  Well, you know, he is -- Dr. Madigan's report has been

12   described as the best analysis of the evidence in the entire

13   litigation, not by me, but by his scientific colleagues.

14   Q.  Okay.  Can we go to the next slide.

15   A.  This is Dr. Madigan, that's just one analysis that he did for

16   us of the difference in deaths between Vioxx and placebo at certain

17   points in time.  So we would build these charts, your Honor, so

18   that the jury could see the progression of the difference in the

19   curve between Vioxx and placebo and when the difference became

20   statistically significant, and at that point Merck had no excuse to

21   not include that data on their label, this was on deaths.

22           So our argument was that -- it's hard for me to read --

23   by 2000 or so, some point in 2000 Merck had statistically

24   significant evidence of cardiovascular thrombotic death on Vioxx

25   that should have been on the label and wasn't.

1    Q.   Okay.  Let's go to the next one.

2    A.   I set up a meeting in Philadelphia in June of 2007.  MDL

3    lawyers attended, they were interested in the work with Madigan.

4    They were also interested in Chris's work on marketing.  I invited

5    Texas firms, I invited -- we had ten cases lined up for trial,

6    Jerry's firm had case, he came down to Philly, came over to Philly,

7    and I brought Dr. Madigan and Dr. Egilman there, again on my dime.

8    We made presentations about the work that was going on.

9         Jerry had been aware of this work but he now had a chance

10   to actually see it, feel it and he knew that he wanted it in his

11   cases and, you know, he sent me this note, again a nice note that

12   he was impressed by my work and Dr. Madigan's work on this project

13   and he wanted to chip in and be a part of it and have Dr. Madigan

14   as an expert in his cases for trial.

15   Q.   And again, who is Jerry Kristal?

16   A.   Jerry is a partner from the Weitz & Luxenberg firm.

17   Q.   Next.  Now, this great job - best report yet.  By far.

18   Krumholz is an expert who is being used by other firms --

19   A.   Yes.

20   Q.   -- commenting on Madigan's report?

21   A.   Yes, yes.

22   Q.   Okay.  Next one.

23   A.   This is an e-mail from Dr. Avorn, who is an MDL expert who was

24   a doctor at Harvard, a leading expert in drug safety, and he had

25   been retained I'm not sure by who in the MDL, he was an MDL expert

1    they had done a good job of working with him, he testified in

2    deposition, it was a very nice deposition that, you know, that was

3    prepared, he testified live in the *Hermans/Humeston* trial I think

4    to great effect.  Again, I had nothing to do with that, that's

5    credit to the lawyers who did that.

6              But Dan Seigelman, my colleague, new doctor at the time I

7    did not know, I had not met him -- actually I defended him in a

8    Vioxx deposition in a separate case.  And Dr. Avorn was deeply

9    impressed by the work in the report that Dr. Madigan had done.

10   Q.  Let me ask you specifically about the highlighted terms.  When

11   he says, "the general contours of his conclusions are all

12   compatible with my own review of the much more limited trial

13   evidence, I was able to see over the years, through my work on

14   behalf of plaintiffs," where would he have gotten the much more

15   limited clinical trial evidence that he had seen over the years?

16   A.  I really don't know.  I know that he worked with other lawyers.

17   And, you know, this is not to say that based on what he reviewed

18   and the opinions that he developed and that we wasn't an effective

19   expert, your Honor, I am not suggesting that at all.  But in his

20   words the information that we put together for Dr. Madigan and it

21   was a pain staking process to put it together, was more detailed

22   and more comprehensive than what we had been able to see to that

23   point.

24   Q.  And of course he was an MDL expert?

25   A.  He was, yes.

1  Q.  And this is after the settlement, so this is pretty late in the

2  day?

3  A.  Yes.

4  Q.  And he is seeing Madigan's work and saying Madigan got

5  more background than I had.  From whom did Madigan get his

6  background data?

7  A.  I was the lawyer who directed the project with Dr. Madigan, and

8  the data that I got mainly came from Chris Seeger's firm and

9  partners, they were managing the database, they had forced Merck to

10 turn over this data.  But we had to go back, you know, get more

11 data and Chris did that work and they would send it to me and I

12 would give it to Dr. Madigan.

13 Q.  Okay.  Next slide -- okay.  Back it up.

14 A.  I'm not sure I know how to do that, this is Chris' computer.

15         MS. WOODWARD:  May I approach?

16         SPECIAL MASTER JUNEAU:  Yes.

17 BY MS. WOODWARD:

18 Q.  Let me call your attention to the bottom two, "makes me wonder

19 whether the prior cases and the settlement would have come out the

20 same way if this compelling analysis had been seen earlier."

21 Again, this is based on the evidence that he viewed in the MDL by

22 comparison to Madigan's data?

23 A.  Well, I had an opportunity to talk to Dr. Avorn about this so I

24 think that basically -- basically he felt that this analysis was

25 really important.  I had an opportunity to talk to him in the

1  context where he had been advising the health care plan about

2  purchasing Vioxx, and basically his take on this was if I had known

3  this stuff at the time I never would have approved the drug.  So

4  it's a pretty powerful statement.

