1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF LOUISIANA

3    * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

4    IN RE: VIOXX PRODUCTS          MDL-1657
     LIABILITY LITIGATION           New Orleans, Louisiana
5                                   Wednesday, May 11, 2011

6    * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

7

8         TRANSCRIPT OF FEE ALLOCATION PROCEEDINGS
        HEARD BEFORE THE HONORABLE PATRICK A. JUNEAU
9                      SPECIAL MASTER

10

11   APPEARANCES:

12

13   FOR THE FEE ALLOCATION COMMITTEE:

14        HERMAN, HERMAN, KATZ & COTLAR
          BY:  RUSS M. HERMAN, ESQ.
15        820 O'KEEFE AVENUE
          NEW ORLEANS, LOUISIANA  70113
16
          BLIZZARD, MCCARTHY & NABERS
17        BY:  ED BLIZZARD, ESQ.
          440 LOUISIANA STREET, #1710
18        HOUSTON, TEXAS  77002

19        WEITZ & LUXENBERG
          BY:  PERRY WEITZ, ESQ.
20        BY:  ED BRANIFF, ESQ.
          180 MAIDEN LANE
21        NEW YORK, NEW YORK  10038

22        LEVIN, FISHBEIN, SEDRAN & BERMAN
          BY:  ARNOLD LEVIN, ESQ.
23        510 WALNUT STREET, SUITE 500
          PHILADELPHIA, PENNSYLVANIA  19106-3697

24

25

```
 1    APPEARANCES (CONTINUED):

 2        SEEGER WEISS LLP
          BY:  CHRISTOPHER A. SEEGER, ESQ.
 3        550 BROAD STREET, SUITE 920
          NEWARK, NEW JERSEY  07102
 4
          BEASLEY, ALLEN, CROW, METHVIN
 5           PORTIS & MILES
          BY:  ANDY BIRCHFIELD, ESQ.
 6        BY:  LEIGH O'DELL, ESQ.
          218 COMMERCE STREET
 7        MONTGOMERY, ALABAMA  36103-4160

 8        THE LANIER LAW FIRM
          BY: W. MARK LANIER, ESQ.
 9        6810 FM 1960 WEST
          HOUSTON, TEXAS  77069
10

11   COUNSEL FOR THE OBJECTORS:

12        MARGARET E. WOODWARD, ESQ.
          3701 CANAL STREET, SUITE C
13        NEW ORLEANS, LOUISIANA  70119

14        ROBERT E. ARCENEAUX, ESQ.
          47 BEVERLY GARDEN DRIVE
15        METAIRIE, LOUISIANA  70001

16

17   COUNSEL FOR THE BRANCH LAW FIRM:

18        BRANCH LAW FIRM
          BY:  CYNTHIA L. ZEDALIS, ESQ.
19        2025 RIO GRANDE BOULEVARD, NW
          ALBUQUERQUE, NEW MEXICO  87104
20

21   COUNSEL FOR KATHRYN SNAPKA:

22        BEIRNE, MAYNARD & PARSONS, LLP
          BY:  JACK E. URQUHART, ESQ.
23        1300 POST OAK BOULEVARD, 25TH FLOOR
          HOUSTON, TEXAS  77056
24

25   COURT REPORTER:  LESLIE B. DOYLE, RMR, RDR
```

```
 1                   INDEX OF EXAMINATIONS

 2

 3   PROCEEDINGS RELATED TO THE BRANCH LAW FIRM

 4

 5   EXAMINATION OF CYNTHIA L. ZEDALIS:

 6        DIRECT EXAMINATION BY MS. ZEDALIS.......16

 7        CROSS-EXAMINATION BY MR. WEITZ.........31

 8

 9   PROCEEDINGS RELATED TO KATHRYN SNAPKA

10

11   EXAMINATION OF KATHRYN SNAPKA:

12        DIRECT EXAMINATION BY MR. URQUHART......82

13        CROSS-EXAMINATION BY MR. BLIZZARD......161

14        REDIRECT EXAMINATION BY MR. URQUHART...215

15

16   CERTIFICATE.............................224

17

18                      *   *   *

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S
 2            (WEDNESDAY, MAY 11, 2011)
 3  (OPEN COURT.)
 4            SPECIAL MASTER JUNEAU:  Please be
 5  seated.  This is for purposes of the record.  This
 6  is the continued hearing in the In Re Vioxx
 7  Attorney Fee Dispute Matter.  I think we are on
 8  our third day here appearing.
 9            Ms. Woodward?
10            MS. WOODWARD:  Yes, Your Honor?
11            SPECIAL MASTER JUNEAU:  Come see just a
12  second, if you please.  Approach the bench.
13            MS. WOODWARD:  Did you want me to
14  approach the bench?
15            SPECIAL MASTER JUNEAU:  No.  This is
16  just a technical matter.  I'm just getting the
17  exhibits straight.  I want to get it straight for
18  the record and make sure we got -- I'm keeping all
19  the exhibits together.  Just to make sure that we
20  have all yours.  We don't have the physical -- are
21  they in the box to the right?  Maybe we can put
22  them all in one location.
23            MS. WOODWARD:  This is a second set.
24  Your set is over there.  Would you like me to read
25  the names of the binders into the record?
```

```
 1              SPECIAL MASTER JUNEAU:  No.  Just so
 2    that they're sufficiently identified by name.
 3    That's my --
 4              MS. WOODWARD:  They are.  Let me show
 5    you what one binder looks like.
 6              SPECIAL MASTER JUNEAU:  I'm going to
 7    step to the side.  Just a minute, please.
 8              Okay.
 9              MS. WOODWARD:  But they're all
10    segregated into one box.
11              SPECIAL MASTER JUNEAU:  What I was doing
12    is just clarifying for the record that we have, in
13    fact, received and do, in fact, have the exhibits
14    and they are all labeled, and I have confirmed
15    that.
16              Mr. Herman?
17              MR. HERMAN:  Yes, Your Honor.  What
18    we're going to do, we accept counsel's
19    representation that all time records are in these
20    20 boxes or on DVDs.  We'd like the DVDs marked,
21    however, with exhibit numbers and identified for
22    the record before we conclude at some point.
23              SPECIAL MASTER JUNEAU:  We'll do it at
24    the end, I would think.
25              MR. HERMAN:  Secondly, we are going to
```

```
 1   label two sets of the status conference
 2   transcripts, the PTOs that Judge Fallon has issued
 3   and the joint reports.  We will give one to
 4   opposing counsel after the exhibits have been
 5   identified.  Since they're hard copies, they
 6   should only take up one box at most or two boxes.
 7   I know that, in the past, you've preferred hard
 8   copies; it's easier to go through.  Would you like
 9   us to ship those to you?
10            SPECIAL MASTER JUNEAU:  I'm waning on
11   that due to the volume here.  I would prefer that
12   you ship that to me.
13            MR. HERMAN:  Okay.  So we'll mark three
14   copies.  We'll give one to opposing counsel.
15   We'll offer one and ship it to you, and we'll keep
16   one.
17            SPECIAL MASTER JUNEAU:  That would be
18   fine.
19            MR. HERMAN:  And we can do that.  And
20   these hard copies of the 20 boxes we're going to
21   ship back to Mr. Garrett's office.  They're
22   actually his records.  Basically, that's the only
23   thing I wanted to state in terms of FAC exhibits,
24   although there may be some individual exhibits.
25            SPECIAL MASTER JUNEAU:  We will address
```

1  the formal introduction and do all the cleanup at

2  the end of the hearing and make sure we have all

3  the exhibits.

4           MR. HERMAN:  That's right.  What I'd

5  like to do, if it's permissible, though, because I

6  understand the federal court's mindset on leaving

7  things in the courtroom after something is

8  finished, I'd like to try and move these out,

9  these Garrett time records, either this evening or

10 tomorrow so that, when we conclude on Friday, we

11 don't have a courtroom full with boxes.

12          SPECIAL MASTER JUNEAU:  I would like to

13 have that out of here by tomorrow.

14          MR. HERMAN:  Yes, Your Honor.  Thank

15 you.

16          SPECIAL MASTER JUNEAU:  Mr. Arceneaux?

17          MR. ARCENEAUX:  Just to explain, there's

18 going to be two --

19          SPECIAL MASTER JUNEAU:  Speak up a

20 little louder.

21          MR. ARCENEAUX:  -- there's going to be

22 two DVDs that have all of the objectors' common

23 exhibits, and the second DVD is a copy of

24 everything that was produced to us in discovery by

25 the FAC, which includes all of that stuff, and

```
 1    that's what this big huge list is.  So I'm going
 2    to let Russ look through the list and look at the
 3    title and make sure he's satisfied it's all
 4    identified.
 5              MR. HERMAN:  I'll take your word for it,
 6    Counsel.
 7              MR. ARCENEAUX:  I also am going to
 8    provide you -- I'm not quite done yet.
 9              MR. HERMAN:  Go right ahead.
10              MR. ARCENEAUX:  When I cross-examine the
11    witnesses and actually use some of these common
12    exhibits, I will give you hard copies.  There are
13    about ten that we're going to actually talk about.
14              SPECIAL MASTER JUNEAU:  We just want to
15    make sure that each of those documents or disks
16    are labeled.
17              MR. ARCENEAUX:  Yes.  They're labeled
18    with your name, the date, common objector
19    documents, Common Exhibits 1 through 36, 1
20    through --
21              SPECIAL MASTER JUNEAU:  Okay.
22              MR. ARCENEAUX:  It's all labeled
23    perfectly.
24              MR. SEEGER:  Special Master Juneau?
25    Russ?  Could we just --
```

```
 1              MR. HERMAN:  Sure.
 2              MR. SEEGER:  Can we just inform you
 3   of -- actually, we have a -- if it's okay, without
 4   Margaret.
 5              SPECIAL MASTER JUNEAU:  Well, let me
 6   take it, and I'll determine what the subject is.
 7                  (Off the record.)
 8              MR. HERMAN:  Your Honor?  Excuse me.
 9              SPECIAL MASTER JUNEAU:  Just a minute.
10              MR. HERMAN:  Yes, Your Honor.
11              SPECIAL MASTER JUNEAU:  For the purposes
12   of the record, they were informing me -- they told
13   me they've already informed you -- the Kline,
14   Specter matter is off the calendar.
15              MS. WOODWARD:  Yes.
16              SPECIAL MASTER JUNEAU:  I'm telling you
17   that.
18              MS. WOODWARD:  Yes.
19              SPECIAL MASTER JUNEAU:  Go ahead.
20              MR. HERMAN:  Mr. Arceneaux is -- Robert
21   Arceneaux is an officer of the Court, so we accept
22   the representation he's made about exhibits.  I
23   don't need to look at them with one exception, and
24   that is when he's labeled them with exhibit
25   numbers, we want to say, of the CDs.
```

```
 1              MR. ARCENEAUX:  Yes.
 2              MR. HERMAN:  And, secondly, I've
 3    previously objected to information that was
 4    originally sent to me by a gentleman by the name
 5    of Markowitz, who is only a fact witness in the
 6    Stratton issues.  If those documents are on the
 7    CDs of common offerings or any offerings, my
 8    understanding is they're not to be exhibits until
 9    the proper foundation is established.  So I'd like
10    a clarification of that before we begin.
11              SPECIAL MASTER JUNEAU:  I'll have
12    Mr. Arceneaux address that.
13              MR. ARCENEAUX:  Mr. Markowitz has two
14    exhibits; one is his curriculum vitae and one is
15    work product, which is an Excel spreadsheet chart
16    which I have to produce on disk because you
17    can't -- it's not a physical thing; it's a digital
18    file that you open with a piece of software.  It
19    is on the disk, and if Your Honor rules that it's
20    not admissible, then it just won't be part of the
21    record.  But in order to burn the disk, I have to
22    put it on there.
23              So I think, though, Mr. Herman may be
24    confused.  Mr. Markowitz is not testifying about
25    the Stratton matter.  He's going to be presenting
```

```
 1  you with a composite lodestar calculation.
 2  Mr. Garrett had two different databases.
 3            SPECIAL MASTER JUNEAU:  I understood
 4  that.
 5            MR. HERMAN:  I'm often confused.
 6            MR. ARCENEAUX:  Okay.  It's not about
 7  the Stratton matter.
 8            MR. HERMAN:  I didn't -- my confusion is
 9  that you may have produced as I saw some documents
10  related to Stratton within your documents.
11            MR. ARCENEAUX:  Yes.  These are common
12  exhibits.
13            MR. HERMAN:  Yes.  And I'm asking that
14  those -- I'm objecting to those being included.
15  That's number one.  That may -- you know, John
16  Dunn said that a lawyer's job is to spread
17  confusion, so I guess I'm guilty.
18            The second -- the second issue is
19  Markowitz.  Until Mr. Markowitz testifies, that
20  material should not be included in any disk that's
21  going to be offered in evidence, and I just want
22  to make sure that in the disks that learned
23  counsel has that he's described, that the
24  Markowitz material is not in those disks.
25            SPECIAL MASTER JUNEAU:  The way we're
```

 1  going to handle that, Counsel, is I'm not going to

 2  let all of those items in evidence until

 3  Mr. Markowitz testifies.  We'll make whatever the

 4  ruling is at the time it's made.  I understand

 5  what the objection is.  I understand what

 6  Mr. Arceneaux said.  We can address that at the

 7  time.  Obviously, the bulk of the exhibit is going

 8  to be the exhibit, and then some small portion may

 9  or may not be admissible, but I'll address that at

10  the time.

11           MR. HERMAN:  Thank you, Judge.

12           SPECIAL MASTER JUNEAU:  Counsel?  Yes,

13  ma'am?  Ms. Woodward?

14           MS. WOODWARD:  With respect to those

15  common exhibits relating to the Stratton

16  matter, --

17           MR. ARCENEAUX:  There's only two of

18  them; 5 and 6.

19           MS. WOODWARD:  -- there are two common

20  exhibits relative to Stratton.  Common Exhibit 5

21  is the Stratton letter, 7/28/10.  It was a letter

22  addressed by Mr. Stratton to Judge Fallon.  It has

23  previously been attached -- it has previously been

24  attached to briefs submitted to the record and to

25  the Birchfield deposition, so they're already in

```
 1    the record.
 2              The second is Common Exhibit 6,
 3    Transcript of Private Settlement Conference,
 4    July 27th, 2010.  That was a transcript of a
 5    hearing held -- a meeting held in Judge Fallon's
 6    courtroom.  That, too, has previously been
 7    attached as a brief and admitted into the record,
 8    so it is part of the record.  The reason for
 9    including it here is simply to make another copy
10    of it more accessible within this wealth of
11    documents that's out there.
12              SPECIAL MASTER JUNEAU:  I understand
13    that, but I want to make it abundantly clear to
14    both sides, I have consistently taken the position
15    and have stated on the record that Judge Fallon
16    has retained jurisdiction in consideration of the
17    Stratton matter, that is clear to all parties.
18    That is not before me.  I'm not going to consider
19    that.  I consider it irrelevant to what I was
20    charged to do in this case.  Judge Fallon has
21    specifically stated that he will address that
22    issue.  So if something is already in evidence,
23    you may put it in evidence, but it's not going to
24    be part of my consideration in the ruling I have
25    to make.  As long as people understand that.
```

```
1              MS. WOODWARD:  I simply want to
2    elaborate on that point.
3              SPECIAL MASTER JUNEAU:  Sure.  That's
4    all right.
5              MS. WOODWARD:  As you know, there are a
6    number of pending Stratton motions, all of which
7    have been retained, as you know, by Judge Fallon.
8    We understand that, and we are not in any way
9    attempting to circumvent Judge Fallon's authority
10   or add to your deliberations.  However, the
11   Stratton matter does, in part, bear on the issues
12   before you because it bears on what is in the
13   Common Benefit Fund and it bears on the activities
14   of the FAC.
15             SPECIAL MASTER JUNEAU:  I don't think
16   that's correct, Ms. Woodward.  The reason for
17   that, if you'll read the order of reference
18   appointing me as the special master to
19   specifically consider the matters we've been
20   dealing with the past few days and will deal with
21   in the next few days and thereafter, specifically
22   stated that I am to deal with the consideration of
23   the allocation -- suggested allocation of
24   $315,250,000.  That's pretty clear to me.  So you
25   say the sum -- it is clear as a bell what I am
```

```
 1   charged to do, and I'm going to follow that
 2   directive of the Court.
 3              MS. WOODWARD:  Thank you, sir.
 4              SPECIAL MASTER JUNEAU:  But because of
 5   that, I don't think what you said, the Stratton
 6   matter has any bearing before me at all.
 7              MS. WOODWARD:  I don't want to argue the
 8   point.
 9              SPECIAL MASTER JUNEAU:  No, no.  I'm
10   setting forth what my position is, what my ruling
11   is so that it will be clear on the record, and
12   I've understood what you've said.
13              MS. WOODWARD:  I appreciate that.  Thank
14   you, Your Honor.
15              SPECIAL MASTER JUNEAU:  Are we ready to
16   proceed with the Branch matter?  Counsel?
17              Good morning.
18              MS. ZEDALIS:  Good morning.  May it
19   please the Court, my name is Cynthia Zedalis, and
20   I am here on behalf of the Branch Law Firm today.
21              SPECIAL MASTER JUNEAU:  You're going to
22   have to speak loudly, because the microphones are
23   not really working, but do the best you can.
24              MS. ZEDALIS:  Okay.  I'll do my best to
25   keep my voice up.
```

1          SPECIAL MASTER JUNEAU:  Thank you.

2          MS. ZEDALIS:  I am going to be giving a

3     presentation of the work that the Branch firm did

4     and why we assert that we are entitled to make our

5     fair share of the Common Benefit Fund allocation.

6          Your Honor, we submitted in excess of

7     7,000 common benefit hours which was approved by

8     the Court-appointed CPA and form the basis of the

9     common benefit fee allocation in the amount of

10    $312,500,000, which was based on the total amount

11    of 562,943.55 hours.  Therefore, the common

12    benefit hours that we submitted equals

13    1.2523 percent of the entire hours billed;

14    therefore, we -- it is our position that we should

15    be awarded 1.25 --

16          SPECIAL MASTER JUNEAU:  Let me ask you,

17    ma'am, are you going to have anybody testify?

18          MS. ZEDALIS:  No.  But I would be glad

19    to be under oath when I give my presentation.

20          SPECIAL MASTER JUNEAU:  Raise your right

21    hand.

22          (Whereupon CYNTHIA L. ZEDALIS

23       was sworn by Special Master Juneau.)

24          SPECIAL MASTER JUNEAU:  Proceed.

25          MS. ZEDALIS:  Because the Branch Law

1    Firm's hours equal 1.2523 percent of the total

2    number of hours billed that form the basis of the

3    fund, the 312 million-dollar fund, it is our

4    position that we are entitled to that same

5    percentage of the fund, which amounts to

6    $3,947,875.75.

7             Now, the history of our award is unusual

8    and a little unnerving.  Many facts suggest that

9    the Fee Allocation Committee either overlooked or

10   ignored our significant contribution to the Vioxx

11   mass tort litigation, particularly in the State of

12   New Jersey, in the New Jersey litigation.  I'm

13   going to start with the beginning of the fall of

14   2005.

15            SPECIAL MASTER JUNEAU:  Let me ask you a

16   question.  How many clients did y'all -- claimants

17   did y'all represent in this matter?

18            MS. ZEDALIS:  We filed lawsuits on

19   behalf of approximately 2,400 litigants.

20            SPECIAL MASTER JUNEAU:  And all of your

21   litigation was where?  In Jersey -- in New Jersey?

22            MS. ZEDALIS:  No.  We had cases in -- I

23   can give you the breakdown, but we had 1,040 in

24   New Jersey, 210 were filed in Texas, and in the

25   MDL, including cases that were transferred from

```
 1   the District of Columbia and federal court in New
 2   Mexico, we had 1,197 cases.
 3              SPECIAL MASTER JUNEAU:  Okay.  Thank
 4   you, ma'am.
 5              MS. ZEDALIS:  You're welcome.
 6              After Katrina in the fall of 2005, and
 7   at the urging of several members on the
 8   Plaintiffs' -- on the Fee Allocation Committee who
 9   are present in this courtroom today, Turner Branch
10   of the Branch Law Firm, founding member of the
11   Branch Law Firm, was urged to concentrate his
12   litigation efforts in the State of New Jersey,
13   because it was apparent, based on Mr. Branch's
14   prior experience in mass tort litigation, he would
15   have a large number of cases.  He contributed
16   financially to the New Jersey trial consortium.
17   He -- the firm funded scientific statistical
18   evidence with Dr. Kostis in New Jersey, and he
19   resigned as New Mexico state liaison counsel in
20   the MDL and started filing cases in the State of
21   New Jersey.
22              SPECIAL MASTER JUNEAU:  He resigned from
23   what?  Excuse me.
24              MS. ZEDALIS:  I'm sorry?
25              SPECIAL MASTER JUNEAU:  You said he
```

1   resigned from what?

2           MS. ZEDALIS:  He was New Mexico's state

3   liaison counsel in the MDL.

4           SPECIAL MASTER JUNEAU:  All right.

5           MS. ZEDALIS:  For the next year and a

6   half, the firm filed 1,040 cases in New Jersey,

7   and in late 2006, Judge Higbee, the presiding

8   judge in New Jersey, made it clear that she wanted

9   to start wave two, as she called it, and wave

10  three of trial cases in the State of New Jersey.

11  She was looking for cases that involved non-New

12  Jersey residents.  Beyond the west, a lot of our

13  cases were -- we represented western plaintiffs,

14  New Mexico plaintiffs, but we did have plaintiffs

15  who lived all over the United States.

16          Members of our firm met with Dave

17  Buchanan, who's a member of Seeger, Weiss.  Our

18  timesheets show that, in late 2006, early 2007,

19  firm attorneys met with Mr. Buchanan, and we

20  started to review all our cases to get the very

21  best trial list of plaintiffs that we could submit

22  to New Jersey.

23          We had 11 cases selected by Judge Higbee

24  for the wave two calendar trials with --

25  depositions were to be completed by the end of

```
 1    July 2007.  At the end of my presentation, I do
 2    have exhibits that I have already given to
 3    counsel --
 4              SPECIAL MASTER JUNEAU:  I'm going to
 5    allow you to put them in.
 6              MS. ZEDALIS:  -- that shows the list by
 7    Judge Higbee, the orders showing our Branch Law
 8    Firm cases set for trial in New Jersey.
 9              Subsequent to that, the firm prepared
10    for and defended plaintiff depositions.  I believe
11    there were nine depositions taken.  These
12    depositions are now claimed to not be critical
13    depositions.  These are plaintiff depositions.
14    These are not, you know, a third-party witness
15    deposition of a relative or somebody to testify
16    about the injury.  These are people that were
17    selected because of their Vioxx use and the
18    proximity of their injury to their use that the
19    New Jersey Steering Committee decided were good
20    cases to go to trial.
21              SPECIAL MASTER JUNEAU:  Those
22    depositions were taken in the New Jersey
23    litigation?
24              MS. ZEDALIS:  Yes.
25              SPECIAL MASTER JUNEAU:  Okay.
```

```
 1            MS. ZEDALIS:  I can tell you which
 2   depositions were taken.  On my exhibit list, Your
 3   Honor, I did say I would submit the transcripts.
 4   If anybody wants them, I can retrieve them, but I
 5   didn't want to overload the Court with deposition
 6   transcripts.  We had depositions of the late and
 7   great president pro temp of the New Mexico State
 8   Senate, he was a legislator for over 20 years, Ben
 9   Altamirano and his wife.  We had a deposition of
10   Ralph Schnarrs, John Dillon, Ross Cox, Joyce Cox,
11   his wife, Bennett Collins, Mike Volk and his wife
12   Donna Volk, James Frazier, Chuck McCoy and Richard
13   Chavez.  Also, in the State of Texas, we had one
14   case, Hobert Miller, H-O-B-E-R-T, I believe, whose
15   deposition was also taken, and he was on the trial
16   calendar in Texas until that litigation was
17   stayed.
18            Most of the work of the 7,000 hours that
19   we contributed to the common benefit were done on
20   these trial depositions for wave two in the State
21   of New Jersey.  Preparing for that deposition, I
22   personally met with physicians.  I was not present
23   at the depositions.  I have a family.  We sent
24   some of the younger guys to go.  I think they were
25   in Pennsylvania, the Philadelphia area, Cherry
```

1  Hill, New Jersey, for three weeks in July of 2007.

2          Despite our work, in December of 2010,

3  we received a fee award form from the claims

4  administrator awarding us $281,521 common benefit

5  fee.  Ironically, that amount, which had

6  subsequently been withdrawn we suppose, even

7  though we did not receive notice of it going to

8  zero until an exhibit was filed before Judge

9  Fallon by the Fee Allocation Committee in

10  January 2011, that amount was less than the common

11  benefit expenses the firm received.

12          So on the one hand, you have the Fee

13  Allocation Committee stating that the hours that

14  firm attorneys spent for the common benefit of the

15  New Jersey litigation was not subject to an award,

16  but our expenses were.  We submitted expenses in

17  the amount of 657,000, something around that

18  number.  200,000 of that were disapproved because

19  we didn't have sufficient data, invoices and such

20  to support that amount.  And we received a check

21  via wire transfer in excess of $400,000 with a

22  cover letter from the Fee Allocation Committee

23  awarding that amount for common benefit work.  Two

24  years later, the Fee Allocation Committee says we

25  didn't do any common benefit work.

```
 1          So, Your Honor, the Fee Allocation
 2   Committee cannot have it both ways.  They cannot
 3   say, yes, you did common benefit work, we'll give
 4   you 400,000 in costs, but we're not going to give
 5   you any fees for the work you did that generated
 6   those costs.  It's unusual.
 7          Despite the fact that the -- in
 8   addition, I should say, to the fact that the Fee
 9   Allocation Committee somehow withdrew the award
10   and did not submit any evidence showing why that
11   award was withdrawn after December 10th, 2010,
12   they state in their opposition paper, in their
13   response to our objection, that we did not -- that
14   the depositions, as I stated before, were not
15   critical witnesses.  And I really ask this Court,
16   what can be more critical to a personal injury
17   lawsuit than the plaintiff's deposition?
18          Also, in December of 2010, after we
19   received the award from BrownGreer, I personally
20   traveled to New Orleans and met in Mr. Herman's
21   office to review the documents that they said they
22   reviewed in making their fee -- their proposed fee
23   allocation awards.  There were several binders in
24   Mr. Herman's conference room which he stated
25   enclosed all of the time sheets and billing
```

```
 1   records, presentations, transcripts of the
 2   presentations that we made at the various cities
 3   back in 2008.  Ours were in Houston.  When I
 4   turned to the tab -- they were tabbed in
 5   alphabetical order -- I turned to the tab for the
 6   Branch Law Firm -- and this is set forth in my
 7   affidavit that I filed earlier this year -- there
 8   were no documents.  I take that back.  There was a
 9   single page which was what I called a cheat sheet
10   that I handed out in Houston in 2008 when we made
11   our presentation before the Fee Allocation
12   Committee.  Our time records were not in the
13   binder.  Our expense reports were not in the
14   binder.  There was no correspondence in the
15   binder.  I asked Mr. Herman, where are our time
16   records?  He said, I don't know.  There was some
17   confusion.  I believe he had Mr. Birchfield on the
18   telephone asking where are the Branch Law Firm's
19   records.  They don't know.  Somehow, though, they
20   did appear on the DVD that they produced to the
21   objectors, and our time sheets are on that DVD,
22   and I do have a copy of it, but I'm not going to
23   submit it to the Court since it's already in
24   evidence.
25            Again, I beg the question, what were
```

1   they looking at when they awarded us $281,000?
2   What were they looking at when they withdrew that
3   amount?  What were they looking at when they gave
4   us 400,000 in common benefit expenses?  Why do
5   they discount time spent on preparing for and
6   taking how many -- ten plaintiff depositions in
7   New Jersey, whereas, I have seen other objectors
8   or claimants been awarded time for 1,000 hours --
9   up to 1,000 hours in attorney time for a single
10  deposition.
11          We have over 7,000 hours for trial
12  cases.  We met -- we initially -- in the MDL, we
13  were on the Science and Discovery Committee.  I
14  don't believe anybody on the Fee Allocation
15  Committee would dispute the experience of either
16  Mr. Branch, his wife, Margaret Branch, myself.  I
17  attended the University of California Davis Law
18  School.  I just realized last night it will be 27
19  years since I graduated come June.  I have worked
20  on both sides of the fence.  I was a defense
21  lawyer for many years in New York City at Hall,
22  Dickler and at Morgan, Lewis & Bockius.  I worked
23  in Los Angeles at Quinn, Emanuel, which is, I
24  think, the largest litigation firm in the country.
25  I do not believe anyone is challenging the Branch

```
 1   Law Firm's expertise in mass tort litigation, but
 2   I beg you, Your Honor, not to award us a single
 3   dollar in common benefit fee for all the work we
 4   did in New Jersey is truly an injustice.
 5          SPECIAL MASTER JUNEAU:  Let me ask you a
 6   few questions, and they'll have a right to cross,
 7   so I can get a feel for what we're talking about.
 8          The bulk of the Branch firm's work was
 9   in New Jersey litigation, right?
10          MS. ZEDALIS:  Actually, when I looked at
11   the numbers, I think it's about 50 percent.  It's
12   a little bit less in New Jersey, probably
13   45 percent.
14          SPECIAL MASTER JUNEAU:  Where was the
15   other work done?
16          MS. ZEDALIS:  I'm sorry?
17          SPECIAL MASTER JUNEAU:  Where was the
18   other 50 percent?
19          MS. ZEDALIS:  Eventually, in the MDL.
20          SPECIAL MASTER JUNEAU:  What I'm
21   interested in is, what work did y'all do in the
22   MDL?
23          MS. ZEDALIS:  Until the fall, until
24   about October of 2005, the work we did in the MDL,
25   we had firm lawyers on the Science or the
```

