```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
 2   *********************************************************

 3   IN RE:  VIOXX PRODUCTS              MDL-1657
     LIABILITY LITIGATION               New Orleans, Louisiana
 4                                      Friday, May 13, 2011

 5

 6   *********************************************************

 7            TRANSCRIPT OF FEE ALLOCATION PROCEEDINGS
          HEARD BEFORE THE HONORABLE PATRICK A. JUNEAU
 8                        SPECIAL MASTER

 9

10   APPEARANCES:

11   FOR THE FEE
     ALLOCATION COMMITTEE:          HERMAN, HERMAN, KATZ & COTLAR
12                                  BY:  RUSS M. HERMAN, ESQ.
                                    820 O'Keefe Avenue
13                                  New Orleans, LA 70113

14                                  BEASLEY ALLEN
                                    BY:  ANDY D. BIRCHFIELD, ESQ.
15                                  218 Commerce Street
                                    Montgomery, AL 36104
16
                                    SEEGER WEISS
17                                  BY:  CHRISTOPHER A. SEEGER, ESQ.
                                    One William Street
18                                  New York, NY 10004

19                                  LEVIN, FISHBEIN, SEDRAN & BERMAN
                                    BY:  ARNOLD LEVIN, ESQ.
20                                  510 Walnut Street, Suite 500
                                    Philadelphia, PA 19106-3697
21
                                    GIRARDI KEESE
22                                  BY:  THOMAS V. GIRARDI, ESQ.
                                    1126 Wilshire Boulevard
23                                  Los Angeles, CA 90017

24                                  THE LANIER LAW FIRM
                                    BY:  W. MARK LANIER, ESQ.
25                                  6810 FM 1960 West
                                    Houston, TX 77069
```

```
 1                                    LEVIN PAPANTONIO
                                      BY:  TROY RAFFERTY, ESQ.
 2                                    316 South Baylen Street, Suite 600
                                      Pensacola, FL 32502
 3

 4                                    WEITZ & LUXENBERG
                                      BY:  PERRY WEITZ, ESQ.
 5                                    700 Broadway
                                      New York, NY 10003
 6

 7   FOR COHEN, PLACITELLA & ROTH
     AND ERIC WEINBERG:              MARGARET E. WOODWARD, ESQ.
 8                                    3701 Canal Street, Suite C
                                      New Orleans, LA 70119
 9
                                      ROBERT E. ARCENEAUX, ESQ.
10                                    47 Beverly Garden Drive
                                      Metairie, LA 70001
11
                                      AJUBITA, LEFTWICH & SALZER
12                                    BY:  PASCAL F. CALOGERO, JR. ESQ.
                                      1500 Energy Centre
13                                    1100 Poydras Street
                                      New Orleans, LA 70163-1950
14
     FOR ESCOBEDO,
15   TIPPIT & CARDENAS:              HOCKEMA & LONGORIA
                                      BY:  DAVID H. HOCKEMA, ESQ.
16                                    600 E Nolana Avenue, Suite 202
                                      McAllen, TX 78501
17
     FOR ANAPOL SCHWARTZ:            ANAPOL SCHWARTZ
18                                    BY:  SOL H. WEISS, ESQ.
                                      1710 Spruce Street
19                                    Philadelphia, PA 19103

20
     FOR KATHRYN SNAPKA:             BEIRNE, MAYNARD & PARSONS
21                                    BY:  JACK E. URQUHART, ESQ.
                                      1300 Post Oak Blvd., 25th Floor
22                                    Houston, TX 77056

23                                    BECNEL LAW FIRM
                                      BY:  KEVIN P. KLIBERT, ESQ.
24                                    106 W. 7th Street, #B
                                      Reserve, LA 70084
25
```

```
 1   FOR KLINE & SPECTER:            KING, KREBS & JURGENS
                                     BY:  HENRY KING, ESQ.
 2                                       REBECCA DIETZ, ESQ.
                                     201 St. Charles Avenue, 45th Floor
 3                                   New Orleans, LA 70170

 4

 5   Official Court Reporter:       Karen A. Ibos, CCR, RPR, CRR
                                     500 Poydras Street, Room HB-406
 6                                   New Orleans, Louisiana 70130
                                     (504) 589-7776
 7

 8

 9      Proceedings recorded by mechanical stenography, transcript
     produced by computer.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                           I N D E X

2

3    WITNESS:                                    PAGE/LINE:

4

5    ANDY BIRCHFIELD - FAC REPRESENTATIVE

6

7      Cross-Examination by Ms. Woodward              6/10

8      Cross-Examination by Mr. Becnel               56/21

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

(FRIDAY, MAY 13, 2011)


1  (OPEN COURT.)

2          MR. URQUHART:  Jack Urquhart for Kathryn Snapka.  We had
an Exhibit No. 47 and there was objection to optimal completeness.
I have marked two documents Exhibits 52 and 53 and have shown them
to Mr. Blizzard, and I think he is satisfied that those are the
e-mail chains, so I would now like to offer, re-offer 47 with 52
and 53.

          THE COURT:  You want to offer 47, 52 and 53?

          MR. URQUHART:  Yeah, I've offered all of my exhibits.  I
think the only one they ended up objecting to, they were all
admitted except 47.

          SPECIAL MASTER JUNEAU:  Mr. Blizzard.

          MR. BLIZZARD:  Good morning, Special Master Juneau.  I
have looked at the e-mails, so I think at this point we have no
objection to Exhibits 47, and we would join in the offer of
Exhibits 52 and 53.

          SPECIAL MASTER JUNEAU:  Okay.  Is that the exhibits
there?

          MR. URQUHART:  Yes.  And they're Snapka Exhibit 52 and
53.

          SPECIAL MASTER JUNEAU:  Let it be received.  Thank you
very much.  Ms. Woodward.

1        MS. WOODWARD:  Your Honor, at this time the objectors

2  would call Andy Birchfield on cross.

3        SPECIAL MASTER JUNEAU:  All right.  Mr. Birchfield, raise

4  your right hand.

5     (WHEREUPON, ANDY BIRCHFIELD, WAS SWORN IN AND TESTIFIED AS

6     FOLLOWS:)

7        SPECIAL MASTER JUNEAU:  Be please be seated.  You may

8  proceed, ma'am.

9                        CROSS-EXAMINATION

10  BY MS. WOODWARD:

11  Q.  Good morning, Mr. Birchfield.

12  A.  Good morning.

13  Q.  The point of the fee application process is to ensure that

14  common benefit lawyers are fairly compensated, isn't it?

15  A.  True.

16  Q.  That their fees are in conformance with reasonable rates?

17  A.  That they are properly compensated for their common benefit

18  contributions.

19  Q.  And according to reasonable rates within their specialties and

20  the areas and in accordance with their levels of experience?

21  A.  I mean, yes, you know that we have a position.  We have

22  evaluated the contributions of each common benefit lawyer based on

23  the value to the fund as opposed to strictly hours versus rates.

24  But we think that they should be properly compensated for common

25  benefit work, yes.

```
 1    Q.  The allocation is supposed to take into account the work of

 2    counsel in the state litigations in Texas and California and New

 3    Jersey, as well as the MDL; is that correct?

 4    A.  Yes.

 5    Q.  You said in deposition, and Judge Fallon said any number of

 6    times, that objective measures of common benefit were to be applied

 7    in reaching the recommended allocation of common benefit work,

 8    right?

 9            MR. HERMAN:  Objection.

10            SPECIAL MASTER JUNEAU:  Just a minute, we have an

11    objection.

12            MR. HERMAN:  Your Honor, it's improper cross-examination

13    to refer to a deposition in the predicate of your question.  I

14    mean, it's not even a page, it's not a citation.  It's just counsel

15    saying you said in your deposition.

16            SPECIAL MASTER JUNEAU:  Ms. Woodward, that is correct.

17    If you're going to refer to a document, refer to a specific page so

18    the witness will be in a position to evaluate it.

19            MS. WOODWARD:  I am not attempting to impeach

20    Mr. Birchfield now.

21    BY MS. WOODWARD:

22    Q.  You would agree, Mr. Birchfield, that according to Judge

23    Fallon's guideline and the guidelines in effect within this circuit

24    that objective measures of common benefit are to be applied in

25    reaching the recommended allocations of common benefit work for
```

1  both counsel in the MDL and state litigation in Texas, California

2  and New Jersey?

3  A.  I agree that Judge Fallon urged us to provide as objective

4  measures as we could.

5  Q.  Neither the MSA nor any order by Judge Fallon says that MDL

6  common benefit work is afforded greater weight or value than the

7  common benefit work, equivalent common benefit work of the counsel

8  in the state litigations in Texas, California and New Jersey?

9  A.  True.

10  Q.  You want people to look at your recommended allocations and say

11  they were fair?

12  A.  Our approach throughout this litigation has been to follow

13  Judge Fallon's instructions and to arrive at a recommendation that

14  is fair and reasonable.

15  Q.  You would agree that lodestar is one established objective

16  component of an allocation calculation within the circuit, is it

17  not?

18  A.  I agree that the lodestar method is a method that is used in

19  the circuit in class actions primarily, and it is a way to approach

20  a fee allocation process.

21  Q.  Now, I understand that you have issues with the reliability of

22  reported hours, but there are means of affording greater

23  reliability to recorded hours, are there not?

24  A.  Yes.  I don't think that there is any question that, you know,

25  that you could take the approach of going line by line, you know,

1  through each of the 560,000 hours in this litigation; but what, you

2  know, what Judge Fallon has established in his orders is that that

3  is a major waste of judicial resources and it's not the best method

4  in arriving at a fee allocation in this case.  But rather to use

5  the lodestar as a cross check and that is what we have done.

6  Q.  My question to you, sir, was there are means of making the

7  hours more reliable for purposes of a lodestar calculation, are

8  there not?

9  A.  There are means of making lodestar more reliable if lawyers

10 only submitted hours that were accurate, if they only submitted

11 hours that were truly for the common benefit.  But, you know, in

12 this case the realities of this case make that nearly impossible,

13 if not impossible, nearly impossible, because what the Master

14 Settlement Agreement did was to allow first that were operating in

15 the state court in the coordinated jurisdiction to reconstruct

16 their hours and that is a valuable assessment tool for us to see

17 the work that they were doing.

18        But as far as relying on the actual time that was

19 submitted and to rely on that firm's determination that what we

20 were doing actually contributed to the common benefit, it is

21 nothing more than a tool to allow a fee allocation committee to

22 assess against the backdrop of their understanding of the

23 litigation in making their recommendation to the court.  It's a

24 tool the court can use.  In this case the Special Master can use to

25 see in broad terms what was the work that was done.

 1          But as far as relying on an entry that says this amount

 2    of hours on this specific task is actually common benefit, that

 3    does not work.

 4    Q.  Once again, I want to return to my question of means of

 5    enhancing the reliability of reported hours.  And one of those

 6    means, wouldn't you agree, would be to have counsel submit

 7    affidavits attesting that the work they've recorded is accurate and

 8    was attributable to the common benefit, is it not?

 9    A.  It's possible, it's not practical.  And we have that in this

10    case.  The hours, the hourly submissions that we have shown to

11    objectors that are all a part of this record, they are sworn

12    statements.  Those statements have a certification at the -- I

13    don't know if I have one here.

14    Q.  That's my point, I don't need to see it, it's a part of the

15    record --

16               MR. HERMAN:  Objection, she is interrupting the witness.

17               MS. WOODWARD:  It's in the record.

18               SPECIAL MASTER JUNEAU:  Counsel, are you finished with

19    your answer, Mr. Birchfield?

20               THE WITNESS:  No, your Honor.

21               SPECIAL MASTER JUNEAU:  Go ahead and finish.

22               THE WITNESS:  The time submissions in this case that are

23    a part of the record, whether they are for the MDL lawyers or the

24    reconstructed time of lawyers that were working primarily in the

25    state court coordinated jurisdictions have the certification.  "I

1  certify that the time documented above is accurate and correct and

2  was incurred for the common benefit of claimants in MDL 1657."

3        So we have that certification.  That has been done.  But

4  I think what the fee allocation saw in evaluating these hours is

5  that there is a wide gap between what we would view as common

6  benefit work and what state court or other lawyers, any lawyers

7  submitted as common benefit time.  We do not think that, you know,

8  that work in screening clients in making a determination as to

9  whether or not they would undertake to represent them, for example,

10  we don't think that that is a common benefit time.

11        But in reviewing these records we saw that.  We saw time

12  where, you know, where lawyers who were not part of any leadership

13  structure were submitting time for reviewing applications to be on

14  the PSC, they submitted common benefit time for reviewing pleadings

15  and notices in cases that they had absolutely nothing to do with.

16        So I don't think that it is -- I don't think that it's

17  practical, I certainty don't think it's practical, I don't know if

18  it's even possible, for lawyers to reconstruct their time in a way

19  that would be suitable for applying the lodestar method in this

20  case.

21  BY MS. WOODWARD:

22  Q.  The fee allocation committee did, in fact, review the time

23  submissions, particularly of the objectors and make a determination

24  in areas where it felt the time was not properly entered, either

25  because it was inflated or it was duplicative or it wasn't properly

1    applied as common benefit hours, we've seen that over the course of

2    the past week, the cross-examination of objectors with respect to

3    their time.  And that is, in fact, another means of testing and

4    insuring the accuracy of the hours reported, is it not?

5    A.  What you have -- what we have done is we have shown records

6    where we have gone through and we have pointed out enough examples

7    that showed us, the Fee Allocation Committee, that that is not a

8    reasonable approach.  We can rely on those time records to get an

9    indication of what that firm was working on.  But as far as getting

10   an accurate picture of the amount of time that they spent on common

11   benefit efforts, the time records are not reliable in that sense.

12   Q.  But you heard Mr. Jacoby's testimony about the duck on the

13   water and the feet paddling underneath?

14   A.  Dave Jacoby?

15   Q.  Yes.  A lot of lawyers' time occurs out of anybody's eyesight,

16   and if all of your seeing is what comes into the MDL trial package

17   or is put into evidence in a trial, isn't it a fact that you're

18   going to miss a tremendous number of hours expended, in fact, for

19   the common benefit?

20              MR. HERMAN:  Objection, predicate.

21              THE WITNESS:  That's why we're not relying --

22              SPECIAL MASTER JUNEAU:  Overruled, go ahead.

23              THE WITNESS:  That's why we're not relying on the hours.

24   When you describe that process, you are describing a process as if

25   the time records were the only tool available to us, but that's not

 1    the case.   In this case Judge Fallon set out the process, and,

 2    first, he appointed a Fee Allocation Committee that was comprised

 3    of members who were involved in every aspect of this litigation.

 4    You have members on the Fee Allocation Committee that have been

 5    litigating these cases for several years before the drug was pulled

 6    from the market and before the formation of the MDL.   You have Fee

 7    Allocation Committee members who were involved in the discovery, in

 8    developing the experts, who were involved in nearly every

 9    bellwether trial.

10              And so you have Fee Allocation Committee members who were

11    involved in the year long settlement negotiations that took on all

12    of the challenges that we faced.   You had Fee Allocation Committee

13    members who were involved in the expensive process of once the

14    settlement was announced of making sure that it was actually

15    executed because there was an 85 percent threshold that had to be

16    met, 85 percent participation.   So we worked to make that happen.

17              Then you had Fee Allocation Committee members who were

18    involved in the daily, the daily process of making sure that this

19    settlement was implemented in an efficient manner and it's a record

20    setting result.   So you look at the entire litigation from the time

21    that the very, the first Vioxx cases were filed until today, and

22    you have Fee Allocation Committee members that were working in

23    every jurisdiction and in every phase of this litigation.

24              So the court started it there in appointing the Fee

25    Allocation Committee that knew what was going on.   And then the

 1    court did not say get the time records and review it.  The court

 2    went much further.  The court said, okay.  Members, if you were a

 3    duck and you think you were paddling out of the water, underwater

 4    and people didn't see it, then submit an affidavit that describes

 5    your contribution to the litigation.  Judge Fallon opened that to

 6    everyone.  Whether they were in the state court litigation or MDL

 7    is open to everyone on the same terms.

 8              So you were able to submit an affidavit that outlined the

 9    work that you were doing that you think may have been underwater.

10              And so then the court went further and said if you don't

11    think that you could adequately describe your activities and your

12    contribution in an affidavit, then the Fee Allocation Committee

13    should give you an opportunity to be heard.  And so we traveled,

14    the Fee Allocation Committee traveled across the country to provide

15    opportunities for fee applicants to describe on the record so that

16    not only does the Fee Allocation Committee have a transcript so

17    that we could go back and review later on at the time we're making

18    our allocation, but it would also be a part of the record for the

19    court to review.

20              So when you say that the time, you know, that the time

21    records don't tell the full story, they don't, you're right about

22    that.  But they're only one piece of a very big process that Judge

23    Fallon has put in place, and we have worked very hard to follow his

24    instructions in making sure that everyone could layout what their

25    contributions were.

```
 1    Q.  And the very big process was an absolute failure, wasn't it,

 2    because you, in fact, did not have a member of the fee allocation

 3    working alongside every applicant for common benefit funds while

 4    every applicant for common benefit funds was doing his or her work

 5    for the common benefit, did you?

