BEFORE THE JUDICAL PANEL ON
MULTIDISTRICT LITIGATION

:                          MDL DOCKET NO.
:

In re:   CHINESE DRYWALL                   :

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TRANSFER OF ACTIONS PURSUANT TO 28 U.S.C. § 1407

Daniel E. Becnel, Jr.
Becnel Law Firm
P.O. Drawer H
106 West 7th Street
Reserve, LA 70084

## I.
## INTRODUCTION

Pursuant to 28 U.S.C. § and Rule 7.2 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, plaintiffs in the action captioned *Jill M. Donaldson, wife of/and John "Jared" Oertling, behalf of themselves and all others similarly situated, v. Knauf Gips KG, Knauf Plasterboard Tianjin Co., Ltd., Taishan Gypsum Co. Ltd. F/K/A Shandong Taihe Dongxin Co. Ltd., USG Corporation, L&W Supply Corporation D/B/A Seacoast Supply, Interior Exterior Building Supply, Independent Builders Supply Association, Inc. and Rothchilt International Limited* respectfully submit this Brief in Support of Plaintiffs' Motion for Transfer of Actions Pursuant to 28 U.S.C. § 1407.

*Jill M. Donaldson, wife of/and John "Jared" Oertling, behalf of themselves and all others similarly situated, v. Knauf Gips KG, Knauf Plasterboard Tianjin Co., Ltd., Taishan Gypsum Co. Ltd. F/K/A Shandong Taihe Dongxin Co. Ltd., USG Corporation, L&W Supply Corporation D/B/A*



*Seacoast Supply, Interior Exterior Building Supply, Independent Builders Supply Association, Inc. and Rothchilt International Limited,* and the other related actions listed in the accompanying Schedule of Actions were filed against numerous Chinese drywall manufacturers and suppliers by individuals whose homes contain Chinese drywall. The legal theories and facts asserted in all of those actions are virtually identical and arise from the common conduct of the defendants in designing, manufacturing, selling, and putting into the stream of commerce their defective Chinese drywall.

II.
## SUMMARY OF THE CASE

Plaintiffs brought actions against manufacturers and supplies of Chinese drywall that has been used in the homes of consumers around the country, but particularly in Florida and Louisiana. Plaintiffs allege that Chinese drywall is inherently defective because it omits various sulfide gasses and other chemicals through "off gassing" that creates noxious, "rotten egg like odors" and causes corrosion of air conditioner and refrigerator coils, microwaves, faucets, utensils and copper tubing, electrical wiring, computer wiring, personal property, electrical appliances and other metal surfaces in household items.

This defect is latent and existed in defendants' drywall at the time plaintiffs' homes were built regardless of the way the product was installed. Furthermore, there is no repair that would correct this defect.

The defendants in this case include the manufacturers of drywall. The manufacturing defendants are located in Germany and China and include defendants, Knauf Gips and its

subsidiaries Knauf Tiajin, Knauf Wuhu, and Knauf Dongguang.  Defendants' drywall is often used in Florida and Louisiana because of the significant amount of hurricanes and environmental disasters, as well as the construction boom of 2004-2006, which resulted in the building of new homes and replacements of homes.

Defendants and numerous other entities around the country used this Chinese drywall and are similarly liable.   The Chinese drywall has been sold and distributed mostly in Florida and Louisiana; however, reports of defective Chinese drywall have also surfaced in Arizona, Colorado, Georgia, Maryland, Nevada, New Jersey, New Mexico, North and South Carolina, Virginia, and Texas.   Shipping records indicate that 550 million pounds of Chinese drywall was offloaded to US ports since 2006.  This is enough drywall to build 60,000 average sized homes. As a result of the conduct of defendants, plaintiffs and thousands of other consumers across Florida and numerous other states have suffered economic losses and personal injury by owning homes containing inherently defective drywall.

Several cases have been filed regarding this problem and others are likely to be filed requiring consolidation pursuant to § 28 U.S.C. § 1407.

III.

PENDING ACTIONS

There are other related actions filed in the federal courts.  There may be other pending federal actions of which Movants are unaware.  Movants expect additional cases to soon be filed.  Pursuant to Panel Rule 7.5(e) regarding notice of "tag-along" actions, these actions should also be transferable.

IV.

## TRANSFER TO ONE DISTRICT FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS WILL PROMOTE §1407'S GOALS OF INSURING THE JUST AND EFFICIENT CONDUCT OF THE ACTIONS, AND AVOIDING INCONSISTENT OR CONFLICTING SUBSTANTIVE AND PROCEDURAL DETERMINATIONS

Pursuant to 28 U.S.C. § 1407 (a) the above actions should be coordinated and

Consolidated. 28 U.S.C. § (a) provides, in relevant part:

> When civil actions involving one or more common questions for
> fact are pending in different districts, such actions may be transferred to
> any district for coordinated or consolidated pretrial proceedings. Such
> transfers shall be made by the judicial panel on the Multidistrict litigation
> authorized by this section upon its determination that transfers for such
> proceedings will be for the convenience of parties and witnesses and will
> promote the just and efficient conduct of such actions.

The transfer of actions to a single forum under §1407 is appropriate where, as here, it

will prevent duplication of discovery and eliminate the possibility of overlapping or inconsistent

pleading determinations by courts of coordinate jurisdictions. *In re Litig. Arising from*

*Termination of Retirement Plan for Employees of Firearm's Fund Ins. Co.*, 422 F. Supp. 287, 290

(J.P.M.L. 1976); In re LTV Corp. Sec. Litig., 470 F. Supp. 859, 862 (J.P.M.L. 1979).

The litmus test of transferability and coordination under § 1407 is the presence of

commonquestions of fact. *In re Fed. Election Campaign Act Litig.*, 511 F. Supp. 821, 823

(J.P.M.L. 1979). Common questions are presumed "where two or more complaints assert

comparable assert comparable allegations against identical defendants based on similar

transactions and events." *In re Air West, Inc., Securities Litig.*, 384 F.Supp.609, 611 (J.P.M.L.

1974); *See also In re Cuisinart Food Processor Antitrust litig.*, 506 F.Supp. 651, 654-655 (J.P.M.L

1981). The transfer of actions to a single forum under §1407 is appropriate where, as here, it

will prevent duplication of discovery and eliminate the possibility of overlapping or inconsistent pleading determinations by courts of coordinate jurisdictions. Moreover, while this matter involves numerous defendants, consolidation and transfer is appropriate because all defendants, and potential defendants, manufactured, distributed or supplied Chinese drywall or were builders of homes with Chinese drywall. *In re Silicone Breast Implants Product Liability Litig.* 793 F.Supp. 1098, 1100 (J.P.M.L. 1992). (The Multidistrict panel found that common questions exist as long as the difference manufacturers all designed similar defective products). *See, also In re Humana Inc. Managed Care Litig.,* 2000 WL 1952080, * 3(J.P.M.L. August 4, 1994) (common questions of law and fact existed even when defendants included different health care insurers.); *In re Orthopedic Bone Screw Products Liability Litig.,* (MDL 1014) (J.P.M.L. August 4, 1992); and *In Re Phenylpropanolamine (PPA) Products Liability Litigation,* at p.2 (MDL 1407) (J.P.M.L. 2001).

A.
## THE PANEL SHOULD TRANSFER THESE CASES TO THE EASTERN DISTRICT OF LOUISIANA

1.
## THE EASTERN DISTRICT OF LOUISIANA IS CONVENIENT FOR ALL PARTIES

The United States District Court for the Eastern District of Louisiana is a particularly convenient forum for litigation after consolidation of these actions. In *In re Worldcom, Inc. Securities & "ERISA" Litig.,* 226 F.Supp. 2d 1352 (J.P.M.L. 2002), this panel consolidated several actions and transferred the consolidated action to the nearby Southern District of New York, noting, in particular, that "a litigation of this scope will benefit from centralization in a major metropolitan center that is well served by major airlines, provides ample hotel and office

accommodations, and offers a well-developed support system for legal services." *Id.* At 1355; *See also, In re Jamster Mktg. Litig.,* 427 F.Supp. 2d 1366, 1368 (J.P.M.L. 2006) (choosing as a transfer forum an "accessible metropolitan location"). These considerations of convenience apply with full force to the United States District Court for the Eastern District of Louisiana's New Orleans courthouse. The courthouse is 12 miles from New Orleans International Airport. New Orleans is easily accessible by plane. Accordingly, convenience weighs in favor transferring and consolidating these actions in the United States District Court for the Eastern District of Louisiana.

### 2.
### THE HONORABLE JAY C. ZAINEY IS AN EXPERIENCED JUDGE CAPABLE OF HANDLING THIS LITIGATION

Also, the experience and ability of Judge Jay C. Zainey is another factor which militates in favor of transferring these actions to the United States District Court for the Southern District of Louisiana. The availability of an experienced and capable judge weighs in favor of transferring a case to that district. *See e.g., In re Hawaiian Hotel Room Rate Antitrust Litig.,* 438 F.Supp. 935, 936 (J.P.M.L. 1977); *In re Sugar Indus. Antitrust Litig.,* 437 F.Supp. 1204, 1208 (J.P.M.L. 1977); *In re Ampicillin Antitrust Litig.,* 315 F.Supp. 317, 319 (J.P.M.L. 1970). The experience and knowledge of a particular judge is one of the factors that may be considered in determining the appropriate transferee forum. *See e.g., In re "Factor VIII or IX Concentrate Blood Prod. Liab. Litig.,* 853 F.Supp. 454, 455 (J.P.M.L. 1993); *In re Silicone Gel Breast Implants Prods. Liab. Litig.,* 793 F.Supp. at 1101; *In re Data General Corp. Antitrust Litig.,* 470 F.Supp. 855, 859 (J.P.M.L. 1979).

Judge Zainey is eminently qualified to preside over this litigation.  Judge Zainey has served in the Eastern District of Louisiana as a federal Judge for seven years and he has had the distinction of presiding over *In re: Train Derailment Near Amite, Louisiana, on October 12, 2003*, MDL No. 1531. In this matter, he brought the case to a final conclusion through settlement and confirming administration of the settlement to bring the entire MDL No. 1531 to a close. Thus, Judge Zainey is eminently qualified to preside over this litigation.

### 3.
### THE EASTERN DISTRICT OF LOUISIANA IS WELL-SUITED TO HANDLE THIS LITIGATION

The MDL Panel has concluded on several occasions that the United States District Court for the Eastern District of Louisiana is an appropriate forum to hear complex litigation because of its expertise in handling these matters. *See MDL-1873 IN RE: FEMA Trailer Formaldehyde Products Liability Litigation; MDL-1355 IN RE: Propulsid Products Liability Litigation; MDL-1657 IN RE: Vioxx Marketing, Sales Practices and Products Liability Litigation; MDL-1390 IN RE: Life Insurance Co. of Georgia Industrial Life Insurance Litigation;  and MDL-1984 IN RE: DirecTech Southwest, Inc., Fair Labor Standards Act (FLSA)* to name just a few of the still active MDL's in the Eastern District of Louisiana. Moreover, the Eastern District of Louisiana is able to handle its docket efficiently.

### V.

### CONCLUSION

For the foregoing reasons and in light of the similar allegations regarding the defendant's conduct, and the likelihood of overlapping discovery and the potential for conflicting pretrial rulings, Movants respectfully request that this Panel order that the related

actions be centralized and transferred to the United States District Court for the Eastern District of Louisiana or alternatively the Middle District of Florida pursuant to 28 U.S.C. §1407, and that all related individual or class actions be transferred thereto as "tag along actions."


Date:  March 13, 2009                                      Respectfully submitted,


                                                           Daniel E. Becnel, Jr.
                                                           Matthew B. Moreland
                                                           Becnel Law Firm LLC
                                                           P.O. Drawer H
                                                           106 W. 7th Street
                                                           Reserve, LA 70084
                                                           Telephone: 985-536-1186
                                                           Facsimile:  985-536-6445

CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of Plaintiff's Motion for Transfer and

Coordination or Consolidation under 28 U.S.C. § 1407 to be served this 13th Day of March, 2009 by U.S.

mail, postage prepaid, upon the following:

Clerk of Court
United States District Court
400 N. Miami Avenue, Courtroom 11-1
Miami, Florida 33128-1807

Clerk of Court
United States Courthouse, Suite 1200
401 West Central Boulevard
Orlando, FL 32801

Clerk of Court
C-151 Hale Boggs Federal Bldg.
     United States Courthouse
500 Poydras Street
New Orleans, LA 70130

Clerk of Court
260 Joseph P. Kinneary
   United States Courthouse
85 Marconi Boulevard
Columbus, OH 43215-2835

Ervin Amado Gonzalez
Patrick Shanan Montoya
Colson Hicks Eidson
255 Aragon Avenue
2nd Floor
Coral Gables , FL 33134-2351

Arnold Levin
Fred S. Longer
Daniel Levin
Levin, Fishbein, Sedran & Berman
510 Walnut, Suite 500
Philadelphia, PA 19106

Jordan L. Chaikin, Esquire
Parker Waichman Alonso, LLP
27399 Riverview Center Blvd., Suite 106
Bonita Springs, FL 34134
Counsel for Plaintiffs:
Shane M. Allen and Nicole J. Allen
M.D. Fl. 09-cv-54-FtM 99 DNF

Daniel E. Becnel, Jr., Esquire
Becnel Law Firm, LLC
106 West 7th Street
P.O. Drawer H
Reserve, LA 70084
Counsel for Plaintiffs:
Jill M. Donaldson and John "Jared"
Oertling

Jack Lanskroner, Esquire
Landskroner Grieco Madden, Ltd.
1360 W. 9th Street, Ste. 200
Cleveland, OH 44113
Counsel for Plaintiff:
Steven Minafri
S.D. Ohio 2:09-cv-167

Michael D. Hausfeld
Richard S. Lewis
James J. Pizzirusso
Faris Ghareeb
Hausfeld, LLP
1700 K Street NW
Suite 650
Washington, DC 20006

Richard Serpe
Law Office of Richard J. Serpe
Crown Center, Suite 310
580 East Main Street
Norfolk, VA 23510-2322

Robert Gary
Gary, Naegele & Theado, LLC
446 Broadway
Lorain, OH 44052

Richard W. Stimson
Attorney at Law
920 Waters Reach Court
Alphretta, GA 30022

## Unrepresented Parties

Kanuf Plasterboard (Tianjin) Co. Ltd.
North Yinhe Bridge, East Jingjin Road
Beichen District
Tianjin, China 300400 P.R.C.

