## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX | § | MDL NO. 1657 |
| | § | |
| PRODUCTS LIABILITY | § | SECTION L |
| LITIGATION | § | |
| | § | JUDGE FALLON |
| This document relates to all cases | § | MAG. JUDGE KNOWLES |
| | § | SPECIAL MASTER |
| FILER:  JACK E. URQUHART | § | PATRICK A. JUNEAU |
| | § | |
| | § | July 18, 2011 |

## BRIEF IN SUPPORT OF OBJECTION OF SNAPKA AND ESCOBEDO, TIPPIT AND CÁRDENAS TO THE REPORT AND RECOMMENDATIONS OF THE SPECIAL MASTER ON ALLOCATION OF COMMON BENEFIT ATTORNEY FEES

Six months ago, Kathryn Snapka ("Snapka") and Escobedo, Tippit & Cardenas (Referred to in this document  by the names of the real parties in interest Joe Escobedo and David Hockema, or, collectively "Escobedo-Hockema") were valued members of the Vioxx team.  Their lengthy, steadfast and successful contribution to this litigation was acknowledged and lauded. Now, the Fee Allocation Committee that has steered the apportionments  dismisses these lawyers as mere troublesome "objectors." What has changed? The Snapka and Escobedo-Hockema contributions to the common benefit of all plaintiffs can not be undone—those are unchanged, objective facts.  The change in the perception of these team members and their contributions is seemingly the result of the dust storm of  unsupported personal insults hurled at them by FAC to defend its misguided apportionment process.

FAC, contrary to the law and the vision articulated by this Court, apportioned arbitrarily, allocating the vast majority of the fund to its members and others in the MDL Control Group. In so doing, FAC ignored its inherent conflict of interest, its fiduciary

duties and the law governing fair apportionment. The Special Master's report effectively adopts FAC's numbers and arbitrary method. In so doing, the report fails to perform its central function—an independent review.

*Garza* illustrates this. Snapka and Escobedo-Hockema  prepared and tried *Garza.* The percentage apportionment assigned to this effort proves the apportionment system as currently applied is gravely flawed. The *Garza* work commands a significant portion of the common fund. The *Garza* work was extraordinarily important to the overall outcome of this litigation.   It was one of the few plaintiff verdicts in a bellwether trial in the entire Vioxx litigation. It was an early case. It defeated Merck's short term use defense. It defeated Merck's multiple risk factor defense. *Garza* the Garza vedict exceeded more than $30 million. And—no doubt threatening to Merck—it was only the first of other cases destined for trial by these same lawyers in venues far less comfortable for Merck than the beautiful city of New Orleans—a venue in which Merck enjoyed considerable trial success.

Yet, FAC has apportioned 0% for *Garza.* This result is impossible if its apportionment process actually followed a lawful-elucidated methodology that was applied uniformly to all applicants. While restoring some value to *Garza*—which was compelled by the evidence and law--the Special Master's Report diminishes its worth based on unsupportable positions asserted by FAC.

No one can argue that trials conferred an important—probably the most important -- common benefit in this litigation? Uncertainty, fueled Merck's desire to settle.  *Garza* was powerful dose of uncertainty. Moreover, the anxiety *Garza* caused Merck was heightened by it's awareness that Snapka and Escobedo-Hockema had more cases

marching toward trial in the same venues. Venues that Snapka and Escobedo-Hockema knew intimately. Venues uncomfortable to Merck.  By comparison, New Orleans was comfortable for Merck. Merck had consistent trial success there. It also had the enjoyment of amenities and intangibles that were absent in the trials they would face in South Texas and elsewhere.

Ironically, the distance—measured not only in miles-- from the epicenter of the MDL and courtroom in which *Garza* was tried helped drive settlement, but hurt Snapka and Escobedo-Hockema in the arbitrary apportionment process. Their work and accomplishments were less visible and more easily diminished by those controlling the apportionment process. The Snapka and Escobedo-Hockema contributions, which were not limited to Garza or Texas, are proven, objective, were praised, and should be fairly rewarded.

Snapka and Escobedo-Hockema were apportioned less than one-half of one percent of the fund by the Special Master's report. A larger percentage is dictated by any lawful apportionment methodology that is applied uniformly to all fee applicants.  Lodestar, lodestar-plus, percentage-of-recovery, a blended-percentage of recovery all produce a higher award percentage. A 10% allocation is merited when all their contributions are fairly evaluated rather than arbitrarily assigned. The current one-half-of-one percent is indefensible.

**OBJECTIONS**

**Snapka and Escobedo-Hockema make these objections to the Report and Recommendation of the Special Master.**

1.      The Special Master's apportionment of the $315,250,000 common benefit fund is improper because it is not based on an elucidated methodology that is reasonably likely to produce fees for each applicant that fairly represent each applicant's contribution to the creation of the overall result in this litigation.  This is a legal requirement and the failure to meet it is an abuse of discretion.

2.      The Special Master's apportionment of the fund among the 108 applicants has no elucidated basis.  Lodestar is not the basis.  Percentage-of-recovery is not the basis.  A uniform application of the *Johnson* factors or Pretrial Order 6D guidelines are not the bases.  The basis for the apportionment must be elucidated.  It was not.  This is an abuse of discretion.

3.      The "point system" once heralded by FAC does not comport with any recognized apportionment methodology.  The system is subjective and is unfairly weighted in favor of FAC members.  If the point system was the basis for the Special Master's apportionment it would have been abuse of discretion.  In reality, neither the Special Master nor FAC used the point system to apportion fees among the 108 applicants.  Assigning any significance to the "point system" is an abuse of discretion.

4.      Side deals predominate in the fee numbers the Special Master assigned.  The Special Master did not evaluate the bases of these side deals.  The side deals resulted from secret negotiations.  The Special Master left these deals unexamined.  Instead, he simply adopted the vast majority of numbers yielded by the side deals.  Undisclosed, unexplained, and unexamined side deals cannot provide a legal basis for a fair apportionment among 108 attorneys.  Adopting the numbers produced by these side deals is an abuse of discretion.

5.      Discovery requests for disclosure of all side deals were denied.  This is an abuse of discretion.

6.      Discovery requests for FAC minutes that admittedly shed some light on the thought processes that were used in apportioning the common benefit fund were denied.  This is an abuse of discretion.

7.      The fees apportioned to Snapka, Escobedo-Hockema, and all fee applicants were not based on a uniformly applied method, but were determined arbitrarily and capriciously.  This is an abuse of discretion and violates due process as required by the United States Constitution.

8.      The Special Master undervalued *Garza*.  Based on discredited "facts," FAC
allocated $0 for *Garza* when the lawyers who tried that case objected to FAC's preliminary
apportionment recommendation.  Trials, particularly those like *Garza* that had a proven
and substantial positive contribution to this overall litigation merit a substantial portion of
the common benefit fund.  The Special Master factually and legally erred in his discussion
of *Garza*.  *Garza* was excluded from the MSA during the NPC-Merck negotiations as were
most other tried cases.  This point is irrelevant to fee apportionment.  So too, the following
factors are irrelevant to fee apportionment: the MDL assessment, if any, of a  recovery in
the *Garza* bellwether trial; the fees that the *Garza* lawyers received or may be entitled to
receive from their individual cases.  All of these factors are shared by other  fee applicants,
but the Special Master only mentioned them in connection with Snapka and Escobedo-
Hockema.  Amazingly, the two cases the Special Master found comparable to *Garza* –
*Albright* and *Doherty* –  are not comparable.  The most glaring distinction is that *Albright*
and *Doherty* resulted in defense verdicts -- Merck won. Cases more comparable, like *Ernst*
and McDarby were not even mentioned by the Special Master.  This "comparable analysis"
is factually mistaken and legally irrelevant.  The only relevance, in fact, is this arbitrary
and capricious selection of comparables proves the arbitrary and capricious nature of the
overall apportionment.  As objectors, the *Garza* lawyers are subject to criteria and analysis
that were not applied to any other fee applicants, particularly other lawyers who won
plaintiff verdicts.

