UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX | ) | MDL NO. 1657 |
| | ) | |
| PRODUCTS LIABILITY | ) | SECTION L |
| LITIGATION | ) | |
| | ) | JUDGE FALLON |
| This document relates to The Fee | ) | MAG. JUDGE KNOWLES |
| Allocation Committee's Common Benefit | ) | SPECIAL MASTER |
| fee for Kathryn Snapka | ) | PATRICK A. JUNEAU |
| | ) | |
| FILER: JACK E. URQUHART | ) | May 27, 2011 |

---

## KATHRYN SNAPKA POST-HEARING MEMORANDUM

---

May it please the Court;

This is Kathryn Snapka's post-hearing memorandum supporting her request for an increase in her recommended portion of the common benefit funds:

The record before Special Master Juneau establishes the following:

I.     **FAC Erroneously Undervalued Kathryn Snapka's Proportionate Contribution to the Common Benefit**

FAC initially informed Ms. Snapka that it valued her proportionate share of the $315,250,000.00 common benefit fund at **$582,458.99.** This translates to a less than 0.2% of the common benefit fund. FAC did not explain the methodology used to reach this number.

Ms. Snapka, as was her right, objected. FAC, then, reduced her proportionate share to **$75,000.00** in a "final" recommendation. This is less than 0.024% of the common benefit fund. FAC did not explain the methodology used to reach this number.

FAC's first and only effort to articulate the method by which it reached these recommendations for Ms. Snapka is found in a document it filed March 2, 2011, called "Fee Allocation Committee's Response to Objections to Recommended Common Benefit Fee Allocation." *See* Snapka Exhibit 12, pps. 45-49. This document is limited to conclusory statements that are unsubstantiated, contradicted by the evidence, and irrelevant.

All work that Ms. Snapka claims as common benefit work has had documented results. When the work was being done, Ms. Snapka's efforts were not criticized. The criticism FAC leveled at her in Snapka Exhibit 12 is unsupported and unsupportable.

## II.   Kathryn Snapka Made Significant Contributions to the Common Benefit

**Early involvement in Vioxx litigation:**   Kathryn Snapka was involved in Vioxx litigation since early 2003. She filed her first Vioxx case in the 267th District Court, Jackson County, Texas, on May 29, 2003 (the *Zajicek* case). Snapka Exhibit 25. This involvement was prior to the formation of the MDL or the Texas State Court consolidation. It was before the market withdrawal of Vioxx. Ms. Snapka was filing cases when the outcome of the litigation was at its least predictable and lawyers involved in the litigation were at maximum risk. She was one of the few lawyers in the country involved in Vioxx litigation at this stage.

**Lost opportunities:**   Kathryn Snapka's commitment to Vioxx led her to decline offered representation in cases involving Zyprexa, Oxycontin, Prempro, Trasylol, as well as other matters that would have required an intense involvement of her personal time. FAC Response Exhibit B—1542.

**Organization of cooperative plaintiff lawyer efforts:**   Ms. Snapka made the first formal outreach in Texas to join forces with other firms that may have had an interest in Vioxx litigation. Specifically, Ms. Snapka organized two well-attended meetings of plaintiff attorneys to begin a cooperative effort to press Vioxx litigation. Attendance at these meetings was not

2

limited to Texas plaintiff lawyers.  Attendees, for example, included Andy Birchfield and his then partner Paul Sizemore.  These meetings were held the Fall and Winter of 2004 at the Four Seasons Hotel in Houston.

**Leadership in Vioxx Litigation Consolidated in Texas State Court:**   The Vioxx litigation was ultimately granted statewide consolidation in Texas.  Ms. Snapka was appointed by the Supreme Court of Texas as the initial Notice Counsel—the Texas equivalent of an MDL liaison counsel.  When the consolidation was assigned to a court in Houston, Texas, a Houston lawyer was named Notice Counsel.  Ms. Snapka remained an active member of the Plaintiffs' Steering Committee in the Texas litigation.

**Organizational leadership outside Texas:**    Ms. Snapka did not confine her organizational efforts to Texas.  She met and communicated with counsel throughout the country to gain information, share information and cooperate in the coordination of the plaintiffs' efforts in Vioxx litigation.  This included attendance at the Panel Hearing that established this federal MDL.  She formally spoke about Vioxx litigation on at least these occasions: December 3, 2004, at a Scientific Evidence Workshop in Houston; November 4, 2005, State Bar of Texas Advanced Personal Injury Seminar in Corpus Christi, Texas; May 8 & 9, 2006, Mealey's Vioxx Litigation Conference in Florida, December 10-12, 2006 (Ms. Snapka was co-chair of the conference); December 10 & 11, 2007, Mealey's Vioxx National Settlement Conference Roundtable; and February 15 & 16, 2008, AAJ Pharmaceutical Seminar, *David V. Goliath-How Plaintiffs are Holding Big Pharmaceutical Companies Accountable.*  FAC Resp. Exhibit B—1542-43.

