# EXHIBIT A





COMMONWEALTH OF KENTUCKY
FRANKLIN CIRCUIT COURT
DIVISION I
CIVIL ACTION NO. 09-CI-1671

**COMMONWEALTH OF KENTUCKY, EX REL.**  **PLAINTIFF**
**JACK CONWAY, ATTORNEY GENERAL**

v.

**MERCK & CO., INC.**  **DEFENDANT**

SERVE:  C T CORPORATION SYSTEM
4169 WESTPORT ROAD
LOUISVILLE, KY 40207
Registered Agent

\*\*\* \*\*\* \*\*\* \*\*\* \*\*\* \*\*\* \*\*\* \*\*\*

## COMPLAINT

Comes the Plaintiff, Commonwealth of Kentucky ex rel. Attorney General Jack Conway, and brings this cause of action for violation of the Kentucky Consumer Protection Act and seeks injunctive relief, civil penalties and other equitable relief against the Defendant, MERCK & CO., INC., a New Jersey corporation (hereinafter referred to as "Merck") and further states as follows:

WCSR
OCT 0 1 2009
RECEIVED

1

M01 43000001

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this action pursuant to KRS 367.190 and over Merck pursuant to KRS 454.210. Venue in this Court is proper under KRS 367.190.

2. At all times material to this complaint, Merck transacted business within the Commonwealth of Kentucky and in Franklin County by advertising, soliciting, selling, promoting and distributing prescription drugs, including Vioxx®, to health care providers, pharmacies and ultimately consumers in the Commonwealth of Kentucky.

## PARTIES

3. Plaintiff, the Commonwealth of Kentucky, *ex rel.* Attorney General Jack Conway, brings this action pursuant to the authority granted under the Consumer Protection Act KRS 367.110 *et seq.*

4. Merck is a global pharmaceutical company incorporated under the laws and statutes of the State of New Jersey with its principal place of business being One Merck Drive, WS3 AB-05, Whitehouse Station, New Jersey. Merck is licensed to and does conduct business in the Commonwealth of Kentucky.

## BACKGROUND

5. Vioxx® is the brand name of rofecoxib, a nonsteroidal anti-inflammatory drug ("NSAID") used in the treatment of arthritis and other acute pain.

6. At all times relevant herein, Merck tested, marketed, distributed, promoted and sold Vioxx®.

2

7. Most NSAIDs, such as aspirin, ibuprofen, and naproxen, function by inhibiting two enzymes: cyclooxygenase-1 ("COX-1"), which is associated with the maintenance of gastrointestinal ("GI") mucus and platelet aggregation, and cyclooxygenase-2 ("COX-2"), which is associated with the response to pain and inflammation. The inhibition of COX-1 leads to harmful GI side effects.

8. Because Vioxx® was designed to suppress COX-2 without affecting COX-1, Merck marketed Vioxx® as possessing the beneficial effects of traditional NSAIDs, but without the harmful GI side effects associated with those drugs. Merck repeatedly touted the safety profile, sales, and commercial prospects of the drug in press releases, public statements, and marketing materials throughout the time Vioxx® was on the market.

9. Prior to the FDA's approval of Vioxx®, officials at Merck were aware that Vioxx® could cause harmful cardiovascular events, such as heart attacks. In 1998, an unpublished internal Merck clinical trial entitled Study 090 revealed that Vioxx® caused a greater incidence of cardiovascular events than a placebo or a different arthritis drug.

10. In January 1999, Merck commenced the Vioxx® Gastrointestinal Outcomes Research ("VIGOR") study, which compared Vioxx® to naproxen, the active ingredient in brand-name pain relievers such as Aleve and Naprosyn. Although the study showed that Vioxx® had a GI safety profile superior to that of naproxen, it also showed that Vioxx® users had a higher incidence of cardiovascular events than naproxen users.

11. In January 1999, before the approval and launch of Vioxx®, Merck's marketing division conceived the ADVANTAGE clinical trial. Physician-investigators, participants, and institutional review board members were told that the purpose of the ADVANTAGE trial was to measure the gastrointestinal safety of Vioxx®.

3

12. Merck's actual goal of ADVANTAGE appears to have been for investigators to gain experience with Vioxx® prior to and during the critical launch phase in order to seed the industry with the use of Vioxx® in lieu of other treatments or drugs.

13. Merck began marketing Vioxx® in May of 1999 with an aggressive and deceptive promotional campaign directed at both consumers and health care professionals. This campaign included a concerted effort to obtain approval for both public and private drug plans or formularies across the United States.

14. On May 21, 1999, Merck issued a press release which announced that the United States Food and Drug Administration (FDA) had approved Vioxx® for the relief of osteoarthritis, menstrual pain, and other forms of acute pain. The press release included a list of common side effects, but failed to include any reference to cardiovascular side effects.

15. Merck was aware of the potential for dangerous cardiovascular side effects associated with Vioxx® through internal studies including Study 090 which was conducted in 1998. The results of Study 090 were not disclosed to the FDA or the public at the time of the product launch. Study 090 concluded that Vioxx® users were six times more likely to suffer severe cardiovascular events than Non-Vioxx® users.

16. In a March 9, 2000 email, Edward Scolnick, then President of Merck Research Laboratories, acknowledged the existence of cardiovascular events, commenting, "it is a shame but it is a low incidence and it is mechanism based as we worried it was."

