**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

|  |  |  |
|---|---|---|
|  | : | **MDL NO. 1657** |
| **IN RE: VIOXX** | : |  |
| **PRODUCTS LIABILITY LITIGATION** | : | **SECTION:  L** |
|  | : |  |
|  | : | **JUDGE FALLON** |
|  | : |  |
|  | : | **MAG. JUDGE KNOWLES** |

.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. :

**THIS DOCUMENT RELATES TO ALL CASES**


**ORDER & REASONS**

  The Court has previously determined the value of the common benefit work in the Vioxx

MDL and associated state litigations which produced the global settlement of November 9, 2007.

*In re Vioxx Prods. Liab. Litig.*,760 F. Supp. 2d 640 (E.D. La. 2010) ("October 19, 2010 Order

and Reasons").  The value was fixed at 6.5% of the $4.85 billion settlement amount for a total of

Three Hundred and Fifteen Million, Two Hundred and Fifty Thousand Dollars

($315,250,000.00).  Now, the Court must allocate those common benefit attorneys' fees among

the attorneys who did the work which produced this settlement.  This allocation is in addition to

common benefit costs, which have already been distributed.

**I. FACTUAL BACKGROUND**

  To put this matter in perspective, a brief review of this litigation is appropriate.

**A. Vioxx Litigation and Settlement**

  This multidistrict products liability litigation involves the prescription drug Vioxx,

known generically as Rofecoxib.  Merck, a New Jersey corporation, researched, designed,

manufactured, marketed, and distributed Vioxx to relieve pain and inflammation resulting from osteoarthritis, rheumatoid arthritis, menstrual pain, and migraine headaches. On May 20, 1999, the Food and Drug Administration approved Vioxx for sale in the United States. Vioxx remained publicly available until September 20, 2004, when Merck withdrew it from the market after data from a clinical trial known as APPROVe indicated that the use of Vioxx increased the risk of cardiovascular thrombotic events such as myocardial infarction (heart attack) and ischemic stroke. Thereafter, thousands of individual lawsuits and numerous class actions were filed against Merck in state and federal courts throughout the country alleging various products liability, tort, fraud, and warranty claims. It is estimated that 105 million prescriptions for Vioxx were written in the United States between May 20, 1999 and September 30, 2004. Based on this estimate, it is thought that approximately 20 million patients have taken Vioxx in the United States.[1]

California was the first state to institute a consolidated state court proceeding on October 30, 2002. New Jersey and Texas soon followed suit, on May 20, 2003 and September 6, 2005, respectively. On February 16, 2005, the Judicial Panel on Multidistrict Litigation ("MDL") conferred MDL status on Vioxx lawsuits filed in various federal courts throughout the country and transferred all such cases to this Court to coordinate discovery and to consolidate pretrial matters pursuant to 28 U.S.C. § 1407. *See In re Vioxx Prods. Liab. Litig.*, 360 F. Supp. 2d 1352 (J.P.M.L. 2005). Even after the creation of this federal MDL, many cases remained pending in the various state courts, particularly the courts in California, New Jersey, and Texas. It is

---

[1]For a more detailed factual background describing the events that took place before the inception of this multidistrict litigation, see *In re Vioxx Prods. Liab. Litig.*, 401 F. Supp. 2d 565 (E.D. La. 2005) (resolving *Daubert* challenges to a number of expert witnesses).

estimated that the census of the litigation totaled over 50,000 claims.

On March 18, 2005, this Court held the first status conference in the Vioxx MDL to discuss procedures for moving this matter forward. Shortly thereafter, the Court appointed steering committees of counsel to represent the parties. In addition, the Court announced at monthly meetings that any attorney who was not appointed but who wished to do common benefit work on behalf of Vioxx claimants could do so by joining a subcommittee. The Plaintiffs' Steering Committee ("PSC") was encouraged to establish subcommittees and include non-PSC members on these subcommittees.[2]

Furthermore, to give transparency to this litigation, the Court created a web site accessible to all counsel and the public at large. All motions, Court orders, opinions, recent developments, a calendar of scheduled events, transcripts of hearings, and various other matters were posted on this web site.[3] Throughout the litigation monthly status conferences were held in open court. Notice of the meetings were posted on the web site and were open to all. The Court established a call-in number for those unable to attend in person, and also posted transcripts of the conferences on its web site.

Discovery rapidly commenced. The common benefit attorneys were responsible for all aspects of pre-trial preparation, including document discovery, the taking of depositions, preparation of experts, motions practice, and to some extent, coordination of federal and state court proceedings. Over nine million documents were discovered and collated. Thousands of

---

[2]The various consolidated state court proceedings also established similar management structures to coordinate the litigation.

[3]*MDL-1657 Vioxx Products Liability Litigation*, http://vioxx.laed.uscourts.gov/.

-3-

depositions were taken and at least 1,000 discovery motions were argued to the Court.  After a reasonable period for discovery, the Court assisted the parties in selecting and preparing certain test cases for bellwether trials.  Additionally, a number of similar trials were scheduled in state courts.

This Court conducted six Vioxx bellwether trials.[4]  The first of the bellwether trials took place in Houston, Texas, while this Court was displaced following Hurricane Katrina.  The five subsequent bellwether trials took place in New Orleans, Louisiana.  Only one of the trials resulted in a verdict for the plaintiff.  Of the five remaining trials, one resulted in a hung jury and four resulted in verdicts for the defendant.  During the same period that this Court was conducting six bellwether trials, approximately thirteen additional Vioxx-related cases were tried before juries in the state courts of Texas, New Jersey, California, Alabama, Illinois, and Florida.

After extensive discovery, after the bellwether trials were completed, and after a number of trials were completed in state courts, this Court and courts from Texas, New Jersey, and California met in New Orleans with a representative of the Board of Merck, their attorneys, and representatives of the PSC.  The Judges suggested that it was an appropriate time to explore a global resolution of this litigation.[5]  Negotiating Plaintiffs' Counsel ("the NPC") were appointed

---

[4]*See Plunkett v. Merck & Co.*, No. 05-4046 (E.D. La. Filed Aug. 23, 2005) (comprising both the first and second bellwether trials, as the first trial resulted in a hung jury); *Barnett v. Merck & Co.*, No. 06-485 (E.D. La. Filed Jan. 31, 2006) (third bellwether trial); *Smith v. Merck & Co.*, No. 05-4379 (E.D. La. Filed Sept. 29, 2005) (fourth bellwether trial); *Mason v. Merck & Co.*, No. 06-0810 (E.D. La. Filed Feb. 16, 2006 (fifth bellwether trial); *Dedrick v. Merck & Co.*, No. 05-2524 (E.D. La. Filed June 21, 2005) (sixth bellwether trial).

[5]The Court once again expresses its thanks to Judge Carol E. Higbee of the Superior Court of New Jersey, Justice Victoria Chaney, formerly of the Superior Court of Los Angeles County in California and currently of the California State Court of Appeal, and Judge Randy Wilson of the 157th Civil District Court of Harris County, Texas for their efforts in bringing this

to explore and engage in settlement discussions with Merck. Counsel for Merck and the NPC met together more than fifty times and held several hundred telephone conferences. Although the parties met and negotiated independently, they kept this Court and the coordinate state courts of Texas, New Jersey, and California informed of their progress in settlement discussions.

On November 9, 2007, Merck and the NPC formally announced that they had reached a Settlement Agreement. *See* Settlement Agreement, *In re Vioxx Prods. Liab. Litig.*, MDL 1657 (E.D. La. Nov. 9, 2007) ("Settlement Agreement" or "MSA"), *available at* http://www.browngreer.com/vioxxsettlement. The private Settlement Agreement establishes a voluntary, opt-in pre-funded program for resolving pending or tolled state and federal Vioxx claims against Merck as of the date of the settlement, involving claims of heart attack ("MI"), ischemic stroke ("IS"), and sudden cardiac death ("SCD"), for an overall amount of $4.85 billion. *Id.* § "Recitals".[6] Merck retained a walk away right to terminate the Settlement Program and Agreement if fewer than 85% of eligible participants enrolled in the Program. *See generally* art. 11. The MSA was designed to provide a fair and efficient means to compensate claimants who could present objective evidence of Vioxx usage and an associated MI, IS, or SCD injury. Claimants enrolled in the Program by signing a release, which would be delivered to Merck once the claim was paid or the claimant had elected to pursue other avenues for the amicable resolution of their claims pursuant to the terms of the MSA. After enrolling, claimants or their

litigation to completion.

[6]For a more detailed factual background of the various mechanics of the Settlement Agreement, including the provisions for the mandatory resolution of governmental liens, *see In re Vioxx Prods. Liab. Litig.*, 2008 WL 3285912 (E.D. La. Aug. 7, 2008) (denying motions to enjoin disbursement of interim settlement payments).

primary attorneys gathered and submitted medical records to the Claims Administrator for processing and review, as set forth in the Agreement.  The deadlines for submitting records were extended several times.

Each claimant's records were assessed pursuant to three "Gates": Injury, Duration, and Proximity, which required the claimant to provide evidence of a qualifying MI, IS, or SCD injury; receipt of 30 Vioxx pills within a 60 day period prior to the injury; and use of those pills at a time close to the injury.  There were  multiple layers of review for eligibility, including initial review by the Claims Administrator, an opportunity to submit additional records, review by a Gates Committee consisting of counsel for claimants and counsel for Merck, and a further opportunity for Merck to include the claim in the Program.  If after that process a claim did not pass one of the Gates, the claimant could appeal to the Court-appointed Special Master for a final and binding review, or alternatively get off of the Settlement tracks and  resume their lawsuit by filing a Future Evidence Stipulation and proceeding to trial.  Claimants who qualified for the program were assigned points based on objective risk factors and the nature and extent of their injury, and were entitled to similar review of those calculations.  Thus, the Settlement Program included an exit opportunity and multiple layers of review to ensure that claims received ample process.

The Settlement Agreement expressly contemplates that this Court will oversee various aspects of the administration of settlement proceedings, including appointing a Fee Allocation Committee ("FAC"), allocating a percentage of the settlement proceeds to a Common Benefit Fund, approving a cost assessment, and modifying any provisions of the Settlement Agreement

that are otherwise unenforceable.[7]  This is consistent with the inherent duty of an MDL transferee court.  Accordingly, this Court has exercised its inherent authority over the MDL proceedings, *see* Manual for Complex Litigation (Fourth) §§ 10.224, 14.215-16, 14.231-.216 (2004), in coordination with its express authority under the terms of the Settlement Agreement to ensure that the settlement proceedings move forward in a uniform and efficient manner.[8]

On July 17, 2008, Merck formally announced that it was satisfied that the thresholds necessary to trigger funding of the Vioxx Settlement Program would be met.  *See Minute Entry, July 17, 2008*, Rec. Doc. 15362 (July 17, 2008).  Merck further advised that it intended to waive its walk-away privileges and that it would commence funding the Vioxx Settlement Program by depositing an initial sum of $500 million into the settlement fund, clearing the way for distribution of interim payments to eligible claimants.  *Id.*  Eventually some 99.9% of all eligible claimants enrolled in the program.

The Settlement Program proceeded at a very rapid rate and Merck made additional payments in order to ensure that the claimants would receive funds in a timely fashion.  Final

---

[7]*See, e.g.,* Settlement Agreement § 9.2.4 (establishing that the Court shall appoint a Fee Allocation Committee); § 9.2.5 (establishing that the Court shall "provide appropriate notices governing the procedure by which [it] shall determine the common benefit attorneys' fees and reimbursement of common benefit expenses"); § 16.4.2 (establishing that the Court may modify any provision of the Agreement under certain limited circumstances if the Court determines that the provision "is prohibited or unenforceable to any extent or in any particular context but in some modified form would be enforceable").

[8]*See e.g.*, Pretrial Order No. 32, Rec. Doc. 13007 (Nov. 20, 2007) (exercising the Court's "inherent authority over this multidistrict litigation" as well as its express authority under Paragraph 9.2.4 of the Settlement Agreement to appoint a Fee Allocation Committee; reserving the right to "issue subsequent Orders governing the procedure by which the Allocation Committee shall carry out its function"; and providing that members appointed to the committee may not be substituted by other attorneys "except with the prior approval of the Court").

payments to heart attack claimants were completed prior to October 14, 2009, final payments to stroke claimants were completed by June 14, 2010, and final extraordinary injury payments (i.e., payments to those who incurred or sustained extraordinary losses) were completed by June 29, 2010. Thus, in only 31 months, the parties to this MDL case were able to reach a global settlement and distribute Four Billion, Three Hundred and Fifty-three Million, One Hundred Fifty-two Thousand and Sixty-four Dollars ($4,353,152,064) to 32,886 claimants, out of a pool of 49,893 eligible and enrolled claimants. This efficiency is unprecedented in mass tort settlements of this size. It was due in large part to the ability, industry, and professionalism of the attorneys for both sides, the plan administrators, the lien administrators, the pro se curator, and the special masters.

**B.      Procedures for Performing and Documenting Common Benefit Work**

**1)      Pre-Settlement Procedures**

As previously mentioned, from the very beginning of this MDL, and before the Settlement Agreement was contemplated or announced, steps were taken to create a fair and open environment for all interested attorneys to perform work for the common benefit of the Vioxx plaintiffs and to create a transparent factual record for an eventual application for common benefit fees.

Thirteen members, including Plaintiffs' Liaison Counsel ("PLC"), were appointed to the PSC. Pretrial Order No. 6 (Apr. 8, 2005). Appointment of a supervising Plaintiffs' Steering Committee is necessary to create centralized leadership and control of litigation of this magnitude. But the Court, the plaintiffs, and the justice system in general also have an interest in broadening the range of attorney participation in MDL cases, lest the work be confined to a

specialized bar of MDL attorneys which would result in exclusivity, unfairness, and discrimination, and inure to the disadvantage of litigants and their attorneys. Therefore, as mentioned above, the Court authorized and encouraged the PSC to "organiz[e] subcommittees comprised of plaintiffs' attorneys not on the PSC and assign[] them tasks consistent with the duties of the PSC." Pretrial Order 6 (Apr. 8, 2005). All interested attorneys, including those in the state court litigations, were encouraged to coordinate with the PSC and to do work for the common benefit. Over one hundred firms or attorneys availed themselves of the opportunity to perform common benefit work.

To receive and vet records of the time spent and expenses incurred by attorneys performing common benefit work, the Court appointed a CPA, Phillip Garrett. *Id.* Those doing common benefit work and incurring common benefit expenses were ordered to report their hours and expenses contemporaneously to the Court-appointed CPA for review and reporting to the Court.[9] Time and Expense Guidelines were established to govern "all activities performed and expenses incurred by counsel that relate to matters common to all claimants in MDL 1657." *Id.* at 4.

Early in the litigation, the Court entered Pretrial Order No. 19, which established a Plaintiffs' Litigation Expense Fund to compensate and reimburse attorneys for services performed and expenses incurred for the common benefit. Pursuant to this Order, any case that was settled, compromised, dismissed, or otherwise reduced to judgment for monetary relief, with

---

[9]After the Settlement Program was announced, the Court issued PTO 6C, establishing procedures for submission of contemporaneous or reconstructed time records and expense reports by attorneys who did not litigate in the MDL but litigated in state court and participated in the Settlement Program.

or without trial, was subject to an assessment.  In order to avail themselves of the benefit of the

initial work of the common benefit attorneys, individual plaintiffs' counsel could, for a limited

time, enter into a contract that was to dictate the assessment amount.  The "Full Participation

Option," which was one such option, established an assessment of 2% of the recovery for fees

and 1% of the recovery for costs.  *See* Pretrial Order No. 19 (Aug. 4, 2005).  Counsel were able

to select the "Full Participation Option" within 90 days of the entry of Pretrial Order 19.

Following that period, counsel could accept a "Traditional Assessment Option" providing for 6%

assessment of recoveries in MDL cases and 4% assessment of recoveries in state court cases.

As mentioned above, the case then proceeded through a period of extensive discovery,

pretrial motions, *Daubert* hearings, six MDL bellwether trials, and over a dozen trials in state

court.  After several years, the settlement occurred.

### 2)    Post-Settlement Procedures

When consummated, the Settlement Agreement modified the landscape regarding

common benefit attorneys' fees for those interested in participating in the settlement.  The

Settlement Agreement provides for a common benefit fee assessment to create a common benefit

fund, to "be administered by the Honorable Eldon E. Fallon," and to be awarded "upon due

consideration by him in consultation with the Honorable Victoria G. Chaney, the Honorable

Carol E. Higbee, and the Honorable Randy Wilson, and in accordance with established Fifth

Circuit precedent."  *Id.* § 9.2.3.  Additionally, the Settlement Agreement states that this

contractual common benefit fee assessment supersedes the assessments provided for in Pretrial

Order No. 19.  *Id.* ("The maximum 8% attorneys' fee assessment shall supersede the assessment

provided to MDL common benefit attorneys pursuant to Pretrial Order No. 19.").  Those who

were not interested in participating in the settlement could proceed with their case and avail

themselves of the common benefit work for the original assessment set forth in PTO 19.

The Settlement Agreement also addressed procedures regarding how the common benefit

fund would be distributed, to which all parties to the Agreement consented.  The Settlement

Agreement called for appointment by the Court of a committee of plaintiffs' attorneys to

recommend an allocation of common benefit fees:

> The Honorable Eldon E. Fallon will be asked to appoint a committee of eight
> plaintiffs' counsel which shall include all members of the [Negotiating Plaintiffs'
> Committee] and two additional plaintiffs' attorneys to be responsible for
> recommending ... the allocation of awards of attorneys' fees from the Settlement
> Fee and Cost Account.  In making its recommendation, the "Allocation
> Committee" is to review the contemporaneous time records, or properly
> reconstructed time records and expense reports of all plaintiffs' counsel that
> request compensation for common benefit work, as audited by the CPA firm of
> Wegmann Dazet.  The Allocation Committee shall take into consideration the
> common benefit work of counsel in the MDL, and the work of counsel in the state
> litigations in Texas, California and New Jersey.  The Allocation Committee shall
> be guided by these objective measures of common benefit counsel's
> contributions, in addition to their subjective understanding of the relative
> contributions of counsel towards generating the Settlement Fund in accordance
> with established fee jurisprudence and subject to the approval of the Honorable
> Eldon E. Fallon in consultation with the Honorable Victoria G. Chaney, the
> Honorable Carol E. Higbee, and the Honorable Randy Wilson.

*Id.* at § 9.2.4.  The Settlement also stated that the Court "provide appropriate notices governing

the procedure by which [the Court] shall determine common benefit attorneys' fees ... including

Common Benefit Attorneys' joint submission of papers by the PLC requesting compensation for

their common benefit work .... [The Court] shall insure that there is ample opportunity for

objections and comments to the application and a notice of hearing regarding the same."  *Id.* at §

9.2.5.

The provisions of the Settlement Agreement correspond to the Court's inherent authority

to award common benefit attorneys' fees out of a limited fund created by the work of those attorneys, *see* October 19, 2010 Order and Reasons, 760 F. Supp. 2d at 647-49, and the Court's inherent authority to appoint a committee of plaintiffs' attorneys to recommend an allocation of common benefit fees, *see In re High Sulfur Content Gasoline Products Liability Litigation*, 517 F.3d 220, 227 (5th Cir. 2008) ("*High Sulfur I*").

The Court exercised its inherent authority as well as its express authority under the MSA by appointing nine members to a Fee Allocation Committee ("FAC"). *See* Pre-Trial Order No. 32 (Nov. 20, 2007). The FAC appointees were heavily involved in the MDL and in the associated state-court litigations and had firsthand knowledge of the nature and extent of the common benefit work which was done and who did it. The Court appointed to the FAC some attorneys who were not on the PSC; thus, the FAC was comprised of both "insiders" and "outsiders" to the MDL leadership, who could bring a wide perspective to assessing all work done for the common benefit both in the MDL and in state court. The makeup of the FAC was intended to provide a broad range of experience and opinions to ensure that an eventual recommended allocation would not over- or under-emphasize the contribution of any attorney in any venue with respect to any aspect of the litigation.

The FAC was charged first with obtaining supporting evidence from every attorney or firm who had performed common benefit work and sought an award of common benefit attorneys' fees. On September 15, 2008, the Court issued Pre-Trial Order 6D, setting forth procedures and guidelines for the FAC to follow in preparing an eventual recommended allocation. Pursuant to PTO 6D, "any attorney wishing to have their time considered for an allocation of any common benefit award" was directed to submit a three-page written affidavit to

the FAC articulating their contribution, with emphasis on factors including "substantial contribution to the outcome of the litigation," quality of work, "consistency quantum, duration, and intensity of ... commitment to the litigation," "level of partner participation," committee membership and leadership positions, the "jurisdiction in which non-MDL common benefit work occurred," "[a]ctivities surrounding trials of individual Vioxx claimants, including bellwether trials and non-MDL trials that impacted proceedings on a common benefit level," participation in ongoing work for the common benefit, involvement in Vioxx litigation prior to withdrawal of Vioxx from the market or the MDL, contribution to funding of the litigation, commitment to the litigation after adverse verdicts, and any other relevant factors.  Over one hundred firms or attorneys submitted common benefit time and costs to the Court-appointed CPA.  The FAC received almost twenty-four hundred pages of affidavits and supporting documentation, all of which were entered into the record of this proceeding.

Also pursuant to PTO 6D, the FAC conducted in-person, on-the-record meetings at which all interested common benefit submitters were invited to "appear and present the reasons, grounds and explanations for their entitlement to common benefit fees and reimbursement of expenses."  The FAC conducted hearings in the epicenters of Vioxx litigation in Atlantic City, New Jersey; New Orleans, Louisiana; Houston, Texas; and Los Angeles, California.  Over forty-five firms out of the more than one hundred firms or attorneys that applied for common benefit fees availed themselves of this opportunity, and the hearings produced over eighteen hundred pages of transcripts from the common benefit fee applicants.

Finally, pursuant to PTO 6D and the MSA, the PLC moved on January 20, 2009 for a common benefit fee award of 8% of the $4.85 billion settlement amount.  The PLC's motion was

posted on the Court's website and on April 17, 2009, the Court invited any interested party to file a Notice of Objection on or before May 8, 2009. After receiving numerous objections, the Court concluded that it was appropriate to appoint a Liaison Counsel for the Common Benefit Fee Application Objectors ("Percentage-Fee Objectors"). Michael Stratton was selected by the Percentage-Fee Objectors for this role. *See* Pretrial Order No. 52 (Sept. 30, 2009). Thereafter, numerous status conferences were convened, discovery was taken, briefing was submitted, and arguments were heard. As a result of that process, the Objectors withdrew their objections and the PLC reduced its request to a common benefit fee award of 7.5% .

The PLC's renewed motion was heard in open court. After the hearing, the motion was taken under submission and on October 19, 2010, the Court issued an Order and Reasons setting the amount of common benefit fees to be awarded and allocated between attorneys who did common benefit work in the MDL and coordinated state litigations. October 19, 2010 Order and Reasons, 760 F. Supp. 2d 640. In fixing the common benefit fee, the Court analyzed the applicable law and concluded that a blended percentage approach to determining common benefit attorney's fees was appropriate. *Id.* at 650-52. After a thorough review of the common benefit fee awards and set-asides in comparable MDLs and consideration of the *Johnson* factors as required by the Fifth Circuit, the Court determined that 6.5% of the settlement amount was appropriate compensation for the common benefit work done in this case. *See id.* at 652-58. Thus a common benefit award of 6.5% of the total settlement, or a sum of $315,250,000.00, was rendered. *See id.* at 658. The common benefit fee is to come from the attorneys' fees of primary counsel and is not an additional fee borne by the litigants. *Id.* at 655.

To test the validity of this common benefit award, a rough lodestar cross-check was

-14-

conducted.  *See id.* at 658-62.  Without delving extensively into individual time submissions, the

Court used the submitted time *in globo*, to verify that a 6.5% award was not excessive or

windfall compensation for the common benefit work actually done in the Vioxx litigation.  The

Court took the sum total of hours submitted to and vetted by Philip Garrett, the Court-appointed

CPA, and multiplied those hours by the average of attorneys' actual billing rates to generate a

time-fee value of the common benefit work of approximately $249,546,751.20.  *See id.* at 659-

61.  Comparing the two values (*i.e.*, $315,250,000.00 and $249,546,751.20), it is apparent that

the 6.5% figure represented only a 1.2633 multiplier over the time-fee value of the common

benefit work, a multiplier that was within the range supported by the legal literature and the case

law.[10]  *See id.* at 661-62.  Accordingly, the rough lodestar cross-check supported the percentage

award fixed by the Court, consistent with percentage awards in other cases.  But it bears

repeating that the common benefit award of $315,250,000.00 was a percentage award supported

by a lodestar value, and not generated in the first instance by the time-fee value.  For the purpose

of performing this cross-check, the Court did not closely scrutinize the hours involved or make

any finding as to the amount of the common benefit fee to which anyone who submitted those

hours would be entitled, and expressly stated that use of the aggregate of submitted hours did

"not preclude the [FAC] or the Court from disallowing any particular submissions of common

benefit time when allocating the common benefit fee award."  *See id.* at 660-61 & n.22.  Nor

---

[10]The Court cited several studies of percentage fee awards and lodestar multipliers in class action cases, as well as prior opinions assessing lodestar multipliers.  *See* Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements:  An Empirical Study*, 1 J. Empirical Legal Stud. 27, 31-32 (2004) ("Eisenberg & Miller 2004"); Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Stud. 248 (2010) ("Eisenberg & Miller 2010"); *Turner v. Murphy Oil*, 472 F. Supp. 2d 830, 862-63 (E.D. La. 2007).

does it prohibit the Court from prioritizing certain common benefit work when dividing the fund among the applicants.

