```
 1                  UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF LOUISIANA
 2   **********************************************************

 3   IN RE:  VIOXX PRODUCTS            MDL-1657
     LIABILITY LITIGATION             New Orleans, Louisiana
 4                                    Thursday, May 12, 2011

 5
     **********************************************************
 6

 7             TRANSCRIPT OF FEE ALLOCATION PROCEEDINGS
           HEARD BEFORE THE HONORABLE PATRICK A. JUNEAU
 8                        SPECIAL MASTER

 9

10   APPEARANCES:

11   FOR THE FEE
     ALLOCATION COMMITTEE:            HERMAN, HERMAN, KATZ & COTLAR
12                                    BY:  RUSS M. HERMAN, ESQ.
                                      820 O'Keefe Avenue
13                                    New Orleans, LA 70113

14                                    BEASLEY ALLEN
                                      BY:  ANDY D. BIRCHFIELD, ESQ.
15                                    218 Commerce Street
                                      Montgomery, AL 36104
16
                                      SEEGER WEISS
17                                    BY:  CHRISTOPHER A. SEEGER, ESQ.
                                      One William Street
18                                    New York, NY 10004

19                                    LEVIN, FISHBEIN, SEDRAN & BERMAN
                                      BY:  ARNOLD LEVIN, ESQ.
20                                    510 Walnut Street, Suite 500
                                      Philadelphia, PA 19106-3697
21
                                      GIRARDI KEESE
22                                    BY:  THOMAS V. GIRARDI, ESQ.
                                      1126 Wilshire Boulevard
23                                    Los Angeles, CA 90017

24                                    THE LANIER LAW FIRM
                                      BY:  W. MARK LANIER, ESQ.
25                                    6810 FM 1960 West
                                      Houston, TX 77069
```

```
 1

 2                                    LEVIN PAPANTONIO
                                     BY:  TROY RAFFERTY, ESQ.
 3                                   316 South Baylen Street, Suite 600
                                     Pensacola, FL 32502

 4                                   WEITZ & LUXENBERG
                                     BY:  PERRY WEITZ, ESQ.
 5                                   700 Broadway
                                     New York, NY 10003

 6

 7   FOR COHEN, PLACITELLA & ROTH
     AND ERIC WEINBERG:             MARGARET E. WOODWARD, ESQ.
 8                                   3701 Canal Street, Suite C
                                     New Orleans, LA 70119

 9                                   ROBERT E. ARCENEAUX, ESQ.
10                                   47 Beverly Garden Drive
                                     Metairie, LA 70001

11                                   AJUBITA, LEFTWICH & SALZER
12                                   BY:  PASCAL F. CALOGERO, JR. ESQ.
                                     1500 Energy Centre
13                                   1100 Poydras Street
                                     New Orleans, LA 70163-1950

14
     FOR ESCOBEDO,
15   TIPPIT & CARDENAS:             HOCKEMA & LONGORIA
                                     BY:  DAVID H. HOCKEMA, ESQ.
16                                   600 E Nolana Avenue, Suite 202
                                     McAllen, TX 78501

17
     FOR ANAPOL SCHWARTZ:           ANAPOL SCHWARTZ
18                                   BY:  SOL H. WEISS, ESQ.
                                     1710 Spruce Street
19                                   Philadelphia, PA 19103

20

     FOR CATHERINE SNAPKA:          BEIRNE, MAYNARD & PARSONS
21                                   BY:  JACK E. URQUHART, ESQ.
                                     1300 Post Oak Blvd., 25th Floor
22                                   Houston, TX 77056

23                                   BECNEL LAW FIRM
                                     BY:  KEVIN P. KLIBERT, ESQ.
24                                   106 W. 7th Street, #B
                                     Reserve, LA 70084

25
```

```
 1   FOR KLINE & SPECTER:              KING, KREBS & JURGENS
                                      BY:  HENRY KING, ESQ.
 2                                        REBECCA DIETZ, ESQ.
                                      201 St. Charles Avenue, 45th Floor
 3                                    New Orleans, LA 70170

 4

 5   Official Court Reporter:         Karen A. Ibos, CCR, RPR, CRR
                                      500 Poydras Street, Room HB-406
 6                                    New Orleans, Louisiana 70130
                                      (504) 589-7776
 7

 8

 9     Proceedings recorded by mechanical stenography, transcript
     produced by computer.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        I N D E X

2

3   WITNESSES:                                    PAGE/LINE:

4

5   **PROCEEDINGS RELATED TO THE LAW OFFICE OF DANIEL E. BECNEL, JR.**

6   DANIEL E. BECNEL, JR.

7

8     Direct Examination by Mr. Klibert              8/21

9     Cross-Examination by Mr. Birchfield           50/19

10    Redirect Examination by Mr. Klibert          126/8

11

12

13                      * * * * * *

14

15

16  PHILIP A. GARRETT

17

18    Direct Examination by Mr. Arceneaux          128/13

19    Cross-Examination by Mr. Rafferty            170/3

20    Redirect Examination by Mr. Arceneaux        205/9

21    Recross-Examination by Mr. Rafferty          223/2

22

23

24

25

```
 1                    P R O C E E D I N G S

 2               (THURSDAY, MAY 12, 2011)

 3                    (MORNING SESSION)

 4

 5      (OPEN COURT.)

 6            THE COURT:  We're ready to commence the continued

 7   hearings in the matter of in re:  Vioxx relating to the attorney

 8   fee dispute concerning common benefit fees.  We have scheduled and

 9   on the agenda today to consider the objection by Mr. Becnel.  I see

10   Mr. Becnel is here.

11            Mr. Becnel, you can appear and make your presentation.

12            MR. BECNEL:  Yes.  Mr. Juneau, this is the original of

13   all of the exhibits.  I thought you might want them, too, as I

14   testify.

15            THE COURT:  That is what you're going to file into

16   evidence?

17            MR. BECNEL:  Yes, that's what I'm going to file so you

18   can follow along.

19            THE COURT:  Let me ask you a question.  All of these

20   exhibits are identified by number, I assume?

21            MR. BECNEL:  Yes.

22            THE COURT:  And it looks like it's 1 through 26?

23            MR. BECNEL:  That's correct.

24            THE COURT:  Counsel, any objection?

25            MR. BIRCHFIELD:  No, your Honor.
```

1          MR. MURRAY:  Excuse me, Special Master Juneau, before we

2    begin with Mr. Becnel, as a housekeeping matter, may I approach?

3          I believe that we have an agreement for the Murray Law

4    Firm's objection to be submitted on the papers.  We had not

5    formally offered, filed, and introduced the exhibits that were

6    attached to our objection.  We would like to do so now if there's

7    no objection.

8          MR. LEVIN:  The FAC has no objection.

9          SPECIAL MASTER JUNEAU:  Are those identified by number,

10   Mr. Murray?  I assume they are, the exhibits.

11         MR. MURRAY:  They are identified by tabs, Mr. Special

12   Master, to our submission.  But I don't know that they have exhibit

13   numbers that are germane to these proceedings.

14         SPECIAL MASTER JUNEAU:  And that's fine.  I just want to

15   make sure that you have a complete record, and I would like to

16   spend some time, I see you standing next to Mr. Levin.  I assume

17   you all have these documents here?

18         MR. LEVIN:  Yes.

19         SPECIAL MASTER JUNEAU:  To look at those documents and

20   give me those documents as exhibits.  I am trying to keep an

21   orderly process and keeping them, all of the exhibits together.

22         MR. LEVIN:  We have the exhibits, and if Mr. Murray

23   prepares them in whatever form and it's the exhibits that

24   previously were filed with the court, we have no objection to them.

25         SPECIAL MASTER JUNEAU:  I understand that, but I want

1   those exhibits in the format given to me today so I can keep them.

2   Insofar as the agreement that it be submitted on behalf by both

3   sides, that will be accepted by the court, and I will let the

4   exhibits that were offered with the submission be introduced into

5   evidence.

6          MR. MURRAY:  Thank you.  And, Mr. Special Master, I just

7   wanted to let you know I am available if you have any questions or

8   if you want any sort of brief argument, but I hadn't planned on

9   doing so nor do I request it.

10          SPECIAL MASTER JUNEAU:  I will do that if necessary.

11   Thank you very much.

12          MR. MURRAY:  I will get with Mr. Levin and make sure we

13   have a packet of those for you.

14          SPECIAL MASTER JUNEAU:  Now we come to Mr. Becnel's

15   exhibits.  He has submitted to me a listing of those exhibits, I

16   have them before me now, and the exhibits go 1 through 31.  Is

17   there any objection?

18          MR. BECNEL:  I've given Mr. Birchfield a copy this

19   morning.  But we e-mailed those to Mr. Herman as liaison when

20   required to and supplemented a few after we got some additional

21   things yesterday, or day before yesterday.

22          SPECIAL MASTER JUNEAU:  Any objection?  Mr. Birchfield,

23   that's been the normal chair where the questioner is, I assume

24   you'll be the questioner?

25          MR. BIRCHFIELD:  Yes.  No, the question but we don't

1   object to them being submitted to the record.

2           SPECIAL MASTER JUNEAU:  Then let those exhibits be

3   received in evidence.  You may proceed.

4           MR. BECNEL:  I am going to take the stand now.

5           SPECIAL MASTER JUNEAU:  Yes.

6           MR. BECNEL:  Are you going to swear me in?

7           SPECIAL MASTER JUNEAU:  Yes, I will swear you in.

8       (WHEREUPON, DANIEL BECNEL, WAS SWORN IN AND TESTIFIED AS

9       FOLLOWS:)

10          SPECIAL MASTER JUNEAU:  Please be seated.

11          MR. HERMAN:  Your Honor, may I sit in the jury box for

12  Mr. Becnel's testimony?

13          SPECIAL MASTER JUNEAU:  Excuse me?

14          MR. HERMAN:  May I sit in the jury box for Mr. Becnel's

15  testimony?

16          SPECIAL MASTER JUNEAU:  Yes, certainly.

17          MR. KLIBERT:  Mr. Juneau, Kevin Klibert, I am going to be

18  questioning Mr. Becnel.

19          SPECIAL MASTER JUNEAU:  Okay.

20                          DIRECT EXAMINATION

21  BY MR. KLIBERT:

22  Q.  Mr. Becnel, will you please describe to Special Master Juneau

23  your experience in prior MDLs.

24  A.  Well, I started off as a sole practitioner.  I tried the first

25  million dollar verdict in the State of Louisiana right out of law

1  school, which was tried in Shreveport for ten days.  It was one of

2  the first million dollars verdicts in the South in 1971.  I then

3  started the first major MDL in the country with Joe Cotchett and

4  Paul Rheingold, two people of noted renowned, in the swine flu

5  inoculation program, which we ultimately settled after taking

6  numerous depositions of Jonas Sulk, Lou Sabin, the president of the

7  United States, Joe Calfano, HEW secretary, and spending months and

8  months at the NIH and the CDC trying to figure out what was the

9  cause of the Guillain-Barré syndrome caused by the swine flu

10 inoculation program.

11         Thereafter, I was involved in $1 million verdict in

12 breast implants.  Wendell Gauthier called me and told me that the

13 Plaintiffs Committee was running out of money on the national

14 level, asked if I would go and start looking at documents.  I flew

15 to Cincinnati.  He was involved on the Plaintiffs Committee, as was

16 Calvin Fayard.  I then went to Cincinnati and within a week found a

17 document that was supposedly looked at by Griffin Bell, the former

18 Attorney General of the United States, who was one of the lawyers

19 representing Dow Corning Corporation.  As a result of that, the

20 document said we had been destroying documents, we've done a lot,

21 we've got a lot to go.

22         Ultimately, I thought Wendell had planted the document as

23 a joke to keep me interested and found out he didn't.  I showed it

24 to Diana McBride, who was working for Stan Chesley at the time, and

25 then she went to work for Mr. Ed Blizzard in the breast implant

 1   case thereafter.  And we put an ad in the paper in Midland,

 2   Michigan.  We found how they were destroying the documents, who was

 3   destroying the documents.

 4        I took the CEO's deposition, and he wound up basically

 5   taking the Fifth Amendment and wouldn't further testify when

 6   confronted with where they were destroying the documents, how they

 7   were destroying the documents and the like.

 8        Wendell asked me to put together a team of people to look

 9   at these documents because nobody else would.  I hired a number of

10   lawyers for Calvin Fayard, Hugh Sibley, John Cummings, and myself

11   and Wendell, and I supervised those lawyers for years in

12   Cincinnati.  We developed -- remember they didn't have a lot of

13   heavy-duty computers at the time, nor did we have laptops.  So

14   these were all paper documents.

15        We put them in a database that was used ultimately to

16   gain a $7.2 billion settlement, which Dow Corning, as one of the

17   lead counsel said, real lawyers try cases and others accept

18   settlements then file for bankruptcy, and I am still dealing with

19   those cases to this day.

20        I've been involved in the Guidant MDL, the Teletronics

21   MDL, the Medtronics MDL, the Medtronic Sprint Fidelis MDL, the

22   Bausch and Lomb eye litigation MDL, the Norplant MDL, the pedicle

23   screw MDL, and I could go on and on, and almost all of the major --

24   and just in the last couple of months, an MDL with Mr. Arsenault,

25   myself, and Jerry Parker started.

```
1            We also just formed the Ford Navistar diesel MDL, which

2    was a defective engine in about 1,000 Ford-250 and 350 diesel

3    pickup trucks from '02 to '07.

4    Q.  Besides your MDL experience, do you also have an active trial

5    practice?

6    A.  I've been trying cases since my first year out of law school.

7    I average some of the biggest cases I've tried and been involved

8    with is, with Judge Fallon, the Perry Foster case, I had the most

9    cases in that case.  Judge Ruban appointed the committee, which was

10   myself, Judge Fallon, Judge Chaisson -- at the time he was not a

11   judge -- Jenny George from Baton Rouge who Richard Arsenault was

12   working for, and that's when I first met Richard, Jack Martzell,

13   who is now deceased; Sal Guiterrez from St. Bernard Parish.

14           And we wound up basically going to Norway putting experts

15   together.  We settled the whole case.  In fact, Judge Ruban took my

16   economics experts, and I had the most cases, I had 15, 16, I

17   believe, death cases, he took my experts and he says, Mr. Becnel,

18   you can't talk to him anymore.  I am going to use your expert to

19   calculate the death benefits for everybody in the thing, and we

20   settled the whole case, which today doesn't sound like a lot but

21   back then it was, $29 million.

22           And one person wouldn't agree.  We had to try that case.

23   That case was tried and came within $200 of what the value was that

24   the experts had said the value was.  So the whole thing was over in

25   a year.
```

1    Q.  You went through a lot of your MDL experience, you didn't give

2    us any time on those.  What year did you first become involved in

3    MDL practice?

4    A.  That was when Richard Nixon resigned and Gerald Ford took over

5    as president of the United States, and I just don't remember the

6    exact years, in the '70s.  But I tried the Mother's Day bus crash

7    for all of the lawyers and all of the plaintiffs.  The case was

8    tried in multiple courts, settled in some of the courts, went to

9    the appellate courts three times, went to the State Supreme Court

10   twice, went the U.S. Supreme Court twice - both on liability, which

11   was bifurcated, and then on damages.  And was successful.  It took

12   12 years but successful in every step.  I was lead counsel, I was

13   the only trial counsel.  I did the appellate briefs and was

14   successful at every level.

15          I was involved in the *Gaylord* case, which Master Juneau

16   was involved in.  The case was tried by Steven Murray, Ronnie

17   Penton, myself and Jerry Meunier.  Most all of the experts in that

18   case I hired, brought to the table, I took many of the depositions

19   in that case.  I had been working with Ronnie Penton since the

20   DuPont explosion in St. John Parish which killed -- when he first

21   got out of law school, and we tried and settled those death cases

22   and injury cases back then.

23          Chinese Drywall.  Virtually most of the MDLs I've been

24   involved in.  I either filed the first case or the second or third

25   case in the country.  I usually move for the MDL, and I've probably

1    appeared before the MDL panel as much as any other lawyer in the

2    country.  Other than maybe some securities lawyers.

3    Q.  Shifting our focus to the Vioxx litigation, when did you first

4    become involved in the Vioxx litigation?

5    A.  Jerry Parker has probably the best website in the country.  I

6    review that website probably weekly, and I know Jerry Parker well.

7    He and I are not only personal friends, we vacation together, we

8    work together on cases, just constantly.  He alerted me to Vioxx.

9    I had not heard about Vioxx prior to him.  He got his first case in

10   the year 2000.

11         He then sent his cases that he had to Mike Papantonio.

12   Mike Papantonio didn't think the case was very good because he had

13   a doctor within his firm or hired by his firm to look at them.  He

14   ultimately sends cases to Mr. Seeger.  And so the more I found out

15   about it, the more I liked looking into it.  Then I met Carlene

16   Lewis at AAJ, it wasn't American Trial Lawyers, at one of the

17   seminars, and she asked me to get involved.

18         So I immediately started doing things, and I am showing

19   you two examples.  This is a Vioxx 12.5 milligram sample.  This

20   expired in October of 2002.  This is one for a 25-milligram sample.

21   This expired in December of 2001.  As a result, two of my business

22   partners, primary care physicians, family practitioners, we started

23   listening to spiels made, and I would usually meet them for lunch a

24   lot of times when detail people come over and pitch them for

25   certain drugs, et cetera.

 1          I started getting these samples of drugs, listening to

 2    what they had to stay, started getting their paraphernalia such as

 3    Vioxx pens, paper clips and things of that type, and just was

 4    looking, trying to figure out what was wrong, asking cardiologists

 5    what do you think, is it a good drug, it is not a good drug, is it

 6    overpriced, is it not overpriced, is it too marketed, is it not too

 7    marketed.  And started really hard about two years prior to its

 8    recall.

 9          If you look at one of my exhibits that I sent to some of

10    the following lawyers:  Calvin Fayard, who I see sitting in the

11    room; I sent it to Wendell Gauthier, I think; Steve Murray, Paul

12    Rheingold, Joe Cotchett.  I have a letter actually in here saying

13    I've been working on this for two years, Joe, I want you involved

14    in it.  I think it's a good case.  And I forget what exhibit it is,

15    but -- can I get some water?  I take this chemotherapy and get

16    tongue tied.

17          I'd like to offer these as exemplars with the date stamps

18    on this showing when I first became involved in the Vioxx prior to

19    its recall as an additional exemplar exhibit for the Special

20    Master.

21          SPECIAL MASTER JUNEAU:  Do you want to offer those,

22    Counsel?

23          MR. KLIBERT:  We will offer, file, and introduce those as

24    Exhibit 27 to the Becnel submission.

25          SPECIAL MASTER JUNEAU:  Your last exhibit was 31.

```
 1                MR. KLIBERT:  Okay, he has my book.

 2                SPECIAL MASTER JUNEAU:  So it would be 31 and 32?

 3                MR. KLIBERT:  Yes, sir.

 4                SPECIAL MASTER JUNEAU:  Let them be received.  Any

 5      objection?

 6                MR. BIRCHFIELD:  No, your Honor.

 7                SPECIAL MASTER JUNEAU:  Let them be received.

 8                THE WITNESS:  I sent those letters to Cotchett and

 9      Rheingold.  Rheingold is one of the earliest pharmaceutical

10      litigators I knew.  I had worked with both Cotchett and Rheingold

11      with the swine flu program years before, and as a result of that,

12      thought they would be excellent in the case.  I did not know Andy

13      Birchfield, came to know him thereafter.  He started getting Vioxx

14      cases.  I knew Carlene Lewis was getting Vioxx cases, I knew Chris

15      Seeger was getting Vioxx cases.  I did not know Mike Papantonio had

16      renewed his interest in Vioxx.  And as a result of that, I was

17      trying to put a team together to take on one of the major

18      pharmaceutical companies to see what we could do.

19                I then started accumulating experts.  And if you look at

20      the exhibit toward the back, John Restaino was the head of science.

21      BY MR. KLIBERT:

22      Q.  What exhibit are you referring to?

23      A.  I am referring to 31.  There is an exhibit called Vioxx MDL

24      Generic Expert Witnesses.  These were the witnesses that we

25      accumulated, not just me, Mr. Herman's partners in Ashcraft and
```

 1    Gerel.  I also sent that same letter to Elizabeth Cabrazer, I sent

 2    it to Don Barrett from Mississippi.  Don Barrett had developed

 3    Dr. David Burns, and as you see on the first page, Dr. Burns was

 4    involved as a potential expert.  Don Arbitblit, who worked for

 5    Elizabeth Cabrazer, was one of the people on the committee.

 6           And if you go through, you will see all of those experts.

 7    I then got a whistle blower, which Wendell had taught me was one of

 8    the most important things in both the tobacco case, as well as the

 9    breast implant cases, and I started accumulating experts that I

10    thought were good.  I was in charge of -- if you look at where my

11    name starts right where Carlene Lewis is --

12    Q.  Are you still on Exhibit 31?

13    A.  Still on Exhibit 31, Dr. Brautbar.  Then I had Dr. Stirling

14    Meyer, then I had Dr. Lawson F. Bernstein, then I had Dr. Cyril

15    Wecht, whom I made reference to that I brought to Mass Torts Made

16    Perfect and was asked to do that by a member of the FAC and his

17    senior partner, Mike Papantonio.

18    Q.  You said you had these experts, can you tell me what you mean

19    by you had them?

20    A.  Started calling them up, trying to find out who was conflicted,

21    who could possibly work, what did they know, how could they be

22    helpful.

23           And you will see, for example, let's just talk Cyril

24    Wecht.  He has testified for Danny for 30 years, testified in the

25    Scott Peterson case, was contacted by the media in the Terri

```
 1    Schiavo case, sample report, eliminate confounding factors, need
 2    him to say Vioxx was a contributing cause and exacerbated these
 3    risks, used on Justice Files.  In fact, I even put a sample of him
 4    that I tried a case just a few weeks ago before Judge Barbier where
 5    he was accepted and Dr. Gould was accepted, one was a cardiologist,
 6    one was a forensic pathologist, in that case and received a
 7    $966,000 verdict.
 8            I contacted Dr. Aruna from Xavier and Xavier, he is in
 9    the pharmacology school there and is one of the best in the
10    country, and had him.  Dr. Daniel Acosta if you look at the book,
11    Casarett and Doul sitting on the table, Mr. -- can you get those
12    two books for me, please, Mr. Klibert.
13            MR. KLIBERT:  May I approach?
14            SPECIAL MASTER JUNEAU:  Yes.
15            THE WITNESS:  Casarett and Doul, a book you can see I use
16    it extensively in many, many cases.  It's known as the Bible of
17    toxicology.  He wrote a whole chapter on cardiovascular and toxic
18    effect of drugs and toxins on the heart, in the pulmonary system,
19    so I got him, brought him down to the mock trial, brought
20    Dr. Acosta down to the mock trial.
21            The whistle blower that I had, if you look on the last
22    page, is Dr. Michael Snabes.  He was in charge -- he was associate
23    professor of reproductive endocrinology and infertility at the
24    University of Chicago.  But more than that, he had done all of the
25    safety studies of phase one to four with the compound on recoxhib.
```

1    And as a result of that, he had done all of these medical -- he was

2    the medical advisor to Pfizer.  And global research and development

3    in inflammation, arthritis, pain, et cetera, and so he wanted to

4    blow the whistle on Merck.  And we kept that pretty quiet.

5           John Restaino knew about it, Carlene Lewis knew about it,

6    I knew about it, and the committee that was the science committee

7    knew about it, and nobody knew exactly, is he calling us to give us

8    all of this information because he is a competing drug company

9    researcher and they're trying to get Merck in trouble, is he

10   calling us because he really thinks their drug is bad?  And so we

11   were developing this expert and trying to decide when and where to

12   use him in an upcoming trial.

13          So that goes to what I did on the science side of Vioxx.

14   I had always been appointed.  In fact, Wendell appointed me cochair

15   of discovery in the tobacco case, he appointed me cochair of

16   experts in the tobacco case.  I took many of the depositions all

17   over the country in the tobacco case.

18          For example, in New Orleans, I got, Dr. George, the chief

19   toxicologist, to take the Fifth Amendment and quit in the middle of

20   his videotaped deposition.  And I've been -- Mark Robinson and I

21   worked together in Pennsylvania, took almost all of the major

22   depositions in tobacco in the Pennsylvania trial.  I've always been

23   recruited in cases, even when I am not on the PLC in an MDL.

24          I was recruited by Mr. Gauthier and Mr. Cummings and

25   Mr. Fayard to send people in the pedicle screw case, which Arnold

1   can tell you, I sent people down, spent as much as three years

2   working on pedicle screw.  I took depositions in pedicle screw with

3   Fred Longer in Paris for two weeks at different times, and I put up

4   in terms of money, I put up, and not being on the PLC, well over a

5   million and a half dollars in common benefit money, cash, to fund,

6   to make the case function.  And I think Arnold, John Cummings and

7   myself were the three top contributors.

8            I had done the same thing in the breast implant case when

9   people did not have money to pay their assessments.  I lent $2

10  million or more to three different members of the Plaintiffs

11  Committee so the case could continue to go forward.  If the Special

12  Master wants to know, I would say it; if he doesn't want to know,

13  that's fine, I don't have to say it.

14           In the Gaylord case I funded almost three-fourths of the

15  entire Gaylord case myself because people either didn't have the

16  money or wouldn't put it up.

17  Q.  You went through, Mr. Becnel, a lot of the work that you did

18  before the MDL was formed, and it seems like most of that had to do

19  with experts and working with experts.  Once the MDL was formed,

20  didn't you offer yourself, as well as attorneys employed by you, to

21  do work, common benefit work for the committee?

22  A.  Well, the first thing I did was I filed for the MDL.  At the

23  time I filed for the MDL, there was only three or four cases in the

24  whole country.  Mr. Birchfield had one, I had one, and mainly the

25  cases were filed predominantly with Chris Seeger, who was really

1    leading the charge in the New Jersey, New York, Pennsylvania area.

2           And Chris wanted to go forward in that area, he had

3    gotten documents already in New York for that consortium.

4    Mr. Birchfield, because he had a case ready to go to trial actually

5    before the MDL, he had documents that he had accumulated in

6    Montgomery.  And they were by and large paper documents, not a lot

7    of electronic data at the beginning.

8           I offered -- after I organized a dinner meeting in New

9    Orleans after the MDL came to New Orleans, I made the only argument

10   for New Orleans, I made the previous only argument and was the only

11   lawyer present for the Propulsid case, other than defense lawyers

12   made the argument to Judge Fallon.  I did the same thing in the

13   Chinese Drywall case, I made the only argument for Judge Fallon for

14   New Orleans in that case.

15          I had made the only argument in the *High Sulphur Gas*

16   case, which I had 2,000 cases, individual cases.  I made the only

17   argument in the FEMA trailer cases that came here.  The Ford

18   ignition case, the Ford, GM and Chrysler paint cases.  So nobody

19   has appeared before the MDL panel, and I have a very decent success

20   rate before the panel.

21          When I organized this meeting, I invited everybody I knew

22   that existed that I had heard about from anybody and said, if you

23   know of anybody else, invite them to this meeting at Antoine's

24   Restaurant, let's try to organize this case and get this thing

25   moving.

1           Jerry Parker flew here in a private jet with Chris

2    Seeger.  Andy Birchfield was there and I nominated Andy Birchfield

3    and Chris Seeger to be co-lead counsel in the case.  I wanted to be

4    on the Plaintiffs Committee, but I didn't want leadership role in

5    that case.

6           I had cases I was accumulating from all of the major

7    advertising lawyers around, Michael Hingle, Morris Bart, Gordan

8    Crawford, and I could go all over the country, and I had people, I

9    wanted to handle lots of cases.  I was asked to send -- if you look

10   at some of the exhibits toward the back -- by Chris Seeger's office

11   to send people, a guy by the name of Michael Wagner, I didn't know

12   him well.  And if you look at Exhibit No. 30, you will see a letter

13   from him thanking me for sending Rebecca Todd, who was one of my

14   top lawyers, and Holly Lamarche whose father owned multiple nursing

15   homes and hospitals, they were both patient -- well, not she was,

16   Holly was, and I sent them to New York.

17          The rest of the people I started sending to -- and I

18   worked in Birchfield's office with three of the lawyers that

19   ultimately left his firm right in the middle of Vioxx or right at

20   the inception of Vioxx.  Number one was Jerry Taylor; number two

21   was -- the second best lawyer in the mock trial, he went with Tom

22   Girardi's office, I can't recall his name right off the top of my

23   head but I put it in the papers.

24          MR. BIRCHFIELD:  Paul Sizemore.

25          THE WITNESS:  Paul Sizemore.  And then I worked with

1    Mr. Miceli who was -- those three people were kind of involved in

2    that aspect of the case, and Birchfield was the head of their

3    department of mass tort.

4    BY MR. KLIBERT:

5    Q.  You said you sent Rebecca Todd and Holly Lamarche to New York,

6    what did you send them there to do?

7    A.  To do whatever Mr. Seeger and his team of lawyers.  One of

8    these people was this guy Michael whom I did not know, Michael

9    Wagner, and Seth Katz were kind of in charge of that project in New

10   York and they started reviewing documents there.  I put them up in

11   hotels, I paid for their expenses, and they would come back to

12   Louisiana.

13         And then I would take two cars and at 2:30 to three

14   o'clock in the morning I had two vehicles, a Suburban and a big

15   Mercedes, and we would put four people in each car and send them to

16   Montgomery.  My cars, my credit cards, putting them in hotel rooms

17   right across -- Hilton-type hotel right across from Birchfield's

18   office.  And they would get there at eight o'clock in the morning

19   and work till five, five days a week, and then drive back.

20         I was told I could not bill for their travel time, which

21   was -- each person was actually spending ten hours per week in

22   travel time, five hours there, five hours back.  They took all of

23   their meals at the Hilton hotel there, or I forgot, Garden Inn or

24   whatever they called.

25   Q.  Mr. Becnel, I think you skipped over, who were these people who

1   you were sending to Montgomery?

2   A.   These were people -- when the committee kept asking -- when I

3   wasn't appointed to the committee, the bulk of my clients

4   disappeared from my referral list, I don't know where they went, I

5   assume they went to the lawyers on the committee.  But I don't know

6   that.

7           I didn't follow through on that because if you're not on

8   the committee, referral lawyers don't think you know very much and

9   you're not a major player.  And referral lawyers usually flock to

10  me because I give them a 50 percent, 50-50 split and I do all of

11  the costs and they have to keep client contact, and that's the most

12  of any referral lawyer I know in the country.  So I've always had a

13  good majority of cases.

14          As a result of that, I started looking for lawyers.  I

15  had a lot of people who were getting laid off because of Katrina,

16  their offices just closed, and I picked up some incredibly talented

17  people.  I had known Will, who is sitting right here, Will Percy

18  who was a 25 year lawyer, who was working for Herman and his

19  office, had worked for us in the tobacco office, I picked him up

20  and he has worked for me ever since.

21          And from everything from the MRGO case, which he worked

22  full-time on, to welding rods, I mean, his affidavit is in the

23  thing and it will tell you all of the MDLs he worked on.  And

24  that's all he does.  In fact, the last three days he spent in

25  Mr. Herman's office on the Chinese Drywall case with two of my

1    other lawyers, Matt Moreland and Jennifer Cross, on that case.  So

2    I always have people and the staff to do it.

3         One of the people here, that can't get up, is the

4    depository person that I lent to the PLC both in Propulsid and I

5    lent to the PLC, she didn't bring -- she drove up with me but

6    didn't bring a driver's license because she left it in her car.  I

7    said, no, just come with me, we're driving together, and she's

8    stuck down there and security won't let her in the courthouse.

9         SPECIAL MASTER JUNEAU:  Who is this person?

10        THE WITNESS:  And they're sending her driver's license, a

11   photograph to the marshal's service.  Mr. Steve Herman knows her

12   and Mr. Lenny Davis knows her.  I tried to say, look --

13        SPECIAL MASTER JUNEAU:  The point is, Mr. Becnel, you

14   said this is another person that worked on Vioxx, you're saying?

15        THE WITNESS:  She worked on Vioxx.  She worked for me for

16   ten years.  I brought her to the Propulsid depository.  I had the

17   Propulsid depository in my building in LaPlace, and she was the

18   head of the document depository, the superior head was Mr. Herman's

19   daughter.  But she was from the river parishes, so she would open

20   it up in the morning and close it in the evening and do pretty much

21   everything.  And when Penny Herman couldn't go there --

22        SPECIAL MASTER JUNEAU:  But that's all Propulsid?

23        THE WITNESS:  That was Propulsid.  But then they asked me

24   to lend her when Vioxx -- to work on Vioxx.

25        SPECIAL MASTER JUNEAU:  They being whom?

```
 1          THE WITNESS:  The committee.  So instead of being my

 2   employee, I let her work for the committee in the Vioxx case.  And

 3   so the reason I have an affidavit from her is because there was a

 4   procedure that you had to sign in and sign out every single day

 5   that you worked, whether you worked two hours a day, eight hours a

 6   day, and those sign-in sheets were given by her to Mr. Lenny Davis

 7   in Mr. Herman's office for documentation.

 8          We have boxes of all of those time sheets where we turned

 9   them in.  So every hour anybody worked was documented with a

10   sign-in/sign-out sheet, whether it was Mr. Seeger's office, whether

11   it was Mr. Birchfield's office.

12          And then Rebecca Todd was asked by Mark Robinson, whom I

13   worked with for years, for him -- he was getting a trial coming up

14   and he called me and asked me, "Who is the person that knows the

15   documents best?"  I said, "Rebecca Todd."  And he said, "Would you

16   let her come to California and teach me the documents."  I said,

17   "Not at all.  Where is she going to stay?"  "I have a big house

18   with a guesthouse and all this, she can stay at my house.  You

19   don't have to worry about hotels."  I said, "I'll send her down

20   there and use her however long you want and then let me know."

21          So she spent weeks down there, two or three different

22   times, preparing for that trial that was tried before Judge Fallon.

23   And that was the only successful trial in the federal court system,

24   the only one that was won.  And I think the verdict was $50

25   million.  She then stayed up here and, Rebecca Todd, when I got her
```

1   and hired her away from the Third Circuit, and she was working also

2   for Bagget in Lake Charles, she worked for Bagget after me, worked

3   for Bagget, and then the Third Circuit, and then I hired her away

4   from the Third Circuit to come work on Vioxx.

5        And she said, "I don't have a place to stay."  "I have a

6   guesthouse, you can stay there.  You don't have to pay.  Just come

7   and help us on this project.  It's a big project and we need help."

8          And so she did that, she relocated, basically sold her

9   house in Lake Charles, moved down and stayed in my guesthouse for

10  the entire project.  Fell in love with New York and after that

11  trial and the settlement was announced said, "I just want to live

12  in New York, I'd rather live in New York.  I like New York.  I

13  don't want to be in the country in Louisiana anymore."

14  BY MR. KLIBERT:

15  Q.  Mr. Becnel, while Ms. Todd was working for you, you paid her

16  salary?

17  A.  I paid everybody's salary.  I do exactly what I've always done.

18  I accumulate the people, I collect their time and charges, I submit

19  their time and charges as per instructed timely.  I was never asked

20  to pay an assessment, which was a unique thing in Vioxx, that was a

21  unique thing.

22          I think I got in trouble with Vioxx for one major reason.

23  Mr. Meunier had asked me and I just spent years with Mr. Meunier on

24  a daily basis in the Gaylord trial, he asked me, he says, "Danny, I

25  would like to be liaison counsel in Vioxx."  I said, "I don't care

1  who is liaison counsel, I am not interested in a leadership

2  position.  I want to be on a committee."  And so I, along with

3  Mr. Arsenault, said, "Yeah, yeah, we would be glad to support you."

4          And then Mr. Herman said, "I want to be liaison counsel,"

5  and I had already made a commitment.  So I had no objection to

6  Mr. Herman being liaison counsel.  And then somebody else said, I

7  want to be liaison counsel, I had no objection to them.  The

8  problem is when you tell somebody, yeah, I am going to support you,

9  you know, well, I think I never stopped paying because the judge

10  then asked for any nominations and three or four people said they

11  wanted to be liaison counsel and then the judge picked.  So, you

12  know, I didn't get the work I thought.

13          One of the major things that I always said in MDLs, if

14  you do the documents and you spend time and you put them together,

15  you will get the depositions either first or second chairs, you

16  will get to participate in trials, you will get to participate in

17  discovery, et cetera.  That just didn't happen, even though they

18  were all told that.  And many of the people like Will and Judge

19  Marino who had 24 years on the bench, ten years prior practice and

20  eight years with me, none of us got anything.  All we got to do was

21  look at documents.

22          When Rebecca would come back because she would come to my

23  house when they got back here at ten, eleven o'clock at night, on

24  Saturday morning, we would sit and meet, all of the documents they

25  had got that whole week and we would work on them.  This is really

1    hot, this is can be of some help, this is a worthless document.

2    And we would classify them.  And we would -- they would submit them

3    to the document depository person who wanted them, and then they

4    would make the call.  But they went through them initially and then

5    me and then they would say when they would go back that following

6    Monday, this is a good document, at least this is what we think is

7    a good document.

8    Q.  You talked earlier, Mr. Becnel, about Ms. Lamarche and Ms. Todd

9    going to New York, and I asked you about Montgomery.  I don't think

10   you ever really answered that.  Who did you send to Montgomery and

11   for how long did you send them?

12   A.  Well, if you look at an example, and I just put one example

13   because I didn't want to put -- if you look at Mr. Will Percy's

14   affidavit, he will tell you that he worked the first few months,

15   and I just don't remember it per se because it was his affidavit, a

16   few months in the beginning.  Then when the New Orleans depository

17   was opened, he was working here.  Then Katrina happened, then he

18   went back to Montgomery, and then when Katrina -- I mean, the New

19   Orleans depository was reopened, then he came back here.  Literally

20   spent two years doing nothing but documentation in Vioxx.  That's

21   it.

22   Q.  And I think you jumped to my next question, which is, were

23   there any other depositories where you sent your employees to

24   review documents in Vioxx?

25   A.  Let me give you an example.  If you look at the list that I

```
 1    have of people reviewing documents, was my son Christopher Becnel,

 2    didn't do a lot; Meghan Becnel; Toni Becnel, my daughter-in-law;

 3    Michael --

 4              SPECIAL MASTER JUNEAU:  Mr. Becnel, all of these are

 5    lawyers?

