FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2007 NOV -9  PM 1:06

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX® | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| | * | |
| | * | **MAG. JUDGE KNOWLES** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## THIS DOCUMENT RELATES TO ALL CASES

### PRETRIAL ORDER NO. 28
### (*Prima Facie* Evidence of Usage, Injury and Causation)

This Order requires all parties who are (1) plaintiffs with personal injury claims

pending in MDL Docket No. 1657 ("Plaintiff" or "Plaintiffs") as of November 9, 2007, or (2)

claimants who have sought tolling pursuant to the tolling agreement dated June 1, 2005

(collectively "Claimant" or "Claimants") to produce specified information regarding their

claims, unless the claim is eligible for, and has been submitted to, the Resolution Program.  This

Order, however, does *not* apply to plaintiffs who file claims after November 9, 2007 ("Post 11.09

Plaintiffs").  Post 11.09 Plaintiffs are covered by a separate order, Pretrial Order No. 29.

Persons who represent themselves *pro se* in this proceeding shall comply fully with all

obligations required of counsel by this Order, unless otherwise stated.

**DEFENDANT'S
EXHIBIT
1**

Fee_____
Process_____
__X__ Dkt_____
CtRmDep_____
Doc. No_____

6.     All medical records relating to the Plaintiff or Claimants from all
       healthcare providers requested in the Amended and Supplemental Plaintiff
       Profile Form for the period from January 1, 1995 to the present, along
       with a signed certification from each healthcare provider who has records
       relating to the Plaintiff indicating that all records in the possession,
       custody or control of the Provider have been produced. Service by
       Plaintiffs shall be made in accordance with the service procedures of PTO
       No. 8 and paragraphs 5 through 7 of PTO 18C. Service by Claimants shall
       be made on Susan Giamportone at Womble Carlyle Sandrige & Rice,
       PLLC.

7.     An affidavit signed by the Plaintiff or Claimant (i) attesting that records
       have been collected from all pharmacies that dispensed drugs to, or for,
       the Plaintiff or Claimant; (ii) attesting that all medical records described in
       subparagraph (6) above have been collected; and (iii) attesting that all
       records collected pursuant to subparagraphs A (1), (2) and (6) have been
       produced pursuant to this Order, along with an index or list identifying the
       source of the records. Service by Plaintiffs shall be made in accordance
       with the service procedures of PTO No. 8 and paragraphs 5 through 7 of
       PTO 18C. Service by Claimants shall be made on Susan Giamportone at
       Womble Carlyle Sandrige & Rice, PLLC.

8.     A Rule 26(a)(2) case specific expert report from a medical expert attesting
       (i) to a reasonable degree of medical probability that the Plaintiff or
       Claimant suffered an injury and (ii) that Vioxx caused the injury. The
       case specific expert report must include (i) an explanation of the basis of
       the attestation that Vioxx caused the Plaintiff or Claimant to suffer the
       injury, (ii) an identification of any other causes that were considered in
       formulating the opinion, (iii) a description of the specific injuries allegedly
       suffered; (iv) a description of the specific medical findings that support the
       diagnosis of those injuries; and (v) and identification of all documents
       relied on by the expert in forming his opinions.

B.   If any of the documents described in paragraphs (A) (1), (2) and (6) above do not
     exist, the Plaintiff shall state that fact in his or her affidavit and the reason why
     they do not exist and provide a certified "No Records Statement" from the
     pharmacy or healthcare provider.

C.   Plaintiffs and Claimants shall produce the items set forth above in this Section II in
     accordance the following schedule:

     1.     For Plaintiffs and Claimants whose last name begins with the letters A
            through L, on or before May 1, 2008;

     2.     For Plaintiffs and Claimants whose last name begins with the letters M
            through Z, on or before July 1, 2008.

- 4 -



24383226
Mar 26 2009
8:30AM

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX | : | MDL 1657 |
| PRODUCTS LIABILITY LITIGATION | : | |
| | | SECTION L |
| | : | |
| | | JUDGE FALLON |
| | : | MAG. JUDGE KNOWLES |

---

This Document Relates to:

**William Andrew Curl and Tonya Curl**
**Case No.: 2:05-cv-05295**

## EXPERT REPORT OF STEVEN A. RICH, M.D.

DEFENDANT'S
EXHIBIT

2

assess the risk/benefit of this drug in the expanding groups of patients to which it was being
marketed, including the elderly and patients undergoing surgery..

Indeed, instead of designing clinical studies to assess cardiovascular data as endpoints, Merck
ignored the strong cardiovascular "signals" in the data from its studies of osteoarthritis and
Alzheimer's Disease in designing subsequent studies to expand the approved indications, and
marketing potential, for VIOXX®. These included rheumatoid arthritis and prostate cancer.  In
the interest of brevity I will discuss the individual studies in connection with my opinions
regarding Merck's failure to properly warn the public, the healthcare community at large, and
physicians in particular about the expected, predicted and demonstrated cardiovascular and deep
venous thrombosis risk inherent in the use of VIOXX®. It is, and has been, my opinion, that
Merck failed to adequately test VIOXX® for safety at both the pre-and post-market stages of
development. Indeed , at no time did Merck ever carry out a study with the primary endpoints
being designed to evaluate the cardiovascular, cerebrovascular,and deep venous thrombosis risks
of VIOXX® .This is true even though it may be said that Merck carried out more clinical trials
than one would ordinarily see in the course of an NDA. The quantity of patients enrolled in
studies does not compensate for the failure to design those studies to look for an expected
adverse effect.  I will conclude by noting that it is my opinion Merck's conduct at the post-
marketing stage was substantially below the standard of care that should be followed by an
ethical pharmaceutical manufacturer.  In this regard Merck failed to properly warn the respective
patient and health care provider communities in issue of the expected cardiovascular,
cerebrovascular, and venous thromboembolic risks of VIOXX®. When the cardiovascular,
cerebrovascular and venous thromboembolic toxicity  of VIOXX® became apparent, Merck

11

VIOXX® contributed to the difficulty physicians experienced trying to keep this choice based on available science and good medicine since the patients were often individuals in substantial pain from arthritis and other ailments caused by inflammation and were thus demanding what they were told was a product with superior efficacy and safety to available medications. None of this was in fact true.

