```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 2
     ********************************************************
 3
     IN RE:  VIOXX PRODUCTS              MDL No. 1657
 4   LIABILITY LITIGATION               Section: "L"
                                        New Orleans, Louisiana
 5                                      Thursday, August 4, 2011

 6   ********************************************************

 7    TRANSCRIPT OF MONTHLY STATUS CONFERENCE PROCEEDINGS AND MOTIONS
            HEARD BEFORE THE HONORABLE ELDON E. FALLON
 8                   UNITED STATES DISTRICT JUDGE

 9
     APPEARANCES:
10
     FOR THE PLAINTIFFS
11   LIAISON COMMITTEE:                 HERMAN, HERMAN, KATZ & COTLAR
                                        BY:  LEONARD A. DAVIS, ESQ.
12                                      820 O'Keefe Avenue
                                        New Orleans, LA 70113
13
                                        BEASLEY, ALLEN, CROW, METHVIN,
14                                      PORTIS & MILES
                                        BY:  ANDY D. BIRCHFIELD, JR., ESQ.
15                                      218 Commerce Street
                                        Montgomery, AB 36104
16
17                                      BARRIOS, KINGSDORF & CASTEIX
                                        BY:  DAWN M. BARRIOS, ESQ.
18                                      701 Poydras Street, Suite 3650
                                        One Shell Square
19                                      New Orleans, LA 70139
20
                                        LIEFF CABRASER HEIMANN & BERNSTEIN
21                                      BY:  ELIZABETH J. CABRASER, ESQ.
                                        Embarcadero Center West
22                                      275 Battery Street, Suite 3000
                                        San Francisco, CA 94111-3339
23
24   FOR VARIOUS PLAINTIFFS:            OLDFATHER LAW FIRM
                                        BY:  ANN B. OLDFATHER, ESQ.
25                                      1330 South Third Street
                                        Louisville, Kentucky 40208
```

```
 1

 2   FOR THE DEFENDANTS
     LIAISON COMMITTEE:                WILLIAMS & CONNOLLY
 3                                     BY:  DOUGLAS R. MARVIN, ESQ.
                                            M. ELAINE HORN, ESQ.
 4                                          EMILY R. PISTILLI, ESQ.
                                       725 12th Street, N.W.
 5                                     Washington, D.C. 20005

 6
                                       STONE, PIGMAN, WALTHER, WITTMANN
 7                                     BY:  DOROTHY H. WIMBERLY, ESQ.
                                       546 Carondelet Street
 8                                     New Orleans, LA 70130

 9

10   CURATOR FOR PRO SE
     PLAINTIFFS:                       LAW OFFICE OF ROBERT M. JOHNSTON
11                                     BY:  HEATHER E. REZNIK, ESQ.
                                       601 Poydras Street, Suite 2490
12                                     New Orleans, LA 70130

13
     REPRESENTATIVE FOR
14   SPECIAL MASTER:                   JUNEAU LAW FIRM
                                       BY:  THOMAS R. JUNEAU, ESQ.
15                                     1018 Harding St., Suite 202
                                       Lafayette, LA 70503
16

17
     ALSO PRESENT:                     HAGENS BERMAN
18                                     BY:  THOMAS M. SOBOL, ESQ.
                                       55 Cambridge Parkway, Suite 301
19                                     Cambridge, MA 02142

20
                                       BECNEL LAW FIRM
21                                     BY:  DANIEL E. BECNEL, JR., ESQ.
                                       106 W. 7th Street, #B
22                                     Reserve, LA 70084

23
                                       MARGARET E. WOODWARD, ESQ.
24                                     3701 Canal Street, Suite C
                                       New Orleans, LA 70119
25
```

1

2    Official Court Reporter:              Karen A. Ibos, CCR, RPR, CRR
                                          500 Poydras Street, Room HB-406
3                                         New Orleans, Louisiana 70130
                                          (504) 589-7776
4

5

           Proceedings recorded by mechanical stenography, transcript
6    produced by computer.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2                 (THURSDAY, AUGUST 4, 2011)

3             (MONTHLY STATUS CONFERENCE AND MOTIONS)

4

5        (OPEN COURT.)

6            THE COURT:  Be seated, please.  Good morning, ladies and

7     gentlemen.  Let's call the case.

8            THE DEPUTY CLERK:  MDL No. 1657, *in re:  Vioxx.*

9            THE COURT:  Counsel make their appearance for the record.

10           MR. MARVIN:  Good morning, your Honor, Douglas Marvin for

11    Merck.

12           MR. BIRCHFIELD:  Andy Birchfield, me and Chris Seeger

13    will be handling for the plaintiffs.

14           THE COURT:  We're here today for the monthly status

15    conference, and I have met with liaison counsel and lead counsel to

16    discuss the agenda with them.

17           The first item on the agenda is the Settlement Program.

18    Anything on that?

19           MR. MARVIN:  Your Honor, there's only really one open

20    issue relating to the Settlement Program because almost all of the

21    claims, as you know, have been processed.  That open issue relates

22    to claims largely where estate issues have not yet been resolved,

23    and we filed a motion to put those moneys into the court registry.

24    And I understand that your Honor will be considering that motion

25    after the hearing?  After the status conference today?

```
1              THE COURT:  Yes.  What basically what's happened is that

2    there's something issues, as I understand it, with the estates of

3    the individuals; there are certain estate issues, certain local

4    estate issues that have to be worked out and there may be some

5    issues on the distribution by and between the heirs of the amount.

6              But what my thinking is I'll give the people an

7    opportunity to tell me why it shouldn't be done.  But what I would

8    like done is that the money should be deposited in the registry of

9    the court, the releases sent to Merck, and then when the estate

10   issues are resolved then those funds get distributed in the form

11   and fashion that the various state courts so order.  But we've got

12   to get those funds into the registry of the court so that both

13   sides are confident that the funds are not going to be dissipated

14   or released or whatever it is.

15             But I won't do that just willy-nilly, I'll give people an

16   opportunity, I'll Rule to Show Cause why that should be done but we

17   need to move on that.

18             MR. MARVIN:  Yeah, I think all of those oppositions have

19   been filed now, so I think that once your Honor has the opportunity

20   to review those.  Largely most of the oppositions related to the

21   fact that they thought their claims were being extinguished, when,

22   in fact, they're not.  The money is just being put in a different

23   place just awaiting the estate issues.

24             THE COURT:  Yes, right.  Special Master, anything from

25   the Special Master?
```

1            MR. THOMAS JUNEAU:  Good morning, your Honor, Thomas

2     Juneau.  Patrick Juneau is at an arbitration this morning, so I am

3     standing in batting for him today.

4            Judge, I have three very brief issues to report very

5     quickly to the court.  First with regard to the overall Vioxx

6     program, there are no new issues to be addressed.

7            Second, with regard to the attorney lien issues that were

8     assigned to the Special Master:  All of those issues have been

9     addressed by the Special Master, the report and recommendations

10    have been made to the court.  So essentially all of the tasks with

11    regard to that issue have been completed by the Special Master.

12            Third and finally, your Honor, with regard to the state

13    Attorney General claims, I believe those claims are going to be

14    addressed by the parties subsequent to my presentation, your Honor.

