```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
 2
       ******************************************************************
 3

 4     IN RE:  VIOXX PRODUCTS              MDL No. 1657
       LIABILITY LITIGATION               Section: "L"
 5                                         New Orleans, Louisiana
                                           Thursday, January 7, 2010
 6
       ******************************************************************
 7

 8           TRANSCRIPT OF MONTHLY STATUS CONFERENCE PROCEEDINGS
               HEARD BEFORE THE HONORABLE ELDON E. FALLON
 9                    UNITED STATES DISTRICT JUDGE

10

11     APPEARANCES:

12     FOR THE PLAINTIFFS
       LIAISON COMMITTEE:                  HERMAN, HERMAN, KATZ & COTLAR
13                                         BY:  RUSS HERMAN, ESQ.
                                                LEONARD A. DAVIS, ESQ.
14                                         820 O'Keefe Avenue
                                           New Orleans, LA 70113
15

16     FOR THE STATE LIAISON
       COMMITTEE:                          BARRIOS, KINGSDORF & CASTEIX
17                                         BY:  DAWN M. BARRIOS, ESQ.
                                           701 Poydras Street, Suite 3650
18                                         One Shell Square
                                           New Orleans, LA 70139
19

20     FOR THE DEFENDANTS
       LIAISON COMMITTEE:                  WILLIAMS & CONNOLLY
21                                         BY:  DOUGLAS R. MARVIN, ESQ.
                                           725 12th Street, N.W.
22                                         Washington, D.C. 20005

23
       CLAIMS ADMINISTRATOR:               BROWNGREER
24                                         BY:  ORRAN L. BROWN, ESQ.
                                                LYNN C. GREER, ESQ.
25                                         115 South 15th Street, Suite 400
                                           Richmond, VA 23219-4209
```

```
 1
    LIEN ADMINISTRATOR:              THE GARRETSON FIRM
 2                                   BY:  JASON WOLFE, ESQ.
                                     7775 Cooper Road
 3                                   Cincinnati, OH 45242

 4
    CURATOR FOR PRO SE
 5  PLAINTIFFS:                      LAW OFFICE OF ROBERT M. JOHNSTON
                                     BY:  HEATHER REZNIK, ESQ.
 6                                   601 Poydras Street, Suite 2490
                                     New Orleans, LA 70130
 7

 8  SPECIAL MASTER:                  PATRICK A. JUNEAU, ESQ.
                                     1018 Harding St., Suite 202
 9                                   Lafayette, LA 70503

10
    VIOXX LITIGATION CONSORTIUM:     GRAVES DOUGHERTY HEARON & MODDY
11                                   BY:  JOHN J. McKETTA, III, ESQ.
                                     401 Congress Avenue, Suite 2200
12                                   Austin, Texas 78701

13  FOR VARIOUS PLAINTIFFS:          LAW OFFICE OF RONALD R. BENJAMIN
                                     BY:  RONALD R. BENJAMIN, ESQ.
14                                   126 Riverside Dr.
                                     P. O. Box 607
15                                   Binghamton, NY 13902-0607
                                         (BY TELEPHONE)
16

17
    Official Court Reporter:         Karen A. Ibos, CCR, RPR, CRR
18                                   500 Poydras Street, Room HB-406
                                     New Orleans, Louisiana 70130
19                                   (504) 589-7776

20

21      Proceedings recorded by mechanical stenography, transcript
    produced by computer.
22

23

24

25
```

```
 1                     P R O C E E D I N G S

 2                  (THURSDAY, JANUARY 7, 2010)

 3                  (MONTHLY STATUS CONFERENCE)

 4

 5          THE COURT:  Be seated, please.  Good morning, ladies and

 6     gentlemen.  Let's call the case, please.

 7          THE DEPUTY CLERK:  MDL 1657, in re:  Vioxx.

 8          THE COURT:  Counsel, make their appearance for the

 9     record, please.

10          MR. HERMAN:  Good morning, Judge, Fallon, Russ Herman for

11     plaintiffs.

12          MR. MARVIN:  Good morning, your Honor, Douglas Marvin for

13     Merck.

14          THE COURT:  We're here for our monthly status conference.

15     In addition to the people in the courtroom I have a number of

16     people on the phone.  I ask that the speakers speak into the mike

17     so that everyone can hear you.  I met with liaison and lead counsel

18     to discuss the agenda with them early this morning.  I have some

19     other matters also on the agenda.  We'll take it in the manner in

20     which it's offered.

21          First, Settlement Agreement, anything on that?

22          MR. HERMAN:  Your Honor, with respect to the Settlement

23     Agreement, Roman numeral 1, and the Vioxx Settlement Program,

24     No. 2, BrownGreer has a report to make to your Honor.

25          THE COURT:  Okay.
```

1        MS. GREER:  Good morning, your Honor.  Lynn Greer from

2   BrownGreer and with me is Orran Brown, and we are BrownGreer who

3   serve as the claims administrators in this settlement program.

4   Today I will first start by apprising the court of the status of

5   the stroke claims review and then Orran will finish by discussing

6   the status of the extraordinary injury program.

7        Your Honor, this slide shows where we are on the stroke

8   claims in the Gates process, and it shows that we have completed

9   all of our initial reviews of Gates claims.  Row 2 shows that there

10  are two claims that we had issued a claims administrator notice of

11  ineligibility on a Gates failure notice.  Counsel submitted

12  additional documentation and we are now currently re-reviewing the

13  claim with the new documentation.

14       As of this week there are now almost 12,000 claims that

15  are eligible for points review.  A lot of those have been paid.

16  Many of those are in the queue to be paid.  And there are currently

17  over 5,000 claims with notices of ineligibility outstanding.  Some

18  of these are our notices of ineligibility, some of these are

19  currently under consideration by the Gates Committee and Merck for

20  possible inclusion in the program, but some of these ultimately

21  will fail and then be given a chance to appeal to the Special

22  Master.

23       Row 4b shows that right now there are 19 claims that are

24  on the Gates Committee portal for consideration, which means that

25  we currently have 17,115 stroke claims in the Gates and points

1    process.

2           The next slide shows the status of the points review, and

3    it shows that 4,843 stroke claims have been paid through December.

4    There are 2,248 that have notice of points awards outstanding, so

5    we have issued the notice of points award, and 1,288 of those the

6    claimants have accepted their award.  The deadline for accepting

7    was yesterday to be placed on the payment list for January, so

8    those will be paid this month.

