1       UNITED STATES DISTRICT COURT
        EASTERN DISTRICT OF LOUISIANA
2

        ***********************************************************
3

4   IN RE:  VIOXX PRODUCTS              MDL No. 1657
    LIABILITY LITIGATION                Section: "L"
5                                       New Orleans, Louisiana
                                        Tuesday, March 23, 2010
6

        ***********************************************************
7

8      TRANSCRIPT OF MONTHLY STATUS CONFERENCE PROCEEDINGS AND MOTIONS
            HEARD BEFORE THE HONORABLE ELDON E. FALLON
9                  UNITED STATES DISTRICT JUDGE

10

11  APPEARANCES:

12  FOR THE PLAINTIFFS
    LIAISON COMMITTEE:                  HERMAN, HERMAN, KATZ & COTLAR
13                                       BY:  RUSS HERMAN, ESQ.
                                             LEONARD A. DAVIS, ESQ.
14                                       820 O'Keefe Avenue
                                         New Orleans, LA 70113
15

16  FOR THE STATE LIAISON
    COMMITTEE:                          BARRIOS, KINGSDORF & CASTEIX
17                                       BY:  DAWN M. BARRIOS, ESQ.
                                         701 Poydras Street, Suite 3650
18                                       One Shell Square
                                         New Orleans, LA 70139
19

20  FOR THE DEFENDANTS
    LIAISON COMMITTEE:                  WILLIAMS & CONNOLLY
21                                       BY:  DOUGLAS R. MARVIN, ESQ.
                                             PAUL E. BOEHM, ESQ.
22                                       725 12th Street, N.W.
                                         Washington, D.C. 20005
23
                                        SKADDEN
24                                       BY:  JOHN H. BEISNER, ESQ.
                                             GEOFFREY M. WYATT, ESQ.
25                                       1440 New York Avenue, N.W.
                                         Washington, D.C. 20005

```
 1
      CLAIMS ADMINISTRATOR:            BROWNGREER
 2                                     BY:  ORRAN L. BROWN, ESQ.
                                            DAVID E. SMITH, ESQ.
 3                                     115 South 15th Street, Suite 400
                                       Richmond, VA 23219-4209
 4
      LIEN ADMINISTRATOR:             THE GARRETSON FIRM
 5                                    BY:  MATTHEW GARRETSON, ESQ.
                                      7775 Cooper Road
 6                                    Cincinnati, OH 45242

 7
      CURATOR FOR PRO SE
 8    PLAINTIFFS:                     LAW OFFICE OF ROBERT M. JOHNSTON
                                      BY:  HEATHER REZNIK, ESQ.
 9                                    601 Poydras Street, Suite 2490
                                      New Orleans, LA 70130
10

11    SPECIAL MASTER:                 PATRICK A. JUNEAU, ESQ.
                                      1018 Harding St., Suite 202
12                                    Lafayette, LA 70503

13
      FOR VARIOUS PLAINTIFFS:         OLDFATHER LAW FIRM
14                                    BY:  ANN B. OLDFATHER, ESQ.
                                      1330 South Third Street
15                                    Louisville, Kentucky 40208

16
                                      LAW OF OFFICES OF STUART A.
17                                    KRITZER, P.C.
                                      BY:  STUART A. KRITZER, ESQ.
18                                         PETE KAUFMAN, ESQ.
                                      140 East 19th Ave,
19                                    One Sherman Place, 3rd Floor
                                      Denver, Colorado 80203-1013
20

21    FOR THE LOUISIANA DEPARTMENT
      OF HEALTH AND HOSPITALS:
22                                    DUGAN LAW FIRM
                                      BY:  JAMES R. DUGAN, II, ESQ.
23                                    650 Poydras St., Suite
                                      New Orleans, LA 70130
24

25
```

```
 1                                    MURRAY LAW FIRM
                                      BY:  STEPHEN B. MURRAY, JR., ESQ.
 2                                    650 Poydras St., Suite 1100
                                      New Orleans, LA 70130
 3

 4                                    LEIFF CABRASER HEIMANN & BERNSTEIN
                                      BY:  DONALD C. ARBITBLIT, ESQ.
 5                                    Embarcadero Center West
                                      275 Battery Street, Suite 3000
 6                                    San Francisco, CA 94111-3339

 7

 8

 9   Official Court Reporter:         Karen A. Ibos, CCR, RPR, CRR
                                      500 Poydras Street, Room HB-406
10                                    New Orleans, Louisiana 70130
                                      (504) 589-7776
11

12

          Proceedings recorded by mechanical stenography, transcript
13   produced by computer.

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>P R O C E E D I N G S</u>

(TUESDAY, MARCH 23, 2010)

(MONTHLY STATUS CONFERENCE AND MOTIONS)

1

2

3

4

5       (OPEN COURT.)

6              THE COURT:  Be seated, please.  Good morning, ladies and

7       gentlemen.  Call the case, please.

8              THE DEPUTY CLERK:  MDL-1657, *in re:  Vioxx*.

9              THE COURT:  Counsel make their appearance for the record,

10      please.

11             MR. HERMAN:  May it please the court, good morning, Judge

12      Fallon, Russ Herman for plaintiffs.

13             MR. MARVIN:  Good morning, your Honor, Douglas Marvin for

14      Merck.

15             THE COURT:  We're here today for our monthly status

16      conference.  I met with the liaison and lead counsel in this matter

17      previously, and I have from them a suggested agenda.

18             First item on the agenda is Settlement Agreement.  Any

19      reports on the Settlement Agreement and the progress thereof?

20             MR. HERMAN:  Yes, your Honor.  Orran Brown is here to

21      make his status report.

22             THE COURT:  All right.

23             MR.  BROWN:  Good morning, your Honor.  I'm Orran Brown

24      from BrownGreer in Richmond, we're the claims administrator for the

25      Vioxx resolution program.  And Lynn Greer asked me to express her

1    regrets today, she had a conflict she could not move this morning.

2    This is the first time in 26 reports that she has not been able to

3    join us.  But we have in her place David Smith, who is a lawyer in

4    our firm who is director of our IS claims review team, and he and I

5    will attempt to perform as well as Lynn normally does.

6              THE COURT:  Difficult shoes to fill.

7              MR.  BROWN:  Yes.  I think everyone in the courtroom is

8    disappointed that Lynn is not here and we're trying to cover the

9    breach.  There's a lot of mumbling behind me, it must be Mr. Levin.

10             What we would like to do this morning, your Honor, is

11   update the court and the parties on where we are and the progress

12   of our review of the extraordinary injury claims and the stroke

13   claims, which are the two remaining phases of the resolution

14   program that we are completing.  I will cover the extraordinary

15   injury payment status and then David will cover where we are on

16   finishing out the stroke claims.

17             We will not spend long on these slides because the court

18   has seen this before.  This is just a reminder that the

19   extraordinary injury program which was set up to provide payments

20   for claimants who suffered catastrophic economic loss or medical

21   injury beyond their stroke or heart attack claims, underlying

22   claims, could seek payments from this fund; and the Settlement

23   Agreement reserved up to 195 million of the payments that would

24   otherwise go to the heart attack claimants, and up to 105 million

25   of the fund that would otherwise go to the stroke claimants for

1    catastrophic injury situations.

2             And in this program, this slide tells us that we ended up

3    with 2,609 claimants trying to seek payments from the extraordinary

4    injury funds.  After taking out some withdrawals and some who did

5    not become eligible on their underlying claims, we have 2,346

6    claims to work with in this program.

7             Now, what that means is each of those people are seeking

8    some or all of the various types of benefits that this

9    extraordinary injury program was set up to cover, and including the

10   past medical expenses, the lost wages income, which are the

11   economic loss side of the equation where if you had $250,000 or

12   more of those economic losses before 11/9/07, which is the date of

13   the Settlement Agreement, you qualified for payments.

14            The special medical injury are people who are asserting

15   an injury not covered on the underlying MI or IS injury grids.

16            Then what we call AED, additional extraordinary damages

17   or the futures, it's beyond the past period, this was not really

18   promised in the Settlement Agreement, but nonetheless a program was

19   designed to allow some compensation or consideration of future

20   economic damages.  And claimants could apply for any one or all of

21   those, and these are the numbers of folks who did, who asserted

22   claims.  We ended up with 3,350 claimants seeking one or more of

23   those types of injuries.

24            And I think Bill Atkinson in our office showed this the

25   last time.  The far right column here shows us how many

 1    transactions or events are really presented by those claims.  There

 2    are a total of 17,215 transactions, so it's really more like 17,000

 3    claims; because these are the employers, the source of incomes that

 4    they're claiming were lost, the medical events, the treatment

 5    events, all of the various 5,300 different types of medical

 6    injuries that they're asserting are catastrophic that we go through

 7    one by one to evaluate these claims.  And we are just about through

 8    with our evaluation of all of these claims, and we wanted to go

 9    through each type of extraordinary injury claim and tell the court

10    where we are.

11            First on the medical expenses, these are folks who are

12    saying that they have unreimbursed medical expenses that were

13    catastrophic to them or extraordinary.  We had a total of 302 folks

14    who sought that benefit, 83 who sought additional beyond the past,

15    and here the program is set up to allow claimants to show us

16    medical expenses from 11/9/07, which is the end of the past period

17    through our claiming period which was 9/1/09, so that's the period

18    that we're looking at medical expenses.

19            We don't have a lot of those claims but we have gone

20    through each one.  We only have these 13 left that are still in our

21    review.  We've issued notices on all of the rest of them, 289 of

22    them.  And this tells us that 108 of them have been accepted by the

23    claimants where they accept the results that we've given them, we

24    have 148 where we're still waiting in the 20 day period for

25    claimants to tell us, and 33 of these folks have asked for a second

1    review, which is a second review with us to take another look at

2    the claim.  And this is their opportunity for us to fill in more

3    documents if they were missing records or missing hospital medical

4    bills to give them to us.  We have those 33 in hand right now and

5    are reviewing them to see if what they gave us the second go round

6    changes the outcome.

7            Similar slide on our lost wages, our past lost wages, and

8    here the future is this AED-LWI is the future wages or our past

9    lost income is before 11/9/07, and our future in this instance we

10   are allowing people to claim future lost wages up to their

11   mandatory social security retirement age, which for most people is

12   67.  These are the numbers of claims we've got for those types of

13   benefits.

14           We have completed our review of just about all of them.

15   We have 20 left for various reasons that we have not issued the

16   first notice on, they have particular problems or defects that

17   we're working on.  The rest have gotten our first pass on them

18   explaining what's payable and what's not, and here 318 of that 836

19   number have accepted the result, 424 have asked us for a second

20   review.  And here is also where they send us more tax returns, more

21   W-2s, they're trying to plug in gaps in their proof because here we

22   collapse the whole deficiency process into the review process to

23   make it faster.

24           Of the 424 people that have asked us to take a second

25   look at it, we are reviewing 368, we've already issued notices on

9

```
1    the other 56 of them; we're waiting on 46 to tell us whether they
2    accept it or not, ten of them have already accepted.  So we're
3    working through the process with the takeaway from this slide and
4    the special medical injury slide is that we have just about
5    finished all of our initial reviews of these claims and issued
6    notices explaining the outcomes, and we're in the process where
7    people are asking us to take a second review of it and we're going
8    through those as fast as we can to finish those.
9             On the special medical injury side we had 1,682 claims,
10   we still have 27 that we have to get our first notice out that are
11   hung up for particular reasons, but they will be out as soon as we
12   clear those out.  And we have issued notices on 1,655.  We see here
13   the same kind of information about 882 have accepted that outcome,
14   they are not going further.  681 are asking for a second review.
15   And of the 681 second reviews, we are going through them now.  We
16   have issued notices on all by this 427 the second time, and we've
17   got some waiting for decision and 64 of the second time around
18   that's been accepted.
19            And this is the first instance, your Honor, where we see
20   that there is an appeal because the program does allow once we
21   finish our first review and the second review and the claimant is
22   still unhappy, they can seek an appeal review from Special Master
23   Juneau.  We have one of those so far and that just came in
24   recently.  There is a $700 appeal fee to pay for the Special
25   Master's fee for this.  This particular claimant hasn't paid that
```

1    fee yet, but that's the only one we have so far.  We don't know how

2    many of these we'll get, but we spent, some folks on our team last

3    week spent some time with Special Master Juneau and his staff to

4    make sure that the Special Master is ready; and they are ready for

5    these appeals, and we know that they will do them as promptly as

6    they've done all of the other appeals they've done in this process.

7         And we have given them all of the details of the program,

8    how it works, and we're going to facilitate their review of these

9    the same way we did in our automated way with the other claims.  We

10   don't think that's going to be anymore of a holdup in the process

11   than they were on the underlying claims because of the ability of

12   the Special Master to go through these so rapidly and fairly.

13        This slide here takes us back to people, we're looking at

14   claims, these are people.  The special medical injury we end up,

15   looking at this slide which is back to the number of claimants,

16   basically the takeaway from this is we've got most everybody other

17   than 42 people have gotten their notices somewhere in the process,

18   and we are about a third of the way through our second reviews of

19   all of the claims.  We expect to have them finished and all of our

20   second reviews finished in April, by mid to the third week of

21   April, and we will I think be able to have whatever appeals we get

22   in the hands of the Special Master as they come in.

23        We're hoping that if that process plays out and we don't

24   have too many appeals that we will finish the extraordinary injury

25   program in April/May, the appeal period, and we hope to be able to

1   make the extraordinary injury payments by the end of the second

2   quarter, by the end of June.

3          This is just a reminder that about half of the folks who

4   get our initial outcome accept it and do not go forward, the other

5   half are asking for us to take a second review.  The second

6   reviews, as you could expect, are larger in the medical injury, the

7   economic loss, the LWI, the lost wages, because more of those folks

8   are asking for second review because that's where they fill in

9   their documentation to us.

10          But this is just showing us by injury type how many

11   people are accepting the first outcome, how many people are asking

12   for a second review.

13          And then the last point is, I've already mentioned the

14   ability in the program to have an appeal.  It's all set up where

15   the Special Master is ready to take these, we've set up the

16   process.  The appeal is fee payable to us, we're going to maintain

17   that in an escrow account to reimburse the Special Master for his

18   time on each appeal at $700 per case.  The Special Master has

19   agreed to limit his fee for these to that amount, no matter how

20   long it takes.

21          It's a 20 day period for folks to tell us they want to

22   appeal and send in that fee, and that fee is non-refundable, it

23   can't be moved to one other person; it's like a court cost, it has

24   to be paid.  If it's not paid, we can't do the appeal.  We've made

25   it very clear to folks that that's how it's going to work, you have

1    to give us that fee to allow the appeal to proceed.  If you don't

2    do that, then our outcome becomes the final outcome.

3              That's where we are, your Honor, on the extraordinary

4    injury side.  Unless the court has some questions, David will go

5    through where we stand on the stroke claims review.

6              THE COURT:  The only point the court makes is that the

7    extraordinary injury fund is a little different than the other.

8    The claims administrator can't make partial payments or can't make

9    payments to some, he has to wait until the claims for the

10   extraordinary injury fund are complete before he can make payments

11   because it's a finite fund, and we need to know the way the fund,

12   the whole fund will be distributed.  So that's the reason, although

13   some individuals have finished early on they haven't received their

14   money yet.

15             MR.  BROWN:  That's right, your Honor.  We have made it

16   clear to the folks and the lawyers that there are no interim

17   payments in this program.  And we've also made it clear that the

18   purpose of this program was for truly catastrophic injuries.  A lot

19   of these results that we see are folks that are getting denials,

20   and we see about half of them are accepting them because they're

21   people just thinking that the extraordinary injury fund was just

22   sort of a second bite at the apple or kind of a fallback for

23   injuries that are less serious than heart attack or stroke, and the

24   parties intended the plan to be for truly catastrophic situations

25   and that's how we're administering it.

```
1              All right.  Thank you very much, your Honor.

2              THE COURT:  Thank you very much.

3              MR. SMITH:  Good morning, your Honor.  I'm David Smith

4    from BrownGreer on behalf of the claims administrator, I'm here to

5    report to the court on our progress on processing the stroke claims

6    through the Vioxx settlement program.

7              Our first slide is a snapshot of exactly how many claims

8    we have processed to date.  Rows 1 and 2 demonstrate that we

9    currently have no claims through the Gates review processes.  Row 3

10   shows that we have 12,435 claims that have passed the Gates

11   criteria, that is the quantity of claims that we are currently

12   reviewing for points and hope to issue points award notices by the

13   end of March.

14             Conversely, line four shows that 5,419 claims did not

15   pass the Gates criteria that were set forth in the settlement

16   agreement.  Those claims have either withdrawn from the program,

17   filed a Gate appeal with Special Master Juneau, or filed their

18   future evidence stipulation to withdraw from the settlement

19   program.  So in total, your Honor, we have 17,854 claims that we

20   have processed, primary stroke claims that we have processed

21   through the settlement program.

22             The next slide is a snapshot as of close of business

23   Friday on exactly where these 12,435 passing stroke claims are in

24   our processes.  Line one demonstrates that through yesterday we

25   have paid 8,952 stroke claims their 40 percent interim payment.
```

1    That figure includes the wires and the checks that U.S. Bank issued

2    yesterday for the March interim payment.

3             Line 2 shows claims that could be paid in April.  We've

4    completed these claims through our processing and issued a points

5    award notice.  967 of these claimants have already accepted or

6    their appeal rights have expired, so those claimants will appear on

7    the April interim payment list and get their 40 percent payment.

8             Line 2(b) shows claimants who we have issued a points

9    award notice and they're eligible for the April interim payment if

10   they elect to accept the points award that we issued or they accept

11   their -- they either abort their appeal or accept the points award.

12            The third group of claimants are 227 claimants that have

13   actually either appealed their points award to Special Master

14   Juneau or have elected not to accept the 5,000 fixed payment.  And

15   just to refresh the court's memory, fixed payments are for those

16   stroke claims that are awarded less than two stroke points.

17            Line 3 are 240 claims that we have processed to

18   completion but have not issued the points award yet for two

19   reasons:  One is we have pushed those claims that we've completed

20   to the lien resolution administrator to get information back on

21   Medicare, Medicaid, and the other government liens programs, that's

22   a day-to-day exchange, so it's always a one-day lag on getting

23   those points awards out.

24            There are 82 in that group that we're trying to get out,

25   so those will be issued imminently.  There's 158 claims left in

1    that group that we've completed processing but we are completing an

2    audit to make sure the records are accurate and reflective of

3    what's required in the Settlement Agreement.  We anticipate all of

4    those being issued by the end of March.

5         Line 4 are claims that are near graduating to line 3 in

6    the slide presentation.  We've initiated review and doing some

7    final steps before we complete our points analysis.

8         Line 5 on the presentation, these are claims that we have

9    picked from our queues to do the points review on the passing

10   stroke claims, but we've deemed the claims package incomplete so

11   we've had to stop our process and issue a notice to the plaintiffs,

12   or their law firms, asking for more complete documentation from the

13   treating facility for the stroke or the rehabilitation facilities

14   that helped the claimants recover from their strokes.

15        Currently our incomplete claims package ratio is 27.6

16   percent, and that's nearly a third, your Honor; so for every three

17   claims we grab, we have to stop one of them and issue a notice

18   asking for complete records.  That's at a minimum if all of these

19   deadlines take their maximum extent, that's a three-week process to

20   give the firms two-weeks notice to try to respond to the incomplete

21   claims package notice, and then an additional week to respond to

22   our notice if we deem their response or lack thereof as

23   insufficient.

24        Those are the claims that are going to take the most time

25   to complete.  We've issued notices to all 463 claims and just wait

```
 1    for the firms to respond with hopefully responsive documentation.

 2              I'd like to take this moment to mention based on the

 3    incomplete claims packages, based on our goal of issuing final

 4    stroke payments by the end of the second quarter of 2010, we're at

 5    a point in the program where we can no longer grant any extensions

 6    in the claims review process.  This would go for people who receive

 7    a notice of incomplete claims package, people who receive a points

 8    award and trying to determine whether to accept it or appeal it, or

 9    for people who want more time to try to get their appellate

10    documents together.  We have to adhere to the deadlines that are

11    established in our claims administrator notices.

