1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF LOUISIANA
2

3    ******************************************************************

4    IN RE:  VIOXX PRODUCTS
     LIABILITY LITIGATION
5
                              MDL DOCKET NO. 1657
6                             NEW ORLEANS, LOUISIANA
                              THURSDAY, JUNE 3, 2010, 9:00 A.M.
7

     THIS DOCUMENT RELATES TO:
8

             ALL CASES
9

10   ******************************************************************

11            TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS
           HEARD BEFORE THE HONORABLE ELDON E. FALLON
12                 UNITED STATES DISTRICT JUDGE

13
     APPEARANCES:
14

15   FOR THE PLAINTIFFS:     HERMAN HERMAN KATZ & COTLAR
                             BY:  LEONARD A. DAVIS, ESQUIRE
16                           820 O'KEEFE AVENUE
                             NEW ORLEANS, LA 70113
17

18                           BEASLEY ALLEN CROW METHVIN
                             PORTIS & MILES
19                           BY:  ANDY D. BIRCHFIELD, JR., ESQUIRE
                                  P. LEIGH O'DELL, ESQUIRE
20                           234 COMMERCE STREET
                             POST OFFICE BOX 4160
21                           MONTGOMERY, AL 36103

22
                             LEVIN, FISHBEIN, SEDRAN & BERMAN
23                           BY:  ARNOLD LEVIN, ESQUIRE
                                  FRED S. LONGER, ESQUIRE
24                           510 WALNUT STREET, SUITE 500
                             PHILADELPHIA, PENNSYLVANIA 19106
25

```
 1   APPEARANCES CONTINUED:

 2

 3                          SEEGER WEISS
                            BY:  CHRISTOPHER A. SEEGER, ESQUIRE
 4                          ONE WILLIAM STREET
                            NEW YORK, NY 10004
 5

 6                          GAINSBURGH BENJAMIN DAVID MEUNIER AND
                            WARSHAUER
 7                          BY:  GERALD E. MEUNIER, ESQUIRE
                            2800 ENERGY CENTRE
 8                          1100 POYDRAS STREET, SUITE 2800
                            NEW ORLEANS, LA  70163
 9

10                          BLIZZARD MCCARTHY & NABERS
                            BY:  EDWARD BLIZZARD, ESQUIRE
11                          LYRIC CENTRE BUILDING
                            440 LOUISIANA, SUITE 1710
12                          HOUSTON, TX  77002

13
                            RANIER GAYLE & ELLIOT
14                          BY:  DREW A. RANIER, ESQUIRE
                            1419 RYAN STREET
15                          POST OFFICE BOX 1890
                            LAKE CHARLES, LA 70602
16

17                          OLDFATHER LAW FIRM
                            BY:  ANN B. OLDFATHER, ESQUIRE
18                          1330 SOUTH THIRD STREET
                            LOUISVILLE, KY  40208
19

20

21   FOR THE DEFENDANTS:    WILLIAMS & CONNOLLY
                            BY:  DOUGLAS R. MARVIN, ESQUIRE
22                               PAUL E. BOEHM, ESQUIRE
                            725 TWELFTH STREET, N.W.
23                          WASHINGTON, DC  20005

24

25
```

1  APPEARANCES CONTINUED:

2

3                                  STONE PIGMAN WALTHER WITTMANN
                                   BY:  DOROTHY H. WIMBERLY, ESQUIRE
4                                  546 CARONDELET STREET
                                   NEW ORLEANS, LA 70130
5

6                                  O'MELVENY & MYERS
                                   BY:  BRIAN C. ANDERSON, ESQUIRE
7                                  1625 EYE STREET
                                   WASHINGTON, DC  20006
8

9                                  SKADDEN ARPS SLATE MEAGHER & FLOM
                                   BY:  JOHN H. BEISNER, ESQUIRE
10                                 1440 NEW YOUR AVENUE NW
                                   WASHINGTON, DC  20005
11

12
   REPRESENTING THE STATE
13 OF LOUISIANA:                   MURRAY LAW FIRM
                                   BY:  JAMES R. DUGAN, II, ESQUIRE
14                                 650 POYDRAS STREET, SUITE 2150
                                   NEW ORLEANS, LA 70130
15

16
   REPRESENTING THE STATE
17 OF FLORIDA:                     OFFICE OF THE ATTORNEY GENERAL
                                   STATE OF FLORIDA
18                                 OFFICE OF THE ATTORNEY GENERAL
                                   SPECIAL COUNSEL
19                                 BY:  JAMES D. YOUNG, ESQUIRE
                                   1300 RIVERPLACE BLVD, SUITE 405
20                                 JACKSONVILLE, FLORIDA 32207

21

22 STATE LIAISON COUNSEL:          BARRIOS, KINGSDORF & CASTIEX
                                   BY:  DAWN BARRIOS, ESQUIRE
23                                 701 POYDRAS STREET, SUITE 3650
                                   NEW ORLEANS, LA 70139
24

25

```
 1   APPEARANCES CONTINUED:

 2

 3   PRO SE CURATOR:            LAW OFFICES OF ROBERT M. JOHNSTON
                               BY:  ROBERT M. JOHNSTON
 4                             400 POYDRAS STREET, SUITE 2450
                               NEW ORLEANS, LA  70130
 5

 6
     FOR THE GOVERNMENT
 7   ACTIONS EXECUTIVE
     COMMITTEE:                LIEFF CABRASER HEIMANN & BERNSTEIN
 8                             BY:  ELIZABETH J. CABRASER, ESQUIRE
                               EMBARCADERO CENTER WEST
 9                             275 BATTERY STREET, SUITE 3000
                               SAN FRANCISCO, CA 94111
10

11
     FOR THE CLAIMS
12   ADMINISTRATOR:            BROWN GREER
                               BY:  LYNN C. GREER, ESQUIRE
13                                  ORRAN BROWN, ESQUIRE
                               115 SOUTH 15TH STREET
14                             SUITE 400
                               RICHMOND, VA  23219
15

16
     FOR THE LIEN RESOLUTION
17   ADMINISTRATOR:            THE GARRETSON LAW FIRM
                               BY:  MATT GARRETSON, ESQUIRE
18                             7775 COOPER ROAD
                               CINCINNATI, OH  45242
19

20

21   SPECIAL MASTER:           JUNEAU DAVID
                               BY:  PATRICK A. JUNEAU, ESQUIRE
22                             THE HARDING CENTER
                               1018 HARDING STREET, SUITE 202
23                             P.O. DRAWER 51268
                               LAFAYETTE, LA  70505
24

25
```

```
 1   APPEARANCES CONTINUED:

 2

 3   ALSO PRESENT:          EBEN FLASTER, ESQUIRE
                           TIMOTHY HOWARD, ESQUIRE
 4                         PERRY WEITZ, ESQUIRE
                           THOMAS GIRARDI, ESQUIRE
 5

 6

 7   OFFICIAL COURT REPORTER:     CATHY PEPPER, CCR, RPR, CRR
                                  500 POYDRAS STREET, ROOM B406
 8                                NEW ORLEANS, LOUISIANA 70130
                                  (504) 589-7779
 9
     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
10   PRODUCED BY COMPUTER.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          **I N D E X**

2

3   AGENDA ITEMS                                          PAGE

4

5   SETTLEMENT AGREEMENT...................................  8

6   THE VIOXX SETTLEMENT PROGRAM..........................  9

7   LIEN RESOLUTION ADMINISTRATOR......................... 18

8   SPECIAL MASTER........................................ 27

9   CLASS ACTIONS......................................... 29

10  STATE/FEDERAL COORDINATION............................ 32

11  *PRO SE* CLAIMANTS...................................... 33

12  THE PSC MDL TRIAL PACKAGE............................. 35

13  GOVERNMENTAL ACTION................................... 35

14  PENDING PERSONAL INJURIES............................. 36

15  FEE ALLOCATION COMMITTEE.............................. 36

16  MERCK'S MOTIONS AND RULES ON PTO...................... 36

17  APPEALS............................................... 36

18  OTHER MOTIONS......................................... 36

19  ATTORNEY'S FEES....................................... 36

20  PENDING PERSONAL INJURY............................... 36

21  THIRD-PARTY PAYOR SETTLEMENT.......................... 37

22  THE NEXT STATUS CONFERENCE WILL BE ON JULY 27TH....... 37

23

24

25

1                        **P-R-O-C-E-E-D-I-N-G-S**

2                    THURSDAY, JUNE 3, 2010

3               M O R N I N G     S E S S I O N

4                    (COURT CALLED TO ORDER)

5

6

7          THE DEPUTY CLERK:  Everyone rise.

8          THE COURT:  Be seated, please.  Good morning, ladies and

9    gentlemen.  Call the case, please.

10         THE DEPUTY CLERK:  MDL Number 1657, *In re: Vioxx.*

11         THE COURT:  Counsel, make your appearances for the

12   record.

13         MR. BIRCHFIELD:  Good morning, Your Honor.

14   Andy Birchfield on behalf of the PSC.  Mr. Herman could not be

15   here today, so Mr. Seeger and I will be covering the agenda on

16   behalf of the PSC.

17         THE COURT:  All right.

18         MR. MARVIN:  Good morning, Your Honor.  Douglas Marvin

19   for Merck.

20         THE COURT:  We're here today for our monthly status

21   conference.  I have a number of people on the phone, so please

22   use the mic if you're going to address the Court.

23             I met with the liaison and lead counsel previous to

24   this meeting and discussed with them the agenda.  I'll take it in

25   the order submitted.

1           Settlement agreement.  Any report on the settlement

2    agreement?

3           MR. BIRCHFIELD:  Yes, Your Honor, we're very pleased to

4    announce that we are on track.  The final payments for the stroke

5    claims will be made, and BrownGreer is going to come and give us

6    the details on that.  The extraordinary injury fund will also be

7    paid out this month, so we are thrilled to be at this place and

8    to be on schedule, which is remarkable.

9           BrownGreer, Orran Brown and Lynn Greer, are

10   prepared to come and give us a report on the settlement program,

11   but as they come, if I could, just for a moment, I understand

12   that tomorrow will be Jared Barnes' last day with the Court, and

13   I regret that Russ is not here to send him off with a

14   Shakespearean quote or a vignette from Greek mythology, but I

15   would like to express our sincere appreciation.  Hopefully Jared

16   is listening in.  I know he has a lot to wrap up.  He has done

17   remarkable work.  He is a skilled lawyer, and on behalf of the

18   PSC and, I am sure, the parties, we wish him the very best as he

19   travels to Boston to begin his legal career and practice of law.

20          THE COURT:  Thank you very much.  He has indeed done

21   yeoman work and the Court appreciates it.  You folks wore out

22   another law clerk of mine.

23          The problem oftentimes I have with these cases is

24   that I change clerks every year, and so I don't have the

25   institutional memory that would be helpful, but they get up to

1    speed very fast, and they do excellent work, and Jared is a lead

2    among them.

3              So while Lynn is approaching the podium, I do take

4    the opportunity to thank and recognize all of the work of the

5    lawyers, as well as the claims administrator in this particular

6    case.  It's remarkable that you folks have been able to work out

7    this matter in such a short time.  There are other less-numbered

8    cases that have taken years and years to work out, and this is a

9    tribute to the lawyers and the administrative staff that worked

10   on this case to really resolve it.  It's been good for the

11   litigants, good for the lawyers and good for the system.  So let

12   me hear from Lynn about the Vioxx Settlement Program.

13             MS. GREER:  Good morning, Your Honor.  Lynn Greer.  I'm

14   with BrownGreer, the claims administrator in this case.

15   Orran Brown is also here.  It's has been our privilege to work on

16   this case, and it's been wonderful to see the collaborative

17   effort between all of the parties involved, and we really

18   appreciate, Your Honor, your guidance and your support throughout

19   this process.

20             As Mr. Birchfield said, we are on tract, and what I

21   would like to do is give a very brief report today on the

22   payments that we have made so far on the stroke claims and to

23   preview for the Court the numbers that we will be paying over the

24   next two weeks, and to then, in my part of the presentation, with

25   the timeline for when payments are going to go out and then to

1   give the range of what the final stroke point value will be.

2            Your Honor, through May -- we paid additional

3   stroke claims last week, and through May we have paid a total of

4   11,353 stroke claimants over $300 million.  10,583 of those

5   claimants received the 40 percent interim payment.  Those are

6   claimants who stand in line for the 60 percent balance when we

7   make the final payment.  That total has been over 297 million.

8            There have been 770 special marker claimants, and

9   Your Honor will recall that these are claimants with stroke point

10   values of less than 2 points.  These have received 5,000 fixed

11   payments.  So the total, again, has been over $301 million paid

12   to date.

13            There are another 1,091 claimants who will be paid

14   this month; 926 of those are those who were mostly just enrolled

15   claimants, not eligible for an interim payment but those who will

16   receive the full final payment when that is made.  Another 138

17   special marker claimants will receive the 5,000 fixed payment,

18   and there are 27 claimants, Your Honor, who are in special

19   review.  These are claimants who received the special marker

20   points designation, elected not to receive the $5,000 fixed

21   payment.  Instead, they will be reviewed as a group by the

22   Special Master, and the settlement agreement dictates that the

23   average for the special review claimants after all is said and

24   done will be 0.5 points.  We are able to set that amount aside

25   and go ahead and proceed with the final payment.  Special Master

1    Juneau will decide those later this month.  So when all is said

2    and done, it appears that there will be 12,444 stroke claimants

3    that will be paid in this program.

4              This next slide is one that we've showed each

5    month.  These are the average points by injury level for stroke

6    claimants.  It shows that level one has an average of 65.22

7    points; level two, 99.04 points; level three, 72.23 points; level

8    four, 44.28 points; and level 5, 29.19 points.  The special

9    marker percentage is 7.46 percent.

10              Your Honor, when we come back in July, we intend to

11   make a summary report that will provide comparative information

12   between the heart attack and the stroke claimants and we'll

13   provide more detail on the injury breakdowns.

14              So the final payment, we are on track.  Last month

15   we predicted and hoped that we would be able to have U.S. Bank

16   make the payments on Monday, June 14th, and that will occur.  So

17   that is a week from this coming Monday.  The payments will

18   actually be issued by U.S. Bank.  What that means is that most of

19   these payments go by wire transfer directly to the firms, so the

20   wire transfers will start going out that morning.  The firms

21   should not be alarmed if the funds have not hit the account by

22   noon.  Sometimes it takes the balance of the day as these wires

23   get transmitted to the firms.

24              The unrepresented checks are handled a little bit

25   differently.  These are checks, obviously not wire transfers, and

1   what we learned when we made the MI final payment is that it was

2   best for those checks to come to us.  The reason is that we need

3   to make sure that all of the derivative claimants are on the

4   check and that *pro se* claimants do not face delays when they go

5   to present the checks to a bank.  We had several instances where

6   banks were quibbling because there was a semicolon and not a

7   comma separating the names, that kind of thing.  So we want to

8   make sure that by the time the unrepresented claimant gets the

9   check that it sails through with no problem.

10                  The claimants in special review that Special Master

11  Juneau will review, they will receive their payment in July

12  because those will not be decided until the end of this month.

13                  Your Honor, we are able to predict that the I.S.

14  point value will be somewhere between $1,828 and $1,833 per

15  point.  The amount that we have been using for interim payments

16  is actually 1,810, so this is higher than that.

17                  We are not able to take this to the penny today.

18  We are still having the dust settle.  A lot of reconciliation is

19  taking place, but within the next several days we will send an

20  e-mail blast to everyone that allows them to calculate the funds

21  per claimant to the penny.

22                  Unless Your Honor has any further questions, Orran

23  will now talk about ordinary injury.

24                  THE COURT:  Thanks for your help on this.  Orran.

25                  MR. BROWN:  Good morning, Your Honor, Orran Brown, and

I'm delighted to be here to report on the status of the second part of the program that we are now finishing, the extraordinary injury program.  What we want to talk about today are where we stand on the processing of these claims because we are on the cusp of finality in all extraordinary injury claims as well.  We will review in our summary report next month the dollars that we have found awardable on extraordinary injury claims and how those funds are being distributed.

Today we want to look at where we are in the processing of these claims by injury type.  This slide shows us the medical expenses claims.  These are folks who are claiming past medical expenses, which is the past med as indicated on this slide.  AED or, additional extraordinary damages, medical expenses for the future, and we had relatively few numbers of these claims.  The 298 claims that we had, what we found in the program was that, I think a lot of these claimants in this program had insurance or they had Medicare or are paying their medical expenses, so we did not have a lot of these folks seeking payments for their medical expenses, and they had to have more than 250,000 medical expenses unreimbursed out of pocket to qualify.  So we had a relatively low number of claims, and the key takeaways from here is that we have finished the processing of these claims.  You see the zeros in here, where we have, all of them have been through our processes, have been through the second review, which is where claimants could ask us to take a

1    second look at it.

2                    For those that appealed, the 13 indicates here that

3    we have 13 appeals of the medical expense, past medical expenses

4    and the Special Master, Mr. Juneau has decided all 13 of them.

5                    There were 11 claims that were appealed on the

6    future medical expenses; all 11 of them have been decided as

7    well.

8                    And on this slide, and the next couple of slides,

9    we're looking at claims, because an individual claimant could

10   have more than one of these past med, future med, lost wages,

11   future lost wages and even special medical injury.  This is where

12   we are on the medical expenses.  With the zeros again telling us

13   that we have concluded the processing of all of these claims.

14                   Now, let's turn to the lost wages component.

15   Again, claimants could submit materials showing that they had

16   lost income as a result of their heart attack or stroke, and if

17   they were $250,000 or more in past lost wages, then they could

18   qualify for extraordinary injury payments.  We received 848

19   claimants who were submitting claims of that type.  Again, this

20   is where they show us in the process.

21                   We have reviewed all of them ourselves.  There is

22   none left for us to review.  In the second review process there

23   is none left for us to do.  There were 66 claims appealed to the

24   Special Master of this type of lost wages, and the numbers in the

25   parentheticals show us that the Special Master has ruled on every

1  one of those appeals.  None left to be decided at the Special

2  Master level so these are all finished as well in the processing.

3         The AED is the future people claiming lost wages

4  after the date of the settlement agreement.  We had 429 of those

5  such claims, and, again, our zeros show us that we have finished

6  all the processing of those.  The Special Master got 31 of these

7  appeals and has decided all 31 of those as well.

8         The last part of the, the last type of

9  extraordinary injury claim or special medical injury people

10  claiming an injury not reflected on the underlying heart attack

11  or stroke injury grids or gate criteria, we had the larger,

12  largest number of claims of this type submitted in the

13  extraordinary injury program, the 1,674 claims.  We have been

14  through all of those claims ourselves, reviewed them all

15  carefully.  There are none left for us to review.  The second

16  review, 721 claims chose a second review from our system.  Of

17  them, we have finished them all, and we had 47 of those claimants

18  who appealed to the Special Master.  Again, the 47 in the

19  parenthesis shows us that all of those have been decided as well.

20  So we have finished the processing of all of the special medical

21  injury claims as well.

22         This slide takes us back to people.  These are

23  claimants, we had 2,331 claimants who submitted claims for the

24  extraordinary injury program.  All of these have been processed.

25  We ended up with a total of 99 appeals.  After all of our

1   reviews, our first reviews, our second reviews, a total of 99

2   appeals that went to Special Master Juneau.  He has issued his

3   decisions to us on all 99 of them.  We are now taking all that

4   information from our own reviews and the Special Master's

5   reviews, making sure we've got all the data correct, making sure

6   we know how the payments are going to work out, and we'll able to

7   announce and describe to the Court in our summary report next

8   month exactly what these claims numbers translated into in terms

9   of dollars paid.

10              The last slide we want to look at is our timeline

11  for the EI payments.  Because, as Mr. Birchfield mentioned, we

12  are on track because of the work that we and the claimants and

13  their counsel have done, we're on track to make payments in the

14  EI program.

15          THE COURT:  Wait just a minute.

16          MR. BROWN:  Is that something I did, Your Honor?

17          THE COURT:  No.

18          MR. BROWN:  I thought maybe it was the arrows.  By the

19  way, I would like to see Mr. Garretson or Mr. Juneau do that.

20          THE COURT:  You were getting too complicated, Orran.

21  They set that off for you to interrupt you.

22          MR. BROWN:  I'll consider that a career accomplishment,

23  Your Honor.

24          THE COURT:  Thank you, marshals.

25          MR. BROWN:  What this slide is showing us, Your Honor,

1  that we are on track to make these extraordinary injury payments

2  by the end of this month, by June 30.  They will trail behind the

3  I.S. payments because with all the work that the escrow agent and

4  we and the lien resolution administrator, Mr. Garretson, have to

5  do to make those payments happen, as Lynn showed, by June 14th or

6  thereabouts, we have to plug these in following it.  But they

7  will be made by June 30th on all of the extraordinary injury

8  claims that have been found eligible.

9          And we had shown this slide last time we were here

10  on April 29th, with the last possible appeal that someone could

11  take to the Special Master falling on June 2nd, yesterday.  Of

12  the 99 appeals we received, it took a lot of work by the

13  Special Master and his staff, including over the Memorial Day

14  weekend, to get those things ruled on.  We received one appeal on

15  the last day, yesterday, the 20 days to review, second review

16  request, 20 days to do the appeal request, the firm took the full

17  time, so we didn't get that appeal until yesterday.  It was all

18  ready for the Special Master to review.  We posted it immediately

19  on his portal, he was able to look at it immediately and finish

20  that appeal last night.

21          And so we were able to say today that all of the

22  extraordinary injury payments, claims are finished, and all of

23  the appeals from the Special Master's office have been decided,

24  and that keeps us on track to be able to make these payments on

25  June 30th.

