1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3

4

5

6   IN RE:  VIOXX PRODUCTS              *
                LIABILITY LITIGATION       *
7                                          *
    This Document Relates to:             *   MDL No. 1657
8                                          *
    All government action cases.          *   Section L
9                                          *
                                           *   New Orleans, Louisiana
10                                          *
                                           *   August 26, 2010
11                                          *
                                           *   10:00 a.m.
12  * * * * * * * * * * * * * * * * * * *  *

13

14                  MOTION HEARINGS BEFORE
               THE HONORABLE ELDON E. FALLON
15               UNITED STATES DISTRICT JUDGE

16

    APPEARANCES:
17

18  For the State of Florida:    Special Counsel Office of the
                                   Attorney General
19                               BY:  JAMES D. YOUNG,ESQ.
                                 1300 Riverplace Boulevard
20                               Suite 405
                                 Jacksonville, Florida  32207
21

22
    For the State of            Office of Attorney General
23  New York:                    Medicaid Fraud Control Unit
                                 BY:  RANDALL FOX, ESQ.
24                               120 Broadway
                                 12th Floor
25                               New York, New York  10271


           JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF LOUISIANA

1    APPEARANCES CONTINUED:

2

3    For the Commonwealth of        Cohen, Placitella & Roth, P.C.
     Pennsylvania:                  BY:  MICHAEL COREN, ESQ.
                                    Suite 2900
4                                   Two Commerce Square
                                    Philadelphia, Pennsylvania  19103
5

6    For the Plaintiffs:            Anapol Schwartz
                                    BY:  SOL H. WEISS, ESQ.
7                                   1710 Spruce Street
                                    Philadelphia, Pennsylvania 19103
8

9

10   For Merck:                     O'Melveny & Myers, LLP
                                    BY:  BRIAN ANDERSON, ESQ.
11                                  1625 Eye Street, NW
                                    Washington, DC 20006

12

13   Official Court Reporter:       Jodi Simcox, RMR, FCRR
                                    500 Poydras Street
14                                  Room HB-406
                                    New Orleans, Louisiana 70130
15                                  (504) 589-7780

16

17

18   Proceedings recorded by mechanical stenography, transcript

19   produced by computer.

20

21

22

23

24

25

1                       **PROCEEDINGS**

2                     **(August 26, 2010)**

3           **THE DEPUTY CLERK:**  Everyone rise.

4           **THE COURT:**  Be seated, please.

5                On that other party matter, the private

6     insurers, as I gleaned from the discussion, the plaintiff

7     wanted some time to supplement his brief on jurisdiction.  I'll

8     give you seven days to do that.

9                Sol, do you need some time to respond?

10          **MR. WEISS:**  Yes, Your Honor.  After I get his brief,

11    can we have a week?

12          **THE COURT:**  Okay.  That's fine.

13          **MR. WEISS:**  Thank you, Your Honor.

14          **THE COURT:**  Just on that discreet issue.

15          **MR. WEISS:**  Just on that discreet issue, yes, sir.

16          **THE COURT:**  I've got the rest of it.  I think I have

17    that too, but I'll give you an opportunity to discuss it.

18                Okay.  We move to the other matter at this

19    point.  As I mentioned, we're in the final phases of this

20    litigation and it's appropriate now to turn to the governmental

21    actions.

22                Several governmental entities have pending

23    litigation in the court, including suits brought on behalf of

24    various states and various counties.  The suits seek damages

25    basically for monies paid by the state for Vioxx, either

1   through the state Medicare program or some other state program
2   which funded the prescription drugs.
3                    I split the governmental entities into two areas
4   or two categories for discovery purposes.  The first group has
5   the shortest time for discovery, and that includes
6   Pennsylvania, Oklahoma, Florida and New York.  We're proceeding
7   with those states first.  Before that, I also had Louisiana,
8   and I had a trial in Louisiana and that matter is presently on
9   appeal.
10                    The issue before me at this point involves some
11   discovery issues.  I think it would be helpful just to take
12   them up as you folks have given me the benefit of your thinking
13   on it.  The issues common to all four states, the first one is
14   information and documentation about the drugs other than Vioxx.
15                    Merck takes the position that this material is
16   necessary so that they can find out about restrictive
17   formularies, any preferred drug lists, any state agency's
18   knowledge of the risks of the comparative drugs, what they did
19   about them, whether they acted differently, if and when there
20   were black box warnings and things of that sort.
21                    The states take the position that this material
22   is irrelevant to the issues present in the cases.
23                    I'll hear from the parties on that matter first.
24             MR. ANDERSON:   Thank you, Your Honor.  Brian Anderson
25   representing Merck.

 1          **THE COURT:**  I might say, you want ten drugs, is that

 2     it, other than Vioxx?

 3          **MR. ANDERSON:**  We want ten drugs with respect to our

 4     document requests and interrogatories.  We want a longer list

 5     of essentially all pain relievers and proton pump inhibitors

 6     with respect to database inquiries.

 7               As Your Honor has summarized, Merck has asked

 8     for documents, interrogatory responses and data that go to the

 9     knowledge and actions and statements of both the government

10     entities that manage these programs, as well as the actions,

11     specifically prescribing actions, of doctors with respect to

12     both Vioxx and this broader group of other drugs.

13               Plaintiffs have objected to producing documents,

14     interrogatory responses and data with respect to any drugs

15     other than Vioxx.

16               I think the major point to make here is that all

17     of the complaints in this group compare Vioxx unfavorably to

18     other drugs.

19               The story that is told in each of these

20     complaints is that there was a family of pain relievers, all of

21     which had their own price, all of which had their own benefits,

22     all of which had their own risks, and that Vioxx is

23     particularly expensive and particularly unsafe, and that had

24     the states and/or individual doctors known more about the risks

25     of Vioxx, as compared to these alternative drugs, the states

1  would have banned Vioxx from the formularies, would have

2  discouraged doctors from prescribing Vioxx and instead have

3  them prescribe other drugs, and that doctors would have

4  prescribed other drugs, which would have at the of the day

5  reduced the amount of money that the state paid to treat these

6  patients and would have resulted in these patients receiving

7  safer drugs.

