1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE:  VIOXX PRODUCTS         *    Docket MDL 1657-L
     LIABILITY LITIGATION          *
6                                  *    August 26, 2010
                                   *
7                                  *    9:00 a.m.
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
8

9
                       STATUS CONFERENCE BEFORE THE
10                      HONORABLE ELDON E. FALLON
                       UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES:

13

14   For the Plaintiffs:          Herman Herman Katz & Cotlar
                                   BY:  RUSS M. HERMAN, ESQ.
15                                 820 O'Keefe Avenue
                                   New Orleans, Louisiana 70113
16

17   For the Defendant:           Williams & Connolly, LLP
                                   BY:  DOUGLAS R. MARVIN, ESQ.
18                                 725 Twelfth Street, NW
                                   Washington, DC 20005
19

20   For the State Liason
     Committee:                    Barrios, Kingsdorf & Casteix, LLP
21                                 BY: DAWN M. BARRIOS, ESQ.
                                   701 Poydras Street
22                                 Suite 3650
                                   New Orleans, Louisiana 70139
23

24

25

1  APPEARANCES CONTINUED:

2  Special Master:              Juneau Law Firm
                                BY:  PATRICK A. JUNEAU, ESQ.
3                               1018 Harding Street
                                Suite 202
4                               Lafayette, Louisiana  70503

5
   Curator:                     Johnston, Hoefer, Holwadel &
6                                   Eldrige
                                BY:  IRA ROSENZWEIG, ESQ.
7                               601 Poydras Street
                                Suite 2490
8                               New Orleans, Louisiana  70130

9
   Lien Resolution              The Garretson Firm
10 Administrator:               BY:  MATT L. GARRETSON, ESQ.
                                7775 Cooper Road
11                              Cincinnati, Ohio 45242

12

13 For Louisiana Attorney       Attorney General's Office
   General's Office:            State of Louisiana
14                              BY:  JAMES DUGAN, ESQ.
                                1885 North Third Street
15                              6th Floor
                                Baton Rouge, Louisiana 70804
16

17
   Official Court Reporter:     Jodi Simcox, RMR
18                              500 Poydras Street
                                Room B-406
19                              New Orleans, Louisiana 70130
                                (504) 589-7780
20

21

22 Proceedings recorded by mechanical stenography, transcript

23 produced by computer.

24

25

1                        **PROCEEDINGS**

2                      **(August 26, 2010)**

3            **THE DEPUTY CLERK:**  Everyone rise.

4            **THE COURT:**  Be seated, please.  Good morning, ladies

5    and gentlemen.  Let's call the case, please.

6            **THE DEPUTY CLERK:**  MDL-1657, *In re:  Vioxx*.

7            **THE COURT:**  Counsel, make their appearance for the

8    record.

9            **MR. HERMAN:**  May it please the Court.  Good morning,

10   Judge Fallon.  Russ Herman for plaintiffs.

11           **MR. MARVIN:**  Good morning, Your Honor.  Douglas

12   Marvin for Merck.

13           **THE COURT:**  Okay.  We're here for the monthly status

14   conference.  We don't have as many people as we usually do, so

15   it looks like the matter is winding down a bit.  We still have

16   some work to do on it.  I do have an agenda.  I've met with

17   lead counsel and liaison counsel and discussed the agenda with

18   them.

19              One of the things I mentioned is that we've got

20   to focus on what's left and we have to have some structure in

21   it.  So I'm now focused on the Attorneys General matters and

22   the third-party payors.  I think we have roughly about 150

23   cases left.  There's some duplicates, so it may be down to less

24   than that.  But when we get to the cases that we know are left,

25   we're going to have to focus on some method of dealing with

 1  those cases.

 2              Some of them may be able to be resolved.  Some

 3  of them may not be able to be resolved.  Those that fall in the

 4  latter category, I'll meet with the attorneys and we'll

 5  schedule some trials to see how we can do them.

 6              If possible, if we can figure out some way of

 7  grouping them and then take some sample trials in those groups,

 8  that might be the easiest way of doing it rather than just

 9  starting at the beginning and go through the end.  But I'll

10  invite your input when we get to that point.

11              The first item on the agenda is Settlement

12  Agreement.  Anything on that?

13         **MR. HERMAN:**  Good morning, Your Honor.  May it please

14  the Court.

