1                   UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF LOUISIANA

3


4
     IN RE:  VIOXX PRODUCTS            *
5            LIABILITY LITIGATION      *
                                       *
6    This Document Relates to:         *    MDL No. 1657
                                       *
7    All government action cases.      *    Section L
                                       *
8                                      *    New Orleans, Louisiana
                                       *
9                                      *    October 7, 2010
                                       *
10                                     *    9:00 a.m.
                                       *
11   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

12
                  STATUS CONFERENCE AND MOTIONS BEFORE
13                 THE HONORABLE ELDON E. FALLON
                   UNITED STATES DISTRICT JUDGE
14

15   APPEARANCES:

16   For the Plaintiffs:         Herman Herman Katz & Cotlar
                                 BY:  RUSS M. HERMAN, ESQ.
17                                    LEONARD DAVIS, ESQ.
                                 820 O'Keefe Avenue
18                               New Orleans, Louisiana 70113

19


20
                                 Barrios, Kingsdorf & Casteix, LLP
21                               BY: DAWN M. BARRIOS, ESQ.
                                 701 Poydras Street
22                               Suite 3650
                                 New Orleans, Louisiana 70139
23

24

25


         JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
                   UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF LOUISIANA

1    <u>APPEARANCES CONTINUED:</u>

2    For the Plaintiffs:        Lieff Cabraser Heimann
                                 & Bernstein, LLP
3                              BY:  ELIZABETH CABRASER, ESQ. ESQ.
                               275 Battery Street, Suite 3000
4                              San Francisco, California 94111

5

6
     For the Defendant:        Skadden Arps
7                              BY:  JOHN H. BEISNER, ESQ.
                               1440 New York Avenue N.W.
8                              Washington, D.C.  20005

9

10                             Stone Pigman Walther,
                                 Wittmann & Hutchinson
11                             BY:  DOROTHY WIMBERLY, ESQ.
                               546 Carondelet Street
12                             New Orleans, Louisiana 70130

13

14
     Also Present:             Patrick Juneau, Esq.
15                             Robert Johnston, Esq.
                               Ann Oldfather, Esq.
16

17
     Official Court Reporter:  Jodi Simcox, RMR, FCRR
18                             500 Poydras Street
                               Room HB-406
19                             New Orleans, Louisiana 70130
                               (504) 589-7780
20

21

22

23   Proceedings recorded by mechanical stenography, transcript

24   produced by computer.

25

1          **PROCEEDINGS**

2          **(October 7, 2010)**

3          **(COURT CALLED TO ORDER.)**

4          **THE DEPUTY CLERK:**  Everyone rise.

5          **THE COURT:**  Be seated, please.  Good morning, ladies

6     and gentlemen.  Call the case, please.

7          **THE DEPUTY CLERK:**  MDL 1657, *In re: Vioxx*.

8          **THE COURT:**  Counsel, make their appearance for the

9     record.

10         **MR. BEISNER:**  Good morning, Your Honor.  John Beisner

11    for defendant Merck.

12         **MR. HERMAN:**  May it please the Court.  Good morning,

13    Judge Fallon.  Russ Herman for plaintiffs.

14         **THE COURT:**  Okay.  We're here today for our monthly

15    status conference.  I received a suggested agenda.  I met with

16    the liaison and lead counsel to go over it with them.  I'll

17    take it in the order presented.

18              The Settlement Program.  Anything on No. I?

19         **MR. HERMAN:**  Your Honor, nothing new on the

20    settlement program.

21         **THE COURT:**  Lien Administrator.  The lien

22    administrator indicated that he was going to send us a report,

23    but he feels that that North Carolina issue has worked itself

24    out.  So he'll be reporting soon on that.

25         **MR. HERMAN:**  No other matters with regard to liens,

1   Your Honor.

2              **THE COURT:**  Anything from the special master?

3              **MR. HERMAN:**  Mr. Juneau's here.

4              **MR. JUNEAU:**  Good morning, Your Honor.  For the

5   record, Pat Juneau, the court-appointed special master.

6              Your Honor, I've reached the point in the stage,

7   I'm ready to give you a final report on the appeals that I

8   handled.

9              Your Honor, the -- in the gate appeals, the

10  second category were the non-submitting plaintiff, they just

11  submitted a partial application on the final points appeal.  We

12  ended up having 10,386 gate appeals that were considered,

13  documentation considered, reviewed.  And all of those decisions

14  were rendered in all of those cases.

15             Next is the second category, that's the

16  non-conforming appeals that were submitted.  There were 119 of

17  those.  All those were considered and rulings issued in those

18  cases.

19             The more detailed, and, of course, voluminous

20  section was those including in the points appeal.  Of those

21  there was 1,095.  That leads to a total of 11,600 appeals that

22  were considered.  I think I had mentioned this in a prior

23  report to the Court, Your Honor.  The fact that a lot of this

24  was done electronically, instantaneous filing, had a tremendous

25  benefit with the rapidity in which these decisions were

1  rendered.

2          I think I gave a story that the last appeal that

3  was considered was filed shortly before we had the final

4  hearing and we had gotten it, I think, two days before.

5  Ironically, that was one of those that was reversed in full.

6          But it allowed us to instantaneously make those

7  records available without the transfer of documents back and

8  forth vis-à-vis mail.

9          THE COURT:  Particularly true in a situation where we

10  had you from Louisiana, we had another judge from New Jersey,

11  and a judge from California.  So if we had to keep moving those

12  cases paper-wise around, we'll still be here.  I was concerned

13  about the procedure and making sure that there was due process.

14          Oftentimes in settlement programs, there's only

15  one review.  Here, we had the review of BrownGreer.  And then

16  from there it went to the attorneys for both sides.  They had a

17  committee equally divided among plaintiff and defendants who

18  brought some other aspects of the case to it.  Then following

19  that, we had an appeal by experienced attorneys and experienced

20  judges, and that's the final appeal and that's what's being

21  reported here.

22          MR. JUNEAU:  What I have up there it's the bottom

23  part of the same page, Your Honor.  It's marked as Special

24  Master 1.  This has to do with the points appeal.  Of that

25  there were -- I thought it would be instructive for the Court

1   to know that of that number, that is the 1,095 number, 514 were

2   MI claims and 581 were stroke cases.  Ironically, it was almost

3   equal as that came down for decision.

4            The other matter, Your Honor is another

5   submission I marked as Special Master 2.  There were two other

6   areas of appeals that we had that had to be handled.  There

7   were the extraordinary injury appeals.  Those were quite,

8   quite, quite detailed.  That was in the latter stage of the

9   review.  There were 198 of those.  Those were considered and

10  rulings were issued on all 198.

11           The last was a special marker category, those

12  who there was a dispute as to whether they didn't want to fall

13  in a category or whether they expanded or stayed within the

14  special marker appeals.  There were 152 of them.  All of those

15  appeals were considered and ruled on.

16           That constitutes the Special Master 1 and

17  Special Master 2, Your Honor.  With the permission of the

18  Court, I'll ask that those two documents be filed in the

19  record.

