1                   UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE:  VIOXX PRODUCTS        *    Docket MDL 1657-L
        LIABILITY LITIGATION        *
6                                   *    June 27, 2008
                                    *
7                                   *    9:00 a.m.
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

8

9
                       STATUS CONFERENCE BEFORE THE
10                      HONORABLE ELDON E. FALLON
                       UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES:

13

14   For the Plaintiffs:          Herman Herman Katz & Cotlar
                                   BY:  RUSS M. HERMAN, ESQ.
                                   820 O'Keefe Avenue
15                                 New Orleans, Louisiana 70113

16

17                                 Beasley Allen Crow Methvin
                                      Portis & Miles
                                   BY: ANDY D. BIRCHFIELD, JR., ESQ.
18                                 234 Commerce Street
                                   P.O. BOX 4160
19                                 Montgomery, Alabama 36103

20

21                                 Levin, Fishbein, Sedrad & Berman
                                   BY:  ARNOLD LEVIN, ESQ.
                                   510 Walnut Street
22                                 Suite 500
                                   Philadelphia, Pennsylvania  19106
23

24                                 Seeger Weiss
                                   BY:  CHRISTOPHER A. SEEGER, ESQ.
25                                 One William Street
                                   New York, New York 10004

1   <u>APPEARANCES</u>:

2   For the Plaintiffs:              Ranier, Gayle & Elliot
                                     BY:  DREW RANIER, ESQ.
3                                    1419 Ryan Street
                                     Lake Charles, Louisiana 70601
4

5
    For the Defendant:              Williams & Connolly, LLP
6                                    BY:  DOUGLAS R. MARVIN, ESQ.
                                     725 Twelfth Street, NW
7                                    Washington, DC 20005

8
                                     Stone Pigman Walther,
9                                       Wittmann & Hutchinson
                                     BY:  PHILLIP WITTMANN, ESQ.
10                                   546 Carondelet Street
                                     New Orleans, Louisiana 70130
11

12                                   O'Melveny & Meyers, LLP
                                     BY:  JOHN H. BEISNER, ESQ.
13                                   1625 Eye Street
                                     Washington, DC 20006
14

15  For the State Liaison
    Committee:                       Barrios, Kingsdorf & Casteix, LLP
16                                   BY: DAWN M. BARRIOS, ESQ.
                                     701 Poydras Street
17                                   Suite 3650
                                     New Orleans, Louisiana 70139
18

19  Claims Administrator:           BrownGreen, PLC
                                     BY:  ORRAN BROWN, ESQ.
20                                   BY:  LYNN GREER, ESQ.
                                     115 South 15th Street
21                                   Suite 400
                                     Richmond, Virginia  23285
22

23  Curator:                         Johnston, Hoefer, Holwadel &
                                        Eldrige
24                                   BY:  Robert M. Johnston, ESQ.
                                     601 Poydras Street
25                                   Suite 2490
                                     New Orleans, Louisiana  70130

1    APPEARANCES:

2    Lien Resolution                The Garretson Firm
     Administrator:                 BY:  MATT L. GARRETSON, ESQ.
3                                   7775 Cooper Road
                                    Cincinnati, Ohio 45242
4

5
     For BrownGreer and            Irwin, Fritchie, Urquhart
6    U.S. Bank:                         & Moore
                                    BY:  JAMES B. IRWIN, ESQ.
7                                   400 Poydras Street, Suite 2700
                                    New Orleans, Louisiana 70130
8

9
     For Louisiana Attorney        Attorney General's Office
10   General's Office:             State of Louisiana
                                    BY:  JAMES DUGAN, ESQ.
11                                  1885 North Third Street
                                    6th Floor
12                                  Baton Rouge, Louisiana 70804

13

14   For AvMed:                     Susman Godfrey
                                    BY:  JOSEPH GRINSTEIN, ESQ.
15                                  5100 First Interstate Bank Plaza
                                    1000 Louisiana Street, Suite 5100
16                                  Houston, Texas 77002

17

18   For Greater New York          King, Krebs & Jurgens
     Benefit Fund:                  BY:  HENRY A. KING, ESQ.
19                                  45th Floor Capital One Building
                                    201 St. Charles Avenue
20                                  New Orleans, Louisiana 70170

21

22                                  Crowell & Moring
                                    BY:  ANDREW H. MARKS, ESQ.
23                                  1001 Pennsylvania Avenue N.W.
                                    Washington, D.C.  20004-2595
24

25

1   <u>APPEARANCES</u>:

2   Official Court Reporter:        Jodi Simcox, RMR, FCRR
                                    500 Poydras Street
3                                   Room B-406
                                    New Orleans, Louisiana 70130
4                                   (504) 589-7780

5

6   Proceedings recorded by mechanical stenography, transcript

7   produced by computer.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **PROCEEDINGS**

2          **(June 27, 2008)**

3          **THE DEPUTY CLERK:**  All rise.

4          **THE COURT:**  Be seated, please.  Good morning, ladies

5     and gentlemen.  Call the case, please.

6          **THE DEPUTY CLERK:**  MDL 1657 in re:  Vioxx.

7          **THE COURT:**  Counsel, make their appearance for the

8     record.

9          **MR. HERMAN:**  May it please the Court, good morning,

10    Your Honor Judge Fallon, I'm Russ Herman for the plaintiffs.

11         **THE COURT:**  Good to see you back, Russ.

12         **MR. HERMAN:**  Thank you, Judge.

13         **MR. WITTMANN:**  Good morning, Your Honor.  Phil

14    Wittmann representing Merck.

15         **THE COURT:**  Okay.  I had met with the committees in

16    advance of the meeting and received from them a suggested

17    agenda.  I have some other matters on the agenda.  We'll take

18    them in the order presented.  The settlement agreement is the

19    first item on the agenda.  Any response?

20         **MR. HERMAN:**  No, Your Honor.  The settlement

21    agreement is going forward.  The various trial orders Your

22    Honor has issued are stated and posted.  I just want to again

23    reference for those listening, the Court's

24    http://vioxx.laed.uscourts.gov and BrownGreer, the claims

25    administrator, www.browngreer.com/vioxxsettlement as Web sites

1   that can be accessed.

2           **MR. WITTMANN:**  Nothing that's not in the report

3   already, your Honor.  Nothing new to add.

4           **THE COURT:**  Okay.  Anything new from BrownGreer?

5   Okay.

6           **MR. BROWN:**  Good morning, Your Honor.  I'm Orran

7   Brown from BrownGreer, the claims administrator.  With me today

8   is Lynn Greer.

9           We would like, Your Honor, as we have done each

10  month, to update the Court and the parties on where the

11  settlement program stands.  As the Court well knows, the

12  settlement program has four phases -- major phases of

13  registration:  The sign-up period, and enrollment, then the

14  claims submission and claims evaluation and review, and then

15  payment.

16          Up until this session, we have talked a lot

17  about registration enrollment because that's where the activity

18  has been as the claimants and their counsel signed up for this

19  program.  Today we're going to go through those quickly and

20  spend a little bit more time on the claims process because that

21  is really where we, and the parties, and the claimants, are

22  focusing right now.

23          This, again, is a very familiar slide for the

24  Court because this shows the folks who've signed up in the

25  registration period.  We still receive claimants coming forward

1    for the first time, either unrepresented or with counsel, to
2    register for the program.

3              The Row 3, the bottom right-hand number there,
4    59,194 claimants who have stepped forward and have registered
5    for the program is up slightly from when we were here in May.
6    It's 59 people more than a month ago.  So we're still receiving
7    some information, and we still have 1,027 law firms who have
8    submitted material to us to register their clients.

9              The next phase, the enrollment phase.  This has
10   been very active since the January 15th period, which was the
11   targeted registration period.  We have been receiving
12   enrollment materials:  The release, the stipulation of
13   dismissal, and the other components of the enrollment package
14   now.  Beginning in December and extending on up to today, we
15   still receive them.

16             We have the numbers shown here of a total of
17   51,391 claimants who have submitted to us enrollment materials.
18   A reminder at the bottom that the enrollment deadline date now
19   for the settlement is June 30, 2008, which is just a few days
20   away.

21             We're urging everyone to get in their enrollment
22   materials to us, if they haven't gotten them in already, so
23   that we'll have them in by that deadline -- post marked at
24   least by that deadline, to get their releases and other
25   materials to us, if they have not submitted them already.

1          We have been working with all the primary

2  counsel, telling them where they are in the process, giving

3  them reports to each firm about their clients and whether they

4  are enrolled or not enrolled, we haven't got the materials in

5  yet.  We're trying to make sure that everyone's aware that if

6  they haven't gotten their materials in in this phase, to get it

7  in to us, post marked at least, by June 30th.

8          For these numbers, Your Honor, Merck and it's

9  counsel are now reviewing this information to compare it

10  against their information about the claimants who are eligible

11  for the program and can participate in it.

