1                    UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE:  VIOXX PRODUCTS        *    Docket MDL-1657-L
       LIABILITY LITIGATION        *
6                                  *    August 20, 2008
                                   *
7                                  *    9:00 a.m.
      * * * * * * * * * * * * * * * *

8

9
                     STATUS CONFERENCE BEFORE THE
10                    HONORABLE ELDON E. FALLON
                     UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES:

13   For the Plaintiffs:          Herman Herman Katz & Cotlar
                                  BY:   RUSS M. HERMAN, ESQ.
14                                      LEONARD DAVIS, ESQ.
                                  820 O'Keefe Avenue
15                                New Orleans, Louisiana 70113

16
                                  Beasley Allen Crow Methvin
17                                   Portis & Miles
                                  BY: ANDY D. BIRCHFIELD, JR., ESQ.
18                                234 Commerce Street
                                  P.O. BOX 4160
19                                Montgomery, Alabama 36103

20
                                  Levin, Fishbein, Sedrad & Berman
21                                BY:   ARNOLD LEVIN, ESQ.
                                  510 Walnut Street
22                                Suite 500
                                  Philadelphia, Pennsylvania  19106
23

24                                Seeger Weiss
                                  BY:  CHRISTOPHER A. SEEGER, ESQ.
25                                One William Street
                                  New York, New York 10004

1   <u>APPEARANCES</u>:

2

3   For the Defendant:              Williams & Connolly, LLP
                                    BY:  DOUGLAS R. MARVIN, ESQ.
                                    725 Twelfth Street, NW
4                                   Washington, DC 20005

5
                                    Stone Pigman Walther,
6                                     Wittmann & Hutchinson
                                    BY:  DOROTHY WIMBERLY, ESQ.
7                                   546 Carondelet Street
                                    New Orleans, Louisiana 70130
8

9   For the State Liaison
    Committee:                      Barrios, Kingsdorf & Casteix, LLP
10                                  BY: DAWN M. BARRIOS, ESQ.
                                    701 Poydras Street
11                                  Suite 3650
                                    New Orleans, Louisiana 70139
12

13  Claims Administrator:           BrownGreen, PLC
                                    BY:  ORRAN BROWN, ESQ.
14                                  BY:  LYNN GREER, ESQ.
                                    115 South 15th Street
15                                  Suite 400
                                    Richmond, Virginia  23285
16

17  Special Master:                 Juneau Law Firm
                                    BY:  PATRICK A. JUNEAU, ESQ.
18                                  1018 Harding Street
                                    Suite 202
19                                  Lafayette, Louisiana  70503

20
    Curator:                        Johnston, Hoefer, Holwadel &
21                                    Eldrige
                                    BY:  Robert M. Johnston, ESQ.
22                                  601 Poydras Street
                                    Suite 2490
23                                  New Orleans, Louisiana  70130

24

25

JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

```
 1    APPEARANCES:

 2    Lien Resolution              The Garretson Firm
      Administrator:               BY:  MATT L. GARRETSON, ESQ.
 3                                 7775 Cooper Road
                                   Cincinnati, Ohio 45242
 4

 5    For U.S. Bank:               Irwin, Fritchie, Urquhart
                                    & Moore
 6                                 BY:  MONIQUE GARSAUD, ESQ.
                                   400 Poydras Street, Suite 2700
 7                                 New Orleans, Louisiana 70130

 8
      For Louisiana Attorney       Attorney General's Office
 9    General's Office:            State of Louisiana
                                   BY:  JAMES DUGAN, ESQ.
10                                 1885 North Third Street
                                   6th Floor
11                                 Baton Rouge, Louisiana 70804

12
      For Greater New York         King, Krebs & Jurgens
13    Benefit Fund:                BY:  REBECCA H. DIETZ, ESQ.
                                   45th Floor Capital One Building
14                                 201 St. Charles Avenue
                                   New Orleans, Louisiana 70170
15

16
      Official Court Reporter:     Jodi Simcox, RMR, FCRR
17                                 500 Poydras Street
                                   Room B-406
18                                 New Orleans, Louisiana 70130
                                   (504) 589-7780
19

20    Also Present:               STUART KRITZER, ESQ.
                                  RANDALL FOX, ESQ.
21                                JAMES FOSLER, ESQ.
                                  JOSEPH STEELE, ESQ.
22                                PETER MILLER, ESQ.

23

24    Proceedings recorded by mechanical stenography, transcript

25    produced by computer.
```

4

<u>**PROCEEDINGS**</u>

1

2          **(August 20, 2008)**

3          THE DEPUTY CLERK:  All rise.

4          THE COURT:  Be seated, please.  Good morning, ladies

5    and gentlemen.

6          ALL LAWYERS:  Good morning, Your Honor.

7          THE COURT:  Call the case, please.

8          THE DEPUTY CLERK:  MDL-1657, in re:  Vioxx.

9          THE COURT:  Counsel, make their appearance for the

10   record.

11         MR. HERMAN:  Yes, Your Honor.  Good morning, Judge

12   Fallon, I'm Russ Herman for the PSC, MDL-1657.

13         MR. MARVIN:  Douglas Marvin for Merck, Your Honor.

14         THE COURT:  We're here today in connection with our

15   monthly status conference.  I've met with the liaison

16   committees.  I received from them an agenda.  I'll take it in

17   the order presented, and then I'll add some additional things.

18   First, the settlement agreement, anything on that?

19         MR. HERMAN:  Your Honor, may Mr. Marvin and I

20   approach first?

21         THE COURT:  Sure.

22              **(OFF THE RECORD)**

23         THE COURT:  Okay.  I was talking to counsel about

24   some dates for the next meeting.  Also, I've been advised that

25   the airports are going to be closed around noon because the

JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1   President's in the area and we generally shut down everything.

2   So we'll try to get you-all out as quickly as we can.

3                    Settlement agreement's first.

4              **MR. HERMAN:**  Good morning, Your Honor.  With regard

5   to the settlement agreement, all of the pertinent dates and

6   trial orders have been listed from November 9th through the

7   last order regarding the actual settlement, which was May 15th,

8   2008.  They're posted on the Web site in connection with the

9   joint report.

10                   I do, again, want to mention the Web site:

11  Vioxx.laed.uscourts.gov.  It's easily accessed.  There is the

12  MDL PSC Web site:  Www.officialvioxxsettlement.com.

13             **THE COURT:**  Anything on the registration and

14  enrollment claims?

15             **MR. HERMAN:**  At this time, we'll call upon

16  BrownGreer, Your Honor.

17             **THE COURT:**  All right.

18             **MR. BROWN:**  Good morning, Your Honor.  I'm Orran

19  Brown and with me today also is Lynn Greer.  We are from

20  BrownGreer in Richmond, and we're the claims administrator for

21  the Vioxx settlement program.  We're happy to be here to offer

22  this report to the Court and the parties on the materials we

23  have received and where we stand on the claims process.

24                   As usual, we will go through each of its stages

25  and spend a little bit more time today talking about our main

 1    focus now, which is the claims process.  We look at this slide
 2    each month, Your Honor, to just show us how many folks have
 3    registered for the program.  And we're now at almost 60,000
 4    people -- 59,299 people we see there in Row 3 -- who have
 5    signed up and registered for the program.
 6                   Remember:  All claimants who claim injury from
 7    Vioxx are required to register.  We're still receiving some of
 8    those.  Every once in a while -- you can see the number is up
 9    47 people from the last time we were here on July 17th.
10                   Because all claimants have to register, this is
11    the total number to be able to tell how many people might
12    actually be eligible to participate in the program, had sort of
13    the threshold requirements of a lawsuit, a tolling agreement by
14    November 9th of last year, et cetera.
15                   We have to take out the folks who have signed
16    up, who seem to be ineligible, and that's where we get the
17    49,954 number in Row 4 of the number of people who have
18    registered who seem to be eligible to move forward in the
19    program.  That number does not change much now.
20                   We're still working with Merck and its advisors
21    to make sure we have all the information about who is or is not
22    meeting those procedural thresholds:  The eligibility of a
23    lawsuit, a tolling agreement, a U.S. resident.  And that number
24    floats around a little bit as we gain more information, but
25    it's been pretty much right at that 49-, almost 50,000, number

1    for several months now.

2                     The next stage, as we all know, is enrolling in

3    the process and sending in the release, and the stipulation of

4    dismissal, and the authorizations for medical records or

5    employment records that are required as the enrollment package

6    in the program, that we hold until the claimant goes through

7    the process or comes out of the process.

8                     And this slide shows us, again, as we've looked

9    at each month, the number of people who have gone that extra

10   step and are enrolling in the program.  We have a total of over

11   52,000 people in Row 3 who have sent us enrollment materials.

12   There, again, we have to look at that group and take out the

13   people who do not seem to be eligible based on the information

14   that we have, and that's in Row 4.

15                    And we get to a net number of around 48,564 of

16   claimants who appear to be eligible and have sent in enrollment

17   materials.  That's the core group of people who then will move

18   forward in the claims process.  That number, as we can tell, is

19   up 14 people from last July.

20                    Again, the percentage in Row 6 of the people who

21   appear to be eligible for the program who have actually

22   enrolled in the program is still at 97 percent.  That's where

23   it was last month.  It is actually a tad higher, about 15 basis

24   points or part of one percent higher, than it was last month.

25                    We are working with Merck to identify those

1    people who are not yet enrolled, and still are finding that a

2    large portion of that difference, the 3 percent, are people --

3    clients that the law firms cannot locate.  We've actually

4    had -- we've been canvassing firms who haven't sent us the

5    information to find out why.  And we're finding that in very

6    few instances are claimants actually flatly refusing to

7    participate.

