```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
 2
        *********************************************************
 3

 4   IN RE:  VIOXX PRODUCTS              MDL No. 1657
        LIABILITY LITIGATION            Section: "L"
 5                                      New Orleans, Louisiana
                                        Thursday, February 24, 2011
 6
        *********************************************************
 7

 8     TRANSCRIPT OF MONTHLY STATUS CONFERENCE PROCEEDINGS AND MOTIONS
              HEARD BEFORE THE HONORABLE ELDON E. FALLON
 9                    UNITED STATES DISTRICT JUDGE

10

11   APPEARANCES:

12   FOR THE PLAINTIFFS
        LIAISON COMMITTEE:              HERMAN, HERMAN, KATZ & COTLAR
13                                      BY:  RUSS HERMAN, ESQ.
                                            LEONARD A. DAVIS, ESQ.
14                                      820 O'Keefe Avenue
                                        New Orleans, LA 70113
15
                                        BEASLEY, ALLEN, CROW,
16                                      METHVIN, PORTIS & MILES
                                        BY:  ANDY D. BIRCHFIELD, JR., ESQ.
17                                      218 Commerce St.
                                        Montgomery, AL 36104
18
        FOR THE STATE LIAISON
19      COMMITTEE:                      BARRIOS, KINGSDORF & CASTEIX
                                        BY:  DAWN M. BARRIOS, ESQ.
20                                      701 Poydras Street, Suite 3650
                                        One Shell Square
21                                      New Orleans, LA 70139

22
        FOR THE DEFENDANTS
23      LIAISON COMMITTEE:              WILLIAMS & CONNOLLY
                                        BY:  DOUGLAS R. MARVIN, ESQ.
24                                      725 12th Street, N.W.
                                        Washington, D.C. 20005
25
```

```
 1                                   SKADDEN
                                     BY:  JOHN H. BEISNER, ESQ.
 2                                   1440 New York Avenue, N.W.
                                     Washington, D.C. 20005
 3
                                     DECHERT
 4                                   BY:  EBEN S. FLASTER, ESQ.
                                     Cira Centre
 5                                   2929 Arch Street
                                     Philadelphia, PA 19104-2808
 6
                                     STONE, PIGMAN, WALTHER, WITTMANN
 7                                   BY:  DOROTHY H. WIMBERLY, ESQ.
                                     546 Carondelet Street
 8                                   New Orleans, LA 70130

 9   CURATOR FOR PRO SE
     PLAINTIFFS:                     LAW OFFICE OF ROBERT M. JOHNSTON
10                                   BY:  ROBERT M. JOHNSTON, ESQ.
                                     400 Poydras Street, Suite 2450
11                                   New Orleans, LA 70130

12   SPECIAL MASTER:                 PATRICK A. JUNEAU, ESQ.
                                     1018 Harding St., Suite 202
13                                   Lafayette, LA 70503

14   FOR VARIOUS PLAINTIFFS:         OLDFATHER LAW FIRM
                                     BY:  ANN B. OLDFATHER, ESQ.
15                                   1330 South Third Street
                                     Louisville, Kentucky 40208
16
     PARTICIPANTS IN THE A.G. CONFERENCE HELD IN CHAMBERS AND BY
17   TELEPHONE:

18
     FOR THE U.S. ATTORNEYS
19   OFFICE - BOSTON, MA:            UNITED STATES ATTORNEY'S OFFICE
                                     BY:  STEPHANIE WINKLER, ESQ.
20                                   CHIEF, HEALTH CARE FRAUD UNIT
                                     408 Atlantic Avenue, 5th Floor
21                                   Boston, MA 02210

22   FOR THE ATTORNEY GENERAL
     OF MASSACHUSETTS:               OFFICE OF THE ATTORNEY GENERAL
23                                   OF MASSACHUSETTS
                                     BY:  ROBERT PATTEN, ESQ.
24                                   One Ashburton Place
                                     Boston, MA 02108-1518
25
```

```
 1   FOR THE STATE OF LOUISIANA:      DUGAN LAW FIRM
                                      BY:  JAMES R. DUGAN, II, ESQ.
 2                                    650 Poydras St., Suite 2150
                                      New Orleans, LA 70130
 3
     FOR THE STATE OF NEW YORK:       DEWEY & LeBOEUF
 4                                    BY:  RANDALL M. FOX, ESQ.
                                      1301 Avenue of the Americas
 5                                    New York, NY 10019-6092

 6   FLORIDA ATTORNEY
     GENERAL'S OFFICE:                OFFICE OF ATTORNEY GENERAL
 7                                    BY:  ELIZABETH ARTHUR, ESQ.
                                      The Capitol PL-01
 8                                    Tallahassee, FL 32399-1050

 9   FOR THE COMMONWEALTH OF
     PENNSYLVANIA:                    COHEN, PLACITELLA & ROTH
10                                    BY:  HARRY M. ROTH, ESQ.
                                           MICHAEL COREN, ESQ.
11                                    Two Commerce Square
                                      2001 Market St., Suite 2900
12                                    Philadelphia, PA 19103

13   FOR THE STATE OF UTAH:           DAVID R. STALLARD, ESQ.
                                      3238 Big Spruce Way
14                                    Park City, UT 84098

15
     FOR THE STATE OF MONTANA:        ROSSBACH, HART, BECHTOLD
16                                    BY:  WILLIAM A. ROSSBACH, ESQ.
                                      P.O. Box 8988
17                                    Missoula, MT 59807-8988

18   FOR THE COMMONWEALTH OF
     KENTUCKY:                        GARMER AND PRATHER
19                                    BY:  WILLIAM R. GARMER, ESQ.
                                      141 North Broadway
20                                    Lexington, KY 40507

21                                    HARE, WYNN, NEWELL & NEWTON
                                      BY:  SCOTT A. POWELL, ESQ.
22                                         BRIAN M. VINES, ESQ.
                                      2025 3rd Avenue North, Suite 800
23                                    Birmingham, AL 35203

24

25
```

```
 1
     FOR SANTA CLARA COUNTY:        OFFICE OF COUNT COUNSEL
 2                                  COUNTY OF SANTA CLARA
                                    BY:  MARCY L. BERKMAN, ESQ.
 3                                  70 West Hedding St.
                                    East Wing, 9th Floor
 4                                  San Jose, CA 95110

 5


 6
     Official Court Reporter:       Karen A. Ibos, CCR, RPR, CRR
 7                                  500 Poydras Street, Room HB-406
                                    New Orleans, Louisiana 70130
 8                                  (504) 589-7776

 9

10        Proceedings recorded by mechanical stenography, transcript
     produced by computer.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>P R O C E E D I N G S</u>

(THURSDAY, FEBRUARY 24, 2011)

(MONTHLY STATUS CONFERENCE AND MOTIONS)


     (OPEN COURT.)

          THE COURT:  Be seated, please.  Good morning, ladies and

gentlemen.  Call the case.

          THE DEPUTY CLERK:  MDL No. 1657, *in re:  Vioxx.*

          THE COURT:  Counsel make their appearance for the record.

          MR. HERMAN:  May it please the court, good morning, Judge

Fallon, Russ Herman for plaintiffs.

          MR. MARVIN:  Good morning, your Honor, Douglas Marvin for

Merck.

          THE COURT:  We're here today for the monthly status

conference.  I met with the lead liaison counsel a moment ago and

discussed with them a proposed agenda.  I received a draft from

them.  I'll take it in the order suggested.

          The Settlement Program, any report on that?

          MR. HERMAN:  May it please the court, from the PSC

there's nothing new.

          MR. MARVIN:  No, your Honor.  From Merck we understand

that the program is almost concluded.  The only issue that remains

that BrownGreer is dealing with are a couple of state issues for

claimants who have not yet been able to appoint representatives,

but that's winding its way through the state process, so my

1    understanding is everything is on track.

2         THE COURT:  Right.  I received word from BrownGreer that

3    they advised that all claims under the program have been processed

4    and there are just a few that are going through the administrative

5    requirements of their respective states.  But as I understand it,

6    all of the claims have been processed.

7         Lien Administrator, are there any issues on that that we

8    need to deal with?

9         What about the Special Master, any report?

10        MR. JUNEAU:  Your Honor, the matter has kind of shifted

11   gears now into the matters that extensively involve the Attorney

12   General matters and fee disputes matters.  Those matters, some of

13   those matters are going to be addressed today, we've already had

14   extensive meetings and it's an active item right now.  But insofar

15   as the actual program, we finished the duties in that regard.

16        THE COURT:  That aspect of the case, like a lot of

17   others, worked very well.  I think that the special master served a

18   significant role, they gave the opportunity to claimants to appeal

19   and have another level of due process.  And the special master is

20   made up of Mr. Juneau, the special master, and two deputy special

21   masters:  one from New Jersey and the other one from California,

22   and they met together both in person as well as online and were

23   able to process thousands of appeals.  And efficiently.  So I

24   appreciate your work.

25        MR. JUNEAU:  Thank you, your Honor.

