```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF LOUISIANA
 3
 4   IN RE:  VIOXX
 5
     PRODUCTS LIABILITY          MDL NO. 1657
 6   LITIGATION
                                 SECTION L
 7   THIS DOCUMENT RELATES TO
     ALL CASES                   JUDGE FALLON
 8                               MAG. JUDGE KNOWLES
     FILER:  ROBERT E.           SPECIAL MASTER
 9   ARCENEAUX/MARGARET          PATRICK A. JUNEAU
     WOODWARD
10
11
12   Deposition of ANDY D. BIRCHFIELD, JR., 218
     Commerce Street, Montgomery, Alabama  36104,
13   taken in the offices of Herman, Herman, Katz &
     Cotlar, Suite 100, 820 O'Keefe Avenue, New
14   Orleans, Louisiana  70113, on Friday, the 6th day
     of May, 2011, beginning at 9:11 a.m.
15
16   BEFORE:
17       SPECIAL MASTER PATRICK A. JUNEAU
18   APPEARANCES:
19       ROBERT E. ARCENEAUX
         47 Beverly Garden Drive
20       Metairie, Louisiana  70001
21                   and
22       MARGARET E. WOODWARD
         Suite C
23       3701 Canal Street
         New Orleans, Louisiana  70119
24
                 CO-LEAD COUNSEL FOR OBJECTORS
25               IDENTIFIED IN FEB. 8 ORDER
```

```
1        court -- not told the court --
2        told the FAC that he represented
3        me.  I've never met the man, don't
4        know him.
5        SPECIAL MASTER JUNEAU:
6             Mr. Becnel, that's the
7        matter to be addressed before
8        Judge Fallon.
9        MR. BECNEL:
10            I understand.  I just put a
11       notice to the court about those
12       facts and sent the money back.
13       SPECIAL MASTER JUNEAU:
14            That's another day, another
15       time.
16            With that comment and caveat
17       I made, that you can proceed, but
18       I would suggest that you limit the
19       scope of that, realizing what I
20       got to deal with here in this
21       case.
22       MS. WOODWARD:
23            Okay.
24   EXAMINATION BY MS. WOODWARD:
25            Q.   All right.  Mr. Birchfield, in this
```

1    transcript, you indicated that Mr. Herman was

2    appearing on behalf of the NPC.  Can you explain

3    to me what authority the NPC had to work out a

4    arrangement with the Stratton objectors?

5         A.    The -- the issue before the -- the

6    issue that was presented by the objectors to the

7    fee percentage, this group of -- of objectors had

8    two components to their objection.  There was a

9    group among the objectors that said 8 percent is

10   too much.  It should be less.  And they were

11   advocating that the percentage be somewhere below

12   8 percent, and there were objectors that had --

13   that were advocating different percentages there.

14   There were also among the --

15        Q.    Mr. Birchfield, I am going to

16   interrupt you because this is not responsive.

17   I'm asking you what role there Herman had on

18   behalf of the NPC to negotiate with the Stratton

19   objectors?

20        SPECIAL MASTER JUNEAU:

21             I think that's a preface to

22        what he's fixing to answer.  He's

23        starting to give the answer, as I

24        anticipated, but maybe we'll see.

25        THE WITNESS:

1           I am.

2    EXAMINATION BY MS. WOODWARD:

3           Q.    Continue, please.

4           A.    The second component of the

5    objectors' argument was that there was a

6    full-participation option that was entered into

7    by some of these -- of these fee percentage

8    objectors and that that agreement -- they should

9    be -- they should be held to that agreement.

10   They should be assessed 2 percent and -- for fees

11   and no more.  For that subset of objectors that

12   were arguing for the full-participation option,

13   what they were seeking was a refund of a -- of

14   the amount that was withheld above the 2 percent,

15   and in order to -- in order to address a refund

16   of a portion of their -- the fees that were held

17   back, that would be the -- the responsibility

18   would fall to the NPC as a party to the Master

19   Settlement Agreement.

20          Q.    Mr. Birchfield, the agreement with

21   the Stratton objectors was for a 4 percent

22   assessment; is that right?

