UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| IN RE: VIOXX | : | MDL NO. 1657 |
| PRODUCTS LIABILITY LITIGATION | : | |
| | : | SECTION: L |
| | : | |
| | : | JUDGE FALLON |
| | : | MAG. JUDGE KNOWLES |

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . :

**This document relates to:   05-2914,** *Aldo Calandra, et al. v. Merck & Co., Inc.*

### ORDER

The Court has received a letter and "Petition for the revision of the Order & Reasons" from Attorney Carlo Rienzi.  IT IS ORDERED that the letter and petition are filed into the record.

On August 5, 2005, the JPML transferred to this Court a proposed class action on behalf of all Italian citizens who took Vioxx.  On August 30, 2006, the Court issued an Order and Reasons granting a motion to dismiss the proposed Italian class action pursuant to the doctrine of *forum non conveniens.  In re Vioxx Prods. Liab. Litig.*, 448 F. Supp. 2d 741 (E.D. La. 2006). The Court found that the Italian courts were an available and adequate forum for the claims of Italian citizens and that the balance of relevant factors suggested that Italian courts would be much more convenient.  *See id.* at 746-48.  Therefore, the Court dismissed the Italian class action complaint.

Mr. Rienzi now submits this letter and petition describing difficulties with the burden of proof that Italian plaintiffs have experienced in litigating their claims in Italian courts.  He requests that the Court reconsider its August 30, 2006 Order and Reasons "given the extreme difficulty of suing for reimbursement of the damages caused to consumers in Italy by" Vioxx.

1

It is not appropriate to revisit the Court's Order dismissing the Italian class action complaint. The Court is not aware of any authority holding that after dismissal from federal court on *forum non conveniens* grounds and after taking advantage of the available and adequate foreign forum, a plaintiff may seek to return to the dismissing court because he or she is unsatisfied with the outcome in that foreign forum.[1] Accordingly, the Petition is DENIED.

Additionally, the matter is referred to Plaintiff's Liaison Counsel to take whatever action, if any, is appropriate.

New Orleans, Louisiana, this 18th day of October, 2011.

UNITED STATES DISTRICT JUDGE

---

[1] The Court conditioned dismissal on Merck's cooperation in allowing the claims to be heard in Italian courts, including not "act[ing] to prevent the Plaintiffs from returning to this Court if the Italian ... forums decline to accept jurisdiction, provided that an action is filed in those forums within 120 days of the order of dismissal." 448 F. Supp. 2d at 750.  According to the Petition, the Italian courts have exercised jurisdiction over Vioxx actions; therefore, this condition is not implicated.

**COORDINAMENTO DI ASSOCIAZIONI PER LA TUTELA DELL'AMBIENTE E DEI DIRITTI DI UTENTI E CONSUMATORI**



**CODACONS**

Sede legale ROMA viale G.Mazzini 73 Tel +39 06 3725809 Fax +39 06 3701709 cap 00195 e-mail: codacons.info@tiscalinet.it
MILANO via Cusani 5 Tel +39 02 72003831 Fax +39 02 86460518 cap 20121 e-mail: codacons.lombardia@tiscalinet.it

### www.codacons.it

STUDIO LEGALE
Avv. Prof. Carlo Rienzi
Viale delle Milizie n. 9
00192 Roma
Tel. 06 62289028 Fax 06 62288993
Email salute@articolo32.net

> **US DISTRICT COURT**
> **EASTERN DISTRICT OF LOUISIANA**
> *Section L Judge Eldon E. Fallon*
> 500 Poydras Street
> Room C-456
> New Orleans LA 70130

Racc. a/r

Rome, 5 october 2011

Object : ***Case 2:05-md-01657-EEF-DEK Document 6578 Filed 08/30/2006***
***Section L***
***Judge Fallon***
***MDL NO. 1657***
***Calandra et al. V. Merck & Co., Inc., 05-2914***

The undersigned lawyer Carlo Rienzi, president of CODACONS, Italian Consumers Association, member of CNCU National Committee of the Italian Minister of Economic Development, with a law firm in Rome, in collaboration with the law firm Kenneth B Moll & Assiciated, LTD, Three First National Plaza, 50 th Floor, Chicago, Illinois60602, prodece here the instance to the Judge Fallon on the object.

The undersigned, in fact, agreed with the decision of the Judge who believed that Italian citizens (and French) were could be protected and treated fairly and rightly by their legislative system so considering inappropriate the use of American justice , because the order also wrote: .. *(omitted) a foreign forum is adequate When the parties will not be Deprived of all remedies or unfairly treated analysis, even thug They May Not Enjoy The Same Benefits as They Might receive in an American court ( ... omitted) (cftr.pag. 6dell'Order)* However, the undersigned, wish to emphasize the historical fact that unfortunately, despite I did various lawsuits about Vioxx damage in Italy, no one court has found there a causal link between the damages suffered by the patients taking Vioxx.

I invite, for the reasons expressed by the instance attached, Judge Fallon to intervene so that the underwriters of the drug Vioxx Italian citizens can act again through a class action to obtain a compensation for damage suffered (also considering that in America the pharmaceutical company's Vioxx has reached an agreement with the underwriters' legal recognition of adequate compensation to the same product).

I'm looking forward to receiving your kind reply as soon as possible

Mr.CarloRienzi
President of Codacons

Il CODACONS è associazione di consumatori inscritta nell'elenco delle associazioni dei consumatori e degli utenti rappresentative a livello nazionale ex art.137 del D.Lgs n. 206/05 (Codice del Consumo) con decreto del Ministero dell'Industria 15 maggio 2000 e, come tale, componente del CNCU - Consiglio Nazionale dei Consumatori ed Utenti e legittimata ad agire a tutela degli interessi collettivi in base alla speciale procedura ex artt. 139 e 140 dello stesso decreto.
E' altresi O.N.L.U.S. - Organizzazione non lucrativa di utilità sociale, ex d.Lgs 460/97, Associazione di Volontariato riconosciuta – ex lege 266/91ed

# UNITED STATES DISTRICT COURT EASTERN DISTRICT OF LOUISIANA

## *PETITION for the revision of the ORDER & REASONS*

### *Case 2:05-md-01657-EEF-DEK Document 6578 Filed 08/30/2006*

### *Section L*

### *Judge Fallon*

### *MDL NO. 1657*

### *Calandra et al. V. Merck & Co., Inc., 05-2914*

### *Document Relates To: Calandra, et al. v. Merck & Co.,Inc., 05-2914*

### *ON BEHALF OF:*

1.  *Aldo Calandra*
2.  *Alessandro Gabriele*
3.  *Enzo Quaglini*
4.  *Dr. Filippo Santangelo*
5.  *Prof. Giovanni Scibilia*
6.  *Marco Ramadori*

*And for all the other persons who were damaged by the drug Vioxx, and are therefore part of the class who has sued* to obtain compensation for damages suffered as a result of taking it – for the purposes of the present petition, represented and defended by the attorney Carlo Rienzi and domiciled at his law office in Rome, Viale delle Milizie n. 9, 00192, phone number +39 06 62289027, fax +39 06 62288993, email salute@articolo32.net

### AGAINST

**The order by Judge Fallon which on the 30th of August, 2006, did not certify the class of persons damaged by the drug Vioxx, upon declaration of** *forum non conveniens.*
The Judge did not certify any class of persons in that they were Italian and French citizens who had already suffered well-known damages to their health as a result of taking the drug, or that, not yet having suffered damage to their health, were seeking reimbursement for the continuous and repeated medical treatment that they were undergoing, or who were simply seeking reimbursement for the cost of the drug. Essentially the Judge believed that Italian (and French) citizens had a judicial-legislative system available to them in their own countries which was able to protect them and treat them in a fair and equitable manner, and therefore believed that it was in opportune for them to turn to the American justice system; indeed, in the order he wrote . . . *a foreign forum is*

*adequate when the parties will not be deprived of all remedies or treated unfairly, even though they may not enjoy the same benefits as they might receive in an American court (page 6 of the Order).*

IT IS BELIEVED INSTEAD THAT

Following this pronouncement the named plaintiffs have unfortunately been forced to act autonomously in Italy, together with the others who have also acted with individual lawsuits, but have unfortunately run into innumerable difficulties in their proceedings. To this day, no one whose health has been damaged after taking the drug Vioxx has obtained justice.

On the other hand, in America, the access to justice and underlying that, the concept of "justice" are more highly guaranteed:  in the Preamble to the Constitution, the State … establish[es] Justice, insure[s] domestic Tranquility, provide[s] for the common defence, *promote[s] the general Welfare* … in America, also, the principle of just and correct information, especially in the pharmaceutical industry, has long been established, as relates to the so-called "failure to warn": in this case the behavior which has prompted this lawsuit is the lack of a warning from a drug manufacturer suitable for guaranteeing an acceptable degree of safety in the use of a product, which would have effectively warned the consumer of the hazards linked to it. Indeed, a class action like the one for the damages caused by the drug Vioxx would also be based on the lack of information on the part of its manufacturer concerning risks connected to its use, and would therefore certainly be successful in the US: the FDA highlighted in a few documents, as early as 2001, how Merck & Co. was conducting "…a promotional campaign for Vioxx (….) [which] minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study , and as such, misrepresents the safety profile for Vioxx." The VIGOR study, the FDA continued, highlighted how "patients on Vioxx were observed to have a four to five fold increase in myocardical infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprossin (naproxen)" (from the warning letter by the FDA dated September 17, 2001). Therefore, **afterwards, on April 11, 2002, the FDA ordered Merck to include in Vioxx's packaging the updates that had emerged from the VIGOR study regarding the severe cardiovascular events caused by the drug.**

Overall, it must also be considered how in America, beyond the compensatory function, there is an overlapping punitive function, i.e., sanctions imposed by courts for the commission of civil torts, recognized by judges as "punitive damages"; therefore, it is obvious that in that country, the pharmaceutical companies, in order to not risk having to pay compensation to persons damaged by their drugs, often manage to reach settlements through alternative dispute resolution, without arriving at a court judgment.

\*\*\*\*\*\*\*

To furnish some examples, the difficulties met in Italy by individuals who were damaged, which in fact have rendered it impossible even for a single one to obtain justice, or an order to the pharmaceutical company to pay for damages to patients whose health suffered by taking Vioxx, have been the following:

1 – every consumer has been practically forced to sue individually, not only because at the time of the filing of the Italian lawsuits, the law concerning "class actions" had not yet been approved (it came into effect on January 1, 2010), but also, and more importantly, because the specific damages to prove required the admission of an expert medical investigation;

2 – in Italy, up until now, all of the expert medical investigations conducted during the case proceedings, as based on the APPROVE study conducted by Merck Sharp & Dohme itself, **specifically require and expect that the consumer used the drug Vioxx daily for at least 18 months** (the length time that the study says is necessary to establish that the patient's health could have been damaged as a result of having taken it.)

The proof that one has taken Vioxx for at least 18 months continually is impossible to furnish.

Additionally, **proof that one has taken Vioxx for any particular period is impossible to furnish to a judge:** the Italians who were damaged, in not being able to fathom that Vioxx would be recalled from the world market one day by its manufacturer and that it could cause harm to their health, did not save all their prescriptions for it.

The drug Vioxx was also paid for by the National Health Service, but for various reasons, the patients often paid for it themselves without keeping any sort of proof of purchase.

Then, in any case, the drug Vioxx was taken for the treatment of pain and osteoarthritic diseases, and therefore a use of it that was daily or for long periods could not have been foreseen; instead, it is logical to assume that the drug was taken as needed for long periods in weekly or monthly therapy cycles.

3 – Additionally, as the attorney and professor Claudio Consolo has argued intelligently in depth, in his writings supporting the class action for the persons damaged by Vioxx in America, the Italian trial is based on a strict and rigorous system of individual proof of the link of causality: in the cases filed in Italy, it was necessary to furnish strict proof of the causal link between the taking of Vioxx and damages to the patients' health. It is therefore difficult, if not impossible in Italy to prove the correlation between the health damages suffered by the patient and the fact that he or she had previously taken Vioxx.

In addition to this fact, unfortunately, the concomitant and inevitable risk factors that each patient presented (including age, gender, the fact of being a smoker or not, the fact of having had previous heart disease or family members with it) did not allow for identifying this causal link;

4 – In Italy it was possible to act only on behalf of persons who took Vioxx and who were able to complain or show concrete damage to his or her health as a result of having taken the defective drug, and not for all those persons who, instead, were not able to prove damage to his or her health, but who would have requested compensation only for having been exposed to a future risk.

The Italian justice system, even in recognizing that persons in this last category have suffered a non-material damage consisting of limits to their freedom of life and action because of the need for check-ups, and for the stress and fear of being afflicted in the future by health problems, has rarely granted protection or even a minimum of relief for these damages.

Already with the sadly famous case of "Seveso," the Italian judiciary system did not recognize forms of responsibility and/or compensation from risk. The environmental accident at Seveso on July 10, 1976, in which a factory explosion occurred, with the resultant spreading of dioxin and environmental pollution to the surrounding areas did not allow for the connection with certainty of a few cancerous diseases which concretely developed in particular individuals with the exposure to dioxin. The citizens who were afflicted by this catastrophe and exposed to an enormous health risk did not receive any form of protection from the justice system: any attempt to connect an ailment to the exposure to dioxin did not appear credible and worthy of protection because of the obstacle represented by the strict requirement for individual proof of the *link of causality*. The only damage that was recognized after many years, even if it was minimal, was the damage caused by severe emotional distress for the lack of information on what had happened, and the risks connected to the exposure to dioxin, as well as the limitations to victims' lives for the need to undergo continuous medical check-ups, and the imposition of conditions on choices in life like not procreating, or the need to move elsewhere; and in any case, in order to receive compensation these damages in a way that was personalized and best suited to the individual, the claim and rigorous proof of the psychophysical damage that one had suffered was expected.

5 – At the time of the filing of the cases in Italy for the damages caused by taking Vioxx, the law on "class action" lawsuits had not yet been approved. It came into effect on January 1, 2010, and was a necessary legal instrument for the class of consumers who wanted to request compensation for damages for all the irregularities that took place from August 16, 2009 onwards. The Italian class action in America had been proposed in May 2005, and on August 30, 2006, was dismissed by Judge Fallon for the presupposition of *forum non convienens,* and consequently in 2006, 2007, and 2008, all of the individual lawsuits in Italy were filed in the Italian civil courts. Therefore, with the

law on class action lawsuits not yet being in effect, the individuals damaged by Vioxx filed individual and autonomous lawsuits, sustaining the pertinent costs, in order to request compensation for the damages caused by the dangerous drug, with each one paying the relative legal fees. Even when the above-mentioned law was approved and went into effect on January 1, 2010, the same individuals were not able to use it legally, both for the expiration of the right to sue, which had occurred in the meantime (Vioxx was recalled from the world market on September 30, 2004 by decision of its manufacturer, and because of its imputabilty for extracontractual responsibility the right to sue expired in September 2009) as well as for the fact that the same law allowed more than one citizen to sue for the protection of homogenous rights only for irregularities that took place after August 16, 2009 (while the events attributable to the action of the drug Vioxx occurred between 2000 and September 30, 2004.)

6 – In Italy, the justice system allows for the damages requested by the plaintiffs to be liquidated when they are specifically suffered and proven in observance of the principle of "material damage," with the "punitive damages" of the American justice system not being admitted or recognized. The idea that compensation for damage could have a punishing effect on the damaging party remains foreign to Italian law.

