### 2) *Qual' è l'emivita del farmaco;*

Dalla sottostante tabella, inerente i parametri farmacocinetici per il Vioxx (Rofecoxib) dopo dose singola di Rofecoxib sospensione (12.5 mg/5ml e 25mg/5mL) e Rofecoxib compresse (12.5mg e 25 mg) [8], si evince l'emivita ($t_{1/2}$) del farmaco VIOXX relativa a ciascuna formulazioni già in commercio nella casella indicata ($t_{1/2}$):

| Parametri | Valori medi (± SD)[a] [se non diversamente indicato] | | Rapporto tra medie geometriche (sospensione/compresse) | 90% CI per il rapporto tre medie geometriche | p-Value |
|---|---|---|---|---|---|
| | Rofecoxib 12.5mg/5mL sospensione (n = 24) | Rofecoxib 12.5mg compresse (n = 24) | | | |
| $AUC_{0-}$ (µg/Lh) | 1778 ± 945 | 1907 ± 847 | 0.93 | 0.89 ± 0.98 | 0.024 |
| $C_{max}$ (µg/L) | 113 ± 39 | 122 ± 39 | 0.92 | 0.85 ± 1.00 | NS |
| $t_{max}$ (h) | 2.0 (1.5, 9.0) | 2.0 (1.5, 6.0) | | | NS |
| $t_{1/2}$ (h) | 10.2 ± 2.9 | 10.5 ± 3.0 | | | NS |
| | Rofecoxib 25mg/5mL sospensione (n = 24) | Rofecoxib 25mg compresse (n = 24) | | | |
| $AUC_{0-}$ (µg/Lh) | 3635 ± 1153 | 3799 ± 1365 | 0.96 | 0.92 ± 1.00 | NS |
| $C_{max}$ (µg/L) | 213 ± 86 | 217 ± 72 | 0.98 | 0.90 ± 1.08 | NS |
| $t_{max}$ (h) | 2.0 (1.5, 5.0) | 3.0 (1.5, 9.0) | | | 0.037 |
| $t_{1/2}$ (h) | 9.4 ± 3.0 | 9.9 ± 2.7 | | | NS |

---

[8]  Pharmacokinetic Evaluetion of Rofecoxib. J. Schwart et al. Clin Dru Invest. 2003;23(8)

Roma, 15/06/2010                                              CTU dott. Arcangelo Mezza

**3) *Se, in base all'anamnesi prossima e remota, il signor Carnevale avesse fattori di rischio per l'insorgenza di eventi cardiovascolari, verificando in particolare l'eventuale esistenza di fattori quali l'età avanzata, la predisposizione genetica all'ipertensione e agli eventi cardiovascolari di tipo ischemico, l'ipertensione arteriosa, la dislipidemia, l'ipercolesterolemia, l'arterosclerosi e la presenza di significativi accumuli di grasso corporeo;***

1) Familiarità per cardiopatia ischemica (fratelli)
2) Non risultano documentate in atti specifiche predisposizioni genetiche, sebbene non escludibili in considerazione della riportata cardiopatia ischemica dei fratelli del periziando
3) Età e sesso maschile (all'epoca dei fatti il CARNEVALE ANTONIO, nato il 26/3/1939, aveva 63 anni.
4) Riscontrata obesità all'epoca dei fatti
5) Ipertensione arteriosa
6) Dislipidemia con ipercolesterolemia
7) Stato ansioso in trattamento con Lexotan 20gtt per tre volte al dì.
8) Aterosclerosi già conclamata con *Coronaropatia aterosclerotica critica bivasale una stenosi critica 90% 1° tratto a valle della biforcazione con ramo D1 (seguita da altra subcritica 50% 2° tratto prima di biforcazione con ramo D2 ed altra subcritica 50% inizio 3° tratto)*" con lo specifico intrinseco coefficiente di rischio legato alla stenosi critica del 90%

**4) in quale misura i fattori di rischio individuali abbiano inciso sulle probabilità che il sig. Carnevale potesse sviluppare un infarto miocardico acuto anteriore;**

Dalla documentazione in atti la probabilità stimata che il periziando andasse incontro a un primo evento cardiovascolare maggiore era pari a: 12,0% nei successivi 10 anni. Questo significa che su 100 persone con le stesse caratteristiche, 12,0 potevano essere colpite da infarto del miocardio o ictus nei successivi 10 anni. Detto rischio generale, così stimato su universalmente condivise basi statistico-epidemiologiche deve essere rivalutato, in senso peggiorativo, nel contesto delle reali condizioni delle arterie coronariche del periziando riscontrate alla coronarografia del 15 ottobre 2002 laddove si ebbe a dimostrare "Coronaropatia aterosclerotica critica bivasale una stenosi critica 90% 1°

tratto a valle della biforcazione con ramo D1 (seguita da altra subcritica 50% 2° tratto prima di biforcazione con ramo D2 ed altra subcritica 50% inizio 3° tratto)" foriera già di per sé di danno ischemico per il suo seppur localizzato, ma quasi totale restringimento della arteria coronarica stessa, assai vicino alla sua completa obliterazione, condizionante una meccanica criticità di perfusione certamente in concreta correlazione con sbalzi pressori e incrementi repentini di frequenza cardiaca, conseguenti anche a sforzi fisici o emozionali, tali da ridurre significativamente il flusso del sangue al muscolo cardiaco proprio quando il suo fabbisogno è aumentato ed è più necessario.

**5) se, tenendo conto della risposta ai quesiti precedenti e secondo i più elevati criteri di probabilità scientifica ed oltre ogni ragionevole dubbio, l'infarto miocardico che avrebbe colpito il signor Carnevale nell'ottobre 2002 sia stato causato dall'assunzione del Vioxx®;**
La patologia cardiovascolare **non** può essere causalmente rapportata, con preponderanza probabilistica, all'assunzione del VIOXX.

**6) in ipotesi di risposta affermativa al quesito 5, quale sia la percentuale d'invalidità temporanea e permanente del signor Carnevale;**
        Risposta negativa al quesito n.5

Roma, 15/06/2010

                                                    Il CTU
                                            dott. Arcangelo Mezza

                                    ---------------------------------------

Roma, 15/06/2010                                CTU dott. Arcangelo Mezza

CTU  CARNEVALE contro MERCK SHARP & DOHME SPA        G.R. dott.ssa VERUSIO    p. 33

ELENCO ALLEGATI ALLA C.T.U.

1. Richiesta Fax e RR del CTU per nuova copia autentica della, già in atti, cartella Clinica n.023574 del ricovero del 13.10.2002 presso l'Ospedale S. Pietro di Roma, copia prescrizioni del prof. Marchetti, copia referti Rx o TAC, copia per riferita patologia a carico del distretto carotideo.
2. Comunicazione fax dell'Avv. Cristina Adducci del 22 marzo 2010 di invia documenti richiesti a mezza posta celere.
3. Conferma arrivo fax del 22 marzo 2010.
4. Busta con timbro n. L04037737 posta celere contenente la richiesta documentazione medica
5. Nuova copia cartella Clinica n.023574 del ricovero del 13.10.2002 presso l'Ospedale S. Pietro di Roma.
6. Copia Referto TAC Rachide Lombo Sacrale del 1 marzo 2001 dell'Azienda Ospedaliera  S. Camillo – Forlanini di Roma.

