**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| In re:  VIOXX | * | MDL Docket No. 1657 |
| | * | |
| PRODUCTS LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| This Document Relates to | * | |
| Cases Listed on Exhibit A | * | |
| | * | MAGISTRATE JUDGE KNOWLES |
| | * | |

* * * * * * * * * * * * * * * * * *

MEMORANDUM IN SUPPORT OF MERCK & CO., INC.'S
<u>MOTION FOR SUMMARY JUDGMENT IN VTE CASES</u>

Of the fewer than 100 claims that remain active in the MDL, approximately one-third involve injuries of pulmonary embolism ("PE") and/or deep vein thrombosis ("DVT"), collectively referred to as venous thrombotic events ("VTEs").[1]  But seven years after commencement of this MDL, there is still no scientific evidence to support the claim that Vioxx can cause VTEs.  The specially-appointed Plaintiffs' Steering Committee ("PSC") for "other injuries" has had more than two years to marshal its case for general causation.  It has not done so.  Nor can it do so.  The science simply does not support general causation.

Neither the parties nor this Court should continue to devote valuable resources to personal injury cases in which causation cannot be established.  Because Plaintiffs can adduce no evidence of general causation, Plaintiffs cannot meet their burden of proof on an essential

---

[1] At the time that the settlement was announced, more than 60,000 claims had been asserted against Merck alleging personal injuries resulting from the use of Vioxx.  Of these, 40,000 claims were subject to the jurisdiction of the MDL (approximately 26,000 plaintiffs with filed claims and approximately 14,000 tolled claims).  *See* Dec. 14, 2007 Minute Entry.

element. The Court should therefore enter judgment for Merck in the cases identified on Exhibit A, in which the claimed injuries are DVTs and PEs.

## I. PROCEDURAL HISTORY

Merck voluntarily withdrew Vioxx from the market on September 30, 2004, acting on preliminary data from the APPROVe study, one of its ongoing clinical trials. The APPROVe study was a double-blind, placebo-controlled clinical trial designed to evaluate the efficacy of Vioxx, a pain medication, as potential treatment for the prevention of colon polyps. The study was halted when preliminary data revealed an increased occurrence of heart attacks after 18 months of use in the Vioxx arm of the trial.

The market withdrawal of Vioxx led to widespread litigation. Ultimately, this MDL was created in February 2005. One of the first acts taken by this Court was to appoint and organize a Plaintiffs' Steering Committee. *See* PTO No. 1, ¶ 16. The PSC was charged with coordinating and conducting extensive discovery, investigating potential claims, and marshalling supporting evidence. The PSC ultimately determined that the claims to be pursued were ones involving heart attacks (including sudden cardiac death) and strokes and developed trial packages supporting those claims. *See, e.g.*, PTO No. 37 (establishing procedures for trial package access); Hr'g Tr. (May 22, 2008) at 44 (excerpts attached as Ex. B) (Court describes MDL trial package as "a ready-to-go trial package that generally involves and focuses on general causation and those aspects of the claim."). The PSC elected not to pursue claims involving VTEs. *See, e.g.*, Hr'g Tr. (May 22, 2008) at 57, 66 (Ex. B).

After six MDL bellwether trials, and 11 other trials in state courts, the large majority of which resulted in jury verdicts for Merck, the parties negotiated a comprehensive settlement program for the myocardial infarction ("MI"), stroke, and sudden cardiac death ("SCD") claims

("Resolution Program").  The Resolution Program, announced in November 2007, was available only to claimants alleging an MI, stroke, or SCD.  More than 99 percent of the eligible claimants elected to participate in the program.  Claimants alleging other injuries, such as VTEs, were not eligible due to the absence of any significant evidence to support such claims.

On April 29, 2009, the Court appointed a separate liaison counsel to coordinate cases involving injuries other than heart attack and stroke and subsequently organized a separate PSC for those claims ("PSC II").  *See* PTO No. 42.  A case management conference regarding those claims was held on July 30, 2009 for the purpose of formulating a plan for moving forward on those cases.  *See* PTO No. 46; *see also* July 31, 2009 Minute Entry § XIII.  At the request of the new PSC II lead counsel, the Court agreed that case-specific discovery in the individual cases held by the PSC II would be deferred for some period of months to allow lead counsel to investigate whether a case for general causation could be made.[2]  Case-specific discovery for the remainder of the other injury cases, held by other counsel, was to move forward.  *See, e.g.*, PTO No. 46 ("[T]he time and resources of [the PSC II] should primarily be focused on investigating and marshaling issues regarding general causation.").

