# Exhibit E

# MERCK SHARP & DOHME CORP.

## 10-Q
Quarterly report pursuant to sections 13 or 15(d)
Filed on 11/08/2004
Filed Period 09/30/2004





Table of Contents

UNITED STATES

SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

# FORM 10-Q

(Mark One)

☒   QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
  For the quarterly period ended September 30, 2004

OR

☐   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
  For the transition period from ___ to ___

Commission File No. 1-3305

MERCK & CO., INC.

P. O. Box 100

One Merck Drive

Whitehouse Station, N.J. 08889-0100

(908) 423-1000

Incorporated in New Jersey

I.R.S. Employer Identification
No. 22-1109110

The number of shares of common stock outstanding as of the close of business on October 29, 2004:

| Class | Number of Shares Outstanding |
|---|---|
| Common Stock | 2,217,584,609 |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.

Yes ☒      No ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act).

Yes ☒      No ☐

## TABLE OF CONTENTS

**Part I — Financial Information**
> **Item 1. Financial Statements**
>> **INTERIM CONSOLIDATED STATEMENT OF INCOME**
>> **CONSOLIDATED BALANCE SHEET**
>> **INTERIM CONSOLIDATED STATEMENT OF CASH FLOWS**
>> **Notes to Consolidated Financial Statements**
> **Item 2. Management's Discussion and Analysis of Financial Condition and**
> **Item 4. Controls and Procedures**

**PART II - Other Information**
> **Item 1. Legal Proceedings**
> **Item 2. Unregistered Sales of Equity Securities and Use of Proceeds**
> **Item 6. Exhibits**

**Signatures**
**EXHIBIT INDEX**
**EX-3.1 RESTATED CERTIFICATE OF INCORPORATION**
**EX-12 COMPUTATION OF RATIOS OF EARNINGS TO FIXED CHARGES**
**EX-31.1 CERTIFICATION**
**EX-31.2 CERTIFICATION**
**EX-32.1 CERTIFICATION**
**EX-32.2 CERTIFICATION**

Table of Contents

Part I - Financial Information

Item 1. Financial Statements

MERCK & CO., INC. AND SUBSIDIARIES

INTERIM CONSOLIDATED STATEMENT OF INCOME

THREE MONTHS AND NINE MONTHS ENDED SEPTEMBER 30, 2004 AND 2003

(Unaudited, $ in millions except per share amounts)

| | Three Months Ended September 30 | | Nine Months Ended September 30 | |
|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 |
| Sales | $ 5,538.1 | $ 5,762.0 | $ 17,190.7 | $ 16,858.8 |
| Costs, Expenses and Other | | | | |
| Materials and production | 1,364.2 | 1,083.4 | 3,676.2 | 3,209.7 |
| Marketing and administrative | 1,752.9 | 1,463.6 | 4,980.5 | 4,567.5 |
| Research and development | 919.3 | 776.5 | 2,901.6 | 2,373.6 |
| Equity income from affiliates | (307.1) | (183.4) | (722.3) | (468.2) |
| Other (income) expense, net | (4.2) | 17.1 | (240.0) | (114.5) |
| | 3,725.1 | 3,157.2 | 10,596.0 | 9,568.1 |
| Income from Continuing Operations Before Taxes | 1,813.0 | 2,604.8 | 6,594.7 | 7,290.7 |
| Taxes on Income | 487.4 | 739.8 | 1,882.4 | 2,096.3 |
| Income from Continuing Operations | 1,325.6 | 1,865.0 | 4,712.3 | 5,194.4 |
| Income (Loss) from Discontinued Operations, Net of Taxes | — | (6.7) | — | 241.3 |
| Net Income | $ 1,325.6 | $ 1,858.3 | $ 4,712.3 | $ 5,435.7 |
| Basic Earnings per Common Share | | | | |
| Continuing Operations | $ .60 | $ .83 | $ 2.12 | $ 2.32 |
| Discontinued Operations | — | — | — | .11 |
| Net Income | $ .60 | $ .83 | $ 2.12 | $ 2.43 |
| Earnings per Common Share Assuming Dilution | | | | |
| Continuing Operations | $ .60 | $ .83 | $ 2.11 | $ 2.30 |
| Discontinued Operations | — | — | — | .11 |
| Net Income | $ .60 | $ .82* | $ 2.11 | $ 2.41 |
| Dividends Declared per Common Share | $ .38 | $ .37 | $ 1.12 | $ 1.09 |

*Amount does not add as a result of rounding.

The accompanying notes are an integral part of this consolidated financial statement.

- 1 -

Table of Contents

MERCK & CO., INC. AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEET

SEPTEMBER 30, 2004 AND DECEMBER 31, 2003

(Unaudited, $ in millions)

| | September 30 2004 | December 31 2003 |
|---|---|---|
| ASSETS | | |
| Current Assets | | |
| Cash and cash equivalents | $ 2,666.9 | $ 1,201.0 |
| Short-term investments | 4,289.9 | 2,972.0 |
| Accounts receivable | 3,908.0 | 4,023.6 |
| Inventories | 2,213.2 | 2,554.7 |
| Prepaid expenses and taxes | 782.4 | 775.9 |
| Total current assets | 13,860.4 | 11,527.2 |
| Investments | 7,256.9 | 7,941.2 |
| Property, Plant and Equipment, at cost, net of allowance for depreciation of $7,821.4 in 2004 and $7,124.7 in 2003 | 14,433.1 | 14,169.0 |
| Goodwill | 1,085.7 | 1,085.4 |
| Other Intangibles, net | 725.7 | 864.0 |
| Other Assets | 5,512.6 | 5,000.7 |
| | $ 42,874.4 | $ 40,587.5 |
| LIABILITIES AND STOCKHOLDERS' EQUITY | | |
| Current Liabilities | | |
| Loans payable and current portion of long-term debt | $ 2,192.4 | $ 1,700.0 |
| Trade accounts payable | 544.5 | 520.5 |
| Accrued and other current liabilities | 4,308.6 | 3,987.5 |
| Income taxes payable | 2,901.4 | 2,538.9 |
| Dividends payable | 843.0 | 822.7 |
| Total current liabilities | 10,789.9 | 9,569.6 |
| Long-Term Debt | 4,394.2 | 5,096.0 |
| Deferred Income Taxes and Noncurrent Liabilities | 6,441.6 | 6,430.3 |
| Minority Interests | 3,937.2 | 3,915.2 |
| Stockholders' Equity | | |
| Common stock | | |
| Authorized - 5,400,000,000 shares | | |
| Issued - 2,976,230,393 shares | 29.8 | 29.8 |
| Other paid-in capital | 6,885.9 | 6,956.6 |
| Retained earnings | 36,366.4 | 34,142.0 |
| Accumulated other comprehensive (loss) income | (7.7) | 65.5 |
| | 43,274.4 | 41,193.9 |
| Less treasury stock, at cost | | |
| 759,278,885 shares - September 30, 2004 | | |
| 754,466,884 shares - December 31, 2003 | 25,962.9 | 25,617.5 |
| Total stockholders' equity | 17,311.5 | 15,576.4 |
| | $ 42,874.4 | $ 40,587.5 |

The accompanying notes are an integral part of this consolidated financial statement.

- 2 -

Table of Contents

MERCK & CO., INC. AND SUBSIDIARIES

INTERIM CONSOLIDATED STATEMENT OF CASH FLOWS

NINE MONTHS ENDED SEPTEMBER 30, 2004 AND 2003

(Unaudited, $ in millions)

| | Nine Months Ended September 30 | |
| --- | --- | --- |
| | 2004 | 2003 |
| CASH FLOWS FROM OPERATING ACTIVITIES OF CONTINUING OPERATIONS | | |
| Net Income | $ 4,712.3 | $ 5,435.7 |
| Less: Income from discontinued operations, net of tax | — | (241.3) |
| Income from continuing operations | 4,712.3 | 5,194.4 |
| Adjustments to reconcile income from continuing operations to net cash provided by operating activities from continuing operations: | | |
| Depreciation and amortization | 1,051.3 | 993.6 |
| Deferred income taxes | 198.8 | 319.4 |
| Other | 552.1 | (210.3) |
| Net changes in assets and liabilities | (83.2) | (698.7) |
| NET CASH PROVIDED BY OPERATING ACTIVITIES OF CONTINUING OPERATIONS | 6,431.3 | 5,598.4 |
| CASH FLOWS FROM INVESTING ACTIVITIES OF CONTINUING OPERATIONS | | |
| Capital expenditures | (1,209.4) | (1,374.1) |
| Purchase of securities, subsidiaries and other investments | (52,770.5) | (41,789.7) |
| Proceeds from sale of securities, subsidiaries and other investments | 52,218.0 | 39,839.9 |
| Banyu acquisition | (12.7) | (1,389.5) |
| Other | (5.4) | (3.4) |
| NET CASH USED BY INVESTING ACTIVITIES OF CONTINUING OPERATIONS | (1,780.0) | (4,716.8) |
| CASH FLOWS FROM FINANCING ACTIVITIES OF CONTINUING OPERATIONS | | |
| Net change in short-term borrowings | (558.0) | 516.1 |
| Proceeds from issuance of debt | 405.1 | 1,295.9 |
| Payments on debt | (10.5) | (721.6) |
| Purchase of treasury stock | (688.0) | (1,389.0) |
| Dividends paid to stockholders | (2,467.7) | (2,423.4) |
| Other | 116.3 | 222.9 |
| NET CASH USED BY FINANCING ACTIVITIES OF CONTINUING OPERATIONS | (3,202.8) | (2,499.1) |
| EFFECT OF EXCHANGE RATE CHANGES ON CASH AND CASH EQUIVALENTS | 17.4 | 112.4 |
| DISCONTINUED OPERATIONS | | |
| Net cash provided by discontinued operations | — | 248.0 |
| Dividend received from Medco Health, net of intercompany settlements and cash transferred | — | 1,187.9 |
| NET CASH PROVIDED BY DISCONTINUED OPERATIONS | — | 1,435.9 |
| NET INCREASE/(DECREASE) IN CASH AND CASH EQUIVALENTS | 1,465.9 | (69.2) |
| CASH AND CASH EQUIVALENTS AT BEGINNING OF YEAR | 1,201.0 | 2,243.0 |
| CASH AND CASH EQUIVALENTS AT END OF PERIOD | $ 2,666.9 | $ 2,173.8 |

The accompanying notes are an integral part of this consolidated financial statement.

Notes to Consolidated Financial Statements

1. The accompanying unaudited interim consolidated financial statements have been prepared pursuant to the rules and regulations for reporting on Form 10-Q. Accordingly, certain information and disclosures required by accounting principles generally accepted in the United States for complete consolidated financial statements are not included herein. The interim statements should be read in conjunction with the financial statements and notes thereto included in the Company's latest Annual Report on Form 10-K.

   The results of operations of any interim period are not necessarily indicative of the results of operations for the full year. In the Company's opinion, all adjustments necessary for a fair presentation of these interim statements have been included and are of a normal and recurring nature.

   Certain reclassifications have been made to prior year amounts to conform with current year presentation.

Table of Contents

Notes to Consolidated Financial Statements (continued)

In January 2003, the Financial Accounting Standards Board (FASB) issued Interpretation No. 46, Consolidation of Variable Interest Entities (FIN 46). FIN 46 requires a variable interest entity (VIE) to be consolidated when a company is subject to the majority of the risk of loss from the VIE's activities or is entitled to receive the majority of the entity's residual returns, or both. In December 2003, the FASB issued a revision to FIN 46 (FIN 46R) which partially delayed the effective date of the interpretation to March 31, 2004 and added additional scope exceptions. Adoption of FIN 46R did not have a material impact on the Company's financial position or results of operations.

2.  On September 30, 2004, the Company announced a voluntary worldwide withdrawal of *Vioxx*, its arthritis and acute pain medication. The Company's decision, which was effective immediately, was based on new three-year data from a prospective, randomized, placebo-controlled clinical trial, APPROVe (Adenomatous Polyp Prevention on *Vioxx*).

The trial, which was stopped, was designed to evaluate the efficacy of *Vioxx* 25 mg in preventing the recurrence of colorectal polyps in patients with a history of colorectal adenomas and to further assess the cardiovascular safety of *Vioxx*. In this study, there was an increased relative risk for confirmed cardiovascular events, such as heart attack and stroke, beginning after 18 months of treatment in the patients taking *Vioxx* compared to those taking placebo. The results for the first 18 months of the APPROVe study did not show any increased risk of confirmed cardiovascular events on *Vioxx*, and in this respect, were similar to the results of two placebo-controlled studies described in the most recent U.S. labeling for *Vioxx*.

As a result of the withdrawal, the Company recorded an unfavorable adjustment to net income of $552.6 million, or $.25 per share, in the third quarter. The adjustment to pre-tax income was $726.2 million. Of this amount, $491.6 million related to estimated customer returns of product previously sold and was recorded as a reduction of Sales; $93.2 million related to write-offs of inventory held by the Company and was recorded in Materials and production expense; and $141.4 million related to estimated costs to undertake the withdrawal of the product and was recorded in Marketing and administrative expense. These amounts did not include any provisions for any potential legal actions relating to *Vioxx* (see Note 12). The tax benefit of this loss was determined to be approximately $173.6 million, which reflects the geographical mix of *Vioxx* returns and the cost of the withdrawal. At September 30, 2004, $318.5 million of the accrued balance was reported in Accrued and other current liabilities and $314.5 million was reported as a reduction to Accounts receivable. The Company may incur additional costs in the fourth quarter related to the withdrawal of *Vioxx*.

3.  In April, Merck and Bristol-Myers Squibb Company (Bristol-Myers Squibb) entered into a global collaborative agreement for muraglitazar, Bristol-Myers Squibb's dual PPAR (peroxisome proliferator-activated receptor) agonist, currently in Phase III clinical development for use in treating both blood glucose and lipid abnormalities in patients with type 2 diabetes. Under the terms of the agreement, Bristol-Myers Squibb received a $100.0 million upfront payment and may receive up to $275.0 million in additional payments based upon the achievement of certain regulatory milestones. The Company recorded the upfront payment as Research and development expense in the second quarter. The companies will jointly develop the clinical and marketing strategy for muraglitazar and share equally in future development and commercialization costs.

4.  In March, Merck completed the sale of its 50-percent equity stake in Johnson & Johnson/MSD Europe, a non-prescription pharmaceuticals joint venture, to Johnson & Johnson for $244.0 million and recorded a $176.8 million gain as Other (income) expense, net in the first quarter. In addition to the sales proceeds, Merck will continue to benefit through royalties on certain products. Merck has also regained the rights to potential future products that switch from prescription to over-the-counter status in Europe. Johnson & Johnson/Merck Consumer Pharmaceuticals Co., a 50/50 joint venture between Johnson & Johnson and Merck that operates in the United States and Canada, is unaffected by this transaction.

5.  In March, the Company acquired Aton Pharma, Inc. (Aton), a privately held biotechnology company focusing on the development of novel treatments for cancer and other serious diseases. Aton's clinical pipeline of histone deacetylase inhibitors represents a class of anti-tumor agents with potential for efficacy based on a novel mechanism of action. Aton's lead product candidate, suberoylanilide hydroxamic acid, known as SAHA, has been extensively studied in Phase I clinical trials and is currently in Phase II clinical trials for the treatment of cutaneous T-cell lymphoma. Consideration for the acquisition consisted of an upfront payment and may include contingent payments based upon the regulatory filing, approval and sale of products. In connection with the transaction, the Company recorded a charge of $125.5 million for acquired research associated with products in development for which, at the acquisition date, technological feasibility had not been established and no alternative future use existed. This charge

- 4 -

Table of Contents

Notes to Consolidated Financial Statements (continued)

was recorded in Research and development expense in the first quarter and was determined based upon the present value of projected future cash flows utilizing an income approach reflecting the appropriate risk-adjusted discount rate based on the product candidate's stage of completion and its probability of technical and marketing success. The remaining net assets acquired in this transaction were not material. Because Aton was a development stage company that had not commenced its planned principal operations, the transaction was accounted for as an acquisition of assets rather than as a business combination and, therefore, goodwill was not recorded. Aton's results of operations have been included with the Company's since the acquisition date.

6.  In February, Merck and H. Lundbeck A/S (Lundbeck) entered into an agreement for the exclusive U.S. development and commercialization of gaboxadol, a compound currently in Phase III development for the treatment of sleep disorders. Under the terms of the agreement, Merck made an initial payment of $70.0 million, recorded as Research and development expense in the first quarter and may pay up to $200.0 million in additional milestone payments in the future. Merck and Lundbeck will jointly complete the ongoing Phase III clinical program, with Merck funding the majority of the remaining development activities. In the second quarter, Merck and Lundbeck announced an extension of their agreement for the exclusive development and commercialization of gaboxadol to Japan.

7.  In August 2003, Merck completed the spin-off of Medco Health Solutions, Inc. (Medco Health). Following the spin-off, the Company's prior period Consolidated Statements of Income and Cash Flows and related disclosures have been restated to present the results of Medco Health separately as discontinued operations.

