# Exhibit J

Randall M. Fox
OFFICE OF THE ATTORNEY GENERAL
MEDICAID FRAUD CONTROL UNIT
120 Broadway – 13th Floor
New York, New York  10271-0007
(212) 417-5390
*Attorneys for the State of New York*

John R. Low-Beer
OFFICE OF THE CORPORATION COUNSEL
OF THE CITY OF NEW YORK
100 Church Street
New York, New York  10007
(212) 788-1007
*Attorneys for the City of New York*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------- x
THE PEOPLE OF THE STATE OF NEW YORK,  :
by ANDREW M. CUOMO, Attorney General of  :
the State of New York, and THE CITY OF NEW  :
YORK,                                    :          No. 07 Civ. 8434 (GBD)
                                         :
                           Plaintiffs,   :
                                         :
            - against -                  :
                                         :
MERCK  & CO., INC.,                      :
                                         :
                           Defendant.    :
---------------------------------------------------------------- x

**NOTICE OF MOTION BY PLAINTIFFS THE PEOPLE OF THE STATE OF
NEW YORK AND THE CITY OF NEW YORK TO REMAND FOR LACK OF
FEDERAL SUBJECT MATTER JURISDICTION**

PLEASE TAKE NOTICE that, upon plaintiffs' Notice of Motion, the Declaration

of Randall M. Fox and the accompanying Plaintiffs' Memorandum of Law in Support of

Their Motion to Remand for Lack of Federal Subject Matter Jurisdiction, plaintiffs the

People of the State of New York and The City of New York will move this Court in the

United States Courthouse for the Southern District of New York for an Order pursuant to

28 U.S.C. § 1447(c) remanding this action to the New York State Supreme Court for

New York County.


Dated: New York, New York
　　　　October 26, 2007

　　　　　　　　　　　　　　　　　　ANDREW M. CUOMO
　　　　　　　　　　　　　　　　　　Attorney General of the State of New York
　　　　　　　　　　　　　　　　　　Attorney for the State of New York


　　　　　　　　　　　　　　　　　　_____S/_____
　　　　　　　　　　　　　　　　　　RANDALL M. FOX
　　　　　　　　　　　　　　　　　　Special Assistant Attorney General
　　　　　　　　　　　　　　　　　　Medicaid Fraud Control Unit
　　　　　　　　　　　　　　　　　　120 Broadway – 13th Floor
　　　　　　　　　　　　　　　　　　New York, New York  10271-0007
　　　　　　　　　　　　　　　　　　(212) 417-5390

　　　　　　　　　　　　　　　　　　MICHAEL A. CARDOZO
　　　　　　　　　　　　　　　　　　Corporation Counsel of the City of New
　　　　　　　　　　　　　　　　　　York
　　　　　　　　　　　　　　　　　　Attorney for the City of New York


　　　　　　　　　　　　　　　　　　_____S/_____
　　　　　　　　　　　　　　　　　　JOHN R. LOW-BEER
　　　　　　　　　　　　　　　　　　Assistant Corporation Counsel
　　　　　　　　　　　　　　　　　　100 Church Street
　　　　　　　　　　　　　　　　　　New York, New York  10007
　　　　　　　　　　　　　　　　　　(212) 788-1007

Randall M. Fox
OFFICE OF THE ATTORNEY GENERAL
MEDICAID FRAUD CONTROL UNIT
120 Broadway – 13th Floor
New York, New York  10271-0007
(212) 417-5390
*Attorneys for the State of New York*

John R. Low-Beer
OFFICE OF THE CORPORATION COUNSEL
OF THE CITY OF NEW YORK
100 Church Street
New York, New York  10007
(212) 788-1007
*Attorneys for the City of New York*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
THE PEOPLE OF THE STATE OF NEW YORK,        :
by ANDREW M. CUOMO, Attorney General of        :
the State of New York, and THE CITY OF NEW        :
YORK,        :        No. 07 Civ. 8434 (GBD)
        :
                          Plaintiffs,        :
        :
                - against -        :
        :
MERCK  & CO., INC.,        :
        :
                          Defendant.        :
------------------------------------------------------------------ x


**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO
REMAND FOR LACK OF FEDERAL SUBJECT MATTER JURISDICTION**

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ...........................................................................................ii

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND FACTS..............................................................................................2

ARGUMENT ................................................................................................................4

I.      MERCK'S REMOVAL WAS WITHOUT BASIS BECAUSE MERCK FAILED
        TO IDENTIFY *ANY* SPECIFIC ISSUES OF FEDERAL LAW IN ITS NOTICE
        OF REMOVAL .....................................................................................................5

II.     MERCK CAN BE FOUND LIABLE UNDER PLAINTIFFS' CAUSES OF
        ACTION WITHOUT THE NEED TO DECIDE ACTUALLY DISPUTED,
        SUBSTANTIAL ISSUES OF FEDERAL LAW THAT CAN APPROPRIATELY
        BE HEARD BY A FEDERAL COURT....................................................................7

        A.      The Narrow Category of State-Law Cases Necessarily Requiring
                Resolution of Actually Disputed and Substantial Federal Questions .......................7

        B.      Plaintiffs' Claims Are Based on State and Local Law and Do Not Require
                Resolution of Questions of Federal Law ..................................................13

        C.      Remand Should Be Granted in the Interests of Comity and Federalism ..................17

CONCLUSION.............................................................................................................21

## TABLE OF AUTHORITIES

PAGE

**Cases**

*Alaska v. Eli Lilly & Co*., No. 3:06-cv-88 TMB, 2006 U.S. Dist. LEXIS 52783 (D. Alaska July 28, 2006) ...................................................................................................12

*Barash v. Ford Motor Credit Corp*., No. 06-CV-6497 (JFB)(ARL), 2007 U.S. Dist. LEXIS 44641 (E.D.N.Y. June 20, 2007) ..................................................................11

*Barbara v. New York Stock Exchg., Inc.*, 99 F.3d 49 (2d Cir. 1996).....................................10

*Caggiano v. Pfizer, Inc*., 384 F. Supp. 2d 689 (S.D.N.Y. 2005) ............................... 10-11, 15

*Caterpillar Inc. v. Williams*, 482 U.S. 386 (1987)..................................................................5

*County of Santa Clara v. Astra USA, Inc*., 401 F. Supp. 2d 1022 (N.D. Cal. 2005) ..............................17

*Eastern States Health & Welfare Fund v. Philip Morris, Inc*., 11 F. Supp. 2d 384 (S.D.N.Y. 1998)...................................................................................................11, 19

*Elmira Teachers' Ass'n v. Elmira City School Dist*., No. 05-CV06513 CJS, 2006 U.S. Dist. LEXIS 3893, at *17-18 (W.D.N.Y. Jan. 27, 2006)..........................................11

*Empire Healthchoice Assurance, Inc. v. McVeigh*, 126 S. Ct. 2121, 2136 (2006)...............................7, 9

*Fagin v. Gilmartin*, No. 03-2631 (SRC), 2007 U.S. Dist. LEXIS 7256 (D. N.J. Feb. 1, 2007) ...............................................................................................13

*Finance and Trading, Ltd.. v. Rhodia S.A.*, No. 04 Civ. 6083, 2004 U.S. Dist. LEXIS 24148 (S.D.N.Y. Nov. 29, 2004)...........................................................15

*Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for So. Cal.*, 463 U.S. 1 (1983)....................................................................................................4, 5, 7

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg*., 545 U.S. 308 (2005). ...............4, 8-9, 17-18

*Gully v. First National Bank*, 299 U.S. 109 (1936) ..........................................................5, 10

*Haggerty v. Wyeth Ayerst Pharmaceuticals*, 79 F. Supp. 2d 182 (E.D.N.Y. 2000) ...............................13

*Hawaii v. Abbott Labs, Inc*., 469 F. Supp. 2d 842 (D. Hawaii Oct. 27, 2006) ................................12, 13

*In re Methyl Tertiary Butyl Ether Prods. Liability Litig*., 488 F.3d 112 (2d Cir. 2007) ...............................4, 6

*In re Orthopedic "Bone Screw" Prods. Liability Litig.*, 132 F.3d 152 (3d Cir. 1997) ...................................................................................................................4

*In re Pharmaceutical Indus. Average Wholesale Price Litig.*, No. 01-12257-PBS, 2007 U.S. Dist. LEXIS 68193 (D. Mass. Sept. 17, 2007) ...................................19

*In re Zyprexa Prods. Liab. Litig.*, 375 F. Supp. 2d 170 (E.D.N.Y. 2005 ) ...........................16

*Jobs, Training & Servs., Inc. v. East Tex. Council of Gov'ts*, 50 F.3d 1318 (5th Cir. 1995) .........................................................................................................19

*Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375 (1994) ...............................4

*Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804 (1986) ...................................6, 7-8, 18

*Minnesota v. Pharmacia Corp.*, No. 05-1395(PAM/JSM), 2005 U.S. Dist. LEXIS 27638 (D. Minn. Oct. 22, 2005)...............................................................................12

*Missouri v. Mylan Labs, Inc.*, No. 4:06CV603 HEA, 2006 U.S. Dist. LEXIS 32570 (E.D. Mo. May 23, 2006)...............................................................................12

*New York v. Dell*, No. 1:07-CV-0572 (LEK/DRH), 2007 U.S. Dist. LEXIS 77152 (N.D.N.Y. Oct. 16, 2007)............................................................................11, 18

*New York v. Justin*, 237 F. Supp. 2d 368 (W.D.N.Y. 2002) ...................................................11

*New York v. Lutheran Center for the Aging, Inc.*, 957 F. Supp. 393 (E.D.N.Y. 1997) ............................................................................................................ 11, 18-19

*Pennsylvania v. Eli Lilly & Co.*, No. 07-1083, 2007 U.S. Dist. LEXIS 46946 (E.D. Pa. June 26, 2007) ...........................................................................12, 16

*Pennsylvania v. TAP Pharmaceutical Prods., Inc.*, 415 F. Supp. 2d 516 (E.D. Pa. 2005) ...............................................................................................................12

*People v. Brooklyn Psychosocial Rehabilitation Inst.*, 185 A.D.2d 230 (2d Dep't 1992) ...............................................................................................................14

*Rivet v. Regions Bank*, 522 U.S. 470 (1998)..........................................................................4

*Rubin v. Mastercard Int'l*, LLC, 342 F. Supp. 2d 217 (S.D.N.Y. 2004) ...............................11

*Shadie v. Aventis Pasteur, Inc.*, 254 F. Supp. 2d 509 (M.D. Pa. 2003) ...................................13

*South Carolina v. Eli Lilly & Co.*, No. 7:07-18750HMH, 2007 U.S. Dist. LEXIS
   56847 (D. S.C. Aug. 3, 2007) ........................................................................12

*South Carolina v. Jannsen Pharmaceutica, Inc.*, No.6:07-1452-HMH, 2007 U.S.
   Dist. LEXIS 49904 (D.S.C. July 10, 2007) ...............................................12, 15

*State v. Ford Motor Co.*, 74 N.Y.2d 495 (1989) .................................................15

*Texas v. Merck & Co.*, 385 F. Supp. 2d 604 (2005) ...................................... 12-13

*Texas v. Merck & Co.*, No. A-06-CA-232-LY, slip op. (W.D. Tex. May 11, 2006).............................13

*United Food & Commercial Workers Union, Local 919, AFL-CIO v. Centermark
   Prop. Meriden Square, Inc.*, 30 F.3d 298 (2d Cir. 1994)...................................4

*Utah v. Eli Lilly & Co.*, No. 2:07-CV-380 TS, 2007 U.S. Dist. LEXIS 65571 (D.
   Utah Sept. 4, 2007) .......................................................................................11

*Wisconsin v. Abbott Labs*, 390 F. Supp. 2d 815 (W.D. Wis. 2005).....................12

## Statutes & Laws

28 U.S.C. § 1331 ...................................................................................... 5, 20

28 U.S.C. § 1441 ...................................................................................... 5, 20

42 U.S.C. § 1396a(a) ..................................................................................... 19

N.Y. Finance Law § 187 ......................................................................... 15, 20

N.Y. Social Services Law § 145-b ........................................................... 14, 15

N.Y.C. Admin. Code §§ 7-801 ...................................................................... 15

Pub. L. 95-142, § 17 ...................................................................................... 20

Pub. L. 109-171, § 6023 ................................................................................ 20

## PRELIMINARY STATEMENT

Plaintiffs the State of New York and the City of New York hereby submit this Memorandum of Law in support of their motion to remand this action to the New York State Supreme Court, New York County, from which defendant Merck & Co., Inc. ("Merck") has improperly removed it.

Merck's removal of this action presents an easy case for remand because the Notice of Removal does not begin to satisfy the standards that Merck admits apply here.  This action alleges violations solely of state and local law concerning Merck's campaign of misrepresentations, suppression and concealment about its pain medication Vioxx and causing false and fraudulent claims to be submitted to the New York State Medicaid program and the Elderly Pharmaceutical Insurance Coverage program.  The sole ground for federal jurisdiction alleged by Merck in its Notice of Removal is that plaintiffs' claims fit into the narrow subcategory of state and local causes of action asserted that can be resolved *only* by deciding actually disputed and substantial issues of federal law that a federal court can entertain without disturbing the congressionally approved balance of responsibilities between federal and state courts.  Merck did not demonstrate that this subcategory applies here for at least two reasons:

*First*, Merck failed to identify a single specific question of federal law that must be decided in order to determine Merck's liability.  Without claiming such a question, Merck cannot satisfy its heavy burden of demonstrating federal subject matter jurisdiction.  *See* Point I, *infra*.

*Second*, plaintiffs can establish Merck's liability on their state and local law claims without having to resolve any actually disputed and substantial questions of federal law that could appropriately be decided by a federal court.  Plaintiffs' claims are about Merck's fraudulent conduct that was, for example, perpetrated through its army of highly scripted sales representatives, who sought to minimize physicians' concerns about the cardiovascular safety of

Vioxx to patients with established coronary artery disease.  To establish liability under their causes of action, plaintiffs will show that Merck had knowledge of Vioxx's heightened risks to these patients, that Merck embarked on a campaign to minimize the significance of these risks and mislead doctors and consumers about these risks, and that doctors in New York wrote thousands of Vioxx prescriptions for these at-risk patients.  Plaintiffs' causes of action thus involve garden variety state law, not federal law, and do not open the door to federal court.  *See* Point II, *infra*.

## BACKGROUND FACTS

### A.      The State and City's Complaint

Plaintiffs filed their complaint in the Supreme Court of the State of New York on September 17, 2007, seeking to recover from Merck the public and consumer funds spent on Vioxx for patients who had established coronary artery disease.  Plaintiffs asserted six state and local statutory causes of action, claiming violations of the New York Social Services Law, the New York False Claims Act, the New York Executive Law, and the New York City False Claims Act.  As is described more fully in the complaint, plaintiffs' claims are based upon Merck's fraudulent conduct.

Plaintiffs allege that as early as 1997, scientists within Merck expressed their concern about the negative cardiovascular impact of Vioxx, stating that "the possibility of increased CV [cardiovascular] events is of great concern."  (Complaint ¶ 20).  Merck's VIGOR study, completed in 2000, showed that, even though it excluded patients with a predisposition to developing serious cardiovascular problems, Vioxx patients were five times more likely to suffer heart attacks than patients on the pain medication naproxen.  (*Id*. ¶¶ 26, 28).

In its communications to physicians and consumers, Merck sought to minimize the negative information about the cardiovascular effects of Vioxx. One method was to arm its sales representatives with "obstacle responses," which were scripts with which the representatives could overcome the "obstacle" to making sales posed by concerns about the risks of Vioxx. Using these obstacle responses, Merck misrepresented the negative findings about Vioxx and provided misleading information about the drug's cardiovascular safety. (*Id*. ¶¶ 34-53). Merck also sought to silence academic researchers who tried to convey the risks of Vioxx. With respect to at least one professor, Merck scientific personnel thought his presentations were "balanced," but a more senior manager threatened the professor's university with repercussions for "Merck-bashing." (*Id*. ¶¶ 59-64). Merck also engaged in a massive direct-to-consumer advertising campaign that failed to warn consumers about the cardiovascular risks of Vioxx. (*Id*. ¶ 70).

Not until September 2004 did Merck remove Vioxx from the market because of its excessive cardiovascular risk, including increased risk of heart attack and stroke. (*Id*. ¶ 5).

### B.    Merck's Notice of Removal

On September 28, 2007, Merck removed the case to this Court by filing its Notice of Removal (the "Notice"). In the Notice, Merck argued as its sole basis for federal subject matter jurisdiction that federal question jurisdiction exists under 28 U.S.C. §§ 1331 and 1441(b) pursuant to the Supreme Court's decision in *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314-15 (2005).[1]

---

[1] Merck has moved to stay this action, and refused an offer to stipulate to stay only proceedings other than this remand motion. The stay motion is pending before this Court and, as plaintiffs describe more fully in their opposition to the stay motion, the remand motion should proceed so that the threshold question of this Court's jurisdiction can be resolved most efficiently and expeditiously.

## ARGUMENT

This action rests on state and local law and does not give rise to federal subject matter jurisdiction.  Federal courts have limited jurisdiction, and Merck, as the party asserting federal jurisdiction, has the burden of establishing a basis for it in its Notice of Removal.  *In re Methyl Tertiary Butyl Ether Prods. Liability Litig.*, 488 F.3d 112, 124 (2d Cir. 2007) ("*In re MTBE*") ("In determining whether jurisdiction is proper, we look only to the jurisdictional facts alleged in the Notices of Removal."); *United Food & Commercial Workers Union, Local 919, AFL-CIO v. Centermark Prop. Meriden Square, Inc.*, 30 F.3d 298, 301 (2d Cir. 1994) ("defendant has the burden of establishing that removal is proper").  Remand is mandatory if Merck fails to sustain its burden.  *In re Orthopedic "Bone Screw" Prods. Liability Litig.*, 132 F.3d 152, 155 (3d Cir. 1997).  Merck, therefore, must overcome the presumption that this matter properly belongs in state court, and any questions concerning the existence of federal jurisdiction must be resolved in favor of state court jurisdiction.  *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) ("It is to be presumed that a cause lies outside [a federal court's] limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction."  (citations omitted)).

Federal courts are especially cautious in finding federal jurisdiction in a state law enforcement action brought in state court on behalf of the people.  As the Supreme Court has stated, "considerations of comity make us reluctant to snatch cases which a State has brought from the courts of that State, unless some clear rule demands it."  *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for So. Cal.*, 463 U.S. 1, 22 (1983).

Because Merck removed this case claiming subject matter jurisdiction based on the existence of a federal question, jurisdiction is determined by examining the allegations in plaintiffs' complaint.  *See Rivet v. Regions Bank*, 522 U.S. 470, 475 (1998).  "[T]he paramount

policies embodied in the well-pleaded complaint rule [are] that the plaintiff is the master of the

complaint, that a federal question must appear on the face of the complaint, and that the plaintiff

may, by eschewing claims based on federal law, choose to have the case heard in state court."

*Caterpillar Inc. v. Williams*, 482 U.S. 386, 398-99 (1987).  To have federal question jurisdiction

where none appears from the face of the complaint, a "right or immunity created by the

Constitution or laws of the United States must be an element, *and an essential one*, of the

plaintiff's cause of action."  *Franchise Tax Bd.*, 463 U.S. at 10-11 (*quoting Gully v. First Nat'l

Bank*, 299 U.S. 109, 112 (1936)).  That Merck might pursue federal defenses to plaintiffs' claims

cannot serve as a basis for federal question jurisdiction.  *Id.* at 7.

## I.  MERCK'S REMOVAL WAS WITHOUT BASIS BECAUSE MERCK FAILED TO IDENTIFY *ANY* SPECIFIC ISSUES OF FEDERAL LAW IN ITS NOTICE OF REMOVAL

Merck removed this case based on the argument that plaintiffs' claims arise under federal

law pursuant to 28 U.S.C. §§ 1331 and 1441 as described in *Grable*.  According to Merck, "As

the Supreme Court explained in *Grable*, the test for whether a federal court should hear a case

under this doctrine is not whether the federal statute provides a parallel private right of action,

but whether the 'state-law claim necessarily raise[s] a stated federal issue actually disputed and

substantial, which a federal forum may entertain without disturbing any congressionally

approved balance of federal and state judicial responsibilities.'"  (Notice ¶ 10).  Thus, to apply

these standards, a court must examine the elements of the causes of action asserted in plaintiffs'

complaint and determine whether liability can be established only if the Court first resolves

issues of federal law that are actually disputed, substantial and appropriate to be heard in federal

court.

Merck fails to satisfy these standards because it did not identify a single specific issue of

federal law that must be decided for liability to be found here.  Merck was required to set forth

the legal basis for removal in its Notice of Removal. *See In re MTBE*, 488 F.3d at 124 ("In determining whether jurisdiction is proper, we look only to the jurisdictional facts alleged in the Notices of Removal."). Because it failed to identify any specific issues of federal law, the Supreme Court's decision in *Grable* offers no ground for federal jurisdiction and this case must be returned to state court.

Rather than identify any specific issues of federal law, Merck, in its Notice of Removal, merely refers generally to two bodies of federal law -- the Food, Drug & Cosmetic Act ("FDCA") and federal Medicaid law (Notice ¶ 8). Referring to the mere existence of these laws and describing some of their provisions does not amount to setting out the detailed jurisdictional facts required by *Grable*. Merck argues that plaintiffs' claims "directly implicate" (Notice ¶ 8) and are "implicitly and explicitly premised" (Notice ¶ 11) on these federal bodies of law, but it failed to explain why liability under plaintiffs' causes of action can be found only if specific questions under these bodies of federal law are also determined. Arguing merely that claims "implicate" a federal law cannot amount to establishing that liability can be found only by resolving actually disputed, substantial questions of federal law. *See, e.g., Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804, 813 (1986) ("*Merrell Dow*") (describing the "long-settled understanding that the mere presence of a federal issue in a state cause of action does not automatically confer federal question jurisdiction").[2]

---

[2] Merck also claims that the "centrality of food and drug law to the allegations at issue in this matter are [*sic*] evidenced by Plaintiffs' own complaint, which repeatedly cites the FDA oversight of the highly regulated representations at issue in this case." (Notice ¶ 14). Merck cites to paragraphs 2 and 29-30 of the complaint, but any proper reading of those paragraphs demonstrates that Merck does not accurately describe them and they do not show plaintiffs' causes of action to require resolution of disputed, substantial federal issues.

## II.   MERCK CAN BE FOUND LIABLE UNDER PLAINTIFFS' CAUSES OF ACTION WITHOUT THE NEED TO DECIDE ACTUALLY DISPUTED, SUBSTANTIAL ISSUES OF FEDERAL LAW THAT CAN APPROPRIATELY BE HEARD BY A FEDERAL COURT

Even apart from Merck's failure to carry its burden in its Notice of Removal, remand to the state court is warranted because Merck can be found liable under plaintiffs' six state and local law causes of action on the basis of garden variety state law.  The narrow ground for federal question jurisdiction described in *Grable* and many other cases is not applicable to such state and local claims, just as it has not been applicable in the overwhelming majority of other cases, including several cases in which Merck unsuccessfully advanced the same argument.

### A.   The Narrow Category of State-Law Cases Necessarily Requiring Resolution of Actually Disputed and Substantial Federal Questions

*Grable* belongs to a sizeable line of decisions where litigants have sought to invoke federal question jurisdiction by claiming a substantial federal ingredient so as to justify including a case within the federal courts' limited jurisdiction.  The Supreme Court, however, has clearly recognized that the set of cases that can appropriately claim this basis of jurisdiction is a "special and small category."  *Empire Healthchoice Assur., Inc. v. McVeigh*, 126 S. Ct. 2121, 2136 (2006).

In *Franchise Tax Bd.*, 463 U.S. at 1, the Supreme Court concluded that a state's action to recover state tax levies from a plan organized under federal ERISA law did not turn on a question of federal law.  *Id*. at 28.  To fit within federal question jurisdiction, the claim had to be one where "some substantial, disputed question of federal law is a necessary element of one of the well-pleaded state claims, or that the one or the other claim is 'really' one of federal law." *Id*. at 13.

In *Merrell Dow*, the Supreme Court further expounded on the availability of federal question jurisdiction over state law claims.  There, a plaintiff argued it was entitled to a

rebuttable presumption of state law negligence because the defendant drug manufacturer had

misbranded a pharmaceutical product in violation of the FDCA by failing to include on the label

"adequate warning that it was potentially dangerous."  478 U.S. at 806.  The Court granted the

plaintiff's motion to remand because "the mere presence of a federal issue in a state cause of

action does not automatically confer federal question jurisdiction."  *Id*. at 813.  The Court

determined that Congress did not intend to provide access to federal courts where such questions

under the FDCA were involved:  "We simply conclude that the congressional determination that

there should be no federal remedy for violation of this federal statute is tantamount to a

congressional conclusion that the presence of a claimed violation of the statute as an element of a

state cause of action is insufficiently 'substantial' to confer federal-question jurisdiction."  *Id*. at

814.  In *Grable*, the Supreme Court further described the reasoning of *Merrell Dow*.  In the

context of the FDCA, it could hardly be assumed that Congress failed to provide such a right of

action by oversight:

> *Merrell Dow* thought it improbable that the Congress, having made
> no provision for a federal cause of action, would have meant to
> welcome any state-law tort case implicating federal law "solely
> because the violation of the federal statute is said to [create] a
> rebuttable presumption [of negligence] . . . under state law."  478
> U.S., at 811-812, 92 L. Ed. 2d 650, 106 S. Ct. 3229 (internal
> quotation marks omitted).  In this situation no welcome mat meant
> keep out.

*Grable*, 545 U.S. at 319.  Moreover, the *Grable* Court recognized that permitting federal

jurisdiction over such garden variety state tort law claims that reference the FDCA would open

the floodgates:  "A general rule of exercising federal jurisdiction over state claims arising on

federal mislabeling and other statutory violations would thus have heralded a potentially

enormous shift of traditionally state cases into federal court."  *Id*.

*Grable* was a very different case from *Merrell Dow*.  There, the plaintiff was a delinquent taxpayer who brought suit in state court to quite title to land that the IRS had seized from it. Plaintiff argued that the IRS had failed to give proper notice of the seizure under a federal statute.  To be successful on its complaint, plaintiff had to prove that a federal agency failed to give notice in the exact manner required under a federal statute.  Federal question jurisdiction arose because the claim "depended on the interpretation of the notice statute in the federal tax law" and concerned the acts of a federal agency under that law.  *Id*.  In *Grable*, the absence of a federal private right of action was not dispositive because Congress would not have been expected to think that similar actions would "materially affect, or threaten to affect, the normal currents of litigation."  *Id*.  The Court recognized it would not be opening federal courts to a large number of new actions, because, unlike the situation with the FDCA, "it will be the rare state quiet title case that raises a contested matter of federal law, [and] federal jurisdiction to resolve disagreement over federal tax title provisions will portend only a microscopic effect on the federal-state division of labor."  *Id*. at 315.  Finally, while the Court eschewed a "single, precise, all-embracing test for jurisdiction over federal issues embedded in state-law claims," it stated that "the question is, does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities."  *Id*. at 314.  As the Supreme Court later noted, the federal question at issue in *Grable* about the proper notice for seizures under federal law "was both dispositive of the case and would be controlling in numerous other cases."  *Empire*, 126 S. Ct. at 2136 (citations and quotations omitted).[3]

---

[3] In *Empire* there was no federal question jurisdiction where, despite the federal involvement in creating an insurer's rights and obligations and despite that money recovered would be provided

9

Federal courts in New York have repeatedly applied this line of cases to reject efforts to expand federal jurisdiction over cases based on state law.  In *In re MTBE*, the Second Circuit concluded that, despite presence of EPA regulations, the state law environmental injury claims did not give rise to federal question jurisdiction.  Quoting *Gully*, 299 U.S. at 117, the Court stated "The most one can say is that a question of federal law is lurking in the background, just as farther in the background lurks a question of constitutional law, the question of state power in our federal form of government.  A claim so far removed from plain necessity, is unavailing to extinguish the jurisdiction of the states."  *See also Barbara v. New York Stock Exch., Inc.*, 99 F.3d 49, 54 (2d Cir. 1996) (no substantial federal question concerning the Exchange's enforcement of its internal rules even where a federal statute gave the Exchange the authority to regulate plaintiff's conduct, because the internal rules themselves were contractual and therefore interpreted solely under state law).

In *Caggiano v. Pfizer, Inc*., 384 F. Supp. 2d 689 (S.D.N.Y. 2005), the court granted a remand motion in a case similar to plaintiffs' case here.  Plaintiffs there sued a drug manufacturer in state court under state law, claiming the manufacturer had caused a prescription drug to be used for unsafe purposes and had misled doctors and patients as to its safety and effectiveness.  *Id*. at 690.  Unlike the claims here, however, the complaint was "peppered with allegations that defendants violated various federal statutes and regulations."  *Id*. at 690.  The Court found no federal question jurisdiction:

> Here, the factual allegations set forth in the complaint state claims under New York law regardless of whether any federal law has been violated.  Put another way, a jury could find defendants liable on each and every one of the eight claims without being required to determine whether any federal law had been violated.  That facts

---

to the United State Treasury, the contractual dispute arose only under state law and did not give rise to federal subject matter jurisdiction.

