1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE:  VIOXX PRODUCTS          *       Docket MDL 1657-L
             LIABILITY LITIGATION    *
6                                    *       November 4, 2011
     THIS DOCUMENT RELATES TO ALL CASES  *
7    * * * * * * * * * * * * * * * * *     9:00 a.m.

8

9

                    MONTHLY STATUS CONFERENCE BEFORE
10                  THE HONORABLE ELDON E. FALLON
                    UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES:

13   For the Plaintiffs:          Herman Herman Katz & Cotlar
                                  BY:  RUSS M. HERMAN, ESQ.
14                                820 O'Keefe Avenue
                                  New Orleans, Louisiana 70113
15
     For the Defendant:           Williams & Connolly
16                                BY:  DOUGLAS R. MARVIN, ESQ.
                                  725 Twelfth Street N.W.
17                                Washington, D.C. 20005

18   Also Participating:          Thomas Juneau, Esq.
                                  Dawn Barrios, Esq.
19                                Bob Johnston, Esq.
                                  Ann Oldfather, Esq.
20
     Official Court Reporter:     Toni Doyle Tusa, CCR, FCRR
21                                500 Poydras Street, Room B-406
                                  New Orleans, Louisiana 70130
22                                (504) 589-7778

23

24

     Proceedings recorded by mechanical stenography using
25   computer-aided transcription software.

**PROCEEDINGS**

**(November 4, 2011)**

1
2
3     **THE COURT:**  Be seated, please.  Good morning, ladies

4 and gentlemen.

5     Call the case, please.

6     **THE DEPUTY CLERK:**  MDL 1657, In Re: Vioxx Products

7 Liability Litigation.

8     **THE COURT:**  Counsel make their appearance for the

9 record.

10     **MR. MARVIN:**  May it please the Court.  Good morning,

11 Your Honor.  Douglas Marvin for Merck.

12     **MR. HERMAN:**  May it please the Court.  Good morning,

13 Your Honor.  Russ Herman for plaintiffs.

14     **THE COURT:**  We have some matters today, not too many.

15 I'm meeting with counsel in chambers after this main meeting.

16 This is our monthly status conference.  I met with liaison and

17 lead counsel to discuss the agenda with them.  I will go

18 through the items on the agenda.

19     The Settlement Program, anything on that?

20     **MR. HERMAN:**  Your Honor, nothing new.

21     **THE COURT:**  Special master and deputy special

22 masters, anything on that?

23     **MR. JUNEAU:**  Good morning, Your Honor.  Thomas Juneau

24 on behalf of the special master, Patrick Juneau.  Judge, I will

25 just report very briefly on four matters.

1         First, there are no further actions or duties to
2   be performed by the special master with regard to the attorney
3   general lawsuits.  With regard to the lien matters involving
4   attorney-client issues, those have all been addressed and the
5   reports of the special master have been submitted to the Court.
6   All issues regarding the attorney fees pertaining to the common
7   benefit fees have been addressed and a report by the special
8   master has been made to the Court, and all assigned duties with
9   regard to the claims program have been completed.
10        So, Your Honor, it is the report and
11  recommendation of the special master that he stand at ease and
12  suspend all activities until ordered to perform additional
13  tasks to be assigned by the Court.
14        **THE COURT:**  That's fine.  He has done yeoman work and
15  contributed greatly to the resolution of the issues that were
16  outstanding.  I do appreciate all of the work that the special
17  master and deputy special masters contributed to this
18  litigation.  It was very smoothly done.
19        I think that in the future the takeaway from
20  some of this is the ease with which the material was able to be
21  transferred back and forth via electronic methods.  I think
22  that was really good.  We had deputy special masters in
23  New Jersey and California and other places.  They were able to
24  communicate with each other with ease and get to the material.
25  I think that that was very helpful.  I'm hearing in other

1    litigations that that's a takeaway that a lot of courts have

2    gotten from this process.  I know the special master was very

3    instrumental in trying that method, and the success is due in

4    large part to his work.  I appreciate that also.

5                 **MR. JUNEAU:**  Thank you, Judge.

6                 **THE COURT:**  Thank you very much.

