UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX | : | MDL NO. 1657 |
| PRODUCTS LIABILITY LITIGATION | : | SECTION: L |
| | : | JUDGE FALLON |
| | : | MAG. JUDGE KNOWLES |

............................................... :

**THIS DOCUMENT RELATES TO ALL CASES**

## ORDER & REASONS

Currently pending before this Court is Merck's Motion for Order to Show Cause Why Relator's False Claims Act Claim Should Not Be Dismissed (Rec. Doc. 55437). The Court has heard oral argument on the motion and reviewed the briefs and the applicable law and now issues this Order and Reasons.

**I.     FACTUAL BACKGROUND**

To put this matter in perspective, a brief review of this litigation is appropriate. This multidistrict products liability litigation involves the prescription drug Vioxx, known generically as Rofecoxib. Merck, a New Jersey corporation, researched, designed, manufactured, marketed and distributed Vioxx to relieve pain and inflammation resulting from osteoarthritis, rheumatoid arthritis, menstrual pain, and migraine headaches. On May 20, 1999, the Food and Drug Administration approved Vioxx for sale in the United States. Vioxx remained publicly available until September 20, 2004, when Merck withdrew it from the market after data from a clinical

trial known as APPROVe indicated that the use of Vioxx increased the risk of cardiovascular thrombotic events such as myocardial infarction (heart attack) and ischemic stroke. Thereafter, thousands of individual suits and numerous class actions were filed against Merck in state and federal courts throughout the country alleging various products liability, tort, fraud, and warranty claims. It is estimated that 105 million prescriptions for Vioxx were written in the United States between May 20, 1999 and September 30, 2004. Based on this estimate, it is thought that approximately 20 million patients have taken Vioxx in the United States.[1]

California was the first state to institute a consolidated state court proceeding on October 30, 2002. New Jersey and Texas soon followed suit, on May 20, 2003 and September 6, 2005, respectively. On February 16, 2005, the Judicial Panel on Multidistrict Litigation ("MDL") conferred MDL status on Vioxx lawsuits filed in various federal courts throughout the country and transferred all such cases to this Court to coordinate discovery and to consolidate pretrial matters pursuant to 28 U.S.C. § 1407. *See In re Vioxx Prods. Liab. Litig.*, 360 F. Supp. 2d 1352 (J.P.M.L. 2005). Even after the creation of this federal MDL, many cases remained pending in the various state courts.

One suit transferred to this Court is a suit brought by a private individual purportedly on behalf of the District of Columbia, pursuant to the District of Columbia False Claims Act.[2] The plaintiff in that suit, termed a relator under the applicable law, alleges that Merck fraudulently

---

[1] For a more detailed factual background describing the events that took place before the inception of this multidistrict litigation, see *In re Vioxx Prods. Liab. Litig.*, 401 F. Supp. 2d 565 (E.D. La. 2005) (resolving *Daubert* challenges to a number of expert witnesses).

[2] The plaintiff also asserts a claim under the D.C. Consumer Protection Procedures. That claim is not implicated by Merck's motion.

marketed Vioxx to physicians in the District of Columbia, who in turn caused the District of Columbia to pay for Vioxx prescriptions that it would not otherwise have authorized. The relator filed suit pursuant to a statute which permits a private whistleblower to pursue claims of fraud on behalf of the District of Columbia, subject to certain limitations.

Merck argues that the relator cannot bring the False Claims Act claim because the complaint is based on publicly disclosed materials and allegations against Merck, and that the relator is not an original source of those allegations or materials. In response, the relator argues that none of the publicly disclosed materials cited by Merck expressly alleged that Merck had defrauded the District of Columbia through its marketing practices or otherwise, and therefore Merck has not carried its burden on the motion to dismiss.

**II.     Law and Analysis**

**A.     Motions to Dismiss**

Motions to dismiss for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6) are "viewed with disfavor and rarely granted." *Lowrey v. Texas A&M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997) (quoting *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards*, 677 F.2d 1045, 1050 (5th Cir. 1982)). Federal Rule of Civil Procedure 8(a)(2) provides that a pleading stating a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007). In considering a motion to dismiss under Rule 12(b)(6), the Court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205

(5th Cir. 2007).

