```
 1                    UNITED STATES DISTRICT COURT

 2                   EASTERN DISTRICT OF LOUISIANA

 3


 4    **********************************
      IN RE:  VIOXX PRODUCTS              *      MDL No. 1657
 5                                        *      SECTION "L"
                                          *
 6    PRODUCTS LIABILITY LITIGATION       *
                                          *
 7                                        *      NEW ORLEANS, LOUISIANA
                                          *      MAY 22, 2008
 8    **********************************

 9
             TRANSCRIPT OF THE MONTHLY STATUS CONFERENCE PROCEEDINGS
10               HEARD BEFORE THE HONORABLE ELDON E. FALLON
                         UNITED STATES DISTRICT JUDGE
11

12    FOR THE PLAINTIFFS'            Russ Herman, ESQ.
      LIAISON COMMITTEE:             Leonard A. Davis, ESQ.
13                                   Herman, Herman, Katz & Cotlar, LLP
                                     820 O'Keefe Avenue
14                                   New Orleans, LA 70113
                                     (504) 581-4892
15
                                     ANDY BIRCHFIELD, Jr., ESQ.
16                                   BEASLEY ALLEN
                                     218 Commerce Street
17                                   Montgomery, AL 36104
                                     (800) 898-2034
18

19    CURATOR, ROBERT M. JOHNSTON    CLAUDIA SANTOYA, ESQ.
                                     Law Offices of Robert M. Johnston,
20                                   LLC
                                     601 Poydras Street
21                                   Suite 2490
                                     New Orleans, LA 70130
22                                   504-561-7799

23
      FOR THE PLAINTIFFS:            JOE GRINSTEIN, ESQ.
24                                   SUSMAN GODFREY
                                     Houston, Texas
25                                   (713) 653-7824
```

1              allegedly suffered [et cetera], an

2              identification of all documents relied on by the

3              expert in forming his opinions."

4         Your Honor, this type of report was not required by

5    you on any MI or IS plaintiff accept those that proceeded to

6    trial, and then only when they were set for trial.  The default

7    provision in the Federal Rules of Civil Procedure is for this

8    type of report to be required 90 days out from trial.  This is

9    not the type of report, Judge, that is necessary for Your Honor

10   to manage these remaining -- and 9,000 are not in your court.  I

11   know those figures were nationwide, but lets say that 5,000 of

12   those claim are in your court.  This is not the way the Court

13   treated case management for the IS and MI claimants.  And who is

14   to say that this set is any less deserving?

15         THE COURT:  Okay, let me just comment on some of the

16   things you made.  First of all, from the standpoint of the

17   Pretrial Orders, nobody ever presents a Pretrial Order to me and

18   I sign it the first time.  The Pretrial Orders that I sign are

19   either drafted by me or discussed with me long before they're

20   presented to me.  So, it's not something that I saw at the

21   eleventh hour and signed.  And I might say that it's the same

22   Pretrial Orders that the State court signed, but they signed

23   them not when they were presented with them.  These were

24   discussions that I was in on for a long period of time.

25         The other thing that I think has to be noted, is that

1    these cases have been going on seven years in the states; four
2    years in the MDL.  We've had discovery.  Thousands of
3    depositions have taken place.  To ask a claimant to submit a
4    report that says they have a condition, and the condition is
5    caused by Vioxx -- I'm not asking for a Daubert report; I'm not
6    asking for even a witness report; I'm not asking for someone to
7    come forward and say, we're going to call this doctor as a
8    witness.  But, for a plaintiff lawyer to have a case for four
9    years and not have any access to a report that says this
10   claimant's injury results from the taking of Vioxx, after seven
11   years if you don't have that in your file, it's a problem, I
12   think.
13              Now, you only had nine cases.  You're very fortunate.
14   I really feel sorry for the individual who has a thousand cases
15   from a lawyer's standpoint, or 2000 cases from a lawyer's
16   standpoint.  What do they do with the cases?  They've had them
17   now for seven years.  They haven't done any work.  They don't
18   have any proof.  They don't have any letter from somebody.  It's
19   difficult for me to understand the difficulty that a lawyer has
20   in getting such a report.  I'm not saying -- I'm not looking for
21   a report from somebody who the lawyer is going to call as a
22   witness, I'm just trying to find out what a viable case is.  And
23   you know and I know that in MDL's there are a lot of cases
24   filed.  Many of them are viable, but a lot of them just are not,
25   and there has to be some way of culling them out, some way that

1   -- frankly, it's been my experience that the plaintiff lawyers
2   are the biggest advocates of the Lone Pine at this stage of an
3   MDL, because they don't know what to do with the cases.  You
4   only have nine.  If you have a thousand, you know and I know,
5   those people call every single day.  You don't have the
6   resources to take care of them.  You've got to do something with
7   their cases, and you can't get out of them because you told them
8   they had a case.
9              MS. OLDFATHER:  Well, I'm glad I only had nine.
10             THE COURT:  I think that's why you're here, and the
11  people who had thousands of them are not.
12             MS. OLDFATHER:  I don't know, Your Honor.  Let me,
13  first of all, apologize.  I did not, certainly did not intend to
14  imply that you were a rubber stamp.
15             THE COURT:  No, no, I understood.
16             MS. OLDFATHER:  I did not know that the Court had seen
17  PTO 28 before November 9th.
18             THE COURT:  You need to know that I've seen every
19  order long before it's presented to me to sign.
20             MS. OLDFATHER:  And, of course, on all the other ones,
21  I've seen them come up for motion and had them discussed
22  previously.  And on that one I had not, and it was -- obviously
23  it was part of the whole settlement.
24             THE COURT:  It seemed reasonable to me.  And, also, I
25  had in there that if the date is a problem, for good cause, I

1    move the date.

