**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**


| | | |
|---|---|---|
| IN RE: VIOXX PRODUCTS LIABILITY | * | MDL No. 1657 |
| LITIGATION | * | |
| | * | SECTION L |
| | * | |
| | * | JUDGE ELDON E. FALLON |
| This document relates to: | * | |
| *D.C. ex. rel. Kenneth Walker v.* | * | MAJISTRATE JUDGE KNOWLES |
| *Merck & Company*, Civil Action No. 08-4148 | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


## MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS


### I.    INTRODUCTION

Pending before the Court is Merck's ("Merck" or "Defendant") Motion for Judgment on the Pleadings seeking dismissal of Mr. Walker's ("Mr. Walker" or "Plaintiff") representative action filed pursuant District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3901, et. seq. [Rec. Doc. 63656] Merck claims that (1) Mr. Walker lacks injury and therefore does not have standing to bring this claim, (2) that Mr. Walker has not alleged a "consumer transaction," and (3) that he has not sought class certification.   These arguments are without merit.

Under recent appellate authority from both the District of Columbia Court of Appeals and the United States Court of Appeals for the District of Columbia Circuit, Mr. Walker, who

purchased Vioxx with his own funds, has legal standing and has been sufficiently injured to bring this action.  Furthermore, he has sufficiently alleged a consumer-merchant relationship, and he will shortly seek class certification.[1]  His claim would easily defeat Merck's Motion for Judgment on the Pleadings in the courts of the District of Columbia, whose laws control disposition of this matter.  In addition, he is an ideal representative for the class of District of Columbia consumers who purchased Vioxx after Merck's extensive and misleading campaign to hide the risks associated with the medication in violation of the D.C. Consumer Protection Procedures Act.[2]

## II.      BACKGROUND

### A.  Procedural Background

This matter arises out of a complaint filed under seal in the Superior Court of the District of Columbia by Kenneth Walker on August 4, 2005, designated *D.C. ex. rel. Kenneth Walker v. Merck & Company*, 05-CABSLD 6143.  *See* Exhibit 1.  Initially, Mr. Walker alleged that Merck violated the False Claims Act of the District of Columbia, D.C. Code § 2-308.14, *et. seq.* by making false statements and presenting false claims regarding the sale of Vioxx to District of Columbia.  Subsequently, Mr. Walker sought leave of the court to add a claim under the District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3901, *et. seq.  See* Exhibit 2. Mr. Walker alleged that Merck engaged in deceptive trade practices regarding the sale of Vioxx

---

[1]      . Counsel for Plaintiffs and Merck were in discussion regarding the potential utilization of the DC claims as a bellwether for the MDL when the Merck filed the Motion for Judgment on the Pleadings.

[2]      When Merck removed the matter from D.C. Superior Court to U.S. District Court for the District of Columbia, it stated that the D.C. Consumer Procedure Protection Act Claim was in essence a "putative class action" and the amount in controversy exceeded the statutory amount.

to both himself and citizens of the District of Columbia.  He  asked the court for leave to amend to pursue a claim in his individual capacity and on behalf of the citizens of the District of Columbia pursuant to D.C. Code § 28-3905 (k)(1).  *Id*.  Judge Anna Blackburne- Rigsby granted Mr. Walker's Motion on September 29, 2005.  *See* Exhibit 3.

The case remained under seal until April 3, 2008.  Merck was served with the Amended Complaint on June 16, 2008.  On July 7, 2008, Merck filed its Notice of Removal to move the case from the District of Columbia Superior Court to United States District Court for the District of Columbia.  *See* Exhibit 4.  Merck sought removal pursuant to 28 U.S.C. §§ 1441, 1446, and 1453.  *Id*. at 2.   In support of its Notice of Removal, Merck advised the court that it had subject matter jurisdiction pursuant to the Class Action Fairness Act.  *Id*. at 10.   Merck argued that "plaintiff's claims, which he purports to bring in a representative capacity, are the functional equivalent of a putative class action…."  *Id*.  Merck further asserted that "Plaintiff's Complaint satisfies the definition of a class under CAFA because it is a civil action brought under a 'statute or rule of judicial procedure authorizing an action to be brought by one or more representative persons as a class action.'"  *Id*. at 11.  Moreover, Merck stated:

> D.C. Code § 28-3905 is a statute authorizing an action to be brought by a representative person.  *See* D.C. Code § 28-3905(k)(1) ("A person, whether acting for the interests of itself, its members, or the general public, may bring an action under this chapter in the Superior Court of the District of Columbia seeking relief from the use by any person of a trade practice in violation of a law of the District of Columbia").   Congress intended such actions to be removable to federal court under the provisions of CAFA even if they are not labeled "class actions" by the named plaintiff.  S. Rep. 109-14, at 35 (2005) ("[T]he definition of 'class action' is to be interpreted liberally [and] should not be confined solely to lawsuits that are labeled 'class actions' by the named plaintiff .... Generally speaking, lawsuits that resemble a purported class action should be considered class actions for the purposes of applying these provisions.")

