# EXHIBIT B

COMMONWEALTH OF KENTUCKY
FAYETTE CIRCUIT COURT
FIFTH DIVISION
CASE NO. 05-CI-4240

NOV 2 7 2006

PATRICIA A. SWANAGIN and
ROBERT L. SWANAGIN, Spouse                                         PLAINTIFFS

VS.                                    ORDER

MERCK & CO., INC., et al.                                          DEFENDANTS

*************************

The Court having heard arguments by counsel and some testimony on Plaintiff's

Motion to Compel, makes the following findings and ORDER:

(1) Information in Merck's "data dictionary" and/or files not already provided to the

Plaintiffs, relating specifically to Vioxx, may be relevant to a claim for punitive

damages and therefore are discoverable based on relevancy, if not barred by other

reasons such as, but not limited to, being unduly burdensome, unduly expensive

or technically irretrievable as determined by the Court and not the parties.

(2) In order to ascertain what this information may be, and how it may be obtained,

Merck shall schedule a meeting prior to February 20, 2007, between Janet Scott

on behalf of Merck and Keith Altman on behalf of the Plaintiffs, other technical

staff as needed, and Ms. Oldfather and Mr. Flaster.

(3) Two weeks prior to this scheduled meeting, Mr. Altman shall be given access to

the "data dictionary" to prepare for the meeting with Ms. Scott. He may use his

laptop for note taking and data comparison but may not scan or copy the data

dictionary. Merck may have someone present at all times. Any information

obtained shall be under the confidentiality Order presently in place.

A True Copy
ATTEST: WILMA F. LYNCH. CLERK
FAYETTE CIRCUIT COURT

By: _____ Deputy

(4) Merck may set the time and place for both meetings, but must confer with opposing counsel before setting.  Any unreasonable arguing over this may lead to one or both parties being held in contempt.

(5) After the review and meeting but no later than the first Friday after February 20, 2007, the parties shall request a pretrial to discuss the status of discovery.

(6) The parties shall meet as set forth above as long as is necessary to complete the review and discussions.  Failure to complete this discussion, even if the end result is disagreement, may lead to one or both parties being held in contempt.

Entered this the 27th day of November 2006.

_Mary C. Noble_

JUDGE NOBLE, FAYETTE CIRCUIT COURT

Attested copies to:

Susan J. Pope
Frost Brown Todd LLC
250 W. Main Street, Suite 2700
Lexington, Kentucky 40507-1749

Winston E. Miller
Frost Brown Todd LLC
400 W. Market St., 32nd Floor
Louisville, Kentucky 40202

Donald K. Brown, Jr.
Joseph C. Klausing
455 S. Fourth Street, Suite 1500
Starks Building
Louisville, Kentucky 40202

David B. Gazak
Daniel G. Brown
James E. Smith
Darby & Gazak
1320 Office Pointe Place, Suite 200
Louisville, Kentucky 40220

Ann Oldfather
Oldfather & Morris
1330 South Third Street
Louisville, Kentucky 40208

Beverly J. Glascock
BUBALO & HIESTAND PLC
401 South Fourth Street, Suite 800
Louisville, Kentucky 40202
(502) 753-1600

Kevin R. King, MD, Pro Se
1934 Bypass Road
Winchester, Kentucky 40392

This the 2⁷ day of November 2006

WILMA F. LYNCH, C.F.C.C.

BY: _____ D.C.

COMMONWEALTH OF KENTUCKY
FAYETTE CIRCUIT COURT
FIFTH DIVISION
05-CI-4240

PATRICIA A. SWANAGIN and                              **Plaintiffs**
ROBERT L. SWANAGIN, Spouse

v.

MERCK & CO., INC., et al.                            **Defendants**

REPORT OF JANET SCOTT REGARDING MEET AND CONFER
WITH PLAINTIFF'S TECHNOLOGY CONSULTANT
<u>RELATING TO THE "FACTS DATABASE"</u>

This report was prepared at the conclusion of the meet and confer regarding the

Field Activity and Customer Tracking System ("FACTS") database – and subsequent

related discussions – between the parties and in response to the Court's request for the

technology consultants to provide a written account of their findings following that

meeting.

<u>INTRODUCTION</u>

1.    My name is Janet Scott.   I am currently employed with Merck & Co., Inc.

      ("Merck") as Senior Director, Global Technology Services, Business

      Management and Compliance.  Prior to that position, I was employed as Director,

      E-Discovery Program Management Office.  Prior to that position, I was employed

      as Manager, Merck Information Systems ("Merck IS"), where I was responsible,

      during my tenure, for technology relating to over twelve of Merck's Sales

      Automation Systems, including the FACTS database.

1

2.      I have a Bachelors degree in Computer Science from Shippensburg University and a Masters in Management from Penn State University. I have worked in the IT industry for over 20 years and have substantial experience with various aspects of technology, including both computers and databases. I began my work in the industry as an applications developer coding software that was used in hospital systems. Since that time, I have performed disaster recovery procedures by rebuilding entire systems from tape, and I have been responsible for worldwide deployments of major computer systems.

3.      I have been responsible for the development, deployment, operation, and support of various systems at Merck, and I have provided leadership and oversight to project portfolios of approximately fifty projects. I have also performed hardware and software installations and maintenance on operating systems, including performance tuning, capacity planning, security monitoring, and system validation. Over the last several years, I have held various management and leadership positions, and in that capacity, I have hired and mentored a number of technological experts. I have also worked with all sorts of IT personnel through various complex system challenges, and I am extremely knowledgeable on these and other technology-related subjects.

4.      In January 2005, I was asked by Merck's Legal Department to investigate how Merck might extract Vioxx-related data from the FACTS database for the Vioxx litigation. To my knowledge, such an extraction of FACTS data had never been done before – in litigation or otherwise – involving any Merck product.

2

5.   On November 27, 2006, this Court ordered a "meet and confer" to occur between myself and plaintiff's designated technology consultant, Keith Altman, to discuss the technical feasibility and burdens associated with producing all Vioxx-related FACTS data for all of Merck's customers.  This meeting took place on February 5, 2007.

6.   Prior to the February 5th meet and confer, Merck produced FACTS data and various supporting materials to plaintiff's counsel, Ann Oldfather, and provided Mr. Altman with access to the so-called "data dictionary" for the FACTS database.  In addition, Merck voluntarily provided Mr. Altman with additional documentation relating to the FACTS database with the underlying objective of making the meet and confer session as productive as possible.

7.   Following the meet and confer, plaintiff's counsel and Mr. Altman submitted a number of additional questions to Merck's outside counsel, to which Merck's counsel responded on two subsequent conference calls.  I was prepared to – and I believe did – answer the questions presented to me.   Nevertheless, plaintiff's counsel and Mr. Altman insisted on being provided with an opportunity to confer with one of Merck's FACTS "programmers" in an effort to answer certain additional questions that they contended were beyond the scope of my personal knowledge or expertise.  Although neither Merck's counsel nor I agreed with their position, Merck accommodated these additional requests, and a conference call with one of Merck's key FACTS programmers, Kirill Azvolinsky, occurred on February 23, 2007.

