EXHIBIT 1

IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
AT INDEPENDENCE

MARY PLUBELL, on behalf of          )
herself and all others similarly    )
situated,                           )
                                    )   Case No.: 04CV235817-01
TED IVEY, on behalf of himself and  )
all others similarly situated,      )   Division: 16
                                    )
            Plaintiffs,             )
                                    )
      vs.                           )
                                    )
MERCK & CO., INC., a New Jersey     )
  corporation,                      )
                                    )
            Defendant.

**SUGGESTIONS IN OPPOSITION TO DEFENDANT'S
MOTION TO EXCLUDE DR. JACK FINCHAM'S
OPINIONS REGARDING ASCERTAINABLE LOSS**

Relying for the most part on the same arguments it made for summary judgment, Merck

seeks to exclude Dr. Jack Fincham's opinion without any legal or factual basis to do so. Merck

also attempts to mount an argument that Dr. Fincham's opinion lacks foundation or is unreliable.

Here too, Merck relies on inapplicable case law and arguments bereft of factual support. Under

governing standards, all of Merck's arguments are meritless and should be rejected.

**A.      Legal Standards For Admissibility Of Expert Opinion.**

Admissibility of expert testimony is governed by Mo. Rev. Stat. § 490.065. *Elliot v.*

*State,* 215 S.W.3d 88, 93 (Mo. banc 2007); *State Bd. of Registration for Healing Arts v.*

*McDonagh,* 123 S.W.3d 146, 153 (Mo. banc 2003). Pursuant thereto, if "specialized knowledge

will assist the trier of fact to understand the evidence or to determine a fact in issue," a witness

qualified as an expert "by knowledge, skill, experience, training, or education may testify thereto

in the form of an opinion or otherwise." Mo. Rev. Stat. § 490.065.1. The "facts or data in a

particular case upon which the expert bases an opinion or inference may be those perceived by

him or made known to him at or before the hearing and must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable."   Mo. Rev. Stat. § 490.065.3. While federal decisions may provide some guidance insofar as Section 490.065 and Federal Rule of Evidence 702 are the same, *McDonagh,* 123 S.W.3d at 155, the Supreme Court of Missouri has made expressly clear that "the standard of admissibility of expert testimony in civil cases that is set forth in [*Frye v. United States,* 293 F. 1013 (D.C.Cir.1923)] or some other standard . . . are no longer to be followed.   The relevant standard is that set out in section 490.065."   *Id.* at 153.[1]   For example,  Section 490.065 "does not authorize" the kind of "wide-ranging" hearing conducted in federal court pursuant to *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).   *Powel v. Chaminade College Preparatory, Inc.*, 197 S.W.3d 576, 590 (Mo. banc 2006) (Wolff, Chief Judge, concurring).   "Missouri's standard for admissibility of expert testimony in civil cases . . . is a far simpler approach than the federal rules. Under Missouri's approach, the trial judge must determine whether the testimony of the expert will assist the trier of fact and whether the expert's testimony is based upon reliable facts or data."   *Id.*

Experts are generally qualified to estimate damages based on expertise and experience. *Missouri Highway and Transp. Com'n v. Kansas City Cold Storage, Inc.*, 948 S.W.2d 679, 685 (Mo. App. 1997) (citing *State ex rel. State Highway Com'n v. Beaty,* 505 S.W.2d 147, 154 (Mo.

---

[1] The *Frye* test required that the basis for expert opinion had "gained general acceptance in the particular field in which it belongs."  *Id.* at 152 (quoting *Frye,* 293 F. at 1014).   In federal court, this test is no longer followed, in favor of the more liberal *Daubert* standards.   "A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."  *McIntosh v. Monsanto Co.,* 462 F.Supp.2d 1025, 1032 (E.D. Mo. 2006) (quoting  *Robinson v. GEICO General Ins. Co.,* 447 F.3d 1096, 1100 (8th Cir. 2006)).   Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility.   *Id.* (citing *Clark v. Heidrick,* 150 F.3d 912, 915 (8th Cir. 1998); *Arcoren v. United States,* 929 F.2d 1235, 1239 (8th Cir. 1991)).

App. 1974)); *see also Doe v. McFarlane*, 207 S.W.3d 52, 62-65 (Mo. App. 2006) (expert qualified by experience to testify regarding lost profits); *L.L. Lewis Constr. LLC v. Adrian*, 142 S.W.3d 255, 265 (Mo. App. 2004) (opinion regarding repair costs properly based on experience with dry walling); *Missouri Dep't of Transp. Ex rel. PR Developers, Inc. v. Safeco Ins. Co. of America*, 97 S.W.3d 21, 39-39 (Mo. App. 2002) (opinion on valuation of equipment, lost use, and rental value properly based on experience). "As a rule, questions as to the sources and bases of the expert's opinion affect the weight, rather than the admissibility, of the opinion, and are properly left to the jury." *McFarlane*, 207 S.W.3d at 62 (Mo. App. 2006) (quoting *Wulfing v. Kansas City Southern Industries, Inc.,* 842 S.W.2d 133, 152 (Mo. App. 1992), *overruled on other grounds Executive Board of Missouri Baptist Convention v. Carnahan,* 170 S.W.3d 437, 447 n. 5 (Mo. App. 2005)); *accord Scott v. Blue Springs Ford Sales, Inc.*, 215 S.W.3d 145, 175 (Mo. App. 2006) (same); *Sanders v. Hartville Mill Co.*, 14 S.W.3d 188, 208 (Mo. App. 2000) ("Questions concerning sources and bases of an expert's opinion affect the weight rather than the admissibility of the opinion."). Similarly, any concern about the accuracy of the facts and data on which the expert relies goes to "the weight the evidence should receive," not its admissibility. *Murrell v. State*, 215 S.W.3d 96, 111 (Mo. banc 2007). "Any weakness in [an expert's] . . . analysis [also are] proper subjects . . . to argue to the jury, but are not grounds for excluding his testimony." *Mathes v. Sher Express LLC*, 2000 S.W.3d 97, 111 (Mo. App. 2006). The same is true of "[a]ny weakness in the factual underpinnings of the expert's opinion or the expert's knowledge," which also are matters of weight, not admissibility. *Whithall v. State*, 129 S.W.3d 409, 414 (Mo. App. 2004); *accord Elliot v. State*, 215 S.W.3d 88, 95 (Mo. banc 2007) (same); *see also Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002) ("As a general rule, the factual basis of an expert opinion goes to the credibility of testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion on cross-examination.");

*Synergetics, Inc. v. Hurst*, 477 F.3d 949, 955-56 (8th Cir. 2007) (same); *OCI Chemical Corp. v. American Railcar Industries, Inc.*, No. 4:05CV1506FRB, 2009 WL 890525 at *2 (E.D. Mo. March 30, 2009) (same).

