## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
|  | : | **MDL NO. 1657** |
| **IN RE: VIOXX** | : |  |
| **PRODUCTS LIABILITY LITIGATION** | : | **SECTION:  L** |
|  | : |  |
|  | : | **JUDGE FALLON** |
|  | : |  |
|  | : | **MAG. JUDGE KNOWLES** |

.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. :

**THIS DOCUMENT RELATES TO: ALL CASES**

### ORDER & REASONS

Currently pending before the Court is Merck's Motion to Enjoin Missouri Plaintiffs Mary

Plubell and Ted Ivey From Pursuing Relief for Vioxx Expenditures Already Subject to

Settlements (Rec. Doc. 63744).  The Court has reviewed the briefs and the applicable law and is

now prepared to rule.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This matter involves the interaction (and potential collision) between the Vioxx litigation

transferred to this federal court by the Judicial Panel on Multidistrict Litigation, and a certified

class action set for trial in Missouri state court.  Merck, Defendant in both the MDL and in the

Missouri case, petitions this Court for an injunction prohibiting the Missouri Plaintiffs from

pursuing damages that Merck argues it has already paid in settlements consummated in the

MDL.  To resolve this motion, the Court will briefly summarize the Vioxx litigation and the

parameters of certain settlements negotiated and consummated in the MDL; discuss the scope of

the Court's authority under the All Writs Act and the Anti-Injunction Act to enjoin state-court proceedings; and then decide whether an injunction is permitted and necessary to protect this Court's jurisdiction or to effectuate judgments entered in the MDL.

First, a brief review of this litigation is appropriate.  This multidistrict products liability litigation involves the prescription drug Vioxx, known generically as Rofecoxib.  Merck, a New Jersey corporation, researched, designed, manufactured, marketed and distributed Vioxx to relieve pain and inflammation resulting from osteoarthritis, rheumatoid arthritis, menstrual pain, and migraine headaches.  On May 20, 1999, the Food and Drug Administration approved Vioxx for sale in the United States.  Vioxx remained publicly available until September 20, 2004, when Merck withdrew it from the market after data from a clinical trial known as APPROVe indicated that the use of Vioxx increased the risk of cardiovascular thrombotic events such as myocardial infarction (heart attack) and ischemic stroke.  Thereafter, thousands of individual suits and numerous class actions were filed against Merck in state and federal courts throughout the country alleging various products liability, tort, fraud, and warranty claims.  It is estimated that 105 million prescriptions for Vioxx were written in the United States between May 20, 1999 and September 30, 2004.  Based on this estimate, it is thought that approximately 20 million patients have taken Vioxx in the United States.[1]

California was the first state to institute a consolidated state court proceeding on October 30, 2002.  New Jersey and Texas soon followed suit, on May 20, 2003 and September 6, 2005, respectively.  On February 16, 2005, the Judicial Panel on Multidistrict Litigation ("MDL")

---

[1]For a more detailed factual background describing the events that took place before the inception of this multidistrict litigation, see *In re Vioxx Prods. Liab. Litig.*, 401 F. Supp. 2d 565 (E.D. La. 2005) (resolving *Daubert* challenges to a number of expert witnesses).

conferred MDL status on Vioxx lawsuits filed in various federal courts throughout the country and transferred all such cases to this Court to coordinate discovery and to consolidate pretrial matters pursuant to 28 U.S.C. § 1407.  *See In re Vioxx Prods. Liab. Litig.*, 360 F. Supp. 2d 1352 (J.P.M.L. 2005).

The Court oversaw rapid and substantial discovery.  Counsel conducted pre-trial preparation, including document discovery, the taking of depositions, preparation of experts, motions practice, and to some extent, coordination of federal and state court proceedings.  Millions of documents were discovered and collated.  Thousands of depositions were taken and at least 1,000 discovery motions were argued.  After a reasonable period for discovery, the Court assisted the parties in selecting and preparing certain test cases to proceed as bellwether trials.  Additionally, similar trials were scheduled in state court.

