# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| In re: VIOXX Products Liability Litigation | * | MDL No. 1657 |
| | * | |
| This Document Relates to: | * | SECTION L |
| | * | |
| State of Utah v. Merck, et al. | * | JUDGE ELDON E. FALLON |
| | * | |
| | * | MAGISTRATE JUDGE |
| | * | KNOWLES |
| | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## AMENDED COMPLAINT

Plaintiff, the State of Utah (hereinafter "Plaintiff" or "the State"), by and through its

Attorney General Mark L. Shurtleff, hereby files an amended complaint against Defendant

Merck & Co., Inc., (hereinafter "Defendant" or "Merck") and alleges as follows:

### JURISDICTION AND VENUE

1.      Jurisdiction over the subject matter of this cause of action is based upon the False

Claims Act, Title 26, Chapter 20 of the Utah Health Code, which provides remedies to redress

Defendant's actions under Utah Code Annotated § 26-20-1 et seq., eff. 5-10-07.

2.      Personal jurisdiction over this Defendant is proper under the Utah Long Arm

Statute as codified in §§ 78-27-22 and 78-27-24 of the Utah Code Annotated.

3.      Venue is proper in the Third Judicial District and Salt Lake County pursuant to

Utah Code Annotated § 78-13-7 in that many of the unlawful acts committed by Defendant were

committed in Salt Lake County, including the making of false claims under the Utah False

Claims Act to the State of Utah, including the Utah Medicaid Program.

## PARTIES

4.     Plaintiff is the State of Utah in its capacity as sovereign and on behalf of the Division of Health Care Financing within the Utah Department of Health, the single State agency administering the Utah Medicaid Program.

5.     Defendant Merck is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business in Whitehouse Station, New Jersey.  At all times relevant to this action, Merck was in the business of licensing, manufacturing, distributing, and/or selling, either directly or indirectly, through third parties or related entities, the prescription pharmaceutical Vioxx (hereinafter "the product" or "Vioxx").  At all times relevant to this action, Merck did business within the State of Utah by marketing and selling Vioxx within the State to both the State and its agencies and to the general public.

## CLAIMS ASSERTED BY THE STATE OF UTAH

6.     As set forth throughout this Complaint, Merck made omissions and misrepresentations to the Food and Drug Administration ("FDA") at the time of submission of Vioxx to the FDA for approval.

7.     The purpose of these omissions and misrepresentations were to obtain approval of the drug for sale within the United States and Utah.  Merck knew or in the exercise of reasonable care should have known prior to the approval of the drug of the significant dangers of Vioxx to patients who took the drug.

8.     But for the false claims, omissions and misrepresentations made by Merck, the FDA would never have approved Vioxx.  Upon approval, the following events occurred to cause harm Utah Medicaid:

a)  Utah Medicaid was required to pay for Vioxx prescriptions after it negotiated a rebate agreement with the Center for Medicaid & Medicare Services (CMS);

b)  Utah physicians prescribed Vioxx to Utah Medicaid patients;

c)  Utah Medicaid patients took Vioxx as prescribed by their physicians;

d)  Utah was forced to pay for the cost of Vioxx and the costs of additional, consequential medical care required to treat Utah Medicaid patients harmed by Vioxx as a result of Merck's submission of false claims, omissions, and misrepresentations relating to the approval and sale of Vioxx;

e)  Utah Medicaid paid approximately five million dollars ($5,000,000) in pharmacy drug claims for Utah Medicaid patients prescribed Vioxx by Utah physicians;

f)  Vioxx and the additional, consequential medical care made necessary by the harm Vioxx caused to Utah Medicaid patients have proved extremely expensive for the Utah Medicaid program;

g)  As a consequence of the use of Vioxx, an unsafe drug proved to cause cardiovascular disease and acute cardiovascular events, Utah Medicaid patients suffered the following cardiovascular diseases: hypertension, acute myocardial infarction (MI), acute ischemic heart disease, unstable angina, angina, pulmonary embolism, pulmonary edema, heart failure, occlusion of cerebral arteries, and occlusion of precerebral arteries;

h)   Paying for the consequential medical care made necessary by the above cardiovascular diseases and events suffered by Utah Medicaid patients as a result of the use of Vioxx, has cost Utah Medicaid in excess of fifty million dollars ($50,000,000); and

i)   All the additional, consequential costs incurred by Utah Medicaid to treat Utah Medicaid patients for the above cardiovascular diseases and events caused by Vioxx are the direct consequence of the false claims, omissions and misrepresentation made by Merck relating to the approval and sale of Vioxx, which allowed the approval, prescription and use of Vioxx.

9.   After the FDA approved Vioxx, Merck undertook post-approval studies by which Merck knew or should have known of the significant dangers in the Vioxx safety profile, yet Merck failed properly to report the results of these studies.

10.   Merck also made false statements in response to federal and state inquiries as to the safety and efficacy profile of Vioxx.  The purpose of these false statements was to induce the medical world (including Utah) into continuing to prescribe Vioxx.  The false statements constitute false claims and inducement to submit false claims.

11.   Merck made these pre-approval and post-approval omissions and misrepresentations to either submit a false claim or cause others including doctors and pharmacists to submit false claims to among many others, Utah Medicaid for the purpose of inducing the use of Vioxx.

12.     As a result of the submission of false claims, Utah Medicaid paid for Vioxx that should not have been reimbursed.  Utah Medicaid also paid for and will pay for the costs of Medicaid recipients that took the drug.

13.     Due to the foregoing, the State of Utah submits the following claims, which are the only claims, asserted by the State of Utah.  They are asserted only under state law.  The State specifically pleads that it is only asserting claims belonging to the State as a result of the expenditure of State funds or claims belonging to the State.  The State specifically denies that it is litigating in parens patriae on behalf of any Utah Medicaid recipient or any other citizen of Utah.  Further, the State specifically denies that any claim asserted in this complaint is brought under or pursuant to any federal statute or common law.

    a.   The State asserts claims on behalf of the Utah Medicaid program arising out of "agreements, combination or conspiracy" between Merck, its agents and employees designed to defraud the State by obtaining or aiding another to obtain the payment or allowance of a "false, fictitious, or fraudulent claim for a medical benefit."  Utah Code Annotated 26-20-6;

    b.  The State claims damages to the Utah Medicaid program arising out of claims which were presented or caused to be presented to the State for medical benefits which were "wholly or partially false, fictitious or fraudulent."  Utah Code Annotated 26-20-7(1)(a);

    c.  The State claims damages arising out of claims which were presented or caused to be presented for medical benefits which misrepresent the qualities (safety and efficacy) of the pharmaceutical Vioxx.  Utah Code Annotated 26-20-7(1)(c);

d.  The State claims damages for the prescription of Vioxx to Medicaid recipients which Merck and its employee "knew" to be "not medically necessary in accordance with professionally recognized standards." Utah Code Annotated 26-20-7(1)(e). (Knowledge by Merck or its employees means that Merck or its employees had actual knowledge, deliberate ignorance or reckless disregard of the truth or falsity of the information. This "knowledge" does not require a specific intent to deceive. Utah Code Annotated 26-20-9.5 (1)(a));

e.  The State claims damages arising out of any effort by Merck or its employees to "falsify or alter with intent to deceive any report or document required by state or federal law, rule or Medicaid provider agreement." Utah Code Annotated 26-20-7(2)(c). The State claims damages herein arising from deception practiced upon the State either directly or through the deception of practitioners submitting or causing to submit claims for Vioxx to Utah Medicaid including but not limited to false labeling of Vioxx prescriptions found on every Vioxx prescription in the State. The State specifically declines to assert claims that the federal government or any other entity may have through the submission of deceptive documents to the federal or state governments;

f.  The State claims damages arising out of Merck's retention of Utah Medicaid's payment for Vioxx which was unlawful as set forth above. Utah Code Annotated 26-20-7(2)(d);

g.  The State claims damages arising out of Merck's aiding and abetting the actions set forth above. Utah Code Annotated 26-20-7(2)(d);

h.   The damages and penalties arising out of these violations are only those allowed under Utah Code Annotated 26-20-9.5(2);

i.   The State of Utah claims and asserts that the current version of the Utah False Claims Act applies to this Amended Complaint.  However, to the extent that any Court should determine that the prior version of the Utah False Claims Act (as set forth prior to the 2007 amendments to the Utah False Claims Act) applies to one or more parts of this Amended Complaint, then the State alternatively (in part or in full) seeks relief under the prior version(s) of the Utah False Claims Act, including but not necessarily limited to, the following:

1)   The State claims damages to the Utah Medicaid program arising out of claims which were presented or caused to be presented to the State for medical benefits which Merck knew to be wholly or partially "false, fictitious or fraudulent." Former Utah Code Annotated 26-20-7(1) (eff. prior to May 10, 2007)[1];

2)   The State claims damages arising out of claims which were presented or caused to be presented for medical benefits by which Merck knowingly misrepresented the qualities (safety and efficacy) of the pharmaceutical Vioxx.  Former Utah Code Annotated 26-20-7(2)(b);

3)   The State claims damages for the prescription of Vioxx to Medicaid recipients which Merck and its employee knowingly filed a claim for which Merck knew

---

[1] For reference sake, the prior version of the Utah False Claims Act is attached to this Complaint in its entirety, as Exhibit A.

to be "not medically necessary in accordance with professionally recognized standards."  Former Utah Code Annotated 26-20-7(2)(d);

4) The State claims damages arising out of any effort by Merck or its employees to knowingly "falsify or alter with intent to deceive by any report or document required by state or federal law, rule or Medicaid provider agreement." Former Utah Code Annotated 26-20-7(2)(j);

5) The State claims damages arising out of Merck knowingly retaining Utah Medicaid's payment for Vioxx which was unlawful as set forth above. Former Utah Code Annotated 26-20-7(2)(k);

6) Any claim under a corresponding provision of a prior version of the Utah False Claims Act invoked elsewhere in this paragraph 13 or elsewhere in this Complaint.

j.   The State of Utah is entitled to common law damages arising out of the negligent conduct of Merck in developing, selling, promoting or advertising Vioxx for sale to the general public. This negligence claim is specifically and totally limited to damages to Utah Medicaid; and

k.   The State further claims any and all consequential damages related to the above, including but not limited to, Utah Medicaid's payments for Vioxx and Utah Medicaid's payment for the medical care, treatment and monitoring of Utah Medicaid patients who suffered cardiovascular diseases and events caused by the wrongful prescription and use of Vioxx as the direct consequence of the false claims,

ommissions and misrepresenataion made by Merck relating to the approval and sale of Vioxx.

## BACKGROUND

14.    Vioxx is the brand name of rofecoxib, a nonsteroidal anti-inflammatory drug ("NSAID") used in the treatment of arthritis and other acute pain.

15.    At all times relevant herein, Merck tested, marketed, distributed, promoted and sold Vioxx.

16.    NSAIDs, such as aspirin, ibuprofen, and naproxen, function by inhibiting two enzymes: cyclooxygenase-1 ("COX-1"), which is associated with the maintenance of gastrointestinal ("GI") mucus and platelet aggregation, and cyclooxygenase-2 ("COX-2"), which is associated with the response to pain and inflammation.

17.    Because Vioxx was designed to suppress COX-2 without affecting COX-1, Merck marketed Vioxx as possessing the beneficial effects of traditional NSAIDs, but without the harmful GI side effects associated with those drugs.  Merck addressed the safety profile, sales, and commercial prospects of the drug in press releases, public statements, and marketing materials.  Merck made these representations to the general public, health care providers and Utah Medicaid.

18.    Prior to the FDA's approval of Vioxx, officials at Merck were aware that Vioxx could cause harmful cardiovascular events, such as heart attacks.  In 1998, an unpublished internal Merck clinical trial entitled Study 090 revealed that Vioxx caused a greater incidence of cardiovascular events than a placebo or a different arthritis drug.  This information, although called for under federal statute and regulation, was never disclosed to the FDA.  It was also

necessary to fully disclose these risks to Utah Medicaid to fully comply with the Utah False Claims Act.

19.     In January 1999, Merck commenced the Vioxx Gastrointestinal Outcomes Research ("VIGOR") study, which compared Vioxx to naproxen.  Although the study purported to show that Vioxx had a GI safety profile superior to that of naproxen, it also showed that Vioxx users had a higher incidence of cardiovascular events than naproxen users.  Merck had the responsibility under federal and state law to make full and fair disclosure of these risks but failed to file the required documentation.

20.     In January 1999, before the approval and launch of Vioxx, Merck's marketing division conceived the ADVANTAGE clinical trial.  Physician-investigators, participants, and institutional review board members were told that the purpose of the ADVANTAGE trial was to measure the gastrointestinal safety of Vioxx.

21.     Merck's actual goal for ADVANTAGE appears to have been for investigators to gain experience with Vioxx prior to and during the critical launch phase.  It was also an attempt to avoid disclosure of Vioxx's poor safety and efficacy profile.

