1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF LOUISIANA
2  ************************************************************

3
   IN RE:  VIOXX PRODUCTS              MDL No. 1657
4  LIABILITY LITIGATION                Section: "L"
                                       New Orleans, Louisiana
5                                      Tuesday, October 19, 2010

6  THIS DOCUMENT RELATES TO:
     Gene Weeks,
7    Case No. 05-4578
   ************************************************************

8

9            TRANSCRIPT OF MOTION PROCEEDINGS
        HEARD BEFORE SPECIAL MASTER PATRICK JUNEAU
10

11

12 APPEARANCES:

13 FOR ATTORNEYS TRIAL GROUP:      ATTORNEYS TRIAL GROUP
                                   BY:  MARIA D. TEJEDOR, Esq.
14                                 540 N. Semoran Blvd.
                                   Orlando, FL 32807
15

16

17

18 Official Court Reporter:       Karen A. Ibos, CCR, RPR, CRR
                                   500 Poydras Street, Room HB-406
19                                 New Orleans, Louisiana 70130
                                   (504) 589-7776
20

21

22      Proceedings recorded by mechanical stenography, transcript
   produced by computer.
23

24

25

<u>P R O C E E D I N G S</u>

(TUESDAY, OCTOBER 19, 2010)

(MOTION PROCEEDINGS)


  (OPEN COURT.)

          SPECIAL MASTER JUNEAU:  We're on the record, it's Patrick

Juneau, the appointed Special Master in the matter *in re:  Vioxx*

*Products Liability Litigation*, MDL 1657, case assigned to Judge

Fallon.

          Specifically what we're here today is a scheduled hearing

involving an attorney fee dispute.  Involved parties are Mr. Weeks,

a Mr. Ronald R. Benjamin, and Maria Tejedor and her firm, and we're

here to receive evidence and consider the matter at this time.

          It is now 1:35 I believe.  I will offer and introduce

into evidence in a minute some of the court filings so that we will

have a complete record.

          For purposes of appearance, would you please make your

appearance, please.

          MS. TEJEDOR:  Yes, Maria Tejedor here.

          SPECIAL MASTER JUNEAU:  Mr. Benjamin, neither Mr.

Benjamin nor Mr. Weeks are here for the scheduled hearing.

          Let me, just for the record, get some of the documents

put into evidence.  I'll mark as SM-1 an order of Judge Fallon

referring the matter involving fee and lien disputes to me as the

special master, that's Special Master 1.

1          The second is a ruling by Judge Fallon and an order dated

2     October 14, 2010, and referring to me as the special master a

3     motion to strike which had been filed, and a motion for summary

4     judgment which had been filed.

5          I might add that the motion had been filed by

6     Mr. Benjamin seeking to set aside or remove from consideration of

7     the special master this matter for the reason he filed a summary

8     judgment.  In the order of October 14, 2010, that motion was denied

9     by Judge Fallon.  I'll mark that, that order as being Special

10    Master 2.

11         Special Master 3 is an order and reasons for judgment --

12    I say judgment, reasons on motions that were filed.  This order is

13    dated February 18, 2010, it was entered by Judge Eldon Fallon.

14    I'll mark that as SM-3.  This addresses multiple issues in the case

15    involving the relationship of the parties and the motion by

16    Mr. Benjamin to attempt to not enforce or allow the plaintiff to

17    remove himself from the enrollment which had been entered into in

18    this case.  The documents speak for itself, but it has relevant

19    bearing on the issues in this case.  And again, that's marked as

20    SM-3.

21         SM-4, which I'll mark now, is the scheduling order and

22    requirements that I as the special master addressed to the parties

23    in this litigation.  It set out several other things, including the

24    actual hearing which is set for today at 1:30, was set for today at

25    1:30 p.m. on October 19th, 2010, in the federal courthouse in New

1   Orleans, Louisiana, room C-311; and that is, in fact, the room that

2   we're in today.

3            As part of the issuance of that scheduling order, I

4   required the appearance of all involved attorneys and parties

5   including Marie Tejedor, Mr. Benjamin, and Mr. Weeks, and I

6   indicated that those appearances were mandatory.

