UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: Vioxx | * MDL Case No. 1657 |
| | * |
| PRODUCTS LIABILITY | * SECTION L |
| LITIGATION | * |
| | * JUDGE FALLON |
| *This document relates to* | * |
| | * MAGISTRATE JUDGE |
| *Ruth Jenkins, et. al v. Merck & Co., Inc.,* | * KNOWLES |
| *2:05-cv-04054-EEF-DEK* | * |
| | * |
| **Only with regard to:** | * |
| **Lynn Hudnut** | * |

*****************************************************************************

## DEFENDANT MERCK SHARP & DOHME CORP.'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Defendant Merck Sharp & Dohme Corp. ("Merck") respectfully requests that the Court enter summary judgment pursuant to Federal Rule of Civil Procedure 56 in Defendant's favor and dismiss Plaintiff's Complaint with prejudice. Plaintiff Lynn Hudnut claims that in July 2002 he developed a "renal elevation in his creatinine," caused by his use of Vioxx. *See* Ex. 1 (Compl.) ¶ 7; Ex. 2 (Pl. Profile Form) at 2.[1] During the entire time that Vioxx was on the market, however, the Vioxx package insert and Patient Information Sheet clearly and specifically warned of the well-known risks of potential renal complications associated with Vioxx. These are the very ailments that Mr. Hudnut alleges as injuries in this lawsuit. Accordingly, Mr. Hudnut's failure-to-warn claims must fail as a matter of law.

---

[1] All exhibits referenced herein are attached to Defendant's Statement of Material Facts As To Which There Is No Dispute, filed contemporaneously with this Motion.

1095785v1

## BACKGROUND

*Plaintiff Lynn Hudnut's Relevant Medical History*

On August 24, 2005, Plaintiff Hudnut, a Missouri resident, filed this lawsuit against Merck alleging that his prior use of Vioxx caused him to suffer "renal elevation of his creatinine." Ex. 1 ¶ 7. Mr. Hudnut was represented by counsel in this lawsuit until his attorneys moved to withdraw in March 2008, citing a fundamental disagreement regarding the representation. *See* Rec. Doc. 16172.

Prior to ever taking Vioxx, Mr. Hudnut had numerous risk factors associated with kidney disease, including several known cardiovascular risk factors (which are also risk factors for kidney disease) and several significant cardiac events. *See* Ex. 3 (Affidavit of Juan Jorge Olivero, M.D., F.A.S.N.) ¶ 7. More specifically, in 1998, Mr. Hudnut (then 51-years-old) suffered an acute inferior wall myocardial infarction (commonly known as a heart attack), and underwent two angioplasties. *See* Ex. 2 at 7; Ex. 4 (Selected medical records of Eugene Childress, M.D.) at 00060-62. He also has a long history of poorly controlled hypertension stretching back to the 1980s. Ex. 4 at 00085.

Mr. Hudnut began taking Vioxx to treat his arthritic pain in March 2000. Medical records collected in this matter indicate that Dr. Christopher Bieniek, an orthopedic surgeon, began prescribing Vioxx 25 mg to Mr. Hudnut starting on March 7, 2000, and that his primary care physician, Dr. Eugene Childress, continued Mr. Hudnut's prescription for Vioxx beginning in September 2001. *See* Ex. 5 (Prescription records from Osco Drug) at 00006; Ex. 6 (Selected medical records of Christopher M. Bieniek, M.D.) at 00006-07. The prescriptions filled by Mr. Hudnut for Vioxx were generally for 25 mg of Vioxx in quantities of 30 pills per month, but he also filled prescriptions for 50mg of Vioxx on June 28, 2002 (30 pills) and August 1, 2002 (30

pills). *See* Ex. 5 at 00005. Mr. Hudnut's medical records also indicate that in August 2001, Dr. Bienick recommended "occasional[]" use of 50mg daily. Ex. 6 at 00008. Throughout the time that Mr. Hudnut was prescribed Vioxx, he was also using prescription medications known as ACE inhibitors (*e.g.*, Lotensin and Lisinopril) to treat his hypertension. *See, e.g.*, Ex. 6 at 00006-07; Ex. 4 at 00089, 57-58; Ex. 7 (Selected medical records from Veterans Administration Medical Center) at 000187-188, 168-169, 155-158; 147-148.

