# EXHIBIT C

# Feldmann

**Rhode Island Hospital**
*A Lifespan Partner*



BROWN UNIVERSITY
SCHOOL OF MEDICINE

Department of
Neurology

Physicians Office Building
Suite 424
Providence, RI 02903
tel 401 444-8806
Fax 401 444-8781
Email
edward_feldmann@brown.edu

Edward Feldmann, MD
Director
Cerebrovascular Laboratory
Rhode Island Hospital
Professor
Program in Neurology
Department of Clinical
Neurosciences
Brown University
School of Medicine

## EXPERT WITNESS REPORT OF EDWARD FELDMANN, M.D.

## BACKGROUND AND QUALIFICATIONS

My name is Edward Feldmann, M.D. I am a licensed physician and Board Certified in both Neurology and Vascular Neurology. I am currently a Professor of Neurology at the Warren Alpert School of Medicine at Brown University, Department of Clinical Neurosciences and Vice Chairman of the Department of Neurology, Director of the Division of Cerebrovascular Diseases and Sonography and Director of the Neurology Cerebrovascular Laboratory, all at Rhode Island Hospital.

The paragraphs that follow provide a brief overview of my background and qualifications, a more detailed description of which is set forth in my Curriculum Vitae attached. My twenty-five years of medical education, training, clinical practice, research, expertise and experience have focused on the study, diagnosis and treatment of stroke.

1

04/28/2009 11:14 FAX  4014448781          NEUROLOGY                            ☒002/061

## EDUCATION

I received a B.A. cum laude in Chemistry from Cornell University in 1979 and graduated from Harvard Medical School in 1983. From 1983-1984, I was an intern and clinical instructor at the Brigham and Women's Hospital, Harvard Medical School in Boston, Massachusetts. From 1984-1986, I was a Resident and Clinical Associate in Neurology at the New York Hospital – Cornell Medical Center and was Chief Resident from 1986-1987. From 1987-1988, I was a Fellow in Cerebrovascular Disease at Tufts - New England Medical Center in Boston, Massachusetts.

## ACADEMIC APPOINTMENTS

I am currently, and have been since 1999, a Professor of Neurology at the Alpert Medical School, Brown University, Department of Clinical Neurosciences in Providence, Rhode Island. From 1993 - 1999, I was an Associate Professor in Neurology and from 1988 - 1993, I was an Assistant Professor in Neurology at Brown University. My responsibilities include teaching neurology to medical students, and the generally accepted scientific technique used by all physicians and neurologists, differential diagnosis, which I use in clinical practice to evaluate patients in order to determine the etiology of their cerebrovascular disease. Differential diagnosis is a time-honored methodology that has been taught

2

in medical schools for decades and is still taught today. In addition to my teaching responsibilities in the area of neurology and stroke, my responsibilities include supervising research and also performing research in the area of cerebrovascular disease.

## LICENSURES

In 1988, I was licensed to practice medicine by the State of Rhode Island, and my license remains in good standing today. From 1987 - 1988, I was licensed to practice medicine in Massachusetts. I chose not to renew my Massachusetts license after it expired.

## BOARD CERTIFICATION

I have been Board Certified by the American Board of Psychology and Neurology since October, 1988. In May, 2005, I passed the Vascular Neurology exam, also administered by the American Board of Psychiatry and Neurology, and am now Board Certified in Vascular Neurology.

## HOSPITAL APPOINTMENTS AND CLINICAL PRACTICE

Since 1988, I have been an Attending Neurologist, and the Director of the Neurology Cerebrovascular Laboratory in the Department of Neurology at

3

Rhode Island Hospital, one of the major teaching hospitals for Alpert Medical School at Brown University. Since 1990, I have been Director, Division of Cerebrovascular Diseases and Sonography in the Department of Neurology. I became the Vice-Chairman of the Department of Neurology at Rhode Island Hospital in 1997. In addition, I was a consulting Neurologist at St. Joseph's Hospital from 1997 - 1999; Butler Hospital from 1992 - 2001; and Newport Hospital from 1992 - 1993. I have been a member of a number of hospital, university, national and international Neurology and stroke committees as set forth in my Curriculum Vitae.

### REVIEWER FOR SCIENTIFIC JOURNALS

I have served as an ad hoc member of the editorial boards of several publications in the field of Neurology, including *Stroke*, *The Lancet*, *Cerebrovascular Disease*, *Neurology*, *Emergency Medicine* and *Journal of the Neurological Sciences*. I have served as an ad hoc member of the editorial board of the *Journal of Neuroimaging* from 1997-2000. I was an Associate Editor of the *Journal of Neuroimaging* from 2000-2006. I was an abstract reviewer for the *American Academy of Neurology* in 1999 and for the *American Heart Association* from 1999-2000.

### CLINICAL RESEARCH, PEER REVIEWED
### PUBLICATIONS, PRESENTATIONS AND ABSTRACTS

4

I have been the lead or local investigator in over fifteen (15) clinical trials involving cerebrovascular disease and stroke, including the Yale Hemorrhagic Stroke Project, a case control epidemiological study that examined the risk of hemorrhagic stroke among phenylpropanolamine ("PPA") users.

I have been the lead author or co-author of over forty (40) articles published in peer-reviewed medical journals such as *The New England Journal of Medicine*, *Stroke*, *Neurology*, *Journal of the American Medical Association*, *Neuroepidemiology*, *Annals of Neurology*, *Journal of Neuroimaging*, as well as others listed in my Curriculum Vitae. I have written over thirty (30) chapters dealing with the diagnosis, etiology, and treatment of stroke.

As set forth in my Curriculum Vitae, over the past twenty years, I have authored or co-authored over 90 scientific abstracts, and have given more than one hundred (100) scientific presentations, many in the area of cerebrovascular disease.

## MONITORING COMMITTEES APPOINTMENTS

I have been appointed to and served on Monitoring Committees or Data

5

Safety Monitoring Boards (DSMBs) for clinical trials involving drugs and medical devices. As such, I have worked extensively with the pharmaceutical industry and medical device manufacturers. For example, I have recently served as the Chair of the DSMB for a study conducted by the National Institute of Neurological Disorders and Stroke (NINDS) involving a potential therapy for Huntington's Disease. I also was previously Chair of the DSMB for the Guidant Corporation's ArCher Carotid Stent Trial, and was a member of the Data Safety Monitoring Committee (DSMC) for two Boston Scientific studies, the SHELTER trial and the Integra Carotid Stent Trial. I chaired the DSMC for Scios Nova's "A Phase I/II Safety Study of FIBLAST (Trofermin) in the Treatment of Patients with Acute Thromboembolic Cerebrovascular Occlusion," and I was a member of the DSMB for the National Institutes of Health (NIH) sponsored "African-American Antiplatelet Stroke Prevention Study." Additionally, I was an Endpoint Adjudicator for the Women's Estrogen in Stroke Trial, and a Medical Monitor for two studies conducted by Cambridge Neuroscience regarding the use of CERESTAT® in patients with head trauma and intracerebral hemorrhage.

## SOCIETY MEMBERSHIPS

I have been a member of numerous medical societies related to neurology and stroke, as set forth in my Curriculum Vitae. I am a Fellow in the Stroke

6

Council of the American Heart Association and a Member of the American Neurological Association. I also served on international and national committees and groups studying various therapies in stroke patients.

## METHODOLOGY

My opinions and conclusions stated in this report are all expressed to a reasonable degree of medical and scientific certainty, and are based on generally accepted principles of science and medicine.

In reaching my opinions and conclusions, I have employed standard methodologies that are generally accepted in the medical and scientific community. My methodology is reliable and I employed the same methods as I would have used if I had been asked to evaluate risk and causation in the real world practice of medicine, specifically stroke neurology.

The basis for my conclusions and opinions expressed in this report is my education, training, research, experience and expertise, my review of internal Merck clinical data and documents, relevant expert reports, testimony of Merck researchers, employees and consultants, FDA documents, and a review of the relevant peer-reviewed medical and scientific literature, including the literature on cox-2 inhibitors including VIOXX® (rofecoxib) (see appendix). In this report I will use the terms

7

"VIOXX" and "rofecoxib" interchangeably.

As I continue to review the data or review newly provided information, I reserve the right to change, supplement and refine my opinion as I see fit.

My current fee for my consulting is $300.00 per hour.

## QUESTIONS PRESENTED AND OPINIONS

I have been asked to consider and address the following questions in this report:

1. Does rofecoxib increase the risk of ischemic stroke?

2. Assuming that there is an increased risk of ischemic stroke, is that risk      present for all dosages of rofecoxib?

3. Assuming that there is an increased risk of ischemic stroke, is that risk      present for all durations of use of rofecoxib?

4. Assuming that there is an increased risk of ischemic stroke, when was      there reasonable evidence of an association between rofecoxib and     ischemic stroke such that Merck knew or should have

8

known of that risk?

5. Assuming that Merck knew or should have known of the association     between rofecoxib and ischemic stroke, did the rofecoxib labels adequately and fully explain the extent of the known risk to prescribing        physicians and patients?

