UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|                                              |   |                    |
|----------------------------------------------|---|--------------------|
|                                              | : | MDL NO. 1657       |
| IN RE: VIOXX                                 | : |                    |
|     PRODUCTS LIABILITY LITIGATION | : | SECTION: L         |
|                                              | : |                    |
|                                              | : | JUDGE FALLON       |
|                                              | : | MAG. JUDGE KNOWLES |

.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. :

**THIS DOCUMENT RELATES TO:** *District of Columbia ex rel. Walker v. Merck & Co., Inc.*, **Case No. 08-4148**

## ORDER & REASONS

Currently pending before this Court are Merck's Motion for Judgment on the Pleadings (Rec. Doc. 63656) and Plaintiff Kenneth Walker's Motion for Leave to Amend Complaints (Rec. Doc. 63713). The Court has heard oral argument, received supplemental briefing, and reviewed the briefs and the applicable law. The Court is now prepared to issue this Order and Reasons.

**I.     FACTUAL BACKGROUND**

To put this matter in perspective, a brief review of this litigation is appropriate. This multidistrict products liability litigation involves the prescription drug Vioxx, known generically as Rofecoxib. Merck, a New Jersey corporation, researched, designed, manufactured, marketed and distributed Vioxx to relieve pain and inflammation resulting from osteoarthritis, rheumatoid arthritis, menstrual pain, and migraine headaches. On May 20, 1999, the Food and Drug Administration approved Vioxx for sale in the United States. Vioxx remained publicly available until September 30, 2004, when Merck withdrew it from the market after data from a clinical

trial known as APPROVe indicated that the use of Vioxx increased the risk of cardiovascular thrombotic events such as myocardial infarction (heart attack) and ischemic stroke. Thereafter, thousands of individual suits and numerous class actions were filed against Merck in state and federal courts throughout the country alleging various products liability, tort, fraud, and warranty claims. It is estimated that 105 million prescriptions for Vioxx were written in the United States between May 20, 1999 and September 30, 2004. Based on this estimate, it is thought that approximately 20 million patients have taken Vioxx in the United States.[1]

California was the first state to institute a consolidated state court proceeding on October 30, 2002. New Jersey and Texas soon followed suit, on May 20, 2003 and September 6, 2005, respectively. On February 16, 2005, the Judicial Panel on Multidistrict Litigation ("MDL") conferred MDL status on Vioxx lawsuits filed in various federal courts throughout the country and transferred all such cases to this Court to coordinate discovery and to consolidate pretrial matters pursuant to 28 U.S.C. § 1407. *See In re Vioxx Prods. Liab. Litig.*, 360 F. Supp. 2d 1352 (J.P.M.L. 2005). Even after the creation of this federal MDL, many cases remained pending in the various state courts.

One of the cases pending in the MDL is a suit brought by Kenneth Walker, a resident of the District of Columbia. Mr. Walker filed suit on August 4, 2005 pursuant to the D.C. False Claims Act, and the case was filed under seal. He later amended that complaint to assert a separate claim under the D.C. Consumer Protection Procedures Act ("CPPA"). The Amended Complaint was unsealed in 2008. Merck removed the case to federal court, and the case was

---

[1] For a more detailed factual background describing the events that took place before the inception of this multidistrict litigation, see *In re Vioxx Prods. Liab. Litig.*, 401 F. Supp. 2d 565 (E.D. La. 2005) (resolving *Daubert* challenges to a number of expert witnesses).

then transferred to the MDL. The Court previously held that Mr. Walker lacked standing under the D.C. False Claims Act and dismissed that claim. (Rec. Doc. 62729). Now the remaining CPPA claim is the subject of briefing.

