UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| In re: VIOXX Products Liability Litigation | **MDL No. 1657** |
| **This Document Relates to:** | **SECTION L** |
| **JIM HOOD, ATTORNEY GENERAL** *ex rel.,* **STATE OF MISSISSIPPI** | **JUDGE ELDON E. FALLON** |
| **v.** | **MAGISTRATE JUDGE KNOWLES** |
| **MERCK & CO., INC.** | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### FIRST AMENDED COMPLAINT

COMES NOW, the Plaintiff, Jim Hood, Attorney General of the State of Mississippi, *ex rel.* the State of Mississippi (the "State" and/or "Plaintiff"), by and through the undersigned counsel of record acting as duly-appointed Special Assistant Attorney General, and would state unto this Honorable Court as cause of action against Defendant, Merck & Co., Inc., the following matters, to-wit:

### INTRODUCTION

1.      The State has discovered that Defendant has willfully engaged in a protracted, deceptive, and unfair course of conduct in violation of the Mississippi Consumer Protection Act, Miss. Code Ann.§§ 75-24-1, et seq. (Rev. 2005), and other state laws, in connection with its marketing, promoting, and selling its drug VIOXX®.

2.      The State brings this action exclusively under the law of the State of Mississippi. No federal claims are being asserted and to the extent that any claim or factual assertion set forth

herein may be construed to have stated any claim under federal law, such claim is expressly and undeniably disavowed and disclaimed by the State.

3.      The claims asserted herein are brought solely by the State and are wholly independent of any claims that individual users of VIOXX® may have against Defendant.

## PARTIES

4.      The State is a body politic created by the Constitution and laws of the State; as such, it is not a citizen of any state. Jim Hood is the State's duly-elected and present Attorney General. The Attorney General brings this action on the State's behalf pursuant to his authority granted, inter alia, by Miss. Const. art. 6, § 173 (1890); Miss. Code Ann. § 7-5-1 (Rev. 2002); and in his capacity as the State's Chief Legal Officer pursuant to the positive statutory, common, and decisional law of the State, which vests in him the right to initiate, conduct, and maintain all suits necessary for the enforcement of the laws of the State, preservation of order, and protection of public rights.

6.      Merck is a global pharmaceutical company incorporated under the laws and statutes of the State of New Jersey with its principal place of business being One Merck Drive, WS3 AB-05, Whitehouse Station, New Jersey. Merck is licensed to and does conduct business in the State of Mississippi.

## JURISDICTION AND VENUE

7.      Subject matter jurisdiction for the instant controversy is conferred upon the Chancery Court of Hinds County pursuant to Miss. Const. art. 6, § 159 (1890), and Miss. Code §§ 9-5-81 and 75-24-9. Defendant is subject to personal jurisdiction in Hinds County as it does business and performs work or service in this State and in Hinds County. Accordingly, Defendant by such acts is deemed to be doing business in Mississippi and is thereby subjected to

the personal jurisdiction of the Chancery Court of Hinds County pursuant to Miss. Code§ 13-3-57.

8.      The instant Complaint does not confer diversity jurisdiction upon the federal courts pursuant to 28 U.S.C. § 1332. Likewise, federal question subject matter jurisdiction pursuant to 28 U.S.C. §1331 is not invoked by the instant Complaint, as it sets forth herein exclusively state law claims against Defendant. Nowhere herein does the State plead, expressly or implicitly, any cause of action or request any remedy that arises under or is founded upon federal law. The issues presented in the allegations of the instant well-pleaded Complaint do not implicate significant or substantial federal issues and do not turn on the necessary interpretation of federal law. The State expressly avers that the only causes of action claimed, and the only remedies sought herein, are founded upon the statutory, common, and decisional laws of the State of Mississippi. Further, the assertion of federal jurisdiction over the claims made herein would improperly disturb the congressionally approved balance of federal and state responsibilities. Accordingly, the State has sought and continues to seek remand to the Chancery Court of Hinds County from which the Defendant improperly removed the case on November 1, 2005, nearly seven (7) years ago.

9.      Venue is proper in the Chancery Court of Hinds County pursuant to Miss. Code § 75-24-9 and Miss. R. Civ. P. 82(b), as Defendant did, individually or in conjunction with others, supply, market, sell, promote, advertise and otherwise distribute, VIOXX®, a pharmaceutical drug, in Mississippi and, specifically, in Hinds County.

## FACTUAL ALLEGATIONS

## DEFENDANT'S FALSE AND MISLEADING STATEMENTS

A.      **1999 False and Misleading Statements.**

- 3 -

10.     During the time period from May 21, 1999, when VIOXX® was first introduced on the market, through December 1999, the Defendant made and/or caused to be issued numerous materially false and misleading statements and/or omissions of material facts concerning the safety and efficacy of VIOXX®, including the following:

### 1.     Merck Announces FDA Approval of VIOXX®

11.     On May 21, 1999, Merck issued a press release (the "May 21, 1999 Press Release") in which it announced that the FDA had approved VIOXX® for the relief of osteoarthritis, menstrual pain and other forms of acute pain.  Merck stated that the most common side effects reported in clinical trials with VIOXX® were upper-respiratory infection, diarrhea and nausea.  The press release stated that VIOXX® should be available in pharmacies by mid-June, 1999.  The press release failed to disclose material adverse information known to Merck concerning the cardiovascular risks associated with VIOXX®.  Defendant was aware of these risks from internal studies, including Study 090, the results of which Defendant failed to disclose to the FDA or to the public.

### 2.     Merck Promotes VIOXX® while Purposely Failing to Disclose The Cardiovascular Risks of the Drug

12.     On October 19, 1999, the Company issued a press release entitled "Publication shows new medicine VIOXX® relieved Menstrual Pain" (the "October 19, 1999 Press Release".)  The October 19, 1999 Press Release stated in pertinent part "Since its approval by the FDA in May, more than 2.2 million prescriptions have been written for VIOXX® in the United States, making it one of the most successful product introductions in the pharmaceutical industry's history."  The October 19, 1999 Press Release failed to disclose material adverse information known to Merck concerning the serious cardiovascular risks associated with VIOXX®.

- 4 -

13.     On October 25, 1999, the Company issued a press release (the "October 25, 1999 Press Release") in which the Company stated that VIOXX® "produced fewer ulcers in osteoarthritis patients than patients taking ibuprofen." Merck announced the results of a new study showing that osteoarthritis patients taking VIOXX® developed fewer stomach ulcers than patients taking ibuprofen. The October 25, 1999 Press Release failed to disclose the material adverse information known to Merck concerning the cardiovascular risks associated with VIOXX® that threatened VIOXX®'s medical and commercial viability.

14.     On November 23, 1999, the Company issued a press release (the "November 23, 1999 Press Release") entitled "In a Study Published in the Journal of the American Medical Association, VIOXX® Significantly Reduced Risk of Serious Gastrointestinal Side Effects Compared to Other NSAIDS." The November 23, 1999 Press Release contained the following materially false and misleading statements and/or omissions of material fact:

> VIOXX®, the new medicine for osteoarthritis from Merck & Co., Inc., significantly reduced the risk of gastrointestinal (GI) side effects such as symptomatic ulcers and bleeding compared to three commonly prescribed non-steroidal anti-inflammatory drugs (NSAIDs), according to a new study being published in tomorrow's issue of the Journal of the American Medical Association.
>
> ***
>
> Common side effects reported in clinical trials with VIOXX® were upper-respiratory infection, diarrhea, nausea and high blood pressure. People who have had an allergic reaction to VIOXX®, aspirin or other NSAIDs should not take VIOXX®. Safety and effectiveness in children below the age of 18 has not been studied.

15.     The November 23, 1999 Press Release failed to disclose material adverse information concerning cardiovascular risks associated with VIOXX®, including results of Study 090 which concluded that VIOXX® users were 6 times more likely than non-VIOXX® users to have severe cardiovascular events.

16.     Each of the Defendant's statements made in 1999 concerning VIOXX® was

materially false and misleading when issued, because each statement failed to disclose

information known to the Defendant, that VIOXX® was associated with negative cardiovascular

events.  The true but concealed and/or misrepresented facts included, but were not limited to:

- • Merck's unpublished Study 090 concluded that VIOXX® users were 6 times more likely to have severe cardiovascular events than users of other NSAIDS;

- • Internal Merck e-mails authored in 1996 and 1997 reveal that even before the FDA approved VIOXX® for prescription use, Merck knew of the VIOXX®-related medical risks;

- • Substantial data existed in 1999 that VIOXX® was associated with a higher risk of cardiovascular events than other NSAIDs;

- • On December 16, 1999, Merck had received the December 16, 1999 FDA Letter admonishing Defendant for misleading the public by using deceptive promotional materials that suggested VIOXX® had a superior safety profile to other NSAIDS, which was not demonstrated by substantial evidence; and

- • The Company could not maintain the positive VIOXX® sales results that it was experiencing because of the known risks to VIOXX®'s medical and commercial viability.

