# EXHIBIT A

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-2664
_____

IN RE: AVANDIA MARKETING, SALES PRACTICES and
PRODUCTS LIABILITY LITIGATION
GLAXOSMITHKLINE, LLC & GLAXOSMITHKLINE,
PLC

HUMANA MEDICAL PLAN, INC. and HUMANA
INSURANCE COMPANY, individually and on behalf of all
others similarly situated,
Appellants
_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. Civ. No. 10-6733 and MDL 1871)
District Judge: Honorable Cynthia M. Rufe
_____

Argued on January 24, 2012
_____

Before: McKEE, *Chief Judge*, FISHER, and GREENAWAY,
JR., *Circuit Judges*.

(Opinion Filed:  June 28, 2012)


Richard W. Cohen, Esq. (argued)
Peter D. St. Phillip, Jr., Esq.
Gerald Lawrence, Esq.
LOWEY, DANNENBERG, COHEN & HART
One North Broadway
Suite  509
White Plains, NY 10601-0000
  *Counsel for Appellants*

Thomas E. Zemaitis, Esq. (argued)
George A. Lehner, Esq.
Kenneth H. Zucker, Esq.
Pepper Hamilton
18th & Arch Streets
3000 Two Logan Square
Philadelphia, PA 19103-0000
  *Counsel for Appellees*

Arthur N. Lerner, Esq.
Crowell & Moring
1001 Pennsylvania Avenue,  N.W.
Washington, DC 20004-2505
  *Counsel for Amicus- Appellants*


_____

OPINION

_____

GREENAWAY, JR., *Circuit Judge*.

Plaintiff Humana Medical Plan, Inc. and Humana Insurance Company (collectively, "Humana") brought suit against GlaxoSmithKline, L.L.C. and GlaxoSmithKline plc (collectively, "Glaxo") alleging that Glaxo was obligated to reimburse Humana for expenses Humana had incurred treating its insureds' injuries resulting from Glaxo's drug, Avandia. Humana runs a Medicare Advantage plan. Its complaint asserts that, pursuant to the Medicare Act, Glaxo is in this instance a "primary payer" obligated to reimburse Humana as a "secondary payer." The District Court dismissed the action, agreeing with Glaxo that the Medicare Act did not provide Medicare Advantage organizations ("MAOs") with a private cause of action to seek such reimbursement. Humana filed a timely appeal.

The Medicare Secondary Payer Act, in 42 U.S.C. § 1395y(b)(3)(A), provides Humana with a private cause of action against Glaxo. Even if we were to find, as Appellees suggest, that this provision is ambiguous, we would nonetheless be required to defer to regulations issued by the Centers for Medicare and Medicaid Services ("CMS"). The regulations make clear that the provision extends the private cause of action to MAOs. Accordingly, we will reverse the judgment of the District Court and remand for further proceedings.


I.      **BACKGROUND**

Glaxo manufactures and distributes Avandia, a Type 2 diabetes drug that has been linked to substantially increased risk of heart attack and stroke. Thousands of Avandia patients have alleged various injuries resulting from their use of the drug and Glaxo has begun entering into agreements to settle these claims.[1] As part of the settlement process, where the claimant is insured by Medicare, Glaxo sets aside reserves to reimburse the Medicare Trust Fund for payments it made to cover the costs of treatment for the claimants' Avandia-related injuries.

While most Medicare-eligible individuals receive Medicare benefits directly from the government, individuals can elect instead to receive their benefits through private insurance companies that contract with the government to provide "Medicare Advantage" ("MA") plans. 42 U.S.C. § 1395w-21(a)(1). Glaxo has not, to date, included reimbursement of MA plans in the settlement agreements that it has reached with Avandia claimants enrolled in MA plans, although MAOs have paid the costs of treatment of Avandia-related injuries for these claimants.[2] Humana's MA plan provides benefits to approximately one million people, and

---

[1] By August 2011, when Appellants filed their brief, Glaxo had paid more than $460 million to settle these claims.

[2] An MA plan assumes full responsibility for paying the medical costs of its plan participants in exchange for a fixed annual per-participant payment from the government. § 1395w-23. This fixed, or "capitated," amount is calculated annually using a formula based on the cost of providing the required benefits that would otherwise be covered by traditional Medicare. *Id.*

Humana filed this lawsuit to seek reimbursement from Glaxo for the costs of treating its enrollees' Avandia-related injuries.

On November 17, 2010, Humana filed its class action complaint in the Eastern District of Pennsylvania.[3] Humana sought, on behalf of itself and a class of similarly-situated MAOs: (1) damages under the Medicare Secondary Payer Act ("MSP Act"), which provides a private cause of action, 42 U.S.C. § 1395y(b)(3)(A), allowing double damages for failure to reimburse a secondary payer; and (2) equitable relief in the form of an order compelling Glaxo to identify settling Avandia claimants to the MAOs that cover them.

