IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: VIOXX PRODUCTS LIABILITY LITIGATION | * * * * * | MDL No. 1657 |
| | | SECTION L |
| | | |
| | | JUDGE ELDON E. FALLON |
| This document relates to: | * | |
| *D.C. ex. rel. Kenneth Walker v.* | * | MAGISTRATE JUDGE KNOWLES |
| *Merck & Company*, Civil Action No. 08-4148 | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF
HIS MOTION TO ALTER OR AMEND THE ORDER/JUDGMENT**

Plaintiff Kenneth Walker ("Plaintiff") hereby urges this court to amend and reconsider its order of dismissal entered on June 13, 2012 pursuant to Fed. R. Civ. Pro 59(e) and Fed. R. Civ. Pro 60(b). This is necessary to correct clear error and prevent manifest injustice. Reviewing the docket, it does not appear that the Clerk of the court has entered judgment respecting this order.

**1. Mr. Walker suffered economic injury when he paid for Vioxx when he would have opted for another medication if he had known of the risks associated with Vioxx.**

The Court erred when it concluded that "merely purchasing a drug – which in fact helped Plaintiff – does not generate an economic injury giving rise to Article III standing and Plaintiff has not alleged a concrete, particularized injury in fact to his economic interests." (Document #63924 at 12) This conclusion is contrary to the weight of authority from the District of Columbia. It appears that the Court recognizes that Plaintiff in fact expended his resources to pay for Vioxx, but suggests that this is not sufficient to confer standing because the drug "in fact helped Plaintiff." *Id.*

1

To start, the Court's conclusion that Vioxx "in fact helped Plaintiff" is central to the Court's analysis, but there is no allegation in the complaint from which the Court can fairly conclude that Mr. Walker benefited from taking Vioxx. In the Second Amended and Restated Complaint (Document #63713-2) the allegations relating to Mr. Walker can be found at paragraphs 149 through 159. *Id*. There is nothing in these paragraphs to support the conclusion that Vioxx "helped" Mr. Walker. Indeed, taking the facts in the light most favorable to the non-moving party, Mr. Walker, one might infer that taking Vioxx played a role in harming him. That is, at paragraph 156, it is alleged that while Mr. Walker was taking Vioxx he was treated for renal failure, high blood pressure, diabetes, and recurrent strokes. (Document #63713-2 ¶ 156) This fact combined with Merck's own admission on September 30, 2004 that it was withdrawing Vioxx from the market because there was new data suggesting that Vioxx produced an increased risk of cardiovascular events including strokes (Document #63713-2 ¶134) is enough to conclude that Vioxx increased the risk of harm to Mr. Walker and perhaps played a role in his worsening cardiovascular condition. At the least, these factors should bar the conclusion that Vioxx helped Mr. Walker, especially considering that the complaint must be read in the light most favorable to the plaintiff.

Once this risk became known to his medical providers, Mr. Walker was taken off Vioxx and prescribed Tylenol. *Id*. at ¶158. It is fair to infer that if his medical providers had known about the risks associated with Vioxx sooner, then they would have stopped prescribing the medication at that time, and prescribed something else. *Id*. at ¶¶ 159, 181, and 182. If Mr. Walker and his doctors had known of the risk, Mr. Walker would not have purchased the drug. *Id*. Mr. Walker and the class suffered "ascertainable losses in that they purchased and/or paid for, Vioxx without knowing the true and complete risks, dangers, disadvantages, and benefits of

2

Vioxx, in general, and specifically in comparison to alternative, and significantly less expensive NSAIDs." *Id*. at ¶181. Accordingly, taking the facts in the light most favorable to Mr. Walker, he did suffer particular and ascertainable loss, the cost of purchasing Vioxx, when he would have opted for something else.

