

2 of 7 DOCUMENTS

In re: WHIRLPOOL CORPORATION FRONT-LOADING WASHER PRODUCTS
LIABILITY LITIGATION. GINA GLAZER, Individually and on behalf of all
others similarly situated; TRINA ALLISON, Individually and on behalf of all others
similarly situated, Plaintiffs-Appellees, v. WHIRLPOOL CORPORATION,
Defendant-Appellant.

No. 10-4188

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

12a0115p.06; *678 F.3d 409*; *2012 U.S. App. LEXIS 9002*; *2012 FED App. 0115P (6th Cir.)*; CCH Prod. Liab. Rep. P18,831

**January 12, 2012, Argued**
**May 3, 2012, Decided**
**May 3, 2012, Filed**

**SUBSEQUENT HISTORY:** Rehearing denied by, Rehearing, en banc, denied by *Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig. v. Whirlpool Corp., 2012 U.S. App. LEXIS 12560 (6th Cir., June 18, 2012)*

**PRIOR HISTORY:** [**1]
  Appeal from the United States District Court for the Northern District of Ohio at Cleveland. No. 08-wp-65000--James S. Gwin, District Judge.
*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig., 2010 U.S. Dist. LEXIS 69254 (N.D. Ohio, July 12, 2010)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant corporation brought an interlocutory appeal of the decision of the United States District Court for the Northern District of Ohio to certify an Ohio liability class under *Fed. R. Civ. P. 23(a)* and *(b)(3)*. Appellee named class members claimed that certain washing machines from the corporation had design defects. The liability class was comprised of Ohio residents who purchased one of the washing machines in Ohio.

**OVERVIEW:** The court held that the *Rule 23(a)* and *(b)(3)* prerequisites were met. The numerosity requirement of *Rule 23(a)(1)* was met because the evidence showed that the corporation shipped thousands of washing machines to Ohio for retail sale, which affected a substantial number of consumers. Whether design defects in the machines proximately caused mold or mildew to grow and whether the corporation adequately warned consumers about the propensity for mold growth were liability issues common to the class. The named members were typical of the class members because they purchased machines, used them for domestic purposes, and experienced problems with mold despite remedial efforts. The court ruled that the named members and their class counsel would adequately represent the class, and that the class as defined was not too broad. The named members' proof showed that common questions predominated over individual ones and that the class action mechanism was a superior method to adjudicate the claims fairly and efficiently.

**OUTCOME:** The decision was affirmed.

Case 2:05-md-01657-EEF-DEK   Document 63993-1   Filed 07/16/12   Page 2 of 9

Page 2

678 F.3d 409, *; 2012 U.S. App. LEXIS 9002, **1;
2012 FED App. 0115P (6th Cir.), ***; CCH Prod. Liab. Rep. P18,831

**COUNSEL:** ARGUED: Malcolm E. Wheeler, WHEELER TRIGG O'DONNELL LLP, Denver, Colorado, for Appellant.

Jonathan D. Selbin, LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP, New York, New York, for Appellees.

ON BRIEF: Malcolm E. Wheeler, Michael T. Williams, Galen D. Bellamy, Joel S. Neckers, WHEELER TRIGG O'DONNELL LLP, Denver, Colorado, F. Daniel Balmert, Anthony J. O'Malley, VORYS, SATER, SEYMOUR AND PEASE LLP, Cleveland, Ohio, for Appellant.

Jonathan D. Selbin, Jason L. Lichtman, LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP, New York, New York, for Appellees.

John H. Beisner, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Washington, D.C., for Amicus Curiae.

**JUDGES:** Before: KENNEDY, MARTIN, and STRANCH, Circuit Judges.

**OPINION BY:** JANE B. STRANCH

**OPINION**

[*412] [***2] JANE B. STRANCH, Circuit Judge. Whirlpool Corporation brings this interlocutory appeal of the district court's decision to certify an Ohio plaintiff liability class under *Federal Rule of Civil Procedure 23(a)* and *(b)(3)*. The case involves multi-district litigation concerning alleged design defects in Whirlpool's Duet®, Duet HT®, Duet Sport®, and Duet Sport [**2] HT® front-load washing machines ("the Duets").[1] Named plaintiffs Gina Glazer and Trina Allison alleged on behalf of the class that the Duets do not prevent or eliminate accumulating residue, which leads to the growth of mold and mildew in the machines, ruined laundry, and malodorous homes.