5  Q.  Okay.  Next slide.

6          SPECIAL MASTER JUNEAU:  Ms. Woodward, why don't you start

7  wrapping it up here.

8          MS. WOODWARD:  We are.

9  BY MS. WOODWARD:

10  Q.  Next one.  Let's just go past this one.  Because this is an

11  entirely new area of scientific inquiry, right?

12  A.  I can make this quick, yes.

13  Q.  Make it quick.

14  A.  Among the placebo studies that Merck had done were studies of

15  the drug in patients with dementia, mild cognizant impairment to

16  see if Vioxx would prevent the progression of mild Alzheimer,

17  Alzheimer or mild cognizant impairment due to Alzheimer.  They

18  thought there was an inflammatory process in the brain and the drug

19  was an inflammatory and it would help, and they had a major project

20  on this for which they projected revenues in the billions if they

21  were successful.

22          These studies were started in 1998 and at the time that

23  Merck got, had the problem with the VIGOR study, they were the

24  largest placebo studies underway in the company at that time.  And

25  they were studies that Merck unblinded and used the data from those

1  studies to put into the warning label.  So the studies were the

2  primary defense to the continued licensure approval of the drug at

3  the time and they were a major defense in the litigation.

4       And based on some things that happened at trials, I felt

5  like we needed in New Jersey to attack these studies.  Some work

6  had been done in the MDL on it, but it didn't really expose what I

7  thought was the truth about the studies; and so I set up this

8  project, I served notice on Merck through liaison counsel to take

9  these steps.  They moved to quash the deps, this is in late 2006,

10  early 2007, and eventually -- and I also had Dr. Madigan's analysis

11  in the data of this studies which told me I knew a lot more about

12  what was going on in these studies than they had told anybody else.

13       So I took the deposition of the clinical monitor of the

14  studies in 2007 and Dr. Egilman attended that deposition with me,

15  consulting with me, and felt that there was trial usable testimony

16  out of that deposition.  But it would have been used in the cases

17  that were set up for trial in New Jersey but the settled occurred.

18  Q.  And in this presentation we're just skimming over the surface?

19  A.  Just skimming, there's a lot of work.

20  Q.  All of this, these reports and analyses are based on the review

21  of thousands or tens of thousands of documents, hours in

22  consultation, depositions, review of depositions, all of that

23  stands behind it?

24  A.  Yes.

25  Q.  And much of it is summarized in your time line of

```
 1   contributions; is that correct?

 2   A.  That's correct, yes.

 3   Q.  So we have provided you another analysis, Judge.

 4              How many hours did your firm submit for common benefit

 5   work?

 6   A.  The total of 10,255 hours, I believe.

 7   Q.  And was all of that work devoted to the common benefit as

 8   opposed to individual cases?

 9   A.  That was all common benefit work.

10   Q.  When you submitted your hours, did you submit hourly rates?

11   A.  No.

12   Q.  Were you asked to do that?

13   A.  I really don't recall.

14   Q.  And you heard Chris Placitella say earlier that there was a

15   range of rates that was appropriate in New Jersey.  Where would you

16   put your own appropriate hourly rate if you were to enter it?

17   A.  Well, I consider Chris my peer and colleague, and I would say

18   we would probably be in the same range.

19   Q.  What did the FAC recommend as an allocation for your firm?

20   A.  $220,000.

21   Q.  And did you calculate how that worked out to an hourly rate?

22   A.  Actually Chris calculated it for me.

23              SPECIAL MASTER JUNEAU:  I didn't hear the last question,

24   could you repeat that?

25   BY MS. WOODWARD:
```

1   Q.  How did that recommendation by the FAC work out in terms of

2   hourly rates for you and your firm?

3   A.  I was paid $21.23 per hour for my work.

4   Q.  And for how many years did you work on the Vioxx matter?

5   A.  I worked for three years.  In my practice, Judge, I went from

6   hemophilia to Baycol to Vioxx, I am a solo practitioner, probably

7   not the best model.  But most of the time that I spent in my legal

8   practice from 2004 through 2007, the vast majority of my time,

9   almost all of my time was on Vioxx.  I didn't take Celebrex cases,

10  I didn't take extra cases.  Dr. Madigan was an expert for my

11  colleagues in those cases who had them.  They asked me if that was

12  okay.  I said fine.  I worked almost exclusively on Vioxx.

13  Q.  When you reconstructed your time, did you have documentary

14  evidence to support every entry to your time sheets?

15  A.  I went through I think what was an exhaustive analysis of my

16  database, so when you save a document it goes into the database

17  with the date on it, that was one so I was able to track through

18  thousands of documents, old PowerPoints when I produced them, my

19  correspondence, my e-mails, the interactions with the experts.  I

20  did the very best that I could.  And all of that information was

21  submitted as a part of my contribution.