1   Discovery Committee, and Mr. Branch was state
2   liaison counsel.  I know there was time spent
3   coming down to New Orleans and looking at the
4   record depository.  But since October of 2005, at
5   the urging of several members on the Fee
6   Allocation Committee who sit here today, urged the
7   Branch Law Firm, look, we have a much better
8   chance of getting our cases tried in New Jersey;
9   let's go to New Jersey.  So we started
10  concentrating our efforts there.  When the statute
11  of limitations ran out, I think it would have been
12  in the end of 2006, we filed the remaining cases
13  in the MDL or in Washington, D.C., which were
14  subject to transfer orders.
15          SPECIAL MASTER JUNEAU:  Okay.  Anything
16  else?
17          MS. ZEDALIS:  Not at this time, Your
18  Honor.
19          SPECIAL MASTER JUNEAU:  I didn't mean to
20  cut you off.
21          MS. ZEDALIS:  I do have exhibits.
22          SPECIAL MASTER JUNEAU:  That's what I
23  wanted to get to, your exhibits.
24          MS. ZEDALIS:  I could read to you the
25  ones and then submit them.  I don't -- I gave

```
 1   Mr. Weitz a complete copy of our exhibits.  How
 2   can they become part of the record?
 3              SPECIAL MASTER JUNEAU:  Do you have
 4   those labeled?  I'd like to label them Branch 1
 5   through whatever you have.
 6              MS. ZEDALIS:  I will put "Branch" on
 7   them.  Right now they just say "Plaintiff's
 8   Exhibit."
 9              SPECIAL MASTER JUNEAU:  Let's put -- the
10   way we're doing that, ma'am, I'm doing it by
11   objector so that I can clearly separate them.  So
12   if you just put Branch whatever the number is, it
13   will make it clearer for me.
14              MS. ZEDALIS:  Will Your Honor object if
15   I label the exhibits after I --
16              SPECIAL MASTER JUNEAU:  Oh, absolutely.
17   Yeah, you can do that.
18              MS. ZEDALIS:  And then I'll submit them.
19              SPECIAL MASTER JUNEAU:  Just give me the
20   numbers.  How many exhibits do you have?
21              MS. ZEDALIS:  I believe there were 14,
22   and there were some 14A, Bs.
23              SPECIAL MASTER JUNEAU:  14 with subparts
24   of some of the numbers is what you're saying?
25              MS. ZEDALIS:  Yes.
```

```
 1              SPECIAL MASTER JUNEAU:  I just want to
 2    make absolutely sure.  It won't take us long to do
 3    it.  Let's go through them.  Just give me the
 4    numbers, like, Branch 1, Branch 8.
 5              MS. ZEDALIS:  Branch Exhibit 1 is a
 6    letter dated --
 7              SPECIAL MASTER JUNEAU:  No.  I don't
 8    need -- Branch 1, Branch 1A, or whatever it is.  I
 9    want to make sure I have the numbers correct.
10              MS. ZEDALIS:  Branch 1, Branch 2.
11              SPECIAL MASTER JUNEAU:  And you can add
12    "Branch" later.
13              MS. ZEDALIS:  Okay.  Branch 3, Branch 4,
14    Branch 5.  Branch 6 is the DVD that includes in
15    alphabetical order the various time submissions
16    the Branch Firm's file is under.  Exhibit 5 --
17              SPECIAL MASTER JUNEAU:  Exhibit 5 -- you
18    gave me 5 and 6.
19              MS. ZEDALIS:  I'm sorry, you're right.
20    There's Exhibit 5 and Exhibit 5A.  Exhibit 6 is
21    the DVD.
22              SPECIAL MASTER JUNEAU:  Right.
23              MS. ZEDALIS:  Exhibit 7, Branch 8,
24    Branch 8A, Branch 9, Branch 10, Branch 11, Branch
25    12.  We have withdrawn 13.  I have a Branch 14A
```

```
 1   and 14B.
 2               SPECIAL MASTER JUNEAU:  Okay.
 3               MS. ZEDALIS:  Let me double-check to see
 4   what 13 is.  That was Mr. Birchfield's deposition
 5   transcript, which I do not have yet.
 6               SPECIAL MASTER JUNEAU:  Would be 13?
 7               MS. ZEDALIS:  13 would be
 8   Mr. Birchfield's deposition transcript, which we
 9   will submit at a later time.  We don't have it
10   yet.
11               SPECIAL MASTER JUNEAU:  Any objection to
12   those exhibits?
13               MR. WEITZ:  No objection, Your Honor.
14               SPECIAL MASTER JUNEAU:  Let the exhibits
15   be received in evidence.
16               Thank you very much.
17               They're going to have -- cross-examine
18   you.  Maybe it's just easier if you come up here
19   to do that.
20               MR. WEITZ:  Your Honor, may I proceed?
21               SPECIAL MASTER JUNEAU:  Yes.  Identify
22   yourself for the record.
23               MR. WEITZ:  Yes.  Perry Weitz from Weitz
24   & Luxenberg on behalf of the Fee Allocation
25   Committee.
```

```
 1              Your Honor, may I approach the witness
 2    and give her the exhibits that we have?
 3              SPECIAL MASTER JUNEAU:  You certainly
 4    may.
 5                        *  *  *
 6                   CROSS-EXAMINATION
 7    BY MR. WEITZ:
 8        Q.   Ms. Zedalis, I'm going to reference
 9    those exhibits during the cross, and we're also
10    going to put them up on the Elmo, so whatever is
11    more convenient for you, just let us know, and
12    we'll -- and we'll reference the Elmo or the
13    exhibit in your hand.
14              I know your firm for a long time, right?
15        A.   Yes.
16        Q.   I know Margaret and Turner.  I've been
17    in many litigations with them.  I don't believe
18    you and I have had the pleasure of litigating
19    together, but I do remember you from Houston when
20    you had your oral presentation, right?
21        A.   Yes.
22        Q.   Okay.  It seems that there is a very big
23    disagreement between what you believe your common
24    benefit should be and what the Fee Allocation
25    Committee recommended for the Branch firm; is that
```

```
 1   correct?
 2         A.    Yes.
 3         Q.    And part of your contention, and I think
 4   that you put it in your objection on page 2 of
 5   your brief, that you felt, and you stated it to
 6   Your Honor, that the Fee Allocation Committee
 7   didn't follow, in your opinion, this scenario.
 8   You requested that it be fairly -- that the Branch
 9   firm be fairly compensated for its common benefit
10   work; the Branch's common benefit time of 7,087
11   hours and a half is 1.2523 percent of the total
12   common benefit of 565,943.55 hours and it should
13   be awarded 1.2523 percent of the total award,
14   315 million, or 3.947875.75, almost $4 million.
15   And, therefore, you rejected the Fee
16   Application's -- the Fee Allocation Committee's
17   recommendation of $281,521.84, correct?
18         A.    Yes, that's what it states.
19         Q.    Okay.  Now, you also state in your
20   papers that you were concerned that the Fee
21   Allocation Committee didn't have representative
22   people from New Jersey on it that could fairly and
23   adequately value your compensation.  You say it
24   here:  Similarly, it's important to recognize that
25   several members of the Fee Allocation Committee
```

```
 1   played no active discernable role in litigation
 2   for which Judge Higbee -- in New Jersey or in
 3   Texas where the Branch Law Firm had cases
 4   calendered for trial and, consequently, may not
 5   understand the valuable contribution that the
 6   Branch Law Firm made in those forums.  Correct?
 7        A.   Yes.
 8        Q.   And you said about 50 percent just now
 9   of your work was done in New Jersey and the other
10   50 percent you felt was done in the MDL and that
11   your hours reflected that, right?
12        A.   I said 50 percent of our cases were
13   filed in New Jersey.  I didn't say 50 percent of
14   the work was done in New Jersey.
15        Q.   Because throughout --
16        A.   Common benefit work.
17        Q.   Because throughout your declaration,
18   Turner Branch's declaration, and throughout your
19   oral presentation and in your briefs, you make it
20   very clear that a significant amount of those
21   7,000 hours, and I think you just said it up here
22   again, were on the 11 cases that you worked on in
23   New Jersey, right?
24        A.   Well, that is correct.
25        Q.   Okay.  And would you agree with me that
```

 1   Weitz & Luxenberg and myself and my partner Rob
 2   Gordon and Paul Pennock and Ellen Relkin and Jerry
 3   Kristal were leaders in New Jersey litigation?
 4        A.   Along with David Buchanan.
 5        Q.   Well, I'm going to go into that.  But my
 6   firm --
 7        A.   The leading group, yes.
 8        Q.   And that Chris Seeger and Dave Buchanan
 9   and everybody at their law firm were leaders in
10   the New Jersey litigation?
11        A.   Yes.
12        Q.   And that Mark Lanier and the people in
13   his firm, Rick Meadow and Evan Janush, were
14   leaders in the New Jersey litigation?
15        A.   I wouldn't put Mr. Lanier's firm in the
16   same category as your firm in New Jersey.
17        Q.   Okay.  But you would agree that my firm
18   and Mr. Seeger's firm were involved in every
19   aspect of what happened in New Jersey, the
20   depositions taken, discovery taken, experts taken,
21   trials, mock trials; we were involved in every bit
22   of that; isn't that correct?
23        A.   I don't know.  I wasn't at every
24   deposition of Merck's witnesses.
25        Q.   But you would agree that we were leaders

1   in the litigation and that we were a -- we were

2   there on a daily basis, right?

3       A.   At all of the monthly status conferences

4   I attended, and I attended plenty in the State of

5   New Jersey, most of the conversation was from

6   Mr. Buchanan and Judge Higbee --

7       Q.   So would it be fair to say --

8       A.   -- and Sol Weiss.

9       Q.   -- that myself and Mr. Seeger and

10  Mr. Buchanan, the people from our office, knew

11  what was going on in New Jersey --

12      A.   Yes.

13      Q.   -- and knew who did what?  Wouldn't you

14  agree with that?

15      A.   Yes, sir.

16      Q.   So, now, let's take a look at what the

17  Branch Law Firm actually did in the litigation.

18  You filed, as I said, a declaration, and then you

19  made an oral presentation in Houston.  And in

20  those two pieces of information, as part of the

21  Court process directed by Judge Fallon, you were

22  to lay out in the declaration and the oral

23  presentation all work that you felt was relevant

24  to you getting the common benefit fee; isn't that

25  right?

 1        A.    The pretrial order 6D stated that we
 2   were to submit time records and there was a form.
 3   And also we did a time summary of date, by month,
 4   by -- and by the number of hours or portions
 5   thereof spent on common benefit work.
 6        Q.    You --
 7        A.    I don't believe that pretrial order 6D
 8   contemplated an advocacy type of document filed.
 9        Q.    You were permitted to --
10        A.    Coincidentally, and I forgot to say this
11   when I was on the stand, nor did pretrial order 6D
12   state that counsel submitting common benefit time
13   were to assign an hourly rate for their work.
14        Q.    That was my --
15        A.    I complied with pretrial order 6D when I
16   submitted our submission, and I did not include an
17   hourly rate because the Court didn't want it; it
18   was not requested.
19        Q.    That wasn't my question.  You filed --
20   Turner Branch, the senior member of your firm,
21   filed a declaration setting forth in his
22   application what work you did and why you were
23   entitled to a common benefit, correct?
24        A.    I believe the time sheets were signed
25   under oath, the form that was provided us.

1        Q.   Could you take a look at -- which
2   exhibit is this, the declaration?
3        A.   You mean the fee allocation marked
4   Branch?
5        Q.   Yeah, Branch 1.  That's a declaration of
6   Turner Branch.  And if you could take a look at
7   that quickly.  That lays out the work that
8   Mr. Branch, the senior member of your firm,
9   believes that, in his application, your firm was
10  entitled to common benefit -- a common benefit fee
11  for; is that correct?
12       A.   It was a partial explanation as to why
13  we were entitled to common benefit fee.  We had
14  already submitted yea thick of documents, you
15  know, three-inch, four-inch pieces of paper
16  showing all the work we did.  This was in
17  connection --
18       Q.   Your hours?  You're talking about your
19  hours?
20            MS. WOODWARD:  Your Honor, if I may.  I
21  don't represent Ms. Zedalis, but I just ask
22  Mr. Weitz's indulgence --
23            SPECIAL MASTER JUNEAU:  I'll take
24  care -- I'll run the courtroom, Ms. Woodward.
25  Thank you.

```
 1              MS. WOODWARD:  Thank you.

 2              SPECIAL MASTER JUNEAU:  Just let her

 3   finish.

 4   BY MR. WEITZ:

 5        Q.    You're talking about your hours, right?

 6        A.    Yes.  This was submitted and attached to

 7   our objection document that we filed in

 8   January 2011.  This was not the affidavit or the

 9   declaration of our time.  That was filed back in

10   2008.

11        Q.    I'm not talking about your time now.

12   I'm talking about the work that was explained in

13   Mr. Branch's affidavit of declaration explaining

14   the common benefit.  And if you look at it, that's

15   what he says, and that's -- that's what that

16   declaration entails.

17        A.    It's a summary.

18        Q.    Yes.

19        A.    Yes, I agree.

20        Q.    And then, just in case you guys didn't

21   get to cover everything, the Fee Application

22   Committee traveled around the country to different

23   cities so that people that made a fee application

24   could appear before us and make an oral

25   presentation on why they -- whey they were
```

1   entitled to a common benefit fee and to explain

2   the work that they did in the litigation.  You

3   remember that; you were there in Houston, right,

4   with Turner Branch?

5         A.   I was in Houston.  This declaration has

6   nothing to do with the meeting you're talking

7   about.  This was filed -- this was signed in

8   January 2011.

9         Q.   Yes.

10        A.   The Turner Branch affidavit, where he

11   signed off on the firm's time, was in June 2008.

12        Q.   Would you agree with me that both of

13   those have to do with -- the oral presentation and

14   that declaration discussed the work that the

15   Branch firm did in relationship to a common

16   benefit fee?  That's all I'm asking.

17        A.   Yes.

18        Q.   Okay.  Now, you filed approximately

19   2,500 cases -- 2,494 cases in the Vioxx

20   litigation, correct?

21        A.   Yes, approximately.

22        Q.   And --

23             SPECIAL MASTER JUNEAU:  What was that

24   total number?

25             MR. WEITZ:  2,494.  We'll just say

1    approximately 2,500.

2    BY MR. WEITZ:

3        Q.    And all of those cases were submitted to

4    the settlement program, Vioxx settlement program,

5    right, under the Master Settlement Agreement?

6        A.    No.  We enrolled less than that.  I can

7    give you the number that was enrolled.

8        Q.    I think 982 of them were approved for, I

9    think, $117 million.  And would you agree with me

10   that your firm got paid over $28 million in fees

11   based upon the Master Settlement Agreement?

12       A.    No.  I disagree with that.

13       Q.    Okay.

14       A.    That's misleading.

15       Q.    And how is that misleading?

16       A.    98 percent, approximately, of those

17   cases were subject to fee-sharing agreements with

18   other firms, including firms that -- comprised of

19   some members of the Fee Allocation Committee.

20       Q.    So you had referring attorneys --

21       A.    So our firm did not receive $27 million

22   in fees.

23       Q.    The Branch firm processed cases and

24   received a 28 million-dollar fee.  What you're

25   telling us now is you had referring attorneys so

1    you didn't net $28 million.  Is that what you're

2    saying?

3         A.    The Branch Law Firm did not net

4    $27 million.

5         Q.    But the Branch Law Firm processed Vioxx

6    cases in the settlement program that totaled

7    28 million-dollar fees that were sent to the

8    Branch firm.  How the Branch firm broke that up

9    afterwards is not the question I'm asking.

10        A.    Fees were waived also in a number of

11   cases.  I cannot testify as to that number.  I do

12   not believe that is correct.

13        Q.    And you indicated that you filed cases

14   in various jurisdictions throughout the country,

15   correct?  You had 780 filed in the MDL, 1,109 in

16   New Jersey, 197 in Texas, 238 filed in New Mexico,

17   which were later transferred to New Orleans MDL,

18   and 170 in D.C., correct?

19        A.    Yes.

20        Q.    And other than one case that you guys

21   were scheduled you said for trial in Texas,

22   primarily you were focused on the New Jersey

23   litigation; is that correct?

24        A.    That's correct.

25        Q.    Now, could you pull out the declaration

1    of Turner Branch, please?  It's Exhibit 1.  In

2    that -- in Mr. Branch's declaration, which we

3    finally agreed was discussing the work that the

4    Branch firm did for common benefit, he states that

5    Branch played a major role in the Vioxx litigation

6    since its inception.  It says that, right?

7         A.   Yes.

8         Q.   Okay.  The word "inception" means from

9    the beginning, right; we could agree on that?

10        A.   Yes.

11        Q.   Do you know when the beginning of the

12   Vioxx litigation started?

13        A.   When the first case was filed?

14        Q.   Yeah.

15        A.   I believe it was 2001.

16        Q.   Right.  And do you know that there was

17   active litigation going on in New Jersey

18   thereafter in 2002 and 2003?

19        A.   I personally did not know that, no.

20        Q.   Okay.  And you guys hadn't filed any

21   cases in 2001, 2002 or 2003, correct?

22        A.   I don't -- I believe that's correct.

23        Q.   In fact, you guys didn't file any cases

24   prior to the withdrawal date of September 2004;

25   isn't that right?

```
 1        A.   I'm not sure.  I know we started filing
 2   cases in 2004, 2005.
 3        Q.   So we could agree that that statement is
 4   inaccurate, that you didn't play a major role in
 5   the Vioxx litigation since inception; isn't that
 6   right?
 7        A.   No.  I disagree with you.
 8        Q.   Okay.  We're going to talk about that.
 9             Your first hours were in -- that you've
10   submitted were in April 2005.  Let's take a look
11   at that.  Now, I know Turner Branch and Margaret
12   Branch, and if you were doing work where there was
13   an MDL and -- they were going to submit their
14   hours, and those are the first hours that your
15   firm submitted in April 2005, so it would be fair
16   to say that you didn't do any work that you felt
17   was common benefit if you didn't submit hours?
18        A.   I don't know about those early months in
19   2005, because I didn't start working on Vioxx
20   until the fall of 2005.
21        Q.   It's fair to say that your first time
22   submissions in hours for work done is April 2005,
23   right?
24        A.   For common benefit, yes.
25        Q.   Okay.  Now, let's focus on the statement
```

```
 1    about your major role in the litigation.  You
 2    really didn't get involved until the MDL was
 3    formed in April 2005; isn't that correct?
 4         A.   I'm not sure what you mean by
 5    "involved."
 6         Q.   Well, the MDL was formed in 2005, and
 7    you were appointed state -- Turner Branch was
 8    appointed state liaison counsel for New Mexico,
 9    and he was appointed as a member of the Discovery
10    and Science Committee in the MDL, right?
11         A.   Correct.
12         Q.   And that's when your time sheets first
13    started being submitted.  Now, --
14              SPECIAL MASTER JUNEAU:  Excuse me,
15    Counsel.  What was the position in New Jersey -- I
16    mean in New Mexico?
17              MR. WEITZ:   State liaison counsel.
18              SPECIAL MASTER JUNEAU:   That's what I
19    thought.
20    BY MR. WEITZ:
21         Q.   And you would agree that your firm spent
22    very little time in those two positions in the
23    MDL, wouldn't you?
24         A.   No.  I don't agree with that.
25         Q.   Well, the MDL starts and is formed in
```

 1   April 2005.  They have some organizational
 2   meetings, there's some appointments, and then
 3   Turner Branch resigns those two positions in the
 4   MDL --
 5        A.   At your request.
 6        Q.   -- in October 2005.  Let's just talk
 7   about the work done.  Okay?  October 2005, right?
 8   Those are the facts.
 9        A.   Yes.
10        Q.   Okay?  Because you said to this Court
11   when you stood up here that 50 percent of your
12   work was New Jersey and the other 50 percent was
13   your work in the MDL.
14        A.   I didn't say work; I said cases filed.
15   There's a big difference.  We were filing cases up
16   until the statute ran, right until the settlement
17   was announced.
18        Q.   So I'm just saying --
19             SPECIAL MASTER JUNEAU:  Let me interrupt
20   you just a minute.  I mean, I understood work.
21   Off the top of your head, how much of the work?
22   Let's get away from cases.
23        A.   I would presume probably 90 percent of
24   our common benefit work was in New Jersey.  I give
25   you that.

```
 1   BY MR. WEITZ:
 2        Q.    Fair enough.  But the fact is that, in
 3   the MDL, from April 2005 to October 2005, your
 4   firm did very little other than attend some status
 5   conferences and review pretrial orders.  You took
 6   no corporate depositions, correct?
 7        A.    That's correct.
 8        Q.    You took no expert depositions, correct?
 9        A.    That's correct.
10        Q.    You did no marketing depositions,
11   correct?
12        A.    That's correct.
13        Q.    You did no legal briefing or argue any
14   substantive briefs in front of Judge Fallon,
15   correct?
16        A.    We may have contributed in some
17   discovery briefing, but nothing -- no substantive
18   issues of law, no.
19        Q.    And you were not involved in any trial
20   preparation for trials in the MDL at that time,
21   right?
22        A.    In the MDL, no.
23        Q.    Now, you said you resigned -- Turner
24   resigned the MDL to come to New Jersey and join
25   the New Jersey consortium of my firm, Mr. Seeger's
```

1  firm and Mr. Lanier's firm; isn't that right?

2       A.   Yes.

3       Q.   And he did that because we were pushing

4  the cases to trial and we were very active and we

5  wanted to try as many cases as we could, right?

6       A.   That's correct.

7       Q.   And you state in paragraph 4 -- you

8  don't state.  Turner Branch states in his

9  declaration in paragraph 4 that your firm was very

10 active in the New Jersey litigation, and the New

11 Jersey Superior Court Judge Carol Higbee placed 11

12 Branch cases on the trial calendar, which was more

13 than any other law firm with cases filed in New

14 Jersey; in the Texas MDL, the firm also had a case

15 scheduled for trial.

16          You would agree with me in Texas, after

17 the MDL judge in Texas issued the preemption

18 decision, that the litigation in Texas pretty much

19 halted.  So I think that that was accurate when

20 you said 90 percent of your work was really in New

21 Jersey, right?

22      A.   Yes.

23      Q.   And then you went on to say that Branch

24 conducted extensive discovery and trial

25 preparation for those New Jersey cases set for

```
1   trial.  I'd like to examine this paragraph and --
2   because this really lays out what you're talking
3   about as far as what you think 90 percent of your
4   contribution to the common benefit was.  And I'd
5   like to go through this with you in detail, and
6   then maybe you'll understand why your fee award
7   was your fee award -- recommendation.
8           Would you agree with me that the Branch
9   firm started work in the New Jersey litigation in
10  the fall of 2005 after you resigned -- after
11  Turner resigned his position in the MDL --
12      A.   Yes.
13      Q.   -- October?  Okay.
14          And you would agree with me that it was
15  right about that period of time, I think Humeston
16  was being tried in September 2005, the Humeston
17  trial.  You remember Chris Seeger tried it?
18      A.   Yes.
19      Q.   December 2005?
20      A.   Yes.
21      Q.   And prior to that, there were mock
22  trials done.  Humeston -- Chris Seeger did mock
23  trials in Humeston; I did mock trials; Mark Lanier
24  did mock trials; other people participated that
25  weren't trying the cases, Ben Morelli, other
```

```
 1    people that were in the New Jersey litigation.
 2    But your firm never participated in any of the
 3    mock trials, right?
 4         A.   Correct.
 5         Q.   And Humeston in 2005 was tried by Chris
 6    Seeger, and it was a defense verdict, but then it
 7    was sent back on a motion for new evidence to be
 8    retried again.  Remember that?
 9         A.   Yes.
10         Q.   Okay.  Your firm had nothing to do with
11    that trial preparation or that trial in any way;
12    is that correct?
13         A.   That's correct.
14         Q.   And then my firm tried the McDarby case,
15    along with Mark Lanier's firm trying the Cona case
16    in the first consolidated trial in New Jersey, and
17    that case resulted in a plaintiffs verdict of 4
18    and a half million in compensatory damages and
19    9 million in punitive damages; is that correct?
20         A.   That's correct.
21         Q.   And that was the first case that went up
22    to the New Jersey Supreme Court and was affirmed
23    on many of those issues.  And you had nothing to
24    do with the trial preparation or the trial in that
25    case?
```

1          A.    No.

2          Q.    The next case in New Jersey was the

3    Doherty case in June 2006.  The Locks firm tried

4    it, and they won consumer fraud, but they lost on

5    specific causation.  You had nothing to do with

6    that case whatsoever, right?

7          A.    Right.

8          Q.    And then Humeston 2 was tried again in

9    January 2007 along with the Hermans case with

10   Mr. Lanier and Mr. Seeger, and they got a great

11   verdict of $20 million in compensatory damages and

12   27.5 in punitive damages, right?

13         A.    I believe that's correct, yes.  I

14   remember the trial, yes.

15         Q.    And your firm had nothing to do with

16   that trial preparation or the trial itself,

17   correct?

18         A.    No.  Because we were busy preparing our

19   cases for trial.

20         Q.    We're going to get to that.  But you

21   would agree with me that in the four only and the

22   four major trials in New Jersey, from the fall of

23   2005, when you started in New Jersey, until March

24   of 2007, your firm was not involved in any way in

25   any of those cases?

```
 1          A.    In those trial cases?

 2          Q.    That's right.

 3          A.    That is correct.

 4          Q.    Now, you'd have to agree with me that,

 5    up until that point, your firm didn't play a major

 6    role or was very active in the New Jersey Vioxx

 7    litigation.

 8          A.    I disagree with that, Counsel.

 9          Q.    Okay.  From April 2005 until March 2007.

10          A.    We had one of the higher number of cases

11    filed in New Jersey.  We were a driving force in

12    getting claims filed that forced Merck to settle

13    this action.

14          Q.    No.  I think you actually say in your

15    declaration, in your objector's brief and at the

16    presentation, that your firm absolutely had the

17    most cases, you make that very clear, of all the

18    cases in the jurisdiction.  We're going to get to

19    that.

20          A.    I'll concede -- I'll concede that's an

21    incorrect statement.

22          Q.    You had more than any other law firm

23    within New Jersey, right?  But we're going to get

24    to that, don't worry.

25                March 29th, Judge Higbee, right after
```

1  the Humeston 2 verdict, is very upset that firms

2  that filed over 1,000 cases aren't participating

3  in the litigation, that the litigation is

4  basically just being driven by a handful of law

5  firms and she wants to see more settlement

6  activity, so she issues an order saying that she's

7  going to send 250 cases out per quarter for

8  expedite discovery.  Do you remember that?

9          A.   Yes.

10         Q.   And Rick Sandoval, one of the attorneys

11 at your office at the time, right, was at that

12 conference.  And he stood up and he said -- after

13 Judge Higbee wanted to know who wanted to step up

14 to the plate, and he said -- Mr. Sandoval:  Your

15 Honor, Rick Sandoval from the Branch Law Firm; I

16 did hear you clearly this morning talk about firms

17 who brought 1,000 cases and weren't willing to do

18 the work; the Branch Law Firm here has brought

19 1,000 cases to your court, and we're certainly

20 willing to do the work, and we would like to get

21 one of the next trial settings, and I look forward

22 to talking with our friends in the room, at least

23 on this side of the room, as far as how to do

24 that.

25         Now, that's March 26th, 2007, and none

1    of those 11 cases are listed yet for trial -- for

2    any work, for discovery or anything.  That's a

3    March 26th, 2007, conference that Rick Sandoval

4    spoke at.  So let me go back to that question.

5              From September of 2005 until March of

6    2007, your firm, wouldn't it be fair to say, did

7    not play a very active role in the New Jersey

8    litigation at that point?

9         A.   I don't agree with the statement.  It's

10   argumentative.  We did not participate in those

11   four trials you mentioned, but that doesn't mean

12   we were not participating in the New Jersey

13   litigation.

14        Q.   Okay.  Well, your 11 cases hadn't even

15   been listed yet, so maybe you want to enlighten

16   the Court and myself as to what you were doing.

17        A.   We were reviewing our filings at

18   Mr. Buchanan's request to come up with the best

19   possible cases for the second wave of trials.  And

20   I have somewhere a proposed case management order.

21        Q.   I'm going to show it to you.  I'll save

22   you the trouble.