 6    A.  No.

 7    Q.  And --

 8    A.  Wait.  Your question was, is it an absolute failure, and my

 9    answer to that is, no, absolutely not.  But the ultimate

10    determination will not be my opinion on that.  The ultimate

11    determination will be first Special Master Juneau's recommendation

12    and then Judge Fallon's, because what we have done is we have

13    followed his instructions to the best of our ability but we have

14    made a recommendation.  We have made a recommendation to Judge

15    Fallon and he will make the determination, he will be the -- he'll

16    decide whether we've been an absolute failure or not.

17    Q.  You didn't have somebody in Chris Placitella's office with him

18    when he was going through and through and through and through and

19    through those tapes to get the Laine and Demopoulos extract out of

20    them, when he had begged for help and nobody came to help him and

21    he was doing it all on his own, you had no idea?

22    A.  Not true.

23    Q.  Well, you heard from him much later, but at the time that he

24    made his affidavit and the time he made his presentation, he was

25    limited to three pages, wasn't he?
```

1   A.  No.  The affidavit was three pages.  He was not limited to --

2   he was not limited to an affidavit and he was not -- and he

3   certainly was not limited to three pages because he's filed

4   multiple pages throughout this process of establishing the

5   appropriate amount for him.

6           But it is absolutely wrong to say that we had no idea.  I

7   mean, I used part of his video deposition in one of my trials, I

8   was aware of what he had done.  Other members of the Fee Allocation

9   Committee had worked with him, we knew what he had done.

10          We, the Fee Allocation Committee is comprised of lawyers

11  who did extensive discovery and we tried some of the cases, so to

12  assume that we did not understand what is involved and the work

13  that is involved in a deposition and getting a deposition that is

14  usable at trial is absolutely incorrect.  We do know.  We're

15  experienced litigators, we know what's involved in that process.

16  We took it into consideration against the entire scope of what was

17  done here.

18          He did good work on a deposition.  There were 2,000

19  depositions, 170 depositions of key witnesses.  So we did take it

20  into consideration, but we took it into consideration against the

21  backdrop of the entire scope of the litigation.

22  Q.  And you believe that your allocation for Chris Placitella and

23  Eric Weinberg common demonstrates your knowledge of all that they

24  did in this case, is that your testimony?

25  A.  Yes.  And I will be glad to explain if you would like.

1    Q.  No.

2            SPECIAL MASTER JUNEAU:  You can explain your answer if

3    you think that's necessary.

4            THE WITNESS:  As we looked at the amount of work that was

5    done, we viewed Chris Placitella's work as good work.  It was

6    limited in scope but it was good work.

7            One of the things that we looked at in the fee allocation

8    process is what was done as a common benefit effort, and there is a

9    difference.  And I will say, you know, that Chris Placitella did

10   share.  But we looked at it -- there were lawyers in state court

11   jurisdictions who litigated in their state court, whether it was

12   New Jersey or Texas or California or other places, but yet they

13   worked cooperatively.  And there is a difference between that

14   effort and the lawyers who operated in their state court venues and

15   made the deliberate decision to go their own way.

16           And that was a factor that was considered.  It didn't

17   draw a hard line but it was considered.  We gave that and in my

18   view the Fee Allocation Committee gave proper value to Chris

19   Placitella's work.

20   BY MS. WOODWARD:

21   Q.  You are saying that Chris Placitella and Eric Weinberg made a

22   decision to go it their own way?

23   A.  Well, I think that the testimony here has established that

24   there was a group of lawyers in New Jersey who made the decision,

25   and I am not faulting them for that, I mean that is a strategic

1    decision that was made very early in the litigation.  The MDL, the

2    leadership of the MDL, the Fee Allocation Committee members made

3    the determination early on that we wanted to reach out to state

4    court venues and we wanted people to work cooperatively, whether

5    they filed their cases in California or New Jersey or Texas, we

6    wanted to work cooperatively.  We put in place measures to

7    accomplish that.

8            There were lawyers, and you heard the testimony here,

9    that made the decision we want to avoid any risk of having to pay

10   an assessment on our cases, we're going our own way.  They made

11   that decision and they operated that way.  Chris Placitella shared

12   and he shared his work and he shared his work early.  And that's

13   one thing that is an important factor to consider because we've

14   heard a lot of testimony about sharing, and I acknowledge Chris

15   Placitella shared his.

16           We heard testimony of others who said that they shared

17   but they shared, you know, after the settlement agreement.  And

18   that's a factor that we take, as a Fee Allocation Committee, we

19   take into consideration as well.  And we have that base of

20   knowledge.

21   Q.  I thought we had established at the outset of your testimony

22   that work performed in state courts, equivalent work, was to be

23   treated equally under the MSA and under Judge Fallon's rules.

24   Isn't it true that the New Jersey consortium was not in any way

25   going its own way, they had spearheaded a team effort on behalf of

1    their state to try cases, to push cases, to cooperate with one

2    another, is that what you're calling going his own way, being a

3    part of the New Jersey team?

4    A.  When you say going their own way and you have a group of, a

5    small group of lawyers that are working cooperatively together

6    within that small group but they have made the decision, look, I am

7    resigning from my position on the state liaison committee with the

8    MDL because -- and the testimony I believe verbatim is we wanted to

9    go our own way, we wanted to do our own thing.

10          And they made clear efforts to avoid any risk of being

11   assessed a common benefit fee.  That's not working cooperatively in

12   the overall litigation.  They may have worked cooperatively among

13   their group, but there's a difference there.

14   Q.  Mr. Birchfield, isn't it a fact that they shared their work

15   with the MDL but the MDL would not share its work back with

16   Placitella and Weinberg?

17   A.  No, that's not true.  The MDL, very early Judge Fallon entered

18   Pretrial Order 13 that allowed any firm access to our material s,

19   they just had to execute a confidentiality agreement.  And as I

20   stated, Chris Placitella did share, but others in that group like

21   Mr. Weinberg, and I have a lot of respect for Mr. Weinberg he did

22   good work, but the work product that he developed like

23   Dr. Madigan's expert report, those were not shared until after the

24   settlement.

25          So when you say -- when you come into court and you say

```
 1   we were willing to share, okay.  But that's not the end of the
 2   inquiry there from a Fee Allocation Committee standpoint in
 3   evaluating the common benefit that was contributed by that sharing.
 4   Sharing is an important factor.
 5   Q.  It's not a fair statement of their testimony that their product
 6   was not shared until after the settlement.  Mr. Madigan's report,
 7   which wasn't available until late in the day, wasn't shared until
 8   it ws completed; isn't that what they said?
 9   A.  I agree that that's what he said in regards to Dr. Madigan.
10   Q.  And everything else was shared as it came out with anybody who
11   wanted it, including the MDL?
12   A.  No.
13   Q.  Well, the testimony will read as it reads.
14           MR. HERMAN:  Objection.
15   BY MS. WOODWARD:
16   Q.  But when they were originally working within the New Jersey
17   consortium, and you're right, there was an agreement for them not
18   to join into the MDL because they didn't want to pay an assessment
19   and they were promised they wouldn't have to, weren't they?
20   A.  No.  I mean --
21   Q.  That was an exhibit in evidence.  You're not going to testify
22   today and in contradiction to the evidence that they were promised
23   that they would not have to pay an MDL assessment?
24   A.  I don't know who promised that they would not have to pay an
25   MDL assessment.  But the way that it worked is he, Sol Weiss was
```

 1   appointed as part of liaison committee and he resigned that

 2   position, he didn't want to be, he didn't want to have to be part

 3   of the MDL.  Work cooperatively with the MDL and risk being

 4   assessed.  And so they worked up their own cases.

 5           But then what happened is the Fee Allocation Committee,

 6   members of the Fee Allocation Committee negotiated a settlement, a

 7   settlement agreement, and that settlement agreement was announced

 8   in November of 2007 was actually an offer.  It was an offer to the

 9   lawyers that represented Vioxx cases and their clients, and it

10   had -- it says here is the settlement that has been negotiated,

11   here are the terms of the settlement, and you can look at it, we

12   went throughout the country explaining the terms telling people

13   what we had done so that we could give them a reasonable estimate

14   of what the point value would be so that they could look at each

15   individual client that they represented and go through each of

16   those cases, know with reasonable certainty the value that would be

17   available under the settlement for those clients and they could

18   make a decision.  Do I want to accept the terms of this settlement

19   agreement, all the terms for each of my clients?  Yes or no.  And

20   one of the terms was that they would agree that Judge Fallon would

21   determine the amount of a common benefit assessment up to a

22   percent.

23           So at that point lawyers, regardless of what decisions

24   they had made about whether they wanted to work with the MDL or

25   not, whether they had signed the full participation option or not,

1    were faced with the choice:  Is this a settlement agreement that is

2    in the best interest of our firm and our clients, yes or no.  Do we

3    think we can get a better deal on our own?  Yes or no.  And they

4    made decisions based on that.  And everyone, every one of the

5    objectors accepted the terms of that agreement and entered the

6    clients into the settlement program.

7    Q.  I understand that and that was a significantly changed

8    circumstance, was it not, that if they agreed to come into the MSA

9    they were then going to be assessed?

10   A.  Okay.

11   Q.  That was part of the MSA package, if you take the settlement,

12   now you're going to be assessed, isn't that part of it?

13   A.  I agree.  I agree that if you accepted the terms of the Master

14   Settlement Agreement, that you would be subject to an assessment to

15   be determined by Judge Fallon.  I don't know what you're talking

16   about when you say a substantial change in circumstances.

17   Q.  Well, assuming that prior to that time they had understood that

18   they would not be assessed, now they're pulled into the settlement

19   and pulled out of state court, out of their state MDLs, into Judge

20   Fallon's MDL for purposes of settlement, and if they sign that

21   agreement now, whatever deals were on the table before, they are

22   going to be assessed if they put their names on that settlement

23   agreement; isn't that right?  If they enrolled cases, if they

24   enrolled their clients in the settlement they're going to be

25   required to pay an assessment?

 1   A.  The settlement agreement offers --

 2           SPECIAL MASTER JUNEAU:  Just a minute, we have an

 3   objection.

 4           MR. HERMAN:  I would like the question read back or the

 5   speech, please.  Would you read that back.

 6       (WHEREUPON, THE QUESTION WAS READ BACK BY COURT REPORTER.)

 7           SPECIAL MASTER JUNEAU:  The shortened version of that is,

 8   if people entered the settlement, they're going to pay the's

 9   assessment is that part of the deal.

10           THE WITNESS:  That is part of the offer that was extended

11   to, extended to all of the lawyers that represented Vioxx clients

12   and their claims.

13   BY MS. WOODWARD:

14   Q.  But also part of the deal was made the involvement of Judge

15   Higbee from New Jersey, for example, and a specific provision in

16   the MSA, which we've averted to earlier in your testimony, that the

17   work in the state courts was going to be treated equivalent to

18   common benefit work in the MDL to the extent that it wasn't.

19           SPECIAL MASTER JUNEAU:  Just so I'll understand the

20   question.  Are you referring to a specific part?

21           MS. WOODWARD:  Yes.

22           SPECIAL MASTER JUNEAU:  Would you cite that so I'll know.

23           MS. WOODWARD:  Give me one second.  MSA paragraph 9.2.4.

24           SPECIAL MASTER JUNEAU:  You have that exhibit?

25           THE WITNESS:  I don't have it -- for a couple of years I

```
 1   nearly had the Master Settlement Agreement memorized.  I can't give

 2   you the exact language of that provision right now, but I'll be

 3   glad to review it or I'll be glad to tell you our understanding of

 4   that provision.

 5   BY MS. WOODWARD:

 6   Q.  I want to hear your understanding because I know what it says.

 7            SPECIAL MASTER JUNEAU:  Counsel, counsel, you're not here

 8   to testify, you're here to ask questions.

 9   BY MS. WOODWARD:

10   Q.  I want to hear how the Fee Allocation Committee construed the

11   application of the MSA provision requiring that common benefit

12   credit be given to state court work.

13   A.  We knew that the settlement agreement provided that Judge

14   Fallon would make the determination about the fee allocation in

15   this case, he would do that after the, after appointing a Fee

16   Allocation Committee to make his recommendation and he would do

17   that after consultation with or with consultation Judge Higbee,

18   Judge Chaney and Judge Wilson.

19            And we understood that lawyers, all lawyers, regardless

20   of what venue they were, they had litigated their cases or had

21   filed their cases, could submit an application for common benefit

22   work.  And that work would be viewed on equal standing.  It's

23   measured against what is the value to the common effort, but it was

24   considered on equal standing.