Rothschilt International Limited
N-510 Chai Hsin Bld.
Annex 96 Chung Shan N. Rd. Sec. 2
Taipel, Taiwan, R.O.C.

Knauf Gips KG
Ridham Dock, Kemsley
Sittingbourne, Kent ME9 8SR, UK

Knauf Plastboard Wuhu Co. Ltd.
No. 2 Gang Wan Road
RC-241009 Wuhu Anhui, China

Knauf Plasterboard Dongguan Co. Ltd
No. 2 Xinsha Development Zone
RC-523147 Guangdong, China

Banner Supply
7195 N.W. 30th Street
Miami, FL 33122

South Kendal Construction
2368 SE 17th Ter.
Homestead, FL 33035

Taishan Gypsum Co., Ltd.
f/k/a/ Shandong Taihe Dongxin Co., Ltd.
Dawenkou, Taian

Taylor Morrison
8430 Enterprise Circle, Ste. 100
Bradenton, FL 34202

Independence Builders Supply Association, Inc.
1801 Wal Pat Road
Smithfield, NC 27577-9436

Tousa
4000 Hollywood Blvd., Ste. 500N
Hollywood, FL 33021

Black Bear Gypsum Supply, Inc.
2050 Tall Pines Drive Suite B
Largo, FL 3771-3899

L & W Supply Corporation
d/b/a Seacrest Supply
550 West Adams Street
Chicago, IL 60661-3676

Interior Exterior Building Supply
727 S. Cortez
New Orleans, LA 70119

New NGC, Inc.
2001 Rexford Road
Charlotte, NC 28211

M/I Homes, Inc.
3 Easton Oval, Ste. 500
Columbus, OH 43219

USG
550 West Adams Street
Chicago, IL 60661-3676
LA Suprema Trading Inc.
221 NE 164th Street
North Miami Beach, FL

LA Suprema Enterprise, Inc.
221 NE 164th Street
North Miami Beach, FL

Matthew B. Moreland

Before the Judicial Panel on Multidistrict Litigation
MDL - - In re Chinese Drywall Litigation

## SCHEDULE OF ACTIONS

| Case Captions | Court | Civil Action No. | Judge |
|---|---|---|---|
| Plaintiffs: Karen Vickers, Felix Martinez, Jenny Martinez, Jason Santiago, Gene Raphael, Walter Niemczura and Jim Tarzy, individually and on behalf of all others similarly situated Defendants: Knauf Gips KG, a German Corporation, Knauf Plasterboard (Tianjin) Co., Ltd., Knauf Plasterbard (Wuhu) Co. Ltd., Knauf Plasterboard (Dongguan) Co. Ltd., Banner Supply Co., Rothchilt International Ltd., Taylorwoodrow Communities at Vasari, L.L.C., a Florida corporation, Tousa Homes, Inc., f/k/a Engle Homes, and South Kendall Construction Corp. | S.D. Fl. | 09-20150 | Allan S. Gold |
| Plaintiffs: Shane M. Allen and Nicole J. Allen, on behalf of themselves and all others similarly situated Defendants: Knauf Gips KG, Knauf Plasterboard Tianjin Co., Ltd., Taishan Gypsum Co. Ltd. f/k/a Shandong Taihe Dongxin Co. Ltd., USG Corporation, L&W Supply Co. d/b/a Seacoast Supply Co., La Suprema Trading, Inc., Black Bear Gypsum Supply, Inc., Independent Builders Supply Association, Incl, Rothchilt International Limited and Banner Supply Co. | M.D. Fla. | 02:09-cv-54 ftm-99-DNF | Douglas N. Frazier |
| Plaintiffs: Jill M. Donaldson, wife of/and John "Jared" Oertling, on behalf of themselves and all other similarly situated | E.D. La | 09-2981 | Jay C. Zainey |

| | | | |
|---|---|---|---|
| Defendants:<br>Knauf Gips KG, Knauf Plasterboard Tianjin Co., Ltd., Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., USG Corporation, L&W Supply Corporation d/b/a Seacoast Supply, Interior Exterior Building Supply, Independent Builders Supply Association, Inc., and Rothchilt International Limited | | | |
| Plaintiffs:<br>Steven Minafri, on behalf of himself and all others similarly situated, On Behalf of the General Public<br>Defendants:<br>M/I Homes, Inc., Knauf Gips KG, Knauf Plasterboard (Tianjin) Co., Ltd. and Does 1-100 | S.D. Ohio | 2:09-cv-167 | Algenon L. Marbley |

Date:   March 13, 2009

Respectfully submitted,

Daniel E. Becnel, Jr.
Matthew B. Moreland
Becnel Law Firm LLC
P.O. Drawer H
106 W. 7th Street
Reserve, LA 70084
Telephone: 985-536-1186
Facsimile:   985-536-6445

*Carlene Rhodes Lewis*

Dear Danny,

Thank you so much for your kind introduction at our Windsor Court meeting. You have been very generous to me.

I also want to thank you for your support of Houston and New Orleans before the MDL panel.

You clearly have xtraordinary insight into the process.

I'm anxious to work with and learn from you in this battle for our clients.

Sincerely,
Carlene


EXHIBIT C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JANIE J. AUBERT, ET AL | * | CIVIL ACTION |
| VERSUS | * | NO:09-3566 |
| UNITED STATES OF AMERICA | * | SECTION "J" (1) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. INTRODUCTION

This is a wrongful death and survival action brought by Plaintiffs Janie J. Aubert (Mrs. Aubert), Rhett J. Aubert (Rhett), and Ryan Aubert (Ryan), the widow and major children of decedent Herman Aubert (Mr. Aubert),[1] against the United States pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671 - 2680.[2]  On March 15, 2008, Mr. Aubert died suddenly due to cardiac insufficiency.[3]

Plaintiffs claim Mr. Aubert's untimely death was caused by the medical negligence of his primary care physician (internist), Dr. Naheed Zahra Qayum (Dr. Qayum), of the Veterans Administration Medical Center in Reserve, Louisiana ("VA").  Specifically, plaintiffs alleges that, beginning in January 2008 and continuing through March 15, 2008, Dr. Qayum  failed to timely order diagnostic tests and follow up on the results (including adenosine stress test results) and further failed to take timely action and implement appropriate medical treatment relative to

---

[1]See Certificate of Marriage re Herman Aubert (Exh. 27); Certificates of Live Birth re Rhett and Ryan Aubert (Exh.  29 *in globo*).

[2]Plaintiffs' Complaint (Rec. Doc. 1); Pre-Trial Order at pp. 2-4 (Rec. Doc. 54).

[3]Death Certificate of Herman Aubert (noting date of death was March 15, 2008, and "cardiac insufficiency" as to cause of death) (Exh. 28).

1



abnormal test results. Plaintiffs also allege that the VA was negligent in handling the communications within their own system as well as between themselves and an outside vendor, Dr. Emmett Chapital (cardiologist), regarding outsourcing tests and the receipt of results. Suffice to say, Plaintiffs contend that the confluence of medical treatment that fell below the standard of care and the VA's inadequate if not stymied system of ordering and processing diagnostic tests for symptoms of cardiac insufficiency caused Mr. Aubert's death, particularly considering the constellation of serious risk factors noted in his VA medical records even predating his January 3, 2008, visit leading up to the time of his death on March 15, 2008.[4]

The Government denied liability and pled, in the alternative, "other fault" for which it was not liable. More particularly, the Government's position is that, assuming there was any breach of the standard of care, Dr. Emmett B. Chapital of Chapital Cardiology Clinic (Dr. Chapital),[5] an outside vendor/independent contractor to whom Mr. Aubert was referred at the critical time for further testing, was the responsible person and not the Government.[6]

All of the threshold elements of the Federal Tort Claims Act are met.[7] VA personnel

---

[4]Plaintiff's Complaint at ¶ XIV (Rec. Doc. 1); Pretrial Order at §§ 6a (Pltf's Summary of Material Facts), 8b, c-k, m-p, s-z (Contested Issues of Fact) and 9g-j (Contested Issues of Law) (Rec. Doc. 54).

[5]"Plaintiffs have filed the necessary papers to convene a Medical Review Panel, under the Louisiana Medical Malpractice Act, with respect to Dr. Emmett Chapital's treatment of Mr. Aubert." Pretrial Order at § 7g (Rec. Doc. 54).

[6]See Government's Answer and Affirmative Defenses at ¶¶ IV, XVII, XXIII-XXV (Rec. Doc. 5); Pretrial Order at §§ 6b (Δ's Summary of Material Facts), 7d-e (Single Listing of Undisputed Facts), 8q-aa,ii-nn (Contested Issues of Material Fact) and 9b,c (Contested Issues of Law).

[7]See Government's Answer at ¶ ¶ XIII, XV (admitting venue is proper in this district and Plaintiffs have complied with the administrative prerequisites for filing the captioned matter) (Rec. Doc. 5).

2

who treated Mr. Aubert were employees of the United States of America through the Department

of Veterans Affairs. More particularly, it is undisputed that Mr. Aubert's VA primary care

physician, Dr. Naheed Qayum, was  acting within the course and scope of her employment with

the VA at all pertinent times.

      This dispute culminated in a one and a half day bench trial held before this Court on

March 14 and 15, 2011.  Plaintiffs and Defendant submitted Post-Trial Memoranda. (Rec. Doc.

65 and 66)  After reviewing the evidence presented at trial and the applicable law, the Court

finds that Mr. Aubert's death was caused, in part, by medical negligence committed by the VA

and its employee/physician, Dr. Naheed Qayum.  Mr. Aubert's death was an unnecessary tragedy

and this determination is based on the following findings of fact and conclusions of law.  To the

extent that any of the Court's findings of fact are conclusions of law and *vice versa*, they are so

adopted.

## II. FINDINGS OF FACT

### A.  Treatment, Testing, and Diagnosis of Mr. Aubert

      Mr. Aubert, a 65-year-old Vietnam War veteran,[8] was a patient at the VA clinic in

Reserve, Louisiana, not far from his home.  On January 3, 2008, Dr. Naheed Qayum saw Mr.

Aubert for the first time for routine followup.  His medical history revealed hypertension (HTN),

Hyperlipidemia, degenerative joint disease, "history of borderline blood sugar," history of colon

polyps (removed), history of a negative stress test within the last two years, and a family history

heart problems (brother had heart surgery).  On January 3rd,  Mr. Aubert complained of

shortness of breath on minor exertion.  He further related two incidents that occurred while

---

[8]See Report of Honorable Discharge (Form DD 214) re Herman Aubert (Exh. 35).

sleeping involving shortness of breath with associated chest discomfort, which improved after sitting up in bed. Mr. Aubert reported no orthopnoea or leg swelling. He did report that he quit smoking about 40 years ago.[9] His prescription drug medications included Diclofenac,[10] Hydrochorothiazide,[11] Lisinopril[12] and Simvastin,[13] which were first prescribed by Dr. Carlos Ramirez, Mr. Aubert's primary care physician/internist for the period of May through July of 2007.[14]

Older VAMC medical records dated July 5, 2007, indicate the following medical diagnoses/impressions with respect to Mr. Aubert, to wit: sub-optimal Hypertension (HTN), Hyperlipidemia, Pre-diabetes, overweight, and significant risk of coronary artery disease (CAD).[15] Dr. Ramirez's July 5, 2007, medical history specifically states that Mr. Aubert had a family history of Diabetes Mellitis (DM) and that Mr. Aubert's brother had a history of CAD, including coronary artery bypass graft (CABG). Said progress notes further report that Mr.

---

[9]See Veterans Affairs Medical Clinic Reserve, La (VAMC) Progress Note dated January 3, 2008 (Exh. 19, pp. 22-23).

[10]See VAMC Medication Records (noting Diclofenac (75 mg's) twice a day for pain and inflammation) (Exh. 23, pp. 60, 64).

[11]Id. (noting Hydrochlorothiazide (50 mg's) every day as diuretic - part of component in Lotensin) (Exh. 23, pp. 59, 63).

[12]Id. (noting Lisinopril (40mg's) every day for heart/blood pressure to replace benazepril in Lotensin) (Exh. 23, pp. 58, 62).

[13]Id. (noting Simvastatin (80mg's) one-half every day for cholesterol) (Exh. 23, pp. 56, 58, 61).

[14]See VAMC Progress Notes dated January 3, 2008 and July 16, 2007 (Exh. 19 pp. 22 and 27).

[15]Id. dated July 5, 2007 (Exh 19 at pp. 30-31).