9.      The Special Master's allocation improperly undervalued the contributions Snapka
and Ecobedo-Hockema made to the creation of the common benefit fund. The contribution
of *Garza* was undervalued as were their other contributions to the common benefit. A
uniform application of any elucidated methodology would have produced a higher
percentage apportionment. The evidence merits an allocation to these attorneys of 10% of
the fund.

10.      The Court tasked the Special Master with apportioning the $315,250,000 common
benefit fund among the 108 fee applicants independently of FAC.  He was tasked to stand
apart from FAC, whose members had an inherent conflict of interest.  Instead, the Special
Master deferred to FAC.  He adopted, with virtually no variance, the allocation made by
FAC in June 2011.  He did so even though the Court did not request or authorize this
"second-final" Allocation.  He did so even though, while the three FAC apportionments
varied greatly from one another, they all allocated most of the $315,250,000 fund to FAC
or PSC members—the MDL Control Group.  He did so even though many of the "second-
final" recommendations were in direct conflict with positions FAC took in its only written
attempt to elucidate its allocation methodology, the positions Birchfield took in his
deposition, and the positions FAC took during the Special Master's hearing of May 9-13,
2011.  The Special Master improperly deferred to FAC, despite FAC members inherent
conflict of interest.  This is an abuse of discretion.

11.      The Special Master improperly did not give equal treatment to Snapka, the law firm
of Escobedo-Hockema, the Branch Firm and the Becnel Firm as compared with the other
common benefit fee applicants.  These four applicants were scrutinized and critiqued and
the other 104 applicants were given a pass.

12.     The Special Master improperly deferred to FAC even though FAC members have received substantial fee awards from their individual cases and have claimed interest in other common benefit funds related to this litigation, e.g., a common benefit fund for Third Party Payer cases and a common benefit fund for governmental claims.

13.     The Special Master improperly did not scrutinize any of the side deals that were the sole bases for many of the FAC apportionment recommendation.

14.     The Special Master improperly allowed FAC to maintain the secrecy of its minutes despite FAC's admission that the minutes exist and would shed some light on the bases for FAC's having timely criticized the objection.

15.     The Special Master should have admitted the emails that were critical of the handling of the bellwether trials. The excluded emails' evidence criticism of FAC members' work.

16.     The fee allocation process as applied has failed to produce a sufficient record to enable this Court or the Court of Appeals to evaluate whether the fund has been apportioned with reasonable fairness.

17.     The Special Master essentially adopted the "second-final" recommendation as his recommendation for all fee applicants except the four "objectors."  The Special Master did, however, make a few adjustments, but improperly failed to elucidate the bases for any of these adjustments.

18.     The Special Master did not scrutinize or mention the VLC side deal.  This side deal is incontrovertible evidence that the "point system" was not used as represented by FAC. The failure to scrutinize this side deal is an abuse of discretion.

19.     The Special Master erred in failing to consider the multiple errors in FAC's attack on Snapka and Escobedo-Hockema.  These errors raise significant questions about all FAC conclusory statements and the overall credibility of FAC.  Failure to address these false statements, and failure to demand an explanation for them is an abuse of discretion.

20.     The Special Master erred in failing to demand an accounting of the common benefit funds.  Birchfield admitted that $315,250,000 is not in the common benefit fund account. It is uncontroverted that more than $18 million was distributed from the fund without the knowledge of the Court.  While the Court must remedy this issue, the fact of its occurrence, particularly given FAC's inherent conflict of interest, is of concern.  The Special Master was required to closely review the evidence before he simply deferred to FAC's apportionment recommendations, or before he simply relied on FAC's conclusory statements about its handling of the fee allocation process.  It is an issue that goes to FAC's credibility.

21.   The Special Master erred in failing to apportion the interest that has accrued on the common benefit fund.

22.   The Special Master improperly failed to inquire or permit inquiry about other common benefit funds that may or might exist in this litigation.

23.   The Special Master erred in denying the motion to make FAC produce records relating to contributions made by all applicants to the common benefit fund.

24.   The Special Master erred in failing to elucidate the bases of his fee apportionments.
   A.   He did not use the guidelines of Pre-Trial Order 6D.
   B.   He did not use the *Johnson* factors.
   C.   He did not use lodestar.
   D.   He did not use percentage-of-recovery.
   E.   He did not use a "point system."
   F.   He did not use any elucidated objective measures in the evaluation of the 108 common benefit fund applicant's contributions in accordance with established fee jurisprudence.

25.   The Special Master improperly deferred to and failed to evaluate FAC's failure to elucidate the bases of its apportionment recommendation.
   A.   He failed to acknowledge the evidence that disproves that FAC followed Pre-Trial Order 6D.
   B.   He failed to acknowledge that the evidence disproves that FAC used the *Johnson* factors.
   C.   He failed to acknowledge the evidence that disproves that FAC used a firm-by-firm Lodestar as a cross check.
   D.   He failed to acknowledge that FAC did not use percentage-of-recovery as a methodology.
   E.   He failed to acknowledge that FAC introduced no evidence to support its assertion that it reviewed all time submissions as closely as it did the submissions of objectors.
   F.   He failed to acknowledge that the FAC "point system" was flawed and designed to favor FAC members and other members of the MDL Control Group.
   G.   He failed to acknowledge the evidence that contradicts FAC's assertion that it "utilized" the "point system" in a uniform or meaningful way.
   H.   He failed to acknowledge evidence that proves that FAC abandoned the "point system," if it ever utilized it.
   I.   He failed to acknowledge the dominance of side deals in the FAC fee apportionment.
   J.   He failed to acknowledge that the statements made by FAC members in the transcribed interviews of fee applicants contradicted the "factual" statements FAC made in its reply to objectors.

7

K.    He failed to acknowledge that, during the 14 day period to object to FAC's preliminary allocation, the fee applicants were provided no meaningful information to evaluate FAC's work.

L.    He failed to acknowledge that side deals were made to reduce the number of "objectors."

M.    He failed to acknowledge the evidence that proves that FAC did not use objective measures to evaluate common benefit counsel's contribution in accordance with established fee jurisprudence.

26.    The Special Master erred in failing, as required by the Court, to "prepare an impartial recommendation to the Court" for the full amount of the $315,250,000 common benefit fund.

27.    The Special Master erred in finding and concluding that "the fee allocation processes were fully transparent and proper."

28.    The Special Master erred in the analysis he used to evaluate Ms. Snapka's work in the *Garza* case.

29.    The Special Master erred in assigning any negative meaning to the time Escobedo submitted for review of the *Ernst* transcript. These lawyer's were preparing for a trial. Examining the record of tried cases in those circumstances is at the very least prudent.

30.    The Special Master erred in failing to consider why three of the four objectors' allocations were reduced after they objected to FAC's preliminary recommendations.

31.    The Fee Allocation process as applied in this case violates the requirements of the Due Process Clause of the United States Constitution.  Specifically, the Special Master erred in limiting depositions to one FAC representative of FAC's choice.  Additionally, the Special Master erred in denying Snapka and Escobedo-Hockema the right to depose a single witness of its choosing.  The Special Master erred in excluding Snapka and Escobedo-Hockema from meetings it limited to lead and liaison counsel.

32.    The Special Master improperly failed to address any aspect of the fiduciary duties owed by FAC members to all 108 fee applicants and whether or not FAC breached those fiduciary duties.