**Won a large verdict in an early bellwether Vioxx trial:**  Ms. Snapka, Mr. Escobedo, and Mr. Hockema won a $32 million verdict in the Vioxx *Garza* case for the family of man who suffered a fatal heart attack.  The decedent had taken Vioxx for only a few days and had multiple risk factors for heart failure.  Mr. Escobedo and Mr. Hockema had filed the *Garza* case in Starr

3

County, Texas, and asked Ms. Snapka to join their team.  Ms. Snapka had worked with Mr. Hockema and Mr. Escobedo in the past, and, knowing of her experience and success in pharmaceutical litigation, they asked her to join the *Garza* trial team.   Mr. Escobedo testified during the hearing that they specifically needed Ms. Snapka's expertise in pharmaceutical trial work. *See _____.*

After overcoming multiple procedural roadblocks thrown up by defendant, the case was tried to a plaintiff's verdict.  It was one of only five cases that resulted in a plaintiff's verdict in the entire Vioxx litigation.   The verdict received immediate national media attention and defendant's stock price fell after the verdict was announced. *See, e.g.,*. Snapka Exhibit 20 (a posting on the Beasley Allen website hailing the *Garza* case, "Plaintiff's Win First Short-Term Use Vioxx Lawsuit."); Snapka Exhibit 29 (Merck shares fell as much as 1.6% immediately after the verdict was announced. Chris Seegar is reported as saying, "This is a big reversal and really exposes [Merck's] litigation strategy as being extremely flawed.  Now they have people with one week's worth of use getting verdicts in the $20 million, $30 million range."

**Participated on the Team that Briefed and Argued the Preemption Motion in MDL**: Defendant moved for summary judgment based on preemption in two cases in the federal MDL. One of those cases was a plaintiff represented by Ms. Snapka.  Ms. Snapka drafted briefing and prepared to argue the case.  Mr. Arnold Levin called Ms. Snapka, informing her that his firm would handle the preemption motion exclusively.  Ms. Snapka pointed out that her client was a target of the motion.  Mr. Levin agreed that Ms. Snapka should participate, and they worked cooperatively.  At the hearing, Ms. Snapka presented the facts of **both cases**, and Mr. Levin presented the legal argument.  The result was a denial of defendant's motion.  The success of defending this motion was obviously a benefit to all Vioxx litigants. *See* Snapka Exhibit 9 (transcript of the preemption motion hearing).

4

**Prepared and Pressed Cases Set for Trial in Texas State Court that Were Not Held Up By the Texas Consolidated Proceedings:**  The Texas state court litigation was dealt a blow when the consolidation judge in Texas granted a summary judgment based on Texas tort reform law that effectively preempted most of the Texas state Vioxx litigation.  Ms. Snapka, however, because of her early involvement n the Vioxx litigation, had cases, particularly, *Zajicek* and *Eller,* that could proceed to trial in Texas because they had been filed before the effective date of the Texas Tort Reforms legislation.  Both of these cases were sent back to the Texas counties in which they were originally filed and set for trial.  Ms. Snapka tenaciously readied these cases for trial, keeping pressure on defendant who had already suffered two of its total of five losses in Texas state court.  The *Zajicek* case, for example, was followed and discussed at most MDL Status Conferences.  It was set for trial in February 2008 at the time of the announcement of the global settlement on November 9, 2007.   As will be discussed below, Plaintiff Liaison Counsel filed an affidavit confirming that state court trial settings put pressure on Merck.

**Proof of ability to use retained blood from an autopsy to prove Vioxx usage:**  Ms. Snapka pioneered the ability to use retained blood from a victim's autopsy to prove Vioxx usage. As a result of Ms. Snapka's development of the trial set *Zajicek* case, she learned that, if blood from an autopsy was retained, it would be scientifically possible to prove Vioxx use.  She shared this valuable information with Vioxx counsel.  The significance of this discovery for all litigants is reflected in the fact that this technique was specifically addressed in the Master Settlement Agreement which recognized the testing of retained blood samples as an accepted method for demonstrating Vioxx use.  Ms. Snapka's work in pioneering the use of retained blood samples was applauded by MDL leadership.  *See, e.g.,* Snapka Exhibit 14 at pps. 5-7.  (MR. BIRCHFIELD: There's a clause in the settlement agreement just for that case.)