17. In a press release on March 27, 2000, Merck emphasized Vioxx®'s superior GI safety profile but explained away the results of the VIGOR study:

> "[S]ignificantly fewer thromboembolic events were observed in patients taking naproxen in this GI outcomes study, which is consistent with

4

> naproxen's ability to block platelet aggregation. This effect on these events had not been observed previously in any clinical studies for naproxen. Vioxx®, like all COX-2 selective medicines, does not block platelet aggregation and therefore would not be expected to have similar effects." -Merck Press Release Dated March 27, 2000

and

> "[a]n extensive review of safety data from all other completed and ongoing clinical trials, as well as the post-marketing experience with Vioxx®, showed no indication of a difference in the incidence of thromboembolic events between Vioxx®, placebo and comparator NSAIDs." -Merck Press Release Dated March 27, 2000

18. The VIGOR study results were widely reported in the press, medical journals, and marketing materials distributed by Merck. To the extent that VIGOR results showed cardiovascular events could be a side effect of Vioxx®, Merck undertook an effort to explain away the results by attributing the findings to the beneficial effects of naproxen's blocking of platelet aggregation rather than to the harmful effects of Vioxx® in causing thromboembolic events. Through other tests, studies and trials, Merck already knew that Vioxx® presented additional dangerous cardiovascular side effects.

19. On February 8, 2001, the FDA's Arthritis Advisory Committee ("AAC") held a public hearing to consider Merck's request to include the positive GI results from the VIGOR study in its Vioxx® labeling. During the AAC hearing, Alise Reicin, Executive Director of Clinical Research at Merck Research Laboratories, explained to the panel, "when you review the results of VIGOR in isolation you don't know whether the imbalance of cardiovascular events was caused by a decrease in events on a platelet-inhibiting NSAID, naproxen, or an increase in events on a COX-2 selective inhibitor." She suggested that naproxen was likely responsible for the difference in cardiovascular events observed in users of the two drugs.

5

MO143U000

20. Numerous additional press releases were issued by Merck in order to further promote and market Vioxx®. None of the press releases sufficiently referenced the adverse cardiovascular events that Merck knew of or made reference to internal study 090.

21. When promoting Vioxx® directly to consumers and health care professionals, Merck materially misrepresented the cardiovascular safety of Vioxx®.

22. Merck also misstated, overstated or exaggerated the efficacy of Vioxx® in comparison to similar medications.

23. Merck utilized internal studies, including but not limited to the VIGOR and ADVANTAGE studies, to further promote and support its representations made in regard to Vioxx®.

24. The ADVANTAGE study was designed to appear as if it answered scientific questions, but was designed by the marketing division to fulfill marketing objectives.

25. In addition to the above actions undertaken by Merck, Merck also engaged in an elaborate scheme to create or publish scholarly articles under fake or ghost authors in order to further develop support for Vioxx®. These articles appeared in medical journals and other industry publications including the Journal of the American Medical Association.

26. Merck's representations that Vioxx® was a safer alternative to traditional NSAIDS was false in that Vioxx® also posed a risk of ulcers and gastrointestinal side effects. More importantly, Vioxx® produced a high rate of cardiovascular events including heart attacks and strokes.

27. For over five years Merck continued to market and promote Vioxx® within the Commonwealth of Kentucky without adequately disclosing the dangerous side effects and true comparative safety profile.

28. For the entire period of time Vioxx® was on the market, Merck's advertisements and promotional activities misrepresented Vioxx®'s cardiovascular safety and failed to include information then known to Merck.

6

29. All practices, acts, and omissions alleged herein were committed by Merck's officers, directors, employees, or agents who at all times acted on behalf of Merck and whose practices, acts, or omissions were authorized or ratified by Merck.

30. All practices, acts, and omissions alleged herein were committed within the applicable statute of limitations.

## VIOLATIONS OF THE KENTUCKY CONSUMER PROTECTION ACT

31. Each of the aforementioned allegations are hereby incorporated by reference as if fully restated herein.

32. KRS 367.170 prohibits unfair, false, misleading or deceptive acts or practices in trade or commerce.

33. As set forth above, Merck has engaged in representations and omissions which are material, and which have the tendency or capacity, or which are likely, to mislead prescribers, purchasers and recipients of Vioxx.

34. Merck has willfully engaged in acts and practices which are unfair, false, misleading and/or deceptive and has committed acts or practices in trade or commerce in violation of KRS 367.170.

WHEREFORE, Plaintiff, Commonwealth of Kentucky, *ex rel.* Attorney General Jack Conway, respectfully request the following:

    A. For the entry of a judgment against the Defendant, Merck, finding that it committed repeated violations of KRS 367.170;

7

B. For an Order permanently enjoining Merck from further acts in violation of KRS 367.170;

C. For an award of civil penalties in the amount of two thousand dollars ($2,000) for each violation of KRS 367.170, and ten thousand dollars ($10,000) for each violation targeted to consumers over the age of 65, pursuant to KRS 367.990;

D. For an award reasonable attorney's fees and costs to Plaintiff;

E. For a trial by jury; and

F. For any and all such other relief as this Honorable Court deems just and proper.

Respectfully submitted,

JACK CONWAY
ATTORNEY GENERAL

*[signature]*

**TAD THOMAS**
**Assistant Deputy Attorney General**
Office of Attorney General
700 Capitol Avenue, Suite 118
Frankfort, Kentucky 40601

**TODD E. LEATHERMAN**
**MARYELLEN B. MYNEAR**
**ELIZABETH UNGAR NATTER**
**Office of Consumer Protection**
Office of the Attorney General
1024 Capital Center Dr., Suite 200
Frankfort, KY 40601

MU1430000