In the October 19, 2010 Order and Reasons, the Court also reiterated and elaborated on the procedure by which it would allocate that total award of common benefit fees.  *See id.* at 662. Under this Order, the FAC would first prepare a suggested distribution in accordance with the Court's announced guidelines and based on the affidavits and testimony gathered by the FAC as well as the FAC members' personal experience with the litigation.  If disputes regarding that suggested allocation arose, the Court would appoint a Special Master to take additional evidence, if necessary, and to evaluate the disputed recommendation.  Thereafter, the Special Master would submit a second impartial report to the Court, and the Court would make the ultimate determination based on the FAC's recommendation, the objections, the special master's impartial report, and all the evidence proffered during those proceedings, as well as the Court's own experience with the litigation.

Shortly after issuance of the October 19, 2010 Order and Reasons, the FAC informed the Court that it was preparing its proposed recommendation as to how the total amount should be allocated, pursuant to the Court's Orders and guidance.  The Court met with the FAC  and suggested that it consider devising objective categories for types of work done for common benefit, based on the relative significance of that work in bringing about the ultimate successful resolution of this litigation.  Even if all of the approved hours logged by the plaintiffs' attorneys who performed common benefit work were helpful, clearly some of the work performed was more helpful and deserves greater compensation.

The FAC proposed a preliminary, "penciled-in" recommended allocation, based on its

personal experience with the litigation, the record, and the Court's guidelines. To arrive at this recommendation, the FAC developed its own objective criteria by breaking down each common benefit fee applicant's contribution to the work categories of Key Leadership Roles, Trials, Settlement, Law & Briefing, Settlement Implementation/Post-Settlement Matters, Discovery/Science, Committee Leadership and Participation, Funding, and Case Management. The FAC assigned a maximum point value to each category based on its relative importance in the litigation and then assigned individual point values to attorneys for their work done in that category. These amounts were then totaled and adjusted pursuant to the *Johnson* factors for a "rough cut" on a preliminary evaluation. This method allowed the FAC to break down the applicants' relative contributions in different areas of the litigation and to compare, for example, trial work to trial work and discovery work to discovery work.

PTO 6D required the FAC to "provide each participating attorney notice of the Committee's Recommendation as it pertains to the participating attorney." Pursuant to PTO 6D, each applicant had fourteen days to submit to the FAC a written objection to that preliminary recommendation before the FAC submitted its final proposed recommendation to the Court. The purpose of this notice and period for response was to elicit prompt feedback so that the FAC could consider and, if appropriate, revise its tentative allocation on the basis of that input before providing the final proposed recommendation to the Court. Some attorneys expressed misplaced concern that objecting or failing to object would have some preclusive effect on the amount that they might eventually receive. The Court explained on its website that "No attorney will be prohibited in any way from objecting to the Committee's final recommendation on the basis of their response to notice of the preliminary allocation."

The FAC received objections, considered them, and in many cases adjusted its penciled-in recommended allocation. Thus, the preliminary notice mandated by PTO 6D served its purpose. On January 20, 2011 the Court received the FAC's final proposed recommendation and posted it on its website for both the attorneys and the public at large to see. The Court ordered any objections to any recommended allocation to be filed by February 4, 2011.

Eighteen firms or attorneys objected.[11] Because of the number of objectors, it was necessary to designate representatives for the Objectors and representatives of the FAC to coordinate discovery and briefing relevant to all fee objectors and applicants. Accordingly, the Court ordered the Objectors and the FAC to meet and confer separately and to select attorneys to serve as Lead and Liaison Counsel for each group. The Objectors and the FAC each unanimously selected Lead and Liaison Counsel who were appointed to those roles.

### 3)      Proceedings Before the Special Master

As presaged by the October 19, 2010 Order and Reasons, given the nature and number of objections the Court appointed Patrick Juneau as Special Master pursuant to Federal Rule of Civil Procedure 53 and assigned him a number of duties. (Rec. Doc. 62606). Special Master Juneau was authorized to "conduct interviews, review any relevant documents, oversee discovery, and then ... submit a written recommendation of the amount every common benefit fee applicant should receive." *Id.* at 2-3. This was to serve as a second review conducted by someone who had no financial interest in the litigation.

The Special Master received extensive briefing from the Objectors and the FAC

---

[11]Sheller, P.C. sought and obtained leave to file a late objection. (Rec. Docs. 62657, 62669).

regarding the scope of discovery into the substantive basis of the FAC's recommended allocation as well as their methodology.  On March 31, 2011, Special Master Juneau ruled on those motions and issued a Report and Scheduling Order.  (Rec. Doc. 62735).  The Special Master noted the extensive discovery that had been made available to the Objectors, including extensive meetings with the Court-appointed CPA and access to submitted time records.  The Special Master denied some additional discovery, permitted the Objectors to depose a representative of the FAC, and scheduled a week-long evidentiary hearing at which all Objectors would be entitled to testify before the Special Master and to question a FAC representative as well as the Court-appointed CPA.  Objectors' Counsel appealed the Special Master's Report and Scheduling Order, and the Court affirmed the Special Master in all respects.  (Rec. Doc. 62883).

On May 6, 2011, pursuant to the Special Master's Report and Scheduling Order, Objectors took a nine-hour deposition of a representative of the FAC.  Beginning on May 9, 2011, and continuing every day of that week through May 13, 2011, the Special Master presided over an evidentiary hearing.  At the hearing, the Objectors testified and submitted evidence regarding their contribution to the common benefit in support of their requested allocation.  The Objectors also had the opportunity to examine the Court-appointed CPA and a representative of the FAC.  The FAC had the opportunity to cross-examine the Objectors.  By the conclusion of the week-long hearing, a number of the Objectors had reached an accord with the FAC regarding the amount the FAC would recommend that they receive.  Only four Objectors remained, and the Special Master concluded that no additional testimony or document production was necessary.  The Special Master also provided all participants an opportunity to file post-hearing briefs, and he received briefs from the remaining Objectors, Lead Counsel for the Objectors, and the FAC.

-19-

On June 27, 2011, the Special Master filed his Report and Recommendations.  (Rec. Doc. 63093).  This Report and Recommendations considered the entire record, including the discovery and evidentiary hearing supervised by the Special Master, addressed the Objectors' positions, and made a comprehensive recommendation as to how the common benefit fund should be divided between all applicants, Objectors and Non-objectors.  The Court posted that Report and Recommendations on its website for all to see and invited a final round of comments and objections.  The Court received objections from the four remaining Objectors, and a response from the FAC.   The Court denied those objections in a previous Order and Reasons. (Rec. Doc. 63188).

To summarize, all attorneys seeking an award of common benefit fees have now had the opportunity to: submit time records to the Court-appointed CPA documenting their common benefit work; provide a written affidavit and supporting materials to the Court-appointed Fee Allocation committee articulating their common benefit contribution; testify on the record before the FAC regarding their common benefit contribution; comment on the FAC's preliminary recommendation before it was presented to the Court; object to the FAC's recommended allocation after it was presented to the Court; testify and produce evidence at a hearing before Special Master Juneau; depose and cross-examine a member of the FAC regarding that Committee's reasoning and methodology in reaching its proposed recommendation; file a post-hearing brief arguing in support of their requested allocation; and respond to the Special Master's report and recommendation.  These proceedings were all recorded and the results posted on the Court's web site.  They have been transparent, have provided all common benefit fee applicants fair notice and ample opportunity to be heard, and have created a sufficient factual

record for the Court to make an informed allocation of the common benefit fund.  The Court has

also kept the courts in Texas, New Jersey, and California advised of these developments and has

periodically conferred with the Judges of these courts.

The Court now has before it the FAC's original and amended recommended allocation of

the common benefit fees, the Special Master's independent Report and Recommendation, and

the ample evidence and testimony produced throughout these proceedings.  It is prepared to rule

and allocate the common benefit fund.  But before turning to the allocation it is appropriate to

review the legal and factual authority of the Court to award common benefit fees and to discuss

the method used in making this allocation.

## II.    LAW & ANALYSIS

### A.    Court's Authority and Jurisdiction to Award Common Benefit Fees

First, it is worth reiterating the source of the Court's authority to award and allocate the

common benefit fund.  Since the nineteenth century, the Supreme Court has recognized an

equitable exception to the general rule that a prevailing litigant is not entitled to collect

attorneys' fees from the loser.  This exception has become known as the common fund or

common benefit doctrine and permits the creation of a common fund in order to pay reasonable

attorneys' fees for legal services beneficial to persons other than a particular client, thus

spreading the cost of the litigation to all beneficiaries.  *See In re Zyprexa Prods. Liab. Litig.*, 594

F.3d 113, 128 (2d Cir. 2010) (Kaplan, J., concurring).  This equitable common fund doctrine was

originally, and perhaps still is, most commonly applied to awards of attorneys' fees in class

actions.  *E.g.*, 4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 13:76 (4th ed.

2002) (discussing common fund doctrine in context of class actions); Fed. R. Civ. P. 23(h).

But the common fund doctrine is not limited solely to class actions.  *See Sprague v. Ticonic National Bank*, 307 U.S. 161 (1939) (employing common benefit doctrine to award fees and costs to litigant whose success benefitted unrelated parties by establishing their legal rights); Alan Hirsh & Diane Sheeley, Fed. Judicial Ctr., *Awarding Attorneys' Fees and Managing Fee Litigation* 51 (2nd ed. 2005) ("Although many common fund cases are class actions ... the common fund doctrine is not limited to class actions."); Manual for Complex Litigation (Fourth) § 14.121 (2004).  As class actions morph into multidistrict litigation, as is the modern trend, the common benefit concept has migrated into the latter area.  The theoretical bases for the application of this concept to MDLs are the same as for class actions, namely equity and her blood brother, quantum meruit.  However, there is a difference.  In class actions the beneficiary of the common benefit is the claimant; in MDLs the beneficiary is the primary attorney.[12]

MDL courts have consistently cited the common fund doctrine as a basis for assessing common benefit fees in favor of attorneys who render legal services beneficial to all MDL plaintiffs.  *E.g.*, *In re Genetically Modified Rice Litig.*, MDL No. 06-1811, 2010 WL 716190, at *4 (E.D. Mo. Feb. 24, 2010) (relying on common fund doctrine as an alternate basis to inherent managerial authority and concluding that "[b]oth sources of authority provide the same result"); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, MDL No. 05-1708, 2008 WL 682174, at *4 (D. Minn. Mar. 7, 2008); *accord In re Zyprexa*, 594 F.3d at 128-30 (Kaplan, J., concurring).

---

[12]The designation of "primary attorney" as used in this opinion refers to the attorney who has the contract with the litigant.

-22-

In addition to judicial precedent the Court also finds authority to assess common benefit attorneys' fees in its inherent managerial authority, particularly in light of the complex nature of this MDL.  The Fifth Circuit has long recognized that a court's power to consolidate and manage litigation necessarily implies a corollary authority to appoint lead or liaison counsel and to compensate them for their work.  *See In re Air Crash Disaster at Fl. Everglades on Dec. 29, 1972*, 549 F.2d 1006 (1977) ("*Everglades*").  In *Everglades*, the JPML transferred all federal cases arising out of a passenger plane crash near Miami to the Southern District of Florida.  *Id.* at 1008.  The transferee court appointed a Plaintiffs' Committee to coordinate discovery and pretrial matters, and then to conduct bellwether trials.  *Id.*  The court compensated the Committee through an assessment on the contingent fees of attorneys who represented MDL plaintiffs but were not on the Committee.  *Id.*  The non-Committee attorneys appealed and the Fifth Circuit upheld the district court's authority to make that assessment.  The Fifth Circuit explained that a district court has inherent authority "to bring management power to bear upon massive and complex litigation to prevent it from monopolizing the services of the court to the exclusion of other litigants."  *Id.* at 1012.  Therefore, an MDL court "may designate one attorney or set of attorneys to handle pre-trial activity on aspects of the case where the interests of all co-parties coincide."  *Id.* at 1014.  Naturally, this authority would be "illusory if it is dependent upon lead counsel's performing the duties desired of them for no additional compensation."  *Id.* at 1016.  Assessment of those fees against other retained lawyers who benefitted from the work done was permissible and appropriate.  *See id.* at 1019-20.[13]

---

[13]The Fifth Circuit also found support in "the body of law concerning the inherent equitable power of a trial court to allow counsel fees and litigation expenses out of the proceeds of a fund that has been created ... by successful litigation," which the Court discussed above.  *Id.*

Other courts have applied this inherent authority to compensate common benefit counsel in complex litigation. *E.g.*, *In re Diet Drugs*, 582 F.3d 524, 546-47 (3rd Cir. 2009); *In re Genetically Modified Rice Litig.*, 2010 WL 716190, at *4 ("An MDL court's authority to establish a trust and to order compensations to compensate leadership counsel derives from its 'managerial' power over the consolidated litigation, and, to some extent, from its inherent equitable power."); *In re Guidant*, 2008 WL 682174, at *5; *In re Zyprexa Prods. Liab. Litig.*, 467 F. Supp. 2d 256, 265-66 (E.D.N.Y. 2006); *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 644, 653-56 (E.D. Pa. 2003); *see also* Manual for Complex Litigation (Fourth) § 22.62 (2004); Restatement (Third) of Restitution § 30 Reporter's Note b (Tentative Draft No. 3, 1994) ("In contrast to the standard view of class-action fees, which explains them as restitutionary, the leading accounts of fees to court-appointed counsel in consolidated litigation properly emphasize factors independent of restitution to justify the imposition of a liability by court order.") (citing *Everglades*).

In addition to equity, quantum meruit, and inherent managerial authority, the Court derives express authority in this case from the very terms of the Settlement Agreement entered into by the parties and consented to by their primary attorneys. Section 9.2 of the Settlement Agreement governs common benefit fees and expressly authorizes this Court to determine common benefit attorneys' fees, as explained in greater detail above. Settlement Agreement § 9.2.1 and 9.2.3 provide:

> 9.2.1. To ensure that ... common benefit attorneys ... are fairly compensated but that their fees are in conformance with reasonable rates, an assessment of common benefit attorneys' fees will be

_____

at 1017.

imposed at no more than 8% of the gross amount recovered for every client that registers under the terms of the Settlement Agreement. Any sum paid as a common benefit fee shall be deducted from the total amount of counsel fees payable under individual plaintiffs' counsel's retainer agreement. The maximum 8% attorneys' fee assessment shall supersede the assessment provided to MDL common benefit attorneys pursuant to Pretrial Order No. 19.

....

9.2.3   [T]he attorneys' fees and common benefit expenses deducted by the Claims Administrator shall be deposited into an interest bearing escrow account (the "Settlement Fee and Cost Account"). The Settlement Fee and Cost Account shall be maintained at a financial institution. Funds within the Settlement Fee and Cost Account shall be administered by the Honorable Eldon E. Fallon and all awards therefrom will be subject to approval, upon due consideration by him in consultation with the Honorable Victoria G. Chaney, the Honorable Carol E. Higbee, and the Honorable Randy Wilson, and in accordance with established Fifth Circuit precedent ....

Thus, all parties to the MSA expressly agreed to the creation of a common benefit fund to be administered by the Court.

### B.   Some Final Thoughts About the Process for Allocating Common Benefit Fees

Before determining the proper fee allocation in this case some general comments are in order.

First, the Court capped the total amount of attorneys' fees for primary counsel at 32% of the $4.85 billion settlement which means that the primary counsel's attorneys' fees in this case are one billion, five hundred and fifty-two million dollars ($1,552,000,000). Out of that 32%, the Court has created a fund for common benefit counsel of 6.5% of the total settlement amount, or Three Hundred and Fifteen Million, Two Hundred and Fifty Thousand Dollars ($315,250,000.00). This amount has been escrowed and the remainder has been paid to primary counsel. Thus, primary counsel for individual claimants have already received over one billion

dollars pursuant to contingent fee agreements.  Many if not all of the common benefit fee

applicants are also primary counsel in at least some if not many cases and thus have already

received substantial compensation pursuant to contingent fee agreements with their own clients.

For this reason, it is disconcerting and disappointing to receive such vexatious, vitriolic, and

acerbic briefs from some of the attorneys who seek common benefit fees.

    Second, there has been much discussion regarding the process by which this Court, or

any court, should allocate attorneys' fees.  The Fifth Circuit's opinion in *In re High Sulfur* is

instructive in this respect.  In *High Sulfur*, the Fifth Circuit reviewed an allocation of attorneys'

fees in a class action case.  The takeaway from *High Sulfur* is that in allocating a fund of

attorneys' fees, the Court must conform to "traditional judicial standards of transparency,

impartiality, procedural fairness, and ultimate judicial oversight."  517 F.3d at 234.  That

requires creating a sufficient record, making sufficient factual findings, considering the time

worked and the *Johnson* factors, providing an opportunity to be heard to all the applicants, and

exercising independent judgment in allocating those fees rather than simply rubber-stamping a

committee recommendation.  The Court has been guided by these principles throughout this

process.

    Third, there has been much ink spilt in this case discussing the methodology by which

common benefit attorneys' fees should be calculated.  As explained in the Court's Order and

Reasons of October 19, 2010, there is a growing trend in this country to use a blended approach

to determine the appropriate common benefit fee in an MDL.  Such an approach seeks an

appropriate percentage through an analysis of similar cases, then modifies it upward or

downward by a review of the *Johnson* factors and tests it through a lodestar cross-check.  In this

case, the Court applied this blended approach.  *See* 760 F. Supp. 2d at 652-62.  The lodestar

process played an important part in the analysis but the lodestar cross-check did not generate the

common benefit award in the first instance; rather, it verified that the percentage fixed by the

Court did not represent a windfall relative to the total hours worked.

Thus, on these facts, rigid application of a lodestar calculation to allocate fees is not the

Court's starting point.  As the Court has explained before:

> In a case of this kind, not all types of work are created equal.  Hours spent taking
> depositions, participating in hearings, or trials, actively participating in
> developing the appropriate litigation strategies and tactics (through moot court
> presentations or similar practices), drafting briefs, actively participating in Court
> conferences, arguing motions, negotiating with opposing counsel to reach a
> settlement, and actively managing and organizing the administrative aspects of
> the case are some of the more significant types of work that a case of this sort
> requires and deserves the most recognition.  This, of course, is not the only type
> of work that such a case requires.  Documents must be reviewed, categorized, and
> analyzed; e-mails must be read and responded to; claimants must be kept advised;
> meetings must be attended and in general the litigation must be monitored.  This
> work, while necessary and often time consuming does not deserve equal treatment
> when allotting fees.

*Murphy Oil*, 582 F. Supp. 2d at 810-11.  In short, there is a hierarchy of value for work that tends

to have a greater impact on the litigation and generates more "common benefit."  Such work

deserves greater compensation.  This is not a unique concept.  It is a common practice in the

legal profession to bill certain work at a higher rate than other work.  Mechanically calculating

hours and allocating fees solely on that basis would incentivize padded hours and diminish the

work that truly moved the litigation toward its conclusion.  *See id.*  A lodestar calculation is

important in comparing the relative contribution of attorneys doing the same kind of work, and it

is also an important check to ensure that the spread between compensation for attorneys doing

more or less significant work is not grossly unfair, but it is not the end-all of allocating fees in an

MDL case such as this.

It is not inconsistent, as some have suggested, to rely on lodestar as a cross-check but to reject it as the sole basis for allocation. The reason it is not inconsistent is because the objective is different. The objective of the lodestar method is to cross-check the accuracy of the percentage method to determine whether the totality of the hours spent and an amount assigned to it under the lodestar has a realistic relevance to the amount assigned as a common benefit fee. But when the focus is on the allocation of that fee the lodestar analysis is incomplete because it is necessary to drill down on the hours and prioritize them, consistent with the facts of each MDL. For those MDLs that are resolved without trials the priority may be different from this case. In this case there were nearly twenty trials: six in the MDL and the remainder in the various state courts. Those trials and the preparation involved therein played a substantial role in creating an environment in which settlement could be spawned, birthed, and nurtured. Therefore, in this case the attorneys who took up the cudgels and participated in those trials deserve an appropriate recognition for their efforts. To simply total the hours spent, apply an appropriate lodestar factor, and allocate the fee on that basis alone would not be appropriate in this case.

However, to uniformly recognize each trial counsel with the same common benefit fee would also be improper. The goal or objective of the proper allocation of the common benefit fee is not to pay counsel for his or her work at the trial stage of a particular case. That is the purpose of the contingent fee in that case. The purpose of the common benefit fee is to materially recognize counsel for the work which inured to the common benefit of the litigation as a whole. Thus, in allocating common benefit fees to trial counsel it is important to determine

when the trial occurred, whether the work was shared with other counsel, whether the work was helpful in other cases or just in that one case.  In this latter event, it does not mean that such counsel would not be entitled to some common benefit fee because there is a salutary rippling effect which a win or "hard fought case" has on other cases.  But it also does not mean that such counsel may be entitled to the same common benefit fee as a colleague whose work was shared with other counsel and had a meaningful effect on subsequent trials.

Fourth, some comments on the role of a fee-allocating committee are also warranted.  It is beyond dispute that a court may "appoint a committee of plaintiffs' counsel to recommend how to divide up an aggregate fee award."  *In re High Sulfur I*, 517 F.3d at 227.  The Court has previously used this mechanism with the hope that the committee could "achieve a unanimous agreement as to how the Common Benefit Fund should be allocated among counsel.  *Murphy Oil*, 582 F. Supp. 2d at 801.  If all counsel had an opportunity for informed arms-length discussion with an allocating committee, and the committee could recommend an allocation of a fixed pot of common benefit fees acceptable to all interested counsel, the Court would give weight to that mutual agreement.  Unfortunately, unanimity is hard to achieve.  Hence, the Court maintains the "responsibility to closely scrutinize the attorneys' fee allocation, especially when the attorneys recommending the allocation have a financial interest in the resulting awards." *High Sulfur I*, 517 F.3d at 227.  To deal with this potential conflict a Special Master was appointed who had no financial interest in the awards.  The Special Master was charged with conducting discovery and making his own recommendation.

In this case, the lengthy fee allocation procedure has provided an opportunity for common benefit fee applicants to review the FAC's recommendation and the Special Master's

recommendation as they pertain to all applicants, and to comment on those recommendations.  In some circumstances this dialogue between the FAC, the Special Master, and the applicants has resolved objections and produced consensus.  Some might criticize any negotiation between the FAC or the Special Master and the applicants as "horse-trading" or "side deals."  The Court interprets this ongoing development of the FAC's and the Special Master's recommended allocations as an indication that the allocation process was working properly.  The effectiveness of this process in this case is supported by the fact that only 4 out of the 108 common benefit fee applicants continue to maintain their objections.

Fifth, there is some criticism expressed that allocation of common benefit fees contains an element of subjectivity.  It is this Court's view that some subjectivity is unavoidable in allotting common benefit fees.  In the fictional and perfect "best of all possible worlds" of Voltaire's *Candide*, an appropriate allocation might be achieved by applying purely objective criteria such as the billing-rate-times-hours method described above.  But in the real and imperfect world of litigation it is an accepted fact that not all work hours are entitled to the same compensation rate.  The nature of the work, the skill and experience of the party doing the work, and the result achieved all factor into the appropriate allocation.  How these factors are weighed injects an unavoidable amount of subjectivity in the analysis.  The best that can be done to assure the validity of the analysis is to base the subjectivity quotient on sufficient facts and experience, and to invite input from those affected.  This Court has attempted to do this through a tedious and long drawn-out process.

Finally, after reviewing the documents and transcripts compiled by the Fee Allocation Committee, the detailed report and recommendations of the Special Master, as well as the

exhibits cited therein, consulting with the Honorable Victoria G. Chaney, the Honorable Carol E.