 6              THE WITNESS:  I didn't put one person who was a paralegal

 7    or nonlawyer.

 8              SPECIAL MASTER JUNEAU:  Just answer the question.

 9              THE WITNESS:  Yes, absolutely.  And every one of them had

10    previous experience dealing with documents.

11              SPECIAL MASTER JUNEAU:  All right.

12              THE WITNESS:  Toni Becnel was working in the depository

13    for me from Baton Rouge when she met my son, Christopher Becnel,

14    and they did documents way back then.  Both of them moved to

15    Washington, D.C., one worked for Senator Landrieu, one worked for

16    Congressman Jefferson, stayed there five years, stayed there, and

17    then they came back here and they have been with my firm since they

18    came back.

19              Sal Christina, Caroline Donlon -- I hired Caroline Donlon

20    away from the DEQ and she had 25 years experience.  Monica Gant was

21    in a major defense firm, she lost her job because of Katrina, I

22    hired her.  They only had, if you look in this room, no African

23    Americans.  I had the only two African American lawyers really

24    working on the case, Holly Lamarche and Monica Gant.

25              And then I had Kevin work some, Mary Lorenz worked a lot,
```

1    Anita Marino worked, Judge Marino worked, Matt Moreland, Kelly

2    Morton, another former law clerk to my wife on the bench and is now

3    with a major defense firm worked for us in this project.  Darla

4    Sanderson was a nurse and a lawyer, I sent her there.  Deanne

5    Sirmon and Rebecca.

6         These are all lawyers, that's all they did.  They didn't

7    have any other case responsibilities, they didn't have any other

8    case files, they didn't have any clients to deal with.  All they

9    did is common benefit work, and it was a lot, a lot of work.  And

10   we kept trying to figure out, well, when are we going to get these

11   depositions?

12        SPECIAL MASTER JUNEAU:  Let me ask you this question.

13   All of the people that you indicated, were they what I would call a

14   W-2 payroll employee or were these contracted?

15        THE WITNESS:  No, I hired them -- Mr. Juneau, I've never

16   had a partner, not even my son, not even my wife.  And the only

17   reason I've never had a partner, I pay people more than most people

18   make as a partner.  The reason why is because I was so disgusted

19   with watching my friends have partnerships where somebody would in

20   the middle of the night run off with half of their files and then

21   there would be turmoil, I just didn't want that.

22        SPECIAL MASTER JUNEAU:  So if I understand what you're

23   telling me, these people were, in essence, independent contractors

24   to you?

25        THE WITNESS:  To me, with a provision that they would get

1   a bonus at the end of the case, as I had always given.

2           SPECIAL MASTER JUNEAU:  What were the rates for these

3   people?

4           THE WITNESS:  It depended on the individual with the

5   responsibility.

6           SPECIAL MASTER JUNEAU:  Give me some examples for the

7   work that was being done.  Let's say the Montgomery work you're

8   talking about.

9           THE WITNESS:  Some people were making 25, $30 an hour.  I

10  had contracts with all of them and I just don't inspect --

11          SPECIAL MASTER JUNEAU:  What -- it ranged from what, from

12  what to what?  Per hour.  I am just trying to get an idea.

13          THE WITNESS:  20, 25, $30 an hour, depending on

14  experience.  Plus paid vacations, malpractice insurance.  All of

15  these people were allowed to go to either my place in Destin,

16  Florida; Gulf Shores, Alabama, for their vacations free of charge.

17  I supplied many of them with automobiles if they stayed with us,

18  usually Mercedes.  I supplied --

19          SPECIAL MASTER JUNEAU:  You supplied people with Mercedes

20  Benz?

21          THE WITNESS:  Absolutely.  Mr. Klibert, Mr. Moreland,

22  that's part of the package I do.

23          In addition to that, if they wanted a home, I funded

24  their mortgage at below-market rates, at whatever the prime rate

25  was for mortgage, would always be one or two points below that.

1   And they paid me what they wanted to on their home, and as a result

2   of that -- so it's a unique package.  And at the end they would get

3   paid.  One person made one time 1.2 million in bonus, one made

4   800,000, one made 500,000.

5          SPECIAL MASTER JUNEAU:  Was there a contract entered into

6   where it was specified what the benefits were, what the pay package

7   was?  Other than you would pay them X amount of dollars per hour?

8          THE WITNESS:  No, it basically said you're paid so much,

9   and if you stay with the case, you're paid so much.  If you get

10  clients in, you get -- any client you bring in you get a percentage

11  of that.  We had a whole list of things that if you handle

12  individual cases.  For example, somebody wanted to handle a divorce

13  case for somebody or a criminal case, you get to keep whatever you

14  got.

15         SPECIAL MASTER JUNEAU:  Well, my focus of the question,

16  though, is, we're walking about Vioxx claims for benefits, common

17  benefits, fees and expenses regarding Vioxx.  I need to know what

18  specific agreement was with the people who worked on Vioxx as to

19  what they were to receive in terms of payment.

20         THE WITNESS:  Depended on what I got.  It all depended on

21  what I got.  In other words, they were going to be this, plus this,

22  plus this.

23         SPECIAL MASTER JUNEAU:  What was this, this and this?

24         THE WITNESS:  Well, for example, if I got a big per-hour

25  rate on them, they would get more.  If I got --

1           SPECIAL MASTER JUNEAU:  What was the ratio?  I am just

2    trying to find out what the agreement was.

3           THE WITNESS:  The agreement basically were -- one thing

4    in writing and in realty it was always something else because I

5    didn't put, well, you get to go on a vacation, or you get to go to

6    my condo, but they're there every weekend.  You get to pick a

7    weekend you want to go or a weekend you're off.  If nobody else is

8    going it's yours.  Whether it's my house in Aspen or my condo in

9    Aspen, Destin, Gulf Shores, Alabama, and the like.

10          SPECIAL MASTER JUNEAU:  Okay.  I didn't mean to interrupt

11   you.

12          THE WITNESS:  But there's a wonderful discussion of that

13   in some of these cases.

14   BY MR. KLIBERT:

15   Q.  I want to ask you about one of those cases, Mr. Becnel.  These

16   contract attorneys that Special Master Juneau is asking you about,

17   do you supervise them or are they autonomous?

18   A.  I personally supervise them.  I personally write their checks,

19   I personally make sure that when they're in my car I've got

20   millions of dollars worth of coverage in case they get hurt in an

21   auto accident.  I personally make sure that they have malpractice

22   insurance that covers them in case they do something bad.

23   Q.  Let me get to that.  Do these contract attorneys get to pick

24   what projects they work on, or do you control what projects they're

25   going to work on?

1   A.  Totally controlled.  And I've never laid off a person in 43

2   years, never.  So a lot of them don't stay because they get married

3   and move on or their husbands get transferred and they move on.

4   Q.  Are you responsible, Mr. Becnel, is your firm responsible for

5   the actions of these contract lawyers?

6   A.  Absolutely.

7   Q.  Do you have hold harmless agreements with them?

8   A.  None.

9   Q.  Who provides the malpractice insurance?

10  A.  My malpractice carrier.

11  Q.  In your 40-plus years of experience, what differences are there

12  besides perhaps the status of these people with associates in a

13  traditional firm?

14  A.  None.

15  Q.  Did you fire anyone after Vioxx was over?

16  A.  No, never.

17  Q.  Do you hire these contract attorneys directly or do you use an

18  agency?

19  A.  No.  Originally what I did was, I'd go, my wife is on the

20  advisory board at Loyola, my office gives scholarships to Southern

21  University, so I went to all of the three schools because in the

22  Shell Norco case we had provided $100,000 in scholarships in

23  perpetuity from the Shell Norco cy pres award, so I deal with all

24  three of the local -- all four of the local law schools.  And I

25  send the same letter, do you have anybody?  And you would be in

```
1    shock as to how many people come when you need help.
2         That's -- when I had 35 lawyers by and large working in
3    the breast implant case, that's how I got them all.  And then
4    Calvin would send me a check for so much for his file.
5         SPECIAL MASTER JUNEAU:  Did Mr. Fayard's check bounce?
6         THE WITNESS:  Never in their life.  And I would
7    supervised his lawyers, trained his lawyers what to do.  I would go
8    down to Cincinnati and deal with it.  Same thing with Wendell, same
9    thing with Fayard, same thing with Cummings, and I kind of was, I
10   guess you would call it an administrator.  So the checks would come
11   in, I would say, Calvin, your share this month is this; Wendell,
12   your share is this, and so on.  They would send me their check, I
13   would write the check, I would supervise them, make sure we had
14   malpractice to cover them, I would make their plane reservations to
15   and from.
16        I would send like Cincinnati, I sent two of my cars would
17   stay there for three years and stayed there so I got apartments.
18   And in Montgomery, I made the lawyers -- two females stayed in the
19   room together, two males stayed in the room together.  I didn't
20   give each other one a room to hold down costs.  We didn't know we
21   were going to have a $4.5 billion settlement in Vioxx.
22        I've had cases where I have tens of thousands of hours,
23   where I've lost virtually every case, either in the district court
24   or the appellate court and lost $1 million.  Mr. Murray and I and
25   Mr. Penton, joint ventures with that deal, we lost a fortune.  So
```

1   you try to be a manager as well as a lawyer.

2   BY MR. KLIBERT:

3   Q.  Mr. Becnel, we sort of jumped ahead a little bit.  Just so we

4   clarify, just so we make sure we tell the Special Master about all

5   of the work that you did in Vioxx.

6           Your pre-MDL work, you testified you did extensive work

7   with experts, as well as talking to referral lawyers to develop the

8   critical mass.  You also went through document review, as well as

9   Rebecca Todd's specific trial work with Mark Robinson.  Is there

10  any other specific work that you want to tell the Special Master

11  about that relates to Vioxx?

12  A.  Yes, yes.  I was totally in shock.  One day I got a call

13  because I wasn't getting -- I couldn't complain, I wasn't on the

14  committee, what could I say?  I was at their mercy.  We got

15  depositions and we needed the page and line summary.  What are we

16  talking about page and line summary?  For 15 years prior to that we

17  would bring the second chair or the third chair, whether it's PPA,

18  whether it's Gaylord, and we were highlighting important questions

19  and important answers.  So at the end of that deposition, even if's

20  a rough transcript, we can e-mail it to everybody on the team and

21  everybody knows what's important, at least from those two or three

22  lawyers at the deposition and it's finished.

23          Well, they hadn't done that.  And I am not criticizing

24  anybody.  I think there were too many people trying to do too many

25  things and too many trials, so it wasn't done.  So we had to stop

1    other projects we were working on and then start doing page and

2    line summaries of depositions.  And, I mean, we just got stacks and

3    stacks of depositions this high, and we did about a third of all of

4    the depositions taken, at least that's what I was told, you know.

5    I don't know how many they ultimately took, but we had to do that.

6    But that was done in my office.

7            And I pulled Mr. Klibert off of what he was doing, I

8    pulled Mr. Moreland off of what he was doing, Mr. Christina off,

9    myself and others, everybody just chipped in, did that, and turned

10   them around as quick as we could.  And that's just how it was done.

11   Q.  Let's move on, I guess, to more of the meat and potatoes for

12   why we're here.  Mr. Becnel, you testified you've been practicing

13   over 40 years.  What areas -- where have you been practicing

14   geographically?

15   A.  All over this country.  I mean, I've done train derailments in

16   North Dakota; I've done train derailments in Granville, North

17   Carolina; I've done chemical explosions in Arizona; and I've done

18   criminal explosions right out of St. Louis; I've done major

19   chemical explosions in the middle of Minneapolis, Minnesota.  I've

20   done ship collisions all over, including the last two, three big

21   ship collisions, one that you read about just a few months ago

22   where the CARNIVAL SPLENDOR lost power in the middle of the ocean

23   off of the Mexican border and people were stranded out there for

24   five days.

25           I did the one brand-new ship out of Miami that turned --

```
 1    as it got out its first maiden voyage, it turned 35 degrees, we had

 2    broken arms, broken legs.  Jerry Parker, Richard Arsenault, and I

 3    did that and settled them all, we're doing the same thing with the

 4    SPLENDER off of the Mexican coast.

 5    Q.  Where do you have offices, Mr. Becnel?

 6    A.  LaPlace and Reserve, but I have located people throughout this

 7    country my entire career.

 8    Q.  Through your entire career, have you had offices in LaPlace

 9    and/or Reserve?

10    A.  Yes.

11    Q.  And those are communities not far from New Orleans; is that

12    correct?

13    A.  That's what so unique as compared to me to nobody else.  I've

14    never spent a night in a hotel in New Orleans and put in a bill for

15    a night in a hotel in New Orleans that indicates I've ever been

16    involved, I always drive back and forth home.

17    Q.  Based on the 40-plus years of experience, both across the

18    country as well as in the New Orleans area, are you familiar with

19    what the prevailing rates are for attorneys in this areas?

20    A.  I know it probably is as good as any in the country.  I've

21    looked, and let me just give you, I looked at attorney fees and

22    class action settlements and empirical studies.  This was done in

23    2003.

24              Usually I hire Professor Author Miller, and Professor

25    Miller has testified, I handled his testimony in the Gaylord case,
```

1    Richard and I handled it in the Eunice train derailment case, New

2    Iberia train derailment case, I handled it in front of -- the case

3    involving Georgia Gulf before Judge Polozola.  We had always gotten

4    40 percent and we got hourly rates, and we had to justify it.  So

5    this New York University attorneys fee empirical study, that shows

6    you what the prevailing rates are as of '03.

7    BY MR. KLIBERT:

8    Q.  I want to ask you, Mr. Becnel, based on your 40-plus years of

9    experience practicing law in the New Orleans area, in your

10   experience, what are the prevailing rates in this area?

11   A.  Well, if you, you know, you've got to look at -- I just found

12   out what the prevailing rate was for me in Baton Rouge, which is

13   $250 an hour; with all of the experience in the world, that's what

14   they said my rate was worth in Baton Rouge.  Went to the en banc

15   court and I submitted that, and the judge, it was a big split

16   decision.  It was a case I was called in to handle by Donna Grodner

17   and Denise Vinet.  I empaneled the jury, I did the mediation first,

18   and I didn't get a contract signed, and so after I got them a two

19   and a half million -- they had no offer at all --

20   Q.  You're talking about this Grodner case?

21   A.  And I got them two and a half million dollars, and they sent me

22   a check and sued me and said here's $50,000 and sued me and sent me

23   a declaratory judgment.

24        SPECIAL MASTER JUNEAU:  Who sued you?

25        THE WITNESS:  Donna Grodner and Denise Vinet.

```
 1            SPECIAL MASTER JUNEAU:  So it was lawyer against lawyer?

 2            THE WITNESS:  Them suing me, saying we're paying you

 3    $50,000 and we want a declaratory judgment that that's all we owe

 4    you.  And I said, are you crazy?  We agreed to a third/third/third,

 5    and we didn't put it in writing.  So basically, the court had to

 6    come up -- we didn't have it in writing, so we're going to set your

 7    rate.  You're the most experienced, these people had nothing going,

 8    you empaneled the jury, you mediated the case, you had multiple

 9    lawyers in the courtroom, you had Abraham Amador (PHONETIC) who was

10    my technology, master degree in technology person in and I got $250

11    an hour.

12    BY MR. KLIBERT:

13    Q.  Mr. Becnel, getting back to the Vioxx case, did you review the

14    rates reported to the New Orleans firm to Mr. Garrett?

15    A.  Yes.

16    Q.  And based on your experience practicing in this area, what can

17    you say about those rates that were reported?

18    A.  A lot of them were outrageous.  Absolutely.  If you look at the

19    Fifth Circuit law, if you look at the Fifth Circuit law and you

20    have to look at the Enron case to be able to determine what the

21    Fifth Circuit law is, which was not that long ago.  And it went

22    through about 103 firms that it submitted, and their rates were

23    anywhere from about 250 to about $400, every one of the law firms.

24    And that was New York lawyers, that was Philadelphia lawyers, that

25    was Texas lawyers, Louisiana lawyers, lawyers all over the country
```

1    that worked on the Enron case.

2    Q.  Mr. Becnel, you just said the rates reported by other firms to

3    Mr. Garrett was outrageous.  Did you tell me based on your

4    experience what would be an appropriate and reasonable rate range

5    for lawyers in this area?

6    A.  I think between 225 and probably $550 for the top lawyers.

7    That would be my understanding.  I mean, I can tell you, I hired

8    Mr. Herman as an expert witness in the Shell Norco case to give us

9    what the rates were of when we were trying to get -- I think I paid

10   him $100,000 to do that.  And as a result of that, our rates, as I

11   recall, was around $300.  In the Shell Norco case.

12   Q.  Now, getting back to --

13   A.  And that was in '92, '93.

14   Q.  Getting back to Mr. Garrett's, the rates that were assigned to

15   these firms, were you ever asked by Mr. Garrett to provide

16   suggested rates for the attorneys in your firm?

17   A.  No.

18   Q.  Did you provide rates or suggested rates for lawyers?

19   A.  No, they didn't ask.  If you don't ask, you don't tell people,

20   it's up -- usually it's up to the to say what you get.  I would

21   love to set my own fee every time I had a case, but that's not the

22   way it works.

23   Q.  Notwithstanding what you might arbitrarily set the fee at for

24   in each case, based on your experience of practicing in this area

25   for more than 40 years, what rates would you have expected for the

1   lawyers?

2   A.  Well, I calculated certainly what the FAC gave me of $79,000.

3   They gave me a sheet, come in and tell us this is what you offered,

4   are you willing to accept this.  I almost fell through the floor.

5   $79,000.  And I couldn't for the life of me understand that.  And

6   as a result of that, I said, "I am going to file an objection."

7   And they said, "Well, you can come back and talk to us."  I said,

8   "Look, I've already made a presentation to you once.  Every time

9   the charge I had was signed where you had the documented hours.

10  And if you look at 16,000 hours I submitted for me and the lawyers

11  that I had working for me, it amounts to about $6 an hour.  That's

12  not even minimum wage, so why am I going to go meet with you

13  again?"

14          So Steve Murray saw me and said, "Danny, I just met with

15  them for the second time, you're wasting your time."  I said,

16  "Steve, they called me up to go meet with them again."  So I walked

17  into the room with Russ Herman and Andy Birchfield.  And I said,

18  "Guys, look, I don't want to waste your time and you don't need to

19  waste my time.  There's no use discussing this.  I am just going to

20  file an objection and I'll see y'all before the court."  And I

21  walked out.  And then the next thing I know -- so I left, I had a

22  $79,000 offer and I left.

23          And the next thing I know, without any input whatsoever

24  from me, they raised it to 400-and-something thousand, I didn't

25  even know about it.  Somebody called me up because we filed an

1    objection and they raised it to 400-and-something thousand.

2    Q.  The 400-and-something thousand was the recommendation.  What I

3    would like you to do is look at the firm list and the lodestar that

4    Mr. Garrett signed and tell me and tell Special Master Juneau what

5    would be appropriate rates based on your 40 years of experience on

6    behalf of the attorneys you submitted common benefit time?

7    A.  If you look at the list I have, my son, Christopher Becnel, he

8    applied a rate $332.07.  I think that's too high and I reduced that

9    rate to $225.  For me he applied a rate of $332.07, and I think I

10   am just as capable a lawyer as almost any 43-year lawyer.  I think

11   I have more experience, especially in the MDL field of complex

12   litigation, I try cases constantly, $550, I think I would -- that

13   would be the highest anybody could get, other than maybe people

14   like in New York or Mr. Seeger in New York.  Because their rates

15   are so high there.  I mean, they pay ten times the rent rates that

16   we pay here in Louisiana and New Orleans and other places.

17   Philadelphia, Mr. Levin, same thing.  He would have a much higher

18   rate than we get in Louisiana.

19          Meghan Becnel they gave $332.07, I would have reduced her

20   to $225, that was too high.  Toni Becnel, gave her $332.07, she is

21   a 20-year lawyer, I would raise her to 350.  So it's just an

22   18-dollar difference increase.  Michael Brennan, they gave him

23   332.07, I would raise him to 425 with his experience.

24          And if I go down the list, Sal Christina, from 332 to

25   350.  Carolyn Donlon, they gave her 595.76, can't figure that out.

1    She is the one I hired away from the EPA, Louisiana DEQ.  They gave

2    her 595.76.  And I would reduce her to about 425, in my opinion.

3          Monica Gant, this is a five- or six-year defense lawyer

4    and they gave her $19.23.  And I would certainly raise her to $250

5    per hour.  Kevin Klibert they gave 332.07, I would raise him to

6    $350 an hour.  Holly Lamarche they gave 235, I would raise her to

7    250.  Mary Lorenz they gave 235, I would raise her to 250.  Juanita

8    Marino they gave her 322.07, I would reduce her to 250.

9          Judge Marino they gave 332.07, I would raise him to 350.

10   Matthew Moreland, who has been with me for ten years, worked for

11   this court for five years, was with a defense lawyer for two years,

12   they gave him 342.97, I would raise him to 400.  Kelly Morton, they

13   gave her 332.07, I would reduce her to 300.  Will Percy they gave

14   235.20, 25-year lawyer who did nothing but complex litigation his

15   whole life, and particularly with all of these deep document

16   reviews that very few people in this room sit and do that.  We

17   might do the second cull or the third cull, but we don't go do that

18   first initial cull, where you don't know what you're doing, you

19   don't know what you're looking at, they usually shuffle a deck of

20   cards on you.  You didn't have all of the algorithms to be able to

21   mine for themself, just recently that all started.  So I would

22   raise him to 425.

23          Darla Sanderson they gave her 235, this is a

24   nurse/lawyer, I would raise her to 345.  Deanne Sirmon, they gave

25   her 342, I would reduce her to 250.  Rebecca Todd, they gave her

1    334.07, I would raise her to $450.  So those are the rates.

2           Now, let's just compare some of the rates, and I don't

3    mean to be disrespectful to Mr. Herman's firm.  Mr. Herman, who is

4    probably one of the top lawyers in this country and should be at

5    the top of the tier, but I didn't set the top of the tier, the

6    Fifth Circuit set the top of the tier.  He's at 850 now.  If he's

7    at 850, then all of us ought to be at 850 with equivalent work and

8    equivalent experience, ability and trial work.

9           Lenny Davis got 750, Steve Herman got 650.  Well, all of

10   those are way above what the Fifth Circuit says.  So I don't want

11   to get hung up on myself to raise my rates to those levels, but

12   those levels are extremely high according to these cases.  And

13   those are not my opinion, you know, I am against the Fifth Circuit

14   rates as much as anybody in this room.  But it --

15   Q.  Mr. Becnel, based on your 40-plus years experience, what do you

16   think are the prevailing rates for attorneys, the ones you just

17   listed, for example, with their levels of experience?

18   A.  Well, those are the numbers I just gave you, all of those

19   numbers of what they should get per hour, you know.  Instead of

20   Mr. Garrett just took and put 332 and one is $19.

21           SPECIAL MASTER JUNEAU:  Counsel, was your question, I

22   don't think y'all --

23   BY MR. KLIBERT:

24   Q.  My question is, with respect to the three attorneys in another

25   firm you just mention and their rates that you described as high,

1   in your experience, what would be the prevailing rate for those

2   three attorneys?

3   A.   What I just said.   If the Fifth Circuit says a person with 40

4   year's experience like Mr. Herman and I only get 550, then that

5   should be the prevailing rate.   If it says we get 400, that should

6   be the prevailing rate based on experience.

7          SPECIAL MASTER JUNEAU:   I think the question is, what do

8   you think the rate for 40-year attorneys should be?   I think that's

9   what his question was.

10          THE WITNESS:   Well, if I'm practicing law in my hometown,

11   I don't think 550 is an unreasonable rate, I think it's a very fair

12   rate.

13          SPECIAL MASTER JUNEAU:   Do you think, what's your

14   personal opinion, a 40-year lawyer with considerable experience in

15   mass tort litigation and complex litigation, do you think 750, 800

16   is an unreasonable rate?   I am asking for your opinion.

17          THE WITNESS:   No, in my opinion, I don't think it's

18   unreasonable.   Just like I don't think a lot of what the Fifth

19   Circuit does has any basis in experience from them having done what

20   Mr. Herman does, what Mr. Levin does, what I do, where we risk

21   time, money and effort.   In many, many cases.   I can tell you

22   Mr. Levin and the typical example is pedicle screw.   There was more

23   hours and time and effort put in by his office, my office and other

24   offices, and the amount of money we made out of that trouble, we

25   got $25 an hour when you figured it out.   So was that adequate?

1    No.  Even though we got basically $100 million settlement, it was a

2    disaster.

3         Mr. Herman and I just spent years in the courtroom in the

4    CDC on a case where I know he spent a fortune, we've all spent a

5    fortune.  Not only in time, sweat and money, but in our staff's

6    working on the case.  And it looks like it might come to naught by

7    the U.S. Supreme Court with one person, after I think Mr. Herman

8    spent 12 years on the case, almost three years picking a jury.  I

9    don't think some of the judges that get picked fully comprehend the

10   complexity of it as you do, Master Juneau, doing this.

11        SPECIAL MASTER JUNEAU:  That's the reason I asked you the

12   question.  I wasn't interested in what anybody else thought and

13   you've expressed your opinion.

14        THE WITNESS:  I think it should be much higher.  I think

15   it should be much higher.  But I think if it's higher for one

16   person, it's got -- you can't say Mr. Herman is worth 850 an hour

17   and then you're going to assign 323.50 for an hour to me.

18   Especially since what I understood Judge Fallon said was, No. 1,

19   it's critical mass of the case.  I had critical mass of the case.

20   It's work prior to the formation of the MDL I was doing way prior

21   to the formation of the MDL.

22        This is -- once we started losing cases, and

23   Mr. Birchfield, as you recall, tried one case and lost it and tried

24   another case and lost it and I didn't quit.  Many of the lawyers

25   dropped out, didn't fool with it, didn't want to go forward, didn't

1    want to invest their money.  But nobody knew, you know.  I've been

2    involved with Phil Beck before in cases, and it's unbelievable how

3    much money they pour into it.

4            We asked Kirkland and Ellis where he came from in cases,

5    and, you know, we usually are never able to compete with the

6    defense bar, never.  Mr. Herman often says just pay me the same

7    rate you're paying the defense lawyers.  And so I think there's

8    where he came up with the figures because Phil Beck charges $1,000

9    an hour, $2,000 an hour.  So he has to take a cut to 850 an hour.

10   And Garrett takes me and cuts me to 332 an hour.  That's

11   outrageous.  We all got to be on the same level with the same level

12   of experience.

13           SPECIAL MASTER JUNEAU:  Do you think it makes a

14   difference what work, what type of work that's being performed?

15           THE WITNESS:  No.  And let me tell you why.  Documents

16   usually make the case.  Experts make the case.  The trial lawyer's

17   experience makes the case, and the only way you can get that is by

18   throwing yourself into the courtroom and trying cases.  This man

19   tries cases every week that he is able to.  I do the same thing.

20   He does it when he is sick, I do it when I am sick.  I don't think

21   there's a person in this courtroom who will tell you that I don't

22   work six and seven days a week.

23           My office opens at seven o'clock in the morning, no other

24   lawyer's office works from seven o'clock in the morning.  My office

25   opens every Saturday, no other lawyer works every Saturday.  Half

1  of the work I do is pro bono, and the MRGO case and the levee

2  failure case I represented 95,000 people in this city pro bono.

3  I've probably lost $5 million in that case so far, in time and

4  money and effort.  And if I don't get paid on a case like this,

5  then people like me won't exist again.

6          SPECIAL MASTER JUNEAU:  I didn't mean to interrupt you.

7          MR. KLIBERT:  That's mine, Special Master.

8  BY MR. KLIBERT:

9  Q.  Mr. Becnel, do you think there's any other information that you

10  think the special master should have in considering your objection

11  to the fee allocation?

12  A.  Yes, I just think the fact, I've worked with most of those

13  people.  Mr. Ed Blizzard and I were on a committee called denture

14  cream, I don't think there's five people in this room that even

15  knows what it's about.  We settled 200 million dollars worth of

16  cases in denture cream hardly without taking any depositions,

17  without reviewing a lot of documents, the cases were extremely

18  limited.  You had to screen 5,000 people's intakes to get one case.

19  And it was that complicated.

20          Mr. Papantonio's firm recruited me, and I didn't even

21  have a case in Acutane, put up a ton of money because he asked me

22  to.  And we had a federal judge who basically cut our throat and so

23  we lost the money.  Other guys went to state court, I'm on that

24  committee that went to state court and they've been hitting some

25  decent verdicts.  At least we try cases and we try and we don't

```
 1    quit when -- I can name you a dozen lawyers every time it doesn't
 2    go so well, like in FEMA trailer, we haven't won a case.  I had
 3    some of the top lawyers in the country.  I had my brother on the
 4    committee and I have Matt Moreland on the committee.  We are not
 5    even going to get our costs out of that case.  Much less an
 6    attorney fee, much less a settlement, and all we do is have tens of
 7    thousands of those cases.
 8               But you have to give people representation and you have
 9    to have good cases where you're able to make a settlement
10    compensate for the bad cases where you're losing but you're
11    representing people.
12               MR. KLIBERT:  Okay.  Special Master, I tender the
13    witness.
14               SPECIAL MASTER JUNEAU:  All right.
15               MR. HERMAN:  May it please the court, Mr. Birchfield will
16    cross-examine for the Fee Allocation Committee.
17               SPECIAL MASTER JUNEAU:  Mr. Birchfield.
18                         CROSS-EXAMINATION
19    BY MR. BIRCHFIELD:
20    Q.  Mr. Becnel, I noticed your voice getting a little weak, do you
21    want to take break?
22    A.  I just need some more water.
23               SPECIAL MASTER JUNEAU:  Let's take no more than a
24    five-minute break.  We'll get water and be right back.
25         (WHEREUPON, A RECESS WAS TAKEN.)
```

```
 1        (OPEN COURT.)

 2             SPECIAL MASTER JUNEAU:  Mr. Birchfield.

 3                          CROSS-EXAMINATION

 4   BY MR. BIRCHFIELD:

 5   Q.  Good morning, Mr. Becnel.

 6   A.  Good morning, Mr. Birchfield.

 7   Q.  I want to try to sort through some of the things that you

 8   raised on direct.  But before we go there --

 9   A.  On who?  I didn't hear you.  On who?

10   Q.  On direct, on your direct examination.

11   A.  Oh, okay.  All right.

12   Q.  But before we go there, I want to drop back to what you are

13   claiming as common benefit contributions in this litigation, start

14   there, okay?

15             And in October of 2008, you submitted an affidavit as

16   part of your common benefit application; is that right, sir?

17   A.  Okay.  Go ahead.

18   Q.  You submitted an affidavit in support of your common benefit

19   application, right?

20   A.  Yes.  It has a few of the names of the people that I dealt

21   with.

22   Q.  And in this first paragraph, and I just want to sort through

23   what your claims are in regards to these folks.  You told us about

24   experts that you had dealt with, I want to see what their role was

25   here.
```

1  A.  Okay.

2  Q.  Dr. Daniel Acosta, you didn't prepare an expert report and file

3  that in any bellwether trial in the Vioxx litigation?

4  A.  No.  You don't prepare an expert report until you've got a CMO

5  that says this case is going to trial.

6  Q.  Right.

7  A.  But that's why I went right off the bat to Casarett and Doull.

8  And if you turn, and I've got his affidavit in the bench book, I

9  mean his chapter in the bench book, and I then took him, paid for

10  it myself at the request of Carlene Lewis who started this case

11  before anybody.

12  Q.  But he never testified in any Vioxx trial, yours or anyone

13  else's, true?

14  A.  No.  But when he came to New Orleans for a three-day seminar

15  and mock trial, he was there meeting with Carlene Lewis, Shelly

16  Sanford, and myself critiquing as when I was asking you questions,

17  as you recall, rating lawyers, that's what he was doing.

18  Q.  And you're an experienced litigator, Mr. Becnel.  You

19  understand that sometimes you will bring doctors and folks that

20  have expertise in an area that you never intend to be a testifying

21  expert, true?

22  A.  Sometimes.  But I wasn't bringing him.  This is a guy that

23  wrote toxic responses of the heart and vascular system to drugs and

24  toxins, that's what this case is all about.

25  Q.  Let's move to the next one.  Dr. John Markis.  He never

1    testified in any Vioxx trial, true?

2    A.  That is correct.  Dr. John Markis was from Harvard.  I brought

3    him to New Orleans to meet with Shelly Sanford, Carlene Lewis,

4    myself, and to sit and critique all of the lawyers, their theories,

5    their themes, the defenses of the defense lawyers, what would play

6    well, whether we were in New Orleans, or Houston, or Alabama, what

7    did they think, and give us questions and answers of how we can

8    improve or how we can eliminate things you think we were hitting on

9    nothing.

10    Q.  I hear you.  He showed up at the conference, but he didn't

11    testify and didn't prepare an expert report, true?

12    A.  No, but not many people spend three days of their lives talking

13    to lawyers trying to help them prepare for the trial.

14    Q.  Dr. Paul Nathan, did he ever testify in any Vioxx trial?

15    A.  No.  Paul Nathan was just a cardiologist that I asked questions

16    to well in advance of the drug being taken off of the market, just

17    trying to figure out what the hell was going on with Vioxx.

18    Q.  Right, right.  And you never prepared an expert report for

19    Dr. Nathan, true?

20    A.  No.

21    Q.  And Dr. Suzanne Parisian, did she ever testify in a Vioxx case?

22    A.  Well, I don't know that she did.  I know she's been on almost

23    all of the major drug cases.  She wrote this book, *FDA Inside and*

24    *Out*, by Susan Parisian.  I was asked by John Restaino to fly her up

25    here, called her up at nine o'clock at night, got her on a flight

1  at 1 A.M. in Phoenix, Arizona, to fly to Miami, Florida, picked her

2  up at the airport at six o'clock in Miami or seven o'clock in the

3  morning and brought her to the hotel, interviewed her.  I am one of

4  the first people who read her book and used her as an expert

5  witness in the country.

6  Q.  Not in this case, right?

7  A.  Not in this case but a case before Judge Fallon.

8  Q.  But you didn't use her as an expert witness in this case, you

9  didn't prepare an expert report for her in this case, correct?

10  A.  How could I use her as an expert witness until Judge Fallon

11  says I can try a case or participate on a trial team and try a case

12  and have some input?

13  Q.  I am just trying to sort through what you did and what the

14  whole roles of these experts were.  You brought her to a

15  conference, a mass tort conference?

16  A.  No, no, sir.  I brought her to a Plaintiff Committee meeting of

17  all of the plaintiff lawyers in Miami, Florida, that John Restaino

18  you and Chris Seeger called and Mr. Herman, and then was asked once

19  I got there, can you get us an FDA expert; I said, yeah, I can get

20  you one right away.

21  Q.  Let's move on to the second paragraph.  The first part of that

22  paragraph you list some lawyers that worked on this case, I think

23  those are ones that you covered from your office.  Earlier you went

24  through the hourly rates for those lawyers, right?

25  A.  That's correct.

1   Q.  I want to come back, we'll come back and go through those in

2   detail.  But I want to look down further in that second paragraph,

3   and there you list a couple more experts that you had dealings

4   with, right?

5   A.  That's correct.

6   Q.  And Dr. Cyril Wecht you talked about your long-standing

7   relationship with him, right?

8   A.  That's right.

9   Q.  And you didn't prepare an expert report for him in the Vioxx

10  litigation and he didn't testify in a Vioxx trial, did he?

11  A.  No.  As you know, he prepared a paper and a talk at Mass Torts

12  Made Perfect, and I think there was over 500 lawyers there to tell

13  people what to look for as a forensic pathologist in a death case

14  where you didn't have an autopsy.

15  Q.  Okay.  And -- but he never testified in any case, he was never

16  used as an expert, offered an expert opinion in any Vioxx case

17  where there was death with no autopsy, true?

18  A.  He spent probably three days talking to me about them, but I

19  didn't put it in writing.  What to look for, what to eliminate,

20  what not to eliminate and how he could be used.  And if you look at

21  the letter I sent to Troy Rafferty, I said as per your request,

22  that's Exhibit 28.

23  Q.  You offered him, but he was never used, true?

24  A.  No.  I've spoken to Dr. Wecht, who has agreed to be our expert

25  in the Vioxx cases.  Enclosed is his reply.  I've also talked to

1    Don Barrett today, and he has agreed to be on the panel for Vioxx

2    at Mass Torts Made Perfect on the 11th and 12th of 2004.  And you

3    will see Dr. Wecht's letter right behind it, saying:  "I would be

4    quite interested in providing whatever expertise I can as an

5    anatomic, clinical and forensic pathologist regarding adverse

6    sequelae and the complications associated with the use of Vioxx."

7    I don't know what else you can ask for.

8                    SPECIAL MASTER JUNEAU:  Just a minute.  This was a

9    seminar?

10                    THE WITNESS:  Mike Papantonio and John Morgan hold a

11   seminar twice a year and invite all of the lawyers known to man.

12                    SPECIAL MASTER JUNEAU:  It's an open seminar?

13                    THE WITNESS:  Only for plaintiff lawyers, only for

14   plaintiff, no defense lawyers.  And experts.  It's anywhere from

15   500 to 1,000 people there twice a year, and they come and discuss

16   cases, help each other.  It's a cross fertilization seminar.

17   BY MR. BIRCHFIELD:

18   Q.  Let's move to the second page of your affidavit.  This is the

19   affidavit October of 2008 that you submitted for your common

20   benefit application.  In the second paragraph on the second page,

21   you state that:  "My case, *Christina v. Merck*, was filed in the

22   Eastern District of Louisiana on October the 1st, 2004."  Right?

23   A.  That's correct.

24   Q.  "This case was allotted to Judge Fallon, and I subsequently

25   then moved for the MDL panel to allot this case to Judge Fallon."

1    A.  That's correct.

2    Q.  "After my oral argument, the case was indeed allotted to Judge

3    Fallon."

4    A.  That's correct.

5    Q.  Now, are you saying or are you transferring in this affidavit

6    and on the stand that it was your argument as opposed to Judge

7    Fallon's qualification that landed the MDL here?

8    A.  Well, No. 1, he wouldn't have been considered unless I would

9    have filed the moving papers for an MDL because there was no MDL on

10   the radar screen at that time.  No. 2, they knew of Judge Fallon's

11   qualifications because I had put forth his qualifications, not only

12   in my moving papers, but he had just concluded the Propulsid

13   trial -- I mean the Propulsid case, and he knew about that.

14            And I kept saying it's the judge, it's the judge, it's

15   the judge, that's who you need.  I've been in these mass tort cases

16   such as Fen-Phen, that's still not finished and that's almost 20

17   years ago.  Breast implant, over 20 years ago, still not finished.

18   And Judge Fallon was able to try cases and get them done.

19   Q.  Mr. Becnel, I mean, you understand that we are here today in a

20   proceeding for you to state your objection about the common benefit

21   allocation, right, and for us to sort through what you contend is a

22   common benefit contribution, right; you understand that?

23   A.  Yes, sir.

24   Q.  Now, what I am trying to find out from you is, are you saying

25   that it was your persuasive argument as opposed to Judge Fallon's

1    qualifications or the wisdom of the judges on the judicial panel

2    that landed the MDL here in New Orleans?

3    A.  What I am telling you, sir, is the following:  Judge Haybrahm

4    and all of the previous MDL judges invited me and a few lawyers to

5    contribute to a study that they're doing with Francis McGovern.  I

6    didn't invite myself, they did.  I have argued more cases before

7    that panel for the last 35 years than almost anybody in the

8    country.  And at one time my percentage of going to where the case

9    I asked for was like 78 percent, which is unheard of.

10   Q.  Okay.  On the third page of your affidavit, the first full

11   paragraph, you say that probably the single most important event in

12   the entire litigation was having Judge Fallon appointed as the MDL

13   judge, as it was through his leadership that this case was

14   ultimately resolved, even after the plaintiffs lost most of our

15   cases, true?

16   A.  No question about it.

17   Q.  So how much, how much do you contend you're entitled to as a

18   result of having this case assigned to Judge Fallon, how much

19   common benefit are you entitled to for that event?

20   A.  I don't know.  All I can do is put my hours down.  I don't say

21   I am entitled to a percentage because of that, that had nothing to

22   do with it.  We're not entitled to a percentage because of that.

23   But I can tell you one thing, Mr. Birchfield, if we'd been sent to

24   some place like Houston, Texas, or Birmingham, Alabama, I can

25   guarantee you you couldn't have lost all of those cases and had a

1    settlement like this without somebody like Judge Fallon.  And you

2    know that and I know that.

3    Q.  Mr. Becnel, well, if you can't put a value on it, do you think

4    that the Fee Allocation Committee or Special Master Juneau or Judge

5    Fallon should be able to put a value on your oral argument before

6    the panel?

7    A.  I would think so.  I would think so.  Because nobody else did

8    it.  I was the only one in the entire litigation that did it, most

9    everybody else wanted to go somewhere else.  The judges that did

10   not have the experience, that was not a trial lawyer, had not tried

11   cases, had not dealt with experts, and I had worked with him in

12   these kinds of cases in a complex nature, and so I knew his

13   ability.  And that's what I --

14          You know, when you argue a case before the Supreme Court,

15   is it your argument that wins the case?  Not necessarily.  But if

16   you don't present the evidence to that Supreme Court, you think the

17   panel knows every judge, federal judge in this country?  I don't

18   think so, or their background or their ability.  They don't meet.

19   The panels now because of Judge Fallon, they have those seminars in

20   Florida where they cross pollinate.  Prior to that you didn't have

21   that.

22   Q.  In your affidavit, you talk about the experts and you talked

23   about getting the case assigned to Judge Fallon.  And then you also

24   talked about the lawyers that you sent to do the work in this case.

25   We'll come back to those lawyers, I promise, but I want to move to

1    another topic for just a second.

2    A.  Okay.

3    Q.  Now, you remember last Friday you attended my deposition,

4    right?

5    A.  Yes, sir.

6    Q.  And in that deposition, one of the things that you objected

7    about, you complained about a little bit, was the lack of due

8    process; do you recall that?

9    A.  That's correct.

10   Q.  And, in fact, you and the other objectors in this proceeding

11   have filed an appeal of the Special Master's order, and in that

12   order, one of your major claims is a lack of due process, right?

13   A.  Well, let me say this --

14   Q.  Is it or not?

15   A.  You have to understand.  I first in this case filed my

16   objection and said, Judge Fallon, I think we ought to have multiple

17   lead counsel.  Some that did work in the federal case, some that

18   did work in the state case.  My request of that was denied.  I

19   wanted to represent myself, I didn't go out looking.  I think we

20   have some of the finest lawyers that I didn't even meet before this

21   case or knew about before this case, and other lawyers from the

22   state court actions hired them individually.

23           Now, Judge Calogero, you know, that was of no moment

24   because he was a liaison counsel.  And the judge said we were going

25   to have one lawyer.  And I said, wait, that's not fair, you know.

1   I don't know what went on in the state courts, they should have

2   their own lawyer; and they don't know what really went on in

3   federal court, they should have their own lawyer.  I lost that

4   argument.

5   Q.  Okay.  I am just trying to establish whether or not you claim

6   that there's a lack of due process in these proceedings?

7   A.  Well, if you look at the lack of due process, you tell me, sir.

8   How can you have a lawyer that you all have settled with, who you

9   estimated was a member of your PLC, was offered $4 million and you

10  settled with him last night for 15 million, does that make due

11  process?  I don't think so.

12  Q.  Let me see if I can help here.

13  A.  I don't think so.

14  Q.  In this proceeding, you and the other objectors filed an appeal

15  of Special Master's report and scheduling order, right?

16  A.  They make the call, they are the lawyers.  All I do is listen.

17  Q.  Let's go to page 22 and 23.  And at the bottom of this filing,

18  you say:  "We have $350 million at stake.  This fee allocation

19  proceeding represents," it cut off there, "represented a more

20  significant controversy than many cases tried at much greater

21  length.  Among them, the 18 objectors represented thousands of

22  clients participated in multiple complex trials and devoted many

23  years of work on the common benefit of Vioxx actions."

24          "To restrict them to a two-hour presentation," and it

25  continues on the next page, "of their efforts to require them to