It is my opinion that Merck consistently and deliberately failed to adequately warn prescribers regarding the known association between VIOXX® and onset of adverse cardiovascular consequences, and this included concealing information from the FDA itself. Published studies comparing the data submitted to the FDA, and that retained by Merck, show that submitted data used suboptimal data analysis techniques (time on treatment) which minimized the mortality of VIOXX® treated patients in Alzheimer's studies.. This information that was not submitted in the more appropriate form of analysis (intention to treat) until after the April 11 2002 label change was approved. This allowed Merck to mention the cardiovascular toxicity of VIOXX® in the precautions rather than the warning section of the label, It also allowed Merck to dilute the impact of the data from the VIGOR study by contrasting it with favorable pooled data from these earlier and inferior studies.  It is my opinion had the FDA been given the accurate data regarding mortality in the Alzheimer's disease trails and the VIGOR study, it would have concluded that a black box warning was called for and that for patients at risk for cardiac disease a contraindication was required.

It is my opinion that Merck, in addition to failing to adequately warn, deliberately downplayed the risk of adverse cardiovascular events including publishing inappropriate comparisons of

COMMONWEALTH OF KENTUCKY
MEADE CIRCUIT COURT
DIVISION <u>II</u>
CIVIL ACTION NO. <u>O5-CI - 00206</u>

WILLIAM ANDREW CURL
And
TONYA CURL, his spouse
265 Gumwell Road
Brandenburg, KY 40108                                                      **PLAINTIFFS**

vs.                                        **COMPLAINT**

MERCK & CO., INC.
One Merck Drive, WS3AB-05
Whitehouse Station NJ 08889

       SERVE:       C.T. Corp. System
                     Ky. Home Life Bldg., Room 1102
                     Louisville KY 40202

and

CHARLES CONLEY, M.D.
455 By-Pass Road
Brandenburg, KY 40108                                                    **DEFENDANTS**

*** *** *** *** *** *** *** *** *** *** ***

Come now Plaintiff, WILLIAM ANDREW CURL, and TONYA CURL, Plaintiff's

spouse, by counsel, and for their Complaint and cause of action against Defendants state as

follows:

## PARTIES, JURISDICTION AND VENUE

1.    Plaintiff, William Andrew Curl, is and was at all times applicable hereto a resident of

       Brandenburg, Meade County, Kentucky. At all times relevant to this Complaint, Plaintiff

       lived and still lives with Plaintiff's spouse, Plaintiff, Tonya Curl. Beginning on or about

       April 4, 2001, and continuing through approximately August 17, 2004, William Andrew

1



DEFENDANT'S
EXHIBIT
3

Curl took the prescription drug Vioxx® manufactured, marketed and sold by Merck and Co., Inc., and prescribed by Charles Conley, M.D. On or about May 2001, William Andrew Curl suffered a deep vein thrombosis and later underwent treatment consisting of Venogram, and started taking coumadin. William Andrew Curl's use of Vioxx® was a substantial factor in causing the deep vein thrombosis and subsequent treatment, injury and damage to William Andrew Curl.

2.    The Defendant, Merck and Co., Inc. (hereafter referred to as "Merck"), is a New Jersey corporation with its principal place of business in New Jersey. At all times material hereto, Merck was engaged in the business of testing, developing, manufacturing, labeling, marketing, distributing, promoting, and/or selling, either directly or indirectly, through third parties or related entities, anti-inflammatory and other drugs, including Vioxx®.

3.    The Defendant, Charles Conley, M.D. (hereafter referred to as "Dr. Conley"), is and was at all times relevant hereto a resident of Brandenburg, Meade County, Kentucky with professional offices located at 455 By-Pass Road, Brandenburg, KY 40108. Dr. Conley was at all times relevant hereto a physician duly licensed to practice medicine in the Commonwealth of Kentucky. His address for service of process is 455 By-Pass Road, Brandenburg, KY 40108.

4.    The Defendant, Merck, at all times relevant hereto, was a foreign corporation, duly licensed and authorized to do business in the Commonwealth of Kentucky and has designated CT Corp. System, Ky. Home Life Bldg., Room 1102, Louisville, KY 40202 as its registered agent for service of process. Said Defendant is subject to the jurisdiction of this Court pursuant to KRS 454.210, and other applicable law.

2

5.   The damages claimed herein are in excess of the minimum jurisdictional requirements of this Court.

6.   Venue is proper pursuant to KRS 452.450 and 452.460.

## FACTUAL BACKGROUND

### Properties of COX Inhibitors

7.   Vioxx® (Rofecoxib) is a prescription drug designed and used to treat pain and inflammation.  As discussed below, Vioxx® is a COX-2 selective non-steroidal anti-inflammatory agent ("NSAID").

8.   NSAIDs were developed in the 1960s and 1970s, and prescribed to provide relief of pain and inflammation. They were widely used by the 1990s, especially by older people suffering from osteoarthritis and rheumatoid arthritis. Epidemiological studies in the 1980s demonstrated that long term use of NSAIDs increased the risk of gastrointestinal ("GI") problems by 4-6 times, with the risk being more pronounced in the elderly.  As a result, researchers and pharmaceutical companies began seeking alternative treatments with fewer gastrointestinal side effects.

9.   NSAIDs work by inhibiting the action of the cyclooxygenase (COX) enzyme which is involved in the production of prostaglandins, thereby reducing inflammation and the associated pain. Research into the causes of gastrointestinal toxicity showed that prostaglandins also play a role in protecting the stomach lining from the effects of gastric acid.

10.  In 1989, it was postulated that there were two forms of the COX enzyme: COX-1 and COX-2. It was believed that COX-2 played a role in the release of prostaglandin from

3

inflammatory sites, while COX-1 helped maintain the integrity of the GI tract. Typical NSAIDs inhibit both forms of the COX enzyme. It was theorized that a drug which inhibited only COX-2 would reduce inflammation without adverse GI effects. This class of drugs is known as the coxibs.

11. COX-2 is involved in more than the inflammatory process. It plays a role in normal renal function, reproductive biology and neurological functioning. COX-2 also plays a role in maintaining normal functioning of the vascular endothelium and in the production of prostacyclin ("$PGI_2$").

12. COX-2 is associated with the production of $PGI_2$ by the vascular endothelium. $PGI_2$ inhibits platelet aggregation (clotting) and is a vasodilator. In contrast, COX-1 is associated with the production of thromboxane $A_2$ ("$TXA_2$") by platelets. $TXA_2$ is a potent platelet aggregator and vasoconstrictor. Under normal circumstances $PGI_2$ and $TXA_2$ have offsetting effects resulting in a homeostatic balance within the body.

13. NSAIDs are non-selective COX inhibitors that inhibit both COX-1 and COX-2, thereby inhibiting production of both $PGI_2$ and $TXA_2$, and maintaining a rough balance between the two. Selectively inhibiting COX-2 upsets the natural balance between $PGI_2$ and $TXA_2$ by inhibiting primarily $PGI_2$, thereby giving free rein to $TXA_2$'s clotting and vasoconstriction properties.