15    Very briefly I will tell you that there have been conferences with

16    the state AG's and Merck that have been held with the Special

17    Master.  There are issues that do continue to exist and there is no

18    resolution at this time.  The NAMFCU 60-day period for reply is

19    still open, and we're hopeful that some outstanding issues can be

20    resolved during that process.  But again, your Honor, I believe

21    that will be reported more fully by the parties later in today's

22    status conference.

23            THE COURT:  Right.  Okay.

24            MR. THOMAS JUNEAU:  Thank you.

25            THE COURT:  Thank you.  Any class actions, any discussion

1   on class actions?

2           MR. BIRCHFIELD:  No, your Honor -- oh, I'm sorry.

3           MS. CABRASER:  Elizabeth Cabraser from the PFC.  As the

4   report indicates, your Honor has Merck's motion under submission.

5   Both sides periodically filed notices of supplemental authority

6   with the court, I think the most recent one was Merck's filed on

7   Tuesday.  Plaintiffs will do likewise in related actions.

8           There is a state court proceeding in Missouri, as your

9   Honor is aware, that's a state wide class action certified under

10  Missouri state law and is set for trial in May.  There is discovery

11  ongoing in that case, and, meanwhile, we remain in place behind the

12  Attorneys General cases for further activity in discovery or

13  resolution.

14          THE COURT:  Tell me about the Missouri case, is that

15  going to have an impact on our situation?

16          MS. CABRASER:  Well, your Honor, we would like to meet

17  and confer with Merck on that, the parties may have different views

18  on that.  We've been in periodic touch with counsel in that case.

19          THE COURT:  Who is trying that case from the plaintiff's

20  standpoint in Missouri?

21          MS. CABRASER:  A local firm, your Honor, the firm that

22  obtained the class certification order and represented plaintiffs

23  through the appellate proceedings.  The class decision and the

24  appellate decisions were submitted to your Honor sometime ago in

25  connection with all of our briefing.

```
 1              THE COURT:  Right.

 2              MS. CABRASER:  It had an earlier trial date but that was

 3    continued by the court.  We think the May 2012 date is firm.

 4              THE COURT:  Okay.

 5              MS. CABRASER:  But if and as the situation changes in

 6    that case, we will report in to your Honor.

 7              THE COURT:  It's state wide?

 8              MS. CABRASER:  It is a state-wide class under the

 9    Missouri consumer law, certified under the Missouri version of

10    Rule 23.  So I think there's a debate between Merck and plaintiffs

11    as to the extent to which that would be applicable here.

12              We would state only at this point that it may serve, if

13    not as a formal bellwether, a helpful case to a similar extent that

14    a personal injury case tried under a different state law but

15    involving the same product might inform the proceedings here.

16              THE COURT:  All right.  Thank you, Elizabeth.

17              State/Federal Coordination, anything?

18              MS. BARRIOS:  Good morning, your Honor.  Dawn Barrios for

19    the State/Federal Committee.

20              Just a footnote to your question to Ms. Cabraser, one of

21    the trial attorneys in the Missouri case is Don Downing in

22    St. Louis, he is co-liaison counsel in the Rice MDL.  And a very

23    competent counsel.

24              Your Honor, the task of the State/Federal Committee is

25    really winding down.  We have all of the remands current through
```

1  PTO 167.  We have whittled the cases down from 105 to 87 on this

2  date, and we have whittled the number of plaintiffs down as well.

3       Of the remaining 87 cases, 24 government

4  actions/TPP/consumer and seven are post settlement filings.

5       In order to assist in cleaning up your MDL so that we can

6  finally see some closure in it, I've been working with Ms. Cabraser

7  in trying to accumulate all of the consumer cases and working with

8  Mr. Birchfield on trying to clean up the rest of the docket.  And

9  in answer to one of your questions last time, I was able to review

10  all of the open cases and found one RICO case and one case that is

11  a breach of contract.  And I will be conferring with the PSC

12  further on that what their recommendation will be, but that's what

13  was found.

14       THE COURT:  Where was the RICO case out of?

15       MS. BARRIOS:  I don't remember, your Honor, but it is on

16  the disc.  And my understanding is that there is a RICO MDL for

17  Vioxx, so I don't know what your Honor wants to do with it.

18       THE COURT:  Right.  Okay.

19       MS. BARRIOS:  Thank you.

20       THE COURT:  Thank you.  Anything on the Pro Se?

21       MR. MARVIN:  Your Honor, just to correct that one point,

22  we are not aware of any RICO MDL.

23       MS. REZNIK:  Good morning, your Honor.  Heather Reznik

24  for pro se curator Bob Johnson.  Our office continues to receive

25  several calls a week from pro se claimants, and we continue to help

```
 1   them as best we can.
 2              THE COURT:  Is that winding down somewhat?
 3              MS. REZNIK:  Usually it's about between five and eight a
 4   week.  It's winding down, a lot of it's the same callers, repeats,
 5   but it is winding down.
 6              THE COURT:  Okay.  Thank you.
 7              And the Government Actions?
 8              MS. BARRIOS:  Your Honor, I believe we're going to do a
 9   that after the status conference because we have a special
10   telephone status conference.
11              THE COURT:  We'll talk about that with the -- one of the
12   things that I have to be aware of in that matter is that the NAMFCU
13   opportunity is still extant and will remain so until September 15th
14   or so, so I think to some extent we're going to have to meet and
15   confer and then talk about what we do after that particular date to
16   see who is on board and who is not and deal with it accordingly.
17              Pending Personal Injuries, it's 28, 29 and 43.
18              MS. OLDFATHER:  Good morning, your Honor, Ann Oldfather
19   liaison counsel for certain of these cases.
20              I suppose the most important thing for me to mention,
21   your Honor, is that we have followed up with the court's directive
22   that we ask all pending personal injury claimants or their counsel
23   to provide a consent or waiver to our firm so that we can obtain
24   medical records, PPF forms, and lone pine reports for each of the
25   remaining personal injury plaintiffs.  We started that process in
```

1    early June, and we have filed two update reports with the court.

2              At this point there are 13 claimants who have not

3    responded to our request for consents.  Would the court like me to,

4    since we might have some telephone participants, read those names?

5              THE COURT:  Yes, let's list them.

6              MS. OLDFATHER:  Some of these people, your Honor, I'll

7    leave them to the end, we haven't contacted yet for specific

8    reasons; but these are people whom we have contacted or attempt to

9    contact.  Claimants Diane Brown, who is pro se; claimant Deborah

10   Byrd, B-Y-R-D, who is pro se; claimant Lerene Campbell, pro se;

11   claimant Sheryl Gross, represented by Don Melancon, well, Law

12   Offices Of Donald J. Melancon in New Orleans; claimant Gene M.

13   Collin, C-O-L-L-I-N, pro se; claimant Darlene Harris, pro se;

14   claimant Patricia Kelly, pro se; claimant Clinita Lawrence

15   represented by Sheryl Berkowitz from Hallandale, Florida; claimant

16   Virginia Pickett; claimant Betty Terrill, represented by Chris

17   Limberopoulos of Tampa, Florida; claimant Shannon Thibault,

18   represented by Richard L. Hughes of Little Rock, Arkansas; and

19   claimant Christine Woodock.