9           There are 746 with awards under consideration.  If those

10   are accepted, they will be paid in February.  And there are 214

11   currently on appeal or they were special marker claims that are in

12   special review.

13          There are 166 where we cannot yet issue the notice

14   because of an administrative issue like lien resolution or some

15   other issue, perhaps audit review, that is holding up our ability

16   to issue the notice.  There are 429 that have gone through our

17   initial review, and as I told the court before we do a second

18   review to make sure that we have captured all of the relevant

19   information, and so the 429 are awaiting our second review.

20          There are 584 that are incomplete for points review, and

21   this is an item I would like to pause on briefly.  This rate of

22   incompletion is about 26 percent of all of the claims that make it

23   through points review.  This is significantly higher than what we

24   experienced in the heart attack population.  I think the reason is

25   is that the records are voluminous, they're difficult to obtain,

1  the stroke claims require a lot of follow-up records for us to

2  evaluate the level of care that was required for the claimant after

3  the stroke, and it's proven to be quite difficult to have full

4  records that we can evaluate.

5         What we do is we stop when we can't complete the points

6  review, we issue a notice of incomplete claims package which gives

7  counsel 14 days to submit records back to us.  This is an area that

8  we continue to watch, sometimes counsel simply write back and says

9  we have nothing further.  But we are looking at this because we

10  fear that it is a possible stumbling point in our ability to keep

11  moving quickly because one in every four claims basically we have

12  to stop.

13         THE COURT:  And that's because counsel has not given you

14  all of the required records?

15         MS. GREER:  That's correct.

16         THE COURT:  Again, I reinforce that request.  This case

17  is not over.  Counsel has obligations in addition to having join

18  the program.  They need to give you the information so that the

19  evaluations can properly be made, particularly in the stroke cases

20  because there's a lot of additional medical that we did not see or

21  you did not see in the heart attack cases.  And it's an ongoing

22  process to some extent and deterioration in some areas, so I think

23  counsel has to be conscious of that and get the material to you,

24  otherwise it's just going to have to be decided with what you have.

25         MS. GREER:  That's correct.

1     THE COURT:  That means that the individuals are not going

2  to get the full benefit of that that they would receive had you had

3  complete records.

4     MS. GREER:  And we encourage counsel to look closely at

5  the Settlement Agreement.  There are very specific time intervals

6  that we need records for, and if counsel could go ahead and

7  evaluate their pending stroke claims and go ahead and send us those

8  and not wait for our notice because it only does give 14 days to

9  submit the records, which in and of itself can be difficult but we

10  have to hold that deadline firm.

11     There are 67 claims where we have begun our initial

12  points review.  And row 7 shows a big number 3,346 which is our

13  queue now of stroke claims, and this number is due to recent

14  activity by the Gates Committee and Merck that has made these

15  claims eligible, and so we are reviewing those and on pace to

16  continue reviewing those at a pace that would allow us to make

17  final payments.

18     Your Honor, this slide, slide 4 shows the average points

19  by injury level on the stroke claims, and as in past months I will

20  not read this into the record, but we encourage those who are not

21  in court to go on our website this afternoon.  If they go to the

22  website there is a banner on the left-hand side where they can

23  access these slides, and it will show the average points by injury

24  level and where we are finding these claims to fall in terms of

25  average points.

1          And finally, your Honor, this summarizes where we are in

2     terms of claims paid and dollars paid for stroke claimants so for.

3     As I mentioned 4,843 stroke claimants have been paid through

4     December, over $144 million; 1,288 will you paid the at end of this

5     month, for another almost 34 million; potential February payments

6     so far of over 18 million.  That number will grow because we do

7     have a lot of activity that will occur and counsel will have until

8     the 1st of February to accept any claim when they receive a notice

9     of points award and be paid in February.

10         So based on what we have now, we will approach the 200

11    million mark at the end of February on payments to stroke

12    claimants.

13         If you have no further questions, Orran Brown will now

14    talk about the extraordinary injury claims.

15         THE COURT:  Thank you.

16         MR. BROWN:  Good morning, your Honor.  I'm Orran Brown

17    from BrownGreer.

18         The other phase of the Vioxx Settlement Program that

19    we're currently well underway on is the extraordinary injury

20    program, and today I want to go through those numbers on where we

21    are and where the claims are in our process and update the court

22    and the parties on how the program is proceeding.

23         THE COURT:  Just remind us with a couple of sentences

24    what that program is.

25         MR. BROWN:  Yes, your Honor.  These were additional funds

1    potentially available out of the heart attack fund and the stroke

2    fund in the settlement program to compensate persons who had

3    catastrophic or extraordinary injuries that were different from the

4    underlying heart attack or stroke injury, as well as provide

5    compensation for people who had suffered extraordinary economic

6    loss of past lost wages of $250,000 or more and/or past medical

7    expenses unreimbursed of $250,000 or more.  So the program provides

8    a potential for additional compensation for claimants who had those

9    extraordinary, different, or special situations on the economic

10   loss side and on, for medical injuries that were atypical and

11   severe beyond what normally happens in a stroke or a heart attack

12   treatment course.

13            And we are now going through all of the medical records,

14   medical expense records, the tax returns, other financial documents

15   that claimants and their lawyers turned in to us by the September

16   1, 2009 deadline to submit these claims, and we are plowing through

17   those to figure out how many of those claimants actually had those

18   catastrophic situations and extraordinary income loss.

19            This slide is No. 6 here, it shows us that by that

20   deadline we received 2,657 claims from persons who wanted to

21   participate in this extraordinary injury program.  And these

22   numbers are people, these are actual claimants.  Each of those

23   claimants could have asserted one or more of the various types of

24   extraordinary claims for lost wages, medical expenses, or for

25   special medical injuries.  Some claimants submitted all three of

1    those, some just one, some two out of three; but this slide looks

2    at the number of people, so we had 2,657 people who wanted to

3    participate in this program.

4         Of those, 48 of them sent us some records but no claim

5    form.  We have set the prerequisite that we had to have an EI claim

6    form by the September 1 deadline to be in the running to be in this

7    program.  There were 48 claimants who sent us some documents but

8    did not send us a claim form, and we have told them that we cannot

9    consider that to be an extraordinary injury claim.  Which gives us

10   this net number of 2,609 claimants, persons, who sent us materials

11   and a claim form to be in this program; and those are the claims

12   that we now have been plowing through working through since

13   September.

14        Some of those 2,609 claimants, they fall out for other

15   reasons, this slide shows us, get us to a net number of persons who

16   really are in the program and are qualified to be in the program.