12              THE COURT:  Let me reinforce that.  This case at its

13    inception as an MDL on February 16, 2005, and as was reported

14    previously, the case was settled on November the 9th, 2007.  And

15    we're now in 2010, so it's taken us awhile to pay out the claims.

16    The reason for that, obviously, is that there's some 50,000

17    claimants or thereabout, so it takes a longer time notwithstanding

18    the herculean efforts of the claims administrator.

19              But part of this is in the hands of the attorneys.  They

20    have to recognize that they have to deliver certain material.  The

21    fact that the case is settled doesn't mean you go on to another

22    case, you have some responsibilities in this particular case.

23              But it also is a part that we've given or I've given

24    extensions of time because matters of this sort it does take time

25    to resolve.  But you get to a point where it has to get over and
```

```
1    we're at that point now, and so everybody has to understand there's
2    no more deadlines in these matters.  I'm going to post that on the
3    website to alert the people; and if they don't comply, then I'll
4    have no recourse except to take appropriate action on it.  But this
5    is the last one, last deadline.  Okay.
6              MR. SMITH:  Thank you for emphasizing that, your Honor.
7              The last two items on this particular slide demonstrate
8    where we were at close of business on Friday.  The stroke review
9    team had, was currently reviewing 71 claims that they had pulled
10   from the queues and were reviewing the documents to try to assign
11   points and risk factors to those claims.  And as of five o'clock
12   Friday, there were only 234 claims left that we had not yet grabbed
13   from the passing Gates queue to review for points.  I anticipate
14   that should be zero by the end of this week.
15             The next slide, the stroke, the court has seen before,
16   but this is a breakdown of what the average points are per stroke
17   injury level.  Level 1 are the death claims, and this has been
18   holding constant at a little bit over 66 points for every death
19   claim we analyze.
20             Level 2 are the more severely injured claims, these
21   stroke claimants were persons permanently disabled, those are, of
22   course, higher and they have been averaging right at 97 points for
23   Level 2 claims.
24             Level 3 claims reflect the stroke claimants who have
25   impaired basic activities of daily living.  The Level 3 claims have
```

1    been averaging right at 73 points.

2            Level 4 are the claimants that have been impaired

3    instrumental activity of daily living, those have been holding

4    steady at about 43 and a half points.

5            And the last injury level for the stroke claims is Level

6    5, which is a catchall, and those have been hovering right at 30

7    points, a little bit at 29, as of the time we ran this data.

8            Item 6 on this presentation shows that 7.43 percent of

9    all of the claims we reviewed become a special review claimant,

10   that means the claims are less than two stroke points which makes

11   them eligible for a fixed $5,000 payment, if they elect that

12   option; or they can decline that option and be reviewed by Special

13   Master Juneau, who will allocate points as directed under the

14   Settlement Agreement.

15           The last slide I would like to discuss shows where we are

16   in paying the stroke claims.  As of yesterday, we had paid 8,952

17   stroke claimants their 40 percent interim payment and that comes to

18   over $250 million under the settlement program.

19           As I disclosed earlier, we already have 967 claims that

20   are ready for the April interim payment list, they will be paid in

21   the third week of April.  Those claims aggregate over $20.5

22   million.

23           There are 1,236 claims that are also potentially eligible

24   for the April interim payment list.  They will make that list if

25   those claimants elect to forego their appeal, resolve their appeal,

```
 1    or just accept the points award as issued by the claims

 2    administrator.  Those payments could aggregate over $27.5 million.

 3            So row four of this slide shows that through today we

 4    could pay or will potentially pay 11,155 claims, stroke claims

 5    through the Vioxx settlement program, to the sum of over $298

 6    million.  Based on the number of passing stroke claims, your Honor,

 7    that represents 90 percent of claimants in the stroke world that

 8    will or immanently will receive their payment.  The roughly ten

 9    percent that haven't received their interim payment, they're either

10    in the process or we're working on trying to get a points award out

11    or clear up their incomplete claims package or those claimants

12    didn't enroll in the program in time to qualify for an interim

13    payment.

14            So I would like to take this opportunity, while we're

15    talking about payments, we do anticipate making final stroke

16    payments by the end of the second quarter in 2010.  We will be

17    making interim payments in April as I disclosed.  If for some

18    reason final payments are pushed to June, we will make an interim

19    payment in May to make sure those claimants get their 40 percent

20    payments.

21            Whenever we do end up making final payments, be it in

22    April or May or June, we will not do an interim payment followed

23    immediately by a final payment.  That would be too much stress on

24    U.S. Bank to get those funds out.

25            So unless the court has any questions, that completes my
```

```
 1   presentation.
 2            THE COURT:  Thank you very much.  I appreciate your work.
 3            MR. SMITH:  Thank you.
 4            THE COURT:  The next item on the agenda is the lien
 5   administrator.  Anything from the lien administrator?
 6            MR. BROWN:  Your Honor, with the court's permission, I'd
 7   like to move our gear out of the way since someone else needs our
 8   spot here.
 9            THE COURT:  Sure.
10            MR. HERMAN:  While Orran is doing that, may it please the
11   court, Ms. Oldfather who is appointed lead liaison with respect to
12   PTO 28, has raised some issues not on the agenda.  What we propose
13   is to discuss those issues with her when your Honor takes a recess,
14   and in the event that Ms. Oldfather wishes to make statements on
15   the record that would be done when you resume.
16            Your Honor, with privilege I want to thank our colleague
17   Dorothy Wimberly and Lenny Davis for the status reports that they
18   always turn out on time.  I want to acknowledge Andy Birchfield our
19   colead, Jerry Meunier, Troy Rafferty and Arnold Levin, who continue
20   to serve regularly on the PSC.  Mr. Levin may mumble, but he
21   doesn't stumble or bumble; particularly on his 71st birthday,
22   probably due to the fact that he got some elixir from Ponce de
23   Leon.  He actually sailed with Ponce de Leon.
24            THE COURT:  He knows him well.  All right.  The lien
25   administrator.
```

1           MR. GARRETSON:  Thank you, your Honor.  I am Matt

2    Garretson and I'm here to report as the lien resolution

3    administrator.

4           As in prior reports, I am going to first speak about the

5    status of the governmental liens and then I'll turn briefly to the

6    status of the private lien resolution program.  Further, I am going

7    to be very, very brief this month and only highlight a few areas

8    where the meter has moved since our last hearing.  Next month I

9    think we will have more substance to share as we're going to be

10   reporting on the ischemic stroke payments, as well as more

11   information regarding the medically based EI claims.

12          In fact, we are going to be having a working session

13   after this hearing with BrownGreer, I have Jason Wolf and Ryan

14   Kalooky from our office here today who are going to be focussing in

15   on pushing the EI claims and the ischemic stroke claims over the

16   goal line.  Our objective with respect to the medically based EI

17   claims, just for information for primary counsel, is to really push

18   hard to get the agreement of Medicare regarding those claims at the

19   same time those claims are being released for payment, so we're

20   hoping for a June time frame completion there.

21          With respect to Medicare and Medicaid, we're still

22   hovering around the 99 percent complete mark.  The remaining claims

23   are those who have social security number discrepancies, which I

24   have talked about quite a bit in past hearings, as well as

25   remaining requests for redetermination.  And we're just going to

1   keep clicking away at those remaining claims until we hit that 100

2   percent mark, but we're pleased to be over the 99 percent mark.

3           With respect to the other governmental liens, I raised

4   the issue last month with the court about the difficulty we were

5   having getting claims data from the military plans.  I am also

6   mindful that this is the first program where the military plans

7   have ever been included in a mass tort settlement program

8   affirmatively where they were given that participation, so I just

9   want to reiterate they are being very cooperative and they told us

10  up front that they would have difficulty given the status of their

11  systems.

12          That being said, we've cut in half the remaining

13  outstanding governmental liens.  And, in fact, just yesterday we

14  received a large batch of outstanding claims from the Department of

15  Veteran Affairs, so that cuts into about a third of what was

16  remaining -- I'm sorry, that affects about a third of the remaining

17  MI and SCD, remaining claims.  I also think we will make

18  substantial progress because the court was gracious enough to enter

19  an order that established March 18th as the last date that primary

20  counsel can give us other governmental liens to resolve.

21          So that's the status of the governmental liens.

22          Turning briefly to the private lien resolution program,

23  we have moved the meter rather significantly here over the last

24  month.  We're now up to 93 percent of the MI and IS liens being

25  audited.  Those that are outstanding, the remaining seven percent

1    are largely due to the fact that they do not yet have points and so

2    we cannot complete them, so they're the ischemic stroke cases that

3    are being finalized.

4              4,259 claimants have been finalized through this program

5    as of today and posted to the claims administrator's web portal,

6    and of course counsel has the ten days to appeal once those are

7    finalized.  And the appeals process is working I think very

8    successfully.  243 claimants, only 243 claimants out of that batch

9    have appealed, and 116 of those have already been withdrawn.  As I

10   mentioned before a lot of our appeals are solved just through

11   education as to why such obligations exist.

12             We're currently working with the third party payors on

13   less than five percent of our audited lien values that they are

14   contesting, and we expect to work through those with them over the

15   next 30 days.

16             To date we've processed 2,000 claimant related payments

17   to the third party payors, so they're beginning to already see the

18   product of this effort.

19             And then, of course, the enrollment has officially closed

20   in this program.  All of the remaining data that was sent, the

21   program if you recall closed February 28th of 2010, so that last

22   bit of data is now in front of the plans and we expect to receive

23   that matching data back from the plans here shortly.

24             So, your Honor, as I said, it would be brief.  I think we

25   will have more to report next month as we move into the EI and IS

```
 1   claims, but that concludes my report as the lien resolution
 2   administrator.
 3            THE COURT:  Thank you very much.  I know we're doing some
 4   things for the first time in many of these issues.  We really felt
 5   that it was appropriate to include military liens in this picture
 6   and I hope that this is the first of many cases that they are
 7   included in.
 8            The statutory liens, as we've been talking, and the
 9   statutory liens have to be paid.  It's by statute.  So everybody is
10   liable, the defendants, the attorneys, the individuals, and so
11   forth.  So those liens have to be paid.
12            The good thing about a case of this sort is that because
13   of the economy of scale that this case presents, the people who
14   have received these benefits can get the significant discounts by
15   paying the liens because it's to the advantage of the lienholder to
16   have one central focus from which they get all of their moneys.
17   It's easier, the transactional cost is down and so forth.  So it's
18   to the benefit of the claimants to do it in this form and fashion.
19   And I am happy that it looks like it's been proceeding well
20            MR. GARRETSON:  Thank you, your Honor.
21            THE COURT:  Thank you very much.
22            The next item is the Special Master.  Any report from the
23   special master?
24            MR. JUNEAU:  Your Honor, Patrick Juneau, Special Master.
25   Very briefly, your Honor.  We are current on the stroke and heart
```

1    attack cases.  There are still some bubbling items as I indicated

2    in my previous report, but we're prepared to handle and finish

3    those.

4          I am pleased to report that we had an extensive meeting

5    with BrownGreer, and the purpose of the meeting was to get ready

6    for the extraordinary fund claims.  There's a lot, a lot of

7    material there being processed, and we've extensively gone through

8    all of their protocols and procedures and guidelines that were

9    published so that I would be in a position to rapidly address

10   whatever appeals appear.

11         We've also got it worked out, your Honor, just as we did

12   in other cases, electronically all of this is going to be

13   communicated to us so we're going to have it in electronic form

14   instantaneously when these appeals are filed.

15         I think I'd be remiss if I didn't make this comment, your

16   Honor, just having had the experience of literally thousands of

17   other claims.  When we talk about extraordinary fund claims, we're

18   talking about a lot of data, a lot of material, a lot of

19   documentation, and I think it would be appropriate just to put on

20   the record that it's neither impressive or productive for counsel

21   to put a statement to the effect see the attached.  That's just not

22   a good thing to do.  It causes a lot of extra review to be made, it

23   increases the possibility of me not catching something that may be

24   should be focused on.

25         So the court is acutely aware of any appellate process

1    that we are aware of in the federal rules you have to target what

2    you want us to look at.  We will look at it, or I will look at

3    that.  But I want you to be very through and complete in analyzing

4    target a specific issue that they want to look at.

5         With that caveat being said, your Honor, we geared up,

6    everything is on schedule, I see no hitches in the system that

7    would preclude the time periods that have been outlined by

8    BrownGreer, they've been very cooperative in giving us information.

9    Between the two, if we've even altered systems, protocols that we

10   thought might apply we've changed those to expedite the process.

11   It's worked very well and will continue to do that in the process.

12   And I think that's exactly where we are today, your Honor.

13        THE COURT:  Thank you very much, I appreciate it.

14        As I mentioned several times, we've tried to plug into

15   this system due process, and we have a number of appeals,

16   administrative appeals, the attorneys review appeals, and then

17   Special Master appeals.  But I do reinforce what the Special Master

18   said, we have one Special Master and two deputy Special Masters and

19   they review the material.  But if you want them to see a particular

20   item in that material, you have to designate that item and not just

21   generalize by saying see all of the material that I've attached.

22   That doesn't get it because they're under time constraints and

23   they're doing a good job, but you have to help them out in that

24   way.  So I hope a word to the wise is sufficient.

25        MR. JUNEAU:  One item Mr. Herman called to my attention.

1    Just so there's a complete report in this respect.  The court has

2    appointed me to handle lien resolution problems that may affect

3    disputes between attorneys that may be pending.  That order has

4    been signed by the court.  I am already requested and have talked

5    to Mr. Brown and we're going to be -- I'll be coordinating with him

6    the assemblage of that information and data, and I am going to be

7    on that pretty quick.

8              THE COURT:  In that regard, there was some attorney lien

9    issues.  The claimant may have had one attorney and then they

10   changed attorney and there's two or three attorneys involved in the

11   case.  Well, those attorneys who no longer represent the claimant

12   have occasionally filed liens for fees for their fees during the

13   time in which they did represent the claimant.

14             I asked, directed BrownGreer in those instances to pay

15   the claimant their amount but then to withhold the attorneys' fees

16   from that amount.  And they've done so and now we have the

17   attorneys' fees to be distributed among and between the various

18   attorneys who have asserted liens.  I looked at the material and

19   there are about 400 of those cases.  If they were short, a smaller

20   number I could have done it, the court could have done it without

21   the assistance of anyone, but this number poses a difficult

22   problem.  So I've appointed Mr. Juneau as the Special Master for

23   that job and have directed him, if necessary, to employ staff and

24   attorneys to assist him, and he may be taking depositions or having

25   hearings or taking evidence or processing information.

1          All of his expense for himself as well as his staff for

2     that project will come out of the disputed fees, and then what's

3     left, if any is left, I will review his report and recommendation

4     and act accordingly.

5          If there is nothing left after his fees and costs, then

6     the matter will be moot.  But that's how we'll deal with those

7     particular fees.

8          MR. JUNEAU:  Thank you, your Honor.

9          THE COURT:  Thank you.  I appreciate your help.

10          The next item is class actions.  The only one that I have

11     presently is the purchase claims.  My thinking on those purchase

12     claims is that when we get finished with some of the items on the

13     agenda, presently Attorney General cases and trials and so forth,

14     I'll get with the parties in the near future and focus them on the

15     purchase claims.  I've set a status conference for that, when is

16     it?

17          THE LAW CLERK:  April 7th.

18          THE COURT:  April 7th.  The attorneys for the purchase

19     claims, and I would like them at that time to be able to discuss

20     with me the outstanding issues.  And also I'm interested in coming

21     up with a scheduling order that works for those particular claims.

22     I'll look to the attorneys to give me some suggestions on it and

23     we'll then start those on the process.

24          Federal-state Coordination Committee, anything on that?

25          MS. BARRIOS:  Good morning, your Honor, Dawn Barrios for

```
 1    the State Liaison Committee.
 2            Today we have provided you not only with a CD but a chart
 3    indicating the progress we've been able to make with BrownGreer's
 4    great assistance.  Since our last conference we have been able to
 5    reduce the number of remands by approximately 180 plaintiffs.
 6    There seems to be a pocket that are not moving and that pocket of
 7    cases are those plaintiffs who have not enrolled or registered in
 8    the program, who are represented by counsel, and whose counsel have
 9    repeatedly told me that they intend to dismiss their cases.  Many
10    of these counsel have filed more than one plaintiff in a complaint.
11    They filed a dismissal for the first named plaintiff and are
12    assuming that means that all of the cases are dismissed.
13            So because I've tried for months, almost a year to get
14    this done, I am going to ask the court's permission, if I could
15    prepare, rather, a generic motion to dismiss, send it to counsel, I
16    fear this is on their way back burner but it's on our front burner
17    and provide them that form so they can sign that and get that out.
18            THE COURT:  Right.  Let's do that, I'll instruct you to
19    do that.
20            From the defendant's standpoint you have to keep an eye
21    on these matters, if they're not dismissed that way, then bring
22    them to the court's attention and then, Dorothy, we'll put them on
23    your list.
24            MS. BARRIOS:  And Ms. Wimberly has been great in her
25    assistance, but we do have approximately 1,540 plaintiffs who are
```

enrolled in the program and we are just waiting for them to be

formally dismissed so we can scratch off their remand.  Thank you,

your Honor.

THE COURT:  As we know with this many claimants it's

nothing unusual, but it has to be recognized that oftentimes in a

case of this sort many people at the outset legitimately feel that

they have a problem and that the problems are related to the

subject matter of the lawsuit and they enthusiastically pursue it

and are interested in pursuing it.

As the case goes on and the case develops and they also

go on with their lives, oftentimes they feel, well, that's not the

problem.  There's something else that's the problem.  And they just

don't want to proceed with their case, but it's still there,

they're included in the litigation.  And from the court standpoint

I have to deal with that.  I do it by giving them notice, once,

twice, three, four times sometimes and I get no response.

At that point after trying to get their attention, one

way or the other, no response or they don't do what they need to

do, the court has to dismiss their case.  They can't just leave it

on the docket.  It has to be dealt with and so that's what I have

been doing.

Every case, as I say, has a beginning, a middle and an

end.  We've focused on the middle and tried to deal with that and

hopefully the middle of the case doesn't get too long, but there

has to be an end and that's where we are at this point.

```
 1          MR. HERMAN:  May it please the court, I do want to for

 2   the record indicate the three websites:

 3   claimsadmin@browngreer.com, HTTP://www.officialvioxxsettlement.com,

 4   one word, and the court's website, which has all of these status

 5   conferences and your Honor's rulings,

 6   HTTP://vioxx.laeduscourts.com.

 7          I also want to indicate that the next issue is pro se,

 8   and in the past six weeks we've had a number of individuals call

 9   our office indicating that their attorneys had -- they had

10   discharged their attorneys and some others who were previously

11   listed as pro se seeking new legal counsel, and we have given them

12   the names, addresses, e-mails, phone numbers of both Ms. Oldfather

13   and Mr. Stratton and we'll continue to do that.

14          THE COURT:  All right.  Okay.

15          MR. HERMAN:  Pro se claimants and we have a

16   representative of Mr. Johnston's firm.

17          THE COURT:  All right.  Often times pro se claimants need

18   information, they don't have anybody to talk to, so we have

19   appointed a pro se attorney to handle questions from those

20   individuals who want to know information, who want to have somebody

21   to talk to, want to ask questions about the settlement program,

22   want to know what to do with their particular case.  So the pro se

23   attorney has filled that role and filled it well.  Let me hear from

24   you.

25          MS. REZNIK:  Good morning, your Honor.  Heather Reznik
```

1   for Robert Johnston, pro se curator.  Our office continues to

2   receive calls from pro say claimants.  We continue to help them as

3   best we can.  Most of the calls are about the notices of points

4   awards and inquires regarding receipt of checks from the settlement

5   program, and we will continue to offer our assistance.

6           THE COURT:  Okay.  Thank you very much.

7           Anything on the trial package?

8           MR. HERMAN:  Your Honor, we're about to take an audit of

9   120 individual lawyer presentations, many of whom represented that

10  they had expert materials but never provided them to the MDL, they

11  were never shared and we requested that they forward those

12  materials so they could be considered for an addition to the PSC

13  trial package, we expect to have those by the time your Honor next

14  meets.  And so there will be a supplement at that time.

15          In terms of the trial package, we've had no new requests

16  for the trial package, it's available.  We haven't had any new

17  requests to enter the document depository for review.  I think it's

18  fair to say that in the last six months the Attorneys General legal

19  representatives have availed themselves of the PSC MDL trial

20  package and documents.  And there are no new issues regarding the

21  trial package at this time.

22          THE COURT:  One of the advantages of an MDL is to afford

23  people who are not having their case tried to at least have the

24  benefit of the experience of those individuals who have tried and

25  prepared their cases and that has been done in this particular

```
 1    case.  We've tried six at the federal level and an equal amount or

 2    thereabout at the state levels, and the attorneys that have tried

 3    those cases have gotten together and prepared a trial package.