```
 1          THE COURT:  That's great.  Orran, thanks a lot for your
 2   work on it.  It takes a lot of effort, as we all know, and a lot
 3   of folks working on it.  You all have done a great job.
 4          MR. BROWN:  Thank you, Your Honor.  It's been a real
 5   pleasure and privilege to work on this matter, as Lynn mentioned,
 6   with all of the parties and the Court involved.
 7          THE COURT:  Let's hear from the lien administrator.
 8          MR. BIRCHFIELD:  Yes, Your Honor, Matt Garretson with
 9   the Garretson Law Firm here to report.
10          MR. GARRETSON:  Orran, I'm going to give my entire
11   presentation from my iPad.  Actually I am going to use this.
12          THE COURT:  Okay.  Let us fix it up for you.
13               Just in case, Matt?
14          MR. GARRETSON:  Just in case I had any difficulty with
15   my iPad.
16               Thank you, Your Honor.  I'm Matt Garretson.  I'm
17   here to report as the lien resolution administrator, and very
18   consistent with previous status reports, I'm going to first speak
19   to the governmental liens and then move on to the private lien
20   resolution program.
21          THE COURT:  Okay.
22          MR. GARRETSON:  At the time of the last hearing, we were
23   unable to have a lot of finalized ischemic stroke liens due to
24   the nature of the timing of the final awards.  I'm going to
25   highlight the progress we've made there with the help of the
```

1  claims administrator today, and I'll have more on that

2  momentarily.

3            I'm also pleased to report that the majority of the

4  Medicare and Medicaid obligations have been finalized now and

5  posted to the claims administrator's web portal.  I do want to

6  point out there is some lagging cases that we're still working

7  hard to complete, and over the next weeks I'll report to the

8  Court the final, what we will call the floor-sweeping issues that

9  we need, may need the Court's assistance on to resolve to wrap up

10 contemporaneous with the claims administrator's work.

11           So with respect to the governmental liens, on the

12 top left of the chart there, you see that we're 96.2 percent of

13 the way complete with the myocardial infarction cases.  The

14 remaining 3.8 percent, which is very similar to the number I

15 reported last status hearing, are due to entitlement

16 discrepancies where we still have discrepancies in the reported

17 Social Security number, and we're working continually with the

18 claims administrator and the plaintiffs' counsel to resolve

19 those, but that may be an issue where we just have to seek the

20 Court's assistance to conclude this program.

21           260 of those are Medicare global redeterminations,

22 and I've brought this issue to the Court's attention in past

23 hearings.  We have a group of claims that have a $10,000 award

24 that we believe the Medicare, in hindsight, the Medicare

25 redetermination or the Medicare amount that would be applied to

1    those cases is too high relative to how other cases have been

2    impacted.

3              We have a program in place for the special marker

4    claims, which has a *de minimis* payment to Medicare, but there is

5    a gap between cases that just exceed that amount and cases that

6    have a higher value.

7              We are working hard with Medicare to resolve that,

8    and I expect to have that resolved by the next status hearing.

9              With respect to Medicaid in the myocardial

10   infarction cases, we are 99.1 percent complete.  We only have 46

11   outstanding obligations, and we have all of those in front of the

12   agencies, the Medicaid agencies, waiting for their approval.

13             My hope is we'll have those resolved before the

14   next hearing as well.

15             THE COURT:  And the 4,857, is that what it is?

16             MR. GARRETSON:  Yes, Your Honor.

17             With respect to the other governmental liens, I've

18   spoke ad nauseam about that issue at the prior status hearings.

19   I believe we've pushed these as far as we can.  The governmental

20   agencies, the VA, Tricare, Indian Health Services, unlike

21   Medicare or Medicaid, they are not centralized.  They have to

22   pull records from the individual treating facilities, and we

23   pushed them, as, I believe, hard as we can and we're going to

24   need the Court's assistance to close those out.

25             THE COURT:  Okay.

1      MR. GARRETSON:  Now, to the top right, we have the
2  ischemic stroke cases.  Your Honor, similar to the myocardial
3  infarction cases, we're 98.3 percent of the way done with
4  Medicare.  We have about 600 cases outstanding that we expect to
5  make great progress on over the next month.  436 of the
6  unfinalized Medicare cases really are, that's that group I've
7  just spoken about that impacts myocardial infarction as well.  We
8  have a number for them.  We could consider them complete but we
9  still believe that the number is too high relative to how other
10 cases have been impacted by the Medicare global reimbursement.
11 That's the issue we hope to push with Medicare before the next
12 status hearing.

13      The remaining unfinalized Medicare cases in the
14 ischemic stroke category, there is about 177 and these are the
15 Social Security discrepancies.  Again, as we come to the end of
16 the program, I would ask counsel that is impacted by this to try
17 to get the correct Social from their client, and if it can't be
18 done, again, we need to seek some assistance from the Court.  All
19 of this I'll outline for the Court in the coming weeks in the
20 form of a memorandum.

21      THE COURT:  Okay.  That's what you need to do, Matt.
22 You need to give me all of the outstanding issues, and then I'll
23 look to you for some suggestions as to how we prioritize those
24 issues or whether we take them all at once or whether we
25 prioritize them and deal with them one at a time.  But we need to

1   know what they are and who are the players so that I can get

2   everybody in and deal with it.

3            MR. GARRETSON:  I agree and thank you, Your Honor.

4            THE COURT:  Okay.

5            MR. GARRETSON:  With respect to the ischemic stroke

6   Medicaid claims, we're 82.8 percent of the way complete.  We've

7   moved the mark quite a bit since the last status hearing.  We

8   were at 45 percent complete at the last hearing.  Medicaid being

9   different than Medicare in the fact that we're not doing a global

10  redetermination, rather, we're pulling actual claims files in

11  order to lock down the Medicaid numbers.  We had to know the

12  final award amounts.

13           So we've made great progress over the last status

14  hearing.  We're down to 664 claimants that we're still working to

15  resolve.  I expect the bulk of those to be resolved in the next

16  few weeks, as we've got our audited numbers back in front of the

17  agencies and we're awaiting their approval.

18           The same issues with other governmental liens that

19  I've just discussed with respect to myocardial infarction.

20           With respect to extraordinary injuries, I don't

21  need to repeat what we spoke about at the last status hearing,

22  but we did determine that nearly every one of the claimants that

23  has an extraordinary injury claim has a Medicare or Medicaid

24  entitlement.  So we will be working hard to ensure that any new

25  liens created are with respect to the injuries that are impacting

1   the extraordinary nature of their award and not due to injuries

2   that we've already repaid a lien on.

3          Now I'll shift just to conclude to the Vioxx

4   private lien resolution program.  I'm going to speak in terms of

5   the waves of data we originally sent out.  There is five waves of

6   data sent to 477 plans.  When I speak of waves of data, it's

7   claimant information on 22,381 claimants that voluntarily chose

8   to participate in the program.

9          The first three waves were the claimants that

10  signed up in the initial stages, and then there was the PTOs that

11  extended the window, and there is about 1,200 claimants that were

12  in the fourth and fifth wave, and I'll speak about that in a

13  moment.

14         But with respect to waves one through three, the

15  bulk of the claims, we had 16,917 claimants, as you see up there,

16  that were, that actually were getting an award.  They were

17  eligible to receive a settlement, and so we matched those with

18  the 477 participating plans.  5,488 of the MI claimants had a

19  private lien obligation.  We have secured the claims for a

20  hundred percent of those that are eligible to receive a

21  settlement, and I'm pleased to report that we are complete with a

22  hundred percent, complete with the audit of a hundred percent of

23  those myocardial infarction plaintiffs.

24         The balance of those, there is only 21 that are

25  outstanding, and we expect to finalize those next week in a

1   meeting we're having with the participating plans to wrap up

2   outstanding issues.

3          With respect to the I.S. category of claimants, you

4   see on the bottom right-hand box, we have also completed a

5   hundred percent of the audit of those claimants.  Again, this is

6   just for the bulk of the waves one through three in terms of

7   data, but we've completed a hundred percent of our audits.  We

8   moved the meter considerably since the last hearing.  We have

9   55 percent of those approved and 49 percent finalized.  The

10  discrepancy is the approved, our approved amount is posted on the

11  web portal and counsel has 10 days to appeal it, and so we're

12  just, that's the, we're waiting for those 10 days to expire and

13  then we'll have 55 percent complete.  That meter has moved up

14  from 13 percent at the last hearing.

15         Again, we're having a meeting next week where we

16  anticipate resolving the remaining cases.

17         So Your Honor, there is really only a few issues

18  that I can abbreviate here.  I will, as you suggested, prepare a

19  memorandum that outlines them in greater detail.  But with

20  respect to the private lien resolution program, the only issues

21  we have to work through now, and we'll do this in a meeting next

22  week, are the impact of various states' antisubrogation statutes

23  on any outstanding liens.

24         We have a plan language review that we're doing for

25  liens that exceed $50,000, and we have several plans that have

1    submitted claims for the same claimant, which, obviously, is a

2    discrepancy that needs to be resolved.

3              These final issues impact about 1,200 claimants.

4    Now, those claimants aren't being held.  We have a holdback in

5    place of that 15 percent, so money will move for these claimants,

6    but I want the Court to understand, and of course everyone

7    participating here today, that there are about 1,200 of these

8    claimants that we still have got to finalize remaining issues on.

9         THE COURT:  In that regard, are those the ones that we

10   are doing samplings to deal with --

11        MR. GARRETSON:  The sampling only impacts about 180

12   claimants.  The balance have to do with issues that we always

13   intended to work through at the end.  There is appeals, there is

14   a handful of claimants that have appeals outstanding, and then

15   these discrepancies with same plans purporting to have liens on

16   the same claimant.  That impacts the 1,200 claimants.

17        THE COURT:  What's your input on the private lien

18   program?  This is the first time it's been tried.  We've tried to

19   have a program involved with statutory liens because both the

20   claimants, the lawyers for both sides and the litigants are

21   responsible for the statutory liens.  So they have to be worked

22   out before any settlement can be consummated.  But the private

23   liens present a different problem.  We've tried to learn from

24   what the statutory liens gave us, namely, an opportunity to

25   reduce the individual's participational requirement because in a

1    bulk situation the claimant was able to get a discount on the

2    liens that were statutory.  We tried to then step that into the

3    private lien programs, mainly those liens that are not statutory

4    to see whether or not a discount, a substantial discount could be

5    gotten for the claimant by grouping them and by negotiating with

6    the private lien holders.  But they do present certain problems.

7              Has it worked out by and large, Matt?

8              MR. GARRETSON:  Yes, Your Honor.  I believe it has.  If

9    you look at a couple things.  Number one, the amount of people

10   who chose to participate.  I think people are concerned about

11   their healthcare, and the reason they chose to participate is

12   they probably looked at the plan and they had an obligation.  So

13   the one thing I can say is that what I like about this program is

14   no obligations were created where none otherwise wouldn't exist,

15   right?  So I like that about the program.  People had an

16   obligation.

17              And if I look at the resources that normally get

18   expended by these plans in having to chase claimants and the

19   litigation that ensues and the loss of benefits, none of that is

20   going to occur for these individuals.  So I think it's, they got,

21   I would say the claimants got a better outcome than they would

22   have individually, and I think it didn't burden the court system

23   nor the plans to have to pursue it in the normal way they did.

24   So I think it was the proverbial win/win for both sides.

25              THE COURT:  That's great.

1          MR. GARRETSON:  Your Honor, that concludes my report and

2     I will have that memorandum you requested to you in the next

3     week.

4          THE COURT:  Thank you, Matt.  I appreciate all of the

5     work that you've done on this.

6               As I've mentioned several times, we have been

7     fortunate to have Special Masters appointed in this particular

8     case, experienced lawyers and former judges who were able to give

9     the claimants another review of their claims to make sure that

10    all of the aspects of the program were met.  I'll hear now from

11    our Special Master Juneau.

12         SPECIAL MASTER JUNEAU:  Your Honor, Patrick Juneau, the

13    Court-appointed Special Master.  Ms. Greer has reported

14    essentially where we are.  The work that was assigned to the

15    Special Master and Deputy Special Master in terms of the stroke

16    claims, the heart attack claims, the extraordinary claims have

17    been completed, and as indicated, it was completed last night.

18              I would be remiss if I didn't say it was an

19    incredible experience for me because I didn't grow up in the

20    Technological Age but the information that was fed to me by

21    BrownGreer in a format that was fed and the promptness, we were

22    able to make these decisions.  We got this, like I said, late

23    appeal last night, and every time one of those hangs up, it hangs

24    up the whole system.  We were able to get all of that information

25    and look at that case.  A lot of people say, Well, is that

1   superficially done?  None of these cases were superficially done.

2   As a matter of fact, the last case was infirmed and reversed in

3   part, which is an interesting kind of comment about the system.

4          The bottom line is, Your Honor, that is completed.

5   As Ms. Greer did say, we have some remaining issues to address,

6   and I have the attorney lien issue, which we will come out with a

7   protocol tomorrow on.

8          THE COURT:  That is one of the areas that the Court

9   ought to comment on, too, that in a matter of this sort where you

10  have Special Masters and Deputy Special Masters from different

11  parts of the country, Pat being in this area and then one judge

12  in California, one judge in New Jersey, if we had to do this with

13  paper, we would have a lot of problems, because the paper is just

14  massive, and moving it around the country in that format would be

15  really problematic.  We were able, through technology, to give it

16  instantly to the three individuals.  They were able to confer and

17  deal with it in a paperless fashion, and I think that that format

18  really worked well in this particular case.

19         SPECIAL MASTER JUNEAU:  Your Honor, I would like to

20  conclude my report, the peer pressure was beyond my comprehension

21  at the last meeting and all these meetings we have attended, with

22  all the charts and the elaborate color schemes, and I have my

23  final report today, but it's what I call a Cajun charting map

24  which we would use in a jury trial, I guess you would say, in the

25  Cajun part of the country.  It, since the format of this, the

charting has been in a pie form, what I did was, is my final

report is in that similar vein and it is an actual cooked, done,

completed apple pie.  We specialize in cuisine in south

Louisiana, but we also specialize in results.  We are firm

believers that you can combine the two and have a successful

future and be a lot more pleasant.  I would like to note that the

reason that the pie is it in its present structure is because it

denotes, and this is the report, that the action has been

complete and the pie is now ready to be served.  I think

Ms. Greer said in June, we will have actual serving of what this

pie denotes to the recipients.

I would like to add one caveat, if the Court could,

though, consider the serving not to go to those who may have been

in this courtroom earlier when I was here and said that this

could not be done.  Y'all can identify who those people were when

you were here.

THE COURT:  They don't get any pie.

SPECIAL MASTER JUNEAU:  With that being said, Your

Honor, I would just formally file this with the clerk.

THE COURT:  We'll take care of it.

SPECIAL MASTER JUNEAU:  And I have been assured by your

clerks that it will be no problem in consumption, so thank you so

much for your time.

THE COURT:  Thank you, Pat.  Thank you for your help.

The next is class actions.  Andy, what do you have

1  on that?

2       MR. BIRCHFIELD:  There is nothing we need to report on

3  that, Your Honor.

4       MR. BEISNER:  Actually we do have a brief report,

5  Your Honor.  John Beisner for Merck, and Elizabeth Cabraser is

6  joining me.

7            Your Honor, we wanted to note to the Court that

8  Ms. Cabraser and I have been consulting on how to go forward with

9  the economic loss class actions.  As we've advised the Court,

10 Merck intends to file a motion with respect to the master

11 complaint that is pending.  We'll be talking with plaintiffs