8              Having cast that net so broadly in their

9  complaint, it is necessary for us to take discovery as to that

10 entire story, including where Vioxx fits within all of these

11 decisions that are made by state actors and doctors about

12 choice of drugs.

13             And you cannot litigate a case that is so framed

14 by focusing the discovery surgically only on what are the risks

15 and benefits of Vioxx, what did Merck say to doctors and

16 agencies about Vioxx.

17             We need to look beyond Vioxx to test the

18 credibility of the conclusions that all of these cases ask the

19 court or a jury to reach about what the agencies would have

20 done if they had had more information about Vioxx or different

21 information about Vioxx, what would doctors have done if they

22 had different information about Vioxx.

23             Plaintiffs have objected to our effort to obtain

24 documents, interrogatory responses and claims data with respect

25 to drugs other than Vioxx on two grounds:  Number one, they say

1  that this information is irrelevant and they contend that it

2  would be too burdensome to gather information about anything

3  beyond Vioxx.

4            As to relevance, I think I've just sort of set

5  the stage as to why this other discovery is clearly relevant.

6  It really comes down to causation and damages.  As to

7  causation, we have to test the allegation that each of these

8  plaintiffs make that the agency would have acted differently if

9  it had had different information, that doctors would have acted

10  differently if they had different information.

11            I think the Court needs to only remember the

12  Louisiana litigation, which it presided over, to see how it

13  works.  In the Louisiana case, of course, Louisiana was

14  contending that had it known more about the risks of Vioxx, it

15  would have discouraged doctors from prescribing Vioxx.  It

16  might have changed its Medicaid program to prevent Vioxx from

17  being available.

18            Yet, evidence in that case about what actions

19  the state took in 2005 and 2006 and, indeed, to the present

20  day, by keeping Celebrex, another Cox II drug which has a black

21  box warning for its CV side effects, keeping that drug as a

22  preferred drug in its formulary discredited the state's

23  allegation that had Merck said something more about the

24  cardiovascular risk of Vioxx that it would have acted against

25  Vioxx.

1      **THE COURT:**  Let me interrupt you.  I understand your

2  argument.  I'll give you an opportunity to respond.  Let me

3  hear from your opponent.  What's the problem from the discovery

4  standpoint with these other drugs, as you see it?

5      **MR. FOX:**  Good morning, Your Honor.  I'm Randy Fox

6  from the New York State Attorney General's Office.

7      I think we need to frame the questions slightly

8  differently than Mr. Anderson framed it.  All along we have not

9  been taking this strong, crisp position of "all or nothing."

10  We have not been saying that we will not produce anything about

11  these non-Vioxx drugs.  There's a whole host of issues within

12  that bigger question, and those issues have different

13  considerations and really need to be addressed.  It cannot be

14  addressed as one big issue as it was just presented.

15      First off, I would draw a distinction between

16  requests for data, and largely that's what the interrogatory

17  requests are, and requests for documents from the files of the

18  different state agencies that we're talking about.

19      When we're talking about data, there are a

20  number of data issues that are in front of the Court today, and

21  I know we're addressing these things one at a time as set forth

22  in Merck's letter, but I want to make sure we don't lose sight

23  of the fact that there are at least three different data issues

24  floating around, only one of which is about these non-Vioxx

25  drugs.

1          There's also a data issue about Vioxx.  There's
2  also a data issue about, at least from New York State, medical
3  data for the Medicaid recipients in New York.  The reason it's
4  important to just keep, at least, in mind that all of those
5  data issues are out there is we're talking about an
6  astonishingly large amount of data.  Sometimes you lose sight
7  of that when you go one by one.

8          **THE COURT:**  Right.  How about your position on
9  documents?

10          **MR. FOX:**  Sure.  For the documents, it is, in fact,
11  the case that for New York that we have agreed that we will
12  produce documents from the Medicaid and Epic programs that
13  relate to the Cox II inhibitors.

14          **THE COURT:**  Okay.  Let me say this:  I've been with
15  this for a while now and I've also sat through some trials.  I
16  do think other drugs are relevant to the whole issue.  Now, the
17  devil may be in the details, as you say.

18          I think that the scope of the production might
19  be an issue.  But whether or not they're entitled to
20  information on other drugs in the discovery phase is really
21  relevant because it comes into the whole mix.  I mean, you
22  present your case, and generally you present your case by
23  saying not only Vioxx is a bad drug but there are other drugs
24  that could or should have been used, and that's always the
25  position.

1           So when you take that position, they really have
2   to have an opportunity to see what drugs you're talking about
3   and what your position was on those drugs and what the various
4   committees considered and why they put one drug on a preferred
5   list and not on a preferred list, whether it was just for
6   economic reasons or because of other reasons.
7           Whether or not they could have done anything
8   about it is an issue that sometimes the other drugs are
9   relevant because they couldn't have taken the drug off in some
10  instances, they had never taken the drug off in some instances,
11  when it's just drug-specific as opposed to class-specific.
12          So, generally, I feel that other drugs and other
13  information is important and relevant certainly to the
14  discussion.  The question is how much.  And the question is
15  what information is needed; and if it's so broad in scope, how
16  do we deal with something so broad in scope, can we do it on a
17  sampling method, can we do it in some method to get that
18  information that both sides can use?
19          Because you're not going to be able to use
20  anything that they don't have access to.  You're not going to
21  be able to come to court and at trial take a position if you
22  haven't given them access to it.  Any court, myself, or anyone
23  else is going to say, "Stop, you can't introduce that
24  evidence."
25          So I think it's to everybody's advantage that

1  whatever you're going to use, they have access to; and whatever

2  they're going to use, you have access to so you can test it and

3  respond to it.

4          **MR. FOX:**  What we've done, Your Honor, is made

5  proposals to try to find some middle ground which gets Merck

6  the information it's asking for, reserving our relevance

7  objections -- or preserving them, but not imposing the burden

8  of having to produce the volume that is being requested.