15              The issues -- just to mention the Web sites.

16  The Court's web site:  Http://vioxx.laed.uscourts.gov.  The

17  claims administrator:  Claimsadmin@browngreer.com and

18  http://www.officialvioxxsettlement.com.

19              As it was reported to Your Honor, the claimants

20  who were successful in the settlement program have been paid

21  and items I and II are completed.

22              Mr. Garretson is here with regard to item roman

23  numeral III, Lien Administration.

24         **THE COURT:**  Okay.

25              You have a slide program and everything.

1       **MR. GARRETSON:**  Yes, Your Honor.  After 38 months,
2    I've decided to give in to technology.
3            The good is news is I filed this morning a
4    20-page report with the court which represents our final court
5    report, although there are, of course, some floor-sweeping
6    issues and I want to make sure that you have all the confidence
7    that I don't intend to just leave those unswept.
8            The good news is this 45-slide presentation, I
9    practiced it this morning, and I should be done in just under
10   two hours.  No.  I truly am just going to give a couple of
11   highlights, and, again, all of this is in a written report.
12           Quickly, I just wanted to sum up where we're at
13   with Medicare, where we're at with Medicaid, the other
14   governmental -- the private lien program and then the remaining
15   steps with extraordinary injuries.
16       **THE COURT:**  Matt, just tell us, so that the record's
17   clear, what the issue is with liens and why we need a lien
18   administrator on this.
19       **MR. GARRETSON:**  Well, I think this actually sums it
20   up well, Your Honor, this slide.  There was over 50,000
21   claimants screened.  One of the things we did in this program
22   is not wait until we saw who came out on the back end to be
23   eligible for payment.  But we truly did screen 50,000 claimants
24   with Medicare with 53 Medicaid agencies.  And then by the end
25   of the program, 22,000 claimants were screened with over 450

1    private health insurers.

2                       Absent a program like that, as many of you know

3    who have participated in other settlement programs, these

4    issues will linger for five, six, seven years as liens and

5    other type of health care reimbursement are addressed.  So I

6    think this program accomplished what we set out to do, which

7    was make it much more efficient and effective for all parties

8    involved.

9            **THE COURT:**  Yes.  I really do feel that way.  I think

10   the MDL concept can help the lienholders with liens, but it

11   helps the claimants also with the liens.  Because the claimants

12   have statutory liens; that simply means that by law and by

13   statute the claimant, the attorneys involved, everyone

14   concerned has an obligation to pay back Medicare/Medicaid.  So

15   they're going to get their money back.

16                      The issue is whether or not by grouping them and

17   making it more efficient that the lienholders can agree to

18   discount their lien, discount what they're going to get back.

19   If they are able to do that, then that helps the claimant,

20   because the claimant doesn't have to pay the full lien back,

21   and that's what's been able to be achieved here.  Through

22   Matt's good auspices and experience, he's been able to

23   negotiate a good deal for the claimants.

24                      It's also a good deal, I recognize, for the

25   lienholders because they have one place to get all the money

1    and they don't have all of the transactional costs involved.

2    But the point is, it's very good for the claimants also.

3              **MR. GARRETSON:**  Thank you, Your Honor.

4                   This slide just shows where we're at today,

5    over -- or approximately 40,000 health care liens have been

6    resolved through our offices during the course of this program.

7                   A quick note on Medicare -- again, I'm not going

8    to go through this slide-by-slide, but in the final report we

9    explain in detail every step that took place with the federal

10   government to create the global model that, in the end, avoided

11   the submission of 24,000 traditional claims to the government

12   as well as, as many of you know, all the appeals, all the

13   waivers, all the requests for compromises that would follow.

14                  I think most importantly in this program is that

15   all of this was accomplished prior to the interim payments for

16   the first 40 percent, and highlighted in the report are the

17   final global reimbursement values for each of six categories we

18   negotiated with Medicare for myocardial infarction and ischemic

19   stroke.

20                  There are a few remaining floor-sweeping issues

21   with Medicare that I've informed the Court about.  I met with

22   Medicare Tuesday at their central offices and we're working

23   towards a solution.  Again, we're now dealing with a universe

24   of about 300 individuals who we're trying to, in effect,

25   continue to lower their Medicare reimbursement claim.  And

 1    that's where we're at.