20           **THE COURT:**  I'll make it a part of the record.

21           **MR. JUNEAU:**  Lastly, Your Honor, the only thing

22  pending that I have for the Court, the essential work of the

23  special master has been completed.  A subset of it, we're down

24  to three matters involving disputes with liens.  Those are set

25  in October -- in late October, this month.  So we will dispose

1   of all of that matter very shortly.  That will complete the

2   totality of the work assigned to the special master.

3                    I do want to complete -- I don't think any

4   record should be deficient.  We had a deficient submission I

5   made last time, Your Honor.  I submitted my own version of a

6   pie to divide up how the work was.  I found out that we had --

7   it was brought to my attention that extraordinary claims and

8   marker claims, the pie wasn't big enough to include those

9   claims.

10                   So this time I brought an el grande pie.  I've

11  been assured by Sam's bakery that the el grande pie is of

12  sufficient size to be handled by all those who should partake

13  in it.

14                   So for purposes of the record, Your Honor, I'm

15  going to offer, introduce and ask to be filed into evidence

16  this el grande pie by which, the record should reflect, though,

17  that the pie is submitted only for purposes of consumption.

18                   Thank you very much, Your Honor.

19            THE COURT:  Okay.  Thank you, Pat.  And thanks for

20  your good work, and, of course, the pies.

21                   Anything on Class Actions?

22            MR. BEISNER:  Your Honor, I think the only thing to

23  report on that front is we have a motion scheduled for

24  hearing --

25            THE COURT:  Yes.  We have a motion following this

 1   meeting where we'll discuss the consumer class actions.

 2                   State Federal Coordination.  Dawn, anything?

 3           MS. BARRIOS:  Good morning, Your Honor.  Dawn Barrios

 4   for the Federal/State Committee.  While I'm here, I'll give you

 5   a little Attorneys General's report as well.

 6                   We're continuing to assist both Merck and the

 7   PSC on cleaning up the record.  And Ms. Wimberly has assured me

 8   that she's taken care of many dismissals that we had requested.

 9   So our remand numbers will go down.  And I'll provide to the

10   Court a CD and schedule of those.

11                   With regard to the Attorneys General's section,

12   we have had numerous meet and confers by telephone since we

13   last spoke with Your Honor and we are narrowing our areas of

14   disagreement.  As of right now, there's no motion on the table

15   or nothing immediately that has to be considered by Your Honor.

16                   But with reflection on the comments that were

17   made in your chambers this morning, we understand we'll meet

18   with Your Honor after the status conference, particularly to

19   discuss the issues that you raised with regard to the 706 panel

20   and the summary jury trial.

21           THE COURT:  Yes.  I mentioned -- we're focused now

22   on -- there are only two remaining aspects to the case.  There

23   are about 100 cases left outside of the program or within --

24   within or outside the program, John?  How does that work?

25           MR. BEISNER:  Some of them, Your Honor, are cases

1  that went into the program and didn't clear the gates and then
2  others were not within the definition of the settlement to
3  start with.
4          **THE COURT:**  Right.  In addition to those, however, we
5  do have the Attorney Generals' group and we have the consumer
6  class issues.
7                 With regard to the Attorney Generals' grouping,
8  I've ruled on some discovery motions so that we could keep the
9  ball moving.  I want them to focus on an end game.  My
10 suggestion was that we either tee up some bellwether trials, or
11 if necessary, some summary trials, so that gives us an
12 opportunity to perform some summary trials to get some
13 information.
14                My thinking would be that each side would get
15 about three days.  We would impanel a jury and try those cases
16 summarily to the jury with the understanding that they wouldn't
17 be defined in judgment form.  But we'd get from the jury a
18 questionnaire which might help us get some information that
19 would make global settlement possible.
20                Also, we might think in terms of some of the
21 remaining claims.  We've got to devise a method of moving those
22 cases in the most efficient, expeditious and less costly way.
23 I don't think that the cases that remain, particularly the
24 non-consumer, non-Attorney General cases, I don't think
25 justifies the type of economic commitment that the parties gave

 1   to some of the other cases.

 2            As you recall, we tried six of them and in each

 3   case the plaintiffs spent between $1- and $2 million.  The

 4   defendants spent between $2- and $3 million.  I don't think

 5   that that makes any sense for the cases that we have left.  So

 6   we've got to figure out a better way of doing it.

 7            Any governmental actions?  Dawn, you reported on

 8   that.

 9            Jim, do you have anything on the governmental

10   actions?

11        **MR. DUGAN:**  Not at this time, Your Honor.  Thank you.

12        **THE COURT:**  Pending personal injuries subject to PTO

13   28, 29 and 43.  Anything on that one?

14        **MR. HERMAN:**  Judge Fallon, Ms. Oldfather is here.

15   Mr. Stratton requested discovery.  Merck has submitted the

16   discovery schedule and there's been no response received by the

17   PSC to Merck's suggested discovery schedule.

18        **THE COURT:**  Okay.  Ann, what do you have?

19        **MS. OLDFATHER:**  Your Honor, you addressed this

20   already in some of the comments you just made.  Just to

21   follow-up, right before we started this morning, Merck gave me

22   two lists of the universe of the remaining cases.  It does look

23   like there's somewhere in the neighborhood of 200 personal

24   injury cases.

25            So I will be talking with Mr. Birchfield and

 1  with Merck to see if we can come up with, not only the specific

 2  issues of whether there should be some case-specific discovery,

 3  but kind of an end game for how do we get these to resolution.

 4          THE COURT:  Yes.  I think the first step has got to

 5  be the census.  You've got to figure out what the census of

 6  those cases are and then see whether or not there's some

 7  similarities, prioritize the cases and we'll come up with some

 8  method of resolving them, because they do have to be resolved.

 9          MS. OLDFATHER:  Thank you, Your Honor.

10          THE COURT:  Thank you.

11              Let's see.  Consumer Purchase.  We'll go into

12  that afterwards.  Third-party payer.  Elizabeth, are those

13  finished, third-party payer, common benefit fees?

14          MR. HERMAN:  Your Honor, let me look at my -- one

15  second.  Excuse me.

16          THE COURT:  Next one was the Fee Allocation

17  Committee.

18          MR. HERMAN:  Yes, that's what I wanted to address,

19  Your Honor.

20              The Judicial Council has issued a writing with

21  respect to essentially common benefit fees with some comment on

22  the *Guidant* resolution and the PSC is contemplating a very

23  short brief in light of that since Your Honor has matters under

24  consideration.

25          THE COURT:  Okay.  Let me have that as soon as you

 1  can because I'm working on that now.

 2          **MR. HERMAN:**  Yes, Your Honor.  We're going to discuss

 3  that after your conference.

 4          **THE COURT:**  All right.  Merck's Motion and Rules on

 5  PTOs.  Anything on that, John?

 6          **MS. WIMBERLY:**  Your Honor, it's just one motion and

 7  one deferred matter which we can take up after.