12          Because there's certain folks who cannot, even

13  though we receive information from them, they don't have a

14  lawsuit by November 9, 2007, or didn't have a tolling agreement

15  by that date, they may be foreign residents who weren't injured

16  in the U.S., some of these folks within the 51,000 plus are not

17  really eligible for the program.

18          But based on Merck's comparison of our

19  information that we give them from these submissions and their

20  own data, it looks as if over 95 percent of the people now who

21  are eligible for the program are enrolling in the program.

22  Actually, I think it's almost 96 percent today.

23          So that's where we are on the enrollment front.

24  The other piece of the enrollment puzzle for a package for

25  counsel is their certification of final enrollment.  It is a

1  document where a law firm tells us that they think they're

2  finished with enrollment and that all of their clients that

3  they represent have either been enrolled by them or someone

4  else, or they also can tell us a list of people that they

5  haven't been able to communicate with, locate, on Exhibit A.

6            Those were due on May 1 of this year, and we

7  have received those from counsel for almost 49,000 claimants,

8  as we see in Row 1.  We have 421 claimants who were in the

9  program, apparently eligible for the program, but we haven't

10  gotten the CFE from their counsel yet, and most of those are

11  law firms that have one person.  We're working with them to try

12  to help them to get their ducks in a row.  Because we're still

13  encouraging people to send us the certification of final

14  enrollment.

15            What are we doing now on the enrollment phase,

16  and this leads to our discussion of the claims, because all of

17  the documents that we have received in the process, all the

18  releases, the medical authorization forms, the stipulations of

19  dismissal, and other documents that they have to send to us to

20  enroll in the program have to be reviewed to make sure they're

21  complete under a set of agreed completeness criteria that we've

22  worked out with Merck's counsel and the NPC.

23            And those documents, to make sure that they're

24  signed, to make sure that they have the right person's name in

25  them, to make sure that the lawyer's have signed them, all of

1    these have to go through a review process and that is well

2    underway now with us and with Merck's counsel reviewing these

3    documents.

4              Merck's counsel looks at them.  We look at them

5    to confirm that there's a problem.  If there's not a problem,

6    we post it as a clean document or a no deficiency document.

7    And we're using for the represented claimants, their Vioxx

8    portals, their secured Web sites, to give them these notices.

9              And we have, on the screens that we've shown

10   here a couple of months ago, the ability to tell the law firms

11   exactly the status of each of their clients, which documents we

12   have, which ones we don't have, which ones have been reviewed,

13   which ones have not, which ones have a problem, which ones do

14   not.

15             And if there is a problem, a lack of signature,

16   a lack of some formality that's material to the effectiveness

17   of that document, we post that word on their portal with a

18   reason why and then what they have to do is fix it, it's a cure

19   action.

20             So now we're receiving cure actions back from

21   counsel to send in the signed release or send in the signed

22   piece of it that they're missing.  This is a fairly elaborate

23   process between us and Merck's counsel and it is well underway.

24   It will still take a while to complete.

25             We have posted a lot of notices to law firms for

 1    each of their clients and made it -- we have a new search

 2    function available on their portals so they can find each one.

 3    They can aggregate them into a report.  They can download it

 4    into an Excel report if they'd like to help them keep up with

 5    it and track it so they know and can tell from day to day what

 6    we posted that's new, and what they still have to do, and when

 7    it's due.

 8              Because we're telling folks for most of these

 9    things you have 20 days once we post it to get us back the

10    signed document, or get us back the complete document.  We have

11    posted a lot of notices to counsel for their clients.  We have

12    to use letters to the unrepresented claimants.

13              But law firms will continue to receive these

14    postings or notices from us of things that are materially wrong

15    with what they gave us, and there are a lot of things that can

16    go wrong with this much paper that they can correct or cure

17    within that 20-day period.  And we're trying to make that, and

18    hope we are making that, work as well as we can with counsel.

19              And we've been working with the parties because

20    the parties are determined that this issue will not become a

21    bottleneck for the program, will not become a delay issue for

22    the program, that interferes with what we're all watching now

23    is heading up towards interim payment.

24              Because we don't want, and the parties do not

25    want, to allow any of these issues about the integrity of their

1    enrollment materials to preclude someone from getting an

2    interim payment if they're otherwise qualified for it.  If

3    they've gotten their claims materials in to us and they're

4    eligible for payment, we don't want this, and will not allow

5    this, to interfere with those folks getting their payment when

6    we get to that stage.

7              Which gets us to that stage, which are the

8    claims materials that we have, and Lynn is going to update the

9    Court on where we are in the claims process.

10             **THE COURT:**  Thank you.

11             **MR. BROWN:**  Thank you, Your Honor.

12             **MS. GREER:**  Good morning, Your Honor.  Lynn Greer

13   from BrownGreer.  I would like to inform the Court as to the

14   progress of the claims packages that we have received, and this

15   slide gives you an overview of the various aspects of the

16   process.

17             Row No. 1 shows that we have to date received

18   9,100 packages that include at least a claims form, event

19   records, or proof of use records.  When a claim hits that stage

20   and we have determined that there is enough for us to begin our

21   gates review, we're able to start the gates review, the

22   eligibility review of those claims.  There are 9,100 claimants

23   that submitted enough for us to begin that review.

24             We have received -- and I'll show in a moment a

25   slide showing the pace of the submissions over the last week --

1  we have received over 5,000 claims materials that we have not

2  yet coded into our system.  What I mean by that is that firms

3  give us their claims packages by uploading them to their secure

4  Web portal.  We then take those packages and we integrate them

5  into our database.

6              So our processors take the package, they

7  identify that there are event records, proof of use records,

8  the follow-up records, and those are linked to each claimant so

9  that then when our reviewer pulls that package, we know exactly

10  what the claimant has submitted, and it's all part of the

11  process that we need to take to be able to do an efficient

12  claims review.

13              Row 3 shows we have received 8,959 claims forms

14  only.  And what we are seeing is that firms are doing the

15  claims forms first and they are submitting those online, and

16  then very quickly the claims packages typically catch up to the

17  claims form.  And probably some of the corresponding claims

18  package materials to the 8,959 are lurking in that 5,000 number

19  right above that.

20              We have received and coded 620 claims package

21  materials that they do not rise to the level of the claims

22  package -- it could be just a random doctor's note -- and those

23  are ones that do not yet constitute a claims package.  But we

24  have received some type of claims material from over 23,000

25  claimants to date from over 387 firms and 100 pro se's.

 1              THE COURT:  Do you have any feeling as to what's the
 2     percentage that pass through the gate?
 3              MS. GREER:  Your Honor, we're still in the fairly
 4     early stages of that.
 5              THE COURT:  Okay.
 6              MS. GREER:  It's probably still too premature to
 7     venture a guess.
 8              THE COURT:  But then it goes from you to the gates
 9     committee for a second review?
10              MS. GREER:  That's correct.
11              This graph shows just the pace of claims package
12     submissions over the last month.  When we were here last, we
13     had roughly over 3,000 claims packages submitted.  You'll see
14     that as of last night about 5:00 that number had risen to
15     14,180.  Not surprisingly, there's a very large vertical climb
16     towards the end as we approach July the 1st.
17              Your Honor, we have received, and I know many
18     people in this room have received, a lot of panicked requests
19     for an extension of the claims package deadline.  What we
20     wanted to do is to spend just a few minutes describing the
21     nature of the deadline, and we sent an e-mail blast last week
22     to primary counsel that informed them and reminded them that
23     the parties anticipated that the claims package deadline would
24     be a hard one to meet because these claims packages are very
25     difficult to assemble and to submit.

1              So in Exhibit 1.5, the parties laid out three

2    extensions, and so the July 1st deadline already has built-in

3    extensions to it.  The way that we will implement Exhibit 1.5

4    is that after July the 1st, we will determine who has submitted

5    a claims package and who has not.

6              Anyone who has not submitted anything will

7    receive a notice from us notifying them that September 1st is

8    the deadline when they need to submit their claims package.  If

9    September 1st passes and we still do not have anything, or we

10   do not have a complete package, we will send a second

11   deficiency notice giving folks until November the 1st.

12             If that date passes, we will send a third

13   deficiency notice, and November 30th is the final submission

14   deadline.  Before that deadline, claimants may request an

15   extension.  We have the discretion to consider that extension.

16   The July 1st deadline, however, is very important for our

17   ability to be able to process claims and pay claims.

18             So the reason that we have, and everyone has,

19   stressed the July 1st deadline is because we cannot review

20   claims unless we have complete claims package to meet our goal

21   of interim payments being issued in August.  We still encourage

22   firms to submit complete claims packages on a timely basis.