8                    I think it's going to end up being less than

9    5 percent of that differential eventually.  But this is where

10   we are on the enrollment.  And on the strength of this number,

11   the percentage of enrolled claimants, at our conference in

12   July, Merck announced that it would waive its walk-away right

13   as of August 4, 2008, which then would call for Merck to

14   provide the initial funding that the settlement agreement

15   requires.

16                    And pursuant to Section 5.1.2.1 of the

17   settlement agreement, on August 5th, 2008, Merck deposited

18   $500 million into the MI settlement fund with U.S. Bank, which

19   is the escrow agent for the program.  That was actually a

20   deposit that was made a day early.  It was due on August 6th.

21   So the MI settlement fund is funded with $500 million being

22   held by U.S. Bank as escrow agent.

23                    And also the next day on August 6th, 2008, Merck

24   delivered to us, as required by Section 5.1.2.2 of the

25   settlement agreement, a letter of credit from the Royal Bank of

1   Scotland with a maximum draw amount of $4.1 billion.  So Merck
2   on August 5th and 6th complied with its obligation under the
3   settlement agreement to provide that initial funding and to
4   provide the letter of credit that the settlement agreement
5   requires.
6           Now, that gets us to the rest of the enrollment
7   phase.  Before Lynn takes up the claims phase, we want to pause
8   and look at this for a moment.  Because we are currently
9   working with the claimant's lawyers, primary counsel who
10  represent these claimants, and with Merck and it's advisors and
11  lawyers, and with the Negotiating Plaintiffs' Counsel to go
12  through the process of reviewing all that enrollment paperwork
13  to make sure that Merck has a valid release at the end of the
14  day, and to make sure that it has a stipulation of dismissal
15  that will work to dismiss a case, the parts of the enrollment
16  package to make sure that they're viable enforceable documents.
17          This is a big task for us, and the claimant's
18  counsel, and Merck, and the Negotiating Plaintiffs' Counsel,
19  and it is in every program.  This is a time-consuming process.
20  Because now Merck and its advisors and counsel and we have to
21  look through all of these documents to make sure they're okay.
22          We have received in enrollment documents in this
23  phase about 300,000 different documents from counsel that are
24  represented -- from claimants that are represented by counsel
25  or pro se's in either hard copy or electronic form, sometimes

1    both.

2              There are about 34 different types of things

3    that people can send us, either originally or as part of a

4    document, in the enrollment phase.  We think that about right

5    now we have about 1,250,000 pages of enrollment materials that

6    we have to go through.  Each of those documents has to be

7    handled, tracked, reviewed individually.

8              It's also worth saying at this stage that

9    thinking about the size of a program of this nature -- and Lynn

10   will describe, in a few minutes, the claims volumes that we've

11   received -- if you put all that together that we're storing

12   electronically, we now have 2.54 terabytes of images.  That's

13   2,644 gigabytes.  It's a lot of information.

14             How much is that?  These are all stored on our

15   servers in electronic form now.  Plus the hard copies that we

16   have are being stored.  If you tried to put all that

17   information on those old floppy disks that we used to use, it

18   would take almost 2 million of them to hold it all.

19             And you read estimates -- just to give us a

20   benchmark on the volume that we and the parties are dealing

21   with here, you read estimates that if you took all the print

22   media in the Library of Congress and converted it to electronic

23   form, it would take 17 to 20 terabytes.  We have 2.54.

24             Right now in this program, we are holding

25   information that's about 13 to 15 percent of the entire print

1  holdings of the entire Library of Congress.  That's how big the

2  scale is on a program like this.

3  　　　　　For the enrollment phase, it means that we are

4  going through all of those documents, the images, working with

5  the claimants, the claimants' lawyers, and with Merck's lawyers

6  to try to make sure that they are in order.  And it is a hard

7  process.  It is hard for us.  It is hard for the parties who

8  are trying to get these things in shape.

9  　　　　　But it has been a lot of communication back and

10  forth between us and the law firms on a constant basis where

11  every day we're working with firms to help them through that

12  program, working with Merck and its advisors on a constant

13  basis to try to make that work as easily as it can.  It is a

14  hard process.

15  　　　　　There have been -- we've heard about issues.  We

16  want to hear about issues.  We want to hear about complaints

17  about the process.  If people have things that they're unable

18  to find, it is a common feature of this stage of one of these

19  programs that getting that paperwork in order takes a lot of

20  work by everybody involved.

21  　　　　　We want to hear about the issues.  We have been

22  working with Merck and its lawyers on the questions or

23  complaints that we hear on this enrollment process, and Merck

24  has been very responsive to that.  We have made adjustments,

25  which is also a natural feature of a program like this.

1          What sounds best in theory at the outset about
2   all the many things that can go wrong with the document and
3   then selecting a subset of that to be the things that you
4   really want fixed to be an enforceable binding document, that a
5   lot of times what sounds perfect at the outset, in practice
6   becomes difficult for us or the lawyers to do and adjustments
7   are made throughout the course of the program.  And that's
8   what's going on right now.

9          We are trying to work with and are working with
10  Merck and its counsel, and the NPC, and the claimants' counsel
11  to try to make this process move along as quickly as it can and
12  make it as the least painful that we can.

13         Because this is -- can be a very painful process
14  to get all this paperwork shaped up, particularly when we're
15  talking about this kind of volume, and particularly when a firm
16  has 100, 200, 500 people that they're doing this for.  It's a
17  tough process.  But it is working.  It's working in a way that
18  it's supposed to.

19         As I said, we're working with Merck to adjust
20  those things to try to resolve the problems, which it happens
21  in every one of these programs.  We want to finish up.  We've
22  made a primary goal of not allowing any of this process, of the
23  looking at the material, posting, to telling law firms what
24  they need to correct, getting the material back, we and Merck,
25  or Merck, or both of us, are reviewing that material to see if

1    it's cleared up.  We are working very hard, and so is Merck,

2    and so are the Negotiating Plaintiffs' Counsel, not to let this

3    hold up claims.

4                 Because none of us want to have this paperwork

5    process impede the progress of claims going through claims

6    evaluation and then getting paid.  So we have prioritized the

7    people who have gotten their claims in to us and are near the

8    top of the claims queue to try to make these two systems work

9    together so that one doesn't hold up the other.

10                We want to hear from firms, whether they're

11   issues that they have, suggestions that they have.  This is

12   very common in one of these programs to make it work and get

13   through it as quickly as we can.

14                Your Honor, that takes us up to, and mentioning

15   the claims process being affected by this, we want to report to

16   the Court where we are on the claims process and looking

17   forward to our first payments, and Lynn will cover that.

18         THE COURT:  Let me reinforce also the fact that

19   there's going to be some glitches.  We have to understand that

20   and be patient with it.  I received a letter from Mr. Grant

21   Kiser calling my attention to the problems that he has had

22   along the way with some of his papers.

23                I've talked to the parties about it and,

24   hopefully, we can work through that.  Not unusual that we have

25   some of these problems, but you need to know that they're being

 1   addressed and we're going to do them as quickly as they can be

 2   done.  So just counsel patience in some regards on some aspects

 3   of the matters.  Let me hear from you, Ms. Greer.

 4            MS. GREER:  Good morning, Your Honor.  Lynn Greer

 5   from BrownGreer.  Today I'd like to cover for the Court where

 6   we are in terms of claims materials that we've received, also

 7   give a brief overview to the Court of some processing that we

 8   have done and features we have put on our portal to allow firms

 9   to be notified of our determinations and to accept or appeal

10   those determinations.  Finally, we'll report to the Court on

11   our anticipated payment schedule.

12            This first slide shows that as of yesterday, we

13   had received almost 35,000 claims packages which we have now

14   received and coded into our database.  There's still about 250

15   claims materials that we have received.  Most of that

16   represents materials that we've received just within the last

17   few days, because those materials do continue to come in.

18            When we last met with the Court in July, that

19   number was about 15,000.  As I explained at that time, this

20   juncture of the process for us, processing-wise just required

21   us to be able to have some time to intake these materials and

22   to put them in the database, which we've now done.

23            Of the materials that we've received, we have

24   received claims forms only for about 3,200 people.  A lot of

25   claimants and firms did make an effort to try to get us at

1   least their claims forms by the deadline of July 1st.

2                   We have since now sent deficiency notices to

3   many claimants telling them that we have just received a claims

4   form, that we need additional claims materials to be able to

5   begin a review of the claim.  And those folks were notified

6   last week that all that we had received were claims forms.  So

7   they have now been put on notice that we need additional

8   materials.

9                   Row 4 shows that we have received about 6,200

10  claims related types documents that we are classifying as

11  claims materials, but we don't have the requisite information

12  to begin a review of the claim, namely:  The claims form, event

13  records, or proof of use records.  We have also sent

14  information -- deficiency notices to people telling them what

15  we're missing.

16                  We've also sent, because you'll see that we've

17  received claims materials from 44,000 people, which is not the

18  entire universe of people from whom we expected materials.  And

19  we have sent deficiency notices to those who are enrolled and

20  eligible but from whom we've received nothing, telling them we

21  have received nothing.  Again, putting in line the process for

22  the deficiency notices, and putting them on notice that we've

23  not received any information.

24                  To date we have received 458,218 claims related

25  documents.  When you look at the pages that comprise that, it's

1   over 30 million pages of records.  And just pause for a moment

2   here to salute the plaintiffs' counsel who have worked very,

3   very hard to put these claims packages together and to submit

4   them to us.  It's a big effort.  There have been 871 such firms

5   and 277 such pro se claimants.

6               Of the 34,959 claimants for whom we have enough

7   to begin our review, this slide shows just a very general

8   overview of where those claimants are in the claims process.