```
 1                THE COURT:  Anything on Class Actions?

 2                MR. HERMAN:  No, your Honor.

 3                THE COURT:  State/Federal coordination, anything, Dawn,

 4      on that?  Is Dawn with us?

 5                MR. HERMAN:  Your Honor, I understand there may be a

 6      report as to Attorneys General by Dawn when we get to governmental

 7      actions.

 8                THE COURT:  First from State/Federal Coordination,

 9      anything on that, Dawn?

10                MS. BARRIOS:  Yes, your Honor.  Sorry for the delay.

11      Dawn Barrios for the Federal State Committee.  We have our CD, all

12      information through the December 9th, 2010, transfer order.  There

13      have been no further transfer orders since that time.  We continue

14      to update the database, remove cases and clean it up for eventual

15      resolution and conclusion of this MDL.

16                The last status conference I reported that we had 244

17      cases with pending remands, today we only have 118.  And last time

18      I reported that we had 425 plaintiffs, now we only have 184.  So

19      we're really whittling them down, and many thanks to Ms. Wimberly

20      who is filing all of the motions to dismiss.

21                We have seven remand cases where all of the plaintiffs

22      have been terminated but they're still open on the docket, and I

23      usually give that to your law clerk and he can close it.

24                THE COURT:  Okay.

25                MS. BARRIOS:  And, your Honor, at the last status
```

1    conference Ms. Oldfather had raised an issue of discrepancy between

2    my numbers and her numbers.  She and I had a discussion, I

3    explained that my numbers come from PACER, I had a discussion with

4    Ms. Wimberly, Merck's numbers and my numbers coincide, so I wanted

5    to make that clear because there was a notation in the joint report

6    that there were 500 cases open and my research does not reveal that

7    there are 500 cases open.

8            THE COURT:  We're getting to that point and we've got to

9    focus on the cases that are remaining.  We started with about

10   50,000 cases and now we're down to the hundreds.  There are three

11   levels, one is the Attorney Generals issues and then the consumer

12   issues, and then there are some cases that are individual cases

13   that we have been focused on also.

14           The next item is Pro Se, anything on pro se plaintiffs?

15           MR. JOHNSTON:  Your Honor, Bob Johnston, curator for the

16   pro ses.  I can report that as I've indicated in the previous few

17   months the numbers continue to go down.  We have some days where we

18   don't get any phone calls, and it is I think indicative of where we

19   are in the process; and there's really -- status quo is what we

20   have, and there's nothing more than I think that needs to be

21   brought to the attention of the court.

22           THE COURT:  And I appreciate your work on it, too, this

23   was very helpful.  We had a number of individuals who just needed

24   to talk to somebody --

25           MR. JOHNSTON:  Oh, yes.