23          A.    Yes.

24          Q.    What was the purpose --

25          A.    For that second component that I was

1    talking about, that the group that had -- that

2    had timely objected, yes.

3              Q.    What was the purpose of the July

4    28th letter from Michael Stratton to Judge Fallon

5    advising that the 7.5 percent joint

6    recommendation made yesterday is well supported

7    by our investigation, precedent and the academic

8    writings in the field.  Moreover, our experts

9    agreed that the 7.5 percent was a fair fee award

10   for the common benefit lawyers given precedent

11   and the work done in this case?

12             MR. ARCENEAUX:

13                  May I ask that Mr.

14             Birchfield speak up a little bit?

15             I'm getting reports that nobody

16             can hear him.

17             SPECIAL MASTER JUNEAU:

18                  Yeah, it would help a little

19             bit, Andy, if you would speak up.

20             A.    You're asking me the purpose of this

21   letter, correct?

22   EXAMINATION BY MS. WOODWARD:

23             Q.    Uh-huh.

24             A.    I presume it is to inform Judge

25   Fallon that he, on behalf of the objectors,

1    examined 500,000 hours submitted by common

2    benefit attorneys and took depositions, briefed

3    several issues, consulted with mass tort class

4    action fee experts in academia and that the 7½

5    percent joint recommendation made yesterday is

6    supported by their investigation, precedent and

7    academic writings in the field.

8         Q.   I can read the letter, but what I'm

9    asking you is:  Don't you believe that any

10   reasonable reader of this letter would conclude

11   that the Stratton group had settled its claims

12   with the FAC for 7.5 percent?

13        A.   No.

14        Q.   And did you advise Judge Fallon that

15   you had reached a 4 percent deal with the

16   Stratton group?

17        A.   After we met with Mr. Stratton

18   and -- I mean, we had met with Judge Fallon

19   before.  Judge Fallon had -- was overseeing the

20   litigation of this matter.  He was advised that

21   we were in discussions and -- and after we

22   reached an agreement, he was informed that an

23   agreement had been reached.  That's it.

24        Q.   Do you dispute any portion of Judge

25   Fallon's statement on the record at the February

1     17th status conference, quote:

2             "The only thing I know of it

3          is that there was an objection to

4          the total sum of the common

5          benefit fund, that Mr. Stratton

6          represented the objectors and I

7          presided or I gave them an

8          opportunity to do some discovery

9          early.  They did some discovery.

10         They had some issues.  I resolved

11         the discovery issues, the

12         evidentiary issues.  They

13         proceeded on with the case.  I was

14         advised that the objectors

15         withdrew the objection.  That's

16         all I know of it.  I wasn't

17         involved in any discussions or

18         agreements.  That's why I didn't

19         issue any orders."

20         A.    No.

21         Q.    And who authorized the transfer by

22    BrownGreer to Michael Stratton of $18,549,236.85?

23         A.    The NPC and Merck.

24         Q.    Who made the call to BrownGreer or

25    wrote the letter to BrownGreer or issued the

1    instructions for that transfer?

2         A.    I did.

3         Q.    Anybody at BrownGreer question you

4    on whether you had a court order for that?

5         A.    Not that I recall.

6         Q.    Okay.  Who on the FAC was aware of

7    the Stratton agreement?

8         A.    I think all of the members of the

9    Fee Allocation Committee were aware.

10        Q.    Did all of them approve that

11   agreement?

12        A.    As far as I know, yes.

13        Q.    In what context did you discuss the

14   deal, if you did, before it was confected in this

15   July 27th transcript?

16        A.    The Fee Allocation Committee, we had

17   ongoing discussions about a number of issues,

18   including this one.  I don't recall the -- I

19   don't recall the specifics of those discussions,

20   other than, you know, there were no -- no

21   objections to -- to this agreement.