CONSIDERING THAT SPECIFICALLY

in the civil cases filed in Italy by individuals damaged by Vioxx or by their estates against Merck Sharp & Dohme Spa (the manufacturer of the drug), the Italian Health Ministry, and the AIFA (the Italian Phamaceutical Agency), the former of whom put the drug on the market, and the latter two who authorized its doing so, the following occurred (and in furnishing these examples, we refer to only a few proceedings):

- In a first-level civil lawsuit, cause number RG 64313/2007, in the Civil Court of Rome, by the plaintiff GABRIELE, the judge, in not believing that he had furnished *any indication sufficient to prove that he had taken the drug continuously for at least 18 months, the amount of time necessary for there to be an increased risk of heart disease, according to the studies done,* rejected Mr. Gabriele's request. In this proceeding, the plaintiff furnished proof of having taken the drug Vioxx, also through his clinical file from the Hospital of San Eugenio in Rome, in which it showed that he had been given the drug during his stay there and upon release, but he was not able to furnish the strict proof that the judge required of the drug having been taken continuously for 18 months. **_SEE ADDENDUM N. 1_ The proof required by the Judge of having taken Vioxx continuously for at least 18 months is extremely difficult, both for the difficulty of saving medical documents, as well as for the fact that the drug was prescribed by doctors for its analgesic effect as needed or at regular intervals, also for long periods of time, but certainly not daily for 18 months.**

- In a first-level civil lawsuit, cause number RG 64295, in the Civil Court of Rome, by the plaintiff FORTUNATI, the judge, in not believing that the plaintiff's proof was sufficient of his prescription for Vioxx and his subsequent taking of it "daily" for 18 consecutive months (as was said in the preceding point *probatio diabolica*) and notwithstanding his doctor's specific certification that he had been prescribed the drug for approximately two years (**_SEE ADDENDUM N. 2_**) rejected Mr. Fortunati's request and even ordered him to pay legal fees in the amount of € 8,550.00, in addition to other fees to both defendants **SEE ADDENDUM N. 3;**

- In a first-level civil lawsuit, cause number RG 64239/2007, in the Civil Court of Rome, by the plaintiff ANTONIO CARNEVALE, the judge admitted medical expert testimony to verify if he had taken the drug Vioxx, on the basis of the documentation produced, and in which quantities, and whether or not the plaintiff presented risk factors such as could rule out that the heart attack he suffered in 2002 was actually caused by Vioxx. However, contrary to what the plaintiff maintained, the expert testimony maintained that *Mr. Carnevale took Vioxx 25 mg tablets in a manner that was inconstant and discontinuous between March 14, 2001 and September 16, 2001, as was prescribed to him, and without the*

specification of a precise pathology. *In total there were 238 tablets over the course of 587 days instead of the 540 tablets over the course of 540 days, consistent with one tablet per day, as recommended, and in the space of 18 months, the minimum time identified by the APPROVE study for demonstrating an increased risk of non-fatal cardiovascular events,* as well as the fact that the plaintiff had other risk factors including ischemic heart disease in his family (his brothers), his age and gender, arterial hypertension, etc. Therefore, the judge concluded, the cardiovascular pathology COULD NOT be causally linked, with the preponderance of probability, to the taking of Vioxx. The case is still pending but the expert report did not recognize a causal link between the problems that the plaintiff had and the taking of Vioxx **SEE ADDENDUM N. 4, the judge required the plaintiff to furnish rigorous proof of the causal link between taking the drug and the subsequent damage to his health that he reported, but the presence of other risk factors (age, gender, hypertension) led him exclude this link** *sic et simpliciter!*

- In a first-level civil lawsuit, cause number RG 64245/2007, in the Civil Court of Rome, by the plaintiff NADIA GIULIANI, the judge believed her request to be unfounded and rejected it, but compensated her litigation fees. The plaintiff was able to produce only a prescription by Dr. Ricciuti to take Vioxx for about 30 days: in fact, the plaintiff had not kept all the prescriptions for the medication, nor had she always purchased it with a prescription, which would have allowed her to ask her local National Health Service bureau for a copy of the prescriptions, since it paid for the drug. Unfortunately, however, the judge would not even recognize that the certificate produced by Dr. Ricciuti was attributable to the plaintiff in that it did not have her name on it. **SEE ADDENDUM N. 5, the proof furnished by the plaintiffs that they took the drug were not believed to be sufficient by the Italian judges!**

- In a first-level civil lawsuit, cause number RG 8068/2009, in the Civil Court of Torino, the damaged party REMO DEL CORSO, deceased, filed by his estate, consisting of his wife Ms. GIUSEPPINA GALBIATI and his children LUCA DEL CORSO and MARCO DEL CORSO, the judge rejected the claim with the order to pay legal expenses, not believing it proven that the drug had been taken by the plaintiff, nor was the proof regarding the prescriptions for Vioxx by Dr. Spinelli sufficient; the judge explained that if it is true that the prescriptions on paper for the drug demonstrate an effective prescription for the medicine, they still do not necessarily prove that the drug was taken. The same judge did not even admit expert medical testimony to evaluate the causal link between the taking of the drug, as the plaintiffs maintained, and the damages suffered by the deceased party, considering that he had not taken Vioxx for more than 18 months. The judge also believed that there was no proof that the drug was dangerous, even in the case of taking it sporadically, and that it is not even possible to cite, in support of the dangerousness of the drug, the American cases, which as was written in his opinion, are characterized *by a completely different approach to the foundation of the damage, based on the principle of punitive damage* **SEE ADDENDUM N. 6.**

all of which believed and further considered, given the extreme difficulty   of suing for reimbursement of the damages caused to consumers in Italy by the dangerous drug Vioxx produced by Merck Sharp & Dohme

### IT IS REQUESTED

That the American Class Action be recognized as admissible as presented *illo tempore.*

Rome , 5 October 2011

AVV. CARLO RIENZI

TRIBUNALE DI ROMA

**COPIA URGENTE**

N. 817/010  Sentenza

N. 946/010  Cronologico

Rep - 957/10

RGAC 64313 ANNO 2007

REPUBBLICA ITALIANA

IN NOME DEL POPOLO ITALIANO

TRIBUNALE DI ROMA - SEZIONE TREDICESIMA CIVILE

il giudice dr Roberto PARZIALE ha emesso la seguente

**SENTENZA** —

nella causa civile di primo grado, iscritta al n. 64313 del ruolo generale per gli affari

contenziosi dell'anno 2007, posta in deliberazione all'udienza del 17 settembre 2009 e

vertente

**TRA**

**Alessandro Gabriele (cf GBRLSN62T09H501C)**, elettivamente domiciliato in Roma, viale

Mazzini n. 73 presso la sede del Codacons, rappresentato e difeso degli avv. Carlo Rienzi,

Marco Ramadori e Cristina Adducci che lo rappresentano e difendono. per delega a

margine dell'atto di citazione

**ATTORE**

**E**

**Merck Sharp & Dohme Italia s.p.a. (p. IVA 00887261006)**, elettivamente domiciliata in

Roma,  P.zza Venezia 11 presso lo studio degli avv. Gian Paolo Zanchini, Francesca

Rolla, Francesco Minà e Daniele La Cognata che la rappresentano e difendono giusta

procura a margine della comparsa di costituzione e risposta

**CONVENUTA**

**E**

**Ministero della salute, in persona del Ministro pro tempore, e Agenzia Italiana del**

**Farmaco, in persona del legale rappresentante pro tempore**, domiciliati in Roma, via

dei Portoghesi n. 12 presso l'Avvocatura dello stato che li rappresenta e difende per legge



TRIBUNALE CIVILE E PENALE DI ROMA
*XIII SEZIONE CIVILE*

Oggetto: risarcimento danni da responsabilità professionale.

## CONCLUSIONI

all'udienza di precisazione delle conclusioni del 19 settembre 2009, i procuratori delle parti

concludevano come in atti.

### SVOLGIMENTO DEL PROCESSO

Con atto di citazione ritualmente notificato Gabriele Alessandro ha convenuto innanzi al

Tribunale di Roma la società Merck, Sharp Dohme s.p.a. il Ministero della Salute e

l'Agenzia Italiana del farmaco per vedere accertare la responsabilità degli stessi nella

commercializzazione del farmaco denominato Vioxx e per l'effetto condannarli al

risarcimento dei danni subiti.

A fondamento della domanda l'attore ha dedotto di essere stato colpito da infarto il 18

aprile 2004 patologia insorta in quanto avrebbe assunto in maniera continuativa dal

gennaio 2002 un farmaco, il Vioxx, che era stato ritirato dal commercio dalla stessa casa

produttrice nel settembre del 2004 in quanto era emerso che l'utilizzo continuativo di detto

farmaco era in grado di raddoppiare i rischi di insorgenza di cardiopatie ischemiche, In

particolare ha evidenziato come a suo avviso, anche sulla base di elementi acquisiti in

analoghi procedimenti che si erano svolti negli Stati Uniti d'America la società MercK,

Sharp & Dohme sarebbe stata a conoscenza di tale effetto collaterale del farmaco ben

prima del momento in cui gli studi commissionati avevano dimostrato tali effetti. Vi era,

inoltre anche la responsabilità delle Istituzioni italiane per non aver vigilato e disposto in

anticipo il ritiro della autorizzazione alla commercializzazione nel territorio italiano.

A fondamento della responsabilità l'attore ha dedotto la responsabilità di cui all'articolo

2050 cc e quella di cui all'articolo 2043 cc.

Si è costituita in giudizio la società Merck, Sharp & Dohme deducendo che, in primo luogo,



TRIBUNALE CIVILE E PENALE DI ROMA
*XIII SEZIONE CIVILE*

l'attore non aveva provato che il farmaco gli era stato effettivamente prescritto e che lo aveva assunto con continuità per il periodo indicato – non essendo applicabile alla fattispecie la responsabilità da attività pericolosa – e in subordine che non vi era prova della esistenza di un idoneo nesso di causalità tra la patologia ischemica insorta e l'eventuale assunzione del farmaco essendo l'attore portatore di specifici fattori di rischio quali l'ipertensione sistemica e il fumo (venti sigarette al giorno) oltre all'utilizzo, due o tre volte al giorno di mariujana oltre alla dedotta familiarità per l'ipertensione arteriosa e per le cardiopatie ischemiche.

Si è Costituito in giudizio il Ministero della salute e l'Agenzia italiana del farmaco deducendo la propria irresponsabilità nella vicenda in quanto il Vioxx era stato introdotto in Italia in conseguenza di procedura comunitaria essendo stato immesso nel mercato europeo inel Regno Unito. Inoltre le vicende del famaco erano state seguite in quanto a seguito di segnalazione delle autorità francesi l'Emea aveva dato corso ad una procedura di arbitraggio che si era conclusa nel novembre del 2003 con la conferma della autorizzazione della commercializzazione con l'aggiunta di alcune indicazioni nel cd "sbugiardino" relativamente alle precauzioni per possibile effetti su soggetti affetti da cardiopatie o ipertensione.

Nel merito hanno contestato la configurabilità della responsabilità ex articolo 2050 e la sussistenza delle condizioni per la responsabilità ex articolo 2043 cc tenuto conto che la vendita del farmaco era stata sospesa in Italia lo stesso giorno di conoscenza della scelta di ritiro volontario del farmaco da parte della società convenuta.

Respinte le richieste istruttorie, ritenute non rilevanti ai fini della decisione, la causa veniva trattenuta in decisione sulle conclusioni precisate dalle parti all'udienza del 19 settembre 2009.



TRIBUNALE CIVILE E PENALE DI ROMA
*XIII SEZIONE CIVILE*

## MOTIVI DELLA DECISIONE

L'attore ha posto a base della sua domanda sia la responsabilità per l'esercizio di attività pericolose, nella specie la produzione e messa in commercio di farmaci, sia la generica responsabilità da fatto illecito.

Costituiscono attività pericolose ai sensi dell'art. 2050 cod. civ. non solo le attività che tali sono qualificate dalla legge di pubblica sicurezza o da altre leggi speciali, ma anche le diverse attività che comportino la rilevante probabilità del verificarsi del danno, per la loro stessa natura e per le caratteristiche dei mezzi usati, non solo nel caso di danno che sia conseguenza di un'azione, ma anche nell'ipotesi di danno derivato da omissione di cautele che in concreto sarebbe stato necessario adottare in relazione alla natura dell'attività esercitata alla stregua delle norme di comune diligenza e prudenza (cfr Cass. Sez. III, 7 maggio 2007 n. 10300; Cass. Sez. III, 19 gennaio 2007 n. 1195).

In entrambi i casi, però, l'attore deve fornire la prova del fatto, del danno e del nesso di causalità (cfr Cass. Sez. III 15 luglio 2008, n. 19449).

Nel caso di specie l'attore ha dichiarato di aver assunto il farmaco Vioxx a decorrere dal gennaio del 2002 e fino al marzo del 2003 con una posologia di 50 mg al giorno per la prima settimana e successivamente nella misura di 25 mg al giorno.

In relazione a tale circostanza, di assoluto rilevo nell'attuale giudizio in quanto i problemi evidenziati in relazione al farmaco Vioxx presupponevano una assunzione protratta per almeno diciotto mesi, l'attore ha citato la cartella clinica di ricovero in data 23 aprile 2002 presso l'Ospedale Sant'Eugenio e la successiva relazione redatta dal predetto nosocomio in data 3 maggio 2002.

In realtà in detta cartella clinica per quanto riguarda l'utilizzo pregresso del farmaco Vioxx vi è un primo riferimento contenuto nella anamnesi patologica prossima nella quale si legge che il paziente avvertiva dei dolori nella deambulazioni, dolori che rispondevano



TRIBUNALE CIVILE E PENALE DI ROMA
*XIII SEZIONE CIVILE*

parzialmente alla somministrazione di antinfiammatori (Vioxx). Nessuna indicazione vi era in ordine al soggetto che avrebbe prescritto il farmaco, la posologia e la durata della somministrazione anche se, indicando il paziente che il dolore era insorto due mesi prima del ricovero è ragionevole ipotizzare che il farmaco non avrebbe potuto essere prescritto che qualche tempo dopo l'insorgere del dolore.

Nel corso del ricovero il Vioxx risulta essere stato somministrato nei giorni del 23 aprile, una capsula, il 24 aprile venivano somministrate due capsule di Vioxx, il 25 aprile veniva ripetuta la stessa terapia, il 26 aprile non risulta somministrazione del farmaco in questione, il 27 venivano prescritte due capsule, lo stesso avveniva fino al primo maggio quando veniva sospesa la somministrazione del Vioxx.

Nella relazione redatta il 3 maggio 2002 – e nella quale si legge che il paziente sarebbe entrato in reparto il 3 maggio 2002 data in cui anche nella relazione risulta dimesso, si riporta quanto contenuto nella cartella in ordine a quanto riferito dal paziente per il periodo pregresso. In tale relazione nella terapia di dimissione veniva indicata la somministrazione di una capsula di Vioxx la sera.

Nella stessa dimissione si indicava che il paziente sarebbe dovuto tornare per proseguire gli accertamenti, ma di tutto ciò non vi è traccia alcuna in quanto è stata prodotta solo la cartella clinica relativa al successivo ricovero presso l'Ospedale Sandro Pertini in occasione dell'ischemia miocardica.

L'attore ha prodotto una certificazione del medico che lo aveva in cura dal settembre del 2002 e fino al 2007 il quale ha riferito che l'attore avrebbe assunto il farmaco Vioxx in ragione di 25 mg dal gennaio 2002 all'aprile 2002 in maniera continuativa e poi discontinuamente dopo tale data. La assunzione dal gennaio del 2002 sarebbe avvenuta sulla base di una consulenza specialistica che avrebbe prescritto il Vioxx.

Tale indicazione, essendo relativa ad un periodo nel quale l'attore non era assistito del dr



TRIBUNALE CIVILE E PENALE DI ROMA
*XIII SEZIONE CIVILE*

Dell'Aquila, come risulta dal fatto che lo stesso ha indicato che era stato suo paziente dal 23 settembre 2002, è chiaramente indicativo di quanto riferito dal paziente il quale non sembra neppure che abbia mostrato la documentazione medica in quanto non vi è alcun riferimento alla cartella clinica del ricovero presso il Policlinico Tor Vergata.

Detta dichiarazione indica che dopo l'aprile del 2002 l'attore avrebbe assunto il farmaco sporadicamente. Lo stesso sanitario non ha indicato di aver prescritto il farmaco al paziente, sia pure su indicazione di altri specialisti.

Di conseguenza, per quanto riguarda l'assunzione del farmaco in atti è stata fornita la prova dell'assunzione durante il ricovero durato una decina di giorni presso l'Ospedale Tor Vergata e dell'assunzione sporadica dopo la dimissione, non essendo stato fornita alcuna indicazione in ordine alla evoluzione della patologia dolorosa che, se non più controllata, si deve essere risolta rendendo inutile la ulteriore assunzione di farmaci antidolorifici.

Tale situazione però non fornisce alcuna indicazione sufficiente a far ritenere provato che l'attore abbia assunto il farmaco in via continuativa per almeno diciotto mesi, tempo necessario perché secondo gli studi effettuati vi fosse un incremento del rischio di patologia cardiache.

Nessuna indicazione vi è, in atti, della posologia del farmaco ed in assenza di specifiche indicazioni non si può presumere che lo stesso sia stato prescritto con modalità eccedenti le posologie consigliate dal momento che il farmaco è commercializzato in diversa concentrazione, 12,5 e 25 mg per capsula, e non appaiono emergere indizi che possano far presumere che non venisse utilizzato il farmaco con 12,5 mg di principio attivo per capsula.