Roma, 15/06/2010

Il CTU
dott. Arcangelo Mezza

-----------------------------------------

Roma, 15/06/2010                                    CTU dott. Arcangelo Mezza

64245/02

# TRIBUNALE ORDINARIO DI ROMA

SEZIONE ⅩⅢ CIVILE

Verbale udienza di prima comparizione.

Nell'udienza del 17. 07. 2008 h. 14.08 tenuta dal G. I.

Dott. SSA FERRARA                è stata chiamata

la causa GIULIANI          contro MINISTERO
DELLA SANITE' 12

Per parte attrice è comparso l'avv.
Marco Lemanni e l'avv. Ovidio Arduini
per la convenuta Merck sono presenti gli avvocati
Daniele lo Cascio, Francesco Xxxx sono
i dott. e Gabriele Gallo, Thomas Ricorelli e
Francesco Ciccarelli ai fini della pratica
forense ed è presente altresì la dott.ssa
Valentino Fermo, por il Ministero è presente
l'avv. Fabrizio S. Rubbo tutti i difensori dichiarano
Tutti Termine ex 0Lit 183, VI c, cpc
le Cti

dato atto rinvio all' udienza del 2 Aprile 2009
ore 11.00 con Termini ex art. 183 6co, cpc
a far data dal 16 Settembre 2008 xx fine,

Successivamente all' udienza del 2

Aprile 2009 alle ore 4.06 è presente per

parte attrice l'avv. Gessica Addeera per

la Rice Sharp e Rohme è presente l'avv.

Daniele la Cognato e Aristidei di Rocca

in sostituzione dell'avv. Polla come da delega

di produrre e per il Ministero della Salute

in persona della dott. Mario Capoluro

Al Giudice

dato atto a nessuna ma richiesta inoltra

Si dà atto della presenza si tien nella prova

forense del dott. Alessandro Tobbi, Veronica

Pordone, Francesco Cristrelli, Hofmann

Silvia Cristina, Gallo Gabriele Carmelo.

Mpeng

Il Giudice

letti gli atti e sentito le

parti in prati; ritenute le

cause mature per la decisione,

riva per la discussione e per

la decisione ex art 281 sexies cpc

all'udienza del 20/04/2009 ore 13.45

S. Cumili per me Croni Roma li 08/04/2009

FATT FAX

16/4/09

Successivamente all' udienza del 20 Aprile 2008 alle ore 14.03 per poter attivare è presente l'avv. Bettino Arducci, per la reale sparge comune l'avv. delaquale Daniele Massimo per l'avvocatura dello stato; ai fini della pratica presente sono presenti i dott.ri Grosso Gabriele Carmelo e Francesco Christielli.

Nella discussione i difensori si riportano ai rispettivi scritti difensivi, l'avv. Lacoquale depone …

Il Giudice

dato atto deciaole ex art. 281, sexies e pu e rinvia per la lettura del dispositivo … e delle ragioni di fatto e di diritto della decisione alle ore 15.45.

Esaurimento all' udienza del 20/04/2008 e alle ore 16.02 … la alla della lettura del dispositivo e delle ragioni della decisione come la sentenza … che il presente verbale è posta … ella presenza dell' avv. Daniele La Carpente …

Ref- 7284/09

**TRIBUNALE DI ROMA**

N. 8540/09   Sentenza

N. 4219/09   Cronologica



REPUBBLICA ITALIANA

IN NOME DEL POPOLO ITALIANO

IL TRIBUNALE CIVILE DI ROMA

SEZIONE XIII

In persona del Giudice unico, dr.ssa Maria Speranza Ferrara, all'udienza del

20 aprile 2009, definitivamente pronunciando ex art. 281 sexies c.p.c., ha

emesso, dandone lettura in esito alla camera di consiglio, la seguente

SENTENZA

nella causa civile di primo grado, iscritta al n. 64245 del ruolo generale degli

affari civili contenziosi dell'anno 2007, vertente

TRA

GIULIANI NADIA

elettivamente domiciliata in Roma, al viale Mazzini n. 73, presso la sede

legale del Codacons, con gli Avv.ti Carlo Rienzi, Marco Ramadori, Cristina

Adducci, che la rappresentano e difendono per procura *ad litem,* a margine

dell'atto di citazione.

PARTE-ATRICE

E

Ministero della Salute e A.I.F.A Agenzia Italiana del Farmaco

ciascuno in persona del legare rappresentante *pro tempore*

entrambi domiciliati in Roma, alla via dei Portoghesi n. 12, presso

l'Avvocatura Generale dello Stato, che li rappresenta e difende *ope legis*

PARTE-CONVENUTA

E

1

Merck Sharp & Dohme Italia s.p.a.,

in persona del legale rappresentante *pro tempore*

elettivamente domiciliata in Roma, Piazza Venezia n. 11, presso lo studio

degli Avv.ti Gian Paolo Zanchini, Francesca Rolla, Francesco Minà e

Daniele La Cognata, che la rappresentano e difendono per delega in calce

all'atto di citazione notificato

PARTE-CONVENUTA

OGGETTO: responsabilità da fatto illecito.

CONCLUSIONI: all'odierna udienza i procuratori delle parti concludevano

come in atti.

ESPOSIZIONE DEI FATTI DI CAUSA RILEVANTI E DELLE RAGIONI

DELLA DECISIONE

Con atto di citazione ritualmente notificato,Giuliani Nadia

conveniva in giudizio,dinnanzi all'intesto Tribunale,il Ministero della

Salute,l'Agenzia Italiana per il Farmaco e  Merk Sharp & Dohme Italia

s.p.a., al fine di sentir accertare e dichiarare la responsabilità ,ex art. 2043

c.c.,dei convenuti,per i danni tutti conseguiti alla assunzione del farmaco

antinfiammatorio non steroideo,denominato Vioxx, prodotto dalla Casa

Farmaceutica Merck Sharp & Dohme,autorizzato alla commercializzazione

dal Ministero della Salute nell'anno 2000 e mantenuto in commercio

dall'AIFA,Agenzia Italiana del Farmaco.

La Giuliani  deduceva  la pericolosità e la dannosità del farmaco per

la salute,come accertata da studi internazionali, e quindi la responsabilità del

produttore nonché la responsabilità del Ministero della Salute e della citata

2

Agenzia del Farmaco,rispettivamente per averne autorizzato e mantenuto in atto la commercializzazione.

Precisava.

- di essere affetta da ipertensione arteriosa da circa dieci anni anche se accertamenti clinic eseguiti nel corso degli anni 2002 e 2001,evidenziavano un ecocardiogramma ed un tracciato elettrocardiografico nei limiti della norma;

- di aver iniziato ad assumere il farmaco nel 2003 e di averlo assunto sino al gennaio 2005 per il trattamento di una sintomatologia osteoarticolare dell'artrite reumatoide nel dosaggio di 50mg al giorno;

- il 12 marzo 2005 ,per dolore toracico irradiato alla spalla sinistra,si era recata presso il pronto soccorso dell'Ospedale "San Camillo Forlanini" di Roma dove veniva accertata la "presenza di ispessimento pericardio con minimo scollamento a livello della parte inferiore-postero- laterale del VS" e da dove veniva dimessa con diagnosi di " sca- stemi in sede anteriore tratta con ptca+ Stent medicato su iva per occlusione del tratto medio. Ipertensione arteriosa. Obesità displidemia. Familiarità C.I." e diagnosi di " infarto miocardico-anteriore- ipertensione-displidemia";

- dal marzo 2005 si era sottoposta a controlli periodici cardiologici che avevano evidenziato facile stancabilità con comparsa,a seguito di sforzi anche non intensi,di affanno



3

associato ad episodi di angoscia,nonché episodi di palpitazioni con tachicardia.