More than two years have now passed since the PSC II was charged with developing the case for general causation for the other injury cases.  Whether Plaintiffs can establish a scientifically valid causal link between Vioxx use and VTEs is a threshold, dispositive issue that

---

[2] Ms. Ann Oldfather, now-lead counsel for the PSC II, had recognized more than a year prior that lawyers electing to move forward with the non-MI and non-stroke cases would have to establish general causation as a threshold matter:  "*Am I a lone voice crying in the wilderness or does anyone else care about this?  I mean, I think that's all I would ask the Court to determine.  Are there people with other claims who would like to see the general causation developed?  And the Fifth Circuit has told us in the Knight case that the general causation has to come first.*"  Hr'g Tr. (May 22, 2008) at 64 (Ex. B) (emphasis added).

is common to all VTE cases, and judicial economy will be best served if the Court rules on the general causation issue now before proceeding further. *See, e.g.*, *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994) (en banc) (per curiam) ("If, after adequate time for discovery, a party cannot produce proof that it has facts to support its case, then the case should be resolved at that point, and this is true irrespective of the type of case.").

II.     FACTUAL BACKGROUND.

      A.     **Venous Events Are Fundamentally Different From Arterial Events.**

All "clots" are not the same. To the contrary, clots that cause arterial thrombotic events such as MIs and strokes are fundamentally different from clots that cause VTEs because they have different anatomies, pathomechanisms, causes, and treatments. Plaintiffs asserting VTE-related injuries therefore present materially different causation issues from plaintiffs asserting injuries from arterial thrombotic events (such as heart attacks and strokes).

VTEs typically originate in the deep veins of the lower extremities. Decl. of Mark A. Crowther, MD, MSc, FRCPC, Ex. 1 ("Crowther Rep.") (attached as Ex. D) at 1; Aff. of John P. Kress, MD, FCCP, Ex. 1 ("Kress Rep.") (attached as Ex. E) at 1-2.[3] If the clot remains in the leg, it is known as a deep vein thrombosis, or DVT. If a clot, or a portion of it, originating in the deep vein dislodges and travels through the deep veins, through the right side of the heart, and to the lung, and blocks the pulmonary vessel, this is known as pulmonary embolism, or PE. Kress Rep. at 1.

Although both venous and arterial clots fall into the broad category of "thrombotic events," heart attacks and strokes are materially different injuries from VTEs. Heart attacks and

---

[3] Legs are the most common clinically significant origin, although venous clots can occur in the upper extremities as well. Kress Rep. at 1.

4

strokes occur as a result of a clot in an artery, which typically results from plaque that develops in the artery and subsequently ruptures. *Id.* By contrast, as explained above, VTEs occur as a result of a clot in a vein.

This is a critical distinction as veins and arteries are different anatomical structures. Arteries are vessels under high pressure, and their lining is prone to the formation of plaques. *Id.* When plaque forms in an artery, it may rupture, leading to the formation of a clot at the point of the rupture. *Id.* Such clots lead to heart attacks, for example, when the clot disrupts blood flow to the heart. *Id.* Veins, on the other hand, are low pressure vessels, and plaques that are prone to rupture do not form in veins. *Id.* Moreover, studies have shown that the COX-2 enzyme is not present in native (i.e., freshly-biopsied) veins. Thus, a COX-2 inhibitor, like Vioxx, cannot have an effect on veins through inhibition of the COX-2 enzyme. Crowther Rep. at 4.

Second, although there is some weak overlap, the primary risk factors for VTE differ from those for heart attack and stroke. The primary known risk factors for heart attack include hypertension, obesity, hyperlipidemia, diabetes, and smoking. Kress Rep. at 1; Crowther Rep. at 3. In contrast, the primary known risk factors for VTEs are trauma, major surgery, fracture of the hip or leg, hip or knee replacement, chemotherapy, pregnancy, estrogen use, immobility, infection, previous VTEs, and various inherited or acquired thrombophilias.[4] Kress Rep. at 2; Crowther Rep. at 2. A significant percentage (up to 40 percent) of VTEs are idiopathic, meaning that the patient presents with no or only weak risk factors. Crowther Rep. at 2.

Third, VTEs generally are the result of three main factors: (1) hypercoagulability, or a change in coagulability (meaning the inherent rate at which an individual's blood tends to clot);

---

[4] The incidence of VTEs increases significantly with age. The rate of VTEs is approximately one in 10,000 at age 20 and one in 1,000 at age 65. Crowther Rep. at 2.

(2) injury to the vessel; and/or (3) stasis, or alteration in blood flow.  These three factors are commonly referred to as Virchow's triad.  Kress Rep. at 2; Crowther Rep. at 2.  The resulting clots are primarily formed of red cells and fibrin, a protein component, and contain fewer platelets.  Crowther Rep. at 3.  Arterial clots, on the other hand, are typically the result of plaque rupture and are formed by platelet aggregation at the point of rupture and contain minimal red cells.  *Id.* at 2-3.