Summarized financial information for discontinued operations is as follows:

| | ($ in millions) | |
| --- | --- | --- |
| | Three Months Ended September 30, 2003* | Nine Months Ended September 30, 2003* |
| Total net revenues | $          4,755.9 | $          20,328.7 |
| Income (loss) before taxes | (5.2) | 369.6 |
| Taxes on income | 1.5 | 128.3 |
| Income (loss), net of taxes | (6.7) | 241.3 |

*Includes operations up through August 19, 2003 (date of spin-off).

8.  In 2003, the Company announced plans to eliminate approximately 4,400 positions worldwide as part of an effort to fundamentally lower its cost structure. As of September 30, 2004 approximately 4,500 positions had been eliminated, as the Company identified additional opportunities to eliminate positions and reduce costs. The program is expected to be completed by the end of 2004. For the three months ended September 30, 2004, the Company recorded restructuring costs of $34.5 million, of which $26.9 million related to employee severance benefits and $7.4 million related to termination charges on the Company's pension and other postretirement benefit plans (see Note 15) and $.2 million related to a modification in the terms of certain employees' stock option grants. For the nine months ended September 30, 2004, the Company recorded restructuring costs of $89.1 million, of which $71.5 million related to employee severance benefits, $16.0 million related to termination charges on the Company's pension and other postretirement benefit plans (see Note 15) and $1.6 million related to a modification in the terms of certain employees' stock option grants. In the fourth quarter of 2003, the Company recorded restructuring costs of $194.6 million, of which $101.8 million related to employee severance benefits, $86.0 million related to curtailment, settlement and termination charges on the Company's pension and other postretirement benefit plans and $6.8 million related to a modification in the terms of certain employees' stock option grants. All restructuring costs were recorded in Marketing and administrative expense. Additional costs may be incurred as the program is completed by the end of 2004.

A summary of the employee severance liability is as follows:

| | ($ in millions) |
| --- | --- |
| 2003 expense | $          101.8 |
| 2003 payments | (23.5) |
| Accrued balance as of December 31, 2003 | 78.3 |
| Nine months-to-date expense | 71.5 |
| Nine months-to-date payments | (84.2) |
| Accrued balance as of September 30, 2004 | $          65.6 |

- 5 -

Table of Contents

Notes to Consolidated Financial Statements (continued)

9.  In 2004, as part of an ongoing compensation review, the Company made certain changes to its stock-based compensation programs. Under the new approach, the Company began granting performance share units (PSUs) and restricted stock units (RSUs), in addition to stock options, to certain management level employees. The financial value of individual stock-based incentive grants under the new approach is designed to be equivalent to the prior approach, only the mix of stock vehicles has changed. Both PSU and RSU payouts will be in shares of Company stock after the end of a three-year period, subject to the terms applicable to such awards. Additionally, PSU payouts will be contingent on the Company achieving certain earnings per share related targets.

Employee stock-based compensation is recognized using the intrinsic value method. Generally, employee stock options are granted to purchase shares of Company stock at the fair market value at the time of grant. Accordingly, no compensation expense is recognized for the Company's stock-based compensation programs other than for its employee performance-based awards (including PSUs), RSUs and options granted to employees of certain equity method investees.

Option grants beginning in 2002 generally vest ratably over three years, while grants prior to 2002 generally vest after five years. Prior to January 1, 2004, pro forma compensation expense for options with graded vesting terms has been calculated using the Black-Scholes model based on a single-option valuation approach using the straight-line method of amortization. In January 2004, the Company revised the assumptions utilized by the Black-Scholes model in determining pro forma compensation expense based on historical data, such that the expense is determined using separate expected term assumptions for each vesting tranche. As a result, beginning in January 2004, the Company has calculated pro forma compensation expense for any stock options granted since that time using the accelerated amortization method prescribed in FASB Interpretation No. 28, Accounting for Stock Appreciation Rights and Other Variable Stock Option or Award Plans.

The effect on net income and earnings per common share if the Company had applied the fair value method for recognizing employee stock-based compensation is as follows:

| | | ($ in millions) | | | | | |
|---|---|---|---|---|---|---|---|
| | Three Months Ended September 30 | | | | Nine Months Ended September 30 | | |
| | 2004 | | 2003 | | 2004 | | 2003 |
| Net income, as reported | $ | 1,325.6 | $ | 1,858.3 | $ | 4,712.3 | $ 5,435.7 |
| Compensation expense, net of tax: | | | | | | | |
| Reported | | 2.2 | | (1.4) | | 12.5 | 1.2 |
| Fair value method | | (125.5) | | (199.3) | | (365.0) | (442.5) |
| Pro forma net income | $ | 1,202.3 | $ | 1,657.6 | $ | 4,359.8 | $ 4,994.4 |
| | | | | | | | |
| Earnings per common share from continuing operations: | | | | | | | |
| Assuming dilution – as reported | $ | .60 | $ | .83 | $ | 2.11 | $ 2.30 |
| Assuming dilution – pro forma | $ | .54 | $ | .78 | $ | 1.95 | $ 2.15 |
| Earnings per common share: | | | | | | | |
| Basic – as reported | $ | .60 | $ | .83 | $ | 2.12 | $ 2.43 |
| Basic – pro forma | $ | .54 | $ | .74 | $ | 1.96 | $ 2.23 |
| Assuming dilution – as reported | $ | .60 | $ | .82 | $ | 2.11 | $ 2.41 |
| Assuming dilution – pro forma | $ | .54 | $ | .74 | $ | 1.95 | $ 2.21 |

- 6 -

Table of Contents

Notes to Consolidated Financial Statements (continued)

10.  Inventories consisted of:

| | | September 30 2004 | | December 31 2003 |
|---|---|---|---|---|
| | | ($ in millions) | | |
| Finished goods | $ | 419.3 | $ | 552.5 |
| Raw materials and work in process | | 2,139.2 | | 2,309.8 |
| Supplies | | 109.2 | | 90.5 |
| Total (approximates current cost) | | 2,667.7 | | 2,952.8 |
| Reduction to LIFO cost for domestic inventories | | (80.4) | | — |
| | $ | 2,587.3 | $ | 2,952.8 |
| Recognized as: | | | | |
| Inventories | $ | 2,213.2 | $ | 2,554.7 |
| Other assets | | 374.1 | | 398.1 |

Amounts recognized as Other assets consist of raw materials and work in process inventories produced in preparation for product launches not expected to be sold within one year.

11.  In the first quarter of 2004, the Company issued $350.0 million of 2.5% three-year notes and $50.0 million of variable rate notes due in 2044 that are subject to repayment at the option of the holders on an annual basis. The Company also entered into an interest rate swap contract that effectively converts the 2.5% fixed rate notes to floating rate instruments. The interest rate swap is designated as a hedge of the fair value changes in the notes attributable to changes in the benchmark London Interbank Offered Rate (LIBOR) swap rate. The fair value changes in the notes are fully offset in interest expense by the fair value changes in the swap contract.

In July 2004, a seven-year combined interest rate and currency swap contract that the Company was a party to matured, with an immaterial impact on net income. This contract was used to convert a foreign currency denominated investment to a U.S. dollar investment.

12.  The Company is involved in various claims and legal proceedings of a nature considered normal to its business, including product liability, intellectual property and commercial litigation, as well as additional matters such as antitrust actions.

As previously disclosed, federal and state personal injury lawsuits involving individual claims, as well as several putative class actions have been filed against the Company with respect to *Vioxx*. As of October 31, 2004, the Company has been served or is aware that it has been named as a defendant in approximately 375 lawsuits, which include approximately 1,000 plaintiff groups alleging personal injuries resulting from the use of *Vioxx*. Certain of these lawsuits include allegations regarding gastrointestinal bleeding, cardiovascular events and kidney damage. The Company has also been named as a defendant in several putative class actions seeking medical monitoring as a result of the putative class members' use of *Vioxx*. In addition, certain state court actions seek various remedies under state consumer fraud and fair business practice statutes, including recovering the cost of *Vioxx* purchased by individuals and third-party payers such as union health plans (all of the actions discussed in this paragraph are collectively referred to as the "*Vioxx* Personal Injury Lawsuits"). The actions filed in the state courts of California and New Jersey, respectively, have been transferred to a single judge in each state for coordinated proceedings. In addition, the Company has filed a motion with the Judicial Panel on Multidistrict Litigation to transfer to a single federal judge and consolidate for pretrial purposes all federal cases of a similar nature alleging personal injury and/or economic loss relating to the purchase or use of *Vioxx*; several plaintiffs in certain *Vioxx* Personal Injury Lawsuits pending in federal court have made similar requests.

As previously disclosed, in addition to the *Vioxx* Personal Injury Lawsuits, a number of purported class action lawsuits also were filed in the third quarter of 2003 and the first quarter of 2004 by several individual shareholders in the United States District Court for the Eastern District of Louisiana naming as defendants the Company and several current or former officers of the Company, and alleging that the defendants made false and misleading statements regarding *Vioxx* in violation of the federal securities laws. The plaintiffs request certification of a class of purchasers of the Company's common stock between May 22, 1999 and October 22, 2003, and seek unspecified compensatory damages and the costs of suit, including attorney fees. After the announcement of the withdrawal of *Vioxx*, the Company was named as a defendant in four additional purported securities class action lawsuits filed in federal courts in New Jersey and Pennsylvania. These later-filed actions request certification of a class of purchasers of Company stock during various periods between September 23, 2003 and September 30, 2004. The allegations in the later-filed actions are similar to those in the earlier-filed actions, except that the later-filed actions

- 7 -

**Table of Contents**

Notes to Consolidated Financial Statements (continued)

also contain allegations relating to the withdrawal of *Vioxx* from the market. The complaint in the earlier-filed consolidated actions has been amended to include allegations regarding the withdrawal of *Vioxx* and to extend the purported class period until October 29, 2004. In October 2004, a purported class action lawsuit was filed in the New Jersey Superior Court for Hunterdon County against the Company and certain officers and members of the Board of Directors (past and present) alleging that the defendants made incomplete and misleading statements and omissions in a registration statement and certain prospectuses filed in connection with the Merck Stock Investment Plan, a dividend reinvestment plan. The plaintiffs in this case request certification of a class of investors who acquired the Company's common stock through the Merck Stock Investment Plan between April 26, 2002 and September 30, 2004, and seek unspecified compensatory damages, rescission and the costs of suit, including attorney fees (all of the actions discussed in this paragraph are collectively referred to as the "*Vioxx* Securities Lawsuits").

As previously disclosed, in March 2004, two shareholder derivative actions were filed in the United States District Court for the Eastern District of Louisiana naming the Company and certain members of the Board (past and present), together with certain executive officers, as defendants. The complaints arise out of substantially the same factual allegations that are made in the *Vioxx*-related federal securities putative class actions filed against the Company, which principally allege that the Company made false and misleading statements regarding *Vioxx*. The derivative suits, which are purportedly brought to assert rights of the Company, assert claims against the Board members and officers for breach of fiduciary duty, waste of corporate assets and unjust enrichment. The court in the Eastern District of Louisiana has consolidated the shareholder derivative actions with the earlier-filed consolidated securities actions. In October 2004, two shareholder derivative actions were filed in the New Jersey Superior Court for Hunterdon County against the Company and certain officers and members of the Board (past and present). The allegations in the later-filed actions are similar to those in the earlier-filed actions, except that the later-filed actions also contain allegations relating to the withdrawal of *Vioxx* from the market (all of the actions discussed in this paragraph are collectively referred to as the "*Vioxx* Derivative Lawsuits"). On October 29, 2004, attorneys representing two individual shareholders made a demand on the Board to take legal action against Mr. Raymond Gilmartin, Chairman, President and Chief Executive Officer and other unspecified individuals for allegedly causing damage to the Company with respect to the allegedly improper marketing of *Vioxx*.

In addition to these shareholder actions, since the announcement of the withdrawal of *Vioxx*, seven putative class actions have been filed against the Company, two in the United States District Court for the Eastern District of Louisiana and five in the United States District Court for the District of New Jersey (the "*Vioxx* ERISA Lawsuits" and, together with the *Vioxx* Securities Lawsuits and the *Vioxx* Derivative Lawsuits, the "*Vioxx* Shareholder Lawsuits") on behalf of certain of the Company's current and former employees who are participants in certain of the Company's retirement plans asserting claims under the Employee Retirement Income Security Act ("ERISA"). The lawsuits make similar allegations to the allegations contained in the shareholder lawsuits described above. The plaintiff in one of the *Vioxx* ERISA Lawsuits has filed a motion with the Judicial Panel on Multidistrict Litigation to transfer to a single federal judge and consolidate for pretrial purposes all of the *Vioxx* ERISA Lawsuits.

In addition to the lawsuits discussed above, the Company has been named as a defendant in actions in various countries in Europe, Canada, Brazil and Israel related to *Vioxx*.

The Company has product liability insurance for claims brought in the *Vioxx* Personal Injury Lawsuits of up to approximately $630 million after deductibles and co-insurance. This insurance provides coverage for legal defense costs and potential damage amounts that have been or will be incurred in connection with the *Vioxx* Personal Injury Lawsuits. The Company believes that this insurance coverage extends to additional *Vioxx* Personal Injury Lawsuits that may be filed in the future. Certain of the Company's insurers have reserved their rights to take a contrary position with respect to certain coverage and there could be disputes with insurers about coverage matters. The Company currently believes that it has at least approximately $190 million of Directors and Officers insurance coverage for the *Vioxx* Securities Lawsuits and *Vioxx* Derivative Lawsuits, and at least approximately $275 million of insurance coverage for the *Vioxx* ERISA Lawsuits. Additional insurance coverage for these claims may also be available under upper level excess policies that provide coverage for a variety of risks. There may be disputes with insurers about the availability of some or all of this insurance coverage.

The Company is unable at this time to determine whether the Company's insurance coverage with respect to the *Vioxx* Personal Injury Lawsuits and the *Vioxx* Shareholder Lawsuits (collectively, the "*Vioxx* Lawsuits") will be adequate to cover its defense costs and losses, if any.

Table of Contents

Notes to Consolidated Financial Statements (continued)

Based on media reports and other sources, the Company anticipates that additional *Vioxx* Lawsuits will be filed against it and/or certain of its current and former officers and directors in the future.

In addition, in November, the Company was advised by the staff of the Securities and Exchange Commission (SEC) that it was commencing an informal inquiry concerning *Vioxx*. Also, the Company has received a subpoena from the U.S. Department of Justice requesting information related to the Company's research, marketing and selling activities with respect to *Vioxx* in a federal healthcare investigation under criminal statutes. The Company will cooperate with the SEC and the Justice Department. The Company cannot predict the outcome of these inquiries, however, it is possible that highly unfavorable outcomes, including a potential civil disposition from the SEC and/or potential civil or criminal dispositions from the Justice Department, could have a material adverse effect on the Company's financial position, liquidity and results of operations.

The Company currently anticipates that one or more of the *Vioxx* Personal Injury Lawsuits may go to trial in the first half of 2005. The Company cannot predict the timing of any trials with respect to the *Vioxx* Shareholder Lawsuits. The Company believes that it has meritorious defenses to the *Vioxx* Lawsuits and will vigorously defend against them. In view of the inherent difficulty of predicting the outcome of litigation, particularly where there are many claimants and the claimants seek indeterminate damages, the Company is unable to predict the outcome of these matters, and at this time cannot reasonably estimate the possible loss or range of loss with respect to the *Vioxx* Lawsuits. The Company has not established any reserves for any potential liability relating to the *Vioxx* Lawsuits. A series of highly unfavorable outcomes could have a material adverse effect on the Company's financial position, liquidity and results of operations.

As previously disclosed, beginning in 1993, the Company was named in a number of antitrust suits, certain of which were certified as class actions, instituted by most of the nation's retail pharmacies and consumers in several states. In 1994, these actions, except for those pending in state courts, were consolidated for pre-trial purposes in the federal court in Chicago, Illinois. In 1996, the Company and several other defendants settled the federal class action, which represented the single largest group of claims. Since that time, the Company has settled substantially all of the remaining cases on satisfactory terms. The Company has not engaged in any conspiracy and no admission of wrongdoing was made nor was included in any settlement agreements. While it is not feasible to predict the final outcome of the few remaining cases, in the opinion of the Company, these proceedings should not ultimately result in any liability which would have a material adverse effect on the Company's financial position, results of operations or liquidity.

As previously disclosed, the Company is a party to claims brought under the Consumer Protection Act of 1987 in the United Kingdom, which allege that certain children suffer from a variety of conditions as a result of being vaccinated with various bivalent vaccines for measles and rubella and/or trivalent vaccines for measles, mumps and rubella, including the Company's *M-M-R* II. The conditions include autism, with or without inflammatory bowel disease, epilepsy, diabetes, encephalopathy, encephalitis, encephalopathy, deafness, chronic fatigue syndrome and transverse myelitis. In early September 2003, the Legal Services Commission announced its decision to withdraw public funding of the litigation brought by the claimants. This decision was confirmed on appeal by the Funding Review Committee ("FRC") on September 30, 2003. The claimants' application for judicial review of the decision to withdraw public funding was dismissed in February 2004 and the April 2004 trial date was vacated. The lead claimants have decided not to apply to the Court of Appeal for permission to appeal that decision. Therefore, legal aid for all lead claimants has now been discharged. The non-lead claimants were subject to a "show cause" procedure to withdraw legal aid unless the claimants could show cause as to why it should not be withdrawn. The FRC heard 37 of the "show cause" appeals by the non-lead claimants in October 2004. The appeals involving autism (26) were unsuccessful, but funding was reinstated for 11 appeals involving other non-autism conditions, such as epilepsy, deafness, encephalitis and transverse myelitis. It is not yet known how many of the 11 appeals involve claimants suing the Company. All claimants for all conditions have until December 2004 to give notice of their intention to continue or discontinue with their claims, irrespective of whether or not they have secured legal aid funding. Directions from the court for the future conduct of the litigation will be made at a case management hearing in 2005.