> alleged also may constitute violations of federal law (for which
> recovery is being sought in federal court) is neither here nor there.

*Id. See also New York v. Lutheran Ctr. for the Aging, Inc*., 957 F. Supp. 393, 400-401 (E.D.N.Y.

1997) (rejecting claim of federal question jurisdiction for recovery of Medicaid funds improperly

expended in place of federal Medicare funds because, despite the presence of the federal

Medicare program, the basis for liability turned on the interpretation of state law; the fact that the

Medicaid funds "are generally derived from a federal program, or the result of a contract

mandated by federal law will not alter this result").[4]

Other decisions involving state law claims about the marketing and sale of prescription

drugs have overwhelmingly granted remand motions, and rejected arguments that state law

claims gave rise to federal jurisdiction because of the FDCA and federal Medicaid laws. *See,

e.g*., *Utah v. Eli Lilly & Co*., No. 2:07-CV-380 TS, 2007 U.S. Dist. LEXIS 65571 (D. Utah Sept.

4, 2007) (remanding action seeking to recover Medicaid funds from maker of prescription drug

Zyprexa under state False Claims Act because no federal question was essential to resolution of

the state law claims and congressional intent was that federal jurisdiction would not be proper);

---

[4] *See also New York v. Dell*, No. 1:07-CV-0572 (LEK/DRH), 2007 U.S. Dist. LEXIS 77152
(N.D.N.Y. Oct. 16, 2007) (rejecting federal question jurisdiction notwithstanding allegations of
federal credit law violations because "Petitioner's right to relief does not necessarily depend
upon federal law; Petitioner's claims are fully actionable under the state laws asserted"); *Barash
v. Ford Motor Credit Corp*., No. 06-CV-6497 (JFB)(ARL), 2007 U.S. Dist. LEXIS 44641, at
*14-15 (E.D.N.Y. June 20, 2007) (reference to federal law in section of complaint entitled
"Applicable Precedents" did not convert state law claims into ones arising under federal law);
*Elmira Teachers' Ass'n v. Elmira City School Dist*., No. 05-CV06513 CJS, 2006 U.S. Dist.
LEXIS 3893, at *17-18 (W.D.N.Y. Jan. 27, 2006) (no federal jurisdiction over claims that school
district negligently selected administrator of retirement plan created pursuant to federal tax
laws); *Rubin v. Mastercard Int'l*, LLC, 342 F. Supp. 2d 217, 219-21 (S.D.N.Y. 2004) (no
substantial federal question because state law claims alleging failure of credit card company to
disclose credit card fees were actionable under state law irrespective of whether plaintiffs
invoked federal Truth in Lending Act); *New York v. Justin*, 237 F. Supp. 2d 368, 374 (W.D.N.Y.
2002) (use of federal law as "guidepost" for state law claims did not give rise to federal question
jurisdiction); *Eastern States Health & Welfare Fund v. Philip Morris, Inc*., 11 F. Supp. 2d 384,
395 (S.D.N.Y. 1998) (Sotomayor, J.) (New York law cause of action did not require reference to
federal law to answer any of legal questions posited by removing defendants).

*South Carolina v. Eli Lilly & Co.*, No. 7:07-18750HMH, 2007 U.S. Dist. LEXIS 56847 (D. S.C. Aug. 3, 2007) (remanding a Zyprexa case seeking recovery of Medicaid funds); *South Carolina v. Jannsen Pharmaceutica, Inc.*, No.6:07-1452-HMH, 2007 U.S. Dist. LEXIS 49904, at *5 (D.S.C. July 10, 2007) (remanding action seeking recovery of Medicaid funds concerning the prescription drug Risperdal); *Pennsylvania v. Eli Lilly & Co.*, No. 07-1083, 2007 U.S. Dist. LEXIS 46946 (E.D. Pa. June 26, 2007) (remanding Zyprexa case seeking recovery of Medicaid funds); *Hawaii v. Abbott Labs, Inc.*, 469 F. Supp. 2d 842 (D. Hawaii Oct. 27, 2006) (remanding False Claims Act case seeking recovery of Medicaid funds based on fraudulent setting of Average Wholesale Prices ("AWP") of prescription drugs); *Alaska v. Eli Lilly & Co.*, No. 3:06-cv-88 TMB, 2006 U.S. Dist. LEXIS 52783 (D. Alaska July 28, 2006) (remanding Zyprexa case seeking recovery of Medicaid funds); *Missouri v. Mylan Labs, Inc.*, No. 4:06CV603 HEA, 2006 U.S. Dist. LEXIS 32570 (E.D. Mo. May 23, 2006) (remanding action seeking recovery of state funds due to fraudulent setting of AWP); *Minnesota v. Pharmacia Corp.*, No. 05-1395(PAM/JSM), 2005 U.S. Dist. LEXIS 27638 (D. Minn. Oct. 22, 2005) (remanding Medicaid Fraud Act case concerning setting of AWP); *Wisconsin v. Abbott Labs*, 390 F. Supp. 2d 815 (W.D. Wis. 2005) (remanding action seeking recovery of state funds due to fraudulent setting of AWP); *Pennsylvania v. TAP Pharmaceutical Prods., Inc.*, 415 F. Supp. 2d 516 (E.D. Pa. 2005) (remanding AWP case).

Merck itself has in other cases sought to invoke federal question jurisdiction by arguing that state law claims required resolution of actually disputed and substantial issues of federal law.  In those cases, however, Merck's arguments were unavailing and the courts remanded. Most significantly, a case brought by the State of Texas against Merck seeking to recover Medicaid funds spent on Vioxx has been remanded to state court twice.  *Texas v. Merck & Co.*,

385 F. Supp. 2d 604 (2005); *Texas v. Merck & Co*., No. A-06-CA-232-LY, slip op. at 3-4 (W.D. Tex. May 11, 2006) (Exhibit B to the accompanying Declaration of Randall M. Fox, dated October 26, 2007).  Merck first removed the case shortly after receiving the complaint, and the court remanded because the state's causes of action did not depend upon actually disputed, substantial federal questions under the FDCA and federal Medicaid laws.  385 F. Supp. 2d at 604.  Merck removed again when the state "conceded" in a discovery response that its Medicaid funding "is contingent upon the State's compliance with the federal laws, rules and regulations pertaining to Medicaid and is calculated according to federal law."  Slip op. at 3-4.  The court again rejected Merck's argument because "[t]he crux of Texas's action is what Merck said and did in order to convince Texas to add Vioxx to Texas's Medicaid Program," and, even with partial federal funding of the state's Medicaid program, the claims still did not require resolution of actually disputed, substantial federal questions.  *Id*. at 6.[5]

### B.   Plaintiffs' Claims Are Based on State and Local Law and Do Not Require Resolution of Questions of Federal Law

The first step in any analysis under *Grable* and its line of cases is to examine the causes of action asserted, which, as noted in Point I, *supra*, is absent from Merck's Notice of Removal.

---

[5] *See also Fagin v. Gilmartin*, No. 03-2631 (SRC), 2007 U.S. Dist. LEXIS 7256 (D. N.J. Feb. 1, 2007) (remanding for lack of jurisdiction case alleging that Merck leadership engaged in mismanagement by failing to prevent inclusion of co-payment revenue in financials and maintain a system of internal controls to ensure compliance with federal securities laws:  "That a court may be called upon to evaluate the offending conduct in light of what federal securities laws and regulations required does not federalize the claims for unjust enrichment, breach of fiduciary duty and contribution and indemnification.  The claims pled require evaluation of the duties that are at their core defined by state law."); *Hawaii v. Abbott Labs*., 469 F. Supp. 2d at 842 (remanding case after defendants, including Merck, had removed it because defendants failed to show interpretation of term "Average Wholesale Price" under federal law was actually disputed or substantial, rather case rested on tort claims under state tort law); *Shadie v. Aventis Pasteur, Inc*., 254 F. Supp. 2d 509 (M.D. Pa. 2003) (remanding case asserting product liability, negligence and fraud against vaccine manufacturers, including Merck, because liability on state law claims did not necessarily require interpretation of or resort to National Vaccine Injury Compensation Act); *Haggerty v. Wyeth Ayerst Pharmaceuticals*, 79 F. Supp. 2d 182 (E.D.N.Y. 2000) (same).

Applying the case law described above, there is no basis for claiming federal question jurisdiction over plaintiffs' six state and local law causes of action.  Instead, these claims will require the jury to assess Merck's statements about Vioxx through the lens of state and local statutory standards.  These standards are not set by federal law, do not depend upon resolution of actually disputed or substantial issues of federal law, and, as described in the subsection C, *infra*, should be heard in state court as a matter of comity and federalism.

In their first cause of action, plaintiffs allege that Merck violated N.Y. Social Services Law § 145-b.  "Social Services Law § 145-b (2) places personal liability on any individual who 'knowingly by means of a false statement or representation, or by deliberate concealment of any material fact' falsely obtains--or attempts to obtain--public funds, 'on behalf of himself or others.' Where public welfare benefits are obtained fraudulently by an entity . . . the individual supervising, overseeing, performing or conspiring to effectuate the fraudulent acts can be held personally responsible, and is liable for treble damages."  *People v. Brooklyn Psychosocial Rehabilitation Inst.*, 185 A.D.2d 230, 234 (2d Dep't 1992).  To succeed on this claim, plaintiffs will show that Merck knowingly conducted a campaign of misinformation and concealment about the risks of Vioxx to patients with existing coronary artery disease and that tens of millions of public and consumer dollars were spent on Vioxx for these patients.

In their second and third causes of action, plaintiffs allege that Merck violated the New York False Claims Act, N.Y. Finance Law § 187, *et seq*.  Under Section 189(a) (the second cause of action), Merck would be liable for knowingly causing false and fraudulent Medicaid claims to be made for Vioxx prescriptions and refills for the at-risk population of persons with established coronary artery disease.  Under Section 189(b) (the third cause of action), Merck could be liable for knowingly making and causing to be made false records and/or statements to

get false or fraudulent claims paid by plaintiffs.  Plaintiffs will demonstrate that Merck has violated these provisions through, among other things, its communications with doctors and consumers that were false and misleading about the effect of Vioxx on at-risk patients.  The sixth cause of action in the complaint similarly alleges violation of the City's False Claims Act, N.Y.C. Admin. Code §§ 7-801, *et seq.*

In their fourth and fifth causes of action, plaintiffs invoke the power of the Attorney General to remedy the repeated or persistent fraudulent acts of Merck, including the acts violating N.Y. Social Services Law § 145-b and the New York False Claims Act.  Plaintiffs will, again, prove those fraudulent acts by showing that Merck undertook a campaign of misinformation.  *See State v. Ford Motor Co*., 74 N.Y.2d 495, 502 (1989).

Liability under all of these causes of action depends upon matters commonly handled by state courts under state and local law.  Such matters include Merck's level of knowledge and the misleading nature of its statements and omissions.  The court's conclusion in *Caggiano* has equal force here:  "[t]he duties alleged to have been breached here are not creatures of federal law." 384 F. Supp. 2d at 691.  *See also Fin. and Trading, Ltd.. v. Rhodia S.A.*, No. 04 Civ. 6083, 2004 U.S. Dist. LEXIS 24148, at *21 (S.D.N.Y. Nov. 29, 2004) (no substantial federal question because "the right plaintiffs say they wish to vindicate is the right not to be lied to in a fashion that causes reliance and results in financial injury, not the narrower right not to be lied to in connection with a securities transaction regulated by federal law").  As was true in the case *South Carolina v. Jannsen*, 2007 U.S. Dist. LEXIS 49904, at *5, "liability will solely depend on [defendants'] respective breach of duties as defined and created by state law."  *Id*.  Accordingly, there are no issues of federal law that must be decided in this action, let alone actually disputed and substantial ones.

The court in *Pennsylvania v. Eli Lilly* aptly described the inapplicability of federal question jurisdiction to claims such as plaintiffs assert here:

> The Complaint in this case alleges a series of tortuous acts committed by the Defendants with the goal – and result – of increasing submissions of claims for non-medically accepted indications and non-medically necessary uses of each drug. The focus is on the Defendants' alleged "wide-spread fraudulent statements and conduct, and pervasive false and misleading marketing, advertising and promotion of their antipsychotic drugs," as well as the Defendants' alleged failures to warn and affirmative misrepresentations with respect to known dangerous side effects. (Compl. ¶ 62.) To prevail, the Commonwealth must prove that the Defendants' fraudulent promotion of their respective drugs caused false of fraudulent claims to be submitted to Medicaid and PACE for reimbursement, and that the Defendants' failure to provide adequate warnings of known risks caused Commonwealth Medicaid and PACE participants to sustain injuries for which Medicaid and PACE provide treatment. Looked at analytically and closely, no violation of federal law is asserted in the Complaint as a basis for liability.

2007 U.S. Dist. LEXIS 46946, at *10-11. The same reasoning applies to the New York state and local causes of action asserted here.

In its Notice of Removal, Merck points to two cases in support of its claim of federal question jurisdiction, but they are unavailing. *In re Zyprexa Prods. Liab. Litig.*, 375 F. Supp. 2d 170, 172 (E.D.N.Y. 2005 ), involved a state's claims that a drug manufacturer marketed a prescription drug specifically in violation of federal law. That court denied the remand motion based on the claims asserted. In the present action, plaintiffs do not claim that Merck violated federal law, and the *Zyprexa* case is inapplicable. Notable, too, is that this *Zyprexa* decision runs counter to the long list of cases described above, many of which concluded, consistent with *Franchise Tax*, *Merrell Dow*, *Grable* and *Empire*, that more than just references to violations of federal law are required for federal question jurisdiction.

16

Merck also cites to *County of Santa Clara v. Astra USA, Inc*., 401 F. Supp. 2d 1022 (N.D. Cal. 2005). In that case, a county in California claimed that the manufacturers of over-the-counter medications charged prices that exceeded maximum prices allowed by a federal statute and a contract between the federal government and the manufacturers that was explicitly governed by federal common law. The court examined each claim asserted by the county and found that, under each one, liability required a determination of a specific question of federal law: "For this case to be resolved on its merits, at least one of the federal issues embedded in the complaint must be addressed. There is simply no other way." *Id*. at 1025. The claims of plaintiffs in the present action are dissimilar. Plaintiffs do not claim violations of any federal law and are not contractually bound to apply federal common law, rather they base their claims on Merck's misconduct in misleading doctors and consumers about the safety of Vioxx for at-risk patients and they claim violations of state and local law standards.

### C.    Remand Should Be Granted in the Interests of Comity and Federalism

The Supreme Court in *Grable* instructed that the question of whether federal question jurisdiction exists over purely state law claims must, as a matter of comity and federalism, take into account whether "a federal forum may entertain [the case] without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 314. A court's finding that Congress did not intend federal jurisdiction to extend to a type of case is a "veto" of such jurisdiction even when an actually disputed, substantial federal question exists. *Id.* at 313. "This principle is even more relevant when, as here, the case was brought by the State itself." *New York v. Dell*, 2007 U.S. Dist. LEXIS 77152, at *9.

Under *Grable*, a court must look at the contextual clues that reveal whether Congress intended the federal courts to hear the type of state law claim in which a disputed and substantial federal question is embedded. *Id*. at 318-19. *Grable* cited such contextual clues as whether

Congress provided a federal private cause of action to vindicate the federal right or interest and whether the state remedies for violation of the federally created interest are preempted. *Id*. As part of this analysis, a court must also evaluate how extending federal jurisdiction to the type of action at issue would affect the volume of cases filed originally or removed to federal court. *Id*.

In the present action, all of the contextual clues signal the absence of any congressional intent to have cases such as plaintiffs' heard in a federal court. *First*, Congress clearly demonstrated its intent by failing to include a private right of action in the FDCA. The *Grable* Court recognized that, where federal questions are claimed to arise under the FDCA, as in *Merrell Dow*, the absence of a private right of action conclusively demonstrates the congressional intent that claims would be heard by a state court. *Id*. at 319. To rule otherwise would herald "a potentially enormous shift of traditionally state cases into federal court." *Id*. The influx of state law cases into federal court would be enormous, as is evidenced by the 19,100 Vioxx cases against Merck that were pending in state courts as of the end of 2006. *See* Merck 2006 Form 10-k, at 22, http://www.merck/finance/proxy/2006_form_10-k.pdf.[6] The numerous cases cited above that involve claims about other prescription drugs further illustrates that the concern about opening the federal court doors to a huge influx of state law personal injury, fraud and Medicaid cases is real and substantial.

Like the FDCA, the federal Medicaid laws do not provide for a private right of action or a federal ground for liability, thus indicating a congressional intent that jurisdiction remain with state courts. *See Lutheran Center for the Aging*, 957 F. Supp. at 400 ("However, neither the [federal Medicaid] statute nor the regulations provide the grounds for liability. Any basis for liability turns on an interpretation of state law." (internal citations omitted)). Providing federal

---

[6] An additional 8,300 cases were pending in federal court, mostly under diversity jurisdiction. *Id*.

jurisdiction over Medicaid cases would also risk a large influx of state law cases into federal

courts.  If, as Merck asserts in the Notice of Removal (at ¶ 15), the fact that the federal

government provides some funding of state Medicaid programs were sufficient to permit federal

jurisdiction over claims seeking to recover Medicaid funds dissipated through fraud, then tens of

thousands of previously state cases around the country could be filed in or removed to federal

court, even where the allocation of recovered proceeds is not an issue for liability.[7]

*Second*, Congress expressed its intent that suits, such as plaintiffs', to recover Medicaid

funds would be handled under state law and in state courts by expressly delegating to the states

the administration and operation of Medicaid programs.  Most importantly, it delegated to the

states the functions plaintiffs are seeking to carry out in this case:  recovery of ill-gotten

Medicaid funds.  *See* 42 U.S.C. § 1396a(a) (a state Medicaid plan must provide that the state take

reasonable measures to ascertain the legal liability of third parties and seek recovery from them).

"Where a federal statute such as Medicaid requires a state to enforce liability against a third party

but does not provide the ground for liability, nor require establishment of a ground for liability,

federal jurisdiction will not lie."  *Lutheran Center for the Aging*, 957 F. Supp. at 403.

*Third*, Congress expressed its intent by providing strong encouragement for states to

establish Medicaid Fraud Control Units so that the states themselves could pursue the recovery

---

[7] In any event, the mere fact of federal funding does not provide a basis for federal jurisdiction. *See Jobs, Training & Servs. v. East Tex. Council of Gov'ts*, 50 F.3d 1318, 1326-27 (5th Cir. 1995) (court lacked federal question jurisdiction over state law claims involving contract using federal grant money where Congress delegated responsibility to ensure financial responsibility and compliance with federal mandates to state); *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, No. 01-12257-PBS, 2007 U.S. Dist. LEXIS 68193, at *19 (D. Mass. Sept. 17, 2007) (federal government's entitlement to 50% of recovery of Medicaid funds did not "federalize" state law claims); *Eastern States Health & Welfare Fund*, 11 F. Supp. 2d at 391 (federal question of whether plaintiff benefit plans could prove under federal law obligation to pay recovered funds to subrogated plan participants insubstantial in case seeking to impose liability on tobacco companies for medical expenses of plan members).

of Medicaid funds obtained by fraud.  *See* Pub. L. 95-142, § 17 (authorizing funding to, as the

Senate Finance Committee noted, "help establish Medicaid Fraud Control Units patterned after

the successful unit in New York").

> *Fourth*, Congress expressed its intent by providing specific incentives for states to enact

their own False Claims Acts which provide an additional tool for states to recover improperly

obtained Medicaid funds.  *See* Deficit Reduction Act of 2005, Pub. L. 109-171, § 6023 (entitled

"Encouraging the Enactment of State False Claims Acts" and permitting states with such laws to

retain a larger percentage of Medicaid recoveries).  New York enacted its False Claims Act in

April 2007 and plaintiffs have asserted claims under that state law here.  *See* Complaint ¶¶ 82-

93, N.Y. Finance Law §187, *et seq*.

> New York State, in fact, has an enormous interest in pursuing the recovery of Medicaid

funds dissipated by fraud.  Medicaid is the single largest budget item for the State of New York.

*See* 2007-2008 New York State Executive Budget Briefing Book, Program Overview ("If no

action is taken to curb costs, total Medicaid spending in New York will reach $48.7 billion in

2007-08, or nearly 35 percent of the proposed State Budget."), http://publications.budget.state.

ny.us/fy0708littlebook/HealthCare.html.

## CONCLUSION

For all the foregoing reasons, the State and City respectfully request that this Court

remand this case to the New York State Supreme Court for the County of New York.


Dated: New York, New York
      October 26, 2007

ANDREW M. CUOMO
Attorney General of the State of New York
Attorney for the State of New York



                            S/
_____
RANDALL M. FOX
Special Assistant Attorney General
Medicaid Fraud Control Unit
120 Broadway – 13th Floor
New York, New York  10271-0007
(212) 417-5390

MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
Attorney for the City of New York



                            S/
_____
JOHN R. LOW-BEER
Assistant Corporation Counsel
100 Church Street
New York, New York  10007
(212) 788-1007

21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

THE PEOPLE OF THE STATE OF NEW YORK,   :
by ANDREW M. CUOMO, Attorney General of   :
the State of New York, and THE CITY OF NEW   :
YORK,   :     No. 07 Civ. 8434 (GBD)
  :
              Plaintiffs,   :
  :
       - against -   :     **DECLARATION OF**
  :     **RANDALL M. FOX**
MERCK  & CO., INC.,   :
  :
            Defendant.   :

---------------------------------------------------------------- x

        RANDALL M. FOX, declares as follows:

        1.     I am a Special Assistant Attorney General in the Medicaid Fraud Control Unit of the Office of the Attorney General of the State of New York, attorneys for the State of New York.  I am fully familiar with the facts set forth herein.

        2.     Attached hereto as Exhibit A is a true and correct copy of defendant's Notice of Removal, which includes a copy of plaintiffs' Complaint.

        3.     Attached hereto as Exhibit B is a true and correct copy of a slip opinion issued on May 10, 2006, by the United States District Court for the Western District of Texas in the case captioned *Texas v. Merck & Co.*, No. A-06-CA-232-LY.

        I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

                                      S/
                                   RANDALL M. FOX

New York, New York
October 26, 2007

Theodore V. H. Mayer
Vilia B. Hayes
Robb W. Patryk
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004-1482
(212) 837-6000

*Attorneys for Defendant Merck & Co., Inc.*



07 CIV 8434

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - -x
                :

THE PEOPLE OF THE STATE OF NEW YORK, :
by ANDREW M. CUOMO, Attorney General of :    **No.:**
the State of New York, and THE CITY OF NEW :
YORK,                  :

                Plaintiffs, :  **NOTICE OF REMOVAL OF**
                   :  **DEFENDANT MERCK & CO.,**
       -against-      :  **INC.**
                   :
MERCK & CO., INC.,          :
                   :
             Defendant. :

- - - - - - - - - - - - - - - - - - - - - - - - - -x

      PLEASE TAKE NOTICE that Defendant Merck & Co., Inc. ("Merck"), through

undersigned counsel, hereby removes the above-captioned action from the Supreme Court of the

State of New York, County of New York, to the United States District Court for the Southern

District of New York, pursuant to 28 U.S.C. §§ 1331 and 1441.  In support of its removal, Merck

respectfully states as follows:

      1.     This action involves allegations regarding the prescription drug Vioxx®.  An

MDL proceeding, *In re Vioxx Marketing, Sales Practices and Products Liability Litigation,*

MDL No. 1657, has been established in the United States District Court for the Eastern District

of Louisiana (Fallon, J.) for coordinated pretrial proceedings of Vioxx-related actions pursuant to

28 U.S.C. § 1407. Six other suits regarding state Medicaid payments for Vioxx have been filed in Louisiana, Mississippi, Alaska, Montana, Utah, and Colorado and are already pending in that MDL proceeding.[1] Because the subject matter of this suit, which involves Medicaid payments by the State of New York for the drug Vioxx, is the same as the six suits already in the MDL proceeding, Merck likewise will seek the transfer of this action to that MDL.

2.      On September 17, 2007, New York Attorney General Andrew M. Cuomo, on behalf of the People of the State of New York, and the City of New York commenced this action in the Supreme Court of the State of New York, County of New York, against Merck, captioned *The People Of The State Of New York, by Andrew M. Cuomo, Attorney General of the State of New York, and the City Of New York v. Merck & Co., Inc.*, No. 07/406439. A true and correct copy of Plaintiffs' Complaint ("Compl.") is attached as Exhibit A. Merck was served with a copy of the Complaint on September 18, 2007. Accordingly, this Notice of Removal is timely filed pursuant to 28 U.S.C. § 1446(b).

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 112(b), because it is the "district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a).

4.      No previous application has been made for the relief requested herein.

5.      Merck will promptly (a) file a true and correct copy of this Notice of Removal with the Clerk of Court for the Supreme Court of the State of New York, County of New York in accordance with 28 U.S.C. § 1446(d); and (b) serve Plaintiffs' counsel with a true and correct copy of this Notice of Removal, in accordance with 28 U.S.C. § 1446(d).

---

[1]      The five Medicaid actions in the MDL are *Foti v. Merck & Co., Inc.*, No. 05-3700 (E.D. La.) (Louisiana), and *Hood v. Merck & Co., Inc.*, No. 05-6755 (E.D. La.) (Mississippi), *Alaska v. Merck & Co., Inc.*, No. 06-3132 (E.D. La.) (Alaska), *Montana v. Merck & Co., Inc.*, No. 06-4302 (E.D. La.) (Montana); *Utah v. Merck & Co. Inc.*, No. 06-9336 (E.D. La.) (Utah); and *Franklin on behalf of the State of Colorado v. Merck & Co., Inc.*, No. 07-2073 (E.D. La.) (Colorado).

6.      Plaintiffs' six-count complaint alleges that Merck "has engaged in repeated and persistent fraud and has caused false and fraudulent claims to be submitted to the New York State Medical Assistance Program ('Medicaid') and the Elderly Pharmaceutical Insurance Coverage ('EPIC') program by suppressing, misrepresenting and concealing material information in its communications with doctors and patients concerning the seriousness of the cardiovascular risks associated" with Vioxx.  (Compl. ¶ 1.)

7.      Plaintiffs seek to permanently enjoin Merck "from engaging in the type of repeated or persistent fraudulent and unlawful practices" alleged and further seeks an order requiring Merck to pay restitution and damages to all aggrieved consumers and the State of New York.  (Compl., Prayer for Relief.)  Plaintiffs also seek, *inter alia*, treble damages, costs, expenses, attorneys' fees, and "all other relief that is just and proper."  (*Id.*)

8.      This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims directly implicate two areas of federal law:  the Federal Food, Drug & Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, which regulates prescription drug manufacturers' public and promotional statements about prescription drugs; and federal Medicaid law, which determines both which drugs a state must cover under its Medicaid program and the limited circumstances under which it can decline to pay for such drugs.  *See* 42 U.S.C. §§ 1396r-8(d)(1)(B), (d)(4).  Thus, this action may be removed to this Court pursuant to 28 U.S.C. § 1441.

9.      The Supreme Court has recognized that federal question jurisdiction exists over claims that are asserted under state law if the state law claims implicate substantial federal questions.  *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314-15

(2005); *Hopkins v. Walker*, 244 U.S. 486, 489-91 (1917); *County of Santa Clara v. Astra USA, Inc.*, 401 F. Supp. 2d 1022, 1025 (N.D. Cal. 2005).

10.     As the Supreme Court explained in *Grable*, the test for whether a federal court should hear a case under this doctrine is not whether the federal statute provides a parallel private right of action, but whether the "state-law claim necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." 545 U.S. at 314. In *Grable*, the Supreme Court concluded that federal question jurisdiction existed because the plaintiff's state law claim was premised on the failure of a government agency to fulfill its responsibilities as defined by federal law. Accordingly, the interpretation of federal law was essential to resolving the state law claim. *Id.* at 314-15. The same is true here.

11.     ***First***, the claim in this case is implicitly and explicitly premised upon alleged violations of the ***federal*** Food, Drug & Cosmetic Act ("FDCA"), specifically, that Merck illegally promoted an unsafe drug for public use and failed to warn doctors and state regulators of risks in violation of FDCA rules and regulations.

12.     Under the FDCA, the FDA is tasked with approving drugs for human use and determining the necessary warning manufacturers must include with their products. 21 U.S.C. § 393(b). The FDCA charges the FDA to ensure that "drugs are safe and effective" for their intended uses, *id.* § 393(b)(2)(B), in part by "promptly and efficiently reviewing clinical research and taking appropriate action on the marketing of regulated products." *Id.* § 393(b)(1). The FDA is vested with the authority to promulgate regulations to enforce the FDCA, which are codified in the Code of Federal Regulations, 21 C.F.R. § 200 *et seq.*; 21 U.S.C. § 371(a).