7                      Anything on class actions?

8                 **MR. HERMAN:**  No, Your Honor, but I would like to add

9    a special thanks from the plaintiff steering committee and from

10   the lawyers in the MDL.  Special Master Pat Juneau and Tom

11   Juneau have really done a remarkable job, as Your Honor

12   indicated.

13                      Under class actions, nothing new, Your Honor.

14   Under state/federal coordination, Ms. Barrios is here to

15   report, Your Honor.

16                 **MS. BARRIOS:**  Thank you, Mr. Herman.

17                      Good morning, Your Honor.  There has only been

18   one conditional transfer order since the last status

19   conference, but there were no remands associated with the case

20   that was transferred over.  We continue to update the database

21   and remove cases and plaintiffs that have been dismissed.

22                      We have about eight derivative claimants that

23   are still open on the docket.  I've been in communication with

24   Ms. Wimberly who understands and will speak with Mr. Marvin

25   about looking at these eight cases and see if they qualify for

1    a dismissal.  We have at 9:45 a special status conference with

2    the attorneys general.  That's the end of my report,

3    Your Honor.

4              **THE COURT:**  Fine.  Thank you very much.

5              The remand situation is persistent in these

6    cases.  It's a little difficult to get your hands around them

7    early on.  The motions are made more often than not in the

8    transferor courts, and the judges in the transferor courts

9    generally send the cases along with the outstanding motions.

10   So the transferee courts in this country get a lot of those

11   motions.  It's difficult to make a decision as to whether you

12   ought to stop everything and deal with the remand motions

13   because they fall into several groups.

14             There's some remand motions that are filed for

15   reasons that they feel that because of the defendants they

16   don't have the diversity and their target defendant is local, a

17   significant defendant is local, and therefore they should be

18   back in their area.  That's a small portion, but it's a portion

19   of the remand.

20             This are other remand motions that are filed for

21   various reasons.  They are not really interested in going back,

22   frankly.  They're interested in creating some issues that call

23   the attention of the plaintiffs' committee to their

24   significance.  Many feel that by filing motions to remand, they

25   get the attention of the plaintiffs' committee.  The last thing

1  they really want is to leave the litigation.  They want to stay

2  in the litigation.  The purpose of the remand is for different

3  reasons.

4           Lastly, oftentimes the motions are filed, but

5  the individual lawyer who has filed the motion may not

6  appreciate the cost that is going to be entailed if he or she

7  has to try that case before any joint discovery is brought

8  about in the MDL.  Oftentimes there's some general liability as

9  well as specific liability in these cases, and the general

10  liability is extremely costly.  If they have to pitch that case

11  from soup to nuts by themselves, the resources that it takes

12  are considerable.  So it's like catching a tiger by the tail;

13  you're sorry you did it.

14           So from my seat in the bus, it's difficult to

15  focus on those cases without some understanding as to the

16  nature of the remand and the significance of the motion.  We

17  talk about this when MDL judges get together, what to do with

18  these matters, and it's difficult sometimes.

19           So what I did in this particular case is to hold

20  them.  My thinking was that at the appropriate time, I would

21  try to group them and then bellwether them, or at least motion

22  practice them so that I would just hopefully do one or two

23  motions in each category and then "me too" the rest of them.

24  There are many ways of doing it.

25           **MS. BARRIOS:**  Yes, Your Honor.  I failed to mention

1    one thing.  I do want to add my thanks on the record to

2    Mr. Juneau because he has been invaluable to the attorneys

3    general.  I ask that you don't totally dismiss him because I've

4    spoken with him about assisting further in the discovery

5    matters of the attorneys general.  Thank you, Your Honor.

6              **THE COURT:**  Thanks very much.

7                   Anything on the *pro se's*?

8              **MR. JOHNSTON:**  Good morning, Your Honor.