However, a pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, — U.S. —, —, 129 S.Ct. 1937, 1949 (2009). Therefore, to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Id*. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 554. The Court will not "strain to find inferences favorable to the plaintiffs" or "accept conclusory allegations, unwarranted deductions, or legal conclusions." *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004) (quotation omitted).

**B.     D.C. False Claims Act**

The District of Columbia has enacted a False Claims Act analogous to the federal statute which permits treble damages and civil penalties against a person "for each false claim which the person ... [k]nowingly makes, uses, or causes to be made or used, a false record or statement to get a false claim paid or approved by the District." D.C. Code. § 2-308.14(a)(2). The statute allows private citizens to bring suit on false claims paid by the District. D.C. Code. § 2-308.15(b)(1). However, a private citizen may not bring suit if the underlying allegations or transactions have been disclosed by the news media, unless the person is the original source:

> (A)    No person may bring an action pursuant to subsection (b) of this section based upon allegations or transactions in a criminal, civil, or administrative proceeding, investigation, or report, or audit conducted by or at the request of the Council, the Auditor, the Inspector General, or other District or federal agency; or upon allegations or transactions disclosed by the news media, unless the person bringing the action is an

-4-

>	original source of the information.
>
> (B)	For purposes of subparagraph (A) of this paragraph, the term "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based, who voluntarily provided the information to the District before filing an action based on that information, and whose information provided the basis or catalyst for the investigation, report, hearing, audit, or media disclosure which led to the public disclosure as described in subparagraph (A) of this paragraph.

D.C. Code. § 2-308.15(c)(2). This "public disclosure bar" is a jurisdictional barrier. *Grayson v. AT&T Corp.*, 980 A.2d 1137, 1146 (D.C. 2009), *vacated in part on other grounds*, 989 A.2d 709. "[T]he purpose of the FCA is to deter and punish false claims by authorizing individuals with *direct* and *independent knowledge* of those claims to file suit on behalf of the District as a *qui tam* plaintiff . . . ." *Id.* at 1147 (emphasis in original).

With respect to the public disclosure bar, the D.C. Court of Appeals in *Grayson v. AT&T Corporation* relied on federal law holding "that the public disclosure bar is triggered where the public disclosure raises the inference of fraud so as 'to set the government squarely upon the trail of the alleged fraud.'" *Id.* at 1148 (quoting *In re Natural Gas Royalties Qui Tam Litig.*, 452 F.3d 1032, 1041 (10th Cir. 2009)). Put another way,

> "[I]f X + Y = Z, Z represents the *allegation* of fraud and X and Y represent its essential elements. In order to disclose the fraudulent *transaction* publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.*, the conclusion that fraud has been committed." Read appropriately, the variables of the formula are labeled as follows: "X (misrepresented state of facts) + Y (true state of facts) = Z (fraud)."

*Id.* (quoting *United States ex rel. Springfield Ry. Co. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994)). "In other words, 'a *qui tam* action cannot be sustained where all of the material elements of the fraudulent transaction are already in the public domain and the *qui tam* relator [only] comes forward with additional evidence incriminating the defendant.'" *Id.* (quoting *United*

-5-

*States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675, 687 (D.C. Cir. 1987)).

In addition, the lawsuit must be "based upon" the publicly disclosed allegations. In *Grayson*, the court surveyed federal law on point and adopted the interpretation of "based upon" as "supported by publicly disclosed allegations or transactions, as evidenced by substantial identity between the publicly disclosed allegations [or transactions] and the qui tam complaint." *Id.* at 1146 (quoting *In re Natural Gas Royalties Qui Tam Litig.*, 452 F.3d at 1040); *see also United States ex rel. Reagan v. E. Tex. Med. Ctr. Regional Healthcare Sys.*, 384 F.3d 168, 176 (5th Cir. 2004) ("An FCA qui tam action even partly based upon public allegations or transactions is nonetheless 'based upon' such allegations or transactions.") (quotation and alterations omitted).

In *Grayson*, the relator alleged that the defendant telecommunications companies were defrauding the District of Columbia by retaining unspent calling card balances and treating them as revenue rather than as unclaimed property which should have escheated to the District. The issue of the legal status of unclaimed credit card balances had been identified in an industry newsletter and several legal articles before the relator brought his suit. The D.C. Court of Appeals affirmed the lower court's finding that "sufficient information existed in the public domain to raise an inference of fraud." *Id.* at 1151. The published newsletter and articles flagged the issue of unclaimed calling card amounts and that telecommunications companies were treating those funds as revenue rather than unclaimed property owed to states. Therefore, "the public disclosures provided specific details about the fraudulent scheme and the types of actors involved in it, removing this from a situation where the government would need to comb through myriad transactions performed by various types of entities in search of potential fraud."