2            MS. OLDFATHER:  Well, let me talk, Judge, if I could

3    on how it plays out.  Because it didn't seem that unreasonable

4    to me when I saw it either when it first came across the wires

5    on November 9.  It plays out differently if you are an eligible

6    plaintiff who decided not to get into the settlement than it

7    does if you are someone who did not qualify to get into the

8    settlement.  And on that first class of people, the three

9    percent that Mr. Marvin mentioned that will not participate in

10   the settlement, those people do need to file one of these

11   reports.  They are going to be able to do that, they just can't

12   do it on this time line.  And that's --

13           THE COURT:  See, the time line doesn't concern me,

14   because if there is a time-line problem that's why I have in

15   there "for good cause shown."  If you can't do it; you can't do

16   it, and you give me some reason other than the fact that you've

17   had other things to do for seven years.

18           MS. OLDFATHER:  No, Judge, I wouldn't say that.  First

19   of all, we filed all of our cases in 2005.  I don't want to say

20   that two and a half years is less egregious than seven.  I think

21   we have the same obligation whether it's two and a half or

22   seven.

23           But, no, everyone has been focused on the resolution

24   program.  This Court has, all of these counsel have.  It has

25   been extremely demanding putting together the claims package.

1   And we've tried to do a good job with Brown Greer's forms.

2              THE COURT:  I know you have.  The problem that I'm

3   having is, that I've got to deal with these individuals.  As you

4   say, there are 9,000 or thereabouts.  They deserve some

5   recognition.  I've got to deal with them.

6              MS. OLDFATHER:  I have a suggestion.  And the

7   suggestion --

8              THE COURT:  Would you want to represent all 9,000?

9              MS. OLDFATHER:  Well, I actually --

10             THE COURT:  I would consider that if you --

11             MS. OLDFATHER:  I actually --

12             THE COURT:  If you commit to the Court that you will

13  use resources, and you'll invest the resources and do it, I'll

14  consider doing something of that sort for you.

15             MS. OLDFATHER:  Judge, actually my request is the

16  Court does appoint a subcommittee to represent this group.  You

17  know, Your Honor, was very careful about the Plaintiff Steering

18  Committee when you selected them, and you gave them specific

19  duties.  And part of their duties were to --

20             THE COURT:  Look, if you will take the -- you will be

21  the subcommittee of one, I'll ask that you to get the 9,000

22  reports.

23             MS. OLDFATHER:  Judge, are you teasing me with this?

24             THE COURT:  No, no, seriously.  I need to work this

25  matter out, but it doesn't seem fair to me to just ignore them,

1   but it's not going to -- as a practical matter, some of these
2   matters don't want to go to court.  They don't want a trial.
3   They don't have a case.  And how do I get to the bottom it?
4   How do I separate the wheat from the chaff in these matters
5   other than to say, get me a report from somebody who says,
6   assuming all of this to be true, I think my patient's problem is
7   due to Vioxx?  That might past muster.
8             MS. OLDFATHER:  Well, Judge, I think you've given us a
9   template to answer your question.  You've shown us exactly how
10  to get to the bottom of it, exactly what you did with the MI and
11  the IS.  Appoint a subcommittee.  If it has to be me as a
12  subcommittee of one, I'll work with Merck to try to identify how
13  many people we're talking about.  Am I a lone voice crying in
14  the wilderness, or does anyone else care about this?  I mean, I
15  think that's all that I would ask the Court to determine.  Are
16  there people with other claims who would like to see the general
17  causation developed?  And the Fifth Circuit has told us in the
18  <u>Knight</u> case that the general causation has to come first.
19            THE COURT:  But the general causation has been
20  developed now for four years.
21            MS. OLDFATHER:  Not on --
22            THE COURT:  The problem that you have is that you're
23  going to get -- you're going to get "Daubertized.  You're not
24  going to have a case.
25            MS. OLDFATHER:  Well, Judge, don't we owe them the

1   responsibility of finding that out?  I mean, the Daubert

2   hearings, Your Honor, has already conducted concluded that there

3   was a path of physiology of Vioxx sufficient to cause these

4   clotting events.

5            THE COURT:  Are there any doctors out there that

6   -- these cases have been seven years now.  Nobody has gotten a

7   doctor to say that this problem -- the nine cases that you have,

8   you don't have one doctor to be able to write a report saying

9   your clients are sick, or whatever it is, because of taking

10  Vioxx?

11           MS. OLDFATHER:  Your Honor, I have a consultant that I

12  worked with before I filed the suit.

13           THE COURT:  Why don't you have a report from them?

14           MS. OLDFATHER:  Because that's not what this order

15  requires.  This order requires a lot more than that.  And the

16  consequence of this order is a dismissal.  Judge, this order is

17  a Motion for Summary Judgment in other clothing.  This is what

18  this is.  And, the Lone Pine, the Superior Court of New Jersey

19  where Lone Pine came down in 1986 -- we've got better precedent

20  right now in the Federal Courts.  The Morgan case, which I cited

21  to Your Honor, 2007, United States District Court.

22                "The economy of scale in a multidistrict

23                litigation argues against this quasi-Summary

24                Judgment practice."

25           That's what this is.  My --