3

*Id.* at 11.   Finally, Merck stated that the amount in controversy requirement in CAFA ($5,000,000.00) had been satisfied.  *Id.* at 13.

The case was removed to federal district court and designated as *D.C. ex. rel. Kenneth Walker v. Merck & Company*, Civil Action No. 08-1176.  The case was then transferred to the Multi-District Litigation, *In Re: Vioxx Products Liability Litigation*, MDL-1657.

In the MDL the parties engaged in limited discovery respecting only the False Claims Act matter.  Subsequently, Merck filed its Motion to Show Cause Why Count I of Mr. Walker's complaint respecting his claims under the D.C. False Claims Act should not be dismissed.  *See* Def. Mot. [Rec. Doc. 55437] Mr. Walker opposed this motion.  The Court issued an Order and Memorandum dated March 28, 2011 granting the Motion, and dismissing the D.C. False Claims Act count.  *See* Mem. Op. [Rec. Doc. 62729]. This dismissal did not affect D.C.'s Consumer Protection Procedures Act claim advanced by Mr. Walker on behalf of himself and other consumers in the District of Columbia.

## B.  Walker's Claims under the D.C. Consumer Protection Procedures Act

Mr. Walker, a resident of the District of Columbia, alleges in his Amended Complaint, Exhibit 5, that he purchased the prescription drug Vioxx.  Am. Compl. at ¶ 2.  He alleges that, Merck is a "merchant" as defined under the under D.C. Code § 28-3901 (a)(3).  *Id.* at ¶ 3, 9. Moreover, he alleges that he and the residents of the District of Columbia who purchased Vioxx qualify as "consumers" as defined by D.C. Code § 28-3901 (a)(2).  *Id.* at ¶ 2, 9.  Most importantly, Mr. Walker states that he "brings this action on behalf of himself, the District of Columbia, and the District of Columbia residents who purchased Vioxx" and that "Defendant, Merck & Company, committed unlawful trade practices in connection with marketing and

4

selling Vioxx *to consumers* in the District of Columbia in violation of D.C. Code Section 28-3904(e) and (f)." *Id.* at ¶ 10 (emphasis added).

Mr. Walker avers that in about 2001, Dr. Paul Manner, a physician at the George Washington University Medical Faculty in Washington, D.C., was evaluating Mr. Walker's chronic knee complaints. *Id.* at ¶12-13. During the course of this evaluation, Dr. Manner prescribed Vioxx for Mr. Walker to take to relieve his pain. *Id.* Mr. Walker claims that he continued to take Vioxx until October 2004, and that, although D.C. Medicaid paid for his prescriptions on most occasions, "there were occasions when Mr. Walker paid for the refill out of his own funds." *Id.* at ¶15.

Mr. Walker further alleges that Merck engaged in a concerted effort to convince doctors and medical providers to prescribe Vioxx to patients like Mr. Walker when, in fact, there were safer and less expensive alternatives. *Id.* at ¶33-40. Mr. Walker alleges that Merck, through its sales force, intentionally withheld important information about the risks associated with Vioxx from medical providers, when in fact, Merck was "aware of significant cardiovascular risks associated with the use of Vioxx." *Id.* at ¶ 29. Mr. Walker alleges that Merck sent a highly trained sales force to meet face-to-face with medical providers (across the United States and) in the District of Columbia, and that these representatives provided medical providers with "inaccurate and misleading information to encourage them to prescribe Vioxx to their patients." *Id.* at ¶ 30-31.

Mr. Walker claims that "but for" this intentional and misleading campaign orchestrated by Merck, he would not have received the medication known as Vioxx. *Id.* at ¶ 42. Additionally, Mr. Walker claims that "Merck & Company, by its conduct, in intentionally obfuscating the risks and dangers associated with the use of Vioxx, misled medical providers and

consumers in the District of Columbia when there were safer and more effective alternatives that did not pose these risks." *Id*. at ¶ 54.  Mr. Walker further asserts that Merck, by its conduct, engaged in a deceptive business practice when it failed to "state a material fact…[because] such failure tend[ed] to mislead."  *Id*. at ¶ 55. Mr. Walker alleges that this conduct violated the D.C. Consumer Protection Procedures Act because Merck misled medical providers *and* consumers in the District of Columbia about the risks associated with the use of Vioxx, and that as a result, District of Columbia residents spent millions of dollars purchasing this drug, and some of these consumers experienced strokes, heart attacks, and renal failure.  *Id*. at ¶ 58.  Mr. Walker, acting on his own behalf and on behalf of the consumers of the District of Columbia, asked the court to award "treble damages (3 times the total sales of Vioxx in the District of Columbia) or $1,500.00 for each sale, whichever is greater, plus attorneys' fees, and punitive damages."  *Id*. at ¶ 59.