**FACTS DATABASE STRUCTURE AND CONTENTS**

8.  The FACTS database is the nexus through which Merck manages data relating to the activities of its field sales force involving approximately 50 different pharmaceutical products.  FACTS moves data among approximately 70 other databases and applications at Merck.  A simplified schematic of the relationship that existed among FACTS and several other databases at Merck is attached to this report for this Court's reference.

9.  The FACTS database contains records relating to approximately 1.4 million medical professionals.  Of those 1.4 million, FACTS stores Vioxx-related data on a minimum of 500,000 physicians, and likely many more.  The FACTS database has approximately 600 tables, 7,000 columns of data, and 837 million rows.  The volume of data is approximately 180 gigabytes, the equivalent of several millions of pages in paper form.

10.  Most of the data in FACTS is unrelated to Vioxx.  Merck employs approximately 8,000 Professional Representatives in the United States, many of whom did not have responsibility for Vioxx.  Those that did have responsibility for Vioxx typically also had responsibility for other Merck drugs.  Indeed, FACTS contains data on approximately 50 Merck products and on hundreds of thousands of physicians and other healthcare providers, many of whom were not called upon by Professional Representatives with respect to Vioxx.

11.  The FACTS database, which became operational in 1994, is not a commercially-available, off-the-shelf database.  On the contrary, FACTS is a proprietary system that was developed at Merck to support a specific business purpose.  It was not

4

designed – nor was it ever intended – to be used in litigation to report past events relating to a single product.

12. Further, the FACTS database is a transactional, rather than a reporting, database. This is a critical point, which makes production of the database enormously complicated and burdensome. A transactional database is not the type of database that allows users to cull and organize information easily; rather, such a database is designed to process individual transactions quickly and efficiently.

13. In December 2004, in an effort to minimize the impact on Merck's business of litigation requests against the live FACTS database, the entire system was replicated in a separate environment known as DEV9. Because live FACTS only maintained two years worth of data, archived tapes containing data from previous years were also uploaded into this alternative environment.

14. Importantly, DEV9 is an identical replica of the live FACTS database, as described above, which is transactional in nature and contains data on all Merck products. The discussion throughout this report relating to FACTS, therefore, applies to DEV9. In fact, the feasibility and burden considerations relating to production of the FACTS database apply with even greater force to DEV9 in that more data is maintained in that system given the existence of archived data over two years old. DEV9 contains an estimated 300 gigabytes of data relating to all Merck products.

## STANDARD FACTS PRODUCTIONS IN NATIONAL VIOXX LITIGATION

15.  Merck has extracted and produced an enormous amount of Vioxx-related FACTS data in various coordinated proceedings and individual cases pending across the country. The current standard protocol for production of Vioxx-related FACTS data in litigation turns on individual plaintiffs providing Merck with the names and addresses of their prescribing physicians and Merck running a standard set of 46 queries – keyed specifically to these particular prescribers – against the data maintained in FACTS. Merck has utilized these queries over the last two-and-a-half years and confirmed that they provide reliable results.

16.  At the time this procedure was developed, Merck devoted substantial time and resources to investigate the requirements for this standard production and to establish the necessary protocols and infrastructure to fulfill these litigation requests in the future. After years of producing FACTS data in national Vioxx litigation, this process remains the most reliable and efficient method for extracting exclusively Vioxx-related data from the FACTS database.

17.  On information and belief, the contents of Merck's standard FACTS productions were originally negotiated with plaintiffs' counsel in the New Jersey Coordinated Litigation, which is pending in Atlantic City, New Jersey and involves thousands of individual plaintiffs' claims. These same requirements were subsequently adopted in the federal MDL, pending in district court in New Orleans, Louisiana (similarly involving thousands of individual claims), and various other litigation in state courts throughout the country. In this way, Merck has already produced

and continues to produce FACTS data – under this standardized protocol – for literally several tens of thousands of cases in national Vioxx litigation.

18. Merck has currently produced FACTS data for approximately 49,000 physicians identified by plaintiffs as their prescribing physicians in particular Vioxx cases. This production includes almost 4,000,000 so-called "call notes" associated with those prescribing physicians – approximately 2,120,400 in the MDL, 1,787,300 in the New Jersey Litigation, and 85,500 in the California coordinated proceedings. Further, given the purpose and special requirements of the federal MDL proceeding, Merck also separately produced over 779,000 call notes associated with an additional 66,750 randomly-selected physicians.

19. On information and belief, on August 16, 2006, Merck reproduced for Ms. Oldfather all of the previously produced FACTS data in pending Vioxx litigation across the country as of that date. This production to Ms. Oldfather includes over a million call notes and other FACTs data relating to tens of thousands of physicians in Vioxx cases pending in Alabama, California, Florida, Illinois, New Jersey, Pennsylvania, Texas, and the MDL (which is to say, nationally). Merck has also produced to Ms. Oldfather relevant Vioxx-related FACTS data – under the above-referenced standard protocol – relating to plaintiffs' prescribing physicians in the cases pending in this Court and other Kentucky state court proceedings.

20. In addition to the massive reproduction of FACTS data that was previously produced in national Vioxx litigation, Merck also provided Mr. Altman with various materials to assist him in understanding how data is maintained in the

7

FACTS database and how relevant data has been routinely extracted and produced to satisfy requests from plaintiffs' counsel in national Vioxx litigation. Specifically, months prior to the meet and confer, Merck identified the FACTS tables, provided their definitions, and created additional documentation for Mr. Altman illustrating how the data stored in the live FACTS database became data produced in litigation.

21.    On January 23, 2007, Merck's counsel met with Mr. Altman for several hours in New York City to provide him with access to the so-called FACTS "data dictionary" (defining not just the individual tables but also the fields as they exist in the live FACTS database) as well as the production "data model" (showing the relationship among various FACTS tables selected for production in Vioxx litigation).   At this initial meeting, Mr. Altman requested additional FACTS documentation (namely, definitions for all produced FACTS tables and fields) and his own copy of the production data model.  Merck agreed to both of these requests, and the additional materials were provided to Mr. Altman on January 26, 2007.

## MEET AND CONFER WITH MR. ALTMAN

22.    On February 5, 2007, I participated in the scheduled meet and confer with Ms. Oldfather and Mr. Altman.  It was clear to me that Mr. Altman did not have the requisite expertise to extract data from FACTS and reconstruct the logical relationships in a way that would produce a reliable end product.

23.    During the meet and confer, Ms. Oldfather and Mr. Altman asked a series of questions regarding the technical feasibility and cost of "full" production of all

Vioxx-related data from the entire FACTS database.   In other words, they requested information about the technical feasibility and cost associated with providing this data for *all physicians in the United States* – regardless of their connection to a particular Vioxx case – available in the FACTS database.

24.   I explained to them that although this request is technically feasible, it would cost approximately $75,000 and would take 6 months to complete.   However, upon further investigation into what would be involved in the requested conversion of the existing format of FACTS data into a new system platform (i.e., a commercial product known as Oracle), it appears that 6 to 9 months is a more accurate estimate of the time involved to complete the project, as 3 additional months would be required to build the capacity to produce the data into Oracle. Moreover, these cost and time estimates do not take into account how these additional processes will affect or be affected by Merck's current productions of FACTS data in national Vioxx litigation, which could even further increase the time it would take for these queries to run their course.