"Only in cases where the sources relied on by the expert are 'so slight as to be fundamentally unsupported,' should the opinion be excluded because testimony with that little weight would not assist the jury." *McFarlane*, 207 S.W.3d at 62 (quoting *Wulfing,* 842 S.W.2d at 152; *Goddard v. State,* 144 S.W.3d 848, 854 (Mo. App. 2004)); *accord Alcorn v. Union Pac. Railroad Co.*, 50 S.W.3d 226, 246 (Mo. banc 2001) (only if expert's sources are "so slight" as to be "fundamentally unsupported" should opinion be excluded); *8000 Maryland, LLC v. Huntleigh Financial Services Inc.*, 292 S.W.3d 439, 477 (Mo. App. 2009) (quoting *Keyser v. Keyser,* 81 S.W.3d 164, 169 (Mo. App. 2002) (same); *Whithall*, 129 S.W.3d at 414 (same); *Scott*, 25 S.W.3d at 176 (same); *In re Shafer*, 171 S.W.3d at 773 (same); *see also In re Genetically Modified Rice Litigation*, 666 F. Supp. 2d 1004, 1032 (E.D. Mo. 2009) (claim that opinion unreliable because four-year weighted average gave  inaccurate results "is not a basis for excluding his opinions.").

"If the facts and data are . . . reasonably relied upon by experts in the field, they are necessarily relevant to the issue the expert is addressing." *8000 Maryland, LLC,* 292 S.W.3d at 477 (quoting *Murrell v. State,* 215 S.W.3d 96, 112 (Mo. banc 2007)).  A trial court "is expected to defer to the expert's assessment of what data is reasonably reliable." *Sanders,* 14 S.W.3d at 208 (quoting *Wulfing,* 842 S.W.2d at 152);  *accord CADCO, Inc. v. Fleetwood Enterprises Inc.*, 220 S.W.3d 426, 434 (Mo. App. 2007) (same); *8000 Maryland, LLC,* 292 S.W.3d at 477 (same). Of course, "a disagreement between experts" does not require exclusion.  *In re Shafer*, 171 S.W.3d at 773 (citing *Alcorn,* 50 S.W.3d at 246).

Whether to admit or exclude expert testimony is within the sound discretion of the trial court. *8000 Maryland, LLC,* 292 S.W.3d at 446 (citing *McGuire v. Seltsam,* 138 S.W.3d 718,

720 (Mo. banc 2004)).  "Likewise, the determination whether the testimony satisfies section

490.065 is within the trial court's sound discretion." *Id.*  The court's determination is reviewed

only for abuse. *Missouri Highway and Transp. Com'n v. Kansas City Cold Storage, Inc.*, 948

S.W.2d 679, 685 (Mo. App. 1997).

### B.      Dr. Fincham Properly Conducted A Benefit-Of-The-Bargain Analysis.

Merck makes a somewhat oblique challenge to Dr. Fincham's opinion as a whole based

on the same arguments it advances for summary judgment, *i.e.*, that under the benefit-of-the-

bargain rule, the value of a consumed item can *never* be zero, and the mathematical result can

*never* amount to a refund. *See* Motion To Exclude Dr. Jack Fincham's Opinions Regarding

Ascertainable Loss ("Mot.") at 2, ¶4; Suggestions in Support of Merck's Motion To Exclude Dr.

Jack Fincham's Opinion Regarding Ascertainable Loss ("Sugg.") at 5. These arguments are

meritless for the reasons Plaintiffs have already addressed in opposition to Merck's summary

judgment motion, which Plaintiffs will not repeat for the sake of brevity, but incorporate as

though fully set forth herein.  In sum, Dr. Fincham expressly relied on the benefit-of-the-bargain

standard in MAI 4.03 for his analysis, and conducted that analysis in a manner fully supported by

Missouri law.  *See, e.g.*, *Jeck v. O'Meara*, 122 S.W.2d 897, 899-900 (Mo. 1938) (rejecting

argument that plaintiff offered no evidence to establish actual value under benefit of the bargain

rule where the evidence demonstrated that stock purchased by plaintiff was "worthless"); *Scott v.

Blue Springs Ford Sales, Inc.*, 215 S.W.3d 145, 182 (Mo. App. 2006) (testimony that wrecked

vehicle had no value supported damages award of "at least" the "as represented" value); *Liberty

Financial Management Corp. v. Beneficial Data Processing Corp.*, 670 S.W.2d 40, 57 (Mo.

App. 1984) (evidence that data processing services were "worthless," if believed by the jury,

would entitle plaintiff to a "full refund" under benefit of the bargain).[2]   Merck has not, and

cannot, provide authority to the contrary.  *See* Sugg. in Opp. to Defendant's Mot. for Summary

Judgment ("Pls. SJ Opp."), Section IA.  Indeed, Merck's own damages expert recently conceded

that it is possible that an inferior product with deadly attributes like Vioxx could have zero value.

*See* Pls.' Resp. to Merck Statement of Facts ("SOF") ¶15 (citing Wiggins Dep. 147:9-16; 148:4-

9; 150:20-23; 151:1-3).[3]   Merck's argument is meritless.

### C. Dr. Fincham's Opinion Regarding The "As Is" Value of Vioxx Comports With Missouri Law.

Merck next makes two arguments challenging Dr. Fincham's opinion that the value of the

"As Is" Vioxx was zero: first, that Dr. Fincham used the wrong comparator in assessing that

value (Mot. at 2, ¶5; Sugg. at 6-8); and second, that his opinion lacks foundation (Mot. at 3, ¶¶7,

8; Sugg. at 8-11).  Plaintiffs address the first contention here.  The second is addressed, *infra*, at

Section D.

In Dr. Fincham's opinion, no reasonable consumer would purchase the "As Is" Vioxx

had an "As Represented" Vioxx been available.  *See* Def. Ex. 1 (Fincham Summary at 6); Def.