This Court conducted six Vioxx personal injury bellwether trials.[2]  The first of the bellwether trials took place in Houston, Texas, while this Court was displaced following Hurricane Katrina.  The five subsequent bellwether trials took place in New Orleans, Louisiana.  Only one of the trials resulted in a verdict for the plaintiff.  Of the five remaining trials, one resulted in a hung jury and four resulted in verdicts for the defendant.  During the same period that this Court was conducting six bellwether trials, approximately thirteen additional Vioxx-related cases were tried before juries in the state courts of Texas, New Jersey, California, Alabama, Illinois, and Florida.  With the benefit of experience from these bellwether trials, as

---

[2]*See Plunkett v. Merck & Co.*, No. 05-4046 (E.D. La. Filed Aug. 23, 2005) (comprising both the first and second bellwether trials, as the first trial resulted in a hung jury); *Barnett v. Merck & Co.*, No. 06-485 (E.D. La. Filed Jan. 31, 2006) (third bellwether trial); *Smith v. Merck & Co.*, No. 05-4379 (E.D. La. Filed Sept. 29, 2005) (fourth bellwether trial); *Mason v. Merck & Co.*, No. 06-0810 (E.D. La. Filed Feb. 16, 2006 (fifth bellwether trial); *Dedrick v. Merck & Co.*, No. 05-2524 (E.D. La. Filed June 21, 2005) (sixth bellwether trial).

well as the encouragement of the several coordinated courts, the parties soon began settlement discussions in earnest.

This Court appointed Negotiating Plaintiffs' Counsel ("the NPC") to explore and engage in settlement discussions with Merck.  Over the course of more than a year, counsel for Merck and the NPC met together more than fifty times and held several hundred telephone conferences. Although the parties met and negotiated independently, they kept this Court and the coordinate state courts of Texas, New Jersey, and California informed of their progress in settlement discussions.

On November 9, 2007, Merck and the NPC formally announced that they had reached a Settlement Agreement addressing Vioxx personal injury claims.  *See* Settlement Agreement, *In re Vioxx Prods. Liab. Litig.*, MDL 1657 (E.D. La. Nov. 9, 2007) ("PI Settlement" or "MSA"), *available at* http://www.browngreer.com/vioxxsettlement.  The PI Settlement created a pre-funded program for resolving pending or tolled state and federal Vioxx claims against Merck as of the date of the settlement, involving claims of heart attack ("MI"), ischemic stroke ("IS"), and sudden cardiac death ("SCD"), for an overall amount of $4.85 billion.  *Id.* § "Recitals".[3]  The Settlement is a voluntary opt-in agreement an objective program with multiple levels of review to allocate points and award compensation to individuals with qualifying injuries caused by Vioxx.  The claimants who enrolled in the program executed a release of "any and all rights, remedies, actions, claims, demands, causes of action, [or] suits at law or in equity ... in any way, arising out of, relating to, reslting from and/or concerned with VIOXX."  (MSA, Exh. 1.2.2.3).

_____

[3]For a more detailed factual background of the various mechanics of the Settlement Agreement, including the provisions for the mandatory resolution of governmental liens, *see In re Vioxx Prods. Liab. Litig.*, 2008 WL 3285912 (E.D. La. Aug. 7, 2008) (denying motions to enjoin disbursement of interim settlement payments).

On July 17, 2008, Merck formally announced that it was satisfied that the thresholds necessary to trigger funding of the Vioxx Settlement Program would be met.  *See Minute Entry, July 17, 2008*, Rec. Doc. 15362 (July 17, 2008).  Merck further advised that it intended to waive its walk away privileges and that it would commence funding the Vioxx Settlement Program by depositing an initial sum of $500 million into the settlement fund, clearing the way for distribution of interim payments to eligible claimants.  *Id.*  Eventually some 99.9% of all eligible claimants enrolled in the program.

The PI Settlement proceeded at a very rapid rate in order to ensure that the plaintiffs would recover in a timely fashion.  Final payments to heart attack claimants were completed prior to October 14, 2009, final payments to stroke claimants were completed by June 14, 2010, and final extraordinary injury payments were completed by June 29, 2010.  Thus, in only 31 months, the parties to this case were able to reach a global settlement and distribute $4,353,152,064 to 32,886 claimants, out of a pool of 49,893 eligible and enrolled claimants. This efficiency is unprecedented in mass tort settlements of this size.  It was due in large part to the ability, industry, and professionalism of the attorneys for both sides and the plan administrators.