22.     Merck began marketing Vioxx in May of 1999 with a deceptive promotional campaign directed at consumers and health care professionals.  This campaign included an effort to obtain approval for both public and private drug plans or formularies across the United States.  Again, Merck made false statements either through affirmative representations or omissions of material fact.

23.     On May 21, 1999, Merck issued a press release that announced that the United States Food and Drug Administration (FDA) had approved Vioxx for the relief of osteoarthritis

pain, menstrual pain, and other forms of acute pain. The press release included a list of common side effects, but did not include reference to cardiovascular side effects. By not including accurate risk information on cardiovascular side effects, Merck made false statements either through affirmative representations or omissions of material fact.

24.     Merck was aware of the dangerous cardiovascular side effects associated with Vioxx through internal studies including Study 090. The results of Study 090 were not disclosed to the FDA or the public at the time of the product launch. Study 090 concluded that Vioxx users were six times more likely to suffer severe cardiovascular events than non- Vioxx users. Merck had the responsibility under federal and Utah State law to make full and fair disclosure but again failed to file the required documentation.

25.     In a March 9, 2000 email, Edward Scolnick, then President of Merck Research Laboratories, acknowledged the existence of cardiovascular events, commenting, "it is a shame but it is a low incidence and it is mechanism based as we worried it was." Merck had the responsibility under federal and state law to make full and fair disclosure but again failed to file the required documentation.

26.     In a press release on March 27, 2000, Merck emphasized its claim that Vioxx had a superior GI safety profile explaining away the results of the VIGOR study:

> "[S]ignificantly fewer thromboembolic events were observed in patients taking naproxen in this GI outcomes study which is consistent with naproxen's ability to block platelet aggregation. This effect on these events had not been observed previously in any critical studies for naproxen. Vioxx, like all COX02 selective medicines, does not block platelet aggregation and therefore would not be expected to have similar effects." –Merck Press Release Dated March 27, 2000

> and

"[a]n extensive review of safety data from all other completed and ongoing clinical trials, as well as the post-marketing experience with Vioxx, showed no indication of a difference in the incidence of thromboembolic events between Vioxx, placebo and comparator NSAIDs." – Merck Press Release Dated March 27, 2000

27.     This press release was an intentional public misrepresentation of Vioxx's safety and efficacy profile. (When "public" is used in this complaint it means broadly disseminated, including in Utah.)

28.     The VIGOR study results were reported in the press, and in medical journals, and in marketing materials distributed by Merck.  To the extent that VIGOR results showed cardiovascular events could be a side effect of Vioxx, Merck undertook an effort to explain the results by attributing the findings to the beneficial effects of naproxen's blocking of platelet aggregation rather than to Vioxx as a cause of increased thromboembolic events.  Through other tests, studies and trials, Merck knew that Vioxx caused such an increase in thromboembolic events.  Again, Merck publicly made false statements either through affirmative representations or omissions of material fact.

29.     On February 8, 2001, the FDA's Arthritis Advisory Committee ("AAC") held a public hearing to consider Merck's request to include the positive GI results from the VIGOR study in its Vioxx labeling.  During the AAC hearing, Alise Reicin, Executive Director of Clinical Research at Merck Research Laboratories, explained to the panel, "when you review the results of VIGOR in isolation you don't know whether the imbalance of cardiovascular events was caused by a decrease in events on a COX-2 selective inhibitor."  She said that naproxen was likely responsible for the difference in cardiovascular events observed in users of the two drugs. This statement was false and misleading.  Merck had the responsibility under federal and state

law to make full and fair disclosure but again failed to file the required documentation or correct this false and misleading statement.

30.     Additional press releases were issued by Merck in order to further promote and market Vioxx. None of the press releases referenced the adverse cardiovascular events that Merck knew of or made reference to internal Study 090. Again, Merck publicly made false statements either through affirmative representations or omissions of material fact.

31.     When promoting Vioxx directly to consumers and health care professionals, Merck materially misrepresented the cardiovascular safety of Vioxx.

32.     Merck also publicly misstated, overstated or exaggerated the efficacy of Vioxx in comparison to similar medications.

33.     Merck utilized internal studies, including but not limited to the VIGOR and ADVANTAGE studies, to further promote and support its representations made in regard to Vioxx.

34.     The ADVANTAGE study was designed to appear as if it answered scientific questions, but was instead designed by the marketing division to fulfill marketing objectives.

35.     Merck also created or published scholarly articles under fake or ghost authors in order to develop support for Vioxx. These articles appeared in medical journals and other industry publications including the Journal of the American Medical Association.

36.     Merck's public representations that Vioxx was a safer alternative to traditional NSAIDs was false in that Vioxx also posed a risk of ulcers and gastrointestinal side effects and produced a high rate of cardiovascular events including heart attacks and strokes.

37.     For over five years Merck continued to market and promote Vioxx within the State of Utah without adequately disclosing the dangerous side effects and true comparative safety profile.

38.     For the entire period of time Vioxx was on the market, Merck's advertisements and promotional activities misrepresented Vioxx's cardiovascular safety and failed to include information then known to Merck.

39.     All practices, acts, and omissions alleged herein were committed by Merck's officers, directors, employees, or agents who at all times acted on behalf of Merck and whose practices, acts, or omissions were authorized or ratified by Merck.

40.     All practices, acts, and omissions alleged herein were committed within the applicable statute of limitations.

## FACTUAL ALLEGATIONS

41.     Merck announced that it was developing a COX-2 specific inhibitor in May 1996. At the time it began advance promotion of the drug, Merck faced patent expirations on some of its successful drugs – including Mevacor, Pepcid, and Prilosec – that had represented more than $4 Billion in U.S. drug sales.  Moreover, financial analysts asserted that Merck could only resolve its financial problems by merging with another pharmaceutical company.  *See* Robert Langreth, *Merck's Health Hinges on Sales of Arthritis Pill,* WALL STREET HOURNAL at B1 (April 14, 1999).  In sum, Merck was in need of a "blockbuster" drug to offset the loss of revenue streams due to patent expirations.  *See* Gloria Lau, *Merck Promises to Remain Healthy Even as Blockbuster Patents Expire,* INVESTOR'S BUSINESS DAILY at 1 (Nov. 16, 2000).

42.     Merck faced a significant competitive threat from Monsanto and Pfizer that together were developing another COX-2 inhibitor, Celebrex. *See* Gardiner Harris, *The Cure: With Big Drugs Dying, Merck Didn't Merge – It Found New Ones,* WALL STREET JOURNAL (Jan. 10, 2001). Celebrex was to go to market months ahead of Vioxx. Merck understood the position it faced. If it could not bring Vioxx to market, Merck's future would have taken a different course: "If those first two [Vioxx] compounds had failed . . . we would be a very different company." *Id.,* (quoting Dr. Edward Scolnick, then president of Merck Research Laboratories).

43.     Understanding the competitive environment for NSAIDs, and knowing that a competitor was developing a COX-2 inhibitor for release ahead of Vioxx, Merck knew that to succeed in gaining market share from competitors, it had to demonstrate a GI safety profile superior to that of competing NSAIDs – including, Celebrex.

44.     Years before approval of the drug, Merck met with the U.S. Food and Drug Administration ("FDA") officials to determine what types of studies would be necessary to demonstrate that Vioxx possessed the safety benefits that Merck claimed. Senior FDA representatives advised Merck that in order to get the label it wanted Merck would have to demonstrate the safety of the drug compared to a placebo, in a large-scale outcomes trial.

45.     Merck made omissions and misrepresentations to the FDA during this submission process to obtain approval of Vioxx for sale within the United States and Utah. Merck knew or in the exercise of reasonable care should have known prior to the approval of the drug of the significant dangers of Vioxx to patients who took the drug.

46.     When the Company planned the large-scale outcomes trial the FDA requested, it realized that such a study would reveal problems with Vioxx. First, when leading experts consulted by Merck concerning the study suggested that the Company compare the safety of Vioxx to Tylenol (acetaminophen) – owing to Tylenol's placebo-like safety perception – Company representatives objected. In particular, two Merck executives "questioned the advisability of an acetaminophen arm, because the findings could highlight the favorable properties of acetaminophen." (COX-2 Inhibitor Consultants' Meeting Minutes (Sept. 28, 1996)). The Company rejected the consultant's recommendation to compare Vioxx to Tylenol in such a trial. (MK-0966 Consultants' Meeting Minutes (Nov. 4, 1996)).

47.     Merck knew that, due to the drugs inhibition of COX-2 but not COX-1, use of Vioxx would result in increased platelet aggregation and thus increased rates of heart attacks and strokes. As one Merck researcher warned: "without COX-1 inhibition you will get more thrombotic events and kill drug [sic]." Moreover, it was clear to researchers that the desired superior GI safety profile would be impossible to demonstrate in Merck's target patient group for Vioxx – arthritis sufferers. Because of their age and accepted medical practice, many potential Vioxx users would also be taking aspirin to reduce the risk of suffering cardiac events. Aspirin, however, has GI side-effects. Although permitting low-dose aspirin ("ASA") use for arthritis sufferers participating in the trial would help to reduce the cardiovascular events caused by Vioxx, it would impact the alleged GI-superiority of the drug because any purported GI benefit of Vioxx would be offset by aspirin use. Merck's Dr. Alise Reicin opined:

> This is a no win situation! The relative risk of [adverse GI event with]
> Even low dose aspirin may be as high as 2-4 fold. Yet, the possibility of
> Increased CV [cardiovascular] events is of great concern (I just can't wait to
> Be the one to present those results to senior management!). What about the

> Idea of excluding high risk CV patients – ie those that have already had an
> MI, CABG, PTCA?  This may decrease the CV event rate so that a
> Difference between the two groups would not be evident.  The only problem
> Would be – Would we be able to recruit any patients?

Merck determined that the safest course was to avoid conducting the outcomes trial.  *See*
Proposal to Generate G.I. Outcomes Data on Vioxx (June 12, 1998) (indicating that the G.I.
Outcomes study had been cancelled in 1997).

48.     This posed problems for Merck since it would have been difficult to penetrate the
market if doctors and patients believed that by choosing Vioxx, they were forgoing a potential
heart benefit.

49.     A November 21, 1996 memo by a Merck official shows that the company wanted
to conduct a trial to prove Vioxx was gentler on the stomach than older painkillers.  To show the
difference most clearly, the Vioxx patients were not allowed to take aspirin.  In such a trial,
"there is a substantial chance that significantly higher rates of cardiovascular problems would be
seen in the Vioxx group," according to the memo.

50.     A similar view was expressed in a February 25, 1997 e-mail by a Merck official,
Briggs Morrison.  He opined that unless patients in the Vioxx group also got aspirin, "you will
get more thrombotic events: - that is, blood clots – "and kill [the] drug."

51.     In response, Dr. Alise Reicin, now a Merck vice president for clinical research,
said in an e-mail that the company was in a "no-win situation."  Giving study subjects both
Vioxx and aspirin, she wrote, could increase the "relative risk," apparently referring to
gastrointestinal problems.  But, she added, "the possibility of increased CV [cardiovascular]
events is of great concern."

52.    As a solution to this conundrum, Dr. Reicin proposed that people with high risk of cardiovascular problems be kept out of the study so the difference in the rate of cardiovascular problems between the Vioxx patients and the others would not be evident.  A subsequent May 25, 2000 internal company e-mail from the Marketing department thanked Reicin for helping to "defuse the CV risk for Vioxx" in the public domain.

53.    Despite Merck's knowledge of the dangers of Vioxx, on December 9, 1998, at Merck's annual analyst meeting, Dr. Edward M. Scolnick stated:  "Short-term, high dose, long-term low dose, it's a wonderful thing . . . Vioxx has lived up to our highest expectations." According to Scolnick, in one major trial, Vioxx's safety profile showed "'statistical equivalence' to placebo."  He further stated that "Merck has 'extensive data' documenting VIOXX's effectiveness in treating pain in different populations."  These statements were false, misleading and public.

54.    Despite Merck's actual knowledge that Vioxx posed serious cardiovascular risks, Merck made a business decision to disseminate false and misleading information on these risks and engaged in a marketing campaign highlighting the claimed improvements in gastrointestinal safety.  This decision was made, knowing that it would be difficult for Vioxx to penetrate the market if doctors knew that, by prescribing Vioxx, they were exposing their patients to cardiovascular risks or foregoing the heart benefit offered by some other NSAIDs.

55.    From 1996 through 1998, Merck issued public statements that promoted the efficacy and gastrointestinal safety of Vioxx.  None of these statements mentioned cardiovascular safety issues or revealed the "mechanism based" problems with Vioxx.  Merck repeatedly denied any link between Vioxx and increased cardiovascular risk and claimed results

with Vioxx were consistent with the clot-preventing effects of naproxen. These representations were false, misleading, and public.

56.    On November 23, 1998, Merck submitted a New Drug Application for Vioxx to the FDA. The FDA, by its Arthritis Drugs Advisory Committee ("the Advisory Committee") granted expedited review of Merck's Vioxx application. This submission was a violation of the Utah False Claims Act, including Utah Code Annotated 26-20-7(2)(c) because it contained representations that were false, misleading, and public.