7            I'll mark as SM-5 another document which is a letter from

8   myself to the attorneys involved in the case.  And the background

9   of that is that I was advised that the parties were not able to

10  schedule a face-to-face meeting as required by the scheduling

11  order, and I attached thereto the letter, one of the letters

12  pointing out the problem.  And in view of the controversy, I

13  ordered all of the parties to appear in New Orleans at a certain

14  date at a certain place on September 13, 2010.  The respective

15  return receipts are indicated hereto indicating that the parties

16  had, in fact, received this letter.  And I'll mark that as SM-5.

17           Ms. Tejedor, as I understand it, you'll recall that I had

18  a telephone conference subsequent to this letter inquiring about

19  the status of who appeared and did not appear, and you indicated

20  that you did, in fact, comply with the order and did, in fact,

21  appear in New Orleans.

22           MS. TEJEDOR:  That's correct, your Honor.

23           SPECIAL MASTER JUNEAU:  Is that correct?

24           MS. TEJEDOR:  That's correct.

25           SPECIAL MASTER JUNEAU:  And in that same conversation

1   Mr. Benjamin indicated that he did not appear.

2           MS. TEJEDOR:  That's correct, your Honor.

3           SPECIAL MASTER JUNEAU:  Next I have a document which has

4   been submitted by you, counsel, which was in compliance with the

5   scheduling order to submit in advance the various exhibits and

6   documents to be introduced as exhibits at this hearing, and that's

7   contained in this folder, is it not?  And I'll show you that folder

8   now.

9           MS. TEJEDOR:  Yes, your Honor.

10          SPECIAL MASTER JUNEAU:  Are you offering to file that,

11  all of those exhibits into evidence?

12          MS. TEJEDOR:  Yes, your Honor, we are.

13          SPECIAL MASTER JUNEAU:  There being no objection, they're

14  going to be received, I'll mark that as, I'll call it for lack of a

15  better word, Maria 1.

16          Lastly, you had sent me a letter, it's a copy of a letter

17  dated January 22, 2009, from you to a Mr. Weeks.  You had submitted

18  this letter to be included as part of that exhibit book, had you

19  not?

20          MS. TEJEDOR:  Yes, your Honor.

21          SPECIAL MASTER JUNEAU:  And you ask that that document be

22  introduced into evidence?

23          MS. TEJEDOR:  Yes, your Honor.

24          SPECIAL MASTER JUNEAU:  Hearing no objection, it will be

25  marked as Maria 2.

1        Now, do you want to raise your right hand, please, ma'am.

2     (WHEREUPON, MARIA TEJEDOR WAS SWORN IN AND TESTIFIED AS

3     FOLLOWS:)

4        SPECIAL MASTER JUNEAU:  Please give us your name.

5        MS. TEJEDOR:  Maria Tejedor.

6        SPECIAL MASTER JUNEAU:  And just confirm for the record

7  your connection and representation in this matter.

8        MS. TEJEDOR:  Yes, your Honor.  I represented, along with

9  my law firm, Mr. Weeks in the Vioxx MDL lawsuit, which our

10  representation with him started in March of 2005, we were hired on

11  a contingency fee basis.

12        SPECIAL MASTER JUNEAU:  And you continued that, I think

13  your documents reflect that, but you had been continuously engaged

14  in the case performing multiple tasks during that period of time?

15        MS. TEJEDOR:  Yes, your Honor, absolutely.

16        SPECIAL MASTER JUNEAU:  So we'll have a procedural

17  history, and then what occurred during the course of the events?

18  Just give us a little historical perspective.

19        MS. TEJEDOR:  Absolutely, your Honor.  After he signed

20  the contingency fee contract with my law firm, we went about

21  obtaining all of his medical records, having an expert review them,

22  and we opted that he had a viable miocardial infarction case; and

23  we, in fact, filed a lawsuit directly here in Louisiana in the MDL

24  directly, and that was on September 30th, 2005, we filed the

25  lawsuit on his behalf.

1          And after that, your Honor, we litigated the case and we

2     complied with the court's order, which required plaintiff profile

3     forms to be filed, I'm sure you aware about those.  And the first

4     one was filed in December of '05, we timely complied with that

5     order; and then we filed a supplemental plaintiff profile form in

6     July 16th of 2006 adding additional new records which helped his

7     case and additional information.  And all of those, every deadline

8     in this case, your Honor, that Judge Fallon posed, we met in a

9     timely fashion and complied with every discovery order in the case.