For the first two years that Mr. Hudnut took Vioxx, his lab work documented normal creatinine levels,[2] and Vioxx helped control his arthritis pain. *See* Ex. 7 at 00150, 00170; Ex. 8 (Selected medical records from Quincy Medical Group) at 00017; Ex. 3 ¶10. In the summer of 2002, Mr. Hudnut's Vioxx dose was increased from 25 mg to 50mg. Ex. 5 at 00002; Ex. 7 at 00145; Ex. 3 ¶ 11. Shortly after this increase, in July 2002, laboratory reports showed elevated serum creatinine levels in Mr. Hudnut's blood. Ex. 7 at 00151-152; Ex. 4 at 00037; Ex. 3 ¶ 11. On July 11, 2002, Dr. Grant Hammons at the Columbia, Missouri VA Medical Center notified Mr. Hudnut of his elevated creatinine and instructed him to stop taking Vioxx until repeat testing could be done. Ex. 7 at 00151. On July 24, 2002, Dr. Childress noted "[p]ossible medication induced renal insufficiency," and, like Dr. Hammons, instructed Mr. Hudnut to "hold the Vioxx as it has a renal component and may be a factor." Ex. 4 at 00016. Notwithstanding these instructions from his physicians, it appears that Mr. Hudnut continued to take Vioxx. *See* Ex. 5 at 00002; Ex. 3 ¶¶ 12-15. On August 22, 2002, new lab work showed that Mr. Hudnut's creatine levels continued to be elevated and he was again instructed to discontinue taking Vioxx. Ex. 4 at 00038. Two weeks later, his medical records document that he had in fact discontinued Vioxx

---

[2]   An individual's creatinine levels track his kidney function. Generally, a higher creatinine level correlates to decreased kidney function. If left untreated, declining kidney function may deteriorate into renal insufficiency and renal failure. *See* Ex. 3 ¶ 8.

3

and his creatine levels were decreasing. Ex. 4 at 00039. By December 2002, Mr. Hudnut's creatine levels had returned to normal range. Ex. 4 at 00040; Ex. 3 ¶ 18. Dr. Childress noted in December 2002: Mr. Hudnut "has had difficulty in the past with renal induced dysfunction secondary to Vioxx therapy. As we discontinued the Vioxx, his lab values . . . have all normalized." Ex. 4 at 00017. In February 2003, Dr. Daryl Miller, a rheumatologist, also noted that Mr. Hudnut "had an elevation of his creatinine with Vioxx. The medication was discontinued. The renal problem was reversible." Ex. 8 at 00019-20.

***Vioxx Labeling: Warnings on Risks of Potential Renal Injuries***

Vioxx is a nonsteroidal anti-inflammatory medication ("NSAID") that was approved by the FDA to treat, among other things, osteoarthritis. Ex. 9 (FDA Approval Letter and initial Vioxx Package Insert) at MRK-99420021411. NSAIDs have long been known to be associated with renal complications on rare occasions. Ex. 3 at ¶¶5, 22. Consistent with this common medical knowledge, throughout the time that Vioxx was available for use in the United States from May 1999 to September 2004, each version of its FDA-approved product labeling contained detailed information about the potential for renal injury associated with NSAIDs like Vioxx. Ex. 3 ¶¶ 22-27.