My opinions, to a reasonable degree of medical certainty, are as follows:

1. Rofecoxib increases the risk of cardiovascular disease, which includes ischemic stroke.

2. The risk of cardiovascular disease, including ischemic stroke, exists with all doses of rofecoxib.

3. The risk of cardiovascular disease, including ischemic stroke, exists for all durations of use of rofecoxib.

4. There was reasonable evidence of an association between rofecoxib and cardiovascular disease, including ischemic stroke, on March 9, 2000 when the preliminary results of the VIGOR trial were available to Merck scientists. Merck knew or should have known of the risk at that time.

04/28/2009 11:15 FAX  4014448781          NEUROLOGY                          010/061

5.  None of rofecoxib's labels adequately and fully explained the extent
    of the known risk to prescribing physicians and patients.

## ANALYSIS AND CONCLUSIONS

## BACKGROUND ON
## CEREBROVASCULAR AND CARDIOVASCULAR DISEASE

Cardiovascular   disease   and   cerebrovascular   disease   share
pathophysiology and risk factors. Because of this, the two are frequently
studied together in clinical trials as a combined endpoint. The primary
endpoint in antiplatelet trials studying cardiovascular events is often a
combination of stroke, myocardial infarction (MI) and vascular death. The
CHARISMA and CAPRIE trials studying clopidogrel and aspirin looked for
a decrease in such a composite endpoint. (CAPRIE Steering Committee,
Lancet 1996, 348:1329-39; Bhatt DL, et al., Am Heart J 2004, 148:263-8).
Additionally, even when atherosclerosis may not be the shared
mechanism, such as in a study of migraine and cardiovascular disease
(Kurth T, et al., JAMA 2006, 296:283-91) the primary outcome measure
used may be a combined endpoint of ischemic stroke, MI, and vascular
death.

04/28/2009 11:15 FAX 4014448781           NEUROLOGY                         ☒011/061

Stroke and MI share common risk factors and mechanisms, and studies demonstrate that stroke patients often have co-existing cardiac disease, including silent cardiac ischemia. (Adams RJ, et al., Circulation 2003, 108:1278-90). The Framingham stroke profile uses the presence of cardiovascular disease to predict risk of first stroke. The presence of cerebrovascular disease is strongly associated with the presence of co-existing cardiovascular disease. (Goldstein LB, et al., Stroke 2006, 37:1583-633).

The mechanism by which myocardial infarctions (MI) and ischemic strokes occur are similar, but a different end organ is involved. In myocardial infarctions, blockage of a coronary blood vessel leads to a lack of blood flow to cardiac muscle. In an ischemic stroke (or cerebral infarction), blockage of a cerebral blood vessel leads to a lack of blood flow to brain tissue.

The American Heart Association/American Stroke Association addresses the risk factors for, causes and outcomes of cardiovascular disease and cerebrovascular disease together. Their mission calls for reduction of disability and death from both cardiovascular disease and cerebrovascular disease. When estimating global risk and discussing risk factors, the AHA/ASA combines cardiovascular disease and cerebrovascular disease. Their publications list intervention targets for primary prevention of

cardiovascular disease and stroke: smoking, blood pressure, dietary intake, aspirin, lipids, activity, weight, diabetes, and atrial fibrillation (CAPRIE Steering Committee, Lancet 1996, 348:1329-39, AHA Guidelines for Primary Prevention of Cardiovascular Disease and Stroke: 2002 update Circulation 2002, 106:388-91, Sacco RL, Stroke 2007, 38:1980-87).

## STROKE

Generally, the non-specific term "stroke" encompasses a heterogeneous group of pathophysiologic events, including thrombosis, embolism, and hemorrhage. Strokes are broadly classified as either hemorrhagic or ischemic. Ischemic stroke is characterized by the sudden loss of blood circulation to an area of the brain, resulting in a corresponding death of brain tissue and loss of neurologic function.

Acute ischemic stroke usually refers to stroke caused by a thrombosis (blood clot) or embolism (blood clot that travels). A thrombotic stroke is caused by the formation of a blood clot in one of the extracranial or intracranial arteries that is large enough to obstruct blood flow and causes ischemia to an area of the brain fed by that vessel (Adams HP Jr., et al., Stroke 1993, 24:34-41). This is analogous to a myocardial infarction, where an obstruction in a coronary vessel leads to ischemia in cardiac

12

muscle. An embolic stroke is caused by a clot that forms in one part of the circulation, often the heart, and travels to become lodged in a cerebral artery.

## THROMBOTIC STROKE

Approximately one-third of all ischemic strokes are thrombotic in nature. These can be due to either large or small vessel occlusions (Petty GW, et al., Stroke 1999, 30:2513; Jorgensen HS, et al., Stroke 1996, 10:1765). Thromboses often result from clot formation on the rough surface of an ulcerated atherosclerotic plaque in the presence of turbulent and reduced blood flow, such as at a vessel bifurcation. When more than 90% of the blood vessel diameter is blocked by plaque, there is a marked reduction of blood flow. A clot is formed when platelets from slow-moving blood flow stop and adhere to the rough surface of the atherosclerotic plaques. The formed clot then occludes the artery where it formed (thrombotic stroke) or embolizes to another area of the brain (another form of embolic stroke, discussed below).

## LACUNAR STROKES

Lacunar infarcts are a subtype of thrombotic stroke and follow the occlusion of tiny, penetrating arteries of the brain, resulting in small

infarctions and restricted clinical syndromes.

## EMBOLIC STROKES

About one fourth of all ischemic strokes are cardioembolic in nature. These strokes occur when a piece of clot, usually formed in the heart, breaks loose and is carried by the blood stream to the brain. The clot travels through branches and gradually reaches smaller and smaller vessels until it reaches a point where it can proceed no further and plugs the vessel, cutting off the blood supply.

Emboli may arise from the heart, the extracranial arteries or, less often, the right-sided circulation (paradoxical emboli). The sources of cardiogenic emboli include valvular thrombi (*e.g.*, in mitral stenosis, endocarditis, prosthetic valves), mural thrombi (*e.g.*, in myocardial infarction, atrial fibrillation, dilated cardiomyopathy, severe congestive heart failure), and atrial myxomas. Myocardial infarction (MI) is associated with a 2-3% incidence of embolic stroke, of which 85% occur in the first month after MI. (Mooe T, Stroke 1997, 28:762-767). Half of these strokes occur within the first 5 days of the MI.

## BIOLOGICAL PLAUSIBILITY AND SUPPORTING DATA

14

04/28/2009 11:15 FAX  4014448781        NEUROLOGY                        ☑015/061

There are multiple plausible mechanisms of action to explain how rofecoxib causes cardiovascular events (CVEs), including ischemic stroke.

Prostaglandins are the arachidonic acid-derived compounds that mediate a variety of processes, including platelet aggregation, vasoconstriction and vasodilation. The processes of platelet aggregation and vasoconstriction may affect clotting, hypertension and atherosclerosis, all of which are relevant to the pathophysiology of cardiovascular and cerebrovascular disease. The two prostaglandins that are key to the discussion of the mechanism of action of rofecoxib with respect to cardiovascular and cerebrovascular disease are thromboxane A2 (TXA-2) and prostacyclin (PGI-2).

Cox-1 and cox-2 are enzymes that convert arachidonic acid to an intermediate chemical, (PGH-2), from which thromboxane and prostacyclin are derived (Schonbeck U, et al., Am J Pathol 1999, 155:1281-91). Cox-2 is the chief source of systemic prostacyclin. Prostacyclin inhibits platelet aggregation, is a vasodilator, and inhibits smooth muscle proliferation. Cox-2 inhibition suppresses prostacyclin.

Previous "non-selective" non-steroidal anti-inflammatory drugs (NSAIDs) prevented patients from experiencing pain by blocking cox-2 production, and thus the production of cox-2 mediated prostaglandins that produce

pain and inflammatory responses. However, these drugs also blocked cox-1, an enzyme which mediates production of a prostaglandin that has a protective effect in the stomach. As a result, the "non-selective" NSAIDs blocked pain, but also were associated with an increase in gastrointestinal side effects, particularly perforations, ulcers and bleeding.

Rofecoxib is a selective cox-2 inhibitor (also known as a cox-1 sparing drug). Unlike non-selective NSAIDs, rofecoxib does not inhibit the cox-1 enzyme but selectively inhibits the cox-2 enzyme. By inhibiting cox-2, the drug still prevents the production of the prostaglandins that cause pain and inflammation, but by sparing cox-1, the stomach lining continues to be protected. It was for this reason that rofecoxib was developed—to provide a pain reliever that was safer for the stomach.

The prostaglandin pathways are complicated and interconnected. Changes to the pathway that may be beneficial in one area of the body may be detrimental in another. As described below, the sparing of cox-1, while beneficial for the stomach, is detrimental for the cardiovascular system.