## II.     PRESENT ISSUES

The Court has two related motions pending before it. First, Merck has moved to dismiss the Amended Complaint on a variety of grounds, including lack of standing under either Article III of the Constitution or the CPPA. Second, Plaintiff has moved for leave to file a Second Amended Complaint to address certain issues raised in Merck's first motion and to add Rule 23 class allegations. Merck opposed the motion for leave to file, arguing futility on the basis of untimeliness as well as its original standing arguments. In an Order and Reasons dated May 9, 2012, the Court addressed certain of Merck's arguments regarding timeliness and relation back of the proposed Second Amended Complaint. (Rec. Doc. 63822). However, the Court postponed ruling on the standing issues and granted the parties leave to file supplemental briefs with respect to the sufficiency of the allegations of the Second Amended Complaint. The parties have submitted supplemental briefs and the matter is now ripe for resolution.

In the present procedural posture, Merck contends that Walker, as the named Plaintiff, lacks Article III standing to bring a claim under the CPPA because he does not allege a sufficient injury and because he has not alleged a merchant-consumer transaction that falls within the scope of the Act.

Walker opposes the motion for judgment on the pleadings. He contends that the Second Amended Complaint states a claim is not legally futile, that he has alleged both an economic and statutory injury for the purposes of Article III standing, and that he has sufficiently alleged a

consumer-merchant transaction.

## III. LAW AND ANALYSIS

### A. Standard on Motions to Amend and Motions to Dismiss

In this posture Plaintiff "may amend [his] pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Thus, the Court has discretion to grant or deny motions for leave to amend. However, as the Fifth Circuit has explained,

> "Discretion" may be a misleading term, for rule 15(a) severely restricts the judge's freedom.... It evinces a bias in favor of granting leave to amend. The policy of the federal rules is to permit liberal amendment to facilitate determination of claims on the merits and to prevent litigation from becoming a technical exercise in the fine points of pleading. Thus, unless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial.

*Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 597-98 (5th Cir. 1981).

The Court may deny leave to amend a pleading if "the movant has acted in bad faith or with a dilatory motive, granting the motion would cause prejudice, or amendment would be futile." *E.g.*, *Jebaco, Inc. v. Harrah's Operating Co.*, 587 F.3d 314, 322 (5th Cir. 2009). "Futility" means "that the amended complaint would fail to state a claim upon which relief could be granted" under "the same standard of legal sufficiency as applies under Rule 12(b)(6)." *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 873 (5th Cir. 2000).

In assessing a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), "all well-pleaded facts are viewed in the light most favorable to the plaintiff, but plaintiffs must allege facts that support the elements of the cause of action in order to make out a valid claim." *City of Clinton v. Pilgrim's Pride Corp.*, 632 F.3d 148, 152-53 (5th

Cir. 2010). "To avoid dismissal, a plaintiff must plead sufficient facts to 'state a claim to relief that is plausible on its face.'" *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The court "do[es] not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005).

**B.      Article III Standing**

It is abecedarian that this Court's jurisdiction, granted by Article III of the Constitution, reaches only justiciable cases and controversies. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-60 (1992). The doctrine of standing is a "core component" and "an essential and unchanging part of the case-or-controversy requirement of Article III." *Id.* at 560. The Supreme Court has explained that "the irreducible constitutional minimum of standing contains three elements":

> First, the plaintiff must have suffered an "injury in fact"–an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not "'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of–the injury has to be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be redressable by a favorable decision.

*Id*. at 560-61 (citations and some alterations omitted). Merck contends that the required "injury in fact" is lacking in this case.

The legally protected interest which, if invaded, creates standing to sue can take many forms. Alleged injury to pecuniary or economic interests undoubtedly qualifies as a concrete

and particularized injury in fact for standing purposes. *See, e.g.*, *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 723 (5th Cir. 2007). But "[t]he actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." *Warth v. Seldin*, 422 U.S. 490, 500 (1975) (citation and quotation omitted). Invasion of such a statutory right "can confer standing to sue even where the plaintiff would have suffered no judicially cognizable injury in the absence of statute." *Id.* at 514. In assessing Article III standing, the Court is not concerned with the merits of a claim under the governing law or the eventual likelihood of success. *See Cole v. Gen. Motors Corp.*, 484 F.3d 717, 723 (5th Cir. 2007).