**B.      2000 Events and False and Misleading Statements**

17.     In 2000, the Defendant made and/or caused to be issued numerous materially

false and misleading statements and/or omissions of material facts concerning the safety and

efficacy of VIOXX®, including the following:

**1.      Merck Announces Results of VIGOR Study, But Conceals Findings of
         Cardiovascular Risks Associated with VIOXX®**

18.     On March 27, 2000 Merck issued a press release (the "March 27, 2000 Press

Release") entitled "Merck Informs Investigators of Preliminary Results of Gastrointestinal

Outcomes Study With VIOXX®."  The March 27, 2000 Press Release commented upon the

results of the VIGOR study previously discussed in this Complaint.  In the March 27, 2000 Press

Release, Merck stated that according to the VIGOR study results, "[a]mong patients treated with VIOXX®, there was a significantly reduced incidence of serious gastrointestinal events compared to patients treated with Naproxen." The March 27, 2000 Press Release also made the following materially false and misleading statements and/or omissions of material facts:

> In addition, significantly fewer thromboembolic events were observed in patients taking Naproxen in this GI outcomes study, which is consistent with Naproxen's ability to block platelet aggregation. This effect on these events had not been observed previously in any clinical studies for Naproxen. **VIOXX®, like all COX-2 selective medicines, does not block platelet aggregation and therefore would not be expected to have similar effects.** As a result, Merck is notifying investigators, who are conducting other Merck studies with VIOXX® or another investigational medicine in the same class, of protocol amendments to allow the addition of low-dose aspiring where appropriate.

***

> An extensive review of safety data from all other completed and ongoing clinical trials, as well as the post-marketing experience with VIOXX®, **showed no indication of a difference in the incidence of thromboembolic events between VIOXX®, placebo and comparator NSAIDs** (emphasis added).

19.     The March 27, 2000 Press Release failed to disclose known material negative information concerning the cardiovascular risks associated with VIOXX® that threatened VIOXX®'s medical and commercial viability. Moreover, the March 27, 2000 Press Release misleadingly and falsely attributed the higher incidence of cardiac events observed in the VIGOR study to the putative cardio protective characteristics of Naproxen.

### 3.     Merck Falsely Touts VIOXX®'s Safety Profile as "Excellent"

20.     On September 8, 2000, Merck issued a Press Release (the "September 8, 2000 Press Release") entitled "Merck Confirms Excellent Safety Profile of VIOXX®." In the September 8, 2000 Press Release, Defendant made the following materially false and misleading statements and/or omissions of material fact:

- 7 -

Merck & Co., Inc. confirmed today that a routine report issued by the U.K. regulatory authority demonstrates the excellent safety profile of VIOXX® (rofecoxib), Merck's medicine for osteoarthritis. The report was issued by the U.K. Medicines Control Agency (MCA) because VIOXX® has now been available in the U.K. for one year. During that time, more than 550,000 prescriptions for VIOXX® were written for patients in the U.K. The events listed were reported by physicians as events that occurred while patients were taking VIOXX®, and were not specifically attributed to VIOXX®.

**Merck considers patients safety to be of the utmost importance, and we routinely monitor all of our medicines. What was reported by the MCA confirms what we've seen in the thousands of patients in our controlled clinical trials and in clinical practice: VIOXX® has an excellent safety profile,** says Eve Slater, M.D. senior vice president, Clinical and Regulatory Development, Merck Research Laboratories. (emphasis added)

21.     The September 8, 2000 Press Release failed to disclose material adverse information known to Merck regarding the cardiovascular risks associated with VIOXX®, including the results of Study 090 and VIGOR which showed that VIOXX® presented a high risk of negative cardiovascular events.

22.     On November 3, 2000, Defendant issued a press release (the "November 3, 2000 Press Release") entitled "VIOXX® Significantly Reduced Pain After Dental Surgery to a Greater Degree Compared to Codeine with Acetaminophen in New Study." In the November 3, 2000 Press Release, Defendant announced the results of a study which showed that "VIOXX® 50mg significantly reduced moderate to severe acute pain after dental surgery to a greater degree compared to codeine 60 mg combined with acetaminophen 600 mg." The November 3, 2000 Press Release stated in pertinent part:

"Overall, VIOXX® was well tolerated in this study, and overall rate of side effects on VIOXX® was generally similar to placebo. Significantly fewer patients taking VIOXX® experienced side effects than patients taking codeine with acetaminophen."

23.     The November 3, 2000 Press Release failed to disclose material adverse information known to Merck concerning the cardiovascular risks associated with VIOXX®.

24.     Each of the Defendant's statements made from January 1, 2000 through

December 31, 2000 concerning VIOXX® was materially false and misleading when made,

because each statement failed to disclose material and statistically significant information known

to the Company that VIOXX® was associated with cardiovascular events.  In this regard, Merck

failed to disclose:

   • Merck's unpublished Study 090 concluded that VIOXX® users were 6 times more
   likely to have severe cardiovascular events than other users of NSAIDS;

   • Internal Merck e-mails authored in 1996 and 1997 reveal that even before the FDA
   approved VIOXX® for prescription use, Merck knew of the VIOXX®-related medical
   risks;

   • Substantial data existed in 1999 that VIOXX® was associated with a higher risk of
   cardiovascular events than other NSAIDs; and

   • On December 16, 1999, Merck had received the December 16, 1999 FDA Letter
   admonishing Defendant for misleading the public by using deceptive promotional
   materials that suggested VIOXX® had a superior safety profile to other NSAIDS, which
   was not demonstrated by substantial evidence;

   • Merck knew that the negative cardiovascular events were not due to the
   cardioprotective properties of Naproxen, but were instead directly attributable to the
   cardiovascular risks that Merck observed in Study 090 and VIGOR; and

   • VIOXX®'s safety profile was not "excellent" as Merck claimed, but was instead
   marked by an unacceptably high risk of negative cardiovascular events.

**C.     2001 Events and False and Misleading Statements**

25.     In 2001, the Defendant made and/or caused to be issued numerous materially

false and misleading statements and/or omissions of material facts concerning the safety and

efficacy of VIOXX®, including the following:

   **1.     Merck Announces the FDA Advisory Committee Meeting To Modify
            VIOXX® Label**

26.     On February 8, 2001, Merck issued a press release (the "February 8, 2001 Press

Release") entitled "FDA Arthritis Advisory Committee Reviews Merck's Application for

- 9 -

Revised Labeling for VIOXX® Based on VIOXX® Gastrointestinal Outcomes Study." In the February 8, 2001 Press Release, Merck announced that the FDA Advisory Committee had agreed that results from the VIGOR study -- that VIOXX® significantly reduced serious GI side effects by half compared to a commonly used dose of Naproxen in rheumatoid arthritis patients -- be included in the labeling for VIOXX®. The February 8, 2001 Press Release made the following materially false and misleading statements:

> Merck is confident that the data presented today support the excellent safety profile of VIOXX®, and we look forward to further discussions with the FDA to complete the review of our application to modify the labeling for VIOXX®, said Eve Slater, M.D., senior vice president, Clinical and Regulatory Development, Merck Research Laboratories.

27.     The February 8, 2001 Press Release failed to disclose known information concerning significantly increased risks of cardiovascular problems associated with VIOXX®, and failed to disclose that VIOXX® had, at best, a questionable safety profile.

### 2. Merck Touts FDA Approval of Revised Label for VIOXX®

28.     On April 10, 2001, Merck issued a press release (the "April 10, 2001 Press Release") entitled "Merck Receives 'Approvable' Letter for VIOXX® from FDA on Application for Revised Labeling Based on VIOXX® Gastrointestinal Outcomes Study." The April 10, 2001 Press Release contained the following materially false and misleading statements and omissions of material fact:

> Merck & Co., Inc. today confirmed that it has received an approvable letter from the U.S. Food and Drug Administration for the Company's application for changes to the prescribing information for its osteoarthritis and acute pain medicine VIOXX® (rofecoxib).
> ***
> The Company submitted a supplemental new drug application on June 29, 2000, seeking changes to reflect results from the VIOXX® Gastrointestinal Outcomes Research (VIGOR) study. The Company is confident in the comprehensive data that support the excellent gastrointestinal and overall safety profile of VIOXX®.

29.     This press release failed to disclose what Merck knew at the time to be a significant risk of serious cardiovascular events.