On December 23, 2010, Glaxo filed a motion to dismiss. The District Court heard oral argument on the motion and, on June 13, 2011, granted it. In dismissing the action, the District Court noted that Part C of the Medicare Act (the "Medicare Advantage" or "MA" statute) contains its own secondary payer provision, 42 U.S.C. § 1395w-22(a)(4). *In re Avandia Mktg., Sales Practices, and Prods. Liability Litig.*, 2011 WL 2413488, at *3 (E.D. Pa. June 13, 2011). The District Court observed that this provision references the MSP Act without fully adopting or incorporating it and that its language is permissive, whereas the language of the MSP Act is mandatory. *Id.* Given the existence of the MA statute's provision, specifically relevant to MAOs, the District Court held that the private cause of action within the MSP

---

[3] Many suits alleging Avandia-related injuries have been filed in federal court and almost all are being coordinated for pretrial purposes in the Eastern District of Pennsylvania. *In re Avandia Marketing, Sales Practices and Products Liability Litigation*, MDL Dkt. No. 1871. This case is among them.

Act did not apply to MAOs, nor did the secondary payer provision in the MA statute create a private right of action for MAOs. *Id.* at *4. Next, the District Court analyzed whether an implied private right of action for Humana existed according to the four-part test laid out by the Supreme Court in *Cort v. Ash*, 422 U.S. 66 (1975). *In re Avandia*, 2011 WL 2413488, at *4. Although the District Court found that Humana met the first prong of the test, as it was a member of the class the statute was enacted to benefit, it found that Humana failed on the other three prongs: there was no clear legislative intent to create a remedy for Humana, it was not consistent with the legislative scheme to imply a remedy, and the cause of action was one traditionally litigated under state law. *Id.* The District Court therefore found that no implied private right of action existed.

Additionally, the District Court found that the statute's silence on the existence of a private right of action for MAOs "does not create ambiguity, but rather indicates [Congress's] intent not to create a private right of action for MAOs." *Id.* at *5. With no ambiguity in the plain text of the statute, the District Court held that the judicial deference to duly-enacted regulations required by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc*, 467 U.S. 837, 842-43 (1984), did not come into play. Accordingly, the Court did not defer to the CMS regulation that granted MAOs parity with Medicare vis-à-vis recovery from primary payers, *see* 42 C.F.R. § 422.108(f). *In re Avandia*, 2011 WL 2413488, at *5.

Finally, Humana sought an order from the District Court ordering Glaxo to disclose information about settlements that Humana's enrollees entered into with Glaxo. The District Court declined to grant Humana the equitable relief it sought. It found that Humana, and not Glaxo, had

access to information about which Avandia claimants were enrolled in Humana's MA plan and that Humana could use this information to remind claimants of their obligation to disclose any settlement they might reach with Glaxo.[4], [5]    *Id.*

Humana filed a timely Notice of Appeal.  Humana asks this Court to determine whether the District Court erred in holding that the private cause of action in the MSP Act, 42 U.S.C. § 1395y(b)(3)(A), did not provide Humana with a cause of action here.  America's Health Insurance Plans, representing the health insurance industry, filed an amicus brief in support of Humana.

## II.    JURISDICTION AND STANDARD OF REVIEW

The District Court had subject matter jurisdiction, pursuant to 28 U.S.C. § 1331, because interpretation of the federal Medicare Act presents a federal question.  This Court has appellate jurisdiction, pursuant to 28 U.S.C. § 1291.  We review de novo the decision of a district court granting a motion to dismiss, pursuant to Rule 12(b)(6).  *McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009).  In ruling upon a motion to dismiss, "all well-pleaded allegations of the

---

[4] The District Court also noted that a pending amendment to the MSP Act might arguably shift the reporting burden to Glaxo, but declined to address that question because it was not yet ripe.  *In re Avandia Mktg., Sales Practices, and Prods. Liability Litig.*, 2011 WL 2413488, at *6 (E.D. Pa. June 13, 2011).

[5] Humana did not appeal the District Court's dismissal of its claim for equitable relief.

complaint must be taken as true and interpreted in the light most favorable to the plaintiffs, and all inferences must be drawn in favor of them." *Id.* (quoting *Schrob v. Catterson*, 948 F.2d 1402, 1408 (3d Cir.1991)).

## III.   ANALYSIS

Humana asks this Court to determine whether the private cause of action for double damages created by the Medicare Secondary Payer Act, 42 U.S.C. § 1395y(b)(3)(A), provides it and other MAOs with the right to bring suit.[6] We find that the plain text of the provision sweeps broadly enough to include MAOs and that, even if we determined the statute to be ambiguous on this point, deference to CMS regulations[7] would require us to find that MAOs have the same right to recover as the Medicare Trust Fund does. We will therefore reverse the decision of the District Court.

### A.   The Medicare Statute

Subchapter XVIII of Chapter 7 of Title 42 of the United States Code is entitled "Health Insurance for Aged and Disabled," and is more commonly known as the Medicare

---

[6] Humana repeatedly states that an MAO has "standing" to bring suit under the provision at issue. In order to avoid confusion with the doctrine of constitutional standing, s*ee Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), this opinion avoids that term.

[7] CMS is an operating division within the Department of Health & Human Services which issues Medicare-related regulations on behalf of the Secretary of Health & Human Services.