The court's analysis further assumes that an economic injury under the DC Consumer Protection Procedure Act ("CPPA") will only confer standing if it is accompanied by some additional harm. In this case, the court's ruling is premised upon the absence of personal injury to the plaintiff. This analysis is flawed. Indeed, in each instance, where the courts of the District of Columbia have found standing under the CPPA, the consumers all received some benefit. The Court's analysis taken to logical extreme would deprive any consumer of a claim under the CPPA, because in each instance the consumer received some identifiable benefit. For example, the Court accepts the economic loss sustained by the consumer in *Shaw v. Marriott International*, 605 F.3d 1039 (D.C. Cir. 2010), because the plaintiffs suffered the obvious economic detriment of paying a hotel room rate that was 18% higher than expected. (Document #63924 at 11) However, even the consumer in *Shaw* received a benefit. That is, each of the consumers stayed in the Marriott Renaissance Moscow, and there is no indication that the room or services provided by the hotel were inadequate. *See Shaw*, 605 F.3d at 1041. Under the trial court's analysis in the case at bar, this benefit would deprive the *Shaw* consumers of the economic injury that confers standing.

Moreover, in discussing the impact of an economic loss on standing, the *Shaw* court cited *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 438 n. 10 (D.C. Cir. 1986) for the proposition that "economic loss clearly constitutes a distinct and palpable injury…" and then stated that,

3

"[d]amages under the CPPA would remedy that loss. Article III requires *no more*." *Id.* at 1042 (emphasis added). *Shaw* did not reject the plaintiffs' standing because their economic injuries were not accompanied by separate personal injuries that somehow lessened the value of the bargain. Rather, the individual plaintiffs did not pay for the hotel stay at all and therefore did not suffer any out-of-pocket loss. *Id.* In *Shaw*, plaintiffs consisted of the Center for Strategic and International Studies (CSIS) and two individuals: Britt Shaw and Sarah Mendelson. *Shaw*, 605 F.3d at 1041. The court found that CSIS had standing, because it paid for the hotel rooms. *Id.* at 1042. Shaw and Mendelson could not rely on economic injury for standing, however, "because their employers paid for their hotel stays." *Id.* Conversely, Mr. Walker has alleged that he paid both co-pays and the full cost of the medication Vioxx, and that he would not have purchased the drug if he had known about the risks associated with the drug. (Document #63713-2 ¶ ¶ 182) Thus, Mr. Walker suffered an Article III economic loss.

The Court was persuaded by the reasoning in *Rivera v. Wyeth-Ayerst Laboratories*, 283 F.3d. 315 (5th Cir. 2002) and *Williams v. Purdue Pharma Co.*, 297 F. Supp. 2d 171 (D.D.C. 2003). (*See* Document #63924 at 12) ("In light of the persuasive reasoning in *Williams* and *Rivera* with respect to the standing requirement for an economic injury…,"). It must be noted, however, that the Fifth Circuit decision in *Rivera*, *supra*, is at odds with the courts of the District of Columbia, which have consistently held that economic injury alone is sufficient to confer standing under the CPPA. As indicated above, the courts of the District of Columbia have conferred standing based upon economic injury without more. Furthermore, *Williams* sought to interpret the pre-October 19, 2000 version of the CPPA only. *Williams*, 297 F. Supp. 2d at 174.

### 2. Mr. Walker sustained a palpable statutory injury under the CPPA as defined by the substantive law of the District of Columbia.

The Court also erred in analyzing whether a statutory injury conferred standing on the plaintiff. The Court improperly considered the level of proof required to maintain a claim under the CPPA and expanded it to include reliance and causation. *Sullivan v. DB Invs.*, 667 F.3d 273, 285 (3d Cir. 2011), cert denied sub nom *Murray v. Sullivan*, 2012 U.S. LEXIS 2656 (April 2, 2012) (rejecting as "unwarranted" the "addition" of a "new requirement into the Rule 23 certification process" that "each class member possess a viable claim or 'some colorable legal claim'"). Specifically, the Court concluded that Plaintiff's "generalized and conclusory allegation does not suffice to show any plausible nexus or causation between Merck's conduct and Plaintiff as an individual." (Document #63924 at 15)  By this statement, the court is demanding proof of reliance and/or causation that is not required by the CPPA. According to the CPPA, commission of any of the enumerated acts is a violation of the statute "whether or not any consumer is in fact misled or deceived by the deceptive conduct." D.C. Code Section 28-3904. Additionally, *In re Light Cigarettes*, 271 F.R.D. 402 (2010), recently addressed the reliance argument raised by a defendant respecting the DC CPPA, and squarely rejected it:

> The Washington D.C. CPPA was amended in 2000 to read that it could be violated by misrepresentation "whether or not any consumer is in fact misled, deceived or damaged thereby." CPPA § 28-3904. The Defendants contend that one federal court has required reliance notwithstanding the CPPA's explicit language. Defs.' Resp. at 49 (citing *Williams v. Purdue Pharma Co.*, 297 F. Supp. 2d 171, 176 (D.D.C. 2003)). *Williams*, however, explicitly limited its reference to "claims that pre-date the October 19, 2000[] amendment to the CPPA." *Williams*, 297 F. Supp. 2d at 176. By its plain meaning, the CPPA "as amended[,] eliminates [the] requirements of injury in fact and causation." *Wells v. Allstate Ins. Co.*, 210 F.R.D. 1, 8 (D.D.C. 2002).

5

*In re Light Cigarettes Mktg. Sales Practies Litig.*, 271 F.R.D. 402, 418 (D. Me. 2010).

Furthermore, the courts of the District of Columbia have repeatedly asserted that consumer has a cause of action against any merchant on the supply side of the transaction. *See Byrd v. Jackson*, 902 A.2d. 778,781 (D.C. 2006) (one who advertises or offers goods or services to a consumer may qualify as a merchant under the DC CPPA without having ever "entered a formal contractual relationship with [the consumer] or received money."). Thus, it would be incorrect to conclude that there must be some closer relationship between the Merck and Walker to establish a consumer transaction actionable under the CPPA.

The courts of the District of Columbia have repeatedly concluded that a statutory violation of the CPPA confers standing to a consumer as defined by the statute to bring a claim against a merchant as defined by the statute. The District of Columbia Circuit's opinion in *Shaw* is instructive on whether a statutory injury is sufficient to confer standing. *See Shaw*, 605 F.3d at 1042 ("The question is whether Shaw and Mendelson are within the class of individuals protected by the CPPA. To answer that, we must apply the substantive law of the District of Columbia. *Smith v. Wash. Sheraton Corp.*, 135 F.3d 779, 782, (D.C. Cir. 1998). 'Our duty, then, is to achieve the same outcome we believe would result if the District of Columbia Court of Appeals considered this case.' *Novak v. Capital Mgmt. & Dev. Corp.*, 452 F.3d 902, 907, (D.C. Cir. 2006)."). Thus, by not applying the standards of *Grayson* to the statutory injury analysis, the Court erred. The Court's reliance on *Williams* is improper, because the *Williams* conclusion that the CPPA did not confer standing to pursue a pure statutory violation without a personal injury, was issued before the D.C. Court of Appeals issued its decision in *Shaw* and *Grayson v. ATT Corp.*, 15 A.3d 219, 249-250 (D.C. 2011). The ultimate conclusion in *Williams* on both standing based upon economic injury and standing based on statutory injury has been

6

undermined by subsequent decisions of the D.C. Court of Appeals and the D.C. Circuit. *See Grayson* 15 A.3d at 249; *Shaw*, 605 F.3d at 1042.