> 1   Whirlpool is supported in this appeal by the Product Liability Advisory Council as amicus curiae.

As certified, the liability class is comprised of current Ohio residents who purchased one of the specified Duets in Ohio primarily for personal, family, or household purposes and not for resale, and who bring legal claims for tortious breach of warranty, negligent design, and negligent failure to warn. Proof of damages is reserved for individual determination. Because the district court did not abuse its discretion in certifying the Ohio plaintiff liability class, we AFFIRM.

**I. BACKGROUND**

The named plaintiffs are Ohio residents. In 2005 Trina Allison purchased a Whirlpool Duet HT® washing machine. In 2006 Gina Glazer bought a Duet Sport® washing machine. Allison used high efficiency ("HE") detergent in her washing machine, while Glazer used a reduced amount of regular detergent. Within six to eight months [**3] after their purchases, the plaintiffs noticed the smell of mold or mildew emanating from the machines and from laundry washed in the machines. Allison [*413] found mold growing on the sides of the detergent dispenser, and Glazer noticed mold growing on the rubber door seal. Although both plaintiffs allowed the machine doors to stand [***3] open as much as possible and also used ordinary household products to clean the parts of the machines they could reach, their efforts achieved only temporary relief from the pungent odors.

Allison contacted Whirlpool about the problem. A company representative told her to use the washer's monthly cleaning cycle, add an Affresht[TM] tablet to that cleaning cycle, and manually clean under the rubber door seal. Allison followed this advice, but when the problem persisted, she placed a service call. The technician who examined the washing machine advised Allison to leave the door open between laundry cycles to let the machine air-dry.

Glazer also complained to Whirlpool. A company representative advised her to switch to HE detergent and Glazer did so. Whirlpool's Use & Care Guide recommended adding bleach to the washer's cleaning cycle, but Glazer did not utilize the cleaning cycle or use bleach to clean her washing machine.

Allison and Glazer continued to experience a mold problem. Neither of them knew at the time of purchase that a Duet washer could develop mold or mildew inside the machine. They allege that, if this information had been disclosed to them, their purchase [**4] decisions would have been affected.

Whirlpool began selling the Duet® and Duet HT®

Case 2:05-md-01657-EEF-DEK   Document 63993-1   Filed 07/16/12   Page 3 of 9

Page 3

678 F.3d 409, *413; 2012 U.S. App. LEXIS 9002, **4;
2012 FED App. 0115P (6th Cir.), ***3; CCH Prod. Liab. Rep. P18,831

front-load washing machines in 2002. These washers are built on the "Access" platform and are nearly identical, although certain models have functional or aesthetic differences. In 2006, Whirlpool began selling the smaller-capacity Duet Sport® and Duet Sport HT® front-load washing machines, which are built on the "Horizon" platform. These machines are also nearly identical, although some models have functional or aesthetic differences. The "Access" and "Horizon" platforms are nearly identical to each other. The two differences are that the "Access" platform is slightly larger than the "Horizon" and the "Access" is tilted a few degrees from the horizontal axis, while the "Horizon" is not.

In contrast to a top-load washing machine, a front-load washer contains a wash basket within a tub that rotates on a horizontal axis to create a tumbling mechanical wash [***4] action instead of the agitation characteristic of top-load machines. A front-load washing machine offers the consumer greater water and energy savings than a top-load machine because it needs less energy to heat water, it maintains lower temperatures [**5] during the wash, and the "tumbling" mechanical motion is more energy efficient than the "spinning" of a top-load machine. Front-load washing machines are designed for use with HE detergent. While all washing machines have the potential to develop some mold or mildew after a period of use, front-load machines promote mold or mildew more readily due to lower water levels, high moisture, and reduced ventilation.

In support of their motion for class certification, plaintiffs produced the report of an expert who opined that the common design defect in the Duets is their failure to clean or rinse their own components to remove residue consisting of dried suds, fabric softener, soil, lint, body oils, skin flakes, and hair. Bacteria and fungi feed on the residue, and their excretions produce offensive odors. Plaintiffs allege that the Duets fail to clean the back of the tub that holds the clothes basket, the aluminum bracket used to attach the clothes basket to the tub, the sump area, the [*414] pump strainer and drain hose, the door gasket area, the air vent duct, and the detergent dispenser duct.