22          MS. WOODWARD:  Thank you.  I have no further questions.

23                      CROSS-EXAMINATION

24  BY MR. SEEGER:

25  Q.  Eric, I just want to try and make sure the record is as clear

1    as can be.  Don't understand the questions I'm asking, I'll

2    clarify, okay.

3              We've had a lot of talk in the last couple of days about

4    trials and I know that you conceded right off the bat you didn't

5    try any Vioxx cases, correct?

6    A.  Absolutely.

7    Q.  And you weren't at counsel table for any of the Vioxx trials?

8    A.  That's true.

9    Q.  Did you depose, were there any witnesses that -- did you depose

10   any witnesses, Merck witnesses that testified at any of the New

11   Jersey trials?

12   A.  I deposed Dr. Demopoulos, I know that cuts were played from her

13   dep.  Mark Lanier took her deposition first and then I took the

14   deposition.  I really don't know, I tried to look, but I don't know

15   whether -- I know cuts of her testimony was played, but I don't

16   know if it was my section of the dep or Mark's.

17   Q.  And there was some mention, I am jumping around because I've

18   been taking notes, about Wayne Ray, Wayne Ray was an expert that

19   was used in the Vioxx litigation, correct?

20   A.  Yes.

21   Q.  Are you aware of what firm retained Wayne Ray?

22   A.  You.

23   Q.  And which firm worked up Wayne Ray's report?

24   A.  You did the work, absolutely.  And it was a good report.

25   Q.  Thank you.  With regard to *Humeston I*, *Humeston II*, and

1  *Cona/McDarby* you're aware that at the local hotels we had war rooms

2  set up and things of that nature, correct?

3  A.  Yes, yes.

4  Q.  And that attorneys worked well into the evening and morning

5  hours every night getting ready for the next day of trial?

6  A.  Absolutely.

7  Q.  Just to be clear, you were not one of those lawyers in the war

8  room, correct?

9  A.  Not every day.  I was there but in no way was I there every

10  day.

11  Q.  Kostis, let's talk about a little bit.  Kostis was an expert

12  that you retained, correct, Eric?

13  A.  Yes.

14  Q.  You knew when you retained him that he was not being retained

15  to be a testifying expert in any of the cases that were going to

16  trial, fair enough?

17  A.  That's true, yes.

18  Q.  And you had mentioned I believe there was an e-mail that was up

19  on the screen about him having a conversation with Dick Kronmal?

20  A.  Correct.

21  Q.  And Dick Kronmal was an expert that was hired by Seeger Weiss,

22  correct?

23  A.  Yes.

24  Q.  And again, we worked up his report?

25  A.  Great expert.

1   Q.  And Dick Kronmal testified at trials, right?

2   A.  He did, yes.

3   Q.  Kostis we know didn't testify at trial, but he never produced

4   an expert report in any case, correct?

5   A.  He was not a testifying expert, he was someone whose expertise

6   I valued for different reasons than being a testifying expert.

7   Q.  And David Madigan was another expert that you were responsible

8   for retaining and working with, correct?

9   A.  That's right.

10  Q.  And Madigan never testified in any trials either, correct?

11  A.  He did not testify in any trials.  He was going to but the case

12  settled, yes.

13  Q.  And Eric, he, in fact, did complete an expert report, but it

14  was really kind of at the time the case was settling and after the

15  time the case was settled, correct?

16  A.  Well, I was -- his expert report was completed and served on

17  Merck on October 9th, 2007.  It's not in the trial package for

18  reasons that I don't understand, it should be, it's been offered.

19  But, yes, he did not get to testify in trials.

20          Subsequently he testified in the Australian class action

21  litigation on Vioxx, I was contacted by the lawyers in Australia

22  who wanted to work with him.  I went with him to Melbourne trial

23  where he testified for a week.  He has been offered as an expert in

24  pending ERISA Vioxx case I believe in New York, I believe in New

25  York, he is an expert in the pending Missouri class action case.

1    And I don't have fee interest in those cases, the lawyers

2  in those cases asked to work with them, and I said if you want to

3  do it, go do it.

4  Q.  I just want to understand your thinking on this.  With regard

5  to Dr. Madigan, who is a.

6    Phenomenal expert I think we would all concede, didn't

7  get to testify at trial, kind of came late; but he's testified now

8  in ERISA cases for other lawyers, in a Missouri class action I

9  believe that was a consumer fraud class action?

10  A.  Correct.

11  Q.  And he's been involved in cases that are going forward against

12  Pfizer regarding Bextra Celebrex, it's not your position that

13  you're entitled to a fee interest or common benefit interest in any

14  of those cases, right?

15  A.  No.  I never asked for that, I wouldn't ask for it.  My point

16  is that if the value of an MDL is to put together a trial package

17  and you've got the best expert analysis, an expert who has been

18  tested now and who has been retained in other cases, and an expert

19  whose report was hand -- was delivered to the MDL PSC not only sent

20  it to you the day I got it, but when I went to make my presentation

21  to the Fee Allocation Committee it was discussed and within a week

22  of that I sent it to Mr. Herman.  I don't get it.  Should be in the

23  MDL trial package, I would think, but it's not there.  That's my

24  point.