23              SPECIAL MASTER JUNEAU:  Let her finish.

24              Are you finished with your answer,

25   ma'am?

```
 1              MS. ZEDALIS:  He can go ahead.
 2              SPECIAL MASTER JUNEAU:  Go ahead.
 3  BY MR. WEITZ:
 4       Q.    Could you put up the June 7th Judge
 5  Higbee case -- case management or whatever?
 6       A.    There's one before that.
 7       Q.    June 6th.  There's a June 6th and a
 8  June 7th.  This is the order in which Judge Higbee
 9  listed the cases by firm, when the firms made
10  available the cases that they said were ready.
11  Like you just said, you looked for cases that you
12  wanted to propose based upon Dave Buchanan's, you
13  know, recommendation, and 11 cases from the Branch
14  firm were listed.
15       A.    That's correct.
16       Q.    Right?
17       A.    But the proposed order was filed much
18  earlier than that.  I think it was filed in --
19       Q.    This is the order.
20       A.    That's the order, that's correct.  But
21  Mr. Buchanan filed a proposed case management
22  order maybe in March, and it took Judge Higbee
23  several months before she signed off on it,
24  because Merck filed their proposed case management
25  order, and Branch Law Firm cases were listed on
```

 1   Mr. Buchanan's proposed order months before Judge

 2   Higbee issued that particular order.

 3        Q.   I was agreeing with you up until then.

 4   She had the conference March 26th.  Okay?  So --

 5             SPECIAL MASTER JUNEAU:  I think the day

 6   was March 29th, according to what I read.  Three

 7   days is not the issue.

 8   BY MR. WEITZ:

 9        Q.   I'm sorry, March 29th.  She had the

10   conference March 29th.  Dave's letter was sometime

11   in April.  The order was in June.  So -- but my

12   point is:  The work hadn't been designated for

13   discovery yet.  This was the order that listed the

14   cases per firm, and you had -- there is your 11

15   cases that you said were the most cases in your

16   declaration, in your oral presentation and in all

17   your briefs, that you had the most cases in New

18   Jersey.  Well, let's just look at that.

19        A.   I agree, Counsel.  That was an incorrect

20   statement.

21        Q.   It was incorrect by a lot of firms.

22   There were a lot of firms.  The Seeger, Weiss firm

23   had 17.  Weitz had 31.  There were five or six

24   other firms that had a lot more than 11 cases,

25   right?

```
 1        A.    That's correct.
 2        Q.    Now, you also state that these cases --
 3   in your declaration, in your objector's brief, in
 4   your presentation that these 11 cases were set for
 5   trial.  Nothing could be farther from the truth
 6   that these cases were set for trial, and let's go
 7   over it.
 8             In March -- I'm sorry -- in June, Judge
 9   Higbee listed the cases.  And then in July,
10   July 26th, she lays out in a detailed order that
11   these cases are set for core expedited discovery,
12   period.  These were fact -- fact witnesses that
13   had to be taken, no experts and no trial date.
14   And this is what she said:  For those non-death
15   cases identified in this court order 2/7/2007,
16   fact witness depositions shall be limited at this
17   time to core discovery; for the purposes of
18   expedited discovery in these cases, core discovery
19   will include plaintiff spouse, prescribing
20   physician, the cardiologist, the neurologist,
21   other physicians who provided significant cardiac
22   and neurological medical care to the plaintiff in
23   the hospital related to the acute event, another
24   cardiologist or neurologist who provided
25   significant out-of-hospital treatment to the
```

1    plaintiff, an interventional cardiologist related

2    to the acute event and any other physicians who

3    rendered substantial primary care to the

4    plaintiff, plus two sales representatives.

5            That was the core expedited discovery

6    that she wanted, no trial dates.  Wouldn't you

7    agree with me?

8        A.   That's what the order says, yes.

9        Q.   Now, you --

10       A.   But it wasn't an exercise in an vacuum.

11   We're obviously taking depositions for preparation

12   of having a trial date.

13       Q.   I want to show what you did.  I'm not

14   going to take away from what you did.  Let's look

15   at it.

16           You, in your 11 cases that she listed in

17   the June order conducted -- defended 12

18   depositions; nine plaintiff depositions, three

19   spouse depositions.  They were -- most of them

20   were defended by a second-year associate, Frank

21   Balderrama, and I think a couple were defended by

22   Rick Sandoval.  None were defended by the senior

23   partner of your firm, none were defended by you;

24   isn't that right?

25       A.   That's correct.

1          Q.    Now, you told this Court that that was
2    critical work done in the cases, right?
3          A.    Yes, it was.
4          Q.    I assume that you have read the case law
5    on common benefit, and it's important that that
6    work is not just done on your individual case but
7    makes a significant contribution that advances the
8    litigation as a whole for all of the plaintiffs;
9    isn't that right?  That's what the case law says?
10          A.    That's correct.
11          Q.    You took no prescriber deps here, none.
12    You took no neurologists, no cardiologists, no
13    internists, you took no people in the hospital,
14    you took no surgeon, you took no sales rep.  But
15    the July 26th order that Judge Higbee rendered
16    allowed you to do that, and you took none of
17    those; is that right?
18          A.    I don't believe that's correct, and I
19    will supplement an affidavit to the Court, because
20    I believe we didn't take the depositions but Merck
21    did.
22          Q.    Who?
23          A.    I think we did take sales rep
24    depositions.
25          Q.    Not in those 11 cases you didn't.  And

1  if you could supplement, please supplement, and

2  we're happy to hear that.  Okay?  It's in your

3  times sheets.

4   (Court Reporter requests one speaker at a time.)

5            SPECIAL MASTER JUNEAU:  Let her finish.

6            Go ahead.

7       A.   I believe some treater depositions were

8  taken in Albuquerque by local counsel for Merck

9  there, and I will supplement that if this

10 Branch -- FAC Exhibit 8 is incorrect.

11 BY MR. WEITZ:

12      Q.   Please do.  We'd like to see that.  But

13 this is from your time records that we got this

14 information.

15           So you would agree with me that, aside

16 from not taking any prescriber depositions or

17 treaters or sales reps, you didn't take any

18 corporate depositions in these cases of any

19 Merck -- of any Merck witnesses?

20      A.   That's correct.

21      Q.   Okay?

22      A.   Yes.

23      Q.   You didn't take any marketing

24 depositions; isn't that right?

25      A.   That's correct.

1      Q.    You didn't take any expert depositions
2  in those cases; isn't that right?
3      A.    That's correct.  But I believe those
4  depositions weren't supposed to be taken by the
5  250 individual claimants.
6      Q.    I'm sorry.  Say that again.
7      A.    Judge Higbee wouldn't have allowed 250
8  plaintiffs to take 250 Merck depositions.
9      Q.    That's my point.  The point is that you
10  only took the plaintiffs' deps in these cases, and
11  yet you said in every piece of paper you filed
12  that these 11 cases were set for trial, and it
13  couldn't be farther from accurate, that these
14  cases were in their infancy state and were far
15  from set for trial; isn't that right?
16      A.    I disagree with you, Counsel.
17      Q.    Did you have any order setting a trial
18  date in any one of those 11 cases?
19      A.    This was the precursor to the trial
20  calendar.  This was out of how many -- what, tens
21  of thousands of cases filed in New Jersey.  Judge
22  Higbee chose 250 cases for wave two trials.  That
23  was significant.  You're forgetting that there's
24  over 50,000 individual cases filed.
25      Q.    Could you just tell me yes or no?  That

1  you wrote -- that Turner Branch wrote in his
2  declaration to the Court and said the same exact
3  thing in multiple places, you said it in the
4  presentation, that the 11 cases, the 11 Branch
5  cases were on the trial calendar set for trial.
6  How could they be set for trial when all you did
7  was take plaintiff deps?
8           Let's move on.  Let's go to your time
9  sheets.  You said that you spent 90 percent of
10 your hours on the 11 cases, and I believe you said
11 in your brief that you spent thousands and
12 thousands of hours preparing those cases.
13      A.   No, that's not what I said.  I didn't
14 say I spent 90 -- we spent 90 percent of our time
15 on those 11 trial cases.  I said we spent
16 90 percent of our time on common benefit -- of the
17 common benefit work we submitted on the cases set
18 for trial in New Jersey.
19      Q.   Okay.
20      A.   Or, no, I'm sorry.
21      Q.   I stand corrected.
22      A.   On cases filed in New Jersey, on the New
23 Jersey litigation.
24      Q.   Okay.
25      A.   I want to be clear about that, because

```
 1   you keep mixing up what I'm saying about time
 2   spent generally on our 2,400 cases we filed, and
 3   we spent, as I'm sure your firm did, a heck of a
 4   lot more than the common benefit hours on our --
 5   on this entire Vioxx litigation.  We probably had,
 6   you know, 30, 40,000 hours on case-specific work.
 7           SPECIAL MASTER JUNEAU:  Let me just
 8   interrupt you.  Let me interrupt you just a
 9   minute.  Define for me what your perception is of
10   common benefit hours that you use so I'll know
11   what you're talking about.
12           THE WITNESS:  It's work that is
13   completed -- and, like, I would have to refer
14   exactly to pretrial 6D; I don't have it in front
15   of me -- that is for the common benefit of all
16   claimants, that it's not just for individual
17   cases.  For example, we did not bill the time we
18   spent in preparing the complaints, preparing the
19   plaintiff fact sheets, which -- you know, getting
20   involved in discovery disputes with Merck.  Those
21   were case-specific hours spent on progressing
22   2,400 cases through litigation.
23           The common benefit time we spent was
24   attending hearings in New Jersey, participating in
25   Science and Discovery Committee, speaking with
```

1  Mr. Buchanan, getting cases that Judge Higbee, you
2  know, ordered for expedited discovery.  Because
3  the better the cases you have prepared for trial,
4  the better the verdict is going to be, the more
5  it's going to drive a settlement.
6              SPECIAL MASTER JUNEAU:  Let me ask you
7  this:  The 12 depositions that we've talked about,
8  what category do you put that in?
9              THE WITNESS:  Well, that's -- those are
10 common benefit, because we were preparing cases
11 that will eventually -- she was going to select
12 trial cases from that case management order.  She
13 wasn't going to set a case for trial that had --
14 that expedited discovery was not completed.  She
15 had selected 250 cases for the next wave of
16 trials.
17             SPECIAL MASTER JUNEAU:  Okay.  All
18 right.
19             THE WITNESS:  That's as much of a common
20 benefit as any of the four cases that were tried
21 in New Jersey.
22             SPECIAL MASTER JUNEAU:  I just wanted
23 your definition of what you're talking about.
24             Go ahead.
25 BY MR. WEITZ:

1    Q.   So we can agree -- we're not in

2  disagreement here.  We can agree you were involved

3  in filing the briefing objection -- the brief on

4  your objections, right?  In that brief, you wrote:

5  As discussed above, Branch had more than 11 cases

6  set for trial -- there's that set for trial again

7  in New Jersey -- here again, the most of any firm

8  in that venue, and one in Texas, and spent

9  thousands of hours preparing those cases for trial

10  and in performing other work for the common

11  benefit of the Vioxx claimants.

12           We're in agreement, right?

13    A.   Yes.

14    Q.   Okay.  Now, we could also be in

15  agreement that, prior to June 2007, your firm had

16  not taken a deposition in the New Jersey Vioxx

17  litigation?

18    A.   That's correct.

19    Q.   And the settlement occurred in November,

20  November 6th, 2007, right?

21    A.   Yes.

22    Q.   That's when it was announced.  Okay.  So

23  let's take a look at the number of hours that you

24  worked on those 11 cases.  Basically, the work

25  that you did on those 11 cases, most of your

1    depositions were done in June, and there were 272
2    hours that you submitted for June.  And then in
3    July, 41 hours; August, 32; September, 171; and
4    October, 59.  And then the settlement was
5    announced and all work stopped on the discovery of
6    those cases.
7              So from June, when the order was issued,
8    until October, your firm did approximately 500
9    hours on the 11 cases that were listed in Judge
10   Higbee's June 7th order.  Would that be accurate
11   based upon your time sheets?
12       A.   I don't know.  I would have to go back
13   and look at the time sheets.
14       Q.   Actually, it's less than 500 because
15   that included all the work, not just on your
16   cases, and you did most of the depositions in
17   June, where you had 272 hours.  That's what your
18   time sheets reflect.
19              So your firm submitted 7,000 hours as
20   common benefit hours, correct?
21       A.   Yes.
22       Q.   And that's what you believe you're
23   entitled to for compensation; that's how you got
24   to the $4 million, correct?
25       A.   Yes.

1      Q.   Yet, in the 11 cases where you say you
2   did 90 percent of your work, you did less than 500
3   hours of work on those 11 cases?
4      A.   I -- no.  I haven't said -- and this is
5   the third time I've said this.  I do not say that
6   90 percent of our common benefit work was on those
7   11 or 12 cases.
8      Q.   You're saying that while you were
9   looking for other cases and you were working on
10  your other individual cases --
11     A.   90 percent of our common benefit time
12  was spent progressing in the New Jersey litigation
13  and preparing for trial.  We reviewed thousands
14  and thousands and thousands of documents in
15  preparation for depositions and in preparation for
16  trial.
17     Q.   In preparation for the plaintiff --
18  defending the plaintiff's dep, you reviewed
19  thousands and thousands of documents?
20     A.   That's what I'm saying.  I believe Merck
21  had depositions scheduled of all the plaintiffs'
22  treating physicians in New Mexico and marketing
23  representatives.
24     Q.   Let's go to your time sheets.  I
25  reviewed your time sheets very carefully, as the

```
 1   other members of the Fee Allocation Committee did,
 2   and your time sheets consist of three primary
 3   things.  Analysis and strategy entries; now,
 4   analysis and strategy entries, based upon your
 5   submissions, were internal staff meetings in your
 6   office with either, you know, four or five
 7   members, pretty much several times a week; isn't
 8   that right?
 9        A.   I do not have the time sheets in front
10   of me, but I'll take your word for it.  That
11   sounds right.  If my memory serves me correctly,
12   yes.
13        Q.   And when you had those meetings, you
14   discussed your individual cases or, you know, how
15   you were going to file them, how you were going to
16   move them, maybe how you were going to select them
17   for New Jersey; is that correct?
18        A.   No.  We parsed those hours out.  But the
19   hours we submitted for common benefit was not our
20   total -- obviously, not our total firm hours.  It
21   would be, you know, 1,000 percent more than what
22   we submitted.
23        Q.   I'm talking about when you --
24        A.   These are hours -- firm -- you know,
25   staff meetings we had that we considered common
```

1  benefit hours because they were selecting cases

2  for New Jersey.

3     Q.   This is an example of what all your time

4  sheets look like.  Analysis and strategy, where

5  you talked about different things internally in

6  your firm, and then each person that was present

7  submitted a separate time sheet for those hours,

8  correct?

9     A.   Correct.  Uh-huh.

10     Q.   Then your time sheets are made up of you

11  appearing at status conferences both in the MDL

12  and in New Jersey, and you went to all of them.  I

13  would agree with that.

14     A.   Yes.

15     Q.   But nobody ever at any of those

16  conferences made a substantive argument in front

17  of either Judge Fallon or Judge Higbee; isn't that

18  right?

19     A.   I'm not sure about New Jersey.

20     Q.   The rest of your time sheets consist of

21  reviewing pretrial orders with your internal

22  group.  You believe that this is work that goes to

23  the common benefit and substantially contributed

24  to the litigation as a whole and moved the Vioxx

25  litigation into a position for resolution?

```
 1              A.    Absolutely.
 2              Q.    Okay.  Let's talk about after the
 3    settlement.  The settlement is announced
 4    November 6th, 2007, and your firm played no role
 5    in the negotiations of the Master Settlement
 6    Agreement, right?
 7              A.    That's right.
 8              Q.    You played no role in briefing or
 9    drafting the settlement agreement, correct?
10              A.    That's correct.
11              Q.    And you played no role in the
12    implementation of the settlement program; isn't
13    that right?
14              A.    That's correct.
15              Q.    Now, after the settlement was announced
16    in November, the work ceased in New Jersey on the
17    individual cases, and all of us were digesting the
18    settlement program and whether or not it was a
19    good settlement and how we were going to recommend
20    it to our clients and how we were going to process
21    our cases, right?  That's what you were doing and
22    that's what my firm was doing, right?
23              A.    Yes.
24              Q.    And, I mean, you had 2,500 cases that
25    you had to decide which ones you were going to
```

1  process.  It was a daunting task.  You filed time

2  sheets in November 2007 for 312 hours and in

3  December for 555.5 hours, a total of 867 hours in

4  November and December after the settlement

5  agreement.

6       SPECIAL MASTER JUNEAU:  How many hours

7  did you say, sir?

8       MR. WEITZ:  867 combined for November

9  and December, Your Honor.

10  BY MR. WEITZ:

11     Q.  During this period of time, your time

12  sheets reflect that you were going to settlement

13  seminars and you were digesting the settlement and

14  you were figuring out how to process the

15  settlement; wouldn't you agree with that?

16     A.  And determining whether the cases met

17  the settlement, you know, would be enrolled in the

18  settlement program, yes.

19     Q.  Right.  Fair enough.

20        Wouldn't you agree that those 867 hours

21  after the settlement had absolutely nothing to do

22  with the common benefit and that you shouldn't be

23  awarded any money for that?

24     A.  No.  I disagree.

25     Q.  Okay.

1       A.    There wasn't a settlement until there
2   was a certain percentage of claimants enrolled in
3   the settlement program.  A deal was reached in
4   November of 2008, or at least it was announced
5   publicly in 2008, but the parameters of the
6   Master -- of the Vioxx Master Settlement Agreement
7   did not kick in unless a certain threshold of
8   claimants agreed to participate --
9       Q.    I agree.
10      A.    -- in the settlement.
11      Q.    I agree with you.
12      A.    There was -- lots of firms contributed
13  lots of time and I've seen awarded in pleadings
14  filed in this issue post-November 6th, 2008.
15      Q.    I agree with what you just said, but you
16  would have to agree with me that the work in New
17  Jersey stopped on individual discovery of those
18  cases, so you weren't working on those 11 cases
19  anymore.
20      A.    That's true, yes.
21      Q.    Yes.  Okay.  And -- and you were
22  working on trying to figure out whether or not
23  this settlement program worked for your individual
24  cases and whether or not you wanted to offer that
25  settlement to your individual clients; is that

 1  right?
 2      A.   And to enroll as many clients as
 3  possible in the settlement agreement.
 4      Q.   Okay.  We understand each other.  Okay.
 5           In conclusion, your firm did not hold
 6  any key leadership roles in either the MDL or New
 7  Jersey; isn't that right?
 8      A.   Well, the firm was -- did serve as state
 9  liaison counsel in the MDL, as we stated before.
10      Q.   For a couple of months, right?
11      A.   Yes.  And was on the Discovery and
12  Science Committee in the MDL.
13      Q.   Your firm did not participate in any
14  trials either in the MDL or in New Jersey; is that
15  correct?
16      A.   That's correct.
17      Q.   Your firm did not have any cases that
18  were scheduled for a trial and set by one of Judge
19  Higbee's trial orders; is that correct?
20      A.   The order implied the cases were going
21  to be set for trial.  She wanted to get through
22  the discovery phase first.  That's how she worked.
23      Q.   Well, will you take my word from
24  somebody that had tried the case, that you got an
25  actual trial order that set your case for trial in

```
 1  Cona and McDarby, in Humeston 1 and Humeston 2, in

 2  Hermans, in Doherty?  That's what you got; you got

 3  a trial date.

 4       A.   That's true.  But Judge Higbee was

 5  talking about getting other judges involved

 6  throughout the State of New Jersey to sit for

 7  those 250 trials.

 8       Q.   Yes, she was.  But you had not received

 9  an order setting any of your 11 cases for trial

10  date.  Yes or no?

11       A.   That's correct.

12       Q.   Your firm did not conduct any

13  depositions of any defendants or critical

14  witnesses to build a liability case against Merck?

15       A.   I agree with the first part of that

16  sentence and disagree with the second part.

17  Plaintiff depositions are highly critical to any

18  personal injury lawsuit.

19       Q.   Your firm did not conduct any

20  depositions whatsoever prior to June 2007; isn't

21  that right?

22       A.   I believe.

23       Q.   In New Jersey.

24       A.   Let's say prior to May.  I thought there

25  was a marketing representative.
```

```
 1          Q.    Okay.  Fair enough.  Fair enough.

 2          A.    That's correct.

 3          Q.    Your firm did not conduct any

 4    depositions in the MDL or in New Jersey with

 5    respect to any experts?

 6          A.    That's correct.

 7          Q.    Your firm was not involved in any of the

 8    Kemp or Daubert motions either in New Jersey or in

 9    the MDL; isn't that right?

10          A.    I believe that's correct.

11          Q.    You were not -- you stated you were not

12    involved in the settlement process.  You did not

13    contribute a single piece of paper to the trial

14    package; isn't that right?

15          A.    That's correct.

16          Q.    Now, I think Turner sums it up best.  At

17    the oral presentation, you guys were laying out

18    for us what work you did and why you were entitled

19    to a common benefit, and Turner said this:  Do I

20    take credit for any new ideas or creative ideas

21    that hadn't been developed by others?  No.  Do I

22    expect an extraordinary amount of money for our

23    effort?  No, we don't.  We just ask to be treated

24    fairly, and I think our time substantiates what we

25    did.  And then Turner thanked all the guys on the
```

```
 1   Fee Allocation Committee for doing great work and
 2   for getting the settlement done, right?
 3       A.    That's correct.
 4       Q.    Thank you.
 5             SPECIAL MASTER JUNEAU:  I want to give
 6   you an opportunity.  Anything else you want to
 7   add?
 8             MS. ZEDALIS:  Who do I give the exhibits
 9   to?  I mean, I don't know if the FAC is going to
10   submit all the exhibits.
11             SPECIAL MASTER JUNEAU:  We had
12   previously discussed Exhibits 1 through 14 --
13             MS. ZEDALIS:  Yes.
14             SPECIAL MASTER JUNEAU:  -- B, I believe.
15             MS. ZEDALIS:  Should I file those
16   directly with you?
17             SPECIAL MASTER JUNEAU:  No.  If you will
18   hand those to the clerk, I'm officially allowing
19   those into evidence right now.
20             MR. BRANIFF:  Your Honor, if I may?
21   Edward Braniff with the Weitz firm.  We have nine
22   exhibits up there that were previously marked
23   Branch 1 through 9.  And what I'll do is I'll put
24   "FAC" on it for Fee Allocation Committee to
25   differentiate that from the defense.  There are
```

```
 1   nine other exhibits, Your Honor.
 2             SPECIAL MASTER JUNEAU:  In addition to
 3   the exhibits she had?
 4             MR. BRANIFF:  That's correct.  So I'm
 5   marking them separately so that you're able to
 6   review them.
 7             SPECIAL MASTER JUNEAU:  Okay.  And I
 8   want you to just give us the numbers, and I'm
 9   going to allow that into evidence.
10             MR. BRANIFF:  Thank you, Your Honor.
11   They're Exhibits 1 through 9.  I can also attach
12   an exhibit list at the top of it, if that's
13   helpful for Your Honor.  Thank you.
14             SPECIAL MASTER JUNEAU:  And just for
15   purposes of the record, the exhibits that were
16   offered by Branch, 1 through 14B, are admitted.  I
17   understand that 13 is Birchfield's deposition.
18             Let me ask counsel:  Have y'all received
19   a copy of the deposition yet?
20             MR. BIRCHFIELD:  Yes, sir, we have.  I
21   think we received a copy yesterday.
22             SPECIAL MASTER JUNEAU:  Okay.  We're
23   going to have to make that part of -- you
24   apparently don't have a copy of the deposition,
25   obviously.
```

1        MS. ZEDALIS:  No, not yet.

2        MS. WOODWARD:  And it's going to be

3    submitted as part of the common objectors'

4    exhibits, so I don't think you need duplicate

5    copies, right?

6        SPECIAL MASTER JUNEAU:  I want to make

7    sure that that document is an exhibit in the case.

8    Okay.

9        MS. WOODWARD:  It will be, Your Honor.

10       SPECIAL MASTER JUNEAU:  All right.  I

11   think that concludes the matter regarding the

12   Branch firm.  I would then move -- let's see.  I'm

13   going to take just about a five-minute break, not

14   longer than that, and we're going to start

15   immediately back with the Snapka matter.

16                   (Recess.)

17       MR. URQUHART:  Jack Urquhart for Kathryn

18   Snapka, Master Juneau.  What I have in my hand are

19   a box that has all of our exhibits in them, and

20   the exhibits are marked.  I've actually marked the

21   box as Exhibit 50, if that would be all right.

22       SPECIAL MASTER JUNEAU:  Thank you very

23   much.

24       Any objection, Counsel?

25       MR. BLIZZARD:  Judge, we are -- our

     1   problem is that a number of these documents that
     2   are contained in the submission that we've
     3   reviewed relate to the Stratton matter, and so
     4   what I heard you say this morning was that that
     5   was not going to be coming into evidence.  There's
     6   also an e-mail exchange that I think is the last
     7   exhibit, 47, which has an e-mail exchange between
     8   Mr. Urquhart and Mr. Stratton that is incomplete
     9   in the sense that it doesn't have the initial
    10   e-mail by Mr. Stratton.  It has a follow-up e-mail
    11   by Mr. Stratton in which he apologizes for his
    12   strong language or feelings concerning the issue,
    13   but the exhibit is incomplete and needs to be
    14   completed if it's going to be offered at all.  So
    15   those are the -- those are our only problems.
    16           SPECIAL MASTER JUNEAU:  Well, I'm going
    17   to make the same ruling I made earlier.  I think I
    18   articulated that in the record.  Those exhibits
    19   will not be considered by the Special Master in
    20   review of my instructions from the Court.  Subject
    21   to that limitation, I will allow the exhibits into
    22   evidence.
    23           MR. URQUHART:  And, Your Honor, just so
    24   that you don't take something I do later on as
    25   either I don't understand what you're saying or

```
 1    I'm being disrespectful of what you're saying, --
 2              SPECIAL MASTER JUNEAU:  Uh-huh.
 3              MR. URQUHART:  -- I am going to offer
 4    certain of the Stratton exhibits that Mr. Blizzard
 5    is talking about, specifically because FAC used
 6    the Stratton agreement --
 7              SPECIAL MASTER JUNEAU:  The what?
 8              MR. URQUHART:  FAC used the Stratton
 9    agreement against Ms. Snapka in making her
10    specific fee allocation, but I --
11              SPECIAL MASTER JUNEAU:  Okay.  Why don't
12    we do this?  You're going to offer them
13    individually as they come up?  Is that how you're
14    going to handle it?
15              MR. URQUHART:  Well, I'm offering all of
16    the exhibits right now.  I understand that
17    Mr. Blizzard has objections to specific exhibits.
18    I would prefer him to tell me which specific
19    exhibits he has objections to.
20              SPECIAL MASTER JUNEAU:  Why don't we do
21    this, Counsel?  And I understand what you're
22    saying.  The specific exhibits that you have
23    objection to, you identify those, and how we'll
24    handle that is, I will not allow those into
25    evidence at this time, but through the witness.
```

```
 1    We'll put the issue before the Court at that time,
 2    and I'll individually consider those exhibits.
 3              MR. BLIZZARD:  Okay.  Let me
 4    double-check the numbers, then.
 5              SPECIAL MASTER JUNEAU:  And the numbers
 6    run from what to what?  Do you know?
 7              MR. URQUHART:  They run from 1 through
 8    48.  The box is 50.  There is no 49.
 9              MR. BLIZZARD:  I was correct.  The
10    Exhibit 47 is the e-mail exchange between Michael
11    Stratton and Jack Urquhart.  Under optional
12    completeness, we would object and ask that the
13    initiating e-mails to this e-mail exchange be
14    included, if we're going to include something for
15    the record.  In addition, there's Exhibit 16, I
16    believe --
17              SPECIAL MASTER JUNEAU:  15?
18              MR. BLIZZARD:  16.  These are all --
19    actually, there's the check that was written by
20    Mr. Stratton; there's a letter enclosing the
21    check.  I guess I don't have any objection to
22    those coming into the record, so I'm not going to
23    object to those.  I'll object to 47 until it's
24    made complete.
25              SPECIAL MASTER JUNEAU:  All right.
```

```
 1          MR. URQUHART:  And with regard to the
 2   completeness, Your Honor, I don't have the
 3   preceding e-mail with me, but if that's the only
 4   issue, I will add the initiating e-mail.
 5          SPECIAL MASTER JUNEAU:  Would you
 6   have -- would you have an objection if he has the
 7   complete e-mail chain, if you will?
 8          MR. URQUHART:  Right.  And it wasn't
 9   actually a chain, which is the reason -- what I
10   have is complete.  It just refers to another
11   e-mail.
12          MR. BLIZZARD:  I won't have an objection
13   to it -- I can't say I won't have an objection to
14   what I haven't seen yet, but if it's made
15   complete, then I won't have an objection to the
16   exhibit, assuming there's nothing in it --
17          SPECIAL MASTER JUNEAU:  I'm going to
18   allow and admit into evidence all documents save
19   and except Exhibit 47, which we will address
20   individually during the hearing.
21          MR. URQUHART:  And 16.
22          MR. BLIZZARD:  No.  16 is fine.
23          MR. URQUHART:  Okay.
24          SPECIAL MASTER JUNEAU:  All right.
25          Proceed, please.
```

```
 1                          *  *  *
 2                  DIRECT EXAMINATION
 3   BY MR. URQUHART:
 4        Q.   Will you please identify yourself to the
 5   Court?
 6              SPECIAL MASTER JUNEAU:  Let me swear her
 7   in.
 8                (Whereupon KATHRYN SNAPKA
 9          was sworn by Special Master Juneau.)
10        A.   My name is Kathryn Snapka.
11   BY MR. URQUHART:
12        Q.   Ms. Snapka, you're a lawyer; is that
13   correct?
14        A.   I am.
15        Q.   Would you give us a little bit of your
16   background very briefly?
17        A.   Yes.  I'm practicing in Corpus Christi,
18   Texas.  I got my undergraduate degree at Texas A&M
19   University at College Station.  Baylor law
20   graduate, 1980.  I've been practicing for more
21   than 30 years.  After a year of briefing attorney
22   on the Court of Appeals in Texarkana, then went
23   back to my hometown to practice.  I've done
24   plaintiff's work and defense work, as well as
25   commercial litigation, but throughout my career, I
```

```
 1   have been a trial lawyer.  I'm board certified in
 2   personal injury trial law by the Texas Board of
 3   Legal Specialization.
 4        Q.   Ms. Snapka, you do understand that the
 5   focus and purpose of this hearing is on the fee
 6   allocation, and, specifically, we are going to be
 7   addressing issues related to your fee allocation?
 8        A.   Yes, sir.
 9        Q.   You understand that?
10        A.   Yes, sir.
11        Q.   And you also understand that the issue
12   is going to be limited to our presentation on
13   common benefit work that you think you performed?
14        A.   Yes, sir.
15        Q.   Would you please advise Master Juneau of
16   what your understanding of Common Benefit Fund is
17   and where that understanding comes from?
18        A.   From the beginning of this litigation, I
19   have been aware that Judge Fallon, as a former
20   trial lawyer, values trial work.  He has said in
21   every pronouncement that the number one thing -- I
22   have a transcript of his January 6th status
23   conference where he said the most important thing
24   is trials; negotiation for settlement is up there;
25   the other things count, but the most important
```

 1  thing is trials.