25   Q.  I just want to be sure so that I can report to Judge Higbee
```

```
 1   what your understanding is --
 2              SPECIAL MASTER JUNEAU:  Counsel, so that you can report
 3   to Judge Higbee?  I don't follow that.
 4              MS. WOODWARD:  Judge Higbee is the liaison --
 5              SPECIAL MASTER JUNEAU:  I know who she is, very respected
 6   judge, I know who she is.  But you said you had to report to Judge
 7   Higbee, I just don't understand.
 8              MS. WOODWARD:  I want to understand because this is very
 9   troubling to me --
10              SPECIAL MASTER JUNEAU:  No, ma'am, no, ma'am.  It's
11   important and relevance and you said you need to have the answer so
12   you could report to Judge Higbee.  I am trying to get the relation.
13   What is your reporting responsibility to Judge Higbee or Judge
14   Fallon or anybody else, anybody in the judicial or to me for that
15   matter?
16              MS. WOODWARD:  I know that Judge Higbee is interested in
17   this process and very interested in the way the New Jersey
18   applicants to the common benefit fund have been treated and
19   concerned about whether there has, in fact, been equivalent
20   treatment for the New Jersey common benefit hours as opposed to the
21   MDL common benefit hours.  And I believe that Judge Higbee is going
22   to be interested in hearing Mr. Birchfield's testimony about
23   Placitella and Weinberg going it alone.  So I want to understand --
24              SPECIAL MASTER JUNEAU:  The question is really not
25   directed to Judge Higbee.  Judge Higbee is obviously a very well
```

1  respected judge, she had involvement in this case and I understand

2  that.  I am trying to figure out, you said you would report to

3  Judge Higbee.  Are you in some liaison capacity or something with

4  Judge Higbee?

5          MS. WOODWARD:  Absolutely not.  I just want to make a

6  clear record for her review.

7          SPECIAL MASTER JUNEAU:  That's a separate and distinct

8  issue from who is reporting to who about what.

9          MS. WOODWARD:  I have never had any direct contact with

10 Judge Higbee.

11         SPECIAL MASTER JUNEAU:  The only reason I asked the

12 question, you brought it up, you said so, "so that I can report to

13 Judge Higbee."  I am just trying to understand the roles and

14 relationships of the parties here.

15         MS. WOODWARD:  Thank you, your Honor.  Is it clear?

16         SPECIAL MASTER JUNEAU:  It's clear that you're not in the

17 liaison capacity and Judge Higbee, if you want to establish a

18 record that you think she is interested in, I certainly understand

19 that.

20         MS. WOODWARD:  Thank you.

21         SPECIAL MASTER JUNEAU:  It's your reporting that I want

22 to know about.

23 BY MS. WOODWARD:

24 Q.  Mr. Birchfield, are you viewing the work of the New Jersey

25 consortium on some different footing than the work of the MDL

1   lawyers because they made an early decision to do their common

2   benefit work within the state of New Jersey and within their

3   process?

4   A.  No, we are not treating them on any different footing.

5   Q.  Well, then I don't understand what you meant by saying you felt

6   that they were going it alone because they didn't come in to the

7   MDL?

8   A.  I described the process.  And I acknowledge that Chris

9   Placitella did good work in his deposition and he shared that

10  freely with lawyers in the MDL and anywhere.  I acknowledge that.

11  That's a factor that we took, that we take into consideration.

12        The point that I make is that the Fee Allocation

13  Committee has the background, we had the working knowledge about

14  what was contributed and what value that contribution had, and what

15  inquiry and when the contribution, you know, was made.  So we took

16  all of that in consideration, we did not look and say, well, Mr.,

17  actually it was Mr. Weiss, Sol Weiss that resigned the state

18  liaison committee.

19        We didn't say, hey, he made that decision early and so

20  we're going to view him differently.  We didn't do that.  We looked

21  at the entire body of their work and what value did it have to the

22  common effort.  That's it.

23  Q.  So you're retracting your earlier statement that Placitella and

24  Weinberg and the members of the New Jersey consortium went it

25  alone?

1    A.  No, I am not retracting.

2    Q.  Now, returning to the issue of hours entered in the case.  I

3    noted that a number of questions were put to some of the objectors

4    about their time entry.  But Mr. Seeger didn't raise any questions

5    about Mr. Weinberg's hours, Mr. Herman didn't raise any questions

6    about Mr. Placitella's hours, so I'm asking you as you sit here

7    today on behalf of the FAC whether the FAC has any questions about

8    the reliability of my clients Eric Weinberg's and the firm of Cohen

9    Placitella & Roth's time submissions into this record?

10   A.  Well, first of all, Mr. Placitella, who I have respect for,

11   took the stand and testified very candidly about the fact that

12   these were reconstructed hours, that they were very difficult, it

13   was difficult, he can't say, you know, that they are accurate.  He

14   acknowledged the challenges of reconstructed hours.

15          So when you say do we challenge the hours, that's not a

16   process that we have, that we've undertaken to do line by line.  We

17   have reviewed the time submissions and we take the work that is

18   reflected there and we valued to the best of our ability the work

19   that was done.

20   Q.  I understand what you did.  I am asking you for my purposes if

21   the court determines that hours play a greater role in this

22   determination than the Fee Allocation Committee has assigned to

23   them, I want to know whether in your review of my clients' hours

24   you have found anything that you consider to be questionable in

25   their time submissions?

1    A.  I would not go any further than -- sitting here on the stand

2    today, I have no reason to go any further than Mr. Placitella did

3    in his testimony about, you know, the process that he undertook.  I

4    think that the process that he applied and he testified candidly

5    about, he did to the best of his ability.

6    Q.  Thank you.

7    A.  Does it accurately reflect the actual amount of time that he

8    spent on a task, you know, I think he said he couldn't really say

9    that.  That was part of it.  But that's the whole point --

10            MS. WOODWARD:  I am going to object to what I think is a

11   misstatement of his testimony because I heard him say that he

12   thought he substantially underreported his testimony, not that his

13   submissions were over.  So I am just making that objection to the

14   response of the witness.

15            THE WITNESS:  I did not state that he overstated his

16   hours, I didn't make that --

17            SPECIAL MASTER JUNEAU:  I didn't understand that either.

18            THE WITNESS:  -- I didn't make that one way or the other.

19   I said his testimony was that he didn't think that his hours were

20   reliable the way that he reported them just because that is, that's

21   inherent in the reconstruction of hours.  And I think that he

22   testified, I think he testified openly and honestly about the

23   process and that it's not reliable.  And I wouldn't dispute it.

24            MS. WOODWARD:  That's your opinion.

25   BY MS. WOODWARD:

1   Q.   Is that your opinion?

2   A.   Is that my opinion about what he testified to?   That's my

3   recollection of his testimony.

4   Q.   Mr. Birchfield, to the extent that a lodestar calculation might

5   be used in any respect in determining an appropriate allocation for

6   my clients, would you agree that their hourly rates should be the

7   equivalent of hourly rates applied in their location and to their

8   levels of experience?

9   A.   I'm sorry, you're asking me to assume that the process that

10   Judge Fallon has instructed us to follow is completely thrown out

11   and we're to start over and what rates should be applied?

12   Q.   Not at all.   You said that you roughed in a lodestar

13   calculation then you did some cross checks with the lodestar

14   calculation.   To the extent that you yourself have used the

15   lodestar calculation and to the extent that any other arbiter might

16   consider a lodestar calculation appropriate in considering the

17   allocation, wouldn't you agree that the hourly rate applied to each

18   attorney in that calculation should be commensurate with the

19   knowledge, skill, experience of that attorney for the work that's

20   being performed in his or her location?

21   A.   Sure.

22   Q.   And you're not arguing, as we sit here today, that because

23   there may have been some miscommunication between Mr. Weinberg and

24   Mr. Garrett that Mr. Garrett's rate, his average rate of $332 per

25   hour should apply just arbitrarily to anybody whose rates he didn't

1    have?

2    A.  I don't think anyone's rates should be applied arbitrarily.

3    Q.  So to the extent that Mr. Weinberg and Mr. Placitella have

4    offered substitute rates that they consider to be more appropriate

5    to their work, you have no quarrel with that.  I believe

6    Mr. Placitella's testimony was 500 to $800 range; is that correct?

7    What was your rate?

8    A.  I don't recall.  I don't recall what rate, you know, he

9    provided.  But I don't -- I couldn't give you, I couldn't sit here

10   today I couldn't give you the proper rate to be applied for

11   Mr. Placitella and Mr. Weinberg.  I agree that they are experienced

12   lawyers and skilled lawyers, but I can't give you a rate.

13   Q.  Now, when the FAC performed its lodestar check, cross check, I

14   am not exactly sure what you did with the lodestar, but whenever

15   you did your lodestar style assessment or calculation, you didn't

16   substitute or alter the rates as entered on Mr. Garrett's chart,

17   did you?

18   A.  We did not alter, we did not alter the rates.  What we did in

19   providing a lodestar cross check is we were evaluating the work

20   that was done, we considered the amount of hours that -- we

21   considered the amount of hours that were reported, we considered

22   the skill levels of the lawyers that were doing that work.  It made

23   a difference to us, you know, whether the work was being done by

24   Mr. Weinberg, who has experience, versus a two-year associate.  So

25   we made those types of calculations, rough calculations as we were

1     valuing the work that was done.

2          But that's the extent of it, we did not, we didn't apply

3     an hourly rate to that cross check, it was a rough lodestar cross

4     check.  And we used the hours and the skill levels and the

5     experience of the lawyers in determining the appropriate values to

6     be assigned as we were completing the point system.  And then we

7     did, after we had the final calculation for a firm, we went back

8     and we looked at the number of hours that they were claiming and we

9     made a comparison and that was a factor that we considered as to

10    whether or not any adjustments needed to be made.

11         MR. HERMAN:  If you're going to put something up, I would

12    like to see it before it goes up.

13         MS. WOODWARD:  All right.  Go ahead.

14         MR. HERMAN:  Thank you.

15    BY MS. WOODWARD:

16    Q.  Mr. Birchfield --

17         MR. HERMAN:  Excuse me, counsel.  If you've got an extra

18    copy it might be helpful if Mr. Birchfield had it.  Andy, can you

19    read this?

20         SPECIAL MASTER JUNEAU:  I can't read it here.  Can you

21    read that?

22         THE WITNESS:  I can read most of it, I am familiar enough

23    with it, I think I can read most of it.

24    BY MS. WOODWARD:

25    Q.  You recognize this document, right?

1    A.  Yes.

2    Q.  This is the Fee Allocation Committee's point system grid, is it

3    not?

4    A.  Yes.

5    Q.  And that's the blank one that was submitted to all of the

6    applicants when they were given their individual recommendations

7    back in December, do you recall that?

8    A.  Yes.

9    Q.  And I've merged these two pages so that you can see my two

10   clients on one page, I put an arrow by Cohen, Placitella & Roth and

11   Eric Weinberg, and I want to go through your point system.

12           The first category is key leadership role; is that right?

13   A.  First column, yes.

14   Q.  Key leadership roles under the point system guide can earn up

15   to 125 maximum points under the FAC's method; is that right?

16   A.  In that column, that's right.

17   Q.  And you heard testimony that Chris Placitella and Eric Weinberg

18   were instrumental in forming the New Jersey consortium and

19   arranging for the sharing of work, work assignments, documents,

20   exhibits, analysis and all that entails, didn't you?

21   A.  I did.

22   Q.  Within the MDL you assigned key leadership points to more than

23   a dozen firms, didn't you?  I am not asking for your recollection,

24   if you don't remember, that's fine, the document is in the record.

25           MR. HERMAN:  Let's give the witness an opportunity to

1    answer the question.

2           THE WITNESS:  I think that that is -- I think that's

3    true, I think it was more than a dozen.

4    BY MS. WOODWARD:

5    Q.  But substantially fewer in New Jersey, is that fair to say?

6           SPECIAL MASTER JUNEAU:  Excuse me, counsel, what's

7    substantial fewer?

8           MS. WOODWARD:  The leadership, the key leadership points

9    awarded to the New Jersey counsel.

10          THE WITNESS:  Are you saying were there fewer than 12

11   lawyers in New Jersey that received points for key leadership?

12   BY MS. WOODWARD:

13   Q.  I am asking, yes.

14   A.  Well, I think in general that is, that's true.  But I am not

15   sure, I am not sure where you draw the line between, you know,

16   lawyers that were, that are New Jersey lawyers versus MDL lawyers.

17   I mean, there are lawyers that did the majority of their work in

18   New Jersey and there are lawyers that did the majority of their

19   work in the MDL.  But there's not a bright line.  For instance,

20   Seeger Weiss served in leadership in New Jersey, they did

21   substantial work in New Jersey, they also did substantial work in

22   the MDL.  My firm did substantial work in the MDL and we also did

23   work in New Jersey.  We filed cases in New Jersey, we had a role

24   where we worked cases up in New Jersey.  But our role in New Jersey

25   was limited but we did work there.

1          There are members of the PSC -- the MDL, the MDL PSC

2  members also did work in New Jersey and in California.  So there is

3  no bright line distinction except for -- I mean, there are a

4  handful of firms that, and you mentioned the, what you're calling

5  the New Jersey consortium, and to the extent that involves Sol

6  Weiss I know he made a clear effort to work exclusively in New

7  Jersey, so there are some firms that worked exclusively in New

8  Jersey.

9          But we didn't draw, we didn't draw that bright line

10 distinction.  We considered the work that was done, we didn't

11 divide lawyers up and say you're a New Jersey lawyer, you're a

12 California lawyer, you're an MLD lawyer.  We looked at the roles

13 they paid in the overall litigation and we made assignments of

14 points based on that work.

15 Q.  I am going to make the appointment of points.  I am going to

16 give Cohen, Placitella & Roth 25 points for key leadership and I am

17 going to give Eric Weinberg 25 points for key leadership, okay?

18          MR. HERMAN:  I don't think it's okay.  I am going to

19 object to it.  What counsel assigns to her own clients is not only

20 self-serving but it has no place in cross-examination.

21          SPECIAL MASTER JUNEAU:  I am going to overrule the

22 objection at this time.  I am not sure where this is leading.

23          MR. HERMAN:  I'll just making it continuing.

24          SPECIAL MASTER JUNEAU:  Right.  Go ahead, I'll permit the

25 question, continue.

1        MS. WOODWARD:  Yes, I do mean to continue.

2    BY MR. HERMAN:

3    Q.  I am looking at the point system guide which says 25 points

4    under the key leadership category for a key leadership position and

5    a key coordinated venue.  That's what you call an objective

6    criteria, right?

7            And the question whether or not my clients actually

8    occupied a key leadership position really is a subjective

9    determination, isn't it?

10   A.  I don't think so.

11   Q.  You heard testimony from Sol Weiss who was a state liaison,

12   you've heard testimony and there are a number of affidavits and

13   presentations, you heard my clients' testimony that they occupied

14   key leadership roles in New Jersey, yet the FAC did not assign them

15   points.  What I am suggesting to you or asking you is that's

16   debatable, isn't it?

17           SPECIAL MASTER JUNEAU:  What's debatable?

18           MS. WOODWARD:  Whether they're entitled to 25 key

19   leadership points for -- under their point system guide key

20   leadership position and a key coordinated venue, I say they do, he

21   says they don't, but I am asking him isn't that debatable.

22           THE WITNESS:  Here is the thing:  It is debatable in the

23   sense that the Fee Allocation Committee who was comprised of key

24   leaders in every venue.  Seeger Weiss, Chris Seeger and his law

25   partner Dave Buchanan provided leadership in New Jersey from the

1    inception, very early in the litigation.

2           We had members of the Plaintiff Steering Committee that

3    worked, that assisted with trials in New Jersey, we had members of

4    the Fee Allocation Committee who tried the bellwether cases,

5    multiple bellwether cases in New Jersey who were involved with the

6    experts that were involved in New Jersey and who had a very

7    detailed understanding of the full operation of the litigation in

8    New Jersey.

9           We had consultation with Judge Higbee who presided over

10   that litigation.  So we as a Fee Committee, the members of the Fee

11   Committee with that background and in addition to the time

12   submissions and the affidavits and the presentations, we as a Fee

13   Committee discussed the amount, the appropriate amount of value

14   that should be assigned to Mr. Placitella and Mr. Weinberg in that

15   category.  And based upon all of that we determined the appropriate

16   value.

17          Now, you have assigned 25 points and you, Ms. Woodward,

18   did not try a case that I am aware of in any Vioxx litigation.  I

19   am not aware if you had any cases, any Vioxx cases in New Jersey or

20   anywhere else.  I am not aware of you being involved in the Vioxx

21   litigation at any point prior to the, prior to filing objections to

22   the Fee Allocation Committee's recommendation.

23          So you have the Fee Allocation Committee's recommendation

24   and we have you taking a different position.  If that makes it

25   debatable, then I agree with you it's debatable.

1    Q.  Thank you.  And if I were to look for further detail on this

2    point system guide for exactly what is key leadership position and

3    key coordinated venue, I wouldn't find any objective definition of

4    that role anywhere, would I?

5    A.  You're not going to find a written definition beyond what is

6    provided there in the point system guide.

7    Q.  The point system guide provides the narrowest breakdown of

8    every point criteria for every category on this grid, does it not?

9    A.  I'm sorry.  Can you repeat that?

10   Q.  Well, there is no better breakout of the point system or

11   written definition of the point system than is contained in the

12   point system guide, is there?

13   A.  That's true.  There is no written -- there is no additional

14   written guide to the point system that exists other than what you

15   have been provided.

16   Q.  So how many points apply to a particular contribution just as a

17   matter of your consultation, your opinion, your subjective view,

18   your -- whatever information you want to bring into it, it's kind

19   of gestalt because there is nothing that breaks out point by point

20   how you earn these points, is there, beyond the point system guide?

21          SPECIAL MASTER JUNEAU:  I think he's already testified

22   the only thing written is the guidelines that you've already

23   identified.  Is that right?

24          THE WITNESS:  That's right.  And I've described the

25   process followed by the Fee Committee.

1        SPECIAL MASTER JUNEAU:  That's the only document we're

2    dealing with.

3    BY MS. WOODWARD:

4    Q.  And on this point system guide you awarded 50 key leadership

5    points to Weiss & Luxenberg, if you recall; is that correct?

6    A.  That's my recollection.

7    Q.  Now let's go to the next criteria or the next column in the

8    grid trials.  Chris Placitella and Eric Weinberg we understand did

9    not try any cases, and so on the point system guide they would not

10   qualify for the minimum losing points for a trial, the 40 points

11   for losing one trial, right, but there is another category five to

12   ten points for local counsel or similar role, do you recall that?

13   A.  Yes.

14   Q.  And you heard testimony that they contributed to the trial

15   effort in case after case in New Jersey, you recall that testimony?

16   A.  Yes.

17   Q.  You awarded trial points for contribution to the trial effort

18   within the MDL, didn't you, for non-trial attorneys for people who

19   were a part of the team?

20   A.  No.

21   Q.  Well, let me give you a specific example.  Jerry Meunier, you

22   awarded Jerry Meunier ten points under the heading of trials, do

23   you recall that?

24   A.  Yes.

25   Q.  Was that because he was local counsel?

1  A.  Jerry Meunier was part of the trial team in the MDL case.  He

2  did not take a witness but he was at counsel table, he helped with

3  the arguments in the case, and he helped with jury selection.

4  Q.  And I read his presentation and he described his role as in the

5  first that he attended as going there to learn and in subsequent

6  trials acting as a sounding board, and you awarded ten points

7  because you considered that he had made a contribution to those

8  trials; is that correct?

9  A.  I was counsel, I was the lead trial lawyer in that case.  I

10  know Jerry Meunier is a man of incredible integrity and he is a

11  humble, gracious man --

12  Q.  I am not questioning your award to him.

13  A.  But you have posed a question to me that where you quote from

14  his presentation that says that he was acting as a sounding board.

15  But as counsel in that case, I know what his role was, I know that

16  he sat there at counsel table and he argued issues for us.  He was

17  part of the trial team.  And so that's why he was awarded points

18  there, not because he did not receive points in the trial category

19  for work that he did behind the scenes at trials.

20        When we tried these cases, every one of us, when I tried

21  cases, when Chris Seeger tried cases, when Mark Lanier tried cases,

22  there were many lawyers, there were many lawyers who attended those

23  trials, some offered help, some were really helpful, others just

24  different roles.  But there were lawyers that came and offered

25  help.