Aubert had a negative stress during the prior year.[16]

At the time  Dr. Qayum first examined Mr. Aubert on January 3, 2008, she ordered an

echocardiogram (ECG).  Because his LDL (Bad Cholesterol) level of 153.6 mg/dL was

"abnormally high," Dr. Qayum increased his Zocor (Simvastatin) from 20 to 40 milligrams daily

but did not supplement with any other medication.[17]  Additionally, the electrocardiogram (EKG)

conducted on January 3, 2008, showed "P mitrale," but no EKG changes and normal sinus

rhythm.[18]  Her findings included: (1) shortness of breath on exertion, (2) paroxysmal nocturnal

dyspnea (PND),[19] and (3) multiple risk factors CAD.  Her plan was to: (1) check

electrocardiogram (EKG -which showed P mitrale), (2) schedule echocardiogram (ECG) with

doppler, (3) in the event of wall motion abnormality, check nuclear stress test, (4) schedule

Pulmonary Function Test (PFT)[20] and chest x-ray, and (4) have patient return after the results of

ECG and PFT were processed.[21]

The ECG (Echo /w doppler) was not performed until almost a month later on February 1,

---

[16]Id. (Exh. 19 at p. 30).

[17]See Patient Notification Letter dated January 3, 2008 (Exh. 19 at p. 20).

[18]See VAMC Progress Note dated January 3, 2008 (Exh. 19 at p. 23).

[19]Dyspnea is a feeling of difficult or labored breathing that is out of proportion to the patient's level of physical activity, which is symptomatic of a various disorders, including but not limited to pulmonary disorders (COPD), cardiovascular disease, and gastroesophogeal reflux disease (GERD).

[20]See VAMC Order Summary - PFT Test Results dated January 30, 2008 (diagnosing shortness of breath (SOB) and dyspnea after severe exertion) (Exhibit 6 at p.121).

[21]See VAMC Progress Note dated January 3, 2008 (Exh. 19 at p. 23).

2011. The ECG report summary stated the results were "ABNORMAL."[22] More particularly, the test results indicated: (1) aortic root not dilated - mild calcification of the aortic root; (2) normal LV systolic function with EF > 55% ; (3) normal RV systolic function; (4) mitral inflow patterns suggestive of E to A reversal; and (5) Grade I diastolic dysfunction.[23] The PFT showed a "mild obstructive pattern."[24]

On February 11, 2008, Mr. Aubert returned for the results of the aforesaid tests with complaints of even more frequent chest pains – i.e., "chest pain on and off at least 20 times in 1 month . . . ."[25] Additionally, within one month (since his January 3, 2008 visit), Mr. Aubert's lipid profile (LDL/Bad Cholesterol) level had increased from 153.6 to 173.1.[26] Along with the escalation of chest pain incidences, which were mostly at night, he further reported his blood pressure spiked with chest pain.[27] Mr. Aubert also reported that he was continuing to experience shortness of breath on *minor* exertion.[28] Dr. Quayam concluded "Grade I diastolic dysfunction" and "atypical" chest pain most likely due to reflux; however, she specifically noted Mr. Aubert's

---

[22]See Confidential Echo Report Summary for procedure date February 1, 2008 (Exh. 22 at p. 54/Exh. 40 at p. 45).

[23]See VAMC Progress Note dated February 11, 2008 (Exh. 19 at p. 14); *see also* Medical Package Information, Confidential Echo Report, procedure date February 1, 2008 (Exh. 22 at pp. 53-54/Exh. 40 at pp. 44-45).

[24]Id.

[25]Id. (Exh. 19 at p. 13).

[26]Id.

[27]Id. (noting that "blood pressure was high with chest pain").

[28]Id. (italicized emphasis added).

6

"multiple risk factors" for CAD and that she would order a thallium stress test.[29]  In the interim,

the only advice given to Mr. Aubert was to continue to comply with his prescription drug

therapy, no eating 2 to 3 hours prior to bedtime, avoid alcohol, soft drinks, caffeine or salt, and

raise the head of his bed to prevent reflux.  Dr. Qayum also prescribed Omeprazole for reflux.[30]

Mr. Aubert was not instructed to return to the clinic or to report to the hospital if chest pain

continued; rather, his instructions were simply to return after the stress test,[31] which was

inordinately and inexcusably delayed until March 11, 2008, as discussed below.

The VAMC's Order Summary reflects that Mr. Aubert's Adenosine Stress Test was

ordered by Dr. Qayum on February 11, 2008.[32]  It was not entered into the system until two days

later on February 13, 2008, along with her "provisional diagnosis" of "chest pain."[33]  Dr. Qayum

testified that she actually had to order the test twice.  The second time on February 13th her

order went into the system.  Dr. Qayum admitted that she followed up at that point by reordering

the stress test immediately on February 13th due to Mr. Aubert's "atypical chest pain and risk

factors;" however, the records clearly reflect that she did so without indicating any urgency

whatsoever.[34]  Most notably, Dr. Qayum admitted that she did not follow up on her patient

thereafter and had no idea why the process of getting a consult took so long in this case.  She did

_____

[29]Id. (Exh. 19 at p. 14).

[30]Id.

[31]Id. ("rtn after stress test").

[32]VAMC Order Summary (Exhibit 6 at p. 111).

[33]See VAMC Consult Request (Exh. 5 at p. 40); VAMC's Coordination Care
Consultation Sheet (also noting request date 2/13/2008 for stress test) (Exh. 8 at EC-004).

[34]See (noting "routine," which means that the test was not ordered with any urgency).

testify that the whole VA New Orleans Center was experiencing problems with Consult

Management. She explained that (1) this locality was still without a VA hospital post-Hurricane

Katrina and (2) Consult Management in New Orleans (not her department in Reserve, Louisiana)

was in charge of outsourcing cardiac diagnostic tests. Suffice it to say, Dr. Qayum's pat answer

or, more appropriately, her excuse for failing to follow Mr. Aubert after the February 11th visit

was that she was not in the Consult Management department – i.e., that's not my job.

Darleane Barnes, RN, who worked in the VA's Consult Management office, shed some

light on the dead slow pace of the VA's outsourcing, receipt, and entry of stress test results

during the period leading up to Mr. Aubert's death. She testified that on February 14, 2008 (the

day after Dr. Qayum's order for a cardiac stress test consult was re-entered into the system), the

VA changed its method of handling nuclear stress test consults. RN Barnes explained that,

before February 14, 2008, stress test consult orders were handled by Radiology and, only

thereafter, by herself (Darleane Barnes) in Consult Management.[35] RN Barnes was not assigned

to Consult Management until February 4, 2008. She admitted that she was in training for a

period of weeks and did not begin functioning independently until February 25, 2008. In the

interim, Mr. Aubert's stress test order remained in limbo awaiting assignment to an outside

vendor.

According to RN Barnes, she did not outsource Dr. Qayum's order to Chapital

---

[35]See also Email Chain dated February 14, 2008 (advising of a change in procedure for stress tests, which would no longer be handled by radiology or forwarded to cardiology service for approval but would instead be provided directly to the outsource nurse (Barnes) with results faxed back to Consult Management (Barnes) and then scanned into the system) (Exh. 4 at pp. 2-3).

Cardiology Clinic until February 27, 2008.[36]  She also did not keep a copy of her facsimile transmittal sheet which would indicate the exact date upon which she processed the physician's stress test order.  The only documentation retained by RN Barnes was the response from Chapital Cardiology Clinic – i.e., the facsimile cover sheet and confirmation letter from Chapital Cardiology Clinic dated March 5, 2008 advising that Mr. Aubert's appointment for his stress test was scheduled on March 11, 2008.[37]

Considering the testimony of the VA's Radiologist Technician, Sandra Ortega, whose department previously handled the process of stress test outsourcing, the Court finds that it is more likely than not that RN Barnes did not issue the request to Dr. Chapital's office until on or after March 1, 2008.  Ms. Ortega credibly testified that, for purposes of outsourcing stress tests, the system changed starting *March 1, 2008* (not February 14, 2008).  She explained that prior to March 1, 2008, when Radiology handled orders for cardiology consults (stress tests), the process did not take any longer than two days.  The request would be entered into the system through Radiology, one of the radiologists would go through the orders, and by next day approved orders for stress tests would be assigned to Dr. Chapital – the only outside vendor for stress tests prior to March 1, 2008.  Thereafter, his clinic would schedule the tests and fax the results back to Radiology.  Additionally, at the end of each week, Dr. Chapital would bring over the CD ROM upon which the actual test results were recorded.

Ms. Ortega's rendition of the facts regarding processing of stress test orders is

---

[36]See also Medical Record Consultation Sheet re Herman Aubert with Coordination Care Fax Line dated February 27, 2008 (Exh. 8 at EC-004).

[37]See Chapital Cardiology Clinic's Facsimile Cover Sheet and Letter to Darleane Barnes dated March 5, 2008 (Exh. 12 *in globo).*

corroborated in significant particulars by the VA's Letter Agreement (Exh. 44) with Chapital

Cardiology Clinic pertaining to Nuclear Imaging, scheduling said diagnostic tests and

interpretation procedures. The Letter Agreement provides:

> Scheduling and performing diagnostic imaging and nuclear imaging procedures
> Contractor's personnel will schedule the procedure within 24 hours of receiving authorization for the procedure.
> Contractor's personnel will perform the procedure within 10 business days of authorization.
>
> Interpretation of procedures
> The time from procedure interpretation being forwarded to SLVHCS must be within 24 hours of procedure.
> If the results are abnormal or critical test values, the contractor must contact the ordering physician within 60 minutes of the results being available.
> Non-critical results must be forwarded to the Director of Radiology Service Line within no less than 24 hours from the date/time of the procedure.
> The examination results will be provided on CD and available to the SLVHCS staff within 24 hours of examination completion. The examination images will be provided on CD within 24 hours of completion. In the instances in which the CD copies are not available, a hard copy of the images (film) will be provided....[38]

It is undisputed that this Letter Agreement governed the outsourcing *vis-a-vis* SLVHCS

and Chapital Cardiology Clinic. The system changed sometime in late February 2008 and at the

latest March 1, 2008, when Dr. Chapital was verbally apprised that reports were to be made to

the VA's Consult Management Department and not to Radiology. Dr. Chapital credibly testified

in that regard, to wit: (1) on or about March 1, 2008, he was told that a "new entity" – Consult

------

[38]Letter Agreement for Nuclear Imaging and Lower Extremity Arterial Services between Southeast Louisiana Veterans Health Care System and Chapital Cardiology Clinic effective October 27, 2006 (Exh. 44).

Management – would be handling outsourcing and receipt of results, and (2) his new point of

contact was Darleane Barnes.

According to Dr. Chapital and his medical assistant (Cheryl Carter), Dr. Qayum's order

for an adenosine stress test was not received by Chapital Cardiology Clinic until March 4, 2008

– *a full three weeks after it was ordered*. Most notably, Dr. Qayum admitted that she put the

request for consult in immediately but *not urgently*, notwithstanding Mr. Aubert's high risk

factors. Upon receipt of the order on March 4, 2008, and consistent with the written agreement,

Ms. Carter contacted Mr. Aubert on March 5, 2008, and scheduled his stress test for March 11,

2008, which is well within the ten business day requirement.[39]

On March 11, 2008, Virgie Walker, RN, assisted Dr. Chapital by preparing the patient for

his test, taking a health history,[40] and administering the Adenosine intravenously. Dr. Chapital

testified that Mr. Aubert came into his office stable and without pain. The stress test revealed

perfusion abnormalities, which means that there was a decrease flow in the inferior and lateral

apex of the heart.[41] Dr. Chapital's report includes the following impressions as to the EKG and

Adenosine Stress tests:

> The resting EKG is interpreted as normal sinus rhythm, ST segment depression
> and low to inverted T waves noted in inferior and lateral precordial leads,
> abnormal tracing.... During the adenosine portion of the examination there was
> marked ST segment depression and T wave inversion ranging from 2.0 mm to 4.0

---

[39]See Medical Record Consultation Sheet re Herman Aubert (noting that on 3/4/08 Mr. Aubert was contacted) (Exh. 8 at EC-007).

[40]See Chapital Cardiology Clinic Patient Health History signed by Herman Aubert on March 11, 2008 (Exh. 8 at EC-002 and 003).

[41]See Chapital Cardiology Clinic Facsimile Coversheet dated March 12, 2008, and Report of Adenosine Spect Gated Cardiolite Examination administered on March 11, 2008 (Exh. 1 *in globo*).

mm in the inferior and lateral precordial leads consistent with an ischemic response. The patient did experience some nonlimiting adenosine induced chest discomfort ....

IMPRESSION [as to EKG]:

1. **Stress test electrocardiographically positive for an ischemic response in inferior and lateral precordial leads.**
2. Adenosine induced nonlimiting chest discomfort.
3. No arrhythmias were observed either during the exercise or the recovery period.
4. The test was terminated at the completion of the adenosine drip.

                                             * * *

IMPRESSION [Tomographic Images]:

1. Adenosine SPECT Gated Cardiolite examination is **indicative of dilated right ventricular cavity with large partially reversible wall perfusion defect, large partially reversible lateral wall perfusion defect, moderate size reversible apical perfusion defect.**
2. There is evidence of **hemodynamically significant stress induced dilation of the LV cavity appreciated on this study.**
3. The gated portion of the examination reveals **moderate inferior apical and lateral wall hypokinesis with EF estimated range of 43%** and end distolic volume of 138 mL.
4. Clinical correlation is requested for **hemodynamically significant coronary artery disease.**[42]

The March 11, 2008, EKG administered as part of the stress test showed a *positive ischemic response.* Despite frank findings of myocardial ischemia noticed at the time of his testing, Dr. Chapital did not apprise either Mr. Aubert or his wife (in the waiting room) of the abnormal EKG findings. Dr. Chapital's excuses were that he was honoring his contract[43] – meaning that the VA handled all communication with the patient. Nevertheless, he readily

_____

[42]Id. (all emphasis added).