33.    The Special Master erred in failing to include all applicants in an appropriate fee apportionment allocation.

## ISSUES PRESENTED

**Issue one:**  The methodology used to apportion fees from a common benefit fund must be elucidated to ensure that the apportionment method is reasonably likely to produce a portion for each participant that is fair.  Neither FAC nor the Special Master elucidated a methodology that they actually followed.  FAC initially claimed it apportioned fees using a make-shift "point system" that – by its very design – ensured that the formal MDL Control Group would receive most of the $315,250,000 common fund.  FAC has since expressly abandoned the pretext of following that point system.  The Special Master did not elucidate any apportionment methodology, and simply adopted most of the FAC recommendations.  Instead of a coherent, elucidated methodology, the obvious foundation of the apportionments were ensuring that the MDL Control Group would receive most of the money, and attempting to force others to agree by combining side deals with threatened and actual personal attack.  The apportionment was arbitrary.  It was not fair and methodical.  Is this disorderly apportionment system reasonably likely to produce a fair fee allocation for each participant?

**Issue two:**  Apportionment of a common benefit fund requires transparency.  Here, the apportionment methodology is hidden.  The bases, terms and even the existence of all side deals are hidden.  For example, the minutes of FAC meetings that FAC concedes would reveal at least some information about its apportionment discernments are hidden.  When the evidence, if any, of a fee apportionment methodology is hidden, there is no transparency.

**Issue three**:  The apportionment methodology must be uniformly applied to all participants.  FAC apportioned most of the fund to the MDL Control Group, and did not explain why.  FAC issued three different apportionment recommendations over a six month period.  Each time, FAC continued to assign the largest portion to the MDL Control Group.  It never explained why.  Each time the portions assigned to others roller-coasted up and down by substantial amounts.  FAC never explained why.  FAC's last apportionment recommendation was issued shortly before the Special Master issued his report.  With very few exceptions, the Special Master simply adopted FAC's recommendations.  But he did not explain why.  Instead, the Special Master focused only on the objectors.  He did not explain why objectors only were examined and others passed without review.  When an apportionment methodology is not applied uniformly, is it reasonably likely that the apportionment will be fair to all participants?

## DISCUSSION

**This limited record illustrates the arbitrariness of FAC's recommended common benefit fee allocations for Snapka and Escobedo-Hockema.**

Because Snapka and Escobedo-Hockema were objectors, FAC was forced to attempt to explain why it gave them so little. This record has only two sources of this explanation attempt – The Response to Objectors[1] and the testimony of Birchfield.[2] This is the only "record" that exists to support this apportionment to Snapka and Escobedo-Hockema. This is the only record available for review by this Court, an appeals court, the public, or anyone else seeking a coherent explanation why FAC and the Special Master apportioned approximately 73% of the $315,000,000 common benefit fund to members of the MDL Control Group and only one-half of one percent to Snapka and Escobedo-Hockema, who were responsible for preparing and trying one of the few bellwether trials resulting in a plaintiff's verdict in the entire Vioxx litigation and made other objective contributions to the common benefit of all plaintiffs.[3]

This record demonstrates FAC's apportionments are arbitrary. It shows FAC's apportionments were not based on an objective methodology uniformly applied to all 108 fee applicants. It further illustrates FAC's apportionments were based on conclusory statements unsupported by evidence. Additionally, the record shows FAC's apportionments were based on private side deals that have never been examined. Moreover, the record reveals FAC's apportionments to Snapka and Escobedo-Hockema were based on legions of mistaken facts.

---

[1] Fee Allocation Committee's Response to Objections to Recommended Common Benefit Fee Allocation.

[2] Deposition of Andy Birchfield Jr., May 6, 2011, taken in *In Re Vioxx MDL* No. 1657.

[3] *See* Fee Allocation Committee's June 1, 2011 Allocation, Report and Recommendation of Special Master on Allocation of Common Benefit Attorney Fees.

Assuming FAC's errors were mistakes, the mistakes were established and then abandoned. Those who made the mistakes offered no evidence of explanation, apology, or remorse. At what point do mistakes become falsehoods? At what point do the mistakes reflect on the overall credibility of those who made them and know them to be untrue? These are important questions, because FAC members controlling the apportionment process made the mistakes. In fact, these same people intentionally and self-servingly negotiated with Merck a provision in the MSA that effectively increased the common fund and provided that they would allocate it.

**Snapka and Escobedo-Hockema made substantial contributions to the common benefit before and during the pendency of the Vioxx MDL. Furthermore, they were recognized and praised for their substantial contributions.**

Snapka and Hockema-Escobedo prepared and tried one of the very few cases that resulted in a plaintiff's verdict in the entire Vioxx litigation. The jury rejected two key Merck defenses—short term use and multiple risk factors. The jury hammered Merck for more than $30 million dollars. The jury verdict immediately hit the national press. The jury verdict caused an immediate and significant drop in Merck stock. Immediately and for years, FAC members publicly praised the verdict. The Plaintiff's Steering Committee ("PSC") even used the *Garza* bellwether trial in PSC's 'trial package." Additionally, Russ Herman used *Garza* in his affidavit as support for his claim for a common benefit fund of 8%. Oddly, only when FAC had to explain its indefensibly low apportionment to Snapka and Escobedo- Hockema did anyone question the substantial contribution of the *Garza* trial to the Vioxx litigation.

FAC's error-filled explanation was proven false and ultimately abandoned. Still, Snapka and Escobedo-Hockema, the lawyers responsible for the outstanding *Garza* result,

were arbitrarily assigned 00.51% of the common benefit fund. Yet the MDL Control

Group is set to pocket more than 73% of the fund.

Snapka and Escobedo-Hockema were not "free riders" in any sense. They were

active participants and contributors in the Vioxx litigation. Their contributions were

substantial.[4]  The contributions were noted and even cited as justifications for 8% common

benefit fee in Russ Herman's affidavit.  Ignoring these contributions defies the *Johnson*

factors, Pretrial Order 6D guidelines, fee jurisprudence and common sense.  Below is a

brief summary of a few contributions of Snapka and Escobedo-Hockema that were

arbitrarily minimized or ignored altogether.

- Escobedo-Hockema began working on the *Garza* case in 2002.  After being
  retained by the Garza family in 2002, Escobedo-Hockema obtained all public
  documents on the  drug and reviewed and accumulated all relevant scientific
  journal articles.  Escobedo-Hockema deposed over 10 Merck corporate
  representatives, some of whom had never been deposed before. Escobedo-
  Hockema developed expert witnesses, some of whom were subsequently
  used by PSC lawyers in their cases.  Escobedo-Hockema provided other
  common benefit attorneys with the invaluable information they discovered in
  developing the *Garza* case.  Additionally, the Garza case was included in
  MDL's "Trial Package."

- Snapka and Escobedo-Hockema tried *Garza* and hit Merck with bell-ringer
  $32 million verdict.   It was one of only five cases that resulted in a
  plaintiff's verdict. The result was published nationally and defendant's stock
  price fell after the verdict was announced. Among the reasons the case was
  significant, Plaintiff was a very short term user with multiple risk factors.[5]
  Chris Seegar is reported as saying, "This is a big reversal and really exposes
  [Merck's] litigation strategy as being extremely flawed. Now they have
  people with one week's worth of use getting verdicts in the $20 million, $30
  million range."[6]

---

[4] The contributions are detailed in the record.  *See e.g.*, their initial affidavits; their February 2011
objections; their testimony and exhibits at the Special Master's hearing.
[5] *See* Beasley Allen, *Plaintiff's Win First Short-Term Use Vioxx Lawsuit* (posted on the Beasley Allen
website hailing the *Garza* case), May 1, 2006; Sophia Pearson, *Merck Loses $32 Million Vioxx Jury Verdict
in Texas*, Bloomberg, April 21, 2006 (posting discussing the case and noting Merck shares fell as much as
1.6% immediately after the verdict was announced.).
[6] Sophia Pearson, *Merck Loses $32 Million Vioxx Jury Verdict in Texas*, Bloomberg, April 21, 2006
(posting discussing the case and noting Merck shares fell as much as 1.6% immediately after the verdict was
announced.)