**Efforts in MDL to limit defendants' "Double Removals":** The trial of the *Garza* case, as mentioned above, was delayed by numerous defense procedural obstacles. Among these obstacles was "double removal." The *Garza* case was originally removed by defendants shortly after it was filed and was remanded by the Texas based United States District Court. The MDL had been formed. After this initial remand, *Garza* was set for trial, but continued several times on defense motions. Defendant, then, removed *Garza* a second time, and it was transferred to the MDL. Ms. Snapka vigorously advocated for a remand, knowing the case was trial ready, would receive an early trial setting and was a favorable case for plaintiffs to try to a jury. Her persistence in seeking remand was supported by Plaintiffs' Liaison Counsel and the PSC. *Garza* was the first, and to Ms. Snapka's knowledge, the only case remanded from the MDL. It was tried and, as stated, resulted in a substantial plaintiff verdict. Ms. Snapka continued to advocate the remand of Double Removal cases, strongly believing the tactic of double removal enabled the defense to avoid trial of state court cases that were of concern to the defense. She, for example, advocated for the remand the *Nettles* case which had been selected as a top "plaintiffs' pick" for a stroke case, before it was removed a second time and transferred to the MDL. She advocated against double removals not only for her clients, but for other plaintiffs' counsel who were losing trial settings as a result of double removals.

**Modification of Extraordinary Injury Process to Allow for Review of Initial Award:** Ms. Snapka suggested a modification to the Vioxx Settlement Program that would afford claimants for extraordinary injury the protection of an avenue for review of an adverse decision. This suggestion was adopted and the Court appointed a Special Master to review the claims of persons who had an issue with the extraordinary injury relief determination made by the claims administrator.

**Ms. Snapka's submission of only 3,000 hours for all the efforts described above was conservative:**  Ms. Snapka submitted reconstructed hours as authorized by the Court.  Those hours were for common benefit work only.  Following the instructions provided her, she submitted no hours for work performed after the MSA was announced.

Her testimony at the hearing and in her submissions to FAC described her conservative approach to reconstructing hours.  She made clear that her submission understated the hours she devoted to common benefit work.  She submitted hours only for herself and one associate attorney.  Consistent with the requirements provided her, she did not submit common hours for work done after the settlement was announced.  Her hours were audited and approved by the accounting firm appointed by the federal MDL.  Her case submissions were also audited and approved.

**Ms. Snapka's cases were all resolved under the Vioxx Settlement Agreement:**  November 2007, the MSA was published.  Ms. Snapka's clients all resolved their claims under and through the Vioxx settlement program.  The *Garza* case was excluded from the MSA by those who negotiated that agreement—Merck and the NPC.  This will be discussed in more detail below.

III.   **FAC Failed to Support In Its Only Effort to Justify Either its Original Recommendation of $582,458.99 or Its "Final" Recommendation of $75,000**

The only information supplied by FAC to explain its methodology for Ms. Snapka's recommendation is found in the "Fee Allocation Committee's Response to Objections to Recommended Common Benefit Fee Allocation" (FAC Response).  *See* Snapka Exhibit 12.  FAC offered no testimony during the hearing before Master Juneau March 9-13, 2011 to justify its award to Kathryn Snapka.  The FAC Response addresses Ms. Snapka at pages 45-49.  The FAC Response is primarily conclusory and the conclusions have been disproved by the evidence.

Moreover, most of the allegations made in the FAC Response are not relevant to the issue of the allocation.

**FAC's Irrelevant Allegation that Ms. Snapka requested that _Garza v. Merck & Co._ not be included in the Vioxx Settlement Program is Mistaken**:  _Garza_ is the only case in which the attorneys who tried a Vioxx case were allotted nothing for the trial by FAC.  FAC gave credit to all other applicants who tried cases, except the _Garza_ trial lawyers.  This is true whether or not the tried case was settled under the Vioxx Settlement program or not.  Birchfield Deposition p. 263, lines 10-25.  _Garza_ and several other tried cases were expressly excluded from the MSA during the negotiations between Merck and the NPC.  The reason these cases were excluded is unknown to Ms. Snapka.   FAC's original common benefit fund recommendation for Ms. Snapka acknowledged that _Garza_ did contribute to the common benefit.  FAC's "Final" recommendation reversed that determination.  FAC has no supportable basis for denying that the _Garza_ trial lawyers contributed to the common benefit work.