Higbee, and the Honorable Randy Wilson, and drawing upon this Court's experience in this case

accumulated during the course of over five years in which there were six bellwether trials,

hundreds of meetings, dozens of hearings, and nearly 1000 Court rulings, and consistent with

applicable law, this Court makes the following allocation of common benefit fees.

### C.    Allocation of Fees

The Court will address each common benefit applicant in alphabetical order, setting out

the amount of the allocation and the factual basis underlying the Court's conclusion.[14]

### 1)    Alley, Clark, Greiwe & Fulmer

Alley, Clark, Greiwe & Fulmer were co-counsel in *Kozic v. Merck & Co.*, a bellwether

case which was tried in state court in Tampa, Florida.  The case was filed prior to Vioxx being

withdrawn from the market and was the last case tried before the announcement of the settlement

program.  Alley, Clark, Greiwe & Fulmer submitted common benefit hours in the amount of

1,611.25 hours, of which 1,204.75 were partner hours.  Alley, Clark, Greiwe & Fulmer incurred

$197,945.81 in common benefit costs and enrolled more than 100 cases in the settlement

program.

The FAC recommended an award of $365,000.  The firm has indicated its acceptance of

that recommended amount.  The Special Master recommended an award of $365,000.

Based on the firm's common benefit contribution and considering the nature of the work

done by Alley, Clark, Greiwe & Fulmer, including its trial work in the *Kozic* case, the firm is

---

[14]This discussion is based on the CPA's affidavit attached to the PSC's original petition
for an award of common benefit fees and includes hours submitted through July 31, 2010.  Hours
submitted after that time have not been taken into consideration.

awarded common benefit fees in the amount of $500,000.

### 2) Alvarez Law Firm

The Alvarez Law Firm submitted 30 common benefit hours.  All time was devoted to document review.  An affidavit in support of the petition for common benefit fees was not received.  A presentation on behalf of the firm was not made to the Fee Allocation Committee. The Alvarez Law Firm submitted $2,763.89 in common benefit costs.  The FAC recommended an award of $15,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $15,000.

Based upon the common benefit contributions and considering the nature of the work done by the Alvarez Law Firm, the firm is awarded common benefit fees in the amount of $15,000.

### 3) Anapol, Schwartz, Weiss, Cohan, Feldman & Smalley, P.C.

Sol Weiss served as Co-Lead Counsel in the New Jersey Coordinated Litigation.  Anapol Schwartz was involved in the prosecution of the Vioxx litigation well in advance of the drug's withdrawal from the market and the firm's involvement continued until the time of the settlement.

Anapol Schwartz submitted 8,430 common benefit hours, 1,777.25 key lawyer hours and 4,034.25 partner hours.  Anapol Schwartz incurred $579,749.50 in common benefit expenses. Anapol Schwartz enrolled over 700 claimants in the settlement program.  The FAC recommended an award of $3,400,000.  The firm objected to that recommended amount and participated in the Special Master's hearing.  The Special Master recommended an award of $4,000,000.  The firm has indicated it does not object to a recommendation of that amount.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Anapol Schwartz, including their leadership role in the New Jersey Coordinated Litigation, the firm is awarded common benefit fees in the amount of $4,000,000.

### 4)      Anastopoulo & Clore, LLC

Anastopoulo & Clore, LLC was lead counsel in *Reck v. Merck & Co.*, which was set for trial in the Texas Consolidated Litigation.  Consequently, members of the firm participated in extensive case-specific discovery and motion practice.  Lawyers for Anastopoulo & Clore also assisted in the development of experts and participated in document review.  Anastopoulo & Clore submitted common benefit hours in the amount of 607.75, of which 255.75 are partner hours.  More than half of these hours were expended for case assessment, development and administration; 170 hours were expended on discovery.  Anastopoulo & Clore incurred $80,373.47 in common benefit costs.  The FAC recommended an award of $15,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $15,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Anastopoulo & Clore, the firm is awarded common benefit fees in the amount of $15,000.00.

### 5)      Andrews & Thornton

Anne Andrews and John Thornton were the primary point of contact for Dr. Douglas Zipes, an expert cardiologist who participated in several bellwether trials, including *Barnett v. Merck & Co.*  Ms. Andrews and Mr. Thornton worked extensively with Dr. Zipes on the development of his Rule 26 report and assisted in Dr. Zipes' preparation for deposition and trial

testimony.  Ms. Andrews and Mr. Thornton worked with Jeffrey Popma, an expert cardiologist

who testified in the *Barnett* trial, as well as Dr. Paul Ridker, Dr. Mark Haigney, and Dr. Michael

Shlipak, among others.  In addition, they pioneered and participated in an extensive vetting

process for cardiologists throughout the country for purposes of identifying experts.  Andrews &

Thornton submitted common benefit hours in the amount of 2,005 hours, of which 1,908.25 were

partner hours.    Andrews & Thornton incurred $388,500.11 in common benefit costs.  The FAC

recommended an award of $600,000.  The firm has indicated its acceptance of that recommended

amount.  The Special Master recommended an award of $600,000.

Therefore, based upon the common benefit contributions and considering the nature of

the work done by Andrews & Thornton, the firm is awarded common benefit fees in the amount

of $600,000.

### 6)      Ashcraft & Gerel

Chris Tisi, a senior partner in the law firm of Ashcraft & Gerel, served as a member of

the PSC, the Science Committee, the Trial Selection Committee, the Privilege Log Committee,

the Trial Package Committee, the Law and Briefing Committee, and as Vice-Chair of the

Discovery Committee.  In addition, Michelle Parfitt, also a senior partner at Ashcraft & Gerel,

served as Co-Chair of the Science Committee and a member of the Discovery Committee.

Ashcraft & Gerel began working on the Vioxx litigation in 2004.  Mr. Tisi worked almost

exclusively on Vioxx-related matters for over three years.

As a Vice-Chair of the Discovery Committee, Mr. Tisi directed the daily activities of this

committee, negotiated discovery disputes with Merck and third parties, managed the

depositories, and coordinated the discovery with various state courts.  Mr. Tisi was the primary

architect of the third-party discovery strategy that was employed by the PSC. This effort secured independent fact witness' testimony that was central in state and federal court trials.

Mr. Tisi personally prepared and took the depositions of key third party witnesses as well as corporate witnesses. Mr. Tisi developed the Defense Profile Form, an innovation used both in the MDL and New Jersey Consolidated Litigation. Mr. Tisi authored, co-authored or argued at least ten significant MDL motions and an additional number of motions in limine in New Jersey state court trials. Mr. Tisi also made significant contributions to the development of the MDL Trial Package.

Mr. Tisi and other members of the Ashcraft & Gerel firm provided significant support for bellwether trials in the MDL and in New Jersey. Ashcraft & Gerel contributed 6,791.5 common benefit hours, including 3,929 key lawyer hours. In addition, Ashcraft & Gerel expended $194,437.40 in the common benefit effort. The firm paid $355,000.00 in PSC assessments. The FAC recommended an award of $9,000,000. The firm has indicated its acceptance of that recommended amount. The Special Master recommended an award of $9,000,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Ashcraft & Gerel Law, the firm is awarded common benefit fees in the amount of $9,000,000.

### 7)   Audet & Partners, LLP

Audet & Partners made material contributions to efforts in the New Jersey Consolidated Litigation. The firm was co-counsel in *LoPresti v. Merck & Co.*, *Tena v. Merck & Co.*, and *Allen v. Merck & Co.*, all of which were set for expedited discovery and potential trial in New Jersey. In those cases, Suzanne Scovern, along with co-counsel Rob Dassow, reviewed

thousands of documents associated with the custodial and personnel files of sales representatives, took the depositions of sales representatives and fact witnesses, participated in numerous discovery hearings, and retained and prepared expert witnesses.  Along with co-counsel, they were able to successfully compel the production of sales representatives' monthly credit card statements through which they discovered evidence of Merck's practice of "gifting" Vioxx prescribers.  In conjunction with preparation of the *Tena* case, members of the firm were instrumental in bringing to light deficiencies in the process by which Merck identified and produced documents in relation to Merck Profile Forms and specifically, Merck's inconsistencies in disclosing physician compensation.   In relation to the *Allen* case, Audet & Partners, along with co-counsel Hovde, Dassow & Deets, successfully sought an order from the court to take the deposition of a regional business manager, Richard Brown.  In relation to that deposition, they reviewed over 75,000 documents, participated in numerous teleconferences regarding production, and participated in a hearing before Judge Higbee.  The matter was under submission at the time the settlement program was announced.

In addition, the firm was lead counsel in three cases set for expedited discovery in the California Consolidated Litigation.  One of those cases, *Andreasen v. Merck & Co.*, was slated to be set for trial.  Though *Andreasen* was not ultimately set for trial, the case was the subject of extensive pretrial discovery and motion practice.

William Audet was instrumental in organizing and paying the initial costs for a number of plaintiffs-only trial strategy seminars presented by Rodney Jew of CDS.  These seminars were attended by counsel in New Jersey trial cases.

Audet & Partners submitted common benefit hours in the amount of 7,666 hours, of

which 1,736.50 were partner hours.   Audet & Partners incurred $243,687.26 in common benefit expenses.  The FAC recommended an award of $1,415,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $1,415,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Audet & Partners, including their special contributions in discovering significant material helpful to the litigation, the firm is awarded common benefit fees in the amount of $1,415,000.

**8)      Aylstock, Witkin, Kreis & Overholz, LLC**

Justin Witkin was a member of the State Liaison Committee.  Members of the firm were involved in document review at depositories in New York and Louisiana.  Members of the firm also participated in the taking of depositions and contributed to the development of discovery regarding sales representatives.  In addition, members of the firm assisted with the drafting of motions in limine, jury questionnaires and deposition designations for the Irvin bellwether trial. Aylstock Witkin submitted common benefit hours in the amount of 841.5 hours, of which 355.25 were partner hours.

The FAC recommended an award of $225,000.  The firm did not file an objection or respond to that recommended amount or participate in the allocation proceedings.  The Special Master recommended an award of $225,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Aylstock, Witkin, Kreis & Overholz, LLC, the firm is awarded common benefit fees in the amount of $225,000.

### 9)   Balkin & Eisbrouch

Balkin & Eisbrouch submitted 25.75 common benefit hours, all of which were partner hours and devoted to case assessment, development, and administration.  An affidavit in support of the petition for common benefit fees was not received.  A presentation on behalf of the firm was not made to the Fee Allocation Committee.  Balkin & Eisbrouch submitted $2,000 in common benefit costs.  The FAC recommended an award of $15,000.  The firm did not file an objection or respond to that recommended amount or participate in the allocation proceedings. The Special Master recommended an award of $15,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Balkin & Eisbrouch, the firm is awarded common benefit fees in the amount of $15,000.

### 10)   Brian K. Balser

Brian Balser submitted common benefit hours in the amount of 592.25, all of which were devoted to discovery, mainly document review and work pertaining to Merck's privilege log. Mr. Balser was a member of the Discovery Committee and the Privilege Log Committee.   Mr. Balser submitted $12,357.19 in common benefit costs.

The FAC recommended an award of $130,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $130,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by the Brian Balser Law Firm, the firm is awarded common benefit fees in the amount of $130,000.

### 11)   Barnow & Associates

Barnow & Associates submitted 67.25 common benefit hours, of which 22.75 appear to be partner hours.  An affidavit in support of the petition for common benefit fees was not received.  A presentation on behalf of the firm was not made to the Fee Allocation Committee. The FAC recommended an award of $15,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $15,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Barnow & Associates, the firm is awarded common benefit fees in the amount of $15,000.

### 12)     Barrios, Kingsdorf & Casteix, LLP

Dawn Barrios was Chair of the MDL State Liaison Committee and also served on the Discovery Committee, Sales and Marketing Committee, the Law and Briefing Committee, the Science Committee, the Stroke Subcommittee, the Third Party Payor Committee, and the Trial Selection Committee.   As Chair of the State Liaison Committee, Ms. Barrios played a critical role in communicating with state court lawyers around the country, issuing newsletters, and addressing questions from lawyers.  She made monthly reports to this Court.  At the Court's request, she oversaw a project identifying all cases in the MDL with pending remand motions and gathering those motions for consideration by the Court.  This project began in July 2005 and remains ongoing at this time.  Ms. Barrios also serves as liaison to Attorneys General who have actions pending in the MDL and has a primary role in the coordination of common discovery on AG cases.  This assignment is ongoing.

Ms. Barrios served as local counsel in *Mason v. Merck & Co.*, an MDL bellwether trial. She assisted with preparation of motions in limine and jury selection, prepared the plaintiff and

his wife for trial, and served as a liaison between the trial team and the PSC.  In support of the *Irvin* bellwether trial, Ms. Barrios assisted in creating a database of motions, replies and rulings and of jury charges and jury interrogatories used in prior cases.  Ms. Barrios also assisted in the preparation of the *Diaz* case, assisting with the plaintiff's deposition.

Barrios, Kingsdorf & Casteix submitted common benefit hours in the amount of 3,439.25 hours, of which 2,448.25 were partner hours.   Barrios, Kingsdorf & Casteix incurred $20,403.98 in common benefit expenses.

The FAC recommended an award of $1,700,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $1,700,000.

Considering the above and factoring in the experience of this Court during the course of the proceedings, and based upon the common benefit contributions and the leadership role and considering the nature of the work done by Barrios, Kingsdorf & Casteix, the firm is awarded common benefit fees in the amount of $1,800,000.

### 13)     Bartimus, Frickleton, Robertson & Gorney

Bartimus, Frickleton, Robertson & Gorney submitted 30 common benefit, all of which were partner hours and were devoted to the preparation of Dr. Thomas Baldwin, an expert cardiologist in *Irvin v. Merck & Co.*, the first MDL bellwether trial.  An affidavit in support of the petition for common benefit fees was not received.  A presentation on behalf of the firm was not made to the Fee Allocation Committee.  Bartimus, Frickleton, Robertson & Gorney incurred common benefit expenses in the amount of $486.95 and enrolled more than 200 cases in the settlement program.  The FAC recommended an award of $15,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of

$15,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Bartimus, Frickleton, Robertson & Gorney, the firm is awarded common benefit fees in the amount of $15,000.

### 14)    Beasley, Allen, Methvin, Portis & Miles

Andy Birchfield served as Co-Lead Counsel in the MDL.  Mr. Birchfield served as a member of the Plaintiffs' Executive Committee, the PSC, the NPC, the Gates Committee, the FAC, and the Vioxx Settlement Liaison Group, as well as a member of most MDL subcommittees.  Along with Russ Herman and Chris Seeger, Birchfield provided the leadership necessary to bring this complex litigation to a successful and efficient resolution.  Andy Birchfield's commitment to the litigation from beginning to end is unmatched; he played crucial roles in MDL leadership, bellwether trials, settlement negotiations, and administration.

Beasley Allen has been at the forefront of the Vioxx litigation since its inception in 2001. Beasley Allen filed the second case in the country in September 2001, three years before Vioxx was withdrawn from the market.  Andy Birchfield's commitment to the Vioxx litigation precluded his pursuit of employment in other litigations.  Mr. Birchfield forewent other opportunities to commit to the Vioxx litigation.

Under Mr. Birchfield's leadership, Beasley Allen spearheaded, along with Seeger Weiss, Lanier Law Firm, and Shelly Sanford's firm, the initial discovery in the Vioxx litigation. Beasley Allen reviewed tens of thousands of Merck documents before Vioxx was withdrawn from the market.  David Miceli, a former Beasley Allen shareholder, took the early and foundational depositions of key Merck corporate witnesses such as Dr. Edward Scolnick, Dr.

Alise Reicin, Dr. Briggs Morrison, Dr. Barry Gertz, and Mr. Adam Schechter, among others.

Portions of these depositions were ultimately used during MDL bellwether trials and others were

valuable building blocks for later depositions.  Beasley Allen pioneered scientific theories which

have ultimately been validated in trials and by the Vioxx resolution program.  More than two

years before Vioxx was withdrawn from the market, Mr. Birchfield was speaking at national

seminars and alerting lawyers to the dangers of Vioxx.  When Vioxx was pulled from the

market, instead of taking a proprietary approach, Beasley Allen shared with lawyers throughout

the country the theories of the case, discovery, contacts, and other resources it had developed.

Beasley Allen has worked diligently to cultivate a spirit of cooperation among lawyers in state

courts and the MDL.  Teamwork between state and federal proceedings has been a hallmark of

the litigation and essential to its overall success.

 In addition to Mr. Birchfield's contributions to the MDL, Frank Woodson, a Beasley

Allen shareholder, served on the MDL Sales and Marketing Committee.  Paul Sizemore, a

former Beasley Allen shareholder, played a vital role on the Science Committee and worked with

numerous experts used in the MDL as well as in other coordinated litigations, such as Dr.

Benedict Luchessi, Dr. Colin Bloor, Dr. Lemuel Moye, Dr. Donna Arnett, Dr. Connie Pechman,

and Dr. Ira Gelb.  During his tenure at Beasley Allen, Mr. Sizemore also served as co-counsel in

*Irvin v. Merck & Co.* and *Grossberg v. Merck & Co.*

 Ms. Leigh O'Dell, a Beasley Allen shareholder, served as a member of the MDL Law

and Briefing Committee and the Trial Package Committee.  Ms. O'Dell contributed more than

8,500 hours of time to the MDL.  Beasley Allen took a lead role in the preparation and

presentation of the Trial Package.  Ms. O'Dell served as co-counsel in *Dedrick v. Merck & Co.*

and assisted in the trials of four other bellwether cases.

Andy Birchfield served as lead or co-lead counsel in five of the seventeen Vioxx trials including four of the six MDL bellwether trials.  Of the seventeen trials that took place during the litigation, Beasley Allen lawyers served as lead counsel, co-counsel, or support counsel in seven: *Irvin* (MDL), *Irvin II* (MDL), *Barnett* (MDL), *Grossberg* (CA), *Dedrick* (MDL), *Albright* (AL) and *Schwaller* (IL).   *Irvin v. Merck*, a Beasley Allen case, was pending in Florida state court when the case was selected by the parties and the Court to be the first case to be tried in the MDL.  Beasley Allen prepared the first MDL trial under a tight time-frame of three months.  The work product developed in preparation for the *Irvin* case became the foundation for preparation in other MDL trials and some state court cases.  Due to Hurricane Katrina, the first *Irvin* trial took place in Houston, Texas.  The case was tried in November, 2005 for approximately two weeks and resulted in a hung jury.  The Court ordered a second trial eight weeks later in New Orleans during February, 2006.  The second trial lasted more than two weeks and resulted in a defense verdict.  The Court granted Beasley Allen's motion for a new trial after finding that Merck's expert cardiologist misrepresented his qualifications during *Irvin II*.

Mr. Birchfield served as co-counsel in *Barnett v. Merck*, the third MDL bellwether trial. Beasley Allen devoted extensive time and energy to the preparation and the trial of the case. After a nearly three-week trial during July and August, 2006, the jury returned a verdict in favor of Mr. Barnett in the amount of $51,000,000.  Beasley Allen invested more than 2,500 hours in the preparation and trial of the Barnett case.  Beasley Allen did not have a fee interest in the *Barnett* case, but made the contributions outlined above purely for the advancement of the overall litigation.

During June, July and August, 2005, while Mr. Sizemore was a shareholder at Beasley Allen, he served as co-counsel in *Grossberg v. Merck*, a Girardi Keese case which was tried in the California Consolidated Litigation.  Mr. Sizemore spent nearly eight weeks in California preparing and participating in this trial.  Beasley Allen did not have a fee interest in the *Grossberg* case, but made the contributions outlined above purely for the advancement of the overall litigation.

Another Beasley Allen case, *Dedrick v. Merck & Co.*, was the last MDL bellwether trial. The *Dedrick* case was a defense-selected trial case.  Mr. Dedrick's medical history included numerous risk factors for heart attack.  Beasley Allen did not withdraw the case from the trial process despite the challenging fact pattern.  The case resulted in a defense verdict.  Beasley Allen invested approximately 5,500 hours and over $1 million in the preparation and trial of the *Dedrick* case.

While the Dedrick trial was underway in the MDL, *Albright v. Merck & Co.* was tried in the Circuit Court of Jefferson County, Alabama.  Ben Locklar, a Beasley Allen shareholder, assisted in the preparation and the trial of the *Albright* case.  Beasley Allen did not have a fee interest in the *Albright* case, but rather assisted with the case purely for the advancement of the overall litigation.

Lastly, Andy Birchfield served as co-counsel with Mikal Watts in the trial of *Schwaller v. Merck & Co.* in Madison County, Illinois.  Mr. Birchfield worked with the Watts Firm to develop trial strategy, and directed and cross-examined key plaintiff and defense witnesses.  Ms. O'Dell prepared and argued all deposition designations and oversaw the admission of all evidence at trial.  Beasley Allen invested approximately 2,250 hours in the preparation and trial

of the *Schwaller* case.  Beasley Allen did not have a fee interest in the *Schwaller* case, but made the contributions outlined above purely for the advancement of the litigation.

On December 14, 2006, the day after the jury returned a verdict in *Dedrick v. Merck*, negotiations between Plaintiffs' counsel and Merck began and continued until a resolution was reached during the early morning hours of November 9, 2007.  As members of the NPC, Mr. Birchfield and Ed Blizzard took the lead in negotiating the actual terms of the Settlement Agreement and researching and testing the effect of key provisions such as various risk factors and degrees of injury to ensure a fair settlement and appropriate compensation for all participants, as evidenced by the 99% voluntary participation rate of all eligible claimants.  Mr. Birchfield, along with Ms. O'Dell and Roger Smith, a Beasley Allen shareholder, spent hundreds of hours developing a random sample upon which settlement terms might be tested.  The random sample involved the claims of approximately 500 claimants.  Beasley Allen retained and worked with a biostatistician to verify the sample and extrapolate test results across the 50,000-person Vioxx claimant population.  These predictions were important to the negotiations.  Following the signing of the settlement agreement, Mr. Birchfield also played a significant role in educating other plaintiffs' counsel about the settlement agreement.

Mr. Birchfield also contributed to the efficient operation of the Vioxx Resolution Program.  He maintained consistent and frequent contact with Merck and BrownGreer, the Vioxx Claims Administrator.  Moreover, he served on the Gates Committee, and along with Ms. O'Dell, reviewed thousands of Vioxx claims before the Gates Committee.

In short, Beasley Allen, under Mr. Birchfield's leadership, was at the forefront of the Vioxx litigation from the filing of the earliest lawsuits, to the formation of the MDL, through the

bellwether trial process, and until the last Vioxx claimant was paid through the settlement.

Beasley Allen submitted common benefit hours in the amount of approximately 36,747.75, of which 20,126 were senior lawyer hours.  Beasley Allen incurred more than $3,580,230.05 in common benefit costs and paid $355,000 in PSC assessments.  Beasley Allen enrolled approximately 5,000 claimants in the settlement program.

The FAC recommended an award of $37,209,289.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $36,860,953.

Therefore, based upon the common benefit contributions and considering the nature of the work done by the Beasley, Allen, Crow, Methvin, Portis & Miles, the firm is awarded common benefit fees in the amount of $36,612,459.44.

### 15)   Becnel Law Firm, LLC

Daniel Becnel served on the Science Committee.  Mr. Becnel filed a motion for the MDL to be formed in New Orleans.  The Becnel Law Firm employed contract lawyers that participated in document review.  The Becnel Law Firm submitted common benefit hours in the amount of 13,038.25 hours, and only 406 of those hours were attributable to Mr. Becnel personally.  The rest were submitted by contract attorneys employed by Mr. Becnel.  Most of the hours logged by the contract lawyers were spent reviewing documents in the document depository.  Of Mr. Becnel's hours, 403.5 were categorized for case assessment and 2.5 were for discovery.  None of those hours were for work on any trials.  The Becnel Law Firm incurred $149,862.08 in common benefit costs, $6,343.71 of which has not been approved.  The firm also enrolled approximately 225 cases in the settlement program.

The FAC recommended an award of $455,000.  The firm objected to that amount and

presented evidence and testimony at the Special Master's evidentiary hearing.  The Special

Master recommended an award of $270,000.  In his report the Special Master concluded that the

evidence revealed that Mr. Becnel took no depositions, tried no cases, and was not involved in

any leadership or trial role in the litigation.  The Special Master also noted that:

> There were 3,054.75 duplicate hours that [] were submitted by Becnel and another
> attorney for the same work.  Compare FAC Exhibit 4 (Becnel time submissions
> for period January 2005 until May 2005) and FAC Exhibit 4 (Neblet Beard and
> Arsenault time submissions for the same period) and see also (Transcript of
> Hearing on May 12, 2011 at pp. 104-111).  The other submitting attorney did
> make the disclosures required by Pre-Trial Order 6D and those hours were
> considered in recommending an award for common benefit compensation.
> Becnel claims that a mistake was made in two different submissions being made
> for the same work.  It is the finding of the Special Master that a mistake was
> made, but the fact remains that errors were made and that Becnel did not make the
> disclosures as required by Pre-Trial Order 6.
> Becnel submitted over 500 hours for time expended by Margaret Parker (FAC
> Exhibit 4).  At the Special Master hearing, Becnel admitted that he did not know
> Margaret Parker (Transcript of Hearing on May 12, 2011 at pp. 111-112, 127).
> At the Special Master Hearing, Becnel admitted that there were numerous entries
> that were submitted as common benefit time that were actually for work on
> individual cases and that this work should not be given common benefit
> consideration (Transcript of Hearing on May 12, 2011 at pp. 113-116, 123).