```
 1    leave out great chunks of work, to de-emphasize the efforts and
 2    achievements, and to prohibit them from effectively comparing their
 3    contributions to others, in short, to prevent them from making
 4    their best case for the fees they have claimed and to deny them due
 5    process of law."
 6              Are you still claiming, you as an objector, are you still
 7    claiming a lack of due process?
 8    A.  Absolutely I am and I'll tell you why.
 9    Q.  Okay.
10    A.  Wait, I am entitled to answer the questions.
11              SPECIAL MASTER JUNEAU:  Let him answer.
12              THE WITNESS:  Okay.  I was involved in the _Murphy Oil_
13    case.  I hired 13 of the 17 experts in _Murphy Oil_.  Everybody else
14    had lost their homes, their businesses, and I was fully
15    functioning.  They had a fee dispute among people in that, not with
16    me.  I pretty well tried to get the whole thing resolved over and
17    over and over again.  Judge Fallon sent out a procedure that's
18    totally different than this procedure.
19              In that case you had, anybody could discover anybody
20    else, you could have interrogatories of anybody else, you could
21    depose anybody else.  I mean, there was a totally different
22    procedure.  And so I think that's why that due process in the
23    _Murphy Oil_, we had ten times more due process or maybe ten times
24    more time to discover, to have expert witnesses, to do all of this
25    stuff.  And I did none of them because I just laid on, look, this
```

1    is what I did on the *Murphy Oil* case, you give me what you think I

2    am entitled to.  The Special Master gave me $900,000, the judge

3    gave me 2 million.  So, you know, that's all I can say.

4    BY MR. BIRCHFIELD:

5    Q.  Mr. Becnel, not only in the *Murphy Oil*, but you have other

6    firsthand knowledge, firsthand experience of what the Fifth Circuit

7    says is a minimum, at least, of due process in fee allocation

8    disputes and fee allocation matters, true?

9    A.  Sir, I know it in every circuit of this country.

10   Q.  You were a lawyer in the *High Sulphur* litigation, true?

11   A.  Sir, I started the *High Sulphur* litigation.  The two lead

12   counsel in the case didn't have any cases.  I was liaison counsel,

13   I hired every expert in that case.  I had 2,000 clients, nobody

14   else had any.

15           I had a whistle blower in the Shell Oil Company case.  I

16   was dealing with the clients, they were all out there -- and Shell

17   offered to settle the case with me right off the bat.  I did the

18   only inspection of one of these vehicles.  And guess what?  I

19   wasn't on the Fee Allocation Committee.  These guys were in

20   Florida -- you had a guy from Chicago that didn't even know what

21   gasoline was in *High Sulphur*.  I've been in those plants.  I do --

22   I've worked in those plants.

23   Q.  I think that qualifies as a yes, you were a lawyer in the *High

24   Sulphur* case?

25   A.  Oh, absolutely I was a lawyer.

1    Q.   And that was a class action, right?

2    A.   That was.

3    Q.   And in that case you appealed the fee award; is that true?

4    A.   Yeah.  I wound up with $184,000 and got nothing for

5    representing 2,000 clients.  And the other people got, I think,

6    $6 million and they had virtually no clients, they had one or two

7    clients.  Don Barrett was co-lead counsel, I brought him into the

8    case, he had no clients.

9    Q.   In that appeal to the Fifth Circuit, you claimed that there was

10   a lack of due process; you challenged the process, true?

11   A.   I challenged the process because Don Barrett and the lawyer

12   from Chicago appointed themselves as the Fee Committee.  Neither

13   one of them did a deposition, neither one of them hired an expert

14   and they divided the money.  And they left me with the clients to

15   deal with after the case settled.  They took their fees, and I

16   dealt with those clients for two years after that.

17   Q.   But the Fifth Circuit Court of Appeals held that the process

18   that allowed for a three-page affidavit and a 25-page memorandum

19   was sufficient, correct?

20   A.   The opinion says what it says.

21   Q.   Okay.

22   A.   I don't think -- you know, it depends on what panel you get as

23   to whether you win or lose in the Fifth Circuit.

24   Q.   Okay.  But, I mean, you were a lawyer integrally involved in

25   that case, right?  You took the appeal, you know that they said --

1    A.  I took the appeal when I was very, very ill and undergoing the

2    same thing I am doing right now and gave it somebody else, because

3    I couldn't deal with it because I was too sick.

4    Q.  This is the *High Sulphur* opinion of the appeal that you took.

5    A.  I stipulated to that, Mr. Birchfield.  The case says what it

6    says.

7    Q.  Well, I want us to see what the case says, Mr. Becnel, if I

8    can, okay?

9    A.  That's fine.

10   Q.  Okay.  "Mr. Becnel contends that he was entitled to a full

11   evidentiary hearing because submissions were limited to three

12   pages.  However, the record shows that he could have submitted a

13   25-page memorandum, and all other lawyers were able to submit their

14   applications within the parameters established by the district

15   court."  Is that correct?

16   A.  That's correct.  And nobody else had 2,000 clients, nobody else

17   even had more than one.

18   Q.  Accordingly --

19   A.  If I could have submitted more than three pages, I could have

20   listed the 2,000 clients I had and all of the work I did dealing

21   with the clients, which is common benefit, because the clients all

22   got the same thing, they got a repair of their gas tank meter.

23   Q.  Let's compare the process in that case to the process that

24   you're fussing about here today.  Now, Pretrial Order 6D in the

25   Vioxx litigation.  You're familiar with Pretrial Order 6D, aren't

1   you?

2   A.  (WITNESS NODS HEAD IN THE AFFIRMATIVE.)

3   Q.  You are?

4   A.  Every single one of those I am familiar with.

5   Q.  Entered into in 2008 by Judge Fallon, correct?

6   A.  That's correct.

7   Q.  And it called for lawyers to submit affidavits in support of

8   their common benefit application, true?

9   A.  That's correct.

10  Q.  And you did that, you submitted your application that we looked

11  at a few minutes ago.

12  A.  That's correct.

13  Q.  It also provided an opportunity for the common benefit

14  applicants to make an oral presentation to the Fee Committee, true?

15  A.  And I did that and that was supposedly transcribed.

16  Q.  Well, more than just supposedly, you've seen the transcript,

17  right?

18  A.  No, no, I was saying supposedly transcribed.  I didn't know --

19  they had a court reporter there.  I didn't know whether they were

20  taking it all until I read it after, I didn't get a copy of it

21  until after.

22  Q.  I don't want to quibble on that, but you were told right up

23  front, and you were sitting there, that there's a court reporter.

24  A.  That's correct.  And the whole FAC wasn't there, just a few of

25  the FAC were there.

```
 1    Q.  Okay.  You were given an opportunity to make your oral

 2    presentation, right?

 3    A.  That's correct.

 4    Q.  And you've seen a transcript of that presentation, right?

 5    A.  Yes, I did.

 6    Q.  And in that Pretrial Order 6D where Judge Fallon lays out this

 7    process, he goes on to say that the court will set the size of the

 8    fund, right?

 9    A.  That's correct.

10    Q.  And then you attended status conferences with Judge Fallon,

11    right?

12    A.  Almost every one.

13    Q.  And you know that he would describe the process from the bench,

14    right?  He would describe the fee allocation process from the

15    bench?

16    A.  I read, write and speak the English language; yes, I understand

17    that.

18    Q.  And you know that he posted his joint reports on his website,

19    right?

20    A.  That is true.

21    Q.  And in describing that process, the court says that once the

22    fee, once the size of the fund is established, he is going to ask

23    the Fee Allocation Committee for a preliminary recommendation,

24    right?

25    A.  That's correct.
```

1    Q.  And the Fee Allocation Committee followed that process, right?

2    A.  I don't know what they did.  I've never seen -- the Special

3    Master I think denied us the minutes of those meetings, so I don't

4    know what they did.

5    Q.  Well, didn't you --

6    A.  I can't answer that question.

7    Q.  Didn't you receive a preliminary recommendation from the Fee

8    Allocation Committee?

9    A.  $79,000.

10   Q.  Ninety-seven, I think.

11   A.  97,000.

12   Q.  And then the applicants were given an opportunity to object to

13   that preliminary recommendation, right?

14   A.  That's right.

15   Q.  And you were given an opportunity to meet with members of the

16   Fee Allocation Committee; you and all of the applicants were given

17   that opportunity, correct?

18   A.  Yes.

19   Q.  And you took advantage of that opportunity.  You came and met

20   with me and Mr. Herman?

21   A.  No, I did not meet with you, sir.  And I am going to tell you

22   what I did.  Mr. Murray was outside and told me he had just spent

23   two and a half or three hours with you and Mr. Herman discussing

24   this.  And said, Danny, you're wasting your time.  And he said,

25   They asked us to do all of this work and we did the work and now

1   they don't want to pay us.  And I said, well, I am not going to

2   waste my time.  They called me, I didn't call them to go meet them.

3   They called me.

4           Somebody from Mr. Herman's office called me and said

5   we're going to schedule you to be here at such and such.  And when

6   somebody says we've scheduled you to be here, I walked in, I said,

7   there's no use you and I discussing because Mr. Murray just told

8   me.  I said, He is objecting and I am going to object, so let's not

9   waste each other's time.  And I walked right out.

10  Q.  You came in the conference room, you met with me and

11  Mr. Herman, right?

12  A.  I just described what I did.  I didn't meet.  I just walked in

13  and said, you spent three hours with Mr. Murray and he said it was

14  a waste of his time and y'all's time.  And I said, I don't have

15  time to waste.

16  Q.  We can fuss about what was said at that meeting, but one thing

17  is clear, the process afforded you the opportunity to meet, true?

18  A.  With two people.  Mr. Birchfield, you have no idea what I was

19  doing.

20  Q.  Okay.

21  A.  Mr. Herman, by and large, had no idea of what I was doing.  He

22  was dealing with administrative processes that were very complex,

23  he was dealing with negotiations that were very complex.  You were

24  dealing with the same thing, except unlike Mr. Herman, you were

25  trying cases all over and you didn't win a one.  So, apparently,

```
 1   all of the experts that you were utilizing didn't convince one
 2   person of one thing.
 3   Q.  Okay.
 4   A.  Except that you lost.
 5   Q.  Okay, Mr. Becnel.
 6   A.  You don't go to the World Series if you lose games.
 7   Q.  All right.  Mr. Becnel, when you say we didn't know what was
 8   going on, prior to that time, prior to that time that you came into
 9   this office and said we don't want to meet, you had provided the
10   Fee Allocation Committee with a three-page affidavit, you had made
11   an oral presentation to the Fee Committee that was transcribed, and
12   you had provided your time submissions that were available to all
13   of the members of the Fee Allocation Committee, true?
14   A.  Yeah.  Except they weren't all given credit for, even though
15   they were all signed and you had the original copies and Ms. Carlis
16   Griffin, your Honor, is sitting, the African American way in the
17   back in the yellow outfit, she is the person that worked for me and
18   was in charge of doing that and submitting them every week, sign in
19   and sign out.
20            And unlike every other firm that showed up over there, my
21   people went in in the morning and stayed until the end of the day
22   and weren't doing other business and weren't on laptops taking
23   other cases and doing other things.  No other firm did that.
24   Because they knew they were getting fired if they did anything
25   other than what they were required to do at that depository.
```

1   Q.  After that meeting, after the preliminary recommendation, there

2   was an objection period, and then the Fee Allocation Committee

3   published a final recommendation, true?

4   A.  I don't know what the Fee Allocation Committee did because it

5   was you and Mr. Herman were there and I said, well, there's no use

6   for us to meet because of what Mr. Murray just told me, and I left.

7   And the next thing I knew, somebody says, well, you got 400 plus

8   thousand dollars now.  I said, well how did I get from $6 an hour

9   to now 20 or 30 dollars an hour?

10  Q.  Mr. Becnel, you would not dispute, would you, sir, that the,

11  that the court, Judge Fallon, posted on its website published for

12  all to see, the Fee Allocation Committee's final recommendation?

13  A.  I saw it, that's where I saw it.  I didn't know it before that.

14  That's where I found out what it was, and that's where I found out

15  one person -- for example, Anthony Ipino was one lawyer with no

16  office, with no overhead, shared office space, got $780,000 for

17  just him.  And I had worked on this case before he even knew what

18  was going on and I got 400-and-something thousand.  It just didn't

19  make much sense to me.  And most other people it didn't make much

20  sense.

21  Q.  And then after the final recommendation was posted so that any

22  applicant could see what any other applicant was recommended, there

23  was another period for an objection, true?

24  A.  I did all of the proper objections all of the way through.

25  Q.  I'm just laying out the process, Mr. Becnel.

1    A.  Yes.

2    Q.  And there was that period for objection, and you filed an

3    objection to the final recommendation?

4    A.  That's correct.

5    Q.  And you know that following that that Judge Fallon appointed

6    Mr. Juneau to serve as Special Master to preside over discovery

7    matters and to give his recommendation.

8    A.  He has an excellent reputation and has done a fine job in every

9    case I've ever heard about, most of which I have not been involved

10   in.

11   Q.  And then, as Mr. Juneau presided over the discovery

12   proceedings, there was significant documentation that was produced,

13   true?

14   A.  I don't know what all has been produced.  All I know is what

15   the lawyers told me were introduced.  I didn't get to read all of

16   that stuff.

17   Q.  Okay.  Are you saying -- you're not telling us, Mr. Becnel,

18   that your lawyers wouldn't make it available to you?

19   A.  No, no.  I am saying, Mr. Birchfield, I have a very active

20   practice.

21   Q.  Okay.

22   A.  I am working on a number of cases as we speak.  I am taking

23   chemotherapy every two weeks.  I am pretty damn sick.

24   Q.  And I am sympathetic to that, Mr. Becnel.

25   A.  And I am dealing with the stress of this, when I did more in

1    this case than almost anybody else, other than maybe Chris Seeger

2    who won cases, and Mark Robinson who won cases.  And those things

3    that we did in the trenches resulted in them being able to try this

4    case.

5    Q.  Mr. Becnel, are you aware that I tried a case with Mark

6    Robinson?

7    A.  I was aware of that.  Of course I was.

8    Q.  Okay.

9    A.  But who, you know --

10   Q.  Mr. Becnel, I don't want to argue that.  And if you are feeling

11   tired and you need a break --

12   A.  I am not feeling tired, I feel upset.

13   Q.  -- I will join you in asking Mr. Juneau --

14   A.  No, I just feel upset.  I feel upset that a FAC committee gave

15   themselves 73 percent of the entire fee.

16   Q.  Now --

17   A.  And they didn't do 73 percent of the work in this case.

18   Q.  I just want to get through the due process right now and then

19   we are going to get into what you and your lawyers did.  I am just

20   trying to go through the process.  There shouldn't be much of a

21   debate here, okay?

22   A.  That's fine.

23   Q.  Special Master Juneau issued his order.  And in that order, he

24   described the material, the documentation that had been produced in

25   connection with these proceedings.  You read that, you're familiar

1   with that, right?

2   A.  That's correct.

3   Q.  And it goes on to the next page.  You're not disputing that

4   this material was all produced, right?

5   A.  That this material was what?

6   Q.  Was all produced as part of this proceeding.

7   A.  Yes, I understand that.

8   Q.  And I know you've been here in and out throughout the

9   proceedings, some days you were not able to be here, but the other

10  day there were 20 banker boxes of material that were stacked right

11  here.

12  A.  I didn't look at any of it, I just saw it was here.  Banker

13  boxes, IDed with certain stuff.

14  Q.  And Mr. Arceneaux, as an officer of the court, said the

15  material that is in those 20 banker boxes, that's what was on these

16  discs that we have submitted to the court, right?

17  A.  I met Mr. Arceneaux know for the first time last Friday.

18  Q.  Okay.

19  A.  In Mr. Herman's office.  I wouldn't have recognized him other

20  than he was on the phone with some conferences that we had.  I saw

21  Ms. Woodward basically for the first time driving to Mr. Lambert's

22  office on the street and I waved them down.  So I really don't know

23  those lawyers.  I didn't hire them individually.  The court issued

24  an order saying you shall have these number of lawyers, and I had

25  objected to it and they were hired, that's it.

1    Q.  A couple more points on the process, we're almost up to today.

2        Now, Special Master Juneau also ordered that the Fee

3    Allocation Committee submit a designee for a deposition, correct?

4    A.  That's correct.

5    Q.  And that was me, right?

6    A.  That's correct.

7    Q.  And you participated in that deposition, right?

8    A.  That's correct.

9    Q.  Now, unlike the *High Sulphur* case that we talked about earlier

10   where there was a three-page affidavit and a 25-page memorandum

11   limit, that was the process there.  Here in this case you and your

12   firm, by my staff's count, have submitted 173 pages between the

13   time of the final recommendation and this proceeding.  Does that

14   sound about right to you?

15   A.  Something like that.

16   Q.  And you're just one of the objectors in this case.  The other

17   objectors in this case have filed briefs and exhibits as well,

18   right?  Have you been tracking the filings here, Mr. Becnel, in

19   these proceedings?

20   A.  Yeah.  I've been tracking the filings, and I've been tracking

21   the settlements that were offered to three-fourths of those people,

22   and it made no sense whatsoever for their number of hours, their

23   rates, what they did in the case.

24   Q.  We are going to get the rates, I promise you, but right now I

25   just want to get through the process.  And does this sound about

1    right?  My staff counts up that there's been a total number of

2    pages and exhibits filed by objectors since the first of this year

3    of 7,308.  Does that sound about right to you, Mr. Becnel?

4    A.  I have no clue.

5    Q.  Well, you reviewed a bunch of these.

6    A.  I have no clue.  You're asking me does it sound about right.  I

7    don't know, I never added it up, I never read them all.  Look, I

8    wasn't interested in what other people were writing.  I was

9    interested in what I was writing.

10   Q.  And now today we are in this courtroom as part of a full

11   evidentiary hearing that you wanted in *High Sulphur*, too, correct,

12   that you wanted in the *High Sulphur*, you wanted a full evidentiary

13   hearing?

14   A.  Same thing happened.

15   Q.  And the court --

16   A.  Let me tell you, the same thing happened.  This case, the only

17   thing different is Mr. Seeger and you and Mr. Blizzard had a lot of

18   cases.  I am looking at Troy Rafferty right now where Jerry Parker

19   offered them in 1990, and they turned the case down and sent the

20   case to Mr. Seeger.  So does that make any sense?  And all of a

21   sudden you get on the Plaintiffs Committee and now you, when you

22   get a settlement you divide the fee.

23   Q.  Let me ask you this, since you brought that up again:  Are you

24   claiming as part of your common -- that you're entitled to a common

25   benefit fee because referral counsel sent cases to someone other

```
 1    than your firm?
 2    A.  No, no, no.  I am saying there was a concerted effort in this
 3    case, and you know that Judge Fallon will address the Stratton
 4    matter.  I couldn't believe it.
 5    Q.  We'll go there next, I promise you.  Let me finish the process.
 6          You are today getting the full evidentiary hearing that
 7    you appealed for in the Fifth Circuit and the Fifth Circuit said
 8    you're not entitled to, correct?
 9    A.  I don't agree with that.  You agree with that, I don't agree
10    with that.
11    Q.  Well, wouldn't you agree that we're taking part in an
12    evidentiary hearing today?
13    A.  I don't agree with you, Mr. Birchfield.
14    Q.  Okay.  All right.  Considering all that we have described in
15    the process from the time that it was laid out in Pretrial Order
16    6D, are you still fussing that there's a lack of due process,
17    Mr. Becnel?
18    A.  Mr. Birchfield, let's talk about two things.  You came into
19    this process, you had never handled a complex case before, you had
20    never been on an MDL before, you never made an argument before in
21    MDL panel before, you had never been in any major case that I could
22    find before of any kind.
23          You had three lawyers, one of whom I rated as one of the
24    best lawyers other than Mark Lanier, in the mock trial, and every
25    one of them skedaddled out of your office because they were leaving
```

1    trying to get cases on their own, and that was Jerry Taylor and

2    that was Paul Sizemore and that was Miceli.  And they were coming

3    making -- trying to make deals with me.

4         At the same time one of them went to work with Gerardi,

5    they tried a case where the guy didn't even take the damn drug, and

6    you're saying this is expertise.  Give me a break, man.

7         SPECIAL MASTER JUNEAU:  What let me interrupt just a

8    minute.  The question on the table is whether he's still objecting

9    to the due process?

10        THE WITNESS:  Yes, I am.  Yes, I am, and it's based upon

11   the *Murphy Oil* case, that the procedure that was laid out by Judge

12   Fallon in that case that never hit the appellate courts.  *Murphy*

13   *Oil* did not hit the appellate courts, Shell Motiva did hit the

14   appellate courts.

15   BY MR. BIRCHFIELD:

16   Q.  Let me see if I can break it down just a little bit.  Were you

17   given notice of the process, in Pretrial Order 6D, were you given

18   notice of the process and the process described by Judge Fallon

19   from the bench?

20   A.  Yes, I was.

21   Q.  And have you been given an opportunity to be heard?

22   A.  Not really.

23   Q.  All right.  Let's go to -- I promised you we would go to the

24   Stratton matter.  That's where you wanted to go, right?  Correct?

25   A.  That's correct.

1   Q.   Okay.  And you had -- we're here today because you're objecting

2   to the fee allocation that has been recommended for your firm,

3   right?

4   A.   That's correct.

5   Q.   But before then you had filed an objection to the Plaintiff

6   Liaison Counsel's petition for an 8 percent assessment.

7   A.   That's correct.

8   Q.   And as a result of your objection, Judge Fallon appointed a

9   liaison counsel to represent the objectors.

10  A.   That's not how it occurred, Mr. Birchfield.  Let me tell you

11  how it occurred.  People like you and people like me, when we had a

12  big inventory of cases, said, look, we don't want a big common

13  benefit fee.  We want to have a 2 percent for fee and 2 percent for

14  costs.  And for people who don't have cases, if that ain't enough,

15  they ought not be involved in this case.

16          We signed a contract with all of the firms.  If you get

17  in by a certain day you get the 2 percent, 1 percent.  That was my

18  idea, that 2 percent and 1 percent.  And I am the one that put it

19  in, and the people that were involved like Chris Seeger, who had a

20  big inventory of cases, if he paid 2 percent, he got to keep the

21  bulk of the money for he and his firm and the same thing with

22  people with big inventories.

23          All of a sudden out of the blue, somehow or another it

24  becomes 8 percent.  Okay.  I've been in this position before.

25  Mr. Levin can tell you in Fen-Phen I was federal state liaison, and

1    I had dichotomy between what the feds wanted in the MDL and what

2    the state court guys wanted in the state court.  They wanted a 9

3    percent fee.  I objected and Judge Bechtel agreed with my objection

4    and made it a 6 percent fee.

5          So there's nothing sacrosanct about the percentage.  What

6    is sacrosanct in this case is that people signed written, signed

7    contracts.

8    Q.  And you received a letter dated September the 2nd, 2010, from

9    Michael Stratton; is that correct?

10   A.  Mr. Stratton sent a letter to me, he has never talked to me in

11   his life.  Didn't know who he was, what he was, never contacted me

12   ever until I got a letter and a check in the mail.

13   Q.  You did receive this letter and his check?

14   A.  Exactly.

15   Q.  And in this letter he describes, as you know, a number of

16   objections were filed as to the common benefit fee assessment of 8

17   percent, right?

18   A.  I didn't know that a number was filed, I wasn't following what

19   other people were doing.  I know what I was doing.  I know I signed

20   the 1 percent, 2 percent deal, and I didn't want to pay more than

21   that.

22   Q.  Let me see if I can throw this up so we can see it a little

23   better in his letter.  In the body of his letter, he says of the 8

24   percent assessed, that's the 8 percent holdback, right?

25   A.  That's correct.

 1    Q.  Three percent aggregate has been rebated, rebated to you,

 2    correct?

 3    A.  That's what he put in the letter.

 4    Q.  The remaining 5 percent aggregate covers all common benefit

 5    fees for this objection.  One percent and the NPC-PSC 4 percent,

 6    correct?

 7    A.  That's what he said.

 8    Q.  Okay.  Well, you knew that when Mr. Stratton sent you this

 9    check that he was resolving the objections, and you were getting a

10    4 percent rebate and he was keeping 1 percent --

11             MR. KLIBERT:  I am going to object, your Honor.

12             THE WITNESS:  Absolutely not.  If I get a letter --

13             SPECIAL MASTER JUNEAU:  Just a minute.  Judge Fallon has

14    reserved determinations on this issue.

15             Normally, Counsel, that is correct, there is no question

16    about that.  But Mr. Becnel clearly said that he wanted to discuss

17    the Stratton issue so I am allowing that latitude, that's the

18    reason I am allowing it.

19             THE WITNESS:  Let's talk about this.  No. 1, when you

20    employ a lawyer, you usually have a contract with them, either oral

21    or in writing.  I never heard of who Mr. Stratton was, that's

22    number one.

23             No. 2, Mr. Stratton never contacted me.

24             No. 3, Mr. Stratton has to talk to his clients if he's

25    representing me because Judge Fallon appointed him to represent,

```
 1    and I think somebody told me it was 60 or 70 people objected who

 2    had sign these 2 percent, 1 percent different contracts, I am

 3    looking for an order.

 4           How in the heck are you resolving this without bringing

 5    this whole group together and saying, what do you think, and do you

 6    want this offer?  And then, what are you charging me?  I am

 7    entitled, just like the clients are, with a settlement breakdown

 8    and a settlement statement.  What are you taking out of this fee,

 9    how much did you get?  What work did you do?  What experts did you

10    have?  What are the issues?  I didn't get any of that.

11           So you know what I did, I immediately wrote back and

12    demanded he give me a breakdown.  I had referral lawyers I had to

13    give money back to, and I had no authority to do it without talking

14    to them.

15    BY MR. BIRCHFIELD:

16    Q.  This is the letter that you're talking about, right?

17    A.  That's it.

18           SPECIAL MASTER JUNEAU:  What's the date of that letter?

19           MR. BIRCHFIELD:  September the 7th, 2010.

20    BY MR. BIRCHFIELD:

21    Q.  So, Mr. Becnel, you received the letter from Mr. Stratton that

22    was dated September 7th, 2010?

23    A.  Called him three time s and he wouldn't respond.

24    Q.  Then he enclosed a check for $440,694.43, right?

25    A.  Yes.
```

1  Q.  And then you replied immediately, pretty soon, to Mr. Stratton

2  with a letter dated September the 7th, 2010; is that right?

3  A.  Right.  But I tried calling him three times and he wouldn't

4  return the call.

5  Q.  And in the letter, you describe your role and how you had asked

6  for the case to go to Judge Fallon, and how you had 16,167 hours in

7  the case, right?

8  A.  That's right.

9  Q.  And then you go to the meat of your concern and you say, to

10  date, you have not furnished me with an itemization of costs and/or

11  fees.  Correct?

12  A.  That's correct, that's required.

13  Q.  As required.  It's required under Rule 1.5(b) and (e), right,

14  of the Louisiana Rules of Professional Conduct?

15  A.  That's correct.

16  Q.  And, in fact, you attach those with your letter?

17  A.  Absolutely I did.

18  Q.  So when you wrote --

19  A.  I figured this -- not only did this guy not know what the rules

20  of professional responsibility required, but I wanted to give him

21  the rules, and I sent a copy of that letter to Judge Fallon, as you

22  see.  And the reason I sent it -- and I sent a copy of that letter

23  to Russ Herman, I had no idea, I had no idea of who was involved in

24  this settlement because I couldn't see how can you get money out of

25  BrownGreer without a court order because the judge said no money

 1    shall come out of this fund without my approval and a court order.

 2    Q.  Here is one thing that's clear, though, Mr. Becnel, from this

 3    letter.  You may have had questions, but one thing is clear.  You

 4    knew from Mr. Stratton's letter that he was sending you a rebate

 5    check and withholding fees and costs for himself, right?

 6    A.  I mean, I could surmise that, I knew none of the facts.

 7    Q.  It's a little more surmising, isn't it, Mr. Becnel, when you

 8    write him a letter and you send him a copy of the Louisiana Rules

 9    of Professional Conduct that requires an itemization for sharing

10    costs and fees?

11    A.  That's correct.  I mean, he has something that he says he

12    talked to Mr. Christina on three occasions, Mr. Christina denies

13    that.

14    Q.  Okay.  But we're focused on your letter and what you put in

15    your letter.

16    A.  It speaks for itself, Counsel, let's introduce it.  Let's

17    introduce both his letter and the checks to me, my letter back.

18    And I was very concerned, enough to send a copy of that letter.

19    And as you know, Judge Fallon said don't send me personal letters,

20    but I didn't know what to do.  I got a check for pretty near half a

21    million dollars, I have a contract for 2 percent and 1 percent.

22    And all of a sudden they're talking about 8 percent and they're

23    reducing it to 4 percent.

24          And I called up members of the Plaintiffs Committee.  And

25    guess what?  I talked to Mr. Arsenault.  He said, what on earth are

1    you talking about?  I said, I have no idea.  I thought you knew

2    about it.  He says, No.  I didn't get a 4 percent rebate.  We've

3    not had a meeting of the Plaintiffs Committee in 15 months.  And he

4    says, I know nothing about this, there's something fishy here.

5    Q.  I am not fussing about whether you were confused about any

6    issues.  I want to focus on what you were clear on.  You were clear

7    that Mr. Stratton was serving as liaison counsel for the objectors,

8    right?

9    A.  No.  When he sent me that, that's the first I knew of that.

10   Q.  You weren't aware that Judge Fallon had entered an order

11   appointing --

12   A.  No, I was not aware of that.

13   Q.  You didn't follow those orders?

14   A.  No, I didn't follow those orders.  I did not know that he did

15   that, and maybe I should have caught it but I didn't, okay?

16   Q.  But you knew that a rebate had been issued to you and that

17   Mr. Stratton had retained fees and costs from your rebate check,

18   correct?

19   A.  That's what he said, I didn't know that as a fact.  I just knew

20   what he put in the letter and I know it was fishy, I knew it was

21   fishy.  And Arsenault confirmed to me -- he knew nothing about it.

22   How can you get a rebate back without a court order?

23   Q.  But it was more than just what Mr. Stratton said, wasn't it?

24   A.  He wouldn't talk to me, he would not talk to me.

25   Q.  But he actually enclosed a check for $440,000, right?

1    A.  He enclosed that one, and then after I wrote him and basically

2    left word that I was going to report this to the bar association as

3    I am required to do because I didn't know what the hell was going

4    on, I was getting money that nobody else was getting, other members

5    of the Plaintiffs Committee wasn't getting it, and that there's

6    something fishy going on here.

7          And the next thing I know, he sends me another check and

8    he puts on there, by depositing this check you agree and accept to

9    these conditions.  So I figured, well, you know what, I am going to

10   put this in my trust account because that's probably what a lawyer

11   should do.  And then I am going to, I am going to file a motion,

12   which I called a notice to the court, saying, look, I have this

13   money, I didn't agree to this, I don't know what's going on.  And

14   this is what I know about it.

15         And then the court issued an order, put it back in the

16   registry of the court, and that's just what I did.

17   Q.  I am showing you what's marked as Exhibit 14, this is one of

18   your exhibits that I saw for the first time today.  Okay.  But this

19   is in your exhibit book, right?

20   A.  Okay.

21   Q.  It is, isn't it?

22   A.  Well, Mr. Birchfield, you know, you're pulling things up, you

23   asked me as a courtesy to give you a copy, I sent this all to

24   Mr. Herman and I just have to turn to the right page, that's all.

25   Q.  Okay.  Just let me know when you're there.

```
 1   A.  Okay.

 2              SPECIAL MASTER JUNEAU:  Before you go there,

 3   Mr. Birchfield, are you going to put into evidence these two

 4   documents we just looked at, the Stratton letter?

 5              MR. BIRCHFIELD:  Your Honor, I will if they're not.  I

 6   think both of those are included in Mr. Becnel's binder, but if

 7   they're not, I'll offer them as FAC exhibits.