14. COX-2 also helps maintain the normal functioning of the vascular endothelium where not only $PGI_2$ but other anti-coagulants such as nitric oxide, thrombomodulin, heparin sulfates and t-PA are produced. COX-2 inhibition therefore blocks redundancies in the vascular system by suppressing production of these other anti-coagulants by the vascular endothelium.

4

15.   This impact on endothelial function is especially important given that many likely users of COX-2 inhibitors will have pre-existing or pre-disposing factors for cardiovascular risks, including some degree of atherosclerotic plaque which damages the vascular endothelium.  A damaged vascular endothelium causes an imbalanced pro-thrombotic state because the damaged endothelium contributes to narrowed arteries and also produces less $PGI_2$ and other anti-coagulants which would otherwise inhibit platelet aggregation.

16.   Many users of COX-2 inhibitors are at a heightened risk and even more susceptible to the pro-thrombotic effects of selective COX-2 inhibition.

17.   With selective COX-2 inhibition, there is no corresponding suppression of the platelet aggregation and vasoconstriction effects of $TXA_2$.

18.   Internal Merck documents indicate that Vioxx® is at least 5 times more COX-2 selective than its competitor, Celebrex®. Research by others suggests that Vioxx® may be as much as 9 times more COX-2 selective than Celebrex®.

### The Vioxx® Timeline

19.   On or about November 23, 1998, Merck submitted to the Food and Drug Administration ("FDA") a New Drug Application ("NDA") for Rofecoxib (Vioxx®).

20.   Before submittal of its NDA, Merck knew that selective COX-2 inhibition could be pro-thrombotic and dangerous to the potential users of Vioxx®.  Merck actively contrived to conceal and minimize this fact for fear that it would "kill" the drug.

21.   Before submittal of its NDA, Merck declined to study the cardiovascular effects of COX-2 inhibition in the patients expected to use Vioxx®, even though Merck was aware that

5

many users of Vioxx® would already be at risk of serious adverse cardiovascular events. Merck never advised physicians or patients of its failure to conduct such studies.

22.     Before approval of its NDA, Merck was aware that other researchers had also confirmed in both human and animal studies the likelihood of serious cardiovascular risk with the use of COX-2 inhibitors and that further trials were necessary to determine whether a COX-2 inhibitor would be both efficacious and safe in its intended population.

23.     On or about May 17, 1999, the FDA safety review of the Merck NDA for Vioxx® also noted Merck's inability to provide an answer to the actual risk of adverse cardiovascular and thromboembolic events for patients on Vioxx®.

24.     Merck has never conducted any testing meant to determine the risk of cardiovascular and thromboembolic events in the intended patient population of Vioxx® users.

25.     On or about May 20, 1999, the FDA approved Vioxx®.

26.     Merck immediately launched aggressive advertising and public relations campaigns to promote Vioxx®.

27.     On or about June 22, 1999, Merck hired Peter Holt, M.D. to promote the use of Vioxx® to physicians.

28.     The FDA later found that parts of Dr. Holt's presentations to physicians promoting the use of Vioxx® were false or misleading.

29.     On or about July 16, 1999, the FDA issued a warning letter to Merck regarding Vioxx® direct to consumer ("DTC") advertising.

30.     On or about January 1, 1999, Merck began the VIOXX Gastrointestinal Outcomes Research ("VIGOR") trial to substantiate a gastrointestinal safety claim for the drug.

6

31.   On or about November 18, 1999, the VIGOR Data Safety Monitoring Board expressed concern about the "excess deaths and cardiovascular events" in the group of study participants taking Vioxx®.

32.   On or about December 16, 1999, the FDA sent Merck a letter noting that several promotional pieces were false or misleading because they misrepresented the safety profile of Vioxx®, contained unsubstantiated comparative claims and promoted unapproved uses.

33.   On or about December 1999, Merck began patient screening for the APPROVe trial, a study to evaluate whether Vioxx® prevented the recurrence of colon polyps.

34.   On or about March 2000, Merck revealed the initial VIGOR results showing that patients using Vioxx® had double the rate of serious cardiovascular events than those on the comparator drug, Naproxen (a non-selective NSAID). The data also showed a four-fold increase in heart attack risk. When the complete data was reanalyzed, the actual increase in relative risk of a heart attack was 5.04, compared to a relative risk of 1.0 in the participants taking a placebo rather than Vioxx®. The relative risk of a serious cardiovascular event, which included heart attacks, strokes, sudden death and unstable angina, was 2.3.

35.   Merck acknowledged internally that the VIGOR results raised serious questions regarding the safety of Vioxx® for its intended users.  Nevertheless, Merck set out to minimize, obfuscate and misrepresent the results of the VIGOR study in order to conceal the cardiovascular risks attributable to Vioxx®.

7

36.   During this time, Merck continued to be aware of the adverse cardiovascular effects associated with the use of Vioxx®.  Merck also became aware of studies indicating that the COX-2 enzyme selectively suppressed by Vioxx® is cardio-protective.

37.   Once again, Merck decided not to conduct a study designed to determine the extent of cardiovascular risks associated with Vioxx®.

38.   Instead, Merck continued to dispute these and other studies indicating increased cardiovascular risks associated with Vioxx® and the cardio-protective effects of the COX-2 enzyme.

39.   On or about November 2000, Merck published the VIGOR results in the New England Journal of Medicine and downplayed the cardiovascular risks, suggesting that the drug presented no risk to those with healthy hearts and omitting detailed information about other cardiovascular complications like strokes. The article prominently discussed the reduction of stomach bleeds in patients taking Vioxx®, but did not mention that patients on Vioxx® had more serious adverse events and more hospitalizations than patients on Naproxen. The true rates for cardiovascular thrombotic adverse events, hypertension and congestive heart failure – all of which were higher in the Vioxx® group - were not disclosed.

40.   On or about February 8, 2001, an FDA Advisory Panel recommended that the Vioxx® labeling be changed to reflect the cardiovascular risks.

41.   On or about August 29, 2001, the Journal of the American Medical Association published a peer reviewed study by the Cleveland Clinic Foundation which conducted a meta-analysis of several clinical trials, including the VIGOR trial. The authors concluded that the VIGOR results showed a 2.2 times greater risk of a serious cardiovascular event in

those taking Vioxx® as compared to Naproxen. The relative risk between Vioxx® and Naproxen among aspirin-indicated patients (i.e., those already at some cardiac risk) was 4.89. The authors theorized that COX-2 inhibitors "by decreasing $PGI_2$ production may tip the natural balance between prothrombotic thromboxane $A_2$ and antithrombotic $PGI_2$, potentially leading to an increase in thrombotic cardiovascular events." The authors concluded with the observation: "Given the remarkable exposure and popularity of this new class of medications, we believe that it is mandatory to conduct a trial specifically assessing cardiovascular risk and benefit of these agents." Mukherjee, D., et al., *Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors*, J. Amer. Med. Assn. 286:8, 954, 957, August 22/29, 2001.