20             In addition, there is claimant Jamaal Bilal, whom we have

21   not yet asked for the consent because he was not on our list

22   originally in June, and I believe his case is up for a dismissal so

23   we thought we would wait and determine the status of his case

24   before we reviewed his medical records.

25             In terms of those folks, your Honor, we haven't heard

```
 1   from those 13, but we have heard from everybody else; and there are

 2   approximately 100 to 106 claimants, depending upon who is counting.

 3   We have submitted those consents to Merck, Merck is in the process

 4   of providing all of the information to us.  We understand that the

 5   bulk of the information has been provided as of yesterday, and we

 6   are going to be continuing with the process we've already started

 7   of reviewing that information.

 8          In addition to obtaining those consents, we are moving

 9   forward in the individual cases.  Various counsel have been

10   providing discovery as requested by Merck and conducting their own

11   discovery.  Merck has agreed to provide me with specific

12   information as liaison counsel that we discussed off the record.

13          And I believe that's all I have to report at this point

14          THE COURT:  I think we're going to have to, Dorothy,

15   you're going to have to file a motion to dismiss those cases.  I

16   will give the people an opportunity, I'll set a Rule to Show Cause

17   why they shouldn't be dismissed for failure to act, I'll give them

18   enough time, I'll send it to them, we'll do the same thing that

19   we've done.  I am not going to willy-nilly dismiss their case, but

20   they have to know that they've got to do something, they can't just

21   stay out there.  We've got to begin -- not begin, but we've got to

22   do something in these cases.

23          So let's do that, I'll set them for next conference, and

24   we'll -- give us the address that you have on those, Ann, and I'll

25   have them mailed, the court will send them out.
```

1          MS. OLDFATHER:  Yes, your Honor.  And I should correct

2     myself.  Virginia Pickette, we have not yet asked her directly for

3     a consent because she has changed counsel and the consent we

4     obtained from her --

5          THE COURT:  Let's take her off the list.

6          MS. OLDFATHER:  Right.  The consent we obtained from her

7     counsel didn't cover her, so we need to get an address for her from

8     Merck.  And there are about two or three other people whose

9     addresses have been problematic, and you asked us to work together

10    with Merck on that.

11         THE COURT:  The attorneys have responsibilities on these

12    cases, but the clients have responsibilities, also.  They have to

13    at least let their attorneys know where we are or let the court

14    know where they are or respond to the court's directive.  They

15    can't just come into the litigation and just forget it, and if they

16    do I'll forget about them.

17         MS. OLDFATHER:  Thank you, your Honor.

18         THE COURT:  Anything from the Fee Allocation Committee?

19         MR. BIRCHFIELD:  Your Honor, the Special Master has

20    completed his report and submitted it to the court.

21         THE COURT:  I have all of the reports and now I'm dealing

22    with it and I will be dealing with it, I will be issuing something

23    shortly.

24         MR. BIRCHFIELD:  The only other issue is the third party

25    payor matter.

```
1              THE COURT:  Sure.

2              MR. SEEGER:  Judge, we have been contacting, as your

3    Honor has, by certain members who are looking for the court to set

4    up a procedure with regard to the fees being held back on that.

5              THE COURT:  My thinking on that is I would like the

6    interested parties to get together and then I'll set a status

7    conference.  Maybe we can talk after this hearing at least to give

8    you some guidance as to how to go about designing a procedure.

9    Hopefully it will be less of a meticulous procedure than the other

10   one, but we do need some procedure, it needs to be transparent.

11             MR. SEEGER:  Thank you, your Honor.

12             THE COURT:  Okay.  Thank you.  Motions that we should

13   know about?

14             MR. MARVIN:  Your Honor, there are two motions that are

15   ready for review by the court, and those will follow the status

16   conference as has been the practice.  The first we've alluded to,

17   that's the motion to show cause about the Settlement Program

18   releases.  Ms. Horn will be able to address that and explain the

19   two-step process that we have in place there.

20             The second motion relates to Jamaal Bilal, and I believe

21   Ms. Pistilli will be dressing that.

22             As for the other motions, motion as to plaintiff Stanley

23   Long, that has been deferred to the next conference; and the

24   motions relating to Mary Jackson and Violet Blanton are now moot.

25             There are several motions that have been fully briefed,
```

```
1    the Quackenbush matter and the Emmanuel Iwobi matter.  And so those

2    have been submitted to the court.

3                THE COURT:  Okay.

4                MS. OLDFATHER:  Your Honor, if I may?

5                THE COURT:  Yes.

6                MS. OLDFATHER:  I believe it was on the status report

7    that Merck would request permission of the Iwobi matter on the

8    brief.  We have been in contact with Mr. Iwobi, and the court may

9    know that he had made a concerted effort as a pro se claimant to

10   file pretty decent pleadings on his own behalf.  And he asked us if

11   we would at least stand up for him today; so I would ask rather

12   than that being submitted, that it be passed to the hearing date

13   that we obtained of August 30 for some of the motions that we

14   haven't gotten to yet that are coming you up later on in the status

15   report.

16               MR. MARVIN:  That's fine, your Honor.

17               THE COURT:  Okay.  We'll do that.

18               Any appeals, any discussion on the appeals?  Other

19   matters?  I understand we have some --

20               MS. WOODWARD:  Good morning, your Honor, Margaret

21   Woodward, former co-lead counsel for the 18 objectors.

22               As the court is aware, at the time of the conclusion of

23   the Special Master's hearing on May 13th, all but four of the

24   objectors had reached a resolution with the Fee Allocation

25   Committee.
```

```
 1              THE COURT:  Right.

 2              MS. WOODWARD:  When the Special Master entered his

 3    recommendations to the court, he addressed only the claims of those

 4    four.  As the matter now moves before your Honor, each of those

 5    four has filed appeals, and the court indicated just a moment ago

 6    that you would be issuing something soon.  We're getting a number

 7    of calls, not only from the objectors but also from people who were

 8    not previously objectors about what the process would be going

 9    forward, whether the court is going to look only at the four --

10              THE COURT:  No.

11              MS. WOODWARD -- whether the court is going to look the at

12    whole matter --

13              THE COURT:  Right.

14              MS. WOODWARD:  -- and whether if the court is going to

15    look at the entire allocation process, will there be a further

16    opportunity -- and if so, for whom -- to submit further material to

17    the court either in defense of the recommendations of the fact

18    which they're approving of or in further opposition.

19              THE COURT:  Okay.  All right.  My thinking on it is that

20    I have all of the material that I am going to need.  I am going to

21    issue my opinion, and then I guess if anybody wishes me to

22    reconsider, state so.  I'll either set that up or deal with it.

23    But I am going to be writing an opinion on everybody at this point

24    deciding the entire amount, that's what I am doing.

25                  As I am doing it, it's sort of like no good deed goes
```

1   unpunished kind of thing.  Traditionally in these cases, or at

2   least I should say early on in this type of litigation, it was

3   necessary, it was felt necessary to appoint a committee.  The

4   committees did all of the work and the committees got all of the

5   fee.  As these cases, not this case, but as the development of this

6   type of litigation proceeded in the '80s and '90s and now into the

7   2000's, it becomes problematic to have a small group go from case

8   to case, place to place, and handle that to the exclusion of local

9   lawyers and to the conclusion of other people who have something to

10  contribute.