17   We had two claims that have been withdrawn after they were

18   submitted.  We had 173 persons who had sent us extraordinary injury

19   materials but really are not eligible for the program.  Fifty-one

20   of them were not eligible on their underlying claim, and one of the

21   basic tenets of the program is that you have to have qualified on

22   your heart attack or stroke claim to be able to participate in the

23   extraordinary injury program, and 51 of them did not.

24        Two of them sent us a claim form but it was after the

25   September 1 deadline.  We've had a few folks who have asked us for

an extension of time to submit those claim forms, we are applying

what is really a Rule 60(b) sort of excusable neglect analysis to

any of those requests.  We have admitted one or two situations

where we got a late claim form and there was a Rule 60(b) type of

excuse.

These two right here were untimely late, had no excuse,

haven't sought any further extension, and they've been told that

their claims are untimely and denied for that reason.  We had 120

folks who sent us a claim form but never backed it up with any

material, and you were supposed to send us the tax records or other

medical records by the deadline as well; and for those 120, we have

told them we have a claim form but you never filled it out and

those claims were denied.

That gets us down to a net number 2,434 people who have

extraordinary injury claims in the program.  And so we are working

through those.

And the next three slides show us the numbers of claims,

this is now no longer people but these are the claims that those

folks have presented.  And this slide deals with the lost wages

issue, and this is one of the types of economic loss that are

potentially recoverable in the program.  If you had past lost wages

between the time of your heart attack and stroke and the time of

the Settlement Agreement on November 9, 2007, then you qualified

for participation in this program, and the past lost wages or lost

wages and income not received because of the injury during that

1  period.

2         This AED is what we call additional extraordinary

3  damages, that's the future, and we had said from the beginning if

4  you had future lost wages beyond the date of the Settlement

5  Agreement, then that would be a factor in the analysis and some

6  folks made claims for having been unable to work downstream, and

7  those are the numbers of the past and future lost wages claims that

8  we've got.

9         912 past, 457 also sought something in the future for

10 future lost wages.  This slide shows us what notices we issued and

11 then on the bottom set of numbers where the other claims are in the

12 process.  We have issued 73 notices on the past lost wages and 28

13 on the futures to tell people what their documents showed and what

14 the result of our analysis was.

15        The second review, the notice tells them that they have

16 20 days to tell us if they'd like a second review.  And in this

17 program we collapsed the deficiency process into this one-step

18 process, that is the opportunity where claimants can show us

19 additional records or additional documents that they were missing

20 that undercut their original evaluation.  So the second review is

21 really the claimant's chance to supplement the record and our

22 chance to look at it afresh and make sure we touched all of the

23 basis and got the numbers correct.  So we expect to get a fair

24 number of second reviews because that's really also the deficiency

25 process.

 1          If we don't hear from them in 20 days, then we consider

 2     it accepted and we see the numbers here for some claimants that

 3     have accepted the results either by default because we haven't

 4     heard from them or sometimes they affirmatively tell us that they

 5     accept the outcome on their claim.

 6          The bottom row here are the lost wages claims that are in

 7     process.  You can see that we have a very similar methodology to

 8     the way we've always reported on the heart attack and stroke claims

 9     of ones that are in various stages of our review.  With our initial

10     review and our QC or quality control we really review all of these

11     claims twice to make sure we get them right.  And you see the

12     numbers here of the ones that each of these types of economic loss

13     claims where they are in our initial review, complete and QC

14     complete means the notice is about to go out, and I expect some of

15     them went out yesterday and are going out today on those claims as

16     we speak here.

17          Others that are in our initial review and still in their

18     quality control, that's a large chunk of these, we're reviewing

19     them for the second time.  We have some claims, 115 of the past, 58

20     of the future in their first review.  And the administrative issues

21     are the claims that we have to put on hold for some reason where

22     we've gone back to the firm to get some clarification on an issue

23     or perhaps the underlying stroke claim is not yet fished itself so

24     we don't have a points award that tells us whether they're

25     qualified to be in this program.  So we have always some claims on

1  hold but they don't stay there long, we move them off of that as

2  quickly as we can.  That's the lost wages population.

3        These are the medical expense claims that we've received,

4  we have fewer of them for unreimbursed medical expenses.  Again

5  past are people who had medical expenses not covered by the

6  insurance during the period between their heart attack or stroke

7  and the date of the settlement agreement, AED is, again, future

8  people claiming medical expenses beyond that date.  And again, the

9  same methodology of reporting them here, showing the notices that

10  we've issued, claims that are still in review, and again a large

11  share of them in our initial review complete now in quality

12  control, notices will go out on them in the next few days.

13        We are on pace in this program for where we wanted to be

14  in the reviews, these are complicated reviews because of all of the

15  records we look at and the various issues.  And the notices we

16  issue on them are really complicated, they tell the claimants and

17  their law firms exactly what they allege for each period of income,

18  each medical service provider and their expenses, and what we found

19  compensable and what we didn't and why.  So it's a long

20  codification of the analysis that they get in the notice.  And it

21  takes a lot of time and effort to do this correctly on our part and

22  the claimant's and counsel's part, but we're on pace to get these

23  things out in the next -- and we hope this program will be

24  finishing up with payments out, hard to guess when, but we think

25  somewhere between April and June is the target depending on how

1    many are appeals or second review requests we get.

2         This next slide shows us a number of special injury

3    medical claims that we received, and that's the lion's share of the

4    extraordinary injuries, 1,776 claims of persons saying that they

5    had some physical injury to the Vioxx user that was not they feel

6    adequately covered by the underlying heart attack and stroke grids

7    and injury levels.

8         And again, here we are on the notices that we've issued,

9    843 have already gone out.  We have 716 of them initial review

10   complete and our quality control complete, those notices are going

11   out now.  We've gotten just about all of these notices out on the

12   special injury side.

13        And our review of these claims, your Honor, is showing us

14   that for the most part a lot of these injuries that we got were

15   people who felt that they had an additional injury but they are of

16   a nature that is really less severe than the heart attack or

17   stroke.  There are other things that people had but they are not as

18   severe medically as the heart attack or stroke, so the bulk of

19   these are not qualifying as really the more severe, more

20   catastrophic type of injury that this program was designed to

21   compensate.

22        This last slide takes us back to people, the three we

23   just looked at were number of claims, this puts it back together in

24   terms of people, 2,434 people who have these claims.  And this

25   shows us we sent notices to 894 of them, and we have the others

 1   that are in the review process still at the bottom; 447 about to go

 2   out today, tomorrow, the next couple of days; 815 initial review

 3   complete and now in our quality control -- again, this is just

 4   where they are in the process -- and 120 on administrative hold,

 5   which is a pretty big number, but they won't stay there long.