 4         And the thought is that anyone who wishes to try their

 5    case but has not tried it or not settled it can take advantage of

 6    the trial package to help them in their particular trials.

 7         The next item is the governmental actions.  We have about

 8    30 Attorney Generals in the United States who have filed claims for

 9    their respective states, we've tried to bellwether those cases, the

10    first trial is Louisiana Attorney General's action, that trial will

11    take place April the 12th, next month.  There's a scheduling order

12    in place and yesterday I had several motions, discovery motions

13    that I heard from each side and ruled on those motions.

14         Today we have several motions in connection with the

15    governmental action cases, one filed by the Attorney General of

16    Colorado, or at least the people involving the state of Colorado,

17    and one filed by the Louisiana Attorney General and one filed by

18    Merck.  I'll take those after this status conference here today.

19         Anything further on the Attorney General cases, Jim?

20         MR. DUGAN:  No, your Honor.

21         THE DEFENDANT:  Doug or John?

22         MR. BEISNER:  No, your Honor.

23         THE COURT:  Okay.  Pending personal injury cases in which

24    Lone Pine expert reports have been served.  Anything on that, Doug?

25         MR. MARVIN:  Your Honor, yes.  Under PTO 28 cases these
```

1   are the cases that were eligible for the summer program but did not

2   enroll or were ineligible, they've gone ahead and submitted expert

3   reports.  Those are the cases that are subject to Item 10, PTO 28

4   cases.

5           Your Honor, there was a stay in place, as you know,

6   pending the resolution program.  That stay has been lifted and

7   discovery has begun.  In some of those cases, the cases that have

8   been filed by Mr. Benjamin and we have been talking to

9   Ms. Oldfather with respect to the next steps for the remaining

10  cases that are the PTO 28 cases.

11          THE COURT:  Okay.

12          MS. OLDFATHER:  Good morning, your Honor.

13          THE COURT:  Good morning, ma'am.

14          MS. OLDFATHER:  Good morning, Mr. Marvin.  Mr. Marvin and

15  I are revisiting the issue, Judge, of the cases that are within the

16  liaison responsibilities of my committee, myself and my committee.

17  These are all of the cases that were governed by PTO 28 that the

18  court put in place on the date the settlement was announced.  PTO

19  29 for cases that had not yet been filed, and PTO 28 for cases that

20  were filed and not enrolled in the program.

21          And what we discovered is there were some cases that did

22  not end up on the spreadsheet that Mr. Marvin and I had developed

23  in 2009, so we're supplementing the spreadsheet.  And it is

24  correct, Mr. Marvin and Merck are proceeding with discovery on

25  Mr. Benjamin's cases, which are kind of a discrete group.  Our

1   cases, we are still working very hard to get our generic expert in

2   line before we do any case specific discovery, and we've discussed

3   that in the chambers with the court.

4            THE COURT:  Yes, we have.  And the thought on those

5   particular cases, when we get to the point, we need to know the

6   numbers and then see if we can categorize them or group them, and

7   then we'll try to bellwether those cases and get those to trial

8   also.

9            MS. OLDFATHER:  We understand that's the plan.  Thank

10  you, your Honor.

11           THE COURT:  Thank you very much.

12           MR. MARVIN:  Your Honor, before I sit down, in the past

13  we've been reporting on state court trials, and we haven't done

14  that for the last couple of months because there have been none;

15  but Ms. Snapka correctly brought to my attention the fact that we

16  should mention that there is a state court trial that is set in

17  April and that's of the *Strong* case and that's in Arizona.  And I

18  believe Ms. Naptka is going to be one of the lawyers trying that

19  case.

20           THE COURT:  Okay.  Anything on that particular case?

21  Okay.  Thank you.

22           The next item is the Fee Allocation Committee.  The court

23  capped general fees at 32 percent and directed BrownGreer to

24  withhold the 32 percent, and also from that 32 percent will come

25  the common benefit fees.  There have been some objectors to the

1    common benefit fees.  The Plaintiff Committee has requested that

2    eight percent be paid.  There's been objectors.  I received all of

3    the objectors' information, I've appointed Mr. Stratton as the

4    liaison for those objectors, and I set a status conference -- well,

5    I directed him and the Plaintiffs Committee to get together to see

6    whether or not they could come up with some plan, discovery plan

7    and trial plan to resolve these matters.

8         They met but couldn't come up with an agreeable method.

9    One side wants to take the depositions of -- a lot of depositions,

10   including from Merck, and the other side feels that those

11   depositions are not necessary.  In any event, since they couldn't

12   agree to it, what I have done is I've issued an order directing the

13   plaintiff liaison to take the deposition of Mr. Stratton and to

14   have Mr. Stratton take the deposition of plaintiff liaison.  I've

15   set a status conference for April the 29th to discuss the future

16   course of those matters.

17        There's been a motion originally filed seeking

18   reconsideration of the court's order capping contingency fees.  I

19   appointed the Tulane Law Clinic to represent the unrepresented.  I

20   heard argument, took briefs, and ruled denying the motion.  A

21   motion was filed seeking a mandamus on the court's opinion while it

22   was in the Fifth Circuit for some time, the parties have withdrawn

23   the motion so that's moot at this time.

24        I do have several motions regarding matters, but I'll

25   take those up at the end of the case.

```
1              Anything further for this meeting?
2              MR. HERMAN:  Next status conference.
3              THE COURT:  What is it?
4              THE LAW CLERK:  April 29th.
5              THE COURT:  April 28th.
6              THE LAW CLERK:  29th.
7              THE COURT:  The next status conference is April 29th at
8    nine o'clock in open court, and I'll see the attorneys, the lead
9    counsel and liaison at 8:30.
10             MR. HERMAN:  Your Honor, if any of the folks who are
11   attending that conference would like tickets to the Jazz Festival,
12   I can arrange that if they'll just e-mail in advance.
13             THE COURT:  The jazz jester is willing to arrange for
14   tickets so take him up on it.
15             MR. HERMAN:  I've graduated from court jester to jazz
16   jester.
17             THE COURT:  Okay.  All right.  I'll take a 20 minute
18   break at this time and come back and deal with the motions.  The
19   court will stand in recess.
20             THE DEPUTY CLERK:  Everyone rise.
21        (WHEREUPON, A RECESS WAS TAKEN.)
22        (OPEN COURT.)
23             THE COURT:  Be seated, please.  I have several motions
24   today, three motions.  One regarding Colorado and then Louisiana
25   and then Merck.  I'll take the Colorado issue first.
```

```
1              MR. BEISNER:  Your Honor, John Beisner.  I just wanted to
2      introduce my colleague Geoffrey Wyatt who has not been before the
3      court before, who will be handling the motion for Merck.
4              THE COURT:  Good.  Anyone from Colorado?
5              MR. KRITZER:  Yes, sir, Stuart Kritzer, K-R-I-T-Z-E-R,
6      for Colorado.  And with me is my cocounsel.
7              THE COURT:  What's the name?
8              MR. KRITZER:  Pete Kaufman.
9              THE COURT:  All right.  New counsel on both sides, the
10     court welcomes you to the court.
11             MR. WYATT:  Thank you, your Honor.  Good morning.
12             THE COURT:  Good morning.
13             MR. WYATT:  This is a lawsuit brought against Merck by a
14     man named James Franklin.  Mr. Franklin is not suing on his own
15     behalf, he doesn't allege that he was injured by Vioxx or that he
16     did not get his money worth from the drug, he doesn't allege he
17     even bought it or used it.
18             THE COURT:  Right.  Let me just set the stage first as I
19     understand it in any event.  On about September the 6th, 2006,
20     plaintiff counsel in this matter met with the representatives of
21     the Colorado Attorney General's office and requested that they
22     present a case against Merck.  Subsequent to the meeting, the
23     plaintiff's counsel was advised that Colorado Attorney General was
24     not going to prosecute Merck.
25             On September the 29th of 2006, the plaintiff James
```

1    Franklin filed suit against Merck in his capacity as a Colorado

2    taxpayer on behalf of the state of Colorado.  On October the 27th

3    Merck removed the case to this court and it was transferred to the

4    MDL, lodged in this court.

5         The plaintiff's complaint, as I read it, asserts a claim

6    for fraud and non-disclosure leading to the loss of millions of

7    dollars for the state of Colorado, which Colorado spent in

8    purchasing Vioxx through its Medicaid program and seeks attorneys'

9    fees, interest, costs and further relief.

10        Presently Merck has filed a motion for an order to show

11   cause why the plaintiff's complaint should not be dismissed on the

12   grounds that the plaintiff lacks authority to sue on behalf of the

13   state of Colorado.  Merck notes that the plaintiff does not have

14   access to and cannot obtain any information possessed by Colorado

15   that's sought by Merck for its discovery purposes.

16        They also take the position that the plaintiff is not the

17   state of Colorado, has no authority to act on its behalf, and that

18   there's no constitutional statutory authority which permits a

19   Colorado taxpayer to bring a derivative action on behalf of the

20   state.  As I read the documents, Merck's position basically is that

21   there's a lack of standing on the part of the plaintiff.

22        The plaintiff, of course, opposes this motion and argues

23   that the Colorado law authorizes private plaintiffs to file suit on

24   its behalf.  They recognize that the right is not explicitly

25   established by statute but they say that it's implied and the

1    court, the Supreme Court of Colorado has recognized the implied

2    right.  The closest case they cite is a case in which a person

3    represented a city in its pursuit.

4            With that brief statement of what I understand from the

5    documents submitted to me, I'll hear oral argument from the

6    parties.  First the mover.

7            MR. WYATT:  Thank you, your Honor.  Mr. Franklin doesn't

8    have Colorado's permission to represent the state; in fact,

9    according to Mr. Franklin's papers, he requested and was denied

10   authority from the Attorney General to represent the state.  So the

11   question is what would authorize him to bring suit.

12           As your Honor pointed out, there is one case in Colorado

13   that discusses the requirements for taxpayer derivative suits on

14   behalf of municipalities, but no court has extended that to actions

15   on behalf of the state.  In fact, the Tenth Circuit has twice

16   considered the question whether a taxpayer derivative suit is

17   authorized under Colorado and has both times said no.  The

18   *Gallagher* case taxpayers brought suit to prevent Colorado from

19   paying $55 million for a highway tunnel.  The court said taxpayers

20   may not bring a derivative suit on behalf of the state absent

21   statutory authorization -- and there was no statutory authority

22   then or now -- and the court declined to imply a right to sue.

23           Same thing later in *Mountain States*, taxpayers sued on

24   behalf of Colorado to oppose an EPA final rule making, the court

25   rejected the claims holding that the Attorney General is vested by

1    statute with exclusive authority to represent the state.

2         Nothing has changed since these cases were decided.

3    Plaintiff relies on the *McCroskey* case --

4         THE COURT:  What was *McCroskey* about?  That's the case in

5    which the party represented the city.  What was that issue there?

6         MR. WYATT:  The issue there was that the city of Denver

7    had enlisted the help of a consultant to purchase federal

8    securities, and basically the allegations were that the consultant

9    didn't disclose how much profit was going to be made off of the

10   sale and also didn't disclose publicly that he was a representative

11   of the state of Colorado and he was doing this business with the

12   city.  So the taxpayers said all of these things needed to be

13   disclosed and that the consultants were unjustly enriched for not

14   having disclosed them and tried to bring a suit on behalf of the

15   city saying that the city had breached its obligation to bring the

16   suit.

17        The court sort of went through the factors that you have

18   to meet:  You have to do a demand on the city to bring a suit; if

19   the city doesn't do it, you can bring a suit but only if either (A)

20   there is some sort of non-discretionary ministerial duty that the

21   city has failed to perform; or it had discretion but it abused it

22   either some kind of ultra vires act or some kind of fraud or

23   collusion with the other party.  And it found that these factors

24   were not satisfied in that case.

25        In fact, that case provoked some dissent saying that that

1    standard was so high to meet that they doubted any plaintiff would

2    ever be able to meet it, and one of the reasons that that

3    prediction was made is because citizens don't ordinarily have the

4    information or evidence in hand to show that the state or the city

5    in that case has abused its discretion in not acting.

6           That's the same thing here as we point out in our papers,

7    the plaintiff doesn't seem to have access to any of the facts, the

8    same situation in Colorado.

9           I guess that concludes our motion.

10          THE COURT:  Okay.  Let me hear a response and then I'll

11   give you an opportunity to rebut.  Thank you.

12          MR. KRITZER:  Good morning, your Honor, and thank you

13   again for the opportunity to visit with you on this.

14          The law in Colorado on standing was most recently

15   articulated and it was probably best articulated in the *Ainscough*

16   case, and that's a case that we cited which has to do with a suit

17   brought against the governor of Colorado and it involved "dues

18   checkoff" for unions.  The reason *Ainscough* is I think so powerful

19   and so worthy of discussion, if I may for a minute or two, is

20   because *Ainscough* is in a sense a kind of kryptonite to the

21   argument of the defendant in this particular case.

22          And this is why:  *Ainscough* discusses the issue of

23   standing and it goes through a series of tests, there are three

24   basic tests:  That the plaintiff has suffered an injury in fact to

25   a legally protected interest.  And *Ainscough* says, the quote says,

1   this is a relatively easy test to satisfy in Colorado.  Now, one of

2   the problems with the position taken by the defendant in this case

3   in terms of the cases cited is that none of those cases involves an

4   action by a municipality or government entity, a sovereign entity,

5   where that entity was legally obligated to do something and didn't.

6   It all involved essentially discretion, whether or not a private

7   citizen under certain circumstances has the ability to step in the

8   shoes of the government entity.

9           And the *McCroskey* case actually talks about the ability

10  of a taxpayer to go after a third party, so in that case --

11          THE COURT:  They take the position though that *McCroskey*

12  is not applicable because *McCroskey* deals only with the

13  municipality and not a state.  As I read it, they don't dispute

14  that a person has a right and has a standing to sue the state.

15  They take the position that the person doesn't have a right to

16  stand in the shoes of the state and sue a third party.  *McCroskey*

17  does but it's a municipality.  How do you distinguish it?

18          MR. KRITZER:  Because I think by implication it's equally

19  appropriate.  It's just that this particular case didn't come

20  along.

21          Now, what's particularly significant is that the state of

22  Colorado under the Medicare statute 42:1396 has a legal duty to

23  pursue those individuals and those entities who are responsible for

24  Medicaid having paid out money.  So in this particular case, unlike

25  all of the other cases that were discussed, the state of Colorado

```
 1    and the Attorney General had no discretion that the Attorney

 2    General and the state of Colorado were obligated to do what James

 3    Franklin has done on behalf of the taxpayers.  The state of

 4    Colorado was obligated to retrieve under subsection B of 1396,

 5    retrieve money that was spent wrongfully on behalf of the treasury

 6    of the state of Colorado.  And the Attorney General of the state of

 7    Colorado has refused to do so.

 8           Let me backtrack a little bit.  We were invited, my

 9    office was invited by a member of the Attorney General's office to

10    make the presentation.  It wasn't something that occurred sua

11    sponte.  The presentation was made and then we heard nothing, we

12    followed it up, and that's when we found out that the Attorney

13    General apparently decided to do nothing.

14           Our position is under either standard articulated in

15    McCroskey, either the Attorney General's acting in an ultra vires

16    capacity by failing to do something that he is legally required to

17    do or it indicates he had no discretion, he has no discretion.

18    Federal law says the state of Colorado must do what James Franklin

19    is doing.