12 through Ms. Cabraser to sort of figure out a briefing schedule

13 with respect to that motion, and then I think we'll confer

14 further about other things that we should be going forward.

15       MS. CABRASER:  That's right, Your Honor.  Elizabeth

16 Cabraser for the plaintiffs for the purchase claims committee and

17 the class action committee.  We have no pie as of yet.  We had

18 considered how to graphically depict the meet and confer process

19 that we have been going through for the past month or so.  We

20 thought of an interpretive dance, but that presents difficulties

21 for the reporter.  So we will be getting, we understand, from

22 Merck, a preview of the motion that they intend to file, which

23 has been discussed with Your Honor.  We'll then work out for

24 submission to Your Honor a briefing schedule and a procedure that

25 we think is fair and makes sense given the issues that are

1   actually raised.

2         And we are also considering how to best raise the

3   intersecting concept of dealing with common fact issues, whether

4   that's possible to do in a class action context or not.  Or

5   whether there is some other procedure that we can use.

6         So this motion process will present various

7   questions, procedural questions, no merits questions per se.  We

8   anticipate essentially a motion to, by Merck to address the class

9   allegations, and we'll try to respond to that as best we can.

10        THE COURT:  Let's get together on it and maybe we can

11  have a informal conference before you put it in the format of a

12  motion and see where we are and see whether or not we can come up

13  with a format to deal with this issue.  John.

14        MR. BEISNER:  Your Honor, I would just note that there

15  will be some aspects of the motion that we have in mind that are

16  sort of in the form of a classic 12(b)(6) motion.  We made that

17  previously to the Court, and I think in the conversations to

18  Your Honor some of those will be failure to state a claim

19  arguments that will be made there as well.

20        I will also note for the record, Your Honor, that

21  the interpretive dance part might have been a challenge for some

22  of the attorneys as well.

23        THE COURT:  For the defense, right.  Thank you.

24        On the larger picture, soon, when the smoke clears

25  on all of it and we get all of the payouts and things of that

1    sort, I'm going to need the defendants, plaintiffs get together

2    and figure out what's left, and then see how they can be grouped

3    and then prioritized.  Then I'll meet with you to determine how

4    we go about resolving those unresolved issues so that we are not

5    looking at it just en globo, that we have some format to deal

6    with it and some bite-size types that we can get to.

7            State/federal coordination?  Anything?  Dawn.

8        MS. BARRIOS:  Thank you, Your Honor.  Good morning.

9    Dawn Barrios for the state/federal committee.  Unfortunately I

10   hurt my knee, so I can't dance, and I didn't bring any costume,

11   but I'll try to do something better at the next status

12   conference.

13           I would like to follow each of my brethren by

14   indicating that there is light at the end of the tunnel.  For the

15   first time, I'm able to report that there has been no conditional

16   transfer orders that have come in since our last status

17   conference, so to me that is a milestone that it is finally

18   winding down.

19           With regard, Your Honor, to the remands, we have

20   diligently been contacting each of the plaintiffs' counsel who

21   have remands.  We've able to get some agreements to dismiss.

22   They had their cases dismissed in state court, they thought that

23   was effective here, and I just have two attorneys who are

24   insistent upon trial or remands being heard, and that is

25   Mr. Ronald Benjamin and Mr. Michael Stratton.  They are insistent

1   on holding tight on their position.

2           We're also cleaning up the record with the help of

3   Ms. Wimberly because we're able to dismiss some derivative

4   claimants who were not dismissed the first time.  So that will

5   substantially reduce the remands as well.  Thank you, Your Honor.

6           THE COURT:  Thank you.

7           Andy, on the cleanup crew, we're probably going to need

8   some kind of subcommittee from the plaintiffs' committee called a

9   cleanup crew.  Then the same way with the defendants, so that

10  these individuals are designated for that job.  The difficulty

11  you have with a case of this sort from the Court's standpoint

12  when we had 50 or 60,000 claimants, is that when the bulk of the

13  claims resolve, somehow or another the rest of it just lingers

14  there.  All of the good work that's been done to push the case is

15  contaminated by this residual tail that keeps festering.  So

16  we've got to try to deal with that in this particular case

17  and have a cleanup crew for each side to deal with that so that

18  they know that's their job and I can encourage them to carry out

19  their job with dispatch.

20          MR. BIRCHFIELD:  Your Honor, I'll work with Mr. Marvin

21  and we'll come up with a cleanup crew committee for each side.

22          Your Honor, the next item on the agenda is the

23  *pro se* claimants, and Mr. Bob Johnston is here to report.

24          THE COURT:  We've had a number of *pro se* claimants, many

25  of whom are residing in government housing.  That presents some

1    difficulty over the years because they don't have access to

2    doctors or other matters.  Hopefully they'll get out soon and be

3    able to visit you in person, Bob.

4         MR. JOHNSTON:  I'm right across the street and maybe you

5    could come on over for a little chat, too.

6         THE COURT:  Some marshals there.

7         MR. JOHNSTON:  Your Honor, Bob Johnston, court-appointed

8    curator.  My report is very brief.  We have provided our

9    22nd curator's status report to the Court.  It contains the

10   information that provides the Court with the general history of

11   our handling of the matters, but also recent communications.  As

12   the Court, I'm sure, will understand, the bulk of the recent

13   communications we've had with *pro ses* have related to their

14   questions as to the circumstances regarding the Motion to

15   Dismiss, and we have done our best to try to assist them to

16   understand the reasonings why the Motions to Dismiss have been

17   filed regarding their particular claims.

18        I think the only thing that I have to add is that

19   you've used the term "residual tail," well, we certainly have

20   some aspect of that on the *pro se* side of the fence, and it's my

21   understanding from talking to Dorothy Wimberly and with Lennie

22   Davis that on July 1st, we're going to a conference with the

23   Court to discuss certain numbers of individuals that are *pro ses*

24   who have pending motions to dismiss.  I think we can deal most

25   effectively at that time with that matter, of those matters.

 1  That's it.

 2           THE COURT:  Good.  Thank you very much.

 3               The PSC MDL trial package, anything on that, Andy?

 4       MR. BIRCHFIELD:  Yes, Your Honor.  Just briefly, the

 5  trial package has been available.  It's been provided either to

 6  lawyers that have requested it, and we continue to supplement the

 7  trial package with the AG case.  We have the trial transcripts,

 8  the trial exhibits that are being submitted and will be

 9  supplemented to the trial package.  It's available to anyone who

10  requests it.  Thank you, Your Honor.

11       THE COURT:  Governmental action?  Have we dealt with

12  that, Jim?

13       MR. DUGAN:  Good morning, Your Honor, James Dugan on

14  behalf of the Louisiana Attorney General and the governmental

15  action committee.  I would add my office is working with Russ's

16  office in creating a governmental action supplement to the trial

17  package, including all of the Louisiana materials.  So that

18  process is ongoing and should be available pretty soon.

19               As Your Honor is aware, we tried the Louisiana

20  Attorney General case, and that case is under submission to

21  Your Honor.  I also understand that there is going to be a

22  governmental action hearing after the close of the main hearing.

23       THE COURT:  Right, I'll meet with the parties to discuss

24  some logistic areas that they have.

25       MR. DUGAN:  The parties are working very hard to get

1  conclusion there also, Your Honor.

2         THE COURT:  All right.  Thank you, Jim.

3               Pending personal injuries, anything on that, Andy,

4  the PTO 28?

5         MR. MARVIN:  Your Honor, under PTO 28 cases, discovery

6  is proceeding in those cases, and indeed, Ms. Oldfather and I

7  spoke this morning about a plan for her pursuing further

8  discovery in those cases, so that is underway.

9         THE COURT:  Okay.

10              The fee allocation committee, I have that.

11        MR. SEEGER:  You got that?

12        THE COURT:  Yes, I do.  I have that and I'm going to be

13  dealing with that shortly.

14              Merck's motions and rules on PTO.  Later on, we'll

15  take that up after the meeting.

16              Any appeals, other motions, Andy?

17        MR. BIRCHFIELD:  None that I'm aware of, Judge.

18        THE COURT:  And then the attorney's fees, that's also

19  under review by the Court.

20              Pending personal injury, 28, 29 and 43, anything on

21  that?

22        MR. BIRCHFIELD:  Yes, Your Honor.  At the last status

23  conference, you had instructed us to meet with Ms. Ann Oldfather

24  and compile lists of the other injury cases that fall under

25  pretrial order 29 and 43.

1          THE COURT:  How many are there, Andy?

2          MR. BIRCHFIELD:  Your Honor, there are a total of 65

3    claimants that would fall into either of those categories, under

4    pretrial order 29 and pretrial order 43.

5          THE COURT:  And these are outside of stroke and outside

6    of MIs?

7          MR. BIRCHFIELD:  Yes, sir.  These are injuries other

8    than heart attack, stroke or sudden cardiac death.

9          THE COURT:  Okay.

10              Any third-party payor settlement issues?

11          MR. SEEGER:  Your Honor, as I brought to your attention,

12    we've had people who've worked solely on third-party payor

13    issues, just inquire about an attorney's fees process.  We wanted

14    to raise it with the Court.

15          THE COURT:  Yes, I set aside some funds to deal with

16    those issues.  I think it was like $15 million.

17          MR. SEEGER:  That's correct, Your Honor.

18          THE COURT:  I'm going to be meeting with the parties to

19    determine how we go about dealing with the payouts on that, so I

20    have that on the agenda.  I'm trying to deal with the attorney's

21    fees on the big issue.

22          MR. SEEGER:  Thank you, Your Honor.

23          THE COURT:  Anything else other than when we come back?

24    The next status conference will be on July 27th at 9:00, and I'll

25    meet with the parties at 8:30 as I usually do.

 1          Anything further from anyone?  Thank you very much.

 2   The Court will stand in recess.  I'll be back in about 10

 3   minutes.

 4          (WHEREUPON, at this point in the proceedings, there was

 5   a brief recess.)

 6          THE DEPUTY CLERK:  Everyone rise.

 7          THE COURT:  Be seated, please.  All right.  We have

 8   several motions that we need to deal with.  Dorothy, do you want

 9   to bring them up.

10          MS. WIMBERLY:  Yes, Your Honor, very quick this morning.

11   The first matter I would like to bring up is the matters deferred

12   from Merck's fifth motion ruling and incorporated memorandum to

13   show cause why cases should not be dismissed with prejudice for

14   failure to comply with PTO 43, and that is Record Document

15   Number 40199.

16          The matter was originally heard on May 13th, and at

17   that time a number of cases were deferred until today.  Those are

18   represented by Exhibit B to the judgment that was entered

19   following the May 13th hearing.

20          With respect to the 11 plaintiffs on Exhibit B, the

21   only plaintiff as, who is ripe for dismissal today is the first

22   plaintiff, Gilbert Swe, S-W-E, in case number 06-8314, who has

23   not responded in any fashion whatsoever, and is not in compliance

24   with PTO 43, and we ask that the case be dismissed with

25   prejudice.

1        THE COURT:  Okay, we've had this matter before several

2   times, and I understand the plaintiff's position and they

3   vigorously object to it and feel that if necessary it should be

4   done dismissal without prejudice.  I'll overrule their

5   well-reasoned arguments and grant the Motion to Dismiss with

6   prejudice.

7        MS. WIMBERLY:  Your Honor, with respect to the remaining

8   10 plaintiffs on Exhibit B, Merck is withdrawing the motion as to

9   Donna Russell, who is plaintiff number 2, Ms.  Russell has

10  complied with PTO 43.

11        We are also deferring or withdrawing the motion as

12  to plaintiff number 11, Terrell Palmore, who has complied with

13  PTO 43.

14        We are withdrawing the motion as to plaintiff

15  number 3, Jimmy Hurst, who was mistakenly included on the motion.

16  Mr. Hurst never perfected his future evidence stipulation.

17  Therefore, his claim was extinguished pursuant to the terms of

18  the settlement agreement.

19        We are also withdrawing as to plaintiff number 4,

20  James Schnepf, who has complied with PTO 43.

21        The motion is moot as to plaintiff number 5,

22  Barbara Mitchell Cockrell, who has filed with the Court a

23  stipulation of dismissal with prejudice, and the Court has

24  already dismissed her case.

25        With respect to the remaining plaintiffs,

1   Jammal Bilal, Robert Lyon, Estelle Facenda, Doris Hudson, we're

2   deferring those until July 27th because of issues relating to

3   whether or not their future evidence stipulations have been

4   perfected, so whether their claims even still exist or have been

5   extinguished.  With respect to plaintiff number 8,

6   Sherwood Beasley, we agreed to defer, and that also is to be

7   deferred until July 27th.

8              The other matters that were deferred today from

9   Merck's first, third and fourth PTO 43 motions and Merck's ninth

10  PTO 28 motion involve three *pro se* plaintiffs whom the Court has

11  heard from numerous times before, James Schneller (spelled

12  phonetically), Janice Baum and Mark Hendricks.

13             The Court and the *pro se* curator and Mr. Davis and

14  myself and with Your Honor are having a conference in court with

15  those *pro se* plaintiffs on July 1st at 3:30, which will provide

16  them a final opportunity to address their concerns and for the

17  Court to ensure that they understand the process.  Failing

18  compliance after that, we will ask that their cases be dismissed

19  at the next hearing on July 27th.

20             THE COURT:  All right.  This is again an instance where

21  I don't dismiss these cases willy-nilly.  I don't dismiss them

22  when they fail to do something a first time, particularly with

23  the *pro ses*.  We give them a second time.  Sometimes a third

24  time.  Sometimes a fourth time.  We write them.  The Court sends

25  them motions instructing them to be present or to be on the phone

1  or let us hear from them in writing.  After a period of time, I

2  have to assume that they are just no longer interested in

3  pursuing their case, which is reasonable.  I understand that.

4  It's a case that sometimes you think you've got a claim, you want

5  to get in it and your life goes on.  Babies are born, people die,

6  your life changes, and so you move on.  We've got to get them out

7  of the litigation so that they are not holding up the whole

8  process.  This may be an instance of it.

9       MS. WIMBERLY:  Your Honor, also, on the docket for today

10  is *pro se* prisoner Brian Anderson's Motion for Reconsideration,

11  Record Document 18800, to which Merck has filed an opposition and

12  to which I received in the mail yesterday from Mr. Anderson a

13  response.  I spoke to Katie this morning and understand that the

14  Court has not received that.  I've provided her with a copy.

15  Your Honor, we would simply like to have this decided on the

16  briefs.

17       THE COURT:  Okay.  All right.

18       MR. MARVIN:  Your Honor, you may recall that this is the

19  case that you asked us about.

20       THE COURT:  Anderson?

21       MR. MARVIN:  Anderson.

22       THE COURT:  Yes, he's the individual who felt that he

23  couldn't get a report because the facility's in-house doctor

24  wouldn't write a report, and he's an inmate in a federal

25  institution, and so he couldn't get out to see his own doctor.

1    They won't let him out for any reason because he's a prisoner.

2        MR. MARVIN:  Right, and he claims he couldn't get his

3    medical records either, so what we asked BrownGreer to do is to

4    go directly and get those records themselves.  So BrownGreer did

5    contact the prison authorities, they did get access to the

6    medical records.  All those medical records were then sent to

7    BrownGreer for review.  So they did review the medical records

8    and found that the claim was not eligible.

9        THE COURT:  Right.  I understand.  He even promised that

10   if he would get out, he would come right back.  That was a

11   problem, I guess.

12       MS. WIMBERLY:  Your Honor, that leaves us with two

13   motions today that Mr. Boehm is going to argue.  These are,

14   actually he'll be responding to, these are Ms. Oldfather's

15   motions to reinstate the claims of plaintiff Elliott and

16   plaintiff Carver.

17       THE COURT:  What about the Ron Benjamin case?

18       MS. WIMBERLY:  Your Honor, that was not actually on the

19   docket today.  That was the Miller motion.  While initially we

20   had planned to ask Your Honor to just consider it on the briefs,

21   based upon the submission of the amicus brief or motion by his

22   prior counsel, Merck wanted the opportunity to review that and

23   respond to that.  So we will be filing a response to that, and at

24   that time we'll be prepared to have it heard or for Your Honor to

25   decide it on the briefs.

1        THE COURT:  Okay.  Okay, let's take the Carver case.  As

2  I understand Carver, this case was dismissed approximately a year

3  ago.  I recall that the plaintiff's claim was filed prior to the

4  creation of the Vioxx resolution program.  When the program was

5  announced, the plaintiff chose not to participate; thus the