9          I'd like to explain for the Court what we've

10  proposed.

11          **THE COURT:**  How do we go about solving that?  How do

12  we go about doing that?

13          **MR. FOX:**  Sure.  I look at it separately for the

14  documents versus the data, because they're really just three

15  different issues as to how you go about getting it.

16          On the data side, in the original document

17  requests Merck asked for claim-by-claim data for, I thought it

18  was a list of 12 drugs, they're saying 10 drugs, and I don't

19  know how we're counting that differently but we are.  And those

20  10 drugs alone, those are the ten NSAIDs, account for over

21  5,000 different NDC codes.  I think it was 5,500 and maybe 1.

22          Since the programs organize their data by NDC

23  codes, we're talking about an enormous volume of data just

24  there, and we're talking about millions and millions of

25  prescriptions.  Vioxx alone was more than a million

1   prescriptions for New York Medicaid.  Celebrex outsold Vioxx in

2   New York, so that was more than a million prescriptions, and

3   you go down the road.

4           In a recent letter, Merck informally -- it's not

5   in any discovery request -- asked that the list be expanded to

6   about 110 drugs; and we haven't counted the NDCs on that, but

7   the presumption is that we're talking now about tens of

8   thousands of NDCs just from an informal request.  So millions

9   and millions and millions of more claim data.

10          So the question becomes, what do they need data

11  for and can we accommodate that in some different way?  What

12  we've suggested we do is --

13          Well, and first off, Merck, as I read it, has

14  made two arguments as to why they need all this non-Vioxx drug

15  data:  One is they want to be able to say, "Well, what would

16  the agency have spent if it hadn't paid for Vioxx?"

17          We don't agree as a legal issue, but just as a

18  matter of getting discovery done, whether -- the legal issue of

19  whether there should be an offset or not, but just as a matter

20  of getting the discovery done, what we said is, "Okay.  You

21  want to figure out what it would have cost, you tell us which

22  specific dosages and NDCs you're going to say are comparable to

23  the Vioxx dosages and we will get you the cost information on

24  an annualized basis."

25          The reason I want to do it on an annualized

1   basis is because if you do it on a quarterly basis there's the

2   risk of disclosing highly confidential rebate information; and

3   one way to avoid that entirely is just to give it on an

4   annualized average basis.  Federal law makes that rebate

5   information very secret.

6                    So that's the cost data.  We're offering them

7   the cost data.  And if they want to calculate what the but-for

8   world would have been in their view, they'll have that data,

9   and we don't have to produce claims data to get there.

10                   And the second argument they're making is they

11  want to look at some sort of prescribing patterns.  Again, I

12  think that prescribing patterns can be dealt with on a summary

13  basis or an aggregate basis for the drugs that Merck identifies

14  to us, at least a reasonable number, as comparable, and

15  certainly at least the ones that are in their formal discovery

16  requests.

17                   We're trying to find that middle ground.  Maybe

18  if they want to highlight specific time periods, we can provide

19  aggregate data for, you know, when some drug was or wasn't put

20  on a formulary.

21          THE COURT:  I really think we've got to look at this

22  and shorten it a little bit more.  I'm trying to figure out how

23  to do this.  I think, to me, there's several ways.  First, I

24  think the data is important and relevant.  The question is how

25  do we go about getting it.

 1           Now, you can go about getting it by either, as

 2   Randy says, give you the bottom lines, or you can go about

 3   getting it by getting you the bottom lines plus some kind of

 4   legitimate statistically relevant sampling.

 5           It seems to me that that's an easier way than

 6   getting hundreds of millions of material to deal with.  Is

 7   there some simpler way of getting this information?

 8           **MR. ANDERSON:**  Well, let me speak to that.

 9           First, before I get to that, I wonder if we

10   could set the document issue aside.

11           **THE COURT:**  Yes.

12           **MR. ANDERSON:**  We reduced -- as part of the

13   compromise, frankly, that we proposed, we reduced the number of

14   drugs as to which we were asking the plaintiffs to search for

15   pieces of paper down to, we say, 10, they say 12.

16           **MR. FOX:**  I'll take 10.

17           **MR. ANDERSON:**  There's a single drug that comes under

18   three brand names, so we're talking about the same thing.  But

19   it's a rather small list.

20           And our view on the burden of that is that our

21   experience in the Texas case and the Louisiana case indicates

22   that there are relatively few people at these agencies who

23   participate in the Medicaid formulary preferred drug list

24   program.

25           There are employees, there are P&T committee

1  members and there are advisers.  And they tend to make these

2  decisions about categories of drugs.  So, frankly, we don't

3  think there's much more burden to simply getting us documents

4  about all NSAIDs as opposed to stripping out the documents that

5  don't specifically mention Vioxx.

6              And as we discussed before, we really need to

7  see a whole picture of what the agencies looked at.

8          THE COURT:  I thought that wasn't an issue.

9          MR. ANDERSON:  I hope not.

10         THE COURT:  I thought you've got the documents.

11         MR. ANDERSON:  If that's not an issue, I'll move on

12  to --

13         THE COURT:  So let's move on.

14         MR. ANDERSON:  -- on to data.

15         THE COURT:  Yes.

16         MR. ANDERSON:  On the data, there are a couple of

17  issues here, and one of them, Randy moved on to a later point

18  in the argument.

19              Let me talk first about why we need data about

20  other drugs.

21         THE COURT:  Let's not waste time on that.  I think

22  you do.  The issue is which data; the issue is how do you go

23  about doing it.

24         MR. ANDERSON:  Okay.  Number two --

25         THE COURT:  Because I don't think it's fair for him

1    to take 15 people out of the line and get them on this material

2    to give to Merck.  We've got to figure out a way of dealing

3    with it.  I think you should have the data.  The issue is how

4    do you get the data in workable form and the easiest way.

5              **MR. ANDERSON:**  Let me explain what we absolutely need

6    and then let me offer a compromise, as I often find myself

7    doing here.