 2              It's not an issue with Medicare.  The terms of

 3    the program that they've agreed to have been met.  We are

 4    effectively trying to find additional benefit for about 300

 5    individuals.

 6              There are some other redetermined -- in addition

 7    to about those 300 cases, we have about 400 redetermination

 8    requests where we're just waiting on documentation from

 9    counsel.  Those are largely from the ischemic stroke cases that

10    have recently been assigned awards.

11              With respect to Medicaid, just a few highlights,

12    Your Honor, that are, again, articulated in the report.  The

13    Medicaid agencies, by and large, have all agreed, save just a

14    few that I've informed the Court about, to the program that

15    we've outlined.

16              The benefit of this was 80 percent of the

17    claimant's gross settlement was able to be distributed at the

18    time of payment eligibility.  The *quid pro quo* for these

19    agencies and this Court was that we avoided all the hearings

20    that are taking place in state court and federal courts

21    throughout the country regarding individual claims and how much

22    a state has a right to recoup from a settlement award; that, of

23    course, being the *Ahlborn* decision, which occurred just prior

24    to this program being announced.

25              A couple quick notes that I think are important

 1    to highlight.  We received in excess of $275 million of claims

 2    from the state Medicaid agencies.  I think this highlights -- I

 3    will not injure my arm trying to pat us on the back, I promise,

 4    but this is more the role and not so much trying to compliment

 5    ourselves is that states need to be educated during this

 6    process as to what is truly compensable and when.

 7              The problem we have when we deal with health

 8    care agencies in pharmaceutical cases are all these individuals

 9    were treating to begin with.  And so there's all this

10    extraneous or preexisting noise in their medical file.

11              Of that $275 million in claims submitted, we

12    negotiated that down, and I shouldn't say *negotiated* because it

13    was all objective evidence based medical criteria, to less than

14    $23 million from the original $257 million in claims submitted.

15              We have approximately 150 outstanding items

16    related to appeals.  Again, those are largely due to the later

17    awards that were given in the ischemic stroke cases towards the

18    end of the program, and 370 cases that are tied to us resolving

19    the Medicare issue.  And those, again, we met with Medicare

20    this week and expect a solution shortly.

21              A couple quick notes of just the completion

22    rate.  The staff, once the payments began, we've been running

23    at 3,200 claims being reviewed, audited and approved a month.

24              A couple of quick notes on the private lien

25    resolution program.  Of course, that was negotiated by the

1    Plaintiff's Steering Committee and the Third-Party Payor

2    Committee and we were appointed in January of '09 as the lien

3    resolution administrator of that program.

4              As this Court's well aware, many of these

5    plaintiffs participating had private health care through

6    employers that they purchased privately or perhaps other

7    supplemental programs or replacement programs for federal

8    Medicare.  It was a voluntary program and many claimants, as

9    I'll show you, chose to participate.  The program, of course,

10   had its caps.

11             The program stipulated the lesser of a

12   50 percent reduction of audited lien value or a tiered cap

13   formula which does not exceed 15 percent.  And then claimants

14   receiving 5,000 or less had their liens waived.

15             We were able to create a series of rules and

16   review such that no obligations were created where none

17   otherwise existed, and that was one of our primary goals is to

18   bring efficiency but not at the risk of creating obligations

19   where none otherwise existed.

20             All the forms for the court's records are now in

21   this report and filed.  A couple of quick points on the

22   enrollment so you have those figures.  Our initial launch, we

23   launched this program to over 900 primary counsel firms to give

24   them all the materials that they would send to their clients to

25   voluntarily elect to participate.

1          Of course, this Court further ordered PTO 48 and

2    54 that ordered counsel to certify that everybody was given

3    that opportunity to participate, and all firms complied with

4    PTO 48 and 54.  And then, again, we gave an additional

5    extension to make sure all the stroke claimants that elected to

6    participate could, in fact, participate.

7          Originally, the -- about 100 plans signed on to

8    the agreement to participate in the private lien resolution

9    program.  Through the efforts of our staff, we were able to do

10   an outreach and secure an additional 350 health plans that

11   agreed to participate strictly according to the terms and

12   conditions of this program.  I outlined, again, to memorialize

13   it for the Court, the process that we went through to ensure

14   the integrity of the data and the privacy of the individuals

15   participating.