 8          **THE COURT:**  Okay.  We'll take that up afterwards.

 9  Okay.  Good.  Any other motions?  Any appeals?

10          **MR. HERMAN:**  No, Your Honor.  The appeals, as such,

11  reported in the status report, which will be posted on Your

12  Honor's Web site.

13              And Your Honor's next status conference?

14          **THE COURT:**  Yes.  The next status conference is

15  January 6th.  We've reached the point now where we don't need

16  to have them every month.  In between, I will be meeting with

17  the attorneys for the AGs and the attorneys for consumers'

18  class and any other matters that need to be addressed with the

19  whole group.

20              We're at that point now where we can meet once

21  every several months instead of once every month.

22          **MR. HERMAN:**  Your Honor, as Mr. Beisner's pointed

23  out, Mr. Johnston is here.  I don't know if he has a report on

24  pro se's.

25          **THE COURT:**  Anything, John?

 1               **MR. JOHNSTON:**  I always have a report on pro se's.

 2               **MR. HERMAN:**  I'm always interested in knowing what he

 3      has to say.  He hasn't written me a note yet, but I think he

 4      wants to be part of the consumer class where that grand pecan

 5      pie is concerned.

 6               **MR. JOHNSTON:**  It looks pretty good.  Your Honor, Bob

 7      Johnston.  Court-appointed curator.  My brief report to the

 8      Court is that our experience is matching everything that you

 9      are hearing and you know, which is that we are in the very late

10      stages of the process of the Vioxx settlement.

11               There were times in the earlier stages that we

12      were getting as much as 20 calls a day from individuals and we

13      are down to 1, maybe 2.  And, yes, there are days where we

14      don't have any calls.  I think that's really the only thing

15      that I'd like to express to the Court, which is that on the

16      graph we have tailed off to that very limited number of

17      individuals who still wish to discuss the reasons why their

18      claims mostly have not been accepted.  And then we continue to

19      do our best to try to help them understand the process.

20               **THE COURT:**  Well, you are.  You've done a good job

21      and that's why they don't need to call anymore, because you've

22      explained yourself so well.

23               I've mentioned in conference that that's a big

24      issue with MDLs, you've got -- particularly some MDLs -- not

25      all MDLs have a lot of pro se people, but the pharmaceuticals

1    tend to have a lot of pro se people.  So we've got to figure a
2    way of dealing with that.
3                    This was a method that was created, and it
4    seemed to have worked because of your good offices.  These
5    individuals just want somebody to talk to.
6              **MR. JOHNSTON:**  Oh, yes, they do.
7              **THE COURT:**  Many of them are being housed at
8    government expense so they don't have much access to the
9    phones, but when they do, they utilize that.
10             **MR. JOHNSTON:**  They call my office, that's right.
11             **THE COURT:**  They call you often and ask about the
12   weather and what's happening on the outside and things of that
13   sort.
14             **MR. JOHNSTON:**   Well, thank you for your kind words.
15   We've gotten to a very good point in terms of this.  Thank you,
16   Your Honor.
17             **THE COURT:**  Good.  Thank you.
18                    Anything else from anyone?  All right.  I'll see
19   you all then in about five minutes.  We'll take a break and
20   I'll come back and we'll deal with the arguments.  Thank you.
21   Court will stand in recess.
22             **THE DEPUTY CLERK:**  Everyone rise.
23             (WHEREUPON, the Court took a recess.)
24                         *  *  *  *  *
25             **THE DEPUTY CLERK:**  All rise.

1          **THE COURT:**  You may be seated, please.

2              Dorothy, let's take yours first.

3          **MS. WIMBERLY:**  Good morning, Your Honor.  We're here

4     this morning on defendant Merck's motion to supplement orders

5     of dismissal pursuant to Pretrial Order 31, regarding

6     derivative plaintiffs.  It appears in the record as record

7     document 51981.

8                  The Court has previously dismissed the claims of

9     the plaintiffs listed on Exhibit A for failure to comply with

10    the requirements of Pretrial Order 31.  In the instance of the

11    32 derivative plaintiffs identified on Exhibit A to the motion,

12    the orders of dismissal fail to make clear that the dismissal

13    of the plaintiff-in-chief's case also included the claims of

14    derivative plaintiffs.

15                  We've received no opposition to the motion.  We

16    ask that the Court enter an order dismissing, with prejudice,

17    the claims of the 32 derivative plaintiffs identified on

18    Exhibit A, consistent with the Court's prior dismissals of the

19    claims of primary plaintiffs.

20         **THE COURT:**  Okay.  I understand that the plaintiffs

21    reurge their motion to reject dismissal; but if dismissal is

22    inevitable, then they ask that it be granted without prejudice.

23    I understand their articulate arguments.  They're well

24    expressed, passionately delivered, but I overrule them.

25         **MS. WIMBERLY:**  The last matter, Your Honor, that I

1   have is a matter that was deferred from Merck's -- one of

2   Merck's Pretrial Order 43 motions to dismiss.  This relates to

3   pro se plaintiff Jamal Bilal.  Mr. Bilal purportedly complied

4   with Pretrial Order 43.  What he did was take the sample of an

5   expert report that Ms. Oldfather had provided along with the

6   list of names and he filled in the report himself.

7              **THE COURT:**  I see.

8              **MS. WIMBERLY:**  Which clearly does not comply with

9   Pretrial Order 43.  He has not provided the other documents

10  that are required pursuant to Pretrial Order 43.  The matter's

11  been pending for months and months.  We had to defer it

12  previously because the documentation that we served on him most

13  recently had been returned by the correction facility.

14              We successfully delivered in the interim since

15  the last hearing and we've received no further response from

16  Mr. Bilal.  And we would ask that the Court dismiss his case,

17  which is proceeding No. 06-2364, for failure to comply with

18  Pretrial Order 43.

19              **THE COURT:**  For the same reasons as I gave before,

20  I'll dismiss his case over the objection of plaintiff's

21  counsel.

22              **MS. WIMBERLY:**  Thank you, Your Honor.  And I'll

23  submit proposed judgments to your clerk.  And I will also be

24  submitting a proposed order resetting motions to dismiss that

25  have been previously deferred because of pending motions to

 1    withdraw in those instances where the orders have been signed
 2    by the Court and where the applicable time delays referenced in
 3    those orders has passed.
 4              THE COURT:  Okay.  Thank you very much.
 5                          *  *  *  *  *
 6              THE COURT:  I'll hear now from the parties on the
 7    motions.  We have two motions before the Court.  One is a
 8    motion for judgment on the pleadings and another motion to
 9    strike class allegations of the consumer cases.
10              MR. BEISNER:  Your Honor, with respect to those two
11    motions that we've brought, I think that the pleadings that
12    we've put in -- the motion that we've put in covers the points
13    we want to present with respect to the motion for judgment on
14    the pleadings.
15              So if I may, I'd like to spend a few minutes on
16    the motion to strike the class allegations, because I think
17    that's probably the more important of the two issues before the
18    Court this morning.
19              THE COURT:  Okay.  Yes.  That's fine.
20              MR. BEISNER:  Your Honor, I think the fundamental
21    problem that we're trying to present with this motion is that
22    in the class actions, we really are no longer writing on a
23    blank slate.  And the courts, including this one, have
24    repeatedly recognized that the problem here is plaintiffs can't
25    prove causation, a central element, of the claims that they

1    assert on an aggregate basis.