23        **THE COURT:**  Yes.  I think that's important because

24   the payout is also determined by first in, first out.  So if

25   you wait too long to submit the claim, then on the other end

1  you're going to receive the money, if you receive any money,

2  very, very, very late.

3            So I urge the parties to meet the deadlines

4  established and not linger.  It's not going to get better.

5  It's going to get worse and harder, and your money is going to

6  be delayed accordingly.

7            **MS. GREER:**  And really the extensions are wonderful

8  for firms who have tried their hardest but who simply have not

9  received records from pharmacies.  But we have encouraged firms

10  that if they have any materials at all to, please, submit them

11  to us by the 1st of July.

12            We have established on the secure Web portals

13  for the firms a new feature.  What we were struggling with,

14  Your Honor, was encouraging firms to submit materials to us

15  knowing that some of them may be incomplete; and yet our

16  commencing a review on an incomplete claims package that would

17  set us down a road towards not being able to complete the

18  review.

19            So last week we rolled out -- or actually Monday

20  of this week, we rolled out a feature where firms can go ahead

21  and submit to us the claims form and the claims package; and as

22  soon as we code that package in our system, it will show up on

23  each firm's portal.  And at the bottom you'll see -- this is

24  just a sample -- that any claim that has been coded into our

25  database will show up here and a firm can tell us to hold it.

1        They can, in essence, tell us, we're still

2   waiting on something.  They can tell us to hold it for the

3   gates review and the points review.  They can tell us to just

4   hold it just for the points review, because there are some

5   records that are relevant to points that we do not need to do

6   the eligibility review of gate, or they can tell us not to hold

7   it at all.

8        This just gives the claimants control, the firms

9   control, over their claims packages, at the same time

10  encouraging the submission of whatever it is that they have,

11  and saving administrative costs by letting us not review a

12  claim that everyone knows to be incomplete.

13       **THE COURT:**  Okay.

14       **MS. GREER:**  Your Honor, that is all we have.  If you

15  have any questions, we'll certainly be happy to answer them.

16       **THE COURT:**  It looks like presently you have 95,

17  96 percent of the eligible people who have enrolled?

18       **MS. GREER:**  That's correct.

19       **THE COURT:**  It wouldn't surprise me if it goes over

20  the 96 percent.  So hopefully around 98 percent it might top

21  out.  What I think is appropriate is that sometime in August or

22  September, at the latest, to convene a status conference and

23  find out what's left, who we're dealing with, what issues and

24  what types of claims, if any, are left.  Then we'll see if we

25  can group those claims and then begin handling them in some

1   efficient, effective way.

2               Right now, it's a little too early to make any

3   determination as to what is left because we're still receiving

4   claims so far.  Thank you for your work.

5               **MS. GREER:**  Thank you, Your Honor.

6               **THE COURT:**  It's very helpful.

7               **MR. BIRCHFIELD:**  Your Honor, Andy Birchfield for the

8   plaintiffs.  If I could just highlight a couple of points that

9   Mr. Brown and Mrs. Greer made.

10              One, as Ms. Greer has pointed out, there have

11  been a significant number of claims packages that have been

12  received to date, and those claim packages are being reviewed

13  by BrownGreer.  The gates committee is already up and running.

14  We're processing these claims.  We're working toward making the

15  initial payments in August, and we're on track for that.

16              So I want everyone out there to know that this

17  process is moving along and that we do expect the initial --

18  the interim payments to begin in August, and then they will be

19  made on a rolling basis.  As Your Honor pointed out, those will

20  be handled on a first-in, first-out basis.

21              And Ms. Greer pointed out that there are

22  extensions that are built into the settlement program.  Those

23  extensions were put in place contemplating that there would be

24  difficulty receiving some records.  I want to urge everyone to

25  be making -- it's very important that you make every effort to

1    meet the July 1st deadline.  Submit the claims form and

2    whatever documents you have by July the 1st, next week.

3                    The idea is that if there are follow-up records,

4    if there's some aspect to the follow-up records, for example,

5    that's missing, then you will receive notice and you're given

6    these times to complete the package.

7                    But there's a real danger in waiting until the

8    last minute and submitting these claims packages because, as

9    Ms. Greer pointed out, BrownGreer has the option, the

10   discretion, to extend that final deadline, the

11   November 30th deadline, for good cause shown.

12                   But the latest that that extension can be is

13   December the 30th.  So all of the claims packages must be

14   completed by December the 30th, and it is a process that law

15   firms need to be working on very diligently and cannot wait

16   until the last minute to get these claims in.

17                   But with the process -- the way the process is

18   going now, the claims packages that we're receiving and the

19   ones that are being processed, we're very encouraged about how

20   the interim payments will be coming out this fall.  So we're

21   excited about that.

22                   I also wanted to point out when Mr. Brown was

23   talking about the review that's ongoing with the releases and

24   the other enrollment documentation, the law firms will be

25   getting notices.  They will be getting notices.  Some have

1   already, but others will be coming out in the very near future

2   about things that need to be corrected on these.

3            I want to encourage everyone to act rapidly in

4   correcting these deficiencies.  But the parties, Merck, and

5   BrownGreer, are committed to working through these so that they

6   do not hold up the interim payments.  But it will require that

7   law firms, once they receive these notices, that they act

8   promptly on remedying those.

9            **THE COURT:**  All right.  Before you leave, Andy, you

10  mentioned gate committee and so forth.  Remind us, BrownGreer

11  first makes the initial cut through the gates and then assigns

12  points.  If they indicate that someone, according to their

13  schedule, doesn't fit through the gates, then it goes to the

14  gate committee, comprised of both lawyers from the plaintiff

15  and lawyers from the defendant, and they do an overall review,

16  in essence, and look at the material and decide which one of

17  those who have failed to fit through the gate need a second

18  look -- or they all get a second look, but whether or not the

19  gates committee allows them through the gates.

20           **MR. BIRCHFIELD:**  Yes.  That's exactly right, Your

21  Honor.  BrownGreer will make the initial pass.  They'll review

22  the records and they'll make a determination, is there a heart

23  attack, or is there an ischemic stroke that meets the

24  definition of the settlement agreement, and is there proof of

25  use that shows they were using Vioxx in proximity to the time

 1    of the event, and did they have at least 30 pills.

 2                   If they pass all those gates, then those

 3    claimants, through their lawyer, will receive a notice that you

 4    have passed the gates, and it will be quickly followed by a

 5    points award where BrownGreer assesses the risk factors that

 6    are involved, makes the payment determination, that information

 7    is provided to the claimant and their counsel so that they can

 8    check it and make sure that it's accurate.

 9                   If not, if there's some discrepancy, they can go

10    back to BrownGreer and say there's a discrepancy, or they will

11    be notified of their appeal options at that point.  But that

12    points award notice will come out for those who passed the

13    gates.

14                   The ones that failed the gates, then the

15    claimant's counsel will be provided notice that you failed this

16    gate.  For example, you may have passed the injury gate and you

17    may have passed the duration gate, but not the proximity gate.

18    They are provided that information.  They are given a 14-day

19    window to provide information to BrownGreer.  They also could

20    be considered by the gates committee that says -- or they will

21    be considered by the gates committee, here is evidence showing

22    that I was taking Vioxx at the time.

23                   That goes to the gates committee.  The gates

24    committee looks at the entire claims package and can make a

25    determination, is there evidence of a heart attack for a person

 1  using Vioxx at that time.  If that happens, then the gates

 2  committee includes it into the settlement program and it goes

 3  to BrownGreer for BrownGreer to go through and make the points

 4  award and provide that notice to the claimant and their

 5  counsel.

 6              **THE COURT:**  Okay.  Thank you.

 7              **MR. BIRCHFIELD:**  Your Honor, another piece that is

 8  important for the interim payment is the Medicare and the

 9  governmental liens and we have Matt Garretson here to report on

10  that.

11              **THE COURT:**  We'll hear from Matt Garretson next, the

12  lien administrator.

13              **MR. HERMAN:**  Before we do that, Your Honor, I want to

14  make one comment about the gates committee.  Sometimes reading

15  a cold document, folks might believe that some appeal process

16  is illusory.  This one is not.  We met in Ted Mayer's office

17  this Tuesday, representatives of Merck, and the plaintiff's

18  negotiating committee, and BrownGreer, with some 17 folks in

19  attendance.

20                   Of the 100 cases that were reviewed, more than

21  50 percent were passed through the gates.  So it's a real

22  process.  I want to assure everyone that we're paying a lot of

23  attention to it, and Merck, for its part, and the plaintiffs

24  representatives are acting together to give every one of these

25  cases a fair review.