9   We have a queue of about 23,500 that are ready for review that

10  are in our queue to start reviewing.

11              There are about 8,000 that are already in the

12  gates for review process, either our initial review or our

13  quality control review of those claims; and 3,431 claimants

14  have come out of the gates review process as eligible claimants

15  and are at some place along the spectrum in the points review

16  process, either initial reviews, or some who have now actually

17  received notice of points awards.

18              This is too small for anyone to read, but I

19  wanted just to be spend a few moments on the process that we

20  are using to notify claimants of our determinations.  This is

21  the main claims page of the portal that each firm has access

22  to.

23              And firms, we rolled this out, I believe, a

24  couple days after our last status conference with the Court.

25  This is the way by which claimants' law firms can go and look

Case 2:05-md-01657-EEF-DEK   Document 63355   Filed 09/07/11   Page 17 of 63

1    to see what notices have been posted.  When they go to this

2    screen, Your Honor, you'll see at the bottom, they can search

3    by notice type.  So this is a representative screen of a law

4    firm who could log on and see that -- they can pull up how many

5    of their claimants have received a notice of eligibility.

6                    This notice is a notice, basically, telling them

7    that they have passed gates and that their claim is now ready

8    for points review.  This is an example.  It's a very short and

9    sweet notice just telling the firm that their claimant has

10   passed gates.  The firms are able to print this and send it to

11   their clients with a cover letter explaining this step.

12                   This is a sample screen that they can also

13   search if they are getting a notice of ineligibility.  And this

14   is a notice telling them that based on our review of the claim,

15   the claim does not pass gates.  This notice of ineligibility,

16   as you'll see, shows them which gate or gates they have failed.

17   It also tells them if the reason they failed was simply because

18   there were no event records submitted at all or no proof of use

19   records submitted.

20                   And with notice what we do is we tell the firm

21   that they are able to submit additional documentation.  If, for

22   example, they forgot to submit a proof of use record or an

23   event record, they have 14 days upon receipt of this notice to

24   review their files and to make sure that they have submitted

25   all materials to us.  Again, this notice can be printed and

JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

1   sent to individual clients.

2                   The other thing the portal does is it allows the

3   firm to notify us what they want to do with the notice of

4   ineligibility.  They can tell us, for example, that they have

5   no additional information to give us and not to wait the 14

6   days, but to go ahead and send the claim to the gates

7   committee.

8                   Or they can tell us they need additional time to

9   get records.  Or they can actually use this portal to upload

10  the additional records that they are able to locate to submit

11  to us.

12                  Finally, the same page is where the firm can go

13  to see which of their claimants has received a notice of points

14  award.  When they print the notice of points award, this is the

15  actual document that the firm gets.  And, again, is able to

16  print and give to their clients.

17                  What it does is it goes through -- this does not

18  contain a lot of information that the actual points awards

19  give.  The actual points award in this section -- we weren't

20  able to run it on live data, Your Honor, because we didn't want

21  to breach any confidentiality -- but the notice of points award

22  actually gives the plaintiffs' counsel information on every

23  factor that is relevant to their award:  Their injury level,

24  the risk factors, the label and consistency adjustments.

25                  It walks through for them mathematically the

1    points that have been assigned and the deductions that have

2    been adjusted for the risk factors.  It also provides for them

3    the information, if it's relevant, about their lien withholding

4    and category.

5                    And we worked, and the lien resolution

6    administrator worked with us very hard and gave us great

7    information and has been working very cooperatively to be able

8    to allow us, to issue these notice of points awards to people

9    with lien withholding issues.

10                   Once a claimant receives a notice of points

11   award, they have the choice to either accept it or to appeal

12   it.  Or if it is a special marker claim, which for an MI claim

13   means the total points is less than 10, they are able to select

14   a fixed payment of $5,000.  The claimant is given a chance on

15   the portal itself to tell us what he or she wants to do.  The

16   firm does these elections.

17                   This allows them in real-time to let us know

18   whether they have appealed the points award or whether they

19   accept it.  As soon as they hit that they have accepted it, it

20   gets placed in line for payment.

21                   If they appeal it, what will happen then is they

22   will be given a chance to submit any additional information.

23   We ask that they not resubmit information they have already

24   sent because we don't want that greater than 30 million page

25   account to increase but so much.

1            But we do encourage if there are additional

2   documentations or explanations that the firm has for why they

3   disagree with the award, that they can submit those to us.  And

4   then they can also make the election right here to elect the

5   fixed payment.  If they also disagree with their lien

6   withholding information, they can let us know that that is the

7   reason why they are also appealing the award.

8            One thing I will mention to Your Honor is that

9   we will certainly look at whatever information the firm submits

10  to us in response to a notice of appeal award.  It is not as if

11  when a firm says they want to appeal the award, it's going to

12  go straight to the special master.  We will have an informal

13  process where we will certainly take a look at whatever the

14  firm submits to make sure there hasn't been a clerical error or

15  an oversight on our part.

16           This is where the firm can, if they decide to

17  appeal, what we have implemented is a process where all of the

18  factors that are relevant to the claim will appear on a screen

19  and the firm has to indicate which specific order -- which

20  specific issue it is that they are appealing.

21           So they can select whatever the factor is that

22  they disagree with.  If we have assessed uncontrolled

23  hypertension, for example, and they do not agree with that,

24  they can select that that's the only issue they want us to look

25  at, and they can give comments -- and we actually require

1  comments from them -- to let us know where it is that they

2  disagree.

3              So, Your Honor, that takes us to the part of our

4  report where we would like to inform the Court that we are

5  prepared to institute interim payments of 40 percent to

6  qualifying claimants next week, August 28th.

7              To give you some background on the process that

8  we have been following, under Section 4.1 of the settlement

9  agreement, the directive is that upon the later of August 1 of

10 this month or our review of 2,500 MI claims that we would go

11 through a process of estimating the point value of each point

12 in an MI claim.

13             We have actually, as of today, reviewed 2,750 MI

14 claims.  Based on our review, what we have done is we have

15 evaluated the data for all of those claims, the finding of all

16 of those claims, the points values of all of those claims.  And

17 we've also made some assumptions of the claims that we haven't

18 seen yet, including enrolled claimants who have not submitted

19 any claims materials, to try to project how many of them may

20 ultimately present claims materials.

21             This process has highlighted for us that the

22 projection and the estimation process is a fluid one, and it

23 will change as we receive more information, as we review more

24 claims, and as we are able to track the empirical data that we

25 have on an ongoing basis.

1          But based on our analysis of the 2,750 claims --
2     and we have shared this with the parties, our process, and this
3     number -- we are prepared to report to the Court today that our
4     projected value of each point to enable us to begin the
5     40 percent interim payment will be in excess of $1,900 per
6     point.
7          Again, Your Honor, it's a static process that
8     will change over time.  In fact, the settlement agreement
9     requires that we continue to estimate and to look at the data
10    to make sure that the number can -- it can be changed over time
11    to protect the adequacy of the fund.
12         Your Honor, I would like to point out that the
13    payments will be done on a rolling basis.  We do expect the
14    first round of payments will begin next week, August 28th.
15    They will be paid on a monthly basis -- rolling basis as a
16    claim matures through the process and is found eligible and
17    accepts a points award.  So it will be a rolling process.
18         Finally, in our experience as claims
19    administrators in other programs, I would like to say that the
20    speed with which this program has come together from January,
21    which was when everyone signed up to now, it is unprecedented
22    that payments can begin going out in an eight-month period.
23         That is due, Your Honor, to many, many different
24    people, the dedication and diligence of Your Honor,
25    representatives from Merck, and the NPC, the lien resolution

1    administrator, U.S. Bank, and the claimants' attorneys

2    themselves who have worked very hard to make this happen.

3            **THE COURT:**  I do agree with that.  This has worked so

4    well because of the diligence of the attorneys, as well as the

5    claims administrators, and all of the people who have worked on

6    this.  You need to know that the Court appreciates it and

7    recognizes it.

8            One thing that I want to follow-up on is the

9    deficiency issues.  This, while it's not been greatly

10   problematic, let me frame it that way, it has a tendency to

11   create some serious problems.  I suggest to the plaintiffs that

12   they form some sort of small deficiency committee whose job it

13   will be to deal with the deficiencies and to report to the

14   Court at these monthly meetings what the deficiencies were and

15   how they've been dealt with.

16           I think if we can nip this in the bud and give

17   some comfort to the lawyers who are having some difficulty with

18   deficiencies, and so they know who to go to.  They've got a

19   name and a face to talk with.  I think that that's part of

20   problem, some of them get frustrated.  They can't talk to

21   anyone.  They don't know who's dealing with it.  That is, in

22   itself, a problem.

23           If they have someone to talk to and understand

24   it, we can work through these deficiencies.  Some of the

25   deficiencies may not be able to be solved.  So we're going to

1  have to deal with them in a different way.  But I think that

2  would be very helpful, and I suggest that to the plaintiffs

3  committee.

4         **MR. HERMAN:**  May it please the Court, Your Honor,

5  we're charting, for the plaintiffs committee, deficiency

6  problems that are pointed out by claimants' lawyers.  If they

7  will get to us specifics by August 28th, we've got a chart.

8         I will make arrangements to meet with Mr. Marvin

9  and I'm certain that Mr. Marvin and I can work through this

10  process and, of course, with the assistance of BrownGreer.

11         **THE COURT:**  Let's put that on the agenda so that we

12  have a focus on it every month, even if there's no deficiency

13  problems.  That would be helpful.

14         **MR. HERMAN:**  It's not enough to just say you have a

15  deficiency, they've got to be particular.