```
 1              THE COURT:  -- and understand what the process was, and I
 2     know you've given them comfort and explained the situation to them
 3     and that was very helpful, and I appreciate it.
 4              MR. JOHNSTON:  Thank you, your Honor.
 5              THE COURT:  Governmental Actions, anything?  Any
 6     Governmental Actions?  Dawn, is that yours, too?  She is outside.
 7              The personal injury cases subject to 28, 29 and 43.
 8              MR. HERMAN:  I'll defer to Mr. Marvin and then I'll have
 9     a report, your Honor.
10              MR. MARVIN:  Your Honor, my understanding is that the
11     court would like to see the parties about the remaining cases.
12              THE COURT:  Yes.  There are several remaining cases and
13     we've got to deal with those cases.  Some of the cases have been
14     around for a long period of time and we're now at the end game, and
15     I want to meet with counsel and get their suggestions as to what we
16     do and how we deal with the remaining cases.  I set a status
17     conference for that purpose next week I think it is, next week,
18     March 2nd.  And at that point I'll be meeting with counsel to talk
19     about scheduling those cases and I'll hear from each side.
20              Ms. Oldfather, do you have any report?
21              MS. OLDFATHER:  Thank you, your Honor.  Thank you for
22     summing up what we had discussed earlier.  And for the benefit of
23     any of the counsel who have these remaining personal injury cases,
24     some of whom may be on the conference call, I just wanted to
25     summarize for the court that at the end of January I sent a letter
```

1    with several attachments to 41 attorneys and 22 pro se claimants;

2    that group should include all of the approximately 185 cases that

3    have been provided to us on a list from Merck.  And as the court

4    mentioned we will back and I will be back here myself next week on

5    Tuesday for further conference with the court about issues

6    pertaining to those remaining cases.

7           And I just wanted also to apologize to Ms. Barrios for

8    the 500 number that was mentioned in the joint status report, I

9    think that number had come from my misunderstanding of some of the

10   counts that were being done on the cases that had not yet been

11   closed.  But it does sound like we're finally getting to

12   synchronicity between PACER and the spreadsheets that we've gotten

13   from Merck, and they're coming in at about the same numbers.

14          MR. BIRCHFIELD:  I just want to make sure we're meeting

15   Wednesday, March 2nd.

16          THE COURT:  Wednesday.

17          MS. OLDFATHER:  I'm sorry, did I say Tuesday?

18          THE COURT:  Wednesday, March 2nd.

19          MR. HERMAN:  Very brief comment, your Honor, on that

20   item.  On January 24th following the status conference I sent

21   communications to the 76 pro se and attorney represented

22   individuals who are on PTO 29 and 43.  I got one written response

23   from an individual represented by an attorney, I then later after

24   Ms. Oldfather's letter went out received two inquiries from pro

25   ses.  I've notified the various attorneys representing pro ses and

1   Mr. Marvin and the court.

2           I understand from Ms. Oldfather this morning that on the

3   list of 76 there's some errors, maybe some attorneys have

4   withdrawn, substituted or whatever, and as soon as I receive those

5   additions or updates from Ms. Oldfather, I'll send out another

6   communication.  Thank you, your Honor.

7           THE COURT:  All right.  Fine.

8           I know that many people are aware of the MDL process, but

9   some individuals, non-lawyers may not be, and also some attorneys

10  as skilled and as good as attorneys as they are may not be as

11  familiar with the MDL process, and, therefore, they really can't

12  understand why their case, which was filed in state court in a

13  particular state was then removed to federal court and then was

14  sent down to New Orleans to be tried or to be handled, to be

15  discovered.  That is created by 1407 of the statute which allows

16  that to be done, it sets up a court, a multidistrict litigation

17  court comprised of seven judges appointed by the Chief Justice of

18  the United States.

19          They look over the nation and they designate cases, MDL

20  cases.  Those MDL case s that have common facts, not necessarily

21  common law but common facts, and then they select one court and

22  then direct all of the federal courts in the country to send all of

23  those cases down to that particular court.  This court was

24  designated the MDL court on February 16th, 2005, for the Vioxx

25  litigation.

1          All of the cases are sent here.  My job as an MDL judge

2     is to prepare the cases for trial so that when they're sent back,

3     if they are sent back to their locations, they are trial ready and

4     can go to trial within a matter of months, a month, weeks or a

5     month rather than start from scratch.  And so that's what we have

6     been doing.

7          Now, some case have been tried here but some cases may not

8     be able to tried here.  I will be at the point after the cases are

9     processed and I finished with the motions and discovery and have

10    them trial ready, I'll then make a decision as to remanding them

11    back or sending them back to their respective states.  At that

12    point I'll have to decide whether or not I'll go with the case and

13    try the case in that respective state or whether I'll let one of my

14    colleagues try the case in that home state.  But it will be ready

15    to go at that point and that's what I plan to do.

16          Fee Allocation Committee, anything?

17          MR. HERMAN:  Fee Allocation Committee has instructed me

18    its recommendations to your Honor, your Honor published them, there

19    are 17 objectors.  The matter has been referred by your Honor to

20    Special Master Juneau and we will be meeting after this conference.

21          THE COURT:  Okay.  As I mentioned on several occasions,

22    what I have done with the common benefit fee, I first announced to

23    all of the attorneys, put on the internet anybody who feels they

24    have been common benefit work to make themselves known, send a

25    claim for their common benefit work.  I have appointed a Fee

1    Allocation Committee -- some of whom were members of the Plaintiff

2    Steering Committee, some were not -- and tasked them with the job

3    of meeting with all of the individuals who made a claim for common

4    benefit work of putting that on the record, asking them to give

5    whatever information they had to support, and then to -- I also

6    tasked that committee with the job of then recommending,

7    recommending a method of distributing the funds.

8           They gave me that after discussing it with the people who

9    made claims and then they gave it to me as a recommendation.  I

10   posted that recommendation on the web site so everybody could see.

11   I then invited anyone having any objections to make those

12   objections.  I received 17 objections.  I then appointed the

13   special master and gave him the job of discovering, if necessary,

14   or creating some program that he would then get some information,

15   review the information and then he would give me a recommendation.

16          So I have a recommendation from the insiders, so to

17   speak, the people who did the work, and a recommendation from

18   someone who has no interest in the litigation.  And then I am going

19   to get those recommendations and then I am going to bring there the

20   information from those recommendations, the information that, the

21   support for those recommendations and also I'll bring there my

22   information that I have seen over the years that I've been

23   presiding over this litigation, and then I will make the decision.

24   I am not going to rubber stamp any recommendation, I am going to

25   make the decision and I'll write a paragraph on each individual

1   supporting, at least giving what my reasoning is for that decision.

2   And then anyone who wishes, they will have a record then to appeal

3   and the Court of Appeals will see how I am doing it.

4          There are many ways of doing this, many ways of doing it.

5   I've selected a method and I am going to stick with that method and

6   deal with it in that method.  The Court of Appeals may decide on

7   another method, that's their job.  But my job is to select a

8   method, I've done so and I am going to stick with that method and

9   deal with it accordingly.

10          Okay.  Merck's motions, we'll get to that afterwards.

11          Any report on Appeals?  I know we've had some appeals.

12          MR. MARVIN:  Your Honor, the only update on the appeals

13   is that the Supreme Court earlier this week denied the petition of

14   cert filed by Mr. Benjamin's firm in the *Dier* case.

15          THE COURT:  And the next status conference, Friday, April

16   1st is the next status conference.  And in the meantime I will be

17   meeting with the remaining cases, that is to say the AG cases and

18   perhaps the consumer cases and then also the cases that

19   Ms. Oldfather represents, and we'll see if we can deal with those.

20   I don't want to wait until the end of each conference because now

21   I've set the conferences about six weeks or eight weeks away as

22   opposed to the monthly conferences.

23          All right.  The only thing we have at this point is the

24   Merck motion, I understand we have one motion.  Why don't you bring

25   that up, please.

1          MS. WIMBERLY:  Yes, your Honor, Dorothy Wimberly on

2     behalf of Merck.

3          We actually had three motions originally set on the

4     docket today.  The first was to dismiss the claims of pro se

5     plaintiff Dennis Harrison for continued failure to comply with the

6     discovery requirements of Pretrial Order 28.  By agreement with

7     Mr. Harrison, we have given him additional time to respond.  He has

8     agreed to that deadline and we agreed that it would be reset to the

9     next status conference.  I will provide an order to the court and

10    will also notify Mr. Harrison by e-mail that his motion is

11    continued to the April 1st status conference.

12         We also had another motion that we are continuing, which

13    was a Rule 25 motion to dismiss for failure to substitute a party,

14    and that is the motion relating to Mr. Pedro Gonzales.  At

15    Ms. Oldfather's request we have agreed to continue that one to the

16    next status conference as well.  And again, I will present an

17    appropriate order.

18         That leaves us with a single Rule 25 motion relating to

19    pro se plaintiff Mark Henrichs.  Your Honor may recall

20    Mr. Henrichs.  We originally moved to dismiss his case for failure

21    to comply with Pretrial Order 28 probably close to two years ago.

22    Mr. Henrichs was a pro se plaintiff, he asked for additional time,

23    we gave him additional time on numerous occasions, and your Honor

24    even undertook to hold a special status conference with

25    Mr. Henrichs and two other pro se plaintiffs in which you had them

1   on the phone and engaged them in conversation for probably close to

2   an hour last July 1st to impress upon them that they had to comply

3   with the applicable pretrial orders and that you were giving them a

4   final deadline of 60 days.

5        One of those pro se plaintiffs complied, Mr. Henrichs did

6   not.  Mr. Henrichs died prior to expiration of the deadline, which

7   would have run on September 1st.  When we learned of Mr. Henrichs'

8   death, we filed a suggestion of death into the record and no

9   substitution of party has occurred, and we then in February earlier

10  this month filed a motion to dismiss for failure to comply with

11  Rule 25.  We've received no response whatsoever and we would ask

12  that the court dismiss his claims with prejudice.

13        THE COURT:  Okay.  Anything on that?

14        MR. HERMAN:  Yes, your Honor.  Because it's pro se, we

15  believe that there has to be some further notification by either

16  certified mail or some other way to a designated representative,

17  that's the only comment we make, other than that we have a standing

18  objection to these dismissals being dismissed with prejudice.

19  Thank you.

20        MS. WIMBERLY:  Your Honor, it was not just served by

21  LexisNexis, it was served by mail on Mr. Henrichs' last known

22  address.

23        MR. HERMAN:  May it please the court, the problem with

24  that, it's sort of like a curatorship.  If you can't -- if it

25  doesn't -- if it goes to the last known address and there's no

1    response under these circumstances, there has to be a procedure for

2    advertising in the local news the whereabouts of a representative

3    of this person before it happens.  I don't believe that's happened.

4              THE COURT:  I understand the issue.  I think that's a

5    fair request.  Let's notify, let's post it in the local news, and

6    if nobody comes forward I'll dismiss the case.

7              MS. WIMBERLY:  Your Honor, would you like for us to take

8    care of that or is that something for the pro se curator?

9              THE COURT:  Why don't you take care of that.

10             MS. WIMBERLY:  Can we go ahead and then roll it to the

11   next status conference, and meanwhile we will do an appropriate

12   posting.

13             THE COURT:  Okay.  Thank you very much.  I'll pass that

14   one and deny the motion at the present time.  The court will stand

15   in recess.

16             MR. HERMAN:  Thank you, your Honor.

17             THE DEPUTY CLERK:  Everyone rise.

18       (WHEREUPON, COURT WAS CONCLUDED.)

19       (OPEN COURT.)

20             THE COURT:  Be seated, please.  I understand we have a

21   pro se claimant.  Why don't you come forward, ma'am.  When I say

22   pro se, I should have made it specific that you were invited to

23   speak also.

24             So why don't you for the record give us your name.

25

1          MS. BAUM:   Janice M. Baum, and I am plaintiff from Fort

2     Wayne, Indiana.

3          THE COURT:   I appreciate you being here and I'm sorry you

4     had to come all the way.   As I mentioned, I am interested, it's an

5     open court proceeding and you're able to come; or if you can't

6     come, you're able to participate by phone.

7          MS. BAUM:   I thank you very much for allowing me to speak

8     today.   I have no public speaking experience and I am not a legal

9     counsel.

10          THE COURT:   Sure.

11          MS. BAUM:   And I am not here by choice being pro se.

12     Forgive me if I say things incorrectly.   As I stand here right now,

13     my best friend's husband is being buried in Fort Wayne, Indiana

14     from heart disease that he knew was from his smoking and drinking.

15     He chose not to quit.   My best friend encouraged me to come down

16     here because I have to get this behind me because the stress over

17     the past six and a half years has basically killed me.

18          Back in 1993 my 17 month old brother was buried due to

19     arrhythmia problems that his heart was considered to be 100 percent

20     healthy.   He was given a drug that never should have been given to

21     him, and his autopsy actually states on his death certificate that

22     he died of drug therapy; and that's why I am so focused on

23     increasing my and pursuing my own health issues that have been

24     caused by my taking Vioxx for nearly five years.

25          I've been diagnosed with pulmonary hypertension which has

 1   since been determined second diastolic dysfunction, this was

 2   diagnosed in August '09.  I went undiagnosed because of my healthy

 3   and perky appearance for nearly six years.  I even been to Mayo

 4   Clinic in 2003 where they could find no known causes of my

 5   increasing vascular issues.  I had developed neuropathy and

 6   circulation issues, escalating blood pressure.  Nine and a half

 7   months later Vioxx was removed from the market and I requested them

 8   to investigate that.  Mayo Clinic said that they did not know of

 9   the connection that I should ask my pharmacist, who happens to be

10   my own daughter who is a registered pharmacist.

11          My first documented Vioxx usage was in December of '09.

12   I've never been a smoker or a heavy drinker, yet my health has

13   slowly deteriorated beginning with fatigue in early 2001.  The help

14   from the curator's office has been basically a joke for me.  All

15   former Vioxx legal counsel are not taking new cases.  I've called

16   numerous lists that have been given to me by the curator's office

17   and none of them are accepting new out of -- non-qualifying out of

18   court cases, out of court settlement cases.

19          My pursuit of justice has been in course nearly six and a

20   half years, now for 13 months without legal counsel, and I am not

21   pro se by choice.  Though hearsay and from very reliable source who

22   tried to help me get new legal counsel, I was told no matter how

23   good her case, she would find no legal counsel in the entire United

24   States.  When this person asked why, and even though it's hearsay,

25   she was told that all attorneys were scared off to not take on any

1    remaining cases who did not qualify for the out of court settlement

2    agreement of heart attack, stroke or death.

3            Because I did not qualify for the out of court

4    settlement, my attorneys made it very difficult and dropped me

5    because they didn't want their contingency fees running upwards of

6    $100,000 like which was threatened by Merck.  Merck told the

7    attorneys that they would prove non-out of court victims would have

8    developed heart attacks, vascular or stroke issues with or without

9    taking Vioxx.

10           I've been unable to get legal counsel even with my own

11   medical doctor's case specific expert opinion, not a generic like

12   most others.  So hearsay has proven to be true.  I've been unable

13   to work since July 10th of -- July 10th of 2010.  I've had six hand

14   surgeries in 2010 from two on my right and four on my left.  My

15   first right hand surgery was in '05 when it was broken in August of

16   '04.  It was broken while I was taking Merck's Fosamax since 2002

17   and Vioxx since 1999.  The Fosamax has been proven to make your

18   bones too hard and my hand shattered during a handshake, by a 13

19   year old kid shook my hand while I was a greeter at my church.  I

20   was also taking Vioxx, a COX-2 inhibiter was disclosed in a 2002

21   research article that I found that the COX-2 inhibitors, which is a

22   classification of drugs Vioxx fell under, that prevented breaks

23   from healing properly.

24           I am requesting my case to remain in your court.  Indiana

25   is very difficult to get settlements, it's the worst in the country

1  because of a tightly owned, doctor owned HMO.  I have been

2  blackballed by all local M.D.s in Physicians Health Plan of

3  Northern Indiana since taking the M.D.s under all -- the same

4  treating doctors are the same treating doctors -- excuse me.  The

5  same treating doctors are the same doctors treating under all other

6  insurance programs.  Because of that I can't get proper care in

7  Fort Wayne, Indiana or from Indianapolis, clear up to northern

8  Michigan over into the Chicago area.  My struggles to get medical

9  answers over the past three and a half years on oxygen uncovered

10 Medicaid and Medicare abuse.  I was billed as a mentally delayed

11 employer client when I was benefits administrator of 3,000 plus

12 employees.  My employer was 100 percent fully funded Medicaid human

13 services employee.  Rightly or wrongly, I feel I was purposely not

14 notified of a pending June 3rd hearing.  I would have been

15 dismissed with prejudice on Wednesday following a three day holiday

16 weekend over Memorial Day.  The next mail came delivered with

17 incorrect address when all previous mailings had my correct

18 address.

19       Two weeks ago I talked with Mr. Herman who basically told

20 me he couldn't even help me or tell me what the next step to expect

21 or proceed with and suggested I buy a book.  He specifically said

22 you chose to go pro se; when I protested I didn't choose to go pro

23 se, that my attorneys that I had come to an impasse, he said it was

24 still my choice to move forward basically saying that you should

25 have given up when you could have.  After many attempts, I've

learned again the hearsay is correct, even Indiana and New Orleans
lawyer firms, names given to me by the curator's office, were not
taking new cases.

My own primary care physician, a world renown
Dr. Harrison Farber of Boston Medical Center, he is the original
*House* TV character.  Last July 1st he determined my pulmonary
hypertension which I developed is secondary to my diastolic
dysfunction.  He referred me to a Boston cardiologist Dr. Eric
Awtry on 7/2/2010.  Together they ruled out all other possible
cases -- causes of my health issues over the past six years, except
two.

Since then they've determined that those two aren't
possible either, I don't have the symptoms, I only have two
symptoms of the small vessel disease and they are not, they could
be symptoms of 100 other things.  I submitted -- they submitted
their case specific expert opinion to Merck's counsel on August
31st, 2010.  When I called to see if Merck's counsel had received
it, they said, no, they had not when the doctor had faxed it to
them.  I was specifically said it's not their fault my M.D. had
faxed it to the wrong fax number.  It was refaxed by my doctor
again on September 1st and it went directly to your office and back
again to Merck's counsel.

Merck has not heard the end of me.  Undiagnosed diastolic
dysfunction led to secondary pulmonary hypertension.  Now I'm also
permanently disabled awaiting social security disability.  Results

1    of my health conditions are both Vioxx and Fosamax.  Most recently

2    this past November I was also diagnosed with osteonecrosis of the

3    jaw.  This is also known as dead jaw bone.  I've developed dimples

4    in my cheeks that have never been there before, they're very

5    noticeable to my kids and to my husband.  In three months diagnosis

6    of osteonecrosis, these dimples, and I can see visible jaw line

7    change due to the stressors in my life.  The stressors of ongoing

8    and seemingly ending health issues led to my recent filing for

9    dissolution of marriage.  If you look at me I appear very healthy,

10   I'm considered youthful but I must go to bed lightly wearing oxygen

11   as you can see the marks on my cheeks.

12          I must be delivered everywhere I travel.  Your Honor,

13   Fort Wayne M.D.s already proved I'm expendable when they gave me an

14   inaccurate right heart cath in July of '09.  I was specifically

15   told now you don't have to go to Boston to be diagnosed for

16   pulmonary hypertension, you have no signs of past or present heart

17   attack or heart disease and absolutely no signs of pulmonary

18   hypertension.  I have handwritten documentation where this doctor

19   was ordered to give this diagnosis and this is because I have

20   uncovered the Medicaid and Medicare abuse.

21          I tested positive for both on August 21, '09, three weeks

22   after 100 percent clean bill of health by Fort Wayne M.D.s, so I

23   developed heart disease and pulmonary hypertension in 25 days

24   between the tests?  I don't think so.  Merck already has made many

25   claimants expendable too, 14 day rule ruled out most women

1    undiagnosed with bronchitis issues.

2          As benefits administrator for my former employer, I

3    processed two death claims on undiagnosed heart disease issues in

4    women:  one was 49 and one was 39.  Another coworker with my exact

5    same symptoms, also a former Vioxx user, has yet to be diagnosed

6    with anything.  All her symptoms are unexplainable, too, as were my

7    11 idiopathic conditions local M.D.s refused to connect to Vioxx

8    usage.  While Fort Wayne is a highly known test market area.

9          Rightfully or wrongly, I believe they received money from

10   Merck to give thumbs up on the wonder drug for arthritic

11   conditions.  I need closure so my health won't deteriorate further

12   over the stressors of my health, lack of local medical care, my

13   marital break up, my disability with my hands, now Merck's Fosamax

14   damage, too.  Who would want to spend their life with me?  I am

15   told to be attractive when I'm potentially going to get very ugly

16   from further dead jaw bone destruction, not to mention I need

17   canula in my nose nightly when I go to bed.  Undiagnosed heart

18   issue after six years.

19         Please, your Honor, keep my case out of Indiana, in your

20   courts, or schedule a pretrial hearing as soon as possible for a

21   possible out of court settlement agreement between Merck

22   Pharmaceuticals and me.  Again, Merck has not heard the end of me

23   regardless.

24         As my former employers were told, I intend to become the

25   next Erin Brockovich of the oxygen supply industry and exposing the