22        Q.    So, everybody on the FAC knew about

23   it?

24        A.    Yes.

25        Q.    What about the PSC, did everybody on

1    the PSC know about it?

2         A.   No.

3         Q.   Did any members of the PSC who were

4    not also on the FAC know about it?

5         A.   Well, the -- I can't say, you know,

6    who -- who knew and who did not.  We had -- we

7    had regular PSC, you know, meetings, you know,

8    every month when Judge Fallon would -- would

9    conduct his status conference.  The PSC members

10   that were present would meet and those would be,

11   you know, oftentimes informal meetings, but I

12   know that the members of the PSC, you know, that

13   were -- were present would have been informed of

14   the development.

15        MS. WOODWARD:

16             At this time, I'd like to

17        offer as an attachment and exhibit

18        to Mr. Birchfield's deposition

19        documents I'm identifying as B1,

20        the July 27th, 2010, transcript

21        and B2, the letter of July 28,

22        2010.

23             (Whereupon, Exhibit B1 and

24        Exhibit B2 were marked for

25        identification.)

Page 76

```
 1                    (Whereupon, a discussion was
 2          held off the record.)
 3          MR. HERMAN:
 4                    Would you read back the
 5          identification, for me?
 6                    (Whereupon, a discussion was
 7          held off the record.)
 8   EXAMINATION BY MS. WOODWARD:
 9          Q.    How much is currently in the common
10   benefit fund?
11          A.    I don't know the precise amount.
12          Q.    Is there $315,250,000?
13          A.    I do not think so.
14          Q.    There's less?
15          A.    I think there's less, yes.
16          Q.    And there's less because of the
17   extraction of the $18 million in Stratton funds?
18          MR. HERMAN:
19                    Objection; predicate.
20          A.    There's less for a couple of
21   reasons, including the agreement with the
22   Stratton objectors.
23   EXAMINATION BY MS. WOODWARD:
24          Q.    What other withdrawals have been
25   made from that fund?
```

```
 1          A.     I'm not aware of any other

 2    withdrawals made from that fund.

 3          Q.     Okay.  You said a couple of other

 4    things besides the Stratton withdrawal had

 5    depleted the fund.  What were the other things

 6    that have depleted the fund?

 7          A.     I did not say that had depleted the

 8    fund.

 9          Q.     Okay.  I'm not trying to put words

10    in your mouth.  You did indicate there were a

11    couple of other reasons that the fund had dropped

12    below its current levels.  Can you explain?

13          A.     It didn't drop below its current

14    level; it was never there.

15          Q.     Okay.

16          A.     I mean, it was not there for these

17    reasons.

18          Q.     All right.

19          A.     It was the agreement that was

20    reached with the Stratton objectors that provided

21    for a refund of half of the 8 percent holdback

22    for each of those objectors.  The -- there was

23    also a -- a decision made by the -- by the NPC

24    where -- and the court was apprised, as far as I

25    know, all primary counsel, you know, were aware
```

1    that an 8 percent holdback, an assessment, would

2    not be -- would not be applied to fixed payment

3    claimants, claimants that were receiving the

4    $5,000 award.  And, so, for each of those

5    claimants, there was -- there was no money

6    withheld.  And, so, the funds were not there to

7    begin with.

8           Q.    Have any other payments been made to

9    any other claimants out of the common benefit

10   fund?

11          A.    No.

12          Q.    Have any other agreements been

13   reached with any other claimants about the

14   amounts of their recommended allocation by the

15   FAC?  And I'm excluding everybody who signed the

16   Exhibit K agreement saying that, yes, the FAC has

17   recommended this specific amount for us and we

18   accept that amount.  I'm talking about outside of

19   those.

20          A.    Well, yes.

21          Q.    Okay.  Which?  Who?  With whom have

22   you reached other agreements?