Per quanto riguarda il nesso di causalità ritiene il giudicante che nessun elemento sia stato fornito in tal senso.



TRIBUNALE CIVILE E PENALE DI ROMA
*XIII SEZIONE CIVILE*

Se, come abbiamo visto, non vi è prova della somministrazione continuativa del farmaco per diciotto mesi – neppure nella prospettazione dell'attore nell'atto di citazione che indica un periodo di soli quattordici mesi dal gennaio 2002 al marzo 2003 – occorre considerare che l'attore era portatore di specifici fattori di rischio.

Nella cartella del ricovero presso il Policlinico Tor Vegata si legge che vi era una familiarità per ipertensione e per le ischemie cardiache. Malgrado ciò l'attore risultava essere fumatore (20 sigarette al giorno).

Nulla si sa del successivo periodo fino all'aprile del 2004 ma nella cartella del ricovero presso l'Ospedale Sandro Pertini si legge che l'attore era iperteso, con in corso un trattamento farmacologico, con un insufficiente controllo dei valori pressori, e che continuava ad essere un fumatore (venti sigarette al giorno) con l'aggiunta di far uso di mariujana due o tre volte al giorno, tutti elementi che aggravavano l'ipertensione in un soggetto che aveva anche familiarità per ischemie cardiache.

All'atto del ricovero nessun riferimento è stato fatto al Vioxx tra i farmaci dei quali stava facendo uso, a conferma del fatto che, comunque, l'utilizzo del farmaco era già cessato.

In questo contesto si ritiene che secondo il criterio di giudizio del più probabile che non la sporadica assunzione del Vioxx siccome provata – e la parte non ha chiesto di provare altro sotto questo aspetto – appare escludere che l'evento ischemico possa essere posto in correlazione al farmaco mentre appare assai più probabile che lo stesso sia conseguenza degli agli specifici fattori di rischio di cui era portatore.

In questo contesto deve essere rigettata la domanda dell'attore in quanto non provata in relazione al presupposto della assunzione del farmaco continuativa per almeno diciotto mesi e per non essere emersi elementi idonei a supportare la esistenza di un concreto nesso di causalità.

Sussistono tuttavia giuste ragioni per compensare tra le parti le spese del presente



TRIBUNALE CIVILE E PENALE DI ROMA
*XIII SEZIONE CIVILE*

giudizio dal momento che la suggestione operata dal ritiro di un farmaco assunto per la

sua possibilità di produrre una patologia di cui l'attore è stato poi affetto era tale da

giustificare in astratto la richiesta risarcitoria.

**P.Q.M.**

Il Tribunale di Roma definitivamente pronunciando sulla domanda proposta da Gabriele

Alessandro nei confronti della società Merck, Sharp & Dohme s.p.a., del Ministero della

salute e dell'Agenzia italiana del farmaco

- rigetta la domanda attrice;
- compensa le spese di giudizio tra le parti.

Così deciso in Roma, lì 9 dicembre 2009

IL GIUDICE

(Roberto Parziale)

IL FUNZIONARIO CANCELLERIA
(Sarni dott.ssa Sandra)

Cancelleria
Re... 16.01.010

18 GEN. 2010
PERVENUTO AL REPERTORIO

# SENTENZA N. 817/10

**TRIBUNALE ORDINARIO DI ROMA**
**SETTORE CIVILE**
Ufficio copie - Sentenze
LA PRESENTE SENTENZA E' STATA REGISTRATA
IL 813/10
SERIE 4 AL N. 1492 VERSATO € 168,00
COME DA ATTESTAZIONE DELL'AGENZIA DELLE
ENTRATE DI ROMA 2 APPOSTA IN CALCE ALLA
COPIA AUTENTICA INVIATA AI SENSI DELL'ART.
278 DEL T.U. 115 DEL 30.05.2002
ROMA_____

— 3 MAG. 2010          IL CANCELLIERE
                       Gabriella Corsaletti

DIRITTI DI COPIA PERCEPITI
€ 37,23

## TRIBUNALE ORDINARIO CIVILE DI ROMA

### Primo Ufficio Copie - AUTENTICHE

Copia conforme all'originale che si rilascia a ri-
chiesta dell'Avv. *Rolla*

Roma, lì...... 1 1 MAG. 2010

IL DIRETTORE DI CANCELLERIA c

IL FUNZIONARIO DIRETTORE
*Gabriella Corsaletti*

**C O P I A**

### RELATA DI NOTIFICA

Ad istanza della Merck Sharp & Dohme Italia S.p.A., con sede in Roma, in

via Fabbroni, 6, io sottoscritto Assistente UNEP addetto all'Ufficio Unico

Notificazioni della Corte di Appello di Roma ho notificato la suestesa

sentenza n. 817/2010 del Tribunale di Roma, Sez. XIII, G.U. Dott. Roberto

Parziale a

- il **Sig. Alessandro Gabriele**, presso i procuratori costituiti, avv.ti Carlo

Rienzi, Marco Ramadori e Cristina Adducci, nel domicilio eletto presso la

sede legale del Codacons in Roma, Viale Mazzini n. 73, 00195, ivi

recandomi e consegnandone copia conforme all'originale a mani di

- l'**avv. Carlo Rienzi**, presso il suo studio in Roma, Via delle Milizie, 9

Scala C, 00192, ivi recandomi e consegnandone copia conforme all'originale

a mani di

- l'**avv. Marco Ramadori**, presso il suo studio in Roma, Via M. Prestinari,

13, 00195, ivi recandomi e consegnandone copia conforme all'originale a

mani di



**Dott. CARLO MORETTI**
*Medico Chirurgo*

*Studio: Via Cassia, 153 - Tel. 0761.461791*
*Abit.:    Via Roma, 40 - Tel. 0761.478915*
*01019 VETRALLA (VT)*

Si certifica che il Sig.Fortunati Alfredo, nato a Viterbo il 18/04/1953 e residente
in Vetralla VT Via Giardino 54, ha effettuato terapia con Refecoxib (Vioxx) in
seguito a grave trauma distorsivo caviglia sn ,per cui aveva subito intervento
chirurgico nel luglio 2001, nei periodi  12/12-2001, 02/04 e 08/12 - 2002, 01/12 -
2003.

Si rilascia in carta libera per gli usi di legge.

Vetrlla 02-11-2006

Dott. CARLO MORETTI
D.S.S.TT - ASL 004
10323AG

---

| COPIA | UNEP - CORTE DI APPELLO DI ROMA | Settore **10** | Zona **171** |

CASSA **3**  **/2010**   Cron. **8.566**   Dest. **4/5**   Data Ric. **18/05/2010**

Richiedente: **ROLLA FRANCESCA**

Relazione di Notificazione **URGENTE**

Trasf.  **6,21**  Sp.postale   **0,00**
Richiesto come in atti, io sottoscritto Ufficiale Giudiziario addetto all'Ufficio Unico c/o la Corte di Appello di Roma, ho notificato il presente atto a
**CRISTINA ADDUCCI**

**ROMA - VIA DEI CARRARESI, 25**
mediante consegna di copia conforme all'originale a mani di persona qualificatasi per _le medime_

capace e convivente, che si incarica della consegna in assenza del destinatario e di persone idonee a ricevere l'atto, _____ qualità, ai sensi di legge.
L'Ufficiale Giudiziario

Roma, _____                                             **Eugenio Maria TAVERNELLI**
                                                                   **UFFICIALE GIUDIZIARIO C1**
                                                                   **160 CORTE DI APPELLO DI ROMA**

**Ai sensi dell'art. 140 c.p.c.** , curando il deposito della copia dell'atto in busta chiusa e sigillata completa di numero cronologico,
nella Casa Comunale di Roma, per non aver rinvenuto alcuno all'indicato domicilio e/o per l'assenza o il rifiuto di persone idonee
a cui poter consegnare l'atto ai sensi di legge.

Roma, _____          L'Ufficiale Giudiziario _____

*Si:VII. 15057/10*
*CRof: 7385/10*

*C.u.*
*REP. 11052*

## REPUBBLICA ITALIANA
### IN NOME DEL POPOLO ITALIANO
### TRIBUNALE DI ROMA
### SEZIONE XIII CIVILE

il giudice unico dr Maurizio Maselli ha emesso la seguente
### SENTENZA
Nella causa civile di primo grado iscritta al n.64295 del ruolo generale per gli affari contenziosi dell'anno 2007 vertente

### TRA

Alfredo Fortunati elett.te dom.to in Roma viale Mazzini n.73 presso la sede legale del Codacons, rappresentato e difeso dagli avv.ti Carlo Rienzi, Marco Ramadori e Cristina Adducci per procura speciale a margine della citazione                                                                    attore

### E

Merck Sharp & Dohme Italia spa, elett.te dom.ta in Roma piazza Venezia 11 presso lo studio dei procuratori avv.ti Paolo Zanchini e Francesco Minà che la rappresentano e difendono per delega in calce all'atto di citazione notificato, in unione agli avv.ti Francesca Rolla e Christian Di Mauro del Foro di Milano                                                                           convenuta

AIFA Agenzia Italia del Farmaco e Ministero della Salute, elett.te dom.ti in Roma via dei Portoghesi n.12, presso l'Avvocatura Generale dello Stato e da questa rappresentati ex lege
                                                                                        convenuti

OGGETTO: responsabilità del produttore

### CONCLUSIONI

All'udienza di precisazioni delle conclusioni del 18/3/10 i procuratori delle parti così concludevano: come in atti.

### Svolgimento del processo

Con atto di citazione ritualmente notificato Alfredo Fortunati conveniva in giudizio innanzi a questo Tribunale la Merck Sharp & Domhe Italia spa, l'AIFA Agenzia Italia del Farmaco e il Ministero della Salute, al fine di sentirli dichiarare solidalmente responsabili della produzione e commercializzazione del prodotto farmaceutico Vioxx, fortemente lesivo della salute dei pazienti assuntori di detto medicinale, in quanto contenente sostanze causative di effetti cardiaci e renali negativi e per l'effetto sentirli condannare al risarcimento dei danni in favore dell'attore per complessivi € 219.800,00, oltre accessori.

Così radicatosi il contraddittorio, si costituivano in giudizio i convenuti, contestando la fondatezza della domanda.

La causa veniva trattenuta in decisione sulle conclusioni delle parti, precisate all'udienza del 18/3/10.

### Motivi della decisione

Va in primo luogo dichiarata l'inammissibilità delle 17 prescrizioni che l'attore ha chiesto di depositare all'udienza del 18/3/10 in violazione del principio di disponibilità della prova ex art. 115, comma 1, c.p.c. e di decadenza dal potere di produrre documenti oltre il termine di cui all'art. 183, VI comma c.p.c, non essendo detta esibizione giustificata né dallo sviluppo assunto dal processo, né dalla loro formazione successiva allo spirare dei suddetti termini.

L'attore deduce di aver assunto il medicinale Vioxx dal novembre 2001 al dicembre 2003 in maniera continuativa, senza aver peraltro offerto alcuna prova né in ordine alla durata del trattamento, né del relativo dosaggio, posto che: 1) la certificazione (doc 23 di produzione attrice) rilasciata dal dott. Moretti in data 17/9/06 (a distanza di circa tre anni dall'asserita ultima assunzione del medicinale) non è idonea a comprovare l'assunzione quotidiana e continuativa del Vioxx per un periodo minimo di 18 mesi – lasso di tempo questo necessario per l'eventuale riconoscimento del nesso di causalità tra l'assunzione del medicinale e gli eventi lamentati - perché

non contiene alcuna indicazione al riguardo di significativo rilievo ai fini che qui interessano e comunque risulta contraddetta dalla stessa affermazione dell'attore (pag. 25 dell'atto introduttivo) di aver assunto il Vioxx "in modo discontinuo dal mese di novembre 2001 fino al dicembre 2003"; 2) le 17 prescrizioni prodotte tardivamente dal Fortunati non possono formare oggetto di esame per le ragioni dianzi esposte, e comunque non dimostrano la sussistenza dei presupposti necessari (durata ed intensità del trattamento) per l'eventuale accertamento dell'incidenza del rischio di eventi cardiovascolari trombotici rispetto al placebo indotti dall'uso prolungato del medicinale oltre i 18 mesi di somministrazione quotidiana continuativa.

Da tali considerazioni discende che l'attore non può fondare le proprie asserzioni sullo studio APPROVe – non essendovi differenza nell'incidenza di detti eventi nei primi 18 mesi di utilizzo tra i pazienti trattati con il Vioxx e i pazienti trattati con il placebo – per dedurre la sussistenza del nesso causale tra l'asserita assunzione e danni lamentati (cardiopatia ischemica); senza considerare che il Fortunati era affetto da molteplici e gravi fattori di rischio - quali l'ipertensione (da almeno 8 anni prima del presunto evento), l'ipercolesterolemia, il fumo, i fattori genetici ed ereditari, la dislipidemia - sicuramente idonei di per se stessi ad ingenerare nel paziente il rischio di cardiopatie ischemiche indipendentemente dall'assunzione del farmaco.

Pertanto, la domanda attrice va respinta con condanna della parte soccombente al pagamento delle spese processuali, liquidate come in dispositivo.

### P.Q.M.

il Tribunale di Roma, definitivamente pronunziando nella causa come in epigrafe promossa, così provvede:

1) rigetta la domanda come in epigrafe proposta;

2) condanna l'attore a rimborsare ai convenuti le spese di lite, liquidate per ciascuno di essi in € 8.550,00, di cui € 20,00 per esborsi, € 2.780,00 per competenze ed € 5.750,00 per onorari, oltre iva, cap e spese generali.

Così deciso in Roma il 15/6/10

Il Giudice Unico
Maurizio Maselli



**SENTENZA** 14057/2010

**DIRITTI DI COPIA PERCEPITI** E3486

# TRIBUNALE CIVILE DI ROMA
### SEZIONE COPIE - AUTENTICHE

COPIA CONFORME ALL'ORIGINALE IN CORSO DI REGISTRAZIONE CHE SI

RILASCIA A RICHIESTA DELL'AVV......... ROLLA ...............................

AD ESCLUSIVO USO APPELLO AI SENSI DELL'ART. 66 DPR 26-4-1986 N.131

ROMA, LI ............ 1 2 LUG. 2010



IL DIRETTORE DI CANCELLERIA

IL FUNZIONARIO DIRETTORE
*Gabriella Corsaletti*

# dott. Arcangelo Mezza

Medico-Chirurgo
Spec. in Medicina Legale e delle Assicurazioni
Spec. in Malattie dell'Apparato Cardiovascolare
Spec. in Anestesia e Rianimazione
Spec. in Medicina Interna
Consulente del Tribunale di Roma

COPIA

TRIBUNALE CIVILE DI ROMA
SEZIONE 13
C.T.U. nella causa
CARNEVALE ANTONIO
contro
MERCK SHARP & DOHME SPA
(R.G. 64239/2007- R.S. 2348/2007)
G.R. dott.ssa VERUSIO

Studio viale Anicio Gallo, 143 – 00174 Roma
www.arcangelomezza.it; e-mail: info@arcangelomezza.it;
tel/segr: 0697612488; cell/segr: 3336373474; fax: 0699938335

CTU  CARNEVALE contro MERCK SHARP & DOHME SPA      G.R. dott.ssa VERUSIO      p. 1

## INCARICO

Il sottoscritto dott. Arcangelo Mezza, nell'udienza del 16/9/2009 prestavo giuramento, dinanzi al G.R. dott.ssa VERUSIO - Tribunale di Roma sez. 13 - per ricevuto incarico di CTU nella causa CARNEVALE ANTONIO contro MERCK SHARP & DOHME SPA (R.G. 64239/2007- R.S. 2348/2007) in responsabilità del produttore sui quesiti così come riportati in verbale d'udienza e qui di seguito riportati.