Si costituivano il Ministero della Salute e la Agenzia del Farmaco con la Avvocatura Generale dello Stato,assumendo la inapplicabilità,alla fattispecie,della previsione di cui all'art 2050 c.c. e,nel merito,la infondatezza della domanda.

Si costituiva altresì la società convenuta, deducendo la infondatezza della domanda.

Concessi alle parti i termini di cui all'art. 183 VI comma c.p.c.,sulla eccezione pregiudiziale di incombenza per territorio sollevata,era decisa ex art. 281 sexies c.p.c. all'udienza del 20 aprile 2009.

Nel merito,la domanda non appare fondata e,pertanto,deve essere respinta.

La parte lamenta che il danno sarebbe derivato dalla assunzione del farmaco per il periodo che va dall'anno 2003 al gennaio 2005.

A dimostrazione di tale assunto,produce un unico certificato su carta intestata,ad apparente firma del dott. Carlo Ricciuti, in data 3 giugno 2003 (cfr. Allegato 25/a ) con prescrizione,senza alcuna indicazione del nominativo del paziente e,dunque,senza possibilità di ricondurre la prescrizione alla deducente,per un periodo di complessivi 30 giorni e per un dosaggio ( di misura inferiore a quella dedotta) di grammi 25 una volta al giorno per i primi dieci giorni e per un dosaggio giornaliero pari alla metà di quello iniziale,per 20 giorni successivi.

La ulteriore documentazione prodotta dalla parte attrice ,non ha ad oggetto l'assunzione da parte della Giuliani del farmaco.



4

In ordine alla avvenuta assunzione del farmaco,poi,la Giuliani non formula ulteriori richieste istruttorie.

La prova per interpello,a tacere dell'ammissibilità della prova nei confronti del legale rappresentante con riferimento alla possibilità di provocare una confessione per difetto dei requisiti di cui all'art. 2731 c.c.,ha ad oggetto le caratteristiche del farmaco ed episodi estranei all'assunzione del farmaco da parte della Giuliani.

Anche la prova testimoniale dedotta dalla parte attrice,ove ammissibile ed ammessa,nulla proverebbe sul punto,avendo essa ad oggetto circostanze dirette a dimostrare la misura dei danni e gli effetti dei danni sulla vita di relazione della Giuliani.

Dunque la parte non ha dimostrato e non ha chiesto di dimostrare le dedotte modalità di assunzione del farmaco poste a fondamento della propria domanda di accertamento di responsabilità e risarcimento danni.

Per altro verso la stessa Giuliani produce ( cfr. all.19),il foglietto illustrativo allegato al farmaco dal quale emerge che la dedotta ( e non provata) prescrizione del farmaco nella quantità di mg 50 al giorno,sarebbe in contrasto con le indicazioni di prescrizione ed uso allegate alla confezione e dunque,riconducibile a responsabilità di soggetto di verso dagli odierni convenuti.

Inoltre il ministero convenuto,con nota informativa in data 30 settembre 2004,ha segnalato di aver ricevuto,in pari data,dalla casa farmaceutica convenuta ,la comunicazione di ritiro volontario dal mercato mondiale del farmaco commercializzato in Italia con il nome di VIOXX,segnalando al causa del ritiro in un aumento dei rischi



5

cardiovascolari nei pazienti con la conseguenza che l'eventuale prescrizione e/o assunzione (si ripete, non provata) da parte della Giuliani del farmaco oltre tale data ( come dedotto dalla parte attrice che dichiara di averlo assunto sino al mese di gennaio 2005),non sarebbe ascrivibile alla responsabilità degli odierni convenuti.

In ogni caso,l'assunzione per il breve periodo indicato nell'unica prescrizione medica allegata ( si ribadisce,non riconducibile alla Giuliani),a fronte della astratta ascrivibilità della lamentata patologia a molteplici e diversi fattori di rischio e della " familiarità per I C " per patologie cardio ipertensive tra le quali rientra quella lamentata dalla parte attrice e accertata,secondo la spetta prospettazione della Giuliani ( cfr. punto 19 atto di citazione nella parte in cui riporta la diagnosi di dimissione dell'Ospedale S. Camillo).

Il forte dibattito sulla questione di fatto dedotta in giudizio e la natura delle parti,rappresentano giusto motivo per compensare integralmente tra le parti le spese di lite.

## P.Q.M.

Il Tribunale di Roma,in persona del Giudice Unico dott. Maria Speranza Ferrara,definitivamente pronunciando sulle domande come in atti proposte,ogni diversa istanza disattesa,così provvede:

1) rigetta la domanda di Giuliani Nadia;

2) compensa tra le parti le spese del giudizio;

Così deciso in Roma,in data 20 aprile 2009, all'esito della udienza di discussione ex art.281 sexies c.p.c.



6

La presente decisione è parte integrante del verbale d'udienza in pari

data.

IL CANCELLIERE
(Sarni dott.ssa Sandra)

Il Giudice

Depositato in Cancelleria
Roma, il _20·04·09_
IL CANCELLIERE
(Sarni dott.ssa Sandra)

PERVENUTO AL REPERTORIO
IL _____ '24 APR 2009



7

SENTENZA N. _8540/09_

**TRIBUNALE ORDINARIO DI ROMA**
**SETTORE CIVILE**
Ufficio copie - Sentenze
LA PRESENTE SENTENZA E' STATA REGISTRATA
IL _18/6/09_
SERIE _4_ AL N. _3128_ VERSATO € _168,00_
COME DA ATTESTAZIONE DELL'AGENZIA DELLE
ENTRATE DI ROMA 2 APPOSTA IN CALCE ALLA
COPIA AUTENTICA INVIATA AI SENSI DELL'ART.
278 DEL T.U. 115 DEL 30.05.2002
ROMA _2 2 LUG. 2009_

IL CANCELLIERE
D.ssa Velia Pedullà



DIRITTI DI COPIA PERCEPITI $6e,44$

## TRIBUNALE CIVILE DI ROMA
### Sezione Copie - Autentiche

Copia conforme all'originale che si rilascia a ri-
chiesta dell'Avv. ...... PeLLA ...........................
Roma, li .......... 16 OTT. 2009

IL DIRETTORE DELLA CANCELLERIA

IL CANCELLIERE
D.ssa Velia Pedullà

**Avv. Daniele La Cognata**
**LOVELLS Studio Legale**
**Piazza Venezia, 11**
**00187 Roma**
**Tel. 06.6758231 - Fax 06.67582323**

## RELATA DI NOTIFICA

Ad istanza degli avv.ti Francesca Rolla, Daniele La Cognata e Christian Di Mauro, difensori della Merck Sharp & Dohme Italia S.p.A., io sottoscritto Assistente UNEP addetto all'Ufficio Unico Notificazioni della Corte di Appello di Roma ho notificato la suestesa sentenza n. 8540/2009 del Tribunale di Roma, Sez. XIII, G.U. Dott.ssa Ferrara

- alla **Sig.ra Nadia Giuliani**, presso i procuratori costituiti, avv.ti Carlo Rienzi, Marco Ramadori e Cristina Adducci, nel domicilio eletto presso la sede legale del Codacons in Roma, Viale Mazzini n. 73, 00195, ivi recandomi e consegnandone copia conforme all'originale a mani di