Fourth, because the formation and pathology of venous clots and arterial clots are different (particularly with respect to the issue of platelet aggregation), the typical treatments for VTEs are different than for arterial clots.  VTEs are most often treated with an anticoagulant, such as heparin or warfarin.  Kress Rep. at 2; Crowther Rep. at 2-3.  Warfarin, for example, blocks magnification of the activation of the protein component of coagulation.  Crowther Rep. at 2-3.  Warfarin does not have a significant direct anti-platelet effect and therefore is not used in acute treatment of arterial thrombosis.  *Id.* at 3.  Aspirin and clopidogrel, which inhibit platelet aggregation, are used in prevention and acute treatment of heart attacks and strokes, but these medications are ineffective for the prevention or recurrence of venous thromboses.  Crowther Rep. at 2-3.

In summary, venous thrombosis and arterial thrombosis differ in every meaningful way: anatomy, pathomechanism, primary risk factors, prevention, and treatment.  Thus, the theoretical proposition that a propensity to cause thrombus formation in arteries translates to a propensity to cause thrombus formation in veins is "inconsistent with basic tenets of vascular physiology and pathophysiology."  Kress Rep. at 1.

## B. There Is No Reliable Scientific Evidence that Vioxx Use Increases the Risk of VTEs.

The question of whether Vioxx is associated with an increased risk of VTEs has been examined in several randomized, double-blind, placebo-controlled clinical trials—the "gold standard" in scientific research. *Reference Manual on Scientific Evidence* 338 (Fed. Judicial Ctr. 2d ed. 2000) ("Ref. Man."); *see also Merck & Co. v. Garza*, 347 S.W.3d 256, 263 (Tex. 2011) ("the controlled, experimental, and prospective nature of clinical trials undoubtedly make them more reliable than retroactive, observational studies") (rendering judgment for Merck in alleged Vioxx-related heart attack case) (attached as Ex. F). Moreover, results from several randomized placebo-controlled clinical trials have been pooled together to investigate the potential association of Vioxx and VTEs. None of the individual studies or pooled analyses show any evidence that Vioxx increases the risk of VTEs.

**1)** *Final Pooled Analysis*. On March 22, 2004, Merck provided to the FDA updated results on cardiovascular thrombotic events in all Phase IIb to Phase V clinical trials of rofecoxib (Vioxx) that were at least four weeks or more in duration and included a placebo or non-selective NSAID as a comparator. *See* Letter from Diane C. Louie, Assoc. Dir., Regulatory Affairs, Merck & Co., to Brian E. Harvey, Acting Dir., Div. of Anti-Inflammatory, Analgesic & Ophthalmologic Drug Prods., FDA (Mar. 22, 2004) ("Pooled Analysis") at 2 (attached as Ex. G). This analysis provided blinded external adjudication of potential thrombotic events. In all, the pooled analysis contained data from 23 placebo-controlled clinical trials, including trials in osteoarthritis, rheumatoid arthritis, back pain, and Alzheimer's disease patients. *Id.* at 6 (Table 1). Because a pooled analysis, or meta-analysis, "pools the results of various studies to arrive at a single figure to represent the totality of the studies reviewed," it has the advantage of presenting "results [that] are less likely to be misleading solely due to chance." *In re Bextra &*

7

*Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1174 (N.D. Cal. 2007).

The final pooled analysis data does not show any evidence of increased risk of VTEs associated with Vioxx use. In the group of 7,296 patients who used Vioxx, there were a total of *two* VTEs. Pooled Analysis at 32 (Table 14). In the group of 4,848 patients who were randomized to placebo, there were *four* VTEs. *Id.* Thus, there were more events—both numerically and proportionally—on placebo than on Vioxx.

**2) *APPROVe*.** The APPROVe trial, published after the Final Pooled Analysis, also showed no evidence of risk of VTEs with Vioxx use. APPROVe, the Adenomatous Polyp Prevention on Vioxx trial, was designed to evaluate whether three years of use of Vioxx would reduce the risk of recurrent adenomatous polyps among patients with a history of colorectal adenomas. Robert S. Bresalier, M.D. et al., *Cardiovascular Events Associated with Rofecoxib in a Colorectal Adenoma Chemoprevention Trial*, N. Eng. J. Med.; 352:1093 (2005) (attached as Ex. H). Potential thrombotic events were adjudicated by an independent committee. *Id.* At study termination, the average duration of treatment was 2.4 years (or 28.8 months) in the Vioxx group and 2.6 years (or 31.2 months) in the placebo group. *Id.* at 1096. In the 1,287 patients who were treated with Vioxx, there were *two* VTEs. In the 1,299 patients on placebo, there were *six* VTEs. *Id.* (Table 2). Again, the difference in VTEs favored Vioxx—there were more VTEs on placebo than on Vioxx.