As previously disclosed, the Company is also a party to individual and class action product liability lawsuits and claims in the United States involving pediatric vaccines (i.e., hepatitis B vaccine and *haemophilus influenza* type b vaccine) that contained thimerosal, a preservative used in vaccines. Other defendants include vaccine manufacturers who produced pediatric vaccines containing thimerosal as well as manufacturers of thimerosal. In these actions, the plaintiffs allege, among other things, that they have suffered neurological and other injuries as a result of having thimerosal introduced into their developing bodies. The Company has been successful in having many of these cases either dismissed or stayed on the ground that the National Vaccine Injury Compensation Program (NVICP) prohibits any person from filing or maintaining a civil action seeking damages against a vaccine manufacturer for vaccine-related injuries unless a petition is first filed in the United States Court of Federal Claims. A number of similar cases (*M-M-R* II alone and/or thimerosal-containing vaccines) have been filed in the United States Court of Federal Claims under the NVICP for a determination first on general causation issues. Three state

- 9 -

Table of Contents

Notes to Consolidated Financial Statements (continued)

court cases and two Federal District Court cases are scheduled for trial in 2005. The Company believes that these lawsuits and claims are without merit and will vigorously defend against them in the proceedings in which it is a party.

The Company has been named as a defendant in antitrust cases in federal court in Minnesota and in state court in California, each alleging an unlawful conspiracy among different sets of pharmaceutical manufacturers to protect high prices in the United States by impeding importation into the United States of lower-priced pharmaceuticals from Canada.

A suit in federal court in Alabama by two providers of health services to needy patients alleges that 15 pharmaceutical companies overcharged the plaintiffs and a class of those similarly situated, for pharmaceuticals purchased by the plaintiffs under the program established by Section 340B of the Public Health Service Act. The Company and the other defendants have filed a motion to dismiss the complaint on numerous grounds.

As previously disclosed, the Company has received a subpoena from the U.S. Department of Justice in connection with its investigation of the Company's marketing and selling activities. The Company has also reported that it has received a Civil Investigative Demand from the Attorney General of Texas regarding the Company's marketing and selling activities relating to Texas. In April 2004, the Company received a subpoena from the office of the Inspector General for the District of Columbia in connection with an investigation of the Company's interactions with physicians in the District of Columbia, Maryland, and Virginia. The Company is cooperating with all of these investigations. The Company cannot predict the outcome of these investigations, however, it is possible that highly unfavorable outcomes could have a material adverse effect on the Company's financial position, liquidity and results of operations. In addition, from time to time, other federal or state regulators may seek information about practices in the pharmaceutical industry in inquiries other than the investigations discussed in this paragraph. It is not feasible to predict the outcome of any such inquiries.

As previously disclosed, on July 6, 2004, the United States District Court for the District of New Jersey granted a motion by the Company, Medco Health Solutions, Inc. ("Medco Health") and certain officers and directors to dismiss a purported class action complaint involving claims related to the Company's revenue recognition practice for retail co-payments paid by individuals to whom Medco Health provides pharmaceutical benefits as well as other allegations. The complaint was dismissed with prejudice. On August 20, 2004 the same court granted the Company's motion to dismiss with prejudice a related shareholder derivative action. Plaintiffs in both actions have appealed the decisions.

Prior to the spin-off of Medco Health, as previously disclosed, the Company and Medco Health agreed to settle, on a class action basis, a number of lawsuits asserting violations of ERISA. Medco Health and the Company agreed to the settlement in order to avoid the significant cost and distraction of protracted litigation. By order dated May 25, 2004, the United States District Court for the Southern District of New York certified a class action, determined that the settlement was fair, reasonable, and adequate, and gave final approval to the settlement agreement among the Company, Medco Health and Class Counsel. Under the settlement, the Company and Medco Health have agreed to pay a total of $42.5 million, and Medco Health has agreed to modify certain business practices or to continue certain specified business practices for a period of five years. The financial compensation is intended to benefit members of the settlement class, which includes ERISA plans for which Medco Health administered a pharmacy benefit at any time between December 17, 1994 and the date of final approval.

The settlement becomes final only if and when all appeals have been resolved. Two notices of appeal have been filed. Certain class member plans have indicated that they will not participate in the settlement. Currently, cases initiated by three such plans and two individuals remain pending in the Southern District of New York. Plaintiffs in these cases have asserted claims that are the same as or similar to the claims that had been asserted by settling class members. The Company, along with Medco Health, is a named defendant in these cases.

At the time of the spin-off of Medco Health, Medco Health assumed substantially all of the liability exposure for the matters discussed in the foregoing two paragraphs. The Company believes that these cases, which are being defended by Medco Health, are without merit.

There are various other legal proceedings, principally product liability and intellectual property suits involving the Company, which are pending but not discussed in this report. While it is not feasible to predict the outcome of these proceedings, in the opinion of the Company, such proceedings are either adequately covered by insurance or, if not so covered, should not ultimately result in any liability that would have a material adverse effect on the financial position, liquidity or results of operations of the Company.

- 10 -

Table of Contents

Notes to Consolidated Financial Statements (continued)

13. The Company's decision to obtain insurance coverage is dependent on market conditions, including cost and availability, existing at the time such decisions are made. As a result of a number of factors, product liability insurance has become less available while the cost has increased significantly. The Company has evaluated its risks and has determined that the cost of obtaining product liability insurance outweighs the likely benefits of the coverage that is available and as such, has no insurance for certain product liabilities effective August 1, 2004, including liability for products first sold after that date. The Company will continue to evaluate its insurance needs and the costs, availability and benefits of product liability insurance in the future.

14. As previously disclosed, the IRS has substantially completed its examination of the Company's tax returns for the years 1993 to 1996 and on April 28, 2004 issued a preliminary notice of deficiency with respect to a partnership transaction entered into in 1993. Specifically, the IRS is proposing to disallow certain royalty and other expenses claimed as deductions on the 1993-1996 tax returns of the Company. The Company anticipates receiving a similar notice for 1997-1999, shortly. If the IRS ultimately prevails in its positions, the Company's income tax due for the years 1993-1999 would increase by approximately $970 million plus interest of approximately $490 million. The IRS will likely make similar claims for years subsequent to 1999 in future audits with respect to this transaction. The potential disallowance for these later years, computed on a similar basis to the 1993-1999 disallowances, would be approximately $540 million plus interest of approximately $40 million. The IRS has proposed penalties on the Company with respect to all periods that have been examined and the Company anticipates the IRS would seek to impose penalties on all other periods.

The Company vigorously disagrees with the proposed adjustments and intends to aggressively contest this matter through applicable IRS and judicial procedures, as appropriate. Although the final resolution of the proposed adjustments is uncertain and involves unsettled areas of the law, based on currently available information, the Company has provided for the best estimate of the probable tax liability for this matter. While the resolution of the issue may result in tax liabilities which are significantly higher or lower than the reserves established for this matter, management currently believes that the resolution will not have a material effect on the Company's financial position or liquidity. However, an unfavorable resolution could have a material effect on the Company's results of operations or cash flows in the quarter in which an adjustment is recorded or the tax is due or paid.

15. The Company has defined benefit pension plans covering eligible employees in the United States and in certain of its international subsidiaries. The net cost of such plans consisted of the following components:

| | ($ in millions) | | | | | | |
|---|---|---|---|---|---|---|---|
| | Three Months Ended September 30 | | | | Nine Months Ended September 30 | | |
| | 2004 | | 2003 | | 2004 | | 2003 |
| Service cost | $ | 73.1 | $ | 65.4 | $ | 225.7 | $ | 194.4 |
| Interest cost | | 70.2 | | 64.6 | | 214.1 | | 193.8 |
| Expected return on plan assets | | (93.1) | | (84.4) | | (274.8) | | (253.9) |
| Net amortization | | 37.2 | | 28.3 | | 97.2 | | 86.2 |
| Settlements | | 17.3 | | — | | 17.3 | | — |
| Termination benefits | | 6.4 | | — | | 13.5 | | — |
| | $ | 111.1 | $ | 73.9 | $ | 293.0 | $ | 220.5 |

The Company provides medical, dental and life insurance benefits, principally to its eligible U.S. retirees and similar benefits to their dependents, through its other postretirement benefits plans. The net cost of such plans consisted of the following components:

| | ($ in millions) | | | | | | |
|---|---|---|---|---|---|---|---|
| | Three Months Ended September 30 | | | | Nine Months Ended September 30 | | |
| | 2004 | | 2003 | | 2004 | | 2003 |
| Service cost | $ | 20.8 | $ | 16.7 | $ | 61.6 | $ | 51.3 |
| Interest cost | | 25.6 | | 22.2 | | 76.1 | | 68.1 |
| Expected return on plan assets | | (22.2) | | (15.3) | | (61.0) | | (46.8) |
| Net amortization | | 6.5 | | 6.9 | | 20.9 | | 21.1 |
| Curtailments | | — | | (4.1) | | (12.3) | | (7.7) |
| Termination benefits | | 1.0 | | — | | 2.5 | | — |
| | $ | 31.7 | $ | 26.4 | $ | 87.8 | $ | 86.0 |

- 11 -

Table of Contents

Notes to Consolidated Financial Statements (continued)

During the second quarter 2004, in accordance with FASB Staff Position No. 106-2, Accounting and Disclosure Requirements Related to the Medicare Prescription Drug, Improvement and Modernization Act of 2003 (the Act), the Company began accounting for the effect of the federal subsidy under the Act, which reduced the benefit obligation of certain of its other postretirement benefit plans by $169.0 million. The service cost, interest cost and net amortization components of net postretirement benefit cost were reduced by $2.0 million, $2.6 million and $3.2 million, respectively, for the three month period ended September 30, 2004 and $6.0 million, $7.9 million and $9.4 million, respectively, for the nine month period ended September 30, 2004. While the Company is recognizing the subsidy in accordance with current accounting requirements, it will continue to evaluate the Act and regulations that follow to determine the optimal approach to incorporating the impact of the Act.

The Company changed participant contributions and the service recognized for eligibility for certain of its other postretirement benefit plans. These amendments generated curtailment gains of $4.1 million for the three month period ended September 30, 2003, and $12.3 million and $7.7 million for the nine month periods ended September 30, 2004 and 2003, respectively.

The Company recorded termination charges for the three and nine month periods ended September 30, 2004 of $6.4 million and $13.5 million, respectively, on its pension plans and $1.0 million and $2.5 million, respectively, on its other postretirement benefit plans related to expanded eligibility for certain employees under the restructuring action (see Note 8).

In addition, the Company recorded a settlement charge of $17.3 million in the third quarter of 2004 on certain of its domestic pension plans resulting from employees electing to receive their pension benefits as lump sum payments.

16. Other (income) expense, net, consisted of:

| | | | | ($ in millions) | | | |
|---|---|---|---|---|---|---|---|
| | Three Month Ended September 30 | | | | Nine Months Ended September 30 | | |
| | 2004 | | 2003 | | 2004 | | 2003 |
| Interest income | $ | (75.7) | $ | (66.9) | $ | (209.8) | $ | (236.5) |
| Interest expense | | 72.4 | | 81.1 | | 216.8 | | 270.9 |
| Exchange losses/(gains) | | 2.8 | | (1.7) | | 9.9 | | (25.1) |
| Minority interests | | 37.6 | | 39.1 | | 114.0 | | 131.5 |
| Other, net | | (41.3) | | (34.5) | | (370.9) | | (255.3) |
| | $ | (4.2) | $ | 17.1 | $ | (240.0) | $ | (114.5) |

Minority interests include third parties' share of exchange gains and losses arising from translation of the financial statements into U.S. dollars.

Other, net for the nine month period ended September 30, 2004 reflects the gain on the divestiture of Merck's 50-percent equity stake in Johnson & Johnson/MSD Europe.

Interest paid for the nine month periods ended September 30, 2004 and 2003 was $238.1 million and $302.2 million, respectively.

17. President Bush recently signed the American Jobs Creation Act of 2004 (the Jobs Creation Act). The Jobs Creation Act contains a number of provisions that might affect the Company's future effective tax rate. The most significant provision would allow the Company to elect to deduct from its taxable income 85% of certain eligible dividends received by the Company from non-U.S. subsidiaries before the end of 2005 if those dividends are reinvested in the U.S. for eligible purposes. The Company is currently evaluating the amount of such eligible dividends that its non-U.S. subsidiaries will remit, as well as the effects the Jobs Creation Act will have on its effective tax rate and deferred tax assets and liabilities.

18. The weighted average common shares used in the computations of basic earnings per common share and earnings per common share assuming dilution (shares in millions) are as follows:

| | Three Months Ended September 30 | | Nine Months Ended September 30 | |
|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 |
| Average common shares outstanding | 2,218.5 | 2,237.0 | 2,220.7 | 2,240.7 |
| Common shares issuable[1] | 7.7 | 16.9 | 8.8 | 18.2 |
| Average common shares outstanding assuming dilution | 2,226.2 | 2,253.9 | 2,229.5 | 2,258.9 |

(1)  Issuable primarily under stock-based compensation programs, including unvested PSUs and RSUs.

Table of Contents

Notes to Consolidated Financial Statements (continued)

19. Comprehensive income for the three months ended September 30, 2004 and 2003, representing all changes in stockholders' equity during the period other than changes resulting from the Company's stock, was $1,367.5 million and $1,884.3 million, respectively. Comprehensive income for the nine months ended September 30, 2004 and 2003 was $4,639.1 million and $5,389.1 million, respectively.

20. The Company's operations are principally managed on a products basis. The Merck Pharmaceutical segment includes products marketed either directly or through joint ventures. These products consist of therapeutic and preventive agents, sold by prescription, for the treatment of human disorders. Other segment revenues include non-reportable human and animal health segments.

Revenues and profits for these segments are as follows:

| | | ($ in millions) | | |
| | Three Months Ended September 30 | | Nine Months Ended September 30 | |
| | 2004 | 2003 | 2004 | 2003 |
|---|---|---|---|---|
| Segment revenues: | | | | |
| Merck Pharmaceutical | $ 5,134.9 | $ 5,348.1 | $ 16,129.4 | $ 15,779.8 |
| Other segment revenues | 345.6 | 350.9 | 887.8 | 909.1 |
| | $ 5,480.5 | $ 5,699.0 | $ 17,017.2 | $ 16,688.9 |
| Segment profits: | | | | |
| Merck Pharmaceutical | $ 3,056.7 | $ 3,511.0 | $ 10,235.2 | $ 10,159.1 |
| Other segment profits | 388.4 | 363.4 | 909.4 | 879.2 |
| | $ 3,445.1 | $ 3,874.4 | $ 11,144.6 | $ 11,038.3 |

A reconciliation of total segment revenues to consolidated sales is as follows:

| | | ($ in millions) | | |
| | Three Months Ended September 30 | | Nine Months Ended September 30 | |
| | 2004 | 2003 | 2004 | 2003 |
|---|---|---|---|---|
| Segment revenues | $ 5,480.5 | $ 5,699.0 | $ 17,017.2 | $ 16,688.9 |
| Other revenues | 57.6 | 63.0 | 173.5 | 169.9 |
| | $ 5,538.1 | $ 5,762.0 | $ 17,190.7 | $ 16,858.8 |

Other revenues are primarily comprised of miscellaneous corporate revenues, sales related to divested products or businesses and other supply sales.

Net sales by category of the Company's products were as follows:

| | | ($ in millions) | | |
| | Three Months Ended September 30 | | Nine Months Ended September 30 | |
| | 2004 | 2003 | 2004 | 2003 |
|---|---|---|---|---|
| Atherosclerosis | $ 1,226.4 | $ 1,421.1 | $ 3,906.9 | $ 3,852.0 |
| Hypertension/heart failure | 895.6 | 848.2 | 2,676.6 | 2,488.9 |
| Osteoporosis | 777.7 | 686.7 | 2,328.7 | 2,026.3 |
| Respiratory | 625.7 | 615.6 | 1,891.2 | 1,502.2 |
| Anti-inflammatory/analgesics | 250.0 | 543.1 | 1,687.0 | 1,906.7 |
| Anti-bacterial/anti-fungal | 304.9 | 280.9 | 859.9 | 754.3 |
| Vaccines/biologicals | 297.8 | 311.3 | 750.2 | 789.2 |
| Urology | 179.8 | 126.3 | 539.1 | 437.7 |
| Ophthalmologicals | 178.2 | 166.2 | 525.2 | 485.7 |
| Human immunodeficiency virus (HIV) | 64.9 | 64.3 | 193.4 | 228.7 |
| Other | 737.1 | 698.3 | 1,832.5 | 2,387.1 |
| | $ 5,538.1 | $ 5,762.0 | $ 17,190.7 | $ 16,858.8 |

Anti-inflammatory/analgesics includes sales of *Vioxx* which was voluntarily withdrawn worldwide on September 30, 2004 (see Note 2). Other primarily includes sales of other human pharmaceuticals, pharmaceutical and animal health supply sales to the Company's joint ventures and revenue from the Company's relationship with AstraZeneca LP.