13.     To accomplish this mandate, the FDA maintains a Center for Drug Evaluation and Research ("CDER"). The CDER oversees the drug companies' development, testing and research, and manufacture of drugs. The staff of approximately 1,800 examines clinical and other testing data generated by drug companies to assess a drug's benefits against its risks and to make an approval decision. In addition to regulating prescription drug advertising generally, the CDER also oversees the Package Inserts that outline benefit and risk information, and monitors marketed drugs for unexpected health risks that may require public notification, a change in labeling, or removal of the product from the market. Indeed, under federal law, even claims in promotional labeling or advertising must be consistent with approved labeling. 21 C.F.R. § 202.1(e)(4).

14.     The centrality of federal food and drug law to the allegations at issue in this matter are evidenced by Plaintiffs' own complaint, which repeatedly cites the FDA's oversight of the highly regulated representations at issue in the case. *See, e.g.*, Compl. ¶ 2 (noting FDA[2] approval of Vioxx and its relationship to the ability to market Vioxx); *id.* ¶¶ 29-30 (noting the oversight role played by both FDA Advisory Committees and the FDA itself).

15.     ***Second***, Plaintiffs' claim for recovery of monies spent by the State of New York on Vioxx necessarily implicates federal laws and regulations related to Medicaid because it depends on the interpretation and application of federal statutory provisions that govern what can be included in or rejected from state Medicaid formularies, including New York's. In addition, federal funds comprise half of the funds at issue in this lawsuit, i.e., money spent for Vioxx under the New York Medicaid Program, and any health benefits that the State of New York has

---

[2]     While Plaintiffs assiduously avoided referencing the FDA in describing the indications for which Vioxx was "approved" for marketing in 1999, the ability to market a prescription drug such as Vioxx is obviously contingent on approval from that agency.

paid or will pay as a result of alleged Vioxx-related injuries among Medicaid recipients.[3] *See* Compl. ¶ 14 (New York "Medicaid[] is jointly funded by the Federal, State, and local governments").

17.     The federal Medicaid program authorizes federal money grants to states to provide medical assistance to low-income individuals. *See* 42 U.S.C. § 1396 *et seq.*; 42 C.F.R. § 430.10 *et seq.* "Although participation in the program is voluntary, participating States must comply with certain requirements imposed by the [Medicaid] Act and regulations promulgated by the Secretary of Health and Human Services . . . ." *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502 (1990). *See also Westside Mothers v. Haveman*, 289 F.3d 852, 858 (6th Cir. 2002) ("[T]he conditions imposed by the federal government pursuant to statute upon states participating in Medicaid and similar programs are not merely contract provisions; they are federal laws."). In New York, the Medicaid program is administered by the New York State Department of Health, which is required under federal law, 42 U.S.C. § 1396a, to submit a Medicaid plan which attests to the state's compliance with federal statutes and regulations. *See* 42 C.F.R. § 430.10 ("The State plan is a comprehensive written statement submitted by the [state Medicaid] agency . . . giving assurance that it will be administered in conformity with the specific requirements of title XIX, the regulations in this Chapter IV, and other applicable official issuances . . . ."). Moreover, federal law mandates both the eligibility requirements for recipients of medical assistance and the types of medical services that must be provided if a state chooses to administer a Medicaid program. 42 U.S.C. § 1396d. *See also Coe v. Hooker*, 406 F. Supp. 1072, 1079 (D.N.H. 1976) (under the Medicaid program, the federal government "will share with the states

---

[3]     For fiscal year 2004 (October 1, 2003 to September 30, 2004), for example, federal funds accounted for 50% of New York's Medicaid financing. *See Federal Financial Participation in State Assistance Expenditures; Federal Matching Shares for Medicaid, the State Children's Health Insurance Program, and Aid to Needy Aged, Blind, or Disabled Persons for October 1, 2003 Through September 30, 2004*, 67 Fed. Reg. 69,223, 69,224 (Nov. 15, 2002).

the cost of any medical service offered in the state programs so long as the service comes within any of the seventeen enumerated categories of medical care" in § 1396d).

18.     In addition, federal law expressly requires states, subject to certain narrow exceptions, to reimburse FDA-approved prescription drugs of any manufacturer that has entered into and complies with a rebate agreement with the Secretary of Health and Human Services. 42 U.S.C. § 1396r-8. Thus, New York is required under federal law to reimburse companies like Merck for the drugs that it reimburses under its state program if the manufacturer has complied with federal requirements.

19.     Indeed, the sole time that a state can exclude from its formulary an outpatient drug that is covered by a federal rebate agreement is "with respect to the treatment of a specific disease or condition for an identified population . . . only if, based on the drug's labeling . . . the excluded drug does not have a significant, clinically meaningful therapeutic advantage in terms of safety, effectiveness, or clinical outcome of such treatment for such population over other drugs included in the formulary and there is a written explanation (available to the public) of the basis for the exclusion." 42 U.S.C. § 1396r-8(d)(4)(C). But even in such a situation, a state cannot deny coverage altogether; rather, a state must condition such reimbursement on prior authorization, meaning that the state may require that it approve reimbursement before the drug is dispensed. *Id.* § 1396r-8(d)(4)(D). And even a decision to require prior authorization must satisfy federally mandated requirements. *Id.* §§ 1396r-8(d)(5). Thus, every step a state takes with regard to coverage of an FDA-approved drug is subject to strict federal mandates.

20.     To summarize, because New York's Medicaid program operates within this overarching federal statutory and regulatory framework, Plaintiffs' claims alleging that Merck's conduct concerning Vioxx caused the State of New York to spend money on Vioxx and

allegedly Vioxx-related injuries necessarily turns on substantial questions of federal Medicaid law.

21.     Other courts have recognized that federal jurisdiction exists under *Grable* over actions, like this one, in which plaintiffs' state law claims are premised on violations of the FDCA and cases in which plaintiffs seek reimbursement of Medicaid expenditures.  For example, in *In re Zyprexa Products Liability Litigation*, 375 F. Supp. 2d 170 (E.D.N.Y. 2005), the court asserted federal question jurisdiction over state-law claims brought by the state of Louisiana involving a manufacturer's marketing of a prescription drug and the state of Louisiana's payments for that drug under Medicaid, finding that state attorney general's claims involved "a core of substantial issues [that were] federally oriented." *Id.* at 172-73.

22.     Likewise, in a recent case involving Medicaid drug pricing, the court in *County of Santa Clara* held that federal jurisdiction was proper under *Grable* because the plaintiff's state law claims against pharmaceutical manufacturers for allegedly overcharging plaintiff for Medicaid drugs presented substantial questions of federal law.  *County of Santa Clara v. Astra USA, Inc.*, 401 F. Supp. 2d 1022, 1031 (N.D. Cal. 2005).  In concluding that the Medicaid drug pricing issues merited federal jurisdiction, the court observed that one measure of evaluating substantiality is "the importance of the federal issue," and noted that "[u]nder this approach, the following issues have been found to be substantial: those that directly affect the functioning of the federal government, those in an area reserved for exclusive federal jurisdiction, and those that impact a complex federal regulatory scheme." *Id.* at 1027.

23.     In short, Plaintiffs' claims here implicate two complex federal regulatory schemes:  the federal FDCA and federal Medicaid law.  Accordingly, as in *Grable, Zyprexa*, and *Astra USA*, Plaintiffs' allegations will necessarily require the Court to address substantial

questions of federal law, and the Court therefore has federal question jurisdiction over this matter.

    24.    WHEREFORE, Defendant Merck respectfully removes this action from the Supreme Court of the State of New York, County of New York, to this Court pursuant to 28 U.S.C. § 1441.

DATED:    New York, New York
                September 28, 2007

                        Respectfully submitted,

                        HUGHES HUBBARD & REED LLP

                        By:  *Vilia B. Hayes*

                            Theodore V. H. Mayer
                            Vilia B. Hayes
                            Robb W. Patryk

                        One Battery Park Plaza
                        New York, New York 10004-1482
                        (212) 837-6000

                        *Attorneys for Defendant Merck & Co., Inc.*

# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

```
WCS&R
SEP 19 2007
RECEIVED
```

------------------------------------------------------------ x
THE PEOPLE OF THE STATE OF NEW YORK,          :
by ANDREW M. CUOMO, Attorney General of       :
the State of New York, and THE CITY OF NEW     :
YORK,                                          :
                                               :
                              Plaintiffs,      :
                                               :          COMPLAINT
            - against -                        :          Index No. 07/406439
                                               :
MERCK  & CO., INC.,                            :
                                               :
                              Defendant.       :
------------------------------------------------------------ x

TO:  THE SUPREME COURT OF THE STATE OF NEW YORK

     The People of the State of New York, by their attorney, Andrew M. Cuomo, Attorney

General of the State of New York, and The City of New York, by its attorney, Michael A.

Cardozo, Corporation Counsel of the City of New York, allege the following upon information

and belief:

## PRELIMINARY STATEMENT

     1.     Merck & Co., Inc. ("Merck") is a pharmaceutical manufacturer with

pharmaceutical sales of billions of dollars each year.  Merck has engaged in repeated and

persistent fraud and has caused false and fraudulent claims to be submitted to the New York State

Medical Assistance Program ("Medicaid") and the Elderly Pharmaceutical Insurance Coverage

("EPIC") program by suppressing, misrepresenting and concealing material information in its

communications with doctors and patients concerning the seriousness of the cardiovascular risks

associated with Merck's drug Vioxx (rofecoxib).

M00B942835

2.      Merck began to market Vioxx in 1999.  Vioxx is a non-steroidal anti-inflammatory drug ("NSAID") of a type known as COX-2 inhibitors.  It was initially approved to treat the symptoms of osteoarthritis, acute pain in adults, and dysmenorrhea (painful menstruation), and was eventually indicated for rheumatoid arthritis, migraine headaches, and juvenile rheumatoid arthritis.  Between 1999 and 2003, over 90 million prescriptions for Vioxx were dispensed in the United States.

3.      New York Medicaid and EPIC have paid over $100 million for Vioxx since it entered the market in 1999.  Tens of millions of these dollars were paid for Vioxx prescriptions and refills for patients with pre-existing cardiovascular risk factors.

4.      Between 2001 and 2004, New York consumers spent millions of dollars on Vioxx.

5.      Merck withdrew Vioxx from the market in September 2004 because of its excessive cardiovascular risks, including the increased risk of heart attack and stroke.  Merck stated that it had concluded that the withdrawal was "the responsible course to take."

6.      Before removing Vioxx from the market, Merck undertook a concerted and tenacious campaign of false and fraudulent statements to minimize the import and seriousness of any reports about the possible association between Vioxx and serious cardiovascular events, especially myocardial infarction ("heart attacks").

7.      Merck tried to distort each negative disclosure about Vioxx.  Its responses, aimed at doctors and consumers, misrepresented the true picture of the danger to patients who took Vioxx, especially the danger posed to patients with established coronary artery disease.  Merck cherry-picked the outcomes from its own research, omitting material information that would have communicated Vioxx's real cardiovascular dangers.

M00B942836

8.      As a result of Merck's disinformation campaign, which continued until just one month before Merck withdrew Vioxx from the market, New York physicians wrote and continued to write prescriptions for Vioxx that they otherwise would not have written, specifically for patients with established coronary artery disease.  Absent Merck's disinformation campaign, those consumers would not have purchased and taken Vioxx, and third-party payors, including Medicaid, would not have paid for Vioxx.

9.      The Attorney General of the State of New York and the City of New York bring this action to prevent Merck from engaging in similar fraudulent and deceptive conduct in the future and to obtain damages and restitution for the consumers and government agencies defrauded by Merck, as well as penalties and costs.

### JURISDICTION AND PARTIES

10.     Andrew M. Cuomo is the Attorney General of the State of New York.  He is authorized to institute all actions and proceedings in which the State is interested, N.Y. Executive Law § 63(1); to seek an order that enjoins repeated or persistent fraudulent or illegal business acts or practices and awards damages and restitution for such acts, N.Y. Executive Law § 63(12); to recover treble damages for overpayments of public funds obtained by means of false statements or other fraudulent schemes, N.Y. Social Services Law § 145-b(2); and to recover three times the amount of damages sustained by the state on account of Merck's false statements along with civil penalties of between $6,000 and $12,000 per violation pursuant to the New York False Claims Act, N.Y. Finance Law §§ 189, 190(1).

M00B942837

11.     Plaintiff the City of New York, is a municipal corporation organized pursuant to the laws of the State of New York.  During the relevant time period, New York State's Medicaid plan required that local social services districts, such as the City, pay one half of the costs for drugs covered by Medicaid, after first deducting the federal share.  N.Y. Soc. Serv. L. § 368-a. The federal share is generally 50 percent of the cost, leaving the remaining 50 percent to be split equally between the State and the City.

12.     Merck, a New Jersey corporation, is a pharmaceutical manufacturing and sales company with headquarters at 1 Merck Drive, Whitehouse Station, New Jersey.  Merck regularly conducts business within the State of New York and derives substantial revenues from goods consumed in New York.

13.     Venue is proper in this court under N.Y. CPLR § 503.

## FACTUAL ALLEGATIONS

**A.      The Medicaid and EPIC Programs**

14.     The Medical Assistance Program in New York State, commonly referred to as Medicaid, is jointly funded by the Federal, State, and local governments, and was created to provide medical assistance and other benefits for low-income individuals and families.  Medicaid reimburses medical care, services, and supplies which are medically necessary and appropriate, consistent with quality of care and generally accepted professional standards.  Prescription drugs are included among the supplies and services reimbursed by Medicaid.  In New York State, the Medicaid Program is administered by the New York State Department of Health.

15.     EPIC is a voluntary New York State-funded and state-administered program that provides prescription drug coverage to lower income consumers who are 65 years of age or older and are not eligible for full Medicaid coverage.  Individuals who choose to participate in the

-4-

M00B942838

program must pay a copayment for each drug purchased based on the price charged for the drug, with the remaining costs being reimbursed by the program.

**B.      Merck's Aggressive Promotion of Vioxx Despite Its Cardiovascular Risks**

16.      In May 1996, Merck announced that it was developing a selective COX-2 inhibitor, publicizing it as a miracle drug for arthritis sufferers. At the time, Merck faced patent expirations on three of its ten most successful drugs – Mevacor, Pepcid, and Prilosec – which represented approximately $4 billion a year in U.S. drug sales. At the same time, Merck faced significant competitive threats from pharmaceutical manufacturers Monsanto and Pfizer, which were, in combination, developing a competitive selective COX-2 inhibitor, Celebrex, scheduled to hit the market months ahead of Merck's COX-2 inhibitor, Vioxx.

17.      In 1996, Merck announced the initiation of clinical trials for Vioxx. Ultimately, Merck proposed a large-scale, long-term, double-blind study of gastrointestinal toxicity in patients taking Vioxx. This study, called the Vioxx Gastrointestinal Outcome Research ("VIGOR"), was designed specifically to demonstrate the gastrointestinal superiority of Vioxx as compared to another NSAID, naproxen.

18.      In the planning stages of VIGOR, Merck suspected that Vioxx might cause cardiovascular problems. On November 21, 1996, an internal Merck memorandum suggested that, because participants in trials would not be permitted to use aspirin during the study to moot the cardiovascular risks of Vioxx "there is a substantial chance that significantly higher rates" of cardiovascular problems would be seen in Vioxx patients.

19.      On February 25, 1997, Merck scientist Briggs Morrison sent an internal e-mail about the design of the VIGOR study. In that e-mail, Morrison suggested that trial participants be allowed to take aspirin to avoid flagging the cardiovascular risks of Vioxx. Unless patients in the

-5-

M00B942839

Vioxx group could take aspirin, he warned, "without COX-1 inhibition [i.e., aspirin] you will get more thrombotic events and kill drug [sic]."

20.     Merck researcher Alise Reicin, now a Merck Vice President for clinical research, responded in an internal Merck e-mail that Merck was in:

> . . . a no win situation! The relative risk of [adverse GI events with] even low dose aspirin may be high as 2-4 fold. Yet, the possibility of increased CV events is of great concern (I just can't wait to be the one to present those results to senior management!). What about the idea of excluding high risk CV patients – i.e. those that have already had an MI, CABG, PTCA? This may decrease the CV event rate so that a difference between the two groups would not be evident. The only problem would be – Would we be able to recruit any patients?

21.     Despite the concerns about cardiovascular risks, from 1996 through 1998, Merck issued public statements that touted the efficacy and gastrointestinal safety of Vioxx. Merck's pre-release marketing campaign conveyed the uniform message that Vioxx provided safe and effective pain relief while omitting any mention of cardiovascular risks.

22.     Merck galvanized its army of sales representatives. In the Merck's 1998 Annual Report, CEO Raymond Gilmartin wrote that "[i]n 1998, to prepare for the introduction of Vioxx, as well as to meet other marketing challenges, we began adding 700 new and talented professional representatives to our already strong U.S. sales force." In fact, during the time period at issue in this complaint, Merck assigned over 3,000 sales representatives across the country to engage in face-to-face discussions with physicians about Vioxx.

23.     Merck also had a huge budget for targeting consumers. In 2000, Merck spent nearly $161 million on direct-to-consumer advertising for Vioxx — more than PepsiCo spent to advertise Pepsi Cola. Over the next few years, until it withdrew Vioxx from the market, Merck spent an unprecedented $100 million a year to continue to market Vioxx directly to consumers.

M00B942840

24.     Merck marketed the drug by attempting to increase public demand by convincing consumers and medical professionals of Vioxx's purported superior safety profile – and effectiveness. Merck's message was clear:  Vioxx provided gastrointestinal benefits while being as safe and effective as traditional NSAIDs.

## C.     A Merck Study Shows the Increased Cardiovascular Risk of Vioxx

25.     In 2000, Merck completed the VIGOR study.  This study had a large scale (over 8,000 patients), and a relatively long duration (median duration nine months).  The focus of the study was whether patients with rheumatoid arthritis would experience fewer serious gastrointestinal problems with Vioxx as compared to naproxen, a generic pain reliever included in the over-the-counter product Aleve.

26.     The final data from VIGOR showed that Vioxx posed a substantial increase in cardiovascular risk over naproxen.  Although VIGOR excluded patients with a predisposition to developing serious cardiovascular problems, forty-five patients in the study, after taking Vioxx, suffered confirmed serious cardiovascular thrombotic adverse events, including cardiac events (sudden death, heart attack and unstable angina), cerebrovascular events (ischemic stroke and transient ischemic accident) and peripheral arterial and venous events, as compared to only nineteen patients in the study who took naproxen.

27.     Neither VIGOR nor earlier studies conducted by Merck (the "osteoarthritis studies") were designed to assess the cardiovascular effect of Vioxx and other NSAIDs.  Because VIGOR was a particularly robust study in number of patients and duration, well-grounded conclusions concerning the cardiovascular effects of Vioxx could be drawn from the study. VIGOR enrolled more patients than in all of the prior osteoarthritis studies combined.  VIGOR's median duration (9 months) was considerably longer than the length of the osteoarthritis studies (more than three-fourths of the patients in these studies were enrolled for either six weeks or six

-7-

M00B942841

months). VIGOR also included a blinded, expert adjudication to confirm the nature and seriousness of all cardiovascular-related adverse events, while the earlier osteoarthritis studies did not.

28.     The results of the VIGOR study showed that the relative risk of serious cardiovascular thrombotic events from Vioxx as compared to naproxen was highly statistically significant at the .002 level. Statistical significance in medical research defines a probability value of 0.05 or less as significant, that is, the likelihood that the results could have occurred by chance is 5% or less. The .002 level means that the relative incidence of heart attacks as between Vioxx and naproxen would only be expected to occur by chance two times in a thousand instances. When all the heart attacks are compared between the Vioxx and naproxen groups, the patients taking Vioxx had five times the risk of having a heart attack compared to patients taking naproxen.

29.     An FDA Medical Review dated February 1, 2001, was presented to an FDA Advisory Committee which met on February 8, 2001, to consider the benefits and risks of Vioxx ("February 2001 Advisory Committee"). Advisory Committees made up of non-agency experts review technical materials presented by the FDA, pharmaceutical manufacturers and others concerning a particular issue in connection with a specific drug or class of drugs and make recommendations on these issues to the FDA. The Medical Review concluded that Merck's own analysis of cardiovascular adverse events from VIGOR "could lead one to conclude that naproxen, with a 51% risk reduction compared to rofecoxib [Vioxx] could be the <u>preferred</u> drug." (Emphasis in original.)

30.     The February 2001 Advisory Committee found that physicians needed clear information, including the data from VIGOR, about Vioxx's serious cardiovascular risks in order to make appropriate treatment judgments for their patients. The FDA concurred in this judgment.

-8-

MOOB942842

31.     In March 2001, Merck filed a patent application for a combination of Vioxx with a thromboxane synthase inhibitor, which helps protect against cardiovascular problems caused by blood clots.

32.     Had they been provided with an accurate analysis of the level of statistical significance or relative risk associated with Vioxx, physicians would not have prescribed Vioxx to patients with established coronary artery disease.

**D.**     **Merck Minimized Vioxx's Cardiovascular Risk Through a Campaign of Suppression and Misrepresentation**

33.     Beginning no later than April 2000, and continuing almost until Vioxx was pulled from the market in 2004, Merck engaged in a campaign to suppress, misrepresent, and conceal adverse cardiovascular data concerning Vioxx, including adverse data from VIGOR, in its communications to doctors and consumers, including New York doctors and consumers.  Merck maintained this consistent pattern of fraudulent and deceptive conduct, which minimized the cardiovascular risk posed by Vioxx, in order to keep doctors prescribing this medication and to induce consumers to ask their doctors for it.  Described below are examples of Merck's conduct that comprised its on-going pattern of deceptive, fraudulent and illegal conduct.

> Merck Required its Sales Representatives to Misrepresent VIGOR's Negative Cardiovascular Data and Minimize Vioxx's Risk When Responding to Doctors' Questions

34.     Merck undertook a campaign to counter each new revelation or analysis of the VIGOR cardiovascular data by providing doctors with distortions of those data.  Until shortly before Vioxx was removed from the market in 2004, Merck directed all of its sales representatives with responsibility for selling Vioxx ("sales reps") to provide misinformation to doctors who asked questions about the negative cardiovascular safety information from VIGOR.

M00B942843

35.     Merck called these directives to its sales reps "Obstacle Responses." These directives included scripts the sales reps were required to follow to overcome the "obstacles" to Vioxx sales created by descriptions of VIGOR's negative cardiovascular findings in medical journals and the press. The Obstacle Responses directed the sales reps not to deviate from Merck's script or to go beyond the limited information set out in the Obstacle Response when responding to doctors' concerns.

36.     Using these Obstacle Responses, Merck successfully barraged doctors with its message that Vioxx was safe for patients without regard to whether they had a history of adverse cardiovascular events, thereby increasing the likelihood that doctors would hear the same misleadingly selective information during multiple sales calls.

37.     Each of Merck's Obstacle Responses and similar communications, which were national in application, were transmitted to Merck's New York sales reps. Merck's New York sales reps, in turn, communicated the information Merck designated, and only that information, to New York doctors who treated New York patients.

38.     In an April 28, 2000 Obstacle Response, Merck directed its sales reps to use a newly developed "Cardiovascular Card" to "respond to questions [from physicians] about the cardiovascular effects of VIOXX." However, this Cardiovascular Card was misleading to physicians because it contained no information from VIGOR. It dealt only with the much smaller scale, shorter duration, less rigorous osteoarthritis studies. The Cardiovascular Card, therefore, was intended to divert doctors' attention, and did divert their attention, from VIGOR's negative results to the less valid, but far more favorable, cardiovascular safety data from the osteoarthritis studies.

39.     Merck also provided its sales reps with a "Roadmap to the CV Card." In the "Roadmap," Merck instructed its sales reps "[t]o ensure that the physician agrees that the

-10-

MODB942844

cardiovascular events seen with VIOXX in OA [osteoarthritis] clinical trials were low and similar to diclofenac and nabumetone [two other NSAIDs]." This sales presentation did not use valid comparisons or address VIGOR's finding of Vioxx's increased cardiovascular risks.

40.    In another Obstacle Response dated May 1, 2000, Merck directed sales reps to respond to doctors' questions about Vioxx's cardiovascular risks, by giving only the percentage of patients in the Vioxx and naproxen groups in VIGOR who had had a heart attack (.5 percent and .1 percent, respectively), and omitting material facts:  the number of patients enrolled in the study (over 8,000); the number of patients who had had a heart attack; and a measure of either the high statistical significance of these findings or the relative risk (a five-fold increase for Vioxx if all the patients who had a heart attack were counted).  The sales reps were also told to guide the doctor through less valid and more favorable data from the osteoarthritis studies described on the Cardiovascular Card.

41.    On May 22, 2001, citing the cardiovascular data from VIGOR, The New York Times published an article that led with the sentence, "Doctors are beginning to worry that Vioxx and Celebrex, two wildly popular arthritis drugs, may not be as safe as they were initially believed to be." On May 24, 2001, Merck sent its sales reps an Obstacle Response addressing this article.  Again, Merck directed its sales reps to limit their answers to doctors' questions about VIGOR to the percentage of Vioxx and naproxen patients in VIGOR who had had a heart attack.

42.    The sales reps were instructed to use their Cardiovascular Cards to show the data from the osteoarthritis studies.  They were directed to tell doctors that the incidence of heart attack in these smaller, generally shorter studies was less than 0.01 percent with Vioxx and that cardiovascular mortality in 6,000 patients (without identifying the studies, which appear to have been the osteoarthritis trials) was Vioxx 0.1, NSAIDs 0.8 and placebo 0.  A doctor hearing this generalized and conclusory information, as opposed to the actual findings of VIGOR, would be

-11-

MODB942845

unable to determine the relative cardiovascular risk posed by Vioxx compared to naproxen. Nor could this minimized extract of VIGOR's cardiovascular outcomes give a doctor sufficient information to evaluate the relative strength of the findings of the VIGOR and osteoarthritis studies based on their size and design.

43.     On August 21, 2001, Merck communicated to all sales reps responsible for selling Vioxx in response to an article in the Journal of the American Medical Association ("JAMA"), a well regarded, widely read, peer-reviewed journal, which analyzed the cardiovascular data from VIGOR. The JAMA article reported that the incidence rate of serious cardiovascular thrombotic events in the Vioxx group, compared to the naproxen group, was highly statistically significant. The article compared the incidence of heart attacks among the VIGOR Vioxx group to the rate of heart attacks suffered by patients receiving a placebo in a very large meta-analysis and found it was statistically significant. The authors urged doctors to exercise caution in prescribing Vioxx for patients at risk of cardiovascular disease.

44.     In its August 21, 2001 communication, Merck directed its sales reps when responding to questions doctors might raise concerning the JAMA article to use the May 1, 2000 Obstacle Response, which limited its information about the VIGOR study to the percent of patients in the Vioxx and naproxen groups who had had a heart attack.

45.     Merck's message to doctors was unequivocal: Merck had the data it needed to evaluate Vioxx's cardiovascular risk, and its data "suggest[ed] that there is no increase in the risk of cardiovascular events as a result of treatment with Vioxx." This statement was based on data from a purported internal Merck meta-analysis involving 28,000 patients, though the supporting data were not publicly available. The only data from VIGOR included in Merck's response to the JAMA article was the same information previously given concerning the <u>percentage</u> of VIGOR subjects who suffered heart attacks.

-12-

M00B942846

46.     Merck also informed its sales reps, and by extension prescribing doctors, that the difference in the rate of heart attacks between Vioxx and naproxen patients "is consistent with the ability of naproxen to inhibit platelet aggregation," i.e., that naproxen acts in a manner similar to aspirin to prevent the blood from clotting and causing thromboses.  There were, however, no adequate studies to support this hypothesis, and the magnitude of the effect Merck claimed for naproxen's supposed anti-platelet properties exceeded that seen in the literature for any other anti-platelet agents.

47.     Merck also issued a "General Bulletin" sometime after September 17, 2001, which instructed its sales reps to respond to doctors' questions concerning the cardiovascular outcomes from VIGOR, and specifically, the higher rate of heart attacks for Vioxx than naproxen, by refusing to discuss VIGOR because it was not reflected on the label.  Instead sales reps were to show doctors the results from the osteoarthritis studies, the same studies that were on the Cardiovascular Card.

48.     On September 17, 2003, Merck issued another Obstacle Response directing how its sales reps were to respond to doctors' questions about an abstract presented at the 2003 annual meeting of the American College of Rheumatology.  The abstract concerned a study funded jointly by Merck and Harvard University which showed that (a) the use of Vioxx increased the adjusted relative risk of cardiovascular events over the use of Celebrex, a competing NSAID, or no NSAID, (b) the most common dosage of Vioxx was associated with the highest risk, and (c) the risk may be highest in the first ninety days of Vioxx treatment, which could adversely affect new prescriptions and new sales.  The Obstacle Response directed the sales reps to respond to questions about the cardiovascular findings in the 2003 abstract by stating:  "First, Doctor, let me say that based on all of the data that are available, Merck stands behind the overall efficacy and safety profile of Vioxx."  This statement was misleading because it suggested that Merck had a

-13-

M00B942847

valid basis for believing in the cardiovascular safety of Vioxx and that the doctor need not worry about the potential for increased serious cardiovascular thrombotic adverse events in prescribing Vioxx for patients, including patients with established coronary artery disease.