9    Bob Johnston, curator for the *pro se's*.

10                  Nothing needs to be reported that is beyond --

11   I'm just looking at it.  I provided the Court with the

12   Curator's Status Report 32.  The first paragraph talks about

13   the February 12, 2008 appointment of the curator, which tells

14   me that we are approaching four years.  So this long history

15   that you're having a commentary by the various individuals,

16   including the special master and Dawn Barrios and what have

17   you, I want to thank you for obviously the appointment, but

18   also because it has gone very, very smoothly.  We have very,

19   very few calls at this juncture.  It's gone from the many to

20   the very few.  I think it's worked extraordinarily well.  I

21   thank the Court.

22             **THE COURT:**  Thanks for your help.  It was very, very

23   significant.  That's an issue that always presents itself in

24   the MDLs.  We really experimented a little bit with the

25   appointment of a *pro se* curator.

1          People just want to know what's happening.  We

2     have tried to do that with the Web site, but oftentimes they

3     are not really familiar or comfortable with the Web site.  They

4     like to be able to talk to somebody.  That aspect of the case

5     was very helpful.  The public, litigation is all about being

6     able to talk to a responsible lawyer and get their questions

7     answered.  You've done a great service and we appreciate it.

8          **MR. JOHNSTON:**  Thank you.

9          **MR. HERMAN:**  Your Honor, if I may, I would like to

10    thank Bob Johnston.  He certainly relieved the PSC of a lot of

11    phone calls and letters, etc.  His more than 45 years at the

12    bar, both as a plaintiff lawyer and a defense lawyer, really

13    served well.  We thank him.

14          I also want to at this juncture, for the record,

15    state what an extraordinary job Dawn Barrios has done as state

16    liaison.  Organizing the various AG conferences, participating

17    in keeping everyone on an even keel, and moving the AGs along

18    has been a vexatious job.  The PSC appreciates what Ms. Barrios

19    has done in that regard.

20          **THE COURT:**  The Court likewise.  The challenge in

21    these cases is -- and it's becoming more and more of a

22    challenge as the cases increase.  By the way, I just came back

23    from an MDL conference, and there's an uptick in the MDLs.  My

24    take on it is one of the reasons for that is CAFA, frankly.

25    Also, I might say that the courts of appeal don't look upon

1    class actions with the enthusiasm that they did five, ten years

2    ago.

3              So as a result of both of those things, I think

4    the plaintiffs' bar is bringing complex litigation cases more

5    in the MDL than they are in class actions.  When they do that,

6    that presents some issues of state/federal coordination that's

7    challenging.  We saw that in *Vioxx*.  A large portion of the

8    inventory was in state courts, primarily in New Jersey but also

9    in Texas and in California as well as other states.  Those are

10   the three centers of gravity for those state court cases.

11             I think in order to bring some organization to

12   that different structure, it's helpful to have a capable person

13   who is the coordinator of that type of litigation.  Dawn has

14   served in that capacity and served well as chair of that state

15   liaison committee.

16             What I do is talk to the state court judges and

17   get recommendations from them, from their particular areas,

18   that they think should be on the committee.  I try to appoint

19   those individuals, but I pick the chair, somebody who I think

20   can coordinate well.  I think that helped me coordinate it with

21   the state judges.  Of course, Dawn has done yeoman work

22   coordinating with the lawyers and I appreciate her.

23             **MS. BARRIOS:**  Thank you, Your Honor.

24             **THE COURT:**  Governmental actions.

25             **MR. MARVIN:**  Your Honor, before we turn to that, I

1    wanted to wait my turn on behalf of Merck until later in the

2    agenda when I would address some other matters, but I would

3    like to rise now and echo the words of Mr. Herman and to thank

4    Mr. Juneau as the special master, Mr. Johnston, and

5    Ms. Barrios.  It really has been a pleasure in dealing with

6    each of them.  Their work has been excellent and just

7    contributed so much to smooth operation of this proceeding.  On

8    behalf of Merck, we would like to thank them for their efforts.

9              **THE COURT:**  This has been a standout litigation

10   because it's the shortest litigation in the history of the MDL

11   from the standpoint of the date that suit was filed until it's

12   completed.  It took us about three years to resolve the case,

13   about 50,000 claimants.  Some litigation is still going on 20,

14   30 years afterwards, and nothing has been accomplished similar

15   to this.