*Id.* (quotation omitted).

**C.     Analysis**

Merck argues that the public disclosure bar precludes the relator from bringing this claim. Merck points out that the complaint cites medical studies and news stories regarding Vioxx and its health risks. It therefore argues that all the relevant facts regarding the state of the facts as misrepresented by Merck versus the facts as they actually existed were in the public domain. Merck argues that Plaintiff merely parrots those facts and that the public disclosure bar prohibits this suit. Additionally, in its reply brief, Merck cites a number of state court cases predating this action, in which allegations of fraud against Merck were publicly disclosed.

In response, the relator argues that although facts regarding the risks of Vioxx were public, there were no allegations that Merck fraudulently withheld information or "engaged in any nefarious conduct in its marketing efforts" that would have triggered the D.C. False Claims Act. Rather, the relator argues that the purported public disclosures cited by Merck merely referred to the uncertain health risks of Vioxx and did not articulate allegations of fraud or contain the elements of fraud, such as allegations that Merck was falsely misleading medical providers to obtain payment for Vioxx. Additionally, the relator argues that cases filed outside the District of Columbia are irrelevant to the disclosure bar analysis under the D.C. False Claims Act. Essentially, the relator argues that, in terms of the $X + Y = Z$ equation, the misrepresented state of the facts was not publicly disclosed, and therefore the public disclosure bar does not apply.

As set forth above, litigation over the health risks of Vioxx began in state courts in 2002, and was well under way by the time Merck withdrew Vioxx from the market in 2004 and the

-7-

Judicial Panel on Multidistrict Litigation assigned federal court Vioxx litigation to this Court in February, 2005. Thus, the Court is not assessing the relator's complaint in a vacuum, but rather against this extensive backdrop of Vioxx litigation which predates his suit.

Merck cites a number of public disclosures predating the relator's suit. First, Merck cites a May 22, 2001 New York Times article which, while not using the word "fraud," certainly indicated some divergence between the Vioxx state of affairs as Merck represented them and the actual state of affairs. The article referred to studies indicating that Vioxx was associated with a high risk of heart problems, that Merck asserted that Vioxx was safe and merely less cardioprotective than other similar drugs, and that "The marketing of [Vioxx] is unbelievable" and "there are many people out there who are taking these drugs that should not be." Thus, the ingredients of fraud, a real risk to Vioxx combined with denial of that risk by Merck and rigorous advertising of the drug, were already being hinted at as early as 2001 in the media. While this may not have been enough in 2001 to "set the government squarely upon the trail of the alleged fraud," it certainly laid the groundwork. 980 A.2d at 1148.

Second, Merck cites a number of state court cases specifically alleging Medicaid fraud against Merck arising out of its marketing of Vioxx. In particular, Merck provides the complaint filed by the State of Texas on June 30, 2005. The Texas complaint alleges that Merck "engaged in knowing misrepresentations, including, but not limited to, direct representations to the Texas Medicaid program that Vioxx was safe and effective as well as advertising and promotional campaigns that falsely represented the safety of Vioxx." (Rec. Doc. 58191-2 at 4).

The relator attempts to exclude the Texas complaint from consideration through a creative interpretation of the D.C. False Claims Act. As set forth above, section 2-308.15(c)(2)

-8-

prohibits suit "based upon allegations or transactions in a criminal, civil, or administrative proceeding, investigation, or report, or audit conducted by or at the request of the Council, the Auditor, the Inspector General, or other District or federal agency" if the plaintiff is not an original source. The relator contends that "conducted by or at the request of the Council, the Auditor, the Inspector General, or other District or federal agency" modifies the entire preceding list of potential sources of allegations, including "criminal, civil, or administrative proceeding[s]," such that only proceedings brought by a District of Columbia or federal entity could disclose allegations that trigger the public disclosure bar.