### C.  Merck's Answer to the Complaint

At the same time that Merck filed its Notice of Removal, it also filed its Answer to the Amended Complaint.  *See* Exhibit 6.  While Merck's Answer denies many of the specific facts alleged by Mr. Walker and asserts a number of Affirmative Defenses, Merck made several significant admissions:

- Paragraph 18, 19, 24: Merck further avers that on September 30, 2004, Merck announced that in a prospective, randomized, placebo-controlled clinical trial there was an increased relative risk for confirmed cardiovascular events beginning after 18 months of treatment in the patients taking Vioxx compared with those taking the placebo. Merck further avers that given the availability of alternative therapies and questions raised by data from that trial, Merck concluded that a voluntary withdrawal of Vioxx from the worldwide market best served the interests of patients.
- Paragraph 33:  Merck denies each and every allegation contained in paragraph 33 of the Complaint, except admits that Merck professional representatives were provided with a Cardiovascular Card and respectfully

refers the Court to that card and the instructions for that card's use for its actual language, full text, and context.

- Paragraph 34: Merck denies each and every allegation contained in paragraph 34 of the Complaint, except admits that Merck professional representatives were provided with a Cardiovascular Card and respectfully refers the Court to that card and the instructions for that card's use for its actual language, full text, and context.

- Paragraph 35: Merck denies each and every allegation contained in paragraph 35 of the Complaint except admits that  the FDA Arthritis Advisory Committee on Vioxx Gastrointestinal Safety recommended that results from the VIGOR study be included in the labeling for Vioxx.

- Paragraph 36: Merck denies each and every allegation contained in paragraph 36 of the Complaint, except admits that plaintiffs refer to a Merck bulletin, and respectfully refers the Court to said bulletin for its actual language and full context.

- Paragraph 37: Merck denies each and every allegation contained in paragraph 37 of the Complaint, except admits that the referenced article (May 22, 2001 N.Y. Times Article regarding the safety of Vioxx) exists and refers the Court to said article for its actual language and full text.

*Id*.

## ARGUMENT

### A.  Plaintiff has Alleged an Injury Sufficient to Maintain Standing

The injury requirements of Article III "may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing ….'" *Warth v. Seldin*, 422 U.S. 490, 500 (1975) (*quoting Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973), and citing *Sierra Club v. Morton*, 405 U.S. 727, 732 (1972)); *see also Zivotofsky ex rel. Ari Z. v. Sec'y of State*, 444 F.3d 614, 619, (D.C. Cir. 2006) ("Although it is natural to think of an injury in terms of some economic, physical, or psychological damage, a concrete and particular injury for standing purposes can also consist of the violation of an individual right conferred on a person by statute."); *see also O'Hair v. White*, 675 F.2d 680, 686 (5th Cir. 1982) (finding that the injury requirements of standing may be satisfied by "rights existing solely by virtue of a statute or

constitution"). Therefore, any inquiry into Plaintiff's standing requires an inquiry into the statute upon which Plaintiff relies for his cause of action: the District of Columbia Consumer Protection Procedures Act. *See Id.*

In *Grayson v. ATT Corp.*, 15 A.3d 219, 249-250 (D.C. 2011), the District of Columbia Court of Appeals recently found that The District of Columbia Consumer Protection Procedures Act confers standing on consumers based solely statutorily violated rights. In *Grayson*, the injury on which the plaintiff based his standing was "a violation or an invasion of his statutory legal rights created by the CPPA." *Id.* at 248-249. Adopting the findings of *Shaw v. Marriott Int'l, Inc.*, 605 F.3d 1039, 1042 (D.C. Cir. 2010), the court found that the plaintiff's statutory injury was sufficient to confer standing. *Grayson*, 15 A.3d at 248-249 (quoting *Shaw*, 605 F.3d at 1042) ("Our analysis of injury under the CPPA aligns with the opinion of the D.C. Circuit in *Shaw v. Marriott Int'l Inc.*, where the court observed that "[t]he deprivation of . . . a statutory right [to be 'free from improper trade practices'] may constitute an injury-in-fact sufficient to establish standing, even though the plaintiff 'would have suffered no judicially cognizable injury in the absence of [the] statute.'"). Specifically, the *Grayson* court found:

> Mr. Grayson alleges personal injury to himself, or injury in fact, based on the defendants' violation of his statutory right (derived from D.C. Code § 28-3904) to the disclosure of information about their failure to report and turn over to the District government breakage for the benefit of those who obtain calling cards in the District. *See Havens*, *Akins*, *Shays*, *supra*. Among other relief authorized by the CPPA, he seeks to enjoin this alleged unlawful practice. As for the two remaining prongs of standing, Mr. Grayson's pleading meets these requirements. In describing appellees' conduct with great detail, Mr. Grayson amply draws a "causal connection" between the injury he suffered as defined by the CPPA and how appellees' allegedly unlawful conduct led to or threatened such an injury. With respect to the third *Lujan* prong, redressability by a favorable decision, the very design of the CPPA's injunctive remedy serves to sufficiently redress the alleged threatened statutory injury, and he also seeks "a remedy for treble

8

> damages or $1500 for each violation, whichever is greater."  Since Mr. Grayson
> satisfies the three prongs of standing as enumerated in *Lujan*, we conclude that,
> with the exception of defendant Verizon Communications Corp. and its affiliates,
> the trial court erred in dismissing his individual CPPA claim on the ground that he
> personally lacked standing.