25.   I also explained to them that Merck currently has the capacity to process FACTS data – employing the current standard "46 query" protocol – for approximately 2,000 prescribing physicians in 4 hours.   Given that the FACTS database maintains data relating to 1.4 million physicians, processing these queries for all physicians in the system would take approximately 6 months.   Again, this 6 month estimate relates only to the process time of *running* the queries and not the initial 3-month development effort.

9

26.     To accomplish this task, Merck would need to modify its existing infrastructure and protocols for producing FACTS data in national Vioxx litigation in an effort to accommodate these new requirements. More specifically, the following steps would be necessary:

- Procure the expertise of a business analyst, project manager, technical designer, database administrator, and QA analyst and conduct a preliminary analysis to formulate an overall plan;
- Modify and test 46 independent programs to change the current output of relatively small Access databases to a single larger Oracle database that can support the significantly increased volume of data;
- Configure and test mapping translations into Oracle database format;
- Create a "customer list" of all Vioxx prescribing physicians maintained in the FACTS database;
- Develop and test a process to automate division of the list of 1.4 million prescribers into manageable portions; and
- Run the programs against the smaller (subdivided) customer lists.

27.     It is absolutely critical to follow a calculated approach. In his article entitled "E-Commerce Missing Link: Software Requirement Specifications," Anthony Mitchell explains, "Ironically, many managers' attempts to control project costs by initially skipping over most of the requirements-development process usually has the opposite effect by increasing overall project costs and the time needed for completion." Accordingly, failure to expend the necessary resources to follow a proven methodology for systems development will surely produce either a process that is destined to fail prior to completion and/or one that produces a result that is manifestly and fundamentally unreliable.

28.    Importantly, if implemented, this process will produce an enormous and unprecedented volume of free-text "call notes" that *cannot* programmatically be limited only to Vioxx, so that Merck's counsel will need to review every call note to determine if the note refers to Vioxx. This is an element of technical feasibility on which I cannot speak with personal knowledge, but I can report that the additional effort involved in this review of call notes would be substantial and would likely add several months to the project.

29.    Despite the burden outlined above, I believe that my assessment in Paragraph 26 is the least expensive and the most efficient and reliable method for providing all the relevant data being requested by Ms. Oldfather and Mr. Altman.

30.    One of the core problems revealed at the meet and confer was Mr. Altman's assumption that the FACTS database is comparable to a standard "reporting" database. The FACTS database, however, is a "transactional" database – not a reporting database – and the two are fundamentally different in both form and function. Whereas a reporting database is designed to do just that – report large amounts of data – a transactional database is designed to process discrete units of data quickly and efficiently, and thereby sacrifices any complex reporting capabilities.

31.    According to a preeminent database expert, Ralph Kimball, in his book entitled *The Data Warehouse Toolkit*, "Every [database analyst] and application designer knows that a query involving several large tables of a million rows or more simply will not return results. These professionals would consider it laughable to let end users construct their own queries in such a database. For queries that span

11

many records or many tables, entity relation diagrams are too complex for users to understand and too complex for software to navigate.  In fact, this is such an important result that we need to state it unequivocally:  'Entity relation data models are a disaster for querying because they cannot be understood by users and they cannot be navigated usefully by [database management system] software. . . .'"  Mr. Altman's proposed solutions relating to FACTS are in direct contradiction to what Mr. Kimball states is common knowledge in the technology industry.

32.    Mr. Altman did not appear to understand the challenges associated with reporting from a transactional database such as FACTS.  When I tried to identify and explain those challenges, he insisted that he has done this type of work in the past and that it simply was not that difficult.  To resolve the apparent discrepancy between my and Mr. Altman's respective positions on the subject, I would respectfully encourage the Court to engage an independent qualified technology expert to review Mr. Altman's conclusions.

33.    Moreover, Mr. Altman was not familiar with the meaning of certain common database notations on the FACTS data model.  Those notations represent the basic symbols used in the industry to identify relationships in a database.  Accordingly, they define the relationship – "one to one," "one to many," or "many to many" – between various tables in the FACTS database. For example, a "call note" can be assigned to one and only one "call," but a single "call" can have "many" notes, and so this represents a "one to many" relationship in the database.  Other notations defined whether the data element is "optional" or not.  For example, for

12

any given "call," a "call note" is optional, whereas "territory number" associated with the call is not optional. Meanwhile, this lack of knowledge may account for the instances of misunderstanding between Mr. Altman and myself during the course of the meet and confer.

34.     In short, the FACTS database is an extremely complicated transactional database with many components. There are highly-skilled technical personnel at Merck IS who have years of training and experience with the FACTS database, and yet there is still no single person who has the full breadth of knowledge and expertise relating to the entire database. Indeed, no one individual on the Merck IS technical team would claim to be knowledgeable enough to query all components of the FACTS database; rather, they would defer to one another for specific areas of expertise.

35.     During the meet and confer, Mr. Altman proposed several "solutions" that he believes will produce equally reliable results on a faster timeframe and at a lower cost. Not one of Mr. Altman's so-called "solutions," however, can legitimately be said to account for the complexity of the task at hand or is otherwise likely to produce a reliable result:

- *Mr. Altman requested that Merck develop a new process that would "filter out" non-Vioxx data and to provide that specific "raw data" in its existing database structure.* This approach ignores the fact that FACTS cannot simply be filtered by one specific Merck product.

- *Mr. Altman requested that Merck provide all "raw data" in its existing database structure; Mr. Altman himself would "filter out" the non-Vioxx data; and Merck IS would then have the opportunity to review the output.* Again, this approach ignores the fact that the FACTS database cannot simply be filtered by one specific Merck product. Further, there is no way Merck would be able to reconstruct and test

13

Mr. Altman's output of millions of rows of data to confirm that he extracted only Vioxx data. The only way to confirm the results would be for Merck independently to attempt the task itself and compare its results to those of Mr. Altman.

- *Mr. Altman requested that Merck develop a new process to provide all "raw data" in its existing database structure but only the tables that relate to a so-called "Vioxx call."* Similarly, this approach ignores the fact that the FACTS database cannot simply be filtered by one specific Merck product, even for a subset of the data.

- *Mr. Altman requested that Merck develop a new process by which Merck would create individual Access files for each report instead of requiring all 46 reports to be produced in a single Access database.* Merck would have to modify and test 46 individual programs, the processing time would still be approximately 6 months, and it is unlikely that the Access platform can even hold all of this data.

- *Mr. Altman also requested that Merck investigate the development of new processes to provide the data in various outputs as well as tools/methods for the extraction or conversion of data from one format to another.* Mr. Altman claimed that there are several off-the-shelf tools that can easily convert data from DB2 to another database platform. However, tools in the marketplace that perform this function require significant configuration and testing.