---

[2] Note that in *Liberty Financial*, unlike here, the plaintiff's benefit-of-the-bargain recovery was limited to out-of-pocket costs pursuant to the terms of its contract with the defendant. *Id.* at 47-50.  The plaintiff could recover "the value of the performance of the contract," which (based on the contractual limitation) was the amount it paid while the contract was in effect and plaintiff would be "entitled to a full refund if the jury finds that [defendant's] services were worthless." *Id.* at 56.  The defendant argued that its services were not totally worthless, citing evidence that the plaintiff continued to use defendant's data processing system for six months and that most of the information on its accounts was correct. *Id.* at 57.  The Court rejected this argument, stating: "The issue is . . . for the jury and not this court." *Id.*

[3] "Q. So, let me ask you this question:  In your hypothetical, what if the one that had 30,000 miles on the odometer also had brakes that didn't work and was deadly as a result of that -- A. Well -- Q. -- would it be possible under your hypothetical that the car that had the 30,000 miles on its odometer was worthless . . . . Q. What's your answer to that? . . . A. Is it possible that I can have a product that has characteristics where it has no value?  Of course it is possible to have a product that has sufficiently unfavorable characteristics.  Q. And in your example -- I want to get back to my question on your example.  You admit that the car that was deadly, the 30,000 miles on its odometer, could possibly have a zero value, don't you? . . . A. I said that you can construct an example where I have a superior product and an inferior product where the inferior product has zero value.  So, yes, there are."

Ex. 2 (Fincham Dep. 36:7-37:9; 208:12-209:1).  Merck provides no legal support whatsoever for

its contention that this opinion uses a faulty comparator.  The single case on which Merck relies,

*Morgan Stanley v. Coleman (Parent) Holdings*, 955 So.2d 1124 (Fla. App. 2007),[4] is both

factually and legally inapposite.

     *Morgan Stanley* involved a claim of fraud involving an exchange of stock in connection

with a merger between Coleman (manufacturer of camping gear), and Sunbeam (manufacturer of

household products).  The plaintiff exchanged its Coleman stock for shares of Sunbeam stock as

part of the merger.  Later, "as reports emerged that Sunbeam's sales were falling and that the

company had artificially inflated the value of its stock, Sunbeam's stock price plunged" and

Sunbeam ultimately declared bankruptcy.  *Id.* at 1125.  The plaintiff sued Sunbeam's investment

banker, Morgan Stanley, alleging that it had engaged in a fraudulent scheme to inflate the stock

price until after the merger.  *Id.* at 1125-26.  Morgan Stanley objected to the admission of the

opinion of plaintiff's expert because, in departure from the usual practice in securities cases, he

did not determine the "fraud-free" price of Sunbeam stock on the date of closing.  *Id.*  at 1127.

In securities fraud cases, a decline in stock price may reflect factors unrelated to the fraud, such

as "changed economic circumstances, changed investor expectations, new industry-specific or

firm-specific facts, conditions, or other events, which taken separately or together account for

some or all of that lower price."  *Id.* at 1131 (quoting *Dura Pharmaceuticals., Inc. v. Broudo*,

544 U.S. 336, 342-43 (2005)).  For this reason, the damages analysis in securities fraud cases

"require[s] elimination of that portion of the price decline that is the result of forces unrelated to

---

[4]  *See* Sugg. at 7.  Merck's citation to *Adkins v. Hontz*, 337 S.W.3d 711 (Mo. App. 2011) for the proposition that Dr. Fincham's opinion is not "legally relevant" (Mot. at 2, ¶4; Sugg. at 5, 8) is misplaced. The "legal relevance" standard in *Adkins* was addressed to the "probative value" of evidence weighed against "the dangers of unfair prejudice, confusion of the issues, undue delay, misleading the jury, waste of time, or needless presentation of cumulative evidence." *Id.* at 720.  *Adkins* dealt only with foundation for an expert's opinion based on the evidence at trial. *Id.* at 719-20. *See* discussion, *infra*, Section D.

the wrong." *Id.* (quoting *Miller v. Asensio & Co.,* 364 F.3d 223, 232 (4th Cir. 2004)).[5]

Plaintiff's expert, however, did not "isolate the fraud-free price and perform the standard

securities analysis" as required. *Id.* at 1128. His valuation also was not based on the value of the

stock at the time of the transaction. *Id.* at 1127.[6]  In this regard, the plaintiff argued that because

Morgan Stanley defrauded it into accepting shares it could not resell, it should not be bound by

the date-of-transaction rule, but allowed to recover for price declines until such time as it could

resell the stock. *Id.* at 1128-29.  As part of the merger deal, however, the plaintiff expressly

agreed to a "lockup" period during which its ability to sell the Sunbeam stock was restricted. *Id.*

at 1125, 1129.  Hence, defendant argued, plaintiff "bargained for at least part of the stock's

illiquidity and accepted the risk of declines in stock price due to market conditions or other non-

fraud related factors" during the lockup period. *Id.* at 1129.  In response, plaintiff urged that it

was "entitled to recover for even non-fraud related stock price declines during this period,

because it would not have entered the agreement, with its 'lockup' clause, but for the fraud." *Id.*

at 1129.  The Court rejected that argument, stating that it "disregards the proximate causation

required for fraud" (*i.e.*, reliance on the false representation) and was at odds with a benefit-of-

the-bargain recovery.  It was in this context that the Court made the statement quoted by Merck

(Sugg. at 7) that: "Benefit-of-the-bargain damages do not turn on what would have happened if

[plaintiff] had known the representations were false.  They measure what [plaintiff] would have

received had the representations been *true*." *Id.* (emphasis original).  Merck leaves out the

---

[5] For this reason, a securities fraud plaintiff usually proves "the actual, or 'fraud-free' value of stock at the time of purchase" with an expert "event study" that isolates "fraud-related and non-fraud related influences of the stock's price behavior." *Id.* at 1130-31.

[6] There is no dispute here that Dr. Fincham's opinion relates to the relevant time period of 1999-2004. *See* Def. Ex. 2 (Fincham Dep. 84:23-85:1).  It is Merck, not Dr. Fincham, who wants to introduce impermissible evidence pertaining to post-transaction events regarding black box warnings added by Celebrex and "second generation antipsychotics" in 2005, a year after Vioxx was taken off the market. Sugg. at 10, n.3.  *See* Pls. SJ Opp. at Section I B 3.

remainder of the Court's opinion that "[t]he bargain, in this case, included sale restrictions" that were part of the plaintiff's contract with the defendant. *Id.*

Here, Plaintiffs are not suing for fraud, but a violation of the MMPA. There is no contractual restriction on their bargain. Plaintiffs are not securities investors. They are not asserting a fraud-on-the-market theory of damages. There is no issue pertaining to market-based price impacts to be segregated as in a securities-fraud context. It is Merck, not Dr. Fincham, who misperceives the benefit-of-the-bargain standard, causation, and injury in this case.