Although the PI Settlement constituted a major accomplishment, other non-personal injury claims remained pending in the MDL.  Among those were the claims of private third-party payors, or TPPs, entities such as insurers or health plans that paid for Vioxx on behalf of individual consumers; those entities asserted independent claims for economic injury against Merck.  After sustained and complicated negotiations, one hundred and seventy-six private TPPs

entered into an $80,000,000.00 settlement agreement with Merck.[4]  Pursuant to the settlement,

settling TPP Plaintiffs released Merck from "any and all debts, liabilities, obligations, covenants,

promises, contracts, agreements and/or obligations ... to any extent, or in any way, arising out of,

relating to, resulting from and/or connected with VIOXX in whole or in part."  (Merck's Exh. 2

at § 4.1.1, Rec. Doc. 63744-4 at 8-9).[5]  Moreover, the settling TPP plaintiffs agreed to

"indemnify and hold [Merck] harmless against any Claims, Liabilities, damages, losses, costs

and expenses incurred," including "any and all Claims that may be asserted, made, or maintained

at any time against [Merck] by, on behalf of or for the benefit of any" TPP.  (Merck's Supp. Exh.

2 at 4.1.7, 4.1.7.2, Rec. Doc. 63759-2 at 11-12).

As noted, the Vioxx litigation in this Court has also proceeded in parallel in the state

courts.  Plaintiffs Mary Plubell and Ted Ivey filed one such case in Missouri state court, which

has been pending since before the inception of this MDL.  Plaintiffs brought their case as a

consumer class action on behalf of Missouri Vioxx users to recover economic damages based on

Merck's misrepresentation of the drug's safety, rather than personal injury damages.  Plubell and

Ivey sought and eventually obtained certification of a class of "All Missouri residents who

purchased Vioxx for personal or family use," excluding "those claiming they have suffered a

personal injury as a result of taking Vioxx."  (Ps' Exh. A at 23, Rec. Doc. 63761-1 at 24).  The

*Plubell* case is scheduled for a jury trial on May 21, 2012.

## II.    PRESENT MOTION

_____

[4]The settlement consisted of $65,000,000.00 owed to the settling TPP plaintiffs, and
$15,000,000.00 in common benefit attorneys' fees, which the Court is in the process of
allocating.

[5]The complete terms of the release are substantially more verbose.

Merck now moves pursuant to the All Writs Act for an injunction against the Plubell Plaintiffs.  The dispute arises from the scope of relief Plaintiffs seek in Missouri state court.  The class action complaint demanded "[r]eturn of all purchase costs Plaintiffs paid for Vioxx," as well as fees and costs.  (Merck's Exh. 3 at 15, Rec. Doc. 63744-5 at 16).  Merck states that in recent expert discovery it has become apparent that Plaintiffs are seeking more than just the amounts that class members personally paid for Vioxx; rather, Plaintiffs intend to present expert testimony that calculates all money ever spent on Vioxx in Missouri by anyone, including individuals who have settled in the MDL or private TPPs (or, for that matter, state and federal Medicaid payments).  This poses a perceived threat of requiring Merck to pay again or at least account for Missouri PI and TPP claims that it has already settled in this MDL.  Therefore Merck seeks an injunction against Plaintiffs prohibiting them "from seeking to recover money spent on Vioxx purchases in the State of Missouri by personal-injury plaintiffs and third-party payors that have settled their claims against Merck."  Merck contends that the risk of double payment is augmented by the state court's orders dismissing motions for summary judgment, allowing Plaintiffs' expert testimony, and granting a "Motion In Limine to Immediately Exclude All Evidence of Collateral Source Payments for Vioxx Prescription."

Plaintiffs oppose any injunction.  They contend that the Anti-Injunction Act divests this Court of the authority to issue the requested injunction.  Moreover, Plaintiffs argue that their case does not threaten the MDL settlements at all because neither they, nor any member of the class they represent, settled a claim in the MDL through the PI or TPP settlements.  Rather, they argue that their claims arise independently under Missouri state law and an injunction would unreasonably limit their rights to recover under Missouri law.

III.    LAW & ANALYSIS

**A.      The Court's Authority Under the All Writs Act and Anti-Injunction Act.**

The All Writs Act authorizes federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651. But the Anti-Injunction Act places some limits on the federal courts' authority to enjoin state court proceedings:

> A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

28 U.S.C. § 2283. The Anti-Injunction Act "represents Congress' considered judgment as to how to balance the tensions inherent in" "a dual system of federal and state courts." *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 146 (1988). Because the Anti-Injunction Act's "core message is one of respect for state courts," a federal-court injunction of state-court proceedings shall not issue unless the injunction falls into one of three exceptions: (1) it is expressly authorized by an Act of Congress, (2) it is necessary in aid of jurisdiction, or (3) it is necessary to protect or effectuate judgments. *Smith v. Bayer Corp.*, 131 S. Ct. 2368, 2375 (2011). The "exceptions are designed to ensure the effectiveness and supremacy of federal law." *Chick Kam Choo*, 486 U.S. at 146.