57.    The Advisory Committee reviewed the VIGOR gastrointestinal safety results, but did not review cardiovascular safety issues. The reason for this was that Merck was not seeking marketing approval related to cardiovascular safety and had not yet published the VIGOR cardiovascular results.

58.    On April 20, 1999, the Advisory Committee recommended approval of Vioxx for the treatment of osteoarthritis pain and acute pain but, in light of Merck's declining to substantiate claims of gastrointestinal superiority, ordered that Vioxx's package insert bear the same gastrointestinal warnings as other NSAIDs.

59.    On May 21, 1999, the FDA accepted the Advisory Committee's recommendations and approved Vioxx for the relief of osteoarthritis pain, for the management of acute pain in adults, and for the treatment of pain associated with primary dysmenorrhea. Merck knew or should have known that this approval was based on the false, misleading and public information provided by Merck. Merck knew or should have known that Vioxx was not safe and effective and would never have been approved for sale by the FDA but for Merck's false representations.

60.     Merck would not have obtained FDA approval but for its omissions and misrepresentations.  Upon such approval, Utah Medicaid was required to pay for prescriptions of Vioxx consistent with negotiations of a rebate for the drug with CMS.

## I.     Merck Introduces Vioxx Through the Largest Direct-to-Consumer Advertising Campaign in History—While Misrepresenting its Risks

### A.  Merck's Early Marketing Was False, Misleading and Public Regarding the Known Cardiovascular Risks of Vioxx

61.      Before it received FDA approval to market Vioxx, Merck engaged in a pre-release marketing campaign to bolster consumer interest and orders.

62.     Merck's pre-release marketing campaign conveyed the message that Vioxx provided safe and effective pain relief, while omitting any mention of cardiovascular risks.

63.     Merck's pre-release marketing campaign showed positive results.  Sales projections for Vioxx based on early orders and inquiries surpassed $2 Billion per year.  *Merck based this calculation on a proposed wholesale price of $2.02 per tablet – about one hundred times the cost of a generic aspirin.*

64.     In June 1999, Merck released Vioxx for sale in the U.S.  This release was accompanied by the largest direct-to-consumer marketing campaign in history.  Merck's Vioxx marketing message was that Vioxx provided safe and effective pain relief, while omitting any mention of cardiovascular risk known to Merck.  Merck was the first pharmaceutical company to run a full-length television spot that included both brand name and indication.  The drug's tagline was:  "Vioxx.  For everyday victories."  Merck did not warn of potentially serious cardiovascular complications in these commercials.  The commercials were false and misleading and intended to sell Vioxx to the American public including Utah Medicaid recipients.

65.     Vioxx sales were aided by Merck's marketing budget and marketing plans, by the fact that Merck had a staff that made false and misleading representations about any damaging disclosures regarding Vioxx and by delaying release of the cardiovascular results of the VIGOR trial.

66.     Merck also issued a number of false and misleading press releases concerning the safety of Vioxx including a March 27, 2000 press release that stated, "[a]n extensive review of safety data from all other completed and ongoing clinical trials, as well as the post-marketing experience with Vioxx, showed no indication of a difference in the incidence of thromboembolic event between Vioxx, placebo and comparator NSAIDs."

67.     In April 2000, Merck responded to news reports that Vioxx posed serious cardiovascular risks by denying that any such risks existed: "Extensive review of data from the completed osteoarthritis trial and on-going clinical trials with Vioxx . . . have shown *no difference* in the incidence of cardiovascular events, such as heart attack, among patients taking Vioxx . . ." (emphasis in original).  This statement was false, misleading, and public.

68.     A May 3, 2000 Pharma Market letter stated that "in a statement, Merck said that 'in response to speculative news reports . . . it confirms the favorable cardiovascular profile of Vioxx'" and that a review of the data shows "no difference in the incidence of cardiovascular events . . . among patients taking Vioxx, other NSAIDs and placebo."  This statement was false, misleading, and public.

69.     During a July 24, 2000 conference call with analysts, Merck's Senior Director of Investor Relations stated: "[T]he Vioxx launch continues to meet the very robust expectations that we've had for the product.  We continue to be extremely pleased with this uptake in the

marketplace in countries throughout the world.  We're extremely pleased with the acceptance by

physicians, patients and payors, and we are very bullish on the product's future growth and

prospects."

70.     Merck spent more than $161 million dollars on direct-to-consumer marketing in

2000 to disseminate this message, and more than $100 million in each of the following four

years.  In the year 2001, Vioxx was the most heavily advertised drug to consumers in the United

States.  The representations in this advertising were false, misleading and public.

71.     Merck increased public demand for the drug by telling physicians and consumers

of the purported superior safety profile of Vioxx.  Merck aggressively promoted Vioxx to health

professionals and consumers.  Within days of receiving marketing approval, Merck was able to

mobilize more than 4,500 sales representatives to detail Vioxx to physicians.  It also launched

advertisements aimed at consumer demand.  Specifically, Merck disseminated materials to Utah

Medicaid, consumers and physicians:

- Claiming that Vioxx is safe and effective, and allows patients to lead
  more fulfilling lives, while making no mention of cardiovascular risk.

- Touting the strength and safety of Vioxx while failing to either warn or
  caution physicians regarding cardiovascular risks incidental to the
  mechanism of the drug.

72.     A typical Vioxx advertisement which was designed to create consumer demand

and awareness is attached hereto as Exhibit B.  This advertisement failed to disclose

cardiovascular risks and failed to disclose that Vioxx is not more effective than far less

expensive NSAIDs.  They also indicated that Vioxx is a superior treatment in only a small

percentage of patients who are at great risk from gastrointestinal side effects of NSAIDs.  A

recent study found that as a result of this type of marketing, 63% of the growth of COX-2

inhibitors occurred in patients who were at little risk of suffering gastrointestinal bleeding from NSAIDs.  Such representations were not a balanced discussion of the safety and efficacy of Vioxx and were thus false claims and led to the submission of false claims under the Utah False Claims Act, including Utah Code Annotated 26-20-7(1)(a).

73.     Attached as Exhibit C is another example of the marketing campaign designed to create demand for Vioxx that fails to disclose cardiovascular risk known to Merck and the lack of need for Vioxx for most patients.  Such representations were not a balanced discussion of the safety and efficacy of Vioxx and were thus false claims and led to the submission of false claims under the Utah False Claims Act.

74.     Merck advertising appealed to consumers to ask their doctors about Vioxx.

75.     Merck "reconfirmed the favorable cardiovascular safety profile of VIOXX" in a May 28, 2001 press release and in a similar press release on June 13, 2001.  These press releases violated the Utah False Claims Act because they were false and misleading.

76.     By July 2001, Merck announced it had added "1,000 more voices describing the product's benefits to the marketplace and clearly that's helping to continue to fuel the growth." A Merck sales representative later stated on a November 14, 2004 broadcast of *60 Minutes* that Merck trained these sales representatives to lie.

77.     Industry analysts predicted that Vioxx sales would exceed $1 billion in its first year on the market.

78.     Merck told consumers, the medical community, and third-party payors that Vioxx was safer than its alternatives even though the FDA never approved a label supporting these

claims.  (Dec. 16, 1999 Warning Letter from FDA to Merck concerning misrepresentation of safety information for Vioxx).

79.     Two months after it approved Vioxx, the FDA warned Merck to desist from using advertising that "in its entirety" made misrepresentations about Vioxx and failed to provide adequate information about side effects.  Merck violated the Utah False Claims Act, including Utah Code Annotated 26-20-7(1)(a) and (c), with this false and misleading advertising.

80.     Merck concealed Vioxx's cardiovascular safety risks through a marketing campaign and falsely represented its safety profile, all while Merck refused to fund independent studies of Vioxx's cardiovascular safety.  Merck violated the Utah False Claims Act by failing to disclose Vioxx's safety risks on every Vioxx product label.

81.     Merck knew that Vioxx's cardiovascular risks were particularly relevant to consumers who use prescription arthritis pain relievers.  Merck also knew that publicizing the cardiovascular risks associated with Vioxx would reduce Vioxx prescriptions and sales that could lead to necessary price reductions.

82.     The State of Utah and the public were harmed by this false and misleading advertising and promotion.  Vioxx costs eight times more than other NSAIDs that were as effective in alleviating arthritis pain and inflammation.  Specifically, a 30-day supply of Vioxx had a wholesale cost of $72.00, whereas competing NSAIDs had a wholesale cost of $9.00 or less for a 30-day supply.

83.     In light of the existing cost disadvantage of Vioxx, Merck authored studies designed to demonstrate that Vioxx was more cost-effective than other NSAIDs due to the latter's GI toxicity.  Merck provided Utah Medicaid, with summaries of clinical studies designed

to demonstrate Vioxx's safety and efficacy that also asserted the increased cost of Vioxx would be more than offset by the **decreased expenses** in treating negative GI side-effects associated with traditional NSAIDs. These costs savings did not result in part due to higher costs for treatment of cardiovascular injuries directly attributable to Vioxx.

84.     The purpose of these misrepresentations and omissions was to cause others, including doctors and pharmacists, to submit false claims to Utah Medicaid.

85.     The State's Medicaid program incurred a large expense to pay for Vioxx, which the FDA should never have approved, and to treat its participant's Vioxx related cardiovascular health problems,  for which the State seeks recovery from Merck.

86.     Merck failed to provide Utah Medicaid and Utah doctors any materials that truthfully discussed Vioxx's cardiovascular health risks.

B.     The FDA Admonishes Merck for its "False and Misleading" Advertising

87.     Merck's false and misleading Vioxx marketing campaign prompted the FDA to issue several warning letters to Merck between 1999 and 2001.  Merck's false and misleading literature violated the Utah False Claims Act, including Utah Code Annotated 26-20-7(1)(a), (c) and (e).

88.     On July 16, 1999, the FDA's Division of Drug Marketing, Advertising, and Communications ("DDMAC") issued a letter to Merck warning that its advertisements failed to provide adequate risk information.  DDMAC informed Merck that certain Vioxx promotional materials were "lacking in fair balance or otherwise misleading."  For example, DDMAC stated that Merck's DTC print ad for Vioxx which appeared in the July 7, 1999 issue of the *El Nuevo Dia*, failed, *inter alia,* "to include risk information" or to provide "necessary information related

to side effects, contraindications, and effectiveness." DDMAC concluded that the materials violated the FDCA and its implementing regulations, and it urged Merck immediately to cease these representations.

89.     On December 16, 1999, DDMAC issued another letter to Merck stating that its promotional pieces entitled, "TEN REASONS WHY VIOXX IS BETTER THAN CELEBREX" and "Vioxx vs. Celebrex Poem," were "false or misleading because they contain misrepresentations of Vioxx's safety profile, unsubstantiated comparative claims, and are lacking in fair balance." For example, DDMAC observed that Merck's claim that Vioxx is safer than placebo in the incident rate of gastroduodenal ulecers "is in direct contrast with the approved product labeling (PL)" which showed that there was an increased risk of ulcers with Vioxx as compared to placebo. DDMAC "object[ed] to this claim because it minimized the GI warning associated with Vioxx and is inconsistent with the data in the PL."

90.     With respect to Merck's "TEN REASONS WHY VIOXX IS BETTER THAN CELEBREX," DDMAC noted several unsubstantiated and "misleading" comparative claims of Vioxx with Celebrex, including the assertion that Vioxx was more effective and safer than Celebrex, even though "such has not been demonstrated by substantial evidence."

91.     The December 16, 1999 the DDMAC letter noted that Merck's promotional materials failed to include a "fair balance with respect to the content and presentation of risk information related to the use of Vioxx." DDMAC categorically stated that, in these materials, Merck had "not presented any risk information concerning the contraindications, warnings, precautions, or adverse events associated with Vioxx's use."

92.     In summary, within seven months of Vioxx's release on the market, the FDA

found that Merck engaged in "false and misleading" promotional activities.  (Dec. 16, 1999

Letter from FDA to E. Westrick.)  The FDA also found that Merck was (i) misrepresenting the

"safety profile of Vioxx" through its claim that it was "safer than a placebo" and (ii)

misrepresenting the efficacy of the drug through "unsubstantiated" comparisons to Celebrex and

other NSAIDs.  *Id.*  Additionally, the FDA found that Merck minimized "the GI warning

associated with Vioxx and [to be] inconsistent with the data in the [product labeling]."  *Id.*

93.     Merck made these claims even though it knew as early as 1996 that due to the

mechanism by which the drug inhibited COX-2 but not COX-1, use of Vioxx could result in

increased platelet aggregation (blood clotting) and thus increase rates of heart attacks and

strokes.  Further, in smaller, pre-VIGOR trials conducted between July 1995 and February 1998,

Merck found that Vioxx increased the risk of cardiovascular events.  Merck's false and

misleading written responses to the FDA violated the Utah False Claims Act.