10          In November of 2007, as you know a settlement was

11     reached.  We prepared a three-page letter, along with the

12     settlement outline of the settlement and we sent it to Mr. Weeks,

13     and we explained to him what the terms of the settlement were,

14     provided him with examples, you know, told him exactly what was

15     there outlined, everything, and we recommended that he participate

16     in the settlement.  He, in fact, signed the endorsement, there was

17     an endorsement that we require he sign saying that he wanted to be

18     a part of the settlement and he agreed to be a part of the

19     settlement.  Signed that endorsement, that was part of Judge

20     Fallon's order, and he sent that back.

21          After he signed that endorsement, we then forwarded to

22     him in January of '08, we forwarded to him the entire release that

23     the Merck defendants wanted them to sign; and it was a several-page

24     release, we explained the release to him, he, in fact, signed the

25     release in January of '08 releasing his case and agreeing to be

1    part of the MDL Vioxx settlement.

2              And, in fact, I had numerous conversations with him and

3    he was on board, he liked the settlement, agreed to it, and wanted

4    his case resolved within the settlement.

5              So that was in January of '08, your Honor, that he signed

6    the settlement.  Then in January of 2009, a year later, we received

7    from the claims administrator a notification that he was not

8    meeting the proximity gate.  So we contacted Mr. Weeks and we

9    discussed that with him and explained it to him how he was not

10   meeting the proximity gate.  And then he said, well, he said,

11   Maria, what are my options at that point?  I said, well, here's two

12   options we have:  We continue to appeal your case through the MDL.

13   I said, and if all options fail, then the other option is to opt

14   out of the settlement and you're going to have to file a civil

15   lawsuit.

16             I explained to him, your Honor, that a part of the

17   settlement agreement at the time precluded attorneys from handling

18   cases within the MDL from filing the tort action.  And I explained

19   that to him, he understood it, and he said, okay, Maria, if that

20   happens then I'll have to find an alternative lawyer to file the

21   tort action.

22             So I went back to the office, we called immediately the

23   claims administrator and the steering committee, and we said, hey,

24   we have this initial notice that he didn't meet the proximity gate,

25   what's going on with these cases?  And they told us it's too early,

1    way too early.  Okay.  Those initial determinations are initial

2    determinations, we anticipate expanding more liberal standards, but

3    right now they said we're trying to assess how much money we've got

4    in our pot, how much points we're going to award, and we think that

5    we're probably going to give a more liberal standard and we're

6    going to include a lot of these people that aren't meeting the

7    gates now and include them in the settlement.  So they said we just

8    need to wait a little bit.

9         And, in fact, the release says that, the release says we

10   can't tell you what your points are going to be or if you're going

11   to get money until the end of the proceeding, until everything is

12   done.

13        SPECIAL MASTER JUNEAU:  I think the agreement provides,

14   does it not, acknowledged period of time there would be a gap for

15   reassessment, it wasn't final?

16        MS. TEJEDOR:  Absolutely, absolutely.  Because it was

17   very early, too early to tell how many people they had, how much

18   the points were going to be.  It was too early.

19        And, in fact, sure enough, and we kept on top of it, kept

20   in constant communication with the claims administrator, we said

21   we'll get you anything you need to make sure this gentleman's claim

22   goes through.  And sure enough, we received good news a few months

23   later in May of '09 telling us he had met the proximity gate, we're

24   going to let him in.