For example, the initial Vioxx prescribing information, approved by the FDA in May 1999, contained a discussion of "*Renal Effects*" in its PRECAUTIONS section, which cautioned that

> ***Long-term administration of NSAIDs has resulted in renal papillary necrosis and other renal injury.*** Renal toxicity has also been seen in patients in whom renal prostaglandins have a compensatory role in the maintenance of renal perfusion. In these patients, administration of a nonsteroidal anti-inflammatory drug may cause a dose-dependent reduction in prostaglandin formation and, secondarily, in renal blood flow, ***which may precipitate overt renal decompensation***. Patients at greatest risk of this reaction

4

> *are those with impaired renal function, heart failure, liver dysfunction, those taking diuretics and ACE inhibitors, and the elderly.* Discontinuation of NSAID therapy is usually followed by recovery to the pretreatment state. Clinical trials with VIOXX at daily doses of 12.5 and 25 mg have shown renal effects (e.g., hypertension, edema) similar to those observed with comparator NSAIDs; these occur with an increased frequency with chronic use of VIOXX at doses above the 12.5 to 25 mg range. (See ADVERSE REACTIONS.)

Ex. 9 at MRK-99420021424 (emphasis added); Ex. 3 ¶ 22. In March of 2000, the Vioxx prescribing information was updated to include the renal complications of "acute renal failure," "interstitial nephritis," and "worsening chronic renal failure" in the ADVERSE REACTIONS section as serious adverse events reported rarely in patients taking Vioxx, regardless of causality. Ex. 10 (Mar. 2000 Vioxx Package Insert) at MRK-LBL0000042; Ex. 3 ¶ 23. In each version of the Vioxx prescribing information from 1999 through September 2004, potential renal complications were discussed in detail. Ex. 3 ¶¶ 22-27.

Likewise, the Patient Information Sheet, provided to patients and appended to the physician prescribing information, highlighted the potential risk of renal complications with Vioxx. The initial Patient Information Sheet from 1999 stated:

> **What are the possible side effects of VIOXX?**
>
> Serious but rare side effects that have been reported in patients taking VIOXX and/or related medicines have included: . . .
>
> - Serious kidney problems occur rarely in patients taking NSAIDs. . . .

Ex. 11 (Oct. 1999 Vioxx Patient Information Sheet) at MRK-LBL0000001. This language was updated in a new Patient Information Sheet issued in March 2000: "Serious kidney problems occur rarely, *including acute kidney failure and worsening of chronic kidney failure.*" Ex. 12 (Mar. 2000 Vioxx Patient Information Sheet) at MRK-LBL0000003 (emphasis added).

1095785v1

**LEGAL STANDARD**

Summary judgment should be granted whenever it becomes apparent that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the . . . Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (*quoting* Fed. R. Civ. P. 1).  A party moving for summary judgment may discharge its burden to support the motion "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.  The burden of production then shifts to the nonmoving party to introduce specific facts showing there is a genuine issue for trial.  *Id.* at 322-24; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Bland v. Norfolk & S. R. Co.*, 406 F. 2d 863, 866 (4th Cir. 1969) ("[A]n adverse party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in [Fed. R. Civ. P. 56], must set forth specific facts showing that there is a genuine issue for trial.").

**ARGUMENT**

Plaintiff Hudnut alleges that Merck failed to warn him and his prescribing physicians about the potential risk of renal side effects associated with Vioxx.  *See* Ex. 1 ¶¶100, 111, 121, 125, 137, 145.  Yet there can be no dispute that the potential risk of renal side effects like those allegedly experienced by Mr. Hudnut were plainly stated in *every* Vioxx package insert and Patient Information Sheet.  Indeed, the PRECAUTIONS sections of the package insert describes *precisely* the renal injury that Mr. Hudnut alleges, *see* Ex. 3 ¶26, and explicitly warns that the

patients at greatest risk of developing renal injury with NSAIDs are those patients who—like Mr. Hudnut—are also taking ACE inhibitors. Ex. 9 at MRK-99420021424.