PGI-2 inhibits platelet aggregation, vasodilates and prevents proliferation of smooth muscle cells in vitro. Selective cox-2 inhibitors, unlike aspirin, inhibit PGI-2 but leave TXA-2 unaffected. PGI-2 suppression predisposes

16

patients to exaggerated thrombotic responses, elevates blood pressure, and may accelerate atherogenesis. Thus, cox-2 mediated PGI-2 suppression plausibly predisposes patients to MI and stroke. The higher the patient's intrinsic risk of cardiovascular (CV) disease, the more likely that a CV event could occur rapidly.

Garrett Fitzgerald, Ph.D. postulated prior to the marketing of rofecoxib that its mechanism of action could cause an increase in cardiovascular events and has more recently postulated that cox-2 inhibition increases cardiovascular risk through three mechanism: it augments the response to thrombogenic stimuli, increases blood pressure and the response to hypertensive stimuli, and promotes initiation and acceleration of early atherogenesis. These are discussed in greater detail below.

## ROFECOXIB PROMOTES THROMBOGENESIS

As stated above, one of the biologically plausible mechanism by which rofecoxib can cause cardiovascular disease, including ischemic stroke, is through the development of a prothrombotic state caused by an imbalance between PGI-2 and TXA-2.

Before rofecoxib was put on the market, Merck conducted a two week trial involving the drug in 1997 internally referred to as "Protocol 023." This

04/28/2009  11:18 FAX  4014448781          NEUROLOGY                          ☑ 018/061

study was conducted by Merck with consultants from the University of Pennsylvania, including Garrett Fitzgerald, Ph.D. Healthy individuals were given rofecoxib, and the urinary excretion of a metabolite of PGI-2 was measured. Compared to controls, there was a statistically significant decrease in the urinary excretion of the PGI-2 metabolite (MRK-OS420022612; Table 27; MRK-NJ0051533).

These results led Dr. Fitzgerald to form the "Fitzgerald Hypothesis" (Merck meeting of Scientific Advisors in 5/98): that cox-2 inhibitors, by selectively inhibiting only cox-2, could cause an imbalance between TXA-2 (formed by the now unopposed cox-1) and intravascular PGI-2 (formed by cox-2). Such an imbalance, Fitzgerald postulated, would lead to a prothrombotic state in the blood vessels, and a corresponding increase in cardiovascular events. Therefore, as far back as 1998, Merck was aware of the biologic plausibility and the possibility that rofecoxib could cause a prothrombotic state in the vasculature that could lead to an increase in cardiovascular events.

Dr. Fitzgerald was not the only outside consultant who discussed this possibility with Merck. In a letter dated November 11, 1997, Merck consultant Dr. John Oates wrote to Dr. Barry Gertz that rofecoxib was likely reducing prostacyclin at multiple sites throughout the body, including in blood vessels.(MRK-ABG0002150). In 1998, Merck's External Board of

18

04/28/2009 11:16 FAX  4014448781          NEUROLOGY                                    ☐019/061

Scientific Advisors also concluded that a reduction of prostacyclin caused by rofecoxib could serve to increase the "probability that a coronary plaque rupture would lead to myocardial infarction and ischemic ventricular fibrillation." (MRK-AEI0002739).

A memo by Dr. Doug Watson dated May 15, 1998, outlined that the Board of Advisers meeting led to the formation of a group to monitor the occurrence of cardiovascular events in Merck's rofecoxib clinical trials. The rationale for this went back to protocol 023 where rofecoxib reduced the excretion of a urinary PGI metabolite, of likely both renal and systemic origin. The concern was that if thromboxane were not also inhibited, rofecoxib could increase thrombosis. It was suggested that data and endpoints (including MIs and strokes) from subsequent clinical trials needed to be followed to explore the possibility of this risk. (MRK-AEI00027422) As a result, Merck created a standard operating procedure (SOP) to collect and monitor the occurrence of cardiovascular events, including strokes, in their clinical trials.

Further pharmacology studies confirmed aspects of the Fitzgerald hypothesis. McAdam BF, et al. Pro Natl Acac Sci USA 1999;96:4668-4673 concluded that a major source of prostacylin in healthy humans was derived from cox-2 mediated physiologic processes. Cheng Y, et al., reached the same conclusion in 2006, reporting that cox-2 is the dominant

source of PGI in vivo, while cox-1 is the dominant source of TXA. (Cheng Y, et al., J Clin Invest 2006,116:1391-1399). Cheng's studies refined the Fitzgerald hypothesis. He found that, in three distinct experimental settings, cox-2 inhibition augmented and enhanced the body's natural response to thrombogenic stimuli so that patients who are predisposed to thrombosis will have an exaggerated response, plausibly predisposing them to CV events.

Fitzgerald noted in a 2001 publication that if the prostacyclin receptor in mice is deleted, the mice, which would now no longer have the benefit of the anti-thrombotic properties of prostacyclin, show an increased sensitivity to thrombotic stimuli. In 2004, Fitzgerald published a review article (Fitzgerald GA, et al., N Engl J Med 2004, 351:1709) where he noted that shear stress on the vascular endothelium induces the production of cox-2, and thus the production of prostacyclin. Hypertension causes increased shear stress on the endothelium. Thus, the production of cox-2 promotes the production of prostacyclin, which then can manifest a protective response to the hypertension by vasodilating the blood vessel and providing an anti-thrombotic response. If a patient ingests rofecoxib, he or she can lose the ability to mount this protective response. Similar conclusions were discussed by others (Antman EM, et al., Circulation 2007, 115:1634-1642).

## ROFECOXIB INCREASES BLOOD PRESSURE

Data demonstrate clearly that rofecoxib increases blood pressure. Elevated blood pressure promotes atherosclerotic plaque rupture, leading to thrombus formation at the site of the rupture, blockage of the vessel, and subsequent ischemia and infarction of the end organ, either the brain or the heart. As will be discussed more fully below, Merck's own clinical trials show that rofecoxib causes a greater increase in blood pressure than another cox-2 inhibitor, celecoxib (Celebrex), or traditional NSAIDs.

The literature supports the conclusion that blood pressure changes of the magnitude reported for rofecoxib, as described below, can contribute to a substantial excess risk of CV events.(SHEP Cooperative Research Group, JAMA 1991, 265:3255-64). Even relatively small changes in blood pressure can substantially change the incidence of cardiovascular events, including ischemic stroke.

In 2006, Dr. FitzGerald and colleagues reported that cox-2 inhibition causes both elevated blood pressure and thrombosis. (Cheng, et al., J Clin Invest 2006; 116:1391-1399.)

## ROFECOXIB MAY ACCELERATE ATHEROGENESIS

21

04/28/2009 11:16 FAX 4014448781          NEUROLOGY                                      ⧉022/061

There is support in the current literature that rofecoxib may accelerate the production of atherosclerosis. Since atherosclerosis is a factor in the development of cardiovascular disease and ischemic stroke, agents that accelerate the production of atherosclerosis would likely increase the incidence of cardiac and brain ischemia.

Kobayashi describes the mechanism by which thromboxane promotes and PGI inhibits the initiation and progression of atherogenesis through influence on platelet activation and leukocyte-endothelial cell interaction (Kobayashi T, et al, J Clin Invest 2004; 114:784-794). If cox-2 mediated PGI is suppressed, and thromboxane is expressed unopposed, then the limiting effect of PGI on atherosclerosis production would be reduced, and plaque formation accelerated. A similar mechanism was proposed by Fosslein, who noted that mice without the PGI receptor, an animal model for cox-2 inhibition in the vasculature, have accelerated atherogenesis. (Fosslein E. Annals Clin Lab Science 2005, 35:347). He also postulated that cox-2 inhibitors may increase monocyte chemotaxis and in that way accelerate atherogenesis. Injury induced vascular proliferation and platelet activation are enhanced in mice genetically deficient in the PGI2 receptor but are deficient in mice missing the TXA2 receptor. (Cheng Y, et al., Science 2002, 296:539-41)

Grosser T, et al., also report on the evidence that the suppression of cox-2

dependent PGI-2 formation can initiate and accelerate atherogenesis. (Grosser T, et al., J Clin Invest 2006, 116;4-15). There is a substantial body of evidence that one mechanism -- suppression of cox-2 dependent PGI-2 formation -- can augment the response to thrombotic and hypertensive stimuli and initiate and accelerate atherogenesis. PGI inhibition predisposes to platelet activation and arterial thrombosis. PGI receptor deletion predisposes to initiation and early progression of atherosclerosis in mice predisposed to hyperlipidemia. Receptor deletion elevates blood pressure and augments the response to dietary sodium. There are substantial interindividual differences in drug response. The longer the exposure to cox-2 inhibition, the greater the anticipated risk. Aspirin would be expected to mitigate but not abolish the hazard. A clinical or genetic predisposition to thrombosis would favor the emergence of a cardiovascular event. NSAID selectivity of cox inhibition is a continuous variable with substantial interindividual differences, so in different patients, relative cox selectivity will vary. The authors conclude that inhibition of cox-2 is sufficient to explain the adverse CV events observed with cox-2 inhibitors.