The parties dispute whether Plaintiff has alleged a sufficient injury to his economic or statutory interests for the purposes of Article III standing. The cases on this issue are fact-intensive and somewhat difficult to reconcile. The Court will first summarize the universe of cases relied on by the parties. Against that background, the Court will then address the parties' arguments regarding the presence of the requisite economic or statutory injury for purposes of Plaintiff's standing to sue.

### 1) Standing Cases Cited by the Parties

Merck relies primarily on *Rivera v. Wyeth-Ayerst Laboratories*, 283 F.3d 315 (5th Cir. 2002), and *Williams v. Purdue Pharma Co.*, 297 F. Supp. 2d 171 (D.D.C. 2003). In *Rivera*, the plaintiff sought to represent a class of individuals who purchased a pharmaceutical that had a risk of causing liver damage but did not actually sustain any physical injury. 283 F.3d at 317. As the Fifth Circuit characterized the case, "Wyeth sold Duract; Rivera purchased and used Duract; Wyeth did not list enough warnings on Duract and/or Duract was defective; other

patients were injured by Duract; Rivera would like her money back." *Id.* at 319. The Fifth Circuit concluded that the plaintiff did not allege an injury in fact sufficient for the purposes of Article III standing.

In *Williams v. Purdue Pharma*, patients who were prescribed Oxycontin filed suit against the manufacturer pursuant to the CPPA, alleging deceptive advertising regarding the duration and addictiveness of the painkiller (but not that the plaintiffs had those problems with the drug). *See* 297 F. Supp. 2d at 172, 175-76. Because the plaintiffs did not allege that "the drug "failed to provide them effective pain relief or that they suffered any adverse consequences," they had "received the benefit of [their] bargain and ha[d] no basis to recover purchase costs." *See id.* at 176. Citing *Rivera*, the court concluded that "[t]he invasion of a purely legal right without harm to the consumer–in this case, to freedom from alleged false and misleading advertising" did not create Article III standing. *See id.* at 177-78. The court paid particular attention to the plaintiffs' failure to allege that they "were any way deceived–or even saw–any of" the allegedly deceptive advertising, or that they personally suffered "any particularized and specific injury-in-fact." *Id.* at 176.

Merck also cites *Hoyte v. Yum Brands, Inc.*, in which a plaintiff doctor filed suit against the seller of Kentucky Fried Chicken, alleging that it violated the CPPA by failing to disclose the presence of trans fats in fried chicken sold in the District of Columbia. 489 F. Supp. 2d 24, 26 (D.D.C. 2007). The plaintiff alleged that he was trying to avoid trans fat and purchased KFC without realizing it contained trans fat. *Id.* at 26. The district court dismissed the CPPA claim for lack of Article III standing because the plaintiff did not allege any physical injury and because the Court concluded he did not adequately specify an economic injury. *See id.* at 28-30.

In opposition, Plaintiff cites *Grayson v. AT&T Corp.*, 15 A.3d 219 (D.C. 2011) and *Shaw v. Mariott International*, 605 F.3d 1039 (D.C. Cir. 2010). In *Grayson*, the District of Columbia Court of Appeals addressed injury-in-fact and standing for two unrelated CPPA claims consolidated for appeal.[2] One plaintiff alleged that an internet service provider violated the CPPA by failing to disclose to current users favorable pricing offered to new users. 15 A.3d at 246. But the plaintiff did not allege he was a customer and filed suit "in a wholly representative capacity." *See id.* at 227, 247. Therefore, his "only connection to the affected ... customers is residence in the District; he is in no different a position to bring this claim than any other unaffected citizen." *See id.* at 247. The second consolidated plaintiff, however, did have standing. That plaintiff, who had purchased prepaid calling cards, alleged that sellers of those cards improperly kept unspent balances as profits instead of turning those amounts over to the District of Columbia as unclaimed property. *See id.* at 225-27, 247-49. The court found this to sufficiently allege a concrete injury to the plaintiff's "statutory right [under the CPPA] to the disclosure of information" regarding defendant's practices. *See id.* at 248-49.