30.     On May 1, 2001, *Med Ad News* published an article entitled "Determined to overtake rival Celebrex, Merck has made VIOXX® the fastest-growing brand," in which a senior Vice President of marketing at Merck, was quoted as stating:

> VIOXX® has broken the traditional new nonsteroidal anti-inflammatory drug shape of the curve because the product has continued to grow way beyond the normal six-month time frame when the older new nonsteroidal anti-inflammatory drugs and even Celebrex tended to flatten off. VIOXX® has continued to grow and that is a result of the good product that we have, the satisfaction that it is providing to patients and physicians, and the strong marketing and marketing messages that we have put into the marketplace.

31.     The foregoing statement by the Defendant failed to disclose material adverse information known to it concerning the cardiovascular risks associated with VIOXX®. The statements by the Defendant were directly contradicted by its internal e-mails and documents and by Merck-sponsored studies described elsewhere herein.

32.     On May 11, 2001, Merck issued a press release (the "May 11, 2001 Press Release") entitled "Merck Confirms Renal Safety Of VIOXX®." The May 11, 2001 Press Release stated that in comparative studies between VIOXX®, celecoxib and acetaminophen, there were no significant differences in the incidents of renal effects, such as hypertension and edema, and that "in these studies, the incidences of increased blood pressure and lower extremity edema among patients taking VIOXX® were similar to those of the comparator NSAIDs; there were no significant differences between the active treatment groups." The May 11, 2001 Press Release failed to disclose material adverse information known to the Defendant concerning the cardiovascular risks associated with VIOXX®, including those specifically revealed by this Merck sponsored study.

- 11 -

33.     On May 22, 2001, Merck issued a press release (the "May 22, 2001 Press

Release") entitled "Merck Confirms Favorable Cardiovascular Safety Profile of VIOXX®." In

the May 22, 2001 Press Release, the Company made the following materially false and

misleading statements:

> In response to news and analyst reports of data the Company first released a year
> ago, Merck & Co., Inc. today reconfirmed the favorable cardiovascular safety
> profile of VIOXX® (rofecoxib), its medicine that selectively inhibits COX-2.

34.     The May 22, 2001 Press Release failed to disclose material adverse information

known to the Defendant concerning the cardiovascular risks associated with VIOXX®. Among

other things, the Defendant failed to disclose the contents of Merck internal e-mails and

documents, Study 090, the VIGOR study, the results of Merck-sponsored research and studies,

and the conclusions that Merck aggressively sought to sponsor.

### 3.     Merck Promotes False Cardiovascular Safety Profile of VIOXX®

35.     On June 13, 2001, Merck issued a press release (the "June 13, 2001 Press

Release") entitled "In New 28,000-Patient Meta-Analysis of Cardiovascular Events: Event Rates

With VIOXX® were Similar to Placebo, Similar to Widely Prescribed NSAIDs Ibuprofen,

Diclofenac and Nabumetone; Event Rate was Reduced with Naproxen." The June 13, 2001

Press Release made, among others, the following materially false and misleading statements

and/or omissions of material fact:

> The rates of cardiovascular events seen in patients taking VIOXX® were similar
> to those seen with both placebo and with the widely prescribed NSAIDs
> diclofenac, ibuprofen and nabumetone, while the event rate was lower for
> Naproxen compared to VIOXX®, said Alise Reicin, M.D., Senior Director,
> Merck Research Laboratories.  The meta-analysis was strengthened by the fact
> that the majority of the data included in it was from studies six months or longer
> in duration.
>
> Aspirin blocks platelet aggregation by more than 90 percent by binding
> irreversibly to platelets. ***This property is believed to be responsible for its***

- 12 -

> *cardioprotective effect. It is reported in the scientific literature that Naproxen blocks platelet aggregation by about 90 percent if given every 12 hours at its recommended dose –as provided for in the studies with VIOXX®.* This anti-platelet effect of Naproxen has not been observed among the other comparator NSAIDs; it has been reported that they do not block platelet aggregation in a sustained manner. (emphasis added)

36.     The June 13, 2001 Press Release failed to disclose material adverse information known to the Defendant concerning the risk of cardiovascular events associated with VIOXX®. Among other things, the statements directly contradicted Defendant's e-mails and the results of internal studies like Study 090.

### 4.     Merck Misrepresents Results of *Journal of American Medical Association* Study

37.     On August 21, 2001, *Dow Jones Business News* published an article entitled "*JAMA* Article Suggests VIOXX® and Celebrex Raise Cardiovascular Risks" (the "First August 21, 2001 Article"). The First August 21, 2001 Article, which appears to have been based upon Dow Jones' receipt of an early copy of the article to be published in *JAMA*, discussed the Cleveland Clinic study and stated in pertinent part:

> An analysis of clinical trials suggests a potential increase in the rate of heart attack, stroke and other cardiovascular events among patients treated with VIOXX® from Merck & Co. Inc. (MRK) and Celebrex from Pharmacia Corp. (PHA) and Pfizer Inc. (PFE), according to an article in *The Journal of the American Medical Association.* Merck said in a prepared statement it stands behind the overall and cardiovascular safety profile and the favorable gastrointestinal profile of VIOXX®.   The Company further contended, "*Extensive cardiovascular data already exist on VIOXX® and that these data, which weren't incorporated into the authors' analysis, suggest that there is no increase in the risk of cardiovascular events as a result of treatment with VIOXX®.*" (emphasis added)

38.     The foregoing statement, failed to disclose material facts concerning the cardiovascular risks that VIOXX® presented and symbolized Defendant' efforts to suppress and distort the truth that VIOXX® was affirmatively dangerous.

39.     Also on August 21, 2001, *Dow Jones Newswires* published an article entitled

"VIOXX®, Celebrex Use Raises Cardiovascular Concerns-Study" (the "Second August 21, 2001

Article").  The Second August 21, 2001 Article further addressed the drug makers' responses to

the findings of the Cleveland Clinic: "First, these drug makers do not believe their respective

COX-2 inhibitors increases [sic] the risk of heart attack, stroke, unstable angina, and other

cardiovascular events.  The drug makers separately insist that their drugs are effective and safe,

overall and with respect to the heart and cardiovascular system."  The Second August 21, 2001

Article described the comments of the senior director of cardiovascular clinical research at

Merck:

> "We can't explain what is behind that observation and the authors point out the
> lower rate of cardiovascular events in those receiving Naproxen may be the result
> of the beneficial effects of Naproxen, which has aspirin-like profile in preventing
> platelet aggregation."
>                                    ***
> Understanding the relationship warrants further studies with placebo, said
> Demopoulos. *But Merck has created an extensive body of cardiovascular data
> on VIOXX®, which was excluded from the author and analysis, which suggests
> VIOXX® doesn't increase the risk of cardiovascular events, she added.*

40.     The Second August 21, 2001 Article failed to disclose material adverse

information known to Merck concerning the cardiovascular risks associated with VIOXX®.

Instead, the Defendant's statement affirmatively misrepresented VIOXX®'s safety profile in a

very direct contradiction of Defendant's internal e-mails and prior studies by Merck and others.

41.     On August 23, 2001, the Company issued a press release (the "August 23, 2001

Press Release") entitled "Merck Stands Behind the Cardiovascular Safety Profile of VIOXX®,"

which stated in relevant part:

> Merck & Co., Inc. today, said the Company stands behind the overall and
> cardiovascular safety profile and the favorable gastrointestinal (GI) profile of
> VIOXX®.  Merck believes VIOXX® is an appropriate and efficacious therapy

- 14 -

for the relief of the signs and symptoms of osteoarthritis and the management of acute pain in adults.

***

The authors [of the *JAMA* article] say that more data are needed on the cardiovascular profile of COX-2 inhibitors.  However, Merck believes that extensive cardiovascular data already exist on VIOXX® and that these data -- which were not incorporated into the author's analysis -- suggest that there is no increase in the risk of cardiovascular events as a result of treatment with VIOXX®.

42.     The August 23, 2001 Press Release failed to disclose material adverse information known to the Defendant concerning the cardiovascular risks associated with VIOXX®, and misrepresented VIOXX®'s safety profile.  The August 23, 2001 Press Release -- apparently designed to falsely reassure both patients and prescribers that VIOXX® was safe -- directly contradicted Defendant's internal documents and other materials that demonstrated conclusively the statistically significant risks known to the Defendant even before VIOXX® was introduced.

### 5.     Merck Refutes Statements in September 17, 2001 FDA Letter

43.·    On September 17, 2001, as described above, the FDA sent the Company a letter (the "September 17, 2001 FDA Letter") stating: "As part of its routine monitoring and surveillance program, the Division of Drug Marketing, Advertising, and Communications (DDMAC) has reviewed your promotional activities and materials and has concluded that they are false, lacking in fair balance, or otherwise misleading in violation of the Federal Food, Drug, and Cosmetic Act (the Act) and applicable regulations."