Statute. 42 U.S.C. §§ 1395 to 1395kkk-1. The Medicare Statute divides benefits into four parts. Part A, "Hospital Insurance Benefits for Aged and Disabled," and Part B, "Supplementary Medical Benefits for Aged and Disabled," create, describe, and regulate traditional fee-for-service, government-administered Medicare. §§ 1395c to 1395i-5; §§ 1395-j to 1395w-5. Part C, inserted with the passage of the Balanced Budget Act of 1997, Pub. L. 105-33, creates the program now known as Medicare Advantage, which allows for the creation of MA plans and is described in detail below. § 1395w-21 to -29. Finally, Part D provides for prescription drug coverage for Medicare enrollees. § 1395w-101 to -154.

Part C allows Medicare enrollees to obtain their Medicare benefits through private insurers (MAOs) instead of receiving direct benefits from the government under Parts A and B. § 1395w-21(a). CMS pays an MAO a fixed amount for each enrollee, per capita (a "capitation"). The MAO then administers Medicare benefits for those enrollees and assumes the risk associated with insuring them. MAOs like Humana are thus responsible for paying covered medical expenses for their enrollees. Part C allows MAOs some flexibility as to the design of their MA plans. The MAO is required to provide the benefits covered under Parts A and B to enrollees, but it may also provide additional benefits to its enrollees. § 1395w-22(a)(1)-(3).

Part C also includes one of the two provisions that lie at the heart of this case. Entitled "Organization as secondary payer," this provision states:

> Notwithstanding any other provision of law, [an MAO][8] may (in the case of the provision of items and services to an individual under [an MA] plan under circumstances in which payment under this title is made secondary pursuant to section 1395y(b)(2)) of this title charge or authorize the provider of such services to charge, in accordance with the charges allowed under a law, plan, or policy described in such section--
>
> (A) the insurance carrier, employer, or other entity which under such law, plan, or policy is to pay for the provision of such services, or
>
> (B) such individual to the extent that the individual has been paid under such law, plan, or policy for such services.

§ 1395w-22(a)(4) (the "MAO secondary payer provision").

----

[8] The statutory text refers to MAOs as "Medicare+Choice" organizations. For simplicity's sake, this opinion substitutes the contemporary terminology wherever that phrase appears. *See* Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. 108-173, 117 Stat. 2176, 42 U.S.C. §1395w-21 note ("[T]he Secretary shall provide for an appropriate transition in the use of the terms 'Medicare+Choice' and 'Medicare Advantage' (or 'MA') in reference to the program under part C of title XVIII of the Social Security Act.").

This provision (the "Part C secondary payer provision") cross-references § 1395y(b)(2) for its definitions of primary payers and its positioning of Medicare as a secondary payer. That cross-referenced provision is located within § 1395y(b), the Medicare Secondary Payer Act, enacted in 1980. It provides that Medicare cannot pay medical expenses where "payment has been made or can reasonably be expected to be made under a workmen's compensation law or plan of the United States or a State or under an automobile or liability insurance policy or plan (including a self-insured plan) or under no fault insurance." § 1395y(b)(2)(A)(ii). Further, a business "shall be deemed to have a self-insured plan if it carries its own risk (whether by a failure to obtain insurance, or otherwise) in whole or in part." *Id.* Glaxo, which pays out of its own pocket to settle the Avandia-related claims, is self-insured and therefore a primary payer in this instance.

The MSP Act also gives the Secretary the authority to make "conditional payments" in circumstances where a primary payer is actually responsible for the cost of medical treatment but "has not made or cannot reasonably be expected to make payment with respect to such item or service promptly." § 1395y(b)(2)(B)(i). In such a circumstance, the primary plan must subsequently reimburse the Medicare Trust Fund. § 1395y(b)(2)(B)(ii). If the primary plan fails to reimburse the Fund, "the United States may bring an action against any or all entities that are or were required or responsible . . . to make payment . . . under a primary plan." § 1395y(b)(2)(B)(iii). The government may then collect double damages, "in accordance with paragraph (3)(A)." *Id.*

Paragraph (3)(A) (the "MSP private cause of action provision") is the other provision central to this case. It states:

> There is established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with [the requirements of the MSP Act].

§ 1395y(b)(3)(A).

The Medicare Statute thus creates two separate causes of action allowing for recovery of double damages where a primary payer fails to cover the costs of medical treatment. When the Medicare Trust Fund makes a conditional payment and the primary payer does not reimburse it, the United States may bring suit pursuant to § 1395y(b)(2)(B)(iii). Additionally, a private cause of action with no particular plaintiff specified exists pursuant to § 1395y(b)(3)(A) anytime a primary payer fails to make required payments.[9]

---

[9] Although the MSP private cause of action provision sweeps broadly, it is not so broad that it can function as a *qui tam* statute, allowing a private party to bring suit as an agent of the government to collect moneys owed to the government. Each of our sister circuits to have considered the question has rejected this interpretation. *Woods v. Empire Health*, 574 F.3d 92, 101 (2d Cir. 2009); *Stalley ex rel. United States v. Orland Reg. Healthcare System, Inc.*, 524 F.3d 1229, 1234 (11th Cir. 2008); *Stalley v. Methodist Healthcare*, 517 F.3d 911, 919 (6th Cir. 2008); *Stalley v. Catholic Health*

Exactly how broadly this latter provision sweeps will determine the outcome of this appeal.