The Court's error is apparently based on a misreading of the class "class of individuals protected by the CPPA." *Id*. The statutory rights conferred by the CPPA are actionable as long as the plaintiff is "within the class of individuals protected by the CPPA." *Id*. To be within this class of individuals, the plaintiff must simply be a consumer. *Id*. at 1043 (citing *Ford v. ChartOne, Inc.*, 908 A.2d 72, 81 (D.C. 2006); *Dist. Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 717 (D.C. 2003)); *see also Grayso*n, 15 A.2d at 249-250. Relying on District of Columbia law, *Shaw* outlines what consumer status entails:

> Though the statute defines "person" broadly, id. § 3901(a)(1), the District of Columbia Court of Appeals has held that the CPPA protects only consumers, see *Ford v. ChartOne, Inc*., 908 A.2d 72, 81 (D.C. 2006); *Dist. Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 717 (D.C. 2003).
>
> We first look to the statute's text to determine whether Shaw and Mendelson engaged in "consumer" transactions within the meaning of the Act. … The CPPA defines "consumer" both as a noun and an adjective. In relevant part, the noun "consumer" means "a person who does or would . . . receive consumer goods or services," D.C. CODE § 28-3901(a)(2), or "a person who does or would provide the economic demand for" "any act which does or would create, alter, repair, furnish, make available, provide information about, or, directly or indirectly, solicit or offer for or effectuate, a sale, lease or transfer, of consumer goods or services," *id*. § 3901(a)(2), (6). When used as an adjective, as in the phrase "consumer goods," the word means "primarily for personal, household, or family use." *Id*. § 3901(a)(2). We read these provisions together to define "consumer" as a person who receives or demands goods or services that are primarily for personal, household, or family use.
>
> Precedent from the District of Columbia Court of Appeals confirms this reading of the Act. In *Ford v. ChartOne*, the District of Columbia Court of Appeals held that a person who had purchased his medical records for the purpose of future litigation had engaged in a consumer transaction under the CPPA because pursuing compensation for injuries was a personal motive. 908 A.2d at 83. *Ford* also noted with approval a district court decision that held that a cab driver's purchase of gasoline was not

7

> covered by the CPPA, *id*. at 84 n.12, because it was made "in connection with his role as an independent businessman," and not primarily for personal use, *id*. at 81 (quoting *Mazanderan v. Indep. Taxi Owners' Ass'n*, 700 F. Supp. 588, 591 (D.D.C. 1988)). These cases teach that purpose is the touchstone of the CPPA's definition of "consumer" and that the statute does not reach transactions intended primarily to promote business or professional interests.

*Id*. Under District of Columbia law, to be a consumer a person must "receive[] or demand[] goods or services that are primarily for personal, household, or family use." *Id*. If a person meets this simple qualification then he is within the purview of the CPPA. Once consumer status is justified, then the CPPA's statutory protections apply, and a plaintiff need not show economic or physical injury. *Id*. Plaintiff has clearly pled that he "received or demanded" Vioxx for personal use. (*See* Document 63713-2 ¶¶ 149-159) Plaintiff is therefore a consumer under the CPPA, and is "within the class of individuals protected by the CPPA." *Shaw*, 605 F.3d at 1042.

All of these requirements and parameters of the CPPA are further laid out in *Adler v. Vision Lab Telecomms. Inc*., 393 F. Supp. 2d 35, 40 (D.D.C. 2005):

> The DCCPPA regulates transactions between a consumer and a merchant. D.C. Code § 28-3904. *See Independent Communications Network, Inc. v. MCI Telecommunications Corp*., 657 F. Supp. 785, 787 (D.D.C. 1987) (DCCPPA "was intended to apply only to trade practices arising out of the supplier-purchaser relationship") (citing *Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 709 (D.C. 1981); see also *Slaby v. Fairbridge*, 3 F. Supp. 2d 22, 27 (D.D.C. 1998). A "consumer" is "a person who does or would purchase, lease (from), or receive consumer goods or services, … or a person who does or would provide the economic demand for a trade practice." D.C. Code § 28-3901(a)(2). A "merchant" is "a person who does or would sell, lease (to), or transfer, either directly or indirectly, consumer goods or services, or a person who does or would supply the goods or services which are or would be the subject matter of a trade practice." *Id*. § 28-3901(a)(3). The Act defines a "trade practice" as "any act which does or would create, … make available … or effectuate, a sale, lease, or transfer of consumer goods or services." *Id*. § 28-3901(a)(6). Finally, "goods and services" are defined broadly as "any and all parts of the economic output of society, at any stage or related or necessary point