Plaintiffs' evidence shows that Whirlpool knew the design of its Access and Horizon platforms contributed [**6] to residue buildup resulting in rapid fungal and bacterial growth. As early as September 2003, Whirlpool began receiving two to three customer complaints each day about the problem. When Whirlpool representatives instructed consumers to lift up the rubber door gaskets on their machines, the common findings were deposits of water, detergent, and softener, along with mold or mildew. Service call reports confirmed problems around the rubber door gaskets, as well as residue deposits and black mold inside the drain hoses. Whirlpool also knew that numerous consumers complained of breathing difficulties after repair technicians scrubbed the Duets in their homes, releasing mold spores to the air.

In 2004 Whirlpool formed an internal team to analyze the problems and formulate a plan. In gathering information about the complaints, Whirlpool learned that the mold problem was not restricted to certain models or certain markets. Whirlpool also [***5] knew that mold growth could occur before the Duets were two to four years old, that traditional household cleaners were not effective treatments, and that consumer laundry habits and use of non-HE detergent might exacerbate the problem, but did not cause [**7] it. Whirlpool contemplated whether it should issue a warning to consumers about the mold problem. To avoid alarming consumers with words like "mold," "mildew," "fungi," and "bacteria," Whirlpool adopted the term "biofilm" in its public statements about mold complaints.

Later in 2004, Whirlpool engineers discussed the need to redesign the tub on the "Horizon" platform because soil and water pooling served as the nucleation site for mold and bacterial growth. Chemical analysis Whirlpool conducted showed that the composition of biofilm found in the "Horizon" and "Access" platforms was identical. Engineers determined that the "Access" platform's webbed tub structure was extremely prone to water and soil deposits, and the aluminum basket cross-bar was extremely susceptible to corrosion from biofilm. Whirlpool found a number of design factors contributing to corrosion, including insufficient draining of water at the end of a cycle and water flowing backward after draining through the non-return valve between the tub and the drain pump. The company made certain design changes to later generations of Duets.

By 2005, Whirlpool unveiled a special cleaning cycle in the Duets, but the company was [**8] aware that the new cycle would not remove all residue deposits. Engineers remained concerned whether the cleaning cycle would be effective to control odor and whether the

Case 2:05-md-01657-EEF-DEK   Document 63993-1   Filed 07/16/12   Page 4 of 9

Page 4

678 F.3d 409, *414; 2012 U.S. App. LEXIS 9002, **8;
2012 FED App. 0115P (6th Cir.), ***5; CCH Prod. Liab. Rep. P18,831

use of bleach in the cleaning cycle would increase corrosion of aluminum parts. By March 2006 Whirlpool acknowledged that consumers might notice black mold growing on the bellows or inside the detergent dispenser, and that laundry would smell musty if the machine was "heavily infected."

By late 2006, having received over 1.3 million calls at its customer care centers and having completed thousands of service calls nationwide, Whirlpool internally acknowledged its legal exposure, noting that it had already settled a class action [***6] concerning its Calypso machines, and that Maytag, another of Whirlpool's brands, had settled a class action concerning the Neptune washer.

At this point, Whirlpool decided to formulate a new cleaning product for all front-load washing machines, regardless of [*415] make or model. Whirlpool expected the "revolutionary" product to produce a new revenue stream of $50 million to $195 million based on the assumption that fifty percent of the 14 million current front-load washer owners might be looking for [**9] a solution to an odor problem with their machines.

In September 2007 Whirlpool introduced to the market two new front-load washer cleaning products: Affresh[TM] tablets for washers in use from zero to twelve months, and Affresh[TM] tablets with six door seal cleaning cloths for machines in use more than twelve months. To encourage sales, the company placed samples of Affresh[TM] tablets in all new Whirlpool and Maytag HE washers. Whirlpool marketed Affresh[TM] as "THE solution to odor causing residue in HE washers." The company changed its Use and Care Guides for Whirlpool, Maytag, and Amana brands to advise consumers to use an Affresh[TM] tablet in the first cleaning cycle to remove manufacturing oil and grease. Whirlpool believed this advice would encourage consumers to use the cleaning cycle and Affresh[TM] tablets regularly, like teaching vehicle owners to change the oil in their cars. Service technicians and call centers were instructed to recommend the use of Affresh[TM] to consumers. But as plaintiff Allison learned from experience, even using Affresh[TM] tablets in the washer's special cleaning cycle did not cure the mold problem.