25  Q.  But there are reports, deposition testimony and trial testimony

1    of others who are biostatisticians that do kind of the same thing

2    that Dr. Madigan did?  And I am not trying to compare.

3    A.  That I disagree with you on.  In terms of being

4    biostatisticians I agree; but in terms of the analysis, the

5    structure of the analysis, what we went for, I completely disagree

6    that it's the same analysis.  It is not.

7    Q.  I didn't say it's the same, I said that there are reports by

8    biostatisticians and others like that that provide essentially the

9    same type of analysis, you disagree with that?

10   A.  The term I am having trouble with is essential.  You're asking

11   me did Dr. Kronmal do statistical analyses, yes, I talked to him, I

12   was on the phone with your partner with him.  Did he do good work?

13   Absolutely.  He is a brilliant guy.  But did he do the same kind of

14   analyses -- did Dr. Kronmal look at the universe of placebo

15   controlled studies to rebut Merck's contention that the first time

16   they had a placebo statistically significant risk in the study was

17   in 2004 when they pulled the drug off the market, no.  That work

18   was not done until it was done by Dr. Madigan.  And it was good

19   work and it's important, should be in there.

20   Q.  But just to be really clear that his report wasn't even

21   available until October of '07 and the case settled a month later,

22   right -- actually not even a month later, it settled November 7th,

23   2007?

24   A.  I agree with that, but, you know, I wasn't hiding Dr. Madigan,

25   okay.

1   Q.  I am not saying that.

2   A.  Other firms used -- I was contacted by Don Arbitblit from the

3   Lieff Cabraser firm, Don is a good lawyer, smart guy, knows a lot

4   about Vioxx, and he asked me if his firm could use Dr. Madigan's

5   analyses in a medical monitoring class action argument they had

6   scheduled in the New Jersey Supreme Court.  And that was before the

7   settlement.  And I said yes.  And I don't know whether his partner

8   used that information or not, but the point is that it was asked

9   for and I said take it, good luck.  And I didn't have a fee

10  interest in that case.

11  Q.  How about in the Australian case did you have a fee interest?

12  A.  No.  In fact, I paid my own way to go down there because I

13  still have, there was still some reasons why I wanted to work with

14  Dr. Madigan, I wanted to make sure that things went well in

15  Australia.

16  Q.  And I am not trying to be funny with you, Eric, I am just

17  really asking questions so we're clear.  Are you going to seek any

18  type of fee common benefit or otherwise from the lawyers in

19  Australia for the work being done by Dr. Madigan?

20  A.  No.

21  Q.  Now, Dr. Altobelli is another expert you worked with, right?

22  A.  Correct.

23  Q.  And Dr. Altobelli also never testified in any trials in New

24  Jersey, correct?

25  A.  Not in any trials, that's correct.

1    Q.  And Harley Krumholz, which was the cardiologist that we spoke

2    about earlier, he is a real big deal in cardiology, correct?

3    A.  Brilliant.

4    Q.  And Yale, the whole bit?

5    A.  Brilliant.

6    Q.  And he is an expert that was not worked up by you, right, Eric?

7    A.  Not worked up by me.

8    Q.  And his expert report wasn't drafted by you?

9    A.  No, no.

10   Q.  You had testified earlier about contributions, actually

11   specifically with regard to me for an FDA expert that Merck wanted

12   to use at *Humeston I* trial, do you recall that testimony?

13   A.  Dr. Rarick.

14   Q.  And I had sent out an e-mail to a number of people and you

15   wouldn't know one way or another sitting here if you were the only

16   person I asked for help or if I sent an e-mail to Kline Specter, to

17   Tom Girardi's office, you wouldn't know?

18   A.  Knowing you I would suspect that you would have reached out to

19   whoever you thought would respond to you because you're a diligent

20   guy.

21   Q.  Thank you.  And that was the point I was leading to.  Now,

22   Dr. Rarick did not ultimately testify at trial in New Jersey,

23   correct?

24   A.  Correct.

25   Q.  Because Judge Higbee ruled that she didn't feel she needed the

```
 1    guidance of a so-called FDA expert?
 2    A.  Correct, I recall that.
 3    Q.  On the FDA issues that you were involved with in the FOIA
 4    requests, Eric, who else was involved in the lawsuit you filed
 5    against the FDA in the southern district -- I'm sorry, in the
 6    district of New Jersey, right?
 7    A.  Yes.
 8    Q.  The district of New Jersey regarding your FOIA request?
 9    A.  Who else --
10    Q.  Who really handled that lawsuit, that was you, right?
11    A.  Yes.
12    Q.  It was pretty much just you on that one?
13    A.  Actually I was the plaintiff.
14    Q.  Right.  Right.
15    A.  So it was me.
16    Q.  Do you know sitting here today what parallel work was being
17    done in the MDL regarding the production of FDA documents?
18    A.  Just generally that there was serious work going on in the MDL
19    as well.  Actually I think in the context of that FOIA action I
20    spoke to I think it was Troy Rafferty at some point about -- Troy
21    was with the Levin Papantonio firm in the MDL, because I think we
22    were going into the mediation at that point, and one of the issues
23    was I didn't want to ask for stuff that had already been produced
24    because at the outset of the mediation process the FDA had agreed
25    that I would be able to get anything that had already been produced
```

1    to the MDL in my FOIA requests so there was no redundancy.  So I

2    needed to know, I didn't want to ask for stuff that had already

3    been produced, and Troy and I knew each other and I called him and

4    said what's the deal and he told me.