 2          What I would like to do, as far as

 3  expanding my definition of common benefit work, is

 4  actually to quote Russ Herman.  The affidavit of

 5  Russ Herman in support of the plaintiff liaison

 6  counsel's memorandum --

 7      Q.  Ms. Snapka, I'm going to stop you for

 8  just a second.  If you could identify the exhibit

 9  number, which I believe is 11?

10      A.  Exhibit No. 11, yes.  Russ Herman

11  offered a sworn affidavit in support of the award

12  of plaintiffs' common benefit counsel fees and

13  reimbursement of expenses.  He states in paragraph

14  2:  The purpose of this affidavit is to describe

15  the work performed by common benefit counsel in

16  the coronated pretrial proceedings in MDL 1657 and

17  those common benefit counsel in coordinated state

18  jurisdiction.  He recites his qualifications to

19  know the value and to describe the common benefit

20  work done.  If Special Master would look on page 3

21  of Exhibit No. 11 --

22          THE WITNESS:  Does he have the exhibits

23  in front of him?

24          SPECIAL MASTER JUNEAU:  I don't have it.

25          MR. URQUHART:  May I approach?

1          SPECIAL MASTER JUNEAU:  Yeah.  Thank

2   you.

3     A.    At the top of page 3, he states:  The

4   following narrative of the plaintiffs' common

5   benefit attorneys' work is intended to provide the

6   Court with an appreciation of the general

7   objectives we pursued in the management of this

8   litigation and are approached to hearing out those

9   objectives.  And then it goes on to describe the

10  background of the litigation.

11  BY MR. URQUHART:

12    Q.    Ms. Snapka, keeping Exhibit 11 in front

13  of you, could I ask you to turn to page 8,

14  paragraph 14?

15    A.    Yes, sir.

16          SPECIAL MASTER JUNEAU:  Paragraph what?

17          MR. URQUHART:  14, Your Honor.

18    A.    What he's doing is he's describing the

19  trials.  By the way, I think this one was -- this

20  was sworn to on the 19th day of January, 2009, so

21  certainly a year and a few months after the

22  November 9th Master Settlement Agreement.  So he's

23  had plenty of time to review to properly prepare

24  his sworn affidavit.

25  BY MR. URQUHART:

1     Q.   If I could stop you, this actually was

2  an affidavit that Mr. Herman, as plaintiffs'

3  liaison counsel, was submitting to Judge Fallon to

4  justify an 8 percent allocation?

5     A.   That's correct.  The 8 percent

6  allocation that the Negotiating Plaintiffs'

7  Committee had inserted into the Master Settlement

8  Agreement.

9     Q.   So this is what he was saying was the

10  common benefit work that supported his

11  application?

12     A.   Yes.  Let me, if I could, point out to

13  Special Master, he says, similarly, in Texas --

14  after describing some other trials, he says,

15  similarly, in Texas, two cases were tried to

16  verdict with two verdicts for plaintiffs in the

17  Ernst and Garza cases; both verdicts were

18  substantial, 253 million and 32 million,

19  respectively; these verdicts helped to establish

20  that liability could be obtained despite Merck's

21  formidable defenses; in addition, Judge Wilson

22  scheduled five waves of cases for trial which were

23  to begin in the spring of 2007; this scheduling of

24  cases for trial also applied pressure on Merck.

25          May I address that for a moment,

```
 1   Mr. Urquhart?
 2        Q.   I can't stop you.
 3        A.   Thank you, sir.
 4             MR. BLIZZARD:  Your Honor, I'm not sure
 5   exactly -- question and answer here?
 6             SPECIAL MASTER JUNEAU:  We don't have a
 7   jury here.  I can handle it.  Go ahead and answer
 8   the question.
 9             THE WITNESS:  Thank you, sir.
10        A.   In the second sentence, when he talks
11   about -- or the third sentence, where he says,
12   Judge Wilson scheduled five waves of cases for
13   trial which were to begin in spring of 2007, and
14   then he cites the scheduling of cases for trial
15   also applied pressure on Merck.
16             I think in Mr. Girardi's -- in his
17   filing, he talked about the waves of cases that
18   Merck themselves said that that applied pressure.
19   I would like to point out to Special Master Juneau
20   that, in those waves of cases that were scheduled
21   for trial, I had one trial in the first wave and
22   one trial in the third wave, the Nettles in the
23   first and Salizar in the third.
24             Additionally, --
25   BY MR. URQUHART:
```

1          Q.    I'm going to stop you there, if that's
2    all right.
3          A.    Yes, sir.
4          Q.    You read paragraph 14.
5          A.    I did.
6          Q.    Could I ask you to read paragraph 16?
7          A.    In his conclusion to the description of
8    state litigation and its impact, paragraph 16
9    says:  All of these state litigations generated
10   significant discovery, expert development,
11   document production and motion practice, which
12   directly contributed to the global resolution of
13   this case.
14         Q.    Ms. Snapka, was there, to your
15   knowledge, ever any question that the Garza case
16   was regarded by Plaintiff Steering Committee and
17   plaintiffs' liaison counsel as a contribution to
18   the common benefit?
19         A.    Never.  In fact, during my
20   presentation, --
21              SPECIAL MASTER JUNEAU:  "My
22   presentation," you're talking about before the Fee
23   Committee?
24              THE WITNESS:  Before the Fee Committee.
25         A.    -- which is -- thank you, sir -- which

```
 1    is located at, I believe Tab 14, Exhibit 14, I was
 2    commended for the tenacity with which I urged this
 3    trial-ready case to be sent back.  In Joe
 4    Escobedo's testimony before the Fee Allocation
 5    Committee, Mr. Herman went out of his way -- and
 6    I'd be happy to read that for Special Master, as
 7    well, because he said, you know, you were ready,
 8    you were tenacious along with Ms. Snapka in
 9    getting it remanded, which the MDL supported.  So
10    as certainly Dawn Barrios in her presentation to
11    the Fee Committee, and I have those as exhibits,
12    they asked her what her -- she felt her most
13    significant contribution was, and she described it
14    was the remands and, in particular, getting Garza
15    remanded back so that we could obtain the
16    32 million-dollar verdict that we did.
17    BY MR. URQUHART:
18         Q.   Ms. Snapka, with regard to the Escobedo
19    & Tippit excerpt that you just referred to, that
20    would be Exhibit 8?
21         A.   Yes, sir.
22         Q.   And with regard to the Barrios testimony
23    that you're referring to, that would be in
24    Exhibit 7?
25         A.   Yes.
```

```
 1          Q.   And we're actually going to touch a
 2   little bit more on those in a moment, but I would
 3   now kind of like to give a bit of chronological
 4   perspective to things.  I think we've been talking
 5   about common benefit as one of definition.
 6          A.   Yes, sir.
 7          Q.   Okay.  Now, I want to talk about your
 8   participation in this litigation in kind of a
 9   brief chronological view.
10          A.   Yes, sir.
11          Q.   All right.  How did you first become
12   involved, and when did you first become involved
13   in Vioxx litigation?
14          A.   Because I had been active in
15   pharmaceutical and medical device litigation for
16   the last 20 years, I was approached in early 2003
17   by someone who had sent me cases in the past
18   saying, I've got two Vioxx cases; would you be
19   interested in looking at them?  And I said, well,
20   these would be my first Vioxx cases; yes, I'll be
21   happy to.
22               So in 2003, I received the Zajicek,
23   Z-A-J-I-C-E-K, case, as well as the Eller case,
24   E-L-L-E-R, and I filed the Zajicek case in May of
25   2003.  I believe that it is also -- the file
```

1   stamped copy of that is also an exhibit.

2           In Texas in 2003, there was a -- tort

3   reform was going to take effect September 1st.  We

4   were trying to get every case in the office filed,

5   so I filed Eller, as well.  Both cases were

6   removed to federal court, so we couldn't -- we

7   couldn't really do a whole lot while they were in

8   federal court.

9           SPECIAL MASTER JUNEAU:  There were two

10  cases you filed in state court is what you're

11  saying?

12          THE WITNESS:  Yes, sir.  Actually, it

13  was three.  Benavidez case, as well, but Eller and

14  Zajicek are significant for a number of reasons,

15  Zajicek in particular.

16  BY MR. URQUHART:

17      Q.   But just for clarification, these are

18  your first filed ones?

19      A.   Correct.

20      Q.   All right.  We're not talking about all

21  of the cases that you have?

22      A.   No.

23      Q.   We're talking about at --

24      A.   At the very outset when I became

25  interested in the litigation.  I began to try to

```
 1   find out information about Vioxx, and in the
 2   course of -- just in the course of practice, I
 3   happened to talk to Mr. Hockema.  Mr. Hockema and
 4   I have been friends for as long as I've been
 5   practicing law.  We call each other just to check
 6   up.  He said, what are you working on?  I said, I
 7   think there's this really great case, this Vioxx
 8   case.  And he said, oh, Escobedo has got one of
 9   those cases, and he's taken a bunch of
10   depositions.  I was very interested in that
11   because I was -- since I had been delayed in
12   federal court, he said, look, Snapka, he said
13   we're auto products lawyers; you've done
14   pharmaceutical cases; why don't you come try this
15   case with us?  I said, that's great; y'all are
16   leaps and bounds ahead of me on discovery.
17        Q.   Ms. Snapka, just so that we can keep a
18   chronology going here, your Zajicek case was the
19   first one you filed; is that correct?
20        A.   That's correct.
21        Q.   And that's Exhibit No. 25, and that was
22   filed May 29, 2003?
23        A.   Yes, sir.
24        Q.   All right.  You have been talking about
25   this initial contact with regard to the Garza
```

```
 1   case.
 2        A.    Yes, sir.
 3        Q.    Give us a time frame on that.
 4        A.    That was in the spring of 2004.  I was
 5   looking back at my records.  My best
 6   reconstruction is April 2004.
 7        Q.    All right.  Now, this obviously was
 8   before the MDL was formed.
 9        A.    Yes, long before.
10        Q.    All right.  And it was also before the
11   Texas consolidation was created.
12        A.    That's correct.
13        Q.    Is that correct?
14        A.    That's correct.
15        Q.    All right.  So now you're having a
16   conversation with Mr. Hockema and Mr. Escobedo --
17        A.    Escobedo.
18        Q.    -- roughly April?
19        A.    April, May of 2004, yes, sir.  I then --
20   in discussing where a lot of the discovery was,
21   Mr. Escobedo told me that a gentleman named David
22   Miceli from Montgomery, Alabama, with Beasley,
23   Allen was working on these cases, that Chris
24   Seeger was working on the cases, and, of course,
25   Shelly Sanford was working on the cases, as well
```

```
 1    as them, and he said that they were able to get
 2    all the discovery because Merck had found out that
 3    all these different law firms were comparing
 4    notes, and they wanted to make sure that they had
 5    all the discovery.
 6              I went to Montgomery, Alabama, and
 7    visited with David Miceli in the Beasley, Allen
 8    office.  In between time, we started talking about
 9    the case, the fact that Mr. Garza was 71 years old
10    and had a number of risk factors, plus the fact
11    that it was a short-term use case.  At that time,
12    the only thing you could really determine was that
13    there were people that were on it for a long time.
14    I think the Ernst case, he had taken it for quite
15    a long period of time.  So we -- as part of the
16    trial team, I came in and we started working out
17    who would take what witnesses.
18         Q.   Can I ask you this about Garza?
19    Because, of course, Mr. Escobedo testified about
20    some things.  But with regard to the Garza case,
21    can I ask you to let Master Juneau know what the
22    evidence was with regard to the length of time
23    that the plaintiff -- the deceased, rather, took
24    Vioxx?
25         A.   Mr. Garza was provided samples so that
```

```
 1   there actually was not a prescription bottle.  It
 2   was a sample and -- sample case, and so we
 3   contended that he had taken Vioxx for 25 days.  He
 4   had gone to see his cardiologist and had been --
 5        Q.   How many days?
 6        A.   25.
 7        Q.   A total of 25 days?
 8        A.   Total of 25 days.
 9        Q.   What about Mr. Garza's risk factors?
10        A.   In addition to his age at 71, Mr. Garza
11   was a smoker, he had high blood pressure, he had
12   high cholesterol, he had previously undergone
13   bypass, had a previous heart attack.  From the
14   very beginning, Mr. Escobedo told me that the
15   thrust of this case was this was the last person
16   on earth that should have been given Vioxx, a
17   pro-thrombotic agent.
18             So we knew from the very beginning that
19   this case had lots of risk factors, but because of
20   the specific fact habit of this case, we knew that
21   we could explain and show that Vioxx was the
22   causative factor.
23        Q.   Quickly, again, because Mr. Escobedo
24   testified about some of these things, but
25   chronologically, you first get involved in,
```

1   roughly, April or May of 2004.  When was the case

2   trial-ready?  When were y'all ready to go to trial

3   and you have a trial setting?

4        A.   If I recall correctly, there was a

5   docket control conference which was set in April,

6   setting the case for trial in November of 2004.

7   We were ready to go to trial at that trial

8   setting.

9        Q.   Would that have been the first case?

10       A.   It would have been -- as far as I know,

11  it would have been the first case in the nation to

12  go to trial.

13       Q.   The case was removed?

14       A.   The case had been removed and had been

15  remanded.  What happened was -- and all during

16  this time, there's more and more information

17  coming out about Vioxx.  On September 30th, 2004,

18  the drug was withdrawn from the market.  And at

19  whatever point you want to, I'll talk about

20  organizational efforts in Texas.

21       Q.   But I want to, again, chronologically,

22  because you bring up a point there, all of this

23  that you've been talking about so far is before

24  Vioxx had even been withdrawn from the market?

25       A.   Yeah.  Oh, absolutely.  No, we had --

```
 1   the case had been discovered.  The depositions
 2   that Ms. Sanford had taken and that others had
 3   taken in this litigation were shared.  The ones
 4   that Joe Escobedo had taken were shared.  And we
 5   all had -- we all had the discovery that was
 6   produced by Merck.
 7        Q.   And we have heard information, and you
 8   have supplied information about the struggles that
 9   were involved, but I want to focus on -- this was
10   a -- and I'll use the word double remand case,
11   double removal case.
12        A.   Double removal case.
13        Q.   Right?
14        A.   Yes, sir.
15        Q.   And what does a double removal case
16   mean?
17        A.   The case had been originally removed and
18   remanded by the federal court.  After Merck
19   obtained a continuance from the November 2004
20   trial setting, it was set for trial February 14th,
21   2005.  After the drug was removed from the market,
22   there was a lot of activity related to the
23   establishment of an MDL.  I attended a JPML
24   hearing in Tampa because I wanted to stay on top
25   of what was going on.
```

1            In January, there was a lot of -- I

2    think Judge Fallon in his remand order calls it a

3    peculiar action by Merck.  They hired first one

4    legislator.  Then after that legislator gets some

5    bad press -- in Texas, if the legislature is in

6    session and a lawyer is in trial, then that trial

7    can be continued so that he can attend to his

8    duties of the legislature.

9            SPECIAL MASTER JUNEAU:  You're talking

10   about the legislator himself?

11           THE WITNESS:  Yes.

12       A.   So what happens is sometimes the process

13   is abused, and in this case, Merck went out and

14   got a state senator and said, oh, well, now we

15   can't go to trial because Senator Hinojosa is now

16   on the trial team and he's in session.  We tried

17   to -- after the bad publicity, Senator Hinojosa

18   said, okay, well, I'm off the case.

19           So then they hired another legislator,

20   Representative Rene Oliviera.  We subpoenaed

21   Representative Oliviera and his files to find out

22   how much work he had actually done to see if this

23   was an abuse of the procedure or not.  Before that

24   hearing took place, Merck removed the case a

25   second time, and it was transferred by the federal

1    judge -- because of the MDL activity, it was

2    transferred into the -- he held on to it for a few

3    weeks and transferred it to the MDL.

4    BY MR. URQUHART:

5        Q.   Did you play any role in getting the

6    Garza case remanded from Judge Fallon's court in

7    the MDL?

8        A.   Yes.  I knew from the beginning that I

9    was going to be involved in the MDL because I was

10   getting other cases, and I knew from previous

11   experience, from my previous, particularly diet

12   drug litigation experience, that it is crucial to

13   be involved in the MDL to know what is going on so

14   that you can adequately represent the clients and

15   so that you can participate in discovery and

16   sharing information.

17            Because I was going to be involved in

18   the MDL, I was the one who at virtually every

19   status conference said, we need to get Garza back;

20   it's trial-ready; we need to get Garza back.  Dawn

21   Barrios assisted in that effort, as well as Russ

22   Herman.  Because the MDL was telling us, you know,

23   yeah, get it back and get it tried; we need a win.

24       Q.   Okay.  I want you to give Master Juneau

25   and slow down and do it, information about the

1    coordination between the MDL folks and you in

2    getting the remand.  I understand this is the only

3    case that was remanded back to state court.

4           A.    As far as I know, that is correct.

5           Q.    All right.  So explain to Master Juneau

6    about the effort to get it remanded.

7           A.    I wanted to make sure that Judge Fallon

8    at every possible opportunity knew that we were

9    trial-ready and that this was an abusive tactic

10   engaged in by Merck.  So I attended -- and I have

11   my list.  Out of 64 status conferences, either I

12   or occasionally my associate appeared at all but

13   nine.  And so in the early days, I was there

14   pushing for Garza.

15          We filed an emergency motion for remand,

16   and Mr. Herman arranged for us to have a hearing

17   in chambers with Judge Fallon that I attended, and

18   he heard us, very generously heard us.

19   Unfortunately, the next month is when Katrina hit

20   in August of 2005, and the Court moved to Houston.

21   I continued to press for my own cases because I

22   wanted to press for trials.  And in November,

23   November 22nd, I believe, of 2005, Judge Fallon

24   issued his remand order in the Garza case.

25          Q.    Now, with regard to the reaction from

```
 1   your MDL colleagues, let's say specifically
 2   Mr. Herman, what has been his consistent position
 3   on that remand?  Has he criticized it?
 4        A.   Never, no.  In fact, in Mr. Escobedo's
 5   presentation, he made a special point.  He wasn't
 6   asking a question.  He made a special point.  And
 7   if I may --
 8        Q.   That's Exhibit No. 8?
 9        A.   -- in Exhibit No. 8, on page 7, line 18,
10   he says -- Mr. Escobedo is giving his
11   presentation, and Mr. Herman interrupts him and
12   says, excuse me, I want to state for the record
13   that Kathy Snapka was relentless in appearing in
14   the MDL to get this case remanded, which the MDL
15   supported, and it was one of the few cases -- I
16   don't know that the judge remanded any more cases
17   other than this, but it was important that you and
18   Ms. Snapka were tenacious in getting this case
19   sent back, and he said something very similar to
20   me.
21        Q.   The case was remanded.  Was the case
22   tried?
23        A.   The case was tried.  We began trial --
24   remember, we were remanded on November 22nd of
25   2005.  We continued to prepare the case.  I
```

```
 1   attended portions of the Ernst case in Angleton,
 2   saw Mr. Lanier there.  I attended the
 3   Irvin/Plunkett case in Houston, particularly on
 4   the day that Dr. Baldwin was on the stand.
 5       Q.   Can I interrupt you for just a second?
 6       A.   Yes.
 7       Q.   With regard to your attendance at the
 8   Ernst case and your attendance at the Plunkett
 9   case, do you bill that time requesting that time
10   as common benefit time?
11       A.   I don't -- I don't think I did.  And my
12   billing is pretty poor to begin with, but I don't
13   think I did, because I was trying to absorb all of
14   the information that I could because we were
15   preparing for trial.  Irvin was a short-term use
16   case.  I was interested from that standpoint.  But
17   I was trying to find out as much as I could about
18   this litigation so that we could be successful.
19       Q.   All right.
20       A.   Anyway, the case that -- you were asking
21   me what happened with the case.  The case
22   proceeded to trial.  We filed an emergency motion
23   for trial setting before Judge Gabert in Starr
24   County.  Because we said, look -- we cited Judge
25   Fallon's order talking about the peculiar Merck
```

```
 1    tactics.  And he set us for trial over Merck's
 2    vociferous objection in January of 2009.  So we
 3    were actually, I think, the third case to proceed
 4    to trial.  Interestingly, McDarby -- the
 5    Cona/McDarby case in New Jersey was begun after
 6    that.  McDarby was the other case that had a
 7    plaintiff who had many, many risk factors.
 8         Q.   And how did the Garza case turn out?
 9         A.   The Garza case -- it was really
10    interesting.  In preparing for today, I found
11    something that I had forgotten about.  It was a
12    comment that Mr. Lanier made.  Master Juneau, in
13    Starr County, Texas -- it's a rural county, and
14    the Court only hears civil matters once a month.
15    And so we started in January; the verdict wasn't
16    obtained until April 21st, but it's a complex way
17    to try the case because you have to sort of review
18    everything for the jury over and over.
19              Mr. Lanier said, the plaintiffs' team in
20    Garza will have to work really, really hard to
21    keep the momentum going, says Lanier.  It's a
22    quote.  The plaintiffs have the burden of proof;
23    the plaintiffs have to move the ball; that's a
24    momentum game; that makes it a lot tougher for the
25    plaintiffs, he says.  That was an interview in
```

```
 1   Texas Lawyer.
 2              SPECIAL MASTER JUNEAU:  The question,
 3   what was the result.
 4        A.   A 32 million-dollar verdict, 25 million
 5   in punitive damages out of that verdict, and
 6   5 million in compensatory -- I'm sorry --
 7   7 million.
 8   BY MR. URQUHART:
 9        Q.   Ms. Snapka, I'm going to ask you to look
10   at what has been marked as Exhibit -- Snapka
11   Exhibit 20.
12              MR. URQUHART:  If I may approach?
13              SPECIAL MASTER JUNEAU:  Uh-huh.
14   Certainly.
15              MR. URQUHART:  Master Juneau, this...
16        A.   Yes, sir.  That's from the Beasley,
17   Allen website.
18   BY MR. URQUHART:
19        Q.   And from the Beasley, Allen website --
20   and the only reason I bring this up is because
21   Mr. Escobedo was cross-examined by Mr. Blizzard
22   about weren't there other short-term use trials.
23   What does the Beasley, Allen website say there as
24   the headline after the Garza verdict?
25        A.   "Plaintiffs win first short-term use of
```

```
 1   Vioxx lawsuit."
 2        Q.   Ms. Snapka, I want to stay on this for
 3   just a second.  We don't have time to read the --
 4   to read the whole thing, but I do want to ask you
 5   a couple of things about this article.  If you
 6   look at the first page, --
 7             (Brief interruption.)
 8   BY MR. URQUHART:
 9        Q.   The last sentence of this from the
10   Beasley, Allen website on the first page says:
11   There is no scientific evidence presented for this
12   short-term use to connect Vioxx to Garza's heart
13   attack, Sales says.  Now,that's referring to
14   Travis Sales, who is a defense lawyer.
15        A.   Merck's defense lawyer, yes.
16        Q.   Right.  And if we turn to the next page,
17   there's a discussion about Havner, which is the
18   Texas version of Daubert; is that correct?
19        A.   Yes.
20        Q.   And this, again, is Merck saying that
21   plaintiffs have failed to introduce evidence of
22   any study that meets that requirement, let alone
23   the two that are required under Texas law.
24             Now, briefly, the Garza case is still on
25   appeal; is that correct?
```

1      A.    It is on appeal to the Texas Supreme

2   Court, yes.

3      Q.    Texas has a two-tiered system of

4   appeals.  The first layer of appeals is the Court

5   of Appeals; is that correct?

6      A.    That's correct.

7      Q.    In the Garza case, in the Court of

8   Appeals, how did the Court of Appeals deal with

9   this Merck argument?  In other words, Merck is

10  saying there is absolutely no way general or

11  specific causation is going to hold up on appeal.

12  What did the Intermediate Court of Appeals say

13  about that?

14      MR. BLIZZARD:  Can I just have some

15  clarification?  At which point in time?  Because I

16  think that changed.