```
1              No one, no one was given points in the trial category for
2     that type role.  They were given credit for that type role as it
3     pertained to discovery work or if they were helping with an expert,
4     then they're given points in the science and discovery category.
5     We drew a line there, we drew a harder line that says we're
6     applying points here for lawyers that were associated with the case
7     that provided a role in the actual trial of the case.
8     Q.  Do you recall Mr. Herman's statements in some of the
9     presentations encouraging some of his friends to submit their hours
10    for trial preparation work for cases they did not try?
11    A.  I don't recall that but that sounds right, absolutely.  We
12    asked lawyers to submit their time.  If they were helping with a
13    bellwether case, they should submit, they should submit their time
14    for that.  And it would be considered.
15             The Fee Allocation Committee considered all the time, all
16    of the work that was reflected there, and we made a determination
17    about how that impacted the overall litigation.
18    Q.  I understand that you're familiar with Jerry Meunier 's work in
19    a case where he assisted you as a trial counsel.  But you are less
20    familiar, are you not, with the work that Chris Placitella and Eric
21    Weinberg did on trial teams of which you were not a part?
22    A.  That is true.  But I am not the Fee Allocation Committee.  I am
23    a member of the Fee Allocation Committee.  The Fee Allocation
24    Committee is comprised of lawyers who were working and tried the
25    cases and were familiar with what took place surrounding those
```

1    trials.

2    Q.  Let me ask you this.  You heard that both of those men produced

3    trial exhibits that were used in trial after trial after trial,

4    took first chair prepped for depositions that were played in trial

5    after trial after trial, made contributions that the trial teams

6    commended as being integral to their trial successes.  So would you

7    disagree with me if I give my guys some trial points?

8    A.  Yes.

9    Q.  I am going to do it any way, as I think you probably

10   anticipated.  I am going to give them ten points --

11            SPECIAL MASTER JUNEAU:  Just a minute.  I think the

12   response was you disagree with her statement, right?

13            THE WITNESS:  Yes.

14            SPECIAL MASTER JUNEAU:  I just want --

15            MR. HERMAN:  One second, I'll just do this one more time.

16   I have never seen in a court where a lawyer in cross-examination

17   gives her own clients points, and I don't understand the validity

18   of it.

19            SPECIAL MASTER JUNEAU:  Let me ask you this,

20   Ms. Woodward.  The question is, does he think in his opinion the

21   assignment on your two clients with regard to the grid is

22   appropriate or not?  I think he is testifying that he thinks it was

23   appropriately done, that was the consensus of the committee,

24   correct?

25            THE WITNESS:  That they would be given zero points in the

1     trial category, that's right.  We do give credit for that work but

2     what Ms. Woodward would do in assigning points there would blur the

3     lines between what's done in trial work and the work that was given

4     credit for in discovery and science.

5           SPECIAL MASTER JUNEAU:  What I am trying to get to,

6     Ms. Woodward.  I think I clearly understand what you said, and your

7     assignment one way or the other of two, ten, 50 or 3 billion, it

8     wouldn't make any difference he disagrees with it, so it's a futile

9     effort to write down any number seems to me.

10          MR. HERMAN:  I want to amplify just one thing, this is

11    argument, this is argument.

12          SPECIAL MASTER JUNEAU:  I am trying to get to that,

13    Mr. Herman.  Do you understand my issue, Ms. Woodward?

14          MS. WOODWARD:  I do.  But --

15          SPECIAL MASTER JUNEAU:  Apparently he disagrees with your

16    basic premise.  I understand what your position is on that, but

17    it's a futile exercise to go through points when he says that he

18    thinks he was correct.  You may prevail on the issue, but what you

19    think or what number you put down right now it just doesn't seem

20    relevant to me.

21          MS. WOODWARD:  All right.

22    BY MS. WOODWARD:

23    Q.  My clients had no role in settlement negotiations, they learned

24    no points there?

25    A.  True.

1   Q.  You also gave them no, you, the FAC, gave them no points for

2   law and briefing; is that correct?

3   A.  I think that that's true.  I mean, I don't have the grid in

4   front of me, I'm testifying to the best of my recollection.  I

5   don't think they were given points.

6   Q.  Let me give you a grid.

7           MS. WOODWARD:  May I approach the witness?

8           SPECIAL MASTER JUNEAU:  Please.

9           THE WITNESS:  Ms. Woodward, is this the grid --

10          MS. WOODWARD:  I believe that's January 13th.

11          MR. HERMAN:  Just one minute.  I know your Honor wants a

12  complete record and give the opponents due process, but I thought

13  this questioning, this cross-examine was supposed to last an hour,

14  at this point it's past an hour.

15          SPECIAL MASTER JUNEAU:  I've already allowed some

16  latitude, Ms. Woodward.  I want to give an opportunity to the other

17  counsel, and I said I would do that to address the issues.  So in

18  deference to those people --

19          MS. WOODWARD:  I will move past --

20          SPECIAL MASTER JUNEAU:  I am going to finish this line of

21  questioning but allow opportunity for these other counsel to

22  address their issues.

23          MS. WOODWARD:  Okay.  I am going to move past my point

24  consideration, but with an objection, your Honor, you understand

25  that I have a great deal of additional questioning that I think is

1   pertinent and which I believe that I should be entitled, but I

2   respect the court's ruling.

3           SPECIAL MASTER JUNEAU:   Just so the record will be

4   abundantly clear.  I've done that, I've given additional time here

5   to you, I want to make it very clear, not only to you but to all

6   parties, that I've allowed and permitted into evidence the

7   extensive deposition was taken last Friday which counsel were

8   afforded an opportunity to question the witness and the same

9   applies to Mr. Birchfield whatever his responses were to that.

10           I have that evidence in the record.  So there's been

11  plenty, plenty of opportunity to explore things.  I just want to

12  get that clear on the record.  But I've noted your objection.

13          MS. WOODWARD:   Thank you, your Honor.

14  BY MS. WOODWARD:

15  Q.  Were the members of the Fee Allocation Committee permitted to

16  weigh in on the allocations to their firms?

17  A.  Yes.  I mean, the entire process was conducted as a Fee

18  Allocation Committee.  Each member of the Fee Allocation Committee

19  made their own presentations, each committee member submitted their

20  own affidavits and their time records.  And so, yes.

21  Q.  And then did you meet as a group to discuss how those

22  allocations would be made amongst yourselves?

23  A.  We met as a committee and we went, we discussed firm by firm

24  the points to be assigned, the values to be assigned to each one,

25  and each member of the Fee Allocation Committee formed that part of

1   the that process.  It wasn't a meeting of the Fee Allocation

2   Committee, it was a meeting where we covered all of the firms.

3   Q.  Would it be fair to say that things got pretty hot in those

4   discussions about what members of the Fee Allocation Committee

5   would recommend as allocations to one another?

6   A.  I would not describe it as hot.  There was --

7   Q.  Would you describe this communication with this adversary

8   proceeding between the Fee Allocation Committee and the objectors

9   as kind of hot?  Just trying to get sort of the template here.

10            SPECIAL MASTER JUNEAU:  Kind of hot you said?

11            MS. WOODWARD:  Hot, kind of hot.

12            SPECIAL MASTER JUNEAU:  You're talking about during the

13   recesses or here in court?

14            MS. WOODWARD:  No, no, no.  I am just talking about the

15   tenner of the adversarial nature of the proceeding, kind of hot,

16   that's fair to say, isn't it?

17            SPECIAL MASTER JUNEAU:  Just a minute.  I don't think

18   that's an appropriate question, ma'am.  The court's in a position

19   to view the proceedings here.  I might add that it's been a very

20   civil proceeding.  Strong positions have been taken on respective

21   sides, but it's been a civil proceeding in the courtroom.  It's

22   been administered accordingly.

23   BY MS. WOODWARD:

24   Q.  What we're dealing with in this courtroom today, Fee Allocation

25   Committee versus objectors, it's really pocket change in terms of

1    dollars compared to what the members of the Fee Allocation

2    Committee were talking about allocating amongst themselves, isn't

3    it?

4    A.  No.  I would not describe the values, the amounts that the Fee

5    Allocation Committee has recommended that the objectors receive, I

6    would not describe that as pocket change.

7    Q.  Comparatively speaking.  I mean, you did award to yourselves 72

8    percent of the common benefit fund, and what we're talking about is

9    just a few objectors within that 20 some odd percent range against

10   the Fee Allocation Committee; isn't that fair?

11   A.  I would say that there is a huge Gulf between the work that

12   was, the common benefit work that was done by the composite of the

13   Fee Allocation Committee members versus the work that, the

14   composite work that was done by the objectors.  And I think that

15   the Fee Allocation Committee's recommendations accurately reflect

16   the amount of common benefit work done for each.

17   Q.  I am just asking as amongst yourselves, did that translate into

18   an easy deliberation process where y'all decided, you know, this

19   one gets 40 million, this one gets 40 million, this one gets 12

20   million.  Did that go down smoothly?

21   A.  The entire allocation process, the meetings, the discussions

22   that were held as part of the Fee Allocation Committee were, they

23   were open, they were -- I mean, they were open in the sense that

24   folks expressed their views and you are -- I mean, this is a group

25   of trial lawyers, we express our views.  But we did so in a civil

1     and a professional manner.

2              I mean, there were strong views one way that sometimes

3     were different, that's true, as it applied to Fee Allocation

4     Committee members themselves, it is true as it applied to other

5     members of applicant firms.  And we had that debate, we had those

6     discussions, and we -- and through the process we built a consensus

7     as to the appropriate values to be assigned for each of the

8     applicant firms.

9     Q.  And wouldn't it be fair to describe that debate as extremely

10    heated from time to time?

11    A.  I would not describe that as extremely, extremely heated.

12    Q.  Heated at all?

13    A.  You know, are there points that were --

14              SPECIAL MASTER JUNEAU:  Counsel, that's argumentative.

15              MS. WOODWARD:  All right.  I'll move on.

16              SPECIAL MASTER JUNEAU:  Heated, hot, cool, warm.

17    BY MS. WOODWARD:

18    Q.  When you were discussing your allocation recommendations

19    amongst yourselves, one fee allocation member versus another, were

20    you arguing about points or about money?

21    A.  As I've described the process, we as a Fee Allocation Committee

22    went through the applicant firms one by one and we assigned values,

23    you know, as points.  Points translate to dollars so you can't

24    separate the two.  But the process that we followed was to fill out

25    this grid firm by firm, category by category.

1    Q.  Everybody knows when you're arguing over five points you're

2    really arguing over something close to $250,000, right, so whether

3    it's points or dollars it translates into dollars; is that fair?

4    A.  The fee allocation process is to ultimately result in the

5    distribution of dollars, that's true.

6    Q.  And in the course of your debates and deliberations, didn't you

7    discover that it was pretty easy to work the point system

8    backwards, to arrive at a dollar amount and then figure out how

9    many points it would take to justify that dollar amount under the

10   point system guide?

11   A.  No.

12          SPECIAL MASTER JUNEAU:  Ms. Woodward, I believe we've

13   extended time.  Why don't you wrap up and afford the other people

14   here an opportunity to question the witness.

15          MS. WOODWARD:  I will.

16   BY MS. WOODWARD:

17   Q.  You have, in fact, backed into the points system time after

18   time, haven't you?

19   A.  No.

20   Q.  Well, you did it with the VLC, isn't it a fact that the

21   settlement agreement that you testified to with the VLC occurred

22   sometime in the winter of 2010, their appeal was dismissed in

23   January of 2010, you weren't sure of the date in your deposition,

24   but that sounds about right, doesn't it?

25   A.  The timing, I wouldn't dispute it, I don't know.

```
 1  Q.  And that dismissal of their appeal you testified in your
 2  deposition was tied to the agreement for dollars that you reached
 3  with the VLC; is that right?
 4  A.  Yes.
 5          SPECIAL MASTER JUNEAU:  Ms. Woodward, three more
 6  questions and we'll terminate because -- I will say it one more
 7  time -- I want to afford these other parties an opportunity to
 8  cross-examine.
 9          MS. WOODWARD:  Thank you, your Honor.
10  BY MS. WOODWARD:
11  Q.  You agreed to pay the VLC 20 to $25 million dollars long before
12  the point system guide had been created, didn't you?
13  A.  We did not agree to pay them 20 to $25 million.  Period.  We
14  reached an agreement with them that we would recommend to the court
15  $25 million for the aggregate of those five firms to the court
16  based upon an 8 percent assessment.
17  Q.  And you did that before --
18          MS. WOODWARD:  Master Juneau, I want to note for you that
19  this is my last question.  It's not my final question, it's the
20  question that I asked before, I'm still on question No. 1, he
21  didn't answer it.  So question No. 1 is --
22          SPECIAL MASTER JUNEAU:  This is like a subset of
23  interrogatories?
24          MS. WOODWARD:  No, it's the question but he didn't answer
25  it so I have to repeat it.  So I just want to make sure --
```

1          SPECIAL MASTER JUNEAU:  I will give you some latitude,

2     you know where I'm headed.

3          MS. WOODWARD:  I do, you're impatient -- excuse me, your

4     Honor, you're ready for me to be finished.

5          SPECIAL MASTER JUNEAU:  Go ahead.

6     BY MS. WOODWARD:

7     Q.  Mr. Birchfield, when you entered the VLC's time on the grid in

8     front of you, you entered points that would add up to the amount

9     that you had agreed to pay the VLC, did you not?

10    A.  The points do add up to that amount.  But that's really to be

11    expected.  At the time we entered into the agreement with the Texas

12    group, we didn't just pick a number.  At that point we knew the

13    contribution of the firms that comprised that group.  We knew the

14    date about the bellwether trials that they had conducted, we knew

15    about their leadership roles, we knew what they had done in

16    discovery, we knew what they had done in regards to science in

17    developing experts, we knew what they had done in regards to the

18    New Jersey litigation.

19          At that point, at the point that we entered into that

20    agreement, it was an agreement that was reached after a

21    considerable period of time and considerable discussions.  And the

22    Fee Allocation Committee, when we agreed to an amount we knew, we

23    knew what their contributions were, we knew the guidelines that

24    Judge Fallon had set forth in Pretrial Order 6D, knew that all

25    of the contributions that the firm had made.

1          So it's not surprising that that number, that the numbers

2    closely aligned with what we had agreed to because we had all of

3    that information before we entered into the agreement.

4    BY MS. WOODWARD:

5    Q.  When you made your recommendation on your December 2010 grid

6    for Kline & Specter, you had had the affidavits, you had had the

7    presentations, you awarded them points that came up to a

8    recommendation of $4.5 million; is that correct?

9    A.  Yes.

10   Q.  Then somewhere between the first allocation grid and the second

11   allocation grid they dropped $500,000 and the points to match

12   dropped with it, didn't it?

13   A.  I think that that's true, but --

14   Q.  And now we're back up to $15 million in this week's settlement

15   with Kline & Specter, more than three times what you recommended

16   for them initially, and what I want to know is whether we're going

17   to see yet another grid that explains those points that went

18   missing, I racked it up at about 200 points that went missing with

19   the ten million extra dollars you've now decided they're entitled

20   to?

21   A.  I don't expect that you will see new grid.  We have throughout

22   this process, we as a Fee Allocation Committee have followed the

23   instructions of the court to the best of our ability.  Judge Fallon

24   instructed us to collect the affidavits, to collect the time

25   submissions and to make a recommendation based upon the best

1     objective criteria that we could, we did that.

2              Judge Fallon has -- he set forth the process and we have

3     followed it.  Judge Fallon appointed Special Master Juneau and gave

4     him authority.  Special Master Juneau instructed the Fee Allocation

5     Committee to explore resolution in these matters, and that's

6     consistent with what the courts have held.  I mean, the

7     jurisprudence is clear, lawyers should strive to work out fee

8     allocation matters among themselves.  And so when we were

9     instructed to do that, we undertook to do that to the best of our

10    ability; and we have reached, we've reached agreements and that's

11    where we are.

12             And we have at every phase of this process, we have done

13    the best that we could to follow the instructions of the court,

14    certainly the orders of the court, and we will continue to do so.

15             MS. WOODWARD:  Thank you, Mr. Birchfield.  Your Honor, I

16    can't say that I have no further questions, only that I will not

17    ask them in deference to the court's ruling.

18             SPECIAL MASTER JUNEAU:  Thank you very much.

19    Mr. Urquhart, do you have any questions?

20             MR. URQUHART:  Your Honor, I had been allocated 20

21    minutes in which to cross-examine Mr. Birchfield.  As the court has

22    pointed out, his deposition was taken and I would like --

23             SPECIAL MASTER JUNEAU:  I didn't get the last thing the

24    court pointed out what?

25             MR. URQUHART:  His deposition has been taken and I would

```
 1        like to reserve any time that I have until after he testifies.

 2                    SPECIAL MASTER JUNEAU:  After what?

 3                    MR. URQUHART:  After he testifies, after he gives his

 4        direct testimony because I may have no additional questions.  If he

 5        is going to stand on what he's said then, about my client,

 6        Ms. Snapka, then I may have no questions.

 7                    SPECIAL MASTER JUNEAU:  They will have to make a decision

 8        whether they want to put Mr. Birchfield on the stand at the

 9        conclusion, I don't know what they're going to do.

10                    MR. URQUHART:  If he doesn't testify --

11                    SPECIAL MASTER JUNEAU:  He may not testify.

12                    MR. URQUHART:  Then I obviously can't cross-examine him.

13                    SPECIAL MASTER JUNEAU:  I am just giving you an

14        opportunity now if you want to ask questions now, I want to afford

15        you that opportunity.

16                    MR. URQUHART:  Right.  And what I am saying is I would

17        like to reserve it if he testifies and if he testifies to anything

18        about my client.

19                    SPECIAL MASTER JUNEAU:  Fine.

20                    MR. URQUHART:  One, I won't call it housekeeping matter,

21        your Honor, but with regard to these agreements that have been

22        reached since this process has started, I actually do not have

23        physical possession of the agreements but I would like them to be

24        attached as exhibits to this proceeding or somehow made a part of

25        the record.
```

1          SPECIAL MASTER JUNEAU:  I would like to, I think I am

2     correct when I say this, we call them what's been referred to as

3     settlement.  What I understand what this is, this is a

4     recommendation to the court because the court is also one that has

5     to weigh that, and be it recommended by anybody or not.  So in that

6     context of the question -- I know I'll ask Mr. Herman, you handed

7     those out.

8          MR. HERMAN:  I believe we provided all of them, the last

9     e-mail I got was related to Kline & Specter.  Did you get that?

10          MR. BIRCHFIELD:  There may be one or two that we have not

11     received.

12          SPECIAL MASTER JUNEAU:  Let me address this because I

13     think it will answer your question.  I am going to direct towards

14     the conclusion of this thing that the FAC submit to me, and I am

15     going to make it a part of this record, all of the, whatever has

16     transpired, whatever all of those recommendations for the totality

17     of all members, and that's going to be made a part of this record

18     and I think that's really what you want.

19          MR. URQUHART:  That's what I'm asking for, thank you.

20          SPECIAL MASTER JUNEAU:  Mr. Hockema.

21          MR. HOCKEMA:  Your Honor, based on the conversation with

22     Mr. Blizzard who I guess would be the one to maybe ask the question

23     of Mr. Birchfield, I don't think I am going to have any

24     cross-examination.  And if I do have, it will be fairly minimal.  I

25     just assume reserve it and see if he does testify.