[43]See Letter Agreement for Nuclear Imaging and Lower Extremity Arterial Service Between Southeast Louisiana Veterans Health Care System and Chapital Cardiology Clinic (Exh. 44).

admitted that he was allowed to treat emergency situations,[44] with the caveat that those situations rarely happen. Dr. Chapital's testimony that he did not believe that Mr. Aubert was experiencing any pain when he left the clinic is clearly contradicted by the physician's own records and his admitted "concern" about the test results. Dr. Chapital testified that he endeavored to ensure that the VA received the examination results *as soon as possible* because he was "concerned."

According to Dr. Chapital and his medical assistant, his report of "abnormal" findings regarding Mr. Aubert was faxed to Darleane Barnes the next day (March 12, 2008).[45] He further testified that his numerous attempts to call Darleane Barnes and Dr. Qayum were unsuccessful and that he could not reach their voicemail; instead, their telephones just rang. Dr. Chapital did not attempt to contact Mr. Aubert or his wife though he had the patient's email address, cellular telephone, and home telephone contact numbers. Dr. Chapital testified that he continued to attempt telephone contact with the VA through March 14, 2008, to no avail.

Ms. Ortega in radiology did in fact recall being contacted by Dr. Chapital but testified that he did not report any abnormal findings to her. Ortega testified that she remembered his call trying to get in touch with someone in Consult Management and that she transferred the call. She credibly testified that, had he mentioned abnormal test results, her personal protocol was to enter a note in the system under the patient so that someone would be aware that the vendor is trying to report abnormal results.

RN Barnes testified that she worked in Consult Management the entire week (March 11

---

[44]Id. at unnumbered pp. 2-3 (regarding patient safety).

[45]See also Facsimile Coversheet dated March 12, 2008, and Adenosine Stress Report re Herman Aubert (Exh. 1 *in globo*).

through March 17, 2008 (when she went on leave)). She denied receiving any faxed report, telephone calls, or voicemail messages from Dr. Chapital on her watch. Similarly, Dr. Qayum testified that she received no telephone call and no voicemail messages from Dr. Chapital.

The faxed report of abnormal finding from Dr. Chapital's office was not processed until March 25, 2008 – i.e., unsurprisingly, the date upon which RN Barnes returned from leave. RN Barnes admitted that there were other nurses in Consult Management but explained that they were on call for handling emergency matters. RN Barnes returned on March 25, 2008, to a stack of reports and other documents which she sent to the scanning nurse.

The Court was not persuaded by RN Barnes' testimony that no report was received prior to her leave on March 17, 2008. Indeed, the abnormal test results were in fact in the stack of documents that RN Barnes sent to scanning on March 25, 2008, and, more likely than not, the results were on her desk before she left for vacation on March 17, 2008.[46] There is no evidence suggesting that Dr. Chapital's office faxed the result twice. Indeed, the VA's snarled communications and sub-optimal performance of outsourcing during the "change over" (from Radiology to Consult Management for stress tests) tell a tale that not one of the VA's employee's dared tell. More specifically, the Court finds that on February 13, 2008, the VA including Dr. Qayum "dropped the ball" and did not pick it back up until RN Barnes returned from leave on March 25, 2008. Only then did the faxed abnormal stress test results belatedly find their way into the VA's medical record imaging system VISTA.

The VA's Nursing Encounter Triage Note entered March 17, 2008, states:

---

[46]See Utilization Review Consult Note entry date March 25, 2008, at 11:57 ("Results of cardiology consult is ready for review in VISTA IMAGING).

14

> Pt's spouse called requesting for results of the nuclear stress test
> done on 3/11/08.
> a[nswer]: Spouse advised that results are not in our system and to
> call back at a later date.  Spouse states that it has been 6 days and
> the results should be and insist[s] on Dr. Qayum calling her back.
> Spouse states that maybe Dr. Qayum can call the facility to get the
> results.  Will notify Dr. Qayum for disposition.[47]

Not only did Mr. Aubert's abnormal stress test results sit in a stack for weeks unattended, Ms.

Aubert's March 17, 2008, call was not addressed by Dr. Qayum.  Over a week later on March

25, 2008, which unsurprisingly coincides with Ms. Barnes return from leave, Mr. Aubert's

abnormal stress test results finally appeared in VISTA.  Thereafter, on March 25, 2008, again

without so much as a hint of urgency, Dr. Qayum wrote: "needs angiogram, refer to cardiology

will schedule for follow up."[48]  On that date, Dr. Qayum either called or had her staff call Mr.

Aubert to inform him of a return or routine appointment the next day but was informed by his

then widow (Janie Aubert) that he had passed away on March 15, 2008.[49]

    Ms. Aubert's message rang clear – i.e., dead or alive, she wanted her deceased husband's

March 11, 2008, stress test results.[50]  She was instructed by the Triage Nurse Michael Bernier

that her concern would be forwarded to the Primary Care Physician, Dr. Qayum, for

---

[47]Nursing Encounter Triage Note entered March 17, 2008 (Exh. 40 at p. 21).

[48]Dr. Qayum's March 25, 2008 Addendum (Exh. 40 at p. 20).

[49]Clinic Nurse Telephone Triage Note dated March 25, 2008 ("Other: per dr qayum, pt
was called to inform of rn appt tomorrow, pts wife answered phone and stated pt passed away
3/15/08") (Exh. 40 at p. 19); *see also* Dr. Qayum April 2, 2008, Addendum ("Stress test report
was posted in Vista on March 25, 2008, while trying to reach the patient I find out that patient
died.  I called his wife and gave my condolences on 3-25-2008") (Exh. 40 at p. 27);

[50]Clinic Nurse Telephone Triage Note dated March 25, 2008 (noting "wife still wants to
speak to pcp about test results") (Exh. 40 at p. 19).

disposition.[51]  The VA filed an incident report on March 26, 2008.[52]

### B. Disclosure of Adverse Events to Patient

Family practitioner Dr. Richard Wallace testified via deposition that, as Acting Chief of

Staff of the VA, he was asked to perform an "institutional disclosure."[53]  He explained that his

role in this process, which took place on April 1, 2008, at the VA's offices on Poydras Street,

was to: (1) express sincere concern about the loss of this veteran (a statement of empathy); (2)

disclose facts as the VA knew them at the time; and  (3) offer assistance which could include

instructions as to how to make a claim against the Government under the FTCA.  In addition to

himself, the VA's Quality/Risk Managers (Donna Collins/Cynthia Edwards), and VA Nurse

LeFlore, the Auberts (Janie, Rhett and Ryan) attended the April 1st meeting.[54]

Addressing Dr. Chapital's abnormal stress test results, Dr. Wallace testified that it was

not a definitive diagnosis, and Dr. Chapital was turning the information/results back over to the

VA physician for clinical correlation of his findings.[55]  He further testified that his role was not

that of investigation and rather it was in the nature of disclosure as discussed above.  Clearly, Dr.

Fred H. Rodriguez (who testified at trial) assumed the role as investigator regarding the adverse

---

[51]See Clinic Nurse Telephone Triage Note dated March 25, 2008 (Exh. 40 at pp. 19-20);
see also Deposition of Dr. Richard Wallace taken November 30, 2010, at pp. 68-69.

[52]See Dr. Qayum's March 26, 2008 Addendum ("patient died on march 15, 2008,
incident report reported to DR. KARCIOGLU on 3-25-2008, AND INCIDENT REPORT FILED
ON 3-26-2008).

[53]See Disclosure of Adverse Event Note dated April 1, 2008 (Exh. 7); VA Directive re
Disclosure of Adverse Events to Patients (Exh. 17).

[54]See Deposition of Richard Wallace, M.D. (Wallace Deposition), taken November 30,
2010, at pp. 12, 24, 42; Disclosure of Adverse Event Note dated April 1, 2008 (Exh. 7)

[55]See Wallace Deposition at pp. 33-34.

event.[56]

Dr. Wallace testified regarding the April 1st disclosures to the Aubert family. As to

cause of death, he told the Aubert family that, given the history of Mr. Aubert's heart disease

preceding his visit to Dr. Qayum and further considering that heart attack is the most common

cause of death in the country, the most likely cause of Mr. Aubert's death was myocardial

infarction (heart attack)/coronary heart disease.[57]   He explained:

> At the time I am making that statement to the family there are a
> number of facts that are very clear.  Number 1, the patient died
> very suddenly....  The patient has a report from a cardiologist that
> preceded that death that say[s] that it's consistent with underlying
> coronary artery disease.
>       The patient has a medical record of several years duration
> which also indicates the underlying coronary disease.[58]

Dr. Wallace's Disclosure of Adverse Event Note specifically states under the section

entitled "Questions Addressed in the Discussion," to wit:

---

[56]See Dr. Rodriguez' Memorandum to the ACOS Patient Safety and Performance
Improvement Department dated March 27, 2008 (noting his telephone contact with Dr. Emmett
Chapital regarding his request for a statement of procedures his clinic follows regarding the
verbal reporting of abnormal test results and his procedures for submitting written reports and
statement regarding the problems his clinic has been having communicating with the VA for the
last several weeks since referrals of patients for cardiac studies switched from Radiology to
Consult Management) (Exh. 3); Dr. Emmett B. Chapital's March 27, 2008, Letter/Statement
(noting that his clinic's experience with the change effective March 1, 2008, in processing and
oversight of nuclear stress testing by the VA being moved from Radiology to Consult Services
has been less than satisfactory: his office had a good rapport with Radiology, and there was a
physician on call each day available to discuss abnormal findings; in contrast, there is only one
phone number, one fax number, and one nurse (Darlene Barnes) in Consult Services with no
names and numbers of physicians supervising that department, and his phone calls went
unanswered until he was finally able to contact a Consult Service nurse on 3/21/08 to discuss
some patient matters) (Exh. 2).

[57]See Wallace Deposition at pp. 56-57.

[58]Id. at pp. 57-58.

17

> 1. How the process for management of abnormal test results has
> changed?  We noted the establishment of direct lines of improved
> communication with external consultants; assignment of a nurse to
> review all incoming faxed test results for possible critical
> results;..."[59]

Dr. Wallace explained that the procedure had changed prior to the disclosure to the family and

that was discussed during the April 1, 2008, meeting.[60]  He further explained that, as to the

claims process, as required under the directive, the Auberts were advised of their rights to make

a claim against the Government as he would have done with any family of a deceased veteran.[61]

Obviously, the Auberts got the wrong impression about the purpose and meaning of the

VA disclosures made in the context of the April 1st meeting.  The Court finds that it was by no

stretch an admission of liability.  In this regard, the Court recognizes that lay persons, such as the

Auberts, may have understandably misconstrued the VA's sincere expression of condolences and

candid disclosure of the Auberts' right to make a claim against the Government, including the

particulars of "how to" make such a claim.  An in depth explanation of the claims administrative

process was clearly a mandated part of the adverse event disclosure process and not the

admission of liability that Plaintiffs perceived.  The likelihood of an admission of liability in the

presence of the agency's risk manager, who was in attendance, would have been nil to none.

Indeed, the Court is convinced, insofar as this case is concerned, the value of Dr.

Wallace's testimony, a family practice/primary care physician, resides in his ability articulate the

standard of care which is applicable to Drs. Qayum and Chapital and/or what could have been

---

[59]See Disclosure of Adverse Event Note dated April 1, 2008 (Exh. 7).

[60]Wallace Deposition at p. 65.

[61]Id. at 66 -67 ("I did not advise them to file a complaint.  I did not advise them to file
against the Government.  I advised them of their right to file against the government.").

18

done by either or both Drs. Qayam and Chapital to save Mr. Aubert's life under the circumstances.

### C. Cause of Death: Expert Testimony

Mr. Aubert died a sudden death, and, more likely than not, the cause was a "heart attack" or myocardial infarction due to cardiac insufficiency.[62]  Plaintiffs presented two experts: Dr. Ira Gelb, a Board Certified Cardiologist, who testified as to the applicable standard of care;[63] and Dr. Cyril Wecht, a Board Certified Pathologist, who testified regarding causation.[64]  Plaintiffs' experts opined that, as of January 2008, Mr. Aubert was a "walking time bomb," and Dr. Qayum's delay in ordering, following up on, and then acting upon positive stress results, *inter alia,* constituted conduct that fell below the applicable standard of care and caused Mr. Aubert's death.  The Government's position articulated by Dr. Lawrence O'Meallie, a Board Certified Internist and Cardiologist, was that, without autopsy, it was impossible to determine cause of death with any accuracy, and Dr. Qayum's treatment of Mr. Aubert did not fall below the applicable standard of care for an internist/primary care physician.[65]

The Court finds that Mr. Aubert's sudden death was more likely than not caused by heart attack or myocardial infarction due to acute cardiac insufficiency.

---

[62]See Trial Testimony of Drs. Richard Wallace (by deposition), Ira Gelb and Cyril Wecht (all in agreement as to the cause of death).

[63]See Letter Opinion of Dr. Ira Gelb dated May 22, 2010 (Exh. 45); Curriculum Vitae of Dr. Ira Robert Gelb (Exh. 15).

[64]Letter Opinion of Dr. Cyril Wecht dated July 7, 2010 (Exh. 46); Curriculum Vitae of Dr. Wecht (Exh. 16).

[65]See Letter Opinion of Dr. Lawrence O'Meallie dated August 23, 2010 (Exh. 47); Curriculum Vitae of Dr. O'Meallie (Exh. 48).

1. Dr. Richard Wallace

As previously noted, Dr. Wallace testified via deposition that given the history of Mr.