- They shared the *Garza* work product with all who requested it; notably, members of the FAC themselves.

- They were pioneers in Vioxx litigation. All were among the first to file Vioxx cases. Their involvement was well before the formation of the MDL and before Vioxx was withdrawn from the market.

- Their lodestar percentages based on Garrett's calculations were significantly higher than their award.

- Their commitment to Vioxx led them to decline offered representation in cases that would have required an intense involvement of their personal time. They specifically identified those lost opportunities.

- They made the first outreach in Texas to join forces with other plaintiff lawyers interested or that potentially may be interested in Vioxx litigation.

- Snapka was appointed by the Texas Supreme Court as the initial Notice Counsel — the Texas equivalent of an MDL liaison counsel. Snapka was an active member of the PSC in the Texas litigation, and had cases selected for upcoming trials.

- They met and communicated with counsel throughout the country to gain information, share information and cooperate in the coordination of the plaintiff's bar in Vioxx litigation.

- Snapka's outreach included attendance at the Panel Hearing that established this MDL. She formally spoke about Vioxx litigation on at least these occasions: December 3, 2004, at a Scientific Evidence Workshop in Houston; November 4, 2005, State Bar of Texas Advanced Personal Injury Seminar in Corpus Christi, Texas; May 8 & 9, 2006, Mealey's Litigation Conference in Florida, December 10-12, 2006 Vioxx Litigation Conference in Florida (Co-chair); December 10 & 11, 2007, Mealey's Vioxx National Settlement Conference Roundtable; and February 15 & 16, 2008, AAJ Pharmaceutical Seminar, *David V. Goliath-How Plaintiffs are Holding Big Pharmaceutical Companies Accountable.*[7] Similarly, Escobedo spoke about Vioxx litigation on most of these occasions as well. Escobedo also served on the MDL Discovery Committee.

- Snapka was on the team that defeated Merck's preemption motion in the MDL. Her client was one of the two specifically targeted by the preemption motion.

- Snapka prepared and pressed cases set for trial in Texas state court. The *Zajicek* case, for example, was noted and discussed at most MDL Status

---

[7] FAC Resp. Exhibit B—1542-43.

Conferences. It was set for trial in February 2008 at the time of the announcement of the global settlement on November 9, 2007.  This is an early example of a case set for trial in a venue that produced the uncertainty that helped drive settlement.

- Ms. Snapka pioneered the ability to use retained blood from a victim's autopsy to prove Vioxx usage.  The significance of this discovery for all litigants is reflected in the fact that this technique was specifically addressed in the Master Settlement Agreement which recognized the testing of retained blood samples as an accepted method for demonstrating Vioxx use.

- Snapka fought against "Double Removals."

- Snapka was praised for her work, as was Walter Umphrey, in clarifying the MSA to eliminate any potential ethical compromise.[8]

- Snapka suggested a modification to the MSA that would afford claimants for extraordinary injury the protection of an avenue for review of an adverse decision. This suggestion was adopted and the Court appointed a Special Master to review the claims of persons who had an issue with the extraordinary injury relief determination made by the claims administrator.
- Snapka explained the extremely conservative nature of her time submissions. By way of example, she strictly followed the instruction to submit no time after the MSA date.

These contributions are objective.  These contributions were praised not criticized until FAC was forced to justify its unreasonable apportionment to Snapka and Escobedo-Hockema.[9]  The contributions fall within the expressly approved guidelines of Pre-Trial Order 6D, the *Johnson* factors and the case law.

**The Special Master erred in failing to elucidate and follow an apportionment methodology that was reasonably likely to produce fair allocation for all common benefit attorneys.**

What basis does FAC or the Special Master have for diminishing or ignoring these contributions?  Just for example, FAC allegedly applied the *Johnson* factors and 6D factors to reduce Snapka and Escobedo-Hockema's "points" by applying a negative "multiplier."

---

[8] Snapka Presentation to FAC at pps 23-24 (For the full discussion on this issue *see Id.* at pps 19-26.)
[9] Fee Allocation Committee's Response to Objections to Recommended Common Benefit Fee Allocation, pp. 27-29, 45-49.

How is this possible?  Undoubtedly, it was made possible using the same arbitrariness that persuaded FAC to award itself positive "multipliers."  Who knows?

Neither FAC nor the Special Master elucidated an apportionment methodology. Over a six month time period, FAC made three apportionment recommendations.  The only common thread is that in all three recommendations, FAC treated its members handsomely.  Otherwise, the three recommendations were primarily noteworthy for large and random changes in individual apportionments.

In its response to objectors, FAC notes in mantra-like fashion that it "considered" things like a point system, the *Johnson* factors, and "objectivity."[10] However, their meaning is unclear.  FAC never testified at the Special Master's hearing to make a record of their use of any coherent apportionment methodology.  They failed to explain the wild shifts in individual apportionments.  An explanation is required.  Such gyrations could never occur had a coherent methodology been followed.

The treatment of the *Garza* case makes the point.  Allegedly using a make-shift point system, FAC first recommended that the *Garza* attorneys, Escobedo-Hockema and Snapka, receive a total award of $1,747,376.99 or 00.55% of the fund.  Of course, Snapka and Escobedo-Hockema objected.  *Garza* was one of only 5 cases tried to a plaintiffs' verdict.  After they objected, FAC coincidentally reduced their total allocation to $75,000 or 00.02% of the fund.  Forced to address the objection, FAC unleashed a barrage of personal attacks on Snapka and Escobedo-Hockema.[11]  The attacks were founded on, what was later shown to be, unsupportable conclusory statements.  The statements were laden with significant factual mistakes.  FAC's attacks were inconsistent with plaudits Snapka

---

[10] *Id*. at pp. 1-5.
[11] Fee Allocation Committee's Response to Objections to Recommended Common Benefit Fee Allocation, pp. 27-29, 45-49.

and Escobedo-Hockema received a short time earlier during the Vioxx litigation. FAC's attacks were irrelevant, out-of-place, and quite simply rude. They did, however, serve a purpose. They provided the bases for FAC's arbitrary and capricious apportionments.

FAC in essence assigned the *Garza* bellwether trial victory to the trash heap. A bellwether trial that produced a verdict in excess of $30 million was deemed absolutely bereft of any common benefit.

FAC's third apportionment recommendation kept *Garza* in the no value category, and left these objectors at 00.02% of the fund.[12]

The Special Master restored value to *Garza* as required by law, evidence and common sense.[13] Then, conversely, the Special Master arbitrarily diminished its worth. The Special Master did not compare *Garza* with any other case that resulted in a significant verdict. He compared Garza to *Albright* and *Doherty*. The most glaring distinction is that *Albright* and *Doherty* resulted in defense verdicts for Merck. Cases more comparable, like *Ernst and McDarby,* were not even mentioned by the Special Master. The Special Master's "comparable analysis" is factually mistaken and legally irrelevant. The only relevance, in fact, is this arbitrary and capricious selection of comparables proves the arbitrary and capricious nature of the overall apportionment.