FAC's explanations for denying the _Garza_ trial lawyers credit for that trial has been totally discredited.  Mr. Birchfield asserted based on clear hearsay, that Ms. Snapka had a telephone conversation with Mr. Blizzard.  Although he did not hear the conversation, Mr. Birchfield testified with precision about when the conversation allegedly took place.  Birchfield Deposition p. 238, lines 2-25.  (I mean we were down to the - - you know, to the last few hours and, as I recall, it was within that narrow window of time when we had to know, you know, whether - - you know, what the position would be for Tommy Fibich and the Ledbetter case and Kathy Snapka and the Garza case.)

Ms. Snapka produced her phone records for all time during and surrounding that period.  These records proved no call between her and Mr. Blizzard took place.  She testified in detail

that such a call never occurred and could not possibly have occurred as described by Mr. Birchfield. FAC offered nothing to challenge Ms. Snapka's testimony.

Ms. Snapka testified at the hearing that she did not speak with Mr. Blizzard about excluding *Garza* from the MSA at any time. Instead, she learned it was excluded when the MSA was made public. *Garza* was listed in an exhibit to the MSA as an excluded case when the MSA was made public. Snapka Exhibit 31 is the Exhibit to the MSA that was a part of the MSA when it was announced. The same exhibit lists other tried cases as excluded, but all the trial lawyers in those cases were given credit for the trials in their fee allocation. In his deposition, Mr. Birchfield admits that *Garza* was the only tried Vioxx case in which the trial lawyers were denied fee allocation credit. *Id.* at p. 263, lines 10-25.

FAC did not even attempt to contradict Ms. Snapka's hearing testimony in which she denied the alleged conversation with Mr. Blizzard. Further, Ms. Snapka introduced as an exhibit her cell logs for the time period during which this alleged call was supposed to have taken place. Snapka Exhibit 26. This concretely discredits FAC's Response.

Mr. Blizzard conducted the cross-examination of Ms. Snapka at the hearing and did not ask a single question that challenged her testimony that she never asked him to exclude *Garza* from the MSA. Mr. Blizzard, Mr. Birchfield, Mr. Herman and most of the FAC members were present for the entire hearing but FAC offered no evidence to contradict Ms. Snapka's testimony.

Nor did FAC offer any evidence to "explain" why *Garza* was the only tried Vioxx case for which the trial lawyers were given no credit in the FAC fee allocation process. This credit was denied despite the wealth of evidence from FAC members that the case did contribute to the common benefit. *See, e.g.,* Snapka Exhibit 11, p.8 ¶14. (This is Mr. Herman's affidavit that says, "Similarly in Texas, two cases were tried to verdict with two verdicts for plaintiffs in the *Ernst* and *Garza* cases. Both verdicts were substantial, $253 million and $32 million,

respectively.  These verdicts helped establish that liability could be obtained despite Merck's formidable defenses.  In addition, Judge Wilson scheduled five waves of cases for trial.  This scheduling of cases for trial also applied pressure upon Merck."

*Garza* was one of the few plaintiffs' verdicts.  It was a substantial verdict.  It was a verdict in a short term usage case.  The mere  announcement of the verdict resulted in a noted drop in Merck share value.

Significantly, FAC in the "recommendations" it negotiated with some objectors during the hearing before the Special Master recommended a significant increase in its recommendation for another objector firm that, at least according to the FAC Response, "stubbornly" tried a case that resulted in "a jury verdict for the defendant at a time when the momentum had been favoring plaintiffs and another plaintiff's verdict would have been ideal."  FAC Response, Snapka Exhibit 12 at page 36.  Nevertheless, FAC, by agreement on March 11, 2011, upwardly adjusted its recommendation for that firm to $1,250,000.  Ms. Snapka is not endorsing the criticism FAC leveled at this firm.  Rather, this is confirmation the FAC Response bears no actual relationship to its ever-shifting recommendations.  FAC's bald conclusory allegation that *Garza* did not contribute to the common benefit has no support whatever.

**The FAC allegation that Ms. Snapka's persistence in the successful remand of *Garza* was somehow detrimental to the common benefit rather than a boon to the common benefit is unsupportable:**  The positive contribution of the *Garza*  trial, and resulting plaintiff's verdict, is unquestionable.  The trial would not have occurred but for its remand to state court, and plaintiffs would have had one less of its few jury verdicts.  Ms. Snapka's efforts to obtain the remand helped the common cause.  In fact, as will be discussed below, the remand was supported by plaintiffs' Liaison Counsel, and Ms. Snapka's perseverance in the remand effort

was applauded, not attacked—at least until it came time to assign it a value in the common benefit fund fee allocation recommendation.