The Court has reviewed the materials adduced at the Special Master's hearing and the CPA's

records and concludes that although Mr. Becnel submitted 3,129.75 duplicate hours, those hours

were rejected by the CPA and were not considered by the Court when it set the common benefit

fund or performed the lodestar cross-check.  The Court finds these factual findings of the Special

Master to be supported by the record and adopts them.

As mentioned above, Mr. Becnel himself logged 406 hours in common benefit work.  But

only 93.75 hours were submitted between 2006 and 2009, and all but 2.5 hours were categorized

as "case assessment."

Taking all of the above into consideration and factoring in the Court's experience in this

matter, and based upon the common benefit contributions and considering the nature of the work done by the Becnel Law Firm, the firm is awarded common benefit fees in the amount of $500,000.  This amount would reimburse this applicant for the amount paid to the contract attorneys and allow him a fee for supervising their work.  It would also pay him a reasonable fee for the work he himself performed in discovery and general administration.

**16)   Robert M. Becnel**

Robert M. Becnel submitted 924.25 common benefit hours, of which 20.75 hours were expended by Mr. Becnel and related to attendance to status conferences and other MDL-related meetings.  Of the total hours, 881 hours appear to have been devoted to discovery, specifically the review of one custodial file.  Mr. Becnel incurred $1,275.58 in common benefit costs.

The FAC recommended an award of $30,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $30,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Robert M. Becnel, the firm is awarded common benefit fees in the amount of $30,000.

**17)   Bencomo & Associates**

Bencomo & Associates submitted common benefit hours in the amount of 1,513.50 hours, of which 303 hours appear to be partner hours.  The hours were devoted to document review in MDL document depositories in New York, Alabama, and Louisiana.  Bencomo & Associates incurred $14,055.27 in common benefit costs.  The FAC recommended an award of $327,500.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $327,500.

-48-

Therefore, based upon the common benefit contributions and considering the nature of the work done by Bencomo & Associates, the firm is awarded common benefit fees in the amount of $327,500.

### 18)   Blizzard, McCarthy & Nabers

Ed Blizzard served on the NPC, Gates Committee, and the FAC.  Ed Blizzard has over twenty years experience in pharmaceutical and medical device cases and has served in leadership roles in other MDLs.  Blizzard, McCarthy & Nabers began working on Vioxx in 2004, near the time that Vioxx was withdrawn from the market.  In February, 2006, one of Mr. Blizzard's cases was selected for a bellwether trial in the MDL.  From the time that this case was selected until the completion of the trial in November 2006, the resources of the firm were devoted almost entirely to the Vioxx litigation.  All three partners of the firm performed extensive work in connection with the bellwether trial.

Mr. Blizzard served on the NPC and for eleven months committed substantial amounts of time to negotiating a resolution of the Vioxx litigation.  Mr. Blizzard's efforts were critical in working out the details of a complex settlement agreement that has resulted in the efficient and fair compensation for participating Vioxx claimants.

After the settlement was announced, Mr. Blizzard traveled throughout the country to help explain the details of the Vioxx settlement agreement.  Mr. Blizzard and members of his firm also expended considerable time serving as members of the Liaison Committee to the Claims Administrator and serving on the Gates Committee.  Blizzard, McCarthy & Nabers contributed 9,169.25 common benefit hours, of which 3,536.75 were key lawyer hours.  The firm also expended $1,001,218.43 in common benefit expenses.

The FAC initially recommended an award of $11,600,000.  At the conclusion of the Special Master's hearing, the FAC recommended an award $10,553,246.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $10,454,451.

Based upon the common benefit contributions and considering the nature of the work done by Blizzard, McCarthy & Nabers, the firm is awarded common benefit fees in the amount of $10,488,974.87.

### 19)   Bossier & Associates

Bossier & Associates submitted 102.50 common benefit hours.  Sheila M. Bossier was a member of the Discovery Committee.  The majority of the submitted hours were devoted to document review.  An affidavit in support of the petition for common benefit fees was not received.  A presentation on behalf of the firm was not made to the Fee Allocation Committee.

The FAC recommended an award of $20,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $20,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Bossier & Associates, the firm is awarded common benefit fees in the amount of $20,000.

### 20)   Branch Law Firm

The Branch Law Firm submitted common benefit hours in the amount of 7,087.50 hours.  Of these hours, 5,172 hours were devoted to case assessment, development, and administration, 730.25 hours to pre-trial pleadings and motions, and 1,159.50 hours to discovery.  The total amount of time devoted to trial was only 25.75 hours; the majority of the hours were attributable

to case assessment.  The Branch Firm incurred $406,059.86 in common benefit costs.  The

majority of the Branch Law Firm's contributions were made in the New Jersey Consolidated

Litigation where the firm represented eleven clients whose cases were selected for expedited

discovery and potential trial selection, although the Branch Firm also had one case scheduled for

trial in Texas.  The Branch Law Firm enrolled approximately 2200 cases in the settlement

program.  They were briefly appointed to the State Liaison Committee in the MDL, but resigned

from that position.

       The FAC initially recommended no award of common benefit fees for the Branch Firm.

The firm objected to that recommendation.  In its briefing and at the Special Master's hearing,

the FAC took the position that the Branch Firm did not have a sustained leadership role in the

MDL.  Further, the FAC stated that in the New Jersey litigation the Branch Firm was focused on

preparing its eleven cases for trial and defended depositions of the plaintiffs or their spouses but

did not depose any Merck witnesses, doctors, prescribers, sales representatives, or expert

witnesses, and in fact none of the eleven cases ever received a trial date.  The Special Master

recommended an award of $190,000.

       The Branch Firm argues that because its 7,087.50 hours constitute 1.2523 percent of the

total number of hours considered by the Court in fixing the total common benefit fund, therefore

it should be entitled to 1.2523 percent of the fund, or an amount of $3,947,875.75.  The Branch

Firm described its common benefit time as time spent "attending hearings in New Jersey,

participating in Science and Discovery Committee, speaking with Mr. Buchanan [a partner at

Seeger, Weiss and a leader in the New Jersey litigation], getting cases that Judge Higbee, you

know, ordered for expedited discovery.  Because the better the cases you have prepared for trial,

the better the verdict is going to be, the more it's going to drive a settlement."

The Special Master concluded that the Branch Firm's work was more appropriately characterized as for the benefit of the firm's individual clients, rather than for the common benefit.  However, he also concluded that "the Branch Firm did do some common benefit work and for the amount and type of common benefit work the Branch Firm performed, it is the finding and recommendation of the Special Master that an appropriate and just award for the Branch Firm is $190,000."

The Court has already explained why a mechanical allocation of common benefit fees solely according to hours worked is inadequate in this MDL proceeding.  The Court must look to the nature of the work and its contribution to the common benefit and the favorable resolution of the matter.  The record discloses that the vast majority of the Branch Firm's hours were for work done in New Jersey on eleven cases set for trial before Judge Higbee.  The testimony of the Branch Firm's representative at the Special Master's hearing and the Court's own review of the Branch Firm's time sheets discloses that the work consisted mainly of internal meetings regarding the cases selected for trial in New Jersey, consistent appearances at status conferences, reviewing pretrial orders, reviewing Merck-produced documents in preparation for trial, and participating in a number of depositions between May, 2007 and November, 2007.  The Branch Firm tried no cases and did not play a meaningful leadership role either in the MDL or in the New Jersey litigation, but their work in the New Jersey litigation did have a salutary effect on the ultimate resolution of the Vioxx litigation.

Therefore, based upon the common benefit contributions and considering the nature of the work done by the Branch Law Firm, the firm is awarded common benefit fees in the amount

of $500,000. This amount, of course, is in addition to the contingetn fee amounts that this firm earned in connection with the work performed in advancing the specific cases in which they were primary counsel.

### 21)   Brandi Law Firm

The Brandi Law Firm tried one of the two bellwether trials in the California Coordinated Litigation. The Brandi Law Firm was lead counsel in *Arrigale v. Merck & Co.*, which was consolidated for trial in the California state court with *Appell v. Merck & Co.* The case ended in a mistrial and preparations were ongoing for a second trial when the settlement program was announced.

The Brandi Law Firm submitted common benefit hours in the amount of 5,214.95 hours, of which 2,826.50 hours appear to be partner hours. The Brandi Firm incurred $340,355.44 in common benefit costs.

The FAC recommended an award of $970,000. The firm has indicated its acceptance of that recommended amount. The Special Master recommended an award of $970,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by the Brandi Law Firm, the firm is awarded common benefit fees in the amount of $970,000.

### 22)   Brown & Crouppen, PC

Brown & Crouppen, PC submitted common benefit hours in the amount of 783.75 hours, of which 507.25 hours were submitted by John Driscoll, a former associate with the firm. Brown & Crouppen, PC were referring counsel and participated in the bellwether trial, *Schwaller v. Merck & Co.*, which was tried in state court in Madison County, Illinois. The firm also enrolled

more than 400 cases in the settlement program.

The FAC recommended an award of $73,000.  The firm did not file an objection or respond to that recommended amount or participate in the allocation proceedings.  The Special Master recommended an award of $73,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Brown & Crouppen, the firm is awarded common benefit fees in the amount of $73,000.

**23)    Bruce Dean, LLC**

Bruce Dean LLC submitted a total of 10.5 common benefit hours.  An Affidavit in support of the Petition for Common Benefit Fees was not received.  A presentation on behalf of the firm was not made to the Fee Allocation Committee.

The FAC recommended no award.  The firm did not file an objection or respond to that recommended amount or participate in the allocation proceedings.  The Special Master recommended no award.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Bruce Dean, LLC, the firm is not awarded common benefit fees.

**24)    Bruno & Bruno, LLP**

Joseph M. Bruno and the firm of Bruno & Bruno, LLP submitted hours which were rejected by the Court-appointed CPA's office as untimely and for failure to comply with the PTO guidelines for time submission.  Bruno & Bruno did not respond to a notice from the CPA's office rejecting those hours.  Accordingly, the FAC's initial proposed recommendation did not allocate any common benefit fee award to Bruno & Bruno.  Bruno & Bruno objected to its

absence from the FAC's recommendation, submitting again documentation of hours worked and requesting an award of common benefit fees for 319.50 hours of work done participating in document review, attending meetings, hearings, and conferences, and reviewing pleadings and discovery responses.  No attorney with Bruno & Bruno served on the PSC or any state or MDL committees or subcommittees.

After the Special Master's hearing, the FAC recommended an award of $75,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $75,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Bruno and Bruno, the firm is awarded common benefit fees in the amount of $75,000.

### 25)   Burg, Simpson, Eldredge, Hersh & Jardine, P.C.

Michael S. Burg was a member of the State Liaison Committee.  John Restaino served as the Co-Chair of the MDL Science Committee.  John Restaino shared responsibility for the development of the scientific evidence and plaintiff experts in the MDL.  He participated in the preparation of MDL expert reports, took and defended expert depositions, and assisted in preparing experts for trial.  Mr. Restaino oversaw the development, with Dr. Egil Fosslien, of an animation depicting the effects of Vioxx in coronary arteries at the time of a myocardial infarction.  Mr. Restaino played a vital support role for three MDL trials.  Mr. Restaino also contributed to the Stroke Subcommittee.

Scott Eldredge was a member of the Science Committee and the Sales and Marketing Committee.  Mr. Eldredge reviewed documents relevant to the cross examination of

Merck/Frosst employees.  In addition, he assisted in the review of documents and preparation for the depositions of Dr. Susan Baumgartner, Deborah Nicole-Griffiths, and Tom Cannell.  Max Yefimenko was member of the MDL Science Committee and contributed to the development of the plaintiffs' case in regard to mechanism of action and pharmacology and to the analysis of numerous scientific articles.  In addition, Mr. Yefimenko worked with MDL experts.  Other members of the firm reviewed documents and attended meetings.

Burg Simpson submitted common benefit hours in the amount of 2,599.75 hours, of which 1,515.75 were partner hours.  John Restaino's common benefit contribution as a shareholder of Burg Simpson began in January 1, 2007.  Prior to that time, his contributions were as a shareholder of Lopez, Hodes, Restaino, Milman & Skikos.  Burg Simpson incurred $20,321.56 in common benefit costs and enrolled more than 150 cases in the settlement program.

The FAC recommended an award of $500,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $500,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Burg, Simpson, Eldredge, Hersh & Jardine, the firm is awarded common benefit fees in the amount of $500,000.

### 26)    Cafferty Faucher

Cafferty Faucher submitted 207.50 common benefit hours, of which 15.25 hours were partner hours.  An affidavit in support of the petition for common benefit fees was not received. A presentation on behalf of the firm was not made to the FAC.  Cafferty Faucher submitted $1,441.62 in common benefit expenses.

The FAC recommended an award of $30,000.  The firm has indicated its acceptance of

that recommended amount.  The Special Master recommended an award of $30,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Cafferty Faucher, the firm is awarded common benefit fees in the amount of $30,000.

### 27)  Capshaw Goss

Capshaw Goss submitted 152.50 common benefit hours, of which 109.25 were partner hours.  All hours submitted by the firm were devoted to case assessment, development, and administration.  Tim Goss was a member of the Purchase Claims Committee.  An affidavit in support of the petition for common benefit fees was not received.  A presentation on behalf of the firm was not made to the FAC.  Capshaw Goss submitted $3,306.50 in common benefit expenses, $1,000 of which is in dispute.

The FAC recommended no award.  The firm did not file an objection or respond to that recommended amount or participate in the allocation proceedings.  The Special Master recommended no award.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Capshaw Goss, the firm is awarded no common benefit fees

### 28)  Carey & Danis

Carey & Danis, in conjunction with the Lowe Law Firm, were lead counsel in *Auslander v. Merck & Co.* and *Donahoo v. Merck & Co.*, two cases which were set for trial in Illinois state court.  In *Donahoo*, members of the firms participated in extensive discovery, including depositions of plaintiffs, sales representatives, case specific experts and treating physicians.   In *Auslander*, discovery was ongoing until the announcement of the settlement program.

Carey & Danis submitted common benefit hours in the amount of 5,518.25 hours, of which 1,749.50 were partner hours.  Carey & Danis incurred common benefit expenses in the amount of $98,725.28 and enrolled approximately 1900 cases in the settlement program.

The FAC initially recommended no award.  At the conclusion of the Special Master's hearing, the FAC recommended an award of $350,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $350,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Carey & Danis, the firm is awarded common benefit fees in the amount of $350,000.

### 29)    Charfoos & Christiansen

Charfoos & Christiansen submitted a total of 396.75 hours.  An Affidavit in support of the Petition for Common Benefit Fees was not received.  A presentation on behalf of the firm was not made to the FAC.

The FAC recommended no award.  The firm has indicated its acceptance of that recommendation.  The Special Master recommended no award.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Charfoos & Christiansen, the firm is awarded no common benefit fees.

### 30)    Childers, Buck & Schlueter

Childers, Buck & Schlueter submitted 74.5 hours for common benefit, of which 63.75 hours were partner hours.  These hours were not documented in accordance with Pre-Trial Order No. 6, and the hours were not accepted by the Court-appointed CPA.  An affidavit in support of the petition for common benefit fees was not received.  A presentation on behalf of the firm was

not made to the FAC.

The FAC recommended no award.  The firm did not file an objection or respond to that recommended amount or participate in the allocation proceedings.  The Special Master recommended no award.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Childers, Buck & Schlueter, the firm is awarded no common benefit fees.

**31)   Cohen Milstein**

Daniel Sigelman was a member of the MDL Science Committee.  In addition, Mr. Sigelman and other members of Cohen Milstein contributed to a science working group which supported the New Jersey Consolidated Litigation, specifically the trial teams in *Cona/McDarby v. Merck & Co.* and *Hermans/Humeston v. Merck & Co.*  Cohen Milstein assisted in uncovering and developing liability and causation evidence against Merck in the scientific area. Specifically, Mr. Sigelman worked extensively with plaintiff experts, Dr. Harlan Krumholz, Dr. David Egilman, and Dr. David Madigan.  He assisted in the drafting of Dr. Madigan's expert report.  In addition, Mr. Sigelman prepared a detailed analysis of placebo-controlled clinical trials that showed how Merck excluded important clinical trial data.  This analysis was used during the *Hermans/Humeston* trial.  Mr. Sigelman took the deposition of Merck employee, Dr. Ned Braunstein.  From August 2005 until November 2007, Mr. Sigelman devoted the majority of his professional time to the Vioxx litigation to the exclusion of other available projects.  Mr. Sigelman reviewed documents and analyzed the scientific literature for purposes of assisting in the development of plaintiffs' scientific liability case and defeating Merck's "placebo-controlled gold standard" defense.  Mr. Sigelman also assisted in gathering evidence to establish general

causation.

Cohen Milstein submitted common benefit hours in the amount of 2,003.75, of which 1,753.50 were partner hours.  Cohen Milstein incurred $5,699.56 in common benefit costs.

The FAC recommended an award of $750,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $750,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Cohen Milstein, the firm is awarded common benefit fees in the amount of $750,000.

### 32)     Cohen, Placitella & Roth, PC

Cohen, Placitella & Roth focused its efforts on discovering the marketing and public relations activities of Merck in response to its knowledge of the dangers of Vioxx.  Members of the firm reviewed more than 100,000 documents, including the custodial files of key Merck employees such as David Anstice, Jo Jerman, Charlotte McKines, Wendy Dixon, Jan Weiner and Mary Elizabeth Blake.  Chris Placitella took the depositions of Jan Weiner and Mary Elizabeth Blake.  Both depositions were used in bellwether trials.  Cohen Placitella's discovery efforts yielded materials from Merck and third-parties relevant to Merck's knowledge of the risks of Vioxx and its marketing efforts, which played a role in bellwether trials.  Mr. Placitella also provided trial support during several bellwether trials in the New Jersey Consolidated Litigation.

Cohen Placitella worked with the following plaintiff experts:  Dr. David Egilman, Dr. Jay Geller (FDA), Dr. Sander Greenland (epidemiologist), Michael Hoffman (ethicist), Dr. John Kostis (cardiologist), Dr. David Madigan (biostatistician), Dr. Anthony Altobelli (cardiologist), and Thomas Nesi (marketing and public relations).

Cohen, Placitella & Roth submitted common benefit hours in the amount of 4,964 hours, of which 3764.25 were partner hours.  Cohen, Placitella & Roth incurred $112,452.57 in common benefit expenses and enrolled approximately 290 cases in the settlement program.

The FAC initially recommended an award of $500,000.  The firm objected to that recommendation.  After the Special Master's hearing, the FAC recommended an award of $3,500,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $3,500,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Cohen, Placitella & Roth, the firm is awarded common benefit fees in the amount of $3,500,000.

### 33)    Cunard Law Firm

Rebecca Cunard served on the Discovery Committee, Science Committee, Sales and Marketing Subcommittee, Theme Grid Subcommittee, and FDA Defense subcommittee.  Cunard Law Firm submitted 2,790.75 common benefit hours.  These hours were devoted primarily to document review.  Rebecca A. Cunard submitted a total of 658 hours personally.  The remaining hours were expended by contract lawyers hired by Ms. Cunard and devoted to case assessment, administration, and document review.  Cunard Law Firm incurred $17,005.57 in common benefit expenses.

The FAC recommended an award of $100,000.  The firm objected to that recommended amount.  After the Special Master's hearing, the FAC recommended an award of $375,000.  The firm has indicated its acceptance of that award.  The Special Master recommended an award of $375,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by the Cunard Law Firm, the firm is awarded common benefit fees in the amount of $375,000.

**34)   Cuneo & Gilbert**

Cuneo & Gilbert provided consulting services and were paid on a contract basis by the PSC.

The FAC recommended no award.  The firm did not file an objection or respond to that recommended amount or participate in the allocation proceedings.  The Special Master recommended no award.

Therefore, Cuneo & Gilbert is awarded no common benefit fees.

**35)   Robert J. DeBry**

Robert J. DeBry submitted common benefit time in the amount of 31 hours, all of which were devoted to discovery.  An affidavit in support of the petition for common benefit fees was not received.  A presentation on behalf of the firm was not made to the FAC.  Mr. DeBry submitted common benefit costs in the amount of $958.07.

The FAC recommended an award of $15,000.  The attorney has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $15,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Robert J. DeBry, the attorney is awarded common benefit fees in the amount of $15,000.

**36)   Dugan & Browne**

Dugan & Browne submitted 114.25 hours.  An Affidavit in support of the Petition for

Common Benefit Fees was not received.  A presentation on behalf of the firm was not made to the FAC.  The time submitted pertains to work done on the Purchase Claims Committee and the Louisiana AG action.  Both are ongoing matters.

The FAC recommended no award.  The firm did not file an objection or respond to that recommended amount or participate in the allocation proceedings.  The Special Master recommended no award.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Dugan & Browne, the firm is awarded no common benefit fees.

### 37)     Engstrom, Lipscomb & Lack

Walter J. Lack, along with members of his firm, worked with Dr. Cheryl Blume and other experts to assist in the development of the general causation case in the California Consolidated Litigation.  Mr. Lack also reviewed the sale of stock by key Merck employees, engaging an expert and proving that Merck employees sold stock at all time high prices in advance of the announcement of negative safety data.  Members of the firm contributed to a comprehensive chronology of the case that was used in the California litigation.

Engstrom, Lipscomb & Lack submitted common benefit hours in the amount of 6,866.95 hours, of which 1,076.50 hours appear to be partner hours.

The FAC recommended an award of $390,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $390,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Engstrom, Lipscomb & Lack, the firm is awarded common benefit fees in the amount of $390,000.

**38)      Escobedo, Tippit & Cardenas; Snapka, Turman & Waterhouse**

The common benefit applications of Escobedo, Tippit & Cardenas("Escobedo Tippit") and Snapka, Turman & Waterhouse ("Snapka") are related and accordingly the Court will address their award jointly.  Collectively, Snapka and Escobedo Tippit request ten percent of the entire common benefit fund, or $31,525,000.00 between them.

Escobedo Tippit was lead counsel in *Garza v. Merck & Co.*, a case which was tried in Texas state court.  The case was tried for four weeks over a four-month period and resulted in a plaintiff's verdict in the amount of $32 million.  On appeal, the verdict was first reversed and judgment rendered in favor of Merck.  Upon rehearing, the appellate court withdrew that opinion and reversed on the basis of jury misconduct.  *Merck & Co. v. Garza*, 277 S.W.3d 430 (Tex. App. 2008).  The Court of Appeals concluded that the trial court erred in denying Merck's motion for a new trial after it came to light that one of the jurors had received interest-free loans from the decedent's wife and that phone calls had been made from the juror's phone to the decedent's wife's phone around the time of the case.  *See id.* at 440-42.  An appeal is still pending with the Texas Supreme Court.  The case was filed prior to the formation of the Vioxx MDL.  Members of the Escobedo firm engaged in extensive discovery which included reviewing thousands of documents produced specifically in the *Garza* case, developing and preparing general causation and case specific experts, and conducting case specific discovery.  Members of the firm deposed ten Merck employees, including Linda Hostelley, Dr. Leonard Tacconi, Dr. Deborah Shapiro, James Dunn, Bernadette McKeon, Dr. Alise Reicin, Dr. Nancy Santanello, and Dr. Thomas Bold.  Other depositions were taken of Merck sales representatives.

Escobedo Tippit submitted common benefit hours in the amount of 14,886.75 hours, of

which 6,238.50 appear to be partner hours.   Escobedo Tippit incurred $444,938.71 in common

benefit expenses.  All of the hours and costs submitted by Escobedo Tippit for common benefit

consideration were expended in the preparation and trial of the *Garza* case.  The *Garza* case was

excluded from the terms of the Master Settlement Agreement by agreement of all parties.

Kathryn Snapka served as co-counsel in *Garza v. Merck & Co.*  Ms. Snapka was also

lead counsel in the case of *Zajicek v. Merck & Co.*, which was scheduled to be tried in Texas

state court in February 2008, but was continued when the settlement program was announced.