 8              SPECIAL MASTER JUNEAU:  Okay.  Go ahead.

 9   BY MR. BIRCHFIELD:

10   Q.  Are you there, Mr. Becnel?

11   A.  Yeah, I got it.

12   Q.  So this is an e-mail from Mr. Stratton to you, correct?

13   A.  That's right.  And I even make reference to the, I objected to

14   9 percent in Fen-Phen and had it reduced to 6 percent.  And when I

15   did that, I didn't charge anybody a dime.

16   Q.  Now, what's the date --

17   A.  In that case, it was $22 billion worth of money rather than

18   $4.85 billion worth of money.

19   Q.  And the date of this e-mail is September the 16th, 2010,

20   correct?

21   A.  Yeah, yeah.

22   Q.  So this is less than eight days after the date of

23   Mr. Stratton's letter to you.

24   A.  That's correct.

25   Q.  So within eight days you had clearly figured out that you were
```

1   receiving a rebate, and he was withholding fees and costs from it.

2   A.  Right.  But I had no idea of how much he had gotten, I didn't

3   know the circumstances he had gotten, I am trying to figure out

4   where is he getting this money to give to me without a court order.

5   I searched the records, there was no court order.  I made calls to

6   other members of the Plaintiffs Committee and said, do you know how

7   is this occurring, why, why I have a signed contract for two, one

8   and now I am paying four, and then I find out he is recommending

9   seven and a half.  Something smelly in Denmark.

10  Q.  Okay.  But the one thing you said there is you knew you were

11  getting 4 percent, you were only paying in 4 percent?

12  A.  That's correct.

13  Q.  And there was --

14  A.  If anything, there's a violation of due process, that is,

15  because I was getting special treatment that I didn't ask for, that

16  I didn't know anything about.

17          And three people made that decision, Mr. Birchfield, you,

18  Mr. Seeger and Mr. Herman, without any authority from your

19  Plaintiffs Committee, without any authority from the lawyers who

20  you had a fiduciary relationship with to tell about, and that you

21  were having first class and second class and third class citizens

22  whom you guys were representing to benefit yourselves.

23  Q.  Mr. Becnel, you wouldn't testify about things you don't know

24  about, would you?

25  A.  I read the transcript.

1   Q.   Okay.

2   A.   I read the transcript.  It was a secret meeting in Judge

3   Fallon's out of the courtroom without the court having any

4   knowledge of it, at least he said I have no knowledge of it.

5   Q.   How many cases did Mr. Seeger have, how many Vioxx cases did

6   Mr. Seeger have?

7   A.   A bunch, I just don't really know because I didn't look.

8   Q.   How many cases did I have?

9   A.   I think at one time you quoted you had 2,500 and then you were

10  quoted as saying 5,000.

11  Q.   How many cases did Mr. Blizzard have?

12  A.   I don't know.

13  Q.   How many cases did Mr. Papantonio or Mr. Rafferty have?

14  A.   I don't know that.

15  Q.   You testified a few minutes ago about all of the cases we had,

16  and I was just testing you to see if you --

17  A.   Look at the exhibit saying where you were quoted,

18  Mr. Birchfield, saying you had 2,500 cases.

19  Q.   Now, let's --

20  A.   You know, I know one thing, most of those lawyers don't want a

21  common benefit fee of any appreciable size unless they have no

22  cases, because they lose their money; they're paying more into the

23  pot than they're going to get out.

24  Q.   Mr. Becnel, I want to go back to a couple of things that you

25  said and just a couple of quick points, hopefully, and then we're

1    going to go to the lawyers and the lawyers that you submitted hours

2    for, okay?

3    A.  All right.

4    Q.  Now, you said that in this case that initially you had

5    recommended Jerry Meunier as liaison counsel; is that right?

6    A.  That is correct.

7    Q.  And I think in some of your pleadings you say that because you

8    recommended Jerry Meunier and Russ Herman ended up as liaison

9    counsel that he black listed you.

10   A.  That's correct, there's no question about it.

11   Q.  And I think in your testimony, in your direct testimony, you

12   said that you were not given any important work for that very

13   reason; is that your position?

14   A.  Mr. Birchfield, I started this case along with you and

15   Mr. Seeger and maybe three or four other people in the country.

16   Okay.  I didn't take one deposition.  I didn't even sit second

17   chair in one deposition.  I am one of the most experienced trial

18   lawyers with a success rate that's almost unequaled in this country

19   in trials.  In this courthouse right here, other than the Propulsid

20   case, which I lost, I am the only one that tried a Propulsid case

21   in the federal court system.

22        I spent a quarter of a million dollars trying it,

23   recommended to the client to take the settlement, she wouldn't, and

24   we had to try it and we knew we lost.  Mr. Herman's firm tried one

25   in state court and he lost.  And every other one was lost.  How we

1   got $100 million settlement, to this day, I still don't know but

2   for Judge Fallon.

3   Q.  I am just trying to get to the point that you contend that you

4   didn't get any important work, you didn't get any discovery work,

5   you didn't get to handle trials, you didn't get any important work

6   because you contend that you were black listed for recommending

7   Jerry Meunier; is that correct?

8   A.  There's no question that that's what occurred.  And not only

9   did it occur, but I was told if you do all of this discovery work

10  in the depository where nobody else was doing it, you're going to

11  be doing these depositions.  And guess what happened?  I didn't get

12  a deposition.

13  Q.  You didn't get any important work, that's your complaint?

14  A.  No, I didn't get any important depositions of sales and

15  marketing people.

16  Q.  Now, the other, I mean, you also mentioned that Richard

17  Arsenault recommended Jerry Meunier, correct?

18  A.  That's correct.

19  Q.  And Mr. Arsenault is not an objector, he is not one of the

20  objectors in this proceeding; is that correct?

21  A.  Mr. Arsenault is so disgusted by this process it is

22  unbelievable, and that's why he's not in the Chinese Drywall case.

23  He saw what went on here and he threw his hands up and said, I

24  don't want to participate in this.  I was in the *Murphy Oil* case, I

25  saw what happened there and I just -- it's distasteful to me and I

1   don't want to do it again.

2   Q.  Okay.  He is not an objector here, right?

3   A.  No.  You offered him a whole lot more than you originally

4   offered him when he did say I am not going to take that.  And just

5   like you did with all of these people that are no longer objectors

6   here, somebody got $195,000 then you give them $1.25 million.  And

7   I don't know what they did.  And if you read what you all said they

8   did, they did virtually nothing.

9   Q.  And then you also --

10  A.  Now you're recommending that they get eight times and six times

11  and three times what you estimated.  It makes no sense,

12  Mr. Birchfield, it makes no sense.

13  Q.  And you and your fellow objectors have also complained that

14  Jerry Meunier is paid too much by the Fee Allocation Committee,

15  right?

16  A.  Let me say this --

17  Q.  Can you tell me, do you think he was paid too much or not,

18  Mr. Becnel?

19  A.  Mr. Meunier is one of the finest lawyers I know, has the best

20  ethics, and I've done more to try to get him appointed to the

21  federal bench than anybody in this state.

22  Q.  I agree with you about Jerry Meunier being a fine lawyer and a

23  fine man, no question about that.

24  A.  Number two, okay.  Number two.  Mr. Meunier knows how to keep

25  time records, he's been doing that in multiple cases.  But he keeps

 1    honest time records.  And if he puts down he worked an hour, that's

 2    what he worked, one hour.  He did it in Gaylord, he's doing it in

 3    FEMA trailer.  He and I, his firm in the Ford Delgado case that I

 4    tried with one of his lawyers, he watched me try that case, and he

 5    is as honest and squeaky clean as any lawyer I have ever met and

 6    has the finest reputation of any lawyer that I ever met.

 7              SPECIAL MASTER JUNEAU:  What's the question,

 8    Mr. Birchfield?

 9    BY MR. BIRCHFIELD:

10    Q.  My question is, are you complaining that Jerry Meunier was paid

11    too much?

12    A.  No.  What I'm saying is, he has 1,000 hours and what did you

13    give him, two-point-something million dollars.  He didn't win a

14    case, either.  He worked on cases, he didn't win a case.  All of

15    the work on the trial package was basically after all of the cases

16    were over.

17              You know, y'all are supposed to have secret negotiations,

18    it was all over the street about the negotiations.  In fact, I even

19    got a call from Judge Fallon asking me not to talk about it.

20    Q.  Judge Fallon called you?

21    A.  Personally, personally.

22    Q.  And told you not to talk about it?

23    A.  Not to say another word about it.

24    Q.  So is the reason it was on the street partly because of you,

25    Mr. Becnel?

1   A.  No, I didn't know about it.  I had no idea.  I heard y'all

2   talking about it.

3   Q.  Okay.

4   A.  Y'all were the ones that were running your mouths.  How would I

5   know about it?  I wasn't in secret negotiations.

6   Q.  Doesn't it seem odd to you that the Fee Allocation Committee

7   that's chaired by Mr. Herman would make recommendations, give

8   assignments to Richard Arsenault and Jerry Meunier and only select

9   you to discriminate against because you recommended him; doesn't

10  that seem odd, sir?

11  A.  No. 1, the judge appointed Richard Arsenault to be on the

12  committee, okay.  The judge appointed Jerry Meunier to be on the

13  committee, and Jerry Meunier had been the judge's law partner for

14  years, okay.  The judge didn't appoint me, so I was kind of, you

15  know, I had to salute and just be a private in the Army and take

16  whatever you gave me.

17          But I thought for a second, with my experience, my

18  ability in trials, my ability in this case, knowing that I had a

19  whistle blower, knowing that after you lost one or two cases maybe

20  you might want to know some of the themes that the whistle blower

21  was saying.  And, you know, maybe we would have had a better

22  percentage of wins and losses.

23  Q.  Let's move to lodestar.

24          SPECIAL MASTER JUNEAU:  Mr. Birchfield, I am going to

25  give you a little more time.  Because of the length of questions

1  and answers I've let it expand.  Keep basically within the time

2  constraints I've talked about, so I would ask you to get focused on

3  a few of the questions.

4          MR. BIRCHFIELD:  Your Honor, I will move this quickly.

5  We're really to the critical point and I will move fast, but I

6  would ask that the answers be --

7          SPECIAL MASTER JUNEAU:  I said I am going to allow you

8  some time, but I want you to take into consideration, get very

9  focused on the questions.  I have allowed you time.

10         MR. BIRCHFIELD:  Yes, sir.

11 BY MR. BIRCHFIELD:

12 Q.  Now, you're aware, you've seen the Wegmann Dazet report.  It

13 shows the lodestar rate, right?

14 A.  Yeah, I saw that.

15 Q.  And in there it assigns a rate of $332 per hour for you,

16 correct, and other members of your firm?

17 A.  Yeah.  But it provides as much, if you look at that, my son

18 Christopher Devon Becnel has a lot of experience in governmental

19 affairs, worked for the Congress for six years.

20         MR. BIRCHFIELD:  Your Honor, your Honor.

21         THE WITNESS:  What does that have to do with my lodestar

22 being the same as his and he didn't try a case?

23         SPECIAL MASTER JUNEAU:  What's the question?

24 BY MR. BIRCHFIELD:

25 Q.  My question is, does this assign a rate of $332?

```
 1   A.  Yes, but God knows who made the assignment, not me.

 2            MR. BIRCHFIELD:  Your Honor, may I approach?

 3            SPECIAL MASTER JUNEAU:  Yes.

 4   BY MR. BIRCHFIELD:

 5   Q.  You testified earlier Phil Garrett or Wegmann Dazet never asked

 6   you for an hourly rate.  I am going to show you a letter from Cliff

 7   Newland from Wegmann Dazet and ask you if that refreshes your

 8   recollection.

 9   A.  Never received this.

10   Q.  Never received it?

11   A.  Never received this.

12   Q.  Okay.

13   A.  You have to remember, it's Daniel E. Becnel, Jr., there's

14   Daniel E. Becnel, III, and there was my father, Daniel E. Becnel,

15   Sr.  I never got this.  In fact, I can tell you that of all of the

16   objectors, almost all of them didn't receive this, either.

17   Q.  Okay.  Of all of the objectors most of them didn't receive it?

18   A.  That's what they said, that's what they said.  I don't know

19   that for a fact, that's what they said.

20   Q.  And you've got one of your exhibits, Exhibit 26 you have

21   assigned what you consider to be the appropriate rate for you and

22   all of the lawyers in your firm, correct?

23   A.  That's what I originally put down.  And when we were being

24   asked, I made adjustments either up or down on all of those

25   lawyers.
```

1   Q.  Well, this is your exhibit that you submitted into evidence

2   this morning.  Are you saying --

3   A.  That's what the original was when I put it together trying to

4   come up with some numbers.  I was asked this morning by Mr. Klibert

5   what would you assign to those various people; some I went up, most

6   I went down on.

7   Q.  Okay.  All right.  So the rate may change, but are these hours

8   accurate --

9   A.  Those hours, if you look at those time sheets right there that

10  were submitted to Mr. Dazet (INDICATING), they're in there, you're

11  welcome to have them and look at them.  I don't think you ever

12  looked at sign-in and sign-out sheets to see what the hours anybody

13  had were.

14  Q.  The total number of hours here, 16,167 hours and a half, right?

15  A.  If that's what the addition -- that wasn't my addition, but if

16  that's what the addition is.

17  Q.  It matches what you submitted in your pleadings, correct?

18  A.  Yes.

19  Q.  Now, you talked about the Grodner case, correct?

20  A.  That's correct.

21  Q.  And in the Grodner case, the court did an analysis similar to a

22  *Johnson* analysis, correct?

23  A.  I mean, I can't read it.

24  Q.  Okay.

25  A.  Go ahead.

1    Q.  Okay.  And in this analysis, they consider for determination a

2    quantum matter theme, considered the time and labor, that's a

3    *Johnson* factor, novelty and difficulty of the issue, the skill

4    required, the likelihood of acceptance of the work might prevent

5    the attorney from accepting other opportunities, and experience,

6    reputation and abilities of the attorney.  Those are *Johnson*

7    factors , aren't they?

8    A.  No question about that.

9    Q.  And the court conducted that analysis and determined that the

10   appropriate hourly rate for you, Mr. Becnel, was $200 an hour,

11   correct?

12   A.  I thought it was 250.

13   Q.  Well, can you see this?

14   A.  I can't see it.  That was the Baton Rouge rate.

15   Q.  Well, you're a Baton Rouge lawyer, right?

16   A.  No.  I wasn't a Baton Rouge lawyer.

17   Q.  Okay.  This court --

18   A.  I tried cases in Baton Rouge, but I wasn't a Baton Rouge

19   lawyer.

20   Q.  Okay.

21   A.  I wasn't asking for that case.  Ms. Vinet's son died.  She

22   couldn't try it, Donna Grodner couldn't try it.  They called me and

23   asked me would I go try it.  I said what's the fee split?  They

24   said, a third, a third, a third.  And when I brought a mediation at

25   my home within two or three days, when somebody calls you and says

1    my only child just died, I can't try this case, would you help me

2    out?  You don't worry about contracts.

3    Q.  When you read that case, the court considered the *Johnson*

4    factors and determined that your hourly rate was $200 an hour;

5    that's a yes or no?

6    A.  Yeah, every lawyer in Louisiana with my skills would have

7    gotten $200 an hour from now on, if you believe that.  That's why

8    there was a bunch of dissent and that's why they made it an en banc

9    because they were just horrified at what had happened.  That they

10   had a zero offer, they had done no real work in the case, it was

11   going to trial.  Donna Grodner was sanctioned by the federal judge,

12   and I got because of my relationship with the defense firm, I tried

13   the case and then settled it.

14          SPECIAL MASTER JUNEAU:  Let me interrupt.  We are getting

15   a little far afield from the question.

16          MR. BIRCHFIELD:  I am fine with Mr. Becnel having his

17   freedom, I just don't want to be limited on my time.

18          SPECIAL MASTER JUNEAU:  Go ahead.

19   BY MR. BIRCHFIELD:

20   Q.  In the exhibit that you submitted, Exhibit 26, you had your

21   hourly rate as the highest in your firm; is that correct?

22   A.  That's correct.

23   Q.  And you told us just a minute ago that you made some

24   adjustments on the fly as you were testifying, correct?

25   A.  I did.

 1  Q.  Did you put anybody in your firm at a higher rate than you?

 2  A.  No.

 3  Q.  You would -- you in your opinion, your hour is worth more than

 4  an hour of any other of the other lawyers that you submitted for?

 5  A.  No, I put Judge Marino and things fairly comfortable.

 6  Q.  Nobody higher than you, right?

 7  A.  No, because I don't think you can get a higher rate.

 8            SPECIAL MASTER JUNEAU:  The answer is no.

 9  BY MR. BIRCHFIELD:

10  Q.  It's your position in this proceeding that the court must use

11  lodestar as the prevailing method in allocating fees, true?

12  A.  They use a lodestar cross check, that's what they usually do

13  now.

14  Q.  On this list of attorneys that you have submitted time for, are

15  some of these lawyers also hired by other law firms?

16  A.  Were they or are they?

17  Q.  Were they hired by other law firms during the Vioxx litigation?

18  A.  I don't know that they were or they weren't.

19  Q.  Did you review the submissions of other firms, their objections

20  to the fee allocation recommendation?

21  A.  No, I did not.

22  Q.  Now, in Mr. Arsenault's affidavit -- first of all, let me back

23  up.  Pretrial Order 6D ordered that if you're making a submission

24  for a contract employee that you -- or contract lawyer, that you

25  are to submit the rate of compensation for those lawyers, correct?

1    A.  What are you talking about?  Never heard of such a thing.

2    Q.  All right.  Then let's go to Pretrial Order 6D.  I thought you

3    were familiar with Pretrial Order 6D, Mr. Becnel, we'll go there.

4    Pretrial Order 6D --

5    A.  You just asked me objectors and now you're talking about

6    Mr. Arsenault.  I am still trying to figure out what you're talking

7    about.

8    Q.  I asked you --

9    A.  You asked me if I read the other objectors and then you put

10   Mr. Arsenault's affidavit on.

11          SPECIAL MASTER JUNEAU:  Mr. Becnel, let him ask the

12   question and then you can answer.

13   BY MR. BIRCHFIELD:

14   Q.  You're familiar with Pretrial Order 6D, right?

15   A.  Yes.

16   Q.  In Pretrial Order 6D, Judge Fallon ordered, where work was

17   performed by contract lawyers, those counsel are required to

18   disclose the salary wage of such contract lawyers to avoid paying

19   windfall profits to such counsel, correct?

20   A.  Okay.

21   Q.  Correct?

22   A.  That's correct.

23   Q.  And you did not provide that information in your common benefit

24   fee application affidavit, did you?

25   A.  And you could not provide it because I don't know what their

1   compensation will be.

2   Q.  Is that your position, Mr. Becnel?

3   A.  I don't know what their compensation will be because I don't

4   know what I'll get on their hours.

5   Q.  Now, let's go back to Mr. Arsenault's affidavit that he

6   submitted as part of his -- in response to Pretrial Order 6D.  And

7   in Mr. Arsenault's affidavit, he lists contract lawyers, and he

8   provides their years of experience and he provides their

9   compensation, correct?

10  A.  I don't know what Mr. Arsenault did, that's the first time I've

11  seen this.

12  Q.  You see it now, right?

13  A.  Well, I am trying to read it.  Yeah, okay.

14  Q.  And M. Lorenz, she is one of the lawyers that you submitted

15  time for, correct?

16  A.  I am the one that hired her.

17  Q.  She is paid $3,000 per month, correct?

18  A.  If that's what Mr. Arsenault put, that's not what I put.

19  Q.  And then --

20  A.  They were paid hourly plus bonuses plus other things.

21  Q.  You didn't put anything in your affidavit.

22  A.  Just what I said because I didn't know what their compensation

23  would be.

24  Q.  Now, in this list, Mr. Percy, Will Percy, he is also one of the

25  lawyers that you submitted time for, correct?

1  A.  That's correct.  He is sitting right there and he still works

2  for me.

3  Q.  And his monthly rate was $3,750, right?

4  A.  Did Mr. Arsenault pay him that, I don't know.

5  Q.  Right.

6  A.  I don't know.

7  Q.  You're a pretty shrewd businessman, aren't you, Mr. Becnel?

8  A.  Pardon?

9  Q.  You're a pretty shrewd businessman, aren't you?

10  A.  I am in a number of businesses, yes.

11  Q.  You wouldn't expect to be paying more for the same services as

12  Mr. Arsenault, would you?

13  A.  Depends.

14  Q.  Would you agree that $3,750 per month, that comes out to $22.50

15  per hour?

16  A.  You can do the calculations, but if you've already done them, I

17  accept your calculations.

18  Q.  Some of the lawyers that you submitted time for also contract

19  lawyers, so we do have the hourly rates for those lawyers, right?

20  A.  If that's what Mr. Arsenault says.  He didn't write their

21  checks, I wrote the checks.

22  Q.  Now, let's go to your time submissions, because time

23  submissions, those are the driving factor if you're going to use a

24  lodestar methodology, correct?

25  A.  That's correct.

1   Q.  And I want to show you the time submission here, and this is

2   for your firm.  You see that law offices of Daniel E. Becnel,

3   correct?

4   A.  Where?  Which one?

5   Q.  At the very top of the page.

6   A.  Oh, okay.  I didn't know what you were pointing me to.  Okay.

7   Q.  And the first line there where we see this is Mike Breinin?

8   A.  That's correct.

9   Q.  He's one of the lawyers you submitted time for, correct?

10  A.  Right.

11  Q.  And you said earlier this morning, and you put it in your

12  affidavit, that you were not allowed to submit time for travel, but

13  you did submit time for travel, right; it was just a mistake,

14  right?

15  A.  Where do you see time for travel?

16  Q.  On the very --

17  A.  No, we were told to put it down but we wouldn't get paid for

18  it.

19  Q.  All right.  So then we see for Michael Breinin on January the

20  10th, 2005, six hours travel to Montgomery; the next entry, January

21  11th, 2005, Vioxx document review in preparation for upcoming

22  depositions, correct?

23  A.  That's correct.

24  Q.  Now, let's look at Mr. Arsenault's time submission.  Neblett,

25  Beard & Arsenault, that's Richard Arceneaux's firm, right?

1    A.  Right.

2    Q.  And we see the lawyers that are covered in this submission

3    listed in the left-hand column, correct?

4    A.  All right.

5    Q.  Do you recognize any of the names there as lawyers that are

6    also contract lawyers for you?

7    A.  A few of them are the same.

8    Q.  Okay, tell me who they are.

9    A.  Well, Darla.

10   Q.  Darla Sanderson.

11   A.  Percy, Holly, Mike, Mary.

12   Q.  Okay.  So we saw the entry of January the 11th, 2005, for Mike

13   Breinin submitted by your firm.

14          Now, let's go to the same submission for Mike Breinin for

15   Mr. Arsenault.  Do you see the initials in the right-hand column

16   MB, that's Mike Breinin, right?

17   A.  Okay.

18   Q.  January the 10th, 2005, three hours -- I'm sorry, travel to

19   Montgomery associated with the document review work, six hours.

20   Just like on your time submission, correct?

21   A.  Okay.

22   Q.  Correct?

23   A.  I said yes.

24   Q.  And then January the 11th, 2005, we've got document review at

25   depository in preparation for upcoming depositions, eight hours by

1   Mr. Arsenault, correct?

2   A.  Okay.

3           MS. WOODWARD:  Wait, can you put that back up.  Where are

4   you getting six and eight?

5           MR. BIRCHFIELD:  In the far right-hand column you can see

6   the hours, correct.

7           MR. ARCENEAUX:  It's okay.

8   BY MR. BIRCHFIELD:

9   Q.  All right.  Especially, then, let's go down further.  This is

10  Mr. Arsenault for Mike Breinin on January the 12th, 2005.  Document

11  review at depository in preparation for upcoming depositions.

12  Eight hours, right?

13  A.  Right.

14  Q.  Same date for your submission for Mike Breinin, January the

15  12th, 2005, eight hours for document review in preparation for

16  upcoming depositions.

17  A.  Okay.

18  Q.  Correct?  Okay.  Do you think it's appropriate for the same

19  time to be counted for the same lawyer doing the same work by two

20  separate firms?

21  A.  I didn't know Mr. Arsenault was filing that.  I was filing it

22  all because I was doing everything.  I was writing the checks, I

23  was providing the cars, I was getting the time sheets, I was

24  submitting the time sheets.  I did not know he did a duplicate of

25  that.

1    Q.  Just so that we're clear, and we can see --

2    A.  As you know, Mr. Arsenault and I agreed when they couldn't find

3    any lawyers within the firms to do the documents, and they kept

4    asking for us.  I said, Richard, I can go try to get some lawyers

5    because Katrina has just happened and people are out of work and

6    I'm getting 20 applications a week.  So I went to the law schools

7    and tried to get some stuff off of their website.  And I said, I

8    will deal with this, and if you want to do this as a joint venture

9    I will be more than happy to do the yeoman's work on that.

10   Q.  Okay.  Now, we can -- we've looked at Mike Breinin and several

11   entries there, but you can see pretty quickly that all of these

12   entries, most of these entries are duplicate entries for the same

13   lawyer, the same day, doing the same work, submitted by you and

14   Mr. Arsenault, correct?

15   A.  All I can tell you is that I submitted the time.  I didn't know

16   that Mr. Arsenault submitted time, too.

17   Q.  Well, it's a problem, it's a problem, isn't it, for lawyer time

18   to be submitted --

19   A.  Did you talk to Mr. Arsenault about it?  I can't answer why he

20   submitted and I did.  I was submitting the time to Mr. Garrett on a

21   monthly basis.  I was paying the paychecks.  It was my cars, I was

22   using my credit cards to get the rooms.  I was getting the

23   documents back.  I don't know what Mr. Arsenault was doing.

24   Q.  Well, for the sake of time because the records are actually in

25   evidence, but these lawyers submitted duplicate time for common

1    benefit application that totals 3,054.75 hours.  You wouldn't

2    dispute that, would you?

3    A.  I don't know what you're looking at there.  I have no idea.

4    You're showing me some compilation.  Is that work that was done in

5    what depository?  You don't have any idea.  That's just Montgomery.

6    Q.  I am just showing you --

7              SPECIAL MASTER JUNEAU:  The question that is on the

8    table, do we have two separate firms submitting time for the same

9    people on the same task for the same day?

10             MR. BIRCHFIELD:  That's it.  And we walked through

11   several entries.  We can go further and look at the different

12   employees.

13             THE WITNESS:  Let's look at New York depository.  Did

14   Mr. Arsenault submit time for New York?  I don't think so.

15   BY MR. BIRCHFIELD:

16   Q.  Let's look at the entries --

17             SPECIAL MASTER JUNEAU:  This is important, we'll get to

18   New York in a second.  But the question is on this billing, on this

19   time, on these days, does that indicate the billing -- the

20   documents we're talking about, does that implicate duplicate

21   billing for a single task?  That's what I need to know.

22             THE WITNESS:  I didn't know what Mr. Arsenault

23   submitted --

24             SPECIAL MASTER JUNEAU:  That's apparently what that

25   reflects.

1          THE WITNESS:  That's apparently what it reflects.

2     Mr. Arsenault is a separate firm from mine.  All I can tell you is,

3     I hired the people, I was in charge of people, I paid the checks

4     for the people, I provided the cars for the people.  They had my

5     credit cards and I paid the bills from those credit cards.  And

6     Mr. Arsenault was going to get credit for his share of that.

7          SPECIAL MASTER JUNEAU:  What do you mean credit for his

8     share?

9          THE WITNESS:  If he contributed to that fund to pay for

10    those people.

11         SPECIAL MASTER JUNEAU:  Did he contribute?

12         THE WITNESS:  Yes, he did.

13         SPECIAL MASTER JUNEAU:  Mr. Arsenault provided monthly

14    rates on these people.  You indicated what you were paying them

15    hourly, and you said you would increase that by bonus and so forth.

16         THE WITNESS:  That's the only way you're going to get

17    these people to work.

18         SPECIAL MASTER JUNEAU:  Mr. Becnel, the question is, on a

19    given day, a single day, a single person, who paid the people for

20    the work that was given on the dates that are reflected in these

21    exhibits?

22         THE WITNESS:  I paid for them.

23         SPECIAL MASTER JUNEAU:  Do you know if Mr. Arsenault --

24         THE WITNESS:  He would contribute money.

25         SPECIAL MASTER JUNEAU:  To who?

1          THE WITNESS:  To me.  To supplement the fund to pay for

2     them.  I set up a separate checking account for these people to be

3     paid.

4          SPECIAL MASTER JUNEAU:  Well, it looks to me, if I am

5     reading these exhibits right, the claim is made by two separate

6     firms for the totality of what they were paid, I think that's what

7     I'm reading.  Am I right or wrong?

8          THE WITNESS:  I don't think so, I don't think so.

9     Because Mr. Arsenault did -- remember, we were doing this before

10    there was an MDL.  He and I were doing this before the MDL.  And

11    then we started doing it after the MDL and he was on the committee

12    and he said he was going to deal, you know, with his own firm

13    because he was on the committee and he could do what the heck he

14    wanted.  And I just continued to do the continued review of these

15    documents and sending these people to do the document review.  I

16    just don't remember when he cut off and I stayed.  For example,

17    Mr. Percy stayed there for two years.

18    BY MR. BIRCHFIELD:

19    Q.  Regardless of who paid for this time, whether it's you or

20    Mr. Arsenault, what's clear from the billing records that have been

21    submitted is that you submitted the exact same time for common

22    benefit fees for the same employees as Mr. Arsenault, correct?

23    A.  I never looked at his, I didn't know he filed them.  Probably

24    he didn't know I was filing them.  I can't answer that.

25    Q.  So this would reflect --

```
 1   A.  A duplication, that's obvious, Mr. Birchfield, that's obvious.

 2   Q.  Of 3,000 hours, right, Mr. Becnel?

 3              MR. KLIBERT:  Objection, your Honor.

 4              SPECIAL MASTER JUNEAU:  He objects, he says he didn't

 5   have knowledge of what it is.  That's what your question was, I

 6   understand, but that's --

 7              MR. KLIBERT:  My objection is even more specific.

 8   Mr. Birchfield asked Mr. Becnel about various people that

 9   Mr. Arsenault had listed.  I don't remember Margaret Parker who is

10   listed at 500 and one and a half hours as being somebody identified

11   by Mr. Becnel as someone he knew.

12              THE WITNESS:  If you look at my list, Judge, look at the

13   list, it doesn't even appear there.  I mean, I don't know what

14   somebody else does.  You can't pop it in front of me and expect me

15   to know who it is.

16              SPECIAL MASTER JUNEAU:  What I want to know in your

17   questioning, is Ms. Parker considered part of the duplicate list?

18   It is according to what I saw.

19              MR. BIRCHFIELD:  If it's up there, yes, and I can go

20   through those.  I am for saving time, there's 3,000 hours.

21              SPECIAL MASTER JUNEAU:  It's an important matter.

22              MR. KLIBERT:  I was seeing something from Mr. Becnel's

23   submission showing that he submitted hours on behalf about

24   Ms. Parker.  Somebody else did a duplicate.

25              SPECIAL MASTER JUNEAU:  That's what I'm trying to find
```

1   out.

2         THE WITNESS:  I don't know who Margaret Parker is, I know

3   everybody else.  I know who Breinin is, I know who Lamarche is,

4   Lorenz and Percy is.  Margaret Parker I never heard of.

5   BY MR. BIRCHFIELD:

6   Q.  All right.  Let me ask you, Mr. Becnel, the fundamental

7   question here.  Does the fact that significant duplication of hours

8   submitted, does that cause you any concern about using lodestar as

9   the primary factor in the fee allocation process?

10  A.  Sir, the cases say when you use independent contractors, and

11  I've gone through, you know, you had shared partners, three of whom

12  objected and left your firm because they were going to get Vioxx

13  cases on their own, okay.  Does that make them a better lawyer than

14  you?  Not necessarily.  When you couldn't put people in your

15  depository and you were getting ready to come to trial and you lost

16  three of your major players, you asked us to send these people.

17  You didn't say is this a partner, is this an independent

18  contractor, and nobody would show up.  And that's why Ms. Griffin

19  back there, Carlis Griffin, begged and begged and begged, Danny,

20  you have to send more people, you have to send more people, we have

21  all of these documents, nobody will come and do the documents.

22        Now, what you -- you know, Mr. Arsenault couldn't send

23  them from Alexandria, he had gotten hit with the hurricane just as

24  bad as everybody else but it was a different hurricane.  His office

25  was flooded, his home was damaged.  He even had somebody living in

1   his guesthouse, I think Ms. -- liaison counsel in this case, not

2   liaison, the state liaison counsel.  She was living at his house

3   because her house was flooded.

4   Q.  Any of the things that you just said about the need for

5   contract lawyers, the fact that I've lost cases, does any of that,

6   does any of that change in any way the fact that it's wrong to have

7   duplicate submissions for common benefit time?

8   A.  If you don't know they're duplicates, how in the heck are you

9   going to do something about it?  Okay.

10  Q.  Let's move to --

11  A.  How do you know they're duplicate?  Until you just showed me

12  that, I've never seen Mr. Arsenault's affidavit.  I've never seen

13  Mr. Arsenault's submission.  I don't know what he even got other

14  than the court published what he got.

15  Q.  Let's focus just on your submissions, okay?

16  A.  Okay.

17  Q.  And the 16,167 hours that you're claiming common benefit fees

18  for, you understand that that's really supposed to be for common

19  benefit efforts, not working on just your individual cases, client

20  communications, fax sheets, stuff like that, right?

21  A.  Not one of those people did that.

22  Q.  Let's look at this entry, Caroline Donlon.  That's one lawyer

23  you submitted time for, right?

24  A.  I did.

25  Q.  This is a time submission for her for February 15th, 2004,

1    right?

2    A.  Okay.

3    Q.  Telephone contact with four potential Vioxx claimants, which

4    did not turn out to have the five suspect symptoms for taking

5    Vioxx, right?

6    A.  Right.

7    Q.  Is that case specific, you said, Mr. Becnel?

8    A.  Of course that is.  This is the person I told you I hired from

9    DEQ and she was not -- she was there before and probably somebody

10   gave somebody her number, and she was meticulous of putting time

11   down.

12   Q.  And we would agree that that should be subtracted from the

13   common benefit hours submission?

14   A.  If she spent four hours doing three calls, four calls, I doubt

15   you would spend four hours doing three or four calls.

16   Q.  This is Caroline Donlon again, January the 13th, 2004,

17   summarizing Chris Rhodes' deposition and related matters.

18   Dr. Chris Rhodes, that's just a treating physician, individual

19   case?

20   A.  No, it was not.

21   Q.  Who was it?

22   A.  She didn't handle individual cases.

23   Q.  We just looked at her time where she spent four hours talking

24   to potential Vioxx claimants, right?

25   A.  We didn't have any individual cases, sir, that went to trial.

1    None of my clients had depositions taken, not one.  I don't know

2    who that is.

3    Q.  No one took a single deposition, right?

4    A.  No, nobody took client depositions in my cases.  Because we

5    didn't have a case going to trial and they weren't taking

6    depositions, that's what the fact sheets were for.

7    Q.  And you see this is your submission, right, for Sal Christina;

8    is that right?

9    A.  Right.

10   Q.  And here on June 28th, 2005, one hour, client calls, right?

11   A.  Okay, all right.

12   Q.  And June 29th, 2005, one hour, client calls; June 30th, 2001,

13   we assume that's a typo.

14   A.  He didn't work at the depository.

15   Q.  Those are client calls, right?

16   A.  Yes.

17   Q.  Those are time submissions for individual client calls; is that

18   right?

19   A.  That's correct.

20   Q.  And you agree it should not be counted as common benefit,

21   right?

22   A.  Absolutely should not be.

23   Q.  But it's part of your submission, right?

24   A.  These were all submissions that were made on a monthly basis.

25   If you look at Mr. Christina, Mr. Christina hardly had any hours in

1   this whole case.

2   Q.  Now, this is actually your time, right?

3   A.  Okay.

4   Q.  At the top you see Daniel E. Becnel, Jr.  Is this yours?

5   A.  That's correct.

6   Q.  And here on July the 11th, 2005, you submitted time for

7   reviewing a *New York Times* article, right?

8   A.  That's correct.

9   Q.  And still on your time submission on July the 20th, 2005,

10  reviewed an article, "Vioxx Exec Explains Ethics Dodge Ball,"

11  you're reviewing an article, right?

12  A.  Dodge ball is a thing you used in your trial every time you had

13  a trial.

14  Q.  Right, but you didn't try a case, right?  You're submitting

15  common benefit time for reviewing newspaper articles, right?

16  A.  No.  Reviewing -- dodge ball was a marketing ploy that the

17  people would utilize to get the doctors so the doctor would

18  question whether or not you should be having ill effects from

19  Vioxx.

20  Q.  I understand dodge ball.

21  A.  Believe me, I know you lost every case you tried it in.

22  Q.  Not exactly, but let's move on.

23  A.  Tell me one you won.

24  Q.  The Barnett case.

25          SPECIAL MASTER JUNEAU:  Gentlemen, it's getting out of

1    hand.  Ask your question and please respond to the question, sir.

2    BY MR. BIRCHFIELD:

3    Q.  July 21st, 2005, review e-mail from Mike Hugo enclosing the

4    trial transcript, right?

5    A.  Okay.

6    Q.  So you submitted common benefit time for reviewing the trial

7    transcript, and you weren't involved and never were involved in a

8    Vioxx trial, right?

9    A.  No.  But how are you going to review all of these documents,

10   how are you going to know what was working and not working when

11   you're in charge of experts, as I've showed you, when you're trying

12   to see you're losing trial after trial after trial what you're

13   going to change and how you're going to do it differently?

14   Q.  And then you submitted for July 24th and 26th three hours and

15   two hours for attending training sessions at an ATLA conference,

16   right?

17   A.  Yeah.  That was -- you all would call meetings and we would

18   have everybody that had these Vioxx cases, and we would go over

19   what was working and what wasn't working, what did we need to do

20   and how we needed to do it.  And you notice these two to three

21   hours out of a seminar, that was probably five days.

22   Q.  And on August the 20th, 2005, you've submitted time for

23   reviewing an e-mail attaching Merck's post verdict press release,

24   right?

25   A.  That's correct.

1   Q.  And again, you have said that you were not given any important

2   work in this litigation.

3   A.  No.  I said I wasn't given any depositions, that's what I said,

4   either first chair or second chair or working up any of the experts

5   for the trial.

6   Q.  We have time submission for the Law Offices of Daniel E.

7   Becnel, right?

8   A.  Okay.

9   Q.  This is Meghan Becnel, correct --

10  A.  All right.

11  Q.  -- time submission.  And it is September the 9th, 2005, is that

12  five hours; is that correct?

13  A.  If that's what it says.

14  Q.  Phone calls to get social security numbers.

15  A.  Okay.

16  Q.  That would be client social security numbers, right?

17  A.  No.  Do you want me to tell you what that's about?  Your office

18  asked us to start checking for confounding Bextra/Celebrex people

19  and Vioxx people.  And, in fact, Mr. Sizemore, that's one of the

20  reasons he left your office, and that's one of the reasons Jerry

21  Taylor left because they wanted to be on the Bextra/Celebrex case

22  in their own right, rather than sharing the fees with you.  And

23  they started asking us to get this information.

24  Q.  But you billed for phone calls to get social security numbers

25  from individual --

1   A.  She was in your office, she was in your office doing that work

2   when they're asking them to do that.  And, apparently, you didn't

3   know they were getting ready to leave your office.

4        SPECIAL MASTER JUNEAU:  Go ahead, Andy.

5   BY MR. BIRCHFIELD:

6   Q.  And you billed seven and a half hours, six hours, four hours

7   for --

8   A.  I didn't bill anything, I didn't bill anything for that.  They

9   put time sheets down.  They were sitting in Montgomery, Alabama,

10  under the direction of your lawyers and they were asked to do those

11  tasks.

12  Q.  And you submitted those times -- those hours as part of your

13  common benefit fee application.  That comprises your 16,167 hours,

14  right?

15  A.  Those were a few of those hours.

16  Q.  Darla Sanderson, she's one of the lawyers that you submitted

17  time for, right?

18  A.  She was a nurse-lawyer.

19  Q.  And you submitted hours on Becnel Vioxx client folders, right?

20  A.  Pardon?

21  Q.  Look, the top entry, you've got, work on Becnel Vioxx client

22  folders, call clients to complete profile sheet s.  You're familiar

23  with the profile sheets?

24  A.  Absolutely.

25  Q.  Those are for individual clients, right?

1    A.  Okay.

2    Q.  So we have eight hours on the 6th, eight hours on the 7th,

3    draft client correspondence including profile sheet, correct?

4    A.  Right.

5    Q.  Draft on the 8th, draft client correspondence including profile

6    sheets, update database, correct?

7    A.  Okay.

8    Q.  Review client folders, update database, correct?

9    A.  Okay.

10   Q.  Those are big chunks of time every day, working on individual

11   client folders, right?

12   A.  That's correct.

13   Q.  And then we see September the 14th, Bextra and Celebrex, update

14   database accordingly, correct?

15   A.  That's correct.

16   Q.  And on September the 15th review existing LA, that's Louisiana

17   client, right, client files; is that right?

18   A.  It says what it says.

19   Q.  Okay.  For Bextra and Celebrex and update database accordingly,

20   right?

21   A.  That's correct.

22   Q.  That whole sheet, 127.5 hours was for work on Bextra/Celebrex

23   and individual client files, correct?

24   A.  That's correct.

25              SPECIAL MASTER JUNEAU:  Do you want to ask a few more

1    questions and wrap it up.  I've extended it for sometime because of

2    the questions.

3              MR. BIRCHFIELD:  Yes, sir.

4    BY MR. BIRCHFIELD:

5    Q.  And this is your time again, right?

6    A.  I guess.

7    Q.  Reviewing an answer of Defendant Merck in -- how do you

8    pronounce that?  Is that your client?

9    A.  Pardon?

10   Q.  Is that your client?

11   A.  Who?

12   Q.  In the -- you're reviewing an answer of Defendant Merck in the

13   Boullet?

14   A.  Not my client.

15   Q.  Not your client?

16   A.  No.

17   Q.  So you're reviewing Merck's answer and somebody else's billing

18   time for that?

19   A.  Somebody sent me that from the New Jersey court.

20   Q.  So would you agree, we've gone through a number of submissions

21   that are included in your 16,167 hours, that are for

22   client-specific work, right?

23   A.  There's a few of them, but very few, very, very few.

24   Q.  Let's take a quick look at some submissions that were made for

25   time after the Vioxx settlement, okay?

1          You know the Vioxx settlement was announced, Settlement

2     Agreement was announced on November the 9th, 2007, right?

3     A.  I know it was, yes.

4     Q.  And so you have submitted here .5 hours for review of

5     negotiating plaintiff counsel's motion for expedited consideration

6     of notice of tag-along action, right?

7     A.  That's correct.

8     Q.  That has nothing to do with any common benefit work, does it?

9     A.  Of course it does.  You realize that I was the guy that would

10    get notified because I was the guy that when you had a tag-along

11    case, since I filed the original MDL petition, they'd send it to

12    me.  They didn't send it to other people, just the people who were

13    involved in the oral argument.  And you just had to read it.

14    Q.  Here we go, this is 28 hours for reviewing files.  This is a

15    month after the settlement, right?

16    A.  Whose signature?

17    Q.  Well, the signature is submitted for Sal Christina and it is

18    approved by Daniel E. Becnel, Jr.  That's you, right?

19    A.  That's me.

20    Q.  So that's common benefit time for work done after the

21    settlement, right?

22    A.  Well, wait, let me see it.

23          SPECIAL MASTER JUNEAU:  Hand him the document, please.

24          THE WITNESS:  This is 48 hours by Juanita, okay.

25    BY MR. BIRCHFIELD:

1   Q.  It's well after the settlement is announced, right?

2   A.  This is Jack Harang who was a referral lawyer to us, yes.

3   Q.  So the submission pertains to a referral lawyer and it's after

4   the settlement?

5   A.  In 12/07.

6   Q.  After the settlement?

7   A.  Yes, yes.

8   Q.  Are you through?

9   A.  Yes.

10          SPECIAL MASTER JUNEAU:  Two more questions,

11   Mr. Birchfield, that's it.

12   BY MR. BIRCHFIELD:

13   Q.  Let me show you one more.  This is February 2008, and these

14   submissions are Vioxx PPF, plaintiff profile forms, right?

15   A.  That's correct.

16   Q.  Deficiencies, reviewing, those are for individual clients after

17   the settlement announcement, right?

18   A.  That's correct.

19   Q.  And you agree, wouldn't you, Mr. Becnel, that that's not proper

20   common benefit time?

21   A.  That should not have been submitted.

22   Q.  All right.  Well, after going through these time submissions

23   and looking at the duplicate submissions for the employees that you

24   were paying a salary for, and looking at the cases where you were

25   submitting time for individual cases, wouldn't you agree that there