42. Two of the Cleveland Clinic study authors, Drs. Topol and Nissen, were lobbied by Merck to temper their criticisms prior to publication.

43. On or about September 17, 2001, the FDA sent a Warning Letter to Merck regarding promotional audio conferences conducted by Dr. Holt, a Merck press release regarding the safety profile of Vioxx®, and oral representations made by Merck sales representatives to promote the sale of Vioxx®. The letter began:

> You have engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for Vioxx.

44. The FDA further stated that Dr. Holt's assertions "minimize the potentially serious MI risk that may be associated with Vioxx® therapy."

45. The FDA noted in the letter that Merck's "misrepresentation of the safety profile for Vioxx® is particularly troublesome because we have previously, in an untitled letter,

objected to promotional materials for Vioxx® that also misrepresented Vioxx®'s safety profile."

46. In the Warning Letter, the FDA also noted repeated misrepresentations of the actual VIGOR study results. For example, Dr. Holt had asserted that the overall safety profile of COX-2 inhibitors, including Vioxx®, was safer than that of other NSAIDs. The FDA noted that "such an advantage has not been demonstrated," and further stated:

> In fact, in the VIGOR study the incidence of serious adverse events was **higher** in the Vioxx treatment group than in the naproxen treatment group (9.3% and 7.8% for Vioxx and naproxen, respectively). The results of safety analyses that were pre-specified in the protocol for the VIGOR trial, such as CHF related adverse events and discontinuations due to edema-related adverse events, hepatic-related adverse events, hypertension-related adverse events, and renal-related adverse events were all numerically higher (in some cases statistically significantly higher) in the Vioxx treatment group than in the naproxen treatment group.

47. The FDA criticized Merck for other misleading actions:

> We have identified a Merck press release entitled, "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx," dated May 22, 2001, that is also false or misleading for similar reasons stated above. Additionally, your claim in the press release that Vioxx has a "favorable cardiovascular safety profile," is simply incomprehensible, given the rate of MI and serious cardiovascular events compared to naproxen.

48. Finally, the FDA determined that Merck sales representatives had engaged in false or misleading promotional activities.

49. Because of the seriousness of the violations and the fact that Merck had previously been notified of similar violations, FDA required Merck to issue a "Dear Healthcare Provider" letter correcting the false or misleading impressions and information.

50. Throughout this time period, a number of healthcare organizations asked Merck to test whether Vioxx® increased the risk of heart attack and stroke.

10

51.     On or about December 15, 2001, the FDA reviewed a Supplemental NDA ("SNDA") to approve Vioxx® for the treatment of rheumatoid arthritis. After evaluating VIGOR and other studies, the FDA reviewer concluded that "the potential advantage of decreasing the risk of complicated [GI adverse events] was counterbalanced by the increased rate of developing serious non-GI events (particularly cardiovascular events)."

52.     By 2003 Merck still had not conducted a study specifically designed to assess cardiac and thrombotic risks associated with Vioxx®. The need for such a study was especially great given inherent limitations in the FDA's Adverse Event Reporting System. That system is useful for identifying unusual events, but practically worthless for common events such as heart attack and stroke.

53.     Independent researchers continued to conclude that the use of Vioxx® and other COX-2 inhibitors lead to increased vascular and thrombotic events and that their poor safety performance could not be excused by the attempted explanations of Merck.

54.     On or about April 11, 2002, over two years after the initial VIGOR results became available and despite much resistance from Merck, the FDA ordered new labeling for Vioxx®. Merck was allowed to place the revised GI labeling up front, followed by a graphical presentation of the cardiovascular data. The revised label urged doctors to use caution in prescribing Vioxx® for patients with ischemic heart disease. The label also stated that Vioxx® 50 mg. was not recommended for chronic use and that the 25 mg. dose was associated with a higher risk of hypertension compared to Naproxen. The cardiac data was presented in the "Precautions" section, not in the warnings. There was no Black Box warning. Despite the findings of other researchers, Merck stated in its

11

label that the significance of the cardiovascular findings seen in VIGOR and other studies was unknown.

55.     On or about September 2002, Merck began the MEDAL study, which included over 23,000 patients and was specifically designed to assess the cardiovascular safety of Arcoxia®, Merck's planned successor to Vioxx®. No comparable study was ever done by Merck to evaluate Vioxx®.

56.     Both independent researchers and studies funded by Merck continued to show the increased cardiovascular risk of Vioxx®.  Merck nevertheless continued to ignore adverse findings and attempted to obstruct and minimize the import of these studies.

57.     On or about August 25, 2004, Dr. David Graham of the FDA presented preliminary research findings at a conference in Bordeaux, France. Dr. Graham had conducted a study prompted by the VIGOR results and funded by the FDA intended to assess cardiac risk in patients taking Vioxx®.  Based on his analysis, Graham concluded that Vioxx® was responsible for over 27,700 heart attacks and sudden coronary deaths between 1999 and 2003; 14,845 of these adverse events were at doses less than or equal to 25 mg. and 12,940 at higher doses. Graham has since increased that estimate to almost 140,000 heart attacks and sudden coronary deaths.

58.     On or about August 27, 2004, Merck issued a press release stating that it "strongly disagrees" with Graham's findings and "stands behind the efficacy and safety, including cardiovascular safety, of Vioxx." On or about the same day, the APPROVe Data Safety Monitoring Board (the colon polyp prevention study begun on or about December 1999) confirmed that Vioxx® tripled cardiac risk, and more than doubled the relative risk for a cerebrovascular event (2.33).

12

59.    On or about September 27, 2004, Merck advised the FDA that data from the APPROVe trial indicated a tripled risk of heart attack.

60.    On or about September 30, 2004, Merck publicly announced that it was pulling Vioxx® from the market.

61.    On or about November 5, 2004, The Lancet published online a cumulative meta-analysis of earlier Vioxx® clinical trial data, in which the authors concluded that Vioxx® should have been withdrawn from the market several years earlier. The authors asserted that "an increased risk of myocardial infarction was evident from 2000 onwards," and that by the end of 2000, "the effect was both substantial and unlikely to be a chance finding." The authors further rejected Merck's efforts "to explain [away] the findings of VIGOR." The authors also commented on the exclusion criteria of most of the trials, noting that patients with a history of cardiovascular disease routinely were excluded. Noting that many such patients were likely taking the drug, the researchers pointed out that the risk of MI in this already at risk population was over eight (8) times higher. Merck never attempted to test the cardiovascular risks of Vioxx® in this population, even though it knew that many patients taking the drug were at increased cardiovascular risk.