11          That doesn't mean in my opinion that you don't need a

12  targeted group who leads the litigation, but I do feel that opening

13  it to everyone is good for the system.  And so I've tried to do

14  that in this particular case, and after I phoned the committees I

15  instructed the committees to think about creating subcommittees and

16  to invite non-committee members on to subcommittees.  Almost every

17  meeting thereafter I came out and told everybody -- and in those

18  days I had a room full of lawyers and a couple of hundred on the

19  phone -- and I would repeat that anybody who was interested in

20  participating in the common benefit of this litigation to feel free

21  to do so, contact the lead and liaison plaintiff counsel and get on

22  a committee.

23          And if you have any problems getting on the committee let

24  the court know and I would look at it.  As a result of that, some

25  107 people participated in this operation.  Now the difficulty is

1    in doing it -- and I've tried to -- we don't have a lot of history

2    and a lot of precedent to follow because some of these things we've

3    done for the first time in this type of litigation.  But early on I

4    created or at least I appointed a CPA and came up with some rules

5    and regulations as to what was compensable and how you would do it,

6    and I asked the parties to submit on a monthly basis their fee and

7    their expenses.

8           And then I received an in-camera report from the CPA on a

9    monthly or bi-monthly basis, and I met with him to go over what the

10   submissions were, particularly in the early stages so that I could

11   be assured when you're coming in in the form and fashion that I

12   felt they should be.

13          But this was done and time logged and expenses given and

14   so forth.  But in doing it, it really does add a level of work that

15   the MDL court has to go though.  So to personally evaluate the 107

16   individuals and look at the material that I have on those

17   individuals is kind of a daunting task, one that I wouldn't have if

18   I only stuck with 12 appointees.  So I don't know whether my other

19   colleagues throughout the nation are going to want to do this, but

20   I think the process is worthwhile, at least to get people who have

21   not been in them before to get some experience and also something

22   on their resumé that they have done MDL work for the next

23   opportunity.

24          But I do recognize that it is a very difficult thing to

25   handle.  It's particularly difficult from my seat in the bus, so to

1  speak, because I change law clerks yearly or sometimes every two

2  years, so my institutional memory is gone each year basically and

3  I'm the only institutional memory.  So it's a difficult task but it

4  is what it is.

5          MS. WOODWARD:  Thank you, your Honor.

6          THE COURT:  Thank you.

7          MR. BIRCHFIELD:  Your Honor, if I could, I just want to

8  address one point --

9          THE COURT:  Wait, before I leave.  You mentioned, too,

10  that I know you all have an interest in fees.  You have to bring

11  that to me so that it just doesn't sit.  I know you filed it and

12  I've also had the opportunity to have other people comment on it,

13  so I would like to take care of that.  You've earned fees in the

14  case, and I want to make sure that fees and costs are transmitted

15  to you.  So let's just not forget about that, let's get to me on

16  it.

17          Danny, you have something?

18          MR. BECNEL:  Judge, I don't want you to forget about the

19  Stratton matter because that's particularly important to me because

20  I've had to pay taxes on that this past year, and I put all of the

21  money back and I can't file anything with the IRS to say, hey,

22  look, I really didn't get this half a million dollars, I got it for

23  a few weeks and did a notice to the court, didn't know what to do

24  with it, gave it right back.

25          THE COURT:  Sure, it is.

```
 1              MR. BECNEL:  And I've been contacted by numerous people
 2     around the country who will pay the difference and weren't in
 3     involved in an outrage.
 4              THE COURT:  Okay.  Thank you.
 5              MR. BECNAL:  I am just letting the court know that.
 6              THE COURT:  Okay.
 7              MR. BIRCHFIELD:  Your Honor, just to address one point
 8     that Ms. Woodward made, and that is in regards to Special Master
 9     Juneau's reports.  For those that are listening or may read the
10     record, I want to make sure that it's clear.
11              Special Master Juneau, following the court's instruction,
12     oversaw the discovery process.  He presided, he ordered the
13     deposition of a Fee Allocation Committee designee.  He not only had
14     that transcript but he provided over that deposition that involved
15     the entire process, each firm that was involved, and his order
16     dealt with each of the applicants.  It was not just addressing the
17     four objectors.
18              I know the court is aware of that, but I wanted the
19     record to be clear on that point.  Because -- he also conducted a
20     week long, full-blown evidentiary hearing where the entire process,
21     each of the applicant firms were on the table.
22              THE COURT:  Okay.
23              MS. WIMBERLY:  Your Honor, under the Other Matters
24     section, Dorothy Wimberly for Merck.
25              We had listed three pending matters that had kind of
```

1    fallen through the cracks.  The first is Merck's motion and Rule to

2    Show Cause to dismiss with prejudice the claims of Dennis Harrison

3    for failure to comply with PTO 28.  That was originally set earlier

4    this year, Mr. Harrison had medical issues, it was continued by

5    consent.  It was supposed to have been reset for hearing today.

6    That order didn't get entered, and we are going to reset it for

7    August the 30th at 9 A.M.

8            THE COURT:  Okay.

9            MS. WIMBERLY:  And I want to make the court aware that

10   early this morning Mr. Harrison did e-mail to me answers to

11   interrogatories along with other documents; so it may be that

12   motion is moot, but we need to get it on the schedule so that we

13   can get it resolved one way are on the other.

14           THE COURT:  Sure.  Right.

15           MS. WIMBERLY:  Also there was our motion and Rule to Show

16   Cause why a case should not be dismissed with prejudice as to

17   plaintiff Michael Wodowski.  It was actually heard on June 1st and

18   the court granted the motion and dismissed the claims, but the

19   order was not entered.  Several weeks later Mr. Wodowski's counsel

20   uploaded to Lexis/Nexis File and Serve a motion to reinstate the

21   claim.  That motion was not filed with the court.  We contacted --

22   and we learned that when we attempted to file our opposition and

23   the clerk wouldn't allow us to do so.

24           After repeated contacts with Mr. Wodowski's counsel, they

25   finally have uploaded the motion to reinstate and also a motion to

 1   substitute a proper party.

 2        We had asked in the joint report to have the case

 3   dismissed in accordance with the order that was entered on June 1st

 4   and then to deal with this new motion, if it was ever filed of

 5   record.  It has now been filed of record, and we would, again, ask

 6   that the court enter the order of dismissal and then let us bring

 7   up the motion to reinstate on August the 30th

 8        THE COURT:  All right.

 9        MS. WIMBERLY:  And then I do have one other matter, but

10   if Ms. Oldfather's wants to address this one.