 6   These are issues that we are working on with counsel to clarify

 7   something so we make sure we understand what the claim is before we

 8   issue a notice on it the first time.

 9           That's the end of the report, your Honor, unless the

10   court has any questions.

11           THE COURT:  Thank you very much.

12           MR. BROWN:  Thank you.

13           MR. HERMAN:  May it please the court, Jason Wolfe is here

14   to report for Mr. Garretson under Roman numeral 3, Lien

15   Administration.

16           MR. WOLFE:  Good morning, your Honor.  Jason Wolfe here

17   to report as the lien resolution administrator.  I'll report on

18   both our capacity on the governmental liens and in addition to

19   speak briefly on the private lien resolution program as well.

20           The statistics I'll share are on all cases that are

21   eligible for final payment or in other words claimants that have a

22   gross settlement dollar as our focus continues to be working in

23   advance and minimizing the need for any holdback provisions out of

24   final payments.

25           Further, before I get into the statistics, I would like

1    to report that we continue to work very closely with BrownGreer,

2    who has been obviously excellent to work with, to ensure that we

3    have a centralized source for all settling parties to view

4    information, and we're introducing new functionality with the help

5    of BrownGreer as we reach new stages in each one of the lien and

6    compliance programs.  Most recently the newest functionality is to

7    introduce appeal functionality for the plaintiff counsel to appeal

8    any finalized lien values for governmental agencies or for private

9    liens.

10         As for government lien obligations, I'll first speak

11    about Medicare and Medicaid and then touch military obligations.

12         With respect to Medicare, the lien resolution

13    administrator has completed the Medicare resolution for those that

14    have an obligation of over 98.5 percent of those entitled to

15    Medicare.  The remaining 311 that are not finalized that have

16    Medicare obligations involve redeterminations, folks seeking

17    redeterminations and looking for different classification of their

18    global settlement application; or there's been a change in the

19    social security number, as we reported in the past that when that

20    happens we reprocess that entire case to make sure that it's

21    compliant.

22         With respect to Medicaid and the state healthcare

23    agencies, the lien resolution administration has finalized 99.1

24    percent of all of those with gross settlements that have a state

25    healthcare obligation.  The unfinalized Medicaid cases are due in

1    order of importance to those that are potentially capped.  If you

2    recall the state agencies part of the compliance program that we

3    had with the agencies is their agreement to satisfy their interest

4    inside of a predetermined allocation of the claimant's gross

5    settlement.  Also, cases that have switched social security

6    numbers, as well as a number of claims where states have not yet

7    approved our audit of the lien and we are seeking their approval.

8    As mentioned, it's a small number of cases.

9            One additional stat is there's only for those that have a

10   Medicaid obligation to gross settlement, there's only 33 claimants

11   that we still have not been able to squeeze out the actual claims

12   history, which is a very important milestone for our work as it

13   allows us to release all of the funds other than that inbound

14   value.

15           With respect to other governmental liens, all of the

16   military health programs, I mentioned before that they are

17   facility-by-facility recovery, there's no consolidated or

18   centralized means of satisfying the V.A. programs, for instance,

19   Tri-Care, et cetera.  We're down to 157 outstanding cases there,

20   and that's about a 33 percent reduction from the last report from

21   last month.  So we're making good progress there.  These last

22   remaining 157 cases, most recently our office has worked with

23   BrownGreer to see if we can expose the treating facility with the

24   records they have in-house which might allow us to report even more

25   favorably next month.

1          The largest amount of activity since the last report for

2     the governmental lien obligations has been actually payments to

3     those Medicare and Medicaid obligation we finalized.  We have

4     processed in the last 30 days 80 percent of the Medicare payments

5     to the agencies.  We aggregate the claimants that reside inside of

6     a certain state and make one payment and give them an itemization

7     and one check.  And we've processed that work with BrownGreer,

8     processed those checks, and sent those checks to over 44 agencies

9     in the last 30 days.

10          One note on the future, looking ahead work is on the

11     ischemic strokes, we're working in a parallel effort with the

12     claims administrator as they process IS claims, we're working those

13     claims to ensure we're in a position to have as many of the lien

14     obligations finalized prior to final payment coming up at the end

15     of this quarter.  And we're very happy with the pace that we're on

16     on that and we look by the end of February prior to final payment

17     to be over 65 percent of IS claims finalized, liens finalized

18     perhaps for a seamless disbursement.

19          I'll move on the private lien resolution program.

20     There's over 477 participating private healthcare plans in the

21     private lien resolution program.  As we've previously reported over

22     22,000 participating claimants.  These claimants we commonly

23     segregate for reporting purposes into two categories, category one

24     those who signed an acceptance form prior to June 19th, that's

25     about 20,000 of the 22,000; and the balance those who signed an

1    acceptance form after that point in time.  As an enrollment, as a

2    result of an enrollment extension for PTO 48 or 54.

3          The third party payors have produced claims for a total

4    of 9,594 claimants to date.  Not only do they match but they

5    actually were able to produce claims.  Those 9,594 claimants with

6    actual claim activity yielded over 14,395 claim summaries because

7    of multiple plans and claims histories for one claimant.

8          For that first large group on September, back in

9    September 29th we released all of the holdbacks associated with

10   participating in the plan.  On October 2nd we submitted to

11   BrownGreer the maximum holdback that each claimant would have, and

12   then these holdbacks for category one claimants were reduced in one

13   of the following ways:  If no valid lien was produced, we released

14   the entire holdback; if a valid lien was produced, we initially

15   held back the inbound value and then further refined it to 50

16   percent of the inbound value.

17         We're finalizing these liens with the third party payors

18   on a rolling basis.  To date we've audited 10,282 of the 14,000

19   inbound claims.  There is a part that hasn't been audit because

20   they're tied to claimants that have not been completely processed

21   through the claims administration process.  We look at every single

22   point, the finalized injury category, any preexisting condition, so

23   we rely heavily on the claims administrator and align their work

24   with the ultimate audit results.

25         But of the 10,282 that have been audited, 8,000 of those

 1   have been sent back to the TTP's for approval.  We have since, it's

 2   a significant advance since the last report, is we have 6,200

 3   approved PLP liens that are finalized.  These liens are being

 4   uploaded in the new functionality that I mentioned earlier through

 5   BrownGreer.  This is a significant milestone as upon posting it

 6   went with an e-mail blast for all counsel to review to see how the

 7   process will take place from this form.  They have the ability and

 8   functionality to appeal the case if necessary, they have a ten-day

 9   window to do that.  It's automatically processed after that ten-day

10   period, which will allow us to release the balance of the

11   claimant's holdback provision that was in place.