20           THE COURT:  Well, when you extend McCroskey though, they

21    took the position that Frothingham doesn't allow that, Booth

22    doesn't allow that, and that the Freedom from Religion Foundation

23    doesn't allow that.  There's no case that I've read that extends a

24    municipality's, that the position of McCroskey is extended to any

25    other entity.  You want me to be the first to do that in Colorado?
```

1          MR. KRITZER:  No, your Honor.  I think that by

2    implication, just as though standing is implied.  The defendant

3    argues that there is no statutory or constitutional authority.

4          THE COURT:  Everybody agrees with that though, don't

5    they?  There's no statute that says that you can do it, it really

6    has to be implied, and you're implying it from the *McCroskey* case;

7    isn't that where we are?

8          MR. KRITZER:  Well, no, your Honor.  The *Ainscough* case

9    says it's a judicially developed test.

10          THE COURT:  Well, but *Ainscough* involves a person who is

11    suing the state as opposed to a person who is standing in the shoes

12    of a state suing a third party.

13          There is no question that they have to right to sue the

14    state.  Everybody agrees with that.

15          MR. KRITZER:  Well, but there's language in *McCroskey*

16    that also talks about the two way of going about it, either suing

17    the state or suing on behalf of the state.  And in this particular

18    case where the state has a non-discretionary duty, that James

19    Franklin or somebody must sue on behalf of the state because the

20    Attorney General isn't doing it.  The federal law says the Attorney

21    General in the state of Colorado has to do this.  So if James

22    Franklin is not empowered to do it as a taxpayer, what it means is

23    that the federal law is being violated by the state of Colorado.

24    And this simply is not appropriate.

25          THE COURT:  Okay.  Okay.  I understand the argument.  Any

1    rebuttal?

2              MR. WYATT:  Yes, your Honor.  Just two points I want to

3    touch on quickly.

4              On the issue of discretion, the Medicaid statute actually

5    does afford states a fair amount of discretion in deciding how to

6    identify liable third parties, which is the provision that counsel

7    is invoking here.  In fact, the U.S. Supreme Court in the Arkansas

8    case in 2006 basically said we think you can satisfy your

9    obligation by just imposing liens when somebody else has done the

10   work of identifying and successfully secured a recovery from a

11   third party.

12             THE COURT:  You feel this is a discretionary call or not

13   a discretionary call?  He takes the position that it's not

14   discretionary, it's mandatory.

15             MR. WYATT:  It's mandatory that you have a system in

16   place to identify a third party liability, but it's not mandatory

17   that you pursue it in any particular way, in this case a lawsuit on

18   behalf of the state to pursue Medicaid funds from Merck.

19             THE COURT:  Is it mandatory that he pursue it in every

20   case?

21             MR. WYATT:  It's not necessary to pursue it in every

22   case, particularly if the state has a reason to believe that the

23   cost of recovery will exceed any recovery that can be gotten, which

24   may have been the judgment here.

25             The only other thing I want to touch on is the issue of

1    extending *McCroskey* to this case.  There are some good reasons not

2    to do that, not least of which is that when you're sort of writing

3    on a blank slate you're opening the door potentially to some

4    serious practical problems:  If there were multiple suits, for

5    example, brought by multiple citizens of Colorado, there would be

6    question about who actually represents the state.  And then if the

7    state itself later wanted to intervene, there would be a question

8    about how to manage that aspect of the litigation as well.

9          THE COURT:  Why isn't the same issue present when the

10   municipality, when you represent the municipality?

11         MR. WYATT:  You would have similar issues in the case of

12   a municipality, but they wouldn't be sort of as wide ranging; sort

13   of the point the Supreme Court made in the *Melon* case that said,

14   look, when you have one taxpayer out of millions, it's a different

15   ball of wax than when you have somebody suing on behalf of a

16   municipality.

17         And the only other thing I point out is that *Gallagher*

18   sort of pointed out this is a sensitive area when you're implying

19   rights to sue on behalf of a state due to the federal-state

20   relations issue, because you're really talking about the

21   organization of state government who is entitled to represent the

22   state in court.

23         THE COURT:  Okay.  All right.  Let me mark this

24   submitted.  I'll take another look at it in view of what each

25   counsel has given to me, and I appreciate your briefing and your

 1    argument was very helpful to me to focus on the issues.  Thanks for

 2    coming.

 3              MR. KRITZER:  Thank you, your Honor.

 4              THE COURT:  All right.  The next motion is the motion of

 5    the Attorney General for the State of Louisiana for summary

 6    judgment on a labelling issue.  They take the position that the

 7    label was false and misleading as to purport a GI benefits to

 8    non-steroid users in the VIGORs study.  They take the position that

 9    the label indicated that there was no distinction made and that

10    there is a distinction and that this was patent, obvious, no facts

11    involved, and they seek summary judgment for court determination on

12    that.

13              I'll hear from the parties.

14              MR. ARBITBLIT:  Good morning, your Honor, Donald

15    Arbitblit on behalf of the plaintiffs --

16              THE DEPUTY CLERK:  I'm sorry, your name again?

17              MR. ARBITBLIT:  Donald Arbitblit, A-R-B-I-T-B-L-I-T.

18    Good morning, your Honor.

19              THE COURT:  Good morning.

20              MR. ARBITBLIT:  I'd like to start by just setting out

21    briefly what the facts are undisputed.  I know the court is always

22    very diligent about reading the pleadings, so I don't want to

23    repeat anything that your Honor is already familiar about with, but

24    I'll just go through it and you can tell me when to move on because

25    you're already familiar with it.

 1           The VIGORs study is our starting point, and the VIGORs

 2    study, as the court has heard, is a very important one in the

 3    history of Vioxx as a product.  It was an outcome study that the

 4    company used to promote the drug as providing a GI benefit widely

 5    and for all comers.  There is a slide further on where Merck

 6    represented to the FDA that the GI benefit was found for all end

 7    points and all subgroups.

 8           And, in fact, Merck's own undisputed data, which is the

 9    heart of this motion, shows that for people who were not taking

10    steroids, there was essentially no difference with regard to the

11    most serious GI events that Merck's documents called the key

12    secondary end point, and that end point is defined as the

13    complicated perforations, ulcers and bleeds, which is abbreviated

14    as PUBs.

15           The complicated PUBs are a subset of the overall

16    perforations, ulcers and bleeds and they're distinguished by their

17    severity.  The perforations are always serious.  The bleeds are

18    only serious if it's a severe bleed and that puts it into the

19    complicated category.  Ulcers can be complicated or not complicated

20    depending --

21           THE COURT:  That's the whole purpose of the COX-2

22    concept.  They devise COX-2 to do away with PUBs or try to do away

23    with PUBs.

24           But isn't the issue in this particular matter how you

25    read the label?  That's what Merck says.  Merck says that you

1    reading the label in essence by saying that a similar risk

2    reduction for PUBs and complicated PUBs is approximately 50 percent

3    was also maintained in patients with or without the Helicobacter --

4              MR. ARBITBLIT:  That's why they call it H. pylori, your

5    Honor.

6              THE COURT:  HP, yes.  Or concomitant corticosteroid use.

7    They would read it a different way, they would say that patients

8    with or without the HP, you put with or without before, they put

9    with or without after the HPs which narrows their interpretation

10   more.  Isn't it a question of how you interpret the label?

11             MR. ARBITBLIT:  Certainly there is an issue of

12   interpretation, your Honor.  In our reply to Merck's pleadings

13   we've tried to set out several reasons why their interpretation is

14   not logical and does not comport with standard English nor the

15   general rule of construction that all terms must have meaning,

16   otherwise they wouldn't be there.

17             And for that, I would like to focus the court's attention

18   on the fact that complicated PUBs are a subset of PUBs, and that

19   the label is very clear when PUBs are being described as the

20   inclusive of all events, and in this particular language at

21   issue -- I don't know why --

22             THE COURT:  Wait just a moment.  Steve.

23             MR. ARBITBLIT:  Thank you.  What we see in the back and

24   forth between Merck and the FDA and the final label is that the

25   complicated PUBs are included in the PUBs, so that when you report

1    the rate for PUBs you're already including 53 complicated events

2    out of a total of 177.  The language in question that is the basis

3    for the motion refers to, here it is, PUBs and complicated PUBs

4    (INDICATING).

5              So what does the phrase "and complicated PUBs" mean if

6    PUBs already includes the complicated PUBs.  If a similar reduction

7    for PUBs was all that it said, then there would only be one basis

8    for the motion being misleading, which is that it didn't include

9    the steroid versus non-steroid group.  But where they say "and

10   complicated PUBs," that's either surplusage or it has meaning.

11             If it has meaning, then the meaning would be that you're

12   referring to two separate end points.  And for complicated PUBs, it

13   is simply not true that there was a reduction of 50 percent risk

14   with or without concomitant corticosteroid use.

15             What I would like to just briefly do is go back to what

16   that data shows.  And this is the undisputed data from Merck's

17   files which were identified in the pleading -- in the materials

18   reviewed that were provided to Merck from their own files that they

19   provided during discovery.  You have the steroid users 27 versus 7,

20   the non-steroid users as 10 versus 9, but it's reported as 37

21   versus 16; so it's like saying that you've got some that are yellow

22   and some that are blue and you're going to report them all as

23   green.  They're not.  They're not the same.

24             And the defense expert Dr. Curtis at his deposition was

25   asked whether he believed that it would be important to a

1    clinician -- before I get there, I just want to show that the

2    defense and the plaintiff agree on this data, the plaintiffs report

3    here shows the 27 versus 7 after reviewing Merck's data files, and

4    the defense expert showed at his deposition the same numbers, 10

5    versus 9, 27 versus 7.  The data is not disputed.

6         So the defense expert said that it would stand out that

7    clinicians would be interested in something that had a 3.85

8    relative risk whereas the other subgroup would have essentially

9    equivalent rates.  And that deposition testimony --

10        THE COURT:  Doesn't Merck also take the position that you

11   have to read the label as a whole and that there's other portions

12   of the label that talks about this and at least they address it?  I

13   get your point and it's a significant point, but I don't know

14   whether it's a summary judgment issue.  I think you can make that

15   argument, but I don't see it as something that I can say there is

16   no other interpretation, there's no other reading and that the

17   label taken as a whole doesn't cover it at all.

18        MR. ARBITBLIT:  Your Honor, the label covers subgroups

19   but it does so in a misleading way.  And there is no dispute as to

20   the data that is not presented.

21        So I would suggest that there are two ways of looking at

22   it:  One focuses on the affirmative statement as to which there is

23   a dispute.  But there is no dispute that the actual data showing

24   this lack of difference for what Merck calls a key secondary end

25   point in their own documents, there is nothing about it in the

```
1    label.  So the court could see this as the affirmative
2    misrepresentation as to which there is some dispute, but there is
3    no dispute that the actual data are not in the label.
4         And the question of whether that is important is very
5    clearly established by the defense witness's own testimony that if
6    you had a difference in one group that it would stand out and that
7    the reason you do these kind of tests comparing one subject to
8    another is to see who gets the benefit and who doesn't.
9         The importance of this to the overall case is that only
10   rheumatoid arthritis patients use the steroids and rheumatoid
11   arthritis patients are a small sliver of the population that uses
12   Vioxx.  The reason the representation becomes important and
13   material to someone deciding to purchase Vioxx for general use in
14   the State of Louisiana, or elsewhere, is that if you know that this
15   most serious end point has not shown a benefit unless you're on
16   steroids, then you don't have a reason to spend the extra money on
17   Vioxx compared to Naproxen or another drug for those vast majority
18   who are not using steroids.
19        And here's the testimony that I was talking about
20   earlier.  Would it make a difference to you as a clinician,
21   interpreting the VIGOR study and trying to decide how to use it in
22   your evidence base for your patients, if the complicated upper GI
23   events occurred at approximately equivalent rates for non-steroid
24   users and were approximately 3.8 times higher in the Naproxen group
25   that were using steroids?  And his answer is:  Obviously as a
```

```
1    clinician --
2              THE COURT:  He also says I'll try to answer.
3              MR. ARBITBLIT:  Certainly.  I'll try to answer, I
4    included that and he did try to answer and this was his answer.  I
5    did not include the objection, there was an objection to form
6    in-between, your Honor, and that may explain why he said I'll try
7    to answer.
8              But in any case, what he says was, if there's one
9    population that stands out then you're interested.  And that's what
10   we have here, you have a population of steroid users for whom a
11   known risk factor in Merck's own documents steroid use was known as
12   a risk factor and their data proved it, but they didn't say that.
13             And they resisted it because in their own documents,
14   rheumatoid arthritis represents only 5 to 10 percent of their total
15   sales.  And among those patients, only a subset of those are on
16   steroids.  So the market would be dramatically reduced.
17             And in back and forth between Merck and the New England
18   Journal of Medicine, Merck's internal documents show continued
19   resistance in July and August 2000 to the New England Journal
20   insisting that we say that in the discussion that Rofecoxib may not
21   be beneficial in patients with RA not on steroids.  Then in the
22   same e-mail string you have Dr. Reicen saying that the concern,
23   they have the reviewer who keeps insisting that Rofecoxib only
24   provides benefit in steroid users write a damaging editorial.  Now,
25   it that context, damaging editorial can only mean one thing, it's
```

1    damaging to the market, it's damaging to the sales.

2            And the plaintiff's position is that to the extent Merck

3    was not damaged by preventing that data from being published,

4    plaintiff was damaged; and that is two sides of the same economic

5    coin, that Merck was able to sell the drug as providing a benefit

6    to all when their data showed that for the most serious end point

7    there was no benefit unless you were using steroids was material

8    information that the State of Louisiana should have had at its

9    disposal in making that determination.

10           Now, there is case law that says the court may decide on

11   a 56(D) motion the issue of a misrepresentation having been made

12   and its materiality and can go as far as assuming a presumption of

13   reliance.  And I would cite for the court the *Haskell v. Wilson*,

14   1991, U.S. District Lexus, 18158, at pages 9 through 12, which

15   addresses this in a different context, it's a securities context,

16   but the definitions of materiality are fairly straightforward and

17   even discussed in other cases as going to the various kinds of

18   settings.

19           THE COURT:  But that case really is a securities case

20   though, isn't it?

21           MR. ARBITBLIT:  Yes, it is, your Honor.  But in *Godchaux*

22   *v. Conveying Techniques*, 846 F.2d 306 the court addresses, and this

23   is a Fifth Circuit case, the court addresses the definition of

24   materiality as it relates to a matter which is so substantial and

25   important as to influence the party to whom it was made.  And goes

```
1    on to state that while there are subtle differences in different

2    contexts, the general point is that if it would have influenced

3    your behavior, it's material.  And this is that type of

4    information, your Honor.

5         So we ask that the court consider the information was not

6    in the label and it should have been.

7         THE COURT:  Okay.  Thank you very much.  Let me hear a

8    response.

9         MR. BEISNER:  Your Honor, John Beisner representing

10   Merck.  Let me just make a few comments.  I think your Honor has it

11   correct in noting up front that much of what we're talking about

12   here is the disagreement of what the label means.  The court has

13   our briefs so I am not going to go through that in detail, but I

14   think the one point that I would note in the language that was from

15   the label earlier is that if you look at that language and you look

16   at the full paragraph that was up there earlier, which I take it

17   we're having trouble getting up now, if you look at full paragraph

18   there, your Honor, I guess -- and the court has our full

19   arguments -- but I think the key one to note there on this dispute

20   about whether this label was referring to PUBs and complicated PUBs

21   as separate end points, is that when you get in to the display of

22   the data that's here with respect to prior PUB without a prior PUB

23   and so on, there's only two numbers here.  They're comparing Vioxx

24   versus Naproxen.  If you're doing this multi end point analysis

25   here, you would have to have four numbers there; and so I think
```

 1    that if there's any confusion in the reader's mind, that's the key

 2    evidence there that the intent here was to speak in terms of PUB's

 3    and complicated PUBs collectively here.  And I think that is a

 4    point that the state hasn't really addressed.

 5            But, your Honor, I think perhaps the more important thing

 6    is your question about where does this fit into the case?  And what

 7    does this have to do with the state claiming that there should be

 8    presumption of reliance and presumption of being mislead.  Before

 9    this label was ever approved, Merck had disclosed to the public and

10    to the FDA that VIGOR did not show a statistically significant

11    reduction in GI events in non-users of steroids.  The state says

12    nothing about this.  Both the VIGOR article and early label

13    submissions to the FDA made this clear.

14            And significantly, your Honor, the VIGOR sturdy is in the

15    Provider Synergies materials that the P&T Committee looked at.

16    They had the information.  If they had any issue with the label,

17    they had all of this data there.  And the submissions that the

18    VIGOR article and what Merck submitted to the FDA made clear there

19    were fewer GI events in non-users of steroids in the Vioxx arm than

20    in the Naproxen arm, but the difference wasn't statistically

21    significant and it would make no sense that having made that

22    disclosure that Merck would then try to submit something here that

23    would be a competing interpretation.

24            Second, the label revision history here, your Honor,

25    which again the state doesn't really address in any great detail,

1    proves that Merck wasn't trying to create a competing

2    interpretation.  The version of the label proposed originally to

3    include in the table disclosed the lack of statistical significance

4    as to non-users of steroids in a chart form and the FDA said take

5    that out, we only want to put in the label data that are

6    statistically significant.

7           And so, your Honor, as you were asking earlier, as a

8    point of summary judgment, I don't know where this goes.  The state

9    hasn't said, there's no witness that says there was reliance on

10   this label.  They questioned -- they sort of asked years later

11   Valerie Taylor, the woman from Provider Synergies how she

12   interpreted this label.  We think it's an ambiguous interpretation

13   on our part.  But more significantly, the VIGOR study that had all

14   of the information on what was statistically significant and what

15   wasn't was in her material, she didn't say that she relied on this

16   or that anybody relied on this or that this influenced any decision

17   making on the state's part.

18          So it's just sort of this concept in the air that is out

19   there.  I noticed that in the original brief the relief requested

20   is for summary judgment, not clear on what claims, but that money

21   should be awarded.  And then in the reply brief there's just sort

22   of this -- not clear what relief the state is asking for.  But I

23   think fundamentally, your Honor, this is not appropriate for

24   summary judgment consistent with the question that was asked

25   earlier.  I don't think that the state has anywhere plugged in how

```
 1   this, what this has to do with this case in terms of the state
 2   relying on this and this having any influence on any decision
 3   making on the part of the state.
 4           The last point I would note, your Honor, is that we
 5   believe the state's argument fails for the additional reason that
 6   it is preempted.  We're fully aware of what the Supreme Court said
 7   in Wyeth v. Levine, but there's also the category of cases that
 8   were noted by Justice Briar in concurrence and in the decision
 9   itself that there are going to be circumstances where a
10   manufacturer is operating based on what the FDA told it to do with
11   respect to the label.
12           This is one of those instances.  I mean, the company
13   proposed a different label that had more information on this
14   subject in there and the FDA said, no, we want you to do it this
15   way.  And to say now, well, that's false and misleading and you're
16   liable for that, I think really gets into the zone of what ought to
17   be preempted in that regard.
18           So for all of these reasons, your Honor, we believe that
19   summary judgment should be denied.
20           THE COURT:  Okay.  Carve out a little piece from Levine
21   and this is the one piece.
22           MR. BEISNER:  There's got to be that little piece, your
23   Honor.
24           THE COURT:  Okay.  I understand.
25           MR. BEISNER:  It really would be ironic in this
```

```
 1    circumstance where you've got a regulator telling you to do it this

 2    way and then to say, well, that's a false and misleading statement.

 3              THE COURT:  Okay.  Any response?

 4              MR. ARBITBLIT:  Yes, your Honor, thank you.  A few

 5    things, your Honor.

 6              First of all, the paragraph that's still on the screen is

 7    a paragraph about subgroups.  And every, according to Merck's

 8    interpretation, every subgroup presented in this paragraph, except

 9    corticosteroid use, is an either/or, mutually exclusive

10    representation.  You have with a history of a prior PUB or without

11    it; you have age 65 or older or you have younger than 65; they say

12    with or without refers to this H. pylori which is the other main

13    cause of ulcers, it's an infection.

14              The only one out of these that they claim is not

15    presented as an either/on situation is the concomitant

16    corticosteroid use, and that is not a reasonable interpretation of

17    the overall context.  The interpretation of the document where

18    there's no dispute as to what it says I believe is for the court.

19              So I do think that in the context it's clear that this is

20    about either or subgroups.