6  plaintiff's claim fell under what I had been terming PTO 28.

7        On October 16, 2008, his claim was dismissed with

8  prejudice by the Court for failure to comply with the terms of

9  that particular pretrial order.  The plaintiff's counsel takes

10  the position that he didn't know that his claim was subject to a

11  Motion to Dismiss and that he was taken by surprise when it was

12  dismissed.

13        MS. OLDFATHER:  Thank you, Your Honor, and I appreciate

14  the Court's summary of the factual statements that lead up to

15  this claim.  I also appreciate the Court's comments that you made

16  a moment ago and that you've made to us here in this courtroom a

17  number of times, both in chambers and in the courtroom.  That is

18  that it is the Court's desire to clean up the docket of those

19  cases where people have moved on with their lives and they are no

20  longer focused on pursuing this claim and have no real interest

21  in pursuing it.

22        I've got today two cases to discuss, the first

23  being Mr. Carver, who is under PTO 28 and then also Ms. Elliott

24  who is under PTO 43.  I neglected to mention when we were in

25  chambers that there was also a Motion to Reinstate for

1    Ms. Leavitt (spelled phonetically), who is under PTO 28.  Due to

2    noticing when that motion was first put on a month and a half

3    ago, we didn't set it for a specific date.  So it's going to come

4    up the next time.  Ms. Wimberly and I have discussed that.

5            But I do think it's important to look at the fact

6    that both Mr. Carver and then, when we talk about her next month,

7    Ms. Leavitt, are under PTO 28, Your Honor, when PTO 28 was put

8    place, it was on the same day that the settlement was announced.

9    Attorneys throughout the country spent the next two to three

10   months trying to get their arms around what the rules were going

11   to be.

12           The first rule that was announced to us is that if

13   we wanted to put any cases in the resolution program, we had to

14   put them all in.  We had to withdraw as counsel of record in any

15   case which we weren't going to put into the resolution program.

16           As Your Honor, and later that was changed, because

17   there was an uproar from a lot of attorneys about the ethical

18   problems that that created.

19           But as Your Honor probably would expect, there are

20   a number of people out there that didn't want to go into the

21   resolution program, even though they qualified, because they did

22   not believe that they would get enough compensation.  You know,

23   there are people that will do that.  They would rather have their

24   case tried than go into the RP.  There also were people who were

25   not eligible.

1       And so you had all of a sudden these folks being

2  faced with having no attorney because most, if not all of the

3  attorneys throughout the country, had people that needed to go

4  into the RP and they needed to represent them, so they told these

5  other people, in this case, Mr. Carver, You're going to have to

6  find another lawyer because I cannot continue to represent you.

7       So Mr. Carver's affidavit and his file reflects

8  that he was told that by his attorney, but that his attorney did

9  not officially withdraw.  So Mr. Carver came up on Merck's, I

10  believe it was second Motion to Dismiss under PTO 28.  It is

11  correct that Mr. Carver was not aware that he had come up on that

12  motion.

13       What I've asked the Court to look at by our

14  supplement that we filed is everything that Mr. Carver did to

15  show by his actions that he wanted to keep his claim alive, like

16  Your Honor has said.  He filed a Plaintiff Profile Form.  He

17  filed answers to discovery.  He filed an amended Plaintiff

18  Profile Form.  He filed with the Court the death certificate of

19  his wife and the order appointing him as administrator.  He

20  provided Merck with medical authorizations, and this was back in

21  2006, so that Merck has not been prejudiced by any delay.

22  They've always been able to get his medical records.  He provided

23  on his own a typed, one complete page, a list of diagnostic tests

24  that his wife submitted to.  He provided all of his pharmacy

25  records.  He provided updated pharmacy records, updated medical

1    records, and a partial compliance with PTO 28.

2              The only thing he didn't provide, Judge, was the

3    *Lone Pine* report, that letter from a doctor that Your Honor is,

4    has characterized as the bus ticket.  You know, it's the thing

5    that we need in addition to everything else.  When Merck put the

6    motion on to dismiss for Mr. Carver, that Motion to Dismiss read

7    literally, Inform the Court that Mr. Carver had hadn't provided

8    any compliance with PTO 28.  It wasn't just that this one letter

9    had not been provided.  The motion, which wasn't just Mr. Carver,

10   so I'm not faulting Merck, it was dealing with a whole bunch of

11   people at that point, claimed that all of those people were

12   materially deficient in their PTO 28 compliance.

13             Your Honor, I don't think that really Mr. Carver

14   was materially deficient.  Mr. Carver at that point didn't know

15   that his attorney was no longer representing him in this matter.

16   So when Mr. Carver -- and, Your Honor, again that's not all that

17   unusual, particularly when we look at the record in this case, it

18   took a while for the PTO 28 cases to get organized and for

19   Your Honor to appoint someone to serve as liaison for those

20   cases.  As a result Mr. Carver ultimately found out that his

21   claim had been dismissed, he got in touch with me and in January

22   of this year we filed a Motion to Reinstate.  We have also filed

23   at this point a PTO 28 compliance with the *Lone Pine* report.

24             So that at this point, Your Honor, there is no

25   prejudice to Merck.  There are other PTO 28 cases that are still

1    there to be resolved.  Merck had, as early as 2006, lots of

2    information about Mr. Carver and the claim for the death of his

3    wife.  The only thing it didn't have was a letter from a doctor

4    saying the pulmonary emboli could be caused by Vioxx.  It had

5    that letter, Your Honor, in lots of other cases, because I filed

6    that letter in other cases well before Mr. Carver contacted me.

7            So what we really have, Your Honor, is it's purely

8    a matter of the Court's discretion obviously about what you want

9    to do with Mr. Carver.  Mr. Carver's wife died.  Mr. Carver's

10   wife died as a result of bilateral pulmonary emboli.  All of that

11   information has been provided by Merck.  Merck knows that doctors

12   have said that that could be caused by Vioxx, and Mr. Carver by

13   his actions has always demonstrated that he cared about bringing

14   this case to the attention of the judicial system.

15           So we ask the Court's exercise of discretion in

16   allowing Mr. Carver the latitude to do that, albeit late, and

17   allow him to present this claim for wherever it might go.

18           THE COURT:  Do they have it now?

19           MS. OLDFATHER:  Yes, Your Honor.  They've had it for

20   some time.

21           THE COURT:  Okay.  Let me hear from counsel.

22           MR. BOEHM:  I believe we received that report at the end

23   of April, I believe April 27th of this year.

24           Your Honor, there is no dispute in this case that

25   the plaintiff did not comply with PTO 28.  That's undisputed.

1   That the case was properly dismissed.  As Your Honor knows, it

2   was dismissed in October 2008.  So that's 18 months ago or so.

3           THE COURT:  The only issue in this case that you want to

4   take a look at, talk to me about, is in most cases that I have

5   dismissed, the person has just totally ignored the orders.  They

6   haven't done anything.  Haven't given anything.  In fact, more

7   often than not, they haven't even contacted anyone.  Nobody has

8   heard from them.  We don't even know if they are in the country.

9   We've had to, we've had to advertise in newspapers in some

10  individuals.  This seems to be a little different from the

11  standpoint of information.  What I hear from counsel is that they

12  supplied all of the information with the exception of the

13  *Lone Pine* order.

14          Now, I'm serious about *Lone Pine* orders, and that's

15  sufficient to dismiss.  This one may be on the edge there.  How

16  do you see it?

17          MR. BOEHM:  Well, as you note, Your Honor, you have said

18  in the past that the failure to provide a *Lone Pine* expert report

19  is in itself a basis, a proper basis to dismiss a case, and

20  that's what happened here.

21          Now, I can't speak as to the full scope of how many

22  medical records were provided.  It is true that some were

23  provided.  I have not done a full assessment to see which were

24  not.  This is a case where I believe the basis for the Motion to

25  Vacate Your Honor's ruling, Your Honor's dismissal of this case

1   is that plaintiff's attorney failed to inform plaintiff that

2   there had been a Motion to Dismiss the case file by Merck.

3            The Fifth Circuit has explicitly ruled that that is

4   not a basis to vacate a dismissal with prejudice, and we cite

5   that case in our reply to Ms. Oldfather's supplement.

6            If there is a malpractice claim that the plaintiff

7   has against that attorney because plaintiff feels the attorney

8   did not fulfill his or her duties, then that's the course that

9   the plaintiff should pursue.

10            Rule 60(c), 60(b) and 60(c), which I think even

11   though it's not stated in Ms. Oldfather's papers, is the rule

12   that she is bringing this motion under, explicitly says that a

13   plaintiff has one year, assuming there are extraordinary

14   circumstances in that case, to bring this type of motion.

15            So this particular case, the Carver motion, is

16   explicitly time barred by Rule 60(c).  That's assuming that the

17   extraordinary circumstances requirement of Rule 60 are met.

18            And finally, Your Honor, as we've discussed with

19   this Court in the past, granting a motion of this nature would

20   set a really unfortunate precedent, a precedent that plaintiffs

21   can ignore deadlines, deadlines have been extended, requirements

22   have been reiterated to plaintiffs on multiple occasions as is

23   true in this case.

24            THE COURT:  Do you know how often that has been told to

25   this person?  How many times have we given notice, did you give

1   him notice or did the Court give him notice?

2           MR. BOEHM:  Well, I can say that the Court gave notice

3   on least two occasions.  I would have to go back and see if there

4   are other instances of that.  I know that off the top of my head.

5   We provided notice.  Of course plaintiff's counsel had notice of

6   the fact that the motion had been had filed and these

7   requirements existed.

8           THE COURT:  Who is the plaintiff's counsel in the Carver

9   case?  Who was plaintiff's counsel?

10          MR. BOEHM:  If you give me a moment I can give you an

11  answer to that.

12          MS. OLDFATHER:  Sheri Wright.

13          MR. BOEHM:  That sounds right.  I believe that is

14  correct.  Sheri Wright.

15          THE COURT:  All right.

16          MR. BOEHM:  And it's important, as the Court has noted,

17  to have that finality, that there is going to be an end to this,

18  that there is, there are deadlines that have to be met.

19  Particularly in this case, where you're up almost two years later

20  talking about reversing a Motion to Dismiss with prejudice.

21          THE COURT:  Okay, thank you.  Talk to me about, what is

22  the next one?

23          MS. OLDFATHER:  Your Honor, it's the Elliott.

24          THE COURT:  Sandra Elliott.

25          MS. OLDFATHER:  Judge, you asked a question about how

1  many times Mr. Carver was given notice.  I don't want to dispute

2  Mr. Boehm.  He said he can prove that he was given notice twice

3  by the Court.  Not that's in their papers.  Certainly not in the

4  file that I got or in Mr. Carver's papers, so it may be that

5  something was sent to the attorney.  But I haven't seen that, and

6  I haven't seen it filed with Merck's papers with the Court.  So

7  I'm not sure of the source of Mr. Boehm's statement.

8        MR. BOEHM:  The two instances I'm talking about are the

9  communications with the attorney, actual notice is given to the

10  attorney.  Your Court's order that this plaintiff comply by a

11  certain date.  That was an extension of the original date to

12  comply.

13        THE COURT:  Okay.  What about the Sandra Elliott motion?

14        MS. OLDFATHER:  Your Honor, Sandra Elliott presents a

15  woman who fell through a crack that was opened by Merck and the

16  Plaintiffs' Steering Committee.  That crack that was opened by

17  Merck and the Plaintiffs' Steering Committee is a little bit

18  contrary to some of the other efforts that have been made by

19  Merck and the PSC to help people pursue their claims and

20  representations that have been made by the PSC in that regard.

21        What happened was that, like everything else in

22  this program, there was a cure period provided and consistent

23  with Your Honor's desires about people really being able to

24  pursue their claims.

25        And so when you had a case that was in the program,

1    because Ms. Elliott is a PTO 43 case, you had a case that was the

2    program.  As Your Honor probably knows, when you enroll in the

3    program, you file, as the plaintiff, a stipulation of dismissal.

4    You've signed it.  That's held in escrow, and BrownGreer releases

5    that to Merck once your claim is, the points are accepted and

6    Merck files that with the Court.

7                    Or if the Special Master takes your final appeal

8    and rules against you.

9                    Or if you don't file an appeal with the

10   Special Master and you elect to go the future evidence

11   stipulation route and you don't file your FES on time, then Merck

12   is to be returned the stipulation of dismissal and will file that

13   to dismiss your claim.

14                   Well, the FES provisions at BrownGreer had the same

15   cure provisions that we had for enrollment, for claims packages,

16   for EI and everything else.  So if you filed an FES and you

17   didn't meet a technically, and Judge, these technicalities could

18   really be technicalities, all right?  Like the FES form had an

19   instruction page as page one, page two, three and four were the

20   actual stipulation.  I have a case where the plaintiff did not

21   return page one.  She signed and had notarized pages two, three

22   and four, which was her future evidence stipulation, and it was

23   turned down because the instruction page had not come back with

24   it.

25                   Well, that wasn't a problem when you had an

1  opportunity to cure, and the opportunity to cure was a 20-day

2  period after BrownGreer might have told you that your FES was

3  inadequate, that the plaintiffs or their attorneys could correct

4  it.

5            Well, Ms. Elliott did everything Your Honor has

6  looked for:  She showed a desire to pursue her claim, she filed a

7  PPF, she enrolled, she registered, she filed a claims package,

8  submitted all of her medical authorizations, submitted all of her

9  medical records.  To her disappointment, she was found to be

10 ineligible to pursue a claim in the RP.  She did not want to go

11 to the Special Master and have that reviewed.  She wanted to come

12 back to the litigation, which was the way the deal is supposed to

13 work and has worked.  So she filed a future evidence stipulation

14 in early August.  She neglected to have her signature notarized,

15 so when it got to BrownGreer it was rejected.  Then what

16 happened, instead of her getting a notice of a right to cure, her

17 future evidence stipulation came in August of 2009.  On

18 August 21st of 2009, and I'm looking at this here on my laptop,

19 BrownGreer sent out a blast e-mail to everyone, saying, "Until

20 now a 20-day period was allowed to correct a future evidence

21 stipulation submitted for a claimant that was rejected for

22 signature issues or other defects.  We," that's BrownGreer, "have

23 received instructions from the parties," that's from Merck and

24 the PSC, "to change that procedure.  Starting today, for any FES

25 you generate for a claimant on your portal, there will be no cure

1   period allowed for defective FES forms submitted to us."

2            I got that, I asked, I sent an e-mail to Russ

3   Herman, I said, Why are you doing this to people?  We need this

4   cure period back.  There was some falderal back and forth.  I

5   didn't get anywhere with the PSC to reinstate the cure period of

6   any type, so I filed a motion with the Court, and it's in the

7   Court's docket on September 15th, asking for the Court to order

8   the parties to reinstate the cure period on FESs.

9            And ultimately that becomes unimportant because

10   Sandra Elliott fell within that period between August and

11   September 15th.  I didn't know she was out there.  But she was

12   one of those people whose counsel got this notice, and on

13   August 22nd, when Sandra Elliott thought she could send back in a

14   corrected FES and did try to do it, her counsel had received this

15   notice saying don't even bother, because it's not going to be

16   accepted.

17            So she did send in a corrected FES on August 22nd,

18   it was within what would have been the 20th day cure period that

19   she was told she had, but then was taken away on August 21st.

20   Her counsel communicated that to her.  She, like too many people,

21   believed the judicial system had failed her.  She threw her hands

22   up, figuratively speaking, and she says, Well then, just never

23   mind.  She told her counsel, forget it, there was nothing else

24   she could do.  Her counsel moved on.  Merck filed a Motion to

25   Dismiss her claim.  This is in 2009, so it's not a year and a

1   half ago.  This is just last fall.  Her counsel doesn't oppose

2   the Motion to Dismiss the claim because this is now the rule.

3   Got changed in midcourse on Sandra Elliott.

4            Oh, by the way, Judge, I ought to say that as a

5   result of me filing my motion, Merck and the PSC instructed

6   BrownGreer to reinstate a cure period for later cases.  It would

7   be a cure that was up to Merck's discretion.  It wasn't an

8   absolute cure any longer.

9            So Ms. Elliott's claim was dismissed.  The first