8              We need claims level data in order to do the

9    complete kind of analysis that Dr. Wiggins talked about doing

10   in his declaration.  To take the simplest example, if the state

11   is suing us saying we spent X millions of dollars on Vioxx over

12   a five-year period, we need to see each and every claims record

13   to see if they, in fact, spent that amount of money.

14             And if the litigation of this case results in us

15   finding that there were certain periods of time within that

16   four or five years that are particularly relevant, we need to

17   see all of the claims records within that period of time.

18             So we need complete claims data as to Vioxx,

19   starting right there, in order to do that kind of analysis.

20             **THE COURT:**  What I'm saying is is that's

21   theoretically correct.  The issue sometimes when you're talking

22   about data is the data is so immense, so voluminous, that

23   you've got to figure out a way of getting the information

24   without being drowned by it.  So I'm looking for some way of

25   dealing with that voluminous nature that New York says it

1    involves.

2              Is there any way of doing a statistical

3    sampling?  People who know how to do these samples can take a

4    sample and extrapolate from that sample.  Is there any way of

5    doing that?

6              MR. ANDERSON:  No.  We're not aware.  We've consulted

7    with Dr. Wiggins about this and he does not believe that he can

8    do the kinds of causation and damages analyses that he needs to

9    do simply by taking every nth claims record.

10             But as to the voluminous quality of seeking

11   large volumes of claim data and the burden associated with

12   that, this is not human work that is involved in getting data

13   about a larger group of drugs versus a smaller group of drugs,

14   or getting every claims record as opposed to every nth claims

15   record.

16             There is a database out there -- a Medicaid

17   database out there.  It has all of this information.  To

18   respond to our data request, somebody will have to write a

19   computer program, a query, that will say, "For the following

20   drugs, give me every claims record," and spit it out to a hard

21   drive and put it onto a DVD and send it out.

22             The only incremental effort that is involved in

23   downloading claims data as to 40 or 50 drugs as opposed to 10

24   drugs as opposed to one drug is typing in more drug names or

25   NDC codes.  The rest of the work is done automatically by the

 1    computer program.  Yes, it takes more computer time, but it's

 2    something that Louisiana did without objection; something Utah

 3    has done without objection.  It's not that hard.

 4              So we're not talking about human beings going

 5    out and searching for 40 times larger quantity of documents.

 6    This is computer downloading.  It's something these agencies do

 7    all the time when they want to run comparative reports on

 8    different drugs.  And in point of fact, as we learned in

 9    Louisiana, the vendors who operate these databases often are

10    contractually obliged to provide these services.  So it's not

11    even a burden on the plaintiff itself.

12              Now, with that as background, let me offer a

13    compromise, which we have discussed with Dr. Wiggins, and this

14    bleeds over a little bit into the relevant period issue.

15              We absolutely as to everybody who took Vioxx at

16    any time, we need to know their entire pain relief treatment

17    history, both before Vioxx came on the market and for two years

18    after it went off the market so that Dr. Wiggins can perform

19    his switching theories studies, or his but-for world analyses.

20              What were these people getting before Vioxx

21    came -- they got Vioxx; how much did it cost; when were they on

22    Vioxx; when Vioxx was withdrawn; or when the doctor changed his

23    mind and decided to put them on to something else, what did he

24    put them on to?  So we absolutely need to have complete

25    histories as to those Vioxx people.

1              As to people who never got Vioxx, they were

2   treated with other pain relievers, the list of 40 or 50 drugs

3   that we asked for in our main letter essentially was all NSAIDs

4   and all other pain relievers.  The theory being that we want to

5   get a complete data picture about all of the data -- all of the

6   pain relief prescriptions that were written.

7              We are prepared to dial that list back down to

8   the NSAIDs, the 10 or 12, however we count them, drugs that are

9   most centrally at issue, plus PPIs, which if you prescribe a

10  non-Cox II pain reliever to a patient, you often had to also

11  prescribe them a PPI to deal with the gastrointestinal effects,

12  and that adds to the cost.

13             That would, as a volume matter, greatly reduce

14  the volume of data that the state's have to gather and that we

15  would process.  And I would say it is precisely -- precisely --

16  the data that Louisiana produced to us and it is the list of

17  drugs that this Court endorsed in the third-party payer cases.

18        THE COURT:  Let me do this -- Randy, I've got it --

19  with regard to providing information and documents about drugs

20  other than Vioxx, I feel that that's relevant and discoverable.

21  With regard to the documents themselves, I order that the

22  states produce the documents themselves.

23             With regard to the data, I want Merck to write a

24  letter saying what they want.  I'd like a response.  If the

25  response is, "Okay," that's fine; if the response is, "We have

1   problems," I really would like to know what the alternative is.

2   Give me some alternative to what he wants on certain issues.

3                    That's the way I'm going to deal with the

4   failure to provide information and documents about drugs other

5   than Vioxx.

6                    The next --

7              **MR. COREN:**  Your Honor?

8              **THE COURT:**  Yes.

9              **MR. COREN:**  Michael Coren on behalf of the

10  Commonwealth of the Pennsylvania.

11             **THE COURT:**  Okay.  Come on up.

12             **MR. COREN:**  Thank you, Your Honor.

13                   There's a corollary issue that's going on there

14  that I want to call to Your Honor's attention.

15             **THE COURT:**  Okay.

16             **MR. COREN:**  Common to these discovery issues that

17  we've been going through and thrashing out before Your Honor, a

18  number of the states, the Commonwealth of Pennsylvania

19  included, received Freedom of Information Act or Right-to-Know

20  requests that are redundant to exactly what we're doing.

21                   To us it seems like it's an end to run around

22  Your Honor's control of discovery here.  We would like some

23  relief as to that.

24             **THE COURT:**  All right.  What's your suggestion?

25             **MR. COREN:**  That they be limited to what Your Honor's

1   telling us to do.  Because it's distracting to have one group

2   be yanking when we're trying to comply with your others.  Your

3   other controls -- discovery controls the parties and Your Honor

4   could just easily direct that those Right to Knows are stayed.