16         A final note on this program.  Again, to show

17   the value of centralizing and educating plans as to what truly

18   is compensable with objective medical evidence, we were able to

19   reduce the inbound claims.  We actually received $300 million

20   worth of claims that people -- these plans wanted to be repaid.

21         Through that audit protocol, which all these

22   plans accepted -- again, it was objective and medical based --

23   we were able to get that reduced by 60 percent even prior to

24   our audit -- our final audit process.

25         The holdback provisions I think worked very well

1    in that money was still able to flow while the people who

2    elected to participate were having their liens satisfied.

3                    A couple of statistics.  There were 22,380

4    claimants who elected to participate.  Of those, approximately

5    17,000 were eligible for a final payment.  We had 9,246 claims

6    that were audited -- claimants who were audited, and that

7    amounted to 14,130 liens because many of these plans --

8    multiple plans often submitted claims for the same claimant.

9    There were over 5,000 -- or 5 million individual claims

10   submitted for our review.  And then, as I showed you, the

11   aggregate amount that was asserted by the participating plans.

12                    Again, in the report, all of the forms in the

13   process, I have to thank the claims administrator for their

14   work in incorporating all of our process and procedures and

15   forms on to the Web portal.  I think that was very much

16   successful, and it enabled the claimants and their attorneys to

17   accept our audits in an efficient fashion.

18                    Final statistics.  We have -- we moved the ball

19   to a 98 percent complete rate for the private lien resolution

20   program since the last hearing.  The remaining issues are

21   simply our getting all the documentation we need to determine

22   if any anti-subrogation state laws apply.  That process is

23   being finalized.

24                    Holdbacks, again, are in place.  We're just

25   working with the plans to gather any outstanding information.

1    I don't believe we need the Court's assistance at this point.
2    This is just going to run itself out over the course of
3    probably 30 more days.
4                    And my final slide is the extraordinary
5    injuries.  We have 129 claimants with 207 individual lien
6    obligations.  66 unique injuries were compensated.  We met with
7    Medicare, as I mentioned, this week and we're working on a --
8    to try to bring the same efficiency to resolving these that
9    were utilized in creating those six grids -- those six
10   categories of Medicare reimbursements.
11                   But we will stay with that process until it is
12   complete with Medicare.  All the claimants with a private lien
13   obligation related to the special medical injuries are now
14   100 percent complete.
15                   So our final steps, we have really 102 cases
16   related to Medicare that have issues that I haven't described
17   here today that are related to just getting further
18   documentation, further social security number verification and
19   further information now that they may be compensable ischemic
20   stroke cases.  We have 14 cases remaining with Medicaid.  And
21   then the other governmental claims, we have 22 other
22   governmental claims that came in before the deadline
23   established by the Court that we're in the process of
24   finalizing.
25                   So with that, we will begin processing

1    payments -- the remaining payments to all the states.  And the

2    federal government, we were able to hand them a substantial

3    check this week.  We have a few more checks to process.  And

4    then I expect that these remaining issues, again, over the next

5    30 days, we'll just see the ball advancing until they're

6    finally resolved.

7              **THE COURT:**  Good.  Okay.  Well, thank you very much,

8    Matt, for your help.  I appreciate it.

9              Special master, anything?

10             **MR. HERMAN:**  We want to thank Matt for the wonderful

11   work that he's done.  I noticed his slides are privileged and

12   confidential.  And it may be that if he has not violated some

13   BrownGreer copyright that he may present to the Court those

14   slides for being posted, but I'll leave that to Matt.

15             **THE COURT:**  I hear that Orran Brown claims that he

16   made them.

17             Anything from the special master?

18             **MR. JUNEAU:**  Patrick Juneau, Your Honor.

19             Very briefly.  I'm very pleased to report that

20   of the lien matters between -- disputes rather between

21   attorneys, that's been limited.  Now we're down to just six of

22   those.  Each one of those is set.  We should be able to

23   complete that in October.  So the funnel is now becoming full

24   focused.

25             I anticipate, Your Honor, at your next status

 1  conference being in the position to make my final report

 2  because I will be at that point to do that.  I will be

 3  intellectually challenged to deal with the computers and the

 4  slides, but I will respond accordingly come the next

 5  conference.