2              This Court has found that on several occasions;

3    Judge Higbee found this in New Jersey; Judge Chaney found this

4    in the purchaser class action that she was handling in

5    California.  The fundamental premise of the purchaser claims is

6    that they wouldn't have bought Vioxx at all or would have paid

7    less for it if they had known about the drug's risks.

8              But this Court made several findings in dealing

9    with the personal injury class that are no less applicable

10   here.  The Court -- quoting the Court -- that "There are

11   variations in what Merck knew about the risks of the alleged

12   injury when the patient was prescribed Vioxx, what Merck told

13   physicians and consumers about those risks in the Vioxx label

14   and other media, what the plaintiffs' physicians knew about

15   these risks from other sources and whether the plaintiffs'

16   physicians would have still prescribed Vioxx had stronger

17   warnings be given."  That's going to vary from case to case

18   precluding class treatment.

19             And the Court in that class certification order

20   on the personal injury claims noted that the label at issue

21   changed repeatedly over the class period, which also foreclosed

22   class treatment in the personal injury cases.  That's no

23   different in these cases.

24             Judge Higbee, Your Honor, in the class action

25   that she had, which is very similar to what is being asserted

1   here, went through a similar analysis noting that the decision

2   of whether to prescribe a medication is made on a host of

3   individualized factors.  Quoting her, "Including other risk

4   factors the plaintiffs possessed and whether other drugs were

5   effective in relieving the plaintiffs' pain."  And for that

6   reason, she found that class treatment was inappropriate.

7            THE COURT:  Of course, last week, the case out of the

8   New Jersey Supreme Court, the diet drug case, came out, and I

9   don't know whether that was hers originally or not, but in any

10  event, that case involved -- what's the name of the drug?

11           MR. BEISNER:  It's the drug Relacore, Your Honor.

12           THE COURT:  It was a diet drug.  They seem to

13  indicate that the CFA, that it was appropriate to have a

14  consumer class.

15           MR. BEISNER:  Well, Your Honor, let me address that

16  case for a moment since that was submitted to the Court

17  yesterday and we haven't had a chance to respond.

18           Let me first note that Judge Higbee's ruling in

19  the Vioxx cases, that ruling was appealed to the New Jersey

20  Court of Appeal and the New Jersey Supreme Court, both of which

21  declined to review it.  I realize that's not an affirmance, but

22  they did decline to get involved.

23           But I think the *Carter-Reed* case, the *Relacore*

24  case, is quite different, Your Honor, than what we're talking

25  about here.  I review that and refer to that kind of case

 1   sometimes as a snake oil case.

 2              First of all, I note that it was a dietary

 3   supplement.  This was not an FDA-approved prescription drug.

 4   That was an over-the-counter product.

 5              **THE COURT:**  And it didn't work at all.

 6         **MR. BEISNER:**  Yeah.  And the advertisements for it,

 7   and I quote, were that the pill was a, quote, natural feel-good

 8   pill that could get rid of belly fat.

 9              **THE COURT:**  People who took it actually gained

10   weight.

11         **MR. BEISNER:**  That may well have been the case.  But

12   plaintiffs presented testimony from medical experts who said

13   that Relacore did not do a single thing touted in the

14   advertisements.  Defendants didn't introduce any medical

15   evidence to the contrary.  And I think the court found that the

16   need for causation inquiries in that case weren't necessary.

17              Indeed, the court went out of its way to say

18   that if Relacore had, in fact, done anything, if it was

19   effective in some respects, causation would have been too

20   individualized to allow for class treatment.

21              In the court's words, if Relacore had produced

22   some of the benefits advertised, then causation would have

23   been, quote, a perplexing problem, the resolution of which

24   would depend on a number of individual inquiries barring class

25   certification.

1          I think, basically, going back to that same

2    court's ruling in the *Engineers* case, which was a Vioxx case,

3    that said class treatment wouldn't be possible.  And so I think

4    we have here two very different categories of cases.  And we

5    all know which side of the line the Vioxx cases fall.

6          As Your Honor noted in the findings of fact and

7    conclusions of law in the Louisiana AG case, Vioxx provides

8    pain relief with fewer GI complications than other NSAIDs.  And

9    that being the case, this is on the side of the line where you

10   have a prescription drug as to which there is efficacy and

11   where we have all the issues of doctor judgments being

12   necessary.  This is a case where individual causation is

13   necessary.

14        **THE COURT:**  Now, I understand your argument and I

15   think it, to me, it makes sense from the global aspect.  I

16   don't think that this is a candidate for class certification

17   nationwide.

18        The question that's a little more challenging is

19   whether or not it is fodder for class certification on a

20   state-by-state basis.  The difference in this type of case is,

21   as we know, that reliance is not as important -- it may not be

22   important at all -- although, I do recognize that at least in

23   some states it raises its head again in the ascertainable loss.

24        So while it doesn't come into play in liability,

25   when you get to prove what your loss is, it does, by another

 1   name, come out as the ascertainable loss.  To ascertain the
 2   loss, you have that causation aspect plugged in there.
 3              But it's a type of claim that is made for the
 4   class action vehicle.  I mean, we're not dealing with personal
 5   injury cases.  We're dealing with consumer cases.  Some
 6   consumer cases may be $20, others may be hundreds or maybe even
 7   thousands of dollars.  But they're all over the board.
 8              I would think a state would have a particular
 9   interest in the advertising within a state to its citizens.  So
10   it's the type of thing that class action vehicles work best in.
11   We sometimes use them to carry other passengers, and that has
12   not worked very well.  But it does tend to lend itself to that
13   type of action.
14              I don't see it on a national basis.  I don't see
15   it on a national basis because it's statutory in origin.  The
16   statutes are different state by state; burdens of proof are
17   different; the causation aspects.  Even the legislative intents
18   are different in each state.
19              So I agree with you from the standpoint of
20   national class, I don't see that as viable.  But
21   state-by-state, maybe states ought to take a look at it.
22              **MR. BEISNER:**  Well, Your Honor, I think that we've --
23   the cases that I've been pointing to are examples of that.
24              **THE COURT:**  Missouri.  Missouri took a different
25   view.

1          **MR. BEISNER:**  Missouri had a different view.  But

2    plaintiffs haven't identified any other states that would come

3    out differently.  I mean, California was --

4          **THE COURT:**  Well, there are only three -- there are

5    only three that I know of:  California, New Jersey and

6    Missouri.  I've spoken on it, but I've spoken on it globally.

7          **MR. BEISNER:**  Well, Your Honor, I think the question

8    is:  Does the state have a causation requirement with respect

9    to the individual members of the class?  And we have these

10   claims here.  I guess this does get over to the motion and the

11   judgment on the pleadings.  But we have New Jersey, where the

12   court concluded that there was a causation requirement.