1          **THE COURT:**  These 100 were the ones that didn't get
2     through the first time?
3          **MR. HERMAN:**  That's correct.  There were 500 that did
4     not get through BrownGreer -- or were rejected by BrownGreer.
5     We spent a day, reviewed 100; and of that 100, more than half
6     were passed through the gates.
7          **THE COURT:**  Okay.
8          **MR. HERMAN:**  I think it shows that we're being very
9     careful about this and it's not an illusory process.  It's a
10    real process.
11         **THE COURT:**  Thank you very much.  Let's hear from the
12    lien administrator.
13         **MR. GARRETSON:**  Thank you, Your Honor.  I'm Matt
14    Garretson with the Garretson Law Firm and I'm here to report as
15    lien resolution administrator.
16              With respect to Medicare, Your Honor, at our
17    last hearing I reported that we were making tremendous progress
18    in our discussions with Medicare regarding their global
19    resolution of their interests in the Vioxx settlement program.
20              This month I'm pleased to announce to the Court
21    and to the parties that just yesterday we finalized a process
22    with Medicare to do just that.  The process covers
23    approximately 80 percent of the claimants or more.  We are
24    working with the team at Medicare to resolve the remaining
25    issues that relate to only a very small subset of the

1    claimants, and we anticipate having those totally resolved by

2    July 17th.

3                    So the majority, the overwhelming I think about

4    80 to 90 percent, have been resolved.  We're now working with

5    the plaintiff's negotiating committee on drafting a disclosure

6    of this process that will be sent to the Medicare entitled

7    claimants with their points award letter as those begin, I

8    assume, in late July.

9                    The disclosure document will, of course, remind

10   Medicare entitled claimants that under the terms of the Vioxx

11   settlement program, his or her statutory obligations to

12   Medicare must be resolved by the lien resolution administrator

13   to the satisfaction of the parties prior to any settlement

14   monies being released.

15                   The process was previously explained to all the

16   claimants and the educational materials that were prepared and

17   provided to them by their counsel.  So this will not be any new

18   news to them.  The disclosure document to be sent with the

19   points award will also list an amount that will be paid upon

20   the claimant's behalf to Medicare out of his or her settlement

21   proceeds.

22                   According to the process we have in place, the

23   global amounts for each claimants -- for each claimant will be

24   based on such factors as the type of injury for which he or she

25   on being compensated in the program, what level in that injury

1   category he or she has achieved, the typical course of

2   treatment associated with that injury level, the prevalence of

3   other confounding damages, of course, the date of his or her

4   entitlement to Medicare, and specifically whether or not they

5   became entitled to Medicare prior to the compensable injury

6   event or after the compensable injury event.

7             So according to these factors, there will be

8   several categories that the claimants may fall into and each of

9   those will have an amount associated with it that will be paid

10  to Medicare.

11            The disclosure document will also explain a

12  process a claimant will go through in the very unlikely event

13  that he or she was mis-categorized.  So, Your Honor, by

14  agreeing to have this amount paid to Medicare out of his or her

15  settlement proceeds, the claimant will satisfy any and all

16  federal Medicare Part A or Part B reimbursement obligations

17  resulting from the medical care rendered from the date of his

18  or her injury to the date of this settlement.

19            In addition, and I think most importantly, it

20  will insure that these claimants will not have future injury

21  related care denied on account of not satisfying Medicare's

22  recovery claim in full at the time of settlement.

23            Your Honor, I'd also just personally note, I'd

24  like to commend the officials at the Centers for Medicare and

25  Medicaid Services for their extraordinary efforts over the last

1   several months to make sure that we could get this done in

2   record time for a record settlement in advance of the interim

3   payment date.

4               Just one little note on Medicare before I move

5   on to give the report on Medicaid.  I think what's really

6   important to understand is this process will eliminate the need

7   to open up 50,000 files by over 1,000 separate attorneys and

8   the related delays.

9               In my humble experience, that process would have

10  delayed this settlement at least 18 months.

11          THE COURT:  Yes.  Medicare, I've been in touch and

12  they need to know also that the Court appreciates their good

13  work in this.  I think it's helpful to the claimants, but I

14  also think that it's helpful to Medicare.  I appreciate all the

15  cooperation that they've given to you and to the Court.

16          MR. GARRETSON:  Yes, sir.

17              With respect to Medicaid, at the last hearing I

18  reported that we're waiting on one last state to give their

19  approval to these voluntary -- or I should say respond to our

20  request to go into a voluntary protocol.  With the risk of

21  being redundant, you'll recall that the protocol has a maximum

22  cap or a holdback in which these liens would be resolved.

23              They also involve a uniform offset that's

24  proportionate to attorney fees and case costs on each finalized

25  lien.  We're only waiting on Texas to respond.  I've not lost

1    hope at all in that, Your Honor.  I just think Texas is unique
2    in the fact that it has many separate programs and many people
3    that must sign off on these proposals.  So I think we will have
4    that.
5            My hope is to have a final answer with respect
6    to Texas by our next hearing.  But for the interim payment
7    process, we do know who is Medicaid entitled.  We have these
8    holdbacks in place.  We're now getting -- we're in the throws
9    of getting actual claims histories in from these states and
10   we're auditing them at a very rapid clip.
11           As those come in from the states, and that of
12   course is a large medical file, we're staffed to have our
13   auditors go through them within 48 hours upon receipt.  So we
14   expect that these liens will be finalized within the holdback
15   amounts, as I said, just within 48 hours of the states being
16   able to get us their materials.
17           **THE COURT:**  You need to keep me posted on the Texas
18   situation.  I know they're unique.  They used to be our largest
19   state.  They're still a very large state and I know that they
20   have some unique problems.  I'm going to strongly suggest that
21   they look at this matter and I'll do a minute entry and send it
22   on to Texas.
23           So you need to get me the names of the people
24   that I should send my minute entry to and, perhaps, the
25   telephone numbers too so that I can follow it up.  I do think

 1   this would be good for Texas, and I want them to be able to
 2   take advantage of this opportunity.
 3           **MR. GARRETSON:**  Yes, Your Honor.  I will do so.
 4                   Finally, with respect to the other governmental
 5   liens such as VA or TriCare, Department of Defense, that is
 6   running smoothly.  We have over 1,000 separate notices that
 7   we've received from those entities on the claimants they've
 8   identified and we're in the process of resolving their
 9   reimbursement claims separately.
10                   So in sum, I'm pleased to report that I think
11   the structure is in place and that the objectives of the Court
12   and the parties are being met and will be prepared for the
13   interim payments.
14           **THE COURT:**  Thank you very much.
15           **MR. GARRETSON:**  Thank you.
16           **THE COURT:**  I appreciate your work.  Anything from
17   the special master?
18           **MR. WITTMANN:**  Nothing that I know of, Your Honor.
19           **THE COURT:**  All right.  What about the state court
20   trial settings?
21           **MR. WITTMANN:**  No state court trial settings have
22   been set through September 30th, 2008.
23           **THE COURT:**  The next item is class action.
24           **MR. WITTMANN:**  That matter is involved in briefs
25   submitted to the Court, Your Honor.

1      **MR. HERMAN:**  We also have a report from Mr. Beisner
2  and Mr. Seeger, Your Honor.
3      **THE COURT:**  Okay.
4      **MR. BEISNER:**  Your Honor, this is really a
5  combination of report on Item VI on the agenda and also Item
6  XIV, the third-party payor cases.  At the last conference I
7  think that you asked Mr. Seeger and I to confer about what to
8  do with the individual third-party payor cases and come back to
9  you on that.
10      Chris and I looked at the list, and there are
11  actually very few individual third-party payor cases that have
12  been filed here.  There are some that have been filed before
13  Judge Higbee in New Jersey.  What we have here is a collection
14  of class actions on that subject.
15      So what we wanted to report to you this morning
16  is we've drawn -- Ms. Brasier entered these conversations as
17  well -- and what we're looking at now is we have those class
18  actions.  We also have some economic loss class actions.
19  There's overlap among those.  There's also overlap with some of
20  the class actions that are pending in some of the other
21  coordinated proceedings in California and New Jersey.
22      We're trying to look to see if we can come up
23  with kind of a comprehensive, coordinated plan on that.  We
24  don't have that to report to you today, Your Honor.
25      **THE COURT:**  Okay.

1          **MR. BEISNER:**  But wanted to mainly tell you we don't

2    have this big pool of individual third-party payor cases here.

3    But we have worked through what to do with the class actions,

4    generally, and we hope to get finished with that shortly and

5    provide a recommendation to you on that, Your Honor.

6          **THE COURT:**  When do you think you can do that?  Can

7    you do it by the next time?

8          **MR. BEISNER:**  We can do it by the next time, yes,

9    Your Honor.

10          **MR. SEEGER:**  Just so we're not misunderstood.  We

11    know that the lawyers representing the individual plaintiffs

12    are anxious to get their cases going.  But we're struggling

13    with whether it makes sense to resolve the class issues first

14    and that's what we're hoping to report back.

15          **THE COURT:**  Yes.