16         **THE COURT:**  Right.

17         **MR. HERMAN:**  We invite all the claimants' lawyers

18  that feel that they have deficiencies -- it's almost like

19  Justice Holmes saying there's a difference between form and

20  substance -- if you give us the substance of what it is you

21  have a problem with, I think we can get through it.

22         I know that Mr. Birchfield wants to address some

23  issue in this process, but there are three other things I'd

24  like to mention very quickly.  Merck was sought an opinion from

25  one of the big CPA firms --

1    **THE COURT:**  Price Waterhouse.

2    **MR. HERMAN:**  -- Price Waterhouse Coopers as to what

3    protections can be implemented in terms of wire transfer or

4    checks.  Mr. Marvin is heading that up.  U.S. Bank is involved.

5    BrownGreer is involved.

6              Your Honor, we believe that Your Honor will be

7    satisfied that the best protection for consumers or claimants

8    that we can provide will be provided.

9    **THE COURT:**  I think the issue here is to be assured

10   that there's some paper trail, some way of policing the

11   material.  I've been told, through Price Waterhouse, that wire

12   transfers may even be the best way.  It not only shows that the

13   funds have gone out, but it shows also that the funds have been

14   received.

15             In this case with attorneys representing

16   individuals, that that will be able to be, perhaps, the best

17   way to assure, not only a prompt process, but also a protected

18   process.  So I'm satisfied with the use of wire transfers, as

19   long as we can trace them and make sure that they've gone out

20   and have been received.

21   **MR. HERMAN:**  In corollary or contemporaneously with

22   that issue, since payments are going out and some claimants,

23   either now or in the future, with their attorneys may need

24   qualified settlement funds set up in order to avoid

25   constructive trust situations, I've asked Mr. Levin for

1  plaintiffs to submit to Your Honor for consideration a proposed
2  motion and order to have the court speak, as it has at least on
3  one other occasion, as to the qualified settlement funds so
4  that claimants won't be penalized.

5          **THE COURT:**  Okay.

6          **MR. HERMAN:**  The last issue, Your Honor's indicated
7  that we should provide Your Honor with the names of health care
8  providers and record gatherers who are not complying with your
9  order as regards medical records releases, and we will do that
10  by August 28th.

11              Again, if there are any attorneys out there that
12  are having problems with health care providers not providing
13  records, or with businesses that gather records, if they will
14  let us know in writing before August 28th, we shall incorporate
15  that notice to Your Honor.

16          **THE COURT:**  Yes.  I need to know that because it's
17  going to be a court order and I need to know if there's someone
18  that's not treating the court order properly.  It's not a
19  question of me or this litigation, it's a question of the
20  federal court authority.  I sit as a court in the entire nation
21  now.  So I expect people to follow the orders; and if they
22  don't follow the orders, I'll get involved in it.

23          **MR. HERMAN:**  Thank you, Your Honor.

24          **MR. BIRCHFIELD:**  Judge, if I could, as Ms. Greer
25  pointed out, I mean, I know that the lawyers and clients have

1   worked very hard to get the claims packages together and have

2   those submitted, but BrownGreer has done a phenomenal job in

3   getting this settlement process to a place where we can make

4   these interim payments in August as was originally

5   contemplated.

6           If I could, I want to just apply a verbal

7   highlighter to one aspect of Ms. Greer's report, and that is

8   the fact that these notices are posted to the primary counsel's

9   portal.  So it is very important that lawyers check this portal

10  daily because they will receive those notices.

11          It triggers appeal's time.  It triggers an

12  opportunity for them to review and make sure the information is

13  accurate.  So that's a critical component of a lawyer's

14  responsibility there to check that primary counsel portal on a

15  regular basis.

16          **THE COURT:**  Mr. Birchfield, prepare a little notice

17  for me and I'll put it on our Web site to highlight that.  It

18  doesn't need to be a large notice, but just highlight it and

19  I'll post it.

20          **MR. BIRCHFIELD:**  Thank you, Your Honor.

21          **THE COURT:**  Thank you.

22          Also, while we're giving accolades, I do

23  recognize that this case is different in the sense that it's

24  taken less than three years to be resolved.  We got this case

25  in February of 2005 and before February of 2008, the matter was

1    settled.  I think that's due, in great part, to the work of the

2    litigators and lawyers who all worked on this case.

3              My concern always about the MDL process -- I

4    think it's a very fine process -- but one problem that is

5    built-in to it is it can become a black hole or a warehouse for

6    cases that just sit and gather dust.  Because of the diligence

7    of counsel on both sides, that was not done in this particular

8    case.  I think this is a fine example of a case that has worked

9    properly.  I appreciate the work of all counsel involved in

10   this case.

11             The next one is lien administrator, any report?

12             MR. GARRETSON:  Good morning, Your Honor.  I'm Matt

13   Garretson with the Garretson firm and I'm here to report as the

14   lien resolution administrator.  I'll start with Medicare, as I

15   do each month.  At the last status hearing, I reported to the

16   Court and the parties that we had finalized a process with the

17   officials at Medicare which covers all the MI and SCD, sudden

18   cardiac death, claimants.

19             Accordingly, as Lynn Greer mentioned this

20   morning, all Medicare beneficiaries who are receiving or who

21   are staged to receive notice of points award letters are being

22   informed about the respective obligations to Medicare as part

23   of the resolution agreement we've reached with the Centers for

24   Medicare and Medicaid Services.

25             The disclosure document that Lynn mentioned and

1    showed a highlight of on the PowerPoint describes for each of

2    the claimants their respective obligations to Medicare as part

3    of the agreement, if they are, in fact, a Medicare beneficiary,

4    I should add.

5              The disclosure document also contains our

6    recommendation and an explanation to the claimants as to why we

7    feel this is in their best interest to accept the terms.

8    There's a sample for anybody who has not seen what that

9    disclosure looks like or the numbers that are associated with

10   each of the reimbursement categories.  There's a sample on the

11   attorney portal at BrownGreer.

12             So in this regard, we've worked closely with

13   BrownGreer to apply the global reimbursement categories.  We

14   have the associated reimbursement amounts locked in to the

15   appropriate VCN numbers.  It looks like everyone who is

16   approved for an interim payment, say for a few I'll mention

17   here, with respect to Medicaid, have a process in place.

18             I should also report for any counsel listening

19   out there, that we do have a call center activated now.  A

20   separate call center.  The number for that call center is on

21   the disclosure documents that the claimants are receiving.

22             That call center is focused solely on addressing

23   these health care related questions about the obligations that

24   some of these claimants have pursuant to the Vioxx settlement

25   program to reimburse government health care providers.

1              It's pretty much the same type -- we're

2    answering the same types of questions, just in live format,

3    that were addressed in the claimant disclosure document that

4    was sent in February for educational purposes, as well as the

5    materials that are going with the notice of points award.

6              So I believe that the process has been very

7    transparent, and I think it's been explained and disclosed

8    adequately to the claimants at this point.

9              With respect to Medicaid, I've been reporting at

10   the last several hearings about the states which have responded

11   to and accepted the proposed voluntary protocols which will

12   allow us to affirmatively verify and satisfy Medicaid's

13   interest in a uniform basis nationwide.

14             These protocols for addressing Medicaid were

15   developed after good counsel from both the Court and from

16   Special Master Juneo and were sent out earlier this year.

17   Forty-six agencies responded that they recognized the mutual

18   advantages and efficiencies and, of course, the

19   cost-effectiveness of agreeing with these voluntary protocols

20   and are working in a collaborative fashion with us now.

21             They're sending in their claims information that

22   I'll report here momentarily.  Six states, as I've disclosed in

23   the past, have requested compromises based on their state

24   statutes that addressed these issues in a similar way as the

25   protocol that we sent out.

1          So, technically, these states haven't agreed to

2     the protocol, but we do now have procedures in place that marry

3     up nicely to their state statute and, in fact, I believe can be

4     accommodated.  Those states are:  Ohio, Idaho, North Carolina,

5     Kentucky, and Connecticut.

6          All of those roughly have a holdback of

7     30 percent instead of the 20 percent.  We think that's very

8     manageable.  Wyoming is the only state that has rejected the

9     protocol and they have no statute in place like the five I just

10    mentioned before.

11         At this point, given that there's fewer

12    claimants in the state of Wyoming than some of the other

13    states, we're just working to secure the claims histories to

14    actually finalize those liens and do not feel that the lack of

15    a holdback is going to upset this settlement program in any way

16    with respect to Wyoming.

17         However, at the last two hearings, I had

18    reported that we were we still waiting on one agency, Texas

19    Medicaid, to respond.  In the June hearing, you graciously took

20    notice of that issue as I raised it and offered to contact the

21    individuals at Texas Medicaid so that you could urge them, and

22    I'm quoting the transcript:  "To come aboard, as it is the

23    best, most efficient way we have for dealing with this issue."

24         Before I left the courtroom in June, I actually

25    got a text message from my office, as I reported, and for a

1    lien resolution administrator, this is a real Perry Mason
2    moment when you get a text message that says, "No, no, stop.
3    We've agreed."
4            Unfortunately, I have yet to get that in writing
5    with Texas.  So at this point, any Texas Medicare beneficiary
6    who's approved for an interim payment is not receiving their
7    notice of points award letter because we've yet to get anything
8    in writing from Texas Medicaid.
9            So despite the fact that I'm a self-professed,
10   you know, internal optimist, we're not gaining any ground, Your
11   Honor.  So I think we may be maybe, in fact, at a point where
12   we need the Court's assistance so that we don't hold those
13   back.
14           **THE COURT:**  No, I'll get involved in it.  Get me a
15   copy of the e-mail that they sent you and I will remind them of
16   that and express my view that they have consented in that
17   fashion --
18           **MR. GARRETSON:**  Yes, Your Honor.
19           **THE COURT:**  -- and we can move on with Texas.
20           **MR. GARRETSON:**  I will do that.  I also wanted to
21   just pause for one moment because we're getting a lot of
22   questions from counsel as to when the liens from Medicaid will
23   be finalized within this holdback amount.  Medicare is a
24   different story, of course, because it's a number certain and
25   we're able to disclose that amount at this time.