```
 1    Medicaid and Medicare fraud that I've uncovered.  I also fully
 2    intend to go public with my story, already being written and just
 3    waiting for an ending to my nightmare.  Thank you very much.
 4              THE COURT:  Well, thank you, ma'am.  I know that it's
 5    very hard for you to say all of these things, but you've done a
 6    good job in explaining yourself and I appreciate you being here.
 7              MS. BAUM:  Thank you very much.
 8              THE COURT:  I know you've had a tough road.  One thing
 9    you need to know is that I don't have before me anything on
10    Fosamax --
11              MS. BAUM:  I know, I understand that.
12              THE COURT:  -- that's another drug I am only focused on
13    Vioxx.
14              MS. BAUM:  I understand that.
15              THE COURT:  And your case has not been dismissed because
16    you were able to supply the court and counsel with the required
17    medical report.  So the thing, the only thing I can do at this
18    point is to set some status conference and then to set a trial date
19    and we'll proceed to trial or whatever discovery is necessary.  It
20    would be helpful if you had an attorney.  Have you talked to
21    Ms. Ann Oldfather --
22              MS. BAUM:  Yes, I have.
23              THE COURT:  -- because she has handled and is handling
24    some of these types of matters.
25              MS. BAUM:  I don't know if she is taking anymore, but
```

 1    they said they didn't know.

 2          THE COURT:  Well, you might again consult with her.  She

 3    was here earlier but she had to leave.

 4          MS. BAUM:  Again, my case specific opinion was not paid

 5    for, it was my own doctor's, it is not a generic one.

 6          THE COURT:  Yes, ma'am.  Okay.  Any response from anyone?

 7          MR. HERMAN:  Yes, your Honor.  First of all, I empathize

 8    greatly.  I believe, I'm sorry I had to go to the bathroom but I

 9    heard most of it, very eloquent presentation.  The practice has

10    been as when your Honor gets notification, you alert liaison

11    counsel to contact individuals and I receive these contacts.  I was

12    contacted, I checked with OrrenBrown to find out that that case has

13    not been dismissed but the applicant was pro se, that I could not

14    handle the case, our firm could not handle the case.  I did mention

15    Ms. Oldfather.  I've never told anybody to go get a book or not go

16    forward.  I don't know where that comes from, but my advice is

17    still what it is, the case is alive and should be handled by an

18    attorney.

19          In addition to that, as liaison counsel, I am only

20    liaison, pro ses have been appointed to handle these issues.

21          As far as other issues, we're not handling Fosamax cases,

22    we don't handle medical negligence in Indiana, and I was unable to

23    give any advice on those issues.  It may be that the book that, if

24    I did refer a book and I will not contradict that if I referred a

25    book, the only books that I have recommended have to do with *Worst*

1    *Pills* as published monthly, and in terms of Vioxx I know of no

2    other publication.

3            So again, I say I empathize, our firm cannot handle the

4    case, it's a pro se case.  If Ms. Oldfather won't take it, our

5    other practice has been to recommend attorneys where the individual

6    lives.  And as far as I know there are no Indiana attorneys that

7    will take this case.  Although I did not at the time recommend

8    Public Citizen, at this time it may be that Public Citizen will

9    intervene in the case if requested.  If the applicant would like me

10   to do that, I'll talk to Robert Johnson, who is the special master,

11   and give him the information and they can communication with Public

12   Citizen; or Trial Lawyers for Public Justice handles these cases

13   regularly whenever they feel there's a meritorious case, whenever

14   they feel that someone is unrepresented, they generally assign one

15   of their counsel.  So I'll also talk to Mr. Johnston about

16   arranging an interview with Trial Lawyers for Public Justice, maybe

17   this is a case they'll be interested in.

18           THE COURT:  All right.  Also the bar association in your

19   home state.

20           MS. BAUM:  I've tried.

21           THE COURT:  Have you tried that?

22           MS. BAUM:  I've tried and I tried the list that was sent

23   to me of New Orleans attorneys.  And like my very good source said

24   that no one in the United States will take my case after, that did

25   not qualify for out of court settlement.