23          A.    We have -- we have reached an

24   agreement regarding our recommendation to the --

25   to the court with -- with Rebecca Cunard.

```
 1          Q.    Okay.  Let me exclude, also, all of

 2    the objectors with whom you've reached agreements

 3    just in the last few days.

 4          A.    Okay.  There are no agreements that

 5    I'm aware of with any common benefit applicant

 6    that has -- excluding the objectors that you just

 7    referred to -- that we have not submitted the

 8    acceptance form for.

 9          Q.    Do you know how much interest has

10    been earned on the common benefit fund to date?

11          A.    No.

12          Q.    Other than the Stratton objectors,

13    has anybody taken more than 1.5 percent back from

14    the common benefit fund after Judge Fallon's

15    October 19th, 2010, order?

16          A.    I'm not sure that I follow you.

17          Q.    I'll restate it.

18          A.    You asked me --

19          Q.    I'll restate it.

20          A.    -- if any other payments have been

21    made from that fund, and my answer was "no."  So,

22    are you asking me something different now?  Help

23    me understand what your question is.

24          Q.    You recall that Judge Fallon reduced

25    in his October 19th order the amount of the
```

1    assessment from 8 percent to 6.5 percent.

2         A.    Yes.

3         Q.    And you've testified that you

4    reached a different agreement with the Stratton

5    objectors.  Have you reached an agreement on the

6    6.5 percent assessment with any other claimants,

7    either -- to reduce their assessment below 6.5

8    percent?

9         A.    No.

10        Q.    Now, in a recent filing --

11        A.    Excuse me.  Let me just clarify

12   that.  I mean, not in regards to, you know, any

13   attorneys.  The only -- the only caveat to that

14   is what I described earlier, and that is for each

15   of the Vioxx claimants, the individuals who had

16   a -- a personal injury claim, if they received

17   the fixed payment, there was no -- there was no

18   withholding for them.

19        Q.    I've got that.

20        A.    Okay.  The -- the only other caveat,

21   you know, to that, is there -- there may have

22   been one or two individual Vioxx claimants who,

23   for -- for some issue in the Vioxx settlement

24   administration process would have been put in a

25   position where if the -- if the 8 percent

1    holdback were applied, they would owe money back.

2    And, so, the -- the NPC said we're not -- we're

3    not going to ask the Vioxx claimants to pay money

4    back into the program.

5             Q.    Can you give some examples, names --

6             A.    No.

7             Q.    -- amounts?

8             A.    No.  I mean, it would not have

9    been -- relatively speaking, it would not have

10   been, you know, large amounts, but the -- the

11   situation would be where an individual received

12   an interim payment and there were -- there were

13   audits done, you know, through the process, and

14   because of an audit and a change in the amount

15   that -- the change in the amount of settlement

16   that the claimant would be entitled to, they

17   would not be in a position to -- to actually

18   receive any money, and the 8 percent would put

19   them in a position of owing money back into the

20   system.  There were very few of those instances,

21   but there were a few.

22            Q.    For those people who paid no

23   assessment, as you've just described, have any of

24   those made claims for a fee award from the common

25   benefit fund?

```
 1          A.     No.   These are individual claimants.
 2          Q.     In a recent filing, you indicated
 3   that you considered the third-party payer work to
 4   be appropriately included within the common
 5   benefit fund.
 6          A.     Can you show me what you're
 7   referring to?
 8          Q.     The third-party --
 9   MR. HERMAN:
10          You have a document?
11   SPECIAL MASTER JUNEAU:
12          Yeah.   Do you have a
13   document?
14   MS. WOODWARD:
15          We're going to pull it up.
16   I didn't bring it.
17   EXAMINATION BY MS. WOODWARD:
18          Q.     How many meetings did the FAC have
19   in person as a body?  I want to exclude the
20   hearings that you conducted where you received
21   the individual claimants' multiple presentations.
22          A.     I don't -- I don't know the number.
23   I would -- I would guess it's in the range of a
24   couple of dozen.
25          Q.     Okay.
```