Concessi 120 giorni per il deposito dell'elaborato peritale indicavo pertanto per il giorno 16/02/2009 ore 16:00, presso il mio studio in Viale Anicio Gallo,143–00174 Roma (tel/segr.0697612488–fax. 0699938335–cell/segr.3336373474) data e luogo per l'inizio delle operazioni peritali, in ordine ai seguenti quesiti:

"Dica il CTU,

- esaminati gli atti e i documenti di causa,
- esaminata la ulteriore documentazione medica sulla anamnesi prossima e remota del signor Carnevale, che il CTU e' autorizzato a richiedere alla parte attrice ovvero a strutture sanitarie e ai medici curanti del signor Carnevale:

1. il periodo (con indicazione delle date esatte) durante il quale il signor Carnevale assunse il farmaco Vioxx®, in base alla documentazione in atti, se risulta che lo stesso lo abbia assunto in modo continuativo e quotidiano e quando, e in quali quantità;
2. quale è l'emivita del farmaco;
3. se, in base all'anamnesi prossima e remota, il signor Carnevale avesse fattori di rischio per l'insorgenza di eventi cardiovascolari, verificando in particolare l'eventuale esistenza di fattori quali l'età avanzata, la predisposizione genetica all'ipertensione e agli eventi cardiovascolari di tipo ischemico, l'ipertensione arteriosa, la dislipidemia, l'ipercolesterolemia, l'arterosclerosi e la presenza di significativi accumuli di grasso corporeo;
4. in quale misura i fattori di rischio individuali abbiano inciso sulle probabilità che il signor Carnevale potesse sviluppare un infarto miocardico acuto anteriore;
5. se, tenendo conto della risposta ai quesiti precedenti e secondo i più elevati criteri di probabilità scientifica ed oltre ogni ragionevole dubbio, l'infarto miocardico che avrebbe colpito il signor Carnevale nell'ottobre 2002 sia stato causato dall'assunzione del Vioxx®;
6. in ipotesi di risposta affermativa al quesito 5, quale sia la percentuale d'invalidità temporanea e permanente del signor Carnevale.

Il CTU

Il Giudice

Roma, 15/06/2010                                              CTU dott. Arcangelo Mezza

## OPERAZIONI PERITALI

Il 16/02/2010 alle ore 17:00 presso il mio studio in viale Anicio Gallo, 143 – 00174 Roma (tel/segr.0697612488–fax.0699938335–cell/segr.3336373474) presente il periziando CARNEVALE ANTONIO nato a Filadelfia (VB) il 20/5/1934, riconosciuto con Pat. B n. 897327 Pref. di Roma il 12/8/1978 rinnovata fino al 16/9/2011 (assente il CT o il legale rappresentante di parte attrice) presente il prof. Bruno Trimarco CT di parte convenuta con (viale Winspore n.6; cell 3386320103; fax 0817462256) l'avv. Lacognata legale rappresentante della MERCK SHARP & DOHME SPA inizio alle operazioni peritali disposte dalla Ill.ssimo G.R. dott.ssa VERUSIO.

### ANAMNESI

Riportata familiarità per cardiopatia ischemica (fratelli)

Scolarità terza media.

Dall'età di 18 anni falegname. Successivamente dipendente Cotral, fino all'età di 27 anni con la qualifica di addetto alle pulizie delle vetture. A 28 anni addetto al controllo ingresso metropolitana, per poi passare ad addetto a mansioni d'ufficio a seguito di benefici per minor aggravio. Iperteso da epoca non meglio precisata. Riferita imprecisata patologia vascolare carotidea

In pensione dall'età di 62 anni.

### IL FATTO

Dalla viva voce del periziando e con riscontro nella relazione medico-legale di parte attrice del Prof. Costantino Ciallella e della dott.ssa Mariarosaria Aromatario [nel fascicolo di parte attrice, allegato 25 a pag. 8] si apprende che il periziando stesso avrebbe assunto Vioxx, per qualche giorno nel 2000, *"per il trattamento della sintomatologia algica associata ad una condizione di coxartrosi e successivamente in modo continuativo dal marzo 2001 al settembre 2002, nel dosaggio di 25mg/die, con la stessa indicazione clinica"*.[1]

---

[1] A tal riguardo il CARNEVALE fa riferimento a prescrizioni del prof. Marchetti, ortopedico, delle quali lo scrivente CTU ne richiudeva formalmente l'esibizione a valutazione, oltre a copia di eventuali referti Radiografici e/o delle TAC: accertamenti questi ultimi necessari a una circostanziata formulazione della sopra riporta diagnosi di coxartrosi [ALL.1]. L'avv. Cristina Adducci legale rappresentante di parte attrice mi faceva recapitare, a mezza posta celere, copia della cartella clinica e del referto TAC del rachide lombo-sacrale seguiti da comunicazione via fax circa l'indisponibilità da parte del periziando di quanto attinente alle prescrizioni ortopediche specialistiche. [ALL. 2-3]

Roma, 15/06/2010                                    CTU dott. Arcangelo Mezza

Dalla documentazione in atti di parte attrice, come da richiesta del 29.11.2005 Prot. n. 620V, all'allegato n. 23 del fascicolo di parte attrice, risultano puntualmente prescritte le seguenti quantità di VIOXX:

| FARMACIA Dr.ssa M.R. SCORZA | | | |
|---|---|---|---|
| RICETTA | N. 3181 | SPEDITA IL | 29/10/2001 |
| RICETTA | N. 1050 | SPEDITA IL | 14/03/2001 |
| RICETTA | N. 964 | SPEDITA IL | 05/12/2001 |
| RICETTA | N 2381 | SPEDITA IL | 23/07/2001 |
| RICETTA | N 816 | SPEDITA IL | 02/09/2002 |
| RICETTA | N 1953 | SPEDITA IL | 28/09/2001 |
| RICETTA | N 1310 | SPEDITA IL | 10/05/2002 |
| RICETTA | N 3728 | SPEDITA IL | 20/03/2002 |
| | | | |
| FARMACIA Dr. M. DE BERARDINIS | | | |
| RICETTA | N 6577 | SPEDITA IL | 31/07/2002 |
| RICETTA | N 6578 | SPEDITA IL | 31/07/2002 |
| | | | |
| FARMACIA Dr.ssa S. IZZO | | | |
| RICETTA | N 38 | SPEDITA IL | 02/08/2001 |

Ancora dalla relazione medico-legale di parte attrice si apprende che: *"Nel mese di ottobre 2002 riferisce la comparsa, in pieno stato di benessere, di una sintomatologia algica a carico dell'emitorace sinistro per cui si recava al Pronto Soccorso dell'Ospedale S. Eugenio di Roma ove veniva formulata la diagnosi di infarto miocardio acuto anteriore, trattato in urgenza con trombolisi. Si disponeva quindi trasferimento in ambulanza presso l'Ospedale San Pietro di Roma. . . "*
Dalla cartella clinica n. 023574 dell'Ospedale San Pietro di Roma il periziando lì risulta giunto in ambulanza alle ore 11:57 del 13.10.2002 *"Trasferito dall'Ospedale S.Eugenio"* con diagnosi di ammissione di:" I.M.A. anteriore" e pertanto ricoverato nel reparto UTIC del medesimo nosocomio[2].

Dalla sintetica anamnesi all'ingresso, redatta su modulo prestampato, con precisazioni categoriali determinabili con semplice segno di spunta, per una risposta affermativa versus un'altra semplicemente negativa, veniva così riportato:

---

[2] Ne richiedevo copia integra ed autenticata dalla Direzione Sanitaria dell'Ospedale, laddove il periziando ne presentava altra rilegata con spalla in plastica e con un ultima pagina visibilmente strappata. [ALL. 1]

A fronte poi della singolare rettifica a riguardo dell'abitudine tabagica così come risulta nella medesima cartella clinica alla pagina n. 4:

**Si rettifica il dato anamnestico riportato nella cartella clinica n. 2002/23574 del sig. Carnevale Antonio, in cui si afferma l'abitudine tabagica del suddetto. Infatti il sig. Carnevale Antonio non ha mai avuto abitudine tabagica.**

Che non trova altrettanta puntualità per la familiarità per cardiopatia ischemica, invece successivamente riportata affermativa nella relazione del dott. Macali, non disponibile in atti, citata anche se con limitata enfasi (vedi puntini di sospensione dopo "*dislipidemia*") assieme ad altri fattori di rischio cardiovascolare, nella CT di parte attrice alla pagina 10:

Roma, 15/06/2010                                    CTU dott. Arcangelo Mezza

> Dall'ottobre 2002 il Sig. Carnevale si sottopone a periodici videat cardiologici sia clinici che strumentali.
>
> **Relazione cardiologia del Dr L. Macali del Servizio Centrale di Cardiologia e Pronto Soccorso Cardiologico dell'Ospedale "San Camillo" di Roma**
>
> <u>Diagnosi:</u> Cardiopatia ischemica. Ipertensione arteriosa. Dislipidemia.
>
> Fattori di rischio CV: Familiarità per C.I. (fratelli), ipertensione arteriosa. Dislipidemia… Ecostress dobutamina, positivo ad alta soglia per anomalie

Ancora dall'anamnesi si rileva:" *Preg ANGINA < l mese. Angor Tipico Riposo Instab. Ingrav* " [angina da meno di 1 mese. Angor tipico a riposo, instabile. Ingravescente n.d.r.]. *OSSERVAZIONI: Pz iperteso. **<u>Riferito stato ansioso in terapia con Lexotan 20gttx3</u>**. Riferita ulcera gastrica. Questa mattina intenso dolore precordiale per cui si rivolgeva al PS del S. Eugenio dove veniva posta diagnosi di IMA anteriore ed eseguita fibrinolisi con TPA, apparentemente efficace*". Mentre si riscontra allo "*ESAME OBIETTIVO GENERALE. Stato generale discreto; Sensorio lucido; colorito roseo; aia cardiaca normale Ritmo regolare; Soffio sistolico rigurg. Lieve FVT normale... Suono chiaro polmonare... Rantoli lievi basale dx.. .Addome globoso, trattabile*"

Infine così ne veniva riportato il complessivo stato clinico:*"Pz in discreto compenso emodinamico. PA 160/90 mmHg. Lieve stasi basale a destra. ACR; toni netti; lieve soffio sistolico al centrum. Fibrinolisi somministrata al PS del S. Eugenio con ritorno dell'ST sull'isoelettrica*"

In data 15.10.2002 effettuava la coronarografia che evidenziava:"**<u>Coronaropatia aterosclerotica critica bivasale</u>**" ed in particolare:"**<u>una stenosi critica 90% 1° tratto a valle della biforcazione con ramo D1 seguita da altra subcritica 50% 2° tratto prima di biforcazione con ramo D2 ed altra subcritica 50% inizio 3° tratto</u>**"

In data 16.10.2002 l'esame ecocardiografico che riportava :"*Normali dimensioni delle camere cardiache. Non versamento pericardio. Lieve insufficienza mitralica. Acinesia del SIV inferiore basale e della parete inferiore medio-basale*".

Infine il 16.10.2002 venne sottoposto ad Angioplastica coronaria/PTCA così descritta:"*Procedura di PTCA eseguita con Standby Cardiochirurgico attivo in sede. Stenosi critica DA 90% 1° tratto. Si predilata con palloncino 2,5x20mm. Si impianta stent 3,0x19mm con ottimo risultato angiografico. Stenosi critica CDX 1° tratto seguita da altra critica inizio 2° tratto. Si predilata la prima lesione con palloncino 2,5x20mm. Si impianta stent 3,5x13mm con ottimo risultato angiografico. Si predilata la seconda lesione con palloncino 3,0x20mm. Si impianta stent 3,0x19mm con ottimo risultato angiografico finale. Introduttore in situ*".

> **Durante il ricovero, in data 13.10.2002, venne inoltre riscontrato un valore di Colesterolo Totale di 210 mg/dl con Colesterolo HDL (del 14.10.2002) di 44mg/dl.**

Particolare attenzione desta l'Rx del torace del 13.10.2002 che documentava:

> "*Non lesioni pleuroparenchimali. Ili vascolari ben evidenti. Immagine cardiaca con* [illeggibile] ***Mediastino superiore slargato (gozzo ?)***" con valori di **TSH = 0.35 microU/ml (v.n. 0.35-5.50)**; FT3= 3.03 pg/ml (v.n 2.00-4.00); FT4=1.26 ng/dl (v.n. 0.80-1.50) - senza ulteriori accertamenti specialistici o di laboratorio (scintigrafia, ecografia, TAC o RMN) – **suggestivo di ipertiroidismo**[3], anche alla luce alla luce di quanto poi riportato sempre alla pagina 10 della CT di parte attrice:"
>
> L'interessato riferisce che dall'epoca dell'evento ischemico presenta facile stancabilità con la comparsa a seguito di sforzi anche non intensi di affanno associato spesso ad episodi di angor; lamenta inoltre la comparsa di palpitazioni con tachicardia in particolare la sera e per cui assume farmaci betabloccanti.

Veniva dimesso in data 21.10.2002 con diagnosi di:"*Infarto miocardico anteriore in coronaropatia aterosclerotica critica bivasale*".

---

[3] Interpretazioni dati di laboratorio – R. Bonardi et al  Ed. 5°  Minerva Medica – pag. 841
Roma, 15/06/2010                                                CTU dott. Arcangelo Mezza

CTU  CARNEVALE contro MERCK SHARP & DOHME SPA      G.R. dott.ssa VERUSIO     p. 7

Si poi fa riferimento ad ulteriori ma non documentati accertamenti specialistici solo accennati nella CT di parte attrice alla pagina 10:

Dall'ottobre 2002 il Sig. Carnevale si sottopone a periodici videat cardiologici sia clinici che strumentali.

**Relazione cardiologia del Dr L. Macali del Servizio Centrale di Cardiologia e Pronto Soccorso Cardiologico dell'Ospedale "San Camillo" di Roma**

Diagnosi: Cardiopatia ischemica. Ipertensione arteriosa. Dislipidemia.

Fattori di rischio CV: Familiarità per C.I. (fratelli), ipertensione arteriosa. Dislipidemia... Ecostress dobutamina, positivo ad alta soglia per anomalie omosede (parete inferiore e setto inferiore). SPET: negativa... ECGD (3/05): sporadiche aritmie sv e ventricolari FCmin 50 e max 196 in un tracciato di pessima qualità. Scintigrafia miocardica(6/05) negativa al DP 30600 e FCM 153 PAM 200/80. Esami di laboratorio (10/05): CL tot 193 TG 145. ECG: RS, Fc 74 bpm ripolarizzazione ventricolare nella norma. Esame obiettivo: Circolo compensato. PA 150/90 mmHg Peso Kg 86.

Al momento attuale assume terapia farmacologica a base di antipertensivi e cardioaspirina.

L'interessato riferisce che dall'epoca dell'evento ischemico presenta facile stancabilità con la comparsa a seguito di sforzi anche non intensi di affanno associato spesso ad episodi di angor; lamenta inoltre la comparsa di palpitazioni con tachicardia in particolare la sera e per cui assume farmaci betabloccanti.

Roma, 15/06/2010                                             CTU dott. Arcangelo Mezza

## CONSIDERAZIONI E CONCLUSIONI MEDICO-LEGALI

Dopo minuziosa ricostruzione della fisionomia clinica e medico legale del caso, al proposito è possibile rappresentare, in sintesi, al Ill.ssimo sig. Giudice gli aspetti fondamentali ed i punti critici seguenti, determinanti per la risposta ai quesiti posti.

**In primo luogo** si ritiene utile precisare alcuni aspetti della commercializzazione del VIOXX (ROFECOXIB) e del ritiro dello stesso sulla base di evidenze di studi statistico-epidemiologici appresso specificati.

Il 21/05/1999 la FDA (FOOD DRUG ADMINISTRATION) ha approvato negli USA la commercializzazione del VIOXX. La stessa è stata approvata in Italia dagli organi Ministeriali nell'anno 2000.

Dallo studio VIGOR (pubblicato nel 2000) sono emerse le prime evidenze di incremento di eventi cardiovascolari gravi. Il compimento di ulteriori studi (ADVANTAGE pubblicato nel 2003) ha registrato un inaspettato decesso di un soggetto femminile di 73 anni parte di un gruppo più ristretto di confronto trattato con VIOXX rispetto ad uno più ampio trattato con naproxene. La decisione dell'azienda, immediatamente operativa, di sospendere la commercializzazione dal VIOXX è basata sui nuovi dati a tre anni emersi da uno studio clinico multicentrico, prospettico, randomizzato, condotto vs. placebo, noto come APPROVe (*Adenomatous Polyp Prevention on VIOXX*) pubblicato nel 2005 sul New England Journal Medicine. Lo studio clinico, per altro sospeso, era stato disegnato per valutare l'efficacia del trattamento triennale di VIOXX nel dosaggio di 25 mg. nella prevenzione delle recidive di polipi colorettali in pazienti con pregressa storia di adenomi colorettali. L'arruolamento dei 2.600 pazienti era iniziato nel 2000.