- all'**avv. Carlo Rienzi**, presso il suo studio in Roma, Via delle Milizie, 9 Scala C, 00192, ivi recandomi e consegnandone copia conforme all'originale a mani di

- all'**avv. Marco Ramadori**, presso il suo studio in Roma, Via M. Prestinari, 13, 00195, ivi recandomi e consegnandone copia conforme all'originale a mani di

**COPIA**

**UNEP - CORTE DI APPELLO DI ROMA**   | Settore **8** | Zona **133**

CASSA **6**   /2009   Cron. **21.670**   Dest.   **1/4**   Data Ric. **22/10/2009**

Richiedente: **AVV LA COGNATA**

Relazione di Notificazione

Trasf.   **1,57**   Sp.postale   **0,00**

Richiesto come in atti, io sottoscritto Ufficiale Giudiziario addetto all'Ufficio Unico c/o la Corte di Appello di Roma, ho notificato il presente atto a
**NADIA GIULIANI PRESSO I PROC.RI COST. AVVTI CARLO RIENZI MARCO RAMADORI E CRISTINA
ADDUCCI ELETT DOM C/O LA SEDE DEL CODACONS**

**ROMA - VIALE MAZZINI GIUSEPPE, 73**
mediante consegna di copia conforme all'originale a mani di persona qualificatasi per _____

_Incaricato della ricezione degli atti_

capace e convivente, che si incarica della consegna in assenza del destinatario e di persone idonee a riceverlo in busta chiusa e sigillata, ai sensi di legge.

Roma, _____   **2 7 OTT. 2009**   L'Ufficiale Giudiziario

**Ai sensi dell'art. 140 c.p.c.** , curando il deposito della copia dell'atto in busta chiusa e sigillata completa di numero cronologico, nella Casa Comunale di Roma, per non aver rinvenuto alcuno all'indicato domicilio e/o per assenza o il rifiuto di persone idonee a cui poter consegnare l'atto ai sensi di legge.

Roma, _____   L'Ufficiale Giudiziario _____



ORIGINALE

**TRIBUNALE  TORINO**
**ORIGINALE**
imposto  di  bollo  assolto  ai  sensi  legge 7 · 2 · 79 n. 59



## REPUBBLICA ITALIANA
## IN NOME DEL POPOLO ITALIANO
### IL TRIBUNALE DI TORINO
### NONA SEZIONE CIVILE

in composizione monocratica *ex* art. 50 *ter* e 281 *bis* e segg. c.p.c.  in persona del Giudice
unico  dott.Umberto Scotti

ha pronunciato la seguente

## S E N T E N Z A

nella causa civile iscritta in primo grado
al n. 8068 R.G.2009, avente ad oggetto: risarcimento danni.
promossa da

**GALBIATI Giuseppina**, residente in Crevacuore (BI),  **DEL CORSO Luca**, residente in
Varallo Sesia (VC),  **DEL CORSO Marco** residente in Varallo Sesia (VC), in qualità di
eredi legittimi, rispettivamente moglie e figli, del sig. **DEL CORSO Remo**, nato a Pisa il
24.05.1937, deceduto a Novara il 18.05.2008, tutti rappresentati e difesi unitamente e
disgiuntamente dagli avvocati Tiziana Sorriento, Carlo Rienzi, Marco Ramadori, Cristina
Adducci ed elettivamente domiciliato presso lo studio del primo in Torino, Via Assarotti n.
15, in virtù di procura a margine dell'atto di citazione  in riassunzione

**ATTORI**

contro

**MERCK  SHARP  &  DOHME  ITALIA  S.p.A.  (MSD)** in  persona  del  legale
rappresentante *pro-tempore*, con sede legale in Roma, via G. G.Fabbroni 6, rappresentata e
difesa dagli avv.ti Francesca Rolla, Daniele La Cognata, Christian Di Mauro e Prof. Alberto
Maria Musy ed elettivamente domiciliata presso lo studio dell'ultimo in Torino, Via Luigi
Mercantini 5, in forza di procura  a margine della comparsa di costituzione e risposta,

**CONVENUTA**

e

**MINISTERO DELLA SALUTE** (subentrato ex art.1, commi 2,3, e 4 legge 13.11.2009
n.172 al Ministero del Lavoro, della Salute e delle Politiche Sociali)  in        persona        del
Ministro  *pro tempore,*
**AGENZIA  ITALIANA  DEL FARMACO – AIFA**    in persona del Presidente  *pro
tempore,*
domiciliati presso l'Avvocatura Distrettuale dello Stato di Torino, in corso Stati Uniti 45,
che li rappresenta e difende  *ex lege,*

**CONVENUTI**

Udienza di  precisazione delle conclusioni: 30 giugno  2010



CONTRIBUTO UNIFICATO

CONCLUSIONI PER PARTE ATTRICE:

*"Voglia l'Ill.mo Tribunale adito, contrariis reiectis:*

*A. accertare e dichiarare la responsabilità della Merck Sharp & Dohme:*

*a. per aver, dolosamente e/o colposamente, prodotto e messo in commercio il medicinale Vioxx contenente sostanze che inducono eventi cardiaci negativi, aritmia ed eventi renali, che ha causato enormi danni alla collettività, e in particolare al Sig. Del Corso conducendolo finanche alla morte, ex artt. 2043 e 2059 c.c.*

*b. per avere messo in commercio un prodotto pericoloso e difettoso ai sensi dell'art. 117 del Codice del Consumo;*

*c. per aver posto in essere comportamenti volti a falsare i dati che emergevano dagli studi effettuati (vedi l'occultamento della morte della donna di 73 anni- studio advantage, articolo New York Time, 24 aprile 2005, all. 5) e dunque per avere dolosamente e/o colposamente continuato a commercializzare un prodotto i cui effetti, era consapevole, incidessero ovvero causassero eventi negativi sulla salute dei pazienti assuntori del farmaco;*

*B. accertare e dichiarare la responsabilità del Ministero della Salute Italiano e dell'AIFA, Agenzia Italiana del Farmaco, ex art. 2050 c.c. per avere il primo autorizzato la commercializzazione del prodotto Vioxx ed il secondo per aver mantenuto tale farmaco in commercio e comunque per non aver revocato l'autorizzazione alla commercializzazione;*

*C. per l'effetto condannarli tutti in solido tra loro, o secondo le responsabilità' che verranno accertate in corso di causa, al risarcimento dei danni tutti subiti dal Sig. Del Corso, in favore degli eredi costituitisi parte attrice, e così quantificati: € 81.800,00 (ottantunottocentomila/00) per danno biologico del de cuius, € 130.000,00 (centotrentamila) per danni morali riportati direttamente dagli eredi da suddividersi in parti uguali ed € 5.000,00 (cinquemila/00) per danno patrimoniale non documentato, per un totale complessivo di € 216.800,00 (duecentosedicimilaottocento) oltre a interessi legali come per legge, e comunque nei limiti previsti dal contributo unificato e da valutarsi anche tutti in via equitativa ex art. 1226 c.c.*

*Con vittoria di spese, competenze ed onorari, oltre i.v.a. e c.p.a., come per legge.*

*Con riserva di precisare, emendare e/o integrare la domanda a seguito dell'esame del comportamento processuale del convenuto.*