**3) *VICTOR and ViP*.** Neither of Merck's Vioxx placebo-controlled cancer-chemoprevention trials, ViP and VICTOR, present any reliable evidence of an increased risk of VTEs associated with Vioxx use. Following the release of the APPROVe data and Merck's voluntary withdrawal of Vioxx, Merck terminated ViP and VICTOR. The VICTOR trial was

8

designed to test the effects of Vioxx in preventing recurrent colon cancer. David J. Kerr, M.D. et al., *Rofecoxib and Cardiovascular Adverse Events in Adjuvant Treatment of Colorectal Cancer*, N. Eng. J. Med.; 357:360-61 (2007) (attached as Ex. I). More than 2,000 patients had been enrolled by the time the study was halted. In the 1,167 patients in the Vioxx arm, there were three VTEs, and in the 1,160 patients in the placebo arm, there was one VTE. *Id.* at 365 (Table 3). The 3-to-1 difference is not statistically significant. *See Brock v. Merrell Dow Pharm., Inc*., 874 F.2d 307, 312 (5th Cir. 1989) (dismissing case where "plaintiffs did not offer one statistically significant (one whose confidence interval did not include 1.0) study that concludes that Bendectin is a human teratogen"); *Garza*, 347 S.W.3d at 265 (requiring plaintiffs to present results from two epidemiological studies demonstrating a "statistically significant doubling of the risk" to meet burden on general causation) (Ex. F).

The ViP trial was conducted to study the cumulative incidence of developing prostate cancer over six years of treatment of Vioxx versus placebo. Janet van Adelsberg, M.D., et al., *The VIOXX in Prostate Cancer Prevention Study: Cardiovascular Events Observed in the Rofecoxib 25 mg and Placebo Treatment Groups*, Curr. Med. Res. Opin.; 23:2063 (2007) (attached as Ex. J). The trial involved over 4,700 patients. The median duration of treatment was 4.14 months. During that time, there were two VTEs in both the placebo and Vioxx arms. *Id.* at 2068 (Table 3).

The below chart summarizes the totality of the placebo-controlled randomized clinical trial data pertaining to Vioxx and the potential association with VTEs.

| Study | Vioxx and Comparator | Number of Patients | Number of Patient Years | Total Number of VTEs |
|---|---|---|---|---|
| Final Pooled Analysis | Vioxx | 7296 | 3019 | 2 |
|  | Placebo | 4848 | 2801 | 4 |
| APPROVe | Vioxx | 1287 | 3059 | 2 |
|  | Placebo | 1299 | 3327 | 6 |
| VICTOR | Vioxx | 1167 | 927 | 3 |
|  | Placebo | 1160 | 986 | 1 |
| ViP | Vioxx | 2369 | 1099 | 2 |
|  | Placebo | 2372 | 1102 | 2 |
| **TOTAL** | Vioxx | 12119 | 8104 | **9** |
|  | Placebo | 9679 | 8216 | **13** |

Thus, in the data above, involving nearly 22,000 patients over approximately 16,000 patient years, there were *fewer* VTEs in the patients randomized to Vioxx (9) than in the patients randomized to placebo (13). There were 1.1 VTEs per 1,000 patient years in the Vioxx-treated group and 1.6 VTEs per 1,000 patient years for the group randomized to placebo. Both of these rates are consistent with the background rate of VTE in the population. As a result, the most reliable data available shows no evidence of any increased risk of VTEs for Vioxx compared to placebo.[5] As shown above, the placebo-controlled, randomized clinical trial data actually trends the other way.[6]

---

[5] The Court is familiar with the VIGOR trial from plaintiffs' reliance on its results in the heart attack cases, but VIGOR was not a placebo-controlled trial. In VIGOR, 50 mg Vioxx usage was compared to Naproxen use. In that trial there were five VTEs in the Vioxx arm and one in the Naproxen arm. This result was not statistically significant (0.20 (0.00-1.79)). *See* VIGOR Safety Update Report (10/13/2000) at Tables 6 & 7 (attached as Ex. K). *See also Brock*, 874 F.2d at 312; *Garza*, 347 S.W.3d at 265.

[6] In recent depositions, Plaintiffs' counsel have directed some individual treating physicians to a *2011* retrospective, non-randomized, observational study by Schmidt, et al. to assert that there is some evidence of general causation of VTEs by Vioxx use. There are many reasons why this observational study does not provide evidence of general causation, but the Court need look no further than the authors' own statement that their study cannot be used for that

(footnote continued)

### III. ARGUMENT

#### A. Standard of Review.

"Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The moving party must "'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." *Id.* (emphasis omitted) (quoting *Celotex*, 477 U.S. at 323). If the movant meets this burden, then "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Id.* (citing *Celotex*, 477 U.S. at 325).