- 13 -

Table of Contents

Notes to Consolidated Financial Statements (continued)

Segment profits are comprised of segment revenues less certain elements of materials and production costs and operating expenses, including components of equity income from affiliates and depreciation and amortization expenses. For internal management reporting presented to the chief operating decision maker, the Company does not allocate the vast majority of indirect production costs, research and development expenses and general and administrative expenses, as well as the cost of financing these activities. Separate divisions maintain responsibility for monitoring and managing these costs, including depreciation related to fixed assets utilized by these divisions and, therefore, they are not included in segment profits.

A reconciliation of segment profits to total income from continuing operations before taxes is as follows:

| | | | | | | | ($ in millions) | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Three Months Ended September 30 | | | | Nine Months Ended September 30 | | |
| | | 2004 | | 2003 | | 2004 | | 2003 |
| Segment profits | $ | 3,445.1 | $ | 3,874.4 | $ | 11,144.6 | $ | 11,038.3 |
| Other profits | | (24.4) | | 72.8 | | .2 | | 138.9 |
| Adjustments | | 112.3 | | 104.1 | | 346.1 | | 310.7 |
| Unallocated: | | | | | | | | |
| Interest income | | 75.7 | | 66.9 | | 209.8 | | 236.5 |
| Interest expense | | (72.4) | | (81.1) | | (216.8) | | (270.9) |
| Equity income from affiliates | | 21.9 | | 11.2 | | 82.0 | | 40.2 |
| Depreciation and amortization | | (312.1) | | (277.8) | | (936.1) | | (854.8) |
| Research and development | | (919.3) | | (776.5) | | (2,901.6) | | (2,373.6) |
| Other expenses, net | | (513.8) | | (389.2) | | (1,133.5) | | (974.6) |
| | $ | 1,813.0 | $ | 2,604.8 | $ | 6,594.7 | $ | 7,290.7 |

Other profits are primarily comprised of miscellaneous corporate profits as well as operating profits related to divested products or businesses and other supply sales. Adjustments represent the elimination of the effect of double counting certain items of income and expense. Equity income from affiliates includes taxes paid at the joint venture level and a portion of equity income that is not reported in segment profits. Other expenses, net, include expenses from corporate and manufacturing cost centers and other miscellaneous income (expense), net.

- 14 -

**Table of Contents**

Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations

*Operating Results*

*Summary*

Earnings per share for the third quarter of 2004 were $0.60, including a $0.25 unfavorable effect associated with the Company's voluntary worldwide withdrawal of *Vioxx* described below. The unfavorable impact includes estimated customer returns of product previously sold, write-offs of inventory held by Merck and costs to undertake the withdrawal of the product. Net income was $1,325.6 million, including a $552.6 million unfavorable effect related to the withdrawal of *Vioxx*. Worldwide sales were $5.5 billion for the quarter, including a $491.6 million unfavorable effect related to the withdrawal of *Vioxx*. For the third quarter of 2003, earnings per share from continuing operations[1] were $0.83, income from continuing operations was $1,865.0 million and sales were $5.8 billion. Global sales performance includes a 2-point favorable effect from foreign exchange for the third quarter of 2004.

For the first nine months of 2004, earnings per share were $2.11, net income was $4,712.3 million and sales were $17.2 billion for the period. These amounts include the unfavorable effects described above associated with the withdrawal of *Vioxx*. Earnings per share from continuing operations were $2.30, income from continuing operations was $5,194.4 million and sales were $16.9 billion for the comparable period in 2003. Global sales performance includes a 3-point favorable effect from foreign exchange for the first nine months of 2004.

The Company's gross margin was 75.4% in the third quarter of 2004 compared to 81.2% in the third quarter of 2003 and 78.6% compared to 81.0% for the respective nine-month period, reflecting the unfavorable effects associated with the withdrawal of *Vioxx* as well as the impact of changes in product mix.

Merck is redeploying research and development and marketing and sales personnel formerly dedicated to *Vioxx* to areas where additional growth opportunities exist, including other research programs, support of in-line products and upcoming product launches. In addition, the Company will continue to drive down its cost structure through a number of initiatives already under way. In October 2003, Merck announced plans to eliminate approximately 4,400 positions by the end of 2004. As of September 30, 2004 approximately 4,500 positions had been eliminated, as the Company identified additional opportunities to eliminate positions and reduce costs. Beginning in 2005, this action is expected to lower the Company's annual payroll and benefit costs by approximately $250 to $300 million.

Marketing and administrative expenses increased 20% compared to the third quarter of 2003, including the effect of $141.4 million for estimated costs related to the withdrawal of *Vioxx* and the impact of $34.5 million for restructuring costs related to previously announced position eliminations. Excluding these effects, marketing and administrative expenses for the third quarter increased 8% from the third quarter of 2003. For the first nine months of 2004, marketing and administrative expenses increased 9%, including the aforementioned effect related to the withdrawal of *Vioxx* and the impact of $89.1 million for restructuring costs related to previously announced position eliminations. Excluding these effects, marketing and administrative expenses for the first nine months increased 4% from the comparable 2003 period.

Research and development expenses increased 18% during the third quarter, reflecting Merck's ongoing commitment to both basic and clinical research, as well as the impact of the Company's external collaborations, such as with DOV Pharmaceutical, Inc. (DOV) and Nastech Pharmaceutical Company Inc. (Nastech). For the first nine months of 2004, research and development expenses increased 22% from the comparable period in 2003, reflecting the same factors affecting the third quarter increase as well as the impact of additional external collaborations, including those with Bristol-Myers Squibb Company (Bristol-Myers Squibb), H. Lundbeck A/S (Lundbeck) and Vertex Pharmaceuticals Incorporated (Vertex), and higher acquired research expense related to the acquisition of Aton Pharma, Inc. in 2004 compared with the acquired research expense related to the increase in the Company's ownership of Banyu Pharmaceutical Co. Ltd. in 2003.

*Voluntary Withdrawal of Vioxx*

On September 30, 2004 Merck announced a voluntary worldwide withdrawal of *Vioxx*, its arthritis and acute pain medication. The Company's decision, which was effective immediately, was based on new three-year data from a prospective, randomized, placebo-controlled clinical trial, APPROVe (Adenomatous Polyp Prevention on *Vioxx*).

The trial, which was stopped, was designed to evaluate the efficacy of *Vioxx* 25 mg in preventing the recurrence of colorectal polyps in patients with a history of colorectal adenomas and to further assess the cardiovascular safety of *Vioxx*. In this study, there was an increased relative risk for confirmed cardiovascular events, such as heart attack and stroke, beginning after 18 months of treatment in the patients taking *Vioxx* compared to those taking placebo. The results for the first 18 months of the APPROVe study did not show any increased risk of confirmed cardiovascular events on *Vioxx*, and in this respect, were similar to the results of two placebo-controlled studies described in the most recent U.S. labeling for *Vioxx*.

(1) Continuing operations exclude only the results from Medco Health Solutions, Inc., which was spun off on August 19, 2003.

Table of Contents

Merck presented data from APPROVe at the American College of Rheumatology (ACR) Annual Scientific Meeting in San Antonio on October 18, 2004. The Company had requested the opportunity to present the data at the ACR meeting.

The Company estimates that there were 105 million U.S. prescriptions written for *Vioxx* from May 1999 through August 2004. Based on this estimate, the Company estimates that the number of patients who have taken *Vioxx* in the United States since its 1999 launch is approximately 20 million. The number of patients outside the United States who have taken *Vioxx* is undetermined at this time.

The Company has received a letter from Senator Charles Grassley requesting certain documents and information related to *Vioxx*. The Company intends to cooperate with Senator Grassley's inquiry so that the Company can continue to describe the reasons for the Company's voluntary withdrawal of *Vioxx* and to answer any questions related to the Company's development and extensive testing of the medicine and its disclosures of the results of its studies.

In October, the Company received a letter from a group of five state Attorneys General raising concerns that the Company's return and refund program for unused *Vioxx* will not provide consumers with adequate notice and will be unduly burdensome. The Company is cooperating with the Attorneys General to respond to their concerns.

*Arcoxia*

On October 29, 2004, the Company confirmed that it had received an "approvable" letter from the U.S. Food and Drug Administration (FDA) for the Company's New Drug Application (NDA) for *Arcoxia*. The FDA informed Merck in the letter that before approval of the NDA can be issued, additional safety and efficacy data for *Arcoxia* are required.

On October 22, 2004, the European Medicines Agency announced that it will conduct a review of all COX-2 inhibitors, including *Arcoxia*, in light of the worldwide withdrawal of *Vioxx*. The agency said that it had been asked to conduct the review by the European Commission as a "precautionary measure" and that it would look at all aspects of the cardiovascular safety of COX-2 inhibitors, including thrombotic and cardio-renal events. The aim of the review is to determine whether there is a need to make EU-wide changes to the products' marketing authorizations, including labeling, and whether additional studies are needed.

*Arcoxia* has been launched in 48 countries worldwide in Europe, Latin America and the Asia-Pacific region. Merck will continue to work with regulatory agencies in the countries where *Arcoxia* is approved, including the European Medicines Agency, to assess whether changes to the prescribing information for this class of drugs, including *Arcoxia*, are warranted.

*Sales*

Net sales by category of the Company's products were as follows:

| | ($ in millions) | | | |
| | Three Months Ended September 30 | | Nine Months Ended September 30 | |
| | 2004 | 2003 | 2004 | 2003 |
|---|---|---|---|---|
| Atherosclerosis | $ 1,226.4 | $ 1,421.1 | $ 3,906.9 | $ 3,852.0 |
| Hypertension/heart failure | 895.6 | 848.2 | 2,676.6 | 2,488.9 |
| Osteoporosis | 777.7 | 686.7 | 2,328.7 | 2,026.3 |
| Respiratory | 625.7 | 615.6 | 1,891.2 | 1,502.2 |
| Anti-inflammatory/analgesics | 250.0 | 543.1 | 1,687.0 | 1,906.7 |
| Anti-bacterial/anti-fungal | 304.9 | 280.9 | 859.9 | 754.3 |
| Vaccines/biologicals | 297.8 | 311.3 | 750.2 | 789.2 |
| Urology | 179.8 | 126.3 | 539.1 | 437.7 |
| Ophthalmologicals | 178.2 | 166.2 | 525.2 | 485.7 |
| Human immunodeficiency virus (HIV) | 64.9 | 64.3 | 193.4 | 228.7 |
| Other | 737.1 | 698.3 | 1,832.5 | 2,387.1 |
| | $ 5,538.1 | $ 5,762.0 | $ 17,190.7 | $ 16,858.8 |

Sales by individual therapeutic class are presented net of rebates and discounts, which in the aggregate, reduced revenues by $982.8 million and $986.1 million for the three month periods ended September 30, 2004 and 2003, respectively, and $3.0 billion and $2.3 billion for the nine month periods ended September 30, 2004 and 2003, respectively. Provisions for rebates and discounts cover discounts that result from sales to a customer through an intermediary wholesale purchaser as well as rebates owed based upon contractual agreements or legal requirements with benefit providers, including Medicaid, after the final dispensing of the product by a pharmacy to a benefit plan

Table of Contents

participant. In the preceding table, Anti-inflammatory/analgesics includes sales of *Vioxx* which was voluntarily withdrawn worldwide on September 30, 2004. Other primarily includes sales of other human pharmaceuticals, pharmaceutical and animal health supply sales to the Company's joint ventures and revenue from the Company's relationship with AstraZeneca LP (AZLP). In connection with the U.S. wholesaler distribution program, implemented in the fourth quarter of 2003, inventory levels at key wholesalers for each of the Company's major products approximate two to three weeks of supply.

Worldwide sales of *Singulair*, a once-a-day oral medicine indicated for the treatment of chronic asthma and the relief of symptoms associated with seasonal allergic rhinitis, reached $625.7 million in the third quarter, which was 2% higher than the third quarter of 2003. Sales in the third quarter of 2003 were favorably impacted by approximately $120 million of wholesaler buy-in. U.S. mail-order-adjusted prescription levels for *Singulair* increased by approximately 18 percent for the quarter, as compared to the third quarter of 2003. Sales for the first nine months were $1.9 billion, a 26% increase over the comparable 2003 period. *Singulair* continues to be the second-most-prescribed product in the overall respiratory market in the United States as patients, physicians and managed care organizations continue to recognize the value *Singulair* offers to those who suffer from asthma or seasonal allergic rhinitis.

*Fosamax* continued as the most-prescribed medicine worldwide for the treatment of postmenopausal, male and glucocorticoid-induced osteoporosis. Global sales were strong, reaching $777.7 million during the quarter and $2.3 billion for the first nine months, representing growth of 13% and 15% over the respective periods of 2003. U.S. mail-order-adjusted prescription levels for *Fosamax* were in line with third-quarter 2003 levels.

In April, the *Journal of Internal Medicine* published findings from the first international head-to-head study that compared the efficacy of *Fosamax* Once Weekly (alendronate) 70 mg to Evista (raloxifene) 60 mg once daily, which showed that *Fosamax* provided significantly greater increases in bone mineral density (BMD) at the lumbar spine and total hip.

Results from the *Fosamax* Actonel Comparison Trial (FACT) were presented on October 1, 2004 at the American Society for Bone Mineral Research meeting. This is the first head-to-head study comparing FDA-approved once-weekly osteoporosis treatments in postmenopausal women with osteoporosis conducted in the United States. FACT showed that *Fosamax* demonstrated significantly greater increases in BMD and reductions in markers of bone-turnover than Actonel. *Fosamax* increased BMD 62 percent more than Actonel at the hip trochanter (hip bone), with similar tolerability. BMD is a major determinant of bone strength; the lower the BMD score the greater the risk of fracture.

Global sales of Merck's antihypertensive medicines, *Cozaar* and *Hyzaar* [2], were strong, reaching $706.2 million for the third quarter and $2.1 billion for the first nine months, representing growth of 14% and 15% over the respective periods in 2003. *Cozaar* is the second-most-frequently prescribed angiotensin II antagonist (AIIA) in the United States and the largest-selling AIIA in Europe. U.S. mail-order-adjusted prescription levels for *Cozaar* and *Hyzaar* increased by approximately 4 percent for the quarter, as compared to the third quarter of 2003.

Worldwide sales of *Zocor*, Merck's statin for modifying cholesterol, were $1.2 billion in the third quarter and $3.9 billion for the first nine months. Third-quarter *Zocor* performance includes an unfavorable comparison to 2003, which was affected by approximately $110 million of wholesaler buy-in, resulting in a decline in sales of 13% from the same period in 2003. *Zocor* sales growth for the first nine months was 2% compared to the first nine months of 2003. U.S. mail-order-adjusted prescription levels for *Zocor* increased by approximately 2 percent for the quarter, as compared to the third quarter of 2003.

In July, the National Cholesterol Education Program (NCEP) issued a report recommending modifications to the Adult Treatment Panel III (ATP III) guidelines. The report, which was based on five major studies, including HPS, was endorsed by: the American Heart Association; the American College of Cardiology; and the National Heart, Lung, and Blood Institute. The new report may lead to an increase in the number of people for whom cholesterol-lowering medicines should be considered. Under the NCEP ATP III guidelines, an estimated 36 million people would be eligible for cholesterol-lowering medication such as *Zocor* for cholesterol management. According to the new report, in high-risk persons, the recommended LDL-C goal is < 100 mg/dL. The report also indicates that when risk is very high, such as for a patient with established cardiovascular disease plus multiple major risk factors (especially diabetes), an LDL-C goal of < 70 mg/dL is a reasonable clinical strategy for physicians.

Global sales of Merck's coxib, *Arcoxia*, reached $61.1 million in the third quarter and $153.5 million for the first nine months. To date, *Arcoxia* has been launched in 48 countries in Europe, Latin America and Asia. On October 29, 2004, the Company confirmed that it had received an "approvable" letter from the FDA for the Company's NDA for *Arcoxia*. The FDA informed Merck in the letter that before approval of the NDA can be issued, additional safety and efficacy data for *Arcoxia* are required.

(2) COZAAR and HYZAAR are registered trademarks of E.I. DuPont de Nemours & Company, Wilmington, Del.

Table of Contents

Results from two acute dental pain studies with *Arcoxia* were published during the second quarter. The first study, published in *Clinical Therapeutics*, showed that patients taking *Arcoxia* 120 mg experienced pain relief lasting for a full 24 hours compared with 10 hours for patients taking ibuprofen. In the second study, published in the *Clinical Journal of Pain*, patients taking *Arcoxia* 120 mg or naproxen sodium 550 mg had significantly greater pain relief scores over eight hours than those taking a commonly used narcotic, acetaminophen with codeine.