49.     The Obstacle Response warned sales reps not to deviate from Merck's script and directed the sales reps to say, "Doctor, let me review the cardiovascular effects section of the VIOXX label," but omitted material elements of the label.  It mentioned the total number of patients in the study (Vioxx and naproxen groups combined, preventing the doctor from making even a gross assessment of relative risk), the median age of the patient population and duration of the study, the raw number of cardiovascular thrombotic events for the two treatment groups, and the number of deaths in each group due to cardiovascular thrombotic events along with the assertion that these mortality data were "similar between the treatment groups."  The Obstacle Response omitted material information from the Vioxx label, such as:

- VIGOR excluded patients with a predisposition to developing serious cardiovascular problems;

- VIGOR showed a statistically significant greater incidence of serious cardiovascular events in Vioxx patients as opposed to naproxen patients largely due to a difference in the incidence of heart attacks between the groups; and

- the information about VIGOR, as well as two other studies, "should be taken into consideration and caution should be exercised when VIOXX is used in patients with a medical history of ischemic heart disease."

Moreover, the Obstacle Response pointedly omitted any mention of heart attacks.  A physician needed to consider all of these omitted data, as well as the FDA's conclusions and cautions, to exercise sound professional judgment about whether to prescribe Vioxx to a patient with established coronary artery disease.

50.     Barely one month before Merck pulled Vioxx from the market, it issued its final Obstacle Response on August 26, 2004, in response to a presentation of information from a

-14-

M00B942848

massive observational study of Vioxx's cardiovascular safety at the August 2004 International Society for Pharmacoepidemiology Conference. This study estimated that Vioxx had contributed to 27,785 acute heart attacks and sudden cardiac deaths among Americans who had taken the drug between 1999 and 2003. The August 26, 2004 Obstacle Response varied little from the one Merck issued in September 2003, other than the addition of the statement that, "Based on all of the available data, VIOXX remains an excellent choice for your appropriate patients." But Merck did not identify which patients were inappropriate for VIOXX or indicate that additional information was available on which the physician could base that decision.

51.     The 2004 Obstacle Response instructed the sales reps to tell doctors that the Vioxx label says the number of "cardiovascular thrombotic events" (forty-five for Vioxx and nineteen for naproxen) was "largely due to nonfatal myocardial infarction (18 vs. 4)." (Emphasis added.) This statement misrepresents the information contained on the cited Vioxx label in at least two respects. First, the label states that these patients suffered "serious cardiovascular thrombotic events" (emphasis added), not just any cardiovascular thrombotic event. Second, the label states that the rate of serious cardiovascular thrombotic events was largely due to "myocardial infarction," not "non-fatal myocardial infarction" as the Obstacle Response asserts. Merck's statement also omits the heart attacks that killed two patients taking Vioxx and falsely implies that patients in VIGOR experienced only non-fatal heart attacks.

52.     Through its systematic dissemination to doctors of very carefully edited cardiovascular risk information from the VIGOR study, Merck set out to divert physicians' attention from source information in the VIGOR study or the label and concealed the impact of the valid information about Vioxx's real cardiovascular risk, especially the risk to patients with established coronary artery disease.

-15-

M00B942849

53.     Merck's New York sales reps received all of the company's Obstacle Responses concerning Vioxx and other communications about how to respond to doctors' questions relating to the cardiovascular safety profile of Vioxx.  Merck's New York sales reps communicated the messages contained in those documents to New York doctors in accordance with the company's instructions and directions described above.

### Merck's Suppression of VIGOR's Negative Cardiovascular Data in Professional Presentations to Medical Audiences

54.     Merck also misrepresented the incidence of heart attacks suffered by Vioxx patients in the VIGOR study in a November 2000 article that had two Merck employees among its authors and was published in the highly regarded, widely circulated, peer-reviewed, professional journal New England Journal of Medicine ("NEJM").

55.     In March 2000, Merck received data from VIGOR showing that twenty Vioxx patients had suffered heart attacks thus far in the study, while only four naproxen patients had had heart attacks during the same period.  Initially, the draft of the article concerning VIGOR contained a table entitled "CV" events showing numbers of heart attacks.  However, two days before the article was submitted to the NEJM, the data was deleted, and the draft was submitted with a blank table.  Later drafts, and the final article, reported only seventeen of the twenty heart attacks among the Vioxx patients in the VIGOR study.

56.     Thus, though the two Merck employees who were authors of the article were aware of the additional three heart attacks among the Vioxx group no later than July 2000, after five drafts, the final, published version of the article inexplicably failed to include them.

57.     Because three of the heart attacks suffered by Vioxx patients were excluded, the article misrepresented the extent of the relative risk of heart attacks among Vioxx patients as compared to naproxen patients.

M00B942850

58.     Due to Merck's omission of the actual number of heart attacks among the Vioxx group, doctors who read and relied on this article were deprived of this material and critically important safety information that would have informed their professional judgment concerning the treatment to prescribe for their patients.

59.     Another example of Merck's effort to suppress true information as to Vioxx's risks is its threats of retaliation against Dr. Gurkirpal Singh when he raised concerns about the cardiovascular safety of Vioxx.  Dr. Singh is a highly regarded Stanford University medical researcher experienced in the types of gastrointestinal issues raised by Vioxx and other pain relievers in its class.

60.     In 1999, Merck contracted with Dr. Singh to give lectures and speeches to doctors discussing Vioxx's benefits.  After hearing about Vioxx's cardiovascular safety risk as identified in VIGOR, Dr. Singh sought additional data from Merck.  Merck did not provide him with such data.

61.     Subsequently, Dr. Singh raised his concerns about the cardiovascular safety of Vioxx during his Merck-sponsored presentations to doctors.  Dr. Singh's primary scientific contact at Merck described these presentations as "balanced" and stated that his negative information about Vioxx was "scientifically accurate."

62.     Merck's Senior Vice-President for Medical and Scientific Affairs reacted to Dr. Singh's presentation by telephoning Dr. Singh's supervisor, a medical professor at Stanford, to complain that Dr. Singh was making irresponsible public statements about Vioxx's cardiovascular effects.  The Merck Vice President implied there would be repercussions for the professor and the university if Dr. Singh did not stop making these statements.

M00B942851

63.     The Merck Vice President further pressured Stanford, instructing a Merck employee to "[t]ell Singh that we've told his boss about his Merck-bashing" and "should it continue, further actions will be necessary (don't define it)." Following Merck's heavy-handed attempt to suppress a presentation that Merck itself had acknowledged as "balanced" and "scientifically accurate," Dr. Singh terminated his relationship with Merck.

64.     The Merck Vice President made similar calls to officials at other university medical schools with staff who had also publicly raised questions about the cardiovascular safety of Vioxx.

### Merck's Omission of Negative Cardiovascular Data in Direct-to-Consumer Advertising

65.     Merck marketed Vioxx as a safe and effective pain reliever, while diminishing and concealing its increased cardiovascular risk. Using various wording, Merck's press releases issued during 2001 and 2002 consistently told consumers that Merck had -- and therefore they too should have -- confidence in Vioxx's safety profile. In May 2001, despite the results of the VIGOR study, Merck stated that "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx." In April 2002, Merck also told the public that the significance of VIGOR and two other studies was "unknown," creating the misimpression that the highly statistically significant negative cardiovascular thrombotic outcomes from VIGOR were unimportant and of no consequence to an individual taking Vioxx.

66.     In September 2001, Merck reiterated its assurance of Vioxx's cardiovascular safety in letters it sent to individual doctors and patients, including those who reside in New York, omitting material information about Vioxx's increased risk of serious cardiovascular thrombotic events, including heart attacks.

M00B942852

67.     Merck's massive direct-to-consumer advertising campaign was aimed at having consumers ask their doctors specifically for Vioxx.  These ads, which ran in national magazines, failed to provide consumers with material information about Vioxx's cardiovascular dangers. Merck, therefore, encouraged individuals to take Vioxx, including patients with established coronary artery disease.

68.     Prior to 2002, Merck's advertisements for Vioxx that appeared in popular magazines and in journals directed at physicians contained no reference to the findings from VIGOR that patients taking Vioxx were at a five-fold increased risk of suffering a heart attack as compared to patients on naproxen and that Vioxx patients' increased risk of experiencing a serious cardiovascular thrombotic event was highly statistically significant.

69.     In 2002 and 2003, Merck disseminated advertisements in popular national magazines which, although they referred to VIGOR, failed to allude in any way to the increased risk of serious cardiovascular thrombotic adverse events, and especially to heart attacks, associated with Vioxx.  The minimal information about serious cardiovascular thrombotic events they contained was not adequate to put patients with established coronary artery disease on notice that taking Vioxx could be very dangerous for them.

70.     The total extent of information related to cardiovascular thrombotic events in these later advertisements consisted of, on the front of the advertisement, a recommendation that patients tell their doctors if they had a history of angina, heart attack or blood clots (variously described as clots in the heart or clots in the body); and on the back of the advertisement, a reiteration of this recommendation, which sometimes came toward the bottom of a long list of ailments that should be mentioned to a doctor, and a statement that serious but rare side effects included heart attacks and similar serious events.  But this latter statement failed to communicate the relative risk of heart attack if the patient took Vioxx instead of another effective, readily

-19-

M00B942653

available drug. Some New York patients, including those with established coronary artery disease, would not have understood Merck's advertisements as constituting a warning of this specific increased risk of future heart attacks.

**E.     The Effect of Merck's Suppression, Misrepresentation and Concealment of Vioxx's Cardiovascular Risk**

71.     Because Merck knowingly and intentionally suppressed, misrepresented and concealed the true cardiovascular dangers of Vioxx and engaged in a unremitting campaign of misinformation about these risks as they were demonstrated by the VIGOR study, as described above, New York physicians prescribed Vioxx for their patients who had established coronary artery disease.

72.     New York physicians, like other physicians, operate under a professional obligation to  recommend and prescribe only those treatments that are appropriate for the individual patient in light of the patient's medical history and current health status.  Conversely, patients rely on the professional judgment of their physicians in deciding whether to consent to and purchase a treatment.

73.     Some of the patients who received Vioxx prescriptions that were induced by Merck's suppression, misrepresentation and concealment of material information about Vioxx's cardiovascular risks were New York Medicaid recipients and/or EPIC participants, many of whom had been diagnosed as having coronary artery disease.

74.     New York consumers and, on behalf of consumers enrolled in Medicaid and/or EPIC, the New York Medicaid and/or EPIC programs, paid all or part of the cost of Vioxx prescribed to these patients with established coronary artery disease.  In the case of such patients who were Medicaid and/or EPIC participants, the relevant program paid claims submitted by the pharmacies that filled these prescriptions for Vioxx.

-20-

M008942854

75.    Merck caused New York Medicaid and/or EPIC to reimburse pharmacies from public funds for covered Vioxx prescriptions written for patients with established coronary artery disease.  Physicians would not have written these prescriptions if Merck had not suppressed, misrepresented and concealed material information about Vioxx's increased risk of serious cardiovascular thrombotic events.

76.    Merck's repeated and persistent fraud in suppressing, misrepresenting and concealing the material information about Vioxx's increased cardiovascular risk created a dishonest marketplace in which doctors and consumers recommended, prescribed or purchased Vioxx for patients for whom it was not an appropriate medication, which injured those consumers, the New York Medicaid and EPIC programs, the State of New York, and the City of New York.

77.    New York consumers and the New York Medicaid and EPIC programs do not have an adequate remedy at law that would provide complete relief for Merck's actions described above.

**FIRST CAUSE OF ACTION**
**OBTAINING PUBLIC FUNDS BY FALSE STATEMENTS**
**(N.Y. Social Services Law § 145-b)**

78.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 77 of this complaint.

79.    Social Services Law § 145-b provides that "[i]t shall be unlawful for any person, firm or corporation knowingly by means of a false statement or representation, or by deliberate concealment of any material fact, or other fraudulent scheme or device, on behalf of himself or others, to attempt to obtain or to obtain payment from public funds for ... supplies furnished ... pursuant to" the Medicaid Program or EPIC.

M00B942855

80.     By engaging in the acts and practices described above, Merck, knowingly made false statements or representations, or deliberately concealed material facts, or engaged in a fraudulent scheme on behalf of itself and others, resulting in the payment and/or overpayment of public funds, in an amount yet to be determined, for Merck's prescription drug Vioxx by the New York Medicaid Program or EPIC in violation of Social Services Law § 145-b.

81.     By reason of the foregoing, Merck is liable to the State and the City pursuant to Social Services Law § 145-b for actual damages, as well as for three times the amounts falsely submitted, plus interest at the highest legal rate.

## SECOND CAUSE OF ACTION
## NEW YORK FALSE CLAIMS ACT
### N.Y. Finance Law § 189(1)(a)

82.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 77 of this complaint.

83.     The State of New York and the City of New York seek relief against Merck under section 189(1)(a) of the New York False Claims Act, N.Y. Finance Law § 189(1)(a).

84.     As set forth above, Merck knowing, or acting in deliberate ignorance or in reckless disregard for the truth, caused to be presented to agents of the State of New York false or fraudulent claims for payment or approval of Vioxx prescriptions for patients with pre-existing cardiovascular risk factors.

85.     The New York State Medicaid and EPIC programs paid such false or fraudulent claims because of the acts or conduct of Merck.

86.     By reason of Merck's conduct, the State of New York and the City of New York have been damaged in a substantial amount to be determined at trial.

MODB942856

87.     By reason of the foregoing, Merck is liable, pursuant to N.Y. Finance Law § 189(1), to the State for treble damages, penalties, and costs, and to the City for treble damages and costs.

### THIRD CAUSE OF ACTION
### NEW YORK FALSE CLAIMS ACT
### N.Y. Finance Law § 189(1)(b)

88.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 77 of this complaint.

89.     The State of New York and the City of New York seek relief against Merck under section 189(1)(b) of the New York False Claims Act, N.Y. Finance Law § 189(1)(b).

90.     As set forth above, Merck knowing, or acting in deliberate ignorance or in reckless disregard for the truth, made, used, or cause to be made or used, false records and/or statements to get false or fraudulent claims for Vioxx prescriptions for patients with pre-existing cardiovascular risk factors paid or approved by the New York State Medicaid and EPIC programs.

91.     The New York State Medicaid and EPIC programs paid such false or fraudulent claims because of the acts or conduct of Merck.

92.     By reason of Merck's false records and/or statements, the State of New York and the City of New York have been damaged in a substantial amount to be determined at trial.

93.     By reason of the foregoing, Merck is liable, pursuant to N.Y. Finance Law § 189(1), to the State for treble damages, penalties, and costs, and to the City for treble damages and costs.

### FOURTH CAUSE OF ACTION
### REPEATED AND PERSISTENT FRAUD
### N.Y. Executive Law § 63(12)

94.     Plaintiff New York State incorporates by reference the allegations set forth in paragraphs 1 through 93 of this complaint.

-23-

M00B942857

95.     Executive Law § 63(12) makes "repeated fraudulent ... acts or ... persistent fraud ...

in the carrying on, conducting or transaction of business" actionable by the Attorney General.

96.     By engaging in the acts and practices described above, Merck has engaged in

repeated fraudulent acts or persistent fraud in violation of Executive Law § 63(12).

**FIFTH CAUSE OF ACTION**
**REPEATED AND PERSISTENT ILLEGAL CONDUCT:**
**OBTAINING PUBLIC FUNDS BY FALSE STATEMENTS**
**N.Y. Executive Law § 63(12)**

97.     Plaintiff New York State incorporates by reference the allegations set forth in

paragraphs 1 through 93 of this complaint.

98.     Executive Law § 63(12) makes "repeated ... illegal acts or ... persistent ... illegality

in the carrying on, conducting or transaction of business" actionable by the Attorney General.

99.     Merck's violations of N.Y. Social Services Law § 145-b and N.Y. Finance Law

§ 189(1) constitute repeated and persistent illegal conduct in violation of Executive Law § 63(12).

100.    By engaging in the acts and practices described above, Merck has engaged in

repeated illegal acts or persistent illegal conduct in violation of Executive Law § 63(12).

**SIXTH CAUSE OF ACTION**
**NEW YORK CITY FALSE CLAIMS ACT**
**N.Y.C. Admin. Code §§ 7-801 et seq.**

101.    Plaintiff City of New York incorporates by reference the allegations set forth in

paragraphs 1 through 77 of this complaint.

102.    The City of New York seeks relief against Merck under sections 7-801 et seq. of

the New York City Administrative Code.

103.    As set forth above, Merck knowing, or acting in deliberate ignorance or in reckless

disregard for the truth, made, used, or caused to be made or used, false records and/or statements

to get false or fraudulent Medicaid claims for Vioxx prescriptions for patients with pre-existing

-24-

M008942858

cardiovascular risk factors paid or approved.

104.    As set forth above, Merck knowing, or acting in deliberate ignorance or in reckless disregard for the truth, caused to be presented to agents of the State of New York and the City of New York, false or fraudulent Medicaid claims for payment or approval of Vioxx prescriptions for patients with pre-existing cardiovascular risk factors.

105.    The City of New York paid such false or fraudulent Medicaid claims because of the acts or conduct of Merck.

106.    By reason of Merck's false or fraudulent claims, records and/or statements, the City of New York has been damaged in a substantial amount to be determined at trial, and seeks treble damages, civil penalties, costs and attorney's fees.

## **PRAYER FOR RELIEF**

WHEREFORE, the People of the State of New York and the City of New York respectfully request that a judgment and order be entered that:

A.    Permanently enjoins Merck from engaging in the type of repeated or persistent fraudulent and unlawful practices alleged herein;

B.    Directs Merck to pay restitution and damages to all aggrieved consumers, including those not known at the time the order is entered;

C.    Directs Merck to pay restitution and damages to the State of New York based on Merck's repeated or persistent fraudulent and illegal practices, for the economic injuries suffered by the New York Medicaid and EPIC programs;

D.    Directs Merck to pay to the State of New York and the City of New York damages equal to three times the amount by which the State or any political subdivision, based on Merck's false statement or representation or other fraudulent scheme, overpaid public funds for Merck's prescription drugs under the New York Medicaid or EPIC program;

-25-

M00B942859

E.      Directs Merck to pay to the State of New York and the City of New York three times the amount of damages sustained because of the acts described herein, pursuant to N.Y. Finance Law § 189(1);

F.      Directs Merck to pay to the State of New York civil penalties in the amount of $12,000 for each false or fraudulent claim that Merck caused to be presented to the State of New York in violation of the New York False Claims Act, pursuant to N.Y. Finance Law § 189(1);

G.      Directs Merck to pay to the State of New York civil penalties in the amount of $12,000 for each false or fraudulent record or statement that Merck made, used, or caused to be made or used, in order to get a false or fraudulent claim paid or approved in violation of the New York False Claims Act, pursuant to N.Y. Finance Law § 189(1);

H.      Directs Merck to pay to the City of New York three times the amount of its damages, plus a civil penalty of $15,000 for each violation of the New York City False Claims Act, Title 7, Chapter 8 of the New York City Administrative Code, §§ 7-801 et seq., plus costs, expenses and attorneys' fees and the cost of the City's investigation;

I.      Awards Plaintiffs costs, including additional costs in the amount of $2,000 pursuant to CPLR § 8303(a)(6); and

J.      Grants all other relief that is just and proper.

Dated: New York, New York
       September 17, 2007

                                ANDREW M. CUOMO
                                Attorney General of the State of New York
                                Attorney for the State of New York

                        By:     *Heidi A. Wendel* (signature)
                                HEIDI A. WENDEL
                                Special Deputy Attorney General
                                Medicaid Fraud Control Unit
                                120 Broadway – 13th Floor
                                New York, New York 10271-0007
                                (212) 417-5250

-26-

M00B942860

MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
Attorney for the City of New York

By:

JOHN R. LOW-BEER
Assistant Corporation Counsel
100 Church Street
New York, New York  10007
(212) 788-1007

M00B942861

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

**FILED**

2006 MAY 10  AM II: 34

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY_____
                    DEPUTY

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | CAUSE NO. A-06-CA-232-LY |
| | § | |
| MERCK & CO., INC., | § | |
| | § | |
| DEFENDANT | § | |

## ORDER GRANTING PLAINTIFF'S MOTION TO REMAND

Before the Court are the Motion of the State of Texas to Remand Action to Texas State Court filed April 4, 2006 (Doc. #3); Opposition of Defendant Merck & Co., Inc., to Plaintiff's Motion to Remand filed April 24, 2006 (Doc. #9); Motion by Defendant Merck & Co., Inc., to Stay All Proceedings Pending Transfer Decision by the Judicial Panel on Multidistrict Litigation filed March 31, 2006 (Doc. #2); The State of Texas's Opposition to Defendant's Second Motion to Stay All Proceedings filed April 11, 2006 (Doc. #4); Merck's Reply in Support of Motion to Stay All Proceedings Pending Transfer Decision by the Judicial Panel on Multidistrict Litigation filed April 24, 2006 (Doc. #10); The State of Texas's Reply to Merck's Opposition to Remand and Response to Defendant's Reply in Support of Its Motions to Stay All Proceedings filed May 1, 2006 (Doc. #11); and The State of Texas's Supplement to Its Reply to Merck's Opposition to Remand and Response to Defendant's Reply in Support of Its Motions to Stay All Proceedings filed May 4, 2006 (Doc. #12). Having considered the motions, responses, and replies, the Court renders the following order.

## I. Background

This action has previously been before this Court. On June 30, 2005, the State of Texas ("Texas") as the Plaintiff filed suit in state court in Travis County, Texas against Merck & Co. Inc. ("Merck") regarding Merck's alleged misrepresentations about Vioxx, a drug that had been placed on Texas's Medicaid formulary. *See The State of Texas v. Merck & Co., Inc.*, No. GV503021 (345th Dist. Ct., Travis County, Tex. June 30, 2005). Texas brought suit in state court against Merck for damages and civil penalties pursuant to Texas's Medicaid Fraud Prevention Act. *See* TEX. HUM. RES. CODE ANN. §§ 36.001–.132 (West 2001).[1] In part Texas alleges that Merck made false statements or misrepresentations of material fact concerning the safety of Vioxx, concealed or failed to disclose the truth about Vioxx, and made claims under the Texas Medicaid program for a product that is substantially inadequate or inappropriate when compared to generally recognized standards within the health-care industry or claims for a product that is otherwise inappropriate. Texas alleges that Merck's conduct regarding Vioxx violates several provisions of Texas's Medicaid Fraud Prevention Act. *See* TEX. HUM. RES. CODE ANN. §§ 36.002(1), (2), (4), (7) (West 2001). As damages Texas seeks restitution with interest for the value of all payments which Texas has made for Vioxx prescriptions under the Texas Medicaid program; civil penalties; twice the value of all payments which Texas has made for Vioxx prescriptions under the Texas Medicaid program; and fees, expenses, and costs associated with the lawsuit.

---

[1] The Texas Legislature amended the act effective September 1, 2005. Because this action was filed in June 2005, the prior law governs. *See* Act of May 23, 2005, 79th Leg., R.S., ch. 806, § 20(a), 2005 Tex. Gen. Laws 2789 ("This Act applies only to conduct that occurs on or after the effective date of this Act. Conduct that occurs before the effective date of this Act is governed by the law in effect at the time the conduct occurred, and that law is continued in effect for that purpose.").

On August 2, 2005, Merck removed the state-court action to this Court on the basis of both diversity and federal-question jurisdiction. *See The State of Texas v. Merck & Co., Inc.*, No. A-05-CA-606-LY (W.D. Tex. filed Aug. 2, 2005). In its first notice of removal, Merck argued federal-question jurisdiction existed because Texas's "claims are premised on the allegations that Merck violated regulations promulgated and enforced by the Food and Drug Administration . . . under statutory authority conferred by the federal Food, Drug & Cosmetic Act . . . 21 U.S.C. § 301, *et. seq.*" Additionally, Merck claimed Texas's petition raised "important federal questions related to the federal Medicaid statute and its associated regulations." Merck claimed that diversity jurisdiction existed because the Texas Health and Human Services Commission, and not Texas, was the real plaintiff. Texas moved to remand the action on August 4, 2005. Concluding that neither diversity nor federal-question jurisdiction was present, this Court granted Texas's motion, and remanded the action to state court in Travis County on August 29, 2005.

Following remand, the parties agreed to a Docket Control Order that the state-court judge signed on January 27, 2006. Pursuant to the Docket Control Order, this action was set for jury trial "the second jury trial week of 2007." The record reflects that Texas has not amended its original state-court petition previously before this Court, and which this Court has already concluded does not present a federal question.

On March 30, 2006, Merck removed the action to this Court for a second time. In its second notice of removal, Merck asserts federal-question jurisdiction on the basis of some of Texas's discovery responses. *See* 28 U.S.C. §§ 1331, 1441. Merck alleges that on March 17, 2006, Texas provided discovery responses that contradict Texas's prior arguments to this Court that this action does not implicate questions of federal law. Merck claims that Texas conceded in these discovery

responses that the federal funding that supports Texas's Medicaid program "is contingent upon the State's compliance with the federal laws, rules, and regulations pertaining to Medicaid and is calculated according to federal law." Merck asserts that these responses are concessions that this action implicates substantial questions of federal law, thereby rendering it removable under *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 125 S.Ct. 2363 (2005).

Texas responds that it has not amended its pleadings since this action was previously before this Court, and that all allegations against Merck continue to be based exclusively on the Medicaid Fraud Prevention Act. Texas states that there are no allegations of violations of federal law or regulations. Texas further responds that Merck has raised no new issue unaddressed by the Court in its original remand order. Texas also questions whether Merck procedurally can remove this case by invoking federal-question jurisdiction based on discovery responses.

## II. Applicable Law

Federal courts are courts of limited jurisdiction. *See Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). A federal court may exercise jurisdiction over cases only as expressly provided by the Constitution and laws of the United States. *See* U.S. CONST. art. III § 2; *see also Kokkonen*, 511 U.S. at 377. As such, "there is a presumption against subject matter jurisdiction that must be rebutted by the party bringing an action to federal court." *Coury v. Prot*, 85 F.3d 244, 248 (5th Cir. 1996). Thus, to support removal, a defendant bears the burden of establishing facts demonstrating that the Court has subject-matter jurisdiction of the cause. *Carpenter v. Wichita Falls ISD*, 44 F.3d 362, 365 (5th Cir. 1995). Any doubt as to the propriety of the removal is to be resolved in favor of remand. *Acuna v. Brown & Root Inc.*, 200 F.3d 335, 339 (5th Cir. 2000).

4

### III. Analysis

Under *Grable*, federal-question jurisdiction may exist when "a state-law claim necessarily

raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain

without disturbing any congressionally approved balance of federal and state judicial

responsibilities." *Grable*, 125 S.Ct. at 2368. Even assuming that Merck's removal of this action is

procedurally proper, the discovery responses upon which Merck relies to establish federal-question

jurisdiction do not reflect that Texas's state-law claims disclose a disputed and substantial federal

issue, much less one that "indicates a serious federal interest in claiming the advantages thought to

be inherent in a federal forum." *Id.* at 2367 (and cases cited therein).

The discovery responses to which Merck directs this Court reflect generally that the federal

Food and Drug Administration bears the initial responsibility to approve drugs, Texas and the federal

government jointly fund Texas's Medicaid program, Texas must reimburse the federal government

out of any recovery in this action for past federal funds received by its Medicaid program, and Texas

has designated witnesses to testify about this dual system.[2] The Court concludes that it does not

follow that Texas's state-law claims contain a disputed and substantial question of federal law that

should be litigated in a federal forum. Even assuming that these discovery responses reflect the

---

[2] As Texas points out, Merck in its second notice of removal quotes only part of the first sentence of Texas's response to Interrogatory 16, inquiring about the procedure and criteria used to evaluate the safety of drugs placed on Texas's Medicaid formulary list. The entire sentence is:

> The Vendor Drug Program expects the manufacturer to properly comply with federal law and to receive approval of its drug from the FDA; *it further expects the manufacturer's assertion to the State of Texas in its questionnaire that the drug is safe and effective to be accurate.* (Emphasis added.)

necessity to apply federal law in Texas's state-law claims against Merck, the "mere need to apply federal law in a state-law claim will [not] suffice to open the 'arising under' door" to federal-question jurisdiction. *Id.* To the extent this case presents a federal issue, it is not a substantial one. There is no serious federal interest in claiming the advantages thought to be inherent in a federal forum.

As addressed by the Court in its first remand order, Texas's action involves Merck's conduct toward and with Texas in requesting and receiving approval from Texas to add Vioxx to Texas's Medicaid program. The crux of Texas's action is what Merck said and did in order to convince Texas to add Vioxx to Texas's Medicaid program. There is no reason for this Court to preempt the state-court's resolution of this dispute. The Court reminds Merck that the phrase "federal issue" is not "a password opening federal courts to any state action embracing a point of federal law," and cautions Merck against removing—and delaying—this action every time a federal law is mentioned in connection with Texas's Medicaid program. *Id.* at 2368.