16              It's in large part because of the good fortune

17   that I've had in having experienced counsel and professional

18   counsel to drive this case.  That's what makes it doable,

19   frankly.  It's not the Court.  It's really counsel that pull

20   the oars and move the boat, so I appreciate it.

21              Third-party payors, anything on that?

22              **MR. HERMAN:**  Yes, Your Honor.  I have a report to

23   make on behalf of the committee.  As I begin, I would like to

24   preface the remarks.

25              Your Honor issued PTO 57 setting forth the

1    third-party payor parameters.  There were 176 third-party payor

2    matters.  At present time there are 33 third-party payor

3    attorney applicants for a limited fund that was negotiated with

4    Merck.  26 of the 33 applicants filed timely.  Nevertheless,

5    the committee felt that rather than bring the matter to the

6    Court that we would make extensions of the deadlines we set

7    ourselves.  We'll issue a written report to Your Honor on

8    Monday.

9                I do want to point out that the matter was

10   negotiated by Chris Seeger and Tom Sobol almost totally, and

11   without their attention to the matter we wouldn't be before you

12   today.  Mr. Dugan, who is on the committee, tried the only

13   third-party payor case.  Elizabeth Cabraser was appointed by

14   Your Honor at inception and has been very important in the

15   third-party payor matters.  Mr. Birchfield, myself, and

16   Mr. Levin have from time to time participated in these

17   considerations along with other lawyers.

18                We sent out two questionnaires to obtain

19   basically the following information:  Were they involved in

20   third-party payor and would they affirm their involvement in

21   detail; were they paid any fees from the third-party payor

22   clients whom they represented; had they previously submitted

23   hours in connection with the prior determination by Your Honor

24   of common benefit; what they computed their lodestar to be in

25   hours and dollars; whether there was an adjusted lodestar;

1    whether they had unreimbursed costs; and other information.

2              We received questionnaires from 31 of the 33

3    applicants and then two additional came in.  We can report,

4    having reviewed the submissions, there are some qualitative

5    differences as well as computation differences among the

6    applicants.  The fee allocation committee yesterday in its

7    meeting determined that we would not make an allocation

8    recommendation but that we would give Your Honor a full report

9    on Monday, a written report, and we would await further

10   instructions from Your Honor as to the future course of this

11   matter.

12             THE COURT:  Let me get the report first, and then I

13   will get back in contact with you and explore some of the

14   details.  Frankly, when I saw the numbers, I didn't know that

15   many people were working on this particular issue.  I knew that

16   Chris and Tom were, and of course I knew Elizabeth and James

17   and the PSC leadership were, but I did not know that a lot of

18   others had done some work in this case.  I am going to have to

19   take a look at that and decide where we go from there.

20             MR. HERMAN:  Your Honor, the next matter at page 6

21   are pending personal injury cases.  I believe Ms. Oldfather and

22   Mr. Marvin will speak to that issue.

23             THE COURT:  We are in that phase of this case where

24   it's closing out.  I make some of these comments for the

25   record.  What I have done, as you all know, is to keep a Web

1   site active in this particular case.  I put on the Web site the

2   transcripts.  I do that not only for people who are interested

3   in the case or participants in the case presently, but I do it

4   because of the scholars who study this area of the law.

5   Hopefully they have a blow-by-blow account of what's going on

6   and what has gone on so that they can at least analyze whether

7   this method works, should be tweaked, should not be tweaked,

8   whatever.  That's the reason I go into some detail on some of

9   these things.  I received from Ann a list of the cases that she

10  has compiled, and we are looking at --

11             What's the total on it, Ann?

12        MS. OLDFATHER:  Good morning, Your Honor.

13  Ann Oldfather for the record.

14             The total is 97.  We subtotaled them by groups.

15  I apologize.  We didn't have a bottom line total.  For the

16  benefit of those listening in, Your Honor, and others in the

17  courtroom, I will just do a quick summary of that census.

18        THE COURT:  Sure.

19        MS. OLDFATHER:  Of course, the census originated from

20  a project that started in June when Your Honor ordered all of

21  the remaining personal injury plaintiffs to provide a consent

22  to me and members of my firm, which we then provided to Merck,

23  and Merck then provided us with a set of plaintiff records on

24  each of those plaintiffs.  We'll get in a moment to where that

25  project stands, but it is substantially completed.  There are

1    only three of the remaining personal injury plaintiffs for whom

2    we have not gotten records.