      The relator's argument is unpersuasive. First, he cites no cases supporting that interpretation. Second, to the extent that he argues it demonstrates a logical "D.C.-centric" focus on public disclosures, that interpretation is undermined by the immediately subsequent clause which prohibits suit based on "allegations or transactions disclosed by the news media," without any limitation to media in the District of Columbia. Third, the statute lists as sources of public disclosure any "criminal, civil, or administrative proceeding, investigation, or report, *or* audit conducted by or at the request of the Council, the Auditor, the Inspector General, or other District or federal agency." The additional "or" preceding "audit" tends to suggest, that the "conducted by" limitation applies only to the first portion of the disjunctive, and not "criminal, civil, or administrative proceeding, investigation, or report." Certainly, the relator does not offer a textual argument sufficient to demonstrate that the District of Columbia intended to allow tag-along *qui tam* actions to be brought on its behalf simply if the allegations of fraud had been aired in a venue outside the District of Columbia. The Court concludes that the statute is properly read to mean only that "audits conducted by or at the request of the Council, the Auditor, the

Inspector General, or other District or federal agency" are public disclosures. Accordingly, predecessor complaints filed outside of the District of Columbia, such as the complaint filed by the State of Texas, also trigger the disclosure bar.

The Court also notes that the allegations of fraud against Merck were sufficiently developed to permit the filing of a Purchase Claims Master Class Action Complaint in the MDL on August 2, 2005, before the relator filed his complaint. (Rec. Doc. 790). The Purchase Claims Master Complaint alleged that "Merck intentionally, recklessly, and/or negligently concealed, suppressed, omitted, and misrepresented the risks, dangers, defects, and disadvantages of Vioxx, and advertised, promoted, marketed, sold, and distributed Vioxx as a safe prescription medication when, in fact, Merck had reason to know and did know that Vioxx was not safe for its intended purposes." (*Id.* at 3). The complaint also alleges that Merck marketed directly to consumers and medical professionals to leverage third party payors and large institutional buyers to reimburse for Vioxx use. (*Id.* at 5-6).

Thus, all of these news reports and other civil proceedings preceded the relator's *qui tam* complaint. According to that complaint, the relator is an individual who was prescribed and took Vioxx. There is nothing in the complaint to indicate that the relator had any particular knowledge about Merck's marketing of Vioxx or what Merck knew about the health risks and when Merck knew it. Although the manner in which the District of Columbia approved Medicaid payments for Vioxx may differ from other states, the fundamental allegations of fraud upon consumers and physicians were public and widely aired before the relator filed his suit. Mindful of the Supreme Court's recent guidance on motions to dismiss, the Court concludes that it is utterly implausible that the allegations of fraud underlying the relator's complaint had not

-10-

already been publicly disclosed.

The Court also concludes that the relator's *qui tam* complaint is "based upon" those public disclosures. According to the D.C. Court of Appeals, a *qui tam* allegation of fraud is "based upon" a public disclosure if it is "supported by publicly disclosed allegations or transactions, as evidenced by substantial identity between the publicly disclosed allegations [or transactions] and the qui tam complaint." 980 A.2d at 1146. Here, the allegations in the relator's complaint are substantially identical to the publicly disclosed allegations of fraud against Merck. Both sets of allegations deal with the actual risks posed by Vioxx, Merck's knowledge of those risks, and Merck's deliberate marketing of Vioxx in spite of its knowledge of those risks. Although the public disclosures may not have related directly to the District of Columbia or its residents, the relator simply piggy-backed on those allegations and identified another victim of the same fraudulent conduct. Under the D.C. False Claims "a *qui tam* action cannot be sustained where all of the material elements of the fraudulent transaction are already in the public domain and the *qui tam* relator [only] comes forward with additional evidence incriminating the defendant," which is at most what the relator has accomplished here. *Id.* at 1148 (quotation omitted).

Accordingly, the relator may only proceed with the case if he is an original source of those public disclosures. Plaintiff does not assert in his complaint that he is an original source and does not take that position in his briefing. Accordingly, Plaintiff is not an original source and is not authorized to assert a *qui tam* claim on behalf of the District of Columbia.

### III. CONCLUSION

For the foregoing reasons, IT IS ORDERED that Merck's motion to dismiss the relator's

-11-

claims under the District of Columbia False Claims Act is GRANTED.

New Orleans, Louisiana, this 28th day of March, 2011.

_____
UNITED STATES DISTRICT JUDGE