*Id.* at 249-250.  Similarly, throughout Plaintiff's complaint, he alleges that Defendant violated his statutory right to "the disclosure of information" regarding Defendant's dangerous misrepresentations.  *See* Am. Compl. at ¶ 10-11, 33-40.  Therefore, without even considering economic injuries, by pleading the existence of a statutory injury, Plaintiff Walker has already pled injuries sufficient to withstand challenges to his standing.

Furthermore, Plaintiff has standing based on his economic injuries.  *See Id.* at ¶ 9, 15. Both the District of Columbia Circuit and the District of Columbia Court of Appeals have found that plaintiffs alleging economic injuries have standing under the DCCPPA.

> [Plaintiff] has standing.  It used its own funds to pay for stays at Marriott's
> Russian hotels, and suffered pecuniary harm as a result of Marriott's pricing
> practices.  *See Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 438 n.10, 255 U.S. App.
> D.C. 216 (D.C. Cir. 1986) ("[E]conomic loss clearly constitutes a distinct and
> palpable injury . . . .") (internal quotation marks omitted).  Damages under the
> CPPA would remedy that loss.  Article III requires no more.

*Shaw*, 605 F.3d at 1042;[3] *see also Dist. Cablevision v. Bassin*, 828 A.2d 714, 725 (D.C. 2003) (affirming the finding of an injury where consumers paid excessive late fees of $5); *see also Silvious v. Snapple Beverage Corp.*, 793 F. Supp. 2d 414, (D.D.C. 2011) ("Accepting, as it must on a motion to dismiss, that plaintiff made the alleged purchases of Snapple products at issue, the

---

[3]      The D.C. Circuit clarifies that "the violation of a statute can create the particularized injury required by Article III only when 'an individual right" has been 'conferred on a person by statute.'"  *Id.* (quoting *Zivotofsky*, 444 F.3d at 619).  In other words, a plaintiff must be "within the class of individuals protected by the CPPA" to avail himself of standing under the DCCPA. *Id.*  Here, there is no question that Plaintiff Walker is a consumer.  Defendant has not disputed this.

Court finds that plaintiff, as a consumer of products in the District of Columbia alleging an unlawful trade practice, has Article III standing."). Thus, where a party has pled that he has suffered from economic loss, he will have standing under the DCCPPA. *Shaw*, 605 F.3d at 1042. Because Plaintiff has pled such injuries, there can be no question that he has standing. *See* Am. Compl. at ¶ 9, 15.

Defendants rely heavily on *Rivera v. Wyeth-Ayerst Labs*, 283 F.3d 315, 320 (5th Cir. 2002) for the proposition that an economic injury cannot constitute an injury in fact sufficient to confer Article III standing. Def. Mot. [#63656-1] at 5. Critically, this argument is inapposite as it does not address the DCCPPA or the standing that it confers on consumers. Furthermore, this argument misconstrues both the holding in *Rivera* and the nature of the instant case. The plaintiffs in *Rivera* failed because (1) their economic injuries were not covered *by the statute* under which they brought their case, and (2) they could not assert an injury based on a benefit-of-the-bargain measure because they did not have a contract with the defendant. In *Rivera*, the alleged economic injuries "had no basis in either products liability law or contract law." *Robertson v. Monsanto Co.*, 287 Fed. Appx. 354, 360 (5th Cir. 2008) (interpreting *Rivera*). In other words, "the law [did] not provide a cause of action to recover the type of damages [the *Rivera* plaintiffs] sought." *Id.* (quotation marks and citation omitted). Because the *Rivera* plaintiffs "did not assert economic harm emanating from anything other than potential physical harm," they could not claim an injury under the Texas Deceptive Trade Practices Act. [4] *Cole v. GMC*, 484 F.3d 717, 723 (5th Cir. 2007). Additionally, the *Rivera* plaintiffs "could not assert

_____

[4]     The Texas Deceptive Trade Practices Acts defines economic damages as "compensatory damages for pecuniary loss, including costs of repair and replacement." Everett v. TK-Taito, L.L.C., 178 S.W.3d 844, 857 (Tex. App. Forth Worth 2005).

benefit-of-the-bargain damages because they had no contract with the manufacturer." *Robertson*, 287 Fed. Appx. at 360. (citing *Rivera*, 283 F.3d at 320).  Further, the plaintiffs never "defined the source of their economic injury."  *Cole*, 484 F.3d at 722.  Consequently, because of the apparent limitations of the Texas Deceptive Trade Practices Act, the *Rivera* plaintiffs could not assert a statutorily-based injury, and no other basis for injury existed.  If the Texas Deceptive Trade Practices Act had recognized the types of non-physical injuries asserted by the *Rivera* plaintiffs, then they perhaps would have had standing.  *See Robertson*, 287 Fed. Appx. at 360 (explaining *Rivera* and finding standing where a Louisiana statute recognized emotional, non-physical injuries).