36. Moreover, Mr. Altman's proposed method for achieving these so-called solutions is fundamentally flawed because it fails to take into account the absolutely critical data relationships existing in the FACTS database. Mr. Altman proposed a method by which he claims that the FACTS data can be filtered by product. This method ignores the fact that several "optional relationships" exist within FACTS.

37. In order to get the responsive data – and only the responsive data – the queries need to be constructed in such a complex way that they will require a significant amount of processing time to complete. Furthermore, none of Mr. Altman's proposed solutions address the sheer volume of free-text "call notes" that will still

require review and redaction by Merck's counsel for references to other Merck products.

## CONCLUSION FROM MEET AND CONFER

38.  Some form of what Mr. Altman and Ms. Oldfather are requesting appears to be technically feasible given enough time and resources.  The parties were not able to agree, however, on how long this effort would take or how much it would cost.  My conclusion from the meet and confer is that Mr. Altman lacks the basic expertise to appreciate the difficulties inherent in extracting data from a transactional database as complex as the FACTS database.

39.  Given that the technical personnel at Merck IS have years of experience working with the FACTS database, understand the complexities and challenges inherent in reporting from a transactional database, and follow a proven methodology for system development, I believe that we are in the best position to determine the most efficient and least expensive approach for delivering reliable results.  In this way, I can report that Mr. Altman's proposed "solutions" for obtaining the requested data from the FACTS database are unlikely to return reliable results, if any data at all.

40.  To resolve the apparent discrepancy between my and Mr. Altman's respective positions on the subject, I would respectfully encourage the Court to engage an independent qualified technology expert to review Mr. Altman's conclusions.  I would recommend that the expert have several years of industry experience working in a large-scale, complex transactional database environment, such as the financial industry.   I believe that someone with a solid IT background and

experience working with a large, transactional system could confirm the accuracy of my conclusions from this meet and confer. Such an expert would also be able to refute Mr. Altman's assertions that all databases are similar, that all queries are simple, and that any database can easily report large amounts of data and produce reliable results.

Signed this _26_ day of March 2007,

Janet Scott

16

Respectfully submitted,

By: *Susan Pope*

Susan J. Pope
Frost Brown Todd LLC
250 West Main Street, Suite 2700
Lexington, Kentucky 40507-1749
(859) 231-0000 Telephone
(859) 231-0011 Facsimile

Winston E. Miller
Frost Brown Todd LLC
400 West Market Street, 32nd Floor
Louisville, Kentucky 40202
(502) 589-5400 Telephone
(502) 581-1087 Facsimile

- and -

Noah Graff
Hughes Hubbard & Reed LLP
350 South Grand Avenue
Los Angeles, California 90071-3442
(213) 613-2878 Telephone
(213) 613-2950 Facsimile

*Counsel for Defendant Merck & Co., Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was served via electronic mail and U.S. mail, except where indicated, on this the 26th day of March 2007, to the following:

Gregory Bubalo
Steve Rotman
Leslie M. Cronen
Bubalo, Hiestand & Rotman, PLC
401 South Fourth Street, Suite 800
Louisville, Kentucky 40202

Ann B. Oldfather
Oldfather Law Firm
1330 South Third Street
Louisville, Kentucky 40208

Tyler Thompson
Dolt, Thompson, Shepherd & Kinney
455 South Fourth Street, Suite 310
Louisville, Kentucky 40202
*Counsel for Plaintiffs*

James E. Smith
Darby and Gazak, PSC
3220 Office Pointe Place, Suite 200
Louisville, Kentucky 40220
*Counsel for Charles J. Johnson, M.D. and Commonwealth Family Physicians, P.S.C.; Advanced Pain Medicine, P.S.C.; Saroj B. Dubal, M.D.; Donald Douglas, M.D.; Todd Martin, ARNP; James W. Templin, M.D.; and Thomas A. Sweasey, M.D.*

Norman F. Klick, Jr.
Carruthers & Roth, PA
235 North Edgewood Street
P.O. Box 540
Greensboro, North Carolina 27402
*Counsel for Thomas A. Sweasey, M.D.*

Joseph C. Klausing
O'Bryan, Brown & Toner, PLLC
455 South Fourth Street, Suite 1500
Louisville, Kentucky 40202
*Counsel for Physician Services, PSC and John W. Gilbert, PSC d/b/a Spine & Brain Neurosurgical Center, PSC; James K. Ritterbusch, Jr., M.D. and Lexington Orthopedic Associates, P.S.C.*

Kevin R. King, M.D., Pro Se
1934 Bypass Road
Winchester, Kentucky 40392
**(via U.S. Mail Only)**

Honorable Roger Crittenden
518 Logan Street
Frankfort, Kentucky 40601

*Susan Pope*

*Counsel for Defendant Merck & Co., Inc.*

Car history VIN search, auto history check at CARFAX Vehicle History Reports

 <u>View a Sample Report</u>

## CARFAX Reports - Order Form

**Secure Checkout**

### YOUR SEARCH RESULTS

**Vehicle:** 2000 PLYMOUTH NEON/LX
**VIN:** 1P3ES46C0YD714661

Your vehicle has
**10 history records**

---

### EACH CARFAX REPORT CHECKS FOR:

- ✔ Major Accident
- ✔ Mileage Rollback
- ✔ Multiple Owners
- ✔ Structural Damage
- ✔ Lease, Personal, Taxi or Police Use
- ✔ Total Loss
- ✔ Rebuilt
- ✔ Flood Damage
- ✔ Airbag Deployment
- ✔ Mileage Rollover
- ✔ Salvaged
- ✔ Hail Damage
- ✔ Branded a Lemon
- ✔ Last Reported Mileage
- ✔ Junked
- ✔ State Owned
- ✔ Length of Ownership
- ✔ Estimated Miles Driven Per Year
- ✔ Not Actual Mileage
- ✔ Recall Information
- ✔ Warranty Information

**Plus**

Service, Inspection, and
Registration History

**Order CARFAX Reports
Be Smart... Be Sure!**

**Money Back Guarantee if Not
100% Satisfied - No Risk!**

### Your Information
*Required Fields

- ◉ 5 CARFAX Reports for $44.99 *(Shopping multiple cars? Get more reports & save)*
- ○ 1 CARFAX Report for $34.99

**Cardholder Name\***   As it Appears on Card
**Billing Address\***   Street Address
**City\***   City    Select State
**Zip\***   Zip
**Email\***
**Card Type\***   
**Card Number\***
**Expiration Date\***   Month   Year
**Security Code\***   Security Code   What's this?

By processing my order, I agree to the terms of the Customer Agreement and understand that CARFAX may not have the complete history of every vehicle.

 **BUY NOW**

Make sure you read our Customer Agreement
before you ask us to process your order.

I agree to pay a one-time charge of $44.99 (USD) plus applicable sales tax in the following states: CT, DC, HI, NJ, NM, NY, SC, SD, TX, WA and WV, according to my card issuer agreement. This 5 CARFAX Reports Plan is valid for 60 days from the date of purchase, and is intended for my personal use only. Commercial use, resale and redistribution of CARFAX Reports is strictly prohibited. "Commercial Use" is defined as

☑ From time to time we offer our customers helpful auto-related information. Leave this checked to receive special offers from CARFAX. CARFAX does not provide its customer list to any third-party organizations.
To learn more about our commitment to your privacy, please refer to our <u>Privacy Statement</u>.