According to Merck, Dr. Fincham "should have asked how much consumers would have paid for the Vioxx they bought if they had known about its alleged risks – not how much they would have paid if there were also a hypothetical Vioxx with no risks." Mot. at 2; Sugg. at 6-7. That is precisely what Merck argued to the court of appeals and its argument was flatly rejected. Merck argued that the focus should be upon what consumers would have done "had the risks been known." *Plubell v. Merck & Co., Inc.*, 289 S.W.3d 707, 714 (Mo. App. 2009). The Court emphatically rejected that approach, pointing out that it was inconsistent with the MMPA to focus on "what they would or would not have done had the product not been misrepresented and the risks known." *Id.* Unlike a fraud case, the MMPA does not require reliance. *Id.* at 714-15. Hence, a consumer need never see or hear the misrepresentation. The causal component of the MMPA is not whether a misrepresentation caused a consumer to make a purchase, but whether the consumer was injured as a result of a violation of the MMPA. *Id.* at 714 ("a plaintiff's *loss* should be a result of the defendant's unlawful practice, but the [MMPA] does not require that the *purchase* be caused by the unlawful practice."). An ascertainable loss has occurred if the actual product (the product "As Is") is less valuable than the misrepresented product (the product had it been "As Represented"). MAI 4.03; *see also Plubell*, 289 S.W.3d at 715 (benefit-of-the-bargain rule is "applicable in MMPA cases to meet the element of ascertainable loss."). To ask "how

much consumers would have paid for the Vioxx they bought if they had known about its alleged risks" (Mot. at 2), is to key injury on what consumers knew or didn't know.  Merck interjects reliance where it does not belong.  A "consumer's reliance on an unlawful practice is not required under the MMPA" and Merck's argument that there is no ascertainable loss without proof that a consumer "would not have purchased Vioxx had he been informed of the risks" improperly "injects reliance into the MMPA."  *Plubell*, 289 S.W.3d at 714-15.  Merck, not Dr. Fincham, is mistaken.

Moreover, and contrary to Merck's suggestion, Dr. Fincham's opinion that Vioxx "As Is" was worthless is not "based solely" on his opinion that no reasonable consumer would choose Vioxx "As Is" if a Vioxx "As Represented" were available.  Mot. at 2, ¶ 3.  He also bases his opinion on a number of other factors as well, including, without limitation: (1) Vioxx neither prevented nor treated any disease; (2) Vioxx did not decrease the risk of costly complications such as hospitalizations and surgery; (3) Vioxx did not improve the quality of life; and (4) the risks of Vioxx outweighed any alleged benefits.  *See* Def. Ex. 1 (Fincham Summary at 6-7); *see also* Pls.' Resp. to Merck SOF ¶ 15 (citing Fincham Aff. ¶ 7 ).

In this case, we are not dealing with a car with seats of regular leather rather than Corinthian leather as per the example given by the Court in *Craft v. Philip Morris Cos.*, No. 002-00406A, 2003 WL 23139381 (Mo. Cir. Ct. Dec. 31, 2003), cited by Merck.  Sugg. at 6.[7]   In that example, there is still value in everything but one replaceable component.  Vioxx, by contrast, is

---

[7]   Merck baldly misrepresents Judge David's analysis in *Craft*, where the plaintiff admitted that the Marlboro Light cigarettes she smoked "are not worthless [but] have some economic value."  *Craft v. Philip Morris Cos.*, No. 002-00406A, 2003 WL 23139381 at *2 (Mo. Cir. Ct. Dec. 31, 2003).  Her request for a full refund was thus tantamount to saying that "100% of the purchase price for any product sold in violation of the [MMPA]" represented actual damages "no matter how valuable the product is."  *Id.* at *5.  Here, there is no such admission, and we are dealing with an expert opinion that the economic value of the product indeed was zero.  The court in *Craft* was not presented with such evidence and made no ruling in that regard.  *See Craft v. Philip Morris Cos., Inc.*, 190 S.W.3d 368, 385-86 (Mo. App. 2005) (noting that the plaintiff did not put on any evidence of damages).

a product not made of replaceable components. As the Western District itself recently observed, "defective drugs, which cannot be fixed or repaired, have no value." *Hope v. Nissan North America, Inc.*, No. WD 73299, 2011 WL 43526203 at *13 (Mo. App. W.D. Sept. 30, 2011). Vioxx was a pain reliever for which there were many alternatives. But Vioxx – more than all other pain relievers – increased the risk of heart attack and death. *See* Def. Ex. 1 (Fincham Summary at 5-6); Def. Ex. 2 (Fincham Dep. 180:3-181:4).[8] Merck itself, as well as the FDA, made a reasoned judgment that the risks of Vioxx outweighed its benefits.[9] It certainly is within the realm of Dr. Fincham's expertise to reach the same conclusion and find the "As Is" value of Vioxx to be zero. Undoubtely, Merck disagrees with this assessment.[10] But at best, that is a *factual dispute* to be resolved by a jury. *E.g., Scott*, 215 S.W.3d at 182-83 (jury free to believe

---

[8]   *See, e.g.,* Madigan Ex. 2, Madigan PowerPoint (Pls.' SJ Opp. Ex. 15); Madigan Ex. 47, Madigan Supplemental Power Point (Pls.' SJ Opp. Ex. 16); VIGOR publication (MRK-Reicin8A) (Pls.' SJ Opp. Ex. 17); Plubell Ex. 78, Warning Letter (Pls.' SJ Opp. Ex. 18); Plubell Ex. 127, APPROVe CV Safety Report, p.8 (Pls.' SJ Ex. Opp. 19); September 30, 2004 News Release (Pls.' SJ Opp. Ex. 20) ("Merck Announces Voluntary Worldwide Withdrawal of Vioxx").

[9]  Merck withdrew Vioxx from the market in 2004. S*ee* September 30, 2004 News Release (Pls.' SJ Opp. Ex. 21) ("Merck Announces Voluntary Worldwide Withdrawal of Vioxx"). The FDA prevented any additional testing of Vioxx because the risks outweighed the benefits. *See* October 2004 letter from FDA to Merck (MRK-AID7283) (Pls.' SJ Opp. Ex. 22) ("there are unreasonable and significant risks of illness or injury to human subjects"). Safer alternatives existed, and Merck knew about at least one of them even before it ever launched Vioxx in the United States. *See* Plubell Ex.138, 1995 Research (Pls.' SJ Opp. Ex. 23).