The Supreme Court has held that "[a]ny doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed in an orderly fashion to finally determine the controversy." *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 297 (1970). The Fifth Circuit likewise recognizes "the overarching principle that federal courts are to be cautious about infringing on the legitimate exercise of state judicial power." *Texas v. United States*, 837 F.2d 184, 186 (5th Cir. 1988). "[T]he fact that an injunction *may* issue under the Anti-Injunction Act does not mean that it *must*

-8-

issue." *Chick Kam Choo*, 486 U.S. at 151 (emphasis in original).  "Specifically, principles of comity, federalism, and equity always restrain federal courts' ability to enjoin state court proceedings."  *In re Diet Drugs (Phentermine/Fenfluramine) Prods. Liab. Litig.*, 369 F.3d 293, 306 (3rd Cir. 2004) ("*Diet Drugs II*").  The All Writs Act power "must be exercised in a manner that minimizes entanglement in the state judge's ability to supervise judicial proceedings in his own courtroom."  *Id.* at 317.  But there are exceptions to this rule.

In the present matter, Merck argues that two exceptions to the Anti-Injunction Act authorize this Court to enjoin proceedings in Missouri state court: the "in aid of jurisdiction" exception, and the "protection of judgments" exception, also called the relitigation exception. The Court will discuss the parameters of both exceptions and analyze whether either or both permit and warrant an injunction.

**B)      Relitigation Exception**

The Anti-Injunction Act permits injunctions where necessary to "protect and effectuate judgments" of a federal court.  This exception, commonly called the "relitigation" exception, "authorizes an injunction to prevent state litigation of a claim or issue 'that previously was presented to and decided by the federal court.'"  *Smith*, 131 S. Ct. at 2375 (2011) (quoting *Chick Kam Choo*, 486 U.S. at 147).  The exception "is founded in the well-recognized concepts of *res judicata* and collateral estoppel."  *Chick Kam Choo*, 486 U.S. at 147.  In a recent case addressing the breadth of the relitigation exception, the Supreme Court emphasized that the relitigation exception is "heavy artillery," and that "close cases have easy answers: The federal court should not issue an injunction, and the state court should decide the preclusion question.  *Smith*, 131 S. Ct. at 2375, 2382.

MDL transferee courts have applied the relitigation exception to effectuate judgments

issued in connection with a global settlement.  *See In re Linerboard Antitrust Litig.*, 361 F.

App'x 392 (3rd Cir. 2010); *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355

(3rd Cir. 2001).  However, under the circumstances involved in the present case, the Court finds

that the "in aid of jurisdiction" exception is more apposite and sufficiently deals with the

requested injunction; accordingly, the Court need not decide whether the relitigation exception

might also apply.  *Cf. In re Diet Drugs II*, 369 F.3d at 306 ("We need not determine whether the

District Court had the authority to effectuate the settlement agreement's punitive damages

provision under the Anti-Injunction Act's relitigation exception, however, because in any case it

had the power to issue the injunction under the 'in aid of jurisdiction' exception.").

>    2)    **Aid of Jurisdiction**

With respect to the "in aid of jurisdiction" exception, the Supreme Court explains that

"some federal injunctive relief may be necessary to prevent a state court from so interfering with

a federal court's consideration or disposition of a case as to seriously impair the federal court's

flexibility and authority to decide that case."  *Atlantic Coast Line R. Co.*, 389 U.S. 281, 295

(1970).