94.     On September 17, 2001, DDMAC issued a "WARNING LETTER" ("2001

Warning Letter") to Raymond Gilmartin, President and CEO of Merck, demanding that Merck

correct false and misleading statements made in the course of its Vioxx promotional campaign.

The 2001 Warning Letter cited Dr. Peter Holt, a physician hired by Merck to promote Vioxx,

promotional audio conferences, a press release, and oral representations made by Merck's sales

representatives to promote Vioxx.  DDMAC stated that it had "reviewed [Merck's] promotional

activities and materials and has concluded that they are false, lacking in fair balance, or

otherwise misleading" in violation of the FDCA and applicable regulations.  The 2001 Warning

Letter noted that Merck minimized the cardiovascular findings observed in the VIGOR study,

failed to present significant risks associated with Vioxx and made several unsubstantiated superiority claims with regard to other NSAIDs.

95.     The 2001 Warning Letter cited misrepresentations concerned Merck's failure to apprise the public of Vioxx's danger of heart attacks.  DDMAC charged as follows:

> You have engaged in a promotional campaign for Vioxx that minimizes the potentially serious cardiovascular findings that were observed in the Vioxx Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile of Vioxx.  Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on Vioxx were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drugs (NSAID), Naprosyn (naproxen).

96.     The 2001 Warning Letter also cautioned, "Your minimizing these potential risks and misrepresenting the safety profile for Vioxx raise significant public health and safety concerns.  Your misrepresentation . . . is particularly troublesome because we have previously, in an untitled letter, objected to promotional materials for Vioxx that also misrepresented Vioxx's safety profile."  The FDA also warned Merck that its recent press releases "confirming the favorable cardiovascular safety profile of Vioxx" were "simply incomprehensible" given the rate of heart attacks and "serious cardiovascular events compared to naproxen."

97.     The 2001 Warning Letter set forth the following misrepresentations made by and/or on behalf of Merck about Vioxx:

(a)     Minimization of Vioxx's risk of heart attacks at Merck's promotional audio conferences, including conferences held on June 8, 2000, June 13, 2000, June 16, 2000 and June 21, 2000;

(b)     Concealment of Vioxx's possible pro-thrombotic properties, which may reasonably explain the increase in adverse cardiac events;

(c)     Inaccurate claims that the heart attack rate for naproxen and Vioxx was .2% and .1% respectively.  The 2001 Warning Letter revealed: "[T]he [heart

attack] rate for Vioxx in this subpopulation was 12 [heart attacks] among 3877 patients (0.3%) as compared to 4 [heart attacks] among 3878 patients (0.1%) for naproxen.";

(d)   False statements comparing the heart attack rate associated with Vioxx in the VIGOR study to the crude heart attack rate of Celebrex in another study. Merck concealed the fact that the patient populations in two studies were different in that the VIGOR study excluded patients with heart problems, whereas the Celebrex study did not;

(e)   Concealment of the fact that Vioxx's less expensive alternative, naproxen, caused half as many heart attacks;

(f)   Concealment of the dangerous interaction of Vioxx with warfarin, an anticoagulant. For example, at an audio conference on June 16, 2000, Merck stated, "if you look at the thromboembolic events, it's very clear that these selective COX-2 inhibitors (of which Vioxx is a member) have the benefit of not having platelet aggregation and bleeding time, and therefore, can be used safely in terms of post-op and with Coumadin." This statement directly contradicts the precaution in the Package Insert and the Physicians' Desk Reference, which states: "[I]n post-marketing experience, bleeding events have been reported, predominantly in the elderly, in association with increases in prothrombin time in patients receiving Vioxx concurrently with warfarin.";

(g)   Nondisclosure of contraindications in patients who have experienced asthma, uticaria or allergic type reactions after taking aspirin or other NSAIDs;

(h)   Concealment of the risk of serious GI toxicity such as bleeding, ulceration or perforation in patients taking Vioxx; and

(i)   Concealment of certain precautions for use in patients with liver and kidney disease, as well as failure to disclose information about which patient populations should not use Vioxx, including women in late-term pregnancy.

These misrepresentations violated the Utah False Claims Act.

98.    Merck responded to this warning letter by pulling or revising the promotional materials at issue, but Merck still refused to include a cardiovascular warning in any of its direct-to-consumer advertisements. Merck's misleading statements were already in the market and

influencing the demand for its products.  As Merck noted in its 2003 annual report, Vioxx was the best-selling arthritis and pain medicine.

## II.     Science Establishes the Dangers of Vioxx

### A.     Early Studies show the Risks of Vioxx

99.     Coincident with the approval of Vioxx in 1999, a University of Pennsylvania cardiologist, Garret A. FitzGerald, M.D., presented research hypothesizing that by treating patients with selective COX inhibitors instead of traditional NSAIDs, patients would spare the stomach at the expense of the heart.[2]  According to FitzGerald, inhibiting COX-2 would lead to the prevention of production of prostaglandin, the primary cyclooxygenase product in endothelium, a slick layer of cells that prevents interaction between blood cells and vessel wall to help regulate blood flow, coagulation, and smooth vascular tissue.[3]

100.    Prior to 1999 it was believed that prostaglandin was produced by COX-1; therefore, the inhibition of COX-2 by Vioxx or similar drugs would have no effect on the heart.[4]  However, it is now known that COX-2 is the dominant source of prostaglandin and by only limiting COX-2, Vioxx raised the risk of causing high blood pressure, hardening of the arteries, and clotting.[5]

---

[2] Garret A. FitzGerald, *et al.*, *Effects of Specific Inhibition of Cyclooxygenase-2 on Sodium Balance, Hemodynamics, and Vasoactive Eicosanoids*, 289 JPET 735-741 (1999).

[3] *Id.*

[4] Garret A. FitzGerald, Coxibs and Cardiovascular Disease, 353:357 *NEW ENGLAND JOURNAL OF MEDICINE 1709-1711 (2004)*.

[5] *Id.*

101.    Thus, in 1999, Merck had another major indication that Vioxx increased the risk of cardio-thrombotic[6] events, but the company did nothing to disprove the potentially serious consequence of ingesting the drug.

102.    Merck was confronted with evidence of increased cardiovascular health risks again in 1999, when the company's third-party consultants confirmed and identified adverse cardiovascular deaths and injuries among Vioxx users, identifying a relative risk ratio greater than 2 in all categories.

103.    More cardiovascular problems were observed in a study presented at the European United League Against Rheumatism conference in 2002, that showed Vioxx use resulted in a statistically significant increase in hypertension and myocardial infarction.[7]

104.    A prescription monitoring study in England found Vioxx could cause serious lower and upper gastrointestinal problems and should be prescribed with caution.[8]

105.    Merck neither disseminated the results of these studies nor did it try to disprove these results.

106.    By early 2001 over one hundred cases of adverse reactions associated with Vioxx use were reported to the FDA's Adverse Event Reporting System (AERS). The FDA found ninety-nine of these cases were unduplicated thrombotic or embolic events associated with

---

[6] Pharmacy Today (2002), Abstract, A. Whelton, *et al.*

[7] *Id.*

[8] Deborah Layton, *et al., Safety Profile of Rofecoxib as used in General Practice in England: Results of a Prescription Monitoring Study,* 55 *JOURNAL OF CLINICAL PHARMACOLOGY* 166 (2002). (Study tracked 15,268 NSAID patients between February and November 2002, and found that one month after ending treatment, numerous patients, including Vioxx users, suffered from serious gastrointestinal events and renal failure).

Vioxx,[9] while also noting the actual number of thrombotic events was likely higher due to under-reporting.[10]  Fifteen of the reported incidents resulted in a patient's death, and sixty-four required hospitalization.

107.    Merck ignored these thrombotic events, as it continued to advertise Vioxx's safety.

108.    Merck violated the Utah False Claims Act when it sponsored several studies to show the efficacy and safety of the drug, but ignored the results "when all studies confirmed Vioxx had potentially serious cardiovascular side effects."

109.    One thousand forty-two patients enrolled in a six-week study called Study 85, that compared Vioxx to nabumetome, another NSAID.[11]  .  Patients in the study either took 12.5 mg of Vioxx or 1000 mg of nabumetome.[12]  Merck claimed the study proved that Vioxx was safe because only one cardiovascular event was attributable to Vioxx.[13]  The FDA prohibited this claim because Merck conducted a trial on a small sample of patients taking only half the recommended dosage.

110.    Study 90, with a similar design to 85, but enrolling 978 patients, reported a total of six serious cardiovascular events associated with patients using Vioxx compared with only

---

9 Memorandum, Department of Health and Human Services Public Health Service Food and Drug Administration Center for Drug Evaluation and Research, www.fca.gov/ohrms/dockets/ac/01/briefing/3677b1_11_thrombo.pdf (Feb. 2001).

10 Id.

11 Food and Drug Administration.  Cardiovascular safety review of Rofecoxib., 24-28 (2001), at www.fca.gov/ohrms/dockets/ac/01/briefing/3667b2_06_cardio.pdf.

12 Id.

13 Id.

two in the nabumetome group.[14]  The results of the smaller study provided Merck with another

warning that Vioxx increased the risk of cardiovascular injury.

111.    Scientists have found that Vioxx causes other adverse health issues.  Doctors in

Spain suggested that Vioxx causes acute tubulointerstitial nephritis after completing a case study

on a patient taking Vioxx and urged further studies.[15]

112.    The Cleveland Clinic Foundation conducted an epidemiologic study that found a

statistically significant increase in the annualized myocardial infarction rates for Vioxx users

when compared to placebo.[16]

113.    Other articles confirmed Vioxx increases the risk of cardiovascular health

issues.[17]  Researchers at Vanderbilt University found patients taking high doses of Vioxx had

double the risk of heart attack or stroke.[18]  The study tracked patients who were part of

Tennessee's Medicaid system taking any NSAID as of July 1, 2001.[19]  Nearly 10,000 of the

study participants were taking Vioxx, and more than 1,000 of those were "high-dose" Vioxx

users, with 30-day supplies of 50-milligram pills.[20]  Fifteen percent of these high dose patients

---

[14] *Id.*

[15] Jose L. Rocha, *et al., Acute Tubulointerstitial Nephritis Associated with Selective COX-2 Enzyme Inhibitor, rofecoxib,* 357 THE LANCET 9272 (2001).

[16] Debabrata, Mukherjee, M.D.. *et al., Riskof Cardiovascular Events Associated with Selective COX-2 Inhibitors,* 286 JOURNAL OF AMERICAN MEDICAL ASSOCIATION 954 (2001).

[17] Debabrta Mukherjee, *Selective Cyclooxygenase-2 (COX-2) Inhibitors and Potential Risk of Cardiovascular Events,* 63 BIOCHEMICAL PHARMACOLOGY 817-821 (2002).

[18] Wayne A. Ray, *et al., supra. N.14.*

[19] *Id.*

[20] *Id.*

were treated for congestive heart failure and twenty-two percent were treated for other forms of heart disease.[21]

114.    In addition, SUCCESS VI, a multi-center, parallel group, double blind, randomized controlled trial comparing Celebrex and Vioxx on patients over the age of 65 found nearly twice as many Vioxx patients experienced cardiorenal events such as edema and elevations in systolic blood pressure.[22]

115.    These studies show that Merck knew its representations, including relevant information on the product and warning label provided with every Vioxx prescription, were false.

116.    These studies show that Merck knew that it was omitting relevant safety data and information regarding Vioxx on the product and warning label provided with every prescription.

117.    Merck violated the Utah False Claims Act when it misrepresented the health risks of Vioxx and misrepresented or failed to disclose the results of these safety studies.

118.    Every Vioxx prescription that contained these misrepresentations and failed to include relevant safety data violated the Utah False Claims Act.

B.    Vioxx Makes False and Misleading Statements Regarding its VIGOR Study

119.    In late 1996, Merck planned a large-scale, long term, double-blind study of gastrointestinal toxicity in patients taking Vioxx or naproxen to treat arthritis.  This study,

---

[21] *Id.*

[22] Andrew Shelton, *et al., Cyclooxygenase-2-Specific Inhibitors and Cardorenal Function: a Randomized, Controlled Trial of Celecoxib and Rofecoxib in Older Hypertinsive Osteoarthritis Patients,* 8 AMERICAN JOURNAL OF THERAPEUTICS 85 (2001).

Merck's largest, came to be called the Vioxx Gastrointestinal Outcomes Research study ("VIGOR").

120.    Merck conducted VIGOR to obtain information regarding clinically meaningful gastrointestinal events and to develop a large controlled database for overall safety assessment. The study compared patients who took Vioxx with patients who took naproxen.

121.    On November 21, 1996, a Merck memo discussing the design of the VIGOR trial suggested that participants be permitted to use aspirin during the study to mute the cardiovascular risks of Vioxx because of its concern that "there is a substantial chance that significantly higher rates" of cardiovascular problems would be seen in the Vioxx group.