25        SPECIAL MASTER JUNEAU:  What's important for this record

```
 1     is all of the documentation and so forth, the assemblage of that

 2     material had been produced long before that and been generated by

 3     your firm; is that correct?

 4              MS. TEJEDOR:  That is correct, your Honor.

 5              SPECIAL MASTER JUNEAU:  Did anybody else provide that

 6     information or do you know?

 7              MS. TEJEDOR:  No, your Honor, we were the only law firm

 8     representing Mr. Weeks at the time.  And you're correct, your

 9     Honor, it's my position that the contingency had been met way

10     before January of 2009 when they initially said he didn't meet the

11     proximity, way before then.  Everything had been done before

12     January of '09 that needed to be done to get him his settlement

13     money, including getting the expert reports, filing the lawsuit,

14     that was in '05, getting the plaintiff profile form, that's really

15     the key, the plaintiff profile form and getting them timely, those

16     were both done in '05 and we supplemented it in '06.

17              And that's the key there, your Honor.  Everything had

18     been done up until January of '09 to get him -- to get him his

19     money, to get him his settlement.  There was nothing else that

20     needed to be done, everything had been done and timely done for

21     him.  We had protected his claim.  And he wanted to be part of the

22     settlement.

23              So what happened at that point, your Honor, is

24     apparently, apparently Mr. Weeks takes the position -- and I want

25     to also for the record bring to the court's attention that
```

1   Mr. Weeks does not object to our attorney fee in this case.  At no

2   time has Mr. Weeks raised an objection to our attorney free.  In

3   fact, as I included in our documents, in Florida when you settle a

4   case they have to sign a closing statement verifying the attorneys

5   fees, costs, and acknowledging that they agree to it and then

6   disburse money to the client.  He signed that closing statement,

7   I've attached it.  I talked to him, I don't have an objection to

8   your attorney fee whatsoever, he signed the closing statement, and

9   he's received all of his settlement money.  He received, I think, a

10  check in the amount of $185,000 and he cashed it a long time ago.

11  So Mr. Weeks doesn't have an objection.

12          It was a few days after Mr. Weeks had received this

13  money, spoke to me and told me that he had no objection to our

14  attorney fee claim, that Mr. Weeks called me up, your Honor, in a

15  mad panic, very upset, poor gentleman, and said to me, Maria, I

16  don't have any objection to your fee but Mr. Benjamin has told me

17  that if I don't raise an objection to your fee he said he is going

18  to sue me personally for the money.  So I said, well, Mr. Weeks, I

19  said don't worry, I said the money is going to be held in trust.

20  It won't be disbursed and the court will have to rule on the

21  matter.  So that's the way I left it with Mr. Weeks.

22          So, your Honor, in January -- so in May we received a

23  letter, a favorable letter saying that he, his case had been

24  approved and they gave us an initial points allocation and it was

25  like $222,000 I believe was the initial points allocation.  Well,

 1   at that point --

 2            And, your Honor, also I want to remind on January 2nd,

 3   2009, I sent Mr. Weeks a letter letting him know that I spoke with

 4   the claims committee, spoke with the committee, and I explained to

 5   him that they said it's too early, your case is still alive

 6   basically; and that he also asked us that in the event that his

 7   case did not meet the proximity gate for us to protect his future

 8   claim by filing a future evidence stipulation, and we said,

 9   Mr. Weeks, we will be happy to do that, absolutely we will protect

10   your claim.

11            SPECIAL MASTER JUNEAU:  That was done at the request of

12   whom?

13            MS. TEJEDOR:  Of Mr. Weeks.  Mr. Weeks said, he said,

14   Maria, in case I don't get through the proximity gate, he said what

15   can you do to protect my case?  I said, we'll have to file a future

16   evidence stipulation for you because that was one of the

17   requirements.  And I said, we'll do that.  We'll do everything we

18   need to do to protect you, Mr. Weeks.

19            So we actually contacted the claims administrator and

20   said what do we need to do to file this future evidence

21   stipulation, and that's when they let us know, Maria, it's too

22   early, you're jumping the gun, it's too early, his claim may very

23   well be qualified.

24            So I wrote him a letter in January of '09 and let him

25   know that we would continue to represent him, and giving him

1    basically the good news that it's too early, your claim may well go

2    through.

3              SPECIAL MASTER JUNEAU:  What I need to know, you're under

4    the understanding that you're still at his request representing his

5    interest?

6              MS. TEJEDOR:  Absolutely, your Honor.  He had asked us to

7    continue to represent him at this time.  He had asked us --

8              SPECIAL MASTER JUNEAU:  You referred to a January 22,

9    2009, letter, I've marked that as Maria 2 as part of the evidence

10   here.