Missouri courts[3] adhere to the learned intermediary doctrine, and have thus held that in cases involving manufacturers of prescription drugs, the manufacturer has "a duty to properly warn the doctor of the dangers involved" in the use of that drug. *Doe v. Alpha Therapeutic Corp.*, 3 S.W.3d 404, 419 (Mo. Ct. App. 1999) (quoting *Krug v. Sterling Drug, Inc.*, 416 S.W.2d 143, 146 (Mo. 1967) (internal quotation marks omitted)); *c.f. In re Norplant Contraceptive Prod. Liab. Litig.*, 955 F.Supp. 700, 709 (E.D. Tex. 1997), *aff'd*, 165 F.3d 374 (5th Cir. 1999) (finding that plaintiff's product liability claims, whether asserted under theories of strict products liability, negligence, breach of implied warranty of merchantability, misrepresentation, or state consumer fraud law, were all essentially failure to warn claims to which the learned intermediary doctrine applies because each of those theories "collapse[s] into a charge that the drug manufacturer failed to warn"). As a "corollary" to the learned intermediary doctrine, "a manufacturer of prescription drugs or products discharges its duty to warn by providing the physician with information about risks associated with those products," and "any warning given to the physician is deemed a warning to the patient." *Alpha Therapeutic*, 3 S.W.3d at 419-20.

In a products liability action that alleges injury based upon the manufacturer's failure to warn, to be adequate, a warning must be "reasonable under the circumstances." *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 853 (10th Cir. 2003) ("An adequate warning of an unapparent risk is one that is reasonable under the circumstances." (citing *Brochu v. Ortho Pharm. Corp.*,

---

[3] This Court has previously determined that the applicable substantive law in Vioxx cases is the law of the state where the plaintiffs resided when they were prescribed Vioxx, when they ingested Vioxx, and when they were allegedly injured by the drug—in this case, Missouri. *See In re Vioxx Prods. Liab. Litig.*, 478 F. Supp. 2d 897, 905-06 (E.D. La. 2007); *In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450, 455-58 (E.D. La. 2006); *In re Vioxx Prods. Liab. Litig.*, 448 F.Supp.2d 741, 749 (E.D. La. 2006).

7

642 F.2d 652, 657 (1st Cir. 1981))); *In re Rezulin Prods. Liab. Litig.*, 331 F. Supp. 2d 196, 202 (S.D.N.Y. 2004) (the "crux of the inquiry is whether the warning is reasonable under the circumstances"). Moreover, where the injury complained of by a plaintiff is covered by the actual warnings provided by the manufacturer, a court can determine that the warnings are adequate as a matter of law. *See, e.g.*, *Rounds v. Genzyme Corp.*, 440 F. App'x 753, 755 (11th Cir. 2011) ("[B]ecause Genzyme expressly and clearly warned . . . about the risk of the exact injury of which the [plaintiffs] now complain, the warnings were adequate as a matter of law."); *Gerber v. Hoffmann-LaRoche Inc.,* 392 F. Supp. 2d 907, 916 (S.D. Tex. 2005) ("If a warning specifically mentions the circumstances complained of, the warning is adequate as a matter of law.); *Brumley v. Pfizer, Inc.*, 149 F. Supp. 2d 305, 310 (S.D. Tex. 2001) (same); *Broderick v. Sofamor Danek Grp., Inc.*, No. 95–8644–CIV–RYSKAMP, 1999 WL 1062135, at *5 (S.D. Fla. Apr. 9, 1999) (ruling adequate as a matter of law a warning that "clearly and unambiguously identified the types of possible adverse affects a patient could suffer"); *Cather v. Catheter Tech. Corp.*, 753 F. Supp. 634, 640 (S.D. Miss. 1991) ("A warning may be held adequate as a matter of law where the adverse effect that was ultimately visited upon the patient was one that the manufacturer specifically warned against.").

The renal warnings provided in Vioxx labeling were adequate as a matter of law. As discussed above, Vioxx's package insert explicitly informed physicians that renal injury, including "overt renal decompensation," "**has resulted**" from long-term administration of NSAIDs like Vioxx, particularly in patients like Mr. Hudnut who also use ACE inhibitors. Ex. 9 at MRK-99420021424 (emphasis added). The labeling also stated that "acute renal failure" and "worsening chronic renal failure" had been reported in patients taking Vioxx. Ex. 10 at MRK-LBL0000042. Accordingly, Mr. Hudnut's alleged renal injury of elevated creatinine in July