In summary, there exist three biological plausible, but not mutually exclusive, mechanisms by which rofecoxib can cause an increased incidence of cardiovascular events and ischemic stroke. Merck's own clinical trial data, as well as a number of observational studies, confirm the

04/28/2009 11:16 FAX  4014448781          NEUROLOGY

existence of an increased risk. This will be discussed more fully in following sections.

## MERCK'S CLINICAL TRIALS

### Perspective on rofecoxib clinical trial data—the DSMB approach

The available data related to rofecoxib represents a complex dataset, including varied patient populations, doses, duration of exposure, controls and endpoints. The varied trial designs make it difficult to easily combine the entire heterogeneous data for analysis. The primary purpose of this assessment of the rofecoxib clinical trial data is to determine if and when the data supported the conclusion that rofecoxib increased the risk of ischemic stroke.

My approach to the data will be similar to the approach of a DSMB monitoring a clinical trial for safety concerns. A DSMB is an independent group of experts that reviews the data generated during clinical research studies (Morse MA, et al., JAMA 2001, 285:1201-5). A DSMB has the primary responsibility and duty to oversee and monitor the trial to ensure patient safety. A DSMB helps to determine whether the benefits of the investigational intervention have been sufficiently demonstrated, whether the risks are greater than anticipated, or whether the benefits no longer

justify the risks of continuing the trial. In the case of the latter, the DSMB must make unbiased judgments about whether an investigation should be modified to minimize those risks or whether the clinical investigation should be halted (Gordon, VM, Sugarman, J & Kass, N, Towards A More Comprehensive Approach to Protecting Human Subject (1998). The most important responsibility of a DSMB is the safety of current and future patients in the trial as well as for all patients who might otherwise use the intervention being tested (Ellenberg, S, Fleming, T, DeMets, D, Data Monitoring Committees in Clinical Trials: A Practical Perspective (John Wiley & Sons Inc., 2002); DeMets, D, Furberg, C, Friedman, L, Data Monitoring in Clinical Trials: A Case Studies Approach (Springer 2006)).

DSMB decisions may be informed as to CV risks via results in high risk subgroups since risk factors for CVEs are additive. A DSMB will also evaluate of the incidence of conditions that predispose to cardiovascular events, such as hypertension, as well as analyzing the actual incidence of CV events, including MI and stroke.

A DSMB approach to assess safety may allow conclusions to be made without the luxury of data that achieves conventional levels of statistical significance for efficacy.

For efficacy endpoints, the conventional cutoff for statistical significance is

25

the point at which the probability that the trial results are due to chance falls to less than 1 in 20 (p< 0.05). Because many of the trials to be reviewed herein do not have safety endpoints as primary endpoints, and because of other trial design issues mentioned in this section, the sample sizes and effect sizes for safety events have a substantial chance of being too small to allow results that reach the conventional level of statistical significance for efficacy. An example of this issue is seen in the fact that an adjudication Standard Operating Procedure (SOP) had been set up to improve the accuracy of diagnosis and to standardize evaluation of thrombotic CVEs for rofecoxib. An analysis of individual trials was not planned as power was always expected to be low. (February 8, 2001 Arthritis Advisory Committee Meeting (ACM) - Background document; MRK-NJ-0174084; MRKW-00581; MRK-ACD-0043165).

The conventional level of statistical significance may not apply when a DSMB is looking at data for safety signals. From a safety point of view it is reasonable to consider that a safety endpoint reveals a significant difference between treatment groups when the probability that the results are due to chance is only less than 1 in 10 (p < 0.10), for example. The EPA, in a study of second-hand smoke, used a cutoff of p < 0.10 for statistical significance (Reference Manual on Scientific Evidence, p.153).

If the danger of a drug is measured by relative risk (RR), another way of

expressing this is that the lower bound of the 95% confidence interval does NOT have to exclude 1.0 for the result to be clinically significant. A reasonable measure of risk to the patient is exhibited by the point estimate of the RR and the upper bound of the 95% CI. For example, a study of celecoxib (Solomon SD, et al., NEJM 2005, 352:1071-80) found a dose-dependent risk for CVEs. Some of the 95% CIs include 1.0 or less, but the DSMB stopped the trial on the basis of these data and data regarding other drugs in this class.

A DSMB approach to assess safety may allow endpoints to be combined as needed.

The primary endpoint in antiplatelet trials studying cardiovascular events is often a combination of stroke, MI and vascular death, identified as APTC endpoints. (Antiplatelet Trialists Collaboration BMJ 2002, 324:71-86) The CAPRIE trial post hoc analyses showed a reduction of all ischemic events in the stroke patient group, highlighting the importance of studying all ischemic endpoints when studying antiplatelet therapy (Bhatt DL, Update on Clinical Trials of Antiplatelet therapy. Cerebrovasc Dis 2000, 10; 34-40). In a January 17, 2000 attachment to an internal Merck memo, Merck workers suggested grouping MI, unstable angina and ischemic stroke in their Data Analysis Plan, as they believed all these events were primarily mediated by platelet aggregation (MRK-AAX0002910).

27

Stroke and MI have a common pathophysiology and are traditionally studied together in clinical trials. Because the trials of rofecoxib were not powered to detect statistically significant difference in strokes or MIs, and because the individual numbers of such events are small, combined endpoints can be used to examine the data. If a given trial does not show a statistically significant difference between groups for ischemic stroke or MI, that does not mean that there was no risk. The trial may not have been powered to see the difference. If a given trial does show a statistically significant difference between study groups, even though it was not powered to do so, that is critically important.

Stroke is a less common event than MI. Often, the number of strokes identified in a given population will be fewer than the number of myocardial infarctions identified in the same population. Therefore, the power of any given trial to detect a statistically significant difference in stroke may be less than the power to detect a statistically significant difference in MI. This is problematic when assessing the rofecoxib dataset, since most of the trials were small, and none were primarily powered to detect a difference in the incidence of the individual cardiovascular events, including ischemic stroke.

Additionally, none of the Merck clinical trials were designed with

28

cardiovascular events as the primary endpoint, so specific criteria for the clinical investigators to pursue, recognize and capture these adverse events were not pre-specified. It is probable that the dataset does not represent the true number of CV events that occurred during the Merck clinical trials. The trials were not designed to optimize and capture all of the CV events prospectively, leading to probable underreporting of CV adverse events, particularly stroke.

Dr. Reicin pointed out that the gastrointestinal evaluations in VIGOR, a primary endpoint of the trial, followed no algorithm. Rather, the evaluation was determined by the treating physician (2/8/01 Arthritis Advisory Committee Meeting (ACM) - Presentation and Discussion). Thus, if the specialty of the treating physician did not include the diagnosis and treatment of stroke, this would have further limited identification of safety endpoints.

If a patient has a stroke or a TIA while in a study, but it is not reported to Merck during the trial, that event would not be 'captured.' In order for an event to be 'captured,' several things must happen. First, the signs and symptoms of stroke must be recognized by the patient/study participant as something for which the patient seeks medical attention. Next, the health care provider must recognize the signs and symptoms of stroke for what they are, and order the appropriate diagnostic tests to establish a proper

29

diagnosis. If the health care provider is the clinical investigator, then the clinical investigator must be relied upon to send that information to Merck. If the health care provider is not the clinical investigator for a given trial, then information and data about the event must somehow reach the clinical investigator and then the clinical investigator must be relied upon to send that information to Merck.

Symptoms of stroke can be subtle, and patients often do not recognize that they are experiencing a problem that requires medical attention. Per the REGARDS study, 41% of people experiencing stroke symptoms do not seek medical treatment. (Howard VJ, et al., Ann Neurol 2008, 63:466-72). Therefore, unaware that they have experienced an adverse event, the patient would not report it and it would not be captured for analysis and adjudication by Merck. It is probable that the true number of cardiovascular adverse events was underreported in part because patients did not recognize they were having a stroke and failed to seek medical attention.

More ischemic strokes are unrecognized by patients than myocardial infarctions. This is, in part, because the symptoms of stroke are not as easily recognized by patients as those of myocardial infarction. According to one study, 95% of patients recognize chest pain as a heart attack symptom, but only 68% recognize that visual symptoms may be a stroke

symptom, and sudden headache is recognized by only 61% (Thom T, et al., 2006. Circulation 2006; 113:e85-151). Another study showed that only 28% of individuals recognized three warning signs of stroke in 2004, up from 14% in 1999 (Reeves, et al., Cerebrovasc Dis 2008. 25:385-91). Thus, in the rofecoxib dataset, it is probable that the percentage of strokes that occurred and were recognized by the patient and reported would be less than the percentage of myocardial infarctions that occurred that were recognized by the patient and reported.

The diagnosis of ischemic stroke is often a more difficult diagnosis than that of a myocardial infarction. The clinical investigators for the Merck rofecoxib trials were neither cardiologists nor neurologists, with the exception of the Alzheimer's trials. It is more probable than not that the true number of potential cerebrovascular adverse events were underreported in part because the clinical investigators were not of the specialty trained to recognize subtle signs of ischemic stroke.