In *Shaw*, a group of differently-situated D.C. individuals and entities filed suit against a hotel chain. 605 F.3d at 1041. They alleged that the hotel chain had violated the CPPA by misrepresenting prices at its Russian hotels.[3] *Id.* The district court granted summary judgment

---

[2] Although not an Article III federal court, the District of Columbia Court of Appeals stated that it has "followed consistently the constitutional standing requirement embodied in Article III." 15 A.3d at 224. Therefore, the D.C. Court of Appeals cited federal as well its own district law in assessing standing. *See id.* at 224, 246-47. Although Merck argues that the analysis in *Grayson* is therefore not binding on this federal court, it is informative.

[3] The hotel chain advertised prices in U.S. dollars but, upon checkout, informed customers that "payment would be due in Russian rubles, which the hotels calculated at an exchange rate less favorable than the official rate set by the Central Bank of Russia," which resulted in

on the basis that none of the named plaintiffs had Article III standing under the CPPA; the D.C. Circuit reversed. With respect to a think tank that paid for its employees to stay at Russian hotels, the Circuit easily found standing:

> CSIS has standing. It used its own funds to pay for stays at Marriott's Russian hotels, and suffered pecuniary harm as a result of Marriott's pricing practices. *See Ciba Geigy Corp. v. EPA*, 801 F.2d 430, 438 n.10 (D.C. Cir. 1986) ("[E]conomic loss clearly constitutes a distinct and palpable injury....") (internal quotation marks omitted). Damages under the CPPA would remedy that loss. ***Article III requires no more.***

*Id.* at 1042 (emphasis added). But two individual plaintiffs did not suffer pecuniary harm because their employers paid for the hotel stays. *See id.* Instead, those plaintiffs argued that they "suffered a legally cognizable injury because Marriott invaded their interest in being free from improper trade practices, an interest protected under the CPPA." *Id.* The circuit recognized that violation of a statute "can create the particularized injury required by Article III," but "only when an individual right has been conferred on a person by statute." *Id.* (quotation omitted). Analyzing the scope of the CPPA, the court held that the plaintiffs' business travel did not constitute "consumer transactions within the meaning of the [CPPA]"; because they did not have rights under the CPPA, they did not have Article III standing. *See id.* at 1043-44.

Plaintiff also refers to *Silvious v. Snapple Beverage Corp.*, in which the plaintiff alleged that he had purchased Snapple beverages which were marketed as "all natural," but actually contained high fructose corn syrup. *See* 793 F. Supp. 2d 414, 415-16 (D.D.C. 2011). He alleged that this marketing violated the CPPA; Snapple moved to dismiss for lack of standing. The

---

overpayment from the quoted price of up to 18 percent. *See id.* at 1041.

district court found in a terse analysis that "plaintiff, as a consumer of products in the District of Columbia alleging an unlawful trade practice, has Article III standing." *See id.* at 417. The court evidently based its reasoning on the pecuniary harm from purchasing a product that was not as it was represented to be, rather than the abstract right to be free from deceptive marketing. *See id.* (citing *Shaw* for the proposition that "Article III requires no more than payment for services and pecuniary harm as a result of pricing practices") (quotation omitted).

With this array of authorities in mind, the Court will turn to whether Plaintiff has alleged either an economic injury or a statutory injury for the purposes of Article III standing.