44.     The September 17, 2001 FDA Letter went on to state:

You have engaged in a promotional campaign for VIOXX® that minimizes the potentially serious cardiovascular findings that were observed in the VIOXX® Gastrointestinal Outcomes Research (VIGOR) study, and thus, misrepresents the safety profile for VIOXX®.  Specifically, your promotional campaign discounts the fact that in the VIGOR study, patients on VIOXX® were observed to have a four to five fold increase in myocardial infarctions (MIs) compared to patients on the comparator non-steroidal anti-inflammatory drug (NSAID), Naprosyn (Naproxen).

- 15 -

45.     The September 17, 2001 FDA Letter ordered the Defendant to stop using certain promotional materials and to send a letter to healthcare providers to correct any false impressions that came from Merck's marketing of VIOXX®.

46.     The September 17, 2001 FDA Letter referenced the December 19, 1999 FDA Letter, adding that Merck's "misrepresentation of the safety profile for VIOXX® is particularly troublesome because we have previously, in an untitled letter, objected to promotional materials for VIOXX® that also misrepresented VIOXX®'s safety profile."

47.     On September 24, 2001, Reuters published an article entitled "Merck VIOXX® Promotions Said Misleading on Safety," in which it described the September 17, 2004 FDA Letter.  The September 24, 2001 article quoted a Merck spokeswoman, who stated that the Company was developing a response to the FDA that it planned to submit by October 1, 2001:

> **"We continue to stand behind the overall safety and cardiovascular safety of VIOXX®."**

48.     Defendant's statements in this regard were false and misleading when made and contradicted Merck's internal documents and the results funded of Merck-funded studies like Study 090.

49.     Each of the statements made from January 2001 through December 2001 concerning VIOXX® was materially false and misleading when made, because each statement failed to disclose material facts needed to make the statements made not misleading in light of the circumstances under which they were made.  In fact, Defendant knew that VIOXX® was associated with a significant risk of cardiac events.  The true but concealed and/or misrepresented facts included, but were not limited to:

    • Merck's press releases "reconfirming the favorable cardiovascular safety profile of VIOXX®" during 2001 were unfounded, because the Defendant knew that VIOXX® was associated with high cardiovascular risks;

• Merck's announcements refuting the Cleveland Clinic study results in *JAMA* and stating that the Company stood behind the safety profile of VIOXX® were unfounded, as the Defendant was aware that VIOXX® in fact caused an increase in adverse cardiovascular events;

• The Revised label for VIOXX® that Merck announced in April 2001 failed to disclose the severe cardiovascular risks that the Defendant had already observed in, among other things, Study 090 and VIGOR;

• The VIOXX® promotional activities that the FDA condemned in the September 17, 2001 FDA Letter stemmed from Defendant's deliberate efforts to conceal VIOXX®'s known risks;

• Merck's unpublished Study 090 concluded that VIOXX® users were 6 times more likely to have severe cardiovascular events than other users of NSAIDS;

• Internal Merck e-mails authored in 1996 and 1997 reveal that even before the FDA approved VIOXX® for prescription use, the Defendant knew of the VIOXX®-related medical risks;

• Substantial data existed in 1999 that VIOXX® was associated with a higher risk of cardiovascular events than other NSAIDs; and • On December 16, 1999, Merck had received the December 16, 1999 FDA Letter admonishing Defendant for misleading the public by using deceptive promotional materials that suggested VIOXX® had a superior safety profile to other NSAIDS, which was not demonstrated by substantial evidence;

• Merck knew that the negative cardiovascular events were not due to the cardioprotective properties of Naproxen, but were instead directly attributable to the cardiovascular risks that Merck observed in Study 090; and

• VIOXX®'s safety profile was not "excellent" as Merck claimed, but was instead marked by an unacceptably high risk of negative cardiovascular events.

**D.     2002 Events and False and Misleading Statements**

50.     In 2002, the Defendant made and/or caused to be issued numerous materially false and misleading statements and/or omissions of material facts concerning the safety and efficacy of VIOXX®, including the following:

       1.    **Merck Promotes New Changes to VIOXX®'s Label While Affirmatively Concealing the Significant Medical and Commercial Risks Associated with VIOXX®**

51.     On April 11, 2002, the Company issued a press release (the "April 11, 2002 Press

Release") entitled "Merck Re-Issues New Release for VIOXX® -rofecoxib-With Prescribing

Information Attached." The April 11, 2002 Press Release described a conference call held that

day by Merck for pharmaceutical industry analysts, during which Merck re-released the

announcement of FDA-approved changes to the label for VIOXX®.  The April 11, 2002 Press

Release stated in pertinent part:

> VIOXX® is now the first and only medicine that selectively inhibits the COX-2
> enzyme that is proven to reduce the risk of developing clinically important
> gastrointestinal (GI) side effects in patients with or without risk factors for such
> GI side effects compared to the non-steroidal anti-inflammatory drug (NSAID)
> Naproxen.   In VIGOR, VIOXX® 50 mg -- a dose two-times the highest
> recommended chronic dose -- significantly reduced serious GI side effects,
> including perforations, obstructions, ulcers and bleeds, by 54 percent compared to
> a commonly used dose of Naproxen (1,000 mg) in rheumatoid arthritis patients.
> The GI safety benefit compared to Naproxen, as shown in VIGOR, now appears
> as a modification to the GI Warning section of the prescribing information, a
> section included in the prescribing information for all NSAIDs, including those
> that selectively inhibit Cox-2.
>
> ***
>
> "Merck is confident in the efficacy and safety profile of VIOXX®. VIGOR was a
> rigorous test of the GI safety of VIOXX® versus Naproxen and based on that
> study, the FDA has approved a modification to the standard GI warning section.
> Our label now reads: 'Although the risk of GI toxicity is not completely
> eliminated with VIOXX®, the results of the VIGOR study demonstrate that in
> patients treated with VIOXX®, the risk of GI toxicity with VIOXX® 50 mg once
> daily is significantly less than with Naproxen 500 mg twice daily,'" said Edward
> M.  Scolnick, M.D., executive vice president, science and technology, and
> president, Merck Research Laboratories, Merck & Co., Inc.

52.     The April 11, 2002 Press Release failed to disclose information known to the

Defendant indicating that VIOXX® presented cardiovascular risks.  The statements in the April

11, 2002 Press Release were precisely the type of statements condemned as false and misleading

by the FDA in the letters it sent to Merck in December 1999 and September 2001.

53.     On April 18, 2002, the *Associated Press Online* published an article (the "April 18, 2002 *AP Online* Article") entitled "Risks of Arthritis Drugs Studied," which stated in pertinent part:

> "There's growing suspicion that switching from aspirin to a more stomach-friendly arthritis drug could increase some people's risk of heart attacks -- and a study suggests the reason: a drug caused chemical imbalance that spurs blood clots. . . . VIOXX® maker Merck & Co. dismisses the study as irrelevant, because it is in mice and presumes an effect in the human body far larger than the drug actually causes." The April 18, 2002 *AP Online* Article further stated: "But the study looked at mice that had completely inhibited prostacyclin, while cox-2 drugs inhibit the chemical only half as much, said Merck scientist Dr. Alise Reicin. She said the study contributed no new information to the debate, but Merck plans further safety studies to deal with the issue, although she would not provide details."

54.     These statements were knowingly and demonstrably untrue when made. Defendant did not introduce new studies because it wanted to avoid the likelihood that additional adverse information would come to light.

55.     Each of the statements made from January 2002 through December 2002 concerning VIOXX® was materially false and misleading when made, because each statement failed to disclose material facts needed to make the statements made not misleading in light of the circumstances under which they were made. In fact, Defendant knew that VIOXX® was associated with a significant risk of cardiac events. The true but concealed and/or misrepresented facts included, but were not limited to:

• At the time of the FDA's February 2001 Advisory Committee meeting, Merck was aware of the cardiovascular risks associated with VIOXX®, and were aware that VIOXX® did not have an excellent safety profile;

• Merck's press releases "reconfirming the favorable cardiovascular safety profile of VIOXX®" during 2002 were unfounded, because Merck knew that VIOXX® was associated with high cardiovascular risks;

• Merck's announcements refuting the Cleveland Clinic study results in *JAMA* and stating that the Company stood behind the safety profile of VIOXX® were unfounded, as Merck was aware that VIOXX® in fact caused an increase in adverse cardiovascular events;

• The Revised label for VIOXX® that Merck announced in April 2002 failed to disclose the severe cardiovascular risks that Merck had already observed in, among other things, Study 090 and VIGOR;

• The VIOXX® promotional activities that the FDA condemned in the September 17, 2001 FDA Letter stemmed from Merck Defendant' deliberate efforts to conceal VIOXX®'s known risks, which continued in 2002;

• Merck's unpublished Study 090 concluded that VIOXX® users were 6 times more likely to have severe cardiovascular events than other users of NSAIDS;

• Internal Merck e-mails authored in 1996 and 1997 reveal that even before the FDA approved VIOXX® for prescription use, Merck knew of the VIOXX®-related medical risks;

• Substantial data existed in 1999 that VIOXX® was associated with a higher risk of cardiovascular events than other NSAIDs; and

• On December 16, 1999, Merck had received the December 16, 1999 FDA Letter admonishing Defendant for misleading the public by using deceptive promotional materials that suggested VIOXX® had a superior safety profile to other NSAIDS, which was not demonstrated by substantial evidence;

• Merck knew that the negative cardiovascular events were not due to the cardioprotective properties of Naproxen, but were instead directly attributable to the cardiovascular risks that Merck observed in Study 090; and

• VIOXX®'s safety profile was not "excellent" as Merck claimed, but was instead marked by an unacceptably high risk of negative cardiovascular events.