## B.    Textual Arguments

1.    MSP Private Cause of Action Provision

The plain text of the MSP private cause of action lends itself to Humana's position that any private party may bring an action under that provision. It establishes "a private cause of action for damages" and places no additional limitations on which private parties may bring suit. § 1395y(b)(3)(A). Accordingly, we find that the provision is broad and unambiguous, placing no limitations upon which private (i.e., non-governmental) actors can bring suit for double damages when a primary plan fails to appropriately reimburse any secondary payer.

Glaxo presents no argument that undermines this facially clear reading. The MSP private cause of action provision allows for damages where the primary plan has failed to pay "in accordance with paragraphs (1) and (2)(A)." *Id.* Paragraph (2)(A), in turn, consistently refers to payments "under this subchapter."[10] § 1395y(b)(2)(A). Glaxo contends that "payments under this subchapter" refers to payments

---

*Initiatives*, 509 F.3d 517, 527 (8th Cir. 2007); *United Seniors Ass'n v. Philip Morris USA*, 500 F.3d 19, 26 (1st Cir. 2007).

[10] The United States Code Service uses the word "title" in place of "subchapter," favored by the United States Code Annotated. This opinion utilizes the statutory text from the latter compilation.

made by the Medicare Trust Fund and excludes payments from the MAO to private entities, which are instead "made pursuant to private contracts of insurance between the MAO and the participant." (*Id.* at 25.)

In contrast, Humana argues that because "subchapter" refers to the Medicare Act as a whole, and not in particular to Parts A or B under which the government provides benefits directly to enrollees, payments made by private providers under Parts C or D are also covered. Humana supports this assertion by highlighting other places in the Medicare Act where Congress intentionally limited the applicability of a provision to payments made under particular Parts of the Medicare Act. (Appellants' Br. 23.) These provisions refer specifically to "payment made under part A or part B of this subchapter," § 1395y(a), or payment made "under Part B of this subchapter," § 1395y(c). *See also* § 1395y(f) (requiring Secretary to establish guidelines as to whether payment may be made for certain expenses "under part A or part B of this subchapter").

This language makes clear that "subchapter" refers to the Medicare Act as a whole. Since the MSP Act and its private cause of action provision do not attach any narrowing language to "payments made under this subchapter," that phrase applies to payments made under Part C as well as those made under Parts A and B. Accordingly, that language cannot be read to exclude MAOs from the ambit of the private cause of action provision.

It is worth noting that, although the MSP Act was enacted before Part C, which created MAOs, private Medicare risk plans were authorized under 42 U.S.C. § 1395mm in 1972, before the passage of the MSP Act. Act of

14

Oct. 30, 1972, sec. 226(a), Pub. L. 92-603, 86 Stat. 1396. Thus, at the time it enacted the MSP Act, Congress was aware that private Medicare providers existed. Had it intended to prevent them from suing under the private cause of action provision, Congress could have done so explicitly.

2.    MAO Secondary Payer Provision

Glaxo raises a number of arguments stemming from its contention that the MSP private cause of action provision cannot be read in a vacuum. Glaxo urges this Court to analyze the relationship between MAOs and the MSP Act by beginning with the MAO secondary payer provision. The plain text of the MAO secondary payer provision, Glaxo avers, makes clear that MAOs do not have a federal cause of action anywhere under the Medicare Act. Further, because this provision specifically defines the relationship of MAOs to secondary payer status and the MSP Act, it controls those relationships, and the MSP private cause of action does not apply to MAOs. [11]

In Glaxo's argument, the MAO secondary payer provision, by stating that an MAO "may . . . charge or authorize the provider of [ ] services to charge" the primary payer, gives MAOs the right to include in their policy

---

[11] Humana has not raised on appeal the question of whether there is some private right of action for MAOs implied in the Medicare Act, although the District Court found that no such implied right of action exists. 2011 WL 2413488, at *4. Accordingly, we are asked to determine whether the text of § 1395y(b)(3)(A) provides Humana with a cause of action and nothing further.

contracts provisions making them secondary payers in situations in which a primary payer would be liable under the MSP Act.  § 1395w-22(a)(4).  It does not, however, provide a federal remedy for the enforcement of that right.  *See Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) (stating that statute does not create private cause of action unless Congress intended "to create not just a private right but also a private remedy").   At oral argument, Glaxo asserted that this provision was intended to preempt state law that could preclude an MAO from positioning itself as a secondary payer, as certain personal injury laws might.

Under the interpretation urged by Glaxo, no rights to reimbursement are granted to an MAO by the Medicare Act. Instead, such rights can be secured by the MAO's contract with an individual insured; that is, the insurance policy.  This policy may define an MAO as a secondary payer, according to the definition contained in the MSP Act, and it may also contain rights of reimbursement and subrogation.[12]  Then, if a primary payer were to fail to reimburse the MAO, the MAO could sue to enforce its contractual rights in state court.  It could be made whole either by recovering from the primary payer through subrogation or, if the insured has received payment from the primary payer, from the insured directly.