8

> in the economic process ...." *Id*. § 28-3901(a)(7). A merchant need not be the "actual seller of the goods or services" complained of, but must be "connected with the 'supply' side of the consumer transaction." *Save Immaculata/Dunblane, Inc. v. Immaculata Prep. Sch.*, 514 A.2d 1152, 1159 (D.C. 1986). Thus, parties providing recommendations of the goods or services of a particular merchant to the consumer assume liability only when they are involved in supply side of the transaction. *See Calvetti v. Antcliff*, 346 F. Supp. 2d 92, 104-05 (D.D.C. 2004) (Antcliff's involvement beyond the recommendation of a particular contractor, in which he obtained supplies and contracts with vendors and agreed to oversee and monitor the contractor's work, placed him on the supply side of the transaction and within the scope of the DCCPPA); *Howard*, 432 A.2d at 710 (Riggs Bank employee's recommendation of a contractor to perform home repair did not fall under DCCPPA because Riggs was not a "merchant").

*Id*.

The instant case meets every one of these requirements. To start, Mr. Walker was undoubtedly a consumer of Vioxx. (*See* Document 63713-2 ¶¶ 149-159) Merck was undoubtedly the merchant seller of Vioxx. Merck undoubtedly engaged in a trade practice when it sold and marketed Vioxx, and Vioxx is undoubtedly a good or service. Thus, under every applicable District of Columbia standard, Mr. Walker is within the class of individuals protected by the CPPA." *Shaw*, 605 F.3d 1039. Because Mr. Walker is within this class, "[t]he deprivation of ... a statutory right [to be 'free from improper trade practices'] may constitute an injury-in-fact sufficient to establish standing, even though the plaintiff 'would have suffered no judicially cognizable injury in the absence of [the] statute.'" *Grayson* 15 A.2d at 249 (quoting *Shaw*, 605 F.3d 1039). Merck's harmful trade practices denied Mr. Walker material information to which he was entitled. This caused an injury under the CPPA, and this injury affords Mr. Walker standing to proceed. *Grayson* 15 A.2d at 249. Furthermore, Plaintiff proffered evidence that Merck orchestrated a nationwide marketing campaign that hid and manipulated material information about Vioxx. *See Shaw*, 605 F.3d at 1042 (finding that Marriott caused plaintiffs'

losses because it exercised control over culpable franchises owned and operated by independent contractors). Therefore there can be no doubt that Mr. Walker's Vioxx related statutory injury traces directly back to Merck.

For these reasons, we urge the Court to reconsider and set-aside its ruling of June 13, 2012.

Respectfully submitted,

DATED: July 11, 2012                /s/ H. Vincent McKnight_____

H. Vincent McKnight
vmcknight@mcknightandkennedy.com
MCKNIGHT & KENNEDY, LLC
8601 Georgia Avenue, Suite 1010
Silver Spring, MD 20910
(301) 565-5281

Elizabeth J. Cabraser
ecabraser@lchb.com
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone:  (415) 956-1000
Facsimile:   (415) 956-1008

Dawn M. Barrios (#2821)
barrios@bkc-law.com
BARRIOS KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Telephone:  (504) 524-3300
Facsimile:  (504) 524-3313

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing has been served on Liaison Counsel, Russ Herman and Phillip Wittmann, by U.S. Mail and e-mail or by hand delivery and e-mail, upon Liaison Counsel Ann Oldfather by e-mail, and upon all parties by electronically uploading same to LexisNexis File & Serve Advanced in accordance with Pre-Trial Order No. 8B, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 1657, on this 11th day of July 2012.

                                                  /s/ Dawn M. Barrios_____
                                                  Dawn M. Barrios