Whirlpool shipped 121,033 "Access" platform Duet washers to Ohio from [**10] 2002 through March 2009. Whirlpool shipped 41,904 ?Horizon" platform Duet Sport washers to Ohio during the period 2006 through March 2009.

In the district court, Whirlpool opposed class certification primarily on the grounds that: the vast majority of Duet owners have not had a mold problem with their washing machines and the incidence of mold is actually rare; Whirlpool made dozens of changes between 2002 and 2009 to increase customer satisfaction and reduce service costs; washers owned by class members were built on different platforms, involve twenty-one different engineering models, spanning nine model years; and consumer laundry habits and experiences with the Duets are so diverse that even the two named plaintiffs do not present a common liability question. Whirlpool contended that numerous liability questions exist as to each of the legal claims, requiring individual proof of the elements of each claim by each consumer.

In support of its arguments, Whirlpool presented copies of its Use & Care Guides, various articles from Consumer Reports, deposition excerpts, affidavits from employees and satisfied Duet owners, expert reports, internal company documents, and photographs. Whirlpool [**11] also provided its data showing that the rate of consumer complaints about the mold problem was far less than the plaintiffs alleged. The company contends that its figures undercut the plaintiffs' assertion that thirty-five percent of Whirlpool customers complained about mold. Whirlpool requested permission to present live testimony at the class action certification hearing, but ultimately did not do so.

After reviewing the factual record and hearing the parties? oral arguments, the district court determined that the *Rule 23(a)* and *(b)(3)* prerequisites were met as to liability on plaintiffs' claims for tortious breach of warranty, negligent design, and negligent failure to warn. The court certified the following liability class:

> All [**12] persons who are current residents of Ohio and purchased a Washing Machine (defined as Whirlpool Duet®, Duet HT®, and Duet Sport® Front-Loading Automatic Washers) for primarily personal, [*416] family or household purposes, and not for resale, in Ohio, excluding (1) Whirlpool, any entity in which Whirlpool has a controlling interest, and its legal representatives, officers, directors, employees, assigns, and

Case 2:05-md-01657-EEF-DEK   Document 63993-1   Filed 07/16/12   Page 5 of 9

Page 5

678 F.3d 409, *416; 2012 U.S. App. LEXIS 9002, **12;
2012 FED App. 0115P (6th Cir.), ***6; CCH Prod. Liab. Rep. P18,831

successors; (2) Washing Machines purchased through Whirlpool's Employee Purchase Program; (3) the Judge to whom this case is assigned, any member of the Judge's staff, and any member of the Judge's immediate family; (4) persons or entities who distribute or resell the Washing Machines; (5) government entities; and (6) claims for personal injury, wrongful death, and/or emotional distress.

Whirlpool appeals the district court's decision to certify this class.

## II. ANALYSIS

### A. Standard of Review

The district court has broad discretion to decide whether to certify a class. *In re Am. Med. Sys., Inc., 75 F.3d 1069, 1079 (6th Cir. 1996)*. We review class certification for an abuse of discretion. *Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich., 654 F.3d 618, 629 (6th Cir. 2011)*. An [**13] abuse of discretion occurs if the district court relies on clearly erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment. Id.

### B. The Class Action Determination

*1. The requirements of Rule 23(a) and (b)(3)*

To obtain class certification, the plaintiffs must show that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.? *Fed. R. Civ. P. 23(a)*. *Rule 23(a)*'s requirements of numerosity, commonality, typicality, and adequate representation serve to limit class claims to those which are fairly encompassed within the claims of the named plaintiffs. *Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2550, 180 L. Ed. 2d 374 (2011)*.

The proposed class must also meet at least one of the three requirements listed in *Rule 23(b)*. *Id. at 2548*; *Sprague v. Gen. Motors Corp., 133 F.3d 388, 397 (6th Cir. 1998)* (en banc). The plaintiffs [**14] sought class certification under *(b)(3)*, which requires a demonstration that questions of law or fact common to the class predominate over individual questions and that the class action is superior to other available methods to adjudicate the controversy fairly and efficiently. The plaintiffs had the burden to prove that the class certification prerequisites were met, *In re Am. Med. Sys., Inc., 75 F.3d at 1079*, and the plaintiffs, as class representatives, were required to establish that they [***9] possess the same interest and suffered the same injury as the class members they seek to represent. *Dukes, 131 S. Ct. at 2550*.