5    Q.  Eric, where I am kind of going with this, the fact -- are you

6    aware sitting here now, that Judge Fallon had actually conducted a

7    series of telephonic hearings with the FDA, attorneys representing

8    the FDA, the Justice Department, and that Russ Herman and Troy

9    Rafferty actually traveled to Maryland, met with the FDA, there was

10   a lot going on, trying to get a sense from you of what you knew

11   about it.

12   A.  I am not here to say that other work wasn't done.  I am here to

13   say what I did.  What I did do I think before there was an MDL was

14   to get what I thought were the key documents, summarize those, put

15   them into a usable fashion, and put them into the hands of a

16   testifying expert in a trial that results in a nice verdict.

17        So, yes, I know there was work going on in the MDL, and,

18   you know, I would have been happy to collaborate on that, I just

19   didn't want to pay an assessment so I stayed in New Jersey.

20   Q.  But I just want to make sure that you understand that in the

21   MDL there was ultimately a very large production made, there were

22   issues fought in the MDL regarding the privilege issues asserted by

23   the FDA, we got the deposition of an FDA epidemiologist David

24   Graham because of the work done in the MDL, are you aware of that?

25   A.  Yes, yes.

1   Q.  And I don't know if I recall this right, Eric, so tell me if

2   I'm wrong.  You clearly got a good ruling from Judge Hotchberg in

3   the district of New Jersey, but you actually had continued the

4   focus of that litigation at some point really for you became

5   focussing on Dan Troy and trying to get Dan Troy censured for some

6   of the positions that he took at the FDA, and you also had a very

7   big interest, if I recall, on an FDA employee who was like a former

8   Merck employee; am I recalling this correctly?

9   A.  Troy was an issue, he is always an issue, but I don't think --

10  I may have, one of my FOIA's may have been addressed to his

11  calendar, I wanted his calendar or something to see whether -- Dan

12  Troy was, I think he was the commissioner of the FDA, but he was

13  known to be very friendly to industry, and there was a whole issue

14  in the case about a labelling change.

15          Yeah, it was Honig I think is the guy you were talking

16  about, Dr. Peter Honig who came from the FDA to Merck in late 2001,

17  early 2002, and then within two months Merck got the label that it

18  wanted.  So yes, we were looking at that.

19  Q.  Eric, I want to switch gears a little bit because I don't have

20  a lot of time and I'm trying to cover a lot.  Toward the end I

21  believe of Mr. Placitella's testimony he had a chart where he

22  showed, you know, it was a breakdown MDL lawyers and fees that they

23  were being recommended by the FAC and then there was New Jersey.

24  Do you recall?

25  A.  Yes.

1   Q.  And you've seen that chart before it was used?

2   A.  I have, yes.

3   Q.  I just wanted to make sure that a couple of things were

4   clarified for the record and the Special Master on that.  Do you

5   have that so we would be able to put it back up?

6   A.  I don't, I don't have it in my presentation.

7   Q.  First of all, in the one side of the page that was the MDL --

8           MS. WOODWARD:  No, I don't.

9   BY MR. MURRAY:

10  Q.  On the left side of the page I believe Mr. Placitella had the

11  members of the Fee Committee and the right side of the page they

12  were New Jersey lawyers for the purposes of showing the differences

13  in fees.  You understand, Eric, don't you --

14     (WHEREUPON, A DISCUSSION WAS HELD OFF THE RECORD.)

15  BY MR. SEEGER:

16  Q.  I just want to clarify a couple of things, Eric, if you don't

17  mind.  Under the MDL what you've got on this chart or

18  Mr. Placitella has on this chart under the MDL you have Mr Girardi

19  listed there, $20 million and change.  Tom Girardi you understand

20  was not a member of the MDL committee, correct, other than the

21  Negotiating Committee?

22  A.  I don't know.

23  Q.  You understand Mr. Girardi was liaison counsel in California?

24  A.  Okay.

25  Q.  And then you've got Ed Blizzard and other than the Negotiating

1   Committee, which he got by virtue of an appointment by Judge Wilson

2   in Texas, you understand he was not a member of the PSC or

3   executive committee in the MDL as well, correct?

4   A.  I think I knew that but I am going to blame Chris for this

5   chart.