17      A.    I can explain.  The San Antonio Court of

18  Appeal initially reversed and rendered, and then

19  after a great deal of interest because it -- the

20  opinion did not comport with the understanding

21  applied by liability law at the time, the Court of

22  Appeals withdrew their opinion and entered an

23  opinion affirming the judgment, but remanding

24  because of an issue having to do with a juror.  So

25  as far as the actual scientific basis and

```
 1  causation, causation was affirmed.  We are in the
 2  Court of Appeals --
 3  BY MR. URQUHART:
 4       Q.    You're in the Texas Supreme Court?
 5       A.    I'm sorry.  Texas Supreme Court, yes.
 6  The Ernst is -- the Ernst case -- Mark's case is
 7  also -- Mr. Lanier; I apologize -- is also in the
 8  Texas Supreme Court.
 9       Q.    Now, the Ernst case was tried in Texas?
10       A.    Yes.
11       Q.    And it was tried before your case?
12       A.    That's correct.  It was tried.  In
13  August of 2005 is when they received the verdict.
14       Q.    And it is also on appeal?
15       A.    That's correct.
16       Q.    Also in that case, the scientific
17  causation evidence was challenged?
18       A.    Yes, sir.
19       Q.    What did the Intermediate Court of
20  Appeals do with the scientific evidence in the
21  Ernst case?
22       A.    They reversed and rendered the Ernst
23  case.
24       Q.    All right.  So the status of the cases
25  right now is, with regard to Garza, the Garza case
```

1    says -- the Intermediate Court of Appeals has said
2    the scientific evidence establishes general and
3    specific causation.  That's what it says with
4    regard --
5         A.   Yes, sir.
6         Q.   -- to your case.  With regard to the
7    Ernst case, the status of the Appellate Court
8    ruling from the Intermediate Court is that there
9    was insufficient proof of causation; is that
10   correct?
11        A.   That statement is correct.
12        Q.   All right.  Now, in pharmaceutical
13   litigation -- and you are an experienced
14   pharmaceutical lawyer; is that correct?
15        A.   Yes, I am.
16        Q.   And I don't want to ask this generally.
17   With regard to Garza, was causation, general and
18   specific, an important issue?
19        A.    In pharmaceutical litigation generally
20   and in the Garza case, in particular, given his
21   risk factors, causation is crucial.  Establishing
22   specific causation is crucial.  General causation
23   also, but by the time you get to a drug being
24   withdrawn, it becomes a little bit easier.  I
25   was -- my responsibilities were to put on

 1   Dr. Simonini, who was the cardiologist who David
 2   Hockema and Joe Escobedo found and developed, and
 3   he is the one who testified to specific causation.
 4   I also cross-examined Dr. Wheeler, the
 5   pathologist, for that same reason.
 6        Q.   So those are two of the specific things
 7   you did with regard to the Garza case?
 8        A.   I did other things, as well.
 9        Q.   Yes.  Describe for us generally what you
10   did.
11        A.   From the very beginning of the Garza
12   case, we would meet as a team and discuss what
13   should be done.  There were experts that they had
14   retained that, quite frankly, I thought were not
15   good experts, and they weren't called.  And it was
16   a very collaborative effort in the trial itself,
17   and there are things in here, in the exhibits,
18   because I pulled them from the trial just in case
19   there was any question at all, and if you could, I
20   think it's Exhibit 45, noting the appearances of
21   counsel for Garza, just so that there's no
22   question about it, Mr. Hockema --
23             SPECIAL MASTER JUNEAU:  What are you
24   saying that demonstrates?
25             THE WITNESS:  Let me just show it to

```
 1   you.
 2           MR. URQUHART:  If I may approach again,
 3   Your Honor.
 4           SPECIAL MASTER JUNEAU:  Sure.
 5           MR. URQUHART:  It's Exhibit No. 45.
 6           THE WITNESS:  If the Court will look on
 7   the second page under appearances of counsel.
 8           MR. BLIZZARD:  I'm sorry.  Maybe I
 9   didn't catch the exhibit number.
10           THE WITNESS:  45.
11           SPECIAL MASTER JUNEAU:  Okay.  Go ahead.
12       A.   Mr. Hockema did general voir dire.  I
13   did specific voir dire.  Mr. Escobedo opened.
14   Mr. Hockema called as an adverse witness,
15   Dr. Nancy Santanello.  I put on Dr. Simonini.  I
16   also put on two of the sons of Leonel Garza.  I
17   cross-examined Dr. Wheeler.  I was the one who
18   interviewed the pathologist in the Garza case to
19   develop the distinctions that we were trying to
20   make to prove that Mr. Garza, who had an -- he had
21   two clots.  That usually doesn't happen.  He had
22   two clots.  So I developed the testimony for
23   Dr. Wheeler.
24           Also, from the very beginning, I was --
25   it was my responsibility to be prepared to
```

```
1   cross-examine Dr. Alise Reicin.  Dr. Reicin has
2   been described by Merck as the Vioxx defender, and
3   what I heard from a lot of people who had either
4   deposed her or been with her in trials, that she
5   was --
6              MR. BLIZZARD:  Your Honor, I object to
7   the hearsay.
8              SPECIAL MASTER JUNEAU:  Go ahead.  I'm
9   going to allow you to answer.
10      A.   In order to prepare, I had to talk to
11  people.  What they said was, is that she was a
12  very well-spoken, attractive and engaging woman,
13  and it was hard to pin her down.  And that was my
14  specific job, because I wouldn't -- I wouldn't
15  necessarily be distracted, and I was primed and
16  ready.  I asked defense counsel from the very
17  beginning to let me know when they were going to
18  put her on so that I could be prepared.  As far as
19  I know -- I mean, she may not have been called in
20  other cases, but I think that was the first case
21  where they didn't call her.
22  BY MR. URQUHART:
23      Q.   The significance of what you were
24  explaining there is that -- and others can
25  contradict if they like -- but that this was
```

```
 1   Reicin -- is that her name?
 2        A.    Yes, Dr. Alise Reicin.
 3        Q.    -- was a particularly -- I'll use the
 4   term well-respected witness by the plaintiffs bar?
 5        A.    Yes.  She was tough to cross-examine is
 6   what I heard.
 7        Q.    And your assignment in the Garza trial,
 8   among others, was to cross-examine her?
 9        A.    Absolutely.
10        Q.    And Richard Josephson and Travis Sales
11   represented Merck, --
12        A.    Yes.
13        Q.    -- along with others, I'm sure, in that
14   case; is that correct?
15        A.    That's right.
16        Q.    And throughout the trial, you were
17   asking Mr. Josephson, when is she coming; when is
18   she coming?
19        A.    Right.  Right.
20        Q.    And for some reason, in your case, --
21        A.    They didn't bring her.
22        Q.    All right.  I'm going to repeat a
23   question, and I apologize.  But to your knowledge,
24   has anyone taken the position that prior to the
25   FAC response, reply, that the Garza case, the
```

 1   Garza verdict, did not contribute to the common

 2   benefit?

 3       A.   To the contrary.  What they talk about

 4   five wins or six wins, they're counting the Garza

 5   case.  Russ Herman's affidavit specifically

 6   mentions it, not only in his affidavit saying that

 7   they want common benefit fees because this was a

 8   common benefit and help to generate the global

 9   settlement.  He said it in conferences.  You know,

10   nobody has ever said anything other than it was --

11   it was significant.

12       Q.   And we actually began with Mr. Herman's

13   affidavit, which was in the 2008 time frame in

14   which he was still crediting it as being a common

15   benefit --

16       A.   I'll correct you.

17       Q.   -- activity.

18       A.   It was January of 2009.

19       Q.   I'm sorry.  And at that time, in his

20   affidavit, he includes it --

21       A.   Yes.

22       Q.   -- as a common benefit activity?

23       A.   Yes.

24       Q.   All right.  Was Garza excluded from the

25   Master Settlement Agreement?

```
 1        A.    Yes.
 2        Q.    How did you -- how did you find out that
 3   Garza was excluded from the Master Settlement
 4   Agreement?
 5        A.    As Master Juneau knows, the negotiations
 6   were kept secret, intentionally secret.  The
 7   settlement was unveiled in open court on the
 8   morning of November 9th, 2007.  As the PowerPoint
 9   was going through explaining the global
10   resolution, I certainly had some questions as it
11   was being explained.  And afterward I went up to
12   -- it was the one time I didn't sit where I
13   usually sit, because it was so crowded because
14   people -- the word came out that there was going
15   to be a settlement announced.  I walked up -- my
16   best recollection is it was to the left table,
17   which would be the Merck table.  And I think it
18   was Mr. Bisner, Merck counsel, who pointed out to
19   me, see, Merck [sic] was excluded.
20             SPECIAL MASTER JUNEAU:  He pointed out
21   what?
22             THE WITNESS:  As an exhibit to the
23   Master Settlement Agreement, there was a list of
24   cases which were excluded from the terms of the
25   Master Settlement Agreement.  In addition to
```

 1   Garza, there was --

 2              MR. URQUHART:  Excuse me just a second.

 3   Your Honor, if I could, I'd hand you Exhibit

 4   No. 31.

 5              SPECIAL MASTER JUNEAU:  Ms. Snapka, my

 6   question is:  You said that Mr. Bisner -- you went

 7   up to him, and he pointed out to you.  I'm just

 8   trying -- I didn't quite hear what you said.

 9              THE WITNESS:  In other words, he said --

10   in other words, knowing that I would have some

11   interest in Garza, he pointed out to me that

12   attachment that you're holding in your hand where

13   Ernst, Cona/McDarby, Humeston, Ledbetter -- I'm

14   sorry.  I'm missing the rest of them.  But there

15   were several cases that were on the attachment to

16   the Master Settlement Agreement which excluded the

17   cases from consideration.

18   BY MR. URQUHART:

19        Q.   Did you have -- now, this was an

20   attachment to the Master Settlement Agreement when

21   it was first publicly disclosed in Judge Fallon's

22   court?

23        A.   On November 9th, 2007, that's correct.

24        Q.   Prior to that time, did you have any

25   knowledge that it was going to be excluded?

```
 1        A.   I didn't even have knowledge that there
 2   was a settlement, no.  So the answer to your
 3   question, sir, is no.
 4        Q.   Mr. Birchfield's deposition was taken
 5   Friday.
 6        A.   Yes.
 7        Q.   Mr. Birchfield testified that he
 8   understood that you had a telephone conversation
 9   with Mr. Blizzard.
10        A.   In the wee hours is what he said.
11        Q.   Of the evening before it was announced?
12        A.   I think the wee hours of the morning of
13   November the 9th is what my understanding of his
14   testimony.
15        Q.   To your recollection, did you have a
16   conversation with Mr. Blizzard or anyone about the
17   exclusion of Garza?
18        A.   No.
19        Q.   At my request, did I ask you whether or
20   not you had any cell phone records?
21        A.   Yes.
22        Q.   Did you --
23        A.   I produced the cell phone records.  I
24   was -- and those are an exhibit, and I went
25   through -- I was traveling, and because I'm on the
```

```
 1    phone frequently, I can tell when I'm on a plane
 2    and when I'm talking on the phone.  I did not
 3    receive -- which would have been the only way that
 4    Mr. Blizzard could have gotten hold of me in those
 5    wee hours as they're finishing up.  I did not
 6    receive a phone call from Ed Blizzard or any other
 7    member of the Negotiating Plaintiffs' Committee.
 8         Q.   Did you ever ask anybody that the Garza
 9    case be excluded?
10         A.   No.
11         Q.   There has been testimony that you had no
12    fee interest in the Garza case.  Is that true?
13         A.   That is true, sir.
14         Q.   All right.  Now, let me back up a little
15    bit in our -- in our chronology.  You described
16    that you became involved in Garza back in April or
17    May of 2004.
18         A.   Correct.
19         Q.   And stayed involved in Garza, obviously,
20    through trial and stayed interested in Garza up to
21    this very moment.
22         A.   That's correct.  My principal -- my
23    principal role was as trial counsel, but yes.
24         Q.   All right.  Now, just in case there's
25    any question about it, why did you have no fee
```

```
 1   interest in that case?
 2        A.   When I first talked to Mr. Hockema about
 3   the Garza case, because they had what had been
 4   produced to Beasley, Allen and to Chris Seeger and
 5   to the -- Carlene Lewis and Shelly Sanford, and
 6   had taken depositions, they were leaps and bounds
 7   ahead of me.  And so I -- when he said, you want
 8   to come try the case -- I love to try cases;
 9   that's what I do.  And I said, look, let's do
10   this; I'll come try the case with you.  And he
11   said, oh, it's already chopped up.  I said, don't
12   worry about the fee; what we'll do is, after we
13   try this case, I've got other cases set for trial.
14   Because Zajicek was set when the MDL formed, and I
15   reported that -- actually, Merck reported the
16   trial setting.  I said, when we get these other
17   cases to trial, y'all can try it with me, and they
18   said that's great.
19        Q.   All right.  Now, let's move away from
20   Garza for just a second.
21             SPECIAL MASTER JUNEAU:  Let me just
22   interrupt.
23             THE WITNESS:  Yes, sir.
24             SPECIAL MASTER JUNEAU:  Do I understand
25   what you're telling me, if that had developed,
```

 1    kind of the intent was they wouldn't charge -- you
 2    wouldn't get any -- they wouldn't get any fee out
 3    of the cases you had?
 4              THE WITNESS:  No.  At the -- if they --
 5    if we could get cases to go to trial, because I
 6    retain the majority of the fee interest in the
 7    cases that are sent to me, I could allow them some
 8    fee participation for future trials.
 9    BY MR. URQUHART:
10        Q.    You actually anticipated getting more
11    cases than they were going to get?
12        A.    Yes.  Because -- yes.
13        Q.    And you actually did --
14        A.    I did get more cases.
15        Q.    Considerably more cases?
16        A.    Yes.
17        Q.    With regard to all of your cases -- just
18    to clear this issue up right now, with regard to
19    all of your cases that you signed up, were they
20    settled under the Master Settlement Agreement?
21        A.    Yes, they were.
22        Q.    All of them?
23        A.    Yes, they were.
24        Q.    All right.  Now, were -- I was going to
25    move away from Garza just a little bit to discuss

1   the issue of consolidated litigation.

2        A.    Yes.

3        Q.    All right?  We've already established

4   that Garza started before there was a federal MDL.

5        A.    Correct.

6        Q.    And it started before there was a Texas

7   consolidated litigation.

8        A.    That's correct.

9        Q.    So can you, in a narrative fashion, if

10  it's okay, describe, first of all, what you did

11  with regard to Texas consolidation?

12       A.    Texas consolidation -- the litigation

13  was relatively new.  It also came into -- it also

14  came into being in September of 2003.  I had cases

15  that were subject to consolidation and cases that

16  predated the Texas MDL process.  However, when the

17  Supreme Court received a Motion for Consolidation,

18  they named me as Texas notice counsel, and I

19  remained as liaison until the case was transferred

20  to Randy Wilson when Mr. Tommy Fibich was -- of

21  Houston.  I live in Corpus; he lives in Houston --

22  was named as Texas notice counsel.

23       Q.    Just to get some geography straight and

24  some timing straight and those sorts of things,

25  your home is Corpus Christi?

```
 1           A.    That's correct.
 2           Q.    Mr. Escobedo's home is where?
 3           A.    In McAllen.
 4           Q.    Mr. Hockema?
 5           A.    McAllen.
 6           Q.    All right.  The Texas Supreme Court
 7    established a consolidated litigation.  This is
 8    the Supreme Court of Texas.  And they named you as
 9    liaison counsel?
10           A.    That's correct.
11           Q.    Initial liaison counsel?
12           A.    That's correct.
13           Q.    The consolidation judge became a
14    Houston-based judge; is that correct?
15           A.    That's correct.
16           Q.    And at that time, Tommy Fibich, who is a
17    Houston-based lawyer, became notice counsel, which
18    is the same as liaison counsel in Texas law; is
19    that correct?
20           A.    Greatest respect for Mr. Fibich,
21    absolutely.
22           Q.    What was your role after Mr. Fibich took
23    over?
24           A.    I was a member of the Executive
25    Committee of the state consolidated litigation.
```

1    Let me back up a little bit.  I'm sensitive to
2    time, and there are some other issues.  But I do
3    want to mention that after the withdrawal -- and
4    Mr. Escobedo and Mr. Hockema didn't claim credit
5    for this, although, I think if credit is given,
6    they should claim credit, as well.  But I
7    organized and sent out e-mails to lawyers that
8    were interested in Vioxx litigation to share the
9    information that we had and to organize so that we
10   could participate in pursuing these cases.
11            We had the first one on October 28th of
12   2004 in Houston.  We had the second one December
13   the 8th, 2004, also in Houston.  I believe the
14   December one is the one that Mr. Birchfield and
15   Mr. Sizemore attended.  I don't -- I don't recall
16   if it was the October or the December one, but I
17   know that they came to one.  We continued to
18   have -- I had one more meeting in 2005, and it was
19   after that that the Texas consolidated litigation
20   sort of took over, and I no longer organized those
21   meetings.  I attended as a member of the Executive
22   Committee, but I'm not the one that facilitated
23   them.
24        Q.   Okay.  For chronology purposes, you set
25   up, along with Mr. Escobedo, two or three

1    meetings--

2         A.   Yes.

3         Q.   -- in which you tried to get lawyers

4    that you knew were interested in this type of

5    litigation --

6         A.   Yes.

7         Q.   -- to share information and those sorts

8    of things; those are meetings that you organized

9    and Mr. Escobedo organized; is that correct?

10        A.   That is correct.

11        Q.   And this is before there was a Texas

12   consolidation?

13        A.   That's before there was a federal MDL, a

14   Texas MDL or anything.  I was just trying to get

15   good Texas lawyers together.

16        Q.   Very quickly, Ms. Snapka, did you have

17   an appointment to any other MDL in your

18   background?

19        A.   Yes.  I was liaison counsel and on the

20   Executive Committee of MDL -- the silicosis MDL

21   located in Corpus Christi.  I was appointed by

22   Judge Janis Jack.

23        Q.   And then we discussed, when the Texas

24   consolidated litigation was formed, you were first

25   notice counsel; Mr. Fibich took over when Judge

1    Wilson was appointed, but you remained active as

2    you've described; is that correct?

3         A.   That's correct.

4         Q.   All right.  Now, sticking with Texas

5    litigation for just a moment, at some point in

6    time, the issue of preemption came up before Judge

7    Wilson, and Judge Wilson granted preemption; is

8    that correct?

9         A.   Yes.  But that was further on down the

10   line in the spring of 2007.

11        Q.   All right.  But I just want to -- we are

12   a little bit short on time, and I just want to

13   make sure that we get some of these complexities

14   of Texas law --

15        A.   Yes, sir.

16        Q.   -- in front of Judge Juneau.  So Judge

17   Wilson preempted Texas litigation?

18        A.   Correct.

19        Q.   And so I think one of the examiners this

20   morning said that that essentially shut down Texas

21   litigation, and by and large, that's correct?

22        A.   Not for -- not for me.  Not for the

23   cases that I had.

24        Q.   I didn't ask about you, Ms. Snapka.

25        A.   Okay.

```
 1          Q.    Don't make me --

 2          A.    Okay.  I'm sorry.  Yes, by and large, it

 3     shut down the Texas consolidated litigation,

 4     correct.

 5          Q.    All right.  I'll ask the Master to

 6     declare you a hostile witness.

 7                It didn't shut down your litigation?

 8          A.    No.  I had two cases, because I had

 9     filed mine prior -- Judge Wilson had granted the

10     motion of Merck based upon some of the tort

11     reforms that went into effect September 1st, 2003.

12     Because I had both the Zajicek and the Eller cases

13     that were filed prior to the effective date of

14     that legislation, both of those cases were

15     actually excluded a long time earlier, and we were

16     working them up, taking depositions.  And as I

17     said, the very first MDL meeting we had here in

18     New Orleans, I think was in March, we reported

19     that Zajicek was set for trial in 2005.

20          Q.    So, in other words, because of your

21     early involvement and because you got these cases

22     on file --

23          A.    Yes.

24          Q.    -- early --

25          A.    Yes.
```

 1          Q.    -- you were able to continue to proceed
 2    and actually got trial settings in some of your
 3    cases?
 4          A.    That's correct.
 5          Q.    All right.  Now, I want to talk for a
 6    second about the -- your involvement in the
 7    federal MDL.
 8          A.    Yes, sir.
 9          Q.    Describe that in narrative form, how you
10    first became interested in it and what you did.
11          A.    When -- particularly, when the drug was
12    withdrawn from the market September 30th, 2004, I
13    knew that there would be a wave of litigation
14    because there were already good lawyers involved,
15    and I knew that there would be a lot of attention,
16    there would be a lot more -- probably would be an
17    MDL.  And the thing that I was very, very
18    cognizant of is, in order to properly represent my
19    clients, I needed to be involved.  I had the skill
20    set.  I had the -- I had tried what, at the time,
21    was the largest single plaintiff -- obtained the
22    largest single plaintiff verdict, before John
23    O'Quinn's, $56.5 million-dollar verdict in
24    Phen/Fen.
25                I was not involved in that MDL, and I

```
 1   decided that the next time I was involved in
 2   litigation for which there would be an MDL, I
 3   would -- I would be involved, because I think
 4   that's the best way to make the MDL better and to
 5   represent my clients.
 6        Q.   So what did you do to try to become
 7   involved?
 8        A.   I certainly -- even before the MDL was
 9   formed, as I indicated, I went to the JPML
10   hearings.  I attended the status conferences
11   initially, virtually all the status conferences.
12   I applied to be on the Plaintiff Steering
13   Committee, and I was not chosen.  I kept on coming
14   and participating.
15        Q.   All right.
16             SPECIAL MASTER JUNEAU:  Let me --
17             THE WITNESS:  Yes, sir.
18             SPECIAL MASTER JUNEAU:  You kept coming
19   to the hearings.  Was that by request or that was
20   your choice?
21             THE WITNESS:  Well, for a number -- for
22   a couple of reasons.  At those early status
23   conferences, the Zajicek setting was being
24   discussed.  The Garza motion for remand was before
25   Judge Fallon, and I continually urged that it be
```

 1   sent back so that we could go to trial.  The --
 2   because they were forming the MDL, we had already
 3   sent our discovery, the discovery that we had
 4   taken.  I think Mr. Birchfield had quite a bit of
 5   it, but we sent our discovery to Mr. Birchfield.
 6   He was going to be heading -- sort of heading up
 7   the discovery.  We had already sent it to him, and
 8   we continued to prosecute the cases.
 9   BY MR. URQUHART:
10        Q.   Why did you think it was -- to further
11   elaborate on Judge Juneau's question, why did you
12   think it was important for you or somebody from
13   your office, just in a general sense, to attend
14   the MDL status conferences?
15        A.   The judge does a tremendous amount of
16   work between the status conferences, at the status
17   conferences, and there is a huge amount that can
18   be learned.  Judge Fallon is also extraordinarily
19   generous with allowing anybody who has any
20   concerns to bring them forward at the status
21   conferences, and that's an opportunity that, if I
22   feel the need to, I can stand up, just as I did
23   many, many occasions.
24        Q.   I want to touch on something, and we may
25   come back to it.  But you were involved, were you

```
 1   not, in the preemption motion, responding to the
 2   preemption motion or dealing with the preemption
 3   motion, in the federal MDL; is that correct?
 4        A.   Yes, sir.
 5        Q.   Can you tell me -- tell all of us from
 6   your perspective about that involvement?
 7        A.   Yes.  In the summer of 2006, Merck filed
 8   a Motion for Preemption in two cases,
 9   Mr. Birchfield's case of Lena Arnold and a case in
10   which I was to be the lead counsel, Alicia Gomez.
11   The case was being handled for claims purposes by
12   the Campbell, Cherry firm out of Waco, but it was
13   to be tried by me, if, in fact, it were going to
14   be tried.  So when that preemption case -- the
15   preemption motion was filed, we started
16   immediately to brief and research the preemption
17   issues.  It's something that I have done before
18   and became involved.
19             At some point, Mr. Levin's firm called
20   me and said that they would take care of it, and I
21   said no -- that they would take care of
22   Ms. Gomez's claim, too.  I said no, she's my
23   client, and I have a responsibility to her, and
24   I'm going to be involved.  And they said, okay.
25   And if you look at the billing records of
```

 1   Mr. Levin's firm and my firm, there was a great
 2   deal of cooperation on the briefing, and what they
 3   decided was because the issues were joined as to
 4   the legal issues regarding preemption, and I would
 5   handle the factual issues on both cases.  What I'd
 6   like to do is --
 7        Q.    Hold on just a second --
 8        A.    Okay.
 9        Q.    -- and let me ask you:  How would you
10   describe your working relationship on the
11   preemption issue?  How would you describe it, your
12   working relationship with Mr. Levin and his group
13   in presenting the defense to the preemption
14   motion?
15        A.    It was a team effort.  Mr. Levin -- I
16   have the transcript of the preemption hearing that
17   was held on November 17th, 2006.  I came in on
18   November 16th.  We had put the finishing touches
19   on these issues.  We all went out to dinner.  It
20   was very cordial.  It was a team effort.
21             The next day, at the hearing, Mr. Levin,
22   after Judge Fallon invited counsel to make their
23   appearances, he says, Arnold Levin for the
24   plaintiff, Fred Longer, Lisa Dagostino, Elizabeth
25   Cabraser, Russ Herman, Kathryn Snapka, Chris

```
 1    Seeger, and Matt Moreland; I have all the troops
 2    with me.  And that's the way we worked together.
 3         Q.   Now, you're not detracting from any of
 4    the contributions that the other people made or
 5    attempting to say that you were responsible -- by
 6    the way, that defense was successful; preemption
 7    was defeated?
 8         A.   It was.  And my argument is found on
 9    page 28 of that transcript.
10         Q.   And that's actually -- let me find what
11    the -- exhibit number here is what I'm looking
12    for.
13         A.   I have it in case you'd like me to hand
14    it to Special Master.
15         Q.   You have the exhibit number?
16         A.   I do not have the exhibit number.  I
17    have the exhibit itself.
18              THE WITNESS:  Would you like to see it,
19    sir?
20              SPECIAL MASTER JUNEAU:  Let me see that.
21    BY MR. URQUHART:
22         Q.   Ms. Snapka, there was a -- you actually
23    filed an exhibit, and it's Exhibit No. 10, which
24    was your objection --
25         A.   Yes.
```

1          Q.    -- to the FAC recommendation, the final

2    FAC recommendation; is that correct?

3          A.    Yes.

4          Q.    And you had attached to that -- and

5    that's Exhibit No. 10, and you had attached to

6    that a number of things; is that correct?

7          A.    Yes.

8          Q.    And one of the things that you had

9    attached to that -- and it's also a separate

10   exhibit, and that's Exhibit No. 14 -- is the

11   transcript where you actually appeared for all of

12   the FAC members and made your fee allocation

13   presentation and answered questions.

14         A.    Yes, sir.

15         Q.    All right.  At that hearing -- and, of

16   course, the transcript will speak for itself -- or

17   at any other time, was there any criticism by

18   anyone, Mr. Levin, Mr. Birchfield, Mr. Herman,

19   Mr. Seeger, anyone?

20         A.    No.  And if I may, Master Juneau, I had

21   mentioned in my presentation about the selection

22   of Arnold and Gomez for preemption, and I say, we

23   had briefed quite a lot of it because my associate

24   had filed several responses in other cases, and

25   then we started to coordinate with your office,

1    Arnold -- meaning Arnold Levin.  I know I was very
2    protective because my feelings -- and Mr. Levin
3    said, it was your client.  I said, yes, it's my
4    client and my case, and I appreciate very much the
5    assistance, but I also appreciate the fact that I
6    was allowed to speak and certainly present the
7    facts.  Mr. Levin said, collectively, we did it.
8    And I responded, that's right; collectively, we
9    did it.
10        Q.    I want to talk very briefly about blood
11   sampling.
12        A.    Yes.
13        Q.    Can you tell me --
14        A.    Yeah.  How that relates --
15        Q.    -- about that?
16        A.    In the Zajicek case, Ms. Zajicek was a
17   33-year-old young mother of two, who had taken
18   Vioxx as a sample from -- that she had received
19   months earlier.  The husband had said he found it
20   on the table, the blister packet was open, it was
21   50 milligrams, and she had been taking it for a
22   few days prior because of an ankle injury.  She
23   died suddenly and, of course, we were very
24   concerned about the proof of use.
25             In prosecuting this case, I went and

```
 1   personally spoke with the pathologist who did the
 2   autopsy on Ms. Zajicek and explained to him that I
 3   was trying to relate it to Vioxx.  And the doctor
 4   said, well, did we run it for Rofecoxib, name for
 5   Vioxx.  And I said, I don't think so.  And he
 6   said, let's see if we have some retained blood
 7   samples.  So he called down to his laboratory.
 8   Sure enough -- and this was in September of
 9   2006 -- since years earlier, they had retained
10   blood samples, they ran the analysis, and they
11   found the Vioxx in her blood.  I was very excited
12   about this because --
13        Q.   Did you share that information?
14        A.   Absolutely.  And I gave --
15        Q.   Did that work to the common benefit?
16        A.   Yes.  Mr. Birchfield was very clear
17   about how there was actually a provision in the
18   settlement agreement that that was a way to prove
19   usage is either through -- either through the
20   prescriptions or if you proved it through the
21   laboratory testing that we did in Zajicek, and he
22   mentioned that in my presentation, that that was
23   very important, and there's a section in the
24   settlement agreement because of that.
25        Q.   And that, what you just told us, is
```

1    actually reflected in your presentation, which is

2    Exhibit No. 14?

3        A.    That's correct.  If I can find -- if I

4    can find that.

5        Q.    It's all right.  We'll see if they

6    contest it.

7              With regard to -- there are a couple of

8    other things.  Let me ask you about the

9    Extraordinary Injury Fund.

10       A.    Yes.

11       Q.    Did you play any role in the

12   Extraordinary Injury Fund?

13       A.    When the settlement was announced in --

14   in November of 2007, there was a provision for the

15   Extraordinary Injury Fund.  However, the way that

16   it -- the system was set up was that the people

17   who had these tremendously debilitating injuries

18   or effects would be reviewed by BrownGreer, and if

19   you disagreed with it, BrownGreer would review it

20   again.

21             I strongly felt that that was

22   insufficient to protect people who disagreed with

23   what BrownGreer did.  So I called Oren Brown, and

24   he said, that's something you need to take up,

25   because, you know, I can't change that.  And so at

 1    the hearing, at the status conference where the --
 2    the next status conference, I stood up and I said,
 3    we ought to be giving the same amount of due
 4    process -- because the Court had already described
 5    the common benefit process, about that there would
 6    be an appeal.  I said, we ought to be giving these
 7    extraordinarily injured people the same amount of
 8    due process that we give the other people.
 9            And so Judge Fallon thought that that
10    was a good idea and directed me to work with the
11    PSC to come up with a way to review these cases.
12    We met at Mr. Herman's office.  We worked out
13    issues of who would pay for it.  And, ultimately,
14    Special Master Juneau, you were charged with the
15    responsibility of hearing those extraordinary
16    injury appeals.
17        Q.   I also want to talk about the issue of
18    when the Master Settlement Agreement came out.
19    Did you have a question about whether or not the
20    Master Settlement Agreement had a provision that
21    would be acceptable for Texas lawyers?
22        A.   Yes.
23        Q.   Describe that for us.
24        A.   When the Master Settlement Agreement
25    came out, and, again, as I heard that was being

1    unrolled, what it said was that it required

2    attorneys to recommend to 100 percent of their

3    clients that they enroll in the settlement

4    program.  That language violates -- in my opinion,

5    violated the Texas Rules -- the disciplinary

6    rules.

7            I had a conversation -- I know that my

8    partner had a conversation with Mr. Blizzard on

9    the 12th, and I had a conversation with him, as

10   well.  I retained ethics counsel, along with

11   Mr. Tommy Fibich, and we had some meetings about

12   it.  And then what happened was the Texas

13   litigation consortium -- Vioxx litigation

14   consortium also had the same concerns, and because

15   they had so many more cases than I did, they ended

16   up sort of being the spokesperson for it, but I

17   spearheaded the ethics challenge, that is correct.

18      Q.   With regard to that ethics challenge,

19   was that also discussed with members of the Fee

20   Allocation Committee in the transcript that we

21   have already identified as Exhibit No. 14?