```
1              SPECIAL MASTER JUNEAU:  If he does, in fact, testify.

2    And that will be reserved if they do, in fact, put him on the

3    stand.

4              MR. HOCKEMA:  Thank you, your Honor.

5              MR. ARCENEAUX:  I have to take you, remember at the end

6    of the day yesterday you reminded me about common exhibits, is it

7    appropriate now?

8              THE COURT:  We are not quite finished.  I am going to get

9    to you.  Mr. Becnel.

10             MR. ARCENEAUX:  I'm sorry, I forgot about Danny.

11             MR. BECNEL:  Yes, I have some questions.  When do you

12   want me to start?

13             SPECIAL MASTER JUNEAU:  Why don't we do this, just take a

14   ten minute break if you don't mind, ten minutes short we will be

15   back for Mr. Becnel's examination.

16        (WHEREUPON, A RECESS WAS TAKEN.)

17        (OPEN COURT.)

18             SPECIAL MASTER JUNEAU:  All right.  We're back on the

19   record.  Mr. Becnel.

20                          CROSS-EXAMINATION

21   BY MR. BECNEL:

22   Q.  Mr. Birchfield, you told the court that you had had no MDL

23   experience whatsoever prior to this case where I nominated you to

24   be co-lead counsel; is that correct?

25   A.  I had not served on a Plaintiff Steering Committee.
```

```
 1    Q.  You had not served on a Plaintiff Steering Committee, nor had

 2    you appeared before the MDL panel, had you?

 3    A.  That's correct.

 4    Q.  Nor had you even filed any kind of papers before the MDL panel

 5    as of that time?

 6    A.  That's true.  I had handled most of my cases in state court and

 7    tried to stay in state court.

 8    Q.  And as a result of that you were not familiar with MDL

 9    procedures, were you?

10    A.  That's not true.

11    Q.  Well, tell me what seminars did you go to that dealt with MDL

12    procedures prior to your being named co-lead counsel.

13    A.  I don't recall that I went to a seminar on MDL procedures,

14    Mr. Becnel.

15    Q.  Did you teach any courses on MDLs prior to that time?

16    A.  No.

17    Q.  Was your firm involved in any leadership positions in MDLs

18    prior to that time?

19    A.  My firm, it's been around for awhile, Mr. Becnel.  I cannot say

20    whether we had other members of my firm have been or not.

21    Q.  Most firms that are in an MDL know whether or not a member of

22    their firm is on a plaintiffs committee or a defense committee in

23    an MDL or has some role because that's kind of the pinnacle of

24    legal practice, isn't it?

25              SPECIAL MASTER JUNEAU:  Just a minute, counsel.
```

1          MR. BLIZZARD:  Objection, speculation what other firms

2    might know.

3          SPECIAL MASTER JUNEAU:  I will sustain that objection.

4          MR. BECNEL:  All right.

5    BY MR. BECNEL:

6    Q.  Now, prior to your involvement in the MDL, you had done a lot

7    of work precursor to the MDL in the state court with this

8    particular drug?

9    A.  We had done substantial work and litigation in Vioxx before the

10   formation of the MDL, yes.

11   Q.  Had you taken depositions?

12   A.  Had our firm taken depositions?

13   Q.  No, I asked you had you taken depositions?

14   A.  I personally did not, I supervised our --

15   Q.  Wait, that's all I asked you, sir, I didn't ask you to

16   supervise, I said did you take depositions, it's either yes or no.

17         MR. BLIZZARD:  Wait a minute.  I would object that the

18   witness be given a chance to answer the question.

19         SPECIAL MASTER JUNEAU:  You can answer the question yes

20   or no and then if you want to explain you can explain.

21         THE WITNESS:  I don't think I had personally taken any

22   depositions in the Vioxx litigation, I supervise our mass tort

23   section and lawyers working under my supervision had taken

24   considerable depositions.

25   BY MR. BECNEL:

1    Q.  Give me the names of the lawyers who were working under your

2    supervision at the time.

3    A.  The primary lawyer that was working on Vioxx was David Miceli

4    and then Paul Sizemore.

5    Q.  Jerry Taylor didn't work on it?

6    A.  No.

7    Q.  Both of those left, did they not?

8    A.  I'm sorry?

9    Q.  Both of those left your firm, did they not?

10   A.  Both of those lawyers are no longer members of our firm.

11   Q.  And they left your firm before you tried your first case?

12   A.  David Miceli left the firm before we tried our first Vioxx

13   case?

14   Q.  Yes, sir.

15   A.  Paul Sizemore did not and Jerry Taylor -- I mean, in putting

16   that in a time frame because Jerry Taylor was -- he was not really

17   working on the Vioxx cases, I don't recall if he left before we

18   tried the first Vioxx case or not, I don't recall.

19   Q.  Was Paul Sizemore on the trial team in the first Vioxx case you

20   tried in Houston?

21   A.  Yes.

22   Q.  And did he take any witnesses?

23   A.  Yes.

24   Q.  How many?

25   A.  He took several witnesses, I don't recall how many.

1    Q.  Mr. Beasley took some witnesses, did he not?

2    A.  Yes.

3    Q.  And you know I was there, did you not?

4    A.  There were a lot of lawyers there, Mr. Becnel.  Did I see you

5    there, I can't say.

6    Q.  Well, are you changing your testimony from the previous

7    deposition you just gave just a few days ago where you said, yeah,

8    you remember me being there?  Are you changing your testimony, sir?

9    A.  No, I am not changing my testimony.

10           SPECIAL MASTER JUNEAU:  He said he wouldn't doubt if you

11   were there; is that right?

12           THE WITNESS:  That's right.  I wouldn't doubt that you

13   were there.

14   BY MR. BECNEL:

15   Q.  Now, let's talk about the people that are here, just as an

16   exemplar for the court.  Was Mr. Blizzard involved in state court

17   litigation prior to the MDL formation on Vioxx?

18   A.  Not that I am aware of.

19   Q.  So he wasn't involved.  Mr. Arnold Levin, was he involved in

20   Vioxx litigation before the MDL was formed?

21   A.  Not that I am aware of.

22   Q.  We know about the Papantonio law firm, they had been given

23   cases by Jerry Parker and they turned them down saying after the

24   doctor looked at them it wasn't a viable case?

25   A.  I don't know that.

```
 1            SPECIAL MASTER JUNEAU:  Just a minute, counsel.

 2            MR. BLIZZARD:  Objection, it wasn't a question, it was

 3   more of a statement by Mr. Becnel.

 4            SPECIAL MASTER JUNEAU:  Put it in question form.

 5   BY MR. BECNEL:

 6   Q.  Were they involved in the Vioxx case prior to the MDL, sir?

 7   Yes or no.

 8   A.  Yes, I believe --

 9   Q.  What role did they play prior to the MDL?  Had they filed a

10   suit in state court?

11            MR. BLIZZARD:  Objection, which question is being asked?

12   BY MR. BECNEL:

13   Q.  Had they filed a suit in state court prior to the MDL, yes or

14   no?

15   A.  I don't know.

16   Q.  Had they filed a suit in federal court prior to the MDL, yes or

17   no?

18   A.  I don't know.  I think that they had but I don't know.

19   Q.  Well, what do you base it on, sir, think they had?

20   A.  Well, I know that after the withdrawal of the drug that there

21   were a number of lawsuits filed, I know that Troy Rafferty and

22   other members of his firm were engaged in the litigation for months

23   before the actual formation of the MDL, but there were 50,000

24   claims here.  So for me to say, you know -- and you went over 1,000

25   law firms -- for me to say when a law firm filed a case and where
```

1  they filed it, you know, I can't say.  That's beyond my knowledge.

2  Q.  Mr. Herman's firm, was he involved in Vioxx litigation prior to

3  the MDL?

4  A.  Yes.

5  Q.  Which case?  State or federal?

6  A.  I don't know.  I don't know about the case that Mr. Herman had

7  filed and whether it was in state court or federal.  You asked me

8  if he was involved in the Vioxx litigation before the MDL and I

9  said yes.  I don't know -- I can't cite you a case that was filed

10  or where it was filed.

11  Q.  Well, his case wasn't part of the MDL moving papers, was it, so

12  that means it wasn't in federal court; isn't that true?

13  A.  I don't know.  I don't know what cases -- the moving papers

14  were filed more than six years ago and they listed cases, but I

15  can't tell you sitting here which cases were part of that and which

16  ones were not.

17  Q.  All you have to do is look at the MDL docket and you can tell

18  which case is a part of it because it's listed right there and

19  everybody has to notify everybody.

20  A.  Are you asking me to do that?

21  Q.  No, you're aware of that, aren't you?

22  A.  I'm aware -- no.  I am not saying that it's not determinable.

23  You're asking me to tell you without looking at any documents

24  sitting here on the stand whether a case was listed in moving

25  papers that were filed over six years ago, and I am acknowledging

1    that's beyond my knowledge.

2    Q.  Mr. Seeger was a leader in state court litigation prior to the

3    MDL, wasn't he?

4    A.  Yes.

5    Q.  Mr. Lanier was a leader in state court litigation prior to the

6    MDL, was he not?

7    A.  Mr. Lanier had been actively engaged in the, in Vioxx

8    litigation, he had taken depositions, he was preparing for trial

9    before the formation of the MDL.

10   Q.  Now, you knew Mr. Arsenault and I were involved in the case

11   prior to the formation of the MDL, didn't you?

12   A.  Yes.  I knew that -- I mean, before the formation of the MDL I

13   knew that you were looking at Vioxx cases, and I've seen recently

14   because you put it in your exhibits that you had filed a case like

15   the day after the withdrawal.  So I am aware that you were involved

16   in the Vioxx litigation before the formation of the MDL.

17   Q.  And you knew I had experts well in advance of the MDL, didn't

18   you?

19   A.  No.

20   Q.  You looked at that expert list of all of the experts, didn't

21   you?

22   A.  Yes.  Now, do --

23   Q.  Yes or no did you look at that exhibit I think it was 31?

24            SPECIAL MASTER JUNEAU:  Just a minute, counsel, I think

25   we're talking about two separate things.  The question was, did you

```
 1   know he had experts, I think is the question?

 2            THE WITNESS:  I understood the question to be did you

 3   have Vioxx experts before the formation of the MDL?

 4            MR. BECNEL:  Yes, sir.

 5            THE WITNESS:  And I knew that you had, that you had

 6   brought some doctors to some seminars, but as far as -- I wouldn't

 7   classify those gentleman as Vioxx experts based upon that fact

 8   alone.

 9   BY MR. BECNEL:

10   Q.  Well, let's go and talk about things you got points for.  You

11   got points for trying cases, is that correct?

12   A.  The Fee Allocation Committee assigned points for trying cases,

13   that's true.

14   Q.  Whether you lost them or won them you got points?

15   A.  That's true.

16   Q.  Okay.  Did Mr. Levin try a case?

17   A.  No.

18   Q.  Did anybody in his firm try a case?

19   A.  A Vioxx case, not that I am aware.

20   Q.  All right.  Did Mr. Blizzard, Ed Blizzard try a Vioxx case?

21   A.  Yes.

22   Q.  Was it successful?

23   A.  It was a defense verdict.

24   Q.  So it wasn't successful.  Mr. Rafferty and the Papantonio firm,

25   did they try a case?
```

1    A.   Yes.

2    Q.   Was it successful?

3    A.   It was a defense verdict.

4    Q.   Mr. Seeger and Mr. Buchanan, they knew all about Vioxx because

5    they were the premier people in Vioxx other than Mr. Lanier,

6    weren't they?

7    A.   Mr. Seeger is a premier lawyer and they had been involved in

8    the --

9    Q.   I said Mr. Seeger and Buchanan.  I said both.

10   A.   And Mr. Buchanan and Mr. Lanier and our firm and Mr. Girardi's

11   firm, and Shelly Sanford and Carlene Lewis and Hockema and Escobedo

12   and Kathy Snapka had been involved in cases before the drug was

13   pulled off the market and had a significant knowledge base before

14   the drug was pulled off the market.

15   Q.   Now, what drove this settle was Mr. Lanier's verdict of $250

16   million, wasn't it?

17   A.   There were a number of factors that drove the settlement.  The

18   very first meeting that we had, the plaintiff leadership, at least

19   the plaintiff executive committee, and the defense committee with

20   Judge Fallon after the formation of the MDL, Judge Fallon said,

21   gentlemen, we're going to try four bellwether cases.  I want you to

22   select bellwether cases and we are going to try those and we're

23   going to get them ready for trial and get them to trial on a tight

24   timetable.

25           MR. BECNEL:  Your Honor, that's unresponsive to my

1    question.  I didn't ask him about what Judge Fallon did and four

2    trials.

3              SPECIAL MASTER JUNEAU:  Repeat your question.

4              MR. BECNEL:  My question was, wasn't Mr. Lanier's verdict

5    of $250 million what drove this settlement.  That's all I asked.

6              SPECIAL MASTER JUNEAU:  You understand the question?

7              THE WITNESS:  Well, I would say that there was not a

8    single driver in this case, and that was a factor and I was trying

9    to explain what I considered to be the factors.

10              SPECIAL MASTER JUNEAU:  Go ahead and explain.

11              THE WITNESS:  At the beginning of this litigation Judge

12   Fallon after the formation of the MDL, the very first meeting said

13   to the leadership of the plaintiffs and to the defense, we are

14   going to try four bellwether cases.  I want you to select

15   representative cases.

16              When we conclude those bellwether trials, I am going to

17   have another meeting.  We are going to come back around this table

18   and we are going to meet.  I am going to invite a Merck

19   representative or CEO, whoever, down here and we're going to sit

20   around this table and we are going to discuss whether there is an

21   interest in trying to resolve these cases or not.  If there is an

22   interest, then I will work to facilitate resolution.  If there's

23   not, then we'll have our trial package and we will remand these

24   cases.

25              So we took Judge Fallon at his word, we bought into his

1    plan.  Hurricane Katrina hit, New Orleans was a much different

2    place to try cases, but nonetheless, Judge Fallon set the cases and

3    we stepped up to the plate, we tried them.

4           As the last case was being tried in the MDL, Judge Fallon

5    had that meeting, he had the discussion, there was interest in

6    resolution, and we began the negotiation process at that point.

7    Q.  All right.  Let me ask you.  What happened to the stock price

8    after Mr. Lanier had a $250 million verdict?

9           SPECIAL MASTER JUNEAU:  Mr. Becnel, you have to speak

10   into the microphone, the court reporter can't hear you.

11   BY MR. BECNEL:

12   Q.  What about the stock price of Merck after his $250 million

13   verdict?

14   A.  I don't know.  I would imagine that the stock price took a dip,

15   but I can't tell you --

16   Q.  Do you know how many billion dollars dip it took, sir, that

17   first day after the verdict?

18   A.  No, I do not.

19   Q.  Would it surprise you that it was well over $50 billion of a

20   dip in stockholder value that first day after the verdict?

21          MR. BLIZZARD:  Your Honor, the relevance of

22   Mr. Birchfield's surprise to that --

23          SPECIAL MASTER JUNEAU:  I was going to ask you,

24   Mr. Becnel, what's the relevance of this testimony?

25          MR. BECNEL:  Because that is what drove the settlement.

```
 1   The dip in the stock value according to every financial expert in

 2   the country.  If he knows, and if he doesn't know --

 3            SPECIAL MASTER JUNEAU:  He already said he doesn't know I

 4   believe.

 5            MR. BECNEL:  Okay.

 6   BY MR. BECNEL:

 7   Q.  Now let's talk about people who did work.  Did Mr. Blizzard

 8   send anybody to the depository in Montgomery to do the documents?

 9   Yes or no?

10   A.  Well, you've gone two different directions there, if you asked

11   about doing work then I can tell you about doing work.

12   Q.  I didn't ask you about doing work, I said did he do any work by

13   sending people to the depository?  Mr. Blizzard first.  In

14   Montgomery or in New York.

15   A.  I am not aware.

16   Q.  How about Mr. Levin's office?  And I am only asking about the

17   people who happen to be here.  Yes or no?