Aubert's heart disease *preceding his visit to Dr. Qayum* and further considering that heart attack

is the most common cause of death in the country, the most likely cause of Mr. Aubert's death

was myocardial infarction (heart attack)/coronary heart disease.[66]  He further opined as to Dr.

Qayum's March 25, 2008, request for consult[67] issued after Mr. Aubert had died, to wit:

> Q.   And you saw where it says, "Stress test, largely reversible, defect
>       lateral wall inferior wall, report Vista." What does that mean to
>       you?
> A.   It means that the patient has ischemic or an area of the heart that is
>       not getting oxygen that can be reversed.
>                              * * *
> Q.   Well, as a general practitioner, family physician, by what
>       procedure would you anticipate that would be reversible by?
> A.   Well, it could be reversible anatomically by a reconstructive
>       procedure either coronary grafting or by PCI or stinting or it could
>       be a reversible lesion that is reversible through medications that
>       dilate the arteries.
>                              * * *
> Q.   Sure. What was stated why they were requesting a consult?
> A.   It's saying she's requesting an angiogram?
> Q.   Why?
> A.   Because the patient has a *highly* positive stress test with a large
>       reversible defect in the lateral wall.
> Q.   And who is saying that?
> A.   This Dr. Qayum.
>                              * * *
> Q.   What does angina mean?
> A.   Angina is when the heart aches because it is not getting enough

---

[66]See Wallace Deposition at p. 56-57.

[67]See Dr. Qayum's Consult Request dated 3/25/2008 (stating provisional diagnosis of
"highly positive stress test, angina," "please schedule for angiogram as early as possible, highly
positive stress test, large reversible defect lateral wall inferior wall" and "Relevant background:
angina +") (Exh. 20); see also Health Summary Addendum by Dr. Qayum Ref: Utilization
Review Consult dated 3/25/2008 ("needs angiogram") (Exh. 25 at p. 73);

oxygen.[68]

Regarding the spectrum of possible actions that could be taken by a hypothetical physician/vendor (such as Dr. Chapital) who is presented with abnormal test results and unable to communicate such results to the primary care physician, Dr. Wallace responded:

Q.     What can he do?
A.     The vendor could have taken independent action and said, if this test is so abnormal. I can't get anybody to contact the V.A., he could have acted responsibly to patient themselves and said despite this I am going to send you to the hospital.
        The vendor could say that I can't get through to the V.A. but if this information is so serious that I must notify someone, let me talk to the boss at the V.A., let me talk to the director, let me talk to the chief of staff ... well, I'll leave it at that.[69]

Dr. Wallace further testified that he was aware of no VA policy or procedure which prevents an outside consultant from taking action and admitting a patient directly to the E.R.[70] The sum and substance of Dr. Wallace's opinion was that such an outside vendor had options, including advising the patient himself of a positive ischemic response and recommending that he report to the E.R., admitting the patient to the E.R. himself, and notifying the VA's chief of staff of abnormal test results that needed to be addressed by surgical intervention on an urgent basis.

2. Dr. Ira Gelb

Dr. Ira Gelb, Plaintiffs' expert cardiologist, opined that the VA, Dr. Qayum, and Dr. Chapital breached the applicable standard of care in a number of particulars. Dr. Gelb opined:

(1) Dr. Chapital should have:

----

[68]Wallace deposition at pp. 70-72.

[69]Id. at pp. 78-79.

[70]Id. at p. 82.

21

- ◎     made immediate arrangements to transfer Aubert to a hospital for urgent cardiac catheterization to determine need for angioplasty and stenting (PTCA) or coronary bypass surgery (CABG), which would have oxygenated the blood to inferolateral and apical walls and in all likelihood averted his death on March 15, 2008; and

- ◎     contacted Dr. Qayum or any physician at the VA; simply faxing the abnormal results the following day was insufficient and fell below the standard of care.

(2) Dr. Qayum should have:

- ◎     contacted Dr. Chapital for the results of the stress test that was delayed over one month in a severely ill patient; and

- ◎     prescribed coronary artery vasodilators and additional therapy to lower LDL levels in the interim.[71]

Dr. Gelb opined that Aubert's constellation of risk factors, escalating complaints of symptoms correlated with CAD, and test results (including 1/03/08 EKG "P mitrale," 2/01/08 ECG "ABNORMAL" and 3/11/08 ETT highly positive/significantly abnormal) demanded prompt testing and invasive procedures on an urgent basis to improve myocardial infusion and avoid death.

    More particularly, as to conduct that fell below the applicable standard of care, Dr. Gelb testified that: (1) the delay in getting tests performed by the cardiologist and results back to and reviewed by Dr. Qayum unequivocally caused Mr. Aubert's death; (2) the VA treated Dr. Chapital like a technician (not a physician) and the whole system "wreaks" of problems accounting for the patient's demise; (3) on January 3, 2008, additional medication to dilate his coronary arteries should have been implemented because, in addition to other noted risk factors including symptoms of classical unstable angina, his LDL was very abnormal in that it should be

---

[71]See Dr. Ira J. Gelb's Letter Opinion dated May 22, 2010 (Exh. 45).

below 70 for a diabetic; (4) Mr. Aubert's ECG results showed changes consistent with myocardial damage – i.e., the same changes demonstrated with the stress test (only more pronounced); and (5) his March 11, 2008 abnormal ejection fraction of 43% showed ventricular, myocardial damage indicating "somebody who is in big trouble."

As to the standard of care applicable to an internist or primary care physician such as Dr. Qayum, Dr. Gelb essentially testified that the classic signs and symptoms should not have eluded her and should have been met with more aggressive treatment. In this regard, Dr. Gelb agreed that almost any student right out of medical school would recognize these classic signs and testified that it was a "no brainer." He further elaborated stating: "You don't need to be a rocket scientist to know what's going on" in the Mr. Aubert's case.

Specifically addressing Dr. Qayum's treatment that fell below the standard of care, Dr. Gelb testified that she should have prescribed vasodilators early on and that the physician's order merely adjusting his cholesterol medication (Zocor) was not enough. Specifically, he faulted Dr. Qayum for her failure to prescribe Nitroglycerin despite Mr. Aubert's escalating complaints of chest pain. Dr. Gelb emphasized that (1) Mr. Aubert's January 3, 2008, EKG was not normal since it showed P mitrale, (2) his February 1, 2008, ECG was decidedly abnormal showing diastolic dysfunction, and (3) Dr. Qayum ordered no testing on any type of urgent basis despite Mr. Aubert's history and complaints of 20 episodes of chest pain within a month.

Dr. Gelb noted that Dr. Qayum was Mr. Aubert's primary care physician, and she should have ordered the test pronto because delay in the process of ruling in or out life-threatening diseases like CAD could be deadly; therefore, the sooner there is intervention, the better the prognosis for the patient. Dr. Gelb opined that had more immediate arrangements been made to

address Mr. Aubert's demonstrated coronary insufficiency, Mr. Aubert would be alive.

In summary, Dr. Gelb believed that there were breaches of the standard of care and that the VA was guilty of medical negligence. He opined that VA physician, Dr. Qayum, should have timely instituted appropriate studies and followed up with her patient and the cardiologist. That was her responsibility as Mr. Aubert's primary care physician. Suffice it to say, after forming her provisional diagnosis (GERD), Dr. Qayum failed to fulfill her duty to move swiftly to rule out the obvious, imminent, serious, and life-threatening causes for Mr. Aubert's signs and symptoms – i.e., chest pain/angina and shortness of breath/ischemia due to coronary artery insufficiency or CAD. In Dr. Gelb's opinion, Mr. Aubert's risk of heart attack was imminent and foreseeable, and Dr. Qayum's failure to deal with the obvious life-threatening risk first and with due haste constituted a breach of the standard of care.

### 3. Dr. Cyril H. Wecht

Dr. Cyril H. Wecht, Plaintiffs' expert forensic pathologist, opined that an acute myocardial infarction[72] from myocardial ischemia, which had been confirmed on the adenosine stress test four days prior to Mr. Aubert's death on March 15, 2008, was the most likely cause of death. Dr. Wecht noted that Mr. Aubert's medical history amply demonstrated that he was at high risk for such an event, and he sought medical attention for definite symptoms of ischemia (dyspnea/shortness of breath on minor exertion) for at least two months prior to his death. According to Dr. Wecht, urgent medical attention was indicated at the time of Mr. Aubert's first visit in January 2008; however, it took well over two months before a definite diagnosis was

---

[72]Dr. Wecht explained that myocardial infarction is actual damage of the heart muscle as a result of myocardial ischemia (deprivation of oxygen to the heart muscle) because of compromised coronary arteries.

24

established *via* nuclear stress test. Dr. Wecht expressed his opinion that Mr. Aubert was managed inappropriately but deferred to other experts insofar as articulating the standard of care applicable to either Dr. Qayum or Dr. Chapital. Dr. Wecht believed that Mr. Aubert's death would have been averted had he been hospitalized and a work up performed at the time he sought medical attention. He further opined that had Mr. Aubert been treated pharmacologically or via stent or CABG at the time when frank myocardial ischemia was established, he would have had close to a 100% chance of survival.[73]

Dr. Wecht emphasized that medical and surgical treatment of coronary artherosclerosis has been widely successful in preventing death in patients like Mr. Aubert.[74] He opined that, with appropriate intervention, Mr. Aubert would have lived 12 to 15 more years. Dr. Wecht explained his opinion by pointing out that Mr. Aubert was already in the category of individuals likely to live to age 75 and beyond because he had already reached the 65-year mark and was still ticking even without treatment addressing his CAD.

Dr. Wecht was quite familiar with the clear evidence of Mr. Aubert's significantly compromised coronary arteries (arteriosclerotic cardiovascular disease) and hypertension. He explained that the latter (hypertension) can lead to enlargement of the heart, which, like CAD, also compromises cardiac activity. The clear evidence consisted of Mr. Aubert's increasing complaints, including shortness of breath on minor exertion and chest pain as well as diagnostic test results including but not limited to the March 11, 2008, EKG/Adenosine stress test.

---

[73]Dr. Gelb similarly testified that appropriate tests followed up with appropriate intervention, whether placement of a stent or bypass surgery, would have resulted in a 99% chance of survival in Mr. Aubert's case.

[74]See Dr. Cyril H. Wecht's Letter Report dated July 7, 2010 (Exh. 46).

25

In sum, Dr. Wecht observed that the results of the March 11, 2008, stress test were significant and disturbing, and something should have been done immediately. In his mind, the situation was urgent and not handled properly. Like all of the other experts, Dr. Wecht also testified that a three week or more delay in testing for someone who has any kind of definitive manifestation of coronary artery insufficiency is *a long time*. Dr. Wecht observed that Mr. Aubert was exhibiting classic symptoms of CAD the entire time he was treated by Dr. Qayum.

### 4. Dr. Larry O'Meallie

Dr. Lawrence O'Meallie, the Government's expert in the fields of cardiology and internal medicine, testified that previous electrocardiograms conducted on Mr. Aubert were normal, notwithstanding the fact that the medical evidence showed otherwise.[75] Similarly, Dr. O'Meallie testified that the results of the February 1, 2008, ECG was normal despite the fact that the VA's own medical records support the opposite conclusion.[76] As to Dr. Qayum's provisional diagnosis of GERD, Dr. O'Meallie noted that Mr. Aubert had a history of GI issues (not otherwise specified) and explained that symptoms of coronary disease can mimic gastrointestinal disorders. He concluded that Dr. Qayum's treatment did not fall below the applicable standard of care.

Initially, the Court notes that to the extent that the medical records reveal a history of GI issues with respect to Mr. Aubert, Dr. O'Meallie agreed that GERD was a benign condition. As

---

[75]Compare VAMC Progress Note dated January 3, 2008 (noting P mitrale but no EKG changes) (Exh. 19 at p. 23).

[76]Compare VAMC Progress Note dated February 11, 2008 (noting Grade I diastolic dysfunction, multiple risk factors, and will schedule thallium stress test) (Exh. 19 at p. 14); VAMC Echo (ECG) Report re February 1, 2008 Procedure (noting in the summary "ABNORMAL") (Exh. 22 at p.54)

noted by Dr. Gelb and Dr. Wecht, the medical evidence does in fact reveal a constellation of risk factors for and classic symptoms of CAD as well as abnormal findings pursuant to the initial EKG and ECG tests ordered by Dr. Qayum. Mr. Aubert's medical records, standing alone, amply demonstrate that Dr. Qayum suspected that Mr. Aubert's chest pain and ischemia could be caused by coronary artery insufficiency[77] notwithstanding a provisional diagnosis (GERD). The Court notes that Dr. Qayum ordered EKG's, an ECG w/doppler, and then Adenosine stress testing, but never on any type of urgent basis.

Dr. O'Meallie denied any knowledge of a change in stress test reporting procedures from Radiology to Consult Services during the pertinent time frame. He testified that such information would not affect his opinion in this matter in any event. Dr. O'Meallie also opined that there was no evidence that Mr. Aubert had an acute myocardial infarction.

Dr. O'Meallie agreed that it was *a long time* before the stress test got accomplished. Regarding the order for nuclear stress testing, the delay and the failure to follow up regarding same, Dr. O' Meallie testified:

Q.   Were you aware that she thought he needed a nuclear stress test and ordered it but it didn't get effectuated for weeks?
A.   Yes, it did not get done for weeks, I don't have any idea why. That was hardly her fault.
Q.   Well, if she ordered it, don't you think it's a physician's duty to make sure it's getting done if she thinks it has to do with a heart condition or angina condition, where it might be classic signs of future heart problems.
A.   Perhaps.[78]

---

[77] See Consult Request by Dr. Qayum dated February 13, 2008 (noting the provisional diagnosis of "chest pain" and requesting an "adenosine stress test").