More amazingly, the Special Master apparently penalized the *Garza* attorneys for factors that were applied to no other attorneys that tried a case in the Vioxx litigation.[14] In footnote 3 of his Report and Recommendation, the Special Master noted:

> Evaluation was made of Escobedo's submitted time of 250 hours for
> reviewing the transcript in the Ernest(sic)case (Transcript of Hearing on

---

[12] Fee Allocation Committee's June 1, 2011 Allocation.
[13] Report and Recommendation of Special Master on Allocation of Common Benefit Attorney Fees, pp. 11-14.
[14] *See id.*

May 9, 2011 at pgs 60-61, 77) and multiple entries for review of same documents by multiple attorneys (Transcript of Hearing on May 9, 2011 at pgs 68-73).[15]

The Special Master did not explain why these two factors were even worthy of evaluation but since this was evidence used by the FAC during their cross examination of Escobedo, it is obvious that these factors were used to penalize Escobedo-Hockema. There are, of course, numerous problems with the Special Master's decision.  First, the penalty factors are unrelated to any published guidelines in this case or in the case law.  Second, FAC long ago accepted these hours as legitimate based upon Phil Garrett's audit.  In fact, FAC used those hours in its overall calculation of common benefit time, and then used that time to justify an award of $312,000,000 in common benefit attorneys fees.  Further, this Court expressly approved the hours in making its attorneys fee award.[16]

Worse, the penalty factors were shared by others.  However, the *Garza* lawyers were the only ones whose awards were lowered because of these factors.  For example, the Beasley Allen firm reported close to 60 hours reviewing *Ernst* in preparation for its Irvin trial.[17]  Once again, the *Garza* attorneys are not arguing that it was wrong for the Beasley Allen firm to do that; in fact, they believe that they all of us would have been remiss in their duties to their clients had they not reviewed the *Ernst* transcript.  *Ernst* resulted in a plaintiffs' verdict.  The transcript required careful review.  After Garza, it would similarly be at least prudent for attorneys preparing for trial to review that transcript.

---

[15] Report and Recommendation of Special Master on Allocation of Common Benefit Attorney Fees, p. 14.

[16] *See* October 19, 2010 Order & Reasons at p. 33.

[17] *See* Beasley Allen submission at pp. 2, 5, 8, 17, 26, 34, 35, 40, 41.

Escobedo-Hockema were also penalized by the Special Master for having "multiple entries for review of same documents by multiple attorneys."[18]  At the hearing, Escobedo explained that the entries were taken out of context and that having the firm's lawyers review documents was crucial to be able to keep up with Merck's army of lawyers.[19]  The unfairness of this attack is obvious; no other firm was subjected to such criticism. A quick review of other firm's submissions reveals that they could be similarly attacked; for example, the submission of the Girardi Keese firm shows the following:

| Time/Date | Employee | Notes | Hours |
|-----------|----------|-------|-------|
| 1/6/2005 | James O'Callahan | Reviewed sales material | 1.5 |
| 1/6/2005 | Thomas V. Girardi | Reviewed sales material | 1.5 |
| | | | |
| 1/7/2005 | James O'Callahan | Reviewed Merck Sales/Promotion | 1 |
| 1/7/2005 | Thomas V. Girardi | Reviewed Merck Sales/Promotion | 1 |
| | | | |
| 1/11/2005 | James O'Callahan | Reviewed sales material | 1.5 |
| 1/11/2005 | Vincent J. Carter | Reviewed sales material | 1.5 |
| | | | |
| 1/14/2005 | James O'Callahan | DVD/document review (ACI) | 5 |
| 1/14/2005 | Vincent Carter | DVD/document review (ACI) | 6 |
| | | | |
| 1/21/2005 | James O'Callahan | DVD/document review (ADK) | 3 |
| 1/21/2005 | Vincent J. Carter | DVD/document review (ADK) | 4 |
| | | | |
| 1/25/2005 | James O'Callahan | Expert Search | 2 |
| 1/25/2005 | Vincent J. Carter | Expert Search | 2 |
| | | | |
| 2/2/2005 | James O'Callahan | Expert Search | 2 |
| 2/2/2005 | Vince Carter | Expert Search | 2 |
| | | | |
| 2/2/2005 | James O'Callahan | Reviewed marketing material | 1.25 |
| 2/2/2005 | Vince J. Carter | Reviewed marketing material | 1.5 |
| | | | |
| 2/21/2005 | James O'Callahan | DVD/document review (ACO) | 8 |
| 2/21/2005 | Vince Carter | DVD/document review (ACO) | 6 |
| | | | |

---

[18] *See* Report and Recommendation of Special Master on Allocation of Common Benefit Attorney Fees, footnote 3 at p. 14.

[19] *See* Transcript of Hearing on May 9, 2011 at p. 78.

| 3/3/2005 | James G. O'Callahan | DVD/document review (ACT) | 7 |
| 3/3/2005 | Vincent Carter | DVD/document review (ACT) | 6 |
| | | | |
| 3/9/2005 | James G. O'Callahan | Legal Research (disqualification) | 5 |
| 3/9/2005 | Vincent J. Carter | Legal Research (disqualification) | 3 |

Escobedo-Hockema are not implying that any of these submissions were improper. The Special Master could have attacked Girardi Keese submissions, much the same as he attacked Escobedo-Hockema, but he did not. The absence of a coherent, elucidated methodology is thus revealed. So is the arbitrary foundation of the apportionment to Snapka and Escobedo-Hockema similarly exposed.

**In addition to failing to apply an objective, verifiable method for its allocations, FAC also failed to utilize a transparent process. As such, the Special Master erred relying on FAC's allocations.**

Transparency is required in fee apportionment.[20] This means transparency-in-fact. Calling a steel wall transparent does not make it so. And that remains true regardless of who says it or how many times it is said. The method by which the common fund was allocated is hidden. Protestations to the contrary do not change the facts. They merely diminish the credulity of those making the claims.

In addition to being transparent, a fee apportionment also must be factually supportable and consistent with the *Johnson* factors.[21] Consider what one court wrote about the failure to have a transparent process and a factually sufficient record:

> Certainly it is not conducive to appropriate appellate review where, as here, the reviewing tribunal is completely in the dark as to what the trial judge found concerning the time and labor involved, the rate of compensation, and the aspects he may have deemed of significance.[22]

---

[20] *In Re High Sulfur Content*, 517 F.3d 220, 227 (5th Cir. 2008).
[21] *Id*. at 230.
[22] *Evans v. Sheraton Park Hotel*, 503 F.2d 177, 188 (D.C. Cir. 1974).

The opacity of the apportionment methodology is evidenced in many ways. These illustrations should suffice. A $10 million dollar swing between FAC's initial fee recommendation for Kline Specter and FAC's final recommendation for that firm shows FAC's level of inconsistency throughout this process.[23] Without explanation, Kline Specter's portion grew from $4,000,000 to $15,000,000.[24] Why? The record offers no answers. In fact, the changes are inconsistent with the harsh criticism made of these firms in their Response to Objectors. That FAC fairly attack these firms is not accepted by Snapka and Hockema-Escobedo. The opposite is true. How could FAC attack them with such vigor and then upwardly adjust their awards by millions of dollars without explanation? A uniformly applied method likely to produce fair results requires an explanation for these obvious inconsistencies.

The Murray Law Firm objected and FAC declared most of that firm's work "low level document review."[25] Targeting Mr. Murray personally, FAC said he "abandoned" an MDL leadership position very early. Therefore, FAC concluded Mr. Murray's "contribution to the litigation, like that of the firm as a whole, was *de minimus*."[26] FAC apportioned the Murray Law Firm $162,000 and proclaimed this amount was properly "calibrated to match the firm's negligible level of contribution."[27] Nevertheless, FAC's third iteration of its apportionment recommendations increased the Murray award to

---

[23] Fee Allocation Committee's Recommendation to Judge Fallon, January 19, 2011; Fee Allocation Committee's Recommendation, June 1, 2011.
[24] *Id.*
[25] Fee Allocation Committee's Response at p. 43.
[26] *Id.*
[27] *Id.* at p. 42.