**The FAC allegation that Ms. Snapka refused to cooperate in "a statute of limitations motions ruling with broad application" is mistaken:** First, this allegation made in the FAC Response, Snapka Exhibit at 12 at 46, suffers from a telling blunder about even the subject of the motion with which it seeks to attack Ms. Snapka. Ms. Snapka participated in defending against a Merck motion for summary judgment based on *preemption* not *statute of limitations.* While this could be dismissed as a typo-like error, it reveals much more about the "FAC process." As with FAC's discredited attempt to argue that Mr. Blizzard and Ms. Snapka had a phone call that simply did not occur, FAC's failure to correctly identity even the subject of the motion before launching its attack on Ms. Snapka's participation in that motion undermines the reliability of FAC's conclusory characterizations of Ms. Snapka and her work. Secondly, Ms. Snapka's desire to participate in a motion that involved her client is not a bad thing or an uncooperative thing or anything that merits attack. Thirdly, Ms. Snapka worked cooperatively with the team assembled by Mr. Levin, and the result was a success. Mr. Levin complimented her effort, as will be discussed below. FAC provided no evidence to support the following conclusory condemnation of Ms. Snapka: "Ms. Snapka refused to cooperate with the PSC, but rather insisted on presenting the matter herself and in her own way." FAC Response, Snapka Exhibit 12 at 46. This is contradicted by the evidence.

**FAC's allegation that "while all other applicants, except Becnel, contributed to the common benefit fund at a rate of 6.5%, Snapka contributed at only 4%" (FAC Response, Snapka Exhibit 12 at 48-49) is irrelevant and mistaken:** Ms. Snapka has not contributed only 4%—8% of her fees are on hold. Again, FAC is just wrong on the facts. Ms. Snapka did not cash checks sent her by Michael Stratton nor did she receive the 1.5% reduction in assessments

that followed this Court's determination that the common benefit fund should be 6.5% rather than 8%. This relates to the "Stratton issue" that the Court has determined is not a part of this stage of the fee allocation process. It is mentioned here, and will be briefly addressed below, only to address mistaken accusations made in the FAC Response. The fact that Ms. Snapka did not negotiate the Stratton checks was known to FAC at the time it made its incorrect 4% allegation. *See,* Snapka Exhibit 15 at page 9, fn 5.

**FAC's conclusory characterizations of legitimate legal positions taken by Ms. Snapka in order to cast her in a bad light are both irrelevant and unsupportable:** Ms. Snapka worked for many years on Vioxx and the achievements she claims in support of her common benefit fee are all objectively verifiable. By contrast, FAC's explanations for disregarding her work are primarily conclusory comments directed at her character. In addition to those FAC arguments already addressed, the following inflammatory FAC conclusary allegations further demonstrate FAC's use of conclusory caricatures that are neither supportable nor relevant to the issue of fee allocation:

A. **"Since the inception of the MDL when she was denied a position on the Plaintiffs' Steering Committee, Ms. Snapka's mode of operation has been to work against the common effort, not for it."** FAC response, Snapka Exhibit 12 at 46.

B. **"Throughout the course of the litigation, Ms. Snapka repeatedly advised the Plaintiff's Liaison Counsel that she did not want to work cooperatively with the PSC."** FAC Response, Snapka Exhibit 12 at 46.

C. **"Once the global settlement was reached, Ms. Snapka sought to sabotage the entire effort by spearheading an empty ethics challenge."** FAC Response, Snapka Exhibit 12 at 47.

**D. "At every step of this litigation, Ms. Snapka has objected vociferously in an effort to improve her own lot."** FAC Response, Snapka Exhibit 12 at 47.

**E. "Perhaps the clearest demonstration of Ms. Snapka's mode of operation is on display now as part of the common benefit fee objection process. Feigning confusion and alarm, Ms. Snapka has accused the Fee Allocation Committee of malfeasance. Again, Ms. Snapka is not allowing the facts, or her lack of knowledge, to temper her accusations or criticisms."** FAC Response, Snapka Exhibit 12 at 47.

These FAC allegations are conclusory, inflammatory, irrelevant and objectively incorrect. A common thread in all these unsupported accusations is an attempt to accumulate all instances in which Ms. Snapka has expressed a point of view that FAC found challenging and turn those instances of divergent opinion into a caricature of a "complainer." The facts do not support FAC in this effort. Her few issues of disagreement with MDL leadership were legally appropriate, presented professionally, and almost universally resulted in beneficial changes.