Extensive discovery had been conducted in that case, including numerous depositions, prior to

the continuance.   Ms. Snapka served for a period of time as Plaintiffs' Liaison Counsel for the

Texas Consolidated Litigation.  She also performed other services in the MDL.

Snapka, Turman & Waterhouse submitted common benefit hours in the amount of

2,926.5, of which 1,830 hours were Ms. Snapka's.  Snapka, Turman & Waterhouse incurred

$107,264.03 in common benefit expenses.

With respect to Escobedo Tippit, the FAC recommended no award.  With respect to

Snapka, the FAC recommended an award of $75,000.  Both firms objected to those

recommended awards and participated in the Special Master's hearing.

The FAC based its recommendation on the contention that all of Escobedo Tippit's work

was in the *Garza* case and none of it was shared, and that the majority of Snapka's work was in

the *Garza* case.  Moreover, the FAC contends that the *Garza* case, at the plaintiffs' attorney's

request, was excluded from the settlement and no common benefit fee was due from that case.

The Special Master heard testimony and argument from Escobedo Tippit, Snapka, and

the FAC and made findings of fact regarding the common benefit contribution of those firms.  In

-65-

his report, the Special Master states:

Escobedo claimed no common benefit contribution apart from his work in the *Garza* case (Deposition of Andy Birchfield on May 6, 2011 at p. 199). Escobedo claims his firm is entitled to $20,000,000 for the work his firm did in the *Garza* case. (Transcript of Hearing on May 9, 2011 at p. 64). Snapka claims she is entitled to $12,000,000 for her work which included the *Garza* case (Transcript of Hearing on May 11, 2011 at p. 221).

One contention of the FAC was that Escobedo and Snapka had opted the *Garza* case out of the settlement program and, therefore, there should be no credit given for their work in that case. The testimony at the hearing does not support the FAC's contention that Escobedo and Snapka opted the *Garza* case out of the settlement with Merck. On the other hand, the settlement agreement clearly provides that the *Garza* case is not part of the settlement program. The end result is that the *Garza* attorneys would be entitled to whatever attorney fees are generated in the *Garza* case and they would not be obligated to pay any common benefit assessment in the present action. At the Special Master hearing, Escobedo testified that if they were ultimately successful and were paid in the *Garza* case, they were willing to pay the common benefit assessment (Transcript of the Hearing on May 11, 2011 at p. 46). Since the *Garza* case is excluded from the settlement agreement, the assessment is not an obligation they would owe. This circumstance must also be considered with the fact that the *Garza* attorneys elected to remand the case to state court and that Snapka had sought exemption from the common benefit assessment (Transcript of Hearing on May 11, 2011 at pp. 180-182). With these set of facts, the issue before the Special Master is what credit, if any, should be given to the work performed in the *Garza* case.

A review of the record, exhibits and transcripts of meetings with the FAC reveals that two other law firms who actually tried cases in state courts that were excluded from the settlement agreement received recommended awards. The Locks Firm received a recommended award of $1,700,000 and the Heninger, Garrison & Davis Firm received a recommended award of $1,300,000 .... It is the finding and recommendation of the Special Master that these two firms represent comparable situations and serve as a reasonable and just basis for a recommended award to Escobedo and Snapka for their work in the *Garza* case.

It is the finding and recommendation of the Special Master that a total of $1,450,000 should be awarded for the work performed by Escobedo and Snapka in the *Garza* case. As between Escobedo and Snapka, an analysis of the testimony demonstrates that a division of the recommended award between the attorneys for work in the *Garza* case is required.

Snapka prepared and handled the direct testimony of Dr. Simonini in the *Garza* trial. Mr. Hockema did the general voir dire and Snapka did the specific voir dire. Snapka also did the direct examination of two sons. She also cross-examined Dr. Wheeler and prepared for the anticipated testimony of Dr. Alise Reicin. Snapka was also involved in the remand proceedings of the *Garza* case

(Transcript of Hearing on May 11, 2011 at p. 110).  In describing her involvement in the case as compared to Hockema and Escobedo, Snapka said they "were leaps and bounds ahead of me" (Transcript of Hearing on May 11, 2011 at p. 118). Hockema stated that Snapka had a limited role in the case (Deposition of Andy Birchfield on May 6, 2011 at p. 183).  Without question, the bulk of the work in the *Garza* case was done by the Escobedo interest.

It is the finding and recommendation of the Special Master that an appropriate and just division of the $1,450,000 recommended award for work in the *Garza* case is $1,087,500 to Escobedo and $362,500 to Snapka.

Snapka performed common benefit work that was beyond the work she did in the *Garza* case.  This work included her efforts for a period of time in her role as Notice Counsel in Texas, appearances and input at MDL status conferences, her efforts on use of retained blood and limited briefing and participation in the preemption-related issues.  For her work on these matters Snapka should receive an additional compensation.  It is the finding and recommendation of the Special Master that an appropriate and just award for this additional common benefit work is $150,000 for a total award of $512,500.

The Court largely agrees with the observations made by the Special Master.  A strong argument can be made that a rigorous presentation in any trial in any court attacking Merck's actions or inactions regarding Vioxx will have some salutary rippling effect on all other cases.  But the significance of that effort may be different in each case depending on the ultimate result, the time it was rendered, and whether or not the work and efforts were shared or made available to others.

The firm awards cited by the Special Master in justifying his recommendation–the Locks Firm's award and the Heninger, Garrison, & Davis Firm's award–are distinguishable.  Each of those firms performed common benefit work on other matters.  For example, the Locks firm re-reviewed large numbers of documents produced in relation to Scientific Therapeutics, Inc. Moreover, the Locks firm had three cases that were selected as discovery pool cases and extensive work was done to prepare the cases and the cases were eligible for trial selection. With regard to the Heninger firm, that firm also extensively worked with experts and provided significant support for other bellwether trials.

Escobedo Tippit, by contrast, performed no common benefit work other than the work on the *Garza* case, which was excluded from the settlement program.  The end result was that the *Garza* attorneys would be entitled to whatever attorneys' fees were generated in the *Garza* case and they would not be obligated to pay any common benefit assessment.  As mentioned, the case was tried to a Texas state jury and an award of $32,000,000 was obtained.  Unfortunately for the litigant, the Texas Court of Appeals reversed the trial court's judgment on that verdict, and further appeals remain pending.  *Garza*, 277 S.W.3d 430.  Now Escobedo Tippit seeks $20,000,000 as common benefit fees for its work in *Garza*, a case specifically excluded from of the Settlement Program and for which it owed no common benefit fees.  This request rings hollow.

Taking into consideration the recommendations of the Special Master and the FAC, and applying the experience this Court has accumulated in this matter, the Court concludes that a fair common benefit fee for Escobedo Tippit is $1,600,000.00.  This figure takes into consideration the work performed in the *Garza* case and its salutary effect on the Vioxx litigation.  As elsewhere explained in this opinion, the purpose of the common benefit fee is not to pay counsel for his or her work in a specific case.  That is the purpose of the contingent fee in that case.  The purpose of the common benefit fee is to compensate counsel for work which inured to the common benefit of the whole litigation.

Snapka's contribution to the MDL's resolution is a bit different.  True, like Escobedo she spent significant time on the *Garza* case and incurred some $107,264.03 in costs.  But she also performed work beyond the *Garza* case.  This work included her efforts for a period of time as notice counsel in Texas, appearances and input at MDL status conferences, her efforts on the use

of retained blood and her work in briefing and argument in the preemption-related issues. Taking all of this into consideration, the Court finds that an appropriate common benefit award for Snapka is $1,100,000.

### 39)   Fayard & Honeycutt

Fayard & Honeycutt submitted 416 common benefit hours, of which 107.25 were partner hours. These hours were devoted exclusively to case assessment, development, and administration. An affidavit in support of the petition for common benefit fees was not received. A presentation on behalf of the firm was not made to the Fee Allocation Committee.

The FAC recommended an award of $15,000. The firm has indicated its acceptance of that recommended amount. The Special Master recommended an award of $15,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Fayard & Honeycutt, the firm is awarded common benefit fees in the amount of $15,000.

### 40)   Fibich, Hampton & Leebron, LLP

Kenny T. "Tommy" Fibich was a member of the Plaintiffs' Steering Committee for the Texas Consolidated Litigation and the MDL State Liaison Committee. In his role in the Texas litigation, Mr. Fibich was Notice Counsel and he worked closely with members of the Texas PSC to develop litigation strategy, select experts, evaluate trial cases, and conduct discovery. Mr. Fibich and members of his firm developed pretrial and case management orders in the Texas MDL, attended hearings, participated in considerable motion practice, and provided support to plaintiffs' counsel who were not members of the Texas PSC. Fibich, Hampton & Leebron were co-counsel in the Texas MDL bellwether case of *Ledbetter v. Merck & Co.* Mr. Fibich and

others members of his firm engaged in extensive discovery, worked with case specific experts, contributed extensively to the briefing and hearings on motions, including motions in limine and a motion to dismiss based on preemption.  Following the decision of Judge Randy Wilson to grant the motion to dismiss based on preemption, Mr. Fibich worked with others to appeal the decision.

Fibich, Hampton & Leebron submitted common benefit hours in the amount of 2,021.25, of which 403.75 were partner hours.  Fibich, Hampton & Leebron incurred $80,640.50 in common benefit costs.

The FAC recommended an award of $610,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $610,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Fibich, Hampton & Leebron, the firm is awarded common benefit fees in the amount of $610,000.

### 41)   Freese & Goss

Freese & Goss submitted 794 common benefit hours, of which 412.5 were partner hours. 624.25 of the total submitted hours were devoted to case assessment, development, and administration.  An affidavit in support of the petition for common benefit fees was not received. A presentation on behalf of the firm was not made to the FAC.  Freese & Goss submitted $10,239.37 in common benefit costs to the Fee Allocation Committee.  $7,198.39 of these costs was approved; the remainder is in dispute.  The firm also enrolled approximately 440 cases in the settlement program.

The FAC recommended no award.  The firm objected to that recommendation.  After the

Special Master's hearing, the FAC recommended an award of $25,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $25,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Freese & Goss, the firm is awarded common benefit fees in the amount of $25,000.

### 42)   Friedman Law Offices

Friedman Law Offices submitted 20.5 common benefit hours.  At the request of the PSC, the Friedman Law Offices assisted with the filing of a statewide class action.

The FAC recommended an award of $6,500.  The firm did not file an objection or respond to that recommended amount or participate in the allocation proceedings.  The Special Master recommended an award of $6,500.

Therefore, based upon the common benefit contributions and considering the nature of the work done by the Friedman Law Offices, the firm is awarded common benefit fees in the amount of $6,500.

### 43)   Gainsburgh, Benjamin, Davis, Meunier & Warshauer, LLC

Gerald E. Meunier served as a member of the MDL PSC.  Mr. Meunier chaired the Trial Package Committee and was also a member of the Law and Briefing Committee.  Mr. Meunier served as co-counsel in the *Irvin II v. Merck & Co.*, arguing motions in limine, jury charges, and Daubert issues.  He participated in a support role in *Irvin I*, assisting with briefing on Daubert and other legal issues.  Mr. Meunier was co- trial counsel with Russ Herman in *Diaz v. Merck & Co.*, and in that role, assisted Bonnie Zabotnick in the preparation of the case prior to its

dismissal.  Mr. Meunier also assisted the trial teams in the *Barnett* and *Dedrick* MDL trials, giving input into jury selection, jury charges, and legal research.  As a member of the Law and Briefing Committee, Mr. Meunier took a lead role in negotiating the case management order for class certification.  In relation to the MDL Trial Package, Mr. Meunier, along with Co-Chair Pete Kaufman, provided leadership to the preparation of the trial packages for both heart attack and stroke claims.

 Gainsburgh, Benjamin, Davis, Meunier & Warshauer submitted common benefit hours in the amount of 1,216 hours, of which 1,151.50 hours were Mr. Meunier's.  Gainsburgh, Benjamin, Davis, Meunier & Warshauer incurred $15,208.64 in common benefit costs.  In addition, the firm paid $355,000.00 in PSC assessments.

The FAC recommended an award of $2,690,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $2,690,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Gainsburgh, Benjamin, Davis, Meunier & Warshauer, the firm is awarded common benefit fees in the amount of $2,500,000.

### 44)   Gallagher Law Firm

The Gallagher Law Firm submitted common benefit hours in the amount of 1,219.5, of which 1,033 were partner hours.  Key lawyer hours were devoted to trial preparation in the Texas Consolidated Litigation.  The firm enrolled approximately 360 cases in the settlement program.

The FAC recommended an award of $40,000.  The firm did not file an objection or respond to that recommended amount or participate in the allocation proceedings.  The Special

Master recommended an award of $40,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by the Gallagher Law Firm, the firm is awarded common benefit fees in the amount of $40,000.

### 45) Gancedo & Nieves, LLP

Tina Nieves was a member of the MDL Discovery Committee, Science Committee, Sales and Marketing Committee, as well as Chair of the Science Research, Publications & Society Meetings Subcommittee.  Hector Gancedo was a member of the Plaintiffs' Executive Committee of the California Consolidated Litigation.  Members of the firm designed and developed a multi-media timeline and integrated document database that became part of the MDL trial package.  Ms. Nieves and other members of the firm assisted in the development of a Science Theme Grid Database that summarized and provided access to relevant medical literature.  Ms. Nieves worked with experts such as Dr. Singh, Dr. Miriam Sturkenboom, Dr. Connie Pechmann, Dr. Gunnar Gislason, Dr. Lemuel Moye, Dr. Francesco Cippolone, and Dr. John LaPuma.  Ms. Nieves attended and reported on various scientific meetings.  Members of the firm deposed sales representatives as part of a Sales & Marketing Committee project.  Members of the firm also reviewed documents in the California depository.  Gancedo & Nieves submitted 3,649.25 common benefit hours.  Gancedo & Nieves incurred $146,983.76 in common benefit costs.

The FAC recommended an award of $600,000.  The firm objected to that recommended amount.  After the Special Master's hearing, the FAC recommended an award of $700,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $700,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by the Gancedo & Nieves, the firm is awarded common benefit fees in the amount of $700,000.

**46)  Gianni Petoyan**

Gianni Petoyan submitted common benefit hours in the amount of 314.75, of which 274.75 were partner hours.  Members of the firm participated in the preparation of the *Arrigale v. Merck & Co.* bellwether trial.  The firm's work on the case included review and analysis of plaintiff medical records, preparation of case specific experts, and preparation and participation in depositions of plaintiff treating physicians.   Gianni Petoyan incurred $86,308.50 in common benefit costs.

The FAC recommended an award of $30,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $30,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Gianni Petoyan, the firm is awarded common benefit fees in the amount of $30,000.

**47)  Girardi & Keese**

Tom Girardi served on the NPC, the FAC, and served as Co-Lead Counsel for the California Coordinated Litigation.  Mr. Girardi has extensive experience from his leadership roles in numerous MDLs, class actions and complex cases.  Tom Girardi and his firm served as Lead Counsel for one of the bellwether trials conducted in California state court.  Girardi & Keese provided excellent leadership in the California Coordinated Litigation.  The firm was involved in Vioxx litigation before the drug was pulled off the market and remained active in the

litigation through the settlement phase and the fee allocation process.  The firm expended 20,469.5 hours in common benefit work and incurred common benefit costs in the amount of $1,260,020.01.  Girardi & Keese enrolled over one thousand cases in the settlement program.

The FAC recommended an award of $20,100,000.  After the Special Master's hearing, the FAC recommended an award of $18,286,228.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $18,115,041.

Based upon the common benefit contributions and considering the nature of the work done by Girardi & Keese, including the work in coordinating the work of the California cases, the firm is awarded common benefit fees in the amount of $18,200,00.00.

### 48)    Goldenberg Heller

Goldenberg Heller initially submitted hours to the CPA.  However, the submission did not comply with Pretrial Order 6 and none of the time submitted was accepted by the Court-appointed CPA.  An Affidavit in support of the Petition for Common Benefit Fees was not received.  A presentation on behalf of the firm was not made to the FAC.

The FAC recommended no award. The firm has indicated its acceptance of that recommendation.  The Special Master recommended no award.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Goldenberg Heller, the firm is awarded no common benefit fees.

### 49)    Goza & Honnold

The FAC recommended an award of $70,000.   The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $70,000.

Therefore, based upon the common benefit contributions and considering the nature of

the work done by Goza & Honnold, the firm is awarded common benefit fees in the amount of $70,000.

**50)   Hagens Berman**

Hagens Berman submitted 236 common benefit hours.  The FAC recommended no award.  The firm did not file an objection or respond to that recommended amount or participate in the allocation proceedings.  The Special Master recommended no award.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Hagens Berman, the firm is awarded no common benefit fees.

**51)   Heins Mills**

Heins Mills submitted 12.5 common benefit hours.  At the request of the PSC, Heins Mills assisted with the filing of a statewide class action.

The FAC recommended an award of $4,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $4,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Heins Mills, the firm is awarded common benefit fees in the amount of $4,000.

**52)   Heninger, Garrison & Davis, LLC**

Heninger, Garrison & Davis was lead counsel in *Albright v. Merck & Co.*, a bellwether case tried in state court in Alabama.  Though the case resulted in a defense verdict, the efforts of the trial team advanced the overall litigation.  The firm also worked extensively with experts and provided support for other bellwether trials.  The firm submitted common benefit hours in the amount of 5,044, of which 4,180 appear to be partner hours.  Heninger, Garrison & Davis incurred $269,578.55 in common benefit costs.

-76-

The FAC recommended an award of $1,000,000.  The firm objected to that recommended amount.  After the Special Master's hearing, the FAC recommended an award of $1,300,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $1,300,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by the Heninger, Garrison & Davis Law Firm, the firm is awarded common benefit fees in the amount of $1,300,000.

### 53)      Herman, Herman, Katz and Cotlar

Before Vioxx was pulled from the market, Herman, Herman, Katz & Cotlar ("HHK&C") had undertaken investigation of Vioxx and its risks.  Partners in the firm, including Russ M. Herman, attended seminars and working groups in Texas, New York and Washington, DC and began to accumulate journal articles and other evaluation materials.  The firm filed several cases and attended the JPML hearing which resulted in MDL Docket Number 1657 being assigned to this Court.

Soon after the MDL was assigned to this Court, Russ Herman was approached by Chris Seeger, Andy Birchfield, Arnold Levin, Mark Robinson and others who had been pursuing Merck in New Jersey and elsewhere, and whose firms had established depositories in New York City, NY, Montgomery, AL and Los Angeles, CA.  They requested that he organize a meeting for interested firms and plan to coordinate depositions.  Russ Herman then organized a meeting in New Orleans for all attorneys wishing to participate in the MDL.  More than 100 lawyers attended that initial meeting.  After several experienced attorneys offered their services as Liaison Counsel, more than 80% elected Russ Herman.

HHK&C set about immediately to establish a depository which could organize and coordinate the three existing depositories, and manage documents, depositions, trial transcripts and other materials.

Subsequently, the Court appointed Chris Seeger and Andy Birchfield as Co-Lead Counsel and Russ Herman as Liaison Counsel and as the third member of an Executive Committee of the PSC.  The Executive Committee appointed committee chairs and members and followed the Court's directive to utilize non-PSC attorneys in the conduct of litigation.  Liaison Counsel coordinated and monitored each of the committees.

Because the MDL was centered in New Orleans, organization, administration, and numerous other duties fell to Liaison Counsel who became a traffic manager and mediator among various plaintiff constituencies, Merck counsel, the Court, the Special Master and the Pro Se Curator, and the Court-appointed CPA.  Numerous meetings were held between State Liaison and Liaison Counsel and information on state cases was routinely exchanged.  Members of the Executive Committee including Liaison Counsel and Arnold Levin conducted meetings with several hundred law firms, explaining the functions of the MDL and enlisting their participation and their cooperation.

Discovery proceeded.  Between March 18, 2005 and August 25, 2005, six status reports were prepared with Merck's Counsel and submitted to the Court.  Lexis Nexis File and Serve was engaged to perfect service of the voluminous pleadings in the MDL and Liaison Counsel facilitated efforts by the Clerk's Office in the implementation of the Court's Orders and Clerk's directives.

Hurricane Katrina struck on August 29, 2005 followed in less than one month by

Hurricane Rita.  Between hurricanes, HHKC moved the master depository and all personnel to Houston.  The first MDL bellwether trial which had been scheduled for New Orleans took place in Houston without having to be rescheduled.  Five status conferences between September 29, 2005 and February 2, 2006 were scheduled in Houston and the duties of Liaison Counsel and the PSC proceeded uninterrupted during that time.

Discovery depositions also proceeded during the Houston period on September 21, 2005; September 28, 2005; September 29, 2005; September 30, 2005; October 4, 2005; October 5, 2005; October 12, 2005; October 13, 2005;  October 18, 2005; October 26, 2005; October 27, 2005; November 2, 2005; November 21, 2005; November 22, 2005; November 23, 2005; December 15, 2005; December 16, 2005; and December 19, 2005.  The depositions were scheduled, assigned, and participated in by the MDL Executive Committee.  HHK&C coordinated and reviewed documents for the depositions of Avorn, Baumgardner, Curfman, Farquhar, Lucchesi, and Topol.  The firm also participated in strategy discussions and outlined the depositions and potential deposition cuts.

During this period, thirty-six substantive motions were briefed and filed.  All motions were subject to meet and confers, and of the twenty-three motions which were argued to the Court, all but two on behalf of plaintiffs were argued by Russ Herman.

Liaison Counsel oversaw the development of a trial package.  The trial package has been supplemented several times and provided upon request to a number of firms and Attorneys General.

More than several hundred e-mails a day required coordination or answer by Liaison Counsel or his partners Leonard Davis and Stephen Herman.  Several sets of discovery

interrogatories to Merck were prepared.  The interrogatories were formulated by the Executive Committee firms and the Levin firm.  Numerous requests for production were also which resulted in numerous meet and confers, motions, and arguments before the Court.  Liaison Counsel argued the essential motions.

Steve Herman, co-chair of Marketing Discovery and Vice-Chair of Insurance coordinated materials and propounded discovery.  Leonard Davis, in addition to service in the administration of the case, was responsible for much of the e-discovery, coordination with the FDA, and every aspect of the litigation.

Liaison Counsel developed arguments for consideration at trials.  Russ Herman monitored the trials in Texas and New Jersey and reported on progress with commentary to the PSC, committee chairs, and trial teams.  In trials held in New Orleans, Herman was requested to do jury venire investigation and commentary and monitored all MDL trials except the *Barnett* trial.  Liaison Counsel's duty was to objectively report to the trial lawyer community the progress and pitfalls.

Liaison Counsel also assisted in other ways.  Russ Herman and Jerry Meunier agreed to pay 50% of the expenses of and co-counsel the *Diaz* trial.  Mr. Herman met with counsel for Diaz several times, interviewed expert witnesses and began a theme grid for trial before the case was withdrawn from trial.  Russ Herman and Leonard Davis met with jury consultants retained by firms in the MDL and were responsible for resolving disputed bill issues with consultants.

HHK&C participated as primary actor in the following:

(a)     41 Primary Motions - submitted by the PSC and argued;
(b)     38 Responses to Merck's motions were submitted and argued;
(c)     80% of the motions which were argued were argued by Russ Herman;
(d)     18 Status Conference reports;

(e)      52 Meets and confer on various issues;
(f)      110 Depositions in the MDL coordinated, taken and summarized;
(g)      49 Subpoena Duces Tecum issued;
(h)      27 Third-party requests; and,
(i)      277 substantive motions ruled upon in the MDL - Russ Herman was part
of every motion, conference or argument.

The Court appointed Mr. Herman as chair of the NPC.  For almost a year, the committee

met face-to-face with Merck representatives.  A number of conferences were held in out-of-state

locations.  Liaison Counsel, along with Doug Marvin, reported the progress on an ongoing basis

to the Court.

Andy Birchfield and Ed Blizzard developed a grid with input from the NPC.  HHKC

participated in testing the "MI" and "Stroke" grid against its inventory.  HHKC also received a

large sampling of claims of claimants not represented by NPC or PSC members for testing

against the grid.  The project was arduous and conducted in secret while the litigation moved

forward in parallel.

Following a joint meeting in Washington, DC, the NPC met and authorized Russ Herman

to negotiate the final dollars in settlement.  The negotiation was concluded that evening for $4.85

billion dollars, the largest settlement of its kind.  The acceptance rate, the accuracy of the NPC's

testing grid, and the speed of payouts all demonstrate the success of the negotiations.

Liaison Counsel traveled to five different states to conduct "Question and Answer"

sessions regarding the Settlement Agreement.  Liaison Counsel also served on the Gates

Committee.  Weekly communications with BrownGreer, the Garretson Firm, Special Master

Juneau, and US Bank continued post-settlement.