```
 1   are serious problems with using the lodestar methodology in this

 2   case?

 3   A.  No, there are not.  Because they're insignificant compared to

 4   the number of hours.  They're totally insignificant and I can't

 5   tell you --

 6   Q.  We were looking at --

 7   A.  -- whether or not the few things that people submitted, they

 8   know that they have to send each individual lawyer has to send in

 9   his time every month or every quarter when they do.  And when you

10   deal with as many cases as we have over as protracted a period as

11   this is, you know, things like that happen, okay.

12   Q.  Would you say, would you still say, would you still say that

13   the lodestar is the best and only method?

14   A.  I think so, much more so than giving you points for things.

15   For example, Mr. Herman never tried a case.  Mr. Herman wasn't

16   involved in Vioxx prior to the case.

17   Q.  One last question, Mr. Becnel.

18   A.  Wait.  You're asking me to answer it.

19            SPECIAL MASTER JUNEAU:  Go ahead and answer.

20            THE WITNESS:  He wasn't involved in the case for two and

21   a half years before Vioxx was filed, he didn't have cases filed.

22   He didn't start accumulating cases until he became liaison counsel,

23   and then he put everybody in his firm on the case.

24            He had a daughter working, which the lady back here did

25   98 percent of the work because she went to Destin after the storm
```

```
 1    and didn't come back, okay.  Now, you get percentages for that?
 2    BY MR. BIRCHFIELD:
 3    Q.  Mr. Becnel --
 4    A.  And they paid her $1,800 a month.  That's pretty durn good, and
 5    there was no African Americans involved, that's pretty good, too.
 6              MR. BIRCHFIELD:  Your Honor, two very quick questions.
 7              SPECIAL MASTER JUNEAU:  You have one question left.
 8              THE WITNESS:  I think that was four questions ago.
 9              SPECIAL MASTER JUNEAU:  Well, your answer was a little
10    lengthy, Mr. Becnel.  I am trying to get justice for everybody,
11    which is a very difficult task.
12    BY MR. BIRCHFIELD:
13    Q.  Mr. Becnel, you personally only had 406 hours that you contend
14    are common benefit hours in this?
15    A.  No, I don't agree with that.
16              SPECIAL MASTER JUNEAU:  That was the last question.  I've
17    extended the time very liberally, both for Mr. Becnel and you, to
18    get the questions asked that need to be asked.  I want to keep to
19    the protocol basically that we've established, and accordingly, I
20    am going to say that that's the end of that testimony.
21              MR. BIRCHFIELD:  Yes, sir.  Thank you.
22              SPECIAL MASTER JUNEAU:  Thank you, sir.
23              MR. KLIBERT:  Your Honor?
24              SPECIAL MASTER JUNEAU:  Sir?
25              MR. KLIBERT:  Are you going to allow any redirect?
```

1          SPECIAL MASTER JUNEAU:  I will allow you some latitude

2    realizing we are beyond.

3          MR. KLIBERT:  Very, very quick.

4          SPECIAL MASTER JUNEAU:  That's fine.  I just want to

5    caution you with that.  I will give you that latitude.

6          MR. KLIBERT:  I will be very, very quick.

7                         REDIRECT EXAMINATION.

8    BY MR. KLIBERT:

9    Q.  Very quickly, Mr. Becnel.  Did any of the other attorneys who

10   performed common benefit work submit their common benefit time to

11   you?

12   A.  No, not one person.

13   Q.  Have you ever reviewed anybody else's common benefit time

14   submissions?

15   A.  No, I have not.

16   Q.  Well, have you ever been informed prior to or during your

17   cross-examination that you had submitted common benefit time

18   applications on behalf of people for whom other persons had

19   submitted the same time?

20   A.  If Mr. Garrett would have told me that, hey, wait a minute,

21   Mr. Arsenault might be submitting time for somebody you submitted

22   to, seems to me I wouldn't have done it, or called Richard

23   Arsenault and say, Richard, what are you doing?  Why are you

24   submitting this and I'm submitting it.  I was not under that

25   impression.

1        This is the first time I know about it right now.

2   Richard and I did not talk.  Richard and I didn't talk about this.

3   He put this project in my hands and said, you run it, you take care

4   of it, I'll pay my fair share of this.  And then he got demolished

5   with another hurricane, a different hurricane, and I had to do

6   everything because his office couldn't function anymore.  His

7   office was flooded, his house was flooded.  He had people that had

8   evacuated, friends of his that he did business with, lawyers in

9   this case living in his guesthouse.  I mean, it was a grand mess

10  back then.

11  Q.  And finally, Mr. Becnel, you were shown a chart that purported

12  to show a bringing together of all of these different multiple

13  submissions.  One of those people, the total hours purportedly

14  3,054 and seventy-five-hundredths of an hour.  When you looked at

15  those names, have you ever heard of any attorney with the last name

16  Parker?

17  A.  Never.

18  Q.  Did you submit any common benefit time sheets on behalf of any

19  attorney with the last name of Parker?

20  A.  No.  I don't know who that is.

21        MR. KLIBERT:  I don't have any other questions.  Thank

22  you very much.

23        SPECIAL MASTER JUNEAU:  Thank you.  Thank you very much,

24  Mr. Becnel.

25        It is now 12:30, we're going to recess and come back at

 1   1:30 and complete the balance of this hearing.  Thank you very

 2   much.

 3          (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

 4

 5                          P R O C E E D I N G S

 6                        (AFTERNOON SESSION)

 7

 8        (OPEN COURT.)

 9          SPECIAL MASTER JUNEAU:  We're back on the record, I see

10   we have Mr. Garrett.  Mr. Arceneaux, are you ready to proceed?

11          MR. ARCENEAUX:  Yes, I am, your Honor.

12                       DIRECT EXAMINATION

13   BY MR. ARCENEAUX:

14   Q.  Mr. Garrett, state your name for the record.

15   A.  Philip A. Garrett.

16   Q.  And you are a CPA, correct?

17   A.  Yes, I am.

18   Q.  And you used to be with the firm of Wegmann Dazet?

19   A.  Yes, sir.

20   Q.  You were a partner in that firm?

21   A.  Yes, sir.

22   Q.  And then at what point in time did you leave the firm?

23   A.  The partnership went from 1979 till 2007, I think I left

24   January of 2007.

25   Q.  And then after that you started your own firm?

1    A.  After I got bored with hunting and fishing and golf -- actually

2    what I do is litigation work, predominantly in sales and mergers

3    and acquisition, I don't take on any regular clients to do

4    financial statements or tax returns.

5    Q.  And the name of your company is?

6    A.  Philip A. Garrett, CPA.

7    Q.  And you became involved in this matter through the court's

8    appointment, through Judge Fallon's appointment, the first document

9    is Pre-Trial Order No. 6.  If we look at page 4 I have some

10   paragraphs that are marked off.

11   A.  Yes.

12   Q.  Do you see under paragraph No. 4 where is says that the

13   Plaintiffs Liaison Counsel is retained to retain your services?

14   A.  Yes.

15   Q.  And under paragraph No. 2 the records that you were to be

16   collecting and analyzing are time and expense guidelines for all

17   activities performed and expenses incurred by counsel that relate

18   to matters common to all claimants in the MDL 1657?

19   A.  Correct.

20   Q.  So you understood very clearly from this Pretrial Order that

21   your task was to only account for only common hours, if it was case

22   specific it was to be excluded?

23   A.  Correct.

24   Q.  Okay.  Very good.  Now, in the beginning -- oh, also, if we

25   look in that same Pretrial Order it says that the time that's

1   supposed to be submitted is time for members of the Plaintiff

2   Steering Committee.  So originally your task was only to account

3   and analyze the records of MDL steering committee members; isn't

4   that correct?

5   A.  I think it said time as authorized by the Plaintiff Steering

6   Committee.

7   Q.  Right.  On page 4 under paragraph 1, all time and expenses

8   submitted must be incurred only for work authorized by the

9   committee.  So it was only committee work?

10  A.  I don't know what you mean by only committee, it's authorized

11  by the committee.

12          SPECIAL MASTER JUNEAU:  That's not what I'm reading.

13          MR. ARCENEAUX:  It's Pretrial Order --

14          SPECIAL MASTER JUNEAU:  I don't understand what you're

15  saying.

16  BY MR. ARCENEAUX:

17  Q.  What I mean by committee is work done by the committee or

18  authorized by the committee, that's what I mean?

19  A.  I agree with that interpretation.

20  Q.  Now, at some point, however, the scope of the data that you

21  were collecting -- and we're going to get to what you collected and

22  how you analyzed it in a moment -- at some point the scope of the

23  data that you were collecting expanded, didn't it?

24  A.  Yes.

25  Q.  Under Pretrial Order 6C, which is the next document on page

1   No. 2, Judge Fallon ordered that state court common benefit

2   attorneys shall present their contemporaneous time records or

3   properly reconstructed time record and expense reports consistent

4   with the previous Pre-Trial Order No. 6 that we just looked at to

5   Philip Garrett.  So Judge Fallon ordered that the state lawyers

6   submit their time records to you, even if they were not authorized

7   to do work by the MDL?

8   A.  Correct.

9   Q.  As long as it was common benefit work?

10  A.  I remember the day very well.

11  Q.  And that's your understanding of what this was?

12  A.  Yes.

13  Q.  So fine.  Then some months later he issued Pretrial Order 6D

14  which is the next document.  And in that document in the paragraph

15  that I've highlighted, he stated that the Settlement Agreement

16  contemplated that the committee would review the contemporaneous

17  time records and properly reconstruct the records and expense

18  reports of all plaintiffs counsel that submit or request common

19  benefit work and take into account time and benefit work performed

20  in the MDL and of counsel and state consolidated litigations.

21       So it's your understanding under this order that you were

22  not to differentiate in any way between state court lawyers or MDL

23  lawyers.  An hour spent was an hour spent, as long as it was common

24  benefit work?

25  A.  Right.  We tried to keep the state court cases into separate

1  cases so that the judge could see how much time was taken in for

2  state court case.

3  Q.  But it's your understanding that an hour was an hour?

4  A.  Correct.

5  Q.  As long as it was a common benefit hour?

6  A.  Correct.

7  Q.  Okay.  Very good.

8  A.  Just to clear up, had to be common benefit and we did scan

9  through the records to see, if we saw anything that wasn't common

10 benefit but we weren't there to read and evaluate the time.  So I

11 can't tell you that, you know, if somebody was working on something

12 and they wrote down "write a memorandum" that it was for the common

13 benefit.

14 Q.  I understand, we are going to cover that.

15 A.  I knew you would.

16 Q.  And I understand, I understand.  Okay.  Now, we've seen now

17 what your orders were from the court under these three.  Let me see

18 if I can summarize how you fulfilled your mission, because we had a

19 conversation I am going to try to do this so we don't waste a lot

20 of time.

21 A.  Great.

22 Q.  Attorneys sent you time records, some of which we saw examples

23 of today, we saw 20 boxes of them lined up there, those were all of

24 the time records.  You had presumably people who did data entry

25 enter that, Wegmann Dazet did in the beginning, enter that into

1    originally a program called Microsoft Access; isn't that correct?

2    A.  Correct.

3    Q.  And explain what Microsoft Access is.

4    A.  Well, originally we really started with Microsoft Excel and in

5    the first three to four months and we didn't realize how big the

6    case was going to get.  When the state court cases came in, we went

7    from 100 hours a month to 500 hours a month work.  So it was -- at

8    that point it was crippling to an Excel worksheet so we went to

9    Access.  Access is basically a database program where you can just

10   input a lot more information very quickly into it and it manages

11   the information better.

12          And then that was in 2008, and then in 2009 I really saw

13   where we were having to keep track of all of the submissions on PDF

14   files and it was just so huge and so cumbersome that I actually

15   went out and contracted with a programming firm to write a program

16   that now attaches everything, so when you look at a submission

17   everything is attached to it.

18   Q.  And that happened, you switched from the Access, Microsoft

19   Access, the last Microsoft Access time that was entered was posted

20   on July 31st, 2009?

21   A.  Correct.

22   Q.  And you began posting to your proprietary program on August

23   1st, 2009?

24   A.  Correct.

25   Q.  And your proprietary program is a web based program?

1   A.  Right.

2   Q.  By that, let me see if I can explain by that.  Microsoft Access

3   would store the database on the computer of the individual person

4   who was working on the file or on a server that that computer was

5   attached to?

6   A.  Correct.

7   Q.  Your information is actually out there on the World Wide Web?

8   A.  Right.  Now, two or three people can look at the same file at

9   the same time.

10  Q.  In different parts of the world?

11  A.  In different parts of the world.

12  Q.  We can go on my laptop right now and log on to your Web site,

13  even though the data is on a server, I am not going to ask you

14  where your server is, but it's on a server somewhere?

15  A.  There's probably ten of them out there.

16  Q.  And you said that you didn't write the program?

17  A.  Oh, no.

18  Q.  That was done -- you're not a programming expert are you?

19  A.  Correct.  I hired -- I've known a programming firm that has

20  done big database programs for the oil and gas industry and I used

21  them to write the program.  I really knew what I wanted in Access

22  and they put all of the bells and whistles.

23  Q.  Right, you gave the list of the specifications of what you

24  wanted this program to be able to do and they wrote the program?

25  A.  Yes, sir.

1    Q.  Let's talk about Access and Excel.  Would it be fair to say

2    that you are not an expert in either of those, that you're very

3    well versed with them and capable of using them as an experienced

4    user but that you're not a high level Access or Excel person?

5    A.  That's true.

6    Q.  Okay.  Very good.  Now, so you've got all of these time records

7    and you entered some of them in Access and then beginning on August

8    1st, 2009, you started entering them on a new web system?

9    A.  Correct.

10   Q.  To transition from access to the new web system on August 1st

11   or shortly thereafter what happened was all of the data entries

12   that were in the previous access database were, I'm going to call

13   it exported out of Access or imported into your web system, and

14   they show up as a single entry on that date, correct?

15   A.  Yes.  We did not -- we made a decision not to export every

16   transaction that was in the Access database.

17   Q.  You just do the totals?

18   A.  Was just do the totals as of July 31st, '09, and move that

19   through.  And let me just correct one thing.  You said I had data

20   entry people entering this stuff, actually we only had CPAs or

21   accountants entering the stuff because it was just --

22   Q.  My mistake.  Somebody typed it in?

23   A.  Right.

24   Q.  Okay.  Fine.  Let me make sure I understand what you just said

25   about what happened on August 1st, 2009, when this new system went

1    into effect.  You said you made the decision not to import into the

2    web everything that you just imported totals.  So let me give you

3    an example to see if I understand.  I am Robert Arceneaux and I had

4    submitted time to you up through July 31st, 2008.  And under the

5    reporting requirements, in the Access database it would show my

6    name, Robert Arceneaux, it would show my status, attorney as

7    opposed to paralegal or clerk, it would show the firm that I am

8    with, Robert Arceneaux, LLC, it would show the case that I was

9    working on or that I reported the time, if I reported that to you,

10   then there were six categories of tasks that Judge Fallon had

11   ordered you or he had ordered the attorneys to report their time

12   under six categories of litigation tasks specified by the ABA.

13   A.  Correct.

14   Q.  Things like case assessment, pretrial and trial work,

15   discovery, appeals, and then it would show the date, like March

16   2007.  All of that would have been in the Access database.  So you

17   could have looked at it and you could have seen in March of 2007

18   what I reported and the tasks, if I did five hours of case

19   management, if I did five hours of appeals, if I did seven hours of

20   pretrial, three hours of discovery, that would be in the database

21   in Access?

22   A.  Correct.

23   Q.  But when you rolled all of that in to the new database all of

24   that detail, those, the time periods, for example, March of 2009 --

25   well -- yeah, March of 2009, February of 2009, January of 2009, and

```
 1   all of those specific task categories, all that didn't get rolled
 2   into your program.  What got rolled in was Robert Arceneaux has as
 3   of this date reported a total of 250 hours?
 4   A.  Oh, no, no.  What got rolled in we didn't do -- first of all,
 5   we only had totals by month.  And then it was broken down by the
 6   six categories and then we had a total.  What we did was instead of
 7   putting all of those transactions in, and it happened a couple of
 8   months later, we took the total, for instance, Robert Arceneaux had
 9   300 hours of case assessment, 200 hours of trial, 400 hours of
10   discovery, all of that, your grand total rolled in by category.
11   Q.  But not by date?
12   A.  So the only thing I lost was the by month total.
13   Q.  Not by date?
14   A.  Correct.
15   Q.  I knew there was something that got dropped out.
16   A.  Right.  We didn't feel like by month was as important as the
17   other data so you did it in January of 2008 or January of 2009
18   wasn't significantly significant.
19   Q.  Thank you very much for clarifying that, I misunderstood.  Now,
20   all of this work that you did, which were you paid over $1 million
21   to do?
22   A.  Well, actually the '08 is when the state court cases, when the
23   stuff jumped and I was -- I had then left the firm.  So
24   unfortunately I picked a bad year to leave the firm, but there you
25   go.  So when "you" got paid, let's say Wegmann Dazet got paid.
```

1    Q.  Someone got paid over $1 million.

2    A.  I didn't know it was going to jump up five times bigger the

3    next six months, but there you go.

4    Q.  Ultimately all of this work that you did as a salaried employee

5    or partner at Wegmann Dazet and then independently on your own,

6    resulted in the production of an affidavit dated January 19th,

7    2009.  It's called affidavit of Philip Garrett, and it's marked as

8    Common Exhibit No. 20.  Is that correct?

9    A.  Yes, sir.

10            MR. LEVIN:  Exhibit what?

11            MR. ARCENEAUX:  Common Exhibit 20.

12            MR. LEVIN:  Thank you.

13            MR. ARCENEAUX:  You're welcome.

14   BY MR. ARCENEAUX:

15   Q.  Who drafted this affidavit, you didn't draft it yourself?

16   A.  No, I didn't, one of the attorneys.

17   Q.  Lenny Davis drafted it, didn't he?

18   A.  I wouldn't know whether Lenny drafted it, Sandra Dugan, Arnie

19   Levin, Russ Herman, one of those people drafted it.

20   Q.  Somebody supplied it to you?

21   A.  Yeah, somebody supplied it to me.

22   Q.  So you did not draft it.  On page 8 of the affidavit in

23   paragraph 21 it has your summary.  So as of the time of this

24   affidavit, which was in January of '09, you're reporting that based

25   upon all of the work that you did, you saw 503,184.95 common

1    benefit hours and the reason why there is a lodestar range there,

2    would you explain that?

3    A.  You asked me to use the actual rates to arrive at the $217

4    million, and then they asked me to do on the highest rate for a

5    particular category like an attorney, if we used the highest rate,

6    that would be, that would be $321 million.

7    Q.  So the 217 million is based upon the actual rates that

8    attorneys had reported to you?

9    A.  The actual rates they had turned in or we took the average.  If

10   somebody didn't turn in rates we took the average of that category,

11   and I'm sure we are going to talk about Danny Becnel.

12   Q.  We're going to look at it in a minute.  That's why, for

13   example, we look at your lodestar calculation we see a tremendous

14   number of people who all have a rate of $337.27?

15   A.  I think it was about 60 or 70.

16   Q.  I might be off, we'll look at it in a minute.  But there are a

17   tremendous number of people and the reason they all have that odd

18   rate is because that was the average, those are people who did not

19   report a rate?

20   A.  It was probably an average, correct.

21   Q.  Do you know how this affidavit was used, did they tell you why

22   they wanted you to sign it?

23   A.  I really don't know.

24   Q.  Let's look then at Common Exhibit No. 2, the next document.

25   It's entitled plaintiff liaison counsel's memorandum in support of

1   motion for award of common benefit fees.  And it was filed on

2   January 20th, which was the very next day after you signed your

3   affidavit, filed the next day.  And I supplied you here with only

4   an extract -- the whole thing will be in the record but it's a long

5   document so I didn't feel necessary to burden you with anymore

6   paper than was necessary.

7           But I did supply with the two sections that I want to

8   look at, I supplied the whole section so that you could see that

9   it's not out of context.

10          So let's go to page --

11          MR. RAFFERTY:  How did you identify it?

12          MR. ARCENEAUX:  It's Common Exhibit No. 2.  Your Honor,

13  may I approach the witness because I think my copy has a page

14  missing?

15          THE WITNESS:  Page 49?

16  BY MR. ARCENEAUX:

17  Q.  On page 49, under the section where the steering committee is

18  justifying an 8 percent assessment, who the author of this

19  document, somebody on behalf of the FAC, says that in addition to

20  being reasonable, the 8 percent is necessary to provide sufficient

21  compensation to all of the common benefit counsel that are now

22  being incorporated into this effort from coordinated jurisdictions,

23  California, New Jersey and Texas.

24          And then I am going to skip down to where I have the word

25  common benefit hours underlined.  "Philip A. Garrett's affidavit

1    reports these submissions and reveals that these state counsel

2    contributed 132,976 common benefit hours with a collected lodestar

3    between 58 million and some change and 87 million and some change.

4           The 58 million would be the one based on actual rates,

5    correct?

6    A.  Yes.

7    Q.  And then right after that, the next sentence, "these state

8    court counsel will now share in the fees obtained in this

9    multi-venue global settlement.  To accommodate this originally

10   unaccounted for increase in hours, the settlement acknowledged the

11   need for and assessment of 8 percent and for an 8 percent

12   assessment to supersede the original assessment of Pretrial Order

13   19.  Increasing the number of attorneys participating in common

14   benefit work, the percentage fee for a successful common benefit

15   will result in a natural increase to fairly recognize the

16   contribution of those lawyers not in a leadership position."

17          So is it fair to say that your affidavit then was used by

18   the FAC to make an argument to Judge Fallon that the reason why

19   they ought to get the huge common benefit fee of 8 percent because

20   state court lawyers now who will not in leadership positions, not

21   in leadership positions but who performed common benefit work and

22   you calculated how many hours that was, 160,000 as of this date,

23   those people were going to share in the common benefit fund equally

24   just like everybody else?

25          SPECIAL MASTER JUNEAU:  Just a minute.

1          MR. RAFFERTY:  Your Honor, I am going to object, this is

2     far afield from what Mr. Garrett is here to testify about as the

3     court appointed CPA as to what was filed in a motion.  He processed

4     the hours, he made the calculations, he did the computations, and I

5     think this is all just argument for counsel.

6          SPECIAL MASTER JUNEAU:  I sustain the objection.

7          MR. ARCENEAUX:  I'll try to tie it together.

8     BY MR. ARCENEAUX:

9     Q.  When you drafted the affidavit did you understand how your

10    affidavit would be used?

11         MR. RAFFERTY:  Same objection.

12         THE WITNESS:  When I was retained by the court in March

13    of 2005, I understood that I was going to account for the hours and

14    the costs involved in.  And I assumed at some point in time, since

15    March of 2005 I reported the numbers to the court almost on a

16    monthly basis.  So this affidavit I had no idea --

17         MR. ARCENEAUX:  This is --

18         SPECIAL MASTER JUNEAU:  Let him finish.

19         THE WITNESS:  The fact that they used it for something in

20    trial, I assume they weren't paying me because they liked me.

21    BY MR. ARCENEAUX:

22    Q.  Okay.  That's fine.  Thank you.  Now, you supplemented that

23    affidavit, right?

24    A.  Yes.

25    Q.  That would be the next document Common Exhibit No. 21.  The

1  date of the supplemental affidavit is August 4th of 2010.  And in

2  the supplemental affidavit I want to refer to, first of all, to the

3  end to see what the final numbers were, so we would go to page, we

4  would go to page 5.

5  A.  Yes, sir.

6  Q.  Paragraphs 15 and 16.

7  A.  Yes, sir.

8  Q.  And at that point based upon the hours that had been reported

9  by MDL lawyers and state court lawyers -- and you're not

10  segregating them out at this point, they're all in the same pot --

11  562,943.55 hours?

12  A.  Correct.

13  Q.  And the lodestar of 249,546,751.20, and that is the lodestar

14  based on the actual rate, not the highest rate, correct?

15  A.  Correct.

16  Q.  Do you know if your calculations were accepted by Judge Fallon?

17  A.  I discussed them with Judge Fallon.

18  Q.  You discussed them?

19  A.  Uh-huh.

20  Q.  And the next document is Common Exhibit No. 3 entitled Order

21  and Reasons.  This is the document where Judge Fallon made his

22  award of common benefit fees.

23  A.  Okay.

24  Q.  I am going to ask you to turn to page 33.

25  A.  Okay.

1    Q.  And then the paragraph that I have marked, we don't have to

2    read the whole paragraph, but it says in there 562,943 hours for a

3    total lodestar of the same amount that I just read above, correct?

4    A.  Correct.

5    Q.  So he accepted your hours?

6    A.  Yes --

7                SPECIAL MASTER JUNEAU:  Do you want to say something?

8                THE WITNESS:  No, I'm all right.

9                MR. ARCENEAUX:  Are you --

10               THE WITNESS:  I'm all right.

11   BY MR. ARCENEAUX:

12   Q.  Prior to the time of this when you had -- I'll come back to

13   that.  Strike that question.

14               Who drafted that, the supplemental affidavit?  I didn't

15   ask you that.  Didn't you tell me Lenny Davis drafted that one?

16   A.  No.  I wouldn't have known.  I was dealing at that time with

17   Arnold Levin and Lenny Davis and Sandra Dugan and Fred Longer and

18   it would have been one of those people.  And I would not doubt if

19   all four of them, then I had my input into it as well.

20   Q.  Do you recall meeting with me on, in early March?

21   A.  Sure.

22   Q.  And I asked you a lot of questions, I took really copious notes

23   and wrote down every word that you said.

24   A.  Nobody can write that much.

25   Q.  And you told me that Lenny Davis specifically drafted that

 1    affidavit.  Do you recall telling me that or are you denying that

 2    you said it?

 3    A.  I would be surprised if I told you -- I mean, if you say I said

 4    it I am not saying I didn't, but I am just telling you Lenny Davis

 5    would have been part of the preparation, but I would have thought

 6    there would have been other attorneys involved in the drafting --

 7    Q.  Somebody in the FAC?

 8    A.  Somebody drafted it.

 9    Q.  You're not denying that you told me it was Lenny Davis?

10    A.  Not going to deny it because I don't think it's that important

11    an issue for me to deny or accept.  I will tell you that some

12    attorney drafted it.  I would have had input into it, I may have

13    called Lenny, I may have called Arnold to have the input.

14    Q.  Let's talk about the meeting that we had.

15    A.  Okay.

16    Q.  The first part of the meeting is not really relevant here, we

17    went over the documents that had been produced by the Steering

18    Committee, remember there were four CD's, CD 1, DVD 1?

19    A.  Right.

20    Q.  We went over what was on those DVDs and you explained to me

21    about the Microsoft Access and the roll over, which now you've

22    explained to the judge and we've got all of that.

23          And then we got to a wish list, because during the course

24    of our discussion there were several things that you had mentioned

25    that I had asked if you would provide to me.

1  A.  Yes, sir.

2  Q.  And you said that you would.  And the next exhibit, Common

3  Exhibit No. 22 is a letter that I wrote to you on March 17th.  And

4  do you recognize that document as being the wish list?

5  A.  Yes, sir.

6  Q.  And item No. 5 is the one I am interested in.

7  A.  Okay.

8  Q.  A copy of the list of common benefit cases supplied to you by

9  the PSC or FAC for use in evaluation of whether time reported to

10  you was individual, and that's my bad typing, should be been

11  quotation marks, or common benefit as per Pretrial Order 6C.  Now,

12  do you recall that you told me during our meeting that the reason

13  for this was that you had been supplied a list by the FAC of cases

14  they considered common benefit cases?

15  A.  By the FAC?

16  Q.  By -- either the PSC --

17  A.  The PSC, right.

18  Q.  Somebody provided you a list?

19  A.  When the bellwether cases started they provided me a list of

20  the bellwether cases, those would have been considered common

21  benefit work.

22  Q.  And do you recall it, I have it specifically here in my notes,

23  that you said Lenny Davis gave you that list?

24  A.  Probably true.

25  Q.  And I have it specifically written here in my notes, and you

 1  don't deny that you told me at that meeting that you relied upon

 2  that list to a large degree in deciding what was common benefit

 3  work and what was that?

 4          SPECIAL MASTER JUNEAU:  There's an objection.

 5          MR. RAFFERTY:  I apologize for the interruption, but I

 6  have to object, your Honor.  The method of questioning here, he can

 7  ask the questions but to sit here and try to, I guess try to I

 8  guess impeach Mr. Garrett before he even asks the question by

 9  referencing his note is inappropriate.

10          MR. ARCENEAUX:  He is on cross-examination.

11          MR. RAFFERTY:  But the notes are not, it's not

12  appropriate.

13          SPECIAL MASTER JUNEAU:  You can just ask him the

14  question, does he agree with what you're saying.  It's not a

15  question of whether it's in your notes or not in your notes or

16  whatever is of no moment to me.  It's a matter of what the

17  testimony is.

18  BY MR. ARCENEAUX:

19  Q.  Did you not tell me at that meeting that that list was a great

20  use to you in deciding the common benefit?

21  A.  When I instructed my people as to what to do.  We had basically

22  three ways to review the information:  One was to make sure it was

23  put together in the way that we had to have the format, it had to

24  have a front sheet, that it had to be signed by a partner in the

25  firm, it said he's reviewed it, it's true and accurate and all

1    common benefit time.  We had to check to see, we had scan over the

2    narratives and see if there was anything unusual.  If we saw

3    somebody was working on the Juneau case and they're working on the

4    Juneau case and working on Juneau trial preparation and Juneau

5    wasn't one of the bellwether cases, we would have called and asked,

6    what is the Juneau case.  If they said that was a separate case

7    that they were working on, they would have withdrawn that time

8    obviously.  So we used it for that purpose.

9    Q.  The answer to my question is, yes, the list was used by you?

10   A.  Yes.  I was trying to explain it.

11   Q.  And I appreciate that.  And the next document Common Exhibit

12   No. 23 is a letter from you on Wegmann Dazet stationery, and in

13   response to my request you said you were unable to locate the list?

14   A.  Right.  And at this point we stopped using that list once the

15   state court cases came in, the deluge was --

16   Q.  So the list we don't, nobody knows where it is, presumably the

17   FAC has the list?

18            MR. RAFFERTY:  Your Honor, I must insist.

19            SPECIAL MASTER JUNEAU:  Go ahead and answer the question

20   so we don't get argumentative.  Proceed.

21   BY MR. ARCENEAUX:

22   Q.  I'm sorry for interrupting you.  Do you have anything more to

23   say?

24   A.  The person who was in charge of most of those duties on that

25   list would have been Kristine Magner who was working for me back

1   then.  She has since moved out of the state and left the firm.  And

2   we've looked through her files, we don't see it.  I haven't

3   contacted her but if you need me to contact her.

4   Q.  No, that's fine.

5   A.  I'm sure you're right, the PSC can probably provide you a list

6   of the cases.

7   Q.  Or the list that they provided you?

8   A.  Right.

9   Q.  The PSC would have the list.  I want to back up to your first

10  affidavit which was Common Exhibit 20.  Sorry for having to back up

11  that way -- actually, I'll save us that because it's the language

12  in 20 and 21 the same.  So we'll just go to 21 which is the

13  supplemental affidavit.

14  A.  Okay.

15  Q.  In the supplemental affidavit on page 3, and Judge Juneau will

16  look at these to see, but paragraph eight in both affidavits is

17  identical.

18          SPECIAL MASTER JUNEAU:  Paragraph eight?

19          MR. ARCENEAUX:  Paragraph eight on page 3.

20  BY MR. ARCENEAUX:

21  Q.  It says you disallowed the following items, and then in (c) it

22  says any item of time or expense which was incurred in connection

23  with the litigation of any individual case or group of individual

24  cases involving person or persons of Vioxx, unless counsel was

25  authorized by a member of the PSC to perform such work for the

1    common benefit.  So you excluded as the best that you could work

2    that was not common benefit work?

3    A.  Right.  And the word excluded we would have questioned.  When

4    we saw time that was for a particular trial and it wasn't one of

5    the bellwether cases, we would have questioned the time.  And I

6    think you saw earlier this morning, you question the time and the

7    attorney will tell you, yes, that is common benefit because of.

8    And at that point in time I didn't feel it was our responsibility

9    to say, okay.  Forget it.  We would leave that in and leave that to

10   the eventual Steering Committee or whoever.

11   Q.  Excluded was a poor choice of words, in my notes it clearly

12   reflects that you made the point that a better word to use would be

13   you analyzed the time and if it appeared to be non-common benefit

14   it raised a red flag?

15   A.  No question.

16   Q.  Which you then pursued to determine whether it was or not.

17          MR. RAFFERTY:  Your Honor, I want to object to the

18   continuous reference to his notes, what is in his notes before he

19   even asks the witness a question.  He has to ask the witness a

20   question.

21          MR. ARCENEAUX:  The witness is on cross-examination, your

22   Honor, I'm entitled to refer to my notes.

23          SPECIAL MASTER JUNEAU:  He is on cross-examination,

24   counsel, but the issue here is not the notes, it's a question of

25   the substance of the subject.  Whatever the subject is ask him the

 1   question.  Either he knows or doesn't know or agrees or disagrees.

 2           MR. RAFFERTY:  Thank you, your Honor.

 3           MR. ARCENEAUX:  The next time it comes up I'll cover it.

 4   BY MR. ARCENEAUX:

 5   Q.  Now, one of the ways we've already discussed that you did this

 6   filter for common benefit was the list that was supplied by the

 7   PSC.  And another way was, as you just explained, you looked for

 8   things that looked anomalous, things that looked like they clearly

 9   were.

10           Now, at our meeting didn't you tell me that when you saw

11   something that was suspect you worked with Lenny Davis?

12           MR. RAFFERTY:  Your Honor, once again, he is asking --

13   whether the question is --

14           MR. ARCENEAUX:  I am entitled to ask him if that's what

15   he told me at our meeting.

16           SPECIAL MASTER JUNEAU:  Counsel, don't argue with the

17   court, go ahead and ask your question.  You don't need to continue

18   to argue if I am sustaining the objection.

19           MR. ARCENEAUX:  Thank you, your Honor.

20   BY MR. ARCENEAUX:

21   Q.  At our meeting didn't you tell me that when you found some

22   things that were anomalous that you worked closely with Lenny

23   Davis, who the word I wrote down was that he was very harsh and had

24   no problem whatsoever trying to get down to the meat of the issue

25   and work with these lawyers for them to correct their time records?

1    A.  Is there a question?

2    Q.  Yes.

3    A.  Yes, your notes are correct.

4    Q.  Okay.  Thank you very much.

5    A.  I didn't mean he was harsh, I meant he was very direct.

6    Q.  I understand, he was forceful.  I don't know Mr. Davis, I don't

7    mean to suggest he's -- he was forceful, he got the job done?

8    A.  Right.  He was great.

9    Q.  He dug down, if there was an issue he investigated it?

10   A.  Yes.

11   Q.  And there were, in fact, some hours that were rejected,

12   correct?

13   A.  There were many hours that were withdrawn.

14   Q.  There were many hours that were rejected.  But of the hours

15   that are in your affidavit that you supplied to the court that

16   Judge Fallon accepted, all of those hours which you worked with

17   Mr. Lenny Davis very closely to screen, in your judgment and after

18   he drilled through them and got down to the bottom of it, your

19   conclusion was they were common benefit hours?

20         MR. RAFFERTY:  I am going to object, I think it's a

21   mischaracterization of what he just said.

22         SPECIAL MASTER JUNEAU:  You can go ahead and answer the

23   question, I understand the question.

24         THE WITNESS:  I think all of my final hours of 562,000

25   hours that were within my reach which was, within my scope and I