62.    Despite a known risk potential, repeated calls for study and results from the VIGOR and other trials, Merck recklessly and willfully failed to conduct adequate studies to establish the safety of Vioxx®.

63.    Merck never disclosed on its warning labels that such testing had not been performed, thereby fraudulently inducing physicians and patients alike to use Vioxx® under the false assumption that it had been sufficiently tested.

13

64.   By the end of 1999, less than 5 million prescriptions had been written for Vioxx® according to the Merck Annual Report. By the time the drug was pulled in 2004, over 105 million prescriptions had been written.

65.   Vioxx® was only tested and approved for up to five days of use at the 50mg dosage.

### Fraudulent Concealment, Tolling and Estoppel

66.   Any applicable statutes of limitations have been tolled by the knowing and active concealment and denial by Merck of the facts as alleged herein.

67.   William Andrew Curl and Tonya Curl have been kept in ignorance of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part.

68.   William Andrew Curl and Tonya Curl could not reasonably have discovered the dangerous nature of and unreasonable adverse side effects associated with Vioxx® before the publicity surrounding the drug's withdrawal from the market.

69.   Merck should be estopped from relying on any statute of limitations defense because Merck is and was under a continuing duty to disclose the true character, quality, and nature of Vioxx® to William Andrew Curl and Tonya Curl and it failed to do so.

70.   William Andrew Curl and Tonya Curl did not have any factual basis to be aware of their claims asserted herein against Merck or Dr. Conley until September 30, 2004, or later.

71.   Merck should be estopped from asserting the affirmative defense that any of William Andrew Curl's physicians were learned intermediaries since Merck actively misrepresented and concealed vital safety information regarding the cardiovascular risks of Vioxx®.

14

## CAUSES OF ACTION

### COUNT I – STRICT LIABILITY
**(Against Merck)**
**Restatement of Torts (Second) §402A**
**or**
**Restatement of Torts (Third): Prod. Liab. §6**

72. Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein at length.

73. Vioxx® as sold by Merck was defective and unreasonably dangerous to consumers, including William Andrew Curl.

74. Vioxx® was expected to reach, and did reach, prescribing physicians and consumers throughout the United States, including William Andrew Curl, without substantial change in the condition in which it was originally sold by Merck.

75. Vioxx® was defective and unreasonably dangerous at the time it was placed in the stream of commerce in ways which include, but are not limited to, one or more of the following particulars:

    a.    Vioxx® had unreasonably dangerous design defects and was not reasonably safe as intended to be used, subjecting William Andrew Curl to risks which exceeded any benefits of the drug;

    b.    Vioxx® was defective in design and formulation, because making use of the drug was more dangerous than an ordinary consumer would expect and Merck failed to adequately warn of the risks associated with the use of said drug;

    c.    Merck failed to conduct adequate pre- and post-clinical testing and research to determine the safety of Vioxx® despite overwhelming evidence of the need for such testing and research; and

    d.    The benefits of using Vioxx® were outweighed by the risks of a serious cardiovascular adverse event.

15

76.     The actions set forth in this Count were a substantial factor in causing damages, as set out in the Counts below, to William Andrew Curl and Tonya Curl, and for which Merck is legally responsible.

## COUNT II - NEGLIGENCE
### (Against Merck)

77.     Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein at length.

78.     At all relevant times, Merck had a duty to exercise reasonable care to properly prepare, design, research, develop, test, manufacture, inspect, label, market, promote, and sell Vioxx®, including a duty to insure that users did not suffer from unreasonable, dangerous or untoward adverse side effects.

79.     At all relevant times, Merck owed a duty to properly warn consumers and their physicians of the risks, dangers, and adverse side effects of Vioxx®.

80.     Merck failed to exercise ordinary care in the preparation, design, research, development, testing, manufacturing, inspection, labeling, marketing, promotion, and selling of Vioxx®.

81.     Merck knew, or in the exercise of reasonable care, should have known, that Vioxx® was likely to cause injury to a significant number of those taking the drug if Merck failed to exercise ordinary care.

82.     Merck was negligent in the preparation, design, research, development, testing, manufacturing, inspection, labeling, marketing, promotion, and selling of Vioxx® in that it:

    a.     Developed a drug with known potential to increase cardiovascular risk, which risks, not outweighed by any potential benefit;

16

b.    Failed to adequately test pre-market to determine actual potential extent of adverse cardiovascular events;

c.    Failed to accurately and completely report known risks of Vioxx® to the FDA;

d.    Failed to fully and completely inform prescribers and the public about known risks of Vioxx®;

e.    Overstated the benefits of Vioxx® relative to other safer drugs, to the FDA, prescribers, and consumers.

f.    Despite direct knowledge that they were indicated and required, Merck refused to conduct any studies designed to determine the extent of the actual potential of adverse cardiovascular events.

g.    Made no meaningful effort to report actual adverse events to the FDA, or to inform prescribers and consumers of the same;

h.    Minimized, attempted to conceal and actively concealed information as it became available about the adverse cardiovascular events attributable to Vioxx®; and

i.    Was otherwise careless and negligent.

83.    Despite the fact that Merck knew or should have known that Vioxx® caused unreasonable and dangerous side effects which many users would be unable to remedy by any means, Merck continued to promote and market said drug to consumers, including William Andrew Curl, when safer and more effective treatments were available.

84.    Merck knew or should have known that consumers such as William Andrew Curl would foreseeably suffer injury as a result of Merck's failure to exercise ordinary care as described herein.

85.    The actions set forth in this Count were a substantial factor in causing damages, as set out in the Counts below, to William Andrew Curl and Tonya Curl, and for which Merck is legally responsible.

17

## COUNT III – FAILURE TO WARN
### (Against Merck)
### Restatement of Torts (Second) § 388
### or
### Restatement of Torts (Third): Prod. Liab. §6

86.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set
       forth herein at length.

87.    Merck had a continuing duty to warn the prescribing physicians and users of Vioxx® of
       the risks and benefits associated with said drug.

88.    Vioxx® was defective and unreasonably dangerous when it left the possession of Merck
       because:

     a.    The labeling was misleading regarding the purported risks and benefits associated
        with said drug; and,

     b.    Their labeling was inadequate to alert physicians and consumers, such as William
        Andrew Curl, to the dangerous risks and adverse cardiovascular events associated
        with said drug.

89.    Merck as a manufacturer of pharmaceutical medications, is held to the level of
       knowledge of an expert in the field.

90.    The warnings that were given by Merck to the prescribing physicians and users of
       Vioxx® were defective in that they misrepresented what Merck knew, or should have
       known, and were not adequate, accurate, clear, or complete.

91.    Merck had a continuing duty to warn the prescribing physicians and users of Vioxx® of
       the dangers associated with said drug, and breached that duty.