11        THE COURT:  Sure, go ahead.

12        MS. OLDFATHER:  Your Honor, we have as liaison counsel

13   been in touch with both of these claimants.  I think the court is

14   well familiar with Dennis Harrison, and Mr. Harrison had a

15   principled but misinformed stand about his obligation to comply

16   with PTO 28 that he has now understood and he has definitely gotten

17   on board.  He started complying with PTO 28 back in the spring, but

18   he had knee replacement, post knee replacement infection and

19   procedures and ended up in the hospital and the nursing home for

20   most of the May and June.  He has been in constant contact with us

21   updating us on his status, I know he sent Dorothy a number of

22   e-mails, and I did see a lot come across yesterday.  So I do hope

23   that --

24        He gave a list of all of his doctors, he has given

25   authorizations, he did that months ago, and I do hope that will be

1    moot because it weighs on him that this keeps coming up.  He had

2    thought and I had thought that it was just on for discussion today,

3    not for dismissal.  So I'll just admit to some misunderstanding of

4    what happened with that.

5           And on the Wodowski matter, Dorothy is correct that it

6    came up for dismissal on June 1st and the court orally granted the

7    motion to dismiss, no one appeared for Wodowski.  I then made it a

8    point -- Wodowski was not on my list, Wodowski was on Mr. Herman's

9    list -- and I didn't know whether those counsel had ever been made

10   aware of exactly what was going on, specifically what the court's

11   different requirements were than what they might have been expected

12   and the obligation for substitution.

13          So we got in touch with them.  What happened, happened.

14   And they have filed pleadings and this is not a question of

15   somebody who doesn't want their claim to continue, and I know that

16   while procedurally the court could have been much more strict about

17   dismissals long ago, you've laid out your intent that people that

18   want to proceed should be allowed to.

19          So if we need a hearing on Wodowski, fine.  I don't

20   really think that we do.  I think at this point it would not be

21   correct to enter the dismissal and then deal with the

22   reconsideration because the parties have appeared, they have done

23   substitution, and they have asked leave of court to get the case

24   active.

25          THE COURT:  It's going the same way.  I'll just rescind

1    my order of dismissal and we'll deal with it as a dismissal rather

2    than dismiss it and then consider a re-admission.  I don't want to

3    put any burden on anybody else that's more burdensome than the

4    other.  So I'll just set that one for the next time.

5            MS. WIMBERLY:  All right.  On August the 30th, your

6    Honor?

7            THE COURT:  Yes.

8            MS. WIMBERLY:  And then finally on page eight of the

9    status report.  There were two pending motions for counsel to

10   withdraw from representation in the Kevin Novick and the Richard

11   Garcia matters.  At the Juneau 1st conference the court orally

12   granted those motions to withdraw, and then again we did not get

13   the order resetting for today.  We would like to have those orders

14   of withdrawn entered, and we would like to reset those motions for

15   August the 30th.

16           THE COURT:  Okay.  Let's make sure that I get those so I

17   can sign them.

18           MS. OLDFATHER:  Your Honor, we have no objection to the

19   withdrawal orders.  Both of these gentlemen have contacted us and

20   have asked us to look at it.  So the August 30th date is coming up

21   awfully soon after this other withdrawal, so I would prefer that

22   they not be set for August 30th because there isn't actually a

23   motion to dismiss their claim at this point.

24           THE COURT:  Well, it's not going to be dismissed, it's

25   just they're withdrawing as attorneys, right?

```
 1        MS. WIMBERLY:  No, your Honor.  We have pending Lone Pine

 2   motions to dismiss that go back to last year that were deferred

 3   pending action on the motions to withdraw as counsel.  So we do

 4   have a pending motion that we are asking to have reset.

 5        MS. OLDFATHER:  But, your Honor, the problem is that

 6   these two clients never got the order that their counsel had

 7   withdrawn, and so they now know that because I communicated with

 8   them after June 1, they're moving forward to get new counsel.

 9   Putting them on for August 30 for dismissal is just such a short

10   leash.

11        MS. WIMBERLY:  We can do September 21st, your Honor.

12        THE COURT:  Yes, let's do it the next time.  Okay.

13        MS. OLDFATHER:  That will help.

14        MR. SOBOL:  May I?

15        THE COURT:  Sure.

16        MR. SOBOL:  Tom Sobol to just briefly address another

17   third party payor matter.  The court might recall that there is

18   subject to the motion to substitute certain law firms for certain

19   John Does.  Having conferred with Mr. Seeger, while I am not

20   counsel in that matter, I will respectfully suggest that the court

21   perhaps direct the PSC and counsel for the third party payors in

22   that matter to confer to determine whether there's any new issues

23   that have arisen, what their positions are on that.

24        THE COURT:  Yes, I would like to have a status conference

25   on that.  Let's set up a status conference on that issue, and we'll
```

1  talk about whether or not any new issues have been raised since

2  that.  If not, I'll set it.

3              MR. DAVIS:  Yes, your Honor, Leonard Davis --

4              MR. SOBOL:  Should that be separate from the 21st, your

5  Honor?

6              THE COURT:  Yes, I think so.  We ought to do that faster.

7              MR. DAVIS:  Leonard Davis for the PSC.  Unfortunately

8  Chris couldn't get a later plane, which he tried to get, he had to

9  be home to do something with his dad.  But he asked me --

10              THE COURT:  Yes, Lenny, you get in touch with those other

11  lawyers and set up a status conference.

12              MR. DAVIS:  We will.

13              THE COURT:  I can do it even on the phone rather than

14  have them come in just for such a short period of time.

15              MR. SOBOL:  Very good, your Honor.

16              MR. DAVIS:  Will do.

17              THE COURT:  Anything else that we need to talk about?

18              MS. WOODWARD:  Just the question about the TPP issue, are

19  you going to set up the status conference on the entire TPP matter

20  or on just some specific issues?

21              THE COURT:  I was just looking for the specific issues

22  that you raised.

23              MR. SOBOL:  The issue I was trying to address is there is

24  a motion that is pending that is before the court, but because it's

25  been pending for a period of time the affected parties in that

```
 1   matter would confer and report to the court whether there's any new

 2   developments.

 3              THE COURT:  That's right.

 4              MR. DAVIS:  That's correct.  We are going to look at that

 5   motion and talk to Tom and then get back to the court.

 6              THE COURT:  If it's ready, I'll put it on the docket and

 7   give a time frame for answering or whatever, argument, and we'll

 8   have it in open court.

 9              Okay.  Anything else?

10              All right.  Folks, thank you very much.  The next meeting

11   is September 21st is the next meeting.  The court will stand in

12   recess.  Thank you.

13              THE DEPUTY CLERK:  All rise.

14         (WHEREUPON, A RECESS WAS TAKEN.)

15         (OPEN COURT.)

16              THE COURT:  Be seated, please.  We have two motions

17   before me.  One is the Bilal motion and the other is the motion

18   regarding the BrownGreer fee material.  Which one do you want to

19   take first?

20              Your Honor, Emily Pistilli from Williams and Connolly

21   representing Merck to address the Bilal motion.  This is docket

22   number, Merck's motion is docket number 63115.

23              Your Honor, in this matter Merck is seeking the dismissal

24   of the duplicate claims that appear to have been inadvertently

25   filed by Mr. Bilal in a second lawsuit.  Mr. Bilal, who is pro se,
```

1    initially filed his suit against Merck in March of 2006.  That case

2    is docketed as 06-CV-02364.  He then enrolled in the Settlement

3    Program, and he ultimately executed a future evidence stipulation

4    and exited the program when his, in spring of 2010 when his claim

5    was termed to be ineligible.