12          And then we will be coordinating obviously in the next 60

13   days processing of payments to the TPPs.  In the same time as we

14   coordinate payment, we will be coordinating the releases.  The

15   releases will be for all claimants that no claims were produced, in

16   addition to those claimants that a claim was produced, audited,

17   approved and paid.

18          In addition to at the next hearing being able report in

19   detail the number of appeals, we don't have statistics to share on

20   the number of appeals because the concentration between the lien

21   resolution administrator and the third party payor organizations

22   have been to exchange those that are approving so we can process

23   those and release the balance of the funds.  So we will be

24   reporting on the number of appeals and should have a better idea of

25   the number of appeals from the third party payors of our audit or

1    of the claimants of our mutual agreement on what amount of

2    healthcare was related to the compensable injury.

3            Your Honor, that concludes my report as lien resolution

4    administrator for this month.

5            THE COURT:  Do you anticipate all of the MI liens being

6    completed?  MI payments are out now.

7            MR. WOLFE:  Yes, sir.

8            THE COURT:  What about the liens regarding those MI's?

9            MR. WOLFE:  The liens for the governmental are down to

10   1.5 percent, I expect those to be finalized by the next report.

11           THE COURT:  Okay.

12           MR. WOLFE:  The private liens by the next report for

13   those 5,000, there's going to be a lag of probably another 60 days

14   for finalization for the full group on the MI because of the

15   different introduction timing of the private lien resolution

16   program.

17           THE COURT:  Okay.

18           MR. WOLFE:  Thank you.

19           THE COURT:  All right.  Thank you.

20           Anything from the Special Master?

21           MR. JUNEAU:  Patrick Juneau the Special Master, your

22   Honor.  One quick report, just for background, your Honor, I

23   checked and we had through the Special Master, the three of us, we

24   have processed 7,052 claims on the MI claims that went through

25   consideration.  On the stroke claims there have been 1,274 matters

1    that were considered and rulings issued in that regard.  There

2    remains only 55 outstanding, as we speak today, and those were

3    recently received.

4            I have talked to BrownGreer and we had all anticipated at

5    the last hearing probably being January when the bubble would occur

6    with the stroke claims, and we've kind of geared up for that.

7    We're kind of honing down now on when that is, and it looks that's

8    going to occur probably in the first week in February.  I have

9    notified Justice Trotter and Judge Corodemus of that fact and they

10   are prepared to handle that as we did in the previous matter, we

11   geared up to do that so they will remain on target.

12           Overall I will say that stroke claims as indicated by one

13   of the attorneys earlier is little bit more involved with the

14   medical.  It just requires a little more time insofar as the review

15   process is concerned.

16           Generally speaking, your Honor, we're on target to do

17   what we've committed to do.  The only other thing that I think that

18   would be of moment and of interest to the court, at the end of this

19   month I have scheduled an audit hearing claim on a case that

20   surfaced through the audit process, will be considered as to what

21   action will be taken about that.  But that will be done at end of

22   this month.

23           THE COURT:  Why don't you explain that a little bit.

24           MR. JUNEAU:  Well, what happens, your Honor, is there's

25   an elaborate process that's set up in the proceedings and they go

back through and select out a certain number of cases, and they are

looked at in detail from an audit standpoint to make sure that the

representations and the submissions and all things that were

supposed to have been done were in fact done.  And through that

process -- very few I might add and I'm glad to say how it turned

out -- but there have been a few cases where there have been some

inconsistencies in the submissions, for example, in medical

records.  We had one, the case has been dismissed, I might add, we

had done earlier in the case where there had been a change in the

medical record.  Some of the matters have been clarified and

resolved.  Some of the matters had to be addressed through

hearings.

        It surfaces through the process that then is referred to

me to consider as the Special Master, your Honor.  And what I do is

we get responses from the respective parties and the attorneys,

view the matter, receive whatever data has to be received.  And if

necessary, I precipitate an actual hearing on that subject to

determine what should be done.  And there are several options that

can be done, including all the way through the ultimate claims can

be dismissed.  That's one of those that's appearing at the end of

this month.

        It's an ongoing process but it ensures the integrity of

the process, and that's important because that spills over to

everybody else in the case.  If the process is unbalanced or the

system was instituted favored one party, that would not be good for

1    the rest of the parties, it dilutes the fund.  So that process has

2    worked very well, and fortunately we've had very few of those to

3    deal with.

4           And other than that, I think we're pretty much on target,

5    your Honor.  Thank you.

6           THE COURT:  Thank you very much.  From the court's

7    standpoint, the best I can do is to make sure that due process is

8    undertaken and that's why I focus on the appeal process.  And there

9    are three appeals, as I've said several times, and the last one, of

10   course, is the Special Master.  And I think that that's been very

11   helpful to this process.

12          Next item is Class Actions.

13          MR. MARVIN:  Your Honor, the joint report summarizes the

14   status with respect to the class actions, and there's nothing

15   additional to report there.

16          I believe the item after that, Item 6 is the State

17   Liaison Committee, and Dawn Barrios is here for that.

18          THE COURT:  Okay.

19          MS. BARRIOS:  Good morning, your Honor.  Dawn Barrios for

20   the State Liaison Committee.  Our statistics really haven't changed

21   since we last met here, but I did want to bring to your attention

22   that the Attorney General for the Commonwealth of Kentucky has

23   filed an action against Merck.  It has been -- it's in the

24   transferor court in Kentucky, there are pending motions to stay the

25   transfer, and motions for remand that have not yet been heard.

```
 1              The bulk of the remand motions before your Honor are with

 2    the governmental entity actions here and those personal injury

 3    claimants who were ineligible for the 2007 settlement.

 4              THE COURT:  Okay.

 5              MS. BARRIOS:  Thank you.

 6              THE COURT:  Thank you.  Anything from the pro se?

 7              MR. HERMAN:  Judge Fallon, Heather Reznik is here to

 8    report on the pro se.

 9              THE COURT:  All right.

10              MS. REZNIK:  Good morning, your Honor.  Heather Reznik on

11    behalf of Robert Johnston pro se curator.  Our office continues to

12    receive calls from pro se claimants.  Most of these calls have to

13    do with the future evidence stipulations and motions to dismiss

14    that claimants have been receiving.  Frequently it's from claimants

15    whose attorneys have withdrawn from representation.

16              We also have been receiving inquiries regarding the

17    review and payment of IS claims, and will continue to help these

18    claimants as best we can.

19              THE COURT:  Good.  Okay.  Thank you very much.  I

20    appreciate your work on that.  I think it's helpful to those

21    individuals who do not have lawyers and feel that they need to talk

22    to a lawyer.  So I've appointed one, a very experience law firm to

23    assist them and they've been doing that and I appreciate it.

24              The next item.

25              MR. HERMAN:  Judge Fallon, I'd just like to note for the
```

1   record that we appreciate the work that BrownGreer and the

2   Garretson firm and Bob Johnston's firm have done because they've

3   really facilitated the process.