21              Second, as far as whether the data is all there, it's all

22    in the VIGOR study, it's all in the monograph, that's simply not

23    true.  The data that was presented about the 27 versus 7 in the

24    non-steroid users and the 10 versus 9 in the non-steroid users was

25    never presented.  It was not presented in the FDA label exchange so
```

1   there's no direct conflict, the FDA couldn't give Merck direction

2   on what to do with that information that it had never seen.

3        It's not in the clinical study report that Merck filed

4   several hundred pages long about the VIGOR study in June 2000, it's

5   not in the VIGOR article, it's not in the VIGOR label, and it's not

6   in the monograph provided by Valerie Taylor and Provider Synergies

7   because it wasn't published.  Provider Synergies reviewed the

8   published literature and to say that the plaintiff didn't rely on

9   that is misreading the nature of misrepresentation by omission.

10  When it's not in the data there's no way for someone to rely on it

11  because it isn't there.

12       So the plaintiff -- in fact, Mr. Hood has submitted an

13  affidavit saying that if he had been aware of this information, he

14  would not have approved Vioxx for widespread use in the State of

15  Louisiana.  And the data has never been published, it's still not

16  published, but it is important.

17       Thank you, your Honor.

18       THE COURT:  Okay.  All right.  Thank you very much.  I've

19  looked at the matter and I have watched testimony on a number of

20  cases.  I really think the issue is really pregnant with facts.

21  What was in the label is a question of fact, how to interpret it is

22  really a question of fact.  Because when I say what was in the

23  label was a question of fact, I mean, it's just not one paragraph,

24  it's the entire label and it has to be interpreted or looked at in

25  its whole form.  What effect it will have or in fact did have, what

1    was known regarding VIGOR and by whom was it known.

2          All of these issues I feel are questions of fact.  I take

3    this as a motion that probably just to give the court a preview of

4    potential issues that I'll see at the trial.  And I appreciate

5    counsel's enthusiasm with it and obviously his hard work on it, but

6    I do see this as something that I can visit at trial and not in

7    motion for summary judgment.

8          So I'll deny the motion for summary judgment.

9          Let's go to the last motion, please.  And this motion is

10   a motion by Merck to dismiss for summary judgment on the Attorney

11   General's claims.

12         Just to package this and cabinet this in some format.  On

13   July the 6th, 2005, Louisiana Attorney General filed suit against

14   Merck in state court seeking injunctive relief as well as damages.

15   On August the 5th, 2005, Merck removed the case, it was transferred

16   to this court by the MDL.

17         The plaintiff asserts claims for:  (1) redhibition, (2)

18   violations of Louisiana Unfair Trade Practices, LUTPA; (3)

19   violations of the New Jersey Consumer Fraud Act; and (4) unjust

20   enrichment.  The plaintiff also seeks multiple forms of relief on

21   behalf of both the states as well as its citizens.  Merck has filed

22   a motion for summary judgment on all of the claims asserted by the

23   Attorney General.

24         It probably would be most helpful to me if we took them

25   in order and you presented your case and let me hear a response.

1          The redhibition claim.  How do you see that?

2          MR. BEISNER:  Your Honor, let me start by noting that

3     although this action is styled as a lawsuit, we really view it as

4     an effort to obtain court approval to break a solemn contract.

5     This is different from a classic consumer class action or something

6     of that sort in that it involves the federal Medicaid drug program,

7     and Louisiana freely made the decision to participate in that, it

8     didn't have to.

9          But that program is fundamentally a deal in which a

10    participating state agrees that it will make available to its

11    citizens and will provide partial reimbursement, the federal

12    government providing the other part, of any FDA approved drug,

13    that's the deal.  The other side of the deal is that the companies

14    that participate in that deal provide substantial rebates to the

15    state on the drugs that they reimburse.  That's the deal.  The

16    federal government goes off, negotiates the deal with the

17    pharmaceutical companies, and the states are free to participate.

18    If they want to do it on their own like Arizona does, that's fine.

19         And of course as your Honor is aware through the

20    settlement program, if something goes wrong with a drug allegedly

21    and there's a settlement of fees that the state had to compensate

22    in order to treat somebody who had a problem with the drug, that's

23    available through the lien programs.  I just note as an aside and

24    the state has or will receive, thousands of dollars through the

25    lien process.

1          But the issue we see in this case is that having this

2    deal out here, the state is basically coming before this court and

3    saying we want to change the deal.  We want to be able to say,

4    well, we don't care what FDA said.  If anybody is out there who

5    says, well, the warnings weren't adequate on the product, which we

6    all know happens with virtually every pharmaceutical product out

7    there, we get all of our money back.

8          That is what the state is saying, they want to break the

9    deal.  State gets all drugs for free program.  And Louisiana has

10   been suing for lots, in lots of drug cases where there has been

11   failure to warn allegations.  It's an effort to get a windfall

12   coming out of that fundamental deal that was struck in the first

13   place as to how the states get access to pharmaceutical products

14   through the Medicaid program.

15         Now, your Honor, I think a place to start with this, with

16   all of the claims, if I may, is what did the state have discretion

17   to do?  Because I think that permeates really all of the claims.

18   And under the federal Medicaid scheme, the state had two options

19   for designating what drugs would be available in the program.  The

20   first was the deal I talked about at the outset, which is we will

21   reimburse all FDA approved drugs.  There is a procedure under which

22   a state can decide to go off a different direction and set its own

23   formulary, but Louisiana didn't do that during the relevant period.

24         THE COURT:  At least prior to 2001?  They had no

25   authority to do it.

1          MR. BEISNER:  Correct.

2          THE COURT:  Right.

3          MR. BEISNER:  And, your Honor, even after actually June

4     2002 they didn't have the capacity to deny coverage of any FDA

5     approved drug either.  I think what your Honor is referring to is

6     that there was the capacity of the state under the Medicaid statute

7     to have a prior approval program.  Louisiana did not adopt that

8     until June 2002.  Again, that's well, halfway through the -- over

9     halfway through the period during which Vioxx was on the market.

10          But even once that program was adopted, all it was was if

11    a doctor said I would like to prescribe Vioxx to a patient and the

12    state had not put the drug on the preferred drug list for the

13    state, the doctor either had to call the State pharmacist and get

14    approval or if you look on the website, you just fill out a little

15    form and fax it.  And the state was obliged within a short period

16    to respond.

17          THE COURT:  And they always gave approval or they had to

18    give approval.

19          MR. BEISNER:  Yes, because the decision rested with the

20    physician, it was just sort of a prior consult requirement.

21          Now I think in its briefing the state realizes that it,

22    therefore, has great difficulty saying to the court Vioxx would not

23    have been prescribed in the state, we therefore get all of the

24    money back.  And so there's a series of alternative positions.  The

25    first is that Vioxx shouldn't have been approved by the FDA in the

first place.  We think that runs into the *Buckman* problem of the
state being able to challenge that.  The state does say that they
could have adopted an exclusive formulary, that second form that I
spoke about; but, your Honor, there is no evidence of any effort to
do that.

Presumably there are other drug issues out there that
might have prompted the state to do that, if they had any interest
in doing so, but it didn't, and it was not something that the state
unilaterally could have done.  The Centers for Medicare and
Medicaid Services, a federal agency, would have had to approve it,
no application was ever filed, this is all just hypothetical that
they could have done this.

THE COURT:  They take the position, as I understand it
there is that at one time they were prohibited from having an
exclusive formulary, but then subsequently this statute was amended
to remove that prohibition and therefore they could have, even
though they did not do it.

MR. BEISNER:  Well, interesting thing, your Honor, that's
not how LDHH itself interpreted the statute itself at the time.
When it put out the notice that they were adopting the prior
authorization program, the call the state before I prescribe
program, they expressly acknowledged that drugs covered under a
rebate agreement with the federal government are subject to
mandatory coverage.  They weren't interpreting the statute itself
that way at that time which is what's relevant, we're talking about

1    what they thought they could have done at the time, not what people

2    are saying now.

3              And the contemporaneous admissions by the agency said

4    that's not how they were interpreting that statute.

5              We've also heard, your Honor, this thought that, well,

6    the state could have barred coverage of Vioxx through a DUR

7    program, and this process that they refer to as perspective deny

8    edits.  But that really doesn't work either, your Honor, because a

9    drug is eligible for that sort of effort which is the way those

10   sorts of things have occurred in some instances, the state can sort

11   of put impediments out there on the use of the drug, you can only

12   get a prescription of this size or things of that sort.

13             But that only is applicable to drugs that the federal

14   government puts on its list for that purpose to start with under

15   1396 r-8(d)(2) of the Medicaid statute, and the secretary of HHS

16   has to put it on there.  The states can propose drugs to be on

17   there, but that has to be a determination made in the first

18   instance by the federal government.  There is no effort, no

19   evidence anywhere in the record, any expert or anybody saying that

20   the federal government would have done that.

21             And the law is pretty clear as the *Edmonds v. Levine* case

22   from Florida which, as I'm sure your Honor appreciates, has

23   probably got the best explanation of how all of this works out

24   there, says you can't use the DUR program in the way that the state

25   is talking about, that is to sort of substitute the state's

1    clinical judgment for the FDA, which is really what they were

2    trying to do here.

3           And, again, as I said, there's really no evidence in the

4    record that that sort of DUR program would have been adopted.

5           We do have Secretary Hood there who says now in his new

6    declaration saying that, well, he might have approved a DUR program

7    if it was presented to him.  But there's nothing there that

8    indicates where the DUR program would have come from, who would

9    have proposed that at the time.

10          And further, your Honor, we note that in his original

11   deposition, which is the record that was there when we made our

12   motion, he basically professed no knowledge, said he didn't know

13   how the DUR program worked, and we believe under the *Thurman* case

14   of the Fifth Circuit that that contrary statement that he's made

15   now shouldn't be credited for purposes of this summary judgment

16   motion.

17          Now, the other piece of this that really applies to all

18   of the claims that the state has brought here is the individualized

19   proof rule.  You know, if they can't get back all of the money that

20   was spent on Vioxx, which is sort of the going imposition, how is

21   the state supposed to prove what would the change of behavior have

22   been if any of these programs that they hypothesize that might have

23   been out there, which again, your Honor, we feel is the stop point,

24   that there is no evidence, no credible evidence that they would

25   have adopted.

```
 1              But even if they would have been, there's a problem in
 2     figuring out, well, what would the impact of those programs have
 3     been?  And this has come up in numerous cases, Judge Weinstein's
 4     Zyprexa decision, Judge Saris' decision in the Neurontin case
 5     shortly thereafter, the Actimmune case, the Iron Workers case, the
 6     Southwest Laborers case, a whole list that are in our briefs that I
 7     won't go through in great detail, that basically say there's no way
 8     for the state to prove this.  There is no credible way to go
 9     through how doctor decisions, because that's what we're talking
10     about here, would have changed with the existence of different
11     facts being out there for physicians to consider or different
12     actions by the state.
13              THE COURT:  Or even what they knew or what they should
14     have known.
15              MR. BEISNER:  Your Honor, yes.  This court dealt with
16     that in your class certification ruling on personal injury, Judge
17     Higbee dealt with this on her rulings on class certification, and
18     so we've been through this.
19              THE COURT:  But would you have to prove that if their
20     first theory, with regard to their first theory, that is to say,
21     that they wouldn't have approved Vioxx at all as opposed to the
22     other part that they --
23              MR. BEISNER:  Your Honor, it gets back to the threshold
24     issue.  They made a deal.  They had to reimburse the drug.  There's
25     no way for them to have avoided that.
```

1          And so the reason we get into this question of, okay.  If

2    you had to reimburse the drug, what would the change have been?

3    That's why you get into this alternative line of argumentation that

4    they present.

5          And so at the end of the day, this notion of doing this

6    in any sort of aggregate way doesn't work.

7          There are a couple of things the state puts out there.

8    They say, well, we could have looked at some computer programs that

9    we have and figured out what the change in behavior would have

10   been, but there's no expert there anywhere explaining how they

11   would do that.  Dr. Harris does some study looking at 2005 about

12   Celebrex but he makes it very clear that doesn't tell you anything

13   about what Vioxx behavior would have been many years earlier.

14         And the time now is for the evidence.  They haven't laid

15   out their, okay, what's the number?  What is it that you think you

16   would present?  No expert has taken this on has presented it, and

17   so there's this sort of hypothetical notion out there, well, we

18   might be able to figure out a way to do that.  But we're at trial

19   now.  The evidence hasn't been presented, the deadlines have

20   passed, so really they've not put on any way they can prove it.

21         And of course you have an unbroken line of precedent,

22   including Judge Weinstein who certainly tried very hard to try to

23   figure out some way that you could do this, who says it's just not

24   permissible.  The causation analysis here is just far too

25   attenuating to allow it.

1          Now, your Honor, let me get then to the specifics of how

2     this applies to redhibition, and I apologize for my detour of

3     getting there, but I thought those were important thresholds for

4     these claims as well.

5          THE COURT:  Sure.

6          MR. BEISNER:  The redhibition claim fails for the reasons

7     that I just described.  There's a causation, fundamentally there's

8     a causation problem with all of the claims.  There are a number of

9     other issues, too.  First, our position is the state lacks standing

10    to sue in redhibition either on its own behalf or on behalf of

11    Louisiana citizens.

12         THE COURT:  They take the position, though, that if you

13    conclude that then nobody has a claim because the state doesn't

14    have a claim and the citizen doesn't have a claim so nobody has it.

15         MR. BEISNER:  Well, we don't have an issue here of

16    whether the citizens have a claim, we're talking about whether the

17    AG -- the arguments we're making are twofold here -- that the AG

18    can't sue because the state isn't the buyer, and the Reslin case

19    has held that specifically with respect to Louisiana, and we've

20    noted a number of cases where that's also been held by other

21    jurisdictions that have similar language, and we believe the

22    McNeely case, which is a Louisiana case, makes that clear as well.

23    The civil code defines a sale as a transfer of ownership of a thing

24    to another for price and money, and the state really just has no

25    indications of being a buyer here.

1          And the second argument we're making is the state can't

2     do this as a parens patriae motion.  Now, your Honor, that doesn't

3     go to the question whether the consumer would have standing to sue,

4     we're not arguing that, the consumers aren't here, it's the state.

5     Our position is the state lacks standing to assert that on a parens

6     patriae basis because the redhibition statute doesn't have language

7     in it granting the Attorney General the authority to do that, which

8     the *Tween Cities Memorial Gardens* case and others that we have

9     cited indicate that it is, would be required.

10          So our arguments are really to the question can the state

11     do it.  We're not saying anything about whether consumers who were

12     owners of the product would be able to sue in that circumstance.

13     Those are the cases your Honor set the status conference on on

14     April 7th.

15          Our second issue is that the state can't prove an

16     entitlement, any remedy under redhibition.  The state's theory is

17     it gets all of the money back it spent on Vioxx, but as your Honor

18     knows, that's not how redhibition works.

19          THE COURT:  Before you get to that.  The standing, they

20     also take the position that they should be able to stand in the

21     shoes of the person and they can do that in personal injury but not

22     here.  Is that what you're --

23          MR. BEISNER:  The problem with that, your Honor, is --

24          THE COURT:  They cite the 46 --

25          MR. BEISNER:  Yeah, they're saying 46:446.  But that it