10  time it came up, it was dismissed in October '09.  Then strangely

11  enough, unbeknownst to Ms. Elliott, on November 11th, Merck and

12  BrownGreer instructed Ms. Elliott that her future evidence

13  stipulation had now been accepted but that her claim was now

14  going to be dismissed because Your Honor had entered the Motion

15  to Dismiss on the unopposed Motion to Dismiss.

16           Ms. Elliott didn't know any of this.  She didn't

17  know about her claim being accepted.  Her counsel hadn't gone

18  back and looked at that because they had been instructed by her

19  to drop it because they told her there was nowhere else to go

20  because it was now too late and no more cure period.

21           And when Ms. Elliott contacted me, it was the first

22  time that she realized that the Court might be willing to listen

23  to these situations that fell between the cracks.  She has asked

24  me to ask the Court to allow her to reinstate her claim.

25           Again there is no prejudice to Merck.  They have

1    had all of these records.  They've seen a complete claims package

2    on her.  We have gotten a *Lone Pine* report on Ms. Elliott.

3    That's been filed with the Court, and we would ask the Court to

4    exercise its discretion to allow Ms. Elliott to proceed with her

5    claim.

6         THE COURT:  What's the issue with this one?  What's the

7    situation?  I know you were conferring with counsel.

8         MR. BOEHM:  Your Honor, the FES, the stuff that

9    Ms. Oldfather has just said about the FES cure period is a little

10   bit new to me.  It was not really addressed, certainly not to

11   that detail in the plaintiff's brief.  More importantly, it's a

12   red herring.  This is not an issue that has anything to do with

13   the FES being filed or whether it was properly filed.

14        It's true that in this case, plaintiff filed an FES

15   that was initially rejected because it was not properly

16   notarized.  A notice of that rejection was sent to plaintiff's

17   counsel and a cured FES was then filed and accepted.  Notice of

18   that was put on plaintiff's counsel's Vioxx portal.  So that's

19   not the issue.

20        The issue here is the plaintiff, having failed to

21   be eligible for enrollment in the resolution program and then

22   having filed an FES, failed to pursue the claim any further.

23   Plaintiff did not file an expert report.  Plaintiff never

24   responded to our motion in any way to dismiss, either by filing

25   an expert report or by providing some other argument for why the

1   case should not be dismissed.

2            And, in fact, according to the affidavit that the

3   plaintiff attached to this motion by Ms. Oldfather, at some point

4   she told her attorneys not to pursue the claim at all.  It was

5   dismissed on October 30, 2009.  So all of this stuff that

6   Ms. Oldfather has talked about, the FES and the cure period, it's

7   entirely irrelevant to this case.

8            THE COURT:  Okay.

9            MS. OLDFATHER:  Your Honor, that's just wrong.  It's

10  here in Merck's attachment.  Merck provided with its papers a

11  summary of the claims event notices.  I'm looking right now at

12  page two, and what I said is exactly the way it went down.  On

13  August 7th, Ms. Elliott filed an FES.  On August 20th, it was

14  rejected.  On August 21st, as the record reflects, Merck and the

15  PSC got together and told BrownGreer not to allow any further

16  cures.  Ms. Elliott corrected her FES and filed it on

17  August 24th.  Mr. Boehm says that it was accepted.  Do you know

18  when it was accepted, Your Honor, and it shows right here on

19  their papers?  It was accepted on November 11th.  November 11th

20  Merck said, We accept, Merck told BrownGreer to accept the FES.

21  But on October 30th, it had already come in here and had you

22  dismiss the claim.

23            THE COURT:  All right.  With regard to this one, you

24  folks have to get together and give me some basis.  You're

25  talking about one thing and she's talking about another thing,

1    and it looks to me that the facts are either one way or the

2    other.  The difficulty I'm having with this last one is that it

3    seems to me the issue is whether or not she simply just changed

4    her mind.  At one time she decided not to pursue her claim, told

5    her lawyer to forget the claim, and now she wants to change her

6    mind.  If that's the case, then I'm not going to let her change

7    her mind, she once dismissed it.  But if that's not the facts,

8    then I'll look at it a different way.

9               So you've got to meet with Ms. Oldfather and see

10   whether or not you can agree on facts.

11              I'll take this up in the next meeting.  So I'll

12   pass on Sandra Elliott.

13              With regard to Carver, I am going set aside the

14   dismissal.  But Carver and those who follow have to understand

15   that this is a special, special case, in my opinion.  It's a

16   situation where all the material was given and clearly the person

17   responded, clearly the person wished to pursue the claim, and you

18   have all of the material now.  I don't see any prejudice, but

19   everybody has to understand, this is not, I'm not cracking the

20   door.  I don't intend to open this thing and have everybody take

21   a second bite at the apple.  I've given people an opportunity to

22   respond.  This is a different type situation.  I recognize the

23   difference in this case.

24              So I'm going to set aside the Carver case for

25   extraordinary circumstances.  With Elliott, I'm going to pass

1   that one for 30 days and see whether or not that one should be

2   dismissed for simply changing the mind or whether there is an

3   argument that both counsel agree on that she's fallen through the

4   cracks in some fashion that nobody intended.

5         MS. OLDFATHER:  Thank you, Your Honor, we understand the

6   Court's comments.

7         THE COURT:  Anything more?

8            The court will stand in recess.  Thank you very

9   much.

10        THE DEPUTY CLERK:  Everyone rise.

11        (WHEREUPON, the proceedings at 10:48 a.m. were

12   concluded.)

13                      *    *    *

14

15                  REPORTER'S CERTIFICATE

16

17     I, Cathy Pepper, Certified Realtime Reporter, Registered
    Merit Reporter, Registered Professional Reporter, Certified Court
    Reporter of the State of Louisiana, Official Court Reporter for
18  the United States District Court, Eastern District of Louisiana,
    do hereby certify that the foregoing is a true and correct
19  transcript, to the best of my ability and understanding, from the
    record of the proceedings in the above-entitled and numbered
20  matter.

21

22                      *s/Cathy Pepper*
                        Cathy Pepper, CRR, RMR, CCR
23                      Official Court Reporter
                        United States District Court

24

25

## $

**$1,828** [1] - 12:14
**$1,833** [1] - 12:14
**$10,000** [1] - 19:23
**$15** [1] - 37:16
**$250,000** [1] - 14:17
**$300** [1] - 10:4
**$301** [1] - 10:11
**$5,000** [1] - 10:20
**$50,000** [1] - 24:25

## '

**'09** [1] - 55:10

## 0

**0.5** [1] - 10:24
**06-8314** [1] - 38:22

## 1

**1,091** [1] - 10:13
**1,200** [4] - 23:11, 25:3, 25:7, 25:16
**1,674** [1] - 15:13
**1,810** [1] - 12:16
**10** [4] - 24:11, 24:12, 38:2, 39:8
**10,583** [1] - 10:4
**10004** [1] - 2:4
**1018** [1] - 4:22
**10:48** [1] - 59:11
**11** [4] - 14:5, 14:6, 38:20, 39:12
**11,353** [1] - 10:4
**1100** [1] - 2:8
**115** [1] - 4:13
**11th** [3] - 55:11, 57:19
**12(b)(6** [1] - 31:16
**12,444** [1] - 11:2
**13** [4] - 14:2, 14:3, 14:4, 24:14
**1300** [1] - 3:19
**1330** [1] - 2:18
**138** [1] - 10:16
**13th** [2] - 38:16, 38:19
**1419** [1] - 2:14
**1440** [1] - 3:10
**14th** [2] - 11:16, 17:5
**15** [1] - 25:5
**15th** [2] - 54:7, 54:11
**15TH** [1] - 4:13
**16** [1] - 43:7
**16,917** [1] - 23:15
**1625** [1] - 3:7

**1657** [2] - 1:5, 7:10
**1710** [1] - 2:11
**177** [1] - 21:14
**18** [2] - 6:7, 48:2
**180** [1] - 25:11
**18800** [1] - 41:11
**1890** [1] - 2:15
**19106** [1] - 1:24
**1st** [2] - 34:22, 40:15

## 2

**2** [2] - 10:10, 39:9
**2,331** [1] - 15:23
**20** [2] - 17:15, 17:16
**20-day** [2] - 53:1, 53:20
**20005** [2] - 2:23, 3:10
**20006** [1] - 3:7
**2006** [2] - 45:21, 47:1
**2008** [2] - 43:7, 48:2
**2009** [4] - 53:17, 53:18, 54:25, 57:5
**2010** [2] - 1:6, 7:2
**202** [1] - 4:22
**20th** [2] - 54:18, 57:13
**21** [1] - 23:24
**2150** [1] - 3:14
**21st** [3] - 53:18, 54:19, 57:14
**22,381** [1] - 23:7
**22nd** [3] - 34:9, 54:13, 54:17
**23219** [1] - 4:14
**234** [1] - 1:20
**2450** [1] - 4:4
**24th** [1] - 57:17
**250,000** [1] - 13:20
**260** [1] - 19:21
**27** [2] - 6:8, 10:18
**275** [1] - 4:9
**27th** [5] - 37:24, 40:2, 40:7, 40:19, 47:23
**27TH.......** [1] - 6:22
**28** [11] - 36:4, 36:5, 36:20, 40:10, 43:6, 43:23, 44:1, 44:7, 45:10, 46:1, 46:8, 46:12, 46:18, 46:23, 46:25, 47:25
**2800** [2] - 2:7, 2:8
**29** [4] - 6:9, 36:20, 36:25, 37:4
**29.19** [1] - 11:8
**297** [1] - 10:7
**298** [1] - 13:15
**29th** [1] - 17:10
**2nd** [1] - 17:11

## 3

**3** [3] - 1:6, 7:2, 39:15
**3.8** [1] - 19:14
**30** [3] - 17:2, 57:5, 59:1
**3000** [1] - 4:9
**30th** [3] - 17:7, 17:25, 57:21
**31** [2] - 15:6, 15:7
**32** [1] - 6:10
**32207** [1] - 33:4
**33** [1] - 6:11
**35** [2] - 6:12, 6:13
**36** [7] - 6:14, 6:15, 6:16, 6:17, 6:18, 6:19, 6:20
**36103** [1] - 1:21
**3650** [1] - 3:23
**37** [2] - 6:21, 6:22
**3:30** [1] - 40:15

## 4

**4** [1] - 39:19
**4,857** [1] - 20:15
**40** [1] - 10:5
**400** [2] - 4:4, 4:14
**40199** [1] - 38:15
**40208** [1] - 2:18
**405** [1] - 3:19
**4160** [1] - 1:20
**429** [1] - 15:4
**43** [11] - 36:20, 36:25, 37:4, 38:14, 38:24, 39:10, 39:13, 39:20, 40:9, 43:24, 52:1
**436** [1] - 21:5
**44.28** [1] - 11:8
**440** [1] - 2:11
**45** [1] - 22:8
**45242** [1] - 4:18
**46** [1] - 20:10
**47** [2] - 15:17, 15:18
**477** [2] - 23:6, 23:18
**49** [1] - 24:9

## 5

**5** [2] - 11:8, 39:21
**5,000** [2] - 10:10, 10:17
**5,488** [1] - 23:18
**50** [1] - 33:12
**500** [2] - 1:24, 5:7
**504** [1] - 5:8
**510** [1] - 1:24

**51268** [1] - 4:23
**546** [1] - 3:4
**55** [2] - 24:9, 24:13
**589-7779** [1] - 5:8

## 6

**60** [2] - 10:6, 49:17
**60(b** [1] - 49:10
**60(c** [2] - 49:10
**60(c)** [1] - 49:16
**60,000** [1] - 33:12
**600** [1] - 21:4
**65** [1] - 37:2
**65.22** [1] - 11:6
**650** [1] - 3:14
**66** [1] - 14:23
**664** [1] - 22:14

## 7

**7.46** [1] - 11:9
**701** [1] - 3:23
**70113** [1] - 1:16
**70130** [4] - 3:4, 3:14, 4:4, 5:8
**70139** [1] - 3:23
**70163** [1] - 2:8
**70505** [1] - 4:23
**70602** [1] - 2:15
**72.23** [1] - 11:7
**721** [1] - 15:16
**725** [1] - 2:22
**770** [1] - 10:8
**77002** [1] - 2:12
**7775** [1] - 4:18
**7th** [1] - 57:13

## 8

**8** [2] - 6:5, 40:5
**82.8** [1] - 22:6
**820** [1] - 1:16
**848** [1] - 14:18
**8:30** [1] - 37:25

## 9

**9** [1] - 6:6
**926** [1] - 10:14
**94111** [1] - 4:9
**96.2** [1] - 19:12
**98.3** [1] - 21:3
**99** [4] - 15:25, 16:1, 16:3, 17:12
**99.04** [1] - 11:7
**99.1** [1] - 20:10

**9:00** [2] - 1:6, 37:24

## A

**a.m** [1] - 59:11
**A.M** [1] - 1:6
**abbreviate** [1] - 24:18
**ability** [1] - 59:19
**able** [21] - 9:6, 10:24, 11:15, 12:13, 12:17, 16:6, 17:19, 17:21, 17:24, 26:1, 27:8, 27:22, 27:24, 28:15, 28:16, 32:15, 32:21, 33:3, 34:3, 45:22, 51:23
**above-entitled** [1] - 59:19
**absolute** [1] - 55:8
**accept** [1] - 57:20
**accepted** [8] - 52:5, 54:16, 55:13, 55:17, 56:17, 57:17, 57:18, 57:19
**access** [1] - 34:1, 42:5
**accomplishment** [1] - 16:22
**according** [1] - 57:2
**account** [1] - 11:21
**action** [7] - 29:8, 30:17, 31:4, 35:11, 35:15, 35:16, 35:22
**ACTION....................
.............** [1] - 6:13
**ACTIONS** [1] - 4:7
**actions** [4] - 29:25, 30:9, 45:15, 47:13
**ACTIONS..................
...................** [1] -
6:9
**actual** [5] - 22:10, 29:2, 29:10, 51:9, 52:20
**ad** [1] - 20:18
**add** [3] - 29:12, 34:18, 35:15
**addition** [1] - 46:5
**additional** [2] - 10:2, 13:13
**address** [4] - 7:22, 28:5, 31:8, 40:16
**addressed** [1] - 56:10
**administrative** [1] - 9:9
**ADMINISTRATOR** [2] - 4:12, 4:17
**administrator** [8] - 9:5, 9:14, 17:4, 18:7, 18:17, 19:1, 19:18,

45:19
**administrator's** [2] - 19:5, 19:10
**ADMINISTRATOR.....** ..................... [1] - 6:7
**advertise** [1] - 48:9
**advised** [1] - 30:9
**AED** [2] - 13:13, 15:3
**affidavit** [2] - 45:7, 57:2
**AG** [1] - 35:7
**Age** [1] - 27:20
**agencies** [4] - 20:12, 20:20, 22:17
**agenda** [4] - 7:15, 7:24, 33:22, 37:20
**AGENDA** [1] - 6:3
**agent** [1] - 17:3
**ago** [5] - 43:3, 43:16, 44:3, 48:2, 55:1
**agree** [3] - 22:3, 58:10, 59:3
**agreed** [1] - 40:6
**agreement** [5] - 8:1, 8:2, 10:22, 15:4, 39:18
**AGREEMENT............** ..................... [1] - 6:5
**agreements** [1] - 32:21
**ahead** [1] - 10:25
**AL** [1] - 1:21
**alarmed** [1] - 11:21
**albeit** [1] - 47:16
**alive** [1] - 45:15
**ALL** [1] - 1:8
**allegations** [1] - 31:9
**ALLEN** [1] - 1:18
**ALLOCATION** [1] - 6:15
**allocation** [1] - 36:10
**allow** [4] - 47:17, 55:24, 56:4, 57:15
**allowed** [2] - 53:20, 54:1
**allowing** [1] - 47:16
**allows** [1] - 12:20
**almost** [1] - 50:19
**ALSO** [1] - 5:3
**amended** [1] - 45:17
**amicus** [1] - 42:21
**amount** [6] - 10:24, 12:15, 19:25, 20:5, 24:10, 26:9
**amounts** [1] - 22:12
**AND** [2] - 2:6, 6:16
**ANDERSON** [1] - 3:6
**Anderson** [3] - 41:12,

41:20, 41:21
**Anderson's** [1] - 41:10
**ANDY** [1] - 1:19
**Andy** [7] - 7:14, 29:25, 33:7, 35:3, 36:3, 36:16, 37:1
**Ann** [1] - 36:23
**ANN** [1] - 2:17
**announce** [2] - 8:4, 16:7
**announced** [3] - 43:5, 44:8, 44:12
**answer** [1] - 50:11
**answers** [1] - 45:17
**anticipate** [2] - 24:16, 31:8
**antisubrogation** [1] - 24:22
**appeal** [9] - 17:10, 17:14, 17:16, 17:17, 17:20, 24:11, 27:23, 52:7, 52:9
**appealed** [4] - 14:2, 14:5, 14:23, 15:18
**appeals** [10] - 14:3, 15:1, 15:7, 15:25, 16:2, 17:12, 17:23, 25:13, 25:14, 36:16
**APPEALS.................** ............................. [1] - 6:17
**APPEARANCES** [5] - 1:13, 2:1, 3:1, 4:1, 5:1
**appearances** [1] - 7:11
**apple** [2] - 29:3, 58:21
**applied** [1] - 19:25
**appoint** [1] - 46:19
**appointed** [3] - 27:7, 27:13, 34:7
**appointing** [1] - 45:19
**appreciate** [4] - 9:18, 27:4, 43:13, 43:15
**appreciates** [1] - 8:21
**appreciation** [1] - 8:15
**approaching** [1] - 9:3
**approval** [2] - 20:12, 22:17
**approved** [3] - 24:9, 24:10
**April** [3] - 17:10, 47:23
**area** [1] - 28:11
**areas** [2] - 28:8, 35:24
**argue** [1] - 42:13
**argument** [2] - 56:25, 59:3
**arguments** [2] - 31:19, 9:5
**arms** [1] - 44:10

**ARNOLD** [1] - 1:23
**ARPS** [1] - 3:9
**arrows** [1] - 16:18
**aside** [4] - 10:24, 37:15, 58:13, 58:24
**aspect** [1] - 34:20
**aspects** [2] - 27:10, 31:15
**assessment** [1] - 48:23
**assigned** [1] - 27:14
**assist** [1] - 34:15
**assistance** [4] - 19:9, 19:20, 20:24, 21:18
**assume** [1] - 41:2
**assuming** [2] - 49:13, 49:16
**assured** [1] - 29:21
**attached** [1] - 57:3
**attachment** [1] - 57:10
**attack** [5] - 11:12, 14:16, 15:10, 27:16, 37:8
**attended** [1] - 28:21
**attention** [3] - 19:22, 37:11, 47:14
**Attorney** [2] - 35:14, 35:20
**attorney** [11] - 28:6, 45:2, 45:8, 46:15, 49:1, 49:7, 51:5, 51:9, 51:10
**ATTORNEY** [2] - 3:17, 3:18
**attorney's** [2] - 36:18, 37:13, 37:20
**ATTORNEY'S** [1] - 6:19
**attorneys** [7] - 31:22, 32:23, 44:9, 44:17, 45:3, 53:3, 57:4
**audit** [2] - 23:22, 24:5
**audited** [1] - 22:16
**audits** [1] - 24:7
**August** [11] - 53:14, 53:17, 53:18, 54:10, 54:13, 54:17, 54:19, 57:13, 57:14, 57:17
**authorities** [1] - 42:5
**authorizations** [2] - 45:20, 53:8
**available** [3] - 35:5, 35:9, 35:18
**AVENUE** [2] - 1:16, 3:10
**average** [3] - 10:23, 11:5, 11:6
**awaiting** [1] - 22:17
**award** [4] - 19:23, 22:12, 23:1, 23:16

**awardable** [1] - 13:7
**awards** [1] - 18:24
**aware** [3] - 35:19, 36:17, 45:11

**B**

**B406** [1] - 5:7
**babies** [1] - 41:5
**balance** [4] - 10:6, 11:22, 23:24, 25:12
**Bank** [2] - 11:15, 11:18
**bank** [1] - 12:5
**banks** [1] - 12:6
**Barbara** [1] - 39:22
**Barnes'** [1] - 8:12
**barred** [1] - 49:16
**Barrios** [1] - 32:9
**BARRIOS** [3] - 3:22, 3:22, 32:8
**based** [1] - 42:21
**basis** [5] - 48:19, 48:24, 49:4, 57:24
**BATTERY** [1] - 4:9
**Baum** [1] - 40:12
**BE** [1] - 6:22
**Beasley** [1] - 40:6
**BEASLEY** [1] - 1:18
**becomes** [1] - 54:9
**BEFORE** [1] - 1:11
**begin** [1] - 8:19
**behalf** [4] - 7:14, 7:16, 8:17, 35:14
**behind** [1] - 17:2
**Beisner** [1] - 30:5
**BEISNER** [3] - 3:9, 30:4, 31:14
**believers** [1] - 29:5
**benefits** [1] - 26:19
**BENJAMIN** [1] - 2:6
**Benjamin** [2] - 32:25, 42:17
**BERMAN** [1] - 1:22
**BERNSTEIN** [1] - 4:7
**best** [6] - 8:18, 12:2, 31:2, 31:9, 34:15, 59:19
**better** [2] - 26:21, 32:11
**between** [6] - 9:17, 11:12, 12:14, 20:5, 54:10, 55:23
**beyond** [1] - 28:20
**big** [1] - 37:21
**Bilal** [1] - 40:1
**bilateral** [1] - 47:10
**Birchfield** [3] - 7:14, 9:20, 16:11

**BIRCHFIELD** [11] - 1:19, 7:13, 8:3, 18:8, 30:2, 33:20, 35:4, 36:17, 36:22, 37:2, 37:7
**bit** [4] - 11:24, 22:7, 51:17, 56:10
**bite** [2] - 32:6, 58:21
**bite-size** [1] - 32:6
**blast** [2] - 12:20, 53:19
**BLIZZARD** [2] - 2:10, 2:10
**BLVD** [1] - 3:19
**Bob** [3] - 33:23, 34:3, 34:7
**BOEHM** [9] - 2:22, 47:22, 48:17, 50:2, 50:10, 50:13, 50:16, 51:8, 56:8
**Boehm** [3] - 42:13, 51:2, 57:17
**Boehm's** [1] - 51:7
**born** [1] - 41:5
**Boston** [1] - 8:19
**bother** [1] - 54:15
**bottom** [2] - 24:4, 28:4
**BOX** [2] - 1:20, 2:15
**box** [1] - 24:4
**breakdowns** [1] - 11:13
**brethren** [1] - 32:13
**BRIAN** [1] - 3:6
**Brian** [1] - 41:10
**brief** [6] - 9:21, 30:4, 34:8, 38:5, 42:21, 56:11
**briefing** [2] - 30:12, 30:24
**briefly** [1] - 35:4
**briefs** [3] - 41:16, 42:20, 42:25
**bring** [4] - 32:10, 38:9, 38:11, 49:14
**bringing** [2] - 47:13, 49:12
**brought** [2] - 19:22, 37:11
**BROWN** [8] - 4:12, 4:13, 12:25, 16:16, 16:18, 16:22, 16:25, 18:4
**Brown** [3] - 8:9, 9:15, 12:25
**BrownGreer** [17] - 8:5, 8:9, 9:14, 27:21, 42:3, 42:4, 42:7, 52:4, 52:14, 53:2, 53:15, 53:19, 53:22, 55:6, 55:12, 57:15, 57:20

**BUILDING** [1] - 2:11
**bulk** [6] - 22:15, 23:15, 24:6, 26:1, 33:12, 34:12
**bunch** [1] - 46:10
**burden** [1] - 26:22
**bus** [1] - 46:4
**BY** [22] - 1:15, 1:19, 1:23, 2:3, 2:7, 2:10, 2:14, 2:17, 2:21, 3:3, 3:6, 3:9, 3:13, 3:19, 3:22, 4:3, 4:8, 4:12, 4:17, 4:21, 5:9, 5:10

**C**

**CA** [1] - 4:9
**Cabraser** [4] - 30:5, 30:8, 30:12, 30:16
**CABRASER** [3] - 4:7, 4:8, 30:15
**Cajun** [2] - 28:23, 28:25
**calculate** [1] - 12:20
**California** [1] - 28:12
**CALLED** [1] - 7:4
**cannot** [1] - 45:6
**cardiac** [1] - 37:8
**care** [1] - 29:20
**cared** [1] - 47:13
**career** [2] - 8:19, 16:22
**carefully** [1] - 15:15
**CARONDELET** [1] - 3:4
**carry** [1] - 33:18
**Carver** [27] - 42:16, 43:1, 43:2, 43:23, 44:6, 45:5, 45:9, 45:11, 45:14, 46:6, 46:7, 46:9, 46:13, 46:14, 46:16, 46:20, 47:2, 47:6, 47:9, 47:12, 47:16, 49:15, 50:8, 51:1, 58:13, 58:14, 58:24
**Carver's** [4] - 45:7, 47:9, 51:4
**case** [55] - 7:9, 9:6, 9:10, 9:14, 9:16, 18:13, 18:14, 27:8, 27:25, 28:2, 28:18, 33:11, 33:14, 33:16, 35:7, 35:20, 38:22, 38:24, 39:24, 41:3, 41:4, 41:19, 42:17, 43:1, 43:2, 44:15, 44:24, 45:5, 46:17, 47:14, 47:24, 48:1,

48:3, 48:19, 48:24, 48:25, 49:2, 49:5, 49:14, 49:15, 49:23, 50:9, 50:19, 51:25, 52:1, 52:20, 56:14, 57:1, 57:7, 58:6, 58:15, 58:23, 58:24