5           THE COURT:  Yes.  What's the problem with that?  Why

6   are we doing it two or three different times?

7           MR. ANDERSON:  Largely out of a sense of frustration.

8           THE COURT:  Okay.  That's easy for me.  I'll stay

9   that.

10          MR. COREN:  Thank you, Your Honor.

11          THE COURT:  Next one is provide information and

12  documents for a relevant time period.  Merck wants it from

13  '98 to 2006 and the states want to give it from '99 to 2005.

14  Why are you getting me involved in that?  What are we talking,

15  six months or eight months?  Ben, give me some help here.

16          MR. ANDERSON:  Do you want me to address that?

17          THE COURT:  Yes.  It doesn't matter.

18          MR. FOX:  With Your Honor's permission, I just want

19  to jump back for a second because I didn't actually address the

20  other drugs documents issue.  I thought we were going to do

21  them seriatim.  And I just wanted to make a couple of quick

22  points just so it's clear on the record.  I realize your

23  Honor's already given his ruling.

24          THE COURT:  Sure.  Go ahead, Randy.

25          MR. FOX:  The first point is that the discussion

1    about how easy it is to get data off of databases is a little

2    bit of déjà vu all over again.  I think I'm quoting my friend

3    John Beisner from August 18th on that.

4              **THE COURT:**  We've all heard that before.

5              **MR. FOX:**  And certainly to the extent we can find

6    solutions in both directions, we should be working towards

7    that.

8              **THE COURT:**  Yes.  I really do think so.  This idea of

9    every document that's existing, that's hard to do.

10             **MR. FOX:**  The other point I want to make is that the

11   relevance of these documents on this list of other drugs as far

12   as the New York case is a different animal.  New York is not

13   claiming that its Medicaid agency would have done something

14   different.  Its case is focused on the fact that the doctors,

15   as a group, would not have been writing prescriptions for Vioxx

16   just for a specific at-risk group of patients, the people with

17   previous coronary artery disease risk factors.

18             So, for example, somebody who had a heart attack

19   previously should not have been getting this drug.  And if

20   there had been clear and honest representations about the risk

21   profile of Vioxx, they would not have and we would not have

22   paid for it.

23             **THE COURT:**  Well, the only problem is is that if you

24   then put them on Celebrex or if they're using Celebrex or if

25   they're using another drug that's similar, the risks are just

1    there.  There hasn't been any change, and they want to know

2    that.  And they also want to know if a black box is put on it,

3    the drugs subsequently with the black box are still prescribed,

4    they want to know that.

5           **MR. FOX:**  Well, that didn't happen until after Vioxx

6    was off the market anyway.  But the data will tell them if a

7    patient went or if, in general, patients went on Celebrex.

8           **THE COURT:**  No, I hear you, and I'll give you an

9    opportunity to respond to each of those specifics that Brian is

10   looking for.

11          **MR. FOX:**  And we've agreed to turn over the non-data

12   documents relating to Celebrex and Bextra.  You get into bigger

13   problems when it's drugs like Ibuprofen, which is on their

14   short list.  There are just thousands and thousands of

15   documents which are really not at all relevant that have to be

16   gone through.

17          **THE COURT:**  No, I see that.  I see that.  I think

18   some of the pain drugs don't present the same problems.  You've

19   got to get some relevant information from it.  I understand

20   that.

21          **MR. FOX:**  So, hopefully, there's a way we can resolve

22   this without having to turn over every document that mentions

23   Ibuprofen.  If you do the corollary to the number of NSAIDs --

24          **THE COURT:**  Or aspirin.

25          **MR. FOX:**  -- there's over 2,000 of them, just for

 1   Ibuprofen.

 2                **THE COURT:**  Yes.  All right.

 3                **MR. ANDERSON:**  Well, earlier, I thought --

 4                **THE COURT:**  What about the time frame?  We're talking

 5   about, what, six months, eight months?

 6                **MR. ANDERSON:**  Right.  The choices of the timeframes

 7   by each side reflects their litigation objectives.  We want

 8   data and documents from 1998, of course, for two reasons:

 9   Number one, Celebrex came on the market in 1998.  We want to

10   see what the prescribing patterns were for Celebrex.  Also, in

11   '98, we want to set the stage for the story.  We need to know

12   what the policies of the government entities were, and here I'm

13   speaking about documents, in the year before Vioxx came on this

14   stage.  How did the states evaluate Celebrex when it came onto

15   the market?

16                So apropos of my comments before, we can't

17   litigate this case by focusing surgically just on Vioxx; we

18   need to see the whole stage.  We need documents and data from

19   '98 so that we know the stage, we know what these soon-to-be

20   Vioxx users were taking before Vioxx came on the market.

21                The reason we need after April 2005 and through

22   2006 is a couple of reasons:  One, Celebrex obtained a black

23   box warning in 2005 and it's very relevant to these theories.

24                **THE COURT:**  No, I understand the issue.  This is what

25   I feel and I think you ought to get them for 1999 to 2006.  So

1    my ruling's going to be you're entitled to the information from
2    '99 to 2006.
3              I think a year after is important because that's
4    when the black box comes in and that's when if you're going to
5    do anything, their position is, then you should have done
6    something about it.  But still with the black box it's still on
7    the formulary, it's still being accepted, it's still being
8    prescribed, and they want to know that information for whatever
9    reason they need the information.
10             So I do think it's important that it be after
11   2005 that we're dealing with.  So 2006, I can see, but '99 is
12   close enough.
13             The next one is failure to provide information
14   about relief sought by the plaintiffs.  What is that about?
15        MR. ANDERSON:  Would you like me to go there, or,
16   with Mr. Fox here, should we finish the New York database
17   issues?
18        MR. FOX:  I'll be here the whole time.
19        MR. ANDERSON:  I don't care.
20             I'll do contention interrogatories.  Contention
21   interrogatories regarding damage.  We're seeking specifics
22   about the types of relief that each plaintiff is seeking, the
23   amounts that they're seeking.
24        THE COURT:  Yeah, but why not?  What's the problem
25   there?  They want to know what you want from them.