 6          **THE COURT:**  All right.

 7          **MR. JUNEAU:**  Thank you.

 8          **THE COURT:**  Thank you very much, Pat.  I appreciate

 9  it.

10              Anything on the class actions?

11          **MR. LEVIN:**  Arnold Levin.

12              We're out of here, Your Honor.

13          **THE COURT:**  All right.

14          **MR. LEVIN:**  The purchase claims class is still

15  pending and it's been scheduled.

16          **THE COURT:**  Okay.

17          **MR. DUGAN:**  Your Honor?

18          **THE COURT:**  Yes.

19          **MR. DUGAN:**  James Dugan on behalf of the consumer

20  class actions.

21              I did speak with -- I didn't speak with her, I

22  got an e-mail from Ms. Cabraser that she would be available at

23  the next status conference to handle that motion.  It's

24  currently set for September 26th, but I think the next status

25  conference will be later than that.

 1                THE COURT:  Okay.  Thank you, Jim.

 2                Anything on state/federal coordination, Dawn?

 3           MS. BARRIOS:  Thank you, Your Honor.

 4                Since the last status conference, we have

 5    concentrated our efforts on attempting to clean your docket up

 6    as much as possible.  And I'd like to, because she's in the

 7    courtroom today, formally thank my paralegal, Dena Folts, who

 8    has done an extraordinary job in keeping track of every remand

 9    case that has ever been filed in Your Honor's court.  So I'd

10    like to thank Dena because she's done a fabulous job.

11           THE COURT:  Thank you very much.

12           MS. BARRIOS:  Because of Dena's great work, we've

13    been able to present to both Merck and to Mr. Herman an Excel

14    spreadsheet with each sheet having three different kinds of

15    lists on it for people that really need to be dismissed.

16                Those given to Merck include cases that are

17    technically open but the Vioxx claimant's portion is settled,

18    but the derivative claimant is open.

19                The second group is open cases with plaintiffs

20    who registered in the settlement but never enrolled.

21                And the third group is open cases with the

22    plaintiffs who have enrolled in the settlement program and

23    BrownGreer holds their judgments of dismissal.  So they just

24    need to be filed.  So Mr. Marvin promised to work diligently on

25    doing that.

 1              For Mr. Herman, I prepared for him a sheet --
 2    another Excel spreadsheet with three different groups.  The
 3    pro se plaintiffs who still have motions for remand.  I've
 4    worked with Mr. Johnston's office on working on that.
 5              And then we have case and counsel information
 6    for those who have filed remand motions but did not enter the
 7    settlement program either because of their refusal to do so or
 8    filing after the date of the settlement.  And I provided him
 9    with that -- Mr. Herman with that so that he can send letters
10    and get that out to the counsel.
11              I'd just like to remind counsel and the Court
12    that, although we've worked diligently, we've only worked
13    through the lens of the cases with remands.  So there may be
14    many other cases out there that need to be similarly treated.
15         **THE COURT:**  Okay.
16         **MS. BARRIOS:**  Lastly, Your Honor, we have four cases
17    that we found that are remand cases that where the plaintiffs
18    have been terminated but the case hasn't been closed on PACER.
19    So I've been providing those to Katie.  I'd now like to give
20    Joe his first set and tell him good luck with them.
21         **THE COURT:**  Okay.  Thank you.  Thank you for your
22    help, Dawn.  It's been very good work that you've done to keep
23    us all coordinated.
24              Pro se claimants, anything?
25         **MR. ROSENZWEIG:**  Good morning, Your Honor.  Ira

1    Rosenzweig for Bob Johnston.

2              We are still fielding some calls.  But over the

3    last couple of weeks we have seen a decrease in the number of

4    calls, as we would expect with the stage of the settlement

5    program, but we're still doing the best we can to help those

6    people who seek our assistance.

7              **THE COURT:**  Good.  Thank you very much.

8              This is an area that we've experimented with and

9    I think it worked, and I'd recommend it to other judges in the

10   program.  Oftentimes in these cases you get people who just

11   need information, they need somebody to talk to, they need some

12   advice as to what to do and how to do it and they don't want to

13   go to a lawyer or they don't know any lawyer.