13   California has concluded that.  Your Honor has concluded that

14   as well with respect to Louisiana law because this issue came

15   up.

16         **THE COURT:**  That is a big issue.  That's really the

17   issue.

18         **MR. BEISNER:**  They came up in the AG case.  And here,

19   plaintiffs haven't identified any jurisdiction where there

20   isn't a causation requirement.

21              I mean, there was a challenge made to, I think

22   it's conceded in a number of cases by plaintiffs that there

23   either is a reliance requirement or a causation requirement.

24   But in Illinois, where plaintiffs have contested that, the case

25   they rely upon has been clarified by the Supreme Court in the

1    *DuBose* case.  And it says that to bring a claim under the

2    Illinois consumer protection statute, there must actually be

3    deception by the -- of the plaintiff by a statement or omission

4    alleged in the class context.  Vermont has that requirement;

5    Florida has that requirement.

6                    And so, Your Honor, I -- is it --

7              THE COURT:  I don't disagree with you.  The friction

8    points are typicality and superiority.  The rest of it is easy

9    from the standpoint of there's certainly numbers and the

10   lawyers are qualified.  But the significant issues on

11   certification are typicality, or if you want to call it

12   commonality, but it's really typicality and superiority.

13                   The challenging thing from the standpoint of the

14   plaintiffs in this particular case is that the truth of the

15   matter is Vioxx was designed to ameliorate pain in such a way

16   as not to contaminate or hurt the stomach, and it does that.

17   In fact, some people testify that if it were still on the

18   market, they would take it.

19                   So it's not like the diet drug which didn't do

20   what it was cracked up to be.  This does do what it's cracked

21   up to be, what it was designed to do.  It just has with it some

22   baggage that creates issues, and significant issues; and the

23   issue of whether who knew it, when, and what they did about it

24   plays a role in it.

25                   But the difficulty I guess I'm having

1   conceptually is that if I see different treatment for different

2   reasons in at least one state, if not more, the issue is,

3   should I step in and rule what that state law would likely be

4   and then let the Fifth Circuit review that or whether that

5   federal judge sitting in that state ought to take a look at it

6   and let his or her respective circuit look at it.

7               That's the issue, as I see it.

8               MR. BEISNER:  Well, Your Honor, I guess I would just

9   note that, as we've pointed out in other MDL proceedings,

10  *St. Jude Medical*, *Neurontin*, *Prempro*, *Paxil*, *Rezulin*.  I mean,

11  these were all MDL proceedings where these sorts of issues were

12  presented.  Now, some of those were nationwide, but then some

13  were nationwide as they are here, alternative leave states.

14              THE COURT:  Yes.  Mississippi is one.

15              MR. BEISNER:  And the courts dealt with that.  You've

16  had more experience about what these cases are about which is

17  really the issue.

18              THE COURT:  Right.

19              MR. BEISNER:  And that's why I think -- Your Honor,

20  one of the things we proposed earlier that sort of fell out of

21  this as we talked about how to proceed, there was a point at

22  which we filed a motion to show cause why the class claim

23  shouldn't be stricken.

24              Because I think that in all of the jurisdictions

25  we have out there, there is going to be a causation

1   requirement.  I mean, if you think about it, there's a certain

2   due process ramification to say, "There was an ad.  It was

3   false.  Pay me money."  I mean, there's got to be some link, "I

4   bought it.  There's a reason I bought it."  I mean, from a due

5   process standpoint, it makes no sense to have this claim in the

6   air out there.

7                   But if there are -- the point of that motion was

8   to say to plaintiffs, look, if there are states that you want

9   to argue there is no causation requirement, bring it on.  But

10  there's no point for us to be laboring here for another three

11  years with respect to states where there clearly is a causation

12  requirement because the story's been told on this.  This Court

13  and other courts have repeatedly said, as Your Honor has said,

14  you can't get there with these claims on a class basis.

15          THE COURT:  Yes.  Let me hear from your opponent.

16  I've got your argument.  I understand it.

17                  I read the recent diet case and it says what it

18  says, and it says what is you say it says.  The issue that I

19  have with the case is that in that case they said that it did

20  these things and, in fact, it didn't do anything.  In fact, one

21  person testified that they actually gained weight after they

22  took the drug.

23                  So the idea of whether or not they would have

24  taken it is out the window because they obviously wouldn't have

25  spent money to take something that has absolutely no effect and

1    could have a reverse effect.  But in Vioxx, it does do

2    something for pain.  How do you deal with that whether a person

3    would have bought it?

4              MS. CABRASER:  Your Honor, the consumer statutes

5    don't deal with that; and consumer statutes do not limit a

6    right of recovery to utterly worthless products.  Most products

7    will do something.  But they are susceptible to a consumer

8    claim if they are not of the standard, grade, quality, do not

9    have the characteristics they are stated to have, have other

10   characteristics, and, in fact, most cases fall within that

11   category.

12             I think *Relacore* is very germane to this Court

13   for some reasons, but really not dispositive on others.  That

14   was the perfect storm of an utterly worthless product.

15             A better case to look at in that regard is the

16   *Pella Windows* case from the Seventh Circuit, Judge Posner's

17   case.  *Pella Windows*, they worked as windows for many years.

18   They weren't utterly worthless.  The problem was that some of

19   them rotted sooner than they should have.  Maybe not all of

20   them, but some of them did.  And that was enough under the

21   consumer statues, including those asserted in our master

22   complaint to certify that class, both under 23(b)(2) for a

23   declaration that there was a violation of those consumer

24   statutes and injunctive relief and a (b)(3) class for people

25   who could come in and prove damages on an individualized basis.

1          I think what's interesting about *Pella* is that
2  many would disagree with the Seventh Circuit's statement that
3  reliance would be an issue under those claims and that it would
4  be individualized.  The Seventh Circuit presumed as much.  I
5  think under those statutes that's an open question and there
6  are many ways to prove causation including by aggregate and
7  objective means.

8          But nonetheless, the Seventh Circuit decided,
9  notwithstanding that issue, which they saw in the case, that a
10  class action was a better way to go because the purpose and
11  policies of the consumer statutes at issue, because people
12  would otherwise have no access to the courthouse, because
13  people were dealing with a product that was not performing as
14  represented, not utterly worthless, but not performing as
15  represented.  And that is the purpose of redress.

16          So here, while Vioxx did some things, it didn't
17  do other things, and it created risks that were not disclosed.
18  The Vioxx that Merck marketed and the Vioxx that doctors
19  thought they were prescribing and patients thought they were
20  buying was not the real Vioxx.  That's the case here.

21          As you heard Dr. Kessler say in the Louisiana
22  Attorney General trial, the real Vioxx should never have been
23  approved and should never have been marketed.  When Merck had
24  to face up to marketing the real Vioxx, the drug was removed
25  from the market.