16          **MR. HERMAN:**  May it please the Court, the next issue

17    on the agenda is discovery directed to third parties.  We're

18    pleased to report that the FDA this morning did communicate a

19    provision of additional documents that they have produced or

20    will produce as of today, that they are revising their

21    privilege log as we speak, and expect to process more documents

22    in the future.

23          The second issue as regards to discovery relates

24    to ESI, the medical benefit provider.  Subpoena duces tecum

25    have now been issued in accord with Your Honor's last

1  conference.  With regard to these discovery matters, the work

2  of the MDL continues.  The matters are all being placed in the

3  depository and indexed as they are produced.

4              I want to thank, as usual, Mr. Davis and

5  Mr. Longer, and Mr. Tisi for the work that they've done on

6  these discovery issues.  They really don't get the recognition

7  they should for the prodigious work that they do, and I wanted

8  to state that for the record.

9          **THE COURT:**  I had an opportunity to confer with the

10  plaintiffs committee and the representatives from ESI on this

11  issue.  I do think it's something that would be better handled

12  by the parties than by the Court.

13              The easiest way is for an agreement to be worked

14  out and certain deadlines plugged into it.  If that can't be

15  worked out, then what needs to be done, as I mentioned to the

16  plaintiff's committee, is a subpoena duces tecum or a 30(b)(6)

17  deposition needs to be taken of ESI and a subpoena duces tecum

18  also requiring the presentation of all that material.

19              If it's electronically produced, it must be

20  produced in the same form and format.  If it is capable of

21  being copied, then the copies have to be brought to the

22  deposition.  Then the Court will establish a payout for that

23  material to reimburse the parties.

24              I know with a Xerox when I was practicing law

25  years ago, it was 15-cents a page.  I know it's increased now.

1    I think the exorbitant rate of 75, 80 cents a page is being

2    charged by the federal court.  That at least gives me some

3    yardstick as to the costs of reimbursing for the production of

4    that.

5              I'm not saying -- I know that it's probably on

6    the plus side of that, but at least that's the star that I will

7    be guided by and will require that those individuals be

8    reimbursed for that presentation.

9              But I also remind both sides that ordinarily my

10   jurisdiction in depositions, and enforcing subpoenas, or

11   holding people in contempt for failing to comply with the

12   subpoenas is generally statewide.  But with the MDL and §1407,

13   I sit as a judge in all jurisdictions in the 94 districts of

14   this nation, so my jurisdiction is nationwide in that regard.

15             So I will be enforcing these subpoenas.

16        **MR. HERMAN:**  Your Honor, Mr. Ranier of plaintiffs

17   steering committee has just brought to my attention a similar

18   issue that was filed this morning regarding health care

19   providers who will not provide records pursuant to your prior

20   orders and authorized medical authorizations, but require

21   subpoenas.

22             This matter was not set on the agenda, not for

23   hearing, but, Your Honor, I request you indulge Mr. Ranier to

24   state what that problem is --

25        **THE COURT:**  Certainly.

 1          **MR. HERMAN:**  -- if Your Honor will hear him.

 2          **THE COURT:**  Certainly.

 3          **MR. RANIER:**  Thank you, Your Honor.  Drew Ranier for

 4  the record.  We filed a motion to show cause why medical

 5  providers should not be held in contempt, Your Honor, because

 6  they're refusing to follow the orders of the Court, which you

 7  just stated are nationwide in this context.

 8              In two of the cases that involve Kaiser

 9  Permanente in California where they will produce the records,

10  but they won't certify them without a subpoena.  And another

11  case, it's a Mississippi doctor who refuses to provide the

12  records unless the plaintiff, quote, dismisses their claim,

13  unquote.  And the third instance is a New York hospital that

14  refuses to provide the records unless you do their hospital

15  specific authorization.

16              We showed them the Court's order and they said,

17  well, you've got to get a New York state court order.  These

18  are four cases that are ready to go, enrolled, the claims

19  packages are ready otherwise, and this is going to prejudice

20  these four people's ability to have settlement money

21  distributed to them unless this is quickly handled.

22          **THE COURT:**  Right.

23          **MR. RANIER:**  So we'd ask the Court for a fast

24  consideration.  We just filed it yesterday, Your Honor.

25          **THE COURT:**  Okay.  I'll follow up on it.

1          **MR. RANIER:**  But I think there are a lot more than

2   just these four people.  These are four that are our clients.

3   But I've heard from lawyers around the country that this is a

4   problem.

5          **THE COURT:**  Make sure I have the addresses and I'll

6   order them to come to court next meeting or thereabouts and

7   show cause why they shouldn't be held in contempt of court.  If

8   they fail to show up, then I will have a local marshal look

9   into the matter.

10         **MR. RANIER:**  Thank you, Your Honor.

11         **MR. HERMAN:**  May it please the Court, in that regard,

12  I'll talk with Mr. Marvin and Mr. Wittmann so that those cases

13  won't be prejudiced in any way since they made a diligent

14  attempt to get records.

15         **THE COURT:**  Okay.

16         **MR. WITTMANN:**  Your Honor, the next thing is the

17  state liaison committee, I think.

18         **MS. BARRIOS:**  Good morning, Your Honor.  Dawn Barrios

19  for the state liaison committee.  Because I have the

20  distinction of following Mr. Ranier, I'd like to report on a

21  problem that I have, and if you can make your order very broad,

22  there's a hospital in North Carolina who refuses to certify the

23  records unless they're sent to Your Honor.

24              I've had many discussions with them.  I have

25  sent copies of your order.  But their position is that if they

1    send the records to me and certify them, anyone in my office or

2    myself can alter the records.

3              So I point this out to you because this is a

4    very persuasive problem and the broader your language in our

5    order on Mr. Ranier's case, the better it will be for all the

6    other attorneys who are having similar difficulties.

7              **THE COURT:**  I'll keep that in mind.  But with regard

8    to yours, you should find the name of the lawyer handling the

9    hospital and then give me the name of the lawyer, and if you

10   can, a telephone number, and I'll convene a status conference

11   with you and that lawyer.

12             **MS. BARRIOS:**  Yes, Your Honor, I appreciate that.

13   Thank you very much.  But to tell you how cooperative

14   BrownGreer is, they have allowed me to file these records with

15   a special certification of the problem.

16             So I bring it to your attention and I appreciate

17   it and I will do that, but I also want to commend BrownGreer

18   and I think Mr. Birchfield's office helped tremendously with

19   that.

20             **THE COURT:**  Okay.

21             **MS. BARRIOS:**  With regards to the formal report of

22   the state federal liaison committee, through Transfer Order No.

23   146, we have no new remand motions.  We also have no new

24   third-party payor economic cases to report to you so I'm not

25   going to burden you with any more paper, and we'll save our

```
 1   trees that way.
 2                  But I am going to give everyone their
 3   long-awaited disk set of all the remands here.  In light of
 4   your comments about wanting to find out in August or September
 5   what we have left, we will now, especially in light of the
 6   July 1st deadline being completed and my office will get
 7   together with BrownGreer on all those cases to find out how
 8   many remands you have left as well.
 9        THE COURT:  Yes.  I think when you have an
10   opportunity to find out who has filed claims, who has passed
11   through the gates and so forth, I think the numbers of those
12   remand motions will go down.  We'll have some left, but we'll
13   at least know how many are left.
14                  It's probably premature to act on it now, but we
15   will have to eventually focus on them.
16        MS. BARRIOS:  I understand.  That's why I want to get
17   Your Honor the hard data on that.
18        THE COURT:  All right.
19        MS. BARRIOS:  Lastly, we're working with Ms. Cabraser
20   on keeping track of all the third-party economic payor cases.
21        THE COURT:  Thank you very much.
22        MS. BARRIOS:  Thank you, Your Honor.
23        THE COURT:  Pro se?  Anything on the pro se?  Court's
24   appointed Bob Johnston to handle the pro se matters and be of
25   assistance to them if they need any assistance.  I'll hear from
```

1    him at this time.

2              **MR. JOHNSTON:**  Thank you, Your Honor.  The first

3    information I would provide to the Court is that regarding the

4    legal notice of publications, we have undertaken the published

5    legal notices for a total of 247 legal notice publications that

6    are either in progress or completed.

7              Regarding the approximate legal notices that

8    have already been published, we've only had five communications

9    back.  It may be of some interest to the Court that a couple of

10   those have a stamp from the Wisconsin prison in which these

11   individuals provide some very basic information.

12             But both of these individuals expressed that

13   they have a fervent desire to become my associate, Claudia's,

14   sometimes pen pal, and I have said she can do whatever she

15   wants.  I would recommend against it.  But if she does, I can

16   represent to the Court there will be no billings for any of

17   that.

18             The only other --

19             **THE COURT:**  They have a very good library in that

20   prison.