1            With respect to Medicaid with these holdbacks in
2    place, we're getting the claims histories in, which are
3    actually hard files of medical claims history that comes into
4    our shop.  We're still receiving them in from most of the
5    states at a good clip.
6            We cannot tell counsel or the claimant what that
7    final lien amount is until we've had a chance to audit all of
8    that medical information.  But just in terms of timing for
9    that, we can't audit a final Medicaid lien until we have fully
10   received confirmation of the actual event, the category of the
11   event, and, therefore, what the compensable injury is.
12           So this process with Medicaid will evolve over
13   the next several months as claims are finalized.  I think
14   finally, as I always end with, just a quick report on other
15   governmental liens, such as VA, TriCare, and the Department of
16   Defense, we're working with each of those programs.
17           We're actually now working with several of the
18   downstream facilities in the military branches to get the final
19   lien amounts and those are -- there's nothing to report other
20   than it seems to be working fine.
21           Your Honor, in all respects, I think, other than
22   addressing these issues I've raised to you today, from our
23   perspective, the interim payments are going to continue on to
24   these government benefit entitled claimants with these
25   procedures in place.

1          **THE COURT:**  Okay.  One issue that is not before me,

2   but I take the opportunity at least to speak a bit on it, is

3   the non-governmental liens.

4               I know that they're different.  They're

5   different in privacy issues.  They're different in policy

6   provisions.  They're different in causation.  They're different

7   in the fact that not everybody is covered by them.  Therefore,

8   it presents different issues and different problems.

9               But it does seem to me -- and I've mentioned

10  this several times -- it does seem to me that it's of interest

11  to both those lienholders, as well as the plaintiffs

12  themselves, that an attempt be made to utilize some economy of

13  scale.

14              The lienholders can benefit by it if they

15  recognize that it is a benefit and, therefore, their liens can

16  reflect that.  A payout is going to tend to reflect that.  Also

17  it would be helpful from the plaintiffs who recognized in the

18  agreement that they have a responsibility to pay the

19  lienholders.

20              Obviously, they have a responsibility; and

21  they're liable to get sued in their location if they have not

22  paid back the liens.  So if it can be worked out, if you can

23  utilize your experience, and utilize the information that

24  you've gotten, and the methods that you've used, if you can be

25  of help to the non-governmental lienholders, that, I think, can

1    be helpful to the litigation as a whole.

2              But the plaintiffs have to get something out of

3    it.  They cannot not get anything out of it.  Because their

4    lawyers are then at a conflict of interest to cooperate if they

5    are not able to show to their clients that it is of great

6    benefit to them.

7              So, hopefully, that can be resolved.  I know

8    I've spoken on that in terms of both informally at our

9    meetings, as well as in opinions.  The issue is before the

10   Fifth Circuit now.  But I do think it's worthwhile for the

11   Court to at least mention what I've just mentioned.

12             **MR. GARRETSON:**  I agree.

13             **MR. SEEGER:**  Your Honor, I just want to note that

14   Matt has, in fact, been very much been involved with us and has

15   sat in on several meetings.  We have attempted to have

16   discussions.  But it's difficult though when one side doesn't

17   know who their insureds are.

18             **THE COURT:**  Sure.

19             **MR. SEEGER:**  But we're doing our best.  Thank you,

20   Judge.

21             **THE COURT:**  Good.

22             **MR. GARRETSON:**  I would just add also, Your Honor,

23   that several of the law firms involved have reached out to us

24   separately and we have pulled some of those claims for which

25   they've received notice and are setting out on a separate

1   engagement to help resolve those.  So there is some traction

2   there as well.

3              **THE COURT:**  All right.  Thank you.

4              **MR. GARRETSON:**  Thank you, Your Honor.

5              **THE COURT:**  Thank you.  Special master report?

6              **MR. JUNEAU:**  Very briefly, Your Honor.  I've been in

7   communication with BrownGreer, obviously, through this process.

8              We think we've narrowed it down.  It looks like

9   towards the end of this month, probably in the first week of

10  September, during that time frame, it looks like that there

11  will be whatever appeals have come to fruition at that point.

12  We will have -- I have also been also in contact with the other

13  two deputy special masters -- and we are prepared to handle

14  those matters promptly when they hit us.

15             BrownGreer is now filtering through those

16  claims, because some of those are resolved before they even get

17  to our state.  But the point being, Your Honor, there's a

18  system in place.  The technology is available.  I see no delay

19  at all in having these matters promptly and swiftly handled,

20  starting probably within the next three weeks.

21             **THE COURT:**  This is an important part of the program

22  because it gives credibility, and it gives some comfort, the

23  quality and experience of the special master and the deputy

24  special masters, I think, elevates this process to a fine

25  level.

1          I think that this will be an important part in

2    it.  I think your role will probably grow in importance as we

3    go into the next step.  I appreciate the work that you've done.

4          **MR. JUNEAU:**  One last item, Your Honor.  I know

5    there's been discussion about the issues of clearing up

6    deficiencies and so forth.

7          Just to notify the Court that I've advised both

8    sides, that is, while not directly on target in terms of the

9    responsibility, I'm aware of the impact it has on the overall

10   program.  And we've offered our assistance and input, whatever

11   it takes, to get that done promptly, swiftly, and to get the

12   case moving forward.

13         **THE COURT:**  I think it's not a problem presently, but

14   at least we're beginning to see a potential problem.  I think

15   it's necessary to nip it in the bud.  Because it does

16   contaminate the whole process.  While we have it in a

17   manageable format now, we better get on it rather than when it

18   becomes a crisis.

19         **MR. JUNEAU:**  I think it's definitely on everybody's

20   radar screen, Your Honor.  Thank you, Your Honor.

21         **THE COURT:**  Thank you.  State court trial settings.

22   Anything from Merck on that?  State court trial settings,

23   anything?

24         **MR. MARVIN:**  No, Your Honor.  There are no cases set

25   for trial --

1        **THE COURT:**  Class actions?

2        **MR. MARVIN:**  -- through the end of this year.

3            And as to class actions, there's no change

4   there, Your Honor.

5        **THE COURT:**  All right.  Discovery directed to third

6   parties?

7        **MR. HERMAN:**  I'm pleased to report, Your Honor, that

8   the FDA documents and that issue is now resolved.  We can

9   remove it from the status report from now on.  We appreciate

10  the U.S. Attorney's Office and the FDA for their cooperation,

11  and particularly Assistant U.S. Attorney Sharon Smith who has

12  helped this process.

13            If I may, Your Honor, I'd like to call on

14  Mr. Davis, who's been dealing with the ESI issue.  He has a

15  brief report on that.

16       **THE COURT:**  While Mr. Davis is walking to the podium,

17  I do appreciate the FDA, and particularly the U.S. Attorney's

18  Office, and the Justice Department, in general, for all their

19  assistance that they've given me, personally, in the case in

20  general on resolving this matter.  It's been very helpful.

21       **MR. DAVIS:**  Your Honor, the Court will recall that

22  pursuant to directives issued by Your Honor, a subpoena was

23  issued to ESI for various pharmacy records in the possession of

24  ESI.  As a result of ESI's actions, we did file a motion to

25  compel with the court.  The motion to compel is set for today.

1        Late yesterday afternoon, we received a response

2  that furthered some information from ESI.  We're in the process

3  of reviewing that right now, as well as BrownGreer, who spent a

4  considerable amount of time with the ESI matter.

5        We will be reviewing that and get back to the

6  Court.  If the matter could be set at a future date, maybe when

7  other matters are being set by the court, we can report back to

8  the Court whether or not that hearing date will be necessary.

9        **THE COURT:**  Okay.  I'll set the hearing date at

10  September the 3rd, and we'll put that as a hearing date for the

11  other matters.  I do appreciate ESI's additional information,

12  and I hope that that matter doesn't take court intervention.

13        This sort of situation is not pleasant for the

14  Court to have to act in a manner in which I'm ready, willing

15  and, of course, able to act in.  So I hope I don't have to do

16  that.

17        **MR. DAVIS:**  Thank you, Your Honor.

18        **THE COURT:**  Yes, sir.

19        **MR. HERMAN:**  Your Honor, just one brief comment on

20  behalf of all plaintiffs' attorneys and their clients, when the

21  health care providers and the pharmacy record providers don't

22  provide records, it means that an inequity happens.

23        Because a substantial number of claimants -- and

24  I want to emphasize the claimants here -- they can't qualify

25  for interim payments because they don't have the records to

1   qualify for interim payments.  So I'm very hopeful that the
2   representatives of ESI and the other health care providers will
3   recognize that issue.
4              Your Honor, has, on a daily basis, emphasized to
5   all of us that it's the claimants that are really the ones that
6   need to be protected here.
7              **THE COURT:**  I think this issue, aside from the fact
8   that I will issue orders and that I expect the orders to be
9   followed, the problem is is that the claimants are not
10  receiving money.  Now, when the claimants do not receive the
11  money, then they have a loss, and it's going to have to be
12  someone who's responsible to take care of that loss.
13             The money involved is such that the loss is
14  substantial.  Even if you put it at a very small interest rate,
15  it's still a considerable amount of money involved.  It's just
16  not worth future litigation developing over that matter.
17             State, federal coordination.  I'll hear from the
18  state liaison committee.
19             **MS. BARRIOS:**  Yes, Your Honor.  Dawn Barrios for the
20  state liaison committee.  If you'll give me a moment to get my
21  documents.
22             **THE COURT:**  Sure.
23             **MS. BARRIOS:**  I apologize for the delay, Your Honor.
24  I stand here to report on several matters to you.  The first
25  are the amount of remands that you technically have before you.