```
 1          MR. HERMAN:  Your Honor, there's just one other issue
 2   that I failed to mention.  Whenever I get these calls, and I'm
 3   certain I did this, indicate that the MSA here, which I always
 4   refer everyone to, only deals with myocardial infarction and
 5   stroke.  Unfortunately hypertension, congestive heart failure and
 6   TIA's are not matters in the MSA.  And although we religiously
 7   pursued evidence and experts with respect to hypertension, TIA's
 8   and congestive heart failure, we were not successful.  And I do
 9   want to put that on the record and I always indicate that.
10          THE COURT:  Merck had something?
11          MR. MARVIN:  Your Honor, the only thing we have to say is
12   we empathize as well with Ms. Baum's medical condition.  We do note
13   that her case is pending, as your Honor noted.  We don't have any
14   motions pending to dismiss her case.  As your Honor knows, in order
15   to prepare a case for trial it needs to go through discovery.  We
16   would hope that she would find counsel that we could deal with and
17   proceed in moving her case along.
18          If that's not possible, we'll work with Ms. Baum in
19   everything we can do in moving the case along so that both parties
20   are aware of the discovery that could be elicited.
21          So we'll do everything we can to work with her.
22          THE COURT:  Ms. Baum, I have your case, I am not going to
23   dismiss it, it's a viable case, and I may have to meet with you
24   again to decide where we go from here.  But what happens in these
25   matters is that I have status conferences and I discuss with the
```

1   lawyers or with the parties some method of discovering the case --

2   that is to say taking depositions and getting documents -- and then

3   after a period of time then the case is set for trial.  And as I

4   say in a case of this sort, it's very technical and it would be

5   helpful if you had a lawyer.  But you can try your case yourself,

6   too, if you would like to do that.

7           MS. BAUM:  I'm hoping that it doesn't get to that because

8   I don't know if I can handle the stresses.  My marriage has already

9   fallen apart because my husband cannot deal with the stress that's

10  been put on him.

11          THE COURT:  Yes, ma'am.  I know that everybody in the

12  courtroom certainly sympathizes and empathizes with you, and I will

13  do everything I can to make sure that you feel at least the court

14  is open to you.  What result it's going to bring about, I have to

15  listen to evidence and things of that sort.  But you certainly will

16  have a day in court.

17          MS. BAUM:  Thank you.  When I called Mr. Herman's office

18  a couple of weeks back, my intention was to find out what the next

19  procedure was.

20          THE COURT:  Yes, ma'am.

21          MS. BAUM:  And that's when I was told to go buy a book or

22  get it from the library on legal procedures like everybody else

23  would have to, and it was my fault that I chose to move forward pro

24  se.

25          THE COURT:  Well, Mr. Marvin represents Merck and so