Laddove detti studi hanno evidenziato un aumento del rischio relativo di eventi cardiovascolari confermati non fatali, come infarti e ictus (stroke), **a partire dal 18° mese di trattamento continuativo nei pazienti che assumevano il VIOXX rispetto a quelli trattati con placebo; aumento del rischio che *non* si era invece verificato nei pazienti che assumevano il VIOXX *da meno di 18 mesi*,** coerentemente con i risultati dei due studi controllati vs. placebo riportati poi nell'attuale scheda tecnica del prodotto di seguito integralmente riportata:

Roma, 15/06/2010                                            CTU dott. Arcangelo Mezza

RIASSUNTO DELLE CARATTERISTICHE TECNICHE DEL PRODOTTO
1) DENOMINAZIONE DEL MEDICINALE:
   -------------------------------
   VIOXX 25 mg compresse.
2) COMPOSIZIONE QUALITATIVA E QUANTITATIVA:
   ------------------------------------------
Ogni compressa contiene 25 mg di ROFECOXIB.
Per gli eccipienti, vedere 6.1.
3) FORMA FARMACEUTICA:
   -------------------
COMPRESSA
Compressa gialla, di forma rotonda, con inciso "MSD 110" su un
lato e VIOXX sull'altro.
4) INFORMAZIONI CLINICHE:
   ----------------------

4.1) INDICAZIONI TERAPEUTICHE:
Sollievo sintomatico nel trattamento dell'artrosi o dell'artrite
reumatoide nell'adulto.
4.2) POSOLOGIA E MODO DI SOMMINISTRAZIONE:
VIOXX viene somministrato per via orale.
VIOXX puo' essere assunto con o senza cibo.
VIOXX non deve essere utilizzato in associazione ad altri prodotti
contenenti la medesima sostanza attiva, ROFECOXIB.
**ARTROSI**
**La dose iniziale raccomandata per l'adulto e' di 12,5 mg una volta**
**al giorno. Alcuni pazienti possono trarre ulteriore beneficio**
**dall'incremento del dosaggio a 25 mg una volta al giorno.**
**Non deve essere superata la dose giornaliera di 25 mg.**
**Per il dosaggio di 12,5 mg in monosomministrazione giornaliera**
**sono disponibili anche le compresse da 12,5 mg.**
ARTRITE REUMATOIDE
La dose raccomandata e' di 25 mg una volta al giorno. In pazienti
con artrite reumatoide (AR) non e' stato osservato alcun ulteriore
vantaggio significativo con un dosaggio di 50 mg in
monosomministrazione giornaliera rispetto a 25 mg in
monosomministrazione giornaliera. La dose giornaliera massima
raccomandata e' di 25 mg.
ANZIANI: deve essere prestata attenzione quando negli anziani si
aumenta la dose giornaliera da 12,5 mg a 25 mg.
INSUFFICIENZA RENALE: non e' necessario l'aggiustamento del
dosaggio per i pazienti con artrosi con una clearance della
creatinina di 30-80 ml/min (vedere 4.4 "Avvertenze speciali e
opportune precauzioni d'impiego" e 5.2 "Proprietà
farmacocinetiche"). Attualmente ci sono solo dati limitati in
pazienti con AR con clearance della creatinina di 30-80 ml/min.
INSUFFICIENZA EPATICA: nei pazienti con lieve insufficienza
epatica (punteggio di Child-Pugh 5-6) non e' necessario alcun
aggiustamento del dosaggio. In pazienti con insufficienza epatica
moderata (punteggio di Child-Pugh 7-9 o albumina sierica 25-35
g/L) non deve essere superato il dosaggio minimo raccomandato di
12,5 mg una volta al giorno. L'esperienza clinica e' limitata in
particolare nei pazienti con insufficienza epatica moderata e si
raccomanda di agire con cautela (vedere 4.4 "Avvertenze speciali e

opportune    precauzioni    d'impiego"    e    5.2 "Proprieta'
farmacocinetiche").
USO PEDIATRICO: L'uso di VIOXX non e' indicato nei bambini.
4.3) CONTROINDICAZIONI:
Il ROFECOXIB e' controindicato in:
* pazienti con ipersensibilita' nota a qualsiasi eccipiente di
questo prodotto
*    pazienti    con    ulcera    peptica    attiva    o    sanguinamento
gastrointestinale (GI)
* pazienti con disfunzione epatica grave (punteggio di  Child-Pugh
maggiore 9)
* pazienti con clearance stimata della creatinina minore 30 ml/min
* pazienti che dopo la somministrazione di aspirina o altri
farmaci antinfiammatori non steroidei (FANS) hanno sviluppato
segni di asma, rinite acuta, polipi nasali, edema angioneurotico o
orticaria
* terzo trimestre della gravidanza e allattamento (vedere 4.6
"Gravidanza e allattamento" e 5.3 "Dati preclinici di sicurezza")
* pazienti con malattie infiammatorie dell'intestino
* pazienti con insufficienza cardiaca congestizia grave
4.4) AVVERTENZE SPECIALI E OPPORTUNE PRECAUZIONI D'IMPIEGO:
Le prostaglandine renali possono svolgere un ruolo compensatorio
nel mantenimento della perfusione renale. Di conseguenza, in
condizioni di perfusione renale compromessa, la somministrazione
del ROFECOXIB puo' provocare una riduzione della produzione di
prostaglandine e, secondariamente, del flusso ematico renale e
dunque compromettere la funzione renale. I pazienti che presentano
il rischio piu' elevato per questa condizione sono quelli con
significativa compromissione della funzione renale preesistente,
insufficienza cardiaca scompensata o cirrosi. In tali pazienti
deve essere considerato un monitoraggio della funzione renale.
Usare cautela quando si inizia un trattamento con il ROFECOXIB in
pazienti notevolmente disidratati. E' consigliabile reidratare i
pazienti prima di iniziare la terapia con il ROFECOXIB.
In pazienti che assumono il ROFECOXIB sono stati osservati
ritenzione idrica, edema ed ipertensione. Tali effetti sembrano
essere correlati alla dose e si osservano piu' frequentemente con
l'uso cronico di ROFECOXIB e a dosi terapeutiche superiori.
L'incidenza dei casi di ipertensione segnalati con ROFECOXIB e'
risultata simile od in alcuni casi leggermente superiore a quella
riportata con alcuni altri FANS a dosaggi paragonabili. Poiche' il
trattamento con il ROFECOXIB puo' determinare ritenzione idrica,
usare cautela nei pazienti con anamnesi positiva per insufficienza
cardiaca, disfunzione ventricolare sinistra o ipertensione o nei
pazienti che presentano un edema preesistente per qualsiasi altra
ragione. In questi pazienti il trattamento con ROFECOXIB deve
essere iniziato alla dose minima raccomandata. (vedere 4.5:
Interazioni con altri prodotti medicinali e interazioni di
qualsiasi altro genere).
Gli inibitori selettivi della COX-2 non sostituiscono l'aspirina
nella profilassi cardiovascolare poiche' non hanno effetto sulle
piastrine. Poiche' ROFECOXIB, un componente di questa classe di
farmaci, non inibisce l'aggregazione piastrinica, le terapie

antipiastriniche non devono essere interrotte e ove indicato devono essere prese in considerazione nei pazienti a rischio o con anamnesi positiva per eventi cardiovascolari o eventi trombotici di altra natura. (vedere 5.1, Proprieta' farmacodinamiche).

A causa del profilo farmacodinamico degli inibitori della COX-2 descritto sopra, il farmaco deve essere usato con cautela nei pazienti con storia clinica di cardiopatia ischemica. In caso di evidenza clinica di peggioramento nelle condizioni cliniche di questi pazienti, devono essere prese contromisure adeguate e deve essere presa in considerazione l'interruzione della terapia con ROFECOXIB. Nei pazienti con storia di patologie cardiovascolari deve essere anche presa in considerazione la mancanza di attivita' antipiastrinica degli inibitori selettivi della COX-2.

Quando si usa il ROFECOXIB i pazienti anziani e quelli con disfunzione renale, epatica o cardiaca, devono essere tenuti sotto adeguata osservazione medica.

Negli studi clinici, alcuni pazienti trattati con il ROFECOXIB hanno sviluppato sanguinamenti, ulcere o perforazioni (SUP). Pazienti con storia precedente di SUP e pazienti di eta' superiore a 65 anni sono risultati a rischio piu' elevato per SUP. Indipendentemente da episodi di SUP, il rischio di sintomi gastrointestinali e' aumentato con dosi giornaliere superiori a 25 mg. (vedere 4.8 Effetti indesiderati).

Negli studi clinici con il ROFECOXIB, in circa l'1% dei pazienti, sono stati riportati aumenti dei valori di SGPT (ALT) e/o SGOT (AST) (circa 3 o piu' volte il limite superiore della norma). Un paziente con sintomi e/o segni che suggeriscono disfunzione epatica, o in cui si riscontri un test di funzione epatica alterato, deve essere monitorizzato per valutare se gli esami di funzione epatica sono persistentemente alterati. Se si riscontrano esami di funzione epatica persistentemente alterati (tre volte il limite superiore della norma), il ROFECOXIB deve essere interrotto.

Il ROFECOXIB puo' mascherare la febbre.

L'uso del ROFECOXIB come quello di ogni altro farmaco noto per inibire la COX-2, non e' raccomandato nelle donne che intendono affrontare una gravidanza (vedere 4-6 "Gravidanza e allattamento" e 5.1 "Proprieta' farmacodinamiche").

PAZIENTI IN ETA' PEDIATRICA: il ROFECOXIB non e' stato studiato nei bambini e dev essere utilizzato solo nei pazienti adulti.

La quantita' di lattosio in ciascuna compressa (79,34 mg nella compressa da 25 mg) non e' probabilmente sufficiente a indurre sintomi specifici di intolleranza al lattosio.

4.5) INTERAZIONI CON ALTRI PRODOTTI MEDICINALI E INTERAZIONI DI QUALSIASI ALTRO GENERE:

INTERAZIONI FARMACODINAMICHE

Nei soggetti in terapia cronica con warfarin, stabilizzati, la somministrazione del ROFECOXIB 25 mg al giorno e' stata associata con un incremento di circa l'8% dell'International Normalized Ratio (INR) del tempo di protrombina (PT). Nei pazienti che assumono il ROFECOXIB al dosaggio clinico contemporaneamente al warfarin, sono stati segnalati incrementi dell'INR, che ha richiesto l'interruzione della terapia con warfarin e in alcuni

casi indotto il recupero dello stato coagulativo. Sono stati inoltre segnalati casi di aumenti dell'INR in pazienti in terapia con ROFECOXIB e l'anticoagulante fluindione. Quindi, l'INR del tempo di protrombina dei pazienti in terapia con anticoagulanti orali deve essere attentamente monitorizzato, particolarmente durante i primissimi giorni, quando si inizia la terapia con il ROFECOXIB o quando si modifica il dosaggio del ROFECOXIB.

In pazienti con ipertensione da lieve a moderata, la somministrazione per 4 settimane di 25 mg/die di ROFECOXIB con un ACE-inibitore (benazepril, da 10 a 40 mg/die) e' stata associata ad una lieve attenuazione dell'effetto antiipertensivo (incremento medio della Pressione Arteriosa Media di 2,8 mmHg) rispetto all'ACE-inibitore da solo. Come con altri agenti che inibiscono la cicloossigenasi, in alcuni pazienti con funzione renale compromessa la somministrazione contemporanea di un ACE-inibitore e ROFECOXIB puo' determinare un ulteriore deterioramento della funzione renale, che e' di solito reversibile. Queste interazioni vanno tenute presenti nei pazienti che assumono il ROFECOXIB in concomitanza con gli ACE-inibitori.

L'uso concomitante di FANS puo' anche ridurre l'efficacia antipertensiva dei beta-bloccanti e dei diuretici, nonche' degli altri effetti dei diuretici. Non ci sono dati sulla possibile interazione tra il ROFECOXIB e Beta-bloccanti o diuretici.

Allo stato stazionario, il ROFECOXIB 50 mg una volta al giorno, non ha avuto effetto sull'attivita' antiaggregante dell'aspirina a basso dosaggio. Deve essere evitata la somministrazione concomitante di ROFECOXIB con dosi piu' elevate di aspirina o di altri FANS.

La somministrazione contemporanea di ciclosporina o tacrolimus e FANS puo' aumentare l'effetto nefrotossico della ciclosporina o del tacrolimus. La funzione renale deve essere monitorizzata quando uno di questi due farmaci viene usato in concomitanza con il ROFECOXIB.

INTERAZIONI FARMACOCINETICHE

L'EFFETTO DEL ROFECOXIB SULLE FARMACOCINETICHE DI ALTRI FARMACI

La concentrazione plasmatica del litio potrebbe essere aumentata dai FANS. Nel corso dell'esperienza postmarketing con ROFECOXIB sono stati segnalati incrementi dei livelli plasmatici del litio. VIOXX 12, 5, 25 e 50 mg, ciascuna dose somministrata per una volta al giorno per 7 giorni, non ha avuto effetti significativi sulla concentrazione plasmatica del metotrexato misurata mediante AUC0-24 in pazienti in terapia per l'artrite reumatoide con singole dosi settimanali di metotrexato da 7,5 a 20 mg. La somministrazione del ROFECOXIB al dosaggio di 75 mg (da 3 a 6 volte piu' elevato rispetto al dosaggio raccomandato per l'artrosi) una volta giorno per 10 giorni, ha incrementato le concentrazioni plasmatiche del metotrexato (AUC 0-24 h) del 23% nei pazienti con AR che ricevevano metotrexato 7,5-15 mg/settimana. Quando il ROFECOXIB e il metotrexato sono somministrati contemporaneamente, deve essere preso in considerazione un adeguato monitoraggio della tossicita' correlata al metotrexato.

Negli studi di farmacocinetica non e' stata osservata alcuna

interazione con la digossina. I pazienti ad alto rischio di tossicita' con la digossina devono tuttavia essere monitorati in caso di somministrazione concomitante di ROFECOXIB e digossina.
I dati IN VIVO sulle interazioni ROFECOXIB/warfarin e ROFECOXIB/teofillina suggeriscono che il ROFECOXIB puo' determinare una modesta inibizione del CYP1A2. Deve essere prestata attenzione quando si somministra il ROFECOXIB contemporaneamente ad altri farmaci metabolizzati principalmente tramite il CYP1A2 (ad esempio amitriptilina, tacrina e zileuton). ROFECOXIB 12,5, 25 e 50 mg, somministrato una volta al giorno per 7 giorni, ha aumentato le concentrazioni plasmatiche (AUC 0-infinito) di teofillina dal 38 al 60% in individui sani ai quali era stata somministrata una dose singola di teofillina da 300 mg. Quando si inizia o si modifica la terapia con ROFECOXIB in pazienti in terapia con teofillina si deve prendere in considerazione un adeguato monitoraggio delle concentrazioni plasmatiche di teofillina.
Negli studi sull'uomo, utilizzando il test al midazolam somministrato per os e il BREATH TEST dopo eritromicina somministrata per via endovenosa, e' stata valutata la possibilita' che il ROFECOXIB inibisca o induca l'attivita' del CYP3A4. Il ROFECOXIB (25 mg al giorno per 12 giorni) ha determinato una modesta induzione del metabolismo del midazolam catalizzato dal CYP3A4, riducendo l'AUC del midazolam del 30%. Questa riduzione e' piu' verosimilmente dovuta ad un aumentato metabolismo di primo passaggio attraverso l'induzione da parte del ROFECOXIB dell'attivita' del CYP3A4 intestinale. Rispetto al placebo, il ROFECOXIB (75 mg al giorno per 14 giorni) non ha prodotto alcun effetto significativo sulla demetilazione dell'eritromicina, indicando l'assenza di induzione dell'attivita' del CYP3A4 epatico.
Sebbene il ROFECOXIB produca una modesta induzione dell'attivita' intestinale del CYP3A4, non si prevede che le farmacocinetiche dei farmaci metabolizzati principalmente dal CYP3A4, siano alterate in misure clinicamente significativa. Deve essere comunque prestata attenzione quando si prescrivono contemporaneamente i substrati del CYP3A4.
In studi di interazione farmacologica, il ROFECOXIB non ha mostrato effetti clinicamente importanti sulle farmacocinetiche del prednisone/prednisolone o dei contraccettivi orali (etinilestradiolo/noretindrone 35/1).
Sebbene non siano disponibili dati IN VIVO sulla base di studi IN VITRO non si prevede che il ROFECOXIB inibisca i citocromi P450, 2C9, 2C19, 2D6 e 2E1.