IN VIA ISTRUTTORIA

*Si chiede:*

*a) l'eventuale disposizione della consulenza tecnica d'ufficio al fine di verificare le responsabilità dei convenuti come sopra descritte e quantificare il danno patrimoniale, biologico, morale subiti dal de cuius e quindi dagli eredi odierni attori;*

*b) l'ammissione di prova testimoniale, per poter meglio evidenziare il danno morale subito dagli attori sui seguenti capitoli di prova:*

*4) "Vero che gli eredi del Sig. Del Corso hanno subito gravissimi danni alla propria vita di relazione in seguito alle instabili condizioni di salute prima e poi al decesso del proprio congiunto? Soffrono ancora ogni giorno tanto e sono affetti da continui stati di crisi e di pianto per aver perso il suddetto familiare? "*
*con riserva di indicare i nominativi dei testimoni;*

*c) ammettersi l'interrogatorio formale del presidente e legale rappresentante della Merck Sharp & Dohme sui capitoli nn. 1-2-3-4-5-6 -7-8 della premessa in fatto ed, inoltre, sulle seguenti circostanze di fatto:*

*3) "vero che la Merck era a conoscenza dei rischi che comportava assumere il medicinale Vioxx già a partire dai primi studi effettuati sul farmaco? ";*

*4)" vero che la Merck, già nel 2000 era più che consapevole degli effetti negativi causati alla salute dei consumatori dal farmaco Vioxx poiché esiste ed è incontestabile la corrispondenza via email intercorsa tra un ricercatore della Merck, Dr. Edward M Scolnick (che ha lavorato per la Merck dal 1985 al 2002) che aveva segnalato la morte di una donna ed era attribuibile al Vioxx ed un responsabile delle ricerche cliniche della compagnia, Dr. Alise S. Reicin (vice presidente delle ricerche cliniche della Merck) che gli chiedeva continuamente di cambiare opinione classificando come "sconosciuta" la causa della morte per "non sollevare preoccupazioni" (cfr articolo New york Time 24 aprile 2005, all. 5 fascicolo di parte depositato in atti del processo tenutosi a Roma) ? ";*

*d) ordinare al Ministero della Salute di esibire tutti gli atti e i provvedimenti, comunque denominati, di approvazione e/o di autorizzazione alla commercializzazione del medicinale Vioxx in Italia ex art. 210 c.p.c..*

---

*Richiam*

CON

*"Voglia*
*- nel me*
*motivi e*
*- in via*
*tecnica*
*ammette*
*Con vit*

CON

*"Dichi*
*statuiz*

La pr
con d
essen:
216.8
sempl
AIFA
setter
succe
MSD
gona:
L'atto
e a d
valor
Il D
colpe
indu
peric
in es
prop
com
sulla
Min
auto
com
In
inco
dich
con
Poi
ricc
effe
Co
con
dar
La

*Richiama le istanze istruttorie di cui alle memorie ex art.183 c.p.c., VI comma.*"

**CONCLUSIONI PER PARTE CONVENUTA MSD:**
"*Voglia l'Ill.mo Giudice, disattesa ogni avversaria istanza; deduzione e richiesta:*
- *nel merito*, *rigettare tutte le domande formulate dagli attori perché infondate in fatto e in diritto per tutti i motivi esposti nei precedenti scritti difensivi;*
- *in via istruttoria*, *rigettare le domande istruttorie formulate dagli attori, nonché la richiesta di consulenza tecnica d'ufficio. In subordine, nella denegata ipotesi di accoglimento delle istanze istruttorie attoree, ammettere la prova contraria richiesta dalla convenuta.*
*Con vittoria di spese, diritti ed onorari.*"

**CONCLUSIONI PER PARTI CONVENUTE MINISTERO SALUTE E AIFA:**
"*Dichiarare inammissibili, improponibili e infondate le avverse conclusioni con ogni consequenziale statuizione anche in ordine alle spese del giudizio.*"

### BREVE SINTESI DELL'OGGETTO DEL GIUDIZIO

La presente controversia scaturisce da un atto di citazione dinanzi al Tribunale di Roma con cui nel 2008 Remo Del Corso aveva richiesto il risarcimento dei danni subiti, essenzialmente non patrimoniali (biologici, morali ed esistenziali), quantificati in € 216.800,00 oltre accessori, nei confronti della Merck Sharp & Dohme (di seguito, semplicemente, MSD), del Ministero della salute e dell'Agenzia Italiana del farmaco – AIFA per effetto dell'assunzione protratta nel tempo (dal mese di settembre 2000 al 18 settembre 2002, nel dosaggio di 25 mg al giorno per 15 giorni consecutivi e poi successivamente a giorni alterni) del farmaco Vioxx prodotto dalla casa farmaceutica MSD, che gli era stato prescritto da uno specialista ortopedico per il trattamento di una gonartrosi destra.

L'attore aveva sostenuto di aver subito nel settembre del 2002, in pieno stato di benessere e a distanza di 60 minuti dall'assunzione del farmaco, un fortissimo malore con rialzo dei valori pressori, che era stato successivamente diagnosticato come *ictus* ischemico.

Il Del Corso, più specificamente, aveva addebitato alla MSD di aver, dolosamente e/o colposamente, prodotto e messo in commercio il medicinale Vioxx contenente sostanze induttive di eventi cardiaci negativi, aritmia ed eventi renali, e quindi un prodotto pericoloso e difettoso ai sensi dell'art. 117 del Codice del Consumo, nonché di aver posto in essere comportamenti volti a falsare i dati che emergevano dagli studi scientifici al proposito effettuati e quindi di avere dolosamente e/o colposamente continuato a commercializzare consapevolmente un prodotto i cui effetti incidevano negativamente sulla salute dei pazienti assuntori del farmaco; l'attore aveva invece rimproverato al Ministero della Salute Italiano e all'AIFA, *ex* art. 2050 c.c., rispettivamente, di avere autorizzato la commercializzazione del prodotto Vioxx e di aver mantenuto tale farmaco in commercio e comunque di non aver revocato l'autorizzazione alla commercializzazione.

In seguito alla costituzione delle parti convenute e alla proposizione di eccezione di incompetenza per territorio il Tribunale di Roma, con sentenza 24473 del 2008 ha dichiarato l'incompetenza per territorio del Tribunale di Roma, indicando come competente il Tribunale di Torino ed assegnando giorni 90 per la riassunzione del giudizio. Poiché nel frattempo (in data 18.5.2008) il sig. Remo Del Corso era deceduto in seguito a ricovero per coronaropatia la riassunzione del giudizio dinanzi a questo Tribunale è stata effettuata dagli eredi, ossia dalla moglie Giuseppina Galbiati e dai figli Luca e Marco Del Corso, riproponendo le domande originarie, coltivate *jure hereditatis*, e prospettando comunque un collegamento causale fra l'assunzione del farmaco e il successivo decesso del dante causa.

La MSD ha chiesto il rigetto di tutte le domande attoree, in particolare sostenendo che il

farmaco Vioxx non era un prodotto difettoso e che era stato ritirato solo prudenzialmente dal commercio nel 2004 e soprattutto che non sussisteva alcun nesso causale fra l'asserita assunzione del Vioxx e la cardiopatia intensiva e il TIA che avevano colpito il Del Corso, riconducibili piuttosto a molteplici fattori di rischio cardio e cerebro-vascolare di cui l'attore originario era portatore (fumo, ipertensione, obesità, età avanzata , fattori ereditari e sesso maschile).