---

(continued footnote)

> purpose: "It will fall to future studies to establish whether this association [between NSAIDs and VTEs] is causal" and "[w]hether the use of NSAIDs is related to the risk of venous thrombosis remains unclear." M. Schmidt, et al., *Non-Steroidal Anti-Inflammatory Drug Use and Risk of Venous Thromboembolism*, J. Thromb. Haemost.; 9:1326, 1332 (2011). In short, the authors themselves disavow any reliance on their study to show that Vioxx causes VTEs, and therefore the study cannot constitute evidence of general causation. *See G.E. v. Joiner*, 522 U.S. 136, 145 (1997) ("Given that [the study authors] were unwilling to say that PCB exposure had caused cancer among the workers they examined, their study did not support the experts' conclusion that Joiner's exposure to PCB's caused his cancer."); *LeBlanc ex rel. Estate of LeBlanc v. Chevron USA, Inc.*, 396 F. App'x 94, 100 (5th Cir. 2010) (per curiam) ("The district court properly rejected the studies as supporting causation because the authors of the studies concluded that there was no proof of causation."); *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 826 (7th Cir. 2010) ("To the extent that Dr. Hirsch does rely on medical literature to support his theory, the articles to which he cites stop short of reaching the same conclusion."); *see also* Ref. Man. at 377 ("Rarely, if ever, does a single study conclusively demonstrate a cause-effect relationship. It is important that a study be replicated in different populations and by different investigators before a causal relationship is accepted by . . . scientists.").

A factual dispute is "'genuine'" only "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Beck v. Somerset Techs., Inc.*, 882 F.2d 993, 996 (5th Cir. 1989) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" "if it might affect the outcome of the suit under the governing substantive law." *Id.*

### B. Plaintiffs Cannot Prove a General Causal Link Between VTEs and Vioxx Usage.

Plaintiffs bear the burden of proving by a preponderance of the evidence that there is a causal relationship between taking Vioxx and VTEs. To do so, Plaintiffs must show both "general" (or generic) causation and "specific" (or individual) causation. As the Fifth Circuit Court of Appeals stated in *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007), "'[g]eneral causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury.'" (quoting *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997)).

"If [a] plaintiff has not demonstrated sufficiently reliable evidence of general causation, her claims fail and there is no need to consider specific causation." *Soldo v. Sandoz Pharm. Corp.*, 244 F. Supp. 2d 434, 525 (W.D. Pa. 2003) (emphases omitted);[7] *see also Holdner v. Wal-Mart Stores, Inc.*, No. 03-CV-0763E(SC), 2005 WL 1263152, at *1 & n.10 (W.D.N.Y. May 26, 2005) (granting motion for summary judgment where plaintiff offered no evidence of general

---

[7] Plaintiffs hail from multiple jurisdictions. At the time of their alleged injuries, the majority of Plaintiffs resided in either Pennsylvania or New York, with six Pennsylvania residents and five New York residents. At the time of their alleged injuries, two Plaintiffs resided in each of Kentucky, Louisiana, Missouri, Ohio, and South Carolina, and one Plaintiff resided in each of Arkansas, Idaho, Massachusetts, Minnesota, Nebraska, New Jersey, and Oklahoma. *See* Ex. A.

causation, even though her treating physicians would have offered evidence of specific causation); *Mancuso v. Consol. Edison Co. of N.Y., Inc.*, 967 F. Supp. 1437, 1446 (S.D.N.Y. 1997) (expert must establish general causation before specific causation); *see also Knight*, 482 F.3d at 351 ("Evidence concerning specific causation in toxic tort cases is admissible only as a follow-up to admissible general-causation evidence.").

To establish general causation, a plaintiff must show that there is evidence of an increased risk between the product and the *specific* injury that he or she suffered. Evidence that a product may generally be associated with a different type of injury not suffered by the plaintiff is insufficient. *See, e.g.*, *Best v. Lowe's Home Ctrs., Inc.*, No. 3:04-CV-294, 2008 WL 2359986, at *5 (E.D. Tenn. June 5, 2008) ("[I]t is improper extrapolation to conclude, without any supporting research, that a substance that causes one harm also causes a different harm."); *In re Norplant Contraceptive Prods. Liab. Litig.*, 215 F. Supp. 2d 795, 833 (E.D. Tex. 2002) (granting summary judgment where plaintiffs failed to produce any evidence that Norplant was associated with the particular types of "exotic" injuries alleged by plaintiffs not identified in the product labeling).