In October, results of a new clinical study were presented at the annual meeting of the American College of Rheumatology which showed *Arcoxia* demonstrated significantly fewer discontinuations due to gastrointestinal side effects compared to diclofenac sodium, a commonly prescribed non-steroidal anti-inflammatory drug. In this one-year study, known as the EDGE (Etoricoxib Diclofenac Gastrointestinal Evaluation) study, the rates of confirmed thrombotic cardiovascular events were similar for *Arcoxia* and diclofenac sodium.

Sales of Merck's other promoted medicines and vaccines were $1.4 billion during the third quarter and $3.8 billion for the first nine months, representing 5% growth over each of the respective periods of 2003. These products treat or prevent a broad range of conditions, such as infectious disease, glaucoma, benign prostate enlargement and migraine.

In support of the call to action issued on October 19 by the U.S. Department of Health and Human Services that emphasizes the importance of pneumococcal vaccine, Merck is increasing its available supply of *Pneumovax 23*. Typically, Merck sells 6 to 7 million doses in the United States annually. The Company is increasing its supply of *Pneumovax 23* by 11 million doses.

Global sales of *Zetia* (branded *Ezetrol* outside of the United States), the cholesterol-absorption inhibitor developed and marketed by the Merck/Schering-Plough partnership, reached $293.1 million in the third quarter and $724.8 million for the first nine months. U.S. prescription levels for *Zetia* increased by approximately 70 percent for the quarter, as compared to the third quarter of 2003. In September, *Zetia* accounted for approximately 6 percent of total prescriptions in the lipid-lowering market [3] and is now reimbursed for nearly 90 percent of all patients in managed care plans in the United States. To date, *Ezetrol* has been launched in more than 40 countries outside of the United States and continues to show solid incremental growth. Worldwide sales of *Zetia* have exceeded $1 billion since its 2002 launch.

*Vytorin* (marketed as *Inegy* in many countries outside of the United States), developed and marketed by the Merck/Schering-Plough partnership, was approved by the FDA on July 23, 2004 and has been recently launched in the United States. In the 12 weeks since the product was approved in the U.S., *Vytorin* has already accounted for nearly 2 percent of new prescriptions in the U.S. lipid-lowering market[4]. Worldwide sales of *Vytorin* were $51.6 million for the third quarter. In addition to the United States, *Vytorin* has now been approved in 10 countries, including Argentina, Brazil, Germany and Mexico. *Vytorin* is performing well in all markets.

*Vytorin* is the first single tablet to provide powerful LDL cholesterol reduction through dual inhibition of the two sources of cholesterol by inhibiting the production of cholesterol in the liver and blocking absorption of cholesterol in the intestine, including cholesterol from food. In two separate clinical trials, *Vytorin* provided greater reductions in LDL cholesterol than Lipitor or *Zocor* across the dosing ranges.

The Company records the results from its interest in the Merck/Schering-Plough partnership in Equity income from affiliates.

*Research and Development*

On November 4, 2004 the Company announced it had filed a Biologics License Application for *ProQuad* [Measles, Mumps, Rubella and Varicella (Oka/ Merck) Virus Vaccine Live] with the FDA. *ProQuad* is an investigational vaccine for simultaneous vaccination against measles, mumps, rubella and varicella in children 12 months to 12 years of age. *ProQuad* combines two established Merck vaccines, *M-M-R* II (Measles, Mumps, Rubella Virus Vaccine Live) and *Varivax* [Varicella (Oka/Merck) Virus Vaccine Live].

In a new study presented at the National Immunization Conference in May, a single dose of *ProQuad* in 4- to 6-year-olds used in place of the routinely administered second dose of *M-M-R* II was generally well-tolerated and resulted in antibody responses similar to those developed with *M-M-R* II and *Varivax* separately.

In addition, muraglitazar, the first-in-class dual PPAR agonist for the treatment of type II diabetes in which Merck is in collaboration with Bristol-Myers Squibb, is targeted for submission to the FDA in the fourth quarter.

(3) Source: IMS NPA Plus Monthly Data

(4) Source: IMS NPA Plus 7 Weekly Data, week ended October 8

- 18 -

Table of Contents

As previously announced, Merck intends to submit applications to the FDA for three investigational vaccines in the second half of 2005. The research and development programs for these investigational vaccines remain on track. The three vaccines are: *RotaTeq*, a vaccine to protect against rotavirus, a highly contagious virus that causes gastroenteritis and results in approximately 50,000 hospitalizations in the United States each year; a vaccine to reduce the incidence of human papillomavirus (HPV) infection and the associated development of cervical cancer – one of the most common cancers among women worldwide – and genital warts; and a vaccine to reduce the pain that accompanies shingles, which afflicts 1 million American adults each year.

*RotaTeq* demonstrated 100-percent efficacy against severe rotavirus gastroenteritis and 74-percent efficacy against rotavirus gastroenteritis of any severity in healthy infants, according to results from a new dose-ranging study presented at the annual meeting of the European Society for Pediatric Infectious Diseases in May. Merck is currently conducting the large-scale Rotavirus Efficacy and Safety Trial (REST) with more than 65,000 infants at clinical sites around the world, which will provide additional safety and efficacy data.

Data from an investigational HPV vaccine studied by Merck was presented on November 1, 2004 at the Interscience Conference on Antimicrobial Agents and Chemotherapy (ICAAC). In the study of 2,391 women aged 16-23 who were HPV 16-naïve at baseline, administration of the HPV 16 vaccine resulted in a 94 percent reduction in the combined incidence of persistent HPV 16 infection and HPV 16-related cervical precancerous lesions (Cervical Intraepithelial Neoplasia = CIN). Of particular importance, the vaccine was 100 percent efficacious in preventing the development of HPV 16-related CIN 2/3 (high-grade cervical pre-cancer, the immediate precursor to invasive cervical cancer). These are the final results of this study after the completion of 48 months of follow-up on all active study participants. The vaccine used in this study was an investigational monovalent vaccine intended to prevent infection by HPV type 16; it is a component of Merck's investigational quadrivalent HPV (types 6, 11, 16, 18) L1 VLP vaccine.

Merck continued to augment its internal research efforts with a comprehensive licensing and external alliance strategy across the entire spectrum of collaborations from early research to late-stage compounds, as well as new technologies and targeted acquisitions. During the first nine months of 2004, Merck executed 41 significant transactions, including research collaborations, pre-clinical and clinical compounds and technology transactions, as well as the acquisition of Aton Pharma, Inc. Merck has more than 40 opportunities currently in detailed review. For the full year of 2003, Merck completed 47 such transactions.

In April, Merck and Bristol-Myers Squibb entered into a global collaborative agreement for muraglitazar, Bristol-Myers Squibb's dual PPAR (peroxisome proliferator-activated receptor) agonist, currently in Phase III clinical development for use in treating both blood glucose and lipid abnormalities in patients with type 2 diabetes. Bristol-Myers Squibb received a $100.0 million upfront payment and may receive up to $275.0 million in additional payments based on the achievement of certain regulatory milestones. Merck and Bristol-Myers Squibb plan to file the U.S. NDA for muraglitazar in the fourth quarter. Merck and Bristol-Myers Squibb will jointly develop the clinical and marketing strategy for muraglitazar and share equally in future development and commercialization costs. Both companies will co-promote the product to physicians on a global basis, and Merck will receive payments based on net sales levels.

In June, Merck and Vertex entered into a global collaboration to develop and commercialize VX-680, Vertex's lead Aurora kinase inhibitor that is expected to enter clinical development this year for the treatment of cancer. Aurora kinases are implicated in the onset and progression of many different human cancers, and novel Aurora kinase inhibitors such as VX-680 have the potential to play an important future role in the treatment and management of a wide range of tumor types. Vertex received a $20.0 million upfront payment and could receive up to an additional $14.0 million in research funding over the next two years. In addition, Vertex could receive additional milestone payments based upon the achievement of significant development events, regulatory filings and other events and approvals.

Also in June, Merck and Lundbeck announced an extension of their agreement for the exclusive development and commercialization of the sleep disorder compound gaboxadol to Japan. In February, the two companies announced their alliance for the exclusive U.S. development and commercialization of gaboxadol. Under the terms of the agreement, Merck made an initial payment of $70.0 million and may pay up to $200.0 million in additional milestone payments in the future. The companies anticipate that Merck will file an NDA with the FDA between late 2006 and mid-2007. Under the terms of the extended agreement, Merck and Lundbeck will jointly conduct the clinical program required for filing an NDA in Japan, with Merck funding the majority of the development activities. Following approval, the companies plan to co-promote gaboxadol in Japan. Lundbeck will receive a share of Japanese gaboxadol sales.

In August, Merck and DOV announced an agreement for the development and commercialization of DOV's novel triple-uptake inhibitors being developed for depression and related psychiatric disorders. DOV received a $35.0 million up-front payment and could receive additional milestone payments based upon the achievement of significant development events, regulatory filings and other events and approvals. Merck has licensed exclusive worldwide rights to DOV 21,947, which is in Phase I, for all therapeutic indications.

- 19 -

Table of Contents

In September, Merck and Nastech announced a global alliance to develop and commercialize Peptide YY (PYY) 3-36 Nasal Spray, Nastech's product for the treatment of obesity, which is currently in Phase I development. The investigational PYY 3-36 Nasal Spray is designed to deliver the natural, appetite-regulating hormone PYY directly to the bloodstream.

*Financial Guidance for 2004*

Worldwide net sales will be driven by the Company's major in-line products, including the impact of new studies and indications. Sales forecasts for those products for 2004 are as follows: *Zocor* $4.9 to $5.1 billion; *Fosamax* $3.0 to $3.2 billion; *Cozaar* and *Hyzaar* $2.7 to $2.9 billion; and *Singulair* $2.4 to $2.7 billion.

Under an agreement with AZLP, Merck receives revenue at predetermined rates on the U.S. sales of certain products by AZLP, most notably *Prilosec* and *Nexium*. In 2004, Merck anticipates these revenues to be approximately $1.4 to $1.6 billion.

The income contribution related to the Merck/Schering-Plough partnership is expected to be positive in 2004. Equity income from affiliates includes the results of the Merck/Schering-Plough partnership combined with the results of Merck's other joint venture relationships. Equity income from affiliates is expected to be approximately $900 million to $1.0 billion for 2004.

Merck continues to expect that manufacturing productivity will offset inflation on product costs.

Product gross margin percentage is estimated to be approximately 76.5% to 77.5% for the fourth quarter of 2004 and 78% to 79% for the full year 2004 as a result of changes to the sales mix. This guidance excludes adjustments related to the withdrawal of *Vioxx*.

Research and development expense (which excludes joint ventures) is anticipated to increase at a high-teens percentage growth rate over the full-year 2003 level. This guidance includes acquired research and development expenses in 2003 and 2004.

Consolidated marketing and administrative expense is estimated to be at the same level as the full-year 2003 expense. This guidance excludes restructuring costs in 2003 and 2004 and excludes adjustments related to the withdrawal of *Vioxx*.

The consolidated 2004 tax rate is estimated to be approximately 28 to 29%. This guidance excludes adjustments related to the withdrawal of *Vioxx*.

Merck plans to continue its stock buyback program in 2004. As of September 30, 2004 $8.8 billion remains under the current buyback authorizations approved by Merck's Board of Directors.

Approximately 4,500 positions had been eliminated as of September 30, 2004 as the Company identified additional opportunities to eliminate positions and reduce costs. This program, which was announced in October 2003, will be completed by the end of 2004. Restructuring costs for full-year 2004 are expected to be approximately $90 to $95 million.

Given these guidance elements, Merck anticipates fourth-quarter earnings per share (EPS) of $0.48 to $0.53, which includes the impact of approximately $700 to $750 million in foregone sales of *Vioxx* and potential additional fourth-quarter costs for the withdrawal of *Vioxx*. As a result, Merck anticipates full-year 2004 EPS guidance of $2.59 to $2.64, which includes the expectation that the impact of the withdrawal will negatively affect full-year EPS by $0.50 to $0.55.

*Liquidity and Capital Resources*

| ($ in millions) | September 30, 2004 | | December 31, 2003 | |
|---|---|---|---|---|
| Cash, cash equivalents and short-term investments | $ | 6,956.8 | $ | 4,173.0 |
| Working capital | $ | 3,070.5 | $ | 1,957.6 |
| Total debt to total liabilities and equity | | 15.4% | | 16.7% |

Cash provided by operations continues to be the Company's primary source of funds to finance operating needs and capital expenditures. Net cash provided by operating activities totaled $6.4 billion and $5.6 billion for the nine months ended September 30, 2004 and 2003, respectively.

Capital expenditures for the nine months totaled $1.2 billion and $1.4 billion in 2004 and 2003, respectively. Capital expenditures for the full year 2004 are expected to approximate $1.5 billion.

Table of Contents

Dividends paid to stockholders were $2.5 billion and $2.4 billion for the first nine months of 2004 and 2003, respectively. In May and July 2004, the Board of Directors declared quarterly dividends of 37 and 38 cents per share on the Company's common stock for the third and fourth quarters of 2004, respectively. The Company's total dividends paid during 2004 will be $1.49 per share, a three percent increase over the amount paid during the same period in 2003.

The Company purchased $688.0 million of its Common Stock (14.9 million shares) for its Treasury during the first nine months of 2004. The Company has approximately $8.8 billion remaining under the July 2002 treasury stock purchase authorization.

On October 22, 2004, President Bush signed the American Jobs Creation Act of 2004 (the Jobs Creation Act). The Jobs Creation Act includes a temporary incentive for U.S. multinationals to repatriate foreign earnings, a domestic manufacturing deduction and international tax reforms designed to improve the global competitiveness of U.S. businesses. The Company is in the process of evaluating the impact of the Jobs Creation Act and has not yet determined the effects on its effective tax rate and deferred tax assets and liabilities.

*Legal Proceedings*

As previously disclosed, federal and state personal injury lawsuits involving individual claims, as well as several putative class actions have been filed against the Company with respect to *Vioxx*. As of October 31, 2004, the Company has been served or is aware that it has been named as a defendant in approximately 375 lawsuits, which include approximately 1,000 plaintiff groups alleging personal injuries resulting from the use of *Vioxx*. Certain of these lawsuits include allegations regarding gastrointestinal bleeding, cardiovascular events and kidney damage. The Company has also been named as a defendant in several putative class actions seeking medical monitoring as a result of the putative class members' use of *Vioxx*. In addition, certain state court actions seek various remedies under state consumer fraud and fair business practice statutes, including recovering the cost of *Vioxx* purchased by individuals and third-party payers such as union health plans (all of the actions discussed in this paragraph are collectively referred to as the "*Vioxx* Personal Injury Lawsuits"). The actions filed in the state courts of California and New Jersey, respectively, have been transferred to a single judge in each state for coordinated proceedings. In addition, the Company has filed a motion with the Judicial Panel on Multidistrict Litigation to transfer to a single federal judge and consolidate for pretrial purposes all federal cases of a similar nature alleging personal injury and/or economic loss relating to the purchase or use of *Vioxx*; several plaintiffs in certain *Vioxx* Personal Injury Lawsuits pending in federal court have made similar requests.

As previously disclosed, in addition to the *Vioxx* Personal Injury Lawsuits, a number of purported class action lawsuits also were filed in the third quarter of 2003 and the first quarter of 2004 by several individual shareholders in the United States District Court for the Eastern District of Louisiana naming as defendants the Company and several current or former officers of the Company, and alleging that the defendants made false and misleading statements regarding *Vioxx* in violation of the federal securities laws. The plaintiffs request certification of a class of purchasers of the Company's common stock between May 22, 1999 and October 22, 2003, and seek unspecified compensatory damages and the costs of suit, including attorney fees. After the announcement of the withdrawal of *Vioxx*, the Company was named as a defendant in four additional purported securities class action lawsuits filed in federal courts in New Jersey and Pennsylvania. These later-filed actions request certification of a class of purchasers of Company stock during various periods between September 23, 2003 and September 30, 2004. The allegations in the later-filed actions are similar to those in the earlier-filed actions, except that the later-filed actions also contain allegations relating to the withdrawal of *Vioxx* from the market. The complaint in the earlier-filed consolidated actions has been amended to include allegations regarding the withdrawal of *Vioxx* and to extend the purported class period until October 29, 2004. In October 2004, a purported class action lawsuit was filed in the New Jersey Superior Court for Hunterdon County against the Company and certain officers and members of the Board of Directors (past and present) alleging that the defendants made incomplete and misleading statements and omissions in a registration statement and certain prospectuses filed in connection with the Merck Stock Investment Plan, a dividend reinvestment plan. The plaintiffs in this case request certification of a class of investors who acquired the Company's common stock through the Merck Stock Investment Plan between April 26, 2002 and September 30, 2004, and seek unspecified compensatory damages, rescission and the costs of suit, including attorney fees (all of the actions discussed in this paragraph are collectively referred to as the "*Vioxx* Securities Lawsuits").