The Court concludes that Merck has failed to satisfy its burden of demonstrating the existence of a federal question involved in Texas's action against Merck. Because federal-question jurisdiction remains lacking, the Court finds that remand is warranted.

**IT IS THEREFORE ORDERED** that the Motion of the State of Texas to Remand Action to Texas State Court (Doc. #3) is **GRANTED**.

**IT IS FURTHER ORDERED** that Texas's request for attorney's fees and costs is **DENIED**.

6

IT IS FURTHER ORDERED that the Motion by Defendant Merck & Co., Inc., to Stay All

Proceedings Pending Transfer Decision by the Judicial Panel on Multidistrict Litigation (Doc. #2)

is DISMISSED.

IT IS FINALLY ORDERED that this action is REMANDED to the 345th Judicial District

Court of Travis County, Texas.[3]

SIGNED this **10th** day of May 2006.

_____

LEE YEAKEL
UNITED STATES DISTRICT JUDGE

---

[3] This action was initially filed in the 345th Judicial District Court of Travis County. The Docket Control Order in state court indicates that this action was removed from the 126th Judicial District Court of Travis County. Regardless, Texas requests that the action be remanded to the 345th Judicial District Court of Travis County.

7

Theodore V. H. Mayer
Vilia B. Hayes
Robb W. Patryk
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004-1482
(212) 837-6000

*Attorneys for Defendant Merck & Co., Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - x
                                                   :
THE PEOPLE OF THE STATE OF NEW YORK,               :
by ANDREW M. CUOMO, Attorney General of            :
the State of New York, and THE CITY OF NEW         :      **No.: 07 cv 8434 (GBD)**
YORK,                                              :
                                                   :
                              Plaintiffs,          :
                                                   :
                -against-                          :
                                                   :
MERCK & CO., INC.,                                 :
                                                   :
                              Defendant.           :
- - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANT MERCK & CO., INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO REMAND FOR LACK OF FEDERAL SUBJECT MATTER JURISDICTION

# TABLE OF CONTENTS

ARGUMENT ...................................................................................................................1

I.  THE COURT SHOULD DEFER CONSIDERATION OF
    PLAINTIFFS' REMAND MOTION PENDING TRANSFER OF
    THIS CASE TO MDL 1657. ...............................................................................1

II. IF THE COURT CONSIDERS PLAINTIFFS' MOTION TO
    REMAND, IT SHOULD BE DENIED BECAUSE THE COURT
    HAS SUBSTANTIAL FEDERAL QUESTION JURISDICTION
    OVER THIS MATTER. .......................................................................................5

    A.  Resolution Of Plaintiffs' Claims Will Turn On
        Interpretations of Federal Statutes and Regulations,
        Including the Federal Food, Drug and Cosmetic and
        Medicaid Acts. ........................................................................................6

        1.  Federal Law Comprehensively Regulates The
            Public Statements That Underlie Plaintiffs' Claims. .....................7

        2.  Plaintiffs' Claims Implicate Significant Issues
            Pursuant to the Federal Medicaid Program.....................................8

    B.  The Supreme Court's *Grable* Decision Makes Clear That
        Federal Jurisdiction Lies Over Claims Like Plaintiffs' That
        Turn On Significant Questions Of Federal Law. .......................................10

III. PLAINTIFFS' ARGUMENTS IN SUPPORT OF REMAND
     FAIL...................................................................................................................14

CONCLUSION..............................................................................................................19

i

# TABLE OF AUTHORITIES

## CASES

*Alaska v. Merck & Co., Inc.*, No. 3:06-cv-0018-TMB (D. Alaska Mar. 6, 2006) ...................2, 3, 4

*Allman v. Hanley*, 302 F.2d 559 (5th Cir. 1962) ...........................................................................14

*Barash v. Ford Motor Credit Corp.*, No. 06-CV-6497 (JFB) (ARL), 2007 U.S. Dist.
LEXIS 44641 (E.D.N.Y. June 20, 2007) ...........................................................................18

*Barbara v. N.Y. Stock Exch.*, 99 F.3d 49 (2d Cir. 1996) .............................................................18

*Bd. of Trs. of the Teachers' Ret. Sys. v. WorldCom, Inc.*, 244 F. Supp. 2d 900 (N.D. Ill.
2002) .....................................................................................................................................4

*Benjamin v. Bayer Corp.*, No. 02-0886 Section: "R", 2002 U.S. Dist. LEXIS 9157 (E.D.
La. May 16, 2002) .................................................................................................................4

*Brennan v. Southwest Airlines Co.*, 134 F.3d 1405 (9th Cir. 1998) ...........................................11

*Caggiano v. Pfizer Inc.*, 384 F. Supp. 2d 689 (S.D.N.Y. 2005) ..................................................18

*County of Santa Clara v. Astra USA, Inc.*, 401 F. Supp. 2d 1022 (N.D. Cal. 2005) ...13, 14, 15, 17

*D'Alessio v. N.Y. Stock Exch., Inc.*, 258 F.3d 93 (2d Cir. 2001) ................................................11

*Drawhorn v. Qwest Commc'ns Int'l, Inc.*, 121 F. Supp. 2d 554 (E.D. Tex. 2000) .....................11

*Empire Healthchoice Assurance, Inc. v. McVeigh*, ---, U.S. -- 126 S. Ct. 2121 (2006) ...............15

*Fontanilles v. Merck & Co., Inc.*, No. 04-22799-CIV-HUCK (S.D. Fla. Dec. 14, 2004) ..............2

*Franchise Tax Bd. of Cal. v. Const. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1
(1983) ..................................................................................................................................15

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005) ............... passim

*Hawaii v. Abbott Labs, Inc.*, 469 F. Supp. 2d 842 (D. Haw. 2006) .............................................16

*Lame Bull v. Merck & Co., Inc.*, No. Civ. S0524265 LKK/DAD, 2006 WL 194277 (E.D.
Cal. Jan. 24, 2006) ................................................................................................................3

*Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804 (1986) ......................................5, 10, 15, 18

ii

*Minnesota ex rel. Hatch v. Pharmacia Corp.*, No. 05-1395  PAM/JSM), 2005 U.S. Dist. LEXIS 27638 (D. Minn. Oct. 22, 2005) ...................................................................16, 17

*Missouri ex rel. Johnson v. Mylan Labs., Inc.*, No. 4:06CV603 HEA, 2006 U.S. Dist. LEXIS 32570 (E.D. Mo. May 23, 2006) ................................................................16

*Nat'l Credit Reporting Ass'n v. Experian Info. Solutions, Inc.*, No. C 04-01661 WHA, 2004 U.S. Dist. LEXIS 17303 (N.D. Cal. July 21, 2004)........................................11

*New York v. Lutheran Ctr. For The Aging*, 957 F. Supp. 393 (E.D.N.Y. 1997) .........................12

*Pennsylvania v. Tap Pharm. Prods., Inc.*, No. 2:05-CV-03604, 2005 WL 2242913 (E.D. Pa. Sept. 9, 2005) .......................................................................................................16, 17

*In re Pharm. Indus. Average Wholesale Price Litig. v. Abbott Labs.*, MDL No. 1456, No. 01-12257-PBS, 2007 U.S. Dist. LEXIS 68193 (D. Mass. Sept. 17, 2007) ...........................16

*Purcell v. Merck & Co., Inc.*, No. 05-443-L(BLM) (S.D. Cal. June 6, 2005)..................................2

*Texas v. Merck & Co., Inc.*, 385 F. Supp. 2d 604 (W.D. Tex. 2005) ...........................................17

*Wash. Legal Found. v. Henney*, 202 F.3d 331 (D.C. Cir. 2000).....................................................7

*West Virginia ex rel. McGraw v. Eli Lilly & Co., Inc.*, 476 F. Supp. 2d 230 (E.D.N.Y. 2007) ................................................................................................................ passim

*White v. Wellington*, 627 F.2d 582 (2d Cir. 1980)......................................................................14

*Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498 (1990) ...........................................................................8

*Wisconsin v. Abbott Labs.*, 390 F. Supp. 2d 815 (W.D. Wis. 2005)........................................16, 17

*In re Zyprexa Prods. Liab. Litig.*, 375 F. Supp. 2d 170 (E.D.N.Y. 2005) ............................. passim

## STATUTES & REGULATIONS

21 C.F.R. § 202.1 ...........................................................................................................................7

21 U.S.C. § 331.............................................................................................................................7

21 U.S.C. § 355...........................................................................................................................7

42 C.F.R. § 430.10 ........................................................................................................................8

42 C.F.R. § 430.12 ........................................................................................................................9

42 C.F.R. § 430.14 ........................................................................................................................9

iii

42 C.F.R. § 431.10 ............................................................................................................8

42 C.F.R. § 447.256 ..........................................................................................................9

42 U.S.C. § 1396 ...............................................................................................................8

42 U.S.C. § 1396r-8 ................................................................................................8, 9, 12

Defendant Merck & Co., Inc. ("Merck") respectfully submits this memorandum in opposition to plaintiffs' Motion to Remand For Lack Of Federal Subject Matter Jurisdiction ("Motion to Remand").

## ARGUMENT

As set forth in Merck's motion for stay, the Court should follow the course recommended by both the MDL Panel and the Vioxx MDL judge and defer consideration of plaintiffs' remand motion pending MDL transfer so that it can be considered in tandem with similar remand motions in six other state attorney general cases. However, if the Court does decide to rule on the remand motion prior to transfer, that motion should be denied because the claims in plaintiffs' complaint require resolution of two substantial federal questions and are thus removable under the Supreme Court's recent ruling in *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing.*, 545 U.S. 308 (2005).

## I.   THE COURT SHOULD DEFER CONSIDERATION OF PLAINTIFFS' REMAND MOTION PENDING TRANSFER OF THIS CASE TO MDL 1657.

Both the MDL Panel and Judge Fallon, who is presiding over the Vioxx MDL proceeding in the Eastern District of Louisiana, have expressed their preference that overlapping remand motions be presented to the MDL court for coordinated treatment. Judge Fallon has explained:

> There are various issues of remand in various cases throughout the country. Again, a significant advantage of the MDL concept is some consistency. The Rule of Law is really based on consistency. If different decisions are made by numerous judges, then you have no consistency and no predictability. . . . It's easier if one court decides some of these matters than if 50 or 100 courts decide the matter.
>
> I'm conscious of dealing with the remand [motions] as quickly as possible, but I do want to get them all together . . . and deal with that issue in a consistent and fair fashion.

1

June 23, 2005 Status Conference Tr. at 21:9-22, *In re VIOXX Prods. Liab. Litig.*, MDL No. 1657

(attached to the November 9, 2007 Declaration of Vilia B. Hayes ("Hayes Decl.") as Exhibit A).

*See also* Letter from JPML to Hon. Ricardo H. Hinojosa (Mar. 21, 2005) (Hayes Decl. Ex. B)

("wait[ing] until the Panel has decided the transfer issue . . . may be especially appropriate if the

[remand] motion raises questions likely to arise in other actions in the transferee court and, in the

interest of uniformity, might best be decided there if the Panel orders centralization").

Judge Fallon's concerns are consistent with the majority view –that the best way to

ensure that MDL proceedings can achieve their statutory goal of efficient, coordinated

proceedings is by staying litigation pending transfer to the MDL court, including the

consideration of remand motions. Federal courts have overwhelmingly agreed, staying ***more***

***than 3,400 Vioxx-related cases, including nearly 500 in which plaintiffs sought remand.*** As

one court explained in granting a stay of a case that has now been transferred to the Vioxx MDL:

> [J]udicial economy and uniformity dictate that the Court defer
> ruling on Plaintiffs' Motion to Remand in order to . . . allow the
> MDL judge to resolve the issues presented by similar remand
> motions. . . . Judicial consistency, economy and uniformity among
> similar VIOXX cases would be served by deferring resolution of
> the remand issues at this time.

*Fontanilles v. Merck & Co., Inc.,* No. 04-22799-CIV-HUCK, slip op. at 1-2 (S.D. Fla. Dec. 14,

2004) (Hayes Decl. Ex. C). *See also Alaska v. Merck & Co., Inc.*, No. 3:06-cv-0018-TMB, slip

op. at 3 (D. Alaska Mar. 6, 2006) (Hayes Decl. Ex. D) ("transfer to the MDL [court] will

promote efficient and coordinated proceedings, including the consideration of remand motions");

*Purcell v. Merck & Co., Inc.,* No. 05-443-L(BLM), slip op. at 4-5 (S.D. Cal. June 6, 2005)

(Hayes Decl. Ex. E) (where "issue[s] common to several of the cases being considered for

consolidation by the JPML [are presented in remand motions] . . . [b]y allowing a single court to

determine this issue, judicial resources will be conserved and the risk of inconsistent rulings is

avoided") (citations omitted); *Lame Bull v. Merck & Co., Inc.*, No. Civ.S0524265 LKK/DAD, 2006 WL 194277, at * 2 (E.D. Cal. Jan. 24, 2006) ("[g]iven the number of cases that present this exact jurisdictional question and given the growing number of Vioxx cases being transferred to the MDL proceeding . . . this court follows the many other district courts in California in finding that the interest of judicial economy favors staying this action pending its transfer").

Deferral is particularly appropriate here because the MDL court already has before it six similar cases (five brought by state attorneys general and one by an alleged taxpayer on behalf of the state) that present the same jurisdictional issues. *See* Notice of Removal, *Foti ex rel. Louisiana v. Merck & Co. Inc.*, No. 05-3700 (E.D. La. Aug. 5, 2005) ) (Hayes Decl. Ex. F); Notice of Removal, *Hood ex rel. Mississippi v. Merck & Co., Inc.*, No. 3:05-cv-666-HTW-JCS (S.D. Miss. Nov. 1, 2005) (Hayes Decl. Ex. G), now E.D. La. No. 05-6755); Notice of Removal, *Alaska v. Merck & Co., Inc.*, No. 3:06-cv-00018-TMB (D. Alaska Jan. 17, 2006) (Hayes Decl. Ex. H), now E.D. La. No. 06-3132; Notice of Removal, *Montana v. Merck & Co., Inc.*, No. CV 0607 H DWM (D. Mont. Mar. 1, 2006) (Hayes Decl. Ex. I), now E.D. La. No. 06-4302; Notice of Removal, *Utah v. Merck & Co., Inc.*, No. 2:06cv00406 (D. Utah May 18, 2006) (Hayes Decl. Ex. J), now E.D. La. No. 06-9336; Notice of Removal, *Franklin ex rel. Colorado v. Merck & Co., Inc.*, No. 06-CV-02164-WYD-BNB (D. Colo. Oct. 27, 2006) (Hayes Decl. Ex. K), now E.D. La. No. 07-2073 .

In all of these cases, the state attorneys general (or, in the case of Colorado, an alleged taxpayer on behalf of the state) seek damages and civil penalties for claimed misrepresentations made to the states and their citizens regarding Vioxx. *See generally id.* Furthermore, Merck has removed all of these cases on the same basis: that the state attorney general allegations, though

styled as state law claims, necessarily implicate federal law because of their entanglement with issues relating to federal food and drug and Medicaid law. *See generally id.*

In addition, there are currently motions to remand on the issue of federal question jurisdiction pending in the six Medicaid-related cases before the MDL court discussed above: *Utah*, No. 06-9336 (E.D. La.); *Hood*, No. 05-6755 (E.D. La.); *Foti,* No. 05-3700 (E.D. La.); *Montana*, No. 06-4302  (E.D. La.); *Alaska* , No. 06-3132 (E.D. La.); and *Franklin,* No. 07-2073 (E.D. La.).[1]  The issue facing the Court here – the existence of federal question jurisdiction over such cases – is thus already in front of the MDL court.

Having the MDL court decide these cross-cutting jurisdictional issues will ensure that the various attorney general actions are treated in a uniform manner and that this Court does not enter a ruling that might ultimately be inconsistent with that of the MDL court on similar motions. *See In re Ivy*, 901 F.2d 7, 9 (2d Cir. 1990) (where "[t]he jurisdictional issue in question is easily capable of arising in [more than one court] . . . [c]onsistency as well as economy is . . . served [by transferring and consolidating cases as to which remand motions are pending]"); *see also Bd. of Trs. of the Teachers' Ret. Sys.  v. WorldCom, Inc.*, 244 F. Supp. 2d 900, 905 (N.D. Ill. 2002) ("The question, then, is whether other courts are facing or are likely to face similar jurisdictional issues in cases that have been or may be transferred to a multidistrict proceeding."); *Benjamin v. Bayer Corp.*, No. 02-0886 Section: "R", 2002 U.S. Dist. LEXIS 9157, at *5 (E.D. La. May 16, 2002) ("because the issues involved in this remand are likely to be common to other transferred cases, the policies of efficiency and consistency of pre-trial rulings are furthered by a stay of the proceedings").

---

1.  In Merck's Reply Memorandum of Law in Further Support of its motion to stay, Merck stated that there were five such pending remand motions; in fact there are six.

4

In short, because the jurisdictional issues presented by plaintiffs' remand motion overlap with those in other state attorney general actions that have been transferred to the Vioxx MDL proceeding, the objectives of the MDL process – namely consistency and efficiency – will best be achieved by allowing the MDL judge to resolve these overlapping remand motions in a coordinated manner.

## II.   IF THE COURT CONSIDERS PLAINTIFFS' MOTION TO REMAND, IT SHOULD BE DENIED BECAUSE THE COURT HAS SUBSTANTIAL FEDERAL QUESTION JURISDICTION OVER THIS MATTER.

If the Court does consider the merits of plaintiffs' remand motion, it should be denied because the Court has substantial federal question jurisdiction over this case. The core of plaintiffs' claims is that Merck misrepresented the safety and efficacy of Vioxx, thereby inducing the state and its citizens to expend money on Vioxx as opposed to an alternative drug. (*See, e.g.,* Compl. ¶¶ 1, 6, 7, 8.) In order to assess the viability and merit of these allegations, a court will be required to intensely examine federal law, specifically the Food, Drug & Cosmetic Act ("FDCA"), which regulates drug manufacturers' public and promotional statements about prescription drugs; and federal Medicaid law, which determines both the drugs a state must cover under its Medicaid program and the limited circumstances under which it can decline to pay for such drugs. Because the claims at issue in this case depend on the resolution of questions of federal food and drug and Medicaid law, this Court has substantial federal question jurisdiction. *See Grable*, 545 U.S. at 311-12.

In *Grable*, the United States Supreme Court held that federal jurisdiction lies over "state law claim[s] [that] necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Id.* at 314. In so holding, the Supreme Court limited its prior opinion in *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804 (1986), by

making clear that a parallel federal private right of action is ***not*** necessary to establish federal question jurisdiction over state law claims.

Based on the *Grable* holding, a number of courts have denied plaintiffs' motions to remand in similar cases to this one. In *In re Zyprexa Products Liability Litigation*, 375 F. Supp. 2d 170 (E.D.N.Y. 2005), an MDL court asserted federal question jurisdiction over state-law claims involving a manufacturer's marketing of a prescription drug and the state of Louisiana's payments for that drug under Medicaid, finding that the case presented "a core of substantial issues [that were] federally oriented." *Id.* at 172-73. *See also West Virginia ex rel. McGraw v. Eli Lilly & Co., Inc.*, 476 F. Supp. 2d 230 (E.D.N.Y. 2007) (same). As shown below, plaintiffs' claims here present the very same dependency on federal law. Like the *Zyprexa* court, this Court should follow *Grable* and deny plaintiffs' motion to remand.

### A.    Resolution Of Plaintiffs' Claims Will Turn On Interpretations of Federal Statutes and Regulations, Including the Federal Food, Drug and Cosmetic and Medicaid Acts.

Plaintiffs' claims are premised on the allegation that Merck "caused false and fraudulent claims to be submitted to the [state Medicaid and EPIC] program by suppressing, misrepresenting and concealing material information in its communications with doctors and patients concerning the seriousness of the cardiovascular risks associated with Merck's drug Vioxx." (Compl. ¶ 1.) More specifically, plaintiffs allege that "[a]s a result of Merck's disinformation campaign . . . New York physicians wrote and continued to write prescriptions for Vioxx that they otherwise would not have written [and] those consumers would not have purchased and taken Vioxx, and third-party payors, including Medicaid, would not have paid for Vioxx." (*Id.* ¶ 8.) Plaintiffs seek, in part, to "obtain damages and restitution for the consumers and government agencies defrauded by Merck[.]" (*Id.* ¶ 9.) In order to assess these claims, a court would be required to navigate through interpretations of various federal statutes and

6

regulations, in particular, the complex body of law surrounding the federal FDCA and Medicaid statutes and regulations. Accordingly, federal law is substantially implicated by this lawsuit.

      **1.    Federal Law Comprehensively Regulates The Public Statements That Underlie Plaintiffs' Claims.**

    *First*, federal food and drug law governs nearly every aspect of the types of public statements regarding Vioxx that form the basis of plaintiffs' allegations. Under the FDCA, the Food and Drug Administration ("FDA") is charged both with determining whether a drug is approved for use by humans and with assessing the specific uses for which that drug may be administered. 21 U.S.C. §§ 331(a), (d), 355; *Wash. Legal Found. v. Henney*, 202 F.3d 331, 332-33 (D.C. Cir. 2000). As part of the federal regulatory scheme, the FDA's Center for Drug Evaluation & Research ("CDER") regulates prescription drug advertising, including the package inserts that outline benefit and risk information, and also monitors marketed drugs for unexpected health risks that may require public notification, a labeling change, or removal of the drug from the market.[2] Under federal law, even the claims made in promotional labeling or advertising must be consistent with approved labeling. 21 C.F.R. § 202.1(e)(4).[3] Thus, the marketing, testing, labeling, and approval of Vioxx – the very issues that form the basis of plaintiffs' complaint – were all governed by federal law. (*See, e.g.,* Compl. ¶¶ 2, 29, 30 (allegations related to FDA oversight of Merck's Vioxx-related activities).)

---

2.  *See* Center for Drug Evaluation and Research, *Frequently Asked Questions to CDER*, Sept. 19, 2002, http://www.fda.gov/cder/about/faq/default.htm.

3.  Furthermore, the FDA recently promulgated a final rule in which it stated that "FDA approval of labeling under the [FDCA] . . . preempts conflicting or contrary State law," in part because "[S]tate law requirements can undermine safe and effective [drug] use." *See* Requirements on Content and Format of Labeling for Human Prescription Drug and Biological Products, 71 Fed. Reg. 3,922, 3,934-35 (Jan. 24, 2006) (to be codified at 21 C.F.R. Parts 201, 314, and 601).

2.    **Plaintiffs' Claims Implicate Significant Issues Pursuant to the Federal Medicaid Program.**

*Second*, plaintiffs' complaint raises substantial disputed federal issues under federal Medicaid law because it depends on the interpretation and application of federal statutory provisions that govern what drugs must be covered by or can be excluded from all state Medicaid drug reimbursement programs, including New York's Medicaid drug reimbursement program.

There can be no doubt from the face of the complaint that plaintiffs expressly claim damages for their Medicaid-related expenditures for Vioxx. (*See, e.g.,* Compl. ¶¶ 1, 76.) The federal Medicaid program authorizes federal money grants to states to provide medical assistance to low-income individuals. 42 U.S.C. § 1396, *et seq.*; 42 C.F.R. § 430.10, *et seq.* In addition to providing federal money for Medicaid drug programs, federal law also determines and controls the method by which states can administer those programs. As the Supreme Court has noted, "[a]lthough participation in the program is voluntary, participating States must comply with certain requirements imposed by the [Act] and regulations promulgated by the Secretary of Health and Human Services." *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502 (1990). One of the primary requirements that the federal Department of Health and Human Services has instituted is that states designate "a single State agency . . . to administer or supervise the administration of the [Medicaid] plan... ." 42 C.F.R. § 431.10(b)(1). Accordingly, the state of New York has designated its State Department of Health to administer its Medicaid plan. *See* New York State Dep't of Health, Medicaid in New York State, *http://www.health.state.ny.us/health_care/medicaid/index.htm*. (*See also* Compl. ¶ 14.)

Federal law also defines what constitutes a "covered outpatient drug" under a state's Medicaid program, *i.e.*, a drug "which may be dispensed only upon prescription" and "which is approved for safety and effectiveness as a prescription drug under" the FDCA. 42 U.S.C.

8

§1396r-8(k)(2)(A)(i). And federal law expressly requires states, subject to certain narrow exceptions, to reimburse the "covered outpatient drugs" of any manufacturer that has entered into and complies with a rebate agreement with the federal Secretary of Health and Human Services. 42 U.S.C. § 1396r-8(d)(4)(B). In fact, the only time that a state can exclude from its Medicaid formulary a covered outpatient drug subject to a rebate agreement is "if, based on the drug's labeling . . . the excluded drug does not have a significant clinically meaningful therapeutic advantage in terms of safety, effectiveness or clinical outcome of such treatment . . . over other drugs included in the formulary . . . ." 42 U.S.C. § 1396r-8(d)(4)(C). But even then, a state cannot deny coverage altogether; rather, it must condition such reimbursement on prior authorization, meaning that the state may require that it approve its reimbursement of the drug prior to dispensation. 42 U.S.C. § 1396r-8(d)(4)(D). And even a decision to require prior authorization is subject to other federal requirements, *see* 42 U.S.C. § 1396r-8(d)(4)(E), (d)(5), and, pursuant to federal statute, must be in writing, 42 U.S.C. § 1396r-8(d)(4)(B).[4] Thus, every step that a state like New York takes with regard to coverage of an FDA-approved drug under its Medicaid program is subject to strict federal mandates.

Here, plaintiffs' complaint, which seeks compensation for money that they paid for Vioxx, while brought under a state law theory, is entwined with federal Medicaid law and regulations, further confirming that substantial federal question jurisdiction exists over this case.

---

4. The New York Medicaid Program is inextricably tied to the federal Centers for Medicare & Medicaid Services ("CMS") in the Department of Health and Human Services, as the CMS is directed to approve all state Medicaid plans and proposed amendments based on the state's compliance with federal Medicaid law. 42 C.F.R. § 447.256. *See also* 42 C.F.R. § 430.14 (CMS "reviews State plans and plan amendments, discusses any issues with the [state] Medicaid agency, and consults with central office staff on questions regarding application of Federal policy."); 42 C.F.R. § 430.12 (outlining mandatory procedures State must follow when submitting a proposed state Medicaid plan or state Medicaid plan amendment for CMS's approval). For example, CMS authorization was required before New York (and other states) could participate in a multi-state pooling agreement for the purchase of Medicaid prescription drugs. *See* U.S. Dep't of Health & Human Services, Centers for Medicare & Medicaid Services, States with Supplemental Rebate Agreements, *http://www.cms.hhs.gov/MedicaidDrugRebateProgram/17_SRAStateChart.asp* (chart listing states that participate in a multi-state pooling supplemental rebate agreement).

**B.** **The Supreme Court's *Grable* Decision Makes Clear That Federal Jurisdiction Lies Over Claims Like Plaintiffs' That Turn On Significant Questions Of Federal Law.**

The Supreme Court's *Grable* decision, which clarifies the scope of substantial federal question jurisdiction, confirms that this case was properly removed to federal court. In *Grable*, the United States Supreme Court held that federal jurisdiction lies over "state-law claim[s] [that] necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." 545 U.S. at 314. The Court further stated unequivocally:

> [T]his Court ha[s] recognized for nearly 100 years that in certain cases *federal question jurisdiction will lie over state-law claims that implicate significant federal issues*. The doctrine captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues.

*Id.* at 312 (internal citation omitted) (emphasis added). The *Grable* court also clarified the Supreme Court's prior opinion in *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804 (1986). Over the last two decades, courts have interpreted *Merrell Dow* to hold that substantial federal question jurisdiction exists only when the federal law implicated by the state-law claims provides a private right of action. In *Grable*, however, the Court explicitly rejected that interpretation of *Merrell Dow*, explaining that while the provision of a federal private right of action can be evidence of whether Congress intended for there to be a federal forum, the key question, as stated above, is whether the "state-law claim necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." 545 U.S. at 314.