3              So of the 97, Your Honor, I provided the same

4    breakdown to Mr. Marvin, and I'll go through his numbers and my

5    numbers very quickly.  This are six categories.  There's a

6    heart attacks category.  There is a stroke/TIA category.  There

7    is a category where the plaintiff claimed to have both a heart

8    attack and a stroke, so both events.  The fourth category is

9    called VTE, venous thromboembolism, which picks up pulmonary

10   emboli cases and deep vein thrombosis cases, PE and DVT cases.

11   So that's the VTE category.  There's an "other" category, and

12   in the census we have provided a very brief description of what

13   that is specifically for each person.  Then the last category

14   are the three folks for which we don't have records.

15             Our totals in the heart attack category -- and

16   again, Your Honor, this is done by lawyers, not doctors.  This

17   is just for planning purposes, not certainly concession or

18   admission or establishing of it as evidence.  Our totals in the

19   heart attack cases are 27.  Merck disagrees on four of those

20   and their total is 23, but roughly equal.

21             Our total in the stroke/TIA category is 15.

22   Merck thinks two of those should come off, but it adds two

23   others that it moved out of another category.  So they end up

24   with 15 also.

25             I should say, Your Honor, that you had asked in

1    the pre-status conference for the number of *pro se's*.  There

2    are three *pro se's* in the stroke category and there are four

3    *pro se's* in the heart attack category.  I neglected to mention

4    that.

5            Then in the third category, which is a combined

6    claim of both an MI and a stroke, our number is the same.  We

7    have one person.

8            In the VTE category, the venous thromboembolism,

9    our count is 29.  Merck disagrees on one of those.  They take

10   off one.  They add two.  They end up with 30.  I'm sorry,

11   Your Honor.  There are six *pro se's* in the VTE category.

12           Then the fifth substantive category, which is

13   the other, our count is that there are 22, and Merck's count is

14   that there are 26.  Of those number, of our 22 there are six

15   *pro se's*.  Then as I mentioned, Your Honor, there are three

16   plaintiffs who have not submitted consents and, therefore,

17   Merck hasn't obviously provided the records.

18           My understanding, Your Honor, is that after the

19   public conference, we are going to have an in-chambers

20   discussion about trial plans and other plans and resolution of

21   all of these 97 cases.  So unless Your Honor has a question --

22           **THE COURT:**  No, I don't.  I think when we talk in the

23   conference room about the VTEs and others, we probably ought to

24   do some motion practice on the *Daubert* issues and see where it

25   is at that point so that you don't spend a lot of money if you

1   don't have a case.  I don't know whether you have a case or

2   don't have a case, but it seems to me before a lot of resources

3   are plugged in, we ought to see what the science is about that

4   particular injury that that particular person is claiming.

5           With the three nonrecords, we have given these

6   people a lot of time to respond.  If they haven't contacted

7   you, it just seems to me that they have moved on in life and

8   they want to get finished with this case; they want it over.

9           **MS. OLDFATHER:**  Your Honor, actually, we have made a

10  lot of progress on that.  When we started back in June, there

11  were quite a few.

12          **THE COURT:**  Oh, yes.  No, I know that.

13          **MS. OLDFATHER:**  When we were here in September, right

14  before that, it was over 10 that had never been located.

15          Since we are doing shout-outs, I need to give a

16  shout-out to Megan Hastings in my office, who utilized some of

17  her prior journalistic career talents, and we have tracked down

18  everybody but one.  That one person, Maureen Campbell, we just

19  cannot find.  We found everybody else that was missing.

20          Of all those people -- and this is an

21  interesting, I think, anecdotal statistic -- everybody was

22  thrilled that they had heard from us and they wanted to keep

23  their case active except for one person.  And Your Honor has

24  mentioned that there are people like that that have just moved

25  on.  I don't want to overstep here, but that person had an

1   opportunity to send in a consent and she declined.