As established above, however, the injuries presently alleged by Plaintiff Walker plainly fall under the purview of the DCCPPA.  *See Grayson*, 15 A.3d at 248-250; *Shaw*, 605 F.3d at 1042.  Therefore, Plaintiff has standing because (1) he has alleged a statutorily based injury, (2) the type of economic damages sustained by Plaintiff are recognized by the DCCPPA and the courts of the District of Columbia, and (3) Plaintiff is within the class of individuals protected by the DCCPPA.  *Id*.

Defendant's reliance on *Williams v. Purdue Pharma*. Co., 297 F. Supp. 2d 171 (D.D.C. 2003) is equally unavailing.  As an initial matter, to the extent that *Williams* conflicts with controlling precedent laid out in *Grayson*, it cannot be relied on.  *See M.A.P. v. Ryan*,  285 A.2d 310, 312 (D.C. 1971) ("[T]he Court Reform Act declared that '[the] highest court of the District of Columbia is the District of Columbia Court of Appeals.'").  Furthermore, in *Williams*, the dispositive point was that the plaintiffs "[did] not plead that these [plaintiffs] were in any way deceived - or even saw – any of that advertising."  *Id*. at 177; *see also Rikos v. P&G*, 782 F. Supp.2d 522, 530-531 (S.D. Ohio 2011) (distinguishing *Williams* on a lack of reliance and

finding that economic injuries resulting from misleading marketing confer standing).   Here, Plaintiff has plainly alleged that Defendant used false advertising to reach consumers including Plaintiff Walker.  *See* Am. Compl. at ¶¶ 42, 54-57.

### B.  Plaintiff has Alleged a Consumer-Merchant Relationship Under the DCCPPA

Defendant further argues that Plaintiff has not properly alleged the existence of a consumer transaction.   Defendant believes that "a claim by a purported consumer does not involve a 'consumer transaction' if it is asserted against an entity that is further up the distribution chain from the seller of the product."  Def. Mot. [#63656-1] at 8.  This argument is based on a mischaracterization of the current legal standard, and has been repeatedly rejected by the courts of the District of Columbia.

The DCCPPA "was designed to police trade practices arising only out of consumer-merchant relationships."  *Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 709 (D.C. 1981).  As such, the DCCPPA, "contemplates complaints against 'merchants' who 'supply the goods or services which are or would be the subject matter of a trade practice.'"  *Id.* (quoting DCCPPA § 2(a)(3)). To implicate the DCCPPA, a transaction must be (1) a consumer-merchant relationship, (2) involving a trade practice, i.e. a transaction, (3) of goods and services (4) for personal use.  Of these requirements, Defendant essentially bases its argument on the consumer-merchant relationship.[5]

---

[5]      The requirements of the DCCPA are conveniently laid out in *Adler v. Vision Lab. Telecomms.*, Inc., 393 F. Supp. 2d 35, 40 (D.D.C. 2005):

> The DCCPPA regulates transactions between a consumer and a merchant. D.C. Code § 28-3904.  *See Independent Communications Network, Inc. v. MCI Telecommunications Corp.*, 657 F. Supp. 785, 787 (D.D.C. 1987) (DCCPPA "was

Defendant attempts to characterize the requirement of a consumer-merchant relationship as one requiring a "consumer transaction." Def. Mot. [#63656-1] at 8. The term "consumer transaction" was used in *Howard* to define a merchant. *Adam Weschler & Son, Inc. v. Klank*, 561 A.2d 1003, 1004 (D.C. 1989) (quoting *Howard*, 432 A.2d at 709)) ("Weschler's second contention is that this transaction does not constitute a 'consumer transaction' as that term is used in *Howard*, *supra*, in defining 'merchant.'"). As used in both *Howard* and *Klank*, the term "consumer transaction" is a relative term used to clarify whether a party can be properly considered a merchant or a consumer. *Id*. Therefore, though phrased as a challenge to Plaintiff's "consumer transaction," Defendant essentially argues that it is not a merchant and therefore