 

Copyright ©, CARFAX, Inc

COMMONWEALTH OF KENTUCKY
FAYETTE CIRCUIT COURT
FIFTH DIVISION
05-CI-4240
(Consolidated with Case No. 05-CI-4241)


PATRICIA A. SWANAGIN and                                    Plaintiffs,
ROBERT L. SWANAGIN, Spouse


v.


MERCK & CO., INC., et al.                                   Defendants

## PLAINTIFFS' NOTICE OF FILING OF
## REPORT OF TECHNICAL CONSULTANT, KEITH ALTMAN

Come the Plaintiffs, by counsel, and hereby notify the Court that all counsel have been served today by email and mail with the attached report of their technical consultant, Mr. Keith Altman.   This Report addresses the meet and confer efforts on Merck's FACTS database pursuant to the order of the Honorable Mary Noble of November 27 , 2007.

Respectfully Submitted,


_____
Ann B. Oldfather
OLDFATHER LAW FIRM
1330 S. Third Street
Louisville, KY  40208
502.637.7200

-and-

Gregory J. Bubalo
Leslie M. Cronen
BUBALO HIESTAND & ROTMAN, PLC
401 S. Fourth Street
Louisville, KY  40202
502.753.1600

*Co-Counsel for the Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served via U.S. Mail, First Class postage paid, upon the following on this the 26th day of March, 2007:

Susan J. Pope, Esq.
FROST BROWN TOOD, LLC
250 W. Main Street, Suite 2700
Lexington, KY  40507-1749

Donald K. Brown, Jr., Esq.
Joseph C. Klausing, Esq.
455 S. Fourth Street, Suite 1500
Starks Building
Louisville, KY  40202

David B. Gazak, Esq.
Daniel G. Brown, Esq.
James E. Smith, Esq.
Darby & Gazak
1320 Office Pointe Place, Suite 200
Louisville, KY  40220

Kevin R. King, MD, Pro Se
1934 Bypass Road
Winchester, KY  40392

Hon. Roger L. Crittenden
Senior Status Judge
518 Logan Street
Frankfort, KY  40601

_____
**Counsel for the Plaintiffs**

2

**Finkelstein & Partners**

436 Robinson Avenue
Newburgh, NY 12550
516-795-6605
kaltman@lawampmmt.com

March 26, 2007

Ann Oldfather, Esq.
Oldfather & Morris
1330 South Third Street
Louisville, KY 40208

Re:  *Swanagin v. Merck* FACTS database production

Dear Ann,

As requested, the following is my report concerning the FACTS database in the Vioxx litigation.
If there are any questions, please call.

Sincerely,

/s/

Keith Altman
Director of Adverse Event Analysis
Finkelstein & Partner

# REPORT OF KEITH ALTMAN

My name is Keith Altman, Managing Director, Complex Litigation Division, Finkelstein & Partners, 696 Broadway, Massapequa, NY 11758. A true and accurate copy of my CV is attached hereto as Exhibit "1." I also serve as the Director of Adverse Event Analysis for the firm. I have been retained by Plaintiff in the matter of *Swanagin v. Merck*.

## Qualifications

My primary business is providing litigation consulting and support services relating to discovery and analysis of electronic and paper information in complex litigation. I frequently respond to queries posed by counsel with respect to specific data, utilizing data and information provided in discovery, and information I obtain by attending depositions of fact witnesses who have knowledge of the data involved. For this matter, my relevant areas of expertise are computer database, electronic discovery, forensic data analysis, and pharmaceutical databases.

I am involved as a data analysis and discovery consultant in several mass tort litigations related to drugs and other medical devices. These litigations include breast implant, FenPhen, Rezulin, Propulsid, Baycol, PPA, Meridia, Accutane, and Lariam, Enbrel, Remicade, Vioxx, Effexor, Ortho-Evra, Paxil, Prozac, and Neurontin. In these litigations, I am involved in the development of document discovery protocols and assist counsel throughout the discovery process. In FenPhen, Rezulin, Meridia, Accutane, Hormone Therapy, Baycol, Propulsid, and Neurontin I was responsible for the receipt of virtually all materials produced by the defendants as well as building the electronic document depositories. I am also often asked to analyze electronic information produced by the defendants.

I have been involved in several other high profile litigations such as University of California v. Genprobe, Mycogen v. Monsanto, GCNA v. City of Cleveland, and Anthony Talalai v. Cooper Tire providing similar services. In the case of South Carolina v. Pitman, the Court admitted me as an expert on adverse event analysis, adverse event reporting systems, and pharmacovigillance. I also serve as an expert on computer forensics in Bishop v. Hoffman LaRoche which is the case of a 15 year old who intentionally crashed his plane into a building in Tampa in early 2002.

In the case of Anthony Talalai v. Cooper Tire heard in Middlesex County, New Jersey before Judge Coredemus, I served as plaintiff's expert in an "open dialog" between plaintiffs and defendants. This court ordered process was designed to allow technical experts for both sides, in the presence of respective counsel, the opportunity to confer and resolve production and preservation protocols to maximize efficiency and minimize cost.

I am routinely asked to speak at conferences and bar associations all over the country on issues of electronic discovery, trial presentation, and data analysis for litigation purposes. In 2001, I was on the faculty of the Judicial College for the State of New Jersey concerning electronic discovery procedures and practices. In June 2002, I spoke at a conference hosted by the Federal Bar Association on electronic discovery. The proceedings of this conference were published

1

under the title Electronic Information: Its Life Cycle A Legal Perspective in which I contributed a chapter. In October 2003, I was on the faculty of the Judicial College for the state of Mississippi speaking on electronic discovery. In March of 2005, I co-authored an article entitled, Deciphering the Adverse Event Reporting System published in Trial Magazine. In October 2005, my article, Make the Most of E-data Experts, was also published in Trial Magazine. In May of 2006, I became a member of the working group on E-Discovery of the Sedona Conference.

In the pharmaceutical litigations in which I have been involved, one of the key roles that I served was the preservation, production, review, and preparation of electronic information and databases as well as paper documents. These databases and documents are very similar to the databases and documents that Plaintiff is seeking in this litigation.

With respect to sales and marketing data from pharmaceutical companies, I am the person responsible for the receipt and preparation of such information in many of the previous litigations. One of the largest databases I have worked with is from the Hormone Therapy litigation. The sales call data in this litigation from just one defendant Wyeth, number over 12 million sales calls. I have received this volume of data and have developed an infrastructure to allow the data to be queried and reports to be generated.

I have also received IMS prescription data in the hormone therapy litigation. There are approximately 170 million rows of data in this database and I have developed the infrastructure for the management of such data.

Based on my experience in several pharmaceutical litigations, companies routinely track which products have been discussed during a given sales call. This data is often used for compensation purposes as well as sales planning purposes. Generally, there is a primary product discussed and other additional secondary products or "reminder" discussion. It would be unusual if Merck did not track the same information.