[10]  For example, Merck contends that Dr. Fincham's opinion that Vioxx was worth nothing because it provided no benefit over other available pain relievers but had deadly cardiovascular and gastrointestinal risks is contrary to a statement by the FDA "in April 2005 that all [NSAIDs] have 'the potential for increased risk of cardiovascular (CV) events and . . . gastrointestinal (GI) bleeding associated with their use.'" Sugg. at 3, 10, n.3   For evidence to the contrary with respect to CV risks, *see* Footnotes 8 and 9 above. For evidence to the contrary regarding GI risks, *see* 1999 label, p.9 (MRK-PLBAA0006502-25) (Pls.' SJ Opp. Ex. 24); April 2002 label, p.8 (MRK-NJ0094478-93) (Pls.' SJ Opp. Ex. 25); Clinical Study Report, p. 32, table 44 (MRK-PLBAB0010723) (Pls.' SJ Opp. Ex. 26); Plubell Ex. 78, Warning Letter; Graham, et al., Rofecoxib and Clinically Significant Upper and Lower Gastrointestinal Events, Nov. 2011, American Journal of the Medical Sciences (Pls.' SJ Opp. Ex. 27). Moreover, it must be noted that Merck is relying exclusively upon evidence from April 2005 (that is, evidence of risks that were never disclosed until after the class period in this case).

that wrecked and defectively repaired vehicle had no value); *Liberty Financial,* 670 S.W.2d at 57 (whether value of contract performance was zero was issue "for the jury and not this court."); *see also OCI Chem. Corp. v. American Railcar Indus., Inc.*, 2009 WL 890525  at *4  (character of expenses as fixed or variable in lost profit calculation was factual debate not appropriately resolved by court); *Artilla Cove Resort, Inc. v. Hartley,* 72 S.W.3d 291, 301 (Mo. App. 2002) (values and calculation of damages "are for resolution by the factfinder.") (citing *Hawkins v. Foster*, 897 S.W.2d 80, 87 (Mo. App. 1997)); *OCI Chemical Corp.*, 2009 WL 890525 at *4 (disputed factual basis for expert's opinion is for the jury not the court).  Merck's position, not Dr. Fincham's opinion, is contrary to Missouri law.

**D.     Dr. Fincham's Opinion Is Properly Based On His Knowledge And Experience And Merck Has No Basis To Assert It Lacks Foundation.**

Merck's contention that Dr. Fincham's opinion is inadmissible because it "does not rest on any facts or data" (Sugg. at 8) is just wrong.  First, his opinion is in no way based on an "assumption" or "guess."  Mot. at 2, ¶¶ 3, 8.  To the contrary, it is based on Dr. Fincham's numerous years of experience as a pharmacist, research, teaching, and interaction with practitioners and patients.  *See* Def. Ex. 2 (Fincham Dep. 99:1-103:6; 220:15-221:20; 334:2-10. *See also* Pls.' Resp. to Merck SOF ¶ 15 (citing Fincham Aff. ¶7).  Under Missouri law, an expert quite clearly is qualified to render an opinion based on knowledge and experience.  *See, e.g., Kivland v. Columbia Orthopoedic Group LLP*, 331 S.W.3d 299, 312 (Mo. banc 2011) (expert qualified by experience to testify regarding whether death proximately caused by defendant's conduct); *McFarlane*, 207 S.W.3d at 62-65 (expert qualified by experience to testify regarding lost profits); *State v. Campbell*, 143 S.W.3d 695, 702 (Mo. App 2004) (expert may be qualified on the "basis of practical experience alone."); *L.L. Lewis Constr.*, 142 S.W.3d at 265 (opinion regarding repair costs based on experience with dry walling); *Safeco*, 97 S.W.3d at 38-39

(valuation of equipment, lost use and rental value based on experience).[11]

Second, Dr. Fincham's refusal to speculate on irrelevant questions about whether a particular doctor would prescribe Vioxx knowing its risks says nothing about the admissibility of his opinion. Sugg. at 8, 10-11.  Third, Merck's counsel did not actually examine Dr. Fincham about the experience, teaching, research and other bases on which he relied. *Id.* at 10-11.

After Dr. Fincham explained that he bases his opinion on his "experience in teaching, in bringing in experts in the field that practice pharmacy in Missouri of various different types of practice who will speak to the issue of consumers and medication and the processes that they use in determining what drugs to take" (Fincham Dep. 101:7-16), Merck's counsel asked whether Dr. Fincham had conducted any research, to which Dr. Fincham responded: "Sir, my research is based upon what I did to form my opinion." *Id.* at 101:17-102:2.  Counsel then stated: "I understand that you have said that you're basing your opinion at least in part on your experience, I understand that.  Okay.  Other than your experience, do you have any other research or any other basis for your opinion that no Missouri consumer would have taken Vioxx if they'd known what you know today." *Id.* at 102:13-21.  Dr. Fincham again responded that his opinion was based on his experience, research, teaching, interaction with practitioners and patients. *Id.* at 102:24-103:6.  Counsel did not attempt to explore or test that experience, research, teaching, and interaction.  Rather than seeking out *those* details, counsel moved on to ask if Dr. Fincham could

---

[11]  This is true regardless of whether the expert has performed a "scientific" analysis, consulted surveys, or conducted testing, as Merck suggests.  Mot. at 3, ¶8; Sugg. at 10 and n.3. *See, e.g., Kivland* , 331 S.W.3d at 312 (expert did not need medical diagnosis for opinion; rejecting argument that opinion was only personal opinion rather than a "scientific" conclusion and finding that expert was qualified by experience and training); *McFarlane,* 207 S.W.3d at 62-65 (expert opinion did not require surveys or documents; fact that it was "anecdotal" might affect the weight, but did not destroy reliability, of expert's opinion); *Mathes,* 2000 S.W.3d at 111 (expert need not personally conduct tests for conclusions; Section 490.065 requires only that he rely on facts and data of a type reasonably relied on by experts in his field); *Campbell*, 143 S.W.3d at 702 (expert qualified on the "basis of practical experience alone."); *Sanders*, 14 S.W.3d at 208 (expert need not test cows to opine that symptoms attributable to aflatoxin in feed).

identify a specific doctor "who would not prescribe Vioxx . . . if they were aware of everything you're aware of [today]." To *that* irrelevant question, Dr. Fincham said he would not "speculate." *Id.* at 103:17-22.[12]  In short, Merck's counsel did little to actually examine Dr. Fincham on his experience, research, teaching, and interactions and (other than asking for specific patients and doctors who would not have taken Vioxx with knowledge of its risks) *did not ask* Dr. Fincham about what facts and data his experience and other bases for opinion entails.