Traditionally, the aid of jurisdiction exception only applied where a *res* was at stake.  *See*

*In re Diet Drugs*, 282 F.3d 220, 234 (3d Cir. 2002) ("*Diet Drugs I*") (recognizing the traditional

notion that the All Writs Act exceptions do not apply to *in personam* actions); *Winkler v. Eli*

*Lilly & Co.,* 101 F.3d 1196, 1202 (7th Cir. 1996) ("Ordinarily, the 'aid of jurisdiction' exception

to the Anti-Injunction Act applies only to parallel state *in rem* rather than *in personam* actions");

*In re Baldwin-United Corp.*, 770 F.2d 328 (2d Cir. 1985)("[T]he federal court is empowered to

enjoin any state court proceeding affecting [its] *res*"); *see also* Joshua J. Wes, Comment,

*Developments in the Law: Federal Jurisdiction and Forum Selection*, 37 Loy. L.A. L. Rev. 1603,

1629 (2004).  Indeed, the Supreme Court has long recognized that where a federal court has

jurisdiction over a *res* and a state court exercises jurisdiction over that same *res*, the federal court

may enjoin the parties from proceeding in state court.  *See Kline v. Burke Const. Co.*, 260 U.S.

226, 229 (1922).  But in the absence of a *res*, "[t]he traditional notion is that *in personam* actions

in federal and state court may proceed concurrently, without interference from either court, and

there is no evidence that the exception to [the All Writs Act] was intended to alter this balance."

*Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 642 (1977).  Nonetheless, in extraordinary cases,

federal courts have enjoined *in personam* state proceedings on the necessary in aid of jurisdiction

basis.  *See Winkler*, 101 F.3d at 1202 ("There are however, exceptions to this rule, most notably

school desegregation cases, where conflicting orders from different courts would only serve to

make ongoing federal oversight unmanageable").

　　　In the context of complex multidistrict litigation, the distinction drawn by the Supreme

Court between an *in rem* and *in personam* proceeding for purposes of applying the necessary in

aid of jurisdiction exception is not so delineated.  *See* Wes, 37 Loy. L.A. L. Rev. at 1627-29.  A

number of Circuits have permitted an MDL court, in certain circumstances, to enjoin a

concurrent state court *in personam* proceeding, *see e.g.*, *In re Diet Drugs I*, 282 F.3d 220;

*Hanlon v. Chrysler Corp.,*150 F.3d 1011 (9th Cir. 1998); *Winkler v. Eli Lilly & Co.*, 101 F. 3d

1196 (7th Cir. 1996); *Battle v. Liberty Nat'l Life Ins. Co.*, 877 F.2d 877 (11th Cir. 1989); *In re

Baldwin-United Corp.*, 770 F.2d 328 (2d Cir. 1985); *In re Corrugated Container Antitrust Litig.*,

659 F.2d 1332 (5th Cir. 1981), while others have adhered to the traditional rule against enjoining

concurrent state *in personam* proceedings.  *See e.g.*, *In re Life Investors Ins. Co. of Am.,*589 F.3d

319 (6th Cir. 2009); *Negrete v. Allianz Life Ins. Co.,* 523 F.3d 1091 (9th Cir. 2008); *In re

General Motors Corp.*, 134 F.3d 133 (3d Cir. 1998); *Standard Microsystems Corp. v. Texas*

-11-

*Instruments, Inc.*, 916 F.2d 58 (1st Cir. 1990). Notably, legal commentators have urged a broader application of the "in aid of jurisdiction" exception for non-*in rem* cases, particularly in complex litigation. *See* Wright & Miller, 17A Fed. Prac. & Proc. § 4225 (3d ed. 2010 Supp.).

Two primary justifications have been put forth for a MDL transferee court's authority to enjoin an *in personam* state court proceeding pursuant to the "in aid of jurisdiction" exception. The first is that complex litigation cases are sufficiently similar to *in rem* proceedings so as to permit injunctions on cases actually *in personam* in nature. *See In re Diet Drugs I*, 282 F.3d at 235 n. 12; *Battle,* 877 F.2d at 881; *In re Baldwin-United*, 770 F.2d at 337. The theory behind the *in rem* analogy is that when complex litigation has reached the point of sufficient advancement, and there has been substantial investment of time and resources, in essence, a *res* is created. *See In Re Diet Drugs I*, 282 F.3d at 235 n. 12. The second justification, which is related to the first, is that the "in aid of jurisdiction" exception should be applied to protect the federal complex litigation settlement process. *See* Wes, 37 Loy. L.A. L. Rev. at 1632. This justification is rooted in the concepts of both judicial efficiency and preventing interference with a federal court's resolution of a case. *See id.*; *In re Diet Drugs I*, 282 F.3d at 235 n. 12; *Winkler*, 101 F.3d at 1202 (quoting Martin H. Redish, *The Anti-Injunction Statute Reconsidered*, 44 U. Chi. L. Rev. 717, 754 (1977)).