122.    On February 25, 1997, Merck employee Briggs Morrison suggested that Merck allow VIGOR participants to take aspirin to avoid disclosing the cardiovascular risks of Vioxx. Mr. Morrison was concerned that unless patients in the Vioxx group could take aspirin, "you will get more thrombotic events and kill [the] drug." In response, Dr. Reicin proposed that people at high risk of cardiovascular problems be excluded from the study so that the rate of cardiovascular problems in those participants taking Vioxx "would not be evident."

123.    In designing the VIGOR Study, Merck also took the unusual step of including an external Vascular Event Committee (VEC), containing three separate subspecialty committees (cardiac, cerebrovascular, and peripheral), for surveillance, monitoring, and adjudication of vascular events occurring in COX-2 inhibitor-trials.

124.    In March 2000, VIGOR's results showed that Vioxx patients suffered fewer stomach problems than the naproxen group, but significantly more blood-clot-related problems, as Merck anticipated in the 1996-97 internal documents. Specifically, the heart attack rate for

Vioxx users in the VIGOR study appeared to be four to five times higher than for users of other NSAIDs, confirming what Merck already knew about Vioxx.

125.    Dr. Scolnick, Merck's research chief, recognized the VIGOR results arose from Vioxx's inherent risks rather than naproxen's cardio-protective properties. In a March 9, 2000 e-mail with the subject line "VIGOR," Dr. Scolnick said the results showed that the cardiovascular events "are clearly there." In an apparent acknowledgment that Vioxx's own mechanism was at least partially at fault for the heart data, he wrote "it is a shame but it is a low incidence and it is mechanism based as we worried it was."

126.    Dr. Scolnick did not want to publish the VIGOR study results until Merck could find other data to make it "clear to the world that this" was an effect of the entire COX-2 class, not just Vioxx. Dr. Scolnick compared Vioxx to past popular medications with side effects when he noted that "[w]e have a great drug and like angioedema with vasotec and seizures with primaxin and myopathy with mevacor there is always a hazard. The class will do well and so will we."

127.    In a March 2000 press release Merck offered no hint of Dr. Scolnick's suggestion that there was a "mechanism-based" problem with Vioxx or a "hazard" that went beyond Vioxx's failure to offer the protective benefits of other painkillers. Merck implied that Vioxx did not do well in the VIGOR trial because the study's results were "consistent with" naproxen's favorable effects.

128.    In April 2000, Merck issued another press release headlined, "Merck confirms favorable cardiovascular safety profile of Vioxx." While acknowledging the VIGOR results, it said other trials and data had shown "[n]o difference in the incidence of cardiovascular events"

between Vioxx and a placebo or between Vioxx and older painkillers. These false claims violated the Utah False Claims Act.

129.    The results of VIGOR, not released by Merck until 2001, showed an increased risk of injury to Vioxx users. The study reported serious cardiovascular events occurred in 101 patients who took Vioxx, compared to only 46 patients who took naproxen. Additionally, myocardial infarctions occurred in 20 patients in the Vioxx treatment group compared to only four patients in the naproxen treatment group.

130.    The study's authors, including Merck scientists, acknowledged the adverse cardiovascular findings were "statistically significant," but Merck falsely claimed the study reflected the cardio-protective property of naproxen rather than the side effects of Vioxx.

131.    The VIGOR results showed that patients taking Vioxx suffered more than *twice* the number of adverse cardiovascular events and *five times* the number of heart attacks as patients taking naproxen. Merck's scientists understood that the difference in cardiovascular events was so great that it must have come from an inherent risk to Vioxx rather than a protective benefit of naproxen.

132.    On March 9, 2000, Dr. Skolnick told his colleagues that the cardiovascular results seen in VIGOR "are clearly there," and that "[the cardiovascular result] is mechanism based as we worried it was."

133.    Merck knew from the VIGOR trial that Vioxx posed serious cardiovascular risks, including heart attack, stroke, unstable angina, cardiac clotting and hypertension as well as an additional threat to anyone with existing heart disease or cardiovascular risk factors.

134.     When researchers reviewed the results of two large studies, including VIGOR, and two smaller studies published between 1998 and 2001 related to COX-2 inhibitors,[23] they found patients taking Vioxx had more than twice as many heart attacks and strokes as patients who took naproxen.[24]  The researchers found that Merck had concealed the relative risk of developing a "confirmed adjudicated thrombotic cardiovascular event" (defined in the article as "myocardial infarction, unstable angina, cardiac thrombus, resuscitated cardiac arrest, sudden or unexplained death, ischemic stroke, and transient ischemic attacks") among Vioxx users in Merck's trials, including VIGOR.  The VIGOR trial, at 95% confidence interval, ranged from 2.2 for event-free survival analysis, 2.35 compared to naproxen users, and a 4.89 for developing serious cardiovascular events among aspirin-indicated patients.  The myocardial infarction rates for Vioxx users compared to placebo revealed a statistical increase among Vioxx users.  The authors stated that "by decreasing PG12 production [Vioxx] may tip the natural balance between prothrombotic thromboxane A2 and antithrombotic PG12, potentially leading to an increase in thrombotic cardiovascular events."[25]

135.     Researchers warned Merck to conduct further investigations to test the safety of Vioxx, but the request was ignored.[26] Merck violated the Utah False Claims Act by its failure to heed these studies and report their results.

---

[23] Debabrata, Mukherjee, M.D.. et al., Risk of Cardiovascular Events Associated with Selective COX-2 Inhibitors, 286 JOURNAL OF AMERICAN MEDICAL ASSOCIATION 954 (2001).

[24] Id.

[25] Id.

[26] Id.

C.     The FDA Cites Merck  For False and Misleading Statements Regarding the VIGOR Study

136.    In October 2000, Merck sent its cardiovascular data from the VIGOR trial to the FDA for review.  This was the first time that Merck made the cardiovascular data gathered during VIGOR available to anyone without ties to Merck.

137.    In November 2000, Merck published the results of its VIGOR trial in the NEW ENGLAND JOURNAL OF MEDICINE.  The article, written by Merck employees and by academics who received consulting contracts and research grants from Merck, made a vague reference to cardiovascular incidents but did not fully report the statistical incidence of cardiovascular complications seen in the study.

138.    Merck's 2000 Annual Report falsely claimed that Merck's new compounds, including Vioxx, "possess better qualities than any of their predecessors brought forward in a like time span because we have been able to analyze and test them in more detail."  And on January 23, 2001, Merck issued a press release referencing strong results from the VIGOR study.

139.    In February 2001, 19 months after Vioxx went on the market, the FDA published a Memorandum on the Vioxx cardiovascular safety data gathered during VIGOR.  In this Memorandum, the FDA concluded that there "is an increased risk of cardiovascular thrombotic events, particularly [heart attack], in the [Vioxx] group compared with the naproxen group."  The FDA considered and rejected each of the defenses raised by Merck to explain the statistically significant increase of cardiovascular incidents among Vioxx users.

140.    Merck responded to the FDA's Memorandum with a press release announcing its confidence "that the data presented today supports the excellent safety profile of Vioxx" and that

"in the completed osteoarthritis trial and on-going clinical trials with Vioxx . . . there was *no difference* in the incidence of cardiovascular events, such as heart attacks among patients taking Vioxx, other NSAIDs and placebo." (emphasis in original).  This false and misleading response violated the Utah False Claims Act.

141.    In February 2001, the FDA also noted that Merck should add a cardiovascular warning to its VIOXX packaging since "it would be difficult to imagine inclusion of VIGOR results in the [Vioxx] labeling without mentioning cardiovascular safety results in the study description as well as the Warnings sections."

142.    FDA officials asked Merck to highlight the cardiovascular risk prominently on Vioxx's label.  Merck resisted the FDA, complaining that the agency was putting more weight on the negative findings than on the positive gastrointestinal aspects.  The FDA and Merck reached a compromise by agreeing upon a new Vioxx label that first indicated Vioxx's positive gastrointestinal aspects and later included two tables explaining its increased cardiovascular risks. These negotiations lasted 14 months until April, 2002, while doctors and consumers continued to wait for information on the cardiovascular risks.

143.    The FDA expressed increased concern about Merck's marketing of the drug to doctors.  For instance, it sent Merck a warning letter on September 17, 2001 concerning a doctor who said in June of 2000 that the VIGOR trial showed that naproxen was "a wonderful drug" for reducing the risk of heart problems, and not that there was anything wrong with Vioxx.  The FDA said such statements "minimized the potentially serious cardiovascular findings" of VIGOR.

144.    A Merck internal marketing document reviewed by THE WALL STREET JOURNAL, addressed to "all field personnel with responsibility for Vioxx," provided an "obstacle handling guide."  The document instructed field personnel to tell doctors concerned about Vioxx's heart health risks that the drug "would not be expected to demonstrate reductions" in heart attacks or other cardiovascular problems and that it was "not a substitute for aspirin."

145.    Merck used another training document called "Dodge Ball Vioxx." Each of its first 12 pages lists one "obstacle," apparently representing statements that might be made by a doctor.  Among them are, "I am concerned about the cardiovascular effects of Vioxx" and "[T]he competition has been in my office telling me that the incidence of heart attacks is greater with Vioxx than Celebrex."  The final five pages each contain a single word in capital letters: "DODGE!"

146.    Merck similarly used a pamphlet called the "Cardiovascular Card," which Merck's sales representatives used to convince physicians that Vioxx did not pose any health risks.  The Cardiovascular Card contained the unsupported, false and misleading claim that patients on Vioxx were 11 times less likely to die than patients on standard anti-inflammatory drugs, and 8 times less likely to die from heart attacks.  The information used on the Cardiovascular Card was pooled from pre-approval clinical trials that were conducted to test the efficacy of the drug to treat pain, not to assess whether the drug caused heart attacks.

147.    The FDA also expressed "serious concerns" about the data on the Cardiovascular Card.  An FDA medical reviewer said that the relevance of Vioxx's pre-approval studies to the drug's cardiovascular safety was "nonexistent" and that it would be "ridiculous" and

"scientifically inappropriate" to present this data to physicians, even as Merck's field representatives continued to use this false and misleading information.

148.    Merck's use of the Cardiovascular Card prompted Representative Henry A. Waxman to acknowledge that "[Merck] used its sales force of thousands to counter growing evidence of concern over the safety of Vioxx . . . providing highly questionable information to physicians and pursuing aggressive marketing strategies."

149.    After the negotiations with the FDA had resulted in the creation of a cardiovascular warning that was sufficiently vague for it, Merck issued a press release that minimized the importance of the risks the FDA required Merck to disclose:  "The significance of the cardiovascular findings from [the VIGOR study] is unknown . . . Merck is confident in the efficacy and safety profile of Vioxx."

D.      Merck Falsely Claims that the Results of VIGOR Arose from the Cardio-
Protective Properties of Naproxen, and Not From the Dangers Inherent in Vioxx

150.    During the same month it released the VIGOR study results to the FDA, Merck
stated that its results were "consistent with" naproxen's cardio-protective effects, an implication
that this explained the comparatively worse cardiovascular risk the study found for Vioxx.

151.    Contrary to Merck's assertions, no clinical study had ever proven that naproxen
had a cardio-protective effect. According to a Center for Drug Evaluation and Research report
released the day Vioxx was withdrawn from the market, naproxen would have had to be one of
the most potent and effective cardio-protectants known to legitimize Merck's interpretation of
the VIGOR results. Moreover, in December 2004, a study testing whether Celebrex or naproxen
would reduce the risk of Alzheimer's disease was stopped after researchers noted an increase in
heart attacks and strokes among participants who were taking naproxen, establishing the opposite
of Merck's claims.

152.    Even as the public learned the results of VIGOR and as the FDA recommended
that Merck add cardiovascular warnings to its Vioxx packaging, Merck issued news releases
headlined, "Merck confirms favorable cardiovascular safety profile of Vioxx." While
acknowledging the VIGOR results, Merck's press releases stated that other trials and data had
shown "no difference in the incidence of cardiovascular events" between Vioxx and a placebo or
between Vioxx and other painkillers. The press release also declared Merck's confidence "that
the data presented support the excellent safety profile of Vioxx."

153.    In June 2000, Dr. Peter Holt, a physician hired by Merck to promote Vioxx,
minimized the results of the VIGOR study in a promotional conference by stating: "Vioxx is a

wonderful, effective, selective COX-2 inhibitor [but it does not] inhibit platelets . . . therefore it cannot be used as a cardiovascular protective drug." In contrast Dr. Holt suggested that naproxen did not have such an effect. Dr. Holt's implication was that the difference between Vioxx and naproxen was due to naproxen's protective properties and not Vioxx's side effects, a conclusion unsupported by the studies.

154.    During the same audio conference, Merck falsely asserted that Vioxx posed no greater risk of heart attacks than its competitor drug, Celebrex. Merck's representative stated: "Now if you remember the crude [heart attack] rate of Vioxx in VIGOR that number was 0.4 percent which is basically the same or in fact a little bit less than the crude [heart attack] rate of Celebrex in [the Celebrex Long-Term Arthritis Safety Study] CLASS which is 0.5 percent." This comparison was false and misleading because the studies had different patient populations, with the Celebrex CLASS trial including patients at higher risk for heart attacks.