11             Okay.  Continue if you want.

12             MS. TEJEDOR:  So in May of '09 we received the

13   information that he had been accepted.  We sent him a letter, which

14   is attached to the record, letting him know the good news that he

15   had been accepted.  And it was some six, yeah, May 5th of 2009, we

16   sent him a letter letting him know that we were pleased to let him

17   know that he had made it through the proximity gate and they would

18   be allocating points to him.

19             And then on May 12th of 2009 I sent him a letter letting

20   him know what points had been allocated for him and that he had

21   received $229,000 in compensation, and I sent him that letter.

22   Now, mind you, from May 5th to May 12th I never received any

23   information, any calls --

24             SPECIAL MASTER JUNEAU:  Give me those dates again,

25   please.

1          MS. TEJEDOR:  May 5th through May 12th.  You know, when I

2    initially told him on the 5th he got approved and then on the 12th

3    when I sent him a letter -- this is like down the street from

4    Orlando, it gets there in a day.

5          So on May 12th, you know, we sent him, these are your

6    points award.  He never called or anything, Maria, stop working on

7    my case, you're fired, I don't want you working on my case, we

8    never got any of those calls from this gentleman.  So we continued

9    to represent him.

10          And then it was a few days after that, it was May 12th we

11    sent him the letter, on May 14th, your Honor, two days later he

12    sends me a letter telling me, "This letter shall serve as notice

13    that I no longer require your representation in this case.  Any

14    actions by your law firm pursuing my case shall be deemed

15    unauthorized.  I am represented by another law firm."

16          SPECIAL MASTER JUNEAU:  That's on May 12?

17          MS. TEJEDOR:  May 14th.  Now, mind you, it doesn't

18    reference, hey, I sent you an e-mail before, it doesn't reference

19    what are you doing working on my case, I don't want you working on

20    my case.  This letter basically references as of today I don't want

21    you working on my case anymore.  So that was the first letter we

22    got from him, May 14th, 2009.  Mind you, your Honor, that's two

23    days after he got his points allocation.  But it's two days after

24    but also a year after, he had already signed a release and agreed

25    to settle his case, which is really the important date here when

1   you agree to the settlement a year before.

2          So, your Honor, my concern was, as you know with these

3   cases is that you had a very limited time to appeal about points

4   award.  I looked at the points award and I said, hey, they got it

5   wrong, he is entitled to more money because they said he had high

6   cholesterol and he didn't.

7          So I immediately attempted to contact Mr. Weeks, he

8   wouldn't call me, could not get a hold of him, wouldn't call me, I

9   was very worried about his appeal.  I think it was very time

10  constraint, less than 30 days we had.  I was very concerned about

11  it, and my concern was, your Honor, if I don't appeal this case, I

12  don't know what his lawyer is doing, I don't know -- what happens

13  if I don't appeal his case and he loses that right.  So I did what

14  I thought was the right thing to do is I filed his appeal for him.

15         And we filed the appeal for him based -- and I attached

16  the appeal and I attached all of the medical records showing that

17  he was entitled to an increase in his award.  And, in fact, your

18  Honor, the claims administrator agreed with me and found that I was

19  correct, that he did not have high cholesterol, and the claims

20  administrator came back and advised me that he was entitled to an

21  additional $60,000.  So the award went up from 229 to 289.

22         And mind you, your Honor, at this time, according to

23  Mr. Benjamin at this time Mr. Benjamin says that he was

24  representing him.  Well, Mr. Benjamin didn't do anything to protect

25  this gentleman's award to make sure it was appealed, to make sure

1    that his points allocation was appropriate, he didn't do anything

2    for this gentleman.  And quite frankly, your Honor, if we hadn't

3    acted, he would have lost his appeal because nothing would have

4    been done.

5            So his award was increased and I think Mr. Weeks was

6    delighted about that.  And that's where we are, your Honor.

7            SPECIAL MASTER JUNEAU:  Let's come full circle.  After

8    that was done then there was an actual disbursement, was there not?

9            MS. TEJEDOR:  Yes, your Honor.  Then after that was done,

10   after that happened, he got his -- Mr. Benjamin filed a motion,

11   Mr. Benjamin filed a motion to have Mr. Weeks' settlement set

12   aside.  Because, see, Mr. Benjamin apparently what he was trying to

13   do, my understanding is that he took Mr. Weeks and other plaintiffs

14   and he filed like this class action lawsuit outside of the MDL to

15   try to, I guess, receive a higher recovery I guess from some of

16   these plaintiffs, outside of the MDL.