2002 was specifically identified in the Vioxx label as an event that had been seen and that could occur while a patient is taking Vioxx (or any NSAID). Ex. 3 ¶26. Furthermore, Mr. Hudnut's own physicians appeared to appreciate this well-known potential for renal side effects due to NSAIDs like Vioxx, as their medical records document a concern for the potential impact of his Vioxx usage on his renal function.[4] *See* Ex. 3 ¶25; Ex. 4 at 00016, 17; Ex. 6 at 00151; *see also Meridia Prods. Liab. Litig. v. Abbott Labs.*, 447 F.3d 861, 867 (6th Cir. 2006) (explaining that, in a case involving a drug prescribed by a physician, the learned intermediary doctrine provides that the adequacy of a product's warning is based on "whether the doctor, rather than the patient, would reasonably understand the risks").

Given these warnings, no reasonable fact finder could conclude that the Vioxx package inserts in effect during the time that Mr. Hudnut was allegedly taking Vioxx inadequately warned his prescribing physicians of the risk of renal injury. Renal complications were a known—and warned about—risk of Vioxx from the moment it became available. Where, as here, a product's label informs the prescribing physician about risks concerning the very condition that a plaintiff subsequently suffers, those warnings are adequate as a matter of law. *See, e.g., Rounds*, 440 F. App'x at 755 (holding that "warnings were adequate as a matter of law" where the drug manufacturer "expressly and clearly warned . . . about the risk of the exact injury of which the [plaintiffs] now complain"). Accordingly, Merck's motion for summary judgment

---

[4]   Indeed, it appears that Mr. Hudnut continued to take Vioxx for over a month after several physicians advised him to discontinue it because his creatinine levels had risen. *See* Ex. 7 at 00151; Ex. 4 at 00016; Ex. 5 at 00002. Under Missouri law, there are "two separate requirements of causation in a failure to warn case: (1) the product for which there was no warning must have caused plaintiff's injuries; and (2) plaintiff must show a warning would have altered his behavior." *Cole v. Goodyear Tire & Rubber Co.*, 967 S.W.2d 176, 184 (Mo. Ct. App. 1998). Given Mr. Hudnut's apparent disregard for his physician's instructions, it is doubtful that any different warning provided to his physicians would have "altered his behavior." *Id.*

should be granted because the Vioxx labels concerning the potential risk of renal injury were adequate as a matter of law.

## CONCLUSION

For the reasons stated above, the Court should grant Defendant's Motion for Summary Judgment and dismiss Plaintiff Hudnut's Complaint with prejudice.

Dated: June 7, 2012                                    Respectfully submitted,


                                                     */s/ Dorothy H. Wimberly*
Phillip A. Wittmann, 13625
Dorothy H. Wimberly, 18509
STONE PIGMAN WALTHER WITTMANN L.L.C.
546 Carondelet Street
New Orleans, Louisiana 70130
Phone: 504-581-3200
Fax:    504-581-3361

Defendants' Liaison Counsel

—and—

Douglas R. Marvin
Eva Petko Esber
M. Elaine Horn
Emily Renshaw Pistilli
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Phone: 202-434-5000
Fax:    202-434-5029

Attorneys for Merck & Co., Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Motion for Summary Judgment has been served on Plaintiff Lynn Hudnut by Federal Express at:

    1405 Wyanconda Avenue
    Canton, MO 63435

I also hereby certify that the above and foregoing Motion for Summary Judgment has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail, upon Liaison Counsel Ann Oldfather by e-mail, and upon all parties by electronically uploading the same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8C, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 7th day of June, 2012.

                                          /s/ Dorothy H. Wimberly
                                          Dorothy H. Wimberly, 18509
                                          STONE PIGMAN WALTHER WITTMANN L.L.C.
                                          546 Carondelet Street
                                          New Orleans, Louisiana  70130
                                          Phone:  504-581-3200
                                          Fax:    504-581-3361
                                          dwimberly@stonepigman.com

                                          Defendants' Liaison Counsel

1095785v1