The problems with sample size and symptom recognition identified above are not solved by creating a SOP for adjudication of CVEs, which would only specify how those events that are reported by investigators should be handled retrospectively (MRK-ABA0019599). There was no system in place to ensure adequate prospective identification of safety endpoints, as is often the case for safety issues.

**<u>Pre-Approval Studies showed evidence that rofecoxib increased
blood pressure more than comparators and that the most common
serious adverse events occurred in the cardiovascular system</u>**

In the original rofecoxib NDA, Merck pooled data from six month studies of
placebo and comparator drugs. Subjects on rofecoxib had a higher
incidence of hypertension adverse events than subjects on placebo,
ibuprofen, or diclofenac. (MRK-NJ0018456). Protocol 010 (MRK-
ABS0016466) studied rofecoxib versus placebo; Protocol 029-30/40
studied 3 different dosages of rofecoxib or diclofenac 150 mg; Protocol
034 studied rofecoxib and diclofenac (MRK-ABS0072950-1); Protocol 045
studied rofecoxib, ibuprofen and placebo; all these studies showed a
consistent link between rofecoxib and hypertension.

Rofecoxib increased blood pressure even in those patients who were
already on antihypertensive medication, and once again, the increase was
more substantial in those on rofecoxib and an antihypertensive than those
on a non-selective NSAID and an antihypertensive (Protocol 054).

In addition to the hypertension data, Lourdes Villalba M.D., the FDA
medical officer who reviewed the pre-approval rofecoxib data noted that
"the most frequent serious adverse events were of the cardiovascular

body system in all study groupings. With all the available data, it is impossible to answer with complete certainty whether the risk of cardiovascular and thromboembolic events is increased in patients on rofecoxib. A larger database will be needed to answer this and other safety comparison questions." (MRK-ADI0005457).

Rofecoxib was approved for use by the FDA in May 1999.

## Post-Marketing Studies

After rofecoxib came on the market, the CV risks of rofecoxib became more apparent. Studies were now large enough to show an increased rate of thromboembolic events compared to other NSAIDs. One of the most significant studies was the largest rofecoxib study ever designed at the time -- the VIGOR study.

## VIGOR

The VIGOR trial was a double-blind, randomized study of the incidence of serious upper gastrointestinal disease with chronic treatment of a daily dose of 50 mg rofecoxib in patients with rheumatoid arthritis compared to a daily dose of 1000 mg of naproxen. (Bombardier C, et al., N Eng J Med 2000, 43:1520-28). There were 4020 patients per treatment arm. The

study participants were 80% female and 70% were greater than age 65 years. Patients who were taking other drugs able to reduce the alleged gastrointestinal benefits of rofecoxib over naproxen were excluded. Patients taking aspirin or other drugs such as anticoagulants were excluded. Patients at high risk of cardiovascular disease, defined as those with a history of cerebrovascular events, myocardial infarction or coronary bypass, were also excluded.

A DSMB oversaw this trial, and months before the stop-date, communicated to the sponsor a recommendation that these events be adjudicated separately, as opposed to the plan already in place to adjudicate the events as part of a review of CV events in all Merck trials ( MRK-AX0002908).

Merck scientists were unblinded to the results on March 9, 2000.

Merck used different methods to calculate relative risk for CVEs associated with rofecoxib and gastrointestinal events. Merck calculated the relative risk ratios for gastrointestinal events with rofecoxib as the numerator and naproxen as the denominator, yet it inverted the ratio, with naproxen as the numerator and rofecoxib as the denominator for CVEs. This approach highlights the lower rate of gastrointestinal adverse events and at same time blurs the recognition of CV risk associated with

04/28/2009 11:17 FAX   4014448781          NEUROLOGY                           ☒035/061

rofecoxib relative to naproxen. For consistency, the data are presented here in the same fashion as in the NEJM publication or the FDA's 2/1/01 Targum memo (MRK-ABX0002367-2404).Thus, a low RR for CVEs here represents an increased risk associated with rofecoxib.

In the VIGOR trial, the CV analysis only counted events occurring on treatment or within 14 days after discontinuation of therapy.  An intent-to-treat analysis was not done here.

Among rofecoxib users there were 20 myocardial infarctions, whereas there were 4 for naproxen users. Rofecoxib users were five times more likely to have myocardial infarctions as were naproxen users. For adjudicated thrombotic CVEs, the RR was 0.42 (0.25, 0.72) for all thrombotic events (cardiac, cerebrovascular and peripheral vascular, 0.36 (0.17, 0.74) for cardiac events and 0.73 (0.29, 1.80) for cerebrovascular events. Dr. Targum, one of the FDA reviewers, noted that the time to event curves show a divergence of risk after 6-8 weeks.  These data alone, along with the knowledge that there had never been a clearly demonstrated protective effect for CVEs shown for the well known comparator drug, naproxen, of a magnitude to explain the VIGOR results, strongly suggested an increased risk for CVEs, which would include stroke, with rofecoxib use.

04/28/2009 11:18 FAX 4014448781          NEUROLOGY                           @036/061

Using APTC endpoints, the RR in the aspirin indicated subgroup was 0.26 (0.07, 0.91), while in the aspirin not indicated subgroup the RR was 0.65 (0.34, 1.25). For all patients, the APTC RR was 0.51 (0.29, 0.91). The FDA reviewer found similar results with confirmed thrombotic CVEs as the endpoint. For stroke alone, the RR in all patients was 0.82 (0.34, 1.97). For stroke in patients where aspirin was indicated, RR 0.69 (0.06, 6.02). In the patients where aspirin was not indicated, the stroke endpoint had a RR 0.87 (0.32, 2.40).

In VIGOR, patients on rofecoxib experienced more edema, hypertension and congestive heart failure than the patients on naproxen. VIGOR had identified a 4.6 mm Hg increase in SBP with rofecoxib compared to the increase in systolic blood pressure with naproxen.

Merck interpreted the VIGOR results by suggesting that the excess cardiovascular events were due to a protective effect of naproxen rather than rofecoxib causing an increase in such adverse events. However, scientifically,, this argument held little merit. Naproxen could only explain the results in VIGOR, if it had a cardioprotective effect three-fold better than aspirin. (Ray WA, et al., Lancet 2002, 359:118). The cardioprotective effect Merck claimed for naproxen had never been demonstrated in a placebo-controlled trial. Merck's explanation that it was effectively replacing aspirin with naproxen for those patients who were aspirin

indicated (but prohibited from participating in VIGOR) was contradicted by the FDA's analysis which reported an increase in cardiovascular events with rofecoxib even in patients in whom aspirin was not indicated. There were no supporting data to substantiate such a protective effect for naproxen.

The published version of the VIGOR study reported that "only a single patient (in the rofecoxib group) had both hypertension and a myocardial infarction as adverse events." However, this only addressed the single patient that actually completed the study who had hypertension and an MI, and failed to address the 28 patients in the rofecoxib arm who discontinued participation in the study due to hypertension-related adverse events, compared to only 6 patients who discontinued in the naproxen group. While most patients with a hypertension related adverse event did not have a confirmed thrombotic CVE, a higher percent of CVE patients in the rofecoxib group had a hypertension related adverse experience (MRK-ABX0002367-404). None of these data were in the NEJM publication.

A year after rofecoxib came off the market, the NEJM editors discovered that the authors of the paper had known about the MIs that had been withheld from the final publication. They published an expression of concern in the NEJM. (Curfman G, et al., N Eng J Med 2005, 353:2813-14). The NEJM article was the primary way the VIGOR results were

04/28/2009 11:18 FAX  4014448781          NEUROLOGY                                 ⊠ 036/061

communicated by Merck to the medical community.


## ADVANTAGE


At approximately the same time Merck learned of the VIGOR data, they
also received the data from the ADVANTAGE study. This was a double-
blind, randomized, 12-week controlled study with a mean duration of
exposure of only 69 days, comparing rofecoxib 25 mg/day to naproxen
500 mg/ twice a day in 5500 patients with osteoarthritis. Even though
ADVANTAGE was completed at about the same time as VIGOR, early
2000, Merck did not submit a preliminary report of its findings to the FDA
until December, 2000, and did not submit final data until mid-2001. (MRK-
Public0002375-2422)(Lisse JR, et al., Ann Intern Med 2003, 139:539-46;
72; Braunstein N, et al., Ann Intern Med 2005, 143:158-9).


The publication concluded that there were too few endpoints to allow
conclusions about the relative effect of the two drugs on thrombosis.
However, despite the fact that this study, like VIGOR, was underpowered
to detect a difference in cardiac events, a difference between the groups
with respect to CV events was still seen and that difference confirmed the
data from the VIGOR trial. ADVANTAGE confirms the VIGOR results with
respect to CV events even though it was a shorter study, the dose was

lower than that used in VIGOR, and osteoarthritis patients had a lower baseline CV risk than RA patients. The FDA reviewed the ADVANTAGE data and found a trend of excess serious cardiac thrombotic events in 25 mg rofecoxib compared to naproxen. (Villalba Memo, MRK-Public0002375-2422).