### 2) Economic Injury

Merck, relying on *Rivera* and *Williams*, contends that simply purchasing a product is not an economic injury that generates standing or a justiciable case in controversy. It argues that "[w]ithout alleging that a product failed to perform as advertised, a plaintiff has received the benefit of his bargain and has no basis to recover purchase costs." *Williams*, 297 F. Supp. 2d at 176. Plaintiff alleges that he took Vioxx between July 29, 2002 and October 2004, when he was unable to refill his prescription due to its withdrawal from the market. (Second Am. Complt. at ¶¶ 153-57). Therefore, Merck argues that Plaintiff paid for and received an effective medication without experiencing any of the side effects that injured others, and he has not suffered any cognizable economic injury.[4]

In response, Plaintiff argues that he has alleged an economic injury through asserting that

---

[4]The Amended Complaint and Second Amended Complaint indicate that while taking Vioxx, Plaintiff "was treated for renal failure, high blood pressure, diabetes, and recurrent strokes." (Second Am. Complt. at ¶ 155). However, nowhere in the pleadings or briefing does Plaintiff suggest that he attributes those conditions to Vioxx or that he is pursuing damages for personal injury on his behalf, or for any proposed class members.

he paid for Vioxx out-of-pocket but would not have if Merck had not misrepresented its safety profile. Plaintiff cites *Grayson* and *Shaw* for the proposition that economic injury such as overpayment creates standing under the CPPA.

The Court has reviewed the authorities cited by the parties and finds little to support Plaintiff's theory of economic injury. *Grayson* did not analyze economic injury at all. *See* 15 A.3d at 249. *Shaw* involved a much more obvious economic injury; in that case, the defendant misrepresented the price of a hotel room and as a result the plaintiffs paid 18% more than they thought they would pay. *See* 605 F.3d at 1042. That is clearly a concrete, particularized economic injury.[5] But in this case, Plaintiff thought he was purchasing a medication that would relieve his pain without causing him personal injury (other than that warned of in the FDA-approved label), and that is what he received. There is no obvious, quantifiable pecuniary loss that Plaintiff incurred from purchasing a drug that worked for him and did not cause him any harm.[6] Plaintiff also does not persuasively distinguish this case from *Rivera*, at least with respect to the question of whether he has alleged a concrete and particularized economic injury;

---

[5] Plaintiff cites *District Cablevision Ltd. P'ship v. Bassin* as another example of economic injury, but the case is not particularly apposite. In *Bassin*, plaintiffs alleged that their cable television provider illegally increased its late payment fee from $2.00 to $5.00. 828 A.2d 714, 718 (D.C. 2003). Although addressing it as an element of a CPPA claim rather than in terms of standing, the District of Columbia Court of Appeals held that the increased late fee was an economic injury whether or not the plaintiffs could have avoided them by paying on time. *See id.* at 725. However, the late fee was a concrete amount of money that the plaintiffs alleged they should not have had to pay to receive their cable service and has little bearing on Plaintiff's theory of economic injury in this case.

[6] Possibly *Silvious*, the case involving the "all-natural" beverage that contained high-fructose corn syrup, found an economic injury solely based on a misrepresentation of the quality of a product. *See* 793 F. Supp. 2d at 417. But the reasoning in that case is sparse and just as consistent with finding of a statutory injury, which the Court will discuss below.

"[m]erely asking for money does not establish an injury in fact." 283 F.3d at 319.

In short, Plaintiff has not cited authorities holding that circumstances such as these give rise to an economic injury. In light of that dearth, as well as the persuasive reasoning in *Williams* and *Rivera* with respect to the standing requirements for an economic injury, the Court concludes that merely purchasing a drug–which in fact helped Plaintiff–does not generate an economic injury giving rise to Article III standing and Plaintiff has not alleged a concrete, particularized injury in fact to his economic interests.

### 3) **Statutory Injury**

Merck argues that Plaintiff fails to allege a statutory injury giving rise to Article III standing for two reasons. First, Merck argues that even if it did violate the CPPA, Plaintiff still fails to allege an additional distinct injury to himself. Second, Merck argues that even if mere violation of a right granted by the CPPA can be a statutory injury that creates standing, Plaintiff personally has not alleged that *his* rights under the CPPA were violated by anything Merck did. Merck relies on *Williams*, in which the court found no statutory injury because the plaintiffs did not allege that they were "in any way deceived–or even saw–any of that advertising." 297 F. Supp. 2d at 177.