**E.    2003 Events and False and Misleading Statements**

56.    In 2003, the Defendant made and/or caused to be issued numerous materially false and misleading statements and/or omissions of material facts concerning the safety and efficacy of VIOXX®, including the following:

         1.    **Merck Continues to Tout Vioxx as Safe, Refuting the Results of a Study Linking Vioxx® to Cardiac Events**

57.     On October 30, 2003, *The Wall Street Journal* published an article (the "October 30, 2003 Article") entitled "Vioxx Study Sees Heart-Attack Risk--Merck Funded Research After Concerns Were Raised About Its Painkilling Drug." The article discussed a study conducted at Harvard University-affiliated Brigham & Women's Hospital in Boston, which found "an increased risk of heart attack, or acute myocardial infarction, compared with patients taking a competing painkiller, Celebrex, from Pfizer Inc. The researchers also found that VIOXX®, which has annual sales of $2.5 billion a year, was linked to an increased heart-attack risk compared with patients not taking any painkillers." The October 30, 2003 Article continued:

> The new study, Dr. Topol said, "greatly substantiates our concern about the cardiac side effects." He observed that the possible cardiac effects of Vioxx appear "worse with the higher doses." Merck discounted the findings. "Randomized clinical trials are the gold standard and this isn't such a trial," said Alise Reicin, Merck's executive director of clinical research. "In our placebo-controlled randomized trials, we have found no significant difference between Vioxx and placebo."

Defendant's comments were directly contradicted by Merck Internal documents, e-mails and materials, and Merck's own studies.

58.     Continuing their aggressive campaign to suppress the truth about VIOXX®, Defendant acted quickly to assure it's consumers that VIOXX® was safe. On November 5, 2003, The Wall Street Journal published a Letter to the Editor by Defendant, (the "November 5, 2003 Wall Street Journal letter") entitled "Merck Stands Behind the Safety of Vioxx." In the November 5, 2003 Wall Street Journal letter, Defendant made, among others, the following materially false and misleading representations and/or omissions of material fact:

> Nothing is more important to Merck than the safety of its medicines. Your Oct. 30th story about an observational analysis of Vioxx was incomplete. The article discussed only the findings from this analysis where Vioxx appeared to have an unfavorable risk profile, but failed to report other findings from the same analysis that showed no statistically significant

difference in the risk of heart attack for Vioxx compared with other commonly used anti-inflammatory drugs.

The story also failed to report that another observational analysis presented at the same scientific meeting also showed no statistically significant difference in heart attacks between Vioxx and two widely used anti-inflammatory drugs, ibuprofen and diclofenac. *A complete reporting of the data presented might have remedied the mistaken impression left by the story.*

Observational methods lack the rigor of randomized, controlled clinical trials, and have led the scientific community astray before. That is why observational studies must be interpreted with caution. *Merck stands behind the safety of Vioxx based on the results of numerous randomized, controlled clinical trials.*

The November 5, 2003 Wall Street Journal Letter failed to disclose what Merck knew: that VIOXX® was in fact associated with serious cardiovascular risks. More specifically, Defendant had long before concluded that VIOXX® actually caused severely negative cardiovascular events -- a fact confirmed in internal Merck materials.

59.    Each of the statements made from January 2003 through December 2003 concerning VIOXX® was materially false and misleading when made, because each statement failed to disclose the extent of the Defendant's knowledge that VIOXX® was in fact associated with a significant risk of cardiac events. The true but concealed and/or misrepresented facts included, but were not limited to:

• The Company was aware that Vioxx itself created an increased risk of heart attack, and that its explanation for the VIGOR study results--that the Vioxx patients suffered greater incidences of cardiovascular events because of cardioprotective qualities of Naproxen--was inaccurate;

• The Company's statements refuting the results of the Brigham & Women's Hospital Study finding an increased risk of heart attack in patients taking Vioxx were unfounded;

• The Company's announcements and press releases throughout 2003, stating that Merck 'stands behind the safety of Vioxx's were unfounded, because Merck knew

that Vioxx, in fact, was associated with cardiovascular events and was therefore not safe;

• Merck's press releases "reconfirming the favorable cardiovascular safety profile of Vioxx" during 2003 were unfounded, because Merck knew that Vioxx was associated with high cardiovascular risks;

• The Vioxx promotional activities that the FDA condemned in the September 17, 2001 FDA Letter stemmed from Merck's deliberate efforts to conceal Vioxx's known risks, which continued in 2003;

• Merck's unpublished Study 090 concluded that Vioxx users were 6 times more likely to have severe cardiovascular events than other users of NSAIDS;

• Internal Merck e-mails authored in 1996 and 1997 reveal that even before the FDA approved Vioxx for prescription use, Merck knew of the Vioxx-related medical risks;

• Substantial data existed in 1999 that Vioxx was associated with a higher risk of cardiovascular events than other NSAIDs; and

• On December 16, 1999, Merck had received the December 16, 1999 FDA Letter admonishing Defendant for misleading the public by using deceptive promotional materials that suggested Vioxx had a superior safety profile to other NSAIDS, which was not demonstrated by substantial evidence;

• Merck knew that the negative cardiovascular events were not due to the cardioprotective properties of Naproxen, but were instead directly attributable to the cardiovascular risks that Merck observed in Study 090; and

• Vioxx's safety profile was not "excellent" as Merck claimed, but was instead marked by an unacceptably high risk of negative cardiovascular events.

**F.      2004 False and Misleading Statements**

60.    During 2004, prior to an after taking VIOXX® off the market, the Defendant made and/or caused to be issued numerous materially false and misleading statements and/or omissions of material facts, some of which included the following:

61.    Not only did Defendant publicly disparage and attempt to discredit the results of the Brigham Study, and therefore continue to mislead the market concerning the cardiovascular risks of the drug, but according to a Wall Street Journal article, entitled "Merck Takes Author's

Name Off VIOXX Study," which was published on May 18, 2004, Merck had ordered the name

of one of its epidemiologists removed from the list of authors of the Brigham Study in an effort

to distance itself from the Study's adverse findings concerning VIOXX's safety profile:

> Stepping into thorny ethical territory, drug titan Merck & Co. ordered the name of one of its epidemiologists purged from the list of authors on a research paper -- after the study produced an unflattering portrait of a blockbuster drug Merck happens to make. And a look at successive published versions of the paper, which link the painkiller Vioxx to an increased risk of heart attack, shows that the effort failed to fully cover its tracks. At one point, the epidemiologist's full name was deleted from the top of the article, but her last name was accidentally left in an errant footnote. It vanished completely from the final version, published earlier this month in the prestigious American Heart Association journal Circulation.

* * *

> "Merck disagreed with the conclusions and didn't think it was appropriate to have a Merck author," company spokeswoman Mary Elizabeth Blake said. The eighth [author] was Carolyn C. Cannuscio, a Merck epidemiologist. When the article appeared, its conclusion -- that Vioxx "was associated with an elevated relative risk of acute myocardial infarction [heart attack]" -- was the same as before. So was the methodology. But this time, Dr. Cannuscio's name was missing.

* * *

> Harvard, which submitted the final version of the article for publication, says it omitted Dr. Cannuscio's name on orders from Merck. "It was definitely not our decision that she be removed as an author," says Harvard medical professor Jerry Avorn, a coauthor. "Our team worked closely with Dr. Cannuscio from the design of the project through the collection and interpretation of the data, and the writing of the paper. She played an active role in all those areas."

62.     The May 18, 2004 Article also quoted Nancy Santanello, Merck executive

director of epidemiology and Cannuscio's manager, who added that Merck is currently

conducting research on Vioxx and heart attacks. The Defendant's statements were false and

- 24 -

misleading because, among other things, it misrepresented the true facts of the Vioxx-related risks and falsely stated that Merck was conducting research on Vioxx and heart attacks.

63.     On July 21, 2004, Defendant issued a Company press release announcing Merck's financial results for the second quarter 2004, the period ending June 30, 2004. In addition to reporting worldwide VIOXX sales were $653 million for the second quarter and $1.3 billion for the first six months of 2004, Defendant again boasted about the "success" of VIOXX, noting that "[o]utside of the United States, VIOXX continues to be the best-selling arthritis and pain medicine."