The District Court accepted this interpretation of the MAO secondary payer provision.  2011 WL 2413488, at *4;

---

[12] As the District Court noted, the policy might also create an obligation for the insured to inform the MAO of any primary insurance coverage, including tort settlements where the tortfeasor qualifies as a primary payer.  *In re Avandia*, 2011 WL 2413488, at *4 n.40.

*see also Parra v. PacifiCare of Arizona, Inc.*, Civ. No. 10-008, 2011 WL 1119736 (D. Ariz. Mar. 28, 2011) (finding Congress did no more than provide MAOs with "right to charge and/or bill a beneficiary for reimbursement, notwithstanding and [sic] state law or regulation to the contrary" ). It is important to remember, though, that Humana does not contend that § 1395w-22(a)(4) endows it with a private right of action. Instead, it hangs its hat entirely on the MSP Act provision. Thus, § 1395w-22(a)(4) is relevant only inasmuch as it assists us in interpreting the MSP private cause of action provision, and we are not persuaded that it undermines the meaning of the plain text of that provision.

Glaxo further contends that the reference to § 1395y(b)(2) in the MAO secondary payer provision, far from incorporating the entirety of the MSP Act into Part C, in fact makes clear that *only* the definition of a primary payer from the MSP Act is incorporated there. (Appellees' Br. 21-22.) This argument is unavailing for the same reason—Humana is not arguing that the MAO secondary payer provision provides a cause of action through its reference to the MSP Act, but that the language of the MSP private cause of action is itself broad enough to encompass an MAO such as Humana, regardless of the existence of § 1395w-22(a)(4). In order to find these arguments persuasive, we would need to determine that, although private insurers providing Medicaid services could have brought suit under the MSP private cause of action provision before the enactment of the MA secondary payer provision, once that text became law, the MSP private cause of action was closed to them. We will not reach this conclusion.

Glaxo's final argument based on the text of the MAO secondary payer provision is that the permissive nature of the language there (an MAO "may" charge a primary plan), in contrast to the mandatory nature of the language in the MSP Act ("Payment under this subchapter may not be made. . .") means that MAOs cannot be authorized to bring suit under the MSP private cause of action. § 1395w-22(a)(4); § 1395y(b)(2)(A). Glaxo reads far too much into this distinction. No MAO, acting rationally, would decline to position itself as a secondary payer in order to charge primary payers where appropriate. Accordingly, the fact that Congress employs permissive language when establishing rules for private, market-driven entities and mandatory language when creating rules for the Secretary, a federal official over whom Congress exercises control, has no effect on the proper interpretation of MSP private cause of action.

In short, there is nothing in the text or legislative history of the MA secondary payer provision that demonstrates a congressional intent to deny MAOs access to the MSP private cause of action.

3.    Court Decisions

None of the decisions cited by Glaxo or the District Court provide us with sufficient reason to conclude that, in contravention of the plain text of the MSP private cause of action provision, an MAO may not bring suit under it. The District Court found that no federal private cause of action exists under the MSP Act by relying on two cases, neither of which had plaintiffs who made an argument based on the MSP Act provision at issue here.

In *Care Choices HMO v. Engstrom*, 330 F.3d 786 (6th Cir. 2003), the Sixth Circuit considered the argument of Care Choices, a Medicare-substitute HMO, that it had an implied federal private right of action allowing it to recover the cost of an insured's medical expenses, where the participant had collected damages from the tortfeasor who had injured her. That court declined to find an implied private right of action in the provision allowing Care Choices to occupy secondary-payer status. In so doing, it compared the language of the MSP Act private cause of action provision with § 1395mm(e)(4),[13] finding the contrast to support its holding that § 1395mm(e)(4) was not intended to create any private right of action. *Id.* at 790. Whether Care Choices could have brought suit as a private actor under the MSP Act was neither raised nor addressed and thus the decision of the United States Court of Appeals for the Sixth Circuit cannot guide us here.

Similarly, in *Nott v. Aetna U.S. Healthcare Inc.*, 303 F. Supp. 2d 565 (E.D. Pa. 2004), the court considered whether § 1395mm(e)(4) or § 1395w-22(a)(4) created a federal scheme for enforcement of a Medicare-substitute HMO's subrogation rights that would completely preempt conflicting state laws. The *Nott* court noted explicitly that § 1395y(b)(2)(B)(ii), the government's cause of action for reimbursement, was not implicated in the case, *id.* at 570, and it nowhere mentioned

---

[13] Because Care Choices was a Medicare-substitute HMO and not an MAO, the relevant, private-insurer-specific secondary payer provision was not § 1395w-22(a)(4), but rather § 1395mm(e)(4), which contains nearly identical language. The two provisions are logically subject to the same interpretation.

the § 1395y(b)(3)(A) private cause of action. Relying substantially on *Care Choices*, it held that "[t]here is no federal cause of action created by either subsection" and thus no preemption. *Id.* at 571.