*2.* Eisen *and consideration of the merits at the class certification stage*

Class certification is appropriate if the court finds, after conducting a "rigorous analysis," that the requirements of *Rule 23* have been met. *Dukes, 131 S. Ct. at 2551*; *Daffin v. Ford Motor Co., 458 F.3d 549, 552 (6th Cir. 2006)*. Ordinarily, this means that the class determination should be predicated on evidence the parties present concerning the maintainability of the class action. *In re Am. Med. Sys., Inc.,* [*417] *75 F.3d at 1079*. "[S]ometimes it may be necessary for the court to probe behind the pleadings [**15] before coming to rest on the certification question," *Gen. Tele. Co. of Southwest v. Falcon, 457 U.S. 147, 160, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)*, and "rigorous analysis" may involve some overlap between the proof necessary for class certification and the proof required to establish the merits of the plaintiffs' underlying claims. *Dukes, 131 S. Ct. at 2551*. There is nothing unusual about "touching aspects of the merits in order to resolve preliminary matters . . . [because doing so is] a familiar feature of litigation." *Id. at 2552*.

Like some other federal courts, this Court had ruled that a district judge need not consider the merits of a case when entertaining a class certification motion in light of the Supreme Court's statement in *Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177, 94 S. Ct. 2140, 40 L. Ed. 2d 732 (1974)*, that "nothing in either the language or history of *Rule 23* . . . gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *See e.g., Beattie v. CenturyTel, Inc., 511 F.3d 554, 560 (6th Cir. 2007)* (quoting *Eisen* to hold that

Case 2:05-md-01657-EEF-DEK   Document 63993-1   Filed 07/16/12   Page 6 of 9

Page 6

678 F.3d 409, *417; 2012 U.S. App. LEXIS 9002, **15;
2012 FED App. 0115P (6th Cir.), ***9; CCH Prod. Liab. Rep. P18,831

district court did not have to inquire into the merits of the suit to resolve *Rule 23* issues). In *Dukes*, [**16] however, the Supreme Court clarified that courts may inquire preliminarily into the merits of a suit to determine if class certification is proper, although courts need not resolve all factual disputes on the merits before deciding if class certification is warranted. *Dukes, 131 S.Ct. at 2551-52 & n.6* ("To the extent the quoted statement [from *Eisen*] goes beyond the permissibility of a merits inquiry for any other pretrial purpose, it is the purest dictum and is contradicted by our other cases.").

[***10] We have indicated, both before and after *Dukes*, that *Eisen* "merely stand[s] for the proposition that . . . the relative merits of the underlying dispute are to have no impact upon the determination of the propriety of the class action." *Gooch v. Life Investors Ins. Co. of Am., 672 F.3d 402, 432 (6th Cir. 2012)* (quoting *Thompson v. Cnty. of Medina, Ohio, 29 F.3d 238, 241 (6th Cir. 1994))* (alteration in original) (internal quotation marks omitted). "[W]hether the class members will ultimately be successful in their claims is not a proper basis for reviewing a certification of a class action." *Daffin, 458 F.3d at 552*.

Other federal appellate decisions are in accord with the view of Supreme Court [**17] precedent articulated by this Court. For example, the Third Circuit held after *Dukes* that courts need not address at the class certification stage any merits inquiry that is unnecessary to the *Rule 23* determination and that any findings made for class certification purposes do not bind the fact-finder on the merits. *Behrend v. Comcast Corp., 655 F.3d 182, 190 (3d Cir. 2011)*. *Behrend* is consistent with the Third Circuit's pre-*Dukes* jurisprudence holding that "*Eisen* is best understood to preclude only a merits inquiry that is not necessary to determine a *Rule 23* requirement" and noting that other courts of appeal had agreed. *In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 317 & n.17 (3d Cir. 2008)* (and cases cited therein). Similarly, the Fourth Circuit had held before *Dukes* that "*Eisen* simply restricts a court from expanding the Rule 23 certification analysis to include consideration of whether the proposed class is likely to prevail ultimately on the merits." *Gariety v. Grant Thornton, LLP, 368 F.3d 356, 366 (4th Cir. 2004)*. The Seventh Circuit recently observed that a district court must resolve factual disputes necessary to class certification, but that "the court should [**18] not turn [*418] the class certification proceedings into a dress rehearsal for the trial on the merits." *Messner v. Northshore Univ. HealthSystem, 669 F.3d 802, 811 (7th Cir. 2012)*.