6   Q.  I don't have Chris up there, it's really Chris's mess up.

7          SPECIAL MASTER JUNEAU:  You had your shot.

8   BY MR. SEEGER:

9   Q.  Okay.  I wanted to clarify that and a couple of other things on

10  this if you could leave it up there for a second.  On the other

11  side on the New Jersey side, I believe that Chris in fairness to

12  him had a reason for leaving this off, but he doesn't have Perry

13  Weitz --

14         MR. PLACITELLA:  You were with Tier 1, this is the

15  Tier 2.

16         MR. SEEGER:  This is just Tier 2?

17         MR. PLACITELLA:  You were a top dog, this is the second

18  group.

19         MR. SEEGER:  Gotcha.  But you do acknowledge with regard

20  to Jersey -- I don't know anything about Tier 1, Tier 2, that's not

21  the way --

22         MR. PLACITELLA:  That means you should get more money,

23  Tier 1.  Do you want me to change the slide?

24         MR. SEEGER:  If you want to put more money on it, you

25  can.

```
 1   BY MR. SEEGER:
 2   Q.  The question I have for you, you understand when you are
 3   looking at the total picture, Weitz & Luxenberg, Seeger Weiss, Mark
 4   Lanier, more or less their cases were filed in New Jersey and we
 5   tried cases in New Jersey, you would agree with that obviously?
 6   A.  I would.
 7   Q.  And, you know, Eric, I want to be fair, but with regard to
 8   knowing, you know, because there were some earlier testimony about
 9   a concern that certain people may not know what you did, what Chris
10   did.  With regard to knowing what was done in New Jersey, wouldn't
11   it be fair to assume that, you know, Perry Weitz, Seeger, me, and
12   Lanier, are some of the firms that really kind of tried the cases
13   and did what Chris has referred to as Tier 1 work, we should know
14   what people did in New Jersey in terms of what their contributions
15   are; is that a fair assumption?
16   A.  Well, not based on what I got for the work that I did, no, it's
17   not a fair assumption.
18   Q.  What about Judge Higbee, would it be a fair assumption that
19   Judge Higbee would have some idea about what people did in New
20   Jersey?
21   A.  You know, I listened to the same question to Dave Jacoby and
22   his answer, and Judge Higbee is a great judge and a good person.
23   But a lot of work that I did, you know, I didn't promote it to the
24   court, I didn't stand up and, you know, yes, I didn't try cases but
25   I supported people who tried case, we would have been there down
```

1   the road.  But I don't think Judge Higbee would necessarily have

2   known all of this work because a lot of it was done in my office.

3   Q.  Let me ask you about that, Eric, and I've already asked you

4   Kostis and Madigan and you said they never testified at trial.  But

5   this NitroMed issue that you were involved with, you recall the

6   slides that you put earlier?

7   A.  Yes.

8   Q.  Were there any trials in New Jersey or anywhere where that

9   NitroMed issue really became a factor in any of the trials?

10  A.  No.  But I included that because it's in the PSC trial package

11  documents.  The PSC is taking credit for it.  So when I read that,

12  I said to myself I remember these deps, they were no MDL lawyers at

13  these depositions, I did all of this work, I reviewed all of the

14  documents, that's why I included it.

15  Q.  Again just getting back to my question, you can't -- putting

16  aside what you just said it was not used?

17  A.  Yes, not used.

18  Q.  And the Alzheimer's issue, it was the Alzheimer's conversion

19  issue I think we used to refer to it as, right, we were concerned

20  that Vioxx brought Alzheimer's on faster than it should have or

21  some issue like that?

22  A.  Well, that was one of the problems that emerged in the studies

23  that as it turned out patients who were on Vioxx in the studies

24  where Merck was trying to find out if Vioxx would prevent

25  Alzheimer's actually had a statistically significant increased risk

1    of conversion.

2            And one of the problems with the study, I actually wrote

3    a long paper on this issue, again, when I went to the Fee

4    Committee, take it, if you want to know what happened in those

5    studies, Merck got rid of all of the external safety monitoring

6    studies, patients went the other way, they converted the

7    Alzheimer's disease, and, patients did convert to Alzheimer's

8    disease and one of the problems I think for Merck is that they

9    never changed the consents in the studies to tell the patients in

10   the study if you're on Vioxx, you're at an increased risk.  My view

11   that may be the most criminal conduct of the company at all; but,

12   yes that happened in the study.

13   Q.  But my question to you on the that is that was also an issue

14   that was really never played out in any of the trials, correct?

15   A.  Yeah.  We had talked about it, I think I talked to Mark Lanier

16   about it and others about whether you could under the New Jersey

17   rules of evidence seek to introduce evidence of risk that showed

18   the hiding of risks that showed a pattern of conduct of the

19   company.  I think Judge Higbee at one point made a ruling on that

20   that said, you know, she is not going to admit that risk evidence

21   in the case.

22   Q.  Right.

23   A.  But it was there.

24   Q.  But not used in trials?

25   A.  When I was talking about the Alzheimer's study I was talking

1    about the placebo --

2    Q.  Just have to get an answer from you on that one.

3    A.  Not in trial.

4    Q.  Go ahead and say what you were going to say, I didn't mean to

5    cut you off.