22      A.   Yes.  In two places, for sure.  The

23   first one was, if you look at -- on my

24   presentation, page 22, line 10, Mr. Herman said,

25   let me add what I said earlier today in another

1   presentation; first of all, through our
2   negotiations, Ed Blizzard was in the forefront,
3   particularly in terms of the Texas potential
4   ethics situation; there wasn't anything put on
5   paper without the retention of three ethics
6   experts and Lynn Baker actually along with two
7   other ethics experts drafted the language of the
8   agreement; once the agreement went into effect and
9   Judge Higbee, Judge Fallon and Judge Chaney looked
10  at it and it passed muster with them, the
11  collective feeling was not that the lawyers in
12  Texas were out of line in getting the ethics
13  opinions they needed to satisfy themselves and
14  their clients.  And Mr. Seeger said, I agree with
15  that, by the way; they talked about the meeting in
16  Atlanta; I was unable to attend it, but I know
17  that Vioxx litigation consortium did.
18          There was some more discussion.  And on
19  Page 24, Mr. Herman said, after the various points
20  were expressed, it not only had a good effect and
21  a better --
22          Q.   And he's talking about the --
23          A.   Ethics.  There was a re-interpretation
24  that reassured lawyers that they were to exercise
25  independent judgment in recommending this to their

1  clients.  The second part, by the way, required

2  that if somebody didn't sign it, you had to

3  withdraw, and even a member of the Fee Allocation

4  Committee disagreed with that.

5          In any event, Mr. Herman said, it not

6  only had a good effect and a better understanding

7  for Texas, but also for the country, because there

8  were other folks from other states that were

9  looking for a way to criticize, and they had sort

10 of latched on to this issue; when it was resolved

11 and the document was fully understood, it went

12 away for everybody.

13         Let me also refer to the statement made

14 to Walter Umphrey of the Vioxx litigation

15 consortium, if I may.

16     Q.   That's Exhibit No. 13?

17     A.   Exhibit No. 13, Page 96.  Because --

18 because I had -- they want to use the word

19 spearheaded.  Because I had raised this as an

20 issue, I was very interested to see how it was

21 treated with the Vioxx litigation consortium, as

22 well, since they had sort of taken the ball and

23 continued to run with it.

24         On page 96, line 17, Mr. Herman again

25 speaking:  I want to get back to the ethics thing

```
 1    that Walter mentioned.
 2              And this was the same one that I was
 3    talking about.
 4              This isn't our opportunity to pat
 5    ourselves on the back, but I think you should know
 6    that Ed Blizzard during the negotiation made
 7    everyone aware on the negotiating committee aware
 8    of the Texas Rules, and I think we had three
 9    ethics experts before anything was put on paper;
10    Ed was extraordinarily conscientious; we had
11    meetings; I don't even remember where we had the
12    meeting; we had a meeting where you brought in, I
13    think, Harry Potter --
14              Joked about his name.
15              But you brought in a couple of folks,
16    and, Walt, I thought that meeting was extremely
17    productive; I think it's important to know that
18    without resolving the special ethics agitation
19    that comes from Texas rulings, in light of trial
20    practice, it not only solved for Texas but it had
21    an impact in other jurisdictions, as well; because
22    there were lawyers that really were looking to the
23    Texas lawyers who were tag-alongs; they don't do
24    much -- I'm sorry.  They don't do very much, but
25    when they see some group of excellent lawyers come
```

```
 1   up with an issue, they immediately want to jump on
 2   it, and the fact that it was resolved to the
 3   satisfaction of your group had an impact beyond
 4   Texas; so I'm glad you brought that up; I don't
 5   think we would have recalled that contribution;
 6   actually, I think it was significant.
 7             Mr. Lanier also commented that, because
 8   he is a Texas lawyer, it made it possible for him
 9   to get involved -- to sign on to the settlement,
10   as well.  I can get that citation for you in just
11   a second.
12        Q.   So, essentially, both in your
13   presentation -- not essentially, but actually --
14   in both your presentation and in the presentation
15   that FAC made for fee allocation, Mr. Herman and,
16   in fact, Mr. Lanier in the consortium indicated
17   that this was a substantial benefit?
18        A.   I have the citation, page 90, line 13.
19   Mr. Lanier:  And probably helped a lot of other
20   Texas lawyers sign on even that had cases in New
21   Jersey, because I would be bound by Texas Rules in
22   New Jersey; that was a big help.
23        Q.   All right.
24             MR. URQUHART:  If I could approach, Your
25   Honor.
```

```
 1                    SPECIAL MASTER JUNEAU:  Sure.
 2                    MR. URQUHART:  I'm going to be looking
 3      at Snapka Exhibit 12, starting on page 45.
 4                    SPECIAL MASTER JUNEAU:  Thank you.  This
 5      is the Fee Allocation Committee's response to
 6      objections.
 7                    MR. URQUHART:  That's correct.  And,
 8      specifically, the provision that refers to
 9      Ms. Snapka.
10                    THE WITNESS:  Did you mean 45,
11      Mr. Urquhart?  You said 25, or I misunderstood
12      you.
13      BY MR. URQUHART:
14           Q.   It's page 45.
15           A.   Yes, sir.
16           Q.   As background, do you recall roughly
17      when you got the first what they call penciled-in
18      allocation from the Fee Allocation Committee, what
19      they penciled in for you as far as an allocation?
20           A.   580-something thousand.
21           Q.   All right.  You objected to that?
22           A.   Yes.
23           Q.   Or more properly, I guess I objected on
24      your behalf?
25           A.   Yes.
```

1    Q.   And what was the final allocation that
2  they gave you for the Garza case, the work you
3  were doing on trial-set cases in Texas, the work
4  you did in the Texas consolidation, the work you
5  did in the MDL, including blood sampling,
6  including working on the preemption issue,
7  including working on the Extraordinary Injury
8  Fund; for all of that, what sum of money did the
9  Fee Allocation Committee judge was a fair
10  allocation for you?
11    A.   $75,000.
12    Q.   I don't want to spend -- well, before we
13  go there, while we have this, let's just -- on
14  page 45.  When you received this reply from the
15  FAC, what was your general reaction to it?
16    A.   I was stunned.
17    Q.   Why?
18    A.   Because I had had a very cordial and
19  professional relationship during the entirety of
20  this litigation.  I had eaten and had a few drinks
21  with these folks on many occasions, and what was
22  in here was not only inaccurate, it was -- it was
23  sort of mean-spirited.
24    Q.   All right.  Let me deal with a couple of
25  things.  Starting on page 45:  The Snapka Law Firm

1  claims common benefit fees for work performed in
2  relation to the Texas MDL in Garza versus Merck
3  and Company; as noted above, the Snapka Law Firm
4  and Escobedo, Tippit requested that the Garza case
5  not be included in the Vioxx settlement program.
6          Now, we've already discussed that; is
7  that correct?
8          A.   It's not true.
9          Q.   It goes on to say that because the Garza
10 case resulted in neither contribution to the
11 common benefit nor to the body of work product
12 available for use by common benefit counsel, the
13 Fee Allocation Committee concluded that common
14 benefit fees are not warranted for the work
15 performed in relation to the case.
16         Now, here's my question:  There were
17 other cases, as we've discussed, that were tried
18 -- some of them lost; some of them won -- that
19 were excluded from the Master Settlement Agreement
20 when the Master Settlement Agreement came out; is
21 that correct?
22         A.   That's correct.
23         Q.   So far as you know, is Garza the only
24 case that was excluded from the Master Settlement
25 Agreement that was given no points and no credit

```
 1   for fee allocation purposes?
 2        A.   That is correct.
 3        Q.   So it was the only case -- they singled
 4   out the Garza case and didn't give it any common
 5   benefit credit, despite all of the documentary
 6   evidence you have in front of you and the
 7   statements made in Mr. Herman's affidavit that
 8   we've discussed that it was a part of the common
 9   benefit?
10        A.   That is correct.  It is also the only
11   case that was won that was tried by people who did
12   not sit on the Fee Allocation Committee.
13        Q.   All right.  Now, on page 46, the
14   paragraph that starts on that page, not the
15   continuation, but the gist of this is that they're
16   taking away the hours that you submitted for
17   Garza; is that correct?
18        A.   That's -- that's what I understand.
19        Q.   All right.  Just a brief thing, as far
20   as time is concerned, Ms. Snapka.  You are one of
21   those people that attempted to reconstruct your
22   time as allowed by Judge Fallon; is that correct?
23        A.   That is correct, and I am not a good
24   biller.  Yes, that's correct.
25        Q.   How did you generally -- and quickly,
```

```
 1   because we're --
 2        A.   It's really important to remember that
 3   the time reconstruction was due at the same time
 4   the claimants' claim packets were due.  That
 5   probably got the majority of my attention rather
 6   than reconstruction of my time records, but what I
 7   did was printed out an index to the e-mails, more
 8   than 15,000 e-mails that I had received, and tried
 9   to cull them and put them into -- into some sort
10   of form to reconstruct my bills.  I also relied
11   on -- to some extent with the Garza matter to --
12   on Mr. Escobedo's reconstruction.
13        Q.   To kind of compare --
14        A.   Yes.
15        Q.   -- what they were doing, like a phone
16   call to you?
17        A.   Right.  If they said they talked to me,
18   then I talked to them.
19        Q.   Nonetheless, with regard to your hours,
20   there was an accounting firm that was supposed to
21   look at them and approve them.  So far as you
22   know, did the accounting firm approve them?
23        A.   So far as I know, yes.
24        Q.   Even in this FAC reply, is there a
25   suggestion here that the hours were not correct;
```

1   they just took away the Garza hours and some other

2   things?

3       A.   Right.  My emphasis has never been on

4   hours spent.

5       Q.   With regard to your time submission,

6   however, Ms. Snapka, and there's a cover letter

7   that you've explained things.  The only time that

8   you actually included was what?

9       A.   Attorney time.  My legal -- the

10  principal legal assistant had left to go into

11  another profession.  I didn't believe that I could

12  reliably reconstruct what legal secretary -- I'm

13  sorry -- legal assistant, secretarial time, clerk

14  time might be, so I only included only my hours,

15  and my associate reconstructed hers.

16      Q.   All right.  Now, back to this document

17  again.  The next paragraph says:  Since the

18  inception of the MDL, when she was denied a

19  position on the Plaintiff Steering Committee,

20  Ms. Snapka's mode of operation has been to work

21  against the common benefit effort, not for it.

22           You met with most of these people, and

23  until you read that, did any of them ever say

24  anything like that?

25      A.   No.  No.  This was -- I mean, this is

```
 1   the first I heard of it.
 2        Q.   It says, at a time when the Court was
 3   seeking cases to be tried as bellwether cases in
 4   the MDL, in seeking lawyers willing to try them,
 5   Ms. Snapka persistently sought to remand the Garza
 6   case.
 7             Now, first of all, were you ever asked
 8   to try an MDL case, and if you had been asked,
 9   what would you have said?
10        A.   I was -- I was not asked to try an MDL
11   case, and I would have loved to try an MDL case.
12        Q.   Now, with regard to the comment that you
13   persistently sought remand of the Garza case,
14   we've discussed that.
15        A.   It's 100 percent true.
16        Q.   And why did you want to do that?  So you
17   could get a trial?
18        A.   It was trial-ready.  We knew the case.
19   We were ready to go.
20        Q.   You went to trial, and your trial team
21   got a big verdict?
22        A.   Yes, sir.
23        Q.   Merck stock fell?
24        A.   Merck stock fell as a result of it.  It
25   had an effect on the defendant.
```

1          Q.    At that time, it was reported in "The
2    New York Times" that the litigation was rolling in
3    the way of the plaintiffs, there were five cases
4    that had been tried, three of them had resulted in
5    plaintiffs' verdicts; is that correct?
6          A.    That's correct.
7          Q.    Since that time, since you tried the
8    Garza case, apparently, there were some 13 cases
9    tried and defendants won all but two.
10         A.    The Barnette case, which was the last
11   case tried in federal court late in '07, was a
12   win, and I'm trying to remember the other one;
13   Humeston 2, maybe.
14         Q.    Roughly correct?
15         A.    Yes.
16         Q.    In other words, when you tried the case,
17   the score was three wins for the plaintiffs out of
18   five cases, and then if we just look at batting
19   average, things go way down after that; is that
20   correct?
21         A.    Yes.  I believe that's correct.
22         Q.    Ms. Snapka then successfully sought to
23   have the Garza case excluded from the global
24   settlement.
25         A.    I didn't know about the global

1    settlement.  It was presented to me.  No.

2        Q.    So that's just an incorrect statement?

3        A.    That's an incorrect statement.

4        Q.    Throughout the course of the litigation,

5    Ms. Snapka repeatedly advised the plaintiffs'

6    liaison counsel, that would be Mr. Herman, that

7    she did not want to work cooperatively with the

8    PSC; when Merck selected Ms. Snapka's case as

9    one --

10           Well, let me just -- we'll deal with

11   that separately.

12           Throughout the course of this

13   litigation, Ms. Snapka repeatedly advised -- that

14   would be Mr. Herman -- that she did not want to

15   work cooperatively with the PSC.  True or false?

16       A.    I did work cooperatively.  We -- we

17   provided everything we had.  I was on programs to

18   disseminate information with the very people who

19   are on the Fee Allocation Committee, so that's

20   just not true from my standpoint.

21       Q.    When Merck selected Ms. Snapka's case as

22   one of two cases in which to seek to obtain the

23   statute of limitations ruling with broad

24   application, Ms. Snapka refused to cooperate with

25   the PSC, but, rather, insisted on presenting the

```
 1   matter herself in her own way.
 2            Now, about that one, this says, when
 3   Merck selected Ms. Snapka's case as one of two
 4   cases to seek to obtain a statute of limitations
 5   ruling, first of all, that's just absolutely
 6   wrong.
 7        A.   That's incorrect.
 8        Q.   It was a preemption issue; is that
 9   correct?
10        A.   Correct.  That's correct.
11        Q.   And then it goes on to say that you
12   refused to cooperate with the PSC, but, rather,
13   insisted on presenting the matter herself and in
14   her own way.
15        A.   That is -- the evidence shows that that
16   is not the case.  The billing records show
17   cooperation.  The statements of Mr. Levin show
18   cooperation.  If it were true, then I'm
19   responsible for the preemption ruling, but that's
20   not the case.  I didn't present it myself and in
21   my own way.  I presented it as part of a team, and
22   that's exactly what Mr. Levin said; I was -- his
23   troops were there.  I was one of his troops.
24        Q.   Next page.  On the global settle -- once
25   the global settlement was reached, Ms. Snapka
```

```
 1   sought to sabotage the entire effort by
 2   spearheading an empty ethics challenge.  Now,
 3   that's the same challenge, apparently, that ends
 4   up being complimented -- your being complimented
 5   during your presentation to FAC and the VLC being
 6   complimented by FAC members.
 7        A.   That is correct.  That is what we just
 8   read to the Special Master.
 9        Q.   Ms. Snapka, I'm going to move to this
10   one.  It says, at every step of this litigation,
11   Ms. Snapka has objected vociferously in an effort
12   to improve her own lot; such efforts should not be
13   rewarded, particularly at the expense of firms who
14   strove mightily to work cooperatively for the
15   common good.
16             Now, that's a mighty strong statement.
17   What was your reaction to that?
18        A.   I don't understand it.  I don't
19   understand it.  It just seems that's -- when I
20   said it's mean-spirited, that's kind of
21   mean-spirited.
22        Q.   If you look at your interview by the
23   FAC, and if we just look at that, is there any
24   reasonable interpretation -- and all the FAC
25   members were there; is that correct?
```

```
 1          A.    Yes.

 2          Q.    Is there any reasonable interpretation

 3    where anyone indicated that that was their opinion

 4    of you?

 5          A.    No.  When we talk about a transparent

 6    process, the underpinning of a transparent process

 7    is also honesty.  I presume that when

 8    Mr. Birchfield and Mr. Herman and Mr. Levin were

 9    commenting positively, certainly when Mr. Herman

10    was swearing in an affidavit as to the effect of

11    my participation, I thought that's the way they

12    felt.  I don't -- I don't and -- I didn't and I

13    don't understand this.

14          Q.    All right.  I want to tread gingerly on

15    this Stratton issue here, but let me clarify one

16    thing that I think is very important.  At the end

17    of page 48 of FAC's reply -- are you there?

18          A.    I am.

19          Q.    The FAC writes:  The Fee Allocation

20    Committee also noted that while all other

21    applicants, except Becnel, contributed to the

22    Common Benefit Fund at a rate of 6.5 percent,

23    Snapka contributed at only 4 percent.

24                Is that a factually correct statement?

25          A.    No.
```

```
 1          Q.    What's the truth?

 2          A.    The truth is that the 8 percent that was

 3  withheld from the Snapka Law Firm cases is still

 4  being withheld.   There's a whole long story

 5  associated with that, but that statement is not

 6  true.

 7          Q.    All of your cases were settled under

 8  the -- all of your cases were settled under the

 9  MSA?

10          A.    That is correct.

11          Q.    And they were -- and your assessment was

12  8 percent?

13          A.    That's correct.

14          Q.    Most people paid 6.5 percent?

15          A.    After the -- after the judge's ruling,

16  yes, that's correct.

17          Q.    You're still at 8 percent?

18          A.    That's correct.

19          Q.    And they say you only paid 4 percent.

20  That's just flat wrong?

21          A.    That's wrong.

22          Q.    Now, you did get a check in the mail

23  from Mr. Stratton?

24          A.    That's correct.

25          Q.    And that would be Exhibit No. 16?
```

```
 1          A.    That's correct.

 2          Q.    Pardon me.  Exhibit No. 15.

 3          A.    Yes, No. 15.

 4          Q.    All right.  If you look at Exhibit

 5   No. 16, that was the cover letter; is that

 6   correct?

 7          A.    That's correct, yes.

 8          Q.    Again, I'm treading gingerly here, but

 9   with regard to this letter, did it make any sense

10   to you at all?

11          A.    None whatsoever.

12          Q.    Did you ever authorize Mr. Stratton to

13   settle anything on your behalf?

14          A.    I have never spoken to Mr. Stratton

15   regarding -- I think I talked to him one time

16   about a completely different issue about six

17   months before.  I never spoke to Mr. Stratton

18   about an objection.

19          Q.    All right.

20          A.    He had no -- he had no authority to act

21   on my behalf, and I didn't talk to him.

22          Q.    Did you try to follow up on that?

23          A.    I have tried, again because of -- from

24   the inception of the litigation, I have tried,

25   and, in fact, I tried to talk to Mr. Herman about
```

1    it and sent him an e-mail which he very quickly
2    said, he's not going to talk to me.
3        Q.   Ms. Snapka, to this day, do you know
4    what the deal actually was between Mr. Birchfield,
5    Mr. Herman, Mr. Seeger and Mr. Stratton?  Do you
6    really know what the deal was?
7        A.   All I know is what has been sent to me,
8    what the e-mails have been, what the transcript of
9    the proceedings was, what the filing by
10   Mr. Stratton the next day was, and I know what
11   Judge Fallon said in court on February 17th, that
12   he had no knowledge of it.
13       Q.   When the fee -- final fee allocation
14   came out, besides your number being only $75,000,
15   was there something else about that fee -- final
16   fee allocation that just jumped out at you?
17       A.   Other than the fact that it was
18   extraordinarily low, and out of all the plaintiffs
19   counsel who had tried winning cases, the others
20   were monumentally higher.
21       Q.   What about the amount, the aggregate
22   amount of the money?
23       A.   Oh, when -- on January -- I was out of
24   town.  On January 21st, when the allocations were
25   published by the Court, I asked my office, I said,

```
1    go ahead and add it up.  It should be 315 minus
2    the 18 and a half that's reflected in the
3    transcript that apparently got paid out.  It
4    wasn't.  It was 311 million.  It didn't add up.
5    In other words, the fact that that amount of money
6    was transferred out didn't make any sense, and it
7    was at that point that I, you know, was throwing
8    up my hands, because I had no idea what was going
9    on.
10        Q.   Now, you're criticized by the FAC for --
11   that they say you overdramatized your approach to
12   Judge Fallon at the status conference when you
13   asked Judge Fallon about the agreement between
14   Mr. Herman and Mr. Seeger and Mr. Birchfield, on
15   one hand; Mr. Stratton, on the other hand.
16        A.   For one thing, it was not a status
17   conference.  I, in fact, asked to see the judge
18   because I was extremely troubled by what was on
19   the record, what was not on the record, and the
20   transcript that had been sent to me.  And I had
21   asked to see Judge Fallon with -- either with
22   Master Juneau, with representatives, but I didn't
23   necessarily want it to be in court.  It was not a
24   status conference.  It was an objectors'
25   conference in any event.  I still to this day
```

1    don't exactly know what happened to be able to
2    negotiate on behalf of people you haven't -- you
3    haven't communicated with, how the three lawyers
4    involved can make that agreement, how the person
5    the next day can say -- can give a completely
6    different reason for withdrawing the objection.
7    Nowhere is there reflected the real reason, not by
8    the Fee Allocation Committee or the leadership or
9    anybody who knew about it.  There's no order that
10   permits a transfer of funds, and when I get a
11   check that says "Full and Final Vioxx Fee" in the
12   memo line, I'm certainly not going to cash it.
13        Q.   Now, Ms. Snapka, again, this is -- the
14   litigation has had a long history.  You've had a
15   lot of contact with these folks.  We've kind of
16   gone over some of the highlights of what FAC said,
17   trying to justify paying you $75,000 for all of
18   your work.
19             I'm now going to ask Mr. Arceneaux to
20   play a brief recording.  Can you tell us what this
21   is from?
22        A.   It was an AHA meeting in Puerto Rico.  I
23   was not there.  And it was in January of 2008.  My
24   understanding of the context was that Mr. Herman
25   was describing the resolution at that time.  And,

1   again, I wasn't there, but I was told about it.  I

2   obtained a copy of it, and this is what he said.

3                    (Recording played.)

4   BY MR. URQUHART:

5        Q.   As far as the general tenor of your

6   relationship with Mr. Herman and really with all

7   of these other folks that, unfortunately, are

8   adversary in the context of this allocation, does

9   the statement Mr. Herman made more comport with

10   your impressions, or is this an aberration of some

11   sort?

12        A.   Up until I saw what was in writing from

13   the FAC's response -- and I continue -- although I

14   don't really understand, I continue to consider

15   these people my friends.  I speak to them.  I

16   shake their hand.  I'm cordial.  I'm professional.

17   Up until I received this response, what you heard

18   -- and he wasn't trying to be nice to me because I

19   was there, because I wasn't there.  What you heard

20   is consistent with the positions that have been

21   taken all along in this litigation.

22        Q.   Right.  I just want to make one thing --

23   because I'm sure it will be a subject of -- well,

24   I'm not sure.  It may be a subject of examination.

25               What have you asked for?  And give me

1     the context in which you have asked for it.

2          A.   We were required to put a number down,

3     and that was in the absence of knowing what

4     everyone else's number was.  A fundamental tenet

5     of fairness is that like amount be paid for like

6     work.  I didn't know what other lawyers were being

7     recommended by the Fee Allocation Committee.  We

8     initially put down the sum of $31 million for both

9     Hockema -- Hockema, Tippit, Escobedo and Snapka

10    law firms.  If you want me to go through how we

11    got to that, I can -- anyway, when I had -- and we

12    still didn't know what individual firms were being

13    recommended.  And so without any guideposts to say

14    whose work I was similar to or comparable to, I

15    put down the sum of $12 million.

16         Q.   With regard to the ultimate sum of money

17    that you are entitled to, what is your feeling

18    about the approach that should be taken?

19         A.   As I said, fundamental fairness dictates

20    that like reward be given for like work, and I

21    think that whatever is recommended for other

22    people who tried litigation in state courts and

23    were successful ought to be treated similarly.

24         Q.   Thank you.

25              SPECIAL MASTER JUNEAU:  All right.  If

```
 1   we --
 2          MR. URQUHART:  Take a break?
 3          SPECIAL MASTER JUNEAU:  Sure.  I'm going
 4   to take a five-minute break.  This is the last
 5   witness we have today.  It's been my experience
 6   after 40-something years of the practice of law,
 7   recesses result in a longer trial.  What I'm going
 8   to do is take a five-minute break and have
 9   Mr. Blizzard conduct his examination so we can
10   conclude this witness, unless there's some
11   compelling reason to --
12          MR. WEITZ:  No.
13          SPECIAL MASTER JUNEAU:  Five minutes.
14   Off the record.
15                    (Recess.)
16          SPECIAL MASTER JUNEAU:  All right.
17   Mr. Blizzard?
18          MR. BLIZZARD:  Yes.  May it please the
19   Court.
20                    *  *  *
21              CROSS-EXAMINATION
22   BY MR. BLIZZARD:
23      Q.   Kathy, as I did with Mr. Escobedo, I'd
24   like to just for formality refer to you as
25   Ms. Snapka during the examination.  Is that fine
```

1   with you?

2        A.    That's fine, Mr. Blizzard.

3        Q.    And we've known each other since back in

4   the Phen/Fen days, haven't we?

5        A.    Since before that, sir.

6        Q.    All right.  And in the Vioxx litigation,

7   you've objected to the recommendation of the Fee

8   Allocation Committee, and that's what we're here

9   today about, correct?

10       A.    That is what we're here today about.

11  That's correct.

12       Q.    But this is not the first time in the

13  litigation that you've objected to something, is

14  it?

15       A.    No.  We covered -- we covered that.

16       Q.    Right.  You were the -- I think what you

17  said was you spearheaded an objection to the

18  settlement, right?

19       A.    The first time that I ever used the word

20  "spearhead" is because that was what the Fee

21  Allocation Committee said, is I spearheaded a

22  legal ethics challenge.  To the extent that we had

23  a conversation on the Monday after it was

24  announced and I had grave concerns, maybe that's

25  where the spearheading came from.

```
 1          Q.    Okay.  Well, did you also say here today
 2    that the Vioxx Consortium just picked up the ball
 3    and ran with the ball that you had already
 4    advanced?
 5          A.    I think they had the same concerns.
 6          Q.    So --
 7          A.    And they were contemporaneously -- we
 8    ended up talking about it.
 9          Q.    Well, you understood from the outset of
10    the announcement of the settlement that that
11    settlement agreement had been reviewed by Judge
12    Fallon?
13          A.    Yes.
14          Q.    And all three of the state court judges
15    where the cases were consolidated, correct?
16          A.    I do.
17          Q.    And you understood that they had
18    absolutely no qualms with approving it, right?
19          A.    I understand that, yes, sir.  I
20    understand that.
21          Q.    And they didn't raise any ethical
22    challenges, did they?
23          A.    They did not.
24          Q.    They didn't raise any ethical concerns,
25    did they?
```

1      A.    They -- I don't know if they did or not.

2      Q.    And you knew that we, as a negotiating

3  committee, had three different ethics experts

4  review all of the provisions of the settlement,

5  correct?

6      A.    That is correct.

7      Q.    And you knew that one of them was Lynn

8  Baker, who was a law professor at the University

9  of Texas who specifically specializes in ethics in

10 complex litigation and in mass settlements, right?

11     A.    I recall our conversation very well,

12 Mr. Blizzard.

13     Q.    And you recall that Ms. Baker had

14 indicated not only -- not only did I indicate it

15 to you, but Ms. Baker in later presentations

16 presented to groups of lawyers the fact that she

17 was involved in the drafting of the language and

18 that the language met all ethical rules?

19     A.    On November the 12th, 2007, you said,

20 Lynn Baker's opinion letter should be on the

21 website tomorrow.  That's correct.

22     Q.    Okay.  So you knew that a Texas lawyer

23 teaching at the University of Texas said it was

24 okay?

25     A.    That's correct.

```
 1          Q.   You didn't accept that?

 2          A.   I have an obligation to every client

 3    that I represent, and I did not believe that a

 4    requirement imposed upon me by a contract to

 5    recommend to every single client, even the ones

 6    where it might not be appropriate, I did not

 7    believe met the ethical guidelines.

 8          Q.   Did you consider it to be acting

 9    cooperatively to try to take down the settlement

10    that could potentially benefit thousands and

11    thousands of people?

12          A.   I didn't intend to take down the

13    settlement.  I intended to find out what was meant

14    by, you have to recommend this to 100 percent of

15    your clients, and if one doesn't want to go along,

16    you must withdraw.

17          Q.   Well, there was nothing unique to Texas

18    about these ethical concerns, in quotes, right?

19          A.   I didn't -- I didn't think so.  That

20    came out actually during the presentations to the

21    Fee Allocation Committee, when they said it helped

22    the Texas concern.

23          Q.   Okay.  Well, tell me -- what specific

24    provision of the Code of Professional

25    Responsibility is it that this presents this
```

1    ethical concern?  What's the provision?

2         A.   I can't call the number of the

3    provision, but I have never entered into a

4    settlement with any defendant where I represented

5    more than one -- more than one person which

6    prevents me from exercising independent judgment.

7         Q.   Has Texas -- has Texas adopted the ABA

8    model rules on professional responsibility?

9         A.   We follow them.

10        Q.   Have they specifically adopted them in

11   1989?

12        A.   Yes.  The model rules of professional

13   conduct?

14        Q.   Model -- the ABA model rules of

15   professional conduct were adopted by Texas in

16   1989, true?