18   A.  Yes or no to what, Mr. Becnel?  I mean, are you --

19   Q.  Did they send people to do the documents in the depository in

20   Montgomery or in New York?

21   A.  That's what I wanted to know if you were talking about solely

22   Montgomery or New York.

23   Q.  That's correct.  That's all I asked.

24   A.  There are other depositories --

25   Q.  I didn't ask you about other depositories, Mr. Birchfield, just
```

1    answer my question.  He is not being responsive.

2            SPECIAL MASTER JUNEAU:  Counsel, counsel.  Just answer

3    the question, we're not going to have argumentative questions.

4    BY MR. BECNEL:

5    Q.  Did he have anybody in New York or in Montgomery doing

6    documents?

7    A.  I don't recall.

8    Q.  You know there was a sign-in sheet that if you did work you had

9    to come in and sing in and sign out each day?

10   A.  I am aware that there was a sign-in sheet.

11   Q.  Mr. Rafferty's firm, Levin Papantonio, did they send anybody to

12   Montgomery or New York to do documents?

13   A.  I am not aware one way or the other.

14   Q.  We know Mr. Seeger's firm, they were the guru of documents,

15   weren't they, because they had more technology than they had in

16   Montgomery, didn't they?

17   A.  I can't answer that question.  I mean, the main depository was

18   established in New York.  We had an effective depository in

19   Montgomery.  The degree of technology, I can't comment on.

20   Q.  Okay.  Mr. Herman, did Mr. Herman send anybody to Montgomery or

21   to New York prior, that you know of, either place?

22   A.  Montgomery or New York, I can't say.

23   Q.  But a sign-in sheet would have certainly told you who was doing

24   the documents, wouldn't it?

25   A.  There are sign-in sheets.

1    Q.  Mr. Lanier had his own documents because he was in state court

2    and he wasn't encumbered and he didn't have "a depository" for

3    coordination, but he had the documents because his was one of the

4    first filed cases in state court; isn't that true?

5    A.  Mr. Lanier had documents.

6    Q.  So the only people doing documents at the time were the Seeger

7    firm and people that would come in at Seeger's request, and they

8    would have to sign in and sign out; isn't that true?

9    A.  No.

10   Q.  Is there any question that any of the people whose time not

11   reported to Mr. Garrett in the MDL, didn't sign in and sign out and

12   were some of the only people doing some of the documents prior to

13   these trials -- other than people like Mr. Lanier who was doing his

14   own and Mr. Seeger who was doing his own -- is there anybody else

15   that you know of on the FAC that did that?

16   A.  Yes, there are --

17   Q.  Tell me who they are and let's tell me when they signed in and

18   who was the person that was doing it and when.

19   A.  Your question was were they doing document review?

20   Q.  Yes.  And tell me who it was.

21   A.  Our firm was doing document review.

22   Q.  Based on your original case that was filed in Alabama?

23   A.  We had documents and we were reviewing those documents.  You're

24   talking about before the formation of the MDL.

25   Q.  Absolutely.

1    A.  And I know that Mr. Rafferty's firm was doing document review.

2    Mr. Blizzard's firm, I know that they did document review.  At what

3    point in time it started, I don't know.  Mr. Herman's firm was

4    doing document review.  We know that Mr. Seeger's firm, you

5    mentioned that his firm was doing document review.  I know that

6    Mr. Levin's firm did document review.  I am not aware -- and

7    Mr. Girardi also had cases that were filed before the formation of

8    the MDL, they had documents, they were doing document review.

9    Perry Weitz's firm, I know that they were involved early in the

10   litigation, I know they did document review, I cannot say whether

11   it was before or after the formation of the MDL.

12   Q.  Most of those other people you talked about just now, it was

13   all after the MDL and the MDL depositories that were formed, other

14   than the people that I've been talking about, Seeger and Lanier.

15   And Carlene Lewis.

16   A.  You're just asking about who was doing, who did document

17   review --

18   Q.  Before the formation of the MDL, that's what I'm asking.

19   A.  Okay.  I've told you all I can tell you in that regard, sir.

20   Q.  Did the FAC ever take those sign-in and sign-out sheets whether

21   it was at the New York depository, New Orleans depository, the

22   Montgomery depository, the Texas depository, or the California

23   depository to see if they all had the same procedure of sign

24   in/sign out and how many documents you were doing per day per

25   lawyer, did they have those procedures and did you look at those

1   sign in/sign out sheets?

2   A.  They have been seen.

3   Q.  No, I didn't ask you about they, I asked you did you?

4   A.  Yes.

5   Q.  You looked at those?

6   A.  I have looked at some sign-in sheets of the depository.

7   Q.  Which ones did you look at, sir?

8   A.  I don't recall, Mr. Becnel.  I mean, there are a lot of sign-in

9   sheets and I can't recall -- I know that I've seen sign-in sheets,

10  but I can't tell you which ones I saw, which ones I didn't.

11  Q.  Let's talk about the MDL.  Who made arguments for different

12  locations at the MDL hearing, because you were present, weren't

13  you?

14  A.  I was present and I recall you making an argument.  I don't

15  recall who else argued.

16  Q.  Has anybody else you know made an argument for a judge, a

17  particular judge or a particular jurisdiction?  You were present,

18  that's an important event in your life, wasn't it?  Big case.

19          MR. BLIZZARD:  Objection.  Mr. Becnel continues to ask

20  multiple questions.  So his questions are compound.

21          SPECIAL MASTER JUNEAU:  I going to sustain the objection

22  as far as it's a compound question.  Ask a single question.

23  BY MR. BECNEL:

24  Q.  This was your first time in an MDL hearing?

25  A.  I think that's probably true.

1   Q.  Your case was named by me from Alabama, my case in Louisiana.

2   Do you know of anybody else who was present and asked for a

3   particular jurisdiction at that MDL hearing?

4   A.  I don't recall who asked for what venues.  I remember you being

5   there, I remember that you had advocated for the Eastern District

6   of Louisiana, beyond that I don't recall.

7   Q.  And particularly Judge Eldon Fallon, didn't I?

8   A.  You said that, I don't dispute it.

9   Q.  Didn't the papers say that?

10  A.  I'm sorry, Mr. Becnel, I mean, that was six years ago and I

11  don't recall what the papers said.

12  Q.  Mr. Birchfield, I filed the first application to be on the

13  plaintiffs committee when Judge Fallon issued an order; isn't that

14  correct?

15  A.  I don't know.  I don't know who was first.

16  Q.  I put in there that Mr. Arsenault and I were getting people to

17  review documents and they were being reviewed in Montgomery,

18  Alabama.  Isn't that in my application?

19  A.  I cannot say.

20  Q.  You knew that shortly after Katrina Mr. Arsenault lost not only

21  his home but lost his office because of a flood with a hurricane

22  called Rita?

23          SPECIAL MASTER JUNEAU:  Just a minute, counsel.  This is

24  repetitious, Mr. Becnel.  We've gone over that.  You went over that

25  precise point in your testimony.

1          MR. BECNEL:  I didn't remember the name.

2          SPECIAL MASTER JUNEAU:  I remember.

3          MR. BECNEL:  I didn't remember the name of the hurricane.

4          SPECIAL MASTER JUNEAU:  That's the difference?

5          MR. BECNEL:  That was the only difference, I didn't have

6    that on the record.

7          SPECIAL MASTER JUNEAU:  Well, that's doubly irrelevant

8    and duplicitous.  Move on.

9    BY MR. BECNEL:

10   Q.  Did you ever issue a call for people in the MDL to send people

11   to do these documents because nobody was doing them?

12   A.  The PSC on multiple occasions reached out to lawyers, invited

13   lawyers to participate.  We had from the very beginnings of this

14   litigation, we had invited cooperation and participation from

15   lawyers all across the country, and we had asked lawyers and we

16   invited lawyers to send, either come or send lawyers to the

17   depositories to review documents.  That's true.

18   Q.  And I stepped to the plate, Mr. Arsenault stepped to the plate,

19   didn't we?

20   A.  You sent lawyers and Mr. Arsenault sent lawyers, yes.

21   Q.  And we sent more than anybody else, didn't we, in the whole

22   MDL?

23   A.  I have not made that comparison, I don't know.

24   Q.  The evidence would show that, wouldn't it, Mr. Birchfield,

25   because --

```
 1              SPECIAL MASTER JUNEAU:  He said he doesn't know, so the
 2    evidence speaks for itself.
 3    BY MR. BECNEL:
 4    Q.  You had a person in charge in your office to do that very thing
 5    to see who was there, who wasn't there, and that's why you
 6    established a sign in/sign out sheet; isn't that true?
 7    A.  We did have a sign-in and sign-out sheets, I did have a person
 8    in my office that monitored my office.  There was other
 9    depositories, there was a depository not only in Montgomery but in
10    New York and New Orleans and California.
11    Q.  Isn't it a fact that every person that either Mr. Arsenault
12    sent or I sent were lawyers with multiple years of experience doing
13    document review in multiple different types of setting in MDLs?
14              SPECIAL MASTER JUNEAU:  Excuse me, counsel.  Mr. Becnel,
15    all due respect, your testimony was very detailed on that, in that
16    regard to describe the lawyers and the level of experience, that's
17    in the record.
18              MR. BECNEL:  I understand, but they didn't look at it.
19    They didn't look at it, that's what I am trying to get to.
20              SPECIAL MASTER JUNEAU:  Then ask him that question.
21    BY MR. BECNEL:
22    Q.  You didn't look at all of the experience of all of the lawyers,
23    did you?
24    A.  Yes, we did.
25    Q.  You did?
```

1    A.  We have, I mean, in the affidavits that were submitted in

2    support of the common benefit application, the years of the lawyers

3    were included and we reviewed it.

4    Q.  Not just years of lawyers were included, years of the lawyers

5    with experience in doing document review.  Isn't that what was

6    critical?

7    A.  We reviewed -- we reviewed the affidavit that you submitted for

8    your common benefit fee application, we reviewed the affidavit that

9    Mr. Arsenault submitted for his common benefit application, we were

10   there for the hearings and we reviewed the transcripts of the

11   presentations that you made and Mr. Arsenault made where you set

12   forth what you deemed to be important for your common benefit

13   application.

14   Q.  You told me there was 2,000 depositions taken; is that correct?

15   A.  That's my understanding there were 2,000, in the neighborhood

16   of 2,000 depositions that were taken.

17   Q.  You were aware of my vast MDL experience, weren't you?

18          SPECIAL MASTER JUNEAU:  Counsel, what relevance does that

19   have?

20          MR. BECNEL:  As to why was I not assigned a single

21   deposition as either first or second chair.

22          SPECIAL MASTER JUNEAU:  Go ahead and answer the question.

23   BY MR. BECNEL:

24   Q.  You knew my vast experience in MDLs at that time in over 35

25   years or 38 years at that time?

1  A.  By reputation.

2  Q.  You knew I had been sent to negotiate with the board of

3  directors in Cologne, Germany the settlement in Baycol, didn't you?

4          MR. BLIZZARD:  Objection, relevance.

5          SPECIAL MASTER JUNEAU:  I am going to sustain that

6  objection.

7  BY MR. BECNEL:

8  Q.  Were you aware that I had taken depositions in the pedicle

9  screw and Baycol and numerous other depositions all over Europe?

10  A.  I was aware that you had taken some Baycol depositions, yes.

11  Q.  Can you explain to me, Mr. Birchfield, since I was the person

12  that "organized" the initial meeting of all of the lawyers that

13  showed up to say let's see if we can agree on two people to be

14  co-lead counsel and make that recommendation to Judge Fallon, that

15  you would expect somebody like me to be involved in at least taking

16  one deposition?

17  A.  We formed committees, we had a discovery committee, there had

18  been extensive work done in the litigation.  We knew the lawyers

19  that were up to speed in the case and had the skill level to take

20  the depositions, we knew the workloads and we made assignments

21  based upon who we thought would do the best job for that deposition

22  and was available.

23  Q.  And you knew that you had said to everybody, if you do the

24  documents, you will be assigned depositions either first or second

25  chairs or on the deposition teams, wasn't that the bait that was

1  thrown out to people to go work in the depository?

2  A.  Not that I know of.

3  Q.  The people didn't think you did such a stellar job as a trial

4  lawyer, did they?

5        SPECIAL MASTER JUNEAU:  I am going to object to that.  We

6  don't have evidence of that.

7        MR. BECNEL:  I am going to show you some evidence, your

8  Honor.

9        MR. BLIZZARD:  Your Honor, I am going to object to the

10  relevance of any testimony about what somebody else thinks about

11  Mr. Birchfield's job in trial.

12        SPECIAL MASTER JUNEAU:  Why is that relevant?

13        MR. BECNEL:  Your Honor, it's relevant because not only

14  did Tommy Fibich write an e-mail saying that this is the worst

15  trial that he had ever seen, but Mr. Seeger basically said the same

16  thing, Mr. Arsenault said the same thing, Mr. Kline said the same

17  thing after that first trial in Texas, and I have all of their

18  e-mails.

19        SPECIAL MASTER JUNEAU:  Here is the question I have for

20  you, Mr. Becnel.  We're here and I am giving you an opportunity to

21  cross-examine this gentleman having to do with your objections.

22  What possible relevance does that line of questioning have to do

23  with your objection as to the award that you got?

24        MR. BECNEL:  Your Honor, it would have everything to do

25  with getting credit where most of the people who attended that

1   trial were horrified about how Mr. Seeger -- I mean, Mr. Birchfield

2   tried this case with his partner and lost it with the themes, with

3   the experts, and with the legal ability.

4          SPECIAL MASTER JUNEAU:  So what --

5          MR. BECNEL:  And then they got credit for it, they got

6   credit for that that everybody thought they had done a horrible

7   job.

8          SPECIAL MASTER JUNEAU:  So the relevance you're saying is

9   that Mr. Birchfield himself should not have gotten a credit for

10  what he got?

11         MR. BECNEL:  That's correct, absolutely.

12         SPECIAL MASTER JUNEAU:  And that's your contention, you

13  made that point based on the observations you don't think he did a

14  good job, right?

15         MR. BECNEL:  Not just I but I didn't put it in a letter.

16  All of those e-mails.

17         SPECIAL MASTER JUNEAU:  I don't have all of those

18  witnesses here, I don't know the substance.  I've got your point, I

19  know that's been noted --

20         MR. BECNEL:  I would like to move --

21         SPECIAL MASTER JUNEAU:  You can offer those into

22  evidence.

23         MR. BECNEL:  -- I'll offer those in evidence right now.

24         SPECIAL MASTER JUNEAU:  I am going to allow them into

25  evidence subject to the weight to which it will be given by the

```
 1    court, I don't know the bases, the substance, or anything regarding

 2    them.

 3            MR. BLIZZARD:  We are going to object to them on

 4    relevance and hearsay grounds.

 5            MR. SEEGER:  To the degree I wrote an e-mail, I am happy

 6    to get on the stand and testify.

 7            MR. URQUHART:  Your Honor, can I take a look at them

 8    while we're discussing this?

 9            MR. HERMAN:  His question was everybody, these folks put

10    in a Puerto Rico tape in which I said Mr. Birchfield did an

11    exceptional job, tried cases that the defense picked, and spent

12    millions of dollars.  And I don't think whether somebody wins or

13    loses a case means a thing as to what Mr. Becnel did.  This is

14    highly irregular.

15            SPECIAL MASTER JUNEAU:  I made the ruling.  But let's

16    move on to something else, I am way past that.

17    BY MR. BECNEL:

18    Q.  After all of that time, money, and effort in getting these

19    documents ready for your trial and other people's trials, you and

20    the FAC estimating the value of my time, money, and effort at

21    $97,000; is that correct?