[78] Trial Testimony of Dr. Larry O'Meallie on Cross-Examination.

27

Nevertheless, Dr. O'Meallie concluded that Dr. Chapital's conduct fell below the standard of care, noting that terms of any contract with the VA should have no bearing on his conduct as a professional. In this regard, Dr. O'Meallie opined that Dr. Chapital's failure to apprise Mr. Aubert of any abnormal results or discuss the implications of the abnormal stress test with him constituted breaches of the standard of care applicable to cardiologists. It was further Dr. O'Meallie's opinion that if Dr. Chapital felt that Mr. Aubert required immediate treatment on account of highly positive test results, Dr. Chapital could have informed Mr. Aubert directly and referred him to the Tulane Medical Center ER, where VA patients are routinely evaluated and treated. Dr. O'Meallie testified that it is the duty and responsibility of the testing physician (Dr. Chapital in this case) to inform both the patient and his referring physician of results on a prompt, if not immediate, basis, depending on the circumstances.

It is not disputed that the VA is a large system, and many VA physicians have cell phones and pagers. Nevertheless, these physicians, even primary care physicians (such as Dr. Qayum), have a duty to follow up on their patients and to ensure that tests they order are performed in sufficient time to be a diagnostic tool. Dr. Qayum failed to order testing on any type of urgent basis and failed to follow up to ensure that such tests were ever performed. It should come as no surprise that this primary care physician was attempting to schedule a return visit with a heart patient who had died after his belated Adenosine stress test.

The Court finds the reasoned approach of Dr. Gelb and Dr. Wecht to be most credible. Their reliance on evidence *in the medical records* supports their findings as to standard of care or professional duty owed to Mr. Aubert. Although Dr. O'Meallie is an extremely well-qualified expert, his testimony has far less factual support and therefore must be viewed as less credible.

Because the Court must make this credibility determination, those factors are weighed in finding that the Plaintiffs' experts' opinions are controlling in this case. Additionally, the Court notes that the testimony of Dr. Wallace is right in line with Dr. Gelb and Dr. Wecht, insofar as cause of death is concerned. All experts agreed that a three to four week delay for thallium stress testing in this case was an inordinately long time.

Indeed, the weeks-on-end delays are inexcusable, both in outsourcing the stress testing and then, on the back end, receiving, inputting results online, and reviewing transmitted results. Such "treatment" is tantamount to no treatment at all by the VA's physician, Dr. Qayum. Mr. Aubert might as well have had no diagnostic test performed at all to rule out or in CAD, despite his history, signs, and symptoms indicating that he was a "walking time bomb." Testing to rule out or in CAD, angina, or coronary insufficiency, all clearly suspected from the "get-go," was unreasonably and inexcusably delayed. The Court finds that Dr. Qayum's treatment of Mr. Aubert fell below the standard of care.

As for Chapital Cardiology Clinic/Dr. Emmett Chapital, all of the experts agreed that something should have been done by Dr. Chapital, and his conduct fell below the applicable standard of care. Dr. Chapital admittedly: (1) failed to contact or notify *any* physician at the VA regarding Mr. Aubert's abnormal/highly positive stress test and EKG results; (2) failed to advise Mr. Aubert or his wife of abnormal EKG results either before he left the office on March 11, 2008, or thereafter; and (3) failed to even consider admitting Mr. Aubert to the E.R. himself despite his concern about the highly positive stress test.[79] All of this conduct fell below the

---

[79]As previously noted at the outset, Dr. Chapital is the subject of a separate medical malpractice proceeding in state court. See State of Louisiana Patient Compensation Fund Letter and Petition for Damages (Exh. 43 *in globo*).

standard of care applicable to cardiologists and is causally related to Mr. Aubert's March 15, 2008, death. The Court further finds that there is nothing in the VA's policy, procedures, or "Letter Agreement" which would have prevented an outside consultant, such as Dr. Chapital, from taking necessary action to prevent what happened in this case. Moreover, and assuming that there were any valid concerns about remuneration on Dr. Chapital's part, in addition to VA benefits, Mr. Aubert also had private insurance which would have covered the cost of necessary medical emergency treatment.[80]

### D. March 15, 2008, Death of Mr. Aubert

On March 11, 2008, Mrs. Aubert accompanied her husband to his appointment at Chapital Cardiology Clinic for the adenosine stress test. She was aware that Mr. Aubert had been experiencing chest pains with increasing frequency during the months of January and February 2008. Mrs. Aubert testified that, because he was experiencing chest pains after the March 11, 2008, adenosine stress test procedure, Mr. Aubert was offered nitroglycerine by the staff at the Chapital Clinic. On cross-examination, Mrs. Aubert testified that neither Dr. Chapital nor anyone on his staff shared either the results of the EKG or the stress done that day.

On their way home from the clinic on March 11, 2008, Mr. and Mrs. Aubert stopped at Sam's and went their separate ways on foot in the store. Mr. Aubert later met up with Mrs. Aubert, but he had commandeered a scooter. Apparently, he was experiencing some chest discomfort merely walking the length of the store. Mrs. Aubert testified that Mr. Aubert had a difficult night on March 14, 2008. However, the next morning (Saturday, March 15, 2008) he

---

[80]Trial Testimony of Mrs. Aubert (regarding private health care insurance in favor of Mr. Aubert).

felt better after resting in the lounge chair. They left home together and headed for the Mall of Louisiana in Baton Rouge. They stopped for a light lunch, and Mr. Aubert exited the car after finishing a cellular phone call with his son, Rhett. Upon entering the restaurant, Mr. Aubert excused himself and did not return. After a few minutes passed and he did not answer his cell phone, Mrs. Aubert asked one of the bus boys to check on her husband in the men's room. He returned to tell her that Mr. Aubert was on the floor, crouched over on his knees. The bus boy yelled for someone to call 911. A lady working in the restaurant attempted CPR; then the EMT's arrived.

Mrs. Aubert was informed by the EMT's that Mr. Aubert was not going to be okay. When Mrs. Aubert turned him over, it was obvious to her that Mr. Aubert had passed away. Both sons, Rhett and Ryan, drove up to meet her at Baton Rouge General where the EMT's took Mr. Aubert, and he was later pronounced dead.

### E. Damages: Wrongful Death and Survival Action

The family members each testified about their "extremely close" relationship as an extended family unit. Indeed, both Mr. and Mrs. Aubert were born and raised in Reserve, Louisiana, lived there all of lives and raised their children in Reserve. Mr. Aubert hunted with his boys, Rhett and Ryan, up until the time of his death.[31] They also spent every holiday together. In addition to spending time with his wife, Janie, and his sons on a daily basis, Mr. Aubert dedicated much time to his only granddaughter. Prior to his death, Mr. Aubert picked up Rhett's daughter on a daily basis from Riverside Academy in Reserve where she attended school. Since Mr. Aubert was retired, he also ran the errands, handled the bills (if necessary), and even

---

[31]The Auberts' daughter pre-deceased them.

31

did some of the cooking. Ryan testified that he and his father "did pretty much everything

together." Ryan credibly testified that his father checked on him "every single day" his entire

life. In this regard, Ryan explained that he worked in a local grocery store, and his father would

stop by just to talk, check on him, and see if he was going to be at the house for supper at night.

It is clear to the undersigned that Mrs. Aubert, Rhett, and Ryan suffer greatly as result of

the loss of Mr. Aubert. The record reflects that Mrs. Aubert received medical treatment to

address her mental and emotional suffering after the fact of Mr. Aubert's death.[82]  She further

testified at length regarding her despondence and inability to concentrate following the death of

her husband. Mrs. Aubert had worked all of her life, since she was 18 years old.  She explained

that she was in "total shock" upon seeing her husband dead, and that remains on her mind to

date.

Mrs. Aubert testified that she went to the doctor for medication because she was so

depressed that she could not concentrate and perform her job at the bank as she had done for

years, even after the death of her daughter. Mrs. Aubert admitted that she did not retire and was

not fired by the bank. She testified that she just gave up and quit because of her inability to

concentrate after her husband died. Mrs. Aubert credibly testified that her life without Mr.

Aubert was very hard to accept, particularly after having lost her daughter.

### III. CONCLUSIONS OF LAW

#### A. The Standard of Care

Plaintiffs filed this claim pursuant to the Federal Torts Claims Act, 28 U.S.C. §§ 2671 -

---

[82]See Ochsner Clinic Foundation Records re Janie Aubert (noting that, in addition to having unexpectedly lost her husband, she was still grieving the death of her daughter) (Exh. 39 *in globo*).

2680 ("FTCA"). The FTCA is a limited waiver of the federal government's sovereign immunity.[83] This Act provides that "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances . . . ."[84] It is undisputed that Louisiana medical malpractice law governs this dispute since Mr. Aubert's treatment and death occurred in Louisiana.

It is well-settled that, under Louisiana law, a hospital may be held liable for the negligence of its physician employees under the doctrine of *respondeat superior*.[85] The VA has not disclaimed responsibility for the acts of its physicians; thus, it accepts responsibility for the actions of the doctor (Dr. Qayum) who treated Mr. Aubert.[86] "In a malpractice action against a hospital, under a theory of respondeat superior, the standard of care and burden of proof involved is the same as for the physician whose activities are questioned."[87]

Section 9:2794 of the Louisiana Revised Statutes governs medical malpractice actions. This provision provides in pertinent part:

> In a malpractice action based on the negligence of a physician . . ., the plaintiff shall have the burden of proving:
>
> (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians . . . licensed to practice in the state of Louisiana and actively practicing in a similar

---

[83]Vanhoy v. United States, 2006 WL 3093646, at *6 (E.D. La. Oct. 30, 2006) (citing *Johnston v. United States*, 85 F.3d 217, 218-19 (5th Cir. 1996)).

[84]28 U.S.C. § 2674; Vanhoy, 2006 WL 3093646 at *6.

[85]Little v. Pou, 42,872, p. 13 (La. App. 2 Cir. 1/30/08); 975 So. 2d 666, 674.

[86]Johns v. United States, 1998 WL 151282, at *8 (E.D. La. Mar. 30, 1998).

[87]Corley v. State of La.. Dep't of Health & Hospitals, 32,613, p. 6 (La. App. 2 Cir. 12/30/99); 749 So. 2d 926, 930.

> community or locale and under similar circumstances; and where
> the defendant practices in a particular specialty and where the
> alleged acts of medical negligence raise issues peculiar to the
> particular medical specialty involved, then the plaintiff has the
> burden of proving the degree of care ordinarily practiced by
> physicians . . . within the involved medical specialty.
>
> (2) That the defendant either lacked this degree of knowledge or
> skill or failed to use reasonable care and diligence, along with his
> best judgment in the application of that skill.
>
> (3) That as a proximate result of this lack of knowledge or skill or
> the failure to exercise this degree of care the plaintiff suffered
> injuries that would not otherwise have been incurred.[88]

To prove medical malpractice, Plaintiffs must demonstrate: (1) the appropriate standard of

medical care, which is the degree of knowledge, skill, and ordinary care possessed and exercised

by physicians in the appropriate medical field; (2) that the VA practitioners either lacked or

failed to exercise this degree of medical care; and (3) that Plaintiffs' alleged harm was the

proximate result of the VA physician's failure to exercise that degree of care.[89]

In <u>Johns v. United States,</u> the court explained:

> In determining whether the VA's medical services met the applicable standard of
> care, the Court must view the reasonableness of the health care provided by the
> VA at the time and under the circumstances that existed when the VA physicians'
> diagnoses were made. The VA was not required to exercise the highest degree of
> care possible; its duty was to exercise the degree of skill ordinarily employed by
> comparable physicians under similar circumstances.[90]

The Court previously found that Dr. Qayum, an internist/primary care physician, violated the

applicable standard of care when she failed to order diagnostic testing with the requisite amount

---

[88]LA. REV. STAT. ANN. § 9:2794.

[39]<u>See</u> McCraw v. La. State Univ. Med. Ctr., 627 So. 2d 767, 769 (La. App. 2 Cir. 1993).

[90]1998 WL 151282 at *8 (citations omitted).

of urgency and then failed to follow up on the testing that had been ordered for weeks on end. Additionally, Dr. Qayum failed to recognize the ultimate problem sooner and institute the appropriate studies earlier so that correct treatment could be implemented.

Dr. Wallace, a family practitioner/primary care physician with the VA, noted that Mr. Aubert's heart disease preceded his first visit with Dr. Qayum. Dr. Gelb opined that his symptoms and test results were noted as early as January 3, 2008, and thereafter required *prompt* testing and invasive procedures on an *urgent* basis to improve myocardial infusion and avoid death. Dr. Gelb further opined that, as primary care physician in charge of Mr. Aubert's treatment, Dr. Qayum should have followed up and contacted Dr. Chapital for the results of the stress test. Dr. Gelb credibly testified that Mr. Aubert clearly had coronary artery disease and unstable angina when first seen by Dr. Qayum. As of February 11, 2008, with his incidences of chest pains having escalated to 20 times a month, Dr. Gelb described Mr. Aubert as "a walking time bomb" and his classic signs as a "no-brainer," which even a student right out of medical school would recognize. Dr. Gelb testified that, at the very least, Dr. Qayum should have prescribed vasodilators early on and that simply increasing his cholesterol medication was not nearly enough. All of the experts agreed that a three week delay for a stress test was inordinately long, and Dr. Gelb believed that, under the circumstances presented by Mr. Aubert's condition, such a delay was an outrageous breach of the standard of care. Suffice it to say, Dr. Qayum could have at any time ordered a stress test on either an "urgent" or "stat" basis because she was the primary care physician and Mr. Aubert was *her* patient. Dr. Qayum admittedly never took any steps whatsoever to verify that her order for a stress test had ever been implemented.