$850,000.[28]  FAC did not explain this "recalibration."  And the Special Master simply

adopted FAC's new version. He did not explain it or even note the change.[29]

Similarly, FAC wrote of Roda Nast that "the inflation of Roda Nast's reported time

is patent."[30]  Further, FAC asserted in some detail that the tasks assigned to that firm were

insignificant and FAC awarded that firm $45,000.[31]   June 2011, FAC discerned that Nast

should receive $300,000.[32]  FAC provided no explanation.  The Special Master, again,

simply adopted the change.[33]  Their decisions fee allocation decisions were wholly

arbitrary.

Again, FAC apportionments for the Lockridge Firm were $364,037,[34] $350,000[35]

and a "final" of $1,100,000.[36]  Why?  Neither FAC nor the Special Master explained the

methodology for their recommended allocations.  These are illustrative of the many

unexplained manipulation of apportionments.

Listing "considerations" is not the elucidation of a methodology.  "Considering the

Ten Commandments" differs in kind from "following the Ten Commandments."  That

"considerations" were not "followed" in this case is demonstrated by the evidence.  FAC's

actual apportionments are not based on following a coherent method.  The random

movement of millions of dollars in fees is arbitrary, not methodical.

---

[28] Fee Allocation Committee's Recommendation, June 1, 2011.
[29] *See* Report and Recommendation of Special Master on Allocation of Common Benefit Attorney Fees.
[30] *Id*. at p. 44.
[31] *Id*. at pp. 44-45.
[32] Fee Allocation Committee's Recommendation, June 1, 2011.
[33] *See* Report and Recommendation of Special Master on Allocation of Common Benefit Attorney Fees.
[34] Fee Allocation Committee's Recommendation, December 10, 2010.
[35] Fee Allocation Committee's Recommendation to Judge Fallon, January 19, 2011.
[36] Fee Allocation Committee's Recommendation, June 1, 2011.

**There is no evidence FAC applied lodestar to its fee allocations.**

The issue of lodestar illustrates the same disconnect between what was said and what resulted.  A lodestar analysis begins with asking if FAC ever used a firm-by-firm lodestar cross check?  FAC says it did, and the Special Master adopts that assertion as true. FAC claimed that it produced all documents upon which it relied.  But it never produced a firm-by-firm lodestar in its Response to Objectors.  Why not?

Move to a second question.  If FAC did use a firm-by-firm lodestar cross check, did it use a lodestar produced by Phil Garrett's group or one of its own creation or something else?  The answer is unknown.  FAC did not clearly identify the lodestar that it insists it used.  And it took Garrett considerable time and thousands of dollars to "find" a firm by firm loadstar.  Curious?  Or incredible?

The third question is the most salient.  Is there any credible evidence that FAC or the Special Master used a firm-by-firm lodestar cross check as part of a coherent apportionment methodology?  The only possible answer to that critical question is, "No." Simply examine the absence of any discernable relationship between lodestar and apportionment.

**There is no evidence FAC applied any fair and reasonable methodology to apportion fees, rather side-deals became the method of apportionment.**

Not only is there no credible evidence that FAC used lodestar, there is no credible evidence that FAC or the Special Master used any apportionment methodology authorized by law.  Was a point system used to reach the new recommended apportionments?  The answer is an admitted, "No."  Were the *Johnson* factors or Pre-Trial Order 6D guidelines truly used?  The record does not evidence, demonstrate or support their use.  Was percentage-of-recovery used?  Neither FAC nor the Special Master  mentions that method.

What were a significant number of the apportionments related to?  Side deals that were divorced from any elucidated methodology?  "Yes" is the answer supported by the evidence.

Pre-Trial Order 6D mandated the elucidation of a uniformly applied apportionment methodology as the law requires in all such cases.  Fee apportionment cannot be based in private side deals.[37]

FAC admits that its VLC apportionment resulted from an undisclosed deal that resolved objections irrelevant to fee allocations.

Michael Stratton's firm received a distribution of more than $18 million from the common benefit fund.  What authorized that invasion of a Court controlled account created for a special purpose?[38]  More prevalent were the many private side deals that controlled the actual apportionment awards.  Were side deals the noted bases for drastic changes in fee allocations cited above?  None of these were reviewed to determine their overall fairness.

**FAC and ultimately the Special Master failed to satisfy the requirement that the same methodology be applied to all fee applicants.**

The apportionment of the common benefit fund requires the application of a universally fair standard of allocation to all participants[39] to ensure the recommended allocation for each attorney is fair and reasonable.[40]  The district court bears the ultimate responsibility to protect and fairly apportion common benefit funds.  In particular, it must

---

[37] *See In Re High Sulfur Content*, 517 F.3d at 232.
[38] *Evans,* 503 F.2d at 188.
[39] *In re Vitamins Antitrust Litig.*, 398 F.Supp.2d 209, 234 (D.D.C. 2005)
[40] *In Re High Sulfur Content*, 517 F.3d at 227.

closely scrutinize any apportionment recommendations made by attorneys with an inherent conflict of interest[41]

In Re Thirteen Appeals Arising out of San Juan DuPont Plaza Hotel Fire Litigation,[42] will be discussed in some detail because it was forced to address an apportionment that appeared unfair and was held unfair.  The Court first acknowledged an obvious truth about the apportionment it was asked to review — most of the fund was apportioned to the MDL Control Group.  This appearance was sufficient to merit the scrutiny of the Court of Appeal.

In that case, the MDL district court awarded to the Plaintiff Steering Committee Members ("PSC") 70% of the common benefit fund.  The First Circuit noted that it was "troubled" by the mere appearance of a trial judge "selecting a chosen few from many lawyers who volunteer, assigns legal tasks to those few (thereby dictating, albeit indirectly, the scope of the work remaining to be done by the many), and then, in awarding fees, heavily penalizes the very lawyers to whom he has relegated the "lesser" duties."[43]

The Court accepted the need for skilled management of mass tort lawsuits.  But said lead counsel should "have no right to harbor any expectation beyond a fair day's pay for a fair day's work if a fee fund develops."[44]  The Court accepted as well that disproportionate fees may be unavoidable, but cautioned that any perception of favoritism must be avoided.[45]

---

[41] Id.
[42] 56 F.3d 295 (1st Cir. 1995).
[43] Id. at 310.
[44] Id.
[45] Id.

In that case, the Court scrutinized the facts and concluded that the objectors[46] were not along for a free ride but to "earn their keep."[47]  The Court went through a litany of responsibilities, duties, and sheer work with a myriad of experts, physicians, and other witnesses the objectors performed in developing their cases.[48]  Then, the Court distinguished that work from the rather routine securities class action.  The Court noted, in those class actions, lead counsel frequently "do virtually all the work, and other counsel piggyback on their efforts."[49]

Like the trial court in *In Re Thirteen Appeals*, the Vioxx Special Master similarly failed to scrutinize FAC's Allocation – exactly what the First Circuit cautioned against in *In Re Thirteen Appeals*.  Additionally, not only did FAC and ultimately the Special Master penalize firms which were not in leadership, and which perhaps performed lesser work, but FAC and the Special Master penalized trial counsel like Snapka and Escobedo-Hockema who performed equal work and provided equal value to the common benefit.

The First Circuit, then explained the importance of the sort of work trial counsel performs away from the administration of the MDL.  The Court noted that in mass tort MDL's the client/attorney relationships differ from that of the same relationship in class actions.  In mass tort MDL's the management of a lawyer's relationship with the client is often "labor-intensive and frequently low in visibility — at least in visibility from the

---

[46] The term "objectors" here refers to the Independently retained counsel and the small number of PSC members who appealed the trial court's decision awarding fees.