Objectively, diversity and inclusiveness were not a hallmark of this MDL leadership. By way of example, *Garza* was the only tried Vioxx case in which lead trial counsel included gender or ethnic diversity.

This observation is made for a single purpose—a difference of view point expressed in concerns, suggestions or in formal objections are not proof that a person is uncooperative or a poor team player. To the contrary, divergent opinion should be expected if not encouraged. FAC's demonstrable effort to reduce Ms. Snapka's years of effort and successful contribution to this litigation to a portrait of a selfish complainer is unfair and unsupportable. Significantly, the *Johnson* factors recognize that "unpopular" positions are a factor favoring higher fees.

Ms Snapka, for example, was not upset that she, along with other applicants, was not chosen for the Plaintiffs' Steering Committee. She was a qualified candidate. She had been

previously appointed by a United States District MDL Judge to serve as Plaintiffs' Liaison Counsel in the Silicosis MDL. The Supreme Court of Texas selected her as the Notice Counsel in the Texas Consolidated Vioxx Litigation.  Despite her qualifications, Ms. Snapka understood that not every qualified applicant is chosen for a particular Steering Committee.  FAC has no evidence to support its speculative, conclusory, inflammatory and unsubstantiated accusation that, because she was not selected on the PSC, she set about on a course of non-cooperation.  The record is clear.  Ms. Snapka consistently devoted her efforts to the success of this litigation.

The FAC accusation that Ms. Snapka "repeatedly" announced her intention not to cooperate is supported by no evidence.  FAC did not offer a single documented instance in which Ms. Snapka advised any member of the MDL leadership that she did not want to proceed cooperatively.  Ms. Snapka has had to support her fee application every step of the way and submitted herself to multi-level scrutiny.  FAC Response, Snapka Exhibit 12,  is the first and only documented criticism of her efforts.  This criticism is conclusory, hearsay, based on no reliable methodology and, in almost every instance, contradicted by hard evidence.

FAC has not identified a single instance in which Ms. Snapka refused any assignment given her by MDL leadership.  In truth, MDL leadership did not offer Ms. Snapka and many other skilled trial lawyers many significant assignments even as plaintiff trial losses mounted.[1] This is true despite Ms. Snapka's trial experience and success in general and in pharmaceutical litigation in particular.  She was not assigned significant assignments by MDL leadership despite her attendance at almost every status conference and her promotion of Vioxx litigation in speaking engagements throughout the country.

---

[1] Ms. Snapka has joined Mr. Becnel's proffer of emails from a wide variety of plaintiff's lawyers strongly criticizing the trial work of counsel selected by MDL leadership.  While there is no need to embarrass particular lawyers, the emails are offered not for their truth, but as evidence of actual timely criticism of Vioxx lawyers' work.  FAC offered nothing at all that criticized any facet of Ms. Snapka's Vioxx efforts, prior to the FAC Response.

Tellingly, Ms. Snapka did express a firm desire to participate in the preemption motion that targeted one of her clients. The FAC Response turns that against her, arguing that this request was both an example of her selfishness and somehow detrimental to the common cause. This accusation is flatly contradicted by the evidence. Ms. Snapka testified at this hearing about the cooperative effort to defeat the preemption motion, and no contrary evidence was produced by FAC. Moreover, Mr. Levin described the preemption effort, during Ms. Snapka's December 3, 2008, appearance before FAC, in this way: "Collectively, we did it." Snapka transcript, Snapka Exhibit 14 at pps. 16-17 of the transcript. This is a far cry from the accusatory conclusion in the FAC Response that Ms. Snapka was non-cooperative and went her own way.

Similarly, the FAC Response demeans Ms. Snapka's efforts to obtain the *Garza* remand and uses her effort as another alleged event of selfish non-cooperation. But for that perseverance, the plaintiffs would have had one fewer of the very few plaintiff's verdicts in this litigation. This is what Mr. Birchfield and Mr. Herman said of her effort during Ms. Snapka's appearance before FAC:

> MR. BIRCHFIELD: Just so you know, Kathy, we just met with Joe Escobedo, and Russ outlined for him your tremendous effort, the effort that both of y'all made in getting that case remanded. Joe took us through the timeline of the incredible struggle, the timeline of getting that case remanded and getting it sent back. Let me tell you what Russ said to Joe. I mean your effort in getting that case back was spectacular. You dogged it all the way.

> MR. HERMAN: I thought you were tenacious, persistent, and without you pushing that at every PSC meeting and every status conference, that case might still be lingering now.