Numerous lawyers, pro se claimants, and represented claimants were referred to Liaison

Counsel by the Court.  On each occasion, Russ Herman or Leonard Davis communicated with

the inquirers, gave answers and advices, referred represented claimants to their attorneys and referred pro se claimants to Robert Johnston, Pro Se Curator.  This activity continues to this date.

Russ Herman, and the firm of Herman, Herman, Katz & Cotlar did not participate in other MDL litigations.  In addition to playing the role of traffic manager among plaintiffs' lawyers, HHK&C accounted for the third most recorded hours and Russ Herman alone accounted for approximately 10,000 personal hours during the litigation.  The reported hours were recorded contemporaneously and not reconstructed.  Further, the work performed by HHK&C was accomplished mostly by three partners and senior paralegals.  HHK&C also expended more than $400,000 pre-settlement.

Herman, Herman, Katz & Cotlar submitted 29,483.5 hours in common benefit time.  HHK&C incurred $184,493.75 in common benefit expenses, and paid $355,000 in PSC assessments.

The FAC recommended an award of $32,500,000.  After the Special Master's hearing, the FAC recommended an award of $29,567,284.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $29,290,489.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Herman, Herman, Katz & Cotlar, which included leadership, discovery, trial support, settlement, and distribution, the firm is awarded common benefit fees in the amount of $26,044,436.30.

### 54)   The Holman Law Firm

Holman Law Firm submitted a total of 212.50 hours.  An Affidavit in support of the Petition for Common Benefit Fees was not received.  A presentation on behalf of the firm was

not made to the FAC.

The FAC recommended no award.  The firm did not file an objection or respond to that recommended amount or participate in the allocation proceedings.  The Special Master recommended no award.

Therefore, based upon the common benefit contributions and considering the nature of the work done by the Holman Law Firm, the firm is awarded no common benefit fees.

### 55) Hovde, Dassow & Deets, LLC

Hovde, Dassow & Deets focused its efforts on the New Jersey Consolidated Litigation. In November 2005, the firm's case, *LoPresti v. Merck & Co.*, was scheduled for trial in April 2006.  Members of Hovde Dassow, along with co-counsel, participated in expedited discovery and trial preparation.  They reviewed the custodial and personnel files of sales representatives, took the depositions of sales representatives and fact witnesses, participated in numerous discovery hearings, and retained and prepared expert witnesses.  Together with Audet and Partners, Hovde Dassow participated in expedited discovery and trial preparation in thirteen other cases as well.  Of particular note is the *Allen* case in which numerous depositions were taken, including the depositions of sales representatives, prescribing physicians, treating physicians, the plaintiff, and plaintiff family members.  Members of the firm helped bring to light deficiencies in the process by which Merck identified and produced documents in relation to Merck Profile Forms.

Hovde, Dassow & Deets submitted common benefit hours in the amount of 8,546.5 hours, of which 5,630.5 were partner hours.  Hovde, Dassow & Deets incurred $217,569.13 in common benefit expenses.

The FAC recommended an award of $1,165,000.  The firm objected to this recommended amount.  After the Special Master's hearing, the FAC recommended an award of $1,415,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $1,415,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Hovde, Dassow & Deets, the firm is awarded common benefit fees in the amount of $1,415,000.

**56)    Irpino Law Firm**

Anthony Irpino was the Chair of the Privilege Log Team, a subcommittee of the Discovery Committee.  In relation to the Privilege Log Team, Mr. Irpino organized an eighteen-member team, played a primary role in devising the strategy for attacking Merck's privilege claims, presided over weekly conference calls, coordinated the assignment of various projects, and reviewed and analyzed Merck's privilege logs, the FDA privilege log, and third-party privilege logs.  Mr. Irpino assisted in drafting and arguing motions and oppositions.  He also handled hearings and meetings with the Court, the Special Master, and Merck in regard to de-privileged documents.  Mr. Irpino oversaw the process and assisted in reviewing over 60,000 privilege log entries and 500,000 pages of de-privileged documents.  In connection with the extensive privilege log battle, Mr. Irpino also drafted more than fifty briefs, letters, and memoranda.  The positive results achieved by the Privilege Log Team were helpful to the overall success of the litigation.  Mr. Irpino was also Chair of the Document Depository Committee.  In that role, he assisted in the coordination of activities among the four MDL depositories and helped institute consistent procedures to ensure efficiency. In addition, he provided trial support

and jury research in connection with the *Dedrick* MDL trial.

The Irpino Law Firm submitted common benefit hours in the amount of 2,920 hours, of which 2,863.25 hours were Mr. Irpino's.   Irpino Law Firm incurred $16,937.78 in common benefit costs.

The FAC recommended an award of $877,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $877,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by the Irpino Law Firm, the firm is awarded common benefit fees in the amount of $877,000.

**57)   Jacobs Burns**

No common benefit time was logged.  The FAC recommended no award.  The firm has indicated its acceptance of that recommendation.  The Special Master recommended no award.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Jacobs Burns, the firm is awarded no common benefit fees.

**58)   John Hornbeck**

John Hornbeck was a member of the MDL Science Committee.  Mr. Hornbeck participated in the preparation and depositions of Merck employees, including Drs. Eliav Barr, Dr. Gilbert Block, and Dr. Nic Braunstein, as well as in the preparation of plaintiffs' experts such as Dr. Richard Kronmal and Dr. Lemuel Moye for deposition.  Mr. Hornbeck reviewed scientific protocols, published scientific literature, as well as documents produced in the litigation to prepare plaintiff experts and cross-examine Merck witnesses.  Mr. Hornbeck assisted with the deposition of Dr. Gregory Curfman, Executive Editor of the New England Journal of

Medicine.  Mr. Hornbeck also assisted in the development of the general liability plan for the litigation.  Mr. Hornbeck submitted common benefit hours in the amount of 1,390 hours.

The FAC recommended an award of $300,000.  The firm did not file an objection or respond to that recommended amount or participate in the allocation proceedings.  The Special Master recommended an award of $300,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by John Hornbeck, the attorney is awarded common benefit fees in the amount of $300,000.

### 59) **Johnson & Perkinson**

Johnson & Perkinson submitted common benefit hours in the amount of 847 hours, of which 520.75 were devoted to pre-trial pleadings and motions and 326.25 to case assessment, development, and administration.  Of the total hours submitted, 304 hours were partner hours.  An affidavit in support of the petition for common benefit fees was not received.  A presentation on behalf of the firm was not made to the FAC.  Johnson & Perkinson submitted $8,774.86 in common benefit costs.

The FAC recommended an award of $15,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $15,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Johnson & Perkinson, the firm is awarded common benefit fees in the amount of $15,000.

### 60) **Jones, Swanson, Huddell & Garrison**

Jones, Swanson, Huddell & Garrison (formerly Jones Verras & Freiberg) submitted

common benefit hours in the amount of 841.5 hours, of which 587.25 hours were devoted to discovery.  Lynn Swanson and Eberhard Garrison were members of the Science Committee (and various science subcommittees), the Discovery Committee, and the Privilege Log Team.  Ms. Swanson and Mr. Garrison, along with other members of the firm, reviewed and coded documents, reviewed privilege logs, performed legal research, summarized depositions, assisted with drafting pleadings related to the privilege log project, and reviewed and coded scientific articles.   The firm incurred $1,639.13 in common benefit costs.

The FAC recommended an award of $30,000.  After the Special Master's hearing, the FAC recommended an award of $350,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $350,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Jones, Swanson, Huddell & Garrison, LLC, the firm is awarded common benefit fees in the amount of $350,000.

### 61)    Ted Kanner Law Office

Ted Kanner submitted 6.75 common benefit hours.  At the request of the PSC, Ted Kanner assisted with the filing of a class action in West Virginia.

The FAC recommended an award of $1,350.  The attorney has indicated his acceptance of that recommended amount.  The Special Master recommended an award of $1,350.

Based on the attorney's common benefit contribution and considering the nature of the work done, the attorney is awarded common benefit fees in the amount of $1,350.

### 62)    Kasowitz, Benson, Torres & Friedman, LLP

Kasowitz Benson's contributions were made primarily in the New Jersey Consolidated

Litigation.  Members of the firm performed extensive, significant, and high-quality document review, reviewing custodial files for key witnesses such as Ray Gilmartin, former CEO of Merck.  Members of the firm also played central roles in five mock trials which took place in preparation for the *Ernst*, *Cona/McDarby*, and *Hermans/Humeston* bellwether trials.

Kasowitz, Benson, Torres & Friedman submitted common benefit hours in the amount of 4,395.4 hours, of which 1,006.75 appear to be partner hours.  Kasowitz, Benson, Torres & Friedman incurred $47,471.72 in common benefit expenses.

The FAC recommended an award of $1,100,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $1,100,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Kasowitz, Benson, Torres & Friedman, the firm is awarded common benefit fees in the amount of $1,100,000.

### 63)   Keller Rohrback

Keller Rohrback submitted a total of 323.00 common benefit hours.  An Affidavit in support of the Petition for Common Benefit Fees was not received.  A presentation on behalf of the firm was not made to the FAC.

The FAC recommended no award.  The firm did not file an objection or respond to that recommended amount or participate in the allocation proceedings.  The Special Master recommended no award.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Keller Rohrback, the firm is awarded no common benefit fees.

### 64)   Kerpsack

The Kerpsack firm submitted 54.5 common benefit hours.  At the request of the PSC, the Kerpsack firm filed and monitored a statewide class action.

The FAC recommended an award of $10,000.  The firm did not file an objection or respond to that recommended amount or participate in the allocation proceedings.  The Special Master recommended an award of $10,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Kerpsack, the firm is awarded common benefit fees in the amount of $10,000.

**65)    Khorrami Pollard & Abir**

Khorrami Pollard performed work in the California Consolidated Litigation reviewing cases for selection for trial and preparing a case for trial.  The firm documented 128.25 hours of attorney time.  The firm did not submit hours to the Court-appointed CPA and was not included in the FAC's January 20, 2011 proposed allocation.

Subsequently, the FAC revised its recommendation and suggested an award of $30,000 to the Khorrami firm.  The firm did not file an objection or respond to that recommended amount or participate in the allocation proceedings.  The Special Master recommended an award of $30,000.

Based upon the common benefit contributions and considering the nature of the work done by Khorrami Pollard, the firm is awarded common benefit fees in the amount of $30,000.

**66)    Kline & Specter**

Tom Kline served as a member of the PSC and co-chair of the Trial Committee.  Kline & Specter, after becoming involved in the Vioxx litigation in 2003, made significant contributions both in the MDL and the New Jersey Consolidated Litigation.   Other members of the firm

served on the Science Committee, the Discovery Committee, the Trial Package Committee and the Trial Selection Committee.  Members of the firm engaged in factual discovery including the review of documents and the taking of depositions.  Kline & Specter was also actively involved in legal research, briefing, drafting and argument of key issues; preparing deposition cuts; and developing legal and trial strategies.  Members of the firm engaged in telephone and in-person conferences, expert preparation, medical and scientific research in support for bellwether trials.

Dr. Lisa Dagostino, J.D., committed extensive time to the litigation.  Dr. Dagostino made substantial contributions to the PSC trial package and served on the Science Committee.  Dr. Dagostino assisted with the common benefit Vioxx litigation effort on a full-time basis to the near exclusion of all other work until the settlement was announced.  Kline & Specter also contributed to the MDL response to Merck's preemption brief.

Tom Kline or a member of Kline & Specter took the depositions of the following Merck officers and scientists: Raymond Gilmartin (CEO), Edward Scolnick, M.D. (former president, Merck Research Laboratories), Peter Kim, M.D. (President, Merck Research Laboratories), Alise Reicin, M.D. (Senior Director), Allen Nies, M.D. (Senior VP, Clinical Sciences), David Anstice (President of U.S. Human Health), Peter DiBattise, M.D. (Merck Research Labs cardiologist), Barry Gertz, M.D., Ph.D (Executive Vice President), Joseph Lynch, PhD (Senior Director, Pharmacology), Kathleen Metters, Ph.D (Head of Basic Research, Merck Frosst), Thomas Simon, M.D. (Senior Director, Clinical Research) and Deborah Shapiro, Ph.D (Director of Clinical Biostatistics).  Tom Kline also took the deposition testimony of Dr. Eric Topol, leading cardiologist formerly of the Cleveland Clinic; Dr. David Graham, Associate Director for Science and Medicine, Office of Drug Safety, Food and Drug Administration; and Dr. Gregory Curfman,

Editor of the New England Journal of Medicine.

Kline & Specter submitted 25,391.25 common benefit hours, including 2,887.75 key lawyer hours.  In addition Kline & Specter incurred $189,318.33 in common benefit expenses. The firm paid $355,000.00 in PSC assessments.  Kline & Specter enrolled approximately 615 claimants in the settlement program.

The FAC initially recommended an award of $4,000,000.  The firm objected to that recommended amount and participated in the Special Master's hearing.  After the Special Master's hearing, the FAC recommended an award of $15,000,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $15,000,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Kline & Specter, the firm is awarded common benefit fees in the amount of $15,000,000.

### 67)   Labaton Sucharow

Labaton Sucharow submitted a total of 389 hours and costs of $1,979.33.  An Affidavit in support of the Petition for Common Benefit Fees was not received.  A presentation on behalf of the firm was not made to the FAC.

The FAC recommended no award.  The firm did not file an objection or respond to that recommended amount or participate in the allocation proceedings.  The Special Master recommended no award.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Labaton Sucharow, the firm is awarded no common benefit fees.

**68)     Langston Law Firm**

The Langston Law Firm submitted a total of 597.5 hours, consisting of 551.50 hours of case assessment, development, and administration and 46.00 hours of discovery.  An Affidavit in support of the Petition for Common Benefit Fees was not received.  A presentation on behalf of the firm was not made to the FAC.

The FAC recommended no award.  The firm did not file an objection or respond to that recommended amount or participate in the allocation proceedings.  The Special Master recommended no award.

Therefore, based upon the common benefit contributions and considering the nature of the work done by the Langston Law Firm, the firm is awarded no common benefit fees.

**69)     The Lanier Law Firm**

Mark Lanier served on the FAC.  He tried three cases to verdict including the very first Vioxx trial which resulted in a jury verdict of $253 million. The Lanier Law Firm submitted 33,574.5 in common benefit hours, including 3,914 key lawyer hours.  The Lanier Law Firm began prosecuting Vioxx-related cases in 2002 and served a vital role in the early discovery and development of the case.

The Lanier Law Firm was a leader among plaintiffs' firms in the New Jersey Coordinated Litigation and tried two of the four Vioxx trials that took place in New Jersey. In *Cona/McDarby v. Merck & Co.*, Mark Lanier represented one of the plaintiffs while Weitz & Luxenberg represented the other.  Mark Lanier played a key role in presenting the liability case and presenting evidence in the punitive phase.  In *Hermans/Humeston v. Merck & Co.*, Mark Lanier represented one of the plaintiffs while Chris Seeger of Seeger Weiss represented the other. This

trial resulted in a substantial plaintiff's verdict and a finding of punitive damages.

Over a five year period the Lanier Law Firm expended $12 million to advance the Vioxx litigation, for which $8,534,630.57 was reimbursed as common benefit costs. The Lanier Law Firm engaged in extensive discovery and the development of significant experts in cardiology, pharmacology, general medicine and biostatistics. The Lanier Law Firm was involved in the trial of three of the five cases that resulted in a verdict for a plaintiff. Mark Lanier is a talented trial attorney, and his talents, time and effort significantly contributed to the success of this litigation. The Lanier Law Firm also enrolled over 950 cases in the settlement program.

The FAC recommended an award of $27,000,000. After the Special Master's hearing, the FAC recommended an award of $24,563,589. The firm has indicated its acceptance of that recommended amount. The Special Master recommended an award of $24,333,637.

Therefore, based upon the common benefit contributions and considering the nature of the work done by the Lanier Law Firm and Mark Lanier, his discovery work, his trial preparation and presentation, his financial commitment, and his work on the FAC, the firm is awarded common benefit fees in the amount of $27,000,436.29.

### 70)     Levin, Fishbein, Sedran and Berman

Arnold Levin served as a member of the PSC, the NPC, and the FAC, and as Co-Chair of the MDL Law and Briefing Committee. Arnold Levin and the Levin Fishbein firm became involved in Vioxx litigation before the formation of the MDL. Their involvement and engagement in this litigation continued through the litigation, settlement negotiation, settlement administration, and fee allocation phases of the case. Significant efforts and firm personnel and resources were committed to each phase of the case.

As chairman of the Law and Briefing Committee, Mr. Levin was responsible for preparing over 150 papers including pleadings, motions, responsive briefs, proposed orders and memoranda.  Mr. Levin and his partner, Fred Longer, prepared or oversaw the preparation of the personal injury, medical monitoring and purchase claims master class complaints.  Mr. Levin and Mr. Longer drafted the brief in opposition to Merck's motion for summary judgment to dismiss based on preemption.  This Court denied Merck's preemption motion.  Mr. Levin also monitored and managed several appeals to the Fifth Circuit Court of Appeals.

Mr. Levin and Mr. Longer provided support for the bellwether trials, working with trial counsel to prepare pleadings and briefs on key trial issues.  For example, Levin Fishbein drafted successful motions compelling the attendance of certain Merck witnesses at trials and a motion for a new trial in a New Jersey case that resulted in one of the bellwether verdicts for the plaintiff.  Levin Fishbein prepared numerous other motions in limine, responses to in limine motions, post-trial motions and participated in appellate briefing in the bellwether trials of *Irvin*, *Barnett* and *Humeston*, as well as providing consultation on legal strategy.

Mr. Levin and the Levin Fishbein firm also contributed to the settlement negotiation process.  Mr. Levin participated in over fifty NPC committee over 500 telephone calls.  Other members of his firm participated in test efforts to evaluate the Gates criteria by meeting with Merck's counsel and applying Gates criteria to actual case factual patterns.  Mr. Levin, as a member of the NPC, traveled to numerous sites around the United States, including New Orleans, Houston and Los Angeles, to explain the Settlement Agreement and encourage others to participate in the program.  These efforts substantially contributed to the successful conclusion of the liability phase of the litigation.

The firm also played a significant role in addressing challenges to various components of the Settlement Program and to Court Orders implementing or complementing the settlement agreement, including PTO 28.

The Levin Fishbein firm made substantial contributions to the development of the stroke trial package. Michael Weinkowitz, a partner, aided in the collection of the relevant medical literature pertaining to strokes. In addition, Mr. Weinkowitz worked closely with key stroke experts, including Dr. Ed Feldmann whose report contributed to the preparation of the stroke claimants' cases.

Levin Fishbein, through Mr. Weinkowitz and Thomas A. Smith, actively participated after the settlement on the Gates Committee and reviewed numerous claims to resolve whether they met the Gates criteria of the Settlement Agreement.

Levin Fishbein contributed substantial time to this litigation both pre- and post-settlement, to the exclusion of other litigation opportunities. Levin Fishbein submitted 27,075.25 common benefit hours, including 4,041 key lawyer hours. The firm expended $436,435.89 in common benefit expenses. In addition, Levin Fishbein paid $355,000.00 in PSC assessments.

The FAC recommended an award of $21,400,000. After the Special Master's hearing, the FAC recommended an award of $19,468,919. The firm has indicated its acceptance of that recommended amount. The Special Master recommended an award of $19,286,660.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Levin, Fishbein, Sedran & Berman, the firm is awarded common benefit fees in the amount of $19,000,000.00.

**71)** **Levin, Papantonio, Thomas, Mitchell, Echsner & Proctor**

Troy Rafferty, partner with Levin Papantonio, served as a member of the PSC, the FAC, and as Co-Chair of the MDL Discovery Committee and member of the FAC.  The Levin Papantonio firm submitted 8,191.75 common benefit hours, including 835 key lawyer hours, 2,537.5 partner hours, and 2,952.25 other lawyer hours. Levin Papantonio served as lead or co-lead counsel in two jury trials, including one MDL bellwether trial and a state court trial in Florida.  In addition, lawyers for Levin Papantonio provided partner-level support in additional jury trials.

Beginning with the withdrawal of Vioxx in September 2004, Levin Papantonio committed significant resources to the advancement of this litigation.  Troy Rafferty and other lawyers at the Levin Papantonio firm immediately began working to develop and advance the plaintiffs' case.  In addition to Troy Rafferty's significant committee contributions, Pete Kaufman served as Co-Chair of the Trial Package Committee.  Other lawyers from the firm also served as members on the Science Committee, Sales and Marketing Committee and Discovery Committee.

Mr. Kaufman played a key role in the development of the Vioxx Theme Grid that organized liability discovery into a usable tool.  Lawyers for the Levin Papantonio firm prepared for and took numerous depositions, many of which were used in trials.  Mr. Rafferty and Mr. Kaufman also worked with a significant number of plaintiff expert witnesses.

Levin Papantonio expended substantial time and resources towards the advancement of this litigation.  The firm expended $386,322.33 in common benefit expenses.   In addition, the firm paid $355,000.00 in PSC assessments.  Levin Papantonio enrolled approximately 535 claimants into the settlement program.

The FAC recommended an award of $15,600,000.  After the Special Master's hearing, the FAC recommended an award of $14,192,296.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $14,059,435.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Levin, Papantonio, Thomas, Mitchell, Eshner & Proctor Law, the firm is awarded common benefit fees in the amount of $13,912,175.71.

### 72)   Levin, Simes, Kaiser & Gornick, LLP

Levin, Simes, Kaiser & Gornick submitted 90 common benefit hours, all of which were partner hours.  The hours were devoted to deposition preparation, the preparation of pretrial pleadings, and hearing attendance.   An affidavit in support of the petition for common benefit fees was not received.  A presentation on behalf of the firm was not made to the Fee Allocation Committee.  Levin Simes submitted $3,855.42 in common benefit expenses.

The FAC recommended an award of $15,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $15,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Levin, Simes, Kaiser & Gornick, the firm is awarded common benefit fees in the amount of $15,000.

### 73)   Lewis & Roberts

Lewis & Roberts were lead counsel in ten cases that were selected for expedited discovery in the New Jersey Consolidated Litigation.  Two of these ten cases were completely prepared for trial.  As lead counsel, members of Lewis & Roberts attended approximately fifty-six depositions, including depositions of plaintiffs, treating physicians, and sales representatives.

Lewis & Roberts submitted common benefit hours in the amount of 3,208 hours, of which 1,108 were partner hours.  Lewis & Roberts incurred $144,459.90 in common benefit costs.

The FAC recommended no award.  The firm objected to that recommendation.  After the Special Master's hearing, the FAC recommended an award of $225,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $225,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by the Lewis & Roberts Law Firm, the firm is awarded common benefit fees in the amount of $225,000.

### 74)   Lieff, Cabraser, Heimann & Bernstein, LLP

Elizabeth Cabraser has extensive MDL, class action and complex litigation experience.  Cabraser served on the PSC, as Co-Chair of the Law and Briefing Committee, and Chair of the Purchase Claims Committee.  In addition, Lieff Cabraser partners served on other major MDL committees including the Purchase Claims, Discovery, Law and Briefing, Science, Trial Selection and Trial Package Committees.  Lieff Cabraser committed to the Vioxx litigation in October 2004 and maintained extensive involvement through the time of the settlement and after.

Don Arbitblit assisted in the preparation of the bellwether case of *Barnett vs. Merck & Co.* and provided support for other bellwether trials.  Elizabeth Cabraser helped prepare the personal injury, medical monitoring and purchase claims master class complaints.  She assisted with class certification briefing.  Ms. Cabraser also participated in the *Local 68 v. Merck & Co.* class certification proceedings at the New Jersey Appellate and Supreme Court levels.  Along with other members of Lieff Cabraser, Elizabeth Cabraser defended the New Jersey medical

monitoring claims at the trial court and appellate court levels.

Mr. Arbitblit made a full-time commitment to the Vioxx litigation from October 1, 2004 through November 9, 2007, the date of the settlement.  Mr. Arbitblit served as Chair of the Subcommittee on Epidemiology and Causation and served as a member of Science Committee. He devoted substantial amounts of time to the review and analysis of thousands of documents and scientific articles.  Mr. Arbitblit worked extensively with key expert witnesses such as Douglas Zipes, M.D. and Richard Kronmal, PhD.  Mr. Arbitblit also played a role in the strategy to subpoena and depose the Editor of the New England Journal of Medicine, Dr. Gregory Curfman, regarding incomplete data submitted for the VIGOR and APPROVe articles.  This resulted in the publication of an Expression of Concern in the New England Journal of Medicine and led to Judge Higbee's granting a new trial in *Humeston vs. Merck & Co.*

Lieff Cabraser's commitment of time and effort of senior partners contributed to the successful resolution to the litigation.  Lieff Cabraser submitted 24,270.75 common benefit hours, including 2,089.75 key lawyers.  In addition, Lieff Cabraser expended $1,008,233.96 toward the common benefit effort.  The firm also paid $355,000.00 in PSC assessments.