```
 1   was judging those all of those hours that I did not see any
 2   non-common benefit hours.
 3   BY MR. ARCENEAUX:
 4   Q.  And it says here in your affidavit, you disallowed things that
 5   were not common benefit, it says it in your affidavit, you said it
 6   under oath?
 7   A.  I am giving you kind of a negative assurance rather than a
 8   positive assurance because I wasn't auditing anybody's time records
 9   to see, hey, was this common benefit, I was doing more of a
10   negative assurance.
11   Q.  I understand.  At any point up to the time that you were
12   supplied this draft affidavit which you didn't write, so presumably
13   this language about --
14           SPECIAL MASTER JUNEAU:  Counsel, I think he said he had
15   input into the affidavit.
16   BY MR. ARCENEAUX:
17   Q.  Did you write this paragraph eight that said I disallowed from
18   inclusion these items, did you write that paragraph?
19           SPECIAL MASTER JUNEAU:  Whether he wrote it or not, he
20   had input.
21           MR. ARCENEAUX:  It is important, your Honor, if he wrote
22   it.
23           MR. RAFFERTY:  He said he had input.
24           SPECIAL MASTER JUNEAU:  If you think it's important, you
25   can ask the question.
```

1   BY MR. ARCENEAUX:

2   Q.  Did you write that paragraph, Mr. Garrett?

3   A.  I don't recall.  I don't --

4   Q.  Did you approve it?

5           SPECIAL MASTER JUNEAU:  Let him answer the question.

6           THE WITNESS:  I didn't write that paragraph.  I did

7   review this whole affidavit, whether I changed any words in that or

8   not I don't recall.

9   BY MR. ARCENEAUX:

10  Q.  And you approved the paragraph?

11  A.  Yes.

12  Q.  You agree with the paragraph?

13  A.  I swore to it.

14  Q.  At any time prior to this affidavit being drafted and signed,

15  whoever drafted it, and signed by you and submitted to the court by

16  the PSC as justification for an 8 percent assessment where they

17  claimed to be entitled for common benefit money for every single

18  one of those 563,000 hours, did the PSC, anybody from the PSC,

19  Mr. Davis, Mr. Levin, Mr. Fishbein, anybody, Mr. Birchfield who was

20  here in court today and extensively showed apparently all kinds of

21  errors that they've now discovered, did anybody ever come to you

22  and say, Phil, there's non-common benefit time in here, you have to

23  take this stuff out?

24          MR. RAFFERTY:  Your Honor, objection.

25          MR. ARCENEAUX:  Did anyone ever come to --

1              SPECIAL MASTER JUNEAU:  I'll overrule the objection.  Go

2    ahead.

3    BY MR. ARCENEAUX:

4    Q.  Did anyone ever come to you and ask you to take any time out?

5    A.  No, they didn't.

6    Q.  Only the rejected time, the stuff that's not included in this

7    affidavit?

8    A.  Right.  When you say rejected time, please understand, I

9    rejected some time, people withdrew a lot more time.  I know the

10   PSC -- or I don't know whether it was Fee Allocation Committee, PSC

11   or whoever, did review a lot of the time records.  What they did

12   with the particular firms was, I wasn't involved in it.

13   Q.  I get it.  Now again let's stick with this supplemental

14   affidavit for a moment, Common Exhibit No. 21.  The paragraph

15   before paragraph eight, paragraph seven, it starts on two and goes

16   to page three.  Do you recall you and I discussing that paragraph

17   at our meeting?

18   A.  No -- let me just read through it one time.

19   Q.  Yeah, please do because my notes reflect that we discussed

20   that.

21              SPECIAL MASTER JUNEAU:  Sir, let's just stay away from

22   the word note.  Ask him the question whether he remembers or

23   doesn't remember.  He is either going to agree with you or he

24   doesn't agree with you.

25              THE WITNESS:  Oh, sure, okay, yes.

```
 1   BY MR. ARCENEAUX:

 2   Q.  Now you remember?  There was a particular phrase in there that

 3   I asked you about, procedural convenience.

 4   A.  Procedural convenience?  Point me to where that phrase is.

 5   Q.  I should have marked it, I apologize that I didn't -- oh, I'm

 6   sorry, I referred you -- I'm very sorry, it's paragraph nine.

 7   A.  I got you.

 8   Q.  Not paragraph seven.  That we talked about paragraph nine.

 9   A.  Nine.

10   Q.  Yeah.  And in particular it says:  I made no subjective

11   adjustment -- subjective judgment.

12   A.  You want me to read nine now?

13   Q.  Yes.  I referred you to the wrong paragraph, it's my error.

14   A.  (WITNESS READS DOCUMENT.)  Yes, okay.

15   Q.  And now do you remember about the procedural convenience that

16   we talked about that?

17   A.  I really don't recall, but you asked me a question I'll --

18   Q.  That's perfectly legitimate if you don't recall.  Perhaps I can

19   refresh your recollection.

20   A.  Sure.

21   Q.  If I suggest to you would you deny that you told me that you

22   said you didn't know what that paragraph referred to, that

23   procedural convenience, you didn't know what that meant?

24              SPECIAL MASTER JUNEAU:  You're talking about the

25   paragraph or those two words?
```

1          MR. ARCENEAUX:  The sentence, the whole sentence with the

2     words procedural convenience, that that sentence didn't -- it

3     didn't really mean anything to you.

4          THE WITNESS:  What that sentence means to me at this

5     point in time I can tell you it just means that I wasn't there

6     reviewing the time narratives and judging whether it was common

7     benefit based on the merits of reading the narrative.  And

8     procedural convenience to me was a way of saying that, hey, you

9     know, if we disallowed something because we saw some kind of

10    anomaly in it or didn't disallow it but we questioned it, then that

11    would have been it.

12         So what I was trying to make sure that we did there, and

13    I may have had some input in that sentence, is that I wasn't taking

14    responsibility for reading all of these time sheets and making sure

15    what people were doing was what they should be doing.

16    BY MR. ARCENEAUX:

17    Q.  Do you recall after we discussed paragraph nine that the very

18    next thing that we talked about was whether or not that sentence in

19    paragraph nine in any way impacted on your sworn statement in

20    paragraph eight that you had disallowed to the best of your ability

21    anything other than common benefit time?

22    A.  I think I just answered that, didn't I?

23    Q.  If you did, I didn't hear it.

24    A.  What I am telling you --

25    Q.  Let me try to rephrase.

```
 1              SPECIAL MASTER JUNEAU:  He is answering.

 2              THE WITNESS:  What I was saying in nine is that I was not

 3    taking responsibility for reading the narrative and taking

 4    responsibility for that.  And eight the state court cases where

 5    they were reconstructing their time and it was being done after the

 6    fact was a matter, you know, it was a matter of me having to work

 7    with attorneys to try to help them put their reconstructed time

 8    into a format that we could use.

 9    BY MR. ARCENEAUX:

10    Q.  And my question to you is, do you recall you telling me that

11    what was in paragraph nine in no way detracted from the sworn

12    statement you made in paragraph eight, that to the best of your

13    ability -- and we understand that you have limitations -- but to

14    the best of your ability, you disallowed non-common benefit time?

15    A.  I think I am on solid ground in both paragraphs.

16    Q.  Okay.  Thank you very much.

17              Now, unfortunately subsequent to our meeting we had some

18    confusion about lodestar charts, and part of that is my fault and

19    for that I wish to apologize both to you and to Special Master

20    Garrett (SIC) because I talked to you on the phone and I talked to

21    you at the meeting about lodestar charts, and there was some

22    confusion about the difference between a lodestar for all the

23    attorneys together, which obviously you had constructed because

24    it's in your affidavit, you swear to the amount.  And my failure to

25    make clear that what I was really asking about were firm by firm
```

1    lodestar charts.  So there was some miscommunication.

2    A.  We went back and forth on lodestar charts for awhile.

3    Q.  There was some miscommunication.  And I misunderstood you to

4    say, and I am admitting it, I understood you to say that no firm by

5    firm lodestar chart had been done?

6    A.  No.

7    Q.  And then you corrected me in an e-mail --

8    A.  Right.

9    Q.  -- later on after the meeting?

10   A.  Right.

11   Q.  You sent me an e-mail, which is the next document C-24, Common

12   Exhibit 24, you sent me an e-mail where you said that, oh, you

13   found the lodestar, firm by firm lodestar chart.  You found that it

14   was done in July of 2010.  Correct?

15              SPECIAL MASTER JUNEAU:  Is there a question?

16              MR. RAFFERTY:  Is there a question?

17              MR. ARCENEAUX:  I am trying to speed things up.

18              SPECIAL MASTER JUNEAU:  Just a minute.  I just want to

19   know is that your question because it looks like he is getting

20   ready to make an objection.  I am trying to figure out where we are

21   procedurally.

22              MR. ARCENEAUX:  I have about ten --

23              SPECIAL MASTER JUNEAU:  I want to know is that your

24   question?

25   BY MR. ARCENEAUX:

1  Q.  My question is, did you not send me this e-mail, CE-24?

2          MR. RAFFERTY:  My objection is simply, your Honor, these

3  are very long speeches, you know, to precede a question about

4  showing him the document and ask him if that's his e-mail.  He is

5  making argument and speeches.

6  BY MR. ARCENEAUX:

7  Q.  Did you send me this e-mail?

8  A.  Yeah, I sent him the e-mail, right.  I am not sure the

9  attachments are the right attachments.

10  Q.  Okay.  Well, at the bottom --

11  A.  I am not questioning that I attached the lodestar, I am

12  questioning whether you deleted the employee class rate or I did.

13  I would have to pull that.  I think you changed this chart from

14  when I did it.  Not that you changed dollars or the hours, I think

15  you just took out some contemporaneous stuff or maybe I did it or

16  Kristine who actually sent you the e-mail.

17  Q.  I don't know how to resolve that because I have attached as

18  Exhibit No. 24 to the court the optical copy of the e-mail

19  downloaded with the attachments, and this is a printout exactly of

20  the attachment that you sent me.

21  A.  That's fine.

22          SPECIAL MASTER JUNEAU:  He said he has no problem with

23  it.

24          THE WITNESS:  I have no problem with the totals.

25          MR. ARCENEAUX:  I just want to make clear I didn't change

1    anything.

2              SPECIAL MASTER JUNEAU:  You can go over it again.

3    BY MR. ARCENEAUX:

4    Q.  And the second attachment is what, what is the second document?

5    A.  The second attachment is I think you had made a statement in a

6    letter that I had never sent the lodestars to the PSC, and I did do

7    research and I said, it's very unlike me to do a report and not

8    give it to my client.  If I do a report, I am going to give it to

9    everybody I can because disclosure usually keeps me out of trouble.

10   But I couldn't find it in my e-mail, but I found this e-mail which

11   is Kristin Maghee which is one of the managers of Wegmann and

12   Dazet, I had instructed her when I was out of town to send the

13   lodestar reports to Lenny Davis, Arnold Levin, Sandra Dugan, so I

14   knew I had transmitted it somewhere.

15   Q.  Do you know who Sandra Dugan is?

16   A.  She is with the Levin Fishbein firm.

17   Q.  Mr. Levin's assistant?

18             SPECIAL MASTER JUNEAU:  Said he doesn't know.

19             THE WITNESS:  She is an attorney with Levin Fishbein.

20             MR. ARCENEAUX:  She is an attorney?

21             THE WITNESS:  I believe she is an attorney.

22             MR. ARCENEAUX:  Humph.

23             THE WITNESS:  Is that a question?

24   BY MR. ARCENEAUX:

25   Q.  You don't know the answer, you don't know the answer.

1    A.  Right.  I don't know.

2    Q.  I am going to show you something, another Wegmann Dazet

3    document.

4    A.  Okay.

5    Q.  That is in the record, it's Exhibit C to the FAC's opposition

6    to, it's Common Exhibit No. 11 in globo, and it's Exhibit C to that

7    document.

8            SPECIAL MASTER JUNEAU:  Does he have that before him?

9            MR. ARCENEAUX:  No.  It's in this enormous stack, you

10   don't have it either, your Honor, it's a 1,000 page document.  You

11   don't want it on hard paper, it's 1,000 pages.

12           SPECIAL MASTER JUNEAU:  Can you see it?

13   BY MR. ARCENEAUX:

14   Q.  Do you recognize this?

15   A.  I know that format real well, I've seen it a thousand times.

16           MR. RAFFERTY:  Which exhibit is this?

17           MR. ARCENEAUX:  It's Common Exhibit No. 11.

18           THE WITNESS:  How many pages does it have in it?

19           MR. ARCENEAUX:  That chart is over 1,000 pages.  It's

20   Common Exhibit No. 11, Exhibit C.

21   BY MR. ARCENEAUX:

22   Q.  This chart, this 1,100 page chart, which I don't know if you

23   can hear me, this 1,100 page chart which is what the Steering

24   Committee submitted in support or in opposition to our clients'

25   objections, this chart, this 1,100 page chart.  This chart does not

```
 1   reflect lodestar, does it?

 2   A.  No.

 3   Q.  Because there's no column for rates?

 4   A.  It only shows hours.

 5   Q.  So in support of -- so there's no lodestar on that chart?

 6   A.  Correct.

 7   Q.  Now, I am going to ask you a hypothetical question.  We talked

 8   about the e-mail that you sent me and you sent me the letter

 9   showing that it went to Ms. Sandra Dugan --

10   A.  The lodestar.

11   Q.  The one that did have the rates.

12   A.  Right.

13   Q.  Assume with me for a second that that chart is not on any of

14   the documents that the FAC produced to us, two DVDs full of

15   documents and that chart is nowhere in there.

16   A.  Okay.

17   Q.  And assume for me that Andy Birchfield testified at the very

18   end of his deposition that every document that the FAC relied upon

19   in their recommendation had been produced to us.

20   A.  Okay.

21   Q.  Assume those two facts.  Ergo that means the FAC didn't rely on

22   that firm by firm chart, did they?

23              MR. RAFFERTY:  Objection, that's improper.

24              MR. ARCENEAUX:  It's a hypothetical question.

25              SPECIAL MASTER JUNEAU:  You can object, make your
```

 1   objection.

 2              MR. RAFFERTY:  It's improper for this witness, you Honor.

 3   He's here to testify about what he created, what he did, not what

 4   the FAC did.

 5              SPECIAL MASTER JUNEAU:  I am going to sustain.  It's

 6   argumentative with what he thinks.  Mr. Birchfield would be the

 7   person to ask that question.

 8              MR. RAFFERTY:  Thank you, your Honor.

 9   BY MR. ARCENEAUX:

10   Q.  Okay.  I am going to show you one more document, it's marked

11   Common Exhibit No. 25.  You have not seen this one before, this is

12   demonstrative thing that I've created.

13   A.  Okay.

14   Q.  In the column that says -- oh, I have to go back to No. 1.  In

15   the column that says firm lodestar, you see this column here

16   (INDICATING)?

17   A.  Yes.

18   Q.  Assume for me, assume with me for the moment that that is --

19              MR. RAFFERTY:  Can I have a clarification?  That's

20   something that you created?

21              MR. ARCENEAUX:  That's something I created.

22              SPECIAL MASTER JUNEAU:  That's Exhibit number what?

23              MR. ARCENEAUX:  CE-25.

24              SPECIAL MASTER JUNEAU:  And it's a document that you

25   created?

1          MR. ARCENEAUX:  It's a document that I created.

2          MR. RAFFERTY:  So this is a demonstrative?

3          MR. ARCENEAUX:  It's a demonstrative.

4          SPECIAL MASTER JUNEAU:  All right.

5    BY MR. ARCENEAUX:

6    Q.  Assume with me for a moment that I accurately recorded from

7    your July chart that you sent me the firm by firm lodestars, assume

8    that I accurately wrote them down, and I am pretty careful, and

9    assume with me for the moment that the next column which says FAC

10   allocation right here (INDICATING)?

11   A.  Yes, sir.

12   Q.  Assume with me for the moment that all of the numbers in that

13   column are the numbers that are on the official FAC recommendation

14   to the court, what they recommended that everybody ought to get.

15   A.  Yes, sir.

16          MR. RAFFERTY:  Your Honor, I hate to keep interrupting.

17          SPECIAL MASTER JUNEAU:  That's fine, make your objection.

18          MR. RAFFERTY:  I don't think it's appropriate for him to

19   ask him now in a document he's created about the calculations and

20   how things were inserted and verified.

21          SPECIAL MASTER JUNEAU:  I am going to let you get to the

22   question.

23          MR. ARCENEAUX:  Let's look at the next column.

24          SPECIAL MASTER JUNEAU:  What's the next column?

25          MR. ARCENEAUX:  The next column says excess or deficit,

1    right here.  This column says FAC allocation, this column says

2    lodestar, this column says excess or deficit.

3    BY MR. ARCENEAUX:

4    Q.  Look down this column and see that in the vast majority of

5    cases, the deficit is huge, it's in excess of $500,000, in some

6    cases it's two million, one million, three million.  And there are

7    very few cases where the firm lodestar and the FAC allocation are

8    even close.  There are many cases where there's an excess of 26

9    million, two million, seven million, okay.

10           So with those predicates, and there is a question, with

11   those predicates now we've looked at the chart and I've asked you

12   to make two assumptions and I've asked you to examine this excess

13   or deficit column, wouldn't you say that the FAC's allocation, if

14   they purported to do a lodestar cross check, they did a pretty bad

15   job, didn't they?

16           SPECIAL MASTER JUNEAU:  That's an argumentative question,

17   counsel.  Whether he did a poor job, not a poor job, that's not his

18   role.  He was appointed by the court to do the accounting.  That's

19   the decisions for the court to make.  I'll have to make those

20   recommendations, Judge Fallon will have to make those

21   recommendations, and God help us if somebody else has to make them.

22           MR. RAFFERTY:  Thank you, your Honor.

23   BY MR. ARCENEAUX:

24   Q.  You would agree with me, however, that the numbers are not even

25   close?

 1              MR. RAFFERTY:  Your Honor, this is the same --

 2              MR. ARCENEAUX:  You're an accountant --

 3              SPECIAL MASTER JUNEAU:  Counsel, they speak for

 4    themselves.

 5              MR. RAFFERTY:  This is a document that was created by

 6    defense counsel.

 7              MR. ARCENEAUX:  Okay.  I only have one other area I want

 8    to touch on about Mr. Markowitz.

 9    BY MR. ARCENEAUX:

10    Q.  We went through a period of time after our meeting where you

11    and I tried to work together on recreating the July 20th chart, we

12    tried to recreate --

13    A.  July 2010 chart, right.

14    Q.  And I retained and brought into the discussion a fella you met

15    today Joey Markowitz.

16    A.  Very nice, young guy in the back.

17    Q.  And you described him to me as Excel whiz kid.

18    A.  I think that was my nickname for him.

19    Q.  We went through a lot of discussions back and forth, and the

20    bottom line is that despite your assistance, which we appreciated

21    very, very much, we never did, we never could --

22    A.  Maybe I should take back my title, huh?  I'm teasing.

23    Q.  So we abandoned that project, didn't we?

24    A.  Right.

25    Q.  And the next thing I sent you was a new -- Mr. Markowitz's

 1   final product, which was an Excel chart from the beginning of time,

 2   from the very first time entries through the date that I sent you

 3   the chart --

 4   A.  January of 2011.

 5   Q.  -- everything that was on your website.  And I am not going to

 6   ask you questions about that chart because there is an objection as

 7   to whether or not it's admissible.

 8   A.  Okay.

 9   Q.  You recall that I sent you the chart?

10   A.  Yes.

11   Q.  Look on the screen, please.  Do you recall sending me this

12   e-mail on Monday, May 9th?

13          SPECIAL MASTER JUNEAU:  Can you center it?

14   BY MR. ARCENEAUX:

15   Q.  I'll read it:  "Did check a few personnel and all was well.

16   The report agrees (close enough for me) --"

17          MR. RAFFERTY:  Your Honor, I want to be sure we're clear

18   on the record, and I'm sorry for the interruption.  But this is

19   going to be discussing the Markowitz work, and I want to make sure

20   that we're clear, we do have our objection, it is not being waived

21   and I intend to ask Mr. Garrett some questions about that as well.

22   But I don't want that --

23          SPECIAL MASTER JUNEAU:  Let me put on the record.

24   Pursuant to my discussion with counsel for both sides, they agreed

25   that if there were any questions through this examination here

 1   regarding anything that Mr. Markowitz may have developed or any of

 2   that report, it would not be deemed as opening a door to testimony

 3   because it's a matter that we have discussed and I have to make a

 4   ruling on, which you will argue shortly.  And I think both panels

 5   agree.  Do you agree to that?

 6              MR. RAFFERTY:  Yes.

 7              SPECIAL MASTER JUNEAU:  What you agree as well?

 8              MR. ARCENEAUX:  Yes.

 9              SPECIAL MASTER JUNEAU:  All right.  You may proceed.

10   BY MR. ARCENEAUX:

11   Q.  "Did check a few personnel and all is well.  The report agrees

12   (close enough for me).  I cannot vouch for Joey but I am reluctant

13   to use pivot tables only because they are a programming tool and

14   can move data and sometimes your answer in a new report is not

15   correct because you lost a variable or gained one.  So I will leave

16   the programming to Joey and yourself and will agree your report

17   ties in to my report."

18              Do you recall sending me that e-mail?

19   A.  Yes.

20              MR. ARCENEAUX:  Thank you very much.

21              SPECIAL MASTER JUNEAU:  Mr. Garrett, you get a double

22   dose, you get if through both counsel.

23              THE WITNESS:  It's unusual that I have the deponent going

24   first.  I'm independent, it's great with me.

25              SPECIAL MASTER JUNEAU:  I think it's an established fact

 1    that this is not an ordinary proceeding, but go ahead.

 2                         CROSS-EXAMINATION

 3    BY MR. RAFFERTY:

 4    Q.  Good afternoon, Mr. Garrett.  Troy Rafferty on behalf of the

 5    FAC.  I am going to go back and cover some things and ask you some

 6    more detailed questions about some areas that Mr. Arceneaux

 7    covered, but I want to kind of start at beginning if that's okay.

 8    A.  Sure.

 9    Q.  You are the court appointed CPA in the Vioxx MDL litigation,

10    correct?

11    A.  Yes, sir.

12    Q.  And have been since 2005?

13    A.  Yes, sir.

14    Q.  Who appointed you to that position?

15    A.  Judge Fallon.

16    Q.  Have you served in that capacity in other multidistrict

17    litigations?

18    A.  Yes, sir.

19    Q.  And can you list those, please.

20    A.  Propulsid, BP, Chinese Drywall, I have been appointed in other

21    cases as a court appointed examiner.

22    Q.  And at the time you were appointed -- I want to make sure that

23    we introduce a copy of your CV, if I may.

24                 SPECIAL MASTER JUNEAU:  It's attached to the affidavit,

25    which is, in fact, an admitted exhibit.

1          MR. RAFFERTY:  Okay.  Thank you, your Honor.

2          MR. ARCENEAUX:  And that's exhibit number what on your

3    exhibit list?

4          THE WITNESS:  CE-21.

5          MR. ARCENEAUX:  The CV is what?

6          MR. RAFFERTY:  It's attached to C-21 is what they're

7    saying.

8    BY MR. RAFFERTY:

9    Q.  When you were appointed by Judge Fallon as the court appointed

10   CPA in this case, did he have your credentials?

11   A.  Yes, sir.

12   Q.  And did he ask you if you would be willing to serve in that

13   role?

14   A.  Yes, he did.

15   Q.  And did you discuss what your role would be in this case?

16   A.  Yes, sir.

17   Q.  And are your duties and procedures laid out in various Pretrial

18   Orders?

19   A.  Yes, they are.

20   Q.  And those include some of the orders that we've seen here,

21   correct?

22   A.  Yes, sir.

23   Q.  What did you understand your role was in this litigation,

24   Mr. Garrett?

25   A.  Pursuant to PTO 6 I was to set up a system whereby everybody

1   would submit time and costs to me, that it would be verified by the

2   firm itself, and that they would represent that it was correct,

3   accurate and common benefit.  That once I received that, I would

4   see if the costs and the time corresponded with common benefit, if

5   they had the receipts behind the costs, if the time was being kept

6   contemporaneously, and lastly I checked the arithmetic to make sure

7   nobody had more than 24 hours in a day, time did not look abnormal

8   for some reason, and then we would make a report to the judge on a

9   monthly basis.

10          And, in fact, since April or May of 2005, I probably met

11  with Judge Fallon all the way through 2010 on a monthly basis.

12  Q.  Let me try to unpack that a little bit.  You agreed to serve in

13  that capacity and to serve the roles that you just described,

14  correct?

15  A.  Yes, sir.

16  Q.  And, in fact, did you do that from the time that you were

17  appointed until today?

18  A.  Still doing it today.

19  Q.  And is part of your appointment as the court appointed CPA in

20  this case did you meet regularly with the court to go over the

21  monthly submissions?

22  A.  Yes, I did.

23  Q.  And how often was this that you met?

24  A.  Monthly.

25  Q.  Now, at the time that you were receiving these -- and I want to

1    focus on the hours for just a minute.  When you started receiving

2    these hours, can you describe for the Special Master and for the

3    record what the process was you went through when you received

4    these submissions from the attorneys?

5    A.  It's a three-step process:  One, make sure the information is

6    submitted in the correct format and it has a partner's signature on

7    it.  So we had set forms that we wanted to have the information

8    submitted on.  We would not accept a submission to the extent I

9    have $18,000 of expenses and didn't attach a receipt, I would

10   automatically send it back to them.  If they sent in, look I

11   reviewed 81 pleadings at quarter of an hour, that's 20 hours, I

12   would not accept that.  It had to have a certain format which

13   contained receipts and contained contemporaneous time.

14        Once we got past that hurdle, the next hurdle was I had

15   to review the information, the receipts had to match up to the

16   actual costs, the time, we would scan over the time to see there

17   was anything and maybe catch somebody, paralegal may have had 100

18   entries in the month for setting up new files and we would call

19   their attention to that and ask if this was common benefit and most

20   of the time they would withdraw without even questioning it.

21        And third we would check the arithmetic, makes sure there

22   weren't excess hours in the day or other kind of anomaly from an

23   arithmetic standpoint.  Those were the three step.

24   Q.  And these were the instructions that you received from the

25   court, correct?

1    A.   Correct.

2    Q.   And in order to implement that, did you utilize or have a

3    program?

4    A.   Yes.

5    Q.   Did you utilize a program?

6    A.   Yes.  You know, we had Wegmann Dazet was a firm of 75 people,

7    so, you know, we had, I had one or two people that were working

8    with me for the first couple of years on the case that were with me

9    working on the case, we worked together developing a system on

10   Excel spreadsheet that worked pretty well and eventually changed it

11   to Access spreadsheet and eventually changed to the web based

12   program.

13   Q.   The web-based program, just so I am clear, all of that

14   information, the program that you have, that you began to use, the

15   web-based program that you currently use has all of that

16   information, all of that was provided to counsel for the objectors,

17   correct?

18   A.   Yes.  Counsel for the objectors got the Access data, that 1,100

19   page report you see, plus they got a copy of the Access database

20   itself for the July '09.  Then those totals were put into the new

21   and I gave them the user name and password so they can go into the

22   web-based program and play with all of the reports I have in there.

23   Q.   You just gave them free access, gave them a user name and

24   password and said use it?

25   A.   That's pretty much what I said.  That's pretty much what I was

1    told to do.

2    Q.  You were asked some questions by Mr. Arceneaux about the switch

3    from the one system to the other.  Do you have access and the

4    ability to reference and utilize all of the hours that have been

5    submitted to you, correct?

6    A.  Yes.

7    Q.  Nothing has disappeared, I mean it's all there?

8    A.  I had two CPAs make sure that my, that the switch from the

9    Access database to the website, I was making sure I didn't put in

10   one person's name wrong or one person's hours wrong.

11   Q.  Getting back for just a second about the submission of the

12   hours.  If you had questions about certain submissions of the hours

13   from the lawyers, describe the process of what you would do.

14   A.  At that point in time we were using a form letter that we would

15   have sent out, somebody sends in some hours and we see that one

16   person has worked on setting up files for the entire month, that's

17   all they've done.  We think, hey, this sure looks like they're

18   working on their separate client files.

19          We would send a form letter back saying the time is going

20   to be rejected because of this.  Would you like to resubmit or what

21   would you like to do with it.  And then we would either call us or

22   e-mail us back or send us a letter back with a resubmission.  99

23   percent of the time I would say they would resend a submission back

24   to us dropping those hours out.

25   Q.  And at some point you started to receive and collect time and

1   expenses from lawyers throughout the country who were handling

2   state court cases, correct?

3   A.  Yes.

4   Q.  And did you handle those submissions the same way that you

5   handled the previous submissions?

6   A.  Yes.  Only difference was quantity, I was receiving -- we went

7   through hundreds of boxes a day.

8   Q.  Is it fair to say that some of those hours met the guidelines

9   and some of them didn't?

10  A.  I would say that was a task to get those hours in compliance.

11  Q.  And there were a number of hours that were ultimately either

12  withdrawn by the attorney or not included, correct?

13  A.  The number of firms that actually had to hire CPA firms in

14  their cities to go and put the stuff together because we wouldn't

15  accept it otherwise, so we didn't.

16  Q.  When you did your monthly reports it would be included in the

17  monthly reports would be the hours that were being questioned or

18  withdrawn, correct?

19  A.  Actually they were being questioned I wouldn't even include

20  them in the reports.  That was only hours in the reports to the

21  judge where the hours under review -- 90 percent of the report

22  showed hours accepted, because I didn't think the judge wanted to

23  see the hours that were under review.  The hours rejected, most of

24  the hours I was going to reject were withdrawn anyway.

25  Q.  Now, in terms of the review of the hours, was it your job, did

1   you view your responsibility to make a subjective judgment as to

2   the value or quality of those hours?

3   A.  Absolutely not, no.  It was talked to the court about it as

4   long as the attorneys about it that I do not have the ability to

5   judge what -- I really am not that involved in the case, I am

6   really the score keeper on the sideline.

7   Q.  And you never made a subjective investigation or determination

8   as to the hours and common benefit or whether they were common

9   benefit, correct?

10  A.  Whether they were very effective hours, uneffective hours, that

11  wasn't my job.

12  Q.  Did you actually do any analysis as to whether or not the work

13  was necessary?

14  A.  Not at all.

15  Q.  And did you do any analysis as to whether the work that was

16  being done by a particular lawyer was then being utilized or shared

17  with other lawyers?

18  A.  No, sir.

19  Q.  I want to talk for a moment about the lodestar calculations,

20  okay?

21  A.  Sure.

22  Q.  At some point in time did you calculate for the court a

23  lodestar based upon the hours submitted?

24  A.  Yes, sir.

25  Q.  Tell me what your understanding of the lodestar is.

1    A.  Lodestar value is basically just taking the billing rate for a

2    person times a number of hours for that person to equal a value for

3    those hours.  And we call it the lodestar value or the lodestar.

4    Q.  There was a lot of questions asked about the billing rates.

5    What was the process used to determine the billing rates for the

6    various attorneys?

7    A.  We requested the billing rates from the attorneys and we were

8    having some problems getting it, so we actually turned it into a

9    major task.  I had one of my partners, Cliff Newland who is an

10   attorney and CPA, he had our people actually list out every time

11   keeper for every firm on a separate sheet of paper; and then all of

12   those sheets they were attached to a letter to that partner in that

13   firm and we sent out those letters I think in September of 2010 --

14   no, must be 2009.

15         Anyway the letters were sent out to them and we had a

16   couple of different CPAs watching over those letters.  As we

17   received the information back in, we would check them off, input

18   the billing rates.  If we never received them back in, we made

19   follow-up phone calls, we check with the administrator, leave

20   messages for the partner, and we tried to get all of them -- we

21   actually had three binders, three big three-ring binders of all of

22   the letters we sent out.

23   Q.  I want to hand you, if I could, a copy of what I've marked as

24   Garrett Exhibit No. 3.

25         SPECIAL MASTER JUNEAU:  Counsel, is this a new exhibit?

1          MR. RAFFERTY:  I believe so, your Honor.

2          SPECIAL MASTER JUNEAU:  You will have to mark it.

3          MR. RAFFERTY:  Garrett Exhibit No. 3 is what it'll be

4    marked and we'll have that entered.

5          MR. ARCENEAUX:  Where is this on your exhibit list?  I've

6    never seen this before.  I've never seen it attached to anything,

7    I've never seen it anywhere.  I've never seen this before.

8    BY MR. RAFFERTY:

9    Q.  Mr. Garrett, have you had an opportunity to review the letters

10   that were sent out to the various attorneys asking for their

11   billing rates?

12   A.  Yes, sir.

13   Q.  I am going to show you on the screen a copy of one of the

14   letters here, and that's on Wegmann Dazet letterhead.

15   A.  Yes, sir, you sent it out September 18th, 2008, they apparently

16   have a received stamp, they stamped the letter September 23rd,

17   2008, and sent it back.

18   Q.  This is the Anapol Schwartz firm?

19   A.  Yes, sir.

20   Q.  And in this letter is a request:  Vioxx allocation committee

21   has requested we obtain the following information in connection

22   with your submission.  And it asks them to complete the form and

23   include the title/position with the firm and the current hourly

24   rate charged by your firm for each employee in the Vioxx case.  Do

25   you see that?

1    A.  Yes, sir.

2    Q.  And then it goes on and gives instruction of how to do that; is

3    that correct?

4    A.  Yes, sir.

5    Q.  This example is the Anapol Schwartz firm?

6    A.  Yes, sir.

7    Q.  And you can actually see that they have responded?

8    A.  Yes, sir.  We were asking for two piece of information, the

9    classification of the person and the billing rate.

10   Q.  I am going to draw your attention to one that's a couple of

11   letters in, and this is to the law offices of Eric Weinberg --

12   A.  Okay.

13   Q.  -- on Wegmann Dazet & Company letterhead.  Do you see that?

14   A.  Yes, sir.

15           MR. ARCENEAUX:  Your Honor, I have an objection.

16           SPECIAL MASTER JUNEAU:  Yes.

17           MR. ARCENEAUX:  These -- this package of documents is not

18   on the exhibit list.  We've never seen it before.  And there's no

19   way for me to prove to you as we stand here that it was not in the

20   documents that were ever produced to us, so I am going to make my

21   objection conditional.  You're going to get a DVD that's going to

22   have every document that was ever produced to us by them.  These

23   documents are not in there despite what Mr. Rafferty says today.

24           So to the extent that when you review that discovery and

25   you find that the documents were not produced to us until today and

```
1    they're not listed on the exhibit list, I would suggest that

2    they're not admissible at this hearing.