92.    The actions set forth in this Count were a substantial factor in causing damages, as set out
       in the Counts below, to William Andrew Curl and Tonya Curl, and for which Merck is
       legally responsible.

## COUNT IV – FRAUD
### (Against Merck)

93. Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein at length.

94. Merck owed a duty to provide complete and accurate information regarding Vioxx® to William Andrew Curl, physicians, and anyone else it knew or should have known would ingest, prescribe or recommend the ingestion of said drug.

95. Merck misrepresented material facts regarding the safety and efficacy of Vioxx® and failed to inform and did conceal these material facts from William Andrew Curl, physicians and the general public.

96. Merck fraudulently, intentionally and/or with gross negligence and recklessness misrepresented to William Andrew Curl, physicians, and the general public that Vioxx® was safe and effective, that the benefits of taking said drug outweighed any risks, and/or fraudulently, intentionally and/or in a grossly negligent and reckless manner misrepresented and concealed safety and effectiveness information regarding said drug, including but not limited to the propensity of said drug to cause serious physical harm.

97. The continuous and ongoing course of action constituting fraud and misrepresentation on William Andrew Curl, physicians, and the general public started as early as 1999, if not earlier, and continued through repeated acts and non-disclosure every year since then, throughout the United States and elsewhere.

98. Vioxx® was in fact unsafe and its use posed a risk of injury and death which outweighed the purported benefits of such use, thereby causing injury to William Andrew Curl and others.

19

99.    Merck made misrepresentations and actively concealed adverse information at a time when Merck knew, or should have known, that Vioxx® had defects, dangers, and characteristics that were other than what Merck had represented to the prescribing doctors or other dispensing entities, the FDA, and the consuming public, including William Andrew Curl.

100.    Specific misrepresentations and/or active concealment by Merck include, but are not limited to, the following:

a.    Failure to disclose that there had been insufficient studies regarding the safety and efficacy of Vioxx®;

b.    Marketing, promoting and/or selling Vioxx® as if it were fully and adequately tested, when it was not;

c.    Misrepresenting the safety and efficacy of Vioxx® in the labeling, advertising, product inserts, promotional materials, and/or other marketing and/or safety surveillance efforts;

d.    Misrepresenting the existence and adequacy of testing of Vioxx® both pre-and post-marketing; and

e.    Concealing or failing to disclose the severity and frequency of adverse health effects caused by Vioxx®.

101.    The misrepresentations and/or active concealment alleged above were perpetuated directly and/or indirectly by Merck, and those acting on its behalf.

102.    The fraudulent misrepresentations of Merck took the form of, among other things, express and implied statements, publicly disseminated misinformation, misinformation provided to regulatory agencies, inadequate, incomplete and misleading warnings about Vioxx®, failure to disclose important safety and injury information regarding said drug, and elaborate marketing, promotional, and advertising activities designed to conceal and

20

mislead regarding the safety of said drug, all while having a duty to disclose such information to William Andrew Curl and others.

103. Merck knew or should have known that these representations were false and material at the time they were made or omitted or concealed, and made the representations with the intent or purpose that patients, including William Andrew Curl, and their physicians would rely on them, leading to the use of Vioxx® by such patients, including William Andrew Curl.

104. William Andrew Curl had no knowledge of the information concealed and/or suppressed by Merck.

105. William Andrew Curl was misled and/or relied on and/or was induced by the misrepresentations and/or active concealment by Merck, and was misled and relied on the absence of safety information which Merck did suppress, conceal or fail to disclose thereby causing injury and damage to William Andrew Curl.

106. Merck made the misrepresentations and/or actively concealed information with the intention and specific desire that William Andrew Curl and the general public would rely on such misrepresentations or on the absence of information concealed by Merck in selecting and using Vioxx®.

107. Merck undertook marketing strategies which included advertising campaigns to aggressively promote and sell Vioxx® by misleading and failing to warn potential users about the serious health effects that Merck knew, or should have known, could result from the use of said drug.

108. This advertising campaign on the whole, through its affirmative misrepresentations and omissions, falsely and fraudulently created the impression that the use of Vioxx® was

21

safe and had fewer adverse health and side effects than were actually known to Merck at the time it made these representations.

109. The misrepresentations and/or active concealment by Merck constitute a continuing tort.

110. The actions set forth in this Count were a substantial factor in causing damages, as set out in the Counts below, to William Andrew Curl and Tonya Curl, and for which Merck is legally responsible.

### COUNT V - MISREPRESENTATION BY SELLER OF CHATTEL
### (Against Merck)
### Restatement of Torts (Second) § 402B
### or
### Restatement of Torts (Third): Prod. Liab. § 9

111. Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein at length.

112. At all relevant times herein, Merck was in the business of selling prescription drugs, including Vioxx®.

113. Through its actions and omissions in advertising, labeling, promotional literature, moving pictures, product brochures, and otherwise, Merck made public misrepresentations of material fact concerning the character, safety, and effectiveness of Vioxx® to both the general public and treating and prescribing physicians.

114. These public misrepresentations and representations include, but are not limited to those set forth in other Counts of this Complaint.

115. The actions set forth in this Count were a substantial factor in causing damages, as set out in the Counts below, to William Andrew Curl and Tonya Curl, and for which Merck is legally responsible.

## COUNT VI - BREACH OF EXPRESS AND IMPLIED WARRANTY
### (Against Merck)

116. Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein at length.

117. Merck, through description, affirmation of fact, and promises relating to Vioxx®, and made to the FDA, to prescribing physicians, and to the general public, including William Andrew Curl, expressly warranted that Vioxx® was both effective and safe for its intended use.

118. These warranties came in the form of: (i) publicly-made written and verbal assurances of the safety and efficacy of Vioxx® by Merck, (ii) press releases, interviews and dissemination via the media of promotional information, the sole purpose of which was to create and increase demand for Vioxx®, and which failed utterly to warn of the risks inherent to the ingestion and use of said drug; (iii) verbal assurances made by Merck, or its agents, regarding Vioxx®, and the downplaying of any risk associated with said drug; (iv) false and misleading written information, supplied by Merck, and published in the *Physicians Desk Reference* on an annual basis, upon which physicians relied in prescribing Vioxx® during the period of William Andrew Curl's ingestion of said drug; (v) promotional pamphlets and brochures published and distributed by Merck, and directed to consumers; and (vi) advertisements. The documents referred to in this paragraph were created by and at the direction of Merck, and, therefore, are in its possession and control.

119. Merck also impliedly warranted that Vioxx® was of merchantable quality and was fit for its intended use and particular purpose.

23

120.    At the time of these express and implied warranties, Merck had knowledge of the purpose for which Vioxx® was to be used and warranted said drug to be in all aspects safe, effective, and proper for such purpose.