6         And he received notice at that time from the claims

7    administrator that his FES had been accepted by Merck, and the same

8    letter notified him that if he did not have a pending claim,

9    pending lawsuit against Merck, he needed to file one within 60

10   days.  Even though he did have a pending lawsuit against Merck at

11   the time, in response to that letter from the claims administrator

12   he filed what was titled a civil rights complaint form on July

13   17th, 2010, which named both Merck and the claims administrator's

14   pro se coordinator in the defendant section.  And on that form he

15   referenced his earlier filed lawsuit and he stated that he had been

16   instructed to refile or resubmit the suit after exiting the

17   Settlement Program.  And that form was docketed as a new lawsuit in

18   the Middle District of Florida and ultimately transferred to this

19   MDL as a new case.

20        Mr. Bilal has filed a reply to Merck's pending motion in

21   which he concedes that he never intended to maintain more than one

22   suit against Merck, that he clarified that his intent is to

23   maintain one lawsuit against Merck and one lawsuit against the

24   claims administrator's pro se coordinator for the Settlement

25   Program.  And Merck's, therefore, requesting that the claims

1   pending in its later filed lawsuit be dismissed as to Merck.

2               THE COURT:  Anybody on Mr. Bilal's team?

3               I've looked over this, I am going to dismiss the lawsuit.

4   It's just part of the program, you have a right to take the money

5   or put in for it; and if you don't, if you wish you can exit the

6   program and proceed with your lawsuit after filing the appropriate

7   document and that's what he chose to do.  You don't need to file an

8   extra pleading, so I'll dismiss that pleading.

9               MS. HORN:  Good morning, your Honor, Elaine Horn here on

10  Merck's motion, it's another motion regarding the Settlement

11  Program.  Specifically this one is our motion for an order to show

12  cause why the remaining settlement programs releases and

13  stipulations should not be tendered to Merck, and the record

14  locater number is docket number 63015.

15              And basically, your Honor, as of more than a year ago we

16  had BrownGreer come in and give their final report of the fact that

17  all of the moneys that had been put into the Settlement Program had

18  been allocated.  Since that time there have still been some

19  claimants that have not actually been paid because of some

20  unresolved issues with their claim, with their papers; primarily

21  it's estate issues, some of them are lien issues, and some are one

22  off issues.

23              Merck has done everything that it's required to do under

24  the terms of the Settlement Agreement.  So at this point what we

25  would like is for the releases and stipulations that are being held

1   by BrownGreer to be tendered to Merck.  And that was the intent of

2   our motion.  We were envisioning a two-step process, which perhaps

3   needs to be tweaked.  The first step, as we had laid this out in

4   our motion, was that BrownGreer would be ordered to tender the

5   documents to Merck, and at some point a date would be set by which

6   any other remaining claim that had not been resolved, any other

7   remaining money that was still being held with BrownGreer would be

8   tendered to the registry of the court.

9          THE COURT:  What I see is that -- I'll take your motion

10  and I'll issue a Rule to Show Cause why the motion should not be

11  accepted or signed.  I want to give everybody an opportunity to

12  tell me why it shouldn't if they have any reason.  I don't see any

13  reason.  I frankly think that the money is best in the registry of

14  the court.  If it's parked in Merck and something happens to Merck,

15  then that money is going to be dissipated, or potentially

16  dissipated, or potentially threatened.  It ought to be out of

17  Merck's hands, into the registry of the court.

18          And when that's done, Merck ought to be absolved or to

19  get whatever document s they're entitled to.  They ought to be out

20  of the lawsuit, they've done everything they should do.  I don't

21  think they ought to be holding the money.  I don't think it's good

22  for the claimants, and I don't think it's good for Merck not to be

23  out of the lawsuit.  It just seems to me to be best for both sides.

24          But rather than just act without any input from the other

25  side, I'll at least say that I am going to issue the order, a Rule

```
 1    to Show Cause why your motion should not be granted and the funds

 2    deposited in the registry of the court and Merck given the

 3    documents.

 4            MS. HORN:  And, your Honor, we thought that had been part

 5    of the motion that was up for today, and there were people who,

 6    there are four groups of, excuse me -- five groups of claimants

 7    that filed oppositions to that, which --

 8            THE COURT:  That was set as a motion and Rule to Show

 9    Cause?

10            MS. HORN:  Yes.

11            THE COURT:  Okay.  And I did get some opposition, but the

12    oppositions understood or at least they assumed that their case was

13    going to be dismissed.  This is not a question of dismissing the

14    case.  Okay.  I see it.  I am mistaken then.

15            I am going to grant the motion and let's get the

16    documents, I'll order BrownGreer to give you the documents, and

17    I'll order you all to put the money in the registry of the court.

18            MS. HORN:  Are you setting a date by which the money will

19    be turned over to the registry of the court?

20            THE COURT:  It ought to be done as quickly as possible,

21    you ought to get the documents first.

22            MS. HORN:  Correct.  We can prepare a proposed order.  In

23    our reply brief we had actually set out different categories of

24    cases, there were on Exhibit A a list of cases where they've

25    cleaned up all of their problems and so the motion is moot as to
```

1    those claimants.

2              THE COURT:  Why don't you have those documents?

3              MS. HORN:  We do, that happened since, subsequent to our

4    filing the motion in the past few weeks.

5              THE COURT:  Okay.

6              MS. HORN:  And there are more people who since we filed

7    our reply brief also fall into that category, so we would move them

8    off of the motion.

9              THE COURT:  As I understand, some of the categories are

10   the documents are pending in state court, so there's a question of

11   getting some state court signatures?

12             MS. HORN:  There are some where they're waiting on or

13   they were waiting on an executive order, an administrator to be

14   appointed; there were some where no estate had ever been opened,

15   the proceedings hadn't even started; there is at least one instance

16   where for whatever reason the claimant is abandoning the claim.

17   There are a variety of issues.  Some of them are just waiting on

18   signatures from the proper people.

19             THE COURT:  Again, my thinking is we have to get Merck

20   out of the picture, but we also have to get the money that Merck

21   has in its possession out of their possession.  So I just think we

22   ought to do that as quickly as we can, let's get the documents, get

23   dismissed from the lawsuit, but give up the money to the registry

24   of the court.  What's wrong with that?

25             MS. HORN:  We're not -- that's what we would like to have

1   happen.

2           THE COURT:  Let's do it.

3           MS. HORN:  We have no problem with that.

4           THE COURT:  You really ought to prepare though a motion

5   in each one of those cases so that I have a separate one.

6           MS. HORN:  Okay.  Okay.  There are a handful of cases for

7   which we were agreeing to defer for some additional time because

8   it's clear they're imminent in terms of getting their papers

9   cleaned up, so we wanted to leave those until the next status

10  conference.

11          THE COURT:  Give me the ones that are ready then.  I

12  don't want to do a vein and useless thing.