4         With regard to the trial package, Roman numeral 8, there

5   is no additional information.

6         Your Honor, with respect to Roman numeral 9 and 12, as

7   your Honor is aware, there was a settlement resolution with the

8   third party payor cases, and Rust company has sent out all of

9   checks, there is no further issue with respect to that.

10        With respect to No. 10, governmental actions and

11   discovery issues in connection with governmental actions under 11,

12   we have both Mr. Jim Dugan here on behalf of Attorneys General and

13   Ben Barnett on behalf of Merck.

14        MR. DUGAN:  Good morning, your Honor, James Dugan on

15   behalf of the Louisiana Attorney General and the Governmental

16   Action Committee.  As your Honor is aware, the Louisiana Attorney

17   General action is set for trial April the 12th.  There is a pending

18   discovery deadline of February the 9th.  At that particular time

19   there will be approximately 40 depositions that have been taken in

20   the case.  There's a March 19th date for dispositive motions, and

21   that case is on track.

22        As to the other governmental action cases, there are

23   representatives of various states here in the court room today,

24   your Honor.  We are back focused and back working with Merck to

25   attempt to in 2010 get to a point to where the various entities can

```
 1   file their motions to remand and the discovery will be done and

 2   attempted to do that by this year.

 3          So we are meeting with Merck and we would ask -- I know

 4   your Honor has a drywall trial in the next two weeks, we would ask

 5   that at the next status conference, along with the Louisiana

 6   Attorney General's regular status conference, that we also have a

 7   governmental action status conference.

 8          THE COURT:  Okay.  Fine, I'll set that up.  Thank you

 9   very much.

10          MR. DUGAN:  All right, thank you.  Your Honor, one other

11   point on the private third party payor settlement.  As Mr. Herman

12   reported, that settlement is going forward and there are over 200

13   companies that participated in that settlement, and Rust Consulting

14   did report that all of those checks have gone out and there have

15   been no objections whatsoever.

16          THE COURT:  And I appreciate your work on that.  I know

17   you've put a lot of time on it and appreciate it.

18          MR. DUGAN:  Thank you, your Honor.

19          THE COURT:  One item that I did have regarding the

20   discovery issues with the governmental actions.  I received letters

21   from defense and also from the Attorney Generals.  The Attorney

22   Generals wanted to retake the deposition of Dr. Reicin.  The

23   defendant objected to it.  I am familiar with the issue, I've

24   considered it, and I do think that Dr. Reicin has testified enough

25   in this litigation, I don't think there's a need for another
```

1  deposition.

2          She's testified in 12 or more or 15 or more depositions,

3  and given testimony in trials, a number of trials.  I think there's

4  enough information to allow the plaintiffs to cross-examine her, to

5  impeach her, to do whatever they need to do.  I think the

6  transcripts would be available to them, or are available to them as

7  I mentioned in another conference.

8          I will entertain a motion to quash the deposition of

9  Dr. Reicin and I'll grant the motion.

10          The next item is third party payor motions.  Anything on

11  that?

12          MR. HERMAN:  No, your Honor, we've covered any issue with

13  regard to third party payor motions.

14          I believe Mr. Marvin will address item 13.

15          THE COURT:  Okay.

16          MR. MARVIN:  Your Honor, item 13 relates to pending cases

17  in which expert reports have been served.  Ms. Oldfather and I

18  spoke this morning about those cases, and we will have a further

19  report for the court at the next status conference.

20          THE COURT:  Okay.  All right.  Next item on the agenda is

21  the Fee Allocation Committee.

22          MR. HERMAN:  Your Honor, there is nothing new.  I do want

23  to point out and I appreciate today the attendance of Perry White

24  and Tom Giradi who are members of that committee.  They're in

25  attendance.

1        Item No. 15, reconsideration or revision of contingent

2  fees, there are no issues, new issues.

3        With regard to Item 16, Merck's motions and rules on PTOs

4  28 and 43, I believe that either Mr. Marvin or Ms. Wimberly will

5  address that, as well as the other motions that are listed under

6  Item 17.

7        THE COURT:  Right, we'll take those up at the end of this

8  meeting and I'll deal with those motions.

9        The new items on the agenda, the last time we had a

10  conference there was an issue involving an Oasis Legal Finance,

11  Inc. Loans.  This had to do with loans that were made to claimants

12  and there was, it came to the court's attention that for some of

13  the loan companies involved, at least loan company involved, the

14  interest was 100 percent.  I felt that that was overreaching and I

15  convened a conference, ordered the CEO to appear with the attorneys

16  and other relevant people.

17        We discussed the matter in some detail and the loan

18  company has agreed to forego all of their interest on the matter

19  and also to forego any charge s that they have.  The attorney has

20  agreed to return any portion of any fee and so the claimant has

21  been made whole, and I do appreciate their cooperation in this

22  matter.  And I really would not want the claims administrator to be

23  paying any liens, any finance liens.  It's one thing for the

24  medical liens, but not any finance liens.

25        The next status conference is?

1          MR. HERMAN:  Your Honor, I believe you indicated would be

2   February 3rd.

3          THE COURT:  February 3rd.

4          MR. HERMAN:  I do want to make one correction to the

5   status report under Item 19.  Your Honor had entered on December

6   17th, 2009 PTO 47A.  There are no other issues before your Honor.

7          THE COURT:  All right.  Anything other than the motions

8   that we have to deal with?  Dawn?

9          MS. BARRIOS:  Thank you, your Honor.  Dawn Barrios.  I've

10   been asked by the attorney representing the Colorado AG in the

11   *Franklin* matter, if you could set Merck's motion to dismiss for the

12   next status conference we would appreciate that.