```
 1    says that they can stand in the shoes -- what that section says:
 2    If an injured, ill or deceased person, nobody's got any personal
 3    injury here.  I mean, that permits them, as I was alluding to
 4    earlier in the personal injury actions, to exercise lien capacity
 5    to get back recoveries that may be had in a personal injury action.
 6    But there's nothing in there, and that provision has never been
 7    interpreted to permit the state to stand in the shoes in an
 8    economic loss situation as your Honor was asking about there.
 9           Then we have the entitlement to a remedy under
10    redhibition.  And as I said, the state says, well, they get all of
11    their money back.  But the problem is under redhibition the way it
12    works, as your Honor knows and has written about frequently, is you
13    give to it back whatever the product is and you get the money back.
14    And nobody's returned.  There's been no return of any product here.
15           Now, the statute says, well, if you can't return them you
16    get a new reduction in price situation such as in the Peara
17    (PHONETIC) case, which was about dynamite that had been used, and
18    there were some other cases that we cite.  But there, for all of
19    the reasons I talked about earlier, the state's got no capacity to
20    prove reduction in price claim.  They've advance no theory.  What
21    is the price?  What's the number we're talking about under that
22    theory?  They is no expert that has put that forward and under the
23    Ashley v. Volkswagen case, that's plaintiff's burden.  And if they
24    don't put that number out there, if they don't do that analysis,
25    the claim fails.  It's not Merck's burden to say, oh, okay.  Well,
```

1    our position is the number is X.  That's the plaintiff's burden.

2    And if they can't do that or don't do that, the claim fails, that's

3    what *Ashely* and *Abraham* cases that we cite say.

4         So, your Honor, that takes me through redhibition, and I

5    can stop there or I can go ahead and do --

6         THE COURT:  Why don't you do the rest of it since we're

7    pretty much finished.

8         MR. BEISNER:  Okay.  I just have the Consumer Protect Act

9    claim, and as your Honor may suspect, the arguments there are quite

10   similar with respect to those.  And I apologize if I got the court

11   off of its game plan.

12        THE COURT:  No, that's okay.

13        MR. BEISNER:  On the LUPTA claim the state's got the same

14   remedial problem as it does because -- as it does with the

15   redhibition claim because of the restitutionary dimension here.

16   You have the same product, same problem I talked about here,

17   needing to return the product in the same limitation on the

18   reduction in price analysis if you can't do that.  And so the

19   state's got the problem that it's put forward, no evidence with

20   respect to that.

21        The state also can't recover its own losses under LUPTA

22   because it wasn't a consumer or business competitor of Merck,

23   that's the requirement to bring a claim under that, again, the

24   state wasn't a buyer nor was it a business competitor.

25        And the third issue, your Honor, that we note is that the

1   state's LUPTA claim would be barred by the Louisiana Product

2   Liability Act, which says that the only option is to sue under that

3   statute.  And the LPLA covers product liability claims based on,

4   among other things, "economic loss arising from a deficiency or

5   loss of use of a product."  Deficiency certainly is the allegation

6   that's being made here, and as your Honor held in the *Slaughter*

7   case and other courts have held, there's two options here:  If one

8   is redhibition or one is the LPLA and neither is available here, or

9   they did not bring a claim under the LPLA.

10          So your Honor that's our position on the summary judgment

11  motion.

12          THE COURT:  All right.  Thank you very much.

13          MR. MURRAY:  Good morning, your Honor, or almost

14  afternoon, your Honor.  Stephen Murray, Jr. on behalf of the

15  Louisiana Attorney General.

16          Your Honor, I would like to begin just with a

17  housekeeping matter.  I would like to offer and introduce and file

18  into the record all of the exhibits that were submitted with our

19  opposition to the motion for summary judgment and our separate

20  statement of facts.  With the exclusion of the affidavits that your

21  Honor struck, which would be the Lutz, Culotta, and Dusky

22  (PHONETIC) affidavits, which we would proffer, your Honor.

23          THE COURT:  Okay.

24          MR. MURRAY:  Mr. Beisner began his discussion talking

25  about how Louisiana entered into a deal and is bound by the terms

1     of that deal.  Well, your Honor, Louisiana recognizes many ways in

2     which a deal ceases to be a deal, and one of the key ways in which

3     a deal ceases to be a deal is when fraud has visciated the deal,

4     and that's exactly what's happened here, your Honor.  Another way

5     is redhibition and I'll get to that in a moment.

6             Merck suggests that in spite of the fact that Merck

7     directly targeted the Louisiana Department of Health and Hospitals

8     with its fraudulent message in order to fulfill its strategy of

9     ensuring unrestricted access to Vioxx, LDHH can assert no claim

10    against Merck to recover any of the more than $20 million it spent

11    on Vioxx, a drug whose risks so outweighed its benefits that it

12    never should have been on the market in the first place.  Merck

13    suggests that the state cannot demonstrate it relied directly on

14    any representations or omissions by Merck and that the only way

15    that the state could prove its claim is through impermissible

16    aggregate proof of prescribing decisions by thousands of doctors.

17            Merck's argument ignores both the facts presented in this

18    record and the unique causes of action available to the Attorney

19    General under both redhibition and restitution.

20            Merck targeted LDHH.  They did so to ensure unrestricted

21    access for key Merck products, which would include Vioxx, through

22    their work with the State of Louisiana, Department of Health and

23    Hospitals and Provider Synergies.  They did so to maximize share

24    for Merck products on the PDL and they did so for continuing to

25    develop product advocates with the product P&T and DUR committee

1    members of Louisiana Medicaid.

2            Merck's motion is based on three fictions:  Fiction

3    No. 1:  That no one from LDHH ever saw or relied on any Merck

4    marketing.  LDHH didn't just receive Merck's fraudulent message,

5    they were expressly targeted to receive it.  That's Merck's

6    strategy, target of P&T members with respective call decks, call

7    on -- must target the right physicians and dose on every call, call

8    at least two times per week until a PDL review, these are Medicaid

9    physicians.  And finally, call on P&T members whether they are '03

10   targets or not.

11           Next slide.  In addition to working with OBRs, I also

12   work very closely -- this is Fran Kaiser, their regional medical

13   director -- I'm sorry, Mary Ogle rather is a national account

14   executive assigned to sell Merck products to LDHH.  She writes:

15   "In addition to working with OBRs --" that's office base

16   representatives, their field sales representatives, people who make

17   calls on doctors, "I also work very closely with the government

18   affairs and the south central regional medical director to

19   regularly call on chief of P&T and pharmacy director.  That's

20   Louisiana P&T, Louisiana Medicaid P&T, and Louisiana pharmacy

21   director.  "Our goal is to ensure that they fully understand the

22   value that our product portfolio provides to the appropriate

23   patient population versus the competition."

24           Next slide.  Another slide.  Here is a list of the

25   members of the P&T Committee.  "In preparation for the upcoming May

1    21st meeting, it would be helpful to have our representatives touch

2    base with the members of the committee to ensure that they have the

3    latest and greatest information on the following products up for

4    review, including Vioxx."

5            Next slide.  And here is yet another example of them

6    targeting P&T committee members.

7            Not only did Merck target Louisiana P&T Committee, they

8    also targeted Provider Synergies, which is the company that

9    Louisiana Department of Health and Hospitals retained in order to

10   provide them with clinical information about the product.  Kerry

11   Edwards, who was a regional medical director for Merck, testified

12   that he met with Provider Synergies at least twice a year and

13   delivered Merck's cardiovascular message at every single meeting.

14           What was that message?  These are the Merck's

15   misrepresentations and omissions that were in all of their

16   messages, all of their targeting of Louisiana Medicaid.  Vioxx was

17   not safer and effective -- they represented that Vioxx was safe and

18   effective when approved in '99, when, in fact, it was not.  Vioxx

19   was not safe and effective when approved in 1999 due to the signal

20   of CV harm that was not adequately investigated.  That's an

21   omission by Merck.

22           Merck omitted that Merck was aware that Vioxx had the

23   potential to induce cardiovascular side effects and failed to

24   adequately investigate that question.

25           Merck omitted that Vioxx was significantly less safe and

1    no more effective than so-called traditional NSAIDs such as

2    Ibuprofen and Naproxen, drugs which cost a fraction of the price of

3    Vioxx.  While Merck-published studies cited in the Provider

4    Synergies monographs, concluded that further study was necessary to

5    determine whether Vioxx posed a cardiovascular risk.  Merck's

6    internal documents recognized that Vioxx did pose a cardiovascular

7    risk and Merck consciously steered its sponsored research away from

8    investigating that risk.

9          Your Honor, those are facts that are amply supported by

10   our separate statement, that's the fraudulent message that was

11   delivered directly to the Louisiana Department of Health and

12   Hospitals.

13         Merck received this message not only through -- I'm

14   sorry, Louisiana Department of Health and Hospitals received this

15   message not only through direct marketing from Merck, but also

16   through Merck sponsored scientific literature, which is

17   incorporated both in the label and in the Provider Synergies

18   monographs which exaggerated the benefits and concealed the risks.

19         They manipulated published GI literature.  By April 2003,

20   Merck's data showed that Vioxx had about four times greater risk of

21   GI harm compared to placebo.  Although the Laine study cited in

22   Provider Synergies monographs provided to the P&T Committee stated

23   that Vioxx ulcer rate was comparable to placebo.  Vioxx was only

24   tested to show GI benefit against high doses of Ibuprofen and other

25   NSAIDs users, while people who used lower doses, the vast majority,

1    received no benefit.  Although the VIGOR study publication cited in

2    the Provider Synergies monographs concluded Vioxx showed a

3    statistically significant benefit over Naproxen for most serious GI

4    events, the VIGOR study results showed such benefit for patients

5    taking steroids, which comprised only a small percentage of Vioxx

6    patients.

7           And by February 27th, 2003, Merck knew that the rated

8    most serious GI events in the osteoarthritis studies was actually

9    higher on Vioxx than on traditional NSAIDs such as Ibuprofen by the

10   end of the study period, but this information was not disclosed in

11   any of the monographs.

12          Louisiana Department of Health and Hospitals, like the

13   high volume Medicaid prescribers that Merck targeted, were lulled

14   into the belief that Vioxx was fit for widespread use in patients

15   and was worth its premium price because of its purportedly safer GI

16   profile; when the reality was that Merck was aware of significant

17   CV risks that it failed to test and the drug should never have been

18   approved in the first place.

19          And that contention, your Honor, is supported by the

20   affidavit -- I'm sorry, the deposition testimony of Dr. Kessler,

21   which has been submitted in connection with our separate statement

22   of contested facts.

23          Fiction No. 2 that Merck advances is that LDHH was aware

24   of the risks of Vioxx.  Secretary Hood in his affidavit testified

25   that none of the information that I've just gone through with your

1    Honor was ever disclosed to him.  In his affidavit no way

2    contradicts his deposition testimony.  Your Honor, we discussed

3    this extensively yesterday and I don't think there's a need to go

4    through that again.

5         I would also note, your Honor, that in the Barnett

6    judgment looking at the very same facts of non-disclosure and

7    concealment, a jury found that medical professionals such as the

8    professionals at LDHH, the P&T Committee were mislead by Merck's

9    fraudulent concealment and misrepresentations, and this court found

10   that the verdict was supported by the record.

11        The final fiction, your Honor, is that LDHH was powerless

12   to do anything about Vioxx had it known the risks.  At all times

13   LDHH had the ability to exclude or restrict coverage for Vioxx.  It

14   could exclude drugs not approved by the FDA, and, your Honor, I

15   will explain to you later that that is not a claim that is subject

16   to FDA fraud on the market preemption -- I'm sorry, fraud on the

17   FDA preemption.

18        It could have excluded by excluding the drug from its

19   formulary, which it was expressly empowered by the Louisiana

20   legislature to do.  It could have restricted by use of a DUR and it

21   could have restricted by prior authorizations.

22        But, your Honor, even if those three fictions that I just

23   talked about were, in fact, true, plaintiffs could still prevail

24   under the unique Louisiana causes of action of redhibition in

25   Section 1408 restitution.  Throughout his argument Mr. Beisner said

that our redhibition claims fail because we cannot prove causation

and that we can't prove that LDHH would have done something

different with respect to Vioxx.  Causation is not an element of

redhibition.  Merck has not cited to a single case that states that

causation is an element of redhibition.  And plaintiffs, contrary

to Merck's contention in their papers, most certainly do contest

the contention that causation is an element of redhibition.

Redhibition is not compensation for damages and courts

have distinguished damages caused by redhibitory defect from the

redhibitory remedy.  And I'd cite your Honor to *State Ex Rel Gus v.*

*General Motors* for that proposition.

The focus in redhibition is not on what the plaintiff

would have done differently.  The focus in redhibition is on the

nature of the things sold and whether it contains a defect, not on

whether the defendant's action caused any action on the part of the

plaintiff.

By continuing to focus on what LDHH itself could or could

not have done, Merck ignores binding Louisiana precedent which this

court is obligated to follow, and by that I am referring to *Mire v.*

*Etell Corp.,* in which the first circuit wrote and Louisiana Supreme

Court denied writs, the inquiry under a redhibition claim does not

involve the buyer's subjective knowledge or reliance, but rather is

an objective inquiry into the deficiency in whether it diminishes

the product's value or renders it so inconvenient that the

reasonable buyer would not have purchased it had he known of the

1    deficiency.  The focus is on what a reasonable buyer would have

2    done, not on what LDHH would have done.  The focus is on the defect

3    in a product.

4         Merck doesn't even attempt to address the *Mire* case in

5    its papers, and I didn't hear Mr. Beisner say anything about the

6    *Mire* case just now.  Merck keeps trying to refer the court to

7    actions of LDHH and what LDHH could have done.  But by doing that,

8    Merck is ignoring the case law that this court is bound to follow

9    with respect to redhibition, which says that you don't do that kind

10   of subjective inquiry into what the plaintiff believed or the

11   plaintiff understood, instead you look at what a reasonable buyer

12   would have believed and what a reasonable buyer would have done.

13        And, your Honor, there is ample evidence in the record to

14   demonstrate that a reasonable buyer would not have bought this

15   product, that this product suffered from what is the very

16   definition of a redhibitory defect; that is, its vices so

17   outweighed any benefit that it had that no one would have bought it

18   in the first place.

19        Now, Merck contends that LDHH was aware of the defect and

20   therefore can't assert a claim.  But, your Honor, we've shown the

21   many ways in which LDHH was mislead in which the defect was not

22   disclosed, certainly the extent of the defect was not disclosed.

23   And I would liken this case, your Honor, to the case in *Buck v.*

24   *Adams*.  *Buck v. Adams*, seller of a boat pointed out to the buyer

25   that there were wormholes in the boat.  The buyer bought it, put it

1    in the water, the thing wouldn't float because of the wormholes.

2    And the court found that even though the seller had put the buyer

3    on notice of the wormholes, just like Merck had put the state, or

4    arguably put the state on notice of some issues of cardiovascular

5    effects, not knowing the extent of those wormholes, not knowing the

6    extent of the defect was an redhibitory defect and entitled the

7    seller to redhibitory remedy.

8            There is ample evidence that LDHH was not aware of the

9    extent of the cardiovascular concerns or the exaggeration of GI

10   benefits, and, your Honor, I would point you to Dr. Abramson's

11   opinion, Dr. Macgregor opinion on the CV effects, Dr. Graham's

12   opinion with respect to the exaggeration of GI benefits, Dr.

13   Julie's opinion with respect to the exaggeration of GI benefits,

14   and finally Mr. Hood's affidavit that he was not aware of the

15   extent of the defects, that he thought the drug was reasonably fit

16   for widespread prescription.

17           Now, Merck argues that we are not entitled to a remedy in

18   redhibition because we're only entitled to a reduction in price

19   because we can't return the Vioxx and we can't, supposedly can't

20   prove what that reduction in price is.  Your Honor, we're not

21   limited to a reduction in price in the redhibitory remedy when the

22   product has been destroyed, when that destruction is due to some

23   reason other than our fault and when the manufacturer is in bad

24   faith.

25           Article 2532 addresses the situation where the product

1    has been destroyed.  And if the destruction was occasioned by the

2    defect, then there is no reduction in price.  The plaintiff gets

3    his purchase price back.  That's exactly what happened here.  The

4    defect is that the product was represented as being capable of or

5    suitable for ingestion by people, by Louisiana Medicaid patients,

6    they ingested it.  The defect is what caused them to ingest it.

7    Merck is not entitled to cancel the redhibitory remedy just because

8    we can't return the product.

9          Even if you accept under 2532 that Merck is not at fault,

10   the destruction was still fortuitous.  The plaintiffs took it as

11   intended, it was no fault on the part of the plaintiff.  And in the

12   case where the destruction of the thing is fortuitous, if like

13   Merck a manufacturer is presumed to not be required to be put on

14   notice, if the destruction happens fortuitously, Merck still bears

15   the loss and has to return the entire purchase price.

16         I would also note, your Honor, that Article 2545, which

17   deals with bad faith sellers, and that's exactly what Merck is

18   presumed to be, not to mention that there's ample evidence to show

19   that they are, says that the burden -- says that, first of all, the

20   buyer gets his entire purchase price back, plus interest, plus any

21   damages that may have flowed, plus attorneys' fees; and the seller

22   only gets a credit for any value that the buyer received.  But in

23   2545 -- I'm sorry, 2545 that situation where you're dealing with

24   the bad faith seller, it is the seller's burden to demonstrate the

25   value received.  Merck has made no showing to support its motion

1   for summary judgment or its contention that Louisiana received any

2   value as a result of its having received, its having gotten Vioxx.

3          The only argument that Merck offers on that point is that

4   supposedly the state received some benefit because it didn't pay

5   for Celebrex, which it would have costs, compare -- it was

6   comparably priced to Vioxx.  Your Honor, that's absurd.  Nothing in

7   the redhibition statutes, nothing in Louisiana fraud statutes says

8   when you rip somebody off, you look at their measure of damages by

9   looking at what they would have paid if they hadn't been ripped

10  off.

11         It's as if Merck were a purveyor of seafood and sold you

12  fake crab meat and then when you came back and said, well, you sold

13  me this fake crab that's worth 20 cents a pound and I paid 20 bucks

14  a pound for it, I want my money back, or at least I want the

15  difference between the value of the fake crab meat and the real

16  crab meat.  And Merck says, oh, well, if you hadn't bought my fake

17  crab meat, you would have gone out and bought real crab meat from

18  somebody down the street and you would have paid the same amount.

19  That's ridiculous.  Louisiana law has never recognized it.  For

20  obvious reasons.

21         Merck's cases that they cite limiting the plaintiff to a

22  reduction in price when the thing has been consumed are all

23  distinguishable because they all deal with good faith sellers.

24  Merck's argument that plaintiff bears the burden to show the

25  difference in price, if plaintiff is reduced to a reduction in

1    price, are also distinguishable because they all deal with good

2    faith sellers, *Ashley v. Volkswagen* was a good faith seller;

3    *Abraham v. Dallworth* cited by the defendants, good faith seller.

4            But even if the plaintiff did bear the burden to show the

5    difference in value between what LDHH paid for Vioxx and what LDHH

6    should have paid for Vioxx, there is ample testimony in the record

7    to support that.  There's the expert testimony of Dr. Abramson who

8    said that Vioxx is not worth the premium over other traditional

9    NSAIDs, says they are no more effective and, in fact, more

10   dangerous than traditional NSAIDs.

11           There is no requirement contrary to Merck's argument that

12   the reduction be fixed with absolute specificity.  Merck says,

13   well, you can't tell us what the exact amount of the reduction

14   would be, therefore you get zero.  Your Honor, there is no support

15   for that in Louisiana law.

16           I cite your Honor to *Ashley v. Volkswagen* which is

17   actually cited by Merck in their papers, where the courts writes:

18   "Where a plaintiff is entitled to a reduction in price, the amount

19   of the reduction should be the difference between the sale price

20   and the fair value as of the time of sale if the defects had been

21   known.  Factors to be considered include expert testimony, cost of

22   repairs, or evidence of any other facts bearing on the price to

23   which informed parties would have agreed.  Ultimately, the amount

24   of the reduction is within the court's discretion."

25           I would also cite your Honor to *AG v. Spears*, 803 So.2d

1   406.  In that case, the appellate court rejected the concept that

2   reduction in prices set by any rigid rules, and there the court

3   considering the totality of the circumstances just reduced the

4   amount of the purchase price by half.  And the appellate court

5   said, well, that's supported, that's within the court's wide

6   discretion in setting a reduction in price.

7        Finally, *Royal v. Cook*, 984 So.2d 156, noted that where

8   the plaintiff bears the burden to show an appropriate reduction in

9   price when damages are insusceptible of precise measurement, much

10  discretion is left to the trial court for the assessment of these

11  damages.  That's also supported by Louisiana Civil Code Article

12  1999.

13       Finally, you asked Merck about whether the state is a

14  buyer and raised the question that plaintiffs raise, if the state

15  is not a buyer, than who is?  And, frankly, Merck dodged on that

16  and said, oh, well, we're not saying that the consumers who paid

17  nothing are the buyer.

18       Well, your Honor, actually Merck's cases all deal with

19  the person who paid nothing not being the buyer.  They don't deal

20  with a situation where the person who paid everything but didn't

21  get actual possession of the thing, none of those cases have dealt

22  with that issue to say whether or not one is a buyer.  In fact,

23  *McNeely v. Ford* which they cite to say that you have to be both the

24  person who bought it and who paid for it and the person who

25  received it in order to get the redhibitory defect -- redhibitory

1    remedy.

2            Your Honor, *McNeely v. Ford*, the plaintiff was the

3    survivor of Mrs. McNeely who had actually bought the car for her.

4    And in analyzing whether or not the plaintiff was entitled to

5    damages for bad faith, the damages actually caused by the

6    redhibitory defect, they said the only one who could have offered

7    testimony on that was the one who paid for the car, who was the

8    son, and that since he didn't offer testimony he didn't get those

9    damages.  So that case actually recognizes that someone who pays

10   for it but it actually goes to someone else is the buyer.

11           *Shavre v. State Farm*, which they cite, the plaintiff

12   didn't pay for it or receive possession of the thing.  They said

13   that person has no redhibition claim.  *Sanders v. Ernest* had to do

14   with whether or not the seller was the proper defendant and the

15   person wasn't a seller, didn't have to do with whether one was a

16   buyer.

17           No Louisiana court has said that if you pay the entire

18   price for something just because you're not the one who receives

19   possession you're not the buyer.  And as your Honor correctly noted

20   under the situation that Merck would have this court embrace, there

21   would be no buyer because your catch 22 situation, the plaintiff

22   didn't pay for it so he doesn't get his money back -- I'm sorry,

23   the Medicaid patient and the Louisiana Department of Health and

24   Hospitals paid for everything.  Well, since he didn't get the

25   bills, supposedly he doesn't get his money back.

Case 2:05-md-01657-EEF-DEK   Document 63340   Filed 09/06/11   Page 90 of 125

90

1          The only court to embrace that suggestion is the Reslin

2    court.  Your Honor, is not bound to follow the Reslin court, and I

3    would note that the Reslin court ignored the Second Circuit's

4    directive in that exact same case where the Second Circuit found

5    that third party payors were, in fact, buyers for purposes of

6    asserting these sorts of claims.

7          Finally, your Honor, turning to the restitution claim.

8    And again, restitution does not require a showing of reliance or

9    causation, it requires only that the AG show that Merck may have

10   acquired funds by means of an unlawful trade practice.  None of the

11   cases cited by Merck on aggregate proof, except for the *in re:*

12   *Actimmune* case involve statutes requiring only funds that may have

13   been acquired.  *In re:  Zyprexa* dealt with a Mississippi statute

14   which required actual causation.  *Guardian Life*, *in re:  Neurontin*,

15   which we'll talk about in a minute, *Iron Workers Local 68*, *Southern*

16   *Illinois Laborers & Employers Local Health and Welfare*, all

17   required proximate cause under RICO.

18         Laborers Health and Welfare Fund, New Jersey Consumer

19   Fraud Act found that a private consumer fraud act required a

20   showing of causation.  But actually distinguished the private act

21   from the AG act noting that the AG claim did not require a showing

22   of causation.  Well, that's exactly the situation we have here.

23   Under a private claim, under Section 1409 there would be a

24   requirement of showing causation, but not under Section 1408

25   because Section 1408 has this critical word may have been caused.

1          Merck ignores the plain language of Section 1408 focusing

2     on that required by means of section but completely writes out the

3     word may.

4          THE COURT:  Let's see if you can get to the end soon.

5          MR. MURRAY:  I understand, your Honor.  You can't write

6     out the word may, your Honor is familiar with the rules of

7     construction.

8          LPLA exclusivity we've already briefed to your Honor and

9     we've argued it before and I think we've knocked that out.

10    Particularly since Merck now contends that 1408 is penal in nature.

11    If it's penal in nature, then LPLA has nothing to do with and the

12    remedies are the same as what you would have in redhibition, and

13    those are not excluded.

14         The standing issue we've already briefed to your Honor,

15    the state is expressly empowered.

16         And finally getting to the crux of Merck's argument, the

17    state is obligated to pay for Vioxx.  The state is not obligated to

18    pay for Vioxx.  *Edmonds v. Levine* is the only case they cited, it's

19    a district court case, it's easily distinguishable.  In *Edmonds v.*

20    *Levine* some Medicaid patients said you have to pay for our

21    off-label uses, didn't deal with a fraud case, it didn't deal with

22    the state saying we have a claim, it just lists some patients

23    saying you have to pay for our off-label uses and the *Levine* courts

24    said, yes, you do.

25         But it didn't deal with the situation presented here