**CASES** [1] - 1:8
**cases** [36] - 8:23, 9:8, 19:6, 19:13, 20:1, 20:5, 20:10, 21:2, 21:3, 21:4, 21:6, 21:10, 21:13, 24:16, 28:1, 32:22, 36:5, 36:6, 36:8, 36:24, 38:13, 38:17, 40:18, 40:21, 43:19, 43:22, 44:13, 46:18, 46:20, 46:25, 47:5, 47:6, 48:4, 55:6
**CASTIEX** [1] - 3:22
**categories** [1] - 37:3
**category** [2] - 21:14, 24:3
**Cathy** [2] - 59:16, 59:22
**CATHY** [1] - 5:7
**caused** [2] - 47:4, 47:12
**caveat** [1] - 29:12
**CCR** [2] - 5:7, 59:22
**CENTER** [2] - 4:8, 4:22
**centralized** [1] - 20:21
**CENTRE** [2] - 2:7, 2:11
**certain** [3] - 26:6, 34:23, 51:11
**certainly** [3] - 34:19, 51:3, 56:10
**certificate** [1] - 45:18
**CERTIFICATE** [1] - 59:15
**Certified** [2] - 59:16, 59:17
**certify** [1] - 59:18
**challenge** [1] - 31:21
**chambers** [2] - 43:17, 43:25
**change** [4] - 8:24, 53:24, 58:5, 58:6
**changed** [3] - 44:16, 55:3, 58:3
**changes** [1] - 41:6
**changing** [1] - 59:2
**characterized** [1] - 46:4
**CHARLES** [1] - 2:15
**chart** [1] - 19:12
**charting** [2] - 28:23,

29:1
**charts** [1] - 28:22
**chase** [1] - 26:18
**chat** [1] - 34:5
**check** [2] - 12:4, 12:9
**checks** [4] - 11:24, 11:25, 12:2, 12:5
**chose** [5] - 15:16, 23:7, 26:10, 26:11, 43:5
**CHRISTOPHER** [1] - 2:3
**CINCINNATI** [1] - 4:18
**Circuit** [1] - 49:3
**circumstances** [4] - 34:14, 49:14, 49:17, 58:25
**cite** [1] - 49:4
**claim** [34] - 15:9, 22:23, 31:18, 39:17, 41:4, 42:8, 43:3, 43:6, 43:7, 43:10, 43:15, 43:20, 45:15, 46:21, 47:2, 47:17, 49:6, 52:5, 52:13, 53:6, 53:10, 54:25, 55:2, 55:9, 55:13, 55:17, 55:24, 56:5, 56:22, 57:4, 57:22, 58:4, 58:5, 58:17
**claimant** [12] - 8:2, 12:21, 14:9, 23:7, 25:1, 25:16, 26:1, 26:5, 53:21, 53:25
**claimants** [50] - 10:4, 10:5, 10:6, 10:8, 10:9, 10:13, 10:15, 10:17, 10:18, 10:19, 10:23, 11:2, 11:6, 11:12, 12:3, 12:4, 12:10, 13:16, 13:25, 14:15, 14:19, 15:17, 15:23, 16:12, 22:14, 22:22, 23:7, 23:9, 23:11, 23:15, 23:18, 24:3, 24:5, 25:3, 25:4, 25:5, 25:8, 25:12, 25:14, 25:16, 25:20, 26:18, 26:21, 27:9, 33:4, 33:12, 33:23, 33:24, 37:3
**CLAIMANTS..............**
**......................** [1] -
6:11
**claimed** [1] - 46:11
**claiming** [3] - 13:11, 15:3, 15:10
**CLAIMS** [1] - 4:11
**claims** [56] - 8:5, 9:5, 9:14, 9:22, 10:3,

13:4, 13:5, 13:7, 13:10, 13:11, 13:15, 13:21, 13:23, 14:5, 14:9, 14:13, 14:19, 14:23, 15:5, 15:12, 15:13, 15:14, 15:16, 15:21, 15:23, 16:8, 17:8, 17:22, 19:1, 19:5, 19:10, 19:18, 19:23, 20:4, 22:6, 22:10, 23:15, 23:19, 25:1, 27:9, 27:16, 30:16, 33:13, 34:17, 40:4, 42:2, 42:15, 51:19, 51:24, 52:15, 53:7, 56:1, 57:11
**class** [5] - 29:25, 30:9, 30:17, 31:4, 31:8
**CLASS** [1] - 6:9
**classic** [1] - 31:16
**clean** [1] - 43:18
**cleaning** [1] - 33:2
**cleanup** [4] - 33:7, 33:9, 33:17, 33:21
**clearly** [2] - 58:16, 58:17
**clears** [1] - 31:24
**clerk** [2] - 8:22, 29:19
**CLERK** [4] - 7:7, 7:10, 38:6, 59:10
**clerks** [2] - 8:24, 29:22
**client** [1] - 21:17
**close** [2] - 20:24, 35:22
**Cockrell** [1] - 39:22
**collaborative** [1] - 9:16
**color** [1] - 28:22
**combine** [1] - 29:5
**coming** [2] - 11:17, 21:19
**comma** [1] - 12:7
**comment** [2] - 28:3, 28:9
**comments** [2] - 43:15, 59:6
**COMMERCE** [1] - 1:20
**COMMITTEE** [1] - 4:7
**Committee** [2] - 51:16, 51:17
**committee** [7] - 30:16, 30:17, 32:9, 33:8, 33:21, 35:15, 36:10
**COMMITTEE............**
**................** [1] - 6:15
**common** [1] - 31:3
**communicated** [1] - 54:20
**communications** [3] - 34:11, 34:13, 51:9

**comparative** [1] - 11:11
**compensation** [1] - 44:22
**compile** [1] - 36:24
**complaint** [1] - 30:11
**complete** [12] - 19:7, 19:13, 20:10, 21:8, 22:6, 22:8, 23:21, 23:22, 24:13, 29:9, 45:23, 56:1
**completed** [6] - 24:4, 24:7, 27:17, 28:4, 29:3
**compliance** [6] - 38:23, 40:18, 46:1, 46:8, 46:12, 46:23
**complicated** [1] - 16:20
**complied** [3] - 39:10, 39:12, 39:20
**comply** [5] - 38:14, 43:8, 47:25, 51:10, 51:12
**component** [1] - 14:14
**comprehension** [1] - 28:20
**COMPUTER** [1] - 5:10
**concept** [1] - 31:3
**concerned** [1] - 26:10
**concerns** [1] - 40:16
**conclude** [3] - 19:20, 23:3, 28:20
**concluded** [2] - 14:13, 59:12
**concludes** [1] - 27:1
**conclusion** [1] - 36:1
**conditional** [2] - 32:15
**confer** [3] - 28:16, 30:13, 30:18
**conference** [8] - 7:21, 31:11, 32:12, 32:17, 34:22, 36:23, 37:24, 40:14
**CONFERENCE** [2] - 1:11, 6:22
**conferring** [1] - 56:7
**CONNOLLY** [1] - 2:21
**consider** [4] - 16:22, 21:8, 29:13, 42:20
**considerably** [1] - 24:8
**considered** [1] - 30:18
**considering** [1] - 31:2
**consistent** [2] - 18:18, 51:22
**consulting** [1] - 30:8
**consummated** [1] - 55:22
**consumption** [1] -

29:22
**contact** [1] - 42:5
**contacted** [3] - 47:6, 48:7, 55:21
**contacting** [1] - 32:20
**contains** [1] - 34:9
**contaminated** [1] - 33:15
**contemporaneous** [1] - 19:10
**context** [1] - 31:4
**continually** [1] - 19:17
**continue** [2] - 35:6, 45:6
**CONTINUED** [4] - 2:1, 3:1, 4:1, 5:1
**contrary** [1] - 51:18
**conversations** [1] - 31:17
**cooked** [1] - 29:2
**COOPER** [1] - 4:18
**coordination** [1] - 32:7
**COORDINATION.......
..................** [1] - 6:10
**copy** [1] - 41:14
**correct** [8] - 16:5, 21:17, 37:17, 45:11, 50:14, 53:3, 53:20, 59:18
**corrected** [3] - 54:14, 54:17, 57:16
**costume** [1] - 32:10
**COTLAR** [1] - 1:15
**COUNSEL** [2] - 3:18, 3:22
**counsel** [25] - 7:11, 7:23, 16:13, 19:18, 21:16, 24:11, 32:20, 42:22, 43:9, 44:14, 47:21, 48:11, 50:5, 50:8, 50:9, 54:12, 54:14, 54:20, 54:23, 54:24, 55:1, 55:17, 56:7, 56:17, 59:3
**counsel's** [1] - 56:18
**country** [6] - 28:11, 28:14, 28:25, 44:9, 45:3, 48:8
**couple** [2] - 14:8, 26:9
**course** [3] - 25:6, 49:8, 50:5
**Court** [52] - 7:22, 8:12, 8:21, 9:23, 16:7, 18:6, 19:8, 21:18, 21:19, 25:6, 27:13, 28:8, 29:12, 30:7, 30:9, 31:17, 34:9, 34:10, 34:12, 34:23,

36:19, 37:14, 38:2, 39:22, 39:23, 40:10, 40:13, 40:17, 40:24, 41:14, 43:8, 45:13, 45:18, 46:7, 49:19, 50:1, 50:2, 50:16, 51:3, 51:6, 52:6, 54:6, 54:7, 55:22, 55:24, 56:3, 59:17, 59:17, 59:18, 59:23, 59:23
**COURT** [69] - 1:1, 5:7, 7:4, 7:8, 7:11, 7:17, 7:20, 8:20, 12:24, 16:15, 16:17, 16:20, 16:24, 18:1, 18:7, 18:12, 18:21, 20:15, 20:25, 21:21, 22:4, 25:9, 25:17, 26:25, 27:4, 28:8, 29:17, 29:20, 29:24, 31:10, 31:23, 33:6, 33:24, 34:6, 35:2, 35:11, 35:23, 36:2, 36:9, 36:12, 36:18, 37:1, 37:5, 37:9, 37:15, 37:18, 37:23, 38:7, 39:1, 40:20, 41:17, 41:20, 41:22, 42:9, 42:17, 43:1, 47:18, 47:21, 48:3, 49:24, 50:8, 50:15, 50:21, 50:24, 51:13, 56:6, 57:8, 57:23, 59:7
**court** [5] - 26:22, 32:22, 34:7, 40:14, 59:8
**Court's** [13] - 19:9, 19:20, 19:22, 20:24, 33:11, 43:14, 43:15, 43:18, 47:8, 47:15, 51:10, 54:7, 59:6
**court-appointed** [1] - 34:7
**Court-appointed** [1] - 27:13
**courtroom** [3] - 29:14, 43:16, 43:17
**covering** [1] - 7:15
**crack** [2] - 51:15, 51:16
**cracking** [1] - 58:19
**cracks** [2] - 55:23, 59:4
**created** [3] - 22:25, 26:14, 44:18
**creating** [1] - 35:16
**creation** [1] - 43:4
**crew** [4] - 33:7, 33:9, 33:17, 33:21

**criteria** [1] - 15:11
**CROW** [1] - 1:18
**CRR** [2] - 5:7, 59:22
**cuisine** [1] - 29:3
**CURATOR** [1] - 4:3
**curator** [2] - 34:8, 40:13
**curator's** [1] - 34:9
**cure** [16] - 51:22, 52:15, 53:1, 53:16, 53:25, 54:4, 54:5, 54:8, 54:18, 55:6, 55:7, 55:8, 55:20, 56:9, 57:6
**cured** [1] - 56:17
**cures** [1] - 57:16
**cusp** [1] - 13:5

# D

**damages** [1] - 13:13
**dance** [3] - 30:20, 31:21, 32:10
**data** [5] - 16:5, 23:5, 23:6, 24:7
**date** [5] - 10:12, 15:4, 44:3, 51:11
**DAVID** [2] - 2:6, 4:21
**Davis** [2] - 34:22, 40:13
**DAVIS** [1] - 1:15
**Dawn** [2] - 32:7, 32:9
**DAWN** [1] - 3:22
**days** [6] - 12:19, 17:15, 17:16, 24:11, 24:12, 59:1
**DC** [3] - 2:23, 3:7, 3:10
**de** [1] - 20:4
**deadlines** [3] - 49:21, 50:18
**deal** [13] - 21:25, 22:2, 25:10, 28:17, 31:13, 32:5, 33:16, 33:17, 34:24, 37:15, 37:20, 38:8, 53:12
**dealing** [4] - 31:3, 36:13, 37:19, 46:10
**dealt** [1] - 35:11
**death** [3] - 37:8, 45:18, 47:2
**decide** [2] - 11:1, 42:25
**decided** [9] - 12:12, 14:4, 14:6, 15:1, 15:7, 15:19, 17:23, 41:15, 58:4
**decisions** [2] - 16:3, 27:22
**defective** [1] - 54:1

**defects** [1] - 53:22
**DEFENDANTS** [1] - 2:21
**defendants** [2] - 32:1, 33:9
**defense** [1] - 31:23
**defer** [1] - 40:6
**deferred** [4] - 38:11, 38:17, 40:7, 40:8
**deferring** [2] - 39:11, 40:2
**deficient** [2] - 46:12, 46:14
**delay** [1] - 45:21
**delays** [1] - 12:4
**delighted** [1] - 13:1
**demonstrated** [1] - 47:13
**denotes** [2] - 29:8, 29:11
**depict** [1] - 30:18
**DEPUTY** [4] - 7:7, 7:10, 38:6, 59:10
**Deputy** [2] - 27:15, 28:10
**derivative** [2] - 12:3, 33:3
**describe** [1] - 16:7
**designated** [1] - 33:10
**designation** [1] - 10:20
**desire** [2] - 43:18, 53:6
**desires** [1] - 51:23
**detail** [3] - 11:13, 24:19, 56:11
**details** [1] - 8:6
**determine** [3] - 22:22, 32:3, 37:19
**diagnostic** [1] - 45:23
**dictates** [1] - 10:22
**die** [1] - 41:5
**died** [2] - 47:9, 47:10
**difference** [1] - 58:23
**different** [6] - 22:9, 25:23, 28:10, 48:10, 58:8, 58:22
**differently** [1] - 11:25
**difficulties** [1] - 30:20
**difficulty** [4] - 18:14, 33:10, 34:1, 58:2
**diligently** [1] - 32:20
**directly** [2] - 11:19, 42:4
**disappointment** [1] - 53:9
**discount** [2] - 26:1, 26:4
**discovery** [3] - 36:5, 36:8, 45:17

**discrepancies** [4] - 19:16, 21:15, 25:15
**discrepancy** [2] - 24:10, 25:2
**discretion** [4] - 47:8, 47:15, 55:7, 56:4
**discuss** [3] - 34:23, 35:23, 43:22
**discussed** [5] - 7:24, 22:19, 30:23, 44:4, 49:18
**dismiss** [11] - 32:21, 33:3, 34:24, 40:21, 46:6, 48:15, 48:19, 52:13, 56:24, 57:22
**Dismiss** [12] - 34:15, 34:16, 39:5, 43:11, 45:10, 46:6, 49:2, 50:20, 54:25, 55:2, 55:15
**dismissal** [8] - 38:21, 39:4, 39:23, 48:25, 49:4, 52:3, 52:12, 58:14
**dismissed** [20] - 32:22, 33:4, 38:13, 38:24, 39:24, 40:18, 43:2, 43:7, 43:12, 46:21, 48:1, 48:2, 48:5, 55:9, 55:10, 55:14, 57:1, 57:5, 58:7, 59:2
**dispatch** [1] - 33:19
**dispute** [2] - 47:24, 51:1
**distributed** [1] - 13:8
**District** [2] - 59:18, 59:23
**DISTRICT** [3] - 1:1, 1:1, 1:12
**docket** [4] - 41:9, 42:19, 43:18, 54:7
**DOCKET** [1] - 1:5
**doctor** [4] - 41:23, 41:25, 46:3, 47:3
**doctors** [2] - 34:2, 47:11
**Document** [2] - 38:14, 41:11
**DOCUMENT** [1] - 1:7
**dollars** [2] - 13:6, 16:9
**done** [18] - 8:16, 8:20, 10:24, 11:2, 16:13, 18:3, 21:3, 21:18, 27:5, 28:1, 29:2, 29:15, 33:14, 34:15, 39:4, 48:6, 48:23
**Donna** [1] - 39:9
**door** [1] - 58:20
**Doris** [1] - 40:1

**DOROTHY** [1] - 3:3
**Dorothy** [2] - 34:21, 38:8
**Douglas** [1] - 7:18
**DOUGLAS** [1] - 2:21
**down** [5] - 22:11, 22:14, 32:18, 52:23, 57:12
**DRAWER** [1] - 4:23
**DREW** [1] - 2:14
**drop** [1] - 55:19
**due** [4] - 18:23, 19:15, 23:1, 44:1
**DUGAN** [3] - 3:13, 35:13, 35:25
**Dugan** [1] - 35:13
**dust** [1] - 12:18
**duties** [1] - 49:8

**E**

**e-mail** [3] - 12:20, 53:19, 54:2
**early** [2] - 47:1, 53:14
**EASTERN** [1] - 1:1
**Eastern** [1] - 59:18
**EBEN** [1] - 5:3
**economic** [1] - 30:9
**edge** [1] - 48:15
**EDWARD** [1] - 2:10
**effective** [1] - 32:23
**effectively** [1] - 34:25
**effort** [2] - 9:17, 18:2
**efforts** [1] - 51:18
**EI** [3] - 16:11, 16:14, 52:16
**either** [5] - 35:5, 37:3, 42:3, 56:24, 58:1
**elaborate** [1] - 28:22
**ELDON** [1] - 1:11
**elect** [1] - 52:10
**elected** [1] - 10:20
**eligible** [7] - 10:15, 17:8, 23:17, 23:20, 42:8, 44:25, 56:21
**Elizabeth** [2] - 30:5, 30:15
**ELIZABETH** [1] - 4:8
**ELLIOT** [1] - 2:13
**Elliott** [21] - 42:15, 43:23, 50:23, 50:24, 51:13, 51:14, 52:1, 53:5, 54:10, 54:13, 55:3, 55:11, 55:12, 55:16, 55:21, 56:2, 56:4, 57:13, 57:16, 58:12, 58:25
**Elliott's** [1] - 55:9
**EMBARCADERO** [1] -

4:8
**emboli** [2] - 47:4, 47:10
**en** [1] - 32:5
**encourage** [1] - 33:18
**end** [7] - 12:12, 17:2, 21:15, 25:13, 32:14, 47:22, 50:17
**ended** [1] - 15:25
**ENERGY** [1] - 2:7
**enroll** [1] - 52:2
**enrolled** [2] - 10:14, 53:7
**enrollment** [2] - 52:15, 56:21
**ensues** [1] - 26:19
**ensure** [2] - 22:24, 40:17
**entered** [2] - 38:18, 55:14
**entire** [1] - 18:10
**entirely** [1] - 57:7
**entitled** [1] - 59:19
**entitlement** [2] - 19:15, 22:24
**escrow** [2] - 17:3, 52:4
**ESQUIRE** [27] - 1:15, 1:19, 1:19, 1:23, 1:23, 2:3, 2:7, 2:10, 2:14, 2:17, 2:21, 2:22, 3:3, 3:6, 3:9, 3:13, 3:19, 3:22, 4:8, 4:12, 4:13, 4:17, 4:21, 5:3, 5:3, 5:4, 5:4
**essentially** [2] - 27:14, 31:8
**Estelle** [1] - 40:1
**ethical** [1] - 44:17
**event** [1] - 57:11
**evidence** [8] - 39:16, 40:3, 52:10, 52:22, 53:13, 53:17, 53:20, 55:12
**exactly** [2] - 16:8, 57:12
**exceed** [2] - 20:5, 24:25
**excellent** [1] - 9:1
**exception** [1] - 48:12
**EXECUTIVE** [1] - 4:7
**exercise** [2] - 47:15, 56:4
**Exhibit** [3] - 38:18, 38:20, 39:8
**exhibits** [1] - 35:8
**exist** [2] - 26:14, 40:4
**existed** [1] - 50:7
**expect** [5] - 20:8, 21:4, 22:15, 23:25, 44:19

**expended** [1] - 26:18
**expense** [1] - 14:3
**expenses** [9] - 13:11, 13:12, 13:14, 13:18, 13:19, 13:20, 14:3, 14:6, 14:12
**experience** [1] - 27:19
**experienced** [1] - 27:8
**expert** [3] - 48:18, 56:23, 56:25
**expire** [1] - 24:12
**explicitly** [3] - 49:3, 49:12, 49:16
**express** [1] - 8:15
**extended** [2] - 23:11, 49:21
**extension** [1] - 51:11
**extinguished** [2] - 39:17, 40:5
**extraordinary** [19] - 8:6, 13:2, 13:5, 13:7, 13:13, 14:18, 15:9, 15:13, 15:24, 17:1, 17:7, 17:22, 22:20, 22:23, 23:1, 27:16, 49:13, 49:17, 58:25
**EYE** [1] - 3:7

**F**

**face** [1] - 12:4
**faced** [1] - 45:2
**Facenda** [1] - 40:1
**facilities** [1] - 20:22
**facility's** [1] - 41:23
**fact** [7] - 22:9, 28:2, 31:3, 44:5, 48:6, 50:6, 57:2
**facts** [3] - 58:1, 58:7, 58:10
**factual** [1] - 43:14
**fail** [1] - 40:22
**failed** [4] - 49:1, 54:21, 56:20, 56:22
**failing** [1] - 40:17
**failure** [4] - 31:18, 38:14, 43:8, 48:18
**fair** [1] - 30:25
**falderal** [1] - 54:4
**fall** [3] - 36:24, 37:3, 55:1
**fallen** [1] - 59:3
**falling** [1] - 17:11
**FALLON** [1] - 1:11
**far** [2] - 9:22, 20:19
**fashion** [3] - 28:17, 38:23, 59:4
**fast** [1] - 9:1
**faulting** [1] - 46:10

**fed** [2] - 27:20, 27:21
**federal** [1] - 41:24
**FEE** [1] - 6:15
**fee** [1] - 36:10
**fees** [3] - 36:18, 37:13, 37:21
**FEES.........................
..............** [1] - 6:19
**fell** [4] - 43:6, 51:15, 54:10, 55:23
**felt** [1] - 41:22
**fence** [1] - 34:20
**FES** [19] - 52:11, 52:14, 52:16, 52:18, 53:2, 53:24, 54:1, 54:14, 54:17, 56:8, 56:9, 56:13, 56:14, 56:17, 56:22, 57:6, 57:13, 57:16, 57:20
**FESs** [1] - 54:8
**festering** [1] - 33:15
**few** [3] - 13:14, 22:16, 24:17
**fifth** [2] - 23:12, 38:12
**Fifth** [1] - 49:3
**figuratively** [1] - 54:22
**figure** [2] - 30:12, 32:2
**file** [11] - 29:19, 30:10, 30:22, 45:7, 49:2, 51:4, 52:3, 52:9, 52:11, 52:12, 56:23
**filed** [28] - 34:17, 39:22, 41:11, 43:3, 45:14, 45:16, 45:17, 45:18, 46:22, 47:5, 50:6, 51:6, 52:16, 53:6, 53:7, 53:13, 54:6, 54:24, 56:3, 56:13, 56:14, 56:17, 56:22, 57:13, 57:16
**files** [2] - 22:10, 52:6
**filing** [3] - 42:23, 55:5, 56:24
**final** [15] - 8:4, 10:1, 10:7, 10:16, 10:25, 11:14, 12:1, 18:24, 19:8, 22:12, 25:3, 28:23, 29:1, 40:16, 52:7
**finality** [2] - 13:5, 50:17
**finalize** [1] - 23:25, 25:8
**finalized** [3] - 18:23, 19:4, 24:9
**finally** [2] - 32:17, 49:18
**finish** [1] - 17:19
**finished** [6] - 13:22, 15:2, 15:5, 15:17,

15:20, 17:22
**finishing** [1] - 13:2
**firm** [2] - 17:16, 29:4
**FIRM** [3] - 2:17, 3:13, 4:17
**Firm** [1] - 18:9
**firms** [3] - 11:19, 11:20, 11:23
**first** [15] - 16:1, 18:18, 23:9, 25:18, 32:15, 33:4, 38:11, 38:21, 40:9, 40:22, 43:22, 44:2, 44:12, 55:9, 55:21
**FISHBEIN** [1] - 1:22
**five** [1] - 23:5
**fix** [1] - 18:12
**fixed** [3] - 10:10, 10:17, 10:20
**FLASTER** [1] - 5:3
**FLOM** [1] - 3:9
**floor** [1] - 19:8
**floor-sweeping** [1] - 19:8
**FLORIDA** [3] - 3:17, 3:17, 3:20
**focused** [1] - 43:20
**folks** [7] - 8:21, 9:6, 13:11, 13:18, 18:3, 45:1, 57:24
**follow** [2] - 32:13, 58:14
**following** [2] - 17:6, 38:19
**FOR** [5] - 1:15, 2:21, 4:6, 4:11, 4:16
**foregoing** [1] - 59:18
**forget** [2] - 54:23, 58:5
**form** [4] - 21:20, 29:1, 31:16, 52:18
**Form** [2] - 45:16, 45:18
**formally** [1] - 29:19
**format** [7] - 27:21, 28:14, 28:17, 28:25, 31:11, 31:13, 32:5
**former** [1] - 27:8
**forms** [1] - 54:1
**forth** [1] - 54:4
**fortunate** [1] - 27:7
**forward** [2] - 30:8, 30:14
**four** [3] - 11:8, 52:19, 52:22
**fourth** [3] - 23:12, 40:9, 40:24
**FRANCISCO** [1] - 4:9
**FRED** [1] - 1:23
**front** [2] - 20:11, 22:16
**fulfill** [1] - 49:8

**full** [4] - 10:16, 17:16, 48:21, 48:23
**fund** [1] - 8:6
**funds** [4] - 11:21, 12:20, 13:8, 37:15
**future** [14] - 13:14, 14:6, 14:10, 14:11, 15:3, 29:6, 39:16, 40:3, 52:10, 52:22, 53:13, 53:17, 53:20, 55:12

## G

**GAINSBURGH** [1] - 2:6
**gap** [1] - 20:5
**GARRETSON** [12] - 4:17, 4:17, 18:10, 18:14, 18:22, 20:16, 21:1, 22:3, 22:5, 25:11, 26:8, 27:1
**Garretson** [5] - 16:19, 17:4, 18:8, 18:9, 18:16
**gate** [1] - 15:11
**GAYLE** [1] - 2:13
**general** [1] - 34:10
**GENERAL** [2] - 3:17, 3:18
**General** [2] - 35:14, 35:20
**generate** [1] - 53:25
**gentlemen** [1] - 7:9
**GERALD** [1] - 2:7
**Gilbert** [1] - 38:22
**GIRARDI** [1] - 5:4
**given** [8] - 30:25, 48:6, 49:25, 51:1, 51:2, 51:9, 58:16, 58:21
**global** [3] - 19:21, 21:10, 22:9
**globo** [1] - 32:5
**GOVERNMENT** [1] - 4:6
**government** [1] - 33:25
**governmental** [9] - 18:19, 19:11, 20:17, 20:19, 22:18, 35:11, 35:14, 35:16, 35:22
**GOVERNMENTAL** [1] - 6:13
**grant** [1] - 39:5
**granting** [1] - 49:19
**graphically** [1] - 30:18
**great** [5] - 18:1, 18:3, 21:5, 22:13, 26:25
**greater** [1] - 24:19

**Greek** [1] - 8:14
**GREER** [3] - 4:12, 4:12, 9:13
**Greer** [5] - 8:9, 9:13, 27:13, 28:5, 29:10
**grids** [1] - 15:11
**group** [3] - 10:21, 19:23, 21:6
**grouped** [1] - 32:2
**grouping** [1] - 26:5
**grow** [1] - 27:19
**guess** [2] - 28:24, 42:11
**guidance** [1] - 9:18

## H

**half** [2] - 44:2, 55:1
**hand** [1] - 24:4
**handful** [1] - 25:14
**handled** [1] - 11:24
**handling** [1] - 34:11
**hands** [1] - 54:21
**hangs** [1] - 27:23
**hard** [5] - 19:7, 20:7, 20:23, 22:24, 35:25
**HARDING** [2] - 4:22, 4:22
**head** [1] - 50:4
**Health** [1] - 20:20
**healthcare** [1] - 26:11
**hear** [6] - 9:12, 18:7, 27:10, 41:1, 47:21, 48:11
**heard** [5] - 32:24, 38:16, 40:11, 42:24, 48:8
**HEARD** [1] - 1:11
**hearing** [15] - 18:22, 19:15, 20:8, 20:14, 21:12, 22:7, 22:8, 22:14, 22:21, 24:8, 24:14, 35:22, 38:19, 40:19
**hearings** [2] - 19:23, 20:18
**heart** [5] - 11:12, 14:16, 15:10, 27:16, 37:8
**HEIMANN** [1] - 4:7
**held** [2] - 25:4, 52:4
**help** [5] - 12:24, 18:25, 29:24, 33:2, 51:19
**helpful** [1] - 8:25
**Hendricks** [1] - 40:12
**hereby** [1] - 59:18
**HERMAN** [2] - 1:15
**Herman** [2] - 7:14, 54:3

**herring** [1] - 56:12
**high** [2] - 20:1, 21:9
**higher** [2] - 12:16, 20:6
**highlight** [1] - 18:25
**hindsight** [1] - 19:24
**history** [1] - 34:10
**hit** [1] - 11:21
**holdback** [1] - 25:4
**holders** [1] - 26:6
**holding** [2] - 33:1, 41:7
**Honor** [91] - 7:13, 7:18, 8:3, 9:13, 9:18, 10:2, 10:9, 10:18, 11:10, 12:13, 12:22, 12:25, 16:16, 16:23, 16:25, 18:4, 18:8, 18:16, 20:16, 21:2, 22:3, 24:17, 26:8, 27:1, 27:12, 28:4, 28:19, 29:19, 30:3, 30:5, 30:7, 30:15, 30:23, 30:24, 31:14, 31:18, 31:20, 32:8, 32:19, 33:5, 33:20, 33:22, 34:7, 35:4, 35:10, 35:13, 35:19, 35:21, 36:1, 36:5, 36:22, 37:2, 37:11, 37:17, 37:22, 38:10, 39:7, 40:14, 41:9, 41:15, 41:18, 42:12, 42:18, 42:20, 42:24, 43:13, 44:7, 44:16, 44:19, 45:16, 46:3, 46:13, 46:16, 46:19, 46:24, 47:5, 47:7, 47:19, 47:24, 48:1, 48:17, 49:18, 50:23, 51:14, 52:2, 53:5, 55:14, 56:8, 57:9, 57:18, 59:5
**Honor's** [3] - 48:25, 51:23
**HONORABLE** [1] - 1:11
**hope** [2] - 20:13, 21:11
**hoped** [1] - 11:15
**hopefully** [2] - 8:15, 34:2
**house** [1] - 41:23
**housing** [1] - 33:25
**HOUSTON** [1] - 2:12
**HOWARD** [1] - 5:3
**Hudson** [1] - 40:1
**hundred** [5] - 23:20, 23:22, 24:5, 24:7
**Hurst** [1] - 39:15,

39:16