1      **MR. FOX:**  Sure.  Well, I can only speak for New York

2  on this one, Your Honor.

3      **THE COURT:**  Okay.

4      **MR. FOX:**  We have revised, supplemented our

5  interrogatory response giving them the specific information

6  that we have.  What they seem to be asking for now is something

7  that is really what will be the result of expert testimony, as

8  it relates to New York at least.  The crux of the request, as I

9  understand it, is that they want us to disclose the expert

10  opinion as to who falls on that line -- across that line of who

11  has a preexisting CV -- or who has risk factors for CV before

12  they get Vioxx prescriptions.

13          And that is something that is going to be expert

14  testimony.  In fact, if you look at the Dr. Wiggins affidavit

15  that was attached to Merck's letter this past Tuesday, the

16  reply letter, even Dr. Wiggins says that's the kind of thing

17  that has to be the subject of expert testimony.  And that's

18  how --

19      **THE COURT:**  That's not the way I read the request.  I

20  thought you were looking for something broader than that.  I

21  thought you were looking for the nature of the damages or the

22  quantity of the damages or the methodology, not the specifics,

23  as Randy's saying.  I mean, that's proof.

24      **MR. ANDERSON:**  Absolutely.  This is the same debate

25  we had in the Louisiana case and you rejected these same

1    arguments.  There is a difference between, you know, give us

2    the basic information so that we know the amount that we're

3    dealing with and your theory that you're pursuing, don't just

4    give us, well, we want three times the amount for which you are

5    liable.

6              There's a difference between that, which is

7    something that they ought to be able to do.  They filed their

8    complaint years ago.  They've had access to their own data

9    forever; and, presumably, they've been consulting with their

10   experts.  So they, at least, ought to be able to give us those

11   basic facts so that we're not blindsided about the amounts or

12   types or theories of discovery.

13             The rule of the expert report next year is for

14   the expert to justify and defend the claim that the states are

15   making.  Those are two different exercises.  And what we're

16   asking for now is information about the amount sought, the type

17   of relief, the basis for it, a plain English explanation of how

18   they get there so we know what we're shooting at.

19             **THE COURT:**  Go ahead, Randy.

20             **MR. FOX:**  Your Honor, I think we did just that, and I

21   don't know how we can have the conversation without having the

22   response in front of us and going through it.

23             **THE COURT:**  Yes, I think that's right.  Yes.

24             **MR. FOX:**  For everybody on the telephone, we've got a

25   request from Katie, and me, that you all put your phones on

 1  mute because we're getting some interference here.  Thank you.

 2              **THE COURT:**  Yes?

 3              **MR. YOUNG:**  Your Honor, James Young from the state of

 4  Florida.  If I could just supplement what Mr. Fox said, because

 5  I think he's limited his representations and arguments to the

 6  state of New York.

 7              **THE COURT:**  Right.

 8              **MR. YOUNG:**  So as to Florida, one of the differences

 9  in our case, which I think I've referenced to Your Honor in

10  previous arguments, is that we actually are seeking civil

11  penalties on a per violation basis for each time that Merck

12  representatives lied or mislead physicians or P&T committee

13  members.

14              So at this point in time, I don't have the

15  information sufficient to tell them a number, there were 10,000

16  violations.  That was what we sought at the hearing last week,

17  which --

18              **THE COURT:**  Yes, that's fair.  But I think that what

19  they need to know is that you're making a claim for civil

20  penalties for each one.

21              **MR. YOUNG:**  And we intend to supplement the

22  interrogatories.

23              **THE COURT:**  I mean, that's the best you can do in

24  that situation.  From your standpoint, it's like if you're

25  making a claim for punitives or if you're making a claim for

1    economic losses or you're making a claim for personal injury,

2    whatever you're making a claim for, I think they should know

3    what area of damages.  The specifics, you can't do that until

4    you prove it.  I can see that.

5              But they ought to know something about what

6    you're making a claim for.

7              MR. YOUNG:  And we do intend to supplement our

8    interrogatories to answer those very questions.

9              THE COURT:  How do we go about nailing that down?

10   What do we do with that?

11             MR. ANDERSON:  Well, there's one particular issue

12   with the New York answer that we feel seriously about.  They

13   say they're only suing as to those Vioxx prescriptions written

14   for people with CV risks.  We believe that a fair answer to

15   that interrogatory will tell us, in plain English, how they

16   intend to identify these people.

17             We're not asking for the list of names today.

18   We want the list of people, and then we want the Medicaid

19   database extract -- or strike that -- we want the explanation

20   of how they're going to identify the people with CV risks so

21   that when we get the database, our expert can begin crunching

22   the numbers and seeing who those people are.

23             MR. FOX:  Well, and where you draw that line is, like

24   Professor Wiggins says, expert testimony.  And there's some

25   things you can sit here today and say it's obvious.  Clearly,

1    somebody who had a previous heart attack would fall into that

2    category, somebody who had a bypass surgery would fall into

3    that category.  But it's going to be a matter of expert

4    testimony as to where that line gets drawn, and I imagine we'll

5    have different views on that.

6              So pinning down that expert evidence now before

7    we get to the expert phase seems to turn the scheduling order

8    on its head.  And maybe this is an issue that we should be

9    discussing more in the context of Merck's very recent request

10   for medical data, because maybe that's the solution to where we

11   go from here.

12             I haven't said, although, you'll see it in their

13   letter, I haven't said that we're never going to turn over

14   medical data.  But I want to make sure that we're responding to

15   a formal request; and there are all those concerns out there,

16   whether it's HIPAA or whatnot, and we don't have a formal

17   request at this point.

18        **THE COURT:**  But your answer to the question is that

19   you're going to find it out by reviewing medical data; right?

20        **MR. FOX:**  They're going to form their expert opinion,

21   presumably, based on medical data, that's what they say they're

22   going to do.

23        **THE COURT:**  How are you going to determine whether

24   somebody's had a previous heart attack or not without reviewing

25   the medical data?