14             So for those individuals, we've appointed a pro

15   se attorney.  So the individuals have been able to contact the

16   pro se attorney who's done yeoman work to give them the

17   direction and comfort that's necessary.

18             The next item is the trial package.  Anything on

19   that?

20             **MR. HERMAN:**  May it please the Court.  Under

21   Mr. Dugan's supervision, the trial package has now been

22   supplemented with the materials from the Louisiana Attorneys

23   General's trial which include an introduction, the case

24   presentation, trial witnesses, motions, such as *Daubert*, and

25   rulings, motions in limine, various additional information,

1    which includes depositions, videos and trial transcripts from

2    other cases, and a host of material.

3                    On behalf of the plaintiff's steering committee,

4    we thank Mr. Dugan and his Louisiana Attorney General's team

5    for providing the supplementary materials to the trial package.

6                    The folks who have cases outstanding are going

7    to receive a notice in the next two weeks that there is a

8    supplement to the trial package in the event that they wish to

9    order same.

10                   With regard to, I believe, the next issue --

11           **THE COURT:**  The next item is governmental actions.

12           **MR. HERMAN:**  Yes.

13           **THE COURT:**  We're going to have some motions after

14   this meeting, so I'll finish the conference and then I'll come

15   back and we'll deal with them.  I have several motions on those

16   cases.

17                   Pending personal injury cases subject to 28, 29,

18   and 43?

19           **MR. MARVIN:**  Your Honor, you addressed this item at

20   the outset of the conference today --

21           **THE COURT:**  Right.

22           **MR. MARVIN:**  --  about the need to move forward with

23   these cases, and we will certainly do that.

24           **THE COURT:**  How many do you have outstanding now,

25   Doug?

1          **MR. MARVIN:**  There's about 200 of those cases.  As

2     Your Honor indicated, some on that list are duplicate filings

3     of cases that have already been dismissed.  Others involve case

4     counsel who have withdrawn, no expert reports have been

5     submitted.  So that number will decline to around 170 or so, I

6     suspect.

7               We are putting those in various groupings.  I

8     know Ms. Oldfather's not here because of a trial commitment,

9     but we'll be working with Mr. Herman's committee and

10    Ms. Oldfather to come up with a plan to deal with those

11    remaining cases.

12          **THE COURT:**  Okay.  Anything on the fee allocation

13    committee?  I heard oral argument on that.

14          **MR. HERMAN:**  No, Your Honor.  Your Honor has under

15    advisement a ruling on the overall common benefit percentage.

16          **THE COURT:**  Merck's motions.  Any rules?

17          **MR. MARTIN:**  Your Honor, there's only one case, and

18    as your practice has been, should we take that up afterwards?

19          **THE COURT:**  Right.  We'll come back afterwards.

20          **MR. MARVIN:**  Thank you.

21          **THE COURT:**  Anything else on the agenda?

22          **MR. HERMAN:**  May it please the Court, with regard to

23    other motions, there is a motion before you regarding the

24    private liens.  Mr. Rob Griffin will speak for the movers,

25    Mr. Sol Weiss and Rick Meadow for the respondents, and I assume

1  you want to take that after this conference.

2         **THE COURT:**  Right.  I will.

3         When I come back, I'll deal with Dorothy's

4  motion first, and then that motion and then we'll deal with the

5  Attorney General's.

6         Anything further?  The next status conference is

7  October 7th.  We're going to skip September and we'll go to

8  October the 7th.  It will be the same time, 9:00 in open court,

9  8:30 for the liaison and lead counsel.

10         **MR. HERMAN:**  Thank you, Your Honor.

11         **THE COURT:**  Thank you.  Court will stand in recess.

12         **THE DEPUTY CLERK:**  Everyone rise.

13         (WHEREUPON, the proceedings were concluded.)

14                       *****

15                   **CERTIFICATE**

16         I, Jodi Simcox, RMR, FCRR, Official Court Reporter

17  for the United States District Court, Eastern District of

18  Louisiana, do hereby certify that the foregoing is a true and

19  correct transcript, to the best of my ability and

20  understanding, from the record of the proceedings in the

21  above-entitled and numbered matter.

22

23

                 S/ Jodi Simcox, RMR, FCRR

24                   Jodi Simcox, RMR, FCRR
                 Official Court Reporter

25