1          **THE COURT:**  But if some of the witnesses would
2   testify that if it was still on the market they would be taking
3   it even now.  Does that show that there's specific causation
4   that has to at least be explored in each case?

5          **MS. CABRASER:**  Not at all, Your Honor.  I think
6   certainly there are some people whose pain is so severe, who
7   have no other recourse, that being fully aware of the standard,
8   quality, characteristics and risks of Vioxx, they would make an
9   informed choice to take that drug.

10          The problem is that during the class period,
11   during the time Vioxx was actually marketed and sold, no
12   consumer got to make that choice.  No consumer had all of this
13   information.  None of it was disclosed.  It was not disclosed
14   to doctors.  It was not disclosed to patients.  Nobody was able
15   to appreciate it.

16          What they thought they were buying was not what
17   they got.  And we can safely presume that a reasonable consumer
18   would have thought twice about taking that drug had all of the
19   characteristics and risks been fully disclosed.  And that's all
20   that causation under these consumer statutes requires.

21          You're right, Your Honor, there is no subjective
22   reliance requirement under most of these statutes.  There's no
23   subjective reliance requirement under any of the statutes that
24   are the subject of this motion.  These are objective standards
25   based on materiality, what a reasonable consumer would have

1    considered important.

2            **THE COURT:**  But don't they back door it, don't they

3    come back in and in some way under the guise of or under the

4    title of *ascertainable loss*?  How do you deal with

5    ascertainable loss?

6            **MS. CABRASER:**  I think the ascertainable loss

7    determination in this case is straightforward under the

8    particular facts of this case.  Because what we know is that

9    Vioxx was a drug, many, many times as costly as competing

10   NSAIDs or alternatives.

11           So we already know if somebody is taking --

12   paying for Vioxx instead of another drug, they are losing

13   money.  If Vioxx was not on the market, as it shouldn't have

14   been, those were the drugs that the consumers would have

15   purchased.  They would have spent less money; and they would

16   have spent that money on a product that was of the standard,

17   quality, grade, and style as represented.  Aspirin is aspirin.

18           The point is not that consumers got something

19   for their money.  The point is not how a particular consumer

20   might subjectively value it.  The point is that it is

21   proveable, from Vioxx's own sales revenues, that consumers paid

22   and Vioxx made money by selling a drug that was not as

23   represented.  People paid for a different product than they

24   got.

25           Now, there's two ways to address that.  There's

1    the ascertainable loss, which is what the consumer statutes
2    talk about.  People lost money because they would not have
3    spent as much money or any money at all on that drug had they
4    known the facts about it.
5                    Indeed, our whole point is, in the master
6    complaint, Vioxx would not have been on the market if the truth
7    had been told about what the consumer statutes require, its
8    standard, quality, grade, style, model, characteristics.
9                    So that whole course of conduct was a deceptive
10   act or practice under every state's consumer statute.  We have
11   the deceptive act or practice.  We have the suppression,
12   concealment, misrepresentation of material information.  That's
13   an objective standard.  And we know people spent money on the
14   drug, paid for the drug, used the drug without having the
15   facts.  It's up to the trier of fact to determine whether a
16   reasonable consumer would have wanted to know those undisclosed
17   facts, not whether a particular consumer did.
18                    Now, if the argument from Merck is that people
19   would have bought something even if Vioxx had not been on the
20   market or had it been cheaper and they have no loss, the answer
21   to that is in the unjust enrichment claim.  Because the fact of
22   the matter is that people would not have spent money on Merck's
23   product.  They would have saved their money.  They would have
24   spent less money or they would have spent that money on a
25   competitor's product and Merck would not have been unjustly

1    enriched.

2              **THE COURT:**  Isn't that specific, though,

3    fact-specific to each individual case?  That's what Merck says;

4    that causation, whether you call it ascertainable loss or just

5    causation, it comes in and creeps into each case and because it

6    creeps into each case it's not something that could or should

7    be certified as a class.

8              **MS. CABRASER:**  Well, there's two answers to that,

9    Your Honor.  I think the better answer is the answer that is

10   found in the cases that we cite in our brief in terms of the

11   absence of a subjective individualized reliance requirement in

12   the statutes at issue.

13             Yes, causation must be demonstrated, but it can

14   be demonstrated objectively.  It need not be demonstrated

15   through individualized testimony of subjective reliance.  That

16   is one way to prove causation.  It is not the only way under

17   these statutes, and they do not require it.

18             What a trier of fact has to look at is how the

19   product was represented, marketed and sold -- that's easy.  The

20   standardized campaign, we all know -- versus what was happening

21   behind the scenes, below the waterline with the FDA.  Is there

22   a material difference between those two scenarios, the

23   representation and the reality?  Would that have been material

24   to a reasonable consumer?

25             Because remember, the purpose of consumer

1    statutes is to vindicate the public's interest.  The citizens
2    of a state's interest in the protections of a fair, truthful
3    marketplace.  That is the damage.  Damage was done to the
4    marketplace.  Damage was done to consumers because a bad
5    product took money from people and crowded out good competing
6    products.  And we can't have that scenario, particularly when
7    we are dealing with issues of health and safety and risk.

8            And here, the huge risk that made Vioxx of a
9    different standard, quality, grade, style or characteristic was
10   not disclosed to anyone that bought and used the drug.  How
11   much --

12           THE COURT:  See, that goes to the contract formation,
13   though.  The formation, that is to say, why you contracted or
14   agreed or wanted to buy the product.  The damage is in the
15   performance, namely, you took the drug and why you took the
16   drug.  They said it would help pain and it helps pain, but it
17   carries some baggage with it.  Are you in that risk category,
18   did your doctor know you were in the risk category, should the
19   doctor have prescribed it.

20           They say all of these things have to do with
21   specifics that make it not class certifiable.

22           MS. CABRASER:  Those are Merck's arguments.  And I
23   think the determination here is which aspects of the case
24   really do predominate.  And we know that Merck was marketed to
25   a target population that had risk factors.  And we know that

1    Merck knew -- or we allege that Merck knew that Vioxx created a

2    particular risk for that population.

3                    Rather than saying that, saying this is a great

4    drug for pain and it's got gastrointestinal benefits, but

5    there's an increased risk, then every consumer would have been

6    able to choose; and they might have made different choices,

7    Your Honor, but they would have all been able to make a choice,

8    do I accept this risk?  Our point is, the common issue is, none

9    of the consumers were able to make that choice regardless of

10   what their decision would have been or how important that

11   factor would have been to them.

12                    If a jury or a finder of fact says any

13   reasonable consumer would at least have wanted to know this to

14   factor it into his or her decision whether to take the drug,

15   that's a common answer to a common question, that's a class

16   question, there's been a violation of a particular state

17   statute.  And then the issue is, what is a fair and just

18   measure of damages or discouragement for that?

19                    I think that consumers -- our class members, and

20   we've said this, in one respect were very lucky.  They dodged

21   the bullet.  They didn't get the heart attacks and they didn't

22   get the strokes that this drug placed them at unknowing risk

23   of.  But they paid for a product that put them at risk.  That's

24   not what they thought they were buying; that's not what they

25   wanted to buy; and that may not have been what they would have

1    bought.