21             **MR. JOHNSTON:**  Oh, and they've taken a lot of time in

22   the letters.  I've seen them.

23             The only other, I think, very important item

24   that we have had discussions in chambers about is the fact that

25   since the last status conference as a result of communications

1   by many attorneys to clients where the attorneys remain

2   enrolled as counsel of record, those letters informed those

3   individuals that for various reasons:  Alleged lack of

4   cooperation, communications, et cetera, et cetera, et cetera,

5   those attorneys were not going to be henceforth essentially

6   providing representation.

7              Those letters, which consistently say the same

8   things, end up with:  Why don't you contact Bob Johnston?  So

9   as a result of that, as I informed the Court, there have been

10  multiple, multiple communications that have been fielded by

11  attorneys in my office.  We have done our very best to assist

12  those individuals, to provide them with essential information,

13  to have made recommendations that they go back and contact

14  their attorneys of records, and where appropriate have, with

15  the permission of those individuals, contact a number of those

16  attorneys.

17             As the Court knows, those individuals would

18  remain counsel of record, and from a technical standpoint, as

19  curator, I'm really not, based upon the Court's order,

20  representing them.  But we have done all that we can and we

21  will continue to do so to assist in terms of their

22  communications with us.

23             They're coming in every day.  As I told the

24  Court in chambers, we had a communication this week from

25  someone who said he got the letter Tuesday of this week and

1    because of close proximity to the July 1 date, we had a

2    discussion in chambers and Lynn Greer, who has already made her

3    presentation on the record, has indicated that if the date

4    passes and these individuals, who we understand are all

5    registered, have not complied with the requirements, that that

6    is not at all fatal to their claim, and that there will be

7    extensions of time basically toward the end of the year.

8                    So with that, I think that everything continues

9    to flow well.  We will continue to do what we've done to date

10   and we'll provide a report next month to Your Honor.

11            **THE COURT:**  Good.  Thank you very much.  I know

12   you've been inundated with material, and I appreciate all the

13   work that you're doing.

14            **MR. JOHNSTON:**  Would you like to be pen pal to a

15   couple these guys?

16            **THE COURT:**  No.  I have my own pen pal group.

17            **MR. WITTMANN:**  Your Honor, on Merck's motion, there's

18   nothing new on that.  We have our motion for certification

19   that's still under submission to the Court.

20            **THE COURT:**  All right.

21            **MR. WITTMANN:**  I think Mr. Herman and I want to

22   report on the Pretrial No. 9 issues.

23            **MR. HERMAN:**  Nothing new, Your Honor, on Pretrial

24   Order No. 9.

25            **THE COURT:**  Next, Vioxx statistics.  Anything on

1  that?

2          **MR. WITTMANN:**  Yes, Your Honor.  As of March 31st,

3  2008, Merck had been served with approximately 14,450 lawsuits,

4  including approximately 32,925 plaintiffs of which 24,325

5  plaintiffs are or stated to be in the MDL, and approximately

6  3,350 plaintiffs are in the New Jersey Superior Court.

7          In addition, as of March 31st, we had 12,760

8  claimants who had entered into tolling agreements.  The

9  statistics are a little bit skewed this month because some

10  21,000 plaintiffs have been dismissed as of March 31st, 2008.

11          The great bulk of that came from the mass

12  dismissals in New Jersey for those plaintiffs who are

13  participating in the settlement agreement.  So as these cases

14  are dismissed as part of the settlement, these numbers come

15  down.  So that's why there's a difference.

16          **THE COURT:**  Okay.

17          **MR. WITTMANN:**  I think that pretty well covers the

18  major statistics on the Vioxx suit statistics, Your Honor.

19          **THE COURT:**  Any cases set for trial?

20          **MR. WITTMANN:**  No, Your Honor.

21          **THE COURT:**  The next item is the MDL trial package?

22          **MR. HERMAN:**  Yes, Your Honor.  As Your Honor is

23  aware, Your Honor's reviewed both the MI and the stroke trial

24  packages.  On May 30th notice was sent out to every lawyer who

25  registered under Order 5A previously issued by this Court.  A

1    copy of that order, a copy of what they had to do in order to

2    receive a trial package.  To date we've received less than 15

3    requests for trial packages.  They're in the process of being

4    sent out, those that conform to what the Court has required.

5              We have had one request from a third-party payor

6    for a trial package.  We are inclined to reject that because --

7    well, Texas is a lone star.  We have two Geminis here from

8    Texas, Mr. Blizzard, Mr. Lanier, who've tried cases at great

9    time and expense.  I don't think they'd be very happy with

10   trial packages that they developed being supplied to insurers

11   that they go to war with regularly, and I don't want to become

12   a pen pal to every plaintiff lawyer in the country.

13             So we have this matter under consideration and

14   we'll be prepared to make a recommendation to the Court and to

15   advise the third-party payors at our next conference, Your

16   Honor.

17        **THE COURT:**  I think it can be problematic if a

18   claimant is taxed for attorney's fees of the plaintiff's

19   committees and they pay those and then they wind up being

20   confronted with an attack on the remainder of their funds by a

21   third-party who uses the material that they received from the

22   lawyer that they paid.

23             There may be some difficulty there in terms of

24   ethics as well.  So let's be very conscious of that.

25        **MR. HERMAN:**  Your Honor, the next item on your agenda

1   is the third-party payor cases, which we generically have

2   called the AvMed matter.  I believe that Your Honor's met with

3   counsel for the parties.

4           **THE COURT:**  I have met with counsel earlier, and I

5   understand that there is some agreement that the parties wish

6   to place on the record.

7           **MR. SEEGER:**  Your Honor, Chris Seeger.  I'm here with

8   Jim Irwin, who is representing BrownGreer and U.S. Bank and

9   Joe --

10          **MR. GRINSTEIN:**  Joe Grinstein.  I'm representing the

11  AvMed plaintiffs, Your Honor.

12          **MR. SEEGER:**  And Arnold Levin, Your Honor.  We've all

13  had an opportunity to talk about this motion and I think this

14  is where we are -- Jim and Joe, if I misstate it, let me

15  know -- but I think there's an agreement that the motion will

16  be pulled down without prejudice today.

17              We're going to get from AvMed their names and

18  social security numbers as timely as possible and we're going

19  to provide -- the people who took Vioxx, for example, we're

20  going to provide those to Orran Brown and his outfit.

21              They're going to take about 90 to 120 days to

22  look through that and try their best to in good faith get back

23  to Mr. Grinstein on which of those people who took Vioxx are

24  actually in the settlement and provide to him the names of the

25  attorneys representing them.  So we envision that happening

 1  really in the next 90 to 120 days, or within 120 days from the
 2  time you get us the list.
 3            Now, Your Honor, you raised something in the
 4  back that we need to still focus on that we're not prepared to
 5  present to the Court and that is the idea of capping the
 6  deductions from the recoveries of individual claimants once
 7  those amounts are actually paid by BrownGreer.
 8            So we need to sit down and talk about that a
 9  little bit after this conference and report back to Your Honor
10  on that.  One other thing that's important is that
11  Mr. Grinstein has agreed that once we go through this protocol,
12  that they would be looking to the individual claimants at that
13  point, and there's nothing that we're agreeing to that times
14  this or connects this to the fund or its settlement in any way.
15            **THE COURT:**  Okay.
16            **MR. LEVIN:**  Your Honor, Levin.  It would not impede
17  payments to the claimants, this process.
18            **THE COURT:**  Yes.
19            **MR. LEVIN:**  We'll expedite it.  We'll work in good
20  faith.  We've worked with BrownGreer, and the Court knows
21  BrownGreer, and we know that BrownGreer will do everything
22  possible to meet the deadline.  And AvMed has agreed to pay
23  BrownGreer their more than reasonable charges for the process.
24            **THE COURT:**  Okay.  Mr. Grinstein?
25            **MR. GRINSTEIN:**  Your Honor, I think that does

1  generally state the agreement, but let me just put a little

2  flavor on a couple of points just to make sure that we don't

3  have a later disagreement about that.

4          With respect to the data that we will be

5  providing to BrownGreer, first of all, we're going to need to

6  sit down with BrownGreer before we provide the data.  It's

7  actually a little bit harder to match than it sounds.

8          We'll be providing social security numbers, but

9  also possibly some additional data to help with the matching,

10 date of birth and things like that, and then we expect the data

11 to flow back to us to be who these people are, who their

12 attorneys are, and so on and so forth.

13         As far as the caps are concerned, I'm not

14 commenting on that one way or the other.  I'm not agreeing to

15 the cap or anything like that at this point, so I want to make

16 that clear.