1   As I've done every month, technically, you have 736 cases

2   before you through CTO No. 140.  Those are contained on the two

3   CDs that I'll present to your law clerk.

4              When we began the process, we began counting

5   cases that were filed for remands, and that's how we got to the

6   736 number.  Now, we're on our second phase in trying to see

7   how many of those remands will be before you after the

8   claimants go through the settlement program.

9              So we're changing our focus on our statistics

10  and I'm going to present to your law clerk a new type of

11  spreadsheet that we've done.  We're now counting claimants.

12  We've found through, and really through the diligence of my

13  assistant Deana Fultz, we have found that many cases contain 20

14  claimants.  So we've now broken that down.

15             And she's been working weekly with BrownGreer.

16  And all the accolades that everyone's given BrownGreer, I have

17  to add another one to their pile today.  Because in the midst

18  of doing all the claims, they're dealing with us, identifying

19  the claimants that have gone through, or at least, their

20  registration and enrollment process.  So they need to be

21  commended for that as well.

22             As you can see by the sheet that I've handed

23  your law clerk, we're going now through states and we're up

24  through Hawaii.  We're now working on the additional states

25  alphabetically.

1          What it looks like, Your Honor, is the number of

2    cases that are not registered -- or number of claimants --

3    excuse me -- that are not registered or not enrolled are really

4    the third-party payor cases, some medical monitoring, some

5    Attorney General's cases, and cases that plaintiffs' counsel

6    plan to dismiss.  I called each of them to see the status of

7    their cases, and you'll be getting some motions to dismiss for

8    various reasons.

9          So I believe at the end of the day, you'll be

10   standing with merely your third-party payor cases, medical

11   monitoring, and Attorney General's cases.

12   **THE COURT:**  Okay.

13   **MS. BARRIOS:**  On the third-party payor issue, I have

14   nothing to report, and I know there'll be a report on that

15   later on.  But on the Attorney General front, at Your Honor's

16   directive, I've been coordinating with the various Attorney

17   Generals.

18          I'm very pleased to report that yesterday we had

19   a day-long meeting with representatives from the Plaintiffs'

20   Steering Committee, particularly Mr. Seeger and Mr. Davis, and

21   I'd like to commend and introduce to Your Honor the various

22   attorneys for the Attorney Generals who traveled here for that

23   meeting and are present in court today.

24          We have Mr. Stuart Kritzer on behalf of the

25   State of Colorado.

1          MR. KRITZER:  Good morning, Your Honor.
2          THE COURT:  Mr. Kritzer, good morning.  Glad you're
3   here.
4          MR. KRITZER:  Thank you, sir.
5          MS. BARRIOS:  Mr. Randy Fox for the State of New
6   York.
7          MR. FOX:  Good morning, Your Honor.
8          THE COURT:  Thank you for being here.
9          MS. BARRIOS:  Mr. Jim Fosler for the State of Alaska.
10         MR. FOSLER:  Good morning, Your Honor.
11         THE COURT:  Good morning.
12         MS. BARRIOS:  He gets the award for traveling the
13   furthest.
14         THE COURT:  Yes.
15         MS. BARRIOS:  Mr. Joe Steele for the State of Utah.
16         MR. STEELE:  Good morning, Your Honor.
17         THE COURT:  Good morning.  Welcome.
18         MS. BARRIOS:  And Mr. Pete Miller from the State of
19   Montana.
20         MR. MILLER:  Good morning, Your Honor.
21         THE COURT:  We welcome you, sir.
22         MS. BARRIOS:  We worked diligently yesterday, as I've
23   said, and we've spoken with Mr. Beisner this morning.  We're
24   going to set up a conference call to move along with your
25   directive to trying to determine if there are common issues

1   that can have discovery conducted before Your Honor.

2                       As you might imagine, there are various views

3   from the various Attorneys General and we're trying to gain a

4   consensus.

5           **THE COURT:**  My view of it is is that you're here now

6   and before we focus with a laser type eye on the question of

7   remand, you might as well at least explore whether or not

8   there's any advantage to being here.

9                       From my vantage point, if I can give you some

10  global opportunities and the economy of scale can work in your

11  advantage, then you want to take advantage of it.  I know that

12  everybody likes home cooking and we tend to gravitate to our

13  own kitchen; but there are some benefits to new cuisine, and

14  you might as well take advantage of it if it's here.

15          **MS. BARRIOS:**  Especially New Orleans cuisine, Your

16  Honor.

17          **THE COURT:**  Right.  So what I'm focused on is whether

18  I can be of help on common issues of discovery; and also if it

19  can give you an opportunity to, as a group, look at these

20  matters and come up with some global resolution that is both

21  quick and also best for your citizens.

22                      That's what I offer you and I think you ought to

23  take a look at it before you enthusiastically look in another

24  forum.

25          **MS. BARRIOS:**  Your Honor, one last matter, we have

1    added another AG action onto our list, so now we're up to

2    eight.  We discovered that the District of Columbia has a

3    private Attorney General's action represented by Ashcraft and

4    Gerel.  So they'll be joining us along with Mr. Dugan from

5    Louisiana.

6                    Thank you.

7              **THE COURT:**  Great.  Thank you.  Pro se?

8              **MR. HERMAN:**  I wanted to just make one footnote.  I'm

9    glad you put Mr. Dugan in the gumbo for Louisiana.  But I have

10   one footnote, the Attorneys General's access to MDL PSC work

11   product is a bit different than third parties because they are

12   not adverse, as far as we can tell, to the claimants for whom

13   the PSC was employed to get the product.  Whereas the

14   third-party insurers are adverse to the claimants in that their

15   job is to diminish payments that go to claimants.

16                   Nevertheless, there is some issue as to sharing

17   work product with AGs.  First of all, if they're going to take

18   MDL work product and then go litigate in the states, that's a

19   problem.  Secondly, we have certain confidentiality orders in

20   place with Merck, so there would have to be a conference on

21   those and Your Honor consulted.

22                   Thirdly, somebody has to provide the Court,

23   perhaps under seal or in camera, contracts from each of these

24   AGs indicating that whoever it is represents the AG, represents

25   the AG.  It's not necessary for us to look at that, but we need

1    to be assured that there aren't some political problems as we
2    have elections coming up and there may be some transitions.
3              Lastly, it would be very beneficial if they
4    decide that they want to litigate any of them in federal court
5    with an MDL product, assuming all the other issues can be
6    worked out, if they have a joint prosecution agreement so that
7    we don't have to, and Merck doesn't have to, every time a
8    request is made go through new confidentiality orders with each
9    individual claimant.
10             On the other hand, we do want to affirm that the
11   depository's open.  The documents are preserved.  The work
12   product is preserved.
13             Lastly, the PSC has not met on the issue of
14   access, but we will have, in our regular conference by phone
15   next week, a discussion about that.
16             THE COURT:  Anything from the pro se administrator?
17             MR. JOHNSTON:  Your Honor, Bob Johnston, counsel for
18   the pro se plaintiffs.  We've provided to the Court the Status
19   Report No. 5.  Let me just go over a few things.
20             We continue to get active communications.  I
21   understand that some are directed to the court, which your
22   staff then sends back to us and we deal with the pro se's.
23   Particularly after the court's order denying individual access
24   to the claims administrator's portal, we sometimes get 15 to 30
25   calls a day.  Some of those are what we call "regulars" and we

1  continue to deal with them, hopefully, with some degree of
2  efficiency.
3          We continue to receive calls requesting
4  duplicate enrollment claims forms.  We either provide those or
5  we forward the request to the claims administrator.
6          I just want to simply stress that we have a
7  terrific relationship with the claims administrator.  You've
8  heard a lot of compliments; they're very deserved.  From my
9  position as court-appointed curator for the pro se's, I don't
10 think it could work any better than it works.
11         Concerning legal notice publications, we are up
12 to 269 notices in newspapers all around the country.  Those
13 include those that have already run and those that will run by
14 the end of the month.  That has triggered a bunch of calls from
15 people.
16         The way we work regarding these communications
17 is that we maintain a contemporaneous communications log.  That
18 log is also available through the claims administrator's
19 portal.  At the end of my duties as the court-appointed
20 attorney for the pro se's, we will submit the entire
21 communications log to the court.
22         Regarding any documents or communications that
23 are forwarded by potential pro se claimants, we forward those
24 to the claims administrator's office.  So once again, the
25 system is working, basically.

1          Now, in the court's order in February,

2    February 12th, 2008, the curator was directed to assist

3    potential pro se's and pro se's by providing the names of

4    attorneys in the region where that individual resides.  We have

5    a current list of attorneys who have handled Vioxx litigation

6    and we provide that information.

7          And as I said at the beginning, there's been an

8    uptick of the calls following the court's order denying the

9    access.  I think that's basically it.  I think that the system

10   continues to work well and we'll continue to do the best we can

11   to represent their interest in the context of the matter.

12        **THE COURT:**  All right.  Thank you for your work on

13   this.  I'm trying to make this user-friendly from the

14   standpoint of the pro se's, people who either don't know

15   lawyers or don't know how to reach lawyers.  We've given them

16   another opportunity to weigh-in in the system, and I appreciate

17   all of your responsive work to their needs.