```
 1    maybe you can get his telephone number and he can get yours; and if
 2    we need to communicate, I'll be able to talk to both of you all.
 3              MS. BAUM:  Okay.  Thank you very much, your Honor.
 4              THE COURT:  Thank you for being with us.  Good.  The
 5    court will stand in recess.
 6              THE DEPUTY CLERK:  Everyone rise.
 7         (WHEREUPON, THE STATUS CONFERENCE AND MOTIONS IN THE COURTROOM
 8         WERE CONCLUDED.)
 9         (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD IN CHAMBERS:)
10              THE COURT:  Hello, good morning.  This is Judge Fallon.
11    Who is on the line?
12              MR. PATTEN:  Robert Patten from the Massachusetts
13    Attorney General's office.  Good morning, Judge Fallon.
14              THE COURT:  Good morning, Robert.
15              MS. WINKLER:  Susan Winkler from the U.S. Attorney's
16    Office in Boston.
17              THE COURT:  Go ahead, anyone else?
18              MR. FOX:  Randy Fox from the New York State Attorney
19    Generals office.
20              MS. AUTHOR:  Elizabeth Author from the Florida Attorney
21    General's office.
22              MR. ROTH:  Harry Roth and Michael Corran, Commonwealth of
23    Pennsylvania.
24              MR. STALLARD:  David Stallard, Utah.
25              MR. ROSCHBACH:  Bill Roschbach, Montana.
```

1           THE COURT:  Anyone else?

2           Okay.  Folks, I have everybody else in the conference

3     room.  I wanted to have a status conference to talk about the

4     matter.  I asked Bob Patton and Susan to participate in the

5     conference.  I know Bob's on vacation, so I appreciate his being

6     with us to give us some input on NAMFCU or anything else that might

7     come up.

8           Dawn, do you want to lead out?

9           MS. BARRIOS:  Yes, your Honor, thank you.  Since our last

10    status conference we have exchanged mediation information requests

11    with the defense and we have gotten their responses, and for the

12    most part we're satisfied with the responses.  There is an issue

13    that I am going to take full blame for that Kentucky, Mr. Brian

14    Vines sent some objections to me and it fell through my cracks.  So

15    he was speaking with Mr. Flaster today and I am hoping that they

16    can work out that issue.  And I trust if they cannot work out that

17    issue, we would come back to you.  But they need time I think to

18    flush that out.

19          The other issue that we have, your Honor, is the

20    discovery stay that you have in place and Mr. Beisner and I have

21    talked about extending it for 30 days.  We didn't want to tie it to

22    a status conference because you know those dates might shift.  But

23    the Commonwealth of Kentucky would like to address your honor on

24    the issue of the stay because Kentucky does not have a Medicaid

25    claim, it just has its three separate claims under state law.  And

1    Mr. Bill Garmer is here to address that issue

2              THE COURT:  Okay.  Why don't you tell us about it.

3              MR. GARMER:  Good morning, your Honor.  Bill Garmer, I'm

4    here for the Commonwealth of Kentucky, along with Scott Powell and

5    Brian Vines.

6              THE COURT:  Okay.

7              MR. GARMER:  As Dawn has just told the court, Kentucky

8    has a CPA claim, and we've said this before before your Honor at

9    the last status conference.  We do not have a Medicaid claim and

10   we're getting concerned with the fact that because we have a

11   distinct and totally different claim and matters from the Medicaid

12   claim and even from the CPA claims for individuals, that us being

13   held up in this discovery really is not doing us any good, if I can

14   put it any other way.

15             THE COURT:  Right, I understand.

16             MR. GARMER:  We would like to get our discovery underway

17   so that we can get the discovery that's necessary for what we

18   believe is our unique claim and get moving.  We feel like, to use a

19   Kentucky saying, you have an open starting gate on the horses and

20   we would like to get out and run.

21             THE COURT:  Okay.

22             MR. BEISNER:  Your Honor, a couple of points to make on

23   that.  I think that if we don't deal with the governmental cases as

24   a group with respect to the stay, the meaningfulness of the stay

25   for sort of dealing with some parties and not others when some of

1   this discovery is common to all of them, I don't think it renders

2   the stay as not being very effective on this.  And I guess the

3   additional point I would make is I don't think I hear the state of

4   Kentucky saying that they are not going to be taking any money from

5   the Medicaid settlement.  I mean, they are part of this process,

6   the state will take it; their position is that it's unrelated to

7   their claims, I think that remains to be seen with respect to what

8   release is negotiated and how they overlap.

9          I mean, if the statement is today that Kentucky will not

10  participate in the Medicaid settlement, that it eschews any

11  interest in that money, and I don't think I hear you saying that on

12  behalf of the state.

13         MR. GARMER:  We have not gone that far.  But as we

14  understand it from what has been said so far that no NAMFCU

15  settlement up to this point in other litigation has ever precluded

16  CPA claims by terms of the release.  And if that's the case,

17  obviously then we would take both the Medicaid claim and proceed

18  with the CPA claim.

19         And on the other hand as I've heard mentioned that Merck

20  may be positioning itself to have something in the release for what

21  they call a clawback, that if Kentucky were to take the Medicaid

22  moneys and then proceed with the CPA claim and be successful in

23  that, Merck would ask for a clawback or credit or whatever you want

24  to call it for the moneys paid in the Medicaid.

25         But any of those situations, the CPA claim would move

 1    forward and that's our position.  It looks to me like the odds of

 2    the CPA claim moving forward from what we hear at this point, and

 3    obviously we don't have anything definitive, but what we hear at

 4    this point that the CPA claim will be allowed to move forward with

 5    the NAMFCU settlement going through.  So that's kind of the

 6    position we're taking.  It looks overwhelmingly that we're going to

 7    move forward as a CPA claim.

 8            MR. BEISNER:  I think, your Honor, the basic facts are

 9    from what I'm hearing here is that Kentucky is a participant in

10    what we're talking about here, that is the Medicaid settlement.

11    And so to sort of say, well, you have other claims, I think other

12    states are taking that, are likely to that position as well, so I

13    don't think Kentucky's position is really different from any of the

14    other jurisdictions.

15            THE COURT:  What we need to do is put a little flesh on

16    the bones.  Maybe what you can do is to give me some idea of the

17    discovery that you feel is necessary.  I think you can consult with

18    Merck and just see what that is so that I can deal with it, rather

19    than just deal with it in theory.  The difficulty is that what I've

20    been trying to do is focus and put all of our energy on this

21    opportunity that I think everybody has, and I think we all have to

22    recognize that if we start doing, putting our energy in other

23    places, we're going to lose some opportunities here.

24            And so I hear you and I think you make a point about

25    discovery, and I don't want to jeopardize the discovery in any way.

 1   But at the same time I don't want you to be excluded from this

 2   situation because I think we have an opportunity to make some

 3   headway.  And if you distract the process, I think it's going to

 4   harm not only them but also you.  And when I say them, I mean the

 5   other Attorney Generals who are interested in participating in it.

 6   Because we're going to get other people to say, well, if Kentucky

 7   has done it then we ought to be able to do it, too; and pretty soon

 8   we're going to have everybody focused on discovery as opposed to

 9   maybe dealing with the global resolution of it.

10         I'm thinking out loud with you, but those are the things

11   that come through my mind.

12         MR. GARMER:  Yes, sir.

13         THE COURT:  So rather than just theoretically look at it,

14   you might put some flesh on those bones and see what you need and

15   in the meantime participate in what we're doing.

16         MR. GARMER:  And I understand what the court is saying

17   and the court's dilemma, and Mr. Vines has prepared a very thorough

18   problem list, if you will, of the discovery that has been already

19   agreed upon and partially provided that we have met with Merck

20   about this morning just briefly, and we certainly will provide them

21   with our letter, which is very thorough, and see if we can work

22   that discovery out.  And we just want to -- I know I hate to sound

23   like a broken record, but we just want to continue to voice our

24   concern and what we believe is our differences from the other

25   states.