EFFETTI DI ALTRI FARMACI SULLA FARMACOCINETICA DEL ROFECOXIB
La principale via metabolica del ROFECOXIB e' la riduzione a CIS- e TRANS-diidroROFECOXIB (come idrossiacidi). In assenza di potenti induttori del citocromo P450 (CYP), il metabolismo catalizzato dal CYP non e' la via metabolica dominante del ROFECOXIB.
Comunque, la somministrazione contemporanea di ROFECOXIB con la rifampicina, un potente induttore degli enzimi CYP, ha prodotto una riduzione di circa il 50% delle concentrazioni plasmatiche del

CTU  CARNEVALE contro MERCK SHARP & DOHME SPA      G.R. dott.ssa VERUSIO     p. 14

ROFECOXIB. Pertanto, quando il ROFECOXIB viene somministrato contemporaneamente a un potente induttore del metabolismo epatico, deve essere considerato l'uso del dosaggio di 25 mg di ROFECOXIB. La somministrazione di ketoconazolo (un potente inibitore del CYP3A4) non ha alterato la farmacocinetica plasmatica del ROFECOXIB. La cimetidina e gli antiacidi non hanno effetti clinicamente importanti sulla farmacocinetica del ROFECOXIB.

4.6) GRAVIDANZA E ALLATTAMENTO:

GRAVIDANZA

L'uso del ROFECOXIB, come quello di altri farmaci noti per inibire la COX-2 non e' raccomandato nelle donne che intendono affrontare una gravidanza (vedere 5.1 "Proprieta' farmacodinamiche").

L'uso del ROFECOXIB e' controindicato nell'ultimo trimestre di gravidanza in quanto, come con altri farmaci noti per inibire la sintesi delle prostaglandine, puo' causare inerzia uterina o chiusura prematura del dotto arterioso (vedere 4.3 "Controindicazioni").

Non vi sono studi adeguati e ben controllati sull'uso del ROFECOXIB nella donna in gravidanza; di conseguenza il ROFECOXIB non deve essere utilizzato nei primi due trimestri di gravidanza a meno che il beneficio potenziale per la paziente giustifichi il potenziale rischio per il feto (vedere 5.3 "Dati preclinici di sicurezza").

MADRI IN ALLATTAMENTO

Non e' noto se il ROFECOXIB venga escreto nel latte umano. Il ROFECOXIB viene escreto nel latte di ratto. Donne che assumono il ROFECOXIB non devono allattare. (Vedere 4.3 "Controindicazioni" e 5.3 "Dati preclinici di sicurezza").

4.7) EFFETTI SULLA CAPACITA' DI GUIDARE E SULL'USO DI MACCHINE:

Pazienti che riportano capogiro, vertigini o sonnolenza quando assumono il ROFECOXIB devono astenersi dal guidare o usare macchinari.

4.8) EFFETTI INDESIDERATI:

Negli studi clinici, il ROFECOXIB e' stato oggetto di valutazione riguardo la sicurezza in circa 11.600 individui, compresi circa 1.000 pazienti trattati per un anno o piu'.

Le seguenti reazioni indesiderate correlate al farmaco sono state riportate o negli studi clinici, con un'incidenza maggiore rispetto al placebo nei pazienti trattati con ROFECOXIB 12,5 mg o 25 mg per un periodo sino a 6 mesi, o nell'esperienza postmarketing: (Comuni (1/100, minore 1/10) Non comuni (1/1000, minore 1/100) Rari (1/10,000, minore 1/1000), Molto rari (minore 1/10.000 e casi isolati)

SANGUE E SISTEMA LINFATICO:

COMUNI: diminuzione dell'ematocrito

NON COMUNI: diminuzione dei livelli di emoglobina, diminuzione del numero degli eritrociti, diminuzione del numero dei leucociti.

MOLTO RARI: trombocitopenia.

SISTEMA IMMUNITARIO

MOLTO RARI: reazioni di ipersensibilita', inclusi angioedema, orticaria, reazioni anafilattiche/anafilattoidi e vasculite.

METABOLISMO E NUTRIZIONE:

NON COMUNI: aumento ponderale.

Roma, 15/06/2010                                      CTU dott. Arcangelo Mezza

DISTURBI PSICHIATRICI:
NON COMUNI: depressione, diminuzione della acutezza mentale.
MOLTO RARI: ansia, confusione, allucinazioni.
SISTEMA NERVOSO:
COMUNI: cefalea, capogiro.
NON COMUNI: insonnia, sonnolenza, vertigini.
MOLTO RARI: parestesie.
CASI ISOLATI: meningite asettica.
DISTURBI OCULARI:
MOLTO RARI: visione offuscata.
APPARATO UDITIVO E VESTIBOLARE:
NON COMUNI: tinnito.
DISTURBI CARDIACI:
MOLTO RARI: insufficienza cardiaca congestizia, palpitazioni.
CASI ISOLATI: infarto del miocardio (non e' stata accertata una
relazione causale)
SISTEMA VASCOLARE:
COMUNI: ipertensione
CASI ISOLATI: accidente cerebrovascolare (non e' stata  stabilita
alcuna relazione causale), crisi ipertensiva.
DISTURBI RESPIRATORI, DEL TORACE E DEL MEDIASTINO:
NON COMUNI: dispnea
MOLTO RARI: broncospasmo
APPARATO GASTROINTESTINALE:
COMUNI: dolore addominale, pirosi gastrica, disturbi  epigastrici,
diarrea, nausea, dispepsia.
NON COMUNI: distensione addominale, stipsi, ulcera orale,  vomito,
sintomi digestivi connessi alla presenza di gas, reflusso acido.
RARI:  ulcere  peptiche,  perforazione  e  sanguinamento
gastrointestinale (principalmente negli anziani), gastrite.
MOLTO RARI: aggravamento delle malattie intestinali infiammatorie.
CASI ISOLATI: pancreatite.
SISTEMA EPATOBILIARE:
COMUNI:  aumento  della  alanina  aminotrasferasi,  aumento  della
aspartato aminotrasferasi.
NON COMUNI: aumento della fosfatasi alcalina.
MOLTO RARI: epatotossicita' inclusa epatite con o senza ittero.
CASI ISOLATI: insufficienza epatica.
(vedere  4.4  "Avvertenze  speciali  e  opportune  precauzioni
d'impiego").
CUTE E ANNESSI:
COMUNI: prurito.
NON COMUNI: rash, dermatite atopica.
MOLTO RARI: alopecia, reazioni di fotosensibilita'.
CASI ISOLATI: reazioni avverse mucocutanee e reazioni  cutanee
gravi  inclusa  la  sindrome  di  Stevens-Johnson  e  necrolisi
epidermica tossica.
APPARATO MUSCOLOSCHELETRICO, TESSUTO CONNETTIVO E TESSUTO OSSEO:
NON COMUNI: crampi muscolari.
SISTEMA URINARIO:
NON COMUNI: incremento dell'azoto ureico (BUN), aumento  della
creatinina sierica, proteinuria.
MOLTO RARI: iperkalemia, alterazione della  funzione  renale,

inclusa l'insufficienza renale, usualmente reversibile dopo sospensione della terapia (vedere: 4,4 "Avvertenze speciali e opportune precauzioni d'impiego).
CASI ISOLATI: nefrite interstiziale.
SISTEMA RIPRODUTTIVO E MAMMELLA:
MOLTO RARI: disturbi mestruali.
DISTURBI GENERALI E DEL SITO DI SOMMINISTRAZIONE:
COMUNI: edema/ritenzione di liquidi.
NON COMUNI: astenia/faticabilita', dolore toracico.
Negli studi clinici, il profilo degli effetti indesiderati e' stato simile nei pazienti trattati con il ROFECOXIB per un anno o piu'.
La sindrome nefrosica e' stata segnalata in associazione all'uso di altri FANS e non puo' essere esclusa per il ROFECOXIB.
4.9) SOVRADOSAGGIO:
Negli studi clinici, la somministrazione di dosi singole di ROFECOXIB fino a 1.000 mg e di dosi multiple sino a 250 mg/die per 14 giorni non ha comportato una tossicita' significativa.
In caso di sovradosaggio, e' ragionevole adottare le comuni misure di supporto, ad esempio rimuovere dal tratto GI materiale non assorbito, monitorare clinicamente il paziente ed istituire, se necessario, una terapia di supporto.
Il ROFECOXIB non e' dializzabile mediante emodialisi; non e' noto se il ROFECOXIB sia dializzabile tramite dialisi peritoneale.
5) PROPRIETA' FARMACOLOGICHE:
       ------------------------
5.1 PROPRIETA' FARMACODINAMICHE:
GRUPPO FARMACOTERAPEUTICO: farmaci antiinfiammatori/antireumatici, non steroidei, coxib
Codice ATC: MO1 AH02
Il ROFECOXIB e' un potente inibitore selettivo della cicloossigenasi 2 (COX-2) attivo per via orale entro il range di dosaggio clinico. La cicloossigenasi e' responsabile della produzione delle prostaglandine. Sono state identificate due isoforme, la COX-1 e la COX-2. La COX-1 e' costitutivamente espressa in alcuni tessuti che comprendono lo stomaco, l'intestino, i reni e le piastrine; la COX-2 e' espressa in modo costitutivo in un numero limitato di tessuti, che comprendono il cervello, il rene e l'apparato riproduttivo. L'evidenza suggerisce che la COX-2 svolge un ruolo nell'ovulazione, nell'impianto dell'embrione, nella chiusura del dotto arterioso e in alcune funzioni del sistema nervoso centrale (induzione della febbre, percezione del dolore, funzione cognitiva). La COX-2 puo' svolgere un ruolo nella cicatrizzazione delle ulcere negli animali da esperimento mentre nell'uomo, sebbene la COX-2 sia stata identificata nei tessuti circostanti le ulcere gastriche, la sua rilevanza nella cicatrizzazione delle stesse non e' stata stabilita. E' stato dimostrato che la COX-2 e' l'isoforma dell'enzima che viene indotta dagli stimoli proinfiammatori ed e' stata ipotizzato che sia responsabile principalmente della sintesi dei mediatori prostanoidi del dolore, dell'infiammazione e della febbre. Nell'uomo, con qualsiasi dosaggio di ROFECOXIB, non e' stata documentata un'inibizione statisticamente significativa

CTU  CARNEVALE contro MERCK SHARP & DOHME SPA       G.R. dott.ssa VERUSIO    p. 17

della   COX-1.   Sulla base di dati IN   VITRO,   durante   la
somministrazione cronica del ROFECOXIB maggiore di 250 mg al
giorno, potrebbe verificarsi l'inibizione della COX-1.
Gli effetti antiinfiammatori del ROFECOXIB sono stati dimostrati
in modelli animali standard utilizzati per la valutazione dei
FANS.
Negli studi di farmacologia clinica il ROFECOXIB, rispetto al
placebo, ha determinato una inibizione dose-dipendente della COX-2
di circa il 70% a dosaggio giornalieri di 12,5 mg e 25 mg,  e di
circa il  95% al dosaggio giornaliero di 375 mg o dopo una dose
singola di 1000 mg. Non si verificata l'inibizione dose-dipendente
della  COX-1 rispetto al placebo. Il ROFECOXIB non ha  inibito  la
sintesi gastrica delle prostaglandine e non ha avuto effetto sulla
funzione piastrinica.
Un ampio  studio clinico (circa 8000 pazienti) su  pazienti  con
artrite reumatoide ha confrontato la sicurezza a lungo termine  di
ROFECOXIB  50 mg/die (due volte la dose massima  raccomandata)  e
naproxene  500 mg/die. IL tasso di eventi avversi seri di  natura
tromboembolica e' risultato significativamente minore nei pazienti
trattati   con naproxene rispetto ai pazienti  trattati   con
ROFECOXIB: 0,70 eventi per 100 pazienti/anno rispetto a 1,67 venti
per     100    pazienti/anno. La     differenza     nell'attivita'
antipiastrinica  fra alcuni FANS inibitori della COX-1 e  gli
inibitori selettivi della COX-2 puo' avere significato clinico nei
pazienti   a  rischio di eventi tromboembolici.  (Vedere    4.4
"Avvertenze  speciali  e opportune  precauzioni  d'impiego"). GLi
inibitori   selettivi della COX-2 riducono la formazione di
prostaciclina a livello sistemico (e pertanto, possibilmente a
livello endoteliale) senza modificare il trombossano piastrinico.
Non e' stata stabilita la rilevanza clinica di tali osservazioni.
IL ROFECOXIB e' stato studiato per  il  trattamento  sintomatico
dell'artrosi. Le principali valutazioni sull'efficacia sono  state
effettuate  solo sull'articolazione dell'anca o del  ginocchio;
comunque  la popolazione dello studio ha incluso il 33% dei
pazienti  con  artrosi concomitante delle  articolazioni  inter-
falangee, il 21% con artrosi del  pollice ed il 35% con artrosi
della colonna.
Dopo una settimana di terapia (il primo timepoint o intervallo di
osservazione) per la determinazione dell'efficacia, il  ROFECOXIB
ha  fornito  una significativa riduzione del dolore nei  pazienti
artrosici. Non sono stati valutati i timepoint relativi a  periodi
di  trattamento  inferiori ad una settimana. Pertanto,  quando  si
desidera  un inizio immediato dell'azione, bisogna considerare  la
TMAX del ROFECOXIB (da due a quattro ore).
ROFECOXIB  25 mg in monosomministrazione giornaliera e'  stato
studiato nel trattamento sintomatico dell'AR. In pazienti con  AR,
ROFECOXIB  25 mg in monosomministrazione giornaliera ha apportato
miglioramenti  significativi ai parametri di risposta legati  alla
malattia,  comprese  le  valutazioni  del  dolore  e  della
funzionalita'. Gli  effetti benefici sono stati mantenuti per
l'intero  periodo  di studio controllato con placebo di  12
settimane. Non e' stato osservato alcun ulteriore vantaggio
significativo con  un dosaggio di 50 mg in  monosomministrazione

giornaliera rispetto a 25 mg in monosomministrazione giornaliera.
In una analisi combinata, predefinita, di due studi endoscopici di
24 settimane in pazienti con artrosi, le percentuali dei pazienti
con ulcerazione gastroduodenale identificata endoscopicamente sono
risultate simili tra placebo e ROFECOXIB 25 mg e 50 mg/die a 12
settimane. In ognuno di questi studi, l'incidenza cumulativa di
ulcere gastroduodenali e' stata significativamente inferiore
durante 12 e 24 settimane nei pazienti trattati con il ROFECOXIB
rispetto ai pazienti trattati con ibuprofen 2400 mg/die. In uno
studio di endoscopia in pazienti con AR, controllato vs. placebo e
controllo attivo, in doppio cieco, della durata di 12 settimane,
l'incidenza cumulativa di ulcere gastroduodenali nel corso delle
12 settimane e' risultata significativamente minore in pazienti
trattati con ROFECOXIB 50 mg in monosomministrazione giornaliera
(due volte la dose massima raccomandata) rispetto ai pazienti
trattati con naproxene 500 mg/bid.
In una analisi combinata, predefinita di otto studi clinici,
l'incidenza cumulativa di SUP accertati del tratto GI superiore in
pazienti trattati con il ROFECOXIB e' risultata significativamente
inferiore rispetto a quella combinata osservata in pazienti
trattati con FANS di confronto (diclofenac 50 mg tre volte al
giorno, ibuprofen 800 mg tre volte al giorno e nabumetone 1500 mg
al giorno. Questi risultati sono stati influenzati principalmente
dall'esperienza con ibuprofen 800 mg tre volte al giorno). Al
dosaggio di 50 mg l'incidenza di SUP e' stata numericamente
superiore rispetto al dosaggio di 25 mg, rimanendo comunque piu'
bassa rispetto al rischio risultante dai dati combinati relativi
ai FANS usati in questi studi. Con il ROFECOXIB le sospensioni per
esperienze indesiderate del tratto GI durante 12 mesi sono state
piu' basse. Le incidenze di un gruppo predefinito di eventi
indesiderati del tratto GI correlati al farmaco, sono state piu'
basse con il ROFECOXIB durante 12 mesi; questo effetto e' stato
maggiore durante i primi 6 mesi.
Una riduzione paragonabile nell'incidenza delle SUP e' stata
osservata in un ampio studio clinico (circa 8.000 pazienti)
condotto in pazienti affetti da artrite reumatoide. I pazienti con
necessita' di profilassi cardiovascolare con aspirina sono stati
esclusi dallo studio. L'uso di ROFECOXIB 50 mg in
monosomministrazione giornaliera (due volte la dose massima
raccomandata) paragonato a naproxene 500 mg/bid e' stato associato
a riduzione significative degli eventi gastrointestinali: SUP
(2,08 eventi per 100 pazienti/anni vs 4,49 eventi per 100
pazienti/anni), SUP complicate (0,59 per 100 pazienti/anni vs 1,37
per 100 pazienti/anni) e sanguinamenti del tratto
gastrointestinale superiore od inferiore (1,15 per 100
pazienti/anni vs 3,04 per 100 pazienti/anni).
5.2) PROPRIETA' FARMACOCINETICHE:
ASSORBIMENTO
Il ROFECOXIB somministrato per via orale viene ben assorbito ai
dosaggi raccomandati di 12,5 e 25 mg. La biodisponibilita' media
dopo somministrazione orale e' di circa il 93%. Dopo la
somministrazione di 25 mg una volta al giorno fino allo stato
stazionario, la concentrazione plasmatica di picco (Cmax

geometrica media = 0,305 mcg/ml) e' stata osservata a circa 2-4 ore (Tmax) dopo la somministrazione in adulti a digiuno. L'area media sottostante la curva geometrica (AUC24h) e' stata di 3,87 mcg h/ml. VIOXX compresse e VIOXX sospensione orale sono bioequivalenti.