La MSD contesta in particolare  le riferite modalità di assunzione del farmaco da parte dell'attore, che non trovavano riscontro nella documentazione prodotta.

Il Ministero e l'AIFA hanno contestato l'applicabilità dell'art.2050 c.c. e del relativo regime di responsabilità oggettiva  e hanno  comunque escluso qualsiasi loro responsabilità in relazione all'autorizzazione e alla commerciabilità del farmaco.

Con ordinanza del 29-30.4.2010, all'esito dello scambio delle memorie istruttorie, il Giudice istruttore ha respinto le istanze istruttorie di parte attrice, reputate irrilevanti agli effetti del decidere e la richiesta di disposizione di consulenza tecnica d'ufficio, parimenti proposta da parte attrice in quanto priva di adeguate basi di valutazione per l'espressione del giudizio tecnico, prima ancora che "esplorativa".

## MOTIVI DELLA DECISIONE

### § 1. L'onere probatorio incombente sulla parte attrice.

E' assolutamente indispensabile mettere a fuoco un punto fondamentale per la decisione della presente controversia, che ha già ispirato la decisione istruttoria assunta con ordinanza del 29-30.4.2010.

Qualunque costruzione giuridica si segua e qualsiasi prospettazione sia impressa alla domande attoree, qualificate alternativamente con riferimento alla responsabilità oggettiva derivante dall'esercizio di attività pericolosa *ex*  art.2050 c.c. ovvero  dalla messa in commercio di un prodotto assertamente difettoso ai sensi dell'art.114 e ss. Codice del consumo, o infine  con riferimento alla responsabilità  extracontrattuale derivante comunque dalla realizzazione di una condotta dolosa o colposa antigiuridica produttiva di una danno risarcibile ai sensi dell'art.2043 c.c., la parte attrice non può esonerarsi dalla prova che il  sig. Del Corso abbia assunto il farmaco assertamente nocivo, il Vioxx, e che lo abbia fatto con modalità potenzialmente idonee  a provocare il pregiudizio dedotto.

L'onere della prova  del nesso causale incombe infatti ai sensi dell'art.2697 c.c. sulla parte che chiede il risarcimento del danno, ancorché sia facilitata da una  presunzione di colpa o da un titolo oggettivo di imputazione, che pur sempre presuppongono che il danno sia stato prodotto dal bene o dall'attività  di cui si deve rispondere oggettivamente.

- "*Nel caso in cui venga chiesta la condanna della p.a. a norma degli art. 2043 e 2051 c.c. per danni prodotti dalla cosa di proprietà e sottoposta alla manutenzione ed al controllo da parte dell'ente territoriale, con indipendenza dal titolo di responsabilità invocato (responsabilità per colpa ai sensi dell'art. 2043 c.c. o responsabilità oggettiva ai sensi dell'art. 2051 c.c.) grava, comunque sul danneggiato l'onere di dare prova dell'evento dannoso (caduta) e del nesso di causalità tra esso evento e la specifica condizione di pericolosità della cosa che lo avrebbe cagionato.*"(Tribunale Milano, sez. X, 18/03/2009, n. 3667, *Giustizia a Milano 2009, 4, 28 (s.m.)*

- "*La Suprema Corte conferma il principio secondo cui la responsabilità del datore di lavoro per violazione dell'obbligo di sicurezza sancito dall'art. 2087 c.c. non ha natura oggettiva e, pertanto, l'onere della prova del nesso causale tra danno e inadempimento resta a carico del lavoratore, mentre il datore di lavoro può liberarsi solo dimostrando la non imputabilità dell'evento. Quanto al tipo di colpa del lavoratore, rilevante per escludere o ridurre la colpa del datore di lavoro, la Corte conferma, inoltre, la propria giurisprudenza secondo cui si ha concorso di colpa del lavoratore quando lo stesso abbia concorso a cagionare l'evento con comportamenti negligenti o imprudenti, ulteriori rispetto a quelli appartenenti al rischio professionale, le cui conseguenze*

*pregiudizievoli le norme sulla prevenzione degli infortuni intendono prevenire, con precetti rivolti al datore di lavoro e la cui osservanza è ad esso rimessa.*"( Cassazione civile, sez. lav., 10/01/2007, n. 238);

- "*In caso di incidente avvenuto su strada statale, il danneggiato che domanda il risarcimento del pregiudizio sofferto in conseguenza dell'omessa o insufficiente manutenzione delle strade o di sue pertinenze (nel caso, un ponte) invocando la responsabilità della p.a. è tenuto, secondo le regole generali in tema di responsabilità civile, a dare la prova che i danni subiti derivano dalla cosa, in relazione alle circostanze del caso concreto. Tale prova consiste nella dimostrazione del verificarsi dell'evento dannoso e del suo rapporto di causalità con la cosa in custodia, e può essere data anche con presunzioni, giacché la prova del danno è di per sé indice della sussistenza di un risultato "anomalo", e cioè dell'obiettiva deviazione dal modello di condotta improntato ad adeguata diligenza che normalmente evita il danno, non essendo il danneggiato viceversa tenuto a dare la prova anche della presenza di un'insidia o di un trabocchetto - estranei alla responsabilità ex, art. 2051 c.c. o dell'insussistenza di impulsi causali autonomi ed estranei alla sfera di controllo propria del custode o della condotta omissiva o commissiva del medesimo. Facendo eccezione alla regola generale di cui al combinato disposto degli art. 2043 e 2697 c.c., l'art. 2051 c.c. determina infatti un'ipotesi (non già di responsabilità oggettiva bensì) caratterizzata da un criterio di inversione dell'onere della prova, ponendo (al comma 2) a carico del custode la possibilità di liberarsi dalla responsabilità presunta a suo carico mediante la prova liberatoria del fortuito (c.d. responsabilità aggravata), dando cioè, in ragione dei poteri che la particolare relazione con la cosa gli attribuisce cui fanno peraltro riscontro corrispondenti obblighi di vigilanza, controllo e diligenza (i quali impongono di adottare tutte le misure idonee a prevenire ed impedire la produzione di danni a terzi, con lo sforzo adeguato alla natura e alla funzione della cosa e alle circostanze del caso concreto) nonché in ossequio al principio di c.d. vicinanza alla prova, la dimostrazione che il danno si è verificato in modo non prevedibile né superabile con lo sforzo diligente adeguato alle concrete circostanze del caso. Il custode è cioè tenuto a provare la propria mancanza di colpa nella verificazione del sinistro - e non già la mancanza del nesso causale, il criterio di causalità essendo altro e diverso dal giudizio di diligenza (avere preso tutte le misure idonee) - che si risolve sostanzialmente sul piano del raffronto tra lo sforzo diligente nel caso concreto dovuto e la condotta - caratterizzata da assenza di colpa - mantenuta. È allora sul piano del fortuito, quale esimente di responsabilità, che possono assumere rilievo (anche) i caratteri dell'"estensione" e dell'"uso diretto della cosa" da parte della collettività che, estranei alla "struttura" della fattispecie e pertanto non configurabili come presupposti di applicazione della disciplina ex, art. 2051 c.c., possono valere ad escludere la presunzione di responsabilità ivi prevista ove il custode dimostri che l'evento dannoso presenta i caratteri dell'imprevedibilità e della inevitabilità non superabili con l'adeguata diligenza, come pure l'evitabilità del danno solamente con l'impiego di mezzi straordinari (e non già di entità meramente considerevole).*"(Cassazione civile, sez. III, 20/02/2006, n. 3651);