As to the type of evidence that a plaintiff must elicit to prove general causation, it is clear that a plaintiff must present reliable, scientific evidence through expert testimony because whether a prescription medication can cause venous blood clots is beyond the ken of the ordinary layperson. *See Soldo*, 244 F. Supp. 2d at 525 ("In a case such as this one involving complex issues of causation not readily apparent to the finder of fact, plaintiff must present admissible expert testimony to carry her burden."); *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999) (expert testimony required to establish that alleged respiratory ailments were caused by carpet fumes); *Ratner v. McNeil-PPC, Inc.*, 898 N.Y.S.2d 772, 773, 780 (N.Y. Sup. Ct. 2010)

(granting summary judgment where plaintiff failed to offer any reliable "medical expert evidence necessary to prove" that drug caused a certain medical condition); *see also LeBlanc ex rel. Estate of LeBlanc v. Chevron USA, Inc.*, 396 F. App'x 94, 101-02 (5th Cir. 2010) (per curiam) (affirming grant of summary judgment where plaintiffs failed to offer reliable expert evidence of general causation).[8]

---

[8] *See also Barrett v. Rhodia, Inc.*, 606 F.3d 975, 984 (8th Cir. 2010) ("Nebraska courts have clearly and consistently held that expert evidence is required to establish both general and specific causation."); *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 992 (8th Cir. 2001) (per curiam) (MO) (affirming grant of summary judgment where district court found plaintiffs' experts to be unreliable with respect to general causation); *Jones v. Am. Cyanamid Co.*, 139 F.3d 890 (4th Cir. 1998) (per curiam) (unpublished table decision), *available at*, 1998 WL 116171, at *2 ("Under South Carolina law, in a tort case 'where a medical causation issue is not one within the common knowledge of the layman,' the plaintiff must present 'medical expert testimony' in order to establish causation." (citation omitted)); *Autery v. SmithKline Beecham Corp.*, No. 05–0982, 2011 WL 1812793, at *6 (W.D. La. Apr. 12, 2011) ("In cases such as this, involving complex issues of medical causation that are beyond the realm of knowledge and experience of the ordinary juror, expert testimony must be presented by the plaintiff to prove . . . causation. . . . Accordingly, courts routinely dismiss product liability cases in which expert testimony on causation is lacking." (citations omitted)); *Baker v. Chevron USA, Inc.*, 680 F. Supp. 2d 865, 874 (S.D. Ohio 2010) ("In order to establish both general causation and specific causation, the plaintiff must present expert medical testimony.  Without expert medical testimony on both general causation and specific causation, a plaintiff's toxic tort claim will fail." (citation omitted)); *In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 950, 968 (D. Minn. 2009) ("[U]nder Minnesota law, expert testimony is required to prove causation in cases involving complex medical issues with which a jury is unlikely to have experience." (quotations omitted)); *Hans v. Matrixx Initiatives, Inc.*, No. 3:04-CV-540, 2007 WL 2668594, at *3 (W.D. Ky. Sept. 6, 2007) ("Courts have held that personal injury cases arising out of exposure to drugs involve complex questions of medical causation beyond the understanding of a lay person, and these require expert testimony on causation issues."); *Nat'l Bank of Commerce v. Associated Milk Producers, Inc.*, 22 F. Supp. 2d 942, 984 (E.D. Ark. 1998) (granting summary judgment where plaintiff failed to produce sufficient expert evidence of medical causation), *aff'd*, 191 F.3d 858 (8th Cir. 1999); *Rutigliano v. Valley Bus. Forms*, 929 F. Supp. 779, 784-85 (D.N.J. 1996) (granting summary judgment where plaintiff's expert failed to demonstrate that she utilized a reliable scientific methodology to determine that a chemical is capable of causing the symptoms exhibited by plaintiff), *aff'd*, 118 F.3d 1577 (3d Cir. 1997); *Whiting v. Boston Edison Co.*, 891 F. Supp. 12, 24-25 (D. Mass. 1995) (finding experts' causation testimony to be unreliable under *Daubert* and, accordingly, granting summary judgment to defendant because "plaintiff will be unable to meet her burden of proof at trial"); *Swallow v. Emergency*

(footnote continued)

Here, after years of preliminary discovery, Plaintiffs have not proffered an opinion from a single expert who can reliably testify that Vioxx use causes VTEs. The only "evidence" Plaintiffs have proffered are bare-bones "*Lone Pine*" reports that the Court has already acknowledged did not need to meet the rigors of *Daubert*. *See* Hr'g Tr. (May 22, 2008) at 60 (Ex. B). Indeed, of the six doctors who submitted *Lone Pine* expert reports for the Plaintiffs listed on Exhibit A, not one cited a single study that shows a statistically significant increased risk of VTEs from use of Vioxx. Some of the *Lone Pine* experts failed to make any case at all about the causal link. *See* Exs. L.1-L.6.[9] Others made only vague and conclusory statements that Plaintiffs' injuries were "consistent with the known propensities of Vioxx" or "the biochemical and pharmacologic properties of rofecoxib," or referenced the "literature pertaining to Cox-2 inhibitors," without citing any particular studies. *See* Ex. L.7-L.25. Another stated that "[t]he same mechanism that leads to thrombotic events causing acute myocardial infarction would cause thrombotic events resulting in pulmonary emboli," but failed to cite any scientific support for that statement[10] and failed to describe the biological mechanism by which Vioxx, a

---

(continued footnote)

*Med. of Idaho, P.A.*, 67 P.3d 68, 77 (Idaho 2003) ("Whether or not the Cipro taken by [plaintiff] was a cause of his heart attack is a matter of science that is far removed from the usual and ordinary experience of the average person. A jury, comprised of lay people, is simply not qualified to determine that issue without the assistance of expert testimony establishing that Cipro can cause a myocardial infarction."); *Nash v. Gen. Motors Corp.*, 153 P.3d 73, 75 (Okla. Civ. App. 2006) (where causation analysis involves "complex medical and biomechanical questions that are beyond a jury's ordinary knowledge and common experience," expert witness testimony provides the best evidence of general causation (footnote omitted)).