As previously disclosed, in March 2004, two shareholder derivative actions were filed in the United States District Court for the Eastern District of Louisiana naming the Company and certain members of the Board (past and present), together with certain executive officers, as defendants. The complaints arise out of substantially the same factual allegations that are made in the *Vioxx*-related federal securities putative class actions filed against the Company, which principally allege that the Company made false and misleading statements regarding *Vioxx*. The derivative suits, which

- 21 -

Table of Contents

are purportedly brought to assert rights of the Company, assert claims against the Board members and officers for breach of fiduciary duty, waste of corporate assets and unjust enrichment. The court in the Eastern District of Louisiana has consolidated the shareholder derivative actions with the earlier-filed consolidated securities actions. In October 2004, two shareholder derivative actions were filed in the New Jersey Superior Court for Hunterdon County against the Company and certain officers and members of the Board (past and present). The allegations in the later-filed actions are similar to those in the earlier-filed actions, except that the later-filed actions also contain allegations relating to the withdrawal of *Vioxx* from the market (all of the actions discussed in this paragraph are collectively referred to as the "*Vioxx* Derivative Lawsuits"). On October 29, 2004, attorneys representing two individual shareholders made a demand on the Board to take legal action against Mr. Raymond Gilmartin, Chairman, President and Chief Executive Officer and other unspecified individuals for allegedly causing damage to the Company with respect to the allegedly improper marketing of *Vioxx*.

In addition to these shareholder actions, since the announcement of the withdrawal of *Vioxx*, seven putative class actions have been filed against the Company, two in the United States District Court for the Eastern District of Louisiana and five in the United States District Court for the District of New Jersey (the "*Vioxx* ERISA Lawsuits" and, together with the *Vioxx* Securities Lawsuits and the *Vioxx* Derivative Lawsuits, the "*Vioxx* Shareholder Lawsuits") on behalf of certain of the Company's current and former employees who are participants in certain of the Company's retirement plans asserting claims under the Employee Retirement Income Security Act ("ERISA"). The lawsuits make similar allegations to the allegations contained in the shareholder lawsuits described above. The plaintiff in one of the *Vioxx* ERISA Lawsuits has filed a motion with the Judicial Panel on Multidistrict Litigation to transfer to a single federal judge and consolidate for pretrial purposes all of the *Vioxx* ERISA Lawsuits.

In addition to the lawsuits discussed above, the Company has been named as a defendant in actions in various countries in Europe, Canada, Brazil and Israel related to *Vioxx*.

The Company has product liability insurance for claims brought in the *Vioxx* Personal Injury Lawsuits of up to approximately $630 million after deductibles and co-insurance. This insurance provides coverage for legal defense costs and potential damage amounts that have been or will be incurred in connection with the *Vioxx* Personal Injury Lawsuits. The Company believes that this insurance coverage extends to additional *Vioxx* Personal Injury Lawsuits that may be filed in the future. Certain of the Company's insurers have reserved their rights to take a contrary position with respect to certain coverage and there could be disputes with insurers about coverage matters. The Company currently believes that it has at least approximately $190 million of Directors and Officers insurance coverage for the *Vioxx* Securities Lawsuits and *Vioxx* Derivative Lawsuits, and at least approximately $275 million of insurance coverage for the *Vioxx* ERISA Lawsuits. Additional insurance coverage for these claims may also be available under upper level excess policies that provide coverage for a variety of risks. There may be disputes with insurers about the availability of some or all of this insurance coverage.

The Company is unable at this time to determine whether the Company's insurance coverage with respect to the *Vioxx* Personal Injury Lawsuits and the *Vioxx* Shareholder Lawsuits (collectively, the "*Vioxx* Lawsuits") will be adequate to cover its defense costs and losses, if any.

Based on media reports and other sources, the Company anticipates that additional *Vioxx* Lawsuits will be filed against it and/or certain of its current and former officers and directors in the future.

In addition, in November, the Company was advised by the staff of the Securities and Exchange Commission (SEC) that it was commencing an informal inquiry concerning *Vioxx*. Also, the Company has received a subpoena from the U.S. Department of Justice requesting information related to the Company's research, marketing and selling activities with respect to *Vioxx* in a federal healthcare investigation under criminal statutes. The Company will cooperate with the SEC and the Justice Department. The Company cannot predict the outcome of these inquiries, however, it is possible that highly unfavorable outcomes, including a potential civil disposition from the SEC and/or potential civil or criminal dispositions from the Justice Department, could have a material adverse effect on the Company's financial position, liquidity and results of operations.

The Company currently anticipates that one or more of the *Vioxx* Personal Injury Lawsuits may go to trial in the first half of 2005. The Company cannot predict the timing of any trials with respect to the *Vioxx* Shareholder Lawsuits. The Company believes that it has meritorious defenses to the *Vioxx* Lawsuits and will vigorously defend against them. In view of the inherent difficulty of predicting the outcome of litigation, particularly where there are many claimants and the claimants seek indeterminate damages, the Company is unable to predict the outcome of these matters, and at this time cannot reasonably estimate the possible loss or range of loss with respect to the *Vioxx* Lawsuits. The Company has not established any reserves for any potential liability relating to the *Vioxx* Lawsuits. A series of highly unfavorable outcomes could have a material adverse effect on the Company's financial position, liquidity and results of operations.

As previously disclosed, the Company is a party in claims brought under the Consumer Protection Act of 1987 in the United Kingdom, which allege that certain children suffer from a variety of conditions as a result of being vaccinated with various bivalent vaccines for measles and rubella and/or trivalent vaccines for measles, mumps and rubella, including the Company's *M-M-R* II. The conditions include autism, with or without inflammatory bowel disease, epilepsy, diabetes, encephalitis, encephalopathy, deafness, chronic fatigue syndrome and transverse myelitis. In early

Table of Contents

September 2003, the Legal Services Commission announced its decision to withdraw public funding of the litigation brought by the claimants. This decision was confirmed on appeal by the Funding Review Committee ("FRC") on September 30, 2003. The claimants' application for judicial review of the decision to withdraw public funding was dismissed in February 2004 and the April 2004 trial was vacated. The lead claimants have decided not to apply to the Court of Appeal for permission to appeal that decision. Therefore, legal aid for all lead claimants has now been discharged. The non-lead claimants were subject to a "show cause" procedure to withdraw legal aid unless the claimants could show cause as to why it should not be withdrawn. The FRC heard 37 of the "show cause" appeals by the non-lead claimants in October 2004. The appeals involving autism (26) were unsuccessful, but funding was reinstated for 11 appeals involving other non-autism conditions, such as epilepsy, deafness, encephalitis and transverse myelitis. It is not yet known how many of the 11 appeals involve claimants suing the Company. All claimants for all conditions have until December 2004 to give notice of their intention to continue or discontinue with their claims, irrespective of whether or not they have secured legal aid funding. Directions from the court for the future conduct of the litigation will be made at a case management hearing in 2005.

As previously disclosed, the Company is also a party to individual and class action product liability lawsuits and claims in the United States involving pediatric vaccines (i.e., hepatitis B vaccine and *haemophilus influenza* type b vaccine) that contained thimerosal, a preservative used in vaccines. Other defendants include vaccine manufacturers who produced pediatric vaccines containing thimerosal as well as manufacturers of thimerosal. In these actions, the plaintiffs allege, among other things, that they have suffered neurological and other injuries as a result of having thimerosal introduced into their developing bodies. The Company has been successful in having many of these cases either dismissed or stayed on the ground that the National Vaccine Injury Compensation Program (NVICP) prohibits any person from filing or maintaining a civil action seeking damages against a vaccine manufacturer for vaccine-related injuries unless a petition is first filed in the United States Court of Federal Claims. A number of similar cases (*M-M-R* II alone and/or thimerosal-containing vaccines) have been filed in the United States Court of Federal Claims under the NVICP for a determination first on general causation issues. Three state court cases and two Federal District Court cases are scheduled for trial in 2005. The Company believes that these lawsuits and claims are without merit and will vigorously defend against them in the proceedings in which it is a party.

The Company has been named as a defendant in antitrust cases in federal court in Minnesota and in state court in California, each alleging an unlawful conspiracy among different sets of pharmaceutical manufacturers to protect high prices in the United States by impeding importation into the United States of lower-priced pharmaceuticals from Canada.

A suit in federal court in Alabama by two providers of health services to needy patients alleges that 15 pharmaceutical companies overcharged the plaintiffs and a class of those similarly situated, for pharmaceuticals purchased by the plaintiffs under the program established by Section 340B of the Public Health Service Act. The Company and the other defendants have filed a motion to dismiss the complaint on numerous grounds.

As previously disclosed, on July 6, 2004, the United States District Court for the District of New Jersey granted a motion by the Company, Medco Health Solutions, Inc. ("Medco Health") and certain officers and directors to dismiss a purported class action complaint involving claims related to the Company's revenue recognition practice for retail co-payments paid by individuals to whom Medco Health provides pharmaceutical benefits as well as other allegations. The complaint was dismissed with prejudice. On August 20, 2004 the same court granted the Company's motion to dismiss with prejudice a related shareholder derivative action. Plaintiffs in both actions have appealed the decisions.

In the previously-disclosed European Patent Office's opposition proceedings challenging the Company's patent for the weekly administration of alendronate, on August 19, 2004 the written opinion was issued confirming the oral decision revoking the Company's patent. On September 16, 2004 the Company filed an appeal of this decision.

In an action in Australia challenging the validity of the Company's Australian patent for the weekly administration of alendronate, on October 5, 2004 the patent was found invalid. The Company is planning to appeal this decision.

Item 4. Controls and Procedures

Management of the Company, with the participation of its Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures. Based on their evaluation, as of the end of the period covered by this Form 10-Q, the Company's Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) are effective. There have been no significant changes in internal control over financial reporting, for the period covered by this report, that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

Table of Contents

CAUTIONARY FACTORS THAT MAY AFFECT FUTURE RESULTS

This report and other written reports and oral statements made from time to time by the Company may contain so-called "forward-looking statements," all of which are subject to risks and uncertainties. One can identify these forward-looking statements by their use of words such as "expects," "plans," "will," "estimates," "forecasts," "projects" and other words of similar meaning. One can identify them by the fact that they do not relate strictly to historical or current facts. These statements are likely to address the Company's growth strategy, financial results, product approvals and development programs. One must carefully consider any such statement and should understand that many factors could cause actual results to differ from the Company's forward-looking statements. These factors include inaccurate assumptions and a broad variety of other risks and uncertainties, including some that are known and some that are not. No forward-looking statement can be guaranteed and actual future results may vary materially.

The Company does not assume the obligation to update any forward-looking statement. One should carefully evaluate such statements in light of factors described in the Company's filings with the Securities and Exchange Commission, especially on Forms 10-K, 10-Q and 8-K. In Item 1 of the Company's Annual Report on Form 10-K for the year ended December 31, 2003, as filed on March 10, 2004, the Company discusses in more detail various important factors that could cause actual results to differ from expected or historic results. The Company notes these factors for investors as permitted by the Private Securities Litigation Reform Act of 1995. One should understand that it is not possible to predict or identify all such factors. Consequently, the reader should not consider any such list to be a complete statement of all potential risks or uncertainties.


PART II - Other Information


Item 1. Legal Proceedings

Information with respect to certain legal proceedings is incorporated by reference from Management's Discussion and Analysis of Financial Condition and Results of Operations contained in Part 1 of this report.


Item 2. Unregistered Sales of Equity Securities and Use of Proceeds

Issuer purchases of equity securities for the three month period ended September 30, 2004 is as follows:

ISSUER PURCHASES OF EQUITY SECURITIES

|  |  |  |  |  | ($ in millions) |
| --- | --- | --- | --- | --- | --- |
| Period | Total Number of Shares Purchased[1] | | Average Price Paid Per Share | | Approximate Dollar Value of Shares That May Yet Be Purchased Under the Plans or Programs[1] |
| July 1 – July 31, 2004 | 1,842,300 | $ | 45.55 | $ | 8,991,718,824 |
| August 1 – August 31, 2004 | 1,945,100 | $ | 45.10 | $ | 8,903,991,109 |
| September 1 – September 30, 2004 | 1,605,500 | $ | 45.09 | $ | 8,831,602,312 |
| Total | 5,392,900 | $ | 45.25 | $ | 8,831,602,312 |

(1)  All shares purchased during the period were made as part of a plan announced in July 2002 to purchase $10 billion in Merck shares.

- 24 -

**Table of Contents**

Item 6. Exhibits

Exhibits

| | |
|---|---|
| 3.1 | Restated Certificate of Incorporation of Merck & Co., Inc. (October 1, 2004) |
| 3.2 | By-Laws of Merck & Co., Inc. (as amended effective September 28, 2004) – Incorporated by reference to Current Report on Form 8-K dated September 28, 2004 |
| 12 | Computation of Ratios of Earnings to Fixed Charges |
| 31.1 | Rule 13a – 14(a)/15d – 14(a) Certification of Chief Executive Officer |
| 31.2 | Rule 13a – 14(a)/15d – 14(a) Certification of Chief Financial Officer |
| 32.1 | Section 1350 Certification of Chief Executive Officer |
| 32.2 | Section 1350 Certification of Chief Financial Officer |

- 25 -

**Table of Contents**

Signatures

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

MERCK & CO., INC.

Date: November 8, 2004        /s/ Kenneth C. Frazier

KENNETH C. FRAZIER
Senior Vice President and General Counsel

Date: November 8, 2004        /s/ Richard C. Henriques

RICHARD C. HENRIQUES
Vice President, Controller

- 26 -

**Table of Contents**

EXHIBIT INDEX

| Number | Description |
|---|---|
| 3.1 | Restated Certificate of Incorporation of Merck & Co., Inc. (October 1, 2004) |
| 3.2 | By-Laws of Merck & Co., Inc. (as amended effective September 28, 2004) – Incorporated by reference to Current Report on Form 8-K dated September 28, 2004 |
| 12 | Computation of Ratios of Earnings to Fixed Charges |
| 31.1 | Rule 13a – 14(a)/15d – 14(a) Certification of Chief Executive Officer |
| 31.2 | Rule 13a – 14(a)/15d – 14(a) Certification of Chief Financial Officer |
| 32.1 | Section 1350 Certification of Chief Executive Officer |
| 32.2 | Section 1350 Certification of Chief Financial Officer |

Exhibit 3.1

**RESTATED**

**CERTIFICATE OF INCORPORATION**

*of*

**MERCK & CO., INC.**

*October 1, 2004*

**RESTATED**

**CERTIFICATE OF INCORPORATION**

**of**

**MERCK & CO., INC.**

Merck & Co., Inc., a corporation organized and existing under the laws of the State of New Jersey, restates and integrates its Restated Certificate of Incorporation, as heretofore amended, to read in full as herein set forth:

**ARTICLE I: NAME**

The name of the Corporation shall be Merck & Co., Inc.

**ARTICLE II: REGISTERED OFFICE AND AGENT**

The address of the Corporation's registered office shall be 820 Bear Tavern Road, City of West Trenton, County of Mercer, State of New Jersey, and the name of its registered agent thereat shall be The Corporation Trust Company.

**ARTICLE III: OBJECTS AND PURPOSES**

The objects and purposes of the Corporation shall be:

To carry on the business of exercising, performing, developing, manufacturing, producing, obtaining, promoting, selling and distributing rights, services, goods, wares, and merchandise of all kinds, including but not by way of limitation, those in the chemical, mineral, pharmaceutical, biological, medicinal, agricultural, mechanical and electrical fields;

To carry on such business alone, in, with or as agent for other individuals, partnerships, joint ventures, corporations, syndicates or other forms of enterprise; and

To borrow or lend money and to make guarantees insofar as such powers may now or hereafter be lawfully exercised by a corporation subject to Title 14A of the New Jersey statutes.

The enumeration herein of the objects and purposes of the Corporation shall be construed as powers as well as objects and purposes and shall not be deemed to exclude by inference any powers, objects or purposes which any corporation subject to Title 14A of the New Jersey statutes may now or hereafter be empowered to exercise.

**ARTICLE IV: CAPITAL STOCK**

The amount of the total authorized capital stock of the Corporation shall be 5,410,000,000 shares, consisting of 5,400,000,000 shares of Common Stock, par value $.01 per share, and 10,000,000 shares of Preferred Stock, without par value, issuable in one or more series.

The Board of Directors may from time to time offer for subscription or otherwise issue or sell any or all of the unissued stock of any class, or any shares of stock of any class which may be held in the treasury of the Corporation, to such persons, firms or corporations and for such consideration (so far as may be permitted by the laws of the State of New Jersey) as it shall from time to time in its absolute discretion determine. No

1

holder of capital stock shall have any pre-emptive right as such holder to subscribe for, purchase or receive any part of any new or additional issue of stock of any class, including unissued and treasury stock, or obligations or other securities convertible into or exchangeable for stock of any class, or warrants or other instruments evidencing rights or options to subscribe for, purchase or receive any stock of any class, whether now or hereafter authorized and whether issued for cash or other consideration or by way of dividend.