*Grable* confirms that this Court has federal question jurisdiction over plaintiffs' claims

for two reasons. ***First***, because plaintiffs' claims turn directly on Merck's heavily regulated

marketing of Vioxx (*see* Compl. ¶ 30 ("the February 2001 [FDA] Advisory Committee found

that physicians needed clear information, including the data from VIGOR, about Vioxx's serious

cardiovascular risks in order to make appropriate treatment judgments for their patients. The

FDA concurred in this judgment[]")), "the propriety of [the defendant's] actions, as prescribed

under federal law . . . is at the heart of [the plaintiffs'] allegations." *D'Alessio v. N.Y. Stock

Exch., Inc.*, 258 F.3d 93, 102-103 & n.6 (2d Cir. 2001) (finding federal jurisdiction because state

law tort claims were "predicated on alleged breaches of" federal securities law by defendants);

*see also Brennan v. Southwest Airlines Co.*, 134 F.3d 1405, 1409 (9th Cir. 1998) (denying

remand where plaintiffs pleaded only state-law causes of action expressly, and the substance of

plaintiffs' suit arose under federal law); *Nat'l Credit Reporting Ass'n v. Experian Info. Solutions,

Inc.*, No. C 04-01661 WHA, 2004 U.S. Dist. LEXIS 17303, at *7 (N.D. Cal. July 21, 2004) ("A

claim raises a substantial federal question when its resolution requires reference to or

interpretation of federal law."). *See also Drawhorn v. Qwest Commc'ns Int'l, Inc.*, 121 F. Supp.

2d 554, 564 (E.D. Tex. 2000) (holding that federal question jurisdiction exists where "the

interpretation of the federal statutes . . . is a necessary and substantial part of the plaintiff's own

causes of action").[5]

   ***Second***, as discussed above, the Court will be required to interpret federal Medicaid law

in assessing the validity of plaintiffs' claims. Specifically, the Court will need to determine

---

5.   The State should not be allowed to avoid federal question jurisdiction merely because, as it states in the Motion to Remand, "[T]his action alleges violations solely of state and local law[.]" (Pls.' Mem. at 1.) What matters, as *Grable* and even pre-*Grable* cases such as *Southwest Airlines Co.* make clear, is whether plaintiffs' state law claims turn on the resolution of a question of federal law – not whether plaintiff explicitly cites those federal laws in the complaint.

whether New York was required to include Vioxx on its Medicaid formulary because, under the federal statutory and regulatory provisions, it was a "covered outpatient drug," thereby "dispensed only upon prescription" and "approved for safety and effectiveness" pursuant to the FDCA, and thus subject to a rebate agreement between Merck and the Secretary of Health and Human Services. 42 U.S.C. § 1396r-8(d)(4)(B), (k)(2)(A). And, as noted above, New York could have excluded Vioxx from its Medicaid formulary "only if, based on the drug's labeling . . . the excluded drug does not have a significant, clinically meaningful therapeutic advantage in terms of safety, effectiveness, or clinical outcome . . . over other drugs included in the formulary." 42 U.S.C. § 1396r-8(d)(4)(C).[6]

The applicability of *Grable* in these circumstances was recognized by an MDL court that denied a motion to remand under similar circumstances. In *In re Zyprexa Products Liability Litigation*, 375 F. Supp. 2d 170 (E.D.N.Y. 2005), the court relied on *Grable* in asserting federal question jurisdiction over state-law claims involving a manufacturer's marketing of a prescription drug and the state of Louisiana's payments for that drug under Medicaid. As in this case, the complaint in *Zyprexa* purported to state claims under state law based on alleged conduct regulated by the FDA. *Id.* at 172. The core allegation was that the manufacturer of the prescription drug Zyprexa marketed the drug for off-label or non-FDA-approved uses, which caused the Louisiana Department of Health and Hospitals to wrongfully disburse Medicaid funds to pay for Zyprexa prescriptions and the resulting Zyprexa-related injuries. *Id.* at 170-72. The MDL court applied *Grable* and retained federal jurisdiction because of the "substantial federal funding provisions involved" and because allegations that the manufacturer had improperly

---

6. For this reason, *New York v. Lutheran Center For The Aging*, 957 F. Supp. 393 (E.D.N.Y. 1997), which plaintiffs argue defeats Merck's argument that substantial Medicaid issues are necessary to plaintiff's claims (Pls.' Mem. at 18-19), is not relevant. In that case, no such federal requirement was at issue. *Id.* at 400 ("The State is 'solely responsible for establishing eligibility requirements for recipients.'").

marketed Zyprexa for non-FDA-approved uses rendered the case "federally oriented." *Id.* at 172-73.

The same federal funding provisions are integral here,[7] as is the question of whether the federally-regulated marketing activities surrounding Vioxx involved misrepresentations. Plaintiffs' attempt to distinguish *Zyprexa* on the grounds that they do not allege that Merck violated federal law (Pls.' Mem. at 16) fails because notwithstanding their attempts to avoid citing the FDCA in their complaint, plaintiffs' allegations do depend on proving violations of that statute. Thus, the interrelation between plaintiffs' allegations and federal FDCA and Medicaid program requirements make this case equally "federally oriented." *Id.*

Likewise, in *McGraw*, the Eastern District of New York denied a similar motion to remand, finding that "[r]esolution of the question of the state's obligation to reimburse its insureds for Zyprexa, using funds largely provided by the federal government, is essential to the state's theory of damages and presents a substantial and disputed federal issue under *Grable.*" 476 F. Supp. 2d at 233. The very same federal questions are involved in assessing plaintiffs' claims here.

Similarly, in another case involving Medicaid drug pricing, the court in *County of Santa Clara v. Astra USA, Inc.*, 401 F. Supp. 2d 1022 (N.D. Cal. 2005) held that federal jurisdiction was proper under *Grable*. In concluding that the allegations that defendants had overcharged plaintiff for Medicaid drugs implicated substantial questions of federal law, the court observed that one measure of evaluating substantiality is "the importance of the federal issue." *Id.* at

---

7. For fiscal year 2004 (October 1, 2003 to September 30, 2004), for example, federal funds accounted for 50% of New York's Medicaid financing. *See Federal Financial Participation in State Assistance Expenditures; Federal Matching Shares for Medicaid, the State Children's Health Insurance Program, and Aid to Needy Aged, Blind, or Disabled Persons for October 1, 2003 Through September 30, 2004*, 67 Fed. Reg. 69,223, 69,224 (Nov. 15, 2002).

1027. The court noted that "[u]nder this approach, the following issues have been found to be substantial: those that directly affect the functioning of the federal government, those in an area reserved for exclusive federal jurisdiction, and those that impact a complex federal regulatory scheme." *Id.* As discussed *supra*, the federal questions implicated here "impact [two] complex federal regulatory scheme[s]." And, for the same reasons explained *supra*, plaintiffs' attempt to distinguish this case on the grounds that they do not allege that Merck violated federal statutes fails.

For all of these reasons, the Court should conclude that federal question jurisdiction exists here under the reasoning of *Grable*.

## III.    PLAINTIFFS' ARGUMENTS IN SUPPORT OF REMAND FAIL.

In arguing against federal jurisdiction, plaintiffs principally make two arguments. First, plaintiffs argue that Merck's removal notice was not sufficiently specific. Second, plaintiffs attempt to rely on cases where courts remanded cases that were removed under federal question jurisdiction. Both arguments fail.

*First*, plaintiffs' argument that remand is required because in its Notice of Removal, Merck "failed to identify any specific issues of federal law" (Pls.' Mem. at 6) is simply a red herring. Notably, plaintiffs do not explain what precisely they found lacking, and "[t]he absence of detailed grounds setting forth basis for removal is not fatal to defendants' right to remove." *Allman v. Hanley*, 302 F.2d 559, 562 (5th Cir. 1962). As the United States Court of Appeals for the Second Circuit put it, "[t]he modern rules of notice pleading 'apply with as much vigor to petitions for removal as they do to other pleadings, which, according to Rule 8(f), F. R. Civ. P. shall be so construed as to do substantial justice.'" *White v. Wellington*, 627 F.2d 582, 587 (2d Cir. 1980) (quoting *Rachel v. Georgia*, 342 F.2d 336, 340 (5th Cir. 1965), *aff'd* 384 U.S. 780 (1966)). By this liberal standard, Merck's Notice of Removal was more than sufficient. As

explained in Section II.A. *supra*, and in Merck's Notice of Removal (*see* Notice of Removal ¶¶ 11-20 (explaining how liability depends on whether Merck violated the federal FDCA and the federal Medicaid Act, along with the regulations promulgated by federal agencies to implement them)), Merck has provided ample jurisdictional grounds for removing this action because it identified two substantial disputed federal questions that must be resolved to determine liability on the claims asserted in plaintiffs' complaint.

*Second*, plaintiffs rely on a series of cases involving federal questions of far less significance to resolution of the claims at issue in those cases than the federal questions at issue here. Accordingly, plaintiffs' cases are irrelevant to the Court's remand analysis and do not refute applicability of *Grable*, *Zyprexa*, *McGraw*, and *Astra USA* to plaintiffs' claims.

For example, plaintiffs rely on *Empire Healthchoice Assurance, Inc. v. McVeigh*, --- U.S. ---, 126 S. Ct. 2121 (2006) (*see* Pls.' Mem. at 7) to argue that *Grable* applies only to a very few cases, and that this is not one of them. In *Empire*, however, the Court declined to apply *Grable* because the underlying factual basis for the claim "was triggered, not by the action of any federal department, agency or service, but by the settlement of a personal-injury action launched in state court[.]" 126 S. Ct. at 2137. Here, the FDA's approval of Vioxx with mandatory labeling and concomitant regulation of marketing activities is precisely what plaintiffs allege caused them injury. Additionally, plaintiffs' reliance on *Merrell Dow* and *Franchise Tax Board of California v. Construction Laborers Vacation Trust for Southern California*, 463 U.S. 1 (1983) to argue that allowing federal question jurisdiction here would undermine comity and federalism, resulting in "opening the federal court doors to a huge influx of state law personal injury, fraud, and Medicaid cases" is unpersuasive. (*See* Pls.' Mem. at 7-9, 18.) This is not a case where the only issue in play is whether Merck violated a federal standard. Nor, contrary to plaintiffs'

15

implication, is it a case where Merck asserts that simply because it has a defense under federal law, the case belongs in federal court. (Pls.' Mem. at 5.) Instead, as explained above, entire complex regulatory schemes administered by two separate federal agencies are implicated, and a need for national uniformity in interpretation of those schemes mandates federal jurisdiction here. *See McGraw*, 476 F. Supp. 2d at 234 (finding substantial federal question jurisdiction where "an intricate federal regulatory scheme including detailed federal funding provisions, requiring some degree of national uniformity in interpretation" was implicated by plaintiff's state-law claims).

In addition, in several of the cases cited by plaintiffs, the federal question at issue was limited to the meaning of the phrase "'average wholesale price' as it appears in the Medicare statute and its implementing regulations." *Wisconsin v. Abbott Labs.*, 390 F. Supp. 2d 815, 823 (W.D. Wis. 2005); *see also In re Pharm. Indus. Average Wholesale Price Litig. v. Abbott Labs.*, MDL No. 1456, No. 01-12257-PBS, 2007 U.S. Dist. LEXIS 68193 (D. Mass. Sept. 17, 2007), *Pennsylvania v. Tap Pharm. Prods., Inc.*, No. 2:05-CV-03604, 2005 WL 2242913 (E.D. Pa. Sept. 9, 2005), *Minnesota ex rel. Hatch v. Pharmacia Corp.*, No. 05-1395(PAM/JSM), 2005 U.S. Dist. LEXIS 27638 (D. Minn. Oct. 22, 2005), *Missouri ex rel. Johnson v. Mylan Labs., Inc.*, No. 4:06CV603 HEA, 2006 U.S. Dist. LEXIS 32570 (E.D. Mo. May 23, 2006), *Hawaii v. Abbott Labs, Inc.*, 469 F. Supp. 2d 842 (D. Haw. 2006) (Pls.' Mem. at 12, 19). Here, in contrast, plaintiffs' claims implicate two huge legal and regulatory frameworks that govern every aspect of the approval, labeling, and marketing of drugs, as well as coverage of FDA-approved drugs by state Medicaid programs. *See, e.g., Zyprexa*, 375 F. Supp. 2d at 172-73 (federal jurisdiction appropriate with regard to Medicaid and the marketing and labeling of a drug); *McGraw*, 476 F. Supp. 2d at 234 (*Hawaii* distinguished because the federal question presented in Medicaid

reimbursement claim involving alleged misrepresentations about drug "extend beyond the definition of a single federal statutory term to encompass a broad range of federal regulatory and funding provisions").

Moreover, the remand orders in *Wisconsin*, *Tap Pharmaceutical*, and *Minnesota* were also based on the fact that the removal was ***procedurally*** defective in those cases, thereby requiring remand. *Wisconsin*, 390 F. Supp. 2d at 824-25; *Tap Pharm.*, 2005 WL 2242913, at * 9; *Minnesota*, 2005 U.S. Dist. LEXIS 27638, at * 8. Notably, another district court rejected a plaintiff's reliance on *Wisconsin* for this very reason, finding that "removal had been procedurally defective and provided an independent and adequate reason to remand to state court." *Astra USA, Inc.*, 401 F. Supp. 2d at 1031 (rejecting *Wisconsin*'s interpretation of *Grable* and concluding that the significant dependence on federal Medicaid law of pricing allegations supported federal jurisdiction).

Plaintiffs' reliance on the decisions to remand in *Texas v. Merck & Co., Inc.*, 385 F. Supp. 2d 604 (W.D. Tex. 2005); No. A-06-CA-232-LY slip op. (W.D. Tex. May 10, 2006) (Pls.' Mem. at 12-13) is not persuasive either. As explained in Section I *supra*, that court's decision to remand is clearly at odds with the majority view. In other state attorney general actions involving Vioxx, courts have stayed all proceedings on the grounds that the cases are best coordinated in the MDL court, or otherwise declined to rule on remand motions prior to the transfer of the cases to MDL-1657. And the *Texas* court's explanation that "[t]here is no serious federal interest in claiming the advantages thought to be inherent in a federal forum" (*Texas*, slip op. at 6) ignores the intricate statutory and regulatory schemes inherent in FDCA and Medicaid law. Moreover, as explained in *McGraw*, the need for national uniformity in interpretation of disputed federal questions surrounding plaintiffs' damages claims under Medicaid is best met by

17

resolving them in a federal judicial form, not multiple state-law regimes. *See McGraw*, 476 F.

Supp. 2d at 234 ("detailed federal [Medicaid] funding provisions, requiring some degree of

national uniformity in interpretation" confer substantial federal question jurisdiction).

Plaintiffs' other cases are inapposite for various reasons. *Barash v. Ford Motor Credit

Corp.*, No. 06-CV-6497 (JFB) (ARL), 2007 U.S. Dist. LEXIS 44641 (E.D.N.Y. June 20, 2007)

involved a *pro se* plaintiff who, while asserting state-law fair credit claims cited analogous

federal cases interpreting the Fair Credit Reporting Act ("FCRA"). *Id.* at *12-13. The court

found that no federal question was raised by plaintiffs' complaint because he sued under a state

analog to the federal FCRA. *Id.* at *13. That is not the case here. *Barbara v. New York Stock

Exch*ange, 99 F.3d 49 (2d Cir. 1996) is inapposite because it relied on *Merrell Dow's* focus on

whether a federal private right of action is provided in the federal scheme. *Id.* at 54 ("[t]he lack

of a private right of action counsels against a finding of federal question jurisdiction"). As

explained above, *Grable* clarified that such a focus is not dispositive. *Caggiano v. Pfizer Inc.*,

384 F. Supp. 2d 689 (S.D.N.Y. 2005) is distinct because the Medicaid-related issues that must

necessarily be determined to find Merck liable in this action were not at issue there.

In short, none of plaintiffs' cases supports remand under these circumstances. Despite

plaintiffs' arguments to the contrary, this matter clearly implicates two very substantial federal

questions – the FDCA and federal Medicaid law – and, under the Supreme Court's *Grable*

decision, the Court plainly has jurisdiction to resolve these substantial federal questions in a

federal forum.

## CONCLUSION

For all of the foregoing reasons, Merck respectfully requests that the Court defer

consideration of plaintiffs' Motion to Remand pending MDL transfer.  Alternatively, if the Court

does rule on the merits of plaintiffs' remand motion, it should be denied.

DATED:       New York, New York
             November 9, 2007

                                        Respectfully submitted,

                                        HUGHES HUBBARD & REED LLP

                                        By: _Vilia B. Hayes_____
                                            Theodore V. H. Mayer
                                            Vilia B. Hayes
                                            Robb W. Patryk
                                            HUGHES HUBBARD & REED LLP
                                            One Battery Park Plaza
                                            New York, NY 10004-1482
                                            (212) 837-6000


                                        *Attorneys for Defendant Merck & Co., Inc.*

Theodore V. H. Mayer
Vilia B. Hayes
Robb W. Patryk
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004-1482
(212) 837-6000

*Attorneys for Defendant Merck & Co., Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                       :

THE PEOPLE OF THE STATE OF NEW     :
YORK, by ANDREW M. CUOMO, Attorney  :   **Civ. No.: 07 Civ 8434(GBD)**
General of the State of New York, and THE  :
CITY OF NEW YORK,                :
                       :   **DECLARATION OF VILIA B. HAYES**
               Plaintiffs,  :
                       :

        -against-         :
                       :

MERCK & CO., INC.,           :
                       :
             Defendant. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

       VILIA B. HAYES declares as follows:

          1.    I am an attorney admitted to practice before this Court and a member of

the firm of Hughes Hubbard & Reed LLP, attorneys for defendant Merck & Co., Inc. ("Merck").

As such, I am fully familiar with the facts set forth herein. I make this declaration based on my

own personal knowledge and the business records of the Firm.

          2.    I make this declaration in support of Defendant Merck & Co., Inc.'s

Opposition to Plaintiffs' Motion to Remand For Lack of Federal Subject Matter Jurisdiction.

3.      Attached hereto as Exhibit A is a true and correct copy of the transcript of the Status Conference held in *In re VIOXX Products Liability Litigation*, MDL No. 1657, before the Honorable Eldon E. Fallon on June 23, 2005.

4.      Attached hereto as Exhibit B is a true and correct copy of the letter from the JPML to the Honorable Ricardo H. Hinojosa, dated March 21, 2005.

5.      Attached hereto as Exhibit C is a true and correct copy of the slip opinion issued in *Fontanilles v. Merck & Co., Inc.*, No. 04-22799-CIV-HUCK (S.D. Fla. Dec. 14, 2004).

6.      Attached hereto as Exhibit D is a true and correct copy of the slip opinion issued in *Alaska v. Merck & Co., Inc.*, No. 3:06-cv-0018-TMB (D. Alaska Mar. 6, 2006).

7.      Attached hereto as Exhibit E is a true and correct copy of the slip opinion issued in *Purcell v. Merck & Co., Inc.*, No. 05-443-L(BLM) (S.D. Cal. June 6, 2005).

8.      Attached hereto as Exhibit F is a true and correct copy of the Notice of Removal filed in *Foti ex rel. Louisiana v. Merck & Co. Inc.*, No. 05-3700 (E.D. La. Aug. 5, 2005).

9.      Attached hereto as Exhibit G is a true and correct copy of the Notice of Removal filed in *Hood ex rel. Mississippi v. Merck & Co., Inc.*, No. 3:05-cv-666-HTW-JCS (S.D. Miss. Nov. 1, 2005).

10.     Attached hereto as Exhibit H is a true and correct copy of the Notice of Removal filed in *Alaska v. Merck  & Co., Inc.*, No. 3:06-cv-00018-TMB (D. Alaska Jan. 17, 2006).

11.     Attached hereto as Exhibit I is a true and correct copy of the Notice of Removal filed in *Montana v. Merck & Co., Inc.*, No. CV 0607 H DWM (D. Mont. Mar. 1, 2006).

Case 2:05-md-01657-EEF-DEK   Document 63574-1   Filed 11/03/11   Page 101 of 152
Case 1:07-cv-08434-GBD   Document 22574   Filed 11/09/2007   Page 3 of 14

3

12.     Attached hereto as Exhibit J is a true and correct copy of the Notice of Removal filed in *Utah v. Merck & Co., Inc.*, No. 2:06cv00406 (D. Utah May 18, 2006).

13.     Attached hereto as Exhibit K is a true and correct copy of the Notice of Removal filed in *Franklin ex rel. Colorado v. Merck & Co., Inc.*, No. 06-CV-02164-WYD-BNB (D. Colo. Oct. 27, 2006).


        I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

                                        _Vilia B. Hayes_
                                        VILIA B. HAYES

Executed this
9th day of November, 2007

# Exhibit A

1

<pre>
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 2                      NEW ORLEANS, LOUISIANA

 3

 4

 5
     IN RE:  VIOXX PRODUCTS         *    Docket MDL 1657-L
 6      LIABILITY LITIGATION        *
                                    *    June 23, 2005
 7                                  *
                                    *    9:30 a.m.
 8   * * * * * * * * * * * * * * *  *

 9

10                   STATUS CONFERENCE BEFORE THE
11                  HONORABLE ELDON E. FALLON
                    UNITED STATES DISTRICT JUDGE
12

13   APPEARANCES:

14
     For the Plaintiffs:           Seeger Weiss
15                                 BY:  CHRISTOPHER A. SEEGER, ESQ.
                                   One William Street
16                                 New York, New York 10004

17
     For the Defendants:           Stone Pigman Walther Wittmann
18                                 BY:  PHILLIP A. WITTMANN, ESQ.
                                   546 Carondelet Street
19                                 New Orleans, Louisiana 70130

20
     Official Court Reporter:      Toni Doyle Tusa, CCR
21                                 500 Poydras Street, Room B-406
                                   New Orleans, Louisiana 70130
22                                 (504) 589-7778

23

24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer.
</pre>

2

1                        PROCEEDINGS

2                      (June 23, 2005)

3           THE DEPUTY CLERK:  Everyone rise.

4           THE COURT:  Be seated, please.  Good morning, Ladies

5    and Gentlemen.  Call the case, please.

6           THE DEPUTY CLERK:  MDL 1657, In Re: Vioxx.

7           THE COURT:  Counsel, make your appearances for the

8    record.

9           MR. SEEGER:  Good morning, Your Honor.  Chris Seeger

10   for the plaintiffs.  I'm going to be playing Russ Herman today.

11          MR. WITTMANN:  Phil Wittmann, Your Honor, liaison

12   counsel for the defendants.

13          THE COURT:  I understand we have some counsel on the

14   phone.  Who is that?

15          MS. SOTOODEH:  Pamela Sotoodeh in Chicago.

16          MS. KOPELMAN:  Richard Kopelman of Decatur, Georgia.

17          THE COURT:  Good morning.  This is our monthly status

18   conference.  I have received from the liaison counsel the

19   proposed agenda.  We will take the items in order.  The first

20   is LexisNexis File & Serve.  Let me have a report on that.

21          MR. SEEGER:  Judge, we continue to have problems with

22   LexisNexis.  We are having problems getting documents posted

23   and served.  On the other end, they're having problems

24   identifying firms that are already previously registered.  We

25   have got some calls set up with them to try to work through

3

1  some of these issues.  We are hoping to be able to do that.

2        THE COURT:  Let's get them in person in the court.

3  Let's do it next week.  I will get my staff to give you a day.

4  I would like to see LexisNexis here, the president of the

5  company, or somebody who can talk with me about any problems.

6  I would like you all present to get this resolved.  We need to

7  go on line as quickly as possible.  We don't have time to have

8  to rely on surface mail.  There are too many people in this

9  case.  It really needs to be worked out.

10        I'm a little disappointed because LexisNexis

11  just took this over.  I've had some experience with the people

12  from whom they bought this company and we didn't have any

13  problems with the prior group.  I don't know why LexisNexis --

14  a bigger outfit, more resources -- is having problems when the

15  earlier group did not, so maybe they can help me understand

16  that.

17        MR. SEEGER:  We will make arrangements to bring them

18  in.

19        THE COURT:  Thank you.

20        MR. WITTMANN:  Yes, Your Honor.  We have not had

21  problems with LexisNexis.  It seems, from the defendants'

22  standpoint, to be working okay.  The few issues that have come

23  up, we have dealt directly with their representatives and they

24  have been responsive to our requests, so we are satisfied.

25  It's going okay from our standpoint.

4

1          If the Court please, we might give the folks a

2    statistical background on what's happening in the MDL at this

3    point.  As of June 15, we had 907 cases in the MDL.  Although

4    some of those cases have not yet been served on Merck, they are

5    here, 907 of them.  There are over 700 Vioxx products liability

6    cases served and pending in federal court but not yet here.

7    There are over 170 cases served and pending in state courts

8    other than New Jersey and California.  There are over 1,900

9    cases served and pending in the New Jersey consolidated

10   proceeding.  There are approximately 180 cases pending in the

11   California state court, and those cases involve approximately

12   1,000 plaintiffs.  That's our statistical update.

13          THE COURT:  What about the numbers of class actions?

14          MR. WITTMANN:  Class actions I believe are 118.

15   That's up about eight from our last status conference.  We

16   either have provided or will provide copies of the additional

17   class action complaints to plaintiffs' counsel.  Their deadline

18   for filing the master complaint, incidentally, is August 1.

19          THE COURT:  Trial settings.

20          MR. WITTMANN:  Yes, Your Honor.  The first case that

21   we know that's set for trial is the Ernst case in Brazaoria

22   County, Texas, on July 11, 2005.  We have a case in New Jersey,

23   the Humeston case, which is set on September 12, 2005.  The

24   Guerra case is set for trial in Hidalgo County, Texas, on

25   September 19, 2005.  The Zajicek case is set for trial in

M001225538

5

1   Jackson County, Texas, on September 26, 2005, but we are told
2   that's likely to be continued over to the first quarter of
3   2006.  The Tomlin case is set for trial in Florida in St. Lucie
4   County sometime between October 3 and December 30, 2005.  That
5   exact date has not been fixed yet.  In addition to that, we
6   have a hearing set in the Engineers case in New Jersey on
7   June 30 to determine whether the court will certify a
8   nationwide case of third-party payors.

9            THE COURT:  One of the challenges, from the
10  standpoint of the MDL, is to deal with cases not only
11  throughout the country in the federal system, but also cases
12  that are in the state system.  One benefit of the MDL is
13  consistency and uniformity.  The significance of uniformity and
14  consistency in the large numbers of cases is to allow you
15  folks, who are the lawyers in the cases, to be able to get a
16  read on matters so that hopefully you can evaluate the cases
17  and see whether or not there's any shorter way of dealing with
18  it, namely settlements or dealing with it in some motion way or
19  other evidence.  Consistency or at least predictability is one
20  of the benefits of trials.

21           My concern oftentimes, if there are trials in
22  various jurisdictions, is that it doesn't afford the same
23  consistency if you had it in one jurisdiction, wherever it is.
24  It just gives you some more consistency and, therefore, more
25  predictability, and you're able to then learn from that

M001255539

6

1  particular trial.

2          My hope was that we could begin trying cases in
3  the MDL as quickly as we can so that you can have that read and
4  benefit, but I do recognize that cases have been in state court
5  for about four years now.  It's hard to have a litigant wait,
6  after they have done all the work in a particular case, and
7  then have to delay unduly.  I have to measure both of those
8  things and weigh both of those things.  I've been getting a lot
9  of good cooperation from the various state courts, and I think
10 that many of them feel the same way as I do.  We will do the
11 best we can with it.  In that regard, let me segue into the
12 next item, which is the selection of cases for an early trial
13 date in this particular proceeding.

14         MR. SEEGER:  Judge, if you don't mind, on the last
15 point, just for the benefit of the lawyers reading the
16 transcript, we have requested of the defendant that going
17 forward, when they list the trial cases, that they give us the
18 name of the case, the court it's in, the attorney of record,
19 and if they can tell us what the injury is.  I think that will
20 assist us in coordinating with those lawyers and help our state
21 federal liaison committee, as well.

22         THE COURT:  Fine.  We have got to watch from both
23 sides that cases are not tried before it's appropriate to try
24 them because that's going to skew the situation.  It's not
25 going to help anybody to try a case that is either not

M001225540

7

1  representative or that's not ready to be tried.  It's going to
2  hurt the rest of your cases.  Let's be conscious of that.
3          MR. WITTMANN:  I think, in response to Chris' point,
4  we have been talking about Ernst and Humeston for a long time
5  now.  I thought I had given that information to Russ, but we
6  will make sure he has it from now on.
7          THE COURT:  Talk to me about trial dates for the
8  cases here.
9          MR. WITTMANN:  Trial dates here, Judge, Mr. Herman
10  and I have been meeting and working on it ourselves.  More
11  recently than that, Mr. Marvin has been meeting with Mr. Seeger
12  and others on the plaintiffs' steering committee to try and get
13  a pool of cases from which we can select cases for trial here
14  in the Eastern District.  I would like to let Mr. Marvin
15  address that since he has been more familiar with the recent
16  negotiations than I have.
17          THE COURT:  Okay.
18          MR. MARVIN:  Good morning, Your Honor.  Your Honor,
19  we have identified two pools of cases that could yield cases
20  for early trials.  The first pool could come from the Eastern
21  District of Louisiana, where there are approximately 40 cases
22  presently on file.  What we would need to do for those cases is
23  to have a short schedule for submission of the plaintiff fact
24  sheets so that both plaintiffs and defendants could look at
25  those cases and make some selections from those cases.