2            That leaves us, really, with we have two people

3   today to talk about, Maureen Campbell and Patricia Kelly.  The

4   third one is a death case, and we can't really get a formal

5   representative to talk to.  We have found them, but we can't

6   get a party in interest.

7            THE COURT:  It's not unusual.  We have all seen that.

8   People have these experiences in life and then they move on,

9   and they don't want to be bothered with it.  They don't want to

10  look back.  It's painful or they have moved on or they have

11  reconsidered or they just don't want to be bothered anymore.

12  That's their right, but I can't keep them on the docket.

13           MS. OLDFATHER:  That is the next item, Your Honor.

14  Mr. Marvin may want to respond to just the general comments

15  about the cases.

16           MR. MARVIN:  It is true that we are in agreement on

17  the final number of cases that exist presently.  We are pretty

18  much in agreement on the categories of injuries that

19  Ms. Oldfather has provided.  I think that there are seven or

20  eight where we might have a disagreement as to which category

21  it should fall into.  I think once we both have an opportunity

22  to look at those cases more closely, we will be able to agree

23  on the correct category.

24           As to the last point that Your Honor was making

25  where records have not been available, two of those are on

1  motion for today, Campbell and Kelly, so I assume that

2  Your Honor will hear that after the hearing as you have before.

3  Those are two which are either missing in action or have not

4  responded with consent, so we have moved to dismiss those

5  cases.

6         We have several other motions.  But as I say, I

7  understand that Your Honor will take that up after the status

8  conference.

9         THE COURT:  Yes.  The thing that we need to talk

10 about in the conference room that will put a little bit more

11 flesh on the bones is that we have to think about the

12 preliminary motions in the cases.  We'll get over that,

13 preliminary motions, and then depositions of treaters, that

14 needs to be done, and any other depositions that need to be

15 done, and then I am going to look to you-all for some guidance

16 or suggestions on how we go about dealing with the cases.

17        My thinking would be that we take one or two in

18 each of those categories, the plaintiff picks one, the

19 defendant picks one, and we bellwether it and see where it is.

20 I would like you-all to look at the categories and see whether

21 or not there's any case that sort of captures the whole

22 category.  Maybe it's not able to be done with just these

23 limited numbers.

24        I think rather than start at the beginning and

25 try every case -- it just doesn't make a lot of sense to me --

1  if we can short-circuit in some way, ideally with bellwethers,

2  and then decide where we want to try the bellwethers, whether

3  it's here or some other place, that will give me an opportunity

4  to make a decision as to whether I go back and try it or we

5  have somebody else try it.

6          **MR. MARVIN:**  Thank you very much.

7          **MS. OLDFATHER:**  Judge, I'm not sure if Mr. Marvin was

8  suggesting that the items that are listed under B noticed for

9  actual hearing today should be discussed at the end of the

10  conference?  It was my impression we were going to bring them

11  up now.

12          **THE COURT:**  I was going to finish this thing and,

13  while everybody is here, bring them up.

14          **MS. OLDFATHER:**  Then we will go back to the B items.

15  Thank you, Judge.

16          **THE COURT:**  The next item on the agenda.

17          **MR. HERMAN:**  Your Honor, there is nothing new.  The

18  original fee allocation committee has done its job.  The

19  third-party payor committee has now reported orally and will do

20  so on Monday.

21          With regard to the other pending motions, I do

22  want to indicate that Mr. Birchfield has talked with

23  Mr. Garretson.  Mr. Birchfield will coordinate with

24  Mr. Garretson the lien situation as regards the remaining

25  cases.

1          **THE COURT:**  That's important.  I mentioned that at

2    the conference a moment ago.  While you have this inventory,

3    Mr. Garretson can deal with the government better as a group

4    than he can with single cases.  Particularly the statutory

5    liens, it's to their benefit that some negotiation be conducted

6    on a group basis because the lawyers are responsible, the

7    litigants are responsible, everybody is responsible, so there's

8    no escape from those liens.