intended to apply only to trade practices arising out of the supplier-purchaser relationship") (citing *Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 709 (D.C. 1981); *see also Slaby v. Fairbridge*, 3 F. Supp. 2d 22, 27 (D.D.C. 1998). A "consumer" is "a person who does or would purchase, lease (from), or receive consumer goods or services, … or a person who does or would provide the economic demand for a trade practice." D.C. Code § 28-3901(a)(2). A "merchant" is "a person who does or would sell, lease (to), or transfer, either directly or indirectly, consumer goods or services, or a person who does or would supply the goods or services which are or would be the subject matter of a trade practice." *Id*. § 28-3901(a)(3). The Act defines a "trade practice" as "any act which does or would create, … make available … or effectuate, a sale, lease, or transfer of consumer goods or services." *Id*. § 28-3901(a)(6). Finally, "goods and services" are defined broadly as "any and all parts of the economic output of society, at any stage or related or necessary point in the economic process …." *Id*. § 28-3901(a)(7). A merchant need not be the "actual seller of the goods or services" complained of, but must be "connected with the 'supply' side of the consumer transaction." *Save Immaculata/Dunblane, Inc. v. Immaculata Prep. Sch.*, 514 A.2d 1152, 1159 (D.C. 1986). Thus, parties providing recommendations of the goods or services of a particular merchant to the consumer assume liability only when they are involved in supply side of the transaction. *See Calvetti v. Antcliff*, 346 F. Supp. 2d 92, 104-05 (D.D.C. 2004) (Antcliff's involvement beyond the recommendation of a particular contractor, in which he obtained supplies and contracts with vendors and agreed to oversee and monitor the contractor's work, placed him on the supply side of the transaction and within the scope of the DCCPPA); *Howard*, 432 A.2d at 710 (Riggs Bank employee's recommendation of a contractor to perform home repair did not fall under DCCPPA because Riggs was not a "merchant")

13

cannot be held liable under the DCCPPA.  *See* Def. Mot. [#63656-1] at 9 ("Thus Merck was not the final distributor of a good or service to Plaintiff or other members of the general public."). This argument has been repeatedly rejected by District of Columbia courts.

Merchants "need not be the 'actual seller of the goods or services' complained of, but must be 'connected with the 'supply' side of the consumer transaction.'"  *Adler v. Vision Lab. Telecomms., Inc.*, 393 F. Supp. 2d 35, 39 (D.D.C. 2005) (quoting *Save Immaculata/Dunblane, Inc. v. Immaculata Prep. Sch.*, 514 A.2d 1152, 1159 (D.C. 1986)); *Howard*, 432 A.2d at 709 ("While a 'merchant' is not limited to the actual seller of the goods or services complained of, he must be a 'person' connected with the 'supply' side of a consumer transaction."); *Chen v. Bell-Smith*, 768 F. Supp. 2d 121, 143 (D.D.C. 2011) (quoting *Howard*, 432 A.2d at 709) ("D.C. courts have found that 'a 'merchant' is not limited to the actual seller of the goods or services complained of,' but only 'must be a 'person' connected with the 'supply' side of a consumer transaction."); *Adler*, 393 F. Supp. 2d at 40 ("As long as an entity falls within the definition of a 'merchant,' the 'actual vendor' -- whether it transmits its information through an 'intermediary' or directly to the injured consumer -- will remain liable for DCCPPA violations."); *Klank*, 561 A.2d at 1004 (quoting *Howard*, 432 A.2d at 709) ("[T]he term 'merchant' is not limited to the actual seller of the goods or services but includes those "connected with the 'supply' side of a consumer transaction.").   Under this "broad definition of 'merchant,'" Defendant clearly constitutes a merchant under the DCCPPA.  *Id*.  It is irrelevant which position on the supply line Defendant occupied, because as the maker of Vioxx, it was clearly "connected with the supply side of the transaction."  *Id*. (internal quotation marks removed).

Additionally, other upstream drug makers have made this exact same "consumer transaction" argument and have been rejected.  In *Williams v. Purdue Pharma, Co.*, 297 F. Supp.

2d 171, 174-175 (D.D.C. 2003), when faced with the same argument currently proffered by Defendant, the court stated:

> Defendants here are up-stream drug manufacturers who promote their products to physicians and patients but who actually sell only to wholesalers or large pharmacies for re-sale. On a defense motion to dismiss, the Court must construe the facts of the complaint favorably to the plaintiffs and give all reasonable inferences in their favor. If Purdue and Abbott promoted OxyContin only to physicians and other non-patients, it might be more difficult to discern a consumer-merchant relationship. The plaintiffs have alleged, however, that Purdue and Abbott issued brochures and a videotape directed to consumer-patients. These materials extended beyond the warnings and labels on OxyContin required by the Food and Drug Administration, and are allegedly insufficient and misleading. More affirmatively, Defendants are alleged to have engaged in persuasive sales activities vis-a-vis individual consumers. *See Howard*, 432 A.2d at 709 (citing D.C. Council Committee Report, explaining a "'respondent' is the merchant, or another merchant further along the supply chain who is deemed legally responsible under relevant substantive law ….") The Court concludes that the activities alleged in the complaint may have created a consumer-merchant relationship between Purdue and Abbott and the plaintiffs sufficient for CPPA coverage and that the complaint is not subject to a motion to dismiss on this basis.").