Merck also stated that there is no easy way to redact information from the free text fields that does not pertain to Vioxx. I have been personally involved in several motions concerning this very topic. In January of this year in the case of Ackerman v. Wyeth (N.D.TX) involving Effexor, I testified at a hearing on this topic. Here the judge ruled that the defendants did not need to redact the information in the call notes because an adequate confidentiality order had been entered in the case. More recently, the judge in the Ortho-Evra litigation in New Jersey state court also ordered the production of the same data. In the cases that I have been involved in, the judges have consistently ruled that the defendant's desire to redact this information is not an impediment to the production of the data.

As to the complexity of the data, I routinely process extremely complicated databases. In the Vioxx litigation, I was the individual who received and processed the company's adverse event database. Because of my experience dealing with complex information from pharmaceutical companies, I will likely require less preparation than described by defendants. Furthermore, it is

2

likely that the protocols and procedures already used by the defendants to comply with other request will be able to be reused here.

# Background

Merck maintains a database of sales calls known as FACTS.  For the purposes of the Vioxx litigation generally, Merck had made a special copy of the FACTS database for use in producing data in response to discovery requests.  This copy was known as DEV9.  Throughout this document, I use the terms FACTS and DEV9 interchangeably as they were essentially the same as of the date of copying.  Since Vioxx was already off the market prior to the copying of FACTS to DEV9, there should be no need to query the live FACTS database.

The purpose of FACTS is to track several kinds of information associated with the marketing of Merck products.  For the Plaintiff's purposes, FACTS contains information relating to sales calls, sample distribution, medical communications, and educational events, for example.

In the past, Merck had only produced sales calls and other information associated with particular prescribers.  Furthermore, not all of the information associated with that prescriber was provided.  Previously, counsel in other cases had met with Merck to determine which data should be provided.  A subset of the overall database was selected and this information was to be provided for prescribers that were specifically identified.

In the summer of 2006, I was asked to review correspondence, affidavits, and transcripts concerning the production of data from FACTS.  In November 2006, I attended a hearing in front of Judge Noble on this issue.  Prior to that point, no meet and confer between technical personnel had taken place with respect to the production of the FACTS data in the Swanagin case, nor, to my knowledge, in any other case.  Judge Noble ordered that a meet and confer should take place.  She also set specific conditions for the conduct of the meet and confer.

As part of my efforts on this case, I have been asked to address three specific issues. 1) Was the selection of tables and fields made by counsel in other cases adequate, 2) What is the extent of data that has not been produced, and  3) What would be the feasibility for Merck to produce the entire database for all Vioxx information?  In my opinion, 1) the selection of specific tables and fields that have been produced are adequate, 2) there is substantial data in Merck's possession not produced that is of interest to Plaintiff and 3) while there is some burden for Merck to produce the data for all prescribers, this effort is limited to a few days and there are no significant difficulties to do so.

# Plaintiff Request and Defendant Response

Plaintiff has requested all data from the FACTS database concerning Vioxx.  Previously, Merck had produced limited portions of the FACTS data to plaintiffs in the MDL and New Jersey litigations.

To fulfill these requests, Merck had created a program to take data from several different tables and created a set of extraction tables. Because of the complex nature of the database queries, this process could take several hours for a given set of prescribers. Merck has stated that it is possible to run this process on all prescribers but that it would take six months of computer processing.

Plaintiff has requested that instead of combining the tables using complex queries, Merck simply provide each of the raw tables used in the queries from previous productions. Out of the 600 or so tables in Facts, this probably represents about 10%-15% of the tables. Because it is unnecessary to use complex queries, this would go much, much faster. Furthermore, once this extraction was done, this could be used for any plaintiff case in the Vioxx litigation.

The best analogy I can use for the situation is that of a builder of homes. In the past, Merck has been delivering a completed house for each Vioxx prescriber, one house at a time. Plaintiff is looking for the data on all prescribers, and Merck insists the only way to do that is to build the entire housing development. If Merck had to build all of those houses, this could take a long time and be very costly. What Plaintiff is really asking for is the delivery of the raw materials. Plaintiff will then take those materials and design whatever style of house they want and then build them. This is much less burdensome and costly.

## Court Ordered Meet and Confer

On January 23, 2007, I visited the New York office of Dechert to review documentary materials for the FACTS database. At this session, the data dictionary was made available to me so that I could review information that existed in the FACTS database that had not been produced to plaintiffs. It had been represented by Merck counsel that a different group of plaintiff attorneys had previously selected the fields that would be produced.

On February 5, 2007, the primary meet and confer took place at the offices of Merck counsel. In attendance were Ann Oldfather, Esq. for the Plaintiff, Eben Flaster, Esq. and Jonathan Swerdloff, Esq. for Merck, Janet Scott of Merck and myself. Ms. Scott was provided as the "technical person" from Merck. Throughout the course of the meeting, it became clear that Ms. Scott was not in fact a "technical person" as there were numerous questions I asked which she was unable to answer. The vast majority of these questions were at a level that anyone with a working knowledge of the database structure of FACTS would have been able to answer easily. Ms. Scott was the project manager for the FACTS database extraction, but had not personally worked on the technical details. Early in the meeting, I informed Mr. Flaster that it was my opinion that Ms. Scott was not the right person for the meet and confer.

At several points in time, my questions were relayed to other personnel telephonically outside of my presence. Responses were then relayed back to me. This sort of asynchronous communication concerning technical information is inefficient and often leads to misunderstanding and misinformation.

4

Subsequent to the meeting with Ms. Scott, there were a two more phone conferences with Ms. Oldfather, Mr. Flaster and me.  It was only in the second and what was to be the last phone conversation (on February 23, 2007) that Merck finally produced a real "technical person" in Mr. Kirill Azvolinsky of Merck.  Defense counsel represented that Mr. Azvolinsky had been involved in the development of the extraction protocol for FACTS.  From the telephone conference, it seemed that Mr. Azvolinsky was in fact (and finally) a true "technical person." We discussed my suggestions for more efficiently extracting data from FACTS.  He agreed that my method would be much less time consuming than using what was already in place.  He was unable to provide estimates of how long he thought it would take to extract the data.  I then suggested that we could conduct a test to evaluate the time.  This call only lasted one hour and while some information was provided, it was difficult to communicate at times because I was not able to show Mr. Azvolinsky examples of what I was asking.  Some of the concepts we were discussing are very difficult to visualize mentally without seeing a sample.  Mr. Flaster ended the call after one hour on the grounds that it had gone on longer than he intended in the first place.

# Opinions

Based on my experience, I express the following opinions.

Merck did not provide adequate access to information and personnel to determine the burden of extracting the FACTS database with respect to Vioxx.  The session with Janet Scott did not yield any significant information.  Although she was the project manager and oversaw the FACTS database for a period, she was not responsible for the technical details of the system as she lacked the necessary skills and knowledge.  Kirill Azvolinsky should have been the person Merck provided at that session.  While not knowing every detail of the process, he had far more knowledge about what had been done with FACTS than Ms. Scott.  Since many of my questions related to technical programming issues, Ms. Scott was unable to answer those questions interactively.