In all the cases Merck cites, lack of foundation for the expert's opinion was established by the evidence presented at trial.  In *Adkins v. Hontz*, 337 S.W.3d 711, 718-19 (Mo. App. 2011), expert testimony regarding the value of future services in a wrongful death case was excluded because the expert, who operated a company providing assisted living services, "was attempting to equate the expenses of her previous unidentified clients to the likely future expenses of the plaintiffs" without demonstrating that the type, ages, needs or disabilities of her clients were similar to plaintiffs. *Id.* at 720 and n.7.[13]  In *Glaize Creek Sewer Dist. v. Gorham*, 335 S.W.3d 590 (Mo. App. 2011), a city sought a permanent sewer easement through the property owner's backyard.  The city's expert did not perform an appraisal on the property or render an opinion of

---

[12] Similarly, counsel asked Dr. Fincham if he could name any Missouri consumer "who would not have taken Vioxx if they had know what you know," which Dr. Fincham properly said was irrelevant. *Id.* at 103:8-16. Dr. Fincham rightly observed that questions assuming knowledge that consumers did not possess were based on faulty hypothesis: "I'd be hard pressed for anyone to make the choice of value 'as is' with the knowledge that's been gained since 2004.  But the issue is they didn't [have that knowledge]. . . [during 1999] to 2004." *Id.* at 97:24-97:6.  Counsel also asked Dr. Fincham to name Missouri consumers "who did not believe they received fair value for the Vioxx they took." Def. Ex. 2 (Fincham Dep. 92:15-93:19).  Dr. Fincham explained, correctly, that consumers were paying for Vioxx "as represented" not Vioxx as it actually was, which they did not know. *Id.* (92:18-93:12).  When pressed to name a Missouri consumer who "does not believe they received full value of Vioxx," Dr. Fincham responded that he could not "speculate what Missouri consumers might feel now eight years after the fact when Vioxx was taken off the market." *Id.* (93:21-24).  What a consumer might "believe" in terms of a purchase decision is not the kind of proof required under the MMPA.  *Plubell*, 289 S.W.3d at 714-15. And benefit of the bargain is an "objective[]" standard of ascertainable loss. *Id.* at 715.

[13] The Court took care to note that "[b]y the use of the word 'unidentified' we do not mean to suggest that the individual patients would need to be identified in order to make this testimony admissible." *Id.* at 720, n.7.

fair market value. *Id.* at 592, 594. He opined only that the easement had no adverse impact, which lacked foundation because "his lack of knowledge of crucial facts" pertaining to the subject property (as per a comparable-sales method for real estate valuations) was revealed during cross-examination. *Id.* at 594-95. In *McGuire v. Seltsam*, 138 S.W.2d 718 (Mo. banc 2004), a personal injury action, defendant's medical expert testified that plaintiff had a somatization disorder (*i.e.*, exaggerated medical complaints by a person seeking attention, medication or life-style change). At trial, the expert admitted that under professional standards, such a diagnosis requires "evidence of some psychosomatic complaints before the age of 30." *Id.* at 721. The records the expert reviewed, however, began when plaintiff was 35, and she simply assumed that if she "could have had all the records back to age 20 on, [she] would have [seen] plenty of [of medical complaints]." *Id.*[14]

All of these decisions were based on a trial record at which the basis for the expert's opinion was fully explored. Here, Merck is seeking pre-trial exclusion based on an incomplete deposition. If Merck wants to test at trial what it did not explore at deposition, it is free to do it. Even then, however, "[a]ny weaknesses in the factual underpinnings of [an] expert's opinion or in [his] knowledge goes to the weight that the testimony should be given and not its admissibility." *Safeco*, 97 S.W.3d at 38 (quoting *Alcorn*, 50 S.W.3d at 246); *accord Whithall*, 129 S.W.3d at 414 (same); *Sanders*, 14 S.W.3d at 208 ("Questions concerning sources and bases of an expert's opinion affect the weight rather than the admissibility of the opinion."); *McFarlane*, 207 S.W.3d at 67 (arguments that expert's opinion was speculative were "matters of

---

[14] *Compare Kivland*, 331 S.W.3d at 312-13 (expert did not need a medical diagnosis to opine that decedent's suicide was the result of defendant's negligence where experience and knowledge provided the basis for his opinion; lack of diagnosis went to weight of testimony and assessment by the jury).

weight" to be explored on cross-examination).  In no way has Merck demonstrated a basis to exclude Dr. Fincham's opinion under these standards.[15]

Dr. Fincham is well recognized in his field.  *See* Pls.' SJ Opp. Ex. 7 (Fincham Aff. ¶ 2 and Curriculum Vitae).  Throughout his educational and work experiences, Dr. Fincham garnered extensive experience and expertise in the areas of pharmaceutical pricing and pharmaceutical valuation, including the appropriate and standard methodologies used to determine such pricing and valuation.  *Id.*  In addition, Dr. Fincham has extensive experience in government service and consultation pertaining to the fields of pharmacy, pharmacy administration and management and health policy.  *Id.*  Some of this experience, both in the United States and internationally, is listed in his curriculum vitae.  *Id.*  In addition, Dr. Fincham was a practicing pharmacist for five years at both a pharmacy of which he was the owner and a long-term care facility, and he currently is a licensed pharmacist.  *Id.*  Through these experiences, Dr. Fincham has garnered expertise as the individual responsible for the determination of the actual price and value of various medications that would ultimately be sold and dispensed at his pharmacy and by other pharmacists.  *Id.*  Merck does not, and cannot, argue that Dr. Fincham is not qualified to render his opinions in this case.  And contrary to Merck's implication, Merck's counsel again *did not ask* at the deposition whether Dr. Fincham's opinions are based on facts and data "reasonably relied upon by experts in his field."  Mot. at 3, ¶ 7; Sugg. at 11.  Lest there be doubt, however, they are.  Pls.' SJ Ex. 7 (Fincham Aff. ¶ 9).  Dr. Fincham's