In practice, the Circuit Courts have been most willing to uphold an injunction pursuant to the "in aid of jurisdiction" exception in the MDL or complex litigation context when settlement is complete or imminent in the federal court, and often after preliminary or final certification of a class. At this stage the settlement because a *res* or at least a quasi-*res* and justifies the Court's protection. *See In re Diet Drugs* I, 282 F.3d at 236-37 (holding injunction appropriate in "the final stages of this complex litigation," that is, after conditional class certification and

-12-

preliminary settlement negotiated and approved by the federal court); *Battle*, 877 F.2d at 880-82 (upholding injunction after federal court judgment on settlement agreement); *In re Baldwin-United*, 770 F.2d at 337-38 (holding injunction appropriate where 18 out of 26 class actions had settled and the remaining class were continuing settlement negotiations); *In re Corrugated Container Antitrust Litig.*, 659 F.2d at 1333 (upholding injunction against pursuing suit in state court after class certified and two settlements approved by the court); *see also* Wes, 37 Loy.L.A. L.Rev. at 1632; Wright & Miller, 17A Fed. Prac. & Proc. § 4225.  Under the justifications discussed above, this makes sense; at the point when settlement is imminent or consummated, the MDL court and parties presumably have expended substantial time and resources, and the final resolution of the case is at stake.  Conversely, where the MDL or complex litigation is in the early stages of litigation, or before a settlement has been negotiated, the Circuits are less likely to enjoin an *in personam* concurrent state court proceeding.  *See In re Life Investors Ins. Co. of Am.,*589 F.3d at 330-32 (denying injunction on basis of in aid of jurisdiction since no class had been certified and federal plaintiff opted out of state class action); *Negrete,* 523 F.3d at 1102-03 (holding injunction not appropriate under Anti-Injunction Act since not an MDL case, discovery not complete, and no settlement progress had been made); *In re General Motors Corp.*, 134 F.3d at 145-56 (holding injunction on state court proceeding barred since the federal court's class certification was reversed and not even the prospect of settlement was imminent); *Standard Microsystems Corp*, 916 F.2d 58 (holding injunction barred by Anti-Injunction Act shortly after the state and federal actions were filed).

   In the Fifth Circuit, the "in aid of jurisdiction" exception to the Anti-Injunction Act in the context of MDL or complex litigation receives similar treatment as that of the other Circuits cited above.  This exception was first addressed by the Fifth Circuit in *In re Corrugated*

*Container Antitrust Litigation*, 659 F.2d 1332 (5th Cir. 1981).  In *In re Corrugated Container*, the Fifth Circuit upheld the MDL transferee court's injunction preventing MDL class plaintiffs from pursuing a similar lawsuit in South Carolina state court and any other court on the basis that these state court suits would challenge the MDL court's jurisdiction.  *Id.*  The Court recognized that the MDL transferee court had before it a "complicated antitrust action [which] required a great deal of the district court's time and necessitates its ability to maintain a flexible approach in resolving the various claims of the many parties."  *Id*. at 1334-35.  Notably, the court did not issue the injunction until after it "approved the settlements and final judgments were predictable if not assured."  *Id*. at 1335.

Thereafter, in *Royal Insurance Co. of America v. Quinn-L Capital Corp*., 960 F.2d 1286 (5th Cir. 1992), the Fifth Circuit reached an entirely different conclusion, holding that an injunction on a state court proceeding was not proper under the "in aid of jurisdiction" exception because the claims in state court posed no threat to the district court's continuing jurisdiction to decide post-declaratory judgment claims.  The Court recognized the possibility of extending the "'in aid of jurisdiction' exception to include 'lengthy, complicated litigation' that is the 'equivalent of a res,'" but it distinguished the facts before it from such type of case.  *Id*. at 1299.

More recently, in *Newby v. Enron Corp*., 338 F.3d 467 (5th Cir. 2003), the Fifth Circuit upheld an MDL transferee court's injunction requiring the withdrawal of motions from state court which sought temporary injunctions to freeze defendants' assets.  The Court reasoned the injunction was proper given the "requests for temporary injunctions in the state court ... are an attempt to taunt the parties and the court and to undermine the district court's ability to control the consolidated litigation."  *Id*. at 475.  The Court approved of the narrow tailoring of the injunction, which directly addressed the treatment to the district court and did not bar the state

-14-

proceeding in its entirety.  *Id.* at 476.