155.    On September 17, 2001, the FDA cited Merck for minimizing the potentially serious cardiovascular findings found in the VIGOR study. In its letter, the FDA warned Merck that it was presenting an un-established hypothetical explanation for the observed increases in myocardial infarctions, instead of warning of Vioxx's pro-thrombotic properties.

156.    The FDA warned Merck's promotional activities and materials were false, lacking in fair balance, and misleading because patients on Vioxx were observed to have a "four to five-fold" increase in heart attacks, compared to patients on naproxen. Merck's false and misleading promotional activities and materials violated the Utah False Claims Act.

157.    Several articles highlighted Merck's false and misleading allegations.  A study published in the British medical journal, THE LANCET, found naproxen was not cardio-protective even for patients who took large doses, 100 mg, for sixty consecutive days.[27]

158.    The ARCHIVES OF INTERNAL MEDICINE reported a population based retrospective cohort study on patients taking naproxen found there was no evidence of short-term reduction of acute myocardial infarction.[28]

159.    Merck's false and misleading advertisements alleging naproxen had cardio-protective propensities harmed the public and the State.

160.    For example, in June 2001, at the 119th Annual Meeting of the Maryland Pharmacists Association in Ocean City, Maryland, a Merck sales representative made the false and misleading claim that VIGOR's finding that Vioxx increased the risk of heart attack arose because naproxen works like aspirin by inhibiting clotting and platelet aggregation.

161.    At an Annual Meeting of the American Society of Health Systems Pharmacists in Los Angeles, California in June 2002, a Merck sales representative repeated these false and misleading claims about naproxen's cardio protective properties.

162.    In August 2004, at the 20th annual meeting of the International Society for Pharmacoepidemiology Conference, the principal investigator for the FDA presented research proving  that in doses greater than twenty-five milligrams, Vioxx caused a greater than three-fold increase in the risk of heart attack and sudden cardiac death His research also proved that at the

[27] Wayne A. Ray, *et al.,* "Non-steroidal anti- inflammatory drugs and risk of serious coronary heart disease: an observational cohort study," 359 *THE LANCET,* 118-123 (2003)

[28] Muhammad Mamdani, *et al.,* Effect of Selective Cyclooxygenase 2 Inhibitors and Naproxen on Short-term Risk of Acute Myocardial Infarction in the Elderly," 163 481-486 (2003).

recommended 25 mg dose, the risk of acute myocardial infarction and sudden cardiac death was greater by 50% for Vioxx than Celebrex.

163.     Contrary to Merck's claims, the research showed naproxen increases the risk of heart problems by 18% instead of protecting the heart.  The research estimates that Vioxx is associated with more than 27,000 heart attacks or deaths linked to cardiac problems.[29]

E.     Merck Hides the ADVANTAGE Study

164.     In 1999 Merck's Marketing Department commissioned ADVANTAGE, its own 12 week clinical trial, as a promotional tool, to show that Vioxx caused fewer stomach problems than naproxen.  ADVANTAGE also revealed a link between Vioxx and an increased risk of heart attacks and strokes.  Senior Merck officials pressured their own researchers to change the trial results, "so that we don't raise concerns" over the adverse cardiovascular effects of Vioxx.

165.     Internal e-mails show Merck's attempts to cover up the fatalities that occurred during its ADVANTAGE study.  In particular, Merck officials told scientists to re-classify a 73-year-old woman's death from myocardial infarction to "unknown."  In a related e-mail from November 2000, Dr. Reicin wrote, "I think this should be called an unknown cause of death . . . so we don't raise concerns."  Dr. Scolnick, Merck's head scientist from 1985 – 2005 also stated in an e-mail that including any of the deaths in the final report would "put us in a terrible situation."

166.     Merck knowingly misrepresented and omitted data from the ADVANTAGE study to avoid an FDA warning that would include Vioxx's known cardiovascular risks, a warning that did not appear on the label for Vioxx's competitor, Celebrex.

---

[29] *See,* Graham, *et al., Abstract, Risk of Acute Myocardial Infarction and Sudden Cardiac Death with Use of COX-2 Selective and Non-Selective NSAIDS (2004).*

167.    In October 2003, more than three years after its completion, Merck reported the results of the flawed ADVANTAGE study in the Annals of Internal Medicine.  Although the report stated that five patients taking Vioxx had suffered heart attacks, the report failed to mention three additional heart-related deaths.

F.    Merck Fails to Report Other Study Results that Show Vioxx Increases the Risk of Other Illnesses and Diseases, including Alzheimers

168.    In 1998, Merck began what were called the Alzheimer's Studies (Protocols 078, 091 and 126) in 3000 elderly patients with Alzheimer's Disease or Mild Cognitive Impairment, to investigate whether Vioxx prevented conversion or progression of Alzheimer's Disease.

169.    The complete safety data from these studies provide reasonable evidence of associations of serious hazards with Vioxx, including a wide array of serious and life threatening side effects, but Merck neither properly nor timely reported the complete safety data from the Alzheimer's Studies.

170.    Merck learned from these studies that not only did Vioxx fail to prevent Alzheimer's Disease but the studies uncovered statistically significant evidence that Vioxx may worsen Alzheimer's Disease.

171.    In November of 2000 Merck also failed to properly and timely report evidence that in these studies, male patients taking Vioxx had a statistically significant risk of developing osteoporosis, compared to placebo.

172.    Merck also failed to properly and timely report that in the Alzheimer's Studies, deaths from pneumonia were ten on Vioxx, and one on placebo.  This result was statistically significant as of February 14, 2001.

173.    In the Alzheimer's Studies, contrary to corporate policy and industry and regulatory standards, Merck declined to establish independent, external Data and Safety Monitoring Boards (DSMBs) to monitor the accumulating, un-blinded safety data for the protection of the patients enrolled by Merck.

174.    The complete safety data from these important studies have never been accurately reported by Merck, to the present day.  Inaccurate and incomplete representations of the safety of Vioxx based on the data from these studies can still be found in the medical literature, and have never been corrected.

G.      Merck Challenges Scientists Who Discuss Vioxx's Health Risks

175.    In light of the VIGOR study, by 2001 the debate over Vioxx shifted from questions about whether Vioxx lacked the benefits of older painkillers to concerns about Vioxx's inherent health risks.  On August 21, 2001, independent doctors from the Cleveland Clinic Foundation performed their own meta-analysis of a Vioxx trial on the issue of cardiovascular safety, and concluded that Vioxx posed an increased risk of adverse cardiovascular events compared to naproxen.  These doctors urged Merck to conduct further trials to quantify the specific cardiovascular risks of Vioxx.

176.    In response to a Cleveland Clinic Foundation article, Merck issued a press release touting "the overall and cardiovascular safety issues" adding that "there is no increase in the risk of cardiovascular events as a result of treatment with Vioxx."

177.    Merck also asked the Cleveland Clinic Journal to run a rebuttal to this article, emphasizing the cardiovascular safety profile of Vioxx.  When it refused, Merck sent "Dear Doctor" letters to thousands of physicians nationwide that "strongly supported the cardiovascular

safety profile" of Vioxx.  Merck also sent "Dear Patient" letters to thousands of consumers

nationwide identified from a prescription database that minimized the risk of "heart attacks and

strokes" and emphasized that Vioxx was "innovative, effective and safe."  Merck's false and

misleading statements contained in these documents violated the Utah False Claims Act.

178.    John Abramson, a family doctor and clinical instructor at Harvard Medical

School, scrutinized data from the VIGOR trial provided by Merck.   In a recently published

book, "Overdosed America:  The Broken Promise of American Medicine," he concluded that

even those without a history of heart trouble doubled their risk of developing a cardiovascular

problem by taking Vioxx instead of naproxen.

179.    Gregory Curfman, executive editor of the NEW ENGLAND JOURNAL OF

MEDICINE, says the journal "didn't have all the details that the FDA had later on."  Given the

available data, he says editors "spent a great deal of time trying to make sure that these

unexpected cardiovascular side effects were fairly and accurately represented" in the article.

180.    Merck also challenged academic researchers who began to question Vioxx's

safety.  Gurkirpal Singh of Stanford University, a COX-2 expert who was giving lectures

sponsored by Merck and other companies, says he pressed Merck for more cardiovascular safety

data.  When Merck refused, Dr. Singh added a slide to his presentation that showed a man –

representing the missing data – hiding under a blanket.  "This was the first time they didn't

answer my questions," he says.  "With VIGOR, suddenly it was a clampdown."

181.    Merck canceled several presentations by Dr. Singh, and in October 2000, a Merck

official, Louis Sherwood, called James Fries, a Stanford University Medical School professor, to

complain that Dr. Singh's lectures were "irresponsibly anti-Merck and specifically anti-Vioxx,"

as Dr. Fries described the call in a January 2001 letter to Mr. Gilmartin, the Merck chief executive. The Merck official "suggested that if this continued, Dr. Singh would 'flame out' and there would be consequences for myself and for Stanford," Dr. Fries wrote.

182.    Dr. Fries responded that "[t]here is a line that you can't go across . . . It had gone over that line." He wrote to Dr. Gilmartin that researchers at several other top medical schools complained about "a consistent pattern of intimidation of investigators by Merck" on Vioxx.

183.    According to the WALL STREET JOURNAL, [30] Lee Simon, a rheumatologist at Beth Israel Deaconess Medical Center in Boston, says he publicly mentioned data showing Vioxx might be associated with a risk of high blood pressure and swelling. While Dr. Simon was closely involved with researching Celebrex, he had worked with Merck in another area. Merck's Dr. Sherwood called Dr. Simon and one of his superiors at the hospital to complain that Dr. Simon's lectures were slanted against Vioxx.

184.    "I was shocked that there was a phone call made like that," Dr. Simon says. "The company was attempting to suppress a discussion about this data."

185.    In August 2001, researchers at the Cleveland Clinic Foundation published an analysis in the JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION that once again raised concerns about Vioxx's cardiovascular risks. Before it came out, Merck's Dr. Reicin and other officials met with the authors, arguing that "they didn't think there was a problem with the drug," says Steven Nissen, one of the Cleveland Clinic researchers. The day before JAMA published the article, Merck's Senior Director of Cardiovascular Clinical Research commented: "We already have additional data beyond what they cite, and the findings are very, very

---

[30] 11/1/2004.

reassuring.  VIOXX does not result in any increase in cardiovascular events compared to placebo."  According to sources, the Journal refused Merck's request to run a rebuttal.

186.    In the summer of 2002, Dr. Joan Ramon Laporte edited a publication of the Catalan Institute of Pharmacology in Barcelona, Spain that repeated THE LANCET's criticisms of Merck's handling of Vioxx.  Soon after, Dr. Laporte refused Merck's request to publish a "rectification" prepared by Merck. After Merck officials approached him twice more, the company filed suit in a Spanish court against Dr. Laporte and the Institute under a Spanish law that allows plaintiffs to demand a public correction of inaccurate published information.

187.    In January 2005, a judge ruled that Dr. Laporte's publication accurately reflected the medical debate about the cardiovascular safety of Vioxx, and ordered Merck to pay court costs.

188.    In March 2005, Dr. Laporte was a featured speaker at an annual update on the pharmaceutical world for about 1,000 Spanish family physicians.  Merck, which had helped pay for the meeting the previous eight years, contacted the organizer, Ramon Morera I. Castell, and told him that the company "preferred" if Dr. Laporte stayed off the program this year.  After Dr. Morera rejected the request, Merck withdrew it's approximately $140,000 financing.  Though Merck made no specific threats, Dr. Morera said "the message was clear."

## III.    Vioxx Is Withdrawn from the Market

189.    Despite the results of the VIGOR study and other published scientific materials, Merck continued to advertise and to market Vioxx to convince physicians it was safe.

190.    On September 30, 2004, the Center for Drug Evaluation and Research of the Food and Drug Administration issued a Memorandum concluding that Vioxx has adverse

cardiovascular effects, which were evident as early as the 2000 VIGOR study: **"*Rofecoxib increases the risk of serious coronary heart disease defined as acute myocardial infarction and sudden cardiac death. . . .*** The observation of an increased risk was first noted with the VIGOR trial, where a 5-fold difference in risk was found between high-dose rofecoxib and naproxen. ***The manufacturer attributed this difference to a never before recognized protective effect of naproxen.*** To explain a 5-fold difference, naproxen would have had to be one of the most potent and effective cardio-protectants known. Three cohort studies and the present nested case-control study found no evidence of cardio-protection with naproxen. The three case-control studies that reported a protective effect were misleading. When analyzed in a manner comparable to the present study, ***no protective effect is shown.*****"[31]**

191.   Vioxx was finally pulled off the market after Merck's own clinical trial, APPROVe (Adenomatous Polyp Prevention on Vioxx), confirmed what researchers had been saying for years, that Vioxx significantly increases the risk of thrombotic events. APPROVe was a multi-center, randomized, placebo-controlled, double-blind study to determine the effects of three years of treatment with Vioxx for the prevention of recurrence of colorectal polyps in patients with a history of colorectal adenomas. The trial started in 2000, enrolled 2,600 patients and compared patients taking 25 mg of Vioxx to patients taking placebo.