17           And apparently he had Mr. Weeks being the class

18   representative in this lawsuit.  And he filed a motion to set that

19   settlement, the MDL settlement aside and Judge Fallon, I came to

20   the hearing here in New Orleans, he didn't appear, he appeared by

21   phone, Mr. Benjamin, and Judge Fallon ruled that Mr. Weeks had

22   knowingly, willingly, intelligently entered into that settlement by

23   verifying by signing all of the releases, signing all of the

24   letters, and Judge Fallon deemed that it was an appropriate

25   settlement.

1            SPECIAL MASTER JUNEAU:  That has to do with Judge

2    Fallon's order of November 18 -- excuse me, February 18, 2010?

3            MS. TEJEDOR:  Yes.

4            SPECIAL MASTER JUNEAU:  Okay.  All right.

5            MS. TEJEDOR:  And the court in that order, your Honor,

6    said that since it was a valid settlement that I was authorized to

7    disburse the moneys to Mr. Weeks, and that's what we did.

8            SPECIAL MASTER JUNEAU:  Did Mr. Weeks accept the money,

9    cash the money?

10           MS. TEJEDOR:  Absolutely.  He signed my closing

11   statement, he accepted it and was very delighted.  Cashed it.

12           SPECIAL MASTER JUNEAU:  Now, I don't have any record and

13   the clerk has no record of ever having received any submission of

14   exhibits of any kind from Mr. Benjamin pursuant to the scheduling

15   order that I published.  My question to you, did you receive any

16   exhibits?

17           MS. TEJEDOR:  No, your Honor.

18           SPECIAL MASTER JUNEAU:  Next question:  Did you receive

19   any requests for an extension of time or anything like that

20   regarding submission of exhibits?

21           MS. TEJEDOR:  No, your Honor.

22           SPECIAL MASTER JUNEAU:  Next, you had, I believe, on

23   August 27th communicated to me about meeting the deadline with

24   regard to face-to-face meeting which was required by the scheduling

25   order.  Do you recall that letter?

1          MS. TEJEDOR:  Yes, your Honor.

2          SPECIAL MASTER JUNEAU:  It's attached to Special Master

3   No. 5.

4          Subsequently I issued a letter to you and to

5   Mr. Benjamin, I have the return receipts here, indicating both had

6   received it indicating that schedule.  I scheduled a face-to-face

7   meeting between the two sides since apparently it couldn't be

8   agreed upon to meet, I set it for ten o'clock A.M. on Monday,

9   September 13th, 2010, in New Orleans at the Hilton Hotel here in

10  New Orleans; is that correct?

11         MS. TEJEDOR:  Yes, your Honor.

12         SPECIAL MASTER JUNEAU:  Now, did you comply with that

13  order?

14         MS. TEJEDOR:  Yes, your Honor, we did.

15         SPECIAL MASTER JUNEAU:  And so you came here for the

16  meeting?

17         MS. TEJEDOR:  That's correct.

18         SPECIAL MASTER JUNEAU:  And I had asked you earlier, you

19  said Mr. Benjamin did not show up for that meeting?

20         MS. TEJEDOR:  He did not, your Honor.

21         SPECIAL MASTER JUNEAU:  Or now.

22         I notice in your submissions, more particularly the

23  exhibit book that you have submitted, you had incurred a cost

24  obviously in coming here, have you not?