Nearly twice as many patients in the rofecoxib arm (1.4%) dropped out of the study because of cardiovascular events when compared to the naproxen arm (0.8%). There were 5 myocardial infarctions in the rofecoxib arm versus 1 in the naproxen arm. There were 2 cerebrovascular thrombotic events on rofecoxib versus 5 in the naproxen arm. The FDA reviewer concluded that either cardiac and cerebrovascular events were different in their relation to rofecoxib, or these results represented the lack of power of the study. The study results, which were similar to those in VIGOR even though the ADVANTAGE patients were allowed to take low-dose aspirin, were evidence against the putative naproxen "benefit" and strongly suggested that the addition of low dose aspirin to a rofecoxib regimen might not eliminate CV risk. (FDA--Villalba Review of ADVANTAGE -- 11/28/01).

In addition to disagreeing with Merck's interpretation of the VIGOR and ADVANTAGE data, the FDA also disagreed with some of the adjudication committee's conclusions regarding adverse events in ADVANTAGE. By

04/28/2009 11:18 FAX  4014448781          NEUROLOGY                    ☒ 040/061

the FDA's analysis, Merck undercounted CV events in the rofecoxib arm of the study and overcounted CV events in the naproxen arm of the study- -Merck adjudication committee found 9 cardiovascular thrombotic events in the rofecoxib arm and 12 in the naproxen arm (cerebrovascular was 1:7 including TIA in favor of rofecoxib). The FDA re-adjudicated these same events and that re-adjudication resulted in 12 cardiovascular thrombotic events in the rofecoxib arm and 10 in the naproxen arm (cerebrovascular was 2:5 including TIA in favor of rofecoxib). (MRK-Public0002402-2405).

While this study shows an increase in MIs in the rofecoxib arm, and an increase in stroke in the naproxen arm, an overall assessment of the data shows a trend that is consistent with the results in VIGOR. The study was not powered to detect a difference in stroke.

The ADVANTAGE study results undercut the explanation that the VIGOR results were the result of naproxen's cardioprotective benefit and its suggestion that adding low dose aspirin might eliminate risk. In ADVANTAGE, patients on rofecoxib taking low dose aspirin had more cardiovascular events than those rofecoxib patients not on aspirin. This was not seen in the naproxen group. The FDA concluded that ADVANTAGE's cardiovascular findings were consistent with those in VIGOR.

All of the above data were available to Merck by mid 2001, well before the new VIOXX[®] label was approved in April 2002. None of these ADVANTAGE data are reflected in the 2002 label.

## THE ALZHIEMER'S TRIALS

Merck conducted three clinical trials to study whether rofecoxib might either slow the progression of Alzheimer's disease or prevent its development in high-risk patients (Protocols 078, 091 and 126).

In Protocol 078, Merck studied 1457 patients with mild cognitive impairment to see whether rofecoxib 25 mg could reduce the rate of progression to Alzheimer's disease. Patients at least 65 years of age with mild cognitive impairment were randomized into two groups, rofecoxib 25 mg and placebo. The study began April 29, 1998, prior to the approval of the drug by the FDA. In 2005, after rofecoxib had been withdrawn from the market, the data were published. No reduction in Alzheimer's progression was demonstrated in Protocol 078. Rather there was a 46% greater risk of developing Alzheimer's in the study population. (Thal LJ, et al., Neuropsychopharm 2005, 30:1204-15). The study also demonstrated an increase of all-cause mortality with rofecoxib compared to placebo.

Protocol 091 was a safety and efficacy study of rofecoxib 25mg in slowing

41

the progression of the symptoms of Alzheimer's disease. Here, 692 patients at least 50 years of age were randomized into two groups, rofecoxib 25 mg and placebo. In 2004, the study was published and reported no effect of rofecoxib on the progression of Alzheimer's disease. (Reines SA, et al., Neuro 2004, 62:66-71).

Protocol 126, similar in size and design to Protocol 091, was a safety and efficacy study of rofecoxib 25 mg in delaying the progression of the symptoms of Alzheimer's disease in patients with probable Alzheimer's disease. The study was discontinued early based on the results of Protocol 091.

It is notable that none of these long-term studies had a DSMB in place to monitor patient safety. Merck statisticians were unblinded to analyze the data on an interim basis. An email from Merck biostatistician Dr. Deborah Shapiro dated 1/29/01, just before Merck was scheduled to present the VIGOR data to an FDA advisory committee, noted that the intention to treat (ITT) deaths in the preliminary Alzheimer's data were 30:10 against rofecoxib. In the March-May 2001 period, other Merck statisticians performed multiple internal analyses on the Alzheimer's data that confirmed Shapiro's conclusions—there was an increase in all-cause mortality in the patients on rofecoxib. (Chen to Bain memo 4/8/01). An ITT analysis revealed an HR for death of 4.43 (1.26-15.53) in 091 after

04/28/2009 11:18 FAX  4014448781        NEUROLOGY                                    ☑043/061

adjusting for age, while in 078 the HR for death was 2.55 (1.17-5.56) after adjusting for age and gender. The on-drug analysis revealed for protocol 091 a HR for death of 4.68 (1.01-21.68) after adjusting for age, and in 078 the HR for death was 2.07 (0.82-5.19) after adjusting for age.

On July 6, 2001,Merck presented a Safety Update Report (SUR) to the FDA for Protocols 091, 078 and 126. In this report, Merck noted that deaths from all causes were increased in the rofecoxib group, but the investigators felt these were not due to study medication, as deaths occurred after a prolonged period off-drug, and there were disparate causes. Merck felt the difference in CV deaths was not due to a pharmacological effect. There was no separate analysis for deaths or CV death in the SUR. Despite the increased death rates in the Alzheimer's trials, Merck told the FDA that their "careful review of the available information for each of the deaths does not reveal any pattern suggesting a risk with rofecoxib." (MRK-01420145856 at p. 21).

A Merck summary of Alzheimer's trials mortality data (MRK-NJ0186457) presented a crude ratio of mortality per patient-year of follow up for study 078, with a mortality ratio on-study all-cause of 2.57, a mortality on-drug of 2.17, and on-drug CV death was 2.5 (with ratios of 2.0 for protocol 126 and 1.25 for protocol 091). The comparator drug for all 3 studies was placebo. (Bain data 10/01). Psaty and Kronmal reviewed the 2001 Merck

43

SUR submission and noted that Merck only presented the on-treatment mortality data, and not an intention to treat analysis for total mortality. (Psaty BM, et el, JAMA 2008, 299:1813-1817).

All of the above data were available to Merck by 2001, well before the new VIOXX[®] label was approved in April 2002.  None of this data is reflected in the 2002 label.

In late 2001, the FDA asked if the DSMB and IRBs were aware of the increase in total and CV mortality and raised an issue of the ethics regarding continuation of 078 (FDA letter 12/5/01 Gould to Silverman). Psaty/Kronmal noted that Merck never informed local IRBs of the early findings. They also noted the ITT data were not presented to the FDA until 2003, when they were presented "without comment."

The delayed presentation of the ITT data to the FDA until after the 2002 label was obtained led to a delayed review of this data by FDA medical officers. In a 1/28/04 memo by FDA officer Villalba, the protocols 078, 126 and 091 were reviewed in light of CV data in VIGOR. Dr. Villalba made note of the imbalance of CV deaths and all deaths between the rofecoxib group and placebo, and recommended that the CV section of the label should be updated to reflect these data. Merck did not amend the label to reflect this data.

44

04/28/2009 11:18 FAX  4014448781          NEUROLOGY                    ☒ 045/061

## MORE STUDIES DEMONSTRATE INCREASED HYPERTENSION COMPARED TO OTHER NSAIDS AND NOW ALSO COMPARED TO COX-2 INHIBITORS (SAFETY UPDATE REPORT 6/18/01 MRK014201-42352)

Internal Merck documents had already (12/26/00 MRK-NJ0281968) noted the importance of small increases in blood pressure from the general medical literature, citing that above 160 mm Hg SBP, every 1 mm Hg increase in pressure resulted on 0.25 deaths in 100 patients followed for 2 years.

The internal trial data demonstrates that Merck was not only aware that rofecoxib caused more significant increases in blood pressure compared to non-selective NSAIDs, but it was also aware that rofecoxib caused more significant increases in blood pressure compared to other members of its own class of drugs.

Protocol 116 compared rofecoxib 25 mg to celecoxib 200 mg and placebo. The study showed statistically significantly greater investigator reported hypertension related adverse events for rofecoxib versus celecoxib. A Merck "Position Paper" dated November 27, 2000 noted the excess hypertension and edema in rofecoxib compared to celecoxib, stating, "We

45

have not released this study and are awaiting the results of the second large head to head trial (Protocol 112) before we decide how to handle these results." (MRK-AFI0130595).