In response, Plaintiff argues that Merck's violation of "his statutory right to 'the disclosure of information' regarding Defendant's dangerous misrepresentations" suffices to establish a statutory injury that creates Article III standing. (Rec. Doc. 63694 at 9). Plaintiff also argues that the Second Amended Complaint adequately alleges that Plaintiff's personal rights under the CPPA were directly violated by Merck's conduct.

The analysis in *Shaw v. Marriott* is instructive. *Shaw* began by applying the well-settled

principle that invasion of the "interest in being free from improper trade practices, an interest protected under the CPPA .... may constitute an injury-in-fact sufficient to establish standing, even though the plaintiff 'would have suffered no judicially cognizable injury in the absence of [the] statute.'" 605 F.3d at 1042 (quoting *Warth v. Seldin*, 422 U.S. at 514). However, *Shaw* also acknowledged that "the violation of a statute can create the particularized injury required by Article III only when an individual right has been conferred on a person by statute." *Id.* (quotation omitted). Thus, the issue in *Shaw* boiled down to whether the individual plaintiffs who had no actual pecuniary injury were nonetheless "in the class of individuals protected by the CPPA." *Id.* The court ultimately concluded that they were not, because as business travelers they were not "consumers" within the meaning of the CPPA. *See id.* at 1044. Because they were not within the scope of protection of the Act, they "could not have suffered any injury-in-fact stemming from a violation of the statute," which deprived them of Article III standing. *See id.*

*Shaw* forecloses Merck's first argument; the *Shaw* court assumed that mere violation of a statutory right would constitute an injury in fact and create Article III standing. *See* 605 F.3d at 1043; *accord Warth*, 422 U.S. at 500 ("The actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing.") (citation and quotation omitted).[7]

The real issue in this case is the second step in the *Shaw* statutory injury analysis:

---

[7]Merck also argues that the absence of statutory injury standing necessarily follows from the Fifth Circuit's opinion in *Rivera*, but *Rivera* does not seem to be controlling on this issue. *Rivera* did not address the issue of statutory injury theory at all, nor did it address a state consumer fraud act in any detail. In the absence of consideration of those issues, the Court does not find *Rivera* applicable to the question of statutory injury standing.

whether Plaintiff is "in the class of individuals protected by the CPPA." 605 F.3d at 1042. This analysis turns on the substantive law of the CPPA and whether the factual allegations in the Second Amended Complaint, taken as true, state a claim for violation of Plaintiff's individual rights under the CPPA by Merck. *See* 604 F.3d at 1042-43; *see also Williams*, 297 F. Supp. 2d at 177 (finding no injury where plaintiffs alleged false advertising but not that they "were in any way deceived–or even saw–any of that advertising").

Merck argues that the Second Amended Complaint is devoid of any meaningful factual allegation that Plaintiff or his doctor personally received any misleading communications or were deceived by any of Merck's statements. In the absence of any connection between Merck's conduct and **Plaintiff** as an individual, Merck submits that **Plaintiff** has not suffered any violation of his right under the CPPA and therefore has no statutory injury giving rise to Article III standing. In its supplemental memorandum, Merck cites the Third Circuit's recent opinion in *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, —F.3d—, 2012 WL 1700836 (3rd Cir. May 16, 2012). In that case, a proposed class representative alleged that the defendant pharmaceutical manufacturer fraudulently marketed its products for off-label purposes, which caused her to take the drug when it was not necessary and suffer side effects. *See id.* at *10-11. However, the plaintiff failed to "present a plausible allegation actually linking [plaintiff's] injuries to any type of miscommunication or false claim about the drugs that were actually prescribed to her." *Id.* at *16. The plaintiff alleged that her doctor was engaged in a "phony" clinical trial with the defendant, but because plaintiff did not receive that "phony" clinical trial treatment, that fact, even if true, did not establish a causal nexus between the defendant's conduct and her injuries. *See id.* at *14-15. In the absence of anything more than

conclusory allegations connecting the defendant's conduct to the plaintiff in particular, the Third Circuit affirmed the lower court's finding of a lack of Article III standing.