64.     The July 21, 2004 press release was materially false and misleading in that, among other things, once Defendant chose to speak about the purported success of VIOXX, it had a duty to speak fully and truthfully, and to disclose the serious cardiovascular risks created by VIOXX, which it did not do.

### 1. Merck Publicly Discredits Results of Kaiser Permanente Study

65.     On August 26, 2004, *Bloomberg News* published an article (the "August 26, 2004 Bloomberg Article") entitled "Vioxx Raises Heart Risk, Study Says; Merck disputes Tests that Favor Pfizer's Celebrex."  The article stated in pertinent part:

> Merck & Co.'s Vioxx painkiller increases the chance of heart attack and death from cardiac arrest more than Pfizer Inc.'s Celebrex, according to a study by a U.S. Food and Drug Administration investigator.
>
> The difference in heart risk was statistically significant between a recommended dose of Vioxx, 25 mg a day or less, and Celebrex, according to results the FDA's David Graham presented at a meeting of the International Society for Pharmacoepidemiology in France.
>
> ***
>
> We found that Celebrex appears to be safer from a cardiac perspective at the lower dose, Graham said in a telephone interview from France.  If there's a difference in risk between Celebrex and Vioxx, that's an

- 25 -

important public health question, because you have two drugs being used for the same gastrointestinal effect.

\*\*\*

Merck disagrees with the results from Graham and his colleagues, spokeswoman Mary Elizabeth Blake said. Conclusions from that type of examination don't carry as much weight as results from a study comparing two groups of patients taking the medicines for a set period of time, she said.

\*\*\*

Merck researchers and officials have said the difference between Vioxx and other painkillers occurs because a comparison drug, an anti-inflammatory called Naproxen, protects the heart. The FDA funded study found the contrary--that Naproxen raises heart risk by 18 percent.

The Defendant's statements attributed were false when made in that the Defendant knew before the drug was introduced that VIOXX® caused serious cardiovascular events.

66.    An article dated August 26, 2004 published by the *Associated Press* (the "First August 26, 2004 AP Article") entitled "Merck Disagrees with Vioxx Analysis," stated that [p]harmaceutical company Merck & Co. "strongly" disagreed Thursday with the conclusions of a Food and Drug Administration-funded study that said use of the company's arthritis pain reliever Vioxx increased the risk of heart attacks. At the same time, and unbeknownst to the public, Merck used all of its influence with the FDA to attempt to delay and/or thwart publication by Graham of the results of this study.

67.    An article dated August 26, 2004 published by the Associated Press (the "Second August 26, 2004 AP Article") entitled "Merck Defends Arthritis Drug's Safety After Critical FDA Study," announced that "Merck shares fell 97 cents, or two percent, to $45.05 Thursday" following the release of the FDA study results showing Vioxx's association with a high risk of cardiovascular events.

68.     The Second August 26, 2004 AP Article discussed the Company's reaction to the

release of the above-described FDA study:

> Pharmaceutical giant Merck & Co.  insisted Thursday its blockbuster
> arthritis drug Vioxx is safe despite new evidence the popular pain pill
> increases risk of serious heart problems, even death, particularly at high
> doses.
>
> ***
>
> Alise Reicin, vice president of clinical research at Whitehouse Station-
> based Merck, said Vioxx is safe and effective, and numerous earlier
> studies comparing it to a dummy pill found 'no difference in the risk of
> having a serious cardiovascular events.' The drug was tested on about
> 10,000 patients before it went on sale.  Reicin said the new study was not
> as rigorous because it was observational, rather than a controlled
> experiment in which randomly chosen patients get different treatments and
> are followed over time.
>
> ***
>
> Reicin, the Merck research executive, said half of the six observational
> studies on Vioxx to date found it did not increase heart complications.

Significantly, the statements attributed to Defendant all fail to disclose the significant

cardiovascular risks caused by VIOXX® -- risks that Defendant was especially familiar with.

69.     An article dated August 26, 2004 published by the *Associated Press* (the "Third

August 26, 2004 AP Article") entitled "FDA Voices Concerns Over Arthritis Drug" quoted

Defendant's analysis of the above-described study results: "Observational analyses do not have

the rigor of randomized, controlled clinical trials. . . .  Based on all of the data that are available

from our clinical trials, Merck stands behind the efficacy and safety, including cardiovascular

safety, of Vioxx." Criticism of methodology notwithstanding, Defendant's efforts to refute

Graham's study were wholly unavailing because the findings were completely consistent with all

of the information in Merck's files, including the results of the 1998 Study 090, the 2000 VIGOR

study, the 2001 JAMA study, the Vanderbilt UnitedHealth Care and Kemper studies and the

APPROVE study which was to be terminated less than one month later.

70.     On September 8, 2004, the *Dow Jones News Service* (the "September 8, 2004 article") published an article entitled: "Merck: FDA OKs Vioxx for Once-Daily Treatment of Juvenile Rheumatoid Arthritis; First and Only COX-2 Specific Inhibitor Approved for Use in Children As Young as Two." The article announced the FDA's approval of Vioxx for the treatment of juvenile rheumatoid arthritis. Merck continued to press for the FDA's approval to prescribe Vioxx for "children as young as two" despite the fact that Merck knew that Vioxx caused serious cardiovascular damage and despite the fact Merck would later withdraw Vioxx from the market during the very month which it received approval to use this deadly drug on children.

### 2.      The Withdrawal of Vioxx and Merck's Continued Campaign of Concealment

71.     On September 30, 2004, Defendant announced that it was withdrawing VIOXX® worldwide, citing as its reason the results of the APPROVe trial. However, the results of the APPROVe study were nothing new to Merck. These results were wholly consistent with studies dating back to the 1998 Study 090 and confirmatory VIGOR study in early 2000.

72.     Following the announcement, Defendant continued to conceal its prior knowledge of the extent of the cardiovascular risks associated with Vioxx. For example, that same day, Defendant held a press conference to explain its decision to withdraw Vioxx. Its CEO gave the following statements:

> I'll just give you a quick summary here. The reason that we're here today is because this morning, Merck is announcing a voluntary worldwide withdrawal of Vioxx, our Cox-2 inhibitor for arthritis and pain. This decision is the result of new data from a three-year placebo controlled study which was designed to evaluate the possible use of Vioxx in preventing the recurrence of colon polyps. This study also collected data on the long-term cardiovascular safety of Vioxx. Importantly, in the first 18 months of the study, there was no difference in the risk for heart attack or stroke in patients taking either Vioxx or placebo. Beginning after 18

months, however, the risk of a cardiovascular event did increase among those on Vioxx.

Accordingly, we are voluntarily withdrawing Vioxx effective today. We are taking this action because we believe it best serves the interest of patients. We believe it would have been possible to continue to market Vioxx with labeling that would incorporate these new data. However, given the availability of alternative therapies, and the questions raised by the data, we concluded that a voluntary withdrawal is the responsible course to take.

Defendant's CEO's statements were wholly false and misleading and were designed to conceal

Merck's pre-1999 knowledge of Merck's cardiovascular risks.

73.     On November 1, 2004, the *Wall Street Journal* published the above-described

article entitled "Warning Signs: Emails Suggest Merck Knew Vioxx's Dangers at Early Stage;

As Heart-Risk Evidence Rose, Officials Played Hardball; Internal Message: 'Dodge!'; Company

says 'Out of Context.'" As described more fully above, the November 1, 2004 Wall Street

Journal article detailed, among other things, how even though Defendant's CEO expressed that

the APPROVe study findings tying VIOXX® to heart attacks and strokes were unexpected,

internal Merck e-mails, marketing materials and interviews with outside scientists indicated that

Merck "fought forcefully for years to keep safety concerns from destroying the drug's

commercial prospects." The article made, among others, the following critical points:

> • E-mails by and between Company executives in the mid to late 1990s showed that Merck knew that Vioxx increased the risk of cardiac events, and sought to conceal such financially damaging information;

> • The VIGOR results, released in March 2000, showed that Vioxx patients, as compared with those taking Naproxen, suffered five times as many heart attacks. In March 2000, defendant Scolnick e-mailed colleagues that the risk of cardiovascular events associated with Vioxx were "clearly there," and was a "mechanism-based problem," but in a news release Merck offered no hint that anyone at the Company knew that Vioxx itself increased the risk of cardiovascular events. When it published the VIGOR results, Merck stated that the study's findings were

consistent with the cardioprotective qualities of Naproxen--rather than the increased cardiovascular risks associated with Vioxx;

• When the VIGOR study results were published in the New England Journal of Medicine, it stated that among patients studied who were not already at high risk for heart attacks, Vioxx did not show a significant rise in heart attacks;

• A Merck training document entitled "Dodge Ball Vioxx" instructed sales representatives to dodge questions or concerns about the cardiovascular effects associated with Vioxx; and

• Merck attempted to suppress discussion about the VIGOR study results by, among other things, telephoning academics to complain about lectures the Company deemed to be "irresponsibly anti-Merck and specifically anti-Vioxx;" withdrawing financing from seminars at which doctors and academics who were critical of Merck's handling of Vioxx were scheduled to speak, and even filing suit to "correct" publications raising concerns about Vioxx's cardiovascular risks and criticizing Merck's handling of those concerns.