Once again, because the decision does not discuss whether a private insurer providing Medicare services can bring suit under the MSP private cause of action, it is of limited relevance here.[14]

In contrast, the decision of the Court of Appeals for the Sixth Circuit in *Bio-Medical Applications of Tenn., Inc. v. Central States Health and Welfare Fund*, 656 F.3d 277 (6th Cir. 2011), does specifically consider the MSP private cause of action provision. There, the court held that the "demonstrated responsibility" provision of the MSP[15] applied

---

[14] For the same reasons, *Parra v. PacifiCare of Arizona, Inc.*, cited by Glaxo and the District Court, is also inapposite. 2011 WL 1119736 (D. Ariz. Mar. 28, 2011). This unreported decision adopts a magistrate's report and recommendation finding no implied private right of action in the MAO secondary payer provision. The report and recommendation relied heavily on *Care Choices*, and neither that decision nor the decision of the district court addressed the argument that an MAO could bring suit under the MSP private cause of action provision.

[15] "A primary plan . . . shall reimburse [the Trust Fund] for any payment made by [Medicare] . . . with respect to an item or service if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service." § 42 U.S.C. § 1395y(b)(2)(B)(ii)

only to situations in which the primary payer was a tortfeasor and not to the case before it, in which the primary plan was actually a primary insurer. *Id.* at 290-91. In explicating this point, it noted that a tortfeasor could be held liable as a primary payer under the MSP Act only when Medicare sues for reimbursement from a primary plan and not when the plaintiff is a private party. *Id.* at 292-93. It buttressed this distinction between Medicare and private parties with a number of arguments from the statute's text and legislative history.[16]  *Id.* at 292. However, the private party bringing suit in *Bio-Medical* was neither an MAO nor a Medicare-substitute HMO, and the court there did not consider how such an entity would fit into the dichotomy it described. As the remainder of this opinion will demonstrate, we believe that denying an MAO the rights to recovery provided to Medicare would undermine the very purpose of the MA program and that Congress did not intend this result.

## C.    Legislative History and Policy

Although we find the text of the statute to be unambiguous, we nonetheless include here a discussion of the

---

[16] These reasons include, *inter alia*, that the demonstrated responsibility provision's "text places a condition only on when primary plans must reimburse Medicare; it does not mention when plans must pay private parties," that "the structure of the Act suggests that the provision is limited to the reimbursement of Medicare," and that "the predominant legislative backdrop was Medicare's (not private parties') failed attempts to bring lawsuits against tortfeasors." *Bio-Medical Applications of Tenn., Inc. v. Central States Health and Welfare Fund*, 656 F.3d 277, 292 (6th Cir. 2011).

legislative history and policy rationales that support our
conclusion.

Congress's goal in creating the Medicare Advantage
program was to harness the power of private sector
competition to stimulate experimentation and innovation that
would ultimately create a more efficient and less expensive
Medicare system. *See, e.g.,* H.R. Rep. No. 105-217, at 585
(1997) (Conf. Rep.) (stating that MA program was intended
to "enable the Medicare program to utilize innovations that
have helped the private market contain costs and expand
health care delivery options"). It was the belief of Congress
that the MA program would "continue to grow and eventually
eclipse original fee-for-service Medicare as the predominant
form of enrollment under the Medicare program." *Id.* at 638.
The MA program was thus, like the MSP statute, "designed to
curb skyrocketing health costs and preserve the fiscal
integrity of the Medicare system." *Fanning v. United States*,
346 F.3d 386, 388 (3d Cir. 2003).

It would be impossible for MAOs to stimulate
innovation through competition if they began at a competitive
disadvantage, and, as CMS has noted, MAOs compete best
when they recover consistently from primary payers. Policy
and Technical Changes to the Medicare Advantage and the
Medicare Prescription Drug Benefit Programs, 75 Fed. Reg.
19678, 19797 (Apr. 15, 2010). When they "faithfully pursue
and recover from liable third parties," MAOs will have lower
medical expenses and will therefore be able to provide

22

additional benefits to their enrollees.[17]  *Id.*  If Medicare could threaten recalcitrant primary payers with double damages and MAOs could not, MAOs would be at a competitive

_____

[17] CMS explains this mechanism more fully elsewhere:

> We note that MAOs claim expenses related to MSP recoveries as part of their administrative overhead. MA organizations that faithfully pursue and recover from liable third parties will have lower medical expenses. Lower medical expenses make such plans more attractive to enrollees. The lower the medical expenses in an MA plan, the higher the potential rebate. The rebate is calculated as the difference between the cost of Medicare benefits and the benchmark for that plan. The benchmark is a fixed amount. Therefore, as the cost of Medicare benefits go down (with the benchmark remaining constant), the larger the rebate. Therefore, as more MSP dollars are collected or avoided, medical expense go down and rebates go up, allowing the sponsoring MA organization to offer potential enrollees additional non-Medicare benefits funded by rebate dollars. Such non-Medicare benefits include reductions in cost sharing. Since cost sharing is generally expressed as a percentage of medical costs, such cost sharing will also be proportionally lower as overall medical costs go down—providing MA organizations offering such plans with an additional competitive edge.

Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs, 74 Fed. Reg. 54634, 54711 (proposed Oct. 22, 2009).

disadvantage, unable to exert the same pressure and thus forced to expend more resources collecting from such payers. It is difficult to believe that it would have been the intent of Congress to hamstring MAOs in this manner.

Although the legislative history is nowhere explicit that MAOs may bring suit for double damages under the MSP private cause of action or using any other provision, it does make clear that MAOs were intended to enjoy a status parallel to that of traditional Medicare:

> Under original fee-for-service, the Federal government alone set legislative requirements regarding reimbursement, covered providers, covered benefits and services, and mechanisms for resolving coverage disputes. Therefore, the Conferees intend that this legislation provide a clear statement extending the same treatment to private [MA] plans providing Medicare benefits to Medicare beneficiaries.

H.R. Rep. No. 105-217, at 638.[18]

Our sister circuits have determined that the MSP Act provides traditional Medicare with a cause of action for double damages "[i]n order 'to facilitate recovery of conditional payments.'" *Stalley v. Methodist Healthcare*, 517

---

[18] Because Congress clearly intended there to be parity between MAOs and traditional Medicare, we find additional support for our decision in § 1395y(b)(2)(B)(iii), the government's cause of action for recovery from primary payers, which also provides for double damages.

24

F.3d 911, 915 (6th Cir. 2008) (quoting *Glover v. Liggett Group, Inc.*, 459 F.3d 1304, 1307 (11th Cir. 2006)). We see nothing in the text or legislative history of the statute to imply that Congress did not intend to facilitate recovery for MAOs in the same fashion.

The District Court determined that providing MAOs with a right of action would not advance the program's cost-savings aim because "payments to the MA from the Medicare trust fund are capitated annually, shifting the economic risk of excessive medical expenses from the government to the MA organization." 2011 WL 2413488, at *4. As we have explained elsewhere, "[t]he Government pays MA plan participants a set amount of money based on the plans' enrollees' risk factors and other characteristics rather than paying them a fee for specific services performed." *U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 300 n.4 (3d Cir. 2011). This capitation rate is based in part on the "adjusted average per capita cost" to the Medicare Trust Fund of covering a traditional Medicare participant in that year. 42 U.S.C. § 1395w-23(c)(1)(D); § 1395mm(a)(4) (defining "adjusted average per capita cost" as "average per capita amount that the Secretary estimates in advance . . .would be payable in any contract year for services covered under parts A and B of this subchapter. . . if services were to be furnished by other than an eligible organization").

The District Court's logic on this point is flawed for several reasons. If an MA plan provides CMS with a bid to cover Medicare-eligible individuals for an amount less than the benchmark amount calculated by CMS, it must use seventy-five percent of that savings to provide additional benefits to its enrollees. 42 U.S.C. §§ 1395w-24 (b)(1)(C)(i),

(b)(3)(C), (b)(4)(C).[19]   The remaining twenty-five percent of the savings is retained by the Medicare Trust Fund. Accordingly, when MAOs spend less on providing coverage for their enrollees, as they will if they recover efficiently from primary payers, the Medicare Trust Fund does achieve cost savings.[20]

---

[19] The "Beneficiary Rebate Rule" provides in full:

> The MA plan shall provide to the enrollee a monthly rebate equal to 75 percent (or the applicable rebate percentage specified in clause (iii) in the case of plan years beginning on or after January 1, 2012) of the average per capita savings (if any) described in paragraph (3)(C) or (4)(C), as applicable to the plan and year involved.

42 U.S.C. § 1395w-24(b)(1)(C)(i).   In 2012, the federal government began to retain a larger portion of the savings and the rebate proportion became tied to assessments of MAO quality.  § 1395w-24(b)(1)(C)(i).

[20] Our decision here unquestionably results in cost savings for the Medicare Trust Fund because our holding on the meaning of the private cause of action will apply equally to private entities that provide prescription drug benefits pursuant to Medicare Part D.  *See* 42 U.S.C. § 1395w-151(b) (requiring that provisions relating to the MA program and MAOs be read to include part D plans).  Because Part D prescription drug plans explicitly share gains and losses with the federal government, 42 U.S.C. § 1395w-115(e), the Medicare Trust

Further, cost savings for the Medicare Trust Fund was not Congress's only goal when it created the MA program. Congress structured the program so that MAOs would compete for enrollees based on how efficiently they could provide care to Medicare-eligible individuals. When, by recovering from primary payers, MAOs save money, that savings results in additional benefits to enrollees not covered by traditional Medicare. Thus, ensuring that MAOs can recover from primary payers efficiently with a private cause of action for double damages does indeed advance the goals of the MA program.

We recognize that only Congress can create private rights of action and that "[t]he judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Sandoval*, 532 U.S. at 286 (2001) (citation omitted). The analysis here of text and legislative history lies strictly within the bounds of that task. Our understanding of the policy goals of the MA program merely buttresses what we have already found in the text of the Medicare Act: MAOs are not excluded from bringing suit under the MSP private cause of action.