Whirlpool contends that the district court improperly relied on *Eisen* to avoid consideration of the merits of plaintiffs' legal claims, failed to conduct the required "rigorous analysis" of the factual record, and failed to make specific findings to resolve factual disputes before certifying the liability class. We disagree. The district court [***11] closely examined the evidentiary record and conducted the necessary "rigorous analysis" to find that the prerequisites of *Rule 23* were met. *See Gooch, 672 F.3d at 418* (rejecting a similar argument and concluding that the district court "probed behind the pleadings, considering all of the relevant documents that were in evidence").

3. Plaintiffs' proof on the Rule 23(a) prerequisites

**a. Numerosity**

Like the district court, we can safely conclude that the numerosity requirement of *Rule 23(a)(1)* is met. While no strict numerical test exists, "substantial" numbers of affected consumers are sufficient to satisfy this requirement. *Daffin, 458 F.3d at 552*. The evidence shows that Whirlpool [**19] shipped thousands of Duet washers to Ohio for retail sale. This is sufficient evidence to support the certification of a class of all Ohio residents who purchased a Duet in Ohio.

**b. Commonality, typicality, and fair representation**

*Rule 23(a)(2)* requires plaintiffs to prove that there are questions of fact or law common to the class, and *Rule 23(a)(3)* requires proof that plaintiffs' claims are typical of the class members' claims. To demonstrate commonality, plaintiffs must show that class members have suffered the same injury. *Dukes, 131 S. Ct. at 2551*. "Their claims must depend upon a common contention . . . of such a nature that it is capable of classwide resolution--which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*. The court's inquiry focuses not on whether common questions can be raised, but on whether a class action will generate common answers that are likely to drive resolution of the lawsuit. *Id*.

Commonality and typicality "tend to merge" because both of them "serve as guideposts for determining

Case 2:05-md-01657-EEF-DEK   Document 63993-1   Filed 07/16/12   Page 7 of 9

Page 7

678 F.3d 409, *418; 2012 U.S. App. LEXIS 9002, **19;
2012 FED App. 0115P (6th Cir.), ***11; CCH Prod. Liab. Rep. P18,831

whether under the particular circumstances maintenance of a class action is economical [**20] and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Dukes, 131 S. Ct. at 2551 n.5*. These two factors also tend [***12] to merge with the requirement of adequate representation, although the latter factor also brings into play concerns about competency of class counsel and any conflicts of interest. *Id*. Accordingly, we will consider these factors together. *See Gooch, 672 F.3d at 429* (considering typicality and adequate representation together).

Whirlpool contends that plaintiffs cannot show commonality because the Duets were built over a period of years on different platforms, there were approximately twenty-one different models manufactured during that time, and consumer laundry habits vary widely by household. Whirlpool also suggests that the district court erroneously identified the alleged design defect as the use of "less and cooler water."

[*419] The district court did not make the mistake that Whirlpool alleges. Whirlpool's own lead engineer stated that the Duets' use of less and cooler water, among other factors, encouraged mold growth. The district court well understood [**21] the proof to show that there were various alleged design defects in the Duets that allowed "biofilm" to collect and mold to grow. More importantly, the district court reached the conclusion that the issues relating to the alleged design defects and the adequacy of Whirlpool's warnings to consumers are likely to result in common answers, thus advancing the litigation. *See Dukes, 131 S. Ct. at 2551*; *Gooch, 672 F.3d at 427*. "[T]here need only be one question common to the class[,]" *Sprague, 133 F.3d at 397*, and "[n]o matter how individualized the issue of damages may be, these issues may be reserved for individual treatment with the question of liability tried as a class action." *Sterling v. Velsicol Chem. Corp., 855 F.2d 1188, 1197 (6th Cir. 1988)*.