6    A.  When I was talking about the Alzheimer's, the risk to patients

7    on Vioxx versus placebo that informed Dr. Madigan's analysis and

8    ended up being used by Dr. Kronmal as part of his testimony in

9    *Hermans/Humeston* case.

10   Q.  And you also delayed wound healing, correct, that was an issue

11   that you were looking at as part of the science?

12   A.  Kind of, yeah.

13   Q.  And again, just to be really clear, not an issue that ever

14   really came up in any trial, we didn't pursue those injuries, you

15   didn't pursue those injuries, correct?

16   A.  No, no.

17   Q.  Now, Eric with regard to the settlement that was negotiated by

18   the Negotiating Committee, you liked the settlement, correct?

19   A.  Yeah.  I was here when Chris testified about that.  And I would

20   endorse everything that he said.  My clients, I had one client who

21   is still an opt out, but all of my clients reviewed it and accepted

22   it.  It was a good job, you guys did a good job.

23   Q.  Thank you.  And you put your clients in it?

24   A.  I did.

25   Q.  And you would agree, you would have no dispute that that was a

1  benefit conveyed to all of the attorneys and all of their clients,

2  no matter what committee they sat on or what jurisdiction they were

3  in, everybody had a Vioxx case in the United States benefited from

4  that settlement?

5  A.  I agree.

6  Q.  Now, in going through some of the time records, and I am not

7  going to do a lot of specifics on the time records I just want to

8  be clear on a few things.  The Cona/McDarby trial was a bit, to

9  characterize it as a big part of your presentation, I don't want to

10  overstate it, but when I look at the PowerPoint that you used

11  you've got 20, 30 pages dedicated alone on Cona/McDarby in terms of

12  discussing your contributions to the attorneys in the case.

13  A.  That was one that was produced.  There were a lot of e-mails

14  but I didn't want to put them all up.

15  Q.  Not, but it was a big part of your presentation.  My question

16  to you is, when I go through the time records, I see a total of 67

17  hours that were dedicated, noted by you that relate to working with

18  Cona/McDarby lawyers, does that sound correct to you?

19  A.  Working what?

20  Q.  Working with the Cona/McDarby lawyers, the Weitz & Luxenberg

21  firm, Mark Lanier.  I've only been able to trace about 67 hours in

22  your 10,000 hours to Cona/McDarby specific work.

23  A.  I don't know.  I didn't break it down that way.  I didn't keep

24  contemporaneous time records so I had to go back and basically

25  backfill and do the best that I could.  I know that I think the

1    work, what's in the record, you know, in terms of what I did and

2    what I was asked to do and how I tried to help kind of speaks for

3    itself.  I am not disputing it, I just really don't know.

4    Q.  And just a couple of more questions.  Again, in going through

5    the records and the submissions and what I can gather honing

6    everything together, there were a number of depositions that you

7    attended but were not the questioner in; is that fair?

8    A.  That's true.

9    Q.  About a dozen?

10   A.  I don't know if it was that many, but possibly.  But just to be

11   clear, Chris --

12   Q.  Sure.

13   A.  -- I was first chair on five depositions and second chair on

14   six depositions, so, you know, I was in there working.

15   Q.  Eric, a couple more questions.  What did you -- what did your

16   firm contribute to the common benefit fund in terms of six and a

17   half percent assessment, do you know what that total amount was?

18            MS. WOODWARD:  Your Honor, again, please note my

19   objection to these questions are being posed without this

20   information --

21            SPECIAL MASTER JUNEAU:  Your objection has been noted.

22            MS. WOODWARD:  -- without being provided to us.

23            MR. SEEGER:  I am asking what his contribution was, I am

24   not asking about anybody else.

25            THE WITNESS:  I think it was, I think it was in the range

1   of about $3 million, I am not totally sure.

2   BY MR. SEEGER:

3   Q.  And, Eric, in the forms that we, that the Fee Committee sent

4   around where there was an offer, which you are not happy with, I

5   understand, but there was a recommendation and there was also a box

6   that said tell, to inform the Fee Committee as to the amount you

7   think you are entitled to.  What was the amount you wrote in that

8   box?

9   A.  I don't recall.

10  Q.  It was a very big number, right, Eric?

11  A.  Oh, okay.  So it was, you're talking about the 22 million or

12  whatever the number is?

13  Q.  Yes.

14  A.  It was a response to $21.23 an hour.  It was not -- and I think

15  this was laid out pretty clearly by my attorneys that this was not

16  my demand, this was a response to a ridiculous allocation for me.

17  Q.  I understand.

18  A.  That's why I did that.

19  Q.  But it is your position, putting aside that number that you

20  just clarified for us, it is your position that the amount that you

21  seek in common benefit fees exceeds the amount of your

22  contribution; is that fair?

23  A.  That would be true for many of the people who did work on this

24  case.  Keep in mind that in New Jersey there were 200 firms that

25  filed cases and maybe ten that did substantial work and I was one

1    of them.