17        A.   Yes.

18        Q.   Okay.  So what I understood you to have

19   done, after being told that we, as a negotiating

20   committee, had thoroughly vetted this issue with

21   ethical experts, you went out and hired another

22   one, right?

23        A.   I consulted counsel, because I had

24   concerns about -- about exercising my duty to my

25   clients.

1    Q.   So you didn't ask to speak to the one

2    that we had retained in a cooperative fashion; you

3    went out and hired one to oppose the ethics

4    expert, right?

5    A.   What you told me, Mr. Blizzard, was,

6    don't worry, Kathy; it's all fine; this has been

7    fully vetted by Lynn Baker.  My response to you

8    was, I don't care who vetted it; I can't be

9    dictated as to what I recommend to a client.

10   Q.   Okay.  So you didn't ask to speak to

11   Lynn Baker?

12   A.   I did not, no.  She already wrote an

13   opinion.

14   Q.   Have you worked with her on other cases?

15   A.   I have not worked with Lynn Baker on

16   other cases.

17   Q.   Okay.  So after you retained this

18   additional expert, what change was made to the

19   agreement that would satisfy you?

20   A.   There was a -- and let me back up a

21   little bit, because there were two parts to it.

22   The first one was that you must recommend this

23   agreement -- to participate, you must recommend

24   this agreement to 100 percent of your clients.

25   The second part was, if there was a client who did

```
 1   not want to go into the program, you were no
 2   longer free to represent them; you had to
 3   withdraw.  What --
 4        Q.   Can we --
 5        A.   If I can finish.
 6             SPECIAL MASTER JUNEAU:  Sure.
 7   BY MR. BLIZZARD:
 8        Q.   Sure.
 9        A.   This got a whole lot of press in the
10   days following, because I think there were other
11   people, as well, who had questions.
12   Interestingly, Perry Weitz of Weitz & Luxenberg
13   was quoted on November 17th -- after Mr. Lanier
14   said that if a client says, Lanier, I don't want
15   to take the settlement, I'll say you need to find
16   another lawyer, Perry Weitz, who is on the Fee
17   Allocation Committee -- he says, my personal
18   representation of each client and the ethical duty
19   I owe them is my priority, he wrote in an e-mail
20   to the Journal; if Merck doesn't accept that, then
21   I'll see them at trial.  So the position that I
22   was taking on that matter was very -- was
23   identical to Perry Weitz.
24        Q.   That's a very interesting answer, but it
25   wasn't my question.  My question was:  What change
```

```
 1   was made that satisfied you?
 2        A.    There was a -- there was -- I'm trying
 3   to use the words Mr. Seeger used -- a
 4   clarification which said that there is nothing in
 5   the agreement that would relieve you of your
 6   independent judgment in dealing with a client.
 7   And I'm sure you have it up there and you can read
 8   it, but that's the -- as Mr. Seeger pointed out
 9   repeatedly, the agreement wasn't changed; there
10   was language added that explained it.
11             MR. BLIZZARD:  Leigh, can we put up the
12   original agreement, please?
13   BY MR. BLIZZARD:
14        Q.    Okay.  So is this the provision that you
15   had ethical concerns about?
16        A.    That's correct.
17        Q.    Okay.  Now, the withdrawal provision,
18   which we don't have up there -- the withdrawal
19   provision always said from the outset that you
20   could withdraw only to the extent you could --
21        A.    With court approval.
22        Q.    -- as permitted by your ethical rules,
23   right?  So it was limited by the ethical rules;
24   you couldn't withdraw if that would be unethical.
25        A.    I never believed it was enforceable
```

```
 1   anyway, that particular provision.
 2        Q.    Okay.  So then that wasn't a concern for
 3   you, right?
 4        A.    It concern -- the whole thing sort of
 5   concern -- the whole ethical issue concerned me,
 6   but there was no way anybody was going to make me
 7   withdraw, just like Mr. Weitz said.
 8        Q.    Okay.  So let's put up the section that
 9   clarifies it.  So the clarifying language is, each
10   enrolling counsel is expected to exercise his or
11   her independent judgment in the best interest of
12   each client individually before determining
13   whether to recommend enrollment in the program,
14   correct?
15        A.    You read it correctly.
16        Q.    Okay.  So when you read the first
17   section here, wasn't it implicit to you that, as a
18   lawyer, you'd be using your independent judgment
19   in the best interest of your clients in
20   recommending whatever you were recommending?
21        A.    It was not.
22        Q.    Well, don't you in every case and don't
23   you expect every lawyer in every case to exercise
24   independent judgment in the best interest of their
25   clients?
```

```
 1        A.   I would hope so.  However, in a
 2   conversation of November the 12th, 2007, what you
 3   said was, if the agreement is available only to
 4   counsel who recommend 100 percent of their clients
 5   to enroll in the program, that the clear intent,
 6   for this to be final and the end of Vioxx; that
 7   is, there shouldn't be a Vioxx round 2, is what
 8   you said.
 9        Q.   So did I suggest to you that you
10   couldn't exercise your independent judgment?  Is
11   that your point?
12        A.   No.  It was, I think, a way to attempt
13   to ensure as much compliance as possible.
14        Q.   And you recommended, too, that -- you
15   also objected to the EIF provisions of the
16   settlement, correct?
17        A.   Yes, I did.
18        Q.   And you are claiming --
19        A.   Actually, I didn't -- I didn't object to
20   them.  What I said was, that -- are they up there?
21        Q.   No, it's not up there.
22        A.   No.  I -- what I said was, that I
23   thought there ought to be more due process.  It
24   was a suggestion for improvement.  I didn't object
25   to that portion.
```

1      Q.    You stood up in open court and said you
2  didn't like it, right?
3      A.    Well, let me find out exactly what I
4  said.
5      Q.    Well, I don't need exactly what you
6  said.  I'm just saying, did you note your
7  disapproval?
8      A.    What I said was that I thought there
9  ought to be another way to review it.  It's not
10 that I disapproved it.  I thought it was great.  I
11 think Mr. Seeger is the one who actually added the
12 extraordinary injury provision, if I was told
13 correctly.  I just thought that it could be made
14 better.
15     Q.    Okay.  And you're claiming that you
16 should be paid for that, right?
17     A.    To the extent that I improved for -- the
18 global settlement for everybody involved --
19 particularly, for those people who suffered
20 extraordinary injuries, I think I made it better,
21 and, yes, that's part of my claim.
22     Q.    Okay.  And part of your claim is that
23 you improved the settlement and you should be paid
24 for the common benefit for the ethical issue?
25     A.    Absolutely.  To the extent that I was

1    complimented -- that Walter Umphrey -- the
2    specific references that said it made everybody --
3    Mr. Lanier saying it helped me, Mr. Herman's
4    comments that it helped other people around the
5    country achieve full participation, yes.
6        Q.   So you're saying that putting in the
7    language that lawyers are to exercise their
8    independent judgment confirms -- conferred a
9    common benefit that you should be paid for?
10       A.   According to Mr. Lanier and Mr. Herman,
11   that's a common benefit.
12       Q.   I'm asking about you.  How much money do
13   you think is attributable that you ought to be
14   paid for that common benefit that you conferred?
15       A.   It depends on what other similar work on
16   the global settlement agreement obtains.
17       Q.   Okay.  Well, do you have in mind similar
18   work done by somebody else who voiced objection to
19   this?
20       A.   I -- I don't.  What -- what has been
21   lacking in this is, I cannot figure out how this
22   system works and what was attributed -- how much
23   money was attributed for each thing.  What -- what
24   Judge Fallon has said from the beginning and what
25   the Fee Allocation Committee did seems to be two

```
 1   different things.
 2        Q.   Mr. Lanier, as of the time of the --
 3   well, I'll strike that.  I'll let Mr. Lanier speak
 4   for himself.
 5             So the EIF claim; do you know how many
 6   appeals there actually were?
 7        A.   I do not.
 8        Q.   Less than 100.  Do you know how many
 9   claims were filed?
10        A.   I don't.  I know Mr. Juneau would know
11   because he was responsible for those, but I don't
12   know.
13        Q.   Do you know how many decisions
14   BrownGreer on the IEF were actually overturned?
15        A.   I do not know.
16        Q.   Okay.  Now, in addition to voicing
17   concerns about the settlement, you also objected
18   to the proposal of the PSC to assess 8 percent as
19   common benefit, right?
20        A.   And that's what I would like to talk
21   about, because from the very beginning, in
22   November of 2005, I had attempted to confer with
23   the Plaintiff Steering Committee regarding
24   assessments.  At that time, we didn't know what
25   the assessment would be.  There was an agreement
```

```
 1   for 2 percent, and I was attempting -- I reserved
 2   my rights when I signed it, and I had been
 3   attempting to speak with the Steering Committee.
 4   I was unable to.  I wrote Mr. Herman.  He wrote me
 5   back and said he would agenda it.  I asked him
 6   repeatedly, and then he said, it's not time; it's
 7   not time; it's not time; it's not time.
 8        Q.   I'm sorry.  Now I'm confused.  You say
 9   that you asked Mr. Herman to talk about your --
10   the common benefit assessment?
11        A.   That's correct.
12        Q.   Or your common benefit fees?
13        A.   No, no.  The common benefit assessment.
14   If you give me one moment, --
15        Q.   Are you talking about this e-mail that
16   you sent Mr. Herman?
17        A.   No.  No, I'm not.
18        Q.   Well, you referenced an e-mail exchange
19   that you had with Mr. Herman where you said, I
20   tried to meet with Mr. Herman and he refused to
21   meet with me.  Do you recall that?
22        A.   I do.  It's a different e-mail.
23        Q.   You didn't try -- you didn't try to talk
24   with Mr. Herman about the Stratton issue; you
25   wanted to talk to Mr. Herman about your common
```

1    benefit fee, right?

2         A.   Not about the Stratton issue, because I

3    didn't know about the Stratton issue.  All I knew

4    about Stratton was that the judge had appointed

5    Stratton, that there were depositions that went

6    on, and then that Stratton filed a letter saying,

7    oh, because the Plaintiff Steering Committee had

8    reduced their request to 7.5 percent, we no longer

9    have an objection.

10        Q.   Okay.  Well, I'm asking you about your

11   testimony earlier that you tried to meet with

12   Mr. Herman and Mr. Herman refused.  Do you recall

13   that?

14        A.   I do.

15        Q.   And you referenced an e-mail, right?

16        A.   What I said was there was a story with

17   it, but, yes, that was part of it.

18        Q.   Right.  And the e-mail that you

19   referenced is up on the screen here.

20             Dear Russ, with all the activity

21   relating to common benefit, I would like to meet

22   with you related to my, as well as Hockema and

23   Escobedo's potential common benefit fee.

24             That's what you were trying to meet with

25   him about, right?

1     A.    As well as what I had sent in initially
2 in November of 2005.
3     Q.    Okay.  It says -- and Russ writes back
4 in response, says, cannot meet on this; Judge
5 Fallon will instruct Fee Committee on process;
6 every common benefit attorney already had
7 opportunities to submit info and give oral
8 testimony; I am sure Judge Fallon will give clear
9 guidance in addition to his prior statement.
10        So he didn't refuse to meet with you; he
11 told you that there was process involved, right?
12     A.    His word was, cannot meet on this.
13     Q.    Right.  Because you had already had your
14 official meeting with the Committee, right?
15     A.    That's what -- that's what the e-mail
16 says.
17     Q.    And you've been arguing for
18 transparency.  You were trying to back door Russ
19 here, weren't you?
20     A.    No.
21     Q.    You were trying to meet with Russ
22 privately about your and Escobedo's and Tippit's
23 fee, right?
24     A.    I was trying to meet with him to discuss
25 the original assessment that I had sent to him.

```
 1           Q.    Well, private meetings with Mr. Herman
 2     about the common benefit fee to be awarded to each
 3     attorney are not part of this process, are they?
 4           A.    According to Mr. Birchfield's testimony
 5     on Friday, they were, because they reached some
 6     kind of private agreement that was never on the
 7     record.
 8           Q.    This was dated in August of 2010,
 9     correct?
10           A.    That's correct.
11           Q.    Okay.  This is before the Fee Committee
12     issued its recommendations, right?
13           A.    Yes.  The Fee Committee issued its
14     recommendations in December.
15           Q.    Okay.  So before the Fee Committee
16     issued its recommendations and after you had
17     already had your formal presentation and submitted
18     all of your hours, you asked for this meeting?
19           A.    That's correct.
20           Q.    Do you blame Mr. Herman for saying no?
21           A.    I would have liked for him to sit down
22     and talk to me so that I could -- I had an
23     objection that had been preserved since November
24     of 2005.
25           Q.    Nevertheless, you objected to the PSC's
```

```
 1   recommended assessment of 8 percent, right?
 2        A.   I filed a letter that said, yes, I'm
 3   tagging along with PLC.
 4        Q.   In fact, from the outset of this
 5   litigation, you wanted special treatment, didn't
 6   you?
 7        A.   I wanted to be recognized for the
 8   contribution that I had made, just like the FAC
 9   did when they negotiated with Merck and put
10   8 percent in.
11        Q.   But you wanted special treatment; you
12   didn't want to have to pay any common benefit fee,
13   correct?
14        A.   When we initially went in, Joe Escobedo
15   said, why do we have to pay anything -- and that
16   gets back to what I was talking about -- why do we
17   have to pay anything if we're giving them all our
18   stuff.
19             From the experience in Phen/Fen
20   litigation, there were some very high fees that
21   were charged, and we didn't know if that initial
22   letter that was sent in or any objection
23   subsequent was going to have any effect on the fee
24   allocation process.  It's never been mentioned by
25   Judge Fallon ever, and any directive that he has
```

 1    said is either how much you've put in, how many
 2    cases you've had.  That's never been a criteria.
 3    I wanted to clarify that.
 4         Q.   Well, I'm specifically talking about the
 5    time frame of November of 2005.
 6         A.   That's right.
 7         Q.   And that was before the trial of the
 8    Garza case, wasn't it?
 9         A.   That's exactly right.
10         Q.   Right.  And you actually were sending in
11    your fee participation agreement?
12         A.   Correct.
13         Q.   And in this letter, you say, I do not
14    wish to cause any problems; while I'm returning my
15    signed participation agreement, I respectfully
16    request because of my unique situation an
17    exemption from the fee agreement, correct?
18         A.   That's correct.
19         Q.   So from the outset of this litigation,
20    from the time that there was an MDL and your
21    involvement, you had asked that you not pay any
22    common benefit fee, right?
23         A.   Initially, we had wanted to talk to the
24    PSC about it.  What happened was Mr. Herman wrote
25    me a letter dated November 20th saying, Dear

```
 1   Kathryn, I am in receipt of your letters of
 2   November 2nd and 3rd, 2005.  I will agenda this
 3   for a PSC call.  This is the letter --
 4              MR. URQUHART:  Your Honor, can I ask
 5   that we identify that as an exhibit?
 6              SPECIAL MASTER JUNEAU:  Excuse me.  I
 7   just didn't hear what you said.
 8              MR. URQUHART:  Can I ask that we
 9   identify that as --
10              MR. BLIZZARD:  She's adding the exhibit.
11              SPECIAL MASTER JUNEAU:  You want her to
12   identify what she's reading from?
13              MR. URQUHART:  Or can we mark it as an
14   exhibit?
15              MR. BLIZZARD:  I haven't seen it yet,
16   but --
17              SPECIAL MASTER JUNEAU:  It would be your
18   exhibit, I guess.
19              MR. BLIZZARD:  Can they do that on
20   re-direct?
21              SPECIAL MASTER JUNEAU:  No.  She can --
22   you can identify it.
23              THE WITNESS:  Okay.
24              SPECIAL MASTER JUNEAU:  And if you want
25   to put that in, that's fine.
```

```
 1  BY MR. BLIZZARD:
 2       Q.   So my question is not what happened.  My
 3  question is:  From day one, you asked to be
 4  exempted from common benefit, right?
 5       A.   Mr. Blizzard, what happened -- the
 6  substance of what happened is critical.
 7       Q.   Well -- well, maybe we'll get to what
 8  happened when your lawyer asks you questions.
 9       A.   Okay.
10       Q.   When I'm asking you questions, I'm just
11  saying, your position was you shouldn't be charged
12  any common benefit fee?
13       A.   I wanted to be able to talk to the PSC
14  about what that should be.
15       Q.   Your letter doesn't say that.  Your
16  letter says, I shouldn't have to pay a fee, right?
17       A.   And to the extent that they used Garza
18  materials, the Garza trial transcript and
19  everything that we did, I wanted to be able to
20  clarify it.
21       Q.   Well, in November of 2005, was there a
22  Garza trial transcript?
23       A.   No.  There were Garza depositions, tons
24  of Garza depositions.
25       Q.   Right.  And did you take any of them?
```

```
 1          A.    I did not.  I was trial counsel.
 2          Q.    And we'll get to Garza in a minute.
 3          Now, more recently, have you, in
 4   connection with the Stratton objection, been an
 5   objector to resolving objections?
 6          A.    I don't understand the question.
 7          Q.    Well, do you understand that Stratton
 8   was liaison counsel for a group of objectors,
 9   including yourself, who objected to the
10   recommendation of 8 percent?
11          A.    I understand that Stratton was
12   appointed.
13          Q.    Right.  You knew -- it's not a secret
14   about it; he was the liaison counsel for all the
15   objectors, including yourself?
16          A.    That's correct.
17          Q.    And you have objected as part of -- and
18   Judge Fallon is going to take care of it, but
19   you've object to resolving that objection with
20   Stratton.
21          A.    No.  I don't understand what you're
22   saying.
23          Q.    Okay.  So you -- haven't you filed a --
24   pleadings, joined in pleadings, and been the
25   instigator of allegations that Mr. Herman,
```

1   Mr. Birchfield and Mr. Seeger committed a fraud on

2   the Court?

3       A.   No.   That was done by Mr. Arceneaux and

4   Ms. Woodward.

5       Q.   And you haven't joined in any of those

6   pleadings?

7       A.   I -- I think that we -- they speak for

8   all of the objectors.

9       Q.   Including yourself?

10      A.   They have made those allegations.   All I

11  know is what occurred.   I have no idea what

12  happened.

13      Q.   You actually filed papers asking Judge

14  Fallon to enter an order saying that that transfer

15  to settle the Stratton objections was

16  unauthorized; you filed a motion on that; your

17  lawyer --

18      A.   Yes.

19      Q.   -- filed a motion on that, didn't he?

20      A.   Yes.   And Judge Fallon confirmed on

21  February 17th.

22      Q.   No.   He didn't sign that order, did he?

23  He didn't sign the order that you asked him to

24  sign.

25      A.   No, you're right.   He didn't sign the

1    order.  What he did was, he explained in open

2    court -- when I asked about it, he said -- he

3    recited sort of the history of it, and he said,

4    there's no order, because I didn't know anything

5    about it.

6         Q.   I'm not asking about that.  I'm asking

7    about you asked for an emergency hearing and asked

8    that the judge enter an order saying that that

9    transfer of money from BrownGreer was

10   unauthorized.

11        A.   And the reason for it --

12        Q.   I'm not asking you for the reason now.

13   I'm asking you if the motion got filed.

14        A.   The motion got filed.

15        Q.   And the order was proposed?

16        A.   The order was proposed.

17        Q.   And the judge didn't sign the order, did

18   he?

19        A.   The judge did alternate relief, yes.

20        Q.   He didn't enter an order saying that

21   this was an unauthorized transfer, did he?

22        A.   He did not enter that order.  He -- he

23   ordered other relief.

24        Q.   Do you think it's a serious allegation

25   to say that co-lead counsel and liaison counsel

```
 1   have committed a fraud on the Court?
 2       A.   I didn't say that.
 3       Q.   Do you think that?
 4       A.   I have no -- until I know what exactly
 5   went on -- I don't know if they told Mr. Stratton,
 6   just go ahead and file a letter that gives an
 7   incorrect reason for the withdrawal of the
 8   objection.
 9       Q.   Well, --
10       A.   I don't know why they didn't correct it.
11       Q.   Well, you've actually stood up in open
12   court and told Judge Fallon in February of 2011
13   that you were confused, right?
14       A.   I'm -- yes, absolutely.
15       Q.   That you had received a check in the
16   mail for $336,000, and you were confused?
17       A.   That's correct.
18       Q.   You actually had a letter that enclosed
19   that check that I saw for the first time
20   yesterday, right?
21       A.   Yes.
22       Q.   And that letter is dated September 2nd,
23   2010, right?
24       A.   That's correct.
25       Q.   And that's the letter that enclosed the
```

```
1   check, right?
2        A.   That's correct.
3        Q.   And the first paragraph of the letter
4   says precisely what that $336,000 is for, doesn't
5   it?
6        A.   I understand what -- what the words say.
7   I don't exactly know what they mean, because I
8   never saw -- I didn't know what that check was.
9        Q.   Well, it says -- it's the first words of
10  the letter.  It says, as you know, right?
11       A.   That's what the first three words are.
12       Q.   A number of objections were filed as to
13  the common benefit fee assessment of 8 percent;
14  fortunately, we have been able to substantially
15  reduce that assessment; as objectors' liaison
16  counsel, we are pleased to enclose your rebate
17  check from the 8 percent initially assessed
18  against your aggregate Vioxx case settlements,
19  right?
20       A.   That's what it says.
21       Q.   Okay.  So in the first paragraph of the
22  letter, Mr. Stratton, as liaison counsel, informs
23  you what the check is for, right?
24       A.   He -- he informed me what the check is
25  for.  I guess that was his intent.
```

```
 1          Q.    That's September, right?

 2          A.    That's correct.

 3          Q.    Was there a status conference in

 4   September?

 5          A.    Yes.  September the 28th, two

 6   thousand -- I'm sorry.  No, there was not.

 7          Q.    Okay.  How about in October?

 8          A.    October the 7th.

 9          Q.    Okay.  Did you attend it?

10          A.    Yes, I did.

11          Q.    Did you raise any issue about this in

12   October?

13          A.    No.  I had communication with

14   Mr. Stratton because I was trying to find out what

15   it was.  And, no, I didn't raise it at that time.

16          Q.    Did you file any pleadings accusing

17   anybody of fraud?

18          A.    No.

19          Q.    And did you join in any pleadings

20   accusing anybody of fraud?

21          A.    No.

22          Q.    Did you raise any issue about this in

23   November?

24          A.    No.

25          Q.    Did you raise any issue about it in
```

1    December?

2         A.    No.

3         Q.    At any time, did you call

4    Mr. Birchfield, Mr. Herman or Mr. Seeger and say,

5    hey, I got a problem because I don't think this

6    Stratton is speaking for me here?

7         A.    No, I didn't.

8         Q.    Did you call anybody besides

9    Mr. Stratton and complain about anything relating

10   to this until the Fee Allocation Committee made

11   its recommendation?

12        A.    Other than my lawyer?

13        Q.    You had a lawyer at that time?

14        A.    Yes, I did.

15        Q.    Okay.  So other than your lawyer and

16   Mr. Stratton, you had no communication with anyone

17   about this Stratton issue during 2005, right?

18        A.    2010 is what you need to say,

19   Mr. Blizzard.

20        Q.    Sorry.  2010.  Right?

21        A.    My former partner had communication with

22   him.  I think that was it.

23        Q.    Okay.  As far as you know, did your

24   lawyer contact anybody on the Steering Committee

25   to ask about it?

```
 1        A.    No.
 2              SPECIAL MASTER JUNEAU:  Mr. Blizzard, is
 3   this document an exhibit?  Are you going to
 4   introduce it?
 5              MR. BLIZZARD:  I'm sorry.  It is an
 6   exhibit.  It is Exhibit 27.  I'm sorry.
 7              MR. URQUHART:  16.
 8              MR. BLIZZARD:  It's Exhibit 16.  And the
 9   previous exhibit was also -- that was Exhibit 27.
10   That was the letter in November of 2005 regarding
11   the exemption -- requested exemption from the Fee
12   Committee.
13              SPECIAL MASTER JUNEAU:  Is this your
14   exhibit?
15              MR. BLIZZARD:  No.  This was
16   Ms. Snapka's exhibit.
17              SPECIAL MASTER JUNEAU:  Okay.  That's
18   what I thought.  I just wanted to confirm it.
19   BY MR. BLIZZARD:
20        Q.    Now, as -- I want to talk to you briefly
21   about the time you've submitted.  You indicated
22   that your request is for $12 million.
23        A.    That is the number that I put down.
24   That's correct.
25        Q.    And that you have -- you have submitted,
```

```
 1   roughly, 3,000 hours, correct?
 2       A.    Roughly 3,000 hours, that's correct.
 3       Q.    So your lodestar rate, if we were to do
 4   a pure lodestar analysis, as argued for in the
 5   objectors' papers, would be $4,000 an hour, right?
 6       A.    I have no idea.  My -- I believe --
 7             SPECIAL MASTER JUNEAU:  Would be what,
 8   sir?
 9             MR. BLIZZARD:  $4,000 an hour.
10   BY MR. BLIZZARD:
11       Q.    Right?
12       A.    I don't know.  If that's the math,
13   that's the math.  I don't believe that the hours
14   that I put in reflect the effect that I've had on
15   the litigation.
16       Q.    Okay.  So you would be opposed to pure
17   lodestar analysis?
18       A.    That's correct.
19       Q.    Okay.  So you don't believe a pure
20   lodestar analysis is the appropriate approach
21   here, right?
22       A.    For lawyers who tried and won cases, I
23   don't -- I don't believe that that's the proper
24   approach.
25       Q.    Are you proposing a different approach
```

1    for people who tried and won cases versus people

2    who didn't try a case versus people who tried a

3    case and lost a case?

4         A.   I'm not speaking for anyone else.  I'm

5    only speaking for myself.

6         Q.   Okay.  So the methodology that you would

7    utilize to arrive at your $12 million would be

8    what?

9         A.   To compare it to similar work done.  In

10   other words, we can -- we have lawyers who tried

11   cases outside the MDL and were successful in

12   getting both compensatory and punitive damages at

13   or about the same time that we tried Garza.  We

14   know what they got, and I would think that between

15   the two trial teams, at least as far as the Garza

16   case is concerned, that it should be something

17   comparable.

18        Q.   Okay.  What -- who is the -- I mean,

19   have you identified lawyers who have done

20   comparable work, tried a case like the Garza case,

21   who you say --

22        A.   Yes.

23        Q.   And who would that be?

24        A.   Obviously, the first case that was tried

25   outside the MDL was the Ernst case.  It was an

1    extremely important case in that it was the first,
2    in that it had a huge punitive damage component.
3    It was also tried in Texas.  It was tried in
4    August of 2005.  Mr. Lanier's recommendation was
5    $27 million.  He also tried two additional cases.
6    Those were -- he tried the Cona portion, but the
7    McDarby case is the one that I think is also very,
8    very similar.
9              The Weitz & Luxenberg firm tried the
10   McDarby case.  They had a client who had lots and
11   lots of risk factors, just like Mr. Garza.  They
12   tried it in state court.  And, of course, the --
13   it's very clear that the state court cases are
14   supposed to be considered from the -- from
15   everything we have, both New Jersey, Texas,
16   California state court cases.
17             We actually started the Garza case in
18   January of '05.  They started the McDarby case
19   after that, but because of our trial schedule,
20   going once a month, they ended the McDarby case in
21   April.  I think it was April the 6th they obtained
22   a verdict in McDarby.  Our verdict in Garza was
23   April 21st of 2005.  They received, I think,
24   20 million as a recommendation.
25        Q.   So you're comparing your contribution to

1   the common benefit to Mr. Lanier and to Mr. Weitz;

2   is that right?  You think that's totally fair?

3       A.   I think that the Garza trial that has

4   been cited by Mr. Herman in his sworn affidavit

5   should be compared in a comparable way with the

6   Ernest trial and the McDarby trial, as Mr. Herman

7   did.

8       Q.   Okay.  I mean, those were lawyers who

9   were leaders in their respective jurisdictions,

10  right?

11      A.   Well, --

12      Q.   Weren't they?

13      A.   In the -- I'm trying to remember.  I

14  know that Ken Soh was on the Steering Committee

15  for the Texas litigation.