22    A.  That's correct.  We took the work that you did and followed

23    Judge Fallon's orders and actually -- Judge Fallon had in Pretrial

24    Order 6D had set out the criteria that you were to follow.  You

25    failed to follow -- comply with his order.  You did not provide any
```

1    information about your contract lawyers.

2            We looked at the work that was done and with your vast

3    experience in MDLs, I know, Mr. Becnel, that you have a very clear

4    understanding, but there is different levels of document review;

5    and there is the first cut and culling documents and there's a

6    higher level of document review where you are determining what

7    really has merit, what can be used at trial, what are the

8    advantages there.

9            We looked at the role that your firm played, we looked at

10   the hours that you submitted personally and the work that you did

11   and we arrived at the, at our preliminary recommendation.

12   Q.  Let's talk about some other people, Mr. Meunier.  He didn't

13   have a case before the case got to MDL, did he?  And he is a very

14   fine lawyer, but he didn't even have a case filed, did he?

15   A.  As we were making our recommendation, we didn't -- it was not a

16   major factor for us about who had a case filed and when as a sole

17   factor.  We looked at who had worked, who was involved and who was

18   doing substantial work early before the withdrawal, before the

19   formation of the MDL.  But who actually had a case filed before the

20   formation of the MDL was not a factor that we gave much weight to.

21   Q.  You knew I had the only whistle blower in this whole case,

22   didn't you?

23   A.  No.

24   Q.  John Restaino, the head of the science committee, from

25   Exhibit 31 tells you that this guy worked for Pfizer, he had been

1   involved in all of the COX Phase I through IV studies.  You weren't

2   aware of that?

3   A.  I was not aware -- I was not aware that you had the only

4   whistle blower in this litigation.

5   Q.  Did you ever talk to that doctor from Chicago?

6   A.  What's the doctor's name, Mr. Becnel?

7   Q.  Snabes -- S-N-I-P (SIC) -- let me get it.  I mispronounce it

8   all the time.  MD, Ph.D., associate professor, did safety studies,

9   Phase I to IV with compounds on rofecoxib.  That's what we dealt

10  with here in Vioxx, isn't it?

11          SPECIAL MASTER JUNEAU:  The question is, the question is

12  did you ever talk to the doctor?

13          MR. BECNEL:  Did he ever talk to him?

14          SPECIAL MASTER JUNEAU:  Let's get the answer.

15          THE WITNESS:  Not that I recall.

16  BY MR. BECNEL:

17  Q.  Were you aware that he was medical advisor of the COX-2 phase

18  global research and development on arthritis, pain and inflammation

19  for Pfizer?

20          MR. BLIZZARD:  My counsel is this was covered by

21  Mr. Becnel yesterday in his own testimony and in the exhibit he is

22  now quoting from, and so this is just more of Mr. Becnel

23  testifying.

24          THE COURT:  Mr. Becnel, we went through that through your

25  testimony.  What do you want to know?

1          MR. BECNEL:  He is trying five cases and didn't even talk

2     to this guy.

3          SPECIAL MASTER JUNEAU:  Give me the relevance of the

4     question.

5          MR. BECNEL:  Because he was a first level expert --

6          SPECIAL MASTER JUNEAU:  So really what you're doing,

7     you're questioning this witness that you think he was incompetent

8     in what he did at the trial of this case?  I am asking --

9          MR. BECNEL:  I am not saying he is incompetent.  I am

10    saying he didn't even talk to the people who could give him

11    relevant information to make a loss into a win.

12         SPECIAL MASTER JUNEAU:  That is incompetent --

13         MR. BECNEL:  It's not, it's just --

14         SPECIAL MASTER JUNEAU:  It's what?

15         THE WITNESS:  It might not be, he might have been too

16    busy doing something else.

17         SPECIAL MASTER JUNEAU:  I will sustain the objection on

18    relevance, plus we've gone through the very same testimony.

19         Mr. Becnel, I had allowed, let me dictate for the record

20    here, I had allowed in the protocol that was established an hour

21    for the cross-examination.  I extended that time for Ms. Woodward,

22    I wanted to allow the time for the other objectors.  I have allowed

23    you additional time, as a matter of fact we're almost 45 minutes,

24    which would be three quarters of the time allowed for everybody in

25    this case.  So I would like you wrap up that testimony.

1          MR. BECNEL:  Give me two minutes and I'll wrap it.

2          SPECIAL MASTER JUNEAU:  Thank you very much.

3    BY MR. BECNEL:

4    Q.  Are you aware of Daniel Acosta who was approved as a

5    first-level expert, that I handled, and he was an expert in drug

6    metabolism and liver toxicity and adverse effects of this

7    particular drug Vioxx.  And he wrote the book, the chapter on that

8    in Casarett & Doul's toxicology book.  Did you talk to him?

9    A.  I don't recall whether I talked to him or not, Mr. Becnel.  I

10   can't recall one way or the other.  I talked to a lot of folks, I

11   lot of experts through the course of this litigation, and I

12   certainly did not use him as an expert.  Whether I ever talked to

13   him or not, I don't recall.

14   Q.  Dr. Wecht, did you talk to him?

15   A.  I don't remember, I know you brought him to a conference, you

16   may have introduced us, I may have spoken to him in those terms;

17   but beyond that, I really can't say.

18   Q.  Did you talk to Dr. Aruna, an African American pharmacologist

19   here at Xavier?

20   A.  I don't recall one way or the other that I talked to him.

21   Q.  Did you talk to Dr. Markis, a cardiologist from Harvard that I

22   brought?

23   A.  I don't recall.

24   Q.  Did you talk to your partner Mr. Paul Sizemore --

25   A.  Yes.

1    Q.  -- after the mock trial where I brought all of those doctors to

2    not only rate Mr. Birchfield but all of the 40 lawyers that

3    participated in the trial, and I and those doctors and the jury

4    rated Mr. Lanier and Mr. Paul Sizemore as No. 1 and 2 of all of the

5    40 lawyers based upon their understanding of their presentation,

6    their science to three different mock trial juries?

7    A.  As I understand your question, did I talk to my partner at some

8    point --

9    Q.  About the doctors reporting to them what themes should play,

10   what should be improved, what should be taken away and not used, of

11   the two top lawyers of 40 lawyers that participated over a two-day

12   event --

13            SPECIAL MASTER JUNEAU:  Your question is did he talk to

14   Mr. Sizemore about that?

15   BY MR. BECNEL:

16   Q.  Yeah, did you talk to him?

17   A.  I talked to him after that.  Whether we talked about any of

18   those details, I cannot say.

19   Q.  Did you ascribe anything of my time for bringing all of those

20   experts to the table available to everybody and sent to everybody?

21   A.  We did not ascribe value to bringing an expert to a conference.

22   We ascribed value to developing experts, to working with experts,

23   to reducing their knowledge and their understanding of Vioxx into

24   an expert report and being prepared to testify or to provide

25   valuable assistance in the litigation.  But we did not ascribe

1    value to bringing experts or experts in some field to conferences,

2    we did not.  I did not.

3    Q.  I was a major player in the expert field committee with

4    Mr. John Restaino, and we were making those recommendations along

5    with Mr. Herman's partner Ms. Michelle Parfitt?

6    A.  Let me say this --

7                SPECIAL MASTER JUNEAU:  Hold on.

8                MR. BLIZZARD:  Objection to Mr. Becnel testifying again.

9                SPECIAL MASTER JUNEAU:  Refine the question, ask him a

10   precise question and I'll instruct him.

11   BY MR. BECNEL:

12   Q.  The purpose of doing Exhibit 31 was to give to the members of

13   the PSC, this is who this group of people think are good experts.

14               SPECIAL MASTER JUNEAU:  That's your testimony.  If you

15   have a question, ask him a question.

16   BY MR. BECNEL:

17   Q.  Now, you didn't give me any credit whatsoever for all of the

18   preMDL work, did you, for those two years I worked on the case

19   accumulated experts, accumulated science, accumulated information?

20   A.  I can describe the process for you, Mr. Becnel, and that is

21   that the Fee Allocation Committee members, we reviewed the

22   affidavits, the affidavit that you submitted along with every other

23   applicant.  We reviewed the testimony at the presentations and what

24   you deemed to be significant, and we reviewed the time submissions.

25   And each member would arrive at a determination and through

```
 1    discussions and deliberations we arrived at point values in each

 2    category.

 3            You asked me, you know, did I ascribe value for those

 4    experts, I did not.  They were listed in your materials and so

 5    other members of the Fee Committee may have given value to those, I

 6    did not.

 7            But in regards to your entire submission, it was

 8    considered by the Fee Allocation Committee in arriving at the

 9    preliminary recommendation and then also in our final

10    recommendation.

11            MR. BECNEL:  May it please the court, in accordance with

12    your limitation, I would like to introduce Exhibit 1A through 1L,

13    those documents.

14            SPECIAL MASTER JUNEAU:  That's the ones that have been

15    identified.  Any objection?

16            MR. BECNEL:  That's the ones I showed counsel a minute

17    ago.

18            MR. BLIZZARD:  If these are the e-mails --

19            MR. BECNEL:  These are the e-mails.

20            MR. BLIZZARD:  -- not written by Mr. Birchfield but BY

21    third parties, those are clearly hearsay.

22            SPECIAL MASTER JUNEAU:  I am going to reconsider that

23    ruling.  I am going to deny the admission of those documents,

24    that's rampant with hearsay.  I have no way to evaluate the

25    validity or non-validity of those statements or why it was made.
```

```
 1   If you want to make a proffer --
 2               MR. BECNEL:  I am going to make a proffer.
 3               MR. URQUHART:  Your Honor, is that going to be on behalf
 4   of all of the objectors?
 5               MR. BECNEL:  On behalf of everybody.
 6               SPECIAL MASTER JUNEAU:  Yes, that's correct.
 7               MR. BECNEL:  Let me enter my objection to the court's
 8   ruling.
 9               SPECIAL MASTER JUNEAU:  Certainly.
10               MR. BECNEL:  Especially since it was ruled one way during
11   examination, now when I make the offer it's ruled another way.  So
12   let me make that objection.
13               SPECIAL MASTER JUNEAU:  What that demonstrates is an open
14   mind.
15               MS. WOODWARD:  And I just want to observe on behalf of
16   the objectors that some of those e-mails are exchanged among
17   members of the Fee Allocation Committee.  Mr. Seeger is the author
18   of some, Mr. Kline is the author of others.
19               SPECIAL MASTER JUNEAU:  I understand that and I
20   understand what the position.
21               Now, Mr. Arceneaux, before we go --
22               MR. ARCENEAUX:  Housekeeping matters?
23               SPECIAL MASTER JUNEAU:  Yes.  There was an introduction
24   matter you wanted to make with regard to your exhibits.
25               MR. ARCENEAUX:  Thank you very much, your Honor.
```

1        We submitted two different exhibit lists on behalf of the

2    objectors.  The first one is materials that were not produced by

3    the FAC.  The second one, which is this very long list, are the

4    materials that were produced by the FAC.  Everything they gave us

5    in document production.

6        So there are two DVDs that correspond to the two lists.

7    One of them says Common Objectors Documents, and it's Common

8    Objector Exhibits 1 through 29, and it says compiled May 13th, and

9    the reason the date of May 13th is important because last night I

10   went and re-edited the disc to make sure that Exhibits 26, 27 and

11   28, which were the Markowitz exhibits which you excluded, are

12   marked on the disc now as proffers.  So the disc clearly reflects

13   they are excluded and they are proffered.  But they're on the disc

14   because they're optical media.

15       And then the other disc says Common Objectors Documents

16   101 through 102, and that is nothing more than everything the FAC

17   produced to us in discovery and it's, this is an index of every

18   single document that's on the DVD.

19       So at this time I would like to move for introduction of

20   Common Exhibits 1 through 25, which I believe Mr. --  I'll let him

21   speak for himself.  1 through 25, 26, 27 and 28 have been

22   proffered, and 29 your Honor ruled or they stipulated was the

23   deposition of Andy Birchfield would be allowed into evidence.

24   That's common Exhibit 29.

25           And I've included in this little packet for you, just for

1    your convenience, a condensed copy of the Birchfield deposition so

2    that you would actually have a copy that you might want to read.

3              SPECIAL MASTER JUNEAU:  That's fine.

4              MR. ARCENEAUX:  So that is the Common Objector Exhibits 1

5    through 26 -- no, 1 through 25 and then 26, 27 and 28 are

6    proffered, and then 29.

7              And then on the second list, it's Common Exhibit 100 in

8    globo and Common Exhibit 200 in globo.  With regard to common

9    Exhibit 200 in globo, let me explain what that is.  That is a hard

10   drive that was supplied to me by Mr. Herman's office of the actual

11   MDL trial package.  There's been a lot of testimony about what's in

12   the trial package and what's not.  This is 465 gigabytes.  I will

13   say, however -- and I spoke to Ms. Valenti about this last night --

14   this disc appears to have crashed and may not be playable.

15             THE COURT:  It may not what?

16             MR. ARCENEAUX:  It may not be playable.  The hard drive

17   crashed and may not be playable.  So Ms. Valenti is going to help

18   me supply you with one that does, a replacement.  So this is the

19   original disc.

20             MR. HERMAN:  Next time you talk to my trial paralegal

21   without -- I'll approve it, but see me first.

22             SPECIAL MASTER JUNEAU:  Counsel, is there any objection

23   at all to the exhibits?

24             MR. HERMAN:  I believe that there is one objection.

25             MR. ARCENEAUX:  These are the common exhibits.  There is

1     one other issue that I need to bring up, and this relates to not

2     the common exhibits but the Weinberg Placitella exhibits, which are

3     this big box right here of all of the binders that we gave you

4     (INDICATING).

5           In these binders, binder No. 2, tab No. 5 is an

6     allocation chart, binder No. 2, tab No. 5 is an allocation chart

7     that showed Mr. Weinberg and Mr. Placitella's lodestar value.  The

8     chart that we included in your binder was from Mr. Markowitz's

9     chart.  So I removed that because that's been excluded and

10    substituted in its place a copy of the allocation from

11    Mr. Garrett's chart, which is already in evidence.

12          The only thing that's different about this extract from

13    Mr. Garrett's chart is that on the right-hand side I did some math

14    with a calculator where I changed Mr. Weinberg's rate to $600 an

15    hour to show what effect that would have and that's simply math

16    that I did with a calculator.

17          So this is -- all of these columns, if you would like to

18    see it and bring it up close, there's nothing controversial about

19    this.  It's Mr. --

20          SPECIAL MASTER JUNEAU:  Can you just identify the exhibit

21    and what you want.

22          MR. ARCENEAUX:  This will be binder 2, tab No. 5.

23          Everything else has already been introduced into

24    evidence, and I just wanted to substitute because you ruled the

25    Markowitz chart out.

1          SPECIAL MASTER JUNEAU:  Counsel for the FAC.

2          MR. RAFFERTY:  Thank you, Special Master.  We do agree

3   the Markowitz should be excluded from the exhibits per the court's

4   ruling; however, we do object to the inclusion of the new exhibit

5   being put in because it is not the chart from Mr. Garrett, it is a

6   chart from Mr. Garrett that's been modified now by counsel for the

7   objectors.

8          And if they wanted to point that out or do some type of

9   illustration or demonstrative with that at the time it was being

10  testified, that would be fine; but to simply modify the chart and

11  put it into evidence in the record would be an inappropriate, your

12  Honor.

13         MR. ARCENEAUX:  May I show you the chart so that you can

14  make a ruling?

15         THE COURT:  I understand exactly what we're talking

16  about.

17         MR. ARCENEAUX:  I added one --

18         SPECIAL MASTER JUNEAU:  I understand, counsel.  I don't

19  mean to be rude but I understand exactly what you're talking about.

20         MR. ARCENEAUX:  I apologize.

21         THE SPECIAL MASTER:  I am going to admit into evidence

22  all of the exhibits that have been offered saving except this last

23  exhibit, which really is it's demonstrative in nature but it's a

24  revised chart.  I have the benefit of all of the reports rendered

25  by Mr. Garrett in evidence, and that's a piece of demonstrative

1    evidence I don't need.

2             MR. ARCENEAUX:  I proffer it then, your Honor, it will be

3    marked as proffer, it will be marked as Weinberg Placitella Proffer

4    No. 1.  And it's found under binder 2, tab No. 5.

5             SPECIAL MASTER JUNEAU:  That will be fine.  Now, if

6    you'll give me the exhibits, the disc I have to give that to the

7    clerk to make sure we have all of that in order.  Ms. Woodward.

8             MS. WOODWARD:  Your Honor, you will recall that during

9    the testimony of my clients Placitella and Weinberg, they were

10   shown this document relating to the claims paid in, into the common

11   benefit fund.  And at the time that that examination was made of

12   them and a couple of other objectors, I objected that we had sought

13   discovery of this information and been denied it.  And I objected

14   to the use of it during the examination.

15            The court ruled, if I understand and am repeating it

16   correctly, that I would be permitted to question Mr. Birchfield

17   about this and that he would be required to produce the information

18   to me on direct examination.  However, as the court will recall, my

19   time ran out.  I was not able to get to this issue.

20            I simply ask now that they produce this material that has

21   not been previously produced and which I was not able to question

22   Mr. Birchfield about because of the time issue.

23            SPECIAL MASTER JUNEAU:  Mr. Herman.

24            MR. HERMAN:  Your Honor, may it please the court.  I had

25   this during the examination of Mr. Placitella, your Honor ruled at

1   that time it would not go into evidence, we never offered it into

2   evidence.

3        SPECIAL MASTER JUNEAU:  I recall the document but it was

4   never offered I don't believe.

5        MR. HERMAN:  I'm sorry?

6        SPECIAL MASTER JUNEAU:  I recall the document being

7   questioned, but I don't recall the document going into evidence.

8        MR. HERMAN:  As a matter of fact, your Honor's ruling at

9   the time was that we could only question about Mr. Placitella and

10  that this document would not be admitted into evidence so we didn't

11  offer it.  If they want to proffer it, we don't have a problem.

12       SPECIAL MASTER JUNEAU:  Counsel, this is real, real easy.

13  One person at a time gets to speak, Ms. Woodward.

14       MS. WOODWARD:  If the court please, he was permitted to

15  question not only my client but a number of other objectors about

16  this chart.  So while it is true that the document itself was not

17  introduced into evidence, the information on the chart was the

18  subject of cross-examination, was -- has now been put into the

19  record.

20       I was told at that time that I would be given access to

21  the same material which we had previously requested and only

22  because my examination time ran out was I not able to do that.  I

23  am not offering this into evidence, I am not offering the material

24  whose production I am requesting be offered into evidence.  I just

25  want to have it.  They have it, they've used it --

1        SPECIAL MASTER JUNEAU:  Wait.  What I don't understand,

2   Ms. Woodward, we I think are near the conclusion, I don't know,

3   that's for them to decide what testimony they're going to present,

4   of this hearing.  The object is to have the hearing and the lawyers

5   are in obligation to put in evidence, not put in evidence, I have

6   to make the rulings with respect to this trial.

7        What I understand you're asking me to do now is order

8   them to produce matters that are the hearing is going to be

9   complete, it's going to be complete.  Why would we order documents

10  that won't even be in this hearing, won't be part of this record?

11       MS. WOODWARD:  I understand, your Honor, that it will not

12  be introduced in the hearing, that the hearing is about to be

13  concluded.  I am not asking that the hearing be held open or the

14  production of further evidence.  However, I understand that we are

15  in a process here and that this court is going to make a

16  recommendation and Judge Fallon is also going to make a decision.

17       SPECIAL MASTER JUNEAU:  I understand, I have a clear

18  handle of what we're talking about.  I am not going to order or

19  direct any production of additional evidence.  If this matter goes

20  beyond this level of court activity and goes to Judge Fallon, you

21  can certainly address that issue to him at that time because he

22  would obviously have some sort of scheduling or some sort of

23  procedure developed and that would be your opportunity.  But

24  insofar as this hearing is concerned, we've conducted it, I think,

25  hopefully in as much due process as one can afford to allow

1    everybody to put into evidence whatever they want to put into

2    evidence, but your objection is noted.

3              MS. WOODWARD:  Thank you, your Honor.

4              MR. HOCKEMA:  I just came up because I had a hard time

5    hearing from back there, Judge.  I can hear everybody up here but I

6    couldn't hear the court.

7              SPECIAL MASTER JUNEAU:  I apologize.

8              MR. HOCKEMA:  Partly because I got a cold, partly because

9    I'm getting old.

10             SPECIAL MASTER JUNEAU:  If you ever have a problem I'll

11   give you what's in my right ear.

12             THE WITNESS:  Your Honor, may I be excused from the

13   witness stand?

14             SPECIAL MASTER JUNEAU:  Yes, you can sit down.

15             MR. ARCENEAUX:  I was going back over my list and I just

16   wanted to make sure I said common Exhibit 29.  I just wanted to

17   make sure I didn't leave that out, that's the Birchfield

18   deposition.

19             MR. BIRCHFIELD:  Your Honor, in regards to my deposition,

20   as I understand it, I'll have the opportunity to read and sign the

21   deposition and we'll submit it.

22             SPECIAL MASTER JUNEAU:  But I am officially filing your

23   deposition into the record so we'll have a complete record.  I

24   understand you have to read and sign and I am permitting the offer

25   of evidence the documents submitted with the one exception I know

1    is Mr. Arceneaux.

2              MR. ARCENEAUX:  Thank you very much, Master Juneau.

3              MR. RAFFERTY:  One house keeping matter also, because it

4    was brought up in regards to the Cohen or the Placitella exhibits.

5    I would like to make sure, as I understand any document, that no

6    documents have been put into any of the binders or any evidence

7    that pertained to the Markowitz analysis, based upon the judge's

8    ruling, and I would just like to confirm that on the record.

9              MR. ARCENEAUX:  I did not prepare those exhibits, I

10   helped prepare them.  To my knowledge there is no other document

11   other than tab 5, binder 2 that has anything to do with the

12   Markowitz chart.  If there's another Markowitz chart in there, it

13   should be removed.  But to my knowledge, there are no others.  And

14   I did look over the list, so I have some basic understanding.

15             SPECIAL MASTER JUNEAU:  Mr. Hockema, I'm sorry you didn't

16   get to hear.  Is there anything we need to clarify for you?

17             MR. HOCKEMA:  No, sir.  I assume Mr. Birchfield's not

18   going to testify any further?

19             SPECIAL MASTER JUNEAU:  I am fixing to ask that question.

20             MR. HOCKEMA:  I just had one matter that Mr. Becnel

21   brought up because my position is a little bit different from the

22   other objectors, I really believe in the trial.  So the part he was

23   talking to Mr. Birchfield about the value of trials versus whatever

24   other stuff you want to call, I'd call it -- I don't want to use a

25   derogatory term -- but in any event I wanted to clarify our