There is more than sufficient evidence of the standard of care applicable to Dr. Qayum.

35

It is well-established that where medical disciplines overlap, it is appropriate to allow a specialist in one field to give expert testimony as to the standard of care applicable to areas of practice common to both disciplines.[91] Dr. Gelb articulated a standard of care for any physician, testifying that the abnormalities exhibited by Mr. Aubert cannot be ignored and that Dr. Qayum's failure to follow up constitutes a breach of the standard of care.

The Court further finds that the Government carried its burden with respect to "other fault" – meaning Dr. Chapital's. Most notably, the Government elicited testimony from Dr. Gelb on the issue of the standard of care applicable to the VA's consulting physician in this case. Dr. Gelb also opined that Dr. Chapital's conduct fell below the standard of care in that he should have admitted Mr. Aubert to the hospital after a highly positive stress test and, *at a bare minimum*, informed the patient of the abnormal results.[92]

As to Dr. Qayum, and based upon credible testimony of the Plaintiffs' experts discussed at length in this Court's findings of fact, the undersigned further finds that none of the tests

---

[91]See, e.g., Roberts v. Warren, 01-1342, at p. 2 (La. 6/29/01); 791 So. 2d 1278, 1280 (oral surgeon testified as to the standard of care required in basic general dentistry for tooth extraction); Campbell v. Hosp. Serv. Dist. No. 1, Caldwell Parish, 33,874, at p. 12 (La. App. 2 Cir. 10/26/00); 768 So. 2d 803, 811 ("Although the plaintiffs did not offer deposition testimony from an expert in emergency medicine, the record clearly shows that the diagnosis and treatment of angina leading to a MI is not peculiar to the practice of emergency room medicine and that plaintiffs' expert witnesses (both cardiologists) in this case were more than qualified to establish the [applicable] standard . . . [of care] . . . ."); Ricker v. Hebert, 94-1743 (La. App. 1 Cir. 5/5/95); 655 So. 2d 493, 495 ("In determining whether testimony regarding the standard of care will be limited under Revised Statute 9:2794(A) to a specialist who practices the same specialty as the defendant, the operative statutory phrase is 'where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved.'"); Slavich v. Knox, 99-1540 (La. App. 4 Cir. 12/15/99); 750 So. 2d 301, 304 (finding no error in allowing a general surgeon to testify as to the standard of care applicable to an internist who failed to diagnose the plaintiff).

[92]See Graphia v. United States, 1993 WL 69999, at *4-5 (E.D. La. Mar. 5, 1993).

ordered by Dr. Qayum were performed with the requisite degree of urgency. The Court

concludes that Dr. Qayum's actions and inactions with respect to *her* patient (Mr. Aubert) fell

below the requisite standard of care. The fact remains that no one from the VA called the

Auberts' residence until a week and a half passed after Mr. Aubert's death and more than five

weeks after Dr. Qayum initially ordered the adenosine stress testing. Dr. Qayum was Mr.

Aubert's primary care physician and breached her duty to follow up regarding tests that she

ordered over a month before his heart attack – the raison d'etre for ordering the stress test.

### B. Causation

Generally, cause-in-fact is the outset determination in the duty-risk analysis.[93]

"Cause-in-fact usually is a 'but for' inquiry which tests whether the accident would or would not

have happened but for the defendant's substandard conduct."[94]  When there are concurrent

causes, the proper inquiry is whether the conduct at issue was a substantial factor in precipitating

the accident.[95]

Professor Robertson has articulated five steps to simplify the "mental gymnastics"

involved in the cause-in-fact analysis.[96]  Professor Galligan summarized the steps as follows:

"(1) identify the injury; (2) identify the wrongful conduct; (3) correct the conduct; i.e., make the

wrong right; (4) ask whether the plaintiff would have still been hurt if the defendant hadn't done

---

[93]Boykin v. La. Transit Co., Inc., 96-1932 (La. 3/4/98); 707 So. 2d 1225, 1230.

[94]Id.

[95]Id. at n.10.

[96]Thomas C. Galligan, Cats or Gardens: Which Metaphor Explains Negligence? Or, Is Simplicity Simpler than Flexibility?, 58 LA. L. REV. 35, 43 (1997).

what it (allegedly) did wrong; and, (5) finally, answer the question just asked."[97]

Applying the instant facts to the foregoing steps, the Court finds that both Dr. Chapital

and Dr. Qayum's respective breaches of the applicable standard of care caused Mr. Aubert's

death. Had his noted heart condition been addressed at any time prior to the date of his death

(March 15, 2008) by either physician in the manner previously described in this Court's findings

of fact, he very likely would not have died of cardiac insufficiency. Both Dr. Chapital and Dr.

Qayum had the opportunity to inform Mr. Aubert of the seriousness of his life-threatening

condition, and each, in turn, failed to so inform Mr. Aubert, notwithstanding a duty to do so.

Dr. Gelb testified that if the VA had not delayed and followed up with respect to the

panoply of positive findings, including the March 11, 2008, stress test, Mr. Aubert's life could

have been saved either by stenting or a coronary bypass procedure. Dr. Wecht agreed with this

assessment and opined that with such intervention Mr. Aubert's chance of survival was 99%, and

he would have in all likelihood lived another 12 to 15 years. The Plaintiffs' experts concluded

that either procedure could have been successfully conducted in January or February 2008 and

could have also been successfully conducted in March at any time prior to his death on March

15, 2008. Accordingly, Plaintiffs are entitled to recover wrongful death damages from the

Government.[98]

## C. Damages

Based on the Court's findings that the VA's breach of the applicable standard of care

---

[97]Id.

[98]See Smith v. State of La., Dep't of Health and Hospitals, 95-0038 (La. 9/3/96); 676 So.
2d 543, 548-49 (distinguishing between wrongful death and loss of chance of survival claims).

resulted in Mr. Aubert's death, Plaintiffs are entitled to recover damages.

### 1. Survival Damages

In a survival action for damages, "the elements of recovery include the decedent's pain and suffering, his loss of earnings, and other damages sustained by the victim from the time of his 'accident' to the time of his death."[99]   If a person dies instantaneously in an accident, there will be no survival action for pain, suffering, and mental anguish, but there may be a wrongful death action.   In the case at bar, Plaintiffs seek to recover for the pain and suffering of Mr. Aubert.   However, Plaintiffs have provided no evidence that Mr. Aubert suffered any conscious pain and suffering as a result of Defendant's negligence.   Plaintiffs are not entitled to recover damages for loss of earnings.[100]   Therefore, *with the exception of $2,978.95 for medical expenses incurred for the treatment of Mr. Aubert at Baton Rouge General Hospital on March 15, 2008 (Exh. 30),* Plaintiffs are not entitled to recover under Louisiana Civil Code article 2315.1.

### 2. Wrongful Death

Plaintiffs are entitled to recover damages for wrongful death.   The elements of damage for wrongful death are: (1) loss of love, affection, companionship, and services ; (2) loss of support; (3) medical expenses; and (4) funeral expenses.[101]   Mr. Aubert had already retired but received a Government pension at the time of his death.   Mrs. Aubert is entitled to recover loss of support damages relating to his pension, which stopped upon her husband's death – i.e., $115

---

[99]Johns v. United States, 1998 WL 151282, at *11 (E.D. La. Mar. 30, 1998).

[100]Id. at *12 (denying damages for loss of support in wrongful death medical malpractice claim when the victim has already retired).

[101]Subervielle v. State Farm Mut. Auto. Ins. Co., 08-0491, p. 3 (La. App. 4 Cir. 1/7/09); 32 So. 3d 811, 813.

per month X 193.5 months for a total of $22,218.00 for the loss of Mr. Aubert's veterans benefits. In addition, Mrs. Aubert produced adequate evidence of Mr. Aubert's funeral/burial expenses in the total amount of $8,187.96 ($7597.96 +$590.00).

With respect to Plaintiffs' claims for loss of love, affection, and companionship, they presented evidence that Mr. Aubert was loving and devoted husband and caring father. Mr. And Mrs. Aubert were married for approximately 40 years. He was described as the backbone of the family, providing companionship, services, and emotional support for his wife and both sons. Plaintiffs testified that their family was extremely close. The Auberts participated in daily activities as a family and shared every holiday. Mrs. Aubert was very dependant on her husband since she worked everyday at the bank and needed help with the house, errands, cooking, and family events.

Plaintiffs presented testimony that Mr. Aubert's death had a significant negative impact on his wife and both sons. Mrs. Aubert was devastated, depressed, and withdrawn, particularly considering Mr. Aubert's tragic death followed closely on the heels of the death of her only daughter. After considering the extensive testimony offered at trial, the Court awards Mrs. Aubert $600,000 and Ryan and Rhett Aubert each $150,000 for their respective losses. These award are reasonable and warranted considering the facts presented at trial and this Court's review of awards in comparable cases.

### D. Apportionment of Fault

The Court has found that the VA is liable for certain breaches of the standard of care owed Mr. Aubert, as set forth *in extenso* throughout this Court's opinion. In addition, the Court finds that Dr. Chapital also breached the standard of care in a manner which was a cause-in-fact

of Mr. Aubert's death. The Government's liability must be apportioned in accordance with

Louisiana's current comparative fault regime. Louisiana Civil Code Article 2323 provides:

> A. In any action for damages where a person suffers injury, death, or loss, the
> degree or percentage of fault of all persons causing or contributing to the injury,
> death, or loss shall be determined, regardless of whether the person is a party to
> the action or a nonparty, and regardless of the person's insolvency, ability to pay,
> immunity by statute . . ., or that the other person's identity is not known or
> reasonably ascertainable. . . .
>
> B. The provisions of Paragraph A shall apply to any claim for recovery of
> damages for injury, death, or loss asserted under any law or legal doctrine or
> theory of liability, regardless of the basis of liability.[102]

Article 2324 of the Civil Code provides for joint and divisible liability of joint tortfeasors. This

provision limits a tortfeasor's liability to his percentage of fault:

> [L]iability for damages caused by two or more persons shall be a joint and
> divisible obligation. A joint tortfeasor shall not be liable for more than his degree
> of fault and shall not be solidarily liable with any other person for damages
> attributable to the fault of such other person, . . . regardless of such other person's
> insolvency, ability to pay, degree of fault, immunity by statute or otherwise . . . .
> [103]

Comparative fault inevitably measures relative causation. In Watson v. State Farm Fire

and Casualty Insurance Co., the Louisiana Supreme Court stated that "[i]n determining the

percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at

fault and the extent of the causal relationship between the conduct and the damages claimed."[104]

In assessing the nature of the conduct of the parties, the court may consider various factors in

determining the degree of fault assigned, including: "(1) whether the conduct resulted from

---

[102]LA. CIV. CODE art. 2323.

[103]LA. CIV. CODE art. 2324.

[104]469 So. 2d 967, 974 (La. 1985).

inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought."[105]

Therefore, considering all of these factors after weighing all of the evidence presented at trial, including the credibility of the witnesses, the Court finds that the fault must be shared 50/50 by Dr. Qayum and Dr. Chapital. The causal relationship between both physicians' various breaches and Mr. Aubert's injury (in this case wrongful death) are clearly direct ones. Indeed, at any point in time, had either Dr. Qayum or Dr. Chapital done something prior to March 15, 2008, Mr. Aubert would not have suffered a heart attack and died of cardiac insufficiency. The Court will not belabor the credible points made over and over again by all experts across the board with respect to Dr. Chapital's breaches of the standard of care or the credible points made by Dr. Gelb and Dr. Wecht with respect to breaches of duty owed by Mr. Aubert's primary care physician/internist, Dr. Qayum. The fact remains that their actionable negligence combined to create a formidable and, ultimately, invincible snare that Mr. Aubert could not negotiate without having had some warning about the seriousness of his condition and prompt diagnosis and treatment of his life-threatening disease. In this Court's opinion, a 50/50 apportionment of fault between the cardiologist (Dr. Chapital) and Mr. Aubert's primary care physician/internist (Dr. Qayum, the VA physician) is appropriate.

---

[105]Id.

42

In <u>Hall v. Brookshire Brothers, Ltd.</u>, the Louisiana Supreme Court specifically held that any allocation of comparative fault must be applied prior to the imposition of the medical malpractice cap.[106]  In both <u>Hall</u> and <u>Miller v. LAMMICO</u>, the court noted that the damages sustained by a medical malpractice victim are distinct from the amount that can be recovered for those damages; thus, the proper application of Article 2323 requires calculation of the damages owed and allocation of comparative fault reduction of the damages award in accordance with the statutory framework Louisiana's Medical Malpractice Act.[107]  Most recently, in <u>Douglas v. Children's Hospital</u>, the Louisiana Fourth Circuit Court of Appeal applied the <u>Hall</u> construct to a case involving both state and private physicians.[108]

Following these procedures, the Court's calculation of damages owed by the Government is as follows:

|  |  | DAMAGES | VA's 50% Fault |
|---|---|---|---|
| • | Janie Aubert (surviving spouse) (which includes medical, funeral, burial, lost VA benefits, and loss of consortium, services...) | $633,384. 93 | $316,692.46 |
| • | Rhett Aubert   (major son) | $150,000.00 | $  75,000.00 |
| • | Ryan Aubert   (major son) | $150,000.00 | $  75,000.00 |

_____

[106]02-2404, p. 23 (La. 6/27/03); 848 So. 2d 559, 573-74.

[107]Id.; <u>see also</u> <u>Miller v. LAMMICO</u>, 07-1352, p. 8-10 (La. 1/16/08); 973 So. 2d 693, 700.