[47] 56 F.3d at 310.

[48] *Id.*

[49] *Id.* (citing *See, e.g., In re Ivan F. Boesky Sec. Litig.*, 948 F.2d 1358, 1364-65 (2d Cir. 1991); *see also* Randall S. Thomas & Robert G. Hansen, *Auctioning Class Action and Derivative Lawsuits: A Critical Analysis*, 87 Nw.U.L.Rev. 423, 429 (1993) (explaining that, in general, lead counsel in class actions have "substantial authority to conduct the litigation, even to the exclusion of other counsel"); Jonathan R. Macey & Geoffrey P. Miller, *The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform*, 58 U.Chi.L.Rev. 1, 3 (1991) (observing that plaintiffs' class action attorneys have "nearly plenary control over all important decisions in the lawsuit" because of the absence of monitoring by clients).

bench."[50]   The Court cautioned that this type of work is "susceptible to being overlooked, leading to an overemphasis on the relative value of the court-related work."[51]

In the *Garza* matter, Snapka and Escobedo-Hockema spent much time with the Garza family.  This was obviously required for a successful trial outcome, but was not performed within the view of MDL trial court or the Control Group.  The same is true of most aspects of the actual trial preparation.

Similarly, Snapka was required work up her Texas venued trial eligible cases.  This work was not visible to MDL operatives.  Particularly significant was her work on the trial set *Zajicek* case.  This case was set for trial when the MSA was reached.  The case was of interest to the MDL.  It was the case in which the retained blood analysis was developed.  It was discussed at most status conferences.  The case posed the type of uncertainty that drove settlement discussions.  According to Mr. Frazier, Merck's general counsel, "The realities of the world are that jury cases have uncertain outcomes.[52]  This important work is just the type of work that may be under-valued simply because it is not as visible as events in the MDL Courtroom.  Not as visible, but perhaps of equal or greater significance in terms of a force contributing to an overall settlement.

The First Circuit made the obvious, but easily overlooked, observation in *In Re Thirteen Appeal* that class action claimants are unaware they even have a claim or a case.[53]  It follows that MDL plaintiffs are altogether different.  As in the Vioxx MDL, the plaintiffs alleged significant injuries and were acutely aware of their individual claims and

---

[50] *Id.*

[51] *Id.*

[52] Alex Berenson, *Merck Loses Vioxx Suit in Texas*, The New York Times, April 22, 2006 (discussing *Garza* trial verdict).

[53] *In Re Thirteen Appeals,* 56  F.3d at 310.

lawsuits.[54]  The First Circuit understood that plaintiffs typically require a multitude of services, many of which cannot be satisfied by an impersonal MDL Control Group.  They look to the attorney they engaged to provide those services.  The Court made clear that in the MDL, setting the work of the individually retained attorneys is crucial to the success of the overall enterprise.[55]

In truth, the mass injury tort involves additional layers of complexity that even the First Circuit failed to reach. For example, many MDL attorneys speak of their "inventory of cases."  They are among those who amass large numbers of clients.  Others, like Snapka, have smaller numbers of clients, focus on them more as individuals, but look for and prepare cases that are most likely to get trial settings, trials and successful trial results.  Again, *Zajicek* illustrates the point.  Snapka had a good client, a good case, a good venue, and a trial setting.  She was also certainly known to Merck.  *Zajicek* work drove settlement.  It benefited the overall litigation.  It is error to dismiss or diminish its value as FAC attempted to do.  The Special Master also gave it no recognition.

The First Circuit also addressed the district court's assessment of the quality of the PSC's work.  To the extent the district court gave the PSC credit for excellent work, the Court felt that should be counter-balanced by "the excellence of the work performed by *all* attorneys."[56]  Simply put, it was "manifestly unfair to reward excellence on the part of one group [PSC] and not the other [objectors]."[57]

Similarly, in the Vioxx litigation, Mr. Herman praised the work of all common benefit counsel as evidenced in his affidavit and by the submission of all counsel hours to

---

[54] *See id. at 311.*
[55] *Id.*
[56] *Id.*
[57] *Id.*

support establishing the fund.  Mr. Birchfield did the same throughout the litigation.  Then, in FAC's Response to Objections to Recommended Common Benefit Fee Allocation, FAC demeaned essentially all objectors.

In sum, the First Circuit found the district court erred in failing to fairly compensate the independently retained plaintiffs attorneys who, though not members of the PSC, prepared and/or tried the "representative" cases — for their work in that capacity.  The Court made clear, it was unreasonable to award so large a percentage of the aggregate fees to the attorneys who managed the litigation, and leave a smaller percentage for those who toiled in a different manner.  The Court wrote, "[b]ecause mass tort cases are a breed apart, it is difficult to envision situations in which, if fees are divided between lead counsel and individually retained counsel under a POF formula, the latter will not be entitled to at least half the fees."[58]

Snapka and Escobedo-Hockema are requesting the MDL trial court to closely examine FAC's methodology and analysis of common benefit fee allocations.  Likewise, they also are requesting the Court examine what the Special Master did in essentially adopting FAC's recommendation.

In the Vioxx MDL, formal leadership in this case is properly described as closed or at least "close knit."   A small group of attorneys controlled most MDL activities.  Membership on the PSC, NPC and FAC substantially overlapped.

Added to this, is the absence of evidence in the record that any FAC member apportionments were formally scrutinized.  This is true even though evidence was proffered that the MDL leadership and its selected trial counsel were strongly criticized

---

[58] *Id.*

from many sources.  Documentation of this criticism was proffered as an exhibit.[59]  But the

Special Master excluded it.

**The Special Master's rulings violated due process.**

The MDL Court's Order and FAC's actions following the order limiting discovery,

limiting hearings, and foreclosing open depositions violated Snapka and Escobedo-

Hockema's due process rights.  Snapka and Escobedo-Hockema had a constitutionally

protected property interest in the common benefit fund.  Their interest was reduced without

affording them the process that was due.

The Supreme Court has held when a property interest is taken, "some form of

hearing is required" before a final deprivation of the interest.[60]  At bedrock, "[t]he

fundamental requirement of due process is the opportunity to be heard at a meaningful time

and in a meaningful manner."[61]  The Court has provided 3 guiding factors to consider:

    1)  the *private interest* that will be affected by the official action;

    2) the *risk of an erroneous* deprivation of such interest through the
procedures used, and the probable value, if any, of additional or substitute
procedural safeguards; and finally,

    3)  the *Government's interest*, including the function involved and the fiscal
and administrative burdens that the additional or substitute procedural
requirement would entail.[62]

The Court's mandate does not necessarily require a full scale trial or even a hearing

conforming to the rules of evidence.[63]  What it does require "is such procedural protections

---

[59] *Id.*

[60] *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976); *accord Wolff v. McDonnell,* 418 U.S. 539, 557-58, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974).

[61] *Mathews,* 424 U.S. at 333, 96 S.Ct. at 902 (citation and internal quotation marks omitted).

[62] *Id.* at 335, 96 S.Ct. at 903; *see also Connecticut v. Doehr,* ___ U.S. ___, ___, 111 S.Ct. 2105, 2112, 115 L.Ed.2d 1 (1991

[63] *See Mathews,* 424 U.S. at 348, 96 S.Ct. at 909; *Doyle v. Secretary of HHS,* 848 F.2d 296, 301 (1st Cir. 1988).

as the particular situation demands."[64]  A court may hand-tailor procedures to account for the nature of the affected interests and the circumstances of the threatened deprivation.[65] Procedural due process does require the guarantee of fair procedure.[66]  Snapka and Escobedo-Hockema did not receive that.