*Id.* at 10-11

This praise of Ms. Snapka's work on the *Garza* remand morphed in the FAC Response into a part of FAC's attempt to paint her in an unfavorable light. This is yet another objective demonstration that the facts of Ms. Snapka's contribution overwhelm the unsubstantiated and unfair conclusory charges of the FAC Response that Ms. Snapka was little more than a pest.

15

FAC's attack on Ms. Snapka's alleged "empty ethics challenges" similarly demonstrates a clear effort create an unfair and unsubstantiated impression of Ms. Snapka's character. Ms. Snapka, for example, was concerned about the MSA provision that she believed required an attorney to recommend the settlement to all clients. She engaged an ethics expert to review the provision. Ms. Snapka has made every effort to deal with disagreement professionally. Ms. Snapka, herself, raised this "ethics challenge" during her transcribed appearance before FAC. Some FAC members clearly expressed their confidence in the ethical validity of the MSA provision as initially written. This, however, is what was said at the conclusion of that discussion:

> Mr. HERMAN: After the various points were expressed, it not only had a good effect and a better understanding for Texas, but also for the country. Because there were other folks from other states that were looking for a way to criticize, and they had sort of latched onto this issue. When it was resolved and the document was fully understood, it went away for everybody.

> MS. SNAPKA: And I know I wasn't popular. I understand that.

> MR. LEVIN: You were never not popular.

> MR. SEEGER: I hope we're not leaving you with that impression, but you were very helpful.

*Id.* at pps 23-24 (For the full discussion on this issue *see Id.* at pps 19-26.)

The FAC Response also erroneously attempts to use Ms. Snapka's concerns about the "Stratton matter" as "feigned." Ms. Snapka does have concerns about the Stratton matter.

The Court, as mentioned above, has ordered that the Stratton matter is not a part of this proceeding, and is an issue that the Court will address. Comments here are limited to responding to the FAC's attempt to use the Stratton matter against her in this allocation proceeding. Ms. Snapka did, as was her right, object to an 8% assessment, because as a matter of contract she holds the belief that her assessment should have been limited in accordance with the FPO she signed. She understands she was one of 60 or so persons who objected and Michael Stratton was

appointed as Liaison counsel for those objectors. Apparently and without ever discussing the matter with her, Mr. Stratton reached an agreement with Mr. Herman, Mr. Birchfield and Mr. Seeger.

The details of that agreement are still very unclear. Ms. Snapka was sent checks by Mr. Stratton that she did not cash, because of her concerns about the agreement. The fact that she did not cash the checks was disclosed to FAC in Ms. Snapka's February 4, 2011 objection to the FAC final allocation. The FAC Response is again factually mistaken in implying that she first raised the issue in open court. Despite this disclosure, the FAC Response mistakenly asserts that Ms. Snapka only paid a 4% assessment. She has actually had 8% of fees held back.

Among Ms. Snapka's concerns about the Stratton matter was the apparent absence of a Court order authorizing the transfer of more than $18 million dollars of the funds held in escrow for the common benefit. Ms. Snapka anticipated that, when FAC released its "final recommendation," some accounting of the $18 million transfer would occur. When that did not happen, Ms. Snapka did appear before the Court to inquire about whether the Court had approved the transfer. Her intent was to pursue her concerns about the Stratton matter prudently, and she has made every effort to do so. The FAC Response, again, mistakenly chose to attribute ill-motive to her legitimate concerns about the Stratton matter. The Stratton matter, however, whenever it fully disclosed, explained and resolved, can not be a legitimate basis for reducing Ms. Snapka's fee allocation and FAC has clearly done that. First, FAC has mistakenly said Ms. Snapka only paid a 4% assessment on her case.

Secondly, FAC uses Ms. Snapka's inquiry of the Court as the centerpiece of its unsupported effort to caricature Ms. Snapka as a complainer rather than address the merits of her claim for a larger percentage of the common benefit funds that more accurately reflects her contribution to the creation of that fund.

**IV.    Applying the Fee Allocation Guidelines Set by This Court FAC Significantly Undervalued Ms. Snapka's Proportionate Contribution to the Common Benefit**

This Court has described the common benefit fund of $315,250,000 as a "pie," and the fee allocation process as the means of fairly determining the size of each fee applicant's "slice of the pie." Each 1% slice of the pie is $3,152,000. Ms. Snapka's pie sliver is $75,000 or less than 0.024% of the common benefit fund. Ms. Snapka's role in the *Garza* trial alone compels a substantial increase in her slice of the pie.