The FAC recommended an award of $6,000,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $6,000,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by the Lieff, Cabraser, Heimann & Bernstein Law Firm, the firm is awarded common benefit fees in the amount of $6,000,000.

### 75)   Lockridge, Grindal, Nauen, PLLP

Lockridge, Grindal & Nauen participated in the Vioxx litigation primarily through its

former partner, Bert Black.  Mr. Black was a member of the Science Committee, the Epidemiology Subcommittee, and the Daubert Subcommittee.  Mr. Black reviewed extensive scientific literature, reviewed documents relevant to expert reports, participated in the development of expert reports, identified and retained experts, defended Daubert motions in the MDL, prepared for and defended expert depositions, and worked with trial teams for three trials. Mr. Black worked with plaintiffs' experts Dr. Richard Kapit, Dr. Benedict Luchessi, Dr. Robert Fletcher, Dr. Colin Funk, Dr. Susanne Parisian, and Dr. Bruce Squires.  He also assisted in preparing the cross-examinations of Dr. Janet Arrowsmith-Low, Dr. Lisa Rarick, Dr. David Silver, Dr. Barry Rayburn, and Dr. Nicholas Flavahan, as well as Merck employee Dr. Alise Reicin.  He took the deposition of Dr. Arrowsmith-Lowe.  Mr. Black assisted in preparing a response to Merck's hypertension defense, developing a chronology of labeling and labeling changes for Vioxx, and other scientific projects.  Other members of the firm consulted with Mr. Black and contributed to his work.

Lockridge, Grindal & Nauen submitted common benefit hours in the amount of 4,712.5, of which 3,773.25 were partner hours.  Mr. Black's efforts constituted 3,690.25 hours. Lockridge, Grindal & Nauen incurred common benefit expenses in the amount of $52,452.97.

 The FAC recommended an award of $350,000.  The firm objected to that recommended amount and participated in the Special Master's hearing.  After the Special Master's hearing, the FAC recommended an award of $1,100,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $1,100,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Lockridge, Grindal & Nauen, the firm is awarded common benefit fees in the

amount of $1,100,000.

**76)**   **Locks Law Firm**

The Locks Law Firm was lead counsel in the bellwether trial of *Doherty v. Merck & Co.*, which was tried in the New Jersey Consolidated Litigation.  The trial, which lasted over five and a half weeks, ended in a defense verdict, but the jury found that Merck knew or should have known of the risks associated with Vioxx and failed to provide adequate warnings.  Members of the firm worked with plaintiffs' expert Dr. John McGregor.  Members of the Locks Firm also reviewed large numbers of documents produced in relation to Scientific Therapeutics, Inc.  The Locks Firm had three cases that were selected as discovery pool cases.  Extensive work was done to prepare the cases, and the cases were eligible for trial selection.

The Locks Firm submitted common benefit hours in the amount of 8,881.5, of which 7,722.5 were partner hours.  The Locks Firm incurred $355,301.06 in common benefit costs and enrolled more than 200 cases in the settlement program.

The FAC initially recommended an award of $585,000.  The firm objected to that recommended amount and participated in the Special Master's hearing.  After the Special Master's hearing, the FAC recommended an award of $1,700,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $1,700,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by the Locks Law Firm, the firm is awarded common benefit fees in the amount of $1,700,000.

**77)**   **Lopez, Hodes, Restaino, Milman & Skikkos**

John Restaino, a doctor as well as a lawyer, served as the Co-Chair of the MDL Science Committee.  Dr. Restaino shared responsibility for the development of the science and experts in the MDL.  He participated in the preparation of MDL expert reports, took and defended expert depositions, and assisted in preparing experts for trial.  Dr. Restaino worked extensively with plaintiff experts Dr. Benedict Luchessi, Dr. Colin Bloor, Dr. Wayne Ray, Dr. Cecil Pace-Asciak, Dr. Egil Fosslien, Dr. Les Cleland, Dr. Michael Snapes, Dr. Colin Funk, Dr. Preston-Mason, and Dr. Michael James.  Dr. Restaino oversaw the development, with Dr. Egil Fosslien, of an animation depicting the effects of Vioxx in the coronary arteries at the time of a myocardial infarction.  John Restaino played a support role for three MDL trials and made significant contributions to the work of the Stroke Subcommittee.

Steve Skikkos was a member of the Plaintiffs' Steering Committee in the California Consolidated Litigation.  Mr. Skikkos, along with Cynthia Garber, provided trial support in the *Barnett* MDL trial.  Mr. Skikkos worked with plaintiff experts Dr. Douglas Zipes and Dr. Connie Pechman, including assisting in the preparation of Rule 26 reports and Daubert briefing as well as preparing for deposition and trial testimony.  Mr. Skikkos also participated in the trial preparation of Dr. Jeffrey Popma.  Ms. Garber, a registered nurse, worked extensively in pre-trial and trial preparations for *Barnett* case, including attending depositions, reviewing medical records and literature, and preparing expert reports and expert examinations and cross-examinations.

Mr. Skikkos also assisted with the preparation of *Berwick v. Merck & Co.*, which was set for trial in California.  Mark Crawford also participated in extensive document review, assisted in working with Dr. Pechman, and prepared motions in limine in the California Consolidated

Litigation.

Lopez, Hodes, Restaino, Milman & Skikkos submitted common benefit hours in the amount of 5,104.25 hours, of which 4,368.25 were partner hours. Dr. Restaino's common benefit contribution as a shareholder of Lopez Hodes ended December 31, 2006. From January 1, 2007, his contributions were made on behalf of Burg Simpson. Lopez, Hodes, Restaino, Milman & Skikkos incurred $60,571.03 in common benefit costs.

The FAC recommended an award of $1,500,000. The firm has indicated its acceptance of that recommended amount. The Special Master recommended an award of $1,500,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Lopez, Hodes, Restaino, Milman & Skikos, the firm is awarded common benefit fees in the amount of $1,500,000.

### 78) Lundy & Davis

Matthew Lundy was a member of the MDL State Liaison Committee, the Discovery Committee, and the Sales and Marketing Committee. Mr. Lundy deposed Merck sales representatives as well as a Merck speaker/consultant. He also performed document review, contributed to the liability case chronology, drafted motions in limine, and prepared deposition excerpts for use in bellwether trials. Lundy & Davis submitted common benefit hours in the amount of 550 hours, of which 153.5 were partner hours. Lundy & Davis incurred $19,387.68 in common benefit expenses.

The FAC recommended an award of $100,000. The firm did not file an objection or respond to that recommended amount or participate in the allocation proceedings. The Special Master recommended an award of $100,000.

-103-

Therefore, based upon the common benefit contributions and considering the nature of the work done by Lundy & Davis, the firm is awarded common benefit fees in the amount of $100,000.

**79)     Martin & Jones**

Martin & Jones submitted 1,943 common benefit hours, of which 497.5 were partner hours.  Martin & Jones participated in the discovery of twelve cases pending in the New Jersey Consolidated Litigation.  This work consisted primarily of reviewing documents and taking the depositions of sale representatives and physicians in those cases.   Martin & Jones incurred $114,842.86 in common benefit costs.

The FAC recommended no award.  The firm objected to that recommendation.  After the Special Master's hearing, the FAC recommended an award of $150,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $150,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Martin & Jones, the firm is awarded common benefit fees in the amount of $150,000.

**80)     Matthews & Associates**

David P. Matthews was Lead Counsel in the Texas Consolidated Litigation.  Matthews & Associates reached an agreement with Merck counsel that resulted in cases remaining in Texas state court rather than being removed.  The firm took the lead in the development, management, and funding of a document depository for the Texas cases.  Matthews & Associates assisted in opposing the preemption defense and took the lead in appealing the Texas court's adverse

decision on preemption and hired appellate counsel.

Mr. Matthews was a member of the MDL Discovery and Science Committees.  Mr. Matthews served as co-counsel in *Irvin I v. Merck & Co.*, the first federal MDL bellwether trial which took place in Houston.  In that trial, Mr. Matthews cross-examined Merck experts and examined plaintiffs and plaintiff family members.  In conjunction with trial preparation, Mr. Matthews participated in two focus groups.  Mr. Matthews also assisted Girardi Keese in the *Grossberg* trial in the California Consolidated Litigation.

Matthews & Associates was lead counsel and prepared *Anderson v. Merck & Co.* for trial in the Choctaw Nation Trial Court, but the case was dismissed on a jurisdictional issue.  The firm also served as lead counsel in *Miller v. Merck & Co.* which was set for trial in the Texas MDL, but was dismissed two weeks before trial.  The trial court's decision was on appeal at the time the settlement was announced.  Members of the firm retained and worked with numerous experts, including Dr. Lemuel Moye, Mr. Steve Levine, Dr. Laura Plunkett, Dr. Benedict Lucchesi, Dr. Miguel Zabalgortia, Dr. Thomas Baldwin, and Dr. Mark Entman.  Matthews & Associates also helped obtain the testimony of former Merck salesperson and whistleblower Barbara DeBato.

Matthews & Associates represented plaintiffs in cases which were selected as trial pool cases in the New Jersey Consolidated Litigation.  The firm performed significant discovery in those cases including depositions of sales representatives, treating physicians, and plaintiffs.  In 2005, Mr. Matthews, along with Dr. Jeb Wait, made a presentation at the FDA Advisory Committee meeting on Vioxx, urging that the drug be withdrawn from the market and that criminal penalties be imposed on Merck executives.

Matthews & Associates submitted common benefit hours in the amount of 10,668.5, of which 1,366.75 hours were key lawyer hours.  Matthews & Associates incurred $962,802.74 in common benefit expenses.  The firm also enrolled approximately 1,650 cases in the settlement program.

The FAC recommended an award of $1,400,000.  The firm objected to that recommended amount.  After the Special Master's hearing, the FAC recommended an award of $1,750,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $1,750,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Matthews & Associates, the firm is awarded common benefit fees in the amount of $1,750,000.

### 81)    Mithoff Law Firm

The Mithoff Law Firm submitted common benefit time in the amount of 16 hours.  These hours were devoted exclusively to case assessment, development, and administration.  An affidavit in support of the petition for common benefit fees was not received.  A presentation on behalf of the firm was not made to the FAC.  The Mithoff Law Firm submitted $67.703.21 in common benefit costs.

The FAC recommended an award of $15,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $15,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by the Mithoff Law Firm, the firm is awarded common benefit fees in the amount of $15,000.

### 82)    Morelli Ratner

Benedict Morelli served as co-counsel in *Ernst v. Merck & Co.* in Texas state court.   The *Ernst* trial was the first Vioxx trial in the country and resulted in a jury verdict of $253 million. Mr. Morelli also served as co-counsel in *Cona/McDarby v. Merck & Co.*, which was tried in the New Jersey Consolidated Litigation.   Prior to the *Ernst* trial, Mr. Morelli assisted in taking the depositions of key Merck employees, including Dr. Edward Scolnick, Dr. Alise Reicin, Dr. Peter Kim, and Mr. Ray Gilmartin.   Mr. Morelli took the lead in deposing James Dunn, a Merck employee involved in marketing.   Morelli Ratner was lead counsel in four cases that were prepared for trial selection in New Jersey.   The cases were ultimately not set for trial due to the announcement of the global settlement.

Morelli Ratner submitted common benefit hours in the amount of 1,833.5 hours, of which 1,712 appear to be partner hours.   Morelli Ratner incurred $79,398.97 in common benefit expenses and enrolled approximately 850 cases in the settlement program.

The FAC recommended an award of $750,000.   The firm objected to that recommended amount.   After the Special Master's hearing, the FAC recommended an award of $2,250,000. The firm has indicated its acceptance of that recommended amount.   The Special Master recommended an award of $2,250,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Morelli Ratner, the firm is awarded common benefit fees in the amount of $2,250,000.

### 83)    Motley Rice, LLC

Motley Rice participated in common benefit efforts in the New Jersey Consolidated

Litigation.  Fred Thompson deposed Merck employee Ellen Westrick and participated in hearings challenging Merck's assertion of privilege over documents.   Mr. Thompson and others on behalf of the firm retained and worked with Dr. Mark Hoffman, a business ethics expert regarding Merck's sales and marketing practices.  Motley Rice cases were being prepared for trial settings in New Jersey, but the trial settings were continued after the settlement program was announced.  Members of the firm participated in document review, focusing primarily on marketing documents.  In addition, they issued subpoenas to third parties Ogilvy and DDB and participated in motion practice in an effort to obtain documents relating to these public relations firms' work on Merck's behalf.

Motley Rice submitted common benefit hours in the amount of 3,289.5, of which 585 were partner hours.  Motley Rice incurred $311,447.25 in common benefit costs and enrolled approximately 235 cases in the settlement program.

The FAC recommended an award of $195,000.  The firm objected to that recommended amount.  After the Special Master's hearing, the FAC recommended an award of $1,250,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $1,250,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Motley Rice, the firm is awarded common benefit fees in the amount of $1,250,000.

### 84)   Murray Law Firm

The Murray Law Firm submitted 2,203.5 common benefit hours, of which 184 were partner hours.   Stephen B. Murray, Sr., served as Co-chair of the Law and Briefing Committee.

Mr. Stephen B. Murray, Jr., was a member of the Law and Briefing Committee.  Mr. Murray, Sr. and Mr. Murray, Jr. participated in legal research projects, and Mr. Murray, Jr. contributed to class certification briefing.   Nearly 2,000 hours of common benefit time submitted by the firm were devoted to document review.  The Murray Law Firm incurred $27,032.58 in common benefit costs.

The FAC recommended an award of $162,000.  The firm objected to that recommended amount.  After the Special Master's hearing, the FAC recommended an award of $850,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $850,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by the Murray Law Firm, the firm is awarded common benefit fees in the amount of $850,000.

### 85)    Neblett, Beard & Arsenault

Richard Arsenault served as a member of the PSC.  In addition, he was Vice Chair of the Discovery Committee and a member of Administrative Committee, Privilege Log Team, Sales and Marketing Committee, and State Liaison Committee.  Mr. Arsenault conducted research related to the privilege log and argued the initial motion on the subject.  In addition, he prepared reports to the Discovery Committee regarding the privilege log, participated in telephonic hearings before the Court on the issue, and worked on various briefs regarding improperly claimed privileges.  Mr. Arsenault worked with others to determine why Merck's insurers had denied coverage, including conducting research and assisting in the preparation of pleadings and discovery and briefs.  Mr. Arsenault assisted in the drafting of the PSC's master discovery

requests and the initial case management orders entered by the MDL court.  Mr. Arsenault reviewed documents related to sales and marketing as well as the custodial file of Jan Nissen. He prepared for and participated in the depositions of Marilyn Krahe, Dr. Alan Nies, and Liz Sutherlin.  He assisted in the preparation for the deposition of Dr. Thomas Bold.

Mr. Arsenault provided trial support for the *Irvin v. Merck & Co.* bellwether trial in Houston.  He secured and summarized previous motion in limine briefing and rulings, researched Florida law issues, expert qualification, and post-verdict motions, and reviewed jury charges and jury questionnaires.  Mr. Arsenault assisted in the MDL bellwether case selection process including potential stroke cases.  Mr. Arsenault also conducted miscellaneous other research tasks, including class action, class certification, expert, tolling, direct action, and witness communication issues.  He assisted in the preparation for the Daubert hearing in the MDL.

Other members of the firm conducted document review and coding at MDL depositories, assisted with preparation for depositions of Merck employees and former employees, and assisted briefing regarding Merck's effort to prevent plaintiffs' lawyers from communicating with treating physicians.

Neblett, Beard & Arsenault submitted common benefit hours in the amount of 7,389.5, of which 2,753.25 were partner hours.  Neblett, Beard & Arsenault incurred $100,257.15 in common benefit expenses.  The firm paid $355,000.00 in PSC assessments.  The firm also enrolled more than 580 cases in the settlement program.

The FAC recommended an award of $1,450,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $1,450,000.

Therefore, based upon the common benefit contributions and considering the nature of

the work done by Neblett, Beard & Arsenault, the firm is awarded common benefit fees in the amount of $1,450,000.

**86)    Panish, Shea & Boyle**

Brian Panish was a member of the PSC in the California Consolidated Litigation.  Panish, Shea & Boyle was lead counsel in *Appell v. Merck & Co.*, which was consolidated for trial in the California state court with *Arrigale v. Merck & Co.*  The case ended in a mistrial and preparations were ongoing for a second trial when the settlement program was announced. Panish Shea was also lead counsel in *Schechter v. Merck & Co.*, a case which was selected for the trial pool in the California Consolidated Litigation.

Panish, Shea & Boyle submitted common benefit hours in the amount of 3,975.75, of which 1,936 were partner hours.  Panish, Shea & Boyle incurred $460,662.64 in common benefit expenses.

The FAC recommended an award of $1,640,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $1,640,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Panish, Shea & Boyle, the firm is awarded common benefit fees in the amount of $1,640,000.

**87)    Price, Waicukauski & Riley, LLC**

Price, Waicukauski & Riley submitted 756 common benefit hours, of which 338.25 were partner hours.  Mr. Riley served as a member of the Purchase Claims Committee.  The firm assisted in the identification of class representatives for the Master Personal Injury and Medical Monitoring Complaints.  An affidavit in support of the petition for common benefit fees was not

received.  A presentation on behalf of the firm was not made to the FAC.  Price, Waicukauski &

Riley submitted $3,811.97 in common benefit expenses.

The FAC recommended an award of $15,000.  The firm has indicated its acceptance of

that recommended amount.  The Special Master recommended an award of $15,000.

Therefore, based upon the common benefit contributions and considering the nature of

the work done by Price, Waicukauski & Riley, the firm is awarded common benefit fees in the

amount of $15,000.

### 88)    Richardson, Patrick, Westbrook & Brickman

Richardson, Patrick, Westbrook & Brickman submitted 111.5 common benefit hours, all

of which were related to document review.  An affidavit in support of the petition for common

benefit fees was not received.  A presentation on behalf of the firm was not made to the FAC.

Richardson Patrick incurred $6,844.33 in common benefit costs.

The FAC recommended an award of $15,000.  The firm has indicated its acceptance of

that recommended amount.  The Special Master recommended an award of $15,000.

Therefore, based upon the common benefit contributions and considering the nature of

the work done by Richardson, Patrick, Westbrook & Brickman, the firm is awarded common

benefit fees in the amount of $15,000.

### 89)    Robins, Kaplan, Miller & Ciresi, LLP

Roberta Walburn, partner, was a member of the Science Committee.  Members of the

firm prepared a comprehensive analysis of the law of causation, assisted in drafting key Daubert

briefs for the *Irvin* bellwether trial, and performed other scientific and legal research.  In

addition, Tara Sutton and Gary Wilson played a primary role in the drafting of a comprehensive

history of the Vioxx label.  Ms. Sutton and Mr. Wilson were on the Discovery Committee and

the Privilege Log Subcommittee.  They reviewed privilege logs, prepared legal memorandums

on the controlling law, analyzed privilege log deficiencies, and drafted the initial motion to

compel.  In addition, Ms. Sutton and Mr. Wilson assisted in the review of more than 10,000

documents that were produced by Merck following the filing of the motion to compel.  Ms.

Sutton was also a member of the Law and Briefing Committee.  Members of the firm also

reviewed documents.

Robins, Kaplan, Miller & Ciresi submitted common benefit hours in the amount of

2,400.75 hours, of which 1,034.75 were partner hours.   Robins, Kaplan, Miller & Ciresi

incurred $48,522.82 in common benefit costs.

The FAC recommended an award of $850,000.  The firm has indicated its acceptance of

that recommended amount.  The Special Master recommended an award of $850,000.

Therefore, based upon the common benefit contributions and considering the nature of

the work done by Robins, Kaplan, Miller & Ciresi, the firm is awarded common benefit fees in

the amount of $850,000.

### 90)     Robinson, Calcagnie & Robinson

Mark Robinson served as a member of the PSC, Chair of the Sales and Marketing

Sub-Committee, and Co-Lead Counsel of the California Coordinated Litigation.  Mr. Robinson

was lead counsel in the *Barnett* MDL bellwether case, the only MDL case resulting in a

plaintiff's verdict.  In addition, Mr. Robinson and members of his firm worked to prepare three

other cases for trial.  Robinson, Calcagnie & Robinson became involved in the Vioxx litigation

immediately following the drug's withdrawal from the market in September 2004, and members

of the firm worked in the litigation up until the time of the settlement.

Other lawyers from Robinson, Calcagnie & Robinson made substantial contributions. Kevin Calcagnie served on the Administrative Committee. Ted Wacker and Carlos Prietto served on the Discovery Committee and the Sales and Marketing Committee. Ted Wacker also served on the Theme-Grid Committee, the Timeline Committee and the Science Committee. Anita Sherbanee served on the Science Committee. Other attorneys also contributed to deposing Merck's sales representatives, expert witnesses, and conducted numerous case-specific depositions necessary for the *Barnett* case.

Robinson Calcagnie & Robinson advanced cases in the MDL court as well as the California Coordinated Litigation and the New Jersey Coordinated Litigation, to the exclusion of other opportunities.

Robinson, Calcagnie & Robinson submitted 21,840.25 common benefits hours including 2,963.25 key lawyer hours. In addition, Robinson, Calcagnie & Robinson expended $3,123,013.77 toward the common benefit effort. Robinson, Calcagnie & Robinson also paid $385,000 in PSC assessments. The firm enrolled approximately 475 claimants in the settlement program.

The FAC recommended an award of $6,000,000. The firm has indicated its acceptance of that recommended amount. The Special Master recommended an award of $6,000,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Robinson, Calcagnie & Robinson, the firm is awarded common benefit fees in the amount of $6,000,000.

**91)    Roda Nast, P.C.**

Diane Nast served as a member of the MDL Law and Briefing Committee.  In that role, she surveyed nation-wide consumer protection laws and medical monitoring laws and contributed to preemption briefing.  Roda Nast, P.C. submitted common benefit hours in the amount of 1,267.75 hours, of which 312.5 were partner hours.   Roda Nast incurred $5,635.95 in common benefit costs.

The FAC recommended an award of $45,000.  The firm objected to that recommended amount.  After the Special Master's hearing, the FAC recommended an award of $300,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $300,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Roda Nast, the firm is awarded common benefit fees in the amount of $300,000.

**92)   Sanders Viener Grossman, LLP**

Sanders Viener Grossman, LLP submitted 112.5 common benefit hours, none of which appear to be partner hours.  A majority of these hours were devoted to document review.  The firm enrolled more than 275 cases in the settlement program.

The FAC recommended an award of $15,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $15,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Sanders, Viener, Grossman, the firm is awarded common benefit fees in the amount of $15,000.

**93)   Seeger Weiss**

During the course of the Vioxx litigation, Seeger Weiss dedicated a large number of senior partners, associates, and paralegals to work in the MDL and the New Jersey Consolidated Litigation.  The attorneys involved not only made significant contributions to the litigation, but assumed key leadership roles as well.  Christopher A. Seeger served as MDL Co-Lead Counsel, as Co-Chair of the PSC, Co-Chair of the Trial Committee, and on the NPC and FAC.  David R. Buchanan served as Plaintiffs' Co-Liaison Counsel in the New Jersey Consolidated Litigation, as Co-Chair of the MDL Discovery Committee, and on the Science Committee.  Jeffrey S. Grand served on the MDL Trial Package Committee, Privilege Committee, and Stroke Commitee. Seeger Weiss attorneys and paralegals submitted time before July 31, 2010 for 57,693.5 hours litigating these actions, and advanced $4.2 million for common benefit expenses.  Indeed, for several of their attorneys, including several partners, the Vioxx litigation was the primary focus of their practice for several years.  Seeger Weiss enrolled approximately 1100 claimants in the settlement program.  Seeger Weiss submitted $3,264,310,80 in common benefit costs and $355,000 in common benefit assessments.

Seeger Weiss took an early leadership role with its appointment as liaison counsel for the consolidated New Jersey litigation in the summer of 2003.  Seeger Weiss litigated the case aggressively in New Jersey through negotiations, extensive motion practice, and coordinated discovery efforts with plaintiffs' counsel in New Jersey and elsewhere.  These efforts resulted in large-scale discovery made available to plaintiffs across the country.  Prior to the formation of the MDL, Seeger Weiss built and maintained a large, multi-user electronic document depository at its offices in New York.  This depository also made available numerous databases and raw clinical data produced by Merck, as well as deposition transcripts and exhibits.  Additionally,

Seeger Weiss created document review and coding protocols, and custodial file review assignments for a database that ultimately exceeded 30 million pages.