3         SPECIAL MASTER JUNEAU:  All right.  And Weinberg and

4    Zedalis both testified on the stand, they could have been asked

5    about these documents.  Ms. Zedalis and Mr. Weinberg both testified

6    in this hearing and could have been asked about whether they

7    received these documents.  And they were not asked those questions,

8    now they purport to introduce the documents addressed to them but

9    there is no way for us to call those witnesses back to see if they

10   received them.  These documents should not be admitted, they're

11   completely produced at the 11th hour.

12        MR. RAFFERTY:  Your Honor, first of all, counsel for the

13   objector was given free access to Mr. Garrett and his office and

14   said they could get anything they want.  We said we were producing

15   and listing all of the materials produced by them.  In addition

16   this is all material, for example, Mr. Weiss, this was his firm, he

17   was in possession of it.  These are document --

18        SPECIAL MASTER JUNEAU:  Mr. Who?

19        MR. RAFFERTY:  Mr. Weiss, for example, his office filled

20   it out.  Ms. Snapka, for example, she sent a letter, this is stuff

21   that would be within her --

22        SPECIAL MASTER JUNEAU:  Counsel, let me address the

23   objection.  Mr. Arceneaux said he has never received that document,

24   if it is true that I had ordered that Mr. Arceneaux and

25   Ms. Woodward, counsel of the objectors, could meet about with
```

1    Mr. Garrett and obtain from him whatever documents they thought

2    would be relevant.

3            Now, whether the documents came out of that or not, I

4    don't know.  I take him at his word, he says he did not receive

5    them.  The realty of the situation is, he is on the stand and has

6    testified that he has sent letters to all of the attorneys, you

7    described in great detail what it was.  So y'all may be talking

8    about a fire somewhere else, I understand what he said, he asked

9    him, whether somebody got it or not I don't know.  I am not saying

10   they got it.

11           So I am not going to permit the -- I am going to sustain

12   the objection about the admissibility of evidence and allow him to

13   ask what he sent to every party and what did they do.  I think he's

14   very well explained it.

15           MR. ARCENEAUX:  I want to make one slight clarification

16   and thank you for that ruling.  When I referred to the exhibits

17   that were produced, I wasn't referring to your order that we have

18   access to Mr. Garrett.  I was referring to Judge Fallon's order

19   that they produce to us all of the documents that they relied on.

20   That's what's on the DVD.  It's judge -- the very first thing that

21   happened in this case is we filed a motion for production, and

22   Judge Fallon ordered them to produce everything they have.  And

23   these documents are not on that DVD, they were never produced to

24   us.

25           SPECIAL MASTER JUNEAU:  You can proceed with the

1    question, counsel.

2              MR. ARCENEAUX:  I just wanted to make that clarification.

3              SPECIAL MASTER JUNEAU:  Proceed, counsel.

4              MR. RAFFERTY:  Thank you, your Honor.

5    BY MR. RAFFERTY:

6    Q.  And have you looked and seen whether or not you had letters,

7    sent those letters out to the objectors or to each law firm,

8    including the objectors?

9    A.  When I tell you this was a task, I know we spent a few thousand

10   dollars of time following up on these letters, preparing the list

11   of timekeepers trying to get all of the time in.  If you want, we

12   can make up a checklist on the chart and go through each letter and

13   see which ones were sent out and which ones actually responded.

14   Q.  And even after the letters were sent out, if you did not

15   receive a response from a particular attorney, did you follow-up?

16   A.  We had monthly meetings, we had monthly checklists, we sent

17   this letter out September 18th, I have a checklist for October, I

18   have another checklist in January, so I'm pretty sure that

19   checklist was made up each month.  And then I think by January I

20   actually at that point in time had our programmer with the Access

21   database figure out an average rate for the people who had not sent

22   rates in.

23   Q.  Or if they responded and said that they didn't have a rate; is

24   that correct?

25   A.  Right.  I mean, if they responded and didn't have a rate I told

1    them we had to have a rate.  And so most of them would go back into

2    their offices and figure out a rate and give me a rate.  I wasn't

3    judging the rate, I wasn't judging their narrative, but they would

4    come back, a few attorneys stuck to their guns and would not give

5    me a rate so I figured out an average rate.

6    Q.  For example, did you send letters out to Mr. Becnel and his

7    firm?

8    A.  Mr. Becnel definitely received a letter, definitely received a

9    follow-up phone call.  In fact, one of his employees, I forgot the

10   lady's name, Monica Gate (SIC), she actually received from Robert

11   Becnel his response to the billing rates and she was on there and

12   her rate was $19.23, so I assumed she was a contract employee who

13   was just passing the cost through, so I used the $19.23.  When

14   Mr. Becnel was on the stand saying I don't know where Garrett could

15   have gotten this rate, he got it from Robert Becnel who faxed me

16   the sheet from Daniel Becnel's office, so it's like, hey.

17   Q.  Did you, for example, send a letter to Mr. Weinberg's firm?

18   A.  Absolutely.

19   Q.  And did you send letters to Ms. Snapka's firm?

20   A.  Absolutely.

21   Q.  In fact, did Ms. Snapka respond?

22   A.  Yes, she did.  She sent back a letter giving me half the

23   information.  She gave the classification of herself as a senior

24   partner and Anita as an associate, but she wouldn't set an hourly

25   rate.

1   Q.  Describe for the court now -- so you sent a letter out, you

2   follow-up with the calls.  Ultimately at some point you have to do

3   your calculation, so how is it that you calculate the rates for

4   those particular firms that didn't have a rate assignment?

5   A.  What we did was, I think there was approximately 600 attorneys

6   and approximately 60 of the attorneys did not send out, maybe 100

7   attorneys did not send out the rates.  So what I did was I had the

8   programmer go in and for every attorney, like, for instance,

9   Ms. Stafford said she was a senior partner, so we took all of the

10  senior partners that gave us rates, calculated an average, and put

11  the average in for senior partners.

12         If they never gave us any information where they were an

13  attorney, we averaged all of the attorneys together who did not

14  have a particular rate, and that was the rate that Mr. Becnel was

15  referring to that most of his attorneys got because they didn't

16  give us any information, so we just averaged all attorney rates and

17  put that in there for them.

18  Q.  So you did that after you exhausted all attempts?

19  A.  I don't know that it wouldn't have been cost beneficial doing

20  any more than that.

21  Q.  Did you send a let to Mr. Placitella?

22  A.  Yes, I have a letter from Mr. Placitella, and he actually

23  responded with his positions and the rates.

24  Q.  In the October 19th, 2010, letter that was referenced by

25  Mr. Arceneaux, there is reference made to an average rate or a

1    combined rate.

2    A.  I'm sorry, what?

3    Q.  On Judge Fallon's October 19th, 2010, order there is a

4    reference to a combined or average rate.

5    A.  Right.

6    Q.  What does that mean, what is that rate?

7    A.  In reference to the lodestar value?

8    Q.  Yes.

9    A.  That is the reference to the July 31st, 2010, lodestar report I

10   generated.

11   Q.  And what was your time fee value calculation as of July 2010?

12   A.  Do I have a copy of it over here?

13   Q.  I have one if you need it.

14           MR. ARCENEAUX:  I gave you one, it's attached.

15           MR. RAFFERTY:  I have one right here.  May I approach,

16   your Honor?

17           SPECIAL MASTER JUNEAU:  Yes.

18           THE WITNESS:  In that report on page 36, the judge noted

19   that the lodestar value was $249,546,751.20.  He also noted on the

20   previous page, page 35 he referenced my January 2009 affidavit of

21   $217 million, and then the August 2010 affidavit, which the July

22   for 249,546,751.20.  I actually went over to the court, the court

23   actually called me and asked me to come over and review these

24   numbers and make sure we had picked up the numbers right and

25   actually calculated that $443.29, that's the average hourly rate by

1   taking the total value divided by the total hours regardless of

2   position.

3   BY MR. RAFFERTY:

4   Q.  So when you went over there -- prior to producing this and

5   giving these numbers for the court, did you verify and double check

6   all of these numbers?

7   A.  I checked it, had somebody check me and I checked them again.

8   Not that I couldn't do it, but I tried hard not to make a mistake

9   with this many commas in it.

10  Q.  And you went through and verified -- the reports that you

11  produced based upon the hours submitted, the billing rates, all of

12  those things, all of the material that you have, you have gone

13  through and verified how those reports were generated, correct?

14  A.  Yes, sir.  You know, the system we set up was that when

15  somebody, I'll say Mr. Becnel as an example.  When we sent him,

16  when he sent in that time he had to sign a form that said he had

17  reviewed this time record, it's accurate and orderly and it

18  represents all common benefit time.  We would not accept hours

19  unless they were signed off by a partner in the firm.

20  Q.  I want to go over a couple of things Mr. Arceneaux asked you in

21  terms of the production of the lodestar report to Mr. Levin, and I

22  think you had said it was sent to Lenny Davis, Mr. Levin,

23  Ms. Dugan; is that correct?

24  A.  Right, yes, sir.

25  Q.  And you got a copy of that I think you were shown a copy of the

1    e-mail transmittal?

2    A.  Yes, sir, somewhere.

3    Q.  Is this a copy of that e-mail transmittal?

4    A.  Yes, it is.

5    Q.  And this is sent from Kristine Maghee?

6    A.  Right.  And it's Kristine is a manager of the office of Wegmann

7    Dazet.

8    Q.  And then your two lines with yourself listed as well as

9    Mr. Levin, Mr. Davis and Ms. Dugan, correct?

10   A.  Yes, sir.

11   Q.  And there's also a cc to Eddie LeBlanc?

12   A.  Eddie LeBlanc is an Access programmer at Wegmann Dazet.

13   Q.  And it says:  "All per Phil's request, attached to the Vioxx

14   billing rate report through July 2010.  Phil is out of town this

15   week, but wanted me to communicate to you that he would be

16   available next week."  Is that correct?

17   A.  Yes, sir.

18   Q.  And that's dated July 30th, 2010?

19   A.  Yes, sir.

20   Q.  And you provided that to Mr. Arceneaux when he came to your

21   office?

22   A.  No.  Somewhere along the line, I'm not sure where,

23   Mr. Arceneaux had the impression that I had never given that to the

24   PCS and he said it to me or in a letter or a phone conversation,

25   but it's very unlike me not to give a report out to them.  So I

1    went looking.

2    Q.  So back in April you sent him an e-mail enclosing that

3    particular e-mail though, correct?

4    A.  Yes, sir.

5    Q.  And explained to him that this is where, that you had sent the

6    report to those members of the --

7    A.  Right, I would have found it earlier but it wasn't in my

8    inbox -- it was in the inbox instead of my sent mail.

9    Q.  I want to go through a couple of your conversations with

10   Mr. Arceneaux.  How many times have you met or spoken with

11   Mr. Arceneaux in regards to these matters?

12   A.  We met face to face once and that was probably a few hours in

13   that conversation, and then I've talked to him, I don't know, a

14   half dozen times.

15   Q.  And every time he wanted to talk you spoke with him?

16   A.  Sure.

17   Q.  Was there another meeting that was set up that Mr. Arceneaux

18   did not make?

19   A.  The first meeting that was set up apparently something changed,

20   you know, he thought the meeting was canceled, he didn't show up,

21   Russ Herman and Andy Birchfield showed up at my office.

22   Unfortunately I could not reach Mr. Arceneaux at the time so we

23   stayed around for a half hour, and he apologized and offered to pay

24   for my time, and so forth, then we set up a subsequent meeting a

25   couple of weeks later.

1    Q.  The second meeting he did show up for it and you had the

2    meeting.  Who else was there?

3    A.  Russ Herman just showed up by himself the second time.

4    Q.  At any time during that entire meeting did Mr. Herman or any

5    other member of the FAC interfere or interrupt or do anything to

6    try to disrupt any of the questions?

7    A.  Mr. Herman's instructions to me were whatever he wants, you

8    know, whatever questions he asks, just tell him everything and

9    don't bother, anything he wanted to get, get it.  That's the same

10   instructions I got from Special Master Juneau to be 100 percent

11   cooperative, which works for me real easy.

12   Q.  That's what you did, isn't it, Mr. Garrett?

13   A.  That's what I did.

14   Q.  On all of these times that you spoke with him on the phone, the

15   half dozen times you spoke to him on the phone, was anybody from

16   the FAC on the phone with him?

17   A.  No, the FAC I didn't inform everybody of most of the

18   conversations.

19   Q.  And you answered all of the questions during the phone

20   conversations, correct?

21   A.  Yes, sir.

22   Q.  And provided him with the information that he requested,

23   correct?

24   A.  I even tried to prepare extra charts to help them balance the

25   2010 report they were trying to work on.

1    Q.  Is it fair to say that you have provided Mr. Arceneaux with all

2    of your data, records, spreadsheets, reports, all of that

3    information pertaining to the work that was done?

4    A.  Everything he's asked for I have provided.

5    Q.  And these are --

6    A.  If he would have asked for the billing letters, I would have

7    given him the billing letters.

8    Q.  Is there anything at all that had been requested by

9    Mr. Arceneaux that you had not provided to him or refused to

10   provide to him?

11   A.  Oh, absolutely no.

12   Q.  At some point did Mr. Arceneaux request that you speak with

13   Mr. Markowitz?

14   A.  Well, we had two or three phone conversations two way with

15   Robert and with Joey Markowitz and with myself, and they were

16   trying to balance it.  And you have to remember July 31st, 2010, is

17   the date that we set as the cut off.  After that we started using

18   the web-based program.  So I my have received submissions in

19   September for time that was being put in in May, so the numbers

20   change at July 31st.  So they were trying to follow that report and

21   you had to watch what the cut off was, if you don't submit it after

22   August 1st, it wasn't in that Access report.

23         And so there were some issues there and we tried to work

24   through it, but eventually they just couldn't do it.  I tried as

25   best I could to try to help them get what they wanted to do.

1    Q.  You did at some point talk with Mr. Markowitz, correct?

2    A.  Yes, I'm sorry, your question did I ever talk to Mr. Markowitz

3    directly.  There was one phone conversation that Robert asked me to

4    call Joey direct, called Joey.  He said, well, I think we're going

5    a different way now, so I'll call Robert.  And that was the end of

6    that conversation, it was a very short conversion.

7    Q.  But you made yourself available if you needed to be?

8    A.  Yes.

9    Q.  You were shown this e-mail by Mr. Arceneaux earlier that he

10   read to you.  I want to draw your attention to one particular

11   sentence and he says, you say here to Mr. Arceneaux, "I cannot

12   vouch for Joey but I am reluctant to use pivot tables only because

13   they are a programming tool and can move data and sometimes your

14   answer in a review report is not correct because you lost a

15   variable or gained one; is that correct?"

16   A.  Yes, sir.

17   Q.  What was your understanding of what Mr. Markowitz was doing?

18   A.  He was trying to generate the spreadsheet that would have all

19   of the information, the additional information he was going to

20   gain, he was going to have the hours by month for pre-July 2009.

21   So he was trying to get all of those months in there together, so

22   now you have January 2011 every month.  He wanted to take that

23   spreadsheet and turn it into a pivot table, which is a part of the

24   Excel program that lets you manipulate data on a multi-platform.

25            So, for example, if you typically think of a spreadsheet

1   as having a row for number one, a row for No. 2, you may have one,

2   two, three, four, and then you hit a button and sum it up, and will

3   be five.  With a pivot table, what it will do is take those four

4   fields and put them over here into a pivot table, now all of the

5   numbers are what the numbers are.  So if you say print me out a

6   report on total, it will print out five.  So you don't know where

7   the five came from, it just shows five.

8            And so you can do things with a pivot table what I refer

9   to as gee whiz reports, you go, gee whiz, what does it mean?  You

10  can manipulate the data so much that sometimes I get worried -- I

11  have clients that use pivot tables, but sometimes I get worried

12  they get lost in the trees.

13  Q.  You're familiar with the use of pivot tables, correct?

14  A.  Yes.

15  Q.  And you've used them in your professional experience, correct?

16  A.  Yes, I have.

17  Q.  In your use of them and your role as a CPA or financial

18  analyst, do you believe those pivot tables are reliable in terms of

19  generating reports that can be relied upon, for instance, in

20  situations like we have here in the Vioxx MDL?

21  A.  I would not ever give a pivot table to a court, probably never

22  give a pivot table to a group of attorneys to use because I think

23  you have to be very knowledgeable with what you're doing and it

24  lets you sort information in 100 different ways.  If you go to my

25  website for the information on the MDL, you have maybe 20 reports

1   you can run.  I know those 20 reports run, so you can't run the

2   21st report, you can only run the 20 reports that I have.

3           If I gave you a pivot table with information in it, you

4   can run literally 1,000 reports.  Now, would all of the thousand

5   reports all balance?  Yeah, it would balance to what information

6   you told it to do.  Did you understand information you told it to

7   do, that's a little more complicated question.

8   Q.  So in order to verify the new reports that are being generated

9   in this pivot table, would you have to go back and verify all of

10  the underlying data and how it's being pulled from different

11  fields?

12  A.  You have to understand what's behind, like I said in my

13  example, one, one, one, one, one adds up to five, you just see a

14  five in there, you have to go see what's behind that and see

15  whether it works or not.

16  Q.  And were you provided one these reports within the last few

17  days from Mr. Markowitz?

18  A.  This is the report, this is my response to Mr. Arceneaux.  What

19  I said in here is I can't vouch for Joey.  Just the bottom here,

20  we'll leave the programming to Joey.  I had never met Joey at that

21  point in time.  So I was telling him, I called Mr. Arceneaux and

22  asked him, I said, look, I looked at the instructions of what Joey

23  did, and this is going to take a little bit more time than I am

24  ready to do.  I would actually have to go get my programmer from

25  Wegmann Dazet, he would sit down with me, figure out how the pivot

1    table was done and go through and look at it.

2              And I said, no, I don't think that's what you really want

3    me to do, I think you just want me to tell you it ties into the

4    total, and ties in within 25 cents or a couple hundred dollars on

5    $250,000,000.

6              So I was pretty happy with the total.  And I did go

7    through and check five or six employees and their total hours and

8    their total dollars, so I think the report I got was great, but

9    what I think I am giving to the court is a report, not a pivot

10   table.

11   Q.  When you talk about the pivot table, let me see if I can try --

12   A.  And unpack it?

13   Q.  -- unpack this a little bit as basically as I can.

14             When you have a pivot table and you are reviewing the

15   materials, the report that is generated from that report, from the

16   pivot table, you have to in order to see whether or not that

17   aggregate number is correct go through and verify the background

18   data and how that information is being pulled from the different

19   fields, correct?

20   A.  For instance, the report that Mr. Arceneaux sent me is probably

21   50,000 lines of data going down, and you can actually reduce that

22   data if you hit the right button to three lines, tell me all of the

23   attorneys, tell me all of the paralegals and tell me what the other

24   classification and that are the totals so you should be able to see

25   the three totals.  If you click on attorneys it's going to print

 1    out 30,000 line items behind it to show you what's in there.

 2              So I did that, I actually went through and said, let me

 3    just see what the classification is, what the total time for

 4    attorneys, what's the total time for paralegals, what's the total

 5    time for others.  And I came up with a different total.  So I go

 6    figure out why I came up with a different total, I had to go

 7    through 50,000 lines of code to figure out what was going on.

 8    Pivot tables are dangerous.  They're dangerous in my hands and I've

 9    used them for a few years.

10    Q.  So you actually ran or tried to run a different report off of

11    the pivot table that was provided to you by counsel for the

12    objectors and it came up with different information than what you

13    had in yours, right?

14    A.  Right.  There's 50,000 difference on 250 million, it wasn't a

15    tremendous amount, but it was different enough for me to notice.

16    Q.  In order to go through and do that analysis, what type -- did

17    you need to have certain expertise to go back and verify that?

18    A.  You have to be pretty knowledgeable about Excel spreadsheets.

19    Q.  Getting to the verification of the underlying data, is as CPA

20    or financial analyst, someone in your position as a court appointed

21    CPA, is that necessary to go through and look at the underlying

22    data in order to verify those reports?

23    A.  If I would have seen the total came to the total of the dollars

24    and the total within the total of the hours, I would have been

25    fairly comfortable.  But if I was going to give it to the court in

1    a court report, I would have the printout behind it to make sure

2    and put it right.

3    Q.  I guess that's my point, in the report you provided for the

4    court, you did the report and you went through and you verified

5    that the way it was being calculated was correct and accurate and

6    the data was being pulled from the appropriate fields and being

7    totaled correctly, correct?

8    A.  I didn't give you versatility, I gave you a report.

9    Q.  Can the pivot table reports also be misleading in terms of how

10   they're presented?

11   A.  Oh, absolutely.  Because pivot tables aren't -- yes, they can.

12   Q.  I want to direct your attention --

13        MR. ARCENEAUX:  Your Honor, I want to enter an objection

14   at this point to these questions about pivot tables, it doesn't

15   have to do with the agreement that we reached.  At the beginning of

16   the testimony I specifically asked Mr. Garrett if he was a

17   programmer and he said he had basic Excel and Access skills.  Now

18   he's purporting to be, I assume -- we haven't qualified him as an

19   expert in computer software, engineering or anything to do with it.

20   But he is testifying as if he is a great authority on pivot tables.

21        THE WITNESS:  Your words to me were that I am not an

22   expert in programming, but I have good deal of knowledge about

23   Excel and --

24        MR. ARCENEAUX:  Yeah, you have basic skills, isn't that

25   what you said?

 1              THE WITNESS:  And I think my basic skills tell me what a

 2   pivot table is.

 3              SPECIAL MASTER JUNEAU:  I understand your objection, go

 4   ahead and proceed.

 5   BY MR. RAFFERTY:

 6   Q.  We were provided last night, some -- a bunch of database

 7   spreadsheets, the pivot tables, that type of things.

 8   A.  Right, the report.

 9   Q.  Have you had a chance to review the reports from that, some of

10   the reports from that?

11   A.  Yes.

12              MR. RAFFERTY:  I guess we'll mark these as Exhibits 27,

13   Garrett, I guess, 27, 28A and 28B.

14              Your Honor, can I approach?

15              SPECIAL MASTER JUNEAU:  You may.

16   BY MR. RAFFERTY:

17   Q.  Do you have your copies?

18   A.  Yes, I do.

19              MR. RAFFERTY:  My cocounsel just reminded me we are

20   marking this for identification at this point only pending the

21   ruling.

22   BY MR. RAFFERTY:

23   Q.  Let's take, for example, let's look at 27 for example.  I hope

24   we can see this.

25   A.  I think the last two columns you can probably see all right.

 1   Q.  This is not going to be the easiest thing in the world to see.

 2   Here is what we're going to do.  We're going to start over here and

 3   if you look real close on here, for example, you can see Daniel

 4   Becnel, Jr., 607, correct?

 5   A.  Yes.

 6   Q.  Now, if you follow that line item all the way across -- at the

 7   top you will see the categories, pretrial, discovery, different

 8   categories of hours, correct?

 9   A.  Yes.

10   Q.  Those are different categories of hours that you broke down,

11   correct?

12   A.  Yes.

13   Q.  Per the court order?

14   A.  Yes.

15   Q.  And it has total hours then it has billing rate and lodestar,

16   do you see that?

17   A.  Yes.

18   Q.  Now, if you just look at this report and you go down here to

19   Mr. Becnel and you follow him across, you'll see that he ends up

20   with what's got listed here in the counsel for objectors report as

21   13,038 hours and a quarter, correct?

22   A.  Yes.

23   Q.  And then it's got a billing rate of $595.76, correct?

24   A.  Yes.

25   Q.  And then it's got lodestar 3,622,000, do you see that?

1   A.   Yes.

2   Q.   If you take the hours and multiply that times the billing rate

3   does it come to that?

4   A.   No.

5   Q.   So if you just looked at this table like this that would be

6   misleading, correct?

7   A.   Yeah.  At first when I looked at this table I said, okay,

8   Danny's firm had 13,000 hours and $595 billing rate, so he has 3

9   million 6; but that isn't -- see, when you put in a pivot table

10   that 3 million 6 and that 13,000 they become just numbers, they are

11   not a calculation anymore, they are just a number that was on the

12   previous calculation.  So you have to be real careful because this

13   is -- most of the numbers in here you cannot multiple hours time

14   the billing rate to get that value, it just doesn't work.

15   Q.   You have to unpack it and figure out what exactly is underneath

16   all of those hours --

17   A.   Right.

18   Q.   -- and what the algorithm is?

19   A.   This report, I would have never put the value to the right of

20   hours, billing rate and then put value because it looks like to the

21   normal reader if you multiply the hours time the billing rate you

22   get a value and that's not what this report is doing.

23   Q.   And, in fact, in this report, which is the same, which is 28A,

24   we have the same Mr. Becnel down there, third from the bottom.

25   A.   Right.

 1   Q.  And you follow him over and he has all of the same hours, he

 2   has 13,038 and a quarter, but a different hourly rate 550 which is

 3   actually less than what the last hourly rate was -- or I'm sorry,

 4   more than, the other one --

 5                SPECIAL MASTER JUNEAU:  More than.

 6                MR. RAFFERTY:  I'm sorry, the other was 595.

 7                THE WITNESS:  This is less than.

 8   BY MR. RAFFERTY:

 9   Q.  So 550 now would be less than --

10   A.  So instead of going from 3,600,000, you go from 3,600,000 to

11   5,200,000.

12   Q.  So now if you look, that's calculating out at 3,622,000 for the

13   same hours, but then when you lower the rate it goes up to

14   5,171,000 that doesn't make any sense, does it?

15   A.  No it doesn't.

16   Q.  Now, in order to figure out why that's calculating that way, as

17   I said you have to unpack everything, right?

18   A.  You have to understand the underlying things that were going on

19   there.

20   Q.  And verify that underlying data to make sure it's been

21   correctly done, correct?

22   A.  Correct.

23   Q.  And like I said before, all of the reports you produced for

24   Judge Fallon and this court you have done that with, correct?

25   A.  Yes.

1        SPECIAL MASTER JUNEAU:  Let me ask you this question.

2   From the court standpoint, all of the reporting you have done now,

3   logs in the hours, assigns rates, does a calculation which we'll

4   call a lodestar, all of that, is that information recorded and

5   reflected for all of the attorneys in this case in the reports that

6   you've generated?

7        THE WITNESS:  Yes, sir.  In my August 2010 report and the

8   same numbers the judge carried forward.

9        SPECIAL MASTER JUNEAU:  All right.

10  BY MR. RAFFERTY:

11  Q.  Now, in any of these conversations -- well, is it fair, would

12  it be a fair statement to say that you have to be very careful when

13  analyzing or using pivot reports in this type of situation?

14  A.  Yeah, I think the more powerful -- the more versatile the tool

15  gets, the more careful you have to be; and pivotal tables are very

16  versatile but they have to be handled by professionals.

17  Q.  In terms of the -- now, any of the conversations that you've

18  had with Mr. Arceneaux or anybody else, has anybody indicated to

19  you that your work was somehow deficient or unsatisfactory?

20  A.  No.  I think everybody's been complimentary of my work.  That

21  could change in a minute but so far it's been good.

22        MR. RAFFERTY:  Let me see if I can just sum up here and

23  then I am going to ask for a two minute real quick break, Special

24  Master, if that's okay before I say I'm completely done.  I just

25  have to ask one question.

1    BY MR. RAFFERTY:

2    Q.  Let me see if I can sum up very quickly.  You are the court

3    appointed CPA in this Vioxx multidistrict litigation, correct?

4    A.  Yes.

5    Q.  You've been in this position since 2005?

6    A.  Yes.

7    Q.  You've served in this position in other courts, correct?

8    A.  Yes.

9    Q.  You have conducted and validated reports that were produced to

10   Judge Fallon in this case, correct, pertaining to lodestar?

11   A.  Yes.

12   Q.  And pertaining to the calculation of the hours and the billable

13   rates, correct?

14   A.  Yes.

15   Q.  And you understand this is an important job and it's a lot of

16   responsibility, correct?

17   A.  Yes.

18   Q.  And given the gravity of this job, given the gravity of the

19   role that you're playing here, would you be comfortable relying

20   upon pivot table reports to provide information to the court in

21   this case?

22   A.  Not without them being -- not without them being scrutinized by

23   a financial professional.

24   Q.  By a financial professional, such as a court appointed CPA,

25   correct?

1   A.  Yeah, or any CPA.

2          MR. RAFFERTY:  If I could take one moment, your Honor.

3          I think I finally figured it out, Special Master.  I

4   apologize.

5          SPECIAL MASTER JUNEAU:  No problem.

6   BY MR. RAFFERTY:

7   Q.  Mr. Garrett.

8   A.  Yes.

9   Q.  The letters that we were discussing earlier to the different

10  objecting counsels and the letters that you sent out to everybody

11  on the billing rates, correct?

12  A.  Yes, sir.

13  Q.  That material, that was just -- that was the material not only

14  the data you used to calculate or to come up with the billing rate

15  that was ultimately used in the lodestar reports that were provided

16  on the FAC and to the court, correct?

17  A.  Yes, sir.

18  Q.  These letters were never given to the FAC as far as you're

19  aware; is that correct?

20  A.  No, the letters, that's just the work paper to get to the

21  billing rate.

22  Q.  You gave us the outcome of your work which were the billing

23  rates which calculated?

24  A.  Right.

25  Q.  And you explained to the court how you came up with those

1   billing rates, correct?

2   A.  Yes.

3           MR. RAFFERTY:  I think that's all Special Master.

4           SPECIAL MASTER JUNEAU:  Are they giving you the okay

5   sign?

6           MR. RAFFERTY:  I think so.

7           SPECIAL MASTER JUNEAU:  Mr. Arceneaux.

8                           REDIRECT EXAMINATION

9   BY MR. ARCENEAUX:

10  Q.  First of all, these billing rate tables, I just want to make

11  clear.  The one from the Murray Firm and the one for Mr. Weinberg

12  firm --

13  A.  You're talking about the billing letter?

14  Q.  The billing letters.  You got no response, they're blank,

15  right, and if we looked at your chart we would see that you

16  assigned them the average rate of 332.27?

17  A.  Right.

18  Q.  So they did not respond to this letter?

19  A.  Right.  But my point was not that they did not respond, my

20  point was that we really tried hard to get them to respond.

21  Q.  Okay.  The opening sentence of the letter says the Vioxx

22  allocation committee has requested.  I am looking at Pretrial

23  Order 6, which was the first document in this stack of stuff I gave

24  you, and I am not able to find anywhere where Judge Fallon ordered

25  any attorney to give you billing rates.  Are you aware of any place

1    where an attorney --

2    A.  Being a CPA --

3    Q.  -- Pre-Trial Order No. 6?

4            SPECIAL MASTER JUNEAU:  He is getting ready to answer.

5            THE WITNESS:  The Vioxx allocation committee could be my

6    own misnomer that --

7    BY MR. ARCENEAUX:

8    Q.  Says --

9    A.  We were just requesting, the PSC --

10   Q.  Yeah, it says request.

11   A.  Okay.  Go ahead.

12   Q.  It says request, right?

13   A.  Yeah, I was requesting.

14   Q.  I am looking at Pretrial Order No. 6, which is up on the screen

15   now, under guidelines for time reporting on page 5, and it has very

16   detailed guidelines of what lawyers were obliged by the court to

17   provide.  And I don't see anywhere in this order where they were

18   ordered to give you billing rates.

19   A.  Okay.

20   Q.  So if someone chose not to respond to your letter they weren't

21   violating the court order, were they, your letter was just a

22   request?

23   A.  That would be a legal decision, not mine.

24   Q.  And it says the Vioxx Allocation Committee.  So it really

25   wasn't your request, it was the FAC's request, even though they

1    claimed they never saw these letters, they asked you to send these

2    letters out, the Vioxx Allocation Committee --

3    A.  They asked me to do lodestar values.

4    Q.  Okay.  That's fine.

5            MR. RAFFERTY:  Are you done?

6            MR. ARCENEAUX:  No.

7    BY MR. ARCENEAUX:

8    Q.  Mr. Rafferty asked you, and this confirms my understanding, I

9    agree with his assessment, this confirms our conversation that you

10   didn't do a subjective analysis, that wasn't your job, you didn't

11   decide whether the hours were useful, whether they were valuable,

12   whether they were necessary.  I mean, we -- everybody agrees with

13   that, that's beyond your area of expertise.

14           My question is, when the Plaintiff Steering Committee

15   used your calculation in their filing in court, they used your

16   calculation to the penny, to the hour, correct, they didn't exclude

17   any hours themselves as being unnecessary to the common benefit?

18   A.  The hours that I put in my affidavit were in a certain motion.

19   Q.  They excluded none of your hours that you calculated as being

20   compliant with Pretrial Order 6(1) that said only common benefit?

21   A.  The only answer I would have to that is when you showed me this

22   chart here that excluded, that discounted a lot of the hours or

23   values, maybe that's where they were doing it at, that's the only

24   answer I can give you.

25   Q.  I'll reserve comment on that for closing argument.  But in the

1   official submission that was filed by, we looked at it, it was

2   Exhibit No. 2 --

3           SPECIAL MASTER JUNEAU:  CE-2.

4   BY MR. ARCENEAUX:

5   Q.  -- CE-2 in their fee petition they relied upon your hours, they

6   didn't question a single hour, correct?

7   A.  Correct.

8   Q.  Okay.  Thank you.  All right.  Now, you said something at the

9   very beginning, and I am not criticizing your work, the last thing

10  you said -- our conversations have been extremely pleasant and

11  you've been extremely helpful.  We did have a little problem with

12  the reconciliation issue.

13          MR. SEEGER:  Objection.

14          SPECIAL MASTER JUNEAU:  Let him answer the question.

15          MR. ARCENEAUX:  I am not criticizing your work, I just

16  want to lay that predicate.

17          SPECIAL MASTER JUNEAU:  You're laying a predicate?

18          MR. ARCENEAUX:  Well, yes, I just want to make clear that

19  I am not criticizing his work or ability.

20          SPECIAL MASTER JUNEAU:  Go ahead.

21          MR. ARCENEAUX:  But there is something I don't

22  understand, and it's going to sound like a criticism and it's not

23  meant to be.

24  BY MR. ARCENEAUX:

25  Q.  You said two CPAs were hired to make sure when you went from

1    the Access system to the web-based system that not one name was

2    wrong and not one hour was wrong.

3    A.  Your question is what?

4    Q.  My question is, isn't it a fact that as of last week you went

5    into the web-based system and changed stuff from the Access

6    database way back from 2008, you added more hours and changed

7    names, as late as last week?

8    A.  No.

9    Q.  It's not a fact?

10   A.  No.

11   Q.  Are you certain about that?

12   A.  Pretty certain.  I may have changed --

13   Q.  Somebody else in your firm may have done it?

14   A.  You may be referring to the web-based program may have inputted

15   hours prior to July of 2010.  I did not go back in, I have never

16   gone back in and changed the July 2010 Access database.  I wouldn't

17   have the ability to go in and change the access database.

18   Q.  No, no, that wasn't my question, that you changed the Access

19   database.  But adjustments were made in the last week to account

20   for stuff that was reported in the Access database, adjustment,

21   adjusting entries were made, things that were in Access that should

22   have been reported and were checked by two CPAs to make sure that

23   not one hour was missed, that as late as last week, someone, maybe

24   not you, went into your web base and made adjusting entries to go

25   back and change stuff --

 1   A.  You would have to show me the entry.

 2              MR. RAFFERTY:  We have an objection.  Lack of foundation.

 3              MR. ARCENEAUX:  He doesn't know.

 4              MR. RAFFERTY:  Argumentative, compound and --

 5              SPECIAL MASTER JUNEAU:  I am going to sustain it.  You

 6   have a particular thing you want to address?

 7              MR. ARCENEAUX:  Mr. Markowitz will go through that.

 8              SPECIAL MASTER JUNEAU:  Then I am going to sustain the

 9   objection.  I don't know that Mr. Markowitz at this stage, we don't

10   know if he is going to testify.

11              MR. ARCENEAUX:  My only point is that he said that

12   nothing has been changed and I am asking him whether --

13              SPECIAL MASTER JUNEAU:  My point is in terms of evidence

14   and foundation, you have to lay a foundation for the question.  If

15   you want to ask him a question, then give him the error that was

16   made and in fairness to the witness he can answer the question.

17   That's common fairness.  Aside from the Code of Civil Procedure.

18   And I will allow the question and he can answer it as best he can.

19   BY MR. ARCENEAUX:

20   Q.  Let's talk about pivot tables for a second, and I don't want to

21   spend a whole lot of time on it because you haven't ruled whether

22   they're admissible.  You aren't suggesting to the court that in the

23   hands of a capable and competent person who is skilled and

24   knowledgeable in the use of what is the gold standard program

25   worldwide for database and analysis that pivot tables are

1    inherently unreliable, are you?

2           MR. RAFFERTY:  Objection, lack of foundation.

3           MR. ARCENEAUX:  What foundation?  You're not suggesting

4    now, are you --

5           SPECIAL MASTER JUNEAU:  Counsel, the way this works is

6    you ask a question, he objects, I make the ruling.  This is my

7    ruling, I am going to allow you to answer the question and the

8    objection is overruled.

9           MR. ARCENEAUX:  Thank you, your Honor.

10          SPECIAL MASTER JUNEAU:  That's the procedure.

11          MR. ARCENEAUX:  Thank you, your Honor.

12          THE WITNESS:  No, I am not suggesting that Excel is not a

13   good program.  I think what I was suggesting was that the more

14   powerful the tool, the more versatile the tool, the more dangerous

15   the tool in the hands of an unskilled operator.

16   BY MR. ARCENEAUX:

17   Q.  In the hands of someone very skilled and in the hands of

18   someone who did work and checked it maybe five or six times on

19   multiple different levels, there isn't any reason to automatically

20   suspect that a pivot table isn't accurate, is there?

21          MR. RAFFERTY:  Objection.

22          THE WITNESS:  I guess my testimony was the fact that I

23   would not give to courts the pivot table itself for it to go run

24   reports because I think that would be very dangerous.  I think the

25   two reports, No. 27 and No. 28, I showed how dangerous they were.

1  BY MR. ARCENEAUX:

2  Q.  We're going to look at that in a second.

3  A.  I'm sure you will.

4  Q.  I'm talking about the value of the a pivot table, why we used a

5  pivot table instead of relying on the reports.  The things that you

6  gave to Judge Fallon and in the record on static.  By that I mean

7  if the judge found that a number needed to be changed, hours were

8  incorrectly reported by a whole category of people or that a whole

9  bunch of rates needed to be change, the reports that you gave him

10  since they're printed out and static, they would not allow him or

11  anyone knowledgeable with Excel to simply enter into the software

12  and make that change, would they?

13  A.  Absolutely they would.

14  Q.  They would not?

15  A.  Absolutely they would.

16  Q.  They would?  How would they do that?

17  A.  Absolutely.  If you changed Danny Becnel's billing rate from

18  335 to 550 it will take me about two minutes, it may take you 30

19  seconds, it may take me two minutes in Excel.

20  Q.  But you would still need the software, you would still need the

21  program?

22  A.  Sure.

23  Q.  You just said to do it in Excel?

24  A.  Sure.

25  Q.  The things that are in the record right now, your Excel charts

1    are not in the record, are they, it's only printouts of your charts

2    that are static, they are not subject to change?

3    A.  Oh, I'm sorry, you're right.  I like static reports, I don't

4    like versatile.  I don't like things that will change.

5    Q.  So the things that are in the record right now are not a tool

6    that the court could use, if it found, for example -- let me just

7    give you an example.  Say Judge Fallon or Master Juneau decided

8    that all of the hours that were performed in this case after the

9    settlement should be cut in half because post settlement

10   administration hours are not valuable, they couldn't use your chart

11   and make that change, could they?

12   A.  First of all, I guess my impression of Special Master Juneau

13   and Judge Fallon is that their concern is what should happened, he

14   cut the hours or not, they're going to make the decision, the

15   actual calculation when he says this is what should happen, they're

16   going to turn it over to the professional, a CPA, a programmer or

17   somebody else to actually do the calculations for them.

18            So they would not, I don't think, I don't think they

19   would want a tool that says, here, Special Master Juneau, go type

20   in the numbers and change the rates.  That would not be something I

21   don't think you would want.

22   Q.  I don't think that answers my question with all due respect.

23   A.  Okay.

24   Q.  The reports that you provided would not allow them to do that?

25   A.  Right.  A piece of paper is not going to change unless you do

1  something to it.

2  Q.  And the properly constructed pivot table would allow a

3  financial person, yourself or any skilled person, any skilled

4  programmer to make those changes, pivot table would be a useful way

5  to do it, you could do it in a flash.  You just go into the table

6  and change those rates, punch a button, and you would have the

7  answer?

8  A.  With all due respect, I am not trying to be argumentative, but

9  the paper is not going to change.  But whether I had an Excel

10  spreadsheet or pivot table within an Excel spreadsheet, either one

11  of them would work.  I am suggesting I would not give those kind of

12  tools to a non-financial computer guy.

13        SPECIAL MASTER JUNEAU:  Let me ask you this question.  If

14  whatever decision is made, that's what all of these proceedings are

15  about, and it would determine that some change would be made

16  according to this hearing if we just said that Judge Fallon says I

17  don't like how this is reported, I don't find it reliable, I am

18  going to cut the hours in half, I am going to apply lodestar and

19  $315,000,000 I think I awarded I want to cut that in half and I am

20  going to start there.  And I want to then apply to each of the

21  people involved, if once the basic decisions were made from the

22  decisional standpoint, they call upon you based upon the data you

23  have to make those changes?

24        THE WITNESS:  Absolutely.

25  BY MR. ARCENEAUX:

1    Q.  But it would have to be done how?

2    A.  I mean --

3    Q.  Monstrous calculations by hand, right?

4    A.  No.  If you told me to cut the hours, take a fee of $200

5    million and allocate it by the hours, I can do that in a few

6    minutes.  Doing the calculation to me is pretty simple.  Verifying

7    the calculation and coming to the decision of what calculation to

8    make are the hard part.

9    Q.  I think -- with all due respect I don't think you answered

10   Master Juneau's or my question.  You said --

11           SPECIAL MASTER JUNEAU:  He answered mine.

12           MR. ARCENEAUX:  He didn't answer mine.

13           SPECIAL MASTER JUNEAU:  If you got a question, ask him

14   now, but I am satisfied with what he told me.

15   BY MR. ARCENEAUX:

16   Q.  All right.  You said you could do the calculation?

17   A.  Sure.  That's what he asked me.

18   Q.  But the court itself from the static sheets could not do it,

19   correct?

20   A.  Oh, correct.

21   Q.  That's the point I am trying to make.  And from the reports

22   that you generated, do you recall in our phone conversations we

23   talked about using your web-based program to generate a report like

24   the one that Mr. Markowitz ultimately generated, and you said you

25   would have to call in programmers to do it?

1   A.  And I did and I believe I sent you the additional lodestars I

2   believe.

3   Q.  But you would have to call in programmers to do it?

4   A.  I did.

5   Q.  That your web based program is not capable to do?

6   A.  The web-based program, that's another level well above pivot

7   tables.

8   Q.  The web-based program is pivot tables?

9   A.  No, I said it's well above.

10  Q.  Oh, it's higher than pivot tables?

11  A.  Right.

12  Q.  It's more complicated?

13  A.  I think it is.

14  Q.  Oh, wow.  The more powerful the program, the more careful you

15  have to be; but you relied on those programs --

16  A.  Do you remember when I was talking about can reports that

17  didn't change and versatility --

18  Q.  It's a higher level of program?

19          MR. RAFFERTY:  Excuse me, can we let -- question and

20  answer, please.

21          THE WITNESS:  I think we understand each other, I don't

22  want to argue with you.

23  BY MR. ARCENEAUX:

24  Q.  I don't want to argue with you either.

25  A.  Okay.

 1    Q.  I really don't.  And we did establish earlier on, let me just

 2    make sure because one of the questions that was asked had to do

 3    with what Mr. Markowitz's work product produced that was not

 4    already in the record.  We did establish that the -- from what's on

 5    the web program, the level of detail going back to monthly/hourly

 6    reporting could not be generated without calling in programmers?

 7    A.  Correct.

 8    Q.  So your web-based program is incapable of doing the tasks that

 9    Mr. Markowitz was assigned, without programmers coming in and

10    writing new code?

11    A.  The hourly, the hours by month were never put into the

12    web-based program, so I would have to go input that information and

13    I have never seen the reason for doing it and the court has never

14    asked me to do it.

15    Q.  Okay.  You said you would not allow a pivot table to be used

16    unless it was scrutinized by a financial professional.  Why do you

17    think a CPA is more knowledgeable?

18    A.  I didn't say a CPA, I said a financial professional.

19    Q.  Oh, so for example, if you had someone who had a degree in

20    hardware and software engineering and robotics, which is the

21    interplay between hardware and software, and they spent four years

22    working for a huge financial services company, and all they did for

23    those four years was database management using Excel and pivot

24    tables, that person would be financial professional capable?

25          SPECIAL MASTER JUNEAU:  We have an objection.