121.    Vioxx® did not conform to these express and implied warranties in that it is neither safe nor effective and its use produces serious adverse side effects, and as such, Vioxx® was not in conformity with the promises, descriptions or affirmations of fact made about said drug nor was it adequately contained, packaged, labeled or fit for the ordinary purposes for which such goods are used.

122.    Merck further breached express and implied warranties to William Andrew Curl by: (i) manufacturing, marketing, packaging, labeling, and selling Vioxx® in a way that misstated the risks of injury, without warning or disclosure thereof by package and label of such risks to William Andrew Curl or prescribing physicians or pharmacists, and without modifying or excluding such express and implied warranties; (ii) manufacturing, marketing, packaging, labeling, and selling Vioxx® to William Andrew Curl which caused serious physical injury and pain and suffering.

123.    The actions set forth in this Count were a substantial factor in causing damages, as set out in the Counts below, to William Andrew Curl and Tonya Curl, and for which Merck is legally responsible.

## COUNT VII – CONSUMER PROTECTION ACT
### (Against Merck)

123.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein at length.

24

124.   Merck misrepresented the efficacy and safety of Vioxx® to Plaintiffs through its advertising, promotion and sales efforts, as directed to Plaintiffs, the local community, prescribing physicians such as Dr. Conley and the FDA.

125.   Merck's actions and failures to act as alleged in this Complaint constitute unfair, false, misleading and deceptive acts and practices in the conduct of trade and commerce in violation of the Kentucky Consumer Protection Act, KRS 367.170.

126.   As a result of Merck's deceptive and unconscionable conduct, William Andrew Curl was prescribed Vioxx®, William Andrew Curl purchased Vioxx® and William Andrew Curl did in fact consume Vioxx®. William Andrew Curl's use of Vioxx® was entirely for William Andrew Curl's personal purposes.

127.   William Andrew Curl is within the class of people intended to be protected by the Kentucky Consumer Protection Act.

128.   The actions set forth in this Count were a substantial factor in causing damages, as set out in the Counts below, to William Andrew Curl and Tonya Curl, and for which Merck is legally responsible.

129.   In addition, the Court should award Plaintiffs reasonable attorneys' fees and costs as allowed by the Kentucky Consumer Protection Act, KRS 367.220(3).

## COUNT VIII - NEGLIGENCE
### (Against Charles Conley, M.D.)

130.   Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein at length.

25

131.    At all times relevant hereto, William Andrew Curl had a physician-patient relationship with Dr. Conley

132.    Beginning on or about February 1999, and continuing through approximately February 2004, Dr. Conley prescribed or otherwise provided Vioxx® to William Andrew Curl.

133.    Despite the fraud of Merck and its attempts to conceal and to misrepresent the safety profile of Vioxx®, Defendant, Dr. Conley, nevertheless failed to exercise reasonable care in prescribing Vioxx® to William Andrew Curl, all as more fully set forth in this Count.

134.    Defendant, Dr. Conley, in the exercise of reasonable care and in compliance with the relevant standard of care knew or should have known that Vioxx® posed real and substantial risks of adverse cardiovascular events, but failed to fully and adequately consider those risks or disclose them to William Andrew Curl before prescribing Vioxx®.

135.    In prescribing Vioxx® to William Andrew Curl, Dr. Conley was negligent and deviated from the relevant standard of care in several particulars, including, but not limited to: failing to be aware of or consider the real and substantial risks that Vioxx® posed of adverse cardiovascular events; failing to determine whether treatment with a COX-2 selective inhibitor was appropriate or indicated because of gastrointestinal or other risks to William Andrew Curl;  prescribing Vioxx® off-label;  failing to obtain  informed consent, including the failure to inform William Andrew Curl of adverse events associated with Vioxx® and failing to provide adequate and complete instructions for safe use of the drug.

26

136.   The actions set forth in this Count were a substantial factor in causing damages, as set out in the Counts below, to William Andrew Curl and Tonya Curl, and for which DOCTOR, M.D is legally responsible.

## DAMAGES

### COUNT IX – William Andrew Curl's DAMAGES
### (Against Merck and Charles Conley, M.D.)

136.   Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein at length.

137.   As a result of the actions and failures to act of Merck and Dr. Conley, as set forth in this Complaint, William Andrew Curl has sustained and will in the future sustain, pain and suffering, physical, emotional and mental, past, present and future, including the loss of enjoyment of life.

138.   As a result of the actions and failures to act of Merck and Dr. Conley, as set forth in this Complaint, William Andrew Curl has incurred, and will in the future incur, medical and other expenses for William Andrew Curl's care, rehabilitation and treatment, including the expense of hospitalization, nursing care and other treatments.

139.   As a result of the actions and failures to act of Merck and Dr. Conley, as set forth in this Complaint, William Andrew Curl has suffered and will in the future suffer, loss of earnings and permanent impairment of his power to labor and earn money.

140.   Merck and Dr. Conley are jointly and severally liable for the compensatory damages of William Andrew Curl as set forth herein.

## COUNT X- LOSS OF CONSORTIUM
### (Against Merck and Charles Conley, M.D.)

141.   Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein at length.

142.   Tonya Curl was at all times relevant hereto the spouse of William Andrew Curl, and as such, lived and cohabited with William Andrew Curl.

143.   As a result of the actions and failures to act of Merck and Dr. Conley, as set forth in this Complaint, Tonya Curl has incurred and will in the future incur medical and other expenses.

144.   As a result of the actions and failures to act of Merck and Dr. Conley, as set forth in this Complaint, Tonya Curl has suffered, and will in the future suffer, the loss of William Andrew Curl's affection, companionship, services and society, and the marital association between husband and wife has been impaired and depreciated, as a result of which Tonya Curl and William Andrew Curl have been and will be caused great suffering, loss and mental anguish.

145.   Merck and Dr. Conley are jointly and severally liable for the compensatory damages of Tonya Curl as set forth herein.

## COUNT XI - PUNITIVE DAMAGES
### (Against Merck)

146.   Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein at length.

147.   Plaintiffs are entitled to punitive damages because Merck's actions and failure to act as set forth herein were reckless and without regard for the public's safety and welfare.

Merck misled both the medical community and the public at large, including Plaintiffs, by making false representations about the safety of Vioxx®. Merck downplayed, understated and disregarded its knowledge of the serious adverse events and side effects associated with the use of Vioxx®, despite available information demonstrating that Vioxx® was likely to cause serious and sometimes fatal side effects to users.

148.    Merck was or should have been in possession of evidence demonstrating that Vioxx® caused serious adverse events and side effects. Merck failed to conduct appropriate and necessary testing, despite repeated indications and calls therefore, and continued to market Vioxx® by providing false and misleading information with regard to the safety and efficacy of said drug.