13          My goal is to get Merck out of the lawsuit because

14  they've done everything they can to get the money either to the

15  individuals or to the registry of the court.

16          MS. HORN:  And we will prepare something along those

17  lines as you just stated.

18          THE COURT:  Okay.

19          MS. HORN:  Since it has been stated before, just to

20  clarify, there are some people who are very confused.  They think

21  that by going into the registry of the court they'll never be able

22  to see it again, it's being forfeited and that's not the case.

23          THE COURT:  That's not the case.  And the reason for the

24  registry of the court, I am not saying that Merck's in any trouble

25  or anything of that sort, but it's a better situation to have the

```
1    money in the registry of the court than the money in the

2    defendant's possession, just is.

3              MS. HORN:  We will prepare the orders in accordance with

4    our schedules that are attached to our reply brief.

5              THE COURT:  All right.  Thank you.  Anything, Dorothy?

6              MS. BARRIOS:  I'm sorry, your Honor, Dawn Barrios.  I'm

7    throwing myself on the mercy of the court because I made a mistake

8    when I said that there was an MDL for Vioxx RICO claims.  Opposing

9    counsel told me, friends on my Blackberry sent me a message told

10   me, and others here.  So it is not -- we do not have a RICO MDL for

11   Vioxx, but there is one on securities.  Thank you.

12             THE COURT:  Right.  There is a security MDL.  What

13   happened with that, I thought it was resolved, it's not?

14             MR. BEISNER:  No.

15             THE COURT:  It's still going on.  It's in New York, isn't

16   it?

17             MR. MARVIN:  New Jersey.

18             THE COURT:  New Jersey.

19             MR. BEISNER:  Yes, your Honor.  As you may recall, there

20   was an issue from that case that went up to the U.S. Supreme Court,

21   and so it's taking awhile.

22             THE COURT:  It's in-between, okay, right.  Anything else

23   that we need to deal with before we have the meeting?

24             Okay.  All right.  Thank you.

25             THE DEPUTY CLERK:  All rise.
```

```
1              (WHEREUPON, THE FOLLOWING MATTERS WERE HELD IN CHAMBERS.)

2                   THE COURT:  Hello, this is Judge Fallon, who is on the

3     line?

4                   MR. COLLINS:  Good morning, Judge, Chris Collins for

5     Santa Clara County.

6                   THE COURT:  Anyone else?

7                   MR. YOUNG:  Good morning, Judge, James Young for Florida.

8                   MS. ARTHURS:  And Elizabeth Arthurs for Florida.

9                   MS. SANFORD:  Shelly Sanford for the state of Oklahoma.

10    Good morning, your Honor.

11                  MR. ROTH:  Harry Roth and Mike Coren for the commonwealth

12    of Pennsylvania.

13                  MR. SPEIGEL:  Good morning, your Honor, Craig Speigel for

14    New York.

15                  MS. WINKLER:  Susan Winkler for the United States.

16                  MR. PATTON:  Bob Patton for the commonwealth of

17    Massachusetts.

18                  MR. KEENAN:  Ted Keenan for Illinois with the NAMFCU

19    team.

20                  MR. GUTHRIE:  John Guthrie with the NAMFCU team.

21                  THE COURT:  Anyone else?

22                  MR. LESSER:  Seth Lesser from Santa Clara.

23                  THE COURT:  Anyone else?  Okay.  I have everybody else in

24    the conference room.

25                  The point of meeting is just to follow-up on the status
```

1    report and see where we are with it.  I know you all came to New

2    Orleans, and you need to know I appreciate that, I think to the

3    extent of trying to see what we could do to resolve the matter.

4    But I also know that the time limitation for accepting NAMFCU has

5    not been met yet, and so I don't know what we can accomplish.  But

6    I did want to get with you all and get some input.  John.

7           MR. BEISNER:  Well, your Honor, I guess the main point I

8    would make is that we continue to be willing to speak with any of

9    the states.  We have had follow-up conversations with a few

10   jurisdictions.  I do think that there are some differences in views

11   on valuation of the cases, as I think we shared during the sessions

12   with the states.  We view that the proposal that has been made

13   through NAMFCU is quite generous, as some states have acknowledged.

14          And we think that this is a -- there are a lot of

15   challenges in this case going forward with the states, and

16   therefore, we're hopeful that people will give a serious

17   consideration to the offer.  I mean, we think that these claims are

18   foreclosed and the individualized proof rule that this court has

19   embraced as well as all of the other federal courts who have looked

20   at this, we think that applies to the penalty claims as well.

21   Judge Weinstein finding that in Zyprexa.

22          And so we think that the proposals that have been made

23   out there are generous and we're hoping that the states will, the

24   litigating states will consider them.  I think that the one

25   direction we understood some of the states were turning into this

1   notion of sampling under the *Hilao* case in the Ninth Circuit, the

2   Supreme Court has now addressed and found an invalid approach we

3   think in this context that's a part of the *Dukes* decision in which

4   the court was unanimous.

5           So again, I don't want to get into a long discussion of

6   the merits, but we do think that there are challenges in this case,

7   and we hope that the proposals that are out there will be

8   considered.

9           But I do think there are some serious differences in the

10  end views on this.  The one sort of evaluation that we got back

11  from one of the states during the mediation process proposed four

12  times pill cost resolution, which is way beyond what I think is

13  ever occurred in these cases, and as another state acknowledged we

14  think the sort of 40 percent level that we're at we feel is

15  extremely generous compared to what's been done in other cases.

16          But I won't belabor that point, I'll just say that we're

17  hoping that the various litigating states will consider this

18  proposal carefully.  We are open to further conversation.

19          I think there are other issues that some states have

20  raised about terms of the agreement and structure of the agreement,

21  so on, that we're also open to discussing.