13          THE COURT:  Okay.  I will do that.

14          MS. BARRIOS:  Thank you, your Honor.

15          THE COURT:  Anything else from anyone?  I'll be back in

16   about ten minutes on the motions.  The court's in recess.

17          THE DEPUTY CLERK:  Everyone rise.

18      (WHEREUPON, A RECESS WAS TAKEN.)

19      (OPEN COURT.)

20          THE COURT:  Okay.  Be seated, please.  All right.  We

21   have a number of motions set today.  The first motion is Merck's

22   renewed PT 28 motion, deferrals from December the 3rd.

23          MS. WIMBERLY:  Yes, your Honor, we had two renewed PTO

24   motions, record document 24266 and record document 24649, all in

25   which involved claims and plaintiffs represented by the law firm of

1    Cellino & Barnes.

2              With respect to all of the plaintiffs on the exhibits to

3    those two motions, we have agreed to defer them until the next

4    status conference on February 3rd based upon representations that

5    certain of those claims will be voluntarily dismissed.  And also

6    based upon the fact that in the majority of the others, Cellino &

7    Barnes has moved to withdraw.

8              In some of those instances, it's our understanding that

9    those plaintiffs will remain and will become pro se plaintiffs, and

10   in others that they may have new counsel of record already lined

11   up.

12             With respect to those, your Honor, and in particular with

13   respect to those in which there are pending motions to withdraw, we

14   would suggest to the court that it would be very helpful in moving

15   the matters along that in the order of withdrawal that is allowed

16   or entered by the court that the withdrawing counsel be required to

17   notify their former clients, not only of the new hearing date of

18   February 3rd, but also some language that we would like to suggest

19   and send to your clerk this afternoon that would give the newly pro

20   se plaintiffs an obligation to contact the pro se curator or obtain

21   new counsel or face dismissal if they don't comply with the terms

22   of Pretrial Order 43.

23             THE COURT:  Okay.  All right.  I'll defer those then.

24             MS. WIMBERLY:  Your Honor, there also was another matter

25   deferred from December 3rd and that was Merck's third pretrial 43

1    motion.  We're deferring again as to all of the pro se plaintiffs,

2    and that would be in particular -- and these are people who have

3    contacted either through their counsel or through the curator, and

4    requested additional time.  And that in particular is Leslie Henry,

5    John Stafisz, Patricia Lewis, Janice Baum and Stanley Bethea.

6            The final matter that was deferred from December 3rd was

7    Merck's fourth PTO 43 motion, which contained a large number of

8    plaintiffs represented by the Carey & Danis law firm.  At the

9    December 3rd hearing the claim was withdrawn as to -- the motion

10   was withdrawn as to two plaintiffs, Severla Germany and Phillip

11   Polk.  It was deferred as to all of the Carey and Danis plaintiffs

12   pending their motions to withdraw.  It was deferred as to the Wood

13   firm plaintiffs, with the exception of Maria Sepulveda-Torres as to

14   whom the motion was withdrawn, and was also deferred as to the

15   Corea firm plaintiffs.

16           Notwithstanding the fact that the matter was reset for

17   today, we've been advised by numerous of the former clients of

18   Carey and Danis that -- and by counsel who are reviewing their

19   cases and intending to enroll -- that they were given a wrong

20   hearing date.  So we are deferring as to all Carey and Danis

21   plaintiffs until February 3rd and we will undertake to notify those

22   plaintiffs.

23           With respect to the Wood firm and Corea plaintiffs, we

24   would ask the court to dismiss their claims today.

25           THE COURT:  Which ones are those?

```
 1        MS. WIMBERLY:  Your Honor, they are identified on the

 2   original fourth PTO 43 motion, record document 27190, beginning

 3   with plaintiff No. 50 on the exhibit to the motion.  And the law

 4   firm is identified.  And in particular we're asking the court to

 5   dismiss the claims of plaintiffs Nos. 50, 51, 52, 53, 54, 55, 57,

 6   58, 59, 60, 61, 62, 63, 64, 66, 67, 68, 69, 70, 71, 73, 74 and 75.

 7        THE COURT:  Over the objection of the Plaintiff's

 8   Committee, I'll dismiss the cases with prejudice.

 9        MR. DAVIS:  Your Honor, Leonard Davis on behalf of the

10   PSC.  I just wanted to make one comment and I've spoken to

11   Mr. Marvin about this.  Counsel a moment ago suggested that some

12   language would be provided to the court for some dismissals and

13   some --

14        MS. WIMBERLY:  For withdrawal.

15        MR. DAVIS:  For withdrawals and other language.  The PSC

16   just wants to make one comment, and that is that if any such

17   withdrawals or dismissals are to occur, we just want to make sure

18   that the claimant gets an opportunity for due process.

19        THE COURT:  Right.  Yes.  That's essential.  That's what

20   we've been trying to do, that's why I don't dismiss these cases

21   lightly, I give the parties an opportunity to appear.  If they

22   don't appear, I ask them to appear a second time and sometimes even

23   a third time.  And when they don't show up at least three times,

24   then we dismiss the cases.  I have to assume that notwithstanding

25   notices, notwithstanding opportunities that if they still don't
```

1    comply then they don't wish to pursue their claims and I dismiss

2    them.

3            MS. WIMBERLY:  Your Honor, the only other deferred

4    matters were from Merck's first PTO 43 motion, record document

5    22492; its ninth Lone Pine motion, record document 21961; and its

6    PTO 31 motion directed to pro se plaintiffs for failure to

7    register, record document 22070.  With respect to all of those that

8    were reset for today, we are deferring again until February 3rd.

9            THE WITNESS:  Okay.

10           MS. WIMBERLY:  That brings us to the one new motion filed

11   by Merck that is set for today, and that is record document 29116,

12   and this is defendant Merck's tenth motion to show cause why cases

13   should not be dismissed with prejudice for failure to comply with

14   the requirements of Pretrial Order 28.  That motion applies to four

15   plaintiffs represented by Ron Benjamin, who I understand is on the

16   phone.

17           With respect to one of the plaintiffs on the motion,

18   Mr. Anthony Orioles, Mr. Benjamin in his opposition correctly

19   points out that he has submitted an expert report, and Merck

20   thereby withdraws its motion as it relates to Mr. Orioles.

21           THE COURT:  All right.

22           MS. WIMBERLY:  With respect to the remaining three claims

23   or plaintiffs to whom the motion is directed; namely:  Lacrita

24   Mobile, Sheryl Singer and Margarita Giordano.  Notwithstanding

25   Mr. Benjamin's opposition, Merck respectfully requests that the

1    cases or the claims of those parties be dismissed with prejudice.