```
 1    where the drug never should have been on the market in the first
 2    place.  Now, Merck suggests that that's an impermissible fraud on
 3    the FDA theory and they cite you to Buckman.  But, your Honor, I
 4    would cite you Desiano v. Warner Lambert & Company, Second Circuit
 5    decision which was affirmed, subknown Lambert v. Kent by the U.S.
 6    Supreme Court.  And they distinguished a claim which requires some
 7    showing of fraud on the FDA in order to prevail under a state law
 8    theory from a claim based exclusively on fraud on the FDA.  The
 9    latter being preempted, the former not being preempted.
10            If the state law claim is based on fraud and failure to
11    warn to the plaintiff, that the plaintiff may be required as a
12    prerequisite to show that state law claims -- as a prerequisite of
13    the state law claims the defendant mislead the FDA is not
14    preempted, and that's exactly what we have here.  In order to
15    respond to their affirmative defense, we are showing that the FDA
16    was mislead and that it is not a preempted claim.
17            Finally, we had the ability to restrict access to this
18    drug from 1999 to 2004 through DURs.  DURs have been used
19    throughout LDHH's history since 1995 for safety reasons to restrict
20    access, and we can show objectively what Louisiana would have done
21    to restrict access.  For instance, if you accept the proposition
22    that only prescriptions would have been paid for for concomitant
23    steroid users, that would have wiped out more than 90 percent of
24    the reimbursements that Louisiana paid for.
25            So we can show how actions by the state would have
```

1    resulted in a reduction in the number of sales.  And particularly

2    under LUPTA where we have a lessened burden in terms of causation,

3    that's sufficient to meet our causation hurdle.  We can show how we

4    would have restricted it, we can show how our prior authorization

5    would have restricted it.

6            And, your Honor, when it comes to whether or not we could

7    have excluded Vioxx from our formulary, Louisiana law we don't look

8    at what the secretary believed at the time -- at the time he didn't

9    even know that Vioxx was a deadly product and shouldn't have been

10   on the market -- we look at the law to say what he could have done.

11   And the law is clear that after 2002 Louisiana, LDHH was empowered

12   to fully restrict access to drugs within the limits of federal law,

13   there was no limitation on it, it wasn't just a prior authorization

14   process.

15           The statute says at B-1, to the full extent empowered by

16   law, they can restrict access.  B-2 says that they may establish a

17   drug formulary that utilizes a prior authorization process, or any

18   other process or combination of processes that prove to be cost

19   effective.  So they had the power to do it if they wanted to do it.

20           Finally, your Honor, I would note that the Reslin 2 court

21   that they rely on noted that after the revision of Section 153.3,

22   the plaintiff could pursue claims that required the plaintiff to

23   say they would have excluded access to Vioxx.

24           And finally on the last point that Merck makes and that

25   is that, well, if you can show that your actions would have

1    curtailed the numbers of prescriptions written, that still relies

2    on an impermissible aggregate proof theory.  Your Honor, that

3    argument was rejected by a court that Merck has cited very heavily

4    to, which was the *in re:  Neurontin* case, which Merck cites heavily

5    to under the name of *Guardian Life*.  And the *Guardian Life* case you

6    had a provider Kaiser that was much in the same situation as LDHH.

7    LDHH had been directly targeted, Kaiser was directly targeted.

8    Kaiser could have implemented an education program and the court

9    found that the implementation or the possibility they could have

10   implemented an education program which would have reduced the

11   number of sales, was enough to meet the causation burden under

12   RICO.

13            Thank you, your Honor.

14            THE COURT:  Okay.  Thank you very much.  Any response?

15            You have a couple more motions, so let's make it brief,

16   please.

17            MR. BEISNER:  I'll make it very brief, your Honor.  Just

18   making three or four points.

19            First, your Honor, I want to go back to the fundamental

20   proposition of counsel saying that in this case the deal with

21   respect to Medicaid was visciated by fraud.  Let's be clear about

22   what the deal was.  The deal was that if the FDA approved the drug,

23   then it was going to be on the state's formula.  That was the deal.

24   And the whole point of that was to avoid when the federal

25   government went to negotiate rebate agreements, the question of

1    what drugs would be involved.  It was some flexibility provided but

2    all under the auspices of the federal government, and to say -- the

3    state is not saying fraud, they're just saying we disagree with

4    whether the drug should have been approved.

5           And the FDA approved it, they've never responded to the

6    fact that there was an FDA Joint Advisory Committee in 2005 after

7    withdrawal that said Vioxx could be returned to the market.  And so

8    they disagreed with that, but the deal they made was to abide by

9    the FDA's judgment on this.  They didn't have to do that, that's

10   the deal they made, they got all of the benefits from that.  And to

11   suggest that in their view fraud or something of that nature could

12   have visciated that deal, that wasn't -- the states were not left

13   with that discretion.  There are a few areas of discretion they

14   were left, but that overall judgment was not left to them.

15          Now, your Honor, I think it's important for everyone, and

16   counsel did allude to it to some extent at the end of the timeline

17   that we're talking about here.  From 1999 through June of 2002,

18   over half the time Vioxx was on the market, from what I just heard

19   the state says that the only method that they could have used to

20   have controlled Vioxx sales during that period was the DUR process.

21          As I said earlier, your Honor, Vioxx had to be on the D-2

22   list issued by the Feds at that time.  There was no witness, no

23   witness they have presented that indicates that would have

24   happened.  I'm not sure that evidence would be credible anyway, but

25   there was nobody there filling that gap.  And the suggestion that

1    the state somehow during that period would have had the capacity to

2    do something otherwise, I mean, the witnesses here, Beardin

3    (PHONETIC), Castile, Hood, Terrebonne, all said Louisiana didn't

4    have the option during those earlier years to do anything else.

5            Then, your Honor, we hit June of 2002, the state for the

6    first time at that time adopts its prior authorization program.

7    But in June 2002 the state decided not to put Vioxx on the

8    preferred drug list, it had to go through the prior authorization

9    process, through mid 2003.  So during that period, your Honor, what

10   the state said, well, we would have done, it did, it had to go

11   through the prior authorization process.

12           And then in mid 2003, Merck got into negotiations with

13   the state and made a special rebate payment to the state, and so at

14   that point the state took Celebrex off the preferred list and put

15   Vioxx on instead.  It wasn't based on safety considerations, it was

16   all looking for the lowest price product.  That's what the P&T

17   committee was primarily interested in was looking for the lowest

18   price and Vioxx remained there on the list through 2004, although

19   my recollection is during part of that period Celebrex was put

20   back.

21           So I think that timeline is critical, your Honor, because

22   what I think we're hearing here is through mid 2003 -- well,

23   through June 2002 there was nothing the state could have done

24   realistically here, the DUR, there's just no evidence that that

25   would have been done here or what it would have been.  Prior

1    authorization was there for the following year.  And so I think

2    that -- and the suggestion that more of something different could

3    have been done thereafter just isn't supported by the factual

4    record that's been developed here.

5          Let me just note a couple of other quick points, your

6    Honor.  There is a suggestion here in redhibition this notion of

7    reasonable buyer; well, the reasonable buyer here didn't have a

8    choice.  The state is basically saying we are the only buyers, in

9    essence is what they're saying here for all of this; but under the

10   agreement they've made, they didn't have a choice but to acquire

11   this product.

12         There's also suggestion that, well, we can go to the

13   reduction in price analysis here because the product was destroyed.

14   Well, that's not what the statute is talking about, that's not what

15   the code is talking about.  The product wasn't destroyed, people

16   took it; and there is no allegation here that it was inefficacious,

17   there was a use made of the product that was beneficial.  People

18   had no consequences; if they did, for some reason and they alleged

19   that there was a problem, the state gets reimbursement through the

20   settlement that's been negotiated.

21         And then finally, your Honor, on this causation point.

22   To be blunt about it, this notion that there is no causation

23   requirement here makes no sense.  If that's the case, your Honor,

24   then the statutes are unconstitutional on due process grounds.

25   There's got to be a causative link in any remedial regime between

1    the wrongdoing that's alleged and what you say the damages are.

2              I mean, the state can't come in here and say, well, you

3    misrepresented Vioxx so you need to pay for all traffic accidents

4    that occurred in New Orleans.  There's got to be a causative link

5    between the two.  To be sure they varied, there are some consumer

6    protection statutes that speak in terms of reliance and others are

7    as a result of or perhaps less onerous causation requirements, but

8    they're all there.  And it's because of that the courts have

9    consistently said that this notion of aggregate analysis of what

10   would have happened under different circumstances simply does not

11   work.  That's what Judge Weinstein, that's the Judge Saris are

12   going at in their circumstances.

13             Thank you, your Honor.

14             THE COURT:  Thank you very much.  I am going to mark this

15   as submitted.  I'll start writing my opinion soon because you have

16   to know since we're getting ready for trial.  But I'll get right on

17   it.  Thank you very much.

18             MR. BEISNER:  Thank you, your Honor.

19             THE COURT:  I've got a couple of motions.

20             Let me see counsel for drywall up here a moment, please.

21         (WHEREUPON, A DISCUSSION WAS HELD OFF THE RECORD.)

22         (OPEN COURT.)

23             THE COURT:  Let's go back on the record for Vioxx.  So,

24   Ms. Wimberly, you have some claims?

25             MS. WIMBERLY:  Yes, your Honor.

```
 1              THE LAW CLERK:  We have one individual on the phone.

 2              MS. WIMBERLY:  We can take care of a couple things while

 3      she is getting him on the phone.

 4              THE COURT:  Go ahead, Dorothy.

 5              MS. WIMBERLY:  Your Honor, the first one that we'll go

 6      ahead and take up just officially on the record is Brian Anderson's

 7      motion for reconsideration, Record Document 18800.  As Mr. Marvin

 8      indicated in chambers earlier, BrownGreer is collecting records and

 9      we will report back to the court; but we are deferring that until

10      April 29th.

11              THE COURT:  Okay.  I'll pass that one until April 29th.

12              MS. WIMBERLY:  Next up, your Honor, we can go ahead and

13      take and dispose of deferrals from Merck's PTO 31 motion, Record

14      Document 22070, that pertains to a single plaintiff Eugene Baldoni.

15      Ms. Oldfather has now enrolled and we have agreed to defer that for

16      a final time until April the 29th for her to determine whether to

17      potentially enroll Mr. Baldoni or to comply with the applicable

18      PTO.

19              THE COURT:  All right.  So I will pass that one.

20              MS. WIMBERLY:  Next up, your Honor, is our deferrals from

21      Merck's fourth PTO 43 motion, Record Document 27190, which pertains

22      to two plaintiffs Mark Hendrichs and Todd Jelden.  Ms. Oldfather

23      has enrolled for Todd Jelden and the same would apply as with

24      respect to Mr. Baldoni; and also Mr. Hendrichs seems to think that

25      the paperwork that he has submitted thus far, he is pro se, is a
```

```
1    case specific expert report.  He does not seem to understand that.

2    I am going to request that the pro se curator take a stab at

3    explaining that to him as well, so we will roll that for a final

4    time until April 29th.

5            THE COURT:  I'll pass it for that.  Let's have the pro se

6    curator put something in writing to them, just simply talk with him

7    first and then say this confirms our conversation, and so forth.

8            MS. WIMBERLY:  I'll get together with Mr. Johnston's

9    office on that.

10           Next up, your Honor, is -- and I don't know whether

11   Mr. Weykamp is on the phone yet or not?

12           THE DEPUTY CLERK:  Not yet.

13           MS. WIMBERLY:  Okay.  Then let me go ahead and take

14   deferrals from Merck's ninth PTO 28 motion, Record Document 21961,

15   deals with a single plaintiff, pro se plaintiff James Schneller who

16   is claiming that he has not received copies of anything.

17           I have FedEx confirmations showing delivery to

18   Mr. Schneller.  He obviously got them because he responded.  He

19   also claimed that the court had never ruled on his pending motions,

20   and I would refer the court to its prior order, which was entered

21   in this matter, giving him until July 10th of last year to provide

22   his expert report.  He filed a motion for reconsideration from

23   that.  This court denied that motion and told him to comply.

24           We are now nine months after the fact.  But to avoid any

25   prejudice to Mr. Schneller, I am going to re-serve him with a copy
```

1   of the original rule, our ninth PTO 28 motion, I am serving him

2   with copies of all orders setting his deadlines, and the order that

3   is entered at this point.  But he has had -- this claim has been

4   pending since 2005.  He has received repeated extensions and the

5   orders of this court to file his report.  And he simply won't

6   comply and we would like to have this matter resolved on April

7   29th.

8           THE COURT:  I agree with that, let's get it resolved next

9   time for sure.

10          MS. OLDFATHER:  Your Honor, I can certain assist on that.

11  Mr. Schneller is one of those PTO 28 people that I never even knew

12  about.  And Dorothy is graciously allowing him the extra 30 days

13  because I have just learned about it and have just gotten to either

14  closure or commitment.

15          THE COURT:  Okay.  Thank you.

16          MS. WIMBERLY:  Is Mr. Weykamp on the phone?

17          THE LAW CLERK:  It's my understanding he is.  Mr. Weykamp

18  are you on the phone, sir?

19          MR. WEYKAMP:  Yes, I am, your Honor.

20          THE COURT:  Okay.

21          MS. WIMBERLY:  Next up, your Honor, is Merck's eighth PTO

22  29 motion, Record Document 35757, filed with this court on March

23  1st of this year.  There are eight plaintiffs on Exhibit A to that

24  motion.

25          With respect to the motion, one plaintiff has complied,

1    has submitted all of the materials required by PTO 29, and

2    specifically that is plaintiff No. 7, Larry Smith on Exhibit A.

3    Therefore, Merck is withdrawing the motion as to Mr. Smith.

4           We heard nothing from any of the other seven plaintiffs

5    on Exhibit A until this morning I received an e-mail from

6    Mr. Weykamp asking that we continue the matter as to his client.  I

7    could not agree to that for a couple of reasons.  First of all, a

8    response was due by March 15th, but more importantly, Mr. Weykamp's

9    client, Mr. Lockhart, had been on the first PTO 29 motion filed in

10   I believe March -- November of 2008.

11          He was on that motion almost two years or one and a half

12   years ago because he hadn't provided any materials.  He ultimately

13   complied in part, he provided the updated PPFs and provided updated

14   authorizations, so we removed him from our original PTO 29 motion

15   in reliance upon the representation that he would fully comply.

16          Well, we are now 14 months after the fact and we still

17   don't have a case specific expert report from Mr. Lockhart, which

18   is why he is on our eighth PTO 29 motion.  And it's why I did not

19   have authority to agree to continue it yet again.

20          THE COURT:  Mr. Weykamp, do you understand that, sir?

21          MR. WEYKAMP:  Yes, I heard her.

22          THE COURT:  What's the problem?

23          MR. WEYKAMP:  Your Honor, we were essentially

24   anticipating getting information from the PSC with regard to

25   experts and potential experts for assessing the medical records,

1    and we had not heard anything from the PSC at all and never been

2    contacted by them in regard to that.  And that's essentially what

3    we were anticipating getting so that we could get that report to

4    counsel.

5            THE COURT:  Hold on, let me get a PSC member.

6            MS. OLDFATHER:  Your Honor, may I address this while

7    we're waiting for Mr. Davis?

8            MS. WIMBERLY:  He's here.

9            THE COURT:  Lenny, Mr. Lockhart said he was waiting for

10   you to give him some information and you never gave him the

11   information.  Mr. Lockhart, what were you saying again, sir?

12           MR. WEYKAMP:  It's Weykamp, your Honor.

13           THE COURT:  I'm sorry, yes, Mr. Weykamp.

14           MR. WEYKAMP:  Right.  That we had been anticipating

15   getting information regarding resources for experts from the PSC

16   and that we had not received any of that information.

17           MR. DAVIS:  With respect to any request the PSC has been

18   asked for, we have a trial package and we invite people to the

19   depository and consistently have done that, and we would welcome

20   you to come to the depository at any time and view the trial

21   package.

22           THE COURT:  Well, Mr. Weykamp hasn't given the expert

23   specific report and he said that he was waiting for the PSC to give

24   him -- what were you waiting for, Mr. Weykamp?

25           MR. WEYKAMP:  Just to be able to obtain information with

```
 1    regard to resources for obtaining experts.

 2              THE COURT:  What have you contacted the PSC?

 3              MR. WEYKAMP:  My understanding was that the PSC was to

 4    disseminate information, your Honor, to plaintiffs' counsel.

 5              MR. DAVIS:  And, your Honor, what we have done, and I'll

 6    repeat it because I know we were on the phone, we have invited

 7    folks to come view the trial package where there are expert

 8    opinions, which also have in it trial testimonies which include

 9    experts and other information that's been developed by the PSC

10    throughout this litigation.

11              By coming to the depository, they have the ability to get

12    to the Merck productions, as well as other productions.  And again,

13    I state on the record that the depository is open and is available.

14              MS. OLDFATHER:  Your Honor, if I could.  Mr. Weykamp,

15    this is Ann Oldfather.  Judge, I think that this could be easily

16    solved.  I have provided Mr. Weykamp yesterday afternoon with the

17    names of two attorney -- two doctors who can get case specific

18    report given the amount of detail that he's already provided on

19    these claims -- given the amount of detail that he's already

20    provided to Merck on these claims.  I think given the fact that

21    we've rolled a number of other cases --

22              THE COURT:  Mr. Weykamp, this is what I'll do.  I'll

23    continue it until the next status conference, which is 30 days.

24              MS. WIMBERLY:  April 29th, your Honor.

25              THE COURT:  April 29th so let's get it by then.  If not,
```

```
 1    I am going to have to take action on it.  It's been a long time,

 2    Mr. WEYKAMP, and some of these individuals, some of the claimants

 3    have moved on in their lives and they are not pursuing the claim

 4    anymore.  And I don't know whether your client has been in contact

 5    with you, but I've had situations where the lawyer hasn't heard

 6    from the client for years notwithstanding trying to contact the

 7    claimant.

 8            So I don't know whether this is your situation or not,

 9    but we've got to bring this to a head one way or the other.  But I

10    will pass it until the next status conference on this matter.

11            MR. WEYKAMP:  Thank you, your Honor.

12            THE COURT:  All right.  Okay.

13            MS. WIMBERLY:  Your Honor, that leaves six other

14    plaintiffs on Exhibit A, I have heard from none of those

15    plaintiffs, and would ask your Honor that their cases be dismissed

16    with prejudice.  I do have proof of service --

17            THE DEPUTY CLERK:  Excuse me, what record document?

18            MS. WIMBERLY:  That is again Record Document 35757,

19    Merck's eighth PTO 29 motion.

20            I do have proof of service, which I would tender as

21    Exhibit A to Record Document 35757, and would ask that the court

22    grant the motion and dismiss their cases with prejudice.

23            MS. OLDFATHER:  If I might, your Honor.

24            THE COURT:  Sure.

25            MS. OLDFATHER:  Ms. Wimberly and I discussed these during
```

 1   the few breaks we've had this morning.  And there were one, two,

 2   three, four, five of the eight on their list that I had asked that

 3   they roll for a month.  The Larry Smith case, Ms. Wimberly has just

 4   withdrawn.  My understanding is that that was filed in error.

 5   We've just dealt with the -- Mr. Weykamp's client.

 6          Three of these people have indicated that they do, in

 7   fact, not want to pursue their claim.  But the other ones, which

 8   are plaintiff No. 4 James Nestor, plaintiff No. 8 Peter Donnelly,

 9   we've not been able to get a hold of those folks.  This is the --

10   this motion was filed on March 1 and when I realized that the PSC

11   wasn't dealing with the PTO 29 in terms of providing resources

12   about where they could get case specific expert reports, I

13   undertook calling these folks.

14          So, Judge, I would simply ask that we give in the

15   interest of all procedural due process, we give an additional 30

16   day period to James Nestor, that's No. 4; Sandra Hurst, No. 6 and

17   Barbara and Peter Donnelly, No. 8, I think those are the only three

18   left on the list, that I would ask the court to give a 30 day

19   period to.

20          Ms. Wimberly did show me some of the tracking information

21   and I have no question about what Ms. Wimberly gave to Federal

22   Express.  But on at least a few of these there is no good proof

23   that these people themselves were ever notified.

24          THE COURT:  But they're represented by the law office of

25   the Cytryn & Velazquez, aren't they?

1        MS. OLDFATHER:  No, your Honor.  As a matter of fact,

2   when we started calling today we were told on Sandra Hurst's case

3   that Michael Riley, that's No. 6, that he doesn't represent her any

4   longer.

5        MS. WIMBERLY:  Your Honor, let me say there are some

6   times where these lawyers say they don't represent or the client

7   says, oh, I fired them, but he is counsel of record and he is who

8   we have to serve.  We don't have the right to go behind who counsel

9   of record is.

10        THE COURT:  You see, Mr. Velazquez has represented Aida

11   Camejo, Felipe Del Rosario, Elba Langley --

12        MS. OLDFATHER:  Those are fine.  Those people have all

13   confirmed that they don't want to pursue.

14        THE COURT:  The point that I make is that he also

15   represents Nestor.  I mean --

16        MS. OLDFATHER:  No, Nestor is Douglas T. Sachse.

17        THE COURT:  I have Law Offices -- I'm sorry.

18        MS. OLDFATHER:  I'm sorry, your Honor, I didn't realize

19   we were on different pages.

20        THE COURT:  No, I've got it.

21        MS. OLDFATHER:  Honestly, with the clarification that

22   we've recently gotten about the uncertainty about PTO 29 and where

23   it falls, I am looking at three of these people and I am simply

24   saying let's give them an opportunity.

25        THE COURT:  I'll do that, I'll pass the three of them