**hurt** [1] - 32:10

## I

**I.S** [3] - 12:13, 17:3, 24:3
**identify** [1] - 29:15
**ignore** [1] - 49:21
**ignored** [1] - 48:5
**II** [1] - 3:13
**immediately** [2] - 17:18, 17:19
**impact** [2] - 24:22, 25:3
**impacted** [2] - 20:2, 21:10, 21:16
**impacting** [1] - 22:25
**impacts** [2] - 21:7, 25:11, 25:16
**important** [2] - 44:5, 50:16
**importantly** [1] - 56:11
**IN** [1] - 1:4
**in-house** [1] - 41:23
**inadequate** [1] - 53:3
**included** [1] - 39:15
**including** [2] - 17:13, 35:17
**income** [1] - 14:16
**incorporated** [1] - 38:12
**incredible** [1] - 27:19
**indeed** [2] - 8:20, 36:6
**Indian** [1] - 20:20
**indicated** [2] - 13:12, 27:17
**indicates** [1] - 14:2
**indicating** [1] - 32:14
**individual** [3] - 14:9, 20:22, 41:22
**individual's** [1] - 25:25
**individually** [1] - 26:22
**individuals** [5] - 26:20, 28:16, 33:10, 34:23, 48:10
**ineligible** [1] - 53:10
**infarction** [6] - 19:13, 20:10, 21:3, 21:7, 22:19, 23:23
**infirmed** [1] - 28:2
**inform** [1] - 49:1
**Inform** [1] - 46:7
**informal** [1] - 31:11
**information** [10] - 11:11, 16:4, 23:7, 27:20, 27:24, 34:10,

47:2, 47:11, 48:11, 48:12
**initial** [1] - 23:10
**injuries** [5] - 22:20, 22:25, 23:1, 36:3, 37:7
**INJURIES..................
........... [1] - 6:14**
**injury** [23] - 8:6, 11:5, 11:13, 12:23, 13:3, 13:5, 13:7, 13:10, 14:11, 14:18, 15:9, 15:10, 15:11, 15:13, 15:21, 15:24, 17:1, 17:7, 17:22, 22:23, 36:20, 36:24
**INJURY.....................
........... [1] - 6:20**
**inmate** [1] - 41:24
**input** [1] - 25:17
**inquire** [1] - 37:13
**insistent** [2] - 32:24, 32:25
**instance** [2] - 40:20, 41:8
**instances** [3] - 12:5, 50:4, 51:8
**instantly** [1] - 28:16
**instead** [2] - 10:21, 53:16
**institution** [1] - 41:25
**institutional** [1] - 8:25
**instructed** [4] - 36:23, 55:5, 55:12, 55:18
**instructing** [1] - 40:25
**instruction** [2] - 52:19, 52:23
**instructions** [1] - 53:23
**insurance** [1] - 13:17
**intend** [3] - 11:10, 30:22, 58:20
**intended** [2] - 25:13, 59:4
**intends** [1] - 30:10
**interest** [1] - 43:20
**interested** [1] - 41:2
**interesting** [1] - 28:3
**interim** [3] - 10:5, 10:15, 12:15
**interpretive** [2] - 30:20, 31:21
**interrupt** [1] - 16:21
**intersecting** [1] - 31:3
**involve** [1] - 40:10
**involved** [3] - 9:17, 18:6, 25:19
**iPad** [2] - 18:11, 18:15
**irrelevant** [1] - 57:7
**ischemic** [4] - 18:23,

21:2, 21:14, 22:5
**issue** [13] - 19:19,
19:22, 20:18, 21:11,
28:6, 31:13, 37:21,
48:3, 56:6, 56:12,
56:19, 56:20, 58:3
**issued** [2] - 11:18,
16:2
**issues** [19] - 19:8,
21:22, 21:24, 22:18,
24:2, 24:17, 24:20,
25:3, 25:8, 25:12,
28:5, 30:25, 31:3,
32:4, 37:10, 37:13,
37:16, 40:2, 53:22
**item** [1] - 33:22
**ITEMS** [1] - 6:3
**itself** [1] - 48:19

## J

**JACKSONVILLE** [1] -
3:20
**JAMES** [2] - 3:13, 3:19
**James** [3] - 35:13,
39:20, 40:11
**Jammal** [1] - 40:1
**Janice** [1] - 40:12
**January** [1] - 46:21
**Jared** [3] - 8:12, 8:15,
9:1
**Jersey** [1] - 28:12
**Jim** [2] - 35:12, 36:2
**Jimmy** [1] - 39:15
**job** [4] - 18:3, 33:10,
33:18, 33:19
**John** [2] - 30:5, 31:13
**JOHN** [1] - 3:9
**JOHNSTON** [4] - 4:3,
4:3, 34:4, 34:7
**Johnston** [2] - 33:23,
34:7
**joining** [1] - 30:6
**JR** [1] - 1:19
**JUDGE** [1] - 1:12
**judge** [3] - 28:11,
28:12, 50:25
**Judge** [4] - 36:17,
46:2, 52:17, 55:4
**judges** [1] - 27:8
**judgment** [1] - 38:18
**judicial** [2] - 47:14,
54:21
**JULY** [1] - 6:22
**July** [8] - 11:10, 12:11,
34:22, 37:24, 40:2,
40:7, 40:15, 40:19
**JUNE** [2] - 1:6, 7:2
**June** [7] - 11:16, 17:2,

17:5, 17:7, 17:11,
17:25, 29:10
**JUNEAU** [6] - 4:21,
4:21, 27:12, 28:19,
29:18, 29:21
**Juneau** [7] - 11:1,
12:11, 14:4, 16:2,
16:19, 27:11, 27:12
**jury** [1] - 28:24

## K

**Katie** [1] - 41:13
**KATZ** [1] - 1:15
**keep** [1] - 45:15
**keeps** [2] - 17:24,
33:15
**key** [1] - 13:22
**kind** [3] - 12:7, 28:3,
33:8
**KINGSDORF** [1] -
3:22
**knee** [1] - 32:10
**knows** [3] - 47:11,
48:1, 52:2
**KY** [1] - 2:18

## L

**LA** [8] - 1:16, 2:8,
2:15, 3:4, 3:14, 3:23,
4:4, 4:23
**ladies** [1] - 7:8
**LAFAYETTE** [1] - 4:23
**lagging** [1] - 19:6
**LAKE** [1] - 2:15
**language** [1] - 24:24
**laptop** [1] - 53:18
**large** [1] - 26:7
**larger** [2] - 15:11,
31:24
**largest** [1] - 15:12
**last** [26] - 8:12, 10:3,
11:14, 15:8, 16:10,
17:9, 17:10, 17:15,
17:20, 18:22, 19:15,
22:7, 22:8, 22:13,
22:21, 24:8, 24:14,
27:17, 27:23, 28:2,
28:21, 32:16, 36:22,
55:1, 58:2
**late** [3] - 27:22, 47:16,
55:20
**latitude** [1] - 47:16
**Law** [1] - 18:9
**LAW** [4] - 2:17, 3:13,
4:3, 4:17
**law** [2] - 8:19, 8:22

**lawyer** [3] - 8:17, 45:6,
58:5
**lawyers** [6] - 9:5, 9:9,
9:11, 25:20, 27:8,
35:6
**lead** [2] - 7:23, 9:1,
43:14
**learn** [1] - 25:23
**learned** [1] - 12:1
**least** [1] - 50:3
**leaves** [1] - 42:12
**Leavitt** [2] - 44:1, 44:7
**left** [6] - 14:22, 14:23,
15:1, 15:15, 19:12,
32:2
**legal** [1] - 8:19
**LEIGH** [1] - 1:19
**Lennie** [1] - 34:21
**LEONARD** [1] - 1:15
**less** [2] - 9:7, 10:10
**less-numbered** [1] -
9:7
**letter** [5] - 46:3, 46:8,
47:3, 47:5, 47:6
**level** [7] - 11:5, 11:6,
11:7, 11:8, 15:2
**LEVIN** [2] - 1:22, 1:23
**LIABILITY** [1] - 1:4
**LIAISON** [1] - 3:22
**liaison** [2] - 7:23,
46:19
**LIEFF** [1] - 4:7
**lien** [12] - 17:4, 18:7,
18:17, 18:19, 23:2,
23:4, 23:19, 24:20,
25:17, 26:3, 26:6,
28:6
**LIEN** [2] - 4:16, 6:7
**liens** [15] - 18:19,
18:23, 19:11, 20:17,
22:18, 22:25, 24:23,
24:25, 25:15, 25:19,
25:21, 25:23, 25:24,
26:2, 26:3
**life** [2] - 41:5, 41:6
**light** [1] - 32:14
**line** [2] - 10:6, 28:4
**lingers** [1] - 33:13
**list** [1] - 45:23
**listen** [1] - 55:22
**listening** [1] - 8:16
**lists** [1] - 36:24
**literally** [1] - 46:7
**litigants** [2] - 9:11,
25:20
**litigation** [3] - 26:19,
41:7, 53:12
**LITIGATION** [1] - 1:4
**lives** [1] - 43:19
**lock** [1] - 22:11

**logistic** [1] - 35:24
**Lone** [6] - 46:3, 46:23,
48:13, 48:14, 48:18,
56:2
**LONGER** [1] - 1:23
**look** [13] - 13:9, 14:1,
16:10, 17:19, 21:23,
26:9, 26:17, 27:25,
44:5, 45:13, 46:17,
48:4, 58:8
**looked** [3] - 26:12,
53:6, 55:18
**looking** [4] - 14:9,
32:5, 53:18, 57:11
**looks** [1] - 58:1
**loss** [2] - 26:19, 30:9
**lost** [5] - 14:10, 14:11,
14:14, 14:16, 14:17,
14:24, 15:3
**LOUISIANA** [5] - 1:1,
1:6, 2:11, 3:13, 5:8
**Louisiana** [6] - 29:4,
35:14, 35:17, 35:19,
59:17, 59:18
**LOUISVILLE** [1] - 2:18
**low** [1] - 13:21
**LYNN** [1] - 4:12
**Lynn** [5] - 8:9, 9:3,
9:13, 17:5, 18:5
**Lyon** [1] - 40:1
**LYRIC** [1] - 2:11

## M

**mail** [4] - 12:20, 41:12,
53:19, 54:2
**main** [1] - 35:22
**majority** [1] - 19:3
**malpractice** [1] - 49:6
**map** [1] - 28:23
**mark** [1] - 22:7
**Mark** [1] - 40:12
**marker** [5] - 10:8,
10:17, 10:19, 11:9,
20:3
**marshals** [2] - 16:24,
34:6
**MARVIN** [6] - 2:21,
7:18, 36:5, 41:18,
41:21, 42:2
**Marvin** [2] - 7:18,
33:20
**massive** [1] - 28:14
**Master** [20] - 10:22,
10:25, 12:10, 14:4,
14:24, 14:25, 15:2,
15:6, 15:18, 16:2,
17:11, 17:13, 17:18,
27:11, 27:13, 27:15,

52:7, 52:10, 53:11
**master** [1] - 30:10
**MASTER** [4] - 4:21,
27:12, 28:19, 29:18,
29:21
**Master's** [2] - 16:4,
17:23
**MASTER.................**
**.................** [1] - 6:8
**Masters** [3] - 27:7,
28:10
**matched** [1] - 23:17
**material** [2] - 58:16,
58:18
**materially** [2] - 46:12,
46:14
**materials** [2] - 14:15,
35:17
**Matt** [6] - 18:8, 18:13,
18:16, 21:21, 26:7,
27:4
**MATT** [1] - 4:17
**matter** [11] - 9:7, 18:5,
28:2, 28:9, 34:25,
38:11, 38:16, 39:1,
46:15, 47:8, 59:20
**matters** [5] - 34:2,
34:11, 34:25, 38:11,
40:8
**MCCARTHY** [1] - 2:10
**MDL** [4] - 1:5, 6:12,
7:10, 35:3
**MEAGHER** [1] - 3:9
**means** [1] - 11:18
**MECHANICAL** [1] -
5:9
**med** [3] - 13:12, 14:10
**Medicaid** [8] - 19:4,
20:9, 20:12, 20:21,
22:6, 22:8, 22:11,
22:23
**medical** [23] - 13:11,
13:12, 13:13, 13:18,
13:19, 13:20, 14:3,
14:6, 14:11, 14:12,
15:9, 15:20, 42:3,
42:6, 42:7, 45:20,
45:22, 45:25, 48:22,
53:8, 53:9
**Medicare** [16] - 13:17,
19:4, 19:21, 19:24,
19:25, 20:4, 20:7,
20:21, 21:4, 21:6,
21:10, 21:11, 21:13,
22:9, 22:23
**meet** [3] - 30:18, 32:3,
35:23, 36:23, 37:25,
52:17, 58:9
**meeting** [8] - 7:24,
24:1, 24:15, 24:21,

28:21, 36:15, 37:18, 58:11
**meetings** [1] - 28:21
**memorandum** [4] - 21:20, 24:19, 27:2, 38:12
**Memorial** [1] - 17:13
**memory** [1] - 8:25
**mention** [1] - 43:24
**mentioned** [3] - 16:11, 18:5, 27:6
**Merck** [32] - 7:19, 30:5, 30:10, 30:22, 31:8, 39:8, 41:11, 42:22, 45:20, 45:21, 46:5, 46:10, 46:25, 47:1, 47:11, 49:2, 51:15, 51:17, 51:19, 52:5, 52:6, 52:11, 53:23, 54:24, 55:5, 55:11, 55:25, 57:10, 57:14, 57:20
**Merck's** [8] - 36:14, 38:12, 40:9, 45:9, 51:6, 55:7, 57:10
**MERCK'S** [1] - 6:16
**Merit** [1] - 59:17
**merits** [1] - 31:7
**met** [4] - 7:23, 27:10, 49:17, 50:18
**meter** [2] - 24:8, 24:13
**METHVIN** [1] - 1:18
**MEUNIER** [2] - 2:6, 2:7
**MI** [2] - 12:1, 23:18
**mic** [1] - 7:22
**Michael** [1] - 32:25
**midcourse** [1] - 55:3
**might** [4] - 31:21, 47:17, 53:2, 55:22
**MILES** [1] - 1:18
**milestone** [1] - 32:17
**Miller** [1] - 42:19
**million** [4] - 10:4, 10:7, 10:11, 37:16
**mind** [6] - 31:15, 54:23, 58:4, 58:6, 58:7, 59:2
**mine** [1] - 8:22
**minimis** [1] - 20:4
**minute** [1] - 16:15
**minutes** [1] - 38:3
**Mls** [1] - 37:6
**mistakenly** [1] - 39:15
**Mitchell** [1] - 39:22
**moment** [4] - 8:11, 23:13, 43:16, 50:10
**momentarily** [1] - 19:2
**Monday** [2] - 11:16, 11:17

**money** [1] - 25:5
**MONTGOMERY** [1] - 1:21
**month** [13] - 8:7, 10:14, 11:1, 11:5, 11:14, 12:12, 13:6, 16:8, 17:2, 21:5, 30:19, 44:2, 44:6
**monthly** [1] - 7:20
**months** [2] - 44:10, 48:2
**moot** [1] - 39:21
**morning** [11] - 7:8, 7:13, 7:18, 9:13, 11:20, 12:25, 32:8, 35:13, 36:7, 38:10, 41:13
**most** [4] - 11:18, 34:24, 45:2, 48:4
**mostly** [1] - 10:14
**motion** [31] - 30:10, 30:13, 30:22, 31:6, 31:8, 31:12, 31:15, 31:16, 38:12, 39:8, 39:11, 39:14, 39:15, 39:21, 40:10, 42:19, 42:21, 44:2, 45:12, 46:6, 46:9, 49:12, 49:14, 49:15, 49:19, 50:6, 51:13, 54:6, 55:5, 56:24, 57:3
**Motion** [5] - 34:14, 39:5, 41:10, 43:11, 43:25, 45:10, 46:6, 46:22, 48:24, 49:2, 50:20, 54:24, 55:2, 55:14, 55:15
**MOTIONS** [1] - 6:16
**Motions** [1] - 34:16
**motions** [8] - 34:24, 36:14, 36:16, 38:8, 40:9, 40:25, 42:13, 42:15
**MOTIONS................. ...................... [1] - 6:18
**move** [3] - 18:19, 25:5, 41:6
**moved** [5] - 22:7, 24:8, 24:13, 43:19, 54:24
**moving** [1] - 28:14
**MR** [49] - 7:13, 7:18, 8:3, 12:25, 16:16, 16:18, 16:22, 16:25, 18:4, 18:8, 18:10, 18:14, 18:22, 20:16, 21:1, 22:3, 22:5, 25:11, 26:8, 27:1, 30:2, 30:4, 31:14,

33:20, 34:4, 34:7, 35:4, 35:13, 35:25, 36:5, 36:11, 36:17, 36:22, 37:2, 37:7, 37:11, 37:17, 37:22, 41:18, 41:21, 42:2, 47:22, 48:17, 50:2, 50:10, 50:13, 50:16, 51:8, 56:8
**MS** [16] - 9:13, 30:15, 32:8, 38:10, 39:7, 41:9, 42:12, 42:18, 43:13, 47:19, 50:12, 50:23, 50:25, 51:14, 57:9, 59:5
**multiple** [1] - 49:22
**MURRAY** [1] - 3:13
**MYERS** [1] - 3:6
**myocardial** [6] - 19:13, 20:9, 21:2, 21:7, 22:19, 23:23
**mythology** [1] - 8:14

# N

**N.W** [1] - 2:22
**NABERS** [1] - 2:10
**namely** [1] - 25:24
**names** [1] - 12:7
**nature** [3] - 18:24, 23:1, 49:19
**nauseam** [1] - 20:18
**nearly** [1] - 22:22
**necessary** [1] - 39:3
**need** [15] - 12:2, 19:9, 20:24, 21:18, 21:21, 21:22, 21:25, 22:21, 30:2, 32:1, 33:7, 38:8, 46:5, 54:3
**needed** [2] - 45:3, 45:4
**needs** [1] - 25:2
**neglected** [2] - 43:24, 53:14
**negotiating** [1] - 26:5
**never** [3] - 39:16, 54:22, 56:23
**New** [1] - 28:12
**new** [2] - 22:24, 56:10
**NEW** [10] - 1:6, 1:16, 2:4, 2:8, 3:4, 3:10, 3:14, 3:23, 4:4, 5:8
**newspapers** [1] - 48:9
**next** [26] - 9:24, 11:4, 12:19, 13:6, 14:8, 16:7, 19:7, 20:8, 20:14, 21:5, 21:11, 22:15, 23:25, 24:15, 24:21, 27:2, 29:25,

32:11, 33:22, 37:24, 40:19, 44:4, 44:6, 44:9, 50:22, 58:11
**NEXT** [1] - 6:22
**night** [3] - 17:20, 27:17, 27:23
**nilly** [1] - 40:21
**ninth** [1] - 40:9
**NO** [1] - 1:5
**nobody** [2] - 48:7, 59:4
**none** [8] - 14:22, 14:23, 15:1, 15:15, 26:14, 26:19, 28:1, 36:17
**noon** [1] - 11:22
**normal** [1] - 26:23
**normally** [1] - 26:17
**notarized** [2] - 52:21, 53:14, 56:16
**note** [5] - 29:6, 30:7, 31:14, 31:20, 48:17
**noted** [1] - 50:16
**nothing** [2] - 30:2, 54:23
**notice** [14] - 49:25, 50:1, 50:2, 50:5, 51:1, 51:2, 51:9, 53:16, 54:12, 54:15, 56:16, 56:17
**notices** [1] - 57:11
**noticing** [1] - 44:2
**November** [3] - 55:11, 57:19
**nowhere** [1] - 55:19
**Number** [2] - 7:10, 26:9, 38:15
**number** [18] - 7:21, 13:21, 15:12, 19:14, 19:17, 21:8, 21:9, 33:24, 38:17, 38:22, 39:9, 39:12, 39:15, 39:19, 39:21, 40:5, 43:17, 44:20
**numbered** [2] - 9:7, 59:19
**numbers** [7] - 9:23, 13:14, 14:24, 16:8, 22:11, 22:16, 34:23
**numerous** [1] - 40:11
**NW** [1] - 3:10
**NY** [1] - 2:4

# O

**O'DELL** [1] - 1:19
**O'KEEFE** [1] - 1:16
**O'MELVENY** [1] - 3:6
**object** [1] - 39:3

**obligation** [3] - 23:19, 26:12, 26:16
**obligations** [2] - 19:4, 20:11, 26:14
**obviously** [3] - 11:25, 25:1, 47:8
**occasions** [2] - 49:22, 50:3
**occur** [2] - 11:16, 26:20
**October** [5] - 43:7, 48:2, 55:10, 57:5, 57:21
**OF** [8] - 1:1, 1:11, 3:13, 3:17, 3:17, 3:18, 4:3
**OFFICE** [4] - 1:20, 2:15, 3:17, 3:18
**office** [3] - 17:23, 35:15, 35:16
**OFFICES** [1] - 4:3
**OFFICIAL** [1] - 5:7
**Official** [2] - 59:17, 59:23
**officially** [1] - 45:9
**often** [2] - 48:7, 49:24
**oftentimes** [1] - 8:23
**OH** [1] - 4:18
**Oldfather** [6] - 36:6, 36:23, 56:9, 57:3, 57:6, 58:9
**OLDFATHER** [10] - 2:17, 2:17, 43:13, 47:19, 50:12, 50:23, 50:25, 51:14, 57:9, 59:5
**Oldfather's** [3] - 42:14, 49:5, 49:11
**ON** [2] - 6:16, 6:22
**once** [3] - 21:24, 52:5, 58:7
**one** [32] - 11:4, 11:6, 14:10, 15:1, 17:14, 21:25, 22:22, 23:14, 24:6, 26:9, 26:13, 27:23, 28:8, 28:11, 28:12, 29:12, 45:23, 46:8, 48:15, 49:13, 50:22, 52:19, 52:21, 54:12, 56:6, 57:23, 57:25, 58:1, 58:2, 58:4, 59:1
**ONE** [1] - 2:14
**ones** [1] - 25:9
**ongoing** [1] - 35:18
**open** [1] - 58:20
**opened** [2] - 51:15, 51:16
**opinion** [1] - 58:15
**opportunity** [7] - 9:4,

25:24, 40:16, 42:22, 53:1, 58:21
**oppose** [1] - 55:1
**opposition** [1] - 41:11
**ORDER** [1] - 7:4
**order** [10] - 7:25, 22:11, 36:25, 37:4, 43:9, 45:19, 48:13, 51:10, 54:7
**orders** [3] - 32:16, 48:5, 48:14
**ordinary** [1] - 12:23
**organized** [1] - 46:18
**original** [1] - 51:11
**originally** [2] - 23:5, 38:16
**ORLEANS** [8] - 1:6, 1:16, 2:8, 3:4, 3:14, 3:23, 4:4, 5:8
**Orran** [8] - 8:9, 9:15, 12:22, 12:24, 12:25, 16:20, 18:1, 18:10
**ORRAN** [1] - 4:13
**OTHER** [1] - 6:18
**otherwise** [1] - 26:14
**ought** [2] - 28:9, 55:4
**ourselves** [2] - 14:21, 15:14
**outcome** [1] - 26:21
**outline** [1] - 21:19
**outlines** [1] - 24:19
**outside** [2] - 37:5
**outstanding** [7] - 20:11, 21:4, 21:22, 23:25, 24:2, 24:23, 25:14
**overrule** [1] - 39:4
**own** [3] - 16:4, 41:25, 45:23

**P**

**P.O** [1] - 4:23
**package** [7] - 35:3, 35:5, 35:7, 35:9, 35:17, 53:7, 56:1
**PACKAGE**.................
.............. [1] - 6:12
**packages** [1] - 52:15
**page** [7] - 45:23, 52:19, 52:21, 52:23, 57:12
**PAGE** [1] - 6:3
**pages** [1] - 52:21
**paid** [7] - 8:7, 10:2, 10:3, 10:11, 10:13, 11:3, 16:9
**Palmore** [1] - 39:12
**paper** [2] - 28:13

**paperless** [1] - 28:17
**papers** [6] - 49:11, 51:3, 51:4, 51:6, 57:10, 57:19
**parenthesis** [1] - 15:19
**parentheticals** [1] - 14:25
**part** [6] - 9:24, 13:2, 15:8, 28:3, 28:25, 31:21
**partial** [1] - 46:1
**participate** [4] - 23:8, 26:10, 26:11, 43:5
**participating** [3] - 23:18, 24:1, 25:7
**participational** [1] - 25:25
**particular** [7] - 9:5, 27:7, 28:18, 33:16, 34:17, 43:9, 49:15
**particularly** [3] - 40:22, 46:17, 50:19
**parties** [8] - 8:18, 9:17, 18:6, 35:23, 35:25, 37:18, 37:25, 53:23, 54:8
**parts** [1] - 28:11
**party** [2] - 37:10, 37:12
**PARTY** [1] - 6:21
**pass** [2] - 58:12, 58:25
**past** [9] - 13:12, 14:3, 14:10, 14:17, 19:22, 30:19, 48:18, 49:19
**Pat** [2] - 28:11, 29:24
**PATRICK** [1] - 4:21
**Patrick** [1] - 27:12
**PAUL** [1] - 2:22
**paying** [2] - 9:23, 13:17
**payment** [11] - 10:5, 10:7, 10:15, 10:16, 10:17, 10:21, 10:25, 11:14, 12:1, 12:11, 20:4
**payments** [18] - 8:4, 9:22, 9:25, 10:11, 11:16, 11:17, 11:19, 12:15, 13:19, 14:18, 16:6, 16:11, 16:13, 17:1, 17:3, 17:5, 17:22, 17:24
**payor** [2] - 37:10, 37:12
**PAYOR** [1] - 6:21
**payouts** [2] - 31:25, 37:19
**peer** [1] - 28:20
**PENDING** [2] - 6:14,

6:20
**pending** [4] - 30:11, 34:24, 36:3, 36:20
**PENNSYLVANIA** [1] - 1:24
**penny** [2] - 12:17, 12:21
**people** [7] - 7:21, 15:3, 15:9, 15:22, 26:9, 26:10, 26:15, 27:25, 29:15, 37:12, 41:5, 43:19, 44:20, 44:23, 44:24, 45:3, 45:5, 46:11, 51:19, 51:23, 54:3, 54:12, 54:20, 58:21
**Pepper** [3] - 59:16, 59:22, 59:22
**PEPPER** [1] - 5:7
**per** [3] - 12:14, 12:21, 31:7
**percent** [19] - 10:5, 10:6, 11:9, 19:12, 19:14, 20:10, 21:3, 22:6, 22:8, 23:20, 23:22, 24:5, 24:7, 24:9, 24:13, 24:14, 25:5
**percentage** [1] - 11:9
**perfected** [2] - 39:16, 40:4
**period** [14] - 41:1, 51:22, 53:2, 53:20, 54:1, 54:4, 54:5, 54:8, 54:10, 54:18, 55:6, 55:20, 56:9, 57:6
**PERRY** [1] - 5:4
**person** [5] - 34:3, 48:5, 49:25, 58:16, 58:17
**personal** [2] - 36:3, 36:20
**PERSONAL** [2] - 6:14, 6:20
**pharmacy** [2] - 45:24, 45:25
**PHILADELPHIA** [1] - 1:24
**phone** [2] - 7:21, 40:25
**phonetically** [2] - 40:12, 44:1
**picture** [1] - 31:24
**pie** [7] - 29:1, 29:3, 29:7, 29:9, 29:11, 29:17, 30:17
**PIGMAN** [1] - 3:3
**Pine** [6] - 46:3, 46:23, 48:13, 48:14, 48:18,

56:2
**place** [5] - 8:7, 12:19, 20:3, 25:5, 44:8
**Plaintiff** [2] - 45:16, 45:17
**plaintiff** [25] - 38:21, 38:22, 38:9, 39:12, 39:14, 39:19, 39:21, 40:5, 42:15, 42:16, 43:5, 47:25, 49:1, 49:6, 49:7, 49:9, 49:13, 51:10, 52:3, 52:20, 56:14, 56:20, 56:23, 57:3
**plaintiff's** [11] - 39:2, 43:3, 43:6, 43:9, 49:1, 50:5, 50:8, 50:9, 56:11, 56:16, 56:18
**plaintiffs** [12] - 23:23, 30:11, 30:16, 32:1, 38:20, 39:8, 39:25, 40:10, 40:15, 49:20, 49:22, 53:3
**PLAINTIFFS** [1] - 1:15
**Plaintiffs'** [2] - 51:16, 51:17
**plaintiffs'** [3] - 19:18, 32:20, 33:8
**plan** [3] - 24:24, 26:12, 36:7
**planned** [1] - 42:20
**plans** [7] - 23:6, 23:18, 24:1, 24:25, 25:15, 26:18, 26:23
**players** [1] - 22:1
**pleasant** [1] - 29:6
**pleased** [3] - 8:3, 19:3, 23:21
**pleasure** [1] - 18:5
**plug** [1] - 17:6
**pocket** [1] - 13:20
**podium** [1] - 9:3
**point** [11] - 10:1, 10:9, 12:14, 12:15, 19:6, 38:4, 46:11, 46:14, 46:23, 46:24, 57:3
**points** [10] - 10:10, 10:20, 10:24, 11:5, 11:7, 11:8, 52:5
**portal** [5] - 17:19, 19:5, 24:11, 53:25, 56:18
**PORTIS** [1] - 1:18
**position** [3] - 33:1, 39:2, 43:10
**possible** [2] - 17:10, 31:4
**POST** [2] - 1:20, 2:15
**posted** [3] - 17:18,

19:5, 24:10