 1          **MR. FOX:**  And we will as well.

 2          **THE COURT:**  Yes.  Right.  So I guess his answer is

 3    the medical data, by reviewing the medical data and, therefore,

 4    you're going to need the medical data.

 5          **MR. ANDERSON:**  And that's a debate that I suspect

 6    we'll have in about five minutes about the medical data.  But

 7    before we get to that debate, yes, we're going to want the

 8    medical data and the information that they have about these

 9    people.  What we'd like them to tell us is what is the test you

10    propose to use to identify the people as to whom you're suing?

11          **THE COURT:**  You know, the problem that you're really

12    faced with is interrogatories is probably the weakest discovery

13    device in the book.  It's a device:  You ask in a lawyer's way

14    for information; they answer in a lawyer's way for information.

15    You're asking for everything, and they're giving you nothing.

16    That's the whole approach to interrogatories.

17               To try to get together on it is just impossible

18    if you're doing interrogatories because that's what happens.

19    Your questions are so broad that they're answered by not giving

20    you anything.

21          **MR. ANDERSON:**  We're all rational actors here and our

22    experience is that when we get a reasonably revealing answer,

23    we don't file a motion; but when we get an answer that says,

24    "See our complaint," which implies that there's no role for a

25    contention interrogatory, then we do file a motion.

1        **THE COURT:**  All right.  Well, I'm going to have to

2  deal with this.  I guess what you're going to have to do is if

3  he doesn't answer it, just move to dismiss the elements of

4  damage or something and I'll deal with it.  Certainly, you

5  folks have to be able to get together on something like that.

6  He should know what your claims are, what's the basis for your

7  claims.

8            Now, from the standpoint of the specifics of the

9  claims, that's not discoverable in an interrogatory; otherwise,

10  you wouldn't have a trial, you'd just file interrogatories,

11  you'd answer, and that would be the end of the day.  We

12  wouldn't put on any witnesses.  So my ruling on that is the

13  plaintiffs have to supply a broad description of the nature of

14  damages, the quantity of damages, the methodology they used;

15  but from specifics, that's going to have to wait for another

16  day.

17            What's the next, failure to clarify allegations

18  of misconduct on Merck.  Now, you're looking for that by

19  interrogatories?

20        **MR. ANDERSON:**  Yes.

21        **THE COURT:**  You want them to detail all of the --

22        **MR. ANDERSON:**  Well, this is the same interrogatory

23  that we served in the Louisiana case and, again, Louisiana

24  objected, you ordered them to supplement their response.

25            The complaints make sweeping allegations about

1  all forms of Merck misconduct.  But as we all know and as we

2  saw in Louisiana, eventually the plaintiff comes down to

3  focusing on some precise misrepresentations or acts of

4  concealment at a particular time to a particular person or

5  persons, and that's what the trial focuses on.

6              And our contention interrogatory is designed to

7  push the states to that point.  Now, we know that discovery's

8  not over and that's why these answers can be supplemented.  But

9  it is not acceptable in a case that has been around for years

10  as to which these states have millions of pages of

11  state-specific Merck documents not to begin to hone their

12  answers.

13             And I will say that I do not have a dispute with

14  Mr. Fox on this issue, but those states that are suing

15  essentially saying Merck lied to us and as a result we, as a

16  government entity, did this or did not do this, we're looking

17  for their best answer at this point.

18         **THE COURT:**  Okay.  I really don't need anything on

19  that.  That's too broad of a question to put in an

20  interrogatory.  You have a right to get the discovery to that

21  information, but you're going to do it either by 30(b)(6)s or

22  some specific matters.

23             You know and I know that the problem with the

24  interrogatories, you say, "List all the areas that you feel

25  that we've done something wrong," and they list all the areas.

1    Then a witness takes the stand and he says something else and

2    then you cross-examine him and say, "You didn't list it in the

3    interrogatories.  He should be discredited because he didn't

4    list it in the interrogatories."

5                    It's just not workable.  It's just too specific

6    for it.  So I'm not going to require that.

7                    Failure to conduct electronic searches on

8    relevant documents.  What's that about?

9               MR. ANDERSON:  As we've recited earlier, we've

10   received 120 documents from Florida, 117 documents from New

11   York, few, if any e-mails, and it became clear during the

12   meet-and-confer exercises that the parties had not, in response

13   to our master document request, included electronic searches in

14   their search for documents.

15              THE COURT:  That really has to be done.  I mean, the

16   idea that, "Well, we'll give them ours when they give us

17   theirs," we've got to get over that, folks.

18              MR. ANDERSON:  And in fairness, in the

19   meet-and-confer exercises, all four Group 1 states have

20   committed to undertake this exercise.  So it's simply a

21   housekeeping matter of asking the Court to include in its order

22   a directive that this be done.

23              THE COURT:  Yes.  Both sides have to do that.

24   Electronic data is a big issue here.

25              MR. YOUNG:  Your Honor, James Young again.  Just

 1   briefly, we have agreed to undertake those efforts.  The sort
 2   of agreement that we have is we would use search terms that
 3   will be provided by Merck and the parties would come to an
 4   agreement.
 5             **THE COURT:**  Yes, that's the way to do it.
 6             **MR. YOUNG:**  And where we're at now I think is their
 7   idea of search terms is significantly broader than what we
 8   think will return and yield a relevant result.  Some of that
 9   has been answered by Your Honor on the earlier rulings on
10   relevancy, but some of it isn't.
11             And whether we have to search for and provide
12   every document where Ibuprofen is referenced is a bit
13   burdensome and broad.
14             **THE COURT:**  This is the way that I think electronic
15   searches need to be handled:  You work out those search terms
16   and then you get the search terms that everybody's agreeable
17   to, and then you use those and then you see whether or not
18   that's sufficient.  If it's not sufficient, then Merck says,
19   "Well, that's not giving all the information, so in addition to
20   that search term, we need these other ones."
21             But let's see what you can agree on first, use
22   those, pull in all the documents and see whether or not we need
23   any more search terms.
24             **MR. YOUNG:**  Absolutely.
25             **THE COURT:**  That's the way to do it.