2              So the fact that there might be a very few

3    people whose pain is so severe and who have nothing else in the

4    world to lose who would take this drug with full disclosure of

5    the risks does not negate the fact that nobody in any of these

6    states in any of these statewide classes got that choice, and

7    that's what the consumer statutes entitle them to.  It's a

8    violation not to give them the information so they can make

9    that choice.

10              Now, I said there's a -- there's another

11    perspective on this, and that perspective is the *Pella*

12    perspective.  And that perspective says, well, all right, let's

13    grant the defendants the argument that at some point there's

14    got to be some individualized proof of damages or causation or

15    alliance, however you want to conceptualize it.  Let's give

16    them that.  Does this negate the efficacy and the priority of

17    the class treatment?  And the Seventh Circuit says no, not

18    under (b)(3), not under (b)(2).

19              In fact, you could certify an issue class under

20    (c)(4) for the central issue in this case, which is what are

21    the characteristics of Vioxx, how was Vioxx represented to the

22    public, is there a material discrepancy between the real drug

23    and the drug that was marketed and sold to consumers.

24              If there's not, then there's no reason to go

25    further; if there is, there's statutory guidance from each

1    state on what the remedies are.  And, of course, as *Pella* says,

2    as well as *Plubell*, the Missouri case that affirmed class

3    certification for consumers in Vioxx, you can utilize special

4    masters, you can utilize questionnaires, you can utilize forms.

5            **THE COURT:**  What's your position on nationwide class

6    action certification?

7            **MS. CABRASER:**  Your Honor, we would love to argue for

8    a nationwide class certification.  But we think as a practical

9    matter, at this point in this case, given the fact that three

10   state courts have weighed in on class certification and we have

11   one state-wide class already certified, affirmed on appeal and

12   headed to trial, that it really does make the most sense to go

13   statute by statute.

14           And you saw in the briefing that we disagree.

15   State by state, we and Merck disagree on what the elements of

16   the claims are, whether or not there's a reliance element and

17   how to prove causation and what is a violation of the statute.

18           Now, part of the reason for that is we were

19   dealing with nine states and we were dealing with page limits

20   and neither of us thought Your Honor wanted to read an

21   Encyclopedia Britannica on state law.  But I think a sensible

22   approach here would be to select several states -- now, there's

23   basically two types of consumer statutes.

24           There's the statute, like the Indiana statute,

25   that makes it a violation of the consumer law to represent or

1    conceal that a product has performance, characteristics, uses

2    or benefits it does not have or is of a particular standard,

3    quality, grade, style or model if it is not and the supplier

4    knows or should reasonably know it is not.

5              So that type of laundry-list deceptive act

6    statute has been enacted in many states, including Indiana in

7    the master complaint.  There's another type of statute, like

8    the Florida statute, where it basically has a very broad

9    language that says unfair methods of competition,

10   unconscionable acts or practices and unfair or deceptive acts

11   or practices in the conduct of any trade or commerce are hereby

12   declared unlawful.

13             So those are the two basic varieties.  There are

14   permutations.  It might make sense in this case, and we would

15   recommend that, either the Court select or ask the parties to

16   select one or more states in each of those categories, brief

17   class certification very specifically addressed to the language

18   of the statute and the pertinent case law, go into depth on

19   issues of causation, whether or not there's an individualized

20   reliance requirement under that particular state's case law and

21   determine whether and to what extent or as to what issues the

22   class can be certified on that state-wide claim.

23             Your Honor, plaintiffs would waive lexicon such

24   that those cases, if they were certified, could be tried as

25   bellwethers in this court.  We also are very intrigued by the

1    notion of a summary trial to inform the parties without a

2    binding effect on what -- we're arguing about this -- what is

3    the trier of fact, what does the public actually think about

4    whether or not, as a policy matter, and the public is the one

5    that should decide this, Merck did something in violation of a

6    consumer protection statute that ought to expose it to damages;

7    and if so, how much.

8               That would enable the parties to extrapolate

9    that information to decide whether the rest of the cases should

10   go back for separate class certification and trial in the

11   transfer of courts, they should stay here for Your Honor to

12   deal with them, whether we should be dismissing some states'

13   claims or standing down on some states' class certification

14   motions, whether Merck should be stipulating to class

15   certification, or whether we have information that would enable

16   us to negotiate a resolution of the matter.

17              I think all of those options are open to Your

18   Honor under the various subsections of 23 and your own inherent

19   authority to manage these cases.

20              We know we're dealing with an economic claim,

21   and we know we're at the tail end of this litigation.  So we're

22   very, very appreciative that our claims are being attended to

23   at this point.  And we're happy to do anything we can to

24   expedite and streamline the adjudication.  And it's only money.

25   And for the consumers who paid for their own pills, maybe it's

1   not a lot of money; but it's money they shouldn't have paid, at

2   least to Merck, at least for Vioxx, and there are profoundly

3   important public policy considerations that inform these

4   consumer statutes at issue.

5              And we submit to Your Honor that, at least as

6   bellwethers at least for one or more states, these issues ought

7   be aired before the Court or a jury as trier of fact and ought

8   be determined before this litigation culminates.

9              Thank you.

10          **THE COURT:**  All right.  Thank you.

11              John, do you have a response?

12          **MR. BEISNER:**  Your Honor, just a few points that I

13   would offer on this.  I think what Ms. Cabraser's talking about

14   is very much at a theoretical level.

15              And if I may engage at that level for just a

16   second, I would urge the Court to look again -- and I know

17   we've talked about it -- at Judge John Minor Wisdom's decision

18   in the *Wilhelm* (phonetic) case, which deals with the theory

19   that counsel just laid out here, this notion that if you go

20   down the road as saying, well, if there's undisclosed risks

21   which were true with respect to any pharmaceutical product that

22   is out there, and you basically say if there's an unidentified

23   risk that after the fact someone points out and you say

24   everyone gets a refund, you're taking away from the real point

25   of the system, which ought to be to compensate individuals as

1    to whom risks were not disclosed who suffered a consequence.

2                    If you pay everybody who took the product and

3    said, well, I didn't know about that risk but it didn't matter

4    to me, the drug was efficacious and I had no consequence, it's

5    just as -- it's a massive compensation program.  It's a

6    windfall to individuals because they really didn't suffer any

7    consequences.  So at the theoretical level, I would just offer

8    that counterpoint.

9                    But at the more concrete legal level, there

10   isn't any precedent out there supporting what counsel is

11   talking about doing here.  In case after case, there are

12   several more of these every week that we -- and we've listed

13   them in the briefing, *Neurontin*, *Prempro*, *Paxil*, *Rezulin*,

14   *St. Jude Medical*.  These arguments have all been made.

15                   And the point is that this hypothetical statute

16   that compensates individuals for buying a product even though

17   there's no evidence of reliance on representations or

18   omissions, even though you had learned intermediaries in the

19   process, there is just not precedent for certifying classes in

20   those circumstances for all the reasons that Your Honor talked

21   about earlier.