17         With respect to how we will pursue our liens in

18 the future, I think we're in agreement.  It just might be a way

19 of phrasing this thing.  I wouldn't anticipate that we're going

20 to file another injunction asking that the fund not distribute

21 any money in the future or anything like that.  But ERISA does

22 require us to jump through certain hoops to make sure that

23 funds aren't dissipated, they aren't commingled.  So we'll have

24 to file appropriate individualized actions with respect to

25 individualized claims to make sure that that doesn't occur.

1           But I think we're all in agreement that this is
2  not going to be a fund issue globally.  It's going to be coming
3  down to individuals.  And I think those were my points.  Thank
4  you, Your Honor.

5           **THE COURT:**  I talked to the parties in chambers and I
6  have a couple of me-too motions that were filed today, I'm
7  told, involving other similarly situated individuals.  I'm not
8  prejudging anything, but the injunction procedure presents a
9  rather complex hurdle.

10          One thing is that when you enjoin a fund such as
11  this, an injunction would require, if I granted an injunction,
12  a bond; and the bond that I usually set is 150 times of the
13  fund enjoined.  So you would be looking at approximately a
14  $6 billion bond.  That can present some complicated problems in
15  a case of this sort.

16          Secondly, I don't see these liens in the same
17  way as I see the statutory liens.  The statutory liens are a
18  different type of lien.  These liens are more factually
19  specific, factually pregnant.  The individual policies need to
20  be looked at, scrutinized, sometimes causation needs to be
21  looked at more closely, and burden of proof, and who has the
22  burden of proof, when the lien attaches all have to be looked
23  upon.

24          So it's more complicated to look at it uniformly
25  from a legal standpoint, at least from a judicial standpoint.

 1    However, this is an opportunity it seems to me for both sides.

 2    It seems to me that the plaintiffs have some advantage in

 3    looking at these matters globally, if they get something out of

 4    it.

 5              I think that that's why I say the cap might be

 6    helpful.  I'm not negotiating the matter.  I'm just suggesting

 7    to both sides.  The plaintiff, an individual, who is being

 8    taxed by the plaintiff lawyer committees to prepare their

 9    cases, to negotiate their cases, to handle their cases, is now

10    in a situation where the lawyers that they hired, in essence,

11    either intentionally or *sub silentio* is now giving information

12    to somebody who will use that information to get some money

13    from them.

14              Now, that's okay if they get something out of

15    it.  But if they get nothing out of it, then the same problem

16    exists.  "So what have you done for me," the plaintiff says.

17    "You taxed me and now you're giving information to somebody to

18    fight me."

19              So you need to focus on what the plaintiffs get

20    from that.  That's where it makes sense, the plaintiff

21    individual has received medical.  The medical has been paid

22    for, and now they're getting paid money.  It seems appropriate

23    for them in some instances to pay back some portion of the

24    money.

25              Now, the economy of scale gives the plaintiffs

1   an opportunity to get a better deal, if you will, on that than

2   if they have to fend for themselves.  So it's to their

3   advantage as long as they get something for it.  But it's also

4   to the advantage it seems to me of the lien holder.

5            So I do feel that the parties do better working

6   this out non-judicially than allowing me to work it out because

7   it will destroy this opportunity and make life more complicated

8   for everybody.

9            MR. IRWIN:  Your Honor, Jim Irwin for BrownGreer and

10  U.S. Bank.  May I add a comment, please?

11           THE COURT:  Yes.

12           MR. IRWIN:  First of all, on behalf of those two

13  defendants in the AvMed litigation, we appreciate the

14  understanding that the injunction will be lifted.  We

15  appreciate the recognition that BrownGreer will be paid for

16  these efforts appropriately.

17           They will be advising me about any concerns they

18  may have along the way.  One concern might be the disclosure of

19  privacy information.  If that occurs, then I will advise Chris

20  Seeger and Arnold Levin about that and Joe Grinstein.  I

21  suspect we can work something out.  If we can't, we will bring

22  it to Your Honor's attention.

23           THE COURT:  Okay.

24           MR. IRWIN:  Also we have filed a motion to sever.  We

25  will withdraw that motion to sever with the understanding that

1  it is without prejudice.  Finally, I understand that in the New

2  York case -- I call it the New York case.  It was filed by two

3  entities in New York -- I understand that they have served or

4  filed a similar type injunction.  I have not had a chance to

5  read it.  I assume it will be treated generally the same way

6  that we're talking here.

7          **THE COURT:**  That's why I made the statements that I

8  made.

9          **MR. HERMAN:**  Your Honor -- excuse me, Jim.  Well,

10  Arnold, go ahead and then I want to advise the Court.

11          **MR. LEVIN:**  One thing with regard to the agreement

12  that was stated of record.  I think I shouldn't used that word

13  "think" because that word "think" was used by Mr. Grinstein and

14  I don't know what it is.

15          I think -- there I used it again and I shouldn't

16  have used it again -- the agreement that we've reached is sans

17  "think".  It's an agreement.

18          **THE COURT:**  Okay.

19          **MR. HERMAN:**  May it please the Court, Your Honor, I

20  was introduced this morning to the attorneys who have filed the

21  release of injunction.  I introduced them to Mr. Irwin.  I

22  think they'd like to at least appear before the Court.

23          **THE COURT:**  Sure.

24          **MR. HERMAN:**  They've made an inquiry as to whether we

25  would consider, that is the PNC would consider, and Mr. Irwin

1    and his clients, in the event that the AvMed issue works out

2    whether their issue can be worked out in the same way.  But I

3    know they would like to introduce themselves to the Court.

4              **THE COURT:**  Sure.

5              **MR. KING:**  Good morning, Judge Fallon, Henry King

6    with King, Krebs and Jurgens, and also with me is Mr. Andrew

7    Marks who is with the firm in Crowell & Moring in D.C.  We have

8    the papers filed for him to be appointed a motion *pro hac vice*,

9    and with the Court's permission, I would like him to address

10   the Court.

11             **THE COURT:**  Certainly.

12             **MR. KING:**  Thank you, Your Honor.

13             **MR. MARKS:**  Thank you, Your Honor.  Andrew Marks on

14   behalf of the two union ERISA self-funded plans on behalf of

15   the tenured class we ask to represent.

16                  The relief we've sought is of the same kin, but

17   it is different.  But it seems to us that to the extent that

18   the constructive discussions are proceeding, we'd like to be

19   part of those.  I wasn't privy to the discussions this morning,

20   but it certainly sounds like there's a good faith effort to

21   find some common ground.  So we welcome that opportunity.

22                  I don't know what the time frame on that is.  We

23   filed our papers.  I assume the parties will be getting

24   together promptly and we would then advise the Court, based on

25   that discussion, whether it makes sense for us to withdraw our

1  motion without prejudice.  So with that said, Your Honor, we

2  appreciate your time and look forward to further communication

3  from you.

4          **THE COURT:**  Fine.  I appreciate your being here, and

5  I would have included you had I known you were here.

6          **MR. MARKS:**  I appreciate that.

7          **MR. HERMAN:**  May it please the Court, and with due

8  respect to the counsel opposite, I want to protest for the PNC

9  any involvement in this new matter in discussions that we're

10  having with AvMed.  It may serve to delay this case, to delay

11  payment.  If they're willing to withdraw their injunction or

12  their papers without prejudice, we'll be happy to talk with

13  them.

14          If they're not willing to do that, we ask that

15  the matter be set and be briefed.  We have undergone --

16  Mr. Irwin has, Merck has, we have -- substantial discussions,

17  briefing, and I might say consternation, in trying to work

18  AvMed out so we could move this case along.

19          To add another party at this juncture, who does

20  have some different issues, is not going to facilitate this

21  matter from the point of vantage of the PNC.

22          **THE COURT:**  You-all talked before and let me know by

23  today.

24          **MR. SEEGER:**  Yes, Judge.  I mean, there are

25  complications that I believe they filed a class.  We're not

 1  going to provide class relief here.  But we have to have a

 2  discussion with the attorneys and we'll get back to the Court.

 3          THE COURT:  Have a discussion and let me know by

 4  today.

 5          MR. SEEGER:  Okay.

 6          THE COURT:  Thank you very much.

 7          MR. MARKS:  Thank you, Your Honor.

 8          THE COURT:  Where are we, Phil?  Item XV?

 9          MR. WITTMANN:  Yes, we're down now to --

10          THE COURT:  We've already dealt with XV.

11          MR. WITTMANN:  Yes.  We're down to XVI on the

12  termination for tolling agreements.

13          THE COURT:  All right.

14          MR. WITTMANN:  Your Honor, on April 23rd, 2008, we

15  gave notice pursuant to the terms of the tolling agreement and

16  the settlement agreement that we were terminating the tolling

17  agreement with respect to all the claims effective 120 days

18  from April 23rd and that has now been done.

19              And the people who are getting those notices are

20  contacting their lawyers or contacting me in many cases.  I

21  don't know what all that means, but that process is underway.