18        **MR. JOHNSTON:**  Thank you, Judge.

19        **THE COURT:**  Any Merck motions?

20        **MR. MARVIN:**  No change there, Your Honor.

21        **THE COURT:**  Okay.  Any issues relating to Pretrial

22   Order No. 9?

23        **MR. MARVIN:**  No.

24        **MR. HERMAN:**  No, Your Honor.

25        **THE COURT:**  What about Vioxx statistics, anything on

1   there?

2          **MR. MARVIN:**  Your Honor, we can report that as of

3   June 30th, there were pending 13,750 lawsuits, which includes

4   approximately 31,750 plaintiffs.  Of that number for the MDL,

5   there are 9,225 lawsuits in the MDL, and 24,000 claimants.

6               In New Jersey, the next largest coordinated

7   proceeding, there are 2,675 lawsuits, the same number of

8   plaintiff groups.  And then finally, Your Honor, in terms of

9   the number of the claims, there are 12,750 claimants who have

10  entered into tolling agreements.

11              While we've been talking about the number of

12  claims pending, the 31,750 claims pending, we should also

13  mention that 22,300 have been dismissed; 2,950 of those

14  dismissals are with prejudice; 19,350 have been dismissed

15  without prejudice.  Of that number of 19,350, there are 11,800

16  who have been dismissed in New Jersey since they've enrolled in

17  the program and those dismissals have been entered for

18  administrative reasons.

19          **THE COURT:**  Okay.  Anything on the MDL trial package?

20          **MR. HERMAN:**  No, Your Honor.

21          **THE COURT:**  All right.  What about third-party payor

22  claims, next item on the agenda?

23          **MR. HERMAN:**  Mr.  Dugan is present in court.

24          **THE COURT:**  All right.

25          **MR. DUGAN:**  Good morning, Your Honor.  James Dugan on

1   behalf of the Louisiana Attorney General.

2           As Your Honor knows, we met at a status

3   conference on July the 11th.  You ordered the parties to meet

4   and confer on potential common discovery issues.  I met with --

5   we had a call with Mr. Beisner; and after the call, I followed

6   up with a letter.

7           And I would like to state, again, for the

8   record, Your Honor, that it's the Louisiana Attorney General's

9   position that the motion to remand is purely jurisdictional and

10  that it's ripe for argument.

11          THE COURT:  Right.

12          MR. DUGAN:  With all due respect and deference to

13  Your Honor, we're engaging in this process; but as the process

14  goes along, obviously, more issues come up.  The assessment

15  issue has now surfaced, which is something that we're all going

16  to have to undertake.  Mr. Herman brought up the contract

17  issue, which all these particular states are going to have to

18  deal with.

19          So I'm still of the opinion, Your Honor, before

20  we go down that path, it would absolutely be the preference of

21  the Louisiana Attorney General to have the motion to remand

22  heard.

23          THE COURT:  Yes.  But some of those issues that you

24  make are common to everybody.  I've been living with this

25  litigation now for three years, and I'm pretty much ready to

1    rule if you present me with a motion.  So on those kinds of
2    issues, I'll deal with them immediately, as opposed to someone
3    who is not familiar with the litigation, having to do a lot of
4    research and take a lot of time and have some inconsistencies
5    in those areas.
6              I think it can be handled more easily by one
7    court.  I understand your position and I appreciate you making
8    it.
9              **MR. DUGAN:**  I agree, Your Honor.  Just to make three
10   more points, which is:  Number one, we had requested from Merck
11   that if we were going to go down this path and engage in some
12   type of common discovery, that we enter into some type of joint
13   stipulation with Merck that somehow that limited discovery
14   would not be used against the various states in their motions
15   to remand.
16             And then, secondly --
17             **THE COURT:**  I don't have any problem with that.  I
18   don't necessarily need Merck to deal with it.  I can say that
19   that's not going to happen.
20             **MR. DUGAN:**  Okay.  Great, Your Honor.
21             **THE COURT:**  So you can get some comfort in filing a
22   motion that the fact that you're participating in discovery
23   does not mean that you give up your right or give up any
24   rights.  I don't see you giving up any rights.  I just see it
25   as an opportunity that you're here.

1          You might as well, as I say, look around and see

2     if there's an advantage.  If there isn't, then I'll deal with

3     the motions one way or another.  But before I even deal with

4     them, you ought to at least look at that and see whether or not

5     there's an advantage for being in a forum that so much has gone

6     on with the process that you don't have to start from square

7     one, and there's some advantages to that.  I hope you get, at

8     least, my suggestion.

9          MR. DUGAN:  No, we agree with that, Your Honor.  So,

10    as you know, we've requested two things from the defendants

11    which is:  Number one, the index and production logs that

12    they've produced in the MDL and the New Jersey state court

13    litigation so we could take a picture and see what's out there.

14         Secondly, we've requested from Merck all of the

15    information that they've produced to the state Attorney

16    Generals who participated in the multi-state settlement.  We

17    think with those two areas of information, it would be a really

18    good start for us to decide what common issues of discovery

19    that we can proceed upon.

20         THE COURT:  I suggest that you get with Merck, talk

21    about it.  If there are any difficulties or disputes, then get

22    to me and I'll have a status conference and I'll talk with both

23    of you-all and we'll work through that.  Let's not necessarily

24    file any motions until you have the status conference.

25         I've been dealing with those matters a little

 1   more efficiently than the traditional motion.  So talk with
 2   them, see if you can resolve it.  If you can't resolve it, then
 3   get to me in a status conference and I'll resolve it.
 4            **MR. DUGAN:**  Thank you, Your Honor.
 5            **THE COURT:**  Motions to dismiss foreign individual
 6   claims?
 7            **MR. MARVIN:**  Yes, Your Honor.  You recall that at the
 8   last status conference we argued several motions to dismiss the
 9   claims of foreign individuals.  At that time one counsel could
10   not be present who has multiple claimants there, and that same
11   counsel cannot be present today as well.
12                 We also agreed to review the motions with
13   respect to several claimants who contended that they had
14   sufficient contacts with the United States.  What we'd like to
15   do on that, Your Honor, if we could put that over to a special
16   date in September --
17            **THE COURT:**  Let's do that on September the 3rd.
18            **MR. MARVIN:**  That will be fine, Your Honor.  We'll go
19   ahead and submit an order to you setting that date for the
20   motion on the foreign claimants.
21            **THE COURT:**  Okay.  I'll deal with it.  Termination of
22   tolling agreements, while you're there?
23            **MR. MARVIN:**  Yes, Your Honor.  The tolling agreement
24   has been terminated.  And just further announce that Merck is
25   not accepting any further claims under the tolling agreement.

1        **THE COURT:**  And that information and notice has gone
2   out to the proper parties?
3        **MR. MARVIN:**  Yes, it has, Your Honor.
4        **THE COURT:**  Third-party payor motions, anything on
5   this?
6        **MR. HERMAN:**  Ms. Garsaud will address that.
7        **THE COURT:**  All right.  Good.
8        **MS. GARSAUD:**  Good morning, Your Honor.  Monique
9   Garsaud on behalf of BrownGreer -- excuse me -- U.S. Bank.
10  Your Honor, as you know, there have been two lawsuits filed in
11  your court from two separate groups seeking to enjoin my
12  clients from making the initial payments.  And as you know,
13  there's an a flurry of activity, particularly in the Av-Med
14  group.
15       Yesterday, the Fifth Circuit came down with
16  several rulings.  One of them was to deny Av-Med's motion to
17  stay; and the second ruling was to grant Av-Med's motion for
18  expedited appeal.
19       In that record order, the court also set a
20  briefing schedule which sets forth that Av-Med's brief is due
21  October 9th, and then our response brief will be due
22  October 16th.  The court anticipates that the oral argument
23  will be heard the first week of November.  We're still waiting
24  for a firm date.
25       Your Honor, in regards to the second group,

1    which I refer to as the New York Employee Benefits Fund Group,

2    we have not heard any word from them regarding the position

3    they're going to take on your prior rulings, which was to grant

4    the motion to strike the class allegations and then to deny

5    their request for preliminary injunction.

6              **THE COURT:**  Is anybody here representing those

7    individuals?

8              **MS. DIETZ:**  There is, Your Honor.

9              **THE COURT:**  Okay.  Do you want to speak on that?

10             **MS. DIETZ:**  Yes.  Good morning, Your Honor.  Rebecca

11   Dietz on behalf of the New York Fund, we'll call them this

12   morning.

13             **THE COURT:**  All right.

14             **MS. DIETZ:**  I just wanted to take the opportunity

15   today, actually, to clarify a few housekeeping issues, we'll

16   call them, on Your Honor's August 7th opinion.  As you know,

17   you heard various motions filed by and against my clients on

18   July 24th and issued an order and opinion later on August 7th.

19                  The first issue I would like to address is that

20   at the hearing on the motion for preliminary injunction, my

21   clients requested a stay of the proceedings pending appeal

22   also, and the opinion didn't address our request.

23             **THE COURT:**  Okay.

24             **MS. DIETZ:**  So what I'd like to request is just a

25   simple order.  I assume you intended to deny our request as

1  well.

2          **THE COURT:**  Yes, I did.  I'll make that clear.

3          **MS. DIETZ:**  Thank you, Your Honor.  Also, my second

4  point of clarification is that we understood, and based on

5  Mr. Ard's understanding also, that you granted the defendant's

6  motion to strike our class allegations.  That's also not clear

7  from the opinion.  The opinion seems to contemplate a further

8  written opinion on the issue.

9          We certainly wouldn't oppose any reconsideration

10  of that decision, but to the extent you did rule granting the

11  motion to strike, we would ask for just a simple order on that

12  point to pursue the appeal.