```
 1                THE COURT:  The thing that after all of us recognize is
 2    that there's reasons for discovery and there's also strategic
 3    reasons for discovery.  There are substantive reasons and strategic
 4    reasons, and sometimes the strategic reasons are important to get
 5    everybody's attention and to get everybody focused on a global
 6    resolution.  That doesn't mean that there's no substantive reasons
 7    for discovery, too, but we've got to -- I hope we're over the
 8    strategic reasons for discovery because everybody's at the table
 9    now and we're dealing with language and we're dealing with issues
10    that I really need everybody to focus on because particularly, and,
11    Bob, you're going to be a key player in this with NAMFCU, we're not
12    there yet, but when we get there that's a thicket that has to be
13    negotiated in some way, shape or form.  I am really going to need
14    everybody's attention on that as opposed to running off and
15    discovering things.
16                MR. JUNEAU:  Judge, this is Pat Juneau for people on the
17    phone.  One of the things I think would be extremely helpful
18    because timelines and how long things take affect states like
19    Kentucky, it affects everybody here.  So I think it would be
20    extremely instructive for everybody if we knew now, if you go back
21    when we first met things have changed since then, but where
22    documents stand now, when do they think documents will be
23    finalized, for example, with the Department of Justice and Merck,
24    if we can get some idea of that, then maybe through the discussions
25    with Mr. Patton everybody can understand about when he thinks that
```

 1    process goes on.

 2         Because the issue was when I first got involved in this

 3    thing was, well, we've got to play this process out before we can

 4    intelligently engage in discussions or non-discussions regarding

 5    the outside issues, as I call them in this case.  So maybe if the

 6    Department of Justice can give us some idea, if they have any idea,

 7    I know they've been working diligently on a document, I just don't

 8    know what stage that's in.

 9         THE COURT:  Susan, what's the situation from your

10    standpoint?

11         MS. WINKLER:  Your Honor, could I ask you direct this

12    question to Merck?  I think in the first instance where our

13    timeline is is in their court.

14         THE COURT:  All right.

15         MR. BEISNER:  Your Honor, I am not directly involved in

16    those negotiations, but my understanding is as follows:

17    Ms. Winkler has delivered to us a draft of the master agreement, I

18    may be not using the precise term for that, but the master

19    agreement between the company and the Department of Justice.  There

20    are a few issues I believe that our team is dealing with with

21    Ms. Winkler on that issue in Boston need to discuss with her, which

22    I believe they've begun the process of doing to work out some

23    issues there.  And we need to complete that process better moving

24    that along as quickly as we can.

25         THE COURT:  What's the time frame on that as you see it?

1          MR. BEISNER:  I think we're talking about a short time

2     frame, over the next week or two to get that accomplished.

3     Certainly I don't mean to speak for Ms. Winkler about what bases

4     need to be touched on her side to deal with whatever issues may be

5     resolved, but I believe we're moving on that quickly and have been

6     having calls with her on that subject to get those issues

7     addressed.

8          And of course once those are concluded, we will be able

9     to then take that document, as I understand it, and move into

10    discussions with the NAMFCU team to deal directly with the

11    agreements with the individual states.

12         THE COURT:  Bob, what's your input on that?  When should

13    NAMFCU get involved, at this stage or earlier or later?

14         MR. PATTON:  Your Honor, from our perspective, this case

15    at least at this stage is much like many or in fact most of the

16    cases that we negotiated in conjunction with the federal

17    government, and that is when the U.S. and the company essentially

18    have their first set of discussions concerning a draft federal

19    agreement subject to further negotiation, typically the U.S. will

20    share that with us, with the team we anticipate that that's going

21    to happen.  When the process you've just heard described reaches

22    the next stage, and then we will as a team begin drafting and

23    negotiating what we call a model state agreement, a single

24    agreement with the company which then once the U.S. has completed

25    its negotiations we get to an end point on what that agreement is

 1    going to look like, we then ship that agreement out to the states

 2    with a calculation of what their anticipated recovery under the

 3    agreement's going to be, and then each state undertakes its own

 4    approval process.

 5           Now, that approval process generally will take 45 or 60

 6    days, but by the time we finish, we get to a handshake with the

 7    defendant on the form of the model state agreement, typically the

 8    agreement will give each state the right to participate in the

 9    agreement as it is drafted.  Now, some states may have some

10    individual provisions that they want to negotiate bilaterally, but

11    typically we feel once we reach that model agreement stage and the

12    state has agreed -- and the defendant has agreed to settle with any

13    state, pretty much the negotiation piece is over with us.

14           And that can take place on a very fast track, and would

15    in this case, and I would anticipate that we would complete our

16    negotiations with the company simultaneously with or shortly after

17    the federal government does so.

18           THE COURT:  How can we speed this process up, Susan, what

19    can we do to move it faster?

20           MS. WINKLER:  Well, this is sort of an unusual place for

21    me to be, but let just say I am waiting for responses back from

22    Merck.  Once I get those back, I can go to the affected and the

23    necessary approval points in the federal system, the agencies and

24    the department.  And once I get final sign off on something, I can

25    then go, I can provide it to Bob and he can do his work.  But I

```
 1    have to hear back from Merck first and we're waiting.

 2              MR. BEISNER:  Okay.

 3              THE COURT:  It's Merck's ball game here.

 4              MR. BEISNER:  Right, your Honor, I again am not part of

 5    that negotiating team.  I thought that at least preliminarily some

 6    response had been given, clearly I am wrong about that, but we will

 7    make sure that our response on that is provided in the next few

 8    days so that we can keep that process moving along.

 9              THE COURT:  Susan, are you in touch with Bob on this?

10    Does he have any rough drafts or anything of that sort that you've

11    seen?

12              MS. WINKLER:  Well, I am in touch with him, and no, he

13    does not have a rough draft.  We follow a very standard model, if

14    you will, you know Bob has seen what's in our model for all of

15    these settlements there's a standard federal model that we work

16    from.  There's only a few things that change from one agreement to

17    the next, and I anticipate that -- the hardest part is getting --

18    once we get the agreement between Merck and the United States, then

19    things tend to flow pretty well, at least in my experience.  But

20    it's that first piece, getting something that the company can live

21    with and that all of the impacting constituents can also live with.

22              THE COURT:  John, we really have to push on that.

23              MR. BEISNER:  We'll commit to get that completed.  As I

24    said, I think we can manage that within the next few days.

25              THE COURT:  I think that's going to play into what you're
```

1     asking on this.

2             MR. GARMER:  Yes.

3             THE COURT:  It's one thing for you to wait a week, it's

4     another thing for you to wait three months.

5             MR. GARMER:  Yes.

6             THE COURT:  So I want you involved in this situation so

7     that if you can keep in touch with them so that if it gets long

8     then we're going to have to deal with the discovery because I can't

9     keep you waiting on that.

10            MR. JUNEAU:  Judge, kind of one of the elephants in the

11    room for everybody, everybody is because from my perspective it's

12    just a question of exerting effort that results in something or are

13    you spinning your wheels, are we going forward or not, and I've got

14    to deal with people.  It's a question do you push back, we don't

15    have enough information now, or we need to know this before we can

16    do this.

17            With that being said, the elephant in the room to me

18    really is this, and I'll just lay it on the table for everybody,

19    it's been for me since I've had the discussions with everybody, is

20    in the terms of the release as crafted is a prohibitions or

21    clawbacks or whatever those words are y'all want to use that affect

22    these cases, I say there are 15, 16 Attorney General cases that

23    they cannot pursue, it affects them pursuing those claims, that's

24    really what we have to discuss here, if not -- we have to find out

25    ultimately because that's the one thing kind of hanging up my

1    discussions with everybody.

2          So I lay it on the table for everybody that's here.

3    Ms. Winkler, may be able to give us some indication on that or not.

4    I know that's kind of broadly put.

5          MR. BEISNER:  I think the right approach is this.  We've

6    got some issues that need to be resolved with the Department of

7    Justice I think as Ms. Winkler was noting, that's sort of the

8    template we need to have.  We'll endeavor to get those finished, I

9    think some of those issues may have an impact of how this flows

10   thereafter.  But we need to get that accomplished right away so

11   that we can move into the process of then taking that and

12   negotiating the various release and other issues you're talking

13   about with the NAMFCU team.

14         So that's the way it works and I think we need to finish

15   that process with DOJ and then move into the next step.  And as I

16   said, those are some things that need to be negotiated, I can't

17   tell you now exactly what it says because we haven't finished that.

18         THE COURT:  Bob, is that case specific or state specific,

19   or do you look at it as a uniform release?

20         MR. PATTON:  Well, I have to confess that the last

21   speaker's remarks were mostly unintelligible because of the

22   conference call connection here.  But if what you're asking is each

23   state settlement agreement in a sense, in essence similar to the

24   others, are they like one template agreement, was that the

25   question?

 1          THE COURT:  Yes, that's basically it.  What we're talking

 2     about is some states have multiple claims and, therefore, there's

 3     some issue as to whether or not the releases would involve some

 4     clawback language.  And if that's the case, is that specific to a

 5     particular state or do you put that in everything?

 6          MR. PATTON:  That would be particular to that state

 7     agreement.  I think what we explained to our constituents, we're in

 8     a position to draft a settlement agreement that resolves claims on

 9     behalf of federally funded healthcare programs, and for the states

10     that means Medicaid.  And to the extent that there are other claims

11     or other program damages at issue, those would need to be -- we as

12     a team are not going to negotiate state consumer protection claims

13     or state wise state employee program plans.  If those states want

14     to open bilateral negotiations with the company on resolving those

15     claims, they certainly may use our settlement agreement template as

16     a platform for doing that and we would support that, but we will

17     not undertake those negotiations on their behalf.

18          THE COURT:  Okay.  All right.

19          MS. BARRIOS:  Your Honor, if I will, I am going to be

20     much more direct and ask you if Merck is going to take the position

21     that each state has to release all of the claims in order to take

22     the Medicaid claim money?

23          MR. BEISNER:  Well, a key issue in each of those

24     negotiations is the subject of covered conduct, and it's

25     complicated in this case because of the way the allegations have