L'assunzione concomitante di cibo non modifica la farmacocinetica del ROFECOXIB.

DISTRIBUZIONE

Il ROFECOXIB e' legato per circa l'85% alle proteine plasmatiche a concentrazioni comprese tra 0,05 e 25 mcg/ml. Nell'uomo il volume di distribuzione (Vdss) e' circa di 100 litri (approssimativamente 1,55 l/kg).

Il ROFECOXIB attraversa la placenta nel ratto e nel coniglio, e la barriera ematoencefalica nel ratto.

METABOLISMO

Il ROFECOXIB e' ampiamente metabolizzato e' circa l'1% di una dose e' stata ritrovata nelle urine come farmaco originario. La via metabolica principale e' la riduzione epatica con produzione di CIS- e TRANS-diidroROFECOXIB (come idrossiacidi), piuttosto che l'ossidazione da parte degli enzimi del citocromo P450 (CYP).

Nell'uomo sono stati identificati 6 metaboliti. I metaboliti principali erano CIS- e TRANS-diidroROFECOXIB (come idrossiacidi), che rendevano conto di circa il 56% della radioattivita' rilevata nelle urine, ed il metabolita 5-idrossi-glucuronide, che rendeva conto di un ulteriore 9%. Questi principali metaboliti o non hanno mostrato attivita' misurabile come inibitori della cicloossigenasi o hanno mostrato una debole attivita' come inibitori della COX-2.

ELIMINAZIONE

Dopo la somministrazione a soggetti sani di una dose orale di 125 mg di ROFECOXIB radiomarcato, il 72% della radioattivita' e' stato rilevato nelle urine ed il 14% nelle feci.

L'eliminazione del ROFECOXIB si verifica quasi esclusivamente sotto forma di metabolita per via renale. Le concentrazioni di ROFECOXIB allo stato stazionario vengono raggiunte entro 4 giorni con la monosomministrazione giornaliera di 25 mg, con un tasso di accumulo di circa 1,7, corrispondente ad una emivita di accumulo di minore 17 ore. Si stima che la clearance plasmatica sia approssimativamente 120 ml/min per una dose di 25 mg.

CARATTERISTICHE DEI PAZIENTI

ANZIANI: nell'anziano (65 anni di eta' ed oltre) la farmacocinetica e' simile a quella del giovane. Nell'anziano, rispetto al giovane, l'esposizione sistemica e' maggiore di circa il 30% (vedere 4.1 "Posologia e modo di somministrazione").

SESSO: negli uomini e nelle donne la farmacocinetica del ROFECOXIB e' confrontabile.

INSUFFICIENZA EPATICA: nei pazienti cirrotici con lieve insufficienza epatica (punteggio di Child-Pugh 5-6) la somministrazione di una dose singola di ROFECOXIB da 25 mg ha determinato una AUC media simile a quella dei soggetti sani a cui e' stata somministrata la stessa dose. Nei pazienti con insufficienza epatica moderata trattati con 12,5 mg/die per dieci giorni l'AUC media allo stato stazionario e' risultata maggiore di circa il 55% rispetto a soggetti sani trattati con la stessa dose.

La dose giornaliera massima di ROFECOXIB nei pazienti con insufficienza epatica moderata (punteggio di Child-Pugh 7-9 o albumina sierica 25-35 g/l) deve essere di 12,5 mg. Non ci sono dati clinici o farmacocinetici nei pazienti con grave insufficienza epatica (punteggio di Child-Pugh maggiore 9 o albumina sierica minore 25 g/l). (vedere 4.2 "Posologia e modo di somministrazione" e 4.3 "Controindicazioni").

INSUFFICIENZA RENALE: la farmacocinetica di una singola dose di 50 mg di ROFECOXIB nei pazienti con malattia renale all'ultimo stadio in emodialisi non e' stata significativamente diversa da quella dei soggetti sani. L'emodialisi ha contribuito all'eliminazione in maniera trascurabile (clearance dialitica minore 40 ml/min). (vedere 4.3 "Controindicazioni" e 4.4 "Avvertenze speciali e opportune precauzioni d'impiego").

PAZIENTI PEDIATRICI: la farmacocinetica del ROFECOXIB nei pazienti pediatrici non e' stata studiata.

5.3) DATI PRECLINICI DI SICUREZZA:
Negli studi preclinici, e' stato dimostrato che il ROFECOXIB non e' genotossico, mutagenico o cancerogeno.
In uno studio di tossicita' cronica nel ratto, basato sull'esposizione sistemica, il ROFECOXIB ha provocato ulcere intestinali a dosaggi comparabili e lievemente superiori al dosaggio terapeutico per l'uomo. Nel ratto, dopo esposizioni diverse volte superiori rispetto al livello terapeutico per l'uomo, sono state indotte la basofilia tubulare renale e, dopo esposizioni piu' elevate, necrosi della papilla renale. Anche nel cane, dopo elevate esposizioni, sono state osservate alterazioni renali e gastrointestinali.
Studi di tossicita' sulla riproduzione hanno mostrato che il ROFECOXIB (al dosaggio uguale o superiore 2 volte la dose giornaliera raccomandata nell'uomo basata sull'esposizione sistemica), ha ridotto la fertilita' e la sopravvivenza embrio/fetale nel ratto. E' stata anche osservata una riduzione del diametro del dotto arterioso correlata al trattamento che e' noto essere associata ai FANS. Studi di tossicita' sulla riproduzione condotti nel ratto e nel coniglio non hanno dimostrato l'evidenza dello sviluppo di anomalie ad un dosaggio superiore a 50 mg/kg/die (nel ratto questo rappresenta circa 29 volte la dose giornaliera raccomandata nell'uomo, sulla base dell'esposizione sistemica). (vedere 4.3 "Controindicazioni" e 4-6 "Gravidanza e allattamento"). Nel coniglio, tuttavia, il profilo dei metaboliti non e' stato determinato; cio' quindi rende difficile stabilire la rilevanza clinica di questo modello animale.
Dati provenienti da uno studio sull'allevamento crociato hanno indicato una tossicita' nel neonato probabilmente dovuta all'esposizione attraverso il latte delle nutrici trattate. (vedere 4.6 "Gravidanza e allattamento").

6) INFORMAZIONI FARMACEUTICHE:
   -------------------------
6.1) ELENCO DEGLI ECCIPIENTI:
Lattosio monoidrato, cellulosa microcristallina, idrossipropilcellulosa, croscarmellosa sodica, magnesio stearato, e E172 ferro ossido giallo.

Roma, 15/06/2010                              CTU dott. Arcangelo Mezza

CTU  CARNEVALE contro MERCK SHARP & DOHME SPA      G.R. dott.ssa VERUSIO    p. 21

```
6.2) INCOMPATIBILITA':
Non applicabile.
6.3) DURATA DI STABILITA':
3 anni.
6.4) SPECIALI PRECAUZIONI PER LA CONSERVAZIONE:
Non vi sono precauzioni speciali per la conservazione.
6.5) NATURA E CONTENUTO DEL CONTENITORE:
Blister in PVC opaco/alluminio.
Confezione in commercio:
14 e 20 compresse da 25 mg
Confezioni non in commercio:
5,  7, 10, 15, 28, 30, 50, 56, 60, 84, 90 E 98 compresse  da    25
mg.
Blister  in PVC opaco/alluminio monodose da 50 e 500 compresse  da
25 mg (non in commercio)
6.6) ISTRUZIONI E MODALITA' PER L'USO:
Non applicabile.
7) TITOLARE DELL'AUTORIZZAZIONE ALL'IMMISSIONE IN COMMERCIO:
   --------------------------------------------------------
MERCK SHARP E DOHME (ITALIA) S.P.A.
Via G. Fabbroni, 6 - 00191 ROMA
Consociata  della  Merck e Co., Inc.,  Whitehouse  Station,  N.J.,
U.S.A.
8) NUMERO DI AUTORIZZAZIONE ALL'IMMISSIONE IN COMMERCIO:
   ----------------------------------------------------
5 compresse da 25 mg               AIC n. 034558142/M
7 compresse da 25 mg               AIC n. 034558155/M
10 compresse da 25 mg              AIC n. 034558167/M
14 compresse da 25 mg              AIC n. 034558179/M
15 compresse da 25 mg              AIC n. 034558181/M
20 compresse da 25 mg              AIC n. 034558369/M
28 compresse da 25 mg              AIC n. 034558193/M
30 compresse da 25 mg              AIC n. 034558205/M
50 compresse da 25 mg              AIC n. 034558217/M
56 compresse da 25 mg              AIC n. 034558229/M
60 compresse da 25 mg              AIC n. 034558231/M
84 compresse da 25 mg              AIC n. 034558243/M
90 compresse da 25 mg              AIC n. 034558256/M
98 compresse da 25 mg              AIC n. 034558268/M
50 compresse da 25 mg              AIC n. 034558294/M
in blister monodose
500 compresse da 25 mg             AIC n. 034558306/M
in blister monodose
9) DATA        DELLA       PRIMA    AUTORIZZAZIONE/DEL    RINNOVO
   -----------------------------------------------------------
   DELL'AUTORIZZAZIONE:
   --------------------
Giugno 2000
10) DATA DI REVISIONE DEL TESTO:
    ---------------------------
Aprile 2004
```

Roma, 15/06/2010                              CTU dott. Arcangelo Mezza

CTU CARNEVALE contro MERCK SHARP & DOHME SPA        G.R. dott.ssa VERUSIO     p. 22

In buona sostanza la storia della commercializzazione del VIOXX ed il suo motivato ritiro dal commercio per riportato rischio cardiovascolare venne sinteticamente riassunta nella seguente tabella pubblicata a pag.195 del Bollettino della Farmacovigilanza  (AIFA Ministero della Salute):

**if**                                                                    **195**

### FARMACOVIGILANZA

# Rofecoxib e rischio cardiovascolare

Dal momento del loro lancio sul mercato, i cox-2 inibitori hanno goduto di un ampio successo commerciale. Al boom prescrittivo ha contribuito in grande misura la forte pressione promozionale finalizzata a sottolinearne, a parità di efficacia, la loro minore gastrolesività rispetto ai farmaci antinfiammatori steroidei (FANS) tradizionali. Questo, nonostante il profilo di sicurezza del coxib non fosse ancora chiaro e nonostante fossero apparsi da subito alcuni dubbi sulla sicurezza cardiovascolare[1].

Nella tabella vengono riportate, in forma schematica e cronologica, le evidenze accumulate sui rischi cardiovascolari associati al rofecoxib.

**1999: Rofecoxib entra in commercio in USA**



- Dati relativi a 5435 pazienti esposti al farmaco. La maggior parte dei pazienti aveva assunto il farmaco per meno di 6 mesi. Il confronto con il placebo era riferito ai dati relativi a 6 settimane di studio[2].
- Nel complesso, bassa incidenza di eventi trombotici sia nel gruppo che riceveva rofecoxib, sia in quello che riceveva placebo o FANS tradizionale[2].

**2000: Pubblicazione dello studio VIGOR[3]**



- I risultati hanno dimostrato una incidenza di eventi cardiovascolari ischemici più elevati tra i pazienti trattati con rofecoxib 50 mg/die rispetto ai trattati con naprossene 1000 mg/die (0,4% vs 0,1%).
- Non era chiaro se i risultati fossero dovuti all'azione protrombotica del rofecoxib o a quella cardioprotettiva del naprossene.

**2000-2004: Studi epidemiologici e sorveglianza postmarketing**



- Dopo l'entrata nel mercato, sono state condotte metanalisi e revisioni sistematiche per cercare di definire gli effetti cardiovascolari dei COX2 inibitori[4-8].
- Sono state fatte varie analisi sull'effetto cardiovascolare dei coxib in fase di postmarketing e sono stati condotti trial clinici e studi osservazionali rivolti, comunque, più alla valutazione dell'efficacia che agli effetti cardiovascolari[9-12].

**2004: Ritiro di Rofecoxib**

- APPROVe, lo studio clinico multicentrico, randomizzato, controllato verso placebo, ha dimostrato un aumento del rischio relativo di eventi cardiovascolari non fatali, a partire dal diciottesimo mese di trattamento continuativo nei pazienti che assumevano il rofecoxib 25 mg rispetto placebo[13].

AIFA - Ministero della Salute

Roma, 15/06/2010                                            CTU dott. Arcangelo Mezza

CTU  CARNEVALE contro MERCK SHARP & DOHME SPA         G.R. dott.ssa VERUSIO    p. 23

   A questo punto, sono necessarie alcune precisazioni in ordine alla durata della terapia farmacologica con VIOXX prescritta al Carnevale.
   Per inciso l'assunzione ottimale del VIOXX non avrebbe potuto essere altro che in costante monodose giornaliera. Infatti così come si evince dalla riportata scheda tecnica del VIOXX per il trattamento nell'Artrosi:

```
La dose iniziale raccomandata per l'adulto e' di 12,5 mg una volta
al  giorno.  Alcuni pazienti possono  trarre  ulteriore  beneficio
dall'incremento del dosaggio a 25 mg una volta al giorno. Non deve
essere superata la dose giornaliera di 25 mg. Per  il  dosaggio di
12,5  mg  in   monosomministrazione   giornaliera  sono disponibili
anche le compresse da 12,5 mg.
```

   Anche come desumibile dai Parametri Farmacocinetici in tabella qui di seguito per sintesi riportata[4]

| Parametri | Valori medi (± SD)[a] [se non diversamente indicato] | | Rapporto tra medie geometriche (sospensione/compresse) | 90% CI per il rapporto tre medie geometriche | p-Value |
|---|---|---|---|---|---|
| | Rofecoxib 12.5mg/5mL sospensione (n = 24) | Rofecoxib 12.5mg compresse (n = 24) | | | |
| $AUC_{0-}$ ($\mu g/Lh$) | 1778 ± 945 | 1907 ± 847 | 0.93 | 0.89 ± 0.98 | 0.024 |
| $C_{max}$ ($\mu g/L$) | 113 ± 39 | 122 ± 39 | 0.92 | 0.85 ± 1.00 | NS |
| $t_{max}$ (h) | 2.0 (1.5, 9.0) | 2.0 (1.5, 6.0) | | | NS |
| $t_{1/2}$ (h) | 10.2 ± 2.9 | 10.5 ± 3.0 | | | NS |
| | Rofecoxib 25mg/5mL sospensione (n = 24) | Rofecoxib 25mg compresse (n = 24) | | | |
| $AUC_{0-}$ ($\mu g/Lh$) | 3635 ± 1153 | 3799 ± 1365 | 0.96 | 0.92 ± 1.00 | NS |
| $C_{max}$ ($\mu g/L$) | 213 ± 86 | 217 ± 72 | 0.98 | 0.90 ± 1.08 | NS |
| $t_{max}$ (h) | 2.0 (1.5, 5.0) | 3.0 (1.5, 9.0) | | | 0.037 |
| $t_{1/2}$ (h) | 9.4 ± 3.0 | 9.9 ± 2.7 | | | NS |

---

[4] Pharmacokinetic Evaluetion of Rofecoxib. J. Schwart et al. Clin Drug Invest. 2003;23(8)
Roma, 15/06/2010                                        CTU dott. Arcangelo Mezza

> Le  concentrazioni  di ROFECOXIB allo stato stazionario vengono raggiunte entro 4 giorni con la monosomministrazione giornaliera di 25 mg, con un tasso di accumulo di circa 1,7, corrispondente ad una emivita di accumulo di minore 17 ore. Si stima che la clearance plasmatica sia approssimativamente 120 ml/min per una dose di 25 mg.