- "*In tema di responsabilità civile per i danni cagionati da cose in custodia, la fattispecie di cui all'art. 2051 c.c. individua un'ipotesi di responsabilità oggettiva, essendo sufficiente per l'applicazione della stessa la sussistenza del rapporto di custodia tra il responsabile e la cosa che ha dato luogo all'evento lesivo, senza che assuma rilievo in sè la violazione dell'obbligo di custodire la cosa da parte del custode, la cui responsabilità è esclusa solo dal caso fortuito. Detto fattore attiene non ad un comportamento del responsabile, ma al profilo causale dell'evento, riconducibile non alla cosa che ne è fonte immediata, ma ad un elemento esterno, recante i caratteri dell'imprevedibilità e dell'inevitabilità. Ne consegue l'inversione dell'onere della prova in ordine al nesso causale, incombendo sull'attore la prova del nesso eziologico tra la cosa e l'evento lesivo e sul convenuto la prova del caso fortuito.*"(Cassazione civile, sez. III, 09/11/2005, n. 21684);

- "*La natura oggettiva della responsabilità di cui all'art. 2051 c.c. pone a carico del danneggiato l'onere di provare l'esistenza del nesso materiale di causalità tra la res custodita da altri e l'evento dannoso, ed a carico del danneggiante quello di fornire la prova liberatoria del caso fortuito, onde, una volta accertata la sussistenza del nesso causale, in virtù dello stretto rapporto di*

*consequenzialità temporale tra il fatto dannoso e l'evento, spetta al convenuto dimostrare che quest'ultimo si è verificato per una causa sopravvenuta da sola sufficiente a determinarlo. (In applicazione di tale principio, la S.C. ha ritenuto adeguatamente motivata la sentenza impugnata, la quale aveva affermato la responsabilità del titolare di un'impresa di trasporti per la morte di un cavallo, rimasto ferito nel corso del trasferimento a bordo di un autoveicolo dell'impresa, non avendo il convenuto fornito la prova dell'interruzione del nesso causale).*"(Cassazione civile, sez. III, 26/07/2005, n. 15613);

In particolare in tema di responsabilità da prodotto difettoso Cass.civ. sez.III del 15.3.2007 n.6007 ha ricordato che

*"L'errore che caratterizza la prima delle due censure che lo compongono è quello di ritenere che la responsabilità del produttore introdotta dalla disposizione del D.P.R. 24 maggio 1988, n. 224, art. 1, al fine di uniformare la legislazione nazionale alla direttiva Comunitaria del 25 luglio 1985, n. 374, presupponga solo la prova del nesso di causalità tra la detenzione del prodotto o la sua utilizzazione e l'evento e che accertato il predetto nesso, sia, quindi, a carico del produttore che pretenda di sottrarsi alla predetta responsabilità l'onere di dedurre e provare che il prodotto non era difettoso o che ricorrono le altre cause di esclusione della responsabilità analiticamente indicate dall'art. 6 della medesima legge.*

*E', invece, del tutto evidente dalla formulazione letterale della norma, che l'art. 1 della legge lega la speciale responsabilità del produttore dalla stessa introdotta al nesso di causalità tra il danno ed il difetto del prodotto al quale (difetto) viene così attribuito il carattere di un prerequisito della responsabilità e la funzione delimitativa dell'ambito di applicazione di tale responsabilità che, proprio perchè tale, piuttosto che causa di esonero della responsabilità, spetta al danneggiato provare secondo il principio generale sull'onere della prova stabilito dall'art. 2697 c.c. e la regola, quindi, che pone a carico di colui che intende fare valere un diritto l'onere di provare gli elementi costitutivi di tale diritto.*

*Giova infatti il sottolineare che sia l'art.2050 , sia l'art.114 Codice del consumo presuppongono pur sempre che il danno sia stato cagionato dall'attività pericolosa o dal prodotto difettoso."*

La parte attrice doveva quindi provare il fatto, contestato e comunque riconducibile alla sfera personale del sig.Del Corso, e come tale riconducibile alla sua sfera di onere probatorio , di aver assunto il farmaco in questione con modalità tali da poter potenzialmente provocare effetti dannosi del genere di quelli dedotti. Siffatta distribuzione dell'onere probatorio è inoltre conforme anche al principio di vicinanza o riferibilità della prova (cfr Cass.civ. 27.5.2009 n. 12259; 11.5.2009 n.10744; 22.2.2007 n.2308; 9.11.2006 n.23918; 20.2.2006 n.3651), riconducibile sul piano costituzionale alla garanzia di effettività della tutela giurisdizionale dei diritti *ex* art.24 Cost.

### § 2. Il concreto assolvimento dell'onere probatorio.

Tale prova non è stata fornita e neppure dedotta.

Parte attrice aveva sostenuto che il sig.Del Corso aveva assunto il farmaco Vioxx dal mese di settembre 2000 al 18 settembre 2002, nel dosaggio di 25 mg/die per 15 giorni consecutivi e poi successivamente a giorni alterni) in conseguenza della prescrizione effettuata da uno specialista ortopedico per il trattamento di una gonartrosi destra.

Nessuna delle prove costituende dedotte da parte attrice appare idonea a soddisfare l'onere probatorio sopra evidenziati:

- la prova testimoniale di cui al capo 1 di pagina 3 di memoria 9.3.2010 riguarda solo il tema del danno morale ed esistenziale ed (o meglio, modernamente *post* SS.UU. 26972/2008, non patrimoniale da perdita o compromissione della relazione parentale) patito dai congiunti;

- la prova per interrogatorio formale di cui ai capi da 1 a 8 articolati nella premessa di atto di citazione e al capo 1 di pagina 3 della memoria 9.3.2010 attengono tutti alla asserita pericolosità del farmaco e al momento in cui sarebbe maturata la consapevolezza della sua nocività da parte della MSD;

- in sostanza, le prove orali dedotte non mirano a dimostrare le circostanze di fatto concernenti la specifica vicenda storia del sig.Del Corso e in particolare i tempi, i modi e le quantità con cui egli avrebbe fatto uso del farmaco *de quo*;

- non è certo sufficiente alla parte attrice dimostrare che il farmaco Vioxx sia difettoso o nocivo, se non viene provato anche che il sig.Del Corso l'avesse assunto e con modalità tali da poter astrattamente provocare gli effetti lamentati;

- tale prova non è stata offerta dalla parte attrice, che anche dopo la pronuncia dell'ordinanza istruttoria non ha prospettato convincenti argomentazioni a confutazione dell'esposto ragionamento, limitandosi nelle sue definitive conclusioni ad insistere per l'accoglimento delle proprie istanze istruttorie.

A diversi approdi non è certamente possibile pervenire sulla base delle prove documentali fornite da parte attrice, rappresentate dalla prescrizione del dott. Spinelli del 13.9.2000 (doc.23) e dai documenti All.1/A, All. 2/A, All. 3/A, All. 4/A, ottenuti presso l'ASL 11 di Vercelli (ossia dei certificati 20.4.2000, 5.10.2000, 26.3.2001 e 11.1.2001).

Tali documenti, che, a rigore, dimostrano solo la prescrizione e l'acquisto del farmaco e non necessariamente la sua assunzione (costituendo semmai solo un rilevante indizio in tal senso), permettono però - a tutto concedere - solo di ricostruire un quadro di prescrizione discontinua del farmaco nell'arco di un paio di anni con interruzioni prolungate anche di 10 mesi.