[9] The *Lone Pine* expert reports for the 28 Plaintiffs are attached hereto as Exhibit L, which is filed under seal.

[10] While Dr. McClain also noted that "[s]ome studies have published data on the incidence of pulmonary embolus as an adverse event during use of selective Cox-2 drugs," citing as one

(footnote continued)

15

COX-2 inhibitor, could cause a venous clot given that there is no COX-2 expressed in veins. *See* Ex. L.26-L.28; *see also Black v. Johnson & Johnson (In re Propulsid Prods. Liab. Litig.)*, 261 F. Supp. 2d 603, 617 (E.D. La. 2003) (Fallon, J.) ("In this case, at best, Drs. Shell and Eckberg have discovered an event, but not a cause. They fail to identify the exact mechanism by which a person's QT interval can become permanently prolonged well after that person has ceased taking Propulsid.").

These expert reports therefore fall far short of the level of proof that is necessary to establish general causation. The *Reference Manual on Scientific Evidence* provides that multiple studies are typically, if not always, needed to establish a cause-effect relationship. Ref. Man. at 377. Plaintiffs' *Lone Pine* experts do not cite **any** reliable, scientific evidence that there is a causal link between VTEs and Vioxx, much less multiple studies. The experts' mere say-so is patently insufficient. *See G.E. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *LeBlanc*, 396 F. App'x at 98 (same). To be sure, Plaintiffs are not limited to their *Lone Pine* expert reports for proof of causation. But, they have given no indication in the past two years that they have any other expert who is able to provide the requisite level of proof under *Daubert*. And even if Plaintiffs have an as-yet undisclosed general causation expert, he or she cannot satisfy the requirements of *Daubert* because the best available science—from numerous randomized, placebo-controlled studies—shows that there is no evidence of a causal connection between Vioxx use and VTEs.

---

(continued footnote)

    example the VICTOR study, he failed to note that those studies have not shown any increase in risk of VTEs with use of Vioxx.

Under these circumstances, MDL courts, including this Court, have granted summary judgment to prescription drug manufacturers and/or excluded plaintiffs' expert testimony in categories of cases where, after ample opportunity to do so, the plaintiffs could not demonstrate reliable evidence of general causation.  *See, e.g.*, *In re Propulsid*, 261 F. Supp. 2d at 616-18 (granting summary judgment where plaintiffs' experts' testimony on causation was excluded because it was scientifically unreliable and irrelevant); *Beylin v. Wyeth* (*In re Prempro Prods. Liab. Litig.*), 738 F. Supp. 2d 887, 895-96 (E.D. Ark. 2010) (excluding plaintiffs' expert testimony in "estrogen only" cases because experts lacked scientifically reliable evidence that estrogen can cause breast cancer generally) (joint opinion with Hon. Montgomery from D. Minn.); *Kuhn v. Wyeth* (*In re Prempro Prods. Liab. Litig.*), 765 F. Supp. 2d 1113, 1126 (W.D. Ark. 2011) (excluding expert's testimony that short-term use of Prempro causes ductal breast cancer); Order, *In re Prempro Prods. Liab. Litig.*, No. 6:04-cv-06042-BRW (W.D. Ark. Feb. 14, 2011) (granting summary judgment where general causation expert's testimony had been excluded) (attached as Ex. C); *In re Norplant*, 215 F. Supp. 2d at 833 (granting summary judgment to manufacturer in cases where there was no evidence to support general causation for claims alleging side effects other than those contained in the product labeling).  *See also*, *Soldo*, 244 F. Supp. 2d at 524-25 ("Proof of causation is a necessary element in a products liability action." "If [plaintiff's] expert testimony cannot support both general and specific causation, summary judgment for the defendant must be granted."); *Fraser v. 301-52 Townhouse Corp.*, 870 N.Y.S. 2d 266, 269 (App. Div. 2008) (affirming grant of summary judgment where "none of the medical literature in the record supports the stated position of plaintiffs' expert that the observed association between [indoor mold] and [plaintiffs' injuries] is strong enough to be considered" (emphasis omitted)); *see also Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 197 (5th Cir.