The preferences, qualifications, limitations, voting rights and restrictions with respect to the capital stock of the Corporation shall be as follows (headings are for convenience only and are not to be taken as aids to interpretation):

**(A) Preferred Stock**

1. The Board of Directors of the Corporation is hereby expressly granted authority, subject to the provisions of this Restated Certificate of Incorporation, to authorize in accordance with New Jersey law from time to time the issue of one of more series of Preferred Stock and with respect to any such series to fix the numbers, designations, rights, preferences and limitations of such series, including, but without limiting the generality of the foregoing, series of Preferred Stock:

(a) entitling the holders thereof to cumulative, non-cumulative or partial cumulative dividends, or to no dividends;

(b) entitling the holders thereof to receive dividends payable on a parity with, or in preference to, the dividends payable on any other class or series of capital stock of the Corporation;

(c) entitling the holders thereof to preferential rights upon the liquidation of, or upon any distribution of the assets of, the Corporation;

(d) convertible, at the option of the holder or of the Corporation or both, into shares of any other class or classes of capital stock of the Corporation or of any series of the same or any other class or classes;

(e) redeemable, in whole or in part, at the option of the Corporation, in cash, bonds or other property, at such price or prices, within such period or periods, and under such conditions as the Board of Directors shall so provide, including provision for the creation of a sinking fund for the redemption thereof; and

(f) lacking voting rights or having limited voting rights or enjoying special or multiple voting rights; provided, however, that no Preferred Stock that is convertible into shares of Common Stock shall have voting rights entitling a holder of a share of Preferred Stock to a greater number of votes than those applicable to the number of Common Shares into which such share of Preferred Stock is convertible, at the initial conversion rate set for such Preferred Stock at the time of issuance thereof.

The Board of Directors may change the designation, rights, preferences, limitations, description and terms of, and number of shares in, any series as to which no shares have theretofore been issued.

All shares of any one series shall be identical in all respects with all the other shares of such series, except that shares of any one series issued at different times may differ as to the dates from which dividends thereon shall be cumulative.

2. Shares of any series of Preferred Stock which have been redeemed (whether through the operation of a sinking fund or otherwise) or purchased by the Corporation, or which, if convertible, have been converted into shares of the Corporation of any other class or classes, shall have the status of authorized and unissued shares of Preferred Stock which are not classified into any series.

**(B) Common Stock**

Subject to the preferences, qualifications, limitations, voting rights and restrictions with respect to each class of the capital stock of the Corporation having any preference or priority over the Common Stock, the holders of the Common Stock shall have and possess all rights appertaining to capital stock of the Corporation.

At all elections of directors, each holder of Common Stock entitled to vote thereat shall be entitled to as many votes as shall equal the number of his shares of Common Stock multiplied by the number of directors to

2

be elected by vote of stockholders without regard to class, and he may cast all of such votes for a single director or may distribute them among the number of directors to be voted for or any two or more of them as he shall see fit. At all times each holder of Common Stock of the Corporation who at any time possesses voting power for any purpose other than for the election of directors shall be entitled to one vote for each share of such stock standing in his name on the books of the Corporation.

Subject to any limitations or restrictions set forth herein with respect to any class of stock other than the Common Stock, any action which, at any meeting of stockholders, requires the vote, assent or consent of two-thirds in interest of all the stockholders, or of two-thirds in interest of each class of stockholders, having voting powers, or which requires such assent or consent in writing to be filed, may be taken upon the assent of and the assent given and filed by, as the case may be, two-thirds in interest of the stockholders present and voting at such meeting in person or by proxy, but where assent by classes is required such assent shall be given by two-thirds in interest of each class so present and voting.

Optional rights to purchase shares of Common Stock may be granted, on such terms, at such price, in such manner and at such time or times as may be expressed in a resolution or resolutions adopted by the Board of Directors, and warrants or other evidence of such optional rights may be issued.

The Corporation shall not be required to issue any fraction of a share of Common Stock of the Corporation.

## ARTICLE V: BY-LAWS

The Board of Directors shall have power to make, alter and repeal By-Laws; but By-Laws made by the directors may be altered or repealed by the stockholders. Notwithstanding anything contained in this Restated Certificate of Incorporation or the By-Laws of the Corporation to the contrary (and notwithstanding that a lesser percentage may be specified by law or the By-Laws), Article II of the By-Laws shall not be altered, amended or repealed and no provision inconsistent therewith shall be adopted without the affirmative vote of a majority of the entire Board of Directors or of the holders of at least 80% of the combined voting power of the then outstanding shares of stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class. Notwithstanding anything contained in this Restated Certificate of Incorporation to the contrary, the affirmative vote of the holders of at least 80% of the combined voting power of the then outstanding shares of stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class, shall be required to alter, amend, adopt any provision inconsistent with or repeal this Article V.

## ARTICLE VI: DIRECTORS

The number of directors of the Corporation shall be such number, not less than three, as may, from time to time, be determined in accordance with the By-Laws. The By-Laws shall prescribe the manner in which the number of directors necessary to constitute a quorum of the Board of Directors shall be determined, which number may be less than a majority of the whole Board of Directors. The By-Laws shall also prescribe the manner in which the retirement age of and other restrictions and qualifications for directors of the Corporation shall be determined. Advance notice of nomination by a stockholder for the election of directors shall be made in the manner provided in the By-Laws.

At the 2004 annual meeting of stockholders, the successors of the directors whose terms expire at that meeting shall be elected for a term expiring at the 2005 annual meeting of stockholders; at the 2005 annual meeting of stockholders, the successors of the directors whose terms expire at that meeting shall be elected for a term expiring at the 2006 annual meeting of stockholders; and at each annual meeting of stockholders thereafter, the directors shall be elected for terms expiring at the next annual meeting of stockholders. Any vacancies in the Board of Directors, by reason of an increase in the number of directors or otherwise, shall be filled solely by the Board of Directors, by majority vote of the directors then in office, though less than a

3

quorum, but any such director so elected shall hold office only until the next succeeding annual meeting of stockholders. At such annual meeting, such director or a successor to such director shall be elected and qualified. No decrease in the number of directors shall shorten the term of any incumbent director.

Any director may be removed from office as a director but only for cause by the affirmative vote of the holders of 80% of the combined voting power of the then outstanding shares of stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class.

The Board of Directors, by vote of a majority of the whole Board, may appoint from the directors an executive committee and such other committees as they may deem judicious; and to such extent as shall be provided in the resolution of the Board or in the By-Laws, may delegate to such committees all or any of the authority of the Board of Directors which may be lawfully delegated, and such committees shall have and thereupon may exercise all or any of the authority so delegated to them. The Board of Directors of the Corporation or the By-Laws may provide the number of members necessary to constitute a quorum of any committee and the number of affirmative votes necessary for action by any committee.

Any officer and any employee elected or appointed by the Board of Directors may be removed (except from the office of director) at any time by a vote of a majority of the whole Board of Directors. Any other employee of the Corporation may be removed at any time by vote of the Board of Directors or by any committee or officer or employee upon whom such power of removal may be conferred by the By-Laws or by vote of the Board of Directors.

The Board of Directors shall from time to time determine whether and to what extent and at what times and places and under what conditions and regulations the accounts, books and records of the Corporation or any of them shall be open to the inspection of the stockholders; and no stockholder shall have any right of inspecting any account or book or document or record of the Corporation except as conferred by statute or authorized by the Board of Directors or by a resolution of the stockholders.

No contract or other transaction of the Corporation shall be affected by the fact that any of the directors of the Corporation are in any way interested in or connected with any other party to such contract or transaction, or are themselves parties to such contract or transaction, provided that at the meeting of the Board of Directors or of the committee thereof authorizing or confirming such contract or transaction there shall be present a quorum of directors not so interested or connected, and such contract or transaction shall be approved by a majority of such quorum, which majority shall consist of directors not so interested or connected.

Notwithstanding the foregoing, whenever the holders of any one or more series of Preferred Stock issued by the Corporation, pursuant to Article IV hereof, shall have the right, voting separately as a class or by series, to elect directors at an annual or special meeting of stockholders, the election, term of office, filling of vacancies and other features of such directorships shall be governed by the terms of the series of Preferred Stock applicable thereto, and such directors so elected shall not be divided into classes pursuant to this Article VI unless expressly provided by the terms of the applicable series.

Notwithstanding anything contained in this Restated Certificate of Incorporation to the contrary, the affirmative vote of the holders of at least 80% of the combined voting power of the then outstanding shares of the stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class, shall be required to alter, amend, adopt any provision inconsistent with or repeal this Article VI.

**ARTICLE VII: DURATION**

The duration of the Corporation shall be perpetual.

4

## ARTICLE VIII: AMENDMENTS

The Corporation reserves the right to amend, alter, change or repeal any of the provisions contained in this Restated Certificate of Incorporation in the manner now or hereafter prescribed by law, and all rights conferred on officers, directors and/or stockholders herein are granted subject to this reservation.

## ARTICLE IX: STOCKHOLDER ACTION

Any action required or permitted to be taken by the stockholders of the Corporation must be effected at a duly called annual or special meeting of such stockholders and may not be effected by any consent in writing by such stockholders.

Notwithstanding anything contained in this Restated Certificate of Incorporation to the contrary, the affirmative vote of the holders of at least 80% of the combined voting power of the then outstanding shares of stock of the corporation entitled to vote generally in the election of directors, voting together as a single class, shall be required to alter, amend, adopt any provision inconsistent with or repeal this Article IX.

## ARTICLE X: CERTAIN BUSINESS COMBINATIONS

(A) In addition to any affirmative vote required by law or this Restated Certificate of Incorporation, and except as otherwise expressly provided in paragraph (B) of this Article X,

1. any merger or consolidation of the Corporation or any Subsidiary (as hereinafter defined) with (a) an Interested Stockholder (as hereinafter defined) or (b) any other corporation (whether or not itself an Interested Stockholder) which is, or after such merger or consolidation would be, an Affiliate or Associate (as such terms are hereinafter defined) of an Interested Stockholder, or

2. any sale, lease, exchange, mortgage, pledge, grant of a security interest, transfer or other disposition (in one transaction or a series of transactions) to or with (a) an Interested Stockholder or (b) any other person (whether or not itself an Interested Stockholder) which is, or after such sale, lease, exchange, mortgage, pledge, grant of a security interest, transfer or other disposition would be, an Affiliate or Associate of an Interested Stockholder, directly or indirectly, of assets of the Corporation (including, without limitation, any voting securities of a Subsidiary) or any Subsidiary, or both, having an aggregate Fair Market Value (as hereinafter defined) of $50,000,000 or more, or

3. the issuance or transfer by the Corporation or any Subsidiary (in one transaction or a series of transactions) of any securities of the Corporation or any Subsidiary, or both, to (a) an Interested Stockholder or (b) any other person (whether or not itself an Interested Stockholder) which is, or after such issuance or transfer would be, an Affiliate or Associate of an Interested Stockholder in exchange for cash, securities or other property (or a combination thereof) having an aggregate Fair Market Value of $50,000,000 or more, other than the issuance of securities upon the conversion of convertible securities of the Corporation or any Subsidiary which were not acquired by such Interested Stockholder (or such Affiliate or Associate) from the Corporation or a Subsidiary, or

4. the adoption of any plan or proposal for the liquidation or dissolution of the Corporation proposed by or on behalf of an Interested Stockholder or any Affiliate or Associate of an Interested Stockholder, or

5. any reclassification of securities (including any reverse stock split), or recapitalization of the Corporation, or any merger or consolidation of the Corporation with any of its Subsidiaries or any other transaction (whether or not with or into or otherwise involving an Interested Stockholder) which has the effect, directly or indirectly, of increasing the proportionate share of the outstanding shares of any class of equity or convertible securities of the Corporation or any Subsidiary directly or indirectly beneficially owned by (a) an Interested Stockholder or (b) any other person (whether or not itself an Interested Stockholder) which is, or after such reclassification, recapitalization, merger or consolidation or other transaction would be, an Affiliate or Associate of an Interested Stockholder, shall not be consummated unless such consummation shall have been approved by the affirmative vote of the holders of at least 80%

5

of the combined voting power of the then outstanding shares of Voting Stock (as hereinafter defined), voting together as a single class. Such affirmative vote shall be required notwithstanding the fact that no vote may be required, or that a lesser percentage may be specified, by law, in this Restated Certificate of Incorporation or in any agreement with any national securities exchange or otherwise.

(B) The provisions of paragraph (A) of this Article X shall not be applicable to any particular Business Combination (as hereinafter defined) and such Business Combination shall require only such affirmative vote as is required by law and any other provision of this Restated Certificate of Incorporation, if the Business Combination shall have been approved by a majority of the Continuing Directors (as hereinafter defined) or all of the following conditions shall have been met:

1. The transaction constituting the Business Combination shall provide for a consideration to be received by all holders of Common Stock in exchange for all their shares of Common Stock, and the aggregate amount of the cash and the Fair Market Value as of the date of the consummation of the Business Combination of consideration other than cash to be received per share by holders of Common Stock in such Business Combination shall be at least equal to the higher of the following:

(a) (if applicable) the highest per-share price (including any brokerage commissions, transfer taxes and soliciting dealers' fees) paid in order to acquire any shares of Common Stock beneficially owned by an Interested Stockholder (i) within the two-year period immediately prior to the Announcement Date (as hereinafter defined), (ii) within the two- year period immediately prior to the Determination Date (as hereinafter defined) or (iii) in the transaction in which it became an Interested Stockholder, whichever is highest; or

(b) the Fair Market Value per share of Common Stock on the Announcement Date or on the Determination Date, whichever is higher;

2. If the transaction constituting the Business Combination shall provide for a consideration to be received by holders of any class or series of outstanding Voting Stock other than Common Stock, the aggregate amount of the cash and the Fair Market Value as of the date of the consummation of the Business Combination of consideration other than cash to be received per share by holders of shares of such class or series of Voting Stock shall be at least equal to the highest of the following (it being intended that the requirements of this subparagraph 2 shall be required to be met with respect to every class and series of outstanding Voting Stock, whether or not an Interested Stockholder has previously acquired any shares of a particular class of Voting Stock):

(a) (if applicable) the highest per-share price (including any brokerage commissions, transfer taxes and soliciting dealers' fees) paid in order to acquire any shares of such class or series of Voting Stock beneficially owned by an Interested Stockholder (i) within the two-year period immediately prior to the Announcement Date, (ii) within the two-year period immediately prior to the Determination Date or (iii) in the transaction in which it became an Interested Stockholder, whichever is highest; or

(b) the Fair Market Value per share of such class or series of Voting Stock on the Announcement Date or the Determination Date, whichever is higher; or

(c) (if applicable) the highest preferential amount per share to which the holders of shares of such class or series of Voting Stock are entitled in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation;

3. The consideration to be received by holders of a particular class or series of outstanding Voting Stock (including Common Stock) shall be in cash or in the same form as was previously paid in order to acquire shares of such class or series of Voting Stock which are beneficially owned by an Interested Stockholder and, if an Interested Stockholder beneficially owns shares of any class or series of Voting Stock which were acquired with varying forms of consideration, the form of consideration for such class or series of Voting Stock shall be either cash or the form used to acquire the largest number of shares of such class or series of Voting Stock beneficially owned by it. The price determined in accordance with subparagraphs 1 and 2 of this paragraph shall be subject to appropriate adjustment in the event of any recapitalization, stock dividend, stock split, combination of shares or similar event;

4. After such Interested Stockholder has become an Interested Stockholder and prior to the consummation of such Business Combination:

(a) except as approved by a majority of the Continuing Directors, there shall have been no failure to declare and pay at the regular date therefor the full amount of any dividends (whether or not cumulative) payable on any outstanding Preferred Stock;

(b) there shall have been (i) no reduction in the annual rate of dividends paid on the Common Stock (except as necessary to reflect any subdivision of the Common Stock) other than as approved by a majority of the Continuing Directors and (ii) an increase in such annual rate of dividends as necessary to prevent any such reduction in the event of any reclassification (including any reverse stock split), recapitalization, reorganization or any similar transaction which has the effect of reducing the number of outstanding shares of the Common Stock, unless the failure so to increase such annual rate is approved by a majority of the Continuing Directors; and

(c) such Interested Stockholder shall not have become the beneficial owner of any additional shares of Voting Stock except as part of the transaction in which it became an Interested Stockholder;

5. After such Interested Stockholder has become an Interested Stockholder, such Interested Stockholder shall not have received the benefit, directly or indirectly (except proportionately as a stockholder), of any loans, advances, guarantees, pledges or other financial assistance or any tax credits or other tax advantages provided by the Corporation, whether in anticipation of or in connection with such Business Combination or otherwise; and

6. A proxy or information statement describing the proposed Business Combination and complying with the requirements of the Securities Exchange Act of 1934 and the rules and regulations thereunder (or any subsequent provisions replacing such Act, rules or regulations) shall be mailed to the stockholders of the Corporation, no later than the earlier of (a) 30 days prior to any vote on the proposed Business Combination or (b) if no vote on such Business Combination is required, 60 days prior to the consummation of such Business Combination (whether or not such proxy or information statement is required to be mailed pursuant to such Act or subsequent provisions). Such proxy statement shall contain at the front thereof, in a prominent place, any recommendations as to the advisability (or inadvisability) of the Business Combination which the Continuing Directors, or any of them, may have furnished in writing and, if deemed advisable by a majority of the Continuing Directors, an opinion of a reputable investment banking firm as to the fairness (or lack of fairness) of the terms of such Business Combination, from the point of view of the holders of Voting Stock other than an Interested Stockholder (such investment banking firm to be selected by a majority of the Continuing Directors, to be furnished with all information it reasonably requests and to be paid a reasonable fee for its services upon receipt by the Corporation of such opinion).