8

1        A second pool of cases, though, could come from
2   cases that have already been filed in the federal court and,
3   indeed, were filed even before the establishment of this MDL.
4   Discovery in a number of those cases has proceeded, and some to
5   an advanced stage.  There are approximately 40 cases, for
6   example, where requests for interrogatories have been made,
7   answers have been given, plaintiff fact sheets have been
8   submitted, and medical records collected.  That's an important
9   matter because collection of medical records could take several
10  months.  So we do have 40 cases where we think that, working
11  with the plaintiffs, we can identify those cases.  Those cases
12  would have objective criteria for the selection of those cases
13  because of the advanced discovery and, indeed, we would be
14  prepared to send our list of cases that we think would fit that
15  criteria within the next five days.

16        THE COURT:  Let's do that in five days, then let me
17  hear from the plaintiffs in five days, and then we will meet
18  and pick the cases.  The Eastern District cases I can try here.
19  The other cases that are put in from other states, even in the
20  federal system, in view of the Lexicon case I may have
21  difficulty trying them unless there's some stipulations.  I can
22  do it in one of two ways.  I can either try them with the
23  stipulations here or I can go to the area that the case
24  emanates from.  An MDL judge sits throughout the country and is
25  able to do that.  I can go to the other area.

M001225542

9

1           The thing that you both have to look at is the

2   Circuit that you are dealing with because if I try them here,

3   even with stipulations, my understanding is the Fifth Circuit

4   will take the case from me in the appeal.  If I try them in

5   another area, the circuit in that area will try it.  I don't

6   know whether it's good or bad or whether people have feelings

7   one way or the other, but at least that's something for both

8   sides to consider when we talk about those cases.

9           MR. MARVIN:  Fair enough.

10          THE COURT:  Also, logistics, if I'm going to go some

11  other place, that area needs to know I'm going to be there, the

12  court space and the Marshals Service and things of that nature.

13          MR. MARVIN:  Thank you, Your Honor.  Once that list

14  is completed, we will continue working with the PLC to review

15  that list and hopefully come up with some cases.

16          THE COURT:  After five days, if the plaintiffs can

17  get to me, I'll set a meeting.  I will see both of you and pick

18  the cases.

19          MR. SEEGER:  Judge, just a couple of brief comments

20  on this.  We are all for getting a case scheduled for trial as

21  soon as possible.  We like the November/December timeframe.

22  I'm not one of those lawyers and I don't think the attorneys on

23  the PSC are lawyers that believe we have to turn over every

24  document and every stone before we start trying a case.

25  However, I do want to make the Court aware of the fact that we

M001225543

10

1   are trying to get discovery from the FDA and some third parties

2   and some remaining discovery from Merck that we would like to

3   get.

4              THE COURT:  The early cases, if we are going to push

5   then as quickly as we can to make them meaningful, it's not

6   just to try the cases.  It's to give both of you some idea of

7   how a jury feels about that particular case.  First, I need

8   cases that are ready for trial.  It's not going to do you any

9   good to try a case that's not ready for trial because whatever

10  the verdict is, somebody is going to have an excuse for it and

11  say, "Well, but for it being ready, it would have been

12  different," that sort of thing, whatever it is.

13             Secondly, I would like you to give some thought

14  to grouping them.  If we are dealing with death cases, I don't

15  want to try all death cases because there are personal injury

16  cases, so we ought to try some cases that will give you some

17  benefit from the jury's view of that particular case.  We need

18  cases that are ready and we need some variety.

19             MR. SEEGER:  Thank you, Judge.  With your comments in

20  mind, we will be talking with the defendants about potentially

21  a pool.  We will be proposing cases, as well.  Thank you.

22             THE COURT:  Thank you.  Class actions is the next

23  item on the agenda.

24             MR. WITTMANN:  Yes, Your Honor.  I have really

25  covered that already.  I think it's on track in accordance with

M001225544

11

1   the Pretrial Order governing class actions, and the plaintiffs

2   are due to file their master complaint or complaints by

3   August 1.

4           THE COURT:  Okay.  The discovery directed to Merck.

5           MR. WITTMANN:  Yes, Your Honor.  There are a couple

6   of facets to that.  First of all, I don't think your Pretrial

7   Order on the individual cases is generally available yet, but

8   we have submitted an agreed Pretrial Order to you on the

9   individual cases.  I understand you have signed it, but it

10  hasn't been posted yet.

11          THE COURT:  I have signed it, yes.

12          MR. WITTMANN:  There are two parts to that order.

13  The first part deals with the actual procedure for filing

14  motions and dealing with that process in the MDL.  The second

15  part, which we suggested be designated "Pretrial Order __ A,"

16  if you recall, dealt with the actual review of prior discovery

17  produced by Merck in other cases.  That process is ongoing.

18  The protocol for doing that is established by that Pretrial

19  Order and the parties are doing that now, even as we speak, up

20  in New Jersey.

21          We don't have any problems with respect to the

22  documents that have already been produced and the depositions

23  that have been taken.  Those are being made available to the

24  plaintiffs' steering committee, and so far as I know that

25  process is going on without any problem.  We have some

M001225545

12

1  significant disputes with respect to the additional discovery

2  propounded by the plaintiffs' steering committee, both the

3  interrogatories and the document requests. It's our belief

4  they are overly broad. We have made that clear to the

5  plaintiffs' liaison counsel and plaintiffs' steering committee.

6  The parties have been working, trying to narrow those requests

7  to take into account the extent of which those requests are

8  duplicative of materials produced in other proceedings which

9  are being made available up in New Jersey.

10          We have set, by agreement with the plaintiffs'

11  steering committee, I think a deadline of July 5 by which to

12  complete that meet-and-confer process to try and narrow down to

13  see if we can agree on what additional materials will or will

14  not be produced. If we are unsuccessful, then we will be in to

15  see Your Honor, I think, within 10 days after that.

16          THE COURT: Let me just make a couple of comments on

17  the discovery part. Discovery, particularly paper discovery,

18  is supposed to be helpful and not just stumbling blocks. The

19  purpose of discovery is to help you try your cases or get ready

20  for trial. If you get so tied into discovery, it gets to be so

21  voluminous and so time consuming and so burdensome that it saps

22  not only your energy, but your resources and your thinking and

23  sidetracks you, it is not good. It's got to be helpful. It

24  can't be just, "Let's get it because it's there," "Let's not

25  give it because we have got it." It's got to be helpful.

1      My thinking on discovery is that you all first
2  meet and share with each other a draft of what you need and
3  discuss it.  If you can arrive at an agreement, that's fine.
4  If you can't arrive at an agreement, then before it's in final
5  form, talk to me about it.  I'll tell you what my ruling will
6  be so we don't have to go back and forth.  The plaintiffs don't
7  have to wait for 30 days to get a response, which is an
8  objection, and then they have to wait for another 30.  We don't
9  have time to do that, so we have to streamline it.  Get
10  together and see what you agree on.  I don't have to be brought
11  into the agreement.  The disagreements, bring me in and I will
12  resolve the disagreements.  We will do it as quickly as we can.
13      MR. WITTMANN:  Your Honor, are you saying that during
14  the course of our negotiations, if we do reach some impasse,
15  that you would welcome a conference call?
16      THE COURT:  Get it to me right there and I'll resolve
17  the controversy.
18      MR. SEEGER:  If Russ were here, he would have a great
19  quote from William Shakespeare something to the effect, "I've
20  never met a defendant that said a discovery request wasn't
21  burdensome," but having said that --
22      THE COURT:  I'm sure Shakespeare said something like
23  that.
24      MR. SEEGER:  In New York there's a guy named
25  Shakespeare who said something along those lines.  The truth is

14

1   we served discovery. Merck has asked for a little bit more
2   time to continue discussing it. We are going to do that. We
3   are anxiously awaiting their response. There are no real
4   surprises in what we are asking for. As you said, Your Honor,
5   the case is being litigated. It has been litigated for a
6   while. I think we all know what we need.

7           THE COURT: Again, if you have already got some
8   material, let's work out something that if you've got it they
9   don't need to reproduce it. I know that sometimes you receive
10  some material that's case specific and this is noncase
11  specific, so you may need to go outside of that. If you have
12  got it, let's get on to something else. The Pretrial Order
13  governing individual cases.

14          MR. WITTMANN: Yes, Your Honor. You have those now.
15  There are actually two Pretrial Orders. One relates to the
16  production of documents in other cases, which is really a part
17  of the Pretrial Order for the individual cases.

18          THE COURT: I have that. I signed it. It should be
19  posted. Merck employee information is the next item. I have
20  briefs on that. I've set next Wednesday at 2:00 to have a
21  hearing on that oral argument on that question. The next item
22  is discovery directed to the FDA. How are we with that? We
23  had some misunderstandings. I got the FDA on the phone and
24  everybody was able to talk about it. I had the opportunity to
25  express my views. I haven't heard on it formally since then.

M001225548

15

1       MR. SEEGER:  Your Honor, my co-lead counsel,
2    Andy Birchfield, met with the FDA, so he is going to address
3    this issue.

4       MR. BIRCHFIELD:  Your Honor, Russ Herman, Troy
5    Rafferty, and I met with the FDA with their counsel and with
6    the U.S. attorney Sharon Smith at the FDA headquarters in
7    Rockville, Maryland.  We discussed the items on the subpoena
8    and we were able to reach agreement on a number of those
9    issues.  We have continuing dialogue on some of the others.
10   The important thing was that we were able to at least get the
11   discovery process, the review process, and the production
12   process moving while we are continuing dialogue.  They have
13   agreed to provide us with the first page of the documents that
14   were produced in Congress so we can review those and identify
15   which ones we actually need.  They have also agreed to start
16   the production.  We expect by the end of July to get the
17   initial production.  They will continue that on a rolling
18   basis.  We are making considerable progress on the FDA
19   production.

20       THE COURT:  I should express the Court's appreciation
21   to the chair of the FDA.  I appreciate his help.  He should
22   know that I am obliged to him for getting involved in this
23   matter and helping us move forward.  I do publicly appreciate
24   his help.

25       MR. BIRCHFIELD:  One other thing on that.  Merck,

M001225549

16

1  Ben Barnett, was also there.  There is cooperation there.  They

2  are agreeing to provide a list of documents that are between

3  the FDA and Merck so we can review that list and determine

4  which ones need to be produced and which ones we already have.

5          THE COURT:  Thank you very much.  Discovery directed

6  to third parties is the next item.

7          MR. SEEGER:  Your Honor, we are in the next couple of

8  days going to get out probably about a dozen or so subpoenas to

9  third parties.  We are going to try to stage it in a way so we

10 do it in phases, but at this point there's not much to report

11 other than we are going to get the subpoenas out.

12         THE COURT:  Let's keep that on the agenda so that you

13 can talk to me about it next time.  We really ought to work

14 through that.  That's an important part.  Deposition

15 scheduling.

16         MR. WITTMANN:  The first and third weeks of the

17 month, Judge, were set by prior Pretrial Order.  We had sent a

18 request to the plaintiffs' steering committee last week asking

19 that depositions be set in some of the Louisiana cases starting

20 the first week in July or, alternatively, the third week in

21 July, depending upon what they were able to pull together from

22 their clients.  We left the selection of the plaintiffs to be

23 deposed to the plaintiffs' steering committee because we are

24 trying to accommodate the individual plaintiffs and not just go

25 out and arbitrarily pick dates and select them.  Your Honor has

M001255550

17

1   told us in our prior Pretrial Order that we are to cooperate in

2   trying to arrange a mutually agreeable date before running out

3   and setting depositions by notice.

4               We have not heard back.  I understand from the

5   plaintiffs' steering committee this morning that the cases that

6   we have selected may not be suitable for the early trials in

7   this Court, so we are waiting to get a list, really, of the

8   cases that we think will go forward for an early trial and will

9   set them for deposition as soon as we can.

10              THE COURT:  Okay.  Let's keep an eye on prioritizing.

11  There's some issues that might cut across the spectrum.  You

12  may want to take depositions of individuals that have something

13  to say about the general theories so they will be significant

14  in each case, but with regard to case-specific discovery I

15  think you should focus on the cases that we select for trial

16  and do those.  Now, that doesn't mean that you only have to

17  have one wave of depositions.  You can have a couple of tracks

18  going on.  You have to be able to do several tracks at the same

19  time in a case like this.

20              MR. SEEGER:  You just anticipated my comments.  We

21  think that the depositions of plaintiffs should somehow

22  dovetail with what we are doing on trial schedules, although I

23  would like to correct the record.  I don't have any opinion on

24  whether cases by any other lawyer are appropriate for trial or

25  not.  I think we have to come up with a criteria for selecting

M001255551

18

1 | cases that will inform decisions that may be made down the road
2 | between the parties.

3 |        THE COURT:  The next item is the plaintiffs' profile
4 | form and Merck's profile form.  I understand from the parties
5 | that with regard to the plaintiffs' profile form they have
6 | reached an agreement.  On Merck's profile form, they have not
7 | reached an agreement.  Each side submitted to me their
8 | disagreements and I have resolved the conflict.  I'll be today
9 | putting out the defendants' profile form that will be used in
10 | this case.  That will be resolved.

11 |        Also, with the profile forms of both sides, it
12 | seems to me that we ought to do that in waves.  The first wave,
13 | I would like both the plaintiffs and the defendants to focus on
14 | and limit the forms to the cardiovascular events -- the
15 | myocardial infarctions, the ischemic strokes, the deaths -- and
16 | then shortly thereafter, when we get some experience with those
17 | forms and with filling them out and any problems, in resolving
18 | those problems we ought to be able to step it out quickly to
19 | the second wave, which may not require as detailed information.
20 | It seems to me to be the best way of doing it.  I put some
21 | handwritten notes on this form and I will simply adopt it in an
22 | order and give you my thinking on that particular form.  The
23 | plaintiffs will have to redraft the form and submit it.
24 | Medical records from healthcare providers is the next item.

25 |        MR. SEEGER:  Judge, I think that we have agreed on a

M001225552

19

1 procedure for having medical records posted online almost

2 identical to what we are doing in New Jersey for plaintiffs'

3 lawyers as well as defense counsel to have access to records in

4 a secure way. I think that's been accomplished.

5 MR. WITTMANN: That's correct, Your Honor.

6 THE COURT: Contact with claimants' healthcare

7 providers. That's the subject of another motion. I received

8 briefs for reconsideration on that issue. I'll be hearing that

9 in oral argument on Wednesday, also. The plaintiffs'

10 depository is the next item on the agenda.

11 MR. SEEGER: We are happy to report we are up and

12 running. We have got it staffed and it is available to

13 plaintiffs' lawyers who want to come look at documents and

14 contribute to the document review. We welcome the help.

15 THE COURT: Talk with the defendants. If they have

16 no objection, I would like to at least look at the depository,

17 if that's possible, just see that it's up and running and so

18 forth.

19 MR. WITTMANN: That's no problem, Judge, whenever

20 counsel wants to set it up.

21 THE COURT: Set it up and we'll take a look at it.

22 The confidentiality agreement is the next one.

23 MR. WITTMANN: That's been signed. Your Honor, I

24 haven't had any problems with it. We had one question as to

25 whether some of the material that was attached to I believe the

M001225553

 1  brief filed by the state liaison committee may have contained
 2  some confidential information.  I don't believe it really did,
 3  but the time hasn't yet run for us to designate.  We are still
 4  looking at that.  We may have some comment about it.  I don't
 5  think it's a major problem.

 6          THE COURT:  That's an issue always of concern and
 7  it's a balancing issue.  It's a balancing issue between the
 8  First and Sixth Amendments.  The First Amendment, of course,
 9  the right of the public to know, it's vital in a democracy that
10  the public know.  It's also vital in a democracy that people
11  have every right to a fair trial.  There's some conflict
12  occasionally between the First and the Sixth Amendment.  The
13  way that it's worked out, in my judgment, in a fair way is to
14  not deprive the public of a right to know, but perhaps delay
15  the public's information, unless it is a critical type of
16  information which is necessary for immediate knowledge.

17          I'm focused, instead, on the right to a fair
18  trial for both sides, and there is certain proprietary
19  information in these documents that drug companies
20  realistically and legitimately get concerned about releasing,
21  proprietary information that could affect their present or
22  future business practices.  I am conscious of the public's
23  right to know, but I am also conscious of the fact that if I
24  don't have a confidentiality order, then it delays the
25  discovery and delays trials and delays justice.  I have dealt

M001225554

Case 2:07-cv-06845-GBD    Document 2574-11    Filed 11/02/11    Page 23 of 4 152

21

1   with this issue in that fashion.  We have a confidentiality
2   agreement which will allow the defendants comfort to produce
3   certain information without fear that their future economic
4   security is in jeopardy.  The remand issues.

5           MR. SEEGER:  Judge, that's in the report.  You are
6   going to be dealing with remand motions as a group by
7   procedures that you will be setting up.

8           THE COURT:  Right.  This is always an issue which the
9   MDL Court has to look at.  The question is posed.  There are
10  various issues of remand in various cases throughout the
11  country.  Again, a significant advantage of the MDL concept is
12  some consistency.  The Rule of Law is really based on
13  consistency.  If different decisions are made by numerous
14  judges, then you have no consistency and no predictability and
15  no one knows exactly what to do or how to do it.  It's easier
16  if one court decides some of these matters than if 50 or 100
17  courts decide the matter.

18          I'm conscious of dealing with the remand as
19  quickly as possible, but I do want to get them all together,
20  look at them, see if I can group them in some way, and then
21  direct my attention on each particular group and deal with that
22  issue in a consistent and fair fashion for that group.  I will
23  be dealing with them as quickly as I can, but also with an idea
24  of having more consistency.  I'll be speaking about this
25  perhaps later on because I do have some concepts and ideas

1    about this.  Tolling agreements is the next item.

2            MR. SEEGER:  Judge, just to report that we have

3    accomplished our goal.  It was a long negotiation, but we got

4    it resolved.  Both sides have compromised and agreed on a

5    tolling agreement.  It seems to be working.  We are getting

6    cases in.

7            MR. WITTMANN:  The agreement was filed, I guess, on

8    the 9th of this month, so it's just recently been filed, but

9    we are starting to get people taking advantage of it.  We are

10   getting the short form exhibits mailed in.  We have a procedure

11   set up by the defendants to respond to those exhibits as they

12   come in.  We are keeping a record of them so we know exactly

13   where we stand with respect to the people who have elected to

14   go forward on the tolling agreements, Your Honor.

15           THE COURT:  I appreciate the help on both sides on

16   the tolling agreements.  I think it's good for each side.  I

17   think there's different advantages, but advantages for each

18   side, and I think it will be helpful to you.  Certainly, I

19   think it will be helpful to the litigants.  The next item is

20   state/federal coordination.  State liaison committee, are there

21   things that you want to say?

22           MS. BARRIOS:  Yes, Your Honor.  We have been fairly

23   active since our last meeting here.  At the Court's order, we

24   were allowed to file a brief on the issue of the Merck employee

25   information.  We did that and I question, Your Honor, if you

23

1  would like us to be present at the hearing on Wednesday to make
2  a presentation?
3          THE COURT:  Sure.  You are always welcome to
4  participate in a hearing.
5          MS. BARRIOS:  Thank you, Your Honor.
6          THE COURT:  I'm interested in your views.  I have
7  looked at the brief.  A lot of it has already been said.  I
8  don't think I need any response from the defendants on it.  I
9  think you have covered it in your particular response.  Let's
10  keep that in mind.  I know that oftentimes you see matters in
11  the same fashion as perhaps the plaintiffs' steering committee.
12          MS. BARRIOS:  Yes, Your Honor.
13          THE COURT:  If you do, just "Me, too" it.  I don't
14  need you to restate it.  That's sufficient.  If you see it in a
15  different light, just carve that out.  If I need some response,
16  I will direct the defendants to give me a response on it.
17          MS. BARRIOS:  Yes, sir.  We have no intention of
18  being duplicative.  With the cooperation of Mr. Wittmann's
19  office and Mr. Herman's office, we have received a roster of
20  over 700 plaintiffs' attorneys names.  We sent out our first
21  very lengthy newsletter detailing the orders, the web site,
22  etc.  We have gotten extremely good feedback from different
23  plaintiffs' attorneys across the country on it.  We have had
24  several conference calls with our committee.  Mr. Witkin on our
25  committee made a presentation at the Mealey's seminar about the

1  MDL yesterday.  We met with the PSC last night and look forward

2  to working with them to reserve the rights of the plaintiffs'

3  attorneys and their clients.

4         THE COURT:  I appreciate all of your interest and

5  work and willingness to work on the committee.  It's very

6  important.  I know there's some interests that are different.

7  That's the way of the world.  There's some joint interests and

8  so rather than reinvent the wheel and do things a second time,

9  third time, fourth time, it is helpful for you to be in the

10 development of it so that you can just migrate that information

11 into your proceedings so you don't have to redo it again.

12         MS. BARRIOS:  Yes, Your Honor.  Thank you.

13         MR. SEEGER:  From the PSC's perspective, we have

14 enjoyed the working relationship with the committee.  We think

15 the lawyers on the committee are of extremely high quality.

16 They have been proactive in anticipating issues.  We welcome

17 their input on anything we do.  We did have dinner last night,

18 had a chance to talk through some important issues before we

19 poured the first bottle of wine -- which was helpful -- and we

20 are looking forward to the continued cooperation between our

21 committee and theirs.

22         THE COURT:  The waiver of service is the next item.

23         MR. WITTMANN:  Yes, Your Honor.  You have the

24 Pretrial Order in effect on that.  I think it's Pretrial

25 Order 15, and we haven't had any problems.

M001225558

25

1    THE COURT: The next item is direct filing into the
2  MDL. Ms. Loretta Whyte was kind enough to meet with us earlier
3  today to discuss that in more detail. The issue, of course, is
4  whether or not the party who files directly into the MDL should
5  have the MDL caption or should have their independent caption.
6  Ms. Whyte tells us that the best way of doing it, from her
7  vantage point, is to have an individual caption just as you
8  would if you file a regular case, but put on that "Related
9  Case, MDL" and give the number. She will then migrate it into
10  the MDL proceedings. That will be the best way of doing that.
11  Is that right, Ms. Whyte?

12    MS. WHYTE: Yes.

13    MR. SEEGER: There's one thing on that issue that's
14  important to note for people reading the transcript. There's
15  been some confusion whether the lawyers need to be admitted
16  pro hac to file cases.

17    THE COURT: They do not need to be admitted pro hac.
18  I have waived that. Anybody who's in the MDL or has a case in
19  the MDL is able to handle a matter.

20    MR. SEEGER: Just to be clear, Ms. Whyte, the cases
21  that get filed must mention the Vioxx MDL and that it's a
22  related case?

23    MS. WHYTE: It's a related case.

24    THE COURT: Anything further on that? Pro se
25  claimants.

M001225559

26

1          MR. SEEGER:  Well, Your Honor, we have been referring
2     what we have been getting from the Court to our plaintiffs'
3     liaison counsel and these are being dealt with.

4          THE COURT:  I think we have a system of doing it.  So
5     far most of the pro se claimants have been individuals who have
6     not been able to be personally present at these meetings.  They
7     are generally incarcerated some other place and can't make it
8     here, so they need a lawyer.  They have expressed their
9     interest in being represented, so I have given that to liaison
10    counsel.  I understand that what they do is contact lawyers in
11    the state of that particular institution and make those lawyers
12    available to them, or at least tell them that they would be
13    available.  That seems to be working.

14          Anything further from anyone that I haven't
15    covered before I set the next status conference date?  Anything
16    either from the state committee, liaison committee, or anyone
17    in the audience?  I'm interested in hearing your views.

18          MR. WITTMANN:  Nothing from the defendants,
19    Your Honor.

20          MR. SEEGER:  Nothing further from plaintiffs,
21    Your Honor.

22          MS. BARRIOS:  Nothing further.

23          MR. BECNEL:  Judge, I have a lawyer who has referred
24    me 160 cases from Oregon.  I have dealt with Mr. Wittmann's
25    associate, Ms. Wimberly.  He wants to bring them all here, but

27

1   because of the peculiar law in Oregon he is starting to have to

2   file them right away in Oregon. I'm trying to get some sort of

3   a deal with the defendants to get them all here without missing

4   a statute problem. I'm just wondering how we can work that

5   out.

6           MR. WITTMANN: We are working that out now, actually,

7   Your Honor, with a procedure for the filing of a master

8   complaint in the MDL that will permit people to come in and tag

9   along and sign on with the short form joinder pleading, which

10  should take care of Mr. Becnel's problem.

11          THE COURT: Mr. Seeger, get with Mr. Becnel and see

12  if we can handle this particular problem.

13          MR. SEEGER: Yes, Your Honor.

14          MR. GIRARDI: Tom Girardi, Your Honor.

15          THE COURT: Mr. Girardi.

16          MR. GIRARDI: Your Honor, we now have a state court

17  judge for the 2,000 cases in California. I will provide you

18  with that contact information, Judge Chaney.

19          THE COURT: Please do that because I am trying to

20  keep in touch with the state court judges. When we begin

21  setting some Daubert hearings or other hearings, if they wish

22  to come in the case, we will do either the voice or do video

23  streaming so that they can participate and deal with it

24  according to their law, but they won't have to retake the

25  witnesses. If they have any questions, they can ask the

M001225561

28

1  questions while the witnesses are there, so I would like to

2  know that.  Thank you.

3          MR. SEEGER:  Just for the record, if I could ask

4  Mr. Girardi to copy liaison counsel on that?

5          MR. GIRARDI:  Yes.

6          THE COURT:  Anything else?  The next status

7  conference is Tuesday, July 19, 9:30.  I'll meet with the

8  liaison counsel in my chambers at 8:00 that day to begin

9  getting ready for this meeting.  I appreciate everybody's

10  cooperation and for their reports.  Thank you.  Court will

11  stand in recess.

12          THE DEPUTY CLERK:  Everyone rise.

13          (WHEREUPON, the Court was in recess.)

14                            * * *

15                        CERTIFICATE

16          I, Toni Doyle Tusa, CCR, Official Court Reporter,
   United States District Court, Eastern District of Louisiana, do
17  hereby certify that the foregoing is a true and correct
   transcript, to the best of my ability and understanding, from
18  the record of the proceedings in the above-entitled and
   numbered matter.

19

20

21                        _Toni Doyle Tusa_
                          Toni Doyle Tusa, CCR
22                        Official Court Reporter

23

24

25



# Exhibit B

# UNITED STATES OF AMERICA
## JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

**CHAIRMAN:**
Judge Wm. Terrell Hodges
United States District Court
Middle District of Florida

**MEMBERS:**
Judge John F. Keenan
United States District Court
Southern District of New York

Judge D. Lowell Jensen
United States District Court
Northern District of California

Judge J. Frederick Motz
United States District Court
District of Maryland

Judge Robert L. Miller, Jr.
United States District Court
Northern District of Indiana

Judge Kathryn H. Vratil
United States District Court
District of Kansas

Judge David R. Hansen
United States Court of Appeals
Eighth Circuit

Robert A. Cahn
Executive Attorney

DIRECT REPLY TO:

Michael J. Beck
Clerk of the Panel
One Columbus Circle, NE
Thurgood Marshall Federal
Judiciary Building
Room G-255, North Lobby
Washington, D.C. 20002

Telephone: [202] 502-2800
Fax:        [202] 502-2888

http://www.jpml.uscourts.gov

March 21, 2005

Honorable Ricardo H. Hinojosa
U.S. District Judge
1701 W Bus Highway 83
Bentsen Tower, Suite 1028
McAllen, TX 78501

Re: MDL-1657—In re Vioxx Products Liability Litigation

*Felicia Garza, et al v. Merck & Co., Inc., et al*, S.D. Texas, C.A. No. 7:05-17

Dear Judge Hinojosa:

Presently before the Panel pursuant to 28 U.S.C. § 1407 is a notice of opposition to the Panel's conditional transfer order in the above matter pending before you. The parties will have an opportunity to fully brief the question of transfer and the matter will be considered at a bimonthly Panel hearing session. In the meantime, your jurisdiction continues until any transfer ruling becomes effective.

If you have a motion pending - such as a motion to remand to state court (if the action was removed to your court) - you are free to rule on the motion, of course, or wait until the Panel has decided the transfer issue. The latter course may be especially appropriate if the motion raises questions likely to arise in other actions in the transferee court and, in the interest of uniformity, might best be decided there if the Panel orders centralization.

Please feel free to contact our staff in Washington with any questions.

Kindest regards,

Wm. Terrell Hodges
Chairman

# Exhibit C

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### CASE NO.: 04-22799-CIV-HUCK

FILED by ___ D.C.

DEC 1 4 2004

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S. D. OF FLA.

CLARA FONTANILLES, an individual, on
behalf of himself and all others similarly
situated,

              Plaintiffs,

vs.

MERCK & CO., INC., a New Jersey Corp.,

              Defendant.