9               It's been our experience in this case that if

10   the lien negotiator or lien organizer has a group, he can go to

11   the government and get a discount from those liens.  They are

12   going to have to pay it or the lawyers are going to have to pay

13   it or somebody is going to be responsible for paying it.  So if

14   you wait until each case spins off, they are going to pay the

15   full lien, whereas now there's an opportunity to pay a

16   substantial discount and you want to take advantage of that.

17          **MR. HERMAN:**  Your Honor, the other pending motion

18   is --

19          **THE COURT:**  What about the appeals, Russ?

20          **MR. HERMAN:**  Well, the appeals as regards the fee

21   allocation committee appeals have now been dismissed in the

22   Fifth Circuit.

23          **THE COURT:**  Okay.

24          **MR. HERMAN:**  Dorothy Wimberly has filed a motion for

25   summary judgment that is quite extensive.  Dorothy may want to

1    address that.  I understand that the Court has set that for

2    January 18 at 9:45.

3         **THE COURT:**  I think that's set on that date.  If we

4    don't have anything else, I will hear from Dorothy on those

5    three motions.  Anything else?

6         **MR. MARVIN:**  Just on the last point about the motion

7    that we filed on the pulmonary embolisms and DVTs.  I think

8    that's something we are going to be discussing in chambers with

9    you.

10        **THE COURT:**  Right.

11        **MR. HERMAN:**  Your Honor, I mentioned Ms. Wimberly,

12   who is an outstanding member of the bar, and my partner Leonard

13   Davis -- and I notice that this is Status Report 67.  They have

14   had primarily the responsibility for coordinating and resolving

15   and producing the written status reports.

16             I might add that because of Your Honor's

17   requirement that lawyers meet face-to-face often to resolve

18   problems and because Your Honor has regular status conference

19   meetings and post reports and conferences, that in large part

20   has moved this case on remarkably well.  We thank Your Honor

21   for Your Honor's attention and your time, which is precious,

22   and we also appreciate Ms. Wimberly and Mr. Davis for what they

23   have done in helping us organize, that is, both sides, our

24   presentations.

25        **THE COURT:**  I think that's something that's been

1   kicked around now in the MDL committees, and the judges are

2   trying to experiment with Skype and a couple other things.

3   Skype is great, but there's something that happens when people

4   get together, and they get together primarily in a conference

5   room atmosphere, that is able to move the case along and also

6   give the feeling that everybody is in this boat together, so to

7   speak.  It's a smaller boat in this kind of room and it has

8   that effect on people, I have found.  When you get more people

9   to row the boat, even if you are rowing it from different sides

10  of the boat, it moves the boat forward a lot better.  I have

11  found that that's helpful.

12           Now, some of my colleagues, as I say, do it on

13  the phone instead of in person, and some think you can use

14  Skype and other methods.  It has been my experience that it's

15  not as effective as in person, but that's something probably

16  you are going to be asked for input on because we are trying to

17  do some interviews of lawyers.  My view of life and living is

18  that if you want to catch a fish, it's better to ask a fish

19  than it is a fisherman.  The committees are going to try and go

20  out and talk with the folks who are specialists in this area.

21           Anything else?

22       MR. HERMAN:  No, Your Honor.  Mr. Davis passed me a

23  note.  I looked around for my colleague, Mr. Becnel, and I

24  didn't see him.  As I understand it, your next status

25  conference will be January 5?

1        **THE COURT:**   January 5.

2        **MR. HERMAN:**   Mr. Davis tells me that may be the BCS

3    game, which means colleagues from outside New Orleans better

4    make transportation and hotel plans today for January 5.

5        **THE COURT:**   I probably won't be able to do anything

6    about that.  I'm not going to issue an injunction to stop it,

7    for sure.

8                    **(End of Status Conference)**

9                              * * *

10                          **CERTIFICATE**

11        I, Toni Doyle Tusa, CCR, FCRR, Official Court

12    Reporter for the United States District Court, Eastern District

13    of Louisiana, do hereby certify that the foregoing is a true

14    and correct transcript, to the best of my ability and

15    understanding, from the record of the proceedings in the

16    above-entitled and numbered matter.

17

18

19                              s/ Toni Doyle Tusa
                                Toni Doyle Tusa, CCR, FCRR
20                              Official Court Reporter

21

22

23

24

25