*Williams v. Purdue Pharma, Co*., 297 F. Supp. 2d 171, 174-175 (D.D.C. 2003).  Thus, under *Williams*, Defendant would be liable under the DCCPPA, because Plaintiff has alleged that Defendant marketed Vioxx directly to consumers.  *See* Original Compl. at ¶¶ 54-57.

Furthermore, other District of Columbia case law has held that recommendations made by parties involved in the supply side of the transaction can form the basis for liability alone. *Adler* , 393 F. Supp. 2d at 40 (citing *Calvetti v. Antcliff*, 346 F. Supp. 2d 92, 104-05 (D.D.C. 2004)) ("Thus, parties providing recommendations of the goods or services of a particular merchant to the consumer assume liability only when they are involved in supply side of the transaction."); *see also Ihebereme v. Capital One*, N.A., 730 F. Supp. 2d 40, 53 (D.D.C. 2010)

(quoting *Adler*, 393 F. Supp. 2d at 39-40) ("For example, even when 'parties providing recommendations of the goods or services of a particular merchant to the consumer' are not parties to the sale, and even when their acts take place before the sale itself, such parties may nonetheless 'assume liability' under the 'broad reach of the DCCPPA.'").  This is distinguishable from a situation in which a merchant recommends the work product of another.  *See Howard*, 432 A.2d at 710.  Here, the only "work product" that was misrepresented to consumers and physicians was that of Defendant Merck.

Defendant relies predominately on *Adam Weschler & Son, Inc. v. Klank*, 561 A.2d 1003, 1005 (D.C. 1989) and *In re G-Fees Antitrust Litig.*, 584 F. Supp. 2d 26, 43 (D.D.C. 2008). Neither of these cases adequately addresses the point at issue in this litigation, because both cases more accurately address the definition of a consumer, not a merchant, under the DCCPPA. In *Klank*, the issue was not the position of the seller, but the position of the purchaser.  *Klank*, 561 A.2d 1005.  The court had to determine whether the purchaser was actually another merchant, or whether he was a consumer under the DCCPPA.  *Id*.  It was in this context that the Court made the following statement, only part of which was quoted by Defendant:

> This analysis, as well as the language of the statute itself, indicates that the relevant distinction is one between retail and wholesale transactions. Transactions along the distribution chain that do not involve the ultimate retail customer are not "consumer transactions" that the Act seeks to reach.  Rather, it is the ultimate retail transaction between the final distributor and the individual member of the consuming public that the Act covers.  Accordingly, it is not the use to which the purchaser ultimately puts the goods or services, but rather the nature of the purchaser that determines the nature of the transaction.  If the purchaser is regularly engaged in the business of buying the goods or service in question for later resale to another in the distribution chain, or at retail to the general public, then a transaction in the course of that business is not within the Act.  If, on the other hand, the purchaser is not engaged in the regular business of purchasing this type of goods or service and reselling it, then the transaction will

16

usually fall within the Act.  Since Klank is not in the regular business of the retail sale of antiques, it follows that the transaction is one within the Act and its protections.

*Id*.

In the instant case, there is no question that Plaintiff is a consumer.  See Am. Compl. at ¶ 8-9.  He purchased Vioxx, either in whole or in part, on numerous occasions, and these purchases were unquestionably for "personal use." *Klank*, 561 A.2d at 1004 (quoting D.C. Code § 28-3901 (a)(2)) ("[A]s an adjective, 'consumer' describes anything, without exception, which is primarily for  personal, household, or family use[.]").

Similarly, *In re G-Fees* dismissed the DCCPPA action based on the fact that the plaintiffs were not consumers, not based on any aspect of defendant's status as an upstream merchant.  *In re G-Fees Antitrust Litig*., 584 F. Supp. 2d 26, 43 (D.D.C. 2008) ("Because plaintiffs are unable to allege that they are consumers of anything Fannie Mae provides, they cannot state a claim under the CPPA ….").  In that case, the defendant, Fannie Mae, was a mortgage guarantor who sold its services to mortgage lenders.  *Id*. at 31.  Essentially, lenders paid a fee, the "G-fee", to Fannie Mae in exchange for security against default by borrowers.  *Id*. at 31.  The plaintiffs, however, were the *borrowers*, and thus were not involved in the transaction with the defendants.[6] As borrowers, the plaintiffs never bought any security against default from the defendants themselves, nor did they stand to benefit from defendant's products or services.  *Id*.  Therefore, they clearly could not constitute people who purchase or would purchase consumer goods or

---

[6]      Actually, because the only transaction in which Fannie Mae took part was between Fannie Mae and mortgage lenders, *see id*. at 43, the transaction was between two merchants, and could not have been maintained on those grounds.  *See Independent Communications Network, Inc. v. MCI Telecommunications, Corp.*, 657 F. Supp. 785, 788 (D.D.C. 1987) ("[The DCCPPA] is not intended to supply merchants with a private cause of action against other merchants. In no imaginable way could plaintiff ICN be categorized as a consumer.").

services, nor could they provide "the economic demand for [the] trade practice."  D.C. Code §
28-3901 (a)(2).  Thus, the plaintiffs were not consumers under the DCCPPA.  *Id*.