While I was able to have a one-hour conference call with Mr. Azvolinsky, this conversation was far from efficient.  First, it would have been more effective if it had been done in person.  I found that there were several times on the phone that we were not communicating clearly and the ability to show an example would have made an enormous difference.  Second, the time limitation was unreasonable.  I was limited to one hour in spite of the court order that stated that technical personnel would be made available as necessary and that the meet and confer process did not have a time limit.  While I appreciate that Merck expended some effort to comply with the court's order, they did not do so efficiently and ultimately did not provide me any information to convince me that I am mistaken in my opinions concerning the data extraction.

I believe that the data extraction could be done in at most a few days.  I base this on my extensive experience working with similar data in other pharmaceutical cases.  If necessary, I can demonstrate to the court that I am correct in a matter of minutes use sample databases of similar size.  The extraction method currently being used by Merck is extremely inefficient and is unnecessary, as Plaintiff is willing to accept the data in substantially the same format as

5

maintained by the company.  As discussed above, plaintiffs are willing to accept the raw materials while Merck is insisting that it can only deliver the housing development. Trying to explain this to Ms. Scott was ineffective, because she lacked the general and specific technical knowledge concerning FACTS that was necessary.  Based on my limited interaction with Mr. Azvolinsky, he should have been at the person at the actual meet and confer instead of Ms. Scott.

Merck has provided no objective evidence that I am wrong.  Furthermore, Merck refused to do anything to test whether I am wrong.  For example, Merck could have extracted one or two tables to see how long that would have taken.  They also could have conducted the meet and confer with a knowledgeable person in a location where the database could have been accessed as part of the meet and confer.  This is a fairly simple project and does not require the level of analysis that Merck would suggest needed to be done to extract the data in the format that plaintiff has requested.

My recommendations for resolving the issues are as follows.  First, Merck can simply perform the extraction.  As discussed above, I am convinced this would only take a few days.  If Merck does not understand an efficient way to do this, then I would be happy to assist them in the process.  I could work with Merck personnel at Merck's facility.  The goal would be to extract the data interactively.  Merck would then have the ability to review the data prior to production to Plaintiff.  Recently in the case of *Madden v. Wyeth* (N.D.TX), the judge ordered that Wyeth allow me to work with their personnel on data extraction issues.  I spent two days working with Wyeth at their Collegeville facility.

If Merck is convinced that my approach is not workable, then they should have to demonstrate that by performing a few test queries on the database.  I should be allowed to participate in this test.  Based on this testing, the true feasibility of produced FACTS data for all prescribers could be assessed.  So far, Merck has refused to do this.

6

Exhibit 1
# Keith L. Altman
Finkelstein & Partners
436 Robinson Avenue
Newburgh, NY 12550
800-634-1212 x 9263
kaltman@lawampmmt.com

**Specific Expertise - Knowledge Management**

Works with attorneys to help them acquire data, turn that data into knowledge, and manage the knowledge.  Often the data is in an electronic format which offers many discovery challenges.

**Educational Experience**

B.S. Astrophysics, 1989, Magna cum Laude, State University of New York at Stony Brook

**Computer Experience**

Languages: Basic, Fortran, Pascal, Assembly, C, APL, SQL Windows, Visual Basic
Databases: Microsoft Access, SQL

**Research Experience**

1981-1982, Corroboration with Teacher Herbert Cohen, Farmingdale Public Schools.
    Worked on developing models for gaming systems using Fibonacci series.  Developed various computer models to analyze gaming systems.

1985-1989, Laboratory of Professor Peter M. Koch, Quantum Electronics Group, Physics Department, State University of New York at Stony Brook.
    Work as a paid employee of the Research Foundation of the State University of New York.  Was responsible for developing computerized tools to analyze experimental data.  Developed applications for instrument control and measurement.  Used sophisticated computer modeling to design microwave klystrons for experiments.

1987, Professor Michael Simon, State University of New York at Stony Brook
    Developed computer models to analyze infrared imaging data from various telescopic sources.

1988, Professor Gerry Brown, State University of New York at Stony Brook
    Developed computer models to analyze theoretical data concerning Supernova 1987A.

1988, Professor Dean Peterson, State University of New York at Stony Brook

Analyzed observational data concerning brightness of stars in the Hyades cluster. Determined error in observational data helping to redefine the distance to the cluster which is used as a yardstick for many calculations of stellar distances.

**Relevant Work Experience**
1989-1995, Legal Systems Manager, Beta Business Products
1995-2003, President, The Fibonacci Systems Group; Vice President, The Fibonacci Group
2003-, Managing Director, Complex Litigation Division, Finkelstein & Partners
2003-, Director of Adverse Event Analysis, Finkelstein & Partners

**Relevant Litigation Experience**

Member of Working Group One (Electronic Discovery) for the Sedona Conference.

18 years experience working in the legal industry.

MindSet
　　　Developed a suite of tools to assist attorneys in managing litigation related data and knowledge.

Breast Implant Litigation
　　　Became involved in the litigation towards the very end ( last two years).  Some notable tasks.
- Medical Science Literature Database
- Assisted in preparation for trials for Baxter, 3M and Bristol Meyers-Squibb.

FenPhen Litigation (representative tasks similar to other litigation projects)

　　　Serves as the chief plaintiff consultant throughout the United States for litigation in the state courts.  Also assisted the MDL in a similar capacity.  In this role is responsible for the following.
- Development of discovery demands
　　　Helps draft discovery demands to take records retention issues and electronic information into account.  Also helps establish opposing party's information management strategy.
- Collection of production materials
　　　Serves as the repository for all discovery materials.
- Review of production materials
　　　Reviews materials to access completeness and reasonableness in respect to complying with formats described in discovery demands.
- Organization of production materials
　　　Takes the materials and prepares them for use by over 100 law firms.
　　　Converts them to a uniform format and catalogues the materials.
- Distribution of production materials for attorney review
　　　Sends materials out to various attorneys and works with them to provide tools so that materials may be reviewed efficiently.

- Collection of attorney work product
    Receives materials from attorneys and assembles them into a repository.
- Management of attorney work product
    Provides expertise in integrating attorney work product with source production materials.
- Preparation for depositions
    Works with the attorneys to help them integrate production materials into the depositions.  Helps prepare exhibit lists.
- Deposition support
    Attends various depositions as both an expert and for support.  Suggested questions during depositions of computer personnel.
- Trial preparation
    Works with the attorneys to prepare all trial materials for use.  Helps develop visual aids and presentation strategy.  Coordinates audio-visual needs for the court room.
- Trial Presentation
    Attends the trial to assist in presentation of exhibits.
- Medical Science Literature Database
    Developed the strategy for collecting and managing over 4,000 medical articles related to the litigation.  Distributed this database to various law firms around the United States.

Major Patent Litigations
  Coordinated document productions sent and received for various patent litigations.
  Helped prepare for trials in many of the same litigations.

Construction Litigation
  Worked on trial preparation and presentation of several construction related cases.  Most recently, provided trial support for GCNA v. City of Cleveland in federal court in Akron Ohio.