---

[15] *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870 (E.D. Wis. 2010), cited by Merck, provides it no aid.  In that unjust enrichment action, two experts were proffered to quantify anticipated profits from the marketing and sale of an SVRS-equipped motor used in swimming pool and spas.  Their opinions relied on numerous factors and assumptions involved in projecting future profits, and the Court demonstrated in painstaking detail *with evidence* that the opinions were wrong or unsupported.  *Id.* at 880-895.  By contrast, Merck provides nothing to show that Dr. Fincham's opinion lacks foundation.  And the only "evidence" it says Dr. Fincham should have considered is "how much consumers would have paid for the Vioxx they bought if they had known about its alleged risks."  Mot. at 2, ¶5.  That evidence is outside the parameters of a MMPA claim as a matter of law.  *Plubell*, 289 S.W.3d at 714-15.

assessment "of what data is reasonably reliable" is entitled to deference. *Sanders*, 14 S.W.3d at 208.   Merck's position here is like the defendant's position in *McFarlane*, where plaintiff's expert testified that the materials he relied on were "the kind of materials that people in my profession rely on in forming opinions and find reliable to forming these opinions" and defendant "put on no evidence to contradict these assertions." *McFarlane*, 207 S.W.3d at 63. Merck's argument is meritless.

### E.    Dr. Fincham's Loss Calculation Fits Plaintiffs' Theory Of Liability.

Again as it argues for summary judgment, Merck contends that Dr. Fincham's "As Represented" value of Vioxx lacks "fit" with Plaintiffs' "theory of liability," in reliance on the prayer in Plaintiffs' Petition and *Boca Raton Comty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227 (11th Cir. 2009).[16]  Plaintiffs have already addressed this issue and incorporate their opposition to Merck's summary judgment motion, Section IC2.  Contrary to Merck's suggestion, Plaintiffs' "theory of liability" is not limited to out-of-pocket costs paid by consumers for Vioxx. Sugg. at 13.  *See* Pls. SJ Opp. at Section IC2.  Plaintiffs' theory of liability is a violation of the MMPA, and the measure of damages for that violation (and applicable to establish ascertainable loss) is the benefit-of-the-bargain standard.  *Plubell*, 289 S.W.3d at 715.  This standard does not limit recovery to amounts paid out of pocket as a matter of Missouri law.  *See* Pls. SJ Opp. at Section IC3.  Dr. Fincham has done what the law instructs.  There is no lack of fit.[17]

---

[16] Merck's reliance on *Adkins* for this argument is again misplaced.  Sugg. at 11-12.  The rationale of the *Boca Raton* decision is that an expert's opinion must have a connection, or appropriate "fit," with the issue under submission.  *Daubert*, 509 U.S. at 590-91.  The Court in *Adkins* was not addressing that federal standard at all, but rather, whether the probative value of a witness' testimony outweighs it costs and whether an expert has foundation for his opinion. *Adkins*, 337 S.W.3d at 719-20.

[17] It is Merck's expert, Dr. Wiggins, who has based his analysis on a fundamentally incorrect model.  Dr. Wiggins has conducted an "out-of-pocket" calculation based on assumptions and estimates concerning copayments, coinsurance and the like to arrive at a figure purporting to represent what was paid out of Missouri consumers' pockets for Vioxx prescriptions.  *See* Resp. to Merck SOF ¶13 (citing Wiggins Dep.

Merck's citation to *Abrams v. Ciba Specialty Chemicals Corp.* illustrates the deficiency of its arguments. Sugg. at 13. That case was a suit against the owner of a chemical plant for contaminating plaintiffs' property with DDT and its metabolites. No. 08-0068, 2010 WL 779273 at *2 (S.D. Ala. March 2, 2010). Plaintiffs retained a civil engineer to evaluate, and testify about, the source of the DDT contamination. *Id.* The Court *rejected* most of defendant's objections to this expert's testimony. *See id.* at *3-6. What the Court excluded was testimony pertaining to "test results for [other] chemicals such as dioxins and furans," which were not at issue and not relevant to whether plaintiffs' property was contaminated with DDT. *Id.* at *7. Here, the issues are ascertainable loss and amount of damages. Plaintiffs' expert has used the correct standard (benefit-of-the bargain) and applied that standard correctly under Missouri law. Merck is far off-base.[18]

Insofar as the class definition, each Vioxx prescription included by Dr. Fincham in his calculation was paid by or on behalf of consumers who are the class members in this case. Pls. SJ Opp. at Section IC, IIA. Whether privately insured or Medicaid beneficiaries, each paid some portion of the cost in the form of a copayment or coinsurance, as Merck itself concedes. Sugg. at 14; Def. Ex. 3 (Wiggins Aff. ¶¶ 9, 11); Pls. SJ Opp. at Section IC. Neither the class definition nor the MMPA define "purchaser" in a way that requires a direct payment from plaintiff to

---

264:18-265:3; 271:17-21; 309:9-311:8). This model, however, is contrary to Missouri's benefit-of-the-bargain standard, which is based on value, not out-of-pocket expenditures.

[18] Merck is even further afield in its reliance on *In re BankAtlantic Bancorp., Inc.*, No. 07-61542-CIV, 2011 WL 1585605 (S.D. Fla. April 25, 2011) (Sugg. at 13), another securities fraud action in which the plaintiff alleged that revelation of fraudulently concealed information caused a stock price decline. Once again, the issue was the expert's failure to "disaggregate the non-fraud effects of other negative information" as required in a securities fraud action. *Id.* at *18, 20. Again, in those kind of cases, loss causation requires proof that the fraudulently concealed information, when revealed, caused the price decline. *Id.* at *15. This requires a link between the "culpable disclosure to the stock-price movement" and extraction of other, non-culpable factors. *Id.* at *19. Neither this case nor *Morgan Stanley* have any application here.

defendant.  *Id.* at Section IIA4.  Merck's arguments pertaining to amounts paid by private insurers, Medicaid, or worker's compensation (Sugg. at 14-15) are in any event barred as relying on evidence inadmissible under the collateral source doctrine.  *See* Pls. SJ Opp. at Section IC1, IIA.[19]