And finally, this Court recently issued an injunction consistent with the All Writs Act and Anti-Injunction Act in connection with the Chinese-Manufactured Drywall MDL.  *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, MDL No. 2047, 2011 WL 2313866 (E.D. La. June 9, 2011).  In connection with preliminary approval of a class action settlement between claimants and one defendant, the Court stayed state court proceedings against that defendant. *See id.* at *1.  A co-defendant with claims against that defendant challenged the stay, which had the effect of enjoining a motion for summary judgment pending in Louisiana state court.  *See id.* On a motion to reconsider the preliminary approval and stay, the Court concluded that the stay was necessary and appropriate under the relevant statutes to protect the *res* created by the substantial efforts of the Court and parties in progressing the litigation to the point of settlement. *See id.* at *6-7.

With the foregoing case law as guidance, the Court now turns to the present matter. Here, the Court has something substantially more developed than some of the preliminary or contingent settlements that other courts have protected through injunction.  The PI and TPP settlements, collectively worth almost five billion dollars, have been successfully consummated. They are finished and the sums have been paid and releases obtained.  Finality is a crucial motivating factor for defendants to enter global settlements in multidistrict litigation.  If subsequent state court proceedings can functionally interfere with or unsettle a completed settlement, years after all parties involved considered the claims to be concluded, it would have a chilling effect on future settlements and interfere with the ability of this Court and others to foster efficient global resolutions in complex multidistrict litigation.  Thus, the afore-mentioned authorities apply with equal if not greater force to protecting settlements of the type at issue here.

-15-

The question, then, is what threat, if any, the Missouri case poses to the PI and TPP settlements.  Merck emphasizes the practical risk of an adverse impact and articulates three threats to the MDL settlements.  First, Merck contends that "the compensatory-damages estimate proffered by plaintiffs indisputably includes the payments for Vioxx made by PI and TPP claimants," and by pursuing those funds Plaintiffs are seeking to recover for claims that have been settled and to make Merck pay twice for the same claims.  (Rec. Doc. 63770 at 2).  Second, Merck argues that if it is forced to pay money pursuant to a judgment to a Missouri Vioxx consumer for economic harm that was incurred all or in part by a TPP that actually paid for a portion of that consumer's Vioxx prescription, Merck may be forced in turn to proceed against those TPPs pursuant to the settlement indemnification obligations.  Third, Merck argues more broadly that if subsequent state court litigation can as a practical matter (through over-inclusive aggregate evidence of damages) recover for amounts attributable to individuals who released all claims in an MDL settlement, future settlements will be deterred and the jurisdiction and ability of future MDL courts to manage their complex cases will be threatened.

In response, Plaintiffs take a narrower view and argue that they are pursuing only individual, unreleased claims for violations of Missouri's consumer fraud law, on behalf of class members who did not participate in the MDL settlements.  They characterize Merck's motion as last-minute shenanigans to disrupt a trial that has been scheduled for over a year.  Essentially, Plaintiffs argue that there is no overlap at all between their case and any claims settled in the MDL settlements, and therefore no injunction is necessary to avoid any threat to this Court's jurisdiction.

Admittedly, Plaintiffs are not directly seeking to unseat any claims that have been resolved in the MDL.  Nor are Plaintiffs themselves expressly seeking to get paid twice for the

-16-

same claim; their class definition expressly excludes personal injury claimants, 99.9% of whom participated in the PI Settlement.  But as a practical matter, the manner in which Plaintiffs are attempting to prove their claims does encroach on the MDL settlements.  The available record suggests that Plaintiffs' expert calculates the recoverable value attributable to Vioxx and utilizes this value in determining the Plaintiffs' measure of damages by reference to the number of prescriptions issued in Missouri.  The Court is in no position to review the relevance or admissibility of that testimony as a matter of Missouri law.  But a subset of Missouri Vioxx prescriptions were issued to individuals who participated in the MI settlement and released all further claims against Merck, or were paid for by participants in the TPP settlement on behalf of Missouri consumers.  To the extent that Plaintiffs' evidence includes the recoverable value attributable to Vioxx consumed by PI plaintiffs or bargained for by TPP plaintiffs, the evidence could potentially (if accepted by a jury) result in a judgment against Merck that includes damages attributable to claims that Merck has already settled and paid in connection with the MDL settlements.  While this may not represent a double recovery for any particular *Plubell* class member, it would result in an impermissibly over-inclusive judgment and force Merck to account for or to pay twice on the same claims.  That is the friction at issue, and the Court concludes that it does threaten this Court's jurisdiction and ability to supervise these MDL settlements enough to warrant an injunction.