192.   Merck ended the trial after three years when numerous patients taking Vioxx for at least eighteen months experienced adverse cardiovascular events. By the eighteenth month, forty-five patients taking Vioxx experienced a confirmed serious thrombotic event, compared

---

[31] David J. Graham, MD, MPH, Associate Director for Science, Office of Drug Safety, Center for Drug Evaluation and Research, FDA, *Risk of Acute Myocardial Infarction and Sudden Cardiac Death in Patients Treated with COX-2 Selective and Non-selective NSAIDs* 13 (Sept. 30, 2004).

with only twenty-five patients taking placebo. Merck was also concerned that blood pressure rates were elevated among Vioxx patients long before the occurrence of myocardial infarctions and thrombotic strokes. The VICTOR (to test efficacy of Vioxx in treatment of colorectal cancer) and VIP trials of Vioxx were also terminated in September 2004.

193.    As set forth elsewhere in this Complaint, despite its claims, Merck knew that Vioxx increased the risks of cardiovascular events before terminating the APPROVe study.

194.    As set forth elsewhere in this Complaint, despite its claims, Merck knew that Vioxx increased the risks of cardiovascular events regardless of the length of time of usage, and such elevated risks were not limited to patients using Vioxx for at least eighteen months.

195.    Merck argues that it had no evidence that Vioxx had serious side effects until it terminated the APPROVe study. However, researchers reviewing all controlled trials and observational studies conducted between 1998 and 2001 (comparing Vioxx with other NSAIDs) found the increased risk of myocardial infarction was evident from 2000.[32] According to the researchers, by the end of 2000, Vioxx's cardiovascular effects were obvious from both long *and* short-term clinical trials, and not chance occurrences.[33] Merck's conscious disregard of these studies and its false and misleading representations concerning these studies violated the Utah False Claims Act.

---

[32] Peter Juni, *et al., Risk of Cardiovascular Events and Rofocoxib: Cumulative Meta-analysis,* THE LANCET, published online November 5, 2004 http://image.thelancet.com/extras/04art10237web.pdf.

[33] *Id.*

196.    The study also debunks Merck's contention that the cardio-thrombotic side effects of Vioxx are minimal for patients taking the medication for less than eighteen months.[34]   These risks not only exist for shorter period usage, but the risk also continues into the indefinite future.

197.    As discussed above, research has also refuted Merck's claim naproxen has a cardio-protective characteristic that explained the findings of VIGOR.[35]

198.    Since Vioxx was pulled from the market, there has been speculation that all COX inhibitors have pro-thrombotic tendencies.[36]   However, there is evidence that the atherothrombotic problems by Vioxx are unique to the drug because of its chemical makeup.[37]

199.    The chemical makeup of every COX-2 inhibitor is different.[38]   For example, Celebrex is a sulfonamide charged at physiologic pH with extensive tissue distribution, while Vioxx is a sulfone with poor tissue distribution.[39]

200.    A comparison of the effects of various COX inhibitors on LDL and other lipid components of the blood believed to play a role in atherosclerotic plaque instability found sulfone COX-2 inhibitors, like Vioxx, make LDL more susceptible to free radical damage and contribute to heart disease.[40]   The study's authors concluded that the activity observed from

---

[34] *Id.*

[35] *Id.*

[36] *See,* Garrett A. FitzGerald, *Coxibs and Cardiovascular Disease,* 351 NEW ENGLAND HOURNAL OF MEDICINE 1709 (2004), *see also,* John R. Vane, *Back to Aspirin Day?,* 296 474 Science (2002).

[37] Mary F. Walter, *et al., Sulfone COX-2 Inhibitors Increase Susceptibility of Human LDL and Plasma to Oxidative Modification: Comparison of Sulfonamide COX-2 Inhibitors and NSAIDS,* 77 ATHEROSCLEROSIS, 235 (2004) *see also,* Andrew Whelton, *et al., supra n.24.*

[38] *Id.*

[39] *Id.*

[40] *Id.*

Vioxx is related to distinct physic-chemical changes that it causes in the blood's lipid structure, independent of the COX-2 inhibition.[41]

201.    These results were confirmed by a population-based retrospective cohort study for 1.3 million patients using Vioxx, Celebrex, or any other NSAID in Ontario, Canada.[42]  The researchers found evidence of a higher risk of congestive heart failure in Vioxx users, but not among Celebrex users, when compared to other NSAIDs.[43]

202.    In addition, research also indicates patients using Vioxx, but not Celebrex or other NSAIDs, had an increased rate of edema and high blood pressure.  In a more recent study, the increased edema rate for Vioxx users was 23%, compared to 18% for Celebrex or NSAID users.[44]

203.    The results of APPROVe re-confirmed what Merck had known for years -- Vioxx has serious pro-thrombotic tendencies.

204.    Articles published in national newspapers such at the WALL STREET JOURNAL and the NEW YORK TIMES have also recently highlighted internal Merck e-mails which suggest Merck hid Vioxx's cardiovascular problems.[45]

---

[41] *Id.*

[42] Muhammed Mamdani, *et al., Cyclo-oxygenase-2 Inhibitors versus Non-Steroidal Anti-inflammatory Drugs and Congestive Heart Failure Outcomes in Elderly Patients:  a Population Based Cohort Study,* 363 THE LANCET 1751-1756 (2004)

[43] *Id.*

[44] Frederick Wolfe, *et al., Blood Pressure Destabilization and Edema Among 8538 Users of Celecoxib, Rofecoxib, and Nonsteroidal Anti-inflammatory Drugs and Nonusers of NSAID Receiving Ordinary Clinical Care, 31 JOURNAL OF RHEUMATORLOGY 1143-51 (2004).*

[45] Barbara Martinez, Expiration Date:  Merck Pulls Vioxx From Market After Link to Heart Problems, 10/1/04, THE WALL STREET JOURNAL A1, and Alex Berenson, *et al.,* Despite Warnings, Drug Giant Took Long Path to Vioxx Recall, 11/14/04, THE NEW YORK TIMES.

205.    Merck's internal correspondence is inconsistent with Merck's claim that it had insufficient evidence to believe Vioxx had pro-thrombotic tendencies until APPROVe was completed.  The company knew of the problems for years.

206.    Also on September 30, 2004, Merck issued a press release announcing the withdrawal of Vioxx based on "new" data indicating an increased risk of cardiovascular events, such as heart attack and stroke for those taking the drug eighteen months or longer.[46]  The decision came after the Data Safety Monitoring Board for APPROVe, the Vioxx study discussed above, recommended that the study be stopped early for safety reasons based on the first three years of results.[47]    An article in THE LANCET pointed out that the "voluntary withdrawal of rofecoxib by its manufacturer, Merck, on the basis of a fairly small trial that was designed for a different purpose raises several questions."[48]  One such "question" is when Merck knew that Vioxx was associated with an unacceptably high risk of adverse cardiovascular events, such as heart attack and stroke.

207.    Merck's false and misleading statements about Vioxx's health risks, made in numerous continuing medical education symposiums and complimented by numerous papers in peer-reviewed medical literature by Merck employees and consultants, violated the Utah False Claims Act.

---

[46] Merck, *Merck announces Voluntary Withdrawal of VIOXX,* available at http://www.vioxx.com/vioxx/documents/english/vioxx_press_release.pdf (accessed Nov. 5, 2004).

[47] FDA, *FDA Public Health Advisory: Safety of Vioxx,* available at http://www.fda.gov/cder/drug/inforpage/vioxx/PHA_vioxx.htm (accessed Nov. 5, 2004).

[48] Peter Juni, *et al.,* THE LANCET,  *Risk of Cardiovascular Events and Rofecoxib:  Cumulative Meta-Analysis* 4 (Nov. 5, 2004).

## IV.     After Withdrawal, Evidence is Developed that Merck Knew Vioxx Is a Dangerous Drug

208.     In 2004, THE LANCET published the results of a meta-analysis of randomized controlled trials and observational studies undertaken to determine what evidence was available concerning the adverse effects of rofecoxib before Vioxx was withdrawn: ***"Our cumulative meta-analysis of randomized controlled trials indicates that an increased risk of myocardial infarction was evident from 2000 onwards.*** At the end of 2000, the effect was both substantial and unlikely to be a chance finding. We found an increased risk of myocardial infarction in trial of both short and long duration, which is in contrast to the unpublished results from the APPROVe trial . . . [T]he reassuring statement by Merck, that there is no excess risk in the first 18 months, is not supported by our data . . . [D]ata from these studies indicate that if a protective effect of naproxen exists, it is . . . not large enough to explain the findings of VIGOR. By contrast to our findings, two earlier meta-analyses from Merck Research Laboratories showed no evidence of a rise in cardiovascular risk or an increase in risk that was restricted to trials comparing rofecoxib with naproxen . . . ***To clarify the reasons behind the misleading results of Merck's meta-analysis of cardiovascular events in clinical trials of rofecoxib will be important*** . . . If Merck's statement in their recent press release that 'given the availability of alternate therapies, and the questions raised by the data, we concluded that a voluntary withdrawal is the responsible course to take' was appropriate in September, 2004, then ***the same statement could and should have been made several years earlier, when the data summarized here first became available. Instead, Merck continued to market the safety of rofecoxib.***"[49]

---

[49] Peter Juni, *et al.,* THE LANCET, *Risk of Cardiovascular Events and Rofecoxib: Cumulative Meta-Analysis 5-7* (Nov. 5, 2004).

209.    In May of 2006, Curt Furberg, a clinical trial expert, and Steven Nissen, a cardiologist with the Cleveland Clinic, reviewed a report given by Merck to the FDA concerning the APPROVe study, and found that the "the risk (from Vioxx) appears to be present from the beginning (of usage)," and flatly denied Merck's claim that any such problems only begin after 18 months of usage.[50]

210.    The New England Journal of Medicine agreed with these findings when it published a correction to the APPROVe study on June 26, 2006 indicating the risk of heart problems was elevated soon after people began taking Vioxx.

211.    Scientists found further evidence that the risks associated with Vioxx remain long after people stop taking the drug by tracking patients who completed the APPROVe study for a year after Merck discontinued the study. Steven Nissen analyzed this additional data and noted that 16 patients on placebo developed heart problems, while 28 former Vioxx users in the study developed heart problems. Nissen concluded that the Vioxx-related risks were almost identical in the year *following* usage as existed while using Vioxx due to long-term damage to the arteries.[51]

212.    A study published in the Archives of Internal Medicine by Randall Stafford, M.D., PhD, associate professor of medicine at the Stanford University School of Medicine, and University of Chicago researchers G. Caleb Alexander, M.D., and Carolanne Dai documented Vioxx's overuse. They found that 63% of the growth in Cox-2 use from 1999 through 2002 occurred in patients with minimal risk of suffering gastrointestinal bleeding from NSAIDs.

---

[50] http://www.npr.org/templates/story/story.php?storyId=5413812
[51] http://www.npr.org/templates/story/story.php?storyId=5400413

213.     The medical profession calls such expansion of the use of a drug beyond its intended target population, "therapeutic creep."  In the case of COX-s, not only does this expansion mean that millions of people paid more for a drug without substantial medical benefit, but they exposed themselves to the risk of heart problems.

214.     For the study, Stafford and his colleagues reviewed national databases that tracked doctor visits between 1999 and 2002 and the types of medications continued or prescribed.  They also used a tool developed at Stanford in the 1990s to categorize patients according to their risk of gastrointestinal bleeding from NSAIDs.

215.     According to the study, 73% of the patients had either a very low or low risk of GI bleeding from NSAIDs, meaning there was no pressing medical reason for them to switch to COX-2 inhibitors.  However, this was the group where the greatest growth of the COX-2 use occurred.  The study showed the number of physician visits associated with COX-2 use in these patients increased from approximately 9.5 million in 1999 to 20.9 million in 2002, accounting for the 63% of the growth in the drugs' use during that time.

216.     The researchers point to key factors behind the rapid growth of COX-2s.  Prime among these is the heavy marketing of the medications.  In 2000, for instance, Vioxx topped all direct-to-consumer drug advertising with expenditures of $161 million.  The researchers also found that during the time period they studied, COX-2s eroded NSAID market share while increasing the total market demand for painkillers.

217.     Merck has agreed to reimburse patients for Vioxx purchased but not used as of September 30, 2004, but this does not help the millions of patients in Utah who have already purchased and consumed Vioxx and who paid more for the drug because it was advertised as a

premium drug with reduced side effects, and/or who would not have purchased Vioxx at all had

they known about its adverse cardiovascular effects. As a consequence of Merck's deceptive

promotional campaign, the State paid approximately *800% more* for Vioxx than equally

efficacious and safer drugs in its class.