25         MS. TEJEDOR:  Yes, your Honor.

```
 1              SPECIAL MASTER JUNEAU:  Let's find that document.  Was
 2   that attached to the affidavit?
 3              MS. TEJEDOR:  Yes, your Honor, let me get it to you.
 4   It's Exhibit 3.
 5              SPECIAL MASTER JUNEAU:  Exhibit what?
 6              MS. TEJEDOR:  Three.  It's attached to the affidavit,
 7   it's three.
 8              SPECIAL MASTER JUNEAU:  Okay.  All right.  I have it.
 9   You had indicated that the airfare and cabs service and meals was
10   $495.15, right?
11              MS. TEJEDOR:  Yes, sir, that's correct.
12              SPECIAL MASTER JUNEAU:  And you're attesting here today
13   before this court that you did, in fact, incur that expense?
14              MS. TEJEDOR:  Absolutely, your Honor.
15              SPECIAL MASTER JUNEAU:  The question I have for you is, I
16   know that's your expense of getting here, but you spent time in
17   going and coming back and forth?
18              MS. TEJEDOR:  That's correct, your Honor.
19              SPECIAL MASTER JUNEAU:  I'm asking you how much time did
20   you spend in doing that?
21              MS. TEJEDOR:  Your Honor, I can say about, I mean, at
22   least 8 hours, it was a full day.
23              SPECIAL MASTER JUNEAU:  All right.
24              MS. TEJEDOR:  It was a full day of back and forth.
25              SPECIAL MASTER JUNEAU:  And obviously you came here
```

```
 1   specifically for that purpose, I mean, there was no other dual
 2   purpose in being here, like you didn't want to come to a Mardi Gras
 3   festival?
 4            MS. TEJEDOR:  No, it was the same day thing.
 5            SPECIAL MASTER JUNEAU:  The other thing I have that I
 6   want to clarify with you, is part of your exhibit you had indicated
 7   under tab 3 is your affidavit, is it not?
 8            MS. TEJEDOR:  Yes.
 9            SPECIAL MASTER JUNEAU:  First of all, are you attesting
10   before the court that the statements contained in that affidavit
11   are true and correct?
12            MS. TEJEDOR:  Yes, your Honor.
13            SPECIAL MASTER JUNEAU:  In that same affidavit you say
14   that part of the costs that were accumulated under your contractual
15   agreement with this claimant in handling this matter amounted to
16   $2,945.74; is that correct?
17            MS. TEJEDOR:  Yes, your Honor.
18            SPECIAL MASTER JUNEAU:  And of course I assume for that
19   you're seeking the attorney's fee for the services rendered in this
20   matter?
21            MS. TEJEDOR:  Yes, your Honor.
22            SPECIAL MASTER JUNEAU:  Plus those costs; is that
23   correct?
24            MS. TEJEDOR:  Yes, sir.
25            SPECIAL MASTER JUNEAU:  And insofar as all of the
```

exhibits that are contained in the bench book which I have marked

as Maria 1, are you attesting that these are, in fact, accurate

documents that are submitted, as well as the contractual agreement

insofar as the letters and sequences of events and time and effort

expended by you, are you attesting that these are true and correct

representations from your standpoint?

          MS. TEJEDOR:  Yes, your Honor.

          SPECIAL MASTER JUNEAU:  Did anybody call you in advance

of today, i.e., Mr. Weeks and/or Mr. Benjamin indicating to you

that they were not going to appear here today for this scheduled

court hearing?

          MS. TEJEDOR:  No, your Honor.

          SPECIAL MASTER JUNEAU:  All right.  Ma'am, is there

anything else you think you want to add, I'll give you the

opportunity to do so at this time?

          MS. TEJEDOR:  No, your Honor.  Just that we did attach

the closing statement, which details what the contingency fees were

in the case.

          SPECIAL MASTER JUNEAU:  I don't have that document in

here?

          MS. TEJEDOR:  Yes, it is in there, your Honor.

          SPECIAL MASTER JUNEAU:  Under what?