In 2000, Merck conducted Protocol 112, a trial of rofecoxib versus celecoxib and placebo (MRK-AGV0113871). A March 24, 2001 email acknowledged that hypertension adverse events nearly doubled for rofecoxib 12.5 mg versus celecoxib 200 mg (MRK-AHO0167042). The data showed significantly increased hypertension for rofecoxib versus celebrex or placebo. (MRK-ADB0019480).

Protocol 906 was a 4-week study of rofecoxib 25 mg versus celecoxib 200 mg daily (MRK-NJ0199453). Patients in the rofecoxib arm had significantly greater edema adverse events (5.3 v. 0.9%, $p<0.05$), and a greater than six-fold higher incidence of hypertension.

All of the above data were available to Merck by 2001, well before the new VIOXX[®] label was approved in April 2002.  None of these data are reflected in the 2002 label.

## APPROVe DATA CONFIRMS PRIOR CLINICAL TRIAL DATA OF INCREASED CV RISK AND PROMPTS REMOVAL FROM THE MARKET

The APPROVe trial was a long-term study comparing the use of rofecoxib 25 mg to placebo in individuals with recurrent neoplastic polyps. There were 1287 patients in the rofecoxib arm and 1299 in the placebo arm. The CV endpoint used in this trial was a combined endpoint called 'thrombotic events' that included MI, unstable angina, sudden death, stroke, TIA, peripheral thrombosis, and pulmonary embolism. Low dose aspirin was allowed, but patients with a history of cardiovascular events were excluded. Enrollment began in February, 2000.

This study had an ESMB to monitor safety. The trial ended when interim results indicating an increased risk of CV events in the rofecoxib arm prompted an early halt to the trial by the ESMB, and the worldwide withdrawal of rofecoxib on September 30, 2004.

This trial, like VIGOR, was not powered to detect CV events, yet significant differences were observed. The data from the APPROVe trial were published in February, 2005. (Bresalier RS, et al., N Engl J Med 2005, 352:1092-102). The relative risk reported for cardiac events was 2.8 for rofecoxib versus placebo, with a 95% CI of 1.44-5.45. For thrombotic events there was a relative risk of 9.59 for patients with a prior history of symptomatic atherosclerotic cardiovascular disease and a relative risk of 6.10 for those with known diabetes. Patients without this prior history had

47

RR 1.58 (0.95-2.64). The hazard ratio was 4.61 for hypertension and edema related events. The relative risk of cerebrovascular events (fatal ischemic stroke, ischemic stroke, transient ischemic attack) was reported as 2.32, CI 0.89-6.74.

Merck initially interpreted the results as showing an increased risk of CV events only after 18 months on the drug. In 2006, Merck admitted publicly that it had made an error in analyzing the data that led to the "18 month hypothesis." The New England Journal issued a correction in the July 18, 2006 issue. A subsequent independent analysis of the APPROVe data published in the New England Journal also disputed the 18 month hypothesis and concluded that the data did not show that short term use of rofecoxib was safe (Lagakos, SW, N Engl J Med 2006, 355:113-17).

In APPROVe, the risk of hypertension, edema, and congestive heart failure were all increased with VIOXX®. A change from baseline mean arterial pressure did not correlate with CV risk. However, on November 11, 2004, Merck scientist James Bolognese prepared an "Assessment of Rofecoxib TCVSAE [Thrombotic Cardiovascular Adverse Experiences] Results by Systolic BP Spike Occurrence." Mr. Bolognese reported that in APPROVe, "examination of the results split by systolic BP (SBP) > 160 mmHg on at least one occasion during the study revealed a striking relationship" to the occurrence of confirmed thrombotic events. (MRK-

48

04/28/2009 11:19 FAX  4014448781          NEUROLOGY

AGO0074496). "The interaction between SBP spike and treatment in TCVSAE was statistically significant (p =0.0471.) In the patients with no SBP spike, the RR was close to 1, but in those with at least one SBP spike, the RR was close to 4. These data suggest that nearly all of the excess CV events observed on rofecoxib versus placebo were in patients with at least one SBP spike. However, in the placebo group, the occurrence of SBP spike showed no increase in rate of TCVSAE's." (MRK-AGO0074496). When the data were analyzed according to a new "at risk" status as of the date when the SBP spike was first recorded, "the interaction... was highly significant (p=0.0043), indicating strong dependence of the treatment effect (hazard ratio) on whether there was a previous SBP spike or not." (MRK-AGO0074497). The APPROVe authors reported in the New England Journal increases of approximately 3 to 4 mmHg in systolic pressure in the rofecoxib group, along with the statement that the BP changes did not explain the excess risk of CV events in the rofecoxib population.

Demets and colleagues (Baron JA, et al., Lancet 2008 online 10/14/08) analyzed extended follow up data from APPROVe. Data were available for 84% of the patients. Followup was attempted for at least one year after stopping study drug. The APTC endpoint was used rather than confirmed thrombotic events because telephone follow up did not ask about all thrombotic events, the event number was too small for each to be an

individual endpoint, and they considered that the APTC endpoint was often used for studies of CV outcomes. They found that the APTC HR was 1.79 (1.17-2.73), the HR for MI was 1.94 (1.09-3.43), and the HR for stroke was 2.17 (0.98-4.80). The APTC risk did not change over time, except to disappear after one year off drug. BP changes did not correlate with risk. Patients with high CV risk had an increased APTC RR of 2.28 (1.25, 4.17); RR was 1.29 for those not at high risk (0.70-2.36). Some subjects were unblinded in this extension study. It is not clear if the investigators were unblinded. There was an occurrence of 7 ischemic strokes and 2 TIAs in the rofecoxib group after discontinuing treatment, compared with no such incidents in the placebo group during one year off-drug. The authors concluded that rofecoxib conferred an early increased risk that persisted for 1 to 3 years after treatment, and that this was likely a class effect for the coxibs.

Although APPROVe, like VIGOR, was not designed to detect a difference in CV events, a statistically significant difference between rofecoxib and placebo was clearly seen, and the subgroup analyses are consistent with an increased risk of CV events for those already at high risk. Based on the extension data, the risk continued off-drug.

## VICTOR

50

At the time that rofecoxib was withdrawn from the market, Merck had another cancer chemoprevention trial in progress, the VICTOR trial. The trial was terminated in September, 2004 with the drug's withdrawal.

The VICTOR study was a double-blind, randomized study of rofecoxib 25 mg versus placebo on the incidence of malignant transformation of intestinal polyps (MRK-18940096411). There were approximately 1200 patients in each arm of the study. Initial estimates suggested that the trial would have 90% power to detect an increase of cardiovascular events from 0.5 to 1.0% in patients on the drug for 2 years, with a necessary 7000 total patients on treatment for 2-5 years planned. Early termination resulted in a 7.4 months median duration of treatment, with a median follow-up of 33-34 months. Confirmed thrombotic events were counted until 14 days off-treatment (modified ITT), and relative risk was 2.66 (1.03-6.86), with a relative risk of 2.41 after adjustment for cardiovascular risk factors. The APTC relative risk was 1.60 (0.57-4.51), with a relative risk of 1.42, adjusted. About 50% of cardiovascular events occurred in patients treated for <12 months. The relative risk up to 24 months after discontinuation of drug was: thrombotic 1.5 (0.76-2.94) not adjusted, APTC 1.29 (0.57-2.95), not adjusted.

## CONCLUSIONS

## ROFECOXIB INCREASES THE RISK OF CARDIOVASCULAR

## DISEASE

## AND ISCHEMIC STROKE, AT ALL DOSES AND DURATIONS OF USE

Multiple lines of evidence support the conclusion that rofecoxib increases the risk of cardiovascular disease and ischemic stroke. There are multiple, plausible mechanisms of action to explain how rofecoxib causes cardiovascular events including ischemic stroke.

Even small increases in hypertension significantly increase the risk of CV events, including stroke. Hypertension plays an important role in the pathophysiology of stroke. Because the Merck studies were not originally powered to see differences in cardiovascular events, including stroke, it is noteworthy that we also examined the available data for evidence of increased rates of hypertension. The data show that rofecoxib increases blood pressure, increases it more than other drugs in both the non-selective NSAID and cox-2 classes, and that those increases in blood pressure may be linked to the development of CV events. The increased risk with respect to blood pressure and CV events with rofecoxib is not just theoretical, given an examination of all the data from VIGOR and APPROVe.

The data regarding the actual cardiac and stroke endpoints lead to the

52

same conclusion. Merck's randomized clinical trials, which were not designed with cardiovascular events, including ischemic stroke, as the primary endpoints, confirmed the increased risk of cardiovascular events.

There are no data supporting a choice of patient population, dose or duration of therapy that would be expected to be free of these risks.