Plaintiff responds that he has sufficiently alleged factual material regarding Merck's misleading marketing, the broad reach of that marketing to residents of the District of Columbia including Plaintiff, and his reliance on those misrepresentations. To support that contention, Plaintiff cites specific allegations of the Second Amended Complaint, including that Merck's "concealment, suppression, omissions, misrepresentations, and practices had the tendency, capacity, and likelihood to deceive Plaintiff and the class," and that the conduct "caused Plaintiff and the Class to suffer ascertainable losses" from purchasing Vioxx. (Second Am. Complt., ¶¶ 180-81).

The Court has reviewed the Amended Complaint and the proposed Second Amended Complaint. Plaintiff has alleged factual material regarding the nature and scope of Merck's consumer- and physician-directed communications, as well as how those communications were misleading and violated the CPPA. But when it comes to connecting that conduct to himself, Plaintiff only alleges in general terms that those communications were directed towards consumers in the District of Columbia and that he was a resident of the District of Columbia. (*See, e.g.*, Second Am. Complt. at ¶ 147 ("Merck's deceptive and misleading marketing campaign concealed, omitted, and suppressed [sic] resulted in inflated payments by consumers, such as Plaintiff and the Class members, for, in whole or in part, the costs of Vioxx.")). This generalized and conclusory allegation does not suffice to show any plausible nexus or causation between Merck's conduct and Plaintiff as an individual; for example, the Second Amended Complaint is devoid of any allegation that Plaintiff or his doctor personally received any

misleading communications regarding Vioxx.

Plaintiff does allege one concrete fact regarding the Vioxx he personally took. According to the Second Amended Complaint, Plaintiff's initial Vioxx pills came in sample packages he received from his doctor, which he alleges "demonstrates that a Merck representative had visited" his doctor. (Second Amended Cmplt. at ¶ 151). But this piles speculation upon speculation; not only does it require an inference that the samples were delivered directly from a Merck representative to Plaintiff's doctor, it requires the additional conjectural leap that such a meeting included some of the allegedly violative misrepresentations. "Factual allegations must be enough to raise a right to relief above the speculative level," and this allegation does not clear that threshold. *Twombly*, 550 U.S. at 555.

Thus, the Court agrees with Merck that the Second Amended Complaint does not suffice to show a statutory injury giving rise to Article III standing. Whether the deficiency is characterized as a missing "causal connection between the injury and the conduct complained of," *Lujan*, 504 U.S. at 560, or a failure to allege that Merck's conduct had an effect on Plaintiff such that Plaintiff's personal rights under the CPPA were invaded, *see Shaw*, 605 F.3d at 1042-43, the pleading fails. Amendment would be futile.[8] Moreover, the currently operative Amended Complaint, which contains even less in the way of factual pleadings, suffers from the

---

[8]Because Plaintiff has failed to articulate Article III standing, the Court need not address in detail Merck's alternative argument that Plaintiff failed to allege a consumer-merchant transaction required by the CPPA. The authorities cited by the parties do not "fully answer[] the question of whether the relationship between defendants–manufacturers who sell through intermediary pharmacies–and plaintiffs–acknowledged consumers–constitutes a consumer-merchant relationship within the coverage of the CPPA." *Williams v. Purdue Pharma Co.*, 297 F. Supp. 2d at 174. It is enough to note that the same pleading deficiencies that fail to establish Article III standing would likely pose an obstacle to establishing a consumer-merchant transaction between Plaintiff and Merck. *See id.* at 175.

same deficiency and must also be dismissed for lack of standing.

## IV.  CONCLUSION

For the foregoing reasons, IT IS ORDERED that Merck's Motion for Judgment on the Pleadings (Rec. Doc. 63656) is GRANTED and Plaintiff's Motion for Leave to Amend (Rec. Doc. 63713) is DENIED.

New Orleans, Louisiana, this 13th day of June, 2012.

_____
UNITED STATES DISTRICT JUDGE