74.    Each of the Defendant's statements made in 2004 concerning VIOXX® was materially false and misleading when made, because each statement failed to disclose the extent of the Company's knowledge that VIOXX® was in fact associated with a significant risk of cardiac events.  The true but concealed and/or misrepresented facts included, but were not limited to:

• Merck's removal of Dr. Cannuscio's name from the Harvard-Brigham Women's Study was a deliberate attempt by Merck to conceal Vioxx's known risks;

• The Kaiser Permanente study confirmed the results of Study 090 and VIGOR, and thus demonstrated that Vioxx caused severe cardiovascular complications;

• Adequate justification for withdrawing Vioxx from the worldwide markets existed well before September 30, 2004, and Merck's attempts to base the withdrawal upon the putative results of the APPROVe study were knowingly false when made;

• The Company was aware that Vioxx itself created an increased risk of heart attack, and that its explanation for the VIGOR study results--that the

Vioxx patients suffered greater incidences of cardiovascular events because of cardioprotective qualities of Naproxen--was inaccurate;

• The Company's statements refuting the results of the Brigham & Women's Hospital Study finding an increased risk of heart attack in patients taking Vioxx were unfounded;

• Merck's statements that the lawsuits filed against the Company with respect to Vioxx were meritless were, in fact, unfounded;

• The Company's announcements and press releases throughout 2004, stating that Merck 'stands behind the safety of Vioxx' were unfounded, because Merck knew that Vioxx, in fact, was associated with cardiovascular events and was therefore not safe;

• Merck's press releases "reconfirming the favorable cardiovascular safety profile of Vioxx" during 2004 were unfounded, because Merck knew that Vioxx was associated with high cardiovascular risks;

• The Vioxx promotional activities that the FDA condemned in the September 17, 2001 FDA Letter stemmed from Merck's deliberate efforts to conceal Vioxx's known risks, which continued in 2004;

• Merck's unpublished Study 090 concluded that Vioxx users were 6 times more likely to have severe cardiovascular events than other users of NSAIDS;

• Internal Merck e-mails authored in 1996 and 1997 reveal that even before the FDA approved Vioxx for prescription use, Merck knew of the Vioxx-related medical risks;

• Substantial data existed in 1999 that Vioxx was associated with a higher risk of cardiovascular events than other NSAIDs;

• On December 16, 1999, Merck had received the December 16, 1999 FDA Letter admonishing Defendant for misleading the public by using deceptive promotional materials that suggested Vioxx had a superior safety profile to other NSAIDS, which was not demonstrated by substantial evidence;

• Defendant knew that the negative cardiovascular events were not due to the cardioprotective properties of Naproxen, but were instead directly attributable to the cardiovascular risks that Merck observed in Study 090; and

• Vioxx's safety profile was not "excellent" as the Defendant claimed, but was instead marked by an unacceptably high risk of negative cardiovascular events.

## COUNT I
## VIOLATION OF MISSISSIPPI'S CONSUMER PROTECTION ACT

75.     Plaintiff hereby repeats, incorporates by reference and realleges each and every allegation set forth above in this Complaint.

76.     Defendant's representations as set forth herein, concerning the characteristics and benefits of VIOXX®, including its safety and efficacy, were false, misleading and untrue when made, and constitute a violation of Mississippi's Consumer Protection Act, § 75-24-1, *et seq.*, Miss. Code Ann. (1972)

77.     Attorney General Jim Hood brings this action for a declaratory judgment that the Defendant's conduct as set forth herein, violated §75-24-1, *et seq.*, Miss. Code Ann.(1972) and seeks, pursuant to §75-24-9, an injunction to restrain the foregoing continuation of dissemination of false safety and efficacy information concerning VIOXX® to the public.  Further, Plaintiff is entitled to civil penalties against Defendant, pursuant to § 75-24-19.

78.     Merck constitutes a "person" within the meaning of, and subject to, the provisions of the Mississippi Consumer Protection Act, Miss. Code § 75-24-3(a).

79.     By labeling, distributing, marketing, promoting and selling VIOXX®  to Mississippi consumers, Defendant has committed acts of unfair methods of competition and unfair or deceptive trade practices or acts in the conduct of trade or commerce within the State, and specifically, Hinds County, as prohibited by Miss. Code Ann. § 75-24-5(2) (Rev. 1991 & Supp. 2007), directly, or indirectly, affecting the people of the State.

80.     Defendant has repeatedly, knowingly and willfully engaged in the following conduct which constitutes a deceptive trade practice and a violation of the Mississippi Consumer

Protection Act:

(a)     Making false and misleading misrepresentations of fact regarding VIOXX®'s risk profile, including but not limited to misrepresenting the likelihood and severity of the side effects associated with VIOXX®, including heart attack, stroke, and other serious and potentially life threatening conditions;

(b)     Misrepresenting and concealing material facts readily ascertainable by Defendant's and in Defendant's sole control;

(c)     Misrepresenting VIOXX®as being of a particular standard, quality, or grade when it was not;

(d)     Misrepresenting that VIOXX® had characteristics, uses or benefits that it does not have; and,

(e)     Intentionally creating confusion or misunderstanding as to whether VIOXX® was safe.

81.     Merck made, orally and in writing, false, misleading, or deceptive representations in advertisements, promotions, marketing materials, statements, and product labeling for VIOXX® to Mississippi consumers regarding the health risks and benefits associated with using VIOXX®. Merck continues to make, orally and in writing, such false, misleading, or deceptive representations in statements regarding VIOXX®.

82.     Defendant acted knowingly and willfully in committing the violations of the Mississippi Consumer Protection Act described herein.

83.     Each piece of marketing material used or disseminated in Mississippi which contained false or deceptive representations constitutes a separate, distinct, knowing and willful violation of the Mississippi Consumer Protection Act.

- 33 -

84.     Each false, deceptive or misleading representation made to a Mississippi citizen (whether the recipient of the representation was a prescriber, a physician, a health care provider, a State employee, or a consumer) constitutes a separate, distinct, knowing and willful violation of the Mississippi Consumer Protection Act.

85.     The Attorney General has determined that the imposition of an injunction against Defendant prohibiting the conduct set forth herein is in the public interest, and the State is seeking the entry of a permanent injunction prohibiting Defendant's conduct in violation of the Mississippi Consumer Protection Act.

86.     As a direct and proximate result of Defendant's conduct in committing the above and foregoing violations of the Mississippi Consumer Protection Act, Defendant is directly liable to the State for penalties for which recovery is sought herein.

## COUNT II
## INJUNCTIVE RELIEF

87.     Plaintiff hereby repeats, incorporates by reference and realleges each and every allegation set forth above in this Complaint.

88.     By Merck's violations of the Mississippi Consumer Protection Act, the State has suffered, and will continue to suffer, immediate and irreparable injury, loss and damage.

89.     As a direct and proximate result of the conduct of Merck in committing the above and foregoing acts, the State moves this Honorable Court for prohibitory and mandatory injunctive relief against Merck in the form of a Preliminary Injunction pursuant to Miss. R. Civ. P. 65(a), thereby enjoining Merck from committing future violations of the Mississippi Consumer Protection Act.

90.     The State moves this Honorable Court for an Order Consolidating Plaintiff's

Motion for Preliminary Injunction pursuant to Miss. R. Civ. P. 65(a) with Trial on the Merits in

the Chancery Court of Hinds County, Mississippi, pursuant to Miss. R. Civ. P. 65(a)(2).

91.     The State invokes the provisions of Miss. R. Civ. P. 65(c) to the extent that no

security is required of the State in regard to the instant Motion for Preliminary Injunction

pursuant to Miss. R. Civ. P. 65(a).

**COUNT III**
**UNTRUE, DECEPTIVE, AND MISLEADING ADVERTISING**
**IN VIOLATION OF § 97-23-3 MISS. CODE ANN. (1972)**

92.     Plaintiff hereby repeats, incorporates by reference and realleges each and every

allegation set forth above in this Complaint.