**D.    *Chevron* Deference**

Although we hold the text of § 1395y(b)(3)(A) to unambiguously provide Humana with a private cause of action, we recognize that a declaration that the language of the Medicare Act is clear may be counterintuitive. After all,

---

Fund unquestionably loses money if these private entities recover less from primary payers.

27

the Medicare Act has been described as among "the most completely impenetrable texts within human experience." *Cooper Univ. Hosp. v. Sebelius*, 636 F.3d 44 (3d Cir. 2010) (quoting *Rehab. Ass'n of Va., Inc. v. Kozlowski*, 42 F.3d 1444, 1450 (4th Cir. 1994)). We therefore find that, even if the statute's text were deemed to be ambiguous, we would apply *Chevron* deference and would reach the same conclusion.

The Supreme Court in *Chevron* established a two-part test for determining when a federal court ought to defer to the interpretation of a statute embodied in a regulation formally enacted by the federal agency charged with implementing that statute. 467 U.S. at 842-43. First, the court must determine whether Congress's intent on the issue is clear — if so, it must abide by that intention, regardless of any regulations. If the statute is unclear, that is, "silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. We defer to the agency's regulations "unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844.

CMS "has the congressional authority to promulgate rules and regulations interpreting and implementing Medicare-related statutes." *Torretti v. Main Line Hosps., Inc.*, 580 F.3d 168, 174 (3d Cir. 2009); *see also* 42 U.S.C. §1395hh(a)(1) ("The Secretary shall prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this subchapter."); 42 U.S.C. § 1395w-26(b)(1) ("The Secretary shall establish by regulation [ ] standards . . . for [MA] organizations and plans consistent with, and to carry out, this part."). Thus, we must accord *Chevron* deference to regulations promulgated by CMS.

CMS regulations state that an "MA organization will exercise the same rights to recover from a primary plan, entity, or individual that the Secretary exercises under the MSP regulations in subparts B through D of part 411 of this chapter." 42 C.F.R. § 422.108. The plain language of this regulation suggests that the Medicare Act treats MAOs the same way it treats the Medicare Trust Fund for purposes of recovery from any primary payer. In this circumstance, we are bound to defer to the duly-promulgated regulation of CMS.

Later CMS statements lend further support to this understanding of the rule. In attempting to predict the savings generated for MAOs as a result of their secondary payer status, CMS "assume[d] a similar MSP rate for MA enrollees as obtains in original Medicare." Policy and Techinical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs, 74 Fed. Reg. 54634, 54711 (proposed Oct. 22, 2009). If MAOs lacked the recovery mechanism available to "original" Medicare, this assumption would be facially invalid.

Additionally, a recent memorandum from CMS specifically responded to decisions of the federal courts holding that MAOs were not "able to take private action to collection for [MSP] services under Federal law because they have been limited to seeking remedy in State court." Ctrs. for Medicare & Medicaid Svcs., Dep't of Health and Human Svcs. Memorandum: Medicare Secondary Payment Subrogation Rights (Dec. 5, 2011). This memorandum clarified that CMS itself understood § 422.108 to assign MAOs "the right (and responsibility) to collect" from primary

payers using the same procedures available to traditional Medicare.[21]  *Id.*

Glaxo argues that this regulation does not directly interpret the MSP private cause of action because the Secretary exercises the right to recover pursuant to § 1395y(b)(2)(B)(iii), which allows the United States to "bring an action against any or all entities that are or were required or responsible . . . to make payment . . . under a primary plan."  The government may then collect double damages, "in accordance with paragraph (3)(A)," the MSP private cause of action.  *Id.*  Glaxo's logic suggests that the regulation would allow MAOs to exercise rights to recovery under the government's cause of action, contrary to the plain language of the statute.  However, given the cross-reference within § 1395y(b)(2)(B)(iii), the statute itself equates the United States' right to recover with a private party's right to recover.  Thus, the regulation refers, ultimately, to the private cause of action in § 1395y(b)(3)(A) and deference to it supports Humana's right to bring suit under that provision.

## IV.    **CONCLUSION**

The language of the MSP private cause of action is broad and unrestricted and therefore allows any private plaintiff with standing to bring an action.[22]  Since private

---

[21]  The memorandum also noted that these same rights, responsibilities, and procedures apply to Part D prescription drug plan sponsors via 42 C.F.R. § 423.462.

[22] Because we find that Humana had the right to sue in federal court pursuant to § 1395y(b)(3)(A), we need not address its

health plans delivered Medicare services prior to the 1980 passage of the MSP Act, Congress was certainly aware that private health plans might be interested private parties when it drafted the cause of action, and it did not exclude them from that provision's ambit. That decision is logically consistent because affording MAOs access to the private cause of action for double damages comports with the broader policy goals of the MA program. Further, even if we were to find the statutory text to be ambiguous on the issue, *Chevron* deference to CMS regulations, which grant MAOs parity with traditional Medicare, would require us to find in favor of Humana here.

For all these reasons, we will reverse the District Court's dismissal of the complaint, pursuant to Rule 12(b)(6), and remand for further proceedings consistent with this opinion.

---

argument that the District Court also had jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).