Based on the evidentiary record, the district court properly concluded that whether design defects in the Duets proximately caused mold or mildew to grow and whether Whirlpool adequately warned consumers about the propensity for mold growth are liability issues common to the plaintiff class. These issues are capable of classwide resolution because they are central to the validity of each plaintiff's legal claims and they will generate common [**22] answers likely to drive the resolution of the lawsuit.

Whirlpool asserts that proof of proximate cause will require individual determination, but the record shows otherwise. Whirlpool's own documents confirm [***13] that its design engineers knew the mold problem occurred despite variations in consumer laundry habits and despite remedial efforts undertaken by consumers and service technicians. Plaintiffs' expert, Dr. Gary Wilson, opined that consumer habits and the home environment in which a Duet sits could influence the amount of biofilm buildup, but those factors were not the underlying cause of biofilm buildup. Whirlpool contends that Dr. Wilson did not evaluate later design changes to the Duets to see if they rectified the mold problem. As we read the pertinent testimony and expert report, Dr. Wilson acknowledged that Whirlpool made some changes to the "Access" platform tub design, but there continued to be other areas in the machine that collected debris. He also examined a new "Horizon" platform washer and found that it still had cavities on the inside of the tub exposed to the water side, increasing the likelihood of biofilm collection. Dr. Wilson testified that even removing those [**23] cavities would not eliminate the biofilm problem. *See Samuel-Bassett v. KIA Motors Am., Inc., 34 A.3d 1, 13 (Pa. 2011)* (rejecting claim that design changes defeated commonality and predominance where modifications did not significantly alter the basic defective design).

Because the plaintiffs have produced evidence of alleged common design flaws in the Duet platforms, this case is dissimilar to *In re Am. Med. Sys., 75 F.3d 1069*, a case on which Whirlpool relies. In that case, the commonality factor was not satisfied because plaintiffs did not allege any particular defect common to all plaintiffs where there were at least ten different prosthesis implant models that had been modified over the years. *Id. at 1080-81*. The plaintiffs' medical histories were also at issue and proof varied from plaintiff to plaintiff because complications from an implanted prosthesis could be due to a variety of factors, including surgical error, improper use of the device, anatomical incompatibility, and infection, among others. *Id. at 1081*. A similar situation is not [*420] presented here. As the plaintiffs argue, this case is more like *Daffin, 458 F.3d at 550*, in which the plaintiff class alleged that a defective [**24] throttle body assembly installed in vehicles caused the

678 F.3d 409, *420; 2012 U.S. App. LEXIS 9002, **24;
2012 FED App. 0115P (6th Cir.), ***13; CCH Prod. Liab. Rep. P18,831

accelerators to stick. In this case, the plaintiffs established the existence of common issues among class members that warrant certification of a liability class.

 [***14] In addition, Glazer and Allison are typical of the class members. They purchased Whirlpool washing machines, used their washers for domestic purposes, and experienced problems with mold despite remedial efforts. While Allison may have followed Whirlpool's suggested care instructions more conscientiously than Glazer did, Whirlpool's own internal documents point to the conclusion that, no matter what consumers did or did not do, the mold problem persisted. Whirlpool's own engineers recognized that the Duets provided the ideal environment for bacteria and mold to flourish. The district court did not abuse its discretion in finding that Glazer and Allison are typical of class members, and that they and their class counsel will adequately represent the class.

Whirlpool insists that the class as certified is overly broad because it includes Duet owners who have not experienced a mold problem. Additionally, Whirlpool argues, Glazer and Allison are not typical of consumers swept [**25] into the class who have had no problems and are pleased with their Duets.

The liability class as defined is not too broad. "What is necessary is that the challenged conduct or lack of conduct be premised on a ground that is applicable to the entire class." *Gooch, 672 F.3d at 428* (internal quotation marks omitted). Class certification is appropriate "if class members complain of a pattern or practice that is generally applicable to the class as a whole. Even if some class members have not been injured by the challenged practice, a class may nevertheless be appropriate." *Id.* (quoting *Walters v. Reno, 145 F.3d 1032, 1047 (9th Cir. 1998))* (internal quotation marks omitted).