2    Q.  But I need to get an answer from you, Eric.

3    A.  Yeah, absolutely.

4    Q.  You are seeking more from the common benefit fund than you

5    contributed in?

6    A.  I think if you're looking at common benefit and asking me did I

7    do common benefit work that benefited all 200 firms in New Jersey

8    the answer would be yes.  If you're saying to me do think on an

9    hourly basis, or however you want to calculate it, I'm entitled to

10   more than what I put in, yes.

11        MR. SEEGER:  I don't have any other questions.  Thank

12   you, Eric.  Thank you for everything that you did.

13        MR. HERMAN:  Your Honor, I want to correct one thing, if

14   you'll allow me it's to the benefit of the witness.  Mr. Weinberg

15   did testify --

16        SPECIAL MASTER JUNEAU:  You're not going to question the

17   witness?

18        MR. HERMAN:  No, I want to correct the record so your

19   Honor has the full information.  Did testify that he sent me an

20   expert opinion and he did send it.  It was received and it was put

21   in a supplemental part of the trial package.  And I want to confirm

22   that and also want to say that he was one of only two lawyers that

23   did submit expert reports after they were requested after the

24   settlement.  Just want to confirm that.

25        MS. WOODWARD:  Thank you for that, Russ.

```
 1                        REDIRECT EXAMINATION

 2    BY MS. WOODWARD:

 3    Q.  Mr. Weinberg, Mr. Seeger asked you a number of questions about

 4    the FDA work that you did inquiring whether you were aware of the

 5    efforts that the MDL was doing to discover FDA records itself.  Did

 6    the MDL share its work with you in the way that you shared your

 7    work with it?

 8    A.  No.

 9              MS. WOODWARD:  Thank you.  I have no further questions.

10              MR. HERMAN:  Your Honor, before we conclude, unless your

11    Honor has questions of the witness, I have two matters to bring up.

12              SPECIAL MASTER JUNEAU:  We're through with the witness I

13    assume?

14              MR. SEEGER:  Yes.  Thank you.

15              SPECIAL MASTER JUNEAU:  You're excused.  Thank you very

16    much.

17              MR. HERMAN:  May it please the court, Russ Herman for the

18    FAC.  You had directed that you would provide today to learned

19    counsel opposite the agreements as regards recommendations that had

20    been accepted in the last week to ten days.

21              SPECIAL MASTER JUNEAU:  That is correct.

22              MR. HERMAN:  I have a set, I also have a set for your

23    Honor.

24              Secondly, your Honor, like all shirts leave lawyers, I

25    make mistakes.  I did not ask with respect to the trial package
```

```
 1    something very important.  There are still lawyers that have cases

 2    to try against Merck who have not settled their cases, including

 3    consumers, PI lawyers, et cetera.  There has been testimony on

 4    direct and cross since we began regarding what's in the trial

 5    package.

 6            To the extent there has been testimony of what's in the

 7    trial package, I am going to ask to reach a stipulation that

 8    objectors may use it in their briefing and in their argument, it

 9    can be considered, but I would like to see that information not

10    public.

11            I think the one thing that every lawyer representing a

12    claimant in Vioxx can state is they're not here to aid Merck in

13    trying future cases.  We would not like on behalf of the FAC to

14    have what's in the trial package public record.

15            MR. ARCENEAUX:  Your Honor, the FAC did produce the trial

16    package to us in response to Judge Fallon's order and it came on a

17    hard drive, it's 465 gigs of stuff.  And before I disseminated that

18    to anyone, I made sure that they understood that it was under a

19    confidentiality order and that it could never be disclosed.  And it

20    is listed as Exhibit 102 on the common exhibit list.  We intend to

21    provide that hard disc to you but I will provide no copies to

22    anyone else.  So you will be the only one who will have a copy of

23    it.

24            SPECIAL MASTER JUNEAU:  Mr. Becnel?

25            MR. BECNEL:  I just said I would so stipulate to
```

1    Mr. Herman's request.

2              SPECIAL MASTER JUNEAU:  Okay.  That will conclude the

3    hearing today.  Just for purposes of housekeeping, we have three

4    separate matters set for tomorrow.  The Branch firm, Ms. Snapka,

5    Kline Specter, Branch and Snapka in the morning and Kline Specter

6    are in the afternoon, and we'll commence the hearings at nine

7    o'clock in the morning.  Thank you very much.

8              (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED FOR THE DAY.)

9

10                        *  *  *  *  *  *

11

12                        REPORTER'S CERTIFICATE

13

14         I, Karen A. Ibos, CCR, Official Court Reporter, United

15    States District Court, Eastern District of Louisiana, do hereby

16    certify that the foregoing is a true and correct transcript, to the

17    best of my ability and understanding, from the record of the

18    proceedings in the above-entitled and numbered matter.

19

20

21

22                        Karen A. Ibos, CCR, RPR, CRR

23                        Official Court Reporter

24

25