16      Q.   All right.  Independent of that, I'm

17  asking whether Mr. Lanier was a leader in the New

18  Jersey litigation and nationally.

19      A.   Certainly.  Mr. Lanier is a --

20           SPECIAL MASTER JUNEAU:  Just a minute.

21  Go ahead.

22      A.   Certainly.  Mr. Lanier as being involved

23  early as we were and being -- having one of the

24  first cases tried and going to New Jersey.  I'm

25  not familiar with the state court litigation in

```
 1   New Jersey as I am Texas.
 2   BY MR. BLIZZARD:
 3        Q.   Okay.  Well, those -- and the Weitz,
 4   Luxenberg firm was a leader in the New Jersey
 5   litigation, right?
 6        A.   That's my understanding.
 7        Q.   And they not only tried cases; they took
 8   depositions in scores of cases, right?
 9        A.   Yes.
10        Q.   And Mr. Lanier was involved with three
11   trials, right?
12        A.   Yes.
13        Q.   And the --
14        A.   But I think --
15        Q.   -- New Jersey case got affirmed on
16   appeal, right?
17        A.   And we got reaffirmed on appeal.
18        Q.   You got remanded for a new trial, didn't
19   you?
20        A.   Yes.  But the causation was affirmed.
21        Q.   Well, that doesn't help you if you got
22   to retry the case, does it?
23        A.   It's a whole lot better than losing.
24        Q.   It's better than losing, but the case
25   was reversed, and you have to try the case again,
```

```
 1   right?
 2         A.    Depending on what the Supreme Court
 3   does.
 4         Q.    Well, and you heard Mr. Escobedo on the
 5   witness stand the other day.  He said that they
 6   were going to lose in the Supreme Court.  You
 7   disagree?
 8         A.    Mr. Blizzard, I have no idea.  We --
 9   actually, to go into the jury issue, there's a --
10   we have a point that Merck should have done more
11   to discover that particular juror, and it's
12   conceivable that they could affirm.
13         Q.    Right.  The reason that that case was
14   reversed and remanded was because of juror
15   misconduct, correct?
16         A.    No.  It was not juror misconduct.  It
17   was a juror issue.
18         Q.    Well, that was the finding, right?
19         A.    It was a juror issue.
20         Q.    Right.  The plaintiff had loaned money
21   to a juror, right?
22         A.    That's correct.  That was the issue.
23         Q.    So that -- you've put in a bunch of
24   exhibits praising the verdict and holding it up in
25   a good light.  There was a lot of negative
```

```
 1    publicity about that verdict, as well, relating to
 2    this juror misconduct, correct?
 3        A.   I don't -- I think it was reported, but
 4    I don't recall a lot of negative publicity.
 5        Q.   It's not good for plaintiffs lawyers or
 6    their clients for there be proof that a juror
 7    received loans from the plaintiff, is it?  That it
 8    wasn't disclosed by either the juror or the
 9    plaintiff, that's not a good -- that's a black eye
10    for plaintiffs, isn't it?
11        A.   I don't really call it a -- what we're
12    here to talk about is what inspired Merck to
13    settle.  Based on what Mr. Herman swore to, Garza
14    had an effect.
15        Q.   Well, you've been talking about how --
16    the wonderful effect that Garza has had.  It
17    wasn't all peaches and cream, was it?
18        A.   In my opinion, anytime you get a
19    32 million-dollar verdict, that's helpful to the
20    plaintiffs' cause generally.
21        Q.   Well, actually, a verdict coming out of
22    Starr County -- on a national level, Starr County
23    is known as a plaintiff's jurisdiction, isn't it?
24        A.   It is a plaintiff-friendly jurisdiction.
25    That's correct.
```

```
 1          Q.   Right.  So a verdict coming out of Starr
 2    County, Texas, is not the same effect as a verdict
 3    coming out of Judge Fallon's court, is it?
 4          A.   According to the stock reports, the
 5    stock dropped, so it had an effect.
 6          Q.   I'm asking you, as an experienced
 7    pharmaceutical lawyer, in terms of its persuasive
 8    value, verdict from Judge Fallon's court versus
 9    verdict from Starr County, which one has more
10    persuasive value?
11          A.   I think you'd have to ask the
12    pharmaceutical defense lawyers.
13          Q.   You can't give me a straight answer to
14    that one?
15          A.   Sir, you're asking me what effect do I
16    think it has on a pharmaceutical company?
17          Q.   Yes, yes.  What do you think it --
18    effect it has on Doug Marvin advising his client,
19    Merck?
20          A.   I think what they would generally say,
21    which is what they were talking to us about before
22    the case went to trial, is they want to settle it
23    because it looks bad.
24          Q.   Yeah.  And --
25          A.   Plaintiffs verdicts just look bad.
```

```
 1          Q.   Right.  And a juror taking a loan from
 2     the plaintiff looks bad, too, doesn't it?
 3          A.   I suppose so.
 4          Q.   Okay.  Now, in Garza, we heard from
 5     Mr. -- let me just back up.  Are you really just
 6     saying you suppose so?  Is that all you can say
 7     about it?
 8          A.   If you want to get into the details of
 9     the voir dire, this is something that had happened
10     a long time ago prior -- I mean certainly prior
11     to -- it's not like they loaned money during the
12     trial.  We had asked the juror how do you know
13     Mrs. Garza.  The juror said, I know her from work.
14     Anything about that that would --
15          Q.   The juror had owed Mrs. Garza money at
16     that time.  Let me drop that and go on to
17     something else.
18               Let me talk about your work on Garza.
19     Garza wasn't your case, right?
20          A.   Initially, it was not my case.
21          Q.   Right.  And you said something -- I
22     guess maybe this was just a misstatement.  You
23     said, at the beginning of the Garza case, but you
24     weren't at the beginning of the Garza case, were
25     you?
```

```
 1          A.   I don't know the context.  Did I say at
 2   the beginning of the Garza trial?
 3          Q.   You said at the beginning of the Garza
 4   case.
 5          A.   I was not at the beginning of the Garza
 6   case, no.
 7          Q.   You didn't take any of the depositions?
 8          A.   I did not.
 9          Q.   You didn't present any witnesses for
10   deposition?
11          A.   No.
12          Q.   You were not first chair?
13          A.   In the Garza trial team -- I'm certainly
14   listed first on appearances for plaintiff.  I was
15   not --
16          Q.   Does that make you first chair?
17          A.   They generally put the lead lawyer down.
18   I was not the lead lawyer.  I was not the second
19   chair.  I was not the third chair.  It was a trial
20   team that was equally divided.
21          Q.   Okay.  So rather than arguing about
22   this --
23          A.   Which, by the way --
24          Q.   You didn't have a financial interest in
25   the case?
```

```
 1           A.    I did not.

 2           Q.    Who gave the opening statement?

 3           A.    Mr. Escobedo.

 4           Q.    Who gave the closing argument?

 5           A.    Mr. Hockema and Escobedo.

 6           Q.    You put on -- did you put on the widow?

 7           A.    I did not.  Mr. Escobedo did.

 8           Q.    You put on a couple of the adult

 9    children, right?

10           A.    I did.

11           Q.    And then you put on a case-specific

12    cardiologist?

13           A.    That's correct.

14           Q.    And crossed the pathologist?

15           A.    That's correct.  The case-specific

16    pathologist.

17           Q.    Okay.  And that was in a four-week

18    trial?

19           A.    That's correct.

20           Q.    Those were the extent of the witnesses

21    you had?

22           A.    That I had, that's correct.  I was

23    prepared to do -- to do Dr. Reicin and, I think,

24    Briggs Morrison.

25           Q.    Yeah.  I understood -- I was a little
```

1    confused by your testimony, saying something about

2    you obviously wouldn't be distracted by

3    Ms. Reicin.  You're not suggesting, are you, that

4    male lawyers could not effectively cross-examine

5    her because they were distracted?

6        A.   What was explained to me when I was

7    doing my research on Dr. Reicin was that she

8    was -- she is very charming; she is hard to

9    attack, because you don't want to look like you're

10   beating up on a woman.  I don't have -- I don't

11   have that problem.  I can cross-examine women

12   without any issue.

13       Q.   Well, I didn't cross her; my partner

14   did, but I wouldn't describe her as charming.

15       A.   That's the way she was described to me.

16       Q.   Okay.  So it's based upon your -- the

17   description of her that you heard of her being

18   charming that suggested to you that maybe that you

19   would be a more effective cross-examiner than some

20   male?

21       A.   I didn't just say charming.  She was

22   well-spoken and a very effective witness.

23       Q.   Okay.  Now, back to lodestar for a

24   moment.  The $4,000 an hour, if you use the

25   12 million-dollar figure and 3,000 hours and you

1    multiply it into, at $4,000 an hour -- you're not

2    saying that there's any -- that you've ever

3    charged a client $4,000 an hour on an hourly

4    basis?

5         A.   I have not.

6         Q.   Okay.  And you're not saying that that's

7    a comparable rate for lawyers of your experience

8    in Corpus Christi, Texas?

9         A.   It is not.

10        Q.   Okay.

11        A.   Let me also say that there -- my

12   understanding of the submission of time was that

13   we were supposed to stop November 9th, 2007, and

14   not count any additional hours.  I continued to

15   participate, as we've -- as we've discussed.  I

16   also -- I found tons of stuff I didn't count, so I

17   don't think those are complete.

18        Q.   All right.  Now, you've submitted time

19   on the Benavidez case, correct?

20        A.   I did.  That may have been rejected.  I

21   don't know.

22        Q.   Okay.  It was never tried, correct?

23        A.   No.  Benavidez was -- as I explained in

24   the cover letter, it was -- it was a weak case.  I

25   didn't intend to say Eller was, but Benavidez

1   certainly was.

2        Q.   Okay.  So it was never tried, never set

3   for trial.  Are you withdrawing your time for

4   Benavidez, or are you just explaining it at this

5   point?

6        A.   I don't think that my -- that the common

7   benefit realized by the litigation was advanced by

8   Benavidez.  It was an early case to the extent

9   that people had early cases.

10       Q.   Okay.  So you don't think there was a

11   common benefit conferred by the Benavidez time?

12       A.   Probably not.

13       Q.   You also submitted time on Gomez,

14   correct?

15       A.   Absolutely.

16       Q.   Okay.  That was the case where Merck

17   filed a motion for summary judgment on the basis

18   of preemption, right?

19       A.   That's correct.

20       Q.   In that case, the preemption brief was

21   prepared by Levin, Fishbein, correct?

22       A.   If you look at the submissions by both

23   my firm and Arnold Levin's firm, there was

24   cooperation in production.

25       Q.   Have you looked at your time records on

1    this?

2         A.   Yes.  My associate, Anita Shahani,

3    submitted time for that.

4         Q.   All right.  And she submitted how much

5    time for doing research on preemption?

6         A.   I do not know.

7         Q.   Five hours is what I counted.  Is that

8    right?

9         A.   Probably.  Because we were using

10   preemption briefs that we had already done in

11   another case, and I did not want to submit time

12   inaccurately.

13        Q.   Well, did you see where she -- how much

14   time she submitted for drafting?

15        A.   No, sir.

16        Q.   Okay.  It's 1.5 hours.  And it says,

17   factual portion of the brief, right?

18        A.   Yes.  That's when -- when Mr. Levin and

19   I spoke, we agreed that he would do the preemption

20   legal briefing and that we would present the

21   factual.

22        Q.   Okay.  So -- this was a 59-page brief,

23   wasn't it?

24        A.   I believe that's correct.

25        Q.   It was an important issue, correct?

1          A.    Critical issue.

2          Q.    And Mr. Levin's firm spent untold hours

3   on this brief, right?

4          A.    Not untold.  They have hours that they

5   submitted.

6          Q.    A lot more than you, correct?

7          A.    Absolutely a lot more.

8          Q.    Right.  And not only them, but Lisa

9   Dagostino from the Kline & Specter firm spent a

10  lot of hours on the factual portion of the brief,

11  correct?

12         A.    I don't know how many she submitted on

13  the factual portion of the brief.

14         Q.    You know she did significant work on it,

15  don't you?

16         A.    Yes, I do.  We met with her.

17         Q.    Do you see that there's a time entry on

18  this document -- these are part of your time

19  entries that were submitted -- that deals with the

20  factual portion of the brief?

21         A.    Yes.  I don't think that accurately

22  reflects the time.

23         Q.    Well, what was reported here is

24  preliminary drafting of factual portion of the

25  brief, an hour and a half, and review and drafting

1    factual portion of the brief, 1.75 hours, right?

2         A.   If that's what it says.  I don't believe

3    that's accurate.

4         Q.   So that's a total of a little over three

5    hours on briefing on this preemption issue, right?

6         A.   That's what's listed.  I don't believe

7    that it's accurate.

8         Q.   Well, I mean, is there anything else

9    listed here that relates to that?

10        A.   I -- honestly, I can't see.  If nothing

11   else is listed, then -- then I'll take your word

12   for it.  I don't believe that -- my time

13   submission, as I state in the cover letter, is

14   extraordinarily conservative.  I'm trying to

15   recreate what happened back in July.  I don't

16   think it's accurate.

17        Q.   Okay.  Well, let's make sure we have the

18   facts straight.  Your contribution to the

19   preemption brief was your client -- it was your

20   client's case; the motion was filed, right?

21        A.   That's correct.

22        Q.   You were actually co-counsel in that

23   case with Zollie Steakley, a trial lawyer from

24   Waco, Texas, right?

25        A.   I was to handle any motions, hearings or

```
 1    trial.
 2         Q.    Right.  But you were co-counsel with
 3    him?
 4         A.    I was trial counsel.
 5         Q.    And so they filed the summary judgment
 6    motion in your case in 2006, correct?
 7         A.    That's correct.
 8         Q.    And you actually, whatever the -- you --
 9    your work was on describing the factual scenario
10    of your particular plaintiff, right?
11         A.    No.  It was -- it was both.  If you'd
12    like to read the -- I presented for Lena Arnold,
13    as well.
14         Q.    Well, okay.  Hold on.  I'm talking about
15    in the briefing now.  Your involvement in the
16    briefing dealt with presenting the facts of your
17    individual client's case, right?
18         A.    We submitted the facts of our client's
19    case.
20         Q.    You did not make a substantial
21    contribution on the briefing related to the
22    preemption issue, the legal preemption issues,
23    right?
24         A.    I disagree, but --
25         Q.    Well, who prepared the preliminary
```

1  draft -- the first draft of the preemption brief,

2  who prepared that?

3      A.   In my office?

4      Q.   No, no.  Who sent -- didn't you get a

5  draft from Fred Longer at the Levin, Fishbein firm

6  of the brief in an e-mail where he said, give me

7  your signature block?

8      A.   That was -- that was way down the road.

9  The initial one -- which, if you look at

10  Mr. Levin's time submission, there's a

11  conversation that -- in his time submission that

12  he has with Kathy Snapka in July of 2006.

13      Q.   But he doesn't -- he doesn't say you

14  prepared the initial brief, does he?

15      A.   No.  But you're confusing the time

16  frames.

17      Q.   I'm just trying to find out who took the

18  laboring oar on the legal issue of preemption.

19      A.   Eventually, Mr. Levin did.

20      Q.   Okay.  And he was the one -- his firm

21  prepared the brief and argued the legal issue of

22  preemption, right?

23      A.   We prepared our brief.  It was

24  coordinated with his law office, and we presented

25  it collectively.

1      Q.    You're saying you had a separate brief

2   that you filed?

3      A.    We didn't have a separate brief that we

4   filed.  We were preparing it.  Then Mr. Levin

5   contacted me, and he said, you know, we're going

6   to do this.  And I said, no; if something were to

7   go wrong, how would I explain to my client that I

8   turned their case over to somebody else.  And I

9   said, I'm going to be involved.  And he said,

10   that's fine; do the factual briefing and the

11   argument.

12      Q.    Okay.  So now do we have straight that

13   what you did was the factual briefing?

14      A.    I presented the facts of both Lena

15   Arnold and Alicia Gomez.

16      Q.    Okay.  So you stood up in front of Judge

17   Fallon, and you said this is -- this is who

18   Ms. Gomez is, and this is how -- what kind of

19   heart attack she had, and this is the effect on

20   her life, right?

21      A.    And for Mr. Birchfield's client.

22      Q.    Right.  They were able to turn that over

23   to you, right?  They were comfortable turning that

24   part of the argument over to you?

25      A.    I think you have to ask Mr. Levin.  He

```
 1   described it as I was one of the troops --
 2              SPECIAL MASTER JUNEAU:  Counsel, the
 3   fact that she argued must have been -- everybody
 4   consented that she would take the factual part of
 5   the case is what I'm hearing, and somebody else
 6   did the preemption.
 7              MR. BLIZZARD:  I'll move on.
 8              SPECIAL MASTER JUNEAU:  I understand
 9   that.
10              MR. BLIZZARD:  I'll move on.
11   BY MR. BLIZZARD:
12        Q.   The Nettles case, you also submitted
13   time on that?
14              Let me back up and ask on the preemption
15   case:  You submitted time for 2005 on the Gomez
16   case even before the preemption issue came up,
17   right?
18        A.   I would have to look at the time
19   submission on the Gomez case.  Again,
20   Mr. Blizzard, I'm not -- my time submission is a
21   minor part of what my effect on this litigation
22   was, in my opinion.
23        Q.   Well, I'm just asking you whether you've
24   submitted time on the Gomez case, and you said
25   it's because of the preemption issue, but,
```

1    actually, you submitted time before the preemption
2    issue, right?  This is time in 2005, correct?
3        A.    Can you tell me the date, sir?
4        Q.    It looks like it says January
5    the 20th of 2005, January 21st, 2005.
6        A.    That is correct.
7        Q.    Telephone conference with Zollie
8    Steakley involving reporter attempting to
9    interview Alicia Gomez?
10       A.    Yes.
11       Q.    You submitted that as common benefit
12   time, correct?
13       A.    I think it was recorded somewhere.  Yes,
14   that's correct.
15       Q.    Okay. And that's before the --
16             MR. BLIZZARD:  Thank you, Mark.
17   BY MR. BLIZZARD:
18       Q.    That's before the --
19       A.    Yes; the preemption issue, yes.
20       Q.    Okay.  So this wasn't really a common
21   benefit; this shouldn't have been submitted as
22   common benefit, should it?
23       A.    An hour and a quarter.  You can take an
24   hour and a quarter off.
25       Q.    Well, I don't have time to go through

 1   all of your time records with you.  Have you gone

 2   through all of your time records to carefully only

 3   submit common benefit time?

 4       A.   I -- at the time we submitted the common

 5   benefit hours, we were also attempting to file the

 6   claim packets because there was a deadline.  I was

 7   trying mightily -- I think your firm submitted

 8   secretarial, legal assistant time.  I didn't.  I

 9   was trying to do the best I could to coordinate to

10   get my time submission in.

11       Q.   Okay.  So have you, as of today,

12   carefully reviewed it to make sure only common

13   benefit time was submitted?

14       A.   No.  I've skimmed it and found some

15   things that were left off, and I have not

16   supplemented it either.

17           MR. BLIZZARD:  I think that's all I

18   have.

19           MR. SEEGER:  Excuse me.

20               (Off the record.)

21   BY MR. BLIZZARD:

22       Q.   You mentioned that you were liaison

23   counsel in the silicosis MDL?

24       A.   That's correct.

25       Q.   And that was in front of Judge Jack in

```
 1   Corpus Christi?
 2        A.    Yes, sir.
 3        Q.    And that MDL for the plaintiffs has been
 4   a disaster, right?
 5        A.    That's correct.
 6        Q.    And the judge has -- lawyers have lost
 7   their law licenses; some doctors have lost their
 8   medical licenses because of conduct in that MDL,
 9   right?
10        A.    Are you saying that --
11        Q.    I'm not saying --
12        A.    -- I'm responsible for that?
13        Q.    No.  You were taking credit for the --
14   well, maybe you weren't.
15        A.    Let me explain.  Because I had been
16   involved in an MDL in a leadership position, what
17   has to have -- I think this may be
18   Mr. Birchfield's first, but what has to have
19   leadership and use that as experience when you
20   apply.
21             MR. BLIZZARD:  I think -- Special Master
22   Juneau, Mr. Lanier had handed me a note earlier,
23   and he has -- he would like to have five minutes,
24   if he could.
25             SPECIAL MASTER JUNEAU:  I'm not -- just
```

```
 1   a minute.  Let me address that.  I'm not going to
 2   permit that because that would be in violation of
 3   the rules I established for both sides at the
 4   inception of this case.
 5             MR. BLIZZARD:  Well, I told him I'd ask,
 6   so I did.
 7             SPECIAL MASTER JUNEAU:  Well, you did.
 8             Yes?
 9                           *  *  *
10                    REDIRECT EXAMINATION
11   BY MR. URQUHART:
12        Q.   Remind me again how much the Fee
13   Allocation Committee thought all of your work for
14   the common benefit was worth, including the work
15   that you did on Garza, a winning trial, including
16   the work that you did as -- setting up the
17   meetings that started the Texas consolidation and
18   resulted in the Texas consolidation, the fact that
19   you were named by the Texas Supreme Court as the
20   initial notice or liaison counsel, the fact that
21   you were involved in the MDL, this MDL, from the
22   very inception, the fact that you came up with a
23   technique for sampling blood that was so important
24   it ended up being in a specific provision in the
25   Master Settlement Agreement, the work that you did
```

1    on the preemption issue in the MDL, the work that
2    you did in advancing cases for trial in Texas and
3    keeping the pressure on Merck, the fact that you
4    filed them early so that you got under the
5    Texas -- or avoided the effect of the Texas
6    preemption, the fact that you raised ethical
7    issues that resulted in adjustments that were
8    complimented, the fact that you raised an issue
9    about adding a layer of due process to those
10   claimants that had extraordinary injuries; for all
11   of the effort that you have committed to this
12   litigation, in its judgment, what did FAC suggest
13   that you get?
14        A.   The second recommendation was $75,000.
15        Q.   Ms. Snapka, how long have you been a
16   trial lawyer?
17        A.   I graduated in August of 1980, and after
18   being a briefing attorney for a year, I started
19   practice, so 30 years.
20        Q.   With regard to your reputation in the
21   community of the State of Texas, do you think
22   there's any serious question that you're an
23   excellent trial lawyer?
24        A.   I don't think so.
25        Q.   A federal judge appointed you as liaison

1    counsel in an MDL, the silicosis MDL?

2        A.   That's correct.

3        Q.   And there was a great deal of notoriety

4    about that silicosis MDL; is that correct?

5        A.   That's correct.

6        Q.   You were there in the middle of all of

7    that fighting as best you could to perform as

8    liaison counsel?

9        A.   That's absolutely correct.

10       Q.   Was your work as liaison counsel ever

11   criticized?

12       A.   As liaison counsel, absolutely not.

13       Q.   Ms. Snapka, correct me if I am wrong,

14   but when a lawyer has a question about ethics and

15   whether something should be done or should not be

16   done, is there anything wrong with consulting an

17   ethics expert even though other ethics experts

18   have given an opinion?

19       A.   I think it's the obligation of the trial

20   lawyer in executing his or her responsibility to

21   their client to make absolutely certain that they

22   can completely and wholeheartedly join in to

23   something.

24       Q.   Do you believe that a person who is

25   participating in consolidated litigation should be

1   a team player?

2        A.   Sure.

3        Q.   Do you believe that a person who is

4   working on consolidated litigation should be

5   cooperative?

6        A.   Yes.

7        Q.   Do you interpret being a team player and

8   being cooperative as meaning that you agree with

9   everything?

10       A.   If there -- if there is a question, the

11   obligation to the client always comes first.

12       Q.   Do you think a lawyer should be punished

13   or penalized or demeaned because they raise

14   ethical concerns?

15       A.   I certainly don't think one should be

16   punished or demeaned or penalized while that same

17   lawyer has been praised and another lawyer has

18   also been praised for the exact same thing.

19       Q.   Isn't Angleton, Texas, Brazoria County,

20   Texas, one of the most notorious plaintiffs

21   jurisdictions in the United States?

22       A.   Yes.

23       Q.   Isn't that where Ernst was tried?

24       A.   Yes.

25       Q.   Do you think it would be fair for me to

1  say to Mr. Lanier, we shouldn't count that,

2  because Mr. Lanier has an in in Angleton?

3      A.   No.  I think that any plaintiff's

4  verdict moves the ball forward.

5      Q.   Do you think it would be fair for me to

6  criticize any of the plaintiffs' lawyer because --

7  lawyers because their case was venued in a venue

8  that was favorable to the plaintiffs?

9      A.   No.  I think that's part of being a

10 trial lawyer.  You pick your cases where you know

11 that you can have the most favorable jury.

12     Q.   Ms. Snapka, I'm going to go ahead and

13 ask this of you:  Do you have any questions about

14 any of the qualifications -- the trial

15 qualifications of any of these lawyers in the room

16 over here?

17     A.   No.

18     Q.   Okay.  Would you ever take the position

19 that any of these lawyers were not competent in

20 what they did in the Vioxx litigation and in

21 trying cases?

22     A.   No.

23     Q.   Would you ever suggest that if a

24 particular issue came up in a case that -- like

25 jury misconduct, which was raised and dealt with,

```
 1   would you criticize the lawyer for that?
 2              MR. BLIZZARD:  I'm going to have to
 3   object at this point.  I'm just laying the
 4   context.  I'm not criticizing.
 5              SPECIAL MASTER JUNEAU:  I'm going to
 6   allow him to ask the question.
 7         A.   No.
 8              SPECIAL MASTER JUNEAU:  Ask the question
 9   again.
10              MR. BLIZZARD:  Also, we went two hours
11   on the original direct, and it's now well into the
12   third hour.
13              SPECIAL MASTER JUNEAU:  I'm acutely
14   aware of this.  If anybody says due process in
15   this case was not done, I want them to come beat
16   me in the Atchafalaya Basin.
17              MR. HERMAN:  Before or after they open
18   the Morganza?
19              SPECIAL MASTER JUNEAU:  Either one.
20              Go ahead.
21   BY MR. URQUHART:
22         Q.   Ms. Snapka, with regard to the amount of
23   the award, will you please restate your position
24   with regard to what it is that you are asking the
25   Master to do in this case?
```

```
 1          A.    For everything that I did that I believe
 2    and that was described as common benefit which
 3    resulted in the global settlement, which is what
 4    Judge Fallon's directive was, I put down the
 5    figure 12 million.  What I'm asking for is similar
 6    treatment for comparable work, which I think is
 7    simply only fair.
 8          Q.    Were you ever asked to try an MDL case?
 9          A.    I have not.
10          Q.    Would you have tried one if asked?
11          A.    Absolutely.
12          Q.    Has anyone suggested that you would not
13    have been competent or capable of doing that?
14          A.    No.
15                MR. URQUHART:  That's all the questions
16    I have.
17                SPECIAL MASTER JUNEAU:  Thanks very
18    much.
19                THE WITNESS:  Mr. Juneau -- Master
20    Juneau, may I make a statement, just real briefly?
21                SPECIAL MASTER JUNEAU:  Well, let's see
22    how far you go.
23                THE WITNESS:  All right.  In the FAC
24    response, there were any number of errors that
25    were very disturbing, for example, that I didn't
```

```
 1   share with the leadership.  We have proof in
 2   the -- in the submission that we sent.  Anytime
 3   anybody asked, whether it -- whether it was with
 4   Garza right before with Seeger, Weiss or to --
 5   sending stuff to Russ Abney, sending stuff to
 6   Williams, Bailey, to Grant Kaiser; however, in
 7   their response, they said no.  I would -- it
 8   concerns me that there were factual errors made.
 9   If those factual errors obviously played a part in
10   me getting a $75,000 award, the only way to know
11   what the basis of those factual errors are is to
12   obtain the minutes, which probably discuss my
13   allocation.  If there are other factual errors,
14   I'd like to be able to address them and rebut that
15   with evidence, as I have attempted to today.  And
16   that's all I want to say, sir.
17           SPECIAL MASTER JUNEAU:  You may step
18   down.
19           THE WITNESS:  Yes, sir.
20           SPECIAL MASTER JUNEAU:  That will
21   conclude the hearing today.  We will reconvene
22   tomorrow morning at 9:00 o'clock.
23           MR. HERMAN:  Mr. Juneau, sir?  I'd just
24   like to know, since we have -- I understand
25   Mr. Murray was on the schedule.  Mr. Murray
```

1  indicated yesterday he was not going to appear.
2         SPECIAL MASTER JUNEAU:  He said he was
3  going to submit it on the record, and FAC agreed.
4         MR. HERMAN:  I understand Mr. Becnel
5  will appear.  I know that Mr. Garrett -- the
6  objectors want to question him.  We may have some
7  questions for him.  And I believe --
8         MR. BIRCHFIELD:  Markowitz.
9         MR. HERMAN:  -- Mr. Markowitz may
10 appear.  Do we have a -- has the order changed?
11        SPECIAL MASTER JUNEAU:  No.
12        MR. ARCENEAUX:  No.
13        SPECIAL MASTER JUNEAU:  The order is
14 Mr. Becnel will present consistent with the
15 protocol I had established before this hearing
16 commenced.  Then we will go with Mr. Garrett.
17 They will call Mr. Garrett.  And then we've got
18 Mr. Markowitz listed after that.  On Friday,
19 Mr. Birchfield is listed.
20        MR. HERMAN:  We'll be filing a motion to
21 preclude Mr. Markowitz.  We'll try to get that to
22 you this afternoon and to opposing counsel.
23 (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED FOR THE
24              DAY.)
25

```
 1                      CERTIFICATE
 2            I, LESLIE B. DOYLE, Certified Court
 3   Reporter (LA), NCRA Registered Professional
 4   Reporter and Certified LiveNote™ Reporter, do
 5   hereby certify that this hearing proceeded as
 6   hereinbefore set forth.
 7
 8            I DO FURTHER CERTIFY that the foregoing
 9   is a verbatim transcript of the testimony as taken
10   stenographically by and before me at the time,
11   place and on the date hereinbefore set forth, to
12   the best of my ability.
13
14            I DO FURTHER CERTIFY that I am neither a
15   relative nor employee nor attorney nor counsel of
16   any of the parties to this action, and that I am
17   neither a relative nor employee of such attorney
18   or counsel, and that I am not financially
19   interested in the action.
20
21
22
23            S/A LESLIE B. DOYLE
24            _____
             LESLIE B. DOYLE, RMR, RDR
             Certified Court Reporter (LA)
25            Certified LiveNote™ Reporter
```