```
 1    position which is different than the other objectors with

 2    Mr. Birchfield for just a couple of questions.  But it's not that

 3    big a deal really.

 4              SPECIAL MASTER JUNEAU:  Mr. Hockema, the weighting and

 5    the consideration of those things are things that I will have to

 6    consider in my assigned duties, and that's just opinions I'll have

 7    to express.  But I understand what the issue is.

 8              MR. HOCKEMA:  We have a little bit different issues than

 9    the other objectors with Mr. Birchfield, and I do not share some of

10    the other objectors' positions on certain things.  And I just

11    wanted to clear that up with Mr. Birchfield, that was all.

12              SPECIAL MASTER JUNEAU:  Let's make it clear.

13              MR. HERMAN:  I'd like to know if they're going to rest

14    subject to Mr. Birchfield.

15              SPECIAL MASTER JUNEAU:  That's what I am fixing to get

16    to.  The state of the proceedings is from the objectors'

17    standpoint, that completes the testimony of Mr. Birchfield, that's

18    what we were here to do.  Am I incorrect about that?

19              MR. HOCKEMA:  You're correct, your Honor.  I didn't mean

20    to imply otherwise.  I thought we were talking about scheduling and

21    what little amount I might have left.  That's all.  I thought you

22    were talking about concluding the hearing and scheduling and that's

23    why I said what I said.

24              SPECIAL MASTER JUNEAU:  You might not have heard and I

25    can well appreciate that having some hearing deficit in the right
```

1  side.

2        Is there a question you wanted to ask Mr. Birchfield?  I

3  understand you couldn't hear, I will allow you to ask him the

4  questions.

5        MR. HOCKEMA:  No, sir, it wasn't that.  It was just a

6  brief question --

7        SPECIAL MASTER JUNEAU:  The question is to who?

8        MR. HOCKEMA:  It was a question that was brought up I

9  guess sort of during Mr. Becnel's examination of Mr. Birchfield

10  about the bellwether trials, and as an objector that had one of the

11  bellwether trials, I wanted to clear up that our position may be a

12  little different than the other objectors.

13        SPECIAL MASTER JUNEAU:  Who did you want to clear that up

14  with?

15        MR. HOCKEMA:  With Mr. Birchfield, if he was going to

16  testify on direct.  If he's not, then I don't need to go into it.

17  I thought we were talking about scheduling, that's all.  And I

18  apologize for not hearing the court.

19        MR. HERMAN:  We would like to know whether they rest

20  before we make a determination.

21        MR. HOCKEMA:  I do, I rest.

22        SPECIAL MASTER JUNEAU:  He rests.

23        THE COURT:  Mr. Becnel.

24        MR. BECNEL:  Your Honor, it was my understanding

25  yesterday that Mr. Garrett said I gave him some or somebody from my

 1    office gave him some number for Monica Gant of $19 and somewhat

 2    cents, and I would like to put on the record either by testimony or

 3    by this statement that no one from my office, Monica Gant was a

 4    lawyer with partnership status in a firm, a defense firm in New

 5    Orleans, lost her job because of Katrina.  I picked her up and

 6    immediately sent her, and she was an African American first line

 7    trial lawyer, and that nobody would have ever given a figure of $19

 8    to Mr. Garrett.  I don't know where he got that from but he's got

 9    to be mistaken.

10            SPECIAL MASTER JUNEAU:  You made that clear.

11            Now, as I understand, they are rested --

12            MR. BECNEL:  And one other thing.  I had contacted

13    Mr. Arsenault --

14            SPECIAL MASTER JUNEAU:  I don't want to get into

15    third-party discussions.

16            MR. BECNEL:  The thing is, Mr. Arsenault and I did not

17    know that each other was --

18            SPECIAL MASTER JUNEAU:  You said that, I understood your

19    testimony.

20            MR. BECNEL:  And because of the hurricane is why it

21    occurred.

22            SPECIAL MASTER JUNEAU:  Procedurally where we stand in

23    this matter is that the objectors will rest.  The question then

24    goes to the FAC.

25            MR. HERMAN:  I don't have a statement on the record that

1    all of the objectors rest.

2              SPECIAL MASTER JUNEAU:  Well, I am asking very clearly.

3              MR. BECNEL:  I'm finished.

4              MS. WOODWARD:  Your Honor, we have called all of the

5    witnesses that the scheduling order allows us to call --

6              SPECIAL MASTER JUNEAU:  That I understand.

7              MS. WOODWARD:  -- and we have questioned them for as long

8    as the court has permitted us to question them.  Therefore, I

9    believe that we are terminated.  Thank you.

10             MR. HERMAN:  Well, what's that mean?

11             SPECIAL MASTER JUNEAU:  I understand.  They have no

12   further testimony under the constraints allowed by the court.

13   You've objected, you've made an objection to the time constraints

14   imposed by the court, and I've noted that.  And you said y'all have

15   finished within the time the court allowed for testimony.  So

16   that's --

17             MR. HERMAN:  This rests is for all objectors, whether

18   they're in the court or not?  Is that correct?

19             MS. WOODWARD:  Well, unless the Special Master wants to

20   issue a new ruling.

21             SPECIAL MASTER JUNEAU:  I have called no other testimony

22   and there is none.  Let the record reflect that I consider the

23   matter that the objectors have rested subject to the objections

24   they noted.

25             MR. HERMAN:  The FAC has three issues:  One, a proffer

1    that I will make on behalf of the FAC; secondly, identify and

2    formally introduce our exhibits; and then reserve the right to

3    examine the objectors' exhibits before they go to your Honor since

4    we haven't had an opportunity to really examine them as they

5    submitted today.

6              This is a proffer on behalf of the FAC.  My name is Russ

7    Herman, I am from New Orleans.  I had the privilege of seeing

8    Mr. Birchfield perform in four trials, Mr. Seeger --

9              MS. WOODWARD:  Your Honor, if I may object.  Mr. Herman

10   is testifying.  The FAC was allowed --

11             SPECIAL MASTER JUNEAU:  Just a minute.  First of all, I

12   am ruling that -- you're not offering this as evidence?

13             MR. HERMAN:  No, I am proffering this.  I am proffering

14   this.

15             SPECIAL MASTER JUNEAU:  You're proffering it.

16             MR. BECNEL:  Your Honor, I object.

17             SPECIAL MASTER JUNEAU:  What I am struggling with,

18   Mr. Herman, is I made no ruling about any testimony so I don't know

19   what the proffer is in response to.

20             MR. HERMAN:  Well, the proffer is in response to some

21   cross-examination, and I have a right to proffer the FAC's

22   position.

23             SPECIAL MASTER JUNEAU:  Well, if you have a witness you

24   want to put on the stand, put them on the stand.  Ms. Woodward, I

25   am bad about sign language and by the way I apologize if I pointed

```
 1    at anybody.

 2               MR. HERMAN:  I'll withdraw it.

 3               SPECIAL MASTER JUNEAU:  So it's withdrawn.

 4               MR. HERMAN:  I'll withdraw it.

 5               THE COURT:  The other issues on the table, do you have

 6    any -- I understand the question about the exhibits, you want to

 7    verify.  The exhibits are admitted into evidence subject to the

 8    review of the parties to make sure that we don't have an exhibit

 9    that's not in there because we have a ton of exhibits, that's the

10    sole purpose of the reservation.  So that's the third matter?

11               MR. HERMAN:  Third matter is I have exhibits to offer on

12    behalf of the FAC and identify for the record.

13               SPECIAL MASTER JUNEAU:  All right.

14               MR. HERMAN:  Exhibit No. FAC 1 is PTO 1-56; FAC 2 are

15    joint reports submitted to Judge Fallon 1 through 63; FAC 3 status

16    conference transcripts, March 18th, 2005, through April 1st, 2011.

17    FAC 4 all time submissions, 20 boxes to be put on CD's, as

18    identified as the time submissions of all applicants; FAC 5, fee

19    affidavits by all firms seeking common benefit; FAC 6, oral

20    presentations transcribed to the Fee Allocation Committee of those

21    fee applicants who wish to appear and give oral testimony.

22               MS. WOODWARD:  Excuse me, I'm sorry to interrupt.  I am

23    looking at your Fee Allocation Committee's exhibit list, and I am

24    trying to read along with you.  And the numbers that you're reading

25    are all different.  I don't have a copy of what you're reading
```

```
 1  from.  I don't know how it differs from the list which the court
 2  required be filed into the record on Monday, and I don't know where
 3  we are.  Can you provide me with a copy of what you're reading
 4  from, or advise the court and the objectors how it supplements or
 5  alters what's in your listed exhibits?
 6            MR. HERMAN:  May it please the court, in every federal
 7  case you're required to file an exhibit list.  That exhibit list
 8  more often than not doesn't correspond with what's allowed in
 9  evidence.  I don't understand.
10            SPECIAL MASTER JUNEAU:  I understand.  Do you have a list
11  of the documents?
12            MR. HERMAN:  I have a handwritten list which I'll given
13  learned counsel opposite as soon as I'm through or learned counsel
14  can stand here as I read it.  Either way.
15            MS. WOODWARD:  Or, Mr. Herman, if you could just advise
16  me whether you are adding anything to what is on your previously
17  offered list.
18            SPECIAL MASTER JUNEAU:  That's the pertinent question,
19  it's not exhibits you already know about.  Are there any exhibits
20  that are not on your written list that were on the list that was
21  filed with the court?
22            MR. HERMAN:  Yes.  FAC -- well, we put in on the exhibit
23  list Mr. Garrett's records.  Admitted in this hearing were FAC 12,
24  letters from Garrett to objectors requesting rates and responses,
25  and FAC Becnel 3, letter dated September 7, '10, from Becnel to
```

1  Stratton with attachments already admitted on May 12th, 2011 by

2  Mr. Birchfield.

3          MS. WOODWARD:  If I may, your Honor, the Garrett letters

4  were identified, objected to, excluded, and we maintain that

5  objection and we were not produced those records.

6          SPECIAL MASTER JUNEAU:  I recall that ruling and I said

7  he can testify as to what he did, who he sent it to, and very

8  meticulous about that but not have and I think we excluded the

9  letters.

10          MR. HERMAN:  We'll proffer FAC 12.

11          SPECIAL MASTER JUNEAU:  Mark that as a proffer.

12          MR. HERMAN:  I sure will.  And I would like to go back to

13  where I was.

14          FAC 7 are the FAC recommendations; FAC 8, the point

15  system guide; FAC 9, the grid; FAC 10, Garrett's July 2010 report;

16  FAC 11, Garrett affidavits of which there are three.  And that

17  concludes everything but the proffer.

18          SPECIAL MASTER JUNEAU:  Counsel.

19          MS. WOODWARD:  No objection.

20          SPECIAL MASTER JUNEAU:  I have to take a conference call,

21  I set it at 12:15, I didn't think we would be -- let see if we can

22  wrap that this up.  Do you have any objection to that?

23          MS. WOODWARD:  No, your Honor.

24          SPECIAL MASTER JUNEAU:  Let those be offered into

25  evidence.

```
 1              MR. HERMAN:  Thank you, your Honor.

 2              SPECIAL MASTER JUNEAU:  And you may proffer the other.

 3              MR. HERMAN:  Yes.  At this point the Fee Allocation

 4    Committee rests and subject to our review of their documents, we

 5    have nothing further.

 6              SPECIAL MASTER JUNEAU:  All right.  Thank you,

 7    Mr. Herman.  This will conclude the hearing.  I am going to give

 8    ten days.  If any party wants to submit just a summary brief to me,

 9    I am going to have it done simultaneously so it won't be one side

10    submit and then the other.  I only say that if you think you want

11    to do that, I want to afford you the opportunity to do that.

12              From my perspective, I have intimate knowledge about this

13    case, I don't think I need that but I want to give you the

14    opportunity if you think that's appropriate.  I do want to mention

15    there is a tremendous volume of documents, many, many of which I've

16    already reviewed.  It is my intent to put this matter on the front

17    burner and to expeditiously address the issues I have to address

18    and to come out with an opinion.

19              The point is I am not going to drag this opinion out for

20    anybody.  I will try to do that as quickly as possible and that is

21    certainly my intent.

22              With all of that being said and done, I'll determine at

23    this time that the hearing is concluded, and I appreciate the

24    participation of everybody.

25              MR. URQUHART:  Your Honor, could I have just one quick
```

1    clarification.  Ten days runs from today?

2              SPECIAL MASTER JUNEAU:  Look, I don't want to put you on

3    your box.  Push it up, push it back, it doesn't matter to me.  If

4    you have a preference or create a problem for people?

5              MR. ARCENEAUX:  Fifteen please because I have to write

6    two.

7              SPECIAL MASTER JUNEAU:  Tell me what you like.

8              MR. ARCENEAUX:  Fifteen.

9              THE SPECIAL MASTER:  Fifteen days is fine starting today.

10             MR. HERMAN:  Mr. Juneau, as we understand it, there will

11   no new documents or evidence in connection with these briefs?

12             SPECIAL MASTER JUNEAU:  This is concluding the hearing,

13   that is correct.

14        (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

15

16                            *  *  *  *  *  *

17

18

19

20

21

22

23

24

25

1

2                        REPORTER'S CERTIFICATE

3

4

5          I, Karen A. Ibos, CCR, Official Court Reporter, United

6    States District Court, Eastern District of Louisiana, do hereby

7    certify that the foregoing is a true and correct transcript, to the

8    best of my ability and understanding, from the record of the

9    proceedings in the above-entitled and numbered matter.

10

11

12

13                        _____

14                        Karen A. Ibos, CCR, RPR, CRR

15                        Official Court Reporter

16

17

18

19

20

21

22

23

24

25