[108]10-213, p. 33 (La. App. 4 Cir. 8/19/10); 2010 WL 3262223 (finding "nothing in the MLSSA that would support a different result from that obtained in <u>Miller</u> [v. LAMMICO]" and holding that application of fault percentages against the entire jury award is consistent with the general rule of comparative fault requiring courts to calculate damages in such a manner that each tortfeasor pays only for the portion of the damage he has caused).

43

$933,384.93          $ 466,692.46

Because the quantum owed by the Government in this case does not exceed the cap after

apportionment of fault consistent with Hall, this Court need not further address the application

of Louisiana's Medical Malpractice Cap.

    Accordingly and for all of the above and foregoing reasons,

    **IT IS ORDERED** that judgment will be rendered finding Defendant United States liable

for medical malpractice and for damages in the total amount of Four Hundred Sixty Six

Thousand Six Hundred Ninety Two ($466,692.46) Dollars to Plaintiffs, allocated $316,692.46 to

Mrs. Aubert,  $75,000.00 to Rhett Aubert, and $75,000.00 to Ryan Aubert, plus interest and

costs.[109]

    New Orleans, Louisiana, this 20th day of April, 2011.

                          CARL J. BARBIER

            UNITED STATES DISTRICT JUDGE

---

[109]"The total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in R.S. 40:1299.43, shall not exceed five hundred thousand dollars *plus interest and cost*." LA. REV. STAT. ANN. § 40:1299.42(B)(1) (emphasis added).

44

HERMAN, HERMAN
KATZ & COTLAR
L.L.P.
Attorneys at Law

820 O'Keefe Avenue, New Orleans, Louisiana 70113-1116
Telephone: (504) 581-4892   Facsimile: (504) 561-6024
http://www.hhkc.com

Harry Herman (1914-1987)
Russ M. Herman*
Maury A. Herman*
Morton H. Katz*
Sidney A. Cotlar*
Steven J. Lane
Leonard A. Davis*
James C. Klick†

Stephen J. Herman
Brian D. Katz
Soren E. Gisleson

Joseph E. Cain
Jennifer J. Greene‡
John S. Creevy
Jeremy S. Epstein
Joseph A. Kott, M.D. J.D. (Of Counsel)

Offices in New Orleans and
Covington, Louisiana

* A Professional Law Corporation
† Also Admitted in Texas
‡ Also Admitted in Arkansas

This Firm and its Partners Are Also
Partners in Herman Gerel, LLP (Formerly
Herman, Mathis, Casey, Kitchens & Gerel, LLP)

June 23, 2009

Penny Herman Grisamore
Propulsid and Vioxx Document Depository Paralegal / Manager
1008 Napa Way
Niceville, Fl 32578
(850) 897-6024
Email: pennyhh14@yahoo.com

To whom it may concern:

    I am writing on behalf of Carlis Griffin, who was my assistant in 2 Multi-District Litigation Depositories. Although, I was not her employer, she worked as my assistant for 7 years. Mrs. Griffin is a wonderful receptionist, as she is extremely personable and was very well liked by everyone who came to work in the depositories. Mrs. Griffin always completed projects given to her properly and I never had to second guess her work. She was also in charge of ordering supplies and making sure everything was in order, in terms of the coffee, drinks etc. However, she was much more than just a receptionist. One of Mrs. Griffin's strongest assets is her organizational skills. Mrs. Griffin was in charge of filing all documents that came into the depository, at my direction. Mrs. Griffin always did an excellent job of filing and always labeled everything appropriately. She could put her hands on anything she touched and filed away. Mrs. Griffin has computer skills and learns new computer tasks easily. She was in charge of scanning and emailing all correspondence to me. At times, she also provided computer training to the attorneys. Mrs. Griffin always completed projects given to her properly and I never had to second guess her work. She was also in charge of ordering supplies and making sure everything was in order, in terms of the coffee, drinks etc.

    I hope this gives you some insight as to the kind of employee she would be.

Yours Very Truly,

Penny Herman Grisamore



EXHIBIT
E

<u>AFFIDAVIT</u>

STATE OF LOUISIANA                                    May 2, 2011

PARISH OF ST. JOHN THE BAPTIST

      BEFORE ME, the undersigned authority, personally came and appeared:

CARLIS GRIFFIN

who being duly sworn, deposed and said:

      I have worked in the legal field for approximately ten years in various cases including chemical explosions, train derailments and pharmaceutical cases.  I have worked for the Becnel Law Firm, as well as was assigned to the Propulsid depository, first for Becnel and thereafter, for the PSC.  Upon the conclusion of Propulsid, I was asked, because of my experience in the document depository, to assist running the Vioxx Depository in New Orleans.  Because the Becnel Law Firm was involved in this litigation, Becnel again loaned me to the PSC to work there until my services were no longer needed.

      In 2004, I again helped set up the document depository and was to assist Penny Herman in all administrative tasks related to Vioxx.  Judge Fallon toured the document depository prior to its approval.  Many of the same systems that were developed in the Propulsid depository, were utilized in the Vioxx depository.  The Propulsid depository remained open for two additional years and since I lived in the River Parishes, I would check on that depository weekly, as well as go to the Vioxx depository every day in New Orleans.

      Doing document review in the depository was the Becnel Law Firm who supplied eight people to work on a daily basis in the Vioxx depository.  They were required to sign in and sign out.  They had no other task or responsibility and worked on no other

EXHIBIT
F

case other than Vioxx. Very few other firms sent people to the document depository and when they were sent, they were sent for just a week at a time.

These lawyers were promised that if they reviewed documents, they would be assigned to assist in depositions, deposition notebooks and briefs. There was a complete series in classification of documents; "hot," "could be useful" and "relevant." No other law firm did as much work on Vioxx than did the Becnel Law Firm.

After Hurricane Katrina, the document depository closed from August to December, 2005. When the documents came from Texas after Hurricane Katrina, I organized the documents and made assignments to lawyers to review these documents. Once again, the Becnel Law Firm supplied most of the people to continue reviewing documents since many of the people were dealing with loss homes, offices and a disruption in their practices. The River Parishes was not affected by Hurricane Katrina except for a few days without electricity.

I remained working in the document depository until February of 2009. After Hurricane Katrina, Ms. Penny Herman did not return to the depository because she moved to Destin, lived in Destin, had a child and had major hip surgery before Hurricane Katrina. I was the person who basically ran the document depository before and after Hurricane Katrina. I was paid $1,820.00 per month.

_____
CARLIS GRIFFIN

SWORN TO AND SUBSCRIBED

BEFORE ME THIS 2nd DAY

OF MAY , 2011

_____
NOTARY PUBLIC

Darryl J. Becnel, Notary Public
La. Bar # 22043
Attorney-at-Law
My commission is for life.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re:  VIOXX Products Liability Litigation

MDL No. 1657

Section: L

This Document Relates to:

All Common Fee Benefit Applicants

Judge Fallon
Mag. Judge Knowles

## AFFIDAVIT OF WILLIAM A. PERCY III

**PARISH OF ST. JOHN**

**STATE OF LOUISIANA**

**BEFORE ME**, Notary Public duly qualified and commissioned for the Parish of St. John personally came and appeared

### WILLIAM A. PERCY III

Who, after being duly sworn by me, stated as follows:

1.

He is of the age of majority, competent to submit this affidavit, and has personal knowledge of the following.

2.

He has been practicing law in Louisiana since 1982.

3.

He has been working on MDLs/mass torts/class actions for over ten years, starting in 2001, when he did document review for the PSC in *Scott v American Tobacco*, working at both the PSC's depository in New Orleans and at Herman, Herman, Katz and Cotlar.

4.

In 2002, he was hired away to work on *Scott* at Usry & Weeks, when that firm began to participate and assist in that case. It hired him to set up their *Scott* file and then do document review and assist in deposition preparation. He initially worked there exclusively on *Scott*, but subsequently assisted Allen Usry on other class actions/MDLs, including *Norplant* and *NOTX* (*Gentilly Tank Car Explosion*)

1



5.

 In March 2005, he was employed by Daniel E. Becnel, Jr. to work exclusively on the *Vioxx MDL*. He worked on this through January 2007. Since January 2007 he continued working at the Becnel Firm, and has done document review and other work on *Bextra, Celebrex, Welding Rods, Murphy Oil Spill, Katrina/Levees/MRGO, FEMA Formaldehyde Trailers, Bayer Aspirin Products, Denture Cream, Yaz, and BP/Deepwater Horizon, Digitek* and others.

6.

 Immediately upon being hired by Mr. Becnel for *Vioxx*, he flew with several other Becnel attorneys to New York City to perform document review at and under the direction of Seeger, Weiss. Subsequent to New York, he spent most of his *Vioxx* time doing document review for the Beasley, Allen firm in Montgomery, Alabama. Later, he also worked at the *Vioxx* document depository in New Orleans. His work over a two-year period on *Vioxx* at these various locations was as follows:

| | | |
|---|---|---|
| -NYC | March 2005 | (one week) |
| -Montgomery, AL | May-July 2005 | (3 months) |
| -New Orleans | July – August 2005 | (2 months) |
| *(Katrina – 8/29/05)* | | |
| -Montgomery | September 2005 – January 2006 | (5 months) |
| -N.O. | January 2006 - January 2007 | (13 months) |

7.

When working in Montgomery for Beasley, Allen and Mr. Birchfield, he, along with several other attorneys from the Becnel Law Firm, would leave New Orleans every Monday at about 2:30 a.m. to drive to Montgomery. They would sign in and out and worked full 40-hour weeks and then spent five hours plus driving back to New Orleans for the weekend. They did not bill for this weekly ten-plus hours of travel time.

8.

 As the MDL proceeded, Mr. Becnel sent more attorneys to Montgomery as needed and requested. Eventually he was sending two carloads of attorneys on these weekly trips to Montgomery. They all lived in the New Orleans area. They worked on no other cases, focusing all their work on the *Vioxx MDL*.

9.

This was because Chris Seeger had trial settings in New Jersey and Andy Birchfield was moving toward a trial setting in Alabama and both needed documents reviewed immediately.

10.

There were always more attorneys from The Becnel Firm doing document review than from any other law firm. Indeed, most of the time there were more attorneys from The Becnel Firm doing document review than attorneys from all other firms combined. Further, often The Becnel Firm's attorneys were the <u>only</u> attorneys in the depository doing document review for Mr. Birchfield.

11.

He and the other Becnel attorneys would review hard copies of documents that were on deposit at Beasley, Allen. Also, Mr. Becnel provided them with laptop computers they used to review documents on the internet document site.  By using the laptops they were able to transmit and distribute documents quicker and more efficiently.

12.

As they received assignments and projects they would review documents and immediately forward "hot" documents to Mr. Birchfield as he was preparing for trial. They would also, at Mr. Becnel's request, send copies of the hot documents to Mr. Becnel for his review.

13.

Mr. Becnel paid for all travel expenses, including providing automobiles for the weekly trips to Montgomery and paying for hotels, transportation, meals and other incidental costs. His attorneys all stayed at a hotel immediately next door to Beasley, Allen to maximize their availability. They were all available on a 24/7 basis the entire time they were in Montgomery, for rush and emergency projects. They would share rooms to keep costs down.

14.

He and the others sent by The Becnel Firm reviewed documents on specific topics given to them by the Beasley, Allen and Seeger, Weiss firms for trials, including:

- Original trial exhibits for 1st Beasley Allen trial
- Data Safety Monitoring Board records
- Clinical trials
- FDA docs
- Worldwide Adverse Experience System reports
- Prostacyclin issues
- Custodial Reviews

15.

In July 2005, he and other Becnel attorneys worked in the Vioxx depository in New Orleans. Two months later, though, after Hurricane Katrina, they again started working and traveling to Montgomery to continue document review, which they did through January 2006.

16.

From January 2006 through January 2007, they worked again in the New Orleans depository. Their assignments there included:

- Custodial reviews
- NDAs (New Drug Applications)
- FDA docs
- Advertising/Marketing/Promotional docs
- Timeline development
-Page and Line deposition summaries on an expedited basis
-Availability to work afterhours and on weekends as needed.

_____
William A. Percy III

Sworn to and subscribed before me,

this __2d___ day of May, __2011__.

_____
Notary Public

Darryl J. Becnel, Notary Public
La. Bar # 22043
Attorney-at-Law
My commission is for life.

4

# CASTANO CLASS ACTION
# TOBACCO LITIGATION

## COMMITTEES

### PRIVILEGED/CONFIDENTIAL
### ATTORNEY WORK PRODUCT

Revised May 25, 1994

Please send any corrections or comments to:
Wendell H. Gauthier or Bruce C. Dean
Gauthier & Murphy
3500 North Hullen Street
Metairie, LA 70002
Telephone: (504) 456-8600
Fax: (504) 456-8624

Castano Tobacco Litigation Committees
Revised May 25, 1994

### DISCOVERY/PHASE II: DEPOSITION DISCOVERY SUBCOMMITTEE:

Co-Chairs:                    Danny Becnel
                              Stan Chesley
                              Will Kemp

Committee Members:            Scott Baldwin
                              Don Barrett
                              Betty Barrios
                              Melvin M. Belli
                              Martis Ann Brachtl
                              John Climaco
                              Bruce Dean
                              Calvin Fayard
                              Ron Goldser
                              Will Kemp
                              Ralph Knowles
                              Arnold Levin
                              Stephen Murray
                              Dianne Nast
                              Mark Robinson
                              Michael St. Martin
                              Francis Scarpulla
                              Gayle Troutwine

### EXPERTS COMMITTEE:

Committee Members:            Don Barrett
                              Danny Becnel
                              Stan Chesley