The First Circuit examined these factors in *In Re Nineteen Appeals Arising Out of San Juan DuPont Plaza Hotel Fire Litigation,*[67] a multidistrict litigation appeal.  The Court identified the affected *private interest* as the monetary share of the fund due each objector.[68] The First Circuit found the district court necessarily deprived the objectors of money when it invaded the attorneys' fund to pay PSC fees.[69]  Further, the Court found not only do the objectors have a property interest in escrowed funds[70], but the amounts involved were substantial and the deprivation was complete.[71]  For the foregoing reasons, the court determined the affected interest was an important one.[72]

Next, in *In Re Nineteen Appeals Arising Out of San Juan*, the court considered risk of an erroneous deprivation.  The First Circuit evaluated the MDL trial court's protocol and found it hogtied the objectors, and severely restricted their ability to participate in the fee-determination process.[73]

Court found objectors were entitled to reasonable forewarning and an opportunity to present their side of the controversy in a meaningful manner. Because objectors received

---

[64] *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).
[65] *See Neron v. Tierney,* 841 F.2d 1197, 1201 (1st Cir. 1988), *cert. denied,* 488 U.S. 832, 109 S.Ct. 90, 102 L.Ed.2d 66 (1988).
[66] *Amsden v. Moran*, 904 F.2d 748, 753 (1st Cir. 1990) (quoting *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990).
[67] 682 F.2d 603 (1st Cir. 1992).
[68] *Id*. at 612.
[69] *Id*.
[70] *Id*. (citing *Reed v. Commissioner,* 723 F.2d 138, 146 (1st Cir. 1983)).
[71] *Id*.
[72] *Id*.
[73] *Id*. at 613.

neither, the Court concluded the risk that objectors would be erroneously deprived of their property was intolerably great.

Finally, the First Circuit examined the substantial *governmental interest* — conserving scarce judicial resources.[74]  The Court recognize the MDL trial court imposed the restrictions were a "well-intentioned" given the lengthy 4 year life-span of the case, in light of the number of lawyers involved, and the Supreme Court's admonition that "[a] request for attorney's fees should not result in a second major litigation."[75]  Nonetheless, the First Circuit held when the district court was not faced with an all-or-nothing choice between allowing the objectors free rein and unfairly hobbling them. As such, the MDL trial court had a wide range of procedures available which, could have brought a sense of fundamental fairness to the fee-determination hearing while at the same time husbanding the court's resources.[76]

In concluding the Court noted it could not see how the MDL trial court could fairly adjudicate the dispute before it unless it afforded the objectors a viable means (comparable to the means afforded the PSC) of describing their contribution to the litigation, contrasting their contribution with the PSC's contribution, and questioning the PSC members regarding their work.[77]

---

[74] *Id*. at 614.
[75] *Id*. (citing *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983)).
[76] *Id*.
[77] *Id*. (citing *Briscoe v. LaHue,* 460 U.S. 325, 333-34, 103 S.Ct. 1108, 1114-15, 75 L.Ed.2d 96 (1983); *California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970); *Kennerly v. United States,* 721 F.2d 1252, 1257-58 (9th Cir. 1983) (reversing district court award of funds where interested party did not receive a hearing); *see also Weinberger,* 925 F.2d at 525 ("The court's role as the guarantor of fairness obligates it not to accept uncritically what lawyers self-servingly suggest is reasonable compensation for their services."); *In re Air Crash Disaster at Fla. Everglades,* 549 F.2d 1006, 1021 (5th Cir. 1977) (requiring plaintiffs' committee and counsel to offer evidence and submit to cross-examination at fee-determination hearing).

Snapka and Escobedo-Hockema were denied any viable avenue to learn what methodology if any was used to ensure that their fee was apportioned using the same yard stick that applied to everyone.  Graphically, they were denied the FAC meeting minutes that admittedly related to this issue.

So too, they were not permitted to introduce evidence of the harsh criticism leveled at the Central Group's handling of all important bellwether trials.  Here, all evidence of record supports the conclusion that Snapka and Escobedo-Hockema were not treated fairly and their apportionments were arbitrary and capricious.

## CONCLUSION

The Special Master's apportionments were not based on a elucidated methodology reasonably likely to result in each applicant receiving a fair portion of the fund. This is error.

The apportionment process as applied thus far is not transparent. Critically, the bases for apportionments is hidden. Private side deals abound, but their bases are hidden. All side deals may not have been disclosed. The minutes of meetings that would shed light on the process that is apparently arbitrary are hidden.  Transparency is a requirement. The secrecy surrounding the method, if any, by which each apportionment was made--the single most important issue—is error.

The method of apportionment, if any, was not uniformly applied to all applicants. Objectors only, for example, were scrutinized, and subject to harsh criticism. Widespread critiques of the handling of a bellwether trial, on the other hand, were ignored. This lack of uniformity is error.

The absence of method,  the secrecy, the lack of uniformity all combine to produce results that are random, arbitrary and capricious. The MDL Control Group ends up with more than 70% of the fund. Other allocations just bounce up and down. And a trial team that earned the *Garza* verdict, one of the few plaintiff's verdicts, is assigned less one-half of one percent. Appearance alone dooms the apportionment made by the Special Master.

The apportionment to the *Garza* trial team defies everything  written about the importance of trials in resolving mass tort aggregate litigation. *Garza* was an engine that helped pull and push the settlement train into the station. The attorneys who tried it deserve credit for it. There were few trials. There very few trials with plaintiff verdicts. There were almost no trials with verdicts as large as *Garza's*.  And, Merck knew there were more South Texas trials to come. One of Snapka's cases was set for trial a few months from the date the MSA was reached.  This was surely known to Merck and among the uncertainties of trial results that Merck publicly acknowledged led directly settlement.

The percentage assigned to Snapka and Escobedo-Hockema was unfairly low, because it was the product of an arbitrary apportionment system. Fairly viewed, these lawyers merited 10% of the fund. They were pioneers of this litigation. They gave up other work to pursue it. They stuck it through. They encouraged other plaintiff lawyers to join the fray. They stood up for their clients without regard to the popularity of there position. They helped work through difficulties in a way that benefited all. They were and remain valuable members of this team. They request a fair allocation process and a share of the fund that truly represents there contribution its creation.

BEIRNE, MAYNARD & PARSONS, L.L.P.

_____/s/ Jack E. Urquhart_____
Jack E. Urquhart
State Bar No. 20415600
1300 Post Oak Blvd., Suite 2400
Houston, Texas 77056
Telephone:  (713) 871-6760
Facsimile:   (713) 960-1527

**ATTORNEYS FOR PLAINTIFF
KATHRYN SNAPKA, JOE ESCOBEDO, JR.
AND DAVID HOCKEMA**

Of Counsel:

Gary Alfred
Terry Adams
Charles T. Miers
Texas Bar No. 00784600
BEIRNE, MAYNARD & PARSONS, L.L.P.
1300 Post Oak Blvd., Suite 2400
Houston, Texas 77056
Telephone:  (713) 871-6760
Facsimile:   (713) 960-1527

Paul M. Lavelle
Louisiana Bar Number is 08134.
BEIRNE, MAYNARD & PARSONS, L.L.P.
110 Poydres Street, Suite 2900
New Orleans, LA 70163
Telephone: (504) 799-2223
Facsimile:  (504) 799-2224

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing document has been served upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, and that the foregoing was electronically filed with the Clerk of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system, which will send a Notice of Electronic Filing, and that the forgoing was sent via email to:

Russ Herman, rherman@hhkc.com

Andy Birchfield, andy.birchfield@beasleyallen.com

Special Master Patrick Juneau, PAJ@juneaudavid.com

This 18th day of July, 2011.

  /s/ Jack E. Urquhart
Jack E. Urquhart