The Court set guidelines for slicing the pie, in a series of orders and statements. Among those guidelines, the Court has noted the particular importance of trials and work on reaching the global settlement. Pre Trial Order 6(D) states: "The over-arching guideline that the Allocation Committee is to consider is the contribution of each common benefit attorney to the outcome of the litigation." Pre Trial Order No. 6 at p.2. The Court directed that FAC "should look to general fee jurisprudence to identify the factors that should be applied in making fee allocations." *Id.* The Court specifically held that the *Johnson* factors should be considered. *Id.* FAC was instructed to "implement additional processes to provide appropriate deliberative fairness to those participating attorneys." *Id.* at 3. The Court listed specific factors that fee applicants should focus on in preparing their application affidavits that were each limited to three pages. *Id.* At 4-5. The Court held that FAC had the right to request a fee applicant "to answer questions or concerns addressing the reasons, grounds and explanations of that participating attorney's entitlement to common benefit fees and reimbursement of expenses." *Id.* at 6.

The Court ordered the accounting firm of Wegman-Dazet to "prioritize the calculation of the separate percentage applicable to common benefit tasks so that the proper deduction can be made from each claimant's share of the settlement." *Id.* at 7.

Ms. Snapka followed these guidelines as they applied to her.  She limited her submissions to work, time and costs that "contributed to the outcome of the litigation."  She responded to all questions posed by FAC in the presence of a court reporter.  FAC did not advise her of concerns about her submissions nor did it criticize her work, her cooperation or her character.  Her time and costs were approved by Wegman-Dazet.

The critique of Ms. Snapka in the FAC Response was addressed item by item by Ms. Snapka in the questioning of Mr. Birchfield who spoke for FAC at the March 6, 2011 deposition, and in Ms. Snapka's testimony during the hearing held before the Special Master.  FAC was provided the opportunity to testify in response to Ms. Snapka's evidence, but failed to respond.

Ms. Snapka has been subject to multiple levels of scrutiny and her significant contributions to the common benefit have been tested and proven.  FAC's one effort to assail Ms. Snapka – the FAC Response – is fraught with unquestionable mistakes and abandoned accusations.   The FAC Response is primarily a document based on conclusory statements attempting to make the irrelevant and unsubstantiated claim that Ms. Snapka should be penalized because she raised concerns with which FAC did not agree.

Required to evaluate her own contribution in dollars and in a vacuum, Ms. Snapka first explained that her ability to do that is impossible given the limited information provided her, and, second, forced to assign a value to her work she has used $12 million.[2]  FAC has held this number against her.

---

[2] The FAC allocation process is challenged on many grounds in other papers.  These positions will not be repeated here as they are of record.  The lack of transparency, however, must be mentioned here.  The production of a large volume of material does not equal transparency.  Transparency, at a minimum, should include at least the disclosure of FAC's basic methodology.  General reference to a point system that the evidence proves has been abandoned altogether is not a description of a methodology.  Keeping hidden side-agreements like the VLC agreement and the Stratton agreement is not transparency.  Negotiating deals with some, but not all applicants is not transparency.  These are examples only.  These examples, however, demonstrate the impossible task that Ms. Snapka is in stating what her specific proportionate share of "the pie" should be.  Without a clearly articulated methodology uniformly applied to all applicant recommendations, the recommendations are just numbers arrived at arbitrarily and capriciously in the secret "deliberations" or secret "negotiations."

In fact, Ms. Snapka, ignoring all her other contributions, was an important part of a team that earned a plaintiff verdict at an important stage of this litigation.  The value she reluctantly set out as her own recommendation represents less than a 4% slice of the common benefit pie. The allocation assigned to her should be fair and based on guidelines uniformly applied to all.  It is clear that the $75,000 recommended by FAC grossly undervalues her proportioned contribution to the common benefit and is on its face arbitrary and capricious.

BEIRNE, MAYNARD & PARSONS, L.L.P.


    /s/ Jack E. Urquhart
Jack E. Urquhart
State Bar No. 20415600
1300 Post Oak Blvd., Suite 2400
Houston, Texas 77056
Telephone:  (713) 871-6760
Facsimile:  (713) 960-1527

**ATTORNEYS FOR PLAINTIFF**
**KATHRYN SNAPKA**

## CERTIFICATE OF SERVICE

I hereby certify that the above and forgoing document has been served upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, and that the foregoing was electronically filed with the Clerk of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system, which will send a Notice of Electronic Filing, and that the forgoing was sent via email to:

Russ Herman, rherman@hhkc.com

Andy Birchfield, andy.birchfield@beasleyallen.com

Special Master Patrick Juneau, PAJ@juneaudavid.com

This 27th day of May, 2011.

_/s/ Jack E. Urquhart_____
Jack E. Urquhart