Seeger Weiss attorneys reviewed substantial numbers of documents and identified some of the most significant "hot docs" in the litigation. Seeger Weiss organized such documents by theme, facilitating their use at deposition, in motion practice, and at trial. Ultimately, this document collection was the genesis of the MDL Exhibit Database and Theme Grid. Further, beginning in 2003, Seeger Weiss attorneys conducted, assisted in, or coordinated numerous depositions of important corporate witnesses, including but not limited to Briggs Morrison, Alise Reicin, Alan Nies, David Anstice, Ed Scolnick, Ray Gilmartin, Louis Sherwood, Beth Seidenberg, Brian Daniels, Thomas Bold, Doug Watson, Adam Schechter, and Jennifer Ng.

The MDL directly benefitted from those efforts because Seeger Weiss' accomplishments in New Jersey resulted in identical or broader productions or more favorable rulings in the MDL. Much of the work-product created by Seeger Weiss, including motions, discovery materials, and document summaries and compilations, were provided to the MDL or served as templates for subsequent MDL work.

After the MDL was formed, Seeger Weiss continued in its leadership role through significant participation in both the New Jersey Consolidated Litigation and the MDL. Further, Seeger Weiss promoted cooperation among state and MDL plaintiffs' counsel, resulting in coordinated discovery, litigation, and trial strategies which facilitated the prompt development and advancement of both the MDL and New Jersey litigations. While serving as both co-chair of the MDL and co-liaison counsel in New Jersey, Seeger Weiss advised and consulted with counsel from around the country litigating in state courts and in the MDL in advance of their

depositions, court hearings, and trials.

For example, Seeger Weiss attorneys made significant contributions to MDL leadership committees, including but not limited to the PSC, Trial Committee, Discovery Committee, Science Committee, and Trial Package Committee.   Seeger Weiss successfully litigated and obtained discovery and scheduling orders in New Jersey that required Merck to prepare large numbers of cases for potential trial, and produce nearly 1,000 custodial files of Merck sales representatives.  These obligations had had a significant benefit to plaintiffs in all jurisdictions, including the MDL.

Seeger Weiss also played a critical role in several Vioxx trials.  For example, Chris Seeger served as lead and co-lead counsel in the cases of *Humeston v. Merck* and *Hermans/Humeston v. Merck* in 2005 and 2007, respectively.  The 2007 *Humeston* trial resulted in a plaintiffs' verdict for $47.5 million.  Additionally, Seeger Weiss attorneys provided valuable assistance and support to other trials throughout the country by providing exhibits, deposition cuts, motion support and templates, examination kits, briefing support and appearance at oral argument, assistance with pre-trial proceedings, and advice regarding specific witnesses and trial themes.  Seeger Weiss provided such assistance in *Ernst*, *Irvin*, *Cona/McDarby*, and *Barnett*, as well as trials in California and Florida.  The *Ernst*, *McDarby*, and *Barnett* trials all resulted in plaintiffs' verdicts.  Seeger Weiss also played a significant role in the development of the MDL trial package, including the Exhibit Database and Theme Grid.

Seeger Weiss was involved in the development of numerous experts with varying specialties in the MDL and other jurisdictions.  Seeger Weiss attorneys were primarily responsible or played a significant role in the development and preparation of Wayne Ray,

-118-

Richard Kronmal, David Egilman, Jerry Avorn, Cheryl Blume, John Guerigian, and Harlan Krumholz.  Further, Seeger Weiss played a significant role in the preparations for and conduct of the depositions of several critical third party witnesses, including Eric Topol, Steven Nissen, Gregory Curfman, and David Graham.  The testimony of these witnesses was featured in many of the trials in both courts and the MDL.

Chris Seeger took a leading role in settlement negotiations with Merck, which ultimately resulted in the $4.85 billion settlement program.  Seeger Weiss attorneys played a significant role in drafting the agreement and also continued to litigate cases while negotiations proceeded. These efforts resulted in court-ordered trial settings and discovery orders that placed pressure on Merck to settle the litigation on a global scale.

Following announcement of the Settlement Program, Seeger Weiss attorneys participated in numerous meetings, conferences, and telephone calls with counsel from around the country, to facilitate a speedy and successful resolution to those claims subject to the settlement program. Additionally, Seeger Weiss attorneys have appeared at numerous hearings to resolve disputes relating to the settlement.  Seeger Weiss reviewed thousands of claim packages and participated on the Gates Committee.  The firm continues to host the electronic document depository, respond to requests related to obtaining documents, and provide access for remaining Vioxx cases.

The firm's significant contributions to virtually every aspect of the Vioxx litigation placed tremendous pressure on Merck and ultimately led to the successful resolution of the majority of Vioxx personal injury claims in federal and state courts.

The FAC recommended an award of $40,900,000.  After the Special Master's hearing,

the FAC recommended an award of $37,209,289.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $36,860,953.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Seeger Weiss, the firm is awarded common benefit fees in the amount of $36,612,459.44.

**94)    Sheller P.C.**

Sheller P.C. submitted 1,824.25 common benefit hours, of which 162 were partner hours. A majority of these hours were devoted to document review.   Sheller Law Offices submitted $11,691 in common benefit expenses.

The FAC recommended an award of $65,000.  The firm objected to that recommended award.  After the Special Master's hearing, the FAC recommended an award of $325,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $325,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Sheller P.C., the firm is awarded common benefit fees in the amount of $325,000.

**95)    Shelly Sanford, PLLC**

Shelly Sanford and her law partner, the late Carlene Lewis, began investigating the first Vioxx case in the summer of 2000.  Ms. Sanford and Ms. Lewis filed the first Vioxx case in the country.  By September 2001, Ms. Sanford and Ms. Lewis represented several hundred Vioxx victims and had filed a national class action in the Southern District of Illinois.  In the summer of 2001, Ms. Sanford and Ms. Lewis were retained by Carol Ernst who had lost her husband from

sudden cardiac death while on Vioxx. Mrs. Ernst's case was the first Vioxx case to go to trial and resulted in a $253 million verdict. Before Vioxx was pulled off the market, Ms. Sanford and Ms. Lewis had conducted extensive discovery, developed experts, and obtained millions of pages of documents in discovery. Ms. Sanford and Ms. Lewis, two of the three partners in their firm, devoted nearly all their time to litigating Vioxx cases. This necessitated forgoing other litigation opportunities.

Before Vioxx was pulled from the market, Ms. Sanford and Ms. Lewis had accumulated $500,000.00 in expenses and had several individual cases prepared for trial. After Vioxx was withdrawn from the market and the MDL was formed, Ms. Sanford and Ms. Lewis worked to educate other lawyers about the case. Carlene Lewis was appointed to the PSC and was elected to serve as Co-Chair of the Science Committee. In 2006, Ms. Lewis passed away. Ms. Sanford was then appointed as a member of the PSC and as Co-Chair of the Science Committee.

Both Ms. Lewis and Ms. Sanford made substantial contributions as members of the PSC and in their leadership role on the Science Committee. Ms. Lewis and Ms. Sanford offered meaningful support to bellwether trials. Ms. Sanford also played a key role in developing the trial package for both heart attack and stroke claims.

The firm submitted 13,946 common benefit hours, including 3,851 key lawyer hours. The firm also incurred $436,371.36 in common benefit costs, including $355,000.00 in PSC assessments. Shelly Sanford, PLLC enrolled approximately 400 claims in the settlement program.

The FAC recommended an award of $6,800,000. The firm has indicated its acceptance of that recommended amount. The Special Master recommended an award of $6,800,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Shelly Sanford, PLLC, the firm is awarded common benefit fees in the amount of $6,800,000.

### 96) Silverman & Fodera

Leonard Fodera served as a member of the MDL State Liaison Committee.  Silverman & Fodera submitted common benefit hours in the amount of 327 hours, of which 180 were partner hours.  Silverman Fodera incurred $11,323.27 in common benefit costs.

The FAC recommended an award of $73,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $73,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Silverman & Fodera, the firm is awarded common benefit fees in the amount of $73,000.

### 97) Singleton Law Firm

W. James Singleton served as a member of the MDL State Liaison Committee.  Mr. Singleton remained active in the litigation.  The Singleton Law Firm submitted common benefit hours in the amount of 2,388.75 hours, of which 768 were partner hours.  The Singleton Law Firm incurred $10,531.75 in common benefit expenses.

The FAC recommended an award of $180,000.  The firm has indicated its acceptance of that recommended amount.  The Special Master recommended an award of $180,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by the Singleton Law Firm, the firm is awarded common benefit fees in the amount of $180,000.

**98)     Snapka**

The award of common benefit fees to Kathryn Snapka is discussed *supra* in connection with the award to Escobedo Tippit.

**99)     Texas Consortium**

The Vioxx Litigation Consortium is composed of five law firms:  Ranier, Gayle & Elliot, Provost Umphrey, Williams Kherkher, the Watts Law Firm, and the Kaiser Law Firm.  Drew Ranier served as a member of the MDL PSC.  Member firms of the Vioxx Litigation Consortium served as lead counsel in two bellwether trials, *Smith v. Merck & Co.* in the MDL, and *Schwaller v. Merck & Co.* in Madison County, Illinois.  In addition, the Consortium participated in the New Jersey Consolidated Litigation.  Two of their cases, *Romans v. Merck & Co.* and *Sanderson v. Merck & Co.*, were set for trial in November, 2007, but were continued at the time the settlement program was announced.  The cases were prepared for trial.  In addition, the Consortium had four cases in New Jersey where expedited discovery was ordered.  The Consortium was lead counsel in *Feldman v. Merck & Co.*, which was set for trial in November, 2007 in the California Consolidated Litigation.  The *Lativio* and *Espinoza* cases were set for trial in March and June 2008.

Mr. Ranier chaired the Insurance Committee which was responsible for the discovery of Merck's insurance coverage, reviewing its insurances policies, working with an insurance consultant, monitoring the arbitration proceedings involving Merck and several of its carriers, and filing a motion to compel further information about those proceedings.

Collyn Peddie, formerly with Williams Kherkher, took the lead in briefing the preemption issue in *Ledbetter v. Merck & Co.* in the Texas Consolidated Litigation at the trial

and appellate level.  The Consortium worked with experts including  Dr. Martin Wells, a biostatistician, Dr. Marvin Goldberg, a marketing expert, and Kenneth Gartrell, a business econometrics expert.

The Vioxx Litigation Consortium submitted common benefit hours in the amount of 20,998.25 hours, of which 10,648.75 hours appear to be partner hours.  Affidavits in support of the Consortium's petition for common benefit fees were received.  A presentation on behalf of the Consortium was made to the FAC.  The Texas Consortium incurred $1,524,310.17 in common benefit costs, including $355,000.00 in PSC assessments.  The Vioxx Litigation Consortium enrolled approximately 1900 claims in the settlement program.

The FAC recommended an award of $20,095,000.  After the Special Master's hearing, the FAC recommended an award of $18,281,679.  The firm has indicated its acceptance of that recommended award.  The Special Master recommended an award of $18,110,535.

Therefore, based upon the common benefit contributions and considering the nature of the work done by the Vioxx Litigation Consortium, the Consortium is awarded common benefit fees in the amount of $18,005,006.17.

### 100)   Ury Moskow

Ury Moskow submitted 3.0 hours of paralegal time.  An affidavit in support of the Petition for Common Benefit Fees was not received.  A presentation on behalf of the firm was not made to the FAC.

The FAC recommended no award.  The firm has indicated its acceptance of that recommendation.  The Special Master recommended no award.

Therefore, based upon the common benefit contributions and considering the nature of

the work done by Ury Moskow, the firm is awarded no common benefit fees.

**101)   Law Offices of Eric H. Weinberg**

Eric Weinberg was involved in the New Jersey Consolidated Litigation.  Mr. Weinberg worked with experts including Dr. John Kostis and Dr. David Madigan.  Mr. Weinberg assisted in exposing the fact that the Alzheimer Studies showed a statistically significant risk of cardiovascular events and death by the years 2000 and 2001, and in conjunction with that effort deposed Merck employee, Dr. Gilbert Block.  Mr. Weinberg prosecuted numerous Freedom of Information Act requests to the FDA regarding Vioxx. Mr. Weinberg also spearheaded, along with others, efforts to develop and execute a comprehensive public relations strategy for the litigation.  Mr. Weinberg deposed Merck/Frosst scientists Dr. Don Nicholson and Dr. Ford Hutchinson.

Mr. Weinberg is a solo practitioner who testified that he spent more than 6,000 hours on the litigation from 2004 until the settlement program was announced.  Mr. Weinberg submitted common benefit hours in the amount of 10,361.75.  Mr. Weinberg submitted $221,351.50 in common benefit expenses, of which $144,768.90 has been approved and $76,582.60 remains unapproved.  Mr. Weinberg enrolled approximately 275 cases in the settlement program.

The FAC recommended an award of $220,000.  The attorney objected to that recommended award and participated in the Special Master's hearing.  After the Special Master's hearing, the FAC recommended an award of $3,500,000.  The firm has indicated its acceptance of that recommended award.  The Special Master recommended an award of $3,500,000.

Therefore, based upon the common benefit contributions and considering the nature of

the work done by Eric Weinberg Law Offices, the firm is awarded common benefit fees in the amount of $3,500,000.

### 102)   Weitz & Luxenberg

Perry Weitz served on the FAC.  The Weitz & Luxenberg firm represented John McDarby in a case tried in New Jersey state court that resulted in a plaintiff's verdict of over $13 million. The trial and appellate effort involved the work of at least four partners and considerable support staff.

Weitz & Luxenberg firm made significant contributions in the New Jersey Coordinated Litigation.  In addition to the *McDarby* case, the Weitz & Luxenberg firm worked up another case to the point of being trial ready.  Weitz & Luxenberg also advanced 30 or more cases through discovery.  This effort put significant litigation pressure on Merck.  Weitz & Luxenberg enrolled approximately 3,000 individual clients in the settlement program.

The Weitz & Luxenberg firm submitted 17,402.75 in common benefit hours, including key lawyer hours of 257, partner hours of 4,730.75 and total lawyer hours of 12,388.  The firm expended $907,403.51 in common benefit expenses.

The FAC recommended an award of $20,000,000.  After the Special Master's hearing, the FAC recommended an award of $18,195,251.  The firm has indicated its acceptance of that recommended award.  The Special Master recommended an award of $18,024,916.

Therefore, based upon the common benefit contributions and considering the nature of the work done by the Weitz & Luxenberg Law Firm, the firm is awarded common benefit fees in the amount of $17,836,121.78.

### 103)   White, Meany & Wetherall

White, Meany & Wetherall was lead counsel in *Crandall v. Merck & Co.*, which was set for trial in state court in Reno, Nevada.  Members of the firm successfully kept the *Crandall* case in state court.  Lawyers on behalf of the firm, as well as co-counsel Robinson, Calcagnie & Robinson, engaged in discovery, reviewed documents, took depositions (including sales representative depositions), prepared experts, filed and opposed motions, attended hearings, and made final preparations for trial.  The case, originally set for trial on October 1, 2007, was continued shortly before the settlement announcement.  White, Meany & Wetherall submitted common benefit hours in the amount of 1,412.75, of which 949.75 were partner hours.  White, Meany & Wetherall incurred common benefit expenses in the amount of $41,682.61.

The FAC recommended no award.  The firm objected to that recommendation.  After the Special Master's hearing, the FAC recommended an award of $160,000.  The firm has indicated its acceptance of that recommended award.  The Special Master recommended an award of $160,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by White, Meany & Wetherall, the firm is awarded common benefit fees in the amount of $160,000.

### 104)   Whitehead Law Firm

The Whitehead Law Firm submitted 504.75 common benefit hours, of which 501.50 hours were partner hours devoted to work related to the Science Committee and the *Humeston v. Merck & Co.* bellwether case.  The firm submitted common benefit costs of $11,318.83.  An affidavit in support of the petition for common benefit fees was not received.  A presentation on behalf of the firm was not made to the FAC.

The FAC recommended an award of $45,000.  The firm has indicated its acceptance of that recommended award.  The Special Master recommended an award of $45,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by the Whitehead Law Firm, the firm is awarded common benefit fees in the amount of $45,000.

**105)   Williamson & Williams**

Williamson & Williams submitted 84.25 common benefit hours.  Williamson & Williams participated in the identification of class representatives for the PSC's master medical monitoring class action.   Williamson & Williams submitted common benefit costs in the amount of $651.33.

The FAC recommended an award of $15,000.  The firm has indicated its acceptance of that recommended award.  The Special Master recommended an award of $15,000.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Williamson & Williams, the firm is awarded common benefit fees in the amount of $15,000.

**106)   Wold Law Firm**

The Wold Law Firm submitted 4.25 common benefit hours.  At the request of the PSC, the Wold Law Firm assisted with the filing of a class action in Montana.

The FAC recommended an award of $580.  The firm has indicated its acceptance of that recommended award.  The Special Master recommended an award of $580.

Based upon the common benefit contributions and considering the nature of the work done by the Wold Firm, the firm is awarded common benefit fees in the amount of $580.

**107)   Zimmerman Reed**

Zimmerman Reed submitted a total of 204.75 hours.  An Affidavit in support of the Petition for Common Benefit Fees was not received.  A presentation on behalf of the firm was not made to the FAC.

The FAC recommended no award.  The firm did not file an objection or respond to that recommended amount or participate in the allocation proceedings.  The Special Master recommended no award.

Therefore, based upon the common benefit contributions and considering the nature of the work done by Zimmerman Reed, the firm is awarded no common benefit fees.

**108)   Zink**

No common benefit hours were logged by Diane Zink.  The FAC recommended no award.  The firm did not file an objection or respond to that recommended amount or participate in the allocation proceedings.  The Special Master recommended no award.

Therefore, based upon the common benefit contributions and considering the nature of the work done, the firm is awarded no common benefit fees.

**D.   Concluding Observations**

This case demonstrates that when a court provides a broad umbrella for willing and able attorneys to perform work in a consolidated mass tort or MDL litigation, those attorneys can achieve impressive results for their clients.  Furthermore, when every firm and attorney is provided a full and transparent opportunity to apply for compensation for common benefit work, to present their case to a committee of their peer attorneys and to an impartial Special Master, and finally to the Court, the results are largely satisfactory to the attorneys.  Out of over 100

firms and attorneys who applied for common benefit fees, and after eighteen initially objected to the FAC's recommended allocation, all but four objectors have agreed on the allocation of the common benefit fee. Although this allocation process seems tedious and time-consuming, the Court finds that the process was necessary to achieve a reasoned and appropriate result and to provide a thorough, transparent, and full opportunity to all interested attorneys to express their position.

## III.   CONCLUSION

For the foregoing reasons, the common benefit fund shall be allocated in the following amounts:

| | |
|---|---|
| Alley, Clark, Greiwe & Fulmer: | $500,000 |
| Alvarez Law Firm: | $15,000 |
| Anapol, Schwartz, Weiss, Cohan, Feldman & Smalley | $4,000,000 |
| Anastopoulo & Clore, LLC | $15,000 |
| Andrews & Thornton | $600,000 |
| Ashcraft & Gerel | $9,000,000 |
| Audet & Partners, LLP | $1,415,000 |
| Aylstock, Witkin, Kreis & Overholz, LLC | $225,000 |
| Balkin & Eisbrouch | $15,000 |
| Brian K. Balser | $130,000 |
| Barnow & Associates | $15,000 |
| Barrios, Kingsdorf & Casteix, LLP | $1,800,000 |
| Bartimus, Frickleton, Robertson & Gorney | $15,000 |
| Beasley, Allen, Methvin, Portis & Miles | $36,612,459.44 |
| Becnel Law Firm, LLC | $500,000 |
| Robert M. Becnel | $30,000 |
| Bencomo & Associates | $327,500 |
| Blizzard, McCarthy & Nabers | $10,488,974.87 |
| Bossier & Associates | $20,000 |
| Branch Law Firm | $500,000 |
| Brandi Law Firm | $970,000 |
| Brown & Crouppen, PC | $73,000 |
| Bruce Dean, LLC | $0 |
| Bruno & Bruno, LLP | $75,000 |
| Burg, Simpson, Eldredge, Hersh & Jardine, P.C. | $500,000 |
| Cafferty Faucher | $30,000 |

| | |
|---|---|
| Capshaw Goss | $0 |
| Carey & Danis | $350,000 |
| Charfoos & Christiansen | $0 |
| Childers, Buck & Schlueter | $0 |
| Cohen Milstein | $750,000 |
| Cohen, Placitella & Roth, PC | $3,500,000 |
| Cunard Law Firm | $375,000 |
| Cuneo & Gilbert | $0 |
| Robert J. Debry | $15,000 |
| Dugan & Browne | $0 |
| Engstrom, Lipscomb & Lack | $390,000 |
| Escobedo Tippit & Cardenas | $1,600,000 |
| Fayard & Honeycutt | $15,000 |
| Fibich, Hampton & Leebron, LLP | $610,000 |
| Freese & Goss | $25,000 |
| Friedman Law Offices | $6,500 |
| Gainsburgh, Benjamin, Davis, Meunier & Warshauer, LLC | $2,500,000 |
| Gallagher Law Firm | $40,000 |
| Gancedo & Nieves | $700,000 |
| Gianni Petoyan | $30,000 |
| Girardi & Keese | $18,200,000 |
| Goldenberg Heller | $0 |
| Goza & Honnold | $70,000 |
| Hagens Berman | $0 |
| Heins Mills | $4,000 |
| Heninger, Garrison & Davis, LLC | $1,300,000 |
| Herman, Herman, Katz & Cotlar, LLP | $26,044,436.30 |
| The Holman Law Firm | $0 |
| Hovde, Dassow & Deets, LLC | $1,415,000 |
| Irpino Law Firm | $877,000 |
| Jacobs Burns | $0 |
| John Hornbeck | $300,000 |
| Johnson & Perkinson | $15,000 |
| Jones, Swanson Huddell & Garrison | $350,000 |
| Ted Kanner Law Office | $1,350 |
| Kasowitz, Benson, Torres & Friedman, LLP | $1,100,000 |
| Keller Rohrback | $0 |
| Kerpsack | $10,000 |
| Khorrami Pollard & Abir | $30,000 |
| Kline & Specter | $15,000,000 |
| Labaton Sucharow | $0 |
| Langston Law Firm | $0 |
| The Lanier Law Firm | $27,000,436.29 |
| Levin, Fishbein, Sedran & Berman | $19,000,000.00 |

| | |
|---|---|
| Levin, Papantonio, Thomas, Mitchell, Echsner & Proctor | $13,912,175.71 |
| Levin, Simes, Kaiser & Gornick, LLP | $15,000 |
| Lewis & Roberts | $225,000 |
| Lieff, Cabraser, Heimann & Bernstein, LLP | $6,000,000 |
| Lockridge, Grindal, Nauen, PLLP | $1,100,000 |
| Locks Law Firm | $1,700,000 |
| Lopez, Hodes, Restaino, Milman & Skikkos | $1,500,000 |
| Lundy & Davis | $100,000 |
| Martin & Jones | $150,000 |
| Matthews & Associates | $1,750,000 |
| Mithoff Law Firm | $15,000 |
| Morelli Ratner | $2,250,000 |
| Motley Rice, LLC | $1,250,000 |
| Murray Law Firm | $850,000 |
| Neblett, Beard & Arsenault | $1,450,000 |
| Panish, Shea & Boyle | $1,640,000 |
| Price, Waicukauski & Riley, LLC | $15,000 |
| Richardson, Patrick, Westbrook & Brickman | $15,000 |
| Robins, Kaplan, Miller & Ciresi, LLP | $850,000 |
| Robinson, Calcagnie & Robinson | $6,000,000 |
| Roda Nast, P.C. | $300,000 |
| Sanders Viener Grossman, LLP | $15,000 |
| Seeger Weiss | $36,612,459.44 |
| Sheller P.C. | $325,000 |
| Shelly Sanford, PLLC | $6,800,000 |
| Silverman & Fodera | $73,000 |
| Singleton Law Firm | $180,000 |
| Snapka, Turman & Waterhouse, LLP | $1,100,000 |
| Texas Consortium | $18,005,006.17 |
| Ury Moskow | $0 |
| Law Offices of Eric H. Weinberg | $3,500,000 |
| Weitz & Luxenberg | $17,836,121.78 |
| White, Meany & Wetherall | $160,000 |
| Whitehead Law Firm | $45,000 |
| Williamson & Williams | $15,000 |
| Wold Law Firm | $580 |
| Zimmerman Reed | $0 |
| Diane K. Zink | $0 |

New Orleans, Louisiana, this 9th day of August, 2011.

UNITED STATES DISTRICT JUDGE