```
 1                MR. RAFFERTY:  Objection, lack of foundation, improper.

 2                MR. ARCENEAUX:  I am just posing a hypothetical question.

 3     You said it didn't have to be a CPA, right?

 4                SPECIAL MASTER JUNEAU:  Yes, he said that.

 5                MR. ARCENEAUX:  Okay.  Fine.  Now the last thing I need

 6     to cover is the chart.  Because the thing that was put up on the

 7     screen, I don't want to see that anymore because that's not

 8     accurate.

 9                MR. RAFFERTY:  This is what you gave us, this is what you

10     sent us.

11                MR. ARCENEAUX:  I sent you the actual chart, you printed

12     this out wrong.

13                MR. RAFFERTY:  They are on paper and they have ink on

14     them.

15                MR. ARCENEAUX:  I want to look at the actual charts

16     because if you look at the actual charts themself, not these

17     printouts which are a collapsed version of the chart, I want to

18     look at the actual chart and see if we can't explain, for example,

19     this anomaly about the Becnel billing to look at the actual chart.

20                SPECIAL MASTER JUNEAU:  Do you have an exhibit to that

21     effect?

22                MR. ARCENEAUX:  Well, I do, but unfortunately it is the

23     pivot table.

24                SPECIAL MASTER JUNEAU:  Are we going to show it up here?

25                MR. ARCENEAUX:  Yes.
```

1          THE WITNESS:  That says database.

2          MR. ARCENEAUX:  I haven't loaded the chart yet.  Give me

3   a second.

4   BY MR. ARCENEAUX:

5   Q.  First of all, this is the pivot table that Mr. Markowitz is

6   going to introduce, and down here at the bottom of the page you see

7   all of these tabs.  And the first page says instructions and down

8   here, right there, I don't know if we can see it, it shows Garrett

9   reference and shows a total number of hours and a total lodestar

10  and it shows a current amount, which is the amount that's reflected

11  on the pivot chart, and a total amount and the difference is 26

12  cents, right, and there is no difference in the hours, it says

13  zero.

14  A.  Right, I forgot what the adjustment was.

15  Q.  257,562 hours and --

16  A.  You're dealing with $250 of 250 million, that's pretty close.

17  Q.  The hours are exact, aren't they, 573,562.03.

18  A.  I can't see that from here, I don't know, is that a half hour

19  difference?

20          MR. ARCENEAUX:  We'll get it with Mr. Markowitz.

21          SPECIAL MASTER JUNEAU:  He's not disputing that.

22          THE WITNESS:  I am okay with that static chart, I am very

23  okay with that.

24  BY MR. ARCENEAUX:

25  Q.  This is the pivot table itself, by the way, and let's go down

1    to Mr. Becnel because there was a question about him.

2          What the defendants didn't do when they showed you this

3    next to Mr. Becnel's name on this chart, and this is the value,

4    this is the power of a pivot table, let me find it, there's a

5    little plus sign right here, and if you click that little plus sign

6    all of a sudden a bunch of information gets revealed.

7          Now, if we go back -- it looks like the billing rate

8    there for Mr. Becnel is 595.76, but anybody who had any knowledge

9    whatsoever of Microsoft Excel would know that all they need to do

10   is push that plus sign, right?

11         MR. RAFFERTY:  Is there a question any time?

12   BY MR. ARCENEAUX:

13   Q.  My question is, if you push that plus sign it expands the

14   chart, correct?

15   A.  Does that not prove my point that the pivot table is powerful

16   tool?

17   Q.  I am asking you that, I am asking you a question --

18         SPECIAL MASTER JUNEAU:  Counsel, I am going to say it for

19   the last time.  I want to keep this orderly, it's time we practice

20   law the way it ought to be practiced.  You asked the question, he

21   has a right to object, he answers, I'll make the ruling, you asked

22   him a question, you interrupted him.  Let him answer the question.

23         THE WITNESS:  I think what you're showing me right now is

24   my point, you shouldn't put a pivot table into the court and I know

25   and I didn't get the chart itself, I just got the printout, if you

1    go hit the plus sign you will see the detail behind it.  That's

2    both the power of the pivot chart and the danger of the pivot

3    chart.

4            If somebody that doesn't know that is going to look at

5    that and think that you multiply 13,000 hours times $500 and you

6    get the resulting number, and that ain't true, that's why you have

7    to be careful.

8            That was my whole point.  I am not saying pivot charts

9    are bad, I am saying they are very dangerous in the hands of a

10   person that doesn't know to go hit the plus sign to see the real

11   numbers.

12   BY MR. ARCENEAUX:

13   Q.  So I expanded it again and now we see Daniel Becnel on line 76

14   and we see quite clearly that his rate is 332.07, which is the rate

15   you gave him, and if you multiply that times his hours it's the

16   correct lodestar?

17   A.  And I think you and I would probably agree the 406 hours is the

18   total of all Daniel Becnel's hours that have been listed by month

19   below that, and you and I would probably agree that the 406

20   hours -- right, okay.  And that you and I would probably agree that

21   the 406 hours that he put in of the 13,000 hours times his rate

22   would equal that value.

23           So I understand, I don't think you and I would have a

24   problem discussing the pivot chart.  I just don't think I should

25   give that --

1    Q.  Well --

2    A.  But that's my opinion, I could be wrong.

3    Q.  So here is my question.  You say it could be dangerous, now

4    that you've explained it on the record that all you have to do to

5    make sure that you look at a pivot chart correctly is push the plus

6    and see what's underneath, how is there any possibility of

7    confusion?  Anybody who reads this record is going to know what to

8    do, right, they just need to push the plus sign?

9           MR. RAFFERTY:  Objection, your Honor, that is not all

10   what he testified to.

11          SPECIAL MASTER JUNEAU:  I am going to allow him to answer

12   the question.

13   BY MR. ARCENEAUX:

14   Q.  You put that on the record, you told the court and anybody

15   reading this record that the correct way to look at a pivot chart

16   is to push the plus sign and make sure that you see the data that's

17   underneath.

18          SPECIAL MASTER JUNEAU:  Counsel, he has testified

19   extensively about that.  He talked about the complexity of the

20   problems that's presented.  I am just telling you what his

21   testimony is.  He answered that question, let's move on to

22   something else.

23          MR. ARCENEAUX:  I'm finished.  Thank you.

24          SPECIAL MASTER JUNEAU:  Do you have any follow-up?

25          MR. RAFFERTY:  Two questions.

```
 1                          RECROSS-EXAMINATION

 2    BY MR. RAFFERTY:

 3    Q.  First of all, can you calculate a lodestar without getting the

 4    billable rates?

 5    A.  No, you cannot.

 6    Q.  Do you have to have some billable rates?

 7    A.  You have to have a billing rate.

 8    Q.  And all of the hypothetical in terms of calculations if they

 9    were to be done, if somebody were to request you do them cutting

10    these hours, that's all stuff you could do using the program and

11    everything and all of the materials you have, correct?

12    A.  Sure.

13              MR. RAFFERTY:  Thank you.  That's all.

14              SPECIAL MASTER JUNEAU:  You may step down.  Thank you

15    very, very much.

16              THE WITNESS:  Thank you, sir, very much.

17              SPECIAL MASTER JUNEAU:  We have to make sure that the

18    exhibits don't walk.

19              MR. ARCENEAUX:  Your Honor, there's one question I forgot

20    to ask.

21              SPECIAL MASTER JUNEAU:  To ask him?

22              MR. ARCENEAUX:  Yes, Mr. Garrett.

23              SPECIAL MASTER JUNEAU:  Mr. Garrett, this is going to be

24    a little different.

25              MR. ARCENEAUX:  There is something you said --
```

1        SPECIAL MASTER JUNEAU:  Counsel, we don't operate that

2   way.  Mr. Garrett, come up here and just stand at the podium, and

3   you can stand next to him, and you can ask him the question and he

4   is going to answer.  And if there's an objection, I'll let him

5   answer.

6   BY MR. ARCENEAUX:

7   Q.  At the conclusion of your testimony you talked about an attempt

8   to verify the activity chart and you came up with 50,000 hours that

9   were different?

10  A.  No, I said $50,000.

11  Q.  Can you explain that?  I don't understand.

12  A.  You have to look at the underlying data, I'm just teasing.  The

13  answer was is that you have February information in there and for

14  some reason when I collapsed everything just to those the class of

15  employee, it brought in the February data which was $50,000 more

16  than what it was before and I didn't know you had February data in

17  there.

18        So I was kind of doing the report on the fly and it came

19  up with $50,000 different number, it took me a little while to

20  figure out why I came up with the number.  I'm so familiar with the

21  numbers it didn't me long to figure it out.

22  Q.  Was it for a particular person?

23  A.  I think it was the Levin Fishbein firm because they filed their

24  stuff very promptly, so they had filed it promptly.

25        MS. WOODWARD:  So it's an addition --

```
 1            SPECIAL MASTER JUNEAU:  Just a minute, if you have a
 2   question, Mr. Arceneaux, ask him.  We passed the one question.
 3            MR. ARCENEAUX:  I am finished.
 4            SPECIAL MASTER JUNEAU:  He is finished.  Mr. Garrett,
 5   thank you very much for your time.
 6            Counsel, now, I would like, I have next on the scheduling
 7   we have listed as Joey Markowitz, that's Mr. Arceneaux again.
 8            MR. ARCENEAUX:  I would like to call Joey Markowitz.
 9            SPECIAL MASTER JUNEAU:  Before we get there, we have a
10   motion that's filed; is that correct?
11            MR. LEVIN:  Yes, sir.
12            SPECIAL MASTER JUNEAU:  And it's a motion to I guess you
13   would call it to exclude.
14            MR. LEVIN:  To exclude his testimony.
15            SPECIAL MASTER JUNEAU:  Let's address the motion first.
16            MR. LEVIN:  May I have a moment for a personal privilege.
17   I need about two minutes and I would like to -- I don't want to
18   characterize it the way we characterize it in the military, but
19   you're doing a lot better than me, your Honor.
20            SPECIAL MASTER JUNEAU:  The bottom line is you want to
21   take a bathroom break?  We'll take five minutes for everybody.
22        (WHEREUPON, A RECESS WAS TAKEN.)
23        (OPEN COURT.)
24            MR. LEVIN:  Good afternoon, your Honor.  For the record,
25   Arnold Levin.
```

    1              SPECIAL MASTER JUNEAU:  Counsel, take a seat, please.

    2         MR. LEVIN:  Before I go into whether he's an expert,

    3    whether he is not an expert, whether we need a report, whether we

    4    do not need a Rule 26 report, I think the testimony of our last

    5    witness made it clear that whatever this pivot program is, it's not

    6    necessary.  The court engaged a CPA.  The CPA performed the

    7    function.  Whatever the Special Master needs or the court needs can

    8    be garnered by the CPA's records rather than superimposing another

    9    program, another tool that may or may not be reliable, and I'll get

   10    to that.

   11         We already have a very, very, very reliable record.  We

   12    have a record that this court, Judge Fallon, has used in Propulsid,

   13    intends to use in Vioxx, is using in Chinese Drywall, and the

   14    Eastern District of Louisiana court is using in British Petroleum.

   15    We don't need another tool, especially one that comes to this court

   16    on the 11th hour, over the weekend like Mary Poppins suddenly the

   17    pivot program drops in.

   18         We don't have -- whether it's an expert report or a

   19    non-expert report, we have absolutely no information as to what the

   20    objectors intend to prove.  We don't have charts, we don't have

   21    indications on what they produced, what they're going to use.  We

   22    are being blindsided and we are being ambushed, and it's just not

   23    fair.  We have no way whatsoever to test the reliability or the

   24    verification of anything that comes into this courtroom this

   25    afternoon when we've been given nothing and it came to us that Joey

1     Markowitz, a programmer, is going to testify.

2          I know Joey Markowitz has been educated as a programmer.

3     I've Googled him -- or at least somebody has Googled him for me.  I

4     know what movies he likes, he likes the *Matrix*, he likes to roller

5     skate, but I don't know what he's testifying to today because the

6     objectors haven't given it to us.

7          Now, what they have said to this court is he will not

8     render expert testimony.  Sitting here this afternoon, you know

9     that anything that comes out of his mouth is an opinion and it's an

10    expert opinion; and by virtue of what counsel for the objectors

11    said, they said he is skilled, he went to school, he's trained,

12    he's a superb programmer.  Well, then he is not a fact witness

13    because under Federal Rule of Evidence 701, an opinion can't be

14    based on scientific, technical or other specialized knowledge

15    within the scope of Rule 702.

16         So he's not an expert or he's -- he is not being

17    proffered as an expert.  If he is an expert, where is the -- where

18    is our report, our Rule 26 report?  We haven't gotten it.  If he is

19    going to come in here and push a key, somebody has to interpret

20    what that is.  A CPA.

21         Well, if he is not an expert, he can't interpret it; and

22    if there is an expert that has to interpret it, we don't have a

23    Rule 26 report.

24         Under the circumstances, I'll be brief, under Rule 37

25    this report and any testimony that was going to be given as a

 1   result of this report has to be excluded.  I mean, it's circular.

 2   If he is not an expert, he can't give an opinion; and if he is an

 3   expert, he hasn't given a report.  And we have no way of testing

 4   the reliability of anything that he testifies to.  Nor does he have

 5   any way, that is the objectors, of proving the reliability because

 6   reliability requires an expert.

 7          SPECIAL MASTER JUNEAU:  All right.  Ms. Woodward.

 8          MS. WOODWARD:  If your Honor please.  Blindsided?

 9   Ambushed?  We just took Andy Birchfield's deposition last Friday.

10   This is Thursday.  It's been less than a week.  It's been less than

11   two weeks since we were told that we could have an expert.  There

12   has been no attempt here --

13          SPECIAL MASTER JUNEAU:  I am more concerned about the

14   other issues, the blindsided part doesn't bother me.  But there are

15   some serious issues, that's what I would like you to address.

16          MS. WOODWARD:  And I will address that because there was

17   no time to do an expert report, but until we put Joey Markowitz on

18   the stand to speak for himself, I don't see how the court can rule

19   on the admissibility of his work.  You haven't heard from him yet

20   what he's done and what he is prepared to offer.  So we're arguing

21   this motion a little bit in advance of our opportunity to explain

22   what we're trying to get at here.  But --

23          SPECIAL MASTER JUNEAU:  Let me ask you a couple of

24   questions.  I really want to get to the heart of the matter and I

25   want really truly get to the merits, which is a lot of material to

1   review and do an intelligent analysis of what my assigned duties

2   are.

3          A couple of questions.  One is, I have your -- it's very

4   clear, and I think at least both sides have told me and your side

5   has told me, you will not and declared you will not be calling and

6   are not calling him as an expert.

7          MS. WOODWARD:  That's correct.

8          SPECIAL MASTER JUNEAU:  Now, in the brief that was

9   submitted to me from your side, you say that Mr. Markowitz is a

10  data minor analyst with a degree in both hardware and computer

11  software and so forth and experience working with programing.

12  Programs would be necessary to produce a chart that's necessary for

13  this court.  The point I am making about that sentence is,

14  obviously there is an educational level of experience that kind of

15  goes beyond what I anticipated to be fact material.

16         Let me go further.  The second thing it says is that in

17  order to understand and work with Mr. Garrett's program in the last

18  week when the hearing is fast approaching, Mr. Markowitz

19  determined, made it, he made a determination based on your brief on

20  the experience and education that he has, he made that decision --

21  to me that's opinion -- that the best solution to work with, he

22  made the decision what this court thinks is the best way to handle

23  the evidence here.  Why isn't that -- if it looks like a duck,

24  sounds like a duck, isn't it a duck, isn't that what you're saying?

25         MS. WOODWARD:  It took expertise to import Mr. Garrett's

data into a new shell, that's all this Excel program is, it's simply a shell. However, Mr. Garrett himself confirmed from the stand that those, what is in Mr. Markowitz's shell is entirely Mr. Garrett's data. So all he's done is created a new shell to put the data into. And now all it is is an Excel program.

SPECIAL MASTER JUNEAU: Doesn't he have to have the expertise to determine whether what he is using, the pivot program, whatever you call it, he has made and has to have expertise and opinion that that program or that system accomplishes what you say it ultimately will result. How can you avoid that?

MS. WOODWARD: I can't avoid that.

SPECIAL MASTER JUNEAU: You can't?

MS. WOODWARD: I cannot because that's what we've been discussing all along, that it took an expert to do this. Mr. Garrett can't do it himself. He relies on programs.

But once we got to the point where Mr. Garrett was able to verify that the data is his data and that it's harmonized, what we have now is simply a very elegant, easy, reliable tool. Now, I understand Mr. Garrett's testimony that that's a dangerous thing, maybe in the wrong hands. But it is a simple, reliable piece of software and used everywhere, and if Mr. Markowitz can testify now to the application of that program to the data that is Mr. Garrett's data, really all you have to do is push buttons. And it would be extremely useful.

SPECIAL MASTER JUNEAU: Let me ask you this question. I

1    was very careful what I asked him because it's important for me to

2    know and whatever person beyond today would need to know.  Do we

3    have in this record based on the reports he's made adequate and

4    sufficient evidence that we, I and some other person has to make

5    the decisions we'll have to make, which are as you know

6    undetermined at this point, the court appointed CPA told me --

7    questionably I had that doubt in the record.

8              Now, what you're saying is I want to give you, you or the

9    court another tool that can take that same data and put it in some

10   other format and it would make it easier for that.  You're not

11   saying I don't have it, I wouldn't have the data, I mean, you're

12   not saying I don't have the material to make the decisions I have

13   to make in this case, you're just saying that this is an easier

14   format we have to call somebody who has expertise because I don't

15   know if anybody else in this room that can make that opinion that

16   has Mr. Markowitz background to really make that conclusion, isn't

17   that what your we're saying, or you're saying?

18             MS. WOODWARD:  We have the data, we have a huge universe

19   of data which Mr. Garrett has applied himself and a very large

20   staff to input it into programs and this Access program and another

21   program from which they can't be used by anybody other than

22   himself.  Now, it's true that if the court were to call Mr. Garrett

23   and say to him I want you to do this, this, this, this, this, this

24   and this to your report --

25             SPECIAL MASTER JUNEAU:  Right.

1          MS. WOODWARD:  -- the data is there and he could do it.

2     But he couldn't do it very easily, it would take doing what

3     Mr. Markowitz --

4          SPECIAL MASTER JUNEAU:  But the question is could he do

5     it?

6          MS. WOODWARD:  He could do it.

7          SPECIAL MASTER JUNEAU:  And he developed the data and

8     court appointed expert -- whatever I would do if I changed one

9     penny, I would use the court appointed CPA to do that calculation,

10    I am not a mathematical genius, but I am at least intelligent

11    enough to know that I can call on people under court appointment

12    who can do it.  It's not really a question of whether we can do it

13    or not, it's an interpretation of whether it's easier or not or in

14    another format.

15         My ruling is that, first of all, it is virtually

16    impossible for Mr. Markowitz to testify in this case and give

17    testimony based on the comments made in his brief and the oral

18    presentation that he wouldn't have to voice expert opinions about

19    the underlying data.

20         Additionally, I want the record to reflect that it is my

21    finding and conclusions that we have and are going to have the data

22    in the record of sufficient reliability, at least to my

23    satisfaction, to make the ultimate decisions that will have to be

24    made in this case based on the arguments that are made.

25         Accordingly, I am going to grant the motion and not

```
 1    permit Mr. Markowitz to testify.
 2              MS. WOODWARD:  Thank you, your Honor.
 3              MR. ARCENEAUX:  May I, your Honor, just briefly?
 4              SPECIAL MASTER JUNEAU:  No, that's the end of that issue.
 5    I've heard the argument, your counsel's already argued the case.
 6              MR. BIRCHFIELD:  Your Honor, one housekeeping matter if I
 7    could.  During Mr. Becnel's testimony you asked about, I was asking
 8    him about an exhibit that dealt with the Stratton matter and you
 9    asked if it was in the record.
10              SPECIAL MASTER JUNEAU:  I did.
11              MR. BIRCHFIELD:  Actually there were three and I told you
12    that I would check and see if they were not, and that I would offer
13    them at that time.  Two of the three are, the third one is in the
14    record but it was not complete, the one that he submitted did not
15    include the copy of the Rule of Professional Responsibility, so we
16    would just offer this as --
17              SPECIAL MASTER JUNEAU:  It's just the attachment to the
18    letter.
19              MR. BIRCHFIELD:  So we just offer at this point to make
20    this complete.
21              SPECIAL MASTER JUNEAU:  I will allow it to be complete.
22    Counsel, we will reconvene at nine o'clock in the morning.
23              MR. ARCENEAUX:  Your Honor, may I?  I at least have the
24    right to say that we will proffer the charts, and we will do it by
25    affidavit.
```

 1          SPECIAL MASTER JUNEAU:  You have an absolute right to do

 2   that.

 3          MR. ARCENEAUX:  And one more point I wanted to make out.

 4   There is a chart that Mr. Markowitz prepared that is not his own

 5   chart.  It's modifications to Mr. Garrett's chart that shows the

 6   rate changes for those people who feel their rates were wrong.  Can

 7   Mr. Markowitz at least take the stand and introduce -- it's not his

 8   own data, it's Mr. Garrett's data.

 9          SPECIAL MASTER JUNEAU:  The rules are very clear,

10   Mr. Arceneaux.  I am going to allow you to make a proffer.  You

11   want to make a proffer, I've made my ruling, I am not going to

12   admit it into evidence but you can make a proffer.  I am going to

13   allow you to do that right now.  If you want to make a proffer do

14   it.  Whatever you want to proffer I am going to allow you to do

15   that.

16          MR. ARCENEAUX:  We're going to proffer exhibits -- we're

17   going to proffer Exhibit No. 26, Mr. Joey Markowitz's CV; Exhibit

18   27, Mr. Markowitz's Vioxx, all data final report version 3, which

19   is Microsoft Excel file --

20          MR. LEVIN:  Excuse me, may I see those exhibits?  No, the

21   exhibit itself.

22          MR. ARCENEAUX:  I sent them to you, they're electronic

23   files.  They're electronic files, there is no hard copy, it's an

24   electronic file.

25          Exhibit 28 is Mr. Markowitz's Vioxx all data final chart

 1   with some adjustments that were made by him, instructed by me to

 2   change hourly rates for those attorneys whose rates were

 3   underreported.

 4          Exhibit 29 -- I'm sorry that was Exhibit 27.  Oh, Exhibit

 5   28 has multiple parts.  Exhibit 28A is Mr. Markowitz's adjustments

 6   to his own chart.

 7          Exhibit 28B, which is the one I thought I would not

 8   require any expert testimony, is Mr. Markowitz's adjustments to

 9   Mr. Garrett's chart, that simply shows for those attorneys whose

10   rates were inaccurate using Mr. Garrett's own data, the blue, the

11   purple and the brown column show what the new totals would be.

12          SPECIAL MASTER JUNEAU:  Okay.

13          MR. ARCENEAUX:  And I would also like to submit an

14   affidavit.

15          MS. WOODWARD:  No, let's proffer his testimony.

16          SPECIAL MASTER JUNEAU:  Excuse me?

17          MS. WOODWARD:  Just take 15 minutes to proffer his

18   testimony.

19          MR. ARCENEAUX:  I'd like to do it by affidavit.

20          SPECIAL MASTER JUNEAU:  What do you want to do?

21          MR. ARCENEAUX:  I'd rather proffer the substance of his

22   testimony by affidavit rather than waste the court's time.  We will

23   just submit an affidavit as to what he would say if we were allowed

24   to testify.

25          MR. LEVIN:  That's the proffer.  I object to the proffer.

1    Everything in that proffer can only be calculated and determined by

2    virtue of the Markowitz opinion, which has already been excluded.

3    They're trying to get in the back door what they couldn't get in

4    the front door.

5          MR. ARCENEAUX:  It's a proffer.

6          SPECIAL MASTER JUNEAU:  Let me make this very clear.  The

7    evidence is excluded, I've already articulated the reasons the

8    material would not be relevant on the part of the court.  I've

9    already articulated the reasons for that.  This is a proffer, I am

10   allowing him to proffer that.  It is not part of the considered

11   record.

12         MR. ARCENEAUX:  And consistent with your ruling, your

13   Honor, I had burned the CD's.  I will go home and burn them again

14   and take that stuff out and put it on separate CD called Proffer 1

15   so there will be no confusion that it's not part of your evidence.

16         SPECIAL MASTER JUNEAU:  If you want to do it by affidavit

17   and proffer?

18         MR. ARCENEAUX:  Yes.

19         SPECIAL MASTER JUNEAU:  I will allow it.

20         MR. ARCENEAUX:  We will submit an affidavit from

21   Mr. Markowitz about what he would have testified to, there is no

22   need to waste your time.

23         SPECIAL MASTER JUNEAU:  We will reconvene at nine o'clock

24   in the morning sharp, and we are scheduled to have the designee of

25   the Fee Committee available for testimony.

1              MR. BIRCHFIELD:  Yes, your Honor.

2              SPECIAL MASTER JUNEAU:  Is that right?

3              MR. BIRCHFIELD:  As I understand your scheduling order,

4     you know, the objectors could call me either at the beginning of

5     their case or they could call me at the end, they chose to call me

6     at the end.  So I assume that I will take the stand under

7     cross-examination, first thing tomorrow morning.  And then what I

8     would propose to do is just testify, I mean just from the stand

9     just testify as opposed to question answer, if that's okay with

10    you.

11             MS. WOODWARD:  Your Honor, if I may.

12             SPECIAL MASTER JUNEAU:  What's that?

13             MS. WOODWARD:  To my mind, direct examination comes

14    before cross-examination.  I am not going to cross-examine him

15    before he testifies.  That's what Mr. Birchfield just suggested

16    that he would be called first under cross-examination and then

17    would testify.

18             MR. HERMAN:  Your Honor, as I recall the schedule, may it

19    please the court, Russ Herman for the FAC, the schedule indicated

20    that they could call Mr. Birchfield under cross at the beginning or

21    the end of "their case".  And then Mr. Birchfield on behalf of the

22    FAC would have two hours to present the FAC's case.

23             During this lengthy due process hearing, the FAC has not

24    yet had an opportunity to make its case; and as I understood it,

25    they would conclude their case and then Mr. Birchfield would have

1    an opportunity.

2            SPECIAL MASTER JUNEAU:  Counsel, I am going to put into

3    this thing a bunch of records in on the rule so that everybody will

4    have a complete record of what we've done.  At the request of

5    counsel I ordered an order of presentation, and I said as follows:

6    This was on May 3.  "Andy Birchfield can be called on cross by the

7    objectors either before or after the presentation by all individual

8    objectors."  And that speaks for itself.  And at the conclusion of

9    that on item five I said that the FAC will make its presentation,

10   and then I talked about if you decide to call Mr. Garrett you could

11   call Mr. Garrett.  And I said if the FAC decided to call an expert.

12   The order of presentation laid out in this previous order and

13   that's what we're going to follow.

14           MR. HERMAN:  Thank you, your Honor.

15           MS. WOODWARD:  They have been permitted to cross-examine

16   each of our witnesses at the conclusion of the witness's testimony.

17   Am I to understand that Mr. Birchfield will be permitted to testify

18   without cross-examination at the conclusion of his presentation?

19           SPECIAL MASTER JUNEAU:  No, no.  I will allow you to

20   cross-examine him.

21           MS. WOODWARD:  After he gives his presentation?

22           SPECIAL MASTER JUNEAU:  I am going to make that decision

23   at the time, but my indication is that I may allow that after his

24   presentation.  But you have got the right in advance of that when

25   he first steps up here is to call -- you have the option to call

 1    him on cross-examination.  Ask him whatever you want to ask him.

 2           MS. WOODWARD:  Thank you.  My preference would be to

 3    conclude with a cross-examination.

 4           SPECIAL MASTER JUNEAU:  Well, I am going to go with what

 5    I told people I would go with, on May 3, and I am not going to

 6    change that order.  This is no objection to that at the time and

 7    you're objecting now, but that is noted, but we're going to go to

 8    with the order of presentation, it's already been ordered by this

 9    court which gives everybody a chance to question.

10           MR. HERMAN:  Yes, it does.  And, your Honor, I would like

11    to speak with Mr. Birchfield and Mr. Seeger for one minute before

12    you adjourn.  All right?

13           SPECIAL MASTER JUNEAU:  Mr. Arceneaux, let's make it

14    clear what's in evidence.  She has some documents, I don't know if

15    those have been -- we have to confirm that those have exhibit

16    numbers and were they offered in evidence.

17           MR. ARCENEAUX:  I have not formerly introduced the joint

18    exhibits, I was going to wait and do it tomorrow at the end when I

19    have the final discs.  Because I didn't know how you were going to

20    rule today, so I am going to take the proffered stuff off and I

21    will go down the exhibit list one by one.

22           SPECIAL MASTER JUNEAU:  The burden will be on you.

23           MR. ARCENEAUX:  Believe me I am not going to forget.  And

24    some of these don't have exhibit numbers because they're already in

25    the record, they're Pretrial Orders, and they're just part of the

 1    record.  But I am not going to forget, Judge.

 2             SPECIAL MASTER JUNEAU:  Mr. Herman, counsel, can I have

 3    your attention, please, just for a minute.

 4             MR. HERMAN:  Yes, your Honor.  You asked a question of me

 5    when the hearing began as to whether we, that is the FAC, would

 6    stipulate that Mr. Birchfield's deposition may be admitted in

 7    evidence by the objectors.  I've consulted the executive committee

 8    and we will not so stipulate.  The deposition can be used for

 9    whatever purpose your Honor believes it can be used, but we are not

10    going to stipulate it in evidence, and there are numerous

11    objections -- we reverse ourselves.

12             SPECIAL MASTER JUNEAU:  Well, you were getting ready to

13    get reversed.

14             MR. HERMAN:  Well, then discretion is the better part.

15             SPECIAL MASTER JUNEAU:  Just for purposes of the record,

16    I am going to allow the transcribed deposition to be allowed as

17    evidence in the case.  Okay.

18             MR. HERMAN:  Thank you.

19             MS. WOODWARD:  Thank you.

20             MR. HERMAN:  To which we will not object to your ruling,

21    we just want to make sure that Mr. Birchfield has adequate time

22    within which to present the position of the FAC.  Notwithstanding

23    their use of the deposition.

24             SPECIAL MASTER JUNEAU:  All right.  Nine o'clock in the

25    morning.

1        MR. HERMAN:  Thank you, your Honor.

2      (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

3

4                    * * * * * *

5

6

7

8              REPORTER'S CERTIFICATE

9

10      I, Karen A. Ibos, CCR, Official Court Reporter, United

11  States District Court, Eastern District of Louisiana, do hereby

12  certify that the foregoing is a true and correct transcript, to the

13  best of my ability and understanding, from the record of the

14  proceedings in the above-entitled and numbered matter.

15

16

17                    _____

18                    Karen A. Ibos, CCR, RPR, CRR

19                    Official Court Reporter

20

21

22

23

24

25