149.    Merck acted willfully, wantonly, intentionally, outrageously, maliciously and with reckless and conscious disregard for the health, welfare, safety and rights of Plaintiffs and the general public.

150.    Merck is liable to William Andrew Curl and Tonya Curl for punitive damages in an amount as supported by the evidence and the law of the Commonwealth of Kentucky.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, William Andrew Curl and Tonya Curl, request that this Court enter judgment against Defendants, and award relief as follows:

A.    Compensatory damages against Merck & Co., Inc. and Dr. Conley, jointly and severally, in an amount supported by the evidence at trial;

B.    An award of attorney's fees, pre-judgment and post-judgment interest, and costs of suit, as provided by law against Merck & Co., Inc. and Dr. Conley, jointly and severally;

29

C.      Punitive damages against Merck & Co., Inc., in an amount to be determined at
        trial;

D.      Trial by jury on all issues so triable; and,

E.      Such other legal and equitable relief as this Court deems just and proper.


**JURY TRIAL DEMANDED**


                                        Respectfully submitted,


                                        _Brian Ratliff_
                                        _____
                                        Gregory J. Bubalo
                                        D. Brian Rattliff
                                        BUBALO & HIESTAND, PLC
                                        401 South Fourth St., Suite 800
                                        Louisville, Ky. 40202
                                        Telephone: (502) 753-1600
                                        Facsimile: (502) 753-1601

                                        and

                                        Ann B. Oldfather
                                        OLDFATHER & MORRIS
                                        1330 South Third Street
                                        Louisville KY 40208
                                        Telephone: (502) 637-7200
                                        Facsimile: (502) 637-3999
                                        **Co-Counsel for Plaintiffs**

                                        and

                                        Tyler Thompson
                                        310 Starks Building
                                        Lousiville, KY  40202
                                        Telephone: (502) 587-6554
                                        **Co-Counsel for Plaintiffs**


30

## CERTIFICATE OF SERVICE

The undersigned counsel for plaintiffs hereby certifies that a true and accurate copy of this Complaint was served via first-class mail, U.S. postage prepaid, this the 15th day of May, 2005, to:

> Office of Attorney General Greg Stumbo
> State Capitol, Suite 118
> Frankfort, KY 40601

Counsel for Plaintiffs

31

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **In re: VIOXX®** | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| | * | |
| | * | **MAG. JUDGE KNOWLES** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### THIS DOCUMENT RELATES TO ALL CASES

### MOTION PURSUANT TO PTO 9A AND
### F. R. CIV. P. 26(C) FOR A PROTECTIVE ORDER

#### NOTICE

PLEASE TAKE NOTICE that the undersigned counsel will bring this Motion Pursuant to PTO 9A and F. R. Civ. P. 26(c) for a Protective Order before the Honorable Eldon E. Fallon, United States District Court for the Eastern District of Louisiana, 500 Poydras Street, New Orleans, Louisiana, 70130, at such time as the Court allows the same to be heard.

#### MOTION

Comes the undersigned counsel, on behalf of certain Plaintiffs in the cases for which deposition notices have been issued by Merck as set forth in the letter from Emily R. Pistilli to Ann B. Oldfather dated May 20, 2011, attached as Exhibit B, and move the Court to enter the attached Protective Order remanding the depositions as noticed and directing Merck to comply with PTO 9A.

In support of this Motion, counsel states she received an email from Ms. Pistilli dated April 11, 2011 stating that Merck planned to "arrange dates" for depositions of unidentified "relevant doctors" in three different cases.  Ms. Pistilli professed that "we would like to work

with your schedule as much as possible to try to find dates that are convenient for all involved." Ms. Pistilli then inquired whether "you [would] let us know if there are any blackout dates in May, June or July when plaintiffs' counsel in these cases would NOT be available to participate in doctor depositions?" See Email thread at Exhibit A.

The undersigned responded promptly on April 15, 2011, and confirmed what she had told Ms. Pistilli and Mr. Marvin on March 2, 2011 (when leaving a hearing before this honorable Court), that "I have already told you and Doug that I am unavailable for most of June and the first part of July." Ms. Oldfather also asked for the names of the physicians in question and concluded by requesting that Mr. Marvin call her on enumerated days the next week. *Id.*

No response *of any kind* was received until Ms. Pistilli's letter of May 20, 2011, with 5 deposition notices attached. *See* Exhibit B. All but one of the depositions were set for dates when Ms. Oldfather had already indicated her unavailability. Ms. Oldfather responded immediately with her letter attached at Exhibit C, by which she attempted to confer with Williams & Connolly counsel in an effort to resolve the dispute without court action. Ms. Pistilli refused to withdraw the deposition notices. *See* Exhibit D.

This Court has provided guidance to counsel in PTO 9A concerning how cooperative deposition scheduling should be conducted. Section I. B. presents the general rule that "[c]ounsel are expected to cooperate with and be courteous to each other .. in scheduling depositions." Section II. C. directs that [a]bsent extraordinary circumstances, counsel shall consult in advance with opposing counsel ... [to] schedule depositions at mutually convenient times...", and concludes by requiring that each side "shall" be notified of the scheduled date "at least thirty (30) days in advance." *Id.*

2

For the foregoing reasons, the Court is respectfully requested, pursuant to F.R. Civ.P. 26

(c), to enter the tendered Order

Respectfully submitted,

/s/

Ann B. Oldfather
KBA Bar #52553
Liaison Counsel/Lead Counsel
OLDFATHER LAW FIRM
1330 S. Third Street
Louisville, KY   40208
502.637.7200
502.637.3999
aoldfather@oldfather.com

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Motion Pursuant to PTO 9A and F. R. Civ. P. 26(c) for a Protective Order has been served upon Liaison Counsels, Phillip Wittmann and Russ Herman, by U.S. mail and email and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 26th day of May, 2010.

/s/

Ann B. Oldfather

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: VIOXX® | * | **MDL Docket No. 1657** |
| | * | |
| **PRODUCTS LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| | * | |
| | * | **MAG. JUDGE KNOWLES** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## O R D E R

### THIS DOCUMENT RELATES TO ALL CASES

Motion having been made by counsel for certain Plaintiffs,

IT IS HEREBY ORDERED BY THE COURT that the deposition notices issued by Defendant Merck & Co., Inc, for deponents Burick, Leal, Cox, Delgado and Nunez shall be vacated.  Merck and its counsel shall comply with PTO 9A generally in the scheduling of depositions.

So ordered.

New Orleans, Louisiana, this __ day of _____, 2011.

_____

Eldon E. Fallon
United State District Judge

4