22          THE COURT:  I think structure and terms are going to be

23  something that each state is going to have to look at.  And I don't

24  know whether uniformity is going be as helpful there other than as

25  a kick off to tweak it to make certain that the structure is

```
 1    consistent with your needs and requirements.  I think some

 2    uniformity in other areas, evaluation can be helpful; but the

 3    structure, I think each state is going to have to just meet with

 4    Merck and make sure it's consistent with their rules and

 5    regulations.

 6            MS. BARRIOS:  Your Honor, for the AG's, I would like to

 7    first tell them how much we appreciate them all coming down because

 8    I know that each one of you made a concerted effort to get

 9    authority, spent a lot of money, even brought some of your AG's

10    down here and we were very disappointed.  We want to move this

11    case, your Honor.  These AG's are pressing, they want their remand

12    motions heard, that's a jurisdictional issue, it should come before

13    any substantive issue, and we're just again met with delay on top

14    of delay.

15            The stay has been in effect since November, now we're

16    going out to September 15th, that's ten months that we haven't done

17    anything.  So I am expressing this on behalf of the states.  But I

18    know that Kentucky has a separate position that they would like to

19    advance.

20            MR. COLLINS:  Chris Collins for Santa Clara County.

21    Santa Clara is in a unique position, your Honor, in that we do not

22    have any Medicaid claims so we are not part of the NAMFCU

23    settlement.  And unfortunately we've been dragged along as if we

24    were part of that group.  In our discussions with Merck in New

25    Orleans they were somewhat enlightening to me, but it just seems
```

```
 1    that, you know, our claims are being pushed aside waiting for the

 2    September date to roll around before any type of discussions with

 3    Santa Clara will take part.

 4              So on behalf of Santa Clara County I would just be

 5    looking for some instructions on how we can proceed.  We don't have

 6    to sign off on anything regarding NAMFCU, we don't have to deal

 7    with any of those issues.  So that's where Santa Clara County

 8    stands.

 9              THE COURT:  Let me ask John to respond to that, I think

10    it's a legitimate point.

11              MR. BEISNER:  Chris, first of all, let me apologize to

12    you.  One of the things that you asked me to do during the

13    mediation session was to send you a letter asking for the county's

14    position on damages in the case because you said that was a problem

15    that you were experiencing, I believe, in getting those numbers

16    from your client.  And I acknowledged that I have failed to get you

17    that letter, and I will take care of that today so that there is

18    something concrete to discuss.

19              You're absolutely right.  The proposal that is out there

20    at the moment does not cover Santa Clara County, but we also need

21    to know what numbers you have in mind before we have any basis for

22    discussion.  So I will take care of that today and you have my

23    apologies for not getting that letter to you.

24              THE COURT:  Let me get back with you all though soon like

25    in two weeks, get me on the phone, Chris, you and John, and let's
```

```
 1    see where we are with it because you might be in a different

 2    position.

 3              MR. COLLINS:  Thank you, sir.

 4              THE COURT:  All right.  Kentucky.

 5              MR. McKENNA:  Tom McKenna for Kentucky.  As the court has

 6    acknowledged, Kentucky is sort of different in many ways.  On June

 7    the 22nd -- to explain how we got where we are today -- you asked

 8    us to come up with a schedule with Merck for Kentucky specific

 9    discovery.  We had two meet and confers on that.  It was supposed

10    to take roughly two weeks, we found at the mediation that it was

11    intentionally delayed to let the mediation happen, which there was

12    no offer other than NAMFCU.

13              And in both meet and confers we offered to discuss the

14    scope of discovery and were met with, no, we don't want to put that

15    in the proposed order, we want to file a motion for protective

16    order.  And that motion for protective order, and I know your Honor

17    has read Merck's letter, they brief it in that letter, is a

18    dispositive motion.  What Merck says is you get no more discovery

19    because you lose on the statute of limitations, which is a Kentucky

20    state law issue.

21              And before Merck has that issue decided, they need to

22    prove that there is federal jurisdiction.  They've improvidently

23    removed the case, we would really like to have the motion for

24    remand considered as a jurisdictional matter before the merits of a

25    statute of limitations claim are heard.
```

1          THE COURT:  Do you need any further discovery from the

2     MDL, because that's something that you need to think about before

3     you go back.  If you've got any requirements, if you need anything,

4     this is the place to get it, I think.

5          MR. McKENNA:  We think --

6          UNIDENTIFIED SPEAKER:  Excuse me, your Honor, and

7     everyone, I apologize for breaking in.  I can hear your Honor

8     clearly, the other person speaking we're having difficulty.

9          THE COURT:  Let's get him closer to the phone.  This is

10    Kentucky speaking.

11         MR. McKENNA:  With regard to whether we have adequate

12    discovery from the MDL process, having reached a tentative

13    agreement with the PSC, having seen the trial package, having been

14    through the depository and gotten documents from there, we believe

15    we have gotten what your Honor talked about in February of 2010.

16    When we have gotten all of the joint discovery that can be had, we

17    are at a point -- and resolution is not a possibility, we're at a

18    point to consider the motions to remand.

19         And Kentucky has formally rejected in it writing the

20    NAMFCU, so resolution is not going to be a possibility.  The only

21    thing left is Kentucky specific discovery that is outlined in our

22    letter.  And frankly, if the case goes back to a state court judge,

23    it might help that judge to familiarize him or herself with the

24    case to deal with the Kentucky specific discovery requests before

25    they have to try the case.

```
1              THE COURT:  All right.  Anything on the other side?

2              MR. BEISNER:  Well, your Honor, I think as I said, we're

3    I think happy to proceed with discovery here, we think it probably

4    makes sense to be doing that in tandem with any other jurisdiction

5    that includes not to resolve.

6              THE COURT:  He says he doesn't need anymore discovery as

7    I hear him.

8              MR. McKENNA:  Not anymore joint discovery.  Anything

9    would be Kentucky specific.

10             THE COURT:  I'll set the motion for remand, I'll give you

11   all an opportunity to brief it.  Let's do that before the next

12   status conference, maybe in two, three weeks, something like that,

13   give everybody an opportunity to brief it and then I'll deal with

14   it.

15             MR. McKENNA:  Thank you.

16             MR. BIRCHFIELD:  Your Honor, just to reiterate.  We do

17   have an agreement for the trial package and that includes

18   assistance with the -- from the PSC and the discovery issues that

19   are needed.

20             THE COURT:  That's important from the other Attorney

21   Generals to kind of recognize.  As I said before, it's kind of the

22   story of the wolf, the strength of the wolf is generally in a pack.

23   While you've got the pack together, you've got to make sure you've

24   got everything.  There's no sense in going back to a state court

25   and then the state court having the burden of getting material that
```

```
 1   you could have gotten immediately from the MDL court, it just
 2   doesn't make any sense to do it that way.  So that's important to
 3   think about.
 4        Also with this NAMFCU, you've got to take a look at that
 5   because that's a significant, that's a significant issue that
 6   presents itself.  The cases are not the easiest case in the world,
 7   I've looked at one in my jurisdiction, so that's something that
 8   everybody has to treat seriously in any event.
 9        I really need to meet with you all or talk with you after
10   the time frame to see where we are.  We've got the next status
11   conference on the 21st, but I think it's helpful, Dawn, if your
12   group could get together and just by yourselves perhaps and think
13   out loud a bit about the pros and cons.
14        MS. BARRIOS:  Your Honor, we do that once a week, we have
15   a weekly call, so we will continue to do that.
16        THE COURT:  I know it's like jumping in the cold water,
17   you want your buddy to go first, so let's see how that works.  But
18   everybody ought to take a look at that.
19        MS. BARRIOS:  Yes, your Honor.  And we will have a
20   special AG status conference following the regular one on September
21   21st.
22        THE COURT:  And I will be hearing from Santa Clara,
23   Chris, you and John sometime get something to me.
24        Okay.  All right.  Thank you very much.
25        MR. DUGAN:  Thank you, your Honor.
```

1          MS. BARRIOS:  Thank you, your Honor.

2       (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

3

4                    *  *  *  *  *  *

5

6                 REPORTER'S CERTIFICATE

7

8       I, Karen A. Ibos, CCR, Official Court Reporter, United

9  States District Court, Eastern District of Louisiana, do hereby

10 certify that the foregoing is a true and correct transcript, to the

11 best of my ability and understanding, from the record of the

12 proceedings in the above-entitled and numbered matter.

13

14

15                    _____

16                    Karen A. Ibos, CCR, RPR, CRR

17                    Official Court Reporter

18

19

20

21

22

23

24

25