2          Mr. Benjamin in his opposition essentially claims that

3    because what he is really seeking are damages for emotional

4    distress that these plaintiffs should not be subject to the

5    requirements of Pretrial Order 28.

6          Your Honor, we believe that this is really a disingenuous

7    argument, it's already been rejected by the court previously in

8    upholding the requirements of Pretrial Order 28, but also in this

9    case these claims are joined with claims for personal injury and

10   pretrial 28 makes it clear that an expert report establishing just

11   the most basic prime facie evidence of causation is required.

12         So, your Honor, we think that really the arguments raised

13   by Mr. Benjamin in his opposition are a red herring and that his

14   three plaintiffs are not exempt from the requirements and at some

15   point -- he argues that they shouldn't be put to the expense of

16   retaining an expert.  Your Honor's made it clear that what is

17   required by Pretrial Order 28 is not a full fledged Rule 26 report,

18   but simply something to establish causation, to establish that

19   prima facie case.

20         At some point if these clients intends to move forward

21   with their cases, they will have to have an expert, whether that's

22   their treating physician or otherwise.  But to just raise the issue

23   of we shouldn't have to retain an expert and bear the expense does

24   not excuse them from the requirements of 28.

25         Additionally, Mr. Benjamin argues that the motion should

 1    be, that this court should defer ruling on our tenth motion to

 2    dismiss until such time as the court rules on its motion to recuse.

 3    While we understand your Honor is not addressing the merits of the

 4    recusal motion and will be deciding that on the briefs, we believe

 5    that no valid ground exists for recusal and therefore there's no

 6    valid basis to delay ruling on Merck's motion to dismiss.  And

 7    unless your Honor has some questions.

 8              THE COURT:  I'll hear from Mr. Benjamin.  Mr. Benjamin,

 9    do you have any comments?

10              MR. BENJAMIN:  Your Honor, I don't really have anything

11    to add to what we put in our opposition papers, and I think as

12    counsel suggested you have heard those issues or arguments before.

13    That is our position.

14              THE COURT:  Okay.  All right.  First I will deal with the

15    motion to recuse.  I deny the motion to recuse.

16              Next I move to the motion to dismiss, and I do feel that

17    Mr. Benjamin's clients have had an opportunity to present the

18    information, they haven't done so, they've violated Pre-Trial Order

19    No. 28.  As I mentioned a number of times, this is nearly five

20    years now since this litigation commenced in this court and I don't

21    think that it's too burdensome to ask that a report, brief report

22    showing causation be submitted.  Lone Pine orders have been

23    approved by this circuit, so I will dismiss these cases with

24    prejudice.

25              We'll go to the next motion.  Anything?

 1          MS. WIMBERLY:  Yes, your Honor.  I believe there was a

 2   motion for reinstatement of case filed by pro se plaintiff Jessica

 3   Adams whose motion -- I believe she filed three motions actually

 4   that were pretty repetitious and those are record document 27440,

 5   30557 and 30651.

 6          Your Honor, Merck's position as to her request is set

 7   forth in our opposition, which was filed yesterday.  While we're

 8   sympathetic, as your Honor just stated, this case has been going on

 9   for almost five years and we're not even talking about expert

10   reports here, we're talking about someone not registering, not

11   taking the first step, not submitting anything.  And we simply

12   don't believe that the grounds set forth in any of her three

13   motions meet the burden for establishing excusable neglect and

14   allowing the court to reinstate her case.

15          THE COURT:  I do agree with that, and I'll dismiss that

16   over the objection of counsel of the PSC and dismiss it with

17   prejudice.

18          MS. WIMBERLY:  Your Honor, there was one additional

19   motion for reconsideration or reinstatement filed by a pro se

20   prisoner Brian Anderson.  As I indicated to your Honor earlier, we

21   are having to go back through literally thousands of notices to

22   pull our proofs of service of our prior motions on Mr. Anderson,

23   and we would ask to defer the motion until the next status

24   conference on February 3rd.

25          THE COURT:  Okay.  I'll defer that.  Does that end your

1    motions?

2            MS. WIMBERLY:  Yes.

3            THE COURT:  I have a motion from plaintiff's counsel

4    asking me to deal with some claims that they have that are not,

5    that they are not claiming any additional fees, additional over the

6    32 percent.  I've read that and I do agree with that, with counsel,

7    I think that those cases in which there's no issue of the 32

8    percent ought to be released.

9            For consistency purposes, I ask that you talk with Orran

10   Brown so that we can get the same stipulations.  I know you filed

11   an affidavit and just from a consistency standpoint I don't want to

12   be dealing with a lot more documentation.

13           But the reason that I withheld all of the fees is because

14   there's an appeal on those cases, and when the court of appeal

15   takes a look at it, they can do one of three things:  They can

16   agree with you and increase the law fee or they can decrease the

17   law fee.  They can come to the conclusion that 32 percent is too

18   high and it should be 10 percent or 15 percent.  In that type

19   situation, I wanted to not have to go back to you and say pony up

20   the amount.  So when that's an issue, it seems to me that the whole

21   fee ought to be withheld because that is a possibility, is a

22   potential.  And if that occurs, then it would simply mean that the

23   balance of the fee would be released to you.

24           But in those instances, those cases in which you're not

25   making that claim, I think you're in the same position as the other

1   attorneys and I have released those.  So I'll grant the motion to

2   that extent.

3           MR. McKETTA:  Thank you, your Honor, Mike McKetta for the

4   Vioxx Litigation Consortium.  Thank you for the motion to clarify.

5   We will submit to Mr. Brown a form that is appropriate under

6   Pre-Trial Order No. 50 limited to these 78 claimants.  Thank you so

7   much, your Honor.

8           THE COURT:  Thank you.

9           Anything further that we need to deal with?  Okay.  Thank

10  you very much.  The court will stand in recess.

11          MS. WIMBERLY:  Thank you.

12          THE DEPUTY CLERK:  Everyone rise.

13     (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

14

15                       * * * * *

16

17                  REPORTER'S CERTIFICATE

18

19     I, Karen A. Ibos, CCR, Official Court Reporter, United States
    District Court, Eastern District of Louisiana, do hereby certify
20  that the foregoing is a true and correct transcript, to the best of
    my ability and understanding, from the record of the proceedings in
21  the above-entitled and numbered matter.

22

23

24                                    Karen A. Ibos, CCR, RPR, CRR
25                                    Official Court Reporter