```
 1    then until next time, but that's the end of it with these.
 2              MS. OLDFATHER:  I understand.
 3              MS. WIMBERLY:  Then, your Honor, that would be dismissals
 4    with prejudice for Aida Camejo, Felipe Del Rosario and Elba
 5    Langley, Nos. 1, 2 and 3.
 6              THE COURT:  Right, dismissed with prejudice, over the
 7    objection of the PSC.
 8              MR. HERMAN:  We object to dismissal with prejudice.
 9              THE COURT:  Right.
10              MR. HERMAN:  Your Honor, I don't want to prolong your
11    Honor in this matter, but I have to really address the statement
12    that was made.
13              In order to get the trial package you have to sign an
14    agreement and a confidentiality.  If that's not signed, you can't
15    get it.
16              Secondly, the PSC does not find experts on specific
17    causation for individual law firms that have cases that they want
18    to try.  What we do is we give them the best of what general
19    causation and specific causation exists.  It's a comprehensive
20    trial package.
21              If what the gentleman wants us to do is go find him an
22    expert on specific causation, not only are we not equipped to do
23    it, but I don't think that we're obligated to do it, and it would
24    be very expensive for us to undertake to go search and get specific
25    causation experts in these cases.
```

1        But the depository is open, if he'd like a trial package

2   and he signs the agreements he gets them.  He reads the

3   transcripts, he sees what causation experts were involved in these

4   cases, he picks up a phone and he calls them and he engages them.

5        And I just want to make it very clear to the gentleman

6   and to any others similarly situated that we are not going to find

7   specific causation experts for them.  We do have general causation

8   experts.

9        THE COURT:  Well, that was the burden of the Plaintiffs

10  Committee, it didn't go down to the individual claimant, it really

11  was to look at the common aspect of this case.  And when they

12  finished with the common aspect of this case; namely, general

13  causation, then the case was packaged for trial and would then be

14  sent back or tried on the specific aspect.  But the lawyer himself

15  or herself had a responsibility to deal with the specifics of their

16  particular client.

17       But because there may have been some confusion, I have

18  passed the case.

19       MS. WIMBERLY:  Your Honor, that leaves one additional

20  deferral motion.  Deferrals from Merck's third PTO 43 motion,

21  Record Document 24995.  Plaintiff Janice Baum appears on that as

22  well as Merck's first PTO 43 motion, which was 22492.  While I did

23  not hear from Ms. Baum, your Honor, I understand from Katie that

24  she faxed something to the court late yesterday.  It appears to be

25  the same material that your Honor had previously reviewed and

1   entered of record back in early February.  Ms. Baum says she still

2   can't find an attorney and this has been going on since August of

3   2009.

4          There are four other plaintiffs on that PTO 43 motion,

5   John Stafisz who late yesterday submitted an expert report.  I

6   would like to defer the motion as to Mr. Stafisz to enable Merck to

7   review his expert report to determine whether it complies.  I spoke

8   to him late yesterday, told him that we would be back -- that we

9   would be deferring and that we would be back in touch with him if

10  we had any issues with his report.

11         THE COURT:  All right.

12         MS. WIMBERLY:  Which leaves us with one additional pro se

13  plaintiff Stanley Bethea, who has not complied in the interim since

14  this motion was filed.  He has filed a renewed motion to remand and

15  I believe also to amend pleadings.  I believe your Honor denied

16  those motions.  And also has previously entered an order

17  instructing that he not file anything else because of the frivolous

18  nature of his filings.

19         And, your Honor, we would ask that his case be dismissed

20  with prejudice, along with Ms. Baum.

21         Which then leaves us with two represented plaintiffs,

22  Leslie Henry and Patricia Lewis both of whom received service

23  through their counsel, the matter has been deferred numerous times.

24  Originally from a motion filed in September.  We've had no

25  response.  Early on we had responses saying that we're looking, you

1    know, we're seeing what we can do.  But since that point in time

2    since it's been deferred the last two or three times, we've had no

3    response and we would ask that the motion be granted as to them.

4         So with respect to all of the plaintiffs on PTO 43

5    motion, Record Document 24995, other than John Stafisz as to whom

6    we defer, we would ask that the court dismiss the claims with

7    prejudice.

8         THE COURT:  Okay.

9         MS. OLDFATHER:  Thank you, Judge.  We've dealt with one

10   of the PTO 43 motions, this is the other one.  And of course these

11   are folks that have already indicated a desire to be in the

12   program.  They've done a PPF, they've provided Merck with

13   authorizations, they've provided Merck with medical records and

14   they didn't make it through the Gates Committee and the RP.  Your

15   Honor, on taking these in order, Leslie Henry when we contacted

16   these folks yesterday, Leslie Henry is represented.  Her attorney

17   said that she was thrilled to get the names of resources that could

18   provide a case specific report.

19        And that's all I've ever suggested that ought to be done

20   by the liaison or coordinating counsel for these cases, is just to

21   provide the names of doctors who will do this at a reasonable fee.

22   She's asked for an additional 30 days within which she can comply

23   for Leslie Henry.

24        The next one, John Stafisz, again we contacted him and

25   Ms. Wimberly has agreed to give him an additional 30 days.

1          Patricia Lewis's attorney is one of those attorneys who

2    says he is withdrawn.  He said that the client needs to be

3    contacted directly, and we don't have any phone numbers for her

4    because we don't have contact information.  And I don't know of

5    anyone perhaps other than Merck that might know how to get a hold

6    of her, but we are trying to reach her.  Same for Janice Baum.

7          And Stanley Bethea has certainly shown an effort to be in

8    this case, I understand he's been tiresome.  But again, your Honor,

9    if you could give these folks the same 30 days, I will commit to

10   aid the court in getting a final answer from these folks that we

11   can all feel good about, or at least then letting them comply with

12   filing the one last thing they need in addition to all of the

13   information about their claim that Merck already has.

14         MS. WIMBERLY:  Your Honor, my only comment to that would

15   be that at least the best we can determine Patricia Lewis is, in

16   fact, still represented by counsel.  We have not found any signed

17   order of withdrawal and consequently we can't talk to her or deal

18   with her.  And her counsel will need to do whatever needs to be

19   done, but we have given repeated extensions.  While an additional

20   30 days to April 29th, but I can almost guarantee that these seam

21   people are going to be back here on April 29th at the last minute

22   asking for yet another extension.

23         MS. OLDFATHER:  Well, I won't be standing up for them.

24         THE COURT:  I am going to extend Stanley Bethea, he is

25   pro se.  I am going to deny the Janice Baum and Patricia Lewis

```
 1   because they're represented.  If they get dismissed, then they have
 2   a right to sue their attorney, I'll let them sue their attorney.
 3            MS. WIMBERLY:  Actually, your Honor, that's not quite
 4   correct.  Ms. Baum is pro se.
 5            THE COURT:  I'm sorry.
 6            MS. WIMBERLY:  It's Leslie Henry and Patricia Lewis who
 7   were represented.
 8            MS. OLDFATHER:  Well, Leslie Henry's attorney sent us
 9   both an e-mail this morning.
10            THE COURT:  Price Waicukauski & Riley, I thought that's
11   who represented Baum?
12            MS. WIMBERLY:  Perhaps, your Honor, could get involved in
13   that one.  Ms. Baum in her correspondence has repeatedly asked or
14   claimed that they will not return her records.
15            THE COURT:  Okay.  I'll pass that for 30 days.
16            MS. WIMBERLY:  And I don't know if perhaps the order,
17   since I'll be drafting it, could it include a directive to her
18   prior counsel --
19            THE COURT:  That's fine.
20            MS. WIMBERLY:  -- to return all of her records?
21            THE COURT:  Right.  Which is the one -- I've got two of
22   them or one of them that's Patricia Lewis, she's represented by the
23   Miller firm.  Is that still the same?
24            MS. WIMBERLY:  Your Honor, I had my paralegal check this
25   morning again to see if there was a signed order of dismissal.
```

1          MS. OLDFATHER:  Judge, I can tell you that we called

2     their office yesterday, the Miller firm, and we were told that they

3     have withdrawn, I am reading my paralegal's quotes, we need to

4     contact the plaintiff directly.  So all of these people are just

5     kind of on the cusp.

6          THE COURT:  But, you know, I mean, this has been five

7     years now, you know.  I've been contacting their attorneys two and

8     three and four times.  So I just, you know, enough is enough

9     honestly.  If she doesn't -- if she wants to sue the Miller firm,

10    she has a right to sue them.  And that's going to be that

11    situation.  I may get that case again in a malpractice format, but

12    I just can't -- I just honestly can't do this.  I can't be -- it's

13    not fair to anybody, including the court.

14         MS. OLDFATHER:  And she may be done, your Honor.

15         THE COURT:  This is not the only time.  I have made a

16    practice of not just doing it the first time, not the second time,

17    not even the third or the fourth time.  But after a period of time

18    I get nothing from anybody, I've just got to say good-bye.

19         MS. OLDFATHER:  I understand that, your Honor, but --

20         THE COURT:  I understand and thank you for standing up

21    for the people.  Anything else?

22         MS. OLDFATHER:  Well, Leslie Henry I think we are not

23    totally clear on.  Leslie Henry is the one whose attorney has

24    e-mailed both me and Ms. Wimberly this morning now that she's got

25    some contacts for case specific experts and has asked for the

1    additional 30 day period.  Is that Leslie Henry or Henry Leslie?

2                 THE COURT:  What is the one that has an attorney?

3                 MS. OLDFATHER:  Leslie Henry, it's the first one on the

4    order.  The attorney's name is Virginia Anello.

5                 MS. WIMBERLY:  At Douglas & London.

6                 THE COURT:  Let's be specific on this.  I am continuing

7    these at your request.  If I eventually dismiss them, they've got a

8    complaint against you now because you're standing up and telling me

9    you're speaking for them and asking me.  So not only does their

10   attorney have some responsibility, but you do too.  And so that's

11   got to be on the record, too.

12                MS. OLDFATHER:  I understand what your Honor is saying.

13                THE COURT:  I can't just have somebody stand up and say I

14   want to extend and have no consequences.  So you're going to have

15   some consequences when you do that.

16                MS. OLDFATHER:  Your Honor, I understand that.  I will

17   undertake to make sure that we get notice to these people about

18   what is happening.

19                MS. WIMBERLY:  Your Honor, that leaves two motions --

20                MS. OLDFATHER:  I am not clear on what the ruling is.

21                MS. WIMBERLY:  I was going to clear that up as well.

22   Your Honor, just because there seems to be a question about whether

23   Ms. Lewis is, in fact, represented, her prior counsel says they

24   withdrew, we don't believe there's a signed order, for purposes of

25   procedural clarity, why don't we just go ahead and roll all of the

1    ones in PTO 43, the third one, Record Document 24995, to the 29th

2    of April.  And failing -- if they get no report in by then, then we

3    will again ask.

4              THE COURT:  Okay.

5              MS. WIMBERLY:  That leaves two motions, one of which is a

6    motion for reconsideration; and the second of which, and perhaps

7    should be taken up first, are nine plaintiffs for whom

8    Ms. Oldfather has enrolled as counsel, and those are deferrals from

9    Merck's first and second renewed PTO 28 motions, Record Documents

10   24266 and 24269.  And Mr. Boehm is going to argue those.

11             MS. OLDFATHER:  Judge, do you want us to keep going?

12   You've been on the bench, we've gone through --

13             THE COURT:  We have to finish.  It doesn't matter.

14   That's why I get the big bucks.

15             MR. BOEHM:  Good afternoon, your Honor, Paul Boehm on

16   behalf of Merck.  You'll recall at last month's status conference

17   your Honor dismissed several cases for failure to comply with PTO

18   28.

19             THE COURT:  Which one are we on now?

20             MR. BOEHM:  Based on Record Documents 24266 and 24269.

21             THE COURT:  And which is the motion, fourth, third?

22             MS. WIMBERLY:  Your Honor, these were the first and

23   second renewed PTO 28 motions.

24             THE COURT:  I got it.

25             MS. WIMBERLY:  All of these clients were formerly

1    represented by Cellino & Barnes.

2              THE COURT:  I've got it.

3              MR. BOEHM:  Renewed first and second motion.

4              THE COURT:  Okay.

5              THE DEPUTY CLERK:  Your last name again?

6              MR. BOEHM:  B-O-E-H-M.

7              But for certain of those cases where Ms. Oldfather was

8    joining Cellino & Barnes as counsel, we agreed to extend the

9    deadline for compliance until March 18th from the last deadline

10   which was November 30th, 2009.  There were nine of these cases as

11   Ms. Wimberly mentioned.  Some of them have been voluntarily

12   dismissed, and if the court would like I could identify which

13   plaintiffs those are.

14             In some of those cases additional materials have been

15   provided by plaintiff's counsel, and we are assessing them against

16   the deficiencies to determine whether or not those deficiencies are

17   cured.  So we're not right now seeking dismissal of those.  There

18   are two of those cases.

19             There are three cases where significant material

20   deficiencies remain, and we are asking that the court dismiss those

21   three cases with prejudice.  The first is Myrtle Butterfield.

22             THE COURT:  Which one is that?

23             MR. BOEHM:  On which motion?

24             THE COURT:  No, I mean which number?  Six?  I'm sorry,

25   which exhibit?  Exhibit 6 -- Exhibit A, No. 6 is Myrtle

1    Butterfield.

2              MR. BOEHM:  Right.  And on your Honor's last order to

3    Exhibit A is that what your Honor is referencing?

4              THE COURT:  No, I was having Exhibit A attached to the

5    motion, the way I have is listed as item 6 on that motion, on that

6    exhibit.  Is that the one we're talking about?

7              MS. OLDFATHER:  I have it as Exhibit B, No. 3.

8              THE LAW CLERK:  Is it on the first or second renewed?

9              MR. BOEHM:  I'm sorry, give me one moment.

10             MS. OLDFATHER:  It's on the second.

11             THE COURT:  I have renewed --

12             MR. BOEHM:  Renewed first?  It's on Exhibit A to the

13   renewed motion, and on Exhibit A it's No. 6.

14             THE COURT:  That's what I had on the renewed motion,

15   Exhibit A, No. 6, that's what I said.

16             MR. BOEHM:  That's correct, your Honor.

17             And in that case the plaintiff's primary care physician

18   and prescriber of Vioxx, we have not received any records from that

19   physician, that's obviously material to the case and it's

20   impossible to formulate a defense without those records.

21   Plaintiff's counsel has informed us that they're simply unable to

22   secure these records.

23             Your Honor, to the extent these records in fact no longer

24   exist, we would submit that it's likely because it has been nearly

25   two years since the original deadline passed for compliance with

```
 1    PTO 28.

 2              THE COURT:  Are they still represented by Cellino &

 3    Barnes?

 4              MR. BOEHM:  They're represented both by Cellino & Barnes

 5    and Ms. Oldfather, I believe, if she has not already entered an

 6    appearance as cocounsel intends to do that.

 7              In this case we went back to look to see if

 8    Dr. Handlesman, who is the doctor I am referencing, had received a

 9    preservation request and we couldn't find even a record of that.

10    So if it exists, we don't have it, there is no record that they

11    ever sent that to the doctor as far as we know.  And that's also a

12    requirement of PTO 28 that they would send out preservation

13    requests.

14              So, your Honor, we would ask that this case be dismissed.

15              THE COURT:  All right.  What's your position,

16    Ms. Oldfather?

17              MS. OLDFATHER:  Your Honor, I haven't heard any of those

18    arguments before.  I thought that we were simply here to report

19    that we had complied and that the motion would be remanded.

20              Your Honor, we have filed as Document Number 37504

21    probably about the third set of compliances to Merck's PTO 28

22    issue.  On October 16th, 2009, Cellino & Barnes provided medical

23    records from Canton Potsdam Hospital, a Dr. Choong, a Dr. Libman, a

24    Dr. Nordberg, a returned correspondence from one doctor that was

25    undeliverable, another correspondence from Dr. Thakur that there
```

1    were no records, correspondence from one of Merck's other target

2    physicians, Joan McElwain, indicating that the plaintiff was not

3    their patient, and pharmacy records from Health Direct, Kinney

4    Drugs and Rite Aid.

5              THE COURT:  Is this all on Myrtle Butterfield?

6              MS. OLDFATHER:  Yes, your Honor.  I am not even started,

7    I could keep going because we did another --

8              THE COURT:  What's the problem there, counsel, from that

9    standpoint?  You want some record?

10             MR. BOEHM:  Your Honor, there's no question that some

11   records have been provided in the case.  The point is that there

12   are significant material records that have not been provided.  In

13   this case it's the plaintiff's prescriber and primary care

14   physician.

15             THE COURT:  You may have a point, but the question of

16   dismissing it, I don't see dismissing it on that basis.  I mean, if

17   they haven't responded at all and keep dodging you and we keep

18   sending them material, I understand dismissing the case because

19   they obviously don't want to pursue it.

20             But if they're giving you some material and you want

21   more, I feel uncomfortable dismissing a case where you've gotten

22   that much material.  If they can't prove their case, they can't

23   prove their case.  But I can't dismiss it if you've gotten that

24   much material on it, it just doesn't seem right.

25             I may carve it out or something and deal with it in some

1    way, but just a dismissal.  I just feel differently about somebody

2    who doesn't even respond, doesn't take the opportunity to fill in

3    any forms, doesn't send it back to you and notwithstanding constant

4    urging, but I think this is a little different than that type case.

5            MR. BOEHM:  Certainly there is that distinction, and your

6    Honor, we're certainly not alleging that nothing at all has been

7    turned over by the plaintiffs in these cases, some things have been

8    provided, and Ms. Oldfather just rattled off a list of several

9    physicians, all of whom are minor characters in this case.  What we

10   really need is to have the prescriber and the primary care

11   physician's records.

12           THE COURT:  Suppose there is none, there is none, you

13   can't get it.

14           MR. BOEHM:  Your Honor, that's what I was getting at, it

15   looks like it may be the case that this prescriber and primary care

16   physician, arguably the most important doctor in the case, may not

17   have ever been sent a preservation requirement notice.

18           THE COURT:  I take that point.  But isn't that then,

19   doesn't that doom the plaintiff's case at a later stage when they

20   can't prove their case?

21           MR. BOEHM:  It may be, your Honor, we're just operating

22   right now under the terms of PTO 28, which have required that these

23   materials --

24           THE COURT:  I understand but I think this is a little

25   different.  But I don't know where we go with this because if I get

```
 1    give her another 30 days and they still don't do it, what do I do
 2    with it?
 3              MS. OLDFATHER:  Please don't give us another 30 days,
 4    Judge.  We think on dismissal we have fully complied.  I didn't
 5    even get to what we sent them on March 16th.  If there are issues
 6    that they think that we have not complied with, Mr. Boehm -- this
 7    is the first time we've met, we corresponded by letter -- but if
 8    Mr. Boehm will send me a letter, we will certainly get responsive
 9    information back to them, your Honor.
10              There nine plaintiffs that are left.  The Exhibit A that
11    you're looking at, Judge, was the first motion, we're really down
12    to the second motion.  On Exhibit B to the second motion --
13              THE COURT:  Wait, wait.  Let me get that.
14              MS. OLDFATHER:  Exhibit B to the second motion, there are
15    four of these folks that we have done a PTO 28 compliance on,
16    tantamount to what I just rattled through on Ms. Butterfield.  We
17    did it in October, we did it again on March 16th, we sent them a CD
18    with all of these records, they've gotten a Lone Pine report,
19    that's No. 2, Louise Amiss, which is also the D'Angelo case; No. 3,
20    we were just talking about, Myrtle Butterfield; No. 6, Judith Eddy;
21    and No. 9, James Reilly.
22              Because we just sent all of this to Mr. Boehm last week,
23    there may be holes, there may be specific things that he wants and
24    we will continue to work.
25              MR. BOEHM:  Your Honor, we've already reviewed the
```

```
 1    material she sent and they were precisely the same materials that

 2    we already had.

 3            THE COURT:  If I do pass these, let's take their

 4    depositions immediately.  Are you going to represent them at the

 5    depositions?

 6            MS. OLDFATHER:  I am, your Honor.  And I have to go to

 7    their depositions because they're people I represent, I don't think

 8    that's the problem.

 9            THE COURT:  I'll pass them, but let's put them on a

10    deposition list and start taking their depositions.  They may have

11    complied all the way with it, so I'll deny the motion at this time

12    with the understanding that within 60 days you take the

13    depositions.

14            MS. OLDFATHER:  Of these plaintiffs?

15            THE COURT:  Of these plaintiffs.

16            MS. OLDFATHER:  All right, your Honor.

17            The only other person on this list that I wanted to

18    mention is John Carroll, No. 4.  I have not yet appeared in that

19    case, the Cellino & Barnes attorneys have not been able to locate

20    him, and they were trying to advise him of this motion.  And I

21    believe they've given voluntarily dismissals on No. 1, No. 5, No. 7

22    and No 8.  So we are trying to help the court make progress.

23            THE COURT:  I understand.  But I've just got to move the

24    cases, so if we're going to take them off the list, we've got to

25    start discovery.  So let's start specific discovery, take the
```

1    depositions on all of their stuff and we'll take them and then

2    those -- when they're finished with discovery, let me know and

3    we'll start trying the cases.

4              Okay.  Thank you very much.

5              MS. OLDFATHER:  Your Honor, we have one other motion and

6    my plane leaves in about an hour, I might still get it, I would

7    love to pass the motion until next week.

8              MR. BOEHM:  Is this the Carver motion?

9              MS. OLDFATHER:  Yes.

10             MR. BOEHM:  I don't anticipate this will take more than a

11   minute from my perspective.

12             THE COURT:  All right.

13             MS. OLDFATHER:  I am just making a request to see if I

14   could still make my flight, but if that's not --

15             THE COURT:  I can do it on the phone if we need to.

16             MR. MARVIN:  We'll just wait.

17             MS. OLDFATHER:  Are we going to pass it?

18             THE COURT:  Pass it.  And get to me, we'll do it on the

19   phone so that I don't wait.

20             MS. OLDFATHER:  Judge, we can be back on the 29th on that

21   or whatever is fine.

22             THE COURT:  Either way, you all get to me and let me know

23   when you want to do it.

24             Okay.  The court will stand in recess.

25             THE DEPUTY CLERK:  Everyone rise.

1        (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

2

3                      *  *  *  *  *  *

4

5                    REPORTER'S CERTIFICATE

6

7      I, Karen A. Ibos, CCR, Official Court Reporter, United States

8    District Court, Eastern District of Louisiana, do hereby certify

9    that the foregoing is a true and correct transcript, to the best of

10   my ability and understanding, from the record of the proceedings in

11   the above-entitled and numbered matter.

12

13

14   _____

15                    Karen A. Ibos, CCR, RPR, CRR

16                    Official Court Reporter

17

18

19

20

21

22

23

24

25