**POYDRAS** [5] - 2:8, 3:14, 3:23, 4:4, 5:7
**PPF** [1] - 53:7
**practice** [1] - 8:19
**precedent** [2] - 49:20
**predict** [1] - 12:13
**predicted** [1] - 11:15
**prejudice** [11] - 38:13, 38:25, 39:4, 39:6, 39:23, 43:8, 46:25, 49:4, 50:20, 55:25, 58:18
**prejudiced** [1] - 45:21
**prepare** [1] - 24:18
**prepared** [2] - 8:10, 42:24
**present** [7] - 12:5, 25:23, 26:6, 29:7, 31:6, 40:25, 47:17
**PRESENT** [1] - 5:3
**presentation** [2] - 9:24, 18:11
**presents** [3] - 30:20, 33:25, 51:14
**pressure** [1] - 28:20
**pretrial** [4] - 36:25, 37:4, 43:9
**pretty** [1] - 35:18
**preview** [2] - 9:23, 30:22
**previous** [2] - 7:23, 18:18
**previously** [1] - 31:17
**prioritize** [2] - 21:23, 21:25
**prioritized** [1] - 32:3
**prison** [1] - 42:5
**prisoner** [2] - 41:10, 42:1
**private** [8] - 18:19, 23:4, 23:19, 24:20, 25:17, 25:22, 26:3, 26:6
**privilege** [2] - 9:15, 18:5
**pro** [11] - 12:4, 33:23, 33:24, 34:13, 34:20, 34:23, 40:10, 40:13, 40:15, 40:23, 41:10
**PRO** [2] - 4:3, 6:11
**problem** [6] - 8:23, 12:9, 25:23, 29:22, 42:11, 52:25
**problematic** [1] - 28:15
**problems** [3] - 26:6, 28:13, 44:18
**procedural** [1] - 31:7
**procedure** [3] - 30:24,

31:5, 53:24
**proceed** [2] - 10:25, 56:4
**proceeding** [1] - 36:6
**PROCEEDINGS** [3] - 1:11, 5:9, 7:1
**proceedings** [3] - 38:4, 59:11, 59:19
**process** [9] - 9:19, 14:20, 14:22, 30:18, 31:6, 35:18, 37:13, 40:17, 41:8
**processed** [1] - 15:24
**processes** [1] - 13:24
**processing** [7] - 13:4, 13:10, 13:22, 14:13, 15:2, 15:6, 15:20
**PRODUCED** [1] - 5:10
**PRODUCTS** [1] - 1:4
**Professional** [1] - 59:17
**Profile** [2] - 45:16, 45:18
**program** [31] - 8:10, 11:3, 13:2, 13:3, 13:16, 13:17, 15:13, 15:24, 16:14, 18:20, 19:20, 20:3, 21:16, 23:4, 23:8, 24:20, 25:18, 25:19, 26:13, 26:15, 27:10, 43:4, 44:13, 44:15, 44:21, 51:22, 51:25, 52:2, 52:3, 56:21
**Program** [1] - 9:12
**PROGRAM**...............
..........[1] - 6:6
**programs** [1] - 26:3
**progress** [3] - 18:25, 21:5, 22:13
**promised** [1] - 42:9
**promptness** [1] - 27:21
**proper** [1] - 48:19
**properly** [3] - 48:1, 56:13, 56:15
**protocol** [1] - 28:7
**prove** [1] - 51:2
**proverbial** [1] - 26:24
**provide** [5] - 11:11, 11:13, 40:15, 46:2, 48:18
**provided** [15] - 34:8, 35:5, 41:14, 45:20, 45:22, 45:24, 45:25, 46:7, 46:9, 47:11, 48:22, 48:23, 50:5, 51:22, 57:10
**provides** [1] - 34:10
**providing** [1] - 56:25

**provisions** [2] - 52:14, 52:15
**PSC** [11] - 6:12, 7:14, 7:16, 8:18, 35:3, 51:19, 51:20, 53:24, 54:5, 55:5, 57:15
**PTO** [25] - 36:4, 36:5, 36:14, 38:14, 38:24, 39:10, 39:13, 39:20, 40:9, 40:10, 43:6, 43:23, 43:24, 44:1, 44:7, 45:10, 46:1, 46:8, 46:12, 46:18, 46:23, 46:25, 47:25, 52:1
**PTO**....................... [1]
- 6:16
**PTOs** [1] - 23:10
**pull** [1] - 20:22
**pulling** [1] - 22:10
**pulmonary** [2] - 47:4, 47:10
**purchase** [1] - 30:16
**purely** [1] - 47:7
**purporting** [1] - 25:15
**pursuant** [1] - 39:17
**pursue** [10] - 26:23, 49:9, 51:19, 51:24, 53:6, 53:10, 56:22, 57:4, 58:4, 58:17
**pursuing** [4] - 36:7, 41:3, 43:20, 43:21
**push** [2] - 21:11, 33:14
**pushed** [2] - 20:19, 20:23
**put** [8] - 31:11, 44:2, 44:7, 44:13, 44:14, 44:15, 46:5, 56:18

### Q

**qualified** [1] - 44:21
**qualify** [2] - 13:21, 14:18
**questions** [5] - 12:22, 31:7, 34:14
**quibbling** [1] - 12:6
**quick** [1] - 38:10
**quite** [1] - 22:7
**quote** [1] - 8:14

### R

**raise** [2] - 31:2, 37:14
**raised** [1] - 31:1
**range** [1] - 10:1
**RANIER** [2] - 2:13, 2:14

**rather** [2] - 22:10, 44:23
**re** [1] - 7:10
**RE** [1] - 1:4
**read** [1] - 46:6
**ready** [2] - 17:18, 29:9
**real** [2] - 18:4, 43:20
**realized** [1] - 55:22
**really** [12] - 9:10, 9:17, 21:6, 24:17, 28:15, 28:18, 46:13, 47:7, 49:20, 51:23, 52:18, 56:10
**Realtime** [1] - 59:16
**reason** [4] - 12:2, 26:11, 29:7, 42:1
**reasonable** [1] - 41:3
**reasoned** [1] - 39:5
**reasonings** [1] - 34:16
**receive** [6] - 10:16, 10:17, 10:20, 12:11, 23:17, 23:20
**received** [11] - 10:5, 10:10, 10:19, 14:18, 17:12, 17:14, 41:12, 41:14, 47:22, 53:23, 54:14
**recent** [2] - 34:11, 34:12
**recess** [3] - 38:2, 38:5, 59:8
**recipients** [1] - 29:11
**recognize** [2] - 9:4, 58:22
**reconciliation** [1] - 12:18
**Reconsideration** [1] - 41:10
**record** [7] - 7:12, 31:20, 33:2, 44:14, 46:17, 57:14, 59:19
**Record** [2] - 38:14, 41:11
**RECORDED** [1] - 5:9
**records** [13] - 20:22, 42:3, 42:4, 42:6, 42:7, 45:22, 45:25, 46:1, 48:22, 53:9, 56:1
**red** [1] - 56:12
**redetermination** [2] - 19:25, 22:10
**redeterminations** [1] - 19:21
**reduce** [2] - 25:25, 33:5
**reflected** [1] - 15:10
**reflects** [2] - 45:7, 57:14
**regard** [5] - 25:9,

32:19, 51:20, 57:23, 58:13
**regarding** [2] - 34:14, 34:17
**registered** [1] - 53:7
**Registered** [2] - 59:16, 59:17
**regret** [1] - 8:13
**reimbursement** [1] - 21:10
**Reinstate** [2] - 43:25, 46:22
**reinstate** [5] - 42:15, 54:5, 54:8, 55:6, 55:24
**reiterated** [1] - 49:22
**rejected** [4] - 53:15, 53:21, 56:15, 57:14
**rejection** [1] - 56:16
**related** [1] - 34:13
**RELATES** [1] - 1:7
**relating** [1] - 40:2
**relative** [2] - 20:1, 21:9
**relatively** [2] - 13:14, 13:21
**releases** [1] - 52:4
**remaining** [7] - 19:14, 21:13, 24:16, 25:8, 28:5, 39:7, 39:25
**remands** [4] - 32:19, 32:21, 32:24, 33:5
**remarkable** [3] - 8:8, 8:17, 9:6
**remiss** [1] - 27:18
**repaid** [1] - 23:2
**repeat** [1] - 22:21
**reply** [1] - 49:5
**report** [32] - 8:1, 8:10, 9:21, 11:11, 13:1, 13:6, 16:7, 18:9, 18:17, 19:3, 19:7, 23:21, 27:1, 28:20, 28:23, 29:2, 29:8, 30:2, 30:4, 32:15, 33:23, 34:8, 34:9, 41:23, 41:24, 46:3, 46:23, 47:22, 48:18, 56:2, 56:23, 56:25
**reported** [3] - 19:15, 19:16, 27:13
**REPORTER** [1] - 5:7
**reporter** [1] - 30:21
**Reporter** [6] - 59:16, 59:17, 59:17, 59:23
**REPORTER'S** [1] - 59:15
**reports** [1] - 18:18
**represent** [2] - 45:4, 45:6
**representations** [1] -

51:20
**represented** [1] - 38:18
**REPRESENTING** [2] - 3:12, 3:16
**representing** [1] - 46:15
**request** [2] - 17:16
**requested** [2] - 27:2, 35:6
**requests** [1] - 35:10
**requirement** [2] - 25:25, 49:17
**requirements** [2] - 49:21, 50:7
**residing** [1] - 33:25
**residual** [2] - 33:15, 34:19
**RESOLUTION** [2] - 4:16, 6:7
**resolution** [10] - 17:4, 18:17, 18:20, 23:4, 24:20, 43:4, 44:13, 44:15, 44:21, 56:21
**resolve** [6] - 9:10, 19:9, 19:18, 20:7, 22:15, 33:13
**resolved** [5] - 20:8, 20:13, 22:15, 25:2, 47:1
**resolving** [2] - 24:16, 32:4
**resources** [1] - 26:17
**respect** [16] - 19:11, 20:9, 20:17, 22:5, 22:19, 22:20, 22:25, 23:14, 24:3, 24:20, 30:10, 30:13, 38:20, 39:7, 39:25, 40:5
**respond** [3] - 31:9, 42:23, 58:22
**responded** [3] - 38:23, 56:24, 58:17
**responding** [1] - 42:14
**response** [2] - 41:13, 42:23
**responsible** [1] - 25:21
**rest** [1] - 33:13
**result** [4] - 14:16, 46:20, 47:10, 55:5
**results** [1] - 29:4
**return** [1] - 52:21
**returned** [1] - 52:12
**reversed** [1] - 28:2
**reversing** [1] - 50:20
**review** [20] - 10:19, 10:23, 12:10, 12:11, 13:6, 13:25, 14:22,

15:15, 15:16, 17:15, 17:18, 24:24, 27:9, 36:19, 42:7, 42:22
**reviewed** [4] - 10:21, 14:21, 15:14, 53:11
**reviews** [5] - 16:1, 16:4, 16:5
**RICHMOND** [1] - 4:14
**right-hand** [1] - 24:4
**ripe** [1] - 38:21
**rise** [3] - 7:7, 38:6, 59:10
**RIVERPLACE** [1] - 3:19
**RMR** [1] - 59:22
**ROAD** [1] - 4:18
**Robert** [1] - 40:1
**ROBERT** [2] - 4:3, 4:3
**Ron** [1] - 42:17
**Ronald** [1] - 32:25
**ROOM** [1] - 5:7
**route** [1] - 52:11
**RP** [3] - 44:24, 45:4, 53:10
**RPR** [1] - 5:7
**rule** [3] - 44:12, 49:11, 55:2
**Rule** [3] - 49:10, 49:16, 49:17
**ruled** [3] - 14:25, 17:14, 49:3
**RULES** [1] - 6:16
**rules** [3] - 36:14, 44:10, 52:8
**ruling** [2] - 38:12, 48:25
**Russ** [2] - 8:13, 54:2
**Russ's** [1] - 35:15
**Russell** [2] - 39:9
**RYAN** [1] - 2:14

### S

**s/Cathy** [1] - 59:22
**sails** [1] - 12:9
**sampling** [1] - 25:11
**samplings** [1] - 25:10
**SAN** [1] - 4:9
**Sandra** [7] - 50:24, 51:13, 51:14, 54:10, 54:13, 55:3, 58:12
**schedule** [3] - 8:8, 30:12, 30:24
**schemes** [1] - 28:22
**Schneller** [1] - 40:11
**Schnepf** [1] - 39:20
**scope** [1] - 48:21
**se** [9] - 12:4, 31:7, 33:23, 33:24, 34:20,

40:10, 40:13, 40:15, 41:10
**SE** [2] - 4:3, 6:11
**seated** [2] - 7:8, 38:7
**second** [11] - 13:1, 13:25, 14:1, 14:22, 15:15, 15:16, 16:1, 17:15, 40:23, 45:10, 58:21
**secured** [1] - 23:19
**Security** [2] - 19:17, 21:15
**SEDRAN** [1] - 1:22
**see** [17] - 9:16, 13:23, 16:19, 19:12, 23:15, 24:4, 26:4, 31:12, 32:2, 41:25, 48:16, 48:23, 50:3, 58:9, 58:18, 59:1
**Seeger** [1] - 7:15
**SEEGER** [6] - 2:3, 2:3, 36:11, 37:11, 37:17, 37:22
**seek** [2] - 19:19, 21:18
**seeking** [1] - 13:18
**semicolon** [1] - 12:6
**send** [4] - 8:13, 12:19, 54:13, 54:17
**sends** [1] - 40:24
**sense** [1] - 30:25
**sent** [7] - 23:5, 23:6, 42:6, 51:5, 53:19, 54:2, 56:16
**separating** [1] - 12:7
**September** [2] - 54:7, 54:11
**serious** [1] - 48:14
**serve** [1] - 46:19
**served** [1] - 29:9
**Services** [1] - 20:20
**serving** [2] - 29:10, 29:13
**ses** [3] - 34:13, 34:23, 40:23
**set** [7] - 10:24, 16:21, 37:15, 44:3, 49:20, 58:13, 58:24
**settle** [1] - 12:18
**SETTLEMENT** [2] - 6:5, 6:6
**Settlement** [1] - 9:12
**settlement** [11] - 8:1, 8:10, 10:22, 15:4, 23:17, 23:21, 25:22, 37:10, 39:18, 44:8
**SETTLEMENT...........
..............** [1] - 6:21
**several** [6] - 12:5, 12:19, 24:25, 27:6, 38:8, 39:1

**Shakespearean** [1] - 8:14
**Sheri** [2] - 50:12, 50:14
**Sherwood** [1] - 40:6
**shift** [1] - 23:3
**short** [1] - 9:7
**shortly** [1] - 36:13
**show** [5] - 14:20, 14:25, 15:5, 38:13, 45:15
**showed** [3] - 11:4, 17:5, 53:6
**showing** [2] - 14:15, 16:25
**shown** [1] - 17:9
**shows** [4] - 11:6, 13:10, 15:19, 57:18
**side** [3] - 33:17, 33:21, 34:20
**sides** [2] - 25:20, 26:24
**signature** [2] - 53:14, 53:22
**signed** [3] - 23:10, 52:4, 52:21
**similar** [3] - 19:14, 21:2, 29:2
**simply** [3] - 41:15, 58:3, 59:2
**sincere** [1] - 8:15
**situation** [4] - 26:1, 56:7, 58:16, 58:22
**situations** [1] - 55:23
**size** [1] - 32:6
**SKADDEN** [1] - 3:9
**skilled** [1] - 8:17
**SLATE** [1] - 3:9
**slide** [8] - 11:4, 13:10, 13:13, 14:8, 15:22, 16:10, 16:25, 17:9
**slides** [1] - 14:8
**smoke** [1] - 31:24
**Social** [3] - 19:17, 21:15, 21:17
**solely** [1] - 37:12
**someone** [2] - 17:10, 46:19
**sometimes** [4] - 11:22, 40:23, 40:24, 41:4
**somewhere** [1] - 12:14
**soon** [3] - 31:24, 34:2, 35:18
**sort** [5] - 28:9, 30:12, 31:16, 32:1, 33:11
**sounds** [1] - 50:13
**source** [1] - 51:7
**south** [1] - 29:3

**SOUTH** [2] - 2:18, 4:13
**speaking** [1] - 54:22
**special** [13] - 10:8, 10:17, 10:18, 10:19, 10:23, 11:8, 12:10, 14:11, 15:9, 15:20, 20:3, 58:15
**SPECIAL** [7] - 3:18, 4:21, 6:8, 27:12, 28:19, 29:18, 29:21
**Special** [25] - 10:22, 10:25, 12:10, 14:4, 14:24, 14:25, 15:1, 15:6, 15:18, 16:2, 16:4, 17:11, 17:13, 17:18, 17:23, 27:7, 27:11, 27:13, 27:15, 28:10, 52:7, 52:10, 53:11
**specialize** [2] - 29:3, 29:4
**specific** [1] - 44:3
**speed** [1] - 9:1
**spelled** [2] - 40:11, 44:1
**spent** [1] - 44:9
**spoken** [1] - 21:7
**staff** [2] - 9:9, 17:13
**stages** [1] - 23:10
**stand** [4] - 10:6, 13:4, 38:2, 59:8
**standpoint** [2] - 33:11, 48:11
**start** [1] - 11:20
**starting** [1] - 53:24
**state** [2] - 31:18, 32:22
**STATE** [4] - 3:12, 3:16, 3:17, 3:22
**State** [1] - 59:17
**state/federal** [2] - 32:7, 32:9
**STATE/FEDERAL** [1] - 6:10
**statement** [1] - 51:7
**statements** [1] - 43:14
**STATES** [2] - 1:1, 1:12
**States** [2] - 59:18, 59:23
**states'** [1] - 24:22
**status** [15] - 7:20, 13:1, 18:18, 19:15, 20:8, 20:18, 21:12, 22:7, 22:13, 22:21, 32:11, 32:16, 34:9, 36:22, 37:24
**STATUS** [2] - 1:11, 6:22
**statutes** [1] - 24:22
**statutory** [5] - 25:19,

25:21, 25:24, 26:2, 26:3
**Steering** [2] - 51:16, 51:17
**STENOGRAPHY** [1] - 5:9
**step** [1] - 26:2
**still** [8] - 12:18, 19:6, 19:16, 21:9, 22:14, 25:8, 40:4, 46:25
**stipulation** [11] - 39:16, 39:23, 52:3, 52:11, 52:12, 52:20, 52:22, 53:13, 53:17, 53:21, 55:13
**stipulations** [1] - 40:3
**STONE** [1] - 3:3
**strangely** [1] - 55:10
**Stratton** [1] - 32:25
**street** [1] - 34:4
**STREET** [16] - 1:20, 1:24, 2:4, 2:8, 2:14, 2:18, 2:22, 3:4, 3:7, 3:14, 3:23, 4:4, 4:9, 4:13, 4:22, 5:7
**stroke** [18] - 8:4, 9:22, 10:1, 10:3, 10:4, 10:9, 11:2, 11:5, 11:12, 14:16, 15:11, 18:23, 21:2, 21:14, 22:5, 27:15, 37:5, 37:8
**structure** [1] - 29:7
**stuff** [2] - 56:8, 57:5
**subcommittee** [1] - 33:8
**subject** [1] - 43:10
**submission** [2] - 30:24, 35:20, 42:21
**submit** [1] - 14:15
**submitted** [10] - 7:25, 15:12, 15:23, 25:1, 35:8, 45:24, 53:8, 53:21, 54:1
**submitting** [1] - 14:19
**substantial** [1] - 26:4
**substantially** [1] - 33:5
**successful** [1] - 29:5
**sudden** [2] - 37:8, 45:1
**sufficient** [1] - 48:15
**suggested** [1] - 24:18
**suggestions** [1] - 21:23
**SUITE** [10] - 1:24, 2:8, 2:11, 3:14, 3:19, 3:23, 4:4, 4:9, 4:14, 4:22
**summary** [5] - 11:11,

13:6, 16:7, 43:14, 57:11

**superficially** [2] - 28:1
**supplement** [4] - 35:6, 35:16, 45:14, 49:5
**supplemented** [1] - 35:9
**supplied** [1] - 48:12
**support** [1] - 9:18
**supposed** [1] - 53:12
**surprise** [1] - 43:11
**Swe** [1] - 38:22
**SWE** [1] - 38:22
**sweeping** [1] - 19:8
**system** [7] - 9:11, 15:16, 26:22, 27:24, 28:3, 47:14, 54:21

**T**

**tail** [2] - 33:15, 34:19
**takeaways** [1] - 13:22
**technicalities** [2] - 52:17, 52:18
**technically** [1] - 52:17
**Technological** [1] - 27:20
**technology** [1] - 28:15
**term** [1] - 34:19
**terming** [1] - 43:6
**terms** [6] - 16:8, 23:4, 24:6, 27:15, 39:17, 43:8
**Terrell** [1] - 39:12
**tests** [1] - 45:23
**THE** [85] - 1:11, 1:15, 2:21, 3:12, 3:16, 3:17, 3:18, 4:6, 4:11, 4:16, 4:17, 4:22, 6:6, 6:12, 6:22, 7:7, 7:8, 7:10, 7:11, 7:17, 7:20, 8:20, 12:24, 16:15, 16:17, 16:20, 16:24, 18:1, 18:7, 18:12, 18:21, 20:15, 20:25, 21:21, 22:4, 25:9, 25:17, 26:25, 27:4, 28:8, 29:17, 29:20, 29:24, 31:10, 31:23, 33:6, 33:24, 34:6, 35:2, 35:11, 35:23, 36:2, 36:9, 36:12, 36:18, 37:1, 37:5, 37:9, 37:15, 37:18, 37:23, 38:6, 38:7, 39:1, 40:20, 41:17, 41:20, 41:22, 42:9, 42:17, 43:1, 47:18, 47:21, 48:3,

49:24, 50:8, 50:15, 50:21, 50:24, 51:13, 56:6, 57:8, 57:23, 59:7, 59:10
**themselves** [1] - 42:4
**thereabouts** [1] - 17:6
**therefore** [1] - 39:17
**they've** [3] - 45:22, 47:19, 56:1
**THIRD** [2] - 2:18, 6:21
**third** [4] - 37:10, 37:12, 40:9, 40:23
**THIRD-PARTY** [1] - 6:21
**third-party** [1] - 37:10, 37:12
**THIS** [1] - 1:7
**THOMAS** [1] - 5:4
**three** [9] - 11:7, 23:9, 23:14, 24:6, 28:16, 40:10, 44:9, 52:19, 52:21
**threw** [1] - 54:21
**thrilled** [1] - 8:7
**throughout** [3] - 9:18, 44:9, 45:3
**THURSDAY** [2] - 1:6, 7:2
**ticket** [1] - 46:4
**tight** [1] - 33:1
**timeline** [2] - 9:25, 16:10
**timing** [1] - 18:24
**TIMOTHY** [1] - 5:3
**TO** [2] - 1:7, 7:4
**today** [18] - 7:15, 7:20, 9:21, 12:17, 13:3, 13:9, 17:21, 19:1, 25:7, 28:23, 38:17, 38:21, 40:8, 41:9, 42:13, 42:19, 43:22, 53:24
**together** [4] - 31:10, 32:1, 57:15, 57:24
**tomorrow** [2] - 8:12, 28:7
**took** [3] - 17:12, 17:16, 46:18
**top** [3] - 19:12, 21:1, 50:4
**total** [6] - 10:3, 10:7, 10:11, 15:25, 16:1, 37:2
**totally** [1] - 48:5
**touch** [1] - 46:21
**track** [6] - 8:4, 11:14, 16:12, 16:13, 17:1, 17:24
**tract** [1] - 9:20
**trail** [1] - 17:2

**transcript** [1] - 59:19
**TRANSCRIPT** [2] - 1:11, 5:9
**transcripts** [1] - 35:7
**transfer** [2] - 11:19, 32:16
**transfers** [1] - 11:20, 11:25
**translated** [1] - 16:8
**transmitted** [1] - 11:23
**travels** [1] - 3:7, 10:10, 37:12, 40:9, 40:23
**treating** [1] - 20:22
**TRIAL** [1] - 6:12
**trial** [9] - 28:24, 32:24, 35:3, 35:5, 35:7, 35:8, 35:9, 35:16
**tribute** [1] - 9:9
**Tricare** [1] - 20:20
**tried** [6] - 25:18, 25:23, 26:2, 35:19, 44:24
**true** [4] - 48:22, 49:23, 56:14, 59:18
**try** [5] - 21:16, 31:9, 32:11, 33:16, 34:15, 54:14
**trying** [2] - 37:20, 44:10
**tunnel** [1] - 32:14
**turn** [1] - 14:14
**turned** [1] - 52:23
**TWELFTH** [1] - 2:22
**twice** [1] - 51:2
**two** [13] - 9:24, 11:7, 29:5, 32:23, 42:12, 43:22, 44:9, 50:3, 50:19, 51:8, 52:19, 52:21, 57:12
**TX** [1] - 2:12
**type** [8] - 13:10, 14:19, 14:24, 15:8, 15:12, 49:14, 54:6, 58:22
**typed** [1] - 45:23
**types** [1] - 32:6

**U**

**U.S** [2] - 11:15, 11:18
**ultimately** [2] - 46:20, 54:9
**unable** [1] - 18:23
**unbeknownst** [1] - 55:11
**under** [12] - 35:20, 36:5, 36:19, 36:24, 37:3, 43:6, 43:23, 43:24, 44:1, 44:7, 45:10, 49:12
**underlying** [1] - 15:10

**underway** [1] - 36:8
**undisputed** [1] - 47:25
**unfinalized** [2] - 21:6, 21:13
**unfortunate** [1] - 49:20
**unfortunately** [1] - 32:9
**unimportant** [1] - 54:9
**United** [2] - 59:18, 59:23
**UNITED** [2] - 1:1, 1:12
**unless** [1] - 12:22
**unlike** [1] - 20:20
**unopposed** [1] - 55:15
**unreimbursed** [1] - 13:20
**unrepresented** [2] - 11:24, 12:8
**unresolved** [1] - 32:4
**unusual** [1] - 46:17
**up** [29] - 8:16, 8:25, 15:25, 18:12, 19:9, 23:10, 23:15, 24:1, 24:13, 27:19, 27:23, 27:24, 31:12, 33:2, 33:21, 36:15, 38:9, 38:11, 41:7, 43:14, 43:18, 44:4, 45:9, 45:11, 50:19, 54:22, 55:7, 55:10, 58:11
**updated** [2] - 45:25
**uproar** [1] - 44:17

**V**

**VA** [2] - 4:14, 20:20
**Vacate** [1] - 48:25
**vacate** [1] - 49:4
**value** [3] - 10:1, 12:14, 20:6
**values** [1] - 10:10
**various** [2] - 24:22, 31:6
**vein** [1] - 29:2
**vignette** [1] - 8:14
**vigorously** [1] - 39:3
**Vioxx** [7] - 7:10, 9:12, 23:3, 43:4, 47:4, 47:12, 56:18
**VIOXX** [2] - 1:4, 6:6
**visit** [1] - 34:3
**voluntarily** [1] - 23:7

**W**

**wages** [6] - 14:10, 14:11, 14:14, 14:17,

14:24, 15:3
**wait** [1] - 16:15
**waiting** [2] - 20:12, 24:12
**WALNUT** [1] - 1:24
**WALTHER** [1] - 3:3
**wants** [1] - 58:5
**WARSHAUER** [1] - 2:6
**WASHINGTON** [3] - 2:23, 3:7, 3:10
**wave** [1] - 23:12
**waves** [6] - 23:5, 23:6, 23:9, 23:14, 24:6
**web** [2] - 19:5, 24:11
**week** [6] - 10:3, 11:17, 23:25, 24:15, 24:22, 27:3
**weekend** [1] - 17:14
**weeks** [4] - 9:24, 19:7, 21:19, 22:16
**WEISS** [1] - 2:3
**WEITZ** [1] - 5:4
**well-reasoned** [1] - 39:5
**WEST** [1] - 4:8
**whatsoever** [1] - 38:23
**WHEREUPON** [2] - 38:4, 59:11
**who've** [1] - 37:12
**whole** [3] - 27:24, 41:7, 46:10
**wife** [5] - 45:19, 45:24, 47:3, 47:9, 47:10
**WILL** [1] - 6:22
**WILLIAM** [1] - 2:4
**WILLIAMS** [1] - 2:21
**willing** [1] - 55:22
**willy** [1] - 40:21
**willy-nilly** [1] - 40:21
**Wimberly** [3] - 33:3, 34:21, 44:4
**WIMBERLY** [6] - 3:3, 38:10, 39:7, 41:9, 42:12, 42:18
**win/win** [1] - 26:24
**winding** [1] - 32:18
**window** [1] - 23:11
**wire** [3] - 11:19, 11:20, 11:25
**wires** [1] - 11:22
**wish** [1] - 8:18
**wished** [1] - 58:17
**withdraw** [2] - 44:14, 45:9
**withdrawing** [4] - 39:8, 39:11, 39:14, 39:19
**WITTMANN** [1] - 3:3

**woman** [1] - 51:15
**wonderful** [1] - 9:16
**wore** [1] - 8:21
**wrap** [3] - 8:16, 19:9, 24:1
**Wright** [2] - 50:12, 50:14
**write** [2] - 40:24, 41:24
**writing** [1] - 41:1

## Y

**y'all** [1] - 29:15
**year** [6] - 8:24, 43:2, 46:22, 47:23, 49:13, 54:25
**years** [4] - 9:8, 34:1, 50:19
**yeoman** [1] - 8:21
**yesterday** [4] - 17:11, 17:15, 17:17, 41:12
**YORK** [1] - 2:4
**YOUNG** [1] - 3:19
**YOUR** [1] - 3:10

## Z

**zeros** [3] - 13:23, 14:12, 15:5