1           Okay.  Do I have anything else?

2           **MR. ANDERSON:**  Well, maybe, maybe not.  How's that

3    for an answer?

4           **THE COURT:**  That's a lawyer's answer:  It may rain

5    and the sun may shine, that's our weather prediction.

6           **MR. ANDERSON:**  The next item in our motion was the

7    Merck's databases and New York's argument that it should simply

8    produce a sampling of the Vioxx claims.  We discussed that

9    earlier.  It may be --

10          **THE COURT:**  You're entitled to the material.  It's

11   just a question of how we go about getting the material that's

12   meaningful to you.  Again, it may well be a step process.  I'd

13   suggest that you get material that is agreeable for production.

14   If that's not sufficient, you'll know it; and if they don't

15   know it, I'll know it.

16          **MR. ANDERSON:**  The next issue is on the medical

17   histories of the New York people.  Maybe we don't have a

18   disagreement here.  It's kind of silly semantics, frankly, from

19   our point of view.  But we have been following the PTO 39A

20   process which involves learning more and more about the

21   databases; and then once we understand the databases, we send

22   them a letter asking, as precisely as we can, for the

23   information that we want.

24               To this point, New York has taken the position

25   that this is informal discovery and they're not going to honor

1  it.  We think that ignores the reality of how this process

2  works.  If they want us to put this into a document request,

3  we'll do it, but it seems kind of pointless.

4          THE COURT:  Look, it's either way:  Either you put it

5  in a document request or just ask for an order of the court.

6  We'll shorten that.  That will give them comfort.  They need

7  some comfort that they're doing something by an order of the

8  court.  If it's an improper thing, they want the court to be

9  improper, not them, and that's okay.

10          MR. FOX:  There are a couple of concerns, Your Honor,

11 that is clearly one of our big concerns.  The other concern is

12 that as the request is phrased in the letter of early August --

13 I think it was August 5th or August 7th -- the request asks for

14 an absolutely enormous volume of documents.  And we really need

15 to be able to go through the process of figuring out what makes

16 sense, what is doable, what is reasonable.

17          THE COURT:  Yes.

18          MR. FOX:  And the best way to do that, in my mind, is

19 to go through a formal discovery process.  There hasn't been a

20 formal request as of yet.  They can make -- you can give them a

21 timeframe in which to serve one and we can respond to that.

22          It does create a little bit of a timing issue

23 because we're now about to get into the deposition phase.

24          THE COURT:  How do we cut through that?

25          MR. FOX:  I can think of a couple of responses.

1      **MR. ANDERSON:**  We could have cut through that when I
2  sent the letter in early August saying this is the medical
3  information we want, if he had responded and said, "Let's talk
4  about burden to get you what you need," rather than saying,
5  "Oh, this is informal discovery, I'm not going to talk about
6  it."  That's not constructive.

7      **MR. FOX:**  I was mirroring Merck's response to our
8  informal discovery requests again, and again, and again.

9      **MR. ANDERSON:**  I'm not going to go there, but I'm
10  happy to discuss it with him.

11      **THE COURT:**  You're going to have to discuss it, but
12  you've got to get back to me.  I don't want to waste time on
13  this formality.  If it's just a question of you need it
14  formally, I'll just say his letter's formal discovery or
15  something.  We've got to cut through it.  There's nothing
16  sacrosanct about it.  If you need formal discovery, I'll look
17  at his letter and I'll put it in an order that you're required
18  to furnish the information, if that's what you need.

19      But I don't understand, he's got to fashion an
20  interrogatory before you give him the information that you want
21  to give them to him?  We're here talking about it now.  What's
22  the issue?

23      **MR. FOX:**  Well, I need to go back to the people in
24  the Department of Health with a very specific request that it
25  has been thought through more than in an informal letter and

1   figure out how to respond to it.  There may be objections,

2   there may be suggestions about how to do it better.

3              THE COURT:  Let's do it this way then:  Give him a

4   letter within three days, I'll give him three days to respond.

5              MR. FOX:  I'm not sure I can accomplish that in three

6   days at the end of August.  I need the Department of Health

7   experts --

8              MR. ANDERSON:  Can I propose another solution that I

9   think works better?

10             THE COURT:  Sure.

11             MR. ANDERSON:  Let's just follow the PTO 39A process.

12  I've sent you the letter, let's have an interview with your

13  people, let's find out what you have, what's too burdensome,

14  what's hard to get, and let's work our way through it.

15             MR. FOX:  You actually already have the data

16  dictionaries.

17             MR. ANDERSON:  We can talk about that.

18             MR. FOX:  We'll figure it out, Your Honor.

19             THE COURT:  Okay.

20             MR. ANDERSON:  Finally, we had a section called

21  "Miscellaneous Deficiencies" in which we threw in the kitchen

22  sink.  The parties have all promised to supplement their

23  responses, and we hope they do.

24             THE COURT:  Okay.

25             MR. ANDERSON:  That's it.

1          **THE COURT:**  Anything else?

2          **MR. ANDERSON:**  Now I have no more issues.

3          **THE COURT:**  Okay.  Thanks.

4          **MR. FOX:**  No, Your Honor.

5          **THE COURT:**  Thank you very much.  Court will stand in

6     recess.

7          **THE DEPUTY CLERK:**  Everyone rise.

8          (WHEREUPON, the proceedings were concluded.)

9                              *****

10                          **CERTIFICATE**

11         I, Jodi Simcox, RMR, FCRR, Official Court Reporter

12    for the United States District Court, Eastern District of

13    Louisiana, do hereby certify that the foregoing is a true and

14    correct transcript, to the best of my ability and

15    understanding, from the record of the proceedings in the

16    above-entitled and numbered matter.

17

18

19                           S/ Jodi Simcox, RMR, FCRR
                             Jodi Simcox, RMR, FCRR
20                           Official Court Reporter

21

22

23

24

25

         JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
                   UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF LOUISIANA