22                   And all of these theories that counsel have

23   talked about had been offered and rejected in those cases.

24   We're not hearing any specific citation for a case where that

25   has worked in the pharmaceutical context.  This idea of, well,

1    you wouldn't have had to pay the price for Vioxx that you did,

2    this sort of "fraud on the market theory" or individual

3    alternative.  I mean, that was the argument in California.

4    That's what Judge Chaney worked with.

5                    And she concluded, look, all right, maybe

6    somebody would have taken aspirin instead.  But you can't prove

7    that in a class-wide basis, other people would have taken

8    Celebrex at a comparable price, or would have had to take other

9    products which were more expensive.  You can't deal with that

10   on a class-wide basis.

11            **THE COURT:**  She says it's not necessary.  You could

12   just do it by reasonable man standard.

13            **MR. BEISNER:**  Well, then that's -- let's just throw

14   due process out the window.  I can go -- that says the

15   plaintiff who says, yep, I appreciated the cardiovascular risks

16   of Vioxx, I liked the product, I'd still use it, it doesn't

17   matter to me, and if they had taken me off of it, I had to use

18   a pump mechanism to take the product that would have been twice

19   as expensive, I'm going to get all my money back, that's great.

20   That's not the way the system works.  That's not the way the

21   class device is supposed to work.

22                    The rule's enabling act says if I show up here

23   as an individual or if I show up as a group, I should be having

24   to prove the same thing; and if that's excused, then Rule 23 is

25   being misused.  And that's why you're not finding, and

1   plaintiffs aren't citing, any support for this sort of class at
2   all in the federal precedent.
3                And *Pella* is not an answer to this.  This is not
4   a design defect lawsuit, which is what the Seventh Circuit was
5   dealing with there.  What's the common question that you could
6   deal with in this case?  Representations were made.  Well, as
7   Your Honor has pointed out, the status of representations and
8   the company's knowledge varied over time.  There's not a
9   class-wide issue there.
10               And what the doctor heard or understood at the
11  time, whether the doctor was involved in prescribing knew about
12  it at a particular time, that's not a class-wide issue either.
13  There isn't a class-wide issue you could handle here like
14  *Pella*.
15               And further, under *Castano*, that was the
16  proposal in *Castano*, let's go get some couple of issues here,
17  and the Fifth Circuit said no.
18               If you're going to have to look at this on an
19  individual causation basis, in the end, you know, you don't
20  have common issues predominating looking at the class.  You
21  can't just look at some narrow little piece of this in a way to
22  permit an issues class.
23          **THE COURT:**  Of course, in *Castano*, you're right, that
24  they didn't have a national class action, but it went back to
25  the states and the states then dealt with class actions on a

1    state-by-state basis.

2            **MR. BEISNER:**  Well, Your Honor, I think in the state

3    courts they did, who may have different rules on this.  But in

4    the federal courts, I think *Castano* was saying, irrespective,

5    you're true, it went up as a nationwide class.  But it also

6    stands for the proposition that in looking at the class

7    proposal, you don't say, do issues predominant on the issue I

8    pick out to put before the jury?

9            You have to look, it's whether the totality of

10   the case that issue predominates, and clearly it doesn't here.

11   Because at the end, you're still going to have to look at these

12   individual causation issues.

13           So for all these reasons, Your Honor, I just

14   don't see where we go with these cases.  I said, you know, we

15   have presented -- you have before Your Honor the briefing on

16   the causation issues and the states that were -- the eight or

17   nine states that were at issue here.  We can deal with that

18   right now.  Do any of those not have causation requirements?

19   That's part of the pleadings motion that is before the Court.

20   So that can be dealt with and resolved now.

21           Thank you, Your Honor.

22           **THE COURT:**  All right.  Thank you both.  Let me take

23   a look at this again and I'll come out with an opinion on it.

24           **MS. CABRASER:**  Your Honor, can I direct your

25   attention just to one point?

1       **THE COURT:**  Sure.

2       **MS. CABRASER:**  I think the problem here is conflating

3  reliance and causation.  Of course, caution must be proved.

4  The problem is Merck would like these cases to be common law

5  fraud cases and would like to require individualized reliance,

6  but the statutes don't and the case law interpreting the

7  statutes don't.

8       I'm not going to reargue the case, but just

9  direct your attention, as an example, to page 13 of our

10  opposition brief dealing with federal decisions interpreting

11  the Florida Deceptive and Unfair Trade Practices Act; the

12  *Fitzpatrick versus General Mills* case from 2010, Southern

13  District of Florida; and the Eleventh Circuit case in *Cold*

14  *Stone Creamery*.  The full cites are on page 13 of our

15  opposition.

16       They make it very clear that individualized

17  reliance is not an element of a Florida consumer claim, that

18  the reliance requirement is objective, is satisfied by the

19  reasonable consumer test, and that, quote, the question is not

20  whether the plaintiff actually relied on the alleged deceptive

21  trade practice, but whether the practice was likely to deceive

22  a consumer acting reasonably in the same circumstances.

23       All Rule 23 requires that the elements and

24  issues that actually exist in a given claim be predominantly

25  common ones, which can be satisfied by one central common issue

1 or more, one overriding issue or more.  We have to take the
2 state statutes as they are.  For many of these state statutes,
3 at least, objective proof susceptible to class treatment is
4 available.

5         Why hasn't it happened more?  Because, Your
6 Honor, as usual you're at the forefront.  The class
7 certification decisions that were cited to you were attempts to
8 get nationwide classes or do choice of law.  As you've noted,
9 those have been largely problematic.  This is a new approach
10 and we would appreciate your consideration of it.

11       **THE COURT:**  Okay.

12       **MR. BEISNER:**  Your Honor, if I may just make a note.
13 The cases that Ms. Cabraser's referring to, I think there are a
14 number of cases that are out there that have criticized those
15 rulings that are noted in our brief as well.  The *Phillip*
16 *Morris USA* case, Florida District Court of Appeal case and the
17 *Black Diamond Properties* case.

18         I would also note, counsel is primarily focusing
19 on the *Fitzpatrick* case.  I would note that the Eleventh
20 Circuit has granted 23(f) review in that case.  So its value,
21 its precedent remains to be seen.

22       **THE COURT:**  All right.  Thank you both.  Let me get
23 back to my drawing board on it and take another look at it.
24 Thank you very much.  Court will stand in recess.

25       **THE DEPUTY CLERK:**  All rise.

1                              *****

2                           **CERTIFICATE**

3          I, Jodi Simcox, RMR, FCRR, Official Court Reporter

4    for the United States District Court, Eastern District of

5    Louisiana, do hereby certify that the foregoing is a true and

6    correct transcript, to the best of my ability and

7    understanding, from the record of the proceedings in the

8    above-entitled and numbered matter.

9

10

11                              _S/ Jodi Simcox, RMR, FCRR_
                                Jodi Simcox, RMR, FCRR
12                              Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25