22          THE COURT:  All right.

23          MR. WITTMANN:  The next item, Item XVII, the motion

24  to modify or suspend Pretrial Order No. 28.  There's nothing

25  new on that other than what's in the status report, Your Honor,

 1   unless Russ has something.

 2          THE COURT:  I issued an order on that recently.

 3          MR. HERMAN:  There's nothing new on that, Your Honor.

 4          THE COURT:  All right.  The third-party payor

 5   motions.  We've already dealt with that.

 6          MR. WITTMANN:  That's already been covered, Your

 7   Honor.

 8          MR. HERMAN:  Mr. Dugan did request that his issue as

 9   regards to the Louisiana Attorney General's case be docketed

10   for discussion.

11          THE COURT:  Okay.

12          MR. DUGAN:  Thank you, Your Honor.  I appreciate the

13   PSC allowing me the opportunity to talk today.  On behalf of

14   the Louisiana Attorney General, my name is James Dugan, and on

15   behalf of the new Attorney General, Mr. Buddy Caldwell.

16              I'd like to first bring to the Court's

17   attention -- you may or may not be aware that Merck settled on

18   behalf of 29 Attorney Generals for $58 million.

19              Is it okay to hand this up?

20          THE COURT:  Sure.  Were you included in that?

21          MR. DUGAN:  No, we were not, Your Honor, and that's

22   the point of discussion, obviously.  Merck settled with 29

23   states for 58 million over allegations that Merck knew Vioxx

24   carried an increased risk of cardiovascular side effects,

25   misrepresented the safety of their product in advertisements,

1   aggressively marketed directly to consumers before doctors had

2   experience with Vioxx, and Merck will pay 58 million to the

3   states involved and they also agreed to delay

4   direct-to-consumer TV adds if recommended by the FDA.

5               What I handed to Your Honor was the announcement

6   by Republican Attorney General Tom Corbett who headed that.

7   Then in addition, Your Honor, I put in there, which was an

8   agreed final judgment and consent decree, which I understand

9   each state would file in the various state courts to get

10  approval of their settlement.

11              With that in mind, Your Honor, I'd like to

12  report, obviously, the Louisiana Attorney General has had a

13  pending motion to remand before Your Honor for some time.  I'd

14  also like to report that in addition to Louisiana, there are

15  six other states that had filed cases in state courts, been

16  removed in front of Your Honor.  Those are the states of

17  Colorado, Mississippi, New York, Alabama, Utah, and Montana.

18              And I, along with counsel on those cases,

19  Mr. Mark Lanier for the State of Alaska, would respectfully

20  request that you consider our motions to remand in the near

21  future.

22              **THE COURT:**  Okay.  Any response from the defendants?

23              **MR. BEISNER:**  Your Honor, one clarification that I'd

24  like to make.  The settlement that was reached with the AGs is

25  on an entirely different set of issues.  The claims that have

 1   been brought here that counsel is referencing are claims

 2   seeking, as I understand it, the recovery of the purchase

 3   price, or at least some aspect of the purchase price of the

 4   product under the Medicaid theory.

 5               Those claims are carved out of the settlement

 6   that was reached with these AGs.  Those were Consumer

 7   Protection Act enforcement actions that were deemed brought.

 8   The relief is, as counsel noted, in some respects injunctive

 9   relief that's prospective.

10               But I just want to the make clear -- there's

11   sort of an implicit suggestion here that we're dealing with

12   some states' claims and not other states.  That's just not

13   accurate.  This was a multiple-state Attorney General

14   investigation aimed at an entirely different set of allegations

15   and claims and what is involved in these cases.

16               So just to make clear, there's not been some

17   selective treatment of dealing with the states on these issues.

18   It's an entirely different set of issues.

19          THE COURT:  And not discriminate against the civil

20   law of the state?

21          MR. BEISNER:  That is correct.

22          THE COURT:  It seems that it would be appropriate

23   shortly for me to have a status conference with you, and

24   Alaska's counsel, and with the defendants and get a feel for

25   this.  You might be able to at that time get me the number of

 1   cases or what you're dealing with.  We'll meet in my office or
 2   over the telephone, and at least I'll talk with you-all about
 3   it.  I'll set something up in the near future.
 4            MR. DUGAN:  Absolutely, Your Honor.  Thank you, sir.
 5            THE COURT:  The Greater New York Benefit fund, is
 6   that --
 7            MR. HERMAN:  Your Honor, the gentleman representing
 8   the fund have addressed Your Honor.  The matter needs to be
 9   briefed and we'll get back to you.
10            THE COURT:  Okay.
11            MR. HERMAN:  The only other issue is we received
12   yesterday -- Doug?
13            MR. MARVIN:  Your Honor, Doug Marvin.  One of the new
14   items that is on the agenda -- sorry, this is Doug Marvin
15   representing Merck -- is we filed a motion for an order to show
16   cause why the plaintiffs who have failed to register their
17   claims should not be dismissed.  We would ask the Court to set
18   a date when that should --
19            THE COURT:  I'm going to set a date for the next
20   meeting, which will be on July 17th, 2008, at 9:00.
21            MR. MARVIN:  Your Honor --
22            THE COURT:  There's another motion?
23            MR. MARVIN:  Yes, there is.  That was Item XV where
24   there was a motion there to show cause with respect to
25   dismissal of foreign individual cases.

1    **THE COURT:**  I'll set that at the same time and I'll

2    put out a briefing schedule based on those dates.

3    **MR. MARVIN:**  Thank you, Your Honor.

4    **THE COURT:**  Okay.  One thing that I wanted to ask

5    counsel, just a housekeeping matter.  I have the records in the

6    *Plunkett*, *Barnett*, *Dedrick*, *Smith*, and *Mason*, the exhibits, do

7    you want them back, or do you want me to destroy them, or what?

8    Those cases have been tried.  Either they're --

9    **THE DEPUTY CLERK:**  I think they were all copies.  I

10   think the documents were copies.

11   **THE COURT:**  These are copies of documents.

12   **UNIDENTIFIED SPEAKER:**  Your Honor, on behalf of the

13   *Mason* case, we don't want them back.

14   **MR. BIRCHFIELD:**  Same for *Irvin* and *Dedrick*.

15   **THE COURT:**  Okay.

16   **MR. MARVIN:**  Same here, Your Honor.

17   **MR. HERMAN:**  Your Honor, we don't want to open the

18   depository here.

19   **THE COURT:**  All right.

20   **MR. HERMAN:**  Your Honor, we received yesterday from

21   Ms. Oldfather, an attorney from Kentucky, a motion which isn't

22   set for today and we'll respond to that motion as Your Honor

23   directs.

24   **THE COURT:**  Yes.  I received a motion from

25   Ms. Oldfather that she be appointed to represent the other

1    individuals.  I've given a lot of thought to the appointments

2    in the case, and I don't take those appointments lightly.  I

3    think I'm through.  If there is a need for specific

4    representation, I'm likely to look at the people that I have

5    already appointed and not start the process all over again, but

6    I'll consider her motion.

7              **MR. HERMAN:**  I do want to make one other comment.  I

8    want to thank BrownGreer, particularly Lynn, Doug, Ava was

9    there, Chris, Andy, Lenny Davis, and Ed Blizzard, for the work

10   that they've done in connection with the gate committee.

11             I don't think that -- it's very difficult to

12   realize until we're in a position to make a final report to

13   Your Honor how much work has to go into the review of each one

14   of these cases and then to have the worthwhile discussions.

15             Everyone that participated in that gate

16   committee had done a prodigious amount of work just to get us

17   where we were, and I want to thank them.

18             **THE COURT:**  Yes.  I like the concept of the gate

19   committee and I hope that future MDLs give it consideration.

20   It's a way of bringing the human touch into the process.

21   BrownGreer is charged with looking at these matters under

22   specific guidelines.

23             Sometimes the guidelines get a little blurry and

24   that needs to be massaged a bit case-by-case.  This gives us an

25   opportunity to have skilled lawyers for both sides inject that

1  human quality into the process, and I think that's very helpful

2  to the litigants on both sides.

3              Thank you very much.  Court will stand in

4  recess.

5              **THE DEPUTY CLERK:**  All rise.

6              **(WHEREUPON, the Court was adjourned.)**

7                          *****

8                          <u>CERTIFICATE</u>

9              I, Jodi Simcox, RMR, FCRR, Official Court Reporter

10  for the United States District Court, Eastern District of

11  Louisiana, do hereby certify that the foregoing is a true and

12  correct transcript, to the best of my ability and

13  understanding, from the record of the proceedings in the

14  above-entitled and numbered matter.

15

16

17                      <u>S/ Jodi Simcox, RMR, FCRR</u>
                        Jodi Simcox, RMR, FCRR
18                      Official Court Reporter

19

20

21

22

23

24

25