13          We certainly don't want to rush any written

14  opinion by Your Honor, but to the extent we could just get an

15  order, that's our request.

16          **THE COURT:**  Your appeal, as I see it, is a 23(f) as

17  opposed to 54(b).

18          **MS. DIETZ:**  Actually, that was my next point, is it

19  would be a 54(b).

20          **THE COURT:**  Well, I'm not sure a 54(b).  It seems to

21  me that 23(f) deals with the appeal.  I don't know whether

22  there's any 54(b) anymore for class actions in view of the

23  23(f) application.  But I'll hear from the --

24          **MS. DIETZ:**  I'll briefly say --

25          **MR. HERMAN:**  Mr. Levin will address that, Your Honor.

1      **MR. LEVIN:**  Your Honor, even before 23(f), 54(b) was
2   not an avenue for appealing a class action.
3      **THE COURT:**  Right.
4      **MR. LEVIN:**  Denial and the striking of the class is
5   the same thing in essence of the denial.  So I think 23(f)
6   would have to be the vehicle and we'd oppose it.
7      **MS. DIETZ:**  If we could, your Honor, we'd like the
8   time to submit a formal request for a 54(b) and then get an
9   actual ruling on that issue as well, as opposed to arguing that
10  here and taking up the time of everyone else.
11          Finally, I guess, as the case stands now, it's
12  our understanding that we have an amended complaint pending
13  that we haven't received responsive pleadings to.  That easily
14  could be an issue that counsel can resolve.
15          But it's our understanding that it is out there.
16  And we'd like to pursue the case and pursue discovery
17  conference and get things moving.  So that's our understanding,
18  and that's a housekeeping issue we can deal with with counsel.
19     **MR. LEVIN:**  For purposes of housekeeping then, our
20  motions to dismiss as to the original complaint are equally
21  applicable to the amended complaint because we did not see any
22  material differences in the two complaints.
23     **THE COURT:**  Okay.
24     **MS. GARSAUD:**  We concur with Mr. Levin's comments.
25     **MS. DIETZ:**  That was what we understood probably was

1    the intention.  We just wanted to clarify and actually see if

2    we could go ahead and set a briefing schedule and a hearing

3    date on the motion to dismiss so that we can, again, get the

4    ball moving.

5              But the motion to strike class allegations is

6    what I understand Your Honor ruled on, not the motion to

7    dismiss.  We didn't brief that.  The motion to dismiss the

8    entire complaint.

9         **THE COURT:**  I'll look it over.  I thought I treated

10   it, but I'll look it over with your comments in mind.

11        **MS. DIETZ:**  Okay.  Thank you.

12        **THE COURT:**  All right.  Thank you.

13        **MR. HERMAN:**  Your Honor, I feel a little weak-kneed.

14   It's always difficult when I have to follow two folks that are

15   younger than I am, who are brighter than I am, and better

16   looking.  So, nevertheless, Your Honor, I do have one statement

17   to make about the Av-Med brief that's been filed.

18             I thought -- maybe I shouldn't, but I think I

19   will -- not necessarily on behalf of myself, but behalf of the

20   plaintiff bar, I'm a dyed-in-the-wool plaintiff lawyer.  We've

21   done that in our firm for over 70 years.  I've been in this

22   court for 42 years.

23             I have never, except in this case by Mr. Susman,

24   been ever accused of putting my fees ahead of my clients.  I

25   find the statement made in brief to the Fifth Circuit

1   defamatory, particularly because we don't have an opportunity
2   even to address it, not that it needs addressing.
3            So I'd just like Mr. Susman to know, on behalf
4   of the 893 plaintiff lawyers who have litigated in Vioxx and
5   represented their clients, that I don't know how that part of
6   his brief got through the spam control in my office on the
7   computer, but it did, and I have no further response to make
8   about the Av-Med brief.
9            **THE COURT:**  All right.  Merck's motion to dismiss
10  cases for non-registrants.
11           **MS. WIMBERLY:**  Yes, Your Honor, as the court recalls,
12  Merck filed this motion for a rule to show cause why
13  approximately 600 claims should not be dismissed for failure to
14  register.  That was filed at the end of May, was amended in
15  June, and then was continued from the last conference as we're
16  attempting to continue to whittle down that list.
17           At the present time, we are down to 320
18  plaintiffs who have, not only failed to register, but have also
19  provided absolutely no response to the rule.  We have another
20  approximately 60 to 70 claimants who have filed an opposition
21  and that we are working through and we believe will all be
22  resolved, and that includes cases by the Lamb firm, which we
23  have some issues with trying to identify the particular parties
24  involved.
25           It's our understanding that the Court is going

1   to roll all of these over to the September 3rd hearing date.

2          **THE COURT:**  Right.

3          **MS. WIMBERLY:**  And we would like to meet with someone

4   from the Lamb firm on not only the foreign non-issues, but also

5   their non-registrants on the rule.

6                And then one final group of cases that we feel

7   will be resolved prior to the September 3rd hearing deal with

8   cases filed by the Jeffrey Lowe or Casey Flynn cases where they

9   have duplicate cases where they've registered one but not the

10  other.  That's really more of a housekeeping matter that we're

11  certain we'll resolve prior to that.

12               But, Your Honor, it's our intention to provide

13  to the court this afternoon an order continuing and resetting

14  the rule as to the remaining 320 plus plaintiffs who have not

15  responded and have not opposed to set that for September 3rd as

16  well.

17               In the meantime, we'll continue to work with

18  Mr. Davis and his office and try to whittle down these down

19  further.  We are still accepting registrations.  If anyone who

20  receives the order setting this yet again would like to

21  register, then they need to get in touch with BrownGreer and do

22  so, which would remove them from the rule on September 3rd.

23          **THE COURT:**  On September 3rd, just be prepared to

24  show the notices, and the nature, and times, and things of that

25  sort, and articulate the specifics of each case so that I can

1    take action on it.

2          **MR. HERMAN:**  May it please the Court, Your Honor,

3    Mr. Davis will facilitate getting in touch with Archie Lamb,

4    who's a senior partner of the Lamb firm, and making sure that

5    they communicate directly with Dorothy and get this issue

6    resolved.

7          **THE COURT:**  All right.  Anything on the New York

8    Benefit Fund?

9          **MS. DIETZ:**  Your Honor, we just went through that,

10   but if I could be heard just briefly.

11         **THE COURT:**  Okay.

12         **MS. DIETZ:**  In light of Mr. Herman's comments, I'd

13   like to further distinguish my clients from the Av-Med group.

14   We have not filed Fifth Circuit pleadings yet, nor did we seek

15   mandamus with this court.  We have similar claims, but we are

16   two different groups with slightly different objectives.

17                I'd also like to request that to the extent

18   defendant's motion to dismiss has not been heard or ruled on

19   that we have an opportunity to be heard on that issue before

20   the Court issues a ruling.

21         **THE COURT:**  Okay.

22         **MS. DIETZ:**  Thank you.

23         **THE COURT:**  Yes, ma'am.

24         **MR. HERMAN:**  Your Honor, there's one matter -- Doug,

25   go ahead.

1          **MR. MARVIN:**  Your Honor, with respect to Item XX, if
2    I'm reading my Roman Numerals correctly here --

3          **THE COURT:**  Right.

4          **MR. MARVIN:**  -- is the motion with respect to
5    claimants who cannot be found.  A number of plaintiffs' counsel
6    have filed motions to withdraw because they aren't able to find
7    their counsel -- find their client or otherwise communicate
8    with that client.

9              What we would ask there, Your Honor, is to put
10   in place an order to show cause that would be heard at the next
11   status conference as to why those claims cannot be dismissed
12   because the clients cannot be found.

13         **THE COURT:**  Why don't you file that.  I'll do that.
14   There's also a handful of cases seeking extension of time of
15   the *Lone Pine* orders.  What's the situation with that, Doug?
16   Our records indicate that there's about five cases that are
17   involved.  They just need more time.  They're not objecting to
18   it, they just need more time.

19         **MR. MARVIN:**  Your Honor, if they would just contact
20   us and let us know how much time they would need, I think we
21   would be able to work that out.

22         **THE COURT:**  Okay.

23         **MR. HERMAN:**  Your Honor, there is one matter not
24   listed that Your Honor brought to our attention earlier and
25   that is we request that we have more briefing time and time to

1   meet with the two law firms and the DecisionQuest people and

2   file our opposition to be heard on the date of the next status

3   conference which Your Honor selects.

4           **THE COURT:**  Yes, I do have that.  That's fine.  I'll

5   do that.  The next status conference will be on September 23rd.

6   I'll meet with the parties at 8:30 and meet in open court at

7   9:00.

8           Anything more on the matter?  Anything that

9   hasn't been talked about?  Anything that anyone in the audience

10  would like to suggest or add to discuss with the Court?  One of

11  the reasons I have these in open court is not only to hear from

12  the liaison counsel, but also to hear from anyone who has any

13  issue that needs to be vetted.

14          Thank you very much.  I appreciate it.  The

15  court will stand in recess.

16          **THE DEPUTY CLERK:**  All rise.

17          **(WHEREUPON, the Court was adjourned.)**

18                          *****

19                        **CERTIFICATE**
         I, Jodi Simcox, RMR, FCRR, Official Court Reporter
20  for the United States District Court, Eastern District of
    Louisiana, do hereby certify that the foregoing is a true and
21  correct transcript, to the best of my ability and
    understanding, from the record of the proceedings in the
22  above-entitled and numbered matter.

23

24
                       S/ Jodi Simcox, RMR, FCRR
25                     Jodi Simcox, RMR, FCRR
                       Official Court Reporter