```
 1    been made in the pending litigation matters here.  I think that's
 2    what makes this different, that's what we have to sort out.  How
 3    will that come out, I don't know at this point.  That's the point
 4    that needs to be negotiated here.
 5             THE COURT:  So what I am hearing, Dawn, is that that's
 6    not necessarily going to be the situation, that is to say that it's
 7    not necessarily that by taking Medicaid they'll give up all other
 8    claims, that's at least going to be on the table.
 9             MS. BARRIOS:  Okay.
10             MR. BEISNER:  You're asking me to predict the outcome of
11    negotiations.
12             MS. BARRIOS:  Actually I just asked what position you
13    were going to take, and I understand your question.
14             Is there any room for beginning the negotiations with the
15    states now on their releases?
16             MR. BEISNER:  I don't think so until we know what the
17    covered conduct definition is, I think that's difficult.
18             MS. BARRIOS:  And who determines the covered conduct, is
19    that something that you negotiate with DOJ?
20             MR. BEISNER:  That's part of what we need to do at this
21    point, yes.  And I think that we should leave that to those
22    discussions, I don't want to air those fully here because those are
23    discussions that we need to have, the team needs to have with the
24    Department of Justice.
25             THE COURT:  And I hope we're able to do that fast, John.
```

1        MR. BEISNER:  Your Honor, I agree completely and we will

2   be on the phone as soon as this is over.

3        THE COURT:  We're down the road a piece, everybody's

4   been -- this is not just the first time we've focused on this

5   issue.  So hopefully we will be able to get that resolved.

6        MR. PATTON:  Your Honor, if it's any comfort to the

7   previous questioner there, there are state specific provisions in

8   the state agreement that relate to state issues generally.  There

9   are many that are the same.  As what's contained in the federal

10  agreement and with respect to covered conduct in virtually, in

11  every agreement that I've worked on, and there have been many, the

12  covered conduct in the state Medicaid settlement agreement is

13  identical to that in the federal agreement.

14        THE COURT:  Okay.  All right.

15        MR. GARMER:  May I ask a question?

16        THE COURT:  Yes.

17        MR. GARMER:  Does the DOJ have authority to execute a

18  settlement that covers anything other than Medicaid claims?

19        THE COURT:  I guess that's a question to you, Susan, did

20  you hear the question?

21        MS. WINKLER:  I did.  And the answer is if you're

22  referring to other state claims?

23        MR. GARMER:  Yes.

24        MS. WINKLER:  The answer is no.  We have no authority

25  over, for example, the state funded employee benefit programs or

```
1    state consumer protection programs, those are state only programs;

2    and we not only don't have any authority, we would never even think

3    about trying to negotiate a state only claim.

4              MR. GARMER:  And you would include, Susan, the consumer

5    protection claims of any individual state in that that you don't

6    have authority over?

7              MS. WINKLER:  No, we never attempt to negotiate the state

8    consumer protection claims, those are state, that's the states.

9              THE COURT:  State specific, too.

10             MS. WINKLER:  Yes, exactly.

11             MR. PATTON:  And if I may add, from the state negotiating

12   team's point of view in this case, because we are representatives

13   of the Medicaid fraud control units which are creatures of federal

14   statute and which statute authorizes us to pursue Medicaid claims,

15   we're federally funded and we are authorized to pursue Medicaid

16   claims only, we are limited in our ability to negotiate and settle

17   claims to Medicaid claims; so what I said before about supporting

18   the process that an individual state might attempt to resolve a

19   range of claims, we would certainly provide support for whatever we

20   could but our authority is limited to the Medicaid arena.

21             THE COURT:  Okay.

22             MR. GARMER:  I think that's helpful.

23             MR. JUNEAU:  That's helpful for me time frame wise.

24             THE COURT:  All right.  Where are we from here, give me

25   some suggestions, where do we go?
```

1        MR. BEISNER:  I think the key, your Honor, is we will get

2    back to DOJ with the comments that Ms. Winkler indicates that she

3    is expecting right away.  And hopefully move that process along as

4    quickly can from everything I've heard the suggestion that once we

5    get that agreement to a reasonably complete posture, the rest of it

6    can move along pretty quickly, it's consistent with everything that

7    I understand about these processes as well.  So I think that's the

8    key.

9        THE COURT:  Okay.

10        MR. JUNEAU:  Seems to me, Judge, once we know that

11    information, that is the end result of the negotiations and what

12    the document is, then I guess the question then will be on the

13    table right then is will Merck be in a position then to sit down or

14    not sit down or have an interest in discussing the disposition of

15    these respective issues, a guess that's what we're talking about,

16    that's as I see it.

17        THE COURT:  Well, I guess what happens is that hopefully

18    the Medicaid/Medicare claims will be out, and then whether or not

19    there's any additional claims we will have to take a look at and

20    see what they are and then whether or not those claims need any

21    discovery, joint discovery, non-joint discovery, and whether the

22    MDL court can facilitate any of that.  But I think the first step

23    is to get rid of the Medicaid claims and see what the releases

24    result from that.

25        When is a reasonable time that you can get back to me on

```
 1    this?  I don't want to just have it get through the cracks.

 2              MR. BEISNER:  Sure.  Well, your Honor, perhaps the best

 3    thing to do would be to, I am not sure a call would be necessary on

 4    this, but perhaps get you a written communication where we stand in

 5    two weeks or perhaps we could do that through Special Master Juneau

 6    on a call with him.

 7              THE COURT:  If necessary, get to me in a conference call,

 8    Dawn, you, John and Pat, and give me what the situation is.  If we

 9    need to set up another conference with everybody, I'll do so.

10              MS. BARRIOS:  Yes, your Honor.

11              MR. BEISNER:  Okay.

12              THE COURT:  Anything else from anybody on the phone?

13              MS. BERKMAN:  Your Honor, Marcy Berkman for Santa Clara

14    County.  We would just like to remind everyone that the county does

15    not have a Medicaid claim (UNINTELLIGIBLE) --

16              THE COURT:  You do not have a Medicaid claim, what's the

17    claim?

18              MS. BERKMAN:  Under the New Jersey consumer law statute.

19              MR. BEISNER:  The counties.

20              MR. JUNEAU:  Santa Clara has the same thing.

21              MR. BEISNER:  That's who that is.

22              THE COURT:  Okay.

23              MR. BEISNER:  Your Honor, since we're on the record, just

24    one quick thing I did want to note since we spent so much time

25    talking about this with Special Master Juneau, is that the process
```

1    we've been going through to provide information has been in the

2    form of informal provision information to facilitate the settlement

3    process.  We, all of us this morning, were sort of throwing around

4    the term discovery versus informal information, and I think we've

5    all agreed that the information we've been providing has been

6    pursuant to 408.  So just since we're on the record I will note

7    that.

8              MS. BARRIOS:  That's correct, your Honor.

9              THE COURT:  Okay.  Fine.  Okay.  Anything else from

10   anybody?

11             All right.  Well, thanks very much.  And, Susan, thanks

12   for participating; and you, too, Bob I think it was very help.

13             MR. PATTON:  You're quite welcome.  Thank you, your

14   Honor.

15             MS. WINKLER:  Bye-bye.

16             THE COURT:  You bet.  Bye-bye.

17             MS. BARRIOS:  Thank you, Judge.

18             MR JUNEAU:  Thank you, your Honor.

19         (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

20

21                         *  *  *  *  *  *

22

23

24

25

1

2

3                        REPORTER'S CERTIFICATE

4

5        I, Karen A. Ibos, CCR, Official Court Reporter, United States

6    District Court, Eastern District of Louisiana, do hereby certify

7    that the foregoing is a true and correct transcript, to the best of

8    my ability and understanding, from the record of the proceedings in

9    the above-entitled and numbered matter.

10

11                        _Karen A. Ibos_

12                        _____

13                        Karen A. Ibos, CCR, RPR, CRR

14                        Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25