Orbene, dalle riportate ricette mediche del curante [*allegato n. 23 nel fascicolo di parte attrice*] chiaramente se ne ricava che il Carnevale, nel dichiarato e certificato periodo in cui è stato in terapia (si è tento conto nel computo anche dei 14 giorni oltre la data del 02.09.2002 allor quando vennero prescritte le ultime 14 compresse) abbia assunto in totale soltanto **238** compresse di Vioxx in ben 587 giorni, invece delle **540**, in costanza di assunzione di una compressa al dì, corrispondenti ai 540 giorni dell'arco temporale dei 18 mesi (giorni: 18 x 30 = 540):

| | PRESCRIZIONE | N. CONFEZIONI | COMPRESSE |
|---|---|---|---|
| | 14/03/2001 | 1 | 14 |
| | 23/07/2001 | 2 | 28 |
| | 28/09/2001 | 2 | 28 |
| | 29/10/2001 | 2 | 28 |
| | 05/12/2001 | 2 | 28 |
| | 20/03/2002 | 1 | 14 |
| | 10/05/2002 | 2 | 28 |
| | 31/07/2002 | 1 | 14 |
| | 31/07/2002 | 1 | 14 |
| | 02/08/2002 | 2 | 28 |
| | 02/09/2002 | 1 | 14 |
| GIORNI | 587 | 17 | 238 |

indicato come "l'efficace" esposizione al CONCRETO realizzarsi del rischio cardiovascolare indicato e riportato nei Trials su citati.

Va inoltre ricordato che il Vioxx è dispensabile presso le Farmacie del SSN solo dietro esibizione di ricetta medica.

Meglio individuati e condivisi dalla comunità scientifica, sono stati i principali fattori di rischio cardiovascolare qui di seguito riportati dalla recensione del 2000:

*"L'aterosclerosi è un processo patologico, lentamente progressivo, che interessa l'intima e la media delle arterie di grosso e medio calibro, con formazione di lesioni focali (placche) contenenti tessuto fibroso e materiale lipidico. Le lesioni arteriose sono classificate in: cellule*

*schiumose isolate; strie lipidiche; preateromi; ateromi e fibroateromi. **Il fibroateroma cresce di dimensioni lentamente nel tempo, è una lesione instabile che può complicarsi con emorragia intraplacca, rottura, trombosi sovrapposta. È in questo stadio che le lesioni arteriosclerotiche diventano sintomatiche, in quanto si realizza un'ostruzione del flusso ematico con produzione di ischemia. Il complicarsi delle lesioni arteriose costituisce il principale meccanismo responsabile dell'infarto miocardico e cerebrale, delle arteriopatie obliteranti degli arti e dell'ischemia mesenterica.** La più accreditata ipotesi patogenetica dell'aterosclerosi è quella detta della risposta alla lesione endoteliale. La sofferenza endoteliale si traduce in un aumento della permeabilità nei confronti dei costituenti plasmatici ed in un'adesione di piastrine e monociti all'endotelio leso. Fattori di crescita liberati dalle piastrine e dai monociti, inducono la migrazione e la proliferazione delle cellule muscolari lisce all'interno dell'intima. Diversi fattori quali l'iperlipidemia, l'ipertensione arteriosa, il fumo di sigaretta, il diabete mellito producono il primitivo danno endoteliale che mette in moto poi tutte le reazioni cellulari coinvolte nell'aterogenesi.*
*Da molti anni è stato segnalato che l'aterosclerosi ha le caratteristiche dei processi infiammatori cronici. La risposta infiammatoria nelle arterie è per molti versi unica e differente da quella che si dimostra in altri organi o tessuti, quali fegato, rene, polmoni, articolazioni.*
*La valutazione degli indicatori metabolici di rischio (colesterolemia, omocisteinemia, emoglobina glicosilata) rientra nell'articolata valutazione del rischio coronarico globale del singolo paziente. La documentazione di placche carotidee con gli ultrasuoni indica una suscettibilità individuale a sviluppare lesioni aterosclerotiche e, con buona accuratezza, permette di valutare la risposta globale del sistema arterioso nei confronti delle diverse terapie".*

*"Cardiopatia ischemica: fattori di rischio e loro ruolo biologico*[5]*"*
pubblicata sul Giornale Italiano di Cardiologia

---

[5] Ital Heart J 2000; 1 (Suppl 2): 17-22; / Ross R. Atherosclerosis - an inflammatory disease. N Engl J Med 1999; 340; 115-26/ Stary HC, Blankenhorn DH, Chandler AB, et al. A definition of the intima of human arteries and of its atherosclerotic-prone regions. Arterioscler Thromb 1992; 12: 120-34./ Bots MML, Breslau PJ, Briet E, et al. Cardiovascular determinants of carotid artery disease. The Rotterdam Elderly Study. Hypertension 1992; 19: 717-20./ Chambless LE, Heiss G, Folsom A, et al. Association of coronary heart disease incidence with carotid arterial wall thickness and major risk factors: the Atherosclerosis Risk in Communities (ARIC) study, 1987-1993. Am J Epidemiol 1997;
Roma, 15/06/2010                                                    CTU dott. Arcangelo Mezza

CTU  CARNEVALE contro MERCK SHARP & DOHME SPA        G.R. dott.ssa VERUSIO     p. 26

Ampiamente confermati ed ulteriormente estesi alla luce di successive ricerche epidemiologiche, così come in sintesi riportate sull'autorevole *"Atlante dei Fattori di Rischio Cardiovascolare"* di J.M. Gaziano e E. Braunwlad ed. Current Medicine del 2008, nonché sulle più recenti edizioni del prestigioso Harrison *"Principi di Medicina Interna"*. Dove a questi altri ed altrettanto efficaci si sono aggiunti:**"familiarità, sesso, età anagrafica, depressione, fattori psico-sociali e stile di vita"**. In particolare è stato dimostrato che l'età già di per sè accentua nettamente il rischio di coronaropatia e patologie correlate quali l'angina pectoris e l'infarto del miocardio.

Nel caso di che trattasi, il rischio complessivo personalizzato all'epoca dei fatti in valutazione può essere stimato a mezzo della

146: 483-94. / O'Leary DH, Polak JF, Kronmal RA, Manolo TA, Burke GL, Wolfson SK, for the Cardiovascular Health Study Collaborative Research Group. Carotid artery intima and media thickness as a risk factor for myocardial infarction and stroke in older adults. N Engl J Med 1999; 340: 14-22. / Hodis HN, Mack WJ, La Bree L, et al. The role of carotid intimamedia thickness in predicting clinical coronary events. Ann Intern Med 1998; 128: 262-9./ Howard G, Wagenknecht LE, Burke GL, et al. Cigarette smoking and progression of atherosclerosis: the Atherosclerosis Risk in Communities (ARIC) Study. JAMA 1998; 279:  119-24./ Mercuri M, Bond MG, Sirtori CR, et al. Pravastatin reduces carotid intima-media thickness in an asymptomatic hypercholesterolemic Mediterranean population. The Carotid Atherosclerosis Italian Ultrasound Study. Am J Med 1996; 101: 627-34./ MacMahon S, Sharpe N, Gamble G, et al. Effects of lowering average of below-average cholesterol levels on the progression of carotid atherosclerosis: results of the LIPID Atherosclerosis Substudy. LIPID Trial Research Group. Circulation 1998; 97: 1784-90./ de Groot E, Jukema JW, Montauban van Swijndregt AD, et al. B-mode ultrasound assessment of pravastatin treatment effect on carotid and femoral artery walls and its correlations with coronary arteriographic findings: a report of the Regression Growth Evaluation Statin Study (REGRESS). J Am Coll Cardiol 1998; 31: 1561-7./ Davies MJ. Stability and instability: two faces of coronary atherosclerosis. The Paul Dudley White Lecture 1995. Circulation 1996; 94: 2013-20. / Assmann G, Carmena R, Cullen P, et al. Coronary heart disease: reducing the risk. The scientific background for primary and secondary prevention of coronary heart disease. A worldwide view. Nutr Metab Cardiovasc Dis 1998; 8: 205-71./ Levine GN, Keaney JF, Vita JA. Cholesterol reduction in cardiovascular disease. Clinical benefits and possible mechanisms. N Engl J Med 1995; 332: 512-21./ Diaz MN, Frei B, Vita JA, Keaney JF. Antioxidants and atherosclerotic heart disease. N Engl J Med 1997; 337: 408-16./ Stein O, Stein Y. Atheroprotective mechanisms of HDL. Atherosclerosis 1999; 144: 285-301./ Mackness MI, Mackness B, Durrington P, et al. Paraoxonase and coronary heart disease. Curr Opin Lipidol 1998; 9: 319/ Fowler B. Disorders of homocysteine metabolism. J Inherit Metab Dis 1997; 20: 270-85./ Boushey CJ, Beresford SAA, Omenn GS, Motulsky AG. A quantitative assessment of plasma homocysteine as a risk factor for vascular disease. Probable benefits of increasing folic acid intake. JAMA 1995; 274: 1049-57/ Graham IM, Daly LE, Refsum HM, et al. Plasma homocysteine as a risk factor for vascular disease. The European Concerted Action Project. JAMA 1997; 277: 1775-81. / Robinson K, Arheart K, Refsum H, et al, for the European COMAC Group. Low circulating folate and vitamin B6 concentrations. Risk factor for stroke, peripheral vascular disease, and coronary artery diseases. Circulation 1998; 97: 437-43/ Bellamy MR, McDowell IF. Putative mechanisms for vascular damage by homocysteine. J Inherit Metab Dis 1997; 20: 307-15./ Avogaro P, Rubba P, Mancini M. Smoking and cardiovascular events: biological links. Cardiovascular Risk Factors 1993; 6: 373-8.
Roma, 15/06/2010                                                    CTU dott. Arcangelo Mezza

CTU  CARNEVALE contro MERCK SHARP & DOHME SPA       G.R. dott.ssa VERUSIO    p. 27

*"Carta del rischio cardiovascolare"* ideata condivisa in seno alla comunità scientifica e reperibile presso il sito dell'Istituto Superiore di Sanità (ISS)[6]. Talché dall'applicazione dell'algoritmo computerizzato dell'Istituto Superiore di Sanità, applicato *ex post* al caso di che trattasi, si potrebbe quantizzare il rischio personalizzato con il seguente risultato:

il progetto cuore

ccm

Epidemiologia delle malattie cerebro e cardiovascolari

## Valutazione del rischio cardiovascolare                14/06/2010

**Nome: Antonio**            **Cognome: Carnevale**

| | |
|---|---|
| Sesso: | uomo |
| Età: | 63 anni |
| Fumatore: | no |
| Pressione sistolica: | 160 mmHg |
| Colesterolo totale: | 210 mg/dl |
| Colesterolo HDL: | 44 mg/dl |
| Diabetico: | no |
| Uso farmaci ipertensione: | no |

"**La probabilità di andare incontro a un primo evento cardiovascolare maggiore è pari a: 12,0% nei prossimi 10 anni. Questo significa che su 100 persone con le stesse caratteristiche, 12,0 saranno colpite da infarto del miocardio o ictus nei prossimi 10 anni.**"

Laddove detto rischio, invece, si sarebbe dovuto altrimenti stimare nella misura del 29,2% se si fosse tenuto conto anche dell'abitudine tabagica (con tanta puntualità successivamente al ricovero negata) assieme alla riferita ipertensione arteriosa e riscontrata all'ingresso presso l'Ospedale S. Pietro di Roma (PA=160/90mmHg) incredibilmente non già trattata ambulatorialmente.

---

[6] http://www.cuore.iss.it/sopra/calc-rischio.asp
Roma, 15/06/2010                                    CTU dott. Arcangelo Mezza

CTU  CARNEVALE contro MERCK SHARP & DOHME SPA        G.R. dott.ssa VERUSIO    p. 28

**Per concludere**, il Carnevale all'epoca dei fatti, nel concreto, risultava già gravato e da molti anni da riconosciuti fattori di rischio così identificati:

1) Familiarità per cardiopatia ischemica (fratelli)
2) Età e sesso maschile (all'epoca dei fatti il CARNEVALE ANTONIO, nato il 26/3/1939, aveva 63 anni.
3) Ipertensione arteriosa
4) Dislipidemia con ipercolesterolemia
5) **Aterosclerosi già conclamata** con *Coronaropatia aterosclerotica critica bivasale*" con un particolare coefficiente di rischio legato alla sua specifica localizzazione anatomica:"***una stenosi critica 90% 1° tratto a valle della biforcazione con ramo D1*** *(seguita da altra subcritica 50% 2° tratto prima di biforcazione con ramo D2 ed altra subcritica 50% inizio 3° tratto)*" **foriera già di per sé di danno ischemico per il suo seppur localizzato, ma quasi totale restringimento della arteria coronarica stessa, assai vicino alla sua completa obliterazione, condizionante una intrinseca meccanica criticità di perfusione certamente in concreta correlazione svantaggiosa con sbalzi pressori e incrementi repentini di frequenza cardiaca, conseguenti anche a sforzi fisici o emozionali[7] tali da ridurre significativamente il flusso del sangue al muscolo cardiaco proprio quando il suo fabbisogno è aumentato e più necessario.**

Complessivo rischio cardiovascolare, questo, nettamente preponderante rispetto a quello legato alla discontinua e non adeguata assunzione del VIOXX possibile causa di eventi cardiovascolari ischemici solo dopo una costante e prolungata esposizione pari e superiore ai 18 mesi, con somministrazione quotidiana di almeno una compressa al giorno da 25 mg, come risulta e cioè all'incremento relativo di eventi cardiovascolari registrati in popolazione anglosassone nello studio clinico multicentrico, prospettico, randomizzato, condotto vs. placebo, noto come APPROVe (*Adenomatous Polyp Prevention on VIOXX*) pubblicato nel 2005 sul New England Journal Medicine, nonché nello studio VIGOR (pubblicato nel 2000) ed ADVANTAGE (pubblicato nel 2003).

---

[7] **All'ingresso presso l'Ospedale S. Pietro di Roma si riporta di una terapia con Lexotan 20gtt tre volte al dì !**

Roma, 15/06/2010                                                    CTU dott. Arcangelo Mezza

CTU  CARNEVALE contro MERCK SHARP & DOHME SPA       G.R. dott.ssa VERUSIO    p. 29

A questo punto giova richiamare il concetto generale di causa, come definita da Stuart Mill: *"la causa di un fenomeno è l'antecedente o la riunione degli antecedenti di cui il fenomeno è invariabilmente e incondizionatamente la conseguenza"*, così come quello della *probability causation*, nella versione più o meno forte del *"più probabile che non"*.

Talché, se da un lato è possibile ammettere che nell'ambito della causalità generale il rischio legato all'assunzione del VIOXX possa provocare effetti cardiovascolari sfavorevoli, dall'altro, nell'ambito della causalità individuale, ovvero della condizione *sine qua non* o causa *but for* anglosassone, detto rischio è nettamente soverchiato dalla presenza certa e preesistente, nella persona di Antonio Carnevale, di condizioni già complessivamente di per se da sole in grado di determinare quel danno cardiovascolare effettivamente realizzatosi.

> **Pertanto esaminati ad accuratamente valutati gli atti ed i documenti di causa, tenuto conto anche di quanto riferito dalla viva voce del periziando, si ritiene così di poter puntualmente e compiutamente rispondere ad ogni quesito posto dall'Ill.sso Sig. Giudice dott.ssa VERUSIO:**

1) *Il periodo (con indicazione delle date esatte) durante il quale il sig. Carnevale assunse il farmaco Vioxx®, in base alla documentazione in atti, se risulta che lo stesso lo abbia assunto in modo continuativo quotidiano e quando, e in quali quantità, con riferimento alla specifica prescrizione (indicazione e posologia) ovvero alle modalità di assunzione allo stato risultante.*

Il sig. CARNEVALE ha assunto il Vioxx compresse da 25mg,  in maniera incostante e discontinua, dal 14 marzo 2001 al 16 settembre 2001, come da ricette mediche in atti e senza che peraltro ne venisse indicata una precisa posologia, in totale soltanto 238 compresse di Vioxx in 587 giorni, invece delle 540 compresse in 540 giorni in costanza di una compressa al giorno come raccomandato e nell'arco temporale dei 18 mesi (giorni: 18 x 30 = 540) Periodo minimo questo individuato dallo studio APPROVe a dimostrazione di un aumentato rischio relativo di eventi cardiovascolari non fatali.

Roma, 15/06/2010                                                    CTU dott. Arcangelo Mezza