Vi è infatti interruzione di oltre 5 mesi fra l'ottobre 2000 e il marzo 2001, di sette mesi dal marzo 2001 al novembre 2001, e di dieci mesi dal novembre 2001 al settembre 2002.

Anche ammesso di poter operare il poco rigoroso salto logico prescrizione – acquisto - assunzione e di ritenere così provata l'assunzione per il solo fatto della prescrizione e dell'acquisto del farmaco, la documentazione prodotta non dimostra nulla più che la sporadica assunzione del farmaco per brevi periodi nel biennio e comunque nell'arco dei 18 mesi anteriori all'evento lesivo (ossia nell'arco temporale considerato rilevante nello Studio APPROVe come fattore di aumento del rischio di eventi cardiovascolari trombotici, a cui ha fatto riferimento anche l'orientamento giurisprudenziale del Tribunale di Roma, di cui alle sentenze allegate in copia alla memoria di replica di parte convenuta MSD *sub* doc.5-8).

Per seguire il ragionamento della parte attrice, proposto a sostegno della richiesta di dar ingresso alla c.t.u. medico legale, il Giudice non solo dovrebbe ritener provata l'assunzione del farmaco (*ut supra*) ma dovrebbe anche svincolarsi da ogni elemento di carattere scientifico per opinare una pericolosità del farmaco anche in caso di assunzione sporadica e remota, in difetto di ogni principio di prova in tal senso. Tale non è certamente il ritiro del farmaco dal mercato (che è un elemento del tutto neutro almeno in relazione all'ipotesi di assunzione remota e sporadica) e l'andamento del contenzioso americano (che, fra l'altro, si caratterizza per un approccio completamente differente al tema del fondamento del danno, basato sul principio del "danno punitivo").

Non vi è poi traccia documentale della prescrizione del farmaco dal novembre del 2001 al settembre del 2002, laddove la parte attrice ha sostenuto senza offrirne prova che il malore del settembre 2002 era insorto a distanza di circa 60 minuti dall'ingestione del farmaco (capo 16 di citazione).

Se si cala poi tale situazione di gravissima carenza probatoria in un contesto quale quello efficacemente delineato dalla difesa di MSD, è del tutto evidente l'insussistenza del nesso di causalità tra il preteso uso del Vioxx e le patologie accusate dal sig.Del Corso.

Risulta infatti che il sig.Del Corso era un fumatore dall'età di 40 anni (doc.24 parte attrice, pag.5), che ha sofferto di ipertensione per circa 20 anni (doc.33 di parte attrice), soffriva di obesità di 1° grado (docc.23, 24, 27 e 33 di parte attrice), era figlio di genitori deceduti per malattie cardiache (cfr doc.33 di parte attrice) e aveva 65 anni al momento dell'attacco ischemico, sicché presentava una serie di concomitanti e molteplici notori fattori di rischio per le cardiopatie ipertensive e attacchi ischemici transitori.

## § 3. *La richiesta di c.t.u.*

Il Giudice non può che ribadire l'opinione espressa nell'ordinanza istruttoria circa la richiesta di consulenza tecnica d'ufficio avanzata da parte attrice.

Gli attori non hanno provato e offerto a prova i fatti storici necessari per effettuare la determinazione del nesso di causalità fra assunzione del farmaco ed evento lesivo, sicché difetta in radice una adeguata base di valutazione per l'espressione del giudizio tecnico da parte del medico legale.

A ben vedere, la consulenza proposta non é soltanto esplorativa (ossia volta a surrogare inquisitoriamente il mancato assolvimento dell'onere probatorio con una ricerca di ufficio della prova carente) ma pare addirittura priva di un sostrato di fatti da valutare.

Le argomentazioni svolte in senso contrario nella conclusionale attorea, pag.4, a sostegno della richiesta c.t.u. si basano su di un presupposto non corretto, ossia che sia stata provata l'assunzione del farmaco da parte del sig.Del Corso; anche la relazione medico-legale prodotta come doc.33 da parte attrice, a firma dei dott. Aromataro e Cialella, in ordine all'assunzione del farmaco si limita a enunciare il dato accogliendo come un postulato riferito dall'interessato e pertanto accolto senza bisogno di prova.

Quanto alle argomentazioni svolte in memoria di replica ( pag.6) la parte attrice non può assolversi dall'onere probatorio sostenendo che il farmaco per la sua stessa connotazione dimostrerebbe il suo uso prolungato e continuativo; non è neppur convincente l'assunto che il sig.Del Corso avrebbe sostenuto personalmente la spesa senza avvalersi delle ricette mediche e quindi dell'esenzione del SSN.

A parte il fatto che l'assunto non è comunque dimostrato né offerto a prova e appare scarsamente plausibile, tanto più che in altre occasioni (quelle di cui alla documentazione prodotta) invece il farmaco era stato acquistato in regime di esenzione, appare abbastanza significativa la confusione in cui incorre la parte attrice fra la prescrizione medica del farmaco, pur sempre necessaria per l'acquisto, e la sua gratuità perché oggetto di ricetta medica in regime di esenzione.

V'è da aggiungere che appare abbastanza significativo sul piano della valutazione dei comportamenti processuali ai sensi dell'art.116 c.p.c. che la parte attrice abbia rinunciato a indicare testimonianze circa l'effettiva assunzione del farmaco, prima fra tutte quella del medico curante che lo avrebbe costantemente prescritto al sig.Del Corso.

## § 5. *Le spese.*

Le spese, secondo il principio generale, seguono la soccombenza, cui non vi è ragione di derogare, liquidate:

- a favore della MSD nella somma nella somma ~~di € 8.150,00~~ (di cui € 250,00 per esposti, € 1.900,00 per diritti, € 6.000,00 per onorari), oltre rimb.forf. 12,5% *ex* art.14 della tariffa professionale forense e accessori fiscali e previdenziali di legge sulle quote imponibili;
- a favore del Ministero e dell'AIFA , difesisi congiuntamente, nella somma di € ~~5.900,00~~ (di cui € 1.900,00 per diritti e € 4.000,00 per onorari), oltre rimb.forf. 12,5% *ex* art.14 della tariffa professionale forense.

## P.Q.M.

Il Tribunale in composizione monocratica,
**definitivamente** pronunciando;
**respinta** ogni diversa istanza, eccezione e deduzione;
**respinge** le domande tutte avanzate dalle parti attrici nei confronti delle parti convenute;

dichiara tenuti e condanna in solido fra loro Giuseppina Galbiati, Luca Del Corso e Marco del Corso, in proprio e quali eredi di Remo Del Corso a pagare a titolo di rifusione spese processuali:

- alla Merck Sharp & Dohme s.p.a. la somma di € 8.150,00 oltre rimb.forf. 12,5% *ex* art.14 della tariffa professionale forense e accessori fiscali e previdenziali di legge sulle quote imponibili;
- al Ministero della Salute e all'Agenzia Italiana per il Farmaco la somma di € 5.900,00= oltre rimb.forf. 12,5% *ex* art.14 della tariffa professionale forense.

Così deciso in Torino il 9.11.2010

Il Giudice unico
dott. Umberto Scotti.

Minuta depositata in Cancelleria
in data 1 5 NOV. 2010

Il Cancelliere

Depositata in Cancelleria
Torino 1 8 NOV. 2010
Il Cancelliere
IL CANCELLIERE
Dr.ssa Paola BOTTO