17

1996) (affirming summary judgment because "not a single scientific study has revealed a link between human brain cancer and EtO exposure"); *Brock v. Merrell Dow Pharm., Inc.*, 874 F.3d 307, 312-13 (5th Cir. 1989) (affirming JNOV where "[t]he plaintiffs did not offer one statistically significant . . . study that concludes that Bendectin is a human teratogen" and concluding that "the lack of conclusive epidemiological proof [was] fatal to the [plaintiffs'] case").[11]

---

[11] *In re Viagra*, 658 F. Supp. 2d at 968 (granting defendant's motion for summary judgment "[b]ecause Plaintiffs have failed to produce admissible expert testimony" establishing causation); *Hans*, 2007 WL 2668594, at *3-4 (Because plaintiffs cannot prove "an essential element of their claim, causation. . . . summary judgment in favor of the Defendants is appropriate."); *Grant v. Pharmative, LLC*, 452 F. Supp. 2d 903, 910 (D. Neb. 2006) ("Without evidence to establish both general and specific causation, plaintiffs cannot survive defendants' motions for summary judgment. Plaintiffs' counsel acknowledged at oral argument that the case fails without expert testimony as to causation."); *Glastetter v. Novartis Pharm. Corp.*, 107 F. Supp. 2d 1015, 1016 (E.D. Mo. 2000) ("[T]he Court concludes that defendant is entitled to summary judgment, because plaintiffs' evidence of causation fails the test for scientific reliability set forth in *Daubert*."), *aff'd*, 252 F.3d 986 (8th Cir. 2001); *Alexander v. Smith & Nephew*, 98 F. Supp. 2d 1310, 1318 (N.D. Okla. 2000) ("Because Plaintiff has put forward no evidence of medical causation, Defendant is entitled to summary judgment on Plaintiff's manufacturers' products liability claim."); *Jones*, 1998 WL 116171, at *2 (affirming summary judgment where "plaintiff has not presented expert medical testimony sufficient to defeat summary judgment on causation"); *Nat'l Bank*, 22 F. Supp. 2d at 983 (granting summary judgment where there are "no scientific studies or medical literature that show any correlation" between exposure to defendant's product and plaintiff's cancer); *Pick v. Am. Med. Sys., Inc.*, 958 F. Supp. 1151, 1179 (E.D. La. 1997) (granting summary judgment where plaintiffs' expert evidence regarding general causation and specific causation were inadmissible); *Sutera v. Perrier Grp. of Am. Inc.*, 986 F. Supp. 655, 667-68 (D. Mass. 1997) (granting summary judgment where expert offers "no testing, peer-reviewed literature or other reliable scientific methodology or basis for his conclusion" that defendant's product caused plaintiff's illness); *Rutigliano*, 929 F. Supp. at 783, 792 (noting that proof of general causation and specific causation is required for plaintiff to satisfy her burden and granting summary judgment where plaintiff "cannot support [this] essential element of her tort claims"); *Swallow*, 67 P.3d at 77 (affirming summary judgment in favor of doctor where plaintiff cannot prove causation); *Kerns v. Hobart Bros.*, No. 2007 CA 32, 2008 WL 1991909, at *5 (Ohio. Ct. App. May 9, 2008) (granting summary judgment where expert could point to "no studies or articles that establish a causal connection between . . . exposure to the chemicals in question" and plaintiffs' injuries).

## IV. CONCLUSION.

For the foregoing reasons, Merck is entitled to summary judgment in the cases listed on Exhibit A.

Dated:  November 2, 2011

                                        Respectfully submitted,

By: */s/ Dorothy H. Wimberly*
    Phillip A. Wittmann, 13625
    Dorothy H. Wimberly, 18509
    STONE PIGMAN WALTHER
    WITTMANN L.L.C.
    546 Carondelet Street
    New Orleans, LA 70130
    Phone: 504-581-3200
    Fax:    504-581-3361

Defendants' Liaison Counsel

  —and—

    Douglas R. Marvin
    Eva Petko Esber
    M. Elaine Horn
    WILLIAMS & CONNOLLY LLP
    725 Twelfth Street, N.W.
    Washington, DC 20005
    Phone: 202-434-5000
    Fax:    202-434-5029

    John H. Beisner
    Jessica Davidson Miller
    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
    1440 New York Avenue, N.W.
    Washington, DC 20005

    ATTORNEYS FOR MERCK SHARP & DOHME CORP

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Memorandum in Support of Merck & Co., Inc.'s Motion for Summary Judgment in VTE Cases has been served on Liaison Counsel, Russ Herman, Phillip Wittmann and Ann Oldfather, by U.S. Mail and e-mail or by hand delivery and e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8C, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 2nd day of November, 2011.

*/s/ Dorothy H. Wimberly*
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER
WITTMANN L.L.C.
546 Carondelet Street
New Orleans, LA  70130
Phone:  504-581-3200
Fax:     504-581-3361
dwimberly@stonepigman.com

Defendants' Liaison Counsel