(C) For the purposes of this Article X:

1. "Business Combination" shall mean any transaction which is referred to in any one or more of subparagraphs 1 through 5 of paragraph (A) of this Article X.

2. "Voting Stock" shall mean stock of all classes and series of the Corporation entitled to vote generally in the election of directors.

3. "Person" shall mean any individual, firm, trust, partnership, association, corporation or other entity.

4. "Interested Stockholder" shall mean any person (other than the Corporation or any Subsidiary) who or which:

(a) is the beneficial owner, directly or indirectly, of more than 5% of the combined voting power of the then outstanding Voting Stock; or

(b) is an Affiliate of the Corporation and at any time within the two-year period immediately prior to the date in question was the beneficial owner, directly or indirectly, of more than 5% of the combined voting power of the then outstanding Voting Stock; or

7

(c) is an assignee of or has otherwise succeeded to the beneficial ownership of any shares of Voting Stock which were at any time within the two-year period immediately prior to the date in question beneficially owned by an Interested Stockholder, unless such assignment or succession shall have occurred pursuant to a Public Transaction (as hereinafter defined) or any series of transactions involving a Public Transaction.

For the purposes of determining whether a person is an Interested Stockholder, the number of shares of Voting Stock deemed to be outstanding shall include shares deemed owned through application of subparagraph 6 below but shall not include any other shares of Voting Stock which may be issuable pursuant to any agreement, arrangement or understanding, or upon exercise of conversion rights, warrants or options, or otherwise.

5. "Public Transaction" shall mean any (a) purchase of shares offered pursuant to an effective registration statement under the Securities Act of 1933 or (b) open-market purchase of shares on a national securities exchange if, in either such case, the price and other terms of sale are not negotiated by the purchaser and the seller of the beneficial interest in the shares.

6. A person shall be a "beneficial owner" of any Voting Stock:

(a) which such person or any of its Affiliates or Associates beneficially owns, directly or indirectly; or

(b) which such person or any of its Affiliates or Associates has (i) the right to acquire (whether such right is exercisable immediately or only after the passage of time) pursuant to any agreement, arrangement or understanding or upon the exercise of conversion rights, exchange rights, warrants or options, or otherwise or (ii) the right to vote or to direct the voting thereof pursuant to any agreement, arrangement or understanding; or

(c) which is beneficially owned, directly or indirectly, by any other person with which such person or any of its Affiliates or Associates has any agreement, arrangement or understanding for the purpose of acquiring, holding, voting or disposing of any shares of Voting Stock.

7. "Affiliate" and "Associate" shall have the respective meanings ascribed to such terms in Rule 12b-2 of the General Rules and Regulations under the Securities Exchange Act of 1934, as in effect on January 1, 1985.

8. "Subsidiary" shall mean any corporation of which a majority of any class of equity security (as defined in Rule 3a11-1 of the General Rules and Regulations under the Securities Exchange Act of 1934, as in effect on January 1, 1985) is owned, directly or indirectly, by the Corporation; provided, however, that, for purposes of the definition of Interested Stockholder set forth in subparagraph 4, the term "Subsidiary" shall mean only a corporation of which a majority of each class of equity security is owned, directly or indirectly, by the Corporation.

9. "Continuing Director" shall mean any member of the Board of Directors of the Corporation who is unaffiliated with, and not a nominee of, an Interested Stockholder and was a member of the Board prior to the time that such Interested Stockholder became an Interested Stockholder, and any successor of a Continuing Director who is unaffiliated with, and not a nominee of, an Interested Stockholder and is recommended to succeed a Continuing Director by a majority of Continuing Directors then on the Board.

10. "Announcement Date" shall mean the date of the first public announcement of the proposed Business Combination.

11. "Determination Date" shall mean the date on which an Interested Stockholder became an Interested Stockholder.

12. "Fair Market Value" shall mean: (a) in the case of stock, the highest closing sale price during the 30-day period immediately preceding the date in question of a share of such stock on the Composite Tape for New York Stock Exchange-Listed Stocks, or, if such stock is not quoted on the Composite Tape, on the New York Stock Exchange, or, if such stock is not listed on such Exchange, on the principal United

8

States securities exchange registered under the Securities Exchange Act of 1934 on which such stock is listed, or, if such stock is not listed on any such exchange, the highest closing bid quotation with respect to a share of such stock during the 30-day period preceding the date in question on the National Association of Securities Dealers, Inc. Automated Quotations System or any system then in use, or, if no such quotations are available, the fair market value on the date in question of a share of such stock as determined by a majority of the Continuing Directors in good faith; and (b) in the case of property other than cash or stock, the fair market value of such property on the date in question as determined by a majority of the Continuing Directors in good faith.

(D) A majority of the Continuing Directors shall have the power and duty to determine for the purposes of this Article X, on the basis of information known to them after reasonable inquiry, all facts necessary to determine compliance with this Article X, including, without limitation, (1) whether a person is an Interested Stockholder, (2) the number of shares of Voting Stock beneficially owned by any person, (3) whether a person is an Affiliate or Associate of another, (4) whether the assets which are the subject of any Business Combination have, or the consideration to be received for the issuance or transfer of securities by the Corporation or any Subsidiary in any Business Combination has, an aggregate Fair Market Value of $50,000,000 or more, (5) whether the requirements of paragraph (B) of this Article X have been met and (6) such other matters with respect to which a determination is required under this Article X. The good faith determination of a majority of the Continuing Directors on such matters shall be conclusive and binding for all purposes of this Article X.

(E) Nothing contained in this Article X shall be construed to relieve an Interested Stockholder from any fiduciary obligation imposed by law.

(F) Notwithstanding any other provisions of this Restated Certificate of Incorporation or the By-Laws of the Corporation or the fact that a lesser percentage may be specified by law, this Restated Certificate of Incorporation or the By-Laws of the Corporation, the affirmative vote of the holders of at least 80% of the combined voting power of the then outstanding Voting Stock, voting together as a single class, shall be required to amend, alter, adopt any provision inconsistent with or repeal this Article X.

## ARTICLE XI: PURCHASES OF STOCK OF THE CORPORATION

(A) Except as otherwise expressly provided in this Article XI, the Corporation may not purchase any shares of Common Stock at a per-share price in excess of the Fair Market Price (as hereinafter defined) as of the time of such purchase from a person known by the Corporation to be a Substantial Stockholder (as hereinafter defined), unless such purchase has been approved by the affirmative vote of the holders of at least two-thirds of the shares of Common Stock voted thereon held by Disinterested Stockholders (as hereinafter defined). Such affirmative vote shall be required notwithstanding the fact that no vote may be required or that a lesser percentage may be specified by law, in this Restated Certificate of Incorporation or in any agreement with any national securities exchange or otherwise.

(B) The provisions of this Article XI shall not apply to (1) any purchase pursuant to an offer to purchase which is made on the same terms and conditions to the holders of all of the outstanding shares of Common Stock or (2) any open market purchase that constitutes a Public Transaction (as hereinafter defined).

(C) For the purposes of this Article XI:

1. "Person" shall mean any individual, firm, trust, partnership, association, corporation or other entity.

2. "Substantial Stockholder" shall mean any person (other than any employee benefit plan or trust of the Corporation or any similar entity) who or which:

(a) is the beneficial owner of more than 5% of the combined voting power of the then outstanding Common Stock, the acquisition of any shares of which has occurred within the two-year period immediately prior to the date on which the Corporation purchases any such shares; or

9

(b) is an assignee of or has otherwise succeeded to the beneficial ownership of any shares of Common Stock beneficially owned by a Substantial Stockholder, unless such assignment or succession shall have occurred pursuant to a Public Transaction or any series of transactions involving a Public Transaction and, with respect to all shares of Common Stock owned by such person, has been the beneficial owner of any such shares for a period of less than two years (including, for these purposes, the holding period of the Substantial Stockholder from whom such person acquired shares).

For the purposes of determining whether a person is a Substantial Stockholder, the number of shares of Common Stock deemed to be outstanding shall include shares deemed owned through application of subparagraph 4 below but shall not include any other shares of Common Stock which may be issuable pursuant to any agreement, arrangement or understanding, or upon exercise of conversion rights, warrants or options, or otherwise.

3. "Public Transaction" shall mean any (a) purchase of shares offered pursuant to an effective registration statement under the Securities Act of 1933 or (b) open market purchase of shares on a national securities exchange if, in either such case, the price and other terms of sale are not negotiated by the purchaser and the seller of the beneficial interest in the shares.

4. A person shall be a "beneficial owner" of any Common Stock:

(a) which such person or any of its Affiliates or Associates beneficially owns, directly or indirectly; or

(b) which such person or any of its Affiliates or Associates has (i) the right to acquire (whether such right is exercisable immediately or only after the passage of time) pursuant to any agreement, arrangement or understanding or upon the exercise of conversion rights, exchange rights, warrants or options, or otherwise, or (ii) the right to vote or to direct the voting thereof pursuant to any agreement, arrangement or understanding; or

(c) which is beneficially owned, directly or indirectly, by any other person with which such person or any of its Affiliates or Associates has any agreement, arrangement or understanding for the purpose of acquiring, holding, voting or disposing of any shares of Common Stock.

5. "Affiliate" and "Associate" shall have the respective meanings ascribed to such terms in Rule 12b-2 of the General Rules and Regulations under the Securities Exchange Act of 1934, as in effect on January 1, 1985.

6. "Disinterested Stockholders" shall mean those holders of Common Stock who are not Substantial Stockholders.

7. "Fair Market Price" shall mean the highest closing sale price on the Composite Tape for New York Stock Exchange-Listed Stocks during the 30-day period immediately preceding the date in question of a share of Common Stock or, if such stock is not quoted on the Composite Tape, on the New York Stock Exchange or, if such stock is not listed on such Exchange, the fair market value on the date in question of a share of such stock as determined by a majority of the Board of Directors in good faith.

(D) A majority of the Board of Directors shall have the power and duty to determine for the purposes of this Article XI, on the basis of information known to them after reasonable inquiry, all facts necessary to determine compliance with this Article XI, including without limitation, (1) whether a person is a Substantial Stockholder, (2) the number of shares of Common Stock beneficially owned by any person, (3) whether a person is an Affiliate or Associate of another, (4) whether a price is in excess of the Fair Market Price, (5) whether a purchase constitutes a Public Transaction and (6) such other matters with respect to which a determination is required under this Article XI. The good faith determination of a majority of the Board of Directors on such matters shall be conclusive and binding for all purposes of this Article XI.

(E) Nothing contained in this Article XI shall be construed to relieve a Substantial Stockholder from any fiduciary obligation imposed by law.

10

## ARTICLE XII: DIRECTOR AND OFFICER LIABILITY

To the fullest extent permitted by the laws of the State of New Jersey, as they exist or may hereafter be amended, directors and officers of the Corporation shall not be personally liable to the Corporation or its stockholders for damages for breach of any duty owed to the Corporation or its stockholders, except that the provisions of this Article XII shall not relieve a director or officer from liability for any breach of duty based upon an act or omission (a) in breach of such person's duty of loyalty to the Corporation or its stockholders, (b) not in good faith or involving a knowing violation of law or (c) resulting in receipt by such person of an improper personal benefit.

11

### ARTICLE XIII: DIRECTORS

The number of directors constituting the current Board of Directors of the Corporation is eleven. The names and addresses of said directors are as follows:

| | |
|---|---|
| Lawrence A. Bossidy | 104 West Mountain Road |
| | Ridgefield, Connecticut 06877 |
| William G. Bowen, Ph.D. | 140 East 62nd Street |
| | New York, New York 10021 |
| Johnnetta B. Cole, Ph.D. | 900 East Washington Street |
| | Greensboro, North Carolina 27401-3239 |
| Raymond V. Gilmartin | One Merck Drive |
| | Whitehouse Station, New Jersey 08889-0100 |
| William B. Harrison, Jr. | 270 Park Avenue |
| | New York, New York 10017-2070 |
| William N. Kelley, M.D. | 21 Penn Tower, 3400 Spruce Street |
| | Philadelphia, Pennsylvania 19104-4385 |
| Thomas E. Shenk, Ph.D. | Washington Road |
| | Princeton, New Jersey 08544-1014 |
| Anne M. Tatlock | 600 Fifth Avenue |
| | New York, New York 10020 |
| Samuel O. Thier, M.D. | 55 Fruit Street, Bulfinch 370 |
| | Boston, Massachusetts 02114-2606 |
| Wendell P. Weeks | 1 Riverfront Plaza |
| | Corning, New York 14831 |
| Peter C. Wendell | 2884 Sand Hill Road |
| | Menlo Park, California 94025 |

12

IN WITNESS WHEREOF, Merck & Co., Inc. has caused this Restated Certificate of Incorporation to be duly executed this 28th day of September, 2004.

MERCK & CO., INC.

BY      KENNETH C. FRAZIER

Kenneth C. Frazier

Senior Vice President

and General Counsel

[CORPORATE SEAL]

By      CELIA A. COLBERT

Celia A. Colbert

Vice President, Secretary and

Assistant General Counsel

13

Exhibit 12

MERCK & CO., INC. AND SUBSIDIARIES

Computation Of Ratios Of Earnings To Fixed Charges

($ in millions except ratio data)

| | Nine Months Ended September 30 2004 | Years Ended December 31 | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2003 | 2002 | 2001 | 2000 | 1999 |
| Income from Continuing Operations Before Taxes | $ 6,594.7 | $ 9,051.6 | $ 9,651.7 | $ 9,948.1 | $ 9,362.3 | $ 8,370.1 |
| Add (Subtract): | | | | | | |
| One-third of rents | 60.5 | 75.6 | 67.2 | 64.2 | 55.9 | 55.0 |
| Interest expense, gross | 216.8 | 350.9 | 390.6 | 463.7 | 484.0 | 315.5 |
| Interest capitalized, net of amortization | (14.6) | (30.1) | (36.9) | (66.1) | (99.0) | (61.4) |
| Equity (income) loss from affiliates, net of distributions | (308.5) | 79.2 | (156.1) | (113.7) | (288.3) | (352.7) |
| Preferred stock dividends, net of tax | 110.7 | 150.9 | 164.3 | 199.6 | 205.0 | 120.2 |
| Earnings from Continuing Operations | $ 6,659.6 | $ 9,678.1 | $ 10,080.8 | $ 10,495.8 | $ 9,719.9 | $ 8,446.7 |
| One-third of rents | $ 60.5 | $ 75.6 | $ 67.2 | $ 64.2 | $ 55.9 | $ 55.0 |
| Interest expense, gross | 216.8 | 350.9 | 390.6 | 463.7 | 484.0 | 315.5 |
| Preferred stock dividends | 158.1 | 215.6 | 234.7 | 285.1 | 292.9 | 171.7 |
| Fixed Charges from Continuing Operations | $ 435.4 | $ 642.1 | $ 692.5 | $ 813.0 | $ 832.8 | $ 542.2 |
| Ratio of Earnings to Fixed Charges from Continuing Operations | 15 | 15 | 15 | 13 | 12 | 16 |

For purposes of computing these ratios, "earnings" consist of income from continuing operations before taxes, one-third of rents (deemed by the Company to be representative of the interest factor inherent in rents), interest expense, net of amounts capitalized, equity (income) loss from affiliates, net of distributions, and dividends on preferred stock of subsidiary companies. "Fixed charges" consist of one-third of rents, interest expense as reported in the Company's consolidated financial statements and dividends on preferred stock of subsidiary companies.

Exhibit 31.1

**CERTIFICATION**

I, Raymond V. Gilmartin, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Merck & Co., Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    November 8, 2004

By:     /s/ Raymond V. Gilmartin

RAYMOND V. GILMARTIN
Chairman, President and Chief Executive Officer

Exhibit 31.2

**CERTIFICATION**

I, Judy C. Lewent, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Merck & Co., Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    November 8, 2004

By:    /s/ Judy C. Lewent
       _____

       JUDY C. LEWENT
       Executive Vice President & Chief Financial Officer
        President, Human Health Asia

Exhibit 32.1

**Section 1350**
**Certification of Chief Executive Officer**

   Pursuant to 18 U.S.C. Section 1350, the undersigned officer of Merck & Co., Inc. (the "Company"), hereby certifies that the Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: November 8, 2004                              /s/ Raymond V. Gilmartin
                                                    _____

                              Name:        Raymond V. Gilmartin
                              Title:       Chairman, President and Chief Executive Officer

Exhibit 32.2

**Section 1350**
**Certification of Chief Financial Officer**

Pursuant to 18 U.S.C. Section 1350, the undersigned officer of Merck & Co., Inc. (the "Company"), hereby certifies that the Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2004 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: November 8, 2004                          /s/ Judy C. Lewent
                                                 _____

                            Name:    Judy C. Lewent
                            Title:   Executive Vice President & Chief Financial Officer
                                     President, Human Health Asia