_____/

### ORDER DENYING PLAINTIFFS' MOTION TO REMAND AND GRANTING DEFENDANT'S MOTION TO STAY

THIS CAUSE is before the Court upon Plaintiffs' Motion to Remand [DE#5], filed

November 10, 2004 and upon Defendant's Motion to Stay All Proceedings [DE#3-1], filed

November 8, 2004. Under different circumstances, the Court would resolve Plaintiffs' Motion to

Remand first. However, the Court finds that several other cases in this district have been filed

regarding claims similar to those alleged by the plaintiffs in the above-referenced case. *See Abraham

v. Merck & Co., Inc.*, Case No. 04-22631-CIV-MARTINEZ/KLEIN; *Schneider v. Merck & Co.,

Inc.*, Case No. 04-22632-CIV-MORENO/GARBER; *Gerber v. Merck & Co., Inc.*, Case No. 04-

61429-CIV-DIMITROULEAS/TORRES. In addition, numerous similar VIOXX cases have been

stayed in other districts. In most, if not all, of these similar cases, the district court has granted

Defendant's Motion to Stay All Proceedings pending a transfer decision by the Judicial Panel on

Multidistrict Litigation ("JPML"). The Court believes that these cases should, as a general

proposition, be treated consistently so that no one plaintiff or plaintiff group has an advantage over

the others with regard to the ability to prosecute claims in a timely manner.

In the present case, the Court concludes that judicial economy and uniformity dictate that the

Court defer ruling on Plaintiffs' Motion to Remand in order to give an opportunity to all similarly

situated VIOXX cases for transfer to the MDL Judge and to allow the MDL judge to resolve the issues presented by similar remand motions. This Court acknowledges that it has jurisdiction to resolve the Plaintiffs' motion to remand prior to a transfer to an MDL order becoming final. However, this Court also has discretion to decline to decide the motion to remand while awaiting the MDL Panel's decision on transfer. *Med. Soc'y of the State of New York v. Connecticut Gen. Corp.*, 187 F. Supp.2d 89, 91 (S.D.N.Y. 2001); *In re Asbestos Products Liab. Litig.*, 170 F. Supp.2d 1348, 1349 n.1 (J.P.M.L. 2001); *Rudy v. Wyeth*, No. 03-80716 (S.D. Fla. December 11, 2003). Judicial consistency, economy and uniformity among similar VIOXX cases would be served by deferring resolution of the remand issues at this time. In the event that the JPML determines that transfer of this case is not warranted, Plaintiffs may then file a notice with this Court stating that they renew their motion to remand. Therefore, Plaintiffs will not suffer prejudice by a stay pending the JPML decision. Accordingly, it is

ORDERED AND ADJUDGED that:

1. Defendant's Motion to Stay All Proceedings Pending Transfer Decision by the Judicial Panel on Multidistrict Litigation [DE#3-1] is GRANTED. This cause remains stayed pending transfer to the MDL Court.

2. Plaintiffs' Motion to Remand [DE#5] is DENIED without prejudice to renew in the event that the cause is not transferred to the MDL Court. If transfer is denied, the Plaintiffs shall file their notice of renewal of the motion for remand within ten (10) days.

DONE in Chambers, Miami, Florida, December 14, 2004.

Paul C. Huck
United States District Judge

cc: Counsel of Record

2

# Exhibit D

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| STATE OF ALASKA,<br><br>               Plaintiff,<br><br>vs.<br><br>MERCK & CO., INC,<br><br>               Defendant. | Case No. 3:06-cv-0018-TMB<br><br><br>O R D E R |

## BACKGROUND

The State of Alaska ("the State") filed this case on December 23, 2005, in Superior Court. The State's complaint alleges that Merck's marketing practices for the drug Vioxx violated Alaska's Unfair Trade Practices and Consumer Protection Act. The complaint also alleges that Merck made false statements concerning the safety of Vioxx "that induced the State of Alaska to authorize expenditure of Medicaid funds for the purchase of Vioxx." Docket No. 1, Ex. 3 (Compl. ¶ 22). Merck removed the case to federal court, arguing that the case raises a substantial federal question. Docket No. 1. Merck then moved to stay all proceedings pending transfer to the Judicial Panel on Multidistrict litigation ("MDL"). Docket Nos. 8 (Mot.); 14 (Opp'n); 15 (Reply). Subsequently, the State moved for remand back to state court. Docket Nos. 13 (Mot.); 19 (Opp'n); 24 (Reply). On February 7, 2006, the MDL Panel issued a conditional transfer of the case. Docket No. 17, Ex. A. The conditional transfer order states that this action appears to involve "questions of fact which are common to the actions previously transferred" to the MDL Panel. *Id.* The MDL Panel issued a schedule requiring the State to oppose the transfer by March 9, 2006. *Id.* The State has moved for expedited consideration of its motion to remand, requesting that the Court issue a

1

ruling before the State's opposition to the MDL transfer is due.  Docket No. 25.  The motion for expedited consideration at **Docket No. 25** is **GRANTED.**

## DISCUSSION

Courts must strictly construe the removal statute, 28 U.S.C. § 1441, against removal jurisdiction.  Federal jurisdiction "must be rejected if there is any doubt as to the right of removal in the first instance." *Duncan v. Sutetzle*, 76 F.3d 1480, 1485 (9th Cir. 1996) (citing *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992).  As is pertinent here, 28 U.S.C. § 1441 provides for the removal of (1) actions arising under federal law or (2) actions between parties of diverse citizenship where none of the defendants are citizens of the forum state.  *See* 28 U.S.C. § 1441(b).[1]  The Court must examine the complaint filed in state court to determine whether it states a claim arising under federal law.  In making this determination, it is irrelevant whether the defendant intends to rely on the United States Constitution or a federal statute in defending the action.  The inquiry is limited to the grounds for relief invoked by the plaintiff in its complaint.  *See Merrell-Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804, 808 (1986).

On February 16, 2005, the MDL Panel issued the first transfer order establishing MDL-1657, *In re Vioxx Marketing, Sales Practices and Products Liability Litigation,* pursuant to 28 U.S.C. § 1407.  In that order the Panel stated, "[t]he pendency of a motion to remand to state court is not a sufficient basis to avoid inclusion in Section 1407 proceedings." 360 F. Supp. 2d 1352, 1354 (J.P.M.L. 2005).  The pendency of transfer to MDL, however, does not limit the Court's authority to rule on the motion for remand.  Several courts have opted to rule on motions for

---

[1]  The statute provides:

> Any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties.  Any other such action shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought.

28 U.S.C. § 1441(b).

ORDER

remand despite the pendency of transfer to MDL-1657.  *See, e.g., Kantner v. Merck & Co.*, 2005 WL 277688 (S.D. Ind. Jan 26, 2005).  However, 3,008 actions have been transferred to MDL-1657. Docket No. 17, Ex. A.

A preliminary review of the complaint and motion to remand reveals the difficult issue of whether federal question jurisdiction exists based on federal Medicaid law, which limits a state's authority to decline to pay for prescription drugs covered under the program.  *See* 42 U.S.C. §§ 1396r–8(d)(4).  As this case does not plainly warrant immediate remand, the Court finds that transfer to the MDL panel will promote efficient and coordinated proceedings, including the consideration of remand motions.[2]  The State will suffer minimal prejudice from the stay.  By contrast, the risk to Merck of duplicative litigation is significant.

**IT IS THEREFORE ORDERED:**

The motion to stay proceedings pending transfer to the MDL panel at **Docket No. 8** is **GRANTED**.  This case will be transferred to MDL-1657 for a consolidated determination of jurisdictional issues.

Dated at Anchorage, Alaska, this 6th day of March 2006.

/s/ TIMOTHY M. BURGESS
**TIMOTHY M. BURGESS**
United States District Judge

---

[2]  The judge presiding over the Vioxx MDL proceeding has expressed his preference that remand motions be presented to the MDL Panel: "There are various issues of remand in various cases throughout the country.  Again, a significant advantage of the MDL concept is some consistency. . . I'm conscious of dealing with the remand [motions] as quickly as possible, but I do want to get them all together . . . and deal with that issue in a consistent and fair fashion."  Docket No. 19, Ex. 1 (Transcript of Status Conference at 21, MDL No. 1657 (June 23, 2005)).

ORDER

Randall M. Fox
OFFICE OF THE ATTORNEY GENERAL
MEDICAID FRAUD CONTROL UNIT
120 Broadway – 13th Floor
New York, New York  10271-0007
(212) 417-5390
*Attorneys for the State of New York*

John R. Low-Beer
OFFICE OF THE CORPORATION COUNSEL
OF THE CITY OF NEW YORK
100 Church Street
New York, New York  10007
(212) 788-1007
*Attorneys for the City of New York*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------- x

THE PEOPLE OF THE STATE OF NEW YORK,         :
by ANDREW M. CUOMO, Attorney General of      :
the State of New York, and THE CITY OF NEW    :
YORK,                                         :     No. 07 Civ. 8434 (GBD)
                                              :
                          Plaintiffs,         :
                                              :
          - against -                         :
                                              :
MERCK  & CO., INC.,                           :
                                              :
                          Defendant.          :
---------------------------------------------------------------- x

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
MOTION TO REMAND FOR LACK OF FEDERAL SUBJECT MATTER
JURISDICTION**

## PRELIMINARY STATEMENT

In its Notice of Removal and its opposition to plaintiff's motion to remand, Merck has failed to carry its burden of demonstrating federal subject matter jurisdiction over this case, and the case must be remanded to the state court in which it was filed.  Most notably, Merck has not established federal question jurisdiction over plaintiffs' exclusively state and local law claims because it fails to answer one simple question:  *what specific question of federal law must be resolved in order to determine liability under plaintiffs' six state and local causes of action?*

Merck asserted in its Notice of Removal that removal jurisdiction exists under the standards the Supreme Court articulated in *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314-15 (2005).  Plaintiffs demonstrated in their moving papers that Merck failed to meet those standards because:  (a) Merck could not identify *any* specific issues of federal law that would have to be decided in order to resolve plaintiffs' state and local law claims; (b) Merck could not identify any such issues that were actually disputed and substantial to this case; and (c) Merck could not overcome the clear congressional intent (as determined by the Supreme Court) that cases such as this one be heard by state courts.

Merck's arguments in opposition to this motion lack merit and this case must be remanded to the New York State court for at least the following reasons:

*First*, Merck's efforts to diminish its burden of establishing jurisdiction are contrary to established Supreme Court and other law, and must be disregarded.  *See* Point I, *infra*.

*Second*, Merck still cannot point to *any specific* issues of federal law that must necessarily be resolved in order for liability to be determined under plaintiffs' claims.  *See* Point II, *infra*.

*Third*, Merck similarly cannot point to any issues of federal law that are actually disputed and substantial and that Congress intended to be heard in federal court.  *See* Point III, *infra*.

*Fourth*, the overwhelming authority rejects the arguments Merck makes, and Merck's

effort to distinguish some, but not all, of those authorities is without merit.  *See* Point IV, *infra*.[1]

## ARGUMENT

### I.   MERCK CANNOT DIMINISH ITS HEAVY BURDEN OF ESTABLISHING REMOVAL JURISDICTION

Merck does not deny in its opposition that it bears the heavy burden of establishing

federal subject matter jurisdiction.  (*See* Supreme Court and Second Circuit cases cited at

Plaintiffs' Memorandum of Law in Support of Their Motion to Remand for Lack of Federal

Subject Matter Jurisdiction ("Pl. Mem.") at 4.)  Instead, it argues that it satisfied its burden by

making only general assertions in its Notice of Removal.  It denounces as a "red herring"

plaintiffs' argument that more is required.  (Opp. Mem. at 14.)

Merck was required to provide a short, plain statement establishing this Court's removal

jurisdiction.  *See Allman v. W.H. Hanley*, 302 F.2d 559, 562 (5th Cir. 1962).  Under the *Grable*

standards invoked by Merck in removing this case, however, Merck was required to provide

more than general statements.  To satisfy those standards, Merck was required to establish that

(a) plaintiffs' state law claims necessarily give rise to questions of federal law that (b) are

actually disputed by the parties and substantial, and (c) can appropriately be determined by a

federal court in accordance with the congressional intent as to the division of responsibilities

between state and federal courts.  *Grable*, 545 U.S. at 314.  This standard leaves no room for

arguments that rely on general references to federal laws that might somehow be implicated by

---

[1] Merck's first argument in its opposition is an effort to avoid remand at this time by seeking a stay.  (*See* Defendant Merck & Co., Inc.'s Opposition to Plaintiffs' Motion to Remand for Lack of Federal Subject Matter Jurisdiction ("Opp. Mem.") at 1-5.)  As plaintiffs have shown in their opposition to Merck's separate stay motion and in its opening memorandum on this remand motion, remand can be easily decided without delay and further waste of the parties' and the judiciary's resources.

plaintiffs' claims.  Rather, Merck had to point to specific claims by plaintiffs and how they

purportedly raise specific federal issues that require resolution.  It did not do so.

## II.  MERCK HAS AGAIN FAILED TO IDENTIFY ANY SPECIFIC FEDERAL ISSUES THAT MUST BE RESOLVED

In their opening memorandum, plaintiffs described the facts and holdings in *Grable* and

other decisions by the Supreme Court, the Second Circuit and other courts that address when

federal question jurisdiction will apply to exclusively state law claims because they depend upon

resolution of actually disputed and substantial federal questions.  (*See* Pl. Mem. at 7-13.)  In its

opposition, Merck does not question that description of the applicable standards.  Instead, it

argues that it has met those standards by referring generally to the Food, Drug & Cosmetics Act

and federal Medicaid laws.

Missing from Merck's argument is any linking of plaintiffs' actual causes of action to the

provisions of the FDCA and Medicaid laws that Merck references.  In fact, Merck does not even

mention plaintiffs' causes of action.  By failing to link any of plaintiffs' claims to the FDCA or

federal Medicaid law, Merck cannot meet the very first of the *Grable* standards – it cannot

establish that liability under plaintiffs' six state and local causes of action can be determined only

by first resolving issues of federal law.

Moreover, Merck has not identified any specific questions under the FDCA or federal

Medicaid law that must be resolved in this case.  Merck leaves entirely unanswered important

questions:  Must plaintiffs prove that Merck violated federal law in order to establish liability on

their claims?  What elements of plaintiffs' claims can only be established by proving violations

of federal law?  What provisions of federal law must be shown to be violated?  Because Merck

could not answer these questions, it cannot begin to meet the *Grable* standards.

Plaintiffs assert six causes of action under four state and local statutes -- the New York State False Claims Act, the New York City False Claims Act, the New York Executive Law and the New York Social Services Law.  They will demonstrate Merck's violations by showing that Merck engaged in a campaign of misinformation and concealment about the cardiovascular risks of its pain medication Vioxx.  As plaintiffs described in their complaint, for example, Merck armed its thousands of sales representatives with misleading "obstacle responses" to overcome the "obstacles" to Vioxx sales created by information that cast doubt on the safety of Vioxx. (*See* Complaint ¶¶ 34-53.)[2]  These sales representatives were charged with the task of allaying doctors' concerns about these cardiovascular concerns, and thus increasing prescriptions even to patients with a established coronary artery disease.  (*Id.*)  Merck has not pointed to any issues of federal law that must be decided to find such liability.

In its opposition, Merck makes reference to federal food and drug law and federal Medicaid law, but none of the provisions cited has any bearing on the claims plaintiffs have asserted.  (Opp. Mem. at 7-9, 11-12.)  *First*, Merck argues that federal food and drug law is implicated because it "comprehensively regulates" aspects of prescription drug marketing.  (*Id.* at 7, 11.)  It points out that the FDA is charged with approving and monitoring drugs and is involved in regulating labels and package inserts that accompany the drugs.  (*Id.*)  These facts, however, are not at issue here.  Merck may well have misled the FDA about Vioxx, but regardless of that fact, plaintiffs can establish liability by demonstrating that Merck (and its sales representatives) misled physicians about Vioxx.

Merck's argument appears to be that *Grable* provides for removal jurisdiction where a plaintiff's claims are somehow related to an area where there is "comprehensive" federal

---

[2] A copy of the Complaint is attached as part of Exhibit A to the previously submitted Declaration of Randall M. Fox, dated October 26, 2007 ("Fox Decl.").

regulation.  Nothing in the Supreme Court's *Grable* decision supports that notion.  To the contrary, the Supreme Court found removal jurisdiction is warranted only where the state law claims cannot be decided without first resolving questions of federal law, those questions are actually disputed and substantial to the case and the congressional intent was to allow federal courts to hear such cases.  *See Grable*, 545 U.S. at 314.  By confirming the validity of *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804, 813 (1986), the *Grable* Court recognized that the existence of federal regulation, and regulation under the FDCA in particular, is not alone a basis for removal under the standards the Court articulated.  *Grable*, 545 U.S. at 318.  In *Merrell Dow*, the plaintiff alleged that a drug manufacturer misbranded a drug "because its labeling did not provide adequate warning that its use was potentially dangerous" and that this "violation of the FDCA 'in the promotion' of Bendectin 'constitutes a rebuttable presumption of negligence.'"  *Merrell Dow*, 478 U.S. at 805-06.  Merck's argument must thus actually be that federal law preempts plaintiffs' claims, but any assertion of that new argument for removal jurisdiction is untimely and precluded.  *See* 28 U.S.C. § 1446 (requiring a statement of the grounds for removal within 30-days of receipt of initial pleadings).[3]

    *Second*, Merck points to certain provisions in federal Medicaid law.  According to Merck, plaintiffs' claims "depend[] on the interpretation and application of federal statutory provisions that govern what drugs must be covered by or can be excluded from all state Medicaid drug reimbursement programs" (Opp. Mem. at 8), and "the Court will need to determine whether New

---

[3] Moreover, Merck has already lost the preemption argument in the multidistrict proceedings against it, where Judge Fallon denied Merck's motion for summary judgment that was premised on a statement by the FDA as to its own authority in a preamble to a regulation, which preamble was not subject to usual rulemaking procedures and was contrary to the FDA's historical position about its own authority.  *See In re Vioxx Products Liability Litig.*, 501 F. Supp. 2d 776, 786-87 (E.D. La. 2007).  Merck cites to the preamble at note 3 of its Opposition Memorandum, but fails to inform this Court that its argument has already been rejected in the multidistrict proceeding.

York was required to include Vioxx on its Medicaid formulary."  (Opp. Mem. at 11-12.)  Any review of the complaint will show that plaintiffs' claims are not about whether Vioxx should have been included in or excluded from Medicaid reimbursement or New York's formulary. Plaintiffs are seeking to recover Medicaid and consumer funds that were spent on Vioxx as a result of Merck's fraud and concealment.  In particular, they are seeking recovery of funds spent to provide Vioxx to those patients who would not have received the drug had Merck not engaged in its campaign of diminishing the cardiovascular risks of Vioxx – patients with established coronary artery disease.  Even Merck does not argue that the State and City are required to pay public funds for prescriptions obtained by fraud.[4]

## III.   MERCK FAILS TO IDENTIFY FEDERAL ISSUES THAT ARE ACTUALLY DISPUTED, SUBSTANTIAL AND APPROPRIATE FOR RESOLUTION BY A FEDERAL COURT

*Grable* and its line of cases require more than just the existence of federal questions that must be decided to resolve state law claims.  They also require that such questions be actually disputed, substantial and appropriate for resolution in a federal court as a matter of federalism and comity.  *See Von Essen v. C.R. Bard, Inc.*, No. CV 07-1850ML, 2007 U.S. Dist. LEXIS 82298, at *13 (D. R.I. Nov. 6, 2007) ("The fact that fraud-on-the-FDA is a necessary element of the [plaintiffs'] claim only shows that the claim indeed includes a federal issue.  The Supreme Court has not 'treated "federal issue" as a password opening federal courts to any state action embracing a point of federal law.'" (quoting *Grable*, 545 U.S. at 314)).  Here, the Court need not reach this question because Merck failed to identify specific issues of federal law that must necessarily be decided to resolve plaintiffs' claims.  Even if Merck had identified such issues,

---

[4] Merck also does not contradict the established case law that the fact that state Medicaid programs receive some funding from the federal government does not give rise to federal subject matter jurisdiction.  (*See* Pl. Mem. at 19 n.7.)

however, it has not established that there are any questions that are actually disputed or substantial to resolving this dispute.  Merck could not do so because plaintiffs' claims can be resolved without having to determine whether Merck misled the FDA or what criteria are necessary for including a drug within the Medicaid program.

Notably, Merck has entirely failed to address in its opposition the clear evidence that Congress intended that claims such as plaintiffs' be heard in state court.  (*See* Pl. Mem. at 18-20.)  As plaintiffs described in their opening memorandum and above, the Supreme Court in *Grable* recognized and let stand the holding in *Merrell Dow* that state law claims for negligence in mislabeling a prescription drug that implicated the FDCA did not give rise to federal question jurisdiction because Congress clearly intended for state courts to handle such claims.  (Pl. Mem. at 7-8.)  Plaintiffs further described Congress' intent by referring to Congress' empowering states to recover Medicaid funds obtained by fraud, and its encouragement of states to establish their own bodies to recover such funds and to enact their own False Claims Act, which can also be used to recover such funds.  (*Id*. at 18-20.)  Plaintiffs further described New York's great interest in recovering Medicaid funds, for the Medicaid program is the State's largest budget item, accounting for approximately $48 billion.  (*Id*. at 20.)  Merck has no response.

## IV.   MERCK IS UNABLE TO DISTINGUISH THE OVERWHELMING NUMBER OF CASES THAT REJECT ITS ARGUMENTS

In their opening memorandum, plaintiffs cited more than a dozen cases that have rejected the very argument that Merck makes here.  (Pl. Mem. at 10-13.)  In its opposition, Merck tries to distinguish only some of them, and its grounds for distinction are far from convincing.  (Opp. Mem. at 15-18.)  Merck does not address numerous cases at all.  Among them are cases brought against pharmaceutical manufacturers by states seeking to recover Medicaid funds because the manufacturers improperly marketed the drugs.  *See Utah v. Eli Lilly & Co*., No. 2:07-CV-380

TS, 2007 U.S. Dist. LEXIS 65571 (D. Utah Sept. 4, 2007); *South Carolina v. Eli Lilly & Co*., No. 7:07-18750HMH, 2007 U.S. Dist. LEXIS 56847 (D. S.C. Aug. 3, 2007); *South Carolina v. Jannsen Pharmaceutica, Inc.*, No.6:07-1452-HMH, 2007 U.S. Dist. LEXIS 49904, at *5 (D.S.C. July 10, 2007); *Pennsylvania v. Eli Lilly & Co*., No. 07-1083, 2007 U.S. Dist. LEXIS 46946 (E.D. Pa. June 26, 2007); *Alaska v. Eli Lilly & Co*., No. 3:06-cv-88 TMB, 2006 U.S. Dist. LEXIS 52783 (D. Alaska July 28, 2006).  In each of these cases, the defendant argued removal jurisdiction under *Grable*, contending that plaintiffs' claims purportedly implicated the FDCA and federal Medicaid law.  In each case, the court granted remand because it rejected those arguments and found that the state law claims did not give rise to federal question jurisdiction.[5]

Merck did attempt, unpersuasively, to distinguish the remand motions granted against it in a Vioxx case brought by an attorney general.  (*See* Opp. Mem. at 17; *see also Texas v. Merck*, 385 F. Supp. 2d 604 (W.D. Tex. 2005) & No. A-06-CA-232-LY Slip Op. (W.D. Tex. May 10, 2006)).[6]  Merck's primary argument is that the federal court in Texas should not have reached the merits of the remand motion.[7]  That argument has no bearing on the validity of the decisions.  As a secondary argument, Merck asserts that the Texas court "ignores the intricate statutory and regulatory schemes inherent in FDCA and Medicaid law."  (Opp Mem. at 17.)  It is Merck, however, that ignores that the Texas court addressed that argument and rejected it.  *See* Slip Op. at 5-6.

---

[5] In its motion to stay, Merck argues that all actions by states are essentially the same.  (*See* Memorandum of Law in Support of Merck's Motion to Stay Proceedings Pending Transfer Decision by the Judicial Panel on Multidistrict Litigation at 2-4.)  Despite the inaccuracy of that characterization, Merck should not be heard pragmatically to argue otherwise on this motion.

[6] A copy of the slip opinion is attached as Exhibit B to the Fox Decl.

[7] Merck is rather cryptic in its argument.  It asserts that "As explained in Section I, *supra*, that court's decision to remand is clearly at odds with the majority view."  (Opp. Mem. at 17.) "Section I" is Merck's argument for a stay of proceedings.

Merck seeks to distinguish *Caggioano v. Pfizer Inc*., 384 F. Supp. 2d 689 (S.D.N.Y. 2005), because "the Medicaid-related issues that must necessarily be determined to find Merck liable in this action were not at issue there." (Opp. Mem. at 18). Merck ignores that the very same arguments about the FDCA were made and rejected in that case, in which plaintiff alleged that a pharmaceutical manufacturer misled physicians about the safety of its drug.

Merck also attempts to distinguish the set of decisions in cases where states have sought to recover Medicaid funds from pharmaceutical manufacturers based on manipulation of the "Average Wholesale Price." (Opp. Mem. at 16-17.) According to Merck, those cases are different because the purported federal question at issue was limited. (*Id*.) Merck neglects that federal jurisdiction did not apply to those cases even though they involved Medicaid funds and prescription drugs subject to the "comprehensive regulation" of the FDA, and even though the claims asserted there were explicitly premised on a question that the defendants claimed was about federal law (while Merck is claiming here (wrongly) that plaintiffs' claims only *implicitly* are premised on federal law).[8]

In its Notice of Removal, Merck ignored the overwhelming precedent against its arguments and relied on two cases, *In re Zyprexa Prods. Liab. Litig*., 375 F. Supp. 2d 170, 172 (E.D.N.Y. 2005 ), and *County of Santa Clara v. Astra USA, Inc*., 401 F. Supp. 2d 1022 (N.D. Cal. 2005). As plaintiffs explained in their opening memorandum, these cases are factually distinct from the present action in that the claims there were directly and explicitly premised upon questions of federal law, and, moreover, they depart from the standards set forth in *Grable* and the numerous other authorities plaintiffs have described. (Pl. Mem. at 16-17). Merck does

---

[8] Merck also tries to distinguish some of the Average Wholesale Price cases on the additional ground that the courts in three of them also found procedural deficiencies in the removal petitions. (Opp. Mem. at 17.) The presence of alternative holdings, however, did not affect the holdings that no federal jurisdiction existed.

not deny that the claims in those cases specifically involved federal law standards.  In its

Opposition Memorandum, Merck nevertheless points to these same cases.  It also cites *West

Virginia v. Eli Lilly & Co.*, 476 F. Supp. 2d 230 (E.D.N.Y. 2007) (Opp. Mem. at 6).  That case,

however, was decided by the same judge and in the same multidistrict proceeding as the *In re

Zyprexa* decision.  It adds nothing to the prior decision and does not overcome Merck's failure to

satisfy the *Grable* standards, nor the large body of precedent that refused to apply the *Grable*

standards to find removal jurisdiction to cases analogous to this one.[9]

## CONCLUSION

For all the foregoing reasons, the State and City respectfully request that this Court

remand this case to the New York State Supreme Court for the County of New York.

Dated:  New York, New York
            November 16, 2007

ANDREW M. CUOMO
Attorney General of the State of New York
Attorney for the State of New York


                    S/
_____
RANDALL M. FOX
Special Assistant Attorney General
Medicaid Fraud Control Unit
120 Broadway – 13th Floor
New York, New York  10271-0007
(212) 417-5390

---

[9] That body of precedent continues to grow.  *See Greene v. Novartis Pharmaceuticals Corp.*, No. 7:07-CV-00091-HL, 2007 U.S. Dist. LEXIS 84082, at **13-15 (M.D. Ga. Nov. 14, 2007) (no removal jurisdiction where plaintiff's state law claims asserted that drug manufacturer inadequately tested a prescription drug and made false representations about its safety); *Ekas v. Burris*, No. 07-61156-CIV-MARRA, 2007 U.S. Dist. LEXIS 84340, at *12 (S.D. Fl. Nov. 14, 2007) (in case about backdating stock options, there was no removal jurisdiction under *Grable* because "the fact that some of [the] false statements were made to the SEC and may have violated federal law is tangential to proving the breach of fiduciary duty"); *Von Essen*, 2007 U.S. Dist. LEXIS 82298, at *12, *supra*.

MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
Attorney for the City of New York


_____ S/ _____
JOHN R. LOW-BEER
Assistant Corporation Counsel
100 Church Street
New York, New York  10007
(212) 788-1007

**PROOF OF SERVICE**

Randall M. Fox hereby declares under penalty of perjury that:  I am a Special

Assistant Attorney General in the Office of the Attorney General of the State of New

York, counsel for plaintiff The People of the State of New York, and that I caused a copy

of Plaintiffs' Reply Memorandum of Law in Further Support of Their Motion to Remand

for Lack of Federal Subject Matter Jurisdiction, to be served upon counsel for defendant

Merck & Co., Inc. by causing the same to be hand delivered on November 16, 2007

addressed to:

      Theodore V. H. Mayer
      Vilia B. Hayes
      Robb W. Patryk
      Hughes Hubbard & Reed LLP
      One Battery Park Plaza
      New York, New York  10004-1482


Dated: New York, New York
      November 16, 2007


                                        S/
                                 Randall M. Fox