In the instant case, as stated above, there is no question that Plaintiff is a consumer.  Not
only did he purchase Vioxx for personal use, but as a Vioxx user, he also clearly provided "the
economic demand" for Vioxx.  *See* D.C. Code § 28-3901 (a)(2).

Under the DCCPPA, a consumer is a person:

[W]ho does or would purchase, lease (from), or receive consumer goods or
services, including a co-obligor or surety, or a person who does or would provide
the economic demand for a trade practice; as an adjective, 'consumer' describes
anything, without exception, which is primarily for  personal, household, or
family use[.]

*Klank*, 561 A.2d at 1004 (quoting D.C. Code § 28-3901 (a)(2)).

### C.  Plaintiff Will Seek Leave to Amend for Class Certification

Defendant argues that Plaintiff cannot represent the citizens of the District of Columbia
because he "has neither pled any class allegations in his Complaint nor sought to certify a class
in this case."  Def. Mot. [#63656-1] at 11.   This argument is disingenuous and premature.  To
begin, Plaintiff's Motion to Amend and the Amended Complaint are being prepared to address
these precise concerns.  Thus, the Court's grant of the Motion to Amend would moot this
argument, as it seeks to clarify and bolster the basis for class certification.   Furthermore, this
Motion to Amend will likely be granted because of generous amendment standards, and because
no undue prejudice would result in the Court's grant of a Motion to Amend.  *See Dussouy v. Gulf
Coast Investment Corporation*, 660 F.2d 594, 598 (5th Cir. 1981).

Additionally, Merck was recently advised of Mr. Walker's intent to amend his complaint
to seek class certification because recent case law suggests that it was necessary, as Mr. Walker
has from the start, damages on behalf of other consumers.  (The PSC is assisting Plaintiff and has

18

communicated with Merck.) In an apparent attempt to pre-empt Plaintiff's Motion to Amend, Defendant filed this motion, while the Motion to Amend and Amended Complaint were being prepared.[7]   Defendant cannot now prevent consideration of the Amended Complaint simply because it has filed its Motion for Judgment on the Pleadings before Plaintiff has had the chance to file his respective documents.

Defendant also acknowledged the class merits of this action in its Notice of Removal.  In fact, Defendant based its Notice of Removal to Federal Court on the contention the Court had subject matter jurisdiction pursuant to the Class Action Fairness Act.  Notice of Removal at 10. Defendant recognized that "plaintiff's claims, which he purports to bring in a representative capacity, are the functional equivalent of a putative class action…."  *Id*.  Defendant further asserted that "Plaintiff's Complaint satisfies the definition of a class under CAFA because it is a civil action brought under a 'statute or rule of judicial procedure authorizing an action to be brought by one or more representative persons as a class action.'"  *Id.* at 11.  Defendant cannot now assert that it is prejudiced by amendments that clarify and strengthen class action status that Defendant had clearly already assumed.  Moreover, these statements confirm the fact that no prejudice exists and therefore support Plaintiff's argument that it should be granted leave to amend.

---

[7]      Plaintiff's Motion to Amend and Plaintiff's Amended Complaint will be filed shortly.

Finally, because the Court here has dismissed the D.C. False Claims Act matter, the federal question basis for removal no longer exists.  Mr. Walker's claim as either a "mass action" or a "class action" is currently the only basis for federal jurisdiction.[8]

**III.     Conclusion**

Based on the reasons and legal precedent set forth above, Plaintiff requests that the Court deny Merck's Motion for Judgment on the Pleadings.


Respectfully submitted,

MCKNIGHT & KENNEDY, LLC


BY:  /s/   H. Vincent McKnight, Jr.
H. Vincent McKnight, Jr.
D.C. Bar No. 293811
8601 Georgia Avenue
Suite 1010
Silver Spring, MD 20910
(301) 565-5281

---

[8]     *See*, *State of Louisiana ex. rel. James Caldwell v. Allstate Insurance Company*, 536 F.3d. 418, 430  (5th Cir. 2008). (Remand denied because Louisiana AG claim for treble damages for policyholders established CAFA jurisdiction).

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail, upon Liaison Counsel Ann Oldfather by e-mail, and upon all parties by electronically uploading same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 27th day of February 2012.

/s/ Dawn M. Barrios
Dawn M. Barrios