Video Teleconferencing Trial
  In Turcinovic v. Floch ( New Jersey ), provided an affidavit which helped to convince the judge to allow the plaintiff, a quadriplegic residing in Chicago, to testify during his trial by video teleconferencing link.  This was the first time in the United States that a plaintiff was allowed to testify in this way.  Coordinated all technology at both sites.  Although the case settled on the eve of trial, the settlement was accepted by the teleconferencing link with the attorneys conducting  an interactive conversation with the plaintiff.

Document Archival Facility Fire
  Working for defendant sprinkler manufacturer in a case involving documents destroyed in a fire at a document archive facility.  Established an information management infrastructure to coordinate several hundred thousand pages of discovery materials.  Providing assistance in assessing compliance with records retention policies on the part of plaintiffs.

Other Litigation Projects
     MTBE
     Cooper Tire
     Lotronex
     PPA
     Baycol
     Accutane
     Oxycontin
     Vioxx
     Celebrex
     Lariam
     Enbrel
     Remicade
     Neurontin
     Ortho-Evra
     SSRI's

**Adverse Event Analysis Experience**

Developed a collection of tools for the analysis of FDA adverse event data. These analyses are commercially available to the general public.

Provided ADE analysis for 120-Day safety updates of major pharmaceuticals.

Interacts with the FDA on adverse event reporting issues concerning the AERS database.

Developed adverse event section for recently submitted new drug application.

**Speaking Experience**

Has spoken at several Mealeys conferences as well as numerous bar associations on topics of electronic discovery and litigation technology.

Was on the faculty of the Judicial College for the state of New Jersey in November, 2001.

In June, 2002, spoke at a symposium on electronic discover sponsored by the Federal Bar Association. The proceedings of this symposium are scheduled to be released in book form late 2002.

In July, 2002, spoke on preservation of electronic information at the annual meeting of the Association of Trial Lawyers of America.

In July 2003, spoke on electronic discovery at the annual meeting of the Association of Trial Lawyers of America.

Was on the faculty for the Judicial College for the state of Mississippi in October 2003.

Course advisor and speaker for ATLA seminar on electronic discovery January 2004

In July 2004, spoke on electronic discovery at the annual meeting of the Association of Trial Lawyers of America.  CLE credit was awarded for this talk.

In July 2005, spoke on electronic discovery at the annual meeting of the Association of Trial Lawyers of America.  CLE credit was awarded for this talk.

In July 2006, spoke on electronic discovery at the annual meeting of the Association of Trials Lawyers of America.  CLE credit was awarded for this talk.

## Expert Testimony

South Carolina v Pittman.  Admitted as expert on adverse event reporting analysis and adverse event reporting systems.  February, 2005

## Publishing Experience

Book Chapter on electronic discovery in Electronic Information: Its Life Cycle edited by Alan Blakely published by the Federal Bar Association.

Deciphering the Adverse Event Reporting System. Bert Black and Keith Altman.  Trial Magazine, March 2005.

Make the Most of e-Data Experts. Keith Altman. Trial Magazine, October 2005.

COMMONWEALTH OF KENTUCKY
FAYETTE CIRCUIT COURT
FIFTH DIVISION
05-CI-4240

PATRICIA A. SWANAGIN and                                    PLAINTIFFS
ROBERT L. SWANAGIN, Spouse

v.

MERCK & CO., INC., et al.                                   DEFENDANTS

<u>ORDER</u>

This matter is before the Court on Plaintiffs' motion to compel production of all Vioxx-related information in the Merck & Co., Inc. ("Merck") Field Activity and Customer Tracking System ("FACTS") database.  The Court, having conducted hearings on April 25, 2007, and May 29, 2007, having heard arguments of counsel and the testimony of Plaintiffs' witness, Keith Altman, and Merck's witness, Janet Heins, having reviewed the papers filed in this matter, and being in all other ways sufficiently advised,

Hereby **DENIES Plaintiffs' motion.**  However, the Court further orders as follows:

1.    On or before June 12, 2007, Merck will provide to Plaintiffs' counsel the consolidated, de-duplicated FACTS production as proposed in Merck's May 21, 2007, correspondence to Plaintiffs' counsel, attached hereto.  In short, Merck will produce this data in the manner described in that May 21, 2007, correspondence by providing Plaintiffs' counsel with a set of Access databases, each of which will contain a combined table of Merck's standard FACTS production that Plaintiffs' counsel can load into a database of their choice.

2.    Merck will further produce to Plaintiffs' counsel any subsequent production of FACTS data it produces in Vioxx-related products litigation in other courts at the same time as those productions are made.

| Deleted: T |
| --- |

| Deleted: on a rolling basis and on a timeframe that is as close to those productions as practicable. |
| --- |

2.      Merck shall produce to Plaintiffs' counsel all Vioxx-related FACTS data recorded by Merck's Professional Representatives who called on any physicians identified by Plaintiffs' counsel in their currently pending Kentucky cases.   The production for these sales representatives shall not be limited by health care provider, date, time or location, or any other particular, but shall include all Vioxx-related FACTS data recorded by that sales representative. Merck shall report to Plaintiffs on or before June 28, 2007, regarding the expected date of delivery of such data.  Merck shall also provide counsel for the health care provider defendants in this case with a copy of this data.

| | Deleted: the Plaintiffs' |

3.      No later than June 28, 2007, Merck shall report to Plaintiffs' counsel regarding the total number of Vioxx sales calls to health care providers recorded in DEV9; and

| | Deleted: details |

4.      Merck shall produce to the Court all other orders entered to date in the Vioxx litigation nationwide relating to the FACTS database, and shall provide a copy to Plaintiffs' counsel.

| | Deleted: . |

Entered this ___ day of June,  2007.


_____
JUDGE ROGER CRITTENDEN

2

## CLERK'S CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was served via U.S. mail this the _____ day of June, to the following:

Gregory Bubalo
Steve Rotman
Leslie M. Cronen
Bubalo, Hiestand & Rotman, PLC
401 South Fourth Street, Suite 800
Louisville, Kentucky 40202

Ann B. Oldfather
Oldfather Law Firm
1330 South Third Street
Louisville, Kentucky 40208

Tyler Thompson
Dolt, Thompson, Shepherd & Kinney
455 South Fourth Street, Suite 310
Louisville, Kentucky 40202
*Counsel for Plaintiffs*

James E. Smith
Darby and Gazak, PSC
3220 Office Pointe Place, Suite 200
Louisville, Kentucky 40220
*Counsel for Thomas A. Sweasey, M.D.*

Norman F. Klick, Jr.
Carruthers & Roth, PA
235 North Edgewood Street
P.O. Box 540
Greensboro, North Carolina 27402
*Counsel for Thomas A. Sweasey, M.D.*

Joseph C. Klausing
O'Bryan, Brown & Toner, PLLC
455 South Fourth Street, Suite 1500
Louisville, Kentucky 40202
*Counsel for Physician Services, PSC and John W. Gilbert, PSC d/b/a Spine & Brain Neurosurgical Center, PSC*

Kevin R. King, M.D., Pro Se
1934 Bypass Road
Winchester, Kentucky 40392

_____
*Clerk, Fayette Circuit Court*

LEXLibrary 0106603.0538362 336088v1

3