Merck's arguments about "double recoveries" as to personal injury claimants, private insurers, and the state of Missouri regarding Medicaid reimbursement, also are meritless.  Sugg. at 15.  Settlement with the state has not even yet "effectuated."  *See* Def. Ex. 4 (Marvin Aff. ¶ 6) (stating that the State "will receive compensation" "when [the settlement] is effectuated."). Moreover, and in regard to both private insurers and the state, Merck offers nothing to suggest that those settlements somehow released the claims of any class member in this case, rendering them entirely irrelevant.  And in no case has Merck provided information pertaining to the amount of any settlement, the number of Vioxx prescriptions involved, or how much these prescriptions might represent in terms of cost.  Pls. SJ Opp. at Section IIA5.  Even now, Merck maintains that this information is inadmissible.  *See* Motion for Summary Judgment at 3, n.2.  To the extent Merck intends to pursue its "double recovery" theory at trial, it will be obliged to provide that information if it has any hope of supporting it.  *See, e.g., Ozark Airlines, Inc. v. Valley Oil Co. LLC,* 239 S.W.3d 140, 147 (Mo. App. 2007) (reduction of judgment properly rejected absent evidence that plaintiff actually recovered by settlement amounts awarded against defendant on same claim); *Stege v. Hoffman*, 822 S.W.2d 517, 519 (Mo. App. 1991) (reduction of judgment rejected absent evidence to demonstrate "amounts paid in settlement," or if paid, for

---

[19] Merck's argument that it "would be impossible for Dr. Fincham to reliably calculate the actual amount of money the class members paid for Vioxx" due to "individualized questions" pertaining to their insurance coverage (Sugg. at 19 n.5) assumes that Plaintiffs are limited to out-of-pocket recovery (they are not) and/or that Dr. Fincham has undertaken such a calculation (he has not).  Pls. SJ Opp. at Section I. Indeed, Merck's argument attacks *its own expert*, who purports to do exactly what Merck says is "impossible," *i.e.*, an "out-of-pocket" calculation, which is otherwise contrary to law.  *See supra*, note 17.

which claims).  For purposes of summary judgment, however, this dearth of evidence renders Merck's motion unsupported.[20]  For purposes of Merck's motion to exclude, it means that Merck has nothing on which to challenge admissibility of Dr. Fincham's opinion.

Merck offers nothing at all to demonstrate that the "type of methodology and data" used by Dr. Fincham in calculating the "As Represented" value of Vioxx "are unreliable or not typically used in his field."  *McIntosh*, 462 F. Supp.2d at 1032.  In fact, Merck does not even attempt to challenge the sources, data, or method by which Dr. Fincham arrived at his conclusion, and makes no argument about their reliability.  Merck's own expert, Dr. Wiggins, testified that in regard to the "As Represented" value, he and Dr. Fincham "are using a very, very similar methodology" except for certain exclusions.  *See* Pls.' Resp. to Merck SOF ¶ 21 (citing Wiggins Dep. 262:11-263:7).  Any argument that an expert considered certain information "to the exclusion of other[] [information] is a subject for cross examination, but an expert's opinion is "not excludable on th[at] basis."  *Id.* at 1032.  Such a contention goes to the weight, not the admissibility, of his opinion.  *McFarlane*, 207 S.W.3d at 65 (citing *Schreibman v. Zanetti*, 909 S.W.2d 692, 698 (Mo. App. 1995)).  All of Merck's arguments are meritless.

**F.    Dr. Fincham's Calculation Of The "As Represented" Value of Vioxx Is Based On A Permissible Aggregate And Is Not Inflated.**

Merck's related, but separate, argument is that Dr. Fincham's "As Represented" value includes people not in the class definition (personal injury claimants and out-of-state purchasers), rendering it inflated.  Sugg. at 14-15.  To the contrary, Dr. Fincham performed the very sort of aggregate calculation that is both necessary and permissible in a class action.  *Gerken v.*

---

[20]    *See, e.g.*, *Grisamore v. State Farm Mut Auto Ins. Co.*, 306 S.W.3d 570, 574 (Mo. App. 2010) (summary judgment inappropriate where movant did not introduce facts directly rebutting element challenged); *Oakley Fertilizer, Inc. v. Continental Grain Ins. Co.*, 276 S.W.3d 342, 351 (Mo. App. 2009) (movant's evidence insufficient to establish lack of material fact issue); *Bank of America*, 348 S.W.3d at 862 (movant's evidence insufficient to establish basis for judgment).

*Sherman*, 351 S.W.3d 1, 10-11 (Mo. App. 2011); Pls. SJ Opp. at Section ID.   As to personal injury claimants who have settled with Merck, there is nothing inherently wrong with recovery for economic loss under the MMPA, which is a separate, distinct injury and does not result in "double recovery." *See* Pls. SJ Opp. at Section ID.   And again, Merck provides no information about who these people might be, the amount of the settlements, how many Vioxx prescriptions are at stake, or what prescription cost is represented.   As such, Merck has no basis to demonstrate what, if anything, it says should be deducted from Dr. Fincham's calculation.   In terms of out-of-state purchasers, Dr. Fincham testified that including such people in his calculation has no affect because that calculation also did not include Missouri residents who might have purchased their Vioxx out of state, resulting in a "wash." Def. Ex. 2 (Fincham Dep. 111:20-112:1).   Merck takes no issue with this conclusion and makes no argument that it affects admissibility.   Again, Merck's arguments are meritless.

## CONCLUSION

For all these reasons, Merck's motion should be denied.

Respectfully submitted,

STUEVE SIEGEL HANSON LLP

Patrick J. Stueve, Mo. Bar #37682
Todd E. Hilton, Mo. Bar #51388
Jack D. McInnes, Mo. Bar #56904
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone:      (816) 714-7100
Facsimile:      (816) 714-7101

**GRAY, RITTER & GRAHAM, P.C.**
Don M. Downing, Mo. Bar #30405
701 Market Street, Suite 800
St. Louis, Missouri 63101
Telephone:      (314) 241-5620
Facsimile:      (314) 241-4140

*ATTORNEYS FOR PLAINTIFFS*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was served, via email and U.S. Mail,

postage prepaid, this 14th day of February, 2012, on:

John H. Beisner
Jessica Davidson Miller
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C.  20005

Travis J. Sales
BAKER BOTTS L.L.P.
910 Louisiana
Houston, Texas  77002

Dan H. Ball
Stephen G. Strauss
BRYAN CAVE LLP
211 N. Broadway, Ste. 3600
St. Louis, Missouri  63102

Ben Barnett
DECHERT LLP
2929 Arch Street
Philadelphia, Pennsylvania  19104

*ATTORNEYS FOR DEFENDANT*

Attorney for Plaintiffs