The state court has acknowledged the possibility of an over-inclusive judgment and stated that any such issue can be addressed "on the back-end" during a distribution process. (Merck's Supp. Exh. 1, Rec. Doc. 63759-1 at 18).  This recognizes the problem but does not solve it.  If a defendant settles claims in an MDL and later has a judgment entered against it based on testimony that includes amounts attributable to those settled claims, the value and

-17-

meaningfulness of the settlement has been depleted.  Later receiving "reverted" amounts that should never have been included in the first place is insufficient; the entry of judgment in a given amount can have business or public relations implications, and moreover the defendant could be required to pay attorneys' fees on the entirety of the judgment, including the settlement amount already paid.  It is imperative that parties in MDL litigation be able to settle claims with plaintiffs and to rely on the peace they have bought through arms-length negotiation.

Merck's argument regarding the complex legal relationship between TPPs and their beneficiaries is also well-taken.  Plaintiffs seek alleged economic losses for the Vioxx they purchased.  However, not all of the Vioxx purchased in Missouri was paid for entirely by consumers; TPPs paid for some, and therefore issues of subrogation and entitlement to recover for the economic injury are raised.  Plaintiffs' evidence seeks the whole alleged economic injury, without consideration of whether a TPP is entitled to assert some or all of the claim, or whether a TPP has settled that claim.  Thus, there is a meaningful risk under these circumstances that, absent an injunction, Merck would be required to pursue its indemnification rights against TPPs who are entitled to some of the damages reflected in the kind of judgment Plaintiffs are seeking, but who have already settled and released that claim.  That prospect of reopening what was thought by all involved to be finished would undercut the TPP settlement and interfere with this Court's flexibility and authority to keep the matter resolved.

And finally, the Court agrees that even state court suits like this, that do not directly or perhaps even deliberately seek to undercut MDL settlements, can still set a dangerous precedent.  Multidistrict litigation in the federal courts presents a unique opportunity to resolve large numbers of claims in an efficient and categorical manner.  Federal courts need and have the authority to enjoin state-court litigation that interferes with the ability to shepherd those

-18-

settlements.  Parallel state court litigation that nominally pursues separate claims but functionally would require Defendants to pay twice on the same claims would severely hinder the incentive to settle, to the detriment of all involved.  Thus, the "in aid of jurisdiction" exception to the Anti-Injunction Act is directly implicated.

The parties also debate whether principles of federalism and comity counsel for or against an injunction in this situation.  The Court finds that the proper balance between state and federal courts can be preserved by narrowly tailoring the injunction in this case.  The Court will not prohibit Plaintiffs from pursuing and proving their damages, if any, in state court; they will simply be enjoined from doing so in a manner that results in an overinclusive judgment by including purported damages attributable to claims that Merck has already settled.

## D.      Scope of the Injunction

The Court remains aware of its obligation to exercise the All Writs Act power "in a manner that minimizes the state judge's ability to supervise judicial proceedings in his own courtroom."  *In re Diet Drugs II*, 369 F.3d at 317.  Likewise, the Court is certain that "the state judge is capable and willing to enforce [the MDL settlements] without close and intrusive supervision" by this Court.  *See id.*  Accordingly, the Court enjoins Plaintiffs from offering any evidence that does not sufficiently exclude damages attributable to claims already settled through the PI and TPP settlements achieved in this MDL and from executing any judgment obtained through admission of such evidence.

## IV.     CONCLUSION

For the foregoing reasons, IT IS ORDERED that Plaintiffs and Plaintiffs' counsel in *Mary Plubell, et al. v. Merck*, pending in the Circuit Court of Jackson County, Missouri under Case Number 04CV235817-01, are enjoined from offering any evidence that does not

-19-

sufficiently exclude damages attributable to claims already settled through the PI and TPP

settlements achieved in this MDL and from executing any judgment obtained through admission

of such evidence.

New Orleans, Louisiana, this 23rd day of April, 2012.

_____
UNITED STATES DISTRICT JUDGE