## V.      The State of Utah's Damages Caused by Merck's False Claims

218.    The statements and omissions set forth above constitute false claims that caused

the State of Utah, by and through its employees and agents to pay for Vioxx prescriptions, a

direct benefit to Merck.

219.    Merck made these omissions and misrepresentations to obtain FDA approval to

sell Vioxx in the United States and Utah and to induce medical professionals to prescribe Vioxx.

Merck knew or in the exercise of reasonable care should have known prior to FDA approval, and

through post-approval studies, of the significant dangers of Vioxx to its users. But for these

omissions and misrepresentations, the FDA would never have approved Vioxx.

220.    Utah Medicaid was required to pay for Vioxx pursuant to its terms with the

federal government in establishing the pharmaceutical component of its Medicaid plan. When

Utah Medicaid discovered perceived problems with the safety and efficacy profile of Vioxx in

the Summer of 2003, the Drug and Utilization Board put Vioxx on prior approval. This meant

that a physician was required to get approval from Utah Medicaid before a prescription of Vioxx

would be reimbursed.

221.    Moreover, numerous Utah patients incurred additional medical expenses for

treatment of thrombotic events related to their use of Vioxx. The State of Utah, through its

Medicaid program, incurred great expense paying for such treatment for those citizens of Utah

covered by the Medicaid program for which it seeks damages to the maximum extent allowed by law.

222. The further purpose of these misrepresentations and omissions was to either submit a false claim or cause others, including doctors and pharmacists, to submit false claims to Utah Medicaid.

223. The above recitation of various actions, representations, omissions and requests for information are illustrative and not exclusive of all of Merck's activities in violation of the Utah False Claims Act.

## FIRST CAUSE OF ACTION

### Violations of the Utah False Claims Act
### (UCA §26-20-6. Conspiracy to Defraud)

224. The preceding paragraphs of this Complaint are re-alleged and incorporated by reference, as if fully set forth herein.

225. Merck's actions, as complained of herein, constitute conspiracy to defraud in violation of the Utah False Claims Act. UCA §26-20-6. This statute prohibits Merck from entering into an "agreement, combination or conspiracy" to defraud the State by obtaining or aiding another to obtain the payment of a false, fictitious, or fraudulent claim for a medical benefit. A "benefit" means the receipt of money. UCA §26-20-2(1). A "medical benefit" means a benefit payable under the State Medicaid laws. UCA§ 26-20-2(5). A "claim" means a request or demand for money made to an employee, officer or agent of the State. UCA §26-20-2(2).

226. Merck entered into such an agreement or combination with its employees to defraud the State by obtaining, or aiding another to obtain, the payment of a false, fictitious or fraudulent claim for a medical benefit.

227.    Violation of this statute exposes Merck to the damages and penalties set forth in UCA 26-20-9.5(2) as explained more fully below.

228.    In the alternative, the State of Utah seeks damages pursuant to a prior version of the same statutory provision set forth above pursuant to the requirements set forth therein.

### SECOND CAUSE OF ACTION

#### Violations of the Utah False Claims Act
#### (UCA §26-20-7.  False Claims for Medical Benefits)

229.    The preceding paragraphs of this Complaint are re-alleged and incorporated by reference, as if fully set forth herein.

230.    Though the activities alleged above, Merck caused numerous pharmacies to submit false claims to Utah Medicaid.  Under the statute a claim is false if it is "wholly or partially false, fictitious of fraudulent."  The statute requires no intent to deceive.

231.    Causing the submission of each of these claims is a violation of the Utah False Claims Act and subjects the defendant to the damages set forth in UCA§ 26-20-9.5(2).  These damages also include the following consequential damages:

a.    Utah was forced to pay for the cost of Vioxx and the costs of additional, consequential medical care required to treat  Utah Medicaid patients harmed by Vioxx as a result of Merck's submission of false claims, omissions, and misrepresentations relating to the approval and sale of Vioxx;

b.    Utah Medicaid paid approximately five million dollars ($5,000,000)  in pharmacy drug claims for Utah Medicaid patients prescribed Vioxx by Utah physicians;

c.    As a consequence of the use of Vioxx, an unsafe drug proved to cause cardiovascular disease and acute cardiovascular events, Utah Medicaid patients

suffered the following cardiovascular diseases: hypertension, acute myocardial

infarction (MI), acute ischemic heart disease, unstable angina, angina, pulmonary

embolism, pulmonary edema, heart failure, occlusion of cerebral arteries, and

occlusion of precerebral arteries; and

d.      Paying for the consequential medical care made necessary by the above

cardiovascular diseases and events suffered by Utah Medicaid patients as a result

of the use of Vioxx, has cost Utah Medicaid in excess of fifty million dollars

($50,000,000).

## THIRD CAUSE OF ACTION

### Violations of the Utah False Claims Act
### UCA §26-20-9.5(2)

232.    The preceding paragraphs of this Complaint are re-alleged and incorporated by

reference, as if fully set forth herein.

233.    Merck caused the submission of claims for services because it represented the

type and quality of Vioxx, including the safety and efficacy profile, in an inaccurate manner.

Merck's representations to doctors, the general public and Utah Medicaid as to the safety and

efficacy of Vioxx were wholly or partially false or fictitious.  These representations are sufficient

to impose liability.  The statute requires no intent to deceive.

234.    Such representations were the proximate cause of the submission to Utah

Medicaid of improper claims precluded by statute.

235.    These improper claims proximately cause Utah Medicaid to make improper and uncalled

for payments under its pharmaceutical plan and subjects Merck to the damages set forth in UCA

§26-20-9.5(2).  These damages also include the following consequential damages:

a.  Utah was forced to pay for the cost of Vioxx and the costs of additional, consequential medical care required to treat Utah Medicaid patients harmed by Vioxx as a result of Merck's submission of false claims, omissions, and misrepresentations relating to the approval and sale of Vioxx;

b.  Utah Medicaid paid approximately five million dollars ($5,000,000) in pharmacy drug claims for Utah Medicaid patients prescribed Vioxx by Utah physicians;

c.  As a consequence of the use of Vioxx, an unsafe drug proved to cause cardiovascular disease and acute cardiovascular events, Utah Medicaid patients suffered the following cardiovascular diseases: hypertension, acute myocardial infarction (MI), acute ischemic heart disease, unstable angina, angina, pulmonary embolism, pulmonary edema, heart failure, occlusion of cerebral arteries, and occlusion of precerebral arteries; and

d.  Paying for the consequential medical care made necessary by the above cardiovascular diseases and events suffered by Utah Medicaid patients as a result of the use of Vioxx, has cost Utah Medicaid in excess of fifty million dollars ($50,000,000).

## FOURTH CAUSE OF ACTION

### Miscellaneous Violations of the Utah False Claims Act

236.  The preceding paragraphs of this Complaint are re-alleged and incorporated by reference, as if fully set forth herein.

237.  In addition to the violations set out above, Merck violated the act by retaining monies paid in violation of the act. UCA §26-20-7(2) (d). Further, Merck's actions aided and

abetted others, including pharmacies, in the violation of the act.  UCA §26-20-7(2)(e).  These statutes require no intent to deceive.

238.   Such violations also subject Merck to the damages and penalties set forth in UCA §26-20-9.5 (2).  These damages also include the following consequential damages:

a.   Utah was forced to pay for the cost of Vioxx and the costs of additional, consequential medical care required to treat  Utah Medicaid patients harmed by Vioxx as a result of Merck's submission of false claims, omissions, and misrepresentations relating to the approval and sale of Vioxx;

b.   Utah Medicaid paid approximately five million dollars ($5,000,000)  in pharmacy drug claims for Utah Medicaid patients prescribed Vioxx by Utah physicians;

c.   As a consequence of the use of Vioxx, an unsafe drug proved to cause cardiovascular disease and acute cardiovascular events, Utah Medicaid patients suffered the following cardiovascular diseases: hypertension, acute myocardial infarction (MI), acute ischemic heart disease, unstable angina, angina, pulmonary embolism, pulmonary edema, heart failure, occlusion of cerebral arteries, and occlusion of precerebral arteries; and

d.   Paying for the consequential medical care made necessary by the above cardiovascular diseases and events suffered by Utah Medicaid patients as a result of the use of Vioxx, has cost Utah Medicaid in excess of fifty million dollars ($50,000,000).

## FIFTH CAUSE OF ACTION

### Violations of the Utah False Claims Act (Prior Version of Statute)

239.    The preceding paragraphs of this Complaint are re-alleged and incorporated by reference, as if fully set forth herein.

240.    In partial or complete addition or in the alternative to the causes of action set forth above, the State of Utah asserts that it is entitled to damages under the Utah False Claims Act as set forth prior to the 2007 amendments to the Statute for the following reasons in relation to false claims as more fully set forth above:

     a.   The State claims damages to the Utah Medicaid program arising out of claims which were presented or caused to be presented to the State for medical benefits which Merck knew to be wholly or partially "false, fictitious or fraudulent." Former Utah Code Annotated 26-20-7(1);

     b.  The State claims damages arising out of claims which were presented or caused to be presented for medical benefits by which Merck knowingly misrepresented the qualities (safety and efficacy) of the pharmaceutical Vioxx.  Former Utah Code Annotated 26-20-7(2)(b);

     c.  The State claims damages for the prescription of Vioxx to Medicaid recipients which Merck and its employee knowingly filed a claim for which Merck knew to be "not medically necessary in accordance with professionally recognized standards." Former Utah Code Annotated 26-20-7(2)(d);

     d.  The State claims damages arising out of any effort by Merck or its employees to knowingly "falsify or alter with intent to deceive any report or document

required by State or federal law, rule or Medicaid provider agreement."

Former Utah Code Annotated 26-20-7(2)(j);

e.   The State claims damages arising out of Merck knowingly retaining Utah

Medicaid's payment for Vioxx which was unlawful as set forth above.

Former Utah Code Annotated 26-20-7(2)(k); and

f.   The State claims damage under (a) corresponding provision(s) of a prior

version of the Utah False Claims Act invoked elsewhere in this Complaint.

## SIXTH CAUSE OF ACTION

### Negligence

241.   The preceding paragraphs of this Complaint are re-alleged and incorporated by reference, as if fully set forth herein.

242.   Merck owed the general public including the Utah Medicaid program a duty of care with respect to the presentation and sales of Vioxx.

243.   Merck, its officers and employees were negligent in their testing, reporting, and representations as to the efficacy and safety of Vioxx.  Merck violated its duty of care towards the general public and Utah Medicaid in the following particulars:

a.   Merck was negligent in its interpretation of the pre-FDA approval tests.  Such tests would have disclosed the increased risks of harm associated with Vioxx;

b.   Merck was negligent in the interpretation of post-approval tests which would have indicated the increased risks of harm associated with Vioxx;

c.   Merck, its marketers and representatives were negligent in promoting literature which downplayed or ignored the increased risks of harm associated with Vioxx;

and

d.   Merck and its marketers and representatives were negligent in failing to warn the general public, doctors and Utah Medicaid as to the nature and extent of the risks of Vioxx when those risks became readily apparent.

244.   As a result of this negligence, the State suffered damages proximately caused by the actions of Merck, its employees and representatives.  The damages include the costs of the medication and the costs of treating Medicaid patients for the damages proximately caused by the Vioxx.  Those damages are alleged more particularly below.

## PRAYER FOR RELIEF

Pursuant to UCA §26-20-9.5, the State is entitled to the following damages:

1.   Full and complete restitution of all damages suffered by the State as a result of any of the activities alleged above.  This would include all consequential damages (subsequent care for Utah Medicaid recipients.)  It would also include the costs of medication;

2.   The costs of the State's enforcement of this action including attorney's fees;

3.   A civil penalty of three times the cost of the amount of damages sustained by the State;

4.   A civil penalty of not less than $5,000 nor more than $10,000 for each and every violation of the act, or alternatively a civil penalty of up to $2000 for each violation of the Act.

Pursuant to common law:  the State is entitled to recover the full amount of the damages

suffered by the State as a consequence of Merck's negligence.

DATED this 17th day of April, 2012.

_____
Joseph W. Steele
Kenneth D. Lougee
STEELE & BIGGS
5664 South Green Street
Salt Lake City, UT  84123
*Attorneys for Plaintiff*

_____
Kenneth D. Lougee
SIEGFRIED & JENSEN
5664 South Green Street
Salt Lake City, UT  84123
*Attorneys for Plaintiff*

_____
Eric H. Weinberg
The Law Offices of Eric H. Weinberg
149 Livingston Avenue
New Brunswick, NJ  08901
*Attorney for Plaintiff*

_____
Richard W. Schulte (Ohio Bar No. 0066031)
812 E. National Road, Suite A
Vandalia, Ohio 45377
(937) 435-7500
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing document has been served upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8, on this _17th_ day of April, 2012.