          MS. TEJEDOR:  Yes, because that's what we're seeking to

recover because per the court order I think the affidavit required

only the costs be placed in there, but we also give you the fees.

```
 1          SPECIAL MASTER JUNEAU:  I am just asking you under what

 2   tab?

 3          MS. TEJEDOR:  Hold on, let me get it for you.  It's J,

 4   1-J.  1-J.

 5          SPECIAL MASTER JUNEAU:  Now, let me ask you this

 6   question.  Does the fee charge that's contained in here, does that

 7   take into consideration the limitation of the fee that was placed

 8   in this case by Judge Fallon?

 9          MS. TEJEDOR:  Yes, absolutely.

10          SPECIAL MASTER JUNEAU:  So it's not the contractual fee,

11   it's what the limited fee was?

12          MS. TEJEDOR:  It's what Judge Fallon said we could

13   charge, your Honor, which my understanding was we could charge no

14   more than 32 but you had -- that included the common fund.  So our

15   fee was reduced to 24 percent, your Honor, pursuant to the court's

16   order.  Yes, that's what Judge Fallon --

17          SPECIAL MASTER JUNEAU:  And that took care of discharging

18   any obligation that you would have with the common benefit cost and

19   fees?

20          MS. TEJEDOR:  Yes.  The common benefit cost and fees,

21   your Honor, they took that money; yeah, they took it, they've been

22   paid.  They took it, yes.

23          SPECIAL MASTER JUNEAU:  And you have more than one law

24   firm listed here, that's for referral counsel that's involved?

25          MS. TEJEDOR:  And my old law firm, your Honor, too, which
```

```
1     we have an amicable relationship, and we've agreed to obviously to

2     the division of the fees.

3               SPECIAL MASTER JUNEAU:  So insofar as all of those

4     contractual relations, all of that can be discharged by what you're

5     suggesting in the closing statement?

6               MS. TEJEDOR:  Absolutely, your Honor, yes.

7               SPECIAL MASTER JUNEAU:  Okay.  Anything else that you

8     want to add?

9               MS. TEJEDOR:  And, your Honor, I had filed a motion to

10    strike Mr. Benjamin's motions -- Mr. Benjamin's request for a fee

11    in this case based upon his failure to comply with this court's

12    order appearing at the conference in New Orleans that the court

13    ordered that I appear for, as well as failing to provide us with

14    the evidence needed to substantiate his fees, I guess the award

15    that he is seeking.  You know, pursuant to your order, your Honor,

16    you had requested that he produce -- required that he produce

17    memorandum, exhibits, contractual agreements, certifications, and

18    affidavit of his time in a case, and today I haven't gotten any of

19    that.  I don't have a contract, I don't have any basis for which he

20    can assert an attorney fee claim.

21              SPECIAL MASTER JUNEAU:  You are correct, prior to today

22    there have been motions to strike which have been filed, there's

23    been a motion for summary judgment by Mr. Benjamin has been filed,

24    and you filed a motion for summary judgment.

25              MS. TEJEDOR:  Yes.
```

1          SPECIAL MASTER JUNEAU:  That will be contained in my

2    report.  And what I going to do is I am referring those matters to

3    the merits of this hearing, which will be addressed in a formal

4    merit finding by the court.

5          MS. TEJEDOR:  Understood.

6          SPECIAL MASTER JUNEAU:  Anything else?

7          MS. TEJEDOR:  I don't have anything else, your Honor.

8          SPECIAL MASTER JUNEAU:  It is now five minutes after two.

9    Mr. Bailiff, would you just check outside and see if Mr. Benjamin

10   or Mr. Weeks are here, please.

11         THE MARSHAL:  Yes, sir.

12         SPECIAL MASTER JUNEAU:  Just let the record reflect that

13   Mr. Benjamin or Weeks are here in the courtroom, nor have they

14   appeared nor have I heard or got any communication from them

15   indicating one way or another whether they would appear.

16         MS. TEJEDOR:  That's correct.

17         SPECIAL MASTER JUNEAU:  And let the record reflect that

18   I've asked the bailiff to go outside the courtroom to ascertain

19   whether or not they may be outside.

20         THE MARSHAL:  No response, your Honor.

21         SPECIAL MASTER JUNEAU:  The bailiff has indicated that

22   there is no response to our call for their appearance.  I would

23   like the record to reflect that the hearing was, in fact, held at

24   the scheduled time and exact place that was noticed in this matter.

25         That being the matter, I'll consider all of the evidence

1   in and close and I will in due course render a formal written

2   report and recommendation to the court.  Thank you very much.

3         MS. TEJEDOR:  Thank you, your Honor.

4      (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

5

6                     *  *  *  *  *  *

7

8                  REPORTER'S CERTIFICATE

9

10        I, Karen A. Ibos, CCR, Official Court Reporter, United

11   States District Court, Eastern District of Louisiana, do hereby

12   certify that the foregoing is a true and correct transcript, to the

13   best of my ability and understanding, from the record of the

14   proceedings in the above-entitled and numbered matter.

15

16

17   _____

18        Karen A. Ibos, CCR, RPR, CRR

19        Official Court Reporter

20

21

22

23

24

25