**THERE WAS REASONABLE EVIDENCE OF AN ASSOCIATION BETWEEN ROFECOXIB AND CARDIOVASCULAR DISEASE, INCLUDING ISCHEMIC STROKE, ON MARCH 9, 2000 WHEN THE PRELIMINARY RESULTS OF THE VIGOR TRIAL WERE AVAILABLE TO MERCK SCIENTISTS. MERCK KNEW OR SHOULD HAVE KNOWN OF THE RISK AT THAT TIME**

Merck's internal company documents and emails demonstrate that it was aware of the possibility that rofecoxib increased risk for cardiovascular events, including ischemic stroke, even before learning of the results from the VIGOR trial. They were aware of the results of protocol 023 and the hypothesis that cox-2 inhibition could cause an increase in CV events.

On November 21, 1996, Merck scientist Dr. Tom Musliner stated in an internal memo that there was a substantial chance that significantly higher rates of CV adverse events will be observed in the selective Cox-2

inhibitor group compared to the standard NSAID group. (MRK-AAX0002413-2420). Dr. Musliner stated that one option for designing the trial that ultimately evolved into the VIGOR study was to prohibit use of low-dose aspirin and accept the risk of observing significant differences in CV rates. Dr. Musliner then proposed that one could attempt to minimize between-group differences by excluding patients with high risk (*i.e.* with prior MI, angina, stroke, TIA, atrial fibrillation, valvular heart disease, peripheral vascular disease). Another Merck scientist, Dr. Brian Daniels, responded that: "It is clear to me that the program will be severly [sic] hurt if the megatrial shows a win in PUBs and a loss in MI/CVA. That is what we are setting up by not allowing ASA." (MRK-NJ0315892).

On February 25, 1997, (MRK-NJ0315892) in email between Merck scientists Dr. Briggs Morrison and Dr. Alise Reicin, Dr. Morrison stated that patients should be allowed to take low-dose aspirin in the trial because "without COX-1 inhibition you will get more thrombotic events and kill the drug." Dr. Reicin responded that: "Low Dose Aspirin - I HEAR YOU! This is a no win situation! The relative risk of even low dose aspirin may be as high as 2-4 fold. Yet, the possibility of increased CV events is of great concern - (I just can't wait to be the one to present those results to senior management!). What about the idea of excluding high risk CV patients- *i.e.* those that have already had an MI, CABG, or PTCA? This may decrease the CV event rate so that a difference between the two

groups would not be evident. The only problem would be -Would we be able to recruit any patients?"

In December 1997, in response to the results from Protocol 023, Merck formed a task force to investigate the incidence of cardiovascular serious adverse events in ongoing rofecoxib osteoarthritis trials. On February 2, 1998, Merck scientist Dr. Doug Watson wrote a report on a cross-study analysis he performed comparing the incidence of cardiovascular events in patients on rofecoxib in the osteoarthritis trials to placebo patients in Merck's clinical trials of Proscar and Fosamax, and to a separate database from the Cardiovascular Health Study. The rofecoxib arm included patients who were both on drug (cox-2 inhibitor and NSAID) as well as placebo because the rofecoxib osteoarthritis trials were still blinded. (Watson analysis of CVEs in the OA trials -- 2/2/98. For VIOXX®, the RR against Proscar controls was 1.28 (0.53-2.82). The RR against Fosamax controls was 2.16 (1.14-3-94). His analysis explains this finding away by citing very low event rates in some of the strata of the control group, so the result was felt to be of no concern.

In a December 20, 1999 letter from the VIGOR DSMB to Dr. Reicin, the DSMB recommended that an analysis plan be developed to study adjudicated serious vascular events in VIGOR separately from other planned analyses and that the adjudication proceed blindly. (MRK-

AAX0002759). On January 9, 2000, Merck scientist Dr. Michael Gresser warned other Merck scientists about "stroke outcomes" stating that "if our worst fears concerning the prostacyclin business have any foundation in reality they [patients on rofecoxib] could have a higher incidence [of stroke]" (MRK-ABT0022638).

In a January 17, 2000 email from Capizzi to Reicin (MRK-AAX0002908), the writer discusses this issue but it is not clear that any plan is in place. The email states that the DSMB request seemed to be based on the size of VIGOR and the importance of the CV issue with respect to cox-2 agents. In a second 1/24/00 letter from the DSMB to Dr. Reicin, the DSMB made the same request again.

In a March 13, 2000 Shapiro email to Barr and Reicin (MRK-NJ0121088), the email states that CV events occurring after 14 days post discontinuation of drug should not be dropped. However, such a true ITT analysis is not usually performed on VIOXX® data. Usually a modified ITT analysis is performed where events are only counted up to 14 days after discontinuation of drug.

By March 9, 2000, the day the Merck scientists were unblinded and learned of the results from VIGOR, there was reasonable evidence of an association between rofecoxib and CVEs including ischemic stroke.

Internal documents confirm Merck's pre-VIGOR knowledge of the possibility of risk. After reviewing the data for the first time, Dr. Edward Scolnick wrote in an email that "the CV events are clearly there... this is real... It is a shame but it is a low incidence and it is mechanism-based as we worried it was. Oates and Alan and Barry were right about the metabolite meanings *i.e.* urine Pg data..."(MRK-ABC0009243). Dr. Scolnick indicated that he wanted to conduct a study of tylenol versus rofecoxib and daily low dose aspirin "to further assess safety." He notes that "endpoint studies tell the truth." To my knowledge, Merck never conducted a study of rofecoxib with cardiovascular disease as a primary endpoint.

The same day, March 9, 2000, in an email to Dr. Barry Gertz, Dr. Peter DiBattise stated that the only way to definitively answer the question about a potential prothrombotic effect of rofecoxib was to conduct a placebo controlled trial in patients with a history of acute coronary syndrome, thus implying high risk patients. (MRK-AFJ0000576). Merck clearly knew by this time that there were serious questions about the CV safety of rofecoxib and there was a reasonable association between rofecoxib use and CV events, including stroke.

Subsequent studies confirmed the presence of a CV risk, identifying no safe dose or duration of treatment. The ADVANTAGE data supported the

VIGOR results. The Alzheimer's trials showed an increase in deaths and CV deaths. Other studies showed an increase in hypertension that was more substantial than other NSAIDs and Cox-2 inhibitors.

## NONE OF ROFECOXIB'S LABELS ADEQUATELY AND FULLY EXPLAINED THE EXTENT OF THE KNOWN RISK TO PRESCRIBING PHYSICIANS AND PATIENTS

Dr. G. Block was the clinical monitor for the Merck SDAT studies. He agreed that a drug's label is the primary guide to the use of the drug (G. Block Depo. 11/2/05). Prior to approval, Merck knew or should have known that rofecoxib increased blood pressure more than non-selective NSAIDs. The initial label approved for the drug did acknowledge that rofecoxib increased blood pressure, but it did not acknowledge that rofecoxib increased blood pressure more than non-selective NSAIDs. This would have been important information for a prescribing physician and patient.

In addition, Merck knew, or should have known, that the blood pressure difference persisted despite the use of antihypertensives. Merck also knew, or should have known, that the most frequent serious adverse events on rofecoxib were in the cardiovascular system. As discussed above, increased blood pressure can lead to CV events, including stroke.

While the originally approved (1998) label and the 2002 label indicate that rofecoxib increases blood pressure, what the labels fail to disclose is that this increase is greater than for traditional NSAIDs. The label's incomplete and inadequate disclosure of rofecoxib's true hypertensive-inducing effects does not give prescribing physicians all the information necessary to make a full risk/benefit assessment of rofecoxib compared to its competitors.

## THE REVISED 2002 LABEL FOR ROFECOXIB PROVIDED AN INADEQUATE WARNING AND INCOMPLETE INFORMATION REGARDING THE KNOWN CARDIOVASCULAR RISKS OF THE DRUG

After reviewing the VIGOR data, an FDA officer, Dr. Targum indicated she felt that information regarding the cardiovascular risks of the drug belonged in the warning section of the label. Her fellow officer, Dr. Villalba, reviewed the ADVANTAGE data and noted that she felt rofecoxib should be used with caution in patients with known CV risk, such as those patients with hypertension and congestive heart failure.

The final 2002 label, however, contained information about the CV events in VIGOR in the precautions section, not a warning section. Additionally, the group for which the label indicates caution should be used was patients with a history of ischemic heart disease. This is only a subset of

59

patients who are at risk for CVEs and only includes those who have had an MI or angina, but does not include those patients at risk for ischemic heart disease, such as those with hypertension or diabetes. The label reports that in VIGOR, serious CVEs were statistically significantly increased with rofecoxib but mortality was similar. The increased risk of death and CV death that was demonstrated in the Alzheimer's trials was considered of "unknown significance" in the label. As noted above, at the time this label was released, the FDA did not have all of the Alzheimer's mortality data. None of the ADVANTAGE data are in the label.

The final 2002 label was inadequate to inform a physician who was considering prescribing rofecoxib about its potential risks. If a patient were considering rofecoxib, the physician should have all of the information available to allow him or her to inform the patient of the reasonable association between rofecoxib and CV events, including stroke. My opinion is that the final 2002 label failed to appropriately guide the prescribing physician in this manner.


Edward Feldmann, M.D.

Dated: ___4/28/09___