93.     As stated herein, Defendant made false, deceptive and untrue statements and

representations concerning the safety, risks, and effectiveness of VIOXX®, to the public

generally, and Mississippians, specifically.  These statements and representations were

published, circulated, disseminated, and placed before the public generally, and Mississippians,

specifically, in print and media advertisements, in publications, and by other means.  Such

statements and representations were made with the intent to sell or distribute VIOXX® to

Mississippians, directly or indirectly, and were made with the intent to increase the consumption

of or demand for VIOXX® by Mississippians.  Defendant knew when the statements and

representations were made that the information concerning VIOXX® was untrue, deceptive or

misleading.

94.     The foregoing conduct of Defendant as alleged above constitutes unfair, deceptive

and misleading advertising of VIOXX® in violation of § 97-23-3 Miss. Code Ann. (1972). As a

result of Defendant's conduct, the State of Mississippi, through its Mississippi State and Public

School Employees' Health Insurance Plan (the "State Health Plan"), which is funded by the State

- 35 -

of Mississippi (the "State") pursuant to Miss.Code Ann. § 25-15-11, has been damaged by

paying excessive amounts for VIOXX®, when it was no more effective than other less expensive

NSAIDS, and when it exposed those who ingested the drug to substantial adverse health effects,

including the risks of heart attack and stroke.

95.     Each VIOXX® prescription and each piece of marketing material used or

disseminated in Mississippi which contained false or deceptive representations constitutes a

separate, distinct, knowing and willful violation of § 97-23-3 Miss. Code Ann. (1972).

96.     As a direct and proximate result of Defendant's conduct in committing the above

and foregoing violations of § 97-23-3 Miss. Code Ann. (1972), Defendant is directly

liable to the State for fines for which recovery is sought herein.

**COUNT IV**
**FRAUD**

97.     Plaintiff hereby repeats, incorporates by reference and realleges each and every

allegation set forth above in this Complaint.

98.     Defendant committed fraud against the State of Mississippi, through its State

Health Plan, that approved VIOXX® for reimbursement in reliance on the false and misleading

safety and efficacy data provided, communicated and/or published by Defendant. Defendant

knew that the safety and efficacy data it provided, communicated and/or published were false.

Defendant provided such false data with the intent of inducing this Mississippi agency to rely on

the false information in determining pharmacy benefits related to VIOXX®.

99.     Mississippi's State Health Plan reasonably relied on such false information in

approving VIOXX® for reimbursement. Defendant's fraudulent conduct is continuing, as it

regularly and periodically continued to issue false data for publication concerning the safety and

efficacy of VIOXX®.

- 36 -

100.    As a result of Defendant's fraudulent conduct, the State of Mississippi, through its State Health Plan, has been damaged by paying excessive amounts for Defendant's drug, VIOXX®, when it was no more effective than other less expensive NSAIDS, and when it exposed those who ingested the drug to substantial adverse health effects, including the risks of heart attack and stroke.  Defendant's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in conscious disregard for the rights of Plaintiff. Plaintiff is therefore entitled to an award of punitive damages.

**COUNT V**
**UNJUST ENRICHMENT**

101.    Plaintiff hereby repeats, incorporates by reference and realleges each and every allegation set forth above in this Complaint.

102.    Defendant knowingly, willfully and intentionally marketed and promoted VIOXX® in a false and deceptive manner.

103.    Defendant knowingly, willfully and intentionally withheld information from the State regarding the risks associated with VIOXX® use.

104.    As a result of the false and misleading statements and representations of the Defendant concerning its drug, VIOXX®, the State of Mississippi, through its State Health Plan, paid, reimbursed or otherwise conferred a benefit upon Defendant that directly resulted from Defendant's fraudulent marketing practices.

105.    As a result of the excessive payments for VIOXX®, Defendant obtained increased sales and market share for its product, and, therefore, increased profits, and was unjustly enriched at the expense of the State of Mississippi.

106.    Plaintiff is entitled to restitution to the extent of the increased revenue received by the Defendant from VIOXX® prescriptions that were reimbursed by the State, through the State Health Plan, and which resulted from Defendant's deceptive and illegal marketing program.

## COUNT VI
## NEGLIGENCE

107.    Plaintiff hereby repeats, incorporates by reference and realleges each and every allegation set forth above in this Complaint.

108.    Defendant had a duty to exercise reasonable care in the marketing, advertising, sale and distribution of Defendant's pharmaceutical drugs, including VIOXX®.

109.    Defendant breached that duty by the conduct alleged herein.

110.    As a result of Defendant's breach, VIOXX® was marketed, advertised, sold, and distributed in the State of Mississippi, through its State Health Plan, and has been damaged by paying excessive amounts for VIOXX®, when it was no more effective than other less expensive NSAIDS, and when it exposed those who ingested the drug to substantial adverse health effects, including the risks of heart attack and stroke.

111.    In breaching its duties to the Plaintiff, as described above, Defendant acted negligently and/or in reckless disregard for the truth, in that Defendant knew or should have known through information available exclusively to them and otherwise that VIOXX® did not have the safety and efficacy it promoted, and that if used in the manner intended by Defendant, those who ingested the drug were at an increased risk for severe adverse health effects, including heart attacks and strokes.  Defendant further knew or should have known that its aforesaid breach of duty would be substantially certain to result in the injuries complained of herein.

112.    Due to the negligent, careless, reckless, willful and/or intentional conduct of the Defendant, as set forth above, the State dispensed millions of dollars of State Health Plan funds in purchasing VIOXX® prescriptions.

113.    As a direct and proximate result of the Defendant's negligence, the State of Mississippi has suffered damages and is therefore entitled to recover those damages.

114.    The reprehensible nature of the Defendant's conduct further entitles the State to an award of punitive damages.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for relief as follows:

(1)     Judgment in favor of the State and against Defendant Merck for damages in excess of the minimum jurisdictional requirements of the Chancery Court of Hinds County, Mississippi, in a specific amount to be proven at trial;

(2)     Judgment in favor of the State and against Defendant Merck for the total sum of all funds expended by the State of Mississippi through its State Health Plan in purchasing VIOXX®;

(3)     Restitution of all money wrongfully acquired by Defendant Merck from the sale of VIOXX® for consumption by members of the State Health Plan on or after May 25, 1999, until the date that full restitution is made to the State herein;

(4)     Judgment in favor of the State and against Defendant Merck for prohibitory and mandatory injunctive relief against Defendant Merck in the form of a Preliminary Injunction pursuant to Miss. R. Civ. P. 65(a);

(5)     Judgment in favor of the State and against Defendant Merck for interest on the value of the total sum of all funds expended by the State of Mississippi through its

State Health Plan in purchasing VIOXX®, at the prejudgment interest rate in effect on the day

the subject funds were expended, for the period inclusive of the dates the subject funds were

expended until the date that full restitution is made to the State herein;

(6)     Judgment in favor of the State and against Defendant Merck for a civil penalty of

up to $10,000 for each violation of the Mississippi Consumer Protection Act by Merck;

(7)     Judgment in favor of the State and against Defendant Merck for fines of up to

$500.00 for each violation of § 97-23-3 Miss.  Code Ann. (1972);

(8)     Judgment in favor of the State and against Defendant Merck for all fees,

expenses, and costs reasonably incurred in pursuing and obtaining the legal remedies herein,

specifically, but without limitation, to wit: costs of court, investigative costs, attorney's fees,

witness fees, deposition fees, prejudgment interest as requested herein, and post-judgment

interest at the maximum legal rate; and

(9)     Judgment in favor of the State and against Defendant Merck for all other relief at

law or in equity to which the State may be entitled, including an award of punitive damages.


BY: _____

SHEILA M. BOSSIER, (LA Bar No. 19491)
**Attorney for JIM HOOD, ATTORNEY
GENERAL,** *ex rel* **THE STATE OF
MISSISSIPPI**


**OF COUNSEL:**

**BOSSIER & ASSOCIATES, PLLC**
P. O. Box 55567
Jackson, MS  39296
Telephone: (601) 352-5450
Facsimile:  (601) 352-5452


- 40 -

Geoffrey Morgan, Esq.
George W. Neville
**OFFICE OF THE ATTORNEY GENERAL**
P. O. Box 220
Jackson, MS  39205
Telephone: (601) 359-3821

Richard A. Freese, Esq.
**FREESE & GOSS, PLLC**
2031 2nd Avenue North
Birmingham, AL 35203
Telephone: (205) 871-4144
Facsimile: (205) 871-4104

Shane Langston, Esq.
Rebecca Langston, Esq.
Jessica Murray, Esq.
**LANGSTON & LANGSTON, PLLC**
Post Office Box 23307
Jackson, MS 39225
Telephone: (601) 969-1356
Facsimile: (601) 968-3866

### CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been served on Liaison Counsel by U.S.

Mail and upon all parties by electronically uploading the same to LexisNexis File and Service

Advance this 15th day of June, 2012.

SHEILA M. BOSSIER

- 41 -