Additionally, the class plaintiffs may be able to show that each class member was injured at the point of sale upon paying a premium price for the Duet as designed, even if the washing machines purchased by some class members have not developed the mold problem. In *Wolin v. Jaguar Land Rover North Am., LLC, 617 F.3d 1168, 1173 (9th Cir. 2010)*, a car manufacturer successfully argued before the district court that class certification was inappropriate because the named class plaintiffs did not prove that an alignment geometry [**26] defect causing premature tire wear manifested in a majority of the [***15] class members' vehicles. The Ninth Circuit reversed and remanded for class certification, holding that "proof of the manifestation of a defect is not a prerequisite to class certification[,]" and that "individual factors may affect premature tire wear, [but] they do not affect whether the vehicles were sold with an alignment defect." *Id.* Similarly, in *Stearns v. Ticketmaster Corp., 655 F.3d 1013, 1021 (9th Cir. 2011)*, the Ninth Circuit concluded that the plaintiff class sufficiently established injury for standing purposes by showing that "[e]ach alleged class member was relieved of money in the transactions." *See also Montanez v. Gerber Childrenswear, LLC, No. CV09-7420, 2011 U.S. Dist. LEXIS 150942, 2011 WL 6757875, *1-2 (C.D. Cal. Dec. 15, 2011)* (holding injury shown where class members spent money on defective infant clothing that was less valuable than Gerber represented it to be); *Kwikset Corp. v. Superior Court, 51 Cal. 4th 310, 120 Cal. Rptr. 3d 741, 246 P.3d 877, 895 (Cal. 2011)* (observing diminishment in value of an asset purchased by the consumer is sufficient to establish injury). [*421] The Third Circuit recently observed that "*Rule 23(b)(3)* does not . . . require individual class [**27] members to individually state a valid claim for relief" and the "question is not what valid claims can plaintiffs assert; rather, it is simply whether common issues of fact or law predominate." *Sullivan v. DB Invs., Inc., 667 F.3d 273, 297, 305 (3d Cir. 2011)* (en banc) (reviewing settlement classes). These cases support the plaintiffs' position that the class as certified is appropriate.

*4. The Rule 23(b)(3) prerequisites: predominance and superiority*

In light of all that we have already said, we have no difficulty affirming the district court's finding that common questions predominate over individual ones and that the class action mechanism is the superior method to resolve these claims fairly and efficiently. This is especially true since class members are not likely to file individual actions because the cost of litigation would dwarf any potential recovery. *See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 617, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997)* (finding that in drafting *Rule 23(b)(3)*, "the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all'"); *Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7th Cir. 2004)* [**28] (Posner, J.) (noting that "[t]he *realistic* alternative to a class action is not 17 million [***16] individual suits, but zero individual

Case 2:05-md-01657-EEF-DEK   Document 63993-1   Filed 07/16/12   Page 9 of 9

Page 9

678 F.3d 409, *421; 2012 U.S. App. LEXIS 9002, **28;
2012 FED App. 0115P (6th Cir.), ***16; CCH Prod. Liab. Rep. P18,831

suits" because of litigation costs). Further, the district court observed, any class member who wishes to control his or her own litigation may opt out of the class under *Rule 23(b)(3)(A)*.

Assuming plaintiffs are successful regarding liability or the parties resolve the case by settlement, we urge the parties and the district court to revisit the issue of whether the liability class should be subdivided into subclasses in order to determine appropriate remedies. For the purpose of determining damages, class members who were injured at the point of sale and also experienced a mold problem might be placed in one *Rule 23(b)(3)* subclass, while class members who were injured at the point of sale but have not yet experienced a mold problem might be placed in a separate *Rule 23(b)(3)* subclass. Alternatively, the class members who have not experienced a mold problem might be placed in a *Rule 23(b)(2)* subclass to allow any declaratory or injunctive relief necessary to protect their interests. *See Gooch, 672 F.3d at 428-29*; *Pella Corp. v. Saltzman, 606 F.3d 391, 395 (7th Cir. 2010)* [**29] (per curiam).

### III. CONCLUSION

For all of the reasons stated, we conclude that the *Rule 23(a)* and *(b)(3)* prerequisites were met. Plaintiffs' proof established numerosity, commonality, typicality, and adequate representation. In addition, plaintiffs' proof showed that common questions predominate over individual ones and that the class action is a superior method to adjudicate the claims. The district court did not abuse its discretion in certifying a class on the issue of liability. Accordingly, we **AFFIRM**.